individual herds (but see Clifford et al. [2009] and Carpenter et al. [2014]).

Despite the breadth of previous studies on pneumonia in bighorn sheep, state wildlife agencies generally do not have a clear understanding of risk factors contributing to epizootics in herds they manage, how data available to them might be associated with such risk factors, or how these data might be used to predict epizootics. Agencies need risk assessment models to help prioritize herds and allocate limited resources to proactively manage risk of disease (Mitchell et al. 2013). Such a model should capture variability across the range of environmental conditions in which managed herds exist; models developed under more limited spatial or temporal extents may have little predictive power. Without such models, management of pneumonia epizootics in bighorn sheep has historically been reactive, resulting in crisis management rather than proactive prevention (Woodroffe 1999).

To begin addressing this issue, Mitchell et al. (2013) developed a preliminary pneumonia risk model and proactive decision model for bighorn sheep in Montana. The goal of the risk model was to predict the likelihood of pneumonia epizootics for herds managed by Montana Fish, Wildlife and Parks (MFWP). The predictions were then used to inform the decision model designed to facilitate proactive management decisions given the objectives and constraints of managers. Their risk model was based only on expert opinion of biologists and managers and did not attempt to empirically quantify risk factors associated with pneumonia epizootics. Our objective, therefore, was to develop an empirical risk model of pneumonia epizootics using readily available data that we hypothesized could contribute to epizootics in bighorn sheep, based on previous work. Our model was designed to facilitate making herd-specific predictions and decisions regarding epizootic risk as part of comprehensive statewide management of bighorn sheep herds in Montana (Fig. 1). We used decision curve analysis (Vickers and Elkin 2006, Steyerberg et al. 2010) to evaluate the capacity of our model to inform such decisions. This analysis allowed us to assess our model's relative capacity for separating high-risk herds from low-risk herds and the relative merits of using reactive or proactive management of all herds in the absence of a predictive model.



| # | Herd | Year[a] | Mortality[b] | (continued) | | |
|---|---|---|---|---|---|---|
| 12 | Bonner | 2010 | >65% | 24 Gibson Lake North | 1984 | >25% |
| 13 | Lower Rock Creek | 2010 | >50% | 24 Gibson Lake North | 2010 | >55% |
| 14 | Upper Rock Creek | 2010 | >60% | 25 Castle Reef | 1984 | >25% |
| 15 | Skalkaho | 2012 | >70% | 25 Castle Reef | 2010 | >55% |
| 16 | East Fork Bitterroot | 2010 | >50% | 26 Ford Creek | 1984 | >25% |
| 19 | Lost Creek | 1992 | >50% | 26 Ford Creek | 2010 | >40% |
| 19 | Lost Creek | 2011 | >60% | 27 Beartooth-Sleeping Giant* | 1984 | >60% |
| 20 | Highland* | 1995 | >85% | 28 Elkhorn | 2008 | >90% |
| 21 | Tendoy Mountains* | 1994 | >80% | 30 Hilgards | 1997 | >50% |
| 22 | North Fork Birch Creek-Teton* | 1984 | >25% | 31 Hyalite | 2013 | >35% |
| 23 | Deep Creek* | 1984 | >25% | X Lower Boulder River | 2000 | 100% |

[a]Herd-year of die-off, with herd-year starting 1 July the previous year through 30 June of year shown.
[b]Approximate total mortality from pneumonia epizootic event.

**Figure 1.** Locations of 43 herds of bighorn sheep with 22 pneumonia epizootic events with ≥25% mortality between 1979 and 2013, which we used to develop a pneumonia risk model for Montana. We excluded several additional epizootics from our analysis. Numbers correspond to risk estimates in Table 5 and to the table for epizootics within the map, where a * after the herd name indicates that we excluded post-epizootic herd-years from analysis because the herd received transplants, confounding signs of recovery.

BLM_0064278

## STUDY AREA

Populations of bighorn sheep are found in western Montana and in portions of the Missouri Breaks in central Montana (Fig. 1). Habitat characteristics vary widely across these regions. Elevations range from 600 m to 4,000 m (MFWP 2010). Northwestern Montana is characterized by dense forests and generally rugged and mountainous terrain with a climate typical of the Pacific Northwest. Southwestern Montana is characterized by rolling foothills and rugged mountains, with heavier snow cover on western aspects, rain shadows on eastern aspects, and shrubs and bunchgrasses leading to conifers and alpine vegetation at increasing elevations. West-central Montana is characterized by low rolling hills and rugged mountain canyons, with a transitional mix of climate characteristics typical of southwestern and eastern Montana. South-central Montana includes sheer mountain canyons and rolling hills with shrub desert, montane forest, intermountain grasslands, alpine plateaus, and widely varying climates. The Missouri Breaks is semiarid with flat or rolling benchlands, rugged badlands, riparian areas, and ponderosa pine (*Pinus ponderosa*) savannahs. Federal sheep and goat grazing allotments have been distributed throughout Montana for the past 3 decades except in the northwestern region. Weed control with domestic sheep and goats has occurred throughout the state, as have commercial and hobby farms on private lands that can include domestic sheep and goats.

## METHODS

### Survey Data For Bighorn Sheep

We developed a disease risk model using survey and management data for 43 of 52 bighorn sheep herds in Montana from 1979 to 2013 (9 herds were not consistently monitored). We selected 1979 as the preliminary year because data from monitoring surveys and pneumonia epizootics were rare prior to that time. We defined a herd as a group of bighorn sheep that generally form a spatially and demographically distinct group (Wells and Richmond 1995). Not all 43 herds were extant in all years; 9 were established after 1979, 1 of which was extirpated after a pneumonia epizootic. Survey data included air and ground observations of bighorn sheep counts, age classifications, and sex classifications collected at intervals that varied from intermittent to annual, depending on the herd. These observations were primarily collected by MFWP (>90% of all years surveyed). Additional observations were collected jointly between MFWP and the Confederated Salish and Kootenai Tribes (CSKT; <3%), by the CSKT (<2%), or in association with the United States Fish and Wildlife Service (<4%), Bureau of Land Management (BLM; <1%), or the University of Montana (<1%; Fralick 1984).

We defined herd-year as 1 July to 30 June following MFWP's definition for a management year, which encompasses a complete reproductive cycle from breeding through lambing. We defined a pneumonia epizootic as a die-off with $\geq 25\%$ mortality (Young 1994) caused by pneumonia ($n = 22$; Fig. 1) based on data and expertise

from herd biologists and disease specialists at the MFWP Wildlife Laboratory. We included mortalities due to culling of symptomatic bighorn sheep during verified pneumonia events (Edwards et al. 2010). Pneumonia was generally confirmed by necropsy and histological examination of lung tissue, culture, and/or pathology reports ($n = 18$). One die-off was attributed to pneumonia based on biologist knowledge and information presented in Enk et al. (2001). When carcasses or biological samples were unavailable from an epizootic event ($n = 3$), pneumonia was determined based on other evidence (drops of $\geq 25\%$ in survey numbers, numerous reports of symptomatic individuals, reports of carcasses, and detection of *Mycoplasma ovipneumoniae* in survivors the year following the die-offs; Brent Lonner, MFWP, unpublished data). For each herd experiencing a pneumonia epizootic ($n = 18$), we excluded the 3 following herd-years from analysis because most herds continued to experience noticeable mortality rates in the few years immediately following the preliminary epizootic year (MFWP 2010). We also excluded all herd-years following a pneumonia epizootic if a herd was augmented with animals from other herds because the need for augmentation meant that the herd was not recovering well, and the addition of animals confounded mortality rates and signs of recovery from the epizootic ($n = 5$ herds). We excluded herd-years where die-offs were caused by winter storms ($n = 1$) or unknown factors ($n = 2$). As with the 3 herd-years after pneumonia epizootics, we excluded the 3 herd-years following die-offs caused by unknown factors because they may have been pneumonia epizootic events.

Conceivably, pneumonia epizootics could have gone undetected between 1979 and 2013. To address this possibility and separate years with pneumonia epizootics from those without, we calculated percentage change in survey counts between consecutive herd-years for each herd. We classified herd-years as free of pneumonia epizootics by the following criteria: 1) for herds surveyed annually, the herd had grown, declined <25%, or declined $\geq 25\%$ followed by $\geq 200\%$ growth the next year; 2) when surveys occurred every 2 years, the herd grew between surveys; and 3) when surveys occurred every 3 years, the herd grew by $\geq 200\%$ between surveys. When calculating percentage change, we excluded harvested animals, documented vehicle mortalities, and additions and removals due to transplantation to analyze unexplained change only. Out of 1,333 herd-years available, we used 637 ($\bar{x} = 14.8$ herd-yr per herd, SD = 8.65, range = 1–34) for analysis including the 22 herd-years with pneumonia epizootics. Largely because of a lack of survey data, we excluded remaining herd-years from analysis because of uncertainty of whether herd-years could safely be classified as free of epizootics.

### Risk Factor Covariates

We selected 10 covariates we hypothesized were predictive of pneumonia epizootics in Montana and for which sufficient data were available. Many covariates were spatial, based on herd distributions, so we obtained agency records and elicited

BLM_0064279

expert opinion of agency biologists to delineate approximate boundaries of distributions of herds in each herd-year (Conroy and Peterson 2013). We categorized each covariate as a potential risk factor we hypothesized could primarily contribute to 1) risk of exposure to pathogens, 2) risk of spread of pathogens, or 3) susceptibility to pneumonia epizootics (Mitchell et al. 2013).

*Risk of exposure to pathogens.*—We hypothesized 5 covariates were positively related to risk of pathogen transmission: proximity to number of domestic sheep and goat allotments (Singer et al. 2000*b*, 2001; Monello et al. 2001; Epps et al. 2004; Clifford et al. 2009), amount of private land (Miller et al. 2011, 2012; Wild Sheep Working Group 2012), use of domestic sheep and goats for weed control (Miller et al. 2012, Wild Sheep Working Group 2012), a history of a pneumonia epizootic in the herd or its neighbors (Onderka and Wishart 1984, George et al. 2008, Edwards et al. 2010, Besser et al. 2013), and close proximity to other herds (Onderka and Wishart 1984, Singer et al. 2000*a*, George et al. 2008, Edwards et al. 2010, Besser et al. 2013). We hypothesized that amount of private land would be representative of risk from hobby or commercial farms with domestic sheep or goats, for which data were not available. For each herd, we estimated an area of high risk for pathogen exposure (distribution of the herd plus a 14.5-km buffer from that perimeter; Wild Sheep Working Group 2012) using a geographical information system (GIS; ArcMap 10.1, Environmental Systems Research Institute, Inc., Redlands, CA). For the first 4 covariates, we modeled risk of pathogen exposure within each area of high risk using 1) number of federally managed sheep and goat allotments, 2) percentage of private land, 3) knowledge of the wildlife biologist responsible for the herd regarding the use of domestic sheep or goats for weed control, and 4) history of a pneumonia epizootic in the herd in a previous herd-year, or a current or previous pneumonia epizootic in a neighboring herd within the area of high risk. We calculated average proximity to the 3 closest herds for the covariate of herd proximity.

We interviewed personnel and consulted records of federal and state agencies to gather data on allotments, private land, weed control, neighbor risk, and herd proximity (Table 1). For data on allotments, we interviewed agency personnel and obtained BLM allotment bills from 1988 onward from the Rangeland Administration System (RAS). We obtained associated geospatial data on allotments from each agency and determined the number of allotment boundaries intersected by each area of high risk using a GIS ($\bar{x} = 0.54$, SD = 1.32 for 565 herd-yr with allotment data). For private land, we obtained the amount of private land within each area of high risk using a GIS ($\bar{x} = 25.58$, SD = 14.53%). We obtained weed control data through elicitation of expert opinion of agency biologists (13.97% of herd-yr had known weed control; Conroy and Peterson 2013). We obtained neighbor risk and herd proximity data through agency records and elicitation of expert opinion of agency biologists. For neighbor risk, when a herd experienced a pneumonia epizootic we assumed neighboring herds were at risk for that and subsequent herd-years. We also assumed a recurring risk to the initial herd in all subsequent herd-years (19.31% of herd-yr had neighbor risk). For herd proximity, we calculated the shortest distance to the perimeters of the distributions of the nearest 3 bighorn sheep herds using a GIS and then calculated the average of those distances (global $\bar{x} = 22.65$ km, SD = 24.27 km). We considered distributions from all herds (including the 9 in Montana excluded from our primary analysis and several herds in British Columbia, Idaho, and Wyoming) for our covariates of neighbor risk if they were within the area of high risk and herd proximity if they were 1 of the 3 closest herds to any of our 43 primary herds.

*Risk of spread of pathogens.*—We hypothesized high ram: ewe ratios represented increased risk of rams wandering,

Table 1. Data types and associated agencies we collected covariate data from to model risk of pneumonia epizootics for 43 herds of bighorn sheep in Montana from 1979–2013. Numbers represent the approximate percentage of data associated with each agency out of all herd-years with data for that covariate, unless otherwise indicated. Where applicable, we included additional herds beyond our 43 primary herds if they were within 14.5-km of our primary herds or were 1 of the 3 closest herds. Agencies were Montana Fish, Wildlife and Parks (MFWP), United States Fish and Wildlife Service (USFWS), Bureau of Land Management (BLM), United States Forest Service (USFS), National Park Service (NPS), Confederated Salish and Kootenai Tribes (CSKT), Chippewa Cree Tribe (CCT), British Columbia Fish and Wildlife Branch (BCFW), Idaho Fish and Game (IDFG), and Wyoming Game and Fish (WGFD). Blank cells indicate data were not associated with these agencies.

| Data | MFWP | USFWS | BLM | USFS | NPS | CSKT | CCT | BCFW | IDFG | WGFD |
|---|---|---|---|---|---|---|---|---|---|---|
| Allotments[a] | | 0[b] | 68 | 32 | | | | | | |
| Private land | | | 100 | | | | | | | |
| Weed control | 94 | 5 | | | | 1 | | | | |
| Neighbor risk[c] | 75 | 2 | | | 5 | 4 | | 4 | 5 | 5 |
| Herd proximity[d] | 72 | 2 | | | 5 | 3 | 2 | 5 | 7 | 5 |
| Ram:ewe ratios | 93 | 6 | | | | 1 | | | | |
| Density | 94 | 5 | | | | 1 | | | | |
| Herd origin | 94 | 5 | | | | 1 | | | | |

[a] Of unique allotments ≤14.5 km of herd distributions (*n* = 47), % associated with each agency.
[b] No allotments on USFWS land were ≤14.5 km of herd distributions.
[c] Of all herds ≤14.5 km from 43 primary herds (*n* = 56, including 13 non-primary herds), % associated with each agency.
[d] Of all herds that were 1 of 3 closest to 43 primary herds (*n* = 61, including 18 non-primary herds), % associated with each agency. Sum >100 is due to rounding.

BLM_0064280

encountering, and spreading pathogens (Onderka and Wishart 1984, Singer et al. 2000a, Monello et al. 2001, George et al. 2008, Besser et al. 2013), and that higher relative density increased risk through greater rates of spread of pathogens (Monello et al. 2001, Lafferty and Gerber 2002, Clifford et al. 2009). We obtained herd survey data from the Montana Bighorn Sheep Conservation Strategy (MFWP 2010) and directly from biologists (Table 1). For ram:ewe ratios ($\bar{x} = 0.65$, SD $= 0.39$), we excluded ratios from analysis where <80% of observed animals were classified by sex, recorded ratios did not match adults counted, or <1 ram or ewe was counted ($n = 50$ excluded ratios associated with included herd-yr). To estimate herd density in each year, we divided the total number of animals counted by the area of the herd's distribution. We then calculated average density, yearly percentage of average density, and the range in percentage of average density for each herd. We assigned each herd's density estimate into 3 equally sized bins of low, medium, and high based on the percentage of average density relative to their 1979–2013 range. Thus, each set of cut-offs were herd-specific, based on historical densities of each herd ($\bar{x}$ cut-off for low density $\leq 92.15\%$ of average, SD $= 13.15$; $\bar{x}$ cut-off for medium density $\leq 151.11\%$ of average, SD $= 31.02$; 43.80% herd-yr had low density, 36.42% medium, and 19.78% high). When density estimates were not available for years without pneumonia epizootics, we excluded those herd-years from analysis ($n = 65$ of excluded herd-yr). When density estimates were unavailable for years with pneumonia epizootics ($n = 3$), we used the most recent density estimate prior to the epizootic ($n = 2$), or estimated density based on reports of percent declines ($n = 1$). We used a 1-year lag for both covariates because surveys were usually done in spring and thus represented the minimum number of animals likely to be present at the start of the following herd-year.

*Susceptibility to pneumonia epizootics.*—We hypothesized that relatively harsh winters contributed to susceptibility to pneumonia epizootics by draining energy budgets (Goodson et al. 1991, Monello et al. 2001, Butler et al. 2013). We used percentage of 30-year normal precipitation to represent winter severity. We hypothesized that relatively dry springs contributed to susceptibility to pneumonia epizootics by decreasing forage quality (Portier et al. 1998, Enk et al. 2001, Monello et al. 2001, Epps et al. 2004) and used percentage of 30-year normal precipitation to represent dry spring conditions. Lastly, we hypothesized that mixed (i.e., native herds augmented with animals from other populations) or non-native (reintroduced) herds had increased susceptibility to pneumonia epizootics because these sites might be more risky if conditions that contributed to a previous herd reduction or extirpation persisted in the area (Monello et al. 2001). For winter and spring precipitation, we calculated percentage of normal precipitation using a GIS to determine monthly PRISM precipitation values and 1980–2010 Normals (PRISM Climate Group, Corvallis, Oregon) in each delineated herd distribution (winter $\bar{x} = 98.68\%$, SD $= 30.16\%$; spring $\bar{x} = 100.18\%$, SD $= 26.97\%$). Similar to Butler et al. (2013) but because spring lambing season

began in April in some herds, we considered winter to be 1 November–31 March, and spring 1 April–30 June. We used a 1-year lag for both effects to capture the influence of the most recent winter and spring on the next herd-year (Portier et al. 1998, Butler et al. 2013). For herd origin, we obtained agency transplant records (Table 1) to determine in each herd-year if herds were native (21.82% of herd-yr), mixed (20.25%), or reintroduced (57.93%).

**Development of Risk Model**

*Analysis of competing models.*—We developed 30 a priori models to test how our hypothesized risk factors predicted pneumonia epizootics. We analyzed the models in a Bayesian framework to allow for modeling of missing values and associated uncertainty and to simplify the use of herd-level random effects due to repeated measurements (Kéry 2010). We centered and scaled covariate data and tested for correlations between continuous covariates; we did not include covariates with >40% correlation in the same model (Dormann et al. 2013). We used JAGS (Version 3.3.0, http://mcmc-jags.sourceforge.net, accessed 14 Mar 2013) called through R (Version 2.13.1, www.r-project.org, accessed 10 Sep 2011) using the package R2jags (Version 0.02-17, http://CRAN.R-project.org/package = R2jags, accessed 14 Mar 2013) to run the logistic regression models (Hosmer and Lemeshow 2000) from these data, with repeated measures and a random effect for herd (Gelman and Hill 2007, Royle and Dorazio 2008, Kéry 2010). We used vague, uniform priors for all parameters (Link et al. 2002). We modeled missing values for ram:ewe ratios ($n = 84$) and number of domestic sheep and goat allotments ($n = 72$) by setting priors equal to the herd mean where available or the global mean otherwise. We ran 100,000 Markov chain Monte Carlo (MCMC) iterations with 3 chains, discarding the first 25,000 iterations as burn-in (Link et al. 2002). We evaluated convergence of the MCMC simulation with the Gelman and Rubin convergence diagnostic ($\hat{R}$; Brooks and Gelman 1998) and visual inspection of the posteriors and chains for mixing (Link and Barker 2010) to ensure convergence for accurate estimates of parameters.

We identified top models based on Deviance Information Criterion (DIC; Spiegelhalter et al. 2002). We excluded models >10 $\Delta$DIC from further consideration. We considered covariates within each model to be fully supported if the 95% credibility interval posterior densities (CRIs; Kéry 2010) did not include 0. Where 95% CRIs included 0, we identified the broadest CRI that would exclude 0 to investigate uncertainty of the covariate.

We used a spreadsheet to calculate probability of a pneumonia epizootic for each herd using the parameter estimates from the top models and covariate data from each herd. The risk model provided probability of a pneumonia epizootic in any given year. We calculated probability of $\geq 1$ epizootic occurring in the next 10 years as $(1 - (1 - \text{Pr-}(\text{Epizootic}_{1-yr}))^{10})$ (Mood et al. 1974).

*Assessment of model fit and usefulness.*—We used decision curve analysis (DCA; Vickers and Elkin 2006, Steyerberg et al. 2010) to compare net benefits of the top models (<10

BLM_0064301

**Table 2.** Parameter estimates of supported a priori models of risk of pneumonia epizootics for 43 herds of bighorn sheep in Montana from 1979–2013. We do not present models with change in Deviance Information Criterion (ΔDIC) >10. Within the distribution of each herd plus a 14.5-km buffer from that perimeter, private land = percentage of private land, weed control = whether the herd biologist knew of the use of domestic sheep or goats for weed control, and neighbor risk = whether the herd or a neighboring herd had a pneumonia epizootic previously. Density = the number of individuals counted divided by the area of each herd's distribution, assigned into 1 of 3 equally sized bins of low, medium (md), and high (hi) density relative to the herd's 1979–2013 percentage of average. Herd effect is the among-herd variation for the herd-level random effect.

| | Mean | SD | Credibility interval 0.025 | 0.975 |
|---|---|---|---|---|
| **Best model** | | | | |
| $\beta_0$ Intercept | −6.269 | 0.761 | −7.931 | −4.911 |
| $\beta_1$ Private land | 0.433 | 0.239 | −0.028 | 0.910 |
| $\beta_2$ Weed control | 1.210 | 0.547 | 0.115 | 2.261 |
| $\beta_3$ Neighbor risk | 2.331 | 0.524 | 1.332 | 3.392 |
| $\beta_4$ Density (md) | 1.660 | 0.728 | 0.309 | 3.180 |
| $\beta_5$ Density (hi) | 2.699 | 0.742 | 1.332 | 4.259 |
| Herd effect | 0.242 | 0.131 | 0.143 | 0.609 |
| Deviance | 153.624 | 4.125 | 146.679 | 162.973 |
| **Second model (ΔDIC = 6.9)** | | | | |
| $\beta_0$ Intercept | −5.705 | 0.709 | −7.246 | −4.445 |
| $\beta_1$ Neighbor risk | 2.184 | 0.488 | 1.244 | 3.164 |
| $\beta_2$ Density (md) | 1.535 | 0.731 | 0.200 | 3.085 |
| $\beta_3$ Density (hi) | 2.548 | 0.731 | 1.206 | 4.090 |
| Herd effect | 0.249 | 0.147 | 0.143 | 0.666 |
| Deviance | 161.519 | 3.874 | 154.019 | 169.736 |

ΔDIC) to estimate fit of each model to the data and usefulness of the model. This method allowed assessment of whether the top models were useful compared to totally reactive (i.e., treat all herds as low risk) or totally proactive (i.e., treat all herds as high risk) management of all herds, and the relative consequences of wrong predictions, which is important because a false negative prediction is arguably more harmful for conservation and public enjoyment of bighorn sheep than a false positive prediction. For each model, risk of a pneumonia epizootic could be classified as high if it exceeded a pre-defined threshold probability ($p_t$). We evaluated a range of $p_t$ (0 to the value of the max. predicted probability of pneumonia epizootic for the 637 herd-yr from each model) for which we calculated sensitivity, specificity, and net benefits,

$$\text{net benefit}_{\text{model}} = (\text{true positive count}/n)$$
$$- (\text{false positive count}/n) \times p_t/(1-p_t)$$

to estimate and summarize performance and advantages of the model, where $n = 637$. Weighting by the ratio $p_t/(1-p_t)$ accounts for the harm of false positive predictions to harm of false negative predictions at each $p_t$. For each model, we plotted decision curves of the net benefits across values of $p_t$ to identify the best model that tended to have higher net benefits than the others.

Finally, we determined if the best model was more useful than abandoning the model and instead managing all herds as low risk, which is a management option in absence of a predictive model. We calculated the model advantage across the range of $p_t$ over the option of assuming all herds are low risk as:

$$\text{net increase in true positives} = \text{net benefit}_{\text{model}} \times 100$$

This measure of the model's usefulness calculates the increase in true positives with no increase in false positive per

100 estimates compared to treating all herds as low risk. Similarly, the model advantage across the range of $p_t$ over the option of assuming all herds are high risk is:

$$\text{net reduction in false positives} =$$
$$\frac{(\text{net benefit}_{\text{model}} - \text{net benefit}_{\text{all high}}) \times 100}{p_t/(1-p_t)}$$

The net reduction in false positives is the reduction of false positives per 100 estimates provided by the risk model without increasing the number of false negatives compared to abandoning the model and treating all herds as high risk. Here, net benefit$_{\text{all high}}$ is calculated with the net benefit$_{\text{model}}$ formula except true positive count is the total number of pneumonia epizootic cases (22) and false positive count the total non-pneumonia epizootic cases (615).

*Second generation model.*—We developed an a posteriori, second generation model by calculating the inclusion probability of each covariate. Inclusion probabilities resulted from introducing a Bernoulli distributed indicator variable with probability equal to 0.5 (Ntzoufras 2009). We ran 3 chains for 500,000 iterations, discarding the first 125,000 iterations as burn-in (Link et al. 2002). We calculated the proportion of times each indicator variable assumed a value of 1 and identified covariates with inclusion probabilities >0.15 (similar to Ntzoufras 2009). We then evaluated a new second generation model with these covariates using the techniques described above for analysis of competing models.

## RESULTS

### Development of Risk Model
The top-ranked model included private land, weed control, neighbor risk, and density (Table 2). The posterior density CRIs excluded 0 except for private land (95%

BLM_0064282

CRI, $-0.03 \leq x \leq 0.91$), but a 93% CRI for private land excluded 0 ($0.01 \leq x \leq 0.87$). The second best model included neighbor risk and density ($\Delta DIC = 6.9$). Smooth unimodal posteriors, history plots (Link and Barker 2010), and $\hat{R}$ values of $<1.1$ indicated convergence (Brooks and Gelman 1998). All other models had $\Delta DIC > 10$, so we excluded them from further consideration.

The top-ranked model was superior to the second-ranked model based on sensitivity, specificity, and net benefits. Sensitivity and specificity were simultaneously maximized for the top model at a $p_t$ of 0.0312, achieving 81.8% sensitivity, 80.2% specificity, and a correct overall classification rate of 80.2% (Fig. 2). Sensitivity and specificity for the second best model were simultaneously maximized at a $p_t$ of 0.0288 with 81.8% sensitivity, 75.3% specificity, and 75.5% correct overall classification rate. We selected the top model as the final risk model because it had a higher overall net benefit than the second model across most $p_t$'s (Fig. 3).

Based on DCA, over a wide range of $p_t$ the final risk model was superior to the 2 alternative options of treating all herds reactively or proactively in absence of a predictive model. The risk model's decision curve had higher net benefits than the decision curve for the alternative of treating all herds as high risk at a $p_t$ of approximately $\geq 0.001$ (Fig. 3). The risk model's decision curve was also higher than the decision curve for treating all as low risk at a $p_t$ of approximately $\leq 0.389$. Between 0.001–0.389, the risk model would therefore provide both a net reduction in false positive estimates over assuming all herds are high risk and a net increase in true positives over assuming all herds are low risk. Using the risk model with any $p_t$ between these levels would

be better than fully reactive management or the alternative of total proactive management of all herds, considering limited resources. It is therefore useful as a model for predicting risk of pneumonia epizootics at any $p_t$ within this range. The model would yield fewer false negative predictions at low values of $p_t$ and fewer false positive predictions at high values of $p_t$ (Table 3).

## Effect Sizes for Top Model

Parameters in the risk model provide estimated effects of each risk factor on probability of a pneumonia epizootic. Holding other parameters constant, the odds of a pneumonia epizootic increased 1.54 (95% CRI, $0.97 \leq x \leq 2.48$) times per additional unit of private land within the area of high risk (global $\bar{x} = 25.58\%$, SD = 14.53%). Herds where domestic sheep or goats were known to be used to control weeds within the area of high risk that year had 3.35 (95% CRI, $1.12 \leq x \leq 9.59$) times greater odds of a pneumonia epizootic than those without. Odds of a pneumonia epizootic were 10.29 (95% CRI, $3.79 \leq x \leq 29.73$) times greater for herds if they or their neighbors in the area of high risk previously experienced a pneumonia epizootic. Herds at medium or high density had odds of a pneumonia epizootic 5.26 (95% CRI, $1.36 \leq x \leq 24.05$) and 14.86 (95% CRI, $3.79 \leq x \leq 70.74$) times greater, respectively, than when they were at low density. Altogether, a herd with no private land, weed control, or neighbor risk and with low density was estimated to have 0.0009 (95% CRI, $0.0001 \leq x \leq 0.0045$) probability of a pneumonia epizootic during any year and represents the least risky extreme. On the most risky extreme, a herd in an area of high risk with 100% private land, weed control,



**Figure 2.** Sensitivity (dashed lines) and specificity (solid lines) at various threshold probabilities ($p_t$'s) for 2 pneumonia risk models developed using data from 1979–2013 for bighorn sheep in Montana. The top-ranked model (black lines) had a higher sensitivity and specificity than the second-ranked model (gray lines): at $p_t = 0.0312$ sensitivity and specificity were simultaneously maximized with 81.8% sensitivity and 80.2% specificity compared to the second-ranked model which had the same sensitivity and 75.3% specificity at $p_t = 0.0288$.

BLM_0064283



**Figure 3.** Decision curves for 2 final a priori models considered for selection as a pneumonia risk model for bighorn sheep in Montana. The most supported model (black line) outperformed the second-best model (gray line) over much of the threshold probability ($p_t$) range based on the higher net benefit overall. We selected the most supported model for the risk model. Using the risk model would be superior to treating all herds as high risk (dotted line; i.e., indiscriminate proactive management of all herds) at any threshold probability at any $p_t$ of approximately ≥0.001, and better than treating no herds as high risk (dashed line at net benefit = 0; i.e., reactive management of all herds) at any $p_t$ approximately ≤0.389.

**Table 3.** Comparison of net benefits and advantages for our pneumonia risk model for 43 herds of bighorn sheep in Montana from 1979–2013. Risk of a pneumonia epizootic is classified as high if it exceeds a pre-defined threshold probability ($p_t$), and low otherwise. The net benefit at each threshold estimates the advantage of the model and can aid selection in $p_t$ for more conservative or liberal estimation based on tolerance of false positives versus false negatives.

| | | | Net benefit | | Advantage of model | |
|---|---|---|---|---|---|---|
| $p_t \leq$ | Sensitivity | Specificity | Risk model | Treat all[a] | Increase in TP[b] | Decrease in FP[c] |
| 0.000 | 1.000 | 0.000 | 0.035 | 0.035 | 3.454 | 0.000 |
| 0.004 | 1.000 | 0.302 | 0.032 | 0.031 | 3.183 | 29.199 |
| 0.008 | 0.955 | 0.411 | 0.028 | 0.027 | 2.838 | 20.251 |
| 0.012 | 0.955 | 0.551 | 0.028 | 0.023 | 2.770 | 40.293 |
| 0.016 | 0.909 | 0.657 | 0.026 | 0.019 | 2.601 | 44.113 |
| 0.020 | 0.864 | 0.711 | 0.024 | 0.015 | 2.412 | 45.526 |
| 0.024 | 0.864 | 0.748 | 0.024 | 0.011 | 2.384 | 53.061 |
| 0.028 | 0.864 | 0.787 | 0.024 | 0.007 | 2.390 | 59.632 |
| 0.032 | 0.773 | 0.807 | 0.021 | 0.003 | 2.051 | 54.121 |
| 0.036 | 0.773 | 0.837 | 0.021 | −0.002 | 2.083 | 59.829 |
| 0.040 | 0.773 | 0.847 | 0.021 | −0.006 | 2.054 | 62.951 |
| 0.050 | 0.727 | 0.876 | 0.019 | −0.016 | 1.884 | 66.719 |
| 0.060 | 0.545 | 0.907 | 0.013 | −0.027 | 1.313 | 63.004 |
| 0.070 | 0.545 | 0.914 | 0.013 | −0.038 | 1.258 | 67.369 |
| 0.080 | 0.545 | 0.914 | 0.012 | −0.049 | 1.160 | 70.173 |
| 0.090 | 0.500 | 0.932 | 0.011 | −0.061 | 1.075 | 72.493 |
| 0.100 | 0.364 | 0.932 | 0.005 | −0.073 | 0.523 | 70.173 |
| 0.200 | 0.273 | 0.977 | 0.004 | −0.207 | 0.392 | 84.301 |
| 0.300 | 0.136 | 0.992 | 0.001 | −0.379 | 0.135 | 88.802 |

[a] Net benefits for treat all herds as high risk, a management alternative in absence of using our risk model to predict and separate high from low risk herds.
[b] Increase in true positives per 100 estimates without increase in false positives compared to treating all herds as low risk.
[c] Reduction in false positives per 100 estimates without increase in false negatives compared to treating all herds as high risk.

BLM_0064284

neighbor risk, and high density was estimated to have 0.8992 (95% CRI, $0.4256 \le x \le 0.9910$) annual probability of a pneumonia epizootic.

## Second Generation Model

Inclusion probabilities were >0.15 for private land, weed control, neighbor risk, and density, which aligns with the top model we developed a priori. A fifth and final covariate with >0.15 inclusion probability was spring precipitation. An a posteriori model with these 5 covariates had a DIC of 4 lower than that of our original best model, indicating greater support for the new model. Parameter estimates of the original 4 risk factors were very similar (Tables 2 and 4).

Spring precipitation was negatively correlated with probability of a pneumonia epizootic the next herd-year (starting 1 Jul). Holding other parameters constant, odds of a pneumonia epizootic were 0.41 (95% CRI, $0.20 \le x \le 0.78$) times that of years of average spring precipitation per standardized unit increase ($\bar{x} = 100.18\%$, SD = 26.97%). Thus, each increase of 27% from average precipitation was associated with less than half the odds of a pneumonia epizootic compared to years with average spring precipitation. Conversely, for each unit decrease in spring rainfall, risk of a pneumonia epizootic more than doubled.

## DISCUSSION

Historically, state wildlife agencies have managed pneumonia epizootics in bighorn sheep largely reactively because they have not had the ability to predict epizootics. Existing models related to pneumonia in bighorn sheep focus largely on predicting consequences of epizootics (e.g., mortality rates and population persistence). Our model was designed to predict the risk of pneumonia epizootics before they happen, which no other model has directly done before (although see Clifford et al. [2009] and Carpenter et al. [2014] for models of disease transmission from allotments). If probability of epizootics cannot be predicted, herds cannot be separated by high and low risk to proactively prevent pneumonia epizootics. Proactively treating all herds as high

risk would likely be prohibitively expensive, resulting in the general reactive management status quo.

A more proactive approach integrating wildlife health with wildlife conservation would lead to more effective conservation and management of wildlife populations (Deem et al. 2001). For more proactive management of pneumonia epizootics in bighorn sheep, agencies need risk assessment tools to better understand risk factors that contribute to pneumonia epizootics. They also need to know how to use available data to predict pneumonia epizootics. Models based on more limited temporal and spatial extents may make more precise estimates on such scales, but lose generality across larger ones. A general model that combines information from herds across a state would aid in prediction of risk at the necessary scale for state wildlife agencies to make decisions on how to allocate resources for proactive management. Accordingly, we analyzed epizootic histories and potential risk factors for 43 herds across Montana from 1979 to 2013 to create a statewide risk model for pneumonia.

## Risk Factors

Risk of pneumonia epizootics was positively associated with greater amount of private land, weed control with domestic sheep and goats, history of a pneumonia epizootic in a herd or a nearby herd, and higher density. Based on our second generation model, risk also appeared to be associated with spring precipitation. Risk was not associated with number of allotments, herd proximity, ram:ewe ratios, winter precipitation, or herd origin, nor did a single risk factor affect all pneumonia epizootics based on our multivariate model. Although the existence of a single risk factor that we did not evaluate cannot be ruled out, our results agree with the findings of Miller et al. (2012) in their review of hypothesized risk factors of die-offs in bighorn sheep. They failed to find evidence of a single etiological agent and concluded that predictive models of epizootics are needed based on the likely complexity of the etiology of such outbreaks.

*Risk of exposure to pathogens.*—As we hypothesized, greater percentage of private land in and near areas used by herds

Table 4. Parameter estimates of the second generation model for risk of pneumonia epizootics for 43 herds of bighorn sheep in Montana from 1979 to 2013. The Deviance Information Criterion (DIC) of our second generation model was 4 lower than that of our top-ranked a priori model. Within the distribution of each herd plus a 14.5-km buffer from that perimeter, private land = percentage of private land, weed control = whether the herd biologist knew of the use of domestic sheep or goats for weed control, and neighbor risk = whether the herd or a neighboring herd had a pneumonia epizootic previously. Density = the number of individuals counted divided by the area of each herd's distribution, assigned into 1 of 3 equally sized bins of low, medium (md), and high (hi) density relative to the herd's 1979–2013 percentage of average. Spring = the percentage of average 1 April–30 June precipitation in the herd distribution compared to the average from 1980 to 2010. Herd effect is the among-herd variation for the herd-level random effect.

| | | | Credibility interval | |
|---|---|---|---|---|
| | Mean | SD | 0.025 | 0.975 |
| Second generation model | | | | |
| $\beta_0$ Intercept | −6.856 | 0.935 | −8.925 | −5.288 |
| $\beta_1$ Private land | 0.487 | 0.256 | −0.002 | 1.005 |
| $\beta_2$ Weed control | 1.300 | 0.577 | 0.144 | 2.409 |
| $\beta_3$ Neighbor risk | 2.474 | 0.549 | 1.426 | 3.583 |
| $\beta_4$ Density(md) | 1.876 | 0.809 | 0.447 | 3.633 |
| $\beta_5$ Density(hi) | 3.066 | 0.843 | 1.577 | 4.884 |
| $\beta_6$ Spring | −0.882 | 0.342 | −1.587 | −0.244 |
| Herd effect | 0.250 | 0.149 | 0.143 | 0.676 |
| Deviance | 147.583 | 4.593 | 139.739 | 157.825 |

BLM_0064285

of bighorn sheep was associated with increased risk of pneumonia epizootics by >1.5-fold per additional unit of private land. Risk associated with contact with domestic livestock on private land has not previously been quantified and tends to be neglected (Miller et al. 2011, 2012), perhaps because data on locations of hobby and commercial farms are generally unavailable and would be highly fluid through time. Exposure to sheep or goats may occur on farms on private lands, whereas exposure on public lands likely occurs primarily on allotments, for which data exist and which agencies can more directly manage. Although risk due to private land was slightly uncertain (the 95% CRI contained 0, however the 93% CRI did not), these results provide the first empirical support for the suggestions of Miller et al. (2011, 2012) and the Wild Sheep Working Group (2012) that risk of exposure to pathogens on private land should receive more focus and concern. The uncertainty of this parameter at the 95% CRI is likely due to the probably low correlation between private land and farms with domestic sheep and goats, because not every parcel of private land contains domestic Caprinae species. Were data available, the effect of commercial and hobby farms could likely be estimated more precisely, yet the readily available percentage of private land was still predictive of risk. Examples of management actions to reduce risk associated with private land might include public education on separation of bighorn sheep and domestic sheep and goats, removal of wandering bighorn sheep in proximity to farms with domestic sheep or goats (Mitchell et al. 2013), or purchasing conservation easements (Sells 2014). We note that the association between private land and pneumonia epizootics could also be related to high human densities or human disturbance (e.g., development) on some areas of private land. Such disturbances could increase stress and potentially predispose herds to pneumonia epizootics.

Our hypothesis that risk of pneumonia epizootics increases when domestic sheep and goats are used for weed control in or near areas occupied by bighorn sheep herds was supported, with a >3.3-fold increase in risk compared to areas or years without known weed control using domestic Caprinae species. To our knowledge, our results are the first to support the suggestion by Miller et al. (2012) and the Wild Sheep Working Group (2012) that such operations increase risk of pathogen exposure. Potential management actions to mitigate this risk include public education about separation between bighorn sheep and domestic sheep and goats (Mitchell et al. 2013), managing timing of grazing to avoid temporal overlap with bighorn sheep, or using other methods to control weeds that do not involve domestic sheep or goats (Sells 2014).

As we hypothesized, risk of pneumonia epizootics increased for a herd when that herd or a nearby herd within 14.5 km had a history of a pneumonia epizootic. Increased risk for a herd after an epizootic is intuitive. Evidence suggests that pathogens become endemic and may cycle for years to decades within herds (Enk et al. 2001, Cassirer and Sinclair 2007, Cassirer et al. 2013). Further evidence suggests that whereas ewes may develop temporary protective immunity, this may wane after exposure to pathogens and does not effectively transfer to lambs, leading to ongoing outbreaks of pneumonia (Plowright et al. 2013). Additionally, Plowright et al. (2013) found that translocated, naïve adults appear to be at particularly high risk of dying from pneumonia. We hypothesized that other naïve individuals in nearby herds may be at a similar risk of contracting pneumonia. Whereas the exposure and spread of pathogens to nearby herds has been hypothesized to contribute to epizootics (Onderka and Wishart 1984, George et al. 2008, Edwards et al. 2010), this risk has not been quantified or received as much focus as other hypothesized risk factors. We found that a pneumonia epizootic was associated with >10-fold risk of pneumonia epizootics for all herds within 14.5 km. Cassirer et al. (2013) reported a slight but uncertain increase in probability of pneumonia for neighboring populations located <20 km apart if a neighbor had any pneumonia mortalities that or the previous year. The reason for this difference may be attributable to an inclusion of short timeframes with all cases of pneumonia as opposed to our use of longer timeframes with high-mortality epizootics. We included histories of epizootics from 1979 to the end of the study given the evidence that pathogens can cycle for decades (Enk et al. 2001, Cassirer et al. 2013). We included only high-mortality epizootics because we hypothesized that pneumonia widely spread in a herd would be linked to more potential exposure between herds (Onderka and Wishart 1984, George et al. 2008, Edwards et al. 2010, Besser et al. 2013), compared to limited cases of pneumonia that may result in less exposure between herds. Thus, across broad temporal and spatial scales, we conclude that pneumonia epizootics have long-term consequences for herds experiencing epizootics and for neighboring herds as well. Potential actions that may reduce this risk could include creating lethal removal zones between infected and naïve herds, culling symptomatic individuals, and avoiding establishing new herds close to those with epizootic histories (Sells 2014). Additionally, we note that past epizootics in or near a herd could be predictive of future epizootics because of shared or recurring conditions in an area besides pathogens (e.g., environmental factors) that could make herds more susceptible to pneumonia epizootics.

Our other hypothesis that proximity to other herds, measured by Euclidean distance, increased risk of pathogen exposure was not supported. The global mean for average proximity to the 3 closest herds (22.65 km, SD = 24.27 km) was >1.56 times farther and highly variable compared to the maximum distance for those herds we considered neighbors (within 14.5 km). Although bighorn sheep are known to move distances comparable to our mean herd proximity (e.g., O'Brien et al. [2014] reported that >10% of rams forayed ≥21.7 km from core herd home ranges each summer), this does not mean they will necessarily come in contact with other herds. By not accounting for barriers to movement, Euclidean distance may misrepresent distances that bighorn sheep would actually travel between herds, particularly at greater distances. Additionally, average distance to the 3 closest herds did not account for epizootic histories, whereas

BLM_0064286

our identified risk factor of neighboring herds with epizootic histories did. The hypothesis Cassirer et al. (2013) tested for distance to nearest herd with recent cases of pneumonia also allowed for herds at much greater distances ($\leq$70 km) and did not have support. Risk therefore appears to be associated with relatively close neighboring herds with histories of pneumonia epizootics, not to Euclidean distance to herds in general.

Proximity to greater number of allotments was not predictive of pneumonia epizootics, contrary to results reported by other researchers. Monello et al. (2001) reported that herds with pneumonia were closer to domestic sheep allotments than were herds without pneumonia. In their analysis, they included allotments at much greater distances compared to our area of high risk. Clifford et al. (2009) estimated risk of pathogen transmission was higher where strong overlap existed between allotments and known bighorn sheep movements. Our result is counter-intuitive because pneumonia in bighorn sheep is strongly associated with exposure to domestic sheep and goats (Wehausen et al. 2011), which is presumably more likely on allotments. In Montana, however, mean number of allotments within 14.5 km of herds was only 0.54 per herd-year (SD = 1.32). Of herd-years with $\geq$1 allotment ($n = 134$), mean number was 2.29 allotments (SD = 1.83, max. = 14). Only 14 of the 43 herds were within 14.5 km of allotments with sheep or goats for at least 1 year between 1979 and 2013; of these herds, only 4 had pneumonia epizootics. Simple presence or absence of allotments within 14.5 km was not predictive of epizootics upon further investigation, either. For herds that are close to allotments, exposure may further depend on numerous factors unique to each allotment, including how they are managed (e.g., timing of grazing, management of strays). It may also depend on the degree of actual overlap between species as suggested by Clifford et al. (2009), for which we had no data commensurate with the large spatial and temporal scales at which we worked. We suggest further, more detailed evaluation of how allotments might contribute to risk of pneumonia epizootics is needed before discarding allotments as a potentially predictive risk factor for future models.

*Risk of spread of pathogens.*—Our hypothesis that relative density within a herd is associated with increased risk of a pneumonia epizootic was supported, lending empirical support to the hypotheses of other researchers (Miller et al. 1991, Monello et al. 2001, Clifford et al. 2009). Risk of a pneumonia epizootic increased >5-fold when herds were at medium density and nearly 15-fold when herds were at high density compared to when they were at low density. Substantial herd variation (e.g., habitat quality and estimated area used by each herd) yielded incomparable absolute densities between herds, so we defined density as relatively low, medium, or high. More analysis on density would be useful in the future, including what absolute values might lead to higher risk of pneumonia epizootics, or if group aggregation size is predictive. Density is a component of risk that has previously received little attention because the positive association between risk of pneumonia and higher

densities had not been quantified. The association between higher herd density and risk may appear to contradict the idea that herds of larger population size should be less threatened by extirpation than smaller herds (Woodroffe 1999, Singer et al. 2001, Cassaigne et al. 2010). Rather than reducing herd size only, expanding the distribution of an existing herd (e.g., through habitat improvements that attract animals to new areas or, potentially, short-distance transplant operations to unoccupied areas nearby) would also reduce density by increasing the total area that a herd occupies (Sells 2014).

Ram:ewe ratios were not associated with increased risk. We chose these ratios to represent the likelihood that rams would wander in search of breeding opportunities, thus potentially encountering and spreading pathogens. Our results suggest that rams may not be as important vectors of pathogens in their herds as we hypothesized. Rams are known to make long movements (Singer et al. 2000*b*, DeCesare and Pletscher 2006, O'Brien et al. 2014), probably even more so at relatively high densities (Singer et al. 2000*a*, Monello et al. 2001). To increase risk of pneumonia for its herd, however, a wandering ram would have to become infected, survive long enough to come in contact with other herd members, and successfully transmit pathogens. These odds may be independent of ram:ewe ratios alone. Historically, MFWP often removed wandering rams when discovered comingling with domestic sheep or goats, and this management effort may have further reduced risk from wandering rams in specific cases. Additionally, not all age classes of rams may be at greater risk of wandering. The ratio of young rams in a herd may be more predictive of this potential source of risk of spread of pathogens, but these data were only occasionally collected over the years we analyzed.

*Susceptibility to pneumonia epizootics.*—We used percentage of normal spring (Apr–Jun) precipitation to represent the hypothesized impact of decreased forage quality on susceptibility to pneumonia epizootics but found no relationship during analysis of our a priori models. This suggested that forage quality might not affect risk of pneumonia epizootics, or that percentage of normal spring precipitation may not be a suitable index to forage quality because it does not account for other environmental factors that also affect forage quality (e.g., timing of precipitation and temperature). We think it more likely, however, that this covariate did not have support because no a priori model included it alongside the other identified risk factors. Based on our a posteriori, second generation model, spring precipitation appeared predictive of pneumonia epizootics. Odds of a pneumonia epizootic were reduced by a factor of 0.41 times per unit of spring precipitation beyond average in the previous spring ($\bar{x} = 100.18\%$, SD = 26.97%). Monello et al. (2001) also noted qualitative evidence for a relationship between summer and fall pneumonia outbreaks and lower than average precipitation. The second generation model could be used to predict risk of pneumonia epizootics instead of our a priori risk model; the effect sizes of the other 4 risk factors were comparable, with a largest difference in any parameter estimate of <0.4 (Tables 2 and 4).

BLM_0064287

We selected percentage of normal winter precipitation to represent the hypothesized impact of harsh winters on susceptibility to pneumonia epizootics because of increased energy expenditures but found no relationship. This result suggests that harsh winters do not increase risk of pneumonia epizootics, consistent with similar results of Monello et al. (2001). Alternatively, percentage of normal winter precipitation may not have been a suitable index for the effects of harsh winters on energy budgets of bighorn sheep because it did not account for patterns and timing of winter precipitation. These factors could be important components

of winter severity but related data were unavailable at the scale of our analysis.

Herds in Montana of mixed or reintroduced origin did not have higher risk of pneumonia epizootics than native herds. This finding contrasts with those of Monello et al. (2001) who evaluated a subset of herds throughout North America and hypothesized that sites of previous herd extirpations could continue to be risky for pneumonia based on characteristics of the site itself. If this were the case, reintroduced herds at sites of historical herd extirpations in Montana could have comparable risk to native herds. This

Table 5. Estimates for risk of pneumonia epizootics as of 2012 for 42 herds of bighorn sheep in Montana, calculated with the pneumonia risk model we developed. The 10-year risk is the probability of $\geq 1$ pneumonia epizootic occurring in 10 years if levels of risk factors remain unchanged. Map ID # corresponds to Figure 1. Within the distribution of each herd plus a 14.5-km buffer from that perimeter, private land = percentage of private land, weed control = whether the herd biologist knew of the use of domestic sheep or goats for weed control, and neighbor risk = whether the herd or a neighboring herd had a pneumonia epizootic previously. Density = the number of individuals counted divided by the area of each herd's distribution, assigned into 1 of 3 equally sized bins of low, medium, and high density relative to the herd's 1979–2013 percentage of average. Where density estimates were unavailable for 2012, we used the most recent density before that year.

| | | Risk factors | | | | Pr(Epizootic) | |
|---|---|---|---|---|---|---|---|
| Map ID # | Herd name | Private land (%) | Weed control | Neighbor risk | Density | 1 yr (2012) | 10 yr (beginning 2012) |
| 1 | Ten Lakes | 21.25 | No | Yes | High | 0.203 | 0.897 |
| 2 | Koocanusa | 6.08 | No | No | Low | 0.001 | 0.011 |
| 3 | Kootenai Falls | 25.75 | No | No | Low | 0.002 | 0.019 |
| 4 | Berray Mountain | 15.06 | No | No | Low | 0.001 | 0.014 |
| 5 | Thompson Falls | 34.96 | No | No | Low | 0.002 | 0.025 |
| 6 | Cut-off | 30.04 | No | No | High | 0.031 | 0.271 |
| 7 | Perma-Paradise | 32.20 | No | No | Medium | 0.012 | 0.114 |
| 8 | Hog Heaven | 57.43 | No | No | Low | 0.005 | 0.048 |
| 9 | Wildhorse Island | 39.32 | No | No | High | 0.041 | 0.340 |
| 10 | Bison Range | 47.81 | No | No | High | 0.052 | 0.412 |
| 11 | Petty Creek | 36.79 | No | No | High | 0.038 | 0.320 |
| 12 | Bonner | 46.27 | Yes | Yes | Low | 0.108 | 0.681 |
| 13 | Lower Rock Creek | 39.75 | Yes | Yes | Low | 0.091 | 0.613 |
| 14 | Upper Rock Creek | 29.33 | No | Yes | Low | 0.021 | 0.194 |
| 15 | Skalkaho[a] | 34.29 | Yes | No | High | 0.109 | 0.685 |
| 16 | East Fork Bitterroot | 10.60 | Yes | Yes | Low | 0.040 | 0.336 |
| 17 | Painted Rocks | 6.03 | Yes | Yes | Medium | 0.161 | 0.827 |
| 18 | Garrison | 54.37 | Yes | Yes | Low | 0.134 | 0.761 |
| 19 | Lost Creek | 35.73 | Yes | Yes | Low | 0.081 | 0.571 |
| 20 | Highland | 35.14 | No | Yes | Low | 0.025 | 0.226 |
| 21 | Tendoy Mountains | 26.14 | No | Yes | Low | 0.019 | 0.178 |
| 22 | North Fork Birch Creek-Teton | 27.24 | No | Yes | Low | 0.020 | 0.183 |
| 23 | Deep Creek | 26.66 | No | Yes | Low | 0.020 | 0.181 |
| 24 | Gibson Lake North | 6.04 | No | Yes | Low | 0.011 | 0.103 |
| 25 | Castle Reef | 34.46 | No | Yes | Medium | 0.118 | 0.714 |
| 26 | Ford Creek | 21.81 | No | Yes | Medium | 0.084 | 0.584 |
| 27 | Beartooth-Sleeping Giant | 74.67 | Yes | Yes | Low | 0.220 | 0.917 |
| 28 | Elkhorn | 51.41 | No | Yes | Low | 0.040 | 0.338 |
| 29 | Spanish Peaks | 28.83 | No | No | Medium | 0.011 | 0.103 |
| 30 | Hilgards | 14.58 | No | Yes | High | 0.173 | 0.850 |
| 31 | Hyalite[b] | 26.86 | No | No | Low | 0.002 | 0.019 |
| 32 | Upper Yellowstone | 9.26 | No | Yes | High | 0.151 | 0.806 |
| 33 | Mill Creek | 17.63 | Yes | No | Medium | 0.026 | 0.229 |
| 34 | Monument Peak | 0.31 | No | No | High | 0.013 | 0.123 |
| 35 | East Yellowstone | 0.75 | No | No | High | 0.013 | 0.125 |
| 36 | Stillwater | 8.53 | No | No | High | 0.017 | 0.155 |
| 37 | West Rosebud | 16.28 | No | No | High | 0.021 | 0.190 |
| 38 | Hellroaring | 9.27 | Yes | No | Low | 0.004 | 0.038 |
| 39 | Pryor Mountains | 14.26 | Yes | No | Low | 0.005 | 0.044 |
| 40 | Missouri River Breaks | 44.91 | Yes | No | High | 0.144 | 0.788 |
| 41 | Little Rockies | 31.18 | No | No | Low | 0.002 | 0.022 |
| 42 | Middle Missouri Breaks | 24.57 | No | No | Low | 0.002 | 0.018 |

[a] Had epizootic in 2012 and is now positive for neighbor risk, increasing Pr(Epizootic$_{10-yr}$) after 2012.
[b] Had epizootic in 2013 and is now positive for neighbor risk, increasing Pr(Epizootic$_{10-yr}$) after 2013.

BLM_0064288

could be true because MFWP has tried to avoid reintroducing herds near areas with domestic sheep. Alternatively, whereas we defined epizootics as events with ≥25% mortality, Monello et al. (2001) defined all detected pneumonia events as epizootics including those with <10% mortality. A difference in risk for native versus reintroduced herds may have been more pronounced if reintroduced herds were more likely to experience low-mortality pneumonia events. Reintroduced herds might also have been monitored more closely, providing the ability to better detect low-mortality events.

**Overall Model**

Availability of certain data limited our ability to analyze additional hypothesized risk factors. Most important was the paucity of pathogen data. Presence of *Mycoplasma ovipneumoniae* or *Mannheimia haemolytica* may be important in predicting risk if sufficient data, understanding, and tests for disease agents are available. Although Montana had over 60 herd-years of *Mycoplasma ovipneumoniae* data and nearly 100 herd-years of *Mannheimia haemolytica* data, more intensive, consistent efforts with larger sample sizes would have been needed for our analysis because so many herd-years were still lacking in data. Also, traditional culture-based methods for *Mycoplasma ovipneumoniae* (Besser et al. 2008) and *Mannheimia haemolytica* (Shanthalingam et al. 2014) appear to miss many positive results compared to new culture-independent methods that detect genetic signatures of the pathogen. This suggests that analysis of these data for our study could lead to misleading and erroneous descriptions; therefore, we excluded them from analysis. In addition to pathogen data, body condition data such as body fat levels, parasite loads, mineral levels, or blood parameters may also be of potential value in a future risk model (Mitchell et al. 2013).

Evaluating our model's capacity to predict future epizootics in Montana, or those occurring in other states, offers an opportunity to evaluate and improve the model. It would also constitute a test of the hypothesized relationships posed by our model and its covariates, providing an opportunity to learn more about risk factors for pneumonia epizootics. Our evaluation of 10 hypothesized risk factors clarified the importance of poorly understood risk factors in Montana to better predict risk. These risk factors could differ in their relative importance for herds in places unlike Montana. To maximize usefulness of the model, we recommend that potential variation in risk factors should be tested and calibrated to local conditions as part of an adaptive approach to disease management. Alternative risk factors may also be important in other areas and a subject for future research toward development of predictive models elsewhere. The evidence, based on our second generation model, that spring precipitation is predictive of pneumonia epizootics deserves further attention in future work.

The scope and scale of our study required data collected from numerous biologists, literature sources, and other agency personnel. Because misclassification of pneumonia epizootics could reduce precision, we excluded herd-years for which we were not reasonably certain were free of pneumonia

epizootics. Accuracy and precision of spatially related covariates would be compromised if biologists were unable to delineate approximate distributions of herds, so we excluded herds without sufficient spatial data due to limited herd histories or biologist knowledge.

The statistically rare nature of pneumonia epizootic events makes their prediction challenging. Pneumonia epizootics occurred in 22 out of 637 (3.45%) of the herd-years we analyzed. A statistical model based on such data has the potential to incorrectly predict epizootics (i.e., false positives) more often than correctly. Our use of decision curve analysis helped evaluate the extent to which managers can rely on our risk model to make accurate predictions, given the number of pneumonia epizootic events we observed. This relatively new analysis determines the net benefits of using a predictive model for making decisions (i.e., its usefulness; Vickers and Elkin 2006, Steyerberg et al. 2010). This assessment first allowed us to conclude that our top model was more useful than our second model. It also allowed us to evaluate whether using our model to make a decision was more useful than using no model at all. If no model such as ours existed, the status quo decision would generally be reactive management (i.e., treat all herds as low risk) because herds cannot be distinguished by risk level and proactive management of all herds would almost certainly be too costly. To be useful, our predictive model should provide more correct classifications than either alternative in absence of the model.

Decision curve analysis showed that our model is expected to be more useful than the status quo. For example, at a threshold probability of 0.028, our model is expected to provide a net increase in true positive detections of 2.390 per 100 herd-years compared to total reactive management. It would also provide a net reduction in false positive detections of 59.632 per 100 herd-years compared to total proactive management, meaning our model would reduce false positive predictions by 60% over completely proactive management. Thus, many more correct classifications will be provided by our model compared to fully reactive management or fully proactive management of all herds. This ability to reliably differentiate herds by risk level will assist managers in making decisions on where to direct appropriate, potentially costly proactive actions.

An important advantage of DCA is that tolerance for false positive versus false negative predictions can be accounted for by selecting different threshold probabilities. Individual managers will have different risk tolerances when making decisions. Some managers will be more risk averse given the severe implications of pneumonia epizootics. More risk-averse managers could select a lower threshold probability to separate high from low risk herds. Other managers may be more risk tolerant if management actions would be too costly, in which case they could then select a higher threshold probability.

## MANAGEMENT IMPLICATIONS

Our model can be used to estimate risk (Table 5), compare and prioritize herds for proactive management, and simulate how potential alternative actions may reduce risk. The model

BLM_0064289

is not only useful for predicting risk for existing herds, but for estimating future risk for new transplant herds as well. Our approach and results are unique because of the extensive spatial and temporal scales used to develop the risk model and make it valuable for herd-specific decisions as part of regional or statewide management of bighorn sheep in Montana. Used to inform decisions in a structured decision making framework (Mitchell et al. 2013), the model can be used to estimate herd-specific recommendations that best meet agency objectives given each herd's predicted risk. Importantly, sophisticated software is not required; a simple spreadsheet can be used to calculate risk using the parameter estimates from the risk model (Table 2). A spreadsheet for a decision model similar to that shown in Mitchell et al. (2013) would help managers use the risk model to inform decisions. Use of both models will lead to a unified, transparent, and consistent approach to making proactive management decisions given the regional or statewide scale, while simultaneously remaining highly specific to each herd's estimated risk and each manager's goals.

## ACKNOWLEDGMENTS

Funding was provided by the general sale of hunting and fishing licenses in Montana, the annual auction sale of bighorn sheep hunting licenses in Montana, matching Pittman-Robertson grants to MFWP, and the Montana Cooperative Wildlife Research Unit. M. Nordhagen provided assistance with data preparation. We thank biologists and employees of MFWP, the US Fish and Wildlife Service, Bureau of Land Management, US Forest Service, US Geological Survey, National Park Service, Confederated Salish and Kootenai Tribes, Chippewa Cree Tribe, the Garrott Lab at Montana State University, Montana Conservation Science Institute, British Columbia Fish and Wildlife Branch, Idaho Fish and Game, and Wyoming Game and Fish for their assistance and expertise. We also thank V. Edwards and 2 anonymous reviewers for helping to improve the manuscript. Any use of trade, firm, or product names is for descriptive purposes only and does not imply endorsement by the US Government.

## LITERATURE CITED

Besser, T. E., E. F. Cassirer, M. A. Highland, P. Wolff, A. Justice-Allen, K. Mansfield, M. A. Davis, and W. Foreyt. 2013. Bighorn sheep pneumonia: sorting out the cause of a polymicrobial disease. Preventative Veterinary Medicine 108:85–93.

Besser, T. E., E. F. Cassirer, K. A. Potter, J. VanderSchalie, A. Fischer, D. P. Knowles, D. R. Herndon, F. R. Rurangirwa, G. C. Weiser, and S. Srikumaran. 2008. Association of Mycoplasma ovipneumoniae infection with population-limiting respiratory disease in free-ranging Rocky Mountain bighorn sheep (Ovis canadensis canadensis). Journal of Clinical Microbiology 46:423–430.

Besser, T. E., E. F. Cassirer, C. Yamada, K. A. Potter, C. Herndon, W. J. Foreyt, D. P. Knowles, and S. Srikumaran. 2012a. Survival of bighorn sheep (Ovis canadensis) commingled with domestic sheep (Ovis aries) in the absence of Mycoplasma ovipneumoniae. Journal of Wildlife Diseases 48:168–172.

Besser, T. E., M. A. Highland, K. Baker, E. F. Cassirer, N. J. Anderson, J. M. Ramsey, K. Mansfield, D. L. Bruning, P. Wolff, J. B. Smith, and J. A. Jenks. 2012b. Causes of pneumonia epizootics among bighorn sheep, western United States, 2008–2010. Emerging Infectious Diseases 18:406–414.

Brooks, S. P., and A. Gelman. 1998. General methods for monitoring convergence of iterative simulations. Journal of Computational and Graphical Statistics 7:434–455.

Butler, C. J., R. A. Garrott, and J. J. Rotella. 2013. Correlates of recruitment in Montana bighorn sheep populations. http://wildsheepworkinggroup.com/app/download/ 7236242856/Correlates + of + Recruitment + in + Montana + Bighorn + Sheep + Populations-FINAL.pdf. Accessed 5 Dec 2013. .

Cahn, M. L., M. M. Conner, O. J. Schmitz, T. R. Stephenson, J. D. Wehausen, and H. E. Johnson. 2011. Disease, population viability, and recovery of endangered Sierra Nevada bighorn sheep. Journal of Wildlife Management 75:1753–1766.

Carpenter, T. E., V. L. Coggins, C. McCarthy, C. S. O'Brien, J. M. O'Brien, and T. J. Schommer. 2014. A spatial risk assessment of bighorn sheep extirpation by grazing domestic sheep on public lands. Preventative Veterinary Medicine 114:3–10.

Cassaigne, G., R. A. Medellin, and J. A. Guasco. 2010. Mortality during epizootics in bighorn sheep: effects of initial population size and cause. Journal of Wildlife Diseases 46:763–771.

Cassirer, E. F., R. K. Plowright, K. R. Manlove, P. C. Cross, A. P. Dobson, K. A. Potter, and P. J. Hudson. 2013. Spatio-temporal dynamics of pneumonia in bighorn sheep. Journal of Animal Ecology 82:518–528.

Cassirer, E. F., and A. R. E. Sinclair. 2007. Dynamics of pneumonia in a bighorn sheep metapopulation. Journal of Wildlife Management 71:1080–1088.

Clifford, D. L., B. A. Schumaker, T. R. Stephenson, V. C. Bleich, M. L. Cahn, B. J. Gonzales, W. M. Boyce, and J. A. K. Mazet. 2009. Assessing disease risk at the wildlife-livestock interface: a study of Sierra Nevada bighorn sheep. Biological Conservation 142:2559–2568.

Conroy, M. J., and J. T. Peterson. 2013. Decision-making in natural resource management: a structured, adaptive approach. Wiley-Blackwell, Oxford, United Kingdom.

DeCesare, N. J., and D. H. Pletscher. 2006. Movements, connectivity, and resource selection of Rocky Mountain bighorn sheep. Journal of Mammalogy 87:531–538.

Deem, S. L., W. B. Karesh, and W. Weisman.. 2001. Putting theory into practice: wildlife health in conservation. Conservation Biology 15:1224–1233.

Dormann, C. F., J. Elith, S. Bacher, C. Buchmann, G. Carl, G. Carré, J. R. G. Marquéz, B. Gruber, B. Lafourcade, P. J. Leitão, T. Münkemüller, C. McClean, P. E. Osborne, B. Reineking, B. Schröder, A. K. Skidmore, D. Zurell, and S. Lautenbach.. 2013. Collinearity: a review of methods to deal with it and a simulation study evaluating their performance. Ecography 36:27–46.

Edwards, V. L., J. Ramsey, C. Jourdonnais, R. Vinkey, M. Thompson, N. Anderson, T. Carlsen and C. Anderson.. 2010. Situational agency response to four bighorn sheep die-offs in western Montana. Biennial Symposium of the Northern Wild Sheep and Goat Council. 29–50. http://media.nwsgc.org/proceedings/MWSGC-2010/Edwards%20et%2029-50.pdf. Accessed 17 Jun 2013. .

Enk, T. A., H. D. Picton, and J. S. Williams. 2001. Factors limiting a bighorn sheep population in Montana following a dieoff. Northwest Science 75:280–291.

Epps, C. W., D. R. McCullough, J. D. Wehausen, V. C. Bleich, and J. L. Rechel. 2004. Effects of climate change on population persistence of desert-dwelling mountain sheep in California. Conservation Biology 18:102–113.

Foreyt, W. J. 1989. Fatal Pasteurella haemolytica pneumonia in bighorn sheep after direct contact with clinically normal domestic sheep. American Journal of Veterinary Research 50:341–344.

Foreyt, W. J., and D. A. Jessup. 1982. Fatal pneumonia of bighorn sheep following association with domestic sheep. Journal of Wildlife Diseases 18:163–168.

Fralick, G. L. 1984. A senior thesis study of the bighorn sheep of the Petty Creek Drainage. Senior thesis, University of Montana, Missoula, USA.

Gelman, A., and J. Hill. 2007. Data analysis using regression and multilevel/hierarchical models. Cambridge University Press, Cambridge, United Kingdom.

George, J. L., D. J. Martin, P. M. Lukacs, and M. W. Miller. 2008. Epidemic pasteurellosis in a bighorn sheep population coinciding with the appearance of a domestic sheep. Journal of Wildlife Diseases 44:388–403.

Goodson, N. J., D. R. Stevens, and J. A. Bailey. 1991. Effects of snow on foraging ecology and nutrition of bighorn sheep. Journal of Wildlife Management 55:214–222.

BLM_0064290

Gross, J. E., F. J. Singer, and M. E. Moses. 2000. Effects of disease, dispersal, and area on bighorn sheep restoration. Restoration Ecology 8(4S):25–37.

Hosmer, D. W., and S. Lemeshow. 2000. Applied logistic regression, Second edition. John Wiley & Sons, Hoboken, New Jersey, USA.

Kéry, M. 2010. Introduction to WinBUGS for ecologists: a Bayesian approach to regression, ANOVA, mixed models and related analyses, First edition. Academic Press, Burlington, Massachusetts, USA.

Lafferty, K. D., and L. R. Gerber. 2002. Good medicine for conservation biology: the intersection of epidemiology and conservation theory. Conservation Biology 16:593–604.

Lawrence, P. K., S. Shanthalingam, R. P. Dassanayake, R. Subramaniam, C. N. Herndon, D. P. Knowles, F. R. Rurangirwa, W. J. Foreyt, G. Wayman, A. M. Marciel, S. K. Highlander, and S. Srikumaran. 2010. Transmission of Mannheimia haemolytica from domestic sheep (Ovis aries) to bighorn sheep (Ovis canadensis): unequivocal demonstration with green fluorescent protein-tagged organisms. Journal of Wildlife Diseases 46:706–717.

Link, W. A., and R. J. Barker. 2010. Bayesian inference with ecological applications. Academic Press, London, United Kingdom.

Link, W. A., E. Cam, J. D. Nichols, and E. G. Cooch. 2002. Of bugs and birds: Markov chain Monte Carlo for hierarchical modeling in wildlife research. Journal of Wildlife Management 66:277–291.

Miller, D. S., E. Hoberg, G. Weiser, K. Aune, M. Atkinson, and C. Kimberling. 2012. A review of hypothesized determinants associated with bighorn sheep (Ovis canadensis) die-offs. Veterinary Medicine International. http://www.hindawi.com/journals/vmi/2012/ 796527/. Accessed 3 Apr 2012.

Miller, D. S., G. C. Weiser, K. Aune, B. Roeder, M. Atkinson, N. Anderson, T. J. Roffe, K. A. Keating, P. L. Chapman, C. Kimberling, J. Rhyan, and P. R. Clarke. 2011. Shared bacterial and viral respiratory agents in bighorn sheep (Ovis canadensis), domestic sheep (Ovis aries), and goats (Capra hircus) in Montana. Veterinary Medicine International. http://www.hindawi.com/journals/vmi/2011/162520/. Accessed 2 Dec.

Miller, M. W., N. T. Hobbs, and E. S. Williams. 1991. Spontaneous pasteurellosis in captive Rocky Mountain bighorn sheep (Ovis canadensis): clinical, laboratory, and epizootiological observations. Journal of Wildlife Diseases 27:534–542.

Mitchell, M. S., J. A. Gude, N. J. Anderson, J. M. Ramsey, M. J. Thompson, M. G. Sullivan, V. L. Edwards, C. N. Gower, J. F. Cochrane, E. R. Irwin, and T. Walshe. 2013. Using structured decision making to manage disease risk for Montana wildlife. Wildlife Society Bulletin 37:107–114.

Monello, R. J., D. L. Murray, and E. F. Cassirer. 2001. Ecological correlates of pneumonia epizootics in bighorn sheep herds. Canadian Journal of Zoology 79:1423–1432.

Montana, F., and P. Wildlife. 2010. Montana bighorn sheep conservation strategy. Montana Fish, Wildlife and Parks, Helena, USA. http://fwp.mt.gov/fwpDoc.html?id=39746. Accessed 5 Sep 2011. .

Mood, A. M., F. A. Graybill, and D. C. Boes. 1974. Introduction to the theory of statistics. McGraw-Hill International, Singapore.

Ntzoufras, I. 2009. Bayesian modeling using WinBUGS. John Wiley & Sons, Hoboken, New Jersey, USA.

O'Brien, J. M., C. S. O'Brien, C. McCarthy, and T. E. Carpenter. 2014. Incorporating foray behavior into models estimating contact risk between bighorn sheep and areas occupied by domestic sheep. Wildlife Society Bulletin 38:321–331.

Onderka, D. K., and W. D. Wishart. 1984. A major bighorn sheep die-off from pneumonia in southern Alberta. Biennial Symposium of the Northern Wild Sheep and Goat Council 4:356–363.

Onderka, D. K., and W. D. Wishart. 1988. Experimental contact transmission of Pasteurella haemolytica from clinically normal domestic sheep causing pneumonia in Rocky Mountain bighorn sheep. Journal of Wildlife Diseases 24:663–667.

Plowright, R. K., K. Manlove, E. F. Cassirer, P. C. Cross, T. E. Besser, and P. J. Hudson. 2013. Use of exposure history to identify patterns of immunity to pneumonia in bighorn sheep (Ovis canadensis). PLoS ONE 8: (4):e61919. http://www.plosone.org/article/info%3Adoi %2F10.1371% 2Fjournal.pone.0061919. Accessed 5 Dec 2013.

Portier, C., M. Festa-Bianchet, J.-M. Gaillard, J. T. Jorgenson, and N. G. Yoccoz. 1998. Effects of density and weather on survival of bighorn sheep lambs (Ovis canadensis). Journal of Zoology 245:271–278.

Royle, J. A., and R. M. Dorazio. 2008. Hierarchical modeling and inference in ecology: the analysis of data from populations, metapopulations and communities. Elsevier, London, United Kingdom.

Rudolph, K. M., D. L. Hunter, W. J. Foreyt, E. F. Cassirer, R. B. Rimler, and A. C. S. Ward. 2003. Sharing of Pasteurella spp. between free-ranging bighorn sheep and feral goats. Journal of Wildlife Diseases 39:897–903.

Rudolph, K. M., D. L. Hunter, R. B. Rimler, E. F. Cassirer, W. J. Foreyt, W. J. DeLong, G. C. Weiser, and A. C. S. Ward. 2007. Microorganisms associated with a pneumonic epizootic in Rocky Mountain bighorn sheep (Ovis canadensis canadensis). Journal of Zoo and Wildlife Medicine 38:548–558.

Scott, M. E. 1988. The impact of infection and disease on animal populations: implications for conservation biology. Conservation Biology 2:40–56.

Sells, S. N. 2014. Proactive management of pneumonia epizootics in bighorn sheep in Montana. Thesis, University of Montana, Missoula, USA.

Singer, F. J., M. E. Moses, S. Bellew, and W. Sloan. 2000a. Correlates to colonizations of new patches by translocated populations of bighorn sheep. Restoration Ecology 8(4S):66–74.

Singer, F. J., C. M. Papouchis, and K. K. Symonds. 2000b. Translocations as a tool for restoring populations of bighorn sheep. Restoration Ecology 8(4S):6–13.

Singer, F. J., E. Williams, M. W. Miller, and L. C. Zeigenfuss. 2000c. Population growth, fecundity, and survivorship in recovering populations of bighorn sheep. Restoration Ecology 8(4S):75–84.

Singer, F. J., L. C. Zeigenfuss, and L. Spicer. 2001. Role of patch size, disease, and movement in rapid extinction of bighorn sheep. Conservation Biology 15:1347–1354.

Shanthalingam, S., A. Goldy, J. Bavananthasivam, R. Subramaniam, S. A. Batra, A. Kugadas, B. Raghavan, R. P. Dassanayake, J. E. Jennings-Gaines, H. J. Killion, W. H. Edwards, J. M. Ramsey, N. J. Anderson, P. L. Wolff, K. Mansfield, D. Bruning and S. Srikumaran. 2014. PCR assay detects Mannheimia haemolytica in culture-negative pneumonic lung tissues of bighorn sheep (Ovis canadensis) from outbreaks in the western USA 2009–2010. Journal of Wildlife Diseases 50:1–10.

Spiegelhalter, D. J., N. G. Best, B. P. Carlin, A. Van Der Linde. 2002. Bayesian measures of model complexity and fit. Journal of the Royal Statistical Society. Series B 64:583–639.

Steyerberg, E. W., A. J. Vickers, N. R. Cook, T. Gerds, M. Gonen, N. Obuchowski, M. J. Pencina, and M. W. Kattan. 2010. Assessing the performance of prediction models: a framework for some traditional and novel measures. Epidemiology 21:128–138.

Vickers, A. J., and E. B. Elkin. 2006. Decision curve analysis: a novel method for evaluating prediction models. Medical Decision Making 26:565–574.

Wehausen, J. D., S. T. Kelley, and R. R. Ramey. 2011. Domestic sheep, bighorn sheep, and respiratory disease: a review of the experimental evidence. California Fish and Game 97:7–24.

Wells J. V., and M. E. Richmond. 1995. Populations, metapopulations, and species populations: what are they and who should care. Wildlife Society Bulletin 23:458–462.

Wild Sheep Working Group., 2012. Recommendations for domestic sheep and goat management in wild sheep habitat. Western Association of Fish and Wildlife Agencies, http://www. wildsheepworkinggroup.com/resources/publications/. Accessed 17 Jun 2013. .

Wobeser, G. A. 2006. Essentials of disease in wild animals. Blackwell, Ames, Iowa, USA.

Woodroffe, R. 1999. Managing disease threats to wild mammals. Animal Conservation 2:185–193.

Young, T. P. 1994. Natural die-offs of large mammals: implications for conservation. Conservation Biology 8:410–418.

Associate Editor: Terry Shaffer.

BLM_0064291

OPEN ACCESS Freely available online

PLoS one

# A New Basal Sauropodomorph Dinosaur from the Lower Jurassic Navajo Sandstone of Southern Utah

**Joseph J. W. Sertich[1]\*, Mark A. Loewen[2]**

**1** Department of Anatomical Sciences, Stony Brook University, Stony Brook, New York, United States of America, **2** Utah Museum of Natural History, Salt Lake City, Utah, United States of America

## Abstract

*Background:* Basal sauropodomorphs, or 'prosauropods,' are a globally widespread paraphyletic assemblage of terrestrial herbivorous dinosaurs from the Late Triassic and Early Jurassic. In contrast to several other landmasses, the North American record of sauropodomorphs during this time interval remains sparse, limited to Early Jurassic occurrences of a single well-known taxon from eastern North America and several fragmentary specimens from western North America.

*Methodology/Principal Findings:* On the basis of a partial skeleton, we describe here a new basal sauropodomorph dinosaur from the Lower Jurassic Navajo Sandstone of southern Utah, *Seitaad ruessi* gen. et sp. nov. The partially articulated skeleton of *Seitaad* was likely buried post-mortem in the base of a collapsed dune foreset. The new taxon is characterized by a plate-like medial process of the scapula, a prominent proximal expansion of the deltopectoral crest of the humerus, a strongly inclined distal articular surface of the radius, and a proximally and laterally hypertrophied proximal metacarpal I.

*Conclusions/Significance:* Phylogenetic analysis recovers *Seitaad* as a derived basal sauropodomorph closely related to plateosaurid or massospondylid 'prosauropods' and its presence in western North America is not unexpected for a member of this highly cosmopolitan clade. This occurrence represents one of the most complete vertebrate body fossil specimens yet recovered from the Navajo Sandstone and one of the few basal sauropodomorph taxa currently known from North America.

**Citation:** Sertich JJW, Loewen MA (2010) A New Basal Sauropodomorph Dinosaur from the Lower Jurassic Navajo Sandstone of Southern Utah. PLoS ONE 5(3): e9789. doi:10.1371/journal.pone.0009789

**Editor:** Vincent Laudet, Ecole Normale Supérieure de Lyon, France

**Received** January 30, 2010; **Accepted** March 1, 2010; **Published** March 24, 2010

**Copyright:** © 2010 Sertich, Loewen. This is an open-access article distributed under the terms of the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited.

**Funding:** Funding for fieldwork was provided by the Utah Museum of Natural History. The funders had no role in study design, data collection and analysis, decision to publish, or preparation of the manuscript.

**Competing Interests:** The authors have declared that no competing interests exist.

\* E-mail: jsertich@ic.sunysb.edu

## Introduction

The Early Jurassic (201.5–176 Ma) was an interval of major global climatic and biotic transition that included the diversification of many vertebrate groups. Among these were the sauropodomorphs, a diverse group of herbivorous dinosaurs that would remain among the dominant herbivores in many terrestrial ecosystems through the close of the Mesozoic, a period of more than 140 million years. The basal members of Sauropodomorpha, often referred to as the 'prosauropods,' achieved a nearly global distribution by the Early Jurassic, with taxa known from Africa [1,2,3,4,5,6,7,8,9], Antarctica [10], Asia [5,11,12,13,14,15], India [5], North America [16,17,18], and South America [19,20].

Basal sauropodomorph remains are scarce in North America. Whereas basal sauropodomorph taxa are well known and globally widespread through the Late Triassic, their remains are conspicuously absent from North American Triassic terrestrial assemblages [21,22,23]. The Early Jurassic record of eastern North America includes several specimens of the well known taxon *Anchisaurus (Ammosaurus)* from the Lower Jurassic Portland Formation of the Newark Supergroup in the eastern United States [17,24,25] and undescribed remains from the Lower Jurassic McCoy Brook Formation in Nova Scotia [18,26]. By comparison, the Early Jurassic sauropodomorph record of western

North America is sparse and fragmentary despite an abundance of exposed terrestrial sedimentary units from this time period. Western North American basal sauropodomorph remains are known from the Lower Jurassic Glen Canyon Group of the Colorado Plateau, including a skull from the base of the Kayenta Formation of Arizona [2,6,16,27] and fragmentary articulated remains from the top of the Navajo Sandstone of Arizona [17,24,28,29,30,31]. The recent discovery [32] of a partially articulated specimen from the Navajo Sandstone of southern Utah represents the most complete basal sauropodomorph yet recovered from western North America and one of the few diagnosable specimens from continental North America.

## Methods

### Field Methods and Preparation

The holotype specimen described here was originally discovered and reported to the UMNH by local artist Joe Pachek. The specimen was extracted from the base of a near-vertical cliff wall using a diamond blade on a gas-powered industrial cut-off saw. Trenching around the specimen block required repeated 10 cm deep cuts in a 10 cm grid around the specimen, with removal of blocks of matrix with hammer and chisel. During excavation, the main block naturally split in two along the medial surface of the

BLM_0064292

ventral abdominal wall. The blocks were prepared using pneumatic air scribes and needles under magnification. Due to the delicate preservation of the fossil bone and the articulated nature of the specimen, only the tibia and pelvis were completely removed from the major blocks.

## Imaging

Computed tomography (CT) of the pelvis was undertaken to reconstruct overall morphology using a Siemens Sensation 64 scanner at 120 Kv (3 mm slice interval) at the University of Utah Medical Center.

## Terminology

We employ traditional, or "Romerian," anatomical and directional terms over veterinary alternatives [33]. For example, "anterior" and "posterior" are used as directional terms in lieu of the veterinary alternatives "cranial" and "caudal." Identification of vertebral laminae follow recent recommendations [34].

## Institutional Abbreviations

**MCZ**, Museum of Comparative Zoology, Cambridge, Massachusetts, USA; **MNA**, Museum of Northern Arizona, Flagstaff, Arizona, USA; **UMNH**, Utah Museum of Natural History, Salt Lake City, Utah, USA; **UCMP**, University of California Museum of Paleontology, Berkeley, California, USA.

## Results

### Systematic Paleontology

**Systematic hierarchy.**
Dinosauria Owen, 1842 [35] *sensu* Padian and May 1993 [36]
Saurischia Seeley, 1887 [37] *sensu* Gauthier 1986 [38]
Sauropodomorpha von Huene, 1932 [39] *sensu* Galton and Upchurch 2004 [5]

### *Seitaad* gen. nov.

**Etymology.** *Séit'áád* (Diné/Navajo), a mythological sand 'monster' of Diné folklore that buried its victims in dunes.
**Type Species.** Seitaad ruessi.

### *Seitaad ruessi* sp. nov.

urn:lsid:zoobank.org:act:FFA6DE17-5A7F-4D86-A176-51D740-BCCA5F
Figures 1C–11

**Etymology.** In honor of the young artist, poet, naturalist, and explorer Everett Ruess (1914–1934?), who mysteriously disappeared in 1934 while exploring southern Utah.

**Holotype.** UMNH VP 18040; articulated partial postcranial skeleton including portions of 11 dorsal vertebrae, 16 dorsal ribs, both pectoral girdles, a nearly complete left and partial right forelimb, partial pelvis, partial left hind limb, and partially articulated array of gastral ribs.

**Type locality.** Comb Ridge, San Juan County, Utah (Fig. 1). The specimen was recovered from UMNH VP Locality 191 at ground level in a slot canyon below remains of the "Eagle's Nest" cliff dwelling.

**Horizon and Age.** UMNH VP 18040 was preserved in a bed of massive sandstone at the base of the Navajo Sandstone, one meter above an interbedded mudstone and sandstone facies of the Kayenta Formation. The Navajo Sandstone is the uppermost unit of the Glen Canyon Group with an age no earlier than Pleinsbachian [31]. The Glen Canyon Group was deposited in a large retroarc basin, with the crossbedded eolian Navajo

Sandstone in a complex gradational contact with the underlying fluvially-dominated Kayenta Formation [40,41,42].

**Diagnosis.** *Seitaad ruessi* is a non-eusauropod sauropodomorph dinosaur distinguished from other basal sauropodomorphs by the following combination of characters (autapomorphies marked by *): mid-dorsal neural arches subequal to or taller than respective centra; presence of distinct plate-like medial process of the scapula contributing posteriorly to glenoid surface*; prominent deltopectoral crest offset proximally from head of humerus by distinct proximally directed hook*; proximally convex and laterally expanded proximal surface of metacarpal I*; pubis with transversely narrow and elongate apron and relatively small obturator foramen; and enlarged pedal ungual present on digit II.

*Seitaad ruessi* can be further distinguished from the basal sauropodomorphs *Panphagia* and *Saturnalia* on the basis of its elongate and narrow scapular blade and from *Asylosaurus* and *Efraasia* on the basis of its enlarged distal carpal I overlapping distal carpal II, its wide metacarpal I inset into the carpus, and its strongly twisted first phalanx of digit I. *Seitaad* can be distinguished from the plateosaurian taxa *Plateosaurus*, *Massospondylus*, *Riojasaurus*, and *Yunnanosaurus* on the basis of its transversely narrow pubic apron and enlarged ungual of pedal digit II; *Jingshanosaurus* by the absence of a fused carpal block uniting distal carpals I-V; *Lessemsaurus* by its narrow strap-like scapular blade; and *Adeopapposaurus* by its transversely wide metacarpal I. *Seitaad* can be distinguished from the eastern North American sauropodomorph taxon *Ammosaurus* on the basis of its robust metacarpal I, enlarged distal carpal I, relatively short and tall dorsal centra, and large calcaneum.

## Description and comparisons

The skeleton of *Seitaad ruessi* (UMNH VP 18040) preserves articulated portions of the axial and appendicular skeleton (Figs. 1C,2,3). Many elements are moderately deformed from post-depositional plastic shear along a roughly posterodorsally/anteroventrally plane.

**Axial skeleton.** The axial skeleton includes portions of eleven articulated dorsal vertebrae (D) and several dorsal ribs preserved in articulation or close association with the vertebrae (Figs. 2,3). Posteriorly, the axial column is laterally flexed to the right. Anteriorly, the column is depressed such that the anterior dorsal vertebrae nearly contact the medial surface of the pectoral girdle. The neural spines and portions of the neural arches of all preserved vertebrae and the proximal portions of most dorsal ribs have been lost to erosion.

The vertebrae are interpreted to represent D3 through D13 based on the number and position of preserved ribs and on the proximity of the ventral pelvis. Only morphologically indistinct portions of D3 are preserved on the dorsal surface of the block. Posteriorly, the dorsal surfaces of D4 and D5 are exposed in articulation, though the neural spines and portions of the neural arch have been lost to erosion. The left lateral (Fig. 4) and dorsal surfaces of D6 through D10 are exposed and permit accurate characterization of overall morphology. D11 and D12 are represented only by the ventral portions of the centra, and D13 is represented only by the anteroventral margin of the centrum (Fig. 2).

The dorsal vertebrae are similar in overall morphology to other basal sauropodomorphs. The centra are amphicoelous and relatively short, with a length/height ratio of approximately 3/2, similar to *Adeopapposaurus* [20] and *Massospondylus* [43]. This condition differs from the relatively anterioposteriorly short and dorsoventrally tall dorsal centra of *Riojasaurus* [44] and *Lufengosaurus* [45], and from the relatively elongate and short centra of

BLM_0064293



**Figure 1. Map and stratigraphic section of the Glen Canyon Group and skeletal reconstruction of *Seitaad ruessi*.** Map showing localities of sauropodomorph remains recovered from the Lower Jurassic Glen Canyon Group of southern Utah and northern Arizona (A) including the type locality of *Seitaad ruessi* (UMNH VP 18040). Surface outcrops of the Glen Canyon Group are modified after [77]. Approximate stratigraphic position of all sauropodomorph remains from the Kayenta Formation and Navajo Sandstone (B) including *Seitaad ruessi* (UMNH VP 18040). Stratigraphy of the Glen Canyon Group is modified after [42]. Skeletal reconstruction (C) of *Seitaad* with known elements indicated in white and missing elements indicated in gray. [planned for page width]
doi:10.1371/journal.pone.0009789.g001

*Anchisaurus* (*Ammosaurus*) [17,24]. The anterior and posterior margins of the dorsal centra are strongly flared, resulting in a constricted appearance in lateral view. A broad, shallow fossa is present ventral to the neural arch on the lateral surfaces of the exposed centra.

The neural arches of D8-D10 are dorsoventrally subequal to slightly taller than their respective centra, similar to the conformation in *Adeopapposaurus* and *Unaysaurus* [46], but differing

from most other basal sauropodomorphs. Parapophyses are exposed laterally on D8-D10 on the anterior border of the neural arch immediately dorsal to the centrum. The parapophyses are elliptical in outline and dorsoventrally taller than long, with their long axis inclined dorsally and posteriorly. As in other basal sauropodomorphs, a thin laminar paradiapophyseal lamina extends from the parapophysis along the ventral surface of the transverse process. Dorsally, the paradiapophyseal lamina defines

BLM_0064294

Basal Sauropodomorph from Utah



**Figure 2. Skeleton of *Seitaad ruessi* (UMNH VP 18040).** Shown in anterodorsal view (A) with interpretive line drawing and labels (B). Scale bar equals 10 cm. *Osteological abbreviations: co*, coracoid; *D*, dorsal vertebra; *dr*, dorsal rib; *h*, humerus; *ra*, radius; *sc*, scapula; *ul*, ulna; *mc*, metacarpal; *I*, digit one. [planned for page width]
doi:10.1371/journal.pone.0009789.g002

BLM_0064295

Basal Sauropodomorph from Utah



BLM_0064296

**Figure 3. Skeleton of** *Seitaad ruessi* **(UMNH VP 18040).** Shown in left lateral view (A) with interpretive line drawing and labels (B). Scale bar equals 10 cm. *Osteological abbreviations: as,* astragalus; *ca,* calcaneum; *dc,* distal carpal; *dr,* dorsal rib; *dt,* distal tarsal; *h,* humerus; *ra,* radius; *sc,* scapula; *ul,* ulna; *mc,* metacarpal; *mt,* metatarsal; *I,* digit one; *II,* digit two; *III,* digit three; *IV,* digit four; *V,* digit five. [planned for page width]
doi:10.1371/journal.pone.0009789.g003

the posteroventral margin of a distinct anteroposteriorly elongate anterior chonos on the lateral surface of the prezygapophysis. Ventrally, the paradiapophyseal lamina forms the anterodorsal margin of a distinct triangular anterior infradiapophyseal fossa. The posterodorsal boundary of the anterior infradiapophyseal fossa is demarcated by a thin posterior centrodiapophyseal lamina. The transverse processes are anteroposteriorly centered over the centrum and project laterally. The dorsal surface of the transverse process is continuous with the dorsally flat surface of the prezygapophysis anteriorly and the distinct postzygodiapophyseal lamina posteriorly.

A total of 13 [10 and over use number] dorsal ribs are preserved in articulation or close association with the dorsal vertebrae. The first eight dorsal ribs are preserved on the right side, with ribs articulated with D3 through D7. One rib, likely representing the eighth, is disarticulated and rotated laterally on the right side of the skeleton (Fig. 2). The first five dorsal ribs are preserved on the left side of the skeleton, with ribs three through five articulated with their corresponding vertebrae. In overall morphology, the dorsal ribs are elongate and weakly curved, with an elliptical cross-section. The distal ends of the ribs are not exposed.

**Appendicular skeleton.**  The appendicular skeleton includes: nearly the entire left and right pectoral girdles lacking only the anterior margins of the scapulae, coracoids, and the clavicles; portions of both articulated forelimbs, including a nearly complete left forelimb; the ventral pelvis, including both nearly complete pubes; and portions of the left hind limb, including the nearly complete pes.

Both scapulae are well preserved and in articulation with the skeleton (Figs. 2,3,5). The scapula is elongate, mediolaterally flattened, and gently arched laterally, as in other basal sauropodomorphs. The blade is proportionally long and narrow, similar to that of *Adeopapposaurus, Plateosaurus* [47], and *Massospondylus,* and differing from the wide scapular blades of *Panphagia* [48], *Lessemsaurus* [49,50] and *Melanorosaurus* [51]. Dorsally, the blade is weakly expanded anteroposteriorly, producing a gently concave

anterior and posterior margin in lateral view. The posterior termination of this expansion forms a sharp corner with the dorsal margin, as in *Plateosaurus* and *Massospondylus* and unlike the more rounded corner of *Adeopapposaurus.* A circular hole, interpreted as pathologic, is present on the dorsal portion of the blade of the left scapula of UMNH VP 18040. Ventrally, the blade expands into the basal portion and its contact with the coracoid (Fig. 5). The anterior margins of the basal portion have been damaged and lost to erosion obscuring the morphology of this region. Anteriorly, the posterior margin of the acromion rises at an angle of less than 65 degrees relative to the long axis of the blade. The basal portion is laterally convex, increasing in thickness mediolaterally toward the coracoid contact. Medially and immediately dorsal to the coracoid contact, a broad semicircular plate of bone projects roughly parallel with the surface of the coracoid (Fig. 6). A similar thickening of this region of the scapula is figured for *Saturnalia* [52], but differs from the plate-like expansion in *Seitaad.* This medial scapular process sweeps posteriorly to contribute, along with the main basal portion of the scapula and the coracoid, to a tri-radiate glenoid surface.

Only the medial surfaces of the strongly overlapping coracoids are visible (Fig. 5). Like the scapula, the anterior margin of the coracoid has been lost to erosion. The medial surface is smooth and concave. As in other sauropodomorphs, the medial margin is strongly convex, curving posteriorly to a sharp posteriorly directed corner. From the posterior corner, the margin turns anteriorly to meet the glenoid surface.

The medial surfaces of both sternal plates are visible, preserved in articulation with the pectoral girdle (Fig. 5). The sternal plates are anteroposteriorly elongate and thin, articulating anteriorly with the posterior corner of the coracoid. Although the sternal plates of other sauropodomorph taxa have been described as elliptical in dorsal or ventral view (e.g., *Adeopapposaurus, Massospondylus,* and *Yunnanosaurus* [13]), the sternal plates of *Seitaad* have three distinct margins, as in *Lufengosaurus* [45]. The medial margin is smoothly arched, beginning at its anterior contact with the



**Figure 4. Dorsal vertebrae of** *Seitaad ruessi* **(UMNH VP 18040).** Shown in left lateral view. Scale bar equals 10 cm. *Osteological abbreviations: D,* dorsal vertebra; *di,* diapophysis; *pa,* parapophysis; *pcdl,* posterior centrodiapophyseal lamina; *poz,* postzygapophysis; *ppdl,* paradiapophyseal lamina; *prz,* prezygapophysis. [planned for page width]
doi:10.1371/journal.pone.0009789.g004

BLM_0064297

Basal Sauropodomorph from Utah



BLM_0064298

**Figure 5. Pectoral and abdominal elements of *Seitaad ruessi* (UMNH VP 18040).** Shown in dorsal view (A) with interpretive line drawing and labels (B). Scale bar equals 10 cm. *Osteological abbreviations*: *as*, astragalus; *ca*, calcaneum; *co*, coracoid; *dt*, distal tarsal; *ga*, gastralia; *h*, humerus; *ra*, radius; *sc*, scapula; *ul*, ulna; *msp*, medial scapular process; *mt*, metatarsal; *st*, sternal plate; *IIi*, digit three; *IV*, digit four. [planned for page width]
doi:10.1371/journal.pone.0009789.g005

coracoid and extending posteriorly to a sharp intersection with the lateral margin. The lateral margin can be separated into two distinct sections, a straight irregularly scalloped section and a smooth anterolaterally directed section. A distinct ridge extends posteromedially over the dorsal surface of the sternal plate, originating at the contact between the two portions of the lateral margin, and separating the medial surface into two distinct planes.

The humerus of *Seitaad* is similar in overall morphology to those of other basal sauropodomorphs. Left and right humeri are preserved in articulation with the pectoral girdle and are exposed along their posterior and lateral surfaces (Figs. 2,3,5,7). The proximal humerus is expanded mediolaterally, with an ellipsoidal proximal head. Medially, the proximal surface is deflected sharply forming a proximomedially directed medial tuberosity. Distal to the medial tuberosity, the humerus is strongly medially concave in posterior view. The deltopectoral crest is prominent, extending anteriorly from the anterolateral edge of the humerus, and extending approximately 50% of the length of the humerus. The anterior edge of the deltopectoral crest is rugose, with a straight proximodistally directed margin. Proximally, the deltopectoral crest is sharply offset from the shaft of the humerus forming a proximally directed spine (Fig. 7A,B). Laterally, a prominent longitudinal ridge extends along the base of the deltopectoral crest to form the lateral margin of the humerus, is similar to the

condition in *Unaysaurus* and, to a lesser extent, in *Massospondylus*, *Asylosaurus* [53], and *Riojasaurus*. Distal to the deltopectoral crest, the humeral shaft is constricted and elliptical in cross-section. The distal humerus expands mediolaterally from this constriction, with a large, robust radial condyle.

The radius is a morphologically simple element, with a length 0.67 times that of the humerus. The proximal end is expanded relative to the shaft, with a simple planar articular surface. The shaft is elliptical cross-section, twisting distally approximately 80 degrees relative to the proximal expansion. The distal articular surface is weakly convex and strongly inclined at an angle of approximately 45 degrees relative to the long axis of the shaft. This morphology differs from other basal sauropodomorphs (e.g., *Adeopapposaurus*, *Massospondylus*, *Plateosaurus*, *Saturnalia*, *Unaysaurus*), in which the distal end is offset from the long axis at an angle greater than 70 degrees. However, this may be accentuated by plastic deformation of the distal end in UMNH VP 18040 that is similar to the distortion of this region observed in *Efraasia* [54].

Portions of both ulnae, including the complete left ulna, are preserved (Fig. 7). In general morphology, the ulna is similar to that of other basal sauropodomorphs, with a length 0.69 times the length of the humerus. The proximal end is triangular in outline, with a shallow depression on the anterolateral surface of the proximal shaft for articulation with the proximal radius. This



**Figure 6. Ventral scapulae and coracoids of *Seitaad ruessi* (UMNH VP 18040).** Shown in dorsal view to highlight the plate-like medial scapular processes. Scale bar equals 5 cm. *Osteological abbreviations*: *co*, coracoid; *h*, humerus; *L*, left; *msp*, medial scapular process; *R*, right; *sc*, scapula; *sccs*, cross section of scalupa blade; *st*, sternal plate. [planned for page width]
doi:10.1371/journal.pone.0009789.g006

BLM_0064299

Basal Sauropodomorph from Utah



**Figure 7. Articulated left arm of *Seitaad ruessi* (UMNH VP 18040).** Shown in anterolateral view (A) and lateral view (C) with interpretive line drawing and labels in anterolateral view (B) and lateral view (D). Scale bar equals 10 cm. *Osteological abbreviations: dc,* distal carpal; *dpc,* deltopectoral crest; *h,* humerus; *im,* intermedium; *ol,* olecranon process; *ra,* radius; *ul,* ulna; *mc,* metacarpal; *I,* digit one; *II,* digit two; *III,* digit three; *IV,* digit four; *V,* digit five. [planned for page width]
doi:10.1371/journal.pone.0009789.g007

BLM_0064300

Basal Sauropodomorph from Utah



**Figure 8. Partial pelvis of *Seitaad ruessi* (UMNH VP 18040).** Shown in anterior/dorsal view (A) and left lateral view (C) with CT-reconstructions in anterior/dorsal view (B) and left lateral views (D). Scale bar equals 10 cm. *Osteological abbreviations: of,* obturator foramen; *p,* pubis; *is,* ischium. [planned for page width]
doi:10.1371/journal.pone.0009789.g008

depression is bounded laterally by a short, rounded lateral crest. Posteriorly, the proximal end expands to form a short, rounded olecranon similar in morphology to those of other basal sauropodomorphs except *Saturnalia* in which it is very large. The shaft is elliptical in section, twisting toward the distally expanded

**Figure 9. Left tibia of *Seitaad ruessi* (UMNH VP 18040).** Shown in anterior view (A) and lateral view (C) with interpretive line drawing and labels in anterior view (B) and lateral view (D). Scale bar equals 10 cm. *Osteological abbreviations: alp,* anterior lateral process; *cn,* cnemial crest; *plp,* posterior lateral process. [planned for column width]
doi:10.1371/journal.pone.0009789.g009

distal articular surface. The distal articular surface is smoothly convex.

The carpus preserves three ossified distal carpals and a small ossified intermedium (Fig. 7). Distal carpal I is robust, with a mediolateral width greater than the mediolateral width of the proximal surface of metacarpal I, similar to other basal sauropodomorphs but in contrast to the relatively smaller distal carpal I of *Adeopapposaurus*. The proximal surface is weakly convex and irregular, with a marked proximodistal thickening laterally toward its articulation with the distal ulna. Distally, distal carpal I articulates with metacarpal I and distal carpal II over a weakly convex surface. Distal carpal II is much smaller, only 0.40 times the mediolateral width of distal carpal I. Within the carpus, distal carpal II is closely articulated with the proximolateral expansion of metacarpal I medially, distal carpal I proximally, and the proximal surface of metacarpal II distally. A small, ossified, irregularly shaped intermedium is exposed lateral to distal carpal II, situated proximal to the medial half of the articular surface of metacarpal III. Laterally, the large distal carpal III is centered proximal to metacarpal IV. The proximal surface of distal carpal III is concave for articulation with the distal ulna and the distal surface is flat to weakly convex for articulation with metatarsals III, IV, and V.

The complete articulated left metacarpus and metacarpals I-III of the right metacarpus are preserved (Fig. 7). Metacarpal I is short and robust, with a proximodistal length 0.77 times the length of metacarpal II and a midshaft width nearly twice that of metacarpal II (1.18 proximal width/length ratio). Proximally, metacarpal I is inset into the carpus, with a prominent proximolateral process articulating laterally with distal carpal II and the proximal surface of metacarpal II. Though an inset metacarpal I is present in many basal sauropodomorphs (e.g., *Adeopapposaurus, Massospondylus, Plateosaurus*), the proximolateral process of *Seitaad* is expanded proximally and laterally beyond the lateral extent of the lateral distal condyle and possesses a

BLM_0064301

Basal Sauropodomorph from Utah



**Figure 10. Left pes of *Seitaad ruessi* (UMNH VP 18040).** Pes shown in dorsal view (A) with interpretive line drawing and labels (B). Tarsus shown in proximal view (C) with interpretive line drawing and labels (D). Scale bar equals 5 cm. *Osteological abbreviations*: *ap*, ascending process; *as*, astragalus; *ca*, calcaneum; *dt*, distal tarsal; *mt*, metatarsal; *I*, digit one; *II*, digit two; *III*, digit three; *IV*, digit four; *V*, digit five. [planned for page width]
doi:10.1371/journal.pone.0009789.g010

distinctly convex proximal surface for articulation with distal carpal I. Distally, metacarpal I is asymmetric, with a distally expanded lateral condyle similar to that of many basal sauropodomorphs. Metacarpal II is the longest of the metacarpals, with moderate expansions of the proximal and distal articular surfaces. Metacarpals III, IV, and V decrease in size sequentially

BLM_0064302



**A**

**B**

**Figure 11. Position of the remains of *Seitaad ruessi* (UMNH VP 18040)**. Position reconstructed as discovered relative to bedding (A) with reconstruction of the specimen (B). White bones exposed on the surface. Scale bar equals 10 cm. [planned for column width]
doi:10.1371/journal.pone.0009789.g011

retaining the same overall proportions, with metacarpal V 0.76 times the length of metacarpal IV. Proximally, all five metacarpals articulate tightly along their medial and lateral surfaces. Distally, the metacarpals diverge, with metacarpal V set nearly perpendicular to metacarpal II as preserved (Fig. 7).

The complete manual phalangeal formula of *Seitaad* is unknown, with the distal portions of digits II and III missing (2-?-?-3-2). The first phalanx of digit I is greatly enlarged and asymmetric, with the transverse axis of the distal articular surface twisted laterally approximately 60 degrees relative to the mediolateral axis of the proximal end. This morphology differs from the significantly less twisted first phalanges of *Efraasia* and *Asylosaurus* but is generally similar to the morphology present in *Massospondylus*, *Unaysaurus*, *Plateosaurus*, *Yunnanosaurus*, and *Anchisaurus*. The second phalanx of digit I consists of a robust, laterally compressed and strongly curved ungual oriented medially within the manus by the combined asymmetry of metacarpal I and of the first phalanx. A

deep longitudinal ridge runs along the medial surface of the ungual distally from the proximal articular facet. Proximally, a well developed flexor tubercle is present on the ventral edge. Portions of the first two phalanges are preserved in digits II and III. The widths of the proximal ends are subequal in size relative to the mediolaterally expanded distal ends. Deep collateral pits are present on the lateral surfaces of the distal condyles. A small medial fragment of the third phalanx of digit III is also present, though more distal phalanges and unguals have been lost in digits II and III. Digit IV preserves three complete phalanges. The first two are similar in overall morphology to the proximal phalanges of digits II and III, though with shallow collateral pits and deeply divided distal condyles. The distalmost ossified phalanx is small and subquadrangular in dorsal outline. Digit V preserves two complete phalanges. The first phalanx is elongate, 0.90 times the length of metacarpal V, and strongly constricted between the proximal and distal surfaces. The distal phalanx is elongate and paddle-shaped, with a flat proximal articulation and a rounded dorsoventrally compressed body. Morphologically, the distal phalanx is much longer than the proximodistally short distal phalanges of other basal sauropodomorphs including *Efraasia*, *Massospondylus*, and *Plateosaurus*.

Much of the dorsal pelvic girdle, including the entire ilium and most of the ischium, has been lost to erosion so that only the pubes are well preserved (Fig. 8). The distal pubic blade is elongate and anteroposteriorly compressed, contacting the contralateral blade along its entire length to form a pubic apron (Fig. 8B). Laterally, each distal blade is thickened, thinning to a lamina toward its medial contact and thus forming a teardrop-shaped transverse section. The pubic apron of *Seitaad* narrows distally, differing from the transversely broad pubic aprons of many basal sauropodomorphs (e.g., *Panphagia*, *Saturnalia*, *Efraasia*, *Massospondylus*, *Melanorosaurus*, *Plateosaurus*, *Riojasaurus*) yet similar to the narrow aprons of *Adeopapposaurus* [20] and *Anchisaurus* (*Ammosaurus*) [17,24]. The distal end of the blade is expanded anteroposteriorly to form a small rugose 'boot.' Proximally, the pubis is thickened toward its contact with the ilium, with a subtriangular cross section. Medially, the proximal end twists to form a dorsoventrally compressed ventral lamina that contacts its antimere medially and the ischium posteriorly. A small elliptical laterally directed obturator foramen (Fig. 8C,D) is present on the lateral surface of the pubis, similar in proportion to the obturator of *Adeopapposaurus* [20]. Only the ventral laminae of the ischia are preserved Both laminae meet at the midline and contact the ventral laminae of the pubes along an anteriorly convex suture.

The complete left tibia is moderately distorted by plastic deformation directed along a proximal/anterior to distal/posterior axis. Generally, the tibia is morphologically similar to the tibiae of other basal sauropodomorphs (Fig. 9). A well developed cnemial crest continuous with the medial surface is present, divided by a shallow fossa from the external prominence laterally. The shaft is straight and elliptical in section, compressed anteroposteriorly. The distal end is expanded mediolaterally, with a well developed anterolateral process and more distally expanded posterolateral process.

The astragalus is subtrapezoidal in dorsal view, with a rounded medial margin expanding laterally to a straight lateral contact with the calcaneum (Fig. 10B), with a similar morphology to *Plateosaurus*, *Massospondylus*, and *Adeopapposaurus* but differing from the mediolaterally short astragalus of *Panphagia* and *Saturnalia* and the anteroposteriorly narrow astragalus of *Efraasia*. The proximal surface consists of an open elliptical fossa with a laterally sloping floor. A subtriangular ascending process originating along the anterolateral margin forms the anterior wall of the proximal fossa;

BLM_0064303

anteromedially, the proximal fossa is open along an anteriorly sloping surface. The lateral surface of the astragalus is weakly concave for contact with the distal fibula.

The calcaneum consists of a proximodistally flattened sub-triangular plate approximately 0.56 times the mediolateral width of the astragalus. The proximal surface is weakly concave for contact with the distal fibula. Distally, the calcaneum articulates with distal tarsal IV.

Two distal tarsals are preserved in the articulated tarsus (Fig. 10). Distal tarsal III is centered over the medial surface of metatarsal III and distal tarsal IV is proximal to the lateral edge of metatarsal III and most of the proximal surface of metatarsal IV. Both distal tarsals articulate proximally with the astragalus and calcaneum.

The first four metatarsals are preserved in articulation (Fig 10A,B). The proximal surfaces are distorted and obscured proximally by the astragalus and distal tarsals. Metatarsal I is the shortest, 0.62 times the length of metatarsal II. Metatarsal II is slightly shorter than the subequal third and fourth metarsals, approximately 0.94 times the length of metatarsal III. Proximally, the metatarsals are mediolaterally expanded, with a laterally imbricating pattern of articulation. The shafts are robust and moderately compressed anteroposteriorly, with elliptical sections. Distally the metatarsals expand to a form a mediolaterally broad distal ginglymus with deep collateral pits on both medial and lateral surfaces. The distal ginglymus of both metatarsals I and II is directed medially at an angle of 10 to 15 degrees relative to the proximal ends. Metatarsal V is either not preserved or not exposed.

The pedal phalanges of the first four digits of the left pes are completely preserved in articulation with a phalangeal formula of 2-3-4-5-? (Fig. 10). The first phalanx of digit I is asymmetric, the transverse axis of its distal end twisted relative to its proximal end. The other pedal phalanges of digits II, III, and IV are similar in morphology, with proximally expanded proximal articular surfaces, and expanded distal condyles with shallow collateral pits. Unlike other basal sauropodomorphs, in which the ungual of digit I is the largest (e.g., *Adeopapposaurus, Massospondylus, Lufengosaurus*), the ungual of digit II is 1.4 times the length of ungual I. The unguals are moderately laterally compressed and triangular, with longitudinal grooves running along the medial and lateral margins.

**Dermal ossifications.** An intact, though distorted gastral array is visible on the medial surface of the ventral abdominal wall (Fig. 5). Distinction between lateral and medial elements is not evident, though an imbricated pattern of overlap between medial elements [55] is evident. The gastralia are elongate and gently curved, with an elliptical, dorsoventrally compressed cross section. Anteriorly, the gastralia are in close association with the sternal plates.

## Discussion

### Preservation

Many vertebrate body fossils from the Navajo Sandstone consist of articulated to partially articulated skeletons deposited in interdune or dune facies [31]. The holotype skeleton of *Seitaad* (UMNH VP 18040) represents one of the most complete vertebrate fossils yet recovered from the Navajo Sandstone and its unique preservation warrants brief discussion here. As exposed on the surface of the canyon wall upon discovery, the remains of *Seitaad* include the cross sections of eroded bone from dorsal vertebrae 3 through 13, as well as the proximal pubes and ventral ischia (Fig. 11). The right forelimb was exposed as an impression along with an accompanying thin film of cortical bone from the scapula through metacarpals I–III. Some distal phalanges of the

left manus were destroyed during excavation. The only preserved element that is not in near articulation is the left tibia, which is rotated 90 degrees on its long axis and displaced by 10 cm from articulation with the astragalus. There is no sign of a left fibula or digit V. Anterior and posterior portions of the skeleton—including the skull, cervical series, caudal region, dorsal pelvis, and femur—are presumed to have been eroded away prior to discovery.

UMNH VP 18040 is preserved in a one meter thick massive sand bed at the base of a 200 m cliff of Navajo Sandstone. The homogenous sand bed represents the first long term onset of Navajo Sandstone in the area. This contact between the Kayenta Formation and Navajo Sandstone illustrates the local switch from a fluvial environment, periodically inundated with tongues of sand erg deposits, to a permanent onset of long term dune activity [56,57]. Locally, the lower Navajo Sandstone is characterized by cross-bedded sandstone interpreted as eolian dune sets. Slumped and massive sandstone beds, sedimentary packages that are locally common in the lower 10 meters of the Navajo Sandstone, are associated with these dune sets and likely indicate dune slumps or collapsed dune faces. These deposits have been identified in other parts of the unit regionally [56]. The sedimentary package preserving UMNH VP 18040 is petrologically identical to laterally equivalent sandstones, but lacks both small and large scale indicators of eolian deposition including forest cross-bedding. The sand bed that preserves UMNH VP 18040 is laterally equivalent to eolian dune sets and is interpreted as a local dune collapse deposit.

Taphonomic preservation of the specimen, with articulation of every preserved bone in place, suggests that the specimen was held together by soft tissues at the time of burial. The orientation of the specimen (40 degrees from horizontal on the mediolateral plane and 85 degrees on the sagittal plane, in a head down position), together with the high degree of articulation, is further suggestive of dune collapse preservation. The partial disassociation of the left tibia and the absence of the fibula and pedal digit V suggest that the animal was dead prior to burial.

### Navajo Sandstone sauropodomorphs

Other fragmentary sauropodomorph remains from the Navajo Sandstone have been referred to *Anchisaurus* (*Ammosaurus*) [17,30], though these referrals have recently come into question [24]. The first sauropodomorph remains reported from this unit [28,29], MNA G2 7233 (now cataloged as MNA V743 through MNA V752), consist of portions of several articulated caudal vertebrae, poorly preserved pubes, a partial right tibia, both articulated pedes, and several articulated gastralia. This specimen is clearly not referable to *Seitaad* because it possesses a broad pubic apron and likely represents an indeterminate taxon given its fragmentary preservation [24]. Another partial sauropodomorph from the Navajo Sandstone, UCMP 82961, consists of two cervical vertebrae and cervical ribs, an articulated left manus, fragments of the right manus, several pedal phalanges, and fragments of the pectoral girdle [31]. Previous authors have mistakenly identified a pedal phalanx and ungual as part of digit I of the manus [i.e., 17,30,31]. Though incomplete, the manus of UCMP 82961 does compare favorably with *Seitaad*, including a proximally expanded lateral process of metacarpal I and an enlarged distal carpal I overlapping distal carpal II. Unfortunately, the specimen is too incomplete to make a confident diagnosis or referral. However, it does preserve enough features to indicate it belongs to the clade Plateosauria *sensu* Yates [24], which includes *Plateosaurus* and all more derived sauropodomorphs.

BLM_0064304

## Phylogenetic position

*Seitaad* is considered a distinct taxon based on several morphologic features of the pectoral girdle and forelimb not present in other basal sauropodomorphs. The distinct, plate-like medial process of the scapula contributing posteriorly to the glenoid surface is autapomorphic. A medial thickening of the scapular glenoid region is figured for *Saturnalia* [52], but does not approach the morphology of the semicircular plate present bilaterally in *Seitaad*. Additionally, the prominent offset proximal hook of the deltopectoral crest is autapomorphic for *Seitaad*. In many basal sauropodomorph taxa, the proximal margin of the deltopectoral crest is offset sharply from the proximal articular surface; however, all other taxa lack the accompanying proximal expansion present in *Seitaad*. Finally, the proximally convex and laterally expanded proximal surface of metacarpal I represents a feature that is absent in other basal sauropodomorph taxa. In other basal sauropodomorphs, the proximal end of metacarpal I is laterally inset into the carpus. However, in these taxa, the lateral margin of the proximal surface does not extend beyond the lateral boundary of the lateral distal condyle or project proximally to the degree present in *Seitaad*.

Relationships among basal sauropodomorphs, or 'prosauropods' have been historically unstable and controversial with some phylogenetic analyses supporting paraphyly of the group with respect to Sauropoda [e.g., 38,46,49,50,58,59,60,61,62,63,64] and other analyses supporting monophyly of all or a reduced subset of 'prosauropods' [e.g., 5,24,65,66,67,68,69,70,71]. However, recent iterations of both datasets have largely converged in their results, agreeing that 'prosauropods' likely represent a paraphyletic assemblage of single lineages and small sub-clades along the stem of Sauropoda [72] though a consensus topology has not yet been achieved. A detailed revision of basal sauropodomorph phylogeny is beyond the scope of this study. In order to assess the phylogenetic position of *Seitaad*, preliminary phylogenetic analyses were performed using two of the most exhaustive datasets published to date representing each of the proposed prosauropod topologies [64,71], as modified by a recent analysis [72]. Both analyses were performed using TNT v. 1.1 [73] with a heuristic search of 1000 replicates of Wagner trees (using random addition sequences) followed by Tree Bisection and Reconnection (TBR) branch swapping (holding 10 trees per replicate).

The phylogenetic analysis of Yates [64] represents one of the most exhaustive published to date in support of prosauropod paraphyly with respect to Sauropoda. In addition to the modifications of Yates et al. [72], additional characters and scorings described by Smith and Pol [10] and the South American saupodomorph *Adeopapposaurus* [20] were included in the analysis (Dataset S1). The analysis resulted in the recovery of 16 MPTs, each with a length of 1173 steps, with a consistency index of 0.358 and a retention index of 0.689. The strict consensus of the 16 MPTs is presented in Fig. 12A. *Seitaad* is recovered as sister to *Adeopapposaurus* from the Lower Jurassic Cañón del Colorado Formation of Argentina. This relationship is supported by four unambiguous synapomorphies: height of neural arches subequal to or greater than the centrum height (Character 164: 0→1); minimum scapula width less than 20 percent its length (Character 200: 1→0); length of deltopectoral crest extends between 30 and 50 percent the length of the humerus (Character 207: 2→1); width of conjoined pubes less than 75 percent their length (Character 259: 1→0). The primary difference between this analyses and previous iterations of the dataset [64,72] is the separation of Massospondylidae (*sensu* [64]) into two separate stem based clades: (*Coloradisaurus* + *Lufengosaurus* + *Glacialisaurus*) and (*Massospondylus* + *Adeopapposaurus* + *Seitaad*).

The analysis of Upchurch et al. [71] represents one of the most comprehensive and complete datasets with results in support of prosauropod monophyly, though the recent modifications to this analysis by Yates et al. [72] recovered a paraphyletic topology with respect to Sauropoda. The analysis was expanded with the addition of the taxa and character modifications of Yates et al. [72] and the inclusion of *Seitaad* and the basal sauropodomorph *Adeopapposaurus* [20] (Dataset S2). The analysis followed the procedures outlined by Upchurch et al. [71] including the treatment of all characters as binary (except character 144 which was treated as an ordered multistate character) and constraining the topology of the non-sauropodomorph outgroup taxa to conform to that of Langer [74]. The phylogenetic analysis resulted in the recovery of 54 most parsimonious trees (MPTs) of 768 steps, with a consistency index of 0.387 and a retention index of 0.659. Exclusion of *Blikanasaurus* from the analysis following Upchurch et al. [71] resulted in the recovery of 18 MPTs of 767 steps, with a consistency index of 0.387 and a retention index of 0.659. Strict consensus of this analysis (Fig. 12B) recovered a *Seitaad* as part of a poorly resolved prosauropod clade in contrast to the recent results of Yates et al. [72]. Support for this clade consists of a single synapomorphy: ratio of proximal width of metacarpal I to length greater than 1.0 (Character 189: 0→1; convergently present in *Melanorosaurus*). With the exception of *Adeopapposaurus*, character 189 is redundant with character 188 in the dataset. Exclusion of character 189 from the analysis reduces the number of MPTs to 8 (762 steps, CI 0.388, RI 0.660) and resolves many of the ingroup relationships among prosauropods in the strict consensus (Fig. 12C), placing *Seitaad* among plateosaurids (*sensu* Upchurch et al. [71]) and sister to a clade that includes *Plateosaurus* and *Riojasaurus*. Support for this clade consists of four unambiguous synapomorphies: strap-shaped scapular blade with subparallel margins in lateral view (Character 157: 1→0; convergently present in *Efraasia, Saturnalia, Lufengosaurus, Shunosaurus, Omeisaurus*); caudal margin of acromion arises at less than 65 degrees from the long axis of the scapular blade (Character 158: 1→0; convergently present in *Thecodontosaurus, Melanorosaurus, Jingshanosaurus, Kotasaurus, Efraasia, Antetonitrus*); craniocaudal length of distal pubic expansion divided by pubis length less than 0.15 (Character 228: 1→0; convergently present in *Saturnalia, Efraasia, Anchisaurus, Antetonitrus*); and ungual on pedal digit I shorter than some pedal phalanges (Character 285: 1→0; convergently present in *Thecodontosaurus* (as *Asylosaurus* [53]), *Saturnalia, Massospondylus*). The recovery of a monophyletic Prosauropoda in this modified Upchurch et al. [71] dataset is notable in context of the recent results of Yates et al. [72] that recovered a paraphyletic assemblage of single lineages and small sub-clades along the stem of Sauropoda. *A posteriori* exclusion of *Adeopapposaurus* suggests that the inclusion of this relatively complete taxon in this analysis causes this shift back to a monophyletic assemblage of prosauropods. However, in this analysis, Prosauropoda does consist of a smaller subset of taxa than in the original iterations of the main dataset [71], with *Anchisaurus* (*Ammosaurus*) and *Gyposaurus* found to be closer to Sauropoda in agreement with the topologies of Yates [24,64] and Yates et al. [72].

The conflicting placement of *Seitaad* among sauropodmorphs in both analyses likely stems from the variable taxon and character sampling among the two analyses and the incomplete nature of the holotype of *Seitaad*. Both analyses are heavily weighted with cranial and vertebral characters that cannot be evaluated for *Seitaad*. Nevertheless, both analyses support inclusion of *Seitaad* in the clade Plateosauria *sensu* Yates [64] as a derived taxon closely related to either *Plateosaurus* and other plateosaurids or *Adeopapposaurus* and *Massospondylus* in a reduced Massospondylidae. Further, the

BLM_0064305

Basal Sauropodomorph from Utah



**Figure 12. Phylogenetic analyses of basal sauropodomorph dinosaurs including *Seitaad ruessi*.** Analyses are based on the datasets of Yates [64] showing the strict consensus of 16 MPTs (A) and Upchurch et al. [71], showing the strict consensus of 18 MPTs (B) and the topology of Prosauropoda in the strict consensus of 8 MPTs with the exclusion of Character 189 (C). Both analyses are modified according to Yates [72] and include additional taxa. Relationships among all non-sauropodomorph taxa (here collapsed into a collective 'outgroups') are identical to those recovered in their respective analyses. [planned for page width]
doi:10.1371/journal.pone.0009789.g012

analyses do not support close association between *Seitaad* and the eastern North American taxon *Anchisaurus* (*Ammosaurus*) as has been suggested for other sauropodomorph remains from the Navajo Sandstone [17,30].

### Biogeographic implications

The recovery of *Seitaad* from the Navajo Sandstone of Utah represents the first diagnosable sauropodomorph material from the Early Jurassic of western North America. Unfortunately, the lack of phylogenetic resolution in analyses of sauropodomorphs including *Seitaad* precludes meaningful biogeographic interpretations. Globally, Early Jurassic basal sauropodomorphs are widely distributed and include taxa from South America (*Adeopapposaurus* [20]), Asia (*Lufengosaurus*, *Jingshanosaurus*. "*Gyposaurus sinensis*", *Ynenosaurus*, and *Yunnanosaurus* [11,12,13,14,15,45]), Antarctica (*Glacialisaurus* [10]), Africa (*Massospondylus*, *Gryponyx africanus*, *Aardonyx* [3,4,43,72]), and eastern North America (*Anchisaurus* [17,24]). These occurrences can be loosely grouped into 'eastern' (Asia) and 'southern' (southern South America, southern Africa, Antarctica) regions, with Early Jurassic continental reconstructions placing North America and Europe in an intermediate position between these regions [75]. Previous attempts to draw biogeographic inferences among continental vertebrates from this time period recovered a pattern of worldwide faunal homogeneity [76].

Morphological similarities between *Seitaad* and plateosaurid and massospondylid taxa are therefore not unexpected given the cosmopolitan distribution of other members of the clade and the intermediate position of North America. The possible close relationship between *Seitaad* and the Early Jurassic 'southern' taxa *Adeopapposaurus* and *Massospondylus* is notable given previous inferred links between these two areas based on sauropodomorph specimens [2,6,16] and theropod specimens [76] from the underlying Kayenta Formation. Ultimately, further resolution of the phylogenetic position of *Seitaad* and a more thorough understanding of other basal sauropodomorph remains from the Kayenta Formation [2,6,16,27] will permit better insight into the role of this biogeographically significant region in analyses of Early Jurassic continental biotas.

### Nomenclatural Acts

The electronic version of this document does not represent a published work according to the International Code of Zoological Nomenclature (ICZN), and hence the nomenclatural acts contained herein are not available under that Code from the electronic edition. A separate edition of this document was produced by a method that assures numerous identical and durable copies, and those copies were simultaneously obtainable (from the publication date listed on page 1 of this article) for the

BLM_0064306

purpose of providing a public and permanent scientific record, in accordance with Article 8.1 of the Code. The separate print-only edition is available on request from PLoS by sending a request to PLoS ONE, 185 Berry Street, Suite 3100, San Francisco, CA 94107, USA along with a check for $10 (to cover printing and postage) payable to "Public Library of Science".

The online version of the article is archived and available from the following digital repositories: PubMedCentral (www.pubmed-central. nih.gov/), and LOCKSS (http://www.lockss.org/lockss/). In addition, this published work and the nomenclatural acts it contains have been registered in ZooBank (http://www.zoobank.org/), the proposed online registration system for the ICZN. The ZooBank LSIDs (Life Science Identifiers) can be resolved and the associated information viewed through any standard web browser by appending the LSID to the prefix "http://zoobank.org/". The LSID for this publication reads as follows: pub:498FF4CB-D04B-409D-B255-AFB09268BDE8

## Supporting Information

**Dataset S1**   Nexus file of the character-taxon matrix used for the phylogenetic analysis based on Yates [2007] as modified by Yates et al. [2010] and with the additional characters of Smith and Pol [2007].
Found at: doi:10.1371/journal.pone.0009789.s001 (0.02 MB TXT)

**Dataset S2**   Nexus file of the character-taxon matrix used for the phylogenetic analysis based on Upchurch et al. [2007] as modified by Yates et al. [2010].
Found at: doi:10.1371/journal.pone.0009789.s002 (0.01 MB TXT)

## Acknowledgments

We wish to thank J. Pachak for alerting the Bureau of Land Management and Utah Museum of Natural History to the location of the type specimen. Thanks also to the Bureau of Land Management field office in Blanding, Utah for their assistance in organizing the recovery of the type specimen. Special thanks to J. Golden for his expert preparation of the specimen and for his dedication to paleontology in the state of Utah. We would also like to thank J. Blackwelder, A. A. Farke, J. Gentry, M. A. Getty, E. Lund, S. D. Sampson, J. A. Smith, J. Vincent, and other crew members for their work in the field. Thanks to K. Sanders and the University of Utah medical CT facilities for specimen scanning. Thanks to N. C. Maryboy and D. Begay for assistance with nomenclature. For access to collections in their care we thank J. A. Gauthier, D. D. Gillette, J. Gillette, P. Holroyd, and W. G. Joyce. R. B. Irmis, M. A. Getty, and S. D. Sampson provided valuable discussion that greatly improved the quality of the manuscript. Thanks to P. M. Galton and an anonymous reviewer for helpful comments and thorough reviews.

## Author Contributions

Analyzed the data: JJWS MAL. Wrote the paper: JJWS MAL.

## References

1. Cooper MR (1984) A reassessment of *Vulcanodon karibaensis* Raath (Dinosauria: Saurischia) and the origin of the Sauropoda. Palaeontologia Africana 25: 203–231.
2. Gow CE (1990) Morphology and growth of the *Massospondylus* braincase (Dinosauria: Prosauropoda). Palaeontologia Africana 27: 59–75.
3. Gauffre FX (1993) The most recent Melanorosauridae (Saurischia, Prosauropoda), Lower Jurassic of Lesotho with remarks on the prosauropod phylogeny. Neues Jahrbuch für Geologie und Paläontologie Monatshefte 11: 648–654.
4. Barrett PM (2004) Sauropodomorph dinosaur diversity in the upper Elliot Formation (*Massospondylus* range zone: Lower Jurassic) of South Africa. South African Journal of Science 100: 501–503.
5. Galton PM, Upchurch P (2004) Prosauropoda. In: Weishampel DB, Dodson P, Osmólska H, eds. The Dinosauria, second edition. Berkeley: University of California Press. pp 232–258.
6. Sues HD, Reisz RR, Hinic S, Raath MA (2004) On the skull of *Massospondylus carinatus* Owen, 1854 (Dinosauria: Sauropodomorpha) from the Elliot and Clarens formations (Lower Jurassic) of South Africa. Annals of Carnegie Museum 73: 239–257.
7. Vasconcelos CC, Yates AM (2004) Sauropodomorph biodiversity of the upper Elliot Formation (Lower Jurassic) of southern Africa. Geoscience Africa, Abstract Volume 2: 670. University of the Witwatersrand, Johannesburg, South Africa.
8. Barrett PM, Yates AM (2006) New information on the palate and lower jaw of *Massospondylus* (Dinosauria: Sauropodomorpha). Palaeontologia Africana 41: 123–130.
9. Yates AM, Bonnan MF, Neveling J, Chinsamy A, Blackbeard MG (2009) A new transitional sauropodomorph dinosaur from the Early Jurassic of South Africa and the evolution of sauropod feeding and quadrupedalism. Proceedings of the Royal Society of London B.
10. Smith ND, Pol D (2007) Anatomy of a basal sauropodomorph dinosaur from the Early Jurassic Hanson Formation of Antarctica. Acta Palaeontologia Polonica 52: 657–674.
11. Young CC (1941) Acomplete osteology of *Lufengosaurus huenei* Young (gen. et sp. nov.). Palaeontologica Sinica, series C 7: 1–53.
12. Young CC (1941) *Gyposaurus sinensis* (sp. nov.), a new Prosauropoda from the Upper Triassic Beds at Lufeng, Yunnan. Bulletin of the Geological Society of China 21: 205–253.
13. Young CC (1942) *Yunnanosaurus huangi* (gen. et sp. nov.), a new Prosauropoda from the Red Beds at Lufeng, Yunnan. Bulletin of the Geological Society of China 22: 63–104.
14. Bai Z, Yang J, Wang G (1990) *Yimenosaurus*, a new genus of Prosauropoda from Yimen County, Yunnan province. Yuxiwenebo (Yuxi Culture and Scholarship) 1: 14–23.
15. Zhang Y, Yang Z (1994) A Complete Osteology of Prosauropoda in Lufeng Basin Yunnan China. Jingshanosaurus. Kunming: Yunnan Science and Technology Publishing House. 100 p.
16. Attridge J, Crompton AW, Jenkins FA, Jr. (1985) The southern African Liassic prosauropod *Massospondylus* discovered in North America. Journal of Vertebrate Paleontology 5: 128–132.
17. Galton PM (1976) Prosauropod dinosaurs (Reptilia: Saurischia) of North America. Postilla 169: 1–98.
18. Fedak TJ (2006) A rich bone bed of sauropodomorph dinosaurs in the Early Jurassic (Hettangian) McCoy Brook Formation. Journal of Vertebrate Paleontology 26 (supplement to 3): 60A.
19. Martinez RN (1999) The first South American record of Massospondylus (Dinosauria: Sauropodomorpha). Journal of Vertebrate Paleontology 19(3): 61A.
20. Martinez RN (2009) *Adeopapposaurus mognai*, gen. et sp. nov. (Dinosauria: Sauropodomorpha), with comments on adaptations of basal Sauropodomorpha. Journal of Vertebrate Paleontology 29: 142–164.
21. Nesbitt SJ, Irmis RB, Parker WG (2007) A critical re-evaluation of the Late Triassic dinosaur taxa of North America. Journal of Systematic Palaeontology 5: 209–243.
22. Irmis RB, Nesbitt SJ, Padian K, Smith ND, Turner AH, et al. (2007) A Late Triassic Dinosauromorph Assemblage from New Mexico and the Rise of Dinosaurs. Science 317: 358–361.
23. Nesbitt SJ, Smith ND, Irmis RB, Turner AH, Downs A, et al. (2009) A complete skeleton of a Late Triassic saurischian and the early evolution of dinosaurs. Science 326: 1530–1533.
24. Yates AM (2004) *Anchisaurus polyzelus* (Hitchcock): The smallest known sauropod dinosaur and the evolution of gigantism among sauropodomorph dinosaurs. Postilla 230: 1–58.
25. Fedak T, Galton PM (2007) New information on the braincase and skull of *Anchisaurus polyzelus* (Lower Jurassic, Connecticut, USA; Saurischia: Sauropodomorpha): implications for sauropodomorph systematics. In: Barrett PM, Batten DJ, eds. Evolution and Palaeobiology of Early Sauropodomorph Dinosaurs. Special Papers in Palaeontology 77: 245–260.
26. Shubin NH, Olsen PE, Sues HD (1994) Early Jurassic small tetrapods from the McCoy Brook Formation of Nova Scotia, Canada. In: Fraser NC, Sues HD, eds. In the Shadow of the Dinosaurs. Cambridge: Cambridge University Press. pp 242–250.
27. Tykoski RS (2005) Vertebrate paleontology in the Arizona Jurassic. Mesa Southwest Museum Bulletin 11: 72–93.
28. Brady LF (1935) Preliminary note on the occurrence of a primitive theropod in the Navajo. American Journal of Science 30: 210–215.
29. Brady LF (1936) A note concerning the fragmentary remains of a small theropod recovered from the Navajo Sandstone in northern Arizona. American Journal of Science 31: 150–215.
30. Galton PM (1971) The prosauropod dinosaur *Ammosaurus*, the crocodile *Protosuchus*, and their bearing on the age of the Navajo Sandstone of Northeastern Arizona. Journal of Paleontology 45: 781–795.
31. Irmis RB (2005) A review of the vertebrate fauna of the lower Jurassic Navajo Sandstone in Arizona. In: McCord RD, ed. Vertebrate Paleontology of Arizona. Mesa Southwest Museum Bulletin 11: 55–71.


BLM_0064307

32. Loewen MA, Sertich JJ, Sampson SD, Getty MA (2005) Unusual preservation of a new sauropodomorph from the Navajo Sandstone of Utah. Journal of Vertebrate Paleontology 25(3): 84A.
33. Wilson JA (2006) Anatomical nomenclature of fossil vertebrates: standardized terms or 'lingua franca'? Journal of Vertebrate Paleontology 24: 511–518.
34. Wilson JA (1999) A nomenclature for vertebral laminae in sauropods and other saurischian dinosaurs. Journal of Vertebrate Paleontology 19: 639–653.
35. Owen R (1842) Report on British fossil reptiles.Part II. Report of the British Association for the Advancement of Science 1841 60–204. pp 60–204.
36. Padian K, May CL (1993) The earliest dinosaurs. In: Lucas SG, Morales M, eds. The Nonmarine Triassic. New Mexico Museum of Natural History and Science Bulletin 3: 379–381.
37. Seeley HG (1887) On the classification of the fossil animals commonly named Dinosauria. Proceedings of the Royal Society of London 43: 165–171.
38. Gauthier J (1986) Saurischian monophyly and the origin of birds. In: Padian K, ed. The Origin of Birds and the Evolution of Flight. Memoirs of the California Academy of Science 8: 1–55.
39. von Huene F (1932) Die forrile Reptil−Ordnung Saurischia, ihre Entwicklung und Geschichte. Monographien zur Geologie und Palaeontologie,Series 1 4: 1–361.
40. Middleton LT, Blakey RC (1983) Processes and controls on the intertonguing of the Kayenta and Navajo Formations, northern Arizona: eolian–fluvial interactions. In: Brookfield ME, Ahlbrandt TS, eds. Eolian Sediments and Processes. Amsterdam: Elsevier Science Publishers. pp 613–634.
41. Blakey RC (1994) Paleogeographic and tectonic controls on some Lower and Middle Jurassic erg deposits, Colorado Plateau. In: Caputo MV, Peterson JA, Fanczyk KJ, eds. Mesozoic Systems of the Rocky Mountain Region, USA. Rocky Mountain Section. Denver: Society for Sedimentary Geology. pp 273–298.
42. Lucas SG, Heckert AB, Tanner LH (2005) Arizona's Jurassic vertebrates and the age of the Glen Canyon Group. New Mexico Museum of Natural History and Science Bulletin 29: 95–104.
43. Cooper MR (1981) The prosauropod dinosaur *Massospondylus carinatus* Owen from Zimbabwe: Its biology, mode of life and phylogenetic significance. Occasional Papers of the National Museums and Monuments of Rhodesia (Series B) 6: 689–840.
44. Bonaparte JF (1972) Los tetrápodos del sector superior de la Formación Los Colorados, La Rioja, Argentina (Triásico Superior). Opera Lillona 22: 1–183.
45. Young CC (1947) On *Lufengosaurus magnus* Young (sp. nov.) and additional finds of *Lufengosaurus huenei* Young. Palaeontologica Sinica, series C 12: 1–53.
46. Leal LA, Azevedo SAK, Kellner AWA, Da Rosa ÁAS (2004) A new early dinosaur (Sauropodomorpha) from the Caturrita Formation (Late Triassic), Paraná Basin, Brazil. Zootaxa 690: 1–24.
47. von Huene F (1926) Vollständige osteologie eines Plateosauriden aus demschwäbischen Keuper. Geologische und Palaeontologische Abhandlungen Neue Folge 15: 137–180.
48. Martinez RN, Alcober OA (2009) A basal sauropodomorph (Dinosauria: Saurischia) from the Ischigualasto Formation (Triassic, Carnian) and the early evolution of Sauropodomorpha. Plos One 4: e4397. doi 10.1371/journal.pone.0004397.
49. Bonaparte JF (1999) Evolución de las vértebras presacras en Sauropodomorpha. Ameghiniana 36: 115–187.
50. Pol D, Powell JE (2005) New information on *Lessemsaurus sauropoides* (Dinosauria, Sauropodomorpha) from the Late Triassic of Argentina. Journal of Vertebrate Paleontology 25 (Supplement to 3): 100A–101A.
51. van Heerden J, Galton PM (1997) The affinities of *Melanorosaurus*, a Late Triassic prosauropod dinosaur from South Africa. Neues Jahrbuch für Geologie und Paläontologie, Monatshefte 1: 39–55.
52. Langer MC, Franca MAG, Gabriel S (2007) The pectoral girdle and forelimb anatomy of the stem-sauropodomorph *Saturnalia tupiniquim* (Upper Triassic, Brazil). In: Barrett PM, Batten DJ, eds. Evolution and Palaeobiology of Early Sauropodomorph Dinosaurs. Special Papers in Palaeontology 77: 113–137.
53. Galton PM (2007) Notes on the remains of archosaurian reptiles, mostly basal sauropodomorph dinosaurs, from the 1834 fissure fill (Rhaetian, Upper Triassic) at Clifton in Bristol, southwest England. Revue de Paléobiologie, Genève 26: 505–591.
54. Galton PM (1973) On the anatomy and relationships of *Efraasia diagnostica* (Huene) n. gen., a prosauropod dinosaur from the Upper Triassic of Germany. Paläontologische Zeitschrift 47: 229–255.
55. Claessens LPAM (2004) Archosaurian respiration and the pelvic girdle aspiration breathing of crocodyliforms. Proceedings of the Royal Society of London B 271: 1461–1465.
56. Blakey RC, Peterson F, Kocurek G (1988) Synthesis of late Paleozoic and Mesozoic aeolian deposits of the Western Interior of the United States. Sedimentary Geology 56: 3–125.
57. Loope DB, Rowe CM (2003) Long-lived pluvial episodes during deposition of the Navajo Sandstone. Journal of Geology 111: 223–232.
58. von Huene F (1929) Kurze Übersicht über die Saurischia und ihre natürlichen Zusammenhänge. Paläontologische Zeitschrift 11: 269–273.
59. Colbert EH (1964) Relationships of saurischian dinosaurs. American Museum Novitiates, 2181: 1–24.
60. Romer AS (1968) Notes and comments on vertebrate paleontology. Chicago: University of Chicago Press. 304 p.
61. Bonaparte JF (1969) Comments on early saurischians. Zoological Journal of the Linnean Society of London 48: 471–480.
62. Bonaparte JF (1986) The early radiation and phylogenetic relationships of the Jurassic sauropod dinosaurs, based on vertebral anatomy. In: Padian K, ed. The beginning of the age of dinosaurs. Cambridge: Cambridge University Press. pp 247–258.
63. Yates AM (2003) A new species of the primitive dinosaur *Thecodontosaurus* (Saurischia: Sauropodomorpha) and its implications for the systematics of early dinosaurs. Journal of Systematic Palaeontology 1: 1–42.
64. Yates AM (2007) The first complete skull of the Triassic dinosaur *Melanorosaurus* Haughton (Sauropodomorpha: Anchisauria). In: Barrett PM, Batten DJ, eds. Evolution and Palaeobiology of Early Sauropodomorph Dinosaurs. Special Papers in Palaeontology 77: 9–55.
65. Cruickshank AR (1975) The origin of sauropod dinosaurs. South African Journal of Science 71: 89–90.
66. Sereno PC (1989) Prosauropod monophyly and basal sauropodomorph phylogeny. Journal of Vertebrate Paleontology 9(3): 38A.
67. Sereno PC (1999) The evolution of dinosaurs. Science 284: 2137–2147.
68. Wilson JA, Sereno PC (1998) Early evolution and higher-level phylogeny of sauropod dinosaurs. Society of Vertebrate Paleontology Memoir 5: 1–68.
69. Yates AM, Kitching JW (2003) The earliest known sauropod dinosaur and the first steps towards sauropod locomotion. Proceedings of the Royal Society of London B 270: 1753–1758.
70. Barrett PM, Upchurch P, Wang XL (2005) Cranial osteology of *Lufengosaurus huenei* Young (Dinosauria: Prosauropoda) from the Lower Jurassic of Yunnan, People's Republic of China. Journal of Vertebrate Paleontology 25: 806–822.
71. Upchurch P, Barrett PM, Galton PM (2007) A phylogenetic analysis of basal sauropodomorph relationships: implications for the origin of sauropod dinosaurs. In: Barrett PM, Batten DJ, editors. Evolution and Palaeobiology of Early Sauropodomorph Dinosaurs. Special Papers in Palaeontology 77: 57–90.
72. Yates AM, Bonnan MF, Neveling J, Chinsamy A, Blackbeard MG (2010) A new transitional sauropodomorph dinosaur from the Early Jurassic of South Africa and the evolution of sauropod feeding and quadrupedalism. Proceedings of the Royal Society of London B 277: 787–794.
73. Goloboff P, Farrish J, Nixon K (2003) T.N.T. Tree Analysis Using New Technology. Available: http://www.zmuc.dk/public/phylogeny.
74. Langer MC (2004) Basal Saurischia. In: Weishampel DB, Dodson P, Osmolska H, eds. The Dinosauria. Berkeley: University of California Press. pp 25–46.
75. Smith AG, Smith DG, Funnell BM (1994) Atlas of Mesozoic and Cenozoic coastlines. Cambridge: Cambridge University Press. 99 p.
76. Smith ND, Makovicky PJ, Pol D, Hammer WR, Currie PJ (2007) The dinosaurs of the Early Jurassic Hanson Formation of the central Transantarctic Mountains: phylogenetic review and synthesis. U.S. Geological Survey and the National Academies, Short Research Paper 003: doi:10.3133/of2007–1047.srp003.
77. USGS (2009) Southern Colorado Plateau Region: Geology. Available: http://geomaps.wr.usgs.gov/navajo/4corners/maps/geology_labels_towns.html. Accessed 2010 January 20.

Case No. 1:20-cv-02484-MSK   Document 47-9   filed 04/28/21   USDC Colorado   pg 32 of 218



Special Publication 12
1979

# Nature's Building Codes
## Geology and Construction in Colorado
### BY DAVID C. SHELTON AND DICK PROUTY

Colorado Department of Natural Resources
COLORADO GEOLOGICAL SURVEY
John W. Rold, Director

with assistance from the
COLORADO LAND USE COMMISSION

BLM_0064309

Special Publication 12
1979



# Nature's Building Codes
## Geology and Construction in Colorado
### BY DAVID C. SHELTON AND DICK PROUTY

Colorado Department of Natural Resources
COLORADO GEOLOGICAL SURVEY
John W. Rold, Director

with assistance from the
COLORADO LAND USE COMMISSION

The preparation of this report was financed in part through a Comprehensive Planning grant from the Department of Housing and Urban Development, under the provisions of Section 701 of the Housing Act of 1954, as amended. The report was completed in August of 1979 and was administered through the Colorado Division of Planning. Additional assistance in funding of the report was provided by the Colorado Land Use Commission. The planning area involved covers the entire state of Colorado.

BLM_0064310

# Introduction

Americans sustain more than $1 billion in damages annually from landslides, mudflows, subsidence, avalanches, and other common earth movements. The cost figures do not include earthquakes or loss of life. While no similar figures have been compiled for Colorado, the price tag is in the millions of dollars. In California, where geologic hazards and improper construction practices associated with them also abound, planning officials project $300 million annually in damages and related geologic hazard costs--nearly $3 billion in a decade.

At the same time the planners believe the losses "could be reduced 90 percent or more by a combination of measures involving adequate geologic interpretations, good engineering practice, and effective enforcement of legal restraints on land use and disturbance."[1]

The situation is put further into perspective by the conclusion that "although slope failures generally are not so spectacular or costly as certain other natural catastrophes such as earthquakes, major floods, and tornadoes, they are more widespread and the total financial loss due to slope failures (landslides, etc.) is probably greater than that for any other geologic hazard to mankind."[1]

Another national study of nine natural hazards estimated the losses in the tens of billions of dollars. It forecast accelerated property damage and deaths unless mitigation measures are initiated. It categorically predicted marked reductions of losses (up to 85 percent) by implementing geologic investigations, building and siting requirements that acknowledge and compensate for known hazard areas.[2]

---

[1] Landslides: Analysis and Control, Special Report 176, Robert L. Schuster and Raymond J. Krizek, editors; National Academy of Sciences, 1978; 234 p.

[2] "Natural Hazards--Earthquake, Landslide, Expansive Soil Loss Models," John H. Wiggins, James E. Slosson, James P. Krohn; and "Building Losses from Natural Hazards: Yesterday, Today and Tomorrow," Daniel H. Baer; J.H. Wiggins Company, 1650 South Pacific Highway, Redondo Beach, CA, 90277; December 1978.

1

BLM_0064311

# A BURNING QUESTION:
# THE EFFECTS OF FIRE AND FIRE MANAGEMENT
# ON CULTURAL RESOURCES

Richard D. Shultz



BLM_0064312

Signature Page.

ii

BLM_0064313

Copyright Page.

iii

BLM_0064314

Authorization for Reproduction page.

iv

BLM_0064315

Acknowledgements Page.

BLM_0064316

vi

BLM_0064317

# CONTENTS

Chapter 1 – Introduction ..............................................................................................1
  Regulatory Context...............................................................................................1
  Project Area Location and Description ................................................................1
  Project Scope and Agreement .............................................................................3
    Methods and Project Personnel......................................................................3
      Methods.....................................................................................................3
      Project Personnel......................................................................................4

Chapter 2 – Project Setting ..........................................................................................5
  Natural Setting .....................................................................................................5
    Physiographic Zones......................................................................................5
      Fault Zone .................................................................................................5
      Inverness Ridge........................................................................................5
      Rolling Hills..............................................................................................8
      Point Reyes Promontory ..........................................................................9
      Estuaries and Beaches .............................................................................9
    Climate...........................................................................................................9
    Paleoclimatic Change.....................................................................................9
    Biotic Environment......................................................................................11
      Fault Zone ...............................................................................................13
        Role of Fire.........................................................................................13
      Inverness Ridge......................................................................................13
        Role of Fire.........................................................................................14
      Rolling Hills............................................................................................14
        Role of Fire.........................................................................................15
      Estuaries and Beaches ...........................................................................15
        Role of Fire.........................................................................................16
      Fire Intervals for Biotic Zones ...............................................................16

Chapter 3 – Cultural Contexts .....................................................................................19
  Prehistoric Context ............................................................................................19
    Research Issues .............................................................................................19
    Archaeological Work in the PRNS...............................................................20
  Ethnographic Context......................................................................................... 24
  Historical Context .............................................................................................. 26
  Types of Resources Expected Within the PRNS ..................................................31
    Fault Zone ....................................................................................................31
    Inverness Ridge ...........................................................................................31
    Rolling Hills..................................................................................................31
    Point Reyes Promontory...............................................................................32
    Estuaries and Beaches..................................................................................32
  Past Use of Fire in California and the PRNS ....................................................... 32
    Native American Burning Practices...............................................................32
    Historic-period Fire Use ...............................................................................37

Chapter 4 –Fire and Fire Behavior ..............................................................................43

BLM_0064318

Basic Fire Concepts ........................................................................................................... 43

Chapter 5 – Effects of Fire and Fire Management ................................................................46
Direct, Operational, and Indirect Effects ........................................................................ 46
Direct Effects. ..........................................................................................................46
Flaked Stone.......................................................................................................46
Groundstone.......................................................................................................48
Glass...................................................................................................................49
Metal ..................................................................................................................49
Historic-era Ceramics..........................................................................................51
Cement, Brick, and Cinder Block.........................................................................51
Rubber and Plastic ..............................................................................................51
Rock Art and Spiritual Resources ........................................................................51
Shell....................................................................................................................52
Bone....................................................................................................................53
Pollen and Archaeobotanical Remains ...............................................................54
Organic Residues ................................................................................................54
Wooden Features and Artifacts ..........................................................................55
Vegetation ..........................................................................................................55
Packrat Middens .................................................................................................56
Fibers and Hides .................................................................................................56
Leather................................................................................................................56
Operational Effects...................................................................................................56
Staging................................................................................................................57
Fire Lines.............................................................................................................58
Ignition Techniques ............................................................................................58
Fire Retardants ...................................................................................................59
Mop-up and Rehabilitation ................................................................................60
Indirect Effects .........................................................................................................61
Looting................................................................................................................61
Increased Surface Runoff and Erosion................................................................62
Increased Tree Mortality....................................................................................62
Increased Burrowing Rodent and Insect Populations .........................................63
Increased Microbial Populations ........................................................................63
Carbon Contamination.......................................................................................63

Chapter 6 – Field Observations .........................................................................................65

Chapter 7 – Recommendations..........................................................................................66
General Recommendations............................................................................................ 66
Mitigation Measures for Wildfire ................................................................................. 68
Mitigation Measures for Prescribed Fire ...................................................................... 69
Fuel Reduction .........................................................................................................69
Surface Collection ....................................................................................................70
Mitigation Measures for Manual and Mechanical Thinning ..........................................72
Treating Cultural Landscapes....................................................................................72
Hand Clearing Resources ..........................................................................................73
Application of Herbicides ..........................................................................................73
Undiscovered Resources ...........................................................................................73

BLM_0064319

Mitigation Measures for Indirect Effects ........................................................ 74
    Runoff and Erosion ......................................................................................74
    Ailing Trees ...................................................................................................74
    Looting............................................................................................................74
The Wildland-Urban Interface .......................................................................... 75

Refferences Cited .....................................................................................................78

Appendix (HPD) ......................................................................................................100

Figures
    1. Project Area and Vicinity ............................................**Error! Bookmark not defined.**
    2. Physiographic Zones of the Point Reyes Area ..........**Error! Bookmark not defined.**
    3. Distribution of Major Geologic Deposits ..................**Error! Bookmark not defined.**
    4. Timing and Extent of Sea-Level Rise ........................**Error! Bookmark not defined.**
    5. Distribution of Major Vegetation Communities .......**Error! Bookmark not defined.**
    6. Prehistoric Settlement Patterns ..................................**Error! Bookmark not defined.**
    7. Ranch Names and Locations in the Olema Valley and Lagunitas Canyon .....**Error! Bookmark not defined.**
    8. Ranch Names and Locations within the Point Reyes National Seashore ........**Error! Bookmark not defined.**


Tables
    1. Fire Intervals for Certain Habitats .............................................................. 17
    2. Fire Intervals in Communities with Coyote Bush ..................................... 18
    3. Diagnostic Traits of Coastal Marin County Facies .................................... 21
    4. Coast Miwok Seasonal Resource Procurement ........................................ 26
    5. Partial History of Fires in the Golden Gate National Recreation Area. ................ 38
    6. Partial History of Fires in the Point Reyes National Seashore. .............................. 40
    7. Partial History of Fires in Marin County. .................................................. 41
    8. Maximum Surface, Litter, and Soil Temperatures .................................... 45
    9. Melting Points of Metal Materials ............................................................. 50
    10. Partial List of WUI Projects in Marin County. .......................................... 75
    11. Wildland-Urban Interface Project Areas and Cultural Resources. ......................... 76

BLM_0064320

BLM_0064321

# CHAPTER 1 – INTRODUCTION

## REGULATORY CONTEXT

The document that formed the basis of this thesis was developed under a cooperative agreement between the National Park Service and the Sonoma State University Academic Foundation, Inc., and was charged with addressing the effects of fire and fire management on cultural resources within the Point Reyes National Seashore, and to present recommendations for the mitigation of negative effects on significant resources. For the purposes of federal-level undertakings, the significance of a cultural resource is defined by its inclusion, or eligibility for inclusion, in the National Register of Historic Places (NRHP). While the PRNS has been extensively surveyed in some areas, and some research has been conducted on the numerous ranches and farms, the Seashore has not been systematically examined for all possible cultural resources. Additionally, those resources that have been identified within the PRNS have yet to be evaluated for inclusion in the NRHP. To avoid negative effects to significant resources, all resources are considered potentially eligible for inclusion in the NRHP unless formally evaluated otherwise. The process of evaluating the NRHP eligibility of cultural resources is described in detail in a series of bulletins produced by the NPS (e.g., NPS 1995).

Point Reyes National Seashore, along with all other NPS units that possess "vegetation capable of burning," has been directed to prepare a plan to guide a fire-management program that is responsive to the park's natural and cultural resource objectives and to safety considerations for park visitors, employees, and developed facilities (NPS 1998a). Director's Order #18 ([DO #18] NPS 1998a) and Reference Manual #18 ([RM #18] NPS 1999) provide the authority and the guidance, respectively, for fire-management-plan implementation. The document presented to the PRNS, concerning fire effects on cultural resources, had been produced in accordance with RM #18, and may be used as part of a forthcoming Fire Management Plan for the PRNS.

## PROJECT AREA LOCATION AND DESCRIPTION

Encompassing some 71,086 acres of west Marin County, California (Figure 1), approximately 40 miles northwest of the Golden Gate, the PRNS was formally created on 16 September 1972, nearly 10 years to the day after being authorized by President John F. Kennedy (PL 87-657 [S. 476]). Beginning with the initial authorization of 64,000 acres, PRNS gradually expanded to its present size through the 1970s and early 1980s (Livingston 1994:74-75). It complements the adjacent NPS-administered Golden Gate National Recreation Area (GGNRA), forming a substantial buffer against the developmental pressures placed on lands in the northern San Francisco Bay Area over the past three decades.

Today, the PRNS attracts millions of visitors (2,254,465 in fiscal year 2002 [NPS 2003a]) to its scenic splendors, which range from barely accessible rugged coastlines and

1

*EFFECTS OF FIRE AND FIRE MANAGEMENT*
*ON CULTURAL RESOURCES*



Point Reyes National Seashore
Fire Management and Cultural Resources

**Figure 1**

**Project Area and Vicinity**

2

BLM_0064323

isolated mountain peaks, to its more easily reached, yet primitive, campgrounds and windswept beaches, and its historic-period ranching landscapes.

## PROJECT SCOPE AND AGREEMENT

A Cooperative Agreement was entered into between the Department of Interior, National Park Service, Point Reyes National Seashore, and the Sonoma State University Academic Foundation, Inc., for assistance and collaboration in archeological studies and initiatives. The current work has been conducted under Project Statement No. 008 of that agreement.

The specific objectives of the project were to provide research, fieldwork, recommendations, and final reports to assist the NPS in complying with the provisions of the National Historic Preservation Act, as amended, and its implementing regulations (36 CFR 800) with regard to fire-management and rehabilitation activities on lands administered by Point Reyes National Seashore.

### Methods and Project Personnel

#### Methods

This thesis is based on research conducted by the author using the following resources: Reports, notes, and maps provided by NPS personnel located at Point Reyes National Seashore, and Golden Gate National Recreation Area, as well as personal communications with individual NPS employees from both locations.

The Jean and Charles Schulz Information Center, located on the Sonoma State University campus provided access to books, periodicals, and other literature from the other 23 California State University campuses through "Link+" system, access to the University of California campuses through the "Melvyl" system, and access to resources nation-wide through "Inter-Library Loan."

Additional resources were located using the Internet, particularly United States governmental websites, such as those representing the National Park Service, the Bureau of Land Management, and the US Forest Service.

Research on the history of fire in Marin County was conducted at the Anne T. Kent California Room of the Marin County Civic Center Library, located at 3501 Civic Center Drive, Room 427, San Rafael, and at the Point Reyes Light (Tomales Bay Publishing Company) located at 11431 State Route 1, # 10, Point Reyes Station, California.

Prior to executing field surveys records searches were conducted at the Northwest Information Center (NWIC) of the California Historical Resources Information System. The NWIC, an affiliate of the State of California Office of Historic Preservation (OHP), is the official state repository of archaeological and historical records and reports for a 16-county area that includes Marin County.

The records search consisted of examining all documented cultural resources records and reports within a 1-mile (1.6-km) radius from the center points of the survey areas. State and Federal historical inventories were also reviewed. These inventories included the *Historic Properties Directory*, which combines the *National Register of Historic*

3

BLM_0064324

*Places*, the *California Historical Landmarks*, *Points of Historic Interest*, and the *California Register of Historical Resources* (California OHP 2002); and *Five Views: An Ethnic Historic Site Survey* (California OHP 1988).

**Project Personnel**

The literature and records search, field survey, report preparation, and administration were performed by the following ASC personnel:

**Principal Investigator:** Dr. Adrian Praetzellis, Registered Professional Archaeologist; Director, Anthropological Studies Center, Sonoma State University.

**Project Coordinator:** Richard D. Shultz, B.A. (Anthropology), M.A. candidate in Cultural Resource Management (CRM); 16 years of experience in California prehistoric and historical archaeology.

**Archaeological Field Crew:** Heidi Koenig, B.A. (Anthropology), M.A. candidate in CRM, with 10 years of experience in California and Middle-Eastern archaeology; and Christina MacDonald, B.A. (Anthropology), M.A. candidate in CRM, with 5 years of experience in California archaeology.

**Report Production:** Margo Meyer, B.A. (Art History) report production. Maria Ribeiro, B.A. (Anthropology), report graphics and report production. Suzanne Stewart, RPA, M.A. (CRM), editor.

The following National Park Service Personnel contributed to this project:

Jessica Maxey, B.A., NPS Archeologist, participated in field surveys on 7 October 2002, 13 May 2003, and 17 May 2003. She also provided various maps, notes, and other sources of information useful in the preparation of this report.

Nelson Siefkin, M.A., NPS Fire Archeologist, provided a number of NPS publications and other documents that would have otherwise been unavailable for research.

Mark Rudo, M.A., NPS Archeologist was instrumental in coordinating Cooperative Agreement No. 1443-CA-8530-96-006 Project Statement No. 008, between the NPS and SSUAF. He too provided a number of NPS publications, documents, and information that would have otherwise been unavailable for research.

4

# CHAPTER 2 – PROJECT SETTING

## NATURAL SETTING

The following section discusses the natural setting of the Point Reyes peninsula. Included here are the physiographic zones, biotic environments, climate, and paleoclimatic change that have shaped or are found within the peninsula. Also discussed is the role of fire within the biotic environments of the National Seashore.

### Physiographic Zones

The various topographic features of the Point Reyes peninsula have resulted from a series of geological processes that began more than 80 million years ago. In describing these features the peninsula has been subdivided into a variety of physiographic zones (Figure 2). The number of zones described in the literature varies in accordance with the writer's focus, with three to five macro-environments usually used to categorize the Seashore. National Park Service personnel (NPS 1973:4), for example, have described the PRNS as occupying three units: "(1) Inverness Ridge, (2) the rolling middleground [sic] west of the ridge, and (3) the beaches and tidal zones," while biologist Kawahara defined five topographic settings: "(1) the long straight depression occupied by Tomales Bay, Olema Valley, and Bolinas Lagoon; (2) the high country of Inverness Ridge; (3) the rolling middle ground west of the ridge; (4) the promontory of Point Reyes itself; and (5) the estuaries and beaches" (1970:5).

For the purposes of this report the five zones as described above will be utilized, as they tend to present a more comprehensive framework for describing the National Seashore's physiography.

#### Fault Zone

The dominant physiographic features of the PRNS, Inverness Ridge and the Olema Valley, owe their existence to the powerful actions of the San Andreas Fault (Kawahara's "long straight depression"), which separates the Point Reyes peninsula from the rest of Marin County. Some indication of this power was illustrated by the 1906 earthquake, which resulted in an average of 4.2 meters (13.8 ft.) of lateral displacement along the fault trace (Daetwyler 1966:20). The rift zone, or Olema trough (Galloway 1977:1), is occupied by Tomales Bay on the north, and the Olema Valley and Bolinas Lagoon on the south. To the east lies a geologic province that is distinctly different from the peninsula (Figure 3): here, the fault is primarily composed of the Jurassic-Cretaceous Franciscan formation, with some exposures of rocks dating to the Pliocene, all cut by meandering streams of gentle gradients of approximately 8 feet per mile. West of the rift zone, the geology is dominated by dioritic granites and Tertiary sediments, with streams beds cutting these features with gradients of up to 500 ft. per mile (Kawahara 1970:5).

#### Inverness Ridge

The approximately 25-mile-long Inverness Ridge runs parallel to and just west of the San Andreas Fault, extending from Tomales Point to Bolinas Mesa, and forming part of the eastern boundary of the PRNS. Three prominent crests—Mount Wittenberg at

5

*EFFECTS OF FIRE AND FIRE MANAGEMENT*
*ON CULTURAL RESOURCES*



Point Reyes National Seashore
Fire Management and Cultural Resources

Figure 2
Physiographic Zones
of the Point Reyes Area

6

BLM_0064327

**Point Reyes National Seashore**
**Fire Management and Cultural Resources**

**Figure 3**
**Distribution of Major Geologic Deposits**
**within and adjacent to the Project Area**

Key
= Alluvium
= Beach sand
= Terrace deposits
= Merced formation
= Drakes Bay formation
= Monterey shale
= Laird sandstone
= Granitic rocks
= Franciscan formation

Drakes Bay

Point Reyes

arbitrary boundary

1906 Earthquake Trace

(adapted from Galloway 1977: Figure 1)

3 – Cultural Setting

BLM_0064328

1,407 ft. (448 m) above mean sea level, Point Reyes Hill at 1,336 ft. (407 m), and Mount Vision at 1,282 ft. (391 m)—cap the ridge, and contain the oldest rocks found in the Seashore. Exposed from Tomales Point to approximately Bear Valley Ranch is the chief component of the ridge (Galloway 1977), a resistant quartz diorite that was formed approximately 80 million years ago when it was intruded into original shales and clays, and sandstones and calcareous sediments. The heat and pressures created by the intruding molten quartz diorite metamorphosed clays and shales into schists, and calcareous sediments and sandstones into marble and quartzites (Galloway 1977:2; Kawahara 1970:8). South of Bear Valley Ranch, and extending to Bolinas Mesa and Duxbury Reef, the granitic formation is buried by younger, light-colored marine shales (Galloway 1977:2). This younger formation, termed the Monterey Shale and the Laird Sandstone, originally covered all of Inverness Ridge, but has since eroded away along the northern margins. This Miocene-period deposit can be seen in an exposure near Kehoe Ranch (Galloway 1977:2).

Inverness Ridge is of such topographical prominence that it channels the prevailing northwesterly winds down through Tomales Bay, then eastward through the Nicasio fog gap to San Francisco Bay. As a consequence of the prevailing winds directing moisture-laden air masses over the summit of the ridgeline, the uplands receive nearly 40 in. (102 cm) of precipitation annually, both in the form of rain and fog. Run-off from this precipitation is channeled by relatively young streambeds to other prominent features found in and near the PRNS: Drakes Estero and western coastal beachheads to the west of the ridgeline, and Tomales Bay, Olema Creek, and Pine Gulch Creek to the east (Kawahara 1970:8; NPS 1973:6).

### Rolling Hills

At the western foot of Inverness Ridge begins the broad plain of two wave-cut terraces that form the rolling hills, which substantially contributes to the Seashore's vast scenic viewshed. The two terrace features are situated along distinctly different elevations. The older, upper terrace lies at an elevation between 600 and 700 ft., while the younger, lower terrace is situated along the 200-ft. contour. The upper terrace is generally composed of fine-grained shales and sandstones of the Monterey formation. Because of its older status, this terrace is considerably more weathered than its younger counterpart and is now characterized by broadly rounded hilltops (Kawahara 1970:8; NPS 1973:7). The lower terrace is composed of an overlying soft, weakly consolidated, light-colored siltstone and claystone layer known as the Drakes Bay formation (Galloway 1977:2). This terrace is better preserved, but deeply scarred by steep, narrow canyons, such as those found draining into Drakes Estero, and is subject to constant slumping and landslides due to the incompetent nature of the soil.

Precipitation in the terrace region averages 30 to 35 inches (76 to 89 cm) per year, decreasing towards the coastline. Much of the precipitation comes in the form of fog generated by warm air masses riding over the cooler ocean waters during the summer months (NPS 1973:7).

8

### Point Reyes Promontory

Standing at the southwestern corner of the PRNS is situated a well-exposed outcrop of dioritic granitics and Paleocene conglomerates. This rocky promontory forms an anchor for the 10-mile-long Point Reyes Beach to the north, and protects Drakes Bay, lying to the east, from direct wave-action during much of the year. The year-round exposure to breakers has gradually broken down this feature, forming numerous isolated rocks, stacks, and islets (Galloway 1977:2; Kawahara 1970:9).

### Estuaries and Beaches

Among the most extensive features in the PRNS are its beaches and estuaries. The geologic foundations of the PRNS have created numerous sandspits, sandbars, estuaries, and beaches. The granitic formations of Inverness Ridge are weathered and transported to the beaches at coves along Tomales Bay, while marine terraces are worn away by wave-action along the coastal margin, forming the sandy beaches found along Drakes Bay. The near-constant northwesterly winds help drive a southerly ocean current that brings sands from the north to settle along Tomales Point, Point Reyes Beach, Limantour Beach, and Bolinas Lagoon.

## Climate

The climate of the Point Reyes peninsula is commonly referred to as Mediterranean, or Evergreen Heath Etesian Climate, according to the Köppen classification system (Beardsley 1954:14; Kawahara 1970:9). The area's climate is often reduced to summer and winter conditions, with gradual transitions to each during autumn and spring. Typically the Point Reyes peninsula is characterized as having cool, foggy summers and mild, wet winters. As noted above, warm air masses sweep over the cooler Pacific during the summer months, often creating a heavy coastal fog zone. This fog is the main source of precipitation during the summer months, as little or no rain falls until late winter and early spring. The summer fog also ameliorates temperatures, keeping the area between 60 and 70° F (16 and 21° C). Winter storms arrive from the Gulf of Alaska, providing 80 percent of the yearly precipitation to the peninsula, with average rainfall varying between 24 and 27 inches (61 and 69 cm; Kawahara 1970:10).

## Paleoclimatic Change

According to Meyer (2002), the paleoclimatic sequence developed for the North Coast Ranges suggests that, compared with present-day climate, former climatic conditions were (1) more continental in the Late Pleistocene-Early Holocene, that is cooler and wetter; (2) more Mediterranean in the Middle Holocene, warmer and drier; and have become (3) more maritime in the Late Holocene, similar to the present conditions.

At the height of the last glacial maximum, more than 15,000 years ago, sea levels were some 120 m (394 ft.) lower than at present (Figure 4). This difference in sea levels results in at least two significant features for the Point Reyes area. First, the now-submerged continental shelf was then fully exposed; creating a coastline that was located 25 to 50 km (15 to 30 mi.) west of the current shoreline (Meyer 2002). This would have resulted in a coastal terrace that was significantly wider than at present, with

BLM_0064330



**Figure 4.** Timing and Extent of Sea-level Rise *(Helley et al. 1979: Figure 12)*

10

BLM_0064331

perhaps a substantially greater area of brush and grasslands that would have been highly attractive to browse animals. The second feature would have been the change in watercourse gradient resulting in deltaic marshes and estuaries. At glacial maximum, watercourses to the bays and beaches would have been longer, creating steeper, highly erosive canyons (Meyer 2002). With the sudden climatic change that initiates the Holocene, continental ice sheets quickly regressed, flooding the oceans with meltwater and raising global sea levels. Between 15,000 and 11,000 years ago, sea levels rose approximately 55 m (180 ft.), covering most of the continental shelf. As the shoreline migrated eastward, short-lived marshes and estuaries were likely created as sediments were trapped within coastal valleys and embayments (Clifton, Hunter, and Gardner 1988:125). Between 11,000 and 8,000 years ago, sea levels rose an additional 25 m (82 ft.), at a somewhat slower pace than in the previous period; 13.0 m (42.6 ft.) versus 8.3 m (27.2 ft.) every 1,000 years. Coincidentally, the earliest known archaeological sites in the region date to this time (Schwaderer 1992; Meyer and Rosenthal 1997). Over the next 2,000 years sea levels rise only about 7 m (23 ft.), averaging a rate of 3.5 m per 1000 years. From 6,000 years ago to the present sea levels have risen an additional 8 m (26.2 ft.) at a rate of about 1.3 m (4.3 ft.) every 1,000 years (Meyer 2002).

As the rate of sedimentation began to outpace the rate of submergence, tidal flats, marshes, and lagoons began to form around the margins of the many protected bays and inlets located along the Pacific coastline (Atwater et al. 1979). The combination of higher sea levels, increased sedimentation, and wetland formation forced local streams and rivers to adjust to progressively higher baselines and lower hydrologic gradients. In response, many streams and rivers were overwhelmed by sediment that filled existing channels, formed new floodplains, and/or spread over the surface of existing floodplains (Helley et al. 1979). During this time, the upper reaches of some floodplains were subject to erosion and lateral channel migration as streams and rivers adjusted to the new conditions (Meyer 2002). Drakes Estero provides a good example of this process.

These coastal valleys and embayments would have been favored by Early and Middle Holocene hunter-gatherer groups, as research in other coastal California environments suggests (see Research Issues below), for the diverse floral and faunal resources that these locations attract. The resultant archaeological deposits would then be subject to, at best, depositional forces resulting in their burial, and at worst, scouring by wave action associated with rising sea levels.

**Biotic Environment**

The dominant plant communities of the Point Reyes peninsula (Figure 5) consist of a mosaic of coastal prairie and scrub, similar to that found along much of the central and northern California coastline (Küchler 1977), and a mixed evergreen/broadleaf hardwood forest that occupies much of the Inverness Ridge. Coastal prairie is often characterized by perennial California oatgrass (*Danthonia californica*), annual fescue (*Festuca idahonensis*, and *F. rubra*), Douglas iris (*Iris douglasiana*), California buttercup (*Ranuculus californicus*), and blue-eyed grass (*Sisyrinchium bellum*; Heady et al. 1977). The coastal prairie of the peninsula has been noted to be somewhat atypical, as California

BLM_0064332

*EFFECTS OF FIRE AND FIRE MANAGEMENT*
*ON CULTURAL RESOURCES*



**Key**

= Mixed Evergreen Forest

= Brushfield and Grassland

= Marsh

= Strand

= Riparian

arbitrary boundary

(adapted from Evendson 1970 Map 4)

Drakes Bay

Point Reyes

Point Reyes National Seashore
Fire Management and Cultural Resources

**Figure 5**

**Distribution of Major Vegetation
Communities within the Project Area**

N

0        5 miles

0        10 km

12

BLM_0064333

brome (*Bromus carinatus*), tufted hairgrass (*Deschampsia caespitosa* var. *halciformis*), and introduced sheep sorrel (*Rumex acetosella*) tend to dominate. Within the coastal scrub community found in the PRNS, south-facing slopes and ridges tend towards a composition of California coffeeberry (*Rhamnus californica*), coast sagebrush (*Artemisia californica*), and poison oak (*Rhus diversiloba*), while northern-facing slopes and ridges are dominated by coyote bush (*Baccharis pilularis* var. *consanguinea;* Gogan 1986:21, 23).

### Fault Zone

The San Andreas Fault zone combines many of the natural environments found in other zones, including mixed evergreen forests, riparian corridors, brush fields/grasslands, and marshes. For the most part the fault zone reflects natural environmental processes. At the head of Tomales Bay is found an extensive marsh system that drains part of the northern portion of Inverness Ridge, while the southern extent of the ridge drains southward towards Bolinas, forming a long riparian environment that also culminates in a marshland. Both mixed evergreen forests and brush fields/grasslands flank the fault, and have been extensively shaped by human populations since the mid- to late-1800s. Farming practices in Marin County during the latter 19th and early 20th centuries have done much to clear brushlands for potato and wheat farming and cattle and dairy ranching, while homesite construction during the 20th century has encroached into the forested margins, introducing many exotic plant species such as eucalyptus, or blue gum (*Eucalyptus globules*), and scotch broom (*Cytisus scoparius;* Kawahara 1970:15-16).

#### Role of Fire

The fault zone is comprised of a mosaic of vegetational communities. Fire within the fault zone would have most likely resulted in reinforcing this mosaic pattern. Accordingly, fire intervals would most likely vary depending upon the structure of the communities within the fault zone. For example, vegetational communities such as grasslands and brush fields would more readily burn than riparian or mixed-evergreen communities. Fire regimes for individual communities located within the fault zone may be similar to regimes presented below where the vegetational communities are similar.

### Inverness Ridge

Two main plant communities are found on Inverness Ridge, reflecting distinctly different soils and geology. Due to its granitic substrate, the northern half of the ridge, with its higher elevations, supports a closed-cone forest structure with Bishop pine (*Pinus muricata*) as the climax species. Additional species in this forest structure include coast live oak (*Quercus agrifolia*), wax myrtle (*Myrica californica*), California bay (*Umbellularia californica*), California buckeye (*Aesculus californica*), Pacific madrone (*Arbutus menziesii*), chinquapin (*Castanopsis chrysophylla* var. *minor*), and Mount Vision ceanothus (*Ceanothus gloriosus* var. *porrectus;* Kawahara 1970:17). The Bishop pine forest found on the ridge may be a remnant of a more widespread, late-Tertiary forest (Vogl et al. 1977:332). The Monterey shale and the Laird sandstone found along the southern portion of the ridgeline favors a mixed-hardwood forest of Douglas fir (*Pseudotsuga menziesii*) and coast redwood (*Sequoia sempervirens*) groves in the higher elevations. A broadleaf forest of California bay, Pacific madrone, tanbark oak (*Lithocarpus densiflora*), coast live oak, big-leaf maple (*Acer macrophylla*), and wax myrtle is sometimes found in

13

BLM_0064334

the Douglas-fir/redwood forest, but is more prevalent at lower elevations (Kawahara 1970:18; NPS 1973:4).

### Role of Fire

As noted above the long, dry summers that characterize California's Mediterranean-type climate induce a susceptibility to fire in the plant communities found on Inverness Ridge. Both plant communities found in this zone have been shaped by fires that occur at regular intervals. Bishop pine is a fire-dependent species that requires the heat generated from fire to open its semi-serotinous cones and release the seeds held inside (Kawahara 1970:17; NPS 1973:6; USDA 2003; Vogl et al. 1977:337). Additionally, fires in Bishop pine forests that occur at intervals of less than 80 years may help the stand to resist rust-gall infection and a secondary fungal infection (Vogl et al. 1977:338). Douglas fir, on the other hand, is both a pioneer and a climax species that will dominate its environment given a sufficient length of time. Fire not only thins or even removes the stand, it also establishes the seedbed for the succeeding generation (USDA 2003). Douglas fir has the capacity to grow in a variety of forest conditions and is kept in check by regular fire intervals. With the removal of fire as a regenerative agent, however, both the Bishop pine and the broadleaf forest margins are being supplanted by the Douglas-fir community (NPS 1973:4, 6; Vogl et al. 1977:349).

### Rolling Hills

The rolling hills area west of Inverness Ridge supports a "soft" chaparral, or coastal scrub, community; prior to the farming and ranching period, the community was intermixed with native coastal prairie species, creating a low, wind-pruned carpet of shrubs, with open patches of grasses. During the 1800s, large areas of the PRNS were converted to non-native grasslands, initially as a result of farming practices, and later as a result of feed-seeding for dairy and beef cattle. The native coastal scrub community occupied much of the Point Reyes peninsula, ranging from the edge of beach and estuary environments, across the marine terraces, and mixing with the forests on Inverness Ridge (Kawahara 1970:19-20; NPS 1973:7-8). Elliot and Wehausen described the peninsula's coastal prairie as being dominated by California brome, tufted hairgrass, and introduced sheep sorrel (Heady et al. 1977:735). Additionally, Kawahara (1970:20) notes coast blue larkspur (*Delphinium decorum*), San Francisco owl's clover (*Orthocarpus floribundus*), Douglas iris (*Iris douglasiana*), yellow eyes (or blue-eyed grass; *Sisyrinchium bellum*), blue dicks (*Broadaea pulchella*), checker bloom (*Sidalcea malvaeflora*), hairy coast goldfields (*Lasthenia hirsutula*), slenderer sedge (*Carex gracilior*), common rush (*Juncus effusus* var. *brunneus*), soft chess (*Bromus mollis*), and California fescue (*Festuca californica*) as common plants found in the grassland habitat. Within the chaparral, or brushland habitat, is found coyote bush, cow parsnip (*Heracleum lanatum*), wax myrtle, bush monkey flower (*Mimulus aurantiacus*), seaside daisy (*Erigeron glaucus*), and California blackberry (*Rubus ursinus*; Kawahara 1970:19).

Located within the rolling hills, or wave-cut terraces, are numerous steeply cut, sedimented-valley watercourses that support riparian species. The upper portions of these drainages are associated with the broadleaf and mixed evergreen forests, and often contain big-leaf maple, red alder (*Alnus oregana*), California bay, elk clover (*Aralia californica*), and California hazel (*Corylus cornuta* var. *californica*). As the drainages

BLM_0064335

descend to the esteros, "[t]here is a sharp delineation between the stand of Red Alders, with its understory of California Stinging Nettle, that chokes the flood plain, and the soft chaparral that borders it" (Kawahara 1970:21).

### Role of Fire

The role of fire in California coastal scrub communities has been long studied and documented (Biswell 1975; Hanes 1977:432; Kelley and Scott 1995; USDA 2003). Most species within the scrub community are well-adapted to California's drought-associated summers, containing substances that both help them survive the dry periods, but which make them extremely flammable. Many plants, like coyote bush and ceanothus, possess leaves that have a waxy appearance; most of those leaves tend to be concentrated along the outer periphery of the plant, leaving a dry, woody interior. This xeric adaptation makes the plant highly flammable, as the waxy leaves contain concentrated volatile organic compounds that are easily ignited, while the woody interior is easily oxidized once a fire has started. Consequently, many scrub species have responded to the frequent fires found in this type of environment by regenerating from meristematic cells contained within their root burls or bulbs. Heady et al. (1977:736) note that the coastal prairies may have evolved under a regime of light grazing pressure and intense fire frequencies, while the introduction of highly competitive, exotic species, cultivation, increased grazing pressure, and the elimination of annual fires have dramatically altered the distribution and composition of the original community.

## Estuaries and Beaches

There are several estuarine and beach settings within the PRNS: Drakes Estero, Limantour Estero, Abbott's Lagoon, Bolinas Lagoon, Point Reyes Beach, Drakes Beach, Limantour Spit, among others. A variety of factors work to make each location a distinctive setting. Some locations possess foredunes, like Point Reyes Beach and Limantour Spit; some are adjacent to steep cliffs, like Drakes Beach, McClure Beach, or Wildcat Beach; while Drakes Estero, Limantour Estero, and Bolinas Lagoon encompass mudflats.

The strands and sandy beaches below the high tide line are, for the most part, devoid of floral species, particularly where heavy surf is present, but they do possess a wealth of faunal species, such as clams, cockles, and mussels. Above the high-tide zone the situation is quite different, with the complex of dunes containing a variety of floral species, including beach strawberry (*Fragaria chiloensis*), yellow sand verbena (*Abronia latifolia*), pink sand verbena (*A. umbellata*), beach morning glory (*Calystegia soldanella*), beach evening primrose (*Camissonia cheiranthifolia*), Douglas blue grass (*Poa douglasii*), seaside daisy, purple bush lupine (*Lupinus propinquus*), sea rocket (*Cakile maritima*), and beach grass (*Amonphila arenaria*; Kawahara 1970:24). Barbour and Johnson (1977:235) note that there is a tendency for floral zonation within most strand/beach environments, with *Cakile* species occupying the most seaward zone within Marin County. The next zone back was dominated by yellow sand verbena and silver beach weed (*Ambrosia chamissonis*), among others, while the third zone, or foredune, supported beach grass, *Elymus* spp., and Douglas blue grass. In places, the historically introduced beach grass can occupy 70 to 80 percent of the dune cover, tending to exclude native dune species. It also appears to alter dune characteristics, creating larger and taller dune systems that

15

BLM_0064336

may further add to its advantage (Barbour and Johnson 1977:226). Located behind the foredune is the forward edge of the scrub community described above under the Rolling Hills zone. Approximately 14 species were identified in this zone, with coyote bush, Chamisso's bush lupine (*Lupinus chamissonis*), coast buckwheat (*Eriogonum latifolium*), and Douglas blue grass comprising approximately 75 percent of the groundcover (Barbour and Johnson 1977:249-250).

Estuarine environments are usually restricted to relatively small areas within bays and protected river mouths, such as Drakes and Limantour esteros, Bolinas Lagoon, and Tomales Bay (Macdonald 1977:265). Because of the relatively high salinity of estuaries, the plant community tends to be dominated by salt-marsh species, known as halophytes. Like the strand/beach environments described above, salt-marsh plants grade from water's edge to drier land in accordance with the species' ability to live in a saturated saline environment. Salt marshes are usually dominated by California cordgrass (*Spartina foliosa*) and pickleweed (*Salicornia virginica*; Macdonald 1977:268-272, 286). Brackish lagoons and marshes tend to be dominated by tule or hardstem bulrush (*Scirpus acutus*) and common cattail (*Typha latifolia*). These vegetative types are usually homogeneous on gentle slopes, but are more zonal on steeper channel banks, with tules growing in deeper waters surrounded by a band of cattails higher up the bank (Macdonald 1977:274). Kawahara (1970:25) also noted that wigeon grass (*Ruppia maritima*), salt grass (*Distichlis spicata*), yerba reuma (*Frankenia grandiflora*), fleshy jaumea (*Jaumea carnosa*), marsh marigold (*Limonium commune* var. *californicum*), pacific seaside plantain (*Plantago juncoides*), coast arrow grass (*Triglochin concinna*), and seaside arrow grass (*Triglochin maritima*) could be found in saltwater-marsh habitats.

*Role of Fire*

The almost constant high relative humidity of the near-shore environment probably minimized natural fires and their influence in these settings. Understandably, saturated environments such as those found around estuarine settings are not very prone to fire, but during periods of drought, natural fires can occur in these settings. Nonetheless, it has been observed that hardstem bulrush and cattail often survive prescribed and natural fire regimes due to their rhizomatic nature; once their top-growth is burned off, new growth quickly follows. In fact, fire-affected seeds from Olney's tule were found to germinate at a higher rate than those not subjected to fire (USDA 2003). This post-fire response suggests some degree of adaptation to periodic fire.

**Fire Intervals for Biotic Zones**

The U.S. Forest Service has established a series of research stations throughout the United States to conduct research on forests and forestry, including studies of fire and its use in modern forestry practices. Fire frequency, or return interval, measures how often a plant community is likely to burn, under natural conditions (that is, those not influenced by humans), usually defined in years. This does not mean that fire will run through a community every year, or every 120 years; rather it is a rough estimate as to when a fire is likely to return to an area previously burned. Understanding fire-return intervals helps in understanding the structure and life cycle of plant communities. For example, in a study of southern California and northern Baja California chaparral, research suggests a strong correlation between the age of the stand when it is at its

16

climax stage, and the fire-return interval, in this case, roughly 70 years (Minnich 1995:22).

Table 1, which illustrates fire-return intervals for habitats found in the PRNS, is taken from a larger table for a variety of documented habitats (USDA 2003). Within the Point Reyes peninsula, as described above, the fault zone would include portions of many of the habitats listed in Table 1, including California chaparral, steppe, mixed evergreen. oakwoods, and live oak. The Coastal Douglas fir and California mixed evergreen ecosystems would be illustrative of the communities found on Inverness Ridge. The broad rolling hills would be best defined by California steppe, chaparral, and sagebrush habitats, and in some areas a mixed evergreen community may be found. There are no specific listings for species representative of a beach or estuarine environment within Table 1, however, because the beaches and estuaries are frequently bordered by a scrub or chaparral community the fire frequency represented by the California chaparral and steppe ecosystems could serve as representative.

**Table 1. Fire Intervals for Certain Habitats** (adapted from USDA 2003)

| Community or Ecosystem | Dominant Species | Fire Return Interval Range (years) |
|---|---|---|
| California chaparral | *Adenostoma and/or Arctostaphylos spp.* | 35 to 100 |
| Coastal sagebrush | *Artemisia californica* | 35 to 100 |
| California steppe | *Festuca-Danthonia spp.* | < 35 |
| Coastal Douglas fir | *Pseudotsuga menziesii var. menziesii* | 40 to 240 |
| California mixed evergreen | *Pseudotsuga menziesii var. menziesii-Lithocarpus densiflorus-Arbutus menziesii* | < 35 |
| California oakwoods | *Quercus spp.* | < 35 |
| Coast live oak | *Quercus agrifolia* | 2 to 75 |

Coyote bush tends to be a dominant species in the PRNS, particularly in the brush and grassland areas, and would be even more dominant were ranching operations to cease. Table 2 illustrates how coyote bush can influence fire-return intervals in environments where the plant is a major component species. It is interesting to note that in the "Aboriginal" period fire frequency is 1 to 2 years for most environments, while during subsequent periods, fire regimes lengthened. Note especially the "Recent" period, which has further extended the return interval past 150 years for most plant communities as a result of successful fire suppression efforts.

BLM_0064338

**Table 2. Fire Intervals in Communities with Coyote Bush**
*(from Greenlee and Langenheim 1990)*

| Fire regime | Vegetation where burning is concentrated | Vegetation where burning is incidental | Recorded or calculated mean fire intervals (years) | Probable mean fire intervals (years) |
|---|---|---|---|---|
| Lightning ignition | | Prairies | | 1-15 |
| | | Coastal sage | | 1-15 |
| | | Chaparral | | 10-30 |
| | | Oak woodland | | 10-30 |
| | Mixed evergreen | | | 15-30 |
| | Redwood forest | | 135 | |
| Aboriginal (until approximately 1792) | Prairies | | 1-2 | |
| | Coastal sage | | 1-2 | |
| | | Chaparral | 18-21 | |
| | Oak woodland | | 1-2 | |
| | | Mixed evergreen | | 50-75 |
| | | Redwood forest | 17-82 | |
| Spanish (1792 to 1848) | | Prairies | | 1-15 |
| | | Coastal sage | | 1-15 |
| | Chaparral | | 19-21 | |
| | | Oak woodland | | 2-30 |
| | | Mixed evergreen | | 50-75 |
| | | Redwood forest | 82 | |
| European-American (1847 to 1929) | | Prairies | | 20-30 |
| | | Coastal sage | | 20-30 |
| | | Chaparral | 10-27 | |
| | | Oak woodland | 50-75 | |
| | Mixed evergreen | | 7-29 | |
| | Redwood forest | | 20-50 | |
| Recent (1929 to present) | | Prairies | | 20-30 |
| | | Coastal sage | 155 | |
| | | Chaparral | 155 | |
| | | Oak woodland | 225 | |
| | | Mixed evergreen | 215 | |
| | | Redwood forest | 130 | |

18

BLM_0064339

# CHAPTER 3 – CULTURAL CONTEXTS

## PREHISTORIC CONTEXT

### Research Issues

For the last several thousand years, the Point Reyes peninsula, with its attendant seashores, bay shores, grasslands, and forests, has contained a wealth of floral and faunal resources that fluctuated with global weather patterns and periodic glaciations. The sheer variety of landscapes and ecotones would have provided ample locations for the gathering of plant materials and the hunting of small and large game, as well as littoral, lacustrine, and pelagic resources for use by early populations. The opportunity for natural resource exploitation over that expansive period of time likely would not have gone unnoticed by prehistoric peoples, and yet there is a surprising paucity of Early Holocene archaeological deposits.

Moratto (1984:275,539) suggests that a Hokan-speaking group, who were subsequently displaced with the arrival of a Proto-Miwok population into the region approximately 4,000 years B.P, initially populated the northern periphery of the San Francisco Bay shore. The earliest radiocarbon date in Marin County comes from excavations at CA-MRN-17 at De Silva Island, which dates to 5,480 ± 125 B.P. (Theiler 1983). The earliest known archaeological deposit within the PRNS is the McClure site (CA-MRN-266), located on the northeastern tip of Tomales Point, northeast of Pierce Point Ranch. As noted above, the McClure site was first described by Beardsley and, along with portions of the Estero (CA-MRN-232) and Cauly (CA-MRN-242) sites, was used to define his "McClure facies." Most archaeological deposits found within the PRNS, however, date to the later stages of the Upper Archaic and the Emergent periods.

Several researchers have interpreted the distribution and the higher frequency of Late Holocene archaeological deposits as evidence of a relatively abrupt shift in settlement patterning and population change beginning in the Upper Archaic and Emergent period (e.g., Bouey 1987:66; Broughton 1994; Schulz 1981:184). From this shift, many have speculated that increases in population led to more intensive subsistence strategies, which gave rise to increased organizational complexity as a result of an imbalance between population density and resource availability (Basgall 1987; Beaton 1991; Bouey 1987; Broughton 1988, 1994; Jones 1992). In contrast, Meyer (2002) suggests that while the assumption that Late Archaic and Emergent-period populations were greater than in previous periods may be valid, the paucity of Lower to Middle Archaic archaeological deposits may have to do more with geomorphological processes than population pressure.

Indeed, while the upper portions of the McClure site date to as early as 2,000 B.P. (the lower portions have not been absolutely dated, but are presumed to be older than the overlying strata), other similar environments in California are beginning to reveal buried archaeological deposits that are nearly five times as old (Erlandson et al. 1999; Goldberg et al. 2000; Jones et al. 2002; Raab and Yatsko 1992; Rick, Erlandson, and Vellanoweth 2001). Given the increasing evidence for early maritime adaptations to coastal California during the Holocene transition, it would seem extraordinary that the

BLM_0064340

resource base that the Point Reyes peninsula would have presented during that period would not have been utilized by early populations. Assuming that the peninsula did provide similar opportunities for resource exploitation at the onset of the Holocene, what could explain the lack of Early Holocene sites within the PRNS? There are at least two possibilities. First, not all of the Seashore has been systematically surveyed. Most surveys have been concentrated along the coastlines, bays, and lagoons (Figure 6), while much of the interior and upland regions have only been cursorily inspected (NPS 1961; Schenk 1970; Compas 1998), possibly leading to erroneous conclusions as to settlement patterns. These unsurveyed areas could contain archaeological deposits not yet recorded. Second, the dramatic change in the environment since the onset of the Holocene (outlined under Paleoclimatic Change above) has radically altered the landscape that now comprises the PRNS.

## Archaeological Work in the PRNS

Richard Beardsley (1948, 1954) was the first to describe archaeological sites found in the Point Reyes area within a taxonomic framework, using data generated by Robert Heizer's surveys in 1938 and 1939, and Heizer's and his own fieldwork conducted in 1940 and 1941. Beardsley described several sites, noting that most within the Point Reyes area were located adjacent to littoral environments (especially prevalent around Drakes Estero and Tomales Bay), with some sort of permanent or semi-permanent freshwater source and usually protected from the direct effects of wind and fog. At the time of publication of Beardsley's scheme, radiocarbon dating was a relatively new technique and was not included in his conclusions. Nonetheless, Beardsley, based on artifact seriation and stratigraphy, inferred that two major temporal periods were reflected in the sites that had been investigated. Several sites were observed to possess archaeological assemblages within their lower portions that fell within the Middle horizon of the Central California Taxonomic System (CCTS). These assemblages included large, heavy projectile points, suggesting an absence of bow-and-arrow technology; a paucity of pestles and mortars, with those that were found being of a simple style; beads predominately of *Olivella* sp.; strong reliance on bone for awls, needles, chisels, daggers, ornaments, and whistles; and burials, both singular and grouped interments, were often found to be stained with red ochre, often with numerous bone implements found in close proximity. The type site for this assemblage is the McClure site, which defined Beardsley's McClure facies.

The upper portions of most sites as well as a number of single-component sites fall within the CCTS Late horizon. The assemblages associated with these sites reflect shifts in hunting technology, an increased use of milling equipment, as well as different mortuary practices. Late horizon sites were often found to contain small projectile points associated with bow-and-arrow technology; an increased, and more elaborate, assortment of mortars and pestles; a shift from *Olivella* sp. to various clam species, steatite, and magnesite for bead making, as well as the adoption of glass trade beads when they became available; and a shift from flexed burials to cremations and burning of property within gravesites prior to interment of the deceased. Like the Late horizon elsewhere in central California, the period was divided into facies on the Marin coast: the Mendoza facies and the Estero facies, named for their type sites (CA-MRN-275 and –232).

Twenty years after Beardsley's framework was promulgated, David Fredrickson (1974) advanced his framework for interpreting archaeological sites found within California's North Coastal region, the Point Reyes area, and portions of the Central Valley. Fredrickson divided this regional prehistory into three broad periods: the Paleo-Indian period, the Archaic period, and the Emergent period. This scheme used sociopolitical complexity, trade networks, population, and the introduction and variations of artifact types to differentiate between cultural units. The scheme, with minor revisions (Fredrickson 1994), remains the dominant framework for prehistoric archaeological research in this region.

**Table 3. Diagnostic Traits of Coastal Marin County Facies** *(from Moratto 1984:235)*

| Central California concordance | McClure Facies<br>Middle Horizon | Mendoza Facies<br>Late Horizon Phase I | Estero Facies<br>Late Horizon Phase II |
|---|---|---|---|
| Burial Pattern | Primary internment; high frequency of funerary items; beds of red ochre | Primary inhumation and cremation; numerous "killed" show mortars | Mostly cremations; associations are frequent |
| Artifacts | 1. Infrequent round-bottom mortars | Flat-based show mortars | Flat-based show mortars |
| | 2. Shaped pestles | Shaped pestles | Rare flanged pestles |
| | 3. Numerous crude stone sinkers | | |
| | 4. Net mesh gauges | | |
| | 5. Long, heavy projectile points; use of atlatl? | Small projectile points of obsidian; triangular body | Small obsidian projectile points often with square serrations |
| | 6. Some points with slight shoulders | | |
| | 7. Finely chipped stone drills | | |
| | 8. Quartz crystals with pitch | | |
| | 9. Abundant bone artifacts: tubes, head scratchers, needles, awls, chisels, daggers, etc. | Relatively few bone artifacts; hairpins, awls, needles | Tubular bird bone artifacts are common: pyro-incised tubes, bird-bone whistles, bone beads |
| | 10. *Olivella* A1, F3a, G1, G2a | *Olivella* A1, G2a, E1 | *Olivella* E2 |
| | 11. – | – | *Tivela* tubular beads; great numbers of clam disk beads; steatite and magnesite beads |
| | 12. Rectangular *Haliotis* ornaments | | Banjo shaped and triangular *Haliotis* pendants |
| | 13. Baked-earth steaming ovens | | Historic spikes, porcelain, trade beads, glass |

In Fredrickson's framework, the Paleo-Indian period (10,000-6000 B.C.) was characterized by small, highly mobile groups occupying broad geographic areas. During the Archaic period, consisting of the Lower Archaic period (6000-3000 B.C.), Middle Archaic period (3000-500 B.C.), and Upper Archaic period (500 B.C.-A.D. 1000), geographic mobility may have continued, although groups began to establish longer-term base camps in localities from which a more diverse range of resources could be exploited. The addition of milling tools, obsidian and chert concave-base points, and the

BLM_0064342

occurrence of sites in a wider range of environments suggest that the economic base was more diverse. By the Upper Archaic, mobility was being replaced by a more sedentary adaptation in the development of numerous small villages, and the beginnings of a more complex society and economy began to emerge.

During the Emergent period (A.D. 1000-1800), social complexity developed toward the ethnographic pattern of large, central villages where political leaders resided, with associated hamlets and specialized activity sites. Artifacts associated with this period are the bow and arrow, small serrated corner-notched points, mortars and pestles, and a diversity of beads and ornaments that become especially abundant (Gerike et al. 1996:3.11-3.17). Most sites in the PRNS that have been dated appear to fall into the Emergent period (e.g., King and Upson 1970; Origer 1982; Von der Porten 1963), although at least two substantial Middle Archaic-period sites, the McClure site and the Cauley site (CA-MRN-266 and –242), are represented.

The first archaeological surveys of the Tomales Bay/Point Reyes area were conducted in the early 1900s by Nels Nelson of U.C. Berkeley (Nelson 1909). These initial surveys identified dozens of prehistoric archaeological deposits in and around the Point Reyes peninsula. Jesse Peter, between 1911 and 1913, conducted surveys from the southern border of Sonoma County south into Marin County; several years later, Bryant, in 1934, recorded and mapped several additional prehistoric sites within the area to become the PRNS. The first prehistoric archaeological excavations at Point Reyes weren't undertaken until the late 1930s and early 1940s, when R.F. Heizer and R.K. Beardsley of the University of California, Berkeley, began major excavations at four sites, and smaller excavations at nine additional sites. Many of the subsequent archaeological studies of the Point Reyes area have tended to focus on the question of Sir Francis Drake's presence in the area.

Edward Von der Porten and the Drake Navigators Guild conducted a series of excavations around the Point Reyes peninsula during the early 1960s, the primary intent of which was to identify remains of Sir Francis Drake's or Sebastián Rodríguez Cermeño's encampments or shipwrecks. In the search for evidence of these encampments, however, Von der Porten (1963) excavated several prehistoric shellmounds within the area, and documented both prehistoric and historic-period artifacts and features.

While quests to locate Drake's and Cermeño's landing sites dominated the archaeological work conducted in the 1960s, additional prehistoric archaeological research was conducted during the 1960s and early 1970s by Adan Treganza, Rob Edwards, Michael Moratto, and other San Francisco State College archaeologists. Much of this work was carried out as part of a National Park Service contract in conjunction with the proposed designation of the area as a National Seashore. Resulting from this work was a settlement-pattern hypothesis for the area in which Edwards (1970) identified three site groups that may be archaeological manifestations of distinct tribelets. In the same volume, King (1970) outlined several research questions for the PRNS and the Coast Miwok lands in general, including the need for the study of adaptive patterns of the Coast Miwok on the Point Reyes peninsula. Moratto (1974) surveyed portions of Point Reyes and created a synopsis of his work and the work

22

conducted by Edwards, as well as evaluations of the various arguments for the location of Drake's landing and a summation of all major archaeological work conducted in the PRNS to date.

Riley (1976) and Upson (1977) conducted studies of 18 possibly endangered archaeological sites within the PRNS. The purpose of their studies was to document negative impacts to the sites as a baseline for assessment of future impacts and to establish a set of priorities for the mitigation of identified impacts (Upson 1977:1). While not addressing specific research questions, both projects provide important background information on the archaeological sites in the PRNS.

Archaeological excavations of CA-MRN-230 by Santa Rosa Junior College under the direction of Tom Origer (1982) were conducted under a research design focusing on questions of seasonal land use; the site yielded relatively abundant faunal bone and shell remains and a variety of artifacts. Obsidian projectile points from the site, along with points from several other Point Reyes archaeological sites, were among those analyzed by Origer (1987) in his study of the hydration rates for Napa and Annadel obsidian. These hydration readings remained the only chronometric dates for PRNS archaeological sites until the past year, when some preliminary radiocarbon studies were initiated by Madeline Solomon of U.C. Berkeley (2000).

Compas (1994) conducted surveys of portions of the PRNS, updating the site records for 21 previously recorded sites. Her graduate thesis (Compas 1998) provides a research design for archaeological work at historic-period Native American sites based upon the settlement and procurement patterns of the native Coast Miwok after contact.

Polansky (2000) constructed an argument for significance for 71 prehistoric archaeological sites on the Point Reyes peninsula as part of her graduate thesis. Her significance arguments were based on her own fieldwork and on field data collected by Compas (1994), and used settlement-pattern models to construct six different site types based on resource exploitation and site artifact content.

Several recent surveys conducted under a cooperative agreement between the Anthropological Studies Center and NPS have been conducted by Michael Jablonowski (Newland 2002, pers. comm.). Using intern or volunteer labor, Jablonowski revisited or discovered numerous archaeological sites throughout the park. In addition, recent work by Jablonowski and Hans Bernaal of NPS sought to identify archaeological deposits within the Seashore that are in particular danger of loss due to erosional or other forces. Their procedures include mapping site locations and boundaries with the use of a sub-meter GPS Total Station system, which may aid in monitoring and documenting the forces contributing to the loss of site structure, and facilitate the implementation of appropriate stabilization methodologies.

Under a cooperative agreement between NPS and the Sonoma State University Academic Foundation, the Anthropological Studies Center is developing a research design for prehistoric and historic-era archaeology in the PRNS and the adjacent Golden Gate National Recreation Area. In addition to comprehensive discussions of regionally relevant approaches to prehistory and history, the research design includes special sections on geoarchaeology of the Point Reyes and GGNRA region; maritime

BLM_0064344

archaeology in the area; and the archaeology of dairy-ranching on the Pt. Reyes peninsula. The volume will be produced in the fall of 2003.

## ETHNOGRAPHIC CONTEXT

The PRNS is within the traditional territory of the Coast Miwok (Kelly 1978:415). The people collectively called the Coast Miwok by ethnographers were actually several distinct sociopolitical groups who spoke dialects of the same Penutian language. These speakers of the Coast Miwok language occupied a territory centered in present-day Marin and adjacent Sonoma County (Kelly 1978:414). The primary sociopolitical unit was the tribelet, or village community, which was overseen by one or more chiefs. The closest village to the PRNS was *Olema-loke*, immediately west in Olema Valley, south of Point Reyes Station; the village may have been a regional political center (Kroeber 1925:273). The total Coast Miwok population prior to missionization was relatively small, around 2,000 people according to Kelly (1978:414). In general, the Coast Miwok were culturally similar to their Pomo neighbors to the north (Kroeber 1925:276).

Economically, the Coast Miwok can be characterized as collectors who engaged in seasonal hunting and plant gathering. The Coast Miwok territory held both coastal and open valley environments containing a wide variety of resources, including grass seeds, bulbs and tubers, bear, deer, elk, antelope, several bird species, and rabbit and other small mammals (Table 4). Marine foods were particularly important: surf and bay fish, bullhead, steelhead, and salmon were captured, and shellfish, including mussels and clams, were gathered from rocks and beaches (Kelly 1978:415-416). In the late spring roots and bulbs were harvested along with nettle leaves, clover, and Indian lettuce, while seaweed was collected from the seashore to be eaten fresh, or dried for later use (NPS 2003b). During the summer and fall gathering seasons, camps were set up in the hills (Collier and Thalman 1991:118). Summer brought the harvest of grass and flower seeds, and berries, as well as the hunting of seals, sea lions, and deer (NPS 2003b). Fall saw the collection of a variety of nuts, including acorn, buckeye, bay, and hazel in preparation for the upcoming winter and early spring months when shortages were most likely to occur (NPS 2003b). Throughout the year, coastal, bay, and estuary resources were utilized, providing both food for consumption and raw materials that were later modified for such items as shell ornaments and currency (NPS 2003b).

The Coast Miwok built above-ground, conical dwellings constructed of a grass-covered frame of two forked, interlocking poles of willow or driftwood, with a slightly excavated central hearth. Large villages had a sizeable sweathouse, dug 4 to 5 feet into the ground, with a large central supportive post; the structure was roofed with poles, earth, brush, and grass. Additional ceremonial chambers, constructed by secret societies, were smaller versions of the sweathouse, being perhaps 15 feet in diameter and excavated to a depth of 2 feet. Female secret society chambers were even smaller (Kelly 1978:417).

BLM_0064345



**Point Reyes National Seashore**
**Fire Management and Cultural Resources**

**Figure 6**
**Prehistoric Settlement Patterns**
(based on incomplete survey
coverage of the Point Reyes area)

Key    = Inhabited Areas

(adapted from Compass 1988, Figure 3.2)

25

BLM_0064346

**Table 4. Coast Miwok Seasonal Resource Procurement**

| Fall | Winter | Spring | Summer |
|------|--------|--------|--------|
| Acorn | Hazel | Angelica | Pinole |
| Bay | Willow Wood | Wild Onion | Oak Sap |
| Angelica | Mussels | Soaproot | Laurel |
| Mushrooms | Clams | Huckleberries | Manzanita berries |
| Seals | Oysters | Hazelnut | Clover |
| Sea lions | Octopus | Clover | Seals |
| Surf fish | Shrimp | Strawberries | Sea lions |
| Octopus | Salmon | Seaweed | Mud hens |
| Whale | Trout | Urchin | Deer |
| Salmon | Elk | Mussels | |
| Trout | Mud hens | Surf fish | |
| Quail | Geese | Squirrels | |
| Geese | Deer | Rabbit | |
| Deer | | Deer | |

*Sources*: Collier and Thalman 1991:118; Duncan 1992:178

The Coast Miwok acknowledged private ownership of goods and songs, and village ownership of rights to land and/or natural resources; they appear to have aggressively protected their village territories, requiring monetary payment for access rights in the form of clamshell beads or even shooting trespassers if caught. Clamshell disk beads were used as currency and appear to have played a central role in the Coast Miwok economy. The beads were used to purchase obsidian and yellow paint from the Wappo, and obsidian and venison from the Pomo. Among the people of their own tribelet and family, Coast Miwok used beads to acquire access to privately held hunting or fishing areas, admission to dances, medical attention, initiation into secret societies, and even the purchase of training and instruction in dancing, singing, curing, and crafts from one's own relatives (Kelly 1978:418). Magnesite cylinders, purchased probably from the Eastern Pomo in Lake County, served a similar function. While currency was used heavily among the Coast Miwok, the group as a whole did not appear to trade for goods but for access rights to resources held by other groups.


## HISTORICAL CONTEXT

The Point Reyes–Drakes Bay–Tomales Bay region was one of the earliest areas described by European explorers along the California coast. The Point Reyes cape was probably encountered by Cabrillo in 1542; almost four decades later, in 1579, English navigator Francis Drake dropped anchor along the coast, probably at what came to be known as Drakes Bay, just east of Point Reyes (Hoover et al. 1990:172-173). Drake had

26

been exploring the defenses of the Spanish New World, and had escaped into the Pacific after his plundering exploits angered the Spanish. Although the ship's log and diaries of the crew have been lost over the years, contemporary published accounts of the voyage based on the diaries of Francis Fletcher, chaplain of the expedition, indicate that Drake's crew remained in the bay for five weeks (Hoover et al. 1990:172). During this time, Drake and his crew reconditioned the *Golden Hinde*, Drake's ship, and made contact with the local Coast Miwok, whose actions suggest that they may have thought Drake and his party were ancestors returning from "the land of the dead" (Kroeber 1925:277). Their meeting represents the first documented contact of English-speaking people with California Native Americans, and appears to have been a cordial encounter (Kroeber 1925:276).

Drake's party left behind a brass plaque, engraved with the date of arrival, Queen Elizabeth and Drake's names, and a short message claiming the lands for England. A sixpence was placed in the bottom of the plaque. A brass plate that fit the above description was "discovered" in 1936; after decades of controversy and study, including an analysis of the plate's material composition and authenticity of the writing style, the Bancroft Library at the University of California at Berkeley concluded that the plate was probably a hoax (Hart 1977). To date, no one has claimed credit for the forgery, and the plate remains on display at the Bancroft Library (Hart 1977:24-25). However, a recent article (Von der Porten et al. 2002) has documented an investigation into this situation, concluding that the "plate of brasse" was crafted as a practical joke to be played on historian Herbert E. Bolton by senior members of the revitalized E. Clampus Vitus and the nascent California Historical Society.

Sixteen years after Drake's landing, the *San Augustín*, a Manila galleon piloted by Sebastián Rodríguez Cermeño, entered Drakes Bay. The ship loaded with Oriental trade goods and heading for Acapulco, was wrecked by a violent storm three weeks after its arrival in November of 1595. Ming Dynasty-period ceramic fragments from the wreck have been found on the beaches throughout Drakes Bay. Before returning to the sea in a surviving launch, the crew explored inland from the bay a distance of 4 leagues (about 10.4 miles), making contact with several Coast Miwok villages, and obtaining acorns from them (Moratto 1974:5; Hoover et al. 1990:172-174).

On the day of *los reyes magos* (the three holy kings), the Vizcaíno expedition of 1602-1603 passed the rocky outcrop of Point Reyes while at sea, conferring to it the name Punta de los Reyes (Gudde 1998:315). The Vizcaíno expedition also encountered Tomales Bay, though they assumed that the narrow bay was a river (Gudde 1998:396). Tomales Bay may be named either for the *támal*, a group of Coast Miwok who appear in the baptismal records of Mission Dolores between 1802 and 1810 (Milliken 1995:255), or for the Coast Miwok word "tomales," or bay (Gudde 1998:396; Hoover et al. 1990:180).

After the visits of Drake, Cermeño, and Vizcaíno, it was nearly 200 years before Europeans returned to the area. With the establishment of the Mission San Francisco de Asís in 1776, local Native American groups were brought into the mission system and dislocated from their traditional territory. Mission recruitment gradually extended to the Point Reyes area; the majority of the Olema tribe was baptized at the missions in 1803 and 1805 (Milliken 1995:248). Native Americans were brought to the missions, both

BLM_0064348

willingly and by force, to be converted to Christianity, to learn farming and other "civilized" skills, and to serve as laborers. Many of the native people at the missions died of diseases introduced by the foreign settlers, from malnutrition, and from conditions related to the often-inclement weather experienced at the mission site. As a result, an *asistencia* was constructed in San Rafael in 1817 to take advantage of the warmer, drier climate.

With secularization of the missions in the early 1830s, many Coast Miwok from the Point Reyes peninsula returned to the general area. Some applied the skills learned at the missions, living and working among the European population, while others attempted to re-establish traditional settlements (Dietz 1976). The virulent small-pox epidemics of the mid-1830s, however, effectively decimated the surviving population. An additional source of disruption came with the acquisition of California by the United States after ratifying the Treaty of Guadalupe Hidalgo in 1848, and the subsequent lumbering, dairying, and agriculture practices that took place in order to feed the mining industry and the ensuing population growth in California.

By the mid-1800s, foreign settlement within the Marin County region had not only displaced the Coast Miwok from the villages and lands from which they had traditionally obtained their livelihood, it also disrupted culturally and economically significant seasonal gathering strategies and trade (Gerike et al. 1996), as well as land-management practices, as noted above. The few surviving Coast Miwok found work in the lumber mills and agricultural fields of the region, maintaining some of their cultural traditions while adapting to the new economy (Campbell et al. 2002; Kelly 1978:414). In the early 1920s, the Bureau of Indian Affairs purchased land near the city of Graton and placed it in government trust as a rancheria for the remaining 75 Coast Miwok and Southern Pomo who shared their territory. Today, the Coast Miwok population has increased to 366 individuals and is represented by the federally recognized Federated Indians of Graton Rancheria located in Graton, with offices in Santa Rosa (Campbell et al. 2002).

The Coast Miwok found the cool moist summers on Point Reyes to be ideal for extending the collecting season for native grasses and forbs. These same conditions were also nearly ideal for raising dairy and beef cattle. But the landscape that Spanish missionaries and Mexican and early American ranchers and settlers found was most likely a product of Coast Miwok cultural practices, particularly burning. With the shift from the native practice of seed harvesting and post-harvest firing, to cattle ranching and fire suppression, Point Reyes's plant communities underwent radical changes (Duncan 1992).

Spanish missionaries utilized Point Reyes, after the removal of the Coast Miwok, as pastureland for cattle beginning in 1817. Secularization of mission lands was initiated in the early 1830s and led to portions of the Point Reyes area being subdivided into "ranchos," setting the stage for the American dairies to come (NPS 2003c). While many ranchos were granted to Mexican citizens, often as a form payment or reward for services to the government, Anglo immigrants could become landholders by becoming naturalized Mexican citizens. This process usually required adopting Catholicism, and marrying a Mexican national (Rawles and Bean 1998:71-74).

During the latter part of the 18th century the expanding Russian empire frequently challenged the northern reaches of the Spanish empire in California. By 1908 the Russian American Fur Company had established a small fortification (Fort Ross) along the Sonoma coast in order to take advantage of the abundant sea otter population, as well as to establish an agricultural concern to help supply their northern settlements in Alaska. It was clear to both sides that neither could defend nor advance their expansion and an "understanding" was reached between the two nations. Officially neither side was to interact with the other, nevertheless trade did take place; often Russian goods in exchange for access to fur seal and otter hunting grounds south of Fort Ross.

Though the Russian colony of Fort Ross never really posed as serious as a threat to Spain, and later Mexico, as either may have perceived there was no guarantee that Russia would not renew its foray into California at a later time. Thus, Mariano G. Vallejo, the official in charge of the disposition of northern California mission lands as part of the secularization process, began a series of land grants to "contain" any future Russian expansion   (Clayborn 1976:9; Gregory 1911:132). These land grants included Rancho Cañada de Jovine, Rancho Estero Americano, Blucher Rancho, Bodega Rancho, and Rancho Cañada de Pogolome.

The first Point Reyes area rancho, Rancho Punta de Los Reyes, consisted of a 35,000-acre grant made in 1836 to Irish-born James Richard Berry. Shortly thereafter Berry sold a portion of the rancho to Joseph Snook, who in turn sold his portion to Antonio María Osio in 1843. Osio obtained the rest of the original grant, and was soon after granted the remaining 48,000 acres of land on Point Reyes, which was titled the Rancho Punta de los Reyes Sobrante (Hoover et al. 1990:181).

Like ranchos in other parts of California, the ranchos on Point Reyes experienced a series of land squabbles, squatting, and litigious conflicts. While the Board of Land Commissioners, the Appellate Court, or the United States Supreme Court settled many of these disputes, litigation costs often forced the legitimate landowners to sell their property to pay for the costs of defending their lawful claim. By taking advantage of this situation between 1852 and 1857, senior partners of the San Francisco law firm of Shafter, Shafter, Park, and Heydenfeldt managed to obtain title to over 50,000 acres on the peninsula, encompassing the coastal plain and most of Inverness Ridge (NPS 2003c). While the early ranches on Point Reyes were small-scale operations, the Shafter clan set about to creating a large-scale ranching system by incorporating existing operations and subdividing other lands, establishing a total of 33 ranches, all of which would deliver their products to the markets of San Francisco by the way of small schooners plying Tomales Bay (NPS 2003c).

The Shafters were instrumental in bringing in Irish, Swedish, Italian-speaking Swiss, and Azore Islands-Portuguese families to act as tenant ranchers. They also employed family members, local residents, and European dairymen as superintendents to construct new dairies, refurbish existing ranches, recruit immigrant ranch hands, and aid in selection of the tenant ranchers. Surviving Coast Miwok families displaced by the Spanish missions also found work on the dairies situated above their Tomales Bay homes (NPS 2003c).

BLM_0064350

By 1869 the dairies were partitioned by the partners along six tracts, leaving each to own and manage a collection of coastal plain and ridgeline ranches. Oscar Shafter and his son-in-law, C.W. Howard, used the letters of the alphabet to distinguish their ranches, while James Shafter used geographic or descriptive names, such as Drakes Head, Muddy Hollow, Oporto, and Sunnyside for his ranches.

As the Shafters increased their property holdings, the first buildings in the area of what would become the town of Point Reyes were constructed; they included the warehouse of the 1856 Taylor Paper Mill, one of the first such mills in the region (Hoover et al. 1990:180). The historic Point Reyes Lighthouse was constructed more than a decade later, in 1870. The town of Point Reyes was formalized in 1887, but when a post office on the headland was also named Point Reyes in 1891 the town changed its name to the current Point Reyes Station (Gudde 1998:315). The first railroad link to the area was completed in 1882, spurring the growth of the small community, and facilitating dairy-product exports (Patterson 1976:6; USDI NPS 2003c). The town has historically served as a shipping and service area for the North Pacific Coast Railroad line, abandoned in 1933, the Point Reyes Lighthouse, and several of the nearby dairy ranches (Patterson 1976:4-7). Today the town is a tourist destination that serves to support the recreation economy of the PRNS.

Soon after the turn of the 20th century, the three estates of the Shafter/Howard families began to decline, and following the 1906 earthquake, many of the Inverness Ridge dairies were forced to close. By 1933, the same year the railroad that serviced the area closed, all ridgeline dairies had shut down, partly due to structural failure, but mainly due to a reduction in rangeland quality caused by following European rather than Native land-management practices. By not periodically firing the land, native coyote bush and poison oak gradually expanded, reducing palatable pasturage for the dairy-cattle population. Though chaparral encroachment into rangeland affected the ranches' success, overgrazing, improvement of competing regional dairies, and the Depression were the main factors that brought an end to the three estates. The land was sold off in pieces to speculators, who then resold the properties to the present tenants (NPS 2003c).

In 2002 six historic Shafter/Howard-era dairies were still in operation within the park. Additionally, nine historic-period ranches and former ranch sites are utilized for running beef cattle. In 1980 NPS personnel initiated evaluation of the Pierce Point Ranch as part of the nomination process for inclusion in the National Register of Historic Places, to which the ranch was added in 1985 as the best example of a 19th-century, west Marin dairy ranch. Today the ranch house and attendant buildings are used as an interpretive center, while much of the ranch lands have been converted for the reintroduction of the once-native tule elk, which had succumbed to a combination of over-hunting and competition by cattle (NPS 2003c).

Governmental interest in the creation of a seashore park began a few years after the closure of the railroad line in 1933, though many of the local property owners were opposed to the idea. Nearly 30 years later, and after many decades of cattle ranching, governmental, recreational, and commercial fishing use, and proposed developments within the peninsula, the 71,000-acre Point Reyes National Seashore was carved out of

BLM_0064351

private and public lands in 1962, when President John F. Kennedy signed the act of Congress that placed the lands under federal control Hoover et al. 1990:185; King and Upson 1970:126-128). Private and leased property was maintained within the park, though private lands could only be sold to the federal government, for inclusion into the park (Hoover et al. 1990:185).

## TYPES OF RESOURCES EXPECTED WITHIN THE PRNS

The PRNS contains an untold number of cultural resources. This lack of specificity is due in part to an incomplete survey of the park itself, as well as an evolution in understanding as to what can be considered a cultural resource; those items that are presently dismissed may one day be considered worth preserving for the future. Nonetheless, there are many known resources within the park, which can be conveniently described according to the areas in which they are located (this does not, however, include traditional cultural properties as none have been formally identified within the park at this time).

### Fault Zone

The numerous environments that comprise the fault zone provided an array of resources and settings that were useful to the Coast Miwok. After the arrival of European settlers the fault zone was reshaped to match their needs and expectations. Cultural resources in the fault zone include prehistoric/ethnohistoric archaeological sites, and ethnographic villages (e.g., *Bauli-n* and *Olema-Loke*), and historic-period ranches, farms, homesteads, and small towns, such as Point Reyes Station, Olema, and Bolinas.

### Inverness Ridge

Identified cultural resources located within the Inverness ridge zone consist solely of former ranches, farms, homesteads, and similar historic-period buildings, as well as landscapes, associated refuse scatters, and access roads and trails. The lack of prehistoric/ethnohistoric resources may be more a function of previous survey strategies than of an actual paucity of prehistoric/ethnohistoric resources.

### Rolling Hills

Cultural resources located within the rolling hills zone are almost entirely comprised of ranches, farms, homesteads, landscapes, and associated refuse scatters, as well as access roads and trails. Most of the Shafter/Howard dairy complex (see Historic Context above) is situated within this zone. The Point Reyes weather patterns, and the gentle rolling hills with its ample grasslands, provide an ideal environment for raising dairy and beef cattle. It would have also provided ample forage for deer and tule elk, among other animals that would have been hunted by the Coast Miwok, yet few prehistoric/ethnohistoric archaeological sites have been identified within this physiographic zone. The apparent lack of archaeological deposits may be a result more of past research interests and survey strategies, than of Coast Miwok settlement patterns.

BLM_0064352

**Point Reyes Promontory**

The most visible resource on the promontory is the Point Reyes Lighthouse and its associated buildings. In addition to the lighthouse complex are a small number of prehistoric archaeological sites.

**Estuaries and Beaches**

Coastal environments were heavily exploited by the Coast Miwok as evidenced by the numerous archaeological sites found along Tomales Bay, Kehoe Beach, Point Reyes Beach, Drakes Beach, and Limantour Spit, and around Drakes Estero, Limantour Estero, Abbott's Lagoon, and Bolinas Lagoon. Cultural resources found in these environments are primarily comprised of midden refuse, which include shell, bone, and organic residue. Several of these sites have been extensively investigated, and have provided substantive information about the past (see Prehistoric Context above).

## PAST USE OF FIRE IN CALIFORNIA AND THE PRNS

### Native American Burning Practices

While the Coast Miwok are traditionally described as collectors who engaged in hunting and plant gathering, this appellation does not acknowledge the Coast Miwok's role in shaping their environment. In fact, Bean and Lawton (1973) have gone so far as to claim that within California many native groups should have been considered proto-agriculturalists. Like other cultures around the world, the Coast Miwok took care to shape and order the natural environment around them to ensure a sustainable future, as well as to maintain a sense of aesthetic value. One of the primary tools used in this process was fire. Fire was not only used for cooking food and keeping warm, it was also used to clear the land of impenetrable brush, to improve visibility around the campsite or village grounds for protection against attack, to hunt and drive game, as well as to improve seed grasses, acorn production, basket grasses and sedges, and browse meadows (Blackburn and Anderson 1993).

Cultural fire has been part of the human-occupied landscape for hundreds of thousands of years (Pyne 1982, 2001). The degree to which that agent has shaped the physical landscape has been extensively debated. With respect to California, the argument has ranged from such positions as that of California State Forestry Board Member and author Raymond Clar (1959:7), who found it difficult to understand why Indians should care if the forest burned, let alone use fire to "improve" the forest, and continued to complain that this "fantastic idea" was being used to justify reintroducing fire into forestlands, to that of biologist Verna Johnston (1970:81, 85), who held that California Indians had used fire as a land-management tool in the Sierra Nevada for more than 3,000 years. Some years earlier, anthropologist Ralph Beals (1933:363) had noted that, until non-Indian authorities stopped the practice, firing of the landscape had taken place on a regular basis in the mountains near Placerville. Fires had been set for the purpose of driving game, resulting in a lighter stand of trees along the ridgelines, often separated by a mile or more, while the canyons and moister locations usually held thickets of timber.

BLM_0064353

The skeptical position in this debate was at least partly founded upon the near total disregard for the culture and customs of the Indians by the Spanish settlers and Franciscan missionaries, who rarely spent much time recording, let alone understanding, such activities. Another factor influencing viewpoints such as Clar's was the disruption of the native economic systems as a result of the missionization process, such that few large-scale, Native American land-management practices persisted into the 1800s. Finally, there were simply different notions of appropriate practice: Clar and others believed in a more European-based forest-management system that did not include fire as a management tool (Pyne 1982).

Several ethnohistoric observations made prior to the full implementation of the mission system in California are especially illustrative of Indian plant and animal husbandry, and maybe even a type of landscape aesthetic. Drake or his crew made no mention of Coast Miwok burning or land-management practices when he careened the *Golden Hind* at Point Reyes, quite possibly because it would have been at the wrong time of year for such activity. In other locations along and within California, however, several observations were made by various other explorers and travelers. During Cabrillo's 1542 seaward expedition, the captain and his crew reported seeing "many smokes" along the San Diego coast. Indeed, the fires were so prominent and numerous that San Diego Bay was termed Bahiá de los Fumos (Bay of the Smokes) by the Spaniards (Bean and Lawton 1973:xviii-xix; Bolton 1967:24, 33). Between the Coronado Islands and the port of San Diego, Vizcaíno reported, in 1602, seeing "so many columns of smoke on the mainland that at night it looked like a procession, and in the daytime the sky was overcast" (Bolton 1967:80). Some have proffered various explanations for this activity, ranging from signal fires for native fishermen to use as beacons while out to sea (Johnson 1962:87-88), to fires used to signal the Spanish crews as they sailed just offshore (Bolton 1967:116). A 1792 journal entry by naturalist José Longinos Martínez has a more likely explanation:

> In all of New California from Fronteras [Mission San Borja, Baja California] northward the gentiles have the custom of burning the brush, for two purposes; one, for hunting rabbits and hares (because they burn the brush for hunting); second, so that with the first light rain or dew the shoots will come up which they call *pelillo* (little hair) and upon which they feed like cattle when the weather does not permit them to seek other food [Bean and Lawton 1973:xix-xx].

Father Crespí, traveling with the 1769-1770 Portolá expedition, reported burning brush as part of a rabbit drive south of San Onofre, and in several locations where the expedition's livestock and pack animals needed forage, little was to be found due to the pasturages having been burned off by the local Indians (Bean and Lawton 1973:xx; Bolton 1927:132, 143, 197, 199, 201,214, 222, 225). Not only was fire used for clearing land, or hunting rabbits or other animals, fire was also used for plant and animal husbandry. What Crespí witnessed, but didn't realize, was a post-harvest burning technique used to improve the next year's yield, as well as a means to encourage browse animals to the area so as to hunt them. By firing the land with an annual or biennial frequency, the plant community was maintained in a primary seral stage, sustaining a grass community and suppressing the encroachment of the climax stage of a chaparral

BLM_0064354

cover. In areas of southern California fire was used to improve the quality of basket grass (Shipek 1971:10-11; Lee 1937:48), to encourage the growth of favored food plants (Lee 1937:52-53), and even to control and prevent plant diseases, such as mistletoe that afflicted mesquite groves (Evens 1873:208), and pests and diseases that inhabited native stands of *Washingtonia filifera* (Patencio 1943:69).

Yet despite this evidence, perceptions that native populations were incapable of managing landscapes for their own reasons, or were simply carrying out the mission fathers' instructions, persisted among the general populace, and particularly among some professional foresters and landscape managers. As noted above, this belief may stem from the extensive disconnect, as a result of the missionization process, between aboriginal burning practices and their relationship to the native economic structure upon which it was founded.

Don José Joaquín de Arrillaga, Interim Governor of Alta and Baja California, issued the first proscription against Indian burning practices on 31 May 1793 (translation reprinted in Clar 1959:8-9). While Indian groups living outside the mission system did not always heed the proscription (for example see Derby 1932:372-373), the fact that the missions had managed to relocate many individuals to within mission walls meant that cultural fire was no longer applied to the landscape on a regular basis. By the time the Americans arrived in California as a political group, Indian management strategies for much of the state had been abandoned or prohibited for at least 30 years (Bean and Lawton 1973:xxi). Consequently, the fire cycle was greatly decreased, wooded areas closed in, and brushlands expanded and thickened (Lewis 1973:49).

Not only did native peoples use fire for hunting and proto-agricultural purposes, fire was used to create a sense of environmental order, or aesthetic. Totuya, an Ahwahneeche who was raised in Yosemite Valley, provided a salient example of this value. In 1929, after a 77-year absence, Totuya returned to the valley, where her reaction to the altered landscape was documented:

> As she toured the valley with her daughter and several white friends, she saw that there were stands of pine trees in the meadows where her people had played field games; azalea thickets, clumps of tall cow parsnip, and showy milkweed. She shook her head disapprovingly and observed in English: 'too dirty; too much bushy.' The Ahwahneeches had kept the meadows open by firing the dry grass each fall. Only Leidig Meadow was yet free of encroaching forest and undergrowth, and she laughed in delight when she saw it. She greeted Yosemite Falls with a cry of joy: 'Cho-lock! Cho-lock no gone!'

> She noted the many man-made changes—roads, the hotels, cabins, campgrounds, offices, stores, and other structures—and clasping her hands, remarked: 'All fixed up! Ahwahne too dirty bushy!' [Sanborn 1989:237-238].

Near Fort Ross an informant to ethnographer Samuel Barrett provided a description of a portion of the Russian River valley that, while not including a direct observation of the use of fire, indicates a setting that most likely resulted from regular fire clearing by members of the Southwestern Pomo:

34

> Except for willows and the like at some points along the river, there were almost no trees in the valley itself. But here was a great wide area of waving grass higher than a man's head, with deer, bear and other big game everywhere . . . In the foothills were many great oaks loaded with acorns, and farther up were the buckeyes, manzanitas, and other kinds of Indian foods. It was up there that we found the Indian potatoes (various bulbs of the lily family) [1952:47].

And in describing Redwood Valley, within the same general area, geographer Fred Kniffen noted:

> The vegetation covering has experienced great changes. Certainly the chaparral thickets of manzanita, madrona, scrub oak, and buckbrush which now characterize many sections of the valley were formerly restricted to the higher slopes and ridges of the mountains. A beautiful park landscape, largely of oaks, was maintained by annual burning, done 'when the straw was dry.' In this manner the brush was held down; the larger trees were uninjured [1939:373].

> Acorn gatherings lasted until late November. That the gathering might be easier, all the dry weeds and brush were annually burned after the seed gathering was over, so that there remained no underbrush in the valley or on the lower hillsides [1939:378].

Additionally, Stewart was told by an informant that "[t]he grass was burned every year. The fires were started and allowed to burn in every place. Burning was to make the weeds grow better and to keep down the brush" (1951:320)

Research conducted by Duncan (1992) documented paleobotanical shifts in the early contact, or *encuentro*, period (1579-1775) in southwestern Marin County, including the PRNS. Using a variety of techniques, including identifying fossil pollen in core samples, macrobotanical samples taken from archaeological sites, and historical documents Duncan noted that there were observable botanical shifts from native species to more dominant European-Mediterranean species within her study area.

Of particular note in Duncan's study were documents relaying the observations made by senior Russian personnel, who based their agricultural and maritime activities at Fort Ross, as well as other non-Spanish explorers/global traders traveling in the region. In 1792 Vancouver described the vegetation community from Point Reyes to the Marin Headlands:

> [T]he verdure of the plain continued to a considerable height up the sides of the hill, the summits of which, though chiefly composed of rugged rocks within a musket shot of the land, one could see it produced a few trees [1967:10].

Chamisso noted while on Von Kotzebue's expedition that "they [Coast Miwok] neither reap nor sow, but burn their meadows from time to time to increase their fertility," and that Point Reyes, Tomales Bay, Stinson Beach, the Marin Headlands, Angel Island, and Corte Madera Creek were "dreary and barren with few scattered trees

BLM_0064356

on the higher elevations and patches of dwarf shrubs in the valleys" (Von Kotzebue 1967:48).

In particular, Klebnikov (1976:126) noted that the Coast Miwok collected rose hips and dug for roots after the fall burning, while Golovnin noted that in order

> [T]o harvest the wild rye grain they resort to a very simple, although rather curious, method: they set fire to the entire field: the grass and stalks, being very dry, burn very fast, while the grain is not consumed by the fire but very scorched. They usually set these fires at night, so that when approaching the coast one always knows where the Indians have established their camps [1979:7].

Duncan's study of core samples documented palynological and sedimentological histories for the Point Reyes area. She hypothesized that, as a result of the contact with Europeans, landscape-management practices were altered, and would be reflected in the core samples. Indeed, Duncan found that not only was there a marked shift in the structure of the plant communities sampled, but this shift was followed by a markedly larger gap between burning episodes, as indicated by carbon layers within the cores. As she states:

> After A.D. 1793, annual grasses and herbs increased; fire dependant, seral stage species such as manzanita did not expand their range, but were replaced by introduced plants; and the small amounts of charcoal recorded diminished through time, reflecting a lengthening of the fire interval [1992:349].

Additionally, Anderson (2001) examined sediment cores taken from Wildcat Lake and Glenmire (immediately north of Glen campground). Based on the data collected Anderson proposed a fire history for the southwest corner of the PRNS in both a coastal scrub setting, dominated by California sagebrush, coyote bush, and California coffeeberry (Wildcat Lake) and in a closed canopy Douglas fir–California Laurel–mixed oak setting, with a hazelnut and California huckleberry understory (Glenmire). Anderson's radiocarbon data suggests a relatively complete fire history to 3,400 years B.P. at Wildcat Lake (core 1), and to 5,250 years B.P. at Glenmire (core 3). Anderson noted that the top 58.5 cm of the Wildcat Lake core contained very little charcoal, as did the top 100 cm of the Glenmire core. Anderson argues that the near lack of charcoal in the upper portion of the columns represents the last 100 years of active fire suppression on the Point Reyes peninsula. Data from the rest of the Wildcat Lake column seemingly indicates that fire occurred at regular intervals, suggesting fires with light to moderate intensity, but higher frequency, as would be expected in a grass/scrubland zone (see Biotic Environment – Rolling Hills above). The Glenmire data, however, suggests less frequent, but more catastrophic fire events, as would be expected in a forested zone (see Biotic Environment – Inverness Ridge above). Interestingly Anderson's data (2001:10, 12) indicates a greater charcoal ratio in the Douglas fir environment from 2,250 to 1,000 B.P., which decreases during the last millennium (1,000 to 100 B.P.), while the charcoal ratio in the California scrub environment is greater in the 1,000 to 100 B.P. period, and lesser in the 2,250 to 1,000 B.P. period. This pattern may be indicative of the use of fire in the coastal scrub area by the Coast Miwok. Anderson rules out dramatic environmental

36

BLM_0064357

change as a factor based on pollen stratigraphy recorded at Coast Trail Pond by Rypins et al. (1998). Future planned studies may go to some lengths to clarify this issue.

Though there may be a lack of documented observation of Coast Miwok land management through the use of fire within the Point Reyes peninsula specifically, it is apparent, based on ethnographic observations (e.g., Chamisso and Klebnikov above), that the Coast Miwok did use fire to modify their environment, and it is entirely possible that these practices were carried out within the PRNS. Additionally, it is evident, from both historical documents and through palynological and ethnobotanical research, that the Coast Miwok, among other groups, did burn the landscape around them, not without purpose, as Clar suggests, but because they had very real goals to be realized for their own survival and sense of what constituted a proper environment.

**Historic-period Fire Use**

With the arrival of the mission system to the North Bay region after 1775, dramatic shifts in population and fire regimes took place in the area, which have been documented in part by pollen studies on the Point Reyes peninsula (Anderson 2001; Duncan 1992; Mudie and Byrne 1980; Russell 1983) and at other locations in Marin County (Duncan 1992). Physical evidence of these changes can be found along many stream and river channels where the lower terraces are often composed of historic-age sediments (Knudsen et al. 2000), as are many of the estuarine deposits. By the late 1800s, native vegetation cover had been greatly reduced through over-grazing by domesticated livestock during periods of intense drought, creating a landscape that was particularly susceptible to erosion (Burcham 1982:171), as did many historic-period logging, mining, and agricultural practices. The 1793 fire proscription issued by Don José Joaquín de Arrillaga, seeking to abolish a cultural practice that interfered with the needs of the missions, was also applicable to the non-native population when California was under Spanish governance. Policies such as these, in the end, had lasting repercussions well into the American period of California history.

Fire is perhaps the single-most efficient means of clearing land of unwanted plant cover. Not only did this technique serve the needs of the Coast Miwok, it almost certainly served the needs of nineteenth and twentieth century ranchers. Praetzellis et al. (1985:44) noted that prior to World War II ranchers in the Warm Springs area used fire, along with girdling, to remove stands of Douglas fir and increase rangeland. After the war the value of Douglas fir dramatically increased and such practices were suspended, but by the 1980s ranchers were again burning sections of their acreage. Unfortunately no official records have been located that describe burning practices during the ranching period on the Point Reyes peninsula. In researching the ranching history for the PRNS, Livingston (2003, pers. comm.) was unable to locate any direct evidence that ranchers systematically fired the landscape as a means of managing or expanding rangeland, but he had been informed by resident Lee Murphy that there had been attempts to burn a brushy hillside near Home Ranch sometime in the 1940s; the action, however, failed to create new pasture. Other individual landowners may have fired their properties for similar reasons as the Coast Miwok had (Maxie 2003, pers. comm.), but evidence of this practice has not yet been documented.

BLM_0064358

While ranchers may or may not have intentionally set fire to their rangelands in the PRNS, accidental fires did occur, sometimes burning hundreds or thousands of acres. For example, Livingston (1994:431) notes that in 1927 a small fire originating from the blacksmith shop of the Oporto Ranch, located on the west side on Inverness Ridge, escaped into the surrounding area, threatening the small community of Inverness on the east side of the ridge. This scenario was not at all atypical in the Point Reyes peninsula and Olema valley areas as Tables 5 and 6 below indicate. In the days of kerosene lamps and wood-fired stoves domestic fires were a particularly dangerous problem in rural communities, especially since efficient means of firefighting was usually only available in urban centers.

Despite the frequency and often devastating effects of fire located on farm and ranch lands, nearly all references to fire found in the Anne T. Kent California Room of the Marin County Civic Center Library archives (Federal Writers folder), and archives held by the Point Reyes Light related to fires located around Mount Tamalpais, Bolinas, San Rafael, and Mill Valley (Table 7), with reportage decreasing proportionally to the distance from these centers unless the fire was substantial; only one reference to fire located on the Point Reyes peninsula was located, that of the 1927 Oporto Ranch fire previously mentioned.

**Table 5. Partial History of Fires in the Golden Gate National Recreation Area.**

| Ranch/Property Name | Date Burned | Property Type Burned | Source: Livingston |
|---|---|---|---|
| McCurdy Ranch | 1935* | Ranch house | 1995:107 |
| McIsaac Ranch | 1885<br>1916 | Tocaloma House<br>Bertrand's Hotel | 1995:351 |
| Neil McIsaac Ranch | 1960s | All remaining ranch buildings | 1995:373 |
| Randall Ranch | October 1890 | Most of the pastures and fences | 1995:151-152 |
| Stewart Ranch | 1931 | Ranch house damaged | 1995:219 |
| Truttman Ranch | December 1941<br>1993** | Bloom's 1870s ranch house<br>Truttman's 1944 house | 1995:251,253<br>1995:260 |
| Wilkins Ranch | October 1890<br>1904<br>1945 | 90% of the rangelands<br>Bridges and culverts<br>Pasture, timber, Union Copper<br>Mine buildings and structures | 1995:80-81 |

* Fire postdates date indicated
** Burned as a firefighting exercise

Note: see Figure 7 for ranch locations in Olema Valley.

BLM_0064359



**Figure 7.** Ranch Names and Locations in the Olema Valley and Lagunitas Canyon *(Livingston 1995:70)*

BLM_0064360

**Table 6. Partial History of Fires in the Point Reyes National Seashore.**

| Ranch/Property Name | Date Burned | Property Type Burned | Source: Livingston |
|---|---|---|---|
| B Ranch | 1950 | Hay Barn | 1994:112 |
| C Ranch | 17 April 1889 | Peterson House (1885) | 1994:129 |
| D Ranch | 19 March 1928 | Bunkhouse, Garage, other buildings slightly damaged | 1994:144 |
| F Ranch | 1845 | Osio's original adobe house | 1994:173, 175 |
| H Ranch | 1930* 1965* | 1883 dairy barn Shafter-era house knocked down and burned | 1994:255 1994:257 |
| I Ranch | 1925 | Main house | 1994:41, 246-247, 270-271 |
| K Ranch | September 1973 | Schoolhouse (early 1930s) | 1994:298 |
| N Ranch | 1939* | Main house | 1994:333 |
| Biesler Ranch | 1966 | Biesler-era house and dairy barn | 1994:497 |
| Hagmaier Ranch | 12 July 1888 1940 1966 | Ranch house Milking barn House | 1995:132 1994:496, 498; 1995:134 1995:134-135 |
| Lake Ranch | November 1890 | Hay barn | 1994:343 |
| Lake Ranch | 1926 | Eight square miles of brush and rangeland | 1994:345 |
| Laguna Ranch | 1950s | Ranch house (partial) | 1994:420-421 |
| Oporto Ranch | 13 October 1927 | Blacksmith shop, thousands of surrounding acres | 1994:431 |
| Pierce Ranch | 1884 and 1895** | Barn and 13 horses | 1994:456 |
| Tomales Bay Gun Club | 1940s | Main building | 1994:479-480 |

\* Date burned approximated
\*\* Burned some time between these two dates

Note: see Figure 8 for ranch locations in the Point Reyes National Seashore.

BLM_0064361

**Table 7. Partial History of Fires in Marin County.**

| Year of Fire | Location | Property Burned |
|---|---|---|
| 1859 | Mount Tamalpais | Mt. Tamalpais burned for 3 months |
| 1865 | Bolinas Bay | Forests along the shore of Bolinas Bay burned for 2 weeks |
| 1878 | Nicasio | Over 1,000 acres burned near Nicasio |
| 1881 | Mill Valley | 65,000 acres of Mill Valley and Mt. Tamalpais |
| 1890 | San Rafael-to-Bolinas | Over 8,000 acres between San Rafael and Bolinas burned |
| 1891 | Ross-to-Mt. Tamalpais | Fire ignited near Ross eventually burned 12,000 acres on Mt. Tamalpais |
| 1893 | Mt. Tamalpais | Over 3,000 acres of Mill Valley and Mt. Tamalpais burned |
| 1904 | Bolinas Ridge | Between 15,000 and 20,000 acres burned on the west side of the Bolinas Ridge |
| 1913 | Rock Springs-to-Larkspur | Over 1,500 acres burned |
| 1923 | Bolinas Ridge-to-Fairfax | Between 20,000 and 30,000 acres burned between Bolinas Ridge to near Fairfax |
| 1929 | Mt. Tamalpais | The "Great Mt. Tamalpais Fire" burned 2,500 acres and 117 Mill Valley homes |
| 1945 | Kent Lake | 18,000 acres burned around the Kent Lake area |
| 1995 | Mount Vision, PRNS | 48 homes and over 12,000 acres burned from Inverness Ridge to the coast |

*Source*: People, Parks & Fire. Supplement to the *Marin Independent Journal*, 5 October 2002:2.

BLM_0064362

*EFFECTS OF FIRE AND FIRE MANAGEMENT
ON CULTURAL RESOURCES*



**Figure 8.** Ranch Names within the Point Reyes National Seashore *(Livingston 1994:32)*

41

42

BLM_0064363

# CHAPTER 4 –FIRE AND FIRE BEHAVIOR

Over the past several years, a number of agencies within the Departments of Agriculture and the Interior have begun to more fully integrate the management of cultural resources with the management of natural resources, particularly those properties with "vegetation capable of burning." This action has resulted in the issuance of NPS Director's Order #18 and Reference Manual #18. In addition, a forthcoming volume (*Wildland Fire in Ecosystems: Effects of Fire on Cultural Resources and Archeology*, RMRS-GTR-42-vol. 3.) of the Rainbow Series will deal specifically with effects on cultural resources (see US Forest Services web site <http://www.fs.fed.us/rm/main/pubs/electronic/rmrs_gtr.html> for information on availability).

National Park Service personnel began reporting on the effects of fire on cultural resources in the early 1960s (e.g., Burgh 1960). Since that time, a number of field experiments and post-burn observations have been reported, noting the effects of fire on artifacts. However, due to the uncontrolled nature of wildfire, collected data were without direct comparability, and laboratory settings have rarely matched the unpredictability of natural fire.

## BASIC FIRE CONCEPTS

Fire behavior is highly variable, and situationally dependent, however, there are a few factors that strongly dictate the overall behavior of a fire. Fire is primarily driven by fuel, or vegetational biomass: the grass, brush, shrubs, and trees. With respect to cultural resources it is the biomass that provides the source of the energy needed to alter the characteristics of an artifact (Ryan and Noste 1985). Fuel is often separated into three component groups: the total above-ground biomass, the total fuel, and the available fuel. Total above-ground biomass is the total dry mass of living and dead plant tissue lying above the mineral soil layer, and is usually greater than total fuel, while total fuel is the amount of plant material that is capable of burning, and is usually in greater abundance than available fuel. Available fuel is that portion of the total fuel that actually burns in a given fire. Above-ground biomass varies by vegetation type and community. Forests often have the least amount of potential fuels, relative to other communities, mainly owing to the fact that much of the biomass is stored within the green wood of the tree. Brushlands, with their more compact floral communities contain more potential fuel than forests. Because of the even higher density of plant life and the greater surface area of those plants available for burning grasslands often contain the most above-ground biomass (Ryan and Noste 1985).

Energy is another critical component contributing to fire behavior and its effect on cultural resources. Total energy is the product of available fuel and its inherent heat content, and results from a combination of the energy release and the amount of time, or duration, of that release. The rate at which energy is released and the duration of burning determine the amount of heat produced. Fuel burn rates, aside from additional factors that can influence burn rates, such as humidity, wind, and slope, are determined by the physical configuration of the fuels. Cylindrical fuels—like grasses, conifer

43

BLM_0064364

needles, twigs, and logs—burn at a rate of about 3.15 min./cm diameter. Partially decomposed materials, like duff and rotten logs, tend to burn more slowly due to their higher moisture content, or higher density and lower surface area; the rate of the burn of these materials tends on the order of hours.

Fuels are often classified as occupying three distinct zones: ground, surface, and aerial. Ground fuels—those that lie directly on the ground surface—include duff, decomposing logs, and roots. Fires that consume these materials are termed *ground fires*, or *creeping surface fires*. Surface fuels lie above the ground surface but are less than about 2 m (6.5 ft.) high; they include such items as grasses, forbs, litter (fallen twigs and branches), low shrubs, and seedlings. Fires that burn off this fuel type are termed, *active*, or *running surface fires*. Aerial fuels are generally taller than 2 m and comprise tall shrubs, trees, and snags. Fires that burn aerial fuels are associated with the upper stories of trees and tall shrubs and bushes, and are termed *crown fires*. Other factors influencing fire behavior are weather, particularly humidity and wind speed and direction, and the terrain upon which the fire is located.

Archaeological resources are differentially affected by the manifold factors that define how a fire will behave. The overall effect on archaeological deposits depends on the amount of energy released, the duration of that release, and the proximity to the source of heat. The greater any of these factors is the greater the potential for adverse effects to occur on cultural resources. The same four basic modes of heat transfer that help fire spread through the environment—radiation, convection, conduction, and mass transport—also affect cultural resources in a similar fashion. In both wildland and prescribed fire situations radiation, conduction, and, to some degree, convection are the means of heat transfer that directly affect archaeological materials. Despite the complex nature of fire behavior and heat-transfer mechanisms, it is possible to characterize fire behavior, in general terms, in the three fire zones: ground, surface, and crown fires.

Of these three zones, ground and creeping surface fires are the least intense. Accordingly, ground-level fires are preferred for prescribed burns, as the direct effects on cultural resources will be substantially less due to the cooler nature of the fire. Moderate damage to cultural materials may result from active and running surface fires, due to the greater amount of energy released. Active and running surface fires are often associated with wildland fires. Many researchers believe that ground and surface wildland fires were the norm in pre-1900 northern California, while running surface and crown fires were far more rare (Lewis 1973; Pyne 1982; Ryan and Noste 1985).

A number of factors influence the temperatures reached at various depths of the soil profile during and after prescribed and natural fires. The zone in which fire predominates, the amount of fuel consumed, the relative humidity, the amount of moisture within the fuel structure, and the amount of moisture within the soil column all have some bearing on soil temperature. Running surface and crown fires can generate a substantial amount of energy, but that energy may only affect the upper 2 to 3 cm of the mineral soil layer. Slow moving, but hot, ground fires in duff and deadfall, however, can result in a significant increase in soil temperature. Surface temperatures can rise over 700° C for several minutes in severe chaparral fires (DeBano, Rice, and Conrad 1979:5-6; Table 5). The depth to which soil will be heated is also a function of soil

44

BLM_0064365

moisture content and, to a lesser extent, soil texture. Soil temperatures in wildfire contexts can reach 200° C at depths of 10 cm or more below surface. Recent research in Giant Sequoia-mixed conifer forests of the southern Sierra Nevada indicates that prescribed burns also produce relatively high temperatures at shallow depths (Haase and Sackett 1998).

**Table 8. Maximum Surface, Litter, and Soil Temperatures during Intense, Moderate, and Light Burns** (adapted from DeBano, Rice, and Conrad 1979:7).

| Burn Intensity | Typical Maximum Temperatures (°C) | | Data from Sampson (1944) | | Data from Bentley and Fenner (1958) | |
|---|---|---|---|---|---|---|
| | Surface | 2.5 cm below surface | Litter layer | Soil | Surface | 2.5 cm below surface |
| Intense | 691 | 199 | 649 | 243 | >538 | 288 |
| Moderate | 427 | 166 | 429 | 202 | 399 | 177 |
| Light | 249 | 88 | 149 | 93 | 177 | 71 |

Tree roots present another potentially significant source of subsurface heating. Once ignited, roots will often burn in a slow, smoldering fashion. Large-diameter root systems can burn for extended periods of time, on the order of weeks, and can burn well below the ground surface, generating relatively high heat. However, because soil around root systems tends to be relatively moist, the effects of the heat will be somewhat mitigated by that moisture, restricting fire effects to the area immediately surrounding the burning root.

BLM_0064366

# CHAPTER 5 – EFFECTS OF FIRE AND FIRE MANAGEMENT

## DIRECT, OPERATIONAL, AND INDIRECT EFFECTS

Both fire and fire management affect cultural resources. The effects associated with managing prescribed fires and fighting wildfires, as well as post-fire operations, can be divided into direct, operational, and indirect categories. Direct effects are those where fire itself is the cause of the adverse effects; operational effects occur as a result of associated operations like fuel-break and line construction or staging; while indirect effects result from the aftereffects of a prescribed or wild fire, or associated operations, which may then result in significant adverse changes in the integrity of a resource.

### Direct Effects.

The direct effects of fire and fire management on cultural resources can be quite substantial. Fire has the capacity to consume all organic materials, both above and below ground, including wooden buildings, structures, or other objects, artifacts made from bone or antler, and organic residues within soil matrices or located on stone tools. Fire also can alter the form and structure of inorganic items, such as glass, various metals, ceramics, and even the very structure of the surrounding soil.

The following sections deal with illustrating how cultural resources are or may be affected by fire and fire behavior. From what has been illustrated above, it can be stated, unequivocally, that the more extreme the fire behavior, the greater the potential for adverse effects on cultural resources. Not all materials, however, are equally predisposed to fire's effects (e.g., organic materials burn more easily than inorganic items). Even within single artifact classes, there can be disparities between overall effects. A case in point is obsidian. The hydration layer, or rind, that forms on newly exposed obsidian debitage and artifacts—which is used for relative dating of the obsidian piece and/or its context—has been shown to be highly sensitive to heat, while the structural integrity of the obsidian may show little or no discernible effects. Because the effects of fire are disproportionate across and within artifact classes, it is necessary to explore separately what is known of the effects of fire on the materials that commonly comprise cultural resources. It should be borne in mind, however, that while the following discussion attempts to be comprehensive, it is by no means an exhaustive review of either fire effects or cultural resource classes.

### Flaked Stone

Flaked-stone artifacts are generally associated with prehistoric archaeological deposits, and usually occur as formed tools and debitage. Common raw materials used in the production of flake-stone tools include obsidian, cryptocrystalline silicates (e.g., chert and chalcedony), and basalt and other fine- to medium-grained igneous rocks. Innumerable studies have demonstrated the value of certain flaked-stone tools, projectile points in particular, as time-markers for building local and regional chronologies. Also, analyses of lithic material sources can illustrate spatial patterns such as trade networks or exclusivity (Pigniolo 1992; Van de Hoek 1990), while debitage analyses can provide information about technology, adaptation, ethnicity, mobility, and other matters (Bieling 1991).

46

BLM_0064367

Flaked-stone tools and debitage of all raw materials are vulnerable to structural modifications (e.g., breakage, melting, discoloration, reduction of mass through water loss or increased porosity) as a result of heat from fire. Luedtke (1992:99-101) notes that chert specimens most often break due to thermal shock resulting from applying heat too rapidly or cooling too quickly. Laboratory studies performed on cryptocrystalline silicate specimens reveal that beyond 350° C, artifacts crack, spall, and shatter (Mandeville 1973; Purdy and Brooks 1971). In a recent experiment Benson (1999) exposed 90 cryptocrystalline silicate specimens to a prescribed burn in light, moderate, and heavy sagebrush fuel loads, which resulted in the breakage of all the samples, including some that were shattered beyond recognition. Temperatures measured ranged from approximately 40° to 705° C.

Prehistoric heat-treating of cryptocrystalline silicates to enhance desired flaking characteristics of this material type has been well-documented (Collins and Fenwick 1974; Mandeville 1973; Purdy and Brooks 1971). While initial heating of siliceous materials "improves" its flaking ability, additional firing can have a particularly negative effect on these resources. Hylkema (2003) noted that heat-treated cherts often shattered or otherwise broke when heated a second time. In addition to increased flaking ability, other alterations to raw materials that undergo heat treatment include potlidding, crazing, and color changes; these same effects can occur under wildfire and prescribed-fire conditions (e.g., Barnes 1939; Benson 1999; Lentz 1996a; Luedtke 1992; Romme, Floyd-Hanna, and Conner 1993). Furthermore, Kritzer (1995) has documented the creation of natural flakes produced by heating cobbles and chunks of basalt and other medium- to coarse-grained igneous materials that are virtually indistinguishable from cultural flaking debris.

Obsidian is particularly important to archaeologists because of its ability to be traced to a specific geologic source, which can help identify particular quarries and possible trade networks, and its ability to provide an approximate absolute date, thereby dating archaeological deposits. Equally important is that obsidian is relatively abundant and can be inexpensively sourced and dated. Consequently, a number of recent studies have addressed the effects of fire on the physical integrity, chemical composition, and hydration rinds of obsidian tools and debitage. Obsidian specimens exposed to heat have shown macroscopic and microscopic alterations as noted by a number of researchers. In a study by Nakazawa (1999), heated laboratory and archaeological specimens developed bubbles, became vitrified, showed microfracturing, or resulted in explosion or breakage. Anderson and Origer (1997:18) collected obsidian artifacts after a wildfire and noted that the specimens had been so altered that visual sourcing was difficult to perform. Additionally, obsidian artifacts exposed to temperatures between 705 and 760° C during a wildfire event were described by Steffen (1999) as displaying extreme vessiculation (melting and frothing).

Chemical sourcing of obsidian can provide particularly useful data to archaeologists or other researchers. Fire, however, has the potential to alter chemical signatures found in obsidian. While obsidian has been collected from post-burn contexts that have been successfully sourced (Deal 2001:5), Shackley and Dillian (1999), have reported finding bonded sands on thermally altered obsidian, which have impeded their X-Ray fluorescence sourcing tests. Similarly, Skinner, Thatcher, and Davis  (1997) had

BLM_0064368

difficulties, while using X-Ray fluorescence, sourcing fire-affected obsidian artifacts due to silica-based encrustations.

The particular nature that allows obsidian to be useful as a datable source in archaeological contexts also makes it susceptible to the effects of fire. When a fresh surface of obsidian is exposed it begins to absorb water from it surrounding environment. Over time this process, or hydration, results in the creation of a hydration band, or rind. Hydration rinds can be adversely affected by the heat resulting from fire events, by driving bonded water within the hydration band further into the artifact. In some cases this diffusion process can result the elimination of the band altogether when temperatures are sufficiently high, or when flame duration is sustained. When hydration rinds are driven further into the obsidian substrate the obsidian-hydration age may result in an overestimation of age (Skinner, Thatcher, and Davis 1997:10). On the other hand, if the band becomes completely diffused, or eliminated, the sample may register as being much younger than its actual age.

Following an informal field plot experiment in Yosemite National Park by Kelly and Mayberry (1979), which included "salting" a prescribed burn with a variety of artifacts to observe any changes, most of the studies addressing this issue have focused on post-burn observations at sites burned during wildfires or prescribed burns (e.g., Anderson and Origer 1994; Origer 1996). These studies, and others like them, have illustrated that the effects to hydration rinds are proportional to the severity of the fire; light burns, such as fast moving ground fires may result in little or no diffusion of the hydration band, while severe fire behavior is more likely to cause a high degree of diffusion, or even elimination of the hydration rind. While several studies conducted in both wildland-fire and laboratory settings indicate that obsidian-hydration bands begin to be visibly altered at about 95° C, and virtually disappear above 150° C, the effects of temperature duration is less well understood. Furthermore, Solomon (2000) has shown that, in addition to temperature and duration of heat application, the medium upon which the artifact was placed affected the point at which hydration rinds were influenced; those placed in ceramic crucibles had less diffused rinds than those placed in or on sand when heated to comparable temperatures and equivalent durations.

While fire events can adversely affect obsidian artifacts, rendering them potentially unusable for dating purposes, Anderson and Origer (1997) suggests that after a relatively short period of time fire-affected obsidian-hydration rinds might actually return to their original size and configuration. Laboratory-based experiments conducted by Loyd (1999), however, produced equivocal results when attempts to induce re-hydration were made.

### Groundstone

Groundstone artifacts include mortars, pestles, millingstones, handstones, and bedrock mortars and milling slicks, also termed milling stations.

Observations of the effects of fire on groundstone have been made mainly on samples from archaeological sites burned over in wildfire situations. Much like obsidian noted above, overall effects to groundstone depend on fire intensity. Pilles (1984) found that raw material composition of groundstone tools dictated the degree of fire effects;

48

BLM_0064369

those made of sandstone frequently cracked, while basalt specimens subjected to the same fire intensity exhibited only blackening. Wilson and DeLyria (1999) also noted that basalt and andesite are more durable than quartzite. Lentz (1996b:63) notes that light-intensity burning generally had little effect on the surfaces of groundstone artifacts, however, high-intensity fire resulted in sooting, oxidation, or loss of structural integrity. In some cases groundstone artifacts showed signs of heat-induced adhesion of adjacent materials. Lentz (1996b:63) also suggested that important information may be lost as a result of high-intensity fires. Groundstone surfaces could exfoliate, possibly leading to misidentification of artifact class (e.g., groundstone versus fire-cracked rock). Information pertaining to use-wear, and environmental and dietary information derived from palynological and macrobotanical data might be lost as well, either by fire directly or through the loss of the ground surfaces. Ancient residues have been found on groundstone in both laboratory and post-fire settings, however, and number of researchers are of the opinion that naturally and culturally fractured rock can be distinguished by observing variables such as fracture patterns and differential on-site fuel loading, or conducting organic-residue analysis and luminescence tests of mineral components of the groundstone (Deal 2001; see below).

Similarly, bedrock milling stations are also susceptible to fire damage resulting in spalling, exfoliation, cracking, and smoke-blackening, as documented by Keefe, Kahl, and Montague (1999:112). Again, like other lithic artifacts, the extent of damage to the bedrock milling features appeared to correspond with the amount of fuel, and thus fire intensity, located on or near the features.

### Glass

Glass artifacts such as beads, bottles, and jars, either whole or fragmented, are commonly found in historical and protohistorical archaeological sites. Glass artifacts can be useful in both determining the function of archaeological deposits, as well as dating them. Flaked-glass tools, such as projectile points or scrappers, have also been found in sites with Native American components as well.

Glass artifacts can be easily affected by fire-associated flames, smoke, and heat build-up (Haecker 2000:7-9). Exposure to heat can result in crazing, or cracking of glass into smaller, irregular fragments, which can impede future identification of both form and function of the artifact. The extent of adverse effects to glass is a function of the type and thickness of the glass, and the temperature of the fire. Soda lime glass—commonly used for containers, windows, pressed-glass vessels, and lighting products—has a melting temperature of about 540° C, while lead glass melts at 420° C.

### Metal

A variety of metal artifacts—including cans, nails, gun cartridges, telecommun-ication lines, fencing wire, automobile parts, woodstoves, horseshoes, coins, utensils, and building materials—are often found in historical, and sometimes in protohistorical deposits. When these materials are found in good preservation they can provide a remarkable amount of information concerning site chronology and the lifeways of the culture that produced the deposit.

49

Metals commonly found in historical archaeological sites have a wide range of melting points, from 135° C to over 1,500° C (Table 9). Haecker (2000:10-12) noted that, under certain circumstances, metals with a higher melting point may form an alloy that begins to melt at lower temperatures when a metal with a lower melting point drips onto the former metal. Metal artifacts that do not melt may warp out of shape under certain conditions.

**Table 9. Melting Points of Metal Materials Commonly Found on Historical Archeological Sites** (adapted from Haecker 2000:10-11)

| Material | Temperature (°C) | Artifacts |
|---|---|---|
| Aluminum | 660 | Kitchenwares |
| Brass (yellow) | 932 | Cartridge cases, military buttons and insignia |
| Cast iron | 1,350 to 1,400 | Kettles, Dutch ovens, wood stoves |
| Copper | 1,082 | Kitchenwares, building materials, coins |
| Gold | 1,063 | Coins, jewelry |
| Iron | 1,540 | Tools, nails, horseshoes, cans, corrugated roofing |
| Lead | 327 | Bullets |
| Nickel | 1,455 | Plating |
| Pot metal | 300 to 400 | Flatware, pots, faucets |
| Silver | 960 | Coins, jewelry |
| Solder (tin) | 135 to 177 | Patch repair on brass and iron objects |
| Steel (stainless) | 1,427 | Eating utensils, kitchenwares |
| Steel (carbon) | 1,516 | Heavy machinery parts |
| Tin | 232 | Kitchenwares, toys, building materials |
| White pot metal | 300 to 400 | Kitchenwares |
| Zinc | 375 | Plating for iron objects |

While purposeful trash burning or accidental building and structure fires have affected many historical metal artifacts, many of these fires may have not been of sufficient temperature to cause adverse damage, though certain components (e.g., lead solder in cans) may have melted, causing a loss of structural integrity and hastening disintegration (Haecker 2000:11). Applied enamel and plating (such as tin, brass and silver) can vaporize or spall off, allowing the base metal to oxidize. The higher melting points of copper and brass means that they tend to be more resistant to the effects of fire, though Haecker (2000:12) documented an incident at the Little Bighorn Battlefield where unfired gun cartridges detonated when exposed to a grass fire. Damage can occur even to more durable metals such as iron and steel. Fire can result in pitting or other surface damage, and may lead to long-term attrition. Another potential impact to metal artifacts and features is thermal shock, which can occur when heated metal is subjected to sudden cooling through the application of water. For example, if cast iron is heated to

BLM_0064371

temperatures below 1,000° C it will crack when rapidly cooled. Not only will this destroy the artifact, it may also accelerate oxidation processes.

### Historic-era Ceramics

Ceramic artifacts and fragments are one of the most frequently recovered artifact types from historical sites, and can be sometimes found in protohistorical deposits. The degree of fire effects to ceramics is conditioned by the characteristics of the ceramic's paste, glaze, and decoration, as well as the temperature to which the artifact is exposed (Haecker 2000). Refined (i.e., glazed) earthenwares (e.g., ironstone, hotel wares) are usually fired between 1000 and 1300° C, but once fired can crack and become discolored at the relatively lower temperatures associated with some natural and prescribed fires. Porcelains have a melting temperature of about 1,550° C, but at lower temperatures overglaze paint decorations and makers' marks can become discolored and/or eliminated, potentially compromising the ability to accurately identify and/or date the artifact.

### Cement, Brick, and Cinder Block

These common building materials are also frequently found in association with historical archaeological sites, as well as standing buildings and structures. Haecker (2000:7) notes that porous firebrick is highly susceptible to fire, and that cinder block, certain masonry surfaces, and cement mortar could spall when exposed to fire. Experimental heating performed on gypsum plaster, firebrick, and cement mortar revealed varying effects depending on fire temperature. At about 245° C, the firebrick and cement mortar were unchanged, and the gypsum plaster was discolored and friable. The firebrick discolored and broke, gypsum plaster became even more friable, and the cement mortar discolored at temperatures exceeding 650° C. Keefe, Kahl, and Montague (1999) recorded damage in the form of spalling and cracking on concrete features burned over during a wildfire event.

### Rubber and Plastic

Though rubber-based artifacts have been recovered from archaeological contexts hundreds of years old, rubber, and especially plastic, artifacts are often found on more recent historical sites. Haecker (2000:11, 12) observes that rubber and rubberized artifacts are completely incinerated in low-intensity fires, while plastics melt at between 75 and 265° C. In addition to loss of information regarding form, function, and age, rubber and plastic products could alter or obscure other artifact classes as the former melts.

### Rock Art and Spiritual Resources

Rock art sites include both petroglyphs and pictographs, which are frequently associated with middens and other habitation debris (Lee, Hyder, and Benson 1988; Loubser and Whitley 1999). Spiritual resources encompass both the tangible (e.g., Vision Quest markers) and the intangible (vistas and landscapes).

Romme, Floyd-Hanna, and Conner (1993) note that rock art panels are particularly susceptible to exfoliation if directly exposed to fire events. Pictographs are also

BLM_0064372

vulnerable to the adverse effects of fire because the organic component of some pigments can be easily oxidized.

Direct impacts to spiritual resources are often more subtle. While tangible items like Vision Quest markers and rock cairns can be damaged much the same way as other lithic-based resources (e.g., spalling, smoke-blackening, fracturing), fire damage to landscapes, vistas, or other spiritually significant locations can have aesthetic and spiritual consequences to contemporary Native Americans. Of particular concern to Native American practitioners is the presence of fire personnel and equipment in the vicinity of spiritual resources.

## Shell

Marine and freshwater shells frequently occur in Native American archaeological deposits, often comprising a major portion of the midden component of the site. Manufactured shell products found in Native American archaeological deposits include beads and ornaments, typically fashioned from purple olive snails (*Olivella* sp.), abalone (*Haliotis* sp.), and a variety of marine clams. Shell beads and ornaments are useful for reconstructing aboriginal trade patterns, or interaction spheres, and are often used for relative dating purposes. Within historical archaeological contexts shell-based items usually consist of unmodified shellfish remains, and manufactured buttons.

The organic nature of shell makes it susceptible to variety of natural processes that can reduce it to its elemental components. Many of the taphonomic forces that affect the integrity of marine and freshwater shell have been identified, ranging from chemical alteration to sediment abrasion (Claassen 1991; Waselkov 1987). Waselkov (1987:149) indicates that shell subjected to high temperatures can undergo accelerated deterioration as heat-released calcium oxide interacted with sodium bicarbonate solution found in the soil.

Seabloom, Sayler, and Ahler (1991) reported that shell exposed on the ground surface during a grass fire fractured or disintegrated. In a series of experiments Haecker (2000:13-14) exposed a shell button and whole oyster shell to relatively low- (ca. 245° C) and high- (ca. 815° C) intensity fires. The low-intensity fire resulted in discoloring the shell button, while the oyster shell appeared to be unaffected. The high-intensity fire, however, resulted in calcining the button, but only slightly discoloring the oyster shell. Haecker (2000:12) explained the results by suggesting that the larger mass associated with the oyster shell insulated it from the effects of the fire, while the thinness and lesser mass of the button contributed to its vulnerability to even low-intensity fires.

As noted above native peoples sometimes intentionally burned shell beads and ornaments when these were part of the crematory process. Natural and prescribed fires could, in some instances, produce similar appearing results that may be misidentified as patterns of cultural behavior. Also, items that were burnt once before could sustain greater damage in subsequent fire events.

In the PRNS the majority of recorded cultural resources located around the perimeter of the Seashore are prehistoric/ethnohistoric in nature. These sites are predominately located near estuaries, bays, and beaches, which allowed easy access to food resources. Accordingly, unmodified, and to a lesser degree modified, shellfish

BLM_0064373

remains comprise a prominent constituent within these deposits. As previously stated, fire can have a detrimental effect on the long-term survivability of shell within the archaeological record, and in the case of modified shell items, can accelerate their decomposition or alter certain characteristics, which may lead to misidentification (e.g., being incorrectly associated with crematory processes).

## Bone

Bone is often found in archaeological settings as dietary remains, formed tools, and human remains. Faunal remains provide valuable information in regard to both human adaptations and past environmental conditions. Human remains have been reported from PRNS. Historically, the Coast Miwok both buried the deceased and performed cremation prior to burial.

Archaeological bone specimens often sustain blackening and charring when exposed to wildland fires, even those of relatively low temperatures (Lissoway and Propper 1984; Seabloom, Sayler, and Ahler 1991). Seabloom, Sayler, and Ahler  (1991), however, suggested that the degree of such alteration was generally less than that typically observed in culturally modified bone (e.g., burned in a hearth).

Fire and heat can induce changes to the physical appearance and chemical structure of bone (diagenesis). Chemical changes in bone structure have the potential to speed up the rate of decomposition. Experiments by Stiner et al. (1995) conclude that burned bone is more fragile and brittle than unburned specimens, and the mechanical strength and durability of bone can be greatly lessened, especially when exposed to more intensive burning. Bennett and Kunzmann (1985:12) conducted laboratory experiments on fresh bone which resulted in significant non-water loss at 100° C, charring above 300° C, and extreme chemical structure alterations above 400° C. McCutcheon (1992:360) also performed experiments on fresh bone and found a loss of free water and some carbonization of organics at temperatures up to 440° C, complete loss of the organic phase and loss of crystal-bound water between 440 and 600° C, and change in crystal size from 650 to 950° C. Further studies by Nicholson (1993) on laboratory-heated mammal, bird, and fish bone showed a general color shift from the natural tone to brown or black to gray and finally white between temperatures of 200 and 900° C. In addition to color changes macroscopic and microscopic morphological changes were observed to coincide with increases in temperature.

Bone that has been exposed to flame or a heat source is usually easily identified by color changes noted above, however, osteological materials can undergo heat-induced changes without being in direct contact with flame or a heat source. Much like bone located on the surface of a deposit effects to subsurface bone is dependant upon the soils in which the bone is situated, and the interaction of heat intensity and duration of exposure. Experiments performed by Bennett (1999) indicated that modern and archaeological specimens were susceptible to alteration when exposed to long-duration (up to 84 hours), low-intensity (500° C) burning, even when buried at a depth of up to 10 cm. Bennett found that bone samples showed color changes typically believed to be associated with higher temperatures and direct, rather than indirect, exposure to flame. Similarly, specimens subjected to high-intensity, short-duration exposure also yielded notable color changes, and moderate distortion. Stiner et al. (1995) documented

BLM_0064374

carbonization in shallowly buried bone (5 cm) located directly beneath a high-intensity heat source (900° C), but none of the specimens exhibited calcination.

Protien, amino acid, and other similar analyses can be compromized by heating events. Taylor et al. (1995) suggested that concentrations of certain constituent amino acids commonly found in bone were altered when exposed to one or more heating events. Provided that there has been no other significant diagenic agents acting on the archaeological bone this pattern may extend to unburned bone if subjected to sufficient heating during a prescribed or wildland fire.

**Pollen and Archaeobotanical Remains**

Pollen and archaeobotanical materials can be found in many archaeological contexts, and the recovery and analysis of these materials can provide an important means of reconstructing human adaptations and past environmental conditions in the region under investigation (see Duncan 1992).

Researching the effects of fire on pollen and archaeobotanical remains in post-wildfire contexts Scott (1990) observed that pollen found on the ground surface was usually destroyed by moderately high-intensity fire, while subsurface pollen remained relatively unaffected. In contrast, research conducted by Fish (1990) following the Long Mesa Fire indicates that surface pollen, although physically altered, was still readily identifiable.

Well-preserved archaeobotanical materials can be recovered if found in contexts that remain constantly dry or wet, such as caves and rockshelters or bogs, but these materials are less likely to be preserved in archaeological contexts that alternate between saturation and desiccation unless carbonized (Micsicek 1987:219). Plant materials begin to carbonize around 250° C and are completely carbonized by 500° C, but only in low-oxygen conditions; introduction of oxygen will reduce plant remains to ash. Apart from mechanical damage, such as trampling, undisturbed, completely carbonized plant residues tend to be resistant to further decay because all organic components have been reduced to elemental carbon, which tends to be fairly stable. Research on how fire affects botanical remains has proven, in some instances, contradictory. Ford (1990) noted that wildfire caused no apparent damage to botanical remains recovered from shallow fire hearths in sites burned during the La Mesa Fire. Eininger (1990:46), however, cited examples of other archaeobotanical studies that suggested the distinction between modern and archaeological charcoal was far less apparent. Perhaps of greater concern in regard to archaeobotanical remains are indirect effects such as carbon contamination, which is discussed in more detail below.

**Organic Residues**

Organic residues, which include lipids, proteins, carbohydrates, and other biopolymers, can adhere to, or be absorbed by artifacts, ecofacts, or features and provide researchers with highly useful information for analyzing tool use and dietary traditions (Heron and Evershed 1993; Orna 1996).

Though residues are increasingly recovered from archaeological contexts, even from deposits subjected to post-depositional fire, the exact nature of how some residues

54

survive and how others are lost is still not fully understood. Some organic residues appear to be easily destroyed when subjected to heating events such as fire (Heron and Evershed 1993). Even ultraviolet radiation can affect the preservation of protein residues as documented by Tuross, Barnes, and Potts (1996) who realized minimal recovery of such proteins on experimental butchering tools after exposure to ultraviolet light. Newman (1995), on the other hand, reported obtaining positive immunological reactions on flaked-stone artifacts recovered from sites subjected to high-intensity wildfire. Using cooking pot residues Malainey, Pryzbylski, and Sherriff (1999) found that the fatty acids of plant and animal foods were altered dramatically, showing thermal and oxidative degradation, and making accurate food source interpretations difficult.

### Wooden Features and Artifacts

Wood occurs on a number of historic-era resources in the form of standing and collapsed buildings, fence posts, scattered lumber, and miscellaneous artifacts, as well as in prehistoric contexts when located in waterlogged or extremely arid settings. In many cases, these artifacts may be several hundred or even thousands of years old. Haecker (2000:2) noted that, like other wood-based fuel sources such as downed tree limbs or trucks, hewn and milled lumber are variously affected by heat or burning depending on a number of factors. Generally speaking, sound dimensional lumber will ignite at about 350° C. In historic-period and archaeological contexts, however, associated lumber is rarely sound, and is often weathered or even highly decomposed, making the wood products particularly susceptible to even low-intensity fires (Haecker 2000). This situation is sometimes further influenced by additional flammable materials, such as heavy vegetation, paints, solvents, or other fuels, located or stored in or near wooden buildings or structures.

### Vegetation

Culturally modified trees are known to exist in the greater Pacific northwestern region of the United States. For example, some Pacific Northwest groups were known to modify juniper trees, perhaps in association with the manufacture of bows. Additionally, the use of imported, or exotic, tree species for use as windbreaks and property line markers is a common feature on the historic-period landscape. The potential for fire related adverse effects to culturally modified trees is related to the condition and health of the tree, and the surrounding fuel load.

Exotic fruit and nut trees, ornamental shrubs, and perennial and annual flowers are common components of historical occupation sites and historical landscapes. Among the species commonly represented are apple, pear, cherry, and walnut trees, English and German ivy, roses, Himalayan blackberry, and various bulb plants such as daffodils and irises. These species probably have varied susceptibility to long and short-term fire effects. Within the PRNS eucalyptus and Monterey cypress are often associated with historic-period ranching and homesteading activities, and are a recurrent feature among the many historic ranches and homesteads of the Seashore.

Tree-ring data have proven to be invaluable in providing fine-grained paleoclimatic and paleoenvironmental analyses. Likewise, standing trees and stumps of certain species can yield excellent fire-history data (Arno and Sneck 1977; Barrett and

BLM_0064376

Arno 1988). Researchers in the American Southwest have been well aware of the potential for fire to damage tree-ring data (e.g., Eininger 1990:47-48; Lissoway and Propper 1988:5; Romme, Floyd-Hanna, and Conner 1993). In the southern Sierra Nevada, Giant Sequoia stumps comprise not only historical archaeological and landscape features, but are also critical sources of long-term climatic and fire histories (e.g., Swetnam 1993). Depending on the condition of the stumps and surrounding fuel loads, stumps can be very vulnerable to damage or complete destruction during wildland or prescribed fires.

### Packrat Middens

Packrat middens can be found throughout western North America and have been shown to be a valuable tool in reconstructing paleoenvironmental settings (Betancourt, Van Devender, and Martin 1990). The analysis of packrat middens has provided valuable information on vegetation shifts on the western margin of the Great Basin (Mehringer and Wigand 1987; Miller and Wigand 1994). Because packrat middens frequently contain dead wood and other plant remains they tend to be highly flammable.

### Fibers and Hides

Plant fibers, such as those used for basketry and textiles, hair, and animal hides are usually found in very specialized contexts, such as dry caves, wells, or other waterlogged settings. These materials, when located in arid contexts, are highly susceptible to fire at even very low intensities (Ryan n.d.).

### Leather

Leather products often occur in the form of shoes, clothing, and horse tack or other similar items. With age, these objects become dry and brittle. They will char in a low-intensity fire, and are consumed at higher temperatures (Haecker 2000:12; Ryan n.d.).

## Operational Effects

Operational effects are those that occur while conducting prescribed burns or fire fighting, including: the establishment of staging areas, construction of fuel breaks, excavation of handlines, widening trails or roads to act as fire roads, or even dousing flame through the use of retardant or water. Efforts towards lessening the severity of future fires through fuel-reduction strategies also have direct effects. Crews disturb soils during the removal of vegetation, and may inadvertently place slash to be burned on top of archaeological deposits, heightening the potential adverse effects of fire. Even the type of ignition source used to carry out a prescribed burn can have differential direct effects. This complex picture presents many additional factors for fire managers to consider prior to executing a prescribed burn, or controlling a wildfire.

Activities associated with the implementation, control, and/or suppression of wildland and prescribed fires provide numerous opportunities for potentially damaging activities to cultural resources to take place (Pyne, Andrews, and Laven 1996). Because of their more noticeable impact, operations that involve ground-disturbing activities have been the focus of concern by cultural resource managers. In fact, many archaeological surveys conducted in anticipation of prescribed burns have tended to

BLM_0064377

focus exclusively on mitigating pre-burn ground disturbance. There are, however, additional operational effects that should be considered, such as ignition techniques (which influence intensity and rate of spread of the flame front), fire suppressants and retardants, and post-burn mop-up and rehabilitation activities.

### Staging

Staging for wildland and prescribed fires involves the distribution of people and equipment before, during, and after a fire event. Disturbances associated with staging vary between prescribed burns and wildfires. In general, not only is the amount of ground disturbance higher in wildfire situations, the locations chosen for heli-spots, spike camps, fuel breaks, and safety zones are often made with little advance planning or notice. Substantial ground disturbance can occur as a result of heavy equipment operations, while such impacts tend to be largely restricted to the surface when only hand tools are employed. Staging areas used for managing wildland and prescribed fires that are located close to developed areas are often sited in previously disturbed areas, such as roads, parking lots, and pullouts. Nevertheless, ground disturbances to these locations, though usually very shallow, can result from fire-related activities. Additionally, all-terrain vehicles, equipment, and personnel are often staged along on constructed fire lines, which can also be used to access other areas of a burn unit.

In more remote, less developed, locations established trails are often used to access interior or distant perimeter locales of a burn unit. Spike camps, established on the margins of the burn and utilized by field personnel, might be placed at existing backcountry camps. In some instances new camps might be created at optimal locations if existing camps are not conveniently located. Ground disturbances associated with these camps might include increased foot traffic, and the excavation of latrines and pits for gray water disposal. Remote camp locations are often serviced by rotary wing aircraft (i.e. helicopters), which necessitates the creation of a heli-spot or drop spot located nearby. Heli-spots are usually established on flat, open areas that may require the removal of vegetation in order to prepare the location.

Staging under wildfire conditions, however, is usually more complex owing to the frequently urgent nature of the response needs, larger number of personnel, and greater variety of equipment. While vehicles and other equipment are often driven and parked in designated and/or previously disturbed areas, the sheer number of vehicles and personnel can lead to a greater potential for resource damage. Personnel are generally housed at large temporary base camps. These are often located a substantial distance from the actual fire, and usually in developed areas like campgrounds and large parking lots. The use of spike camps on large conflagrations can require hundreds of firefighting personnel, necessitating the use of large areas for camping activities. If no suitable areas exist, one or more heli-spots and drop locations will be constructed. In the absence of vegetation-free areas, safety zones are sometimes constructed along the perimeter of the wildfire. These are used by fire-fighting personnel in the event of extreme fire behavior. Safety zones can be substantial in size (hundreds of square meters) and will be cleared of all standing and ground fuels with hand tools.

BLM_0064378

### Fire Lines

Fire lines–breaks in fuel continuity–come in several varieties. Handlines are, as the name implies, hand excavated fire lines. Scratch lines are preliminary handlines, which are used for an initial attack against a fire, and later improved to help contain the fire. Catline fire lines are constructed by using tracked vehicles, such as bulldozers. Wetline fire lines are made by putting down a strip of water on fine fuels. Retardant lines are similar to wetlines, but are made with chemical retardants. Foam lines are much like wetlines and retardant lines using chemical foams to suppress a fire. Director's Order #18 dictates that all prescribed and wild fires have some form of finite, delimited boundary. Generally these boundaries are comprised of a combination of natural (e.g., rock outcrop, river) and human-made (e.g., road, handline, wet line, catline) component. Often, fire lines are constructed in anticipation of (prescribed burn) or during (wildfire) a fire event. When natural and human-made boundaries are employed, some form of fireproofing is usually carried out along these features, such as live vegetation thinning, removal of dead-and-down fuels, and felling of hazard trees.

Fire lines tend to be constructed in defensible locations often incorporating natural features such as major ridges, wet drainages, and rocky outcrops, if present. Likewise, existing trails and roads are frequently utilized as fire lines, although some vegetation may be removed along the margins of these features. Very rarely will fire lines follow midslope contours, especially when in the context of prescribed fire.

The urgent nature of wildfire often translates to fire line construction that is far less systematic than those used for prescribed fires, which are usually planned well in advance of their implementation. Heavy equipment is often utilized, which could result in some resource damage. More often, however, hand crews are employed to construct lines similar to those described above. In many instances, multiple crews are simultaneously operating in multiple locations, sometimes at night, and often without the supervision of a professional archaeologist. Depending on conditions, these lines are constructed in order to attain *direct* control of the fire (containing it to extinguishment), or *indirect* control (securing the perimeter of the burn from strategic boundaries).

Wettstaed (1993; Wettstaed and LaPoint 1990) documented a variety of impacts to twelve previously unrecorded archaeological sites exposed through the construction of more than 80 km of catlines used to contain a wildfire in Montana. These lines ranged from one to eight blade-widths wide (to 30 m or more), and cut into soils to depths of up to 1 mater. The remains of several prehistoric fire hearths were observed in the berms of the numerous fire line cuts. Siefkin, Burger, and Kerr (n.d.) also documented extensive bulldozer damage on a late prehistoric habitation site in the foothills of the southern Sierra Nevada. Though at a smaller scale, the construction of fire lines with hand tools can also have an adverse effect on site integrity (e.g., Keefe, Kahl, and Montague 1999).

### Ignition Techniques

Suppressing wildfires and conducting prescribed burns often employs the use of various ignition patterns for controlled burns, and control and containment of wildfires (Pyne et al. 1996). The method employed can influence the effects on archaeological resources. Generally, there are four commonly used techniques. Heading fires are set upwind of a fuel source selected to burn, and are generally ignited in spots or strips and

BLM_0064379

allowed to spread with the wind or up slope. These fires tend to burn quickly, but with high intensity, and can have a high spotting potential (leading to spot fires developing from firebrands). Backing fires burn into the wind or down slope, and are ignited along an established safe zone or baseline (e.g., fire line, road, stream). Backing fires spread slowly, as they are moving against the prevailing wind or slope direction, and usually have low heat intensity and low spotting potential. Like backing fires flanking fires are set directly into the wind. Several individuals ignite multiple strips that form a series of widening triangles, or chevron. Fire intensity and flame heights lie between those of heading fires and backing fires, but the technique requires a high degree of coordination between field personnel to be successful. The last, and perhaps the most potentially damaging technique is the center or ring fire. This technique burns an area from the middle outward with concentric rings of fire surrounding the central point. This method results in a fast burn, but in heavy fuels can burn with a very high intensity, and may also result in long distance spotting.

Not only is burning technique a factor in determining potential adverse effects of fire on cultural resources, but so too is the fire ignition agent employed. Ground and aerial ignition are the most common forms used, and are often utilized during prescribed burns. Ground ignition is frequently accomplished through the use of drip torches, flamethrowers, and terra-torches, frequently applied by one or more field personnel who may actually enter the interior of the burn unit to apply ignition fuels. Aerial ignition sources include plastic sphere dispensers (of burning jellied gasoline or fuels), and heli-torches. Both of these ignition source could potentially result in damage if dropped on or in close proximity to archaeological resources.

### Fire Retardants

Fire retardants fall into two general groups: physical agents and chemical agents (Pyne, Andrews, and Laven 1996). Physical agents, such as water and dirt, influence heat and diffusion processes, but usually only provide short-term protection against combustion. Chemical agents, on the other hand, are generally applied as slurries, and affect fuels by modifying the course of combustion, affording long-term protection against combustion. When water is used as a suppressant it is usually combined with additives that either reduce surface tension (i.e., wetting agents), allowing treated water to penetrate deeply into combustible material, or to increase water viscosity (i.e., thickening agents), so that treated water congeals on the surface of fuels. Water combined with a thickening agent is considered particularly effective in firefighting, and is often delivered by aircraft as a gel or slurry.

The effects of the application and composition of chemical agents and chemically modified water on cultural resources have received only sparse attention. Typically, backpack pumps, fire hoses, and aircraft are used to apply fire retardants. Aside from any potential negative effects caused by retardants themselves Romme, Floyd-Hanna, and Conner (1993) speculated that high velocity drops of slurry or water from aircraft could topple standing walls of prehistoric structures, wooden historical features, or cause physical impacts to midden deposits and artifact scatters, potentially adversely affecting the resource. Some fire retardants are known to be corrosive and/or toxic,

BLM_0064380

which can adversely affect cultural resources, as well as make post-burn investigation of
such locations inadvisable.

### Mop-up and Rehabilitation

Mop-up and rehabilitation occur once a fire has been declared controlled and out,
respectively. These are carried out most often following wildfires, often under the
direction of a Burned Area Emergency Rehabilitation (BAER) team. Some mop-up and
rehabilitation may also take place after prescribed burns. Depending on circumstances,
mop-up varies: from a concerted effort to extinguish all combustion through intensive
hand labor, to ground patrol, or to aerial reconnaissance. The more aggressive
approaches can be particularly detrimental to cultural resources. This involves extensive
ground disturbance through the use of hand tools, hazard-tree felling, and hose lays. In
forested areas, smoldering tree roots and stumps are often excavated and broken up.

Because the nature of cultural resources varies considerably, for example, from partially
to fully buried archaeological sites to standing architectural features, damage resulting
from mop-up activities can vary appreciably, usually in direct proportion to the
visibility of the resource. Wettstaed (1993; Wettstaed and LaPoint 1990) described heavy
damage to an archaeological site resulting from mop-up activities, including extensive
subsurface disturbance and artifact breakage resulting from tool blows. Traylor et al.
(1990) found that mop-up following the La Mesa Fire produced surprisingly little
damage to archaeological resources, and none to architectural remains.

Rehabilitation involves reconditioning fire lines and other disturbed areas,
stabilizing volatile landforms, and controlling runoff. This is accomplished using a
combination of hand tools, heavy machinery, and aircraft. Fire-line rehabilitation
associated with prescribed burns is often as simple as pulling back (with hand tools) the
berm adjacent to the scratched line, perhaps disguising the course by scattering cut
vegetation. On larger fire lines, such as those constructed by bulldozers, heavy
equipment is often needed return removed soils back into fire line cut. Wettstaed (1993;
Wettstaed and LaPoint 1990) suggested that rehabilitation in these instances could result
in significant, if unrecognized, damage to cultural resources. For example, the
rehabilitation of a fire line that passes through an archaeological site will return artifacts
to the footprint of the line, but out of original context. Given enough time, it might prove
difficult to identify any previous impacts, especially if the lines were not mapped.
Traylor et al. (1990) reported similar problems from rehabilitation following the La Mesa
Fire and with the restoration of bulldozer lines in particular.

Emergency measures are often employed after wildfires to stabilize hill slopes,
stream channels, and roads (Robichaud, Beyers, and Neary 2000; USDA and DOI 2001a,
2001b). As described in greater detail below, extensive research documents that surface
runoff and erosion can increase markedly following a large, moderate- to high-intensity
wildland fire. Among the most commonly employed hill-slope treatments are grass-
seeding, or emplacing contour-felled logs, mulches, fabrics, scattered brush, and silt
fences. Previously employed channel treatments include straw-bale check dams, log
check dams, rock dams, log-and-rock grade stabilizers, in-channel debris basins and
clearing, and stream-bank armoring. Road treatments consist of outsloping, culvert
removal and upgrading, rolling dips, water bars and others. Some of these, such as

BLM_0064381

contour-felled logs, contour trenching, outsloping, and channel clearing, might require the use of heavy equipment and could result in extensive disturbances.

Wildeson (1982) summarized impacts to archaeological resources exposed to a variety of heavy-equipment disturbances, including chaining, scarification, brush crushing, tractor yarding, and logging. Impacts common to each include displacement and damage of artifacts and features, and soil compaction. Not surprisingly, Wildeson (1982:63-64) found that the degree of damage correlated positively with the nature of the impact agent, distribution of disturbances, number of impact events, and the nature of the site sediments and archaeological resources.

## Indirect Effects

Indirect fire effects include intentional and inadvertent looting, increased erosion of soils that can remove or bury archaeological resources, increased tree mortality resulting in impacts from tree fall or uprooting, increased rodent and insect populations that can alter subsurface soil structure, increased microbial activity, which can feed on organic matter within archaeological soils, and the addition of "new" carbon, which can be move through the soil column of archaeological sites through a variety of agents. They are a potential threat to archaeological resources following all prescribed and wildland fires.

### Looting

The cultural resource manager faces a particular challenge when it comes to protecting cultural resources from prescribed and natural fires. Firefighting activity requires the effort of a great many people who may be expert at fighting fire, but may know little about cultural resources or cultural resource protection laws. The cultural resource manager is confronted with balancing their obligation not to disclose sensitive locational information to members of the public, including fire personnel, while at the same time providing the very same sensitive information to field personnel in order to protect and/or avoid those resources.

In regions where the density of cultural resources is particularly high, such as the American Southwest, the need to establish communications between various resource personnel is critical in order to prevent damage to cultural resources. For example, Traylor et al. (1990:103-104) found surface artifact collecting common among firefighting staff during the La Mesa Fire, mainly due to the fact that fire personnel were often unaware of laws against collecting. It was also noted, however, that fire personnel were particularly receptive to educational information provided by archaeologists associated with the event. Given the greater potential access to cultural resources during fire-fighting activities, the need for relaying basic instructions concerning resource-protection laws to fire crews is in order. This also could prove to be an opportune moment to involve fire crews with reporting cultural resource finds to appropriate resource staff.

Additionally, because NPS lands are primarily designated for public-use, and because fire can remove vegetation that obscures previously hidden cultural resources, the opportunity for looting by the general public is dramatically increased. Also, designated trails are often lined by heavy vegetation, which if removed by fire, could

BLM_0064382

allow the public to wander, creating "unauthorized" trails leading to or cutting through sensitive areas. In these situations, it may be necessary for NPS staff to increase site visitations to monitor site integrity, and/or increase public awareness of resource-protection laws. This also could prove to be an opportune moment to involve the general public with site protection by reporting suspicious activity to appropriate NPS staff.

### Increased Surface Runoff and Erosion

Research has been conducted on factors affecting increased surface runoff and erosion following a fire (Robichaud et al. 2000:5-11). Under good hydrological conditions, that is, more than 75 percent of ground surface covered with vegetation and litter, no more than 2 percent of rainfall becomes surface runoff, and erosion is low. Severe disturbances, however, such as those caused by large, moderate- to high-intensity fires, can result in poor hydrological conditions, with less than 10 percent of ground surface covered with vegetation and litter, resulting in substantially increased surface runoff (up to 70 percent higher than normal) and erosion (up to 300 percent higher than normal). These effects can be particularly acute and wide-ranging if the fire is closely followed by moderate or heavy precipitation. A water-repellent, or hydrophobic, layer sometimes forms on, or just below, the ground surface following a fire, exacerbating the impact of even moderate rainfall (DeBano, Rice, and Conrad 1979:13-14; Wells et al. 1979:18-19). Until the water-repellant layer is broken down precipitation, particularly heavy rain can alter the upper surface structure of archaeological deposits. In time new vegetation will become established and help minimize surface runoff and erosion, though this may take several years or even decades following severe fires and/or in xeric vegetation communities.

The loss of vegetation and the subsequent loss of soil following a fire can have a particularly deleterious effect on not only cultural resources, but also on the geomorphological and hydrological nature of the surrounding area. The horizontal and vertical spatial integrity of archaeological resources can be easily compromised if located on or adjacent to slopes, and exposed to the elements. Sheet erosion (induced by water, wind, and other phenomena), in combination with gravity, has been observed to relocate   cultural materials in a number of studies (e.g., Rick 1976; Schiffer 1987). Likewise, Wettstaed (1993; Wettstaed and LaPoint 1990) observed that localized heavy downpours were capable of produced a puddling effect, concentrating flaked-stone debitage into pools that might later be mistaken for activity areas. In more extreme situations, the collection of water in geologic formations can result in landslides, which can relocate or bury cultural resources.

### Increased Tree Mortality

Some tree species resist fire better than others, while some require fire for their survival. For example, Giant Sequoia, with their thick bark and high limbs, are highly resistant to fire. Bishop pine, on the other hand, are easily consumed by fire, but in the process heat-dependant seeds are released, establishing the next generation of trees.

Most trees will die if the cambium layer is significantly damaged in a fire. If this vital layer is only partially damaged, and the tree isn't killed immediately, then in it's

BLM_0064383

weaken state it is likely to become diseased and/or infested with insects. Trees killed outright or severely weakened by fire are susceptible to collapse. If archaeological resources are located near or among a stand of weakened trees any collapse could cause severe damage by the upheaval of root systems, or crushing by the trunk or main branches. Subsurface features and artifacts also can be damaged by branches being driven into the soil as the tree impacts the surface. Finally, fallen trees comprise heavy fuels that will burn at extreme temperatures during a future fire event.

### Increased Burrowing Rodent and Insect Populations

The effect of burrowing rodents and insects on subsurface archaeological resources has been well illustrated (e.g., Armour-Chelu and Andrews 1994; Bocek 1986; Erlandson 1984; Schiffer 1987; Wood and Johnson 1978). Burrowing animals, particularly those that reside and feed mostly underground (e.g., gophers, earthworms), can cause considerable horizontal and vertical movement (usually within the first 2 meters of the soil column) of soils and cultural artifacts. The creation of burrows, nests, tunnels and runs can result in obscuring soil stratigraphy or other subtle features, separating and combining unassociated items, moving older artifactual materials to younger stratigraphic proveniences or younger artifactual materials to older proveniences, as well as physically alter artifacts and ecofacts through abrasion or breakage.

While most animals are capable of fleeing fire, many can be overcome by smoke, oxygen deprivation, heat, or by being burned. Research suggests, however, that populations of burrowing rodents will eventually increase for a period following prescribed and wildland fires (Wirtz 1995:63-67). Some rodent populations remain high after a fire, as a result of being protected within their burrows, while other species may colonize the area from outside locations, taking advantage of an increased supply of food (plant seeds, roots, bulbs, and tubers). Accordingly, populations of rodent predators such as coyotes will also increase, and these species can also disturb significant amounts of soil in the quest for prey.

### Increased Microbial Populations

Microbial populations can increase following fires (Bissett and Parkinson 1980; Romme, Floyd-Hanna, and Conner 1993) and these organisms might have a detrimental effect on the archaeological record. Microbial growth rates increase as the organic matter within the soil is altered (generally increasing nitrogen levels) following soil-heating events, such as natural and prescribed fires (DeBano, Rice, and Conrad 1979:10). Recent studies have demonstrated that microorganisms are often present in bone samples, although the implications for digenesis and taphonomy require additional research (Child 1995).

### Carbon Contamination

As discussed above, the potential for contamination of archaeological sites and features with non-cultural carbonized botanical remains is an issue of major concern. While radiometric testing laboratories go to considerable lengths to remove sources of contamination from test samples, the adherence of relatively recent carbon on the sample would likely yield an erroneously late determination. In terms of the reconstruction of economic systems and paleoenvironments, introduction of recently

BLM_0064384

burned plant remains like acorn hulls and grass seeds could result in misleading interpretations.

Archaeologists have recently become far more cognizant of the integrity of charcoal assays submitted for radiocarbon analysis. Schiffer (1986, 1987) pointed to the "old wood problem": the submission of conventional radiocarbon samples obtained from charcoal that is far older than the actual episode of occupation (e.g., recycling of wooden beams in architecture of the American Southwest, use of driftwood as firewood), as a potentially serious problem. The advent of Accelerator Mass Spectroscopy (AMS) dating allows for the submission of samples that are far lighter and smaller than those required earlier. This permits the researcher to submit charcoal samples from portions of a plant that would have otherwise disintegrated through time, and would not have been available for submission. The possible incorporation of recent charcoal fragments (through the action of fire itself [e.g., burned tree roots] and/or subsurface disturbances [e.g., rodent burrowing]) resulting from prescribed or natural fire into archaeological contexts, and the opportunity to submit small charcoal fragments, rather than more robust samples, gives rise to the potential for underestimating the age of the stratigraphic level being tests. Additionally, given that natural and anthropogenic fires have burned through the landscape innumerable times over the millennia, the collection and submission of isolated charcoal fragments, or those not in direct and clear association with cultural material or features should be regarded as suspect. Ford (1990), however, suggests that the difference between natural and cultural charcoal is easily distinguished. Analyzing carbonized botanical remains from sites, that were then recently burned over in the La Mesa Fire, Ford explained that natural charcoal fragments varied greatly in terms hardness and combustion, and were often only scorched or burned on a single surface, while culturally modified charcoal were consistently harder, thoroughly carbonized, exhibited no textural or color differences, and were more friable. Siefkin (2001:21) cautions, "the La Mesa samples were obtained relatively soon after the area had burned. Given enough time, recent charcoal may well take on the characteristics of older material, and the survivorship of more thoroughly carbonized modern charcoal would be favored."

BLM_0064385

# CHAPTER 6 – FIELD OBSERVATIONS

Still organizing and writing this section.

BLM_0064386

# CHAPTER 7 – RECOMMENDATIONS

As has been illustrated above, fire and fire-management strategies can have an adverse effect on cultural resources. The criteria of adverse effect is defined in the implementing regulations of Section 106 which states:

> An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association [36 CFR 800.5(a)(1)].

It is the policy of the National Park Service (NPS) to assume that cultural resources within the Point Reyes National Seashore are eligible for inclusion in the National Register of Historic Places unless formally evaluated otherwise. This policy further assumes that any effects on cultural resource are potentially adverse, requiring the establishment of mitigation measures to avoid or minimize those adverse effects.

Wildland-fires are spontaneous, by nature, and are often fought with all immediacy, leaving little time for consideration of adverse effects on cultural resources. Prescribed fires and manual and mechanical thinning programs are often planned well in advance of their implementation, allowing much more time for identifying cultural resources within the proposed project area, and planning accordingly. The manifold complexities of both fire behavior and site structure preclude the application of simple actions to minimize those effects for all situations. There are, however, strategies that can be employed, either singly or in combination, to be used to avoid or minimize many of those effects. Several recommendations are suggested below that can mitigate adverse effects on cultural resources.

## GENERAL RECOMMENDATIONS

In Chapter 2 is a discussion of the physiographic zones and the types of cultural resources found in the Point Reyes National Seashore, and though there is a reasonable connection between a physiographic zone and the type of cultural resource likely to be found there (e.g., rolling hills dominated by ranches, farms, homesteads; beaches, bays, and estuaries dominated by prehistoric/ethnohistoric archaeological deposits) fire, and its potential to cause adverse effects, minds no such boundaries. The Vision fire, for example, burned from the top of Inverness Ridge, down across the rolling hills, and terminated at the shoreline after running out of fuel. Additionally, prescribed fire or other fuel-reduction strategies may encompass multiple physiographic zones and encounter a variety of cultural resources. Consequently, the following proposed recommendations are structured not according to effects likely to result from a wildfire in a specific physiographic zone, but according to the effects fire and fire management outlined above in the previous chapter.

Cultural resources cannot be protected from adverse effects if their location or presence is unknown. Presently, prior to implementing a prescribed burn or other fuel-

66

BLM_0064387

reduction strategy, background research and field reconnaissance, if necessary, is conducted by an NPS archeologist to determine if there are any recorded or previously unidentified cultural resources located within the project area. When cultural resources are found within the proposed project area, the NPS archeologist coordinates with other personnel associated with the fuel-reduction program so that adverse effects on cultural resources are avoided or minimized. It is recommended that this policy continue in place. It is also recommended that future surveys focus on the interior upland regions of the PRNS as these areas have been neglected during the last 60 years of cultural resource investigation within the Seashore boundary.

The Point Reyes peninsula, as discussed above, is comprised of a variety of topographic, geologic, and floral zones that have contributed to the patterns of human activity on the peninsula. Though the PRNS has not been fully surveyed certain patterns of human interaction with the Point Reyes environment are apparent. The Coast Miwok, who may have utilized the region for nearly 4,000 years, seem to have concentrated their activities primarily along the coastal margins of the peninsula, with a small number of archaeological deposits having been found along certain interior streams, and in the Olema Valley. These archaeological deposits tend to be comprised mainly of shell midden refuse, particularly those sites along the coastal margins (i.e. Drakes Estero, Limantour Estero, Abbott's Lagoon, Bolinas Lagoon, Point Reyes Beach, Drakes Beach, Limantour Spit), though some of these deposits are intensive cultural activity (e.g., village sites). These shell midden deposits contain a wealth of information that can be used to answer questions not only about the people who generated them, but also about the environment in which they lived and how they adapted to the conditions placed upon them. Fire, particularly extreme fire, can pose a serious threat to the information contained within these resources. Care should be exercised when considering prescribed fire activity in the areas where these archaeological deposits are found.

With the arrival of the Spanish, Mexican, and American settlers emphasis on the resources found on the peninsula shifted away from the coastal areas and on to the interior regions of the peninsula and Olema Valley where grasses could feed cattle and timber could feed sawmills. There was a corresponding shift in settlement patterns, away from the coast and towards the grasslands and hillsides, where settlers, speculators, and entrepreneurs built their ranches, farms, and homesteads. By the late 1800s portions of the peninsula were being developed as upper class retreats, a process that continue to this day in towns like Inverness Park and Point Reyes Station. The many ranches, farms, homesteads, and town buildings form an integral part of the history and fabric of the PRNS. Many of these buildings, and attendant structures, objects, and plantings, have the potential to be included in the National Register of Historic Places, which requires that they be considered in any action that may alter their significance, and thus, their eligibility for inclusion in the National Register (16 U.S.C. 470).

In wildfire and prescribed-fire situations, numerous fire-fighting personnel are employed to control and contain the fire lines. In the course of their work they may encounter previously unidentified cultural resources. Some of the work crew many not be aware of what cultural resources are, or may not realize that resources can be present within the fire zone or project area. When feasible, firefighting crews should be educated about working around cultural resources and the importance of maintaining resource

BLM_0064388

integrity. While the frantic nature of rapid-response firefighting activity may not allow for such training, planned fuel-reduction programs tend to have more lead-time, and resource awareness training should take place prior to initiating prescribed burns.

When conducting a prescribed burn, and while fighting wildland fires, if feasible, avoiding direct impacts to recorded cultural resources should be a priority. An NPS archeologist or authorized representative should review with project personnel the location and mitigation measures required for all eligible resources before project implementation. For prescribed burns, and if possible during wildfires, an NPS archeologist, or a qualified consultant approved by an NPS archeologist should mark all cultural resources requiring protection with flagging tape, or similar demarcation device, prior to initiation of project activities so that these locations can be avoided. At the conclusion of prescribed fire or wildfire activities flagging tape or other markers used to indicate sensitive areas should be removed.

## MITIGATION MEASURES FOR WILDFIRE

Though the occurrence and nature of wildfires are highly unpredictable features of wildland areas, cultural resources can be actively protected during these events when their location is known to coordinating personnel who may then direct firefighting crews and equipment in ways to avoid them. The use of modern computer-based programs such Geographic Information Systems (GIS) can greatly enhance the protection of resources in the face of fire and firefighting related activities. Because GIS locational information is based on Global Positioning System (GPS) data cultural resources with known locational data points can be easily relocated in the field with handheld GPS receivers. Once relocated, these resources can be demarcated and avoided, or treated as deemed appropriate in a manner that minimizes the potential for adverse effect.

In many cases following a wildfire, a Burned Area Emergency Rehabilitation (BAER) team will conduct field studies to determine what effects a fire may have had on natural and cultural environments. Following the 1995 Vision Fire a BAER report (DOI-BAER 1995) was produced, outlining the effects of the fire, and provided recommendations for remediation of adverse effects on natural and cultural resources resulting from the fire and attendant firefighting activities. A cultural resources team was assembled and surveyed areas within the Vision Fire burn area. The team noted:

> [The f]ire burnt over many historic sites where most structural elements had been removed. Damage was limited to burning of historic fences at the Home Ranch and moderately intensive burn of the historic eucalyptus grove at the Sky Ranch [Z Ranch]. There was no damage to the integrity of prehistoric sites. Suppression activities resulted in no impacts to historic properties. The fire burned out the grass and coyote bush which resulted in excellent delineation of individual site and road topography [DOI-BAER 1995:Appendix I Cultural Resources II (C)(2)].

The team surveyed a number of the dozer lines created as fuel breaks, but not hand lines, as well as the locations of recorded cultural resources (13 prehistoric/ethnographic

BLM_0064389

deposits, and 20 historic-period sites located within or adjacent to the fire area), documenting effects on historic-period roads and ranch sites, and on prehistoric/ethnohistoric archaeological sites. While not specifically noting direct impacts caused by the fire itself (e.g., charring, melting, etc.), save for effects to historic-period trees, the team did note that dozer lines had directly altered portions of a number of historic and historic-period roads, and that the fire had exposed, and made easily accessible to park visitors, numerous previously hidden refuse dumps and prehistoric archaeological sites.

The most frequent post-fire mitigation recommendations offered by the team were to obscure from view newly exposed resources (artifact scatters and prehistoric deposits) with vegetation cut from elsewhere within the park; to survey the firebreaks, road cuts, and burned over archaeological resources after the first rains had fallen; and to monitor firebreak (dozer line) rehabilitation where the break occurred on historic and historic-period roads. Other measures proposed included replacement of a portion of an historic fence line at Home Ranch, managing the cutting of historic eucalyptus trees at Sky Camp (Z Ranch), protecting historic-period vegetation at ranch sites, and increasing protection patrols for selected sites (DOI-BAER 1995:Appendix I Cultural Resources III (B)). With the exception of the recommendation of placing vegetation over exposed cultural resources, which is not advised (doing so could substantially add organic material to the soil matrix, and could add significantly to the fuel load in a fire situation), the BAER team recommendations were practicable. It is unclear which, if any, of these recommendations were carried out (White 2003, pers. comm.).

A BAER team is often the first organized effort to document and recommend redress following a wildfire event. Accordingly, if a BAER team is assembled for a particular wildfire event within the PRNS, it is recommended that an NPS archeologist, or a qualified consultant approved by an NPS archeologist, form part of the team, visiting recorded cultural resources that may have been affected by the fire. It is also recommended that a cultural resources survey be conducted in those areas within the fire zone that have not been previously surveyed, or were surveyed in the past, but under less than ideal conditions. If cultural resources are identified, they should be documented, describing any visible effects to the resource or individual artifacts, and recorded on the pertinent DPR 523 forms. The forms should be filed with the appropriate Information Center of the California Historical Resources Information System (CHRIS), and resource information, including a condition assessment, should be entered into the NPS Archeological Site Management Information System (ASMIS).

## MITIGATION MEASURES FOR PRESCRIBED FIRE

### Fuel Reduction

One of the most effective means of minimizing adverse effects on cultural resources during wildfire and prescribed-fire situations is reducing heavy fuel loads on or adjacent to them. Fuel-load reduction is often achieved through prescribed fire and/or manual or mechanical thinning. Most adverse effects on cultural resources occur at the ground surface, where controlling the environmental conditions on and near the resource can

BLM_0064390

diminish the severity of impact. Mitigation measures may include one or a combination of the following:

- Remove sufficient fuels from the resource to reduce burn intensity so that prescribed fire will not cause a substantial adverse change in the physical characteristics of cultural resources.

- Develop a burn prescription that reduces the intensity of the burn. Appropriate measures may include adjusting the thresholds for environmental conditions of the prescription, such as reducing maximum wind speed, requiring a higher relative humidity, and/or requiring a lower ambient temperature, which will result in a less intense burn.

- Avoid burning those portions of a cultural resource that contain the significant characteristics of that resource. Appropriate measures may include hand clearing fuels from around the resource, directly suppressing flames during the burn, covering the resource with foam or fire fabric, or wetting the resource with water.

- Avoid or adjust the timing of prescribed fires in areas currently used by Native Americans for traditional activities, in order to avoid conflicting periods of use.

- Recorded resources that are inadvertently burned-over during a prescribed fire should be documented, describing any visible effects to the resource or individual artifacts, and updated on DPR 523 forms, which should be filed with the appropriate Information Center of the CHRIS, and resource information, including a condition assessment, should be entered into the NPS ASMIS database.

- In areas where vegetation was dense, restricting access or ground visibility during the pre-burn field reconnaissance, a post-burn survey should be conducted, particularly in areas that appear to be likely locations for past habitation. If cultural resources are identified they should be documented, describing any visible effects to the resource or individual artifacts, and recorded on the pertinent DPR 523 forms, which should be filed with the appropriate Information Center of the CHRIS, and resource information, including a condition assessment, should be entered into the NPS ASMIS database.

**Surface Collection**

An additional mitigation measure frequently cited by resource managers from a variety of agencies is the scientific collection of surface artifacts within a prescribed burn area. There are, however, a number of potential complications associated with the collection of certain classes of artifacts, including proper documentation, appropriate long-term curation, and concerns from members of the public about the collection of sensitive materials (e.g., human remains or funerary items). Native American human remains, funerary objects, sacred objects, or objects of cultural patrimony found on Federal or tribal land are subject to the Native American Graves Protection and Repatriation Act (NAGPRA [25 U.S.C. 3001 et seq.]). Section 10.4(b) states:

> Any person who knows or has reason to know that he or she has discovered inadvertently human remains, funerary objects, sacred objects, or objects of cultural patrimony on Federal or tribal lands after

BLM_0064391

November 16, 1990, must provide immediate telephone notification of the inadvertent discovery, with written confirmation, to the responsible Federal agency official with respect to Federal lands, and, with respect to tribal lands, to the responsible Indian tribe official. The requirements of these regulations regarding inadvertent discoveries apply whether or not an inadvertent discovery is duly reported. If written confirmation is provided by certified mail, the return receipt constitutes evidence of the receipt of the written notification by the Federal agency official or Indian tribe official.

Presently, the PRNS does not have an approved collection policy that would allow for and guide, the collection, documentation, and future curation of surface artifacts, or human remains. The collection of human remains, funerary objects, sacred objects, or objects of cultural patrimony on Federal land may require consultation with the appropriate tribal representatives prior to the collection of such items. The PRNS is currently constructing a Memorandum of Agreement (MOA) in consultation with the Federated Indians of Graton Rancheria for the collection of prehistoric/ethnohistoric artifacts and human remains, funerary objects, sacred objects, or objects of cultural patrimony as per 25 U.S.C. 3001 §10.5(f). Under this directive a Plan of Action (POA) will be established that complies with 25 U.S.C. 3001 §10.3 (b)(1) and documents the following:

1. The kinds of objects to be considered as cultural items as defined in §10.2 (b);

2. The specific information used to determine custody pursuant to §10.6;

3. The planned treatment, care, and handling of human remains, funerary objects, sacred objects, or objects of cultural patrimony recovered;

4. The planned archeological recording of the human remains, funerary objects, sacred objects, or objects of cultural patrimony recovered;

5. The kinds of analysis planned for each kind of object;

6. Any steps to be followed to contact Indian tribe officials at the time of intentional excavation or inadvertent discovery of specific human remains, funerary objects, sacred objects, or objects of cultural patrimony;

7. The kind of traditional treatment, if any, to be afforded the human remains, funerary objects, sacred objects, or objects of cultural patrimony by members of the Indian tribe or Native Hawaiian organization;

8. The nature of reports to be prepared; and

9. The planned disposition of human remains, funerary objects, sacred objects, or objects of cultural patrimony following §10.6.

(25 U.S.C. 3001 §10.5 [e]).

Once an MOA and a POA have been agreed upon the collection of surface artifacts from prehistoric/ethnohistoric deposits may be considered as a means of minimizing adverse effects on those resources. If plans are made to collect surface artifacts prior to a prescribed burn then all associated archaeological work, including the documentary

BLM_0064392

reports, must meet the Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation.

While NAGPRA and tribal consultation shall be considered when working with prehistoric/ethnohistoric cultural materials, historic-period cultural resources generally fall outside the purview of these legal requirements. Nonetheless, the Archaeological Resource Protection Act, and other NPS regulations and guidelines (e.g., NPS Director's Order #28 [NPS 1998b]) do apply to cultural resources associated with the historic era and should be considered when planning to collect artifacts from the surface prior to conducting a prescribed burn. Accordingly, if a surface collection plan is implemented all associated archaeological work, including the documentary reports, must meet the Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation.


## MITIGATION MEASURES FOR MANUAL AND MECHANICAL THINNING

Manual and mechanical clearing of vegetation poses a significant risk to the physical integrity of cultural resources. Adverse effects to resources could result from disking, bulldozing, and driving across sensitive areas, as well as the indiscriminant thinning of vegetation associated with historic-period resources such as ranching and homesteading landscapes. Removal of shrubs, bushes, and grasses can greatly disturb soil matrices when root systems are pulled from the ground, and covering resources by piling slash or wood chips can result in overloading the resource with organic compounds and heavy fuel loads, which could create a substantial adverse effect if left in place, or burned.

- Vegetation surrounding resources with clearly defined boundaries (e.g., fences or other protective elements located at or slightly beyond the perimeter of the resource) can be reduced with mechanical devices if machinery remains outside the resource boundary and posses no other adverse effect.

- Mechanical clearing (e.g., disking, chaining, etc.) should, in general, not be allowed within the boundaries of a cultural resource. No vegetation should be treated (e.g., chemically sprayed, burned, etc.) or placed on cultural resources.

- Inspect the project site periodically during implementation of undertakings to assure that known cultural resources are not being adversely affected.

### Treating Cultural Landscapes

Historic and historic-period resources such as ranches and homesteads (often defined as rural historic landscapes) are frequently delineated in the PRNS by Monterey pine or Eucalyptus trees situated along property lines, or used as windbreaks, and can present particular problems to resource managers. Monterey pine and Eucalyptus tend to be highly flammable and can cause serious damage to other nearby resources if ignited and allowed to develop into a crown fire. One technique used to minimize this potential scenario is to "limb-up," or remove lower-level branches, eliminating "ladder fuels" from between ground and surface fuels and fuels stored in the tree canopy. This strategy, however, could constitute an adverse change if the treated trees are determined

BLM_0064393

to be significant or contribute to the significance of historic resources and the treatment results in altering the qualifying attributes of the resource. A balance must be struck between protecting vegetational resources from the potential adverse effects resulting from a fire event, and from the potential change in the significance of the resource that may result from trimming vegetational resources. The advice of a cultural resource specialist should be sought to resolve this issue in relation to specific impacts.

- Treatment of cultural landscapes, and features included therein, should follow the procedures discussed in NPS Director's Order #28, specifically Chapter 7: Cultural Landscapes (NPS 1998b:87-112).

## Hand Clearing Resources

Hand clearing can damage artifacts and their spatial distributions within resource areas. Artifact collecting by work crews and other project personnel may occur in these situations if precautions are not taken.

- Hand clearing should be conducted in such a way as to minimize adverse effects, or should be avoided as necessary, within cultural resource areas. Vegetation within culturally sensitive areas should not be treated (e.g., chemically sprayed, burned, etc.) or placed on archaeological or historical resources.

- Work crews should be told that collecting archaeological artifacts is illegal. It may be necessary to supervise work crews to ensure that no unauthorized collection of artifacts or other disturbances to the cultural resource take place.

## Application of Herbicides

Little research has been conducted on the impacts of chemical control on historical resources. Application of herbicides could have an effect on ornamental plantings and orchards associated with historic-era homestead and ranching resources.

- Herbicides should be applied carefully to avoid losses to non-native vegetation associated with homestead and ranching resources.

## Undiscovered Resources

Manual and mechanical clearing can remove vegetation cover and soils that previously obscured cultural resources from discovery. In the event of such a discovery:

- Work in the immediate vicinity of the newly identified resource should be temporarily suspended while the NPS archeologist is consulted regarding further work in the area and the adoption of appropriate treatment measures.

- Newly discovered resources should be recorded on the appropriate DPR 523 form(s), identifying standard resource information, and especially noting any observed adverse effects. DPR 523 form(s) should then be filed with the appropriate Information Center of the CHRIS, and resource information, including a condition assessment, should be entered into the NPS ASMIS database.

BLM_0064394

## MITIGATION MEASURES FOR INDIRECT EFFECTS

Treating vegetation within the boundaries of a cultural resource often requires balancing competing agendas: leaving plant cover to help protect the resource form potential looting activity versus reducing plant cover to protect the resource from the adverse effects associated with wildland and prescribed fire. Balancing these agendas will require that the needs of the resource are analyzed on a case-by-case basis. In some instances the potential for looting may be such that it outweighs the potential for adverse effects resulting from fire or fuel-reduction programs. At other times a balance may be struck that achieves both goals. This balance may require communication between a cultural resource manager, a fire manager, and a biologist/botanist to develop a treatment plan that satisfies the various agendas. Additionally, treatment of vegetation that surround cultural resources can adversely change the hydrological conditions of soils and drainage systems, and could lead to the burial, or the destabilization, of cultural resources.

### Runoff and Erosion

The following suggestions are designed to help prevent resources from being damaged by natural processes such as erosion or burial by colluvial and alluvial processes, damaged by ailing trees, or intentionally or unwittingly looted.

- Prescribed fire intensity should be moderated along steeply sloped areas adjacent to valley edges and riparian environments, or similar locations so as to retain soil integrity and root structures to minimize erosional forces. This procedure will maintain soil integrity by allowing some of the plant community to survive, while at the same time reducing some of the fuel load, minimizing the potential of soil eroding from resources located on drainage edges, or minimizing deposition onto resources located in drainage bottoms.

- Inspect the project site periodically during implementation of undertakings to assure that known cultural resources are not being negatively affected.

### Ailing Trees

Ailing trees, which can fall or drop heavy limbs on to ground surface, can damage cultural resources, and artifacts and stratigraphic information can be displaced and lost when trees are uprooted. Sick, dying, and dead trees can burn with greater intensity than healthy trees, increasing the potential adverse effects on cultural resources. Trees that appear to be jeopardizing cultural resources should be assessed for possible treatment options.

### Looting

If there is concern about the potential for looting or the long-term stability of a resource resulting from proposed fuel-reduction program then consultation between managers of cultural resources, natural resources, and fire programs should be conducted to devise a solution that avoids or minimizes potential adverse effects on the cultural resource while achieving the project goals. This may include selective manual thinning of vegetation within the boundaries of the resource, such as pruning or

BLM_0064395

removing the larger bushes from archaeological deposits, but leaving grasses in place to keep the resource sufficiently hidden from view.

- Keep cultural resource locations confidential and do not disclose them in any public document. Any perceived conflict between confidentiality policy and public-disclosure requirements should be reviewed by an NPS cultural resource specialist. Those individuals trusted with resource location information must be advised of the importance of keeping this information confidential.

- Inspect the location periodically during project implementation to assure that known cultural resources are not being negatively affected

- If a resource appears to have been looted in the past, or if looting appears to be ongoing, contact an NPS archeologist, describing the location and condition of the resource.

## THE WILDLAND-URBAN INTERFACE

The catastrophic fire season of 2000, highlighted by the Los Alamos, New Mexico prescribed fire that escaped control, stimulated the federal government to confront the dangers associated with high fuel loads in wildlands that are being encroached by residential development. These fringe areas are known as the Wildland-Urban Interface (WUI). The Wildland-Urban Interface is defined as the physical area where people build homes along the outer periphery of urban centers, often abutting Federal, State, or County open-space or other public lands. Within these areas

> a set of conditions that exist, or could exist, in nearly every community in the country. These conditions include weather, humidity, type of vegetation, building construction, road construction, lot size, topography, and other factors that simply make some communities more vulnerable to wildfire than others [Smally 2001:9].

In response to this growing problem, Congress authorized the Wildland-Urban Interface initiative, in conjunction with the National Fire Plan, to reduce hazardous fuels on federal lands and assist communities with wildland fire protection (NPS 2002:2).

The Point Reyes National Seashore, through grants from NPS, funds fuel-reduction and clearance programs within WUI locations adjacent to the National Seashore, which includes the towns of Inverness, Inverness Park, Point Reyes Station, Olema, and Bolinas. Table 10 illustrates the types of projects funded by the NPS grants during the 2002 funding period.

Numerous cultural resources are located within the above WUI, and encompass Federal, State, County, and private lands. These resources are located both within the "wildland" aspect of the WUI and within the urban centers. Small villages such as Inverness, Olema, and Bolinas not only contain historic-period buildings (see Appendix A), they also abut and permeate into the wildland areas that surround them, which often contain additional cultural resources (see Table 11).

BLM_0064396

**Table 10. Partial List of WUI Projects in Marin County. Sponsored in Part by the National Park Service and FIRESafe Marin** (adapted from NPS 2002:2).

| WUI Project Area | Project Type | Funding Allocation |
|---|---|---|
| Inverness | Keith Way Fuel Break | $15,000 |
| | Seahaven Fire Management Plan and Implementation | $172,000 |
| | Vision Road Fuel Buffer | $46,000 |
| | Inverness Defensible Space Program | $12,000 |
| | Inverness Public Utility District Chipper | $20,000 |
| | Shell Beach Wildfire Protection | $47,700 |
| Inverness Park | Paradise Ranch Estates Fire Management Plan and Implementation | $167,500 |
| | Emergency Access and Fuel Reduction | $90,000 |
| Point Reyes Station | Chipping Program | $20,000 |
| Olema | Water Pump System Upgrade | $61,000 |
| Bolinas | Resource Recovery Project | $52,500 |
| | Wish Creek Watershed Fuel Reduction | $46,000 |
| | Bolinas Mesa Defensible Space Survey | $20,000 |
| | Homestead Valley Hazardous Fuel Reduction | $60,000 |

**Table 11. Location of Wildland-Urban Interface Project Areas and Cultural Resources.**

| WUI Location | Prehistoric/Ethnohistoric Resource | Historic/Historic-period Resource |
|---|---|---|
| Tomales Bay State Park to Inverness Park | CA-MRN-205, -206, -207, -208, -209, -217, -219, -220, -221, -241, -248, -253, -283, -284, -343, -361-, 362, -378, -563, -564 | None Recorded. See also Appendix A |
| Olema Valley | CA-MRN-386, -659, -660 | McFadden Ranch, DeSouza Ranch site, Olema Cemetery, Olema Lime Kilns, Johnson Farm site, Schultz House and Barn, Stewart Ranch, Garrison House site, Five Brooks School site, McLean Cabin, Old Sawmill site, Original Five Brook School site, Randall Grave Yard site (CA-MRN-633/H), Randall Ranch, Sieroty Cabin, Biesler Ranch site, Hagmaier Ranch, Seaver Ranch site, Teixeira Ranch, United Copper Mine, Wilkins Ranch. See also Appendix A |
| Bolinas | CA-MRN-334, -335, -372, -373, -380, -381, -382, -383, -401, -576 | Ingermann Ranch, See also Appendix A |

Twenty prehistoric/ethnohistoric resources have been recorded along the western margin of Tomales Bay from Tomales Bay State Park south to Inverness Park. These archaeological deposits are typically situated along the margin between the fault zone

76

BLM_0064397

and the Inverness Ridge zone (Figure 2) described above. The underlying geology of the area (Figure 3) is the granitic bedrock associated with the Inverness Ridge, which is dominated by a mixed evergreen forest (Figure 5). The archaeological resources are often located at or near the mouths of drainages, which provide ideal conditions for vegetation overgrowth.

Cultural resources within the Olema Valley tend to be dominated by ranches, farms, and homesteads. The Olema Valley has been dramatically modified during the last century, altering the riparian-type environment that once dominated the valley and transforming it to one more suitable for grazing purposes. This process is reflected in the numerous historic-period dairy farms located in the valley (see Livingston 1995). This fault zone environment (Figure 2), underlain by the Merced and Franciscan formations (Figure 3), is presently characterized by brush fields and grasslands, with riparian corridors along the many streams (Figure 5).

Bolinas Lagoon, like Tomales Bay, was utilized by the Coast Miwok who generated numerous shell midden deposits, which represent their past use of the area. These archaeological deposits are generally located along the lagoon shore, though there are a few that are approximately 1-mile (1.6-km) from the lagoon. The Bolinas area is characterized by the fault zone environment (Figure 2), is underlain by the Merced and Franciscan geologic formations (Figure 3), and generally covered by brush field and grassland species (Figure 5).

Fuel-reduction programs taking place on historic properties must be designed to comply with the Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation. If any WUI funded projects are declared undertakings under Section 106 of the NHPA, the above listed recommendations may be utilized to avoid or minimize adverse effects to cultural resources.

BLM_0064398

# REFFERENCES CITED

Anderson, R. Scott
    2001   *Long-Term Fire History from Sedimentary Charcoal Analysis: The Wildcat Lake and Glenmire Sites in Point Reyes National Seashore, California*. Center for Environmental Science and Education, and Quaternary Science Program, Northern Arizona University, Flagstaff, Arizona.

Anderson, Jessica, and Thomas M. Origer
    1997   Adding a Little Fuel to the Fire: Some Thoughts on Fire and Obsidian Hydration. *International Association for Obsidian Studies Bulletin* 19:17-20.

Armour-Chelu, Miranda, and Peter Andrews
    1994   Some Effects of Bioturbation by Earthworms (*Oligochaeta*) on Archaeological Sites. *Journal of Archaeological Science* 21(4):433-443.

Arno, Stephen F., and Kathy M. Sneck
    1977   A Method for Determining Fire History in Coniferous Forests of the Mountain West. *General Technical Report* INT-GTR-42. USDA Forest Service, Intermountain Forest and Range Experiment Station, Ogden, Utah.

Atwater B.F., S.G. Conrad, J.N. Dowden, C. Hedel, R.L. MacDonald, and W. Savage
    1979   History, Landforms, and Vegetation of the Estuary's Tidal Marshes. In *San Francisco Bay: The Urbanized Estuary*, edited by T.J. Conomos, A.E. Leviton, and M. Berson, pp. 347-381. Pacific Division/American Association for the Advancement of Science, San Francisco.

Barbour, Michael G., and Ann F. Johnson
    1977   Beach and Dune. In *Terrestrial Vegetation of California*, edited by Michael G. Barbour and Jack Major, pp. 223-261. John Wiley and Sons, New York.

Barnes, Alfred S.
    1939   The Differences Between Natural and Human Flaking on Prehistoric Flint Implements. *American Anthropologist* 41(n.s.):99-112

Barrett, S. A.
    1952   Material Aspects of Pomo Culture, Part I. *Bulletin of the Public Museum of Milwaukee* 20:1-260. Milwaukee.

Barrett, Stephen W., and Stephen F. Arno
    1988   Increment Borer Methods for Determining Fire History in Coniferous Forests. *General Technical Report* INT-GTR-244. USDA Forest Service, Intermountain Research Station, Ogden, Utah.

BLM_0064399

Basgall, Mark E.
   1987   Resource Intensification among Hunter-Gatherers: Acorn Economies in Prehistoric California. *Research in Economic Anthropology* 9:21-52.

Beals, Ralph L.
   1933   Ethnology of the Nisenan. *University of California Publications in American Archaeology and Ethnology* 31(6):335-414. Berkeley.

Bean, Lowell John and Harry W. Lawton
   1973   Some Explanations for the Rise of Cultural Complexity in Native California with Comments on Proto-Agriculture and Agriculture. In *Patterns of Indian Burning in California: Ecology and Ethnohistory*, edited by Henry Lewis pp. v-xlvii. Ballena Press Anthropological Papers No. 1. Ramona, California.

Beardsley, Richard K.
   1948   Culture Sequences in Central California Archaeology. *American Antiquity* 14(1):1-28.

   1954   *Temporal and Areal Relationship in Central California Archaeology.* Reports of the University of California Archaeological Survey No. 24-25. Berkeley.

Beaton, J.M.
   1991   Extensification and Intensification in Central California Prehistory. *Antiquity* 65:947-951.

Bennett, Joanne L.
   1999   Thermal Alteration of Buried Bone. *Journal of Archaeological Science* 26(1):1-8.

Bennett, Peter S., and Michael Kunzmann
   1985   *Effects of Heating on Artifacts: A Brief Report of Work Conducted at Western Archeological and Conservation Center, Tucson.* On file at the Western Archeological and Conservation Center, Tucson.

Benson, Arlene
   1999   *Meadow Canyon Prescribed Burn: The Effects of Fire on Obsidian Hydration Rinds.* Paper presented at the 33rd Annual Meeting of the Society for California Archaeology, Sacramento.

Bentley, J.R., and R.L. Fenner
   1958   Soil Temperatures During Burning Related to Postfire Seedbed on Woodland Range. *Journal of Forestry* 56:737-740.

Betancourt, J. L., T. R. Van Devender, and P. S. Martin
   1990   *Packrat Middens: The Last 40,000 Years of Biotic Change.* University of Arizona Press, Tucson.

BLM_0064400

Bieling, David G
   1991   *Perspectives on Behavior Gained from Lithic Analysis and Archaeological
          Investigations Near Bridgeport, Mono County, California.* Master's thesis, Sonoma
          State University, Rohnert Park, California.

Bissett, J., and D. Parkinson
   1980   Long-Term Effects of Fire on the Composition and Activity of the Soil
          Microflora of a Subalpine, Coniferous Forest. *Canadian Journal of Botany* 58:1704-
          1721.

Biswell, Harold H.
   1975   Effects of Fire on Chaparral. In *Fire and Ecosystems*, edited by Theodore T.
          Kozlowski and Clifford E. Ahlgren, pp. 321-364. Academic Press, New York.

Blackburn, Thomas C., and Kat Anderson
   1993   Before the Wilderness: Environmental Management by Native Californians.
          Ballena Press, Menlo Park, CA.

Bocek, Barbara
   1986   Rodent Ecology and Burrowing Behavior: Predicted Effects on Archaeological
          Site Formation. *American Antiquity* 51:589-603.

Bolton, Herbert Eugene
   1927   *Fray Juan Crespí: Missionary Explorer on the Pacific Coast, 1769-1774.* University of
          California Press, Berkeley.

   1967   *Spanish Explorations in the Southwest, 1542-1706.* Barnes and Noble, New York.

Bouey, Paul D.
   1987   The Intensification of Hunter-Gatherer Economies in the Southern North Coast
          Ranges of California. *Research in Economic Anthropology* 9:53-101.

Broughton, Jack M.
   1988   *Archaeological Patterns of Fish Exploitation in the Sacramento Valley.* Master's
          thesis, California State University, Chico.

   1994   Late Holocene Resource Intensification in the Sacramento Valley, California:
          The Vertebrate Evidence. *Journal of Archaeological Science* 21:501-515.

Burcham, Lee T.
   1982   *California Range Land: An Historico-Ecological Study of the Range Resource of
          California.* University of California, Davis.

Burgh, Robert F.
   1960   Potsherds and Forest Fires in the Pueblo Country. *Plateau* 33:54-65.

BLM_0064401

California Office of Historic Preservation
  1988   *Five Views: An Ethnic Sites Survey for California*. State of California Department
        of Parks and Recreation, Sacramento.

  1990   *California Historical Landmarks*. State of California Department of Parks and
        Recreation, Sacramento.

  1992   *Points of Historical Interest*. State of California Department of Parks and
        Recreation, Sacramento.

  2003   *Historic Properties Directory Listing by City* (through 12 May 2003). State Office of
        Historic Preservation, Sacramento.

Campbell, Tim, Dorothea Theodoratus, Sylvia Thalman, Beverly Ortiz, and Geri
        Emberson
  2002   Historical Background. Posted on Federated Indians of Graton Rancheria
        website: <http://www.coastmiwok.com>. Accessed 31 March 2003.

Child, A. M.
  1995   Towards an Understanding of the Microbial Decomposition of Archaeological
        Bone in the Burial Environment. *Journal of Archaeological Science* 22:165-174.

Claassen, Cheryl
  1991   Normative Thinking and Shell-Bearing Sites. In *Archaeological Method and
        Theory*, Volume 3, edited by Michael B. Schiffer, pp. 249-298. University of
        Arizona Press, Tucson.

Clar, C. Raymond
  1959   *California Government and Forestry: From Spanish Days until the Creation of the
        Department of Natural Resources in 1927*. Division of Forestry, Department of
        Natural Resources, Sacramento.

Clayborn, Hannah M.
  1976   *Dirt Roads and Dusty Tales: A Bicentennial History of Bloomfield, Sonoma County,
        California*. Cleone Publishing Company, Santa Rosa, California.

Clifton, H. Edward, Ralph E. Hunter, and James V. Gardner
  1988   Analysis of Eustatic, Tectonic, and Sedimentologic Influences on Transgressive
        and Regressive Cycles in Upper Cenozoic Merced Formation, San Francisco,
        California. In *New Perspectives in Basin Analysis*, edited by K.L. Kleinspehn and
        C. Paola, pp. 109-128. Springer-Verlag, New York.

Collier, Mary E. T., and Sylvia Barker Thalman
  1991   *Interviews with Tom Smith and Maria Copa: Isabel Kelly's Ethnographic Notes on the
        Coast Miwok Indians of Marin and Southern Sonoma Counties*. Miwok
        Archaeological Preserve of Marin, Occasional Paper No. 6, San Rafael,
        California.

BLM_0064402

Collins, Michael B., and J. M. Fenwick
1974    Heat Treating of Chert: Methods of Interpretation and Their Application. *Plains Anthropologist* 19:134-145.

Compas, Lynn
1994    Archaeological Site Recording and Site Record Updating of Twenty-one Tomales Bay Archaeological Sites in Point Reyes National Seashore, Marin County, California. Manuscript on file at National Park Service, Western Regional Office, San Francisco.

1998    *Research Design, Case Study, and Proposed Management Plan: Post-Contact Coast Miwok Settlement Patterns and Resource Procurement Strategies in Point Reyes National Seashore.* Master's thesis, Sonoma State University, Rohnert Park, California.

Daetwyler, Calvan C.
1966    *Marine Geology of Tomales Bay, Central California.* Research Report No. 6. Scripps Institution of Oceanography and Pacific Marine Station, Dillon Beach, California.

Deal, Krista
2001    Fire Effects to Lithic Artifacts. Manuscript on file at the Western Archeological and Conservation Center, Tucson.

DeBano, Leonard F., Raymond M. Rice, and C. Eugene Conrad, editors
1979    *Soil Heating in Chaparral Fires: Effects on Soil Properties, Plant Nutrients, Erosion, and Runoff.* Research Paper PSW-145. USDA Forest Service, Pacific Southwest Forest and Range Experiment Station, Berkeley, California.

Department of the Interior (DOI)-BAER
1995    *Mount Vision Fire Incident Burned Area Emergency Rehabilitation (BAER) Plan.* Department of the Interior BAER Team, North Zone. Prepared for the National Park Service, Point Reyes National Seashore, Marin, California.

Derby, George H.
1932    The Topographical Reports of Lieutenant George H. Derby. Report on a Reconnoissance [sic] of the Gulf of California and the Colorado River, 1850-1851. *Quarterly of the California Historical Society* 11(4):365-382.

Dietz, Stephen
1976    *Echa-tamal: A Study of Coast Miwok Acculturation.* Master of Arts thesis, Department of Anthropology, San Francisco State University.

Duncan, Faith Louise
1992    *Botanical Reflections of the Encuentro and the Contact Period in Southern Marin County, California.* Ph.D. dissertation, University of Arizona, Tucson. UMI Dissertation Services, Ann Arbor, Michigan.

BLM_0064403

*References Cited*

Edwards Robert L.
  1970   A Settlement Pattern Hypothesis for the Coast Miwok based on an
          Archaeological Survey of Point Reyes Seashore. In *Contributions to the*
          *Archaeology of Point Reyes National Seashore: A Compendium in Honor of Adan E.*
          *Treganza*, edited by Robert E. Schenk, pp. 105-113. Treganza Museum Papers
          No. 6., San Francisco State College, San Francisco.

Eininger, Susan F.
  1990   *Long Mesa Fire 1989, Archeological Survey and Post Fire Assessment.* Manuscript on
          file at the Superintendent's Office, Mesa Verde National Park. U.S. Department
          of the Interior, National Park Service, Mesa Verde National Park, Colorado.

Erlandson, Jon M.
  1984   A Case Study in Faunalturbation: Delineating the Effects of the Burrowing
          Pocket Gopher on the Distribution of Archaeological Materials. *American*
          *Antiquity* 49(4):785-790.

Erlandson, Jon M., Torben C. Rick, René L. Vellanoweth, and Douglas J. Kennett
  1999   Maritime Subsistence at a 9300 Year Old Shell Midden on Santa Rosa Island,
          California. *Journal of Field Archaeology* 26(3):255-265.

Evens, Colonel Albert S.
  1873   *A la California: Sketches of Life in the Golden State*. A. L. Bancroft and Company,
          San Francisco.

Fish, Suzanne K.
  1990   Fire Effects on Pollen: An Evaluation. In *The 1989 Long Mesa Fire: Archeological*
          *Rehabilitation, Report on Stage I: Archeological Survey and Post-Fire Evaluation*,
          edited by Susan Eininger. U.S. Department of the Interior, National Park
          Service, Mesa Verde Research Center, Mesa Verde National Park, Colorado.

Ford, Richard I.
  1990   Ethnobotanical Consequences of the La Mesa Fire, Bandelier National
          Monument. In *The 1977 La Mesa Fire Study: An Investigation of Fire and Fire*
          *Suppression Impact on Cultural Resources in Bandelier National Monument*, by
          Diane Traylor, Lyndi Hubbell, Nancy Wood, and Barbara Fiedler, pp. 147-152.
          National Park Service, Southwest Cultural Resources Center Professional
          Papers No. 28. U.S. Department of the Interior, National Park Service,
          Southwest Cultural Resources Center, Santa Fe.

Fredrickson, David A.
  1974   Cultural Diversity in Early Central California: A View from the North Coast
          Ranges. *Journal of California Anthropology* 1(1):41-53.

BLM_0064404

Fredrickson, David A. (continued)
1994    Archaeological Taxonomy in Central California Reconsidered. In *Toward a New Taxonomic Framework for Central California Archaeology: Essays by James A. Bennyhoff and David A. Fredrickson*, assembled and edited by Richard E. Hughes, pp. 91-103. Contributions of the University of California Archaeological Research Facility, No. 52. Berkeley.

Galloway, Alan J.
1977    *Geology of the Point Reyes Peninsula, Marin County, California*. Bulletin 202, California Division of Mines and Geology, Sacramento.

Gerike, Christian, Seana L.S. Gause, Suzanne Stewart, and Katherine Johnson
1996    *Cultural Resources Study for Santa Rosa Subregional Long-Term Wastewater Project, Volume I*. Anthropological Studies Center, Sonoma State University, Rohnert Park, California. Prepared for Harland Bartholomew and Associates, Sacramento.

Gogan, Peter John Patrick
1986    *Ecology of the Tule Elk Range, Point Reyes National Seashore*. Ph.D. dissertation, University of California, Berkeley. UMI Dissertation Services, Ann Arbor, Michigan.

Goldberg, Carol, Michelle Titus, Roy Salls, and Rainer Berger
2000    Site Chronology on San Clemente Island, California. *Pacific Coast Archaeological Society Quarterly* 36(1):31-40.

Golovnin, Vasilii M.
1979    *Around the World on the* Kamchatka, *1817-1819*. The University of Hawaii Press, Honolulu.

Greenlee, Jason M., Jean H. Langenheim
1990    Historic fire regimes and their relation to vegetation patterns in the Monterey Bay area of California. *The American Midland Naturalist* 124(2):239-253.

Gregory, Thomas
1911    *History of Sonoma County, California, with biographical sketches of the leading men and women of the county, who have been identified with its growth and development from the early days to the present time*. Historic Record Company, Los Angeles, California.

Gudde, Erwin G.
1998    *California Place Names: The Origin and Etymology of Current Geographical Names*. Fourth edition. University of California Press, Berkeley.

BLM_0064405

Haase, Sally M., and Stephen S. Sackett
    1998    Effects of Prescribed Fire in Giant Forest-Mixed Conifer Stands in Sequoia and
            Kings Canyon National Parks. In *Fire in Ecosystem Management: Shifting the
            Paradigm from Suppression to Prescription*, edited by Teresa L. Pruden and
            Leonard A. Brennan, pp. 236-243. Tall Timbers Fire Ecology Conference
            Proceedings No. 20. Tall Timbers Research Station, Tallahassee, Florida.

Haecker, Charles
    2000    Effects of Fire on Historic Structures and Historic Artifacts. Draft manuscript on
            file, U.S. Department of the Interior, National Park Service, Intermountain
            Support Office, NHL Program, Santa Fe.

Hanes, Ted L.
    1977    California Chaparral. In *Terrestrial Vegetation of California*, edited by Michael G.
            Barbour and Jack Major, pp. 417-469. John Wiley and Sons, New York.

Hart, James D
    1977    *The Plate of Brass Reexamined: A Report Issued by the Bancroft Library, University of
            California, Berkeley*. The Bancroft Library, University of California, Berkeley.

Heady, Harold F., Theodore C. Foin, Mary M. Hektner, Dean W. Taylor, Michael G.
        Barbour, and W. James Barry
    1977    Coastal Prairie and Northern Coastal Scrub. In *Terrestrial Vegetation of California*,
            edited by Michael G. Barbour and Jack Major, pp. 733-760. John Wiley and
            Sons, New York

Helley, Edward J., Kenneth R. Lajoie, William E. Spangle, and M. L. Blair
    1979    *Flatland Deposits of the San Francisco Bay Region, California: Their Geology and
            Engineering Properties, and Their Importance to Comprehensive Planning*. U.S.
            Geological Survey Professional Paper 943. Washington, D.C.

Heron, Carl, and Richard P. Evershed
    1993    The Analysis of Organic Residues and the Study of Pottery Use. In
            *Archaeological Method and Theory*, Volume 5, edited by Michael B. Schiffer, pp.
            247-284. University of Arizona Press, Tucson.

Hoover, Mildred Brooke, Hero Eugene Rensch, Ethel Rensch, and William N. Abeloe
    1990    *Historic Spots in California*. Fourth edition, revised by Douglas E. Kyle. Stanford
            University Press, Stanford, California.

Hylkema, Mark
    2003    *Recent Archaeological Investigations at Año Nuevo State Reserve, San Mateo County
            Coast: Chipped Stone Tool Assemblages*. Paper presented at the 37th Annual
            Meeting of the Society for California Archaeology, Sacramento.

Johnson, Bernice Eastman
    1962    *California's Gabrieliño Indians*. Southwest Museum, Los Angeles.

BLM_0064406

Johnston, Verna R.
   1970   The Ecology of Fire. *Audubon* 72(5):76-119.

Jones, Terry L.
   1992   Settlement Trends along the California Coast. In *Essays on the Prehistory of Maritime California,* edited by Terry L. Jones, pp. 1-37. Center for Archaeological Research at Davis Publication No. 10. University of California, Davis.

Jones, Terry L., Richard T. Fitzgerald, Douglas J. Kennett, Charles H. Miksicek, John L. Fagan, John Sharp, and Jon M. Erlandson
   2002   The Cross Creek Site (CA-SLO-1797) and Its Implications for New World Colonization. *American Antiquity* 67(2):213-230.

Kawahara, Saichi
   1970   A Survey of the Physical Setting of the Point Reyes Peninsula Area, Marin County, California. In *Contributions to the Archaeology of Point Reyes National Seashore: A Compendium in Honor of Aden E. Treganza*, edited by Robert E. Schenk, pp. 1-64. Treganza Museum Papers No. 6, San Francisco State University.

Keefe, Timothy M., Bruce M. Kahl, and Suzanna T. Montague
   1999   *The Ackerson Post-Fire Archeological Project, Yosemite National Park, California, Volume 1, Draft*. Yosemite Research Center, Yosemite National Park. On file, Archaeology Office, Yosemite National Park, California, and Western Archeological & Conservation Center, Tucson.

Keifer, MaryBeth
   1998   Fuel Load and Tree Density Changes Following Prescribed Fire in the Giant Sequoia-Mixed Conifer Forest: The First 14 years of Fire Effects Monitoring. In *Fire in Ecosystem Management: Shifting the Paradigm from Suppression to Prescription,* edited by Teresa L. Pruden and Leonard A. Brennan, pp. 306-309. and. Proceedings of the Tall Timbers Fire Ecology Conference No. 20. Tall Timbers Research Station, Tallahassee, Florida.

Kelley, Jon E., and Tom Scott
   1995   *Brushfires in California: Ecology and Resource Management*. International Association of Wildland Fire, Fairfield, Washington.

Kelly, Isabel
   1978   Coast Miwok. In *California,* edited by Robert F. Heizer, pp. 274-288. Handbook of North American Indians, vol. 8, William C. Sturtevant, general editor. Smithsonian Institution, Washington, D.C.

Kelly, Roger E., and Jim Mayberry
   1979   *Trial by Fire: Effects of NPS Burn Programs upon Archeological Resources*. National Park Service, San Francisco, California.

BLM_0064407

King, Thomas F.
  1970    Archaeological Problems and Research in the Coast Miwok Area. In *Contributions to the Archaeology of Point Reyes National Seashore: A Compendium in Honor of Adan E. Treganza*, edited by Robert E. Schenk, pp. 275-287. Treganza Museum Papers No. 6., San Francisco State College, San Francisco.

King, Thomas F., and Ward F. Upson
  1970    Protohistory on Limantour Sandspit: Archaeological Investigations at 4-MRN-216 and 4-MRN-298. In *Contributions to the Archaeology of Point Reyes National Seashore: A Compendium in Honor of Adan E. Treganza*, edited by Robert E. Schenk, pp. 115-194. Treganza Museum Papers No. 6., San Francisco State College, San Francisco.

Klebnikov, Kiril T.
  1976    *Colonial Russian America: Kiril T. Klebnikov's Reports 1817-1832*. Oregon Historical Society, Portland.

Kniffen, F. B.
  1939    Pomo Geography. *University of California Publications in American Archaeology and Ethnology* 36(6):353-400.

Knudsen, Keith, Janet M. Sowers, Robert C. Witter, Carl M. Wentworth, and Edward J. Helley
  2000    Preliminary Maps of Quaternary Deposits and Liquefaction Susceptibility, Nine-County San Francisco Bay Region, California. USGS Open-File Report 00-444, Version 1.0. U.S. Geological Survey, Western Region Geologic Information Server, Menlo Park, California. Online report and database available at <http://geopubs.wr.usgs.gov/open-file/of00-444/>. Updated 24 January 2001.

Kritzer, Kelly Norman
  1995    *Thermolithofractography: A Comparative Analysis of Fire-Cracked Rock from an Archaeological Site and Cracked Rock from a Culturally Sterile Area*. Master's thesis, Ball State University, Muncie, Indiana.

Kroeber, Alfred L.
  1925    *Handbook of the Indians of California*. Bureau of American Ethnology Bulletin 78, Smithsonian Institution, Washington, D.C. Reprinted 1976 by Dover, New York.

Küchler, A. Will
  1977    The Map of the Natural Vegetation of California. University of Kansas, Lawrence.

Lee, Georgia, William D. Hyder, and Arlene Benson
  1988    *The Rock Art of Petroglyph Point and Fern Cave, Lava Beds National Monument, Final Report*. Associated Rock Art Consultants, Los Osos, California. Prepared for Lava Beds National Monument.

BLM_0064408

Lee, Milicent
  1937   *Indians of the Oaks*. Ginn and Company, Boston.

Lentz, Stephen C.
  1996a  Lithic Artifact Analysis. In *Fire Effects on Archaeological Resources, Phase 1: The Henry Fire, Holiday Mesa, Jemez Mountains, New Mexico*, edited by Stephen C. Lentz, Joan Gaunt, and Adisa J. Willmer, pp. 65-73. General Technical Report RM-GTR-273. USDA Forest Service, Rocky Mountain Forest and Range Experiment Station, Fort Collins, Colorado.

  1996b  Ground-Stone Artifact Analysis. In *Fire Effects on Archaeological Resources, Phase 1: The Henry Fire, Holiday Mesa, Jemez Mountains, New Mexico*, edited by Stephen C. Lentz, Joan Gaunt, and Adisa J. Willmer, pp. 61-64. General Technical Report RM-GTR-273. USDA Forest Service, Rocky Mountain Forest and Range Experiment Station, Fort Collins, Colorado.

Lewis, Henry T.
  1973   *Patterns of Indian Burning in California: Ecology and Ethnohistory*. Ballena Press Anthropological Papers 1:1-101. Ramona, California.

Lissoway, John, and Judith Propper
  1988   *Effects of Fire on Cultural Resources*. Paper presented at the Effects of Fire in Management of Southwestern Natural Resources Symposium, Tucson.

Livingston, D.S.
  1994   *Ranching on the Point Reyes Peninsula: A History of the Dairy and Beef Ranches Within Point Reyes National Seashore, 1834-1992*. U.S. Department of the Interior, National Park Service, Point Reyes Station, California.

  1995   *A Good Life: Dairy Farming in the Olema Valley*. U.S. Department of the Interior, National Park Service, Point Reyes Station, California.

  2003   National Park Service historian. Electronic mail correspondence with Richard D. Shultz on 9 May 2003.

Loubser, Johannes H. N., and David S. Whitley
  1999   *Recording Eight Places with Rock Imagery, Lava Beds National Monument, Northern California, Volume 1*. New South Associates Technical Report 604. U.S. Department of the Interior, National Park Service, Redwood National Park, Arcata, California

Loyd, J.
  1999   Rehydration of Burned Obsidian. Paper presented at the 33rd Annual Meeting of the Society for California Archaeology, Sacramento.

Luedtke, Barbara E.
  1992   *Archaeologist's Guide to Chert and Flint*. Archaeological Research Tools 7, Institute of Archaeology, University of California, Los Angeles.

BLM_0064409

McCutcheon, Patrick
  1992    Burned Archaeological Bone. In *Deciphering a Shell Midden*, edited by Julie K.
          Stein, pp. 343-370. Academic Press, Orlando. Florida.

Macdonald, Keith B.
  1977    Coastal Salt Marsh. In *Terrestrial Vegetation of California*, edited by Michael G.
          Barbour and Jack Major, pp.263-294. John Wiley and Sons, New York.

Malainey, M.E., R. Przybylski, and B.L. Sherriff
  1999    The Effects of Thermal and Oxidative Degradation on the Fatty Acid
          Composition of Food Plants and Animals of Western Canada: Implications for
          the Identification of Archaeological Vessel Residues. *Journal of Archaeological
          Science* 26:95-103.

Mandeville, M. D.
  1973    A Consideration of the Thermal Pretreatment of Chert. *Plains Anthropologist*
          18:177-202.

Marin Independent Journal
  2002    People, Parks & Fire. *Marin Independent Journal* (supplement), 5 October 2002.

Maxie, Jessica
  2003    National Park Service archeologist. Telephone conversation with Richard D.
          Shultz, 8 May 2003.

Mehringer, P.J., Jr., and P.E. Wigand
  1987    Western Juniper in the Holocene. In *Proceedings: Pinyon-Juniper Conference, Reno,
          Nevada*, compiled by Richard L. Everett, pp. 13-16. General Technical Report
          INT-215. USDA Forest Service, Intermountain Research Station, Ogden, Utah.

Meyer, Jack
  2002    *A Geoarchaeological Landscape Approach for PORE-GOGA, U.S. National Park
          Service*. Draft report produced for the Indigenous Research Design for National
          Park Service Archaeological Overview and Assessment, Golden Gate National
          Recreational Area and Point Reyes National Seashore (scheduled for
          production fall 2003).

Meyer, Jack, and Jeffrey S. Rosenthal
  1997    *Archaeological and Geoarchaeological Investigations at Eight Prehistoric Sites in the
          Los Vaqueros Reservoir Area, Contra Costa County*. Los Vaqueros Final Report #7.
          Anthropological Studies Center, Sonoma State University, Rohnert Park,
          California. Report prepared for Contra Costa Water District, Concord,
          California.

BLM_0064410

Micsicek, Charles H.
  1987   Formation Processes of the Archaeobotanical Record. In *Advances in Archaeological Method and Theory*, Volume 10, edited by Michael B. Schiffer, pp. 211-248. Academic Press, San Diego.

Miller, Richard E., and Peter E. Wigand
  1994   Holocene Changes in Semiarid Juniper Woodlands. *BioScience* 44(7):465-474.

Milliken, Randall
  1995   *A Time of Little Choice: The Disintegration of Tribal Culture in the San Francisco Bay Area, 1769-1810*. Ballena Press, Menlo Park, California.

Minnich, Richard A.
  1995   Fuel-Driven Fire Regimes of the California Chaparral. In *Brushfires in California: Ecology and Resource Management, e*dited by Jon E. Keeley and Tom Scott, pp 21-27. International Association of Wildland Fire, Fairfield, Washington.

Moratto, Michael J.
  1974   *An Assessment of the Cultural Resources within Point Reyes Seashore*. California State University, San Francisco. Prepared for the National Park Service, Tucson, Arizona.

  1984   *California Archaeology*. Academic Press, Orlando, Florida.

Mudie, Peta J., and Roger Byrne
  1980   Pollen Evidence for Historic Sedimentation Rates in California Coastal Marshes. *Estuarine and Coastal Marine Science* 10:305-316.

Nakazawa, Yuichi
  1999   *Obsidian and Heating: Experiments, Classification, and Method for Detection*. Paper presented at the annual meeting of the Society for California Archaeology, Sacramento.

National Park Service
  1961   *Land Use Survey: Proposed Point Reyes National Seashore*. Prepared by Region Four Office. Elliott Print Company, Oakland, California.

  1973   *Proposed Point Reyes Wilderness: Revised Draft Environmental Statement*. DES 73-11. U.S. Department of the Interior, National Park Service, Washington, D.C.

  1995   *How to Apply the National Register Criteria for Evaluation*. National Register Bulletin 15. U.S. Department of the Interior, National Park Service, Washington, D.C.

  1998a  Director's Order #18 in "Fire and Aviation Management," available at NPS website: <http://www.nps.gov/meve/fire/do18.htm>. U.S. Department of the Interior, National Park Service. Updated 9 December 2002, accessed 14 April 2003.

BLM_0064411

National Park Service (continued)

1998b   *Cultural Resource Management Guideline Director's Order #28* available at NPS website <http://www.cr.nps.gov/history/online_books/nps28/28contents.htm>. U.S. Department of the Interior, National Park Service. Accessed 4 August 2003.

1999   *Wildland and Prescribed Fire Management Policy Reference Manual 18,* available at NPS website: <http://www.nps.gov/fire/fire/policy/rm18/download.htm>. U.S. Department of the Interior, National Park Service.

2002   *Fire and Fuels.* Fire and Fuel Management 2002, edited by John Dell'Osso and Barbara Moritisch. National Park Service, Point Reyes National Seashore, and Golden Gate National Recreation Area.

2003a   Park "Facts," available at NPS website: <http://www.nps.gov/pore/pphtml/facts.html>. U.S. Department of the Interior, National Park Service. Accessed 13 April 2003.

2003b   *"The History of the Coast Miwok at Point Reyes,"* at NPS website: <http://www.nps.gov/pore/history_miwok.htm>. U.S. Department of the Interior, National Park Service. Accessed 31 March 2003.

2003c   *"Ranching History at Point Reyes,"* at NPS website: <http://www.nps.gov/pore/history_miwok.htm>. U.S. Department of the Interior, National Park Service. Accessed 31 March 2003.

Nelson, Nels

1909   Transcript of Archaeological Reconnaissance Notes. Document on file (S-18475), Northwest Information Center, California Historical Resources Information System, Sonoma State University, Rohnert Park, California.

Newland, Michael

2002   Staff archaeologist, Anthropological Studies Center. Information gathered from telephone conversation with Michael Jablonowski on 11 March 2002, Anthropological Studies Center, Sonoma State University, Rohnert Park, California.

Newman, Margaret

1995   Appendix H: Immunological Analysis of Artifacts from Cleveland Fire Sites. In *The Cleveland Fire Archaeological Site Evaluation Program on the Eldorado National Forest,* edited by Kim Tremaine and Robert J. Jackson. On file at Eldorado National Forest, Placerville.

Nicholson, Rebecca A.

1993   A Morphological Investigation of Burnt Animal Bone and an Evaluation of its Utility in Archaeology. *Journal of Archaeological Science* 20:411-428.

BLM_0064412

Origer, Thomas
   1982   *Archaeological Investigations at CA-MRN-230, Point Reyes National Seashore, Marin County, California.* Department of Behavioral Sciences, Santa Rosa Junior College, Santa Rosa, California. Prepared for the Division of Cultural Resource Management, Western Region, U.S. National Park Service.

   1987   *Temporal Control in the Southern North Coast Ranges of California: The Application of Obsidian Hydration Analysis.* Papers in Northern California Anthropology, No. 1. Northern California Anthropological Group, Berkeley, California.

   1996   Obsidian Hydration. In *Fire Effects on Archaeological Resources, Phase 1: The Henry Fire, Holiday Mesa, Jemez Mountains, New Mexico,* edited by Stephen C. Lentz, Joan Gaunt, and Adisa J. Willmer, pp. 81-83. General Technical Report RM-GTR-273. USDA Forest Service, Rocky Mountain and Range Experiment Station, Fort Collins, Colorado.

Orna, Mary Virginia
   1996   *Archaeological Chemistry: Organic, Inorganic, and Biochemical Analysis.* American Chemical Society, Washington.

Patencio, Francisco
   1943   *Stories and Legends of the Palm Springs Indians.* Times-Mirror Company, Los Angeles.

Patterson, Bette
   1976   Historical/Architectural Sketch of Point Reyes Station. In *Point Reyes Station Archaeological and Historic Resource Survey.* North Marin Water District, Novato, California.

Pigniolo, Andrew R.
   1992   *Distribution Of Piedra De Lumbre "Chert" and Hunter-Gatherer Mobility and Exchange in Southern California.* Master's thesis, San Diego State University, San Diego, California.

Pilles, Peter J.
   1984   *The Effects of Forest Fires on Archeological Sites.* Paper presented at the 49th Annual Meeting of the Society for American Archaeology, Portland.

Polansky, Barbara
   2000   *A Prehistoric Archaeological Settlement Pattern Model for the Point Reyes Peninsula.* Master's thesis, Cultural Resources Management, Sonoma State University, Rohnert Park, California.

Praetzellis, Mary, Adrian Praetzellis, and Suzanne B. Stewart
   1985   *Before Warm Springs Dam: A History of the Lake Sonoma Area.* Sonoma State University, Rohnert Park, California. Draft report prepared for the Army Corps of Engineers, San Francisco District.

BLM_0064413

Purdy, B. A., and H. K. Brooks
1971   Thermal Alteration of Silica Minerals: An Archeological Approach. *Science* 173:322-325.

Pyne, Stephen J.
1982   *Fire in America: A Cultural History of Wildland and Rural Fire*. Princeton University Press, Princeton, New Jersey.

1 2001   *Fire: A Brief History*. University of Washington Press, Seattle.

Pyne, Stephen J., Patricia L. Andrews, and Richard D. Laven
1996   *Introduction to Wildland Fire*. Second edition. John Wiley and Sons, New York.

Raab, L. Mark, and Andy Yatsko
1992   Ancient Maritime Adaptations of the California Bight: A Perspective from San Clemente Island. In *Essays on the Prehistory of Maritime California*, edited by Terry L. Jones, pp. 173-193. Center for Archaeological Research at Davis Publication No. 10. University of California, Davis.

Rawls, James J., and Walton Bean
1998   *California: An Interpretive History*. Seventh edition. McGraw-Hill, San Francisco.

Rick, John W.
1976   Downslope Movement and Archaeological Intrasite Spatial Analysis. *American Antiquity* 41:133-144.

Rick, Torben C., Jon M. Erlandson, and René L. Vellanoweth
2001   Paleocoastal Marine Fishing on the Pacific Coast of the Americas: Perspectives from Daisy Cave, California. *American Antiquity* 66(4):595-614.

Riley, Lynn M.
1976   An Assessment of Endangered Archaeological Sites at Point Reyes National Seashore. Prepared for the National Park Service, Western Region Office, Tucson, Arizona.

Robichaud, Peter R., Jan L. Beyers, and Daniel G. Neary
2000   Evaluating the Effectiveness of Postfire Rehabilitation Treatments. General Technical Report RMRS-GTR-63. USDA Forest Service, Rocky Mountain Research Station, Fort Collins, Colorado.

Romme, William H., Lisa Floyd-Hanna, and Melissa Conner
1993   Effects of Fire on Cultural Resources at Mesa Verde National Park. *Park Science* 13(3):28-30.

Russell, Emily W. B.
1983   Pollen Analysis of Past Vegetation at Point Reyes National Seashore, California. *Madroño* 30:1-11.

BLM_0064414

Ryan, Kevin C.
    n.d.    Evaluating Fire Effects on Cultural Resources. On file at the Western
             Archeological and Conservation Center, Tucson.

Ryan, Kevin C., and Nonan V. Noste
    1985    Evaluating Prescribed Fires. In *Proceedings, Symposium and Workshop on
             Wilderness Fire, Missoula, Montana, November 15-18, 1983*, edited by James E.
             Lotan, Bruce M. Kilgore, William C. Fischer, and Robert W. Mutch, pp. 230-238.
             General Technical Report 182. USDA Forest Service, Intermountain Forest and
             Range Experiment Station, Ogden, Utah.

Rypins, S., S.L. Reneau, R. Byrne, and D.R. Montgomery
    1989    Palynologic and Geomorphic Evidence for Environmental Change During the
             Pleistocene-Holocene Transition at Point Reyes Peninsula, Central Coastal
             California. *Quaternary Research* 32:72-87.

Sampson, Arthur W.
    1944    Plant Succession on Burned Chaparral Lands in Northern California. Bulletin
             685, Agricultural Research Station, University of California, Berkeley.

Sanborn, Margaret
    1989    *Yosemite: Its Discovery, Its Wonders and Its People*. Yosemite Association,
             Yosemite National Park, California.

Schenk, Robert E.
    1970    *Contributions to the Archaeology of Point Reyes National Seashore: A Compendium in
             Honor of Adan E. Treganza*, edited by Robert E. Schenk. Treganza Museum
             Papers No. 6., San Francisco State College, San Francisco.

Schiffer, Michael B.
    1986    Radiocarbon Dating and the Old Wood Problem: The Case of the Hohokam
             Chronology. *Journal of Archaeological Science* 13(1):13-30.

    1987    *Formation Processes of the Archaeological Record*. University of New Mexico Press,
             Albuquerque.

Schulz, Peter D.
    1981    *Osteoarchaeology and Subsistence Change in Prehistoric Central California*. Ph.D.
             dissertation, Department of Anthropology, University of California, Davis.

Schwaderer, Rae
    1992    Archaeological Test Excavation at the Duncans Point Cave, CA-SON-348/H. In
             *Essays on the Prehistory of Maritime California*, edited by Terry L. Jones, pp. 39-53.
             Center for Archaeological Research at Davis Publication No. 10. University of
             California, Davis.

BLM_0064415

Scott, Linda J.
  1990    Pollen Analysis of Three Sites in the La Mesa Study Area. In *The 1977 La Mesa Fire Study: An Investigation of Fire and Fire Suppression Impact on Cultural Resources in Bandelier National Monument*, by Diane Traylor, Lyndi Hubbell, Nancy Wood, and Barbara Fiedler, pp. 153-164. Southwest Cultural Resources Center Professional Papers No. 28. U.S. Department of the Interior, National Park Service, Southwest Cultural Resources Center, Santa Fe

Seabloom, Robert W., Rodney D. Sayler, and Stanley A. Ahler
  1991    Effects of Prairie Fire on Archeological Artifacts. *Park Science: A Resource Management Bulletin* 11(1):1, 3.

Shackley, M. Steven, and Carolyn Dillian
  1999    *Thermal and Environmental Effects on Obsidian Geochemistry: Experimental and Archaeological Evidence*. Paper presented at the 33rd Annual Meeting of the Society for California Archaeology, Sacramento.

Shipek, Florence C.
  1971    Prepared Direct Testimony of Florence C. Shipek, Anthropologist. Exhibit B-50. Federal Power Commission Project No. 176, San Diego County, California.

Siefkin, Nelson
  2001    The 1998-2000 Archeological Surveys Related to Prescribed and Wildland Fire Compliance in the Northern California Subcluster, Lassen Volcanic National Park, Lava Beds National Monument, and Whiskeytown National Recreation Area. Partial draft report in possession of the author.

Siefkin, Nelson, Thomas L. Burge, and Susan L. Kerr
  n.d.    *Rehabilitation of the Sycamore Site*. On file at Sequoia and Kings Canyon National Park.

Skinner, Craig E., Jennifer J. Thatcher, and M. Kathleen Davis
  1997    *X-Ray Fluorescence Analysis and Obsidian Hydration Rim Measurement of Artifact Obsidian from 35-DS-193 and 35-DS-201, Surveyor Fire Rehabilitation Project, Deschutes National Forest, Oregon*. Northwest Research Obsidian Studies Laboratory Report 98-96. Northwest Research Obsidian Studies Laboratory, Corvallis, Oregon.

Smally, Jim
  2001    Homes Don't Have to Burn – Getting Firewise in Your Community. In *Reducing the Risk of Wildland-Urban Interface Fires: Issues and Ideas Papers Presented During a PERI Internet Symposium*. Public Entity Risk Institute, Fairfax, Virginia. Available online at <http://www.riskinstitute.org/ptrdocs/Wildland-UrbanInterfaceFires.pdf>.

BLM_0064416

Solomon, Madeline
    2000    *An Assessment of the Potential Effects to Obsidian Hydration Bands Caused by Prescribed Fires*. CDF Archeological Reports No. 26. California Department of Forestry and Fire Protection, Sacramento.

Steffen, Anna
    1999    The Dome Fire Study: Extreme Forest Fire Effects on Jemez Obsidian. Paper presented at the 33rd Annual Meeting of the Society for California Archaeology, Sacramento.

Stewart, Omer C.
    1951    Burning and Natural Vegetation in the United States. *Geographical Review* 41:317-320.

Stiner, Mary C., Steven L. Kuhn, Stephen Weiner, and Ofer Bar-Yosef
    1995    Differential Burning, Recrystallization, and Fragmentation of Archaeological Bone. *Journal of Archaeological Science* 22:223-237.

Swetnam, Thomas W.
    1993    Fire History and Climate Change in Giant Sequoia Groves. *Science* 262:885-889.

Taylor, R.E., P.E. Hare, and Tim D. White
    1995    Geochemical Criteria for Thermal Alteration of Bone. *Journal of Archaeological Science* 22:115-119.

Theiler, Don
    1983    Gary Pahl at Mrn-17. *Miwok Archaeological Preserve of Marin Newsletter* 1:1.

Traylor, Diane, Lyndi Hubbell, Barbara Fiedler, and Nancy Wood
    1990    The 1977 La Mesa Fire Study: An Investigation of Fire and Fire Suppression Impact on Cultural Resources in Bandelier National Monument. Southwest Cultural Resources Professional Papers Number 28. National Park Service, Branch of Cultural Resources Management, Santa Fe.

Tuross, Noreen, Ian Barnes, and Richard Potts
    1996    Protein Identification of Blood Residues on Experimental Stone Tools. *Journal of Archaeological Science* 23:289-296.

U.S. Department of Agriculture (USDA)
    2003    Fire Effects Information System Online database at <http://www.fs.fed.us/database/feis/>. U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Fire Sciences Laboratory. Accessed 23 April 2003.

BLM_0064417

U.S. Department of Agriculture and U.S. Department of Interior
   2001a  *Interagency Burned Area Emergency Stabilization and Rehabilitation Handbook* (Version 2.0). Posted on the website of the U.S. Fish and Wildlife Service, U.S. Department of Agriculture and U.S. Department of Interior, Washington, D.C., at <http://fire.r9.fws.gov/ifcc/Esr/Handbook>. Updated 1 March 2002.

   2001b  Burned Area Emergency Stabilization and Rehabilitation Technical Reference. U.S. Department of Agriculture and U.S. Department of Interior, Washington, D.C. Posted on the website of the U.S. Fish and Wildlife Service, updated 26 March 2002, at: <http://fire.r9.fws.gov/ifcc/Esr/TechRef>. Interagency Burned Area Emergency Stabilization and Rehabilitation Handbook (V. 1.0). Online at http://fire.r9.fws.gov/ifcc/Esr/Handbook

Upson, Ward F.
   1977  *A Description of Fifteen Archaeological Sites at Point Reyes National Seashore.* Prepared for the National Park Service, Tucson, Arizona. On file, Anthropological Studies Center, Sonoma State University, Rohnert Park, California.

Vancouver, George
   1967  *A Voyage of Discovery to the North Pacific Ocean and Round the World, 1757-1798.* De Capo Press, New York.

Van de Hoek, Enid J.
   1990  *A Spatial and Temporal Study of Blue Mountain Obsidian: Territorial Implications on the Devil's Garden in Northeastern California.* Master's thesis, Sonoma State University, Rohnert Park, California.

Vogl, Richard J., Wayne P. Armstrong, Keith L. White, and Kenneth L. Cole
   1977  The Closed-Cone Pines and Cypress. In *Terrestrial Vegetation of California,* edited by Michael G. Barbour and Jack Major, pp. 295-358. John Wiley and Sons, New York.

Von der Porten, Edward
   1963  *Drakes Bay Shell Mound Archaeology 1951-1962.* Drake Navigators Guild, Point Reyes, California. On file, S#17450, Northwest Information Center of the California Historical Resources Information System, Sonoma State University, Rohnert Park, California.

Von der Porten, Edward, Raymond Aker, Robert W. Allen, and James M. Spitze
   2002  Who Made Drake's Plate of Brass? *California History* 81(2):116-133.

Von Kotzebue, Otto
   1967  *A Voyage of Discovery into the South Sea and Bering Straits.* Biblioteca Australiana, Amsterdam.

BLM_0064418

Waselkov, Gregory A.
  1987   Shellfish Gathering and Shell Midden Archaeology. In *Advances in Archaeological Method and Theory*, Volume 10, edited by Michael B. Schiffer, pp. 93-210. Academic Press, San Diego.

Wells, Carol G., Ralph E. Campbell, Leonard F. DeBano, Clifford E. Lewis, Richard L. Fredriksen, E. Carlyle Franklin, Ronald C. Froelich, and Paul H. Dunn
  1979   *Effects of Fire on Soil: A State-of-Knowledge Review*. United States Forest Service, General Technical Report WO-7.

West, G. James
  1989   Early Historic Vegetation Change in Alta California: The Fossil Evidence. In *Columbian Consequences, Volume 1: Archaeological and Historical Perspectives on the Spanish Borderlands West*, edited by David Hurst Thomas, pp. 333-348. Smithsonian Institution Press, Washington, D.C.

Wettstaed, James R.
  1993   Forest Fires and Archaeological Sites: Observations Resulting from the 1988 Fire Season in Southeast Montana. *Archaeology in Montana* 34(1):7-15.

Wettstaed, James R., and Halcyon LaPoint
  1990   Short and Long Term Effects on Site Preservation Due to Wildfires. Paper presented at the 55th Annual Meeting of the Society for American Archaeology, Las Vegas.

White, Gordon
  2003   National Park Service Chief Cultural Resources. Telephone conversation with Richard D. Shultz, 15 August 2003.

Wildeson, Leslie E.
  1982   The Study of Impacts on Archaeological Sites. In *Advances in Archaeological Method and Theory*, Volume 5, edited by Michael B. Schiffer, pp. 51-96. Academic Press, New York.

Wilson, Douglas C., and David V. DeLyria
  1999   The Experimental Reduction of Rock in a Camas Oven: Towards an Understanding of the Behavioral Significance of Fire-Cracked Rock. *Archaeology in Washington* VII:81-89.

Wirtz, II, William O.
  1995   Responses of Rodent Populations to Wildfire and Prescribed Fire in Southern California Chaparral. In *Brushfires in California: Ecology and Resource Management,* edited by Jon E. Keeley and Tom Scott, pp 63-67. International Association of Wildland Fire, Fairfield, Washington.

BLM_0064419

Wood, W. Raymond, and Donald L. Johnson
    1978    A Survey of Disturbance Processes in Archaeological Site Formation. In *Advances in Archaeological Method and Theory*, Volume 1, edited by Michael B. Schiffer, pp. 315-381. Academic Press, New York.

BLM_0064420

**APPENDIX (HPD)**

BLM_0064421

# Long Foraging Distances
# in Two Uncommon Bat Species
# (*Euderma maculatum* and *Eumops perotis*)
# in Northern Arizona

Melissa S. Siders

*North Kaibab Ranger District*
*Kaibab National Forest*
*Fredonia, AZ 86022*

Michael J. Rabe
Tim K. Snow

*Arizona Game and Fish Department*
*Non-Game Branch*
*2221 W. Greenway Rd.*
*Phoenix, AZ 85027*

and

Kei Yasuda

*575 East 43rd Ave*
*Eugene, OR 97405*

**Abstract.**     The Kaibab Plateau of north-central Arizona is a high elevation, limestone plateau on the northern edge of the Grand Canyon. We used radio telemetry to determine foraging areas for seven lactating female spotted bats (*Euderma maculatum*) and located roosts for four of these bats. We also captured greater western mastiff bats (*Eumops perotis*) and located a single roost for this species. Roosts for both spotted and mastiff bats were in xeric cliffs in or near Grand Canyon National Park (GCNP) at approximately 650 to 1040 m elevation. Distances from capture location to maternity roosts ranged from approximately 28 to 42 km. Capture sites and foraging areas were located at approximately 2600 m elevation for spotted bats and 1900 m for mastiff bats. We caught 18 bat species during mist net surveys conducted from 1994 through 1998. The high species diversity that we observed may be due to the proximity of the Kaibab Plateau to the Grand Canyon, and the great range of elevations and habitats available from the floor of GCNP (600 m elevation, desert) to the meadows (2600 m elevation, subalpine) on the Kaibab Plateau.

113

BLM_0064422

**Key words:** foraging, western mastiff bats, *Eumops perotis*, spotted bats, *Euderma maculatum*, Kaibab Plateau, Arizona, Grand Canyon National Park, surveys

## INTRODUCTION

Once thought to be extremely rare, spotted bats (*Euderma maculatum*) are widely distributed throughout western North America and probably have a discontinuous, patchy distribution (Fenton et al. 1987, Nagorsen and Brigham 1993). Much of what is known of spotted bat behavior and ecology has been gained from three locations where they are relatively common: the Okanagan Valley in southern British Columbia, Canada (Leonard and Fenton 1983), Big Bend National Park in southern Texas (Easterla 1970), and Fort Pierce Wash on the Utah-Arizona border (Ruffner et al. 1979). High cliffs were nearby in all three of these locations. Radio tracking of three spotted bats in British Columbia (Wai-Ping and Fenton 1989) found that bats foraged all night and did not travel farther than 10 km from cliff day roosts. Preferred foraging habitat appears to be open areas surrounded by ponderosa pines (Woodsworth et al. 1981, Leonard and Fenton 1983, Wai-Ping and Fenton 1989).

Roost sites for greater western mastiff bats (*Eumops perotis*) were not known from the state of Arizona since the 1970s, and was not known north of the Grand Canyon until we captured eight lactating females in 1995. These captures were a range expansion for the species (Castner et al. 1996). Roost sites have been described for California (Cockrum 1960, Dalquist 1946, Howell and Little 1924), Texas (Ohlendorf 1972) and Arizona (Cox 1965). In general greater western mastiff bats live in high, dry places, and roosts are in locations that allow the bat to drop >3 m to launch into flight (Freeman 1981). In the southwestern United States, roosts are typically found in rugged rocky canyons and cliffs (Barbour and Davis 1969, Dalquist 1946). Little is known about the foraging habitat for this species. The purpose of this study was to locate day roosts and foraging areas used by spotted and mastiff bats on the North Kaibab Ranger District (NKRD) of the Kaibab National Forest, in northern Arizona.

## METHODS

During July – August 1995, July 1996, July – August 1997, and August 1998 we caught bats with mist nets set across small ponds (ca. 15 to 35 m across) in subalpine meadows on the NKRD, north of Grand Canyon National Park (GCNP). Spotted bats were captured in mead-

ows from approximately 2400 to 2650 m in elevation that were linked across the landscape to form a series of meadow systems. These meadows were surrounded by ponderosa pine (*Pinus ponderosa*) forests that included Douglas-fir (*Pseudotsuga menziesii*), white fir (*Abies concolor*), and patches of aspen (*Populus tremuloides*). Mastiff bats were captured in similar meadows from approximately 1900 to 2400 m elevation.

We attached radio transmitters to captured spotted and mastiff bats with surgical glue, and followed them to day roosts. We placed transmitters (0.68 g, BD2, Holohil Inc., Ontario, Canada) on six (1 male, 4 lactating females, 1 post lactating female) spotted bats in 1995, six (four lactating and two non-reproductive adult females) spotted bats in 1996 and seven (all lactating adult females) spotted bats in 1997. We also placed 1.28g transmitters on six ( all lactating female) mastiff bats in 1995, one (non-reproductive adult female) mastiff bat in 1997, and one (lactating adult female) mastiff bat in 1998. Radio telemetry was conducted through a combination of vehicle pursuit, stationary positions, and airplane.

## RESULTS

The presence of many audible (low-frequency) spotted bat echolocation calls and feeding buzzes (increased rates of echolocation calls associated with insect detection and pursuit; Griffin et al. 1960) in the meadows indicated that spotted bats were locally common and that the meadow systems were heavily used as foraging areas. Over 13 weeks, during four summers, we caught 25 spotted bats and 18 mastiff bats in 44 nights of netting, and we heard many spotted bat and mastiff bat calls. We caught other bats that also used the meadows for foraging (big free-tail, *Nyctinomops macrotis*; Mexican free-tail, *Tadarida braziliensis*; and Allen's big-eared bat, *Idionycteris phyllotis*), but spotted bat and mastiff bat calls are distinctive (Fenton et al. 1987, Cockrum 1960) and we could distinguish their calls from the others. Although we primarily netted ponds within forested habitat on the NKRD, we rarely heard and never caught spotted or mastiff bats in forested areas.

### Spotted Bats

Spotted bats are rapid flyers (Woodsworth et al. 1981, Wai-Ping and Fenton 1989) and the rugged topography and few roads on the NKRD made nighttime pursuit difficult. While radio tracking from the ground, foraging bats were rarely detectable >1.5 km due to effects of forest canopy and topography. When in open country or from lookout towers, we were sometimes able to detect the bats from greater distances.

BLM_0064423

Initial attempts to detect signals from roosting bats during daylight, even from aircraft, were unsuccessful. However, by using a combination of vehicle pursuit and hilltop radiotelemetry sites, several bats were relocated sufficiently to obtain general flight directions during early morning when bats left meadows and were presumably en route to day roosts.

In July 1996, we tracked one lactating female to a day roost in a remote area of GCNP, 38 km from the capture site (Rabe et al. 1998; Table 1). We located the roost from an airplane overflight after triangulating transmitter signals from the canyon rim in early morning. The day roost was at an elevation of ca. 700 m in a south-facing limestone cliff ca. 150 m above and 200 m from the Colorado River. The roost site was located in Sonoran Desert habitat with predominantly catclaw (*Acacia greggii*) and mesquite (*Prosopis glandulosa*) vegetation.

The bat followed a predictable pattern in its foraging movements. In four sequential nights of monitoring, we first detected the signal from the canyon rim (we could detect signals near the river 8 to 15 km distant) at 2010 h to 2030 h (170 to 190 minutes after sunset) each night the bat emerged from its cliff roost. It arrived in the same meadow system each night at about 2130 h, and foraged until ca. 2400 h to 0100 h, when it night-roosted in the same patch of aspen on the south face of a small ridge, 1 km east of the meadow. Radio signals indicated no movement during this night-roosting period, but the bat did not appear torpid. The bat was easily disturbed and would fly away if approached. Each night, the bat left the night roost between 0330 h and 0350 h (103 to 83 nimutes before sunrise) and flew directly towards the cliff roost, 38.5 km away. The animal did not seem to forage after night roosting and we lost the signal over the rim of the Grand Canyon 40 to 45 minutes after depart-

ing the night roost. This resulted in a flight speed of approximately 50 km/h.

In July 1997, we tracked four additional lactating females to four day roosts in remote areas of GCNP and Kanab Creek Wilderness on the NKRD. Distances from the capture sites ranged from 38.2 km to 42.7 km (Table 1). We located the bat roosts from airplane overflights after triangulating transmitter signals from the canyon rims in early morning. Day roosts ranged in elevation from ca. 700 m to 1080 m. One roost was approximately 850 m from the Colorado River. The three roosts located within Kanab Creek canyon were all <100 m from Kanab Creek. Roost sites were located in Sonoran Desert habitat with predominantly catclaw (*Acacia greggii*) and mesquite (*Prosopis glandulosa*) vegetation. Because these roosts were located in very rugged, isolated desert country, we visited only one roost for an exit count. The Kanab Creek roost was visited on two occasions, 18 July and 24 July 1997. The exact roost site could not be determined during exit counts; however, the general location was on a cliff face, approximately 20 m from the base of the cliff, in the top one-third of the cliff. The bat exited the roost at approximately 2015 h (ca. 30 minutes after sunset) each night and returned to roost at approximately 0420 h. Based on audible echolocation calls and radio telemetry signals, this was the only bat to exit.

In 1996 and 1997, female spotted bats averaged three hours foraging in the high elevation meadows. With extensive radio telemetry on six lactating female spotted bats in 1997, there appeared to be an overlap of foraging territories (Fig. 1). In 1997, we again noticed night roosting behavior in some of the females; however, they also appeared to arrive in the meadow systems later and leave earlier than in 1996. Because we were tracking spotted bats slightly earlier in the season from 1996, we thought that perhaps the females could not leave younger offspring for long periods of time due to feeding demands. Bats arrived in the meadow systems at approximately 2300 h and left at approximately 0200 h. Again, bats flew straight lines back to their canyon day roosts and did not appear to forage on the return trip.

### Greater Western Mastiff Bats

In 1995 we captured eight greater western mastiff bats, six of which where lactating females. Since all eight females were captured relatively early in the evening (60 to 100 minutes after sunset), we speculated that a roost site was nearby. We placed transmitters (BD-2, Holohil) on the six lactating females and attempted to follow them. Mastiffs are very rapid

**Table 1.** Spotted bat capture and roost site elevations and roost-to-capture-site distances.

| Year | Bat | Capture Elevation (m) | Roost Elevation (m) | Elevation Change (m) | Distance (km) |
|------|-----|----------------------|---------------------|----------------------|---------------|
| 1996 | 102 | 2499 | 700 | 1799 | 38.7 |
| 1997 | 216 | 2536 | 1024 | 1512 | 42.7 |
| 1997 | 246 | 2536 | ca. 1000 | | |
| 1997 | 275 | 2536 | 1036 | 1500 | 39.4 |
| 1997 | 301 | 2597 | 768 | 1829 | 41.3 |
| 1997 | 325 | 2597 | ca. 1000 | | |
| 1997 | 371 | 2524 | 1134 | 1390 | 38.2 |
| 1997 | 406 | 2597 | | | |



**Figure 1.** Estimated foraging areas for six spotted bats in 1997. Foraging areas were estimated from radio telemetry observations of individual bats.

fliers and we were able to follow them for only a short period that night. We detected only one faint signal the next day in a cliff a few miles south of the trap site, but quickly lost the signal. We detected no signals over the next few nights despite substantial effort.

In 1997 we captured several greater western mastiff bats at higher elevation meadow tanks. Because we assumed that the 1995 trap location was near the maternity roost, we waited to attach radios until we returned to that trap location. Although many mastiff bats were heard at the 1995 location at various times during the summer, we were only able

to capture one non-reproductive female in 1997. We held her until early morning (ca. 0400 h) when a plane we had arranged to be overhead arrived. Equipped with telemetry receiver and antenna, the plane was able to track her until just after sunrise, when she roosted in a tall ponderosa pine tree near the rim of the Grand Canyon, ca. 19.5 km from the trap site. Over six nights of telemetry from stationary points along the rim of the Grand Canyon, we were able to triangulate on a 20 km$^2$ area along the Colorado River (ca. 29 km from the trap site) where the bat appeared at ca. 2000 h and ca. 0500 h each day (Table 2). On day six, no signal was detected, and it was assumed that the bat dropped its transmitter at the roost. A plane made an overflight of the area two days later, but did not detect any radio signal.

Although we did not attempt to determine the foraging areas for the mastiff bat, it did return to the plateau and headed in the general direction of the trap site each night. Mastiff bats were also heard in several locations on the plateau in meadows, where they appeared to travel in groups. Hoffmeister (1986) suggested that these bats forage in groups, keeping contact with their roost mates.

In 1998, we again attempted to capture mastiff bats at several locations. It appeared to us that fewer feeding buzzes were detected at several locations compared to previous years. One lactating female was finally captured at the 1995 trap location and a radio transmitter attached. A general roost location was determined from three telemetry points along the rim of the Grand Canyon, very close to the 1997 location. An airplane overflight determined the exact roost location, which appeared to be near an overhang of an east-facing cliff in a side drainage approximately 1000 m from the Colorado River. The location was accessible only from the river, with no feasible overland route. We accompanied GCNP personnel to the site during a scheduled river trip on September 18, but could not determine if mastiff bats were in the area.

Distances from the capture sites to apparent roosts were approximately 28 km in 1997 and 29.1 km in 1998. The apparent day roost we

**Table 2.** Greater western mastiff bat capture and roost site elevations and roost-to-capture-site distances.

| Year | Bat | Capture Elevation (m) | Roost Elevation (m) | Elevation Change (m) | Distance (km) |
|------|-----|----------------------|---------------------|----------------------|---------------|
| 1997 | 015 | 1889 | ca. 606-883 | | ca. 28 |
| 1998 | 155 | 1889 | 737 | 1152 | 28.7 |

BLM_0064425

located in 1998 was at 737 m elevation. The site was located in Sonoran Desert habitat, similar to the spotted bat roosts.

## DISCUSSION

Female spotted and mastiff bats appear to forage long distances from their night roosts and use completely different roosting and foraging habitats. The differences between the foraging behaviors of spotted bats in British Columbia and the Kaibab Plateau may be explained by a lack of suitable high-cliff roost sites near the meadow systems on the Kaibab Plateau. In British Columbia, observed spotted bats (1) foraged in open areas 6 to 10 km from day roosts in cliffs, (2) foraged continuously while away from cliff roosts, and (3) flew at about 19 km/h while foraging (Wai-Ping and Fenton 1989). The night-roosting that we observed may be a response to the high energy demand of long distance flight. The faster flight speeds we report probably indicate that bats on the Kaibab Plateau were not foraging on their return flight and may approximate the actual flight speed capabilities of spotted bats.

The long distance traveled by spotted bats from roost to foraging habitat (77-86 km round trip) is substantially longer than previously reported distances for this species (Wai-Ping and Fenton 1989). Spotted bats have very low frequency echolocation calls that may enable them to detect insects at relatively long distances but probably limits them to resolving large (>10 mm) prey (Woodsworth et al. 1981, Leonard and Fenton 1984). Spotted bats may, therefore, prefer open foraging areas because uncluttered habitats allow detection of large prey items at relatively long distances.

Little has been described about the foraging habitat and habits of mastiff bats. Due to the timing of our first and last radio signals each day, we feel confident that the 1997 bat was roosting near the Colorado River in the Grand Canyon and may be the same roost as that found in 1998. This results in a relatively long distance traveled by this mastiff bat from roost to trap site (58 km round trip).

For both the spotted and mastiff bats to travel such distances, we suspect there may be an abundance of insect prey in the high meadow systems sufficiently valuable to justify the energy expenditure of such long flight distances. The large elevation and temperature differences between the low, hot desert cliff roost in GCNP and the high, cool subalpine meadows on the NKRD present an opportunity to forage in several habitat types, but high energetic demands of lactation (Racey 1982) should force lactating females to choose the most productive foraging

habitat. Although we have not yet analyzed insect sampling data, large moths appeared abundant in meadows on the NKRD during July and August. Further research should document whether the long day-roost to foraging distance and night roosting behavior of these bats is typical of local spotted and mastiff bats and what insect species bats select in these meadows.

## ACKNOWLEDGMENTS

This project was a cooperative effort between the Arizona Game and Fish Department (AGFD), and the North Kaibab Ranger District of the U.S. Forest Service. Funding was provided by an AGFD Heritage grant, the U.S. Forest Service and the AGFD Research Branch. We thank W. Alber, T. Bricker, B. Breyer, L. Bunting, D. Garcia de la Cadena, P. Campbell, S. Castner, K. Covert, W. Draper, D. Emmons, C. Funari, J. Foster, R. Gordon, L. Gowey, G. Grasso, H. Green, G. Harding, M. Herder, T. Hiserodt, R. Hoverman, M. Howard, J. Jackson, J. Kendall, J. Lowsky, A. Miller, A. McIntire, M. Painter, N. Plomgren, R. Plomgren, W. Porter, R. Revis, D. Sinton, R. Steffensen, D. Ward, and L. Williams for assistance in the field. J. Petterson, S. Cherry, R. Ward, E. Leslie, and M. Vandzura of GCNP and R. Miller, S. MacVean, A. Holycross, and J. C. deVos, Jr. of the AGFD provided valuable logistical support.

## LITERATURE CITED

Barbour, R. W. and W. H. Davis. 1969. Bats of America. The Univ. Press of Kentucky, Lexington, 286 pp.

Castner, S. V., T. K. Snow, D. C. Noel, M. J. Rabe, M. S. Siders, and D. Garcia de la Cadena. 1996. Redefining the range of the greater-western mastiff bat in Arizona. Bat Research News 37(1):23.

Cockrum, E. L. 1960. Distribution, habitat and habits of the mastiff bat, *Eumops perotis*, in North America. Journal of the Arizona Academy of Science 1:79-84.

Cox, T. J. 1965. Behavior of the mastiff bat. Journal of Mammalogy 46:687-688.

Dalquest, W. W. 1946. The daytime retreat of a California mastiff bat. Journal of Mammalogy 27:86-88.

Easterla, D. A. 1970. First records of the spotted bat in Texas and notes on its natural history. American Midland Naturalist 83:306-308.

Fenton, M. B., D. C. Tennant, and J. Wyszecki. 1987. Using echolocation calls to measure the distribution of bats: the case of *Euderma maculatum*. Journal of Mammalogy 68:142-144.

Freeman, P. W. 1981. A multivariate study of the family Molossidae (Mammalia, Chiroptera): morphology, ecology, evolution. Fieldiana: Zoology, new series, 7:1-173.

Griffin, D. R., F. A. Webster, and C. R. Michael. 1960. The echolocation of flying insects by bats. Animal Behavior 8:141-154.

122    SIDERS ET AL.

Hoffmeister, D. F. 1986. Eumops—Mastiff bat. Pages 120-121 *in* Mammals of Arizona. The Univ. of Arizona Press, Tucson, AZ.

Howell, A. B. and L. Little. 1924. Additional notes on California bats; with observations upon the young of Eumops. Journal of Mammalogy 5:261-263.

Leonard, M. L., and M. B. Fenton. 1983. Habitat use by spotted bats (*Euderma maculatum*, Chiroptera: Vespertilionidae): roosting and foraging behavior. Canadian Journal of Zoology 61:1487-1491.

Leonard, M. L., and M. B. Fenton. 1984. Echolocation calls of *Euderma maculatum* (Vespertilionidae): Use in orientation and communication. Journal of Mammalogy 65:122-126.

Nagorsen, D. W., and R. M. Brigham. 1993. Bats of British Columbia. Univ. of British Columbia Press, Vancouver, British Columbia.

Ohlendorf, H. M. 1972. Observations on a colony of *Eumops perotis* (Molossidae). The Southwestern Naturalist 17:297-300.

Rabe, M. J, M. S. Siders, C. R. Miller and T. K. Snow. 1998. Long range foraging distance for a spotted bat (*Euderma maculatum*) in Northern Arizona. The Southwestern Naturalist 43:266-269.

Racey, P. A. 1982. Ecology of bat reproduction. Pages 57-104 *in* T. H. Kunz, editor. Ecology of Bats. Plenum Press, New York.

Ruffner, G. A., R. M. Poche, M. Meierkord, and J. A. Neil. 1979. Winter bat activity over a desert wash in southwestern Utah. The Southwestern Naturalist 24:447-453.

Wai-Ping, V., and M. B. Fenton. 1989. Ecology of spotted bat (*Euderma maculatum*) roosting and foraging behavior. Journal of Mammalogy 70:617-622.

Woodsworth, G. C., G. P. Bell, and M. B. Fenton. 1981. Observations of the echolocation, feeding behavior, and habitat use of *Euderma maculatum* (Chiroptera: Vespertilionidae) in southcentral British Columbia. Canadian Journal of Zoology 59:1099-1102.

BLM_0064427

# Correlates to Colonizations of New Patches by Translocated Populations of Bighorn Sheep

Francis J. Singer[1,4]
Michael E. Moses[1]
Susan Bellew[2]
William Sloan[3]

## Abstract

By 1950, bighorn sheep were extirpated from large areas of their range. Most extant populations of bighorn sheep (*Ovis canadensis*) in the Intermountain West consist of <100 individuals occurring in a fragmented distribution across the landscape. Dispersal and successful colonizations of unoccupied habitat patches has been rarely reported, and, in particular, translocated populations have been characterized by limited population growth and limited dispersal rates. Restoration of the species is greatly assisted by dispersal and successful colonization of new patches within a metapopulation structure versus the existing scenario of negligible dispersal and fragmented, small populations. We investigated the correlates for the rate of colonizations of 79 suitable, but unoccupied, patches by 31 translocated populations of bighorn sheep released into nearby patches of habitat. Population growth rates of bighorn sheep in the release patches were correlated to $N_e$ of the founder group, and early contact with a second released population in a nearby release patch (logistic regression, $p = 0.08$). Largest population size of all extant released populations in 1994 was correlated to potential $N_e$ of the founder group, the number of different source populations represented in the founder, and early contact with a second released population ($p = 0.016$). Dispersal rates were 100% higher in rams than ewes ($p = 0.001$). Successful colonizations of unoccupied patches ($n = 24$ of 79 were colonized) were associated with rapid growth rates in the released population, years since release, larger area of suitable habitat in the release patch, larger population sizes, and a seasonal migratory tendency in the released population ($p = 0.05$). Fewer water barriers, more open vegetation and more rugged, broken terrain in the intervening habitat were also associated with colonizations ($p = <0.05$). We concluded that high dispersal rates and rapid reoccupation of large areas could occur if bighorn sheep are placed in large patches of habitat with few barriers to movements to other patches and with no domestic sheep present. Many restorations in the past that did not meet these criteria may have contributed to an insular population structure of bighorn sheep with limited observations of dispersal.

**Key words:** bighorn sheep, colonization, patch size, dispersal, corridor features, *Ovis canadensis canadensis*, *O. c. nelsoni*.

## Introduction

Fragmentation and insularity of populations of wild vertebrates is a pervasive problem in increasingly human-altered landscapes. Small isolated populations of animals may be at higher risk of extirpation from large, contiguous populations (Gilpin & Soulé 1986). Beier and Noss (1998) recently argued that landscape connectivity enhances population viability for many species, and that undisturbed environments were, in general, more continuous than those disturbed by humans. Here we report on a species that currently occurs in small, isolated populations, that formerly occupied a much wider range (Buechner 1960; Wishart 1978), and that has been rarely reported to disperse. The distribution of the species was likely naturally fragmented to some extent (Geist 1971; Schwartz et al. 1986; Bleich et al. 1990). But unregulated hunting, habitat destruction, overgrazing of rangelands, and diseases contracted from domestic livestock contributed to large scale declines and further fragmentation of the species during the 1870–1950 period (Cowan 1940; Buechner 1960; Wishart 1978; Monson 1980; Thorne et al. 1985). Most (64–88%) extant populations of bighorn sheep within the western United States currently consist of less than 100 individuals (McCutcheon 1981; Thorne

[1]U.S. Geological Survey, Natural Resources Ecology Laboratory, Colorado State University, Fort Collins, CO 80523–1189, U.S.A.
[2]National Park Service, Dinosaur National Monument, CO 81610, U.S.A.
[3]Canyonlands National Park, Moab, UT 83532, U.S.A.
[4]Address correspondence to F. J. Singer, email francis@nrel.colostate.edu

© 2000 Society for Ecological Restoration

BLM_0064428

et al. 1985; Singer 1994). About 55–58% of present-day populations stem from translocations (Bailey 1990; Singer 1994). Only about 40% of these translocations were judged successful (Leslie 1980; Bailey 1990; Singer et al. 2000a), thus slowing the restoration process. Information on factors that contribute to successful dispersal and colonization, in particular, would greatly accelerate the restoration process.

Historically, bighorn sheep likely occurred in a naturally fragmented distribution, because bighorn sheep are habitat specialists that prefer open patches of steep, cliffy habitat, and these patches of habitat tend to occur in islands on mountains separated by flat areas or dense forests (Van Dyke et al. 1983; Risenhoover et al. 1988; Smith et al. 1991). Traditional views held that: (1) suitable habitats are climax vegetation types that change slowly; (2) the species is a classic K-selected species that lives in matrilineal groups; (3) subadults are retained in groups; (4) movements and migrations are learned from older animals (Geist 1971; Festa-Bianchet 1986); and thus, (5) colonizations of new habitat is rare. Present day support for these views include mtDNA differences between nearby mountain ranges inferring restricted movements by ewes (Ramey 1995; Boyce et al. 1999), the present-day evidence of an insular distribution of the species, persistence of many small populations of 50 or less (Krausman & Leopold 1986; Stevens 1994; Wehausen 1999), strong fidelity of ewes to home ranges (Dodd 1983), and the near absence of new colonizations. Bleich et al. (1996) reported only one instance of a ewe emigrating and reproducing in a new mountain range, while McQuivey (1978) reported only four such dispersals by marked ewes.

Several authors have proposed that bighorn sheep may naturally occur in large metapopulations consisting of populations on isolated mountains that are connected by intermountain travel of 10–20 km by ewes and rams (Cochran & Smith 1983; Schwartz et al. 1986; Bleich et al. 1990, 1996). The highly connected populations of about 73,000 Dall sheep (*Ovis dalli*) that occur on every mountain and steep hill in Alaska also imply high dispersal, successful colonizations, and a metapopulation structure (Singer 1982; Heimer 1985). Dispersing Dall sheep were frequently observed during a period of population increase in the early 1980s (F. Singer & E. C. Murphy, personal observation). A past metapopulation structure also for bighorn sheep was suggested by similarities in microsatellite DNA, inferring extensive movements by rams across geographic distances (Luikart & Allendorf 1996; Boyce et al. 1997; Gutiérrez-Espeleta et al. 1998) although mtDNA suggest past low levels of movements by ewes (Boyce et al. 1999). Also, the spread of pasteurellosis across 170 km during two breeding seasons was attributed to extensive movements of breeding rams (Onderka & Wishart 1984). A metapopulation structure requires dispersal rates ad-

equate to recolonize vacated or newly occupiable patches of habitat (Hanski 1989; McCullough 1996). Extinctions of local populations of bighorn sheep by a variety of causes (including disease that killed entire populations, periodic drought, post-fire succession, possibly predation, and periodic severe winter weather in northern climates) have been reported (Buechner 1960; Weaver & Mensch 1971; Wishart 1978; Wehausen et al. 1987; Torres et al. 1994; Bleich et al. 1996; see Fig. 1). Subsequently, newly suitable patches would have been created periodically by large fires, relief from drought, milder winters, recovery by nondiseased groups, and post-glacial succession (Geist 1971, 1975; Fig. 1). It is possible that bighorn sheep existed mostly in metapopulations but human disturbance has accelerated extinction rates in these metapopulations, and bighorn sheep populations now occur in a nonequilibrium state (Harrison 1994).

Increaser dispersal is defined as dispersal during periods of the most rapid population increases prior to habitat saturation. Increaser dispersal is most typical of small mammals (Lidicker 1976; Krebs 1978; Beacham 1979; Stenseth 1983). Sinclair (1992) felt that saturation dispersal (i.e., dispersal from saturated habitats) was typical of most ungulates (McCullough 1985; LaBonte et al. 1998). Increaser versus saturation dispersal can alter the rate of restoration. Presaturation or increaser dispersal will result in a faster recovery, since dispersal is most likely at highest rates of increase (highest lambda's, $\lambda$) and when the habitat is not yet fully occupied (highest $\lambda$'s typically occur at about 50–70% occupation of the habitat in ungulates). A saturation dispersal model for



Potential Metapopulation Dynamics for Bighorn Sheep: Periodic Extirpations and Reoccupations of Habitat Patches

Figure 1. Factors that create new habitat patches for bighorn sheep and that encourage a metapopulation structure consisting of periodic extirpations and recolonizations.

BLM_0064429

bighorn sheep would obviously result in a slower natural recovery, since dispersal would not occur until the entire available habitat was occupied.

Bighorn sheep translocations are very expensive. The founder animals are subjected to stress and risk of death during capture and transplant, sources are limited, and intra- and inter-state transports are logistically cumbersome. The typical translocation of about 28 bighorn sheep costs about $20,000–40,000.

Much habitat remains unoccupied for potential restoration. Our Geographic Information System (GIS) analysis in a six-state area near national park lands indicated only 38% of the entire potential suitable habitat was occupied (Singer et al. 2000*b*). Dispersal is considered important to wildlife species because it leads to the discovery and occupation of new patches (Stenseth 1983), it contributes to the persistence of populations (Brown & Kodric-Brown 1977; Beier & Noss 1998), and it may contribute to the avoidance of inbreeding (Geist 1971; Dobson 1982).

Thus, managers need to know what procedures they can follow that will promote natural dispersal and subsequent colonizations of unoccupied habitat rather than translocations into each patch. The purpose of our study was to determine those factors correlated with dispersal and colonization of unoccupied habitat patches by 31 translocated populations of bighorn sheep that occurred in or near 15 National Park Service (NPS) units in the western United States. Our objectives were to analyze those factors that could be modified or altered by managers during restoration (e.g., selection of patches near versus distant to domestic sheep; selection of larger versus smaller patch sizes for releases; selection of areas for restoration with certain corridor features; total size of founder groups; and adult sex ratios in founder groups) that might increase the likelihood of successful natural colonizations of additional patches by translocated groups.

Considerable marking of animals ($n = 679$ marked animals), 527 population-years of post-release monitoring, and extensive GIS analysis of suitable habitat in the patches (39,117 km$^2$ of potential habitat were assessed) were available in this large data set.

## Study Areas

Sheep were released into 31 study areas in five states from 1946–1991 (Table 1). The study areas, state, released populations, total size of release, number of years of data collection, type of data, estimated potential N$_e$ of the released group, the source nearby unoccupied patches, and size of the habitat patches are all detailed in Table 1. Dispersal and colonizations were closely monitored in nine of the released populations by university graduate students, and by full-time resource agency technicians or biologists in 11 others. There were also regular aerial radio

locations and periodic helicopter surveys of 28 populations in all occupied and unoccupied patches (Table 1).

## Methods

### Dispersal of Translocated Populations

We documented population dispersal from the release patch through observations of the occupied range of all marked and unmarked animals. Colonizations were determined by the first presence of marked or unmarked animals of both sexes and the production of young in previously unoccupied patches of habitat. Each management agency (NPS, Bureau of Land Management [BLM], Colorado Division of Wildlife, Utah Wildlife Resources, U.S. Forest Service, our own U.S. Geological Survey crews, and university graduate students) closely monitored any colonizations of new patches and pioneering movements by radiocollared or marked animals dispersing from the released populations (detailed in Singer & Gudorf 1999).

In 12 of the translocated populations monitored most intensively by our NPS and USGS crews, we monitored all dispersal events and movements of radiocollared animals by aircraft and from the ground at least weekly ($n = 143$ radiocollared animals). Less intensive radiotelemetry studies were conducted in another 16 populations ($n = 28$ total radiomonitored populations; $n = 412$ additional radiocollared animals; $18 \pm 3$ radiocollars per translocated founder group) by state and federal agencies along with periodic helicopter surveys to determine the status of occupied and unoccupied habitat. Marking collars on another 124 bighorn sheep, along with national park observation recording systems, provided extensive information for another three populations ($n = 31$ marked populations). All national park units encourage employees who travel in the backcountry in the park to record any sightings of the released bighorns on Wildlife Observation Cards. These sightings represent thousands of km of backcountry travel by human observers within each park unit. We used bighorn sheep locations from helicopter and ground sightings within each park, combined with locations of radiocollared animals, and estimated the approximate largest area occupied by connecting the outermost observations (Mohr 1947; White & Garrott 1990). To obtain an approximate rate of spread by the released populations, we estimated the largest area occupied by released bighorn sheep within the release patch and divided by years since release.

We concluded no successful colonizations went undetected. Nevertheless, some short-term transient exploratory movements and return to the first patch by unmarked or marked individuals might have gone undetected.

We investigated the characteristics of 79 suitable, but

BLM_0064430

*Dispersal of Translocated Bighorn Sheep*

**Table 1.** Translocated released populations, characteristics of the release and the release patch, and number of colonizations by the released bighorn sheep population.

| Name | State | Year of Release | Founder N | Potential $N_e$ of Founder | Number of Founder Sources | Population Growth Pattern[a] | Size of Release Patch (km²)[b] | 1994 Census N | Migratory Tendency[d] | Number Unoccupied Patches Colonized[f] |
|---|---|---|---|---|---|---|---|---|---|---|
| Moody Canyon[e,g,h] | UT | 1975 | 23 | 18 | 3 | 1 | 466[c] | 395 | 3 | 1 |
| Red Slide[e,h] | UT | 1984 | 22 | 22 | 2 | 1 | 466[c] | 145 | 3 | 1 |
| Mesa Verde[j] | CO | 1946 | 14 | 12 | 1 | 2 | 4.9 | 10 | 1 | 0 |
| Dillon[f,g,h,i] | CO | 1974 | 44 | 21 | 2 | 2 | 264 | 7 | 1 | 1 |
| Lake Fork[f,g,h] | CO | 1975 | 16 | 14 | 1 | 2 | 28.3 | 8 | 1 | 0 |
| Black Canyon[g,h] | CO | 1986 | 83 | 51 | 4 | 2 | 25 | 30 | 1 | 0 |
| Colorado Monument[e,f,g,h,i] | CO | 1979 | 39 | 27 | 3 | 1 | 312 | 138 | 2 | 1 |
| Beaver Creek[f,g,h] | CO | 1983 | 21 | 18 | 1 | 2 | 18.5 | 9[j] | 1 | 1 |
| Bear Mountain[e,g,h] | UT | 1983 | 36 | 27 | 2 | 1 | 120 | 36 | 3 | 1 |
| Sheep Creek[f,g,h] | UT | 1989 | 21 | 16 | 1 | 1 | 1,000[c] | 45 | 3 | 2 |
| Hole-in-Rock[g,h] | UT | 1989 | 22 | 17 | 1 | 1 | 1,000 | 60 | 1 | 2 |
| Cross Mountain[g,h,i] | CO | 1977 | 19 | 15 | 1 | 2 | 49 | 10 | 1 | 0 |
| Ladore Canyon[e,h,i] | CO | 1952 | 32 | 24 | 1 | 3 | 136 | 130 | 1 | 1 |
| Pool Creek[f,g,h,i] | CO | 1984 | 19 | 11 | 2 | 1 | 333 | 70 | 1 | 1 |
| Arches[e,f,g,h,i] | UT | 1985 | 23 | 15 | 2 | 1 | 224 | 93 | 1 | 2 |
| Maze[g,h,i] | UT | 1982 | 25 | 24 | 2 | 1 | 1,145 | 90 | 3 | 3 |
| Bighorn Canyon[e,f,g,h,i] | MT | 1975 | 13 | 12 | 2 | 1 | 736 | 195 | 3 | 2 |
| Badlands North[f,g,h,i] | SD | 1967 | 14 | 12 | 1 | 1 | 161 | 163 | 1 | 2 |
| Theodore Roosevelt[h,i] | ND | 1966 | 20 | 15 | 1 | 2 | 8.1 | 0 | 3 | 0 |
| Island Sky[e,f,g,h,i] | UT | 1966 | 60 | 45 | 1 | 1 | 442 | 225 | 3 | 2 |
| Potash[f,g,h,i] | UT | 1975 | 10 | 9 | 1 | 1 | 449 | 160 | 3 | 2 |
| Lockhart[f,g,h,i] | UT | 1980 | 7 | 6 | 1 | 2 | 1,416[c] | 35 | 3 | 0 |
| Needles[f,g,h,i] | UT | 1965 | 15 | 12 | 1 | 2 | 1,416 | 30 | 1 | 0 |
| BLM[e,g,h] | ND | 1991 | 28 | 21 | 2 | 1 | 30 | 30 | 1 | 1 |
| Lone Buttes[g,h] | ND | 1985 | 18 | 15 | 1 | 1 | 10.8 | 33 | 1 | 0 |
| Magpie Creek[g,h] | ND | 1959 | 20 | 15 | 1 | 2 | 3 | 18 | 1 | 0 |
| Wanagan[g,h] | ND | 1970 | 10 | 9 | 1 | 1 | 3.9 | 20 | 1 | 0 |
| Chateau[g,h] | ND | 1970 | 15 | 12 | 1 | 1 | 4.2 | 40 | 1 | 0 |
| Moody[g,h] | ND | 1970 | 10 | 9 | 1 | 1 | 15 | 25 | 1 | 1 |
| North Bullion[g,h] | ND | 1989 | 9 | 9 | 1 | 1 | 10 | 20 | 1 | 0 |
| South Bullion[g,h] | ND | 1974 | 20 | 15 | 1 | 1 | 5 | 50 | 1 | 0 |

[a]1 = steadily increasing to stable; 2 = initially increased but then declined to extirpation or remnant; 3 = declined to <30, but then increased.
[b]Suitable habitat where translocated animals were released based on GIS habitat model of Smith et al. (1991) modified by Johnson & Swift (2000).
[c]Two translocated populations joined, and their suitable habitat areas were pooled.
[d]Migratory tendency: 1 = nonmigratory; 2 = only segments of the population migratory; 3 = fully migratory.
Dispersal and colonization of released group monitored by:
[e]university graduate student; [f]full-time resources agency technicians or biologists; [g]regular aerial radiotelemetry flights; [h]periodic helicopter surveys of the unoccupied patches; [i]park observation system; [j]this herd was later depopulated in 1997.

unoccupied, patches of habitat and also in release patches for the 31 translocated populations of bighorn sheep. GIS procedures were used to quantify the amount of suitable habitat in both the release and unoccupied patches. Suitable habitat was calculated following a step-by-step elimination of unsuitable areas using successive GIS map overlays (Smith et al. 1991; Johnson & Swift 2000). First, all areas of occupiable escape terrain (slopes 27°–85°) averaged across 30×30 m grids, adjacent flat areas <300 m from that escape terrain, and flat areas <500 m to either side when located between escape terrain on two sides were mapped as potentially suitable (Buechner 1960; Van Dyke et al. 1983; Hurley & Irwin 1986; Bentz & Woodard 1988). All areas were first defined as occupiable in step one, but the areas with dense

vegetation (defined as <55% visibility) (Risenhoover & Bailey 1985) were removed. Vegetation maps of tree density were ground checked in all the study areas during the summers of 1995–1997. In successive steps, areas with natural and manmade barriers, areas developed by humans, and areas with excessive snowpacks were also removed from the estimate of potentially suitable habitat (Smith et al. 1991). We differentiated other unoccupied patches from the initial release patch as those areas separated by either potential barriers (such as rivers, highways, low flat lands, rolling flat lands, densely forested areas) or other unsuitable habitat from the release patch. In some instances, limited and scattered pieces of escape terrain existed in the movement corridor. We defined corridors as those areas >3 km

BLM_0064431

across patches and with <1 km$^2$ total of suitable escape habitat. Only new patches <40 km from translocated populations and with >5 years since release were considered to have potential for colonization and were included in the analysis ($\bar{x}$ = 17 years ± 12 SE) since release, range 5–47 years.

Population size in 1994, total founder size, $N_e$ of founders, average rate of population growth ($\lambda$, averaged) of the released population from time of release until 1994, years since release, and distance to the nearest domestic sheep (km) were recorded for each released population during the study period. The sex ratio of males:females is often low during translocations because adult rams may be more difficult to capture or transport, which reduces the relative potential $N_e$ of the founding group. To investigate the role of sex ratio as a potential correlate to success, we calculated the largest potential $N_e$ of the founding group using the formula, $N_e = 4 \, NmNf/Nm + Nf$, assuming that 100% of adult females (Nf) were potential breeders, and about 40% of the adult males were potential breeders (Nm) (Fitzsimmons et al. 1995). We assumed that, on average, 59% of any female or male lambs would survive to potentially produce young at age 2.5 (Festa-Bianchet 1988; Jorgenson et al. 1997).

For those 28 populations that contained radiocollared individuals, we could determine with certainty the released translocated population responsible for colonization. For the remaining five populations, we assumed colonization occurred from the closest release population, although colonization could potentially have come from other, more distant populations. If so, this represents a potential source of error. We measured corridor distances as the shortest straight line (km) distance between all 79 unoccupied patches and the release patch, although not all dispersing animals may have traveled in a straight line. We rated water barriers to movements across corridors as follows: (1) no water barriers or small streams; (2) small river(s) present; (3) medium river(s) present; or (4) large river(s), reservoir(s), or large steep-sided canal(s) present. We rated resistance to movements caused by vegetative cover (Risenhoover & Bailey 1985; Hurley & Irwin 1986; Risenhoover et al. 1988) from low to high resistance to movement across corridors as follows: (1) open, low substrates (grasses, bare soil, low shrubs); (2) areas of tall shrubs or scattered trees; (3) tall shrubs and patches of mature trees; or (4) dense, continuous coniferous forest. Escape terrain within the corridors was rated from low to high resistance to movement as follows: (1) continuous or extensive broken terrain with small cliffs; (2) scattered escape terrain; and (3) large, flat expanses (Bailey 1980; Risenhoover & Bailey 1985; Hurley & Irwin 1986; Bentz & Woodard 1988; Risenhoover et al. 1988; Woodard & VanNest 1990).

Those factors that were potentially correlated to colonizations of new patches, rates of spread in the release

patch, and population growth rates of released translocated populations were analyzed with logistic regression. We pooled the continuous variables of $\lambda$, population size in 1994, and years since release into categories that provided the best fit. We investigated all combinations of two, three, and four variables to select the most parsimonious or best biological model, as a trade-off between the number of variables, model bias, and variance of the estimate following guidelines of Burnham & Anderson (1991). We used the lowest AIC (Akaike Information Criteria) value for the best model selection (Sakamoto et al. 1986). Acceptance level was $p < 0.10$.

## Results

### Population Growth Rates

Eighteen populations (55%) increased at a rate of $\lambda$ = 1.17 + 0.04 $\bar{x}$ ± SE (range = 1.04–1.23). Only nine populations (29%) grew to a size >100 by 1994. For these increasing populations, there were no verified contacts and only one suspected contact with domestic sheep. The area of suitable bighorn habitat for the initial release was much larger for these increasing populations ($\bar{x}$ = 490 ± 90 km$^2$, range 35–1,145 km$^2$) than for populations that declined ($\bar{x}$ = 60 ± 30 km$^2$, range 5–350 km$^2$). Twelve populations (39%) went extinct or declined to a remnant status of <30 individuals that were not expected to recover or were unlikely to recover (size of remnant populations, $\bar{x}$ = 14.5 ± 12, range = 7–30). These populations initially grew ($\lambda$ = 1.11 ± 0.03), before declining ($\lambda$ = 0.77 ± 0.07 during declines). Only one population was observed to rebound from this remnant category (Ladore Canyon, Table 1).

Population growth rates of translocated populations were correlated with both $N_e$ of founder group and early contact with a second translocated population in a nearby patch ($p$ = 0.08). Population size reached in 1994 was correlated with potential $N_e$ of founders, the number of source populations represented in the founder group, and early contact with a second translocated population ($p$ = 0.016).

### Rates of Spread Within the Release Patch

Approximate linear rates of spread through the first or release patch averaged 11.4 ± 0.2 km/year. Area rates of spread for populations during the increasing phase averaged 5.1 ± 0.9 km$^2$/year, but declining diseased populations lost 0.3 ± 0.2 linear km and 1.2 ± 0.8 km$^2$ of area range/year. Rate of spread through the first patch (km/year) was positively correlated with estimated potential $N_e$ of founder group rate of increase in population size, number of source populations repre-

BLM_0064432

*Dispersal of Translocated Bighorn Sheep*

sented in the founder group, and early contact with a second translocated population ($p = 0.07$).

**Colonizations of New Patches**

We documented the colonization of 24 of 79 (30%) potential patches of unoccupied habitat. Many colonizations occurred during the first 15 years following the release (Fig. 2). A successful colonization occurred every 13.5 years for the increasing populations, or once every 22 years for all populations, both increasing and decreasing. Successful colonizations of new patches were positively correlated to rate of population increase in the release patch ($p = 0.0001$), number of years since release ($p = 0.02$), larger population size in the release patch in 1994 ($p = 0.05$), and seasonal migrations by the released population ($p = 0.004$; Table 1, Figs. 3–5). The number of successful colonizations was also correlated to patch size of the release habitat patch (F = 18.7; $r^2 = 0.64$, $p = 0.001$).

Fewer water barriers, more open vegetation, and more rugged, broken terrain in travel corridors were correlated with successful colonization (this model). The single, most parsimonious model explaining successful colonizations (lowest relative AIC value of 59.5) included: (1) high population growth rates ($p = 0.002$); (2) fewer water barriers ($p = 0.13$); (3) fewer vegetation barriers ($p = 0.02$); and (4) more rugged terrain ($p = 0.03$).

Distance did not explain colonizations in a linear fashion. Thus, we estimated colonization rates based on the distance between patches using Equation 1:

$$\text{probability of colonization} = \quad (1)$$

$$a\left[\frac{1}{sd\sqrt{2\pi}\, e^{0.5}}\left[\frac{distance - 2\mu}{sd}\right]\right]$$

where $a = 0.973$, $\mu = 12.28$, and $sd = 5.17$. This function describes a normal distribution. The maximum proba-



Figure 3. Probability of successful colonizations of new patches was correlated to population growth rates (λ) of the 31 translocated populations of bighorn sheep in the western United States, 1946–1997.

bility of colonization versus distance (0.75 probability) was for patches 12.3 km from the release patch. Bighorn sheep apparently colonize patches at an intermediate distance more readily than patches that are nearby or distant. For example, 18 patches were separated by <5 km, but only 5 (28%) of those close patches were colonized, possibly because it was too easy for the animals to return to their original home ranges when <5 km away.

Rates of ram dispersal events were 100% greater than ewe dispersal events (z = 4.5; $p = 0.001$; $n = 295$ radio-collar-animal years). Rams typically pioneered habitat patches several years before ewes.

**Discussion**

We observed much higher rates of colonizations by bighorn sheep than prior researchers (Geist 1971, 1975; McQuivey 1978; Bailey 1986, 1990; Schwartz et al. 1986;



Figure 4. Probability of successful colonizations in relation to migratory tendency in the release patch for 31 translocated populations of bighorn sheep (migratory = >75% of the population uses distinct seasonal ranges; partially migratory = part of the population migrates; nonmigratory = year-round use of the same ranges).



Figure 2. Probability of successful colonizations in relation to years since release in the first patch for 31 translocated populations of bighorn sheep released, 1947–1991.

BLM_0064433

*Dispersal of Translocated Bighorn Sheep*

**a**



**b**



Figure 5. Schematic correlates for colonizations (a) versus no colonizations (b) of nearby unoccupied habitat patches by bighorn sheep following their release into a new patch.

Risenhoover et al. 1988; Bleich et al. 1990, 1996). We suspect this was because our study areas included large regions of unoccupied habitat with a greater probability of detecting colonizations by released animals than the other studies. We stress many of the colonizations we report are too recent to provide conclusions to their eventual long-term persistence.

As we originally predicted, large rivers, continuous conifer forest, and flat terrain constituted significant barriers to bighorn sheep dispersal. We also observed higher rates of dispersal from rapidly increasing populations that had not yet reached habitat saturation or ecological carrying capacity, i.e., we concluded the pre-saturation or increaser dispersal hypothesis (Lidicker 1976; Krebs 1978; Stenseth 1983) applied to bighorn sheep. Most colonizations of new patches occurred between 6 and 15 years post-release and during a time when released populations were growing fastest. Most colonizations were of patches 10–15 km distant. The rate of colonizations dropped off approximately linearly beyond 15 km, while fewer colonizations also occurred in patches <5 km distant.

We conclude that prior reports of low rates of dispersal from many bighorn sheep populations may be the result of poor prior restoration procedures. Many prior translocations consisted of small founder groups (typically <25 animals) released into small, isolated patches of habitat (Risenhoover et al. 1988). This may be a prescription for failure.

Sedentariness, or overconcentration, of translocated populations of bighorn sheep may be a large obstacle to restoration of bighorn sheep populations (Risenhoover et al. 1988). Sedentariness may result in higher transmission rates of lungworms, overcrowding on restricted habitats, and overuse of forages due to year-round grazing of the same ranges (Risenhoover et al. 1988). Potential $N_e$ of founders was positively correlated with population increase and rate of spread; however, adult rams are harder to trap and managers are reluctant to transport many rams since they may injure others if not transported separately. Typically, only those few young rams caught with ewes are transported (which reduces $N_e$). Our study also emphasized the need to restore populations into large patches of suitable habitat, because dispersals will be more likely from these large patches.

Dispersal is potentially important to bighorn sheep for the successful recolonization of historic but currently unoccupied habitat patches, for gene flow between subpopulations, and for the discovery of newly-created suitable habitat due to fires or to the recent removal of livestock leases and grazing (Geist 1975; Goodson 1982; Stenseth 1983; Risenhoover et al. 1988; Bleich et al. 1990, 1996). Male-biased dispersal during the breeding season in bighorn sheep may decrease deleterious inbreeding by close relatives (Geist 1971, 1975; Wolff 1994). Survival of self-perpetuating metapopulations of bighorn sheep that do not require constant augmentations and restorations will depend upon at least moderate rates of dispersal. Caveats for increased dispersal might be greater exposure to predation while moving through unknown habitats and marginal escape terrain (Watts & Schemnitz 1985), or greater exposure to diseases. We conclude that colonizations by recovering populations of bighorn sheep can be increased, and thus the process of restoration expedited and made less expensive by the following practices: (1) increasing the size of $N_e$ of founder groups; (2) mixing founders; (3) placing translocated groups into larger patches (>400 km² of suitable habitat); (4) placing

BLM_0064434

animals in patches with few barriers between patches; and (5) placing bighorn in patches with no domestic sheep.

## LITERATURE CITED

Bailey, J. A. 1980. Desert bighorns, forage competition, and zoogeography. Wildlife Society Bulletin 8:208–216.

Bailey, J. A. 1986. The increase and die-off of Waterton Canyon bighorn sheep: biology, management, and dismanagement. Biennial Symposium of the Northern Wild Sheep and Goat Council 5:325–340.

Bailey, J. A. 1990. Management of Rocky Mountain bighorn sheep herds in Colorado. Colorado Division of Wildlife, Special Report No. 66. Fort Collins, Colorado.

Beacham, T. D. 1979. Dispersal tendency and duration of life of litter males during population fluctuations of the vole *Microtus townsdendii*. Oecologia 42:11–21.

Beier, P., and R. F. Noss. 1998. Do habitat corridors provide connectivity? Conservation Biology 12:1241–1252.

Bentz, J. A., and D. M. Woodard. 1988. Vegetation characteristics and bighorn sheep use on burned and unburned areas in Alberta. Wildlife Society Bulletin 16:186–193.

Bleich, V. C., J. D. Wehausen, and S. Holl. 1990. Desert-dwelling mountain sheep: conservation implications of a naturally fragmented distribution. Conservation Biology 4:383–390.

Bleich, V. C., J. D. Wehausen, R. R. Ramey II, and J. L. Rechel. 1996. Metapopulation theory and mountain sheep: implications for conservation. Pages 353–373 in D. R. McCullough, editor. Metapopulations and wildlife conservation. Island Press, Washington, D.C.

Boyce, W. M., P. W. Hedrick, N. E. Muggli-Cockett, S. Kalinowski, M. C. T. Penedo, and R. R. Ramey II. 1997. Genetic variation of major histocompatibility complex and microsatellite loci: a comparison in bighorn sheep. Genetics 145:421–433.

Boyce, W. M., R. R. Ramey II, T. C. Rodwell, E. S. Rubin, and R. S. Singer. 1999. Populations subdivision among desert bighorn sheep (*Ovis canadensis*) ewes revealed by mitochondrial DNA analysis. Molecular Ecology 8:99–106.

Brown, J. H., and A. Kodric-Brown. 1977. Turnover rates in insular biogeography: effect of immigration on extinction. Ecology 58:445–449.

Buechner, H. K. 1960. The bighorn sheep in the U.S.: its past, present, and future. Wildlife Monograph 4:1–174.

Burnham, K. P., and D. R. Anderson. 1991. Data-based selection of an appropriate biological model: the key to modern data analysis. Pages 16–30 in D. R. McCullough and R. H. Barrett, editors. Wildlife 2001: populations. Elsevier Scientific Publications, London.

Cochran, M. H., and E. L. Smith. 1983. Intermountain movements by a desert bighorn ram in western Arizona. Desert Bighorn Council Transactions 27:1.

Cowan, I. McT. 1940. Distribution and variation in the native sheep of North America. American Midland Naturalist 24:505–580.

Dobson, F. S. 1982. Competition for mates and predominant male dispersal in mammals. Animal Behavior 30:1183–1192.

Dodd, N. L. 1983. Ideas and recommendations for maximizing desert bighorn transplant efforts. Desert Bighorn Council 37:12–16.

Festa-Bianchet, M. 1986. Site fidelity and seasonal range use by bighorn rams. Canadian Journal of Zoology 64:2126–2132.

Festa-Bianchet, M. 1988. Age-specific reproduction of bighorn ewes in Alberta, Canada. Journal of Mammalogy 69:157–160.

Fitzsimmons, N. N., S. W. Buskirk, and M. H. Smith. 1995. Popu-

lation history, genetic variability and horn growth in bighorn sheep. Conservation Biology 9:314–323.

Geist, V. 1971. Mountain sheep: a study in behavior and evolution. University of Chicago Press, Chicago, Illinois.

Geist, V. 1975. On the management of mountain sheep: theoretical considerations. Pages 77–105 in J. B. Trefethen, editor. The wild sheep in modern North America. Winchester Press, New York, New York.

Gilpin, M. E., and M. E. Soulé. 1986. Minimum viable populations process of species extinction. Pages 19–34 in M. E. Soulé, editor. Conservation biology: the science of scarcity and diversity. Sinauer Associates, Sunderland, Massachusetts.

Goodson, N. J. 1982. Effects of domestic sheep grazing on bighorn sheep populations: a review. Biennial Symposium of the Northern Wild Sheep and Goat Council 3:287–313.

Gutiérrez-Espeleta, G. A., S. T. Kalinowski, W. M. Boyce, and D. W. Hedrick. 1998. Genetic variation in desert bighorn sheep. Desert Bighorn Council Transactions 42:1–10.

Hanski, I. 1989. Metapopulation dynamics: does it help to have more of the same? Trends in Ecology and Evolution 4:113–114.

Harrison, S. 1994. Metapopulations and conservation. Pages 111–128 in P. J. Edwards, N. R. Webb, and R. M. May, editors. Large-scale ecology and conservation. Blackwell Scientific Publications, Oxford, England.

Heimer, W. E. 1985. Population status and management of Dall sheep in Alaska, 1984. Pages 1–15 in R. Valdez, editor. Wild sheep of the world. Northern Wild Sheep and Goat Council, Special Report. Whitehorse, Yukon, Canada.

Hurley, K., and L. L. Irwin. 1986. Prescribed burning vs. mitigation for bighorn sheep ranges. Biennial Symposium of the Northern Wild Sheep and Goat Council 4:298–312.

Johnson, T., and D. Swift. 2000. A test of a Rocky Mountain bighorn sheep habitat evaluation procedure. Restoration Ecology 8:47–56.

Jorgenson, J. T. M. Festa-Bianchet, J. Gaillard, and W. D. Wishart. 1997. Effects of age, sex, disease, and density of survival of bighorn sheep. Ecology 78:1019–1032.

Krausman, P. R., and B. D. Leopold. 1986. The importance of small populations of bighorns. Transactions of the North American Wildlife and Natural Resources Conference 51:52–61.

Krebs, C. J. 1978. A review of the Chitty hypothesis of population regulation. Canadian Journal of Zoology 56:2463–2480.

LaBonte, J., J. P. Ouellet, R. Courtois, and F. Bélisle. 1998. Moose dispersal and its role in the maintenance of harvested populations. Journal of Wildlife Management 62:225–234.

Leslie, D. M., Jr. 1980. Remnant populations of bighorn sheep as a source for transplantation. Desert Bighorn Council Transactions 24:36–44.

Lidicker, W. C., Jr. 1976. Social behavior and density regulation in the house mouse living in large enclosures. Journal of Animal Ecology 45:677–697.

Luikart, G., and F. W. Allendorf. 1996. Mitochondrial DNA variation and genetic population structure in Rocky Mountain bighorn sheep (*Ovis canadensis canadensis*). Journal of Mammalogy 77:109–123.

McCullough, D. R. 1985. Long range movements of large terrestrial mammals. Pages 444–465 in M. A. Rankin, editor. Migration: mechanisms and adaptive significance. Contribution in Marine Science, Supplement 27.

McCullough, D. R. 1996. Introduction. Pages 1–10 in D. R. McCullough, editor. Metapopulations and wildlife conservation. Island Press, Washington, D.C.

McCutcheon, H. E. 1981. Desert bighorn sheep zoogeography and adaptation in relation to historic land use. Wildlife Society Bulletin 9:171–179.

McQuivey, R. P. 1978. The desert bighorn sheep of Nevada. Ne-

BLM_0064435

vada Department of Fish and Game, Biological Bulletin No. 6. Reno, Nevada.

Mohr, C. O. 1947. Table of equivalent populations of North American small mammals. American Midland Naturalist **37**:223–249.

Monson, G. 1980. Distribution and abundance. Pages 40–51 in G. Monson and L. Sumner, editors. The desert bighorn sheep, its life history, ecology, and management. University of Arizona Press, Tucson, Arizona.

Onderka, D. K., and W. D. Wishart. 1984. A major bighorn die-off from pneumonia in southern Alberta. Biennial Symposium of the Northern Wild Sheep and Goat Council **4**:356–363.

Ramey, R. R., II. 1995. Mitochondrial DNA variation, population structure and evolution of mountain sheep in the southwestern United States and Mexico. Molecular Ecology **4**:429–439.

Risenhoover, K. L., and J. A. Bailey. 1985. Visibility: an important factor for an indigenous, low-elevation bighorn herd in Colorado. Biennial Symposium of the Northern Wild Sheep and Goat Council **2**:18–28.

Risenhoover, K. L., J. A. Bailey, and L. A. Wakelyn. 1988. Assessing the Rocky Mountain bighorn sheep problem. Wildlife Society Bulletin **16**:346–352.

Sakamoto, Y., M. Ishiguro, and G. Kitagawa. 1986. Akaike information criterion statistics. KTK Science Publications, Tokyo, Japan. pp. 290.

Schwartz, O., V. C. Bleich, and S. A. Holl. 1986. Genetics and the conservation of mountain sheep, *Ovis candensis nelsoni*. Biological Conservation **37**:179–190.

Sinclair, A. R. E. 1992. Do large mammals disperse like small mammals? Pages 229–242 in N. Stenseth and W. Lidicker, editors. Animal dispersal: small mammals as a model. Chapman and Hall, London.

Singer, F. J. 1982. Some population characteristics of Dall sheep in six national parks and preserves. Biennial Symposium of the Northern Wild Sheep and Goat Council **4**:1–10.

Singer, F. J. 1994. Bighorn sheep in the Rocky Mountain national parks. Pages 332–333 in E. T. LaRoe, G. S. Farris, C. E. Puckett, P. D. Doran, and M. J. Mac, editors. Our living resources: a report to the nation on the distribution, abundance, and health of U.S. plants, animals, and ecosystems. U.S. Department of the Interior, National Biological Service, Washington, D.C.

Singer, F. J., and M. A. Gudorf. 1999. Restoration of bighorn sheep metapopulations in and near 15 national parks. U.S. Geological Survey, Open File Report 99–102, Fort Collins, Colorado.

Singer, F. J., C. Papouchis, and K. K. Symonds. 2000*a*. Translocations as a tool for restoring populations of bighorn sheep. Restoration Ecology **8**:6–13.

Singer, F. J., V. C. Bleich, and M. A. Gudorf. 2000*b*. Restoration of

bighorn sheep metapopulations in and near western national parks. Restoration Ecology **8**:14–24.

Smith, T. S., J. T. Flinder, and D. S. Winn. 1991. A habitat evaluation procedure for Rocky Mountain bighorn sheep in the Intermountain West. Great Basin Naturalist **51**:205–225.

Stenseth, N. C. 1983. Causes and consequences of dispersal in small mammals. Pages 63–101 in I. R. Swingland and P. J. Greenwood, editors. The ecology of animal movement. Clarendon Press, Oxford.

Stevens, N. J. 1994. Persistence and population size in bighorn sheep: why different interpretations? Conservation Biology **8**:617–618.

Thorne, E. T., W. O. Hickey, and S. T. Stewart. 1985. Status of California and Rocky Mountain bighorn sheep in the United States. Pages 56–81 in M. Hoefs, editor. Wild sheep: distribution and management. Special report of the Northern Wild Sheep and Goat Council. Whitehorse, Yukon, Canada.

Torres, S. G., V. C. Bleich, and J. D. Wehausen. 1994. Status of bighorn sheep in California, 1993. Desert Bighorn Council Transactions **38**:17–28.

Van Dyke, W. A., A. Sands, J. Yoakum, A. Polentz, and J. Blaisdell. 1983. Wildlife habitat in management rangelands – bighorn sheep. U.S. Forest Service General Technical Report, PNW-159. Pacific Northwest Forest and Range Experiment Station, Portland, Oregon.

Watts, T. J., and S. D. Schemnitz. 1985. Mineral lick use and movement in a remnant desert bighorn sheep population. Journal of Wildlife Management **49**:994–996.

Weaver, R. A., and J. L. Mensch. 1971. Bighorn sheep in northeastern Riverside County. California Department of Fish and Game, Wildlife Management Administrative Report **71**:1–8.

Wehausen, J. D. 1999. Rapid extinction of mountain sheep revisited. Conservation Biology **13**:378–384.

Wehausen, J. D., V. C. Bleich, and R. A. Weaver. 1987. Mountain sheep in California: a historical perspective on 108 years of full protection. Western Section of the Wildlife Society Transactions **23**:65–74.

White, G. C., and R. A. Garrott. 1990. Analysis of wildlife radio-tracking data. Academic Press, New York, New York.

Wishart, W. 1978. Bighorn sheep. Pages 161–171 in J. L. Schmidt and D. L. Gilbert, editors. Big game of North America. Stackpole Books, Harrisburg, Pennsylvania.

Wolff, J. O. 1994. Sex-biased dispersal in mammals. Northwest Science **68**:159.

Woodard, P. M., and T. VanNest. 1990. Winter burning on bighorn sheep range—a proposed strategy. The Forestry Chronicle **October 1990**:473–477.

BLM_0064436



## Society for Conservation Biology

Role of Patch Size, Disease, and Movement in Rapid Extinction of Bighorn Sheep
Author(s): Francis J. Singer, Linda C. Zeigenfuss and Leslie Spicer
Source: *Conservation Biology*, Vol. 15, No. 5 (Oct., 2001), pp. 1347-1354
Published by: Wiley for Society for Conservation Biology
Stable URL: http://www.jstor.org/stable/3061490
Accessed: 18-03-2015 19:30 UTC

**REFERENCES**
Linked references are available on JSTOR for this article:
http://www.jstor.org/stable/3061490?seq=1&cid=pdf-reference#references_tab_contents

You may need to log in to JSTOR to access the linked references.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at
http://www.jstor.org/page/info/about/policies/terms.jsp

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content
in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship.
For more information about JSTOR, please contact support@jstor.org.

*Wiley* and *Society for Conservation Biology* are collaborating with JSTOR to digitize, preserve and extend access to
*Conservation Biology.*

http://www.jstor.org

BLM_0064437

# Role of Patch Size, Disease, and Movement in Rapid Extinction of Bighorn Sheep

FRANCIS J. SINGER,*‡ LINDA C. ZEIGENFUSS,* AND LESLIE SPICER†

*U.S. Geological Survey, Midcontinent Ecological Science Center, Natural Resources Ecology Lab, Colorado State University, Fort Collins, CO 80523, U.S.A.

†Curecanti National Recreation Area, 102 Elk Creek, Gunnison, CO 81230, U.S.A.

**Abstract:** *The controversy (Berger 1990, 1999; Wehausen 1999) over rapid extinction in bighorn sheep (Ovis canadensis) has focused on population size alone as a correlate to persistence time. We report on the persistence and population performance of 24 translocated populations of bighorn sheep. Persistence in these sheep was strongly correlated with larger patch sizes, greater distance to domestic sheep, higher population growth rates, and migratory movements, as well as to larger population sizes. Persistence was also positively correlated with larger average home-range size ($p = 0.058$, $n = 10$ translocated populations) and home-range size of rams ($p = 0.087$, $n = 8$ translocated populations). Greater home-range size and dispersal rates of bighorn sheep were positively correlated to larger patches. We conclude that patch size and thus habitat carrying capacity, not population size per se, is the primary correlate to both population performance and persistence. Because habitat carrying capacity defines the upper limit to population size, clearly the amount of suitable habitat in a patch is ultimately linked to population size. Larger populations (250+ animals) were more likely to recover rapidly to their pre-epizootic survey number following an epizootic ($p = 0.019$), although the proportion of the population dying in the epizootic also influenced the probability of recovery ($p = 0.001$). Expensive management efforts to restore or increase bighorn sheep populations should focus on large habitat patches located ≥23 km from domestic sheep, and less effort should be expended on populations in isolated, small patches of habitat.*

El Papel del Tamaño del Parche, Enfermedades y Movimientos en la Rápida Extinción del Borrego Cimarrón

**Resumen:** *La controversia (Berger 1990, 1999, Wehausen 1999) sobre extinciones rápidas del borrego cimarrón (Ovis canadiensis) se ha enfocado solo en los tamaños poblacionales como una correlación con los tiempos de persistencia. Reportamos la persistencia y adaptabilidad de 24 poblaciones translocadas de cimarrones. La persistencia de estos borregos cimarrones estuvo fuertemente correlacionada con parches de tamaño grande, distancias grandes con los borregos domésticos, tasas de crecimiento poblacional elevadas, movimientos migratorios, y con tamaños poblacionales grandes. La persistencia también estuvo positivamente correlacionada con un tamaño de rango de hogar promedio grande ($p = 0.058$, $n = 10$ poblaciones translocadas) y el tamaño del rango de hogar de los cimarrones ($p = 0.087$, $n = 8$ poblaciones translocadas). Un mayor tamaño en el rango de hogar y mayores tasas de dispersión estuvieron positivamente correlacionadas con parches grandes. Por lo tanto concluimos que el tamaño del parche y la capacidad de carga del hábitat, pero no el tamaño poblacional, en sí, es la correlación principal tanto para la adaptabilidad como para la persistencia de la población. Debido a que la capacidad de carga del hábitat define los límites superiores del tamaño poblacional, es claro que la cantidad de hábitat propicio en un parche está en última instancia ligada a la población. Las poblaciones más grandes (250+ animales) tuvieron más factibilidad de recuperación de sus n muestreados pre-epizoóticos después de una epizootia ($p = 0.019$), aunque la proporción de la población que estaba falleciendo durante el evento epizoótico también influenció la probabilidad de recuperación ($p = 0.001$). Los costosos esfuerzos de restauración o incremento de poblaciones de bor-*

‡Current address: Natural Resources Ecology Lab, Colorado State University, Ft. Collins, CO 80523, U.S.A., email francis@ nrel.colostate.edu
Paper submitted October 25, 1999; revised manuscript accepted December 6, 2000.

This content downloaded from 204.124.92.254 on Wed, 18 Mar 2015 19:30:18 UTC
All use subject to JSTOR Terms and Conditions

BLM_0064438

*rego cimarrón deberían ser canalizados hacia parches grandes que se encuentran a más de 23 km de las ovejas domésticas, y se deberían canalizar menos esfuerzos hacia poblaciones que se encuentren en parches de hábitat aislados y pequeños.*

---

## Introduction

The rapid extinction of small populations of bighorn sheep (*Ovis canadensis*) has been described by Berger (1990). He proposed a general model of extinction as a function of population size based on extinction rates of 122 bighorn sheep populations in California, Colorado, Nevada, Texas, and New Mexico. He estimated that all populations of ≤50 sheep would be extinct within 50 years, approximately 50% of populations of 51–100 animals would survive 50 years, and all populations of ≥100 would persist for 50 years. Berger (1990:93) concluded that "native populations below a threshold size ($n = 50$) are unable to resist rapid extinction." Several exceptions of small populations that persisted were later reported by Krausman et al. (1993, 1996) for Arizona and by Goodson (1994) for Colorado. Wehausen (1999) reported more exceptions and questioned the validity and the general applicability of Berger's model. Berger (1999) later countered that Wehausen's (1999) reinterpreted data set demonstrated the same approximate high extinction rate (42%) for all populations as did Berger's (1990) original paper, but simply with less steep trajectories.

Our goal was to evaluate factors that may influence the persistence or extinction of small bighorn sheep populations consistent with the declining population paradigm of Caughley (1994). Recent analyses by Berger and Wehausen emphasize the role of small size (i.e., the small population paradigm of Caughley 1994), rather than identifying limiting factors or mechanisms that might account for the extinction of small populations. Caughley (1994) has described the limitations of the small population paradigm, wherein the effect (i.e., smallness) is treated as if it were the cause of extinction. We suspect that carrying capacity—the upper limit to population size—and other factors are more critical than is small population size per se. We inspected all the factors that might contribute to the rapid decline (smallness) and extinction of a number of translocated populations of bighorn sheep. We address other limiting factors to shed light on why some populations go extinct and others do not. We propose that a blending of the two paradigms may help explain the rapid extinction of some bighorn sheep populations.

We present an analysis of the persistence of 24 translocated populations of bighorn sheep as an independent and better-documented replicate of the indigenous populations analyzed by Wehausen (1999) and Berger (1990). Independent replication is always desirable where there is a conflict of interpretation. In our sample, the release

date is known and persistence can be compared to time since release for all populations. Also, there is less confusion over movements between herds because all releases occurred in areas devoid of other sheep and many released animals were radiocollared. The translocations were roughly comparable at the time of release because all occurred in areas of historic range. All release areas possessed some suitable habitat. We analyzed populations in only one state (Colorado) analyzed by Berger (1990) and none of those analyzed by Wehausen (1999). Our information was more recent (translocations occurred 1946–1986, median year of release 1975), and the techniques (use of helicopter, radiocollars, mark-recapture, sightability models) were more modern and quantitative (Neal et al. 1993; Bodie et al. 1995; Krausman et al. 1996) than some of the survey techniques in the data sets of Berger (1990) and Wehausen (1999). Finally, the observation period was sufficient based on population performance under optimal conditions (e.g., North and South San Rafael Swell, Utah; Moody Canyon) for any of the populations to grow to several hundred animals.

We predicted that persistence of translocated populations of bighorn sheep would be positively correlated with patch size and negatively correlated with ratio of patch perimeter to area. In many taxa, persistence of animal populations has been positively correlated with patch size (Fritz 1979; Schoener & Spiller 1987; Thomas 1990; Fahrig & Merriman 1992; Kindvall & Ahlen 1992; Hanski 1994) because larger patches typically support larger populations that are more resistant to catastrophe and chance extinction (Gilpin & Soulé 1986). Larger patches are also likely to contain more habitat diversity, will create less edge effect because of a lower ratio of perimeter to area, and should permit greater genetic heterozygosity in populations (Saunders et al. 1991).

We also predicted that the presence of domestic sheep would be negatively associated with persistence. Bighorn sheep are vulnerable to epizootics and large die-offs, most of which are caused by bronchopneumonia typically traced to *Pasteurella* (Spraker & Hibler 1982). Active epizootics in bighorn sheep have been associated with close physical contact with livestock, especially domestic sheep (Buechner 1960; Lange et al. 1980; Foreyt & Jessup 1982; Goodson 1982; Sandoval 1988).

We also hypothesized that sedentariness in bighorn sheep populations would be negatively correlated with persistence. Sedentariness (Risenhoover et al. 1988) is the nonmigratory tendency and overconcentration typical of many static or declining bighorn sheep herds. The

This content downloaded from 204.124.92.254 on Wed, 18 Mar 2015 19:30:18 UTC
All use subject to JSTOR Terms and Conditions

BLM_0064439

sedentariness may be related to increasing habitat isolation from human development and to encroaching tall shrub and conifer cover due to fire suppression (Risenhoover et al. 1988; Etchberger et al. 1990). Sedentariness may be the single largest problem facing modern bighorn sheep populations (Risenhoover et al. 1988). The overconcentration of bighorn sheep in small areas makes them more vulnerable to predators and may increase parasite loads. Additionally, forages are used by nonmigratory herds at higher rates and on a year-round basis, likely causing poorer animal body condition (Risenhoover et al. 1988).

Thus, we predicted that population size and growth rate would be positively related to greater movement and dispersal, including seasonal migration, larger home-range size, and greater numbers of forays. Greater movement, in turn should be positively correlated with increasing patch size. We hypothesized that the recovery and subsequent persistence of any populations of bighorn sheep subjected to epizootics would be correlated with larger population sizes (sensu Berger 1990).

## Methods

### Persistence, Population Growth, and Patch Size

We determined population size in 1997 (the most recent year of data for all herds) from 24 translocated populations of bighorn sheep (Table 1). We estimated population sizes from annual helicopter counts, corrected for animals missed by means of either (1) mark-recapture (Neal et al. 1993), (2) population reconstruction, or (3) Idaho sightability corrections (Bodie et al. 1995; Singer & Gudorf 1999; Singer et al. 2000a, 2000b). We calculated average lambda ($\lambda$) for the most recent 10 years for each population with the formula $\lambda = N_{t+1}/N_t$, where $t$ is time in years and $N$ is population size. We categorized each population as migratory when $\geq 75\%$ of the population used two or more distinct seasonal ranges that did not overlap, partially migratory when 25–74% of the population used two or more ranges, and nonmigratory when <25% of the population used seasonal ranges (Table 1).

We calculated area of suitable habitat within each occupied habitat patch using a habitat evaluation procedure for Rocky Mountain bighorn sheep developed by Smith et al. (1991), with modifications made by Johnson and Swift (2000). Six habitat criteria were integrated in a geographic information system (GIS) to determine areas of habitat suitable for viable populations of bighorn sheep. Bighorn sheep are habitat specialists that prefer open, steep slopes or open, flat areas located adjacent to these steep slopes. Bighorn sheep confine nearly 95% of their activities to open areas of escape terrain or to areas within 300 m of escape terrain (Smith & Flinders 1991). We defined occupiable habitat as all escape terrain on slopes of 27–85° (averaged across 30-m$^2$ pixels and iden-

tified from standard U.S. Geological Survey digital elevation models) and all adjacent habitat located within 300–500 m of escape terrain. We used five additional criteria to evaluate habitat suitability for bighorn sheep: (1) distance to perennial water sources; (2) presence of human-made and natural barriers to routine bighorn movement; (3) adequate horizontal visibility (measurement of visibility of 55% through vegetation; Johnson & Swift 2000); (4) presence of urban or developed areas; and (5) presence of livestock grazing allotments. These criteria are described in greater detail by Zeigenfuss et al. (2000).

We evaluated current population size and population growth rate ($\lambda$) as a function of habitat and population variables through general linear models. Independent variables tested included (1) our GIS estimate of suitable habitat area, (2) migratory tendency, (3) perimeter-to-area ratio of modeled suitable habitat (an indication of patchiness of the habitat), (4) distance to domestic sheep, (5) founder size, (6) population growth rate, and (7) years since release. We investigated all combinations of two, three, or four of these variables to select the most parsimonious or "best" biological model, defined, following Burnham and Anderson (1991), as a trade-off between the number of parameters, model bias, and variance of the estimate. We used Akaike's information criteria (AIC) and forward and backward stepwise regression to select the best model (McQuarrie & Tsai 1998). We also ran univariate models for each variable.

We gathered information on movements of radiocollared individuals from 10 of the populations from more than 5000 radiotelemetry locations of 99 individual sheep. Study-site home ranges were estimated by the 95% convex polygon estimation method, which removes the observation farthest from the arithmetic center, calculates a new center, and then repeats the procedure until 5% of the observations are excluded (Ackerman et al. 1990). By defining a probabilistic measure of home-range size, this method removes outliers and increases the objectivity of the estimate. These adjustments allow for comparison across populations with different sample sizes (White & Garrott 1990).

We defined a dispersal foray as any short-term movement of a radiocollared animal from and back to an established home range. Rate of foray was determined for each herd by totaling the number of forays for all radiocollared individuals and dividing by the total number of years of individual's radiocollar data. We also recorded the number of colonizations by both sexes of adjacent unoccupied patches. We conducted univariate analyses of the 10 populations with information on sheep movements (the sample was insufficient for multivariate analysis) with general linear models as described above.

### Population Size versus Recovery from Epizootics

We analyzed data from an additional 41 bighorn sheep populations that had experienced epizootics (Feuerstein

This content downloaded from 204.124.92.254 on Wed, 18 Mar 2015 19:30:18 UTC
All use subject to JSTOR Terms and Conditions

BLM_0064440

This content downloaded from 204.124.92.254 on Wed, 18 Mar 2015 19:30:18 UTC
All use subject to JSTOR Terms and Conditions

**Table 1. Demographic and habitat characteristics of 24 translocated populations of bighorn sheep in the western United States.**

| Site[a] | State | Year of release | Founder n | Population growth pattern[b] | Size of release patch (km²)[c] | Perimeter of release patch (km) | 1997 population size | Migratory tendency[d] | Population growth rate (λ) | Distance to domestic sheep (km) | Home range (km²) | Average ewe home range (km²) | Average ram home range (km²) | Foray rate[e] | Colonizations of unoccupied patches |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Moody Canyon (1,3,4) | Utah | 1975 | 23 | 1 | 466[f] | 3200 | 324 | 3 | 1.17 | 45 | 17.6 | 11.4 | 30.1 | 0.23 | 1 |
| Red Slide (1,3,4) | Utah | 1984 | 22 | 1 | 466 | 3200 | 145 | 3 | 1.17 | 24 | | | | | 1 |
| Mesa Verde (5) | Colorado | 1946 | 14 | 2 | 4.9 | 26 | 5 | 1 | 0.96 | 8 | | | | | 0 |
| Dillon (2,3,4,5) | Colorado | 1974 | 44 | 2 | 264 | 8000 | 35 | 1 | 0.90 | 1 | 19.5 | 30.6 | 14.0 | 0 | 1 |
| Lake Fork (2,3,4) | Colorado | 1975 | 16 | 2 | 28.3 | 1000 | 20 | 1 | 0.74 | 0 | | | | | 0 |
| Black Canyon (3,4) | Colorado | 1986 | 83 | 2 | 25 | 760 | 40 | 1 | 0.85 | 1 | | | | | 0 |
| Colorado Monument (1,2,3,4,5) | Colorado | 1979 | 39 | 1 | 312 | 630 | 150 | 2 | 1.18 | 10 | 35.3 | 35.3 | | 0.04 | 1 |
| Beaver Creek (2,3,4,6) | Colorado | 1983 | 21 | 2 | 18.5 | 23 | 0 | 1 | 0.52 | 1.8 | | | | 0.13 | 1 |
| Ladore Canyon (1,4,5) | Colorado | 1952 | 32 | 3 | 136 | 700 | 130 | 1 | 0.89 | 3 | | | | | 1 |
| Pool Creek (2,3,4,5) | Colorado | 1984 | 19 | 1 | 333 | 1500 | 70 | 1 | 1.26 | 3 | 29.0 | 3.2 | 54.7 | | 1 |
| Arches (1,2,3,4,5) | Utah | 1985 | 23 | 1 | 224 | 580 | 125 | 1 | 1.21 | 15 | 11.5 | 12.5 | 9.8 | 0 | 2 |
| Maze (3,4,5) | Utah | 1982 | 25 | 1 | 1145 | 2000 | 90 | 3 | 1.13 | 45 | | | | 0.15 | 0 |
| Bighorn Canyon (1,2,3,4,5) | Montana | 1975 | 13 | 1 | 736 | 2800 | 90 | 3 | 1.13 | 10 | 19.6 | 15.7 | 24.2 | | 2 |
| Badlands north (2,3,4,5) | South Dakota | 1967 | 14 | 1 | 161 | 610 | 111 | 1 | 1.18 | 4 | 6.1 | 6.1 | | 0.16 | 2 |
| Badlands south (2,3,4,5) | South Dakota | 1981 | 6 | 1 | 253 | 870 | 45 | 1 | 1.00 | 8.5 | | | | 0.21 | |
| Theodore Roosevelt (4,5) | North Dakota | 1966 | 20 | 2 | 8.1 | 400 | 0 | 3 | 0.27 | 3 | | | | | 0 |
| Island in the Sky (1,2,3,4,5) | Utah | 1966 | 60 | 1 | 442 | 790 | 225 | 3 | 1.13 | 52 | 21.2 | 11 | 31.5 | 0.05 | 2 |
| Potash (2,3,4,5) | Utah | 1975 | 10 | 1 | 449 | 2350 | 160 | 3 | 1.15 | 31 | | | | | 2 |
| Lockhart (2,3,4,5) | Utah | 1980 | 7 | 2 | 1416[f] | 2350 | 45 | 3 | 1.20 | 6 | | | | | 0 |
| Needles (2,3,4,5) | Utah | 1965 | 15 | 2 | 1416 | 2350 | 30 | 1 | 1.17 | 24 | 9.4 | 8.6 | 14.7 | 0 | 0 |
| Lone Buttes (3,4) | North Dakota | 1985 | 18 | 1 | 10.8 | 34 | 33 | 1 | 1.08 | 2 | | | | | 0 |
| Magpie Creek (3,4) | North Dakota | 1959 | 20 | 2 | 3 | 31 | 28 | 1 | 1.00 | 10 | | | | | 0 |
| Wanagan (3,4) | North Dakota | 1970 | 10 | 1 | 3.9 | 30 | 20 | 1 | 1.05 | 16 | | | | | 0 |
| Chateau (3,4) | North Dakota | 1970 | 15 | 1 | 4.2 | 35 | 40 | 1 | 1.08 | 16 | | | | | 0 |

[a] Dispersal and colonization of released group monitored by 1, university graduate student; 2, full-time resources-agency technicians or biologists; 3, regular aerial radiotelemetry flights; 4, periodic helicopter surveys of the unoccupied habitat; 5, park observation system. 6, herd depopulated in 1997.

[b] 1, steadily increasing to stable; 2, initially increased but then declined to extirpation or remnant; 3, declined to <30 but then increased.

[c] Suitable habitat in release patch based on geographic information system habitat model of Smith et al. (1991), modified by Johnson (2000).

[d] Migratory tendency: 1, nonmigratory; 2, only segments of the population migratory; 3, fully migratory.

[e] Number of forays (departure and return to normal home range) per radiocollared animal per year.

[f] Two translocated populations joined; their suitable habitat areas were pooled.

BLM_0064441

et al. 1980; Lange et al. 1980; Jessup 1981; Foreyt & Jessup 1982; Onderka & Wishart 1984; Bailey 1986, 1990; Festa-Bianchet 1988; Coggins & Matthews 1992; Meagher et al. 1992; Singer et al. 2000*b*). We included only those populations with data on pre-epizootic population size, percent population decline as a result of the disease outbreak, number of years to full recovery (defined as recovery to pre-epizotic size for those that recovered), whether the epizootic resulted in extirpation or quasi-extirpation, and most recent population size of the herd. We defined quasi-extirpation as a decline to ≤29 animals, a size from which we believed the population was unlikely to recover. Only one population from a sample of 100 populations (Singer et al. 2000*a*) ever declined to this small size and later grew beyond 30. We categorized a recovery rate as rapid (≤10 years) or slow (>10 years or no recovery at all). We then compared (1) extirpation and (2) recovery rate to pre-epizootic population size using logistic regression.

**Table 2. Comparison of significant values for variables that correlated with population performance of bighorn sheep.\***

| Dependent variable | Independent variable | p (n = 24) | F |
|---|---|---|---|
| Current population size | suitable habitat | 0.3948 | 0.75 |
| | distance to domestic sheep | 0.0002 | 20.53 |
| | migratory tendency | 0.0245 | 4.45 |
| | population growth rate | 0.0166 | 6.72 |
| | years since release | 0.6559 | 0.20 |
| | preimeter: area of habitat | 0.1531 | 2.19 |
| | size of founder group | 0.3255 | 1.01 |
| Population growth rate (λ) | suitable habitat | 0.0255 | 5.74 |
| | distance to domestic sheep | 0.0451 | 4.69 |
| | migratory tendency | 0.4080 | 0.94 |
| | years since release | 0.4772 | 0.52 |
| | perimeter: area of habitat | 0.0184 | 6.49 |
| | size of founder group | 0.5744 | 0.32 |

*\*Tests based on univariate models.*

## Results

We found that (1) larger patch sizes, (2) a migratory tendency, (3) population growth rate, and (4) the absence of domestic sheep were correlated to 1997 population size (AIC = 9.25). We selected this "best model" using both stepwise regression and AIC criteria. Univariate analyses showed that translocated bighorn sheep populations grew to a large size when they were farther from domestic sheep ($p < 0.001$), when population growth rates were higher ($p = 0.035$), and when the animals were migratory ($p = 0.005$; Table 2). Although univariate analysis did not show a significant correlation of 1997 population size with patch size (Fig. 1a), this variable was an element of the best multivariate model for predicting population size. Growth rates (λ) were higher in those translocated populations that were released in larger patches ($p = 0.039$; Fig. 1b), where the patch possessed a smaller perimeter-to-area ratio ($p = 0.002$), and where distances to domestic sheep were larger ($p = 0.067$; Table 2).

Greater movements by bighorn sheep also contributed to the success of translocated populations. Bighorn sheep in larger populations had larger average home-range sizes ($p = 0.032$) and larger ram home-range sizes ($p = 0.079$; Fig. 2). The rate of colonization of nearby unoccupied patches was also correlated to patch size for the original release ($p < 0.004$). Bighorns released into smaller patches of suitable habitat—small patches averaged 81.5 ± 34.4 km² ($x$ ± SE)—were less likely to colonize nearby patches, whereas animals released into larger patches of $x$ = 158.7 ± 60.3 km² colonized, on average, one nearby patch. Those animals released into patches of suitable habitat of 573.1 ± 130.5 km² successfully colonized two adjacent patches on the average.



*Figure 1. The relationship of size of release patch to 1997 (a) population size and (b) population growth rate (λ).*

This content downloaded from 204.124.92.254 on Wed, 18 Mar 2015 19:30:18 UTC
All use subject to JSTOR Terms and Conditions

BLM_0064442



*Figure 2. The relationship between population growth rates of 10 translocated bighorn sheep herds to average home-range size of both sexes and to home-range size of rams.*

Pre-epizootic population size was correlated with extirpation or quasi-extirpation of the population. Following disease epizootics, smaller populations (49.2 ± 11.8 animals) were more likely to become extirpated or quasi-extirpated than larger populations (292.2 ± 82.4, $p = 0.019$). Small populations (67.6 ± 13.5 animals) were also slower to recover to their pre-epizootic number than were larger populations (371.0 ± 112.3, $p = 0.023$). Only 5% of herds with pre-epizootic population sizes of ≤50 were able to persist after a disease epizootic, whereas 75% of herds with populations of 51–100 and 83% of herds with populations of >100 individuals were able to recover and persist following an epizootic ($p = 0.001$).

## Discussion

Consistent with findings for other vertebrates (Fritz 1979; Schoener & Spiller 1987; Fahrig & Merriman 1992; Kindvall & Ahlen 1992; Hanski 1994), patch size and ratio of the perimeter to area within the patch were positively correlated with growth rates (λ) of released populations of bighorn sheep. The growth of released populations to large sizes was best explained by larger patch size, longer distance to domestic sheep, higher population growth rates, and greater migratory and movement tendencies. Because population size is logically related to patch size, there appears to be a basis for a potential minimum threshold of population size for extinction, as Berger

(1990, 1999) contends. But we concluded that patch size, not population size, is the parameter of concern. Thus, management actions that are justified for large patches of suitable habitat may be less justified for isolated small patches. Expensive management actions for bighorn sheep, such as habitat augmentation, creation of new water sources, prescribed burning, clearing, and corridor creation, should be conducted primarily in areas that meet minimum patch criteria, including minimum thresholds for patch size and ratio of perimeter to area and the absence of domestic sheep.

Persistence of bighorn sheep populations was negatively correlated with the presence of domestic sheep. Evidence from controlled experiments (Onderka et al. 1988; Callan et al. 1991) and anecdotal field observations (Lange et al. 1980; Goodson 1982; Sandoval 1988) are in accordance with this correlation. We recommend that bighorn sheep be restored only to areas >23 km away from domestic sheep (Singer et al. 2000a).

We recommend that GIS evaluations of habitat patches be conducted prior to costly restoration or management interventions for small populations (see also Berger 1999). This is worth the effort considering the high cost of habitat manipulation, additional translocations or augmentations (Bleich 1990), and the scarcity of source stock of bighorn sheep (Leslie 1980).

We suspect that several mechanisms relate patch size to persistence. Larger patches tend to be more diverse in habitat and elevation, and, in larger patches, more-mobile bighorn sheep would have an opportunity to forage on a wider variety of phenological stages. Migration, which we found to increase with larger patch size, may be advantageous as a predator-avoidance strategy among ungulates (Bergerud 1984; Sinclair 1985), in particular due to the increased dispersion of vulnerable ungulates at birthing time (Bergerud & Page 1987). Migratory reproductive female ungulates also have larger body mass and thus potentially higher reproductive success than nonmigratory females. Larger patches should also result in less overcrowding and a higher per capita rate of food availability and thus improved body condition. The possibility of higher parasite loads and higher vulnerability to predators on overcrowded smaller patches also makes for interesting (Risenhoover et al. 1988), although as yet untested, hypotheses. Overcrowding on small patches may be associated with disease epizootics (Bailey 1986; Festa-Bianchet 1989). Larger populations that occupy larger patches should also possess higher genetic heterozygosity (Saunders et al. 1991; Fitzsimmons et al. 1995, 1997).

A larger pre-epizootic population size increased the likelihood of the persistence and rapid recovery of a population following disease outbreaks. Krausman et al. (1996) and Wehausen (1999) argue that populations of bighorn sheep with ≤50 animals have persisted, but our analysis suggests that such populations have only a 5% chance of surviving even a single epizootic. The opti-

This content downloaded from 204.124.92.254 on Wed, 18 Mar 2015 19:30:18 UTC
All use subject to JSTOR Terms and Conditions

BLM_0064443

Case No. 1:20-cv-02484-MSK   Document 47-9   filed 04/28/21   USDC Colorado   pg 167 of 218

mum population size for recovery from epizootics determined by our analysis (292 $\pm$ 82 animals, $x \pm$ SE) was six times larger than the 50 animals that Wehausen (1999) argues is a persistence threshold. Of course, not all populations are subjected to epizootics, but no bighorn sheep population is ever completely without risk. Disease is so common in this species (Bailey 1990; Hobbs & Miller 1991; Gross et al. 1997, 2000) that we recommend populations be managed for sufficient size to survive epizootics.

We conclude that larger patch size, larger home-range size, greater migratory tendency, and the absence of domestic sheep are the most critical factors for population persistence in bighorn sheep. Small population size alone should not be treated as the cause of extinction (Caughley 1994). But because population size is ultimately a consequence of patch size, it may be sensible for management to identify some population thresholds for persistence. One advantage to managers of identifying a threshold population size is to identify the population size at which persistence and recovery are more likely following epizootics. Also, below some threshold population size, the average group size may be too small for efficient vigilance and predator detection. For example, Berger and Cunningham (1988) reported a group size of 6–10 bighorn sheep and Risenhoover and Bailey (1985) a group size of >10 animals for optimal vigilance behavior and foraging efficiency. In support of this relationship, three populations in our study numbering >100 possessed average group sizes of 9.8 $\pm$ 0.9 ($x \pm$ SE) animals, and three small populations of 25–30 animals possessed smaller group sizes of only 3.7 $\pm$ 0.4 animals. Thus, the smaller populations possessed average group sizes below the suggested optimum. We concur with Berger (1999) that some populations may be too small to justify expensive management, although not all small populations should be written off (Thomas 1990; Wehausen 1999). We recommend that resources be directed to those bighorn sheep populations that inhabit large, high-quality patches of habitat where potential contacts with domestic sheep are minimal.

## Acknowledgments

We appreciate the insightful reviews and suggestions of J. Gross, T. O'Shea, K. Schoenecker, G. Belovsky, and two anonymous reviewers. D. Barnett provided assistance with the home-range analyses, and M. Moses and C. Papouchis assisted with data collection. The authors thank T. Clark of Capitol Reef National Park, W. Sloan of Canyonlands National Park, S. Petersburg and S. Bellew of Dinosaur National Monument, V. Graham of the Colorado Division of Wildlife, S. Gamo and B. Bessken of Badlands National Park, and K. Stalnaker of Curecanti National Recreation Area for their assistance in collecting movement information for radiocollared animals and making it available for this analysis.

## Literature Cited

Ackerman, B. B., F. A. Leban, M. D. Samuel, and E. O. Garton. 1990. User's manual for program HOME RANGE. 2nd edition. Technical report 15. Forestry, Wildlife and Range Experiment Station, University of Idaho, Moscow.

Bailey, J. A. 1986. The increase and die-off of Waterton Canyon bighorn sheep: biology, management and dismanagement. Biennial Symposium of the Northern Wild Sheep and Goat Council **5:**325–340.

Bailey, J. A. 1990. Management of Rocky Mountain bighorn sheep herds in Colorado. Special report 66. Colorado Division of Wildlife, Fort Collins.

Berger, J. 1990. Persistence of different-sized populations: an empirical assessment of rapid extinction in bighorn populations. Conservation Biology **4:**91–98.

Berger, J. 1999. Intervention and persistence in small populations of bighorn sheep. Conservation Biology **13:**432–435.

Berger, J., and C. Cunningham. 1988. Size-related effects on search time in North American grassland female ungulates. Ecology **69:** 177–183.

Bergerud A. T. 1984. Antipredator tactics of calving caribou: dispersion in mountains. Canadian Journal of Zoology **62:**1566–1575.

Bergerud, A. T., and R. E. Page. 1987. Displacement and dispersion of parturient caribou at calving as an antipredator tactic. Canadian Journal of Zoology **65:**1597–1606.

Bleich, V. G. 1990. Costs of translocating mountain sheep. Pages 67–75 in P. R. Krausman and N. S. Smith, editors. Managing wildlife in the Southwest. Arizona Chapter of the Wildlife Society, Phoenix.

Bodie, W. L., E. O. Garton, E. R. Taylor, and M. McCoy. 1995. A sightability model for bighorn sheep in canyon habitats. Journal of Wildlife Management **59:**832–840.

Buechner, H. K. 1960. The bighorn sheep in the United States: its past, present and future. Wildlife Monographs **4:**11–74.

Burnham, K. P., and D. R. Anderson. 1991. Data-based selection of an appropriate biological model: the key to modern data analysis. Pages 16–30 in D. R. McCullough and R. H. Barrett, editors. Wildlife 2001: populations. Elsevier Scientific, London.

Callan, R. J., T. D. Bunch, G. W. Workman, and R. E. Mock. 1991. Development of pneumonia in desert bighorn sheep after exposure to a flock of exotic wild and domestic sheep. Journal of the American Veterinary Medical Association **198:**1052–1056.

Caughley, G. 1994. Directions in conservation biology. Journal of Animal Ecology **63:**215–244.

Coggins, V. L., and P. E. Matthews. 1992. Lamb survival and herd status of the Lostine bighorn herd following a *Pasteurella* die-off. Biennial Symposium of the Northern Wild Sheep and Goat Council **8:** 147–154.

Etchberger, R. C., P. R. Krausman, and R. Mazaika. 1990. Effects of fire on desert bighorn sheep habitat. Pages 53–57 in P. R. Krausman and N. S. Smith, editors. Managing wildlife in the Southwest. Arizona Chapter of the Wildlife Society, Phoenix.

Fahrig, L., and G. Merriman. 1992. Conservation of fragmented populations. Conservation Biology **8:**50–59.

Festa-Bianchet, M. 1988. A pneumonia epizootic in bighorn sheep, with comments on previous management. Biennial Symposium of the Northern Wild Sheep and Goat Council **6:**66–76.

Festa-Bianchet, M. 1989. Individual differences, parasites, and the cost of reproduction for bighorn ewes (*Ovis canadensis*). Journal of Animal Ecology **58:**785–795.

Feuerstein, B., R. L. Schmidt, C. P. Hibler, and W. H. Rutherford. 1980. Bighorn sheep mortality in the Taylor River-Almont Triangle Area, 1978–1979: a case study. Special report 48. Colorado Division of Wildlife, Denver.

This content downloaded from 204.124.92.254 on Wed, 18 Mar 2015 19:30:18 UTC
All use subject to JSTOR Terms and Conditions

BLM_0064444

Fitzsimmons, N., S. W. Buskirk, and M. H. Smith. 1995. Population history, genetic variability, and horn growth in bighorn sheep. Conservation Biology 9:314–323.

Fitzsimmons, N. N., S. W. Buskirk, and M. H. Smith. 1997. Genetic changes in reintroduced Rocky Mountain bighorn sheep populations. Journal of Wildlife Management 61:863–872.

Foreyt, W. J., and D. A. Jessup. 1982. Fatal pneumonia of bighorn sheep following association with domestic sheep. Journal of Wildlife Diseases 18:163–167.

Fritz, R. S. 1979. Consequences of insular population structure: distribution and extirpation of Spruce Grouse populations. Oecologia 42:57–65.

Gilpin, M. E., and M. E. Soulé. 1986. Minimum viable populations process of species extinction. Pages 19–34 in M. E. Soulé, editor. Conservation biology: the science of scarcity and diversity. Sinauer Associates, Sunderland, Massachusetts.

Goodson, N. J. 1982. Effects of domestic sheep grazing on bighorn sheep populations: review. Biennial Symposium of the Northern Wild Sheep and Goat Council 3:287–313.

Goodson, N. J. 1994. Persistence and population size in mountain sheep: why different interpretations? Biennial Symposium of the Northern Wild Sheep and Goat Council 8:617–618.

Gross, J. E., F. J. Singer, and M. E. Moses. 1997. Simulating desert bighorn sheep populations to support management decisions: effects of patch size, spatial structure, and disease. Desert Bighorn Council Transactions 41:26–36.

Gross, J. E., F. J. Singer, and M. E. Moses. 2000. Effects of disease, dispersal, and area on bighorn sheep restoration. Restoration Ecology 8(45):25–37.

Hanski, I. 1994. Patch-occupancy dynamics in fragmented landscapes. Trends in Ecology and Evolution 9:131–135.

Hobbs, N. T., and M. W. Miller. 1991. Interactions between pathogens and hosts: simulation of Pasteurellosis epizootics in bighorn sheep populations. Pages 997–1007 in D. R. McCullough and R. H. Barrett, editors. Wildlife 2001: populations. Elsevier Scientific, London.

Jessup, D. A. 1981. Pneumonia in bighorn sheep: effects on populations. California-Nevada Wildlife Society Transactions 12:72–78.

Johnson, T. L. 1995. A test of a habitat evaluation procedure for Rocky Mountain bighorn sheep. M.S. thesis. Colorado State University, Fort Collins.

Johnson, T. L., and D. Swift. 2000. A test of a habitat evaluation procedure for Rocky Mountain bighorn sheep. Restoration Ecology 8:47–56.

Kindvall, O., and I. Ahlen. 1992. Geometrical factors and metapopulation dynamics of the bush cricket, *Metrioptera bicolor* Philippi (Orthoptera:Tettigoniidae). Conservation Biology 6:520–529.

Krausman, P. R., R. E. Etchberger, and R. M. Lee. 1993. Persistence in mountain sheep. Conservation Biology 7:219.

Krausman, P. R., R. E. Etchberger, and R. M. Lee. 1996. Persistence of mountain sheep populations in Arizona. Southwestern Naturalist 41:399–402.

Lange, R. E., A. V. Sandoval, and W. P. Meleny. 1980. Psoroptic scabies in bighorn sheep (*Ovis canadensis mexicana*) in New Mexico. Journal of Wildlife Diseases 16:77–82.

Leslie, D. M. 1980. Remnant populations of desert bighorn sheep as a source for transplantation. Desert Bighorn Council Transactions 24:36–44.

McQuarrie, A. D. R., and C. L. Tsai. 1998. Regression and time series model selection. World Scientific, Singapore.

Meagher, M., M. M. Guinn, and L. Stackhouse. 1992. Chlamydial-caused infectious eratoconjunctivitis in bighorn sheep of Yellowstone National Park. Journal of Wildlife Diseases 28:171–176.

Neal, A. K., G. C. White, R. B. Gill, D. F. Reed, and J. H. Otterman. 1993. Evaluation of mark-resight model assumptions for estimated mountain sheep numbers. Journal of Wildlife Management 57:436–450.

Onderka, D. K., and W. D. Wishart. 1984. A major bighorn sheep die-off from pneumonia in southern Alberta. Biennial Symposium of the Northern Wild Sheep and Goat Council 3:356–363.

Onderka, D. K., S. A. Rawluk, and W. D. Wishart. 1988. Susceptibility of Rocky Mountain bighorn sheep to pneumonia induced by domestic livestock strains of *Pasteurella haemolytica*. Canadian Journal of Veterinary Research 52:439–444.

Risenhoover, K. L., and J. A. Bailey. 1985. Foraging ecology of mountain sheep: implications for habitat management. Journal of Wildlife Management 49:797–804.

Risenhoover, K. L., J. A. Bailey, and L. A. Wakelyn. 1988. Assessing the Rocky Mountain bighorn sheep management problem. Wildlife Society Bulletin 16:346–352.

Sandoval, A. 1988. Bighorn sheep die-off following association with domestic sheep: case history. Desert Bighorn Council Transactions 32:36–37.

Saunders, D. A., R. J. Hobbs, and C. R. Margules. 1991. Biological consequences of ecosystem fragmentation: a review. Conservation Biology 5:18–32.

Schoener, T. W., and D. A. Spiller. 1987. High population persistence in a system with high turnover. Nature 330:474–477.

Sinclair, A. R. E. 1985. Does interspecific competition or predation shape the African ungulate community? Journal of Animal Ecology 54:899–918.

Singer, F. J., and M. A. Gudorf. 1999. Restoration of bighorn sheep metapopulations in and near 15 national parks: conservation of a severely fragmented species. Open file report 99–102. U.S. Geological Survey, Midcontinent Ecological Science Center, Fort Collins, Colorado.

Singer, F. J., C. M. Papouchis, and K. K. Symonds. 2000a. Translocations as a tool to restoring populations of bighorn sheep. Restoration Ecology 8:6–13.

Singer, F. J., E. S. Williams, M. W. Miller, and L. C. Zeigenfuss. 2000b. Population growth, fecundity, survivorship and dispersal in recovering populations of bighorn sheep. Restoration Ecology 8:75–84.

Smith, T. S., and J. T. Flinders. 1991. The bighorn sheep of Bear Mountain: ecological investigations and management recommendations. Research final report. Utah Division of Wildlife Resources, Salt Lake City.

Smith, T. S., J. T. Flinders, and D. S. Winn. 1991. A habitat evaluation procedure for Rocky Mountain bighorn sheep in the intermountain West. Great Basin Naturalist 51:205–225.

Spraker, T. R., and C. P. Hibler. 1982. An overview of the clinical signs, gross and histological lesions of the pneumonia complex in bighorn sheep. Biennial Symposium of the Northern Wild Sheep and Goat Council 3:163–172.

Thomas, C. D. 1990. What do real population dynamics tell us about minimum viable populations? Conservation Biology 4:324–327.

Wehausen, J. D. 1999. Rapid extinction of mountain sheep populations revisited. Conservation Biology 13:378–384.

White, G. C., and R. A. Garrott. 1990. Analysis of wildlife radio-tracking data. Academic Press, San Diego.

Zeigenfuss, L. C., F. J. Singer, and M. A. Gudorf. 2000. Test of a modified habitat suitability model for bighorn sheep. Restoration Ecology 8:25–37.



This content downloaded from 204.124.92.254 on Wed, 18 Mar 2015 19:30:18 UTC
All use subject to JSTOR Terms and Conditions

BLM_0064445

# Soil Survey Manual
# Introduction



The Soil Survey Manual provides in a single volume the major principles and practices needed for making and using soil surveys and for assembling and using data related to them. The Manual is intended primarily for use by soil scientists engaged in the classification and mapping of soils and in the interpretation of soil surveys. Although the Manual is oriented to the needs of those actively engaged in preparing soil surveys for publication, workers and students who have limited soils experience or are less familiar with the soil survey process also will be able to use the information.

The Manual focuses on the major concerns of the members of the National Cooperative Soil Survey, a cooperative undertaking of the United States Department of Agriculture and an agency of each of the States: commonly, the State agricultural experiment station of a State's land-grant university. Other agencies—local, State, or Federal—cooperate under special agreements. The original Federal authority for the soil survey of the United States is contained in the record of the 53rd Congress, chapter 169, Agricultural Appropriations Act of 1896. The authority was elaborated in Public Law 74-46, The Soil Conservation Act of April 27, 1936, and again in Public Law 89-560, Soil Surveys for Resource Planning and Development, September 7, 1966. The Manual is the primary reference on principles and technical detail for local, State, and Federal contributions to soil surveys authorized under these acts. The term "the Soil Survey" is used in the Manual to refer to the National Cooperative Soil Survey.

It is hoped this third edition of the Manual will be as universally useful as were the first and second editions. Many professional people engaged in other aspects of soil science and in other disciplines have used earlier editions of the Manual as a reference. Soil Scientists concerned with soil surveys in other countries have used them as well. Teachers haved used the earlier editions both as texts and as references for students. This third edition retains those attributes of the Manual that have made it useful to many groups without deviating significantly from its primary purpose of serving the needs of soil scientists in the field.

Except for isolated passages, this edition of the Manual has been rewritten. Since the second edition (1951) was printed, a new soil taxonomy has been prepared and adopted. New and more intensive uses of soils have dictated changes, and advances in soil science as well as in related disciplines have provided new and more refined concepts and techniques. The increased use of soils for purposes other than farming has prompted new interpretations, more collaboration with professional people of other disciplines, and more adaptation of soil surveys to the concepts of other disciplines. These and other changes of two decades of work have made major revision of the Manual essential. This edition retains the practice of defining terms and concepts within the context of the explanatory text. A glossary is not included; to find definitions, explanations, and uses of specific terms, refer to subject listings in the index.

BLM_0064446

Case No. 1:20-cv-02484-MSK   Document 47-9   filed 04/28/21   USDC Colorado   pg 170 of 218

Although this edition reflects the results of experience mainly in the United States, it also reports the experiences of people in other countries. Studies similar to those that preceded the earlier editions were continued, or intensified, for this third edition, especially in the areas of classification of soils and the interpretations of soil surveys. In addition, many soil scientists in the United States and abroad tested the definitions, concepts, and techniques before they were printed in this current edition.

The chapters of the Manual are arranged in the approximate chronological order in which the work required for a published soil survey is done. As background for the chapters that follow, the first chapter defines the concepts of soils and and nature of soils as geographic bodies, and the second chapter describes the nature and uses of soils surveys, the kinds of soil surveys, and the map units.

The succeeding chapters describe procedures and conventions of soil surveys from the start of a survey to its publication. Chapter 3 deals with the attributes of bodies of soil that are mapped and the details of their internal properties. The fourth chapter tells how to prepare a mapping legend and the descriptive legend, which contains the technical instructions for mapping soils and related activities. Only after these facts are known can the units to be mapped be defined and identified consistently. fourth chapter also describes the supplies, equipment, and mapping bases required for conducting a soil survey. Data are accumulating during all of these activities. Chapter 5 describes the ways in which data are recorded, stored, and retrieved.

After the mapping is completed and related data about the soils are gathered, the information must be provided to those who use it in forms they can understand. Chapter 6, therefore, discusses interpretations of soil surveys. The final product is the published soil survey. Chapter 7 describes the publication of the soil survey map, the accompanying text, and other publications based on the findings of soil surveys.

All serious users of the Manual will benefit from complementary reading in the classification and genesis of soils, geology, climatology, engineering, forestry, hydrology, and urban and country planning.

Many dedicated SCS staffers have made significant contributions to the information published in this edition of *Soil Survey Manual*. Work on the *Manual* was started by Marlin G. Cline, Professor Emeritis, Cornell University, Ithaca, New York. It was completed at the National Soil Survey Center, Lincoln, Nebraska, by Richard W. Fenwick, retired soil scientist, and Robert B. Grossman, research soil scientist. Robert J. Ahrens and Robert J. Engel, soil scientists at the National Soil Survey Center, updated this edition of the *Manual* in 1993.

A soil survey describes the characteristics of the soils in a given area, classifies the soils according to a standard system of classification, plots the boundaries of the soils on a map, and makes predictions about the behavior of soils. The different uses of the soils and how the response of management affects them are considered. The information collected in a soil survey helps in the development of land-use plans and evaluates and predicts the effects of land use on the environment.

Soil surveys were first authorized in the United States in 1896. Although extensive writings on husbandry by L.J.M. Columella were published in the first century A.D., practical experience was the teacher of most farmers until the advent of agricultural chemistry in the nineteenth century. By the end of the nineteenth century, agricultural chemistry, biology, and geology grew into a unified concept of the soil itself.



**CHAPTER**

# 1

## Soil and Soil Survey



A soil survey describes the characteristics of the soils in a given area, classifies the soils according to a standard system of classification, plots the boundaries of the soils on a map, and makes predictions about the behavior of soils. The different uses of the soils and how the response of management affects them are considered. The information collected in a soil survey helps in the development of land-use plans and evaluates and predicts the effects of land use on the environment.

Soil surveys were first authorized in the United States in 1896. Although extensive writings on husbandry by L.J.M. Columella were published in the first century A.D., practical experience was the teacher of most farmers until the advent of agricultural chemistry in the nineteenth century. By the end of the nineteenth century the knowledge about soils that had been gained from farming, agricultural chemistry, biology, and geology grew into a unified concept of the soil itself.

## Early Concepts

The first scholar to study soils in the United States was Edmund Ruffin of Virginia. He worked diligently to find the secret of liming and discovered what we now call exchangeable calcium. After writing a brief essay in the *American Farmer* in 1822, he published the first edition of *An Essay on Calcareous Manures* in 1832. Much of what Ruffin had learned about soils had to be rediscovered because his writings circulated only in the South.

E.W. Hilgard was one of the first true pedologists in the United States, but he never received the credit that his accomplishments deserved during his lifetime. The early concepts of soil were based on ideas developed by a German chemist, Justus von Liebig, and modified and refined by agricultural scientists who worked on samples of soil in laboratories, greenhouses, and on small field plots. The soils were rarely examined below the depth of normal tillage. These chemists held the "balance-sheet" theory of plant nutrition. Soil was considered a more or less static storage bin for plant nutrients—the soils could be used and replaced. This concept still has value when applied within the framework of modern soil science, although a useful understanding of soils goes beyond the removal of nutrients from soil by harvested crops and their return in manure, lime, and fertilizer.

The early geologists generally accepted the balance-sheet theory of soil fertility and applied it within the framework of their own discipline. They described soil as disintegrated rock of various sorts—granite, sandstone, glacial till, and the like. They went further, however, and described how the weathering processes modified this material and how geologic processes shaped it into landforms such as glacial moraines, alluvial plains, loess plains, and marine

BLM_0064448

Case No. 1:20-cv-02484-MSK   Document 47-9   filed 04/28/21   USDC Colorado   pg 172 of 218

terraces. N.S. Shaler's monograph on the origin and nature of soils summarized the late 19th century geological concept of soils (Shaler, 1891). In 1906, other details were added by G.P. Merrill.

Near the end of the nineteenth century, Professor Milton Whitney inaugurated the National Soil Survey Program (Jenny, 1961). Professor Whitney and his coworkers in the newly organized soil research unit of the U.S. Department of Agriculture became impressed by the great variations among natural soils—persistent variations that were in no way related to the effects of agricultural use. Whitney and his coworkers emphasized soil texture and the capacity of the soil to furnish plants with moisture as well as nutrients. Professor F.H. King of the University of Wisconsin was also reporting the importance of the physical properties of soils about this time (King, 1910).

Early soil surveys were made to help farmers locate soils responsive to different management practices and to help them decide what crops and management practices were most suitable for the particular kinds of soil on their farms. Many of the early workers were geologists because only geologists were skilled in the necessary field methods and in scientific correlation appropriate to the study of soils. They conceived soils as mainly the weathering products of geologic formations, defined by landform and lithologic composition. Most of the soil surveys published before 1910 were strongly influenced by these concepts. Those published from 1910 to 1920 gradually added greater refinements and recognized more soil features but retained fundamentally geological concepts.

Early field workers soon learned that many important soil properties were not necessarily related to either landform or kind of rock. They noted that soils with poor natural drainage had different properties from soils with good natural drainage and that many sloping soils were unlike level ones. Topography was clearly related to soil profile differences. As early as 1902, soil structure was described in the soil survey of Dubuque County, Iowa. The 1904 soil survey of Tama County, Iowa, reported that, on similar parent material, soils that had formed under forest contrasted markedly with soils that had formed under grass.

The balance-sheet theory of plant nutrition dominated the laboratory and the geological concept dominated field work. Both approaches were taught in many classrooms until the late 1920Õs. Although broader and more generally useful concepts of soil were being developed by some soil scientists, especially E.W. Hilgard (Hilgard, 1860) and G.N. Coffey (Coffey, 1912) in the United States and soil scientists in Russia, the necessary data for formulating these broader concepts came from the field work of the soil survey during the first decade of its operations in the United States. After the work of Hilgard, the longest step toward a more satisfactory concept of soil was made by G.N. Coffey, who determined the ideal classification to be a hierarchical system that was based on the unique characteristics of soil as "a natural body having a definite genesis and distinct nature of its own and occupying an independent position in the formations constituting the surface of the earth" (Cline, 1977).

Beginning in 1870, the Russian school of soil science under the leadership of V.V. Dokuchaiev and N.M. Sibertsev was developing a new concept of soil. The Russian workers conceived of soils as independent natural bodies, each with unique properties resulting from a unique combination of climate, living matter, parent material, relief, and time (Gedroiz, 1927). They hypothesized that properties of each soil reflected the combined effects of the particular set of genetic factors responsible for the soil's formation. Hans Jenny later emphasized the functionally relatedness of soil properties and soil formation. The results of this work became generally available to Americans through the publication in 1914 of K.D. Glinka's textbook in

BLM_0064449

German and especially through its translation into English by C.F. Marbut in 1927 (Glinka, 1927).

The Russian concepts were revolutionary. Properties of soils no longer were based wholly on inferences from the nature of the rocks or from climate or other environmental factors, considered singly or collectively; rather, by going directly to the soil itself, the integrated expression of all these factors could be seen in the morphology of the soils. This concept required that *all properties* of soils be considered collectively in terms of a completely integrated natural body. In short, it made possible a science of soil.

The early enthusiasm for the new concept and for the rising new discipline of soil science led some to suggest the study of soil could proceed without regard to the older concepts derived from geology and agricultural chemistry. Certainly the reverse is true. Besides laying the foundation for a soil science with its own principles, the new concept makes the other sciences even more useful. Soil morphology provides a firm basis on which to group the results of observation, experiments, and practical experience and to develop integrated principles that predict the behavior of the soils.

Under the leadership of Marbut, the Russian concept was broadened and adapted to conditions in the United States (Marbut, 1921). As mentioned before, this concept emphasized individual soil profiles to the subordination of external soil features and surface geology. By emphasizing soil profiles, however, soil scientists at first tended to overlook the natural variability of soils which can be substantial even within a small area. Overlooking the variability of soils seriously reduced the value of the maps which showed the location of the soils. This weakness soon became evident in the United States, perhaps because of the emphasis here on making detailed soil maps for their practical, predictive value. Progress in transforming the profile concept into a more reliable predictive tool was rapid because a large body of important field data had already been accumulated. By 1925, a large amount of morphological and chemical work was being done on soils throughout the country. The data available by 1930 were summarized and interpreted in accordance with this concept, as viewed by Marbut in his work on the soils of the United States (Marbut, 1935).

Furthermore, early emphasis on genetic soil profiles was so great as to suggest that material lacking a genetic profile, such as recent alluvium, was not soil. A sharp distinction was drawn between rock weathering and soil formation. Although a distinction between these sets of processes is useful for some purposes, rock and mineral weathering and soil formation are commonly indistinguishable.

The concept of soil was gradually broadened and extended during the years following 1930, essentially through consolidation and balance. The major emphasis had been on the soil profile. After 1930, morphological studies were extended from single pits to long trenches or a series of pits in an area of a soil. The morphology of a soil came to be described by ranges of properties deviating from a central concept instead of by a single "typical" profile. The development of techniques for mineralogical studies of clays also emphasized the need for laboratory studies.

Marbut emphasized strongly that classification of soils should be based on morphology instead of on theories of soil genesis, because theories are both ephemeral and dynamic. He perhaps overemphasized this point to offset other workers who assumed that soils had certain characteristics without examining the soils. Marbut tried to make clear that examination of the soils themselves was essential in developing a system of Soil Classification and in making usable soil maps. In spite of this, Marbut's work reveals his personal understanding of the contributions of geology to soil science. His soil classification of 1935 depends heavily on the concept of a

"normal soil," the product of equilibrium on a landscape where downward erosion keeps pace with soil formation.

Clarification and broadening of the concept of a soil science also grew out of the increasing emphasis on detailed soil mapping. Concepts changed with increased emphasis on predicting crop yields for each kind of soil shown on the maps. Many of the older descriptions of soils had not been quantitative enough and the units of classification had been too heterogeneous for making yield and management predictions needed for planning the management of individual farms or fields.

During the 1930s, soil formation was explained in terms of loosely conceived processes, such as "podzolization," "laterization," and "calcification." These were presumed to be unique processes responsible for the observed common properties of the soils of a region (Jenny, 1946).

In 1941 Hans Jenny's *Factors of Soil Formation*, a system of quantitative pedology, concisely summarized and illustrated many of the basic principles of modern soil science to that date (Jenny, 1941). Since 1940, time has assumed much greater significance among the factors of soil formation, and geomorphological studies have become important in determining the time that soil material at any place has been subjected to soil-forming processes. Meanwhile, advances in soil chemistry, soil physics, soil mineralogy, and soil biology, as well as in the basic sciences that underlie them, have added new tools and new dimensions to the study of soil formation. As a consequence, the formation of soil has come to be treated as the aggregate of many interrelated physical, chemical, and biological processes. These processes are subject to quantitative study in soil physics, soil chemistry, soil mineralogy, and soil biology. The focus of attention also has shifted from the study of gross attributes of the whole soil to the co-varying detail of individual parts, including grain-to-grain relationships.

In both the classification of Marbut and the 1938 classification developed by the U.S. Department of Agriculture, the classes were described mainly in qualitative terms. Classes were not defined in quantitative terms that would permit consistent application of the system by different scientists. Neither system definitely linked the classes of its higher categories, largely influenced by genetic concepts initiated by the Russian soil scientists, to the soil series and their subdivisions that were used in soil mapping in the United States. Both systems reflected the concepts and theories of soil genesis of the time, which were themselves predominantly qualitative in character. Modification of the 1938 system in 1949 corrected some of its deficiencies but also illustrated the need for a reappraisal of concepts and principles. More than 15 years of work under the leadership of Guy Smith culminated in a new soil classification system. This became the official classification system of the U.S. National Cooperative Soil Survey in 1965 and was published in 1975 as *Soil Taxonomy: A Basic System of Soil Classification for Making and Interpreting Soil Surveys* (Soil Survey Staff, 1975).

Categories and classes of the new taxonomy are direct consequences of new and revised concepts and theories. The system of soil classification discussed in *Soil Taxonomy* is dynamic and will change as new knowledge is obtained. Its most significant contribution comes from defining class limits quantitatively. The theories on which the system is based are tested every time the taxonomy is applied. For soil survey, the application of quantitatively defined classes to bodies of soil produces quantitatively defined mapping units. This permits the soil maps to be interpreted with more precision than was formerly achieved. Furthermore, this soil-classification system simplifies and accelerates the process of soil correlation.

In addition to the new soil classification system, several other techniques have contributed to the increased precision of soil survey. The use of aerial photographs as mapping bases became

Case No. 1:20-cv-02484-MSK   Document 47-9   filed 04/28/21   USDC Colorado   pg 175 of 218

almost universal in detailed soil mapping during the late 1930s and early 1940s. Using aerial photographs has greatly increased the precision with which soil boundaries can be delineated on maps. At the same time, the scale of published maps was increased from about 1:63,360 to 1:24,000 to 1:15,840. The smallest area that can be delineated legibly at a scale of 1:63,360 is about 15.8 ha; areas of 1 ha can be delineated legibly at a scale of 1:15,840.

Another factor has had an immense impact on soil survey, especially during the 1960s. Before 1950, the primary applications of soil surveys were farming, ranching, and forestry. Applications for highway planning were recognized in some States as early as the late 1920s, and soil interpretations were placed in field manuals for highway engineers of some States during the 1930s and 1940s. Nevertheless, the changes in soil surveys during this period were mainly responses to the needs of farming, ranching, and forestry. During the 1950s and 1960s nonfarm uses of the soil increased rapidly. This created a great need for information about the effects of soils on those nonfarm uses.

Beginning about 1950, cooperative research with the Bureau of Public Roads and State highway departments established a firm basis for applying soil surveys to road construction. Soil scientists, engineers, and others have worked together to develop interpretations of soils for roads and other nonfarm uses. These interpretations, which have become standard parts of published soil surveys, require different information about soils. Some soil properties that are not important for growth of plants are very important in evaluating soils for building sites, sewage disposal systems, highways, pipelines, and recreation. Many of these uses of soil require very large capital investments per unit area; errors can be extremely costly. Consequently, the location of soil boundaries, the identification of the areas delineated, and the quantitative definition of map units have assumed great importance.

## Modern Concept of Soil

*Soil* is "the collection of natural bodies in the earth's [sic] surface, in places modified or even made by man of earthy materials, containing living matter and supporting or capable of supporting plants out-of-doors. Its upper limit is air or shallow water. At its margins it grades to deep water or to barren areas of rock or ice. Its lower limit to the not-soil beneath is perhaps the most difficult to define. Soil includes the horizons near the surface that differ from the underlying rock material as a result of interactions, through time, of climate, living organisms, parent materials, and relief. In the few places where it contains thin cemented horizons that are impermeable to roots, soil is as deep as the deepest horizon. More commonly soil grades at its lower margin to hard rock or to earthy materials virtually devoid of roots, animals, or marks of other biologic activity. The lower limit of soil, therefore, is normally the lower limit of biologic activity, which generally coincides with the common rooting depth of native perennial plants" (Soil Survey Staff, 1975).

The "natural bodies" of this definition include all genetically related parts of the soil. A given part, such as a cemented layer, may not contain living matter or be capable of supporting plants. It is, however, still a part of the soil if it is genetically related to the other parts and if the body as a unit contains living matter and is capable of supporting plants.

The definition includes as soil all natural bodies that contain living matter and are capable of supporting plants even though they do not have genetically differentiated parts. A fresh deposit of alluvium or earthy constructed fill is soil if it can support plants. To be soil, a natural body

BLM_0064452

must contain living matter. This excludes former soils now buried below the effects of organisms. This is not to say that buried soils may not be characterized by reference to taxonomic classes. It merely means that they are not now members of the collection of natural bodies called soil; they are buried paleosols.

Not everything "capable of supporting plants out-of-doors" is soil. Bodies of water that support floating plants, such as algae, are not soil, but the sediment below shallow water is soil if it can support bottom-rooting plants such as cattails or reeds. The above-ground parts of plants are also not soil, although they may support parasitic plants. Rock that mainly supports lichens on the surface or plants only in widely spaced cracks is also excluded.

The time transition from not-soil to soil can be illustrated by recent lava flows in warm regions under heavy and very frequent rainfall. Plants become established very quickly in such climates on the basaltic lava, even through there is very little earthy material. The plants are supported by the porous rock filled with water containing plant nutrients. Organic matter soon accumulates; but, before it does, the dominantly porous broken lava in which plant roots grow is soil.

More than 50 years ago, Marbut's definition of soil as "the outer layer" of the Earth's crust implied a concept of soil as a continuum (Marbut, 1935). The current definition refers to soil as a collection of natural bodies on the surface of the Earth, which divides Marbut's continuum into discrete, defined parts that can be treated as members of a population. The perspective of soil has changed from one in which the whole was emphasized and its parts were loosely defined to one in which the parts are sharply defined and the whole is an organized collection of these parts.

## Factors that Control the Distribution of Soils

The properties of soil vary from place to place, but this variation is not random. Natural soil bodies are the result of climate and living organisms acting on parent material, with topography or local relief exerting a modifying influence and with time required for soil-forming processes to act. For the most part, soils are the same wherever all elements of the five factors are the same. Under similar environments in different places, soils are similar. This regularity permits prediction of the location of many different kinds of soil.

When soils are studied in small areas, the effects of topography or local relief, parent material, and time on soil becomes apparent. In the humid region, for example, wet soils and the properties associated with wetness are common in low-lying places; better drained soils form in most instances in higher lying areas. The correct conclusion is that *topography* or *relief* is important. In arid regions, the differences associated with relief may be salinity or sodicity, but the conclusion is the same. In a local environment, different soils are associated with contrasting parent materials, such as residuum from shale and from sandstone, and the correct conclusion is that *parent material* is important. Soils on a flood plain differ from soils on higher and older terraces where there is no longer deposition of parent material on the surface. The correct conclusion is that *time* is important. The influence of topography, parent material, and time on the formation of soil is observed repeatedly while studying the soils of an area.

With the notable exception of the contrasting patterns of vegetation in transition zones, local differences in vegetation are closely associated with differences in relief, parent material, or time. The effects of microclimate on vegetation may be reflected in the soil, but such effects are likely associated with differences in local relief.

BLM_0064453

Regional climate and vegetation influence the soil as well as topography or relief, parent material, and time. In spite of local differences, most of the soils in an area typically have some properties in common. The low-base status of many soils in humid or naturally acid rock or sediment regions stands in marked contrast to the typical, high-base status in arid or calcareous sandstone or limestone regions. To one who has studied soils only on old landscapes of humid regions, however, low base status is so commonplace that little significance is attached to it.

Regional patterns of climate, vegetation, and parent material can be used to predict the kinds of soil in large areas. The local patterns of topography or relief, parent material, and time, and their relationships to vegetation and microclimate, can be used to predict the kinds of soil in small areas. Soil surveyors learn to use local features, especially topography and associated vegetation, as marks of unique combinations of all five factors. These features are used to predict boundaries of different kinds of soil and to predict some of the properties of the soil within those boundaries.

## Soil-Landscape Relationships

Geographic order suggests natural relationships. Running water, with weathering and gravitation, commonly sculptures landforms within a landscape. Over the ages, earthy material has been removed from some landforms and deposited on others. Landforms are interrelated. An entire area has unity through the interrelationships of its landforms.

Each distinguishable landform may have one kind of soil or several. Climate, including its change with time, commonly will have been about the same throughout the extent of a minor landform. The kinds of vegetation associated with climate also likely will have been fairly uniform. Relief varies within some limits that are characteristic of the landform. The time that the material has been subjected to soil formation has probably been about the same throughout the landform. The surface of the landform may extend through one kind of parent material and into another. Of course, position on the landform may have influenced soil-water relationships, microclimate, and vegetation.

Just as different kinds of soil are commonly associated in a landscape, several landscapes are commonly associated in still larger areas. These areas cover thousands or tens of thousands of square kilometers. Many can be identified on photographs taken from satellites. From this vantage point, broad geomorphic units—the East Gulf Coastal Plain, the Allegheny Plateau, the Laramie Basin, and the Great Valley of California—are apparent. These broad units usually have some unity of landscape, which is characterized by such terms as "plain," "plateau," and "mountain." These physiographic units are composed of many kinds of soil.

The main relief features of a physiographic unit are usually the joint products of deep-seated forces and a complex set of surface processes that have acted over long spans of time. Within a physiographic unit, groups of minor landforms are shaped principally by climate-controlled processes. The climate and biological factors, however, vary much less within a geomorphic unit than across a continent.

Still broader than the geomorphic units are great morphogenetic regions having distinctive climates. For example, one classification recognizes glacial, periglacial, arid, semiarid-subhumid, humid-temperate, and humid-tropical climatic regions associated with distinctive sets of geomorphic processes. Other major regions characterized by seasonal climatic variation are

Case No. 1:20-cv-02484-MSK   Document 47-9   filed 04/28/21   USDC Colorado   pg 178 of 218

also recognized. These geomorphic-climatic regions are related to soil moisture and soil temperature regimes.

Thus, the great climatic regions are divided into major geomorphic units. Landforms and associated soil landscapes are small parts of these units and are commonly of relatively recent origin.

The landforms of concern in soil mapping may include constructional units, such as glacial moraines, and elements of local sequences of graded erosional and constructional land surfaces. These bear the imprint of local, base-level controls under climate-induced processes. Most surfaces that have formed within the last 10,000 years have been subject to climatic and base-level controls similar to those of the present. Older surfaces may retain the imprint of climatic conditions and related vegetation of the distant past. Most landforms of the present started to form during the Quaternary Period; some started in late Tertiary time. In many places conditions of the past differed significantly from those of the present. Understanding climatic changes locally and worldwide far into the past contributes to understanding the attributes of landforms in the present.

Geomorphic processes are important in mapping soils. Soil scientists need a working knowledge of local geomorphic relationships in areas where they map and should understand the interpretations of landforms and land surfaces made by geomorphologists. The intricate interrelationships of soil and landscape are best studied by a collaboration between soil scientists and geomorphologists.

## Development of the Soil Survey

Soil surveys were authorized in the United States by the U.S. Department of Agriculture Appropriations Act for fiscal year 1896, which provided funds for an investigation "of the relation of soils to climate and organic life" and "of the texture and composition of soils in field and laboratory."

In 1899 the U.S. Department of Agriculture completed field investigations and soil mapping of portions of Utah, Colorado, New Mexico, and Connecticut. Reports of these soil surveys and similar works were published by legislative directive. At the same time, the State of Maryland, using similar procedures and State funds, completed a soil survey of Cecil County. Since then many soil surveys have been initiated, completed, and published cooperatively by the Department of Agriculture, State agencies, and other Federal agencies. The total effort is the National Cooperative Soil Survey (NCSS).

The early soil surveys investigated the use of soils for farming, ranching, and forestry. As experience was acquired in the use of soil surveys, predictions were made about other uses, such as highways, airfields, and residential and industrial developments. As the making and the use of soil surveys expanded, the knowledge about soils—about their nature, occurrence, and behavior for defined uses and management—also increased. The Highway Department of Michigan was applying soil survey experience to assist in planning highway construction in the late 1920s. At about the same time soil surveys in North Dakota were used in tax assessment.

Soil surveys published between 1920 and 1930 reveal a marked transition from earlier concepts to give emphasis to soil profiles and soils as independent bodies. The maps retained significant geologic boundaries as soil maps do today. Many of the surveys of that period provide excellent general maps for evaluating engineering properties of geologic material. In

BLM_0064455

addition, maps and texts of the period show more recognition of other soil properties significant to farming and forestry than do earlier surveys and have value for broad generalizations about farming practices in large areas.

The use of aerial photographs for soil mapping, which began during the late 1920s and early 1930s, greatly increased the precision of plotting soil boundaries. To meet the needs for planning the management of individual fields and farms, greater precision of interpretation was required. The changing objectives of soil surveys initiated changes in methods and techniques that made surveys more useful and forced reconsideration of the concept of soil itself.

Beginning in the 1930s, the Soil Conservation Service (SCS) emphasized the control of soil erosion as it used soil surveys for the resource conservation planning of farms and ranches. In the 1950s, extensive use was made of soil survey information in urban land development in Fairfax County, Virginia, and in the subdivision design of suburban areas of Chicago, Illinois. Soil surveys were an important base for resource information in regional land-use planning in southeastern Wisconsin. Rural land zoning has also relied on soil surveys.

Soil surveys necessarily involve thousands of different kinds of soils—as many as there are significantly different combinations of genetic factors. The history of a soil and evidence of its potential for use are contained in the properties soil scientists are able to identify through observation and research in the field and laboratory. These properties determine the limitations, suitability, and potential for rural and urban land use of soils. Soil surveys are particularly valuable because they identify specific soil properties and help soil scientists make broad generalizations significant to farming and forestry practices.

The program of the NCSS can be divided into soil mapping, description of the mapping concepts, and the prediction of the behavior of these mapping concepts for various uses. Soil behavior prediction relies on the evaluated and named soil properties to interpret the concept of map units.

## Soil Survey and the Soil Map

The different kinds of soil used to name soil map units have sets of interrelated properties that are characteristic of soil as a natural body. This definition is intended to exclude maps showing the distribution of a single soil property such as texture, slope, or depth, alone or in limited combinations; maps that show the distribution of soil qualities such as productivity or erodibility; and maps of soil-forming factors, such as climate, topography, vegetation, or geologic material. A soil map delineates areas occupied by different kinds of soil, each of which has a unique set of interrelated properties characteristic of the material from which it formed, its environment, and its history. The soils mapped by the NCSS are identified by names that serve as references to a national system of soil taxonomy.

The geographic distribution of many individual soil properties or soil qualities can be extracted from soil maps and shown on separate maps for special purposes, such as showing predicted soil behavior for a particular use. The number of such interpretative maps that can be derived from a soil map is large, and each such map would differ from the others according to its purpose. A map made for one specific interpretation can rarely serve a different purpose.

Maps to show one or more soil properties can be made directly from field observations without making a basic soil map. Such maps serve their specific purposes but have few other applications. Predictions of soil behavior can also be mapped directly; however, most such

BLM_0064456

Case No. 1:20-cv-02484-MSK   Document 47-9   filed 04/28/21   USDC Colorado   pg 180 of 218

interpretations need to be changed with changes in land use and in the cultural and economic environment. A map showing the productivity of crops on soils that are wet and undrained, for example, has little value after drainage systems have been installed. If the basic soil map is made accurately, interpretative maps can be revised as needed without doing additional fieldwork. In planning soil surveys, this point needs to be emphasized. Occasionally, "short-cut" inventories are made for some narrow objective, perhaps at a cost lower than that of a soil survey. Such maps quickly become obsolete. They cannot be revised without fieldwork because vital data are missing, facts are mixed with interpretations, or boundaries between significantly different soil units have been omitted.

The basic objective of soil surveys is the same for all kinds of land, although the number of mapping units, their composition, and the detail of mapping vary with the complexity of the soil patterns and the specific needs of the users. Thus a soil survey is matched to the soils and the soil-related problems of the area. Soil surveys increase our general knowledge about soils and serve practical purposes. They satisfy a need for soils information about specific geographic areas for State, county, and community land-use plans. These plans include resource conservation plans for farms and ranches, development of reclamation projects, forest management, engineering projects, as well as other purposes.

The storage and retrieval of soil survey data are possible through the use of Automatic Data Processing (ADP). ADP helps develop important interpretations and policy decisions for both the present and the future.

BLM_0064457



**CHAPTER**

# 2

## Soil Systematics



The factors of soil formation are discussed in chapter 1. Climatic and biological factors generally produce broad geographic patterns. These have given rise to a zonal concept and definition of soil distribution. Parent materials contribute to soil variations within climatic and vegetative zones. Local topographic patterns add further complexity, affecting both the time of exposure to processes of soil formation and the kinds of processes. The complex interactions among these factors occur in repetitive patterns which lead to the formation of repetitive combinations. These are the basis for defining, identifying, and mapping soils.

The repetitive patterns imprinted in soils by the soil-forming factors can be observed at scales ranging from continental to microscopic. The patterns are the basis for soil identification and mapping at vastly different scales. A system of terminology, definitions, and operations can be ascribed to the various scales. Hierarchical systems of classes and subclasses can be set up to produce groupings at the different scales.

The National Cooperative Soil Survey of the United States has systems of descriptive terminology, class definitions, hierarchical soil groupings, and operations that are applicable to various scales and appropriate to a wide variety of uses. Development of such flexibility has, in turn, required a fairly complex system in which it is important to understand a number of philosophical, conceptual, and operational relationships. Foremost among these are the relationships between mapping units and taxonomic units, site data and mapping unit data, conceptual models and the real entities in the landscape.

Map units are designed to carry important information for the more common uses of soils in the survey area such as small grain, rural living, and small community development. The map units must also be easily recognizable and mappable at scales compatible with the available base maps, the time allocated to collecting the data, and the skills of the surveyors.

In the United States, soil surveys vary in scale and in intensity of observations. The components of map units are designated by taxa in *Soil Taxonomy* (Soil Survey Staff, 1975) and miscellaneous areas if they are present. Soil taxa are modified with phases, such as slope and stoniness to convey more specific information. The phase often is a portion of the range of properties exhibited by the taxon. For example, a certain soil series may have slopes from 3 to more than 60 percent, but map units are shown with narrower ranges—such as 3 to 8, 8 to 15, 15 to 25—in order to provide information that is useful in managing the soils in the area.

Kinds of soils are known best by the characteristics embodied in small samples. Field descriptions of soil include horizon designation; depth and thickness; color; moist and dry; features of ped surfaces and interiors; texture; structure; consistence at several water states; and special features such as roots, pores, nodules, salts, rock fragments, pH, and boundary conditions. Site characteristics of the soil and its immediate surrounding are usually described.

BLM_0064458

Case No. 1:20-cv-02484-MSK   Document 47-9   filed 04/28/21   USDC Colorado   pg 182 of 218

Chemical and physical data are obtained from horizon samples analyzed in a laboratory. Special features of microbial entities and activities are not routinely determined but may be carried out for research or special purposes.

All samples and all models of soils have a purpose in the soil survey program. Small samples from peds and profiles help us describe the properties of points and how they are organized. This mainly gives us a perspective of the results of soil genesis. We only know what is present by the techniques of measurement that are used, although we may speculate about what has been removed, changed, added, or translocated. Profile features are combined into models of soil formation and the processes and events of geomorphology that have influenced and helped shape the hypothesized features. These mental processes of model building permit us to shift readily from considering an ion in solution to the arrangement of horizons in profiles and their stratigraphic relationships across landscapes.

Purposive sampling of soil map units depends on whether the answers or relationships we desire are related in a meaningful way with the features of the soil map units. The actual clues are not necessarily soil properties at all but are features of identification that we associate with the unseen soil models. Mapping in most surveys involves delineating segments of the landscape, cutting out geographic areas, and putting the boundaries on base maps. Tonal shades and patterns on aerial photographs are used to indicate possible changes of vegetation, drainage conditions, materials, and so forth. The patterns of the gray tones are used to delineate areas on maps. As we look at the existing vegetation, we see differences of tones and composition of the species makeup, and we verify or modify the boundary locations of the units accordingly. Configurations of the visible surface of the land, stones, and other features are used as evidence of changes important enough to be recognized as separate areas. Finally, the soils are examined at a few locations to verify the models being used in the mapping process.

Soil surveys are conducted so that all the clues, features, and pieces of evidence that support the delineations that are called soil map units are in fact surrogates for the models that have been established. The measure of models of landscape evolution and soil formation relative to observable landscape areas is provided by the constant testing that goes on in the soil survey. The outdoors is a laboratory in which variability is subject to some level of systematic portrayal. Thus the small items that are used to assist in locating, verifying, modifying, and developing soil models are similar to the criteria used to identify the basis of differentiation in the classification of soils.

Predictions of properties that exist in soil map units and the predictions made about the qualities and suitabilities and responses of areas of land are all based on the relationships that exist between the desired or expected result and the actuality that is represented by the models used in mapping.

Many schemes have been proposed and tested for determining the composition of map units. The same can be said for the distribution of properties that exist, or are thought to exist, in areas of the landscape that can be delineated consistently on base maps. It is fairly well accepted that certain features of soils and of landscapes are not in accord with existing models of distributions in systematic and predictable ways. The frequency of random events can readily be predicted and tested; however, the location of the occurrences associated with events is, and likely will remain, a probabilistic phenomenon. Such aberrant features are what gives rise to most of the inclusions in map units because their occurrence cannot be predicted and mapped with models even at larger scales. It is the nonsystematic features that make all models approximations of what

BLM_0064459

Case No. 1:20-cv-02484-MSK   Document 47-9   filed 04/28/21   USDC Colorado   pg 183 of 218

actually takes place. The composition of map units can never be known. It can only be approximated from samples of them.

It is common to employ transects to estimate the composition of map units. The first aspect of composition is to identify the taxonomic components because they are the things that we have learned to identify and recognize. These can be translated or interpreted as responses or properties or whatever has an acceptable relationship. If results are not satisfactory or favorable, it is because the models are being used beyond their capability. As long as one is aware of the probability of accuracy or known variability, then soil survey information can have relevant use.

Transecting carries with it some important assumptions when it is used as a means of purposive sampling for map unit composition. A major assumption is that the points observed along a line will be representative of areas on the land that are shown as map units. This line varies in utility with different landscapes and models developed for soil surveys.

Transects crossing landscape units must cross all parts of the landscape, rather than line up with known patterns of variability as this would unduly bias the results. For example, transects that follow small steam valleys overweigh the alluvial-colluvial material relative to what occurs on the hillslopes and uplands. The differences between accuracy of line and point transects for grid points or sample plots is not the same for all landscapes and is better determined by some preliminary checking. Point transects have proven to be satisfactory for most surveys in the United States. Observations made at points along a transect are usually identified as belonging to a class... often a particular taxon, but they could be a combination of properties such as depth, a thickness, a color, or a structure. Because the assumption that point-to-area relationships are satisfactory, the number of observations in the various classes are handled as samples, and statistical inferences are made about the mean values and the ranges that are thought to exist.

## Pedon and Polypedon

In soil surveys the individual parts that make up the soil continuum are classified. The classes are defined to include bodies of soil of significant kinds and sizes. The classes are concepts, not real soils, but they are related to their representatives in nature—the pedon and the polypedon.

**Pedon.**—The pedon is presented in Soil Taxonomy (Soil Survey Staff, 1975) as a unit of sampling within a soil. The limits on the area of a pedon establish rules for deciding whether to consider one or two or more kinds of soil within a small-scale pattern of local lateral variability. A pedon is regarded as the smallest body of one kind of soil large enough to represent the nature and arrangement of horizons and variability in the other properties that are preserved in samples.

A pedon extends down to the lower limit of a soil. It extends through all genetic horizons and, if the genetic horizons are thin, into the upper part of the underlying material. The pedon includes the rooting zone of most native perennial plants. For purposes of most soil surveys, a practical lower limit of the pedon is bedrock or a depth of about 2 m, whichever is shallower. A depth of 2 m provides a good sample of major soil horizons, even in thick soil. It includes much of the volume of soil penetrated by plant roots, and it permits reliable observations of soil properties.

The surface of a pedon is roughly polygonal and ranges from 1 m2 to 10 m2 in area, depending on the nature of the variability in the soil. Where the cycle of variations is less than 2 m and all horizons are continuous and nearly uniform in thickness, the pedon has an area of approximately 1 m2. Where horizons or other properties are intermittent or cyclic over an

BLM_0064460

Case No. 1:20-cv-02484-MSK   Document 47-9   filed 04/28/21   USDC Colorado   pg 184 of 218

interval of 2 to 7 m, the pedon includes one-half of the cycle (1 to 3 1/2 m). If horizons are cyclic over an interval greater than 7 m, each cycle is considered to contain more than one soil. The range in size, 1 to 10 m2, permits consistent classification by different observers where important horizons are cyclic or repeatedly interrupted over short distances.

**Polypedon.**—The pedon is considered too small to exhibit more extensive features, such as slope and surface stoniness. The polypedon is presented in Soil Taxonomy as a unit of classification, a soil body, homogeneous at the series level, and big enough to exhibit all the soil characteristics considered in the description and classification of soils (fig. 2-1).

**FIGURE 2-1**



A schematic diagram of a polypedon as a unit soil body on the Earth's surface, illustrating (a) its characteristic landscape and (b) its unique set of internal properties. Its margins represent the geographic limits of a set of soil properties defined for a soil series. (courtesy of Walter M. Simonson)

In practice, the concept of polypedon has been largely ignored and many soil scientists consider a pedon or some undefined body of more or less similar soil represented by a pedon large enough to classify. Polypedons seldom, if ever, serve as the real thing we want to classify because of the extreme difficulty of finding the boundary of a polypedon on the ground and because of the self-contradictory and circular nature of the concept. Soil scientists have classified pedons, regardless of their limited size, by deliberately or unconsciously transferring to the pedon any required extensive properties from the surrounding area of soil.

George Holmgren incorporated this pragmatic, flexible view of the pedon in his proposal of the point pedon which combines the fixed position of a pedon with consideration of whatever area is needed to identify and measure the properties under consideration (Holmgren, 1988). This concept, combined with criteria for the scale of lateral variability to be considered within one kind of soil, could establish the pedon as the basic unit of classification and eliminate the need for the polypedon; however, the term "polypedon" will be used in this manual.

BLM_0064461

Polypedons link the real bodies of soil in nature to the mental concepts of taxonomic classes.

## Soil Series

The soil series category is the most homogeneous category in the taxonomy used in the United States. As a class, a series is a group of soils or polypedons that have horizons similar in arrangement and in differentiating characteristics. The soils of a series have a relatively narrow range in sets of properties.

Soil series are differentiated on all the differentia of the higher categories plus those additional and significant characteristics in the series control section. Some of the characteristics commonly used to differentiate series are the kind, thickness, and arrangement of horizons and their structure, color, texture, reaction, consistence, content of carbonates and other salts, content of humus, content of rock fragments, and mineralogical composition. A significant difference in any one of these can be the basis for recognizing a different series. Very rarely, however, do two soil series differ in just one of these characteristics. Most characteristics are related, and generally several change together.

### New series, variants, and taxadjuncts

Some soils are outside the limits of any recognized soil series and have unique sets of properties. These are potential new series. When such a soil is first recognized, it is described and identified as a taxon of the lowest category in which it can be classified. A phase of that taxon can be used to identify a map unit. In some surveys, including virtually all detailed surveys, greater refinement of definition is needed. For these, the soil is proposed as a new series, but the new series remains tentative until its properties can be described in detail, its extent determined, and any conflicts with established series resolved. If the soil proves to be unique and significant in extent, it is established as a new series.

Before October 1988, a soil that had characteristics outside the limits of any defined series and was less than 800 hectares (2,000 acres) in extent was designated as a *variant*. Variants differed enough in one or more properties from the series for which they were named that major interpretations for comparable phases were different. They were named by adding the word "Variant" to the name of a closely related series, preferably one within the survey area. Variants were potential soil series, and the soil was established as a new series if a significant area of a variant was eventually recognized.

*Taxadjuncts* are polypedons that have properties outside the range of any recognized series and are outside higher category class limits by one or more differentiating characteristics of the series. The differences in properties are small so that major interpretations are not affected. A taxadjunct is given the name of an established series that is most similar in characteristics. It is an adjunct to, but not part of, the named series. It is treated as if it were a member of the named series, and its interpretations are similar to those for comparable phases of the series for which it is named. The difference from the established series is described. Example: A potential series is in a fine-silty family particle size class, marginal to fine-loamy; however, it differs from an established fine-loamy series in only particle size and no appropriate fine-silty series has been

BLM_0064462

identified. The potential series is given the name of the established series, and a new series is not proposed.

## Phases

If a property of a taxon has too wide a range for the interpretations needed or if some feature outside the soil itself is significant for use and management, these are bases for defining phases. Phases commonly include only part of the range of features exhibited by a taxon, but phases can be based on attributes such as frost hazard, character of the deeper substratum, or physiographic position that are not characteristics used to identify taxa but, nevertheless, affect use and management. If these vary from place to place within the survey area, phases can be defined to accommodate the differences.

A soil map unit that bears the name of a phase of a taxon consists dominantly of that phase of the taxon, but it also includes other soil components. The other components are included because of the limitations imposed by the scale of mapping and the number of points that can be examined. *When the limits of soil taxa are superimposed on the pattern of soil in nature, areas of taxonomic classes rarely, if ever, coincide precisely with mappable areas.* Some polypedons are too small to be drawn on the map and are included in delineations and named for another soil. The boundaries between polypedons are not always so obvious that they can be plotted precisely on a map, so part of one polypedon is commonly included in the delineation of an adjacent polypedon. Some polypedons are so intimately intermingled that mappable areas are necessarily identified in terms of two or more taxa. Other polypedons are not easily distinguished from similar adjacent ones and are inadvertently or deliberately included in delineations named for other soils because apparent differences in use and management are small.

Classes of soil properties are not necessarily used directly as phases. Defined class limits of properties are designed for a convenient description of soil, and they can also be used to define phases of soil where appropriate. But they are not useful for all soils. Distinctions significant for one kind of soil are not significant for every other kind. Any single property is significant only through its interactions with other properties. The usefulness of each phase must be repeatedly tested and verified during a survey. Separate phases of a taxon must differ significantly in behavior. If no useful purpose is served by separating them in mapping, similar phases of different taxa may be combined, and the combination described. The interpretations prepared during the course of a survey provide evidence of similarities and differences among map units.

The justification for most phases rests on the behavior of the soils under use. At least one statement about soil behavior must be unique to each phase of a taxon, and the differences of soil properties must exceed normal errors of observation.

## Miscellaneous Areas

Some land areas have little or no soil and thus support little or no vegetation without major reclamation. Rock outcrop is an example. Such areas are called miscellaneous areas. The names of the different kinds of miscellaneous areas (discussed later) are used in the same manner as the names of soil taxa to identify map units.

BLM_0064463

## Map Units

A map unit is a collection of areas defined and named the same in terms of their soil components or miscellaneous areas or both. Each map unit differs in some respect from all others in a survey area and is uniquely identified on a soil map. Each individual area on the map is a *delineation*.

Map units consist of one or more components. An individual component of a map unit represents the collection of polypedons or parts of polypedons that are members of the taxon or a kind of miscellaneous area. Parts of polypedons are common when phases are used to divide a taxon. Classes of miscellaneous areas are treated the same as soil taxa in soil surveys. A taxonomic unit description describes the ranges in soil properties exhibited in the polypedon for the maps in a survey area that are referenced by that taxonomic unit. The limits of these ranges are set for the taxonomic class of which a taxonomic unit is a member, but generally the full range allowed by the taxonomic class is not exhibited in a small survey area (<200,000 ha).

A delineation of a map unit generally contains the dominant components in the map unit name, but it may not always contain a representative of each kind of inclusion. A dominant component is represented in a delineation by a part of a polypedon, a complete polypedon, or several polypedons. A part of a polypedon is represented when the phase criteria, such as a slope, requires that a polypedon be divided. A complete polypedon is present when there are no phase criteria that require the subdivision of the polypedon or the features exhibited by the individual polypedon do not cross the limits of the phase. Several polypedons of a component may be represented if the map unit consists of two or more dominant components and the pattern is such that at least one component is not continuous but occurs as an isolated body or polypedon. Similarly, each inclusion in a delineation is represented by a part of a polypedon, a complete polypedon, or several polypedons. Their extent, however, is small relative to the extent of the dominant component(s). Soil boundaries can seldom be shown with complete accuracy on soil maps, hence parts and pieces of adjacent polypedons are inadvertently included or excluded from delineations.

A few delineations of some map units may not contain any of the dominant components named in the map unit description, but contain very similar soils. In most survey areas there are a few soils that occur as mappable bodies, but they have very limited total extent. They are normally included with other map units, if, for all practical purposes, interpretations are the same.

The kinds of map units used in a survey depend primarily on the purposes of the survey and the pattern of the soils and miscellaneous areas in the landscape. The pattern in nature is fixed and it is not exactly the same in each delineation of a given map unit. In soil surveys these patterns must be recognized and map units designed to meet the major objectives of the survey. It must be remembered that soil interpretations are made for areas of land and the most useful map units are those that group similarities.

## Designing Map Units

While studying the soil patterns in different landscapes, the soil scientist must keep in mind how best to relate the patterns observed to appropriate map units. The kinds of map units, the level of soil taxa, and the phases needed to satisfy the survey objectives must be determined. This requires many judgements. Every map unit that is tentatively identified is evaluated by two tests: (1) Can it be mapped consistently? (2) Is it needed to meet the objectives of the survey?

BLM_0064464

Designing map units to indicate significant differences in behavior among soils is particularly important to meet the current objectives of a survey. Reflecting differences in genesis and morphology is also important, even if no immediate differences in interpretations are known. Differences in soil properties that do not affect current interpretations may be important in the future; however, having too many delineations seriously reduces the immediate usefulness of a soil map. A potential benefit must be weighed carefully against the costs incurred in making additional separations. One objective of every soil survey is to record knowledge about soils, but this does not mean that the soil map must show the location of every kind of soil in a survey area or that the publication must record all that has been learned about the soils.

Taxonomic classes provide the basic sets of soil properties with which soil map units are defined. They summarize an immense amount of research and experience related to the significance of soil properties and combinations of properties. They provide predefined sets of soil properties that have been tested for genetic relationships and for interpretative value. Taxa provide a firm base for recognizing the components of potential map units in an unfamiliar area. Using established taxa is much easier than independently sorting out sets of properties and determining significant class limits.

The objectives of a survey determine the kind of map units and the taxonomic level used to identify components of map units. For the more detailed surveys, decisions must be made about what criteria to use to recognize phases of soil series, how broadly or narrowly to define the phases, and whether similar phases of different series have such similar interpretations that they can be combined. For the less detailed surveys, decisions must be made about how the complexities of soil in large areas can be best identified for purposes of the survey, what combinations of soils characterize useful and mappable units, what taxonomic level should be used in naming map units, and which phases contribute to the usefulness of the map units.

The names of soil taxa, along with one or more modifying terms are used to identify the soils in map units. For example, the name "Tama silt loam, 2 to 5 percent slopes," indicates that soils of the Tama series (a Udoll) are dominant in that map unit. The names of taxa of higher categories are also used in map unit names, especially on small scale maps. "Udolls, rolling," for example, identifies a map unit consisting dominantly of soils of the Udoll suborder, which includes Tama and other series. The name of a taxon of the lowest category that accurately identifies the dominant soil is commonly used.

Within each survey, soil maps can be designed with component taxa of low or high categories that reflect narrowly or broadly defined ranges of soil properties. In addition, soil map units can be designed with different compositions of soil taxonomic units and mapping inclusions. This flexibility permits the design of map units that will be most useful for the purposes of a specific survey as well as for the attainment of as much uniformity in mapping as possible.

As methods of measuring soil properties are refined, as experience in the field increases, and as use and management requirements are intensified, progressively narrower ranges in soil properties can be recognized or established. Narrow ranges of properties are not established just because methods permit it. Unnecessary separations are time consuming to delineate consistently, and they make the survey difficult to use. Not separating two significantly different, mappable units, however, makes a survey less useful. The significance of each map unit in meeting the objectives of the survey must be constantly evaluated during the mapping process.

Improper use of phases to designate map units and misinterpretations of soil survey procedures can result in unreasonably detailed soil maps delineating unnecessary map units or

BLM_0064465

ones in less detail than is needed to accomplish the objectives of the survey. Using pre-established classes of selected soil properties—surface texture, depth, slope, accelerated erosion, and stoniness—as phase criteria and then using all combinations of these in defining phases, creates problems. Meaningless map units cause an unnecessary expense.

Phase distinctions must be compatible with natural variability. To illustrate, a series may range in depth to bedrock from 1.5 m to more than 2 m. For some uses, a separation at 1.5 m would be significant. If within a survey area the soils of a series range in depth to bedrock from slightly less than 1.75 m to slightly more, designating two depth phases cannot be justified. The mapping is likely to be inconsistent and the difference of a few centimeters in depth is likely to be of minor significance. In this case it is far better to designate only one phase on the basis of depth to bedrock. The description of the map unit should, of course, give the depth range.

Another example: In some areas a slope of 8 percent is about the upper limit for cropping many soils without special practices for erosion control; yet, in some series a large part of the soil has slopes of less than 3 percent, most of the rest has slopes of 6 to 10 percent, and a small acreage has slopes of 3 to 6 percent. Dividing phases of such soils at 8 percent slope would produce a large number of delineations having a gradient a little below 8 percent and a large number having a gradient a little above 8 percent. The differences in interpretations of the phases thus defined would probably not be consistently significant. For these soils, slope phases could be set at 0 to 3 percent, 3 to 6 percent, and 6 to 10 percent; or, if there is little or no significance of the break at 3 percent, they could be set at 0 to 6 percent and 6 to 10 percent.

Phases must also be compatible with practical needs. In a hypothetical survey area that is relevant to farming, the polypedons of Alpha soils are similar in all properties except stoniness and slope. The areas range from nearly stone-free to very stony and from undulating to steep. The most important single distinction for farming is the distinction between areas that can be cultivated feasibly and areas that cannot. As many as three mappable classes of stoniness could be combined with four mappable classes of slope—a total of 12 potential phases. Four of these twelve phases might be used to distinguish combinations of degrees of slope and degrees of stoniness within the limits that permit cultivation. Using the remaining eight to subdivide the nonarable areas would confuse the user with unnecessary detail more than it would help. Perhaps two, and probably no more than three, phases are adequate for all significant distinctions among nonarable areas if the survey area is to be used primarily for farming. A list of potentially useful phases is as follows:

**A. Arable areas:**

1. An undulating, nonstony phase

2. An undulating, moderately stony phase

3. A rolling, nonstony phase

4. A rolling, moderately stony phase

**B. Nonarable areas:**

1. An undulating and rolling, very stony phase

2. A hilly phase (ranging from nonstony to very stony)

3. A steep phase (ranging from nonstony to very stony)

If the soil map is to be used for planning operations related to forestry or other nonfarming activities, other distinctions may be needed.

The object of surveying soils is to gather relevant facts, record the facts on maps, and then interpret the facts. Field records and observations together with other relevant information must be coordinated in defining phases and map units that meet the objectives of a soil survey.

## Kinds of Map Units

Soils differ in size and shape of their areas, in degree of contrast with adjacent soils, and in geographic relationships. Four kinds of map units are used in soil surveys to show the relationships: consociations, *complexes, associations,* and *undifferentiated groups.*

**Consociations—**In a consociation, delineated areas are dominated by a single soil taxon (or miscellaneous area) and similar soils. As a rule, at least one-half of the pedons in each delineation of a soil consociation are of the same soil components that provide the name for the map unit.[1] Most of the remainder of the delineation consists of soil components so similar to the named soil that major interpretations are not affected significantly. The total amount of dissimilar inclusions of other components in a map unit generally does not exceed about 15 percent if limiting and 25 percent if nonlimiting. A single component of dissimilar limiting inclusion generally does not exceed 10 percent if very contrasting. The amount of dissimilar inclusions in an individual delineation of a map unit can be greater than this if no useful purpose would be served by defining a new map unit. The soil in a consociation may be identified at any taxonomic level.

A consociation named for a kind of miscellaneous area is dominated by the kind of area for which it is named to the extent that inclusions do not significantly affect the use of the map unit. Generally, this means that less than about 15 percent of any delineation is soil or less than about 25 percent is other kinds of miscellaneous areas. Percentages may vary, depending on the kind of miscellaneous area and the kind, size, and pattern of the inclusions.

**Complexes and associations—**Complexes and associations consist of two or more dissimilar components occurring in a regularly repeating pattern. Only the following arbitrary rule related to mapping scale determines whether the name complex or association should be used. The major components of a complex cannot be mapped separately at a scale of about 1:24,000 (fig. 2-2). The major components of an association can be separated at a scale of about 1:24,000 (fig. 2-3). In either case, the major components are sufficiently different in morphology or behavior that the map unit cannot be called a consociation. In each delineation of either a complex or an association, each major component is normally present, though their proportions may vary appreciably from one delineation to another. The total amount of inclusions in a map unit that are dissimilar to any of the major components does not exceed about 15 percent if limiting and 25 percent if nonlimiting, and a single kind of dissimilar limiting inclusion generally does not exceed 10 percent if very contrasting.

---

[1] Some consociations may be less than one-half the named soil if most of the remainder of the map unit consists of two or more soils that are similar to the named soil. The unit is named for the dominant soil.

Case No. 1:20-cv-02484-MSK   Document 47-9   filed 04/28/21   USDC Colorado   pg 191 of 218

**FIGURE 2-2**



An area of a soil complex where plowing 12 inches deep turns up the dark- colored spots in the subsoil. Note the uniform color of the areas on the left that have not been "deep plowed."

**FIGURE 2-3**



Landscapes of Associations of Soil Series. (Soil Survey Thayer Co., Nebraska).

**Undifferentiated groups—**Undifferentiated groups consist of two or more taxa components that are not consistently associated geographically and, therefore, do not always occur together in the same map delineation. These taxa are included as the same named map unit because use and management are the same or very similar for common uses. Generally, they are included together because some common feature such as steepness, stoniness, or flooding determines use and management. If two or more very steep soils geographically separated are so similar in their potentials for use and management that defining two or more additional map units would serve no useful purpose, they may be placed in the same unit. Every delineation has at least one of the

major components and some may have all of them. The same principles regarding proportion of
inclusions apply to undifferentiated groups as to consociations.

## Inclusions Within Map Units

In all soil surveys, virtually every delineation of a map unit includes areas of soil components or
miscellaneous areas that are not identified in the name of the map unit. Many areas of these
components are too small to be delineated separately. The location of some components cannot
be identified by practical field methods. Some mapping inclusions are deliberately placed in
delineations identified as another map unit to avoid excessive detail of the map or the legend.

Inclusions reduce the homogeneity of map units and may affect interpretations. The
objective is to define map units that will contain as few inclusions as practical of components
that behave differently from the naming components. Also, map units must be so defined that
they can be recognized and delineated consistently in the field.

The number of inclusions reflects the taxonomic purity of map units. The number and
degree of contrast of inclusions with the reference taxa can be used to estimate the interpretative
purity of map units. The actual amount of inclusions is estimated from observations made during
the survey. Adjustments in mapping are made if appropriate.

In the definition of map units, judgement must be exercised about the effects of inclusions
on management and about how much effort is justified to keep the amount of inclusions small. In
exercising these judgements, visualizing two kinds of differences between components is useful.
If differences are small, the components are compared as similar. If differences are large, the
components are contrasted as dissimilar.

Similar components are alike or much alike in most properties and share limits of those
diagnostic properties in which they differ. Differences are beyond the limits of the reference
taxon or phase class, but they generally are within or slightly beyond normal errors of
observation. Because only a few limits are shared or the range is small, interpretations for most
common uses are alike or reasonably similar and the interpretative value of a map unit is not
affected.

Dissimilar components on the other hand, differ appreciably in one or more properties, and
the differences generally are great enough to affect major interpretations. Some dissimilar
components are limiting, and others are nonlimiting relative to the interpretations being
considered.

If an inclusion does not restrict the use of entire areas or impose limitations on the feasibility
of management practices, its impact on predictions for the map unit is small. Inclusions of soil
components that have less severe restrictions on use than the dominant soil of a map unit do not
adversely affect predictions about the unit as a whole. They may even be beneficial. Such
inclusions are nonlimiting and the interpretative purity of a map unit for most interpretations is
not altered.

For example, the inclusion of many small areas having slopes of 4 to 8 percent in an area
having slopes mainly of 15 to 25 percent has no adverse effect on use of the area for most
purposes; however, if an inclusion has significantly lower potential for use than the dominant
component in the map unit or affects the feasibility of meeting management needs, a small
amount in a map can affect predictions greatly. These are the most critical inclusions because
they decrease the interpretative purity of map units. Even a small area having slopes of 15 to 25
percent in a map unit dominated by slopes of 4 to 8 percent can seriously affect the use of the

BLM_0064469

area for many purposes. Even small inclusions of Typic Epiaqualfs in areas of Aquic Hapludalfs, for an example, may control and limit the uses of the dominant soil.

Soils that cannot be used feasibly for the same purposes as the surrounding soils are especially critical. They are separately delineated if the map scale permits it and if showing them will improve the usefulness of the map for the major anticipated uses. Areas too small to delineate may be identified and located on the map by special symbols.

## Naming Map Units

All map units in a soil survey are named. Different conventions are used for each of the four kinds of map units so that the kind of unit can be determined at a glance. In general, names are as short as is practical; the name of a map unit should be only as long as is necessary to distinguish it from all others in the survey. At times an extra term, not needed to distinguish a phase from all others in the survey, is used so that comparable phases in other areas have the same name.

Although some of the conventions for naming map units are discussed in this chapter, a more complete discussion is provided in the *National Soils Handbook* (Soil Conservation Service). Soil names indicate the categorical level used for identification, but soil taxonomic names are never used alone.

Phases are groupings created to serve specific purposes in individual soil surveys. Phases can be defined for any class or classes of any category. The classes are helpful in describing the soil phases that are important for the survey. Differences in soil or environmental features that are significant to use, management, or behavior are the bases for designating soil phases.

Any property or combination of properties that does not duplicate class limits for a taxon can be used to differentiate phases, and any value of a property can be set to divide phases. The choice of properties and limits are determined by the purpose of the survey and by how consistently the phase criteria can be applied. Because objectives differ from one soil survey to another, limits and ranges of a property or attribute may also differ from one survey to another. In general, phase criteria are given a smaller range where soil use is intensive (as for irrigated farming or urban development) and a larger range where use is extensive (as for forestry or grazing).

The attributes most commonly used in defining phases in soil surveys are:

**Texture of the surface layer.—**As the surface layer has special significance for use of the soil, texture of the surface layer is commonly indicated in the names of consociations bearing the names of soil series. These phases generally identify the dominant texture of a mineral layer about equal in thickness to that commonly mixed in tillage, which is generally 12 to 25 cm. If the layer has not been mixed, the texture that would be produced by mixing is estimated. If, after mixing, the layer is organic, terms for organic material are used to name the phase. In some areas such as deserts, where the surface layer is normally thin and cultivation is unlikely, the texture of the A horizon can be used in naming phases even if it is less than 12 cm thick.

Some mineral soils have a thin layer at the surface that contrasts sharply with the next layer. Such soils may be designated as separate phases if they are unlikely to be tilled and if clearly significant to use or management. On rangeland, for example, the texture of the uppermost few centimeters of soil is important. A thin layer of sandy material at the surface may mean the difference between success and failure of seedings on some soils. For some surveys, such layers need to be recognized and their areas delineated. Moreover, a thin cover of silt or clay is an important distinction.

BLM_0064470

Conceivably, other kinds of phases based on texture could be useful in mapping, but they should be used only if the indicated property has a major and lasting effect on interpretations.

**Deposits on the surface.**—Some soils have received deposits of material thick enough to influence interpretations of the soil but not thick enough to change the classification. Depositional phases of the buried soils may be recognized:

**Overblown:** A recent deposit of wind-blown material on the surface of an older soil can be identified consistently throughout the area and is thick enough to influence use, management, or behavior.

**Wind hummocky:** Recent wind-laid deposits form a fine pattern of hummocks that markedly alter management requirements of the soil. The original soil is identifiable throughout most of the area, although it is covered in spots.

**Overwash:** Material deposited by water that contrasts with the underlying soil and is thick enough to influence management requirements significantly. Ordinarily, overwash phases are not used for very young alluvial soils that have weakly expressed genetic horizons.

Texture terms in the names of map units describe the material currently at the surface. Phases may be recognized for soils covered by a thin layer of volcanic ash. Such phases are generally used only if needed to distinguish the phase from another phase that lacks the ash cover.

**Rock fragments.**—Rock fragments at the surface and in the surface layer are commonly used as phase distinctions. Kinds of rock fragments are defined by shape and size in chapter 3.

Phases of the smaller rock fragments accommodate most of the detailed phase distinctions that generally can be made accurately by field methods. The term "gravelly" is used in the examples of the names that follow, but the adjectives for each of the other kinds of rock fragments, such as cobbly or channery, are substituted as appropriate. The effect of 20 percent fine gravel on the use of arable soil, for example, is quite different from the effect of 20 percent flagstones; therefore, the phase limits may differ for larger fragments.

The following definitions are applicable to arable soils. For other uses—such as forestry, range, or recreation—the sizes, shapes, amounts, and mixtures of rock fragments have different significance. Pebbles, cobbles, and stones influence forestry much less than they do cultivation, although they could affect access and reforestation.

**Nongravelly.** The surface layer may contain enough pebbles to affect special uses that tolerate few if any rock fragments, but the pebbles do not interfere with the tillage of such field crops as corn. The volume is less than 15 percent. A slightly gravelly phase can be recognized for soils that are used for special purposes, such as growing turf.

**Gravelly.** The surface layer contains enough pebbles to interfere with tillage of common field crops. Generally, however, tillage is performed in the same manner and with the same equipment as for soils free of fragments. The pebbles are a nuisance. They may cause some equipment breakage, but they cause few major delays in field operations. The effects of the pebbles on the quality of tillage are small or moderate, depending on the kind of operation. The volume of pebbles is 15 to 35 percent.

**Very gravelly.** The surface layer contains enough pebbles to interfere seriously with the tillage of common field operations. The quality of tillage operations is affected. The kinds of

BLM_0064471

crops that can be grown is restricted, the precision of planting and of fertilizer placement is reduced, and young plants are frequently covered during tillage. The volume of pebbles is 35 to 60 percent.

**Extremely gravelly.** The surface layer contains so many pebbles that tillage of the common field crops is often impractical, although not necessarily impossible. Tillage implements must force their way through a mass of pebbles that have fine earth between them. The volume of pebbles is more than 60 percent.

The rock fragments in the surface layer commonly span two or more size classes. The included fragments may be of more than one shape. The name of the kind of fragment that is judged most important in limiting the management of the soil is used in the phase designation. Generally, the largest fragments that are present in significant amounts are the most restrictive on soil use.

Classes of stoniness and boulderiness (chapter 3) are also used to define phases. The following phases of the larger rock fragments represent about the maximum detail that can be mapped consistently in most soil surveys. "Bouldery" is substituted for "stony" as appropriate.

**Stony.** The areas have enough stones at or near the surface to be a continuing nuisance during operations that mix the surface layer, but they do not make most such operations impractical. Conventional, wheeled vehicles can move with reasonable freedom over the area. Stones may damage both the equipment that mixes the soil and the vehicles that move on the surface. Usually, these areas have class 1 stoniness. If necessary in a highly detailed survey, these areas may be designated as "slightly stony" and "moderately stony."

**Very stony.** The areas have so many stones at or near the surface that operations which mix the surface layer either require heavy equipment or use of implements that can operate between the larger stones. Tillage with conventionally powered farm equipment is impractical. Wheeled tractors and vehicles with high clearance can operate on carefully chosen routes over and around the stones. Usually, these areas have class 2 stoniness.

**Extremely stony.** The areas have so many stones at or near the surface that wheeled powered equipment, other than some special types, can operate only along selected routes. Tracked vehicles may be used in most places, although some routes have to be cleared. Usually, these areas have class 3 stoniness.

**Rubbly.** The areas have so many stones at or near the surface that tracked vehicles cannot be used in most places. Usually, these areas have class 4 or 5 stoniness. If necessary in a highly detailed survey, they may be designated as "rubbly" and "very rubbly."  If the soil has stones, boulders, and smaller fragments, the name includes the kind of rock fragment that are most limiting in the use or management of the soil. This is not necessarily the kind that is most abundant or the kind that is used to modify texture class of horizons in the profile description.

**Rockiness.** Map units, consisting of about 0.1 to 10 percent Rock outcrop, can be named either as "rocky" phases or as complexes or associations of soil and Rock outcrop. Map units consisting of more than 10 percent outcrop are normally named as complexes or associations of soil and Rock outcrop. Where rockiness phases are used, both "rocky" and

BLM_0064472

"very rocky" phases can be named. Commonly, map units with less than 2 percent Rock outcrop are named "rocky" and those with 2 to 10 percent "very rocky."

**Slope.** The slope range of some soil taxa is narrow; in others, it is wide enough to include differences that are important for soil use and management. Slope phases are used to divide soil series or other taxa as may be needed for the purpose of the survey.

Slope gradient, complexity, shape, length, and aspect are all potential bases for phase distinctions. By far the most commonly used is gradient. Complexity is also used in many surveys. Slope length can often be appraised directly from delineations on the map. In many cases, the significance to use and management of slope length depends on the kind of landscape in which the soil occurs. Shape is seldom used as a phase distinction; differences in shape are commonly related to differences in internal properties that distinguish taxa. Slope aspect is used mainly in high latitudes.

Phases defined on the basis of slope should fit the landscape. They should be so distinct that they can be identified and mapped consistently without adding useless complexity to the map. In addition, such phases should separate areas that have significant differences in suitability or management needs.

A uniform system of slope classes should not be used indiscriminately as the basis for differentiating phases. Slope phases that have narrow ranges in gradient may be needed for soils that can be used intensively. For other soils having additional limitations, such as stoniness, these narrow ranges may be useless. The limits of slope phases should be based on data or experience in order to indicate the most useful distinctions for each kind of soil. Range in the slope of a phase of one series may encompass the ranges of two or more phases of another series. A single set of slope classes that would serve as phase distinctions for all soils is impractical because of the varied relationships of slope to mappable landscapes and to the use and management of different kinds of soils.

Table 3-1 defines slope classes in terms of flexible limits for both simple and complex slopes. The flexible limits permit use of terms to identify most distinctions of slope that may be needed. Names may use either numerical gradient limits, with or without designations of complexity, or descriptive terms. Slope terms for map units for taxa above the series are generally given in descriptive terms. The word "slopes" is used if gradient is specified as a percentage, but it is omitted if descriptive terms are used.

**Depth.**—Soil depth phases are used where variations in depth to a contrasting layer are significant to soil use, management, or behavior. Terms for depth classes in Chapter 3 are generally used in naming phases, but modifications are needed in some areas. For instance, the class "moderately deep," ranging from 50 to 100 cm, may be too broad to satisfy the objective of a particular survey. This range can be divided, with perhaps one class ranging in depth from 50 to 75 cm and the other from 75 to 100 cm, if the more narrowly defined phases occur in a consistent pattern within the survey area and can be mapped. Generally, the phase that covers the least acreage is given the depth designation. If the deeper phase is more extensive, "moderately shallow" is used to designate the shallower phase. If the shallower phase is more extensive, "moderately deep" is used to designate the deeper phase. In some surveys, using the standard class terms may be misleading. For example, if a series that is normally more than 175 cm deep to bedrock has a phase that is 150 to 175 cm deep, calling the less extensive phase "deep" could be construed to mean that the phase is deeper than normal. In such cases, depth limits can be specified in the phase name, or substratum phase terminology can be used instead.

BLM_0064473

**Substratum.**—Where underlying material contrasts sharply with the material above and interpretations are affected, substratum phases are used. The kind of contrasting material is indicated in the name of the map unit. Some examples of commonly used substratum phases are: *gravelly substratum, sandy substratum, silty substratum, shale substratum, and till substratum.* These terms are descriptive and not mutually exclusive. Where there is a choice between using a depth phase or a substratum phase to identify a map unit, a depth phase is generally used if the contrasting layer is bedrock.

**Soil water.**—Phases are used to distinguish differences in soil-water state, water table level, drainage, and the like where the range of the taxon in one or more of these properties needs to be divided for purposes of the survey. Significant differences in these factors are commonly reflected in differences in soil morphology and are distinguished at the series level. In some soils, however, evidence of wetness, such as redoximorphic features, does not fully reflect the natural drainage or wetness of the soil. These soils may not be differentiated at the series level with the refinement needed for the purposes of the survey.

Examples of soil water phases commonly used are: *high water table, poorly drained, slightly wet,* and *drained.* Some soils have properties that reflect former wetness, but they have been drained artificially; "drained" phases can be used to separate drained areas from undrained. In other soils, a water table fluctuates below the depth where properties are criteria for defining series; "water table" phases can be used to identify such soils.

**Salinity.**—Saline phases are used to distinguish between degrees of salinity that are important for soil use or management. Electrical conductivity values and observations of plant growth are guides for recognizing phases.

Designation of salinity phases depends on the various uses likely to be made of the soils and the effect of excessive amounts of salt on the uses. In farming areas, the crops most likely to be grown must be considered. Management induced salinity that fluctuates widely with management practices generally would not be a basis for phase distinctions.

Vegetation, especially the native cover, often shows the location of saline soils and their boundaries. Using vegetation, landform, and other features as guides and correlating these field observations with laboratory or field analyses of soil samples, the surveyor can usually draw boundaries with reasonable accuracy. Plants, however, vary in their tolerance of salt by species, variety, age, and perhaps other factors. Some plants are not good indicators of salinity because they grow well in soils that may have excessive amounts.

Other problems must also be considered in designating salinity phases. Different kinds of salts and combinations of salts have varied effects on soil behavior. In many soils, salts are transitory; in others, they are permanent. Excessive sodium may or may not be associated with excess salinity. The following classes of salinity, which are a general guide to naming phases, refer to the presence of salts in the soil. Salinity classes are defined in chapter 3.

**Nonsaline:** Effects of salinity on plant growth are negligible. Salinity is mainly class 0 and 1. "Nonsaline" is omitted from the names of mapping units unless the soil taxon is typically saline. A very slightly saline phase may be useful in some surveys for crops extremely sensitive to salts.

**Slightly saline:** Growth of many plants is affected. Yields of such plants as bromes, sunflower, corn, and peas are reduced seriously. Western wheatgrass, kale, and barley are affected little. Salinity is mainly class 2.

**Moderately saline:** Only plants tolerant of salinity, such as western wheatgrass, beets, and barley, grow well. Yields of these are commonly reduced. Salinity is mainly class 3.

**Strongly saline:** Only the most tolerant halophytic plants, such as saltgrass, grow well. Salinity is mainly class 4.

Terms for saline phases follow terms for surface texture in phase names.

**Sodicity.**—For some soils, recognizing a "sodic" phase is useful. The term "sodic" is used as a phase designation, if needed, generally without terms for degrees of sodicity.

**Physiography.**—Landform or physiographic position may be used as a phase criterion to distinguish phases of a single taxon. A soil in a deposit of loess 3 meters thick on a terrace, for example, may be so much like a soil in a similar deposit on a till plain that the two are members of the same taxon. For some uses, however, the two soils need to be distinguished on the map. A physiographic phase can be used to identify the less extensive soil.

Examples of terms that have been used to designate physiographic phases are: *bench, depressional, fan, karst, ridge, and terrace*. The terms generally identify phases that differ in position from what is typical for the soil. The typical physiography is not given in a phase name. The physiographic phase designation follows the term for surface texture and precedes any terms for slope or erosion.

**Erosion.**—Differences in soil potential for use, management needs, or performance because of accelerated erosion are a basis for recognizing phases. Phases of eroded soil are identified on the basis of the properties of the soil that remains, although the amount of soil lost is estimated and noted. In some places, erosion has changed the taxonomic classification of a soil.

Properties related to natural erosion are a part of the definition of a taxon, not bases for erosion phases. Erodibility, too, is an inherent quality of a soil and not itself a criterion for erosion phases.

Eroded phases are defined so the boundaries on the soil maps separate soil areas of unlike suitabilities and soil areas of unlike management needs and responses.

Guidelines for naming phases of soil that are eroded by water are as follows. Erosion classes are defined in chapter 3.

**Slightly eroded:** Erosion has changed the soil enough to require only slight modification of management from that of the uneroded soil; potential use and management remain generally the same. Most slightly eroded soils have class 1 erosion. Slightly eroded areas are not distinguished from uneroded areas in most surveys.

**Moderately eroded:** Generally, the plow layer consists of a mixture of the original A horizon and the underlying horizons. Most mapped areas of moderately eroded soils have patches in which the plow layer consists wholly of the original A horizon and others in which it consists wholly of underlying horizons. Shallow gullies may be present in some places. Erosion has changed the soil to such an extent that required management or the response to management differs in major respects from that of the uneroded soil. In most moderately eroded soils, ordinary tillage implements reach through the remaining A horizon or well below the depth of the original plowed layer. Most moderately eroded soils have class 2 erosion.

**Severely eroded:** Severely eroded phases commonly have been eroded to the extent that the plow layer consists essentially of material from underlying horizons. Patches in which the

BLM_0064475

plow layer is a mixture of the original A horizon and underlying horizons may be present within some delineations. Shallow gullies, or a few deep ones, are common in some places. Erosion has changed the soil so much that (1) the eroded soil is suited only to uses significantly less intensive than the uneroded soil, such as use for pasture instead of crops; (2) the eroded soil needs intensive management immediately or over a long period to be suitable for the same uses as the uneroded soil; (3) productivity is reduced significantly; or (4) limitations for some major engineering interpretations are greater than on the uneroded soil. Most severely eroded soils have class 3 erosion.

A "gullied" phase can be recognized if gullied land occupies less than about 10 percent of the map unit. Gullied phases are used for areas having gullies so deep that intensive measures, including reshaping, are required to reclaim the soil. Where the areas are more than 10 percent gullied land, the map units are named as complexes or associations of soil and gullied land.

Guidelines for designating phases of soil eroded by wind are as follows:

**Eroded (blown):** Wind has removed enough soil that required management differs significantly from that of the uneroded soil, but suitabilities for use remain the same. The term "moderately" is understood.

**Severely eroded (severely blown):** Wind has removed much of the soil or has shifted it from place to place within the area. Suitability for use is different from that of the uneroded soil, unless extensive reworking is done and/or intensive management practices are used.

Many areas identified as moderately and severely wind eroded are, in fact, mixtures of small areas of uneroded soil and soil eroded to various degrees. The amount of erosion throughout a delineation can be described only in general terms.

**Thickness.—**The solum and the various horizons in soil have characteristic ranges in thickness for each taxon. Thickness phases may be used to divide the range of thickness of the solum or of the upper horizons. Phases are not used to differentiate thickness of the subsoil or the substratum. Four thickness phases are used:

**Thick surface:** The thickness of the A horizon or of the A and E horizons combined is within the thicker half of the range for the taxon.

**Thin surface:** The thickness of the A horizon or of the A and E horizons combined is within the thinner half of the range for the taxon.

**Thick solum:** The thickness of the solum is within the thicker half of the range for the taxon.

**Thin solum:** The thickness of the solum is within the thinner half of the range for the taxon.

A term is used for the less extensive of two thickness phases. For example, most delineations of a given soil may have an A horizon that is dominantly between 25 and 35 cm thick. If the A horizon is dominantly 35 to 40 cm thick in other delineations of the same soil and the difference is significant for purposes of the survey, a thick-surface phase can be recognized. The phase in which the A horizon is dominantly 25 to 35 cm thick is the norm; thickness of the A horizon is described for this phase but is not identified in the name.

**Climate.—**In some places, especially in mountainous or hilly areas, precipitation or air temperature can differ greatly within short distances, yet these differences may not be reflected

in internal properties of the soil. Air drainage can differ enough from one location to another to produce a difference in the dates of the last killing frost in the spring or the first in the fall, or one area may be frost free. Climatic phases are used for these situations.

Only two climatic conditions are recognized for a given taxon: (1) the common climate, the climate that influences the greatest extent of the taxon, from which the climate designation is omitted, and (2) a departure from the common climate, for which a climatic designation is used. The departure may be in either of two directions from the norm: *warm or cool, high precipitation or low precipitation*. Each of the terms is connotative only in reference to the common climate of the taxon and must be described specifically for each phase to which it is applied.

In many places, especially on plains, precipitation or temperature changes gradually over distance. A soil in a single survey area commonly includes only part of the range for the series. Climatic phases generally are not used if only part of the range is within a soil survey area. Climatic phases are local distinctions. They are used where temperature or precipitation differs markedly between parts of a survey area.

**Other.—**A great variety of phase distinctions can be made. In addition to those already described, others may be needed to provide suitable map units; for example: *frequently flooded, occasionally flooded, burned, calcareous, leached surface, dark surface*. "Burned," for example, might be used for organic soils that have lost enough of their organic material by fire to alter their potential use or their management requirements.

The phases designated by special terms are defined to fit special kinds of soils. Such phases are defined according to the common properties of the taxon of which they are members. Thus, the terms usually have different specific meanings when used for different taxa and in different survey areas.

## Miscellaneous Areas

Miscellaneous areas have essentially no soil and support little or no vegetation. This can be a result of active erosion, washing by water, unfavorable soil conditions, or man's activities. Some miscellaneous areas can be made productive but only after major reclamation efforts. Map units are designed to accommodate miscellaneous areas, and most map units named for miscellaneous areas have inclusions of soil. If the amount of soil exceeds the standards for inclusions defined in this chapter, the map unit is named as a complex or association of miscellaneous area and soil.

Following are discussions of recognized kinds of miscellaneous areas.

**Badland** is moderately steep to very steep barren land dissected by many intermittent drainage channels. Ordinarily, the areas are not stony. Badland is most common in semiarid and arid regions where streams cut into soft geologic material. Local relief generally ranges between 10 and 200 meters. Potential runoff is very high, and erosion is active.

**Beaches** are sandy, gravelly, or cobbly shores washed and rewashed by waves. The areas may be partly covered with water during high tides or storms.

**Blown-out land** consists of areas from which all or most of the soil material has been removed by extreme wind erosion. The areas are generally shallow depressions that have flat or irregular floors. In some places the floor is a layer of material that is more resistant to wind than the removed material or is a layer of pebbles or cobbles; or, the floor may have been formed by exposure of the water table. Areas covered by water most of the year are mapped as Water. Some

areas have a few hummocks or small dunes. Few areas of blown-out land are large enough to be delineated; small areas can be shown by spot symbols.

**Cinder land** is composed of loose cinders and other scoriaceous magmatic ejecta. Water-holding capacity is very low, and trafficability is poor.

**Cirque land** consists of areas of rock and rubble in characteristically cirque shape. The shape is caused by glacial erosion.

**Dumps** are areas of smoothed or uneven accumulations or piles of waste rock and general refuse. Dumps, mine consist of areas of waste rock from mines, quarries, and smelters. Some dumps with closely associated pits are mapped as Dumps-Pits complex.

**Dune land** consists of sand in ridges and intervening troughs that shift with the wind.

**Glaciers** are large masses of ice formed, at least in part, on land by the compaction and recrystallization of snow. They may be moving slowly downslope or outward in all directions because of the stress of their own weight; or, they may be retreating or be stagnant. A little earthy material may be on or in the ice.

**Gullied land** consists of areas where erosion has cut a network of V-shaped or U-shaped channels. The areas resemble miniature badlands. Generally, gullies are so deep that extensive reshaping is necessary for most uses. Small areas can be shown by spot symbols. Phases indicating the kind of material remaining may be useful in some places.

**Gypsum land** consists of exposures of nearly pure soft gypsum. The surface is generally very unstable and erodes easily. Trafficability is very poor. Areas of hard gypsum are mapped as Rock outcrop.

**Lava flows** are areas covered with lava. In most humid regions, the flows are of Holocene age, but in arid and very cold regions they may be older. Most flows have sharp, jagged surfaces, crevices, and angular blocks characteristic of lava. Others are relatively smooth and have a ropy glazed surface. A little earthy material may be in a few rocks and sheltered pockets, but the flows are virtually devoid of plants other than lichens.[2]

**Oil-waste land** consists of areas where liquid oily wastes, principally saltwater and oil, have accumulated. It includes slush pits and adjacent areas affected by the liquid wastes. The land is barren, although some of it can be reclaimed at high cost.

**Pits** are open excavations from which soil and commonly underlying material have been removed, exposing either rock or other material. Kinds include Pits, mine; Pits, gravel; and Pits, quarry. Commonly, pits are closely associated with Dumps.

**Playas** are barren flats in closed basins in arid regions. Many areas are subject to wind erosion and many are saline, sodic, or both. The water table may be near the surface at times.

**Quarries** (see Pits).

**Riverwash** is unstabilized sandy, silty, clayey, or gravelly sediment that is flooded, washed, and reworked frequently by rivers.

**Rock outcrop** consists of exposures of bare bedrock other than lava flows and rock-lined pits. If needed, map units can be named according to the kind of rock: Rock outcrop, chalk; Rock outcrop, limestone; Rock outcrop, gypsum. Many rock outcrops are too small to be delineated as

---

[2] Lava flows in very wet climates that support a nearly continuous plant cover, even though the amount of fine earth is small, are classified as soil and not as lava flows. Some soils of this kind have been in place for less than 100 years.

BLM_0064478

areas on soil maps but can be shown by spot symbols. Some areas are large, broken by only
small areas of soil. Most rock outcrops are hard rock, but some are soft.

**Rubble land** consists of areas of cobbles, stones, and boulders. Rubble land is commonly at
the base of mountains but some areas are deposits of cobbles, stones, and boulders left on
mountainsides by glaciation or by periglacial processes.

**Salt flats** are undrained flats that have surface deposits of crystalline salt overlying stratified
very strongly saline sediment. These areas are closed basins in arid regions. The water table may
be near the surface at times.

**Scoria land** consists of areas of slag like clinkers, burned shale, and fine-grained sandstone
remaining after coal beds burn out.(Scoria land should not be confused with volcanic slag.)

**Slickens** are accumulations of fine-textured material, such as that separated in placer-mine
and ore-mill operations. Slickens from ore mills consist largely of freshly ground rock that
commonly has undergone chemical treatment during the milling process. Slickens are usually
confined in specially constructed basins.

**Slick spots** are areas having a puddled or crusted, very smooth, nearly impervious surface.
The underlying material is dense and massive. The material ranges from extremely acid to very
strongly alkaline and from sand to clay.

**Urban land** is land mostly covered by streets, parking lots, buildings, and other structures of
urban areas.

**Water** includes streams, lakes, ponds, and estuaries that in most years are covered with
water at least during the period warm enough for plants to grow; many areas are covered
throughout the year. Pits, blowouts, and playas that contain water most of the time are mapped as
Water.

## Records and Definitions of Soil Taxa

Keeping definitions and names of soil taxa up to date is essential for identification of map units,
for correlation of soils nationwide, and for transfer of information about soils at one place to
similar kinds of soil elsewhere.

Definitions and names of soil taxa can be kept by different methods. The methods used are
modified from time to time. Some kind of centralized system is needed to obtain a nationwide
perspective, to maintain standards for defining soil taxa, to assemble field and laboratory data,
and to disseminate information to the field.

### Soil Series Definitions

Soil series are used for naming most map units of soil surveys in the United States. Over time,
the concepts of the series category and of individual series have changed, but more than 16,000
series are now defined and named. These definitions are the framework within which most of the
detailed information about soils of the United States is identified with soils at specific places.
These definitions also provide the principal medium through which detailed information about
the soil and its behavior at one place is projected to similar soils at other places.

Rigorous standards for definitions of soil series ensure that names and descriptions for the
same kinds of soils are consistent from survey to survey. Consistency is a major objective of the
correlation process. The classes of the soil series category are not static. As new knowledge is
acquired, definitions of some established series must be modified. New series are defined for

BLM_0064479

newly recognized kinds of soils. Changes in criteria or limits of taxa in higher categories often require modification of definitions of member series.

Keeping records of series names and updating definitions of series is a continuing process. The changes should be accomplished in ways that detract the least from the predictive value associated with the earlier definitions and names. A centralized system for keeping records of soil series names and definitions ensures that names and definitions of soil series meet the rigorous standards needed in a national soil survey program.

**Official soil series descriptions.**—Each soil series must be defined as fully and accurately as existing knowledge permits. This applies to proposed soil series used in an individual survey as well as to established series. To ensure the inclusion of essential information and to permit comparison of series definitions, a standard format for recording specific kinds of information is used.

Official soil series descriptions record definitions of soil series and other relevant information about each series. The format, the kind, and the amount of detail may change from time to time, but detailed definition and a series interpretation record are essential. General, descriptive information is also needed to aid the reader in identifying the soil in the landscape and relating it to other kinds of soil.

An official soil series description should include at least the following:

1. Full taxonomic name of the family taxon for which it is a member. This indicates the classes that provide limits of properties that are diagnostic for the series at all categorical levels, except for those between series of the same family.

2. A description of a typical pedon and its horizons, describing each in as much detail as necessary to recognize its taxonomic class. Horizons that are diagnostic for the pedon must be described.

3. A statement of the ranges of properties of the series. This section also contains statements about the relationship of the series control section and diagnostic horizons to vertical subdivisions of the typical pedon.

4. A statement distinguishing the series from "competing series" with which it might be confused. Competing series are mainly those that share common limits with the series described or are members of the same family.

5. A statement that identifies at least one specific place that represents a norm for the series—a "type location." A type location should be described accurately enough so that it can be located in the field.

Descriptive parts of an official soil series description are not required to define the series, but they aid the reader. All parts are not equally important for all soils. Many descriptions include the following:

1. Landform and physiographic position of the series, including its position relative to other landscape elements with which it is associated.

2. Evolution of the landscape. Influences of the soil-forming factors on the genesis of the series should be identified.

3. Parent-material: The kind of mineral or organic material in which the soil formed, including kinds of rock from which the regolith was derived if that can be determined.

BLM_0064480

4.  Drainage of the soil by drainage class or other means of description relative to soil moisture regimes. Seasonal wetness or dryness may be important.

5.  Other kinds of soil with which the series is closely associated geographically.

6.  Major uses of the soil and dominant kinds of vegetation that grow on it. Native plants are identified, if known.

7.  Rationale for classification. Implicit assumptions related to family classification may be described when laboratory data are not available.

8.  Distribution and extent: the known geographic distribution and whether the soil occupies a large, small, or intermediate aggregate area.

9.  Year and the survey area where the series was proposed or established.

10. Name of the person who prepared and approved the series description and the date it was prepared or approved.

11. References to available laboratory data.

12. Interpretations for common uses of the soil. [3]

## Other Taxa

Soil series identified in individual surveys are classified in specific taxa of higher categories. The limits of most properties of soil series are set by the limits of the higher taxa in which they are classified. Soil Taxonomy (Soil Survey Staff, 1975) is the basic reference book for identification, classification, nomenclature, and correlation of kinds of soils for categories above the series.

During a survey, the taxonomic system is tested and retested many times. The results of these tests are reported at field reviews and at the field correlation. Problems in mapping or identifying soils and inconsistencies between the system and observed properties of the soils are recorded in field review reports and correlation memoranda. After appraising these reports, supervisory soil scientists call any inadequacies to the attention of the office responsible for keeping the system up to date.

## Orders of Soil Surveys

All soil surveys are made by examining, describing, and classifying soils in the field and delineating their areas on maps. Some surveys are made to serve users who need precise information about the soil resources of areas a few hectares or less in size. These surveys require refined distinctions among small, homogeneous areas of soil. Others are made for users who need a broad perspective of heterogeneous, but distinctive, areas of thousands of hectares. A soil survey made for one group of users may not serve the other group well.

The elements of a soil survey can be adjusted to provide the most useful product for the intended purposes. Different intensities of field study, different degrees of detail in mapping,

---

[3] Methods and conventions for developing and displaying soils series interpretations will be described in chapter 6.

different phases or levels of abstraction in defining and naming map units, and different map unit designs produce a wide range of soil surveys. Adjustments in these elements form the basis for differentiating five orders of soil surveys (table 2-1).

Recognition of these different levels of detail is helpful for communicating about soil surveys and maps, even though the levels cannot be sharply separated from each other. The orders are intended to aid in the identification of the operational procedures used to conduct a soil survey. They also indicate general levels of the quality control that is applied during the survey. These levels affect the kind and precision of subsequent interpretations and predictions. The orders differ in the following elements:[4]

I.   The soil survey legend, including

- the kinds of map units: consociations, complexes, associations, and undifferentiated groups, and

- the kinds of soil taxa for identifying the map units: soil series, families, subgroups, great groups, suborders, orders, and phases of them;

II.  The standard for purity of delineated soil areas, including

- the minimum area of a limiting dissimilar soil that must be delineated separately and thus excluded from areas identified as another kind of soil, and

- the maximum percentage of limiting dissimilar inclusions that is permissible in a map unit;

III. The field operations necessary to identify and delineate areas of the map units within prescribed standards of purity; and

IV.  The minimum map scale required to accommodate the map units of the legend, the standards of purity, and the map detail justified by field methods.

---

[4] "Delineations", "map units", "complex", "consociation", "association", "group", "similar soils", "dissimilar soils", "limiting dissimilar soils", and "inclusion" are explained in chapter 2. Soil survey legends, maps, and map scales are discussed in chapter 4. Chapter 5 explains information-recording procedures. The levels of soil classifications are explained in chapter 5 of *Soil Taxonomy*.

BLM_0064482

**Table 2-1.  Key for Identifying Kinds of Soil Surveys**

| Level of data needed | Field procedures | Minimum-size delineation (hectares)[1] | Typical components of map units[2] | Kind of map units | Appropriate scales for field mapping and publications |
|---|---|---|---|---|---|
| **1st order -** Very intensive (i.e., experimental plots or individual building sites.) | The soils in each delineation are identified by transecting or traversing. Soil boundaries are observed throughout their length. Remotely sensed data are used as an aid in boundary delineation. | 1 or less | Phases of soil series, miscellaneous areas. | Mostly consociations, some complexes, miscellaneous areas. | 1:15,840 or larger |
| **2nd order -** Intensive (e.g. general agriculture, urban planning.) | The soils in each delineation are identifies by field observations and by remotely sensed data. Boundaries are verified at closely spaced intervals. | 0.6 to 4 | Phases of soil series, miscellaneous areas, few named at a level above the series. | Consociations, complexes; few associations and undifferentiated groups. | 1:12,000 to 1:31,680 |
| **3rd order -** Extensive (i.e., range or community planning.) | Soil boundaries plotted by observation and interpretation of remotely sensed data. Soil boundaries are verified by traversing representative areas and by some transects. | 1.6 to 16 | Phases of soil series or taxa above the series; or miscellaneous areas. | Mostly associations or complexes, some consociations and undifferentiated groups. | 1:20,000 to 1:63,360 |
| **4th order -** Extensive (e.g., general soil information for broad statements concerning land-use potential and general land management.) | Soil boundaries plotted by interpretation of remotely sensed data. Boundaries are verified by traversing representative areas and by some transects. | 16 to 252 | Phases of soil series or taxa above the series or miscellaneous areas. | Mostly associations; some complexes, consociations and undifferentiated groups. | 1:63,360 to 1:250,000 |
| **5th order -** Very extensive (e.g., regional planning, selections of areas for more intensive study.) | The soil patterns and composition of map units are determined by mapping representative ideas and like areas by interpretation of remotely sensed data. Soils verified by occasional onsite investigation or by traversing. | 252 to 4,000 | Phases of levels above the series, miscellaneous areas. | Associations; some consociations and undifferentiated groups. | 1:250,000 to 1:1,000,000 or smaller |

[1]This is about the smallest delineation allowable for readable soil maps (see Table 2-2). In practice, the minimum-size delineations are generally larger than the minimum-size shown.

[2]Where applicable, all kinds of map units (consociations, complex, associations, undifferentiated) can be used in any order of soil survey.

BLM_0064483

*Mapping legends* are designed to provide the degree of refinement of map units required by the objectives of the survey. A map unit can be identified as a consociation (an area dominated by a soil of a single taxon such as a series or a suborder) or as a group (geographic mixture) of taxa, such as associations or complexes. A group may be more heterogeneous, and less refined, than a consociation at the same level of classification. A soil series has a much more narrowly defined set of soil properties than a suborder; and, therefore, it is a more refined distinction. Thus, phases of soil series are used as map units if users need more precise information about small areas of soils. Phases of any category in *Soil Taxonomy* might be used as soil map units if a very broad perspective of the soil resources of very large areas is needed.

Standards of *purity* are adjusted according to the precision required by the survey objectives. Probably all delineations contain some kinds of soil besides that identified in the map unit name. These inclusions reduce purity. Different kinds of inclusions, however, have different effects on the value of the map for use. The inclusions that most detract from purity are those that are distinctly more limiting for use than the named soil. These are called limiting dissimilar soils. Not only the amount of such limiting soils but also the size of their individual areas is important. Soil survey standards for both are set at levels that do not seriously detract from the validity of interpretations based on the named soil.

Standards of purity are attained by adjusting the field operations. If the standards require that areas of limiting dissimilar soils as small as 0.1 ha be delineated, for example, the area must be traversed at intervals close enough to find areas that small and the soil must be examined at enough places along each traverse to detect them.

The *map scale* must be large enough to allow areas of minimum size to be delineated legibly. Figure 2-4 illustrates the effect of scale on legibility of maps.

The choice of map scale also depends on the perspective of the user. Users who need precise information about small areas focus their attention on a small part of the map and on a relatively few delineations. They are not distracted by boundaries and symbols on other parts of the map. Consequently, the map scale can be the smallest that will permit legible delineation of the pertinent areas.

Map users who want a broad perspective of large areas, however, are usually concerned with comparisons among delineations of all, or a large part, of the map. Consequently, delineations on maps for such uses are generally larger and fewer in number.

Table 2-2 shows the relationships between map scales and the smallest delineations that can be made legibly at those scales. The difference between the smallest delineation that could be made and the smallest that is commonly made increases as map scale decreases.

The order of a survey is a consequence of field procedures, the minimum size of delineation, and the kinds of map units that are used. Table 2-1 is a key for identifying orders of soil surveys.

*First-order* surveys are made for very intensive land uses requiring very detailed information about soils, generally in small areas. The information can be used in planning for irrigation, drainage, truck crops, citrus or other specialty crops, experimental plots, individual building sites, and other uses that require a detailed and very precise knowledge of the soils and their variability.

Field procedures permit observation of soil boundaries throughout their length. The soils in each delineation are identified by traversing and transecting. Remotely sensed data are used as an aid in boundary delineation. Map units are mostly consociations with few complexes and are phases of soil series or are miscellaneous areas. Some map units named at a categorical level above the series may be appropriate. Delineations have a minimum size of about 1 hectare (2.5

BLM_0064484

**FIGURE 2-4**



Copies of the same map at different scales: A, 1:21,120; B, 1:31,680; C, 1:63,360 (equivalent to 3, 2, and 1 inch equals one mile, respectively). The numbers within individual delineations are the acreages of the areas represented (1 acre equals 0.40 hectares).

acres) or less, depending on scale, and contain a minimum amount of contrasting inclusions within the limits permitted by the kind of map unit used. Base map scale is generally 1:15,840 or larger.

*Second-order* surveys are made for intensive land uses that require detailed information about soil resources for making predictions of suitability for use and of treatment needs. The information can be used in planning for general agriculture, construction, urban development, and similar uses that require precise knowledge of the soils and their variability.

Case No. 1:20-cv-02484-MSK   Document 47-9   filed 04/28/21   USDC Colorado   pg 209 of 218

**Table 2-2.  Guide to Map Scale and Minimum Delineation Size**

| Map scale | Inches per mile | Minimum size delineation[1] | |
|---|---|---|---|
| | | acres | hectares |
| 1:500 | 126.7 | 0.0025 | 0.001 |
| 1:2,000 | 31.7 | 0.040 | 0.016 |
| 1:5,000 | 12.7 | 0.25 | 0.10 |
| 1:7,920 | 8.00 | 0.62 | 0.25 |
| 1:10,000 | 6.34 | 1.00 | 0.41 |
| 1:12,000 | 5.28 | 1.43 | 0.57 |
| 1:15,840 | 4.00 | 2.5 | 1.0 |
| 1:20,000 | 3.17 | 4.0 | 1.6 |
| 1:24,000 (7 1/2') | 2.64 | 5.7 | 2.3 |
| 1:31,680 | 2.00 | 10.0 | 4.1 |
| 1:62,500 (15') | 1.01 | 39.0 | 15.8 |
| 1:63,360 | 1.00 | 40.0 | 16.2 |
| 1:100,000 | 0.63 | 100.0 | 40.5 |
| 1:125,000 | 0.51 | 156.0 | 63.0 |
| 1:250,000 | 0.25 | 623.0 | 252.0 |
| 1:300,000 | 0.21 | 897.0 | 363.0 |
| 1:500,000 | 0.127 | 2,500.0 | 1,000.0 |
| 1:750,000 | 0.084 | 5,600.0 | 2,270.0 |
| 1:1,000,000 | 0.063 | 10,000.0 | 4,000.0 |
| 1:5,000,000 | 0.013 | 249,000.0 | 101,000.0 |
| 1:7,500,000 | 0.0084 | 560,000.0 | 227,000.0 |
| 1:15,000,000 | 0.0042 | 2,240,000.0 | 907,000.0 |
| 1:30,000,000 | 0.0021 | 9,000,000.0 | 3,650,000.0 |
| 1:88,000,000 | 0.0007 | 77,000,000.0 | 31,200,000.0 |

[1] The "minimum size delineation" is taken as a 6-mm square area (1/16 sq. in.). Cartographically, this is about the smallest area in which a symbol can be printed readily. Smaller areas can be delineated, and the symbol lined in from outside; but such small delineations reduce map legibility. On maps at the smaller scales, delineations are commonly 1 1/2 to 2 times the size of the minimum area that can be shown.

BLM_0064486

Field procedures permit plotting of soil boundaries by observation and by interpretation of remotely sensed data. Boundaries are verified at closely spaced intervals, and the soils in each delineation are identified by traversing and in some map units by transecting. Map units are mostly consociations and complexes. Occasionally undifferentiated groups or associations are also used. Components of map units are phases of soil series or phases of miscellaneous areas; map units named at a categorical level above the series can be used. Delineations are variable in size with a minimum of 0.6 to 4 hectares (1.5 to 10 acres), depending on landscape complexity and survey objectives. Contrasting inclusions vary in size and amount within the limits permitted by the kind of map unit used. Base map scale is generally 1:12,000 to 1:31,680, depending on the complexity of the soil pattern within the area.

*Third-order* surveys are made for land uses that do not require precise knowledge of small areas or detailed soils information. Such survey areas are usually dominated by a single land use and have few subordinate uses. The information can be used in planning for range, forest, recreational areas, and in community planning.

Field procedures permit plotting of most soil boundaries by observation and interpretation of remotely sensed data. Boundaries are verified by some field observations. The soils are identified by traversing representative areas and applying the information to like areas. Some additional observations and transects are made for verification. Map units include associations, complexes, consociations, and undifferentiated groups. Components of map units are phases of soil series, taxa above the series, or they are miscellaneous areas. Delineations have a minimum size of about 1.6 to 16 hectares (4 to 40 acres), depending on the survey objectives and complexity of the landscapes. Contrasting inclusions vary in size and amount within the limits permitted by the kind of map unit used. Base map scale is generally 1:20,000 to 1:63,360, depending on the complexity of the soil pattern and intended use of the maps.

*Fourth-order* surveys are made for extensive land uses that need general soil information for broad statements concerning land-use potential and general land management. The information can be used in locating, comparing, and selecting suitable areas for major kinds of land use, in regional land-use planning, and in selecting areas for more intensive study and investigation.

Field procedures permit plotting of soil boundaries by interpretation of remotely sensed data. The soils are identified by traversing representative areas to determine soil patterns and composition of map units and applying the information to like areas. Transects are made in selected delineations for verification. Most map units are associations, but some consociations and undifferentiated groups may be used in some surveys. Components of map units are phases of soil series, of taxa above the series, or are miscellaneous areas. Minimum size of delineations is at least 16 to 252 hectares (40 to 640 acres). Contrasting inclusions vary in size and amount within the limits permitted by the kind of map unit used. Base map scale is generally 1:63,360 to 1:250,000.

*Fifth-order* surveys are made to collect soils information in very large areas at a level of detail suitable for planning regional land use and interpreting information at a high level of generalization. The primary use of this information is selection of areas for more intensive study.

Field procedures consist of mapping representative areas of 39 to 65 square kilometers (15 to 25 square miles) to determine soil patterns and composition of map units. This information is then applied to like areas by interpretation of remotely sensed data. Soils are identified by a few onsite observations or by traversing. Most map units are associations, but some consociations and undifferentiated groups may be used. Components of map units are phases of taxa at categorical levels above the series and miscellaneous areas. Minimum size of delineations is

about 252 to 4,000 hectares (640 to 10,000 acres). Contrasting inclusions vary in size and amount within the limits permitted by the kind of map unit used. Base-map scale ranges from about 1:250,000 to 1:1,000,000 or smaller.

**Two Orders of Soil Survey in the Same Project**

Some soil survey areas have two or more separate and distinct parts that have different needs. For example, one part may be mapped to make predictions that pertain to irrigation, but the other may be mapped to make predictions that relate to range management. The irrigated part should be mapped at the intensity required for a second-order soil survey, and map units are mostly consociations of narrowly defined phases of soil series. The part used for grazing, however, can be mapped as a third-order survey and uses associations, complexes, and some consociations of more broadly defined phases of soil series or of taxa above the series. Some map units of the two parts will consist of the same kinds of soil, but great care is exercised to ensure that map units for the two different orders of soil survey maps do not have the same names or symbols.

Large, separate, and distinct areas that are within the same project but surveyed by different methods should be distinguished clearly by boundaries on the published soil map or on a small-scale inset map. Each part is identified by a note printed parallel to the line separating the areas of each survey order. The two parts have separate legends. The parts are considered as distinctly different orders of soil survey, but the results are reported in the same publication. The same or different map scales may be used for the different survey orders, depending on the intended uses.

Many 2nd-order surveys delineate some map units by methods that are less intensive, even though the areas mapped at different intensities are intermingled on the map. For example, within an otherwise detailed soil map, the delineations of very steep or very stony soils are commonly investigated at the intensity normally used in a third-order survey. This is discussed in soil survey procedures.

Still other soil surveys include areas consisting of two or more distinctive soils that could be mapped separately by detailed soil survey methods; however, the cost of making the separation cannot be justified. For example, a survey area that is mostly productive soils suitable for general farming may contain large areas of unproductive sandy soils covered with thick brush. Although the sandy areas contain contrasting kinds of soil that could be delineated separately, the cost of detailed mapping to separate the two kinds of soils may exceed the expected return. The outer boundaries of the sandy areas are plotted in as much detail and with as careful investigations as any other boundaries of the soil survey, but the sandy areas themselves are mapped by third- or fourth-order methods. Traverses are made, and the composition of the areas is defined in terms of the kinds, proportions, and patterns of the individual soils. The delineations are described in the text of the published soil survey as soil associations mapped by methods of the appropriate survey order.

## Soil Maps Made by Other Methods

Although most soil maps published in the United States by the National Cooperative Soil Survey are made by field investigations, some are compiled from other sources. These kinds of soil maps are described in the following sections.

BLM_0064488

## Generalized Soil Maps

Some users need soils information about areas larger than individual fields or tracts, as large as perhaps several square kilometers, but a detailed map tends to obscure the broad relationships. Generalized soil maps are made to reveal geographic relationships that cannot be seen readily on detailed maps. Most soil survey reports include a general soil map for the area. The scale of these maps depends on the intended uses.

Generalized soil maps are made by combining the delineations of existing soil survey maps to form broader map units. Scrutiny of a detailed map usually will find large areas in which a few soil series, commonly two or three, are consistently associated. A detailed map is generalized by enclosing those larger areas within which a few kinds of soil predominate in relatively consistent proportions and patterns. These larger areas are described in terms of the dominant soils. The map is interpreted to show the combined effects of the constituent soils of each map unit.

Some of the possible uses for generalized soil maps are for appraising the basic soil resources of whole counties, for assisting farm advisors in the geographic emphasis of their educational programs, and for guiding commercial interests. Increasingly, these maps are compiled for county and regional land-use planning. Other possible uses include predicting the general suitability of large areas of soils for residential, recreational, wildlife, and other nonfarm uses, as well as for agriculture. Suggesting alternative routes for roads and pipelines where the least problems with soils are expected is also a potential use. The information in generalized soil maps may be useful as one basis for zoning.

Soil maps that are already less detailed can be generalized further for purposes that require very broad perspective. For example, 4th-order soil surveys for individual counties at scales of less than 1:250,000 can be combined and generalized to provide maps of States or regions at a scale of 1:1,000,000 or smaller. Soil maps that show the soils of areas of a few square kilometers can be converted to maps having delineations of a few hundred square kilometers, or more. Areas defined as associations of soil series or their phases are combined in this process into larger areas that can be defined in terms of associations of taxa at higher categories. These broad soil associations can be divided into phases to specify ranges in physiography, soil texture, or other features if such distinctions are useful. Soil maps at such levels of abstraction are designed for very broad regional planning and other uses that focus on areas of hundreds of square kilometers.

## Schematic Soil Maps

Schematic soil maps are also compiled, but they differ from generalized soil maps in being compiled from information other than pre-existing soil maps. Scale is commonly 1:1,000,000 or smaller, although useful maps are sometimes made at larger scales. Schematic soil maps are commonly made as a preliminary step to locate areas where further investigation is justified. For many areas, especially in undeveloped regions, a schematic soil map is useful in advance of an organized field survey. Some maps serve as the only source of soils information in areas where more intensive studies are not feasible.

Schematic soil maps are made by using many sources of information to predict the geographic distribution of different kinds of soil. First, all available data are assembled. Information about climate, vegetation, geology, landforms, and other factors related to soil are gathered and studied. Data obtained by remote sensing techniques, including aerial photography,

BLM_0064489

may provide useful information. Any available information about the soil is used to the extent justified by its quality. Some soils information exists for most parts of the world, but in wild areas the information may be mainly notes by travelers and rough maps interpreted from aerial photographs without verification on the ground.

Schematic soil maps merge with 5th-order (exploratory) soil surveys without a sharp line of distinction.

A soil is the unique result of five interrelated factors: *climate* and *living organisms*, conditioned by *relief (topography)*, acting on parent material for periods of time. If good geographic data about these factors are available, good soil maps can be compiled by experienced soil scientists who are familiar with the combinations of factors that produce the different kinds of soils. The amount of detail and verification by field investigation depends upon the purpose and intended use of the soil survey.



**CHAPTER**

# 3

# Examination and Description of Soils

**A** description of the soils is essential in any soil survey. This chapter provides standards and guidelines for describing most soil properties and for describing the necessary related facts. For some soils, standard terms are not adequate and must be supplemented by a narrative. The length of time that cracks remain open, the patterns of soil temperature and moisture, and the variations in size, shape, and hardness of clods in the surface layer must be observed over time and summarized.

This chapter does not include a discussion of every possible soil property. For some soils, other properties need to be described. Good judgment will decide what properties merit attention in detail for any given pedon (sampling unit). Observations must not be limited by preconceived ideas about what is important.

Although the format of the description and the order in which individual properties are described are less important than the content of the description, a standard format has distinct advantages. The reader can find information more rapidly, and the writer is less likely to omit important features. Furthermore, a standard format makes it easier to code data for automatic processing. If forms are used, they must include space for all possible information. Formats for recording and retrieving information about pedons will be discussed in more detail in chapter 5.

Each investigation of the internal properties of a soil is made on a soil body of some dimensions. The body may be larger than a pedon or represent a portion of a pedon. During field operations, many soils are investigated by examining the soil material removed by a sampling tube or an auger. For rapid investigations of thin soils, a small pit can be dug and a section of soil removed with a spade. All of these are samples of pedons. Knowledge of the internal properties of a soil is derived mainly from studies of such samples. They can be studied more rapidly than entire pedons; consequently, a much larger number can be studied in many more places. For many soils, the information obtained from such a small sample describes the pedon from which it is taken with few omissions. For other soils, however, important properties of a pedon are not observable in the smaller sample, and detailed studies of entire pedons may be needed. Complete study of an entire pedon requires the exposure of a vertical section and the removal of horizontal sections layer by layer. Horizons are studied in both horizontal and vertical dimensions.

## Some General Terms Used in Describing Soils

Several of the general terms for internal elements of the soil are described here; other more specific terms are described or defined in the following sections.

A <u>soil profile</u> is exposed by a vertical cut through the soil. It is commonly conceived as a plane at right angles to the surface. In practice, a description of a soil profile includes soil

BLM_0064491

properties that can be determined only by inspecting volumes of soil. A description of a pedon is commonly based on examination of a profile, and the properties of the pedon are projected from the properties of the profile. The width of a profile ranges from a few decimeters to several meters or more. It should be sufficient to include the largest structural units.

A <u>soil horizon</u> is a <u>layer</u>, approximately parallel to the surface of the soil, distinguishable from adjacent layers by a distinctive set of properties produced by the soil-forming processes. The term layer, rather than horizon, is used if all of the properties are believed to be inherited from the parent material or no judgment is made as to whether the layer is genetic.

The <u>solum</u> (plural, <u>sola</u>) of a soil consists of a set of horizons that are related through the same cycle of pedogenic processes. In terms of soil horizons described in this chapter, a solum consists of A, E, and B horizons and their transitional horizons and some O horizons. Included are horizons with an accumulation of carbonates or more soluble salts if they are either within, or contiguous, to other genetic horizons and are judged to be at least partly produced in the same period of soil formation. The solum of a soil presently at the surface, for example, includes all horizons now forming. It includes a bisequum (to be discussed). It does not include a buried soil or a layer unless it has acquired some of its properties by currently active soil-forming processes. The solum of a soil is not necessarily confined to the zone of major biological activity. Its genetic horizons may be expressed faintly to prominently. A solum does not have a maximum or a minimum thickness.

Solum and soils are not synonymous. Some <u>soils</u> include layers that are not affected by soil formation. These layers are not part of the solum. The number of genetic horizons ranges from one to many. An A horizon that is 10 cm thick overlying bedrock is by itself the solum. A soil that consists only of recently deposited alluvium or recently exposed soft sediment does not have a solum.[1]

In terms of soil horizons described in this chapter, a solum consists of A, E, and B horizons and their transitional horizons and some O horizons. Included are horizons with an accumulation of carbonates or more soluble salts if they are either within, or contiguous, to other genetic horizons and are judged to be at least partly produced in the same period of soil formation.

The lower limit, in a general sense, in many soils should be related to the depth of rooting to be expected for perennial plants assuming that water state and chemistry are not limiting. In some soils the lower limit of the solum can be set only arbitrarily and needs to be defined in relation to the particular soil. For example, horizons of carbonate accumulation are easily visualized as part of the solum in many soils in arid and semiarid environments. To conceive of hardened carbonate accumulations extending for 5 meters or more below the B horizon as part of the solum is more difficult. Gleyed soil material begins in some soils a few centimeters below the surface and continues practically unchanged to a depth of many meters. Gleying immediately below the A horizon is likely to be related to the processes of soil formation in the modern soil. At great depth, gleying is likely to be relict or related to processes that are more geological than pedological. Much the same kind of problem exists in some deeply weathered soils in which the

---

[1] As much as 50 cm of recently deposited sediment is disregarded in classifying the underlying set of genetic horizons (Soil Taxonomy). These thin deposits are not part of the solum bat may be otherwise important. By the same convention, a soil is not considered to be buried (*Soil Taxonomy*) unless there is at least 50 cm of overlying sediment that has no genetic horizons in the lower part.

Case No. 1:20-cv-02484-MSK   Document 47-9   filed 04/28/21   USDC Colorado   pg 216 of 218

deepest material penetrated by roots is very similar to the weathered material at much greater depth.

For some soils, digging deep enough to reveal all of the relationships between soils and plants is not practical. Roots of plants, for example, may derive much of their moisture from fractured bedrock close to the surface. Descriptions should indicate the nature of the soil-rock contact and as much as can be determined about the upper part of the underlying rock.

A <u>sequum</u> (plural, <u>sequa</u>) is a B horizon together with any overlying eluvial horizons. A single sequum is considered to be the product of a specific combination of soil-forming processes.

Most soils have a single sequum, but some have two or more. A Spodosol, for example, can form in the upper part of an Alfisol, producing an eluviated zone and a spodic horizon underlain by another eluviated zone overlying an argillic horizon. Such a soil has two sequa. Soils in which two sequa have formed, one above the other in the same deposit, are said to be <u>bisequal</u>.

If two sequa formed in different deposits at different times, the soil is not bisequal. For example, a soil having an A-E-B horizon sequence may form in material that was deposited over another soil that already had an A-E-B horizon sequence. Each set of A-E-B horizons is a sequum but the combination is not a bisequum. The lower set is a <u>buried soil</u>. If the horizons of the upper sequum extend into the underlying sequum, the affected layer is considered part of the upper sequum. For example, the A horizon of the lower soil may retain some of its original characteristics and also have some characteristics of the overlying soil. Here, too, the soils are not considered bisequal; the upper part of the lower soil is the parent material of the lower part of the currently forming soil. In many soils the distinction cannot be made with certainty. Nevertheless, the distinction is useful when it can be made. Where some of the C material of the upper sequum remains, the distinction is clear.

## Studying Pedons

Pedons representative of an extensive mappable area are generally more useful than pedons that represent the border of an area or a small inclusion.

For a soil description to be of greatest value, the part of the landscape that the pedon represents and the vegetation should be described. This is referred to as the setting. The level of detail will depend on the objectives. A complete setting description should include information about the encompassing polypedon and, possibly, the polypedons conterminous with the encompassing polypedon (Soil Survey Staff, 1975). Furthermore, the setting may include information about the portion of the polypedon that differs from the central concept of the polypedon.

The description of a body of soil in the field, whether an entire pedon or a sample within it, should record the kinds of layers, their depth and thickness, and the properties of each layer. Generally, external features are observed throughout the extent of the polypedon; internal features are observed from the study of a pedon or that part of a pedon that is judged to be representative of the polypedon (see appendix).

A pedon for detailed study of a soil is tentatively selected and then examined preliminarily to verify that it represents the desired segment of its range.

A pit exposing a vertical face approximately 1 meter across to an appropriate depth is satisfactory for most soils. [2]

After the sides of the pit are cleaned of all loose material disturbed by digging, the exposed vertical faces are examined, usually starting at the top and working downward, to identify significant changes in properties. Boundaries between layers are marked on the face of the pit, and the layers are identified and described.

Photographs should be taken (ch. 5) after the layers have been identified but before the vertical section is disturbed in the description-writing process. A point-count for estimation of the volume of stones or other features also is done before the layers are disturbed.

A horizontal view of each layer is useful. This exposes structural units that otherwise may not be observable. Patterns of color within structural units, variations of particle size from the outside to the inside of structural units, and the pattern in which roots penetrate structural units are often seen more clearly in a horizontal section.

Excavations associated with roads, railways, gravel pits, and other soil disturbances provide easy access for studying soils; old exposures, however, must be used cautiously. The soils dry out or freeze and thaw from both the surface and the sides. Frequently, the soil structure in such excavations is more pronounced than is typical; salts may accumulate near the edges of exposures or be removed by seepage; and other changes may have taken place.

## Depth to and Thickness of Horizons and Layers

Depth is measured from the soil surface. The soil surface is the top of the mineral soil; or, for soils with an 0 horizon, the soil surface is the top of the part of the 0 horizon that is at least slightly decomposed. Fresh leaf or needle fall that has not undergone observable decomposition is excluded from soil and may be described separately. The top of any surface horizon identified as an O horizon, whether Oi, Oe, or Oa, is considered the soil surface.

For soils with a cover of 80 percent or more rock fragments on the surface, the depth is measured from the surface of the rock fragments.

The depth to a horizon or layer boundary commonly differs within short distances, even within a pedon. The part of the pedon that is typical or most common is described. In the soil description, the horizon or layer designation is listed and is followed by the values that represent the depths from the soil surface to the upper and lower boundaries, in that order. The depth to the lower boundary of a horizon or layer is the depth to the upper boundary of the horizon or layer beneath it. The variation in the depths of the boundaries is recorded in the description of the horizon or layer. The depth limits of the deepest horizon or layer described include only that part actually seen.

In some soils the variations in depths to boundaries are so complex that usual terms for description of topography of the boundary are inadequate. These variations are described separately. For example, "depth to the lower boundary is mainly 30 to 40 cm, but tongues extend to depths of 60 to 80 cm." The lower boundary of horizon or layer and the upper boundary of the horizon or layer below share a common irregularity.

---

[2] For soils having cyclic horizons or layers recurring at intervals between 2 m and 7 m, a pit large enough to study at least one half of the cycle is necessary.

Case No. 1:20-cv-02484-MSK   Document 47-9   filed 04/28/21   USDC Colorado   pg 218 of 218

The thickness of each horizon or layer is the vertical distance between the upper and lower boundaries. Thickness may vary within a pedon, and this variation should be shown in the description. A range in thickness may be given. It cannot be calculated from the range of upper and lower boundaries but rather must be evaluated across the exposure at different lateral points. The location of upper and lower boundaries are commonly in different places. The upper boundary of a horizon, for example, may range in depth from 25 to 45 cm and the lower boundary from 50 to 75 cm. Taking the extremes of these two ranges, a wrong conclusion could be that the horizon ranges in thickness from as little as 5 cm to as much as 50 cm.

## Land Surface Configuration

Land surface configuration considered here is geometrical and includes <u>soil slope</u> and <u>land surface shape</u>. Landform from a morphogenetic aspect is not considered. It may be applicable to a pedon or to a larger area.

Land surface configuration and relief are quite different as used here, although the meanings may be similar in other contexts. <u>Relief</u>, in this context, refers to the elevation or differences in elevation above mean sea level, considered collectively, of a land surface on a broad scale. Elevation can be determined from topographic maps or by using a calibrated altimeter.

## Soil Slope

<u>Slope</u> has a scale connotation. It refers to the ground surface configuration for scales that exceed about 10 meters and range upward to the landscape as a whole. Slope has gradient, complexity, length, and aspect. The scale of reference commonly exceeds that of the pedon and should be indicated. The scale may embrace a map unit delineation, component of it, or an arbitrary area.

<u>Slope gradient</u> is the inclination of the surface of the soil from the horizontal. It is generally measured with a hand level. The difference in elevation between two points is expressed as a percentage of the distance between those points. If the difference in elevation is 1 meter over a horizontal distance of 100 meters, slope gradient is 1 percent. A slope of 45° is a slope of 100 percent, because the difference in elevation between two points 100 meters apart horizontally is 100 meters on a 45° slope.

<u>Overland flow gradient</u> is the slope of the soil surface in the direction of flow of surface water if it were present. The following examples show equivalences between percentage gradient and degree of slope angle:

| Percentage | Angle | Angle | Percentage |
|---|---|---|---|
| 0 | 0°00′ | 0° | 0 |
| 5 | 2°52′ | 2° | 3.5 |
| 10 | 5°43′ | 4° | 7.0 |
| 15 | 8°32′ | 6° | 10.5 |
| 20 | 11°19′ | 8° | 14.0 |
| 25 | 14°02′ | 10° | 17.6 |
| 30 | 16°42′ | 12° | 21.2 |
| 35 | 19°17′ | 15° | 26.8 |
| 40 | 21°48′ | 20° | 36.4 |

BLM_0064495