

BLM_0064840



BLM_0064841

# Table of Contents

Executive Summary — xvii

Acronyms and Abbreviations — viii

Figures and Tables — xii

**1** Introduction: Collaborating on Colorado's Water Future — 1-1

**2** Colorado's Legal and Institutional Setting — 2-1
2.1 Colorado Water Law and Administration — 2-3
2.2 Interstate Compacts and Equitable Apportionment Decrees — 2-11
2.3 Colorado's Local-Control Structure — 2-21
2.4 Local, State, Tribal, and Federal Water Planning, Approval, and Permitting — 2-25
2.5 Tribal and Federal Reserved Water Right Issues within Colorado — 2-29

**3** Overview of Each Basin — 3-1

**4** Water Supply — 4-1

**5** Water Demands — 5-1

**6** Water Supply Management — 6-1
6.1 Scenario Planning and Developing an Adaptive Water Strategy — 6-3
6.2 Meeting Colorado's Water Gaps — 6-15
6.3 Water Conservation and Reuse — 6-59
6.3.1 Municipal Water Conservation — 6-61
6.3.2 Reuse — 6-75
6.3.3 Land Use — 6-83
6.3.4 Agricultural Conservation, Efficiency, and Reuse — 6-91
6.3.5 Self-Supplied Industrial Conservation & Reuse — 6-102
6.3.6 State Agency Conservation — 6-111
6.4 Alternative Agricultural Transfers — 6-115
6.5 Municipal, Industrial, and Agricultural Infrastructure Projects and Methods — 6-127
6.5.1 BIP-Identified Municipal, Industrial, and Agricultural Infrastructure Projects and Methods — 6-130
6.5.2 Agricultural Viability — 6-138
6.5.3 Storage — 6-145
6.5.4 Maintenance of Existing Projects and Methods — 6-153
6.6 Environmental and Recreational Projects and Methods — 6-157

**7** Water Resource Management and Protection — 7-1
7.1 Watershed Health and Management — 7-3
7.2 Natural Disaster Management — 7-11
7.3 Water Quality — 7-17

BLM_0064842

**8**   **Interbasin Projects and Agreements**                                                8-1

**9**   **Alignment of State Resources and Policies**                                          9-1
        **9.1**  Protecting Colorado's Compacts and Upholding Colorado Water Law              9-3
        **9.2**  Economics and Funding                                                        9-9
        **9.3**  State Water Rights and Alignment                                             9-25
        **9.4**  Framework for a More Efficient Permitting Process                            9-34
        **9.5**  Outreach, Education, and Public Engagement                                   9-53

**10**  **Critical Action Plan**                                                             10-1
        **10.1** Colorado's Water Values                                                     10-3
        **10.2** Measurable Objectives and Adaptive Management                               10-5
        **10.3** Critical Goals and Actions                                                  10-8

**11**  **Updating Colorado's Water Plan**                                                   11-1

**Appendix A**   Executive Order D2013-005                                                    A-1

**Appendix B**   How Other States Have Worked to Meet Their Gap                               B-1

**Appendix C**   Instream Flow and Natural Lake Level Examples                                C-1

**Appendix D**   Existent Watershed Plans in Colorado                                         D-1

**Appendix E**   Source Water Protection Plans in Colorado                                    E-1

**Appendix F**   Summary of Outreach, Education, and Public Engagement Activities             F-1
                 Completed During Development of Colorado's Water Plan

**Appendix G**   Organizations the CWCB Met with While Developing Colorado's Water Plan       G-1

**Appendix H**   Summary of Actions in Colorado's Water Plan                                  H-1

BLM_0064843

## Acronyms and Abbreviations

### CHAPTER 1

| | | | |
|---|---|---|---|
| IBIP | Basin Implementation Plan | IBCC | Interbasin Compact Committee |
| CWCB | Colorado Water Conservation Board | SWSI | Statewide Water Supply Imitative |

### CHAPTER 2

| | | | |
|---|---|---|---|
| BLM | U.S. Bureau of Land Management | DWR | Colorado Division of Water Resources |
| BOR | U.S. Bureau of Reclamation | EPA | Environmental Protection Agency |
| CCP | Compact Compliance Pipeline | ESA | Endangered Species Act |
| CDPHE | Colorado Department of Public Health and Environment | FERC | Federal Energy Regulatory Commission |
| CDSS | Colorado's Decision Support System | FLPMA | Federal Land Policy and Management Act |
| CEQ | Council on Environmental Quality | IBCC | Interbasin Compact Committee |
| Corps | U.S. Army Corps of Engineers | MOU | Memorandum of Understanding |
| CPW | Colorado Parks and Wildlife | NEPA | National Environmental Policy Act |
| CWA | Clean Water Act | NPS | U.S. National Park Service |
| CWCB | Colorado Water Conservation Board | RRCA | Republican River Compact Administration |
| WQCD | Colorado Water Quality Control Division | SWSI | Statewide Water Supply Initiative |
| DLG | Division of Local Governments | USFS | U.S. Forest Service |
| DNR | Department of Natural Resources | USFWS | U.S. Fish and Wildlife Services |
| DOLA | Department of Local Affairs | | |

### CHAPTER 3

| | | | |
|---|---|---|---|
| ALP | Animas-La Plata | IPP | Identified Projects and Processes |
| BIP | Basin Implementation Plan | M&I | municipal and industrial |
| BLM | U.S. Bureau of Land Management | PRRIP | Platte River Recovery Implementation Program |
| BOR | U.S. Bureau of Reclamation | SWSI | Statewide Water Supply Imitative |
| CWCB | Colorado Water Conservation Board | USFS | U.S. Forest Service |
| ESA | Endangered Species Act | | |

### CHAPTER 4

| | | | |
|---|---|---|---|
| BOR | Bureau of Reclamation | CWCB | Colorado Water Conservation Board |

### CHAPTER 5

| | | | |
|---|---|---|---|
| BIP | Basin Implementation Plan | CWCB | Colorado Water Conservation Board |
| CDPHE | Colorado Department of Public Health and Environment | EPACT | Energy Policy Act |
| GDP | gross domestic product | SWSI | Statewide Water Supply Initiative |
| IPP | Identified Projects and Processes | WQCC | Water Quality Control Commission |
| M&I | municipal and industrial | | |

BLM_0064844

## Acronyms and Abbreviations

### CHAPTER 6

| | | | | |
|---|---|---|---|---|
| AMI | Advanced Metering Infrastructure | | ISA | interruptible service agreements |
| ARR | aquifer recharge and recovery | | IWM | irrigation water management |
| ASR | aquifer storage and recharge | | IWSA | interruptible water supply agreement |
| ATM | Alternative Transfer Method | | LULA | Land Use Leadership Alliance Training |
| BIP | Basin Implementation Plan | | M&I | municipal and industrial |
| BLM | Bureau of Land Management | | MGD | million gallons per day |
| CDA | Colorado Department of Agriculture | | MW | megawatts |
| CDPHE | Colorado Deparment of Public Health and Evironment | | MWh | megawatt per hour |
| CDSS | Colorado's Decision Support Systems | | ORV | Outstandingly Remarkable Values |
| CIR | crop irrigation requirement | | P&M | projects and methods |
| CPW | Colorado Parks and Wildlife | | PBO | Programmatic Biological opinion |
| CRCA | Colorado River Cooperative Agreement | | PLT | Project Leadership Teams |
| CRCT | Colorado River cutthroat trout | | PSOP | Preferred Storage Option Plan |
| CU | consumptive use | | PUC | Public Utilities Commission |
| CWA | Clean Water Act | | RBF | river bank filtration |
| CWCB | Colorado Water Conservation Board | | RICD | recreational in-channel diversions |
| DNR | Department of Natural Resources | | RO | reverse osmosis |
| DORA | Department of Regulatory Agencies | | SECWCD | Southeastern Colorado Water Conservancy District |
| DPR | direct portable reuse | | SMP | stream management plan |
| DRCOG | Denver Regional Council of Governments | | SSI | self-supplied industrial |
| DWR | Division of Water Resources | | SWSI | Statewide Water Supply Imitative |
| EIS | Environmental Impact Statement | | TMD | transmountain diversion |
| EPA | Environmental Protection Agency | | USFS | U.S. Forest Service |
| ESA | Endangered Species Act | | USFWS | U.S. Fish and Wildlife Service |
| EQIP | Environmental Quality Incentives Program | | WEGP | Water Efficiency Grant Program |
| ET | evapotranspiration | | WFET | Watershed Flow Evaluation Tool |
| COGCC | Colorado Oil and Gas Conservation Commission | | WISE | Water Infrastructure and Supply Efficiency |
| GIS | geographic information system | | WQCC | Water Quality Control Commission |
| GPCD | gallons per capita per day | | WQCD | Water Quality Control Division |
| IBCC | Interbasin Compact Committee | | WSRA | Water Supply Reserve Account |
| IPP | Identified Projects and Processes | | ZLD | zero liquid discharge |
| IPR | indirect portable reuse | | | |

### CHAPTER 7

| | | | | |
|---|---|---|---|---|
| BIP | Basin Implementation Plan | | CWCB | Colorado Water Conservation Board |
| CDOT | Colorado Department of Transportation | | WQCD | Colorado Water Quality Control Division |

BLM_0064845

## Acronyms and Abbreviations

### CHAPTER 8

| | | | | |
|---|---|---|---|---|
| BIP | Basin Implementation Plan | | IBCC | Interbasin Compact Committee |
| BOR | Bureau of Reclamation | | SWSI | Statewide Water Supply Imitative |
| CRCA | Colorado River Cooperative Agreement | | TMD | transmountain diversion |
| CRWCD | Colorado River Water Conservation District | | WISE | Water Infrastructure and Supply Efficiency |
| CWCB | Colorado Water Conservation Board | | | |

### CHAPTER 9

| | | | | |
|---|---|---|---|---|
| AG | Attorney General | | IPP | Identified Projects and Processes |
| ATM | Alternative Transfer Method | | IT | Information Technology |
| Authority | Water Resources and Power Development Authority | | LEDPA | Least Environmentally Damaging Practicable Alternative |
| BIP | Basin Implementation Plan | | M&I | Municipal and Industrial |
| BLM | Bureau of Land Management | | MOA | memorandum of agreement |
| BMP | best management practices | | MOU | Memorandums of Understanding |
| BOR | Bureau of Reclamation | | NCWCD | Northern Colorado Water Conservancy District |
| CAWS | Collaborative Approach to Water Supply Permit Evaluation | | NEPA | National Environmental Policy Act |
| CDPHE | Colorado Department of Public Health and Environment | | NGO | nongovernmental organizations |
| CFR | Code of Federal Regulations | | NRCS | Natural Resources Conservation Service |
| CFWE | Colorado Foundation for Water Education | | P&I | principal and interest |
| CJRP | Colorado Joint Review Process | | P3 | Public-Private Partnerships |
| Corps | U.S. Army Corps of Engineers | | PEPO | Public Education, Participation, and Outreach |
| CPW | Colorado Parks and Wildlife | | ROD | Record of Decision |
| CRSP | Colorado River Storage Project | | SDS | Southern Delivery System |
| CRWAS | Colorado River Water Availability Study | | SLB | Colorado State Land Board |
| CWA | Clean Water Act | | SMWSA | South Metro Water Supply Authority |
| CWCB | Colorado Water Conservation Board | | SWIFT | State Water Implementation Fund for Texas |
| DNR | department of natural resources | | SWIRFT | State Water Implementation Revenue Fund for Texas |
| DOC | Department of Corrections | | SWSI | Statewide Water Supply Initiative |
| DORA | Department of Regulatory Affairs | | TU | Trout Unlimited |
| DWR | Division of Water Resources | | USFS | U.S. Forest Service |
| EIS | Environmental Impact Statement | | WEGP | Water Efficiency Grant Program |
| ESA | Endangered Species Act | | WET | Water Education for Teachers |
| EPA | U.S. Environmental Protection Agency | | WIFIA | Water Infrastructure Finance and Innovation Authority |
| EPAT | Extreme Precipitation Analysis Tool | | WISE | Water Infrastructure and Supply Efficiency |
| FERC | Federal Energy Regulatory Commission | | WPCRF | Water Pollution Control Revolving Fund |
| FWS | U.S. Fish and Wildlife Service | | WQCD | Colorado Water Quality Control Division |
| IBCC | Interbasin Compact Committee | | WRRC | Water Resources Review Committee |
| WRA | Western Resource Advocates | | WSRA | Water Supply Reserve Account |
| WRBP | Water Revenue Bond Program | | | |

BLM_0064846

## Acronyms and Abbreviations

### CHAPTER 10

| | | | |
|---|---|---|---|
| AGO | Colorado Attorney General's Office | DNR | Department of Natural Resources |
| ATMs | Alternative Transfer Methods | DOLA | Colorado Deparment of Local Affairs |
| BIPs | Basin Implementation Plans | DWR | Colorado Division of Water Resources |
| BRTs | Basin Roundtables | IBCC | Interbasin Compact Committee |
| CDA | Colorado Department of Agriculture | NEPA | The National Environmental Policy Act |
| CDPHE | Colorado Department of Public Health and Environment | NRCS | Natural Resources Conservation Service |
| COIN | Colorado Innovation Network | SWSI | Statewide Water Supply Initiative |
| CPW | Colorado Parks and Wildlife | WRRC | Water Resources Review Committee |
| CSU | Colorado State University | WSRA | Water Supply Reserve Account |
| CWAPA | Colorado Water and Power Authority | | |
| CWCB | Colorado Water Conservation Board | | |

### CHAPTER 11

| | | | |
|---|---|---|---|
| BIP | Basin Implementation Plan | IBCC | Interbasin Compact Committee |
| CWCB | Colorado Water Conservation Board | | |

**STOCK PHOTO CREDITS**

**Chapter 1**
Winter stream, Shafara Photo/shutterstock

**Chapter 3**
Garden of the Gods, Pilgrims49/iStock by Getty Images
Snowshoeing on the Continental Divide,
  Dr. Alan Lipkin/shutterstock
Lanphier Lake, Kelly Vandellen/iStock by Getty Images
Ice climbing in Ouray, Brian Brewi/iStock by Getty Images
Bridal Veil Falls, Amy Gdala/iStock by Getty Images
Sandhill Cranes, David Parsons/iStock by Getty Images
Potato farm, iStock by Getty Images

**Chapter 4**
Maroon Bells, Kan Khampanya/shutterstock
Rushing stream, River North Photography/
  iStock by Getty Images
Dust on snow, Kwkozil/iStock by Getty Images
Chairlift, Steve Estvanik/iStock by Getty Images

**Chapter 5**
Soccer, Christopher Futcher/iStock by Getty Images
Fish, Claire RaeAnn/Stock by Getty Images
Coal Train, Castle Rock, CO, David Parsons/
  iStock by Getty Images

**Chapter 6**
Wetlands sunset, Adam Springer/iStock by Getty Images
Big Thompson River, Xurzul/iStock by Getty Images
Baseball fields aerial, iStock by Getty Images
Headgate, Mara Kuliassi/iStock by Getty Images
Easter in Phoebe, David Parsons/iStock by Getty Images
Faucet, The-Toni/iStock by Getty Images
Aerial of Ft. Collins, CO, Thomas Bonati/shutterstock
Sprinkler irrigation, Joe Colby/iStock by Getty Images
Peach orchard, Linda Armstrong/shutterstock
Wind turbines, Arina P Habich/shutterstock
Capitol complex building, Ray Batson/iStock by Getty Images
Denver Botanic Gardens, Ami Parikh/shutterstock
Colorado melons, Arina P. Habich/shutterstock
Lake San Cristobal, Roschetzky/iStock by Getty Images
Kayaker Arkansas River, Luke Urbine/shutterstock
Flyfishing, Michael Svoboda/iStock by Getty Images
Wetland bird, David Parsons/iStock by Getty Images
Flatirons, Beklaus/iStock by Getty Images
Rio Grande River, Erik Foltz/iStock by Getty Images

**Chapter 7**
Wildflowers on mountain stream, Adventure Photo/
  iStock by Getty Images
Gross reservoir, Epicurean/iStock by Getty Images

**Chapter 9**
State capital dome, Joseph Sohm/shutterstock
Lake Powell, Sumiko photo/iStock by Getty Images
Skiing down into Telluride, Doug Berry/
  iStock by Getty Images
Manitou Springs storefront, Ivan A. Star/
  iStock by Getty Images
Maroon Creek, E. Schmidt/iStock by Getty Images
Hot air balloons at Chatfield Reservoir, Steve Krull/
  iStock by Getty Images
Coin, Andrew Lobachev/shutterstock
Bald Eagle, David Parsons, David Parsons/
  iStock by Getty Images

BLM_0064847

## Figures

| Figure 2.1-1 | "Colorado's Water Divisions" | 2-8 |
| Figure 2.2-1 | "The Colorado River Basin" | 2-14 |
| Figure 2.5-1 | "Colorado's Tribal Lands" | 2-29 |
| Figure 4-1 | "Principal Aquifers and Structural Basins of Colorado" | 4-3 |
| Figure 4-2 | "Designated Groundwater" | 4-4 |
| Figure 4-3 | "Average Precipitation in Colorado 1981-2010 (Inches)" | 4-5 |
| Figure 4-4 | "Hydrologic Classification Criteria" | 4-5 |
| Figure 4-5 | "Annual Flow Values for Varying Conditions at Select Gages (Acre-Feet per Year)" | 4-6 |
| Figure 4-6 | "Average Monthly Flows by Hydrologic Classification" | 4-7 |
| Figure 4-7 | "Wet- and Dry-Year Flows at Select Gages" | 4-8 |
| Figure 4-8 | "Tree-Ring Reconstructed Water-Year Streamflows for Four Major River Basins in Colorado" | 4-10 |
| Figure 4-9 | "Plot of Runoff versus Crop Irrigation Requirement Using the Bureau of Reclamation Archive" | 4-11 |
| Figure 4-10 | "Projected Depleted Flows for 2050 (Acre-Feet per Year)" | 4-13 |
| Figure 4-11 | "Colorado Dam and Reservoir Cumulative Construction and Storage History" | 4-14 |
| Figure 4-12 | "Colorado Dam and Reservoir Construction History and Volume (by Decade)" | 4-16 |
| Figure 4-13 | "Potential Statewide Reservoir Storage Increase Based on Storage Delta Factor Only" | 4-17 |
| Figure 5-1 | "Statewide Consumptive Water Use" | 5-3 |
| Figure 5-2 | "Low, Medium, and High 2050 Population Projections by Basin" | 5-4 |
| Figure 5-3 | "Projected Municipal & Industrial Water Demands (Acre-Feet) with Range of Potential Climate Change Increases" | 5-5 |
| Figure 5-4 | "Statewide Municipal Use Patterns" | 5-6 |
| Figure 5-5 | "Statewide Water Supply Initiative Levels- Analysis Framework" | 5-6 |
| Figure 5-6 | "Potential Water Savings for 2030 and 2050 in Statewide Water Supply Initiative 2010" | 5-7 |
| Figure 5-7 | "Projected Agricultural Water Demands (Acre-Feet) with Range of Potential Climate -Change Increases" | 5-11 |
| Figure 5-8 | "Statewide Environmental and Recreational Needs" | 5-13 |
| Figure 5-9 | "Illustrative Climate-Informed Actions in Response to Climate Change Effects on the Availability of Suitable Habitat for Cold-Water Native Trout" | 5-15 |
| Figure 6.1-1 | "The Traditional "Predict-and-Plan" Approach Compared To The Scenario-Planning Approach" | 6-4 |
| Figure 6.1-2 | "Scenario Planning Identifies Successive Sets of Common Actions That Apply to Multiple Futures" | 6-4 |
| Figure 6.1-3 | "Common Actions and Adaptive Strategies in Scenario Planning" | 6-5 |
| Figure 6.1-4 | "Summary of the Stakeholder and Plan Development Process" | 6-6 |
| Figure 6.1-5 | "No-and-Low-Regrets Portfolio versus the Status-Quo Portfolio" | 6-9 |
| Figure 6.1-6 | "Colorado's Scenarios and Their Matching Portfolios" | 6-12 |

BLM_0064848

## Figures

| | | |
|---|---|---|
| Figure 6.2-1 | "Potential Changes in Irrigated Acres by 2050" | 6-32 |
| Figure 6.2-2 | "Percent of Perennial Stream-Miles Statewide with Protection for Cutthroat-Trout Species, Warm-Water Fish, and Important Riparian and Wetland Focus Areas" | 6-41 |
| Figure 6.2-3 | "Nonconsumptive Toolbox" | 6-41 |
| Figure 6.2-4 | "Yampa/White/Green Basin Implementation Plan-Associated Risk in Dry-Future Scenario with Identified Projects and Processes Implementation" | 6-54 |
| Figure 6.2-5 | "Demonstration of How a Dry Future Could Affect the Yampa Programmatic Biological Opinion, and a Dry Future with Implementation of Identified Projects and Methods" | 6-55 |
| Figure 6.3.1-1 | "South Platte and Metro Basin Conservation Goals" | 6-70 |
| Figure 6.3.4-1 | "Agricultural Water Use and Losses" | 6-92 |
| Figure 6.3.4-2 | "Irrigation Efficiency Outcomes" | 6-93 |
| Figure 6.3.5-1 | "Colorado's 2012 Electricity Portfolio" | 6-102 |
| Figure 6.3.5-2 | "Lifecycle Water Consumption for Various Methods of Energy Production" | 6-103 |
| Figure 6.3.5-3 | "Colorado's Electricity Portfolio (Net-Generation)" | 6-104 |
| Figure 6.3.5-4 | "Energy is Used to Pump, Treat, Distribute, and Use Potable Water, and to Treat Wastewater" | 6-109 |
| Figure 6.3.6-1 | "Water Use (Actual and Goal) Through Time" | 6-113 |
| Figure 6.5.2-1 | "Statewide Irrigated Acres" | 6-139 |
| Figure 6.6-1 | "Colorado's Recreational In-Channel Diversions and Whitewater Park Locations" | 6-162 |
| Figure 7.1-1 | "Stream Hydrograph" | 7-4 |
| Figure 7.1-2 | "Colorado State Forest Service Risk of Post-Fire Erosion in Watersheds That Are Important Sources of Drinking Water" | 7-5 |
| Figure 7.1-3 | "Coalition Stakeholder Figure" | 7-8 |
| Figure 7.3-1 | "Colorado State Agencies and Quasi-Government Organizations with Quantity and Quality Responsibilities" | 7-21 |
| Figure 7.3-2 | "Current Water Quality Conditions" | 7-25 |
| Figure 9.2-1 | "2015 Colorado State Budget" | 9-9 |
| Figure 9.2 -2 | "Estimated Near-Term Infrastructure Need" | 9-13 |
| Figure 9.2-3 | "Framework for How a New Source of Funding Could be Maximized" | 9-20 |
| Figure 9.4-1 | "State Involvement in Federal 404 Permitting Process" | 9-45 |
| Figure 9.5-1 | "CWCB Education Funds Used Per Fiscal Year" | 9-57 |

BLM_0064849

## Tables

| | | |
|---|---|---|
| Table 2.2-1 | "Colorado's Interstate Compacts" | 2-11 |
| Table 2.2-2 | "Colorado's Interstate Decrees" | 2-11 |
| Table 4-1 | "Summary of Projected Climate Changes and Potential Effects on Colorado's Water Resources" | 4-9 |
| Table 4-2 | "Projected Climate and Hydrology Changes" | 4-10 |
| Table 5-1 | "Comparison of 2050 Implementation- and Penetration -Levels for Three Conservation Strategies and Demand Reduction Used in Forecasts" | 5-8 |
| Table 5-2 | "Summary of Agricultural Goals Indicated in the Basin Implementation Plans" | 5-11 |
| Table 6.1-1 | "Scenarios and Their Matching Portfolios" | 6-13 |
| Table 6.2-1 | "Common Themes across Basin Implementation Plans" | 6-17 |
| Table 6.2-2 | "Summary of Basin Implementation Plans Addressing the Municipal & Industrial No-and-Low-Regrets and Gaps" | 6-20 |
| Table 6.2-3 | "Summary of How Each Basin Met Its Agricultural Gaps" | 6-34 |
| Table 6.2-4 | "Summary of How Each Basin Meets its Environmental and Recreational Gaps" | 6-42 |
| Table 6.2-5 | "Strategies for Implementation of the Basin Implementation Plans" | 6-56 |
| Table 6.3.1-1 | "Interbasin Compact Committee  Potential Future Actions Summary" | 6-66 |
| Table 6.3.2-1 | "Interbasin Compact Committee No-and-Low-Regrets Actions" | 6-78 |
| Table 6.3.2-2 | "South Platte and Metro Providers' Reuse of Identified Projects and Processes" | 6-80 |
| Table 6.4-1 | "Types of Alternative Transfer Methods Promoted in Colorado" | 6-116 |
| Table 6.4-2 | "No-and-Low-Regrets Alternative Transfer Method Actions" | 6-125 |
| Table 6.5.1-1 | "No-and-Low-Regrets Action Plan Summary to Have a High Success Rate for Identified Projects and Processes" | 6-137 |
| Table 6.5.2-1 | "Irrigated Lands Taken Out of Production" | 6-138 |
| Table 6.5.3-1 | "No-and-Low-Regrets Action Plan Summary To Implement and Assess Storage and Other Infrastructure" | 6-152 |
| Table 6.6-1 | "Completed, Ongoing, and Potential Future Actions" | 6-177 |
| Table 8-1 | "Colorado River Development: Discussion in the Basin Implementation Plans" | 8-19/20 |
| Table 9.2-1 | "Project Costs Identified in the Basin Implementation Plans" | 9-10 |
| Table 9.3-1 | "State Land Board Water Assets" | 9-30 |
| Table 9.3-2 | "History Colorado Water Assets" | 9-31 |
| Table 9.4-1 | "Reclaimed Water Uses Authorized in Regulation 84" | 9-37 |
| Table 9.4-2 | "Stakeholder Input" | 9-40 |
| Table 9.4-3 | "Summary of the IBCC No-and-Low-Regrets Action Plan and BIP Comments on Permitting" | 9-50/52 |
| Table 11-1 | "Cyclical Planning Process Proposed by the CWCB" | 11-3 |

BLM_0064850



BLM_0064851



BLM_0064852



## EXECUTIVE SUMMARY

### People love Colorado.

Our iconic mountains, rivers, minerals, plains, communities, forests, snow, wildlife, and wilderness have drawn people by the millions to our centennial state. Our population has ballooned from 1 million in 1930 to over 5 million today, and could nearly double by 2050. Sustaining this growth requires water. While we grow at this pace, how do we preserve what we love about our state?

### Colorado's Water Plan has answers.

This plan is a roadmap that leads to a productive economy, vibrant and sustainable cities, productive agriculture, a strong environment, and a robust recreation industry. It sets forth the measurable objectives, goals, and actions by which Colorado will address its projected future water needs and measure its progress—all built on our shared values. Just as it was created, this plan will be implemented by working collaboratively with the basin roundtables, local governments, water providers, other stakeholders, and the general public. It includes a set of policies and actions that all Coloradans and their elected officials can support and help implement.

Meeting by the hundreds in small-town community centers and big-city water utilities, Coloradans have undertaken the largest civic engagement process in our state's history. We have faced our water challenges head-on and focused on solutions. Just as our forbearers created sound and functional water law and policy, we now take up the torch of innovation as a headwaters state ready to again lead the way on water.

BLM_0064853

# Introduction: Collaborating on Colorado's Water Future

Never before has Colorado experienced this type of momentum regarding water issues. We are galvanized by our challenges: drought, wildfire, flooding, climate change, and unprecedented growth. And we are energized by our capability: hundreds of meetings, thousands of participants, tens of thousands of comments, and the political will of our Governor and our General Assembly. If we are wise stewards of our water resources, Colorado has enough water to meet our state's future needs. The following are actions we can, and will, take immediately:

❖ The State will safeguard Colorado's water by proactively protecting our interstate water interests. We will also continue to apply and strengthen the doctrine of prior appropriation. This requires us to recognize that water rights are property rights whose owners are free to respond to the economics of the marketplace and to continue to work within our local control structure. Moreover, we strengthen the doctrine of prior appropriation when we evaluate and improve upon the water law and policy we have built on its foundation.

❖ The State will continue to stress that every water conversation begins with conservation and must include water storage. When we lower demand (conservation) and increase supply (storage), we close the supply-demand gap.

❖ The State will investigate options to raise additional revenue to support implementation of this plan. Only one-tenth of 1 percent of the state's budget goes toward natural resources, including loans for water projects. While we estimate $20 billion in financial need in the areas of water supply, water infrastructure, recreation, and the environment over the next 30 years, water providers have plans in place to meet much of this need. Because our water is too important to fail, the State will continue to work with water users and stakeholders to ensure financing options are available for water projects.



**FIGURE ES-1** | 2015 COLORADO STATE BUDGET

Water gets a portion of this; mostly in loans

Natural Resources $0.25 B, 1%
Other $3.53 B, 13%
Health and Human Services $10.55 B, 39%
Transportation $1.43 B, 6%
Public Safety/Courts $1.88 B, 7%
Education $9.21 B, 34%

BLM_0064854

❖ The State will examine and use its water-rights portfolio to ensure alignment with Colorado's water values. State agencies will coordinate their uses of water to achieve multiple benefits, including environmental flows, irrigation important to wildlife habitat, and compact compliance. Like the Rio Grande Cooperative Project and the Animas-La Plata Project, the State will encourage projects that enhance the environment, provide recreation, increase supplies, and meet compact compliance. Like the Chatfield Reallocation Project, the State will continue to pursue and support projects that can creatively move water through various uses and through shared facilities.

❖ The State will increase efficiency and effectiveness in water project permitting while properly mitigating negative environmental impacts. It will achieve this by front-loading the State's role in the permitting process and establishing a path to State support of water projects without being pre-decisional.

❖ The State will continue to strengthen water outreach, education, and public engagement to equip Coloradans with the necessary information to make informed water choices. Colorado's Water Plan has generated momentum on Colorado water as a worthy statewide issue: Over 30,000 comments from across the state, and input from over 150 diverse entities, helped shape the plan. We will leverage this momentum to both educate a wider band of our population on water and tap Coloradans for good ideas and discussion.

This is the beginning of the next phase in Colorado water policy, where collaboration and innovation come together with hard work to meet and implement the objectives, goals, and actions set forth in Colorado's Water Plan. The CWCB will continue the dialogue moving forward, and will strive for transparency along the way—this document lays the foundation for this discussion. The chapters of the plan consist of the following content:

**Chapter 1** provides background on how we got to where we are today and explains the need for Colorado's Water Plan.

**Chapters 2 through 5** focus on the foundational elements that guide Colorado's water management; our strategies and actions will build upon those elements going forward. Core elements include descriptions of Colorado's legal structure and critical facts about supply and demand.

**Chapters 6 through 9** discuss the dynamic strategy we need to put into place to meet Colorado's future water needs, including goals and actions. Chapters 6 through 8 focus on ways in which we can meet our water needs and prepare for an uncertain future.

**Chapter 9** addresses increased funding opportunities, more efficient and effective permitting, and enhanced education for citizens.

**Chapters 10 and 11** further detail strategies and recommendations for implementation as well as future updates to the plan.

Colorado's Water Plan discusses values, objectives, goals, and actions throughout. These are defined as follows:

| TABLE ES-1 | KEY TERMS AND DEFINITIONS |
|---|---|
| **Terms** | **Definitions** |
| Value | An overarching tenet that guides how Colorado's Water Plan will work to shape Colorado's water future. |
| Measurable Objective | A result or benchmark expected to be achieved from the implementation of Colorado's Water Plan. |
| Goal | A purpose toward which Colorado's Water Plan is directed. |
| Action | A necessary step to achieve the measurable objectives and goals, and ultimately to maintain Colorado's water values. |

BLM_0064855

# Colorado Water Law & Our Basins

The legal and institutional system that governs the use and allocation of water in Colorado has three foundational elements: interstate compacts and equitable apportionment decrees, Colorado water law, and local control. Colorado's Water Plan is premised on these elements.



At the headwaters of the Continental Divide, all of Colorado's major rivers flow downstream to eighteen states and Mexico. As Colorado and its downstream neighbors developed over time, disputes arose among states over the allocation of interstate stream waters. Following early U.S. Supreme Court litigation, Colorado negotiated nine formal agreements with downstream states. These interstate water compacts are federal law, state law, and legally binding contracts among the signatory states.

Colorado water law, rooted in the doctrine of prior appropriation, commands widespread respect—not because of its longevity (older water law exists), or its rigidity (it has undergone significant change over the years), and certainly not due to its clarity. Our water law is respected because it works. First, it stipulates that water rights are property rights that can be bought and sold by willing parties and that can be transferred to new users. Second, it provides certainty among competing water uses by telling us which rights have priority. Third, it has accommodated Colorado values as they developed over time: when our mining and agricultural economies grew, when our municipalities on both sides of the Continental Divide grew, when we recognized the connection between groundwater and surface water, when we recognized the need for water for the environment, when we experienced energy booms and busts, and now, when growing demands for water threaten to eclipse diminishing supplies.

A network of water providers, public utilities, ditch and reservoir companies, individual water rights owners, and special districts deliver Colorado's water. Each river basin in Colorado faces unique challenges that demand custom solutions. So, who better than local water users and stakeholders to tackle these challenges? Municipal, county, and district officials make day-to-day decisions about topics ranging from water to emergency response. Colorado's Water Plan recognizes this structure as an asset—and local control allows us to effectively respond to our water challenges. Communities in each of eight basins developed regional plans, called Basin Implementation Plans, which now allow a comprehensive view of water statewide. But this approach also requires heightened collaboration among state and local entities on water issues. To this end, the CWCB has engaged the Colorado Municipal League, Colorado Counties, Inc., and the Special District Association of Colorado to embark on a new era of collaboration between state and local government on water and land use issues.

BLM_0064856



BLM_0064857

## Supply & Demand



Seventy to 80 percent of Colorado's water falls west of the Continental Divide, while 80 to 90 percent of our population resides east of it. Twenty-four tunnels and ditches move an annual average of 500,000 acre-feet from the western slope to the eastern slope. Our average precipitation yields 14 million acre-feet of water annually in Colorado.

Over 5 million acre-feet of water is consumed annually through agriculture, municipal, industrial uses—though we've reduced our consumption in certain areas by 20 percent since the 2002 drought. States downstream of us are legally entitled to water as determined by our nine interstate compacts and two equitable apportionment decrees from the U.S. Supreme Court.

Since projections suggest wide variability in future precipitation,[1] Colorado faces the possibility of a significant water supply shortfall within the next few decades, even with aggressive conservation and new water projects.[2] Our legal and physical constraints open a gap between projected supply and demand in each basin. Colorado's Water Plan sets an objective to close this gap by 2030, while also addressing the effects of a changing climate on our water resources.



BLM_0064858



BLM_0064859

# Managing Our Water

Chapters 6 and 7 establish action steps to help Colorado respond to its water challenges. These chapters delineate ways in which Colorado can advance conservation, reuse, alternative agricultural transfers, and multipurpose and collaborative projects while protecting the health of rivers, streams, and watersheds.

Chapter 6 opens with scenario planning, which provides the framework for how Colorado will address its water future, no matter what water supply and demand challenges we may face. Scenario planning also indicates what Colorado needs to first accomplish in the short term, and the rest of Chapter 6 explores specific approaches to meet our water needs. Chapter 7 examines factors beyond supply and demand—such as natural hazards, watershed health, and water quality—that affect water availability.



BLM_0064860



BLM_0064861

# The Colorado Way Forward

**8+9**

**C**olorado's Water Plan focuses on collaboration. The basin roundtables not only provide grassroots insight into each river basin's challenges and solutions, but are a mechanism to resolve conflicts between basins. *Why does it matter if we get along?* Because our water challenges are great and demand our united focus. Because other governments watch Colorado's water positions closely. Because discordant infighting weakens Colorado's position in interstate and international arenas, invites unnecessary federal intervention in our water affairs, and dulls our responsiveness. It's undeniable: our water challenges necessitate that we pull together as one, innovate, and become more agile.



Fortunately, we are positioned to be better collaborators as a result of a recent paradigm shift in Colorado water. Indeed, this shift helped galvanize Colorado's Water Plan. Over the past decade, historically adversarial views have shifted toward: [1] the benefits of collaborating on win-win projects that benefit all parties; [2] putting money to work solving problems instead of escalating litigation; and [3] capitalizing on the regional connections that tie Colorado together economically and hydrologically—instead of ignoring those connections.

Colorado's Water Plan recognizes the historic nature of eastern slope-western slope relations. Never before has Colorado's footing been as firm on the issue of transmountain water as it is right now, as a result of this effort. Despite differences of opinion, the IBCC, basin roundtables, the CWCB directors, and numerous county commissioners reached consensus to support a conceptual framework, which sets out the fundamental principles the parties to a new transmountain diversion should expect to address. It presents seven principles to guide future negotiations between end users and basin-of-origin communities in the contemplation of any new transmountain diversion. The IBCC's diverse stakeholders thoroughly explored the difficult issues that would surround any new transmountain diversion. The CWCB will ensure that this conceptual framework is implemented by playing an active role in brokering agreements among parties on transmountain water. In this role, the State will promote eastern slope-western slope cooperation as well as consideration of interstate compacts in any transmountain diversion discussions.

This level of collaboration has already helped solve some of the most intractable issues in Colorado. Colorado's Water Plan aims to continue this practice to solve a growing funding need, a broken permitting system, and real risks in the Colorado River system. Education and outreach will be critical to ensuring that we understand the water challenges across Colorado, and that we are prepared to work together to find innovative solutions to address those challenges.



BLM_0064863

# Measurable Objectives, Actions, and Future Updates



10 + 11

**C**olorado's Water Plan is not the end of our story; rather, it marks the beginning of a new chapter in Colorado water. Implementing this plan, and meeting its goals and objectives, will require Colorado innovation and hard work. Rather than guess about the direction of our state's water policy, we now have measurable objectives to achieve, and we can monitor our progress on these objectives in real time.

Chapter 10, which summarizes the objectives, goals, and actions in Chapters 6 through 9, focuses on the actions that are most critical to implementing Colorado's Water Plan in the near term. Chapter 11 confirms that the plan is a living document that will require updates on an ongoing basis. Additionally, the CWCB will monitor our progress and report to the governor and the Colorado General Assembly annually. Together, these chapters will help ensure that Colorado is responsive in addressing its immediate water challenges and is prepared to adapt to changing conditions. The measurable objectives on which we will gauge our progress and success are outlined on the following pages.

The children of several of the authors of Colorado's Water Plan, standing together at Clear Creek in Golden. They represent the importance of planning for a sustainable water future: Gizachew Mitchell, Taye Mitchell holding Emma Bornstein, Saba Mitchell holding Wrenna McIntire, Forest Eklund, Aidan Reidy, Maeve Reidy, Sierra Mitchell holding Clay McIntire, and Rowan Eklund.

BLM_0064864



BLM_0064865

## "Failure is not an option."

—Gene Kranz, Apollo Mission Flight Director

## Supply-Demand Gap

*Colorado's Water Plan sets a measurable objective of reducing the projected 2050 municipal and industrial gap from as much as 560,000 acre-feet to zero acre-feet by 2030.*

The success of Colorado's Water Plan will ultimately be measured by whether or not the municipal water supply-and-demand gap is closed, and the choices we make to close it. With increased efforts on conservation, storage, land use, alternative transfer methods, and reuse, Colorado can close its gap, balance its water values, and address the effects of climate change on water resources.

## Conservation

*Colorado's Water Plan sets a measurable objective to achieve 400,000 acre-feet of municipal and industrial water conservation by 2050.*

Colorado must address projected gaps between future water needs and available water provisions from both the supply side and the demand side. Every acre-foot of conserved water used to meet new demands is an acre-foot of water that does not need to come from other existing uses.

## Land Use

*Colorado's Water Plan sets a measurable objective that by 2025, 75 percent of Coloradans will live in communities that have incorporated water-saving actions into land-use planning.*

In order to reduce the amount of water needed for future generations of Coloradans and keep urban-adjacent agricultural lands in production, Colorado must support the growth of the next 5 million residents more strategically than the last 5 million. Colorado's Water Plan calls for a partnership among local water providers and Colorado's communities. This partnership aims to incorporate water-saving actions into local land-use planning. The CWCB will work with the Department of Local Affairs, local governments, water providers, Colorado Counties Inc., Colorado Municipal League, the Special District Association, councils of governments, and homebuilders (Colorado Association of Homebuilders) to examine and strengthen the tools they collectively possess to help Colorado reach this objective.

BLM_0064866

## Agriculture

*Colorado's Water Plan sets an objective that agricultural economic productivity will keep pace with growing state, national, and global needs, even if some acres go out of production.*

To achieve this objective, the State will work closely with the agricultural community, in the same collaborative manner that has produced agricultural transfer pilot projects, to share at least 50,000 acre-feet of agricultural water using voluntary alternative transfer methods by 2030.

Without a water plan, Colorado could lose up to 700,000 more acres of irrigated agricultural lands—that equals 20 percent of irrigated agricultural lands statewide and nearly 35 percent in Colorado's most productive basin, the South Platte. While the right to buy or sell water rights must not be infringed upon, Colorado's Water Plan describes market-competitive options to typical "buy-and-dry" transactions. Such alternative transfer methods can keep agriculturally dependent communities whole and continue agricultural production in most years, and if such arrangements can be made more permanent in nature, they will provide certainty to both municipal water providers and agricultural producers. Options include lease-fallowing agreements, deficit irrigation, water banking, interruptible supply agreements, rotational fallowing, water conservation programs, and water cooperatives. The State will encourage innovation and creativity by agricultural producers and research institutions to maximize the productivity of every drop of water.

## Storage

*Colorado's Water Plan sets a measurable objective of attaining 400,000 acre-feet of water storage in order to manage and share conserved water and the yield of IPPs by 2050. This objective equates to an 80 percent success rate for these planned projects.*

As the state conserves, Colorado must also develop additional storage to meet growing needs and face the changing climate. Tomorrow's storage projects will increase the capacity of existing reservoirs, address a diverse set of needs, and involve more partners. New storage projects will be increasingly innovative, and will rely on technologies such as aquifer storage and recharge. In addition, water managers will need to be more agile in responding to changing conditions, so that storage can be more rapidly added to Colorado's water portfolio while maintaining strong environmental health. To do this, we must address a broken permitting system that currently produces uncertainty and fosters mistrust among all stakeholders.

BLM_0064867

# Watershed Health, Environment, and Recreation

*Colorado's Water Plan sets a measurable objective to cover 80 percent of the locally prioritized lists of rivers with stream management plans, and 80 percent of critical watersheds with watershed protection plans, all by 2030.*

The environment and recreation are too critical to Colorado's brand not to have robust objectives; a strong Colorado environment is critical to the economy and way of life. In addition, the WQCC identified a strategic water quality objective to have fully supported classified uses—which may include drinking water, agriculture, recreation, aquatic life, and wetlands—of all of Colorado's waters by 2050. These plans will address a variety of concerns, including pre- and post-fire mitigation, forest mortality, water quality impairments, potential impacts of legacy mines, flood mitigation and recovery, aquatic and riparian habitat enhancement, and land use change.

# Funding

*Colorado's Water Plan sets an objective to sustainably fund its implementation. In order to support this objective, the State will investigate options to raise additional revenue in the amount of $100 million annually ($3 billion by 2050) starting in 2020.*

Such funds could establish a repayment guarantee fund and green bond program focused on funding environmental and recreational projects. In addition, such funds could further support conservation, agricultural viability, alternative transfer methods, education and outreach, and other plan implementation priorities.

Colorado faces challenging fiscal conditions, not only for water infrastructure, but most other parts of the State budget. In order to address the water infrastructure fiscal need, the CWCB will explore creation of a repayment guarantee fund and green bond program with an initial investment of $50 million from the Severance Tax Perpetual Fund. A repayment guarantee fund could assist water providers in securing financing for regional multi-partner and multi-purpose projects by backing bonds so that all the partners can achieve financing. Issuance of green bonds could support large-scale environmental and recreational projects. These funds could be operated in a conjunctive manner. As water provider bonds were paid down, the guarantee fund could be reduced and could be used to pay green bonds. By doing so, an initial $50 million investment could leverage half a billion dollars of regional projects. Under a well-planned, phased approach, an additional $100 million per year might address all of the State-related funding needs described in Colorado's Water Plan, as further detailed in Section 9.2.

BLM_0064868

# Education, Outreach, and Innovation

*Colorado's Water Plan sets a measurable objective to significantly improve the level of public awareness and engagement regarding water issues statewide by 2020, as determined by water awareness surveys. Colorado's Water Plan also sets a measurable objective to engage Coloradans statewide on at least five key water challenges (identified by CWCB) that should be addressed by 2030.*

Colorado's Water Plan will expand outreach and education efforts that engage the public to promote well-informed community discourse and decision making regarding balanced water solutions. This work will be collaborative and include state, local, and federal partners. As one component of this overall strategy, the CWCB will work with Colorado's innovation community, education and outreach experts, research institutions, and the Governor's Colorado Innovation Network (COIN) to address Colorado's water challenges with innovation and "outside-the-box" creativity.

**COVER, OPENING PAGES AND EXECUTIVE SUMMARY - CAPTIONS AND CREDITS**

**Front Cover**
Young patron at the Routt County Fair in Hayden, M. Nager
Riding the chairlift
Aerial photo of Ridgway, K. Gramkey
Denver at night
Red barn at the Sakata Farm in Brighton, M. Nager
Uncompahgre River near Ouray
Playing soccer on a grassy field
Center pivot irrigation at Sakata Farm in Brighton, M. Nager
Birds take flight over the Yampa River on the Daughenbaugh Ranch, M. Nager
Wheat growing on the eastern plains
Little girl playing in the sprinkler
Rafting the Arkansas River near Buena Vista, M. Nager
Vicki Phelps and students on the San Miguel River, M. Nager
Cameo Call set of diversions, M. Nager

**Back Cover**
Crystal Mill, abandoned, near Carbondale
Sunset over Ridgway Reservoir
Columbine, Colorado's state flower
Ruddy duck (male) among water smartweed, near Walden, All Canada Photos / Alamy Stock Photo
Water droplet on leaf
Hayfield near Steamboat Springs, M. Nager
Boy playing in fountain in Aspen, Visions of America, LLC / Alamy Stock Photo
Woman flyfishing on the Arkansas River, H. Mark Weidman Photography / Alamy Stock Photo
Cows grazing
Mountain goat mother and kid atop Mount Evans with Rocky Mountains in background, Danita Delimont / Alamy Stock Photo
River flowing

**Inside Back Cover**
Works When I am 100 (Winona McIntire)
Photo: J. Johnson

**Pages iv and v:**
Aerial photo of Ridgway, K. Gramkey

**Executive Summary (beginning on page xvi):**
Snowy trees

**Chapter 2+3:**
New dam built on Saint Vrain River near Longmont, CO after historic 2013 floods, M. Nager
Kids playing soccer on a grassy field
Crop rows, Sakata Family Farms, Brighton, M. Nager
Durango-Silverton Narrow Gauge Railroad

**Chapter 4+5:**
Denver Broncos helmet
Dallas Divide, San Juan Mountain Range, near Ridgway

**Chapter 6+7:**
Cameo Call set of diversions and Roller Dam, Colorado River, M. Nager
Coors Field, Denver, G. Molowony
A berro Oxianda of the Perilous Sheep Company, herds sheep in Routt National Forest, Colorado, M. Nager
Working the ditches at one of Harold Griffith's irrigated corn fields in Fort Morgan, M. Nager

**Chapter 8+9:**
Grand Lake, M. Nager
4H competition at the Routt County Fair in Hayden, M. Nager
Cows graze on Marsha Daughenbaugh's ranch near Steamboat Springs, M. Nager
Vicki Phelps teaches students as part of a Telluride Institute Watershed Education Project collaborative program with the Telluride Academy, in the San Miguel River Basin, M. Nager

**REFERENCES**

[1] Jeff Lukas, Joseph Barsugli, Nolan Doesken, Imtiaz Rangwala, and Klaus Wolter. "Executive Summary." In *Climate Change in Colorado: A Synthesis to Support Water Resources Management and Adaptation.* Second ed. (Boulder: University of Colorado, 2014), 3-4.

[2] Colorado Water Conservation Board (CWCB). *Statewide Water Supply Initiative 2010* (Denver 2011), Section 5-28.

BLM_0064869

# Introduction: Collaborating on Colorado's Water Future



**P**eople love Colorado. Our state's population ballooned from 1 million in 1930 to more than 5 million today, and is projected to grow at even faster rates in the future. So how do we ensure that this population growth doesn't change what we know and love about our state—including our precious natural resources, and particularly, our water resources? When it comes to our water, Colorado's Water Plan has answers.

BLM_0064870



COLORADO'S WATER PLAN HAS ANSWERS

BLM_0064871



One of the views at Sakata Family Farms in Brighton, Colorado. The farm produces more than 1,600 acres of vegetables each year. Photo: M. Nager.

BLM_0064872

This plan articulates collaborative, balanced water solutions to Colorado's water challenges. Equally important, it establishes the method by which we will continue to find solutions to those challenges into the future. This method is based in our grassroots basin roundtable structure and the geographic representation that forms the Colorado Water Conservation Board (CWCB).

If Colorado's water is managed strategically, our state has enough water to meet our needs well into the future. As is the case with other Western states, Colorado does not have enough water to meet historic and future uses in a balanced manner without a collaborative plan of action. Our principal water challenge lies not in the amount of water we're given, but in our management of what we have under Colorado's unique legal system, and given the diverse needs and values of citizens. Colorado's Water Plan offers a suite of actions for present and future Coloradans to measurably achieve this strategic balance.

Moving forward, the implementation of identified actions in this plan and the Basin Implementation Plans (BIPs) will decrease uncertainty and close identified supply gaps in a manner that encourages collaboration, innovation, and protection of Colorado's water values. State agencies and basin stakeholders must gain measurable progress on these identified actions, or the status quo will continue and uncertainty will increase unabated.

---

### THE COLORADO WATER CONSERVATION BOARD

The CWCB is Colorado's water planning and policy agency and is responsible for stream, watershed, and lake protection; water conservation; flood mitigation; stream restoration; drought planning; water supply planning; and water project financing. The agency works to protect the state's water apportionments in collaboration with other Western states and federal agencies.[1]

---

We have used the real and looming "gap" between water supply and demand to catalyze action on water in Colorado. The challenges ahead are numerous, and the CWCB and stakeholders around the state have identified inherent difficulties and points of contention through our grassroots process:

❖ Establishing cooperative alternatives to the rapid removal of water from farms and ranches to supply urban growth.

❖ Implementing projects and methods that take into account potential multiple beneficiaries, potential multiple uses, and the effects on river systems on which all Coloradans rely.

❖ Replacing the continued mining of groundwater aquifers to supply municipal growth with renewable water resources and the implementation of collaborative projects and methods.

❖ Developing a statewide conservation ethic that recognizes the need to work within Colorado's naturally arid environment, increases the understanding of conservation practices, and reduces wasteful behavior.

❖ Improving regulatory processes for critical water storage projects to reduce project costs and time commitment while maintaining the integrity of permitting review.

❖ Establishing a plan with stakeholders and water managers statewide to finance the daunting cost of water infrastructure projects (municipal, industrial, and environmental).

❖ Strengthening state water management policies and tools to ensure state and local control - as opposed to federal intervention - over water management decisions.

❖ Allowing for efficient and effective water sharing by overcoming such hurdles as high transaction costs.

❖ Continuing to promote agility in Colorado water law and administrative practices, which have proven to be flexible enough to meet challenges presented by competing uses and increasing demands while protecting private property rights.

❖ Cooperating more efficiently across state agencies with different statutory mandates, so that regulatory and policy decisions are made in a more adaptive manner.

BLM_0064873



Boating on Grand Lake, Colorado's largest natural lake, near Rainbow Bridge. Photo: M. Nager.

If we do nothing, these challenges demonstrate the uncertain future we will hand down to our children and grandchildren. It is a future without a value-based strategy. Colorado's Water Plan offers an alternate path. This path will not solve all our problems, and it will not be easy. It will require the continued hard work and effort of Coloradans both inside and outside of the water profession, as well as measurable progress made on items identified in the Critical Action Plan.

This strategic plan is the first of its kind for Colorado: a plan by Coloradans, for Coloradans. Colorado's Water Plan is designed to be dynamic so that it can evolve as Colorado grows and transforms. While the plan reflects the most current water data available, the CWCB will update the plan as data, needs, and projections change.

Colorado's Water Plan is rooted in a thoughtful, strategic approach initiated by Governor John Hickenlooper. In May 2013, Governor Hickenlooper issued Executive Order D 2013-05, which directed the CWCB to prepare a water plan for Colorado (see Appendix A). The order directed the CWCB to:

A. Create a water policy that reflects Colorado's water values.

B. Work with the Governor's Office to complete the final plan no later than December 10, 2015.

C. Align state support of projects, studies, funding, and other efforts to Colorado's Water Plan to the greatest extent possible.

D. Align the state's role in water project permitting and review processes with the water values, and streamline the state's role in the approval and regulatory processes regarding water projects.

E. Utilize the Interbasin Compact Committee (IBCC) and the basin roundtables in drafting Colorado's Water Plan, as well as review and build upon discussions and points of consensus that have emerged as part of the IBCC and basin roundtable processes to capitalize on the momentum generated by these grassroots efforts.

F. Work with its sister agencies and other relevant state agencies as needed.

G. Reaffirm the Colorado Constitution's recognition of priority of appropriation while offering recommendations to the governor for legislation that will improve coordination, streamline processes, and align state efforts.

BLM_0064874

## Colorado's Water Values

This plan acts as a foundation for Colorado to honor the State's core water values. The CWCB developed these water values, set out in Governor Hickenlooper's executive order, by assessing the grassroots work the IBCC and the basin roundtables conducted.

## COLORADO'S WATER VALUES[7]

* A productive economy that supports vibrant and sustainable cities, viable and productive agriculture, and a robust skiing, recreation, and tourism industry;

* Efficient and effective water infrastructure promoting smart land use; and

* A strong environment that includes healthy watersheds, rivers and streams, and wildlife.

## Our History of Collaboration

The year 2015 marks more than a decade of unprecedented efforts to engage diverse stakeholders and develop water planning information, serving as the foundation of Colorado's Water Plan. Over the course of the past decade, Coloradans from all sectors of the economy and all corners of the state have identified the need for a focused plan for the future.[3]

CWCB established the roots of the water plan when Colorado experienced extreme drought in 2002 and 2003. When some municipalities were mere weeks away from running out of water, it became apparent that there was need for a comprehensive analysis of Colorado's water needs. That realization sparked the Statewide Water Supply Initiative (SWSI).[4] Today,



People enjoying the South Platte River and Cherry Creek at Confluence Park, Denver. Photo: M. Nager.

the CWCB leads the SWSI, conducting an ongoing analysis of Colorado's water resources, and in providing key technical data and information that are used to guide decision-making. The SWSI also takes different climate variability scenarios into account. As a result of the SWSI and other technical work performed by the agency, Colorado has more information today than ever before about available water supplies and agricultural, environmental, recreational, and community water needs.



BLM_0064875



Vineyards in the Grand Valley, near Palisade. The valley is a major fruit growing region, with a large number of orchards including wine grapes and peaches. Photo: M. Nager.

BLM_0064876



In 2005, Colorado leaders recognized the need to depoliticize water issues for the good of the entire state. The General Assembly passed, and Governor Bill Owens signed, House Bill 1177, which created 10 essential stakeholder engagement bodies. These bodies included the IBCC and nine basin roundtables.[5] The 27 members of the IBCC represent every basin and take into account nearly every water perspective in Colorado. The IBCC agrees that steps must be taken in the near future to avoid undesirable consequences that would result from a growing water gap.[6]

In 2014, each basin roundtable developed a draft Basin Implementation Plan (BIP) that examined each basin area's future water needs and provided strategies for addressing those needs. The basin roundtables brought together representatives from the business community, local government, and water users, as well as stakeholders representing the environment, agriculture, recreation, and various industries. Providers from each of Colorado's major river basins and the Denver metro area began mapping out each basin's needs. The grassroots approach of the basin roundtables and the IBCC (which engaged hundreds of stakeholders across diverse sectors and regions) enabled citizens in each basin to share their vision for Colorado's water future. This "produced informed discussions, provided a forum for building consensus, and generated momentum."[7] The last decade has focused on actively engaging communities through concerted public involvement, and on developing balanced, locally driven, collaborative water management solutions. Those solutions form the building blocks of this water plan.

## Why Do We Need a Water Plan?

Many people regard Colorado as one of the best locations in which to live, work, and play.[8] As a result, more and more people and businesses are moving to Colorado and staying. Even with a robust conservation ethic, this growth will increase demand for water. At the same time, we as a state have witnessed sustained and systemic drought on a scale never before recorded by humans. This gap between water supply and our increased demand for water results in the possibility of a significant shortfall within the next few decades, even with aggressive conservation and additional water projects.[9] To complicate matters further, precipitation patterns and amounts have recently shown their ability to swing and vary wildly. For example, in 2013, Colorado suffered from systemic drought and deadly flooding simultaneously.[10]

BLM_0064877



The Historic Arkansas Riverwalk of Pueblo, a riverfront promenade with family-oriented activities and events including boat rides and concerts

These are the big water challenges facing Colorado:

❖ **Growing water supply gap:** The gap between municipal water supply and demand is growing, and water conservation and the completion of proposed water projects are likely insufficient to address projected 2050 shortfalls that could total more than 500,000 acre-feet statewide.[11]

❖ **Agricultural dry-up:** The purchase and permanent transfer of agricultural water rights is causing irrigated agriculture to disappear. At the current rate of transfer, there will be a major reduction in Colorado's agricultural lands in the future. This could affect Colorado's economy and food security. In addition, rural communities could suffer along with agriculture if enough agricultural business goes away.[12]

❖ **Critical environmental concerns:** A key component of Colorado's brand is its natural environment. We must address water quality, watershed health, and ecosystem resilience in light of water demands and a changing climate. An increasing number of fish species in Colorado are at risk of becoming endangered because of habitat loss. This risk has the potential to increase if agricultural, municipal, and industrial water needs are set up to clash with environmental and recreational water needs.[13]

❖ **Variable climatic conditions:** Climate change and its associated effects make it more difficult to meet Colorado's future water needs because of diminishing supplies, increased demand for water, and potential big swings in precipitation patterns and amounts of precipitation in the future. Chapters 4 and 5 discuss this phenomenon at length.[14]

❖ **Inefficient regulatory process:** Colorado requires a more efficient regulatory process if we as a state are to effectively respond to our water challenges. By encouraging up-front collaboration and resource prioritization, Colorado can do its part to move multi-partner and multipurpose projects forward more quickly.

❖ **Increasing funding needs:** Colorado faces a financial gap in addressing future environmental, recreational, agricultural, and communal needs. Without adequate investment, Colorado cannot effectively address the challenges described above.

BLM_0064878



The Gunnison River flowing
through the Black Canyon of
the Gunnison National Park
near Montrose. The Gunnison
River is managed for a range
of needs.
Photo: M. Nager

BLM_0064879



Winter river flowing on Telluride's Valley Floor. A conservation easement protects 560 acres of open space in perpetuity.

BLM_0064880

## Colorado's Water Plan as a Roadmap

This plan is focused on achieving the right balance of water resource management strategies. It recognizes that water is important for all sectors and regions in Colorado, and greatly affects Coloradans' livelihoods.

Water connects Colorado. While the majority of our precipitation falls west of the Continental Divide, the majority of our state's people reside to the east. Through a vast infrastructure, we move water from the west to the east in large quantities every year. Western slope ranchers finish their cattle on the eastern slope, and process and distribute them there. The people who live in the eastern slope consume western slope peaches and wine. The western slope offers world–class recreational opportunities, and Front Range families are the largest users of these recreational opportunities and own many of the second homes in western slope communities. The Front Range is the economic hub of Colorado, accounting for almost 75 percent of the state's gross domestic product.[15] Water is one of our most critical, contentious, and shared resources, but because we are all connected, Colorado's success depends on the ability of all regions to work collaboratively to solve challenges.

This plan takes into account Colorado's history, legal system, policy structure (which includes local, state, and federal laws, institutions, and players), and institutional arrangements that influence decisions about Colorado's water resources. Colorado's Water Plan affirms the private ownership of water rights under the state's prior appropriation system. Furthermore, this plan supports the authorities and responsibilities of local governments and water providers established by state law. It recognizes the limited statutory role of state agencies in decisions regarding the allocation and reallocation of water to various beneficial uses, and the overlay of federal regulatory and permitting processes that pervade water resources management decisions in Colorado. Thus, the plan advocates for cooperation among parties so that no one governmental agency, water provider, or private party is compelled to go it alone and make unilateral decisions.

This plan is a framework to guide future decision-making and to address water challenges with a collaborative, balanced, and solutions-oriented approach. The State recognizes that Coloradans have accomplished innovative and creative work—and acknowledges that there is still much work to do.

Although moving beyond the status quo can be both difficult and complex, it is our responsibility as Coloradans to come together to find compromises and opportunities to ensure that our state remains a vibrant place to live, work, and play for future generations.

## The Goal

Colorado is composed of vibrant and sustainable cities, viable and productive agriculture, a robust recreation and tourism industry, and a thriving natural environment. The goals of the Colorado Water Plan are to meet the water supply gap, defend Colorado's compact entitlements, improve regulatory processes, and explore financial incentives—all while honoring Colorado's water values and ensuring that the state's most valuable resource is protected and available for generations to come.

Chapters 2 through 5 focus on the foundational elements that guide Colorado's water management. These include descriptions of Colorado's legal structure and critical facts about supply and demand.

Chapters 6 through 11 establish action steps to help Colorado respond to future challenges. These sections show how Colorado can advance conservation, reuse, alternative agricultural transfers, and multipurpose and collaborative projects while protecting the health of rivers, streams, and watersheds. Building on successful agreements between eastern and western slopes, Chapter 8 charts a collaborative path forward for discussion regarding transmountain water from the western slope. Chapter 9 addresses increased funding opportunities, more efficient and effective permitting, and enhanced education for citizens. Chapter 10 pulls together the measurable objectives and critical actions found in Chapters 6 through 9. Because the various factors affecting forecasts, hydrology, the economy, and the fields of science and technology will continue to be dynamic, Chapter 11 suggests ways to update the plan moving forward.

BLM_0064881



# A LOOK AT HISTORY

Mural related to water, located in Colorado's State Capitol building.

BLM_0064882

[1] "About the CWCB," Colorado Water Conservation Board, accessed October 17, 2014. http://cwcb.state.co.us/about_us/about_the_cwcb/Pages/main.aspx.

[2] Governor John Hickenlooper, "Executive Order D 2013-05, Directing the Colorado Water Conservation Board to Commence Work on the Colorado Water Plan," May 14, 2013. https://www.colorado.gov/pacific/governor/atom/18351.

[3] BBC Research & Consulting, *Public Opinions, Attitudes and Awareness Regarding Water in Colorado* (Denver, CO, 2013), Section II, 14. http://www.bbcresearch.com/images/Final_Report_072213_web.pdf.

[4] Colorado Water Conservation Board, *Statewide Water Supply Initiative 2010* (Denver, 2011). http://cwcb.state.co.us/water_management/water_supply_planning/pages/swsi2010.aspx.

[5] Colorado Revised Statutes §§ 37-75-104, 37-75-105.

[6] Colorado Water Conservation Board, *Statewide Water Supply Initiative 2010*, 7-2.

[7] "Executive Order D2013-005."

[8] "Living in Colorado," Colorado Office of Economic Development and International Trade, accessed July 26, 2015, http://www.advancecolorado.com/living-colorado.

[9] Colorado Water Conservation Board, *Statewide Water Supply Initiative 2010*.

[10] "Despite Fall Floods, Drought Persists in Southeastern Colorado", National Oceanic and Atmospheric Administration (NOAA), February 18, 2014. https://www.climate.gov/news-features/event-tracker/despite-fall-floods-drought-persists-southeastern-colorado.

[11] Colorado Water Conservation Board, *Statewide Water Supply Initiative 2010*.

[12] Colorado Water Conservation Board, *Alternative Agricultural Water Transfer Methods Grant Program Summary and Status Update* (Denver: CWCB, 2012). http://cwcb.state.co.us/loansgrants/alternative-agricultural-water-transfer-methods-grants/Pages/main.aspx.

[13] Colorado Water Conservation Board, *Nonconsumptive Needs Assessment Focus Mapping* (Denver: CWCB, 2010). http://cwcbweblink.state.co.us/weblink/0/doc/143889/Electronic.aspx?searchid=a05c7436-830c-490a-a93b-a24fe22bf46e.

[14] Jeff Lukas, Joseph Barsugli, Nolan Doesken, Imtiaz Rangwala, and Klaus Wolter, "Executive Summary," *Climate Change in Colorado: A Synthesis to Support Water Resources Management and Adaptation*, Second ed. (Boulder: University of Colorado, 2014).

[15] "Water," Denver Metro Chamber of Commerce, last accessed July 26, 2015, http://www.denverchamber.org/policy_committees/water.aspx.

BLM_0064883

# Colorado's Legal and Institutional Setting

Chapter 2 provides an overview of the regulatory framework that guides water management in Colorado. The doctrine of prior appropriation establishes much of the foundation of water law within the state. This chapter presents a brief explanation of this system along with an overview of how this resource is administered by state and federal agencies.

As a headwaters state, Colorado is subject to interstate agreements and international treaties regarding usage of water and obligations downstream. Section 2.2 of this chapter explains interstate compacts and equitable apportionment decrees as well as their effects on water availability within the state. Colorado also has the distinction of being a local control state, in which much of the planning and implementation authority rests at the local level. Section 2.3 reviews key features of the local control system and describes the importance of these processes to water management within the state.

When moving a water project or method forward in Colorado, interaction with regulatory agencies is necessary at the federal, state, and local levels. Section 2.4 briefly enumerates these agencies, their delegated jurisdictions, and the roles each plays in the approval and permitting processes. Finally, Section 2.5 of this chapter examines the issue of federal- and tribal-reserved water rights, as these types of water designations affect the management and decision making of entities within the state.

An understanding of this legal and institutional landscape is very important for water managers as they move forward in planning and implementation processes within Colorado. Moreover, in order to make our state's laws and policies better, we as Coloradans must understand where we stand and how we got here.

The cover of an 1874 issue of Harper's Weekly depicting two irrigators letting water into a sluiceway and the engineering needed to bring water from where it flows to where it is needed. This represents a foundational principle of Colorado water law. Courtesy of Justice Gregory Hobbs.



BLM_0064885

# 2.1

# COLORADO WATER LAW AND ADMINISTRATION

The evolution and history of Colorado water law is as rich and complicated as the history of the West itself. From the San Luis People's Ditch (the oldest operational water right in Colorado, developed before the creation of the Colorado Territory) to the innovations of Aurora's Prairie Waters project, the result of this complex and varied history is the current massive body of law, legal precedent, rules, and regulations that governs this valuable resource.[1] To sufficiently plan for the opportunities and challenges apparent in Colorado's water future, we as Coloradans must understand the legal framework on which they rest.

Water users in Colorado's semi-arid climate require a flexible system that honors private water rights, provides reliable administration, and responds to changes in supply and demand. As the Colorado Supreme Court articulated in 2001, "The objective of the water law system is to guarantee security, assure reliability, and cultivate flexibility in the public and private use of this scarce and valuable resource."[2] Through ever-evolving case law, policies established by state and local government, and laws passed by the General Assembly, Coloradans are constantly working together to maintain this flexible and reliable system.

## The Prior Appropriation System

The foundation of Colorado water law is the "prior appropriation system," which is a framework for establishing one water user's priority for use over that of another. This framework was necessary because of the arid nature of the Western United States, and because the riparian water laws of Europe and the Eastern United States would not have adequately protected older water rights from new uses when there were water shortages.[3]

Colorado established the prior appropriation doctrine, in large part, to protect gold mining claims, and it is not a coincidence that the basic tenets of the prior appropriation doctrine are similar to early mining laws.[4] Colorado was the first to formalize the prior appropriation system in a set of principles known as the "Colorado Doctrine," which the State adopted in the 1860s, even before Colorado obtained statehood in 1876.[5] Most Western states share this legal system in a pure or hybrid form.

The Colorado Constitution explains the heart of the prior appropriation system. It states: "The right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using the water for the same purpose."[6] The simple distillation of this legal framework is "first in time, first in right."[7]

### THE COLORADO DOCTRINE

All surface and groundwater in Colorado is a public resource for beneficial use by public agencies and private persons;

A water right is a right to use a portion of the public's water resources—a usufructuary right;

Water-rights owners may build facilities on the lands of others, either by agreement or with just compensation, to divert, extract, or move water from a stream or aquifer to its place of use; and

Water-rights owners may use streams and aquifers for the transportation and storage of water.

BLM_0064886

After constitutional establishment of the prior appropriation system, the Water Right Determination and Administration Act of 1969 ("The 1969 Act"), which applies to surface water and tributary groundwater,[8] further codified the procedure for adjudication and administration of water rights in Colorado. The 1969 Act specified that all water in the state intended for public use was subject to appropriation and administration to "maximize the beneficial use of all of the waters of the state."[9]

## MAJOR ACCOMPLISHMENTS OF THE 1969 ACT[10]

❖ Integration of surface water and tributary groundwater into a unitary adjudication and administration system;

❖ Specialized water court jurisdiction and engineer administration on a watershed basis;

❖ Resumption of notice procedure for obtaining jurisdiction for adjudication of rights;

❖ Case-by-case decrees and appeals in the context of an ongoing and comprehensive adjudication;

❖ Authorization of augmentation plans to enable otherwise out-of-priority water use through the provision of replacement water;

❖ Effective rulemaking and enforcement authority by the Colorado Division of Water Resources and division engineers for the protection of state, federal, and interstate rights; and

❖ Explicit procedures for filing and pursuing applications and objections to applications for water rights, conditional water rights, changes of water rights, and augmentation plans.

Colorado allocates and administers water according to two general categories: (1) Surface water, which includes tributary groundwater, and (2) other groundwater. The first category is subject to Colorado's prior appropriation



# JOE GALLEGOS

## RIO GRANDE RIVER BASIN

Joe is a Costilla County Commissioner and still works on the land his family farmed five generations ago. His great grandfather helped dig the People's Ditch, which has the oldest water right in Colorado. Joe is pictured next to the People's Ditch.

The Colorado Water Plan is a great start to getting a grasp on the water and a direction when shortages or dispute take place but this plan cannot be written in stone; water, weather, and human situations are dynamic and therefore the plan must also be dynamic. The Plan must be consistently updated and have an ability to improvise for unforeseen occurrences. Like everyone else I worry about the future water supply, but with a plan and power of the community, shortages can be managed. Having a lifestyle that is totally dependent on water, my commitment to being involved in creating a future manageable water situation is part of that lifestyle. I am a fifth Generation rancher and farmer benefiting...

CONTINUED AT END OF CHAPTER

PROFILE

BLM_0064887

doctrine; Article XVI, Sections 5 and 6, of the Colorado Constitution and the 1969 Act generally govern it.[11] This category of water includes all natural stream water and all tributary groundwater, which is groundwater that is hydrologically connected to a surface stream. Colorado law presumes that all groundwater in Colorado is tributary unless law defines it otherwise, or facts prove it.[12]

A modified prior appropriation doctrine governs, and Colorado's Groundwater Management Act ("The Groundwater Act") partially governs, the second category.[13] This category includes groundwater that law or fact has found to be insignificantly hydrologically connected to a surface stream. This category of water encompasses many different types of water, including: (a) designated groundwater (within a designated groundwater basin);[14] (b) nontributary groundwater outside of designated groundwater basins;[15] (c) "not nontributary" groundwater;[16] (d) Denver Basin groundwater;[17] (e) geothermal groundwater;[18] (f) exempt groundwater;[19] and (g) other types of groundwater that may require a well permit from the Colorado Division of Water Resources (DWR),[20] or as determined by the Colorado Ground Water Commission.[21] For instance, the doctrine of prior appropriation does not apply to nontributary, Denver Basin, or designated groundwater. Such water is allocated as correlative rights generally based on overlying land ownership.[22] The Colorado Ground Water Commission (comprising 12 members, nine of whom are appointed by the governor and confirmed by the Senate) may determine and alter boundaries of designated groundwater basins and their subdivisions by geographic description; these boundaries are subject to statutory limitations.[23]

The vast majority of Colorado's water rights are subject to the prior appropriation system, which aligns water rights in order of appropriation and adjudication dates. This system can result in a situation in which a downstream water user that has a senior priority right, which the water court has adjudicated, may divert and use water before upstream users with less senior water rights (or junior rights) on the same stream. This becomes particularly vital during a time of water shortage when senior water rights are more highly valued. A "call" on a stream by a downstream senior water rights holder may cause an upstream user with junior rights to reduce diversions or curtail water usage completely; in that case, the calling downstream user may receive the quantity of water to which it is entitled.

The DWR and division engineers are required to regulate such a call pursuant to state statute.[24]

"Beneficial use," defined as a reasonable level of use beyond which waste may occur,[25] serves as both the measure and the limit of water.[26] There are a number of important water law terms that require definition. Three very good existing glossaries are available online at Colorado State University Extension,[27] Denver Water,[28] and Colorado River Water Conservation District.[29]

The term "beneficial use" is used to both determine and administer water rights. In the early territorial days, beneficial use extended primarily to domestic and agricultural use. As the state's population has grown and water values have evolved, the definition of beneficial use has likewise evolved and expanded to include municipal, industrial, recreational, wildlife, and other uses.[30] Instream flow water rights are held exclusively by the CWCB. The purpose of instream flow water rights is to preserve or improve the environment to a reasonable degree, as codified in the statutory definition of beneficial use.[31] The General Assembly has recently amended the statutory definition to recognize in-channel uses for recreational purposes.[32]

## Water Rights and Adjudication

The prior appropriation system today is a product of our constitutional, legislative, regulatory, and judicial processes. Colorado's seven water courts in each of the state's seven major watersheds issue decrees confirming water use rights.[33] Water rights may be confirmed for use on a direct flow basis, by storage, or by exchange.[34] With a direct-flow right, the water user directly applies the water from the stream or tributary aquifer for irrigation, domestic, industrial, or other uses. A user typically accomplishes a storage right by placing water into a vessel, such as a reservoir or a tank (or, under certain conditions, into an aquifer), for beneficial use at a later time. A user generally accomplishes an exchange by diverting water at an upstream location while providing a substitute supply of water at a downstream location; that supply must be suitable in quantity and quality to satisfy downstream senior priorities, and must not affect existing, intervening water uses within the exchange reach. Water court decrees generally quantify direct flow and exchange water rights in terms of flow, which is measured in cubic feet per second, while storage water rights are generally measured volumetrically in acre-feet.[35]

BLM_0064888



The People's Ditch holds the first adjudicated water rights in Colorado, dated in 1851. This is ten years prior to Colorado becoming a U.S. territory and 25 years before statehood. Photo: M. Nager.

BLM_0064889

Section 6 of Article XVI of the Colorado Constitution sets forth the right to appropriate as "the right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied."[36] In Colorado, a user appropriates a water right by demonstrating intent and taking steps to put water to beneficial use. A user makes that right absolute by storing or directly applying a specified amount of water for beneficial use.[37] A water user may then receive protection under the priority system by adjudicating that right through the water court process.[38] A user can also obtain a conditional water right by showing an intent to put water to beneficial use and proving that that user "can and will" put the water to beneficial use under Colorado's anti-speculation doctrine.[39] To avoid the requirement of further diligence applications, a user must exercise conditional right in priority, and a court must establish it as an absolute right by decree.

As the prior appropriation system has evolved, more adjudicated water rights exist than some river basins can satisfy in dry years. When this occurs, that basin is described as over-appropriated, meaning that there is limited opportunity to develop new junior water rights in that basin.[40] In over-appropriated basins, a user may create new water uses by changing existing water rights to the new uses, or by developing augmentation plans to increase the water supply.[41]

## Changes of Water Rights

The right to use water in Colorado is usufructuary.[43] As such, it is limited to the amount of diversion, location of diversion, place of use, manner of use, and type of use a water court decree allows.[44] A user may convey a water right to another water user or, with appropriate water court or administrative approval, change it to another location of diversion, place of use, manner of use, or type of use, while still retaining its priority. However, changes in water rights are subject to terms and conditions that prevent injury to existing water rights.[45]

### USUFRUCTUARY RIGHT

A civil law term referring to the right of enjoying a thing, the property of which is vested in another (in this case the State), and to draw from the same all of the profit, utility, and advantage which it may produce, providing it be without altering the substance of the thing.[41]

The engineering analysis in a change-of-water-right proceeding establishes the time, place, and amount of decreed and historical consumptive use, which serves as the volumetric limitation on any new consumptive use.[46] In addition to establishing historical consumptive use, an analysis must establish the timing, location, and amount of historical return flows (the non-consumed portion of the diversion). Return flows must be replaced in the stream so that water users senior to the date of the change may continue to enjoy stream conditions that were in place at the time of their appropriation.[47] A full analysis considering time, place, and amount of historical use on a stream is generally referred to as a "net stream depletion" analysis. Because the prior appropriation doctrine forbids the change of one water right to the injury of another (even a junior water right[48]), making such changes is a costly proposition that requires complex legal and engineering analyses.

The goal of the net stream depletion assessment, including historical beneficial consumptive use, is to ensure that future depletions or consumptive use do not exceed historic depletions or consumptive use. Maintaining flows after a change of water right ensures that water users that established their rights before the date of the change in use receive the water to which they are entitled, and do not suffer an injury to their water rights as a result of that change.[49]

BLM_0064890

## Augmentation Plans

Colorado water law allows users to divert water out of priority if they replace any injurious depletions under what is called a "plan for augmentation."[50] A typical plan for augmentation allows a user with a junior water-rights holder to divert out of priority ("cutting in line," so to speak), as long as that junior water user can replace or remedy its injurious depletions to the user with senior calling water rights, and avoid injuring other water users in the process.[51] A common scenario is one in which a water user pumps a well out of priority and then replaces stream depletions with other senior surface water or nontributary groundwater. Under an augmentation plan, the replacement water must generally be available in the same quality and quantity. It also must be available at the same time, location, and amount as the stream depletions the out-of-priority pumping or diversions caused.[52] Permanent or long-term plans for augmentation and changes of water rights require water court approval, but the DWR has statutory authority to approve temporary, substitute water supply plans and interruptible water supply agreements for similar purposes.

## State Administration of Water Rights

The DWR, a division of the Department of Natural Resources (DNR), administers water rights. Also referred to as the State Engineer's Office, the DWR evaluates well permits, inspects dams and wells, and oversees the work of field water commissioners who physically allocate the water and enforce compacts, water court decrees, and well permits.[53]

The DWR is headquartered in Denver and has seven field offices in each major river basin across the state. Every field office has a division engineer who serves as the lead and manages the administration of that particular water division.[55] Water commissioners, who work under the division engineer, not only monitor diversion structures and streams in the field for immediate administration of water rights, but also gather important data for use in water planning studies and decision-support systems.[56]



FIGURE 2.1-1   COLORADO'S WATER DIVISIONS[54]

The water commissioners also administer calls on the river system to ensure that the holder of a senior water right receives its entitlement. Other duties of the water commissioners and other DWR employees include regulating headgates, measuring devices, and administering and enforcing storage water rights, plans for augmentation, exchanges, and transmountain water diversions.[57] The DWR also oversees the well-permitting process for all types of groundwater.[58] The DWR requires well permits for extraction of tributary groundwater, designated groundwater, nontributary groundwater, Denver Basin groundwater, produced water from tributary coalbed methane wells, and geothermal groundwater.[59]

In its management of water records statewide, the DWR maintains decrees, permits, maps, historical streamflow and diversion measurements, real-time streamflow and major diversions, and groundwater levels. The DWR also maintains a repository of policy documents, planning materials, rules, and regulations.[60]

BLM_0064891



Rainbow over the lower Colorado River near Grand Junction. Photo: M. Nager.

BLM_0064892

The DWR collects water resources data and makes them available online through Colorado's Decision Support Systems (CDSS), a joint effort of the CWCB and the DWR.[61] The CDSS consists of data, mapping, and analytical tools and models to assist the State and stakeholders in water resources planning and management. The CDSS contains historical data and information about streamflow, diversions, climate, water rights, call records, well permits, aquifer properties and groundwater levels. The CDSS's analytical resources include an online map viewer, data processing and graphing tools, crop consumptive use models, and surface water and groundwater models. The CDSS map viewer is available here.[62]

The Colorado Ground Water Commission is responsible for adjudicating groundwater rights and issuing large-capacity well permits. Much of the groundwater located within the basin has been authorized as being in a designated groundwater basin. The Colorado Groundwater Commission has also established eight designated basins and 13 groundwater management districts within such basins. Groundwater management districts are local districts that have additional administrative authority.

## Moving Forward

The evolution of Colorado water law through the courtroom and the legislative process presents both challenges and opportunities for Colorado's Water Plan. The institution of the prior appropriation system can be difficult to navigate because of the planning and costs associated with judicial and administrative approvals. Efforts are currently underway to simplify the process and support evolving water uses in Colorado. Alternatives, such as the Alternatives to Agricultural Transfer Grant Program, new legislation, water court rule changes, and ongoing studies and processes on water banking have helped increase the flexibility within this landscape, and demonstrate how well the complex Colorado water administration system can adjust.

Recent agreements between multiple stakeholders, such as the Colorado River Cooperative Agreement, between Denver Water and more than two dozen western slope entities,[63] and subsequent agreements with various entities, including the CWCB, illustrate the ability to work collaboratively and creatively within of Colorado's water administration system to achieve maximum use of the state's water resources for the greatest benefit.

BLM_0064893

# 2.2
# INTERSTATE COMPACTS AND EQUITABLE APPORTIONMENT DECREES

Colorado is a headwaters state in which the major rivers flow to downstream states on both sides of the Continental Divide. As Colorado and other downstream states developed those rivers in the late 19th and early 20th centuries, disputes arose regarding the authority of one state to control the use of an interstate stream that originates in another state.[64] Initially, downstream states sought to resolve water disputes through litigation before the United States Supreme Court.[65]

| TABLE 2.2-1 | COLORADO'S INTERSTATE COMPACTS |
|---|---|
| Colorado River Compact | 1922 |
| La Plata River Compact | 1922 |
| South Platte River Compact | 1923 |
| Rio Grande River Compact | 1938 |
| Republican River Compact | 1942 |
| Upper Colorado River Compact | 1948 |
| Arkansas River Compact | 1948 |
| Costilla Creek Compact | 1963 |
| Animas-La Plata Compact | 1969 |

The United States Supreme Court decided two cases that convinced Colorado water leaders that negotiated interstate water agreements were preferable to interstate litigation.[66] Colorado is party to nine formal interstate water agreements called "compacts." These compacts, in addition to water administration within Colorado, place limits on Colorado's ability to use all of the water supplies that originate within the state (see Table 2.2-1 and Table 2.2-2).

In the 1907 case of *Kansas v. Colorado,* which arose from the contention that water users in Colorado were depriving users in Kansas of their fair share of Arkansas River flows, the United States Supreme Court announced the doctrine of equitable apportionment.[67] This doctrine provides that the principle of "equality of right" should be applied when determining how states should share rivers to ensure that each state receives equal benefit.[68] The court dismissed Kansas' claim because it could not show sufficient injury from Colorado's diversions, but allowed Kansas to bring a new action in the event of a "material increase in the depletion of the waters of the Arkansas by Colorado."[69] *Kansas v. Colorado* left future disagreements about river use to the uncertain and expensive process of protracted, United States Supreme Court litigation. A similar dispute over Colorado's proposed diversions from the Laramie River, to the detriment of downstream senior appropriators in Wyoming, led to the case of *Wyoming v. Colorado.*[70] Resolving the dispute in Wyoming's favor, the Supreme Court ruled in 1922 that when two states each use the prior appropriation doctrine, the doctrine should be applied to determine relative priorities on an interstate basis.[71] As a result, this decision required junior water users in Colorado to honor senior water rights in Wyoming.[72]

| TABLE 2.2-2 | COLORADO'S INTERSTATE DECREES |
|---|---|
| Laramie River Decree | 1957 |
| North Platte Decree | 2001 |

Greeley's Delph Carpenter, one of the attorneys representing Colorado in the Wyoming litigation, was a visionary who recognized that the law resulting from the *Kansas* and *Wyoming* decisions put Colorado's future at great risk.[73] Carpenter, an experienced irrigation litigator as well as a rancher and a former state senator, was appointed to be interstate streams commissioner in 1913.[74] As an attorney for Colorado, he worked on negotiations with Nebraska regarding the South Platte River.[75] During that time, he formulated the leading theory on rights and authorities for entering into interstate compacts, which guided the creation of the nine water compacts the State of Colorado ultimately signed.[76]

Historic map of the rivers in the southern Rocky Mountains.
Courtesy of Justice Gregory Hobbs.

BLM_0064894



BLM_0064895

## Colorado's Interstate Compacts and Interstate Equitable Apportionment Decrees

### Colorado River Compact

Carpenter became especially concerned about the Colorado River. California, a prior appropriation state, was growing rapidly.[77] Carpenter feared that without an agreed apportionment between the states, California farmers and municipalities would appropriate the river to the point that Colorado would not be able to provide for future development.[78] With a vision to protect Colorado, Carpenter became the principal force in the negotiation of the Colorado River Compact, and went on to negotiate additional compacts on behalf of Colorado.[79] Carpenter's model guided other negotiators of interstate water compacts, providing greater certainty to water users in all participating states.[a]

Interstate water compacts are formal agreements among participating states. The United States Constitution authorizes these compacts, and state legislatures and the United States Congress must ratify them for them to take effect. Under this framework, compacts are considered federal law, state law, and legally binding contracts among the signatory states. These compacts help the states negotiate, rather than litigate, over the management of interstate waters. As this chapter more fully describes, litigation still occurs regarding compact interpretation; however, that litigation tends to be more streamlined and efficient as a result of an existing water compact. The nine water compacts, along with two court decrees, are fundamental elements of Colorado's Water Plan because they dictate how states share water. The compacts also identify and delineate the rights and obligations that control the use and future development of every stream in Colorado.

The Colorado River Compact is the foundation for a complicated body of law regarding use and management of the Colorado River. Together, the Colorado River Compact and the associated body of law are known as the "Law of the River."[b] Negotiators of the compact signed it on November 24, 1922, and the United States Congress approved it by passage of the Boulder Canyon Project Act in 1929.[80]

Generally, the compact divides the right to consume water for beneficial use from the Colorado River system among the Upper Basin states (Colorado, Utah, Wyoming, and New Mexico) and the Lower Basin states (California, Arizona, and Nevada).[81] Lee Ferry, Arizona marks the dividing point between the basins[82] (See Figure 2.2-1). The compact recognizes each basin's right to the beneficial consumptive use of 7.5 million acre-feet of water per year in perpetuity.[83] The Lower Basin states may increase their beneficial consumptive use by 1 million acre-feet per year.[84] The compact also obligates the Upper Division states to "not cause the flow of the river at Lee Ferry to be depleted below an aggregate of 75 million acre-feet zfor any period of 10 consecutive years."[85]

Anticipating a potential treaty between the United States and Mexico, the compact further specifies that the states are to address any obligation to deliver water to Mexico under a future treaty by using water in excess of the apportionments between the basins.[86] If no surplus exists, the Upper and Lower Basin states are to share equally in meeting any such deficiency.[87] In addition to the apportionment provisions, the Colorado River Compact asserts that the compact does not affect present, perfected rights, and recognizes the states' respective authority to regulate and control the appropriation, use, and distribution of water within their boundaries.[88] Present, perfected rights are defined as "perfected rights, as here defined, existing as of June 25, 1929, the effective date of the Boulder Canyon Act."[89] Complete text of the compact is available here.[90]

---

[a] Carpenter also negotiated the South Platte River Compact and the La Plata River Compact. Other negotiators of interstate water compacts include: Clifford H. Stone (Upper Colorado River Compact and original Costilla Creek Compact); M.C. Hinderlider (Río Grande River Compact and Republican River Compact); J.E. Whitten (amended Costilla Creek Compact); Henry C. Vidal, Gail L. Ireland and Harry B. Mendenhall (Arkansas River Compact); and multiple negotiators (Animas-La Plata Compact).

[b] The "Law of the River" is a colloquial phrase that generally refers to the collective body of compacts, decrees, statutes, regulations, contracts, treaty, and other legal documents and agreements applicable to the allocation, appropriation, development, exportation, and management of the waters of the Colorado River.

BLM_0064896

## FIGURE 2.2-1 | THE COLORADO RIVER BASIN



BLM_0064897

## Upper Colorado River Basin Compact

The Upper Colorado River Basin Compact divides the right to beneficial consumptive use of the Colorado River among the Upper Division states (Colorado, Wyoming, Utah, and New Mexico), plus Arizona, which receives an allocation based on the portion of the state that is located in the Upper Basin.[91] These five states signed the compact on October 11, 1948, and subsequently ratified it. Congress then ratified it in 1949.[92] The compact allocates the consumptive use as follows: Colorado, 51.75 percent; New Mexico, 11.25 percent; Utah, 23 percent; Wyoming, 14 percent; and Arizona, 50,000 acre-feet per year.[93] In addition to the allocation provisions, the compact outlines parameters for the Upper Division states to assure compliance with the flow obligation at Lee Ferry under the Colorado River Compact, and establishes a commission to implement and administer the compact.[94] Each of the four Upper Division states and the federal government may appoint a commissioner to the commission.[95]

The Upper Colorado River Basin Compact sets forth specific terms for apportioning, among the states, the use of interstate tributaries to the Colorado River. These interstate tributaries include the Yampa, San Juan, Little Snake, and Henry's Fork.[96] The compact also recognizes water use as decreed by the La Plata River Compact, and accounts for such uses as part of the Upper Colorado River Compact.[97] Complete text of the compact is available here.[98]

## Arkansas River Compact

Recognizing the value of settling uncertainties associated with the equitable apportionment decree from *Kansas v. Colorado*, those two states signed the Arkansas River Compact on December 14, 1948, and Congress ratified it in 1949.[99] This compact does not impose any fixed-delivery obligation.[100] Instead, it protects water uses in existence in 1949, and limits future development in either Colorado or Kansas to the extent that it would cause any material depletion of usable state-line flow.[101] The compact also addresses the allocation of benefits from use of storage at John Martin Reservoir, whose construction was complete the same year the Congress approved the compact.[102] Specifically, the compact directs that John Martin Reservoir be operated for the benefit of both states, and provides specific terms for operation.[103] Based on the compact, storage periods are divided between winter (November 1 to March 31), when all inflows are stored, and summer (April 1 to October 31), when generally only large flood flows are stored.[104] The compact also establishes the Arkansas River Compact Administration, with designated roles and responsibilities.[105]

Based on its authority and obligations, the Arkansas River Compact Administration adopted the 1980 Operating Plan for John Martin Reservoir, substantially modifying the storage and release of water from the reservoir to improve the efficiency of water delivery to users in both states.[106] Recent litigation in *Kansas v. Colorado* provides more specific guidance for administration of the river, within the framework established in the compact and the operating plan.[107] Complete text of the compact is available here.[108]

## Animas-La Plata Project Compact

Signed on June 7, 1969, this compact between Colorado and New Mexico informs the operation of the Animas-La Plata Project.[109] The compact recognizes New Mexico's right to divert and store water from the Animas and La Plata Rivers, for uses the federal reclamation Animas-La Plata Project describes, with the same priority as those diversions made under the same project for Colorado users.[110] The compact further clarifies that any of New Mexico's use of these waters counts toward that state's allocation under the Upper Colorado River Basin Compact.[111] Complete text of the compact is available here.[112]

BLM_0064898

## La Plata River Compact

Following on the heels of the Colorado River Compact, New Mexico and Colorado signed the La Plata River Compact on November 27, 1922, and Congress approved it in 1925.[113] The La Plata River Compact designates the location and operation of two gages on the river and defines the calculation for determining La Plata River flows.[114] This compact allows both states unrestricted use of the river between December 1 and February 15 of each year.[115] During the rest of the year, the compact entitles each state to unrestricted water when the interstate gage station is greater than 100 cubic feet per second.[116] When the interstate gage station is less than 100 cubic feet per second, Colorado must deliver half of the mean flow measured at the Hesperus gage station to New Mexico.[117] Additionally, the compact allows for alternating periods of use between the two states during times of low flow, and specifies that it will not consider minor deviations from the required water deliveries to be a violation.[118] Complete text of the compact is available here.[119]

## Republican River Compact

Colorado, Kansas, and Nebraska signed the Republican River Compact on December 31, 1942, and Congress ratified it in 1943.[120] The compact quantifies the average annual "Virgin Water Supply" (defined as water within the basin "undepleted by the activities of man") within the basin and its tributaries as 478,900 acre-feet of water per year.[121] For beneficial consumptive use each year, the compact allocates 54,100 acre-feet of water to Colorado, 190,300 acre-feet of water to Kansas, and 234,500 acre-feet of water to Nebraska.[122] In addition, the compact allocates the entire water supply originating in the basin downstream from the lowest crossing of the river at the Nebraska-Kansas state line for beneficial consumptive use in Kansas.[123] If the water supply of any sub basin varies by greater than 10 percent relative to the period of record used as a basis for the compact, the allocations also change by the same percentage.[124]

Rather than establishing principles for dispute resolution, the compact calls for each state to administer the compact through its respective water administration officials, and acknowledges that those officials may, by unanimous action, adopt rules and regulations consistent with the compact.[125] Consequently, in 1959 the states established the Republican River Compact Administration (RRCA).[126] Each year, by unanimous action, the three RRCA members compute the Virgin Water Supply within the basin and the beneficial consumptive use of each state.[127] Under the accounting procedures the RRCA established, Colorado's allocation for beneficial consumptive use in the Republican River sub-basins, under normal conditions, includes 10,000 acre-feet from the North Fork of the Republican, 15,400 acre-feet from the Arikaree River, 25,400 acre-feet from the South Fork of the Republican, and 3300 acre-feet from the Beaver Creek. Kansas and Nebraska may each consume 190,300 acre-feet and 234,500 acre-feet of water, respectively.[128]

Despite efforts to avoid litigation and promote interstate amiability through the Republican River Compact, the states have been involved in formal disputes regarding compact compliance and interpretation since 1999. Currently, the lack of consensus regarding accounting procedures and compact compliance has formed the basis of several non-binding arbitrations and litigation before the United States Supreme Court. Complete text of the compact is available here.[129]

BLM_0064899

## Rio Grande River Compact

The Rio Grande Compact allocates beneficial use of water from the Rio Grande River among Colorado, New Mexico, and Texas. These states signed the Rio Grande Compact on March 18, 1938, and Congress approved it the following year.[130] The compact defines the boundaries of the Rio Grande River Basin and establishes the operation of six gage stations and recorders near reservoirs built after 1929.[131] It requires that Colorado deliver a certain amount of water at the New Mexico/ Colorado state line annually based on an index schedule, and includes provisions for New Mexico to deliver certain amounts to Elephant Butte Reservoir based on a similar, though separate, index schedule.[132] The compact assumes a normal release of 790,000 acre-feet from Elephant Butte to irrigate lands in southern New Mexico and Texas, and to provide water to Mexico consistent with the 1906 Treaty.[133] Additionally, the compact creates a system of water credits and debits, storage, spills, and releases from the Rio Grande Project at Elephant Butte, and places further restrictions on storage within Colorado and New Mexico.[134] The compact also establishes a commission for compact administration purposes. Colorado's state engineer serves as Colorado's commissioner.[135] Complete text of the compact is available here.[136]

## South Platte River Compact

Colorado signed the South Platte River Compact shortly after the La Plata River Compact on April 27, 1923; however, Congress did not fully ratify the compact until 1926.[137] This compact allocates the waters of the South Platte River between Colorado and Nebraska.[138] It relies on the western boundary of Washington County to separate the upper and lower sections of the South Platte River within Colorado, and establishes a gage at Julesburg to measure flow.[139] The South Platte Compact provides Colorado unrestricted use of water in the lower section between October 15 and April 1 and includes several provisions relating to Nebraska's canals. Between April 1 and October 15,

the compact stipulates that Colorado curtail diversions in the lower section by appropriators with decrees junior to June 14, 1897, when the mean flow (as measured at the Julesburg gage) is less than 120 cubic feet per second.[140] Like the La Plata Compact, the South Platte Compact specifies that minor irregularities in water delivery will not constitute a violation of the compact.[141] Complete text of the compact is available here.[142]

## Amended Costilla Creek Compact

Colorado and New Mexico signed the Costilla Creek Compact on September 30, 1944, and amended the compact in 1963.[143] Congress ratified it in 1963. The Costilla Creek Compact is intended to establish integrated operations between Colorado and New Mexico for existing and prospective irrigation facilities, and to equalize the benefits of the water and its beneficial use between the two states.[144] The compact defines May 16 to September 30 as the irrigation season, designates October 1 to May 15 as the storage season, and prohibits direct-flow diversions during the storage season.[145] The compact further sets forth the amount of water to be delivered among the water users within both states, and provides for allocation of surplus flows and storage in reservoirs constructed after the compact took effect.[146] Costilla Creek flows downstream from where the water leaves the mountains make deliveries to water users in Colorado.[147] Moreover, the compact allocates 36.5 percent of the usable capacity of the Costilla Reservoir to Colorado, and 63.5 percent to New Mexico.[148] The 1963 amendment to the compact allows for a change in point-of-diversion for the Cerro Ditch, where delivery from Costilla Reservoir is made.[149] A commission comprising the state engineers for both Colorado and New Mexico oversees the compact.[150] Complete text of the compact is available here.[151]

BLM_0064900

## Laramie River Decree

The decree in *Wyoming v. Colorado,* 353 United States 953 (1957), permits Colorado to divert 49,375 acre-feet of water per calendar year from the Laramie River and its tributaries, provided that Colorado diverts no more than 19,875 acre-feet per calendar year of that total amount outside of the Laramie River Basin.[152] Further, Colorado may divert no more than 1800 acre-feet after July 31 of each year for use within the basin. All waters diverted for use within the Laramie River Basin in Colorado are restricted to irrigation use on those lands the court designated at the time of the decree, while waters diverted for use outside of the basin are not subject to that restriction. The waters of Sand Creek are specifically excluded from the operation of this decree.[153] Complete text of the decree is available here.[154]

## North Platte Decree

The amended decree in *Nebraska v. Wyoming,* 534 U.S. 40 (2001), equitably apportions water in the North Platte River among Colorado, Nebraska, and Wyoming.[155] The decree limits Colorado's diversion of water from the North Platte River in Jackson County for irrigation of no more than 145,000 acres during one irrigation season (May 1 to September 30), and limits storage to no more than 17,000 acre-feet of water for irrigation purposes between October 1 of any year and September 30 of the following year. The decree also limits total water exports from the North Platte River Basin in Colorado to no more than  60,000 acre-feet during any 10-year period. The decree  does not affect or restrict the use or diversion of water for ordinary and usual domestic, municipal, orstock-watering purposes.[156] Complete text of the decree is available here.[157]

## Other Institutional Interstate and Federal Agreements

To effectively manage water resources, Colorado has entered into many interstate agreements (rather than more formalized compacts) in addition to the compacts and interstate equitable apportionment decrees described above. Two such agreements are memoranda of understandings (MOUs) between Colorado and neighboring states; the MOUs involve Pot Creek in Utah and Sand Creek in Wyoming. This plan more fully describes these less-formally recognized interstate water agreements below.

In addition, Colorado is actively involved in interstate and federal water matters to protect the State's rights and interests in water resources. Recognizing that formal disagreements or disputes among states rise directly to the United States Supreme Court and inevitably result in expensive, protracted litigation, Colorado, the federal government, and downstream states have engaged in an unprecedented amount of cooperation and interstate consensus the last two decades about matters related to enforcement, interpretation, or implementation of the interstate compacts, or reconsideration of equitable apportionment decisions. The result of this cooperation is that interstate agreements have ultimately resolved many disputes. This plan further describes some of these cooperative arrangements below.

## Pot Creek Agreement

Rather than using an interstate compact, Colorado and Utah used an MOU to define their relationship regarding Pot Creek.[158] Originating in the Uinta Mountains in Utah, Pot Creek flows for eight miles within Colorado before joining the Green River. The two states signed the Pot Creek MOU on April 1, 1958 and established an equitable and workable division of water. This MOU stipulates that both Colorado and Utah believed that a compact would eventually be necessary to appropriate water between the two states, but that in the meantime, the MOU would help develop a functioning system. One aspect of the Pot Creek MOU defines the parameters for appointing a water commissioner with the authority to administer water in both Colorado and Utah. The MOU also calls for a division of the expenses, with Utah bearing 80 percent of the costs and Colorado bearing 20 percent. Additionally, this MOU states that the states may not exercise direct flow diversions before May 1 of each year, and establishes a schedule of priorities for use in the two states.[159]

BLM_0064901

## Sand Creek Agreement

Sand Creek originates in the Laramie Mountains of Colorado and flows into Wyoming, where it joins the Laramie River.[160] To equitably apportion Sand Creek, Colorado and Wyoming signed an MOU on March 13, 1939. The Sand Creek MOU allocates waters according to the priority water rights in Colorado and Wyoming, recognizing that Wyoming was entitled to 50.68 cubic feet per second before any Colorado diversions. This provision was later revised on August 7, 1997 to require Colorado to deliver 40 cubic feet per second over a seven-day period at the beginning of the irrigation season; after that period, Colorado was required to deliver 35 cubic feet per second. Finally, the Sand Creek MOU limits diversions of the Sand Creek Ditch and the Wilson Supply Ditch to amounts of water in excess of the water allocated to Wyoming.[161]

## Colorado River Agreements

Within the Colorado River Basin in the last several decades, states have made extraordinary strides toward cooperation. For example, the Upper Colorado River Endangered Fish Recovery Program and the San Juan River Recovery Implementation Program enable Colorado to fully use its compact entitlements, while striving to support the recovery of endangered fish species. This plan further describes these programs.

In 2006, Arizona, Colorado, Nevada, New Mexico, Utah, and Wyoming also signed the Range-Wide Conservation Agreement and Strategy for Roundtail Chub, Bluehead Sucker, and Flannelmouth Sucker (the "Three Species Agreement").[162] Through a collaborative and cooperative interstate effort, the states created this agreement to expedite the implementation of conservation measures for the three species. Using coordinated, state-driven preventative measures, the Three Species Agreement seeks to minimize potential threats to the species that could result in a federal listing.[163]

In 2007, the states overcame substantial disagreement to collectively support the Bureau of Reclamation's (BOR's) Record of Decision on Interim Guidelines for Lower Basin Shortages and Coordinated Operation of Lake Powell and Lake Mead through 2026.[164] Among other things, these guidelines: 1) Set forth coordinated,

operational protocols between Lakes Mead and Powell to allow the system to operate more efficiently during drought; 2) establish shortage guidelines in the lower basin; and 3) implement the "Intentionally Created Surplus" mechanism for banking water in Lake Mead.[165]

Continued cooperative efforts have helped lower-basin interests to use water more efficiently. Such efforts include the creation of the Intentionally Created Surplus, the pilot operation of the Yuma Desalting Plant, and the construction and operation of Brock Reservoir.

The states and the federal government have also continued to develop a working relationship with Mexico, resulting in Minutes 316-319 to the 1944 Water Treaty.[166] These minutes identify and implement voluntary options for creating a larger quantity of water in the system, enhancing environmental values, providing Mexico with access to storage in the United States, providing improved water management during drought in both countries, and establishing the foundation for developing and implementing cooperative projects that are mutually beneficial to both countries—and that are consistent with the 1944 Water Treaty and the Law of the River.

In response to the basin-wide drought that began in 2000, there has also been increased interstate activity in the field of weather modification. Weather modification, or cloud seeding, is designed to increase winter precipitation through aerial and ground-based techniques. The Colorado Basin states are pursuing winter cloud seeding efforts in Colorado, Wyoming, and Utah. Additionally, New Mexico helps fund Colorado's weather modification program in Southwest Colorado to increase runoff and flow in the Colorado River.[167]

Most recently, the Colorado River Basin states have turned their attention to: 1) Collaborating on drought contingency planning to protect certain reservoir thresholds in the event of continued drought conditions; 2) protecting power generation and instream natural resources, including endangered fish and other natural resources; and 3) ensuring the continued use and development of existing water supplies.

BLM_0064902

## Platte River Agreements

On the South and North Platte Rivers, Colorado, Wyoming, and Nebraska are currently working with the Department of the Interior to collectively manage the rivers, with the dual goals of enabling endangered species recovery and protecting water development. The Platte River Recovery Implementation Program, established in 1997 and authorized by Congress in 2008, seeks to restore habitat, provide for increased streamflows, and encourage an adaptive management approach to river operations.[168] Chapter 6 further describes this program.

## Republican River Agreements

Within the Republican River Basin, the State of Colorado continues to be involved with Colorado water users, as well as with water users in Nebraska and Kansas, to identify reasonable methods for future compact compliance by all parties. Colorado recently constructed the Compact Compliance Pipeline (CCP) to facilitate Colorado's ongoing and future compact compliance, while mitigating any negative effects of compact compliance on Colorado water users. Before the pipeline can become fully operational, Nebraska, Kansas, and Colorado must agree on how to account for the water under the compact. This includes negotiating, and in some instances arbitrating, appropriate changes to compact accounting procedures, and implementing new operations in the basin. Once the states reach a final agreement, water deliveries from the CCP will count toward Colorado's compact obligations to Nebraska and Kansas.

## Rio Grande River Agreements

On the Rio Grande, the State continues to work on intrastate and interstate issues related to groundwater administration and compliance with the compact and the Endangered Species Act (ESA). The DWR is addressing groundwater issues in the San Luis Valley through the establishment of basin sub-districts and ongoing efforts to develop groundwater administration rules for the Rio Grande Basin in Colorado. Additionally, the State continues to work with the federal government and stakeholders to address survival and recovery efforts of endangered and threatened species in a manner that respects and complies with existing Colorado water rights, as well as with interstate compact rights and authorities. The State is also involved in an interstate lawsuit before the United States Supreme Court concerning groundwater pumping and usage between Texas and New Mexico below Elephant Butte Reservoir. Because interpretation and enforcement of the Rio Grande River Compact may form the basis for part of the controversy between Texas and New Mexico, Colorado, as a signatory to the compact, is a named party to the lawsuit.[169]

## San Juan/Dolores River Agreements

In the San Juan/Dolores Basin, a major project was recently built to assist Colorado in meeting its compact obligations to New Mexico. The State worked with local stakeholders to construct Long Hollow Reservoir to both supplement the irrigation needs for the region and to assist in fulfilling compact requirements. This reservoir allocates 300 acre-feet of annual storage to be used for deliveries to New Mexico during summer low-flow months. In addition, the State worked with local governments, neighboring states, tribal interests, and the federal government to complete the Animas-La Plata Project. The water the CWCB purchased for this project will be important to Colorado in the future.

BLM_0064903

# COLORADO'S LOCAL-CONTROL STRUCTURE

## 2.3

Colorado's local governments have considerable authority in making water development and management decisions. The state's 64 counties and 271 municipalities exercise a broad range of powers, which state law explicitly delegates to them, to address the needs of respective constituents.

Generally, counties have discretionary powers to provide services, including water and sewer, and to operate districts for irrigation and recreation, among other uses. Cities and towns have the ability to address the needs of their denser populations through self-government, including administrative, police, and financial powers. Furthermore, the State constitution authorizes municipalities and counties to adopt home-rule charters, which provide even greater autonomy and flexibility to address local problems.[170] Municipal home-rule is intended to ensure that cities can make decisions on expending funds, incurring debt, building and maintaining public facilities, and undertaking other activities to meet their needs. County home-rule charters are authorized to establish the organization and structure of county government, but do not provide the "functional" home-rule powers of municipal charters.[171]

## Land- and Water-Use Planning Authority

State law also provides local governments with authority specific to land use and water planning. The Local Government Land Use Control Enabling Act broadly allows counties and municipalities to balance environmental protection with the need to provide for the planned and orderly use of land.[172] The act allows a local government to provide for the phased development of services and to regulate the location of activities and development that may cause substantial changes in population density. The act also requires a local government to make a determination about whether an applicant for larger developments (in excess of 50 units or single-family equivalents) has demonstrated that the proposed water supply is adequate to serve the proposed development.[173]

The act requires counties and municipalities to adopt master plans for the development of their jurisdictions; these plans which may include a water supply component.[174] State law encourages water efficiency and conservation through public project landscaping guidelines.[175]

Counties and municipalities have the authority to impose an impact fee as a condition of a development permit to pay for certain costs associated with growth. Counties and municipalities can only use these fees to offset the added burden of new development on existing infrastructure and capital improvements, and cannot use them for ongoing expenses and maintenance.[176] Nearly half of Colorado's cities have implemented impact fees, and the most commonly used fees are for water and sewer.[177] When the market can sustain the full price increase needed to cover the fee, the new development's residents typically bear the costs collectively through increased housing prices, and the developer pays the actual fee.[178]

In addition to providing a tool for offsetting burdens on existing infrastructure, state law allows a municipality to construct or authorize the construction of new waterworks, if voters approve. State law also authorizes the municipality to protect the waterworks and water supply from pollution for up to five miles above the point from which the water is taken.[179]

BLM_0064904

Finally, HB-74-1041 powers (further explained in Section 2.4) allow local governments, primarily counties, to identify, designate, and regulate 21 statutorily defined "areas and activities of state interest," including site selection, construction, or extensions of major new water and sewage treatment systems. This ensures that local governments can consider and mitigate the effects of new developments.[180]

## Special Districts Overview

Colorado law allows voters to create many types of local special districts,[181] which are governing entities that oversee specific services, such as fire protection, water, and sewer. Special districts have the autonomy to solve local problems using local funds. Districts do this by dividing the costs of services among all property owners and residents. They are also able to finance larger infrastructure and public-facility projects, and repay these costs over time as development occurs and property values increase.[182] Several special districts are related to water use and water planning, including:

❖ **Water Districts:** Supply water for domestic and other public and private purposes by any available means and provide all necessary or proper reservoirs, treatment works, and facilities.[183]

❖ **Sanitation Districts:** Provide for storm or sanitary sewers, or both; flood and surface drainage; treatment and disposal works and facilities; solid waste disposal facilities or waste services; and all necessary or proper equipment.[184]

❖ **Water and Sanitation Districts:** Provide both water and wastewater services.[185]

❖ **Metropolitan Districts:** Provide two or more of a variety of services, including parks and recreation, wastewater, and water.[186]

❖ **Park and Recreation Districts:** Provide park or recreational facilities or programs.[187]

❖ **Irrigation Districts:** Provide for the irrigation of lands and the drainage work necessary to maintain irrigation in the district.[188]

❖ **Water Conservancy Districts and Water Conservation Districts:** Build and administer water projects, interface with federal agencies, and administer the repayment of project capital and operations and maintenance costs, as well as transmit information and coordinate efforts among agencies, political subdivisions, and private citizens and businesses concerning the conservation, protection, and development of Colorado's water resources.[189]

❖ **Urban Drainage and Flood Control:** Assist local governments with multi-jurisdictional drainage and flood control challenges and provide funding or levy property taxes to fund programs and projects.[190]

❖ **Groundwater Management Districts:** Adopt rules and regulations to help administer groundwater within the district.[191]

BLM_0064905

## The Department of Local Affairs Overview

The Department of Local Affairs (DOLA) is responsible for supporting Colorado's local communities and augmenting local government capacity by providing training, technical, and financial assistance. The department's divisions serve several purposes, including provision of affordable housing, property tax assessment and collection, training for local government issues, and distribution of state and federal funds for community projects. Within the DOLA, the Division of Local Government (DLG) provides local governments with demographic data, technical assistance for local governments on common issues (such as budgeting and planning), technical resources, and financial assistance programs. Specifically within the DLG, the Community Development Office provides technical and financial assistance to local governments on land-use planning and general community development, including training for planners and planning commissioners. The DLG often funds county and municipal comprehensive plans and encourages water supply and conservation elements.



BLM_0064906



Houses dot the hillside above Grand Lake. Photo: M. Nager.

BLM_0064907

# 2.4

## LOCAL, STATE, TRIBAL, AND FEDERAL WATER PLANNING, APPROVAL, AND PERMITTING

Those that wish to implement a water project in Colorado must have permits, licenses, contracts, certifications, or other approvals from numerous local, state, and federal governmental entities. Partnerships with and among these agencies at all levels of government are critical to ensure that the State can identify and address environmental issues in a timely and effective manner. This section provides an overview of the entities typically involved in permitting, and the State's role in planning.



Lake Nighthorse is part of the Animas La Plata Project and provides water for local communities including Durango and the Ute Mountain Ute Tribe. Photo: M. Nager.

## Governmental Entities with Permitting, Licensing, Contract, and Certification Responsibilities

Typically, the following organizations are involved in the permitting process.

### Local Entities:

❖ *Project proponents* include a wide array of water users and water providers including, but not limited to, local governments that run a utility, private water companies that act as a local utility, special districts, ditch companies, and regional water conservancy and conservation districts that sell water to local water providers. These entities are responsible for coordinating with state and federal permitting entities to successfully permit their water project.

❖ *Local governments* have jurisdiction and authority over parts of development projects, and can request mitigation for any effects resulting from proposed water projects because of their 1041 powers. Section 9.4 of Colorado's Water Plan details those powers.[192]

### State Entities:

❖ *The CWCB* is a division within the Colorado DNR. The CWCB sets water policy and planning in Colorado and has a role regarding the review of mitigation plans.[193]

❖ *The Colorado Water Quality Control Division (WQCD)* is housed within the Colorado Department of Public Health and Environment (CDPHE). The agency reviews water quality certifications under Section 401 of the federal Clean Water Act (CWA).

❖ *The DWR* is housed in the Colorado DNR and is responsible for water administration. The DWR ensures that the water rights for a project can be administered.

BLM_0064908

❖ *The Colorado Attorney General's Office* is the legal authority regarding matters of law, including whether or not a particular project or agreement is legal under Colorado law.

❖ *Colorado Parks and Wildlife (CPW)* is a division within the Colorado DNR. CPW reviews state wildlife mitigation plans under Colorado's state statutes, known as 122.2 plans.[194]

## Tribal Entities:

❖ The Southern Ute Indian Tribe and the Ute Mountain Ute Tribe are federally recognized tribal governments with responsibilities for the protection and use of water on the Southern Ute Indian Reservation and the Ute Mountain Ute Indian Reservation.

❖ The Ute Mountain Ute Tribe Environmental Programs Department is responsible for implementing tribal water-quality standards (including anti-degradation provisions under Section 303 of the CWA) and for federal permitting under Section 401 of the CWA for projects located on the Ute Mountain Ute Indian Reservation.

❖ The Southern Ute Indian Tribe Water Resources Division is a division of the Southern Ute Indian Tribe overseeing: 1) Water resources planning; 2) project implementation, including cooperative projects with non-Indian communities coordinating tribal actions in Colorado's water courts; and, 2) the Tribe's role in the cooperative and coordinated administration of the Tribe's water rights.

## Federal Entities:

Federal entities have several roles that relate to water management issues in Colorado. As land managers, federal agencies provide land-use authorizations for water projects that occupy federal lands. Three federal agencies own substantial tracts of land in Colorado:

❖ *The U.S. Forest Service (USFS)* manages national forests and grasslands (see also Section 2.5).

❖ *The U.S. Bureau of Land Management (BLM).*

❖ *The U.S. National Park Service (NPS)* manages national parks and monuments (see also Section 2.5).

In addition, federal agencies must comply with numerous federal laws in order to issue permits and other authorizations for any water projects. These include, for example, the Federal Land Policy and Management Act (FLPMA), the ESA, the Clean Water Act (CWA), and the Wild and Scenic Rivers Act. The existence of a federal nexus often triggers the need for consultation under Section 7 of the ESA. A water project is considered to have a federal nexus if it involves federal funding, federal permitting or licensing, use of federal lands, or a federal program. All significant federal actions also require compliance with the National Environmental Policy Act (NEPA). In addition to the land management responsibilities listed above, the following agencies can all act as lead agencies responsible for NEPA compliance and other federal authorizations; many of these agencies are responsible for compliance with land-use authorizations for water projects.

❖ *The Environmental Protection Agency (EPA)* comments on NEPA documents and reviews the United States Army Corps of Engineers' (Corps) Clean Water Act 404 permits.

❖ *The United States Army Corps of Engineers (Corps)* is responsible for 404-permitting, related to the placement of dredged or fill material in waters of the United States, including jurisdictional wetlands, under the CWA; it is also responsible for the approval of uses of the federally owned flood control and water supply facilities.

BLM_0064909

- *The United States Forest Service (USFS)* manages national forests and grasslands and has substantial land holdings in Colorado (Section 2.5 describes its role related to water rights). The USFS assumes the lead agency role under NEPA in certain situations.

- *The United States Fish and Wildlife Service (USFWS)* manages threatened and endangered species-recovery programs and regulates actions affecting threatened or endangered species listed under the ESA. This agency is responsible for determining whether a project exceeds the bounds of any programmatic biological opinions regarding further water development. In addition, under the Fish and Wildlife Coordination Act, federal agencies responsible for coordinating federal NEPA compliance must consult with the USFWS regarding a project's potential effects on threatened and endangered fish and wildlife species.

- *The BOR* is the agency that built, and now manages, several water supply and hydropower projects. In Colorado, these include Blue Mesa Reservoir and the Fryingpan-Arkansas Project, among other projects. The BOR is responsible for contracting water out of these federal projects, and these federally owned facilities.

- *The United States Bureau of Land Management (BLM)* is responsible for managing substantial public-land holdings within Colorado. The BLM assumes the lead agency role under NEPA in certain situations.

- *The United States National Park Service (NPS)* manages substantial land holdings within Colorado for national parks, monuments, recreation areas, and historic sites (see Section 2.5 for the NPS). The NPS assumes the lead agency role under NEPA in certain situations.

- *The Federal Energy Regulatory Commission (FERC)* is responsible for licensing non-federal hydropower projects.

## Cooperating Agency Status

Federal agencies actively consider designation of cooperating agencies in the preparation of analyses and documentation NEPA requires, and they participate as cooperating agencies in other agencies' NEPA processes.[195] The Council on Environmental Quality (CEQ) regulations that address cooperating governing agencies specify that federal agencies responsible for preparing NEPA analyses and documentation do so "in cooperation with state and local governments" and other agencies with jurisdiction by law or special expertise.[196]

Stakeholder involvement is important in ensuring that decision-makers have the environmental information necessary to make informed and timely decisions. Cooperating agency status is a major component of agency stakeholder involvement in the NEPA process. The benefits of early cooperating agency participation in the preparation of NEPA analyses include: Disclosing relevant information early in the analytical process; applying available technical expertise and staff support; avoiding duplication with other federal, state, tribal, and local procedures; establishing a mechanism for addressing intergovernmental issues; and other benefits. On a case-by-case basis, Colorado participates as both a non-federal project sponsor and as a cooperating technical agency for water projects in the state.

Section 9.4 of this plan explores in greater detail the permitting process, along with potential permitting-process improvements.

BLM_0064910

### State Planning

The CWCB is the primary state agency responsible for statewide water planning. Water planning determines the types of water projects and quantity of water needed to support Colorado's growing population in the future.[197] In 2005, the General Assembly created the basin roundtables and the IBCC, which are participants in the CWCB's statewide water planning efforts.[198]

The IBCC comprises two representatives from each basin roundtable, six governor appointees, and two appointees from the state legislature.[199] Their charge is to develop agreements among basins and to develop statewide policy issues.[200]

Both the basin roundtables and the IBCC provide critical input to the SWSI and to Colorado's Water Plan. The SWSI creates a technical foundation and a common technical platform that stakeholders and Colorado's Water Plan use and build upon. The report, which the SWSI periodically updates with the latest technical information, tracks Colorado's changing water supply and demand. In addition, the basin roundtables and the CWCB have developed a forum through which project proponents can find technical and financial support.[201] Other state agencies have a critical role in planning for other water-related aspects. For instance, CPW develops management plans for fish and other water-dependent species.[202] These planning efforts and the technical documentation supporting them often provide a baseline of information that is helpful in the permitting process.



# CHAIRMAN MANUEL HEART

## UTE MOUNTAIN UTE TRIBE SOUTHWEST RIVER BASIN

Manuel Heart is the current Chairman of the Ute Mountain Ute Tribe. He was sworn in for a three year term on November 1, 2013. Chairman Heart is pictured in front of Lake Nighthorse, the reservoir he worked to get approved.

My first and foremost hope for the future of water supply is to preserve and protect the 1868 Ute Mountain Ute water treaty settlement of the Animas La Plata project water and the McPhee reservoir for my Tribe. I also hope to help with a state water plan and look at upper and lower basin allocations and a water plan for the future.

I believe that in Colorado's Water Plan we must work toward partnerships for the future of water, but we as Ute Mountain Ute Tribe are also looking to work with the state of Colorado on a...

CONTINUED AT END OF CHAPTER

PROFILE

## 2.5
## TRIBAL AND FEDERAL RESERVED WATER RIGHT ISSUES WITHIN COLORADO

In addition to the patchwork of local, state, and federal agencies involved in water planning (as Section 2.4 describes), many federal agencies and Native American tribes hold water rights that serve as part of the existing institutional setting for water planning. Colorado is home to a substantial amount of tribal and federally held lands. Of the 66,485,760 acres that form the State of Colorado, the federal government holds title to more than one-third—totaling 24,996,075 acres, including tribal lands.[203] Federal agencies with major,

federal-land holdings in Colorado include: the USFS, the BLM, the NPS, and the USFWS. In addition, two different Native American tribes have reservations located within Colorado borders. The Southern Ute Indian Tribe and the Ute Mountain Ute Tribe are both located in southwestern Colorado (and the Ute Mountain Ute Reservation also includes lands in northwestern New Mexico and in southeastern Utah). The Southern Ute Indian Tribe is governed by its Tribal Council, whose constitution was approved in 1936.[204] The Ute Mountain Ute Tribe is governed by its Tribal Council, whose constitution was approved in 1940.[205] Beyond the two tribes, only the USFS, the NPS, and the BLM have pursued substantial reserved water rights associated with their landholdings in Colorado.

The history of federal and tribal water rights as they relate to these land holdings in Colorado is unique and complicated. Any discussion of federal water rights must begin with a discussion of "the Winters Doctrine."[206] The Winters Doctrine, which the United States Supreme Court established in 1908, generally indicates that when the United States sets aside an Indian reservation, it also reserves a sufficient amount of water necessary to fulfill the purposes of the reservation, while establishing the priority date as the date of the reservation's formation.[207] The Winters Doctrine is a landmark case: it was the first time the federal government had deviated from the established convention that water law was purely a state matter.[208] The court subsequently expanded application of the Winters Doctrine beyond tribal reservations, also applying the doctrine to other "reserved" federal lands, such as USFS lands. These lands have been withdrawn from the public domain, and water is deemed either expressly or impliedly necessary to satisfy the primary purposes of the federal reservation.[209] This expanded version of the judicially created Winters Doctrine resulted in what is generally referred to as "federal reserved water rights."

Federal reserved rights differ from rights acquired under state law in that reserved rights typically, but not always, rest on the date a reservation was created—not when the water was first put to beneficial use—and cannot be lost through non-use. Moreover, before 1952, the United States avoided, and was not required to formally list, its federal claims to water, nor was it required to make those claims the subject of any decree or permit within the state water administration system. Rather, federal reserved water rights existed outside of



**FIGURE 2.5-1**   **COLORADO'S TRIBAL LANDS**

Tribal Ownership
Southern Ute
Ute Mountain Ute

Colorado's Tribal Lands

BLM_0064912

(and separate from) the procedure for administering all other water rights within the states. Therefore, the federal reserved water rights complicated the ability of the state systems to avoid conflict and create a firm water supply through a comprehensive and cohesive water administration system.

As a direct response to this unintended ambiguity, Congress adopted the McCarran Amendment in 1952. The amendment rectified the fact that "the extent and priority of federal water rights, including federal reserved rights, were unknown and not subject to adjudication or determination in state courts."[210] To overcome this complication, the amendment provides a limited waiver of the United States' sovereign immunity for the purpose of including the United States (on its own behalf or on behalf of the tribes) in state stream adjudications and water administration suits.[211] Since then, Colorado has settled and adjudicated tribal reserved rights claims asserted on behalf of the Southern Ute Indian and Ute Mountain Ute Tribes in Colorado, as well as claims for federal reserved water rights by federal agencies throughout the state. The State and the tribes administer the reserved rights recognized by these proceedings in conjunction with state-based water rights.

## Federal Agencies

Water rights held by the USFS, the USFWS, and the NPS have complicated histories.[212] Each agency has sought substantial federal reserved water rights in a variety of locations throughout the Western United States. In Colorado, the USFS has filed for reserved water rights in all seven water divisions. In Water Divisions 1 and 2, the water court denied and withdrew with prejudice the USFS claims for nonconsumptive reserved rights.[213] In Water Division 3, the USFS reached a stipulated decree settlement for both consumptive and nonconsumptive reserved rights in 2000.[214] Stemming from the Colorado Supreme Court decision in *U.S. v. Denver*, the USFS may not claim federal reserved water rights for instream flow purposes in Water Divisions 4, 5, or 6.[215] The USFS's applications for federal water rights are still pending in Water Division 7.[216]

The USFWS manages eight national wildlife refuges and two national fish hatcheries in Colorado. These facilities use water in compliance with water-rights decrees based on Colorado's system of prior appropriation. The NPS has obtained federal reserved water rights for Rocky Mountain National Park, Great Sand Dunes National Park, Colorado National Monument, the Black Canyon of the Gunnison National Park, and Mesa Verde National Park.[217] The federal government also maintains a wild and scenic river designation that includes a federal reserved water right for the upper reaches of the Cache La Poudre under the Wild and Scenic Rivers Act.[218]

BLM_0064913

## Tribes

In 1895, the United States established the Southern Ute Indian Reservation in Southwest Colorado and the Ute Mountain Ute Reservation in the southwest corner of Colorado and northern New Mexico (later adding lands in southeastern Utah).[219] On behalf of the Southern Ute Tribe and Ute Mountain Ute Tribe, the United States filed claims to water in Southwest Colorado to resolve reserved rights claims for the two reservations in 1976. Through an enormous effort of the Ute Tribes, the State of Colorado, the United States, water districts, and local water users, all of the parties were able to resolve the tribal litigation claims in 11 river basins through negotiated settlement, resulting in the 1986 Colorado Ute Indian Water Rights Final Settlement Agreement.[220] In 1988, Congress passed the Colorado Ute Indian Water Settlement Act, approving the 1986 Settlement Agreement. The settlement set forth shared responsibilities for the administration of some of the tribal rights.[221] A critical component of the 1986 Settlement Agreement is the provision of water to the tribes from the Animas-La Plata Project, a participating project of the Colorado River Storage Project Act, which the Colorado River Basin Project Act authorized.[222]

In the early 1990s, complications concerning endangered species, water quality, and other issues prevented the full implementation of the 1986 Settlement Agreement as it related to the Animas and La Plata Rivers. For the second time, the parties forged a new compromise related to the down-sizing of the Animas-La Plata Project. Congress approved the modifications and amended the 1988 Settlement Act in December 2000.[223] The Ute Tribes, the State of Colorado, and the United States agreed to an institutional framework that establishes quantities of water rights, priorities of tribal rights, permitting requirements, conditions for changing water rights, conditions for leasing, and other terms. Most importantly, it recognizes the need for cooperative and coordinated administration of the tribes' reserved water rights under state and federal law.

BLM_0064914



# A LOOK AT HISTORY

The two-year negotiation of the Colorado Ute Indian Water Rights
Final Settlement Agreement was formally concluded at a signing ceremony on December 10, 1986,
in the old Supreme Court Chambers, Colorado State Capitol.

source: J. William McDonald's personal collection [Bureau of Reclamation, photographer unknown].

caption: Thomas V. Cech, J William McDonald, Defend and Develop:
*A Brief History of the Colorado Water Conservation Board's First 75 Years,*
[Denver: Wellstone Press and the Colorado Water Conservation Board, 2012.]

BLM_0064915



# A LOOK AT HISTORY

Commission members signing the Rio Grande Compact in 1938, along with
their legal and engineering advisors. This compact still guides water supply management
between Colorado, New Mexico, Texas, and Mexico.

caption: Thomas V. Cech, J William McDonald, Defened and Develop:
*A Brief History of the Colorado Water Conservation Board's First 75 Years,*
[Denver: Wellstone Press and the Colorado Water Conservation Board, 2012.]

BLM_0064916

**JOE GALLEGOS,** CONTINUED FROM PAGE, 2-4:

from the legacy of water battles that my forefathers endured. They left us a long record and appreciation for the miracles of water. So when misuse or pollution occurs on the ever "blood of the land," the issue becomes very personal.

I am 59 years old and have a college degree in Mechanical Engineering from CSU- Go Rams! Now I am presently a General Partner in the family business, Corpus A. Gallegos Ranches (Colorado Centennial Ranch). I have worked on the Ranch since 1986 when I returned from the oil business (worked five years in oil patch), to be back on the land, or should I say back with the water. My love for clean water drove me out of the oil industry to my family ranch in San Luis only to get involved in a major water battle with a mining company that involved many water quality issues. With personal and economic reasons to be immersed in water issues, I was appointed to be on the Costilla County Conservancy District in 1989. I was also the Mayordomo (ditchrider) for thirteen years for the

San Luis Peoples Ditch (SLPD), known as an acequia. SLPD is the first and oldest established water right in the state but the SLPD acequia was established much earlier than Colorado's statehood. In 1851 pioneers like my Great grandfather, Dario Gallegos, dug the first recorded ditch to divert water from a creek to beneficially use the precious resource.

A satisfying and positive accomplishment of mine is having been involved and having the opportunity to testify in front of the Colorado Agricultural Committee in 2009 for the passage of House Bill HB09-1233, known as the Acequia Recognition Law. The newly enacted law speaks for itself as the acequias strive for a special place in Colorado Water Law.

**CHAIRMAN MANUEL HEART,** CONTINUED FROM PAGE 2-28:

government-to-government basis to help protect and preserve our treaty of 1868 and to our water rights as Ute Mountain Ute Tribe. In Colorado's Water Plan the State needs to look at our tribal lands for the Ute Mountain Ute Tribe.

Our land base totals around 600,000 acres and extends into three states: Colorado, New Mexico and Utah. Based on Colorado water law and the compacts between the two states, we cannot manage our water in the contiguous tribal lands as one by taking water across state lines, despite the fact that our lands were established before the states were recognized as states.

I've served on the Ute Mountain Ute tribal council since 1994 in various capacities. In addition to my current chairmanship, I've served as Vice Chairman, Treasurer and Secretary Custodian. I am also a board member on various committees Tribal, State, and National level, including for the Weminuche Construction Company, Brunot Hunting Commission, Blue Mountain Hospital Board, Animas La Plata Water Board, La Plata West water Board, Albuquerque Area Health Board, Colorado Commission of Indian Affairs, Utah Tribal Leaders, National Congress of American Indians, Native American Bank, and Council of Energy Resource Tribes.

I have been involved in water for the Ute Mountain Ute Tribe throughout my career on the Tribal Council. Just as his past Ute elders did, I advocate that water is life for everything in this world and we must protect it.

I started my Tribal Council career with the Animas La Plata project (ALP) in Southwestern Colorado where the tribal reservation is located. I started out lobbing Congress for the authorization of the project, taking many trips to Washington DC with tribal council from Ute Mountain Ute Tribe and

Southern Ute Indian Tribal Council and their non-Indian local water board partners from two states. I was there to witness Secretary Babbits signing ceremony of the authorization of the ALP project at the Interior Department in Washington DC.

I am married to my high school sweetheart Marie Heart, and have 6 children, 16 grandchildren, one great grandson, and many relatives from both sides of our family.

BLM_0064917

**Section 2.1: Colorado Law and Administration**

1   Mortimer Shtone ed., "A Survey of Colorado Water Law," *Denver Law Journal*, 47 (1970): 231-247.

2   Empire Lodge Homeowners' Ass'n v. Moyer, 39 P.3d 1139, 1147 (Colo. 2001).

3   A. Dan Tarlock, James N. Corbridge, Jr., David H. Getches, and Reed D. Benson, *Water Resource Management: A Casebook in Law and Public Policy*, 6th ed. (New York: The Foundation Press, 2009): 154-265.

4   Tarlock et al., *Water Resource Management: A Casebook in Law and Public Policy*, 67-70, 154-158.

5   Mortimer Stone ed., "A Survey of Colorado Water Law," 230-235.

6   Colo. Const. amend. XVI, § 6.

7   Comstock v. Ramsay, 133 P. 1107, 1110 (Colo. 1913).

8   Water Right Determination and Administration Act of 1969, Colorado Revised Statutes §§ 37-92-101 through -602 (2014).

9   C.R.S § 37-92-102 (1)(a).

10   Justice Gregory J. Hobbs, Jr., "Colorado's 1969 Adjudication and Administration Act: Settling In," *University of Denver Water Law Review 3* (1999): 18.

11   Safranek v. Limon, 228 P.2d 975, 977 (Colo. 1951).

12   Colo. Const. amend. XVI, §§ 5, 6; C.R.S § 37-92-101 et seq.

13   Colorado Groundwater Management Act, C.R.S. §§ 37-90-101 through -143 (2014)

14   See C.R.S §§ 37-90-103(6), (7) for the definition of the term; see C.R.S § 37-90-101 et seq. for the governance of "designated groundwater."

15   See C.R.S § 37-90-103(10.5) for the definition of the term.

16   See C.R.S § 37-90-103(10.7) for the definition of the term.

17   C.R.S § 37-90-137(4); The Denver Basin Rules, 2 C.C.R § 406.2 (1985).

18   The Colorado Geothermal Resources Act, C.R.S §§ 37-90.5-101 through -108 (2014).

19   C.R.S § 37-92-602.

20   "Guide to Colorado Well Permits, Water Rights, and Water Administration," Colorado Division of Water Resources, accessed June 24, 2015. http://water.state.co.us/DWRIPub/Documents/wellpermitguide.pdf

21   C.R.S §§ 37-90-104, 106.

22   C.R.S § 37-90-102(2).

23   C.R.S §§ 37-90-104, 106.

24   C.R.S §§ 37-92-501-503.

25   C.R.S § 37-92-103 (4).

26   Williams v. Midway Ranches Property Owners' Association, 938 P.2d 515, 522 (Colo. 1997).

27   "Glossary of Water Terminology", Colorado State University Extension, accessed July 2015. http://www.ext.colostate.edu/pubs/crops/04717.html

28   "Glossary of Terms," Denver Water, accessed July 2015. http://denverwater.org/AboutUs/GlossaryofTerms/

29   "Water Glossary," Colorado River District, accessed July 2015. http://www.coloradoriverdistrict.org/education-resources/water-glossary/

30   Colorado Foundation for Water Education, *Citizen's Guide to Colorado Water Law*, 3rd ed., (Denver: Colorado Foundation for Water Education, 2009): 17-21.

31   §37-92-102 (3), C.R.S.; §37-92-103 (4).

32   §37-92-102 (5).

33   "Water Courts," Colorado Judicial Branch, accessed June 24, 2015, https://www.courts.state.co.us/Courts/Water/

34   Dick Wolfe (State Engineer for the Colorado Division of Water Resources) interview in Denver, CO, June 23, 2014.

35   Wolfe, interview.

36   Colo. Const. amend. XVI, § 6.

37   *Empire Lodge Homeowners' Ass'n*, 39 P.3d 1139, 1147.

38   David Getches, *Water Law In a Nutshell*, 3rd ed. (St. Paul: West Publishing, 1997): 152-155.

39   Carrie L. Ciliberto ed., *Colorado Water Law Benchbook*, 1st ed., 2013 Supplement (Denver: Continuing Legal Education in Colorado, 2013): §2.4.3 at 2-9; City of Thornton v. Bijou Irrigation Co., 926 P.2d (Colo. 1996)

40   Wolfe, interview.

41   C.R.S § 37-92-103(9).

42   George E. Radosevich, Western Water Laws and Irrigation Return Flow (Ada: EPA, 1978); Bryan A. Garner, ed., Black's Law Dictionary, 7th ed. (St. Paul: West Group, 1999): 1542-1543.

43   Santa Fe Trail Ranches Property Owners Association v. Simpson, 990 P.2d 46, 54. (Colo. 1999)

44   Santa Fe Trail v. Simpson, 990 P.2d 46, 54.

45   C.R.S. § 37-92-305 (3), (4).

46   Trail's End Ranch, L.L.C. v. Colo. Div. of Water Res., 91 P.3d 1058, 1063 (Colo. 2004).

47   Santa Fe Trail v. Simpson, 990 P.2d 46, 54; Colorado Water Conservation Board v. City of Central, 125 P.3d 424 (Colo. 2005).

48   *Colorado Water Conservation Board v. Central*, 125 P.3d 424.

49   *Colorado Water Conservation Board v. Central*, 125 P.3d 424.

50   C.R.S § 37-92-103 (9).

51   Simpson v. Bijou Irrigation Co., 69 P.3d 50, 60 (Colo. 2003).

52   C.R.S §§ 37-92-305(5),

53   "Guide to Colorado Well Permits, Water Rights, and Water Administration," Colorado Division of Water Resources, accessed June 24, 2015. http://water.state.co.us/DWRIPub/Documents/wellpermitguide.pdf

54   "Colorado Basins," State of Colorado Department of Natural Resources, Division of Water Resources, accessed June 23, 2015. http://water.state.co.us/DWRIPub/DWR%20Maps/ColoradoRiverBasins.pdf ; "Division Offices by Major River Basins," Division of Water Resources, accessed June 23, 2015. http://water.state.co.us/DivisionOffices/

55   "DWR Home," Colorado Division of Water Resources, accessed June 24, 2015. http://water.state.co.us/

56   "Division Offices by Major River Basins," Division of Water Resources.

57   "DWR Home," Colorado Division of Water Resources.

58   "Guide to Colorado Well Permits, Water Rights, and Water Administration," Colorado Division of Water Resources.

59   Colorado Foundation for Water Education, *Citizen's Guide to Colorado Water Law*, 3rd ed., 17-21. "Guide to Colorado Well Permits, Water Rights, and Water Administration," Colorado Division of Water Resources; Produced Nontributary Ground Water Rules, 2 C.C.R § 402.17.

60   Wolfe, interview.

BLM_0064918

61  "Colorado's Decision Support System," Colorado Division of Water Resources and Colorado Water Conservation Board, accessed June 24, 2015. http://cdss.state.co.us
62  "Map Viewer," Colorado Division of Water Resources and Colorado Water Conservation Board, accessed June 24, 2015.
    http://cdss.state.co.us/onlineTools/Pages/MapViewer.aspx
63  "Colorado River Cooperative Agreement: Path to a Secure Water Future," Denver Water, accessed June 24, 2015.
    http://www.denverwater.org/SupplyPlanning/Planning/ColoradoRiverCooperativeAgreement/

**Section 2.2: Interstate Compacts and Equitable Apportionment Decrees**

64  Thomas V. Cech and J. William McDonald, *Defend and Develop* (Ashland, OR: Wellstone Press), 25.
65  Cech and McDonald, *Defend and Develop*, 25-26.
66  Daniel Tyler, *Silver Fox of the Rockies* (Norman, OK: University of Oklahoma Press), 88-122.
67  *Kansas v. Colorado*, 206 U.S. 46 (1907).
68  *Kansas v. Colorado*, 206 U.S. 46.
69  *Kansas v. Colorado*, 206 U.S. 46.
70  *Wyoming v. Colorado*, 259 U.S. 419 (1922).
71  *Wyoming v. Colorado*, 259 U.S. 419.
72  *Wyoming v. Colorado*, 259 U.S. 419.
73  Tyler, *Silver Fox of the Rockies*, 104-105.
74  Tyler, *Silver Fox of the Rockies*, 100.
75  Tyler, *Silver Fox of the Rockies*, 104-105.
76  Tyler, *Silver Fox of the Rockies*, 119.
77  Tyler, *Silver Fox of the Rockies*, 115.
78  Tyler, *Silver Fox of the Rockies*, 115.
79  Tyler, *Silver Fox of the Rockies*, 88-122.; Norris Hundley, Water and the West: The Colorado River Compact and the Politics of Water in the American West (Berkeley: University of California Press), 83-137.
80  C.R.S. § 37-61-101 et seq., Colorado River Compact and approved by Congress by the Boulder Canyon Project Act, Chapter 42, § 4, 45 (1928)(codified at 42 U.S.C.A. § 617c).
81  C.R.S. § 37-61-101 et seq.
82  C.R.S. § 37-61-101 et seq.
83  C.R.S. § 37-61-101 et seq.
84  C.R.S. § 37-61-101 et seq.
85  C.R.S. § 37-61-101 et seq.
86  C.R.S. § 37-61-101 et seq.
87  C.R.S. § 37-61-101 et seq.
88  C.R.S. § 37-61-101 et seq.
89  *Arizona v. California*, 283 U.S. 423 (1931).
90  C.R.S. § 37-61-101 et seq.
91  C.R.S. § 37-61-101 et seq.
92  C.R.S. § 37-61-101 et seq., and approved by Congress by the Colorado River Storage Project Act, ch. 203, 70 Stat 105 (1956) (codified at 43 U.S.C. § 620-620 (o)).
93  C.R.S. § 37-62-101 et seq., Upper Colorado Compact.
94  C.R.S. § 37-62-101 et seq.
95  C.R.S. § 37-62-101 et seq.
96  C.R.S. § 37-62-101 et seq.
97  C.R.S. § 37-62-101 et seq.
98  C.R.S. § 37-62-101 et seq.
99  C.R.S. § 37-69-101 et seq., Arkansas River Compact and approved by Congress by Act on May 31, 1949, ch.155 (codified at 63 Stat. 145).
100 C.R.S. § 37-69-101 et seq.
101 C.R.S. § 37-69-101 et seq.
102 C.R.S. § 37-69-101 et seq.
103 C.R.S. § 37-69-101 et seq.
104 C.R.S. § 37-69-101 et seq.
105 C.R.S. § 37-69-101 et seq.
106 Arkansas River Compact Administration, *Resolution Concerning an Operating Plan for John Martin Reservoir, Resolution No. 2010-01*(1980, revised 1984 & 2010).
107 Kansas v. Colorado, 543 U.S. 86.
108 C.R.S. § 37-69-101 et seq.
109 § 37-64-101, C.R.S. and approved by Congress by Act on September 30, 1968, Public Law No. 90-527 (codified at 82 Stat. 885, 898).
110 C.R.S. § 37-64-101., Animas-La Plata Project Compact
111 C.R.S. § 37-64-101.
112 C.R.S. § 37-64-101.
113 C.R.S. § 37-63-101 et seq., Animas-La Plata River Compact and approved by Congress by Act on January 29, 1925, ch. 110 (codified at 43 Stat. 796).
114 C.R.S. § 37-63-101 et seq.
115 C.R.S. § 37-63-101 et seq.
116 C.R.S. § 37-63-101 et seq.
117 C.R.S. § 37-63-101 et seq.
118 C.R.S. § 37-63-101 et seq.
119 C.R.S. § 37-63-101 et seq.
120 C.R.S. § 37-67-101 et seq., Republican River Compact and approved by Congress by Act on May 26, 1943, ch. 104 (codified at 57 Stat. 86).
121 C.R.S. § 37-67-101 et seq.
122 C.R.S. § 37-67-101 et seq.
123 C.R.S. § 37-67-101 et seq.

BLM_0064919

[126] "Republican River Compact Synopsis," Republican River Water Conservation District, accessed October 8, 2014, http://www.republicanriver.com/CompactInfo/tabid/93/Default.aspx

[127] "Republican River Compact Synopsis."

[128] "Republican River Compact Synopsis."

[129] C.R.S. § 37-67-101 et seq.

[130] C.R.S. § 37-66-101 et seq., Rio Grande River Compact and approved by Congress by Act on May 31, 1939, ch. 155 (codified at 53 Stat. 785).

[131] C.R.S. § 37-66-101 et seq.

[132] C.R.S. § 37-66-101 et seq.

[133] C.R.S. § 37-66-101 et seq.

[134] C.R.S. § 37 66 101 et seq.

[135] C.R.S. § 37-66-101 et seq.

[136] C.R.S. § 37-66-101 et seq.

[137] C.R.S. § 37-65-101 South Platte River Compact and approved by Congress by Act on March 8, 1926, ch. 46 (codified at 44 Stat.195).

[138] C.R.S. § 37-65-101.

[139] C.R.S. § 37-65-101.

[140] C.R.S. § 37-65-101.

[141] C.R.S. § 37-65-101.

[142] C.R.S. § 37-65-101.

[143] C.R.S. § 37-68-101 et seq., Amended Costilla Creek Compact and approved by Congress by Act on December 12, 1963, Public Law No. 88-198 (codified at 77 Stat. 350).

[144] C.R.S. § 37-68-101 et seq.

[145] C.R.S. § 37-68-101 et seq.

[146] C.R.S. § 37-68-101 et seq.

[147] C.R.S. § 37-68-101 et seq.

[148] C.R.S. § 37-68-101 et seq.

[149] C.R.S. § 37-68-101 et seq.

[150] C.R.S. § 37-68-101 et seq.

[151] C.R.S. § 37-68-101 et seq.

[152] *Wyoming v. Colorado*, 353 U.S. 953.

[153] *Wyoming v. Colorado*, 353 U.S. 953.

[154] *Wyoming v. Colorado*, 353 U.S. 953.

[155] *Nebraska v. Wyoming*, 534 U.S. 40 (2001).

[156] *Nebraska v. Wyoming*, 534 U.S. 40.

[157] *State of Nebraska, Plaintiff v. States of Wyoming and Colorado*, No. 108 (Orig.), (Nov. 13, 2001).

[158] Dick Wolfe and Joseph Grantham, "Water Administration: State Engineer's Office," in *Colorado Water Law Benchbook*, eds. Carrie Ciliberta and Timothy Flanagan (Denver: Continuing Legal Education in Colorado, Inc., 2014), 14-63.

[159] Wolfe and Grantham, "Water Administration: State Engineer's Office," 14-63.

[160] Wolfe and Grantham, "Water Administration: State Engineer's Office," 14-64.

[161] Wolfe and Grantham, "Water Administration: State Engineer's Office," 14-64.

[162] Utah Department of Natural Resources, Division of Wildlife, Conservation and Management Plan for Three Fish Species in Utah (Salt Lake City: 2006), 5.

[163] Utah Department of Natural Resources, Division of Wildlife, Conservation and Management Plan for Three Fish Species in Utah, 5.

[164] U.S. Bureau of Reclamation, *Record of Decision: Colorado Interim Guidelines for Lower Basin Shortages and the Coordinated Operations for Lake Powell and Lake Mead*, 72 Fed. Reg. 62272, November 2, 2007.

[165] U.S. Bureau of Reclamation, *Record of Decision: Colorado Interim Guidelines for Lower Basin Shortages and the Coordinated Operations for Lake Powell and Lake Mead.*

[166] International Boundary and Water Commission, United State and Mexico, *Minute No. 319: Interim International Cooperative Measures in the Colorado River Basin through 2017 and Extension of Minute 318 Cooperative Measure to Address the Continued Effects of the April 2010 Earthquake in the Mexicali Valley, Baja California* (2012). http://www.ibwc.state.gov/Treaties_Minutes/Minutes.html

[167] "Weather Modification Program," Colorado Water Conservation Board, accessed October 8, 2014. http://cwcb.state.co.us/water-management/water-projects-programs/pages/%C2%ADweathermodificationprogram.aspx

[168] "Program Information," Plate River Recovery Implementation Project, accessed October 8, 2014. https://www.platteriverprogram.org/AboutPRRIP/Pages/ProgramInformation.aspx; see also Platte River Recovery Implementation Program and Pathfinder Modification Project Authorization, enacted by Congress on May 8, 2008, Public Law No. 110-229.

[169] *Texas vs. New Mexico and Colorado*, Docket No. 220141, Original (January 2013).

**Section 2.3: Colorado's Local-Control Structure**

[170] Colo. Const. Article XX § 9.

[171] Colo. Const. Article XIV § 16.

[172] C.R.S. § 29-20-102.

[173] C.R.S. § 29-20-301 et seq.

[174] C.R.S. § 30-28-106 and C.R.S. 31-23-206.

[175] C.R.S. § 37-96-101 et seq.

[176] C.R.S. § 29-20-104.5.

[177] Colorado Municipal League. 2013. Accessed October 2014. http://www.cml.org/

[178] Kathlene, Dr. Lyn, Jewlya Lynn, Adam Greenwade, Wendy Sullivan, and Quinn Lung. *Colorado Review: Water Management and Land Use Planning Integration* (Center for Systems Integration, Spark Policy Institute, 2010).

[179] C.R.S. § 31-15-707.

[180] C.R.S. § 24-65.1-101 et seq.

[181] C.R.S. § 32-1-103 et seq.

[182] Special District Association of Colorado. Legislator's Guide to Special Districts. 2013.

[183] C.R.S. § 32-4-40.

[184] C.R.S. § 32-1-103 (18).

BLM_0064920

[185] C.R.S. § 32-1-103 (24).

[186] C.R.S. § 32-1-103 (10).

[187] C.R.S. § 32-1-103 (14).

[188] C.R.S. § 37-41-101 to 37-44-149.

[189] C.R.S. § 37-45-101 and C.R.S. 37-47-101 to 37-50-142.

[190] Urban Drainage and Flood Control District. Accessed October 15, 2014. http://www.udfcd.org/, and C.R.S. § 32-11-101

[191] C.R.S. § 37-90-101 et seq.

### Section 2.4: Local, State, Tribal, and Federal Water Planning, Approval, and Permitting

[192] Department of Local Affairs, "1041 Regulations," accessed October 8, 2014. http://www.colorado.gov/pacific/dola/1041-regulations

[193] C.R.S. § 37-60-122.2.

[194] C.R.S. § 37-60-122.2.

[195] National Environmental Policy Act (NEPA) enacted by Congress on January 1, 1970, Public Law No. 91-190, 83 Stat. 852 (codified as amended at 42 U.S.C. § 4321-4370).

[196] Council on Environmental Quality, *Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act, 40 CFR Parts 1500-1508* (2005).

[197] C.R.S. § 37-60-101 et seq.

[198] C.R.S. § 37-75-101 et seq.

[199] C.R.S. § 37-75-101 et seq.

[200] C.R.S. § 37-75-101 et seq.

[201] C.R.S. § 37-75-101 et seq.

[202] C.R.S. § 37-60-122.2.

### Section 2.5: Tribal and Federal Reserved Water Rights Issues within Colorado

[203] Ross W. Gorte, Carol Hardy Vincent, Laura A. Hanson, and Marc R. Rosenblum, *Federal Land Ownership: Overview and Data* (Congressional Research Service, 2010), http://fas.org/sgp/crs/misc/R42346.pdf

[204] Department of the Interior, Office of Indian Affairs, *Constitution and By-Laws of the Southern Ute Tribe of the Southern Ute Reservation* (Washington: United States Government Printing Office, 1936).

[205] Department of the Interior, Office of Indian Affairs, *Constitution and By-Laws of the Ute Mountain Tribe of the Ute Mountain Reservation* (Washington: United States Government Printing Office, 1940).

[206] *Winters v. United States*, 207 U.S. 564 (1908).

[207] *Winters v. United States*, 207 U.S. 564.

[208] *California v. United States*, 438 U.S. 645, 653 (1978).; *United States v. New Mexico*, 438 U.S. 696, 702 (1978).

[209] *Cappaert v. United States*, 426 U.S. 128 (1976); United States v. New Mexico, 438 U.S. 696.

[210] 43 U.S.C § 666 (1952).

[211] 43 U.S.C § 666 (1952).

[212] James M. Corbridge Jr. and Theresa A. Rice, *Vranesh's Colorado Water Law, Revised Ed.* (Niwot, CO: 135 University Press of Colorado, 2000), 441-461.

[213] In the Matter of the Amended Application of the United States of America for Reserved Water Rights in the Platte River in Boulder, Clear Creek, Douglas, El Paso, Gilpin, Jefferson, Larimer, Park and Teller Counties (Dist. Ct., Water Div. No. 1, Colo. 1993) (Nos. W-8439-76, W-8977-77, W-9052-77, and W-9065-77).; U.S. v. Jesse, 744 P.2d 491 (Colo. 1987).; Remanded case name: In the Matter of the Application for Water Rights of the United States of America in Water Division No. 2 (Dist. Ct., Water Div. No. 2, Colo. 1998) (Nos. 79-CW176, 81-CW-220, 81-CW-221, 81-CW-222, 81-CW-223, 82-CW-18-, 82-CW-19, 82-CW-20, 82-CW-27-34).

[214] Concerning the Application for Water Rights of the United States of America in Alamosa, Archuleta, Hinsdale, Mineral, Rio Grande, Saguache, Costilla, and San Juan Counties, Colorado (Dist. Ct., Water Div. No. 3 1998) (decreed in 2000) (No. 81-CW-183 consolidated).

[215] In the Matter of Application for Water Rights of the United States of America (Dist. Ct., Water Div. No. 4, Colo)(Nos. W-425-W-438).; In the Matter of the Application for Water Rights of the United States of America (Dist. Ct. Water Div. No. 5, Colo. )(Nos. W-467 and W-69).; In the Matter of the Application for Water Rights of the United States of America (Dist. Ct. Water Div. No. 6, Colo.)(Nos. W 85 and W 86).

[216] In the Matter of the Application for Reserved and Appropriative Water Rights of the United States of America in Archuleta, Hinsdale, La Plata, Mineral and San Juan Counties (Dist. Ct., Water Div. No. 7, Colo. 1976)(No.w-1605-76B).; In the Matter of the Application for Reserved Water Rights of the United States of American to Water on, in and under the San Juan National Forest (Dist. Ct., Water Div. No. 7, Colo. 1973)(Nos. 1146-73, 1148-73).

[217] Memorandum of Decision Concerning the Application for Water rights of the United States of America for Reserved Rights in Rocky Mountain National Park in Boulder and Laramie Counties (Dist. Ct., Water Div. No. 1, Colo. 1993) (No. W-8439-76 and W-8788-77).; In the Matter of the Application of the United States of America for Water Rights in the Rio Grande River Drainage in Alamosa and Saguache Counties (Dist. Ct., Water Div. No. 3, Colo. 1981) (No. 81-CW-164).; In the Matter of the Application for Water Rights of the United States of America in Alamosa and Saguache Counties (Dist. Ct., Water Div. No. 3, Colo. 2004)(2004CW35) (decided 2008).; Concerning the Application for Water Rights of the United States of America in Montrose County (Dist. Ct., Water Div. No. 4, Colo. 2001)(2001CW05) (decided 2008); Concerning the Application of Water Rights for the United States of American in the County of Montezuma (Reserved Water Rights for Mesa Verde National Park), Findings of Fact, Conclusions of Law and Decree (Dist. Ct., Water Div. No. 7, Colo. 1997)(No. W-1633-76).

[218] Revised Findings of Fact, Conclusions of Law, and Decree Concerning the Application of the United States of America for Reserved Water Rights for the Cache La Poudre Wild and Scenic River in Larimer County (Rocky Mountain National Park and Roosevelt National Forest) (Dist. Ct., Water Div. No. 1, Colo. 1986) (No.86-CW-67).

[219] Charles Kappler, *Indian Affairs: Laws and Treaties*, vol. 2, ed. (1904; repr., Washington, DC: Government Printing Office, 1972).

[220] Colorado Ute Indian Water Rights Settlement Act of 1988, Pub. L. No.100-585 (102. Stat. 2973).

[221] Colorado Ute Indian Water Rights Settlement Act of 1988.

[222] Colorado Ute Indian Water Rights Settlement Act of 1988.

[223] 1988 Settlement Act in the Colorado Ute Settlement Act Amendments of 2000, Pub. L. No. 106-554, 114 Stat. 2763A 258 (2001).

BLM_0064921

# Overview of Each Basin

Chapter 3 examines the river basins in the context of the larger river systems they comprise. While Colorado is one state, each river basin is unique. An understanding and recognition of each basin's particular landscape, historical context, and current challenges provide the necessary basis to explore Colorado's complete water picture.

Basin residents provided the following descriptions. Members of the basin roundtables and of the CWCB reviewed and updated these descriptions, working from the SWSI report the CWCB released in 2011. The CWCB updated the basin descriptions, concerns, and challenges with recent feedback from the basin roundtables.

BLM_0064922



Green Mountain Reservoir near Kremmling is important for water management in the mainstem of the Colorado River. Photo: M. Nager.

BLM_0064923