## Yellow toadflax (*Linaria vulgaris*) and Broad-Leaved Dalmatian toadflax (*Linaria dalmatica*)

Toadflax is known to occur along the Dolores River in Montezuma and Dolores Counties.  *A portion of the Dalmatian toadflax infestation occurring upstream of Dove Creek Pump House Station (river mile 19) is documented in the "Secondary_Weeds" shapefile included in the DR-RAP DVD.

Information for yellow toadflax and Dalmatian toadflax gathered from CSU Extension Service Fact Sheet No. 3.114 unless otherwise noted.

### Quick Facts

- Yellow toadflax and Dalmatian toadflax are invasive perennials that are noxious in Colorado as well as other western states.
- Seeds of yellow toadflax germinate and emerge in early to mid-May while Dalmatian toadflax seeds may germinate and emerge earlier, especially on south or southeast facing slopes.
- Toadflax invasion is favored by disturbance in degraded areas such as roadsides, abandoned lots and fields, gravel pits, clearings, and overgrazed rangeland.
- Dalmatian toadflax taproots may reach depths of 4-10 feet, and lateral roots can extend 12 feet from parent plant.
- Both are very difficult to control once established.

### Identification

**Yellow toadflax** grows up to 2 feet tall and is often profusely branched.  The flowers look like typical snapdragons, with a pale yellow spur and darker yellow to orange throat.  The numerous leaves are linear and pointed.  Yellow toadflax begins to flower when shoots are from 16 to 24 inches tall, mid- to late May, though may not flower until fall under drought conditions.

### Photos

   

Image 4: Yellow toadflax flower

Image 5: Yellow toadflax fruit

Image 6: Yellow toadflax  plants

Image 7: toadflax foliage from

F - 4

BLM_0065957

**Broad-Leaved Dalmatian toadflax g**rows 1-3 feet tall with showy, yellow snapdragon-like flowers. Leaves are very waxy, heart shaped and the upper leaves clasp the stem. Flowers arise in the axils of the leaves and have a yellow spur and fuzzy orange throat. Dalmatian toadflax typically flowers beginning in late May or June in Colorado. Seed production is very high.

NOTE: *Narrow-leaved Dalmatian toadflax* has similar flowers but linear leaves.

**Photos**







Image 8: Dalmatian toadflax flower

Image 9: Dalmatian toadflax foliage

Image 10: Dalmatian toadflax grouping



Image 11: Dalmatian toadflax plant

**Effective Known Management**

All toadflax species are difficult to eradicate. Keys to successful control include prevention of seed production, depleting root reserves, and killing seedlings before vegetative reproduction begins. Repeated hand grubbing can be effective for small infestations. Large infestations may

BLM_0065958

require herbicide use and competitive planting. A surfactant or adjuvant must be added to the herbicide mix to break through the waxy leaf surface.[4]

**Known Chemical Control**

The combination of spraying and seeding competitive grasses controls Dalmatian toadflax better than spraying alone. Research in Colorado has shown that the addition of methylated seed oil surfactant improves control when using picloram plus 2, 4-D. Yellow toadflax appears to be more difficult to manage than Damlatian toadflax. For herbicide recommendations, contact Dr. George Beck at CSU Extension (George.Beck@colostate.edu).

**Timing**

Yellow toadflax is susceptible to treatment before flowering in the spring or in the fall. Dalmatian toadflax is susceptible to treatment during summer when flowerheads are first appearing and in the fall when at least 25% of stems are necrotic (turning yellow), usually after a hard frost.

**Known Biological Control**

Several classical biocontrol agents are available to use against toadflaxes. However, the success of these agents remains largely unknown. A defoliating moth (*Calophasia lunula)*, an ovary-feeding beetle *(Brachypterolus pulicarius)*, and two seed capsule-feeding weevils *(Gymnaetron antirrhini* and *G.netum*) have been released in the U.S. and Canada for control of all toadflax species. Particularly the flowering and seed feeding insects should help decrease seed production. A stem-boring weevil *(Mecinus janthinus)* and a root-boring moth **(***Eteobalea intermediella*) also were released in Canada and the U.S. for control of all species of toadflax. These species may help to control shoots and seed production as well as decrease root vigor, but data are unavailable to document their effectiveness. Several of these classical biocontrol agents are available from the Colorado Department of Agriculture Insectary in Palisade.

Very few published studies are available to determine whether grazing by livestock will affect any method of control of Dalmatian or yellow toadflax.

**Yellow toadflax**
Mesa County Management Strategy: Eradication throughout the county

**Broad-leaved Dalmatian toadflax**
Mesa County Management Strategy: Eradication throughout the county

Areas of Infestation: scattered pockets of broad-leafed Dalmatian toadflax have been located from river mile 7 to 19 (the largest being near 19).

---

[4] Mesa County Noxious Weed Plan (December 2009).

BLM_0065959

## Cheatgrass or downy broame (*Bromus tectorum*)

Cheatgrass is known to occur along the Dolores River in Montezuma, Dolores, San Miguel, Montrose, and Mesa Counties in Colorado and Grand County Utah.

Information for cheatgrass gathered from CSU Extension Service Fact Sheet No. 6.310 unless otherwise noted.

**Quick Facts**

- Cheatgrass is a noxious weed that can invade grassland communities and displace native plants; it thrives in disturbed areas but also invades "bare" spots in undisturbed areas.
- Cheatgrass reproduces by seed and is termed a winter annual because its seed germinates from fall into winter. The plant reaches maturity in the spring and turns brown and dies with the onset of summer
- This weed can produce 10,000 plants per square yard and is highly flammable.

**Identification**

The height of cheatgrass ranges from three to 30 inches. It has a crooked seed head and small soft hairs covering the entire body of the plant. Leaves emerge dark green with a hint of purple. As it matures and begins to cure, cheatgrass turns yellow to reddish-brown in color with purple seed heads. The seeds have wedge-shaped awns that may enable dispersal by wind and water. Most often seeds are spread by adhering to clothes or to the coat of a wild or domestic animal.

**Photos**





Image 12: Cheatgrass fruit    Image 13: Cheatgrass detail    Image 14: Cheatgrass infestation

**Effective Known Management**

Cheatgrass can be controlled mechanically, biologically, chemically, or by applying fire under controlled conditions. The best results usually come from a combination of some or all of these techniques. Cheatgrass seed may survive in soils for up to four to five years, a major factor in its difficulty to manage.

BLM_0065960

**Known Mechanical Control**

- **Hand pulling** – remove plants before seed production in the spring and when new plants emerge in the fall; repeat when new plants appear; effective in small areas only.
- **Disking/tilling (live plants)** – spring and fall before the seed heads turn purple; repeat when new plants appear; use disk, rototiller, spike-tooth harrow, etc.
- **Disking/tilling (seeds)** – once in late spring before seeding with desirable species in the fall; bury seeds at least three inches deep to prevent germination. It is always best to control cheat grass before it begins to produce seed.
- **Mowing** – not recommended as a long-term control technique as seed may be produced by mown plants.

**Known Chemical Control**

A few chemical formulations exist, such as imazapic or glyphosate that may control or even eradicate cheatgrass. However, before using any chemical make sure that the herbicide label lists cheatgrass; if it is not listed, do not use it. Combinations of herbicides may be required for control. Herbicide damage to native or desirable grasses is possible and may need to be tolerated until the cheat grass is under control. Timing of treatment may limit the amount of collateral damage.

**Known Biological Control**

Cheatgrass is susceptible to very heavy livestock grazing in the early spring when the grass is green but prior to seed formation.  Grazing should occur twice approximately three weeks apart and should be repeated for at least two years to guarantee success.

**Known Cultural Control**

Controlled burning has been shown effective during late spring and summer but has associated risks which should be addressed in a prescribed burn plan. If not done correctly, prescribed burns may escape control and become wildfires, produce smoke that impairs visibility on highways or impacts individuals with respiratory problems, and may cause damage to desirable vegetation. **Consultation with a prescribed fire/controlled burn specialist is recommended when developing a prescribed burn plan.** Prescribed burn plans may require local and/or state burning permits. Contact your county sheriff or local fire official prior to burning.

BLM_0065961

## Canada thistle (*Cirsium arvense*)

Canada thistle is known to occur along the Dolores River in Montezuma, Dolores, San Miguel and Montrose Counties in Colorado[5].

Information for Canada thistle gathered from CSU Extension Service Fact Sheet No. 3.108 unless otherwise noted.

### Quick Facts

- Canada thistle is a creeping perennial that reproduces from rhizomatous roots, vegetative buds in its root system and from seed.
- It is difficult to control because its extensive root system allows it to recover from control attempts.
- Combining control methods is the best form of Canada thistle management.
- Persistence is imperative so the weed is continually stressed, forcing it to exhaust root nutrient stores and eventually die.
- Seeds can remain viable in the soil for 40 or more years.

### Identification

Leaves are alternate on the stem with spines along the edges. The edges of leaves are highly variable and can be wavy-edged on one plant and deeply lobed on another. The purple flowers are small, about 1/2" to 3/4" in diameter, and grow in a cluster at the branch tips. Flowers may have a sweet smell and are visited by bees and other pollinators. Plants grow 1-4 feet tall and are usually found in large clumps. Canada thistle is commonly found in moist soil conditions.

### Photos

  

Image 15: Canada thistle Flowering

Image 16: Canada thistle flower heads

Image 17: Canada thistle foliage

---

[5] Although there are no known Canada thistle infestations on the Dolores River in Mesa County, where it occurs the Management Strategy is: Suppression throughout the county

BLM_0065962

     

Image 18: Canada thistle plant        Image 19: Canada thistle infestation

NOTE: There is a rare native thistle (*C. perplexans*) with flowers that resemble Canada thistle. However, the flowers of this thistle are borne singly at the end of the flower stalks, rather than in a cluster.

**Effective Known Management**

The key principle to Canada thistle control is to stress the plant and force it to use stored root nutrients. Canada thistle can recover from almost any stress, including control attempts, because of root nutrient stores. Therefore, returning infested land to a productive state occurs only over time. Success requires the management plan to be implemented over several years.

**Known Mechanical Control**

Mowing hay meadows can be an effective tool if combined with herbicide treatments.  Mowing alone is not effective unless conducted at one-month intervals over several growing seasons. Always combine mowing with cultural and chemical control. Mowing at hay cutting stimulates new Canada thistle shoots to develop from its root system.

In irrigated grass hay meadows, fall herbicide treatments that follow mowing can be an effective management system because more Canada thistle foliage is exposed after cutting to intercept herbicide. Additionally, root nutrient stores decrease after mowing because the plant draws on them to develop new shoots.

If a Canada thistle infestation exists in a field that will be rotated to alfalfa, control the weed before seeding alfalfa. Alfalfa is an effective competitor only after it is established. It will not adequately establish in a well-developed Canada thistle infestation. A Canada thistle management system can start with crop or grass competition combined with herbicides, with the field rotated to alfalfa when the management plan ends.

BLM_0065963

**Known Chemical Control**

Research at Colorado State University shows that picloram plus 2, 4-D, aminopyralid, clopyralid, dicamba and chlorsulfuron are effective against Canada thistle. Canada thistle is difficult to control and re-treatment is commonly needed for three or more years after the initial application.

**Known Biological Control**

*Ceutorhyncus litura* is a weevil currently used as a biocontrol agent in Colorado. The female lays eggs on the underneath side of Canada thistle leaves in early spring. Larvae bore into the main leaf vein, then down into the plant's crown area. If the population is high enough, plant death can occur; otherwise Canada thistle is stressed and less vigorous.

*Ceutorhyncus* alone will not effectively control Canada thistle. It must be combined with other methods to be successful. Combine the weevil with cultural techniques that allow for maximum desirable plant competition. Research combining *Ceutorhyncus* with herbicides or mowing has not been conducted.

**Known Cultural Control**

Grasses and alfalfa can compete effectively with Canada thistle if their growth is favored by good management. Maintain fertility and, if possible, moisture at optimum levels to favor grass or alfalfa growth. Soil analysis can easily determine fertility needs. Be cautious with nitrogen fertilizers, because excess available soil nitrogen may favor weed growth.

These are essential management steps to ensure optimum desirable plant growth and competition. However, competition alone seldom is effective against Canada thistle.

BLM_0065964

## Siberian Elm (*Ulmus pumila*)

Siberian elm is known to occur along the Dolores River in Dolores, San Miguel, Montrose, Mesa Counties in Colorado and Grand County Utah.

Information for Siberian Elm gathered from The Plant Conservation Alliance, Alien Plant Working Group unless otherwise noted.

### Quick Facts

- Siberian elm is a fast growing tree, is the hardiest of all elms and grows well in dry and moist soils.
- This tree flowers in spring before leaves begin to unfold. The fruits develop quickly and are disseminated by wind, allowing the species to form thickets of hundreds of seedlings in bare ground.
- Seeds germinate readily, are dispersed by wind and spread rapidly.

### Identification

This medium to large-sized tree has an open, round crown of slender, spreading branches. Siberian Elm generally reaches 50-70 feet. Its bark is gray or brown, with shallow furrows at maturity. Both the buds and twigs are nearly hairless. Siberian elm is distinguished by its small, elliptical, smooth, singly-toothed leaves that reach lengths of approximately 0.8-2.6 inches. They are tapering or rounded at their asymmetrical base. The alternate leaves are dark green and smooth above, paler and nearly hairless beneath. Foliage is slightly pubescent when young. Flowers are greenish, lack petals, and occur in small drooping clusters of 2-5 blossoms. The winged fruit has one seed that is circular or ovate with a smooth surface. Fruit are about 1/2 inch wide and hang in clusters.[6]

### Photos

  

Image 20: Siberian elm tree    Image 21: Siberian elm bark    Image 22: Siberian elm foliage

---

[6] Center for Invasive Species Control and Ecosystem Health: www.invasive.org

BLM_0065965





Image 23: Siberian elm fruit cluster          Image 24: Siberian elm fruit

**Effective Known Management**

**Known Mechanical Control**

Girdling trees is the preferred management technique. Girdled trees die slowly over the course of one to two years and do not resprout. Girdle in late spring to mid-summer when sap is flowing and the bark easily peels away from the sapwood. When girdling, the bark must be removed in a band around the tree trunk just to the outside of the wood. If girdled too deeply, the tree will respond by resprouting from the roots. If resprouting should occur, the resprouts should be cut.

Seedlings can be pulled out by hand, and small trees can be removed carefully with a grub hoe or weed wrench. Wind-dispersed elm seeds from nearby areas are often a greater threat than resprouting of established elms. Managers should eliminate nearby Siberian elms whenever possible.

**Chemical Control**

Herbicides may be used as a cut-stem or cut-stump application for large trees and resprouts. Contact local weed manager for appropriate herbicide, rate, and timing.  If herbicide is used, care should be taken to prevent contact with non-target species.

F - 13

BLM_0065966

## Hoary cress or whitetop (*Cardaria draba*)

Hoary cress is known to occur along the Dolores River in San Miguel, Montrose (large infestations in Nucla and Naturita), Mesa[7] Counties in Colorado.

Information for Hoary cress gathered from the Mesa County Noxious Weed Management Plan unless otherwise noted.

### Quick Facts

- Hoary cress is a creeping perennial that reproduces by seed and creeping roots
- It is generally considered unpalatable to livestock
- This invasive is a highly competitive plant once it becomes established and spreads primarily by extremely persistent roots.  It will eventually eliminate desirable vegetation and become a monoculture.
- Hoary cress grows well on alkaline soils that are wet in late spring and generally does better in areas with moderate amounts of rainfall.
- Hoary cress is often associated with Russian knapweed as they seem to tolerate similar soil, moisture, and salinity (pers. com. Shelia Grother July 28, 2009).

### Identification

Hoary cress grows up to 2 feet tall.  Plants form a dense, contiguous patch. Leaves are waxy and slightly toothed, with upper leaves clasping the stem.  Numerous small white flowers form a flat-topped flowerhead.  Seed pods are heart shaped and contain 2 seeds each.

### Photos





Image 25: Hoary cress Flowers

Image 26: Hoary cress plant, roots

Image 27: Hoary cress Infestation

---

[7] Mesa County Management Strategy: Suppression throughout the county

BLM_0065967

NOTE: Two other species of hoary cress exist, globe-podded (*C. pubescens*) and lens-podded (*C. chalepensis*). Treatment is the same as for *C. draba*.

DO NOT HANDLE hoary cress with bare hands as it has been known to cause a rash and sensitivity to the sun.

**Effective Known Management**

The most cost-effective method for managing hoary cress is to prevent initial invasion and establishment. Prevent establishment by frequently monitoring management areas to detect and eradicate new plants early.  In order to reduce the possibility of invasion, seed dispersal must be limited.

Herbicide applications can be very effective on hoary cress when applied at the proper time, before or at very early bloom.  Tillage or hand grubbing break up root pieces, which can sprout into new plants and is therefore not recommended. No biological control agents are available for this species.

**Known Mechanical Control**

Mechanical control (tillage, hand pulling, mowing) is not recommended for control of hoary cress. Even a small piece of root can grow into a new plant. Mowing could be used to prevent seed set, but will not deter vegetative growth.

**Known Chemical Control**

Hoary cress can be controlled using herbicides, although it is difficult.  Successful control usually depends on an aggressive reapplication program. On rangeland, roadsides and waste areas apply metsulfuron at ranges from 0.5 to 1 ounce of product per acre to actively growing rosettes early in the spring, to regrowth before bud stage, in the early flowering stage, or to fall regrowth before the first killing frost.  Regrowth in the fall is unpredictable; do not rely on fall application as the primary treatment timing.

Treatment after full bloom is generally less effective. It is important to apply metsulfuron with at least 10 gallons of water per acre and to use a nonionic surfactant at a rate of 2 quarts per 100 gallons of solution. Nitrogen fertilization can enhance the vigor of grasses which will slow the rate of re-invasion.

BLM_0065968

## Field bindweed (*Convolvulus arvensis*)

Field bindweed is known to occur along the Dolores River in Dolores County Colorado.

Information for Field bindweed gathered from Adams County Weed Department; Fact Sheet 6 unless otherwise noted.

### Quick Facts

- Field bindweed is a non-native deep-rooted perennial that reproduces from seed and creeping, horizontal roots.
- Seeds can remain viable in the soil for up to 40 years.
- Field bindweed requires active management once it is established because of its potential to regenerate rapidly. New and small infestations should be viewed as a serious threat and managed aggressively.

### Identification

Field bindweed is a vining plant, often climbing other plants, with leaves shaped like arrow-heads.  Their flowers are funnel shaped, white to pink, and have two small bracts right below the flower base. The taproot is the primary root from which the lateral roots develop. The root system may reach 20 to 30 feet laterally as an extensive underground network.

### Photos

  

Image 27: Field
bindweed flowers

Image 28: Field
bindweed vine

Image 29: Field
bindweed fruit

### Effective Known Management

It is important to contain and persistently control infestations in order to exhaust the root system and deplete the soil seed bank.  A healthy cover of perennial plants should be maintained to discourage field bindweed establishment.

BLM_0065969

**Known Cultural Control**

Establishment of selected grasses can be effective in slowing the spread of field bindweed and to deter the establishment of new infestations, but will not be sufficient as the only management technique.  Contact local Natural Resources Conservation Service for seed mix recommendations.

**Known Biological Control**

The bindweed gall mite, *Aceria mahlerbae*, has proven to be effective in reducing field bindweed infestations. This is an option for large infestations. Contact the Colorado Department of Agriculture for more information, 970-464-7916.

**Known Mechanical Control**

Cutting, mowing, or pulling has a negligible effect unless the plants are cut well below the surface in the early seedling stage.  Repeated deep (12") digging and removal of all root pieces can be done in areas where herbicides cannot be used (ex. under desirable shrubs), but the process will only reduce the amount and vigor of the infestation, not control it.

**Known Chemical Control**

Herbicides labeled for use on field bindweed and found to be effective include, but not limited to: picloram, dicamba, glyphosate, and 2, 4-D. Picloram and dicamba can injure trees.  Effective control can take many years with some herbicide use strategies.  Proper timing of application is critical, during late spring, or just after full-bloom, and early fall are ideal opportunities to apply picloram and 2,4-D.[8]

---

[8] CSU Adams County Extension, www.coopext.colostate.edu/Adams/weed/bindweed_mgt.html

BLM_0065970

## Perennial pepperweed or tall whitetop (*Lepidium latifolium*)

Perennial pepperweed is known to occur near the San Miguel River, a major tributary to the Dolores River in Nucla and Naturita, Montrose County, CO.  This species may spread downstream.

Information for perennial pepperweed gathered from NPS PCA Alien Plant Working Group fact sheet unless otherwise noted.

**Quick Facts**

- Pepperweed is a highly invasive herbaceous perennial.
- It invades a wide range of habitats including riparian areas, wetlands, marshes, and flood plains.
- Pepperweed rarely produces seedlings in the field.  There is no known reason for this, as laboratory tests have shown seed viabilities to be high. Seeds lack a hard seed coat and lose viability rapidly, suggesting that resurgence of a treated infestation from the seed bank would be low. The plant mainly propagates clonally from its brittle rhizome-like roots. Roots exposed by washouts and land disturbances fragment and move along riparian corridors to start new infestations downstream.  Roots fragmented by the mechanical actions of land management practices (e.g. tillage) increase infestation densities and facilitate spread.

**Identification**

Plants are multiple stemmed and grow in stiffly erect masses up to 5 ft. tall, sometimes taller. Leaves are lanceolate, bright green to gray green, and entire or toothed.  Basal leaves are stalked, up to 1 ft. long and 3 in. wide and have serrate margins.  Basal leaves often dry out as the plant matures. Stem leaves are smaller, ranging from 3-10 in. in length, tapered at the base, entire to weakly serrate and are sessile to stalked.  Flowering occurs from early summer to fall. Abundant tiny white 4-petaled flowers are borne in dense clusters near the stem tips.  The fruits are small, flattened pods about 1/10th inch long, each containing 2 seeds (1 per chamber).  Fruits remain on the plant, dropping irregularly throughout the winter.  The base of the stem is semi-woody.  The roots enlarge at the soil line, forming a woody crown.  Root length is dependent on soil tilth, but can be up to 6 feet.  Roots are creeping, with new plants springing from root sections as small as 2 inches. Seedlings, when present, have leaves that are ovate to oblong, ¼-½ inch long, with smooth to slightly wavy edges and a petiole approximately 1/5th inch long.  Subsequent leaves resemble first leaves, but are larger in size.

NOTE: A common native pepperweed, *L. montanum*, can be distinguished from tall white top by the deeply lobed basal leaves, compact growth habit and shorter height (up to 3 feet).  The native pepperweed typically grows in drier sites.

BLM_0065971

**Photos**



Image 30: Pepperweed flowers



Image 31: Pepperweed foliage



Image 32: Pepperweed plant



Image 33: Pepperweed basal rosettes



Image 34: Pepperweed infestation

**Effective Known Management**

Deep-seated rootstocks make pepperweed difficult to control. With the exception of continual flooding, no non-chemical treatments have been found to effectively control this weed as a sole control option. Excellent control can be obtained with a combination of herbicides and cultural practices, but application must be repeated numerous times to obtain lasting management.

Perennial roots can also remain dormant in the soil for several years, thus intense early detection, monitoring, and treatment are the best control measures for perennial pepperweed. The primary sources of infestation should be located and eliminated to prevent further spread. Treating pepperweed with herbicides at a non-optimal time of year (e.g. other than at flower bud) is ineffective, as the roots, where carbohydrates are stored, are not affected by the spray and new plants will rapidly resprout.

BLM_0065972

Control regimes that have been shown to be effective include:

- Spring grazing with subsequent chlorsulfuron or imazapyr application at flower bud
- Spring mowing with subsequent chlorsulfuron or imazapyr application at flower bud
- Glyphosate alone at flower bud when populations are not dense
- Spring mowing followed by glyphosate at bud stage in wetland areas

**Known Chemical Control**

Only foliar application methods have been shown to be effective. A list of herbicides, sites where the compound has been approved for use, restrictions, and effectiveness is included in Table 1. Contact local weed managers for appropriate rates.

Table 1

| Herbicide | Site | Restrictions | Effectiveness |
|---|---|---|---|
| Imazapyr | Riparian, wetlands, wildlands | Non-selective herbicide, do not apply near water | Excellent control for 1-2 years. Treated areas typically remain void of any vegetation for 1-2 years after application. |
| Glyphosate | Wildlands, aquatic | Non-selective herbicide | Effective unless infestation is dense. If dense, mow area and apply to resprouts. |
| 2, 4-D | Wildlands, aquatic | Selective herbicide (will not harm grasses) | Somewhat effective unless infestation is dense. If dense, mow area and apply to resprouts. |
| Chlorsulfuron | Non-crop industrial | Selective herbicide (will not harm grasses), do not apply near water | Excellent control for 1-2 years. |

**Known Mechanical Control**

Mechanical control options are typically not effective. Very small patches can be controlled by hand removal if the process is repeated often for several years and plants are not allowed to mature. Because root systems are brittle and can extend so deep in the soil most mechanical techniques, such as disking, can spread the weed and increase the density.

BLM_0065973

## Musk thistle (*Carduus nutans*)

Musk thistle is known to occur along in Montezuma County, Colorado[9].

Information for Musk thistle gathered from CSU Extension Service Fact Sheet No. 3.102 unless otherwise noted.

**Quick Facts**

- Musk thistle is a biennial weed that reproduces only from seed.
- The key to successful musk thistle control is to prevent seed production.
- Combine control methods into a management system for best results.

**Identification**

Musk thistle is a bushy biennial plant that grows up to 6 feet tall.  The dark green leaves have spines along the edges and are lobed and wavy.  Rosette leaves are spiny with a white central vein that is very visible on the underside.  Leaves often have a whitish edge.  The leaves clasp the stem and form "wings" along the stem below the leaf.  Flowers are borne singly on long spineless stems.  The flowers are deep pink to magenta and 1½ to 3 inches in diameter with very broad green or somewhat magenta bracts below the petals.  When mature, the flowers "nod," hence the other common name, nodding thistle.[10]

**Photos**





Image 34: Musk thistle flower

Image 35: Musk thistle stem

Image 36: Musk thistle plant

---

[9] Although there are no known Musk thistle infestations on the Dolores River in Mesa County, where it occurs the Management Strategy is: Contain infestations above approximately 7,000 feet elevation. Eradicate infestations below approximately 7,000 feet elevation.
[10] Mesa County Noxious Weed Plan (December 2009).

BLM_0065974





Image 37: Musk thistle flowers       Image 38: Musk thistle foliage

**Effective Known Management**

Severing the tap root at least 2" below the soil line before flowering is shown to be very effective. Herbicides can be used in the rosette to early bolting stage. Flowering plants should be chopped and bagged to prevent spread of seeds. Several insect species are available for biological control.

**Known Cultural Control**

Maintaining pastures and rangeland in good condition is a primary factor for musk thistle management. To favor pasture and rangeland grass growth, do not overgraze. Fertilize only when necessary and according to soil testing recommendations. To successfully manage musk thistle, prevent seed formation.

**Known Mechanical Control**

Musk thistle will not tolerate tillage and can be removed easily by severing its root below ground with a shovel or hoe. Mowing can effectively reduce seed output if plants are cut when the terminal head is in the late-flowering stage. Gather and burn mowed debris to destroy any seed that has developed.

**Known Chemical Control**

Several herbicides are registered in pasture, rangeland and noncrop areas to control musk thistle. Picloram, Milestone, dicamba, or 2, 4-D, are commonly used. Apply these herbicides in spring or fall to musk thistle rosettes. Refer to local weed managers for rates and application timings. Applications during the reproductive growth stages with these herbicides (bud through flowering) will not eliminate viable seed development.

Metsulfuron or chlorsulfuron also can be used in pastures, rangeland, and non-crop areas. Research from Colorado State University and the University of Nebraska shows that chlorsulfuron or metsulfuron prevents or dramatically reduces viable seed formation when applied in spring, up to early flower growth stages. The latest time to apply these herbicides is when developed terminal flowers have opened up to the size of a dime. Adding a good agricultural surfactant is needed otherwise control is inadequate.

BLM_0065975

**Known Biological Control**

The Colorado Department of Agriculture has established a weevil, *Trichosirocalus horridus*. This weevil attacks the crown area of musk thistle rosettes and kills or weakens the plant before it bolts. This weevil is being distributed throughout Colorado by the Department of Agriculture. It tends to be more effective than the seed head weevil.

The musk thistle seed head weevil, *Rhinocyllus conicus*, can be found throughout Colorado. The female deposits her eggs on the back of developing flowers and covers them with chewed leaf tissue. After eggs hatch, larvae bore into the flower and destroy developing seed. The seed head weevil reduces seed production by 50 percent on the average. If used alone, however, it is not an effective management tool. Certain herbicides or mowing can be combined with the seed head weevil if these are used during late flowering stages. This allows the weevils to complete their life cycle and ensures their presence in subsequent growing seasons. The musk thistle seed head weevil is not being redistributed anymore because it attacks many different species of thistles, including native thistles.

F - 23

BLM_0065976

## Halogeton (*Halogeton glomeratus*)

Halogeton may be a concern for the Lower Dolores River.

Information for halogeton gathered from USU Extension unless otherwise noted.

### Quick Facts

- Halogeton typically produce enormous quantities of seed (average is ~ 75 seeds per inch of stem). Seeds disperse with wind, water, human activities, seed-gathering ants, animals, and when dry plants break off at ground level and tumble with the wind.
- Plants are toxic to livestock, especially sheep, from high oxalate content.
- Halogeton competes poorly with established perennial vegetation.
- This annual species is especially abundant in alkaline or saline soils.
- Preferred habitat includes roadsides, dry lakebeds, shrub lands and other arid and semi-arid regions.

### Identification

Halogeton is a small forb, growing 3 to 12 inches in height. Its stems are red when young, turning yellow to white with maturity. The stems are branched from the base, spreading first, and then growing vertical. Halogeton flowers July to September, and reproduces from seeds. The flowers are small and inconspicuous, in leaf axils, and can be unisexual or complete.

Halogeton reproduces from two seed types: (1) a black seed, with yellowish or reddish fan-like wings and similar to a snail coil, and (2) a brown wingless seed. The black seed germinates quickly, and the brown seed has delayed germination. Seeds are often very numerous, forming a mass from the ground to the tip of the leaves. Brown seeds can remain viable in the soil for 10 years or more.  Halogeton leaves are alternate, simple, fleshy and tubular. There is a small hair at the end of the bluish-green leaves.

### Photos





Image 39: Halogeton flowers       Image 40: Halogeton plants

BLM_0065977





Image 41: Halogeton seeds                    Image 42: Halogeton seedlings

**Effective Known Management**

Halogeton cannot compete with healthy range plants. Therefore, control involves keeping a healthy cover of desirable forage plants.  There are no currently registered biocontrol agents available for halogeton. Previously, a stem boring moth (*Coleophora porthenica*) was released but never successfully established.

**Known Mechanical Control**

Tillage will effectively control halogeton. However, it is best to avoid increasing disturbance unless successful restoration of perennials is highly probable.

**Known Chemical Control**

For small infestations spot treatment with 2, 4-D applied in late May or early June has shown to suppress halogeton. Repeated treatments are likely necessary for control.  Herbicide control of established stands on saline soils and low precipitation is not recommended.[11]

**Known Cultural Control**

Crested wheatgrass is very competitive and may strongly suppress or eliminate halogeton.

---

[11] USDA Poisonous Plant Research Laboratory

BLM_0065978

## Purple loosestrife (*Lythrum salicaria*)

Purple loosestrife is known to occur along the San Miguel River, a major tributary to the Dolores River in Nucla, Montrose County, CO.  Mesa County, CO and Grand County, UT are concerned that this species may spread downstream.  Land managers should be on the lookout for this species and contact county weed professionals immediately if it is found.

Information for Purple loosestrife gathered from the Mesa County Noxious Weed Management Plan unless otherwise noted.

### Quick Facts

- Purple loosestrife is a wetland invader, thriving in moist conditions.
- Successful eradication depends on the prevention of seed production and stressing the root system.
- The key to eradication is early detection.
- Seeds are mainly distributed by water, but can also be dispersed by animals and humans. Purple loosestrife seeds do not drop from capsules until the air temperature becomes cold in the early fall.

### Identification

Purple loosestrife is a perennial with creeping, rhizomatous roots that grows up to 10 or more feet tall.  Leaves are lance shaped with veins that do not reach the edge of the leaf but parallel the edge.  The very showy purple to magenta flowers grow on long stalks and have 5-7 petals each. The ribbed stems are square or 6-sided.

### Photos



Image 43: Purple loosestrife flower and foliage



Image 44: Purple loosestrife flower



Image 45: Purple loosestrife infestation

F - 26

NOTE:  An uncommon native loosestrife is shorter and more delicate, with fewer flowers. Gayfeather or blazing star, a native plant, has coarse, more linear leaves that are much narrower than loosestrife.  Fireweed, a common native plant, has only 4 petals per flower, a round stem and the flower heads form an elongated triangle.

**Effective Known Management**

Mechanical control and hand-pulling can be effective for small infestations and young purple loosestrife plants but must be done before seed set.

**Known Chemical Control**

For older plants, spot treatment with a glyphosate herbicide has shown to be effective. These herbicides will be most effective when applied late in the season when plants are preparing for dormancy.  However, it may be best to do a mid-summer and a late season treatment, to reduce the amount of seed produced.

Timing of herbicide applications is important.  Early summer applications should be done just before flowering to prevent flowering and seed set.  Fall applications can be done from late August through September, but before a hard freeze.  Flowerheads must be removed to prevent spread of seeds.

**Known Biological Control**

Several biocontrol agents are available, but establishment is dependent on proper regulation of water levels and may work better in drier habitats.  Though biological control agents are available, it is not recommended because eradication is the state-wide management goal for this species.

BLM_0065980

# Kochia (*Kochia scoparia*)

Kochia is known to occur in all six counties associated with the Dolores River watershed.

Information for Kochia gathered from the New Mexico State University Extension Weed Service unless otherwise noted.

## Quick Facts

- Farmers in dry areas, including the Southwest, have grown kochia as a drought-resistant forage crop on lands where other crops are difficult to grow -- hence the nickname "poor man's alfalfa."
- Kochia has low water requirements, resistance to diseases and insects, and high protein content
- Kochia is an annual broadleaf forb that reproduces by seed.
- Kochia thrive in areas of high disturbance and are common along roadsides, construction sites, and other areas where soil is frequently disturbed.

## Identification

The bushy plants grow 1 to 7 ft tall and have taproots. The erect, striated stems are light green and have many branches. The many alternate leaves are hairy, 1 to 2 in. long, narrow, pointed and attached directly to the stems. Small, green flowers and seeds are produced in narrow heads at the leaf axils. The plant is dark green when young and turns red as it matures. The seeds, when mature, are rough, flat, triangular and grayish-black in color. In the fall, the plants often break away from the roots and tumble over the ground, scattering the seeds.

## Photos





Image 46: Kochia flowers          Image 47: Kochia plant          Image 48: Kochia stem

BLM_0065981

**Effective Known Management**

Prevention or reduction of disturbance is critical in preventing establishment of this weed. Kochia germinate in the spring through the summer and can produce thousands of seeds per plant.  Not all seeds in the soil germinate every year; consequently management of infested areas needs to continue until the seeds present in the soil have been depleted.   Kochia does not compete well with grasses.

**Known Chemical Control**

Several herbicides are available that can successfully manage kochia.  Pre-emergent herbicides can provide season long control of these weeds.  Post-emergent applications such as 2, 4-D are also effective, but applications should be made when plants are small (< 4 inches in diameter) for effective control.

**Known Cultural Control**

Revegetating areas with desirable species that are well adapted to the area is recommended and can improve success dramatically.  Kochia can also be controlled by grazing animals on the plants if they are young.  Care must be taken to supplement the diet of animals if these plants are the sole source of farage in the area or poisoning may result.

**Known Mechanical Control**

Mowing can be effective on smaller plants, if all above ground tissue is removed.  Tillage, hand hoeing, or any other method that disrupts the contact between the plant roots and soil is also effective at controlling both seedling and larger plants.

BLM_0065982

**Other Invasive, Non-native Species of Concern for the Dolores River Below McPhee Dam Include:**

**For Montezuma County Colorado:**

- Spotted or Diffuse knapweed – www.ext.colostate.edu/Pubs/natres/03110.html
- Leafy Spurge – www.ext.colostate.edu/pubs/natres/03107.html
- Bull Thistle – www.mesacounty.us/pest/bullthiste/aspx

**For San Miguel County Colorado:**

- Spotted or Diffuse knapweed (along highway 141) – www.invasivespeciesinfo.gov/plants/spotknapweed.shtml
- Burdock – www.ppws.vt.edu/scott/weed_id/arfmi.htm

*All images gathered from Invasives.org*

F - 30

BLM_0065983

# Appendix G:  Best Management Practices for Livestock Grazing & Fencing for Riparian Areas

Information gathered directly from *Riparian Area Management: Grazing Management Processes and Strategies for Riparian-Wetland Areas (2006),* a handbook produced by the BLM, unless otherwise noted.

Riparian areas are often the primary, and sometimes the only, watering places for livestock grazing on pastures and rangelands.  This significantly increases the amount of pressure livestock places on riparian vegetation.

Successful livestock riparian grazing strategies are developed by considering site-specific resource conditions, soil and vegetation capabilities, water quality requirements, livestock and wildlife needs, and human perspectives.  While no single grazing system will maintain improved riparian areas or consistently help recover degraded areas, combinations of strategies can be used to customize an approach for each site.  Managers must work together to find grazing strategies and practices that make control of livestock distribution and grazing intensity easier and more effective or at least achievable.

Any attempt to improve grazing management generally follows these basic principles:

- Avoid grazing the same place at the same time year after year.
- Provide for plant development prior to or plant recovery following the grazing period.
- Defoliate the primary forage plants only moderately.
- Provide for livestock needs throughout the year.
- Manage for maintenance or improvement of riparian area physical functionality.
- Assess riparian area condition at a frequency adequate to enable, if necessary, prompt corrective management action to protect the health of the riparian area.

An ecosystem perspective is critical to successful riparian area management and provides a comprehensive basis for evaluating current grazing practices and other land uses, identifying riparian management objectives, and developing future management alternatives.  Analyzing trends from an adaptive management perspective will help determine if goals and objectives are being met and what changes may be needed to move toward the desired outcome.

## Interaction of Livestock Grazing and Riparian Habitat Health

Livestock can indirectly and directly affect stream condition through soil compaction, bank shearing, or severing of roots of riparian vegetation, which are needed for plant survival and bank stability.

Understanding the relationship between vegetation and channel stability is critical in the planning and design of grazing management strategies that are compatible with riparian area restoration and maintenance.  Understanding that the condition and management of the associated uplands can directly affect conditions in the riparian area is also important.

BLM_0065984

Change in management of the upland should not be to the detriment of the riparian area and vice versa.

A.  Vegetation

Vegetative attributes that can change in response to a grazing strategy include:

- Plant community composition, distribution, and production
- Plant species diversity
- Rooting characteristics (deep-rooted or shallow-rooted)
- Vegetation contribution to percentage of soil organic matter
- Amount of bare ground vs. vegetated ground cover
- Plant community structure including woody plant size, diverse age classes, location, and abundance

Riparian plant community types are important because they are more suitable for maintaining and enhancing the stability of streams.  The roots of these plants have four basic characteristics that affect bank stability.  They are:

- Root biomass
- Total root length
- Resistance to comprehensive force (hoof action)
- Linear or stretching strength

B.  Channel Stability

Plants differ in their ability to protect streambanks.  Riparian vegetation communities with assigned stability class ratings allow managers to assess riparian areas for site potential and set reasonable goals and objectives for maintenance or restoration, development of alternatives, and design of management strategies.  These systems are also extremely important in assessing trend and ultimate attainment of desired plant communities.

One frequently overlooked period when grazing strategies can be critical for recovering streams is during droughts.  These periods of low flows and reduced stream energies allow vegetation to expand roots and aboveground biomass into areas that were previously in the active channel.  The increase in root biomass enhances stream stability and resistance to both lateral widening and vertical incision.  This is especially important in alluvial systems composed of finer sediments.  Grazing strategies should allow these processes to occur.

C.  Upland Connection

Consideration must be given to management effects on other types of ecological sites within a pasture or watershed, including upland areas, when planning livestock grazing in riparian areas.  There are many factors that need to be

G - 2

BLM_0065985

evaluated, including landscape and animal behavioral interactions. For example, cattle tend to use primarily riparian areas during the hot season on steep landscapes. If this condition is not adequately addressed during the planning stages, the result may cause significant degradation to the riparian area.

In many parts of the West, a reduction in fire frequency and intensity, primarily in pinyon and juniper woodlands, has allowed woody plants to encroach into grasslands. These additional shrubs and trees have caused a variety of effects. A shift from plant communities dominated by grasses and forbs to those dominated by woody plants can result in substantial changes to the hydrology of an area. For example, a switch from herbaceous to woody dominated vegetation has the potential to alter runoff patterns, infiltration, and ground-water recharge or discharge. These changes can, in turn, alter the flow regime of area streams. In addition to altering the hydrology, woody plant encroachment may also affect livestock use patterns. Thick stands of woody plants may limit livestock access to portions of a pasture and consequently put more pressure on other more accessible areas of the pasture. When and where appropriate, prescribed fire can be used to address such concerns. Wildfire effects can promote riparian health and restoration as well as create many riparian problems. Accumulated fuels can increase fire intensity and watershed effects leading to debris flows and flooding. Flood damage is likely to be more severe where riparian vegetation has been consumed in hot fires fueled by accumulated wood.

**Management Tools and Techniques to Mitigate Grazing Impacts on Riparian Areas**

Successful grazing strategies generally involve a combination of management tools and techniques that aid livestock managers. These tools can help extend grazing periods within pastures by promoting distribution. The economic implications of using various management tools and techniques should be evaluated during the development of the grazing plan.

In developing a grazing plan, livestock operators and land managers need to consider the cost of a variety of techniques, including the following:

- Installation of improvements and practices
- Loss of grazing area
- Extra hay, grazing land, and leases
- Decrease in stocking rate
- Change in management
  - Initial time and cost for setup
  - Amount of time involved in ongoing management practices and maintenance

Livestock operators and land managers should also consider the potential benefits of:

- Increased time and use (AUM) within a pasture or allotment

BLM_0065986

- Decreased use of leased land at a higher cost than privately owned of Federal Land
- Accelerated upward trend of riparian and upland area (function and forage)
- Decreased peak and increased base water flows
- Improved livestock health and weight gain
- Aesthetic benefits of health streams and riparian areas (e.g., fishing, hunting, and wildlife viewing)
- Increased ranch value
- Quality of life for family

Economic considerations often determine the applicability of a grazing plan.  Managers need to ask the right questions to determine what the costs and benefits could be with the implementation of various tools.  Will the use of low-stress stockmanship and low-moisture nutrient supplement blocks increase the length of time a pasture or allotment may be grazed?  Will it improve animal performance?  Will the costs of installation or use of different techniques be offset by the benefits?  Economic outputs will vary on a case-by-case basis, as will the applicability of different grazing strategies.

Most successful grazing strategies include management tools and techniques that promote distribution of livestock, such as:

**Techniques that attract livestock away from riparian areas**

(1) Offsite water developments
(2) Upland seeding
(3) Prescribed burning, brush beating, and tree clearing
(4) Grass reserves
(5) Supplementation as a livestock distribution tool

**Herd management and animal husbandry practices that promote mobility**

(1) Culling practices
(2) Kind of livestock
(3) Breed of livestock

**Techniques that restrict livestock from riparian areas**

(1) Fences

Fencing, when properly located, well constructed, and maintained, can be an effective tool for controlling distribution of livestock.  Fencing facilitates management of riparian areas by either including or excluding livestock use, depending on management objectives.  Sometimes exclusion fencing may be the most practical approach for initiating rapid riparian recovery or improving highly sensitive areas.  It can also be a temporary measure for initiating recovery.  The loss of forage from exclusion fencing may be inconsequential on streams in poor

BLM_0065987

condition that lack vegetation. Fencing water sources at springs and seeps and piping the water to adjacent areas for use is often the only effective measure for protecting small riparian areas.

Fencing may also restrict wildlife and livestock movements in an undesirable manner. In addition, fence construction and maintenance can be costly and time consuming. Temporary electric fencing can be an effective tool for improving distribution so that parts of a pasture can be grazed while others are rested. Temporary fencing is also useful for evaluating multiple placement locations before constructing more expensive permanent fencing. Using temporary fencing from year to year to break up grazing patterns and facilitate implementation of rangeland management practices provides flexibility in obtaining long-term objectives.

Livestock acclimate to temporary electric fencing easier in a controlled environment, such as a spring calving pasture, as opposed to much larger rangeland pastures. Livestock need to learn to respect the fence as a barrier. It is important to note that temporary electric fencing does not provide the same level of control as permanent barbed-wire or wooden-rail fencing and should be used to influence rather than control animal behavior.

Suspending panels of corrugated metal roofing over the stream, between ends of a fence, has proven effective in controlling livestock movement in Oregon. The panels swing with the flow of water, do not catch trash, and are avoided by livestock. Other forms of swing panels constructed of hanging pipe or heavy chain have also proven effective.

(2) Barriers

Barriers formed by placing trees and brush on streambanks may discourage livestock use and help stabilize eroding banks. Placing boulders (10 to 20 inches or larger) along streambanks where livestock trail and cause trampling damage can effectively displace livestock use and promote recovery.

(3) Hardened Crossing and Water Access Points

Hardened crossings and water access points are coarse gravel pads that provide livestock sure footing on a gentle grade to water, either for crossing a stream or for drinking. Livestock prefer gravel pads over steep, overhanging streambanks or soggy low areas to access the water in the stream channel. During a roundup, cows will run for the gravel pad before trying to negotiate the streambanks. Locate crossing or access points in areas where the streambed is stable and avoid sites where:
- The channel grade or alignment changes abruptly
- The channel bed is unstable
- Head cuts exist

BLM_0065988

- Large tributaries enter the stream
- There is a recently located or constructed channel
- A culvert or bridge is immediately upstream or downstream
- Water velocity and depth are excessive

Locating water access in rocky areas (natural or manmade) minimizes trampling damage to streambanks and streambeds. Narrow water access (water gap) discourages livestock from loafing at the water source. Ice and high flows need to be considered when locating water access points and hardened crossings in some areas.

Fish spawning and rearing areas should be considered when determining the location of the water gap or crossing. Even when the vegetation has expressed itself, there are some key fisheries habitat areas that need to be addressed to ensure that a grazing strategy is successful. These include:
- *Pool formation and cover:* Are cattle impacts preventing pool formation and overhanging cover on the outside of the meanders?
- *Margin habitat:* Is there adequate vegetation in the margins to provide habitat for fry or minnow species?
- *Spawning area:* Are there trampling impacts to spawning areas?

(4) Bedding Grounds

Bedding grounds and other livestock handling facilities should be located away from riparian areas. The use of low-stress stockmanship and salt, mineral, or other supplements (e.g., low-moisture blocks) may be useful for establishing or relocating bedding grounds away from riparian areas.

(5) Livestock Turnout Locations

Placing livestock far away from overused riparian areas when they are moved to a new pasture (turnout) may help regulate timing, duration, and amount of riparian use in large pastures that contain adequate stock water. It is beneficial to change turnout locations each year to vary behavior patterns.

(6) Drift Fencing

A drift fence is an open-ended fence used to retard or alter the natural movement of livestock; it is generally used in connection with natural barriers. Drift fencing in conjunction with gullies, cliffs, and other natural barriers can regulate natural trailing or loafing by livestock in some riparian areas.

(7) Stockmanship

Frequent range riding and herding can effectively control livestock distribution in many situations. On some rough or poorly watered ranges, proper stockmanship

BLM_0065989

may increase breeding, conception, and calf crops.  Low-stress stockmanship techniques are once again becoming more popular as a tool to distribute livestock.

Successful application of low-stress stockmanship enables the rider or range manager to control the duration that plants and soils are exposed to grazing animals.  This controls overgrazing and over-resting, both of which lead to deterioration of range health.  Proper handling can thus improve livestock distribution and rangeland condition and trend, and it can lead to improved riparian conditions that benefits fisheries and wildlife while improving water quality.  Livestock can be moved away from critical habitats at critical times to minimize social displacement of wildlife (e.g., elk and deer winter range, fawning sites).

BLM_0065990

# Appendix H:  Conservation Youth Corps –
# Dolores River Restoration Pilot Program 2009 Report




## Dolores River Restoration Pilot Program 2009 Report

*Where indicated, each Corps presented information individually, followed by compiled results. In areas where this is not indicated, the results and feedback are compiled.*

I.  **Work Accomplishments on the ground**
  A.  **Work completed by both SCC and CCYC Crews**
    1.  River miles in the Upper Canyon were effectively treated between R.M. 19-42: **23**
    2.  Remote access (Upper Canyon) acres effectively treated: **170**
    3.  Remote access acres inventoried:  **481**
    4.  Medium/High density acres effectively treated**: 21**
    5.  Fire break maintained: ¾ **mile (Crocker-Bedford property)**
    6.  Slash piles constructed: **79 (12'x12')**
    7.  Data collection for BLM included: **acreage, amount of herbicide applied, and presence of other invasive species.**
    8.  *Challenges:  Information was not clear on the size/extent/location of infestations in the remote upper canyon due to lack of time for more thorough field visits before project work began.*

  B.  **Cost** – Costs have been calculated per mile and per acre in remote areas, and per acre only in front country, vehicle access sites.  **Effective treatment** denotes entire area benefitting from treatment per priority area site.
    1.  **Compiled Average Corps costs**
      a.  **Remote Access Site Costs** *(23 river miles or 170 acres treated and 481 acres inventoried)*
        i.  **Per mile:  $1,643.47** *(remote sections, based on weekly rate of $6,300 for treatment of 23 river miles over 6 weeks)*
        ii.  **Per acre effectively treated:  $222.35** *(sparse and intermittent infestations, 170 acres treated over 6 weeks)*
        iii.  **Per acre inventoried:  $78.59** *(481 acres over 6 weeks)*
      b.  **Vehicle Access Site Costs** *(road access sections, based on weekly rate of $6,300 per crew, medium/high density infestations)*
        i.  **Average cost:  $4,200.00** *(21 acres/14 weeks @ $6,300)*
      c.  **Training Costs:**
        i.  **2009 total cost:  $37,800** (3 weeks training, 2 crews)

BLM_0065991

**ii. 2010 cost: $25,200** (2 weeks training, 2 crews)
**d. Herbicide Costs: $6,681.00** *(estimate for 26 weeks)*
**e. Amount of herbicide applied:** Garlon 4 (Triclopyr) 55 gallons
Methylated Seed Oil (MSO) 150 gallons
3 to 1 mix: One part Garlon 4, three parts MSO

## II.  Accomplishments - Social Goals
*The following social goals were targets set for crewmembers.  CLs have also been included for comprehensive review.*

### Goal A: Crew Composition-each crew will be comprised of 2 crew leaders (CLs) and four crewmembers (CMs)

**1. SCC:**  There was 100% retention rate amongst CLs and a 50% retention rate amongst CMs.  2 of the 4 AmeriCorps direct members left because of compelling personal circumstances.  We replaced these two members with a total of three non-AmeriCorps individuals over the course of the rest of the season.

**2. CCYC:**  There was a 50% retention rate amongst CL's and a 100% retention rate amongst CM's. The CL left just after the 1st week of training because of compelling personal circumstances, and she was replaced immediately. CCYC also added 2 non-AmeriCorps CM's to help late in the season.

### Goal B: Crew will be 1/3 Native American: ½ At-Risk (Low income, high school dropout, or criminal record)

**1. SCC:**  Of the 4 CM's originally hired, 50% were Native American.  100% were at-risk based on their individual income.  Of the 2 CL's hired, 0% were native, 0% at risk.

**2. CCYC:** Of the 4 CM's originally hired, 50% were Native American. 75% were at-risk based on individual income. Of the 2 CL's hired, 50% were native, 50% at risk.

**3. Complied:** *42% of the 8 CM's and 4 CL's (12 total) originally hired were Native American.  67% were at-risk based on their individual income.*

### Goal C: 80% of CL's and CM's will be from Dolores Watershed (4 Corners area)

**1. SCC:**  50% of CM's were from the Dolores Watershed, 50% have ancestral ties to the area.  50% of the CL's were from the Dolores Watershed.

**2. CCYC:** 75% of the CM's were from the Dolores Watershed, 50% have ancestral ties to the area. 50% of the CL's were from the Dolores Watershed, 50% of the CL's have ancestral ties to the area.

**3. Complied:** *59% of the CM's & CL's were from the Dolores Watershed and 42% have ancestral ties to the area. Note: This is one of the more challenging goals to meet in terms of recruiting.*

### Goal D: 20% of CM's will want to pursue careers in land management

**1.  SCC:**  Of the 4 original CM's hired, 2 of them may pursue careers with public land management agencies.  Of the 2 original CL's, 1 may want to pursue a career with

BLM_0065992

public land management agencies.  None are currently actively pursuing these positions.

2. **CCYC:** Of the 4 original CM's hired, 4 of them may pursue careers with public land management agencies. One of them has been hired for 2010 by the USFS to be a Hotshot Wildland Firefighter. Of the 2 CL's, 1 may want to pursue a career with public land management agencies.  1 is currently actively pursuing these positions.

3. *Compiled: 67% of the CM's and CL's hired may pursue careers with public land management agencies. 9% have actually gotten a job with a public land management agency for 2010.*

**Goal E: 75% of CM's will earn an AmeriCorps scholarship:**

1. **SCC:**  50% of original CMs will receive their scholarships.  25% (Tye Mackey) is most likely going to complete his award via volunteer work since he is only 25 hours short.  One member left because of compelling personal circumstances.

2. **CCYC:** 100% of the original CM's will receive their scholarships.

3. *Compiled: 75% of the 8 original CM's will receive their AmeriCorps Education Award Scholarship.  CL's do not qualify for AmeriCorps Education Awards.*

**Goal F. Education**
   **a. 2009 Training-on-the-job skills, education**
   1.  S 212 Chain Saw Safety and Maintenance (40 hours)
   2.  Noxious weeds, species identification, and herbicide application (24 hours)
   3.  Species specific cutting, brushcutter safety (12 hours)
   4.  GPS mapping, taking waypoints and data collection (4 hours)
   5.  Team building, trust initiatives, riparian ecology, hitch preparation (40 hours)
   6. In addition to training and on-the-job skills learned, there was 44.75 hours of recorded facilitated education time on the SCC and CCYC crews on subjects ranging from Navajo culture to geology trivia to astronomy to flash flood warnings, etc.  The focus and process of SCC/CCYC Education is place based, experiential education with each participant and leader alternating between the role of facilitator and participant.  Each hour of education is recorded in a daily field log and 4 hours are encouraged per week.
   7. USA Jobs/AVUE Online Application training class with the USFS (2 hours).
   6.  **Total Education and training hours per CM: 186.75**
   7.  **Value to CM's=$1,250 in AmeriCorps Education Awards per CM**

This year we did 3 weeks of training. We provided a full week (40 hours) of **S-212 Chainsaw Safety training** and practical evaluations in a timber environment for the benefit of the individuals on the crew, so they have experience in professional development that is not an option in a riparian environment. It was also helpful to have timber falling experience on these crews given the large diameter and height of some of the tamarisk the Corps were removing.

S-212 was followed by a **second week of species-specific cutting techniques, species identification, herbicide application, waste management practices, and GPS mapping/documentation** on the sites we will be working. We provided two separate GPS trainings (one off project site and one on project site). This on-the-job approach was also used and allows for increased production and site relevant field support. **The 3-day river**

H - 3

BLM_0065993

**orientation, also in week two,** with it's team building initiatives were absolutely positive in terms of building trust amongst the group, field staff, and administrative staff and also in engaging the members in the true spirit of team based, partnership/collaborative, non-profit, conservation work, as well as learning how to be low impact, comfortable, and safe campers.

**The third week was herbicide, noxious weeds, and species identification training** was both thorough and comprehensive, facilitated by both Mike Jensen of the BLM and Sheila Grother of San Miguel County. We involved as many partners and outside agencies as we could to legitimize the trainings we offer and safety in the field.

### b. CM Success Stories

**1. SCC:** Dwayne Chapo heard about SCC through the Durango Adult Education Center (DAEC) where he was working toward his GED. The DAEC sent Dwayne to SCC to help him with his need to find a job that would provide him with an opportunity to work, gain skills, and continue his education. Dwayne lives in a small apartment in Durango with his mother and brother now but grew up in northern New Mexico. Since Dwayne had very little work experience SCC chose to put Dwayne on an 8 week long summer crew to see how he would do. His crew leaders were impressed enough with his work ethic, positive attitude and sense of humor that they recommended him to move on to a more advanced crew such as DRRC. He thrived on this crew, maintaining his consistent work ethic and positive attitude throughout – even when he was sick or not feeling well. As this 13 week project came to a close, Dwayne expressed interest in finding ways to continue working while earning his GED and potentially receiving additional vocational training. He is now applying to Job Corps to continue his success.

**2. CCYC:** This entire crew was a major success for CCYC. We lost our original head crew leader, but were able to move the Assistant leader into that role. We then immediately re-hired an Assistant Leader who was Navajo and a former CCYC crewmember. All 4 crewmembers stood out as amazing and highly motivated individuals, but one in particular really stood out. Reed Steele worked for CCYC during the summer of 2009 on a 4-Week Crew doing fence and trail work, but his real desire was the chainsaw. He did so well and showed such positive peer leadership during the summer, we decided to bring him onto the Dolores Crew. His ultimate goal for doing this work was to get the practical field experience to help him get a job as a wildland firefighter. He was hired for a job in 2010 with the Blue Ridge Hotshots based out of Happy Jack, Arizona. He was also given a Notice of Exemplary Performance from his Crew Leader, *"Reed has conducted himself most professionally while on this crew. He showed excellent leadership through setting a high standard on the worksite and eagerly imparted his mechanical and wilderness knowledge to the other crewmembers. He showed a superior attitude toward working hard and we could not have finished our projects without him."*

### c. CM Comments
**1. SCC:**

H - 4

BLM_0065994

*"I take pride in the work we do because I'm doing it for the public and for the environment."*

*"I really like how everyone RESPECTS each other at SCC."*

*"I love the chainsaw and I try my BEST. I help others to learn what I know."*

**2. CCYC:**
*"I loved every part of the experience from the training to the work itself. Mainly though, I loved running my Stihl chainsaw."* Darwin Begay, 2009 DRRC

*" The best part of my experience on this crew was the unity among our crew and also with the SCC crew. We all worked really well as a team."* Kim Bohne, 2009 DRRC.

*"The part of this program I liked best was meeting new people and working hard day after day."* Reed Steele, 2009 DRRC.

**d. Summary of Corps Programs Evaluations:**
**1. SCC:**
- 100% of the agency, private and county project contacts felt that SCC did an exceptional job on the assigned work projects and felt that SCC was a valuable asset.
- 100% of the DRRC crewmembers felt this program was beneficial for them personally and professionally.
- 100% of the crewmembers felt they had increased their knowledge of the environment and the Four Corners Region.

**2. CCYC:**
- 100% of the agency, private and county project contacts felt that CCYC did an exceptional job on the assigned work projects and felt that CCYC was a valuable asset.
- 100% of the DRRC crewmembers felt this program was beneficial for them personally and professionally.
- 100% of the crewmembers showed an increase in knowledge of the Colorado Plateau and its surroundings from the beginning to the end of this program. The average increase of knowledge was 80% on pre and post questionnaires.

**III.    Safety (no serious incidents)**
    **a.  Accidents/Incidents**
As per SCC/CCYC policy, each time an accident, incident, or near miss occurs, our field staff will complete an accident/incident report. There were no recorded safety incidents, accidents, or near misses for the SCC or the CCYC crew. ***This is much lower than average and it is likely that additional species specific focused training and field oversight in the 3rd week of training combined with more experienced crew leaders prevented accidents/incidents to these crews.***

BLM_0065995

**b.  Sickness**

Flu-infected individuals were removed from the field immediately as symptoms warranted it, but this flu like most, was highly contagious.  It is not evident that anything else could have been done to prevent the spread of the flu within the constraints of a residential program with such communal living conditions.  Hygiene is always a risk management concern with field intensive crew work, and Corps policies are both specific and comprehensive when it comes to personal and group hygiene. Aside from administering flu shots, or pulling the entire crew out and separating individuals as symptoms became evident, it is doubtful that a more proactive approach could have been taken.

IV.  **Resources and Gear**

Aside from normal wear and tear, which is generally significant given this type of work, the equipment held up relatively well.  There were some issues with the backpack sprayers missing minor components and needing repair, but nothing substantial enough to warrant a different approach in terms of equipment or approach.  We used 200 feet of saw chain, but this is to be expected in this type of work also.

V.  **Future Planning 2010 and beyond**

**a. Conservation Corps Director (for Dolores River Crews-SCC/CCYC)**

SCC is pursuing funding to support an 18 month Director level position, housed at SCC, to oversee and support crews on the ground and to develop and retain the expertise and knowledge to create and export a Corps model to other Corps for doing tamarisk removal and river restoration work.  There is also a proposal pending for an external evaluator for social goals.

**b. Crew size and salary (crew size 8, salaries consistent with other corps)**

Initially we believed a smaller crew size (6 instead of the normal 8) would be best due to access issues. This would have necessitated the use of a 4wd pickup truck for the upper canyon. As we now know, that is not the case. It will be more efficient to have teams of 4 (one sawyer, 2 swampers, and one applicator), so we will run with crews of 8 in the future.

This year we paid the DRRC crews a higher wage. This caused problems with our other crews, who learned of this wage differential. In the future all crews will be paid the same wage, and trainings, education, and projects will serve to distinguish between programs rather than wages.  This reflects the philosophy of most Corps work nationwide.

**c. 2010 Training**

Next year we will plan to do 2 weeks of training, concentrating the training to be more cost efficient and productive.  The same above trainings will be given.  Any species specific and/or individual-based follow up training can occur in the 3rd week of the program and on the job.

The spring river orientation trip may have to be pushed to later in the crew for weather concerns. The Fall river orientation will be at the beginning of the fall crew. Instead of doing two separate GPS trainings (one off project site and one on project site), we will make the GPS training more relevant by doing it all on site with the GPS units being used for the actual documentation on the ground.

BLM_0065996

SCC/CCYC and other western U.S Corps programs will be creating more rigorous chainsaw program policies. These will include training for chainsaw trainers, First Aid/CPR, and increased follow up field support and evaluation.

**d. SCC/CCYC Program Improvements**
**1. SCC:** A much more comprehensive CM Development system is being developed for next year. It involves:

    a.   A far more intensive evaluation process based on goals set by the funder, project member groups, evaluator, and each CM individual and measured throughout the season by CLs and Staff.
    b.   More professional training around securing employment after their contract.
    c.   More site specific education with career specialists (such as federal agency and partner personnel) and educational visits to the crews.

    **2. CCYC:** We will work closely with SCC to help develop and utilize their CM Development System listed above. CCYC will also be creating a much more comprehensive education manual for field education, closely related to specialized work within riparian environments.

**e. Corps Work Calendar 2010**
    **a.  Spring 2010 (March 7 to May 14, 10 weeks each)**
       • 2 conservation corps groups working with 1 licensed applicator/contractor, Big Gypsum to Coyote Wash (half-way down remote Wilderness Study Area) (CCYC/SCC) (TBD by group)
    **b.  Fall 2010 (August 29 to November 5, 10 weeks each)**
       • 2 conservation corps groups working with 1 contractor with licensed applicator, Coyote to Bedrock (SCC/CCYC) (TBD by group)
       • 1 conservation corps working with BLM in Moab Office area, Gateway to Confluence (CCYC or Western Colorado Conservation Corps) (TBD by group)

**f. Project pre-planning and approach**
In 2010, access to the lower canyon in the WSA will pose challenges, and Corps will be working with private contractors. Thus, more comprehensive site visits will be critical prior to crew start time, to properly identify and plan project sites and hitches.

**g. More accurate documenting of herbicide application per date and site**
This can be accomplished with more specified accuracy and follow up on both the documentation template and follow up by Corps admin staff.

**h. More consistent and scheduled communication between Corps coordinator/director and agencies**
With a Corps Director level position for DRRC crews, regular weekly communication can be expected as other support staff can cater to crews' day-to-day logistical needs.

**i. More Sharing of Info and Trainings between Corps**

H - 7

BLM_0065997

Improvement in this area will improve work outcomes, CM retention, and paperwork accountability, especially when we add a third Corps.

BLM_0065998

# Appendix I:  Key Management Questions for the Dolores River

The following is a list of key management questions solicited from the four BLM Offices managing lands on the Dolores River.  These questions represent critical gaps in: (1) knowledge necessary to inform management decisions and (2) communication to and amongst land managers of existing restoration information.  Currently, these knowledge gaps inhibit the efficiency and effectiveness of riparian management on the Dolores River.

These key management questions are listed below in the spirit of increased collaboration across the basin.

It will be important for the Dolores River Restoration Partnership to refer to this list periodically to identify mechanisms, such as monitoring or research, to answer these questions.

General Restoration
1. What are the best, most cost effective over the long term, locations to treat tamarisk?
2. What areas should be left alone as reference or control sites?
3. What parameters best define which tamarisk treatment method is appropriate in any give area?

Biological Control
1. Where is biological control alone satisfactory for tamarisk control and where is additional restoration work needed?
2. How will biological control affect tamarisk areas with sparse, moderate, or thick tamarisk densities; areas with steep banks; areas in the active floodplain, upper terraces; or areas with a noxious weed understory?
3. How long does it take for biological control to result in tamarisk mortality in young, mid, and old-age tamarisk on the Colorado Plateau?
4. How long will standing dead tamarisk persist?
5. Where should standing tamarisk biomass be removed? Where should it be left?  What are the impacts of standing dead versus removal to the riparian community?
6. What is the best time to treat tamarisk so as not to harm the tamarisk leaf beetle population?

Revegetation
1. Can the need for active revegetation be predicted based on site characteristics or tamarisk/noxious weed canopy?
2. What factors lead to successful active revegetation?  What species, hydrologic position, planting methodologies, and type and amount of existing vegetation lead to success?

Wildlife Habitat
1. Which tamarisk infested areas (such as mature stands) should be left behind for bird habitat?
2. Which stands need to be treated in an effort to protect habitat from potential wildfire risk until other revegetation/ new habitat is created.

BLM_0065999

Russian Knapweed
1. What is the best product, at the best time, and at the best rate for Russian knapweed control?
2. When should Russian knapweed removal sites be seeded? Which species are most likely to establish?

Maintenance
1. What is the maintenance schedule of treatment sites? 1 year? 2 years? 5 years? For example: What level of long term effectiveness can we expect from a few years of herbaceous noxious weed control. Will the herbaceous weeds ultimately take over the sites in which tamarisk has been killed, even with a couple of years of weed spraying? How long before it re-invades to an unacceptable level? How much knapweed are we willing to live with?

BLM_0066000

# Appendix J:  Dolores River Restoration Partnership
## Executive Summary February, 2010

### Project Vision

*A Dolores River watershed dominated by native vegetation, where the threats from tamarisk and other associated invasive species have been mitigated and the riparian areas of the watershed continue to become more naturally functioning, self-sustaining, diverse, and resilient over time.* This ecologically focused  vision is a step toward  the overarching vision of the Dolores River Restoration Partnership of . . . *a thriving Dolores River system that is ecologically, socially, and economically sustainable in a multiuse context.*

Through our efforts we expect to improve habitat throughout the watershed as well as further develop a new generation of well trained land stewards to help address future environmental challenges.

### Partnership History

The Dolores River Restoration Partnership was formed in October 2008 to create a collaborative approach to treat tamarisk, Russian olive and other invasives that are threatening the health of the 184 miles between the McPhee Reservoir and the confluence with the Colorado River.  The Partnership is also charged with the responsibility of using other restoration activities to ensure that native vegetation replaces the invasives that have been treated and removed.  The Partnership is coordinated by The Nature Conservancy and relies heavily on contributions from the Tamarisk Coalition and the cooperation and support of the four respective BLM Offices: Dolores Public Lands Office, Uncompahgre Office, Grand Junction Office, and the Moab, Utah Office.

**Decision Making Process**

As mentioned, each BLM Office will be responsible for determining what work is done on their land.  The Partnership will work with respective Offices to help make these decisions, but final decisions must be made by the respective Offices. The decision making process may be different in each Office.  For example, there may be more input from a non-profit organization and a Conservation Corps group in one Office, and less diverse input in another.  However, the structure of that decision making process will be similar.  With each Office, the Partnership will meet at the respective BLM Field Offices headquarters to discuss the Restoration Plan and its specific Implementation Plan. A work plan or schedule will be produced by the Partnership for each BLM Office prior to beginning work.

**Funding**

There are different funding sources supporting the work being done by the Partnership. Private and public funding is supporting The Nature Conservancy's coordination of the project, as well as funding tamarisk treatment, restoration and monitoring work. Other private support from the Walton Family Foundation is being given to Conservation Corps groups as well as other labor sources deemed necessary by the Partnership. Finally, the

BLM_0066001

federal government is supporting the Dolores Public Lands' Field Office which is also providing funds to Conservation Corps efforts, and to the Dolores Tamarisk Action Group. The Partnership identifies where and what work will be done by different entities. This collaborative decision making process has worked well in our first year of work.

Future funding, either private or public, can be directed to Conservation Corps groups, The Nature Conservancy or to Assistance Agreements that are established by the respective BLM Offices in order to channel funds onto the ground. The BLM can site these private dollars as match to help guide future federal dollars to the BLM and the Dolores restoration work. More detailed budget numbers are available upon request of the Coordinator, Peter Mueller

### Roles and Responsibilities
*The Tamarisk Coalition*
Develop the Dolores River Restoration Action Plan (March 2010) is informed by science and on-the-ground experience. Once plan is complete, Tamarisk Coalition will continue to serve as a resource to help guide implementation, advocate for additional financial support, and help disseminate the lessons learned from our experiences and monitoring.

*The Nature Conservancy*
Contract the Tamarisk Coalition to develop the Restoration Plan, and help insure the plan incorporates wide spread input and is supported by the four Bureau of Land Management Field Offices. The Conservancy will coordinate the project, helping the different public land agencies, counties, non-profits and conservation corps groups work in concert to established restoration goals. The Conservancy will work with Conservation Corps groups and private contractors to secure land owner permissions and assist with overseeing treatment of areas that have been deemed its responsibility by the Partnership.

*Bureau of Land Management*
The vast majority of the project lies within four BLM Field Offices. As such, they are the primary stewards who need to support and guide how the Restoration Plan is implemented. Each BLM Office will develop an Implementation Plan that further determines what work will be done, when it will take place and where. Partnership members will assist in this process as the BLM Office sees fit. The Dolores Public Lands Office has hired a restoration specialist to coordinate the work within the Office's Interdisciplinary Team to complete the Implementation Plan. Once completed, the DPLO Implementation Plan will be shared with the other three Offices.

BLM's In-Kind Contributions
The DPLO has been a strong leader in helping to plan and implement the initial treatment work in the upper Dolores watershed. In addition to identifying the areas in which to work, the DPLO also supplied herbicide, licensed applicators, and logistics support to help the conservation corps groups get in and out of remote locations. This in-kind support was a key factor in ensuring that the initial work done by the Conservation Corps was successful.

BLM_0066002

*Walton Family Foundation*

The WFF will assist in the planning, funding and evaluation of the Partnership's work towards meeting ecological and social goals. The WFF has made a commitment to fund Conservation Corps groups as well as other labor sources deemed necessary by the Partnership to achieve the ecological vision detailed in the Tamarisk Coalition's Dolores River Restoration Action Plan (DR-RAP), and they continue to work closely with the Partnership in general.

*The Conservation Corps*

These groups are used to achieve both restoration and social goals via employment skills training, life skills training, and the completion of challenging, meaningful restoration work. As a primary labor source they will also have key knowledge of how best to complete treatment and restoration work and as such they will be an integral part of the planning process that takes place within each BLM Office

*Independent Contractors*

Will be used when deemed necessary by the Partnership

*County Weed Programs*

While most of the project lies within BLM lands, the rest is privately owned. County Weed Program Coordinators often have well established relationships with private land owners and they will play a key role in advocating for the Partnership goals and attaining land owner permissions. County Weed Programs may also be advocates for some limited County funding, and or help secure other grant funding that can be applied toward restoration goals. County Weed Programs have also been instrumental in helping stage community work days with school-age children and the public as a means to complete project goals and raise awareness and support of the project.

*Colorado Department of Transportation*

In all riparian areas that are proximate to State highways, coordination with CDOT is required. CDOT shares Partnership goal of restoring the river corridor to its native health. There are long stretches of the Unaweep Scenic Byway along Highway 141 that are so dominated by tamarisk, that travelers cannot see the Dolores River. CDOT can be a great natural partner in treating tamarisk in these areas that compromise the scenic values along the highway.

*National Resource Conservation Service* (NRCS)

NRCS provides grant opportunities to private land owners who are interested in completing restoration work on their properties. NRCS provides a valuable resource to ranchers and land owners who are interested in improving the health of their properties.

*Southeast Utah Tamarisk Partnership*, Moab, Utah

SEUTP was established in 2006 to plan collaborative riparian restoration efforts in Southeastern Utah's Colorado River Watershed. This partnership is composed of

BLM_0066003

agencies, organizations, businesses, non-profits, and individuals who live and work near or on the Colorado River in Southeastern Utah.

*Dolores Tamarisk Action Group (DTAG)*
DTAG is a Dolores based non-profit that provides on the ground resources to treat tamarisk and other invasives in the upper Dolores River basin below McPhee. The Dolores Soil Conservation District founded the DTAG in 2005 as a collaborative watershed effort consisting of private, county, state and federal organizations to combat tamarisk as a noxious weed.   Initial efforts began on McPhee Reservoir when a new infestation of tamarisk covering several hundred acres began to take hold as a result of several years of low water levels and drought.  Since that collaborative effort, numerous projects have been initiated covering hundreds of acres with a "TOP DOWN" approach to tamarisk control and revegetation.

*Dolores River Dialogue (DRD)*
The DRD is a coalition of diverse interests whose purpose is to explore management opportunities, build support for and take action to improve the ecological conditions downstream of McPhee Reservoir while honoring water rights , protecting agriculture and municipal water supplies, and the continued enjoyment of rafting and fishing.  The DRD has provided funding for scientific investigations and mapping that is informing the kind of restoration activities most appropriate in different sites.

*Colorado Department of Wildlife (CDOW)*
CDOW has been consulted in developing the Dolores River – Tamarisk Action Plan to ensure that the overall vision and goals of the project will yield the desired outcomes of healthy, self-sustaining riparian areas throughout the Dolores River watershed.

*Packard Foundation*
The Packard Foundation has provided the initial funding to develop the Dolores River – Tamarisk Action Plan and build capacity within the four BLM Offices to support and guide this process.

*Colorado State University*
Dr. Scott Nissen of Colorado State University is working with the Partnership to conduct Russian knapweed control pilot projects along the Dolores River.  These pilot projects will provide valuable knowledge to inform future restoration efforts.  This is an excellent example of the collaboration and research opportunities provided by the Partnership and can hopefully be extended to other researchers and Universities.

*Entrada Ranch*
Entrada Ranch is a research station located along the Dolores River in Utah at approximately river mile 162.  The Ranch is a remote research station for Utah State University where several researchers are already researching tamarisk and Russian knapweed.  While no collaborative projects have yet been planned, there is a lot of potential for this partnership.

BLM_0066004

*Palisade Insectary, United States Department of Agriculture*
The Palisade Insectary is operated by the Colorado Department of Agriculture in
Palisade, Colorado. Its director, Dr. Dan Bean is among the most prominent researchers
of the tamarisk leaf beetle. The Insectary has been involved in intensive beetle
monitoring efforts along the Dolores River since 2004 and is currently partnering with
the Tamarisk Coalition to continue those efforts. The Insectary's efforts are providing
the most extensive and consistent information on beetle presence on the Dolores River.

BLM_0066005

## Appendix K:
## Grant Opportunities Available for Addressing TRO Issues

The following information lists possible grant opportunities available for addressing tamarisk and Russian olive (TRO) issues and riparian restoration. The tables are divided into Non-profit Foundations, Corporate, and Other Funding Sources; Federal and State Grants; and Congress Chartered Foundations.

This list of grant opportunities has been compiled as a tool to be used as a starting point for grant funding research. This list is not exhaustive and is designed only to provide an overview of available grants. For more detailed information, utilize the resources listed below, visit the funding source's website, or contact the funding source directly.

- ✓ Environmental Grantmaking Foundations www.environmentalgrants.com

- ✓ Center for Invasive Plant Management www.weedcenter.org

- ✓ Federal Government www.grants.gov

The activities funded by the grantors have been categorized as Advocacy, Education, Policy, Direct Action, Research, and Start Up. The following categories are defined to aid in selecting appropriate grants. Individual grantors may define categories somewhat differently.

**Advocacy** (Adv) includes activities associated with communicating about TRO issues such as organizing community meetings or distributing public education materials.

**Education** (Edu) involves direct education programs to a targeted group.

**Policy** (Pol) is defined as activities related to influencing and/or developing environmental policies.

**Direct Action** (Dir) includes activities such as volunteerism, control, revegetation, and other direct implementations.

**Research** (Res) is defined as planning and implementing basic scientific research.

**Start Up** (SU) is defined as funds for a new project ("seed money") or funds for a new organization.

Geographic information is included to indicate the physical locations that are emphasized by the grantor. The geographic information included in this report only reflects grants that are applicable to the seven Colorado River Basin States.

Blank spaces indicate that no information was available. **Grants and grantors are subject to change at any time for a variety of reasons. It is critical that the funding sources are contacted for the most current information before any type of grant submission.**

BLM_0066006

# Non profit Foundations, Corporate, and Other Funding Sources

| Organization | Website | Geography | Award Range | Adv | Edu | Pol | Dir | Res | SU |
|---|---|---|---|---|---|---|---|---|---|
| Abelard Foundation West | www.commoncounsel.org | US | $9,000 to $12,000 | ☑ | ☐ | ☐ | ☑ | ☐ | ☐ |
| Acorn Foundation | http://www.commoncounsel.org | Western US | $5,000 to $10,000 | ☑ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Afognak Foundation | | ID, WY | $10,000 to $100,000 | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| Aksel Nielson Foundation | | CO | $100 to $15,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Altria | www.altria.com | Altria plant locations | $2,500 to $50,000 | ☑ | ☐ | ☐ | ☑ | ☐ | ☐ |
| American Express Philanthropic Program | home3.americanexpress.com/corp/csr.asp | US | varies | ☑ | ☑ | ☐ | ☑ | ☐ | ☐ |
| American Forests | www.americanforests.org | US | | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| American Honda Foundation | http://corporate.honda.com/america/philanthropy.aspx | US | $20,000 to $87,000 | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ |
| American Landscape and Nursery Association | http://www.anla.org/research/growing_effectiveness.htm | US | $5,000 to $25,000 | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ |
| American Wildlife Conservation Foundation | http://www.americanwildlifeconservationfoundation.org/grants.htm | US | | ☑ | ☑ | ☐ | ☑ | ☑ | ☐ |

K - 2

BLM_0066007

| Organization | Website | Geography | Award Range | Adv | Edu | Pol | Dir | Res | SU |
|---|---|---|---|:---:|:---:|:---:|:---:|:---:|:---:|
| Angelica Foundation | www.angelicafoundation.org | CA, NM, Mexico | $300 to $30,000 | ☑ | ☑ | ☑ | ☑ | ☑ | ☑ |
| Animas Foundation | | NM | $1,000 to $1,500 | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| APS Foundation, Inc. | http://www.aps.com/general_info/aboutaps_14.html | AZ | | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| ARCO Foundation 90071 | www.ntlf.com/html/grants/5977.htm | US | varies | ☑ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Argosy Foundation | www.argosyfnd.org | US | | ☐ | ☑ | ☐ | ☐ | ☑ | ☐ |
| Arizona Community Foundation | www.azfoundation.org/ | AZ | $500 - $14,000 | ☐ | ☐ | ☐ | ☑ | ☐ | ☑ |
| As You Sow | http://asyousow.org/ | CA | $5,000-$10,000 | ☑ | ☑ | ☑ | ☑ | ☑ | ☐ |
| Aspen Business Center | | CO, Aspen | $3,000 to $13,000 | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ |
| Aurora Foundation | | NM | $250 to $35,000 | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ |
| Bacon Family Foundation | | CO | $4,000 to $10,000 | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

K - 3

| **Organization** | **Website** | **Geography** | **Award Range** | *Adv* | *Edu* | *Pol* | *Dir* | *Res* | *SU* |
|---|---|---|---|---|---|---|---|---|---|
| Barbara Smith Fund | www.jaf.org | US | $1,000 to $10,000 | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| BASF | http://www.emnrd.state.nm.us/FD/FWHPlan/documents/matchgrantprogram.pdf | US | up to $20,000 | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| BASF Invasive Vegetation Management Vegetation Management Matching Grant | | US | $20,000 as non-federal matching | ☐ | ☐ | ☐ | ☑ | ☑ | ☐ |
| Ben and Jerry's Foundation | www.benjerry.com/foundation | US | $1,001 - $15,000 | ☐ | ☐ | ☑ | ☑ | ☐ | ☐ |
| Beneficia | www.beneficiafoundation.org | US | ,000. In most instances, grants are | ☑ | ☐ | ☑ | ☐ | ☐ | ☐ |
| BF Foundation | | NM, CO | $500 to $7,500 | ☑ | ☑ | ☐ | ☐ | ☐ | ☐ |
| Boat US | www.boatus.com/foundation/cleanwater/grants | US | $1,000 - $4,000 | ☑ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Boeing - Global Corporate Citizenship | http://www.boeing.com/companyoffices/aboutus/community/focus_objectives.html | US | state, CO $5,000 to $10,000, CA | ☑ | ☑ | ☐ | ☑ | ☐ | ☑ |
| Bradshaw Knight Foundation | www.bkfnd.org | CO, Delta County | $30 to $30,000 | ☐ | ☑ | ☑ | ☐ | ☑ | ☐ |
| Bridgeston Firestone Trust Fund | http://www.bridgestone-firestone.com/trustfund.asp | US | | ☑ | ☑ | ☐ | ☑ | ☑ | ☑ |

K - 4

BLM_0066009

| **Organization** | **Website** | **Geography** | **Award Range** | *Adv* | *Edu* | *Pol* | *Dir* | *Res* | *SU* |
|---|---|---|---|:---:|:---:|:---:|:---:|:---:|:---:|
| Brindle Foundation | | NM | $2,500 to $30,000 | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ |
| Bydale Foundation | | US | $2,500 to $25,000 | ☑ | ☑ | ☐ | ☑ | ☐ | ☑ |
| Caleb C. and Julia W. Dula Educational Charitable Foundation | | US | $5,000 to $50,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Captain Planet Foundation | www.captainplanetfdn.org | US | $250 to $2,500 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Cedar Tree Foundation | cedartreefound.org | US | $5,000 to $200,000 | ☐ | ☑ | ☑ | ☐ | ☐ | ☐ |
| Center for Invasive Plant Management | www.weedcenter.org | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Charles Delmar Foundation | | US | $250 to $3,000 | ☑ | ☐ | ☐ | ☑ | ☐ | ☐ |
| Charles Stewart Mott | www.mott.org | US | $100,000 to $500,000 | ☑ | ☑ | ☑ | ☐ | ☐ | ☐ |
| Cheeryble Foundation | | US | $900 to $50,000 | ☑ | ☐ | ☐ | ☑ | ☐ | ☐ |
| Christensen Fund | www.christensenfund.org | S.W. US | $50,000 to $200,000 | ☑ | ☑ | ☐ | ☑ | ☐ | ☐ |

K - 5

BLM_0066010

| **Organization** | **Website** | **Geography** | **Award Range** | *Adv* | *Edu* | *Pol* | *Dir* | *Res* | *SU* |
|---|---|---|---|---|---|---|---|---|---|
| Cinnabar Foundation | | WY, MT | $1,000 to $9,000 | ☑ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Clark Charitable Trust | | US | $1,000 to $15,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Colorado Tree Coalition | http://www.coloradotrees.org/ | CO | $500-$1500 | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Community Foundation Serving Boulder City | http://www.commfound.org/grants/funds.html | Mostly CO | | ☑ | ☑ | ☑ | ☑ | ☐ | ☐ |
| Conservation and Research Foundation | | US | $100 to $3,000 | ☑ | ☑ | ☑ | ☑ | ☑ | ☐ |
| Conservation Trust Grants from National Geographic Society | www.nationalgeographic.com/research/grant/rg2.html | | $15,000 to $20,000 | ☐ | ☑ | ☐ | ☑ | ☑ | ☐ |
| Donnell Initiative Fund | | CO | $10,000 to $20,000 | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Doris Duke Charitable Foundation | http://www.ddcf.org/page.asp?pageId=1 | US | $125,000 - $2mil multi-year grant | ☑ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Eddy Foundation | | US | $150 to $10,000 | ☑ | ☐ | ☐ | ☑ | ☐ | ☐ |
| Education Foundation of America | www.efaw.org | US | $30,000 to $160,000 | ☑ | ☑ | ☑ | ☑ | ☐ | ☑ |

BLM_0066011

| **Organization** | **Website** | **Geography** | **Award Range** | **Adv** | **Edu** | **Pol** | **Dir** | **Res** | **SU** |
|---|---|---|---|---|---|---|---|---|---|
| El Pomar Foundation | www.elpomar.org | CO | $2,500 to $10,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Elinor Patterson Baker Foundation | | US | $2,000 to $75,000 | ☐ | ☐ | ☐ | ☑ | ☑ | ☐ |
| Environmental Systems Research Institute (ESRI) Conservation Technology Support Program | http://www.conservationgis.org/aagisgrant.html | US | | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ |
| Environmental Trust | | CO | $5,000 to $27,000 | ☑ | ☑ | ☑ | ☐ | ☑ | ☐ |
| ESRI Conservation Program | http://www.conservationgis.org/aaesrigrants.html | US | | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ |
| ESRI Grant Assistance Program | http://www.esri.com/grants/ | US | | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Fairfax Foundation | | US | $1,000 to $75,000 | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| Firman Fund | | CO | $1,000 to $15,000 | ☑ | ☑ | ☐ | ☑ | ☐ | ☐ |
| FishAmerica Foundation | www.asafishing.org/faf | US | $7,500. | ☑ | ☐ | ☐ | ☑ | ☐ | ☐ |
| Ford Foundations | http://www.fordfound.org/ | US | | ☑ | ☐ | ☑ | ☐ | ☑ | ☐ |

BLM_0066012

| Organization | Website | Geography | Award Range | Adv | Edu | Pol | Dir | Res | SU |
|---|---|---|---|---|---|---|---|---|---|
| Ford Motor Company Fund | www.ford.com | US | $600 to $1,200,000 | ☐ | ☑ | ☑ | ☐ | ☑ | ☐ |
| Freeport-McMoRan Copper and Gold | http://www.fcx.com/envir/pdf/community/CharitableGivingGuidelinesJune2007Update.pdf | US | | ☑ | ☑ | ☑ | ☑ | ☑ | ☐ |
| Fund for Wild Nature | www.fundwildnature.org | US | $1,000 to $3,000 | ☑ | ☐ | ☐ | ☑ | ☐ | ☐ |
| Gates Foundation | http://www.gatesfamilyfoundation.org/ | CO | $20,000 to $220,000 | ☑ | ☐ | ☐ | ☑ | ☐ | ☐ |
| General Service Foundation | http://www.generalservice.org/default.htm | Western US | $25,000 - $100,000 | ☑ | ☑ | ☑ | ☑ | ☐ | ☐ |
| Gibbet Hill Foundation | | US | $10,000 to $122,500 | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ |
| Great Outdoors Colorado Open Space | http://www.goco.org/Home/tabid/106/Default.aspx | CO | | ☑ | ☑ | ☑ | ☑ | ☐ | ☐ |
| Harder Foundation | www.harderfoundation.org | CO, ID, MT, NV, OR, UT, WA, WY | $1,000 and $35,000 | ☑ | ☐ | ☐ | ☑ | ☐ | ☐ |
| Harris and Frances Block Foundation | www.blockfound.org | US | Small grants | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Hawley Family Foundation | | US | $2,000 to $50,000 | ☑ | ☑ | ☐ | ☑ | ☐ | ☐ |

BLM_0066013

| **Organization** | **Website** | **Geography** | **Award Range** | **Adv** | **Edu** | **Pol** | **Dir** | **Res** | **SU** |
|---|---|---|---|---|---|---|---|---|---|
| Helen K. and Arthur E. Johnson Foundation | http://www.johnsonfoundation.org/ | CO | $25,000 to $100,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Intermountain West Joint Venture Project | http://iwjv.org/ | Intermountain West | Max $100,000 | ☐ | ☐ | ☐ | ☑ | ☑ | ☑ |
| J.M. Kaplan Fund, Inc. | www.jmkfund.org | Border regions | $75 to $220,000 | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| Jacob and Terese Hershey Foundation | | CO, TX | | ☑ | ☑ | ☑ | ☑ | ☑ | ☐ |
| James M. Cox Foundation | | Areas in which Cox Enterprises | $20,000 to $200,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| James M. Cox Jr. Foundation | | Areas in which Cox Enterprises | $20,000 t0 $45,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Jenifer Altman Foundation | http://jaf.org/apply/index.html | US | $1,000 to $10,000 | ☑ | ☑ | ☑ | ☑ | ☑ | ☑ |
| Justine & Leslie Bialy Charitable Trust | | Pre-selected in CO | $12,500 to $17,538 | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| Katz Family | | US | $1,000 to $28,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Lawrence Foundation | http://thelawrencefoundation.org | | | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |

K - 9

BLM_0066014

| Organization | Website | Geography | Award Range | Adv | Edu | Pol | Dir | Res | SU |
|---|---|---|---|---|---|---|---|---|---|
| Liz Claiborne and Art Ortenberg Foundation | www.lcaof.org | Northern Rocky Mountain Region | $50,000 to $200,000 | ☑ | ☑ | ☐ | ☑ | ☑ | ☐ |
| Maki Foundation | | Rocky Mountain Region | $3,000 to $10,000 | ☑ | ☑ | ☐ | ☐ | ☐ | ☐ |
| Max and Anna Levinson Foundation | www.levinsonfoundation.org | Southwestern US | $2,500 to $5,000 | ☑ | ☐ | ☑ | ☐ | ☑ | ☐ |
| McGrath Investment Foundation | | CO, OR | $8,500 to $14,000 | ☐ | ☑ | ☐ | ☑ | ☑ | ☐ |
| Mitsubishi Corporation Foundation for the Americas | http://www.mcfamericas.org/ | US | $20,000 - $500,000 | ☑ | ☑ | ☑ | ☑ | ☐ | ☐ |
| Nathan Cummings Foundation | www.nathancummings.org | US | | ☑ | ☑ | ☑ | ☐ | ☑ | ☐ |
| New Mexico Energy | http://www.emnrd.state.nm.us/FD/ | NM | up to $85,000 | ☐ | ☑ | ☐ | ☑ | ☑ | ☐ |
| New-Land Foundation | | AK, CO Plateau | $5,000 to $30,000 | ☑ | ☑ | ☑ | ☑ | ☐ | ☑ |
| Norcross Wildlife Foundation Inc. | www.norcrossws.org | US | Max $10,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Patagonia | www.patagonia.com | US | $3,000 to $8,000 | ☑ | ☐ | ☐ | ☑ | ☐ | ☐ |

K - 10

BLM_0066015

| **Organization** | **Website** | **Geography** | **Award Range** | *Adv* | *Edu* | *Pol* | *Dir* | *Res* | *SU* |
|---|---|---|---|---|---|---|---|---|---|
| R.E.I | www.REI.com | US | | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Ralph L. Smith Foundation | | CO, AZ, CA, OR | $1,000 to $62,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| RBC Blue Water Project | http://www.rbc.com/donations/blue-water.html | US | up to $500,000 | ☑ | ☑ | ☑ | ☑ | ☑ | ☐ |
| Rockefeller Family Fund, Inc. | www.rffund.org | US | | ☑ | ☐ | ☑ | ☐ | ☐ | ☐ |
| Rockefeller Philanthropy Advisors | www.rockpa.org | US | | ☑ | ☑ | ☑ | ☑ | ☐ | ☑ |
| Ruth H. Brown Foundation | | CO, Western US | $5,000 to $20,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Sandler Family Supporting Foundation | | US | $20,000 to $500,000 | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| Sears-Swetland Foundation | http://foundationcenter.org/ | US | | ☑ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Shapiro Family Charitable Foundation | | US | $250 to $2,500 | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| Steven C. Leuthold | | US | $100 to $40,000 | ☑ | ☑ | ☐ | ☑ | ☐ | ☐ |

BLM_0066016

| Organization | Website | Geography | Award Range | Adv | Edu | Pol | Dir | Res | SU |
|---|---|---|---|---|---|---|---|---|---|
| Surdura Foundation | www.surdna.org | | $50,000 to $200,000 | ☑ | ☑ | ☑ | ☑ | ☐ | ☐ |
| Tapeats Fund | | US | $2,500 to $50,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| The Conservation Alliance | http://www.conservationalliance.com/grants | North America | up to $35,000 | ☑ | ☑ | ☐ | ☑ | ☐ | ☐ |
| The Conservation Fund Kodak American Greenway Awards Program | http://www.conservationfund.org/kodak_awards | US | $500-$2,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| The George S. and Dolores Doré Eccles Foundation Preservation and Conservation Grants | http://www.gsecclesfoundation.org/preservation/index.html | UT | $1,000 to $1,000,000 | ☑ | ☑ | ☐ | ☑ | ☐ | ☐ |
| The Tides Foundation | www.tides.org/tides-foundation/index.html | US | $10,000 - $200,000 | ☑ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Tides Foundation | www.tidesfoundation.org | US | $7,000 to $10,000 | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Tiffany & Co. Foundation | http://www.tiffanyandcofoundation.org/grants/ | US | $30,000 up to $1,000,000 | ☑ | ☑ | ☑ | ☑ | ☐ | ☐ |
| Tourism Cares - Worldwide Grant Program | http://www.tourismcares.org/RelId/606053/ISvars/default/Worldwide_Grant_Prog.htm | US | | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ |
| Towards Sustainability Foundation | | US | $2,500 to $50,000 | ☑ | ☑ | ☐ | ☑ | ☐ | ☐ |

K - 12

BLM_0066017

| Organization | Website | Geography | Award Range | Adv | Edu | Pol | Dir | Res | SU |
|---|---|---|---|---|---|---|---|---|---|
| Town Creek Foundation | www.towncreekfdn.org | US | $5,000 to $75,000 | ☑ | ☐ | ☑ | ☑ | ☐ | ☐ |
| Toyota USA Foundation | www.toyota.com/about/our_comm itment/philanthropy/education/gra nts/ | US | $90,000 | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ |
| Trout Unlimited | http://www.tu.org/site/c.kkLRJ7M SKtH/b.3198137/k.9DD6/Embrac eAStream.htm | US | up to $10,000 | ☑ | ☑ | ☑ | ☑ | ☑ | ☐ |
| Turner Foundation | http://www.turnerfoundation.org/g rants/gp.asp | AZ, NM | | ☑ | ☐ | ☑ | ☑ | ☑ | ☐ |
| Unity Avenue Foundation | www.srinc.biz | US | $4,000 to $20,000 | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ |
| Wallace Genetic Foundation | www.wallacegenetic.org | US | $25,000 to $40,000 | ☑ | ☑ | ☐ | ☑ | ☑ | ☐ |
| Weeden Foundation | http://www.weedenfdn.org | | | ☑ | ☐ | ☐ | ☑ | ☐ | ☐ |
| Western Colorado Community Foundation | http://www.wc-cf.org/ | Western CO | $500 and $1,000 | ☐ | ☑ | ☐ | ☑ | ☑ | ☐ |
| Whole Systems Foundation | www.whole-systems.org | US | $500 to $5,000 | ☑ | ☑ | ☐ | ☐ | ☑ | ☐ |
| Wiegers Family Foundation | | CO | $250 to $75,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |

K - 13

BLM_0066018

| **Organization** | **Website** | **Geography** | **Award Range** | **Adv** | **Edu** | **Pol** | **Dir** | **Res** | **SU** |
|---|---|---|---|:-:|:-:|:-:|:-:|:-:|:-:|
| Wilburforce Foundation | www.wilburforce.org | AZ, MT, ID, UT, NM, OR, WA, WY | $10,000 to $650,000 | ☑ | ☐ | ☐ | ☑ | ☐ | ☑ |
| Wildlife Forever | http://www.wildlifeforever.org/ | US | $1,000 to $10,000 | ☐ | ☑ | ☐ | ☑ | ☑ | ☐ |
| Wildlife Habitat Policy Research Program | http://www.whprp.org | US | $50,000 to $190,000 | ☑ | ☐ | ☑ | ☑ | ☑ | ☐ |
| William and Flora Hewlett Foundation | www.hewlett.org | Western US | $20,000 - $50,000 | ☐ | ☑ | ☑ | ☑ | ☑ | ☐ |
| William C. Kenney Watershed Protection Foundation | http://www.kenneyfdn.org/ | CO, AZ, CA, MT, NV, NM, OR, UT | $5,000 to $75,000 | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| William E. Weiss Foundation | | US | $5,000 to $25,000 | ☑ | ☐ | ☐ | ☑ | ☐ | ☐ |
| William H. & Mattie Wattis Harris Foundation | | US | $1,000 to $10,000 | ☑ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Winn Foundation Trust | | US | | ☑ | ☑ | ☐ | ☑ | ☑ | ☐ |
| Winslow Foundation | | US | $250 to $100,000 | ☑ | ☑ | ☑ | ☐ | ☑ | ☑ |
| Wolcott Family Foundation | http://www.wolffoundation.org/ | CO | $1,000 - $7,500 | ☑ | ☑ | ☐ | ☑ | ☐ | ☐ |

K - 14

BLM_0066019

| Organization | Website | Geography | Award Range | Adv | Edu | Pol | Dir | Res | SU |
|---|---|---|---|---|---|---|---|---|---|
| Wyoming Community Foundation | http://www.wycf.org/grants.asp | WY | various | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ |
| Wyss Foundation | www.wyssfoundation.org | Intermountain West | $1,000 to $300,000 | ☑ | ☑ | ☑ | ☐ | ☑ | ☐ |

K - 15

BLM_0066020

# Federal and State Funding Sources

| Organization | Website | Geography | Award Range | Adv | Edu | Pol | Dir | Res | SU |
|---|---|---|---|---|---|---|---|---|---|
| Arizona Department of Parks and Recreation | www.azstateparks.com/grants/downloads/FY2009_SLIF_Rating_Criteria.pdf | AZ | $10,000 - $50,000 | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| Arizona Department of Water Resources (ADWR) | http://www.awpf.state.az.us/ | AZ | $4 million will be available for awards | ☐ | ☐ | ☐ | ☑ | ☑ | ☐ |
| Arizona Game & Fish | www.azgfd.gov/w_c/heritage_program.shtml | AZ | $10,000 - $50,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Arizona State Parks | www.pr.state.az.us/partnerships/grants/grants.html | AZ | $10,000 - $500,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| Arizona Water Protection Fund | http://www.awpf.state.az.us/ | AZ | $30,000- $300,000 | ☑ | ☑ | ☐ | ☑ | ☑ | ☐ |
| Army Corps of Engineers | http://www.aocweb.org/emr/Portals/2/Section%20206%20Restoration%20Grants.pdf | US | 35% local match of total project costs required. | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| AZ Dept of Env Quality - Water Quality Improvement grants | http://www.azdeq.gov/environ/water/watershed/outreach.html - grants | AZ | | ☑ | ☐ | ☐ | ☑ | ☑ | ☐ |
| AZ Game and Fish Department | http://www.azgfd.gov/w_c/heritage_apply.shtml | AZ | up to $100,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |

K - 16

BLM_0066021

| Organization | Website | Geography | Award Range | Adv | Edu | Pol | Dir | Res | SU |
|---|---|---|---|:---:|:---:|:---:|:---:|:---:|:---:|
| U.S. Bureau of Reclamation (USBR) | http://www.usbr.gov/newsroom/presskit/factsheet/factsheetdetail.cfm?recordid=3 | Western US | | ☐ | ☐ | ☐ | ☑ | ☑ | ☐ |
| U.S. Fish and Wildlife Service (USFWS) | | US | 10% non-federal match required | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| US Bureau of Indian Affairs | www.federalgrantswire.com/bureau-of-indian-affairs-department-of-the-interior-federal-grants.html | Reservations | $2,000 - $10,000 | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| US Bureau of Indian Affairs | www.federalgrantswire.com/bureau-of-indian-affairs-department-of-the-interior-federal-grants.html | Reservations | $10,000 - $1,000,000 | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| US Bureau of Indian Affairs | www.federalgrantswire.com/bureau-of-indian-affairs-department-of-the-interior-federal-grants.html | Reservations | $1,500 - $22,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| US Bureau of Land Management (BLM) | | NM | $1,000 - $75,000 | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| US Department of Commerce National Oceanic and Atmospheric Administration (NOAA) | http://www.nmfs.noaa.gov/habitat/restoration/projects_programs/crp/partners_funding/callforprojects4.html | US | $30,000 - $250,000, 1:1 match required | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| US Dept. of Agriculture | http://www.ers.usda.gov/Briefing/InvasiveSpecies/preism.htm | US | $50,000 to $250,000 | ☐ | ☐ | ☐ | ☑ | ☑ | ☐ |
| US Dept. of Agriculture | grants.gov | US | $146,000 | ☐ | ☐ | ☐ | ☑ | ☑ | ☐ |

K - 17

BLM_0066022

| Organization | Website | Geography | Award Range | Adv | Edu | Pol | Dir | Res | SU |
|---|---|---|---|---|---|---|---|---|---|
| US Dept. of Agriculture | www.nrcs.usda.gov/programs/whip | US | Up to 75% Cost Share. | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| US Dept. of Agriculture | http://wsare.usu.edu/ | Western US | $15,000 to $150,000 | ☐ | ☑ | ☐ | ☑ | ☑ | ☐ |
| US Dept. of Interior | | Colorado River (excluding UT) | $20,000 | ☐ | ☑ | ☐ | ☑ | ☑ | ☐ |
| US Dept. of Interior | | US | | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| US Environmental Protection Agency (EPA) | http://www.epa.gov/owow/wetlands/restore/5star/index.html | US | $5,000 to $20,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| US Environmental Protection Agency (EPA) | http://www.federalgrantswire.com/surveys-studies-investigations-training-demonstrations-and-special-purpose-grants-for- | | $15,000 to $4,970,000 | ☐ | ☐ | ☐ | ☑ | ☑ | ☐ |
| US Environmental Protection Agency (EPA) | http://www.epa.gov/twg/ | US | Max $900,000, 25% local match of total project costs required. | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| US Environmental Protection Agency (EPA) | http://www.epa.gov/owow/wetlands | | Loans can cover 100% of eligible costs. Interest rates between market rate and 0%. | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| US Environmental Protection Agency (EPA) | http://www.epa.gov/owow/wetlands/ | US | | ☐ | ☐ | ☐ | ☑ | ☑ | ☐ |

K - 18

BLM_0066023

| Organization | Website | Geography | Award Range | Adv | Edu | Pol | Dir | Res | SU |
|---|---|---|---|---|---|---|---|---|---|
| US Fish and Wildlife Service | http://www.fws.gov/coloradofishandwildlife/ | CO | Cost share of 50% encouraged but NOT required | ☐ | ☑ | ☐ | ☑ | ☑ | ☐ |
| US National Park Service (NPS) | www.nps.gov/ncrc/programs/ccsp/ | US | $7,000 to $21,000, 1:1 non-federal match required | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| US National Park Service (NPS) | www.nps.gov/rtca/ | US | | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| USDA with technical support from NRCS | http://www.fsa.usda.gov/FSA/webapp?area=home&subject=copr&topic=cep | US | A Federal annual rental rate is offered, plus cost-share of up to 50% of eligible costs. | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| USDA Animal and Plant Health Inspection Service (APHIS) | | US | | ☐ | ☐ | ☐ | ☑ | ☑ | ☐ |
| USDA APHIS | www.aphis.usda.gov/plant_health/ | US | | ☐ | ☐ | ☐ | ☑ | ☑ | ☐ |
| USDA Cooperative State Research, Education and Extension Service (CSREES) | http://www.csrees.usda.gov/fo/weedyinvasivespeciesnri.cfm | US | | ☐ | ☐ | ☐ | ☑ | ☑ | ☐ |
| USDA CSREES | http://www.invasivespeciesinfo.gov/docs/news/teamtam/tamarisk%20grants%20ARS,%20CSREES,%20FS.doc | US | | ☐ | ☐ | ☐ | ☑ | ☑ | ☐ |
| USDA Forest Service (FS) | http://www.invasivespeciesinfo.gov/docs/toolkit/usdagrants2007.pdf | US | | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |

BLM_0066024

| Organization | Website | Geography | Award Range | Adv | Edu | Pol | Dir | Res | SU |
|---|---|---|---|---|---|---|---|---|---|
| USDA Natural Resources Conservation Service (NRCS) | http://www.nrcs.usda.gov/Programs/WRP/ | US | Options are permanent easement, 30-year easement, and restoration cost-share agreements. | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| USDA NRCS | http://www.nrcs.usda.gov/programs/cig/ | US | $75,000 to $500,000 Max $1 Million | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| USDA NRCS | | | 50% match required | ☐ | ☐ | ☐ | ☑ | ☑ | ☐ |
| USDA NRCS | | US | | ☐ | ☐ | ☐ | ☑ | ☑ | ☐ |
| USDA NRCS | http://www.nrcs.usda.gov/programs/cta/ | US | | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| USDA NRCS | http://www.nrcs.usda.gov/programs/watershedsurvey/ | US | | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| USDA NRCS | www.usda.gov | US | EQIP may cost-share up to 75% of the costs of certain conservation practices. | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| USDA NRCS | http://www.nrcs.usda.gov/programs/glci/ | US | $50,000 to $500,000 | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| USDA NRCS and FS | | Grasslands | | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |

BLM_0066025

| Organization | Website | Geography | Award Range | Adv | Edu | Pol | Dir | Res | SU |
|---|---|---|---|---|---|---|---|---|---|
| USDA, Economic Research Service (ERS) | http://www.ers.usda.gov/briefing/InvasiveSpecies/preism.htm | US | | ☐ | ☐ | ☐ | ☑ | ☑ | ☐ |
| USFWS | http://wsfrprograms.fws.gov/Subpages/GrantPrograms/LIP/LIP.htm | National | Reimbursement basis for up to 75% of the project costs up to $200,000. | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| USFWS | http://ecos.fws.gov/partners/viewContent.do?viewPage=home | US | 1:1 Match | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| USFWS | http://www.fws.gov/nativeamerican/ | National | maximum award for any one project under this program is $200,000. | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| USFWS | http://www.fws.gov/birdhabitat/Grants/NAWCA/index.shtml | US | Max $75,000, 1:1 non federal match required | ☐ | ☐ | ☐ | ☑ | ☑ | ☐ |
| Wyoming Department of Agriculture | wyagric.state.wy.us/news/eminsectmgmtinfo/2009EIMGApplicationFinal.doc | WY | $200,000 awarded annually | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| Wyoming Wildlife and Natural Resource Trust | http://wwnrt.state.wy.us/application.htm | WY | $600,000 in 2006. Wyoming Legislature added $1,500,000 in 2007 | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |

K - 21

BLM_0066026

# Congress Chartered Foundations

| Organization | Website | Geography | Award Range | Adv | Edu | Pol | Dir | Res | SU |
|---|---|---|---|:-:|:-:|:-:|:-:|:-:|:-:|
| National Environmental Education Foundation (NEEF) | www.neetf.org | US | | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ |
| National Fish and Wildlife Foundation (NFWF) | www.nfwf.org | US, Golf Courses | Max $30,000, 1:1 non federal match required | ☐ | ☐ | ☐ | ☑ | ☑ | ☐ |
| National Forest Foundation (NFF) | www.natlforests.org | US | $500 to over $100,000, 1:1 non federal match required | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| National Parks Foundation (NPF) | www.nationalparks.org | National Parks | | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| National Science Foundation (NSF) | http://www.nsf.gov/funding/pgm_summ.jsp?pims_id=5361 | U.S. | $75,000 to over 1 million | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ |
| NFF | www.natlforests.org | US | Max of $50,000,1:1 non federal match required | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |

K - 22

BLM_0066027

| Organization | Website | Geography | Award Range | *Adv* | *Edu* | *Pol* | *Dir* | *Res* | *SU* |
|---|---|---|---|---|---|---|---|---|---|
| NFWF | www.nfwf.org | US | 2:1 non federal match required | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| NFWF | www.nfwf.org | US | $5,000 to $15,000, 1:1 matching funds required | ☐ | ☑ | ☐ | ☑ | ☐ | ☑ |
| NFWF | www.nfwf.org | US | | ☑ | ☐ | ☑ | ☑ | ☐ | ☐ |
| NFWF | www.nfwf.org | US | $5,000 to $20,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| NFWF | www.nfwf.org | US | $10,000 to $50,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| NFWF | www.nfwf.org | US | $5,000 to $20,000 | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |

K - 23

BLM_0066028

| Organization | Website | Geography | Award Range | Adv | Edu | Pol | Dir | Res | SU |
|---|---|---|---|---|---|---|---|---|---|
| NFWF | www.nfwf.org | ConocoPhillips Presence | Min $25,000, 1:1 non federal match required | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
| NFWF | www.nfwf.org | US | $50,000-$300,000, 2:1 non federal match required | ☐ | ☑ | ☐ | ☑ | ☐ | ☐ |
| NFWF, USFWS, National Wildlife Refuge System, National Conservation Training Center (NCTC), and National Wildlife Refuge Association | http://www.fws.gov/refuges/education/natureOfLearning/index.html | US | $10,000 for start-up; $5,000 for continuing | ☐ | ☑ | ☐ | ☐ | ☐ | ☑ |

K - 24

BLM_0066029

# Appendix L:  Cost Calculator

Appendix L is an excel spreadsheet with embedded formulas based on the cost algorithms presented in Appendix C.  This spreadsheet allows one to apply these algorithms to any given restoration site along the Dolores River.  The spreadsheet requires that total average tamarisk canopy cover and total project site acreage (or number of crew days required) are known for a given site.  Total number of crew days is needed for those sites in which total site acreage is so large in relation to total tamarisk canopy cover that cost is a function of time spent rather than acres cleared.  These pieces of information drive all of the algorithms imbedded in the table.

Once the tamarisk canopy cover and site acreage (or crew days) are known, the percent of the total site acreage designated for various control techniques can be entered to determine an estimated cost.  The control and restoration options included in the table are as follows (each technique is described in detail in Appendix C):

1. Hand Control – Crew Time Basis (for extremely sparse tamarisk infestations)
2. Hand Control – Acreage Basis (for low to high tamarisk infestations)
3. Mechanical Extraction Tamarisk Control
4. Mechanical Mulching Tamarisk Control
5. Mechanical Grab & Cut-Stump Tamarisk Control
6. Biological Control
7. Biomass Reduction by Mulching
8. Biomass Reduction by Fire
9. Biomass Reduction by Natural Decomposition
10. Russian Knapweed Control – Percent Area Infested
11. Revegetation – Percent Area Needing Revegetation

When summed, the costs of each approach for the project constitute the total estimated control, biomass reduction, and revegetation.  A cost multiplier is then used to account for remoteness and access difficulties common to the Dolores River.  The short-term monitoring and maintenance costs for active control is then calculated as a percentage of these combined restoration costs: 20% for light infestations, 25% for moderate infestations, or 30% for heavy infestations.

BLM_0066030

# Appendix M:  Introduction
## Dolores River Riparian Action Plan
## Preliminary Sites Recommended for Restoration

The four BLM Office documents labeled 2 – 5 that are included in this folder articulate the recommended tamarisk control, biomass reduction, secondary weed control, and revegetation methods for each recommended restoration site in both narrative and tabular form.

These recommended restoration sites, as well as the mapping and cost estimate data, were originally created as a result of field work, interviews, and meetings conducted in the summer of 2009.  The resulting version of these documents was presented to stakeholders in the Dolores River Restoration Partnership.  The approach to selecting priority sites at that time is presented at the end of this document under the "August 2009 Approach to Selecting Priority Sites" heading.

The content of these documents, accompanying maps, and cost estimates have since been revised using information gathered through solicited comments and stakeholder meetings. The result of these activities is the main body of the 2010 Dolores River Riparian Action Plan (DR-RAP).

Recommended sites contained in documents 2-5 and the cost estimate tables have been revisited using the 2010 DR-RAP's Criteria for Prioritization and Decision Trees. Criteria and decision making steps relative to each site are listed with the individual site descriptions.

## Preliminary Sites Recommended for Restoration on the Dolores River

The management strategies suggested for tamarisk control, biomass reduction, secondary weed control, and revegetation at each site are based on information collected in the 2009 mapping effort and an in-depth review of technologies' appropriateness, effectiveness, and costs[1], and relevance to the Dolores River watershed.  These decisions are inherently site specific and should be reassessed by the land manager at the time of the project.  At that point, new cost estimates can be calculated as cost calculation spreadsheets are included in Appendices M & L.

The Recommended Sites are presented in four documents (2 – 5), one for each of the Bureau of Land Management Field Offices operating on the river.  Dolores River Segments divisions within each of these offices are organized based on geomorphology, vegetation, and access.  Individual worksites are listed in order of river mile.

---

[1] *Riparian Restoration – Assessment of Alternative Technologies for Tamarisk Control, Biomass Reduction and Revegetation.* Revised July, 2008. Tamarisk Coalition and Colorado Water Conservation Board.

BLM_0066031

In general, locations where active restoration is not recommended, or where natural extensions of these recommendations are unlikely to occur, should be monitored for biological control impacts. Additionally, recommended sites that are unable to meet the necessary Feasibility Characteristics or that fall in line with the criteria outlined in Table 2 from DR-RAP, should be monitored for biological control.

Supplemental documents that explain the rationale used to assign techniques and costs for each priority site listed below include:
- Appendix A – State-of-the-science for tamarisk and Russian olive
- Appendix B – State-of-the-science for the tamarisk leaf eating beetle
- Appendix C – Detailed explanations of tamarisk control, biomass mitigation, revegetation techniques, and costs estimates
- Appendix F – Detailed explanations of additional woody or herbaceous invasive, non-native species and associated control mechanisms
- Appendix M – Maps meant to accompany and supplement this information

**Dolores BLM Field Office**

The Dolores BLM Field Office manages the Dolores River from the McPhee Reservoir Dam to river mile 85.5 in Slick Rock Canyon. Approximately 330 acres of tamarisk exist on this stretch of river with an additional 740 acres occurring along Disappointment Creek. There are 16 sites where active tamarisk removal work is recommended along this section of river.

Tamarisk control and restoration within the boundaries of the Dolores BLM Field Office will be approached using additional priority parameters. The first is to control all tamarisk occurring upstream of the confluence of Disappointment Creek (RM 42.3). This approach is due to the relatively low occurrence of tamarisk and thus the ability to completely control its presence in this section.

Additionally, tamarisk removal in this section of the river will contract with the Southwest Conservation Corps (SCC) and the Canyon Country Youth Corps (CCYC) to provide education, life skills, and to promote the development of the next generation of well trained land stewards. For additional information see Appendix H.

**Uncompahgre BLM Field Office**

The Uncompahgre BLM Field Office manages the Dolores River from the river mile 85.5 in Slick Rock Canyon to the end of river mile 118 along Highway 141. This section encompasses Paradox Valley, which contains large continuous stands of tamarisk responsible for the estimated 1,010 acres that exist along this section of the Dolores River. There are 21 sites where active tamarisk removal work is recommended.

It is likely that the Uncompahgre BLM Field Office will have additional priority parameters to add to those contained in this document and DR-RAP. Efforts will be

BLM_0066032

made in earnest to account for both the BLM Offices parameters and those agreed upon in these plans.

**Grand Junction BLM Field Office**

The Grand Junction BLM Field Office manages the Dolores River from the end of river mile 118 along Highway 141 to the Colorado/Utah state line at river mile 148.5.  This section is largely accessible via Highway 141 and supports an estimated 720 acres of tamarisk.  There are 20 sites where active tamarisk removal work is recommended along this section of river.

It is likely that the Grand Junction BLM Field Office will have additional priority parameters to add to those contained in this document and DR-RAP.  Efforts will be made in earnest to account for both the BLM Offices parameters and those agreed upon in these plans.

**Moab BLM Field Offices**

The Moab BLM Field Office manages the Dolores River from the Colorado/Utah state line at river mile 148.5 to the Colorado River Confluence at river mile 171.   This section supports an estimated 630 acres of tamarisk.  There are 13 sites where active tamarisk removal work is recommended along this section of river.

It is likely that the Moab BLM Field Office will have additional priority parameters to add to those contained in this document and DR-RAP.  Efforts will be made in earnest to account for both the BLM Offices parameters and those agreed upon in these plans.

BLM_0066033

## August 2009 Approach to Selecting Priority Sites

To achieve the GOAL of increasing native vegetation along the Dolores River the Plan prioritizes tamarisk removal and restoration sites by the level to which they would benefit from tamarisk control and the probability of restoration success.

The parameters for these priorities outlined below are general and are displayed in no particular order:

Sites that would benefit from tamarisk control include:
- High public use areas providing recreational or educational opportunities as well as those presenting safety concerns associated with tamarisk flammability or highway visibility.
- Healthy native vegetation that could be negatively impacted by the fire risks and competition posed by tamarisk.
- Critical wildlife areas that may be disproportionately impacted by tamarisk.
- Areas that may benefit from control due to current or potential beetle activity. This includes areas lacking a substantial native seed source or where standing dead tamarisk could be an issue.

Sites that are likely to experience restoration success are distinguished by:
- Cooperation, commitment, and common goals with the land owner or land manager. Without long-term collaboration, monitoring, and maintenance, restoration is unlikely to succeed.
- Ability to limit grazing pressure from wildlife and livestock. Young, revegetated plants are unlikely to survive grazing activity.
- The current condition of the site. The degree to which physical processes are properly occurring on the site directly affect its ability to recover.
- To a lesser extent the accessibility of a site is important to consider due to the difficulty in monitoring and maintaining the site.  If there are adequate financial resources to properly monitor and maintain remote sites this is not an issue.

BLM_0066034

## DOLORES BLM OFFICE

**DOLORES RIVER SEGMENT 1**
**Lone Dome Recreation and Wildlife Area – McPhee Dam to Bradfield Bridge,**
**McPhee Dam to the end of RM 0 (13 miles)**
**Maps:** DR1, DR2, DR3
**Photos:** 7.10.09_1 – 7.10.09_22

In general, this river segment is not a high priority as no tamarisk was found here in the summer of 2009. However, it is possible that a few, small individuals were missed in the survey or that some tamarisk could move into this area in the future. For these reasons it will be important to monitor this section of the river for tamarisk, other noxious weeds, and other threats to the ecosystem. Tamarisk control in this area can be considered an early detection rapid response operation. This approach to invasive species control is the most effective and economically viable.

Noxious weeds currently present in this river segment include Canada thistle, cheatgrass, and Russian knapweed. Other weeds known to be a problem in Montezuma and Dolores Counties are bindweed, Dalmatian toadflax, and yellow toadflax.

Native communities present from McPhee Dam to Bradfield Bridge are dominated by narrowleaf cottonwood, boxelder, as well as coyote and strapleaf willows.

The landownership of the riparian zone is almost evenly split between the United States Forest Services (USFS) and the State of Colorado. Approximately one river mile is privately owned. The river section is a popular recreation area for camping and fishing and is easily accessible via Route 504.

It is recommended that this river section be monitored on an annual basis.

BLM_0066035

**DOLORES RIVER SEGMENT 2**
**Bradfield Bridge to Dove Creek Pump House, RM 0 to the end of RM 19**
**Maps:** DR4, DR5, DR6, DR7, DR8, DR9

This river segment is considered a high priority because the only tamarisk present are a few isolated individuals directly downstream of Bradfield Bridge and a light, consistent infestation along Williams Draw. As a result the infestation could easily be removed from the system and it is a known desire of the land manager to do so. No tamarisk were found below river mile 1 along this river segment in the summer of 2009. However, it is possible that a few, small individuals were missed in the survey or that some tamarisk could move into this area in the future. For these reasons it will be important to monitor this section of the river for tamarisk, other noxious weeds, and other threats to the ecosystem. Tamarisk control in this area can be considered an early detection rapid response operation. This approach to invasive species control is the most effective and economically viable.

Noxious weeds currently present in this river segment include cheatgrass, Canada thistle, Russian knapweed, Siberian elm, and Dalmatian toadflax. Other weeds known to be a problem in Dolores County are bindweed, and yellow toadflax.

Native communities present from Bradfield Bridge to the Dolores Canyon Pump House are dominated by ponderosa pine, Gambles oak, three-leaf sumac, as well as strap leaf and coyote willows.

This river segment is entirely owned and managed by the Dolores BLM District. Although this river segment begins in a relatively broad floodplain it quickly narrows as it enters the towering walls of Dolores Canyon. Thus, access is limited to foot, horseback, or boat.

The following management recommendations are appropriate for the tamarisk infestation in Williams Draw and below Bradfield Bridge; the remaining section should be monitored on a biannual basis.

**Recommended Site 0**
Photos:  7.9.09_1 – 7.9.09_36
Acreage:  5.42 acres
Landowner:  Bureau of Land Management, Dolores Field Office
Maps:  DR4, 1_PS 0

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – It is possible that this currently sparse tamarisk infestation could spread (Decision Tree for Prioritizing Tamarisk Control) at which point it could cause aesthetic harm to the nearby campground and increased fire danger (Table 1: Criteria C & G).

BLM_0066036

- Restoration is likely to succeed because it meets the following Feasibility Characteristics –
  - o Funding is available:  Not yet determined
  - o The Landowner is willing:  Yes
  - o Site Access is Economically Feasible:  Yes
  - o A good Native Seed Source is present:  Yes

River Segment 2: Bradfield Bridge to Dove Creek Pump House

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| Control:  Hand cut-stump with herbicide application to achieve eradication. |
| Biomass:  Stack outside of floodplain for wildlife habitat. |
| Revegetation:  Natural recruitment. |
| **Other Invasive, Non-native Species of Concern** |
| Woody:  The few existing Siberian elm and Russian olive should be controlled in concert with tamarisk. |
| Herbaceous:  Dalmatian toadflax, common mullein, and Canada thistle are present and Russian knapweed are prevalent in the area but will not be controlled as part of this effort. |
| **Monitoring** |
| This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. |

River Segment 2: Bradfield Bridge to Dove Creek Pump House

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $4,278 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 20% | $433 |
| Multiplier for Access or Other  Issues | 20% | $942 |
| Monitoring and Maintenance for 3-5 years | 20% | $1,131 |
| **Total Cost** | | **$6,785** |

M - 7

BLM_0066037

**DOLORES RIVER SEGMENT 3**
**Dove Creek Pump house to Disappointment Creek Confluence, RM 19 to the end of RM 42.3**
**Maps:** DR9, DR10, DR11, DR12, DR13, DR14

This river segment is a priority area for this project as it supports a light tamarisk infestation occurring throughout the section that can be nearly eradicated. The upstream boundary of this section occurs at around 6,300 feet, an elevation below which tamarisk becomes invasive. Tamarisk infestations in this area are generally composed of individual trees interspersed in mixed stands of native vegetation. As a result, the cost estimates for this segment are based on the length of time need to control the infestations rather than the tamarisk canopy cover acreage. Many of the tamarisk are difficult to identify among dense native vegetation. At river miles 37 and 38 the stands become large enough to easily identify.

Noxious weeds currently present in this river segment include Dalmatian toadflax, Siberian elm, Russian olive, common mullein, Canada thistle and Russian knapweed. Other weeds known to be a problem in Dolores and San Miguel Counties include bindweed, yellow toadflax, and hoary cress.

Native communities present from Dolores Canyon Pump House to the end of Dolores Canyon are dominated by ponderosa pine, boxelder, Gambles oak, and willows. New Mexico privet begins occurring in this section as well.

This river section is owned and managed by the Dolores BLM District except for some private land along the last mile. Access is afforded via a service road which runs along the entire length of the segment. The road is in its best condition along the west bank from the Dove Creek pump house (RM 19) for 16 miles to a point below Snaggletooth Rapids (RM 35) at which point it crosses the river and deteriorates. The track is also accessible from the north via 13.R Road, though its condition at this end is unknown. This road is only suitable for 4-wheel drive vehicles or ATVs at best.

This river segment is grazed by both cattle and wildlife.

The following management recommendations are appropriate for this entire river segment:

**Recommended Site 19 to 42.3 – Completed Spring/Summer 2009**
Photo:  5.11.09_29 – 5.11.09_43; & 5.15.09_1 – 5.15.09_5
Acreage:  4.60 acres
Landowner:  Bureau of Land Management, Dolores Field Office
Maps:  DR12, DR13, DR14; 1_PS 19-42.3 – 6_PS 19-42.5

M - 8

BLM_0066038

- <u>The site would benefit from tamarisk control because</u> – It is possible that this currently sparse tamarisk infestation could spread (Decision Tree for Prioritizing Tamarisk Control) at which point it could cause aesthetic harm and increased fire danger to campgrounds in the area (Table 1: Criteria C & G).

- <u>Restoration is likely to succeed because it meets the following Feasibility Characteristics</u> –
  - o Funding is available:  Yes
  - o The Landowner is willing:  Yes
  - o Site Access is Economically Feasible:  Yes (relative to the funding source)
  - o A good Native Seed Source is present:  Yes

River Segment 3: Dove Creek Pumphouse to Disappointment Creek Confluence

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| <u>Control:</u>  Hand cut-stump with herbicide application to achieve eradication. |
| <u>Biomass:</u>  Stack outside of floodplain for wildlife habitat. |
| <u>Revegetation:</u>  Natural recruitment. |
| **Other Invasive, Non-native Species of Concern:** |
| <u>Woody:</u>  The few existing Siberian elm and Russian olive should be controlled in concert with tamarisk. |
| <u>Herbaceous:</u>  Dalmatian toadflax, common mullein, and Canada thistle are present and Russian knapweed are prevalent in the area but will not be controlled as part of this effort. |
| **Monitoring** |
| As this section is difficult to access, vegetation monitoring should occur once a year for three years and then once every three years. |

River Segment 3: Dove Creek Pumphouse to Disappointment Creek Confluence

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $31,200 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Multiplier for Access or Other  Issues | 20% | $6,240 |
| Monitoring and Maintenance for 3-5 years | 25% | $9,360 |
| **Total Cost** | | **$46,800** |

**\*Generally, removal costs are determined by tamarisk acreage and density. However, this infestation is extremely sparse and costs were determined by crew hours.**

M - 9

BLM_0066039

**DOLORES RIVER SEGMENT 4**
**Disappointment Creek**
**Maps:** DC1, DC2, DC3, DC4, DC5

Currently work along Disappointment Creek is considered a low priority except for a few demonstration sites. Lessons learned about restoration in Disappointment Creek's conditions such as high soil salinity and livestock grazing, as well as those from a past project further upstream, will help to determine the priority level of this tributary. Due to the sharp increase in tamarisk infestations along the Dolores River below Disappointment Creek, it is fair to recognize the tributary as a contributing factor to tamarisk dominance downstream. However, this relationship is not fully understood and could be due to an increase in sediment, salinity, or tamarisk seed source. Controlling tamarisk along this creek would certainly help to reduce the seed source though sediment and salinity shifts are more difficult to predict. Tamarisk removal may also help to increase the habitat and agricultural value of this riparian ecosystem.

Tamarisk infestations on Disappointment Creek, approximating 180 acres, are frequent and moderately dense until the gravel pit slightly upstream of the intersection of 23.G and 19.Q roads. The elevation of this area is roughly 6,300 feet, a height at which tamarisk is less invasive.

The San Miguel county weed manager identified Russian knapweed, Canada thistle, hoary cress, musk thistle, Russian olive, and Siberian elm as weeds of concern for this area. Fremont cottonwoods and coyote willow are also known to occur.

Disappointment Creek is largely privately owned along its lengthy journey from the rocky, high-country boundary between San Miguel and Dolores Counties in the San Juan National Forest to the agricultural lowlands by the Dolores River. As a result it will be important to ensure that both the BLM and local landowners agree to whatever actions are taken. Access to the creek is afforded by roads 13.R, P16, 19.Q, and D.00 along the majority of its reach.

**Recommended Site D1 – Completed Fall 2009**
Acreage: 0.71 acres
Landowner: Bureau of Land Management; Dolores Field Office
Maps: DC1; 1_PSD1

Recommended Site D1 is located approximately a mile upstream of the confluence of Disappointment Creek and the Dolores River. A stressed, mid-age Fremont cottonwood gallery occurs on river right with an understory of sage, greasewood, rabbitbrush, and light knapweed.

This site was recommended for tamarisk removal for the following reasons:

BLM_0066040

- <u>The site would benefit from tamarisk control because</u> – There are native vegetative communities present that would benefit from decreased tamarisk competition. Tamarisk also presents a risk of crown fire in the cottonwoods (Table 1: Criteria A). Additionally, information gathered at this site will help to inform future restoration work along Disappointment Creek (Adaptive Management).
- <u>Restoration is likely to succeed because it meets the following Feasibility Characteristics</u> –
  - o  Funding is available:  Yes
  - o  The Landowner is willing:  Yes
  - o  Site Access is Economically Feasible:  Yes
  - o  A good Native Seed Source is present:  Yes

Recommended Site D1

| Control, Biomass Reduction, & Revegetation Approach |
| --- |
| **Tamarisk Control**<br>Control:  Hand cut-stump with herbicide application.<br>Biomass: Stack outside of floodplain for wildlife habitat.<br>Revegetation:<br><ul><li>Monitoring wells should be installed at the time of tamarisk removal.</li><li>Consult experts in saline soil revegetation techniques. See Appendix F.</li></ul>**Other Invasive, Non-native Species of Concern**<br>Woody: N/A<br>Herbaceous:  Though Russian knapweed is found in the area, it should only be controlled if revegetation is deemed necessary.<br>**Monitoring & Maintenance**<br>This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. |

Recommended Site D1

| Estimated Costs | | |
| --- | --- | --- |
| Hand Control | 100% | $1,559 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Multiplier for Access or Other  Issues | 20% | $312 |
| Monitoring and Maintenance for 3-5 years | 25% | $468 |
| **Total Cost** | | **$2,339** |

**\*\*It is important to note that actual work performed on Disappointment Creek in 2009 exceeded the footprint recommended here (extending from jnst upstream of**

BLM_0066041

the creek's confluence with the Dolores to Recommended Site D1).  This is an example of professional judgment determining an appropriate project scope, centered on a recommended site, due to funding and work force considerations. The cost calculator for this site (included in Appendix M) can be used to recalculate cost estimates based on actual restoration site acreages.**

BLM_0066042

**DOLORES RIVER SEGMENT 5**
**Slick Rock Boat Launch Area, RM 42.3 to the end of RM 53**
**Maps:** DR14, DR15

Tamarisk infest approximately 58 acres in the Slick Rock Boat Launch Area. While there are no large, monotypic stands, tamarisk does begin to significantly encroach on native vegetation.

There are several Russian olives in river miles 43 and 44, Siberian elm in river mile 51, cheatgrass, and Russian knapweed is present throughout the area.

Native, riparian communities present in the Slick Rock Boat Launch Area are dominated by coyote willows, sedges, and New Mexico privet. Upland communities of rabbitbrush, sage, and greasewood adjoin the narrow riparian zone.

The Slick Rock Boat Launch area, defined here as beginning just below Disappointment Creek, is a priority as it is the first river section to support a substantial tamarisk infestation. It is also a heavily used area due to the Slick Rock boat launch.

Approximately 6 miles of this 11 mile reach is privately owned. The BLM owns the remaining 5 miles. All of the priority sites within this reach occur on private land. As a result, it is essential to work closely with those landowners to gain their permission for all actions completed and their cooperation in long-term maintenance and monitoring plans. Access to the river through this stretch is mixed. River miles 43 to 47 are only accessible at a few specific points, and miles 48 to 52 are generally accessible via road or through agricultural fields with the exception of the second half of mile 52.

Grazing pressure is present throughout the river segment. Efforts should be made to limit the impact of wildlife, beaver, and cattle at restoration sites during establishment of native vegetation.

**Recommended Site 49**
Photo: 5.16.09_6700
Acreage: 2.29
Landowner: Bureau of Land Management; Dolores Field Office
Map: DR16; 1_PS 49, 50, &51

Recommended Site 49 is located in the first half of river mile 49 on an inside curve of S8 Road. It consists of large, dense tamarisk with an understory of knapweed and a few coyote willow, NM privet, and phragmites.

This site was chosen as a priority for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – Visibility would improve along the road if this stand was removed (Table 1: Criteria C). The healthy

M - 13

BLM_0066043

looking tamarisk at the site could be an indication of good hydrology at the site (Table 1: Criteria E).

- <u>Restoration is likely to succeed because it meets the following Feasibility Characteristics</u> –
    - o Funding is available:  Not yet determined
    - o The Landowner is willing:  Likely
    - o Site Access is Economically Feasible:  Yes
    - o A good Native Seed Source is present:  Yes

Recommended Site 49

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| <u>Control</u>:  Mechanical removal using a feller-buncher or mulching (timber or hydro ax) equipment with hand cut-stump control as needed. |
| <u>Biomass</u>:  Stack outside of floodplain for wildlife habitat or burn if the feller-buncher is used, spread the mulch for revegetation purposes if mulching is used. |
| <u>Revegetation</u>: <br> • Monitoring wells should be installed at the time of tamarisk removal. <br> • Seed with native grasses over the entire site to help reduce Russian knapweed recruitment <br> • Closely monitor to see if other revegetation is necessary. |
| **Other Invasive, Non-native Species of Concern** |
| <u>Woody</u>:  N/A |
| <u>Herbaceous</u>:  Russian knapweed should be controlled, to reduce competition with recruiting native plants (for more information see Appendix F.) |
| **Monitoring & Maintenance** |
| This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used plan to foliar spray tamarisk re-sprouts. |

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $2,045 |
| Mechanical Mulching | 80% | 1,694 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 100% | $916 |
| Revegetated Area | 100% | $2,688 |
| Multiplier for Access or Other  Issues | 20% | 1,469 |
| Monitoring and Maintenance for 3-5 years | 30% | $2,643 |

M - 14

BLM_0066044

| | |
|---|---|
| **Total Cost** | **$11,455** |

**Recommended Site 50**
Photo: 5.16.09_6700
Acreage: 2.15
Soil Samples: 4"- pH 7.5/non-saline/loamy sand; 10" - pH 7.2/very slightly saline/loam
Landowner: Private Landowner
Map: DR16; 1_PS 49, 50, &51

Recommended Site 50 is located on private land at the end of river mile 50, just downstream of the S8 Road Bridge. Here tamarisk and some coyote willow line the banks and are backed by Russian knapweed along with some sage, rabbitbrush, and greasewood.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – Though the tamarisk infestation is narrow it is dense and could threaten the bridge or road with wildfire (Table 1: Criteria C).
- Restoration is likely to succeed because it meets the following Feasibility Characteristics –
    o Funding is available: Not yet determined
    o The Landowner is willing: Not yet determined
    o Site Access is Economically Feasible: Yes
    o A good Native Seed Source is present: Yes (although there is a large non-native seed source as well)

Recommended Site 50

| **Control, Biomass Reduction, & Revegetation Approach** |
|---|
| **Tamarisk Control**<br>Control: Access to this site is excellent and allows the use of mechanical mulching equipment. If so a timber or hydro ax should be used to control 80% of the infestation. Hand cut-stump should be used for the remaining 20%.<br>Biomass: 80% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat.<br>Revegetation:<br>• Grass seeding where mechanical control is used to compete with Russian knapweed.<br>• Willow bundles and/or pole plantings should be planted the winter following tamarisk removal.<br>**Other Invasive, Non-native Species of Concern**<br>Woody: N/A<br>Herbaceous: Cheatgrass is present in the area and should be considered. Russian knapweed is prevalent in the area and should be controlled where mechanical removal occurs, to reduce competition with recruiting native plants (for more information see Appendix F). |

BLM_0066045

**Monitoring & Maintenance**
This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used play to foliar spray tamarisk re-sprouts.
**Other Comments/Concerns**
Close proximity to the highway makes this site a candidate for educational signage.

Recommended Site 50

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $1,475 |
| Mechanical Mulching | 80% | $1,222 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 80% | $688 |
| Revegetated Area | 80% | $1,227 |
| Multiplier for Access or Other Issues | 20% | 923 |
| Monitoring and Maintenance for 3-5 years | 25% | $1,384 |
| **Total Cost** | | **$6,920** |

**Recommended Site 51**
Photos:  5.1.09_36, 5.1.09_37, 5.1.09_38
Acreage:  10.84
Soil Samples:  4"- pH 7.7/non-saline/silt loam; 10" - pH 7.7/non-saline/silt loam
Landowner:  Private Landowner
Maps:  DR16; 1_PS 49, 50, &51

Recommended Site 51 is located on private land in the first half of river mile 51. The site, on river right, supports a mature Fremont cottonwood stand with tamarisk and New Mexico privet in the understory. Its banks are lined with a mixture of tamarisk and coyote willow.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – There is a good native vegetative community present consisting of Fremont cottonwood, New Mexico privet, and coyote willow that would benefit from decreased tamarisk competition. Tamarisk also presents a risk of crown fire in the cottonwoods (Table 1: Criteria A).

M - 16

BLM_0066046

- <u>Restoration is likely to succeed because it meets the following Feasibility Characteristics</u> –
  - o Funding is available:  Not yet determined
  - o The Landowner is willing:  Not yet determined
  - o Site Access is Economically Feasible:  Yes
  - o A good Native Seed Source is present:  Yes

Recommended Site 51

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| <u>Control</u>:  Access to these sites may allow the use of mechanical mulching equipment. If so a timber or hydro ax should be used to control 80% of the infestation. Hand cut-stump should be used for the remaining 20%. |
| <u>Biomass</u>:  80% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat. |
| <u>Revegetation</u>: |
| • Monitoring wells should be installed at the time of tamarisk removal. |
| • Seed with native grasses over the entire site to help reduce knapweed recruitment |
| • Closely monitor to see if other revegetation is necessary |
| **Other Invasive, Non-native Species of Concern** |
| <u>Woody</u>:  N/A |
| <u>Herbaceous</u>:  Cheatgrass is present in the area and should be considered.  Russian knapweed is prevalent in the area and should be controlled where mechanical removal occurs, to reduce competition with recruiting native plants (for more information see Appendix F.) |
| **Monitoring & Maintenance** |
| This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used play to foliar spray tamarisk re-sprouts. |

Recommended Site 51

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $4,779 |
| Mechanical Mulching | 80% | $3,958 |
| Biomass Reduction by Mulching & Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 100% | $4,337 |
| Revegetated Area | 100% | $3,829 |
| Multiplier for Access or Other  Issues | 20% | $3,381 |
| Monitoring and Maintenance | 25% | $5,071 |

BLM_0066047

| | | |
|---|---|---|
| for 3-5 years | | |
| | **Total Cost** | **$25,356** |

**Recommended Site 52 – Completed Fall 2009**
Acreage:  7.71
Landowner:  Private Landowner
Maps:  DR16; 2_PS 52

Recommended Site 52 is located on private land at the end of river mile 52. The site spans both sides of the river. A mid-age Fremont cottonwood gallery occurs on river right while a large boxelder grove occupies the river left site, tamarisk occupies the understory of each. Coyote willows line both banks.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – There are native vegetative communities present that would benefit from decreased tamarisk competition. Tamarisk also presents a risk of crown fire in the cottonwoods and boxelders (Table 1: Criteria A).
- Restoration is likely to succeed because it meets the following Feasibility Characteristics –
  - o  Funding is available:  Yes
  - o  The Landowner is willing:  Yes
  - o  Site Access is Economically Feasible:  Yes
  - o  A good Native Seed Source is present:  Yes

Recommended Site 52

| **Control, Biomass Reduction, & Revegetation Approach** |
|---|
| **Tamarisk Control**<br>Control:  Access to these sites may allow the use of mechanical mulching equipment. If so a timber or hydro ax should be used to control 75% of the infestation. Hand cut-stump should be used for the remaining 25%.<br>Biomass:  75% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat.<br>Revegetation:<br>    • Monitoring wells should be installed at the time of tamarisk removal.<br>    • Seed mechanically treated areas with native grasses to help exclude Russian knapweed<br>    • Closely monitor to determine if other revegetation is necessary<br>        ◦ If so – mid-story plantings including New Mexico privet<br>**Other Invasive, Non-native Species of Concern**<br>Woody:  N/A<br>Herbaceous:  Cheatgrass is present and Russian knapweed is prevalent in the area and should be controlled where mechanical equipment is used to reduce competition with recruiting |

M - 18

BLM_0066048

native plants (for more information see Appendix F.)
**Monitoring & Maintenance**
This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used play to foliar spray tamarisk re-sprouts.

| Estimated Costs | | |
|---|---|---|
| Hand Control | 25% | $3,676 |
| Mechanical Mulching | 75% | $2,283 |
| Biomass Reduction by Mulching & Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 80% | $2,468 |
| Revegetated Area | 80% | $1,770 |
| Multiplier for Access or Other  Issues | 20% | $2,039 |
| Monitoring and Maintenance for 3-5 years | 25% | $3,059 |
| **Total Cost** | | **$15,296** |

BLM_0066049

**DOLORES RIVER SEGMENT 6**
**Little Glen Canyon, RM 53 to the end of RM 58**
**Maps:** DR16, DR17

Much of Little Glen Canyon is a moderate priority for tamarisk control and restoration. Although Recommended Site 54A is accessible by vehicle during low flows, the majority of this reach is an ideal location for tamarisk biological control due to difficult access that would significantly increase the costs of control, restoration, monitoring, and maintenance activities (Table 2: Criteria C). Additionally, the narrow canyon walls here serve to constrict any high flows that occur, increasing the likelihood of overbank flooding and overall riparian vegetation health. As a result, these healthy vegetative communities are more likely to recover as the tamarisk leaf stresses tamarisk, reducing its competitive edge.

However, there are many riparian zones throughout the southwest affected by the tamarisk beetle that are only accessible by raft. It may be necessary or desirable to combine active tamarisk control and revegetation in some of these areas. It has been suggested that areas on the Dolores River, like Little Glen Canyon, would be ideal training grounds for raft based tamarisk management and restoration crews. For example, Recommended Site 54B is difficult to access but would greatly benefit from some active tamarisk control.

Additionally, there is a river runner campsite in the area currently threatened by increased fire danger due to tamarisk presence and that will be significantly less appealing as the leaf beetle defoliates tamarisk. Though the time frame in which flows allow rafters to visit the area is relatively short, there can be large numbers that move through the area. If they avoid leaf beetle degraded site and move into native vegetation for shade they could cause damage, delaying positive native vegetation response.

For these two reasons; if adequate funds are made available for invasive control, monitoring, maintenance and necessary revegetation; the Recommended Sites listed below would be appropriate for active restoration.

Tamarisk infestations in this reach are significant, covering approximately 20 acres and generally occur as linear strips lining the river or as individuals sparsely present within native vegetation stands. However, in several areas, tamarisk forms dense, monocultures across wide, historic floodplains.

A few Russian olive and abundant Russian knapweed are present in many areas in this section. The County weed manager for San Miguel County also identified Canada thistle, hoary cress, musk thistle, Russian olive, and Siberian elm as species of concern for this area.

Native communities present in Little Glen Canyon are dominated by coyote willow, sedges, New Mexico privet, and some boxelder.

BLM_0066050

The first half mile and last half mile of this segment are privately owned, the remainder is owned by the BLM. These areas of private ownership are accessible via primitive dirt roads, though the upstream track crosses the river several times but is accessible most of the year excepting high flow events. Tall canyon walls render the rest of the river inaccessible except by boat or on foot.

Livestock grazing is evident at either end of the canyon but does not seem to occur in the deepest part of the canyon. If restoration occurs, efforts should be made to limit the impact of wildlife, beaver, and cattle during the establishment of natives.

**Recommended Site 54A**
Photos:  5.12.09_6701, 5.12.09_6702
Acreage:  4.77
Landowner:  Partially Private Landowner, Primarily Bureau of Land Management; Dolores Field Office
Maps:  DR16; 1_PS 54A & 54B

Recommended Site 54A is located on river right in the first half of river mile 54. Coyote willows line the banks along with a few tamarisk, Russian olive, and Siberian elm. Several mid-age and several mature Fremont cottonwoods occur in the historic floodplain surrounded by stand of tamarisk. New Mexico privet is common throughout the site as is Russian knapweed.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – The presence of mixed age Fremont cottonwoods as well as substantial New Mexico privet and coyote willow stands would benefit from the decreased competition and fire risk if tamarisk is removed. Mid-age cottonwoods indicate that this site may be hydraulically connected to the river (Table 1: Criteria A).
- Restoration is likely to succeed because it meets the following Feasibility Characteristics –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Likely
  - A good Native Seed Source is present:  Yes

Recommended Site 54A

| Control, Biomass Reduction, & Revegetation Approach |
| --- |
| **Tamarisk Control** |
| Control:  Access to these sites may allow the use of mechanical mulching equipment. If so a timber or hydro ax should be used to control 80% of the infestation. Hand cut-stump should be used for the remaining 20%.<br>Biomass:  80% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat. |

BLM_0066051

Revegetation:
- Monitoring wells should be installed at the time of tamarisk removal.
- Grass seeding to compete with Russian knapweed where mechanical equipment is used.
- Closely monitor to determine if other revegetation is necessary
  - If so – mid-story plantings including New Mexico privet

**Other Invasive, Non-native Species of Concern**

Woody:  Russian olive should be controlled in concert with tamarisk.

Herbaceous:  Russian knapweed is prevalent in the area and should be controlled where mechanical equipment is used to reduce competition with recruiting native plants (for more information see Appendix F.)

**Monitoring & Maintenance**

This site will take some time to access, incurring additional costs. These should be closely considered before this project is undertaken. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used play to foliar spray tamarisk re-sprouts.

**Other Comments/Concerns**

The private landowner should be contacted to ascertain if overland access to the site will be granted.

Recommended Site 54A

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $3,273 |
| Mechanical Mulching | 80% | $2,711 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 80% | $1,526 |
| Revegetated Area | 80% | $2,722 |
| Multiplier for Access or Other  Issues | 20% | $2,046 |
| Monitoring and Maintenance for 3-5 years | 25% | $3,070 |
| | **Total Cost** | **$15,348** |

**Recommended Site 54B**

Photo:  5.12.09_6703

Acreage:  8.20

Landowner:  Bureau of Land Management; Dolores Field Office

Maps:  DR16, DR17; 1_PS 54A & 54B

M - 22

BLM_0066052

Recommended Site 54B is located on river right towards the end of river mile 54. Though the banks are lined with coyote willow a dense, monotypic stand of mature tamarisk with an understory of knapweed dominates the site. However, substantial amounts of New Mexico privet, alkali sacaton, and other grasses are also present. Some of the soils here are covered in salty deposits.

*Note: This site is remote and it would be difficult to access with mechanical equipment. However, its large size and dense tamarisk infestation make hand cut stump control difficult and expensive. It may be more feasible to remove only a portion of the tamarisk infestation to install a native seed source island amongst the remaining tamarisk.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – The native vegetation seed source for this large, monotypic tamarisk infestation would benefit from enhancement and a decrease in tamaris competition (Table 1: Criteria A). In light of the active tamarisk leaf eating beetle in the watershed, it would be beneficial to increase the native seed source to aid natural recruitment of desirable species (Table 1: Criteria F).
- Restoration is likely to succeed because it meets the following Feasibility Characteristics –
  - Funding is available: Not yet determined
  - The Landowner is willing: Likely
  - Site Access is Economically Feasible: Unlikely (depending on funding source)
  - A good Native Seed Source is present: Yes, but limited

Recommended Site 54B

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| Control: Hand cut-stump control. |
| Biomass: The landowner should be consulted about the reduction of biomass. If permission is granted much of the wood (75%) should be stacked and burned. Otherwise it could be piled away from the floodplain for wildlife habitat. |
| Revegetation: |
| • Monitoring wells should be installed at the time of tamarisk removal. |
| • Grass seeding should be done throughout the site to compete with Russian knapweed. |
| • Willow bundles and pole plantings should be planted along the bank. |
| • Mid-story plantings including New Mexico privet and three-leaf sumac. |
| **Other Weed Species Control** |
| Woody: N/A |
| Herbaceous: Cheatgrass is present and Russian knapweed is prevalent in the area and should be controlled throughout the site to reduce competition with recruiting native plants (for more information see Appendix F.) |
| **Monitoring & Maintenance** |
| This site will be difficult to access, incurring additional costs. This should be closely |

BLM_0066053

considered before this project is undertaken. Site visits should be planned twice a year for three years and then once per year for the next seven years.

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $32,582 |
| Biomass Reduction by Fire | 75% | $554 |
| Biomass Reduction by Natural Decomposition | 25% | 0 |
| Herbaceous Weed Control | 100% | $3,281 |
| Revegetated Area | 100% | $7,639 |
| Multiplier for Access or Other Issues | 20% | $8,811 |
| Monitoring and Maintenance for 3-5 years | 30% | $15,860 |
| **Total Cost** | | **$68,727** |

**Recommended Site 56**
Photo:  5.12.09_6703
Acreage:  3.31
Landowner:  Bureau of Land Management; Dolores Field Office
Maps:  DR17; 2_PS 56

Recommended Site 56 is in the middle of Little Glen Canyon at river mile 56 and consists of a remote campsite surrounded by moderate tamarisk infestations.  Coyote willow, New Mexico privet, phragmites, and rabbitbrush are also present.  Accessing this site will be a challenge

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – The location of the campsite presents a greater fire hazard for this tamarisk stand (Table 1: Criteria C). Additionally, the campsite would be more appealing if it supported native vegetation, particularly in light of potential beetle induced tamarisk defoliation (Table 1: Criteria G).
- Restoration is likely to succeed because it meets the following Feasibility Characteristics –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Unlikely (depending on funding source)
  - A good Native Seed Source is present:  Yes, but it is limited

M - 24

BLM_0066054

Recommended Site 56

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control**<br>Control:  Hand cut-stump control.<br>Biomass:  Stack away from the floodplain for wildlife habitat.<br>Revegetation:  Closely monitor to determine if other revegetation is necessary<br>**Other Weed Species Control**<br>Woody:  N/A<br>Herbaceous:  Many weeds, including Russian knapweed, are prevalent in the area and should be monitored to ascertain the need for control.<br>**Monitoring & Maintenance**<br>This site will be difficult to access, incurring additional costs. This should be closely considered before this project is undertaken. Site visits should be planned twice a year for three years and then once per year for the next seven years. |

Recommended Site 56

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $6,263 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 20% | $265 |
| Multiplier for Access or Other  Issues | 20% | $1,305 |
| Monitoring and Maintenance for 3-5 years | 25% | $1,958 |
| **Total Cost** | | **$9,791** |

M - 25

BLM_0066055

**DOLORES RIVER SEGMENT 7**
**Big Gypsum, RM 58 to the end of RM 64**
**Maps:** DR17, DR18

Big Gypsum is a priority area for tamarisk removal and restoration efforts as it contains a boat launch and campground area, providing a public education opportunity.  The area is also largely accessible via 20.R Road, though many of the secondary routes are primitive dirt roads. These roads provide more options for tamarisk removal and revegetation methods, such as those requiring heavy equipment and to perform monitoring and maintenance activities.

Tamarisk infestations in this reach are significant, covering approximately 50 acres, and often occur as mature stands growing in the understory of Fremont cottonwood galleries. There are, however, some instances of young, whippy to mid-sized tamarisk amongst willow stands or small tamarisk monocultures.

Infestations of Russian knapweed, hoary cress, and cheatgrass are substantial throughout the reach. The San Miguel county weed manager also identified Canada thistle, musk thistle, Russian olive, and Siberian elm as species of concern for this area.

Big Gypsum supports several; native vegetation communities including Fremont cottonwood, coyote willow, New Mexico privet, as well as some three-leaf sumac. Though several of the cottonwood galleries are showing obvious signs of stress, others appear to be healthy.

Approximately four miles of this six mile stretch are privately owned, the remainder is managed by the Dolores BLM Field Office. Several tamarisk removal projects have occurred, or are currently occurring, in this area on private land. The Dolores River Dialogue has a research site in this area and the private landowner has completed some tamarisk removal.

The entire reach is grazed by cattle and impacted by beaver and other wildlife. Efforts should be made to limit the impact of wildlife, beaver, and cattle at restoration sites while native plants are establishing.

**Recommended Site 59 & 60**
Photos:  4.29.09_16, 4.29.09_18 – 4.29.09_21
Acreage:  91.01
Soil Samples:  4"- pH 8.3/slightly saline/silty clay loam; 10" - pH 8.1/very slightly saline/loam with a clay layer
Landowner:  Private Landowner
Maps:  DR18; 1_PS 59 & 60

The Recommended Site rating of this area is not intended to imply that the entire area become a restoration project. Rather it is meant to indicate that any area within this reach

BLM_0066056

where the landowner would be willing to limit cattle grazing during the restoration project would be a good priority site.

Recommended Site 59 & 60 begins at river mile 58.5 and ends at river mile 60. This priority area is large as it encompasses a historic river bottom consisting of several decadent cottonwood galleries. Knapweed and hoary cress are prevalent throughout the site. New Mexico privet, three-leaf sumac, and coyote willow are also prevalent beneath the cottonwoods in all areas but one (tamarisk shapefile 60b) on river right at the beginning of river mile 60.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – Healthy stands of native Fremont cottonwoods and in some cases New Mexico privet, three-leaf sumac, and coyote willow would benefit from the decreased competition and fire risk is tamarisk were removed (Table 1: Criteria A).
- Restoration is likely to succeed because it meets the following Feasibility Characteristics –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Yes
  - A good Native Seed Source is present:  Yes, but it is limited and there are large non-native seed sources as well

Recommended Site 59 & 60

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control**<br>Control:  A timber or hydro ax should be used to control 80% of the infestation. Hand cut-stump should be used for the remaining 20%.<br>Biomass:  80% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat.<br>Revegetation:<br>• Monitoring wells should be installed at the time of tamarisk removal.<br>• Grass seeding throughout the site to compete with Russian knapweed<br>• Closely monitor to see if other revegetation is necessary<br>   • If so - Willow bundles and pole plantings should be planted along the bank.<br>   • If so - Mid-story plantings including New Mexico privet and three-leaf sumac.<br>**Other Weed Species Control**<br>Woody:  N/A<br>Herbaceous:  Cheatgrass is present and Russian knapweed and hoary cress is prevalent in the area and should be controlled throughout the site to reduce competition with recruiting native plants (for more information see Appendix F.)<br>**Monitoring & Maintenance**<br>This majority of this area will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years.<br>*Note: if a hydro ax is used play to foliar spray tamarisk re-sprouts. |

BLM_0066057

**Other Comments/Concerns**
Landowner cooperation to determine the most appropriate site to conduct work in this area is essential.

Recommended Site 59 & 60

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $42,139 |
| Mechanical Mulching | 80% | $34,900 |
| Biomass Reduction by Fire | 20% | $865 |
| Biomass Reduction by Natural Decomposition | 80% | 0 |
| Herbaceous Weed Control | 100% | $36,403 |
| Revegetated Area | 100% | $34,560 |
| Multiplier for Access or Other Issues | 20% | $29,773 |
| Monitoring and Maintenance for 3-5 years | 25% | $44,660 |
| | **Total Cost** | **$223,301** |

**Recommended Site 62**
Photos:  4.29.09_7 – 4.29.09_9
Acreage:  7.66
Soil Samples:  4"- pH 7.1/strongly saline/sandy loam with thin clay layer; 10" - pH 7.3/moderately saline/sandy loam with thin clay layer
Landowner:  Partially Private Landowner, Primarily Bureau of Land Management; Dolores Field Office
Maps:  DR18; 2_PS 62, 63

Recommended Site 62 is located on river left in the middle of river mile 62. It consists of a dense, monotypic stand of mature tamarisk with an understory of knapweed. A few New Mexico privets are intermixed with the tamarisk and sagebrush surrounds the area. A Fremont cottonwood gallery is set back from the river along the road and isolated from the tamarisk stand.

This site was recommended for tamarisk control for the following reasons:
- The site would benefit from tamarisk control because – The native seed source of phragmites, New Mexico privet, Fremont cottonwood, and upland plants is limited in this area. As a result, it unlikely to quickly revegetate the area. The site would greatly benefit from native plant seed source especially in light of the tamarisk leaf beetle (Table 1: Criteria F). Additionally, this site has a high

M - 28

educational potential due to a proximity to the Big Gypsum Boat Launch and good access for monitoring, maintenance, and showcase purposes (Table 1: Criteria G).

- <u>Restoration is likely to succeed because it meets the following Feasibility Characteristics</u> –
    - o  Funding is available:  Not yet determined
    - o  The Landowner is willing:  Likely
    - o  Site Access is Economically Feasible:  Yes
    - o  A good Native Seed Source is present:  No

Recommended Site 62

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| <u>Control</u>:  A timber or hydro ax should be used to control 85% of the infestation. Hand cut-stump should be used for the remaining 15%. |
| <u>Biomass</u>:  80% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat. |
| <u>Revegetation</u>: |
| • Monitoring wells should be installed at the time of tamarisk removal. |
| • Grass seeding over the entire site to compete with Russian knapweed |
| • Willow bundles and pole plantings should be planted along the bank. |
| • Mid-story plantings including New Mexico privet and three-leaf sumac. |
| **Other Weed Species Control** |
| <u>Woody</u>:  N/A |
| <u>Herbaceous</u>:  Cheatgrass is present and Russian knapweed and hoary cress is prevalent in the area and should be controlled over the entire site to reduce competition with recruiting native plants (for more information see Appendix F.) |
| **Monitoring & Maintenance** |
| This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used play to foliar spray tamarisk re-sprouts. |
| **Other Comments/Concerns** |
| Close proximity to the campground/boat launch makes this site a candidate for educational signage. |

Recommended Site 62

| Estimated Costs | | |
|---|---|---|
| Hand Control | 15% | $4,069 |
| Mechanical Mulching | 85% | $4,775 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 100% | $3,065 |

BLM_0066059

| | | |
|---|---|---|
| Revegetated Area | 100% | $5,778 |
| Multiplier for Access or Other Issues | 20% | $3,537 |
| Monitoring and Maintenance for 3-5 years | 30% | $6,367 |
| **Total Cost** | | **$27,591** |

**Recommended Site 63**
Photos: 4.29.09_10 – 4.29.09_11
Acreage: 47.89
Landowner: Private Landowner
Maps: DR18, 2_PS 62, 63

This site encompasses a broad, historic floodplain that spans almost the entire river right bank of river mile 63. Heavily infested with tamarisk and Russian knapweed, this site experiences heavy grazing pressure. These challenges, along with the large scale of the site, would make restoration work here expensive, complicated, and a long-term commitment. However, young Fremont cottonwood and tamarisk recruits, as well as several wetland areas set back from the river indicate a closer connection to the water table than many Dolores River sites, signifying potential for successful restoration.

It is also important to note that the Dolores River Dialogue has been collecting baseline vegetation and hydrological data for quite some time. As a result this site has great potential to answer some key management questions for the watershed if the correct restoration design is chosen.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – Though the mature stand of Fremont cottonwood occurring here is stressed, young recruits and evidence of a relatively shallow water table create the opportunity for healthy, native vegetation here in the future if tamarisk is controlled. Additionally, there are indications of a higher level of hydrologic functionality than is commonly encountered on the Dolores River (Table 1: Criteria A). This is also an excellent site to use for educational purposes (Table 1: Criteria G).
- Restoration is likely to succeed because it meets the following Feasibility Characteristics –
  - Funding is available: Not yet determined
  - The Landowner is willing: Likely
  - Site Access is Economically Feasible: Yes
  - A good Native Seed Source is present: Yes

Recommended Site 63

BLM_0066060

| **Control, Biomass Reduction, & Revegetation Approach** |
|---|
| **Tamarisk Control** <br> <u>Control</u>:  A timber or hydro ax should be used to control 80% of the infestation. Hand cut-stump should be used for the remaining 20%. <br> <u>Biomass</u>:  80% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat. <br> <u>Revegetation</u>: <br> • Monitoring wells should be installed at the time of tamarisk removal. <br> • Grass seeding where there is mechanical control to compete with Russian knapweed <br> • Closely monitor to see if other revegetation is necessary <br> **Other Weed Species Control** <br> <u>Woody</u>:  N/A <br> <u>Herbaceous</u>:  Cheatgrass is present and Russian knapweed and hoary cress are prevalent in the area and should be controlled where mechanical equipment is used to reduce competition with recruiting native plants (for more information see Appendix F.) <br> **Monitoring & Maintenance** <br> This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used play to foliar spray tamarisk re-sprouts. <br> **Other Comments/Concerns** <br> This site is a research location for the Dolores River Dialogue. Thus, it is essential to collaborate with all parties involved as well as the landowner. |

Recommended Site 63

| **Estimated Costs** | | |
|---|---|---|
| Hand Control | 20% | $21,108 |
| Mechanical Mulching | 80% | $17,482 |
| Biomass Reduction by Mulching & Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 80% | $15,325 |
| Revegetated Area | 80% | $13,529 |
| Multiplier for Access or Other  Issues | 20% | $13,489 |
| Monitoring and Maintenance for 3-5 years | 25% | $20,233 |
| **Total Cost** | | **$101,166** |

BLM_0066061

**DOLORES RIVER SEGMENT 8**
**Slick Rock Canyon, RM 64 to the end of RM 85.5**

Slick Rock Canyon is a moderate priority for tamarisk control and restoration as the majority of this stretch is extremely remote and can be accessed only by boat, on horseback, or on foot. Thus, this reach is an ideal location for tamarisk biological control due to difficult access that would significantly increase the costs of control, restoration, monitoring, and maintenance activities (Table 2: Criteria C). Additionally, the narrow canyon walls here serve to constrict any high flows that occur, increasing the likelihood of overbank flooding and overall riparian vegetation health. As a result, these healthy vegetative communities are more likely to recover as the tamarisk leaf stresses tamarisk, reducing its competitive edge.

However, there are many riparian zones throughout the southwest affected by the tamarisk beetle that are only accessible by raft. It may be necessary or desirable to combine active tamarisk control and revegetation in some of these areas. It has been suggested that areas on the Dolores River, like Slick Rock Canyon, would be ideal training grounds for raft based tamarisk management and restoration crews.

Additionally, there are many river runner campsites in the area currently threatened by increased fire danger due to tamarisk presence and that will be significantly less appealing as the leaf beetle defoliates tamarisk. Though the time frame in which flows allow rafters to visit the area is relatively short, there can be large numbers that move through the area. If they avoid leaf beetle degraded site and move into native vegetation for shade they could cause damage, delaying positive native vegetation response.

For these two reasons; if adequate funds are made available for invasive control, monitoring, maintenance and necessary revegetation; the Recommended Sites listed below would be appropriate for active restoration.

The tamarisk infestation in this section of Slick Rock canyon is light and patchy in the beginning, becoming more substantial just upstream of Spring Canyon at around river mile 81. There are approximately 13 acres of tamarisk in this segment.

Russian knapweed is present throughout the reach. The Montrose county weed manager also identified hoary cress, and Canada thistle as species of concern for this area.

Several native vegetation communities co-occur with tamarisk in this stretch including coyote willow, New Mexico privet, phragmites, and boxelder. Fremont cottonwood, woods rose, redosier dogwood, juniper, and Gambles oak also occur at a lower frequency. The health and density of native vegetation sharply decrease as tamarisk infestations increase in the Spring Canyon area. Anecdotally, this seems to correlate with increased salinity levels in the soil.

The entire section is BLM owned and managed by the Dolores Field Office.

BLM_0066062

There is little to no cattle grazing in this area although beaver and other wildlife is likely present. Restoration work should consider the possibility of such predation.

**Recommended Site 64**
Photos:  4.29.09_13, 4.29.09_14
Acreage:  2.51
Landowner:  Bureau of Land Management; Dolores Field Office
Maps:  DR19; 1_PS 64

This site is located on both sides of the river at the end of river mile 64 and in the beginning of river mile 65. Moderate tamarisk stands are interspersed with native coyote willow, New Mexico privet, 3-leaf sumac, and phragmites. There is a campsite on river right and a healthy New Mexico privet and 3-leaf sumac community directly upstream of the site. Located just off of 20.R Road that runs through Big Gypsum Valley this sight is relatively easily accessed.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – The tamarisk is interspersed with native vegetation and adjacent to a large healthy stand. These plants would benefit from reduced competition if tamarisk were removed (Table 1: Criteria A). Additionally, the campsite presents a wildfire risk and would be more appealing if it supported native vegetation, particularly in light of potential beetle induced tamarisk defoliation (Table 1: Criteria C & G).
- Restoration is likely to succeed because it meets the following Feasibility Characteristics –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Likely
  - A good Native Seed Source is present:  Yes

Recommended Site 64

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| Control:  Hand cut-stump with herbicide application to achieve eradication. |
| Biomass:  Stack outside of floodplain for wildlife habitat. |
| Revegetation: |
| • Grass seeding where there is mechanical control to compete with Russian knapweed |
| • Closely monitor to see if other revegetation is necessary |
| **Other Weed Species Control** |
| Woody:  N/A |
| Herbaceous:  Cheatgrass is present and should be a consideration in revegetation. Russian knapweed and hoary cress are prevalent in the area and should be monitored to determine whether control is necessary (for more information see Appendix F). |
| **Monitoring & Maintenance** |

BLM_0066063

> This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years.

Recommended Site 64

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $6,793 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 20% | $201 |
| Multiplier for Access or Other Issues | 20% | $1,399 |
| Monitoring and Maintenance for 3-5 years | 25% | $2,098 |
| | Total Cost | $10,491 |

**Recommended Site 82 & Recommended Site 84**
Recommended Site 82
Photos:  4.29.09_13, 4.29.09_14
Acreage:  6.52
Landowner:  Bureau of Land Management; Dolores Field Office
Map:  DR21; 2_PS 82

Recommended Site 84
Photos:  5.17.09_32, 5.17.09_3
Acreage:  1.42
Landowner:  Bureau of Land Management; Dolores Field Office
Map:  DR21; 2.5_PS84

Recommended Sites 82 and 84 are in the middle of Slick Rock Canyon at and consist of a remote campsites surrounded by moderate tamarisk infestations.  Coyote willow, New Mexico privet, three-leaf sumac, boxelder, and woods rose are interspersed among the tamarisk at site 82 and privet, phragmites, and greasewood occur at site 84.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – The campsite presents a greater fire hazard for this tamarisk stand and would be more appealing if it supported native vegetation, particularly in light of potential beetle induced tamarisk defoliation (Table 1: Criteria C & G).
- Restoration is likely to succeed because it meets the following Feasibility Characteristics –
  - Funding is available:  Not yet determined

M - 34

BLM_0066064

      o  The Landowner is willing:  Likely
      o  Site Access is Economically Feasible:  Yes
      o  A good Native Seed Source is present:  Yes

Recommended Site 82 & 84

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| <u>Control</u>:  Hand cut-stump control |
| <u>Biomass</u>:  Stack away from the floodplain for wildlife habitat |
| <u>Revegetation</u>:  Closely monitor to determine if other revegetation is necessary |
| **Other Weed Species Control** |
| <u>Woody</u>:  N/A |
| <u>Herbaceous</u>:  Many weeds, including Russian knapweed, are prevalent in the area and should be monitored to ascertain the need for control. |
| **Monitoring & Maintenance** |
| This site will be difficult to access, incurring additional costs. This should be closely considered before this project is undertaken. Site visits should be planned twice a year for three years and then once per year for the next seven years. |

Recommended Site 82

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $14,360 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 30% | $782 |
| Multiplier for Access or Other  Issues | 20% | $3,028 |
| Monitoring and Maintenance for 3-5 years | 25% | $4,543 |
| | **Total Cost** | **$22,713** |

Recommended Site 84

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $4,038 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 50% | $284 |
| Revegetated Area | 50% | $370 |
| Multiplier for Access or | 20% | $938 |

BLM_0066065

| Other Issues | | |
|---|---|---|
| Monitoring and Maintenance for 3-5 years | 25% | $1,408 |
| | **Total Cost** | **$7,038** |

BLM_0066066

## UNCOMPAGHRE BLM FIELD OFFICE

**DOLORES RIVER SEGMENT 9**
**Slick Rock Canyon, RM 85.5 to the end of RM 97**
**Maps:** DR21, DR22, DR23, DR24

This latter portion of Slick Rock Canyon is not a high priority area for tamarisk removal and restoration efforts. The segment is an ideal candidate for biological control coupled with monitoring for the following reasons. Much of this reach is extremely remote and can be accessed only by boat, on horseback, or on foot, though there is a primitive road along several miles at the end of the canyon. This access difficulty significantly increases the costs of control, restoration, monitoring, and maintenance activities (Table 2: Criteria C). Additionally, salt deposits and vegetation indicated that the soils in this section, which is all below Coyote Creek, are saline. Tamarisk stands increase in this portion of the canyon even though the narrow walls in the upper portion of this segment increase the likelihood of overbank flooding and should increase overall riparian vegetation health. Best management practices (BMPs) for passive or active revegetation in such remote and saline conditions are not well defined (Table 2: Criteria D).

However, there are many river runner campsites in the area currently threatened by increased fire danger due to tamarisk presence and that will be significantly less appealing as the leaf beetle defoliates tamarisk. Though the time frame in which flows allow rafters to visit the area is relatively short, there can be large numbers that move through the area. If they avoid leaf beetle degraded sites and move into native vegetation for shade they could cause damage, delaying positive native vegetation response.

Thus, a pilot project at one of these campsites to refine BMPs for restoration in the area would be beneficial if adequate funds are made available for invasive control, monitoring, maintenance and necessary revegetation. The Recommended Sites listed below describe campsite locations available for such a project.

The first nine miles of tamarisk infestation in this section is a continuous strip of light to moderate density. At mile 95 the floodplain broadens and the tamarisk stands become wider and denser. In total there are approximately 180 acres of tamarisk in this segment.

Russian knapweed and Siberian elm are present throughout the reach, particularly in the latter portion. The Montrose County weed manager also identified hoary cress, and Canada thistle as species of concern for this area.

Native vegetation interspersed with tamarisk in this section includes coyote willow, New Mexico privet, phragmites, sage, greasewood, and three-leaf sumac. Fremont cottonwood, boxelder, woods rose, redosier dogwood, juniper, and Gambles oak also occur at a lower frequency. The density of the native vegetation declines as the tamarisk infestation increases around mile 94.

BLM_0066067

The entire section is BLM owned and managed by the Uncompahgre Field Office. River miles 85 to 95 are within a wilderness study area. As a result, special restrictions apply to the tamarisk control and restoration methods allowed in these areas.

There is little to no cattle grazing upstream of river mile 97 although beaver and other wildlife is likely present. Restoration work should consider the possibility of such predation and of the impact of cattle below mile 97.

**Recommended Site 86**
Acreage:  2.05
Landowner:  Bureau of Land Management; Uncompahgre Field Office
Map:  DR21; 3_PS 86

This site is located at the mouth of Coyote Wash just past river mile 85. Three campsites are located in the area near dense tamarisk stands. Though several New Mexico privet and some native grasses are present, there is not a large native seed source. Additionally, the salty soils in this area will make revegeation a challenge.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – Heightened activities around campsites present a greater risk of tamarisk wildfire, especially considering the dense nature of tamarisk at this site.  Additionally, the camps would be more appealing if they supported native vegetation stands, particularly in light of potential beetle induced tamarisk defoliation. Shade is a factor to consider when revegetating such sites (Table 1: Criteria C & G).
- Restoration is likely to succeed because the site meets the following Feasibility Characteristics –
    o Funding is available:  Not yet determined
    o The Landowner is willing:  Likely
    o Site Access is Economically Feasible:  Possibly (depending on funding source)
    o A good Native Seed Source is present:  No

Recommended Site 86

| Control, Biomass Reduction, & Revegetation Approach |
| --- |
| **Tamarisk Control** |
| Control:  Hand cut-stump control |
| Biomass:   Stack away from the floodplain for wildlife habitat |
| Revegetation: |
| • Soil samples should be collected throughout the site. |
| • Consult experts in saline soil revegetation techniques. |
| • Seed with native grasses over the entire site to help reduce knapweed recruitment |
| • Mid-story plantings such as New Mexico privet should be planted as well as a shade producing species appropriate for the soil. |
| **Other Weed Species Control** |

BLM_0066068

Woody: N/A
Herbaceous: Russian knapweed should be controlled, to reduce competition with recruiting native plants (for more information see Appendix F.)
**Monitoring & Maintenance**
This site will be difficult to access, incurring additional costs. This should be closely considered before this project is undertaken. Site visits should be planned twice a year for three years and then once per year for the next seven years.

Recommended Site 86

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $8,135 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $819 |
| Revegetated Area | 100% | $1,907 |
| Multiplier for Access or Other Issues | 20% | $2,172 |
| Monitoring and Maintenance for 3-5 yrs | 30% | $3,910 |
| **Total Cost** | | **$16,943** |

**Recommended Site 89 & Recommended Site 91**
Recommended Site 89
Photos: 5.17.09_38, 5.17.09_39
Acreage: 1.10
Landowner: Bureau of Land Management; Uncompahgre Field Office
Map: DR22; 1_PS 89 & 91

On river left, in the middle of mile 89, a campsite is surrounded by a light infestation of tamarisk interspersed with coyote willow, phragmites, and New Mexico privet. Russian knapweed is also prevalent in the area. The sparse nature of this tamarisk infestation makes it less of a priority than campsites surrounded by denser stands.

Recommended Site 91
Acreage: 0.38
Landowner: Bureau of Land Management; Uncompahgre Field Office
Map: DR22; 1_PS 89 & 91

There is a light tamarisk infestation that surrounds a river left campsite on this site. Phragmites, coyote willow, and three-leaf sumac are present amongst the tamarisk. The sparse nature of this

BLM_0066069

tamarisk infestation makes it less of a Recommended than campsites surrounded by denser stands.

These sites were recommended for tamarisk removal for the following reasons:

- <u>The site would benefit from tamarisk control because</u> – Heightened activities around campsites present a greater risk of tamarisk wildfire. Additionally, the camps would be more appealing if they supported native vegetation stands, particularly in light of potential beetle induced tamarisk defoliation. Shade is a factor to consider when revegetating such sites (Table 1: Criteria C & G).
- <u>Restoration is likely to succeed because the site meets the following Feasibility Characteristics</u> –
  - o Funding is available: Not yet determined
  - o The Landowner is willing: Likely
  - o Site Access is Economically Feasible: Possibly (depending on funding source)
  - o A good Native Seed Source is present: Yes

Recommended Site 89 & 91

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control**<br>Control:  Hand cut-stump control<br>Biomass:  Stack away from the floodplain for wildlife habitat<br>Revegetation:  Closely monitor to determine if other revegetation is necessary<br>**Other Weed Species Control**<br>Woody:  N/A<br>Herbaceous:  Many weeds, including Russian knapweed, are prevalent in the area and should be monitored to ascertain the need for control.<br>**Monitoring & Maintenance**<br>This site will be difficult to access, incurring additional costs. This should be closely considered before this project is undertaken. Site visits should be planned twice a year for three years and then once per year for the next seven years. |

Recommended Site 89

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $1,666 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $439 |
| Multiplier for Access or Other  Issues | 20% | $421 |
| Monitoring and Maintenance for 3-5 yrs | 20% | $505 |

M - 40

BLM_0066070

| | | |
|---|---|---|
| **Total Cost** | | **$3,032** |

Recommended Site 91

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $581 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $153 |
| Multiplier for Access or Other  Issues | 20% | $147 |
| Monitoring and Maintenance for 3-5 yrs | 25% | $220 |
| **Total Cost** | | **$1,101** |

**Recommended Site 93 & Recommended Site 94**
<u>Recommended Site 93</u>
<u>Acreage</u>:  2.28
<u>Landowner</u>:  Bureau of Land Management; Uncompahgre Field Office
<u>Map</u>:  DR22, DR23; 2_PS 93 & 94

Two campsites occupy this site, located directly across the river from one another. Both are located among moderately dense tamarisk infestations. New Mexico privet, coyote willow, phragmites, greasewood, three-leaf sumac, and woods rose in the area provide a diverse native seed source.

<u>Recommended Site 94</u>
<u>Acreage</u>:  3.08
<u>Landowner</u>:  Bureau of Land Management; Uncompahgre Field Office
<u>Map</u>:  DR22, DR23; 2_PS 93 & 94

This site is located on river right just past river mile 93 and consists of a campsite surrounded by a moderate tamarisk infestation. Native seed sources in the area are light but include coyote willow, phragmites, and boxelder. The combination of moderately dense tamarisk stands presenting a real risk of wildfire and the retention of a diverse and substantial native seed source make this site a higher priority than some of the other campsite locations.

These sites were recommended for tamarisk removal for the following reasons:
- <u>The site would benefit from tamarisk control because</u> – Heightened activities around campsites present a greater risk of tamarisk wildfire.  Additionally, the camps would be more appealing if they supported native vegetation stands, particularly in light of

M - 41

potential beetle induced tamarisk defoliation. Shade is a factor to consider when revegetating such sites (Table 1: Criteria C & G).

- <u>Restoration is likely to succeed because the site meets the following Feasibility Characteristics</u> –
    - o Funding is available:  Not yet determined
    - o The Landowner is willing:  Likely
    - o Site Access is Economically Feasible:  Possibly (depending on funding source)
    - o A good Native Seed Source is present:  Yes

Recommended Site 93 & 94

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| <u>Control</u>:  Hand cut-stump control |
| <u>Biomass</u>:  Stack away from the floodplain for wildlife habitat |
| <u>Revegetation</u>:  Closely monitor to determine if other revegetation is necessary |
| **Other Weed Species Control** |
| <u>Woody</u>:  N/A |
| <u>Herbaceous</u>:  Many weeds, including Russian knapweed, are prevalent in the area and should be monitored to ascertain the need for control. |
| **Monitoring & Maintenance** |
| This site will be difficult to access, incurring additional costs. This should be closely considered before this project is undertaken. Site visits should be planned twice a year for three years and then once per year for the next seven years. |

Recommended Site 93

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $6,491 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $914 |
| Revegetated Area | 50% | $595 |
| Multiplier for Access or Other  Issues | 20% | $1,600 |
| Monitoring and Maintenance for 3-5 yrs | 25% | $2,400 |
| **Total Cost** | | **$12,000** |

Recommended Site 94

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $6,783 |

M - 42

| | | |
|---|---|---|
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $1,231 |
| Revegetated Area | 50% | $543 |
| Multiplier for Access or Other Issues | 20% | $1,711 |
| Monitoring and Maintenance for 3-5 yrs | 25% | $2,567 |
| **Total Cost** | | **$12,836** |

**Recommended Site 97**
Photo:  2006_57
Acreage:  6.97
Soil Samples:  4"- pH 7.1/slightly saline/sandy loam; 10" - pH 7.1/slightly saline/sandy loam
Landowner:  Partially private; Primarily Bureau of Land Management; Uncompahgre Field Office
Map:  DR24; 3_PS 97

Recommended Site 97 is located near the end of river mile 97.  This site is a boat launch and receives a great deal of public use.  Tamarisk infestations here are dense and native growth limited. Although coyote willow, New Mexico privet, sage, and various grasses are present. Revegetation, with particular consideration for shade trees, would be a large component of this project.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – The dense nature of the infestation by a highly used area creates a wildfire concern and removal would also improve aesthetics. Successful revegetation efforts would increase the recreational value of the site while providing a native seed source for the area (Table 1: Criteria C & G).
- Restoration is likely to succeed because the site meets the following Feasibility Characteristics –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Yes
  - A good Native Seed Source is present:  No

Recommended Site 97

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control**<br>Control:  Access to this site is excellent and allows the use of mechanical mulching equipment. If so a timber or hydro ax should be used to control 80% of the infestation. Hand |

BLM_0066073

cut-stump should be used for the remaining 20%.

Biomass:  80% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat.

Revegetation:
- Monitoring wells should be installed at the time of tamarisk removal.
- Grass seeding where mechanical control is used to compete with Russian knapweed.
- Willow bundles and/or pole plantings should be planted the winter following tamarisk removal.
- New Mexico privet and a shade tree such as boxelder or Fremont cottonwood should be planted as well.

**Other Invasive, Non-native Species of Concern**

Woody:  N/A

Herbaceous:  Russian knapweed should be controlled, to reduce competition with recruiting native plants (for more information see Appendix F.)

**Monitoring & Maintenance**

This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used plan to foliar spray tamarisk re-sprouts.

**Other Comments/Concerns**

This site is a candidate for educational signage because of proximity to boat launch.

Recommended Site 97

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $5,539 |
| Mechanical (mulching) | 80% | $4,589 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 100% | $2,789 |
| Revegetated Area | 100% | $6,494 |
| Multiplier for Access or Other  Issues | 20% | $3,882 |
| Monitoring and Maintenance for 3-5 years | 30% | $6,988 |
| **Total Cost** | | **$30,282** |

M - 44

BLM_0066074

**DOLORES RIVER SEGMENT 10**
**Paradox Valley, RM 97 to the end of RM 103**
**Maps:** DR24, DR25

The Dolores River runs through a broad, historic floodplain with many meanders and an oxbow in Paradox Valley. Cutting through a collapsed salt dome, the river has left many tall, cut banks and high benches with mature Fremont cottonwood galleries. However, there are still areas where young cottonwoods indicate a greater connection to the floodplain and potential for restoration of valuable vegetative communities. A large concern for this area is the soil salinity level. This should be considered in any area that revegetation is planned.  Access is good throughout this entire section.

Although there is no recommended site that addresses the salinity issue, it would be very beneficial to create several native seed source islands in this extensive tamarisk stands, especially in light of the tamarisk beetle (Table 1: Criteria F).  This would best be started as a pilot project to see how the high soil salinity in the area affects the revegetation project.

Tamarisk infestations, totaling approximately 250 acres, are significant and spread widely into upland habitat. Russian knapweed is a prevalent throughout the reach. The Montrose County weed manager also identified hoary cress, and Canada thistle as species of concern for this area.

Native vegetation interspersed with tamarisk in this section Fremont cottonwood, New Mexico privet, coyote willow, rabbitbrush, sage, and three-leaf sumac. Greasewood, sage, four-wing saltbush, and saltgrasses become the dominant native vegetation around river mile 100. While coyote willow is present here, it is much less prevalent than in other reaches leaving many tall, cut banks exposed.

The entire reach is privately owned and grazed. Restoration work should consider these potential impacts and the level of landowner cooperation. The Natural Resource Conservation Service promotes several private landowner grants that may be appropriate for this section.


**Recommended Site 99 A**
Photo:  2006_55
Acreage:  69.18
Soil Samples:  4"- pH 7.9/non-saline/sandy loam w/ thin clay layer; 10" - pH 6.9/non-saline/sandy loam
Landowner:  Privately owned
Map:  DR24; 1_PS 99A & 99B

Recommended Site 99A spans the end of river mile 98 and the start of river mile 99.  Consisting of a large, historic floodplain on river right, this project footprint supports dense areas of tamarisk mixed in with priority vegetation.  Native plants in the site area include Fremont cottonwoods (both mature trees and recruits) coyote willow, sage, rabbitbrush and some New Mexico privet.

BLM_0066075

This site was recommended for tamarisk removal for the following reasons:

- <u>The site would benefit from tamarisk control because</u> – There are native vegetative communities present that would benefit from decreased tamarisk competition. Tamarisk also presents a risk of crown fire in the cottonwoods. Mid-age cottonwoods indicate that this site may be somewhat hydraulically connected to the river (Table 1: Criteria A).
- <u>Restoration is likely to succeed because the site meets the following Feasibility Characteristics</u> –
  - o Funding is available: Not yet determined
  - o The Landowner is willing: Not yet determined
  - o Site Access is Economically Feasible: Yes
  - o A good Native Seed Source is present: Yes

Recommended Site 99 A

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| <u>Control</u>: Access to this site is excellent and allows the use of mechanical mulching equipment. If so a timber or hydro ax should be used to control 80% of the infestation. Hand cut-stump should be used for the remaining 20%. |
| <u>Biomass</u>: 80% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat. |
| <u>Revegetation</u>: |
| • Monitoring wells should be installed at the time of tamarisk removal. |
| • Grass seeding where mechanical control is used to compete with Russian knapweed. |
| • Willow bundles and/or pole plantings should be planted the winter following tamarisk removal. |
| • Mid-story plantings including New Mexico privet and three-leaf sumac. |
| **Other Invasive, Non-native Species of Concern** |
| <u>Woody</u>: N/A |
| <u>Herbaceous</u>: Russian knapweed should be controlled where mechanical control is used, to reduce competition with recruiting native plants (for more information see Appendix F.) |
| **Monitoring & Maintenance** |
| This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used plan to foliar spray tamarisk re-sprouts. |
| **Other Comments/Concerns** |
| Must consult with landowner to obtain cooperation for revegetation and control efforts. |

Recommended Site 99 A

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $36,570 |
| Mechanical (mulching) | 80% | $30,289 |
| Biomass Reduction by | 100% | 0 |

M - 46

BLM_0066076

| Natural Decomposition | | |
|---|---|---|
| Herbaceous Weed Control | 100% | $27,672 |
| Revegetated Area | 100% | $32,138 |
| Multiplier for Access or Other Issues | 20% | $25,334 |
| Monitoring and Maintenance for 3-5 years | 25% | $38,001 |
| | **Total Cost** | **$190,004** |

**Recommended Site 99 B**
Photo: 2006_55
Acreage: 17.57
Landowner: Privately owned
Map: DR24; 1_PS 99A & 99B

Recommended Site 99B is located across the river from site 99A on top of a bench that reaches the river via a tall cut bank. There are many mature cottonwoods this area and the stand of tamarisk is less dense. Some coyote willow, New Mexico privet, and three leaf sumac are also present. The tall cut bank may indicate that further cottonwood and other riparian species recruitment is unlikely and that the site should be revegetated as an upland site. Russian knapweed is present the area. This site should be considered a lower priority than those able to support riparian vegetation.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – There are native vegetative communities present that would benefit from decreased tamarisk competition. Tamarisk also presents a risk of crown fire in the cottonwoods (Table 1: Criteria A).
- Restoration is likely to succeed because the site meets the following Feasibility Characteristics –
    - Funding is available: Not yet determined
    - The Landowner is willing: Not yet determined
    - Site Access is Economically Feasible: Yes
    - A good Native Seed Source is present: Yes

Recommended Site 99 B

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| Control: Access to this site is excellent and allows the use of mechanical mulching equipment. If so a timber or hydro ax should be used to control 80% of the infestation. Hand cut-stump should be used for the remaining 20%. Control efforts on this site will be similar and can be included with control on site 99 A. |

BLM_0066077

Biomass:  80% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat.

Revegetation:
- Monitoring wells should be installed at the time of tamarisk removal.
- Grass seeding where mechanical control is used to compete with Russian knapweed.
- Willow bundles and/or pole plantings should be planted the winter following tamarisk removal.
- Closely monitor to determine if other revegetation is necessary

**Other Invasive, Non-native Species of Concern**

Woody:  N/A

Herbaceous:  Russian knapweed should be controlled where mechanical control is used, to reduce competition with recruiting native plants (for more information see Appendix F.)

**Monitoring & Maintenance**

This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used plan to foliar spray tamarisk re-sprouts.

**Other Comments/Concerns**

Must consult with landowner to obtain cooperation for revegetation and control efforts.

Recommended Site 99 B

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $7,746 |
| Mechanical (mulching) | 80% | $6,415 |
| Biomass Reduction by Mulching and Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 100% | $7,029 |
| Revegetated Area | 100% | $6,206 |
| Multiplier for Access or Other  Issues | 20% | $5,479 |
| Monitoring and Maintenance for 3-5 years | 25% | $8,219 |
| | **Total Cost** | **$41,093** |

**Recommended Site 100**

Photo:  2006_55

Acreage:  8.72

Landowner:  Privately owned

Map:  D24

M - 48

BLM_0066078

Recommended Site 100 is located at the end of river mile 100. Work is recommended for the left bank of the river. There is a section of dense tamarisk which threatens a fire risk to the stand of young cottonwood that is mixed in this site. Rabbitbrush is also prevalent at the site. There is Russian knapweed in the area which should be considered during revegetation efforts.

This site was recommended for tamarisk removal for the following reasons:
- <u>The site would benefit from tamarisk control because</u> – There are valuable young cottonwoods present that would benefit from decreased tamarisk competition. Tamarisk also presents a risk of crown fire in the cottonwoods. Young cottonwoods indicate that this site may be hydraulically connected to the river and could produce a next generation cottonwood gallery (Table 1: Criteria A).
- <u>Restoration is likely to succeed because the site meets the following Feasibility Characteristics</u> –
  - o Funding is available: Not yet determined
  - o The Landowner is willing: Not yet determined
  - o Site Access is Economically Feasible: Yes
  - o A good Native Seed Source is present: Yes

Recommended Site 100

| **Control, Biomass Reduction, & Revegetation Approach** |
|---|
| **Tamarisk Control** <br> <u>Control</u>: Access to this site is excellent and allows the use of mechanical mulching equipment. If so a timber or hydro ax should be used to control 80% of the infestation. Hand cut-stump should be used for the remaining 20%. <br> <u>Biomass</u>: 80% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat. <br> <u>Revegetation</u>: <br> • Monitoring wells should be installed at the time of tamarisk removal. <br> • Grass seeding where mechanical control is used to compete with Russian knapweed. <br> • Willow bundles and/or pole plantings should be planted the winter following tamarisk removal. <br> • Closely monitor to determine if other revegetation is necessary <br> **Other Invasive, Non-native Species of Concern** <br> <u>Woody</u>: N/A <br> <u>Herbaceous</u>: Russian knapweed should be controlled where mechanical control is used, to reduce competition with recruiting native plants (for more information see Appendix F.) <br> **Monitoring & Maintenance** <br> This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used plan to foliar spray tamarisk re-sprouts. <br> **Other Comments/Concerns** <br> Must consult with landowner to obtain cooperation for revegetation and control efforts. |

Recommended Site 100

BLM_0066079

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $7,788 |
| Mechanical (mulching) | 80% | $6,452 |
| Biomass Reduction by Mulching | 80% | 0 |
| Biomass Reduction by Natural Decomposition | 20% | 0 |
| Herbaceous Weed Control | 100% | $3,489 |
| Revegetated Area | 100% | $10,240 |
| Multiplier for Access or Other  Issues | 20% | $5,594 |
| Monitoring and Maintenance for 3-5 years | 30% | $10,069 |
| **Total Cost** | | **$43,632** |

M - 50

BLM_0066080

**DOLORES RIVER SEGMENT 11**
**Paradox Canyon, RM 103 to the end of RM 113**

This segment begins in a relatively broad canyon that narrows significantly where the San Miguel River enters at river mile 108. Here the hydrology also shifts as evidenced by the sharp increase in riparian vegetation. The section of Paradox Canyon below the San Miguel is a moderate priority for tamarisk control and restoration due to difficult access that would significantly increase the costs of control, restoration, monitoring, and maintenance activities (Table 2: Criteria C). Additionally, the narrow canyon walls here serve to constrict any high flows that occur, increasing the likelihood of overbank flooding and overall riparian vegetation health. As a result, these healthy vegetative communities are more likely to recover as the tamarisk leaf beetle stresses tamarisk, reducing its competitive edge. For these reasons, tamarisk biological control with associated monitoring is the preferred approach for this river section.

However, there are many riparian zones throughout the southwest affected by the tamarisk beetle that are only accessible by raft. It may be necessary or desirable to combine active tamarisk control and revegetation in some of these areas. It has been suggested that areas on the Dolores River, like Little Glen Canyon, would be ideal training grounds for raft based tamarisk management and restoration crews. For example, Recommended Site 54B is difficult to access but would greatly benefit from some active tamarisk control.

Thus, if adequate funds are made available for invasive control, monitoring, maintenance and necessary revegetation; Recommended Site 108 to 112.5, described below, would be appropriate for active restoration.

Tamarisk infestations in this section range from light to dense and occur in a near continuous, linear strip along both sides of the river. Russian knapweed is a large presence throughout the section and Russian olive, cheatgrass, and Siberian elm occur in river mile 113. The Montrose County weed manager also identified hoary cress, and Canada thistle as species of concern.

Native vegetation stands above the San Miguel are initially dominated by four-wing saltbush, mule-fat, alkali sacaton, sage, saltgrass, and sedges. These transition into New Mexico privet and three-leaf sumac communities with occasional juniper, phragmites, Fremont cottonwood, coyote willow, woods rose, and serviceberry. Below the confluence coyote willow, phragmites, New Mexico privet, three-leaf sumac, boxelder, woods rose, and occasional juniper dominate the area.

The entire reach is owned by the Bureau of Land Management and operated by the Uncompahgre Field Office excepting river mile 113 which is privately owned. Though the area is remote it does experience some cattle grazing pressure. Restoration work should consider the possibility of such predation and the level of landowner cooperation.

**Recommended Site 104**
Photo: 4.28.09_19 – 4.28.09_21, 2006_48
Acreage: 2.32

BLM_0066081

<u>Soil Samples</u>:  4"- pH 8.1/slightly saline/sandy loam w/ thin clay layer; 10" - pH 8.49/non-saline/sandy loam with coarser sand
<u>Landowner</u>:  Bureau of Land Management; Uncompahgre Field Office
<u>Map</u>:  RD26; 1_PS 104 & 105

Recommended Site 104 is located on river right at the end of river mile 104.  There is a small campsite here with a light infestation of tamarisk to the south and a moderate infestation to the north.  Natives in this area include four-wing saltbrush, sage, mule-fat, sedges, saltgrass, and alkali sacaton.  There is also Russian knapweed present.

This site was recommended for tamarisk removal for the following reasons:
- <u>The site would benefit from tamarisk control because</u> – There are native vegetative communities present that would benefit from decreased tamarisk competition (Table 1: Criteria A). The campsite/public use area would benefit for aesthetic reasons (Table 1: Criteria G). Although wildfire could be an issue the light nature of the tamarisk infestation keeps that concern at a minimum (Table 1: Criteria C).
- <u>Restoration is likely to succeed because the site meets the following Feasibility Characteristics</u> –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Yes
  - A good Native Seed Source is present:  Yes

Recommended Site 104

| **Control, Biomass Reduction, & Revegetation Approach** |
|---|
| **Tamarisk Control**<br><u>Control</u>:  Hand cut-stump should be used.<br><u>Biomass</u>:  The biomass should be stacked away from the floodplain for wildlife habitat.<br><u>Revegetation</u>:<br>• Monitoring wells should be installed at the time of tamarisk removal.<br>• Grass seeding where mechanical control is used to compete with Russian knapweed.<br>• Closely monitor to determine if other revegetation is necessary<br>**Other Invasive, Non-native Species of Concern**<br><u>Woody</u>:  N/A<br><u>Herbaceous</u>:  Russian knapweed should be controlled where mechanical control is used, to reduce competition with recruiting native plants (for more information see Appendix F.)<br>**Monitoring & Maintenance**<br>This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years.<br>**Other Comments/Concerns**<br>Must consult with landowner to obtain cooperation for revegetation and control efforts.  Also, as this campsite is not listed currently on area maps, it should be determined if protecting it is within the land management goals.  If so, this site might be a good candidate for an educational sign. |

BLM_0066082

Recommended Site 104

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $4,161 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 50% | $465 |
| Revegetated Area | 50% | $306 |
| Multiplier for Access or Other Issues | 20% | $986 |
| Monitoring and Maintenance for 3-5 years | 25% | $1,479 |
| | Total Cost | $7,397 |

**Recommended Site 105**
Photos:  4.28.09_24, 4.28.09_25, 2006_47
Acreage:  2.61
Landowner:  Bureau of Land Management; Uncompahgre Field Office
Map:  DR26; 1_PS 104 & 105

Recommended Site 105 is located in the middle of river mile 105. A portion of the site becomes an island at high water.  The site is dominated by New Mexico privet and three-leaf sumac with some light tamarisk.  There are also a variety of native grasses and sedges present, as well as phragmites, mule-fat and some juniper. The tamarisk infestation increases toward the upstream end of the site and access also becomes more difficult.  There are a few campsites (fire rings) at this site and some evidence of grazing.

This site was recommended for tamarisk control for the following reasons:
- The site would benefit from tamarisk control because – This site has valuable native vegetation, primarily New Mexico privet, which would benefit from reduced competition following tamarisk removal Table 1: Criteria A).  This site is used by campers which increase the risk of fire, although the light tamarisk infestation makes this less of a concern (Table 1: Criteria C).
- Restoration is likely to succeed because the site meets the following Feasibility Characteristics –
  - o Funding is available:  Not yet determined
  - o The Landowner is willing:  Likely
  - o Site Access is Economically Feasible:  Yes
  - o A good Native Seed Source is present:  Yes

Recommended Site 105

BLM_0066083

| Control, Biomass Reduction, & Revegetation Approach |
| --- |
| **Tamarisk Control**<br>Control:  Hand cut-stump is most appropriate due to accessibility and to preserve existing native plants.<br>Biomass:  Brush should be piled outside of the floodplain for wildlife habitat<br>Revegetation:  The site should be monitored carefully to ensure that native species are recruiting.<br>**Other Weed Species Control**<br>Woody: N/A<br>Herbaceous:  Closely monitor the knapweed infestation to ascertain whether control is necessary.<br>**Monitoring & Maintenance**<br>This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years.<br>**Other Comments/Concerns**<br>This site is a candidate for educational signage because of the campsites. |

Recommended Site 105

| Estimated Costs | | |
| --- | --- | --- |
| Hand Control | 100% | $3,961 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 20% | 209 |
| Multiplier for Access or Other  Issues | 20% | $834 |
| Monitoring and Maintenance for 3-5 years | 20% | $1,001 |
| **Total Cost** | | **$6,004** |

**Recommended Site 105A & Recommended Site 106**
Recommended Site 105A
Photos:  2006_47, 2006_46
Acreage:  2.05
Landowner:  Bureau of Land Management; Uncompahgre Field Office
Map:  DR26; 1.5_PS 105A, 106, 108

Recommended Site 106
Photos:  4.28.09_26, 4.28.09_27, 2006_45, 2006_46
Acreage:  1.33
Landowner:  Bureau of Land Management; Uncompahgre Field Office
Map:  DR26; 1.5_PS 105A, 106, 108

BLM_0066084

Recommended Site 105A is located on river left towards the end of river mile 105. It has poor access and a light to moderate tamarisk stand mixed with some New Mexico privet, poison ivy, and a few Fremont cottonwoods. Site 106 is an island campsite surrounded by a light tamarisk stand with some coyote willow and other shrubs. Native seed sources at both locations are sufficient to expect significant natural recruitment

These sites were recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – Heightened activities around campsites present a greater risk of tamarisk wildfire, although the light infestations here make fire less of a concern (Table 1: Criteria C). Additionally, the camps would be more appealing if they supported native vegetation stands, particularly in light of potential beetle induced tamarisk defoliation. Shade is a factor to consider when revegetating such sites (Table 1: Criteria G).
- Restoration is likely to succeed because the site meets the following Feasibility Characteristics –
  - Funding is available: Not yet determined
  - The Landowner is willing: Likely
  - Site Access is Economically Feasible: Yes
  - A good Native Seed Source is present: Yes

**Recommended Site 105A & 106**

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| Control: Hand cut-stump control |
| Biomass: Stack away from the floodplain for wildlife habitat |
| Revegetation: Closely monitor to determine if other revegetation is necessary |
| **Other Weed Species Control** |
| Woody: N/A |
| Herbaceous: Many weeds, including Russian knapweed, are prevalent in the area and should be monitored to ascertain the need for control. |
| **Monitoring & Maintenance** |
| This site will be difficult to access, incurring additional costs. This should be closely considered before this project is undertaken. Site visits should be planned twice a year for three years and then once per year for the next seven years. |

Recommended Site 105 A

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $4,526 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $821 |
| Revegetated Area | 50% | $363 |

BLM_0066085

| Multiplier for Access or Other Issues | 20% | $1,142 |
|---|---|---|
| Monitoring and Maintenance for 3-5 yrs | 25% | $1,713 |
| | **Total Cost** | **$8,564** |

Recommended Site 106

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $2,933 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $532 |
| Revegetated Area | 50% | $235 |
| Multiplier for Access or Other Issues | 20% | $740 |
| Monitoring and Maintenance for 3-5 yrs | 25% | $1,110 |
| | **Total Cost** | **$5,551** |

**Recommended Site 108**
Photos:  2006_40, 2006_41, 4.28.09_28, 4.28.09_29
Acreage:  3.10
Landowner:  Bureau of Land Management; Uncompahgre Field Office
Map:  DR26; 1.5_PS 105A, 106, 108

Recommended Site 108 is a roadside campsite on river right just downstream of river mile 107. Here a moderate tamarisk stand is interspersed with some New Mexico privet, mule-fat, and sage with light levels of three-leaf sumac and woods rose.  There are a few campsites (fire rings) at this site and some evidence of grazing.

This site was recommended for tamarisk control for the following reasons:
- The site would benefit from tamarisk control because – This site has valuable native vegetation, primarily New Mexico privet, that would benefit from reduced competition and fire risk following tamarisk removal (Table 1: Criteria A).  This site is used by campers which increase the risk of fire (Table 1: Criteria C).
- Restoration is likely to succeed because the site meets the following Feasibility Characteristics –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Yes

M - 56

BLM_0066086

o   A good Native Seed Source is present:  Yes

Recommended Site 108

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control**<br>Control:  Access to this site is excellent and allows the use of mechanical mulching equipment. If so a timber or hydro ax should be used to control 80% of the infestation. Hand cut-stump should be used for the remaining 20%.<br>Biomass:  80% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat.<br>Revegetation:<br>• Grass seeding where mechanical control is used to compete with Russian knapweed.<br>• Closely monitor to determine if other revegetation is necessary<br>**Other Weed Species Control**<br>Woody:  N/A<br>Herbaceous:  Russian knapweed should be controlled where mechanical control is used, to reduce competition with recruiting native plants (for more information see Appendix F.)<br>**Monitoring & Maintenance**<br>This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used plan to foliar spray tamarisk re-sprouts.<br>**Other Comments/Concerns**<br>This site is a candidate for educational signage because of the campsites. |

Recommended Site 108

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $2,127 |
| Mechanical | 80% | $1,762 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $1,240 |
| Revegetated Area | 50% | $2,212 |
| Multiplier for Access or Other  Issues | 20% | $1,468 |
| Monitoring and Maintenance for 3-5 yrs | 25% | $2,203 |
| | **Total Cost** | **$11,013** |

**Recommended Site 108 to 112.5**
Photo:  5.19.09_77 – 5.19.09_78; 2006_18 – 2006_24

M - 57

BLM_0066087

Acreage:  40.10
Landowner:  Bureau of Land Management, Uncompahgre Field Office
Maps:  DR26, DR17; 2_PS 108-112.5_1 – 4_PS 108-112.5_3

This Recommended Site encompasses the narrow, inaccessible canyon from the San Miguel River confluence to the boat ramp around river mile 112.5. The tamarisk infestation here ranges from extremely light, patchy infestations to mid-size, dense stands. Even these dense stands however are surrounded by substantial native seed sources consisting of New Mexico privet, coyote willow, phragmites, woods rose, and three-leaf sumac as well as a few boxelder, sages, and juniper. This section is remote but short and enjoys the higher, more consistent flows due to the San Miguel River. As a result it is one of the more accessible canyon areas along the river. This site is an ideal candidate for biological control and associated monitoring.  However, if a rafting demonstration project was conducted; active tamarisk control, monitoring, and maintenance here could be completed via boat or on foot.

This site was recommended for tamarisk control for the following reasons:
- The site would benefit from tamarisk control because – This site has valuable native vegetation, primarily New Mexico privet, which would benefit from reduced competition and fire risk following tamarisk removal (Table 1: Criteria A).  This site is used by campers which increase the risk of fire (Table 1: Criteria C).
- Restoration is likely to succeed because the site meets the following Feasibility Characteristics –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Possibly (depending on funding source)
  - A good Native Seed Source is present:  Yes

Recommended Site 108 to 112.5

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| Control:  Hand cut-stump with herbicide application to achieve eradication. |
| Biomass:  Stack outside of floodplain for wildlife habitat. |
| Revegetation:  Natural recruitment. |
| **Other Invasive, Non-native Species of Concern** |
| Woody:  The few existing Siberian elm and Russian olive at the downstream end should be controlled in concert with tamarisk. |
| Herbaceous:  Russian knapweed is prevalent in the area and should be monitored to ascertain if control is necessary. |
| **Monitoring** |
| This area should be monitored for tamarisk re-sprouts or recruits once a year for three years and then once every three years. |

Recommended Site 108 to 112.5

| Estimated Costs |
|---|

M - 58

BLM_0066088

| | | |
|---|---|---|
| Hand Control | 100% | $96,468 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $16,039 |
| Revegetated Area | 50% | $8,064 |
| Multiplier for Access or Other  Issues | 20% | $24,114 |
| Monitoring and Maintenance for 3-5 yrs | 25% | $36,171 |
| **Total Cost** | | **$180,856** |

M - 59

BLM_0066089

**RIVER SEGMENT 12 –**
**Highway 141, RM 113 to the end of 118**
**Maps:** DR28, DR29

There are many recommended sites in this relatively short segment. This is largely due to the several wide floodplain areas that support valuable Fremont cottonwood galleries and excellent access afforded by Highway 141. A past tamarisk removal site on river right, just past river mile 116, has cleared much of one such cottonwood understory. Though not quite to the point of ideal restoration, the site is much improved and serves as an example of the possibilities in this section.

The tamarisk stands in this segment are large and dense, though a few moderate stands exist. Russian knapweed and Siberian elm occur in the area and should be considered in any restoration projects. The Montrose County weed manager also identified hoary cress, and Canada thistle as species of concern.

Many of the tamarisk infestations occur in the understory of Fremont cottonwood mixed in with coyote willow, New Mexico privet, three-leaf sumac, mule-fat, woods rose and various grasses.

Approximately four river miles of this section are privately owned; the remainder is owned by the Bureau of Land Management and operated by the Uncompahgre Field Office. There is significant cattle's grazing in the area. Restoration work should consider the possibility of such predation as well as beaver and other wildlife impacts as well as the level of landowner cooperation.

As this section occurs along Highway 141 it is important to note that any work performed within 50 feet of the road's centerline may be within the state highway right of way. In such areas permission for restoration activities need to be obtained from the Colorado Department of Transportation (CDOT) State Right of Way Access Permit Office. Additionally, CDOT has established a clear zone that exists within 30 feet of the center line where no tall vegetation should be planted.

**Recommended Site 114A**
Photos:  4.28.09_33 - 4.28.09_35, 2006_25
Acreage:  16.66
Soil Samples:  4" – pH 8/non-saline/sandy loam; 10" – pH 8.1/non-saline/sand with a clay layer
Landowner:  Primarily privately owned, partially owned by Bureau of Land Management, Uncompahgre Field Office
Maps:  DR28; 1_PS 114A, 114B, & 114C

Recommended Site 114A is located on river right in a river bend in the first third of river mile 114. This property is privately owned, and preliminary conversations with the landowner, indicate an enthusiasm for tamarisk removal. This site features some older cottonwoods and healthy looking willow swales; it does not appear that new cottonwoods are recruiting here. A portion of this site would fall into the state right of way and the State Right of Way Access Permit Office will need to be contacted.

M - 60

BLM_0066090

This site was recommended for tamarisk control for the following reasons:

- <u>The site would benefit from tamarisk control because</u> – The existing cottonwoods at this site would benefit from reduced competition and fire risk following tamarisk removal (Table 1: Criteria A).
- <u>Restoration is likely to succeed because the site meets the following Feasibility Characteristics</u> –
  - o Funding is available:  Not yet determined
  - o The Landowner is willing:  Likely
  - o Site Access is Economically Feasible:  Yes
  - o A good Native Seed Source is present:  Yes but it is limited

Recommended Site 114A

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control**<br>Control:  A timber or hydro ax should be used to control 80% of the infestation. Hand cut-stump should be used for the remaining 20%.<br>Biomass:  80% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat.<br>• Monitoring well should be installed at time of tamarisk removal<br>• Native grass seeding with salt-tolerant species<br>• Rabbitbrush, New Mexico privet and three-leaf sumac would be appropriate at this site.  Depending on depth to groundwater, tall pots could be used or conventional nursery stock may be used with temporary irrigation.<br>**Other Weed Species Control**<br>Woody:  There are a few Siberian elms on site that should be cut-stump treated when tamarisk is removed.<br>Herbaceous:  There is a significant infestation of Russian knapweed and kochia that will need to be controlled to reduce competition with establishing native plants.<br>**Monitoring & Maintenance**<br>This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used plan to foliar spray tamarisk re-sprouts.<br>**Other Comments/Concerns**<br>Further contact should be made with the landowner to determine his willingness to cooperate in aspects of the project beyond tamarisk removal including monitoring, maintenance, revegetation, and possible temporary limitation of grazing. |

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $14,875 |

BLM_0066091

| | | |
|---|---|---|
| Mechanical Mulching | 80% | $12,323 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 50% | $3,332 |
| Revegetated Area | 50% | $9,778 |
| Multiplier for Access or Other  Issues | 20% | $8,062 |
| Monitoring and Maintenance for 3-5 years | 30% | $14,511 |
| **Total Cost** | | **$62,881** |

**Recommended Site 114B & Recommended Site 114C**
Recommended Site 114B
Photos:  4.28.09_37, 4.28.09_39, 2006_26
Acreage:  11.39
Landowner:  Primarily privately owned, partially owned by Bureau of Land Management, Uncompahgre Field Office
Maps:  DR28; 1_PS 114A, 114B, & 114C

Recommended Sites 114C
Photos:  4.28.09_40, 2006_27
Acreage:  5.49
Landowner:  Primarily privately owned, partially owned by Bureau of Land Management, Uncompahgre Field Office
Maps:  DR28; 1_PS 114A, 114B, & 114C

Recommended Sites 114B and 114C are located on river right and span the latter half of river mile 114 and edges into river mile 115.  There is a steep bank from the edge of the road (Highway 141) down to 114B, and a small road would need to be cut in order to access the site with mechanical equipment.  Both properties are privately owned. Preliminary conversations with the owner indicate an enthusiasm for tamarisk removal.  There is a small, campsite on the downstream end of site 114C.  An on-the-ground- assessment was not possible on the upstream area of the site as access was cut off due to flooding.  There is a substantial amount of New Mexico privet, three-leaf sumac and willow on this site.  However, there are also significant amounts of herbaceous weeds including knapweed, white-top or hoary cress and Canada thistle. A portion of these sites would fall into the state right of way and the State Right of Way Access Permit Office will need to be contacted.

These sites were recommended for tamarisk control for the following reasons:
- The site would benefit from tamarisk control because – There are native species on the sites including New Mexico privet, cottonwood and three-leaf sumac that would benefit from reduced competition and fire risk following tamarisk removal. The site seems to

BLM_0066092

have good hydrologic connectivity, particularly on the downstream end (Table 1: Criteria A).

- <u>Restoration is likely to succeed because the site meets the following Feasibility Characteristics</u> –
    - o Funding is available:  Not yet determined
    - o The Landowner is willing:  Likely
    - o Site Access is Economically Feasible:  Yes
    - o A good Native Seed Source is present:  Yes

Recommended Site 114B and 114C

| Control, Biomass Reduction, & Revegetation Approach |
| --- |
| **Tamarisk Control** <br> <u>Control</u>:  A timber or hydro ax should be used to control 80% of the infestation. Hand cut-stump should be used for the remaining 20%. <br> <u>Biomass</u>:  80% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat. <br> <u>Revegetation</u>: <br> • Monitoring well should be installed at time of tamarisk removal. <br> • Plant with New Mexico privet and three-leaf sumac. Depending on depth to groundwater, tall pots could be used or conventional nursery stock may be used with temporary irrigation. <br> • Grass seeding over the entire site to compete with herbaceous weeds <br> • Willow bundles and pole plantings should be planted along the bank and areas with high groundwater. <br> **Other Weed Species Control** <br> <u>Woody</u>:  There is a small amount of Siberian elm present at the site that should be cut-stump treated at the time of tamarisk removal <br> <u>Herbaceous</u>:  Infestations of Russian knapweed, hoary cress (white-top) and Canada thistle should be controlled to reduce competition with establishing native plants. <br> **Monitoring & Maintenance** <br> This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used plan to foliar spray tamarisk re-sprouts. <br> **Other Comments/Concerns** <br> Further contact should be made with the landowner to determine his willingness to cooperate in aspects of the project beyond tamarisk removal including monitoring, maintenance, revegetation, and possible temporary limitation of grazing. |

Recommended Site 114B

| Estimated Costs | | |
| --- | --- | --- |
| Hand Control | 20% | $9,047 |
| Mechanical Mulching | 80% | $7,494 |
| Biomass Reduction by | 100% | 0 |

BLM_0066093

| Natural Decomposition | | |
|---|---|---|
| Herbaceous Weed Control | 60% | $2,733 |
| Revegetated Area | 50% | $5,303 |
| Multiplier for Access or Other Issues | 20% | $4,915 |
| Monitoring and Maintenance for 3-5 years | 30% | $8,848 |
| **Total Cost** | | **$38,340** |

Recommended Site 114C

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $4,360 |
| Mechanical Mulching | 80% | $3,612 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 60% | $1,317 |
| Revegetated Area | 50% | $2,555 |
| Multiplier for Access or Other Issues | 20% | $2,369 |
| Monitoring and Maintenance for 3-5 years | 30% | $4,264 |
| **Total Cost** | | **$18,476** |

**Recommended Site 116**
Photos:  4.28.09_48 – 4.28.09_51, 2006_29
Acreage:  11.96
Landowner:  Primarily privately owned, partially owned by Bureau of Land Management, Uncompahgre Field Office
Map:  DR29; 2_116, 117A, & 117B

This site consists of large, dense tamarisk stands on the inside of a curve on Highway 141. A portion of the tamarisk also surrounds a private campground. Low levels of native vegetation are mixed into the tamarisk including New Mexico privet, coyote willow, and mule-fat. A portion of this site would fall into the state right of way and the State Right of Way Access Permit Office will need to be contacted.

These sites were recommended for tamarisk control for the following reasons:

M - 64

BLM_0066094

- <u>The site would benefit from tamarisk control because</u> – Removing tamarisk along the road will increase visibility, improving both safety and aesthetics (Table 1: Criteria C & G). Although only limited native vegetation, low growing shrubs or grasses, can be planted within 30 feet of the highway center line, this would be an improvement.
- <u>Restoration is likely to succeed because the site meets the following Feasibility Characteristics</u> –
  - o Funding is available:  Possible help from CDOT weed program
  - o The Landowner is willing:  Not yet determined
  - o Site Access is Economically Feasible:  Yes
  - o A good Native Seed Source is present:  No

Recommended Site 116

| **Control, Biomass Reduction, & Revegetation Approach** |
| --- |
| **Tamarisk Control**<br>Control:  A timber or hydro ax or feller buncher (depending on the bank's steepness) should be used to control the infestation within 30 feet of the road. Some fire/river viewing breaks could be made to the river.<br>Biomass:  The biomass will be mulched in the removal process if mulching equipment is used. If the feller buncher is used the biomass should be burned if the landowner agrees.<br>Revegetation:<br>• Grass seeding within 30 feet of the center line<br>• If swaths are cut to the river:<br>    • Monitoring well should be installed at time of tamarisk removal.<br>    • Plant with New Mexico privet and three-leaf sumac. Depending on depth to groundwater, tall pots could be used or conventional nursery stock may be used with temporary irrigation.<br>    • Willow bundles and pole plantings should be planted along the bank and areas with high groundwater.<br>**Other Weed Species Control**<br>Woody:  N/A<br>Herbaceous:  Infestations of Russian knapweed should be controlled to reduce competition with establishing native plants.<br>**Monitoring & Maintenance**<br>This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used play to foliar spray tamarisk re-sprouts.<br>**Other Comments/Concerns**<br>Further contact should be made with the landowner to determine his willingness to cooperate in aspects of the project beyond tamarisk removal including monitoring, maintenance, revegetation, and possible temporary limitation of grazing. |

Recommended Site 116

| **Estimated Costs** |
| --- |

BLM_0066095

| | | |
|---|---|---|
| Mechanical - Mulching | 20% | $2,212 |
| Mechanical – Grab and Cut Stump | 30% | $2,449 |
| Biomass Reduction – Mechanical Mulching | 50% | $832 |
| Biomass Reduction – Natural Decomposition | 50% | $0 |
| Herbaceous Weed Control | 50% | $2,392 |
| Revegetated Area | 50% | $7,019 |
| Multiplier for Access or Other Issues | 20% | $2,981 |
| Monitoring and Maintenance for 3-5 yrs | 30% | $5,365 |
| **Total Cost** | | **$23,249** |

**Recommended Site 117 A**

Acreage:  30.84

Landowner:  Private and Uncompahgre BLM Field Office

Map:  DR29

Recommended Site 117A is located on river left at the start of river mile 117.  The site is characterized by dense tamarisk mixed in with young cottonwoods, indicating a good hydrologic connection.  This section of the river was surveyed by car and as this site is inaccessible except by raft, an on-the-ground assessment was not possible.

This site was recommended for tamarisk control for the following reasons:

- The site would benefit from tamarisk control because – Cottonwoods present at this site would benefit from reduced competition and fire risk following tamarisk removal. Additionally young cottonwoods at the site suggest good hydrologic connectivity (Table 1: Criteria A).
- Restoration is likely to succeed because the site meets the following Feasibility Characteristics –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Possibly (depending on funding source)
  - A good Native Seed Source is present:  Yes

Recommended Site 117A

**Control, Biomass Reduction, & Revegetation Approach**

BLM_0066096

**Tamarisk Control:**\
Control:  Hand cut-stump treat tamarisk around the bases of cottonwoods.  This will aid in reducing the risk of fire killing the cottonwoods
Biomass:  Pile cut tamarisk outside of the floodplain for wildlife habitat
Revegetation:  Seed with native grasses in areas where tamarisk and other weeds are controlled to reduce likelihood of reinvasion
**Other Weed Species Control**
Woody:  N/A
Herbaceous:  Knapweed is likely present on this site and should be controlled to prevent further infestation following tamarisk removal.
**Monitoring & Maintenance**
This site is not easily accessed for monitoring and maintenance.  Site visits should be planned at least once a year for the next ten years.

Recommended Site 117A

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $24,502 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 20% | $2,467 |
| Revegetated Area | 20% | $5,745 |
| Multiplier for Access or Other  Issues | 20% | $6,543 |
| Monitoring and Maintenance for 3-5 years | 30% | $11,777 |
| | **Total Cost** | **$51,034** |

**Recommended Site 117B**
Photos:  2006_30
Acreage:  32.14
Landowner:  Primarily privately owned, partially owned by Bureau of Land Management, Uncompahgre Field Office
Map:  DR29; 2_116, 117A, & 117B

Recommended Site 117B is located on river right and spans the downstream half of river mile 117.  Just downstream of this site, a tamarisk removal project has cleared much of the infestation beneath a cottonwood gallery. The site is posted as private property and as such an on-the-ground assessment was not possible.  The property owner should be contacted and a more thorough assessment of this portion of the site should be done before any work is planned.  This site is distinguished throughout by young cottonwoods which suggest that the hydrologic function of the site is good.  In addition, the previous tamarisk removal done on a portion of the

BLM_0066097

site suggests that the landowner would be cooperative.  The land owner may also be able to apply for a Natural Resource Conservation Service EQUIP grant.

This site was recommended for tamarisk control for the following reasons:
- <u>The site would benefit from tamarisk control because</u> – There are young cottonwoods on this site that would benefit from reduced competition and fire risk following tamarisk removal. The young cottonwoods at this site suggest that hydrologic function here is good (Table 1: Criteria A).
- <u>Restoration is likely to succeed because the site meets the following Feasibility Characteristics</u> –.
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Yes
  - A good Native Seed Source is present:  Yes

Recommended Site 117B

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| <u>Control</u>:  A timber or hydro ax should be used to control 80% of the infestation. Hand cut-stump should be used for the remaining 20%. |
| <u>Biomass</u>:  80% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat. |
| <u>Revegetation</u>:  Site should be monitored carefully to determine if there are sufficient densities of native species to allow for passive revegetation. |
| **Other Weed Species Control** |
| <u>Woody</u>:  N/A |
| <u>Herbaceous</u>: Knapweed occurs here and should be controlled to reduce competition with recruiting native plants. |
| **Monitoring & Maintenance** |
| This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used plan to foliar spray tamarisk re-sprouts. |

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $25,535 |
| Mechanical Mulching | 80% | $21,153 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 50% | $6,429 |
| Revegetated Area | 25% | $7,484 |
| Multiplier for Access or | 20% | $12,120 |

M - 68

BLM_0066098

| Other Issues | | |
|---|---|---|
| Monitoring and Maintenance for 3-5 years | 30% | $21,816 |
| | **Total Cost** | **$94,537** |

BLM_0066099

## GRAND JUNCTION FIELD OFFICE

**RIVER SEGMENT 13**
**Highway 141, RM 118 to the end of RM 141**
**Maps:** DR29, DR30, DR31, DR32, DR33, DR34

This river segment supports a narrow floodplain along Highway 141 through constricted canyons. Of the twelve priority sites located in this twenty-three mile section, seven were chosen due the location of a campsite, four due to their location on the inside of a sharp turn, and only one due to a stand of priority vegetation.

Although there is no recommended site that addresses this issue, it would be beneficial to create several native seed source islands in this extensive tamarisk stands from river mile 34 to 38, especially in light of the tamarisk beetle (Table 1: Criteria F).

Tamarisk infestations occur in near continuous, linear stretches on either side of the river. The majority of these infestations are narrow though there are some wider areas. Russian knapweed and Siberian elm are prevalent throughout the section. In Montrose County (upstream of river mile 125) hoary cress and Canada thistle are also of concern. In Mesa County (downstream of river mile 125) hoary cress may also be present.

New Mexico privet, boxelder, coyote willow, and phragmites occur frequently amongst the tamarisk stands in this section. Three leaf sumac, rabbitbrush, sage, mule-fat, four-wing saltbush, juniper, and native grasses are also present. There are only a few areas where Fremont cottonwoods occur along this stretch.

Approximately nine river miles of this section are privately owned; the remainder is owned by the Bureau of Land Management and operated by the Grand Junction Field Office. There are significant cattle grazing in the area. Restoration work should consider the possibility of grazing, beaver and other wildlife impacts. Landowner cooperation will also be important to ascertain.

As this section occurs along Highway 141 it is important to note that any work performed within 50 feet of the road's centerline may be within the state highway right of way. In such areas permission for restoration activities need to be obtained from the State Right of Way Access Permit Office. Additionally, a clear zone exists within 30 feet of the center line where no tall vegetation should be planted.

**Recommended Site 120**
Photo: 4.28.09_64, 2006_35
Acreage: 10.99
Landowner: Bureau of Land Management; Grand Junction Field Office
Map: DR29; 0_PS 120,121

This site spans both sides of the river. On river left, a light tamarisk infestation occurs in the understory of Siberian elms. Access here is good. A campsite on river right is surrounded by

BLM_0066100

dense tamarisk and has poor access. New Mexico privet, boxelder, coyote willow, and phragmites are also present in both areas. Native seed sources on river left are much better than those on the right. A portion of the river left site would fall into the state right of way and the State Right of Way Access Permit Office will need to be contacted.

These sites were recommended for tamarisk removal for the following reasons:

- The site would benefit from tamarisk control because – Heightened activities around campsites present a greater risk of tamarisk wildfire (Table 1: Criteria C). Additionally, the camp would be more appealing if it supported native vegetation stands, particularly in light of potential beetle induced tamarisk defoliation. Shade is a factor to consider when revegetating such sites. Additionally, eliminating tamarisk and Siberian elm on river left would increase highway safety and aesthetics (Table 1: Criteria G).
- Restoration is likely to succeed because the site meets the following Feasibility Characteristics –
  - o Funding is available: Not yet determined
  - o The Landowner is willing: Likely
  - o Site Access is Economically Feasible: Yes
  - o A good Native Seed Source is present: Yes, on river left

Recommended Site 120

| Control, Biomass Reduction, & Revegetation Approach |
| --- |
| **Tamarisk Control** |
| Control: River Left – Feller buncher (30%); River Right - Hand cut-stump control around the campsite (70%) |
| Biomass: Mulch areas in which feller buncher is used. Stack remaining biomass away from the floodplain for wildlife habitat |
| Revegetation: Closely monitor to determine if other revegetation is necessary |
| **Other Weed Species Control** |
| Woody: Siberian elm should be controlled |
| Herbaceous: Many weeds, including Russian knapweed, are prevalent in the area and should be monitored to ascertain the need for control. |
| **Monitoring & Maintenance** |
| Part of this site will be difficult to access, incurring additional costs. This should be closely considered before this project is undertaken. Site visits should be planned twice a year for three years and then once per year for the next seven years. |

Recommended Site 120

| Estimated Costs | | |
| --- | --- | --- |
| Hand Control | 70% | $25,867 |
| Mechanical – Grab and Cut-Stump | 30% | $1,770 |
| Biomass Reduction by | 30% | $320 |

BLM_0066101

| | | |
|---|---|---|
| Mulching | | |
| Biomass Reduction by Natural Decomposition | 70% | $0 |
| Weed Control | 50% | $2,198 |
| Revegetated Area | 50% | $3,786 |
| Multiplier for Access or Other Issues | 20% | $6,788 |
| Monitoring and Maintenance for 3-5 yrs | 25% | $10,182 |
| | **Total Cost** | **$50,910** |

**Recommended Site 121, Recommended Site 122, Recommended Site 123, & Recommended Site 124A**

<u>Recommended Site 121</u>
<u>Photo</u>:  4.28.09_65, 4.28.09_66, 4.23.09_335 – 4.23.09_337
<u>Acreage</u>:  5.49
<u>Landowner</u>:  Bureau of Land Management; Grand Junction Field Office
<u>Map</u>:  DR29; 0_PS 120, 121

<u>Recommended Site 122</u>
<u>Photo</u>:  4.23.09_332 – 4.23.09_334, 2006_37
<u>Acreage</u>:  2.91
<u>Landowner</u>:  Bureau of Land Management; Grand Junction Field Office
<u>Map</u>:  DR30; PS 122, 123

<u>Recommended Site 123</u>
<u>Photo</u>:  4.23.09_324, 4.23.09_325, 2006_37
<u>Acreage</u>:  9.02
<u>Landowner</u>:  Bureau of Land Management; Grand Junction Field Office
<u>Map</u>:  DR30; PS 122, 123

<u>Recommended Site 124A</u>
<u>Photo</u>: 2006_37
<u>Acreage</u>:  2.91
<u>Soil Samples</u>:  4" – pH 6.8/moderately saline/silt loam; 10" – pH 7.8/non-saline/loam
<u>Landowner</u>:  Bureau of Land Management; Grand Junction Field Office
<u>Map</u>:  DR30; 2_PS 124A & 124B

These four sites are grouped as they each consist of thin, moderate to dense tamarisk stands on river left occupying the inside of a curve along Highway 141. Russian knapweed is present at site 123 and Siberian elm occupies sites 121 and 124A.  Low levels of native vegetation are mixed into the tamarisk in each of these sites including boxelder, New Mexico privet, and coyote

BLM_0066102

willow. In addition, site 124A supports some golden current.  A portion of these sites would fall into the state right of way and the State Right of Way Access Permit Office will need to be contacted.

These sites were recommended for tamarisk control for the following reasons:

- The site would benefit from tamarisk control because – Removing tamarisk along the road will increase visibility, improving both safety and aesthetics. Although only limited native vegetation, low growing shrubs or grasses, can be planted within 30 feet of the highway, this would be an improvement (Table 1: Criteria C and G).
- Restoration is likely to succeed because the site meets the following Feasibility Characteristics –
  - o  Funding is available:  Possible support from CDOT weed program
  - o  The Landowner is willing:  Likely
  - o  Site Access is Economically Feasible:  Yes
  - o  A good Native Seed Source is present:  No

Recommended Site 121, 122, 123, 124A

| Control, Biomass Reduction, & Revegetation Approach |
| --- |
| **Tamarisk Control**<br>Control:  A timber or hydro ax or feller buncher (depending on the bank's steepness) should be used to control the infestation.<br>Biomass:  The biomass will be mulched in the removal process if mulching equipment is used. If the feller buncher is used the biomass should be burned if the landowner agrees.<br>Revegetation:<br>&bull; Grass seeding within 30 feet of the center line<br>&bull; If swaths are cut to the river:<br>  &bull; Monitoring well should be installed at time of tamarisk removal.<br>  &bull; Plant with New Mexico privet and three-leaf sumac. Depending on depth to groundwater, tall pots could be used or conventional nursery stock may be used with temporary irrigation.<br>  &bull; Willow bundles and pole plantings should be planted along the bank and areas with high groundwater.<br>**Other Weed Species Control**<br>Woody:  Siberian elm should be controlled in the area.<br>Herbaceous:  Infestations of Russian knapweed should be controlled to reduce competition with establishing native plants.<br>**Monitoring & Maintenance**<br>This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used plan to foliar spray tamarisk re-sprouts. |

Recommended Site 121

| Estimated Costs |
| --- |

BLM_0066103

| Hand Control | 20% | $4,904 |
|---|---|---|
| Mechanical | 80% | $2,999 |
| Biomass Reduction by Mulching | 70% | $1,426 |
| Biomass Reduction by Natural Decomposition | 30% | $0 |
| Herbaceous Weed Control | 50% | $1,098 |
| Revegetated Area | 50% | $3,224 |
| Multiplier for Access or Other Issues | 20% | $2,730 |
| Monitoring and Maintenance for 3-5 yrs | 30% | $4,915 |
| **Total Cost** | | **$21,296** |

Recommended Site 122

| **Estimated Costs** | | |
|---|---|---|
| Hand Control | 20% | $1,652 |
| Mechanical | 80% | $1,072 |
| Biomass Reduction by Mulching | 70% | $431 |
| Biomass Reduction by Natural Decomposition | 30% | $0 |
| Herbaceous Weed Control | 50% | $581 |
| Revegetated Area | 50% | $757 |
| Multiplier for Access or Other Issues | 20% | $899 |
| Monitoring and Maintenance for 3-5 yrs | 25% | $1,348 |
| **Total Cost** | | **$6,740** |

Recommended Site 123

| **Estimated Costs** | | |
|---|---|---|
| Hand Control | 20% | $6,190 |
| Mechanical | 80% | $3,944 |
| Biomass Reduction by | 70% | $1,673 |

BLM_0066104

| Mulching | | |
|---|---|---|
| Biomass Reduction by Natural Decomposition | 30% | $0 |
| Herbaceous Weed Control | 50% | $1,804 |
| Revegetated Area | 50% | $3,218 |
| Multiplier for Access or Other Issues | 20% | $3,366 |
| Monitoring and Maintenance for 3-5 yrs | 25% | $5,049 |
| | Total Cost | $25,243 |

Recommended Site 124A

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $456 |
| Mechanical | 80% | $310 |
| Biomass Reduction by Mulching | 70% | $108 |
| Biomass Reduction by Natural Decomposition | 30% | $0 |
| Herbaceous Weed Control | 50% | $583 |
| Revegetated Area | 50% | $135 |
| Multiplier for Access or Other Issues | 20% | $319 |
| Monitoring and Maintenance for 3-5 yrs | 20% | $382 |
| | Total Cost | $2,293 |

**Recommended Site 124B**
Photo: 4.23.09_316 -4.23.09_323, 2006_38
Acreage: 6.58
Soil Samples: 4" – pH 7.6/very slightly saline/loam; 10" – pH 7.8/non-saline/loam
Landowner: Bureau of Land Management; Grand Junction Field Office
Map: DR30; 2_PS 124A & 124B

A campsite here is surrounded by dense tamarisk with some Siberian elm, Russian knapweed, and New Mexico privet nearby. The tamarisk infestation lines Highway 141 and a portion of the

M - 75

BLM_0066105

project would fall into the state right of way and the State Right of Way Access Permit Office will need to be contacted.

These sites were recommended for tamarisk control for the following reasons:

- <u>The site would benefit from tamarisk control because</u> – Removing tamarisk along the road will increase visibility, improving both safety and aesthetics. Although only limited native vegetation, low growing shrubs or grasses, can be planted within 30 feet of the highway, this would be an improvement. Additionally, campsites present a greater risk of tamarisk wildfire and would be more appealing if they supported native vegetation stands, particularly in light of potential beetle induced tamarisk defoliation. Shade is a factor to consider when revegetating such sites (Table 1: Criteria C & G).
- <u>Restoration is likely to succeed because the site meets the following Feasibility Characteristics</u> –
  - ○ Funding is available:  Possible support from CDOT weed program
  - ○ The Landowner is willing:  Not yet determined
  - ○ Site Access is Economically Feasible:  Yes
  - ○ A good Native Seed Source is present:  No

Recommended Site 124B

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control**<br>Control:  A timber or hydro ax should be used to control the infestation.<br>Biomass:  The biomass will be mulched in the removal process.<br>Revegetation:<br>• Grass seeding within 30 feet of the center line<br>• Monitoring well should be installed at time of tamarisk removal.<br>• Plant with New Mexico privet and three-leaf sumac. Depending on depth to groundwater, tall pots could be used or conventional nursery stock may be used with temporary irrigation.<br>• Willow bundles and pole plantings should be planted along the bank and areas with high groundwater.<br>**Other Weed Species Control**<br>Woody:  Siberian elm should be controlled in the area.<br>Herbaceous:  Infestations of Russian knapweed should be controlled to reduce competition with establishing native plants.<br>**Monitoring & Maintenance**<br>This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used plan to foliar spray tamarisk re-sprouts. |

Recommended Site 124B

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $5,230 |

BLM_0066106

| | | |
|---|---|---|
| Mechanical Mulching | 80% | $4,332 |
| Biomass Reduction by Mulching & Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $2,633 |
| Revegetated Area | 100% | $6,131 |
| Multiplier for Access or Other  Issues | 20% | $3,665 |
| Monitoring and Maintenance for 3-5 yrs | 30% | $6,597 |
| **Total Cost** | | **$28,588** |

**Recommended Site 126**
Photo:  4.23.09_283, 4.23.09_284, 2006_38, 2006_39
Acreage:  3.06
Landowner:  Bureau of Land Management; Grand Junction Field Office
Map:  DR30; PS 126

This site is located on an island at the end of river mile 126 with a campsite.  The island supports a moderate tamarisk infestation interspersed with some coyote willow. This willow seed source will likely be adequate to recruit following tamarisk removal.

These sites were recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – Heightened activities around campsites present a greater risk of tamarisk wildfire.  Additionally, the camps would be more appealing if they supported native vegetation stands, particularly in light of potential beetle induced tamarisk defoliation (Table 1: Criteria C & G).
- Restoration is likely to succeed because the site meets the following Feasibility Characteristics –
  - o  Funding is available:  Not yet determined
  - o  The Landowner is willing:  Likely
  - o  Site Access is Economically Feasible:  Possibly (depending on funding source)
  - o  A good Native Seed Source is present:  Yes

Recommended Site 126

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control**<br>Control:  Hand cut-stump control<br>Biomass:  Stack off island, away from the floodplain for wildlife habitat<br>Revegetation:  Closely monitor to determine if other revegetation is necessary |

BLM_0066107

**Other Weed Species Control**
<u>Woody</u>: N/A
<u>Herbaceous</u>: N/A
**Monitoring & Maintenance**
This site will be somewhat difficult to access, incurring additional costs. This should be closely considered before this project is undertaken. Site visits should be planned twice a year for three years and then once per year for the next seven years.

Recommended Site 126

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $6,736 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 30% | $367 |
| Multiplier for Access or Other Issues | 20% | $1,421 |
| Monitoring and Maintenance for 3-5 yrs | 25% | $2,131 |
| | **Total Cost** | **$10,654** |

**Recommended Site 128**
<u>Acreage</u>: 5.64 acres
<u>Landowner</u>: Privately owned
<u>Map</u>: DR31

Recommended Site 128 is located at the end of river mile 128 on river left along State Route 141. The site consists of light to moderate tamarisk stands beneath a mixed over story of cottonwood and Siberian elm. The upstream portion of this site is occupied by a home and the downstream portion serves as a horse pasture.

This site was recommended for tamarisk removal for the following reasons:
- <u>The site would benefit from tamarisk control because</u> – There are stands of valuable native vegetation including cottonwoods that would benefit from decreased fire risk and tamarisk competition (Table 1: Criteria A). This site is in close proximity to the highway which would improve aesthetics (Table 1: Criteria G). The tamarisk stands also surround a private residence that could be threatened by an increased fire risk (Table 1: Criteria C).
- <u>Restoration is likely to succeed because the site meets the following Feasibility Characteristics</u> –
  - Funding is available: Not yet determined
  - The Landowner is willing: Not yet determined

BLM_0066108

o   Site Access is Economically Feasible:  Yes
o   A good Native Seed Source is present:  Yes

Recommended Site 128

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control**<br>Control:  A timber or hydro ax should be used to control 80% of the infestation. Hand control should be used for the other 20%.<br>Biomass: The biomass will be mulched in the removal process.<br>Revegetation: Monitor to see if revegetation is necessary<br>**Other Weed Species Control**<br>Woody:  Siberian elm should be controlled in the area.<br>Herbaceous:  Infestations of Russian knapweed should be controlled to reduce competition with establishing native plants.<br>**Monitoring & Maintenance**<br>This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used plan to foliar spray tamarisk re-sprouts. |

Recommended Site 128

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $3,847 |
| Mechanical | 80% | $3,186 |
| Biomass Reduction by Mulching | 80% | $0 |
| Biomass Reduction by Natural Decomposition | 20% | $0 |
| Herbaceous Weed Control | 70% | $2,550 |
| Revegetated Area | Monitor | $0 |
| Multiplier for Access or Other  Issues | 20% | $1,917 |
| Monitoring and Maintenance for 3-5 yrs | 25% | $2,875 |
| | **Total Cost** | **$14,375** |

**Recommended Site 129**
Photo:  4.23.09_269, 4.23.09_270, 2006_59
Acreage:  7.81
Landowner:  Bureau of Land Management; Grand Junction Field Office
Map:  DR31; 1_PS 129

M - 79

BLM_0066109

Recommended Site 129 is a thick tamarisk stand located near the middle of river mile 129 along State Route 141. The recommendation is for work to be completed on the river left bank where access is good. There are young cottonwood galleries, native willow and some upland plants. Russian knapweed is also present.

This site was recommended for tamarisk removal for the following reasons:
- <u>The site would benefit from tamarisk control because</u> – There are stands of valuable native vegetation including cottonwoods that would benefit from decreased fire risk and tamarisk competition. Mid-age cottonwoods indicate that this site may be hydraulically connected to the river (Table 1: Criteria A).  This site is in close proximity to the highway which would improve aesthetics and reduce fire risk (Table 1: Criteria C & G).
- <u>Restoration is likely to succeed because the site meets the following Feasibility Characteristics</u> –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Yes
  - A good Native Seed Source is present:  Yes but are limited

Recommended Site 129

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control**<br>Control:  Access to these sites may allow the use of mechanical mulching equipment. If so a timber or hydro ax should be used to control 80% of the infestation. Hand cut-stump should be used for the remaining 20%.<br>Biomass:  80% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat.<br>Revegetation:<br>&bull; Monitoring wells should be installed at the time of tamarisk removal.<br>&bull; Grass seeding to compete with Russian knapweed where mechanical equipment is used.<br>&bull; Closely monitor to determine if other revegetation is necessary.<br>   If so: Use willows, New Mexican privet, grass mix.<br>**Other Invasive, Non-native Species of Concern**<br>Woody:  Siberian elm should be controlled.<br>Herbaceous:  Russian knapweed should be controlled. (See Appendix F).<br>**Monitoring & Maintenance**<br>This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used plan to foliar spray tamarisk re-sprouts. |

Recommended Site 129

| Estimated Costs |
|---|

M - 80

BLM_0066110

| Hand Control | 20% | $7,197 |
|---|---|---|
| Mechanical | 80% | $5,962 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $3,224 |
| Revegetated Area | 100% | $9,462 |
| Multiplier for Access or Other Issues | 20% | $5,169 |
| Monitoring and maintenance for 3-5 yrs | 30% | $9,304 |
| | **Total Cost** | **$40,319** |

**Recommended Site 131**
Photo:  4.23.09_260 - 4.23.09_263, 2006_63
Acreage:  7.81
Landowner:  Partially private though mostly on Grand Junction BLM land
Map:  DR32; PS 131

Recommended Site 131 is located near the middle of river mile 131 along State Route 141.  The river bends away from the road and there is a campsite located on river right.  There is tamarisk on both sides of the river mixed with coyote willow, sage, three-leaf sumac, phragmites, New Mexico privet and service berry.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – There are stands of valuable native vegetation that would benefit from decreased fire risk and tamarisk competition (Table 1: Criteria A).   This site is in close proximity to the highway which would improve aesthetics.  Heightened activities around the campsite present a greater risk of tamarisk wildfire, although the light infestation makes fire less of a concern.  Additionally, the camps would be more appealing if they supported native vegetation stands, particularly in light of potential beetle induced tamarisk defoliation.  Shade is a factor to consider when revegetating such sites (Table 1: Criteria C & G).
- Restoration is likely to succeed because the site meets the following Feasibility Characteristics –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Possibly, depending on the funding source
  - A good Native Seed Source is present:  Yes

Recommended Site 131

BLM_0066111

| Control, Biomass Reduction, & Revegetation Approach |
| --- |
| **Tamarisk Control**<br>Control:  Hand cut-stump control near campground.<br>Biomass:  Stack away from floodplain for wildlife habitat<br>Revegetation:  Closely monitor to determine if other revegetation is necessary.<br>**Other Invasive, Non-native Species of Concern**<br>Woody:  N/A<br>Herbaceous:  N/A<br>**Monitoring & Maintenance**<br>This site may be difficult to access on river right incurring additional costs.  Site visits should be planned twice a year for three years and then once per year for the next seven years.<br>**Other Comments/Concerns**<br>This site is a candidate for educational signage because of the campsite. |

Recommended Site 131

| Estimated Costs | | |
| --- | --- | --- |
| Hand Control | 100% | $11,848 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Multiplier for Access or Other  Issues | 20% | $2,370 |
| Monitoring and maintenance for 3-5 yrs | 20% | $2,844 |
| | **Total Cost** | $17,062 |

**Recommended Site 132**
Photo:  4.23.09_243 - 4.23.09_245, 2006_64
Acreage:  15.77
Landowner:  BLM; Grand Junction Field Office
Map:  DR32; PS 132

Recommended Site 132 is located on river right near the middle of river mile 132 along State Route 141.  The tamarisk infestation in this area is moderate to dense.  There is a campsite located in the tamarisk stand on river right.  There is some priority vegetation mixed in with the tamarisk including New Mexico privet, coyote willow, phragmites, and other grasses. There is Russian knapweed in the area.  Due to access issues hand crews will likely be used.  As a result, the site around the camp could be cleared and revegetated as a seed source island.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – This site is in close proximity to the highway which would improve aesthetics.  Heightened activities around the campsite

M - 82

BLM_0066112

present a greater risk of tamarisk wildfire, although the light infestation makes fire less of a concern.  Additionally, the camp would be more appealing if they supported native vegetation stands, particularly in light of potential beetle induced tamarisk defoliation. Shade is a factor to consider when revegetating such sites (Table 1: Criteria C & G).

- Restoration is likely to succeed because the site meets the following Feasibility Characteristics –
  - o Funding is available:  Not yet determined
  - o The Landowner is willing:  Likely
  - o Site Access is Economically Feasible:  Possibly depends on funding source
  - o A good Native Seed Source is present:  No

Recommended Site 132

| Control, Biomass Reduction, & Revegetation Approach |
| --- |
| **Tamarisk Control** <br> Control:  Hand cut-stump control near campsite only. <br> Biomass:  Stack away from floodplain for wildlife habitat <br> Revegetation: <br> • Monitoring wells should be installed at the time of tamarisk removal. <br> • Grass seeding to compete with Russian knapweed where mechanical equipment is used. <br> • Closely monitor to determine if other revegetation is necessary. <br>   If so: Use willows, New Mexican privet, grass mix. <br> **Other Invasive, Non-native Species of Concern** <br> Woody:  N/A <br> Herbaceous:   Russian knapweed. <br> **Monitoring & Maintenance** <br> This site may be difficult to access on river right incurring additional costs.  Site visits should be planned twice a year for three years and then once per year for the next seven years. <br> **Other Comments/Concerns** <br> This site is a candidate for educational signage because of the campsite. |

Recommended Site 132

| Estimated Costs | | |
| --- | --- | --- |
| Hand Control (around campsite only) | 50% | $31,321 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $6,308 |
| Revegetated Area | 50% | $7,343 |
| Multiplier for Access or Other  Issues | 20% | $8,995 |

BLM_0066113

| Monitoring and Maintenance for 3-5 yrs | 30% | $16,190 |
| --- | --- | --- |
| **Total Cost** | | **$70,158** |

**Recommended Site 134**
Photo:  2006_65, 2006_66
Acreage:  1.38
Landowner:  BLM; Grand Junction Field Office
Map:  DR32; PS 134

Recommended Site 134 is located on river right near the middle of river mile 134 along State Route 141.  The tamarisk infestation in this area is moderate and surrounds a campsite.  There is some priority vegetation mixed in with the tamarisk including New Mexico privet, coyote willow, phragmites, and other grasses.  Due to access issues, the site around the camp should be cleared and revegetated as a seed source island. Shade should also be a consideration in this area.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – Heightened activities around the campsite present a greater risk of tamarisk wildfire, although the light infestation makes fire less of a concern (Table 1: Criteria C).  Additionally, the camp would be more appealing if they supported native vegetation stands, particularly in light of potential beetle induced tamarisk defoliation.  Shade is a factor to consider when revegetating such sites (Table 1: Criteria G).
- Restoration is likely to succeed because the site meets the following Feasibility Characteristics –
  - o  Funding is available:  Not yet determined
  - o  The Landowner is willing:  Likely
  - o  Site Access is Economically Feasible:  Possibly depending on funding
  - o  A good Native Seed Source is present:  No

Recommended Site 134

| Control, Biomass Reduction, & Revegetation Approach |
| --- |
| **Tamarisk Control**<br>Control:  Hand cut-stump control near campsite only.<br>Biomass:  Stack away from floodplain for wildlife habitat<br>Revegetation:<br>• Monitoring wells should be installed at the time of tamarisk removal.<br>• Closely monitor to determine if other revegetation is necessary.<br>**Other Invasive, Non-native Species of Concern**<br>Woody:  N/A<br>Herbaceous:  N/A<br>**Monitoring & Maintenance** |

BLM_0066114

This site may be difficult to access on river right incurring additional costs. Site visits should be planned twice a year for three years and then once per year for the next seven years.
**Other Comments/Concerns**
This site is a candidate for educational signage because of the campsite. Grazing is a consideration to be address during revegetation.

| Estimated Costs | | |
|---|---|---|
| Hand Control | 50% | $1,967 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 50% | $277 |
| Revegetated Area | 50% | $360 |
| Multiplier for Access or Other Issues | 20% | $521 |
| Monitoring and maintenance for 3-5 yrs | 25% | $781 |
| | **Total Cost** | **$3,906** |

**Recommended Site 139**
Photo: 4.20.09_200 – 4.20.09_206, 2006_68
Acreage: 7.35
Landowner: Bureau of Land Management; Grand Junction Field Office
Map: DR34; 3_PS 139

Recommended Site 139 is located at the end of river mile 139 along State Route 141 on river left. Native plant community includes rabbit brush, New Mexican privet, sage, sumac, rice grass and willows near the bank. The area is grazed and has Russian knapweed and hoary cress. A tall, dense stand of tamarisk is present on both sides of the river that is encroaching on upland natives. The site recommended for work is river left, on the highway side. There is a campsite at this location that increases the risk of fire in the area.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – This area is close to the highway and would benefit aesthetically from tamarisk control (Table 1: Criteria G). The upland natives in the area would benefit from decreased tamarisk competition (Table 1: Criteria A). The camp would be more appealing if they supported native vegetation stands, particularly in light of potential beetle induced tamarisk defoliation (Table 1: Criteria G).
- Restoration is likely to succeed because the site meets the following Feasibility Characteristics –
  o Funding is available: Not yet determined

BLM_0066115

o   The Landowner is willing:  Likely
o   Site Access is Economically Feasible:  Yes
o   A good Native Seed Source is present:  Yes, but limited

Recommended Site 139

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| Control:  Access to this site is excellent and allows the use of mechanical mulching equipment. If so a timber or hydro ax should be used to control 80% of the infestation. Hand cut-stump should be used for the remaining 20%.  Only the river left side, in between the highway and the river is recommended for work. |
| Biomass:  80% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat. |
| Revegetation: |
| • Grass seeding where mechanical control is used to compete with Russian knapweed and hoary cress. |
| • Willow bundles and/or pole plantings should be planted the winter following tamarisk removal. |
| • Monitoring wells should be installed at the time of removal. |
| • Upland species probably best for revegetation. |
| **Other Invasive, Non-native Species of Concern** |
| Woody:  N/A |
| Herbaceous:  Russian knapweed and hoary cress. |
| **Monitoring & Maintenance** |
| This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used plan to foliar spray tamarisk re-sprouts. |
| **Other Comments/Concerns** |
| Part of this site may be on a state right of way, CDOT Mesa County office should be consulted to confirm right-of-way location and to gain access for tamarisk control and revegetation efforts.  The location of the campsite may make this site good for educational signage. |

Recommended Site 139

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $5,041 |
| Mechanical (mulching) | 80% | $4,175 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $2,398 |
| Revegetated Area | 50% | $2,621 |
| Multiplier for Access or | 20% | $2,955 |

M - 86

BLM_0066116

| Other Issues | | |
|---|---|---|
| Monitoring and maintenance for 3-5 yrs | 25% | $4,432 |
| | **Total Cost** | **$22,162** |

BLM_0066117

**RIVER SEGMENT 14**
**Gateway to the CO/UT Stateline, RM 141 to the end of RM 148.5**
**Maps:** DR34, DR35, DR36, DR37

This section of the river runs north of Gateway to the Colorado / Utah Stateline.  The seven priority sites in this section were picked based on protecting priority vegetation, mainly mid-age cottonwood stands at risk from fire due to tamarisk in establishment in the understory. There is a campsite located at river mile 144 which sees heavy public use.  The fire risk in this area is also an issue and would be reduced by tamarisk removal.  The access is generally good throughout this segment which would aid in restoration efforts.

The tamarisk infestation ranges from light to moderate along this entire segment.  Russian knapweed is present along this entire stretch. Siberian elm is present in few areas.

This area supports both upland and riparian species.  Priority vegetation in this area includes Freemont cottonwoods, rabbitbrush, sumac, willow, New Mexican privet, pinyon pine, juniper, sage brush, and some grasses.

The segment consists of both private and public land.  The public land sections are managed by the Bureau of Land Management Grand Junction Field Office.  There is evidence of heavy grazing in the area on both public and private land.  Previous tamarisk removal efforts were completed on private land near river mile 141.

**Recommended Site 142 A**
Photo:  4.20.09_178 – 4.20.09_182, 2006_13, 2006_14
Acreage:  52.32
Soil Samples:  4" – pH 8/very slightly saline/sandy loam; 10" – pH 8/non-saline/sandy loam
Landowner:  Primarily private; Partially Bureau of Land Management; Grand Junction Field Office
Map:  DR35; 1_PS 142A & 142B

Recommended Site 142 A is located on river left on the lower half of river mile 142.  The site is located on private land north of Gateway on Stateline Road.  A treatment facility is located on the property surrounded by debris.  There is good access on both sides of the river.  Other sections of this river reach have been cleared of tamarisk through other projects.  This is an upland area that is mostly tamarisk with some Freemont cottonwoods, rabbit brush, sage, sumac, willow and New Mexican privet.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – The structure in this area would benefit from decreased fire risk (Table 1: Criteria C).  There is some priority vegetation mixed in that would benefit from decreased competition with tamarisk (Table 1: Criteria A).  This site is visible from both roads on both sides of the river and aesthetics would be improved.  Clearing this area would benefit restoration projects in close proximity (Table 1: Criteria G).

M - 88

BLM_0066118

- Restoration is likely to succeed because the site meets the following Feasibility Characteristics –.
  - o Funding is available:  Not yet determined
  - o The Landowner is willing:  Likely
  - o Site Access is Economically Feasible:  Yes
  - o A good Native Seed Source is present:  Yes

Recommended Site 142 A

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| Control:  Access to this site on both banks may allow the use of mechanical mulching equipment. If so a timber or hydro ax should be used to control 80% of the infestation. Hand cut-stump should be used for the remaining 20%. |
| Biomass:  80% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat. |
| Revegetation: |
| • Monitoring wells should be installed at the time of tamarisk removal. |
| • Grass seeding to compete with Russian knapweed where mechanical equipment is used. |
| • Revegetate with upland shrub species. |
| **Other Invasive, Non-native Species of Concern** |
| Woody:  Siberian elm |
| Herbaceous:  Russian knapweed and kochia |
| **Monitoring & Maintenance** |
| This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used plan to foliar spray tamarisk re-sprouts. |
| **Other Comments/Concerns** |
| Landowner cooperation would need to be established.  Contact landowner to see if there are plans to clear the area of tamarisk as other site under this management have been previously cleared.  Debris could be a safety concern in controlling portions of this site. |

Recommended Site 142 A

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $23,061 |
| Mechanical (mulching) | 80% | $19,099 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $20,928 |
| Revegetated Area | 70% | $12,933 |
| Multiplier for Access or | 20% | $15,204 |

BLM_0066119

| Other Issues | | |
|---|---|---|
| Monitoring and maintenance for 3-5 yrs | 25% | $22,807 |
| **Total Cost** | | **$114,033** |

**Recommended Site 142 B**
Photo: 2006_13, 4.20.09_173 – 4.20.09_175
Acreage: 20.18
Landowner: Private Landowner
Map: DR35; 1_PS 142A & 142B

Recommended Site 142 B is located in the middle of river mile 143 north of Gateway off of Stateline Road. The recommended work site is on river right and is easily accessed. A moderate tamarisk infestation exists beneath a large cottonwood gallery with grasses, rabbit brush, sage, sumac, willow and New Mexican privet. There is Russian knapweed and kochia present.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because –There is priority vegetation including mid-age cottonwoods that would benefit from decreased fire risk and competition from tamarisk. Mid-age cottonwoods indicate that this site may be hydraulically connected to the river. Adjacent cottonwood galleries would also benefit from decreased fire danger (Table 1: Criteria A).
- Restoration is likely to succeed because the site meets the following Feasibility Characteristics –
    - Funding is available: Not yet determined
    - The Landowner is willing: Likely
    - Site Access is Economically Feasible: Yes
    - A good Native Seed Source is present: Yes

Recommended Site 142 B

| **Control, Biomass Reduction, & Revegetation Approach** |
|---|
| **Tamarisk Control**<br>Control: Access to this site on both banks may allow the use of mechanical mulching equipment. If so a timber or hydro ax should be used to control 80% of the infestation. Hand cut-stump should be used for the remaining 20%.<br>Biomass: 80% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat.<br>Revegetation:<br>• Monitoring wells should be installed at the time of tamarisk removal.<br>• Grass seeding to compete with Russian knapweed where mechanical equipment is used.<br>• Suggest revegetation with upland species and some willows for erosion control. |

BLM_0066120

**Other Invasive, Non-native Species of Concern**
Woody:  Siberian elm
Herbaceous:  Russian knapweed, kochia
**Monitoring & Maintenance**
This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used plan to foliar spray tamarisk re-sprouts.
**Other Comments/Concerns**
Need landowner cooperation for work and to determine whether grazing is an issue.

Recommended Site 142 B

| Estimated Costs | | |
|---|---|---|
| Hand Control | 20% | $8,129 |
| Mechanical (mulching) | 80% | $6,732 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $7,377 |
| Revegetated Area | 80% | $5,210 |
| Multiplier for Access or Other  Issues | 20% | $5,490 |
| Monitoring and Maintenance for 3-5 yrs | 25% | $8,235 |
| | **Total Cost** | **$41,173** |

**Recommended Site 144**
Photo:  4.20.09_160 – 4.20.09_162, 2006_10, 2006_11
Acreage:  5.46
Landowner:  Bureau of Land Management; Grand Junction Field Office
Map:  DR36; 2_PS 144, 146

Recommended Site 144 is located at the end of river mile 144 next to Stateline Road on BLM land.  This site has tamarisk mixed with native vegetation such as New Mexican privet, cottonwood, willow, sumac pinyon pine, juniper, and sage brush.  There is evidence of grazing in the area.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – There is priority vegetation including mid-age cottonwoods that would benefit from decreased fire risk and competition from tamarisk.   Mid-age cottonwoods indicate that this site may be hydraulically connected to the river (Table 1: Criteria A).  This high use campground

BLM_0066121

area near the road would benefit for safety and aesthetic reasons (Table 1: Criteria C & G).

- Restoration is likely to succeed because the site meets the following Feasibility Characteristics –
  - o  Funding is available:  Not yet determined
  - o  The Landowner is willing:  Likely
  - o  Site Access is Economically Feasible:  Yes
  - o  A good Native Seed Source is present:  Yes

Recommended Site 144

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| Control:  Hand control cut-stump.  Some smaller tamarisk mixed with willows may be best to monitor as using herbicide will be inefficient. |
| Biomass:  If permission is granted much of the wood (75%) should be stacked and burned. Otherwise it could be piled away from the floodplain for wildlife habitat. |
| Revegetation: |
| • Monitoring wells should be installed at the time of tamarisk removal. |
| • Grass seeding to compete with Russian knapweed. |
| • Closely monitor to determine if other revegetation is necessary. |
| **Other Invasive, Non-native Species of Concern** |
| Woody:  N/A |
| Herbaceous:  Russian knapweed. |
| **Monitoring & Maintenance** |
| This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. |
| **Other Comments/Concerns** |
| The campground on the left bank and proximity to the road make this site a possibility for an educational sign. |

Recommended Site 144

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $12,036 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $2,185 |
| Revegetated Area | 50% | $964 |
| Multiplier for Access or Other  Issues | 20% | $3,037 |
| Monitoring and Maintenance for 3-5 yrs | 25% | $4,555 |

BLM_0066122

| | |
|---|---|
| **Total Cost** | $22,777 |

**Recommended Site 146**
Photo:  4.20.09_142 – 4.20.09_144, 2006_6, 2006_7
Acreage:  19.37
Landowner:  Bureau of Land Management; Grand Junction Field Office
Map:  DR36; 2_PS 144, 146

Recommended Site 146 is located at the start of river mile146 on State Line Road north of Gateway. There is priority vegetation including cottonwood, sage, pinyon pine, phragmities, willows, and New Mexican privet.  Tamarisk exists in cottonwood understory.  The island has priority vegetation that is isolated from grazing.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – There is priority vegetation including mid-age cottonwoods that would benefit from decreased fire risk and competition from tamarisk. Mid-age cottonwoods indicate that this site may be hydraulically connected to the river (Table 1: Criteria A and E).  This area is visible from the road and would benefit for aesthetic reasons (Table 1: Criteria G).
- Restoration is likely to succeed because the site meets the following Feasibility Characteristics the site meets the following Feasibility Characteristics –
  o Funding is available:  Not yet determined
  o The Landowner is willing:  Likely
  o Site Access is Economically Feasible:  Yes
  o A good Native Seed Source is present:  Yes

Recommended Site 146

| **Control, Biomass Reduction, & Revegetation Approach** |
|---|
| **Tamarisk Control**<br>Control:  Hand control cut-stump 30% and mechanical mulching 70%.<br>Biomass:  The biomass that is not mulched should be stacked out of the floodplain for wildlife habitat.<br>Revegetation:<br>• Monitoring wells should be installed at the time of tamarisk removal.<br>• Grass seeding to compete with Russian knapweed.<br>• Closely monitor to determine if other revegetation is necessary.<br>**Other Invasive, Non-native Species of Concern**<br>Woody:  N/A<br>Herbaceous:  Russian knapweed.<br>**Monitoring & Maintenance**<br>This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. |

BLM_0066123

Recommended Site 146

| Estimated Costs | | |
|---|---|---|
| Hand Control | 30% | $7,096 |
| Mechanical Mulching | 70% | $3,428 |
| Biomass Reduction by Mulching & Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $7,750 |
| Revegetated Area | 50% | $1,539 |
| Multiplier for Access or Other  Issues | 20% | $3,963 |
| Monitoring and Maintenance for 3-5 yrs | 20% | $4,755 |
| Total Cost | | $28,530 |

**Recommended Site 147 A & B**
Recommended Site 147A
Acreage:  8.66
Landowner:  Private Landownership
Map:  DR36; 3_PS 147A, 147B, 148

Recommended Site 147B
Acreage:  20.18
Landowner:  Partially Bureau of Land Management; Grand Junction Field Office; Partially Private Landownership
Map:  DR36; 3_PS 147A, 147B, 148

Recommended Site 147 A & B encompasses river mile 147 in its entirety.  Stateline Road travels the length of the mile on river left.  A county road provides access to river right.  Priority vegetation including mixed-age cottonwood, willow, New Mexican privet, greasewood, three-leaf sumac, sagebrush, phragmities, and grasses are present. The tamarisk exists in moderately dense stands under the cottonwood understory.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – There is priority vegetation including mid-age cottonwoods that would benefit from decreased fire risk and competition from tamarisk.  Mid-age cottonwoods indicate that this site may be hydraulically connected to the river.  The channel is braided and has evidence of flooding (Table 1: Criteria E).  This area is visible from the road and would benefit for aesthetic reasons (Table 1: Criteria G).

M - 94

BLM_0066124

- <u>Restoration is likely to succeed because the site meets the following Feasibility Characteristics</u> –
  - o The Landowner is willing:  Not yet determined
  - o The Landowner is willing:  Likely
  - o Site Access is Economically Feasible:  Yes
  - o A good Native Seed Source is present:  Yes

Recommended Site 147 A & B

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **<u>Tamarisk Control</u>**<br><u>Control</u>:  Access to this site on both banks may allow the use of mechanical mulching equipment. If so a timber or hydro ax should be used to control 50% of the infestation. Hand cut-stump should be used for the remaining 50%.<br><u>Biomass</u>:  50% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat.<br><u>Revegetation</u>:<br>• Monitoring wells should be installed at the time of tamarisk removal.<br>• Grass seeding to compete with Russian knapweed where mechanical equipment is used.<br>• Closely monitor to determine if other revegetation is necessary.<br>**<u>Other Invasive, Non-native Species of Concern</u>**<br><u>Woody</u>:  Siberian elm<br><u>Herbaceous</u>:  Russian knapweed<br>**<u>Monitoring & Maintenance</u>**<br>This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used plan to foliar spray tamarisk re-sprouts. |

Recommended Site: 147 A

| Estimated Costs | | |
|---|---|---|
| Hand Control | 50% | $12,304 |
| Mechanical Mulching | 50% | $2,548 |
| Biomass Reduction by Mulching & Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $3,464 |
| Revegetated Area | 50% | $2,255 |
| Multiplier for Access or Other  Issues | 20% | $4,114 |
| Monitoring and maintenance for 3-5 yrs | - | $6,171 |

BLM_0066125

| | **Total Cost** | **$30,856** |
|---|---|---|

Recommended Site: 147 B

| **Estimated Costs** | | |
|---|---|---|
| Hand Control | 50% | $22,236 |
| Mechanical Mulching | 50% | $4,604 |
| Biomass Reduction by Mulching & Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $8,072 |
| Revegetated Area | 50% | $3,563 |
| Multiplier for Access or Other Issues | 20% | $7,695 |
| Monitoring and maintenance for 3-5 yrs | 25% | $11,543 |
| | **Total Cost** | **$57,713** |

**Recommended Site 148**
Photo:  4.14.09_299 – 4.14.09_303, 2006_5
Acreage:  22.32
Landowner:   Private Landownership
Map:  DR37; 3_PS 147A, 147B, 148

Recommended Site 148 spans the first half of river mile 148.  Stateline Road travels the length of the section on river left.  A county road provides access to river right.  Priority vegetation includes willow, mature Freemont cottonwoods, and upland species such as sage are adjacent the riparian zone. The tamarisk exists in dense stands under the cottonwood understory.  There are steep banks in this area and also some evidence of flooding.

This site was recommended for tamarisk removal for the following reasons:
- The site would benefit from tamarisk control because – There is priority vegetation including mature cottonwoods that would benefit from decreased fire risk and competition from tamarisk (Table 1: Criteria A).  This area is visible from the road and would benefit for aesthetic reasons (Table 1: Criteria G).
- Restoration is likely to succeed because the site meets the following Feasibility Characteristics –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Yes
  - A good Native Seed Source is present:  Yes

BLM_0066126

Recommended Site 148

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control**<br>Control:  Access to this site on both banks may allow the use of mechanical mulching equipment. If so a timber or hydro ax should be used to control 40% of the infestation. Hand cut-stump should be used for the remaining 60%.<br>Biomass:  40% of the biomass will be mulched in the removal process. The remaining biomass should be stacked for wildlife habitat.<br>Revegetation:<ul><li>Monitoring wells should be installed at the time of tamarisk removal.</li><li>Grass seeding to compete with Russian knapweed where mechanical equipment is used.</li><li>Willow bundles and/or pole plantings should be planted the winter following tamarisk removal.</li></ul>**Other Invasive, Non-native Species of Concern**<br>Woody:  N/A<br>Herbaceous:  Russian knapweed<br>**Monitoring & Maintenance**<br>This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. *Note: if a hydro ax is used plan to foliar spray tamarisk re-sprouts. |

Recommended Site 148

| Estimated Costs | | |
|---|---|---|
| Hand Control | 60% | $29,514 |
| Mechanical Mulching | 40% | $4,074 |
| Biomass Reduction by Mulching & Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 100% | $8,928 |
| Revegetated Area | 50% | $3,941 |
| Multiplier for Access or Other  Issues | 20% | $9,292 |
| Monitoring and maintenance | 25% | $13,937 |
| | **Total Cost** | **$69,687** |

M - 97

BLM_0066127

## MOAB FIELD OFFICE

**RIVER SEGMENT 15**
**CO/UT Stateline to the Colorado River, RM 148.5 to the end of RM 171**
**Maps:** DR37, DR38, DR39, DR40, DR41, DR42

River Segment 15 is a moderate priority for tamarisk control and restoration as the majority of this stretch is extremely remote and can be accessed only by boat, on horseback, or on foot. Near the state line, many of the potential priority sites in this segment are accessible via 4.10 Road. However, after river mile 155 the rest of this segment is almost exclusively accessible by raft except for Entrada Ranch and the confluence with the Colorado River.

Thus, this reach is an ideal location for tamarisk biological control due to difficult access that would significantly increase the costs of control, restoration, monitoring, and maintenance activities (Table 2: Criteria C). Additionally, in many areas, narrow canyon walls here serve to constrict any high flows that occur, increasing the likelihood of overbank flooding and overall riparian vegetation health. As a result, these healthy vegetative communities are more likely to recover as the tamarisk leaf beetle stresses tamarisk, reducing its competitive edge.

However, there are many riparian zones throughout the southwest affected by the tamarisk beetle that are only accessible by raft. It may be necessary or desirable to combine active tamarisk control and revegetation in some of these areas. It has been suggested that areas on the Dolores River, like this segment, would be ideal training grounds for raft based tamarisk management and restoration crews.

Additionally, there are many river runner campsites in the area currently threatened by increased fire danger due to tamarisk presence and that will be significantly less appealing as the leaf beetle defoliates tamarisk. Though the time frame in which flows allow rafters to visit the area is relatively short, there can be large numbers that move through the area. If they avoid leaf beetle degraded sites and move into native vegetation for shade they could cause damage, delaying positive native vegetation response.

For these two reasons; if adequate funds are made available for invasive control, monitoring, maintenance and necessary revegetation; the Recommended Sites listed below would be appropriate for active restoration.

Tamarisk infestations between the state line and the Colorado River are significant and river segment 15 is a high priority for tamarisk control and restoration. Most of these infestations are relatively narrow and confined to the immediate river bank, however in some areas tamarisk infestations expand across historic floodplain.

The native community in this segment is dominated by coyote willow, New Mexico privet, Baccharis and phragmites. Knapweed is present throughout this segment and will be a challenge during restoration.

BLM_0066128

The majority of this segment is owned by the Bureau of Land Management, however there are some privately owned parcels near Gateway, as well as the Entrada Ranch field research station, owned by the University of Utah near the confluence. In addition, there is an area owned by the State of Utah near the confluence at Lake Bottom.

**Recommended Site 151A**
Photos: 4.14.09_284
Acreage: 14.23
Landowner: Moab BLM Office
Maps: D37; 1_PS 151A, 151B

Recommended Site 151A is located on river right in the downstream half river mile 151. Tamarisk at this site is mixed in with cottonwood, New Mexico privet, Baccharis, and rabbit brush. Russian knapweed is common at this site. There is an old berm along the river's edge for approximately half the length of the site that may impact the hydrologic function of the site.

This site was recommended for tamarisk control for the following reasons:
- The site would benefit from tamarisk control because – There are healthy native species, such as cottonwood, New Mexico privet and willow, present in this area that would benefit from the removal of tamarisk and its associated competition and increased fire risk (Table 1: Criteria A).
- Restoration is likely to succeed because it meets the following Feasibility Characteristics –
  - Funding is available: Not yet determined
  - The Landowner is willing: Likely
  - Site Access is Economically Feasible: Yes
  - A good Native Seed Source is present: Yes

Recommended Site 151A

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| Control: A timber or hydro ax should be used to control 50% of the infestation. Hand cut-stump should be used for the remaining 50%. |
| Biomass: Biomass may be stacked for wildlife habitat outside of the floodplain; good access by road would also allow a brush chipper to be brought in if desired. |
| Revegetation: |
| • Monitoring wells should be installed at the time of tamarisk removal, this is particularly important in order to assess hydrologic alteration due to the berm. |
| • Grass seeding over the entire site to compete with Russian knapweed |
| • The healthy mix of natives of diverse ages may allow for passive revegetation of woody riparian species such as willow and sumac, but site should be monitored. |
| • Cottonwoods should be planted if hydrologic conditions appear favorable. |
| • Cattle should be temporarily excluded from site following tamarisk removal to allow |

BLM_0066129

for the establishment of native plants.

**Other Weed Species Control**

<u>Woody</u>:  There is a very small amount of Russian olive present that should be removed before it becomes a problem.

<u>Herbaceous</u>:  Russian knapweed is common and kochia and whitetop may also be present. These herbaceous weeds should be controlled to reduce competition with recruiting native plants.

**Monitoring & Maintenance**

This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years.

**Other Comments/Concerns**

There is a small rustic building of unknown origin at this site that may add to the site's cultural value.

Recommended Site 151A

| Estimated Costs | | |
|---|---|---|
| Hand Control | 50% | $15,684 |
| Mechanical Mulching | 50% | $3,247 |
| Biomass Reduction by Mulching & Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 75% | $4,270 |
| Revegetated Area | 75% | $3,770 |
| Multiplier for Access or Other  Issues | 20% | $5,394 |
| Monitoring and Maintenance for 3-5 years | 25% | $8,091 |
| **Total Cost** | | **$40,457** |

**Recommended Site 151B**

<u>Photos</u>:  4.14.09_284, 4.14.09_1 - 4.14.09_3

<u>Acreage</u>:  41.12

<u>Landowner</u>:  Moab BLM Office

<u>Maps</u>:  DR37, DR38; 1_PS 151A, 151B

Recommended Site 151B is located on river left in the downstream half river mile 151. Tamarisk at this site is mixed in with mid-age cottonwood, New Mexico privet, Baccharis, and rabbit brush. Russian knapweed is common at this site.

This site was recommended for tamarisk control for the following reasons:

BLM_0066130

- The site would benefit from tamarisk control because – There are healthy native species, such as cottonwood, New Mexico privet and willow, present in this area that would benefit from the removal of tamarisk and its associated competition and increased fire risk.  The presence of mid-age cottonwoods suggests that the hydrologic condition of this site is good (Table 1: Criteria A).
- Restoration is likely to succeed because it meets the following Feasibility Characteristics –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Yes
  - A good Native Seed Source is present:  Yes

Recommended Site 151B

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control**<br>Control:  A timber or hydro ax should be used to control 50% of the infestation. Hand cut-stump should be used for the remaining 50%.<br>Biomass:  Biomass may be stacked for wildlife habitat outside of the floodplain; good access by road would also allow a brush chipper to be brought in if desired.<br>Revegetation:<br>• Monitoring wells should be installed at the time of tamarisk removal.<br>• Native grass seeding over the entire site to compete with Russian knapweed<br>• Willow bundles and pole plantings should be planted along the bank.<br>• Mid-story plantings including New Mexico privet, three-leaf sumac and wood's rose.<br>• Cattle should be temporarily excluded from site following tamarisk removal to allow for the establishment of native plants.<br>**Other Weed Species Control**<br>Woody:  N/A.<br>Herbaceous:  Russian knapweed is common.  Kochia and whitetop may also be present.  These herbaceous weeds should be controlled to reduce competition with recruiting native plants.<br>**Monitoring & Maintenance**<br>This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years. |

Recommended Site 151B

| Estimated Costs | | |
|---|---|---|
| Hand Control | 50% | $45,307 |
| Mechanical Mulching | 50% | $9,381 |
| Biomass Reduction by Mulching & Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 75% | $12,335 |

BLM_0066131

| | | |
|---|---|---|
| Revegetated Area | 75% | $10,890 |
| Multiplier for Access or Other  Issues | 20% | $15,583 |
| Monitoring and Maintenance for 3-5 years | 25% | $23,374 |
| | **Total Cost** | **$116,870** |

**Recommended Site 151C**
<u>Acreage</u>:  18.36
<u>Landowner</u>:  Moab BLM Office
<u>Maps</u>:  DR38; 4_PS 156 &157

Recommended Site 151C is located on river right and has limited access.  The site consists of a small stand of mixed age cottonwoods along with New Mexico privet, three-leaf sumac, rabbit brush, alkali staccato, salt grass and other grasses.  A light infestation of tamarisk is intermixed with this vegetation.  Knapweed is also present.

This site was recommended for tamarisk control for the following reasons:
- <u>The site would benefit from tamarisk control because</u> – The native riparian species present would benefit from reduced competition and fire risk following tamarisk removal. The young cottonwoods indicate beneficial hydrologic connectivity (Table 1: Criteria A).
- <u>Restoration is likely to succeed because it meets the following Feasibility Characteristics</u> –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Possibly, depending on the funding source
  - A good Native Seed Source is present:  Yes

Recommended Site 151C

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control**<br><u>Control</u>:  Due to relative inaccessibility of the site and the fact that biocontrol is active in the system; tamarisk control may be accomplished via biocontrol.  Alternatively, hand cut-stump techniques could be used if crews were able to raft into the site.<br><u>Biomass</u>:  If tamarisk control is accomplished via biocontrol, biomass could be left standing as the infestation is not severe.  If hand cut-stump methods are used, brush should be stacked outside of the floodplain for wildlife habitat.<br><u>Revegetation</u>:<br>• The high density of natives and relative inaccessibility of the site make passive revegetation the best option here.  However, the site should be carefully monitored to |

M - 102

BLM_0066132

ensure that natives are recruiting.
- Additionally grass seeding will be necessary to repress knapweed.
- Cattle should be temporarily excluded from site following tamarisk removal to allow for the establishment of native plants.

**Other Weed Species Control**
Woody:  N/A
Herbaceous:  Knapweed should be controlled to reduce competition with recruiting native species.

**Monitoring & Maintenance**
This site is relatively easily accessed for monitoring and maintenance. Site visits should be planned at least once a year for the next ten years.

**Other Comments/Concerns**
Grazing should be limited following tamarisk and knapweed control in order to allow for passive revegetation.

Recommended Site 151C

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $27,870 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 75% | $5,509 |
| Revegetated Area | 75% | $2,898 |
| Multiplier for Access or Other  Issues | 20% | $7,256 |
| Monitoring and Maintenance for 3-5 years | 25% | $10,883 |
| | **Total Cost** | **$54,417** |

**Recommended Site 152-Beaver Creek**
Photos:  4.13.09_8 - 4.13.09_11
Acreage:  1.97
Landowner:  Moab BLM Office
Maps:  DR38; 2_PS 152

Recommended Site 152-Beaver Creek is located on river left in the downstream half of river mile 152. There is a broad age range of cottonwoods at this site and a limited infestation of tamarisk.  In addition there is a good mix of native species such as willow, New Mexico privet, and native grasses.  Knapweed is present at the site and will need to be managed.  There are two structures at the site that might be old homesteads, as well as a river campsite.

BLM_0066133

This site was recommended for tamarisk control for the following reasons:

- <u>The site would benefit from tamarisk control because</u> – There are healthy native species, such as cottonwood, New Mexico privet and willow, present in this area that would benefit from the removal of tamarisk and its associated competition and increased fire risk. The diverse age range of the cottonwoods present at this site suggests that hydrologic function here may be good which will aid in the establishment of native plants (Table 1: Criteria A). This site is used as a river rafter's campsite, which increases fire risk, but also provides an opportunity for education and aesthetic improvement (Table 1: Criteria C & G).
- <u>Restoration is likely to succeed because it meets the following Feasibility Characteristics</u> –
  - Funding is available: Not yet determined
  - The Landowner is willing: Likely
  - Site Access is Economically Feasible: Yes
  - A good Native Seed Source is present: Yes

Recommended Site 152-Beaver Creek

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control**<br><u>Control</u>: Hand cut-stump is recommended to preserve existing native species<br><u>Biomass</u>: Biomass may be stacked for wildlife habitat outside of the floodplain.<br><u>Revegetation</u>:<br>• The healthy mix of native species and the limited tamarisk infestation at this site may allow for passive revegetation; however the site should be monitored carefully to ensure that natives are recruiting on their own.<br>• Cattle should be temporarily excluded from site following tamarisk removal to allow for the establishment of native plants.<br>**Other Weed Species Control**<br><u>Woody</u>: N/A<br><u>Herbaceous</u>: Knapweed is present and should be controlled to reduce competition with recruiting native species.<br>**Monitoring & Maintenance**<br>This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years.<br>**Other Comments/Concerns:**<br>There two structures that may be old homestead buildings at this site that may add to the site's cultural value. |

Recommended Site 152-Beaver Creek

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $1,541 |
| Biomass Reduction by | 100% | 0 |

BLM_0066134

| | | |
|---|---|---|
| Natural Decomposition | | |
| Herbaceous Weed Control | 40% | $315 |
| Multiplier for Access or Other  Issues | 20% | $371 |
| Monitoring and Maintenance for 3-5 years | 25% | $557 |
| **Total Cost** | | **$2,784** |

**Recommended Site 155-Fisher Canyon**
Photos:  4.13.09_1 - 4.13.09_3
Acreage:  3.12
Landowner:  Moab BLM Office
Maps:  DR38; 3_PS 155

Recommended Site 155-Fisher Canyon is located on river left at the upstream end of river mile 155.  The site is characterized by a nice assortment of riparian and upland native species including cottonwood, New Mexico privet, greasewood and rabbit brush, mixed in with older tamarisk.  There is a significant infestation of knapweed.  The site is grazed by cattle.

This site was recommended for tamarisk control for the following reasons:
- The site would benefit from tamarisk control because – The native species present at this site would benefit from the reduced competition and fire risk following tamarisk removal (Table 1: Criteria A).
- Restoration is likely to succeed because it meets the following Feasibility Characteristics –
  - o  Funding is available:  Not yet determined
  - o  The Landowner is willing:  Likely
  - o  Site Access is Economically Feasible:  Yes
  - o  A good Native Seed Source is present:  Yes

Recommended Site 155-Fisher Canyon

**Control, Biomass Reduction, & Revegetation Approach**

BLM_0066135

**Tamarisk Control**
Control:  Hand cut-stump is recommended to preserve existing native species
Biomass:  Biomass may be stacked for wildlife habitat outside of the floodplain.
Revegetation:
- The high density of natives and relative inaccessibility of the site make passive revegetation the best option here.  However, the site should be carefully monitored to ensure that natives are recruiting.
- Seed for native grass to aid in outcompeting knapweed.
- Cattle should be temporarily excluded from site following tamarisk removal to allow for the establishment of native plants.

**Other Weed Species Control**
Woody:  N/A
Herbaceous:  There is a significant infestation of knapweed at the site that should be controlled to reduce competition with recruiting native species.

**Monitoring & Maintenance**
This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years.

Recommended Site 155-Fisher Canyon

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $4,739 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 50% | $624 |
| Revegetated Area | 50% | $329 |
| Multiplier for Access or Other  Issues | 20% | $1,138 |
| Monitoring and Maintenance for 3-5 years | 25% | $1,708 |
| | **Total Cost** | **$8,538** |

**Recommended Site 156**
Acreage:  7.07
Landowner:  Moab BLM Offices
Maps:  DR39; 4_PS 156 &157

Recommended Site 156 is located on both sides of the river approximately midway in river mile 156.  On river left, the site features a patch of native plants, such as willow and New Mexico privet, mixed with tamarisk at the mouth of a small side canyon that is marked in the Dolores River Guide as a nice short hike.  On river right there is a river

BLM_0066136

campsite and a mix of tamarisk, willow, phragmites and Baccharis.  Knapweed is present and the site is grazed.  Access is by raft only.

This site was recommended for tamarisk control for the following reasons:
- The site would benefit from tamarisk control because – The campsite and hike marked in the Dolores River Guide means that the site sees increased public use, providing opportunities for education as well as an increased fire hazard at the campsite (Table 1: Criteria C & G). The native riparian species present would benefit from reduced competition and fire risk following tamarisk removal (Table 1: Criteria A).
- Restoration is likely to succeed because it meets the following Feasibility Characteristics –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Possibly, depending on funding sources
  - A good Native Seed Source is present:  Yes

Recommended Site 156

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| Control:  Due to relative inaccessibility of the site and the fact that biocontrol is active in the system; tamarisk control may be accomplished via biocontrol.  Alternatively, hand cut-stump techniques could be used if crews were able to raft into the site. |
| Biomass:  If tamarisk control is accomplished via biocontrol, biomass could be left standing as the infestation is not severe.  If hand cut-stump methods are used, brush should be stacked outside of the floodplain for wildlife habitat. |
| Revegetation: |
| • The high density of natives and relative inaccessibility of the site make passive revegetation the best option here.  However, the site should be carefully monitored to ensure that natives are recruiting. |
| • Cattle should be temporarily excluded from site following tamarisk removal to allow for the establishment of native plants. |
| **Other Weed Species Control** |
| Woody:  There may be one Siberian elm at the site which should be removed if hand cut-stump methods are used. |
| Herbaceous:  Knapweed should be controlled to reduce competition with recruiting native species. |
| **Monitoring & Maintenance** |
| This site is not easily accessed for monitoring and maintenance. Site visits should be planned at least once a year for the next ten years. |
| **Other Comments/Concerns** |
| Grazing should be limited following tamarisk and knapweed control in order to allow for passive revegetation. |

BLM_0066137

Recommended Site 156

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $10,737 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Herbaceous Weed Control | 20% | $566 |
| Revegetated Area | 0% | $0 |
| Multiplier for Access or Other Issues | 20% | $566 |
| Monitoring and Maintenance for 3-5 years | 25% | $3,391 |
| | Total Cost | $16,954 |

**Recommended Site 157**
Acreage:  7.94
Landowner:  Moab BLM Office
Maps:  DR39; 4_PS 156 & 157

Recommended Site 157 is located on river right and makes up the downstream half of river mile 157.  There is a large sandy river camp here at the mouth of a scenic side canyon that features a nice hike.  The site has a mix of mature tamarisk, willow and Baccharis as well as Siberian elms.  Knapweed is common upland of the sandy camp.

This site was recommended for tamarisk control for the following reasons:
- The site would benefit from tamarisk control because – High public use:  the large, sandy camp is likely heavily used by rafters and the side canyon hike adds to human traffic.  These factors provide opportunities for education as well as increase the fire risk at the site (Table 1: Criteria C & G).  In addition there is valuable native vegetation at the site that it would be desirable to preserve (Table 1: Criteria A).
- Restoration is likely to succeed because it meets the following Feasibility Characteristics –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Possibly, depending on the funding source
  - A good Native Seed Source is present:  Yes

Recommended Site 157

| Control, Biomass Reduction, & Revegetation Approach |
|---|

M - 108

BLM_0066138

**Tamarisk Control**

Control:  Biocontrol may reduce tamarisk infestation, or if desired work crews could raft in and hand cut-stump methods could be used.

Biomass:  If tamarisk is controlled via biocontrol, biomass may be left standing.  If hand cut-stump methods are used, brush should be piled outside of the floodplain for wildlife habitat.

Revegetation:
- Due to the relative inaccessibility of this site and presence of native species, passive revegetation is the best option.
- Seeding with native grasses should be considered if knapweed is controlled.

**Other Weed Species Control**

Woody:  Siberian elms are present.  Even if tamarisk control is left to biological control, cut-stump treatment of Siberian elms should be considered.

Herbaceous:  Knapweed is common upland of tamarisk infestation.  Knapweed should be controlled to reduce competition with recruiting native plants.

**Monitoring & Maintenance**

This site is not easily accessed for monitoring and maintenance. Site visits should be planned at least once a year for the next ten years.

**Other Comments & Concerns**

This site should be prioritized only if a raft trip for Conservation Corps crews is desired to satisfy other value based criteria (Table 1: Criteria G).  Otherwise, the relative inaccessibility of this site makes it a low priority.

Recommended Site 157

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $12,053 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 50% | $1,588 |
| Revegetated Area | 50% | $836 |
| Multiplier for Access or Other  Issues | 20% | $2,895 |
| Monitoring and Maintenance for 3-5 years | 25% | $4,343 |
| Total Cost | | $21,716 |

**Recommended Site 158**

Acreage:  4.47

Landowner:  Moab BLM Office

Maps:  DR40; 5_PS 158 & 159

M - 109

BLM_0066139

Recommended Site 158 is located on river right at the end of river mile 158. The site is characterized by a mix of tamarisk, willows and phragmites. There is a river campsite at this site.

This site was recommended for tamarisk control for the following reasons:
- <u>The site should benefit from tamarisk control because</u> – There are healthy native species on the site (willow and phragmites) that would benefit from reduced competition and fire risk following tamarisk removal (Table 1: Criteria A). The campsite means that the site is used by the public, which provides opportunities for education as well as an increased fire risk at the site (Table 1: Criteria C & G).
- <u>Restoration is likely to succeed because it meets the following Feasibility Characteristics</u> –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Possibly, depending on the funding source
  - A good Native Seed Source is present:  Yes

Recommended Site 158

| **Control, Biomass Reduction, & Revegetation Approach** |
| --- |
| **Tamarisk Control** <br> <u>Control</u>:  Due to relative inaccessibility of the site and the fact that biocontrol is active in the system; tamarisk control may be accomplished via biocontrol.  Alternatively, hand cut-stump techniques could be used if crews were able to raft into the site. <br> <u>Biomass</u>:  Pile cut tamarisk outside of floodplain for wildlife habitat. <br> <u>Revegetation</u>:  The high density of natives and relative inaccessibility of the site make passive revegetation the best option here.  However, the site should be carefully monitored to ensure that natives are recruiting. <br> **Other Weed Species Control** <br> <u>Woody</u>:  N/A <br> <u>Herbaceous</u>:  N/A <br> **Monitoring & Maintenance** <br> This site is not easily accessible for monitoring and maintenance.  Site visits should be planned at least once a year for the next ten years. |

Recommended Site 158

| Estimated Costs | | |
| --- | --- | --- |
| Hand Control | 100% | $9,847 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Multiplier for Access or Other  Issues | 20% | $1,969 |

BLM_0066104

| Monitoring and Maintenance for 3-5 years | 25% | $2,954 |
|---|---|---|
| | **Total Cost** | **$14,771** |

**Recommended Site 159**
<u>Acreage</u>:  9.48
<u>Landowner</u>:  Moab BLM Office
<u>Maps</u>:  DR39

Recommended site 159 is located on river left at the start of river mile 159.  The site is characterized by a mix of tamarisk, New Mexico privet, willows and Baccharis.  There is a river rafter's campsite at this site.

This site was recommended for tamarisk control for the following reasons:
- <u>The site should benefit from tamarisk control because</u> – There are healthy native species on the site (willow and New Mexico privet) that would benefit from reduced competition and fire risk following tamarisk removal (Table 1: Criteria A).  The campsite means that the site is used by the public, which provides opportunities for education as well as an increased fire risk at the site (Table 1: Criteria C & G).
- <u>Restoration is likely to succeed because it meets the following Feasibility Characteristics</u> –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Possibly depending on the funding source
  - A good Native Seed Source is present:  Yes

Recommended Site 159

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** <br> <u>Control</u>:  Due to relative inaccessibility of the site and the fact that biocontrol is active in the system; tamarisk control may be accomplished via biocontrol.  Alternatively, hand cut-stump techniques could be used if crews were able to raft into the site. <br> <u>Biomass</u>:  Pile cut tamarisk outside of floodplain for wildlife habitat. <br> <u>Revegetation</u>:  The high density of natives and relative inaccessibility of the site make passive revegetation the best option here.  However, the site should be carefully monitored to ensure that natives are recruiting. <br> **Other Weed Species Control** <br> <u>Woody</u>:  N/A <br> <u>Herbaceous</u>:  N/A <br> **Monitoring & Maintenance** <br> This site is not easily accessible for monitoring and maintenance.  Site visits should be |

BLM_0066141

planned at least once a year for the next ten years.

Recommended Site 159

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $20,890 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Multiplier for Access or Other Issues | 20% | $4,178 |
| Monitoring and Maintenance for 3-5 years | 25% | $6,267 |
| | Total Cost | $31,334 |

**Recommended Site 161-Entrada Ranch**
Acreage: 11.76
Landowner: Private - University of Utah
Maps: DR40; 6_PS 161

Recommended site 161 is located on both sides of the river along the bend between river mile 160 and 161. The site is characterized by a fairly narrow infestation of tamarisk mixed with native species such as willows, phragmites and some privet, three-leaf sumac and rose. There are a few cottonwoods on the site including some along the road, significantly farther inland than the rest of the riparian vegetation. The site is accessible by road is part of the Entrada Ranch Field Station operated by the University of Utah. This site was not assessed on foot during the survey period because landowner permission had not yet been secured. A more detailed on-the-ground assessment should be performed prior to initiating any work.

Entrada Ranch was contacted during this project and requested that the Recommended Site listed below be considered for work. Tamarisk and Russian knapweed experiments are being conducted on other areas on the property and restoration work can not be completed there.

The site was recommended for tamarisk control for the following reasons:
- The site would benefit from tamarisk control because – There are native species at the site that would benefit from reduced competition and fire risk following tamarisk removal (Table 1: Criteria A). In addition, the site is part of field research station at which there is ongoing research on tamarisk. Restoration at this site would provide an opportunity for the process to be studied, evaluated and inform future restoration efforts (Adaptive Management).

M - 112

BLM_0066142

- Restoration is likely to succeed because it meets the following Feasibility
  Characteristics –
    o Funding is available:  Not yet determined
    o The Landowner is willing:  Likely
    o Site Access is Economically Feasible:  Yes
    o A good Native Seed Source is present:  Yes

Recommended Site 161

| Control, Biomass Reduction, & Revegetation Approach |
| --- |
| **Tamarisk Control**<br>Control:  In most areas of this site, there is native vegetation mixed in with the tamarisk and hand-cut stump techniques should be used to preserve native plants.<br>Biomass:  Pile hand-cut tamarisk outside of floodplain for wildlife habitat.<br>Revegetation:<br>• Willow bundles and/or pole plantings should be planted the winter following tamarisk removal.<br>• Site should be reassessed on foot to determine presence of herbaceous invasives such as knapweed.<br>• Other native species, such as wood's rose, New Mexico privet and three-leaf sumac may be appropriate in areas where tamarisk is removed.<br>**Other Weed Species Control**<br>Woody:  N/A<br>Herbaceous:  N/A (but should be assessed on-the ground)<br>**Monitoring & Maintenance**<br>This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years.<br>**Other Comments/Concerns**<br>Because this site is a part of field research station, there is a unique opportunity for collaboration and education that should not be overlooked. |

Recommended Site 161

| Estimated Costs | | |
| --- | --- | --- |
| Hand Control | 100% | $18,839 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Multiplier for Access or Other  Issues | 20% | $3,768 |
| Monitoring and Maintenance for 3-5 years | 25% | $5,652 |
| **Total Cost** | | **$28,258** |

BLM_0066143

**Recommended Site 167**
Acreage:  7.53
Landowner:  Moab BLM Office
Maps:  DR41; 7_PS 167

Recommended site 167 is located on river right in the upstream half of river mile 167. The site is characterized by tamarisk mixed with some native willows and New Mexico privet.  There is a lone cottonwood on this site as well as one of the very few Russian olives that were observed on the Dolores River.  There is a two-track road to the site, but it may only be accessible via a roundabout route over Glade Park in Colorado.  The site is probably most easily accessed by raft and there is a river campsite located on the site. This site was not assessed on foot and an on-the-ground assessment should be performed before any work is planned.

This site was recommended for tamarisk control for the following reasons:
- The site would benefit from tamarisk control because – There are native species present, such as willow and New Mexico privet, that would benefit from reduced competition following tamarisk removal (Table 1: Criteria A).  In addition, there is a campsite located here which increases the potential for wildfire, but also presents an opportunity for education (Table 1: Criteria C & G).
- Restoration is likely to succeed because it meets the following Feasibility Characteristics –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Possibly, depending on funding source
  - A good Native Seed Source is present:  Yes

Recommended Site 167

| Control, Biomass Reduction, & Revegetation Approach |
| --- |
| **Tamarisk Control** |
| Control:  Due to the relative inaccessibility of the site and the native vegetation mixed in with the tamarisk, hand-cut stump techniques should be used to preserve native plants. Alternatively, because there are beetles active in the area, tamarisk control may be accomplished via biocontrol. |
| Biomass:  Pile hand-cut tamarisk outside of floodplain for wildlife habitat. |
| Revegetation: |
| • Site should be reassessed on foot to determine presence of herbaceous invasive such as knapweed. |
| • The relatively high density of natives and relative inaccessibility of the site make passive revegetation the best option here.  However the site should be carefully monitored to ensure that natives are recruiting. |
| **Other Weed Species Control** |
| Woody:  N/A |
| Herbaceous:  N/A (But should be assessed on-the-ground- knapweed is present in the area.) |

BLM_0066144

> **Monitoring & Maintenance**
> This site is not easily accessed for monitoring and maintenance. Site visits should be planned at least once a year for ten years.

Recommended Site 167

| Estimated Costs | | |
|---|---|---|
| Hand Control | 100% | $25,852 |
| Biomass Reduction by Natural Decomposition | 100% | $0 |
| Multiplier for Access or Other Issues | 20% | $5,170 |
| Monitoring and Maintenance for 3-5 years | 25% | $7,756 |
| | **Total Cost** | **$38,778** |

**Recommended Site 170 - Lake Bottom**
Photos:  5.21.09_09 - 5.21.09_18
Acreage:  66.68
Landowner:  State of Utah
Maps:  DR42; 8_PS 170, 171

Recommended Site 170 is located on river right and occupies the bend between river mile 169 and 170.  This site is interesting because it was burned extensively in 2009.  There is high public use of this site as the road crosses the river here (at low water) and there is a river camp.  There is a wetlands area in the center of the site against the bluff.  Prior to the burn, the site supported many cottonwoods, New Mexico privet and tamarisk.  About 50% of the cottonwoods appear to have survived the fire and much of the tamarisk (and perhaps some of the New Mexico privet) appears to be re-sprouting.  Currently there is a heavy infestation of Russian knapweed in the burned areas.

The Moab BLM Office has been monitoring this site and should be contacted about any work planed here.

This site was recommended for tamarisk control for the following reasons:
- The site would benefit from tamarisk control because – There are valuable cottonwoods here that would benefit from fire risk reduction when tamarisk is removed (as evidenced by the cottonwoods lost to the recent fire) (Table 1: Criteria A).  This site sees high public use due to the road crossing and the campsite.  These features increase the potential for fire as well as provide an opportunity for public education (Table 1: Criteria C & G).  In addition there is a

M - 115

BLM_0066145

small wetland area in this site that likely has high value as wildlife habitat (Table 1: Criteria B & E).  The recent burn at this site makes it interesting from an adaptive management perspective.

- Restoration is likely to succeed because it meets the following Feasibility Characteristics –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Yes
  - A good Native Seed Source is present:  Yes

Recommended Site 170- Lake Bottom

| Control, Biomass Reduction, & Revegetation Approach |
|---|
| **Tamarisk Control** |
| Control:  Most of the tamarisk at this site has been burned in a wildfire and resprouts should be controlled using foliar spraying.  Any remaining unburned tamarisk should be controlled using hand cut-stump methods. |
| Biomass:  Biomass has already been reduced via wildfire.  Any unburned tamarisk that is cut can be piled outside of the floodplain for wildlife habitat. |
| Revegetation: Native grass seed should be applied to prevent reinvasion of knapweed following herbaceous weed control.  Site should be monitored to determine if burned privet and other natives are re-sprouting or recruiting. |
| **Other Weed Species Control** |
| Woody:  N/A |
| Herbaceous:  There is a severe Russian knapweed infestation that needs to be controlled to allow for recruitment of native species. |
| **Monitoring & Maintenance** |
| Even if no restoration work is done here, this site is a high Priority for monitoring.  Documenting the process of re-growth after a burn will be informative for riparian restoration work. |
| **Other Comments/Concerns** |
| This site should be prioritized only if a raft trip for Conservation Corps crews is desired to satisfy other value based criteria (Table 1: Criteria G).  Otherwise, the relative inaccessibility of this site makes it a low priority. |

Recommended Site 170- Lake Bottom

| Estimated Costs | | |
|---|---|---|
| Hand Control | 10% | $26,487 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 100% | $26,673 |
| Revegetated Area | 100% | $62,100 |
| Multiplier for Access or | 20% | $23,052 |

M - 116

BLM_0066146

| Other Issues | | |
|---|---|---|
| Monitoring and Maintenance for 3-5 years | 25% | $34,578 |
| | **Total Cost** | **$172,890** |

**Recommended Site 171- Lake Bottom**
Acreage:  54.49
Landowner:  State of Utah
Maps:  DR42; 8_PS 170, 171

Recommended Site 171 is located on river left at river mile 171 near the confluence with the Colorado.  The site features many nice cottonwoods as well as willows mixed in with tamarisk.  The site is accessible via road.

This site was recommended for tamarisk control for the following reasons:
- The site would benefit from tamarisk control because – The cottonwoods and other natives at the site would benefit from reduced competition and fire risk following tamarisk removal (Table 1: Criteria A).  This site sees high public use due to the road crossing and the campsite.  These features increase the potential for fire as well as provide an opportunity for public education (Table 1: Criteria C & G).
- Restoration is likely to succeed because it meets the following Feasibility Characteristics –
  - Funding is available:  Not yet determined
  - The Landowner is willing:  Likely
  - Site Access is Economically Feasible:  Yes
  - A good Native Seed Source is present:  Yes

Recommended Site 171- Lake Bottom

| **Control, Biomass Reduction, & Revegetation Approach** |
|---|
| **Tamarisk Control** |
| Control:  A timber or hydro ax should be used to control 50% of the infestation. Hand cut-stump should be used for the remaining 50%. |
| Biomass:  Biomass left after cut-stump treatment can be stacked outside the floodplain for wildlife habitat. |
| Revegetation: |
| • The relatively high density of natives may allow for passive revegetation at this site. However, the site should be monitored carefully to ensure recruitment of native species. |
| • Seed with native grasses to help outcompete knapweed. |
| **Other Weed Species Control** |

BLM_0066147

Woody:  N/A
Herbaceous:  Russian knapweed is present and should be controlled to reduce competition with recruiting native species.
**Monitoring & Maintenance**
This site will be easily accessed for monitoring and maintenance. Site visits should be planned twice a year for three years and then once per year for the next seven years.
**Other Comments/Concerns**
This site was surveyed by raft and should be reassessed on foot to ensure that no infestations of herbaceous invasives are present.

Recommended Site 171- Lake Bottom

| Estimated Costs | | |
|---|---|---|
| Hand Control | 50% | $41,349 |
| Mechanical Mulching | 50% | $8,561 |
| Biomass Reduction by Natural Decomposition | 100% | 0 |
| Herbaceous Weed Control | 60% | $13,078 |
| Revegetated Area | 40% | $4,587 |
| Multiplier for Access or Other  Issues | 20% | $13,515 |
| Monitoring and Maintenance for 3-5 years | 25% | $20,272 |
| **Total Cost** | | **$101,362** |

BLM_0066148



# THE WILDLIFE SOCIETY

**FACT SHEET**

# Impacts of Disease on Bighorn Sheep Management



A Rocky Mountain bighorn ram near Flathead Lake in Montana. Bighorns, once ubiquitous throughout the West, are threatened by disease introduced from domestic sheep (Credit: William Mullins).

## WHY ARE BIGHORNS VULNERABLE TO DISEASE?

Bighorn sheep evolved in North America thousands of years before domestic sheep were introduced by European settlers. The domestic sheep brought novel diseases to which native sheep had never evolved a resistance. Bighorns also venture widely in search of resources and other herds. These journeys increase the chance of contact with domestic sheep.

Bighorn sheep (*Ovis canadensis*) are an iconic species of the American West. Wildlife managers have used reintroductions to restore wild sheep populations in response to declines over the past 150 years. However, diseases introduced by domestic sheep and goats have negatively impacted the size and viability of bighorn populations, reducing the effectiveness of reintroductions throughout public lands. Government agencies and nonprofits are exploring new management strategies to manage wild bighorn sheep and protect them from disease.

### History of the Bighorn Sheep

Bighorn sheep (*Ovis canadensis*) are large, wild ungulates native to western rocky and arid land. Their preferred habitats are barren and rugged areas containing steep hillsides or rocky outcrops that can be used to avoid predators.[1]

Bighorns were one of the most abundant wild ungulates in the west. Population estimates range from 1.5 million to 2 million at the onset of the 19th century.[2,3] Populations declined with westward expansion of human populations due to overhunting, introduction of domestic sheep and goats, and overgrazing of rangelands. Bighorns were extirpated from Washington, Oregon, southwestern Idaho, northeastern California, Nebraska, the Dakotas, northern Nevada, Texas, and drastically reduced in other states and Canadian provinces by the end of the 19th century.[4,5]

### Restoration and Obstacles

State and federal wildlife agencies have used translocations and federal protections to repopulate bighorn sheep habitat.[4,6,7] The Sierra Nevada subspecies (*O. c. sierrae*), and the peninsular Distinct Population Segment (DPS) of the desert subspecies

(*O. c. nelsoni*) are listed as endangered under the Endangered Species Act.[8] Restoration and protection have allowed North American populations to grow from an estimated 25,000 in 1955[9] to 70,000 in the 1990's[10], but growth has stagnated since despite continued efforts. There are currently an estimated 80,000 bighorns in North America.[11]

The main obstacle to restoring populations is bacterial pneumonia.[5,12] Disease outbreaks have plagued bighorns for at least a century with reports from Colorado as early as 1885.[13] Evidence from wildlife scientists and managers associates contact with domestic sheep and goats and subsequent transfer of bacteria as the root cause for disease-caused mortality events.[4]



A bighorn lamb. Lamb recruitment is reduced for several years after initial mortality events in herds affected by pneumonia infections (Credit: Tony Bynum).

## Domestic Sheep and Pneumonia

Domestic sheep, originally from Europe, have evolved resistance to several forms of respiratory diseases and are able to carry the disease-causing bacteria without clinical symptoms.[14] Several studies have shown that these bacteria are highly virulent in wild bighorn sheep and prove lethal after transmission from domestic sheep herds.[2,14]

Numerous controlled experiments have shown more than 90% mortality in bighorn populations due to respiratory diseases within two months after exposure to domestic sheep.[15,16,17] Several disease-caused mortality events have been recorded in wild populations immediately after contact with domestic sheep in northeastern Oregon, central Colorado, Washington, California, Nevada, Montana, the Dakotas, British Columbia, Alberta, and other locations.[12,16,18,19,20] The disease persists following mortality events and reduces reproductive success, preventing regrowth of the population.[12]



Circa 1850[9]   Circa 1960[9]   Circa 2012[23]

The estimated ranges of bighorn sheep over time in western North America. The introduction of domestic sheep and goats, and historic overhunting led to large reductions in range size and local extirpations (Credit: Wild Sheep Foundation[22], WAFWA[3]).

## Management Implications

State wildlife managers, federal officials, and bighorn advocates have emphasized the need to reduce contact between wild and domestic sheep species, citing evidence of disease transfer.[3,21] But federal and state lands – where most of the bighorn populations reside – are also allotted for domestic sheep grazing. Land managers are tasked with balancing the needs of the domestic sheep industry with the conservation of the wild bighorns while accounting for several compounding factors. The "foray" behavior of wild sheep, where individuals will travel up to 50km searching for food and other herds, facilitates the spread of disease[22] while domestic sheep strays are common and increase interaction. Experimental trials to develop and test vaccines are underway, but are far from conclusive. If successfully developed, vaccinations would be logistically difficulty and expensive to administer[4]



Close contact between a wild bighorn and a flock of domestic sheep grazing near Yellowstone River in Montana. Research has shown that the bighorns contract pneumonia-causing bacteria that the sheep carry and then spread the disease rapidly among their own herds leading to high levels of mortality in addition to low reproductive capacity for several years (Credit: Kevin Hurley).

Separating domestic sheep allotments and wild sheep habitat is the most viable current management option.[3,5,16,21,22] U.S Forest Service and Bureau of Land Management personnel have developed a data-driven Risk of Contact Assessment tool which identifies and evaluates interspecies contact to help land managers make land use decisions that reduce the risk of contact.

1. Krausman, Paul R. 2000. An introduction to the restoration of bighorn sheep. Restoration Ecology 8: 3-5.
2. Lawrence, Paulraj K., et al. 2010. Transmission of Mannheimia haemolytica from domestic sheep (Ovis aries) to bighorn sheep (Ovis canadensis): Unequivocal demonstration with green fluorescent protein-tagged organisms. Journal of Wildlife Diseases 46: 706-717.
3. Wild Sheep Working Group. 2012. Recommendations for Domestic Sheep and Goat Management in Wild Sheep Habitat. Western Association of Fish and Wildlife Agencies.
4. Wehausen, John D., Scott T. Kelley, and Rob R. Ramey II. 2011. Domestic sheep, bighorn sheep, and respiratory disease: A review of the experimental evidence. California Fish and Game 97: 7-24.
5. Cahn, Maya L., et al. 2011. Disease, population viability, and recovery of endangered Sierra Nevada bighorn sheep. Journal of Wildlife Management 75, no. 8 (November): 1753-1766.
6. Singer, F. J., et al. 2000. Translocations as tool for restoring populations of bighorn sheep. Restoration Ecology 8: 6-13.
7. Ramey II, R. R. 1993. Evolutionary genetics and systematics of North American mountain sheep. Ph.D. Thesis, Cornell University, Ithaca, New York, USA.
8. U.S. Forest Service. 2014. Index of species information, Ovis canadensis. Accessed August 2014 from http://www.fs.fed.us/database/feis/animals/mammal/ovca/all.html
9. Buechner, H. K. 1960. The bighorn sheep in the United States, its past , present and future. Wildlife Monograph 4.
10. Valdez, R., and P. R. Krausman. 1999. Description, distribution, and abundance of mountain sheep in North America. Pages 3-22 in R. Valdez and P. R. Krausman, editors. Mountain sheep of North America. The University of Arizona Press, Tucson Arizona.
11. personal communication, Kevin Hurley, Conservation Director, Wild Sheep Foundation and Clay Brewer, Chair, WAFWA Wild Sheep Working Group.
12. George, Janet L., et al. 2008. Epidemic Pasteurellosis in a bighorn sheep population coinciding with the appearance of a domestic sheep. Journal of Wildlife Diseases 44: 388-403.
13. Coggins, Victor L. 2010. Historic bighorn sheep disease outbreaks in western North America and mountain sheep extirpation from Oregon. In proceedings of Northern Wild Sheep and Goat Council's 17th Biennial Symposium, Hood River, OR. June 7-11.
14. Foreyt, William J., et al. 1994. Fatal pneumonia following inoculation of healthy bighorn sheep with Pasteurella haemolytica from healthy domestic sheep. Journal of Wildlife Diseases 30: 137-143.
15. Drew, Mark L., et al. 2014. Health status and microbial (Pasteurellaceae) flora of free-ranging bighorn sheep following contact with domestic ruminants. Wildlife Society Bulletin 38: 332-340.
16. Foreyt, William J. 1989. Fatal Pasteurella haemolytica pneumonia in bighorn sheep after direct contact with clinically normal domestic sheep. Am J Vet Res 50: 341-344.
17. Onderka, D. K. and W. D. Wishart. 1988. Experimental contact transmission of Pasteurella haemolytica from clinically normal domestic sheep causing pneumonia in Rocky Mountain bighorn sheep. Journal of Wildlife Diseases 24: 663-337.
18. Foreyt, W. J., and D. A. Jessup. 1982. Fatal pneumonia of bighorn sheep following association with domestic sheep. Journal of Wildlife Diseases 32: 594-602.
19. Coggins V. L. 1988. The Lostine Rocky Mountain bighorn sheep die-offs and domestic sheep. Proceedings of the Biennial Symposium of Northern Sheep and Goat Council 6: 57-64.
20. Elena Garde et al. 2005. Examining the risk of disease transmission between wild Dall's sheep and mountain goats, and introduced domestic sheep, goats, and llamas in the Northwest Territories. Other Publications in Zoonotics and Wildlife Disease. Paper 29.
21. Schommer, Timothy J. and Melanie M. Woolever. 2008. A review of disease related conflicts between domestic sheep and goats and bighorn sheep. U.S. Forest Service. Report RMRS-GTR-209.
22. O'Brien, Joshua M., et al. 2014. Incorporating foray behavior into models estimating contact risk between bighorn sheep and areas occupied by domestic sheep. Wildlife Society Bulletin 38: 321-331.
23. Wild Sheep Foundation. 2014. Wild Sheep Foundation website. Accessed September 2014 from www.wildsheepfoundation.org



**The Wildlife Society**
Laura Bies
Director of Government Affairs
5410 Grosvenor Lane
Bethesda, MD 20814
laura@wildlife.org

See our other Fact Sheets and Position Statements at **wildlife.org/policy**

BLM_0066150

Case No. 1:20-cv-02484-MSK   Document 48-8   filed 04/28/21   USDC Colorado   pg 195 of 265





Shared methods. **Smarter conservation.**   Home   Library   TNC's Priorities   Science Chronicles   Subscribe

Go »

Advanced Search

**Conservation Planning**      **Conservation Practices**      **Conservation By Geography**

**Welcome to Conservation Gateway**

The Gateway is for the conservation practitioner, scientist and decision-maker. Here we share the best and most up-to-date information we use to inform our work at The Nature Conservancy.

 **CONSERVATION LANDS**    **MEASURES**

## San Miguel/Lower Dolores River Project: Measures of Conservation Success

The Nature Conservancy
8/7/2012

**DOWNLOAD FILE:**



Pressured by oil and gas development, invasive species, altered hydrology and wildlife diseases, this area has been identified as a priority landscape for conservation efforts. The vision for these watersheds is the conservation of dynamically-functioning river systems with healthy riparian and aquatic communities and includes working in partnership with local communities and public entities for long-term conservation of the area's biodiversity.

*Citation:*
San Miguel/Lower Dolores River Project: Measures of Conservation Success. The Nature Conservancy, Boulder, Colorado. 2008.

GO BACK »

**About the Gateway**

About
Contact Us
Site Map
Sign in

**Additional Resources**

Nature.org
ConserveOnline
ConPro
CoolGreenScience
Conservation Training



The Nature Conservancy is the leading conservation organization working around the world to protect ecologically important lands and waters for nature and people.
VISIT NATURE.ORG »

© Copyright 2010 The Nature Conservancy. All rights reserved. Terms of Use | Privacy Policy | Governance | Financials

BLM_0066151

# A Review of Hydro "Fracking" and its Potential Effects on Real Estate

Ron Throupe
*University of Denver*

Robert A. Simons
*Cleveland State University*

Xue Mao
*University of Denver*

*Abstract*

In this paper we review the phenomena of hydro "fracking" operations for oil and gas in the United States. We provide background information on fracking, a summary of federal and state fracking disclosure and management regulations, and an evaluation of the potential surface and subsurface effects. We then examine case studies of claims of contamination from several shale-heavy states. Lastly, we report the results of survey research related to proximity to fracking operations in Texas and Florida. Our contingent valuation surveys show a 5%–15% reduction in bid value for homes located proximate to fracking scenarios, depending on the petroleum-friendliness of the venue and proximity to the drilling site.

As the international thirst for hydrocarbons continues unabated, domestic exploration in the United States has turned away from oil and natural gas in underground and offshore pockets to other alternatives. In the 1980s, we had an abortive quest to exploit oil shale in Colorado. The Canadian tar sands process was initiated at about the same time, and is just now gathering momentum where its products can be delivered to the U.S. and other markets by a controversial pipeline though the northern Midwest. For the past few years, a relatively "new" exploration procedure, "fracking" or "hydro-fracking," has been developed to extract natural gas trapped in dense shale deposits. Tens of thousands of shale extraction leases have already been signed, keeping many landmen busy, but very little is known about the effects of the fracking process on the local environment and on proximate real estate markets. There is almost no real estate sales data on this issue, indicating a need for alternative methods such as contingent evaluation analysis. Yet, there is tremendous urgency to move forward with exploration, for many viable reasons.

The speed of this exploration will likely be driven by the price of natural gas [currently $4.04 per million British Thermal Units (BTUs)][1] compared with the price of extracting the gas from the ground. In general, based on hydrocarbon BTUs, shale gas is much cheaper to extract than oil, and is much less polluting than coal, thus better for greenhouse gas emissions. Within the shale deposit options, some like the Marcellus and Utica shale deposits in Ohio, Pennsylvania, and New York cost less than $2 per metric cubic feet (MCF) to extract, while shale in other locales are only profitable above $3 per million BTU's of energy.[2] Further, there's a political

BLM_0066152

controversy if hydro-fracking is an alternative energy. Since it's a hydrocarbon, some say it's not, especially compared with renewable sources like solar or wind. However, the big energy company players involved, plus some others, argue that hydro-fracking is a new source of energy. In a down economy, economic development (especially the gold standard: job creation) from shale exploration and production potential is quite large. In manufacturing-heavy Ohio, for example, the unemployment rate shrank from above the national average in most years, to a point below the national average in August, 2012 (7.2% vs. 8.3%).[3]

The oil and gas industry continues to claim that there has never been a case of fracking fluid in "direct" contamination to drinking water. They promote fracking as safe, but the number of documented spills, blowouts, leaks, trucking accidents, and pollution from normal drilling activities appears to contradict these benign claims. The focus has been clearly on the well and casing maintenance, not on other effects or conditions. One main concern is the potential for fracking to invade historic groundwater drinking wells near drilling areas, or old oil and gas wells, where the new operations could blow out their seals or create a vertical conduit to upward aquifers or the surface. The oil and gas industry continues to say the mixture is mostly water and sand and a little bit of chemicals on a percentage basis. However, when even very small amounts of chemical exposure are hazardous (e.g., benzene toxicity, which is measured in parts per billion), this is a potential concern. The actual amounts of chemicals are tens of thousands of gallons per well.

The oil and gas industry in the U.S. is an economic driver, and has evolved over the last 20 years from a public focus on offshore drilling and traditional exploration to a more diversified set of activities. Technological advances in drilling have created the ability to extract oil and gas deposits that were not economically feasible a decade ago. Hydraulic fracturing is frequently used in the completion of gas wells, particularly those involved in what's called "unconventional production," such as production from so-called "tight shale" reservoirs. The process has been used on over 1 million producing wells. As the technology continues to develop and improve, operators now fracture as many as 35,000 wells of all types (vertical and horizontal, oil and natural gas) each year.[4] This circumstance and an exemption from monitoring of drilling operations have led to a boom in drilling operations and in particular the ability to "frack" a new or existing well to create a producing well when previously not economically feasible.

This paper introduces the concept of hydraulic fracking as a new lexicon for oil and gas drilling. Fracking is now associated with drilling of all types, whether a well is actually fracked or not. Although the fracking (injecting a mixture of water, sand, and chemicals into the groundwater to facilitate hydrocarbon recovery) process has been used since at least the late 1970s in the Rangely Oil Field of northwestern Colorado, to facilitate secondary or tertiary recovery of oil and gas, its focus was never as a primary technique. What's new is a primary recovery of shale gas, and vastly upgraded horizontal drilling techniques. Thus, due to the maturity of the on-shore, hydrocarbon extraction business in the U.S., it's expected that a majority of wells drilled in the near future will be fracked multiple times over their production life.

BLM_0066153

The organization of the paper is as follows: We first provide background information on fracking, including the concept, history, locations of deposits, and chemical concerns. We continue with a summary of federal and state fracking disclosure and management regulations. This is followed by existing peer-reviewed literature on petroleum damages to residential property and evaluation of the potential surface and subsurface effects. We then examine case studies of claims of contamination from several shale-heavy states. Next, we discuss the results of survey research related to proximity to "fracking" operations in Texas and Florida. We close with policy recommendations and calls for future research.

## BACKGROUND ON FRACKING

Hydraulic fracturing is not a "drilling process" but a process used after the drilled hole is completed. Hydraulic fracturing or "fracking" is the propagating of fractures in a rock layer caused by the presence of a pressurized fluid creating small cracks, or fractures, in deep, underground geological formations to liberate oil or natural gas. This process is used to release petroleum, natural gas (including shale gas, tight gas, and coal seam gas), or other substances for extraction, via a technique called induced hydraulic fracturing. "Protecting groundwater contained in intervening aquifers are important steps to take during the fracking process. In this process, chemical-and-sand-laden watery fluid will be pumped down into the well and the watery oil or gas will eventually be collected. Therefore, in order to prevent the fluid from entering the water supply, steel surface or intermediate casing need to be inserted into the well. Normally the depths of the insertions are between 1,000 and 4,000 feet. Also, cement needs to be filled into the annulus, the space between the casing strings and the drilled hole. Once the cement has set, then the drilling continues from the bottom of the surface or intermediate cemented steel casing to the next depth. This process is repeated, using smaller steel casing each time, until the oil and gas-bearing reservoir is reached (generally 6,000 to 10,000 feet)."[5]

To fracture the formation, fracturing fluids—water and sand, and proprietary chemical mixes—are injected down the well bore into the formation. The fluid, injected under pressure, causes the rock to fracture along weak areas. The fluids that create the initial fractures are then mixed with thicker fluids that include sand and gelatin. These thicker fluids lengthen the openings in the rock. When the fractures are complete, and pressure is relieved, a portion of the fluids flows back up the well where it is captured and stored for later treatment or disposal. As the fluids flow back up, sand remains in the fractures and props the rock open, maintaining an open pathway to the well. This allows the oil and gas to seep from the rock into the pathway, up the well and to the surface for collection. A distinction can be made between low-volume hydraulic fracturing used to stimulate high-permeability reservoirs, which may consume typically 20,000 to 80,000 gallons of fluid per well, with high-volume hydraulic fracturing, used in the completion of tight gas and shale gas wells; enormous amounts of water, up to 5 million gallons of water for a single well. After the fracturing procedure is complete, 15% to 80% of the fluid returns to the surface as waste water, often contaminated by fracturing chemicals and subsurface contaminants including

BLM_0066154

toxic organic compounds, heavy metals, and naturally occurring radioactive materials. Left untreated or not adequately secured, this wastewater can have detrimental environmental and health effects. Exhibit 1 is an overview of the fracking process.

## HISTORY OF FRACKING IN THE U.S.

The first fracking operation in the U.S. was performed in 1947 in the Hugoton Kansas gas fields by Halliburton. However, hydraulic fracking did not become economical for commercial use for several decades. Significant R&D was necessary before hydraulic fracturing could be commercially applied to shale gas deposits, due to shale's high porosity and low permeability. In the 1970s, the federal government initiated both the Eastern Gas Shale Project and the Gas Research Institute. The Eastern Shale Project was a dozen public-private hydro-fracturing pilot demonstration projects. The Gas Research Institute was established as a gas industry research consortium receiving approval for research and funding from the Federal Energy Regulatory Commission. During that time, Sandia National Laboratories was conducting research into microseismic imaging for use in coal beds. Sandia contributed its geologic micro-mapping software, which proved to be crucial for the commercial recovery of natural gas from shale. In the late 1970s, the Department of Energy (DOE) pioneered massive hydraulic fracturing, a drilling technique, later improved upon for the economic recovery of shale gas. In 1986, a joint DOE-private venture completed the first successful multi-fracture horizontal well in shale. The DOE later subsidized Mitchell Energy's first successful horizontal drilling in the north-Texas Barnett Shale in 1991. Mitchell Energy engineers developed the hydraulic fracturing technique known as "slickwater fracturing," the addition of chemicals to water to increase fluid flow. This innovation was implemented in 1996, and started the modern shale gas boom.

## ADVANCES IN DRILLING: GOING HORIZONTAL

Technological drilling advances allow drillers to deviate from vertical drilling, and steer the drilling equipment to a location that is not directly underneath the point of entry. This is in contrast to 'slant drilling' where the well is drilled at an angle instead of directly vertical. New technology is allowing for the drilling of tightly curved well holes where 90-degree turns can be accomplished within several feet underground. Traditional directional drilling takes several thousand feet to turn 90 degrees.[6] These new technologies are aided by borehole telemetry to gain real time information from steerable drilling motors.

Conventional vertical wellbore suffers from a lack of exposure to the shale formation in comparison to horizontal wellbores. Horizontal drilling is particularly useful in shale formations that do not have sufficient permeability to produce economically; therefore, it is becoming more and more pervasive, especially in North America (Seale, 2007). In the U.S., tight reservoirs such as the Bakken (ND and Montana), Montney, Barnett, and Haynesville (Texas/Oklahoma) Shale and most recently Marcellus Shale (NY, Pennsylvania, and Ohio) are drilled, completed, and fractured using this method.

BLM_0066155

**Exhibit 1
The Fracking Process**



A Review of Hydro "Fracking" and its Potential Effects on Real Estate   209

Source: ProPublica: Graphic by Al Granberg and Krista Kjellman Schmidt.

BLM_0066156

## HARVESTING GAS AFTER DRILLING

After the drilling rig is moved off site, water tanks and water-hauling trucks arrive at the site. The day the operation is to begin, the sand haulers, pump truck, blender, and control van arrive. The equipment will all be connected together and then connected to the well head with high pressure hoses. After testing the equipment, the actual fracture stimulation will begin. The operation may take several hours to several days depending on the number of fracture zones. The equipment noise and truck traffic is the most noticeable occurrence during the operations.[7]

## FRACKING HOT SPOTS IN THE U.S.

While the locations of gas-bearing shale have been known for some time, the confluence of advanced technology and market demand for clean-burning fuel has made development of these resources more urgent. Exhibit 2 shows U.S. locations where oil and gas reserves are being fracked, or where extraction is likely. About 20 states can expect to feel the effects of fracking exploration. The densest deposits are the Marcellus and Utica shale belts stretching from New York through Pennsylvania, Ohio, and Indiana into Illinois. Some states, like Texas, Oklahoma, Colorado, and Wyoming, are also experiencing resource extraction near populations. Others, like North Dakota and Montana, are largely rural.

## FRACKING MIX OF CHEMICALS

Many of the communities in these locations face a choice of potential economic booms, along with potential exposures, accidents, congestion, and a loss of quiet enjoyment of property.

Water is the largest component of fracking fluids. Over its lifetime, an average well can require five million gallons of water for the initial hydraulic fracturing operation and possible restimulation. The large volumes of water required have raised concerns about fracking in water shortage areas such as Texas, which has been in a multiple-year drought. Chemical additives used in fracturing fluids typically make up less than 2% by weight of the total fluid. Nonetheless, over the life of a typical well, this may amount to 100,000 gallons of chemical additives.[8] These additives include some that are known carcinogens, some are toxic, and some are neurotoxins. These include benzene, lead, ethylene glycol, methanol, boric acid, and 2-butoxyethanol. High levels of iodine-131 (a radioactive tracer used in hydraulic fracturing) are the major contributor to the generally elevated radiation levels found near hydraulic fracturing sites. However, it is not listed among the chemicals to be monitored in the U.S. Environmental Protection Agency's Hydraulic Fracturing Draft Study Plan. The 2011 U.S. House of Representatives investigative report on hydraulic fracturing chemicals showed that there are 750 compounds in hydraulic fracturing products. "More than 650 of these compounds contained chemicals that are either known or possible human carcinogens, regulated under the Safe Drinking Water Act, or listed as hazardous air pollutants."[9] This report also showed that between 2005 and 2009, many components were listed as "proprietary" or "trade secret" on their Occupational Safety and Health Administration (OSHA) required Material Safety Data Sheets (MSDSs).

BLM_0066157

A Review of Hydro "Fracking" and its Potential Effects on Real Estate    211

**Exhibit 2**
**Fracking Locations**



Source: www.ehelpfultips.com.

When asked to reveal the proprietary chemical components, most companies participating in the investigation did not do so. This non-disclosure prevents government regulators from monitoring and documenting the changes in the components, thereby making it impossible to prove that hydraulic fracturing is contaminating the environment (Fitz Patrick, 2011). Without knowing the identity of the proprietary components, regulators cannot pass measures requiring testing for their presence.

In his 2012 State of the Union, Barack Obama stated his intention to force fracking companies to disclose the chemicals they use, but proposed guidelines were criticized for failing to specify disclosure of the chemicals used. This and other prior intentions are known as part of the proposed Fracturing Responsibility and Awareness of Chemicals Act (FRAC Act).[10] Exhibit 3 shows the categories of chemicals that are potentially part of a fracking fluid mix.

## VOLATILE ORGANIC COMPOUNDS

One group of emissions associated with natural gas development and production are those associated with combustion. They include particulate matter, nitrogen oxides, sulfur oxide, carbon dioxide, and carbon monoxide. Another group of emissions that are routinely vented into the atmosphere are those linked with natural gas itself, which is composed of methane, ethane, liquid condensate, and volatile organic compounds (VOCs). The VOCs that are especially impactful on health are benzene, toluene, ethyl

BLM_0066158

**Exhibit 3**
**Fracking Fluid Composite**



Source: FracFocus.com.

benzene, and xylene (BTEX). The health effects of exposure to these chemicals include neurological problems, birth defects, and cancer.

VOCs, including BTEX, mixed with nitrogen oxides from combustion and combined with sunlight can lead to ozone formation. Ozone has been shown to impact lung function, increase respiratory illnesses, and is particularly dangerous to lung development in children.[11] In 2008, measured ambient concentrations in rural Sublette County, Wyoming, where ranching and natural gas are the main industries, were frequently above the National Ambient Air Quality Standards (NAAQS) of 75 parts per billion (ppb) and have been recorded as high as 125 ppb (Urbigkit, 2011). A 2011 study for the city of Fort Worth, Texas that examined air quality around natural gas sites ''did not reveal any significant health threats.'' The Fort Worth *Star-Telegram* characterized that report as ''the most comprehensive study of urban gas drilling to date.''[12]

## GOVERNMENT REGULATIONS ON FRACKING

A number of federal laws and regulations, including the Federal Oil Pollution Control Act, address petroleum extraction. Further, the Environmental Protection Agency (EPA) may also regulate the chemicals that oil and gas companies use. A detailed accounting of this is beyond this research, but we do address three pertinent topics: the 2005 Energy Policy Act, the ongoing EPA study of fracking, and regulations pertaining to obtaining permission to drill wells on federal lands.

BLM_0066159

**2005 ENERGY POLICY ACT**

"The oil and gas industry received a helping hand from the federal government during the Bush Administration. Although fracking was never regulated by the federal government when it was a less prevalently used technique, it was granted explicit exemptions, despite dissent within the EPA, from the Safe Drinking Water Act, the Clean Air Act, and the Clean Water Act by the Energy Policy Act of 2005, the wide-ranging energy bill crafted by Dick Cheney in closed-door meetings with oil-and-gas executives and what has become known as the "Halliburton Loophole." Thus, drilling firms do not need to disclose to the public their practices. Congressional hearings held by the House Energy and Commerce Committee have been taking place since 2009, but proposed legislation to eliminate the Halliburton Loophole has made little progress" (Bateman, 2010).

"Claiming that the information is proprietary, drilling companies have not fully disclosed the components of their fracking fluids; however, activists and researchers have been able to identify some of the chemicals.[13] According to Theo Colborn, a noted expert on water issues and endocrine disruptors, at least half of the chemicals known to be present in fracking fluid are toxic; many of them are carcinogens, neurotoxins, endocrine disruptors, and/or mutagens. Colborn has estimated that a third of the chemicals in fracking fluid remain unknown to the public" (Bateman, 2010).

**ENVIRONMENTAL PROTECTION AGENCY**

The major role and competency of the EPA is protecting human health and safeguarding the environment. In terms of oil and gas extraction, the EPA is responsible for researching and assessing the air and water contamination that is harmful to the public health and safety, along with evaluating the detrimental physical, chemical, and biological changes to the environment. To be more specific, the EPA has an obligation associated to four aspects: (1) improving understanding of hydraulic fracturing; (2) providing regulatory clarity and protections against known risks; (3) assuring regulatory compliance; and (4) promoting transparency and conducting outreach.

The House of Representatives Appropriation Conference Committee identified the necessity of a study on hydraulic fracturing in its 2010 fiscal year. On behalf of the Congress, the EPA fracking study is aimed at studying if there is a relationship between hydraulic fracturing and the ground water and drinking water by conducting research and monitoring the water use in hydraulic fracturing. This study, after many delays, is expected to be completed in 2014.[14]

According to the final plan of the study, the EPA is expected to implement different approaches including analysis of existing data, case studies, scenario evaluation, laboratory studies, and toxicity assessments. On one hand, the data analysis focuses on the existing data regarding well location and construction, chemicals, operating procedures, spills, and wastewater disposal. Furthermore, the EPA sent a letter to nine randomly chosen oil and gas companies to request additional information to support

BLM_0066160

the study, in August 2011. The requested information includes quantity and quality of well cement, extent of integrity testing, identity of products or chemicals used, drinking water resources near the well or through which the well passes, and extent of baseline water quality monitoring. In order to assess the impact of hydraulic fracturing on the drinking water resources, seven cases were identified that include five retrospective cases (Killdeer, Dunn County, ND; Wise County, TX; Bradford & Susquehanna Counties, PA; Washington County, PA; Animas & Huerfano Counties, CO) and two prospective cases (DeSoto Parish, LA; Washington County, PA). As shown in the February 2012 progress update of the EPA study, verification of potential issues in the five retrospective cases is finished. The final study plan was amended based on a peer review from the EPA's Science Advisory Board, which is an independent, external federal advisory committee and comments from the stakeholders including individual citizens, communities, tribes, state and federal partners, industry, trade associations, and environmental organizations.

**FEDERAL LAND PROCESS**

The process for obtaining drilling permits on federal land is separate from individual state procedures. State laws for drilling are now developing and are addressed in the next section. The Federal land process for drilling is as follows. A copy of "a notice of intention to drill" must be given to the surface owner, but surface owner permission is not required prior to entry. The exploration period begins 30 days after notice is given and lasts 60 days. During exploration, the "entry" onto the surface owner's land does not allow for use of mechanized equipment, the construction of roads, drill pads, or the use of hazardous materials, and may not cause more than "a minimal disturbance of surface resources."

Failure to reach agreement requires the operator to post two bonds with the Bureau of Land Management (BLM). The surface use bond must cover damages to crops, permanent improvements, and your land's grazing value. The bond must exceed $1,000 and be provided to the landowner, along with a description of their right to appeal the bond. A second copy must be submitted to the BLM. If the bond is insufficient, the landowner may challenge it with the BLM within 30 days. If the BLM decides the bond is sufficient, you may appeal again. The reclamation bond must cover the cost of plugging wells and reclaiming and restoring land and surface waters. Standard bond amounts per company are: $10,000 per lease, $25,000 for all leases in a state, or $150,000 for all leases nationwide. If a landowner determines the total reclamation costs will exceed the bond, they can ask the BLM to increase the bond.

Before mineral operators can begin an oil and gas operation they must submit an Application Permit to Drill (APD) and a drilling plan. Once the APD is filed, the BLM must consult with other federal agencies and other appropriate interested parties. Surface owners have 30 days to comment. The drilling plan details the location of proposed roads, well pads, and other facilities, along with methods for handling waste such as garbage, sewage, and produced wastewater, and reclamation plans and other requirements. One can contact the BLM field office for a copy of the drilling plan.

BLM_0066161

Within 15 days of receiving a complete APD, the BLM must conduct an on-site inspection. Surface use and reclamation stipulations are developed during the inspection. By participating, the surface owner can press for tough reclamation requirements and responsible siting of roads and other infrastructure. The BLM will decide whether to incorporate the surface owner's suggestions.

**STATE LAW INITIATIVES**

A growing number of states have passed their own set of disclosure regulations. Wyoming was the first state, in September 2010, followed by Arkansas, Pennsylvania, and Michigan. In June 2011, Texas became the first state to pass a law requiring companies to disclose what chemicals are being injected into the ground at each well. Several other states, including North Dakota and Colorado, have recently enacted disclosure regulations. Colorado was the first to require disclosure of the chemicals used for fracking (family of chemical).

In December 2011, Colorado regulators approved new disclosure rules that are associated with the disclosure of hydraulic fracturing chemicals used during the fracking process. The chemical disclosure registry, by definition, means the chemical registry website known as fracfocus.org developed by the Ground Water Protection Council and the Interstate Oil and Gas Compact Commission. If the website becomes permanently inoperable, then chemical disclosure registry shall mean another publicly accessible information website designated by the Commission.[15]

Texas was the first state to pass a law requiring companies to disclose the concentration of hydraulic fracturing chemicals by listing the chemicals on a national registry. Similar to the law in Texas, Colorado's disclosure rules require a company to disclose the concentration of all chemicals used in hydraulic fracturing, along with the chemical family of the ingredients; however, the exact chemicals are very often considered a trade secret. The companies are required to disclose the secret ingredients in emergencies. The Colorado rules took effect on April 1, 2012.

Even though some state disclosure regulations only require the companies to disclose the concentration of hydraulic fracturing chemicals or the ingredient's chemical family, physicians and other medical professionals may request specific information of certain chemicals and gases for diagnosis or treatment purposes. However, the legislations can forbid them from disclosing the information for any purpose other than those two stated above.

In Ohio, the medical gag rule, introduced in the amendment of SB 315 that passed on May 15, 2012, requires a medical professional who receives information about trade secret chemicals to keep the information confidential. In Pennsylvania, Act 13, which was approved in early February 2012, allows the companies to not provide trade secret or proprietary information to physicians and others who work with citizen health issues. Also, the regulation forbids health care professionals from telling their patients, specialists, or the community.

Severance taxes are excise taxes on non-renewable natural resources that are extracted from the earth. They historically have been a significant revenue generator in energy-

rich states. Currently, at least 36 states have some form of severance tax; 31 of which are especially on oil and gas extraction; at least 11 states are considering either imposing new or amending existing ones. However, Pennsylvania, the largest natural gas-producing state, has no such tax. Some states impose impact fees rather than taxes. In Pennsylvania, H.B. 1950 was enacted in early February 2012 to impose an impact fee based on the average natural gas price in the following year, with a cap at $355,000 per well within 15 years.

Due to different geological factors, different states have various ways of addressing fracking waste management and monitoring. These include addressing transportation, the use of open pits, and testing for fracking waste. Some states are taking steps in reducing risks related to the transportation of fracking disposal waste. In Pennsylvania, the pending H.B. 1741 would require placards to be posted on the outside of the vehicles if they are carrying hydraulic fracking wastewater. Drilling companies are experimenting with recycling frack fluid, reducing the amount of transport.

Some oil and gas companies evaporate fracking wastewater in large retention ponds for disposing purposes. Using retention ponds is dangerous because chemical oxidation and airborne toxins can potentially affect "downwind" areas. States, such as North Dakota, are regulating and attempting to reduce the number of open pits for frack fluid storage. If a new pit is the only alternative, it is required to have liners to attempt to prevent ground water contamination.

Fracking locations are required to be tested for waste in recent law enactments. A Statewide Groundwater Baseline Sampling and Monitoring rule, being the first rule for groundwater testing both before and after drilling, was approved by Colorado regulators on January 7, 2013. It requires four water samples from aquifers to be collected. In New York, several pending bills require wastes to be tested for radioactive contaminants and samples to be gathered to identify contaminants of concern.

Moratoriums are established in some states by law in order to delay or ban hydraulic fracking operations until the effects are better known. In New York, a moratorium of 120 days is established by pending A.B. 5547 after the EPA issues its reports on the effects of fracking treatment. A.B. 300, another pending bill, establishes a moratorium of 120 days on disposal of fluid after the EPA's report is released.

Several states are considering well setback regulations. In New York, pending A.B. 4237 prohibits drilling within 10 miles of the city water supply infrastructure. Fracking near a watershed is also prohibited by pending SB 1234. In Colorado, a hearing is required when oil and gas companies want to operate within 1,000 feet of a school or a hospital, under a newly proposed regulation. Also, in Texas, a bill was filed in 2011 to prohibit drilling within 1,200 feet of public schools; however, the bill did not pass due to industry opposition.

## PEER-REVIEWED LITERATURE ON PETROLEUM CONTAMINATION

Since there is no peer-reviewed literature on fracking, the next closest body of research addresses petroleum groundwater contamination, primarily from leaking underground

BLM_0066163

storage tanks. Four recent studies have addressed the effect of groundwater contaminated with benzene on residential property values (Simons, Bowen, and Sementelli, 1997, 1999; Simons, 1999a; and Simons and Winson-Geideman, 2005).

Simons, Bowen, and Sementelli (1997, 1999) focused on housing using municipal drinking water in Cuyahoga County, Ohio (Cleveland). Using regression analysis countywide, the observed losses ranged from 13% to 16% of property value. One case study of a higher priced suburban residential subdivision showed 16% losses. The houses were on municipal drinking water, and the contamination plume extended about one-quarter of a mile, and several dozen homes were involved.

A case study near Akron, Ohio in a rural subdivision on well water had losses of 25%, resulting from benzene contamination from a pipeline release (Simons, 1999a). These losses were about 10% higher than for homes on municipal drinking water. Simons and Winson-Geideman (2005) used contingent valuation analysis to gauge stated preference losses due to contaminated groundwater in several states, with losses in the 11%–27% range, depending on the severity of the scenario and location. To summarize, the residential leaking underground storage tank (LUST) literature indicates a loss of between 13% and 25% under various circumstances.

In similar fashion to this article, Wilde, Loos, and Williamson (2012) review the effect of pipelines on property values. Their review included the effect of proximity to pipelines, as well as from releases and ruptures. They conclude that research is limited and that results based on survey research in comparison to actual sales data requires further scrutiny to determine if the finding of their survey match the actual pricing effects for properties over time.

## SUMMARY OF LITERATURE: POTENTIAL ISSUES

There is some concern that drilling leases may be problematic in relation to mortgage financing, lender's insurance, and homeowners insurance. In particular, mortgages typically stipulate that an owner is not to allow damage, destruction or substantial change to collateral including the use, disposal, storage or release of hazardous materials. In addition, the signing of a gas or drilling lease may require permission of the underlying lender. This result could give either of the federally-run companies (Fannie Mae and Freddie Mac) the right to demand immediate payment of the full loan.

Airborne chemicals (VOCs) and contaminated groundwater are types of toxic trespasses related to fracking, spills, and storage mishaps (Anderson, 2010).[16] The concept of an underground trespass and subsequent rent due for storage was developed by Krause, Throupe, Kilpatrick, and Speiss (2012). The concept being that chemical stored on the land of another constitutes a tenant status with rent due. The renter in this case would be the drilling firm who was aware of the chemicals used and left within the well during the fracking process. There are others who claim that a trespass per say is not due compensation unless there is damage to the surface rights (Anderson, 2010). For fracking where it is known that chemicals have been used,

BLM_0066164

although not exactly which chemicals, residual effects to the surface from oil and gas drilling may be linked.

This type of easement is usually considered a temporary easement subject to paying rent. These easements typically last for a time period of less than a year. For natural gas operations, one could split the time into the period for when the well is initially drilled and then fracked versus a length of time that the well is in operation. During operation, there is a potential for visual degradation, traffic, and odor.

The development of a drilling site can create a loss of quiet enjoyment to adjacent property owners. Many times there is a need to create roads for access; and the transport to and from the site creates unwanted traffic and noise. Adjacent neighbors to drilling sites can also experience interruption from noise, lighting, and odor from releases of gases. For the local community, the discovery and extraction of natural gas or oil can create increased truck traffic, congestion, and noise effecting the quite enjoyment of the community.

The result of actual or perceived risk is based on various levels of knowledge (Mundy 1992a,b). The publicity and the lack of clarity from industry participants lead to a level of unknown risk to potential buyers. The result can be a discount for housing in proximity to drilling operations.

An onerous feature of gas drilling in New York is that the land owners by default will get stuck with the comprehensive liability for environmental clean-up, while the gas companies who leased the mineral rights have a more limited liability, like renters. Some leases protect land owners better than others, so there is some variety in how this issue is resolved.

## CASE STUDIES

The following examples from Pennsylvania, Ohio, Colorado, and Wyoming illustrate issues related to fracking.

### PENNSYLVANIA

The town of Dimock, Pennsylvania, population 1,400, exemplifies the dangers posed by hydraulic fracturing. Dimock residents began noticing ill-smelling, brown, well water in 2008 after Houston-based Cabot Oil & Gas began fracking. Both the Pennsylvania Department of Environmental Protection (DEP) and the EPA found that at least 18 residential water wells were fouled by stray methane gas from Cabot's drilling operation. The town was later featured in the documentary "Gasland" by Josh Fox.

Residents claim that "landmen" from Cabot Oil & Gas, a midsize player in the energy-exploration industry, came knocking on doors to inquire about leasing the mineral rights to their land. Some residents claim the landmen told them that their neighbors had already signed leases and that the drilling would have no impact whatsoever on their land. "Others in Dimock claim they were told that if they refused

to sign a lease, gas would be taken out from under their land anyway, since under Pennsylvania law a well drilled on a leased piece of property can capture gas from neighboring, unleased properties" (Bateman, 2010).

Cabot's drilling operations in Pennsylvania commenced in August 2008. Clearing and ground leveling were performed to make way for a four-acre drilling site less than 1,000 feet away from property owners. Residents claimed they could feel the earth beneath their home shake whenever fracking was initiated. A month later, their well water had turned brown and corrosive. They complained to Cabot, which eventually installed water-filtration systems in some homes. The problem appeared to be resolved, until additional DEP testing indicated high levels of methane.

Several incidents occurred after Cabot came to town. A truck turned over and caused an 800-gallon diesel fuel spill in April 2009. Also, in September 2009, up to 8,000 gallons of Halliburton-manufactured fracking fluid leaked from faulty supply pipes, with some seeping into surrounding wetlands and a stream, killing fish. By October 2009, the DEP had taken all the water wells in affected neighborhood offline. A major contamination was acknowledged with dangerously high levels of iron and aluminum, in addition to the methane found in the water. The residents relied on water delivery every week by Cabot. Some claim the value of their land was damaged. Others wanted to move but could not afford to buy a new house while carrying their current mortgage.

Residents are suing the company for diminution in value, negligence, breach of contract, and fraudulent misrepresentation, among other charges. Cabot declines to comment on the lawsuit but said that its operations are "in full compliance with environmental and oil and gas drilling regulations" and "the accidental release of materials has occasionally occurred" during its operations (Bateman, 2010).

In 2010, Cabot was banned by the DEP from drilling additional wells around the village of Dimock and required to take legal responsibility for the methane found in the wells, including constructing a pipeline to bring in clean water. Cabot contends that water wells in the area were tainted with the gas long before the company arrived. The company also says it met a state deadline to restore or replace Dimock's water supply. On November 30, 2011, Cabot won permission from state regulators to halt daily water deliveries. The environmental group "The Sierra Club" then arranged for trucks to continue to deliver water.

Confusion remains regarding whether the water in Dimock is safe to drink. On December 2, 2011, the EPA sent an email to several Dimock residents indicating that their well water presented no immediate health threat. However, on January 19, 2012, the EPA reversed its position, and asked that the agency's hazardous site cleanup division take immediate action to protect public health and safety (Gardner, 2012). Meanwhile, the Agency for Toxic Substances and Disease Regulation (ATSDR) continues to investigate the long-term effects of exposure to Dimock's water. This case illustrates: (1) the case illustrates the struggle of a lack of coordination, disruption to people's lives; (2) landmen ultimatums; (3) a debate of whether Cabot should continue supplying clean water and doing more tests relating to water quality; and (4) ongoing debate among the residents, DEP, the EPA, ATSDR, and Cabot.

BLM_0066166

**OHIO**

The eastern and central parts of Ohio and western Pennsylvania are imbued with the Marcellus Shale layer, a gas-rich rock formation. The Utica Shale formation (characterized as more liquid rich) is also in Ohio.[17] The shale formation has attracted the attention of many oil and gas landmen scrambling to obtain mineral rights to the deep (about 7,000 feet) shale formation under contract. In Northeast Ohio, Chesapeake Energy has been one of the more active firms in acquiring leases. This energy focus has started to ignite an economic mini-boom, and Ohio's unemployment rate has dropped below the national average for the first time in five years.[18] The battle for minds and influence has taken sides, with Cleveland State's Levin College of Urban Affairs conducting an economic impact analysis on behalf of the state addressing the positive side of the equation,[19] and the No Frack Ohio Coalition[20] taking the contrarian view, for both Pennsylvania and Ohio. Some assert that the potential employment from shale exploitation in these hard-hit areas is at least 10,000 jobs, and potentially as high as 40,000 jobs. Just on the Pennsylvania side, the estimate is over 23,000 jobs.[21] However, only a modest portion of these would be specific to the drilling locations. For example, a case study of Susquehanna County, Pennsylvania showed direct impacts of only a few hundred jobs and under $10 million in overall economic impact for 2010.[22]

On the downside, residents are concerned about increased truck traffic, the influx of new workers, and taxing local infrastructure, especially water. Although property value impacts have been mentioned on the No Frack Ohio website, no data are presented to back up claims.[23]

The other issue peculiar to Ohio is the incidence of modest seismic activity near Youngstown, Ohio in early 2012. Research shows fracking-related activity, notably water injections, have eluded control and "slipped into a previously unknown fault line." The location has been linked to earthquakes in the area where there are over 150 horizontal fracking injection wells. A 4.0 magnitude earthquake near one of the deep disposal injection wells is likely linked to a disposal well for injecting wastewater used in the hydraulic fracturing process, according to seismologists at Columbia University. Consequently, Ohio has since tightened its rules regarding the wells, increased fees, and is considering a moratorium on the practice. The Youngstown area, thus, is at the epicenter of the Marcellus Shale exploration, incurring both the negative environmental effects of earthquakes and potential degradation of water quality, and the positive economic boom of having its moribund steel industry revived.

This case illustrates the tradeoffs of economic stimulus versus disruption of lives.

**COLORADO**

The process of hydraulic fracturing has been used for decades in Colorado, dating back to the 1970s. Hydraulic fracturing continues to be refined and improved and is now standard for virtually all oil and gas wells in the state, and across much of the country. But in Colorado, 206 chemical spills were linked to 48 cases of water

BLM_0066167

contamination in 2008 alone. In Parachutte, Colorado, 1.6 million gallons of fracking fluid leaked and were transported by groundwater. According to state records, it seeped out the side of a cliff, forming a frozen waterfall 200 feet high. It was later melted into a tributary of the Colorado River.[24]

Reports of environmental degradation have come out of many places where natural gas drilling and fracking are occurring. The full extent of the problem is difficult to determine because much of the evidence is anecdotal because drilling companies are accused of buying people off when things go wrong. "In Silt, Colorado, a woman no longer talks about the adrenal gland tumor and other health complications she developed after her water was contaminated by a gas well drilled less than 1,000 feet from her home. (A state investigation into the matter concluded that a drilling failure had likely led to intermingling between the gas and water strata in the ground.) She signed a non-disclosure agreement as part of an agreement to sell her tainted land to EnCana, the large Canadian gas company that drilled the well. But perusing newspapers from towns where fracking was going on revealed how the issue refused to die, with headlines like "Fears of Tainted Water Well Up in Colorado," "Collateral Damage: Residents Fear Murky Effects of Energy Boom," and "Worker Believes Cancer Caused by Fracking Fluids" appeared regularly" (Bateman, 2010).

In Garfield County, Colorado, the location of the documentary "The Split Estate,"[25] another area with a high concentration of drilling rigs, VOC emissions increased 30% between 2004 and 2006; during the same period there was a rash of health complaints from local residents. Epidemiological studies that might confirm or rule out any connection between these complaints and fracking are virtually non-existent (Brown, 2007). The health effects of VOCs are largely unquantified, so any causal relationship is difficult to ascertain; however, some of these chemicals are suspected carcinogens and neurotoxins.

"Clusters of unusual health problems have popped up in some of these Colorado drilling hot spots. Kendall Gerdes, a physician in Colorado Springs, has told how he and other doctors in the area saw a striking number of patients come to them with chronic dizziness, headaches, and neurological problems after drilling began near their homes. One of Dr. Gerdes's patients developed idiopathic hemorrhaging, or spontaneous bleeding, as well as neuropathy, a pituitary gland tumor, and a rare neurological speech impediment after alleged frequent exposure to noxious fumes from drilling. Although her health improved after she moved to another part of Colorado, she claims to continue to have trouble speaking and walking" (Bateman, 2010). In addition, the Colorado School of Public Health performed a study in 2011 regarding potential adverse health effects, concluding that residents near gas wells may suffer a series of ailments. This study was never published, after disagreements between drilling company and community members over the study's methods.[26]

This case illustrates: (1) buy out of problems with gag orders; (2) long-term degradation of a community; and (3) oil and gas company ability to potentially thwart information.

BLM_0066168

**WYOMING**

Sublette County, Wyoming was the first site of groundwater contamination to be documented by a federal agency, the U.S. Bureau of Land Management, in 2008. Water from more than 88 drinking wells were contaminated and found to contain benzene, a chemical that causes leukemia, at concentrations up to 1,500 times a safe level. Researchers returned to take more samples, but were unable to open the water wells. Monitors showed they contained so much flammable gas that they were likely to explode (Lustgarten, 2008).

The industry pointed out the uniqueness of the location as the reason. Industry representatives say the gas wells in Wyoming were drilled under circumstances not found in most other fracking sites, with shallower wells, closer to water sources. Some of the fracking wells were drilled at around 1,200 feet, while most other shale drilling sites were between 4,000 and 14,000 feet, well below water sources. There were comments that the elevated levels of methane, benzene, and other petrochemical compounds found in EPA monitoring wells are naturally occurring because the wells were drilled "into hydrocarbon-bearing zones." Thus, it is claimed to not be from fracking operations.

Another incident involving water was reported by residents near a gas field in Pavillion, Wyoming prompting the EPA to conduct a groundwater investigation. Pavillion is a town in Fremont County, Wyoming, with a population of 165 as of the 2000 census. Residents near the drilling sites in Pavillion asked the EPA in 2009 to investigate possible contamination after water from their wells started tasting and looking off. Canada's largest natural gas producer, Calgary-based Encana Corp. (ECA), owns about 150 wells in Pavillion. In 2010, the EPA opened an investigation into the possible contamination of groundwater approximately five miles east-northeast of Pavillion. Also in 2010, the Department of Health and Human Services recommended that Pavillion residents use alternate sources of water for drinking and cooking. While testing detected petroleum hydrocarbons in wells and in groundwater, the agency at the time said it could not pinpoint the source of the contamination. Meanwhile, Encana started providing drinking water to about 21 families in Pavillion in August 2010. A few days later the EPA released draft findings of contamination by hydraulic fracturing drilling operations in Wyoming. The industry's reaction was to attempt to find holes in the EPA's findings.

In December 2011, the EPA concluded that chemicals used in extracting natural gas through hydraulic fracturing were found in a drinking water aquifer in west-central Wyoming. The report also commented on contaminants in wells near pits, indicating that (frack) pits are a source of shallow ground water contamination. Two deep monitoring wells were dug by the EPA. They identified "compounds likely associated with gas-production practices, including hydraulic fracturing." These chemicals in the deep wells were "well above" acceptable standards under the Safe Drinking Water Act. The EPA also found that the reports companies filed detailing jobs, listed chemicals as a class or as "proprietary," "rendering identification of constituents impossible."

BLM_0066169

The draft EPA report also stated: "Alternative explanations were carefully considered to explain individual sets of data. However, when considered together with other lines of evidence, the data indicates likely impact to ground water that can be explained by hydraulic fracturing" (Phillips, 2011). The EPA also said that the type of contamination found is "typically infeasible or too expensive to remediate or restore." Industry figures rejected the EPA's findings. The location is now part of the EPA study on hydraulic fracking.

This case illustrates: (1) Sublette, Wyoming as the first time an agency has documented groundwater contamination; (2) Pavillion, Wyoming as the first time the EPA confirmed drinking water contamination; and (3) an inability to determine exact chemical identification.

## RESIDENTIAL BUYER MARKET SURVEY

### SETBACK LEGISLATION

Recent proposed legislation by multiple states has included setback requirements for fracking operations. As previously mentioned, these proposals address proximity to schools, residential property, and hospitals. A residential buyer survey was constructed to further study the potential impacts of fracking. This survey was designed to study proximity and general population sensitivity to fracking operations. Documented market transactions of properties are difficult to find and verify. Thus, a contingent valuation (CV) survey is used to investigate further. CV is a peer-reviewed procedure that can utilizes telephone calls to potential buyers, in this case homeowners in nearby counties, who are asked a series of questions about buying property, including acquisition of contaminated property.[27]

A professional survey firm (NSØN, Inc. of Salt Lake City, Utah) conducted telephone surveys under the direction of a researcher. The calls were made to a random sample of homeowners in ZIP Codes 77015, 77017, 77502, 77503, 77506, 77520, 77521, 77536, and 77587 in Metropolitan Houston, Texas, and ZIP Codes 32404, 32405, 32409, 36608, 36609, 36618, and 36619 along the Florida/Alabama Gulf Coast. Because Texas is a "petroleum friendly" location, we expected some differences in homeowner preferences, so we present the results separately.

The survey firm called names at random, until they reached a homeowner who was willing to participate in the brief 8-to-10-minute survey. Two different survey forms were used for this research (frack "heavy" and frack "light"); one case (frack "heavy" only) was presented to both Texas and Florida respondents. Two hundred surveys of each type were collected for a total of 570 respondents. This number of responses generates statistically significant results with an approximate 90% level of confidence. The survey instruments contained a baseline case to establish value, and four scenarios with potential environmental or nuisance-related disamenities. Each survey was presented with a business park (harmless, meant to calibrate the survey form to show zero losses) with a leaking gas station scenario (meant to benchmark to the peer reviewed literature), and one of two fracking scenarios. Finally, one

BLM_0066170

scenario in each survey subgroup relates to litigation, and these results are not presented here. With respect to the disamenities, the respondent is asked if they would make a bid on the property and, if so, how much. The instrument is quite detailed, and avoids key problems described in Mundy and McLean (1998a,b) and later expanded upon in Lipscomb (2011) and Lipscomb et al. (2011). These survey problems were originally debated as part of the Natural Resource Damages Assessment document (Federal Registrar 1996) produced by the National Oceanic and Atmospheric Administration. These include hypothetical bias with inflated responses because of the hypothetical nature of the questionnaire; and a self-interest bias based on respondents' motives; additional bias based on the survey instrument structure can be reviewed in Mitchell and Carson (1989).

We use an identical methodology to that used in peer-reviewed literature (Simons, 2002; Simons and Throupe, 2005; Simons and Winson-Geideman, 2005).[28] The instrument also did not specifically guide the respondent to a fracking scenario, but "nests" the issue in a broader context.

Each survey instrument was successfully pretested with 30 respondents (for each of the three groups) before beginning survey protocol. The pretests revealed no issues regarding survey design or respondent understanding.

**INTERPRETING THE SURVEY RESULTS**

There are two factors of major importance in evaluating survey results. The first is the portion of respondents that would bid on a scenario, which indicates any reduction in market demand. This is measured by the ratio of "no bid" to total responses. The second factor addresses potential value loss where there are bids. Of those that did bid, the ratio of maximum bid to baseline case reflects the percentage respondents state that they would pay. One minus this percentage reflects the discount. For example, if the person's baseline house price is $100,000, and the maximum they would bid on a particular scenario was $85,000, then that bid would reflect a 15% discount. The first part of the survey was a "warm up" and lets the respondent become comfortable with the bidding scale. It also determined a baseline property price in the context of a job move. In addition to the litigation and fracking scenarios, each respondent was asked about two other scenarios: a house near a business park and a house near a leaking underground storage tank ("LUST"). These scenarios were presented for benchmarking purposes and to familiarize respondents with the evaluation and bidding process. Bid percentages for these three comparative scenarios are presented in the data table, but are only discussed relative to methodology issues.[29] As mentioned above, two variations of the fracking situation were presented. Fracking "heavy" includes potential effects on groundwater, and was closer to the drilling site, which was visible from the house. About 200 Texas homeowners near Houston, Texas and a similar number of people in the Florida panhandle were asked about this scenario. In the fracking "light" scenario, the home was a mile away from the drilling site, and it was not visible from the home. Only Florida area homeowners were asked about this scenario. Thus, the difference could be attributable to a visual and possibly an auditory nuisance.

BLM_0066171

**THE FIRST FRACKING SCENARIO (HEAVY)**

Respondents to the group of surveys were asked to consider the following scenario:

*The property is located at the edge of town. Last year, an energy company bought the rights to inject a pressurized mix of water, sand and chemicals into a lower groundwater aquifer to try to recover natural gas trapped under the property you are looking at buying. This is called hydraulic fracturing, or fracking. The drilling and injection equipment for this procedure is over one-quarter mile away, and is visible from the house. The house is on well water from a shallow aquifer, separate from the lower aquifer the natural gas is being recovered from. This process is expected to go on for five years. Except for this issue, the neighborhood is like yours, and the house is very similar to your house.*

The bidding issue was determined by the following question: "Using the scale below, where −3 means you definitely would not bid and +3 means you would, how likely is it that you would make any offer on this home?"[30] Of the 194 Texas respondents to the fracking heavy scenario, only 26% expressed a willingness to offer any bid on this scenario. In other words, 74% of the respondents would not even consider living in the house described in this scenario. This latter percentage reflects the reduction in the market demand for this type of property. These results as well as all other fracking scenario findings are reported in Exhibit 4. Of those who bid, the following question was asked: "What is the most you would be willing to pay for the home?" Of the 66 Texas bids on this fracking heavy scenario (within ¼ mile, drilling site visible, possible groundwater contamination), the prices offered were discounted by amounts between 0% (that is, no discount, or full price) and 99.9%. The average bid discount (i.e., value loss) for the property affected by fracking was 34% (median bid 32%). However, not all these bids necessarily would be in the market. Due to search costs, and the smaller number of bidders, the chances are reduced that any of the potential bidders would find a suitable home and place a bid that would be accepted by a seller. On the other hand, hugely discounted "bottom fishing" (very low) bids would have little value in the market, because it is the bids with the smallest discounts that would get the attention of likely sellers and culminate in a sale.[31] For this case, due to the reduced percentage of potential buyers (34% willing to make any offer), we considered market-clearing bids in the top half of the market (average loss of 14%) and the top quarter of the market (average loss of 6%). In other words, for this first fracking scenario offered to Texans, the average discount of the top half of potential bidders is 20% where information about the refinery's recent history of airborne chemical releases is known. Moving to the same fracking heavy scenario offered to 177 Gulf Coast Floridians, 36% offered any bid, a higher percentage than for Texas respondents; however, the discounts were deeper: 50% was the average bid, with 29% as the average of the top half bid, and 15% as the average of the top quarter bid. Thus, petroleum-friendly Texans had smaller discounts of about 10% with respect to the fracking heavy scenario (e.g., 6% for top quarter vs. 15% for top quarter bids for Floridians), than did those from places where petroleum exploitation is less commonly accepted.

**Exhibit 4**
**Residential Contingent Valuation Survey**

**BUSINESS PARK:** Several stores 3 blocks away. No unpleasant or unattractive uses.

|  | % Bidding Scenario | Average Bid | Top Half Discount | Top Qtr. Discount |
|---|---|---|---|---|
| Texas ($N$ = 194) | 83% | 15% | −1% | −3% |
| Florida ($N$ = 360) | 78% | 20% | 2% | −4% |

**LUST:** Closed gasoline service station with leaking underground storage tanks (LUST); gasoline components including MTBE in groundwater, on subject property; house on municipal drinking water.

|  | % Bidding Scenario | Average Bid | Top Half Discount | Top Qtr. Discount |
|---|---|---|---|---|
| Texas ($N$ = 194) | 21% | 47% | 28% | 16% |
| Florida ($N$ = 360) | 20% | 59% | 37% | 24% |

**FRACKING:** Hydraulic fracturing injection site ¼ mile away; house on well water, drill site visible.

|  | % Bidding Scenario | Average Bid | Top Half Discount | Top Qtr. Discount |
|---|---|---|---|---|
| Texas ($N$ = 194) | 26% | 34% | 14% | 6% |
| Florida ($N$ = 177) | 36% | 50% | 29% | 15% |

**FRACKING:** Hydraulic fracturing injection site one mile away; house on well water, no mention of drill site.

|  | % Bidding Scenario | Average Bid | Top Half Discount | Top Qtr. Discount |
|---|---|---|---|---|
| Florida ($N$ = 183) | 37% | 41% | 17% | 6% |

Source: Authors' surveys.

## THE SECOND FRACKING SCENARIO (LIGHT)

Floridian respondents (183 people) to the second fracking scenario were asked about the following situation:

*The property is located at the edge of town. Last year, an energy company bought the rights to inject a pressurized mix of water, sand, and chemicals into a lower groundwater aquifer to try to recover natural gas trapped under the property you are looking at buying. This is called hydraulic fracturing, or fracking. The drilling and injection equipment for this process is a mile away, but is not visible from the house. The house is on well water from a shallow aquifer, separate from the lower aquifer the natural gas is being recovered from. This process is expected to go on for five years. Except for this issue, the neighborhood is like yours, and the house is very similar to your house.*

BLM_0066173

Results based on 183 responses indicate that 68 respondents (about 37%) bid on the property described in this scenario, meaning that the corresponding reduction in market demand would be 63%. Of the 68 bids (home 1 mile from the drilling site out of view), the prices offered were discounted by amounts between 0% (that is, no discount, or full price) and nearly 100%. The average bid discount (i.e., value loss) for the property was 41%. The market-clearing bids in the top half of the market were an average loss of 17%, and in the top quarter of the market it was a 6% discount. Thus, for this fracking light scenario, for Floridians, the reported discounts were about ten percentage points lower than for the fracking heavy scenario, ¾ mile closer, and in view of the drilling site. Exhibit 4 shows the results of the residential survey.

### ANALYSIS OF THE RESIDENTIAL CV SURVEY

The results demonstrate the relative undesirability of residences in fracking areas. Based on the contingent valuation survey results, only 26%–37% of prospective buyers with the information stated in the fact paragraph would bid to buy a home situated similarly to those in the fracking scenarios, and many of those that do bid would discount their offers so much that many sellers would probably refuse them, at least within a normal, reasonable marketing period. And perhaps permanently, in light of the stated reduction in market demand revealed in this survey. The expected loss on this example residential property near fracking sites would be 5% to 15% in a robust real estate market. If the market is weaker (fewer sales, mortgage foreclosure issues, etc.), losses could increase by another 10%. Texan homebuyers are less risk averse than Floridians (also by about 10%) and being within close proximity and view of the drilling site would likewise indicate a 10% greater discount than further away. This reduction in bid value is a way to measure the reduction in housing services, the flow of enjoyment from owner-occupied housing. It also typically assumes more complete information than is often the case among actual buyers and sellers of homes.

## CONCLUSION

The oil and gas industry has accelerated efforts to extract because of improved technology. This field as an area of study is very new and the ability to confirm information and data is difficult with non-standardized industry practices. Case studies show a lack of coordination and disclosure of potential effects to the quite enjoyment of property. The short- and long-term effects are contested as interests aligned with economic benefits in contrast to health and property concerns. There is a need for impartial and uninfluenced review and input, which is hard to come by.

Survey results for markets in Texas and Florida evaluating the effects of fracking on residential property values show single-digit discounts in strong markets of what is perceived as petroleum-friendly places. In contrast, low double-digit discounts in places unfamiliar with petroleum extraction, illustrate the effect of a potential stigma and how the new lexicon "fracking" can influence public opinion.

There is an emerging focus on reducing the environmental impact of exploration for oil and gas. The questions for future research include the long-term implications of

chemicals left underground, the air quality implications, the storage solution to flow-back materials such as toxic fracking fluids and radioactive materials, and health and safety concerns of nearby people.

There is a need to share best or improved practices in connection with fracking operations. These include site development or shrinkage, post reclamation, reuse and disposal practices for frack fluid, cutting the emissions from drilling operations, and the public review process. These reactions to the industry, policy changes, and effects on operations and real estate are for further study.

## ENDNOTES

1. http://money.cnn.com/data/markets/. Last visited 5/3/13. Oil at the same date was $95.61 a barrel.

2. 1 million BTU's of energy is approximately 1 million cubic feet of gas.

3. http://www.bls.gov/news.release/pdf/laus.pdf. Last visited 8/18/12.

4. http://fracfocus.org/hydraulic-fracturing-how-it-works/history-hydraulic-fracturing.

5. http://fracfocus.org/hydraulic-fracturing-how-it-works/hydraulic-fracturing-process.

6. Directional and Horizontal Drilling, Natural Gas. http://www.naturalgas.org/naturalgas/extraction_directional.asp.

7. Information on Hydraulic Fracking, State of Colorado Oil and Gas Conservation Commission, Colorado Department of Natural Resources, http://cogcc.state.co.us/General/HydraulicFracturingInfoSheet.pdf.

8. Committee on Energy and Commerce, Chemicals used in hydraulic fracturing. Available at: http://democrats.energycommerce.house.gov/.

9. Chemicals Used in Hydraulic Fracturing (Report). Committee on Energy and Commerce U.S. House of Representatives. April 18, 2011. http://democrats.energycommerce.house.gov/sites/default/files/documents/Hydraulic%20Fracturing%20Report%204.18.11.pdf.

10. A legislative proposal in the U.S. Congress to define hydraulic fracturing as a federally regulated activity under the Safe Drinking Water Act.

11. EPA, Achievable Air Pollution Standards for Oil and Natural Gas/Half of fractured wells already deploy technologies in line with final standards, which slash harmful emissions while reducing cost of compliance, *EPA Issues Updated,* April 18, 2012.

12. Study: No 'significant health threats' from natural gas sites in Fort Worth. *Fort Worth Star-Telegram* July 15, 2011.

13. They include such substances as benzene, ethyl benzene, toluene, boric acid, monoethanolamine, xylene, diesel-range organics, methanol, formaldehyde, hydrochloric acid, ammonium bisulfite, 2-butoxyethanol, and 5-chloro-2-methyl-4-isothiazotin-3-one. Recently, in congressional testimony, drilling companies have confirmed the presence of many of these chemicals.

14. Http://www.epa.gov/hfstudy/.

15. Colorado Oil and Gas Conservation Commission Rules, Definitions (100 Series), as of April 1, 2012.

16. The bundle of rights also has a vertical spatial component. Surface rights are the most widely understood, and include the right to use the surface of the property subject to zoning,

BLM_0066175

building codes, covenants, and easements. The real estate bundle of rights is usually thought to apply most directly to the surface of the land. If someone deposits contamination on your soil without your permission, you have lost control of this part of your real estate rights. There are also subsurface rights which include the water, groundwater, and mineral rights under the property. In some rural areas mining and water rights are valuable. If someone allows hazardous material from their property to encroach on subsurface water or air pockets underneath your property, without your permission, it is toxic trespass. In some urban areas, this hazardous material may get into a basement and present a fire hazard. It would also be of concern to a lender, and make it less likely that a buyer could get a mortgage secured by the real estate. In rural areas, where property owners obtain their drinking water from private wells, the same issues apply, but the added risk of contamination of the drinking water means the health risk, through the drinking water pathway, is an issue. In addition the air rights above your land or building, extending at least up to the legal building limit or height, and in some cases beyond that. When someone allows hazardous substances or nuisance odors from their property to disperse into the air above your property, it is also a form of trespass. Where the airborne substances include hazardous or potentially noxious compounds, there is an associated health risk issue, through the breathing pathway. Where nuisance odors foul the air on your property, there is a loss in value related to the reduction in use and enjoyment of the property's outdoor features, and sometimes to the additional cost incurred to keep the nuisance odors from encroaching into the dwelling itself.

17. http://articles.marketwatch.com/2012-04-3/general/31335058_1_marcellus-shale-oil-rich-region-horizontal-drilling.

18. Ohio Department of Employment Services, 2012.

19. http://www.csuohio.edu/news/releases/2011/09/14931.html.

20. www.nofrackohio.com.

21. http://www.msetc.org/docs/EconomicImpactFINALAugust28.pdf.

22. http://extension.psu.edu/naturalgas/publications/economic-impact-study-in-5-counties/economic-impacts-of-marcellus-shale-in-susquehanna-county-employment-and-income-in-2010/view.

23. http://www.nofrackohio.com/quick-facts-on-fracking/.

24. ProPublica and *Vanity Fair*.

25. The Split Estate, Documentary film by Debra Anderson, 2009.

26. Study shows air emissions near fracking sites may have serious health impacts. @theForefront. Colorado School of Public Health. March 19, 2012. http://attheforefront.ucdenver.edu/?p=2546. Retrieved 25 April 2012.

27. As a research methodology, CV has well-documented limitations. If survey participants had a financial stake in the outcome of a specific case, they could bias their responses to questions to get money. Other survey participants could have issues with the polluter, and may give responses based on this instead of the facts presented to them. To avoid these threats, we did not name polluters, and there is no fracking litigation involved.

   Other respondents may be tempted to give certain answers to "please" the surveyors. This issue has been minimized by having the surveyors stick to a prearranged script. Also, some respondents may give answers that may not reflect their actions in real life because there are no consequences to providing responses to hypothetical questions (Rowe, d'Arge, and Brookshire 1980; and Mathews and Desvousges, 2002). This has been associated with a discrepancy between stated and revealed preferences (Jackson, in Kinnard, 2003).

BLM_0066176

Hypothetical bias is a validity threat that can include potential overbidding (resulting in smaller losses than might be expected), and potential underbidding, which could lead to bigger-than-expected losses. Some bidders facing this situation could overbid, and because of their lack of familiarity with environmental situations, trivialize the perceived risks, and artificial nature of the survey (compared to an actual transaction). This may underestimate the discount because an upper bid could in actuality pull out, whereas in a hypothetical situation they state that they would bid full value. The underbidding component is addressed by removing unreasonably low bids from the analysis, focusing instead on bids closer to full value, which would be more likely to be accepted by a seller. This top-of-the-market approach employs marginal bids (as opposed to the average bid approach, which averages all bids). Two studies have compared revealed (actual sales) and stated preferences (surveys) for contaminated real estate. They found that stated (survey) techniques generate higher losses than actual sales outcomes, in the range of mid-single digits (Simons and Winson-Geideman, 2005; Simons and Saginor, 2006). This range gives an indication as to the potential order and magnitude of hypothetical bias. Therefore, while hypothetical bias is still a potential validity threat to CV research, we believe its effects are manageable.

28. The technique is also similar to that summarized in Simons (2006), and set forth in Simons, Saginor, Karam and Baloyi (2008), who used personal interviews but the same tabulation approach, and Simons and Saginor (2010), who applied the CV technique to commercial property.

29. For the business park scenario, 75%–82% of the respondents bid some amount, indicating only a modest reduction in market demand. The business park had little effect on the bid amount for the top quarter of bidders (those closest to full value), from a small premium of 2% to a slight loss of 3%. These results are used to calibrate the survey instrument to zero. For the gas station LUST scenario, the reduction in demand was substantial. Between 65% and 80% refused to offer a bid at all, with Florida respondents slightly less likely to bid. Among those that did bid on the LUST scenario, the extent of losses was between 15% and 25% for the top quarter of bidders, with Texas bidders closer to 15% and Florida bidders closer to a 25% discount. This is consistent with published survey results set forth in Simons and Winson-Geideman (2005), and is used to benchmark these survey results to the peer-reviewed literature. The detailed results are shown on Exhibit 4.

30. The bidding scale was designed to include negative values in part because the authors wanted respondents to consider the negative and positive aspects of housing characteristics. It was also used to separate those respondents who were paying attention and could also understand negative numbers in two initial "tripwire" (screening) questions. The authors are unaware of any potential behavioral biases that were induced by using this scale, which has been part of previous published literature of real estate damages.

31. While the number of participants may well decline, the intensity of the search may increase for bargain hunters, thus altering the dynamics of the marketplace and ultimately the equilibrium price and transactions volume levels.

## REFERENCES

Anderson, O.L. Subsurface Trespass: A Man's Subsurface is Not His Castle. *Washburn Law Journal*, 2010, 49:2, 247–81.

Bateman, C. A Colossal Fracking Mess. The Dirty Truth Behind the New Natural Gas. *Vanity Fair*, June 21, 2010. http://www.vanityfair.com/business/features/2010/06/fracking-in-pennsylvania-201006.

BLM_0066177

Brown, V.J. Industry Issues: Putting the Heat on Gas. *Environmental Health Perspectives*, 2007, 115:2, A76.

EPA. Achievable Air Pollution Standards for Oil and Natural Gas. Half of fractured wells already deploy technologies in line with final standards, which slash harmful emissions while reducing cost of compliance, *EPA Issues Updated,* April 18, 2012.

Fitz, Patrick, K. Ensuring Safe Drinking Water in the Age of Hydraulic Fracturing. November 17, 2011. http://sites.duke.edu/sjpp/2011/ensuring-safe-drinking-water-in-the-age-of-hydraulic-fracturing/.

Gardner, T. Water Safe in Town Made Famous by Fracking-EPA. *Reuters*. 5/11/2012. http://uk.reuters.com/article/2012/05/11/usa-fracking-dimock-idUKL1E8GBVGN20120511.

Krause, A., R. Throupe, J. Kilpatrick, and W. Speiss. Contamination, Trespass & Underground Rents. *Journal of Property Investment and Finance*, 2011, 30:3, 304–20.

Lipscomb, Clifford, Max Kummerow, Will Spies, Sarah Kilpatrick, John Kilpatrick, Contingent Valuation and Real Estate Damage Estimation. *Journal of Real Estate Literature*, 2011 283–305.

Lipscomb, C. Using Contingent Valuation to Measure Property Value Impacts. *Journal of Property Investment and Finance*, 2011, 29:4/5, 448–59.

Lustgarten, A. Buried Secrets: Is Natural Gas Drilling Endangering U.S. Water Supplies? *ProPublica*, November 13, 2008.

Mathews, K. and W. Desvouges. The Truth The Partial Truth and Anything But The Truth: Survey Reliability and Property Valuation. Working paper by Triangle Economic Research Co., Presented at the Symposium on Environmental and Property Damages: Standards, Due Diligence, Valuation and Strategy, Toronto Canada, 2002.

Mitchell, R.C. and R.T. Carson. Using Surveys to Value Public Goods: The Contingent Valuation Method. Washington, DC: *Resources for the Future*, 1989.

Mundy, B. The Impact of Hazardous and Toxic Material on Property Value. *The Appraisal Journal*, 1992a, October, 463–71.

——. Stigma and Value. *The Appraisal Journal*, 1992b, 61:1, 7–13.

Mundy, B. and D.G. McLean. Adding Contingent Valuation and Conjoint Analysis to the Required Body of Knowledge for the Estimation of Environmental Damages to Real Property. *Journal of Real Estate Practice and Education*, 1998a, 1:1, 1–19.

——. Using the Contingent Value Approach for Natural Resource and Environmental Damage Applications. *The Appraisal Journal*, 1998b, 66:3, 290–97.

Phillips, S. EPA Blames Fracking for Wyoming Groundwater Contamination. *State Impact Pennsylvania*. WITF, WHYY & NPR. December 8, 2011. http://stateimpact.npr.org/pennsylvania/2011/12/08/epa-blames-fracking-for-wyoming-groundwater-contamination/.

Rowe, R.D., R.C. d'Arge, and D.S. Brookshire. An Experiment on the Economic Value of Visibility. *Journal of Environmental Economics and Management*, 1980, 7, 1–19.

Rubinkam, M. Associated Press, EPA: Dimock PA. Water Quality Initial Tests Results Revealed. March 15, 2012. http://www.huffingtonpost.com/2012/03/16/epa-dimock-pa_n_1350446.html.

Seale, R. Open Hole Completion Systems Enables Multi-stage Fracturing and Stimulation Along Horizontal Wellbores. *Drilling Contractor*, July/August 2007. http://drillingcontractor.org/dcpi/dc-julyaug07/DC_July07_PackersPlus.pdf.

Simons, R.A. Settlement of an Oil Pipeline Leak with Contaminated Residential Property: A Case Study. *Real Estate Issues*, 1999a, 24:2, 46–52.

——. The Effects of Oil Pipeline Ruptures on Non-Contaminated Easement-Holding Property. *The Appraisal Journal*, 1999b, 67:3, 255–63.

——. Estimating Proximate Property Damage from PCBs in a Rural Market: A Multiple Techniques Approach. *The Appraisal Journal*, 2002, 70:4, 388–400.

BLM_0066178

——. When Bad Things Happen to Good Property. Washington DC: Environmental Law Institute Press, 2006.

Simons, R.A., J. Saginor, A. Karam, and H. Baloyi. Use of Contingent Valuation Analysis in a Developing Country: Market Perceptions of Contamination on Johannesburg's Mine Dumps. *International Real Estate Review*, 2008, 11:2, 75–104.

Simons, R.A. and J. Saginor. Determining Offsite Damages to Non-residential Property from Leaking Underground Storage Tanks. *International Real Estate Review*, 2010, 13:2, 134–56.

Simons, R.A., W. Bowen, and A. Sementelli. The Effect of Underground Storage Tanks on Residential Property Values in Cuyahoga County, Ohio. *Journal of Real Estate Research*, 1997, 14:1/2, 29–42.

——. The Price and Liquidity Effects of UST Leaks from Gas Stations on Adjacent Contaminated Property. *The Appraisal Journal*, 1999, 67:2, 186–94.

Simons, R.A. and R. Throupe. An Exploratory Review of the Effects of Toxic Mold and Real Estate Values. *Appraisal Journal*, 2005, 73:2, 156–66.

Simons, R.A. and K. Winson-Geideman. Determining Market Perceptions on Contamination of Residential Property Buyers Using Contingent Valuation Surveys. *Journal of Real Estate Research*, 2005, 27:2, 193–220.

Urbigkit, C. Ozone Mitigation Efforts Continue in Sublette County, Wyoming. *Wyoming's Energy News*, March 10, 2011.

Wilde, L., C. Loos, and J. Williamson. Pipelines and Property Values: An Eclectic Review of the Literature. *Journal of Real Estate Literature*, 2012, 20:2, 245–59.

*Ron Throupe, University of Denver, Denver CO 80208 or rthroupe@du.edu.*

*Robert A. Simons, Cleveland State University, Cleveland, OH 44122 or R.simons@ csuhio.edu.*

*Xue Mao, University of Denver, Denver CO 80208 or mm.xuer@gmail.com.*

BLM_0066179

## PACWPL Policy Paper SG-01-02

# Ranch-Level Impacts of Changing Grazing Policies on BLM Land to Protect the Greater Sage-Grouse: Evidence from Idaho, Nevada and Oregon

L. Allen Torell
John A. Tanaka
Neil Rimbey
Tim Darden
Larry Van Tassell
Aaron Harp



## Policy Analysis Center for Western Public Lands

16952 S. Tenth Avenue
Caldwell, ID  83607-8249
Phone: (734) 340-4203 / (208) 459-6365
Fax: (734) 340-4376 / (208) 454-7612

director@pacwpl.nmsu.edu

BLM_0066180

**About the Authors**

**L. Allen Torell** is a professor in the Department of Agricultural Economics and Agricultural Business at New Mexico State University.

**John A. Tanaka** is an associate professor in the Department of Agricultural and Resource Economics at Oregon State University.

**Neil Rimbey** is a professor in the Department of Agricultural Economics and Rural Sociology at the University of Idaho.

**Tim Darden** is a research associate in the University Center for Economic Development in the Department of Applied Economics and Statistics at University of Nevada, Reno.

**Larry Van Tassell** is professor and head of the Department of Agricultural Economics and Rural Sociology at the University of Idaho.

**Aaron Harp** is director of the Policy Analysis Center for Western Public Lands.

*The authors would like to thank E. Tom Bartlett, Colorado State University; William Champney, University of Nevada, Reno; Wendy Favinger, USDI Bureau of Land Management, Billings, MT; Roy Allen, USDI Bureau of Land Management, Cheyenne, WY; and John Martin, USDI Bureau of Land Management, Boise, ID for their valuable comments and criticisms.*

*The mission of the Policy Analysis Center for Western Public Lands is to help rural communities, policy makers, resource managers and users, and others understand, analyze and engage effectively in the public land policy process. The Center will provide relevant, science-based information and analysis of ongoing and proposed public land management policies.*

BLM_0066181

**Table of Contents**

1.       Introduction ............................................................................................................... 1

   1.1.     Impact Alternatives Considered ........................................................................... 2

2.       Literature Review ..................................................................................................... 2

   2.1.     Removal of Spring Grazing .................................................................................. 2

   2.2.     Allotment Reductions .......................................................................................... 3

3.       Methods and Procedures ........................................................................................... 4

   3.1.     Linear Programming Model Description ............................................................... 5

   3.2.     Representative Ranches ........................................................................................ 6

   3.3.     Linear Programming Analysis ............................................................................... 8

      3.3.1.    Output Prices .................................................................................................. 9

4.       Results ...................................................................................................................... 10

   4.1.     BLM Grazing Reductions ...................................................................................... 10

      4.1.1.    Jordan Valley, Idaho Model ........................................................................... 10

      4.1.1.1.  Sensitivity Analysis ...................................................................................... 10

      4.1.2.    Northeastern Nevada Model ......................................................................... 12

      4.1.2.1.  Sensitivity Analysis ...................................................................................... 12

      4.1.3.    Lake County, Oregon Model .......................................................................... 13

      4.1.3.1   Sensitivity Analysis ....................................................................................... 13

   4.2.     Eliminating Spring Grazing ................................................................................... 13

      4.2.1.    Jordan Valley, Idaho Model ........................................................................... 13

      4.2.2.    Northeastern Nevada Model ......................................................................... 15

      4.2.3.    Lake County, Oregon ..................................................................................... 16

5.       Summary and Conclusions ........................................................................................ 17

6.       Literature Cited ......................................................................................................... 19

BLM_0066182

## 1.   Introduction

The greater sage-grouse (*Centrocercus urophasianus*) is widely discussed as a candidate for listing under the Endangered Species Act (ESA). Biologists, conservation groups and government organizations have documented sage-grouse population declines and the apparent reasons for these declines, and have made recommendations for how to recover the species (see, for example, American Lands Alliance 2002, Connelly et al. 2000, USDI-BLM 2000 and 2001). Most states have convened local sage-grouse working groups to develop sage-grouse recovery plans built on collaboration across agencies and communities (see Nevada Sage-Grouse Project 2001, USDI-BLM 2001). Suggested conservation actions include educational programs about the species, mapping of sage-grouse habitat and distributions, research to evaluate how to manage and improve sage-grouse habitat, and habitat-restoration programs to recover the species and maintain habitat quality (Connelly et al. 2000, USDI-BLM 2001). Some proposed actions include significant changes to livestock grazing, and many biologists and environmentalists believe livestock grazing is the single greatest threat to sage-grouse (Clifford 2002).

A Memorandum of Understanding (MOU) between the Western Association of Fish and Wildlife Agencies (WAFWA), the U.S. Department of Agriculture, Forest Service (USFS), the U.S. Department of the Interior, Bureau of Land Management (BLM), and the USDI Fish and Wildlife Service (FWS) was signed in 2000. This MOU provided for the establishment of a team of representatives from the federal agencies and four states (Nevada, Idaho, Montana and Wyoming) to coordinate state and federal efforts to conserve sagebrush and sage-grouse. Specifically, the states and agencies agreed to consider, among other things, the WAFWA Guidelines to Manage Sage-Grouse Populations (Connelly et. al. 2000) in designing recovery plans for sage-grouse. These guidelines call for recovery plans that use local working groups to identify and solve regional problems related to the grouse. Local differences in conditions that affect sage-grouse populations may occur and Connelly et al. (2000) suggests these local differences should be considered in conservation plans.

Most management actions in completed state and regional sage-grouse plans are general and could apply in varying degrees to almost any area of the sagebrush ecosystem. This generality makes an assessment of potential impacts stemming from management changes impossible until local and specific courses of action are defined. One possible exception is livestock grazing.

Relatively healthy populations of sage-grouse occur in habitats grazed by domestic livestock, and grazing management in these areas results in habitat characteristics that support sage-grouse populations. However, low density or declining sage-grouse populations also occur in some areas characterized by a depleted herbaceous understory that may be the result of past or present grazing practices. Changes in grazing management may be necessary to increase sage-grouse populations, but experimental data are lacking to guide management decisions.

The political discussion surrounding livestock grazing and sage-grouse recovery is intense (see Clifford 2002). In many western states, the BLM lists the sage-grouse as a "sensitive species," and USFS defines it as a "management indicator species." This obligates these agencies to account for the needs of sage-grouse populations in their planning and management decisions. Management of public lands for the needs of livestock and sage-grouse will, at a minimum, require changes in land-use policies and goals. These changes are likely to occur even if an Endangered Species Act listing is postponed.

An example of these changes is a recent appeal by the National Wildlife Federation of a USFS environmental assessment (EA) on the Big Sheep grazing allotments in the Beaverhead-Deerlodge National Forest in Montana (National Wildlife Federation 2001). The appeal was based on two essential points. First, the appellants asserted that the USFS had failed to monitor sage-grouse populations over time on the grazing allotments in question. Second, the agency concluded that continuation of current grazing programs and maintenance of upland range improvements would have no significant impact on sage-grouse, even though the agency had virtually no population information for sage-grouse. The appellants argued that, because sage-grouse population data was lacking, this decision violated federal law. They requested that a "sage-grouse" alternative be added and the EA process be repeated with this alternative considered. The proposed alternative did not include elimination of grazing. It contained two main objectives (National Wildlife Federation 2001, p. 16):

> 1. "...fully implement the *Guidelines to Manage Sage-Grouse Populations* (Connelly et al. 2000) by adopting range utilization standards that provide optimal breeding habitat and protect summer and winter habitats. Such an alternative would have forage utilization standards of around 25% (well

1

BLM_0066183

below current levels), would avoid the construction of new water developments, and would assess whether elk winter range utilization was negating the effects of livestock utilization standards."

2. "...reduce or eliminate the existing upland water developments and fences."

Sage-grouse is a management indicator species for the USFS and this appeal constitutes an example of how that management status will confront land agencies with demands to modify grazing use to meet the habitat needs of sage-grouse. Modifications to forage utilization, existing and potential range improvements and changes in grazing seasons in the name of sage-grouse are within the realm of likely policy changes.

Sage-grouse habitat needs for breeding, nesting and brooding coincide with the periods when cattle are grazing on public lands (Connelly et al. 2000). Thus, the habitat needs of the grouse will likely constitute a benchmark against which management policies will be judged under both the threat of and the event of an ESA listing. If sage-grouse habitat does not meet this benchmark, it is our conclusion that reductions in grazing on public lands (such as the 25% forage utilization limit mentioned in the USFS appeal discussed above) is as likely to occur as any other management change.

Given the continuing controversy and efforts to list the sage-grouse under the ESA, the Policy Analysis Center for Western Public Lands (PACWPL) was asked to evaluate policy alternatives and the implications of an ESA listing for both the sage-grouse and for affected human communities. This paper provides an analysis of potential ranch-level impacts from altered livestock grazing uses on public lands.

## 1.1. Impact Alternatives Considered

During the spring, sage-grouse chicks need herbaceous cover for protection. Forbs are particularly critical to their diet during this period (Connelly et al. 2000). While the condition of spring habitat is critical for the survival of sage-grouse chicks, this spring period is also critical for forage and livestock production. In this paper, we estimate the value of BLM spring forage for livestock production. We also estimate the economic consequences of eliminating spring grazing and reducing grazing capacity on BLM lands so as to improve and maintain habitat for sage-grouse. The projected economic consequences of two policy

changes (i.e. eliminating spring grazing and reducing federal land allotments) would be applicable for numerous other endangered species and land-use issues where similar policy changes have been suggested. The answer is generic in its application.

Economic options available to many ranchers are to use deeded lands and meadows more intensively as grazing alternatives to public lands. Unfortunately, these same acreages are often prime habitat for sage-grouse, and adjusting seasons of use and stocking levels on deeded rangelands and meadows could be counterproductive. We make no judgment about whether the adjusted grazing strategies determined to be economically optimal with altered public land grazing policies would actually benefit sage-grouse. Our purpose is to provide an estimate of the economic value of public land forage potentially lost to representative ranches in each of three study states: Idaho, Nevada and Oregon.

## 2.   Literature Review

### 2.1. Removal of Spring Grazing

On western ranches, the typical harvest pattern for forages and raised feeds, and level of dependence on western rangelands, varies by season. In northern climates where rangelands are grazed seasonally during the spring, summer and fall, a typical seasonal grazing use pattern may include feeding hay in November or December and continuing until March, April or early May when livestock are moved to BLM and state trust lands. During the summer, livestock may be moved to USFS permits or remain on BLM and state trust lands. As hay harvest is completed and temperatures cool in the fall, cattle are moved back to the ranch headquarters, grazing deeded lands and hay aftermath until the cycle starts again.

Rangelands traditionally provide a substantial amount of forage during selected seasons for many western ranches. If a ranching operation is permitted for yearlong grazing on public lands, as is typical in New Mexico and Arizona, a decrease in allowed federal grazing would likely reduce production in the same proportion as the decrease in available public AUMs. If the ranch is dependent seasonally on federal forage, a reduction in federal AUMs may create forage imbalances and produce a greater reduction in grazing capacity than just the loss of the federal AUMs.

The federal government has recognized the varying seasonal importance of federal grazing in many parts of the West. The 1986 Grazing Fee Review and Evaluation report (USDA/USDI 1986, p. 3) states:

2

BLM_0066184

In numerous local areas in the West, the operating size of many livestock operations often is affected by the amount of federal range available during seasons of feed shortage on privately owned lands. Such critical periods may occur in the fall prior to hay feeding, in the summer when forage on private lands is low in nutritive value compared to forage on public ranges at higher elevations, and in the spring when private lands are needed to produce next winter's feed.

The impacts of eliminating or reducing spring grazing will depend on ranch resources and the substitute forage alternatives that are economically available. Obviously, the winter feeding period could be extended if spring grazing was eliminated, but this would increase feed costs. In many cases it would mean spring hay feeding would have to move from meadows to other areas so irrigation water could be applied.

Leased private lands might be available in the spring if public land grazing capacity were reduced, but in many cases additional grazing forage could only be leased by shipping livestock a substantial distance and with a substantial increase in feed costs. Marginal hay land could be converted to pasture and grazed, and grazing use of deeded rangelands and existing improved pastures could be adjusted by season where possible. However, in most cases there is little flexibility to implement seasonal changes in grazing use, and herd size reductions may be the only alternative, at least in the short run.

Some research on the economics of reduced or eliminated federal land grazing is available. Greer (1994) found that the reliance of southeastern Oregon ranchers on public lands can appear insignificant when calculated on an acreage or AUM basis, but, when calculated on a seasonal dependency basis, federal grazing is quite important. Taylor et al. (1992) found that, in Colorado, federal forage meets only 25% of annual forage requirements; yet, over 50% of summer season forage is obtained from federal lands.

Cook et al. (1980) found that changes in spring use had a greater impact on livestock sales per AUM for Colorado ranchers than did AUM changes in any other season. Van Tassell and Richardson (1998) also found that spring and summer forage obtained from public lands was critical to the operation of federally based ranches in Wyoming. Similarly, Torell et al. (1981) found the same situation for public land ranches in northern Nevada. Optimal production strategies and ranch income were not exceptionally sensitive to increases in the grazing fee, but production and net returns changed substantially when federal AUMs were removed from any season, particularly the spring season.

If an altered land-use policy means that grazing will not be allowed during the spring period, but the number of public land AUMs allowed for grazing is not correspondingly reduced, it is possible that eliminating spring grazing and shortening the allowed grazing period on public lands would increase optimal herd sizes. Torell et al. (1981) estimated this would be the situation for northeastern Nevada ranchers when spring grazing was eliminated. Given the cost/price definition of the analysis, the profit-maximizing strategy was to make up lost public land AUMs during the spring period by feeding more hay and to substitute other forages where possible. Net returns were reduced, but it was most profitable to use BLM AUMs previously grazed during the spring in other seasons and to expand herd size. For other ranches with few low-cost alternative sources of forage, optimal herd size could decrease with the elimination of spring grazing.

### 2.2. Allotment Reductions

Linear programming (LP) and ranch budgeting procedures have been used to estimate the seasonal value of public land forage (Bartlett 1983, Gee 1983, Hahn et al. 1989) and to estimate economic impacts from changes in federal land policies (Bartlett et al. 1979, Gee 1981, Perryman and Olson 1975, Rowe and Bartlett 2001, Torell et al. 1981, Van Tassell and Richardson 1998). All of these earlier LP models were single-year models that considered production under some defined average cost/price situation. Typical or representative ranches were defined from available cost-and-return studies in the various study areas. These studies found reductions in income and net ranch returns were not proportional to reductions in federal forage. The rigidity of seasonal forage availability meant the optimal use of other forages and resources were impacted when federal AUMs were removed. Other forages were reallocated to offset part of lost federal forage (Gee 1981, Van Tassell and Richardson 1998).

Gee (1981) and Hahn et al. (1989) used LP to estimate forage value on BLM and USFS lands. Forage values in 1981 were estimated to be $10.86/AUM for BLM and $11.58/AUM for USFS (Gee 1981). Hahn et al. (1989) updated Gee's work and reported forage values for each of nine USFS regions and as a national average. Values ranged from $9.22/AUM in Region 3 (New Mexico and

3

BLM_0066185

Arizona) to $15.11/AUM in Region 5 (California). Van Tassell and Richardson (1998) reported much higher values for BLM and USFS AUMs. For the Wyoming ranches studies, complete elimination of the BLM permit was estimated to decrease annual net cash income by an average of $55/BLM AUM removed. Eliminating the USFS permit decreased annual net returns by a similar amount, $52/AUM. At the other extreme, because some western ranchers are not necessarily in the business to make a profit and spend more than they justifiably should to produce livestock, Rowe and Bartlett (2001) found that eliminating federal grazing permits in Colorado would actually benefit some ranchers by forcing them to reduce the size of their money-losing livestock enterprise. Economic changes from allotment adjustments varied widely, ranging from a loss of $40/AUM to a gain of $27/AUM when herd reductions were the assumed adjustment strategy.

## 3. Methods and Procedures

We define the economic situation, typical resource base, production rates and practices for western ranches in three areas in the West: Owyhee County, Idaho; Northeastern Nevada; and Lake County, Oregon. Representative ranches in these areas were selected because livestock cost-and-return estimates and policy impact models had been developed for these areas. Additionally, ranches in these areas provide sage-grouse habitat and are dominated by the sagebrush rangeland type.

Data from cost-and-return studies were used to build multi-period linear programming (LP) models to evaluate how optimal (profit-maximizing) production strategies would change as permitted grazing use on public land changes. The specific ranches considered included medium-sized (300 cows) ranches in the Jordan Valley area of Owyhee County, Idaho; large ranches (720 cows) in north-eastern Nevada; and large ranches (500 cows) in Lake County, Oregon.

The economic analysis was completed in four steps. First, ranch-level data defining typical production practices, production rates and production costs were gathered from group interviews with area ranchers (Darden et al. 2001, Rimbey et al. 1998, Oregon cost-and-return studies have not yet been published). Second, a multi-period linear programming model was developed to depict the production processes of each representative ranch. Published cost-and-return studies that provided baseline cost data were for either the 1997 or 1998 production years. All prices were adjusted to real 1997 levels.

An initial baseline optimization was estimated for each model ranch. This was followed by additional optimizations that evaluated profit-maximizing production strategies under different policy scenarios. The estimated impact of changes in land-use policies is then the difference in optimal herd size, forage use and economic returns as compared to the baseline.

The projected economic consequences of two policy changes, elimination of spring grazing on BLM land and BLM allotment reductions, are evaluated. For eliminating spring grazing, we considered the removal of the first month of grazing. Spring grazing dates considered varied between the representative ranches because typical turn-out dates are different for each ranching area and ranch model, but in all cases the defined spring period would correspond to a period of critical concern for sage-grouse. During these spring months, sage-grouse use sagebrush habitats for breeding, feeding, roosting, nesting and rearing young. Available sagebrush, herbaceous cover and insects are considered to be critical for sage-grouse chick survival during the spring period (Connelly et al. 2000).

Allotment reductions considered included a 50% reduction, 75% reduction and total elimination of available BLM AUMs. The actual reduction level that might be necessary to improve sage-grouse habitat on a particular allotment, and alternative management options that could be used to minimize the disruption of grazing uses, will be site specific and variable. Further, reduction levels considered in the analysis may not be adequate because of the inter-dispersed nature of land tenure on many western ranches. State trust lands are often small, scattered parcels located with the BLM allotment, and private lands are also scattered within allotment boundaries. The Jordan Valley, Idaho model, for example, was defined to have state trust lands in addition to BLM lands, but the exact location of these lands was not defined. Elimination of spring grazing or reductions in federal land grazing may mean elimination or reductions on these other lands as well.

Each representative ranch has different amounts and types of resources defined to be available for grazing, and different options for replacing public land forage. Substitute forages and strategies considered to be available as BLM allotment grazing capacity was reduced included leasing outside private forage, converting native meadow hay land to irrigated pasture, extending the hay feeding period, and reducing the size of the cow herd. These alternative forage sources were considered to be available during selected seasons for both the base run and for additional policy impact runs. Converting hay land to pasture was not considered an option in the Oregon model because of the improved meadow and meadow hay produced.

4

BLM_0066186

We considered two alternative analyses for the elimination of spring grazing on BLM land. The first scenario was restrictive but may be most realistic in many cases because of limited opportunities to develop forage substitutes. This scenario considers only the options of feeding hay or reducing herd size. The second scenario allowed leasing outside private AUMs, converting hay land to pasture, moving the season of use of all deeded land to the spring, extending the winter feeding period, and reducing herd size.

We considered reductions to the BLM allotment to be phased in over five years in equal increments. The first 1/5 of the reduction was considered to occur during the second year. Results reported for optimal number of BLM AUMs used started with the sixth year when the full reduction had been implemented.

### 3.1. Linear Programming Model Description

The policy impact models used in this analysis were developed in five states and are structured for western livestock ranches that rely on both deeded and public lands for grazing capacity. A limited number of crop-raising alternatives are included in the models, but only as these crops provide forage, crop residue and feed for livestock production.

The net present value (NPV) of discounted net annual returns (profits or gross margin) is maximized over a T-year planning horizon subject to linear constraints that define resource limitations and resource transfers between years. Seasonal forage supply and demand is explicitly considered.

Figure 1 illustrates the general structure of the constraint set for the LP models during a given year t. Equations are discussed from top to bottom in the figure. A ranch has available a given set of cropland and rangeland for harvest and grazing. Each type of land is restricted at a level at or below some available upper limit, and that is the first block of equations in the model. Also considered in this block is recognition that certain forages will be restricted in use to only selected seasons, because of regulation, physical availability or production limitations.

The next block of equations is included to



**Figure 1. LP model constraint structure.**

BLM_0066187

transfer forage and crop production to livestock-raising activities and crop-selling activities. Within the livestock-raising block are equations that define the required ration between different animal classes. Some examples: bulls must be included based on a specified bull-to-cow ratio and the specified calf crop defines the number of young animals available for sale and herd replacement.

Seasonal forage requirements for each animal class are calculated based on defined animal unit equivalencies (Table 1) and the length of each grazing season. Equations are also included that transfer brood animals from the previous year. Typical animal death loss and the relative number of different animal classes are considered at the time of the transfer. The livestock-marketing block includes equations that transfer between livestock-raising and livestock-selling activities. Yearling animals are carried over from year t-1 to year t; this is another inter-year linkage in the model.

**Table 1. Animal unit equivalencies used to calculate seasonal forage requirements [from Vallentine (1990)].**

| Animal Class | Animal Unit Equivalency (AUE) |
|---|---|
| Brood cows | 1.00 |
| Bulls | 1.25 |
| Horses | 1.25 |
| Weaned calves | 0.50 |
| Yearlings | 0.75 |

The next equations define the cash flow constraint. Crop and livestock sales generate income and are a source of cash. Livestock-, crop- and forage-raising activities use cash. The cash constraint requires that a cash reserve be maintained so as to cover variable production expenses, fixed ranch expenses, family living expenses, loan obligations and an annual cash residual. Excess cash at year t-1 can be transferred to year t, and in fact it is implicitly assumed that any excess cash from a "good" year will be transferred to cover expenses and cash shortfalls in future years. Other sources of cash include off-ranch income and annual borrowing. Any funds borrowed must be repaid during the next year. Borrowing is not allowed during the last year and all debt obligations must be paid in full by the end of the T-year planning horizon. While numerous equations are included to define the production and economic processes of the representative ranch, forage resources and available cash ultimately determined the level of production possibilities.

Torell et al. (2001) and numerous other studies reviewed in that paper highlight that western ranchers do not have profit maximization as the primary goal; rather, they ranch for the way of life and the desirable attributes of rural living. As noted by Van Tassell and Richardson (1998), western public land ranchers will, for the most part, continue to ranch until forced to do something else. How, then, do we justify using profit maximization as our model objective? First, the utility-maximization model that ranchers subscribe to is impossible to measure and quantify. Individual ranchers and ranch families have differing levels of commitment to the ranching lifestyle and decreasing annual ranch income through altered land-use policies can be expected to dampen enthusiasm for ranching to varying degrees. It will not be possible to predict how many ranchers a particular land-use policy will force out of business (Torell et al. 2001).

The profit-maximizing objective provides a measurable criterion against which to judge policy changes. It is tempered by considering only invest-ment alternatives related to ranching and livestock production, and by including cash flow restrictions. The LP model determines the optimal production strategy with the current policy prescription and how optimal production changes with a new policy. The implicit assumption is that ranch families will continue to consider only the limited investment opportunities associated with the ranch property; they prefer more money to less; and will continue to ranch until cash flow restrictions can no longer be met and they are forced from the business.

### 3.2. Representative Ranches

Table 2 summarizes forage resources, typical production rates and costs, and forage harvesting alternatives defined for each of the representative ranches. The grazing seasons and the seasons when alternative forages were considered to be available for grazing are defined in Table 3. Grazing seasons were defined based on typical turn-out dates, potentially adjusted turn-out dates and livestock marketing dates. Notice that the cost per unit of harvesting both federal and private forage (Table 2) includes both fee and non-fee grazing costs (e.g. herding cattle, checking cattle, improvement maintenance) as estimated by Van Tassell et al. (1997) and Van Tassell and Richardson (1998). The cost of leasing private rangeland in Nevada was considered to be exceptionally high ($30/AUM) because little private forage is available for lease in the state and this activity would require high non-fee costs because of the distance to available private leases.

Table 4 presents the assumed productivity of rangeland and pasture resources for each of the

6

**Table 2. Characteristics and resources of the representative ranches.**

| | Units | Number of Units | | | Objective Function Cost ($/unit) | | |
|---|---|---|---|---|---|---|---|
| | | Idaho | Nevada | Oregon | Idaho | Nevada | Oregon |
| Land resources owned | | | | | | | |
| Alfalfa hayland | Acres | | | 90 | | | 400.00 |
| Native meadow hayland | Acres[a] | 325 | 800 | 290 | 50.00 | 50.00 | 97.00 |
| Convert meadowland to pasture | Acres[a] | 325 | 800 | | 13.75 | 12.50 | |
| Deeded rangeland | AUMs | 240 | 115 | 600 | 3.25 | 3.25 | 3.25 |
| | | | | | | | |
| Land resources leased or purchased[b] | | | | | | | |
| State trust land | AUMs | 144 | | | 10.64 | | |
| BLM | AUMs | 2,098 | 4,148 | 2,400 | 7.19 | 7.19 | 7.19 |
| USFS | AUMs | | | 2,560 | | | 9.46 |
| Private leased land | AUMs | 500 | 500 | 500 | 13.25 | 30.00 | 13.25 |
| Purchase alfalfa hay | Tons | | Unlimited | | 100.00 | 85.00 | 120.00 |
| Purchase meadow hay | Tons | | Unlimited | | NA | 70.00 | 85.00 |
| Sell alfalfa hay | Tons | | All available | | | | 100.00 |
| Sell meadow hay | Tons | | All available | | 55.00 | 55.00 | 65.00 |
| | | | | | | | |
| Livestock resources[c] | | | | | | | |
| Animal units yearlong | AUY | 333 | 700 | 607 | | | |
| Brood cows | Head | 286 | 602 | 511 | 68.75 | 62.40 | 9.88 |
| Replacement heifers | Head | 65 | 120 | 86 | 68.75 | 62.40 | 9.88 |
| Bulls | Head | 19 | 36 | 29 | | | |
| Horses | Head | 6 | 12 | 10 | | | |
| | | | | | | | |
| Miscellaneous income/expenses | | | | | | | |
| Fixed ranch expenses | $ | | | | 24,430 | 33,361 | 25,432 |
| Family living allowance | $ | | | | 24,000 | 24,000 | 24,000 |
| Off-ranch annual income | $ | | | | 30,000 | 10,000 | 10,000 |
| Required minimum cash reserve | $ | | | | 500 | 500 | 500 |
| Efficiency measures[d] | | | | | | | |
| Calf Crop (Calves born as % of Jan. 1 cow inventory) | % | 88 | 85 | 90 | | | |
| Calf death loss | % | 4 | 3 | 4 | | | |
| Cow death loss | % | 2 | 2 | 2 | | | |
| Bull death loss | % | 1 | 1/2 | 1 | | | |
| Steer calf sale weight | lb | 440 | 475 | 525 | | | |
| Heifer calf sale weight | lb | 390 | 435 | 450 | | | |
| Heifer yearling sale weight | lb | 800 | 750 | 850 | | | |
| Cull cow sale weight | lb | 950 | 950 | 1,100 | | | |
| Cull bull sale weight | lb | 1,800 | 1,450 | 2,000 | | | |

[a]/Converting hayland to grazable pasture is not generally practiced but is a possible source of forage if public land AUMs are removed. This conversion would use some of the available hayland and thus would reduce the land available for crop production. The cost of the conversion was estimated by Van Tassel and Richardson (1998).

[b]/In addition to the $1.35/AUM grazing fee that has been paid for public land grazing in recent years, grazing costs shown above include estimates of non-fee grazing costs (e.g. herding, checking, moving). These estimates were made by Van Tassell and Richardson (1998) using rancher producer panel data and grazing cost data reported by Van Tassell et al. (1997).

[c]/Animal numbers reported are from the published cost-and-return publications for each state. Optimal animal numbers in the LP model will vary by year as beef prices vary. Animal costs exclude the cost of feed stuffs and non-fee grazing costs which are separate activities in the LP model. Animal costs include expenses for other classes of animals like bulls and horses as well.

[d]/Other production parameters used to develop the LP models are defined in the cost-and-return series publications.

BLM_0066189

**Table 3. Seasonal availability (*) of hay and forage for representative ranches.**

| Idaho | Season | | | | | |
|---|---|---|---|---|---|---|
| | 1-Mar 15-Apr | 15-Apr 15-May | 15-May 15-Oct | 15-Oct 15-Nov | 15-Nov 15-Dec | 15-Dec 1-Mar |
| State trust land | | * | * | | | |
| BLM | | * | * | | | |
| Private lease | * | * | * | * | * | |
| Deeded range | * | * | * | * | * | |
| Aftermath grazing | | | | * | * | |
| Convert meadow to pasture | * | * | * | * | * | |
| Feed raised/purchased hay | * | * | | | | * |

| Nevada | Season | | | | | |
|---|---|---|---|---|---|---|
| | 8-Apr 8-May | 8-May 8-Jun | 8-Jun 1-Oct | 1-Oct 23-Nov | 23-Nov 15-Dec | 15-Dec 8-Apr |
| BLM | * | * | * | | | |
| Private lease | * | * | * | * | * | * |
| Deeded range | * | * | * | * | | |
| Aftermath grazing | | | | * | * | |
| Convert meadow to pasture | * | * | * | * | * | |
| Feed raised/purchased hay | * | * | | | * | * |

| Oregon | Season | | | | | |
|---|---|---|---|---|---|---|
| | 1-Mar 1-Apr | 1-Apr 1-May | 1-May 1-Oct | 1-Oct 1-Nov | 1-Nov 1-Dec | 1-Dec 1-Mar |
| BLM | * | * | * | * | | |
| USFS | | | * | | | |
| Private lease | * | * | * | * | * | |
| Deeded range | * | | | | * | |
| Aftermath grazing | | | | | * | |
| Convert meadow to pasture | | * | * | * | * | |
| Feed raised/purchased hay | * | * | | | * | * |

**Table 4. Productivity measures for harvested and grazed forages.**

| | Unit | Idaho | Nevada | Oregon |
|---|---|---|---|---|
| Hay conversion to AUMs | AUMs/ton | 2.42 | 2.42 | 2.42 |
| Raised native hay | tons/acre | 1.5 | 1.5 | 1.5 |
| aftermath | AUM/acre | 2.3 | 2.5 | 2.3 |
| Raised alfalfa hay | tons/acre | | | 4.5 |
| aftermath | AUM/acre | | | 0.3 |
| Pasture native hayland | AUMs/acre | 5.5 | 5.0 | |

representative ranches. These rates were defined in the cost-and-return publications for each state.

### 3.3. Linear Programming Analysis

Optimal production and economic returns for the representative ranches was simulated over a 40-year planning horizon with 100 different iterations (beef price situations). The ranch starts the process in year 1 with an inventory of breeding animals (Table 2). From this point, during years 2 through 40, the model is free to adjust herd size (purchase or sell) to profit-maximizing levels subject to forage and cash limitations. Forage and pasture resources can be grazed or not grazed depending on its potential contribution to profit. An exception to this was state trust land in Idaho. Because the Idaho Department of Lands requires fees be paid whether the land is grazed or not, the restriction was included that state land AUMs had to be used.

8

### 3.3.1. Output Prices

Annual ranch income and optimal production strategies are greatly influenced by crop and live-stock prices. To minimize the effect of beef prices on the results of the policy assessment, a Monte Carlo analysis was used (Hillier and Leiberman 1986). Real (constant 1997) livestock prices were stochastic exogenous variables in the LP analysis. Monthly average livestock prices were used from markets in each of the three study states for the period January 1, 1980 to August 24, 2000 (Unpublished data supplied by David Weaber, Cattle-Fax, Inc., Centennial, Colo., Sept. 8, 2000) to estimate a time series price-forecasting model. The beef price model considers and estimates an approximate 12-year cycle of beef prices. It considers the relative price spread between different classes of livestock and the interdependence of beef prices for different animal classes at any point in time.

The starting point of the beef price cycle was randomly assigned for each iteration. Running the model with numerous alternative beef price scenarios and reporting averages and standard deviations across all iterations minimizes the effect of beef prices in the policy impact assessment.

The cost of purchasing bulls was not reported in the Cattle-Fax data. Data from the Tucumcari, N.M. bull sale was used to estimate that the sale price of bulls (constant 1997) is about twice that of bred cow prices.[1]

Hay prices were not varied by iteration because a long-term data series was not available to estimate annual price variability and relationships. The assumed real purchase and sale price of hay (Table 2) was considered to be the same during each year of the analysis. Another limitation was that annual fluctuations in forage production were not considered. While the importance of variability in annual forage production and the need to adjust stocking rates downward when production is low is widely recognized (Vallentine 1990), it is rarely considered in economic studies because of data limitations. We followed the standard analysis procedure of assuming an average annual level of forage production from each alternative forage source.

Initial debt obligations were not considered as an expense category in the analysis. This is because cost-and-return data used to define typical production practices, production rates, and costs and returns of the representative ranches do not include information about "typical" debt obligations of area ranchers. This personal data is generally not available and is known to vary widely from ranch to ranch. Gentner and Tanaka (2002) reported relatively low average debt loads for different classifications of public land ranchers responding to a West-wide survey.

The amount of off-ranch income and wealth available to ranch families is also variable. Recent studies have found new ranch buyers are not the traditional ranch family that depends exclusively on the ranch for disposable income (Gentner and Tanaka 2002, Torell et al. 2001). People with wealth or great outside income are purchasing many western ranches. As an overall weighted average, Gentner and Tanaka (2002) found large, full-time ranchers to have about $10,000 in annual off-ranch, retirement, and/or investment income. Small, part-time ranchers had $47,000 in off-ranch and other income, and depended on the ranch for less than 20% of annual disposable income. By comparison, full-time ranchers depended on the ranch for about 80% of disposable income (Gentner and Tanaka 2002).

While debt loads, wealth and off-ranch income are highly variable between ranches, the commitment of western ranchers to remain on the ranch remains constant (Gentner and Tanaka 2002, Torell et al. 2001). Given this commitment and the variability in financial resources across ranches, we followed two modeling procedures. First, we did not include investment opportunities like land development or the stock market. The LP model maximizes net discounted returns given the economic opportunity of raising cows or selling hay. Second, we assumed that the representative ranch would have at their disposal average levels of off-ranch income near that found by Gentner and Tanaka (2002). We assumed the 333 AUY ranch in Jordan Valley, had $30,000 in off-ranch income and the larger Nevada and Oregon models had $10,000 in off-ranch income. We assumed no initial wealth other than the initial inventory value of breeding animals and the ranch capital investment. For the base run and impact assessment, there were no debt obligations against the cow herd or the land. Given the known variability in debt across ranches, we then conducted a sensitivity analysis to investigate how the base run and policy impacts would change with increasing debt obligations and/or reduced levels of off-ranch income. We computed the average annual debt payment that could be sustained before and after the land-use policy change. The cash flow constraints of the LP model are of key importance for this assessment in that they require all variable, fixed and family living expenses to be covered each year, given calculated

---

[1] The regression equation estimated was Bull Price = $154 + 2.0549$_Bred Cow Price, $R^2 = 73\%$. [Annual average prices 1975 – 2001].

BLM_0066191

annual ranch returns and alternative assumptions about off-ranch income.

Annual borrowing was allowed (10% annual interest rate) with the full amount repaid the following year. The model allows repeated borrowing from year to year across a 40-year planning horizon, but debt must be repaid at the end of that period. Incurring an annual land payment or intermediate loan payment is equivalent to having an additional fixed expense obligation. If fixed expense obligations are too high, the cash flow constraint cannot be met and an "infeasible solution" is obtained. This is how the sensitivity analysis was conducted. The assumed level of off-ranch income was repeatedly reduced and even made negative (implying a borrowing situation) to investigate how decreasing levels of off-ranch income and increasing levels of debt added to the frequency by which annual cash flow requirements would become limiting. This was done for both the base run and the policy impact runs.

The sensitivity analysis presents a best-case situation because the model assumes that all excess funds in good years are saved to meet future cash shortfalls. With this definition the ranch family does not squander money during the good years; they live within the $24,000 family living allowance. Other fixed obligations of the ranch including depreciation and replacement of vehicles, equipment and improvements; electricity; telephone; and insurance are also subtracted as an annual fixed expense (Table 2).

## 4.    Results

### 4.1. BLM Grazing Reductions

#### 4.1.1. Jordan Valley, Idaho Model

Table 5 presents the average and standard deviation [computed over 100 beef price situations (iterations) and 40 years] of key production, and economic and resource variables estimated to be optimal (profit-maximizing) for the Jordan Valley, Idaho model under different levels of BLM AUM availability.  For the current situation, given the defined seasonal forage resources of the representative ranch, approximately 22% of BLM AUMs would optimally go unused each year because cash and forage resources in other seasons are more limiting. An average 345 AUY would be maintained on the ranch. Annual net cash income[1] was estimated to be $8,856 with a great deal of variability (standard deviation of $21,820). Given an assumed

annual input of $30,000 from off-ranch sources, this means the ranch was subsidized by off-ranch employment by about $21,000/year. Approximately 35% of the time net annual income (including ranch and off-ranch sources) would be negative, requiring transfer of savings from previous years or borrowing to meet cash flow requirements. These periods of negative income occurred in low beef price years or when herd expansion was economically optimal.

With off-ranch income and assumed frugal behavior and saving, the Jordan Valley model was always able to find a feasible solution, i.e., cash flow requirements could always be met. Only a minimal amount of annual borrowing was required with current allowed uses of federal forage.

As BLM grazing was sequentially reduced, net annual ranch returns decreased. The reduction in net ranch income per BLM AUM removed ranged from $2.41/AUM with a 50% BLM reduction to $3.44/AUM when BLM grazing was precluded. Average annual net cash income decreased from $8,856/year under the current situation to $1,631/year with a 100% BLM grazing reduction. This is the average residual amount that remains as a return on total ranch investment once all variable costs, loan costs, fixed costs and family living expenses have been paid.

Because the representative ranch did not depend on BLM land for 100% of annual grazing capacity, the optimal reduction in herd size was far less in percentage terms than the percent reduction in BLM forage. A 50% BLM reduction, for example, reduced optimal average herd size by 19% and a 100% BLM reduction reduced optimal average herd size by 42% (Table 5). This reduction is very near the average 39% that the representative ranch depended on BLM for annual grazing capacity under the current allotment allocation.

In addition to herd size reductions, other optimal adjustments to reduced BLM AUMs included conversion of hay land to pasture. Over 100 acres of hay land would optimally be used as pasture if the total BLM allotment were removed (Table 5). At an assumed cost of $13.25/AUM, private leased forage would only be the least-cost forage substitute when beef prices were relatively high and minimum number of private leased AUMs would optimally be used.

##### 4.1.1.1.   Sensitivity Analysis

It was assumed that the representative Jordan Valley model ranch had at its disposal an annual $30,000 in off-ranch income. The utmost level of

---

[1]Net cash income was defined to be gross crop and livestock sales + off-ranch income – variable production expenses – annual loan costs – fixed ranch expenses - family living expenses. It is the residual return to the investment in land and cattle, and to risk.

10

frugality was assumed with all excess funds in the good years saved to meet shortfalls in future years. With this frugal savings plan, a minimal level of annual borrowing was required.

Figure 2 shows how the likelihood of going broke (i.e. incurring an infeasible solution) increased with decreasing amounts of off-ranch income and for alternative reductions in available BLM AUMs. As shown, access to about $25,000 in outside annual income is crucial. With the current allocation of BLM AUMs, the Jordan Valley ranch would be unable to meet cash flow requirements in

5 out of 100 iterations (beef price situations) when off-ranch income was reduced to the $25,000 level. These infeasible solutions occurred when relatively low beef prices were realized in the early years of the analysis.

As off-ranch income was reduced to $20,000/ year and below, cash flow restrictions became limiting in all cases. The $15,000 range in off-ranch income (from $30,000 to $15,000) between being able to always meet annual ranch and family expenses and the 100% probability of going broke is extremely narrow. There is no ability to service

**Table 5. Optimal adjustments to reductions in BLM AUMs, Jordan Valley, Idaho model.**

| Adjustments in optimal use levels | Percent reduction in BLM AUMs | | | |
|---|---|---|---|---|
| | 0% | 50% | 75% | 100% |
| BLM available (AUMs) | 2,098 | 1,049 | 525 | 0 |
| Optimal average BLM used (AUMs) | 1,632 (223) | 1,040 (35) | 523 (14) | 0 (0) |
| Percent of AUMs from BLM land | 39% | 31% | 18% | 0% |
| Average number of brood cows (head) | 223 (18) | 180 (22) | 154 (28) | 127 (34) |
| Average number of AUY | 345 (31) | 280 (33) | 239 (41) | 199 (50) |
| Percent reduction in AUY (%) | – | -19% | -31% | -42% |
| Average annual variable production costs ($) | 71,231 (7,569) | 59,246 (6,718) | 49,268 (8,156) | 39,646 (11,083) |
| Average annual variable production costs ($/AUY) | 206 | 212 | 206 | 199 |
| Average annual net cash income ($) | 8,856 (21,820) | 6,331 (17,624) | 4,223 (15,472) | 1,631 (14,814) |
| Average annual net cash income ($/AUY) | 25.67 | 22.61 | 17.67 | 8.20 |
| Average change in net cash income ($/BLM AUM removed) | – | -2.41 | -2.94 | -3.44 |
| Deeded Range (AUMs) | 240 (0) | 240 (0) | 240 (0) | 240 (47) |
| State trust land (AUMs) | 144 (0) | 144 (0) | 144 (0) | 144 (0) |
| Private Lease (AUMs) | 1 (9) | 35 (91) | 38 (100) | 38 (100) |
| Meadow hayland acres hayed/grazed (acres) | 325 (0) | 313 (10) | 265 (14) | 214 (14) |
| Meadow acres converted to pasture (acres) | 0 (0) | 12 (10) | 60 (14) | 111 (14) |
| Raised meadow hay fed (tons) | 440 (35) | 359 (42) | 307 (54) | 256 (65) |
| Raised meadow hay sold (tons) | 47 (35) | 113 (44) | 100 (46) | 82 (44) |
| Purchased alfalfa hay fed (tons) | 123 (34) | 98 (26) | 83 (24) | 68 (22) |
| Average amount borrowed annually ($) | 83 (1,234) | 66 (1,118) | 57 (1,012) | 457 (5,222) |
| Probability of being forced out of business (%) | 0% | 0% | 0% | 0% |
| Probability of negative net annual cash income (%) | 35% | 37% | 40% | 45% |

[a]/Number in parenthesis is the standard deviation measured over the 100 iterations and 40 years.

[b]/The assumption was made that the reduction in allowed grazing capacity would be incrementally phased in over 5 years. Thus, the computed average is for years 6 through 40 after the reduction is fully implemented.



**Figure 2. Probability of not being able to meet cash flow requirements with alternative levels of off-ranch income and with BLM allotment reductions, Jordan Valley, Idaho model.**

11

BLM_0066193

long-term or intermediate debt from net ranch income for this 300-AUY ranch. This representative ranch must be subsidized by off-ranch income or accumulated wealth if the assumed fixed costs and family living allowance is to be paid each year.

The percentage of time that the representative ranch went broke increased as increasing levels of BLM forage was removed. Removal of the BLM permit would cause an 80% probability of going broke when off-ranch income was reduced from $30,000, to $25,000 (Fig. 2).

As shown by Gentner and Tanaka (2002), many public land ranchers have annual off-ranch income and wealth far in excess of what was assumed here. Others have less. Whether ranchers will remain in business as federal AUMs are removed will depend on their willingness to incur reduced ranch income, and their commitment to the ranching lifestyle. The cash flow restriction does not limit production opportunities for ranchers subsidizing the ranch enterprise with large amounts of off-ranch income and wealth, but it was a limiting factor for the defined representative ranch.

#### 4.1.2. Northeastern Nevada Model

Table 6 presents results for the Northeastern Nevada model under different levels of BLM AUM availability. About 7% of available BLM AUMs would optimally go unused with the current AUM allocation. An average 728 AUY would be produced on the ranch. Annual net cash income was estimated to be $30,794 ($42.30/AUY) with the current BLM allotment. Given an assumed annual input of

$10,000 from off-ranch sources, this means the representative northeastern Nevada ranch returned an average net annual profit from livestock and crop production of about $20,800/year (i.e., return to investment and risk). Approximately 25% of the time, net annual income would be negative.

As BLM AUMs were reduced by 50%, 75% and 100%, a nearly constant reduction in net returns per AUM was estimated, $5.77/AUM, $6.03/AUM and $6.16/AUM, respectively (Table 6). Annual net cash income decreased from $30,794/year under the current situation to $5,259/year (83% reduction) with a 100% BLM grazing reduction. This means the ranch would move from a positive average profit of $20,800/year to an average loss of $4,741/year with removal of the BLM permit. Annual net cash income was estimated to be positive because of the assumed off-ranch income. With a 100% BLM reduction, 44% of the time, annual net cash income would be negative. In addition to herd size reductions, other optimal adjustments to reduced BLM AUMs included conversion of hay land to pasture (Table 6). Private leased land was not profitable to graze at the assumed $30/AUM cost for the Nevada model (Table 2).

##### 4.1.2.1. Sensitivity Analysis

A negative level of off-ranch income is equivalent to including an annual loan payment or cash outlay. Sensitivity analysis indicates the representative Northeastern Nevada model, given the current allocation of BLM grazing capacity, could incur an additional $10,000 fixed annual

**Table 6. Optimal adjustments to reductions in BLM AUMs, Northeastern Nevada model.**

| Adjustments in optimal use levels | Percent reduction in BLM AUMs | | | |
|---|---|---|---|---|
| | 0% | 50% | 75% | 100% |
| BLM available (AUMs) | 4,148 | 2,074 | 1,037 | 0 |
| Optimal average BLM used (AUMs) | 3,847 (276)[a] | 2,074 (0) | 1,037 (0) | 0 (0) |
| Percent of AUMs from BLM land | 44% | 31% | 18% | 0% |
| Average number of brood cows (head) | 419 (27) | 321 (41) | 272 (51) | 223 (62) |
| Average number of AUY | 728 (39) | 556 (52) | 472 (68) | 389 (87) |
| Percent reduction in AUY (%) | – | -24% | -35% | -47% |
| Average annual variable production costs ($) | 127,341 (6,705) | 96,010 (6,804) | 78,045 (9,995) | 60,076 (13,567) |
| Average annual variable production costs ($/AUY) | 175 | 173 | 165 | 154 |
| Average annual net cash income ($) | 30,794 (40,254) | 18,836 (31,620) | 12,028 (28,477) | 5,259 (26,140) |
| Average annual net cash income ($/AUY) | 42.30 | 33.88 | 25.48 | 13.52 |
| Average change in net cash income ($/BLM AUM removed) | – | -5.77 | -6.03 | -6.16 |
| Deeded Range (AUMs) | 115 (0) | 115 (0) | 115 (0) | 115 (0) |
| Private Lease (AUMs) | 0 (0) | 0 (0) | 0 (0) | 0 (0) |
| Meadow hayland acres hayed/grazed (acres) | 778 (31) | 651 (45) | 542 (38) | 432 (31) |
| Meadow acres converted to pasture (acres) | 22 (31) | 149 (45) | 258 (38) | 368 (30) |
| Raised meadow hay fed (tons) | 934 (50) | 610 (91) | 610 (91) | 503 (114) |
| Raised meadow hay sold (tons) | 221 (98) | 271 (98) | 226 (85) | 181 (71) |
| Purchased alfalfa hay fed (tons) | 170 (25) | 106 (16) | 106 (16) | 79 (19) |
| Purchased meadow hay fed (tons) | 2 (18) | 1 (17) | 1 (16) | 0 (14) |
| Average amount borrowed annually ($) | 6 (382) | 7 (323) | 5 (269) | 4 (248) |
| Probability of being forced out of business (%) | 0 | 0 | 0 | 0 |
| Probability of negative net annual cash income (%) | 25% | 30% | 36% | 44% |

[a]/Number in parenthesis is the standard deviation measured over the 100 iterations and 40 years..

[b]/The assumption was made that the reduction in allowed grazing capacity would be incrementally phased in over 5 years. Thus, the computed average is for years 6 through 40 after the reduction is fully implemented.

12

BLM_0066194

payment and still cover production expenses, fixed costs and the family living allowance. With this $10,000 annual payment, the model would fail to meet cash flow requirements only 2% of the time (Fig. 3). This payment could service an approximate $100,000, 30-year loan to purchase the ranch, or a revolving $35,000 5-year loan (assuming a 9% interest rate). The likelihood of going broke quickly increases as additional $5,000 increments of annual loan obligation are added. Further, the ability of the representative Northeastern Nevada ranch to incur added debt is quickly removed as BLM AUMs are removed (Fig. 3). The average optimal size of the ranch moves from 728 AUY with the current BLM allotment allocation to 389 AUY when the permit was removed (Table 6), and this reduced ranch size is no longer able to generate the income needed to cover loan payments.

### 4.1.3. Lake County, Oregon Model

Table 7 presents results for the Lake County, Oregon model under different levels of BLM AUM availability. All available BLM AUMs would be used each year with the current allotment allocation and resource combination. About 2% of available USFS AUMs would optimally go unused in the baseline situation. An average of 723 AUY would optimally be produced on the ranch. Over half (57%) of the grazing capacity of the ranch would come from BLM and USFS grazing allotments.

Annual average net cash income was estimated to be $50,059/year ($69.24/AUY) with current BLM and USFS allotments. Approximately 16% of the time, net annual income would be negative.

The economic impact of sequentially reducing the availability of BLM AUMs ranged from about $10/BLM AUM removed for 50% and 75% BLM allotment reductions to $11.77/AUM with total elimination of BLM grazing. Annual net cash income was reduced to $21,808/year (56% reduction) with a 100% BLM reduction (Table 7).

With a 100% reduction in BLM grazing, the optimal use of USFS AUMs would be reduced by about 11%. Some of the BLM AUMs were replaced by leasing increasing amounts of private forage (Table 7), but the primary way the profit-maximizing model adjusted to AUM reductions was to reduce herd size. The average number of livestock produced was reduced from 723 AUY with the current allotment allocation to 485 AUY (33% reduction) with elimination of the BLM permit (Table 7). The representative Lake County, Oregon model is defined to have substantial hay land resources and optimally switches to hay selling when the size of the BLM allotment is reduced.

#### 4.1.3.1. Sensitivity Analysis

With the current BLM and USFS allotment allocation, the representative Lake County, Oregon model could sustain a $40,000 annual debt payment (Fig. 4). Similar to the other two ranch models, removing BLM AUMs reduced the optimal scale (herd size) and profitability of the ranch. The ability to service debt was increasingly reduced with increasing reductions in BLM grazing capacity.

### 4.2. Eliminating Spring Grazing

#### 4.2.1. Jordan Valley, Idaho Model

The representative Jordan Valley Ranch under current policy turns out on BLM and state lands on April 15. Table 8 presents the optimal seasonal grazing use when the turn-out date is moved to May 15. In this analysis, the only possible or allowed grazing alternative was to extend winter feeding through the April 15 – May 15 period. Herd size



**Figure 3. Probability of not being able to meet cash flow requirements with alternative levels of annual debt payment and with BLM allotment reductions, Northeastern Nevada model.**

13

BLM_0066195

**Table 7. Optimal adjustments to reductions in BLM AUMs, Lake County, Oregon model.**

| Adjustments in optimal use levels | Percent reduction in BLM AUMs | | | |
|---|---|---|---|---|
| | 0% | 50% | 75% | 100% |
| BLM available (AUMs) | 2,400 | 1,200 | 600 | 0 |
| Optimal average BLM used (AUMs) | 2,400 (0)[a] | 1,200 (0) | 1,200 (0) | 0 (0) |
| Optimal average USFS used (AUMs) | 2,513 (132) | 2,540 (78) | 2,533 (76) | 2,269 (150) |
| Percent of AUMs from BLM and USFS lands | 57% | 51% | 56% | 39% |
| Average number of brood cows (head) | 416 (17) | 350 (26) | 318 (31) | 278 (41) |
| Average number of AUY | 723 (37) | 607 (37) | 552 (42) | 485 (58) |
| Percent reduction in AUY (%) | – | -16.0% | -23.7% | -32.9% |
| Average annual variable production costs ($) | 140,703 (10,999) | 122,757 (9,298) | 115,635 (8,027) | 109,411 (8,529) |
| Average annual variable production costs ($/AUY) | 195 | 202 | 209 | 226 |
| Average annual net cash income ($) | 50,059 (49,542) | 37,972 (40,818) | 31,456 (38,066) | 21,808 (35,256) |
| Average annual net cash income ($/AUY) | 69.24 | 62.56 | 56.99 | 44.96 |
| Average change in net cash income ($/BLM AUM removed) | – | -10.07 | -10.34 | -11.77 |
| Deeded Range (AUMs) | 113 (0) | 113 (0) | 113 (0) | 113 (0) |
| Private Lease (AUMs) | 249 (208) | 298 (198) | 376 (139) | 492 (24) |
| Meadow hayland acres hayed/grazed (acres) | 290 (0) | 290 (0) | 290 (0) | 290 (1) |
| Raised Alfalfa hay fed (tons) | 341 (45) | 182 (44) | 253 (35) | 221 (39) |
| Raised meadow hay fed (tons) | 435 (0) | 543 (75) | 425 (13) | 402 (37) |
| Raised meadow hay sold (tons) | 0 (0) | 0 (1) | 10 (13) | 33 (36) |
| Raised alfalfa hay sold (tons) | 64 (45) | 123 (38) | 152 (35) | 184 (39) |
| Purchased alfalfa hay fed (tons) | 0 (0) | 0 (0) | 0 (0) | 0 (0) |
| Purchased meadow hay fed (tons) | 135 (26) | 1 (10) | 16 (35) | 21 (40) |
| Average amount borrowed annually ($) | 0 (0) | 0 (0) | 0 (0) | 2 (117) |
| Probability of being forced out of business (%) | 0 | 0 | 0 | 0 |
| Probability of negative net annual cash income (%) | 16% | 18% | 21% | 27% |

[a]/Number in parenthesis is the standard deviation measured over the 100 iterations and 40 years..

[b]/The assumption was made that the reduction in allowed grazing capacity would be incrementally phased in over 5 years. Thus, the computed average is for years 6 through 40 after the reduction is fully implemented.



**Figure 4. Probability of not being able to meet cash flow requirements with alternative levels of annual debt payment and with BLM allotment reductions, Lake County, Oregon model.**

could also be altered if that was most profitable.

With these two available options, the profit-maximizing adjustment would be to reduce average herd size from 345 AUY to 274 AUY. An estimated 75 tons (182 AUMs) of hay would be required to replace the loss of AUMs of grazing capacity previously harvested from BLM land (Table 8). With the reduced herd size, 18 tons of additional hay would be sold.

The average 248 AUMs previously grazed during the April 15 – May 15 on BLM land was not removed from potential grazing; only the season of

use was restricted in the analysis, but, eliminating spring grazing reduced optimal average BLM AUM use to 972 AUMs. This was a 683 AUM reduction relative to the base run. Spring grazing now limits annual production, and AUMs supplied in other seasons are not economically useful; thus, elimination of spring grazing became economically equivalent to an allotment reduction.

Average net economic returns decreased by $5,994 with the elimination of spring grazing (Table 8). When divided by the 248 AUMs previously grazed on BLM land during the spring period (Table

14

BLM_0066196

**Table 8. Optimal adjustments to elimination of spring grazing on BLM land, Jordan Valley, Idaho model.**

| Season | | | BLM | State | Deeded | Meadow hayland grazed/ hayed | Raised meadow hay fed | Purchased alfalfa hay | Total |
|---|---|---|---|---|---|---|---|---|---|
| Adjustments in seasonal forage use | | | | | | | | | |
| Base run with BLM spring grazing (AUMs) | | | | | | | | | |
| 2-Mar | to | 16-Apr | 0 | 0 | 0 | 0 | 433 | 51 | 485 |
| 16-Apr | to | 16-May | 248 | 0 | 40 | 0 | 0 | 34 | 322 |
| 16-May | to | 16-Oct | 1,407 | 144 | 97 | 0 | 0 | 0 | 1,648 |
| 16-Oct | to | 16-Nov | 0 | 0 | 100 | 377 | 0 | 0 | 477 |
| 16-Nov | to | 16-Dec | 0 | 0 | 3 | 369 | 0 | 0 | 373 |
| 16-Dec | to | 2-Mar | 0 | 0 | 0 | 0 | 632 | 213 | 845 |
| | TOTAL USED (AUM) | | 1,655 | 144 | 240 | 747 | 1,066 | 298 | 4,150 |
| | | | | | | | | | |
| No BLM spring grazing (AUMs) | | | | | | | | | |
| 2-Mar | to | 16-Apr | 0 | 0 | 0 | 0 | 343 | 41 | 384 |
| 16-Apr | to | 16-May | 0 | 0 | 40 | 0 | 189 | 27 | 256 |
| 16-May | to | 16-Oct | 972 | 144 | 188 | 0 | 0 | 0 | 1,304 |
| 16-Oct | to | 16-Nov | 0 | 0 | 12 | 453 | 0 | 0 | 464 |
| 16-Nov | to | 16-Dec | 0 | 0 | 0 | 294 | 0 | 0 | 295 |
| 16-Dec | to | 2-Mar | 0 | 0 | 0 | 0 | 490 | 179 | 669 |
| | TOTAL USED (AUM) | | 972 | 144 | 240 | 747 | 1,022 | 247 | 3,372 |

| Adjustments in: | Base Run with BLM spring grazing | Without BLM Spring Grazing | Change |
|---|---|---|---|
| Average number of AUY | 345 | 274 | -71 |
| | (31) | (53) | |
| Average number of brood cows | 223 | 175 | -48 |
| | (18) | (34) | |
| Average annual net cash income ($) | 8,856 | 2,862 | -5,994 |
| | (21,820) | (17,235) | |
| Average annual net cash income ($/AUY) | 25.67 | 10.44 | -15.22 |
| Average change in net cash income ($/BLM AUM removed during the spring period) | | | -24.17 |
| Raised meadow hay sold (tons) | 47 | 65 | 18 |
| Average amount borrowed annually ($) | 83 | 493 | 410 |
| Probability of being forced out of business (%) | 0% | 2% | |
| Probability of negative net annual cash income (%) | 35% | 45% | |

8), the loss in net returns is $24.17/AUM removed.

The economic impact of removing spring grazing will depend on what alternative forages are considered to be available. Thus, as a second analysis, spring grazing on BLM land was removed, but in this case it was assumed the ranch could freely adjust the seasonal use of all deeded AUMs. Hay land could be converted to pasture and grazed in the spring, and private leased land could be leased during the spring. With these forage alternatives (table not shown), the economic impact of removing spring grazing on BLM land was much less ($5.34/AUM removed from spring grazing). The optimal adjustment would be to graze nearly all deeded AUMs in the spring and lease a small amount of private AUMs. Optimal herd size would be reduced to 311 AUY. Optimal BLM AUM use would decrease to 1,342 AUMs.

The flexibility to have alternative forage sources is likely not possible for many of the Jordan Valley ranches, but the analysis clearly shows the potential to minimize the economic impact of removing spring grazing if other grazing resources can be substituted.

### 4.2.2. Northeastern Nevada Model

The representative Northeastern Nevada ranch under current policy turns out on BLM land on April 8. Table 9 presents the optimal seasonal grazing adjustments when the turn-out date is moved to May 8. In this analysis, the only possible or allowed grazing alternative was to extend winter feeding through the April 8 – May 8 period. Herd size could also be altered.

With elimination of BLM spring grazing, hay sales would be reduced from 221 tons to 120 tons.

15

BLM_0066197

An estimated 222 tons (538 AUMs) of hay would be required to replace the loss of AUMs of grazing capacity previously harvested from BLM land during the spring (Table 9). Average herd size would also be reduced from 728 AUY to 589 AUY.

Eliminating spring grazing reduced optimal average BLM AUM use to 2,187 AUMs. This was a 1,684 AUM reduction (44% reduction) from the base run. A major shift in the seasonal use of forage would optimally occur. BLM AUMs supplied in other seasons could not economically be used because of the forage shortages in the spring.

Net economic returns decreased by $17,171 with elimination of spring grazing (Table 9). When divided by the 665 AUMs previously grazed on BLM land during the spring period, the loss in net returns was $25.82/AUM removed from spring grazing. If more seasonal flexibility of other forages was assumed, the estimated loss would still be relatively high, $18.76/BLM AUM removed in the

spring. In this second analysis, additional hay land would optimally be converted to pasture and deeded AUMs would be allocated for spring grazing (table not shown). Hay feeding would not increase. Similar to the Jordan Valley, Idaho model, grazing alternatives are cheaper then hay feeding if those alternatives exist.

### 4.2.3. Lake County, Oregon

The representative Lake County, Oregon ranch under current policy turns out relatively early on BLM land (March 1). Table 10 presents the optimal adjustments when this turn-out date is moved to April 1. Alternative sources of spring forage considered only the feeding of hay. Herd size could be altered if that would be more profitable. With these two allowed adjustments, the optimal strategy would be to extend the winter hay feeding period by a month. The 285 BLM AUMS removed during March would optimally be used later in the grazing

**Table 9. Optimal adjustments to elimination of spring grazing on BLM land, Northeast Nevada model.**

| Season | | | BLM | Deeded | Hayland converted to pasture | Meadow hayland grazed/ hayed | Raised meadow hay fed | Purchased meadow hay | Purchased alfalfa hay | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Adjustments in seasonal forage use | | | | | | | | | | |
| Base run with BLM land spring grazing (AUMs) | | | | | | | | | | |
| 9-Apr | to | 9-May | 665 | 0 | 0 | 0 | 0 | 0 | 0 | 665 |
| 9-May | to | 9-Jun | 688 | 0 | 0 | 0 | 0 | 0 | 0 | 688 |
| 9-Jun | to | 2-Oct | 2,518 | 29 | 4 | 0 | 0 | 0 | 0 | 2,551 |
| 2-Oct | to | 24-Nov | 0 | 86 | 125 | 1,435 | 0 | 0 | 0 | 1,646 |
| 24-Nov | to | 16-Dec | 0 | 0 | 15 | 490 | 0 | 0 | 67 | 572 |
| 16-Dec | to | 9-Apr | 0 | 0 | 0 | 0 | 2,260 | 5 | 346 | 2,612 |
| | TOTAL USED (AUM) | | 3,871 | 115 | 144 | 1,925 | 2,260 | 5 | 413 | 8,734 |
| | | | | | | | | | | |
| No BLM land spring grazing (AUMs) | | | | | | | | | | |
| 9-Apr | to | 9-May | 0 | 0 | 0 | 0 | 525 | 13 | 0 | 538 |
| 9-May | to | 9-Jun | 536 | 3 | 17 | 0 | 0 | 0 | 0 | 556 |
| 9-Jun | to | 2-Oct | 1,651 | 100 | 312 | 0 | 0 | 0 | 0 | 2,063 |
| 2-Oct | to | 24-Nov | 0 | 12 | 19 | 1,371 | 0 | 0 | 0 | 1,401 |
| 24-Nov | to | 16-Dec | 0 | 0 | 2 | 394 | 0 | 0 | 53 | 449 |
| 16-Dec | to | 9-Apr | 0 | 0 | 0 | 0 | 1,834 | 8 | 273 | 2,116 |
| | TOTAL USED (AUM) | | 2,187 | 115 | 349 | 1,765 | 2,360 | 21 | 326 | 7,123 |

| Adjustments in: | Base Run with BLM spring grazing | Without BLM Spring Grazing | Change |
|---|---|---|---|
| Average number of AUY | 728 | 589 | -139 |
| | (39) | (55) | |
| Average number of brood cows | 419 | 341 | -78 |
| | (27) | (41) | |
| Average annual net cash income ($) | 30,795 | 13,624 | -17,171 |
| Average annual net cash income ($/AUY) | 42.30 | 23.13 | -19.17 |
| Average change in net cash income ($/BLM AUM removed during the spring period) | | | -25.82 |
| Raised meadow hay sold (tons) | 221 | 120 | -101 |
| Average amount borrowed annually ($) | 7 | 92 | 85 |
| Probability of negative net annual cash income (%) | 25% | 37% | |

[1]/Number in parenthesis is the standard deviation computed over the 100 iterations and 40 years.

16

BLM_0066198

season, allowing herd size to increase by 19 head.

This result of using the BLM forage during a later season and increasing herd size is different from the results for the Nevada and Idaho models, but similar to the findings of Torell et al. (1981). The Oregon model is defined to have substantial hay resources, yet the assumed production cost of the hay ($/ton) is nearly equivalent to the sale price (Table 2). By comparison, the profit margin is defined to be $22/ton for the Idaho and Nevada models. Further, developing marginal hay meadows for grazing was not considered to be a viable option for the Oregon model whereas these activities were included for the Idaho and Nevada models. For the Oregon model, limited alternatives for hay land were included and the opportunity cost of feeding the hay to cows was relatively low. This likely explains the difference in the optimal adjustment strategy when spring BLM AUMs were removed.

The economic consequences of eliminating spring BLM grazing was to reduce net income by $8.17/BLM AUM removed from grazing during March. The total loss of net income for the ranch was $5,607.

If an expanded number of leased private AUMs are allowed to be grazed during the March period (table not shown), the economic consequences of removing spring grazing on BLM is minimal. Under the current situation, the ranch optimally leases an average of 250 AUMs of private leased forage. Most of that is leased May 1 to October 1 (Table 10). If the ranch has the flexibility to alter when those private AUMs are leased, the cost-minimizing adjustment would obviously be to move them to March and graze BLM later in the summer. By doing this, the model suffered no economic losses from the season-of-use adjustment. Economic returns and herd size remained unchanged; just the seasonal use pattern of forage was changed.

## 5. Summary and Conclusions

Public land is an important seasonal source of forage for western ranches. Thus, eliminating BLM grazing to improve habitat for sage-grouse would

**Table 10. Optimal adjustments to elimination of spring grazing on BLM land, Lake County, Oregon model.**

| Season | | BLM | USFS | Deeded | Leased private forage | Meadow hayland grazed/ hayed | Raised meadow hay fed | Purchased meadow hay | Purchased alfalfa hay | Raised alfalfa hay | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Adjustments in seasonal forage use | | | | | | | | | | | |
| Base run with BLM land spring grazing (AUMs) | | | | | | | | | | | |
| 2-Mar | to 2-Apr | 285 | 0 | 266 | 0 | 0 | 0 | 0 | 0 | 160 | 711 |
| 2-Apr | to 2-May | 686 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 686 |
| 2-May | to 2-Oct | 763 | 2,496 | 0 | 243 | 0 | 0 | 0 | 0 | 0 | 3,502 |
| 2-Oct | to 2-Nov | 666 | 0 | 0 | 2 | 284 | 0 | 0 | 0 | 0 | 952 |
| 2-Nov | to 2-Dec | 0 | 0 | 334 | 5 | 383 | 0 | 0 | 0 | 0 | 722 |
| 2-Dec | to 2-Mar | 0 | 0 | 0 | 0 | 0 | 1,053 | 327 | 1 | 666 | 2,046 |
| | TOTAL USED (AUM) | 2,400 | 2,496 | 600 | 250 | 667 | 1,053 | 327 | 1 | 825 | 8,619 |
| | | | | | | | | | | | |
| No BLM land spring grazing (AUMs) | | | | | | | | | | | |
| 2-Mar | to 2-Apr | 0 | 0 | 266 | 0 | 0 | 155 | 140 | 2 | 165 | 728 |
| 2-Apr | to 2-May | 705 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 705 |
| 2-May | to 2-Oct | 977 | 2,445 | 0 | 173 | 0 | 0 | 0 | 0 | 0 | 3,595 |
| 2-Oct | to 2-Nov | 718 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 718 |
| 2-Nov | to 2-Dec | 0 | 0 | 334 | 2 | 892 | 0 | 0 | 0 | 0 | 1,228 |
| 2-Dec | to 2-Mar | 0 | 0 | 0 | 0 | 0 | 922 | 513 | 5 | 687 | 2,127 |
| | TOTAL USED (AUM) | 2,400 | 2,445 | 600 | 175 | 892 | 1,077 | 653 | 7 | 852 | 9,101 |

| Adjustments in: | Base Run With BLM Spring Grazing | Without BLM Spring Grazing | Change |
|---|---|---|---|
| Average number of AUY | 723 | 742 | 19 |
| | (37) | (44) | |
| Average number of brood cows | 416 | 425 | 9 |
| | (17) | (19) | |
| Average annual net cash income ($) | 50,059 | 44,452 | -5,607 |
| Average annual net cash income ($/AUY) | 69.24 | 59.91 | -9.33 |
| Average change in net cash income ($/BLM AUM removed during the spring period) | | | -8.17 |
| Raised alfalfa hay sold (tons) | 64 | 53 | -11 |
| Raised meadow hay sold (tons) | 0 | 0 | 0 |
| Average amount borrowed annually ($) | 0 | 0 | 0 |
| Probability of negative net annual cash income (%) | 16% | 19% | |

17

BLM_0066199

have a significant impact on the economic viability of affected ranches. This is especially true during the spring period. Early spring grazing is valuable because few alternative forage sources are available at that time. In most cases, the only feasible forage alternative would be to feed hay.

Rowe and Bartlett (2001, p. 64) concluded that once hay was needed to compensate for public forage losses, reducing herd size would be the most cost-effective adjustment. Our results generally support this conclusion. Making alterative grazing resources available during the spring always minimized losses relative to feeding hay or reducing herd size. If complete flexibility of other deeded forages were assumed, the economic loss of restricting the early use of BLM lands was minimal; seasonal use of alternative forages would be rearranged with little if any economic consequence.

The economic value of the BLM forage during the spring period was found to be 5 to 10 times the value in other seasons later in the year for both the Idaho and Nevada models. In this case, the elimination of spring grazing was equivalent to a grazing reduction because the BLM forage would not be used at a later date for profit maximization. This was not the case for the Oregon model with the major difference being the assumed hay resources. The Lake County, Oregon model was defined to have substantial hay land resources that made feeding hay a feasible alternative for the spring period. BLM AUMs would optimally be used in a later season allowing an increase in the average optimal herd size.

The economic impacts from reducing BLM grazing in any season were found to vary widely depending on several key factors. First, individual ranches will be able to substitute alternative forages to varying degrees as federal AUMs are eliminated. Substituting forages minimizes economic losses relative to the option of feeding hay and reducing cow herd size. Those ranches with restricted seasons of forage availability will have less ability to substitute alternative forages if BLM grazing is removed.

Annual average economic losses from removing AUMs ranged from about $3/AUM for the Jordan Valley, Idaho model, $6/AUM for the Northeastern Nevada model, to about $10/AUM for the Lake County, Oregon model. This is a wide range in annual value, but other similar studies in the literature report even a wider value range (Hahn et al. 1989). The contributory value of the federal grazing permits for livestock production varies widely depending on the seasonal complement of forage and pasture resources ranches have, and the level of dependency on federal lands.

Seasonal forage limitations, the degree to which public land forages meet seasonal forage demands, and the availability of substitute forages largely determined the economic value of the federal grazing permit. It is widely believed that the complement between public and private lands contributes greatly to the economics of western ranching and our analysis clearly shows that to be the case. Economic losses estimated here from reducing or changing seasons of grazing use on public lands are annual values. Capitalizing these annual values at any reasonable rate suggests a significant "permit value" and contribution from holding the federal grazing permit.

Western ranches vary greatly in financial resources (Gentner and Tanaka 2002). For those ranches with limited off-ranch wealth and income, reducing public land grazing capacity by even marginal amounts was found to greatly impact the ability of ranchers to meet annual financial obligations and to repay debt. We provided an estimate of what percentage of the time the representative ranches would be unable to meet the cash flow requirements assumed in the model when grazing policies were changed. Yet, in reality, how many ranchers will potentially be forced from the business as policies change cannot be determined because debt loads and off-ranch income are highly variable and unknown. The level of commitment to remain on the ranch is also variable and unknown.

Ranch-level impact estimates of how ranch returns would change if public land grazing levels and allowed seasons of use change are generic. The assessment and impact estimates apply to any situation where public land grazing is reduced or spring grazing is eliminated. As related specifically to sage-grouse, eliminating public land AUMs or removing grazing during the spring are options that have been discussed (Clifford 2002). Hopefully less drastic management options can be adopted. "The Gunnison Sage-Grouse Working Group recognizes the need to be opportunistic and carry out specific conservation actions as situations present themselves", as an example (USDI-BLM 2001, p. 7). What this analysis shows is that, if less drastic management options cannot be found and grazing use on public lands is curtailed or allowed seasons of use altered in the name of protecting the sage-grouse, the economic impact to western public land ranchers will be significant.

18

## 6.    Literature Cited

**American Lands Alliance. 2002.** American Lands Alliance sage-grouse conservation project. http://www.sagegrouse.org/. Accessed May 22, 2002.

**Bartlett, E.T. 1983**. Valuing range forage on public rangelands. p. 92-99 *In:* F.J. Wagstaff (ed.), Proc.: Range Econ. Symposium and Workshop, Aug. 31-Sept. 2, 1982, Salt Lake City, Ut. USDA Forest Serv. Gen. Tech. Rep. INT-149. pp. 92-99.

**Bartlett, E.T., R.G. Taylor, and J.R. McKean. 1979**. Impacts of federal grazing on the economy of Colorado. A Report to the U.S. Forest Serv., Bur. of Land Manage., and the Colo. State Agr. Exp. Sta., Fort Collins, Colo.

**Clifford, H. 2002.** "Can cows and grouse coexist on the range?" High Country News 34(2).

**Connelly, J.W., M.A. Schroeder, A.R. Sands, and C.E. Braun. 2000.** Guidelines to manage sage-grouse populations and their habitat. Wildlife Society Bull. 28:967-985.

**Cook, C.W., G. Taylor, and E.T. Bartlett. 1980**. Impacts of federal range forage on ranches and regional economics of Colorado. Colorado State Univ. Exp. Sta. Bull. 576S (July). Ft. Collins, Colorado.

**Darden, T., W. Riggs, R. Torell, and G. Myer. 2001.** Cow-calf costs and returns for Elko County, Nevada,1999: Northeastern Nevada production area 600 cow operation. Univ. of Nev. Coop. Ext. Serv. Fact Sheet 01-19. Univ. of Nev., Reno. Reno, Nev.

**Gee, C.K. 1981.** Estimating economic impacts of adjustments in grazing on federal lands and estimating federal rangeland forage values. Tech. Bull. 143. Colo. State Univ. Agr. Exp. Sta., Fort Collins, Colo.

**Gee, C.K. 1983**. The use of linear programming to estimate range forage values. p. 89-91. *In:* F.J. Wagstaff (ed.), Proc.: Range Econ. Symposium and Workshop, Aug. 31-Sept. 2, 1982, Salt Lake City, Ut. USDA Forest Serv. Gen. Tech. Rep. INT-149.

**Gentner, B.J., and J.A. Tanaka. 2002.** Classifying federal public land grazing permittees. J. Range Manage. 55:2-11.

**Greer, A.J. 1994.** The nature of federal land grazing permits and seasonal grazing dependencies in a four-county region in southeastern Oregon. Ore. State Univ. Ext. Serv. Spec. Rep. 932. (April). Corvallis, Oregon.

**Hahn, W.F., T.L. Crawford, K.E. Nelson, and R.A Bowe. 1989.** Estimating forage values for grazing National Forest lands. Staff Rep. No. 89-51. Commodity Econ. Div., Econ. Res. Serv., USDA. Washington, D.C.

**Hillier, F.S., and G.J. Lieberman. 1986.** Introduction to operations research. 4th Edition. Holden-Day, Inc., Oakland, Calif.

**National Wildlife Federation. 2001.** "Appeal of decision notice, environmental assessment, and finding of no significant impact for the Big Sheep grazing allotments (File Code 1950, April 13, 2001), and statement of reasons for the appeal." Missoula, Mont, May.

**Nevada Sage-Grouse Project. 2001.** Nevada sage-grouse conservation strategy. Governor's Sage-Grouse Conservation Team, Nevada Div. of Wildlife, Reno Nev.

**Peryman, J.S., and C.E. Olson. 1975.** Impact of potential changes in BLM grazing policies on west-central Wyoming cattle ranches. Univ. of Wyo. Agr. Exp. Sta. Res. J. 87. Laramie, Wyo.

**Rimbey, N.R., R.L. Smathers, C.W. Gray, and C.C. Gibson. 1998**. Cow-calf budget 300 cow: summer on federal and state range, winter on harvested feeds and crop aftermath. Univ. of Ida., Coll. of Agr. EBB-CC5-98. Moscow, Ida. Available online at http://www.uidaho.edu/ag/agecon/livestockpub.html.

19

Rowe, H.I., and E.T. Bartlett. 2001. Development and federal grazing policy impacts on two Colorado counties: a comparative study. *In:* L.A. Torell, E.T. Bartlett, and R. Larranaga (eds.). Current issues in rangeland resource economics: Proc. of a symposium sponsored by Western Coordinating Committee 55 (WCC-55), N.M. State Univ., Res. Rep. 737, Las Cruces, N.M.

Taylor R.G., E.T. Bartlett, and K.D. Lair. 1992. Seasonal dependence on federal forage in Colorado. J. Range Manage. 35:634-636.

Torell, L.A., J.R. Garrett, and C.T.K. Ching. 1981. The economic effects of three changes in public lands grazing policies. J. Range Manage. 34(5):373-376.

Torell, L.A., N.R. Rimbey, J.A. Tanaka, and S.A. Bailey. 2001. The lack of a profit motive for ranching: implications for policy analysis. *In:* L.A. Torell, E.T. Bartlett, and R. Larranaga (eds.). Current issues in rangeland resource economics: Proc. of a symposium sponsored by Western Coordinating Committee 55 (WCC-55), N.M. State Univ., Res. Rep. 737, Las Cruces, N.M.

U. S. Department of Agriculture, Forest Service and U. S. Department of the Interior, Bureau of Land Management (USDA/USDI). 1986. "Grazing fee review and evaluation update of the 1986 final report." A report from The Secretaries of Agriculture and Interior. Washington, D.C.

U.S. Department of Interior, Bureau of Land Management (USDI-BLM). 2000. Draft interim management guidelines for sage-grouse and sagebrush-steppe ecosystems. http://www.blm.gov/nhp/efoia/or/fy2000/IBs/b2000-136.htm.

U.S. Department of Interior, Bureau of Land Management (USDI-BLM). 2001. Gunnison sage-grouse conservation plan. http://www.co.blm.gov/gra/sagegrouse.htm. .

Van Tassell, L.W., and J.W. Richardson. 1998. Impact of federal grazing reductions on Wyoming Ranches. *In:* Stubble height and utilization measurements: uses and misuses. p. 50-56. Ore. State Univ. Agr. Exp. Sta. Bull. 682. Corvallis, OR.

Van Tassell, L.W., L.A. Torell, N.R. Rimbey, and E.T. Bartlett. 1997. Comparison of forage value on private and public grazing leases. J. Range Manage. 50(3):300-306.

Vallentine, J.F. 1990. Grazing management. Academic Press, Inc. New York, N.Y.

BLM_0066202



**TOWN OF**
# edaredge

## Master Plan

### Adopted April 26, 1999
### Revised January, 2005

**Prepared by Four Corners Planning, Inc. (Revised by Cedaredge Planning Commission)**

**[970.728.0646]**

**Revisions Adopted by Cedaredge Planning Commission April 13, 2005**
**Approved by Board of Trustees April 21, 2005**

BLM_0066203

# TOWN OF CEDAREDGE MASTER PLAN
## *Table of Contents*

**Page**

**I. INTRODUCTION**
Authorization ............................................................................................................................................ 1
Applicability ............................................................................................................................................. 2
*Cedaredge Municipal Influence Area map* ......................................................................................... 3
Why plan? ................................................................................................................................................ 4
The planning process ............................................................................................................................. 4
Vision statement .................................................................................................................................... 5

**II. EXISTING CONDITIONS**
Brief history ............................................................................................................................................ 5
The setting ............................................................................................................................................... 5
Sales tax growth .................................................................................................................................... 6
Public facilities and services ................................................................................................................ 7
Hazard and resource areas .................................................................................................................. 8
*Hazard Areas map* ............................................................................................................................... 10
Economic and demographic growth *potential* ................................................................................. 11
Population estimates and projection .................................................................................................. 12
Land use pattern (existing) ................................................................................................................. 13
*Existing Land Use map* ....................................................................................................................... 14

**III. GOALS AND OBJECTIVES**
Land use goal ........................................................................................................................................ 15
Growth management goal .................................................................................................................... 16
Open space/ recreation goal ............................................................................................................... 16
Downtown revitalization goal .............................................................................................................. 17
Historic preservation goal .................................................................................................................... 17
Economic development goal ................................................................................................................ 18
Affordable housing goal ....................................................................................................................... 18
Transportation goal .............................................................................................................................. 18

**IV. PLAN ELEMENTS** ...................................................................................................................... 19

**V. PRESERVATION PLAN** ............................................................................................................. 20

**VI. ANNEXATION POLICY** ............................................................................................................. 21

**VII. IMPLEMENTATION** ................................................................................................................... 21

**VIII. BIBLIOGRAPHY** ........................................................................................................................ 23

BLM_0066204

# TOWN OF CEDAREDGE MASTER PLAN

## I. INTRODUCTION

The Cedaredge Master Plan ("the Plan"), comprised of both text and maps, is a policy statement about community goals and desires over the next 5 to 10 years. The Study Area for the Plan includes the Town of Cedaredge and lands within the town's statutory, 3-mile Cedaredge Municipal Influence Area. The Plan is a "living" document, the result of strong community participation and involvement. It is intended to be used regularly as a guide to making decisions. The Plan is also a statement of current community values; a benchmark against which future changes and needs may be weighed with a clear understanding of the ideas and considerations that came before. It should provide policy direction in matters relating to many aspects of government including development review, budgeting, priorities, and community desires. When kept up-to-date through periodic review the plan will provide a central and integrated expression of community wili.

The original Master Plan had a Preservation Plan and map that identified principal land uses, density ranges, existing and planned major streets, and public use areas. The Plan was meant to be general in nature. However the Planning Commission removed the Preservation Plan because it believes that more flexibility is needed in planning a zoning ordinance. The map on page 14 shows the existing land uses and a circulation plan has been adopted since the original Master Plan was adopted by the town.

## Authorization

Colorado Revised Statutes authorize municipalities (or towns) to plan their communities as provided by the following statutes:

| | |
|---|---|
| C.R.S. 31-12-105 | Three-mile plans |
| C.R.S. 31-23-202 | Grant of power to municipality |
| C.R.S. 31-23-206 | Master plan |
| C.R.S. 31-23-207 | Purposes in view |
| C.R.S. 31-23-212 | Jurisdiction |
| C.R.S. 31-23-213 | Scope of control |

The Cedaredge Master Plan is designed to comply with 1987 amendments to the Colorado Municipal Annexation Act of 1965, and specifically with Colorado Revised Statute (C.R.S.) 31-12-105, which requires the annual update of each town's master plan as a prerequisite to annexation.

The following paragraphs provide a brief description of the purpose and laws governing Master Plans, three (3) mile plans, annexation, and land use codes:

### Master Plans
Master Plans are the foundation to the land use regulatory system. They serve as the policy "guide" to land use regulation. CRS 31-23-206 explains that, "it is the duty of the (planning) commission to make and adopt a master plan for the physical development of the municipality, including any areas outside its boundaries, subject to the approval of the governing body having jurisdiction thereof, which bears relation to the planning of such municipality. Such plan, with the accompanying maps, plats, charts, and descriptive matter, shall show the commission's recommendations for the deveiopment of said territory …"

### Three (3) mile plans
Towns are required by state law [CRS 31-12-105(1)(e)] to plan for expansion – the law recognizes that some growth is inevitable for most towns, that coordination of growth is of general public benefit, and the law establishes a 3-mile planning area around each municipality. According to the author of the statute, such plans "are intended to cover the entire three (3) mile area. The plan should make reasonable provision for the extension of streets, bridges, parks, public utilities, and etc., to be provided by the municipality."[1]

---

[1] *Three Mile Plan Requirements: Municipal Annexation*, Gerald E. Dahl, Gorsuch Kirgis, L.L.C., Denver Colorado



BLM_0066205

I. Introduction

"Reasonable provision" for a large metropolitan municipality obviously means the entire three (3) mile area should be planned in detail. "Reasonable provision" for a small town can mean that such facilities should be planned to accommodate reasonably expected future growth, which may well be limited to a much smaller area. In either case, the plan should identify proposed land uses, with emphasis on areas that are believed to be eligible for annexation. The Town has developed a circulation plan and done a 201 study that includes areas in the three (3) mile area. The study area for the Cedaredge Master Plan is illustrated on page 3 – the Cedaredge Municipal Influence Area.

### Annexation

All annexations are governed by and subject to the specific requirements of Colorado state law. Annexation is, except under rare circumstances, a landowner-initiated activity. An annexation most commonly occurs when the owner of land eligible for annexation (i.e., the parcel has at least 1/6 perimeter contiguity with town boundaries) requests that his or her land become part of a town. In other cases, a town may annex property when more than 50% of the landowners in an eligible area request annexation, and the town agrees to add the land to the town. [2]

The decision to annex is significant for a town -- towns are statutorily obligated to provide services to annexed areas that is comparable to service levels in other parts of town within a reasonable timeframe. Therefore, annexation can be a very expensive proposition for towns and should be approached with careful consideration. In all cases, annexation is discretionary; a town has no obligation to approve an annexation or to provide water, sewer, or other services outside of town boundaries.

### Land use codes

A land use code is an implementation tool. It is a legal document that changes Master Planning policies into law. A land use code applies solely to lands that are inside town boundaries; and, it should contain all town regulations that might apply to land use and development. By consolidating subdivision, zoning, annexation, site development, and other regulations relating to land use and development into a single document, public review processes can best be coordinated, expedited and simplified.

"Subdivision", in its simplest terms, is the division of land into more than one (1) parcel. The primary purpose for subdivision regulations is to protect the consumer. As part of subdivision review, a "subdivider" demonstrates the public facilities (i.e., water, sewer, access, utilities, etc.) necessary to serve the development are available.

"Zoning", in its simplest terms, is the regulation of land use. The primary goal of zoning is to separate any incompatible uses, and to protect quality of life and property value from degradation as result of the intrusion of incompatible uses. Typically, zoning specifies "allowable uses" and the specific standards; such as, the number of units per acre, setbacks, height limits, and other development standards.

## Applicability

The Cedaredge Master Plan is designed to provide guidance for growth in the town of Cedaredge, and its statutory, 3-mile Municipal Influence Area. However, the primary focus and most recommendations of the Plan apply to Cedaredge. These are areas in which municipal services are available or can reasonably be expected to be available in the near future. All development on the mesa around Cedaredge may affect the municipality, its ability to provide economical services to its citizens, and raise compatibility issues with other land uses. Therefore, it is the area of primary municipal concern. The area south of town abuts Orchard City and therefore is not under consideration.

---

[2] *Summary of Municipal Annexation in Colorado*, October 20, 1998, prepared by Tim Sarmo & Andy Hill, Colorado Department of Local Affairs.


TOWN OF
Cedaredge

BLM_0066206

# CEDAREDGE MUNCIPAL INFLUENCE AREA



Key:
CEDAREDGE INFLUENCE AREA
COUNTY ROADS/THOROUGHFARES
CEDAREDGE TOWN BOUNDARY

N

Four Corners Planning, Inc.
[ 970.728.0646 ]

Page 3

## Why Plan?

Land use planning is a means of achieving community goals through citizen participation and rational decision-making, consistent with a desired community image. It is fiscally responsible to base major infrastructure finance decisions on land use planning. Planning is a statutory responsibility of all towns, because Colorado law recognizes that both public and private investment can yield greater benefits where there is an orderly, reliable program for development. The Cedaredge Master Plan is intended to provide guidance for investment decisions that must be made by the town of Cedaredge, other area service providers, and individual landowners.

Planning occurs with or without a coordinated, community planning effort. All land use decision-making, whether accomplished by individuals or as a community, is "planning" and it affects everyone in the community. Planning affects people's homes and investments, their peace and enjoyment, the cost of living, and overall quality of life. With effective, coordinated planning, a community can achieve its preferred future. Without effective, coordinated planning, the future of a community is determined solely through individual decision-making that seeks to achieve personal goals, and without necessarily considering the good of adjacent property owners and others in the community.

A myth regarding the "rugged individual" that settled the west is prevalent in our western slope culture today. The myth would have us believe that complete independence, self-reliance, and private property rights have always been the paramount principals of the west. In reality, cooperation with other pioneers and recognition of the need for community were the more common characteristics of our western forefathers. The people who settled the west and the Upper Surface Creek area, traveled together for security, and settled together in community, where they could build their lives together, help each other in tough times, celebrate the good times, and work together to achieve a successful future for their families and for their neighbors. The rugged individuals who settled the Cedaredge area believed quite strongly in community. Working together, they built the town of Cedaredge, its schools, its water and sewer systems, the Cedaredge Park, the public buildings, irrigation systems, and planted orchards.

If Cedaredge is to preserve its local culture and character as it moves into the future and absorbs new residents with new ideas, Cedaredge citizens must continue to recognize the importance of community and work together, with due respect for individual property rights, to achieve a common vision. The adoption of a common vision in the form of a Master Plan may be the town's best chance for preserving the characteristics of Cedaredge that everyone loves.

## The Original Planning Process (1998-1999)

The Cedaredge Master Plan was shaped according to the documented preferences of local residents. Citizen input, ideas and participation were documented throughout the process and used to determine the planning project's direction.

The planning process, which began with the initial Vision/Scoping Workshop on September 27, 1998 and continued over the next several months, started with a sharing of ideas about what Cedaredge is and what it can become. Over 80 citizens attended and participated in the Vision/Scoping Workshop. First, participating citizens agreed on an overall vision for the community. From that shared view of what the place should be like, goals statements were solicited from participating citizens and recorded as a means to achieve the Cedaredge Planning Vision and Mission Statement. Goal statements were subsequently organized and edited into the Plan's goals, objectives, and policies. Existing conditions were evaluated to determine where the town is today, and what it will take to get the community where it wants to be.

46 citizens attended the Alternatives Workshop, which followed on November 10, 1998. Three (3) alternative scenarios designed to represent the principal citizen viewpoints offered in the Vision/Scoping Workshop where presented: (a) Infill, (b) Moderate Expansion, (c) Area Service Provider. These alternate scenarios and their respective attributes were presented to citizens for evaluation. Participating citizens provided written responses in the form of survey response sheets. Citizen responses to the three (3) alternative scenarios determined the direction of the process and were utilized to develop the Preferred Alternative.



BLM_0066208

The Preferred Alternative was presented to the public in the Preferred Alternative Workshop on December 9, 1998.  Over 90 citizens attended the Preferred Alternative Workshop and expressed their opinions.  All participants in the Preferred Alternative Workshop were asked to record their comments on the plan – 46 citizen survey responses and preferences were collected and documented.  Only the citizens preferred features of the Plan are incorporated into the Cedaredge Master Plan. The Planning Commission, in 2004-2005, under the direction of the Board of Trustees, revised and amended the Master Plan. This included revision of the Goals and Objectives, updating tables, and other minor modifications.  The revised plan was adopted by the Planning Commission on April 13, 2005 after a brief public hearing. No citizens made suggestions. Written comments from a Grand Junction planner were discussed.

## Vision Statement

At each of the public visioning sessions, participating citizens exchanged ideas about planning for the community's future and refined the Town of Cedaredge Planning Vision and Mission Statement.  The statement establishes the overall direction for the Master Plan and the community in a few concise sentences.

---

**TOWN OF CEDAREDGE PLANNING VISION AND MISSION**

The image theme for Cedaredge requires that citizens weigh carefully the options for change so as not to lose those qualities that make this a special place.  With its near perfect weather, forever views and famous trees, Cedaredge welcomes visitors to share in its enjoyment.  Our vision is to retain the special, small town character with its natural mesa openness and create positive economic and living opportunities for current and future residents.

---

## II. EXISTING CONDITIONS

In order to plan for the future, it is first necessary to understand the community's history, to assess the community's present situation, and the demographic, economic trends.  This part of the Cedaredge Master Plan summarizes information obtained from a variety of sources to provide a realistic assessment of existing conditions.

## Brief History

In the late 1880's, the present site of Cedaredge was headquarters for the Bar-I Cattle Ranch.  Sophie Kohler, wife of the ranch foreman, observed that their location was at "The edge of the cedars".  The name Cedar Edge was shortened to one word when the post office became official in 1894.

The Town of Cedaredge was incorporated on March 25, 1907.  The Town was initially planned by the Cedaredge Town, Land and Development Company to be a traditional small town, defined by a grid of small town lots defined by streets and alleys.  According to a local newspaper report on August 19, 1904, the Company provided a town park and built a hotel, and intended to make Cedaredge, "one of the prettiest little towns in this part of Colorado".

## The Setting

According to information published on the Internet in 1998 through "gj.net":  "Cedaredge is located in the Upper Surface Creek Area in a prominent location on the south slope of the Grand Mesa.  Cedaredge, which has long been known as the gateway to Grand Mesa, enjoys direct access to the Mesa via the National Scenic Byway Colorado Highway 65.  At over 10,000 feet high and more than thirty-five miles long, Grand Mesa is a distinctive landmark, an important natural resource, and the world's largest flat top mountain.  Nestled at the sunny, southern foot of this grand mountain, the town of Cedaredge is ideally situated at a comfortable elevation of 6,200 feet. The valleys on the south side of Grand Mesa are blessed with some of the mildest weather in Colorado.  For nearly a century, fruit growers have found this climate, along with abundant irrigation water from Grand Mesa, ideal for apples, peaches, apricots, cherries and pears.  More recently, innovative growers in the Surface Creek Area have discovered the mild seasons perfect for wine grapes; it's now possible to buy a fine wine with a Cedaredge label.  Apples, though, remain the fruit Cedaredge celebrates annually.  Each October, an Applefest brings an influx of weekend visitors to this usually quiet, mountain-valley town of eighteen hundred residents."



BLM_0066209

"Cedaredge and the Surface Creek Area enjoy four (4) moderate, sunny seasons.  The annual rainfall is usually five to eight (8) inches; winters may bring fifteen to thirty inches of snow.  Although some long-time residents tell of snowstorms of over a foot, individual snows seldom exceed four to six inches in Cedaredge.  As you go north from town, the snow becomes noticeably deeper with each mile. The top of Grand Mesa, only twenty minutes from Cedaredge, is a winter sportsman's paradise."

"The Surface Creek Area's affluent population of 6,000 people support many good art galleries, gift shops and antique stores.  Pioneer Town, a museum monument to early Surface Creek settlers, comprises restored original buildings, new structures and an impressive collection of interesting artifacts. The unique and original Bar-I wooden grain silos are themselves well worth seeing."

"The Cedaredge area has a large number of painters, sculptors, writers and artisans.  But stop for breakfast at any of several popular eateries and you will likely rub elbows with farmers and doctors, lawyers and town employees, shopkeepers and senior citizens.  The Cedaredge area is home to a genuinely interesting cross-section of people from everywhere."

"Cedaredge is affordable, too.  Although some expensive houses are built on choice country lots and around the Deer Creek Village Golf Club, other fine homes sell for well below the national average."[3]  The Golf Course, owned and operated by the Town, is a primary recreational asset and major tourist attraction for Cedaredge and Delta County.   Players are drawn from Montrose and Mesa Counties, other parts of the western slope, the Denver Area, and from many states across the country.

Table 1 shows that there has been a steady increase in average real estate sales in the Surface Creek Area between 1995 and 2004.  Real estate sales data for just the town of Cedaredge are not available.

**Table 1**
**AVERAGE REAL ESTATE VALUES[4] – SURFACE CREEK AREA**
(Thousands of Dollars)

| PROPERTY | AVERAGE SALES AMOUNT (thousands of dollars) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
| Single-family | 102K | 100K | 118K | 135K | 129K | 127K | 130K | 135K | 141K | 153K |
| Town houses | --- | --- | --- | --- | 123K | 162K | 72K | 104K | 185K | --- |
| Manufactured homes | 43K | 59K | 50K | 59K | 76K | 78K | 51K | --- | 29K | 35K |
| Residential land | 24K | 28K | 30K | 34K | 35K | 35K | 56K | 70K | 59K | 43K |

## Sales Tax Growth

Cedaredge has experienced a considerable increase in economic activity over the last several years.  Table 1 illustrates the healthy upward trend in sales tax revenues collected by the Town.

**Table 1 -- SALES TAX REVENUES**

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|
| Revenues | 219K | 270K | 275K | 263K | 275K | 279K |

The positive sales tax trend points to a potentially bright economic future for the Town of Cedaredge and the surrounding area, if Cedaredge can manage and direct growth so as to protect the characteristics that are most likely to lead to even greater economic success.

---

[3] Town of Cedaredge, 1998, published through the Grand Junction, Colorado server gj.net.
[4] Delta County Board of Realtors & MLS-for trends only. Not responsible for its accuracy.



BLM_0066210

# Public Facilities and Services

The following section contains information on Cedaredge's parks, roads and streets, water system, wastewater disposal, and other aspects of the local infrastructure.

### Parks and recreation
The Town of Cedaredge provides several in-town recreational facilities, which are available for use by town and county residents alike, as well as visitors. These facilities include the Cedaredge Park, the Deer Creek Golf Course, the Surface Creek Trail, the Grand Mesa Gateway Trail, and several pocket parks.

### Roads and Streets
The historic grid pattern of streets and alleys plays a role in the residential community's living environment. In addition to serving as transportation routes and as linkages between neighborhoods (for residents, trash trucks, school buses, etc.), Cedaredge streets provide residents with a means of identity and orientation to their surroundings. Some neighborhoods benefit from the presence of alleys, which help to create more attractive streetscapes by making it possible to place cars, garages and trash in the rear of lots and thus to avoid garage or parking area dominance of the streetscape. As the town grows, it would be desirable to continue the street and alley grid, or a modified grid where dictated by topography.

Cedaredge's existing street system is generally in good condition with the exception of normal maintenance problems. Several streets remain unpaved. None-the-less the street system is adequate to accommodate the *existing* platted development. Cedaredge streets currently provide a service level "A" -- there is never a waiting period. There are some dust and other air quality problems despite the low traffic volume. The Town has plans to make road upgrades as the water distribution lines are replaced.

There are some circulation problems that affect the town of Cedaredge. A significant deficiency in the town's road system is the fact that many residential streets terminate in cul-de-sacs and no provision was planned for the continuation of the streets. A related problem is that a limited number of alternatives are available for north-south and east-west travel. Traffic tends to be channeled to a few streets, including Main Street, rather than being dispursed across a network of streets and roads. As future development occurs in and outside of town, this situation should be corrected with the addition of new streets and thoroughfares.

The Town of Cedaredge enjoys a compact, human scale, meaning that it is possible to be a pedestrian in Cedaredge and to travel over most of the town in a relatively short period. However, many areas do not have sidewalks, thus pedestrianization is made more difficult. Sidewalks or trails are particularly needed along both sides of Main Street and to connect the downtown area to the Cedaredge Public Library. Extension of the Surface Creek Trail and the Grand Mesa Gateway Trail with the addition of lateral accesses to the Surface Creek Trail through adjacent subdivisions would enhance the usability of the trail for both transportation and recreational purposes.

### Water System
Cedaredge is serviced by a central water system and currently serves approximately 1200 service connections. A "Water System Study" was initiated in August 2002, prepared by Buckhorn Geotech Engineering, to determine future needs for the Town's water supply, treatment, storage, and distribution. The study showed that the current raw water supply, treatment and storage are adequate to meet the Town's future needs. However, the water distribution system has areas of low water pressure, is undersized and not adequately looped to provide reliable service, and experiences frequent "water main breaks". This could limit new growth.

In 1997 and 1998 the Town completed modifications to the treatment facilities along with construction of a 1,000,000 gallon storage tank. In 1999 a new 12" pressurized transmission line and an additional 1,000,000 gallon tank were built to go along with modifications to the existing storage tank to increase capacity to 1,000,000 gallons; bringing total storage for the Town to 3,000,000 gallons. The Town is currently negotiating with USDA "Rural Development" for a combination of low interest loans and grants to fund replacement of 70% of the Town's distribution lines. The remaining 30%, using capital outlay monies coming from service fees, will be phased in over a 20-30 year period.



BLM_0066211

Case No. 1:20-cv-02484-MSK   Document 48-8   filed 04/28/21   USDC Colorado   pg 256 of 265

II. Existing Conditions

**Wastewater System**
Cedaredge operates and is serviced by a central wastewater system. The system currently serves approximately 1100 service connections, within and adjacent to the Town of Cedaredge. The Town's discharge permit expired December 2004, and is currently on an administrative extension . The Town has a "Site Application" pending to increase both organic and hydraulic flows from 0.218 million gallons per day (MGD) to 0.275 MGD summer and 0.26 MGD winter. This will be accomplished by going from a partial mixed lagoon system to a complete mix to accommodate approximately five to eight years of growth. The Town has budgeted $140,000 to implement the modifications and is awaiting the go ahead from the CDPH&E. Sewer collection lines serve or are capable of serving all parts of the Town of Cedaredge.

# Hazard and Resource Areas

Physical hazards that affect the suitability of land for development include both wildfire and floodplain hazards. Floodplain hazards areas are found along Surface Creek and several other intermittent streams and irrigation ditches that traverse the area. Wildfire hazards are present on the steep side slopes of Cedar Mesa and in other similar parts of the community. This information is included in the Master Plan so that land owners and town officials will:  (1) be informed, regarding the physical characteristics, magnitude, severity, frequency, and extend of hazard areas affecting the Cedaredge community, and (2) can take steps to protect the public and prevent property loss.

**Floodplain hazard areas**
The Federal Emergency Management Agency ("F.E.M.A.") completed 100-year floodplain mapping through town in May 27, 1993.  Subsequently, the Town decided to "option out" of the Federal Flood Insurance Program and rescinded its adoption of the floodplain map.  The F.E.M.A. map is now "out-of-print" and is unavailable for public or private planning purposes.  However, a "rendering" of the identified 100-year floodplain survives in the previously completed, but un-adopted *Cedaredge Tomorrow Town Plan.* [5] The floodplain illustrated in the Hazard Areas Map on page 10 is a reproduction of the floodplain information found in the *Cedaredge Tomorrow Plan.*

Surface Creek is the major drainage channel through Cedaredge.  In addition, there are a number of intermittent stream channels that contribute to Surface Creek.  Flooding along Surface Creek may occur primarily in mid-June with the principal cause being frontal type rainstorms, convection type cloudbursts, and snowmelt.  Spring runoff usually begins in the first week in April, increasing to a peak in mid-June and returning to normal flow in early August.  Flooding is generally caused by rapid snowmelt coupled with a high intensity thunderstorm.  This results in such high discharge that both natural and fabricated drainage-ways reach capacity within a short period; the drainage-ways cannot contain the total discharge and flooding occurs.

The 100-year floodplains through the planning area are generally confined to well defined channels.  This is particularly true for Surface Creek.  A new floodplain study and map should be done and until it can be completed, the town may wish to simply establish a minimum stream setback from Surface Creek and the intermittent streams.  After the floodplain study is completed, existing bridges and culverts should be evaluated to be sure they are properly sized to handle the flows of a 100-year flood.

*Note:  The flood plain information provided on the Hazard Areas Map is intended for general locational purposes only.  Prior to developing lands that may be subject to a hazard, property owners are advised to seek professional assistance in determining the exact nature of the site-specific condition and to determine appropriate mitigation techniques.*

---

[5]*Cedaredge Tomorrow Town Plan, Cedaredge, Colorado,* prepared by the Cedaredge Planning Commission with assistance from Region 10, League for Economic Assistance and Planning, February 1988.



*Wildfire hazard areas*

The Colorado State Forest Service has identified several wildfire hazard areas in the Cedaredge area.  These hazard areas are generally confined to steep slopes areas, which are located below the Cedar Mesa and in similar areas.  Wildfire hazards may exist around homesites in forested areas and in areas with heavy brush -- they become more severe with increased hillside gradient.  Effective mitigation techniques for wildfire hazards include establishing and maintaining a "zone system" of defensible space, landscape maintenance, and avoidance of certain construction style and materials.  Wildfire hazards mapped by the Colorado State Forest Service are illustrated on the Hazards Area Map, page 10.

*Wildlife habitat resource area*

The riparian area along the Surface Creek corridor through Cedaredge is an important wildlife habitat.  Riparian zones are areas immediately adjacent to rivers, streams, and wetlands.  Riparian zones frequently parallel or coincide with floodplain areas.  Such areas are valuable habitats in that they provide a diverse environment of flora and fauna.  Wildlife depends on these areas for providing food and cover as well as a means for protective travel.  Stream setbacks can an effective tool for preserving the riparian vegetation and habitat area.  Up to 70% of the vertebrate species of the area will use a riparian corridor in some significant way.  Maintaining the riparian community will be key to maintaining the aesthetic qualities of Surface Creek and the area's wildlife diversity.  The numerous wildlife species that are present in the Cedaredge area are too numerous to describe and beyond the scope of this Master Plan.[6]

---

[6] *Research and Managaement Techniques for Wildlife and Habitats.* 5th ed. Bookout, T.A., Editor. 1994. The Wildlife Socirty, Bethesda, MD. 740pp.



BLM_0066213



## Hazard Areas Map

Key:

- COUNTY ROADS/THOROUGHFARES
- CEDAREDGE TOWN BOUNDARY
- 100-YEAR FLOODPLAIN
- WILDFIRE HAZARDS

Four Corners Planning, Inc.
[ 970.723.0046 ]

Page 10

TOWN OF
Cedaredge

BLM_0066214

## Economic and Demographic Growth Potential

Cedaredge is strategically located on the eastern edge of the Colorado Plateau, an area that is clearly in a state of change.  Over the last two decades, the Colorado Plateau has undergone profound social, economic and demographic change.  Some evidence suggests that the rate of change may be accelerating, while the economy has undergone a major shift.  Findings contained in a research report prepared of the Grand Canyon Trust[7] include the following:

- "Farming and ranching, whether measured by employment or by income, has been a declining proportion of economic activity for the plateau, while service-based employment has increased.

- The population on the plateau is growing rapidly, at a rate more than double the national population growth rate for 1900-1990.

- People are coming to the plateau for the vast open space, high quality of life, premier scenery, pristine air and water, recreational opportunities and small-town lifestyles.

- Amenities are fueling much of the new economic activity, and service-based employment related to these new activities has been the primary contributor of new jobs and new wealth over the past two decades.

- The rate of business creation on the plateau far exceeds that of the nation.  While the U.S. created 75% more businesses from 1970 to 1990, new businesses on the plateau grew by 132%.

- The sustainability of the Colorado Plateau first requires an understanding of the changes underway, and of the complementary relationship between the human and natural landscapes.

- Policies and practices are needed that ensure economic development protects the economy's fundamental base -- the region's environmental amenities.

- The availability of vast, high quality, public open space appears to be the plateau's primary attraction and the "goose that lays the golden eggs."

The report by Grand Canyon Trust explains that the key to economic sustainability is economic diversity and investment in human resources through education.  A strong base economy should have multiple segments.  Excessive emphasis on any one sector may not be sustainable or increase affluence.  Job growth in a diversified economy, like services, health care, education, and agriculture, can better handle changes that may affect any one sector and tends to pay higher wages.

Cedaredge and the Upper Surface Creek area are located in one of the more desirable locations on the Colorado Plateau, so it is not surprising that it is experiencing profound economic and demographic changes.  Cedaredge historically enjoyed a vibrant agricultural economy – fruit production was a major source of economic activity.  Cedaredge's base economy has for many years been changing from an agriculture-base to a tourism/service/retirement-base.  The community's success in the coming years will be dependent upon the degree to which it recognizes the changes that are taking place, and adjusts its policies accordingly.  Public and private decision-makers need to make investment decisions that provide improved services, and enhance the desirability of the area for both tourism and retirement.

---

[7] *Charting the Colorado Plateau, An Economict and Demographic Exloration,* Prepared by Walter E. Hecox and Bradley L. Ack, 1996.



## Population Estimates and Projection

According to the Colorado Department of Local Affairs, the annual growth rate for the Town of Cedaredge has averaged 3.1% for the last seven (7) years.  Table 3 summarizes the Department's population estimates for Cedaredge since the base year of 1980.

**Table 3**
**CEDAREDGE POPULATION ESTIMATES**
**(Source: Colorado Department of Local Affairs)**

|  | 1980 | 1990 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|
| Population | 1184 | 1380 | 1707 | 1760 | 1814 | 1854 | 1938 | 1998 | 2095 |

The town reached its peak growth rate between 1992 and 1995 when the Golf Course was completed and new residential properties along the Golf Course became available.  Since that time, the Town's growth rate has moderated, as illustrated below in Table 4.

**Table 4**
**CEDAREDGE POPULATION GROWTH**

|  | 1980 to 1990 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|
| Population Growth | 195 | 327 | 53 | 54 | 40 | 84 | 60 | 97 |
| Percentage Change | 1.6/ average | 4.0 | 3.0 | 3.0 | 2.2 | 4.3 | 3.0 | 4.6 |

However, the annual growth rate for the prior decade averaged only 1.6% per year; the growth rate from 1990 to 1996 was 4% but since then has averaged 3.1%. It is reasonable to assume that this rate will continue but for purposes of this planning project we will use the  growth rate projections for Cedaredge that are currently provided from the Colorado Department of Local Affairs.These are 1.9% until 2005 and 2.2% until 2010 as illustrated in Table 5, below.

**Table 5**
**CEDAREDGE POPULATION GROWTH PROJECTION**
**(Assumes an average growth rate of 2.4% per year)**

|  | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2010 |
|---|---|---|---|---|---|---|---|---|---|
| Population | 1760 | 1814 | 1854 | 1938 | 1998 | 2095 | 2135 | 2176 | 2426 |



BLM_0066216

## Land Use Pattern (Existing)

The Town of Cedaredge's existing land use pattern, as illustrated on the Existing Land Use map (page 14), is characterized by the presence of a wide variety of mixed uses: retail, office, service and light industrial activities are all present, interspersed among primarily single family uses.  It is neither uncommon nor undesirable for small towns to provide such a mixture of compatible and often interrelated uses within a community.  For example, offices and retail uses are interrelated with housing -- residents utilize them on a daily basis.  The presence of these uses in close proximity decreases residents' dependence upon the automobile and enhances the quality of life.  Such a mix is necessary to provide residents with jobs, as well as daily services and goods.  Yet, the largest commercial enterprises and most jobs in Cedaredge are found along Main Street and along the highway.

A strict "Euclidean" separation of use types is impractical for small towns.  In fact, a pattern of mixed and multiple uses is common among traditional communities.  "Mixed uses" refers to the presence of different uses side by side.  "Multiple uses" refers to the presence of different uses in the same building.  Some uses are ideal for multiple use, for example: offices or apartments above retail, and small offices and particularly home offices in residences.  Both mixed and multiple uses are desirable in small towns and should be encouraged to continue within an established framework designed to ensure compatibility among uses.

However, some uses may be incompatible within a small community -- uses such as industry, manufacturing, auto repair and painting shops, drive-in restaurants.  Other uses might not be acceptable solely because they are too large in scale to fit comfortably within the community; these include large warehouses and retail uses.



BLM_0066217

# Existing Land Use



Key:
- SINGLE FAMILY
- MIXED HOUSING
- MULTI-FAMILY
- AGRICULTURE-RESIDENTIAL
- PUBLIC / INSTITUTIONAL
- LIGHT INDUSTRIAL
- COMMERCIAL

Four Corners Planning, Inc
[ 970 . 728 . 0646 ]

Page 14

BLM_0066218

## III.   GOALS AND OBJECTIVES

Toward the attainment of the Vision Statement, a number of goals have been outlined below.  These goals are all equal, no one goal has priority over any other goal.  Although they are stated separately for clarity and convenience, collectively they present a mosaic of Cedaredge's Vision.

The following goals and objectives are based on documented citizen input and opinions expressed in a series of public workshops held during the fall of 1998.  All major viewpoints expressed by citizen groups were incorporated into the goals and objectives in accordance with the consensus developed, with emphasis on the recommendations of town residents. In 2005 the Planning Commission eliminated some policies that had been enacted and added some they felt were needed, Citizen input was requested at two public hearings in 2005.

**Goals, Objectives, and Policies are defined as follows:**

**GOAL:**  A broad statement of the desired result that Cedaredge wishes to obtain

**OBJECTIVE:**  A more detailed or specific description of the ends that support the goal or steps that may be taken to achieve the goal

**POLICY:**  Statements of public policy that will guide the drafting of land use regulations, zoning and rezoning decisions

LAND USE GOAL: Preserve the small town environment.

**1.  Objective:**     **Establish a detailed land use plan and an orderly implementation plan.**

    *a.  Policy:*     Protect private property rights and establish reasonable land use regulations and procedures, adopting only those that are necessary to accomplish legitimate public objectives.

    *b.  Policy:*     Minimize the strict separation of land uses (common to many zoning ordinances), but rather, accommodate a mixture of uses and densities in town, while ensuring compatibility.

    *c.  Policy:*     Limit strip commercial development to established areas.

**2.  Objective:**     **Ensure compatibility of future land uses with affected neighborhoods.**

    *a.  Policy:*     Protect established residential neighborhoods from incompatible uses.

    *b.  Policy:*     Minimize and mitigate the impact of future development on current town residents.

    *c.  Policy:*     Establish a zoning plan.

**3.  Objective:**     **Encourage enhancement of Cedaredge.**

    *a.  Policy:*     Establish sign regulations to ensure attractive signs that are complementary to the community, to include restricted size, lighting, and number of signs per establishment.

    *b.  Policy:*     Encourage the cleanup of yards and open spaces.

    *c.  Policy:*     Promote effective use of landscaping and the preservation of trees.

    *d.  Policy:*     Adopt outdoor lighting standards to mitigate the adverse impacts of such lighting.

**4.  Objective:**     **Protect the public health, safety and welfare.**

    *a.  Policy:*     Avoid development in hazard areas, and if it cannot be avoided, such hazards should be reasonably mitigated.

    *b.  Policy:*     Seek funding for a floodplain study and to map the 100-year floodplain.

    *c.  Policy:*     Adopt floodplain regulations consistent with F.E.M.A. requirements.

    *d.  Policy:*     Establish minimum stream setbacks as an interim measure, pending completion of the floodplain study and the adoption of floodplain regulations.



BLM_0066219

  *e. Policy:*   Review the capacity of culverts and bridges to pass the 100-year flood waters, and replace them as necessary.

  *f. Policy:*   Establish wildfire hazard mitigation standards.

  *g. Policy:*   Maintain safe drinking water standards.


## GROWTH MANAGEMENT GOAL: Grow logically and wisely.

 **1. Objective:**   **Adopt an annexation policy.**

  *a. Policy:*   Higher densities and commercial uses are most appropriate in Cedaredge, rather than in the surrounding county.

  *a. Policy:*   Maintain a crisp "edge" to the town, separating town densities from low density residential and agricultural uses.

  *b. Policy:*   Avoid annexing any land areas without a significant majority, landowner approval, consistent with state law; and a determination of consistency with the Annexation Policy.

 **2. Objective:**   **Provide Town residents with adequate and affordable public facilities and service.**

  *a. Policy:*   Implement the 201 Wastewater Study as recommended when mandated.

  *b. Policy:*   Upgrade water transmission lines and storage capacity to meet projected future needs.

 **3. Objective:**   **Improve existing town streets, sidewalks and lighting.**

  *a. Policy:*   Establish an annual street and sidewalk maintenance schedule.

  *b. Policy:*   Budget money annually for streets, sidewalks and lighting improvements throughout Town.

 **4. Objective:**   **Ensure that new development pays its own way.**

  *a. Policy:*   Require developer pay for all infrastructure needed to serve new development.

  *b. Policy:*   Ask developers seeking annexation to submit a cost/benefit analysis to demonstrate the cost of services and the revenue impact upon town.

  *c. Policy:*   Establish impact fees.


## OPEN SPACE/RECREATION GOAL:  Provide adequate recreational  opportunities to meet the needs of all ages.

 **1. Objective:**   **Promote diversity of recreational activities.**

  *a. Policy:*   Support the development of an area-supported Recreation Center.

  *b. Policy:*   Provide active and passive recreational facilities in town parks.

  *c. Policy:*   Support the Grand Mesa Scenic By-way.

 **2. Objective:**   **Extend the public trail system and develop  open space as the town grows.**

  *a. Policy:*   Continue to implement the Cedaredge Trail Plan.

  *b. Policy:*   Mitigate adverse impacts of public trails on private property through site planning, use of landscape screening, fencing, etc.

 **3. Objective:**   **Develop new park lands to provide for future needs.**

  *a. Policy:*   Maintain the same public and park land "level of service" as the town grows.

 **4. Objective:**   **Preserve trees and open green spaces.**

  *a. Policy:*   Encourage the preservation of trees.



BLM_0066220

    *b. Policy:*    Preserve riparian areas and natural areas.

    *c. Policy:*    Preserve open spaces as part of new development approvals.

**5. Objective:**    **Encourage the use of school facilities by all ages.**

**6. Objective:**    **Support the Deer Creek Golf Course.**

    *a. Policy:*    Promote the recreational attractions in Cedaredge and the surrounding areas.

## COMMUNITY REVITALIZATION GOAL:   Make the business districts more attractive and welcoming.

**1. Objective:**    **Encourage appropriate maintenance for all buildings, streets and trails.**

**2. Objective:**    **Support revitalization and make the business districts more "pedestrian-friendly".**

    *a. Policy:*    Develop a downtown improvement plan.

    *b. Policy:*    Enhance the quality of the downtown pedestrian experience with decorative street lighting, sidewalk improvements, benches, street trees, flower planters, and traffic slowing devices.

    *c. Policy:*    Provide adequate off-street parking that is dust and mud-free.

    *d. Policy:*    Discourage highway strip development in favor of filling in the Main Street hub and developing another hub in the south part of town.

## HISTORIC PRESERVATION GOAL: Promote historic preservation.

**1. Objective:**    **Focus attention on the community's heritage.**

    *a. Policy:*    Inventory historic structures and districts.

    *b. Policy:*    Establish a historic register and voluntary, historic designation procedures.

    *c. Policy:*    Develop a Historic Walking Tour.

    *d. Policy:*    Inform the public on grants, low-interest loans and other benefits of historic designation.

    *e. Policy:*    Encourage the restoration of historic structures.

    *f. Policy:*    Reactivate the Historical preservation Board.

**2. Objective:**    **Continue to support Pioneer Town.**

    *a. Policy:*    Encourage the expansion, increased visibility of Pioneer Village.

    *b. Policy:*    Promote use of "pioneer village" theme in future commercial buildings.

    *c. Policy:*    Support the Surface Creek Valley Historical Society.

## ECONOMIC DEVELOPMENT GOAL: Promote economic stability and diversity.

**1. Objective:**    **Promote appropriate medical services for the community.**

**2. Objective:**    **Promote free enterprise and small business growth.**

    *a. Policy:*    Make hospitable for and mitigate the impacts of home-based businesses.

    *b. Policy:*    Adopt cottage industry standards to mitigate the impact on residential neighborhoods.

**3. Objective:**    Encourage new businesses to locate here.

    *a. Policy:*    Advertise the attractiveness and other benefits of conducting business in Cedaredge.



BLM_0066221