b. *Policy:*     Seek the types of businesses that integrate well with residential use.

c. *Policy:*     Seek and encourage those businesses that can find a market niche, while allowing other, larger communities to attract the big box stores.

d. *Policy:*     Encourage the town's people to attend business gatherings; and to present Cedaredge as a good place to enjoy quality of life and to conduct business.

e. *Policy:*     Work with the Cedaredge Chamber of Commerce to market Cedaredge.

## HOUSING GOAL: ENCOURAGE housing to meet the needs of all residents.

**1. Objective:   Encourage new projects to include a mix of housing types and sizes.**

a. *Policy:*     Accommodate mixed-use projects and a variety of densities.

b. *Policy:*     Establish simple aesthetic design standards for all housing.

c. *Policy:*     Implement RV and mobile home park design standards to mitigate the adverse visual impacts of RVs and mobile homes.

**2. Objective:   Establish standards and zoning.**

## TRANSPORTATION GOAL: Improve streets and pedestrian circulation.

**1. Objective:   Provide more trails, bike paths and sidewalks.**

a. *Policy:*     Support the Trail Plan.

b. *Policy:*     Provide ADA accessibility when replacing sidewalks or within required time frame.

**2. Objective:   Continue to improve streets and traffic circulation.**

a. *Policy:*     Continue the town grid of streets and alleys as the town grows.

b. *Policy:*     Require traffic studies, as necessary to support new subdivision development.

**3. Objective:   Encourage public transportation.**

a. *Policy:*     Encourage the establishment of a financially self-supporting transit or cab company to provide transit to Delta.

**4. Objective:   Focus on safety and protect pedestrians.**

a. *Policy:*     Add traffic lights as necessary.

b. *Policy:*     Identify crosswalks and give pedestrians the right-of-way throughout town.



BLM_0066222

## IV.   PLAN ELEMENTS

Principal elements in the Cedaredge Master Plan are intended to accommodate limited change and improvement without undermining the community's small town character.  Infill (development on existing, vacant lots) with limited, moderate population growth is preferred to enable progressive, affordable responses to the Town's identified needs.  Eight (8) element components are being addressed in the Cedaredge Master Plan: Land Use, Growth Management, Open Space/Recreation, Downtown Revitalization, Historic Preservation, Economic Development, Affordable Housing, and Transportation:

**A.  LAND USE** – Maintaining an interesting mix of activities on a small community scale is the basis for land use recommendations.  Infill on platted properties, with compact expansion adjacent to Town limited to areas easily serviced by existing town facilities, allows for gradual, positive growth.

   1.   **Residential** – Residential is the most significant growth category in terms of land area.  Infill lots are earmarked as opportunity sites for new residential construction.  The Plan encourages a variety of lot sizes and housing types – particularly affordable dwellings that fit local incomes, provide quality shelter for a mixture of family income levels and individuals of all ages – that are compatible with surrounding, established neighborhoods.

   2.   **Commercial** – Downtown revitalization, streetscaping, provision of more parking, and possible expansion of Pioneer Village are positive means for attracting tourism.  More commercial development and activity is needed in the downtown commercial area.  Expansion of commercial development areas, particularly strip-commercial development, is discouraged until existing areas are more fully developed.  Preference is to avoid franchise-style development and garish sign clutter.  Creating walking districts for shopping and dining activities is an aim that would benefit from coordinated, ample parking spaces.

**B.  GROWTH MANAGEMENT** – Citizens prefer that Cedaredge remain a small compact town and that future growth be focused on infill within current town.   New development is therefore encouraged on already platted town lots, which can be most economically served by municipal systems.  This is recommended as a practical approach to growth management.

**C.  RECREATION/OPEN SPACE** – It is recommended that green space  expansion continue with additional facilities and leisure enjoyment areas, new neighborhood parks, and north-south extension of the Surface Creek Trail to connect to the Grand Mesa Gateway Trail.  Community events such as Apple Fest are strong visitor attractions that need room to grow.  The community is encouraged to work together to achieve the goal ofdeveloping an area recreation center with recreational facilities for all ages.

Developers will be required to make public land dedications for parks, trails, and other public purposes.  Other land areas that the town should consider for public dedications in conjunction with future development approvals include lands along the Surface Creek corridor.  The dedication of these areas would provide direct benefit to the residents of the annexed area as well as to the entire town.

The development of trails, especially in already developed areas, must be undertaken with utmost sensitivity to privacy concerns of residents along such trails.  Where appropriate, landscape screening should be provided to mitigate adverse impacts.  Trail alignments should circumvent areas where impact mitigation is not possible.

**D.  DOWNTOWN REVITALIZATION** – Downtown revitalization is accomplished by promoting a more desirable pedestrian environment.  Anticipated improvements include sidewalk repairs and expansion, and the addition of decorative street lighting, flower planters, benches, street trees, and more merchant and visitor parking.



BLM_0066223

**E.   ECONOMIC DEVELOPMENT** – Agriculture and ranching as economic activities have long been in decline in the Cedaredge area.  The agriculture-based economy has now been substantially replaced by a service/retirement/recreation-based economy.  None-the-less agriculture and ranching remain an integral part of the history and culture of the area.  It is in everyone's best interest to continue to promote agriculture in the area of influence, along with the aesthetics of agricultural fields and open spaces.  The plan seeks to protect agricultural and ranch lands from the adverse impacts of surburban sprawl by separating town from rural uses and densities.

Creating economic assets and diversity for the town, without creating adverse fiscal impacts on the town or damaging the small town character, is a priority of the Plan.  Economic interests and open space conservation are not necessarily at odds – high quality open space amenities are, in fact, critical to the long-term success of Cedaredge's emerging base economy.

**F.   TRANSPORTATION** – Improved street maintenance and traffic circulation are needed to solve current problems and to prepare for the future.  Citizens want to see town streets, street lighting, and sidewalks improved throughout town.  The extent of planning streets and thoroughfares is illustrated on page 3 and in the circulation plan adopted by the Town on July 17, 2004. The street and alley grid is recommended to be continued and extended to the extent practical as the Town grows.

Internal circulation and connections with other communities for work and shopping are critical to community success.

1. *Internal Town Circulation* – Street improvements, including merchant and visitor parking areas, need to be considered on a cost-benefit priority basis with other needs.  Residents and business people alike, strongly support pedestrian amenities in the Town's central core.

2. *Alternate Transportation Modes* – Extension of a multi-purpose sidewalk or trail along Surface Creek and along both sides of the highway through town will serve recreational and transportation purposes.  More lateral connections are needed to access the Surface Creek Trails from adjacent neighborhoods through town.

3.

# V.   PRESERVATION PLAN

Cedaredge's future land use pattern is designed to preserve the character of the small town.  It will be characterized by a compact, commercial core area; a highway commercial area with well defined edges; and residential densities generally decreasing with distance from the commercial core.



BLM_0066224

## VI.   ANNEXATION POLICY

An alternative to suburban sprawl, is to focus new development on existing platted, but undeveloped lots. In this way, some of the unique features of the surrounding open space, farms, orchards, and ranch land can be conserved, housing will be more affordable, and the town will be able to offer a higher level of municipal services for lower taxes.  Based on citizen input, lands outside the Town Boundary are considered most appropriate for agriculture, ranching and low density home sites where few town services are required.

Annexation of residential land is a losing proposition for a muncipality – it costs more to provide public services than the land yields in property taxes.  Therefore very little, if any, annexation is anticipated by the Town of Cedaredge.  The Town has no obligation to approve an annexation or to provide muncipal services outside of town boundaries.  Service plans should be directed toward meeting the needs of town residents.

Future annexations could occur when the owners of land that is eligible for annexation initiate the annexation process.  In each case, the Town needs to consider annexation petitions based on sound criteria and findings that support the need for additional developable land in order to maintain an orderly, compact growth pattern within the town's service capability.

The town of Cedaredge provides a variety of infrastructure and services to the incorporated area, including: streets, bridges, drainage, sidewalks, traffic control, parking, parks, trails and open space and recreational programs, street lighting, and police patrol and protection.  These services must be extended to annexed areas within a reasonable time following the annexation.  Other public or quasi-public services needed to serve the annexed areas that are not provided by the town include gas, electricity, telephone, and cable television.  It is the intent of the town to work with those providers to ensure a level and quality of service consistent with that provided to the balance of the town.

Major water distribution lines and sewer trunk lines necessary to serve all areas within town boundaries are already installed.  It will be the developer's responsibility to construct any new distribution, collection and service lines that will be needed to serve individual properties.

However, since annexation is an activity that is authorized and anticipated by state statutes, some sound policies are needed to guide any proposed annexation.  Vacant land annexations should be reviewed based on the following general criteria:

1.   The property is eligible for annexation pursuant to the requirements of state law;
2.   Proposed land uses and lot sizes are compatible with adjacent town land uses and densities;
3.   There is a need for additional developable land to meet identifiable needs;
4.   The town has the physical and economic capabilities and the capacity to provide the same level of services to the site that is provided to other parts of town within a reasonable period of time;
5.   The developer has the ability to develop within a reasonable period of time;
6.   The developer of the site has the ability to install all required services and facilities; and
7.   There is a positive cost-benefit analysis of the annexation.
8.   The property has the ability to provided usable water for its needs.

Proposed developed land annexations should be positively considered only where the area property owners agree to bring the infrastructure up to current town standards.

## VII.   IMPLEMENTATION ACTION PLAN

Implementation of the Cedaredge Master Plan should include the adoption of a zoning ordinance by the Cedaredge Town Board, following a recommendation by the Cedaredge Planning Commission, as a part of a unified Land Use Code.  The Land Use Code will be applicable to lands within the incorporated limits of the town of Cedaredge; lands outside of town boundaries will not be subject to the Code.  Simultaneous with the adoption of the Land Use Code, a Zoning Map should be adopted to identify the zoning categories applicable to the various parts of town.



BLM_0066225

Towns have limited powers to guide developments that will eventually become part of the Town.  For this reason, recommendations have been included in a Master Plan, in the form of Goals, Objectives and Policies, regarding physical development in the municipal influence zone.  Such recommendations can provide the basis for greatly improved governmental coordination and help to ensure the timely provision of services and facilities, regardless of which jurisdiction development occurs in, and thus forestall many of the problems resulting from urbanization in the past.

### A.  STRATEGIES –
The success of the Master Plan depends on designing specific tools that suit the community, then appiying available resources in a strategic manner.

1.   *Short-term.*  Completion of reasonable regulations (Land Use Code) is intended to occur shortly following adoption of the Master Plan.  The Code should include zoning classifications and standards; provisions for the protection of existing nonconforming uses and structures; subdivision and site development standards (park dedication, outdoor lighting, sidewalks, signs, access, parking, etc.); common procedures and submission requirements for subdivision, annexation, historic preservation, conditional uses, and all other land use applications; and a set of definitions in order to establish the meaning ascribed to words and phrases used throughout the Code.  Other immediate needs include the completion of a zoning map, and the completion of water and wastewater capital improvement programs.

2.   Mid-term.  Downtown restoration is fostered by parking, pedestrian, and appearance improvements.  A specific downtown improvement plan should be developed.  The plan should include plans for street trees and furniture, sidewalk and parking area improvements, and street lighting, The town may wish to meet with downtown property owners in order to explore interest in the formation of a downtown improvement district, which would be a joint venture between the town and downtown property owners.  The town's annual budget process should include a review of the street and sidewalk maintenance scheduling and the need for street lighting improvements across town.

The Land Use Code will include public land dedication requirements designed to ensure that new development contributes an amount of land reasonably calculated to maintain the town's current park and public lands level of service.  New developments should contribute land (or cash-in-lieu) for pocket parks in new neighborhoods, expansion of the Cedaredge Park, or for the expansion of the public trails system.  However, since it is unlikely that all of the public parklands anticipated in the Master Plan can be acquired through parkland dedication requirements, it will be necessary to pursue other land acquisition techniques.  Cooperative landowner agreements, easements, leases, grants, or outright purchase are all techniques that should be considered to supplement developer  dedications.

3.   *Longer-term.*  Public and private facilities investment and employment expansion are expected to take somewhat longer to occur, helped along by new housing and revenue-base growth.

### B.  TIMEFRAME – In schematic fashion, action program examples may be phased:

| PHASE | TIMING | RECOMMENDED ACTIONS |
|---|---|---|
| Short-term | 2005-2006 | ⇒ Land Use Code completion, with incentives<br>⇒ Zoning Map completion<br>⇒ Water/wastewater system enhancements |
| Mid-term | 2005-2006 | ⇒ Downtown improvement pians<br>⇒ Street and sidewalk, trails and building maintenance scheduling and improvements across town<br>⇒ Park lands acquisition and development |
| Long-term | 2006-2020 | ⇒ Housing and business-driven job growth<br>⇒ New parks and traiis funded by grants and/or dedications<br>⇒ Apply for grants to fund merchant parking<br>⇒ Visitor attractions |



BLM_0066226

**C.   INTERGOVERNMENTAL AGREEMENT** – Following town adoption of the Plan, endorsement of the plan by the Delta County Commissioners and the Orchard City Council should be sought through intergovernmental agreements.

**Delta County IGA**
Elements of the agreement with the Delta County Commissioners should include:

1. Adoption of the Cedaredge Master Plan as an amendment to the Delta County Master Plan;

2. Commitment that any master plan, subdivision, site specific development plan, resolution or ordinance, adopted in the future be consistent with this Master Plan and its Preservation Plan;

3. Establishment of a standard referral procedure between jurisdictions, and where necessary, the joint review of land use applications (e.g., subdivisions, zoning, building and development permits);

4. Coordination of Subdivision Improvements Agreements with the Town;

5. Cooperation and support with respect to the annexation of all eligible properties, including public rights-of-way where deemed necessary by the Town;

6. Prevent the unnecessary duplication of local governmental services and unnecessary diffusion of local tax sources, subject to the review criteria set forth in C.R.S. 32-1-203;

7. Discourage service plans that transfer the cost of development from the private developer to the tax payer; and

8. Adoption of development standards as necessary to implement the Plan.

**Orchard City IGA**
An intergovermental agreement with Orchard City is desirable in order to promote cooperation between the two municipalities and to address joint planning problems.  Such an agreement should, at a minimum, include mutual agreement to respect each jurisdiction's Municipal Influence Area, as defined by state statute.  It would be preferable for each jurisdiction to limit the provision of municipal services to lands within their respective influence areas, so that one municipality does not create service demands and planning problems for the other. A less desirable, but possible, problem-solving alternative would be mutual agreement to provide sewer service and water service to each residence or development served.

## VIII.   BIBLIOGRAPHY

A. *Cedaredge Tomorrow, Town Plan, 1988,* prepared by the Cedaredge Planning Commission with assistance from Region 10, League for Economic Assistance and Planning, February, 1988.

B. *Survey Report, Cedaredge Community Attitude Survey, Spring, 1987,* produced by David Anderson, District 10, Regional Planning Commission, Montrose, Colorado, May 21, 1987.

C. *Charting the Colorado Plateau, An Economic and Demographic Exploration*, prepared by Walter E. Hecox and Bradley L. Ack, 1995.

D. *Three (3) Mile Plan Requirements: Municipal Annexation, Gerald E. Dahl, Gorsuch Kirgis, L.L.C., Denver, Colorado.*

E. *Summary of Municipal Annexation in Colorado*, October 20, 1998, prepared by Tim Sarmo & Andy Hill, Colorado Department of Local Affairs.

F. *Visions For a New American Dream*, Anton Clarence Nelessen, APA Planners Press, January 1994.

G. *Preliminary Engineering Report, Town of Cedaredge Transmission Line Replacement and New Water Storage Reservoir*, prepared by Ute Engineering and Surveying Company, September 1998.

H. *Wildfire Protection in the Wildland Urban Interface, Colorado State Forest Service.*

I. *Delta County Master Plan, Final Draft, October 1996.*


TOWN OF Cedaredge

BLM_0066227

**Town of Norwood, Colorado**

BLM_0066228

The Town of Norwood Planning and Zoning Commission
And the Town of Norwood Board of Trustees
With the assistance from
Amy Levek, Town Planner and Sandra Stuller, Esq.
Jennifer Russell, Town Attorney

repared by

ly 11, 1994
ne 14, 1995

"       " March    1997

Amended April 14, 2004
Amended August 10, 2005
Amended October , 2006
Amended November 12, 2008
Amended June 9, 2010

## § 1.01 Enactment and Repeals

(a) Upon the adoption of this Chapter, the following are hereby repealed in their entirety: Title 7: Zoning Regulations of the Town of Norwood, Colorado, passed and approved with Ordinance 483, Series 1974 on Nov. 6, 1974, together with all amendments thereto; Ordinance #239, Series 1974, creating the Planning and Zoning Commission, passed and approved in 1983, together with all amendments thereto; Town of Norwood Annexation Policies and Requirements Fourth Draft, passed and approved in March, 1983, together with all amendments thereto; and Subdivision Regulations for the Town of Norwood, Colorado, passed and approved in October, 1985, together with all amendments thereto, of the Town Code of Norwood Colorado, 1993; and any other ordinance or regulation inconsistent with this Code.

BLM_0066229

# TABLE OF CONTENTS
## CHAPTER 7: LAND USE CODE

**1.00   General Provisions**                                                                    **Page**

1.01   Enactment and repeals ..................................................................................1
1.02   Purpose..........................................................................................................1
1.03   Jurisdiction....................................................................................................2
1.04   Consistency with comprehensive plan ..........................................................2
1.05   Municipal services outside of town boundaries.............................................2
1.06   Nonconforming provisions ............................................................................3
1.07   Enforcement and penalties.............................................................................6
1.08   Fees................................................................................................................7
1.09   Severability ...................................................................................................7
1.10   Void Permits..................................................................................................7

**2.00   Rules of Construction, Definitions and Interpretations**

2.01   Rules of construction of language..................................................................8
2.02   Definitions...................................................................................................10
2.03   Interpretations .............................................................................................28

**3.00   Zoning District Regulations**

3.01   Scope and applicability ...............................................................................29
3.02   Districts established .....................................................................................29
3.03   Official zoning map .....................................................................................29
3.04   Temporary zoning of annexed territory .......................................................31
3.05   Use regulations............................................................................................32
3.06   Area regulations...........................................................................................50
3.07   A, Agricultural district ................................................................................56
3.08   R-1, Residential district ..............................................................................59
3.09   MH, Mobile home district............................................................................62
3.10   B-1, Business district ...................................................................................64
3.11   I, Industrial district......................................................................................68
3.12   P, Public district...........................................................................................71
3.13   PUD, Planned Unit Development Overlay district .......................................73
3.14   Medium Density Residential district............................................................77

**4.00   Subdivision Standards**

4.01   Purpose and applicability ............................................................................80
4.02   Building lots.................................................................................................81
4.03   Streets and alleys.........................................................................................82
4.04   Easements ....................................................................................................87

BLM_0066230

4.05    Park land dedication .......................................................................................88
4.06    Drainage ........................................................................................................90
4.07    Water supply ..................................................................................................90
4.08    Sewage treatment ...........................................................................................91
4.09    Underground utilities ......................................................................................91
4.10    Impact fees (reserved) ....................................................................................91
4.11    Prominent Site Features .................................................................................91

**5.00    Site Development Standards                                              Page**

5.01    Scope and applicability ..................................................................................91
5.02    Parking, loading and access ...........................................................................91
5.03    Sidewalks and trails .......................................................................................97
5.04    Fences and walls ............................................................................................99
5.05    Landscaping and screening ...........................................................................100
5.06    Signs ...........................................................................................................103
5.07    Performance standards ..................................................................................107
5.08    Lighting standards ........................................................................................111

**6.00    Administration and Procedures**

6.01    Planning and Zoning Commission .................................................................113
6.02    Zoning map and land use code amendments ...................................................116
6.03    Master plan amendments ..............................................................................119
6.04    Preliminary plats ..........................................................................................121
6.05    Final plats ....................................................................................................126
6.05A   Small scale subdivisions procedures ..............................................................131
6.05B   Condominium subdivision regulation .............................................................138
6.06    Acceptance of subdivision improvements .......................................................141
6.07    Improvements agreements .............................................................................143
6.08    Mandatory Homeowners' Association ............................................................144
6.09    Replats and plat amendments ........................................................................146
6.10    Conditional uses ..........................................................................................148
6.11    Vested property rights ...................................................................................151
6.12    Annexations .................................................................................................154
6.13    Board of Adjustment .....................................................................................160
6.14    Appeals .......................................................................................................162
6.15    Variances .....................................................................................................164
6.16    Special exceptions ........................................................................................165
6.17    Temporary uses ............................................................................................165
6.18    Sign permits .................................................................................................166
6.19    Zoning development permits ..........................................................................167
6.20    Certificates of occupancy .............................................................................167
6.21    Administrative officials .................................................................................168

**Appendix**

A        Town of Norwood zoning development permit..............................................................169

BLM_0066232

# CHAPTER 7

# LAND USE CODE

## § 1.00  GENERAL PROVISIONS

### § 1.01  Enactment and Repeals

**(a)**      Upon the adoption of this Chapter, the following are hereby repealed in their entirety:  Title 7: Zoning Regulations of the Town of Norwood, Colorado, passed and approved with Ordinance 483, Series 1974 on Nov. 6, 1974, together with all amendments thereto;  Ordinance #239, Series 1974, creating the Planning and Zoning Commission, passed and approved in 1983, together with all amendments thereto; Town of Norwood Annexation Policies and Requirements Fourth Draft, passed and approved in March, 1983, together with all amendments thereto; and Subdivision Regulations for the Town of Norwood, Colorado, passed and approved in October, 1985, together with all amendments thereof, of the Town Code of Norwood Colorado, 1993; and any other ordinance or regulation inconsistent with this Code.

**(b)**      The following is hereby adopted as Chapter 7: Land Use Code of the Town Code of Norwood, Colorado.  It may be referred to herein as "this chapter" or the "Land Use Code."

**(c)**      By the adoption of this chapter, no presently illegal use shall be deemed to have been legalized unless specifically such use falls within a zoning district where the actual use is a conforming use.  Otherwise, such uses shall remain nonconforming uses where recognized, or an illegal use, as the case may be.  It is further the intent and declared purpose of this chapter that no offense committed, and no liability, penalty or forfeiture, either civil or criminal, incurred prior to the time the existing Zoning Regulations were repealed and this Zoning Ordinance adopted, shall be discharged or affected by such repeal; but prosecutions and suits for such offenses, liability, penalties or forfeitures may be instituted or causes presently pending proceeded with in all respects as if such prior Ordinance had not been repealed.

### § 1.02  Purpose

The regulations of this chapter have been established in accordance with a Comprehensive Plan for the purpose of promoting the health, safety and general welfare of the Town of Norwood.  They have been designed to lessen the congestion in the streets, to secure safety from fire, panic and other dangers, to provide adequate light and air, to prevent the overcrowding of land, to avoid undue concentration of population, to promote energy conservation and to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements.  They have been made with reasonable consideration, among other things, for the character of the districts, and their peculiar suitability for the particular uses specified; and with a view of conserving the value of buildings and encouraging the most appropriate use of land throughout the Town consistent with a Comprehensive Plan.

BLM_0066233

### § 1.03  Jurisdiction

All development of land within the corporate limits of the Town of Norwood, and all land outside the corporate limits of the Town of Norwood that the Board of Trustees may be petitioned to include within the corporate limits of the Town, by an extension of said corporate limits, shall conform to the following rules and regulations unless specifically exempted herein or by law.

### § 1.04  Consistency with Comprehensive Plan

The regulations of this chapter are intended to implement and be consistent with the Town's official Comprehensive Plan, as such may be amended from time to time.  A copy of the plan shall be kept in the office of the Town Clerk with the original ordinance adopting it and it shall be available for public inspection during regular business hours.

### § 1.05  Municipal Services Outside of Town Boundaries.

The provision of municipal services to development outside of the incorporated limits of the Town shall be subject to the property owner's execution of a pre-annexation agreement pursuant to C.R.S. 31-12-121, including but not limited to, the following terms and conditions:

**(a)     Use.**  The use of the area to be served shall be consistent with the adopted Norwood Major Streets and Future Land Use Plan, in harmony with the intent of Town zoning and policies of the Town, and compatible with adjacent neighborhoods;

**(b)     Municipal water services outside Urban Growth Boundary.**  Extension of municipal water service to development outside the Urban Growth Boundary shall be subject to the Rules and Regulations of the Norwood Water Commission.

**(c)     Municipal water service outside of Town and inside Urban Growth Boundary.** Extension of municipal water service to development inside the Urban Growth Boundary shall be subject to the Rules and Regulations of the Norwood Water Commission, and all land uses shall be consistent with the Norwood Major Streets and Future Land Use Plan, and the property owners execution of a pre-annexation agreement.

**(d)     Non-complying uses and substandard-sized parcels.**  Municipal water service and any other municipal services shall not be extended to lots or parcels or uses that are not consistent with the Comprehensive Plan and in compliance with the Norwood Major Streets and Future Land Use Plan as implemented by Sec. 3.05, Use regulations, and Sec. 3.06, Area regulations, of this Chapter.

**(e)     Consent to Annexation.**  As a condition precedent to the provision of municipal services by the Town to land within the Urban Growth Boundary, the Town may require that the owners of such land apply for or consent to the annexation of such land to the Town at such future date as such land becomes eligible for annexation.

BLM_0066234

**§ 1.06  Nonconforming Provisions**

**(a)**     **Nonconforming uses and structures.**

(1)     Nonconforming status.  The use of land, use of a structure, or a structure itself shall be deemed to have nonconforming status when each of the following conditions are satisfied:

   a.     The use or structure does not conform to the regulations prescribed in the district in which such use or structure is located and was in existence and lawfully constructed, located and operating prior to, and at the time of, the event that made such use or structure nonconforming.

   b.     The event that made such use or structure nonconforming was one of the following:  annexation into the Town of Norwood, adoption of this chapter or a previous zoning ordinance, or amendment of this chapter or a previous zoning ordinance.

   c.     The nonconforming use or the use occupying the nonconforming structure has been operating since the time that the use or structure first became nonconforming without abandonment, as abandonment is defined in subsection (a)(4) below.

(2)     Expansion.  No nonconforming use may be expanded or increased.

(3)     Change of use.

   a.     Any nonconforming use may be changed to a conforming use and once such change is made, the use shall not thereafter be changed back to a nonconforming use.

   b.     Where a conforming use is located in a nonconforming structure, the use may be changed to another conforming use by securing a Zoning Development Permit.

   c.     A change from one nonconforming use to another nonconforming use may be made by securing a Zoning Development Permit provided such change is to a permitted use in a more restrictive zoning district classification.  For the purpose of interpreting these provisions, the zoning districts shall be considered to be arranged in a hierarchy as they are listed in Sec. 3.02, Districts established, from the most restrictive A, Agricultural District to the least restrictive I, Industrial.  The P and PUD Districts shall not be considered part of the hierarchy.  In addition, for the purpose of interpreting this paragraph (c), a use that is authorized in a district with a conditional use permit shall not be considered a permitted use in such district.

(4)     Abandonment.  Whenever a nonconforming use or a conforming use in a nonconforming structure is abandoned, all nonconforming rights shall cease and the use of the premises shall henceforth conform to this chapter.  Abandonment shall involve the actual act of discontinuance, regardless of the intent of the user or owner to discontinue a

BLM_0066235

nonconforming operation. Any nonconforming use that is discontinued for, or that remains vacant for a period of six (6) months, shall be considered to have been abandoned. Any nonconforming use that is moved from the premises shall be considered to have been abandoned.

(5)　　Destruction. If a nonconforming structure or a structure occupied by a nonconforming use is destroyed by fire, the elements or other cause, it may not be rebuilt except to conform to the provisions of this chapter. In the case of partial destruction of a structure occupied by a nonconforming use not exceeding sixty percent (60%) of its reasonable value, reconstruction may be permitted after a hearing and favorable action by the Board of Adjustment, but the size and function of the nonconforming use shall not be expanded.

**(b)　　Nonconforming lots.**

(1)　　General. A single family dwelling and customary accessory buildings may be developed on a lot that has less area than the minimum required by the underlying zone district and was an official "lot of record" prior to the adoption of the Town's original Zoning Ordinance (Nov. 6, 1974), if:

a. The "lot of record" is in separate ownership or contiguous to lots in the same ownership; and

b. The proposed single family dwelling can be located on the lot so that the yard, height, and other dimensional requirements of the underlying zone district can be met, or a variance is obtained from said dimensional requirements pursuant to Sec. 6.16 of this Chapter.

(2)　　Undivided lot. If two or more lots or combinations of contiguous lots in a single ownership (including husband and wife as, in all cases, a single owner) are of record at the effective date of the adoption or amendment of this Chapter, regardless of time of acquisition, or all or parts of the lots do not meet the requirements established for lot width and area, the lots shall be considered an undivided parcel, and no portion shall be used or occupied which does not meet the width and area requirements of this Chapter.

(3)　　Lot Reduction.

a. No lot or interest therein shall be transferred, conveyed, sold or subdivided so as to create a new nonconforming lot, to avoid, circumvent or subvert any provision of this Chapter, or to leave remaining any lot in violation of the dimensional requirements of this Chapter.

b. No lot or portion of a lot required as a building site under this chapter shall be used as a portion of a lot required as a site for another structure.

BLM_0066236

c.  No building permit shall be issued for any lot or parcel of land which has been conveyed, sold, or subdivided in violation of this subsection.  Any transferee who acquires a lot in violation of this subsection without knowledge of such violation, and any subsequent transferee, shall have the right pursuant to Colorado law to rescind and/or receive damages from any transferor who violates the provisions of this paragraph.

**(c)**     **Nonconforming signs.**   Any sign that is permitted to remain in place as a nonconforming use may be continued in use until the sign, or a substantial part of it, is blown down or otherwise destroyed or dismantled for any purpose other than maintenance operations or for changing the letters, symbols, or other matter on the sign.  A sign, or a substantial part of it, shall be considered to have been destroyed or dismantled if the cost of repairing the sign is more than sixty percent (60%) of the cost of erecting a new sign of the same type at the same location.

**(d)**     **Nonconforming mobile homes and mobile home sites.**  An individual mobile home in a mobile home park or mobile home subdivision shall not be replaced unless the individual mobile home site is in compliance with the following provisions:

(1)     Each mobile home site in mobile home parks and mobile home subdivisions shall be clearly designated and arranged so that all mobile home have access to the internal driveway.

(2)     There shall be a minimum of twenty feet (20') between mobile homes.

(3)     Each trailer site shall be improved with a four inch (4") concrete or gravel pad.  No trailer with a footprint larger than the pad shall be placed on site.

(4)     Exposed ground surfaces in all part of a mobile home park or mobile home subdivision shall be paved or covered with stone screening or other solid material, or protected with a vegetative growth that is capable of preventing soil erosion and of eliminating objectionable dust.

(5)     A detached, accessory storage building or buildings shall be provided within a mobile home park or mobile subdivision containing a minimum storage capacity of ten (10) cubic yards per mobile home site.

(6)     Mobile home dwelling units shall be "skirted" within (60) sixty days of its placement in a Mobile Home Park or Subdivision by affixing thereto of a solid, nonporous screening or skirt between the underside of the dwelling unit at its outer edge around ground level.

BLM_0066237

## § 1.07  Enforcement and Penalties

**(a)**      Any person, firm or corporation who shall violate any of the provisions of this chapter or who shall fail to comply with any provisions hereof within the corporate limits of the Town of Norwood shall be guilty of a misdemeanor and upon conviction shall be subject to a fine.  Any person violating any of the provisions of this chapter shall be fined upon conviction not less than one dollar ($1.00) nor more than one thousand dollars ($1,000.00), or imprisoned for a period of up to ninety (90) days, or both such fine and imprisonment.  Each day any violation or noncompliance continues shall constitute a separate and distinct offense.

**(b)**      Any person, being the owner or agent of the owner of any land located within a subdivision, who transfers or sells, agrees to sell, or negotiates to sell any land by reference to or exhibition of or by use of a plat of a subdivision before such plat has been approved by the Board of Trustees and recorded or filed in the office of the San Miguel County Clerk shall pay a penalty of one hundred dollars to the Town for each lot or parcel so transferred, or sold, or agreed or negotiated to be sold.

**(c)**      The penalties provided herein shall be cumulative of other remedies provided by state law as provided in Colorado Revised Statutes 31-23-216.5 or 31-23-308 and the power of injunction may be exercised in enforcing this chapter whether or not there has been a criminal complaint filed.

**(d)**      In addition to the penalty provided for, the right is hereby conferred and extended to any property owner owning property in any district where such property may be affected by a violation of the terms of this chapter, to bring suit in such court or courts having jurisdiction thereof and obtain such remedies as may be available at law or in equity for the protection of the rights of such property owners.

**(e)**      When it is determined that there has been a violation of any provision of the Land Use Code, written legal notice of violation shall be served in the following manner:

    (1)      Determine and include a list of violations, refer to the section or sections of the Code violated;

    (2)      Determine and specify a time for compliance with relevant Land Use Code provisions thirty (30) days from the service of the notice; and

    (3)      Serve the notice on the owner, occupant, operator, lessee, agent or other responsible party in person, provided that such notice and requirement shall be deemed to be properly served on such responsible party if a copy thereof is delivered to, posted on, or sent by registered or certified mail to his/her last known mailing address, residence or place of business.

BLM_0066238

## § 1.08  Fees

**(a)**      Fees for the processing of land use applications for proposed developments shall be set by ordinance of the Board of Trustees commensurate with the level of service.  Such fees may include all costs occasioned to the Town, including publication of notices, public hearing and review costs, planning, engineering, legal and other professional review costs.

**(b)**      No person or entity owing money to the Town, in any amount or for any purpose, including delinquent taxes certified by the County Treasurer or any land use application fees, may be granted any development permit or any other development approval and the Town and any of its boards, commissions, departments, officers or agents will take no action on a zoning development permit or other land use application until all monies owed the Town by an applicant are paid.  This provision shall not prohibit the Town or any of its designees from conducting a pre-application conference or determining application completeness.

## § 1.09  Severability

It is hereby declared to be the intention of Board of Trustees of the Town of Norwood that the sections, paragraphs, sentences, clauses and phrases of this chapter are severable, and if any phrase, clause, sentence, paragraph or section of this chapter shall be declared unconstitutional or invalid for any reason, such unconstitutionality or invalidity shall not affect any of the remaining phrases, clauses, sentences, paragraphs or sections of this chapter, since the same would have been enacted by the Board of Trustees without the incorporation in this chapter of any such unconstitutional or invalid phrase, clause, sentence, paragraph or section.

## § 1.10 Void Permits

All persons are presumed to know the terms and requirements of this Land Use Code and the extent of the legal authority of the Town and its employees, boards, and commissions to issue development approvals or permits. Any permit or approval issued in error or otherwise not in conformity with the requirements of this Code shall be void. Similarly, any permit or approval issued in reliance upon, or as a result of, a materially false statement or representation made in the process of obtaining the permit or development approval shall be void. Any person having received a void or void  able permit or approval shall not be relieved from having to comply with all applicable terms and conditions of this Code and the Town shall not be stopped from fully enforcing the same.

BLM_0066239

## § 2.00  RULES OF CONSTRUCTION, DEFINITIONS AND INTERPRETATIONS

### § 2.01  Rules of Construction

**(a)**     **Meaning and intent.**  All provisions, terms, phrases and expressions contained in this chapter shall be liberally construed in order to accomplish the purposes declared in subsection 1.02.

**(b)**     **Text.**  In case of any difference of meaning or implication between the text of this Zoning Code and any illustration or figure, the text shall control.

**(c)**     **Computation of time.**  The time within which an act is to be done shall be computed by excluding the first and including the last day; if the last day is a Saturday, Sunday or legal holiday declared by the Town, that day shall be excluded.  In the computation of time for public hearing notice, both the first day (day of the advertisement) and the last day (day of the hearing) shall be excluded.  The following time-related words shall have the meanings ascribed below.

 (1)     "Day" means a calendar day unless working day is specified.

 (2)     "Week" means seven (7) calendar days.

 (3)     "Month" means a calendar month.

 (4)     "Year" means a calendar year, unless a fiscal year is indicated.

**(d)**     **Conjunctions.**  Unless the context clearly indicates to the contrary, conjunctions shall be interpreted as follows:

 (1)     "And" indicates that all connected items, conditions, provisions or events shall apply; and

 (2)     "Or" indicates that one or more of the connected items, conditions, provisions or events shall apply.

**(e)**     **Delegation of authority.**  Whenever a provision appears requiring the head of a department or some other officer or employee to do some act or perform some duty, it is to be construed to authorize the head of the department or other officer to designate, delegate and authorize professional-level subordinates to perform the required act or duty unless the terms of the provision or section specify otherwise.

**(f)**     **Non-technical and technical words.**  Words and phrases shall be construed according to the common and approved usage of the language, but technical words and phrases and such others as may have acquired a peculiar and appropriate meaning in law shall be construed and understood according to such meaning.

BLM_0066240

**(g)     Public officials, bodies and agencies.**  All public officials, bodies, and agencies to which reference is made are those of the Town of Norwood, Colorado, unless otherwise indicated.

**(h)     Mandatory and discretionary terms.**  The word "shall" is always mandatory.  The word "may" is permissive.

**(i)     Tense, number and gender.**  Words used in the past or present tense include the future as well as the past or present, unless the context clearly indicates the contrary.  The singular number shall include the plural and the plural shall include the singular, as the context and application of this Code may reasonably suggest.  Words of one gender shall apply to persons, natural or fictitious, regardless of gender as the context and application of this Code may reasonably suggest.

BLM_0066241

## § 2.02  Definitions

Words defined in this section shall be given the meanings set forth here.  All other words shall be given their common, ordinary meanings, as the context may reasonably suggest.  In case of dispute over the meaning of a term not defined here or over the application of a definition set forth here, the Town Planner shall give a written interpretation in accordance with Chapter 2.03.

**Accessory Use or Structure:**  A use or structure naturally and normally incidental to, subordinate to, and devoted primarily to the principal use or structure of the premises.

**Agriculture:**  The use of land for the production of food and fiber, including the growing of crops and/or the grazing of animals.

**Antique Shop:**  An establishment offering for sale, within a building, articles such as glass, china, furniture or similar furnishings and decorations that have value and significance as a result of age, design or sentiment.

**Alley:**  A space or thoroughfare that affords only secondary means of access to property abutting thereon that has been dedicated or deeded to the public for public use.

**Alley House**: A separate dwelling unit located on a lot which includes a single family dwelling unit or double wide manufactured/mobile home. The alley house is accessory to the primary residential use on the property.

**Amusement, Commercial (Indoor):**  An amusement enterprise wholly enclosed in a building offering entertainment or games of skill to the general public for a fee or charge and including, but not limited to, a bowling alley or billiard parlor.

**Asphalt or Concrete Batching Plant, Temporary:**  A temporary facility for producing asphalt or concrete products used in construction activities on the same or nearby sites.

**Auto Repair Garage:**  A building or place arranged, designed, used or intended to be used for the purpose of providing general repair and servicing of motor vehicles.  Such repair or servicing may include reconditioning of engines, air conditioning systems and transmissions; wrecker service; collision services including body, frame or fender straightening or repair; painting, undercoating and rustproofing; replacement or repair of brakes, shock absorbers, tires, batteries, mufflers, or upholstery; and other similar services.

**Basement:**  A building story having at least one-half (1/2) of its height below the average level of the adjoining ground.  A basement shall not be counted as a story in computing building height.

**Bath Facilities:**  That portion of a structure which includes a bath tub, shower and/or other personal bathing or washing areas.

**Bed and Breakfast:**  An owner occupied,  single-family dwelling unit converted into an

BLM_0066242

establishment that provides lodging and breakfast for temporary overnight occupants in no more than five separate bedrooms for compensation.  In addition to residential off-street parking requirements, a bed and breakfast shall provide one off-street parking space per bedroom offered for use for temporary overnight accommodations.

**Billboard:**  An outdoor advertising sign placed along a right-of-way; billboards generally are prohibited in the Town of Norwood.

**Block:**  An area enclosed by streets and occupied by or intended for buildings; or if said word is used as a term of measurement, it shall mean the distance along a side of a street between the nearest two (2) streets that intersect said street.

**Board of Adjustment:**  The Town of Norwood Board of Adjustment as established in Chapter 6.13 of the Land Use Code.

**Board of Trustees:**  The governing and legislative body of the Town of Norwood, Colorado.

**Boarding House or Rooming House:**  A building, other than a hotel or motel, where lodging and/or meals for three (3) or more persons are provided for compensation.

**Bridle Path:**  See "Trail."

**Building:**  Any structure built for the support, shelter and enclosure of persons, animals, chattels or movable property of any kind.  When subdivided in a manner sufficient to prevent the spread of fire, each portion so subdivided may be deemed a separate building.  Building includes yurts, removable sheds, and similar uses, but does not include signs or fences.

**Building Material Yard and Construction Office, Temporary:**  A yard or building for storing or housing building material and building equipment in conjunction with an approved construction or development project on a temporary basis.

**Building Official:**  The Building Inspector charged with the responsibility of issuing permits and enforcing on behalf of the Town the Uniform Building Code, or other building code adopted by the Town, and Land Use Code, including any amendments, or that person's designee.

**Building Permit:**  A permit issued by the Building Official, after  approval of a Zoning Development Permit, that allows a developer to erect, construct, reconstruct, excavate for a foundation, alter or change the use of a building or other structure or improvements of land.

**Campground**: A tract of land designed for use by temporary or short term occupancy for travel, recreation or vacation.

**Caretaker or Guard Residence:**  Dwelling facilities located on a premise occupied by a permitted main use for the housing of persons and their families who are employed on the premises as guards, caretakers or in similar custodial capacity.

BLM_0066243

**Car Wash:**  A facility designed and used for the primary purpose of washing and cleaning passenger automobiles.

**Cellar:**  See "Basement."

**Certificate of Occupancy:**  An official certificate issued by the Town through the enforcing official that indicates conformance with or approved conditional waiver from the zoning regulations and authorizes legal use of the premises for which it is issued.

**Character (of a developed area):**  The density, height, coverage, setback, massing, fenestration, materials and scale of materials.

**Church or place of worship:**  A site used primarily or exclusively for religious worship and related religious services operated by a bona fide religious group for religious activities.

**Cleaning Shop or Laundry Pick-up Station:**  A custom laundry cleaning or pressing shop a pick-up station for laundry or cleaning where the work is performed other than on the premises.

**Clustering**:  The act of consolidating and closely grouping development within a parcel for the purpose of protecting and/or preserving common open space areas, environmentally sensitive lands, open meadows, scenic vistas and wetlands, and to encourage the efficient provision of utility facilities and public transportation.

**Commercial Development:**  Includes, but is not limited to: expansion or construction of office, retail, wholesale, warehouse, manufacture, commercial recreation, restaurant/bar and/or service-commercial operations by the addition of square footage.

**Common Open Space:**  A parcel of usable land, area of water, or a combination of land and water within the site designated for a planned unit development designated and intended primarily for the use or enjoyment of residents, occupants and owners of the planned unit development.  Common open space may include, but is not limited to, areas devoted to recreation, courts, gardens, parks and walkways.  The term shall not include space devoted to streets, parking and loading areas.

**Community Center:**  A building and grounds operated by a governmental entity or non-profit corporation, for the social, recreational health or welfare of the community served.

**Commissioners:**  Board of County Commissioners of San Miguel County, Colorado.

**Compatible:**  Consistent with, harmonious with, similar to and/or enhancing the mixture of uses, siting and/or complimentary architectural styles, either of an individual structure or the character of the surrounding structures.

BLM_0066244

**Comprehensive Plan:**  The comprehensive plan of the Town and adjoining areas adopted by the Planning and Zoning Commission and Board of Trustees, including all of its revisions.  The plan indicates the general locations recommended for various land uses, transportation routes, public and private buildings, streets, parks and other public and private developments and improvements.

**Condominium, Attached:**  A residential dwelling unit in a structure containing two or more such units, the living spaces of which are individually owned; the balance of the property (both land and building) is owned either in common by the owners of the individual units or by an association consisting of such owners.

**Condominium, Detached:**  One of at least two individually owned, unconnected residential dwelling units located on property owned either in common by the owners of such units or by an association consisting of such owners.

**Constructive Notice:**  Notice that shall be deemed given as a result of actual notice or any action by the Town recorded in the public record maintained by the County Clerk.

**Contiguous:**  Sharing a common border at more than a single point of intersection and in such a manner that the shared boundaries are touching and not separated except by boundaries of public or private rights-of-way, watercourses or water bodies, or other minor geographical divisions of similar nature running parallel and between the shared boundaries.  Contiguity is not the mere touching of points at intersections.

**Convenience Store:**  A retail establishment primarily offering for sale meats, fruits, vegetables, bakery products, dairy products, personal care items, cleaning products and similar household items to a localized or neighborhood market, for off-premise consumption.

**Cottage Dwelling Units:**   A detached dwelling unit not greater than 850 square feet in lot coverage and a maximum floor area of 1500 square feet or 1.5 times the lot coverage, whichever is less, constructed as part of a comprehensive site plan in a single application for development.

**Cottage Housing Development:**   A comprehensive development consisting of cottages on a single lot. The site plan includes individual dwelling units clustered around a shared court yard, off street parking and access. The cluster includes a minimum of four and maximum of nine units included in a single application. Cottage housing development will be accomplished through a condominium subdivision and include covenants.

**Cul-de-sac:**  A street that terminates at one (1) end in a vehicular turnaround.

**Custom Personal Service:**  Barber shop, beauty shop, tailor, dressmaker, shoe shop or similar shop offering custom service.

**Day Camp for Children:**  A facility arranged and conducted for the organized recreation and instruction of children, including outdoor activities, on a daytime basis only.

BLM_0066245

**Day Care Center:**  A facility licensed by the Colorado Department of Social Services (defined by that department as "Child Care Center") that is maintained for the whole or part of a day for the care of five or more children under the age of 16 years who are not related to the owner, operator or manager thereof, whether such facility is operated with or without compensation for such care, and with or without stated educational purposes.  A day care center must provide Town and State approved water and sewer systems and shall provide one off-street parking space per employee, a child loading/unloading area of adequate dimensions (preferably off-street) and adequately sized indoor and outdoor play areas.

**Day Care Home:**  An accessory use facility licensed by the Colorado Department of Social Services that provides care for two or more children not related to each other, or for children from more than one family, not related to the care provider. Care shall be provided for each child for more than two consecutive full days (seven or more hours each) on a regular weekly basis.  If established in conjunction with a residential use, a day care home shall meet the requirements of a home occupation.  If established in conjunction with an institution or business, its use shall be limited to children of employees or guests of that institution or business and shall provide two off-street parking spaces.

**Decibel:**  A unit of measurement of sound pressure.

**Dedication:**  The turning over by an owner or developer of private land for public use, and the acceptance of land for such use by the governmental agency having jurisdiction over the public function for which it will be used.  Dedications for roads, parks, school sites, or other public uses often constitute conditions for approval of a development.

**Demolition:**  The act of demolishing a structure.

**Density:**  The maximum number of dwelling units per gross acre of land permitted in a zone district, as set forth in Chapter 3.00.

**Development:**  The physical extension and/or construction of urban land uses.  Development activities include:  subdivision of land; change in the intensity of use of land; construction, reconstruction, demolition or partial demolition or alteration of buildings, roads, utilities, and other facilities; commencement of drilling (except for a well or to obtain soil samples), mining, or excavation; installation of septic systems; grading; deposit of refuse, debris, or fill materials; and clearing of natural vegetation cover (with the exception of agricultural activities).  Exempted are routine repair and maintenance and normal and customary ranching and agriculture-related activities.

**Developer:**  Any public or private person, partnership, association or agency that prepares raw land for the construction of buildings or causes to be built physical building space for use primarily by others, during which preparation the land or the creation of the building space is in itself a business and is not incidental to another business or activity.

**Development Permit:**  See "Zoning Development Permit."

BLM_0066246

**District:** A section of the Town of Norwood for which the regulations governing the height, area or use of the land and buildings are uniform.

**Driveway:** An area providing vehicular access between a street and an off-street parking or loading area.

**Dwelling unit:** A structure or portion of a structure, other than a mobile home, that is designed, occupied or intended to be occupied as living quarters and includes facilities for cooking, sleeping and sanitation.

> **Duplex dwelling:** The use of a lot for two dwelling units, other than mobile homes, within a single building and under a single roof.

> **Single-family dwelling:** The use of a lot for one dwelling unit that has no physical connection to a building located on any other lot.

> **Multi-family dwelling:** The use of a lot for three or more dwelling units within a single building.

**Easement:** A property right given by an owner of land to another person or entity for specific limited use of that land.

**Electrical Transmission Line, High Voltage:** Those lines used for bulk transmission of electricity and not normally used for serving the end uses. For electric utilities, this includes all lines operated at 60 KV or above, when measured phase-to-phase.

**Encumber:** To legally obligate by contract or otherwise commit to use by appropriation or other official act of the Town or RJ-2 School District.

**Engineer:** A person duly authorized under applicable provisions of Colorado Revised Statutes to practice the profession of engineering.

**Equestrian Center:** A recreational facility, the primary activity of which is the business of recreational horseback riding and instruction, boarding of horses and competitive riding activities.

**Essential Services:** The development or maintenance of public utilities or Town-approved underground, surface or overhead gas, electrical, telephone, steam, fuel or water transmission or distribution systems, including towers, poles, wires, mains, drains, sewers, pipes, conduits, cables, fire alarm and police call boxes, traffic signals, hydrants and similar equipment.

**Events Center:** A building or complex of buildings housing community recreation facilities owned, operated or leased for operation by a non-profit organization or governmental entity and may include equestrian facilities, swimming pools, tennis and other indoor or outdoor athletic facilities.

BLM_0066247

**Evidence:**  Any relevant and competent testimony, map, table, chart, contract or other document offered, prepared or certified by a person qualified to attest to a specific claim or condition.

**Excavation:**  The formation of a cavity formed by cutting, digging or scooping earth.

**Exclusionary Zoning:**  Illegal development regulations resulting in the exclusion of individuals and/or families from a community on the basis of income or ethnic background.

**Exterior Architectural Feature:**  The architectural style, design and general arrangement of the exterior of a structure, including but not limited to, texture, materials, windows, lights, signs and other fixtures appurtenant to a structure.

**Family:**  Two or more persons related by blood or marriage, or between whom there is a legally recognized relationship, or not more than 5 unrelated persons occupying the same dwelling unit.

**Farm, Orchard or Truck Garden:**  An area used for growing of usual farm products, vegetables, fruits, trees, and grain and for the raising thereon of the usual farm poultry and farm animals, such as horses, cattle and sheep and including the necessary accessory uses for raising, treating and storing products raised on the premises.

**Fence:**  Any structure intended for the use of confinement, prevention of intrusion, boundary identification, or screening of an activity.

**Field Office, Temporary:**  A structure or shelter used in connection with an approved development or building project for housing on the site of temporary administrative and supervisory functions and for sheltering employees and equipment.

**Finished Grade:**  The elevation of the ground surface, following development, next to the completed walls of a structure, prior to placement of any fill material.

**Floor Area, Gross Floor Area:**  The sum of the gross horizontal areas of all floors of a building measured from the exterior faces of the exterior walls or from the centerline of walls separating buildings, plus the floor area projected over stair and elevator openings.  Covered and enclosed areas, such as but not limited to covered decks and balconies, shall be included in calculating floor area. Floor area that is more than seventy five percent below grade shall not be considered in gross floor area, but shall be used to calculate allowable uses, parking and other mitigation.

**Floor Area Ratio:**  The gross floor area of a building on a lot, divided by the lot area.

**Frequency:**  The number of times per second a vibration or sound wave oscillates.

**Free-standing Sign:**  Any sign permanently affixed to the ground, supported by a standard or legs or other self-supporting structure used solely for that sign, and physically separated from any building or structure.

BLM_0066248

**Gasoline Service Station:**  A place of business for the retail sales of gasoline, which may or may not exist in conjunction with an auto repair shop, based upon specific zoning requirements.

**Gross Area:**  The total area of a site minus any dedicated rights-of-way and surface easements.

**Groundwater:**  Subsurface water within and below the zone of continuous saturation.

**Group Home:**  A facility providing 24-hour care in a protected living arrangement for not more than eight (8) residents per home sixty years of age or older, or for the developmentally disabled, limited to cerebral palsy, multiple sclerosis, mental retardation, autism, and epilepsy and not more than two (2) supervisory personnel.  Such homes for the developmentally disabled must be state-licensed.

**Height:**  The maximum possible upward distance to the top of a building, measured adjacent to a building at a right angle to the horizon line from each and every point on the finished grade, except that:  (1)  The ridge of a gable, hip, gambrel or similar pitched roof may extend up to five feet above the specified maximum height limit;  (2)  Antennas, chimneys, flues, vents or similar structures may extend up to ten feet above the specified maximum height limit, and radio transmission antennas may extend above the specified maximum limit;  (3)  Water towers and mechanical equipment may extend up to five feet above the specified maximum height limit;  (4)  Church spires, bell towers and like architectural features, as well as flag poles, may extend over the specified maximum height limit;  (5)  Schools, churches and public administration buildings in residential zone districts may exceed the established height limitation by fifty percent, provided they comply with all other requirements for the zone district and that the total floor area of the structure does not exceed the total area of the lot on which the building is located.

**Heliport:**  A landing facility for rotary wing aircraft used for public purposes only.

**Home Occupation:**  A business, occupation or trade conducted entirely within a residential building or accessory structure for gain or support by a resident of the dwelling.

**Hospital or Clinic:**  A public or private facility that:  (1)  Provides in- and out-patient care, medical and/or dental, ward, surgery, laboratory, physical therapy, diagnostic, radiology, emergency medical and/or pharmacy services;  (2)  Contains administration offices, gift shop, waiting rooms, kitchen (to service hospital patients, staff and visitors), and similar uses; and/or  (3)  Contains health service and prepaid health maintenance offices, ambulance garage, heliport and/or parking lot.

**Hotel or Motel:**  A building or group of buildings designed and occupied as a temporary lodging place of individuals.  To be classified as a hotel or motel, an establishment shall contain a minimum of six (6) individual guest rooms or units and shall furnish customary hotel services.

**Impact:**  The effect of any direct manmade actions or indirect repercussions of manmade actions on existing physical, social, or economic conditions.

**Impervious Surface or Cover:**  Material placed over the surface of the ground (e.g. pavement, side-

BLM_0066249

walks, roofs, driveways) that reduces the infiltration of precipitation into the ground.

**Improvement:**  The addition of one or more structures or utilities on a vacant parcel of land.

**Improvement Permit:**  A permit issued by the Building Official after Final Plat approval that allows development of required improvements within a subdivision.

**Landscaping:**  May include trees, shrubs, ground cover, vines, walkways, ponds, fountains, sculpture, and other organic and inorganic materials used for creating an attractive appearance.  Smooth concrete or asphalt surfaces are not considered landscaping.

**Library:**  A publicly operated facility housing a collection of books, magazines, audio and video tapes, or other material for use by the general public.

**Living Unit:**  The room or rooms occupied by a family and must include cooking facilities.

**Lot:**  An undivided tract or parcel of land under one ownership having frontage on a public street and either occupied or to be occupied by a building or building group together with accessory buildings, which parcel of land is designated as a separate and distinct tract.

**Lot Area:**  The net area of the lot, excluding portions of streets and alleys.

**Lot Coverage**:  That portion of a lot that is covered by buildings, measured from where the exterior wall meets the foundation, excluding open decks, roof projections (extending less than three feet (3') from the exterior wall), stoops, sidewalks, pathways, patios and driveways. Portions of the building that project beyond the foundation wall and are covered with an impervious membrane (roof covering) such as bays, bay windows, porches, decks and basement spaces, shall be included in the site coverage calculations. Basements that are contained within the footprint of the first story shall not be counted towards site coverage. When an alley house is constructed on a lot, up to 250 square feet of lot coverage shall be excluded from lot coverage computations, provided that the structure is constructed in rear yards only.

**Lot Lines:**  The lines bounding a lot as defined herein.

**Lot line, front:**  Any lot line adjacent to a street.

**Lot line, rear:**  A lot line opposite a front lot line and not adjacent to a street.

**Lot line, side:**  Any lot line not defined as a front or rear lot line.

**Lot of Record:**  A lot that is part of a subdivision or the original town site, the plat of which has been recorded in the office of the County Clerk of San Miguel County or a parcel of land, the deed for which is recorded in the office of the County Clerk of San Miguel County prior to the adoption of the Town's original Zoning Ordinance (Nov. 6, 1974).

BLM_0066250

**Lot Width:**  The length of the line or curve representing the minimum required front yard setback.

**Manufacturing, general**: An establishment engaged in the basic processing and manufacturing of materials or products predominately from extracted or raw materials, excluding uses classified as manufacturing, hazardous or objectionable.

**Manufacturing, hazardous or objectionable:**  A use engaged in storage of, or manufacturing processes utilizing, flammable or explosive materials, or storage or manufacturing processes that potentially involve hazardous or commonly recognized offensive conditions.  Typical uses include chemical manufacturing and warehousing, dry ice manufacturing, fat rendering plants, fertilizer manufacturing, fireworks and explosives manufacturing and warehousing, petroleum refineries, pulp processing and paper products manufacturing, radioactive materials manufacture or use, steel works, slaughterhouses and tanneries.

**Manufacturing, light:**  An establishment or use engaged in the manufacture, predominantly from previously prepared materials, of finished products or parts, including processing, fabrication, assembly, treatment and packaging of such products, and incidental storage, sales and distribution of such products, but excluding activities classified in another land use category.  Typical uses include apparel and garment factories, appliance and computer products assembly, bakeries engaged in large-scale production and wholesale distribution, boat building and repair, electrical and electronic equipment, furniture and fixtures, jewelry manufacturing, leather products, meat cutting and wholesale storage, monument and grave marker manufacturing, motion picture production lots, musical instrument manufacturing, pharmaceutical and toiletries manufacturing, printing and publishing, rubber and plastics products, sports equipment manufacturing, and toy manufacturing.

**Mass Transit:**  A coordinated system of transit modes providing transportation for the general public.

**Master Plan:**  The Town of Norwood Comprehensive Development Plan.

**Master Plan Boundary:**  See "Urban Growth Boundary."

**Mayor:**  Chief Administrative Officer of the Town of Norwood, Colorado.

**Mini Storage:**  A structure containing separate, individual, and private storage spaces of varying sizes, leased or rented on individual leases for varying periods of time.

**Mobile Home Dwelling:**  A structure designed to be transported after fabrication and equal to or exceeding eight feet in width and/or 32 feet in length, excluding towing gear and bumpers.  Such a structure is suitable for human habitation on a year-round basis when equipped with required plumbing, heating and electrical facilities.  Mobile homes have integral chassis or permanent hitches to allow future movement.  Any substandard-size mobile homes occupied at the time of adoption of these regulations shall be allowed to continue.

**Mobile Home Subdivision:**  A tract of land subdivided into lots, which are designed as sites for mobile or relocatable homes and which are served by separate utilities and dedicated streets on a legally filed

BLM_0066251

plat and are capable of being conveyed as separate lots.

**Mobile Home Park:**  A tract of land designed or being used to accommodate two or more mobile home dwelling sites for rental.

**Mobile Home Park Accessory Building:**  A building providing laundry facilities operated by the mobile home park management, recreational facilities, storage and all other activities, facilities and uses authorized or approved by the Board of Trustees under Chapter 6.10.

**Mobile Home Park Access way:**  A way providing access for vehicular traffic from a mobile home stand to an abutting collector street, cul-de-sac street or a service street.

**Mobile Home Park Pad:**  That portion of an individual mobile home space reserved for the placement of a mobile home, and structures or additions appurtenant to the mobile home.

**Modular Unit:**  A Uniform Building Code-approved, factory-fabricated, transportable building or major component designed for use by itself or for incorporation with similar units on-site into a structure for residential, commercial, educational, or industrial use.  A modular unit must be placed on a permanent foundation.

**Museum:**  An institution for the collection, display of objects of art, history or science and open to the general public.

**Natural Grade:**  The highest natural elevation of the ground surface, prior to development, next to the proposed walls of a structure. If the natural grade has been disturbed immediately prior to development, the Building Official may establish the natural grade.

**Neighborhood:**  The area adjacent to or surrounding existing or proposed development and characterized by common use or uses, density, style and age of structures and environmental characteristics.

**Net Leasable Area:**  Those areas within a commercial or office building which are or which are designed to be, leased to a tenant and occupied for commercial or office purposes, exclusive of any area including, but not necessarily limited to, areas dedicated to bathrooms, lobbies, stairways, circulation corridors, mechanical areas, space related to the operation and maintenance of the building, and storage areas provided, however, that these areas are used solely by tenants on the site.

**Noise:**  Any sound that interferes with speech and hearing, is intense enough to damage hearing or is otherwise annoying or unwanted.

**Nonconforming Lot:**  A lot that fails to meet the minimum lot size or width standards for the zone district in which it is located.

**Nonconforming Structure:**  Any structure that no longer conforms to the area and bulk requirements for the zone district in which it is located.

BLM_0066252

**Nonconforming Use:**  Any use no longer permitted under the regulations for the zone district in which it is located.

**Nursing Home:**  A home where ill or elderly people are provided with lodging and meals with or without nursing care.

**Occupancy:**  The use or intended use of the land or buildings by proprietors or tenants.

**Office, Business or Professional:**  A use where business, professional, or governmental services are made available to the public, including:  (1)  Business Office - an office for use by persons such as realtors, travel, advertising or insurance agents and property managers providing both products and services, or the home office of a company that sells retail or wholesale products or provides professional services.  (2)  Professional Office - an office for use by persons such as physicians, dentists, lawyers, architects, engineers, accountants and other professionals who primarily provide services rather than products.

**Off-site Sign:**  A type of directional sign generally prohibited in San Miguel County that directs attention to a business, commodity, service, entertainment, attraction or product sold, offered or existing elsewhere than upon the same lot where the sign is located, including billboards.

**Off-street Parking:**  Land anywhere except within a public right-of-way used for parking, storing, or displaying motor vehicles, mobile homes and similar items. Off-street parking shall be paved with all-weather surfacing or covered with gravel and shall be maintained in a usable condition at all times.

**Open Space:**  Area included in any side, rear or front yard or any unoccupied space on the lot or tract that is open and unobstructed to the sky except for the ordinary projections of cornices, eaves, porches and plant material.

**Overburden:**  All earth and other materials lying above natural mineral deposits and other excavated materials that are disturbed from their natural state in the process of excavation.

**Owner:**  Any part owner, joint owner, tenant in common, tenant in partnership, joint tenant or other person with sole or with concurrent legal and/or beneficial title to the whole or to part of a building or land.

**Parcel:**  Any quantity of land and water for which location and boundaries can be established that is designated by its owner or developer as land to be used or developed as a unit, or which has been used or developed as a unit.

**Park:**  Publicly owned land used for active or passive recreational purposes.

**Park Maintenance Building:**  A building within a park used for park operation and maintenance purposes, including but not limited to storage and repair of park vehicles and equipment, greenhouse or park offices.

BLM_0066253

**Particulate Matter:**  Finely divided solid or liquid matter, other than water, that is released into the atmosphere.

**Person:**  An individual, proprietorship, trust, partnership, corporation, association, or other legal entity.

**Planned Unit Development:**  A development provided for by the Planned Unit Development Overlay District wherein certain yards, areas and related standards may be varied and a variety of land uses associated on a tract, the plan of which is subject to approval by the Planning and Zoning Commission and Board of Trustees.

**Planning and Zoning Commission:**  The agency designated in this chapter and appointed by the Board of Trustees as an advisory body to it.

**Plat, Final:**  A map of the subdivision showing accurate surveying by a registered surveyor. The map shall show all streets, alleys, blocks, lots and all other requirements listed in Section 6.05.

**Plat, Preliminary:**  The plat of any lot, tract or parcel of land drawn and submitted in accordance with the requirements of adopted regulations listed in Section 6.04, that is not to be recorded of record, but is only a proposed division of land for review and study by the Town.

**Portable/Wheeled Sign:**  A sign not permanently affixed to the ground, a building, or other permanently affixed structure, which may be moved from place to place and which may be mounted on wheels.

**Pre-application Conference:**  An informal conference held between Town staff or Planning and Zoning Commission and a potential developer for the purpose of obtaining information and guidance prior to formal filing of a land use application.

**Principal Use:**  The primary use for which a parcel and any buildings thereon are developed.

**Projecting Sign:**  Any non-free-standing sign, affixed to or supported by a building or structure, that projects beyond the surface of that portion of the building or structure to which it is affixed or supported by more than six inches.

**Pnblic Building, Shop or Yard:**  Facilities such as office buildings, maintenance yards and shops required by branches of Local, State or Federal Government for service to an area such as Highway Department yard, Town Service Center or Experiment Station.

**Public Facilities/Services:**  Major capital improvements, including but not limited to transportation, sewer, solid waste, drainage, water, education and parks and recreation facilities.

**Public Land:**  Land or interests in land owned by a governmental entity or held in trust for the benefit of the public by a not-for-profit organization.

**Public Right-of-way:**  Any parcel of land unobstructed from the ground to the sky dedicated or

BLM_0066254

appropriated to the general public.

**Public Use:**  Land, buildings and/or facilities owned or operated by a government agency.

**Radio, Television or Microwave Tower:**  Structures supporting antennae for transmitting or receiving any portion of the radio spectrum, but excluding noncommercial antennae installations for home use of radio or television.

**Real Property:**  All real property within the Town of Norwood included within the boundaries of any lot approved and recorded in the plat records of San Miguel County, Colorado, or within the boundaries of any unplatted tract or parcel of land described and recorded in the Real Property Records of San Miguel County, Colorado.

**Recreational Vehicle/Travel Trailer:**  A vehicular portable structure designed for a temporary or short term occupancy for travel, recreation, or vacation.

**Recreational Vehicle/Travel Trailer Park:**  A tract of land designed or being used to accommodate two or more Recreational Vehicles or Travel Trailers for travel, recreation or vacation purposes.

**Refreshment Stand, Temporary:**  The use of a portable building or other temporary facilities for the retail sale of food and beverages in a ready-to-consume state.  This use may be a principal use or an accessory use to a principal use located on the premises.

**Repair Services, Heavy Equipment:**  An establishment engaged in the repair of trucks, buses, agricultural equipment, construction equipment or other heavy equipment.

**Repair Services, Limited:**  An establishment engaged in the repair of personal apparel and household appliances, furniture, and similar items, excluding repair of motor vehicles.  Typical uses include apparel repair and alterations, small appliance repair, bicycle repair, lawn mower repair, clock and watch repair, and shoe repair shops.

**Replatting:**  The re-arrangement of any part or all of a previously platted subdivision, addition, lot or tract.

**Residence:**  Same as dwelling.

**Restaurant, General:**  An establishment where the principal business is the sale of food and beverages in a ready-to-consume state and where the design or principal method of operation is where customers, normally provided with an individual menu, are generally served in non-disposable containers by a restaurant employee at the same table or counter at which said items are consumed.  This use may include take-out service or service to a customer in a motor vehicle.

**Retail, General (Indoors):**  A retail establishment that does not fit the definition of any other land use classification and that does not entail any outdoors sales, service, display, storage or other activity. Typical uses include but are not limited to apparel and accessory stores, camera and photographic supply

BLM_0066255

stores, clothing rental stores, consumer electronics stores, gift, novelty and souvenir shops, liquor stores, luggage and leather goods stores, jewelry stores, music stores and video tape rental stores.

**Retail, General (Outdoors):**  A retail establishment that does not fit the definition of any other land use classification and that entails some outdoors sales, service, display, storage or other activity.  Typical uses include but are not limited to boat dealers, hot tub dealers, recreational vehicle dealers, and monument sales.

**Roof:**  The top covering structure of a building.

**Rooming House:**  See "Boarding House."

**Sales Trailer, Temporary:**  A mobile office trailer used while model homes are being constructed.

**Safety services:**  A facility for conduct of public safety and emergency services, including fire and police protection services and emergency medical and ambulance services.

**School, Elementary or Secondary:**  The use of a site for instructional purposes on an elementary or secondary level, approved under the regulations of the state.

**Secondhand Store or Pawnshop:**  An establishment primarily engaged in the retail sale of previously owned merchandise.

**Setback:**  Open space at grade between a structure and the property line of the lot on which the structure is located, measured by the horizontal distance between the lot line and the closest projection of the principal or accessory building.  Each setback shall remain unoccupied and unobstructed from the ground upward, except for fences.  Where no public dedication exists and the lot line extends to the centerline of the right-of-way, the required yard setback shall equal the distance specified under zone district regulations, plus an additional distance equal to one-half the right-of-way width.

**Sign:**  Any letter, figure, character, mark, plane, point marquee sign, design poster, pictorial, picture, stroke, stripe, line, trademark, or reading matter of illuminated or non-illuminated surface that shall be so constructed, placed, attached, painted, erected, fastened, or manufactured in any manner whatsoever, so that the same shall be used for the attraction of the public to any place, subject, person, firm, corporation, public performance, article, machine, or merchandise whatsoever, that is displayed in any manner whatsoever out of doors.

**Small Scale Subdivision:**      The division of any parcel of land into no more than three lots or parcels. Such action may also include aggregation or reconfiguration of lots. The subdivision consists of a parcel of land in excess of 15,000 square feet, but not more than 45,000 square feet.

**Smoke:**  The visible discharge of particulate matter from a chimney, vent, exhaust or combustion process.

**Stable, Private:**  An accessory building for quartering horses for private use without fee.

BLM_0066256

**Street:**  A public way, other than an alley or driveway, which affords the principal means of access to abutting property.

**Street, collector:**  A street which has the primary function of carrying through traffic, but which also provides access to abutting property.

**Street, local:**   A street which has the primary function of providing access to abutting property, and which does not normally carry through traffic.

**Street Line:**  A dividing line between a lot, tract or parcel of land and a contiguous street, the right-of-way line or easement line.

**Street Width:**  The dimension of the shortest distance between the lines that delineate the right-of-way of a street, road or other way.

**Street Yard:**  The area of a lot that lies between any street line and the facing wall line or lines of the principal building, extended by imaginary lines from the outer corners of the building and parallel to the street to the property lines.  In the case of multiple principal buildings located on a building tract, imaginary lines shall connect the corners of facing walls of adjacent buildings.

**Structural Alterations:**  Any change in the supporting member of a building, such as a bearing wall, column, beam or girder.

**Structure:**  That which is built or constructed, an edifice or building or any kind or any piece of work artificially built up or composed of parts joined together in some definitive manner.

**Subdivider:**  A person, corporation, any other legal entity who causes land to be divided into a subdivision for him or herself or others or seeks authorization therefor.

**Subdivision:**  The division of any parcel of land into two or more parcels, separate interests or interests in common, except when such division:  (1)  Creates parcels of land each 35 or more acres, none of which is intended for use by multiple owners;  (2)  Creates parcels of land, such that the land area of each parcel, when divided by the number of interests therein, results in 35 or more acres per interest;  (3)  Is caused by order of any court in this state or by operation of law;
(4)  Is caused by a lien, mortgage, deed of trust or other security instrument;
(5)  Is caused by a security or unit of interest in any investment trust regulated under the laws of this state, or any other interest in an investment entity;  (6)  Creates cemetery lots;
(7)  Creates an interest or interests in oil, gas, minerals, or water that is now and hereafter severed from the surface ownership of real property; or  (8)  Is caused by the acquisition of an interest in land in the name of a husband and wife or unit of persons in joint tenancy, or as tenants in common;
unless the Board of Trustees finds that steps were taken to establish one of the above conditions (1-8) solely to prevent the division from qualifying for this definition.

**Subdivision Improvements Agreement:**  One or more security arrangement(s) that may be accepted by

BLM_0066257

the Town to secure the construction of such public improvements as are required by this Code as a condition of the approval of a subdivision.

**Supermarket:**  A retail establishment primarily offering for sale meats, fruits, vegetables, bakery products, dairy products, personal care items, cleaning products and similar household items for off-premise consumption.

**Surveyor:**  A licensed surveyor as authorized by the State statutes to practice the profession of surveying.

**Town:**  The Town of Norwood, San Miguel County, Colorado.

**Town Planner:**  The person designated to receive and process plats, amendments to this chapter or the zoning map, and other land use applications and advise the Planning and Zoning Commission and Board of Trustees on matters of planning and/or engineering.

**Toxic and Noxious Matter:**  Any solid, liquid, or gaseous matter that is present in sufficient quantities to endanger health, safety and comfort of persons in the vicinity or that may cause injury or damage to property.

**Trail:**  A multi-purpose easement designed to provide safe and easy passage for non-motorized means of travel.

**Trail Clearing:**  The vertical (v.) clearance from the trail tread to overhead obstructions, or the horizontal (h.) clearance from the edge of the trail tread to obstructions within the required vertical clearance.  The matrix of Trail Construction Standards in Section 5.03 (c) shows the total required horizontal clearance for both sides combined.  For nordic skiing trails, the vertical clearance shown indicates distance above maximum snow depth, and the horizontal clearance indicates the overall requirement including the trail tread width.

**Trail Cross Slope:**  The slope measured perpendicular to the centerline of the trail.

**Trail Cross-slope (X-slope) Range:**  The range of existing topographic slopes on which a particular type of trail may be constructed economically.

**Trail Maximum Profile:**  The maximum slope measured along the centerline of a trail commonly accepted for a particular type of use.

**Trail, Multi-use:**  Multi-use trails are designed for the most restrictive of several types of uses they can accommodate.  They typically accommodate high-volume pedestrian, equestrian, hiking, and mountain biking.

**Trail Tread:**  The useable surface of a trail.

BLM_0066258

**Urban Growth Boundary:** The Master Plan Boundary illustrated in the Norwood Major Streets and Future Land Use Plan and identifying an area surrounding the Town of Norwood that separates urbanizable land from rural land and within which the Plan anticipates that urban growth will be contained.

**Variance:** An adjustment in the application of certain zoning district regulations to a particular parcel of property that, because of special conditions or circumstances peculiar to the particular parcel, is necessary to prevent the property from being deprived of rights and privileges enjoyed by other parcels in the same vicinity and zoning district.

**Vibration:** A periodic displacement of the earth measured in inches.

**Wall Sign:** Any sign painted, placed on, incorporated in or affixed to a building wall, window or canopy, or any sign consisting of cut-out letters or devices affixed to a building wall, window or canopy with no background defined on the building wall, window or canopy, with the exposed face of the sign located in a place substantially parallel to the wall, window or canopy surface on which it is placed.

**Warehouse:** A building or portion of a building for the storage of materials or goods.

**Wrecking or Auto Salvage Yard:** A yard or building where automobiles or parts of automobiles or machinery are stored, dismantled and /or offered for sale in the open as whole units, as salvaged parts or as processed metal.

**Yard:** An open space on the lot that is not obstructed from any point thirty inches (30") above the general ground level of the graded lot to the sky, except as authorized obstructions.

**Yard, front:** A yard adjacent to a front lot line and extending from the lot line a uniform distance into the lot.

**Yard, rear:** A yard adjacent to a rear lot line and extending from the lot line a uniform distance into the lot.

**Zoning Development Permit:** A permit issued by the Town Planner that allows a developer to engage in development in compliance with all applicable sections of this Code and further enables the developer to seek a building permit that would allow the developer to commence actual development.

**Zoning Map:** The certified Official Zoning Map upon which the boundaries of the various zoning districts are drawn.

BLM_0066259

## § 2.03  Interpretations

**(a)**      **Authority.**  The Town Planner shall have the authority to make all interpretations of the text of this chapter, and the boundaries of the Official Zoning Map.

**(b)**      **Initiation.**  An interpretation may be requested by any affected person, any resident or real property owner in the Town of Norwood, or any person having a contractual interest in real property in the Town of Norwood.

**(c)**      **Procedures.**

    **(1)**      **Submission of request for interpretation.**  Before an interpretation shall be provided by the Town Planner, a Request for Interpretation shall be submitted to the Town Planner in a form established by the Town Planner.

    **(2)**      **Determination of completeness.**  Within  a reasonable amount of time after a Request for Interpretation has been received, the Town Planner shall determine whether the request is complete.  If the Town Planner determines the request is not complete, he shall serve written notice on the applicant specifying the deficiencies.  The Town Planner shall take no further action on the Request for Interpretation until the deficiencies are remedied.

    **(3)**      **Rendering of Interpretation.**  After the Request for Interpretation has been determined complete, the Town Planner shall render an interpretation within  a reasonable amount of time. The Town Planner shall consult with the Mayor and Town Attorney and review this chapter and the Official Zoning Map, whichever is applicable, before rendering an interpretation.

**(d)**      **Form.**  The interpretation shall be in writing and shall be sent to the applicant by certified mail.

**(e)**      **Official Record.**  The Town Planner shall maintain an official record of all interpretations in the Town Hall, which shall be available for public inspection during normal business hours.

**(f)**      **Appeal.**  Any person who has made a Request for Interpretation may appeal interpretation of the Town Planner to the Board of Trustees by filing a petition within thirty (30) days of the Town Planner's decision.  The date of the decision shall be the postmark date of the certified mail notifying the applicant of the interpretation.  The petition shall be considered by the Board of Trustees within thirty (30) days of its filing, and the interpretation of the Town Planner affirmed or modified.

BLM_0066260

## § 3.00  ZONING DISTRICT REGULATIONS

### § 3.01  Scope and Applicability

The regulations of this Sec. 3.00 shall apply to all lands located within the corporate limits of the Town of Norwood, Colorado.  All land, buildings, structures or appurtenances thereon located within the Town of Norwood, Colorado, that are hereafter occupied, used, erected, altered, removed, placed, demolished or converted shall be occupied, used, erected, altered, removed, placed, demolished or converted in conformance with the zoning regulations prescribed for the zoning district in which such land or building is located as hereinafter provided.

### § 3.02  Districts Established

In order to implement the Comprehensive Plan and the other purposes and provisions of this Land Use Code, the Town of Norwood, Colorado, is hereby divided into seven (7) zoning districts.  The regulations as set out herein are uniform throughout each district.  The districts established herein shall be known as:

| Abbreviated Designation | Zoning Districts |
|---|---|
| A | Agricultural District |
| R-1 | Residential District |
| MH | Mobile Home District |
| B-1 | Business District |
| P | Public District |
| I | Industrial District |
| MD | Medium Density District |

### §3.03  Official Zoning Map

**(a)    Map adoption.**  The boundaries of the zoning districts set out herein are delineated upon the Official Zoning Map of the Town of Norwood, Colorado, said map being hereby adopted as a part of this chapter as fully as if the same were set forth herein in detail.

**(b)    Zoning map amendment**.  No changes or amendments to the district boundaries shown on the official zoning map shall be made except in compliance and conformity with all procedures set forth in Sec. 6.02, Zoning Map and Land Use Code Amendments including areas rezoned Planned Unit Development Overlay as provided in Section 3.13 (d).   If, in accordance with these procedures, changes or amendments are made to district boundaries, such changes or amendments shall be made promptly after official adoption of the change or amendment as provided for herein.  The Town Planner shall be responsible for the physical updating and amendment of the official zoning map.

BLM_0066261

**(c)** **Map replacement**. In the event that the official zoning map becomes damaged, destroyed, lost or difficult to interpret because of the nature or number of changes and additions, the Board of Trustees may adopt a new official zoning map that shall supersede the prior map. The new official zoning map may correct drafting and clerical errors or omissions in the prior official zoning map, but no such corrections shall have the effect of amending this chapter or any subsequent amendment thereto without a duly noticed public hearing as provided herein. Unless the prior official zoning map has been lost or totally destroyed, the prior map or any significant parts thereof remaining shall be preserved, together with all available records pertaining to its adoption or amendment.

**(d)** **Interpretation of district boundaries.** The district boundary lines shown on the Official Zoning Map are usually along streets, alleys, property lines or extensions thereof. Where uncertainty exists as to the boundaries of districts as shown on the official zoning maps, the following rules shall apply.

(1) Boundaries indicated as approximately following streets, highways or alleys shall be construed to follow the centerline of such street, highway or alley.

(2) Boundaries indicated as approximately following platted lot lines shall be construed as following such lines.

(3) Boundaries indicated as approximately following town limits shall be construed as following town limits.

(4) Boundaries indicated as approximately following the centerline of irrigation ditches or drainage ways shall be construed to follow such centerline.

(5) Boundaries indicated as parallel to or extensions of features indicated in this subsection shall be so construed. Distances not specifically indicated on the original Zoning Map shall be determined from the graphic scale on the Map.

(6) Whenever any street, alley or other public way is vacated by official action of the Board of Trustees the zoning district line adjoining each side of such street, alley or other public way shall be automatically extended to the centerline of such vacated street, alley or way, and all area so involved shall then and henceforth be subject to all regulations of the extended districts.

(7) Where physical features of the ground are at variance with information shown on the Official Zoning Map, or when there arises a question as to how or whether a parcel of property is zoned and such question cannot be resolved by the application of subsections 3.03(d)(1) through (7), the property shall be considered as classified A, Agricultural District, temporarily, and subject to Sec. 3.04.

BLM_0066262

**§ 3.04  Temporary Zoning of Annexed Territory**

**(a)**     All territory hereafter annexed to the Town of Norwood shall be temporarily classified as A, Agricultural District, until permanent zoning is established by the Board of Trustees of the Town of Norwood.  The procedure for establishing permanent zoning on annexed territory shall conform to the procedure established by this chapter for zoning amendments.

**(b)**     In an area temporarily classified as A, Agricultural District, the following regulations shall apply.

   (1)     No person shall erect, construct or proceed or continue with the erection or construction of any building or structure or add to any building or structure or cause the same to be done in any newly annexed territory to the Town of Norwood without first applying for and obtaining a Zoning Development Permit and a Building Permit therefore from the Building Official or the Board of Trustees as may be required herein.

   (2)     No permit for the construction of a building or use of land shall be issued by the Building Official other than a permit that will allow the construction of a building permitted in the A, Agricultural District, unless and until such territory has been classified in a zoning district other than the A, Agricultural District, by the Board of Trustees in the manner provided in subsection 6.02.

BLM_0066263

## § 3.05  Use Regulations

**(a)**     **Use regulations generally.**  Land and buildings in each district may be used for any of the principal or accessory land uses authorized in the regulations set forth for that district in Sec. 3.07, A, Agricultural District through Sec. 3.12, P, Public District and Sec. 3.14, MD, Medium Density District, but no land shall hereafter be used and no building or structure shall hereafter be occupied, used, erected, altered, removed, placed, demolished or converted that is arranged or designed to be used or used for other than those uses specified for the district in which it is located, other than accessory uses incidental to a permitted principal use and complying with the provisions of Sec. 3.05(d)(1), Accessory use or structure, general.

**(b)**     **Use classification**.  The use regulations of the zoning districts are based on the following use classification system.

>     (1)     Purpose and intent.  The purpose of these provisions is to classify uses of land into a number of specially defined land use categories on the basis of common functional characteris-tics and similar compatibility with other uses, thereby providing a basis for regulation of uses in accordance with criteria that are directly relevant to the public interest.  These provisions shall apply throughout this chapter.

>     (2)     Classification of principal uses.  The use categories listed on the following Use Regulations Schedule shall be considered to be principal uses.  A single lot may contain more than one principal use, unless otherwise prohibited by the provisions of this chapter.  All existing and proposed uses shall be classified into the use category that most closely portrays the overall nature of such activity, consistent with the definitions of the use categories in Sec. 2.02, Definitions.  Any use that cannot be so classified shall not be permitted in any district.

**(c)**     **Schedule of use regulations.**  The following Use Regulations Schedule summarizes the use regulations of the districts.  In the event of any conflict between the Use Regulations Schedule and the text of the zoning district regulations, the text shall control.  Uses that were established prior to the adoption of this chapter or its predecessors, but that are now inconsistent with the requirements of this chapter, shall be permitted if such uses meet the requirements of Sec. 1.05, Nonconforming Provisions, for a valid nonconforming use.  The Use Regulations Schedule shall be interpreted as follows.

>     (1)     Permitted uses.  Uses identified in a particular district column with a "P" shall be permitted in such district, subject to compliance with any applicable conditions and all other provisions of this chapter.

>     (2)     Conditional uses.  Uses identified in a particular district column with an "C" shall be permitted in such district only upon approval of a conditional use permit by the Board of Trustees in accordance with the procedures and standards of Sec. 6.10, Conditional use permits.

>     (3)     Temporary uses.  Uses identified in a particular district column with a "T" shall be permitted in such district only upon approval of a temporary use permit in accordance with the

BLM_0066264

procedures and standards of Sec. 6.17, Temporary use permits.

(4)      Not permitted.  Uses not identified in a particular district column with a "P," "C" or "T" are not allowed in such district unless otherwise expressly permitted in this chapter.

(5)      Special use conditions.  Numbers occurring in parenthesis after the names of selected use categories refer to conditions applicable to the use and set forth in Sec. 3.05(d), Special use conditions.

## SCHEDULE OF USE REGULATIONS

| Use Type | Zoning District | | | | | | |
|---|---|---|---|---|---|---|---|
| | A | R 1 | M H | B 1 | I | P | M D |
| **Residential uses** | | | | | | | |
| Single-family dwelling | P | P | P | C | P | | P |
| Medium Density Residential (19) | | C | | | | | |
| Cottage Dwelling Units (17) | | C | | | | | C |
| Double-wide manufactured/ mobile home (12) | P | P | P | | | | P |
| Duplex dwelling | | P | | C | | | P |
| Multi-family dwelling (See Note 1) | | C | | P | | | C |
| Mobile home park (6) | | | P | | | | |
| Mobile home subdivision (6) | | | P | | | | |
| **Accessory and temporary uses** | | | | | | | |
| Accessory use or structure (1) | P | P | P | P | P | P | P |
| Alley house | | C | | | | | |
| Asphalt or concrete batch plant, temporary (3) | | T | T | | T | T | T |
| Building material yard/construction office, temporary | T | T | T | T | T | T | T |
| Caretaker or guard residence | C | | | | P | P | |
| Field office, temporary | T | T | T | T | T | T | T |
| Home occupation (5) | P | P | P | C | | | P |
| Off-street parking, accessory | P | P | P | P | P | P | |
| Sales trailer, temporary (7) | T | T | T | | T | | T |
| Stable, private (8) | P | C | | | C | | |

BLM_0066265

| Use Type | Zoning District | | | | | | |
|---|---|---|---|---|---|---|---|
| | A | R 1 | M H | B 1 | I | P | M D |
| **Educational, institutional and civic uses** | | | | | | | |
| Church or place of worship | P | P | P | P | P | P | |
| Community center (18) | | C | C | C | C | C | C |
| Correctional facility or jail, public | | | | | I | C | |
| Day care center | P | C | C | P | P | P | C |
| Day care home | P | P | P | P | P | P | P |
| Educational Facilities | | | | | P | | |
| Essential services | P | P | P | P | P | P | |
| Events center or fairgrounds | C | | | | | P | |
| Fraternal club or lodge | C | | | P | P | P | |
| Group home | P | P | | P | | | P |
| Hospital or clinic (13) | | C | | C | | C | |
| Library | | | | P | | P | |
| Museum | | | | P | P | P | |
| Nursing home (13) | C | C | | C | C | | C |
| School, elementary or secondary | P | P | | | | P | P |
| Fire station | P | P | P | P | | P | |
| Gas line and regulating station (10) | P | C | C | | | C | |
| Private franchise Utility | | | | | C | | |
| Private utility shop, yard or building | | | | | C | | |
| Public building, shop or yard (10) | | | | P | P | P | |
| Radio, TV or microwave tower (10) | C | | | | | P | P |
| School, commercial trade | | | | | C | | |
| Sewage treatment plant (10) | C | | | | C | | |
| Sewage pump station (10) | P | P | P | C | | P | |
| Water treatment, storage or pump station (10) | C | P | P | C | | P | |
| **Transportation-related uses** | | | | | | | |
| Bus station or terminal (13) | | | | P | P | | |
| Heliport | C | C | | | | P | |
| Parking lot, trucks or trailers (transport) | | | | C | | | |

BLM_0066266

*Chapter 7: Land Use Code*

| Use Type | Zoning District | | | | | | |
|---|---|---|---|---|---|---|---|
| | A | R1 | MH | B1 | I | P | MD |
| Storage or hauling company | | | | | P | | |
| Truck freight terminal | | | | | P | | |
| **Retail uses** | | | | | | | |
| Antique shop (13) | | C | | P | | | |
| Art gallery or handicraft sales (13) | | | | P | | | |
| Art supply store (13) | | | | P | | | |
| Bakery or confectionery shop (13) | | | | P | P | | |
| Bar | | | | P | | | |
| Book or stationary store or newsstand (13) | | | | P | | | |
| Convenience store (13) | | | | P | P | | |
| Department or variety store (13) | | | | P | | | |
| Drug store or pharmacy (13) | | | | P | | | |
| Fabric, drapery and needlework store (13) | | | | P | | | |
| Florist (13) | | | | P | | | |
| Fruit or vegetable stand (13) | P | | | P | P | | |
| Furniture or appliance store (13) | | | | P | P | | |
| Greenhouse or plant nursery (13) | C | | | P | P | | |
| Hardware store and hobby shop (13) | | | | P | P | | |
| Liquor store (13) | | | | P | | | |
| Optical sales (13) | | | | P | | | |
| Paint and wallpaper store | | | | P | | | |
| Pet store (13) | | | | P | P | | |
| Photography shop | | | | P | | | |
| Restaurant (13) | | | | P | | | |
| Retail, general (indoors) (13) | | | | P | | | |
| Retail, general (outdoors) (13) | | | | | P | | |
| Second hand store or pawnshop (13) | | | | P | | | |
| Sporting goods (13) | | | | P | | | |
| Supermarket (13) | | | | P | C | | |
| Toy store or hobby shop (13) | | | | P | | | |

BLM_0066267

| Use Type | Zoning District | | | | | | |
|---|---|---|---|---|---|---|---|
| | A | R I | M H | B 1 | I | P | M D |
| **Personal service uses** | | | | | | | |
| Bank or savings and loan (13) | | | | P | | | |
| Bed and Breakfast (13) | P | P | | P | | | |
| Boarding or rooming house (13) | | | C | C | | | C |
| Cleaning shop or laundry pick-up station (13) | | | | P | P | | |
| Custom personal service (13) | | | C | P | P | | C |
| Hotel or motel (13) | | | | P | C | | |
| Household appliance service and repair (13) | | | | P | P | | |
| Key shop (13) | | | | P | P | | |
| Laundry, self-service (13) | | | | P | P | | |
| Office, business and professional (13) | | | | P | P | | |
| Mortuary or funeral home (13) | | | | P | | | |
| Studio, television or radio (13) | | | | P | P | | |
| Tattoo Parlor | | | | C | | | |
| Tool rental (domestic equipment) (13) | | | | P | P | | |
| Travel bureau or consultant (13) | | | | P | P | | |
| Veterinary clinic (13) | P | | | P | P | | |
| **Recreational and entertainment uses** | | | | | | | |
| Amusement, commercial (2)(13) | | | | P | | | |
| Boat service (13) | | | | C | | | |
| Boat storage and service (13) | | | | | P | | |
| Campground | | | | C | C | C | |
| Day camp for children | C | C | C | | P | P | C |
| Dude ranch | C | | | | | | |
| Equestrian center | C | | | | | P | |
| Park | P | P | P | P | P | P | P |
| Rodeo grounds | C | | | | | C | |
| Recreational vehicle storage and service | | | | | P | | |
| Recreational Vehicle/Travel Trailer Park (11)(13) | | | | C | C | C | |

BLM_0066268

| Use Type | Zoning District | | | | | | |
|---|---|---|---|---|---|---|---|
| | A | R 1 | M H | B 1 | I | P | M D |
| Stable, commercial boarding or rental | C | | | | | | |
| Theater (13) | | | | P | C | | |
| **Automobile and related service uses** | | | | | | | |
| Auto leasing or rental | | | | | P | | |
| Auto parts and accessory sales (indoors) (13) | | | | P | P | | |
| Auto repair garage (13) (15) | | | | P | P | | |
| Car wash (13) | | | | C | P | | |
| Gasoline service station (15) | | | | P | P | | |
| New or used car or truck sales (13) | | | | C | P | | |
| Snowmobile, motorcycle or scooter sales, service (13) | | | | C | P | | |
| Wrecking or auto salvage yard | | | | | C | | |
| **Heavy commercial uses** | | | | | | | |
| Building material sales and yard | | | | | P | | |
| Cabinet and upholstery shop | | | | | P | | |
| Cleaning or laundry plant | | | | | P | | |
| Contractor storage or equipment yard | | | | | | | |
| Electrical substation, high voltage | C | C | C | | C | | |
| Heating or air conditioning shop | | | | | P | | |
| Print shop (13) or Copy Shop | | | | P | P | | |
| Machinery, heavy - sales and rental | | | | | P | | |
| Maintenance and repair service for buildings | | | | | P | | |
| Mini-warehouse-Less than 2500 square feet | | | | | P | | |
| Mini-Warehouse – greater than 2500 square feet | | | | | C | | |
| Plumbing shop | | | | | P | | |
| Repair services, limited (13) | | | | P | P | | |
| Storage warehouse (mini-storage units) (16) | | C | | | P | | |
| Trailer or mobile home sales or rental | | | | | P | | |
| Welding or machine shop | | | | | P | | |

BLM_0066269

| Use Type | Zoning District | | | | | | |
|---|---|---|---|---|---|---|---|
| | **A** | **R I** | **M H** | **B 1** | **I** | **P** | **M D** |
| **Industrial uses** | | | | | | | |
| Asphalt/concrete batching plant, permanent | | | | | | | |
| Food processing | | | | | | | |
| Manufacturing, general | | | | | | | |
| Manufacturing, hazardous/objectionable | | | | | C | | |
| Manufacturing, light | | | | | | | |
| Repair services, heavy equipment | | | | | P | | |
| **Farm-related uses** | | | | | | | |
| Animal pound or kennel (public or private) (13) | C | | | C | P | | |
| Animal production and husbandry (4) | P | | | | | | |
| Farm buildings (under 25' in height) | P | -- | -- | -- | -- | | -- |
| Farm buildings (over 25' in height and under 35') | C | -- | -- | -- | -- | | -- |
| Feed store (13) | | | | P | | | |
| Earth, clay, rock or soil storage | P | | | | | | |

(d)     **Special use conditions**.  The following conditions apply to the listed uses when referenced in the use regulations of a particular zoning district, Sec. 3.07, A, Agricultural District through Sec. 3.13, PUD, Planned Unit Development Overlay District.

(1)     Accessory use or structure.  Accessory uses or structures may be permitted subject to the following conditions:

a.     Such accessory uses shall be limited to those customarily associated with and appropriate, incidental and subordinate to the principal use,

b.     Such accessory uses shall be located on the same lot or tract as the associated principal use.

c.     Such accessory uses shall be controlled in the same manner as the associated principal use, except as otherwise expressly provided in this chapter.

In no event shall an accessory use be construed to authorize a use not otherwise permitted in the

BLM_0066270

zone district in which the principal use is located, and in no event shall an accessory use or structure be established prior to the principal use or structure to which it is accessory.

(2)     Amusement, commercial.  An indoor commercial amusement enterprise shall be wholly enclosed in a building that is treated acoustically so that noise generated by the enterprise is not perceptible at the bounding property line.

(3)     Asphalt or concrete batching plant (temporary).  A temporary asphalt or concrete batching plant permit may be approved by the Planning and Zoning Commission subject to the following conditions.

   a.     The batching plant site shall comply with all applicable provisions of Town, State and Federal laws.

   b.     The batch plant shall not be located within six-hundred feet (600') of a residence.

   c.     Hours of operation will be limited to Monday through Friday, 7:00 a.m. to 7:00 p.m.

   d.     The batch plant permit be valid for up to six (6) months.

   e.     No portion of the batch plant or its operation shall be located on a public street.

   f.     The batch plant shall only furnish concrete, asphalt, or both, to the specific project for which the temporary Zoning Development Permit is issued.  The placement of a temporary batching plant for a private project is restricted to the site of the project.

   g.     The temporary plant shall be operated in a manner that eliminates unnecessary dust, noise and odor (as illustrated by, but not limited to, covering trucks, hoppers, chutes, loading and unloading devices and mixing operations, and maintaining driveways and parking areas free of dust).

   h.     The site must be clear of all equipment, material and debris upon completion of the project.

   i.     All public improvements that are damaged during the operation of the temporary batching plant must be repaired or replaced within thirty (30) days of completion of the project.

   j.     At termination and/or removal of plant permit, permittee shall have the person responsible walk the site with the Building Official or his/her designee to verify the site meets Town approval.

(4)     Animal Production and Husbandry.  The production and care for typical farm animal such

BLM_0066271

as poultry, cows and sheep on a small scale, as in a 4-H project, shall be permitted only on a lot or tract of one acre or more. In the event that the Planning and Zoning Commission receives written complaint from an adjacent property owner that animals or animal husbandry practices on a particular lot or tract are causing a public nuisance or preventing an adjacent property owner from enjoying the use of their property, the animal production and husbandry shall be subject to approval of a conditional use permit and the Commission shall schedule a hearing for the purpose of deciding whether such use may continue. The approval of a Conditional use permit for animal production and husbandry in any zone district shall be subject to the following standards:

    a.    Sec. 6.10, Conditional uses, and

    b.    Sec. 5.07, Performance Criteria.

Animal production and husbandry shall not include the commercial feeding of offal and garbage to swine and other animals or any type of husbandry specifically prohibited by Ordinance or law.

(5)    Home occupation. A home occupation shall be permitted as an accessory use to a dwelling unit subject to compliance with the following conditions.

    a.    A home occupation shall be permitted only when it is an accessory use to a dwelling unit and does not change the essential residential character of the use.

    b.    A home occupation shall not involve any structural alteration in the main building or any of its rooms which changes the residential character.

    c.    A home occupation shall not involve the installation of machinery or additional equipment other than that customary to normal household operations.

    d.    Not more than one person other than a member of the family of the owner or the user of the principal dwelling shall be employed or work in or at such home occupation.

    e.    A person who engages in a home occupation may have one sign no greater than two (2) square feet in size on the building in which the home occupation is located.

    f.    A home occupation shall not operate during the hours other than 8:00 a.m. to 7:00 p.m.

    g.    A home occupation shall not involve more than four (4) patrons on the premises at one time.

    h.    A home occupation shall not generate loud and raucous noise, or utilize mechanical, electrical or other equipment or items that produce noise, electrical or magnetic interference, vibration, heat, glare, smoke, dust, odor or other nuisance causing annoyance outside the residential building or accessory structure by the sense of normal

BLM_0066272

human beings that substantially and unreasonably interferes with the use and enjoyment of adjacent property or interferes with public peace and comfort.

i.      A home occupation does not store outside of the dwelling unit any equipment or materials used in the home occupation.

j.      The home occupation may be located in an accessory building on the property.

k.      A home occupation shall be totally contained within a structure(s) and shall be secondary to primary use of residential.  The floor area devoted to a home occupation shall not exceed fifty (50) percent of the floor area of the primary structure or 1000 square feet, whichever is less.

l.      No retail sales may occur on the premises unless by appointment.  The home occupation shall be a service, contractor or similar businesses whose customers are by appointment only.

m.      There shall be no storage on site of dangerous, toxic, combustible or hazardous materials.

n.      At least one additional off-street parking space shall be provided for the non-resident employee.

o.      The use shall not cause off-site impacts on the surrounding neighborhood due to traffic and deliveries.

p.      The operator of a home occupation may apply to the Town Board for special or temporary outside or other types of activities that may cause off-site noise impacts no more than two (2) times per calendar year.

(6)     Mobile home park or subdivision.  Mobile home parks and mobile home subdivisions shall be subject to the following requirements. Mobile Home Parks shall be reviewed according the procedures and standards included in Sec. 6.10, Conditional Uses and according to the standards listed in Sec. 3.05 (d) (19). Mobile Home Subdivisions shall be reviewed according to the procedures in Sec. 6.04, 6.05, 6.05A, 6.05B, 6.06, 6.07, 6.08 and 6.09 and according to the standards included in Sec. 3.05 (d) (19).

a.      Existing mobile home parks or mobile home subdivisions shall not be enlarged, expanded or additional mobile homes permitted unless the same shall be brought into compliance with the standards of this subsection and the area regulations of section 3.09, MH, Mobile Home District regulations.

b.      Individual mobile homes in mobile home parks or mobile home subdivisions shall not be replaced unless the individual mobile home site is in compliance with the standards of this subsection and the area regulations of section 3.09, MH, Mobile Home

BLM_0066273

District regulations.

c.      Mobile home parks or mobile home subdivisions shall have an internal driveway not less than twenty feet (20') wide and the internal driveway shall be paved with two inches (2") of asphalt.

d.      Each mobile home site in mobile home parks and mobile home subdivisions shall be clearly designated and arranged so that all mobile homes have access to the internal driveway.

e.      There shall be a minimum of twenty feet (20)' between mobile homes.

f.      Mobile home parks and mobile home subdivisions shall be improved with adequate and sufficient night lighting to enable persons to walk in such areas at night without difficulty.

g.      Mobile home parks and mobile home subdivisions shall be properly graded and well drained, so as to prevent the accumulation of surface water.

h.      Each trailer site shall be improved with a four inch (4") concrete or gravel pad. No trailer with a footprint larger than the pad shall be placed on a site. .

i.      All refuse shall be stored in fly-tight, water-tight, rodent-proof, dog-proof containers, which shall be located no more than one hundred feet (150') from each mobile home site.  Containers shall be provided in sufficient number and capacity to properly store all refuse generated in the mobile home park or mobile home subdivision.

j.      Exposed ground surfaces in all parts of a mobile home park or mobile home subdivision shall be paved or covered with stone screening or other solid material, or protected with a vegetative growth that is capable of preventing soil erosion and of eliminating objectionable dust.

k.      A detached, accessory storage building or buildings shall be provided within a mobile home park or mobile home subdivision containing a minimum storage capacity of ten (10) cubic yards per mobile home site.

l.      Mobile home dwelling units shall be "skirted" within sixty (60) days of its placement in a Mobile Home Park or Subdivision by the affixing thereto of a solid, nonporous screening or skirt between the underside of the dwelling unit at its outer edge around ground level.

m.      Exterior boundaries of mobile home parks and mobile home subdivisions shall be developed with a fence, or other acceptable border to create an attractive border.  The land between the fence/border and the public street improvements shall be landscaped with street trees and other landscaping materials and shall be maintained by the owner of

BLM_0066274

the mobile home park.

n.    Mobile home parks and mobile home subdivisions shall connect to the sanitary sewer system of the Norwood Sanitation District.  All utility lines shall be installed underground.

o.    Each mobile home park or mobile home subdivision shall include a recreational area and facilities for the use and enjoyment of the residents encompassing an area of ten percent (10%) or two (2) acres, which ever is less, of the total area of the mobile home park or mobile home subdivision.  Lawns, parking, driveways, accessway, streets, etc shall not be considered part of the required recreational area and facilities.

p.    Notwithstanding any other provision of this chapter, mobile home sites in mobile home parks and mobile home lots within mobile home subdivisions shall be developed according to the area regulations for mobile home dwellings set forth in Sec. 3.09, MH, Mobile Home District regulations, except as such standards may be modified by more restrictive conditions imposed by the Board of Trustees in a Planned Unit Development Overlay District.

q.    All parks and individual mobile home sites shall be provided with safe, convenient, all season pedestrian access of adequate width for the intended use.

r.    The minimum size of a mobile home park or subdivision shall be five (5) acres.

(7)    Sales trailer, temporary.  A temporary use permit may be issued by the Planning and Zoning Commission for a mobile office trailer used while model homes are being constructed, subject to the following conditions:

a.    A temporary permit allowing sales from a mobile office trailer may be issued for a period not to exceed one hundred twenty (120) days from approval of a Zoning Development Permit, with no extensions, while permanent model homes are being constructed.

b.    The trailer shall not be used for living or sleeping purposes.

c.    Skirting shall be installed around the trailer to conceal the undercarriage.

d.    The trailer shall be located in a platted subdivision on a lot that is owned by the applicant/builder and shall not be located within a required front yard.

e.    A building permit must be issued for the model home at the time of the temporary permit for the trailer.

(8)    Stable, private.  A private stable shall be located on a lot or tract containing a minimum of two (2) acres of land and shall be set back from all adjacent property lines at least fifty feet.

BLM_0066275

(9)     Multi-family dwelling.  Multi-family dwellings are permitted in the B-1, Business District only in conjunction with, attached to, and under the same roof as a permitted non-residential use(s).

(10)     Utility structures and facilities (above ground).  Above ground utility structures and facilities, shall be comply with the requirements of Sec. 5.05, Landscaping and Screening.

(11)     Recreational Vehicle/Travel Trailer Park and Campground.  A recreational vehicle/travel trailer park, campground and incidental facilities shall comply with the standards in this section.

    a.     Such areas may be occupied only by persons using travel trailers, truck campers and tents for overnight and short duration camping (30 consecutive days maximum or a total of 30 days within any 120 day period);

    b.     Each space for travel trailers, truck campers and tents shall be at least 1500 sq. ft. in area;

    c.     Each space shall be at least 30 ft. in width;

    d.     Each park or camping area shall connect be served by the Norwood Water Commission and the Norwood Sanitation District;

    e.     No dependent travel trailer, truck camper or tent shall be located more than 200 ft. from a water and sewage service building; and

    f.     Provisions shall be made for adequate all-weather parking and walkways to each space.

    g.     No park or campground shall be used for long term housing (stays of longer than 30 consecutive days or a total of 30 days within any 120-day period).

    h.     Parks and campgrounds shall be landscaped and screened from adjacent roadways and residential land uses.

    i.     The minimum setback from a residential use may be increased and the Town may apply the screening and landscaping standards included in Sec. 5.05 as necessary as part of a conditional use review outlined in Sec. 6.10.

    j.     Recreational vehicle/travel trailer parks shall not exceed 2 acres.

    k.     Convenience establishments may be permitted as an accessory use subject to the following restrictions:
        i.     such establishment shall be restricted in their uses to occupants of the park.
        ii.     such establishment shall present no visible evidence from any street

BLM_0066276

outside the park of their commercial character which would attract customers other than occupants of the park.

iii.      the structure of such facility shall not be located closer than 100 feet to any public street and shall be accessible only from a street within the park or campground.

iv.      should the recreational vehicle park be discontinued, the convenience establishment shall also be discontinued.

(12)    Double-wide manufactured/ mobile home.  Not withstanding other provisions to the contrary, a HUD Standard double-wide manufactured/ mobile home shall be permitted subject to the following conditions:

a.      The roof must be pitched, have overhangs and be constructed of materials that are the same as, or resemble standard house roofs.  Bowed roofs, and/or roofs painted with aluminum appearing tar are not acceptable.

b.      The siding must be brick, rock, vinyl, stucco, wood or cosmetically similar to standard house siding.  Mobile home type, "slick siding" is not acceptable.

c.      There must be off-street parking provided.

d.      If there is no garage, an enclosed outside storage area must be provided.

e.      There shall be a permanent foundation meeting the UBC Guidelines for Manufactured Housing Installation and there shall be a continuous perimeter that produces the appearance of a site built home.

f.      All axles, wheels and hitches must be removed.

g.      The residence shall be a minimum of 21 feet wide with an average roof pitch of at least 4:12, a minimum eave overhang of 12 inches, a minimum floor area of 800 square feet and shall be designed for a 40 pound snowload.

i.      The double-wide manufactured/mobile home shall be subject to all of the setback and minimum lot area requirements of the underlying zone district.

j.      The ownership of the home and the lot or parcel shall be the same.

How the structure appears is very important.  How the structure was put together is not as important as how the finished product looks.  If the structure "looks and feels" like a house, even though it was delivered to the site in a similar fashion to the way mobile homes are, and it meets the above criteria, the structure would be permitted as if it were a single family house and as a use permitted by right.

(13)    Commercial Development in B-1 District.  Commercial Development permits may be

BLM_0066277

issued only where alley service access is dedicated to adequately serve the proposed commercial development across the rear of the subject property.  Such access shall be consistent with the standards of Section 4.03 (j) and the Town of Norwood Major Streets and Future Land Use Plan.  The condition may be waived in accordance with Section 4.03(m).

(14)   Alley House, Accessory.  An accessory alley house may be permitted as an accessory use to a conforming single family dwelling including a double wide manufactured/mobile home, subject to the following conditions:

    a.      The alley house may contain up to 500 square feet or 50% of the finished and heated square footage of an otherwise conforming single family dwelling or double-wide manufactured/mobile home (excluding garage space) whichever is less;

    b.      One (1) additional off-street parking space with access to and from an alley shall be provided for the alley house, in addition to off-street parking otherwise required in Sec. 5.02 (d);

    c.      The alley house may be attached or detached to an otherwise conforming single family dwelling unit or a double wide manufactured/mobile home, a garage or other accessory building, subject to compliance with applicable setbacks and maximum lot coverage requirements;

    d.      All applicable water and sewer fees shall be paid for the accessory alley house as required for any residence or dwelling unit; and

    e.      The alley house shall not be sold separately.

(15)   Auto Repair Garage.  Auto repair garages may be permitted subjects to the following conditions:

    a.      All parts and equipment shall be shored indoors at all times or screened from off-site view.

    b.      There shall be no off-site parking of vehicles awaiting repairs.

(16)   Storage warehouses (mini-storage units) Storage units may be permitted as a conditional use subject to the following conditions:

    a.      Daily hours of operation 8 A.M. to 8 P.M.

    b.      6 foot perimeter fencing that will be conductive to the neighborhood.

    c.      Unlit signage.

    d.      No exterior storage allowed at this site, including but not limited to boats, motor

BLM_0066278

homes, trailers, or automobiles.

e.    Covered trash dumpsters adequate to serve the facility shall be maintained on site at all times.

f.    No commercial or retail business shall be permitted on site.  Units will be used for the purpose of storage only.

g.    Exterior lighting shall illuminate downward.

h.    A landscape plan that allows the property to blend with the surrounding area.

i.    Location and surrounding uses must be considered.

(17)   Cottage Housing Development.  A cottage housing development may be permitted, subject to the following conditions:

a.    The minimum lot area requirement for a cottage housing development shall be thirty thousand (30,000) square feet and the maximum shall be 45,000 square feet.

b.    The maximum lot coverage for a cottage dwelling unit shall be 850 square feet.

c.    The maximum floor area for a cottage housing dwelling unit shall be one thousand five hundred (1,500) square feet or 1.5 times the lot coverage, whichever is less. Interior stairways shall be allocated between floors served. The floor area of attached garages shall be included in total floor area.

d.    The following areas shall not be included in floor area calculations:
1.    Unheated storage space which is more than ¾ below grade;
2.    Architectural projections such as bay windows, fireplaces or utility enclosures not greater than eighteen (18)  inches in depth or six (6) feet in width;
3.    Attached porches with roofs.

d.    Cottage Housing Developments shall include a minimum of four (4) units and a maximum of nine (9) cottage dwelling units, all included in one development application site plan.

e.    Cottage Housing Development shall not exceed one unit per 2500 square feet lot area, and shall not exceed nine units.

f.    Cottage dwelling units are encouraged to have a covered porch.

g.    A minimum of two hundred and fifty (250) square feet of common open space shall be included for each cottage dwelling unit. At least fifty (50) percent of the each

BLM_0066279

cottage dwelling unit shall abut common open space. All cottage dwelling units shall be within sixty (60) feet of common open space and the common open space shall have cottage dwelling unit abutting at least fifty percent of its boundaries.

h.      Parking shall be provided for each cottage dwelling unit as follows:
1. Units less than 750 square feet:     one space
2. Units 750 square feet or greater:   two spaces

i.      The rules and regulations of the Norwood Water Commission, Norwood Sanitation District and the Norwood Fire Protection District shall apply to all cottage housing developments.

j.      The floor area shall not be increased following construction.

k.      Approval of a condominium subdivision by the Town of Norwood Board of Trustees. The condominium shall include covenants to guide design and use and a phasing plan for development.

l.      The town grid pattern shall be respected in site plans.

m.      A phasing plan shall be submitted for the project.


(18)    Community Center. A Community Center may be permitted as a conditional use subject to the following conditions:

a.      The use provides adequate off-street parking. At a minimum, one space shall be provided for every five hundred square feet of usable floor area and one space per four seats of auditorium area.

b.      The use will be compatible with the surrounding uses allowed in the zone district.

c.      Lighting will be screened.

d.      Noise will not interfere with the surrounding uses allowed in the zone district.

e.      Adequate provision has been made in the design and/or the location of the building for loading and unloading of people, equipment and supplies.

f.      Hours of operation do not exceed 8 a.m. to 9 p.m, or as conditioned by the Town in its review to minimize impacts on surrounding uses.

g.      The access and streets in the vicinity of the site are adequate for the use.

h.      Except at private, invitation-only functions, no alcohol may be served except

BLM_0066280

pursuant to a valid special events liquor license.

(19)     Medium density within the R-1 Zone District, manufactured housing and/or mobile home parks and subdivisions, and trailer parks may be permitted as a Special Use subject to meeting the following standards:

a.     The use is compatible with the surrounding neighborhood.

b.     Roads accessing the development are adequate for traffic generated by the use or the applicant's plan for mitigating the impacts is acceptable to the Town.

c.     Impacts associated with the use such as but not limited to traffic, parking and noise are adequately mitigated through measures included in the applicant's plan.

d.     The development provides a variety of model or building types that are compatible with the surrounding neighborhood.

e.     The plans are designed to break up the scale of the project and to provide visual diversity.

f.            The project is located adjacent to or close enough to the Town's commercial core, schools and other services so as to minimize vehicle use.

g.     The use can be designed and constructed to achieve compatibility with the surrounding environment and in harmony with the site's environmental characteristics.

h.     Utilities in the vicinity of the property are adequate to serve the development or the applicant can bring the utilities to a level of service to serve the development without negatively affecting existing utility users.

BLM_0066281

**§ 3.06  Area Regulations**

**(a)      Schedule of residential area regulations.**  The following Residential Area Regulations Schedule summarizes the regulations of this chapter with regard to minimum lot size, minimum yards, maximum lot coverage, minimum floor area per dwelling unit and maximum building height of residential uses in the various zoning districts.  The standards shown in the following schedule may be modified by additional provisions contained in this section or in the individual district regulations.  In the event of any conflict between the text of this chapter and the Schedule of Residential Area Regulations, the text shall control.

### RESIDENTIAL AREA REGULATIONS

| Development Standard | Zoning District | | | | | | |
|---|---|---|---|---|---|---|---|
| | A | R-1 | MH | B-1 | I | PUD | MD |
| **Single-Family** | | | | | | | |
| Min. Lot Area/unit (sq. ft.) | 2 Ac. | 7,500 | 3,000 | 7,500 | -- | 4,000 | 3,500 |
| Min. Lot Width (ft.) | 200 | 48 | 30 | 48 | -- | 40 | 40 |
| Min. Front Yard (ft.) | 40 | 15 | 25 | 15 | -- | 15 | 15 |
| Min. Side Yard (ft.) | 25 | 10 | 10 | 10 | -- | -- | 5-10 |
| Min. Rear Yard (ft.) | 25 | -- | 10 | 0 | -- | 10 | 0 |
| Max. Lot Cover (%) | 25% | 40% | 25% | 25% | -- | 40% | 45% |
| Min. Floor Area (sq. ft.) | 800 | 800 | 800 | 800 | -- | 800 | 800 |
| Min. Common Open Space (%) | -- | -- | -- | -- | -- | 25% | -- |
| Max. Height (ft.) | 25 | 25 | 25 | 25 | -- | 30 | 30 |
| **Cottage Housing Development** | | | | | | | |
| Min. Lot Area/unit (sq. ft.) | -- | 2,500 | -- | -- | -- | 2,500 | 2,500 |
| Min. Lot Width (ft.) | -- | 35 | -- | -- | -- | 40 | 40 |
| Min. Front Yard (ft.) | -- | 15 | -- | -- | -- | 15 | 15 |
| Min. Side Yard (ft.) | -- | 5 | -- | -- | -- | 5 | 5-10 |
| Min. Rear Yard (ft.) | -- | 5 | -- | -- | -- | 5 | 5-10 |
| Max. Lot Cover (%) | -- | 40% | -- | -- | -- | 40% | 45% |
| Min. Floor Area (sq. ft.) | -- | 500 | -- | -- | -- | 500 | 500 |
| Min. Common Open Space % | -- | -- | -- | -- | -- | 25% | 25% |
| Max. Height  (ft.) | -- | 18 | -- | -- | -- | 18 | 18 |

BLM_0066282

### RESIDENTIAL AREA REGULATIONS

| Development Standard | Zoning District | | | | | | |
|---|---|---|---|---|---|---|---|
| | A | R-1 | MH | B-1 | I | PUD | MD |
| **Duplex** | | | | | | | |
| Min. Lot Area/unit (sq. ft.) | -- | 5,000 | -- | 5,000 | -- | 3,000 | 3,500 |
| Min. Lot Width (ft.) | -- | 60 | -- | 48 | -- | 50 | 60 |
| Min. Front Yard (ft.) | -- | 15 | -- | 15 | -- | 25 | 15 |
| Min. Side Yard (ft.) | -- | 10 | -- | 10 | -- | 6 | 5-10 |
| Min. Rear Yard (ft.) | -- | -- | -- | 0 | -- | 10 | 0 |
| Max. Lot Cover (%) | -- | 40% | -- | 25% | -- | 50% | 40% |
| Min. Floor Area (sq. ft.) | -- | 500 | -- | 500 | -- | 500 | 500 |
| Min. Common Open Space | -- | -- | -- | -- | -- | 25% | -- |
| Max. Height (ft.) | -- | 25 | -- | 25 | -- | 35 | 30 |
| **Multi-Family** | | | | | | | |
| Min. Lot Area (sq ft) | -- | 2,800 | -- | 5,000 | -- | 2,800 | 2,500 |
| Min. Lot Width (ft.) | -- | 60 | -- | 60 | -- | 50 | 60 |
| Min. Front Yard (ft.) | -- | 15 | -- | 15 | -- | 25 | 15 |
| Min. Side Yard (ft.) | -- | 10 | -- | 10 | -- | 10% | 5-10 |
| Min. Rear Yard (ft.) | -- | 10 | -- | 10 | -- | 10 | 10 |
| Max. Lot Cover (%) | -- | 40% | -- | 100% | -- | 40% | 40% |
| Min. Floor Area (sq. ft.) | | | | | | | 350 |
| Min. Common Open Space (%) | -- | -- | -- | -- | -- | 25% | -- |
| Max. Height (ft.) | -- | 25 | -- | 25 | -- | 35 | 30 |
| **Mobile Home** | | | | | | | |
| Min. Lot Area/unit (sq ft) | -- | -- | 3,000 | -- | -- | 3,000 | |
| Min. Lot Width (ft.) | -- | -- | 38 | -- | -- | 30 | |
| Min. Front Yard (ft.) | -- | -- | 25 | -- | -- | 25 | |
| Min. Side Yard (ft.) | -- | -- | 10 | -- | -- | 10 | |
| Min. Rear Yard (ft.) | -- | -- | 10 | -- | -- | 10 | |
| Max. Lot Cover (%) | -- | -- | 30% | -- | -- | 30% | |
| Min. Common Open Space (%) | -- | -- | -- | -- | -- | 25% | |
| Max. Height (ft.) | -- | -- | 25 | -- | -- | 25 | |

BLM_0066283

## RESIDENTIAL AREA REGULATIONS

| Development Standard | Zoning District | | | | | | |
|---|---|---|---|---|---|---|---|
| | A | R-1 | MH | B-1 | I | PUD | MD |
| Alley House (on same lot as a single family dwelling or double wide unit) | | | | | | | |
| Min. Lot Area/unit (sq ft) | | 7500 | | | | | |
| Min. Lot Width (ft.) | | -- | | | | | |
| Min. Front Yard (ft.) | | | | | | | |
| Min. Side Yard (ft.) | | 10 | | | | | |
| Min. Rear Yard (ft.) | | 0 - 10 | | | | | |
| Max. Lot Cover (%) | | 50 UP TO 5000 SF | | | | | |
| Min. Common Open Space (%) | | | | | | | |
| Max. Height (ft.) | | 18 | | | | | |

**(b)      Schedule of nonresidential area regulations.**  The following Nonresidential Area Regulations Schedule summarizes the regulations of this chapter with regard to minimum yards, maximum lot coverage, maximum floor area ratio, maximum floor area ratio and maximum building height of nonresidential uses in the various zoning districts.  In the event of any conflict between the text of this chapter and the Schedule of Nonresidential Area Regulations, the text shall control.

## NONRESIDENTIAL AREA REGULATIONS

| Development Standard | Zoning Districts | | | | | |
|---|---|---|---|---|---|---|
| | A | R-1 | B-1 | I | PUD | MD |
| Min. Lot Area (sq.ft.) | 2 ac. | 7,500 | 5,000 | 6000 | 4000 | |
| Min. Lot Width (ft.) | 200 | 48 | -- | 50 | 40 | |
| Min. Front Yard (ft.) | 40 | 15 | -- | 15 | 15 | |
| Min. Side Yard (ft.) | 25 | 10 | -- | 10 | -- | |

BLM_0066284

### NONRESIDENTIAL AREA REGULATIONS

| Development Standard | Zoning Districts | | | | | |
|---|---|---|---|---|---|---|
| | A | R-1 | B-1 | I | PUD | MD |
| Min. Rear Yard (ft.) | 25 | 10 | 10 <br><br>From alley center line; 0 ft. if alley is dedicated plus 5 for ingress/ egress | 10 | 10 | |
| Max. Lot Cover (%) | 25% | 25% | 100% | 50% | 50% | |
| Min. Common Open Space (%) | -- | -- | -- | -- | 25% | |
| Max. Height (ft.) | 25 | 25 | 35 | 30 | 35 | |

**(c)     Minimum lot area per dwelling unit.**  Residential uses shall comply with the minimum lot area per dwelling unit standards contained in the district regulations and summarized in the Residential Area Regulations Schedule, as may be modified by additional provisions in the district regulations, in this subsection or elsewhere in this chapter.

**(d)     Minimum lot width.**  Lots used for residential uses shall comply with the minimum lot width standards contained in the district regulations and summarized in the Residential Area Regulations Schedule, as may be modified by additional provisions in the district regulations, in this subsection or elsewhere in this chapter.

>     (1)     Measurement.  Lot width shall be the length of the minimum required front yard setback line between the two side lot lines.  If the front yard setback line is an arc or a curve, the lot width shall be the length of said arc or curve.

>     (2)     Cul-de-sacs.  Notwithstanding any other provisions of this chapter, lots fronting on a cul-de-sac shall have a minimum front street line of fifty feet (50') and a minimum lot width of seventy-five feet (75'), provided that this provision shall not apply in the PUD, Planned Unit Development Overlay District.

**(e)     Minimum floor area per dwelling unit.**  Residential uses shall comply with the minimum floor area per dwelling unit standards contained in the district regulations and summarized in the Residential Area Regulations Schedule, as may be modified by additional provisions in the district regulations, in this subsection or elsewhere in this chapter.

>     (1)     Measurement.  The floor area of a dwelling, for the purpose of these minimum

BLM_0066285

floor area per dwelling unit requirements, refers to the total of the horizontal area of each floor, measured from the outside face of the building walls and excluding garages, carports, cellars and accessory buildings.

**(f)     Minimum front yard setback.**  The location of buildings shall comply with the minimum front yard setback standards contained in the district regulations and summarized in the Residential and Nonresidential Area Regulations Schedules, as may be modified by additional provisions in the district regulations, in this subsection or elsewhere in this chapter.

(1)     Corner lots.  For lots with frontage on two (2) intersecting streets, the front yard shall be the yard adjacent to the shorter of the two street lines, unless otherwise designated on the plat approved by the Planning and Zoning Commission or by Resolution approving the Planned Unit Development.

(2)     Double frontage lots.  Where lots have double frontage, running through from one street to another, a required front yard shall be provided on both streets unless a building line for accessory buildings has been established along one frontage on the plat or by Resolution, in which event only one (1) required front yard need be observed.

(3)     Accessory buildings.  Detached accessory buildings shall not be located within ten feet (10') of any other building.

**(g)     Minimum side yard setback.**  The location of buildings shall comply with the minimum side yard setback standards contained in the district regulations and summarized in the Residential and Nonresidential Area Regulations Schedules, as may be modified by additional provisions in the district regulations, in this subsection or elsewhere in this chapter.

(1)     Corner lots.  For lots with frontage on two (2) intersecting streets, the side yard shall be the yard adjacent to the longer of the two street lines, unless otherwise designated on the plat approved by the Planning and Zoning Commission or by Resolution, subject to the following provisions.

a.     On a corner lot used for a single-family or duplex dwelling, both street exposures shall be treated as front yards on all lots platted after the effective date of this Ordinance chapter.

b.     On a corner lot used for a single-family or duplex dwelling that was an official lot of record prior to the effective date of this chapter, the minimum side yard adjacent to a side street shall comply with the minimum required side yard for the respective district.

(2)     Accessory buildings.  Detached accessory buildings shall have a side yard of not less than three feet (3') measured from any side lot line, alley line or easement line. Where a one (1) hour fire wall is provided, no side yard need be provided, on one side of a lot only.  Detached accessory buildings shall not be located within ten feet (10') of any

BLM_0066286

other building.

**(h)     Minimum rear yard setback.**  The location of buildings shall comply with the minimum rear yard setback standards contained in the district regulations and summarized in the Residential and Nonresidential Area Regulations Schedules, as may be modified by additional provisions in the district regulations, in this subsection or elsewhere in this chapter.

(1)     Accessory buildings.  Detached accessory buildings may be located within a required rear yard, provided that, if no alley exists, the rear yard shall not be less than ten feet (10') as measured from the rear lot line.  Detached accessory buildings shall not be located closer than ten feet (10') to any other building.

**(i)     Maximum lot coverage.**  The size of buildings shall comply with the maximum lot coverage standards contained in the district regulations and summarized in the Residential and Nonresidential Area Regulations Schedules, as may be modified by additional provisions in the district regulations, in this subsection or elsewhere in this chapter.

**(j)     Maximum height.**  The height of buildings and structures shall comply with the maximum height standards contained in the district regulations and summarized in the

Residential and Nonresidential Area Regulations Schedules, as may be modified by additional provisions in the district regulations, in this subsection or elsewhere in this chapter.

(1)     Measurement.  Height refers to the maximum possible upward distance to the top of a building, measured adjacent to a building at a right angle to the horizon line from each and every point on the finished grade

(2)     Permitted exceptions.

(a)     The ridge of a gable, hip, gambrel or similar pitched roof may extend up to five feet above the specified maximum height limit;

(b)     Antennas, chimneys, flues, vents or similar structures may extend up to ten feet above the specified maximum height limit, and radio transmission antennas may extend above the specified maximum limit with the approval of the Planning and Zoning Commission;

(c)     Water towers and mechanical equipment may extend up to five feet above the specified maximum height limit;

(d)     Church spires, bell towers and like architectural features, as well as flag poles, may extend over the specified maximum height limit;

(e)     Schools, churches and public administration buildings in residential zone districts may exceed the established height limitation by fifty percent,

BLM_0066287

provided they comply with all other requirements for the zone district and that the total floor area of the structure does not exceed the total area of the lot on which the building is located.

## § 3.07  A, Agricultural District

**(a)**     **Purposes.**  The A, Agricultural District is designed primarily for agricultural uses and for single-family development on lots of two acres or greater if required by septic system requirements.  It is also intended for application as Temporary Zoning following annexation but prior to final subdivision approval, as defined in subsection 3.04.  In addition to the use and area regulations of this section, development in the A, Agricultural District shall be in compliance with all other applicable provisions of this chapter.

**(b)**     **Permitted uses**.  The following uses shall be permitted in the A, Agricultural District, subject to compliance with any applicable conditions and all other provisions of this chapter.

Accessory use or structure
Animal production and husbandry, subject to Sec. 3.05(d)(4)
Bed and breakfast
Church or place of worship
Day care center
Day care home
Double-wide manufactured/ mobile home, subject to Sec. 3.05(d)(12)
Essential services
Earth, clay, rock or soil storage
Farm buildings (under 25' in height)
Fire station
Fruit or vegetable stand
Gas line and regulating station
Group home
Home occupation, subject to Sec. 3.05(d)(5)
Park
Veterinary clinic
School, elementary or secondary
Sewage pump station
Single-family dwelling
Stable, private, subject to Sec. 3.05(d)(8)
Water treatment, storage or pump station

BLM_0066288

**(c)     Conditional uses**.  The following uses shall be permitted in the A, Agricultural District only upon approval of a Conditional use permit by the Board of Trustees in accordance with the procedures and standards of Sec. 6.10, Conditional use permits.

> Animal pound or kennel (public or private)
> Boarding or rooming house
> Caretaker or guard residence
> Day camp for children
> Dude ranch
> Electrical substation, high voltage
> Equestrian Center
> Events center or fairgrounds
> Farm buildings (over 25' in height and under 35')
> Fraternal club or lodge
> Greenhouse or plant nursery
> Heliport
> Nursing home
> Radio, TV or microwave tower
> Rodeo grounds
> Sewage treatment plant
> Stable, commercial boarding or rental

**(d)     Temporary uses.**  The following uses shall be permitted in the A, Agricultural District only upon approval of a temporary use permit in accordance with the procedures and standards of Sec. 6.17, Temporary use permits.

> Building material yard/construction office, temporary
> Field office, temporary
> Sales trailer, temporary, subject to Sec. 3.05(d)(7)

**(e)     Minimum lot area.**  The minimum lot area for all uses in the A, Agricultural District shall be two (2) acres or 87,120 square feet, subject to Sec. 3.06(c).

**(f)     Minimum lot width.**  The minimum lot width for all uses in the A, Agricultural District shall be two hundred feet (200'), subject to Sec. 3.06(d).

**(g)     Minimum front yard.**  The minimum front yard for all uses in the A, Agricultural District shall be forty feet (40'), subject to Sec. 3.06(f).

**(h)     Minimum side yard.**  The minimum side yard in the A, Agricultural District shall be twenty-five feet (25') for all uses, subject to Sec. 3.06(g):

**(i)     Minimum rear yard.**  The minimum rear yard in the A, Agricultural District shall be ten feet (10') for residential uses and fifteen feet (15') for nonresidential uses, subject to Sec. 3.06(h).

BLM_0066289

**(j)**     **Maximum lot coverage.**  The maximum lot coverage in the A, Agricultural District shall be twenty-five percent (25%) for all uses, subject to Sec. 3.06(i).

**(k)**     **Maximum height.**  The maximum height of buildings and structures in the A, Agricultural District shall be twenty-five feet (25') for all uses, subject to Sec. 3.06(k).

**(l)**     **Minimum floor area per unit.**  The minimum floor area per dwelling unit in the A, Agricultural District shall be eight hundred (800) square feet, subject to Sec. 3.06(e).

BLM_0066290

**§ 3.08      R-1, Residential District**

**(a)      Purpose.**  The R-1, Residential District is designed to accommodate a variety of housing types and to promote diversity.  It is intended for application in areas designated "Res. P-1 or Res. P-2" on the Future Land Use map of the Comprehensive Plan.  In addition to the use and area regulations of this section, development in the R-1, Residential shall be in compliance with all other applicable provisions of this chapter.

**(b)      Permitted uses**.  The following uses shall be permitted in the R-1, Residential District, subject to compliance with any applicable conditions and all other provisions of this chapter.

> Accessory use or structure, subject to Sec. 3.05(d)(1)
> Bed and breakfast
> Church or place of worship
> Day care home
> Double-wide manufactured/ mobile home, subject to Sec. 3.05(d)(12)
> Duplex dwelling
> Essential services
> Fire station
> Group home
> Home occupation, subject to Sec. 3.05(d)(5)
> Park
> School, elementary or secondary
> Single-family dwelling
> Water treatment, storage or pump station

**(c)      Conditional uses.**  The following uses shall be permitted in the R-1, Residential District only upon approval of a Conditional use permit by the Board of Trustees in accordance with the procedures and standards of Sec. 6.10, Conditional use permits.

> Alley house, accessory, subject to Sec. 3.05 (d) (14)
> Antique shop
> Boarding or rooming house
> Community center, subject to Sec. 3.05 (d) (18)
> Cottage Housing Development
> Custom personal services
> Day camp for children
> Day care center
> Electrical substation, high-voltage
> Gas line and regulating station
> Heliport
> Hospital or clinic
> Medium Density, subject to Sec. 3.05 (d) (19)
> Multi-family dwelling
> Nursing home

BLM_0066291

Stable, private, subject to Sec. 3.05(d)(8)
Storage warehouse (mini-storage units), subject to Sec 3.05 (d)(16)

**(d)     Temporary uses.**  The following uses shall be permitted in the R-1, Residential District only upon approval of a temporary use permit in accordance with the procedures and standards of Sec. 6.17, Temporary use permits.

Asphalt/concrete batch plant, temporary, subject to Sec. 3.05(d)(3)
Building material yard/construction office, temporary
Field office, temporary
Sales trailer, temporary, subject to Sec. 3.05(d)(7)

**(e)     Minimum lot area per dwelling.**  The minimum lot area per dwelling unit in the R-1, Residential District shall be as follows, subject to Sec. 3.06(c):

(1)     Seventy-five hundred (7,500) square feet per single-family and unit or five thousand (5,000) square feet per single-family dwelling for lots created prior to adoption of Ordinance #256 on 12-03-86, and

(2)     Five thousand (5,000) square feet per duplex dwelling unit, and

(3)     Two Thousand five hundred (2,500) square feet multi-family dwelling unit.

(4)     Two thousand five hundred (2500) square feet per Cottage Housing Unit.

(5)     Alley House:   Seven thousand five hundred (7500 square feet) for a combination single family dwelling unit and alley house, provided that an alley house is constructed after or concurrently with a single family dwelling unit on the same lot.

**(f)     Minimum lot width.**  The minimum lot width in the R-1, Residential District shall be as follows, subject to Sec. 3.06(d):

(1)     forty-eight feet (48') for single-family dwellings, and

(2)     sixty feet (60') for duplex or multi-family dwellings, and

(3)     thirty-five feet (35') for cottage housing.

**(g)     Minimum front yard.**  The minimum front yard setbacks for all uses in the R-1, Residential District shall be fifteen feet (15'), subject to Sec. 3.06(f).

**(h)     Minimum side yard.**  The minimum side yard setbacks for all uses in the R-1, Residential District shall be ten feet (10') for all uses, subject to Sec. 3.06(g). For Cottage Housing Developments, the setback shall be an average of ten (10) feet but no less than five (5) feet, subject to Sec. 3.06(g).

BLM_0066292

**(i)** **Minimum rear yard.** The minimum rear yard setbacks in the R-1 Residential District shall be as follows, subject to Sec. 3.06(h):

    (1)    none (0') for single family dwellings, duplex dwellings, alley houses, non-residential and mixed uses when the rear yard is adjacent to an alley, and

    (2)    ten feet (10') for multi-family dwellings, Alley houses and for all uses when the rear yard is not adjacent to an alley.

    (3)    For Cottage Housing Developments, the setback shall be an average of ten (10) feet but no less than five (5) feet.

**(j)** **Maximum lot coverage.** The maximum lot coverage in the R-1, Residential District shall be forty (40%) percent for single family and Cottage Housing Development uses and twenty-five percent (25%) for all uses, subject to Sec. 3.06(i). The maximum lot coverage shall be fifty (50) percent or five thousand (5000) square feet, whichever is less, for a single family dwelling unit combined with an Alley house, provided that an alley house is constructed after or concurrently with a single family dwelling unit on the same lot.

**(k)** **Maximum height.** The maximum height of buildings and structures in the R-1, Residential District shall be twenty-five feet (25') for the primary use and eighteen (18) feet for accessory uses, Cottage Dwelling Units and Alley houses and all uses, subject to Sec. 3.06(k).

**(l)** **Minimum floor area per unit.** The minimum floor area in the R-1, Residential District shall be as follows, subject to Sec. 3.06(e):

    (1)    eight hundred (800) square feet for single family dwelling units,

    (2)    five hundred (500) square feet for duplex dwelling units, and Cottage Dwelling units.

    (3)    three-hundred fifty (350) square feet for multi-family dwelling units and Alley houses.

BLM_0066293

## § 3.09        MH, Mobile Home District

**(a)       Purpose and intent.**  The MH, Mobile Home District is designed primarily to accommodate mobile home parks and mobile home subdivisions.  It is intended for application in areas currently being used for mobile home parks and for selective application in the future to areas designated "Res. P-1 or Res. P-2" on the "Future Land Use" map of the Comprehensive Plan.  In addition to the use and area regulations of this section, development in the MH, Mobile Home District shall be in compliance with all other applicable provisions of this chapter.

**(b)       Permitted uses**.  The following uses shall be permitted in the MH, Mobile Home District, subject to compliance with any applicable conditions and all other provisions of this chapter.

> Accessory use or structure, subject to Sec. 3.05(d)(1)
> Church or place of worship
> Day care home
> Double-wide manufactured/ mobile home, subject to Sec. 3.05(d)(12)
> Essential services
> Fire station
> Gas line and regulating station
> Home occupation, subject to Sec. 3.05(d)(5)
> Mobile home park, subject to Sec. 3.05(d)(6)
> Mobile home subdivision, subject to Sec. 3.05(d)(6)
> Park
> Sewage pump station
> Single-family dwelling
> Water treatment, storage or pump station

**(c)       Conditional uses**.  The following uses shall be permitted in the MH, Mobile Home District only upon approval of a Conditional use permit by the Board of Trustees in accordance with the procedures and standards of Sec. 6.10, Conditional use permits.

> Community center, subject to Sec. 3.05 (d) (18)
> Day camp for children
> Day care center
> Electrical substation, high voltage
> Gas line and regulating station

**(d)       Temporary uses.**  The following uses shall be permitted in the MH, Mobile Home District only upon approval of a temporary use permit in accordance with the procedures and standards of Sec. 6.17, Temporary use permits.

> Asphalt/concrete batch plant, temporary, subject to Sec. 3.05(d)(3)
> Building material yard/construction office, temporary
> Field office, temporary
> Sales trailer, temporary, subject to Sec. 3.05(d)(7)

BLM_0066294

**(e)     Minimum lot area per dwelling.**  The minimum lot area per dwelling unit in the MH, Mobile Home District shall be as follows, subject to Sec. 3.06(c):

>    (1)     Five thousand (5,000) square feet per single-family  dwelling unit, and

>    (2)     Three thousand (3,000) square feet per mobile home dwelling unit.

**(f)     Minimum lot width.**  The minimum lot width for residential uses in the MH, Mobile Home District shall be as follows, subject to Sec. 3.06(d):

>    (1)     Forty-eight feet (48') for single-family dwellings, and

>    (2)     Thirty-five (35')  for mobile home dwellings.

**(g)     Minimum front yard.**  The minimum front yard for all uses in the MH, Mobile Home District shall be  twenty-five feet (25'), subject to Sec. 3.06(f).

**(h)     Minimum side yard.**  The minimum side yard for all uses in the MH, Mobile Home District shall be ten feet (10'), subject to Sec. 3.06(f).

**(i)     Minimum rear yard.**  The minimum rear yard setbacks in the MH, Mobile Home District shall be as follows, subject to Sec. 3.06(h):

>    (1)     Ten feet (10') for mobile home dwelling units

>    (2)     None for single family dwelling units when the rear yard is adjacent to an alley.
>    (3)     Ten feet (10') for single family dwelling units when the rear yard is not adjacent to an alley.

**(j)     Maximum lot coverage.**  The maximum lot coverage in the MH, Mobile Home District shall be as follows, subject to Sec. 3.06(i):

>    (1)     fifty percent (50%) for mobile home dwellings, and

>    (2)     twenty-five percent (25%) for all other uses

**(k)     Maximum height.**  The maximum height of buildings and structures in the MH, Mobile Home District shall be twenty-five feet (25') for all uses, subject to Sec. 3.06(k).

**(l)     Minimum floor area per unit.**  The minimum floor area per single family dwelling in the MH, Mobile Home District shall be eight hundred (800) square feet, subject to Sec. 3.06(e). There shall be no minimum floor area per mobile home dwelling unit.

BLM_0066295

## § 3.10  B-1, Business District

**(a)**     **Purpose and intent.**  The B-1, Business District is designed primarily to accommodate a wide variety of residential, office, retail and repair/service uses as may be appropriate for a mixed-use community center. The B-1, Business District, is intended to accommodate the majority of retail uses within the Town, with residential uses located above and/or behind commercial uses on a lot.  It is intended for application in areas designated "Commercial" on the future land use map of the Comprehensive Plan.  In addition to the use and area regulations of this section, development in the B-1, Business District shall be in compliance with all other applicable provisions of this chapter.

**(b)**     **Permitted uses**.  The following uses shall be permitted in the B-1, Business District, subject to compliance with any applicable conditions and all other provisions of this chapter.

> Accessory use or structure, subject to Sec. 3.05(d)(1)
> Amusement, commercial, subject to Sec. 3.05(d)(2)
> Antique shop
> Art gallery or handicraft sales
> Art supply store
> Auto parts and accessory sales (indoors)
> Bakery or confectionery shop
> Bank or savings and loan
> Bar
> Bed and Breakfast
> Book or stationary store or newsstand
> Bus station or terminal
> Church or place of worship
> Cleaning shop or laundry pick-up station
> Convenience store
> Custom personal services
> Day care center
> Day care home
> Department or variety store
> Drug store or pharmacy
> Essential services
> Fabric, drapery or needlework store
> Fire station
> Fraternal club or lodge
> Furniture or appliance store
> Gasoline service station
> Greenhouse or plant nursery
> Group home
> Feed store
> Florist
> Fruit or vegetable stand

BLM_0066296

Hardware store and hobby shop
Hotel or motel
Household appliance service and repair
Key shop
Laundry, self-service
Library
Liquor store
Mortuary or funeral home
Multi-family dwelling (see Note 1)
Museum
Office, business and professional
Optical sales
Paint and wallpaper store
Park
Pet store
Photography shop
Print shop or copy shop
Public building, shop or yard
Recreational vehicle/travel trailer park, subject to Sec. 3.05(d)(11)
Repair services (limited)
Restaurant, general
Retail, general (indoors)
Secondhand store or pawn shop
Sporting goods
Studio, television or radio
Supermarket
Theater
Tool rental (domestic equipment)
Toy store or hobby shop
Travel bureau or consultant
Veterinary clinic

**(c)** **Conditional uses.** The following uses shall be permitted in the B-1, Business Center District only upon approval of a Conditional use permit by the Board of Trustees in accordance with the procedures and standards of Sec. 6.10, Conditional use permits.

Animal pound or kennel (public or private)
Boat service
Boarding or rooming house
Campground
Car wash
Community center, subject to Sec. 3.05 (d) (18)
Duplex dwelling (See note 1)
Home occupation, subject to Sec. 3.05 (D) (5)
Hospital or clinic

BLM_0066297

New or used car or truck sales
Nursing home
Parking lot, trucks or trailers (transport)
Recreational vehicle/travel trailer park
Sewage pump station
Single family dwelling nit (See note 1)
Snowmobile, motorcycle or scooter sales and service
Hospital
New or used car or truck sales
Tattoo parlor
Water treatment, storage or pump station

NOTE 1:       Restriction on Residential Dwellings.
No residential use as defined in Section (b) or (c) above, as Uses Permitted by Right (b) or Uses permitted as Conditional Uses (c) shall be permitted within the first or ground floor of a building or structure (that floor which is closest to the elevation of the adjacent street), unless such use is setback an average of thirty-five (35') from the front exterior wall of the building or structure as measured perpendicularly from the front exterior wall. In no case shall such use be closer than twenty feet (20') from the front exterior wall. For the purposes of this section, the "front exterior wall" of building or structure shall mean that wall which establishes the front yard, or in the absence of a front yard, the front lotline. Also, for the purpose of this section, the "front lotline" shall mean the frontage along the street with the shortest linear frontage for lots which have more than one street frontage. Provided, however, that single family and duplex units located in areas zoned B-1 to the east of Market Street and to the west of Spruce Street need not comply with the setback requirements provided for herein.

**(d)      Temporary uses.** The following uses shall be permitted in the B-1, Business Center District only upon approval of a temporary use permit in accordance with the procedures and standards of Sec. 6.17 , Temporary use permits.

Field office, temporary
Building material yard/construction office, temporary
Sales trailer, temporary, subject to Sec. 3.05(d)(7)

**(e)      Minimum lot area.** The minimum lot area in the B-1, Business District shall be five thousand (5,000) square feet; seven thousand-five hundred (7,500) square feet for single family dwelling units and five thousand (5,000) square feet per duplex dwelling unit.

**(f)      Minimum lot width.** There shall be no minimum lot width for non-residential and mixed use projects in the B-1 Zone District. The minimum lot width for residential uses in the B-1, Business District shall be as follows, subject to Sec. 3.06(d):

(1)      Forty-eight feet (48') for single-family dwellings, and

(2)      Sixty feet (60') for all other residential uses .

BLM_0066298

**(g)     Minimum floor area per dwelling unit.**  The minimum floor area per dwelling unit in the B-1, Business District shall be as follows, subject to Sec. 3.06(e):

(1)     Eight hundred (800) square feet per single-family dwelling unit,

(2)     Five hundred (500) square feet per duplex dwelling unit, and

**(h)     Minimum front yard.**  The minimum front yard setback for residential uses in the B-1, Business District shall be as follow fifteen feet (15') and no requirement for nonresidential and mixed use structures, subject to Sec. 3.06(f).

**(i)     Minimum side yard.**  The minimum side yard setback in the B-1, Business District shall as follows, subject to Sec. 3.06(g):

(1)     None for non-residential and mixed use structures with masonry exterior walls, subject to Sec. 5.04(c), and

(2)     Ten feet (10') for all residential uses.

**(j)     Minimum rear yard.**  The minimum rear yard in the B-1, Business District shall be none (0') for single family dwellings and duplex structures, and ten feet (10') from centerline of alley for non-residential, commercial uses, mixed and multi-family dwellings, for property adjacent to an alley for which an easement or dedication of property has not been granted to the Town subject to Sec. 3.06 (h).  All structures shall be setback a minimum of five feet (5') for ingress and egress.

**(k)     Maximum lot coverage.**  The maximum lot coverage in the B-1, Business District shall be twenty-five percent (25%) for single family and duplex residential uses up to one hundred percent (100%) for all non-residential, multi-family, and mixed use structures, subject to Sec. 3.06 (i).

**(l)     Maximum height.**  The maximum height of buildings and structures in the B-1, Business District shall be twenty-five feet (25') for single family and duplex residential uses and thirty-five (35') for all other uses, subject to Sec. 3.06 (j).

**(m)     Minimum floor area per unit.**  The minimum floor area per single family dwelling in the B-1, Business District shall be eight hundred (800) square feet, five hundred (500) per duplex dwelling unit, subject to Sec. 3.06(e).

BLM_0066299

## § 3.11  I, Industrial District

**(a)**     **Purpose and intent.**  The I, Industrial District is designed primarily to accommodate a wide variety of repair/service and light industrial uses.  It is intended for application in areas designated "Light Industrial" on the "Future Land Use" map of the Comprehensive Plan.  In addition to the use and area regulations of this section, development in the I, Industrial District shall be in compliance with Sec. 5.05, Landscaping and Screening, and all other applicable provisions of this chapter.

**(b)**     **Permitted uses**.  The following uses shall be permitted in the I, Industrial District, subject to compliance with any applicable conditions and all other provisions of this chapter.

Accessory use or structure, subject to Sec. 3.05(d)(1)
Animal pound or kennel (public or private)
Auto parts and accessory sales (indoors)
Auto leasing or rental
Auto repair garage
Auto parts and sales (outdoor display)
Bakery or confectionery shop
Bank or savings and loan
Building materials sales and yard
Bus or intercept lot
Cabinet and upholstery shop
Campground
Car wash
Caretaker or guard residence
Church or place of worship
Cleaning or laundry plant
Convenience store
Custom personal services
Day care center
Day care home
Day camp for children
Educational facilities
Fraternal club or lodge
Fruit or vegetable stand
Furniture or appliance store
Gasoline service station
Greenhouse or plant nursery
Hardware store and hobby shop
Heating or air conditioning shop
Household appliance service and repair
Key shop
Laundry, self service
Lithographic or print or copy shop

BLM_0066300

Maintenance and repair service for buildings
Mini-warehouse– equal to or less than 2500 square feet
Motorcycle or scooter sales and service
Museum
New or used car or truck sales
Office, business and professional
Park
Pet store
Plumbing shop
Public building, shop or yard
Radio, TV or microwave tower (10)
Recreational vehicle storage and service
Recreational vehicle/travel trailer park with less than twenty (20) spaces, for visitor stays
      of less than 30 consecutive days
Repair services, limited
Retail general (outdoors)
Single family dwelling unit
Snowmobile, motorcycle or scooter sales and service
Storage or hauling company
Storage warehouse
Studio, television or radio
Tool rental (domestic equipment)
Trailer or mobile home sales or rental
Travel bureau or consultants
Veterinary clinic
Welding and machine shop

**(c)** **Conditional uses**.  The following uses shall be permitted in the I, Industrial District only upon approval of a conditional use permit by the Board of Trustees in accordance with the procedures and standards of Sec. 6.10, Conditional use permits.

Community center, subject to Sec. 3.05 (d) (18)
Mini-warehouse greater than 2500 square feet
Motel
Nursing home
Private utility shop, yard or building
Private franchise utility (not listed)
Recreational vehicle or travel trailer park – twenty (20) spaces or  greater, for visitor
      stays of less than 30 consecutive days
School, commercial trade
Supermarket
Theater

**(d)** **Temporary uses.** The following uses shall be permitted in the I, Industrial District only upon approval of a temporary use permit in accordance with the procedures and standards of Sec.

BLM_0066301

6.17, Temporary use permits.

>  Asphalt/concrete batch plant, temporary, subject to Sec. 3.05(d)(3)
>  Building material yard/construction office
>  Field office, temporary
>  Sales trailer, temporary, subject to Sec. 3.05(d)(7)

**(e)     Minimum lot area.**  The minimum lot area requirement shall be six thousand square feet (6000 s.f.) in the I, Industrial District.

**(f)     Minimum lot width.**  The minimum lot width requirement shall be fifty feet (50') in the I, Industrial District.

**(g)     Minimum floor area per unit.**  There shall be no minimum floor area per dwelling unit requirement in the I, Industrial District.

**(h)     Minimum front yard.**  The minimum front yard setback requirement shall be fifteen feet (15') in the I, Industrial District, subject to Sec. 3.06(f).

**(i)     Minimum side yard.**  The minimum side yard setback requirement shall be ten feet (10') for all uses in the I, Industrial District, subject to Sec. 3.06(g).

**(j)     Minimum rear yard.**  The minimum rear yard in the I, Industrial District shall be ten feet (10') for all uses, subject to Sec. 3.06(h).

**(k)     Maximum lot coverage.**  The maximum lot coverage in the I, Industrial District shall be fifty percent (50%) for all uses, subject to Sec. 3.06(i).

**(l)     Maximum height.**  The maximum height of buildings and structures in the I, Industrial District shall be thirty feet (30') for all uses, subject to Sec. 3.06(k).

BLM_0066302

## § 3.12  P, Public District

**(a)**    **Purpose and intent.**  The P, Public District is designed primarily to accommodate the development of governmental and quasi-governmental facilities for the cultural, education, civic, recreation and other governmental purposes.  It is intended for application to areas that are currently publicly owned.  In addition to the use and area regulations of this section, development in the P, Public District shall be in compliance with all other applicable provisions of this chapter.

**(b)**    **Permitted uses**.  The following uses shall be permitted in the P, Public District, subject to compliance with any applicable conditions and all other provisions of this chapter.

> Accessory use or structure, subject to Sec. 3.05(d)(1)
> Caretaker or guard residence
> Church or place of worship
> Day camp for children
> Day care center
> Day care home
> Fire station
> Essential services
> Events center or Fairgrounds
> Equestrian center
> Fraternal club or lodge
> Heliport
> Library
> Museum
> Park
> Public building, shop or yard
> Radio, TV or microwave tower
> Sewage pump station
> School, elementary or secondary
> Studio, radio or television
> Water treatment, storage or pump station

**(c)**    **Conditional uses.**  The following uses shall be permitted in the P, Public District only upon approval of a conditional use permit by the Board of Trustees in accordance with the procedures and standards of Sec. 6.10, Conditional use permits.

> Campground
> Community center, subject to Sec. 3.05 (d) (18)
> Correctional facility or jail, public
> Gas line and regulating station
> Hospital or clinic
> Recreational Vehicle/Travel Trailer Park
> Rodeo Grounds

BLM_0066303

**(d)    Temporary uses.**  The following uses shall be permitted in the P, Public District only upon approval of a temporary use permit in accordance with the procedures and standards of Sec. 6.17, Temporary use permits.

> Asphalt/concrete batch plant, temporary, subject to Sec. 3.05(d)(3)
> Building material yard/construction office
> Field office, temporary

**(e)    Minimum lot area.**  There shall be no minimum lot area requirement in the P, Public District.

**(f)    Minimum lot width.**  There shall be no minimum lot width requirement in the P, Public District.

**(g)    Minimum front yard.**  The minimum front yard requirement in the P, Public District shall be 10 feet (10').

**(h)    Minimum side yard.**  The minimum side yard requirement in the P, Public District, shall be 10 feet (10').

**(i)    Minimum rear yard.**  The minimum rear yard in the P, Public District shall be ten feet (10') for all uses, however, no rear yard setback shall be required for non-residential buildings if an alley is located adjacent the rear lot line.

**(j)    Maximum lot coverage.**  The maximum lot coverage in the P, Public District shall be sixty percent (60%) for all uses, subject to Sec. 3.06(i).

**(k)    Maximum height.**  The maximum height of buildings and structures in the P, Public District shall be thirty-five feet (35') for all uses, subject to Sec. 3.06(k).

BLM_0066304

## § 3.13  PUD, Planned Unit Development Overlay District

**(a)      Purpose and intent.** The Planned Unit Development Overlay District is a rezoning process that, upon approval results in a detailed plan that is the basis for development of a particular property. An application for a PUD plan approval may be made for land located in any zoning district. The PUD Planned Unit Development Overlay District is designed primarily to provide flexibility to accommodate mixed-use, nontraditional and innovative developments and to encourage more efficient utilization of sites and the preservation of usable open space. The PUD shall be consistent with the requirements of the zone district in which the parcel is located unless a variation or variations of the dimensional limitations have been granted pursuant to this section. In addition to the use and area regulations of this section, development in the PUD Planned Unit Development Overlay District shall comply with all other provisions of this Land Use Code.

**(b)      Types of planned unit developments.** The Board of Trustees of the Town of Norwood, Colorado, after public hearing and proper notice and after recommendation from the Planning and Zoning Commission, may authorize the creation of the Planned Unit Development Overlay Districts on parcels of land containing more than 20,000 square feet. A Planned Unit Development Overlay designation may be applied to land intended for residential, commercial or other development purposes.

**(c)      Site plan requirement.** In establishing a Planned Unit Development Overlay District in accordance with this section, the Planning and Zoning Commission shall require a comprehensive site plan of the development. Such site plan shall be approved as part of the resolution approving a Planned Unit Development Overlay and recorded as a burden to run with the land. Such required plan and resolution shall set forth the requirements for ingress and egress to the property, public streets or drives, with adequate right-of-way, sidewalks, utilities, drainage, parking space, height of building, maximum lot coverage, yards and open spaces, screening walls or fences, landscaping and other development and protective requirements including maintenance considered necessary to create a reasonable transition to and protection of the adjacent property.

**(d)      Procedures for approval and conditions.** Every Planned Unit Development Overlay District approved under the provisions of this chapter shall follow the procedure of Sec. 6.02 for and be considered an amendment to the zoning map. In approving the Planned Unit Development Overlay District , the Board of Trustees may impose conditions relative to the standard of development and such conditions shall be complied with before a Zoning Development Permit is issued for the use of the land or any structure that is part of the Planned Unit Development Overlay District and such conditions shall not be construed as conditions precedent to the approval of the zoning amendment, but shall be construed as conditions precedent to the granting of a Zoning Development Permit. All Planned Unit Development Overlay Districts approved in accordance with the provisions of this chapter shall be referenced on the Official Zoning Map and a list of such Planned Unit Development Overlay Districts, together with the category of uses permitted therein, shall be maintained in the office of the Town Clerk.

BLM_0066305

**(e)**     **Status of prior and future approvals.**

    (1)     In the Planned Unit Development Overlay Districts previously approved, where the Board of Trustees approved conditional minimum development requirements for single-family dwellings that are less stringent than the minimum development requirements contained in this chapter for single-family dwellings in Planned Unit Development Overlay Districts, the less stringent minimum development requirements set forth in such Planned Unit Development Overlay Districts are hereby ratified.

    (2)     In all Planned Unit Development Overlay Districts previously approved that are silent or contain no conditional minimum development requirements for single-family dwellings, the minimum development requirements contained in this chapter for single-family dwellings in Planned Unit Development Overlay Districts shall apply.

**(f)**     **Permitted, conditional and temporary uses.**  The land uses permitted shall be those of the underlying zone district.

**(g)**     **Maximum density.**  The maximum density shall be no greater than that permitted in the underlying zone district prior to PUD approval.  Furthermore, densities may be reduced if:

    (1)     There is not sufficient water pressure and other utilities to service the proposed development;

    (2)     There are not adequate roads to ensure fire protection, snow removal and road maintenance to the proposed development;

    (3)     The land is not suitable for the proposed development because of ground reasons of soil or geologic conditions;

    (4)     The proposed development will have a deleterious effect on air quality in the surrounding area and the Town; or

    (5)     The design and location of any proposed structure, road, or driveway in the proposed development is not compatible with surrounding land uses, would adversely affect the character of the Town or cause harmful disturbance to critical natural features of the site.

**(h)**     **Minimum lot area per dwelling.**  The minimum lot area for non-residential uses shall be four thousand feet (4000') in the PUD, Planned Unit Development Overlay District shall be as follows, subject to Sec. 3.06(c):

    (1)     Four thousand (4,000) square feet per single-family dwelling unit,

    (2)     Three thousand (3,000) square feet per duplex dwelling unit,

BLM_0066306

(3)      Two thousand eight hundred (2,800) square feet per multi-family dwelling unit.

(4)      Three thousand (3,000) square feet per mobile home dwelling unit.

(5)      two thousand five hundred  (2,500) square feet per cottage dwelling unit, provided no less than four units nor more than nine units may be nine cottage units may be located in a given application.

**(i)      Minimum lot width.**  The minimum lot width for non-residential uses shall be forty feet (40') in the PUD, Planned Unit Development Overlay District and for residential uses the minimum lot width shall be as follows, subject to Sec. 3.06(c):

(1)      Forty feet (40') for single-family dwellings, and

(2)      fifty feet (50') for duplex and multi-family dwellings, and

**(j)      Minimum front yard.**  The minimum front yard setback requirement shall be fifteen feet (15') in the PUD, Planned Unit Development Overlay District, subject to Sec. 3.06(f).  Where the front yard is not specified for an approved PUD, the minimum front yard shall be established according to the standards of the underlying zone district.

**(k)      Minimum side yard.**  The minimum side yard requirements in a PUD, Planned Unit Development Overlay shall be as established by the approved PUD.  Where the side yard is not specified for an approved PUD, the minimum side yard shall be established according to the standards of the underlying zone district.

**(l)      Minimum rear yard.**  The minimum rear yard in a PUD, Planned Unit Development Overlay District shall be established by the approved PUD.  Where the rear yard is not specified for an approved PUD, the minimum side yard shall be established according to the standards of the underlying zone district.  The minimum rear yard for multi-family dwellings in Planned Unit Development Overlay Districts shall be as follows:

(1)      Ten feet (10') from the foundation line to the rear property line. For cottage housing developments, five (5) feet from the rear or side property line.

(2)      On lots backing up to any other single-family residential district, and not separated by a public street, a minimum rear yard of twenty feet (20') shall be provided.

(3)      A minimum distance of ten feet (10') from foundation line to foundation line shall be provided between all buildings.

**(m)      Maximum lot coverage.**  The maximum lot coverage in the PUD, Planned Unit Development Overlay District shall be fifty percent (50%) for all uses except for cottage housing developments, which shall be forty (40) percent, subject to Sec. 3.06(i).

BLM_0066307

**(n)     Maximum height.**  The maximum height of buildings and structures in the PUD, Planned Unit Development Overlay District shall be three (3) stories or thirty-five feet (35') for all uses, subject to Sec. 3.06(k), provided that the maximum height for single-family dwellings shall be twenty-five feet (25'). Cottage dwelling units shall not exceed fifteen (15) feet.

**(o)     Minimum floor area per unit.**  The minimum floor area per single family dwelling in the PUD, Planned Unit Development Overlay District shall be eight hundred (800) square feet, five hundred (500) per duplex dwelling unit and Cottage dwelling unit, subject to Sec. 3.06(e).

**(p)     Minimum common open space.**  The minimum common open space in the PUD, Planned Unit Development Overlay District shall be twenty-five percent (25%).

**(q)     Site plan notations.**  For any PUD in which zone district variations or density transfer for one portion of the site to another are approve, a note shall be placed on the site plan sufficient to place purchasers of all or part of the tract on notice of how exactly the zoning requirements and densities allowed on the property may differ from underlying zoning requirements.

**(r)     PUD agreement.**  For any PUD in which variations are granted, public improvements required, or for PUD's involving numerous or complex condition of approval the applicant shall submit a PUD agreement describing the variances, public improvements required and conditions of approval which agreement shall provide guarantees for the improvements as required of subdividers in Section 6.07. The PUD agreement shall run with and be a burden on the land to which it applies.

**(s)     Zone district map.**  An approved PUD plan shall be illustrated and designated as overly on the official zone district map. Permanent underlying zoning designation and regulations shall remain unchanged and in the event a PUD is not completed or is terminated, the underlying zone district requirements shall apply.

BLM_0066308

## § 3.14 Medium Density Residential District

**(a) Purpose.** The MD, Medium Density Residential District is designed to accommodate a variety of housing types and to promote diversity. It is intended for application in areas in Norwood where services, utilities and roads can accommodate greater density as referenced in the Future Land Use Plan. In addition to the use and area regulations of this section, development in the MD, Medium Density Residential District shall be in compliance with all other applicable provisions of this chapter.

**(b)      Permitted uses**. The following uses shall be permitted in the MD, Medium Density Residential District, subject to compliance with any applicable conditions and all other provisions of this chapter.

> Accessory use or structure, subject to Sec. 3.05(d) (1)
> Day care home
> Double-wide manufactured/ mobile home, subject to Sec. 3.05(d) (12)
> Duplex dwelling
> Group home
> Home occupation, subject to Sec. 3.05(d) (5)
> Park
> School, elementary or secondary
> Single-family dwelling

**(c)      Conditional uses**. The following uses shall be permitted in the MD, Medium Density Residential District only upon approval of a Conditional use permit by the Board of Trustees in accordance with the procedures and standards of Sec. 6.10, Conditional use permits.

> Boarding or rooming house
> Community Center
> Cottage Housing Development
> Custom personal services
> Day camp for children
> Day care center
> Multi-family dwelling
> Nursing home

**(d)      Temporary uses.** The following uses shall be permitted in the MD, Medium Density Residential District, only upon approval of a temporary use permit in accordance with the procedures and standards of Sec. 6.17, Temporary use permits.

> Asphalt/concrete batch plant, temporary, subject to Sec. 3.05(d) (3)
> Building material yard/construction office, temporary
> Field office, temporary
> Sales trailer, temporary, subject to Sec. 3.05(d) (7)

BLM_0066309

**(e)     Minimum lot area per dwelling.**  The minimum lot area per dwelling unit in the MD, Medium Density Residential District shall be as follows, subject to Sec. 3.06(c):

   (1)     Thirty-five hundred (3,500) square feet per single-family unit, and

   (2)     Thirty-five hundred (3,500) square feet per duplex dwelling unit, and

   (3)     Two Thousand five hundred (2,500) square feet multi-family dwelling unit.

   (4)     Two thousand five hundred (2,500) square feet per Cottage Housing Unit.

**(f)     Minimum lot width.**  The minimum lot width in the MD, Medium Density Residential District shall be as follows, subject to Sec. 3.06(d):

   (1)     forty feet (40') for single-family dwellings, and

   (2)     sixty feet (60') for duplex or multi-family dwellings.

**(g)     Minimum front yard.**  The minimum front yard setbacks for all uses in the MD, Medium Density Residential District shall be fifteen feet (15'), subject to Sec. 3.06(f).

**(h)     Minimum side yard.**  The minimum side yard setbacks for all uses in the MD, Medium Density Residential District shall be an average of ten (10) feet but no less than five (5) feet, subject to Sec. 3.06(g).

**(i)     Minimum rear yard.**  The minimum rear yard setbacks in the MD, Medium Density Residential District shall be as follows, subject to Sec. 3.06(h):

   (1)     none (0') for single family dwellings, duplex dwellings, non-residential and mixed uses when the rear yard is adjacent to an alley, and

   (2)     ten feet (10') for multi-family dwellings and for all uses when the rear yard is not adjacent to an alley.

   (3)     For Cottage Housing Developments, the setback shall be an average of ten (10) feet but no less than five (5) feet.

**(j)     Maximum lot coverage.**  The maximum lot coverage in the MD, Medium Density Residential District shall be forty-five (45%) percent for single family and Cottage Housing Development uses and forty percent (40%) for all other uses, subject to Sec. 3.06(i).

**(k)     Maximum height.**  The maximum height of buildings and structures in the MD, Medium Density Residential District shall be thirty feet (30') for all uses, subject to Sec. 3.06(k). Cottage

BLM_0066310

Dwelling Units shall not exceed eighteen (18) feet.

**(l)**      **Minimum floor area per unit.**   The minimum floor area in the MD, Medium Density Residential District shall be as follows, subject to Sec. 3.06(e):

(1)      eight hundred (800) square feet for single family dwelling units,

(2)      five hundred (500) square feet for duplex dwelling units, and Cottage Dwelling units.

(3)      three-hundred fifty (350) square feet for multi-family dwelling units.

BLM_0066311

## § 4.00  SUBDIVISION STANDARDS

### § 4.01  Scope and Applicability

**(a)      Applicability.**  All plats and subdivision of land within the corporate limits of the Town of Norwood, and all land outside the corporate limits of the Town of Norwood that the Board of Trustees may be petitioned to include within the corporate limits of the Town, by an extension of said corporate limits, shall conform to the following rules and regulations.

**(b)      Creation of building site.** No permit for the construction of a building or building upon any tract or lot shall be issued until a building site, building tract or building lot has been created by compliance with one of the following conditions:

(1)      The lot or tract is part of a plat of record, approved by the Board of Trustees of the Town of Norwood and filed in the plat records of San Miguel County, Colorado; or

(2)      The parcel, tract or lot faces upon a dedicated street and was separately owned prior to the effective date of the original subdivision regulations of the Town or Norwood or prior to annexation to the Town or Norwood, whichever is applicable. Any further subdivision of said parcel tract or lot shall be in conformance with the Town subdivision regulations then in effect. Any development of nonconforming lots must satisfy the requirements of Section 1.06 (b).

**(c)      Platting property not permanently zoned.**

(1)      The Planning and Zoning Commission of the Town of Norwood shall not approve any plat of any subdivision within the Town limits of the Town of Norwood until the area covered by the proposed plat shall have been permanently zoned by the Board of Trustees of the Town of Norwood, Colorado.

(2)      The Planning and Zoning Commission of the Town of Norwood shall not approve any plat of any subdivision within any area where a petition or Ordinance for annexation or a recommendation for annexation to the Town of Norwood is pending before the Board of Trustees.

(3)      In the event the Planning and Zoning Commission holds a hearing on proposed annexation, it may, at its discretion, at the same time hold a hearing upon the permanent zoning that is to be given to the area or tract to be annexed, and make a recommendation on both matters to the Board of Trustees so that the Board of Trustees can, if it desires, act on the matter of permanent zoning and annexation at the same time.

BLM_0066312

## § 4.02  Building Lots

**(a)     Lot configuration.**  The lot size, width, depth, shape and orientation, and the minimum building setback lines shall be appropriate for the location of the subdivision and for the type of development and use contemplated and shall not be less than those specified as minimum standards by the zoning district.  The depth and width of properties reserved or laid out for commercial and industrial purposes shall be adequate to provide for the off-street service and parking facilities required by the type of use and development contemplated.

**(b)     Side lot lines.**  Side lot lines shall be substantially at right angles to street lines unless otherwise approved by the Planning and Zoning Commission.

**(c)     Street frontage required.**  Each lot or building tract shall front upon a public street.

**(d)     Double frontage lots.**  Double frontage lots shall be avoided, except where essential to provide separation of residential development from traffic or to overcome specific disadvantages of topography and orientation.

**(e)     Large lots.**  Where the area is divided into larger lots than for normal town building sites and, in the opinion of the Planning and Zoning Commission, any or all of the tracts are susceptible of being resubdivided, the original subdivision shall be such that the alignment of future street dedications may conform to the general street layout in the surrounding area and so that the larger tracts may be later subdivided in conformance with the requirements of this chapter and the minimum standards specified by the zoning district.

BLM_0066313

**§ 4.03  Streets and Alleys**

**(a)**     **Applicability.**  The following design standards shall be required for all subdivisions.

**(b)**     **Street surfaces.**  On and after the passage of these regulations, all developers shall be required to construct asphalt streets with curbs and gutters and a road base with gravel alleys in accordance with the Town of Norwood Road Design Standards and Regulations.

**(c)**     **Street layout.**  Unless otherwise approved by the Planning and Zoning Commission, provisions shall be made for the extension of streets in accordance with the Major Streets and Future Land Use Plan for street extension and shall bear a logical relationship to the topography and to the location of existing or planned streets on adjacent properties.  Adequate local streets shall be provided to accommodate the subdivision and provide access to lots.  Where the layout of streets is not shown in an approved streets plan, the arrangement of streets in a subdivision shall either:

> **(1)**     Provide for the continuation or appropriate projection to existing principal streets in surrounding areas; or
>
> **(2)**     Conform to a plan for a neighborhood or planned unit development approved or adopted by the Planning and Zoning Commission to meet a particular situation where topographical or other conditions make continuance or conformance to existing streets impracticable or where neighborhood design makes a varied plan appropriate.

**(d)**     **Street connections.**  The system of streets designated for the subdivision, except in unusual cases, must connect with streets already dedicated in adjacent subdivision; and where no adjacent connections are platted, must in general be the reasonable projection of streets in the nearest subdivided tracts, and must be continued to the boundaries of the tract subdivided, so that other subdivisions may connect therewith.  Reserve strips of land controlling access to or egress from other property or to or from any street or alley or having the effect of restricting or damaging the adjoining property for subdivision purposes or that will not be taxable or accessible for special improvements shall not be permitted in any subdivision unless such reserve strips are conveyed to the Town in fee simple.

**(e)**     **Half streets.**  Half streets shall be prohibited unless they are for the purpose of increasing the width of an inadequate existing right-of-way.

**(f)**     **Street intersections.**  More than two (2) streets intersecting at a point shall be avoided, except where it is impractical to secure a proper street system otherwise and all intersections shall be as near ninety (90) degrees as possible and in no case shall the intersection angle be less than sixty degrees (60°).

**(g)**     **Street jogs.**  Non-intersecting streets with centerline offset of less than one hundred twenty-five feet (125') shall not be approved.

**(h)**     **Block lengths.**  Block lengths shall be consistent with the Town of Norwood Master Plan

BLM_0066314

and Major Streets Plan/Future Land Use Plan. Block lengths shall generally not be less than three hundred feet (300') or more than four hundred fifty feet (450').

**(i)      Cul-de-sacs and hammerhead turnarounds.**   Streets with sul-de-sacs or hammerhead turnarounds shall not exceed four hundred (400') in length.  Cul-de sacs shall have a turnaround diameter of one hundred feet (100').  Hammerheads shall extend a minimum 24' beyond each side of the improved  roadway.  Hammerheads are preferred over cul-de-sacs.

**(j)      Dead-end streets.**  Dead-end streets, except for cul-de-sacs, shall be prohibited unless they are designed to connect with future streets on adjacent lands and that have not ben platted.  In cases where these type of dead-end streets are allowed, a temporary turnaround of one hundred feet (100') shall be constructed.

**(k)      Street design standards.**   Street and alley widths, curves, grades design speed and centerline radius shall meet following standards.

### STREET  DESIGN STANDARDS

| Design Feature | Alley | Local | Local Collector |
|---|---|---|---|
| Number of lanes | 1 | 2 | 2 |
| Lane width | 15' | 10' | 11' |
| Pavement or chip/seal width (ft.) | -- | 28 ft. | 28 ft. |
| Right-of-way width | 20 | 50 ft. | 60 ft. |
| Shoulder width (ft.) | -- | 2' | 2' |
| Crown (%) | 2% | 2% | 2% |
| Borrow ditch | -- | 5ft. | 5ft. |
| Design speed (mph) | -- | 20-30 | 20-30 |
| Maximum grade | 5% | 7% | 6% |
| Min. centerline radius | 50 ft. | 150 ft. | 250 ft. |

**(l)      Designation of local and local collector streets.**

1.      Streets designated a local collector streets include San Miguel Street, Market Street. 44 Z (Vet Road), and 42Z (Aspen Street).

2.      Streets designated as local streets include all other streets.

BLM_0066315

**(m)    Street grade and curves**.  Streets may have a maximum grade of seven percent (7%). Centerline grade changes with an algebraic difference of more than two percent (2%) shall be connected with vertical curves of sufficient length to provide a minimum two-hundred (200') feet of sight distance.  No vertical curve shall be less than two hundred feet (200') in length.

**(n)    Street curve radii.**  Streets shall have a minimum radii at the centerline of one hundred fifty feet (150'), unless in special circumstances the Board of Trustees approves a local residential street with a smaller minimum radius in which case the developer shall pay any additional cost of installing the water and sewer lines caused by the smaller radius.

**(o)    Alley right of way dedications required.**  Alleys right of way dedications shall be provided in all residential areas unless otherwise approved by the Planning and Zoning Commission and in commercial and industrial districts, except that the Planning and Zoning Commission may waive the requirement where other definite and assured provision is made for service access such as off-street loading, unloading, and parking consistent with and adequate for the uses proposed.

**(p)    Minimum alley width.**  The minimum right-of-way width of an alley shall be twenty feet (20').  The minimum gravel surface width of alleys shall be fifteen feet (15').

**(q)    Construction and dedication of internal streets.**  Streets shall be constructed by the developer and dedicated to the Town, along with all necessary right-of-way, with no pro-rata share from the Town.

**(r)    Turn by-passes and turn lanes.**  Right-turn by-passes or left-turn lanes may be required at the intersection of collector streets if traffic conditions indicated they are needed.  Sufficient right-of-way shall be dedicated to accommodate such lanes when they are required.

**(s)    Street names.**  Street names shall be as established by the Norwood Major Streets and Future Land Use Plan, subject to approval of the Planning and Zoning Commission.  When streets are in alignment with existing streets, any new streets shall be named according to the streets with which they correspond.  Streets which do not fit into an established street-naming pattern shall be named in a manner which will not duplicate or be confused with existing streets within the Town or its environs.  Street numbers shall be assigned by the Building Official in accordance with the Town numbering system.

**(t)    Street posts and markers.**  The developer shall pay the cost of purchasing and installing street posts and markers at each street intersection, which posts and markers shall be the same type as used throughout the Town.  The cost of such street posts and markers shall be paid to the Town Clerk upon final approval of construction plans for the subdivision. No subdivision construction, including but not limited to, street grading, street paving, storm sewer installation, curb and gutter work, sanitary sewer and water main installation, can begin until the cost of purchasing and installing such street posts and markers is paid to the Town Clerk.

BLM_0066316

(u)     **Traffic signs.**  The developer shall pay the costs of purchasing and installing traffic signs at each street intersection, which traffic signs and posts shall be the same type as used throughout the Town.

(v)     **Street Lighting.**  The developer shall pay the costs of purchasing and installing all street lighting equipment.  The developer shall also pay the cost of all street lighting service for a period of two (2) years or until such time as seventy percent (70%) of the buildings for which building permits have been issued are completed, whichever is sooner.  Prior to the issuance of any building permits or Certificates of Occupancies in the subdivision, the developer shall enter into a contract with the Town, in a form approved by the Town, setting forth the specific street lighting requirements for such subdivision.  The type of equipment, method of installation and location of the wiring and light poles shall meet the minimum standards and requirements of the electric company from which electricity is to be purchased.

(w)     **Street improvements.**  All final plats shall be subject to the following requirements regarding street improvements, provided that compliance with this subsection shall not be required for plat amendments approved and issued pursuant to Sec. 6.07(b), Plat amendments.

   (1)     No permit will be issued on property abutting any street in a subdivision prior to the approval of street grades and street improvements by the Town Engineer.  Construction of the street improvements as required by the provisions of this chapter will not be necessary where the Town Engineer has determined that such street improvements are not possible or practical at the time the street improvements are required to be constructed.  In the event the Town Engineer makes such a determination, a cost estimate for the construction for the required street improvements shall be prepared by the Town Engineer.  The developer shall enter into an agreement with the Town, in a form approved by the Town, for the deposit of funds in accordance with the agreement and shall have no further liability for the construction of the required street improvements.  The terms and conditions under which construction shall be accomplished and a disposition of the escrow account shall be provided for in the agreement.  In lieu of depositing such funds in escrow, an Irrevocable Letter of Credit made out to the Town in an amount approved by the Town and in a form approved by the Town Attorney will be accepted.

   (2)     No permit will be issued on property in a subdivision abutting a State Highway 145 until compliance with this paragraph has been met.

      a.     The Town Planner shall make a determination whether the State of Colorado will require participation in the cost of the improvements, and shall prepare a cost estimate for the required participation of the improvement of the state roadway.

      b.     In the event participation in the cost of improvements is required, the developer shall enter into an agreement with the Town, in a form approved by the Town, to deposit funds equal to the required cost of participation, including the cost for curbs, gutters, parallel storm sewer system, right-of-way, and utility adjustments.

BLM_0066317

c.     The developer shall then deposit funds in accordance with the agreement and shall have no further liability for the construction of the required street improvements.   The terms and conditions under which construction shall be accomplished and a disposition of the escrow account shall be provided for in the agreement.

(3)     Guarantee for construction or maintenance of streets.  Approval of the plat shall not impose any duty upon the Town or County concerning the maintenance of improvements of any such dedicated parts until the proper authorities of the Town or County have made acceptance of the same by entry, use or improvement.

BLM_0066318

## § 4.04  Easements

**(a)    Utility easements required.**  Utility easements shall be provided in all residential areas unless otherwise approved by the Planning and Zoning Commission and in commercial and industrial districts, except that the Planning and Zoning Commission may waive the requirement where other definite and assured provision is made for service access such as off-street loading, unloading, and parking consistent with and adequate for the uses proposed.

**(b)    Minimum width.**  The minimum right-of-way width of a utility easement shall be ten feet (10') respectively.

**(c)    Utility easements.**  Utility easements of ten (10)' feet in width on each side of all rear lot lines and five (5') feet in width on each side of side lot lines shall be provided where necessary. Where the rear or side lot lines abut property outside of the subdivision on which there are no rear or side lot line easements at least five (5') feet in width, the easements on the rear and side lot lines in the subdivision shall be ten (10') feet in width.

**(d)    Potable water and sewer easements.**  Water and sewer easements shall be a minimum of twenty (20') feet in width.

**(e)    "T" intersections and cul-de-sacs.**  Easements twenty (20') feet in width shall be provided in "T" intersections and cul-de-sacs for the continuation of utilities or drainage improvements, if necessary.

**(f)    Fire lanes and emergency access easements.**  Fire lanes and emergency access easements twenty (20') feet in width shall be provided where required by the Fire Marshal.

**(g)    Drainage easements.**  When a proposed subdivision is traversed by an irrigation ditch or channel, natural creek or stream or a proposed drainage easement, there shall be provided a an easement sufficient for drainage and to allow for maintenance of the ditch.

**(h)    Adjoining areas.**  When easements in areas adjoining proposed subdivisions are necessary to provide adequate drainage thereof or to serve such subdivisions with utilities, the subdivider shall obtain such easements.

**(i)    Trail easements.**  Whenever a subdivision embraces any part of a bikeway, bridle path, cross country ski trail or hiking trail designated on the Major Streets and Future Land Use Plan, an easement shall be provided to accommodate the plan within the subdivision.  A developer seeking final plat, rezoning or any other site specific development approval shall dedicated trail easements extending 25 feet either side of the proposed trail centerline for construction purposes and ten feet either side of the proposed trail centerline for public use purposes.

BLM_0066319

**§ 4.05  Park Land Dedication**

**(a)  Purpose.**  The requirements for open space, park, trails and recreational areas contained in this section are intended to ensure that in the Town of Norwood there will be sufficient land dedicated or otherwise set aside to meet the demand and need of the future residents of the development for open space, and parks, containing passive or active recreational areas that are reasonably attributable to such development.

**(b)  Applicability.**  Every subdivision shall include a dedication of land to the Town, or other entity, as determined by the Board of Trustees, to be used for parks and recreation, trails, open space or cash-in-lieu of such dedication in an amount established by this section as a condition of final plat approval and prior to the recording of a final plat.

**(c)  Dedication requirement.**  The obligation of the subdivider shall be to dedicate to the Town eight percent (8%) of the gross land area in fee simple, or other equivalent consideration, unless such a land dedication was required for the subject land at the time of annexation.

**(d)  Specifications.**

(1)  Land dedicated or otherwise set aside for open space, trails, and park and recreational areas shall be of such size, dimensions, topography, and general character as is reasonably required for the type of use necessary to meet the demand and need of future residents, e.g., open space buffer, public trails, active recreation for team or individual sports, playground, tot lot, picnic area, etc.

(2)  Unique natural areas or flood prone areas that provide an opportunity for linkage parks may be included in areas dedicated or otherwise set aside or reserved for open space.

(3)  No land dedicated or otherwise reserved in compliance with this section, except for areas dedicated for public trail purposes, shall have dimensions smaller than one hundred feet (100') in width and one hundred fifty feet (150') in depth, without the specific approval of the Town Board.

(4)  The Town, at its sole discretion, may elect to use the dedicated land for any municipal, school or other public function deemed necessary.  Such use shall be compatible with surrounding use.

(5)  All lands to be dedicated must have access via a minimum 50-foot right-of-way and also must accommodate connection of all utilities necessary to operate the dedicated land as a public park or recreation area.

(6)  Signage designating this area as a trail or as park land shall be supplied by developer and/or owner.  The selection and type of signage shall be approved by Board of Trustees.

(7)  Whenever a development proposal includes any part of a pedestrian, bicycle,

BLM_0066320

equestrian or skiing trail designated on the Norwood Major Streets and Future Land Use Plan, a right-of-way shall be dedicated in compliance with the plan, and that portion of the land which is dedicated for public use purposes may be deducted from the otherwise required park land dedication.

**(e)      Platting requirements.**  Any land dedicated for open space, trails, or park and recreational areas shall be shown on the face of a plat submitted for approval by the Planning and Zoning Commission and Board of Trustees.

(1)      Pins to be installed.  Each corner of the park land to be donated shall be marked with permanent monument consisting of three-fourths inch (3/4") iron pins set in concrete. These shall be located and identified on a recordable land survey completed by a land surveyor registered in the State of Colorado and provided to the Town by Owner and/or developer.

(2)      Plat to be recorded.  Upon approval by the Board of Trustees, said plat shall be filed of record in office of the San Miguel County Clerk and Recorder.

**(f)      Payment of Cash in Lieu of Dedication.**  Payment of cash in-lieu of dedication of land for trails and park and recreational purposes shall be made prior to the recording of a final plat and shall be subject to the following provisions.

(1)      Applicability.  In any case in which the land required to be dedicated or otherwise reserved by this section would be less than one (1) acre, and in all cases in which the Board of Trustees may find that the park and recreational needs of a proposed development would be better served by a park in a different location or the expansion or improvement of an existing park or recreational area, the Town Board shall require a developer or subdivider to the Town of Norwood cash in lieu or to dedicate or convey other equivalent consideration in lieu of applicable cash dedication.

(2)      Schedule for Cash in Lieu.  The amount of cash payment required shall be based on the number of acres that otherwise would be required to be dedicated.  The Board of Trustees, following recommendation by the Planning and Zoning Commission shall, by resolution, set the per-acre fee for dedicated land based upon the current fair market value for raw lands adjacent to the Town of Norwood, which shall be annually updated.  The current schedule for cash in lieu is $25,000 per acre or $0.574 per square foot.

(3)      Accounting, expenditure and refunds.  All such payments of cash in-lieu fees shall be accounted for and spent according to the following requirements.

a.      Cash in-lieu payments shall be segregated in a separate fund to be spent on a first in, first out basis and used only for the acquisition and improvements of open space, trails, and park and recreational areas within the Town of Norwood that will meet the needs of the residents of the development or subdivision in respect of which such payment was made;

BLM_0066321

b.      Cash in-lieu payments shall be expended on the acquisition or improvement of open space, trails, or park land within reasonable proximity to the proposed development or subdivision from said development or subdivision; and,

c.      If cash in-lieu payments are not expended or unconditionally committed to be expended within ten (10) years of receipt, the developer or subdivider shall be entitled to a refund of the amount paid upon written request by the developer or subdivider filed with the Town Clerk within one (1) year after the right to such refund arises.

## § 4.06  Drainage

**(a)      Adequate drainage required.**   A developer shall provide, at his expense, drainage structures that will become integral parts of the existing street or roadway drainage system, and the dimensions of all drainage structures must be approved by the Town Public Works Director prior to installation.  Drainage structures and ditches shall be of a size and nature sufficient to carry the calculated storm water from streets, roadways and open drainage areas as based on standard engineering principles.

**(b)      Minimum standards.**  All provisions for drainage and flood control shall be established at a minimum to handle the anticipated 100 year frequency storms for maximum period of intensity over the entire drainage basin which the subdivision serves, and they shall be made in accordance with the approved improvement plan.  The 100-year floodplain referred to herein shall mean that floodplain calculated on the basis of a fully-developed watershed, regardless of any regulated floodplain designations.

**(c)      Erosion.**  Where free fall of water occurs, satisfactory means shall be provided to prevent erosion of soil.  Culverts shall have concrete head walls and wing walls where conditions require.

**(d)      Catch basins.**  Standard drop inlet catch basins shall be constructed.

**(e)      Engineered design.**  The Town may require that improvements be designed by a Colorado registered engineer.

**(f)      Water and sewer system protection.**  Water supply systems and sanitary sewage systems shall be designed to minimize or eliminate infiltration of floodwaters.

## § 4.07  Water Supply

All municipal water service shall be subject to the Rules and Regulations of the Norwood Water Commission.   All potable water lines, fire hydrants and appurtenances shall be designed and constructed to meet the requirements of the Norwood Water Commission's Standards and Specifications, Exhibit "B" to the Rules and Regulations, and the Norwood-Redvale Fire District. Fire hydrants shall be provided to serve new subdivisions sufficient to maintain a Class 7 fire rating

BLM_0066322

by the Insurance Service Office ("ISO").

## § 4.08  Sanitation

Sanitary sewer service and facilities shall be provided by and meet all requirements of the Norwood Sanitation District.

## § 4.09  Underground Utilities

All utilities shall be placed underground, except transformers, switching boxes, terminal boxes,

## § 4.10  Impact Fees (Reserved)

## § 4.11 Prominent Site Features

Prominent site features, such as landmarks, historic character and structures on the site, and significant topographic features shall be identified and taken into consideration in site planning and development. The Town may require such features to be preserved or otherwise protected.

## § 5.00  SITE DEVELOPMENT STANDARDS

## § 5.01  Scope and Applicability

No building permit or certificate of occupancy shall be issued for any development until all of the applicable standards of this Sec. 5.00, Site development standards, are met.

## § 5.02  Parking, loading and access

(a)     **Purpose.**  The purpose of this section is to require off-street parking and loading facilities in proportion to the parking demand for each use in order to ensure functionally adequate, aesthetically pleasing and secure off-street parking.  The regulations and design standards of this section are intended to accomplish the following.

  (1)     To ensure the usefulness of parking facilities.

  (2)     To ensure sufficient parking spaces on-site in order to prevent excessive parking on public streets and in residential neighborhoods.

  (3)     To ensure that access to parking does not impair the function of adjacent roadways or endanger the public safety.

BLM_0066323

**(b)      Applicability.**

(1)      New and complying development.  New development occurring after the effective date of this section, and development existing on the effective date of this section and complying with the number of off-street parking spaces required by this article shall be subject to the following provisions.

a.      Every use of a building or land hereafter established shall provide the minimum off-street parking spaces as required by this section.

b.      The number of parking spaces may be reduced when the land use or floor area of a building is changed or reduced to a use or floor area for which fewer parking spaces are required.

c.      When a building is expanded or a land use is changed so as to increase the number of parking spaces required, the number of such spaces shall be increased.

(2)      Existing noncomplying development.  Developments with legally noncomplying parking areas shall be subject to the following provisions.

a.      Existing parking spaces shall not be reduced below the minimum required by this section.

b.      Building permits and certificates of occupancy may be issued for a change of use or remodeling or structural alterations in developments containing legally noncomplying parking areas, without requiring compliance with this section, provided that such redevelopment does not result in an increase in the number of required parking spaces.

c.      Any building expansion or change of use that results in an increase over the number of parking spaces that would be required under this section for the lot shall provide additional parking spaces only for that increment of the expansion, as if it were a separate development.  Only the expanded portion of the parking area shall be required to comply with the provisions of this section.

**(c)      Computing parking.**  The minimum number of parking spaces required for a specific development proposal shall be based on the requirements listed in Sec. 5.02(d), Off-street parking requirements, and the following provisions.

(1)      Unlisted uses.  Where questions arise concerning the minimum off-street parking and requirements for any use not specifically listed, the requirements may be interpreted as those of a similar use.

(2)      Multiple uses.  In computing the parking requirements for any building or development, the total parking requirements shall be the sum of the specific parking space

requirements for each class of use included in the building or development.

(3)     Fractions.  When measurements determining the number of required parking  spaces result in fractions, any fraction less than one-half (½) shall be disregarded and any fraction of one-half (½) or more shall be rounded upward to the next highest full number.

**(d)     Off-Street  parking  requirements.**    Off-street  parking  spaces  shall  be  provided  in accordance with the following minimum requirements.

## SCHEDULE OF OFF-STREET PARKING REQUIREMENTS

| Zone District | Churches and Auditoriums | Hotel and Motel Units | Residential Uses Single Family | Residential Uses Multi Family | Non-Residential Uses |
|---|---|---|---|---|---|
| A, Agricultural | 1 space per 4 seats | None | 2 spaces per dwelling unit | | 3 spaces per 1000 sq. ft. of net leasable space |
| R-1, Residential | 1 space per 4 seats | None | 2 spaces per dwelling unit | 1 space per dwelling unit up to 750 square feet<br><br>2 spaces per dwelling unit 751 square feet or larger | 3 spaces per 1000 sq. ft. of net leasable space |
| R-1, Residential Cottage Housing Development | | | 1 space per unit for units >750 square feet<br><br>2 space per unit for units 750 square feet or larger | | |
| MH, Mobile Home | 1 space per 4 seats | None | 2 spaces per dwelling unit | | None |
| B-1, Business | 1 space per 4 seats | 1 space per rental unit or manager's unit | 2 spaces per Dwelling Unit | 1 space per dwelling unit up to 750 sf<br><br>2 spaces per dwelling unit 751 to 2000 sf | 1 spaces per 450 sq. ft. of net leasable space<br><br>1 space per 150 sf of space accessible by public and 1 space per 450 sf of space not accessible to public for |

BLM_0066325

| Zone District | Churches and Auditoriums | Hotel and Motel Units | Residential Uses Single Family | Residential Uses Multi Family | Non-Residential Uses |
|---|---|---|---|---|---|
| | | | | 3 spaces per dwelling unit 2001+sf | bars and restaurants. |
| I, Industrial | 1 space per 4 seats | None | 2 spaces per dwelling unit | 1 space per dwelling unit up to 750 sf<br>2 spaces per dwelling unit 751-2000 sf<br>3 spaces per dwelling unit 2001+sf | 3 spaces per 1000 sq. ft. of net leasable space<br>1 space per 150 sf of space accessible by public and 1 space per 450 sf of space not accessible to public for bars and restaurants |
| P, Public | 1 space per 4 seats | None | 2 spaces per unit | 1 space per dwelling unit up to 750 sf<br>2 spaces per dwelling unit 751-2000 sf<br>3 spaces per dwelling unit 2001+sf | None |
| PUD, Planned Unit Development | 1 space per 4 seats | Those of the underlying zone district. | Those of the underlying zone district | Those of the underlying zone district | Those of the underlying zone district |

**(e)** **Off-site parking**.   Required off-street parking spaces shall be on the same lot as the principal use, provided that all or a portion of the required parking spaces may be located on a separate lot from the lot on which the principal use is located, based on the following provisions.

    (1)    Contiguous.   The off-site parking shall be located on a lot that is immediately adjacent to and contiguous with the lot containing the principal use.

    (2)    Common ownership.  Any off-site parking area shall be under the same ownership as the principal use to which it is accessory, and all necessary legal instruments shall

BLM_0066326

be executed to ensure that the required number of spaces shall remain available throughout the life of the principal use.

**(f)      Parking space dimensions and design**.  Each off-street parking space shall consist of an open area measuring eight feet (8') wide by eighteen feet (18') long and seven feet (7') high and shall have vehicular access to a public street or alley.  Off-street parking shall be properly drained and must be paved with all-weather surfacing or be covered with gravel and maintained in a usable condition at all times.

**(g)      Restricted use of parking areas**.  No junked vehicle shall be parked or stored in public view on any street or private property in any residential district.  Junk vehicles shall be defined as those that either (1) lack a current license or inspection sticker or (2) are wrecked and/or dismantled.

**(h)      Design of loading areas.**  All loading spaces in the I, Industrial District shall comply with the following design requirements.

(1)      Location.  No loading space shall be located within the right-of-way of a public street.  Any loading dock or door shall be set back far enough from the right-of-way so that no portion of the right-of-way is occupied by trucks or other vehicles while loading or unloading.  The location of the loading area shall not interfere with the free circulation of vehicles in the off-street parking area.  No loading space shall be located so as to block access by emergency vehicles.

(2)      Size of berths.  The minimum required dimensions of loading spaces, open or enclosed, shall be twelve feet (12') in width by fifty-five feet (55') in length, with a minimum vertical clearance of fifteen feet (15').  Where tractor-trailer units will be using the facility, the minimum length shall be sixty-five feet (65').

(3)      Paving standards.  The surface of all open off-street loading spaces shall conform to the requirements for off-street parking areas.

(4)      Use of loading areas.  Required off-street loading spaces and associated aisles and maneuvering areas shall be used for vehicle loading only.  No sales, storage, display of merchandise (including automobiles), repair work or dismantling shall be permitted in such areas.

lot as the principal use, provided that all or a portion of the required parking spaces may be located on a separate lot from the lot on which the principal use is located, based on the following provisions.

(1)      Contiguous.  The off-site parking shall be located on a lot that is immediately adjacent to and contiguous with the lot containing the principal use.

(2)      Common ownership.  Any off-site parking area shall be under the same ownership

BLM_0066327

as the principal use to which it is accessory, and all necessary legal instruments shall be executed to ensure that the required number of spaces shall remain available throughout the life of the principal use.

**(f)    Parking space dimensions and design**.  Each off-street parking space shall consist of an open area measuring eight feet (8') wide by eighteen feet (18') long and seven feet (7') high and shall have vehicular access to a public street or alley.  Off-street parking shall be properly drained and must be paved with all-weather surfacing or be covered with gravel and maintained in a usable condition at all times.

**(g)    Restricted use of parking areas**.  No junked vehicle shall be parked or stored in public view on any street or private property in any residential district.  Junk vehicles shall be defined as those that either (1) lack a current license or inspection sticker or (2) are wrecked and/or dismantled.

**(h)    Design of loading areas.**  All loading spaces in the I, Industrial District shall comply with the following design requirements.

(1)    Location.  No loading space shall be located within the right-of-way of a public street.  Any loading dock or door shall be set back far enough from the right-of-way so that no portion of the right-of-way is occupied by trucks or other vehicles while loading or unloading.  The location of the loading area shall not interfere with the free circulation of vehicles in the off-street parking area.  No loading space shall be located so as to block access by emergency vehicles.

(2)    Size of berths.  The minimum required dimensions of loading spaces, open or enclosed, shall be twelve feet (12') in width by fifty-five feet (55') in length, with a minimum vertical clearance of fifteen feet (15').  Where tractor-trailer units will be using the facility, the minimum length shall be sixty-five feet (65').

(3)    Paving standards.  The surface of all open off-street loading spaces shall conform to the requirements for off-street parking areas.

(4)    Use of loading areas.  Required off-street loading spaces and associated aisles and maneuvering areas shall be used for vehicle loading only.  No sales, storage, display of merchandise (including automobiles), repair work or dismantling shall be permitted in such areas.

**(i)    Driveways and access.**

(1)    Access required.  All required off-street parking shall be provided with driveway access to a public street or alley.

(2)    Minimum driveway width.  Driveways shall be a minimum of ten feet (10') in width when serving one (1) dwelling unit, or fourteen (14) feet wide when serving more that one

BLM_0066328

residence or another use such as a boarding house.

(3)    Corner visibility.  No walls, fences or other obstruction to view shall be placed on any corner lot that would obstruct vision to automobile drivers.

## § 5.03        Sidewalks and Trails

**(a)    Applicability.**  This section is intended to ensure pedestrian access is available to serve uses that need and benefit from such access.   Builders shall be required to construct sidewalks and trails in accordance with the Major Streets and Future Land Use Plan, on all streets adjacent to their building sites in all zoning districts.   No Certificate of Occupancy shall be issued until the requirements of this section are met.

If a builder or property owner has reason to believe a proposed use does not need or benefit from pedestrian access, a written request for interpretation per Section 2.03 of this Chapter may be submitted to the Town Planner describing the use and explaining why pedestrian access should not be required as a condition of the building permit for the proposed use.

**(b)    Sidewalk construction standards.**  Sidewalks shall be five feet (5') in width in the B-1, Business District; or eight feet (8') in width if installed adjacent to a curb.  Sidewalks shall be four feet (4') in width in the all other districts.  The construction specification of sidewalks will conform with Town specifications for streets on file with the Town Engineer and Town Clerk.

**(c)    Trails construction standards.**   Trails in the Town of Norwood may be designed specifically as for horseback riding, hiking, mountain biking, nordic skiing or any combination thereof.   As a result, the Board of Trustees may require any specific standards (including less restrictive standards) for a particular proposed trail, or section thereof, based on the design standards set forth in the following figure and in the "Trail" definitions in subsection 2.02. However, in most cases and unless otherwise specified by the Board of Trustees, all trails shall be designed based as multi-use urban trails.

| TRAIL DESIGN STANDARDS | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | X-Slope Range | Tread Width | Clearing | | Surface Materials | | | | Cross Slope | Max Profile |
| | | | | h. | v. | natural | gravel | asphalt | concrete | | |
| **Access** | Disabled access | 0-10% | 7' | +4' | 10' | No | No | Pref. | Pref. | <2% | 5% avg, 8.33% max |
| | | | | | | | | | | | |

BLM_0066329

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Hiking** | Walking | 0-10% | 10' min | +4' | 10' | No | No | Pref. | Pref. | 4% | 5% avg |
| | Standard | 10-70% | 24-36" | +4' | 10' | Pref. | Pref. | No | No | 4% | 12% |
| | | | | | | | | | | | |
| **Mountain Bike** | Rural double Track | 10-70% | 48-96" | +6' | 10' | Pref. | Pref. | No | No | 4% | 12% |
| | | | | | | | | | | | |
| **Equestrian** | Rural double track | 10-70% | 48-96" | +6' | 10' | Pref. | Pref. | No | No | 4% | 12% |
| | | | | | | | | | | | |
| **Nordic** | Single track | 0-70% | 12" | 5' | +6' | Pref. | Pref. | OK | OK | NA | 10% desired |
| | Double track | 0-70% | 12"/12" | 10' | +6' | Pref. | Pref. | Ok | OK | NA | 10% desired |
| | Skate track | 0-70% | 8' | 10' | +6' | Pref. | Pref. | OK | OK | NA | 10% desired |
| | | | | | | | | | | | |
| **Multi-Use** | Urban | 0-10% | 10' | +4' | 10' | Pref. | Pref. | No | No. | 2% | 5% avg |
| | | | | | | | | | | | |

BLM_0066330

§ 5.04        **Fences and Walls**

**(a)      Height of fences.**  In any residential district or along the common boundary between any residential or nonresidential district where a wall, fence or screening separation is erected or where a screening wall or fence is required by Ordinance, resolution, regulation or law the following standards for height and design shall be observed.

(1)        Fences and walls shall be erected in accordance with the requirements of Sec. 5.02 (i) (3), Corner visibility.

(2)        Barbed wire fences are prohibited.

**(b)        Exterior building materials.**

(1)        B-1 zone district.  At least a two hour, exterior fire wall is required by the Uniform Building Code for all non-residential and mixed use structures with less than twenty feet (20') of separation between buildings.  Masonry exterior walls are the preferred building material in this circumstance due to historic precedent on Grand Avenue.

BLM_0066331

## § 5.05      Landscaping and Screening

**(a)      Purpose.**  This section is designed to provide standards for the installation and maintenance of landscaping, walls and screening devices so as to promote the general welfare of the community. This is accomplished by encouraging the creation of an attractive appearance along collector streets and by screening from view those uses that may be unattractive to the public eye.  Landscaping materials, including ground covers, shrubs, and trees further facilitate the control of erosion and the reduction of glare and dust, as well as the visual softening of building masses.  Native plant materials require less water than do non-native plants and therefore are preferred for required landscaping.  Walls and screening devices allow for the separation of incongruous uses and for the buffering of intensive activities.  Landscaping, walls and screening devices together, help to effectuate privacy, logical development, and enhancement of property values.

**(b)      Applicability.**  This section shall apply to all development in Planned Unit Development Overlay District and to all development in I, Industrial District.

**(c)      General requirements.**

(1)      Landscape or screening plan.  Any proposed building or use shall be shown on a landscape or screening plan indicating the location of existing and proposed buildings, parking areas, street improvements, locations and types of landscaped areas, walls, and screening devices.

(2)      Location of utilities.  Proposed utilities shall be located, when possible, so that their installation will not adversely affect vegetation to be retained on a site.

(3)      Installation.  Landscaping, watering devices, walls and screening structures shall be installed in accordance with the approved landscape or screening plan prior to issuance of a final Certificate of Occupancy for the building or use.  The Building Official may grant a temporary Certificate of Occupancy during the winter months when installation is impracticable or not feasible.

(4)      Removal of topsoil prohibited.  No person, firm or corporation shall strip, excavate or otherwise remove top soil except in connection with the construction or alteration of a building on such premises and excavation or grading incidental thereto.

(5)      Maintenance requirements.

a.      Landscaped areas shall be reasonably maintained by the owner or the lessee of the property, including pruning, trimming, watering, weed control or treatment, and other requirements necessary to create an attractive appearance for the development.

b.      Any plant materials not surviving shall be replaced within thirty (30) days of its demise or in the next appropriate season.

BLM_0066332

      c.    Lack of maintenance of required landscaping material shall constitute a violation of this chapter.

     (6)    Setbacks.  When industrial uses abut residential land uses, setbacks may be increased by Town boards or staff in its/their review of the project if the increase will mitigate potential conflicts between the uses.

(d) Landscaping standards.  Nonresidential development in the I, Industrial District shall landscape with native trees, grass, shrubs or other plants appropriate for the climate, as follows:

     (1)    Street yard landscaping.  All undeveloped areas of the street yard shall be landscaped.

     (2)    Native plant materials.  Native, low water use plant materials shall be utilized in order to minimize the consumption of water.

     (3)    Irrigation.  All required landscaped areas may be required to include an irrigation system to insure the health and growth of the landscape.  Where possible, irrigation systems shall utilize untreated, irrigation water instead of treated water.  Drip irrigation or other water efficient systems are encouraged.

(e) Screening standards. Development in the I, Industrial District shall comply with the following screening standards.

     (1)    Height of screening devices.  The height of screening devices shall be measured from the highest finished adjacent grade of the element to be screened.  Screening shall be high enough to shield the view of storage areas, parking and outdoor lighting from uses off-site.

     (2)    Parking areas.  Parking areas shall be screened from street view to a minimum height of three feet (3') above the highest finished grade of the parking area.  Such screening may be accomplished by the use of plants, earth berms, or natural topography.

     (3)    Outdoor storage areas.  All outdoor storage areas for materials, trash, mechanical equipment (to include ground based satellite dishes), vehicles, or other similar items shall be screened from street view by a minimum six foot (6') high screening device.  Such screening device shall consist either of plant material or a wall constructed of or finished with materials to match the main building of the site.

     (4)    Roof mounted equipment.  Roof mounted mechanical equipment to include satellite dishes and antennas shall be screened by parapet walls or other screening devices to be no lower in height than six feet (6') below the height of the

BLM_0066333

mechanical equipment on side, front, or rear walls, whichever are adjacent to public streets or residential districts.

(5)     Outdoor lighting.  All outdoor lighting shall be shielded on the top, and directed down and screened away from adjacent properties and streets.  Sodium vapor and similar high intensity light sources shall be prohibited.

(6)     Landscaping.  Landscaping is encouraged as a method of screening industrial uses and to create a transition to adjacent areas. Screening is encouraged to be natural, consisting of trees, plants and other live material, or a mix of structural screening and landscaping.

(7)     Location Adjacent to Residential Areas.     Where industrial uses abut residential uses, screening shall block views of storage areas and high activity and traffic portions of the industrial use to the extent possible. Screening shall also be used to shield adjacent uses from noise and light emanating from the industrial uses.

(8)     Berms.     Berms are also encouraged to provide adequate screening between industrial and off-site uses, especially to reduce noise and light impacts on adjacent or nearby properties.

BLM_0066334

**§ 5.06  Signs**

**(a)     Purpose and intent.**   The purpose of these regulations is to encourage and promote a consistent and appropriate signage element for the benefit of the citizens as well as the business community.  These regulations are not designed or intended to discourage or inhibit aesthetically pleasing signage design, materials, and placement.

**(b)     Applicability.**  The following regulations shall govern the placement and construction of all outdoor advertising display within the Town of Norwood.

**(c)     Permanent signs.**  Permanent signs shall be regulated as follows:

(1)     Signs shall be set back from the right-of-way a distance equal to the front yard requirement for the zoning district in which they are located or as specifically approved on the final site plan of a planned unit development.

(2)     Signs shall identify only interests conducted on or uses located on the lot.

(3)     Signs shall be maintained in good repair.

**(d)     Illumination**.   Illumination of all signs shall be in accordance with the standards in this section.

(1)     The light from any illuminated sign shall be so shaded, shielded or directed that the light intensity or brightness will meet the requirements of Sec. 5.08.

(2)     No sign shall have blinking, flashing or fluttering lights or other illuminating devices which have a changing light intensity, brightness or color.  Beacon lights are not permitted.  This does not apply to normal and customary Christmas lighting.

(3)     No colored lights shall be used at any location or in any manner so as to be confused with or construed as traffic control devices.

(4)     Neither the direct nor reflected light from primary light sources shall create a traffic hazard to passing motorists.

**(e)     Prohibited Signs.**  Prohibited signs are signs which:

(1)     Contain statements, words, or pictures of an obscene, indecent or immoral character;

(2)     Are of a size, location, movement, content, coloring or manner of illumination which may be confused with or construed as a traffic control device or which hides from view any traffic or street sign or signal;

BLM_0066335

(3)     Advertise business, activity, product or service not conducted on the premises upon which sign is located, such as billboards;

(4)     Have a moving part or are portable or wheeled; or

(5)     Contain or consist of ribbon streamers, strings of light bulbs, spinners, or other similarly moving devices.

**(f)     Permitted Signs.**  Signs listed in this section are permitted.

(1)     Temporary signs.  All temporary signs shall comply with the standards in this section.

(a)     Purpose: to announce the sale or leasing of a property or building; public events to be held; the builder or tenant of a proposed building or property; election campaigns.

(b)     Maximum size: 6 sq. ft. per sign.

(c)     Number: one for each street frontage upon which the property faces, and so placed that only one sign faces each street.

(d)     Illumination: none.

(e)     Time limit: three months maximum, with two renewals each of two months duration upon application.  Once the purpose for which the sign has been erected has been fulfilled, the permit shall be deemed void.

(f)     Traffic control signs erected by proper authority shall be exempt from these regulations.

(g)     Pennants, banners, and posters may be erected advertising a special civic event.  Such items may be erected two weeks prior to the opening of the event advertised, and must be removed promptly following termination of the event.  Banners and pennants erected under this clause may exceed the normal size limitation for temporary signs.  Pennants, banners, and posters visible from any State Highway must also be approved by the State Department of Highways.

(2)     Identification Signs.  All identification signs shall comply with the standards in this section.

(a)     Such signs shall identify a residence, business or principal authorized use on the premises where the sign is located.  An identification sign may be a wall

BLM_0066336

sign, a projecting or a free-standing sign.

(b)     A premises is limited to one identification sign per principal use unless otherwise specifically excepted in these regulations.

(c)     Size: residential use and home occupations - 2 sq. ft. per sign.  Other uses - 20 sq. ft. per sign.

(3)     Advertising Signs.  All advertising signs shall comply with the standards in this section.

(a)     Such signs may advertise the sale of products produced or sold on the premises where the sign is located.  Window decals, posters, etc., shall be included in the area allowance for such signs.

(b)     The total area of all such signs shall not exceed 20 sq. ft. in area per face or faces for each principal use.

(c)     Such signs shall not be allowed for home occupation uses.

(4)     Directional Signs.  All directional signs shall comply with the standards in this section.

(a)     Such signs shall show name, direction, and mileage and may be located adjacent to a public right-of-way.  Signs visible from any State Highway shall require a permit from the State Department of Highways prior to issuance of a Town sign permit.

(b)     Directional signs will be permitted only when authorized by the Board of Trustees, upon determination that, as a special exemption, the same are necessary or convenient to the traveling public to locate distinctive objects, businesses or land uses.

(c)     Permits for directional signs shall not be issued where such requirements are served by a sign installation provided by the State or Town.

(d)     Directional signs shall not exceed 6 sq. ft. in area per sign and must conform to design standards set by the Board of Trustees.  No more than two such off-site signs per principal use may be allowed.

(e)     No sign shall be allowed that prevents the driver of a vehicle from maintaining a clear and unobstructed view of official signs and approaching or merging traffic.

**(g)     Structural Characteristics.**  The structural characteristics of signs shall comply with the

BLM_0066337

standards of this section.

(1)     Free-standing signs shall not exceed 35 feet in height; and shall be a minimum of 8 feet above grade when located adjacent to or projecting over a pedestrian way and larger than two 2 sq. ft. in area.  Each free-standing sign may have two faces, each with the maximum area allowed under subsection 5.04 (f), provided the two faces are the same size and join back-to-back without any overlap.

(2)     Projecting Signs shall not be higher than the eave line or parapet wall of the principal building and shall be a minimum of 8 feet above grade when located adjacent to or projecting over a pedestrian way; shall not extend more than 4 feet from the building wall except where such a sign is an integral part of an approved canopy or awning.

(3)     Wall Signs shall not be higher than the eave line or parapet wall of the principal building and no sign part, including cutout letters, shall project more than 12 inches from the building wall.

**(h)     Permits.**  It shall be unlawful to erect, construct, reconstruct, alter, paint, or repaint, or change the use of any sign as defined in this section without first obtaining a sign permit; however, a sign permit shall not be required to repaint a sign exactly as it was permitted for the purpose of maintenance.

(1)     For all sign permits required, a fee shall be charged to cover the costs of administration.

(2)     Off-premise advertising signs require a permit from the Town.

BLM_0066338

## § 5.07  Performance Standards

**(a)      Applicability.**  All uses in any district of the Town of Norwood shall conform in operation, location and construction to the subjective performance standards herein specified so that the public health, safety and welfare will be protected.

**(b)      General.**  The location, size, design and operating characteristics of all uses shall minimize adverse effects, including visual impacts, on surrounding properties; and

**(c)      Unreasonable Noise**

(1) It is unlawful to any person to make, continue, or cause or permit to be made or continued any unreasonable noise upon any premises within the Town of Norwood under such person's control or operation.

(2) For purposes of this section "unreasonable noise" means any sound of such level or duration as to be or tend to be injurious to human health or welfare, or which would interfere with the enjoyment of life or property throughout the Town or any part thereof.

(3) The following noises shall be prima facie a violation of this section:

a.  Use of loudspeakers, amplifiers or other devices for amplification of sound which is plainly audible a distance of fifty feet from the building, structure or vehicle from which it is emanating between the hours of
   i.  For Sunday through Thursday: 9:00 p.m. and 7:00 a.m. the following morning.
   ii. For Friday and Saturday: 11:00 p.m. and 7:00 a.m. the following morning.

b.  Noise resulting from construction related activities during the time of 7:00 p.m. and 7:00 a.m. the following morning.

(4) The following are factors which may be considered in determining whether a noise is in violation of this section:
   a.  The volume of the noise.
   b.  The intensity of the noise.
   c.  The duration of the noise.
   d.  Time of day or night of the noise.
   e.  The volume and intensity of the background noise, if any.
   f.  The proximity of the noise to residential development.
   g.  The zoning, density, and types of development of the areas from which the noise emanates and to which it travels.
   h.  Whether the noise is recurrent, intermittent or constant.

BLM_0066339

        i.  And all other factors tending to show the magnitude and/or disruptive effect of the noise.

(5) This section shall not apply to traditional agricultural operations being conducted within the A, Agricultural Zone District.

(6) This section shall not apply to construction projects conducted between the hours of 7:00 a.m. and 7:00 p.m., Monday through Saturday, and in compliance with any time limitations imposed by any construction permit issued by the Town of Norwood, or, if no time limitation is imposed, for a reasonable period of time for completion of the project.

(7) Noise caused in the performance of rescue or emergency work for the immediate safety, health or welfare of the community or any individual shall be exempt from the provision of this article.

(8) Noise caused in the maintenance, construction, repair or improvement of any public road or public facility by public employees, by any person acting pursuant to a public works contract, or any person acting under the direction or control of any employee of any public agency, shall be exempt from the provision so this section.

(9) This section is not applicable to the use of property owned or used by the State of Colorado, the Town of Norwood, San Miguel County, or any political subdivision of the State of Colorado, or any of their lessees, licensee, or permittees for the purpose of promoting, producing, or holding cultural, entertainment, athletic or patriotic events, including, but not limited to concerts, music festivals and fireworks displays.

(10)      Any person may petition the Board of Trustees, thirty (30) days in advance, for a temporary hardship permit setting for the basis of the undue hardship in writing, the anticipated duration of the condition creating hardship and any other relevant matters. A temporary hardship permit may be granted if it is found that the activity, operation or noise source will be of a temporary duration, and that compliance with the requirements of this section cannot reasonably be obtained. No temporary permit may be issued for a period exceeding forty five (45) days and the Board of Trustees may set any conditions, limitations or requirements necessary to minimize adverse effect on the area impacted by the noise. In making a determination as to whether or not to issue a permit or the conditions, limitation or requirements to be imposed thereon, the Board may consider, among other things, the following circumstances:

        a.  Whether additional time is necessary for the permittee to alter or modify his activity or operation to comply with this Section.

BLM_0066340

   b. Whether the activity, operation or noise source will be of a temporary duration, and cannot be done in a manner that would comply with this section.

   c. Whether any other reasonable alternative is available to the permittee.

   d. Any interim noise control measures to be taken to minimize the noise.

   e. And the schedule of noise control measures that will be taken to bring the source into compliance within a reasonable time.

  **(11)**  Any violation of this section shall be deemed a violation of this Land Use Code and shall be subject to all remedies for a violation hereof. Each day of a violation shall constitute a separate offense.

**(d)** **Smoke and Particulate Matter.** No operation or use in any district shall at any time create smoke and particulate matter that, when considered at the bounding property line of the source of operation creates a nuisance or distracts from the use and enjoyment of adjacent property.

**(e)** **Odorous matter.** No use shall be located or operated in any district that involves the emission of odorous matter from a source of operation where the odorous matter exceeds the odor threshold at the bounding property line or any point beyond the tract on which such use or operation is located. The odor threshold shall be the concentration of odorous matter in the atmosphere necessary to be perceptible to the olfactory nerve of a normal person.

**(f)** **Fire and explosive hazard material.**

  (1) Explosives.  No use involving the manufacture or storage of compounds or products that decompose by detonation shall be permitted in any district, except that chlorates, nitrates, phosphorus and similar substances and compounds in small quantities for use by industry, school laboratories, druggists or wholesalers may be permitted when approved by the Fire Marshall as not presenting a fire or explosion hazard.

  (2) Flammables.  The storage and use of all flammable liquids and materials such as pyroxylin plastics, nitrocellulose film, solvents and petroleum products shall be permitted only when such storage or use conforms to the standards and regulations of the Town of Norwood.

**(g)** **Toxic and noxious matter.** No operation or use in any district shall emit a concentration across the bounding property line of the tract on which such operation or use is located of toxic or noxious matter that will exceed the threshold limits set forth by the Colorado Department of Health.

**(h)** **Vibration.** No operation or use in any district shall at any time create earthborne vibration that, when considered at the bounding property line of the source of operation creates a nuisance or distracts from the use and enjoyment of adjacent property.

BLM_0066341

**(i)      Open storage.**  No open storage of materials or commodities shall be permitted in any district except as an accessory use to a main use located in a building in an "I" or "PUD" Industrial District.  No open storage operation shall be located in front of a main building.  No wrecking, junk, or salvage yard shall be permitted as a storage use in any district.

BLM_0066342

**§ 5.08        Lighting Standards**

(a)        Purpose and Intent.    The purpose of the regulation is to regulate outdoor night-time lighting fixtures to preserve, protect and enhance the Town's dark sky while conserving energy, permitting reasonable and safe use of outdoor night-time lighting, minimizing glare and obtrusive light, and helping to protect the natural environment from the damaging effects of night lighting.

(b)        Applicability.  All outdoor lighting fixtures (luminaries) shall be installed in conformance with this section.

(c)        Maximum Wattage and Shielding.    All lighting installations shall be designed and installed to be fully shielded (full cutoff), except as in exceptions below, and shall have a maximum lamp wattage of 250 watts for commercial lighting, 100 watts incandescent and 26 watts compact fluorescent for residential lighting. In residential areas, light should be shielded such that the lamp itself or the lamp image is not directly visible outside the property perimeter.

(d)        Exempt Lighting.        The following are exempt from the requirements of this section:

   (1)    Outdoor lighting fixtures existing or legally installed prior January 1, 2009 however, when existing lighting fixtures become unrepairable or are replaced, their replacements are subject to all the provisions of this section

   (2)    Outdoor lighting fixtures that are necessary for worker safety at farms, ranches, dairies, feedlots or industrial, mining or oil and gas facilities.

   (3)    Lighting for stairs, ramps, exit signs and other illumination required by building code.

   (4)    Holiday and temporary lighting (less than thirty days use in any one year).

   (5)    Emergency lighting used by police, firefighters or medical personnel and that is in operation as long as the emergency exists.

(e) Nonconforming Light Fixtures.        In addition to other exemptions provided in this section, an outdoor lighting fixture not meeting these provisions shall be allowed, if the fixture is extinguished by an automatic shutoff devise between the hours of 11:00 p.m. and sunrise. No outdoor recreational facility, whether public or private, shall be illuminated after 11:00 p.m. except to conclude any recreational or sporting event or other activity conducted, which is in progress prior to 11:00 p.m. at a ballpark, arena or similar facility.

BLM_0066343

(f) Additional Requirements:

1. Lighting attached to single-family home structures shall not exceed the height of the eave.

2. Residential pole height restrictions can be considered to control light trespass on adjacent properties.

3. Architectural lighting shall not be allowed.

(g) Use of Mercury Vapor Lighting Fixtures.   No new mercury vapor outdoor lighting fixtures shall be sold or installed after January 1, 2009.

(h)      Definitions:

Fully Shielded.   A fixture that is shielded in such a manner that light rays emitted by the fixture, either directly from the lamp or indirectly from the fixture, are projected below a horizontal plane running through the lowest point on the fixture where light is emitted.

Glare.     Intense and blinding light that causes visual discomfort or disability.

Landscape lighting.      Luminaries mounted in or at grade (but not more than 3 feet above grade) and used solely for landscape rather than any area lighting.

Luminaire (light fixture).       A complete lighting unit consisting of one or more electric lamps, the lamp holder, any reflector or lens, ballast (if any), and any other components and accessories.

Obtrusive light.  Spill light that causes glare, annoyance, discomfort, or loss of visual ability. Light pollution.

Outdoor light fixture.     An outdoor artificial illuminating devices, lamps and other devices, permanent or portable, used for illumination or advertisement. Such devices shall include, but are not limited to, search, spot or flood lights for buildings and structures, recreational areas, parking lot lighting, landscape lighting, billboards and other signage and street lighting.

Spill light.       Light from a lighting installation that falls outside of the boundaries of the property on which it is located. Usually results in obtrusive light.

BLM_0066344

## § 6.00  ADMINISTRATION AND PROCEDURES

### § 6.01  Planning and Zoning Commission

**(a)**     **Planning and Zoning Commission created.**   There is hereby created an advisory board known as the Planning and Zoning Commission.

**(b)**     **Organization.**

(1)     The commission shall consist of five at-large regular members and may include two (2) alternates. All members shall be qualified electors of the town appointed by the mayor and ratified by a majority vote of the board of trustees.

(2)     In addition to the seven (7) members, there shall be at least one ex-officio member from the Board of Trustees which shall be the Mayor or his/her designee. there shall also be one (1) ex-officio member who shall be the Town Fire Marshal. the Town Board may appoint  two (2) non-resident ex-officio members of the Commission.

(3)     Alternate members may not vote, except in the absence of a regular member; and the ex-officio members may not ever vote.  All regular members, alternate members and ex-officio members may participate in all discussions.

(4)     Each non-resident ex-officio member must be a resident of Wright's Mesa, but not the Town of Norwood.

(5)     Each regular and alternate member of the Commission shall be a resident citizen and qualified elector of the Town of Norwood, Colorado, at the time of his or her appointment.  A member who ceases to reside in the Town during his or her term of office shall immediately forfeit his or her office.

(6)     The term of office of regular, alternate and ex-officio members of the Commission shall be for two (2) years; except that the term of office of the ex-officio member from the Board of Trustees, the Mayor and the ex-officio member who is the Fire Marshal shall coincide with their other respective and relevant positions.  The three (3) regular members shall be appointed to two (2) year terms ending on Feb 1 in even years and three (3) members shall be appointed for two (2) year terms beginning on Feb 1 in odd years.

(7)     All members of the Commission shall serve without compensation.

(8)     Other  qualifications  for  regular  membership  and  for  non-resident  ex-officio

BLM_0066345

membership shall be a genuine interest in the planning and zoning of the Town, ability to work with the public and time to devote to this service.

(9)     Regular members, alternates, and non-resident ex-officio members of the Commission shall be appointed by the Mayor and all appointments shall be subject to ratification by the Board of Trustees in accordance with established procedures.

**(c)     Officers and procedures.**   At the first scheduled Commission meeting in September of each year, or as soon thereafter as practicable, the first item of business shall be the selection of the Commission's chairperson and vice-chairperson from among the membership of the Commission.

(1)     The chairperson shall preside over meetings.   In the event a question over procedures arise, Robert's Rules of Order shall prevail.

(2)     The vice-chairperson shall assist the chairperson in directing the affairs of the Planning and Zoning Commission.   In the absence of the chairperson, the vice-chairperson shall assume the duties of the chairperson.

(3)     The recording of minutes of all Commission meetings shall be the responsibility of the Town staff.

(4)     A majority of the Commission shall constitute a quorum to do business and the affirmative vote of the majority of those attending shall be necessary to pass any motion.

(5)     The Commission shall establish rules and procedures that govern its operation.

**(d)     Powers and duties.**   The Planning and Zoning Commission shall have the following powers and duties:

(1)     To recommend the boundaries of the various zoning districts and appropriate regulations to be enforced therein under this chapter or the laws of the State of Colorado to the Board of Trustees and to recommend approval or denial of zoning changes and regulations under this chapter.

(2)     To hear, recommend or determine any matter relating to zoning, planning or subdivision control as they may be specified or required under this chapter or applicable laws of the State of Colorado.

(3)     To make and adopt a comprehensive plan for the physical development of the Town, including any areas outside its boundaries, subject to the approval of the Board of Trustees, which in the Commission's judgement bear relation to the planning of the Town of Norwood (C.R.S. 31-23-306).

(4)     To exercise the duties and powers as may be now or hereafter conferred by the this

BLM_0066346

chapter or applicable laws of the State of Colorado.

(5)      To hear and decide special exceptions to the terms of this chapter, pursuant to Sec. 6.16, Special exceptions.

**(e)      Allocation of Powers and Duties.**  The Board of Trustees, by enactment of this Chapter, hereby assumes and shall have the authority to exercise all powers granted to and duties placed upon the Planning and Zoning Commission by Colorado law and reserves the authority to delegate by Ordinance to the Planning and Zoning Commission any power granted to or duty placed upon the Board of Trustees by part 2, Article 23, Title 31 of the Colorado Revised Statutes.

BLM_0066347

## § 6.02  Zoning Map and Land Use Code Amendments

**(a)**     **Initiation of amendment.**  Any person having a proprietary interest in any property may apply to the Board of Trustees for a change or amendment to the provisions of this chapter, or the Planning and Zoning Commission may on its own motion or on request from the Board of Trustees, institute study and proposal for changes and amendments in the public interest.

**(b)**     **Application for zoning map amendment.**

(1)     Any person having a proprietary interest in any property within the corporate limits of the Town of Norwood, Colorado, requesting a change or amendment to the zoning classification of such property shall file ten (10) copies of an application requesting such change or amendment with the Town Planner, which application shall clearly state the requested change or amendment and describe the property to be affected by such request by metes and bounds or by other legal description.  The application shall include signature of property owner. If the applicant is not the owner of the property, s/he shall also submit a letter from the property owner designating the applicant as his/her agent with the authority to represent the application.

(2)     The application shall be accompanied by a title certificate from a licensed title company or attorney listing the name of the property owner(s) and all liens, easements and judgments of record that affect the title to the subject property.

(3)     Applications for map amendments shall include:

a.     A legal description of land area to be rezoned along with a sketch to scale showing the boundaries of the area to be rezoned which indicates the current zoning for all areas adjacent to the area proposed to be rezoned;

b.     A statement of the requested new zone district classification and justification for the rezoning;

c.     Description and sketches of buildings or uses proposed in the area proposed to be rezoned, along with a description of land and building uses within one hundred feet (100') in all directions;

d.     A time schedule for any contemplated new construction or uses; and

e.     A description of the effect that the rezoning would have on uses of adjacent properties in the neighborhood of the area proposed to be rezoned and on the town generally. the determination of the "neighborhood of the area proposed to be rezoned" shall be made by the planning and zoning commission and/or the board of trustees.

(4)     Applications for code amendments shall include the precise wording of the

BLM_0066348

proposal along with an explanation of why the amendment should be adopted.

(5)     A filing fee shall be submitted to cover the cost of review and processing with every petition in accordance with the fee schedule adopted by resolution of the board of trustees.

**(c)     Review by Planning and Zoning Commission.**  Before taking action on any proposed amendment, supplement or change, the governing body shall submit the same to the Planning and Zoning Commission for its recommendation and report.

(1)     Public hearing required.  The Planning and Zoning Commission shall hold a public hearing on any application for amendment or change prior to making its recommendation to the Board of Trustees.

(2)     Notification requirements for zoning map amendment.   When any such amendment or change relates to a change in the zoning classification of property or a change to the boundary of a zoning district, the applicant shall mail the written notice of public hearing before the Planning and Zoning Commission on the proposed amendment or change, after obtaining a copy of the notice from the Town Staff, to all owners of real property lying within one hundred feet (100') of the property on which the change is requested.  The notice shall be given not less than fifteen (15) days before the date set for hearing by depositing in the mail such notice properly addressed and postage paid to each such owner as the ownership appears on the last approved County tax roll. Notice shall be mailed to all owners of mineral estates of record in the records of the San Miguel county clerk and recorder. Applicants shall provide proof of mailing of notice to the Town prior to the public meeting or hearing that is the subject of the mailing of a notice.

(3)     Notification requirements for text amendment.  When any such amendment relates to a change of a regulation or to the text of this chapter not affecting specific property, the Town Clerk shall cause notice of the public hearing of the Planning and Zoning Commission to be given by one publication in a newspaper of general circulation in the Town of Norwood without the necessity of notifying property owners by mail.  Notice shall be mailed to all owners of mineral estates of record in the records of the San Miguel county clerk and recorder. Such notice shall state the time and place of such hearing and the nature of the subject to be considered, which time shall not be earlier than fifteen (15) days from the date of publication.

**(d)     Action by Board of Trustees.**  A public hearing shall be held by the governing body before adopting any proposed amendment, supplement or change.

(1)     The Town Clerk shall cause notice of the public hearing of the Board of Trustees to be given by publication in a newspaper of general circulation in the Town of Norwood without the necessity of notifying property owners by mail.  Such notice shall state the time and place of such hearing and the nature of the subject to be considered, which time shall

BLM_0066349

not be earlier than fifteen (15) days from the date of publication.

(2)     Such amendments shall not become effective except by the favorable vote of a majority of the quorum of the Board of Trustees present and voting.

(3)  When any such amendment or change relates to a change in the zoning classification of property or a change to the boundary of a zoning district and a protest against such proposed amendment has been filed with the Town Clerk, duly signed and acknowledged by the owners of twenty percent (20%) or more, either of the area of land included in such a proposed change or twenty percent (20%) of the land adjacent thereto extending one hundred feet (100') therefrom, disregarding intervening public streets and alleys, such amendments shall not become effective except by a two-thirds (2/3) vote of the Board of Trustees.

(e)     **Standards for Approval.**     The Planning and Zoning Commission and the Board of Trustees may approve an amendment to the zoning map or to the land use code when any one of the following criteria has been met:

(1)     There has been a substantial change in conditions in the neighborhood or area proposed to be rezoned since the date of approval of the existing zoning map designation;

(2)     There has been a substantial change in the circumstances or conditions of the town at large;

(3)     There is demonstrated to be an error in the existing zoning or land use code text;

(4)     The proposed amendment is in conformance with or would implement the Norwood Master Plan, Major Streets Plan/Future Land Use Plan, as amended;

(5)     There exists a substantial and compelling public interest in such amendment; or

(6)     The amendment protects the public health, welfare and safety of the town and its residents.

BLM_0066350

## § 6.03  Master Plan Amendments.

**(a)  Initiation of Amendment.**  Any person having a proprietary interest in any property may petition the Board of Trustees for a change or amendment to the Town of Norwood Comprehensive Plan ("Master Plan"), or the Planning and Zoning Commission may on its own motion or on request from the Board of Trustees, institute study and proposal for changes and amendments in the public interest.

**(b)  Application for Master Plan Amendment.**

    (1)  Any person having a proprietary interest in any property within the corporate limits of the Town of Norwood, Colorado, requesting a change or amendment to the master plan affecting such property, shall file ten (10) copies of an application for such change or amendment with the Town Planner, which petition shall clearly state the requested change or amendments with the Town Planner. The application shall include signature of property owner. If the applicant is not the owner of the property, s/he shall also submit a letter from the property owner designating the applicant as his/her agent with the authority to represent the application.

    (2)  The application shall clearly include:

        (a)  Requested change in designation for property;
        (b)  Legal description of affected property;
        (c)  Rationale for change and supporting information to justify change.
        (d)  Map showing area included in request

    (3)  A filing fee shall be submitted to cover the cost of review and processing with every private sector application in accordance with the fee schedule adopted by resolution of the Board of Trustees.

**(c)  Review by Planning and Zoning Commission.**  Before taking action on any proposed amendment, supplement or change, the governing body shall submit the same to the Planning and Zoning Commission for its recommendation and report.

    (1)  Public hearing required.  Before adopting any plan, any part, amendment, extension or addition to the plan, the Planning and Zoning Commission shall hold a public hearing prior to making its recommendation to the Board of Trustees.

    (2)  Notification requirements for master plan amendment.  The Town Clerk shall cause notice of the public hearing to be given by one publication in a newspaper of general circulation in the Town of Norwood without the necessity of notifying property owners by mail.  Such notice shall state the time and place of such hearing and the nature of the amendment to be considered, which time shall not be earlier than fifteen (15) from the date of publication. Notice shall also be mailed to all owners of mineral estates of record in the records of the San Miguel county clerk and recorder.

BLM_0066351

(3)     Requirements for approval.  Such amendments shall not become effective except by resolution of the Commission carried by the favorable vote of a two-thirds of the entire membership of the Commission.  The resolution shall refer expressly to the maps and descriptive matter intended by the commission to form the whole or part of the plan, and the action taken shall be recorded on the map and plan and descriptive matter by the identifying signature of the chairperson or secretary of the Commission.  An attesting copy of the plan or part thereof shall be certified to each governmental body of the territory affected and, after the approval by each body, shall be filed with the county clerk and recorder of San Miguel County.

(4)     Board notification of disapproval.  In the event of a disapproval by the Commission of a proposed master plan or an amendment to the plan, the commission shall communicate its reasons to the Board of Trustees.

(5)     Statutory approval requirement.  Failure of the Commission to act within sixty days from and after the date of official submission to it shall be deemed approval.

**(d)     Action by Board of Trustees.**  A public hearing shall be held by the governing body before adopting any proposed amendment, supplement or change.

(1)     Notification requirements for master plan amendment.  The Town Clerk shall cause notice of the public hearing to be given by one publication in a newspaper of general circulation in the Town of Norwood without the necessity of notifying property owners by mail.  Notice shall be mailed to all owners of mineral estates of record in the records of the San Miguel county clerk and recorder.  Such notice shall state the time and place of such hearing and the nature of the amendment to be considered, which time shall not be earlier than fifteen (15) days from the date of publication.

(2)     Positive Commission recommendation.  If the Commission has recommended approval, such plan or amendment shall not become effective except by the favorable vote of a majority of the quorum of the Board of Trustees present and voting.

(3)     Negative Commission recommendation.  If the Commission has recommended denial, such plan or amendment shall not become effective unless the Board of Trustees overrules such disapproval by a recorded vote of not less than two-thirds of its entire membership.

(e)     **Standards for approval.**     The Planning and Zoning Commission and Board of Trustees shall evaluate the request and consider changes in circumstances since the adoption of the Master Plan.

BLM_0066352

## § 6.04  Preliminary Plat Procedures

**(a)      Pre-application conference.**  Prior to the filing of a preliminary plat, the subdivider shall meet with the Town Planner or his or her designated agent to acquaint himself or herself with the requirements of the Town and the relationship of the proposed subdivision to the comprehensive plan.  At such meeting, the application contents, referral agencies, review procedures, density standards, use and area standards, street requirements, utility service and the general character of the development may be discussed.  At the pre-application conference, the subdivider may be represented by a land planner, engineer or surveyor.  Applicants are encouraged to meet with the R-2 School District prior to submitting an application for subdivision.

**(b)      Submittal requirements.**  The subdivider or owner shall file fifteen (15) copies of an application requesting preliminary plat approval, a title certificate from a licensed title company or attorney listing the name of the property owner(s) and all liens, easements and judgements of record affecting the subject property, and of the preliminary plat. The application shall include signature of property owner. If the applicant is not the owner of the property, s/he shall also submit a letter from the property owner designating the applicant as his/her agent with the authority to represent the application.  Such plat shall be accompanied by or show the following information:

>    (1)      Boundary lines and bearings.  Boundary lines, bearings, and distances sufficient to locate the exact area proposed for subdivision.  At least one (1) subdivision corner shall be referenced to a survey (abstract) corner.  The area, in acres, of the subdivision shall also be shown.

>    (2)      Adjacent subdivisions.  The name and location of a portion of adjoining subdivisions shall be drawn to the same scale and shown in dotted lines adjacent to the tract proposed for subdivisions in sufficient detail to show actually the existing streets and alleys and other features that may influence the layout and development of the proposed subdivisions.  Where adjacent land is not subdivided, the name of the owner of the adjacent tract shall be shown.

>    (3)      Intersecting streets.  The angle of intersection of the centerline of all intersecting streets.

>    (4)      Proposed streets, alleys and easements.  The names, location and widths of all streets, alleys and easements proposed for the subdivision, and all known rights-of-way and/or easements within or affecting the area to be subdivided.

>    (5)      Proposed blocks, lots and parks.  The subdivision shall show all proposed streets and alleys, easements, blocks, lots, parks, etc., with principal dimensions.

>    (6)      Contours.  Topographic contours at five foot (5') intervals and all easements or right-of-way necessary for drainage within or without the boundaries of the addition.

>    (7)      Subdivision title and planner.  The title under which the proposed subdivision is to

BLM_0066353

be recorded, the name of the owner and the name of the engineer or land planner who prepared the plat.

(8)    Dedicated parks, playgrounds and other public uses.  Sites, if any, to be reserved or dedicated for parks, playgrounds or other public uses.

(9)    Scale, north point.  Scale, north point, date and other pertinent data.  The scale of the preliminary plat may be at one inch (1") equals twenty feet (20').

(10)    Name, address and telephone number.  Property owner's name, address, and telephone number.

(11)    Proposed layout of utilities.  A proposed preliminary layout of sanitary sewer and water lines to serve the subdivision.

(12)    Drainage report.  A general drainage report or drainage statement shall accompany the preliminary plat.  This study or report shall show the acreage draining into the subdivision, points of runoff through and away from the subdivision.

(13)    Protective covenants.  Draft of any protective covenants where the subdivider proposes to regulate land use or development standards in the subdivision.

(14)    Proposed land uses.  A designation of the proposed uses of land within the subdivision and any zoning amendments proposed to be requested.

(15)    Vicinity map.  A vicinity map on a smaller scale showing the proposed subdivision and its relationship to the surrounding area and Town limits.

(16)    Application fee.  A filing fee shall be submitted to cover the cost of review and processing with every preliminary plat in accordance with the fee schedule adopted by resolution of the Board of Trustees.

**(c)    Action of Commission.**

(1)    The Town Planning and Zoning Commission consideration shall include paving and layout of streets, alleys and sidewalks; means of ingress and egress, provisions for drainage, parking spaces, protective screening and open spaces; areas designated for landscaping; and other aspect deemed by the Town Planning and Zoning Commission necessary to consider in the interest of promoting the public health, safety, order, convenience, prosperity and general welfare.

(2)    Preliminary master plan.  If the proposed subdivision is a portion of a tract that is later to be subdivided in its entirety, then a tentative master plat of the entire subdivision shall be submitted with the preliminary plat of the portion first to be subdivided.  The master subdivision plan shall conform in all respects to the requirements of the preliminary

BLM_0066354

plat; except, it may be on a scale of not more than one inch (1") to one hundred feet (100').

(3)    Subdivisions outside Town.  If the information shown on a preliminary subdivision plat is of land located outside the corporate limits of the Town of Norwood and within Norwood's Urban Growth Boundary, the procedure for approval, modification or disapproval, shall be the same as required for preliminary plats within the Town.

**(d)    Application review procedures.**

(1)    Date of filing.  Ten (10) copies of the preliminary plat as described in subsection (b) above shall be submitted to the Town Planner thirty (30) days prior to the Planning and Zoning Commission meeting at which consideration is desired.  The preliminary plat shall be considered officially filed after application review fees which are established by resolution of the Board of Trustees have been paid and after it is examined and found to be in compliance with the general provisions of these regulations by the Town Planner.

(2)    Distribution of preliminary plats.  The following notice shall be stamped on the face of each preliminary plat:  "Preliminary Plat - for inspection purposes only, and in no way official or approved for record purposes."   The Town Planner shall distribute the preliminary plats immediately upon receipt to the following:

  a.  Town Planner/Consultant (one copy)

  b.  Town Engineer/Consultant (one copy)

  c.  Town Public Works Director (one copy)

  d.  San Miguel Power Association or other electricity provider (one copy)

  e.  SourceGas or other natural gas provider (one copy)

  f.  Centurylink or other telephone provider (one copy)

  g.  R-2 School District (one copy)

  h.  Norwood Water Commission (one copy)

  i.  Norwood Sanitation District (one copy)

  j.  Norwood Town Clerk (one copy - for the public record)

(3)    Distribution to County.  Whenever a preliminary subdivision plat, involving land in the Town's Urban Growth Boundary outside the corporate limits, is submitted to the Planning and Zoning Commission for approval, two (2) additional plat copies shall be provided and forwarded for comment and recommendation to the County Commissioners.

BLM_0066355

One (1) of the copies shall be specifically directed to the attention of the Commissioner in whose district the subdivision is located and the other to the County Planning Director. The transmittal to the County Commissioners shall specify the date at which the Planning and Zoning Commission will act on the preliminary plat and request a reply setting forth the improvement standards and other requirements essential to the acceptance of streets, roads and other public dedications proposed by the plat.

(4)     Comments; written report.   At least ten (10) days prior to the meeting of the Planning and Zoning Commission at which the plat is to be considered, each agency listed above shall submit their written recommendations concerning the plat in question to the Town Planner.   The recommendations shall be given to the Planning and Zoning Commission with the plat for their consideration.  A written report shall be prepared by the Town Planner and submitted to the Planning and Zoning Commission at the next regular meeting.   Such report should include comments relative to the proposed subdivision's compliance to these regulations, the comprehensive plan or other master plans such as utility plans.  The report may include comments from other municipal departments, county, or state agencies concerned with urban development.

**(e)      Review by Commission.**

(1)     The Planning and Zoning Commission shall hold a public hearing on a preliminary plat prior to making its recommendation to the Board of Trustees.

(2)     Notification requirements for preliminary plat.   When a hearing is to be held on preliminary plat of property, the applicant shall mail the written notice of public hearing before the Planning and Zoning Commission on the proposed preliminary plat, after obtaining a copy of the notice from the Town Staff, to all owners of real property lying within one hundred feet (100') of the property on which the change is requested.  Notice shall be mailed to all owners of mineral estates of record in the records of the San Miguel county clerk and recorder. The notice shall be given not less than fifteen (15) days before the date set for hearing by depositing in the mail such notice properly addressed and postage paid to each such owner as the ownership appears on the last approved County tax roll. Applicants shall provide proof of mailing of notice to the Town prior to the public meeting or hearing that is the subject of the mailing of a notice.

(3)     Items for consideration by Commission.  The Planning and Zoning Commission shall, in its action on the preliminary plat, consider the physical arrangement of the subdivision, and determine the adequacy of street rights-of-way and alignment and the compliance of the streets with any Norwood Streets Plan, the existing street pattern in the area and with any other applicable provisions of the comprehensive plan.  The Planning and Zoning Commission shall also ascertain that adequate easements for proposed or future utility service and surface drainage are provided, and that the lot size and area are adequate to comply with the minimum requirements for the type of sanitary sewage disposal proposed.  Where connection to an approved sanitary sewage collection and treatment system is not proposed, all lots and building sites shall contain a minimum area of one (1)

BLM_0066356

acre or more depending upon studies of the particular soil condition and evaluation of the physiographic and geologic character of the area being subdivided.

(4)     Action within 30 days.  Following review of the preliminary plat and other materials submitted for conformity thereof to these regulations, and negotiations with the subdivider on changes deemed advisable and the kind and extent of improvements to be made by the subdivider, the Planning and Zoning Commission shall, within thirty (30) days, act thereon as submitted or modified, and if approved the Planning and Zoning Commission shall express its approval as conditional approval and state the conditions of such approval, if any, or if disapproved, shall express its disapproval and its reasons therefor.

(5)     Notation of action.  The action of the Planning and Zoning Commission shall be noted on two (2) copies of the preliminary plat, referenced and attached to any conditions determined.  One (1) copy shall be returned to the subdivider and the other retained by the Planning and Zoning Commission.  A notation of the action taken and requisite reasons therefor shall be entered in the records of the Planning and Zoning Commission.

**(f)     Review by Board of Trustees.**

(1)     Submittal to Board of Trustees.  The Town Planner shall, at the next regularly scheduled Board of Trustees meeting following conditional approval or disapproval by the Planning and Zoning Commission, submit the preliminary plat with the conditions established by the Planning and Zoning Commission to the Board of Trustees for their consideration.

(2)     Action by Board of Trustees.  The Board of Trustees shall approve or disapprove the preliminary plat as to street dedication and utility services either with or without special provisions.

**(g)     Effect of preliminary plat approval.**

(1)     Not approval of final plat.  Conditional approval of a preliminary plat shall not constitute approval of the final plat.  Rather, it shall be deemed an expression of approval to the layout submitted on the preliminary plat as a guide to the preparation of the final plat.

(2)     Lapse of approval.  Preliminary approval of the subdivision shall be valid for a period of twelve (12) months from the date of approval and the general terms and conditions under which the preliminary approval was granted will not be changed.  The Planning and Zoning Commission shall withdraw its preliminary approval of a subdivision unless the final plat is submitted within the twelve (12) month period or unless the twelve (12) month period is extended by the Planning and Zoning Commission at the request of the subdivider.

BLM_0066357

## § 6.05  Final Plat Procedures

**(a)      Final plat submittal requirements.**  The owner of land on which preliminary plat approval has been obtained shall prepare and submit a final plat to the Planning and Zoning Commission. The owner shall provide a non-erasable mylar copy of the original and six (6) copies drawn to a scale of one hundred feet (100') to one inch (1").  The drawing shall measure twenty-four inches by thirty-six inches (24" x 36").  When necessary the plat may be on several sheets accompanied by an index sheet showing the entire subdivision.  For large subdivisions, the final plat may be submitted for approval progressively in sections satisfactory to the Planning and Zoning Commission.  The final plat shall show or be accompanied by the following:

(1)      Control points; acres.  The primary control points, or descriptions and "ties" to such control points, to which all dimensions, angles, bearings, and similar data on the plat shall be referred shall be placed on the final plat.  The area of the subdivision, in acres, shall be shown.

(2)      Boundary lines and bearings.  Tract boundary line sufficient to locate the exact area proposed for subdivision, right-of-way lines of streets, easements and other rights-of-way, and property lines of residential lots and other sites; with accurate dimensions, bearings or deflection angles, and radii, arcs and central angles of all curves shall be placed on the final plat.

(3)      Streets.  Name and right-of-way width of each street or other right-of-way shall be placed on the final plat.

(4)      Easements.  Location and dimensions of all easements shall be placed on the final plat.

(5)      Lot and block numbers.  Number to identify each lot or site and each block, and the dimensions of lots and blocks, shall be placed on the final plat.

(6)      Purpose of sites.  The purpose for which sites, other than residential lots, are dedicated or reserved shall be indicated on the final plat.

(7)      Building lines.  Minimum building setback lines when required or approved by the Planning and Zoning Commission shall be placed on the final plat.

(8)      Monuments.  Location and description of monuments shall be placed on the final plat.

(9)      Adjacent land.  References to recorded subdivision plats or adjoining platted land by record name shall be placed on the final plat.

(10)      Legal description.  A legal description and surveyor's certificate, to, in the following form, shall be placed on the final plat:

BLM_0066358

KNOW ALL MEN BY THESE PRESENTS:

That I, _____, do hereby certify that I prepared this plat from an actual and accurate survey of the land and that the corner monuments shown thereon were properly placed under my supervision.

_____
Signature

(11)    Approval certification.   Certification of approval by the Planning and Zoning Commission and Board of Trustees, in the following form, shall be placed on the final plat.

APPROVED this _____ day of _____, 19___, by the Planning and Zoning Commission of the Town of Norwood, Colorado.

_____
Chairman

APPROVED this _____ day of _____, 19___, by the Board of Trustees of the Town of Norwood, Colorado.

_____
Mayor

_____
Town Clerk

(12)    Title; scale.  A title, scale, and north point shall be placed on the final plat.

(13)    Street intersections.  The location of the point of intersection and points of tangency of street intersections, and the bearing and distance of each street right-of-way center line shall be placed on the final plat.

(14)    Plat identification.  A positive reference and identification of the plat and date of plat shall be placed on the final plat.

(15)    Dedication certificate.  The property owner's certificate or deed of dedication shall be placed on the final plat.   The dedication deed or certificate of dedication shall be executed by all persons, firms or corporations owning an interest in the property subdivided and platted, and shall be acknowledged in the manner prescribed by the laws for the State of Colorado for conveyances of real property.   The spouse of all married persons executing such dedication deed or certificate of dedication shall join therein unless satisfactory proof be provided showing that the property to be subdivided does not constitute any portion of such party's homestead, in which case the instrument of dedication shall state the fact that the property subdivided and platted does not constitute a part of such party's actual

BLM_0066359

homestead.  In the case of surface lien holders, they may execute a subordination agreement subordinating their liens to all public streets, alleys, parks, school sites and any other public areas shown on the plat of such subdivision as being set aside for public uses and purposes. The dedication deed or certificate of dedication shall, in addition to the above requirements, contain the following:

> a.    An accurate description of the tract of land subdivided.

> b.    A statement and express representation that the parties joining in such dedication are the sole owners of such tract of land.

> c.    An express dedication without reservation to the public for public use; the streets, alleys, rights-of-way, school site and any other public areas shown on the attached plat.

> d.    A positive reference and identification of the plat of such subdivision, date of plat and engineer.

(16)    Tax certificates.  Tax certificates indicating that all taxes on the land being subdivided have been paid to the current year shall be submitted with the final plat.

(17)    Construction plans.  Three (3) sets of plans for required improvements and a set of reproducible transparent sheets, 23" x 36" in size along with all data and calculations related to utilities, drainage or other construction in the subdivision shall be submitted with the final plat.  Such plans shall also show all existing or proposed surface and subsurface improvements and obstruction.

**(b)    Application review procedures.**

(1)    Date of filing.  After approval of the preliminary plat by the Planning and Zoning Commission and Board of Trustees and within twelve (12) months of the approval date unless extended by action of the Planning and Zoning Commission, the subdivider may submit for approval the final plat.  The application, meeting all the requirements of subsection (a) above, shall be submitted to the Town Planner at least thirty (30) days prior to the meeting at which consideration is desired.  The official filing date of the final plat shall be the date upon which the plat and construction drawings are found to be in full compliance with the provisions of the preliminary approval after examination by the Town Planner.

(2)    Conformance with preliminary plat.  The final plat shall conform substantially to the preliminary plat as approved and, if desired by the subdivider, it may constitute only that portion of the approved preliminary plat that he or she proposes to record and develop at the time, provided however, that such portion conforms to all requirements of these regulations.

(3)    Review of construction plans.  After the presentation of the construction plans for a

BLM_0066360

subdivision to the Town Planner, the Town Planner shall submit the construction plans to
the Town Engineer/Consultant for review.  The Town Engineer/Consultant shall review the
plans and submit to the Planning and Zoning Commission his or her report at the final plat
presentation.  The developer shall pay the reasonable cost of review of the construction
plans before the final plat is presented to the Board of Trustees.

**(c)**     **Review by Commission.**

(1)     Action by Commission.  The final plat shall be presented to the Planning and
Zoning Commission at its next regular meeting, along with any appropriate
recommendation by the Town Planner.  The Planning and Zoning Commission shall act on
the final plat within thirty (30) days after the official filing date or within a reasonable time
thereafter.

(2)     Review in stages.  An owner or subdivider, at his or her option, may obtain approval
of a portion or a section of a subdivision provided he or she meets all the requirements of
this chapter with reference to such portion or section in the same manner as is required for a
complete subdivision.  In the event a subdivision and the final plat thereof is approved by
the Planning and Zoning Commission in sections, each final plat of each section is to carry
the name of the entire subdivision, but is to bear a distinguishing letter, number or subtitle.
Block numbers shall run consecutively throughout the entire subdivision, even though such
subdivision may be finally approved in sections.

(3)     Approval by Commission.   After the Planning and Zoning Commission has
determined that the plat is in proper form, that the arrangement of the development
proposed for the property being subdivided is consistent with zoning regulations and that
the subdivision complies with the provisions of this chapter, it shall act to approve the plat,
subject to action by the Board of Trustees.

(4)     Disapproval by Commission.  Final plats that are disapproved by the Planning and
Zoning Commission shall be returned to the subdivider by the Town Planner with an
attached statement of the reasons for such action.

(5)     Appeal.  Any subdivider aggrieved by any finding or action of the Planning and
Zoning Commission that involves the jurisdiction of the Board of Trustees as to dedication
or improvements, shall have the right of appeal to the Board of Trustees within thirty (30)
days from the date of such finding or action but any appeal must be taken within thirty (30)
days of such action and not thereafter.

**(d)**     **Review by Board of Trustees.**  The Board of Trustees shall consider all proposals with
respect to the dedication of right-of-way for public use, the construction of utilities, streets,
drainage, and other improvements, and when satisfied with the proposals, shall authorize the
establishment of agreements for same and ratify the approval action of the Planning and Zoning
Commission relative to the final plat.

BLM_0066361

**(e)**     **Action following approval.**

(1)     Certification of approval.  The Planning and Zoning Commission's approval and the Board of Trustees's ratification of the final plat shall authorize the Chairman of the Planning and Zoning Commission to execute the certificate of approval on the original copy of the final plat.

(2)     Recordation of plats.  The final plat for any subdivision located within the corporate limits of the Town of Norwood shall then be caused to be filed of record by the subdivider in the plat records of San Miguel County, but only after the Board of Trustees has officially acted upon the final plat with reference to improvements, dedications and utilities. Recording fees shall be paid by the developer.

(3).     Sign off on construction plans.        Three sets of final construction plans shall be provided by the subdivider and signed by the subdivider and the Board of Trustees or the Boards' designee and retained as a record by the Town Clerk.

BLM_0066362

**§ 6.05A – Small Scale Subdivision Procedures**

**(a)      Pre-application conference.**  Prior to the filing of a small scale subdivision plat, the subdivider shall meet with the Town Planner or his or her designated agent to acquaint himself or herself with the requirements of the Town and the relationship of the proposed subdivision to the comprehensive plan.   At such meeting, the application contents, referral agencies, review procedures, density standards, use and area standards, street requirements, utility service and the general character of the development may be discussed.   At the pre-application conference, the subdivider may be represented by a land planner, engineer or surveyor.  Applicants are encouraged to meet with the R-2 School District prior to submitting an application for subdivision.

**(b)      Submittal requirements.**  The subdivider or owner shall file fifteen (15) copies of an application requesting small scale subdivision plat approval, a title certificate from a licensed title company or attorney listing the name of the property owner(s) and all liens, easements and judgements of record affecting the subject property, and of the small scale subdivision plat. The application shall include signature of property owner. If the applicant is not the owner of the property, s/he shall also submit a letter from the property owner designating the applicant as his/her agent with the authority to represent the application.  Such plat shall be accompanied by or show the following information:

(1)      Boundary lines, bearings, monuments and control points. Tract boundary line sufficient to locate the exact area proposed for subdivision, right-of-way lines of streets, easements and other rights-of-way, and property lines of residential lots and other sites; with accurate dimensions, bearings or deflection angles, and radii, arcs and central angles of all curves shall be placed on the final plat.

The primary control points, or descriptions and "ties" to such control points, to which all dimensions, angles, bearings, and similar data on the plat shall be referred shall be placed on the final plat.  The area of the subdivision shall be shown.

Location and description of monuments shall be placed on the plat.

(2)      Adjacent subdivisions.   The name and location of a portion of adjoining subdivisions shall be drawn to the same scale and shown in dotted lines adjacent to the tract proposed for subdivisions in sufficient detail to show actually the existing streets and alleys and other features that may influence the layout and development of the proposed subdivisions.  Where adjacent land is not subdivided, the name of the owner  of the adjacent tract shall be shown. References to recorded subdivision plats or adjoining platted land by record name shall be placed on the plat.

(3)      Intersecting streets. The location of the point of intersection and points of tangency of street intersections, and the bearing and distance of each street right-of-way center line shall be placed on the final plat.

BLM_0066363

(4)     Proposed streets, alleys and easements.   The names, location, dimensions and widths of all streets, alleys and easements proposed for the subdivision, and all known rights-of-way and/or easements within or affecting the area to be subdivided.

(5)     Proposed blocks, lots and parks.   The subdivision shall show all proposed streets and alleys, easements, blocks, lots, parks, etc., with principal dimensions. Each lot, block and site shall be numbered to identify.

(6)     Contours.   Topographic contours at five foot (5') intervals and all easements or right-of-way necessary for drainage within or without the boundaries of the addition.

(7)     Subdivision title and planner.   The title under which the proposed subdivision is to be recorded, the name of the owner and the name of the engineer or land planner who prepared the plat.

(8)     Dedicated parks, playgrounds and other public uses.   Sites, if any, to be reserved or dedicated for parks, playgrounds or other public uses.

(9)     Scale, north point.   Scale, north point, date and other pertinent data.  The scale of the small scale subdivision plat may be at one inch (1") equals twenty feet (20').

(10)    Name, address and telephone number.   Property owner's name, address, and telephone number.

(11)    Proposed layout of utilities.   Layout of sanitary sewer and water lines to serve the subdivision.

(12)    Drainage report.   A general drainage report or drainage statement shall accompany the small scale subdivision plat if required at the pre-application conference.  This study or report shall show the acreage draining into the subdivision, points of runoff through and away from the subdivision.

(13)    Protective covenants.   Draft of any protective covenants where the subdivider proposes to regulate land use or development standards in the subdivision, if identified at the pre-application meeting.

(14)    Purpose of sites.   The purpose for which sites, other than residential lots, are dedicated or reserved shall be indicated on the plat.

(15)    Vicinity map.   A vicinity map on a smaller scale showing the proposed subdivision and its relationship to the surrounding area and Town limits.

(16)    Application fee.   A filing fee shall be submitted to cover the cost of review and processing with every small scale subdivision plat in accordance with the fee schedule adopted by resolution of the Board of Trustees.

BLM_0066364

(17)    Legal description.  A legal description and surveyor's certificate, to, in the following form, shall be placed on the final plat:

KNOW ALL MEN BY THESE PRESENTS:

That I, _____, do hereby certify that I prepared this plat from an actual and accurate survey of the land and that the corner monuments shown thereon were properly placed under my supervision.

_____
          Signature

(18)    Approval certification.  Certification of approval by the Planning and Zoning Commission and Board of Trustees, in the following form, shall be placed on the final plat.

APPROVED this _____ day of _____, 19___, by the Planning and Zoning Commission of the Town of Norwood, Colorado.

_____
Chairman

APPROVED this _____ day of _____, 19___, by the Board of Trustees of the Town of Norwood, Colorado.

_____
Mayor

_____
          Town Clerk

(19)    Title; scale.  A title, scale, and north point shall be placed on the final plat.

(20)    Plat identification.  A positive reference and identification of the plat and date of plat shall be placed on the final plat.

(21)    Dedication certificate.  The property owner's certificate or deed of dedication shall be placed on the final plat.  The dedication deed or certificate of dedication shall be executed by all persons, firms or corporations owning an interest in the property subdivided and platted, and shall be acknowledged in the manner prescribed by the laws for the State of Colorado for conveyances of real property.  The spouse of all married persons executing such dedication deed or certificate of dedication shall join therein unless satisfactory proof be provided showing that the property to be subdivided does not constitute any portion of such party's homestead, in which case the instrument of

BLM_0066365

dedication shall state the fact that the property subdivided and platted does not constitute a part of such party's actual homestead.  In the case of surface lien holders, they may execute a subordination agreement subordinating their liens to all public streets, alleys, parks, school sites and any other public areas shown on the plat of such subdivision as being set aside for public uses and purposes. The dedication deed or certificate of dedication shall, in addition to the above requirements, contain the following:

  a.  An accurate description of the tract of land subdivided.

  b.  A statement and express representation that the parties joining in such dedication are the sole owners of such tract of land.

  c.  An express dedication without reservation to the public for public use; the streets, alleys, rights-of-way, school site and any other public areas shown on the attached plat.

  d.  A positive reference and identification of the plat of such subdivision, date of plat and engineer.

(22)  Tax certificates.  Tax certificates indicating that all taxes on the land being subdivided have been paid to the current year shall be submitted with the final plat.

(23)  Construction plans, if any.  Three (3) sets of plans for required improvements and a set of reproducible transparent sheets, 23" x 36" in size along with all data and calculations related to utilities, drainage or other construction in the subdivision shall be submitted with the final plat.  Such plans shall also show all existing or proposed surface and subsurface improvements and obstruction.

(c)  **Application review procedures.**

(1)  Date of filing. The application, meeting all the requirements of subsection (a) above, shall be submitted to the Town Planner at least thirty (30) days prior to the meeting at which consideration is desired.  The small scale subdivision plat shall be considered officially filed after application review fees which are established by resolution of the Board of Trustees have been paid and after it is examined and found to be in compliance with the general provisions of these regulations by the Town Planner.

(2)  Distribution of plans. The Town staff shall distribute the plans immediately upon receipt to the following:

  a.  Town Planner/Consultant (one copy)

  b.  Town Engineer/Consultant (one copy)

BLM_0066366

    c.       Town Public Works Director (one copy)

    d.       San Miguel Power Association or other electricity provider (one copy)

    e.       Rocky Mountain Natural Gas or other natural gas provider (one copy)

    f.       U.S. West or other telephone provider (one copy)

    g.       R-2 School District (one copy)

    h.       Norwood Water Commission (one copy)

    i.       Norwood Sanitation District (one copy)

    j.       Norwood Town Clerk (one copy - for the public record)

(3)    Distribution to County.  Whenever a small scale subdivision plat, involving land in the Town's Urban Growth Boundary outside the corporate limits, is submitted to the Planning and Zoning Commission for approval, two (2) additional plat copies shall be provided and forwarded for comment and recommendation to the County Commissioners.  One (1) of the copies shall be specifically directed to the attention of the Commissioner in whose district the subdivision is located and the other to the County Planning Director.  The transmittal to the County Commissioners shall specify the date at which the Planning and Zoning Commission will act on the small scale subdivision plat and request a reply setting forth the improvement standards and other requirements essential to the acceptance of streets, roads and other public dedications proposed by the plat.

(4)    Comments; written report.  At least ten (10) days prior to the meeting of the Planning and Zoning Commission at which the plat is to be considered, each agency listed above shall submit their written recommendations concerning the plat in question to the Town Planner.  The recommendations shall be given to the Planning and Zoning Commission with the plat for their consideration.  A written report shall be prepared by the Town Planner and submitted to the Planning and Zoning Commission at the next regular meeting.  Such report should include comments relative to the proposed subdivision's compliance to these regulations, the comprehensive plan or other master plans such as utility plans.  The report may include comments from other municipal departments, county, or state agencies concerned with urban development.

(3)    Review of construction plans.  After the presentation of the construction plans for a subdivision to the Town Planner, the Town Planner shall submit the construction plans to the Town Engineer/Consultant for review.  The Town Engineer/Consultant shall review the plans and submit to the Planning and Zoning Commission his or her report at the final plat presentation.  The developer shall pay the reasonable cost of review of the construction plans before the final plat is presented to the Board of Trustees.

BLM_0066367

**(d)**      **Review by Commission.**

(1)      The Planning and Zoning Commission shall hold a public hearing on a small scale subdivision plat prior to making its recommendation to the Board of Trustees.

(2)      Notification requirements for small scale subdivision plat.   When a hearing is to be held on a small scale subdivision plat of property, the applicant shall mail the written notice of public hearing before the Planning and Zoning Commission on the proposed small scale subdivision plat, after obtaining a copy of the notice from the Town Staff, to all owners of real property lying within one hundred feet (100') of the property on which the change is requested.  Notice shall be mailed to all owners of mineral estates of record in the records of the San Miguel county clerk and recorder. The notice shall be given not less than fifteen (15) days before the date set for hearing by depositing in the mail such notice properly addressed and postage paid to each such owner as the ownership appears on the last approved County tax roll.  Applicants shall provide proof of mailing of notice to the Town prior to the public meeting or hearing that is the subject of the mailing of a notice.

(3)      Items for consideration by Commission.  The Planning and Zoning Commission shall, in its action on the plat, consider the physical arrangement of the subdivision, and determine the adequacy of street rights-of-way and alignment and the compliance of the streets with any Norwood Streets Plan, the existing street pattern in the area and with any other applicable provisions of the comprehensive plan.   The Planning and Zoning Commission shall also ascertain that adequate easements for proposed or future utility service and surface drainage are provided, and that the lot size and area are adequate to comply with the minimum requirements for the type of sanitary sewage disposal proposed. Where connection to an approved sanitary sewage collection and treatment system is not proposed, all lots and building sites shall contain a minimum area of one (1) acre or more depending upon studies of the particular soil condition and evaluation of the physiographic and geologic character of the area being subdivided. After the Planning and Zoning Commission has determined that the plat is in proper form, that the arrangement of the development proposed for the property being subdivided is consistent with zoning regulations and that the subdivision complies with the provisions of this chapter, it shall act to approve the plat, subject to action by the Board of Trustees.

(4)      Action by Planning and Zoning Commission.  Following review of the small scale subdivision plat and other materials submitted for conformity thereof to these regulations, and negotiations with the subdivider on changes deemed advisable and the kind and extent of improvements to be made by the subdivider, the Planning and Zoning Commission shall act thereon as submitted or modified, and if approved the Planning and Zoning Commission shall express its approval as conditional approval and state the conditions of such approval, if any, or if disapproved, shall express its disapproval and its reasons therefor.

(5)      Notation of action.  The action of the Planning and Zoning Commission shall be noted on two (2) copies of the small scale subdivision plat, referenced and attached to any conditions determined.   One (1) copy shall be returned to the subdivider and the other

BLM_0066368

retained by the Planning and Zoning Commission.  A notation of the action taken and requisite reasons therefor shall be entered in the records of the Planning and Zoning Commission.

(6)     Disapproval by Commission.  Small scale subdivision plats that are disapproved by the Planning and Zoning Commission shall be returned to the subdivider by the Town Planner with an attached statement of the reasons for such action.

(7)     Appeal.  Any subdivider aggrieved by any finding or action of the Planning and Zoning Commission that involves the jurisdiction of the Board of Trustees as to dedication or improvements, shall have the right of appeal to the Board of Trustees within thirty (30) days from the date of such finding or action but any appeal must be taken within thirty (30) days of such action and not thereafter.

**(e)     Review by Board of Trustees.**  The Board of Trustees shall consider all proposals with respect to the dedication of right-of-way for public use, the construction of utilities, streets, drainage, and other improvements, and when satisfied with the proposals, shall authorize the establishment of agreements for same and ratify the approval action of the Planning and Zoning Commission relative to the small scale subdivision plat.

**(f)     Action following approval.**

(1)     Certification of approval.  The Planning and Zoning Commission's approval and the Board of Trustees's ratification of the final plat shall authorize the Chairman of the Planning and Zoning Commission to execute the certificate of approval on the original copy of the final plat.

(2)     Recordation of plats.  The final plat for any subdivision located within the corporate limits of the Town of Norwood shall then be caused to be filed of record by the subdivider in the plat records of San Miguel County, but only after the Board of Trustees has officially acted upon the final plat with reference to improvements, dedications and utilities. Recording fees shall be paid by the developer.

(3).     Sign off on construction plans, if any.         Three sets of final construction plans shall be provided by the subdivider and signed by the subdivider and the Board of Trustees or the Boards' designee and retained as a record by the Town Clerk.

BLM_0066369

## § 6.05B Condominium Subdivision and Conversion

**(a)     Purpose.** The purpose of this section is to provide review procedures to ensure that the creation or conversion of condominium subdivisions will comply with the provisions of the Norwood Land Use Code.

**(b)     Definition.** For purposes of this section a condominium is defined as a common interest community in which portions of the real estate are designated for separate ownership and the remainder of which is designated for common ownership solely by owners of the separate ownership portions.

**(c)     Procedures.** The procedures and standards for review and approval of a condominium subdivision shall be the same as that specified for all subdivisions, with applications meeting the definition of a small scale subdivision being processed pursuant to section 6.05A. However, all condominium conversions shall be reviewed as small scale subdivisions without regard to the number of units or size of the parcel proposed for conversion.

**(d)     Compliance.** Condominium subdivisions shall comply with all standards and review criteria generally applicable to subdivisions, as well as, to the extent applicable, the following:

(1)     Provisions of the Condominium Ownership Act, Section 38-33-101, et seq. C.R.S.

(2)     Provisions of the Colorado Common Interest Ownership Act. Section 38-33.5-101, et seq.

(3)     Title 38, Articles 50 and 51, C.R.S.

(4)     Norwood Land Use Code Section 1.00, General Provisions

(5)     Norwood Land Use Code Section 3.00, Zoning Regulations

(6)     Norwood Land Use Code Section 4.00, Subdivision Standards

(7)     Norwood Land Use Code Section 5.00, Site Development Standards.

(8)     Norwood Land Use Code Sections 6.04, 6.05, 6.05A, 6.06, 6.07 and 6.08, Subdivision Procedures

**(e)     Preliminary Plat Submission Requirements.** In addition to the preliminary plat submission requirements contained in Section 6.04(b) or 6.05A (b), as applicable, the applicant shall submit:

(1)     Fifteen (15) copies of a preliminary condominium plat/map meeting the

BLM_0066370

requirements of a land survey as set forth in Section 38-51-106, C.R.S. and the requirements of a map/plat as set forth in Section 38-33.3-209, C.R.S., being a part of the Colorado Common Interest Ownership Act.

(2)     A copy of the Condominium Declaration as required by Section 38-33.3-205, C.R.S., being a part of the Colorado Common Interest Ownership Act.

(3)     A narrative in sufficient detail to the satisfaction of the Town Planner demonstrating compliance of the condominium project with each of the following, as applicable:
  a.     Norwood Land Use Code Section 1.00, General Provisions
  b      Norwood Land Use code Section 3.00, Zoning District Regulations
  c.     Norwood land Use code Section 4.00, Subdivision Standards
  d.     Norwood Land Use Code Section 5.00, Site Development Standards.
  e.     Norwood Land Use Code Sections 6.06, 6.07 and 6.08, Subdivision Review Procedures

**(f) Final Plat Requirements.** In addition to the plat statements specified in Section 6.05 (a) or 6.05A (b), as applicable, the following shall be required on the final condominium plat and shall be worded substantially as follows:

Heading: The heading of the final condominium plat shall include the complete name of the condominium subdivision, the lot, block, or land sections, township, range, principal meridian, "The Town of Norwood, San Miguel County, Colorado." Also, where applicable, the United States mineral claim name, number and mining district shall be shown.

Land Surveyor's Certificate**:** I( printed name of land surveyor) being a Registered Land Surveyor in the State of Colorado, do hereby certify that this plat and survey of (NAME OF CONDOMINIUM SUBDIVISION IN CAPITAL LETTERS) was made by me and under my supervision and that both are accurate to the best of my knowledge.
Dated this _____ day of _____ A.D. 20__
(Signature)_____
Colorado Registration Number _____ (Seal)

County Treasurer's Certificate: I certify that according to the records in the San Miguel County Treasurer's office, there are no liens against the property included in the subdivision, or any part thereof, for unpaid state, county or municipal ad valorem taxes or special assessments certified to the County Treasurer for collection.

**(g)     Condominium Conversion.** In the case of an application to convert an existing structure or development to condominium units, the owner of such property shall demonstrate that the following requirements have been or will be met:

(1)     The structure or development subject to the proposed condominium conversion meets current off street parking requirements for the underlying zone district found in

BLM_0066371

Section 5.02. Each residential condominium unit shall be considered a separate dwelling unit for purposes of determining parking compliance.

(2)      There is or will be a one (1) hour fire wall between all units.

(3)      Owners of the property proposed for condominium conversion have or will give the notice to residential tenants of the building required by, and otherwise comply with the requirements of, Section 38-33-112, C.R.S., being a part of the Condominium Ownership Act, as amended. Copies of the notification shall be filed with the Town Clerk as proof of compliance.

(h)      **Recording Prohibited.** No condominium subdivision shall be recorded until the Town determines that it has satisfied all Town requirements and has obtained all required Town approvals.

BLM_0066372

## § 6.06  Acceptance of Subdivision Improvements

**(a)**  **Time frame for completion.**

(1)  Plan resubmittal.  If construction has not commenced within one (1) year after approval of the plans, resubmittal of plans may be required by the Town Engineer for meeting current standards and engineering requirements.  These plans will be reviewed and comments noted in fifteen (15) working days.  A fee as provided for in the fee schedule adopted by resolution of the Town Board is required upon the resubmittal of plans for review.  "Construction" shall mean the start or commencement of construction of Town maintained facilities.

(2)  Expiration and extension of approval.  If the public improvements for a subdivision have not been constructed and accepted by the Town, and the corresponding final plat for said subdivision filed in the plat records of the San Miguel County within eighteen (18) months from the date of final plat approval by the Town, said final plat shall be null and void and shall conclusively be deemed to be withdrawn, without further action by the Town; provided however, this provision shall not apply to final plats approved by the Town prior to the adoption of this Land Use Code (adoption date).  If the public improvements for a subdivision that was approved prior to (adoption date) have not been constructed and accepted by the Town, and the corresponding final plat for said subdivision filed in the map and plat records of the San Miguel County by within 18 months of the adoption of the Land Use Code (insert appropriate date) said final plat shall be null and void and shall conclusively be deemed to be withdrawn, without further action by the Town.  An approved, unexpired final subdivision plat may be extended once for a period not to exceed twelve (12) months, pursuant to the following provisions:

a.  The Board of Trustees may extend the approval of the final plat, for good cause shown by the applicant, if there has been no significant change in development conditions affecting the subdivision plan and the plat continues to comply with all applicable standards and ordinances.

b.  A request for an extension of time to complete final public improvements for a subdivision pursuant to these provisions shall be submitted to the Town Planner no later than the date the final subdivision plat expires.  The request shall be in writing, and the application shall state the reason and justification for the requested extension.

**(b)**  **Improvements required.**  The improvement of all streets, sidewalks, alleys, and drainageways as herein required shall be in accordance with the standard specifications of the Town of Norwood for installation of such improvements.  The Town shall withhold all improvements and services of whatsoever nature, from all additions that have not been approved in accordance with the regulations herein contained.

**(c)**  **Inspection.**  All construction work, such as street grading, street paving, storm sewers, curb

BLM_0066373

and/or gutter work, sanitary sewers or water mains performed by the owner, developer or contractor, shall be subject to inspection during construction by the proper authorities of the Town and shall be constructed in accordance with the standard specifications approved by the Board of Trustees, and in accordance with the provisions of any other ordinance of the Town of Norwood applicable thereto.

**(d)** **As-built plans.** Prior to the acceptance of a subdivision by the Town, the engineer for the developer shall submit to the Town staff a complete set of drawings of the paving, drainage, water, and sewer improvements showing all changes made in the plans during construction and containing on each sheet an "As-Built" stamp bearing the signature of the engineer and the date. In addition, one reproducible drawing of the utility plan sheets, containing the "As-Built" information, shall be submitted.

**(e)** **Maintenance bond.** Prior to the acceptance of a subdivision by the Town, the subdivider shall furnish a good and sufficient maintenance bond in the amount of ten percent (10%) of the contract price with a reputable and solvent corporate surety in favor of the Town, to indemnify the Town against any repairs that may become necessary to any part of the construction work performed in connection with the subdivision arising from defective workmanship or materials used therein, for a full period of two (2) years from the date of final acceptance of the entire project.

**(f)** **Inspection fee.** Prior to the acceptance of a subdivision by the Town, the subdivider shall reimburse the Town for all design review and inspection costs incurred by the Town for design review and inspection of the water and sewer utilities, drainage facilities, and streets and other public improvements in each subdivision.

BLM_0066374

## § 6.07  Improvements Agreements and Performance Guarantees

**(a)     Improvements Agreements.**  Prior to the issuance of a building permit and the recording of a final plat, an applicant shall submit for approval to the Board of Trustees an improvements agreement for construction of any required public improvements designated on the final plat.

**(b)     Performance Guarantee**
(1)      Prior to the issuance of any building permit, the Board of Trustees shall require an applicant to file a financial guarantee in order to insure compliance with any or all requirements of the Board stipulated in the improvements agreement and the final plat.

(2)      The financial guarantee, in the judgment of the Board of Trustees, shall be sufficient to make reasonable provision for completion of said improvements in accordance with design and time specifications.

(3)      Ordinarily, a letter of credit to the Board of Trustees from a commercial bank, savings and loan institution, insurance company or other qualified lending institution(s) licensed or authorized to do business in the State of Colorado, or a letter from the Federal Housing Administration or Veterans Administration in a form satisfactory to the Mayor shall be required.

(4)      Nothing in subsection 6.07 (b)(3) shall preclude the Board of Trustees from approving other forms of financial security.

**(c)     Release of Collateral**

(1)      As public improvements are made, an applicant may apply to the Board for release of part or all of the collateral deposited with the Board.

(2)      Upon inspection and approval, the Board shall release collateral, provided that in the event a combination of forms of collateral has been accepted, the Board shall release collateral on a priority basis it deems appropriate.

(3)      If the Board determines that any of the required improvements are not constructed in substantial compliance with specifications, it shall furnish the applicant a list of specifications and shall be entitled to withhold collateral sufficient to insure substantial compliance.

(4)      If the Board determines that the applicant will not construct any or all of the improvements in accordance with all of the specifications, the Board may withdraw and employ from the deposit of collateral such funds as may be necessary to construct the improvements in accordance with the specifications.

**(d)     Form of Agreement.**  All Improvement Agreements shall utilize the standard Town template or guide for the format and content of such Agreements.

BLM_0066375

## § 6.08  Mandatory Homeowners' Associations

**(a)      Applicability.**  When a residential subdivision contains any physical facilities, structures, improvements, systems, areas or grounds held in common and necessary or desirable for the welfare of the area or subdivision, or that are of common use or benefit and that are not or cannot be satisfactorily maintained by the Town or another public agency, the Town may require the establishment and creation of a mandatory homeowners' association to assume and be responsible for the continuous and perpetual operation, maintenance and supervision of such facilities, structures, improvements, systems, areas or grounds.

**(b)      Approval.**  If the establishment and creation of a mandatory homeowners' association is required by the Town, a copy of the agreements, covenants and restrictions establishing and creating the association must be approved by the Town Attorney and Board of Trustees prior to the approval of the final plat of the subdivision and must be filed of record with said final plat in the Map and Plat Records of San Miguel County, Colorado.  Said final plat shall clearly identify all facilities, structures, improvements, systems, areas or grounds that are to be operated, maintained and/or supervised by said association.

**(c)      Responsibilities.**  Such mandatory homeowners' associations shall be responsible for the continuous and perpetual operation, maintenance and/or supervision of landscape systems, features or elements located in parkways, common areas, between screening walls or living screens and adjacent curbs or street pavement edges, adjacent to drainage ways or drainage structures, or at subdivision entryways.  Subdivision entryway treatments or features shall not be allowed unless a mandatory homeowners' association as required herein is established and created.

**(d)      Dedications to association.**  All facilities, structures, improvements, systems, areas or grounds that are to be operated, maintained and/or supervised by a mandatory homeowners' association, other than those located in public easements or right-of-ways, shall be dedicated by easement or deeded in fee simple ownership interest to said association.  Such easements or ownership shall be clearly identified on the final plat of the applicable subdivision.

**(e)      Contents of agreements.**  At a minimum, the agreements, covenants and restrictions establishing and creating a mandatory homeowners' association required herein shall contain and/or provide for the following:

(1)      Definitions of terms contained therein;

(2)      Provisions acceptable to the Town for the establishment and organization of the mandatory homeowners' association and the adoption of by-laws for said association, including provisions requiring that the owner(s) of any lot or lots within the applicable subdivision and any successive buyer(s) shall automatically and mandatorily become a member of the association;

(3)      The initial term of the agreements, covenants and restrictions establishing and creating the association shall be for a twenty-five (25) year period and shall automatically

BLM_0066376

renew for successive ten (10) year periods, and the association may not be dissolved without the prior written consent of the Town;

(4)     Provisions acceptable to the Town to ensure the continuous and perpetual use, operation, maintenance, and/or supervision of all facilities, structures, improvements, systems, areas or grounds that are the responsibility of the association and to establish a reserve fund for such purposes;

(5)     Provisions prohibiting the amendment of any portion of the association's agreements, covenants or restrictions pertaining to the use, operation, maintenance and/or supervision of any facilities, structures, improvements, systems, areas or grounds that are the responsibility of the association without the prior written consent of the Town;

(6)     The right and ability of the Town or its lawful agents, after due notice to the association, to remove any landscape systems, features or elements that cease to be maintained by the association; to perform the responsibilities of the association if the association fails to do so in compliance with any provisions of the agreements, covenants or restrictions of the association or of any applicable Town codes or regulations; to assess the association for all costs incurred by the Town in performing said responsibilities if the association fails to do so; and/or to avail itself of any other enforcement actions available to the Town pursuant to state law or Town codes or regulations; and

(7)     Provisions indemnifying and holding the Town harmless from any and all costs, expenses, suits, demands, liabilities or damages, including attorney's fees and costs of suit, incurred or resulting from the Town's removal of any landscape systems, features or elements that cease to be maintained by the association or from the Town's performance of the aforementioned operation, maintenance or supervision responsibilities of the association due to the association's failure to perform said responsibilities.

BLM_0066377

## § 6.09   Replats and Plat Amendments

**(a)**      **Replats.**      Replats shall be subject to all of the requirements of this chapter regarding preliminary plats and final plats.  In addition to the requirements applicable to a final plat, a replat shall comply with the following requirements when applicable.

(1)      If the replat is submitted for approval before the sale of any lot located within the subdivision being replatted, a written instrument declaring the previous plat to be vacated, duly executed and acknowledged by the owner or owners of the land, shall be submitted first to the Planning and Zoning Commission for its approval and then to the Board of Trustees for its approval and subsequent recording in the office of the County Clerk of San Miguel County.  Such written instrument shall be submitted simultaneously with the filing of the replat.

(2)      If the replat is submitted for the approval after the sale of a lot or lots located within the subdivision being replatted, an application of all the owners of all the lots in the plat to be vacated shall be submitted first to the Planning and Zoning Commission for its approval and then to the Board of Trustees for its approval and subsequent recording in the office of the County Clerk of San Miguel County.   Such application shall be submitted simultaneously with the filing of the replat.

(3)      In the event there is no compliance with either paragraph (1) or (2) above, a public hearing shall be held by the Planning and Zoning Commission and the Board of Trustees on any application for a replat without vacation of the immediate previous plat at which parties in interest and citizens shall have an opportunity to be heard. Such replats shall be submitted first to the Planning and Zoning Commission for approval and then to the Board of Trustees for approval and subsequent recording in the office of the County Clerk of San Miguel County.  Such replats shall be signed and acknowledged by only the owners of the particular property being resubdivided.  Replats filed under this subsection shall not alter, amend or remove any covenants or restrictions nor attempt to do so.

a.      The Town Clerk shall cause notice of the public hearing of the Planning and Zoning Commission and the Board of Trustees to be given by one publication in a newspaper of general circulation in the Town of Norwood without the necessity of notifying property owners by mail.  Such notice shall state the time and place of such hearing and the nature of the subject to be considered, which time shall not be earlier than fifteen (15) days from the date of publication.

**(b)**      **Plat amendments.**   Notwithstanding any other provision of this section, the Board of Trustees is authorized to approve and issue an amending plat that is signed by the applicants only, and that is for solely one or more of the following purposes, and such approval and issuance shall not require notice, hearing, or approval of other lot owners.

(1)      The purpose of the amendment is to correct an error in any course or distance shown on the prior plat.

BLM_0066378

(2)     The purpose of the amendment is to add any course or distance that was omitted on the prior plat.

(3)     The purpose of the amendment is to correct an error in the description of the real property shown on the prior plat.

(4)     The purpose of the amendment is to indicate monuments set after death, disability, or retirement from practice of the engineer or charged with responsibilities for setting monuments.

(5)     The purpose of the amendment is to show the proper location or character of any monument that has been changed in location or character or that originally was shown at the wrong location or incorrectly as to its character on the prior plat.

(6)     The purpose of the amendment is to correct any other type of clerical error or omission as previously approved by the Planning and Zoning Commission and the Board of Trustees; such errors and omissions may include, but are not limited to, lot numbers, acreage, street names, and identification of adjacent recorded plats.

(7)     The purpose of the amendment is to correct an error in courses and distances of lot lines between two (2) adjacent lots where both lot owners join in the application for plat amendment and neither lot is abolished, provided that such amendment does not attempt to remove recorded covenants or restrictions and does not have a material adverse effect on the property rights of the owners in the plat.

(8)     The purpose of the amendment is to relocate a lot line in order to cure an inadvertent encroachment of a building or improvement on a lot line or on an easement.

(9)     The purpose of the amendment is to relocate or vacate one or more lot lines between one or more adjacent lots where the owner or owners of all such lots join in the application for the plat amendment, provided that such amendment does not:

    a.      Attempt to remove recorded covenants or restrictions;

    b.      Increase the number of lots; or

    c.      Result in the creation of a lot with less the minimum lot area in the required in underlying zone district (see Sec. 3.06).

BLM_0066379

## § 6.10  Conditional Use Permits

**(a)     General.**  A conditional use is a use that may or may not be appropriate in a given location depending upon the specific characteristics of the proposed use and\or the conditions imposed upon the approval of the use.  Conditional use permits may be approved for the uses indicated in the use regulations of the zoning district of the property for which the conditional use permit is requested.

**(b)     Pre-application conference.**  Prior to the filing of a conditional use permit application, the applicant shall meet with the Town Planner or his or her designated agent to acquaint himself or herself with the requirements of the Town.  As such meeting, the application contents, referral agencies, review procedures, use and area standards, and the general character of the development may be discussed.  At the pre-application conference, the applicant may be represented by a land planner, engineer or surveyor.

**(c)     Submittal requirements.**  The applicant shall file ten (10) copies of an application requesting a conditional use permit and of a title certificate from a licensed title company or attorney listing the name of the property owner(s) and all liens, easements and judgements of record affecting the subject property.   The application shall include signature of property owner. If the applicant is not the owner of the property, s/he shall also submit a letter from the property owner designating the applicant as his/her agent with the authority to represent the application. The application shall be accompanied by or show the following information:

> (1)     The street address and legal description of the property affected; and

> (2)     Site plan and description of proposed use and any and all plans, information, operating data and expert evaluation necessary to clearly explain the location, function and characteristics of any building or use proposed; and

> (3)     A report addressing the following standards:
> a.       Compatibility with surrounding land uses
> b.       Extent of noise, light, odor and activity and/or measures to mitigate intensity of use
> c.       Circulation, traffic impact and parking
> d.       Number of customers/other (if applicable)
> e.       Ability to provide necessary utilities
> f.       Provisions for providing services and maintaining the site
> g.       Provisions for screening, lights and other items potentially causing off-site impacts

> (4)     A filing fee to cover the cost of review in accordance with the fee schedule adopted by resolution of the board of trustees.

**(d)     Review by Planning and Zoning Commission.**  Before taking action on any proposed conditional use, the Board of Trustees shall submit the same to the Planning and Zoning Commission for its recommendation and report.

Page 148

BLM_0066380

(1)     Public hearing required.  The Planning and Zoning Commission shall hold a public hearing on any application for conditional use permit prior to making its recommendation to the Board of Trustees.

(2)     Notification requirements.

a.     The applicant shall mail the written notice of public hearing before the Planning and Zoning Commission on the proposed amendment or change, after obtaining a copy of the notice from the Town Staff, to all owners of real property lying within one hundred feet (100') of the property on which the change is requested.  Notice shall also be mailed to all owners of mineral estates of record in the records of the San Miguel county clerk and recorder. The notice shall be given not less than fifteen (15) days before the date set for hearing by depositing in the mail such notice properly addressed and postage paid to each such owner as the ownership appears on the last approved County tax roll.  Applicants shall provide proof of mailing of notice to the Town prior to the public meeting or hearing that is the subject of the mailing of a notice.

b.     The Town Clerk shall cause notice of the public hearing of the Planning and Zoning Commission to be given by one publication in a newspaper of general circulation in the Town of Norwood without the necessity of notifying property owners by mail.  Such notice shall state the time and place of such hearing and the nature of the subject to be considered, which time shall not be earlier than fifteen (15) days from the date of publication.

**(e)     Action by Board of Trustees.**  A public hearing shall be held by the governing body before approving a conditional use permit.

(1)     Notification requirements.  The Town Clerk shall cause notice of the public hearing of the Board of Trustees to be given by publication in a newspaper of general circulation in the Town of Norwood without the necessity of notifying property owners by mail.  Such notice shall state the time and place of such hearing and the nature of the subject to be considered, which time shall not be earlier than fifteen (15) days from the date of publication.

**(f)     Standards For Approval.** The board of trustees shall use the following standards to evaluate an application for conditional use. The Board of Trustees may, in the interest of the public welfare and to assure compliance of this Ordinance, establish conditions of operation, location, arrangement and construction of any use for which a permit is authorized.  In authorizing the location of any use listed as a Conditional Use Permit, the Board of Trustees may impose such development standards and safeguards as the conditions and location indicate important to the welfare and protection of adjacent property from noise, vibration, dust, dirt, smoke, fumes, gas, odor, explosion, glare, traffic circulation or other undesirable or hazardous conditions.

BLM_0066381

Standards for approval of conditional uses include:

(1)      Sufficiency of water pressure and supply, availability of sewer service and other utilities as determined by the utility provider;

(2)      Adequacy of roads to accommodate proposed use and ability to ensure fire protection, snow removal and road maintenance;

(3)      Suitability of soils and subsurface geologic conditions to support proposed use;

(4)      The proposed use will not have a deleterious effect on air quality in the surrounding area and the town;

(5)      The design and location of any proposed structure, access or other characteristics of the use will not adversely affect surrounding land uses or the character of the town, nor cause harmful disturbance to critical natural features of the site or surrounding area.

(6)      Compatibility with surrounding area

**(g)**      A file containing all documents relevant to the application and disposition of such conditional use permit shall be maintained by the Town Clerk.

BLM_0066382

## § 6.11  Vested Property Rights

**(a)      General**

(1)      Pursuant to the provisions of Article 68 of Title 24, C.R.S., a property right shall be deemed vested with respect to any property, following notice and public hearing, when required, upon the approval or conditional approval, of a final plat by the Board of Trustees.

(2)      A vested property right shall attach to and run with the applicable property and shall confer upon the landowner the right to undertake and complete the development and use of said property under the terms and conditions of the approval.

(3)      The Board of Trustees may approve a subdivision plat or grant other final approval upon such terms and conditions as may reasonably be necessary to protect the public health, safety and welfare.   Such conditional approval shall result in a vested property right, although failure to abide by such terms and conditions will result in a forfeiture of vested property rights.

**(b)      Vested Property Right Term.**        A property right that has been vested as provided in subsection 6.11(a) shall remain vested for a period of three years.  However, the Board of Trustees may enter into development agreements with land owners specifying that property rights shall be vested for a period exceeding three years when warranted in light of all relevant circumstances, including but not limited to the size and phasing of development, economic cycles and market conditions.   Such development agreements shall be adopted as legislative acts subject to referendum.

(1)      Issuance of a building permit or a development permit shall guarantee vested rights to use the property in compliance with the terms and conditions of final plat, although failure to comply with such terms and conditions shall result in forfeiture of vested property rights.

(2)      Should no building permit or development permit be issued within said three years, the plan shall be terminated and the vested property right shall automatically expire.

**(c)      Extension of Vested Property Right Term.**      The affected landowner may request that the Board of Trustees grant an extension of the final plat for up to three years, provided that:

(1)      A written request for an extension is submitted by the affected landowner no less than sixty (60) days prior to the date of termination of the vested property right;

(2)      Such extension request shall be considered by the Board in a public hearing, notice of which shall be advertised not less than 30 days prior to such hearing in a newspaper of general circulation within the County;

(3)      There is no conflict with the Land Use Code or that any conflict may be corrected by

BLM_0066383

an amendment to the final plat, which shall be presented with the request for extension;

(4)     The applicant has demonstrated that the final plat continues to be compatible with adjacent properties and the surrounding area, or that compatibility may be established by an amendment to the final plat, which shall be presented with the request for extension;

(5)     The applicant has demonstrated that the final plat is consistent with the Comprehensive Development Plan; and

(6)     Such extension, if granted, shall be valid only for the period approved by the Board of Trustees.

**(d)     Further Reviews**.     Following approval or conditional approval of a subdivision plat or other final approval, nothing in this section shall exempt such a plan or plat from subsequent reviews and approvals, including, but not limited to, construction drawings, drainage plans, building permit and certificate of occupancy to ensure compliance with the terms and conditions of the original approval, provided that such reviews and approvals are not inconsistent with said original approval.

**(e)     New Regulations**.     The establishment of a vested property right shall not preclude the application of land use regulations which are general in nature and are applicable to all property subject to land use regulation by the Town, including, but not limited to, building, fire, plumbing, electrical, mechanical codes, and other public health, safety and welfare codes.

**(f)     Natural or Man-made Hazards**.     A vested property right shall automatically terminate upon the discovery on or in the immediate vicinity of the subject property of natural or man-made hazards which could not reasonably have been discovered at the time of site-specific development plan approval, and which, if uncorrected, would pose a serious threat to the public health, safety and welfare.

**(g)     Public Improvements**.     The vested property rights provided herein shall in no way diminish or alter the requirement for public improvements, or other requirements, as provided in Town regulations.

**(h)     Effective Date of Final Plat Approval**

The effective date of the approval of a final plat shall be the date of approval or grant by the Board of Trustees.   In the event amendments to a final plat are proposed and approved, the effective date of such amendments, for purposes of duration of a vested property right, shall be the date of approval or granting of the original final plat, unless the Board of Trustees finds to the contrary and incorporates such finding in its approval of the amendment.

BLM_0066384

**(i)     Vested Rights Language**

Each final plat shall contain the following language: "**approval of this plan may create a vested property right pursuant to article 68 of Title 24, C.R.S., as amended.**"  Failure to contain this statement shall invalidate the creation of the vested property right.  In addition, a notice describing generally the type and intensity of use approved and the specific parcel or parcels of property affected and stating that a vested property right has been created shall be published once, not more than fourteen (14) days after approval of the final plat, in a newspaper of general circulation within the County.

**(j)     Other Town Rules**

Approval of a final plat shall not constitute an exemption from or waiver of any other provisions of the Town's regulations pertaining to the development and use of property.

BLM_0066385

## § 6.12  Annexations

**(a)      Authority**

The provisions of the *Colorado Municipal Annexation Act of 1965* ("Act"), as the same may from time to time be amended, shall govern the filing and processing of all petitions for annexation of land to the Town of Norwood. The provisions herein contained are intended to be complementary and in addition to the Act and not to be construed as altering, modifying, eliminating or replacing any requirements set forth in that Act, or any requirements set forth in other sections of this Land Use Code.

**(b)      Conditions on Annexation; Policies**

The Town will impose terms and conditions on annexation to protect the public interest and to that end shall ensure that the following policies are met:

(1)      All annexations shall be consistent with the Norwood Comprehensive Plan and the Norwood Major Streets and Future Land Use Plan.

(2)      The Norwood Major Streets and Future Land Use plan identifies a Master Plan Boundary area surrounding the Town as an area appropriate for the future residential, commercial and industrial growth of the Town. Consent to annexation by petitioning landowners within the Master Plan Boundary and conformance with the Comprehensive Plan as amended by the Norwood Major Streets and Future Land Use Plan and the implementation zoning shall be a condition of extension of municipal utility service.

(3)      There will be no annexations of areas outside the boundaries of the Master Plan Boundary indentified by the Norwood Major Streets and Future Land Use Plan, with the possible exception of annexation of any acquired open space.

(4)      The Town is very concerned about long term maintenance costs of annexed land. Petitioners and developers shall identify revenues adequate to pay the long term costs of maintenance of their development, and the Town shall ensure that revenues will be adequate prior to approval of a petition for annexation.

**(c)      Pre-submission Conference.**

Prior to filing of an annexation submission, the prospective petitioner shall meet with the Town Planner or his or her designated agent. The purpose of the meeting is to allow the petitioner an opportunity to obtain information regarding the general annexation policies and requirements of the Town, the relationship of the proposed annexation to the comprehensive plan, and to prevent unnecessary expenditures for preparation of annexation submission which may not be consistent with Town Policies and requirements. At such meeting the annexation submission contents, referral agencies, review procedures, density standards, use and area standards, street requirements, utility service, long term maintenance costs and the general character of the land

BLM_0066386

proposed to be annexed may be discussed. At the pre-submission conference, the petitioner may be represented by an attorney, land planner, engineer or surveyor. A prospective petitioner may request a pre-submission conference with the Planning and Zoning Commission and/or Board of Trustees. All pre-submission conference discussions shall be non-binding.

**(d)    Annexation Submission Requirements**

The petitioner shall supply one original and fifteen (15) copies of the annexation submission which shall include all of the following:

(1)    Petition for Annexation: A petition for annexation meeting the requirements of Section 31-12-107(1) (a), C.R.S.

(2)    Annexation Map. An annexation map drawn at a scale of one inch (1") equals twenty feet (20') with a north point, date and other pertinent data and meeting the requirements of Section 31-12-107(1)(d), C.R.S.

(3)    Vicinity Map. A vicinity map on a smaller scale showing the relationship of the area to be annexed and the existing town boundaries including existing and proposed land uses, residential densities, streets, watercourses, utilities, easements and any other major feature in and adjacent to the tract of land proposed for annexation, zoning of all adjacent properties, special districts within the area proposed to be annexed and contour intervals of not more than ten (10) feet.

(4)    Master Plan Report. A written report describing the proposed land use and requested zoning of the area proposed to be annexed, including:
a.   A statement addressing consistency with the Town of Norwood Comprehensive Plan as amended by the Norwood Major Streets and Future Land Use Plan.
b.   A copy of a draft annexation agreement, unless waived by the Town, which shall address all issues relating to the annexation and/or development of the property.
c.   Estimates of the current population, assessed property value and costs of providing public services including but not limited to such services as fire protection, trash removal, law enforcement, school, utilities and street maintenance.
d.   The name(s) of special district(s) providing services that would be affected by the annexation. An analysis of the cost of providing services to the area to be annexed. If the unincorporated area to be annexed is part of a special district or county service area whose responsibilities are to be assumed by the Town, a statement shall be included indicating what steps will be taken to ensure a smooth transition in service delivery.
e.   A description of any and all water rights appurtenant to the area proposed for annexation.
f.   A description including a time table demonstrating how petitioner will

BLM_0066387

develop and finance the extension and undergrounding, where necessary, of utilities and services including, but not limited to, water and sewer, electricity, gas, cable television, and telephone service.

g.   A statement and description of what land areas are to be dedicated for public use, or what equivalent cash will be paid, and what other types of public benefit will be provided within an agreed to period of time specifically addressing affordable housing, recreational trails and facilities and conveyance of water rights.

h.   A description of how the extension of municipal services, other than utilities, will be financed.

i.   A statement of zoning requested for the property, including a complete application for a zoning change.

(5)     Tax Payment Certification. Tax certificates showing payment of taxes then due on the property proposed for annexation.

(6)     Annexation Impact Report. An annexation impact report shall be submitted for all proposed annexations unless waived, in whole or in part, by the Board of Trustees. The Town may, in its discretion, prepare the report or arrange for the preparation of the report by a party of its choosing. If the Town prepares or arranges for the preparation of the report by a third party, the petitioner shall reimburse the Town for the cost of the report. The report shall meet all the informational and submission requirements of Section 31-12-108.5, C.R.S. as well as include:

a.   General information including gross acreage of the area proposed for annexation, approximate number and type of units, acreage of streets and parking, acreage and percentage of open space to be created (analyzed as to the amount to be deeded or dedicated to the Town, the amount to be retained in public ownership and the estimated Town maintenance costs), density ratio (acres to be developed with lots and unit compared to acres in streets and open apace) and a statement of effect upon the R-2 School district including estimated number of students generated and capital construction required to serve.

b.   Traffic impacts including projected vehicle trips to enter or depart the site (calculated on a peak and daily basis).

c.   Utilities impacts including projected demand for municipal water (year-round average and seasonal peak demand and consumptive use), impact on existing water and sewer capacity and the potential need for additional facilities, and potential solid waste disposal costs.

d.   Environmental analysis including soil types and bearing capacities, geologic hazard areas, high groundwater tables, potential erosion problems, flood-prone areas, effects on wildlife and vegetation, aesthetic considerations and wetland designation.

(7)     Filing Fee. A filing fee shall be submitted to cover the cost of review and processing the petition in accordance with a fee schedule adopted by resolution of the

BLM_0066388

Board of Trustees.

**(e)      Development Applications**

Simultaneously with the filing of the annexation submission, the petitioner may file additional development applications for the property proposed for annexation. Any development applications and all proceedings taken thereon shall conform to the requirements of this Land Use Code and shall be in addition to the requirements of this Section 6.12. The processing of the annexation submission, rezoning and other development applications may proceed concurrently, but applications and approvals must be sequenced and processed according to the requirements of the Norwood Land Use Code and the Act. See also Section 4.01(c)(3).

**(f)      Referrals; Staff Evaluation**

Upon receipt of a complete annexation submission and payment of the filing fee, the original of the submittal shall be retained by the Town Clerk and copies shall be distributed to:

|     |     |
| --- | --- |
| (1) | The Town Planner/Consultant (one copy) |
| (2) | Town Engineer/consultant (one copy) |
| (3) | Town Public Works Director (one copy) |
| (4) | Town Attorney (one copy) |
| (5) | San Miguel Power Association or other power company (one copy) |
| (6) | Natural Gas company (one copy) |
| (7) | Telephone company (one copy) |
| (8) | R-2 School District (one copy) |
| (9) | Norwood Water Commission (one copy) |
| (10) | Norwood Town Clerk (one copy for public record) |
| (11) | Norwood fire district (one copy) |
| (12) | US Postal Service (one copy) |
| (13) | Any other agencies as determined appropriate by the Town Planner |

No later than ten (10) days before  the meeting of the Planning and Zoning Commission as provided for in subsection (h) each person or agency listed herein shall submit its comments and/or recommendation on the proposed annexation.

The Town Planner shall review the annexation submission; comments received from referral agencies, the Standards for Annexation, and all other relevant information and shall provide a written report of his or her evaluation and recommendations to the Planning and Zoning Commission prior to the meeting provided for in subsection (h).

**(g)      Reimbursement of Costs**

The petitioner shall reimburse all of the Town's actual costs of reviewing and processing any annexation request. At any time during the review process, the Town may employ professional consultants to assist the Planning Commission and Board of Trustees in their review of the

annexation request. As used in this section, "actual costs" shall include all direct and indirect costs incurred by the Town to review and process an annexation submission, the costs of consultants, publication, mailing, recording, engineering, legal, town personnel expenses, supplied, material and equipment. In addition, the petitioner shall assume the cost of updating the Town boundary map upon the successful completion of an annexation proceeding.

**(h)       Planning Commission Review and Recommendation**

The Planning and Zoning Commission shall consider the annexation submission at a regular or special meeting and prepare a written recommendation on issues related to annexation to the Board of Trustees prior to the hearing established pursuant to Section 31-12-108, C.R.S. In making its recommendation on the annexation, the Planning Commission shall consider all relevant information including, but not limited to, the annexation submission, the Town Planner Report, referral comments, public comments and the Standards for Annexation established in subsection (i).

**(i)       Standards for Annexation**

It shall be the policy of the Town with respect to annexation and the consideration of annexation submissions that all the following criteria have been met before annexation of any lands:

(1)       Use. That the master plan for the area to be annexed is consistent with the Norwood Comprehensive Plan and the Norwood Major Streets and Future Land Use Plan, is in harmony with the intent of Town zoning and policies of the Town, and compatible with adjacent neighborhoods. The annexation of lots that have less than the minimum area required by the respective zone district that implement the Comprehensive Plan will be nonconforming and shall be subject to the provisions of subsection 1.06 (b).

(2)       Open Space. That the open spaces have a workable program established for maintenance and up-keep.

(3)       Necessity. That the proposed annexation is necessary or desirable and will contribute to the general well being of the community.

(4)       Health, safety and general welfare. That the proposed annexation will in no way be detrimental to the health, safety, or general welfare of person residing within the corporate boundaries or injurious to property or improvements in the vicinity of the annexed area.

(5)       Logical Road System. That the area has incorporated in its design, if a design has been developed, a logical extension of roads.

(6)       Utilities and Roads. That the extension of services is feasible and will be financed totally by the petitioner; and that the petitioners will post performance guarantees to assure the completion of public improvements.

BLM_0066390

(7)     Water Rights. That the petitioner has or will convey all right, title and interest in any water rights associated with the property or in any and all water located beneath the property to be annexed if the annexed area is to be served by the municipal water system or water is needed for the maintenance of open space or parks.

(8)     Revenues. That the revenues and/or public benefit to be gained from the Town's portion of the increased tax base are equal to or greater than the cost of services to be provided.

(9)      Public Lands and Trails. That a minimum of eight percent (8%) of the gross land area approved for annexation is dedicated to the Town in fee simple, or equivalent cash or consideration given; and that trails shall be dedicated and constructed consistent with an adopted trails plan. Land area dedicated for trails may be credited toward the land dedication required herein.

BLM_0066391

## § 6.13  Board of Adjustments

**(a)**    **Creation and organization.**    There is hereby created a board known as the Board of Adjustment, which shall be organized as follows.

(1)    The Board of Adjustment shall consist of five (5) regular members, including one member of the Planning and Zoning Commission or Board of Trustees, appointed by the Mayor, subject to ratification by a majority of the Board of Trustees.

(2)    In addition to the five (5) regular members of the Board of Adjustment, two (2) alternate members of the Board of Adjustment, who shall serve in the absence of one (1) or more regular members when requested to do so by the Chairperson of the Board or Mayor, may be appointed by the Mayor, subject to ratification by majority of the Board of Trustees, so that all cases heard by the Board of Adjustment will always be heard by a minimum of four (4) members.

(3)    Each member of the Board shall be a resident citizen and qualified voter of the Town of Norwood, Colorado, at the time of his or her appointment.  A member that ceases to reside in the Town during his or her term of office shall immediately forfeit their office.

(4)    The term of office of members of the Board shall be for two (2) years.  Two (2) members shall be appointed for two (2) year terms beginning September 30, in even years and three (3) members shall be appointed for two (2) year terms beginning September 30, in odd years.  Alternates shall serve the same term of office as regular members; one (1) member shall be appointed beginning September 30, in even years and one (1) member beginning September 30, in odd years.  Regular and alternate members may be removed before their term of office expires.

(5)    Board members shall serve without compensation.

**(b)**    **Officers and procedures.**

(1)    The Mayor shall designate, and the Board of Trustees confirm, a chairperson as well as a vice-chairperson from the regular members of the Board each year.  The designation and confirmation shall be made no less than fifteen (15) days before the terms of the current members expire.

(2)    The chairperson shall preside over meetings.   In the event a question over procedures arise, Robert's Rules of Order shall apply.

(3)    The vice-chairperson shall assist the chairperson in directing the affairs of the Board of Adjustment. In the absence of the chairperson the vice-chairperson shall assume the duties of the chairperson.

(4)    The recording of the minutes of the Board of Adjustment meetings shall be the

BLM_0066392

responsibility of the staff.

(5)     The Board of Adjustment may adopt rules to govern its proceedings and conduct of the business before the Board provided, however, that such rules are not inconsistent with this chapter or Statutes of the State of Colorado.

(6)     Meetings of the Board shall be held at the call of the chairperson, and at such other times as the Board may determine.  Such chairperson or, in his or her absence, the vice-chairperson shall administer oaths and compel attendance of witnesses.  All meetings of the Board shall be open to the public.  Minutes of its proceedings shall be kept by the staff showing the vote of each member upon such question or, if absent or failing to vote, indicating such fact, and shall keep records of its examinations and other official actions, all of which shall be filed in the office of the Board and shall be a public record.

(7)     The concurring vote of four (4) members of the Board shall be necessary to reverse any order, requirement, decision or determination of the Town Staff, or to decide in favor of the applicant on any matter upon which the Board is required to act under this chapter or to grant any variance authorized by this chapter.

(8)     The filing fee for every petition to be submitted to the Board of Adjustment shall be calculated to cover the cost of legal publications, accumulation of data, administrative cost and all other costs incurred by the Town in the review and processing of the petition or as provided for in the fee schedule adopted by resolution of the Board of Trustees.

**(c)**     **Jurisdiction.**  The Board of Adjustment shall have the following powers, and shall have the power to impose reasonable conditions to insure compliance and protect adjacent property:

(1)     To hear and decide appeals where it is alleged there is error in any order, requirement, decision or determination made by an administrative official of the Town in the enforcement of this chapter, pursuant to Sec. 6.14, Appeals.

(2)     To permit variance or modifications of the height, yard, area, coverage and parking regulations, pursuant to Sec. 6.15, Variances.

BLM_0066393

## § 6.14  Appeals

**(a)    Authority of Board.**  In exercising its powers, the Board of Adjustment may, in conformity with the provisions of the Statutes of the State of Colorado as existing or hereafter amended, reverse or affirm, wholly or partly, or may modify the order, requirements, decision, or determination appealed from and make such order, requirement, decision or determination in the Board's opinion, as ought to be made and shall have all the powers of the officer from whom the appeal is taken.

**(b)    Application for appeal.**  Appeals to the Board of Adjustment can be taken by any person aggrieved or by any officer, department or board of the municipality affected by the decision of the Building Official.  Such appeal shall be taken within thirty (30) days after the decision has been rendered by the administrative officer, by filing with the officer from whom the appeal is taken and with the Board of Adjustment, a notice of appeal specifying the grounds thereof.  The officer from whom the appeal is taken shall forthwith transmit to the Board of Adjustment all the papers constituting the record upon which the action appealed from was taken.

**(c)    Filing fee.**  A filing fee shall be submitted to cover the cost of review and processing with every appeal in accordance with the fee schedule adopted by resolution of the Board of Trustees.

**(d)    Stay of proceedings.**  An appeal shall stay all proceedings of the action appealed from unless the officer from whom the appeal is taken certifies to the Board of Adjustment after the notice of appeal shall have been filed with him or her that by reason of facts stated in the certificate, a stay would, in his or her opinion, cause imminent peril to life or property.  In such case, proceedings shall not be stayed, otherwise than by a restraining order that may be granted by the Board of Adjustment or by a court of record on application on notice to the officer from whom the appeal is taken and on due cause shown.

**(e)    Hearing and notice.**  The Board of Adjustment shall fix a reasonable time for the hearing of an appeal, give the public notice as follows:

(1)    The applicant shall mail the written notice of public hearing before the Board of Adjustment on the appeal, after obtaining a copy of the notice from the Town Staff, to all owners of real property lying within one hundred feet (100') of the property on which the appeal is made.  Notice shall also be mailed to all owners of mineral estates of record in the records of the San Miguel county clerk and recorder. The notice shall be given not less than fifteen (15) days before the date set for hearing by depositing in the mail such notice properly addressed and postage paid to each such owner as the ownership appears on the last approved County tax roll. Applicants shall provide proof of mailing of notice to the Town prior to the public meeting or hearing that is the subject of the notice.

(2)    The Town Clerk shall cause notice of the public hearing of the Board of Adjustment to be given by one publication in a newspaper of general circulation in the Town of Norwood without the necessity of notifying property owners by mail.  Such notice shall state the time and place of such hearing and the nature of the subject to be considered,

BLM_0066394

which time shall not be earlier than fifteen (15) days from the date of publication.

**(f)**     **Appeals to court.**  Any person or persons, jointly or severally, aggrieved by any decision of the Board, or any taxpayer or any officer, department or board of the municipality may present to a court of record a complaint, duly verified, setting forth that such decision is illegal, in whole or in part, specifying the grounds of the illegality.   Such petition shall be presented to the court within thirty (30) days after the filing of the decision in the office of the Board and not thereafter.

BLM_0066395

## § 6.15  Variances

**(a)**     **Authority of Board.**  The Board of Adjustment shall be authorized to permit such variance or modifications of the height, yard, area, coverage and parking regulations as may be necessary to secure appropriate development of a parcel of land that differs from other parcels in the district by being of such restricted area, shape or slope that it cannot be appropriately developed without such modification.

**(b)**     **Submittal requirements.**  The applicant shall file three (3) copies of an application requesting a variance**.**  The application shall include signature of property owner. If the applicant is not the owner of the property, s/he shall also submit a letter from the property owner designating the applicant as his/her agent with the authority to represent the application. The application shall be accompanied by or show the following information:

>  (1)     The street address and legal description of the property affected;

>  (2)     A site plan and any and all other information necessary to clearly demonstrate eligibility for the requested variance based upon the required findings in subsection 6.15(c), below; and

>  (3)     A filing fee to cover the cost of review in accordance with the fee schedule adopted by resolution of the Board of Adjustment.

**(c)**     **Required findings.**  In exercising its power to grant a variance in accordance with this chapter, the Board of Adjustment shall make finding and show in its minutes that:

>  (1)     There are special circumstances existing on the property on which the application is made related to size, shape, area, topography, surrounding conditions and location that do not apply generally to other property in the same area and the same zoning district;

>  (2)     That a variance is necessary to permit the applicant the same rights in the use of this property that are presently enjoyed under this Chapter, by other properties in the vicinity and zone, but which rights are denied to the property on which the application is made;

>  (3)     That the granting of the variance on the specific property will not adversely affect the land use pattern as outlined by the Land Use Plan and will not adversely affect any other feature of the Comprehensive Plan of the Town of Norwood;

>  (4)     That the variance, if granted, will be no material detriment to the public welfare or injury to the use, enjoyment or value of property in the vicinity;

>  (5)     That such unnecessary hardship has not been created by the applicant; and

>  (6)     That the proposed use is a Permitted Use in the underlying zone district.

BLM_0066396

## § 6.16  Special Exceptions

The Planning and Zoning Commission shall have the power to hear and decide the following special exceptions to the terms of this chapter.

### Sec. 6.16 (a)  Reconstruction of non-conforming use

The Planning and Zoning Commission shall be authorized to permit the reconstruction of a building occupied by a nonconforming use, or permit resumption of a nonconforming use on the lot or tract occupied by such building, or the reconstruction of a structure destroyed by fire or the elements on the tract occupied by such building, provided an application is submitted to the town clerk within six months of the date the structure was destroyed. All new construction shall conform to the applicable uniform building code, current fire code and any other applicable safety and construction codes which are in effect at the time the rebuilding is proposed.

**(b)     Discontinuance of nonconforming use.**  The Planning and Zoning Commission shall be authorized to require the discontinuance of nonconforming uses of land or structures under any plan whereby the full value of the structure and facilities can be amortized within a definite period of time, taking into consideration the general character of the neighborhood and the necessity of all property to conform to the regulations of this chapter.  All actions to discontinue a nonconforming use of land or structure shall be taken with due regard to the property rights of the persons affected when considered in the light of the public welfare and the character of the area surrounding the designated nonconforming use and the conservation and preservation of the property.

**(c)     Status of nonconforming uses.**  The Planning and Zoning Commission shall, from time to time, on its own motion or upon cause presented by interested property owners or on request of the Board of Trustees or Planning and Zoning Commission inquire into the existence, continuation or maintenance of any nonconforming use within the Town.

## § 6.17  Temporary Use Permits

Temporary use permits shall be issued by the Planning and Zoning Commission, subject to the following provisions.

**(a)     Zoning.**  The use for which the permit is requested shall be authorized as a temporary use in the district in which the use is to be located.

**(b)     Conditions.**  The applicant shall meet all conditions for such temporary use permit set forth in this chapter.

**(c)     Time limit.**  A time limit for the discontinuance of the temporary use shall be specified on the temporary use permit.

BLM_0066397

BLM_0066398

### § 6.18  Sign Permits

**(a)**     **Permits.**   It shall be unlawful to erect, construct, reconstruct, alter, paint, or repaint, or change the use of any sign as defined in this section without first obtaining a sign permit; however, a sign permit shall not be required to repaint a sign exactly as it was permitted for the purpose of maintenance.

   (1)     For all sign permits required, a fee of one dollar per square foot of surface area shall be charged to cover the costs of administration.

   (2)     Off-premise advertising signs require a permit from the Town.

**(b)**     **Sign permit application.**   Application for a sign permit, where such permit is required by Sec. 5.06, Signs, shall be made upon forms provided by the Town of Norwood and shall include the following information:

   (1)     A drawing to scale of the proposed sign.

   (2)     A drawing to scale of the site plan or building facade showing the proposed location of the sign.

   (3)     Name, address and telephone number of the applicant.

   (4)     Name, address and telephone number of the owner.

   (5)     Name, address and telephone number of the person or firm responsible for the erection of the sign.

   (6)     Location of the building, structure or tract to which, or upon which, the sign is to be attached or erected.

**(c)**     **Sign permit fees and procedures.**   Every sign permit application shall be accompanied by a permit application fee payable to the Town of Norwood.   The application fee for pennants, banners and posters that are erected pursuant to subsection 5.06(f)(1)(g) a fee of $5 dollars shall be charged.   For all other sigh permits required, a fee of one dollar per square foot of surface area shall be charged to cover the costs of administration.

   (1)     Exception.  No application or permit fee shall be required for special event or public announcement signs for bona fide charitable and other non-profit organizations.

BLM_0066399

## § 6.19  Zoning Development Permits

**(a)** **Applicability.**  No building permit may be issued and no person(s) may engage in any development within the incorporated area of the Town of Norwood without obtaining a development permit (Appendix "A" to this Code).  Failure to comply with any condition(s) of approval, as determined by the Board of Trustees, shall result in inability to obtain any rights granted conditionally thereunder, in accordance with Land Use Code subsection 6.11(b)(1), and Town revocation of the development permit upon 30 day notice to the Developer and opportunity for hearing and Town determination of non-compliance with conditions.

## § 6.20  Certificates of Occupancy

**(a)** **Applicability.**  No building hereafter erected, converted or structurally altered shall be used or occupied and no land or nonresidential building may be changed in use unless or until a Certificate of Occupancy shall have been issued by the Building Official of the Town of Norwood stating that the building or proposed use of land or building complies with the provisions of this chapter and other building and health laws of the Town of Norwood.

**(b)** **Application.**  A Certificate of Occupancy shall be applied for coincident with the application for a Building Permit and will be issued within ten (10) days after the completion of the erection, alteration or conversion of such building or land provided such construction or change has been made in complete conformity to the provisions of this chapter.

**(c)** **Record.**  A record of all certificates shall be kept on file in the office of the Building Official, and copies shall be furnished, on request, to any person having a proprietary or tenancy interest in the land or building affected.

BLM_0066400

## § 6.21  Administrative Officials

**(a)**     **Town Planner.**   There is hereby created a official administrative position know as the Town Planner.   The Town Planner shall be the Director of the Town of Norwood Planning Department and shall be appointed by, directed by, and serve at the pleasure of the Board of Trustees.  The Town Planner shall have the following jurisdiction, authority and duties:

>   **(1)  Administer the Land Use Code.**  The Town Planner administers the Land Use Code and has those powers and duties expressly assigned to him/her under this Code and other-wise delegated or assigned to him/her in accordance with Town policy.

>   **(2)   Issue Zoning Development Permits**.   The Town Planner shall issue zoning development permits as required by Sec. 6.19 prior to the issuance of any building permits for construction activities pursuant to the procedures in the Code and deny development permits that are inconsistent with the Code.

>   **(3)  Enforce the Land Use Code.**  The Town Planner shall enforce the provisions of this Chapter.

>   **(4)  Interpret the Land Use Code.**  The Town Planner shall have the authority to make all interpretations of the Land Use Code and the boundaries of the Official Zoning Map.

**(b)**     **Building Official.**   There is hereby created an official administrative position know as the Building Official.  The Building Official shall be the Director of the Town of Norwood Building Department and shall be appointed by, directed by, and serve at the pleasure of the Board of Trustees.   In addition to the jurisdiction, authority and duties which may be conferred on the Building Official by the Uniform Building Code, the Building Official shall have the following jurisdiction, authority and duties:

>   **(1) Issue Building Permits**.   The Building Official shall issue applicable permits to allow construction activities which have received a zoning development permit pursuant to the procedures in the Code and deny building permits for activities which have not received a zoning development permit.

>   (2)   **Interpret and enforce the Uniform Building Code**.   The Building Official shall interpret and enforce the applicable Uniform Building Code.

>   (3)  **Enforce the Land Use Code**.  The Building Official shall enforce the provisions of this chapter.

BLM_0066401

APPENDIX "A"

## TOWN OF NORWOOD
## ZONING DEVELOPMENT PERMIT

Compliance with applicable Town Land Use Code criteria for each of the categories listed in Sections 3 and 4 must be verified by the Town Planner and Building Official prior to consideration of applications for building permits.

**1. APPLICANT SHALL COMPLETE:**

Property Owner          Mailing Address          Phone

Subject Property Street Address

Legal Description; or _____ Attached

Existing Use(s)

Proposed Use(s)                    Square Footage

Lot Size          Proposed Bldg. Height No. Off-Street Parking Spaces

Proposed Setbacks:     Front          Side          Rear

Water Commission Approval? Sanitation District Approval?

I hereby certify, subject to penalty of perjury, that the above is true and accurate to the best of my knowledge and that I understand all provisions of County and State codes applicable to the proposed development, any and all conditions placed upon the proposed development by the Board of County Commissioners and all information requested by this document. I also understand that if I violate any applicable provisions of County and/or State codes, I may be required to remedy such violation(s) through appropriate legal process imposed by the County, including moving or removing structures and ceasing of construction and/or uses.

Signature of Applicant          Date

**2. APPLICANT SHALL ATTACH COMPLETE SITE AND ACCESS PLAN**

**3. TOWN PLANNER SHALL VERIFY COMPLIANCE WITH:**

BLM_0066402

Application Completeness _____ (If incomplete, return to applicant)

Zoning _____    Cond. Use Permit #_____

List Conditions of Approval or Attached:_____

_____

_____

Should Bldg. Permit Application Be Considered?    YES_____        NO_____

Comments_____

_____

_____

Signature of Town Planner            Date

## 4. BUILDING OFFICIAL SHALL VERIFY COMPLIANCE WITH:

Use _____ Height _____        Setbacks _____

Access _____        Driveway width _____    Parking Spaces _____

Water Commission Approval _____

Sanitation District Approval _____

Can Building Permit Be Applied For? YES_____        NO_____

Comments_____

_____

_____

Signature of Building Official Date

**5.    IF THE BUILDING OFFICIAL SO AUTHORIZES, APPLICATION(S) FOR A BUILDING PERMIT THAT CONFORM MATERIALLY WITH ALL INFORMATION PROVIDED ABOVE MAY BE SUBMITTED TO THE BUILDING DEPARTMENT.**

BLM_0066403

BLM_0066404

BLM_0066405

BLM_0066406

BLM_0066407

BLM_0066408

BLM_0066409

# NORTHWEST AREA MASTER PLAN

**Town of Ridgway**
**November 25, 2008, as amended**

BLM_0066410

# TABLE OF CONTENTS

I.    **INTRODUCTION**

    1.  Background Information
    2.  Northwest Area Planning Process
    3.  Boundary Definition


II.   **LAND USE SUMMARY**

    1.  Land Uses
    2.  Transportation and Road Networks
      a.  Streets
      b.  Alleys
    3.  Parks, Trails, Open Spaces
    4.  Pace, Timing, Phasing of Development
    5.  Land Use Density
    6.  Natural Environment
    7.  Open Space
    8.  Affordable Housing
    9.  Acquisition of Water Rights
    10. 1999 Land Use Maps and 2000 Comprehensive Plan


III.  **NORTHWEST AREA PLAN CONCEPTUAL MAP**

BLM_0066411

## I. INTRODUCTION

1. <u>Background Information</u>
For over a century the Town of Ridgway's central roads, blocks and alleys have remained a traditional grid network.  This network consists of 36 historically platted blocks measuring 300' x 300' arranged in a 6 block x 6 block square grid pattern and encompasses the Historic Residential, Historic Business and Downtown Service Districts.  Subsequent to a number of annexations and subdivisions, the perimeter lots, alleys, streets, and open spaces have expanded the original Town boundary into a varied arrangement of lots, blocks, roads and alleys.  The Town now also consists of residential, commercial and industrial districts surrounding the historic core.

Commencement of the Northwest Area planning process is subsequent to the Town of Ridgway's 1982 and 1991 Comprehensive Development Plans, the 2000 Master Plan Update and the adoption of both the Transportation Element and Downtown Streetscape Master Plan in 2007.  The 2000 Master Plan Update encompasses the 1999 Land Use Element, outlining goals, policies, implementation measures and growth boundaries for the Town.  This 2000 document is the primary guidance instrument for land use decisions affecting the Town.

2. <u>Northwest Area Planning Process</u>
At the direction of the Planning Commission, town staff appealed to the community for participation in an Area Planning Task Force.  A group of 13 individuals including community members, elected and appointed officials, property owners and staff convened in early 2008 to identify growth and development patterns in this Northwest Area.  The Task Force was asked to review the 2000 Comprehensive Plan and evaluate the nine land use goals in the 1999 Land Use Element.  Thorough discussion and analysis of these goals resulted in consensus to proceed through a sub-area planning process for the Northwest Area with recognition that the ensuing discussion will contribute significant insight and parallel discussion toward a pending, Town-wide, master plan update.

The services of the land use planning firm, Design Workshop, Inc., were secured to facilitate a sub-area planning process that included public meetings with the Task Force and the community.  A series of meetings commenced, including interim joint discussions with the Town Planning Commission.

The boundary for the study area was defined based on developed and undeveloped areas of Town and existing natural boundaries.  Design Workshop presented a variety of visual concept plans during the ensuing meetings, which were based largely on the discussions of the Task Force, natural slopes, drainages, existing development patterns within the Town and adjoining property uses.  In addition, targeted discussion points identified by the group included land use, transportation, infrastructure (water, sewer, roads, storm water, pathways, and connectivity),

BLM_0066412

pace/timing/phasing, density, growth boundaries/ annexation and the natural environment/ open spaces.

The sub-area plan and conceptual map present community preferences and objectives identified during this process and are intended to guide development decisions for this area.   However, the plan is also designed with flexibility to accommodate future consideration of unidentified or unknown factors, including environmental constraints and sensitive areas such as wetlands and soil conditions, within the Northwest Area.

3. Boundary Definition
   The Northwest Area Plan boundary encompasses approximately 138 rural, undeveloped, agricultural acres.   The northern portion, which is roughly 74 acres, abuts the northwest boundary of the Town to the west and lies within the Urban Growth Boundary as defined in the 2000 Master Plan.   The remaining 64, or so, acres to the south are within the existing Town boundary with zoning designations of Historic Residential and Future Development.   The sub-area is generally defined, without metes and bounds, and described as follows (*see vicinity map below*):

   *Southern Boundary*
      Town of Ridgway Blocks 8 and 17 abutting Charles Street and bordered by North Elizabeth and North Mary Streets, and Block 19 abutting Frederick Street and bound to the east by North Laura Street

   *Western Boundary*
      Amelia Street/ CR 5 to Town of Ridgway Block 6, and the western edge of Blocks 7 and 8 abutting Elizabeth Street

   *Northern Boundary*
      Southern boundary of Eagle Hill Ranch Subdivision and County Road 5 (east/west)

   *Eastern Boundary*
      Beginning at the north: the western boundaries of The School Addition, Parkside PUD and Ridgway River Park Industrial Park PUD

BLM_0066413



Town of Ridgway Boundary, parcels and Northwest Study Area

BLM_0066414

## II.  LAND USE SUMMARY

1. Land Uses
   General land uses recommended for the Northwest Area are Residential, Mixed Residential/ Commercial, and Parks/Trails/Open Spaces.  Within the residential use areas are High, Medium and Low-Density uses.  Much of the area is recommended for Medium-Density Residential, which is generally consistent with the existing density target for the Historic Residential district.  The Town's existing Residential (R) zoning requires a minimum lot size of 10,000 square feet, which more accurately reflects a Low-Density designation.  The Town may wish to consider developing a Medium-Density zoning district in the future or during a future master planning process.

   Lower residential density is recommended for the northern aspect of the study area as a transitional buffer to lower density development in the county and where topographic and geologic constraints will likely prohibit any higher density development.  High-Density Residential and Mixed Use areas are planned abutting existing open spaces and industrial uses.  Although not defined on the conceptual map for the area, parks, trails and open spaces are to be incorporated into the 138 acre plan, with pedestrian and bicycle pathways creating connectivity throughout the area and into the developed neighborhoods of the Town.

   The land west of the existing River Park Industrial Park is identified as appropriate for mixed commercial and residential uses, incorporating structures up to three stories, with a maximum of 35 feet in height.  The land west of the Town's 6.9 acre Park, which abuts the western boundary of Green Street and the adjoining Parkside Planned Unit Development (PUD), is appropriate for High-Density Residential structures up to two stories, with a maximum of 27 feet in height.  In addition, light commercial uses may be appropriate when planned in conjunction with the Higher-Density Residential area abutting the western edge of the 6.9 acre Town Park west of Green Street, when planned in conjunction with an overall development plan and open spaces.

2. Transportation/ Road Networks
   a. Streets
   While a number of objectives are stated here, the Town's 2007 Transportation Element shall also assist in shaping the transportation network, specifically regarding North Railroad and Amelia Streets (County Road 5).   Goal II of the 2007 Transportation Element proposes some road configurations within and adjoining the Northwest Study Area.  This network includes connectivity between the schools, connectivity of North Railroad Street and County Road 5, and a grid-pattern road network for the southern part of this Northwest Study Area.  The Transportation Element recommends a perimeter and bisect road system for connectivity of the schools and for North Railroad Street to intersect County Road 5.  This connectivity consists of an east/west collector street between North Railroad and County Road 5 and an east/west local street connecting Marion Overlook and County Road 5.

BLM_0066415

Finally, citing continuity and efficiency, the Transportation Element recommends completion of the grid pattern in at least the area of blocks 7, 8, 17, 18, 19, which comprise the southernmost boundary of this Northwest Study Area.



Framework Transportation Plan for Northwest Area from the 2007 Transportation Element

Continuation of the grid (i.e.: the alignment of roads generally in a north/south and east/west pattern) throughout the Northwest Area is recommended in order to provide a natural extension of the existing grid from the historic core exists, at least up to a point where the natural environment may dictate a varied network (e.g.: interruption of slopes and drainages). Absolute adherence to the grid may be forgiven if the arrangement is designed to calm traffic, including interventions in long, straight sections of road. Nonetheless, long, curved arrangements of roads and alleys are not advised or desired. Finally, lot, block, street and alley arrangements shall, to the extent possible, consider maximum solar gain for each of the planned properties.

The Northwest Area Boundary directly intervenes between the elementary and secondary schools, which are located at the southern aspect of North Amelia Street and the northern aspect of Green Street, respectively. As such, a logical, direct and clearly defined connectivity between these schools, as originally stated in the Transportation Element, shall be present through this Northwest Area. Having stated this, the recommendations of the Transportation Element to provide accesses to Amelia Street (CR 5) via Marion Overlook and North Railroad Street shall be

BLM_0066416

considered when determining access points along Amelia Street (CR 5) and school connectivity.  In addition, access points to Amelia Street (CR 5) shall occur no more frequently than every 660 feet.  Individual accesses shall not be allowed directly via Amelia Street (CR 5), as it is planned collector street and not conducive to a significant number of access points.

Transitional buffering at Amelia Street from the western edge of the Northwest Plan Area toward the ranchlands to the west received significant discussion throughout the planning process with no clear consensus on the defined transition.  There was general agreement that some buffering should be present in this area.  Ideas for buffering include incorporation of green space, landscaping with berms and trees, and a pedestrian pathway.

   b. Alleys
Alley arrangements shall be considered as part of the desired grid network of roads, lots and blocks.  Alleys are beneficial for buried infrastructure as well as general access points, including deliveries for commercial properties.  Design and layout of alleyways should maximize and encourage alley access, where possible, to maintain streetscape features and amenities.

Although alley intersections at Amelia Street are not encouraged, any alley connecting into Amelia Street (CR 5) shall be carefully considered and determined an access point, subject to the minimum 660 feet separation as identified previously for street intersections at Amelia Street.

3.  Trails, Parks, Open Spaces
The Town currently has a Parks, Trails and Open Space Task Force that is nearing completion of planning a Town-wide Trails, Parks and Open Space Element for inclusion in the Town's Master Plan.  While this Element is not yet complete, it will consider this Northwest Area and include overall pedestrian and bicycle connectivity to the currently platted, developed areas of Town.  In addition, Goal V of the 2007 Transportation Element addresses desired extensions, linkages and connectivity of pedestrian and bicycle routes and street crossings throughout the Town.  These general objectives and goals defined in the Transportation Element shall also be considered and guide planning efforts as development is planned for this area.

A number of objectives specific to the Northwest Area are defined here to facilitate future detailed planning for parks, trails and open spaces within and connecting through this Northwest Area.  Recognizing the need to further examine specific geologic parameters including soils, topography, drainages, wetlands, slopes and other natural features as well as land use development proposals, this sub-area plan does not provide great detail on locations of these amenities, but does suggest that one primary objective shall be good connectivity from developed areas of Town and throughout the Northwest Area.

BLM_0066417

Pedestrian and bicycle connectivity shall be comprehensively planned throughout the Northwest Area. Trails and pathways shall connect into the platted area of Town as well as to the schools, parks and commercial/ mixed-use areas. Ideally natural drainages and slopes may be incorporated as part of the trails and parks network, although a primary objective is to connect parks, schools and residential / commercial uses.

Parks should be designed, sized and located as functional community gathering areas. In particular, higher residential and mixed use developments shall incorporate park spaces such that there is functional buffering and green space for shared recreation. When planning the park network consideration shall be given to connectivity and usability of the parks.

Due to the complexity of open space dedications and a need to identify and consider open space requirements on a town-wide basis there are not specific requirements or locations identified for parks and open spaces. Rather, it is recommended that the Town proceed with development of a parks / open space dedication policy that identifies and incorporates a linkage between the dedication requirement and the development demand for open space, incorporating community desires. This requirement should become part of the Town's land use policy such that open space dedications are identified and commensurate with annexation and/or development proposals.

It is also recommended that the policy development consider the National Parks and Recreation Association Standards, which identify parks and open space dedications based on population estimates for planned growth areas. Generally, in this Northwest Area, larger open spaces are preferred to smaller, narrow strips or boulevards and higher density areas shall abut park and open space uses.

4. Pace/Timing/ Phasing of Development
The first goal of the 1999 Land Use Element is to limit growth at "5% or less per year based on the number of new residential lots approved for development as a percentage of existing residential lots". Significant, conclusive dialogue on pace, timing and phasing of development in this area has not been had, although it is generally agreed that the Town has adhered to the 5% goal over this last decade and will likely continue with this maximum growth rate until such time there is community need to do otherwise. It is estimated that between 800 – 1500 dwelling units (based loosely on the proposed land uses with minimum and maximum development densities accounting for the wide range) may eventually occupy this 138 acres. As such, development in this area is likely to be dependent upon infrastructure availability and existing capacity to serve any proposed development.

While within the Urban Growth Boundary, nearly half of the Northwest Study Area is outside of the Town boundary. With no pending development proposals for the study

BLM_0066418

area, it is recommended that the pace, timing and phasing of development in this area be considered by the Town upon request for development or annexation.

5. <u>Land Use Density</u>
The northernmost area of the study boundary abutting Eagle Hill Ranch is appropriate for Lower-Density Residential with lots sizes of approximately 10K - 20K sq. ft.  This recommendation is based on the desire for transitional buffering between the denser area of Town and the platted properties in the county to the north.  In addition, within this Lower-Density Residential region there are areas of steep topography as well as areas of apparent moisture where denser development is not desired or practical.  Transitional buffering and open spaces appear to be conducive to the topographic and apparent geologic constraints of this northern area.

Most of the subject area is suited for Medium-Density Residential use with lot sizes of 4K-8K square feet and interspersed with trails, parks and open spaces.  Currently, this Medium-Density Residential is primarily found in the Historic Residential District as well as a handful of planned unit developments within the Town.

High-Density Residential uses consisting of 12-18 dwelling units per acre and limited to 2 stories above grade with a maximum height of 27' may be appropriate when abutting parks and open spaces commensurate with the development.  Higher density uses should be located internal to the overall Northwest Area in order to avoid stark transitions to the rural areas to the north and west.  As such, the preferred location for any High-Density Residential use is abutting the western edge of the 6.9 acre Town Park that is west of Green Street and the Parkside PUD.  Medium and heavy commercial uses do not appear compatible with this area; however, lighter commercial uses such as a neighborhood coffee shop, neighborhood store, or ice cream shop may be considered with an application for development, as appropriate.

Mixed-Use Density (12-18 dwelling units/ acre) includes mixed-use development (residential and commercial) with a maximum height of 3 stories up to 35' when incorporating architectural features and roofline variations.  This use is appropriate for the area west of the existing River Park PUD Industrial Park, to accommodate work/live arrangements and transition from industrial to medium density residential uses.

Strong consideration shall be given to geotechnical information, such that wetlands and other sensitive areas are not planned for inappropriate densities.  Relocation of density may be appropriate to accommodate environmental concerns and sensitive areas, as defined in the 2000 Master Plan.  In particular but not singularly, the northern area of the plan retains natural slopes and drainages as well as apparent wetland areas.  The Town may consider the costs and benefits of full and partial density transfers commensurate with discussions on open space requirements and cluster development.  Regardless, dedications of open spaces and parks shall

BLM_0066419

incorporate useable land for community gatherings and not consist solely of environmentally constrained areas.

It is noted that the preference for higher density uses in much of the Northwest Area, and perhaps other areas within the Urban Growth Boundaries, may illustrate the need for a higher density residential zoning district to be considered as a policy matter by the Town.

6. <u>Natural Environment</u>
Chapter III-2 of the 2000 Comprehensive Plan addresses Environmental Constraints and Sensitive Areas such as riparian areas and wetlands, steep slopes and geological features, wildlife areas and migration corridors, wildfire, agricultural lands, soils, visual resources.  As the specific environmental constraints and sensitive areas in this Northwest Area are not known at this time, the sub-area plan does not directly address these town-wide objectives.  However, it is understood that these constraint areas will be identified and analyzed as part of a development plan and commensurate with the goals of the Town.

It is apparent that there will need to be consideration for nearly all of the environmental constraint and sensitive areas defined in the 2000 Master Plan.  When planning for open spaces, transportation corridors and variable densities, significant consideration shall be given to these constraint areas.

In conformance with the planned street and alley layout, lots should be arranged in a complementary grid fashion at least up to the area where natural drainage(s) interrupt the grid.  Ideally, the lot layouts will optimize solar pathways such that homes might be constructed and oriented for active and passive solar benefits.

7. <u>Affordable Housing</u>
Late in 2007 the Town of Ridgway, City of Ouray and Ouray County completed a county-wide housing needs assessment.  Coincidentally, the three jurisdictions created a Multi-jurisdictional Housing Authority as a coordinated effort to pursue affordable housing objectives within the County.  The Housing Needs Assessment acknowledged a defined housing need and the Town is working to act on the desired recommendations of the report.  At this time, there is a county-wide effort to develop a strategic plan for implementing affordable housing programs in follow up to the recommendations of the 2008 report.

Due to the complex nature of affordable housing policy, the need for Town-wide housing considerations and the desire for a comprehensive approach for housing and other policy objectives, the affordable housing in this Northwest Area shall be provided commensurate with Town regulations at the time and/or as determined by the Town based on the affordable housing need for the area.

BLM_0066420

8.  Water and Wastewater Infrastructure Demands
    As with any annexation or development request, the Property Owner(s) will need to identify and demonstrate that sufficient resources are available for the proposed development demand.  In particular, the potential wastewater treatment and water demands in this Northwest Area will certainly impact the Town's existing infrastructure.  The Owner(s) will need to comply with state and local laws governing sufficient water supply and compulsory connectivity to sewer systems.  Specific demands and proposed infrastructure designs have not been addressed for this area, although it is understood that with an estimated growth of between 800-1200 dwelling units in this Northwest Area alone, sufficient infrastructure will need to be provided commensurate with any consideration of development or annexation. Dedication to the Town of existing water rights for this area shall be a consideration.

9.  1999 Land Use Maps and 2000 Comprehensive Plan
    The Urban Growth and Initial Growth Boundaries, as defined on the 1999 Land Use Maps and 2000 Comprehensive Plan, have not been and are not intended to be, relocated by this sub-area plan and map.  The Northwest Area Plan is intended to complement these documents and serve as a guidance document for future development of the Northwest Area and future master planning of the Town.

    This plan does not attempt to relocate, plan or otherwise modify any area outside of the Northwest Area Plan Boundary.  Any inconsistencies, discrepancies or propagated errors between this Northwest Area Conceptual Map and the 6/29/1999 Comprehensive Plan Land Use Map, outside of the Northwest Area Plan Boundary, are not intended to supersede the 1999 Land Use Map.

    Boundaries and lines on the Northwest Area Plan Map are conceptual, not held by metes and bounds, and subject to change.

BLM_0066421

## III.  NORTHWEST AREA PLAN CONCEPTUAL MAP



*Location of parks and open space shall be determined per the guidance document accompanying this map.

Legend:
- NW Area Plan Boundary
- Low Density Residential (10-20K sf lots)
- Medium Density Residential (4-8K sf lots)
- High Density Residential (12-18 du/ac)
- Mixed Use High Density (12-18 du/ac)

BLM_0066422

Case No. 1:20-cv-02484-MSK    Document 48-9    filed 04/28/21    USDC Colorado    pg 202 of 297



**Home** ✳ **Town Government** ✳ **Doing Business** ✳ **Town Documents**
**Calendar** ✳ **Staff Directory** ✳ **Other Links**

Site Search

## Town Documents » Municipal Code

### Municipal Code

This volume of the Ridgway Municipal Code contains the Ridgway Municipal Code 1994 Revision, as adopted by Ordinance No. 1, Series 1995, and as such has been amended through Ordinance No. 7, Series 2011.

📄 **TITLE SHEET** (updated August 29, 2011)
📄 **TABLE OF CONTENTS** (updated August 29, 2011)

**TITLE 1:    GENERAL PROVISIONS**

   📄 1-1:    General Provisions

**TITLE 2:    ADMINISTRATION**

   📄 2-1:    General Administrative Provisions
   📄 2-2:    Officers, Employees, Salaries
   📄 2-3:    Unclaimed Intangible Property
   📄 2-4:    Administrative Enforcement of the Ridgway Municipal Code

**TITLE 3:    FINANCE**

   📄 3-1:    Telephone Utility Occupation Tax
   📄 3-2:    Sales Tax
   📄 3-3:    Lodging Occupation Tax
   📄 3-4:    Development Excise Tax

**TITLE 4:    ELECTION**

   📄 4-1:    Election Procedures

**TITLE 5:    MUNICIPAL COURT**

   📄 5-1:    Municipal Court

**TITLE 6:    BUILDING REGULATIONS**

   📄 6-1:    Building Regulations (updated August 30, 2012)
   📄 6-2:    Flood Plain Management Regulations
   📄 6-3:    Regulations for Mobile Homes, Travel Homes, and Other Factory Manufactured Structures
   📄 6-4:    Fence, Hedge and Wall Regulations
   📄 6-5:    Outdoor Lighting Regulations
   📄 6-6:    Single Family Home Design Standards

**TITLE 7:    PLANNING & ZONING**

   📄 7-1:    Planning Commission
   📄 7-2:    Board of Adjustment
   📄 7-3:    Zoning Regulations (updated June 2013) | 📄 Sign Code Brochure (Sept. 2012)
   📄 7-4:    Subdivision Regulations
   📄 7-5:    Legislated Vested Property Rights
   📄 7-6:    Adequate Public Water Supply

**TITLE 8:    LICENSING**

   📄 8-1:    Mobile Home Park and Travel Home Park Regulations
   📄 8-2:    Outdoor Concerts
   📄 8-3:    Transient Merchants
   📄 8-4:    Medical Marijuana (updated June 2013)

**TITLE 9:    WATER & SEWER**

   📄 9-1:    Water and Sewer Systems
   📄 9-2:    Utility Services

**TITLE 10:    GENERAL OFFENSES**

   📄 10-1:    Litter and Junk
   📄 10-2:    Nuisances
   📄 10-3:    Miscellaneous Offenses
   📄 10-4:    Liquor Laws

BLM_0066423



**TITLE 11:    ANIMALS/FOWL**

    11-1:　Animals (updated June 2013)

**TITLE 12:    WEEDS/REFUSE**

    12-1:　Weeds and Brush
    12-2:　Burning Restrictions

**TITLE 13:    IMPROVEMENT DISTRICTS**

    13-1:　(Reserved)

**TITLE 14:    PUBLIC PROPERTY**

    14-1:　Streets and Sidewalks
    14-2:　Construction and Repair of Public Infrastructure
    14-3:　Private Use of Public Property
    14-4:　Street Numbering and Naming
    14-5:　Excavation In and Encroachment Of Town Property
    14-6:　Cable Television System Permits

**TITLE 15:    TRAFFIC**

    15-1:　Traffic Regulations - Traffic Code

(Back to Top)



Adobe Reader (free here) must be installed to view documents. © Town of Ridgway, Colorado, 2013. ✳ Design by mtngeogeek. Contact webmaster

BLM_0066424

# RIDGWAY COMPREHENSIVE PLAN

# INTEGRATED WEED MANAGEMENT AND NATIVE PLANT RESTORATION



Town of Ridgway
Final Plan: May 3, 2011

Page 1 of 55

BLM_0066425

# TABLE OF CONTENTS

I.      INTRODUCTION

II.     BACKGROUND INFORMATION

III.    DEFINITIONS

IV.     SCOPE, PURPOSE AND GUIDING PRINCIPLES

V.      EXISTING CONDITIONS

VI.     LAND MANAGEMENT GOALS AND WEED MANAGEMENT OBJECTIVES

VII.    PRIORITIES

VIII.   RECOMMENDATIONS
            A.   Implementation Measures
            B.   Techniques/ Methods for Managing Prioritized Noxious Weeds Monitoring
            C.   Test Areas

IX.     CONCLUSIONS

X.      ATTACHMENTS
            A.   Photos of Noxious Weeds within the Town of Ridgway
            B.   Line Drawings of Noxious Weeds within the Town of Ridgway
            C.   Chemical Application Protocol and Recommendations

XI.     EXHIBITS
            A.   Ridgway Municipal Code Chapter 12, Section 1: Weeds and Brush
            B.   Town of Ridgway Resolution 03-06: Noxious Weed Management
            C.   Intergovernmental Agreement Regarding Weed Control
            D.   Public Meeting Outline and Details
            E.   Meeting Agendas, Objectives and Notes

BLM_0066426

# I.      INTRODUCTION

An enormous thank you is extended to the Committee and Meeting Facilitator for the extensive time, effort and energy put forth in developing this Integrated Plan.  The Committee includes the following Community Members, Town Councilors, and Town Staff:

| | | | |
|---|---|---|---|
| Heather Bussey | John Clark | Ellen Hunter | Joanne Fagan |
| Jean McDonnell | Sheelagh Williams | Pam Kraft | Dickson Pratt |

Meeting facilitation: Don Batchelder

This Integrated Plan could not be the well-rounded and inclusive document that it is without the persistent and extensive inputs received from our dedicated community members at large who deserve a sincere thank you for their continued and undying participation in pulling this plan together.

Thank you to our knowledgeable guest speakers: Susan Rose, Kelley Liston, Jude Sirota, and Tim Seastadt for providing basic and advanced technical information on noxious weeds, integrated weed management and plan development, and land stewardship, and who provided us with the knowledge required to address this complicated issue.

Finally, we would like to express sincere gratitude for the extensive local coverage in the Ridgway Sun for each of the lengthy and informative meetings.

This document is organized into 11 sections:

I.       Introduction
II.      Background Information
III.     Definitions
IV.      Scope, Purpose and Guiding Principles
V.       Existing Conditions
VI.      Land Management Goals and Weed Management Objectives
VII.     Priorities
VIII.    Recommendations
IX.      Conclusions
X.       Attachments
XI.      Exhibits

BLM_0066427

## II.   BACKGROUND INFORMATION

While the Town of Ridgway has addressed weed management through various mechanisms for years, pursuant to state regulations (Colorado Revised Statutes Title 35, Article 5.5), there is now a requirement to develop an integrated management plan that comports with the needs and desires of the community, while effectively managing weeds within our budgetary limits.

The Weed Management Plan for the Town of Ridgway is reflected in Chapter 12 Section 1 (Exhibit A) of the Ridgway Municipal Code.  This plan calls for maintaining stubble "no higher than 6 inches above the ground", and non-compliance is managed through nuisance procedures.  On August 13, 2003 the Town Council adopted Resolution 03-06 (Exhibit B), which states "the Town shall not use toxic or poisonous, chemical-based herbicides within the Town limits toward the control of noxious weeds, and that the use of non-toxic, organic management practices shall be implemented".  Since that time, the Town has managed noxious weeds on publicly-owned properties through mechanical efforts including mowing, weed whacking, and hand pulling, and with targeted chemical applications of a vinegar-based solution.  Private property owners are allowed to manage weeds on their property by whatever mechanism, chemical or other method they prefer.

During the March 17, 2010 Town Council workshop the Ouray County Weed Manager approached the Town Council with concern over a growing and significant noxious weed population within the Town limits that needed management.  Of particular concern was the spotted knapweed, a State of Colorado B-list noxious species that was propagating along the river corridor and primarily in Rollans Park, public property under the Town's stewardship.  In addition to the spotted knapweed along the corridor, the Weed Manager indicated there were a number of other noxious weeds of concern that were not being managed.  The Council reviewed the option of using Milestone, a chemical treatment that would be spot sprayed in targeted locations within the Town.  During the April 14, 2010 Town Council meeting, the Council considered a resolution for a temporary exemption to Town policy regarding the use of chemicals for noxious weed management.  In response to citizen concerns and an organized volunteer pulling effort, the Council agreed to monitor volunteer mechanical efforts for weed management.  Volunteer and mechanical efforts continued through 2010 with no applications of Milestone on public properties within the Town.

In August 2010, the Town entered into an Intergovernmental Agreement with Ouray County, which included an agreement to develop an Integrated Weed Management Plan (Exhibit C) for the Town of Ridgway.  In December 2010, using the State of Colorado's "Creating An Integrated Weed Management Plan:  A Handbook for Owners and Managers of Lands with Natural Values"[1] as a guide, a committee was formed and the plan development commenced.  All

---

[1] Colorado Natural Areas Program, Colorado State Parks, Colorado Department of Natural Resources, Colorado Department of Agriculture Division of Plant Industry, and the Colorado Department of Agriculture. Creating an Integrated Weed Management Plan: A Handbook for Owners and Managers of Lands with Natural Values, Caring for the Land Series Volume IV. March 2000.

BLM_0066428

committee and public meetings were noticed and advertised, including distribution of meeting fliers, email distribution, website information and verbal outreach.   The Town's website maintained a repository of meeting dates, events, scheduling, and weed management resource information at http://www.town.ridgway.co.us/weedcommittee.html.

BLM_0066429

### III.   DEFINITIONS

"Integrated management" - the planning and implementation of a coordinated program utilizing a variety of methods for managing noxious weeds, the purpose of which is to achieve specified management objectives and promote desirable plant communities. Such methods may include but are not limited to education, preventive measures, good stewardship, and the following techniques:

(a) "Biological management", which means the use of an organism to disrupt the growth of noxious weeds.

(b) "Chemical management", which means the use of herbicides or plant growth regulators to disrupt the growth of noxious weeds, and includes vinegar-based and alternative solutions.

(c) "Cultural management", which means methodologies or management practices that favor the growth of desirable plants over noxious weeds, including maintaining an optimum fertility and plant moisture status in an area, planting at optimum density and spatial arrangement in an area, and planting species most suited to an area.

(d) "Mechanical management", which means methodologies or management practices that physically disrupt plant growth, including tilling, mowing, burning, flooding, mulching, hand-pulling, hoeing, and grazing.

*Source: CRS 35-5.5-103 (9)*

"Management" - any activity that prevents a plant from establishing, reproducing, or dispersing itself.                               *Source CRS 35-5.5-103 (11.6)*

"Native plant" - a plant species that is indigenous to the state of Colorado.

*Source CRS 35-5.5-103 (15)*

"Noxious weed" - an alien plant or parts of an alien plant that have been designated by rule as being noxious or has been declared a noxious weed by a local advisory board, and meets one or more of the following criteria:

(a) Aggressively invades or is detrimental to economic crops or native plant communities;
(b) Is poisonous to livestock
(c) Is a carrier of detrimental insects, diseases, or parasites;
(d) The direct or indirect effect of the presence of this plant is detrimental to the environmentally sound management of natural or agricultural ecosystems.

*Source CRS 35-5.5-103 (16)*

BLM_0066430

## IV. SCOPE, PURPOSE AND GUIDING PRINCIPLES

**SCOPE**

The scope of this noxious weed management plan focuses primarily on noxious weed management for public properties within the Town of Ridgway, as well as the properties in Ouray County owned by the Town, which include the water treatment facility and Lake Otonowanda Reservoir, south of Town.  The plan also addresses the need for noxious weed management on private properties within the Town of Ridgway.

**PURPOSE and GUIDING PRINCIPLES**

This is a multi-purpose plan, grounded with the following:

- Create a scientifically based protocol for weed management that considers, reconciles, and integrates the community's desires, and the Town's available resources for the effective management of prioritized noxious weeds through the utilization of priority management, a variety of control methodologies, appropriate revegetation, and monitoring;

- Effectively manage or control of the Town of Ridgway's prioritized noxious weeds of concern;

- Effectively safeguard Town-owned property and facilities including parks, trails, open spaces, recreational facilities, and rights of ways in the safest manner possible;

- Manage noxious weeds with least impact on human health, wildlife, wetlands, gardens, riparian and ditch corridors, and individual ecosystems;

- Provide education for the general population and other governmental entities in noxious weed identification and management;

- Pursue Town and external resources for noxious weed management goals and objectives;

- Be a good neighbor;

- Improve and maintain natural habitat, including native plant and wildlife populations.

The meeting schedule and plan outline is appended as Exhibit D.

BLM_0066431

## V.   EXISTING CONDITIONS

During the December 21, 2010 public meeting the following existing conditions for weed species, locations, and population size/density were identified.  These data are based upon findings and mapping efforts completed during the 2010 growing and weed management season.  It is recommended that the weed inventory be updated each year beginning July 1st. While the inventory presented here is believed to be reasonably accurate and sufficient to use as a baseline for this integrated management plan, it was developed largely from memory by members of the committee, and should be updated in July 2011.  Accurate records will provide monitoring data from year to year.  The locations and populations represented on the map are general to the properties upon which they are identified, and not necessarily specific to the exact coordinate for which they sit on the map (ie: they were not located via GPS).  For these reasons, the 10% weed reduction objective will be difficult to measure in 2011.

Population size and density are categorized as follows:

#1 = <100 square feet
#2 = 100-500 square feet
#3 = >500 square feet

| Location | Noxious Weed | State Rank | Size/Density | Public/Private |
|---|---|---|---|---|
| River Park PUD - Residential | | | | |
| | Canada Thistle | B | 3 | Private |
| | Spotted Knapweed | B | 1 | Private |
| | Russian Knapweed | B | 3 | Private |
| | Canada Thistle | B | 3 | Public ROW |
| River Park PUD - Industrial Park | | | | |
| | Spotted Knapweed | B | 2 | Public/Private |
| | Musk Thistle | B | 1 | Public/Private |
| Green Street Park | | | | |
| | Canada Thistle | B | 1 | Public |
| | Russian Knapweed | B | 3 | Public |
| Parkside PUD | | | | |
| | Russian Knapweed | B | 2 | Public |
| | Canada Thistle | B | 3 | Public |
| Uncompaghre River Trail | | | | |
| | Spotted Knapweed | B | 1 | Public |
| | Russian Knapweed | B | 1 | Public |
| | Canada Thistle | B | 1 | Public |
| | Musk Thistle | B | 1 | Public |
| | Common Mullein | C | 1 | Public |
| | Hounds Tongue | B | 2 | Public |
| Wastewater Treatment Plant | | | | |
| | Canada Thistle | B | 3 | Public |
| | Russian Knapweed | B | 3 | Public |

BLM_0066432

| | | | | |
|---|---|---|---|---|
| | Spotted Knapweed | B | 3 | Public |
| | Sow Thistle | B | 3 | Public |
| | Burdock | C | 3 | Public |
| **Water Treatment Plant** | | | | |
| | Canada Thistle | B | 2 | Public |
| **Lake Otonowanda** | | | | |
| | Canada Thistle | B | 3++ | Public |
| | Burdock | C | 3 | Public |
| **BMX Track** | | | | |
| | Spotted Knapweed | B | 1 | Public/Private |
| | Canada Thistle | B | 3 | Public |
| **Rollans Park (Uncompahgre River Corridor)** | | | | |
| | Common Mullein | C | 3 | Public |
| | Oxeye Daisy | B | 1 | Public |
| | Canada Thistle | B | 2 | Public |
| | Spotted Knapweed | B | 3 | Public |
| | Chinese Clematis | B | 1 | Public |
| | Sow Thistle | B | 1 | Public |
| **Ridgway Land Co Open Space** | | | | |
| | Spotted Knapweed | B | 3 | Private |
| | Russian Knapweed | B | 2 | Private |
| | Canada Thistle | B | 3 | Private |
| **Moffat / Lena** | | | | |
| | Spotted Knapweed | B | 3 | Public/Private |
| **Hwy 62/ South Railroad and South Liddell Stanton** | | | | |
| | Leafy Spurge | B | 1 | Private |
| **Triangle Subdivision** | | | | |
| | Common Mullein | C | 3 | Private |
| **Cottonwood Park** | | | | |
| | Canada Thistle | B | 1 | Public |
| | Common Burdock | C | 1 | Public |
| **Amelia Street/ School Road** | | | | |
| | Spotted Knapweed | B | 1 | Public/Private |
| **Marie Scott Subdivision/ Amelia Street** | | | | |
| | Russian Knapweed | B | 1 | Public/Private |
| | Hoary Cress | B | 3 | Public/Private |
| **CR 5 (in Town)** | | | | |
| | Hoary Cress | B | 3 | Public/Private |
| **Solar Ranches - Open Space (Outlot B)** | | | | |
| | Canada Thistle | B | 2 | Private |
| | Leafy Spurge | B | 1 | Private |
| | Oxeye Daisy | B | 2 | Private |
| | Dames Rocket | B | 2 | Private |
| | Spotted Knapweed | B | 3 | Private |
| **Regional Athletic Park (Solar Ranches Outlot A)** | | | | |
| | Dames Rocket | B | 1 | Public |

BLM_0066433

|  | Canada Thistle | B | 2 | Public |
|  | Spotted Knapweed | B | 2 | Public |
| The Preserve | | | | |
|  | Leafy Spurge | B | 1 | Private |
|  | Spotted Knapweed | B | 3 | Private |
|  | Scotch Thistle | B | 2 | Private |
|  | Russian Knapweed | B | 3 | Private |
| Solar Ranches – Private Lots | | | | |
|  | Canada Thistle | B | 3 | Private |

The following natural resources were defined during the December 21, 2010 public meeting:

River corridor, wetlands, parks, wildlife habitat (bald eagles), drinking water (Lake Otonowanda and the water treatment facility), irrigation ditches, streams and creeks, landscape plantings with native and desired species, and natural willows.

While the Town policy states that property owners adjoining public rights of way are responsible for maintenance and management of that right-of-way, there needs to be collaborative efforts with weed management between public and private property owners.

BLM_0066434

Baseline Noxious Weed Types and General Locations (from memory) for the 2010 season



BLM_0066435

## VI.    LAND MANAGEMENT GOAL AND WEED MANAGEMENT OBJECTIVES

**GOAL**

Reduce or eliminate priority noxious weeds, depending on species and size of infestation, on the Town of Ridgway public property.

**Objectives:**

I.     Educate the public and Owners Associations on the impacts of, identification of, and methods of control of noxious weed species.

II.    Use the least toxic method that is feasible and effective, to reduce or eliminate weeds.

III.   Eradicate small infestation of priority noxious weeds before they spread and become large infestations.

IV.    Control large infestations of priority noxious weeds by preventing them from going to seed or vegetative spreading.

V.     Control identified large infestations of priority noxious weeds by reducing their numbers with a target goal of 10% reduction or more per year.

VI.    Prevent new infestations of noxious weeds by restricting movement of weed contaminated soil.

VII.   Prevent new infestations of noxious weeds by reducing soil disturbance of intact native plant communities and/or reseeding with non-invasive species, preferably native plants.

VIII.  Town Staff should annually update this plan to identify and locate the various noxious weed types within the Town, and to prioritize weed management for the season.

BLM_0066436

## VII.    PRIORITIES

**CRITERIA FOR DETERMINING WEED MANAGEMENT PRIORITIES**

1. Utilize annual mapping data that identifies noxious weed types, locations, population size, and other critical data.

2. Prioritize small infestations of targeted noxious weed populations.

3. Identify and prioritize critical locations for management.

4. Identify and prioritize noxious weed species with the greatest impact such as toxicity, most invasive, difficulty of control/containment.

5. Coordinate annually with County Weed Manager as priorities for noxious weed management change and evolve.

6. Determine financial costs and required resources, based on specific noxious weed species, locations, and methods of control.

| | Spotted Knapweed | Canada Thistle | Russian Knapweed | Leafy Spurge | Hoary Cress | Hounds Tongue | Scotch Thistle | Any new found B weed |
|---|---|---|---|---|---|---|---|---|
| Uncompahgre River | 1.4 | 2.3 | | | | | | 1.0 |
| Lake Otonowanda | | 2.1 | | | | | | 1.0 |
| Uncompahgre Riverway Trail | 2.1 | 2.4 | 2.3 | 1.3 | 3.3 | 2.7 | | 1.2 |
| Riparian areas, ditches | 2.3 | 2.6 | 2.4 | 1.5 | 3.4 | 3.1 | | 1.3 |
| Small patches of any B weed | 1.1 | 1.1 | 1.1 | 1.1 | 1.4 | 1.5 | 1.3 | 1.1 |
| Athletic Park esp'lly S ditch | 2.1 | 2.4 | 2.5 | | | 2.4 | | 1.0 |
| Road rights of way | 2.6 | 2.9 | 2.8 | 1.6 | 3.6 | 3.3 | | 1.6 |
| Trails | 2.1 | 2.6 | 2.7 | 1.6 | 3.6 | 3.3 | | 1.5 |

| | |
|---|---|
| | 1.0 - 1.5 (Highest Priority) |
| | 1.6 - 1.9 |
| | 2.0 - 2.5 |
| | 2.6 - 2.9 |
| | 3.0 - 3.5 |
| | 3.6 - 4.0 (Lowest Priority) |

= weed not known to be in that area

Lowest number = Highest Priority

BLM_0066437

## VIII.   RECOMMENDATIONS

### A. IMPLEMENTATION MEASURES

Education and Outreach

1) Educate the public, including Owners Associations, about: the Town's weed management regulations, this integrated weed management plan, financial costs to the Town for weed management, and the Colorado Revised Statutes Title 35 Article 5.5 addressing weed management.

2) Public outreach efforts may include: collaboration with the Ouray County Weed Manager on special events such as Pulling for Colorado and the noxious weed symposium, posting information on the Town's website, incorporating information into building permit and land use applications (e.g.: subdivisions).  General information on noxious weeds may include: weed identification and methods of control, the potential negative impacts of soil and vegetation disturbance, and sources for weed-free seed mixes.

3) Explore opportunities for organized, informed, and easy volunteer actions and education for weed control.

4) Work with schools to promote educational programs by exploring natural resource-based programs and hands-on learning.

5) Contact and collaborate with neighboring property owners to control noxious weeds, and provide opportunities for participation in weed management on public lands.

6) Encourage the public to contact town staff when noxious weeds are identified within the Town through education and public outreach efforts, including signage at trailheads, and other methods of posting information about noxious weeds.

Prevention and Monitoring

1) Implement noxious weed management throughout the Town through enforcement and/or implementation of land development and code enforcement regulations, including minimizing disturbance of areas within proposed developments and during construction, and working to prohibit redistribution of noxious weed infested soils and chemically treated soils, and mandatory re-vegetation of disturbed areas on public and private properties.

2) Minimize surface disturbance of Town-owned property to limit the need for re-vegetation, create specific revegetation plans and budget funds for re-vegetation during projects.

3) Utilize the varied techniques as indicated in this plan for effective management, and adapt to changing conditions annually.

4) Prepare and implement site specific plans for weed management at prioritized locations annually.

5) Identify populations as quickly as possible through annual mapping of noxious weed locations, densities, and populations to identify and target specified, small, noxious weed population that can be readily eradicated.

6) Annual evaluation of specific management plans and techniques and efficacy thereof, through continuous mapping of noxious weed locations, densities, and populations.

BLM_0066438

7) Identify, assess and prioritize effective management tools from this integrated plan, including creation and management of healthy soils and environments not conducive to noxious weed growth.
8) Work from "the outside in" when controlling weeds, i.e.: manage the perimeter.

Least Toxic Methods

1) Encourage and collaborate with volunteers to effectuate weed management.
2) Target and manage weed infestations early when first identified, and they are less costly and least difficult to control.
3) Pursue grant and outside funding opportunities for noxious weed management commensurate with management goals, objectives, and priorities.
4) Use biological methods as much as possible in riparian areas to complement other management techniques.
5) Favor native plant populations and establish goals using trend-line analysis *(i.e.: plotting data from year to year and drawing a line from point to point in order to visually establish positive and negative trends); Are populations growing (positive line), diminishing (negative line), or staying the same (flat line)?*
6) Encourage and nurture habitats for native species.
7) Develop a chemical application protocol as a guideline for utilizing chemical management methods.
8) Work to control weeds in a manner that least impacts neighboring properties.
9) Explore and utilize effective alternatives to chemical treatments, including identification and maximization of areas in town that can be effectively managed without toxic chemicals, and using chemical applications as a last resort to the extent allowed with available resources.

BLM_0066439

**B. TECHNIQUES/ METHODS FOR MANAGING PRIORITIZED NOXIOUS WEEDS**
  *Targeted weeds, locations, and management techniques are in priority order:*

**1.) Any new found "B" list, noxious weed**
  <u>*Past Management Methods*</u>
  *Pulling, mowing, weed whacking by Town Staff; Vinegar based chemical applications.*

  **Management Goal:          Eradication**

  <u>*Proposed Management Techniques:*</u>
  *Mechanical is the preferred method for all new "B" list noxious weeds when practical. The goal is to eradicate the small populations while they are isolated and possible to effectively manage, so as to minimize requiring future resources and to minimize any future management issues. These newfound "B" list weed populations are the highest priority for the Town of Ridgway. Perennials and non-perennials require varied management techniques, as follows:*

  <u>***Perennials***</u>
  *(Canada Thistle, Hounds tongue, Hoary Cress, Dames Rocket, Leafy Spurge, Oxeye Daisy, Spotted Knapweed, Russian Knapweed)*

| | |
|---|---|
| Biological control: | Not practical due to limited population size. |
| Cultural control: | Minimize disturbance, re-vegetate with native perennial grasses, followed by native forbs, if desired, and maintain until established. If desirable grass competition is evident, judicious herbicide application that does not injure grasses may release them to compete effectively with the weeds. Irrigation may help stimulate grass competition in these cases. Seeding suitable perennial grasses is necessary to prevent weed re-invasion. |
| Mechanical control: | Pulling, mowing, weed-whacking with goal of preventing the weeds from seeding. |
| Chemical control: | Contact the Ouray County Weed Manager or a licensed applicator for specific recommendations. Refer to Attachment C for recommendations including preferred active ingredient, and the Chemical Application Protocol. |

BLM_0066440

### *Non-perennials/ Biennials*
*(Musk Thistle, Scotch Thistle)*

| | |
|---|---|
| Cultural: | Minimize disturbance, re-vegetate with native perennial grasses, followed by native forbs, if desired, and maintain until established.  Prevent from seeding, and suppress growth with healthy soils, native perennial grasses, and rapid re-vegetation. |
| Biological control: | Not practical due to limited population size. |
| Mechanical: | Prioritize all mechanical treatments: pulling, mowing, weed-whacking, etc. |
| Chemical: | Not necessary and not desired. |

## 2.) Leafy Spurge on the Town-Owned areas of the Uncompahgre River Trail
### *Past Management Methods*
*Pulling, mowing, weed whacking by Town Staff; Vinegar based chemical applications*

| | |
|---|---|
| Description: | A perennial up to three feet tall that reproduces by vigorous root stalks and seed. |
| Comments: | Leafy spurge is primarily found along the ditches in Solar Ranches and near the intersection of Hyde and Railroad. |
| **Management Goal:** | **Eradication** - *although it is estimated this weed in this location may already be eradicated, it should be checked in season for management need.* |

### *Proposed Management Techniques:*

| | |
|---|---|
| Biological control: | Population is too small for biological controls. |
| Cultural control: | Minimize disturbance, re-vegetate with native perennial grasses, followed by native forbs, if desired, and maintain until established.  Any activity that encourages vigorous grass growth is very important. |
| Mechanical control: | Mowing leafy spurge at 14 to 21 day intervals may cause higher susceptibility to fall applied herbicides. |
| Chemical control: | Spot spray small populations with signage and exclosure sufficient to keep out animals and pets, with such exclosure |

BLM_0066441

present for 2 weeks.   Contact Ouray County Weed Manager or a licensed applicator for specific recommendations.   Refer to Attachment C for recommendations including preferred active ingredient, and the Chemical Application Protocol.

**3.)  Spotted Knapweed on Uncompahgre River Corridor (Rollans Park)**

*Past Management Methods*
*3 "Pulling for Colorado" events; 2 years of Youth Corps pulling; 2 years of Community Corps pulling; Volunteer pulling efforts in 2010.*

Description:           A short-lived, non-creeping perennial that reproduces from seed and forms a new shoot each year from a taproot.

Comments:            One of the most invasive, aggressive weeds to plague the western United States.  Significant infestations are located along the river and elsewhere in town.

**Management Goal:   Control**

*Proposed Management Techniques:*

Biological control:    Use of goats is not recommended in this location due to the desire to retain native vegetation, moist soils with parasite concerns, steep rocky slopes, and resulting soil disturbance; Due to the limited size of the weed infestation, there are concerns about the insect biological agent population's ability to over-winter and the sufficiency of the existing weed population to sustain the insects; The seed-head flies, *Urophora affinis* and *Urophora quadrifasciata,* have been released in many Front Range counties.  These insects cause plants to produce fewer viable seeds and abort terminal or lateral flowers.  Root feeding insects may have more of a detrimental effect on knapweed populations than seed feeding insects.  Larvae of the yellow winged knapweed moth feed in the roots of both knapweed species.

Cultural control:      Minimize disturbance, re-vegetate with native perennial grasses, followed by native forbs, including willows, if desired, and maintain until established.  If desirable grass competition is evident in spotted knapweed stands, judicious herbicide application that does not injure grasses may allow them to compete effectively with the weeds.  Irrigation may help

BLM_0066442

stimulate grass competition in these cases.   Seeding suitable perennial grasses is necessary to prevent weed re-invasion.

Mechanical control:   Frequent and consistent pulling (most effective), mowing, weed-whacking with goal of preventing the weeds from seeding.

Chemical control:   Contact the Ouray County Weed Manager or a licensed applicator for specific recommendations.  Refer to Attachment C for recommendations including preferred active ingredient, and the Chemical Application Protocol.   In order to minimize chemical applications and maximize effectiveness, only the rosettes should be spot sprayed in the spring, and bolted plants should be pulled repeatedly.   If consistently applied for 3-4 years, the spotted knapweed should begin to decline as the seed bank is exhausted.

**4.)  Leafy Spurge in Riparian Areas and Ditches**
      **Management Goal:    Eradication**

      *Past Management Methods and Proposed Management Techniques:*
      Refer to Priority #2 – Leafy Spurge on the Uncompahgre River Trail.

**5.)  Leafy Spurge along Trails**
      **Management Goal:    Eradication**

      *Past Management Methods and Proposed Management Techniques:*
      Refer to Priority #2 – Leafy Spurge on the Uncompahgre River Trail.

**6.)  Leafy Spurge along Road Rights-of-Way**
      **Management Goal:    Eradication**

      *Past Management Methods and Proposed Management Techniques:*
      Refer to Priority #2 – Leafy Spurge on the Uncompahgre River Trail.

**7.)  Canada Thistle at Lake Otonowanda**
      *Past Management Methods*
      *Pulling, mowing, weed whacking by Town Staff; Vinegar based chemical applications*

BLM_0066443

| | |
|---|---|
| *Description:* | *Perennial.  Reproduces from vegetative buds in root system and from seed.* |

Comments:          Canada thistle is best managed through an integrated management system that emphasizes competitive, desirable plants. Population at the Lake is dense.

**Management Goal:   Control**

*Proposed Management Techniques:*

Biological control:    Bugs are not a preferred option due to potential to damage native thistle populations in addition to the noxious weed population.  Prioritize goats as a biological control.

Cultural control:    Minimize disturbance, re-vegetate with native perennial grasses, followed by native forbs, if desired, and maintain until established.

Mechanical control:    Research indicates that mowing of Canada thistle may be effective when done repeatedly at two week intervals over a period of several years.  Pulling and digging up Canada thistle is ineffective as the plant has such an extensive root system. Weeds may also be weed-whacked.

Chemical control:    Contact the Ouray County Weed Manager or a licensed applicator for specific recommendations.  Refer to Attachment C for recommendations including preferred active ingredient, and the Chemical Application Protocol.  Due to non-public access, signage should be placed on the gate accessing the reservoir property.  Any chemical application should observe a 30 foot setback from the water surface of the lake.

**8.)  Spotted Knapweed along Town-Owned areas of the Uncompahgre River Trail**
     **Management Goal:   Control**

*Past Management Methods and Proposed Management Techniques:*
Refer to Priority #3 – Spotted Knapweed on the Uncompahgre River Corridor.

BLM_0066444

**9.)  Spotted Knapweed in the Athletic Field**
     **Management Goal:    Control**

     _Past Management Methods and Proposed Management Techniques:_
     Refer to Priority #3 – Spotted Knapweed on the Uncompahgre River Corridor, with the exception that goats may be an effective management technique in this location.  This location has potential for volunteer, mechanical weed management efforts, which should be coordinated through a centralized volunteer management program.

**10.)  Spotted Knapweed along Trails**
      **Management Goal:    Control**

      _Past Management Methods and Proposed Management Techniques:_
      Refer to Priority #3 – Spotted Knapweed on the Uncompahgre River Corridor.

**11.)  Spotted Knapweed in Riparian Areas and Ditches**
      **Management Goal:    Control**

      _Past Management Methods and Proposed Management Techniques:_
      Refer to Priority #3 – Spotted Knapweed on the Uncompahgre River Corridor.

**12.)  Russian Knapweed along Town-Owned areas of the Uncompahgre River Trail**

      _Past Management Methods_
      _Pulling, mowing, weed whacking by Town Staff; Vinegar based chemical applications_

      Description:              A perennial with an extensive underground root system.

      Comments:               Like other creeping perennials, the key to Russian knapweed control is to stress the weed and cause it to expend nutrient stores in its root system.   An integrated management plan should be developed that places continual stress on the weed. Currently, the best management plan includes cultural control combined with mechanical and/or chemical control techniques. A single control strategy, such as mowing or an herbicide, usually is not sufficient.  Russian knapweed releases toxins into the soil, which prohibit the growth of native plants. _**The plant is toxic to horses, however they must consume it over a period of time before poisoning will occur.  Once poisoning occurs horses are unable to chew and advance food to the back of their**_

BLM_0066445

*mouths, swallowing is impaired and horses can drink only if they immerse their head in water far enough to get water to the back of their mouths.  Poisoning is irreversible and death by starvation will occur.*

**Management Goal:   Control**

*Proposed Management Techniques:*

Biological control:    None currently available.

Cultural control:    Minimize disturbance, re-vegetate with native perennial grasses, followed by native forbs, if desired, and maintain until established.  Russian knapweed tends to form monocultures by eliminating other plants.  Therefore, sowing desirable plant species is necessary after the weed is controlled.  Research indicates that the native grasses, streambank wheatgrass and thickspike wheatgrass will establish in an area after Russian knapweed is suppressed with herbicides.  If the Russian knapweed stand is not too old and grasses are still present, stimulating grass growth by irrigation (where possible) should increase grass competition with knapweed and keep it under continual stress.

Mechanical controls:    Repeated mowing combined with herbicide applications will gradually stress the plant, and this is the recommended approach in this location.

Chemical control:    Contact the Ouray County Weed Manager or a licensed applicator for specific recommendations.  Refer to Attachment C for recommendations including preferred active ingredient, and the Chemical Application Protocol.  Spot spray small populations.

**13.) Canada Thistle along Town-Owned areas of the Uncompahgre River Trail**
     **Management Goal:   Control**

*Past Management Methods and Proposed Management Techniques:*

Refer to Priority #7 – Canada Thistle at Lake Otonowanda, minus the 30' setback from the lake and signage on the gate, and minus the biological insect controls as the population is insufficient to sustain an insect population.

BLM_0066446

**14.)  Canada Thistle in the Athletic Field**
        **Management Goal:    Control**

*Past Management Methods and Proposed Management Techniques:*
Refer to Priority #13 – Canada Thistle along the Uncompahgre River Trail, minus the biological insect controls as the population is insufficient to sustain an insect population.  *A dedicated, local citizen has offered resources for volunteer mechanical management services in this location, which should be coordinated through a centralized volunteer management program.*

**15.)  Russian Knapweed in Riparian Areas and Ditches**
        **Management Goal:    Control**

*Past Management Methods and Proposed Management Techniques:*
Refer to Priority #12 – Russian Knapweed along the Uncompahgre River Trail

|    | Priority Noxious Weed Type and Location | Cultural | Biological | Mechanical | Chemical |
|----|------------------------------------------|:--------:|:----------:|:----------:|:--------:|
| 1  | Any new found "B" list, noxious weed     | X |   | X | X |
| 2  | Leafy Spurge on the Uncompahgre River Trail | X |   | X | X |
| 3  | Spotted Knapweed on Uncompahgre River Corridor | X | X | X | X |
| 4  | Leafy Spurge in Riparian Areas and Ditches | X |   | X | X |
| 5  | Leafy Spurge along Trails                | X |   | X | X |
| 6  | Leafy Spurge on Road Rights of Way       | X |   | X | X |
| 7  | Canada Thistle – Lake Otonowanda         | X | X | X | X |
| 8  | Spotted Knapweed along Uncompahgre River Trail | X | X | X | X |
| 9  | Spotted Knapweed in the Athletic Field   | X | X | X | X |
| 10 | Spotted Knapweed along Trails            | X | X | X | X |
| 11 | Spotted Knapweed in Riparian Areas and Ditches | X | X | X | X |
| 12 | Russian Knapweed along Uncompahgre River Trail | X |   | X | X |
| 13 | Canada Thistle along Uncompahgre River Trail | X | X | X | X |
| 14 | Canada Thistle in the Athletic Field     | X | X | X | X |
| 15 | Russian Knapweed in Riparian Areas and Ditches | X |   | X | X |

BLM_0066447

C.      **TEST AREAS**

**Green Street Park**

Green Street Park is recommended as a potential test site for volunteer management of noxious weeds.  The will be a collaborative effort of dedicated community members under the supervision and direction of Town Staff.  A detailed action plan should be developed with the community volunteer group and should include: weed inventory and mapping (type, size, location, etc.), proposed management efforts, detailed documentation of completed efforts, and constant monitoring of the test area with annual reporting to Town Staff.

**Mycorrihzal Test Area**

A mycorrihzal test area should also be incorporated with this plan in order to ascertain the viability of this product in assisting in effective weed management.  Effective monitoring will be required and necessary to evaluate the efficacy of this product.

BLM_0066448

## IX.   CONCLUSIONS

Integrated weed management for a small municipality requires a technical and coordinated approach considering a variety of sometimes competing needs and desires, including identification of shared community values and priorities, evaluating noxious weed science, incorporating weed management experiences, and understanding human and animal sensitivities to weeds and various chemical treatments.   Creating this plan was incredibly difficult and at times required reconciliation of seemingly incompatible objectives and demands.  The discussions and conclusions developed through an organized series of public meetings where information was gathered, shared, solicited, and eventually crafted into a community guidance document.  Extensive outreach efforts were put forth in both real and virtual space to insure the needed inputs were gathered, and educational opportunities were offered to encourage community involvement.

In the end, this plan puts forth a list of 4 priority noxious weeds found in 15 prioritized weed management locations on public properties within the Town, and including Town property outside of the municipal boundary (Lake O).  In addition, the plan identifies specific management techniques for each of the various priority weed types and specific locations.   Based on community inputs throughout the plan development process, a Chemical Treatment Protocol is recommended (Attachment C), and specific active ingredients for the chemical treatments are identified as a management technique to be incorporated for effective management of the priority noxious weeds. When the biological, cultural, and mechanical management techniques have not or will not be effective, and /or staffing and financial resources are insufficient or unavailable, in managing the noxious weed, in order to preserve the desired natural resources impacted by the weeds, chemical methods will need to be utilized for effective management (eg: Russian Knapweed).  The Chemical Treatment Protocol was developed through community inputs for this purpose.  When biological, cultural, and mechanical methods will effectively manage the weed population, those methods have been prioritized.

As remains true for small, local government operations, the need to balance very dynamic human and financial resources will need to be taken into consideration with any management plan.  This plan is drafted to provide the appropriate technical and financial information to assist with these determinations, and of course will develop and change over time with variable resources and changing priorities.

BLM_0066449

# X.    ATTACHMENTS

## ATTACHMENT A: Photos of Noxious Weeds within the Town of Ridgway

Oxeye Daisy



Musk Thistle



Scotch Thistle



Common Burdock



Dame's Rocket



Hoary Cress



Houndstongue



Leafy Spurge



Spotted Knapweed



Canada Thistle



Russian Knapweed



Spotted Knapweed



Page 26 of 55

BLM_0066450


Canada Thistle Rosette


Leafy Spurge Rosette


Musk Thistle Rosette


Burdock Rosette


Spotted Knapweed Rosette


Oxeye Daisy Rosette


Absinthe Wormwood Rosette

Page 27 of 55

BLM_0066451

**ATTACHMENT B:  Line Drawings of Noxious Weeds within the Town of Ridgway**



Canada Thistle

White Top

Musk Thistle

Oxeve Daisv

Scotch Thistle

Spotted Knapweed

Common Burdock

Leafv Spurge

Dames Rocket

Page 28 of 55

BLM_0066452

**ATTACHMENT C:  Chemical Application Protocol and Recommendations**

- Contact adjoining property owners prior to chemical applications, a minimum of 48 hours prior to possible time of application.

- Posting of chemical treatment usage on public properties within the Town, for a 2 week period following treatment.

- Posting and notification of chemical treatment usage to adjoining private properties within the Town, for a 2 week period following treatment.

- Selection and use of available least toxic, effective chemical treatments are recommended and desired.

- Make available sources of information on the impacts of chemical applications.

- Maintain a list of registered chemically sensitive persons within the town limits for notification purposes and encourage private property owners to post property when spraying chemicals for weed management, and make available signage for public use at Town Hall.

- Persons desiring to not have chemical management techniques utilized on public properties directly adjoining their property may request a no-spray buffer when they agree to manage the noxious weeds that otherwise would have been treated by the Town.

*Comments taken from inputs during the previous goals and objectives development discussions*

### Specific Chemical Recommendations

The following least-toxic, effective active ingredients available at the time of this Integrated Weed Management Plan for chemical treatments are recommended for the specified noxious weeds:

| | |
|---|---|
| Leafy Spurge | - Imazapic |
| Spotted Knapweed | - Aminopyralid |
| Canadian Thistle | - Aminopyralid |
| Russian Knapweed | - Aminopyralid |

BLM_0066453

## XI.    EXHIBITS

## EXHIBIT A

Ridgway Municipal Code                                    12-1-1

### CHAPTER 12

### SECTION 1

Weeds and Brush

Subsections:

12-1-1            Removal Of Weeds And Brush.

<u>12-1-1    REMOVAL OF WEEDS AND BRUSH.</u>

(A) It shall be unlawful for any person to fail to remove or cut weeds or brush located upon his property or property in his control or possession, and upon that portion of abutting street and alley rights of way lying between said property and the center line of said rights of way, from time to time so that the stubble is kept no higher than 6 inches above the ground.            (Ord 14-1999)

(B) Weeds or brush higher than 6 inches high are hereby declared to be a nuisance and may be abated in accordance with law.

(C) In addition to other remedies, the Town may abate weeds and brush, as follows:

(1) It may mail a notice to the owner or person in possession of the property ordering them to cut the weeds or brush addressed to the address listed in the County tax records, or in Town utility account records, unless a better address is known.

(2) If the weeds and brush are not removed within ten (10) days of the mailing, the Town may cause the weeds or brush to be removed and assess the cost of so doing against the property affected, together with 5% for inspection.  Such assessment shall be mailed similarly to owner or person in possession, as provided in Subsection (C)(1), above, and shall be due as of the date of mailing.            (Ord 14-1999)

(3) If the assessment is not paid within ten (10) days of mailing, the Town may certify the assessment, together with a 5% penalty, to the County Treasurer for collection as property taxes are collected.            (Ord 14-1999)

BLM_0066454

**EXHIBIT B**
RESOLUTION NO. 03-06

RESOLUTION OF THE TOWN COUNCIL OF RIDGWAY, COLORADO
ESTABLISHING A POLICY RELATIVE TO NOXIOUS WEED MANAGEMENT

WHEREAS, the proliferation of noxious weeds poses a genuine health threat to the Ridgway community; and

WHEREAS, the Town of Ridgway ("Town") has chosen to establish a noxious weed management program to help eradicate and control noxious weeds; and

WHEREAS, the community has expressed its desire to eliminate and contain noxious weeds without the use of toxic and poisonous chemical herbicides, the use of which may itself pose a health threat to the Ridgway community; and

WHEREAS, the Town Council has agreed to this type of management program and has expressed its desire to establish a policy relative to noxious weed management through the use of non-toxic, organic herbicides.

NOW, THEREFORE, BE IT HEREBY RESOLVED BY THE TOWN COUNCIL OF THE TOWN OF RIDGWAY, COLORADO that the Town shall not use toxic or poisonous, chemical-based herbicides within the Town limits toward the control of noxious weeds, and that the use of non-toxic, organic management practices shall be implemented.

PASSED AND APPROVED this 13th of August, 2003.

TOWN OF RIDGWAY

_____
Pat Willits, Mayor

ATTEST

_____
Pam Kraft, CMC
Town Clerk

Page 31 of 55

BLM_0066455

## EXHIBIT C
### INTERGOVERNMENTAL AGREEMENT REGARDING WEED CONTROL

This Intergovernmental Agreement Regarding Weed Control entered into and effective this _____ day of _____, 2010, hereinafter referred to as the "Agreement" or the "IGA" entered into by and between the **Board of County Commissioners of Ouray County, Colorado ("County"); the Town of Ridgway ("Town")** and the **City of Ouray ("City"),** and collectively referred to as ("Parties") as follows**:**

**WHEREAS,** C.R.S. §35-5.5-101, *et seq.* is known as the Colorado Noxious Weed Act ("Act") and the legislative declaration to the Act provides, in part, that "there is a need to ensure that all the lands of the state of Colorado, whether in private or public ownership, are protected by and subject to the jurisdiction of a local government empowered to manage undesirable plants as designated by the state of Colorado and the local governing body"; and

**WHEREAS,** further that:  "certain undesirable plants constitute a present threat to the continued economic and environmental value of the lands of the state and if present in any area of the state must be managed"; and

**WHEREAS,** the Act provides at C.R.S. §35-5.5-105(3) that the County may cooperate with municipalities for the exercise of any or all of the powers and authorities granted by the Act through the use of an intergovernmental agreement; and

**WHEREAS,** Art. XIV, section 18(2)(a)(b), Colo. Const. and section 29-1-203(1), C.R.S., provide that government entities may cooperate or contract with one another to provide any function, service, or facility lawfully authorized to each of the cooperating or contracting units, including the sharing of costs, the imposition of taxes, or the incurring of debt, only if such cooperation or contracts are authorized by each party thereto with the approval of its legislative body or other authority having the power to so approve; and

**WHEREAS,** by Resolution 2002-017 the County adopted a Noxious Weed Management Plan which set forth a list of noxious weeds as well as a plan for the management of noxious weeds in Ouray County; and

**WHEREAS, municipalities have plans in place?  Per 35-5.5-106**

**WHEREAS,** there currently exists the Ouray County Weed Advisory Board ("Weed Board") that has the power and duty to recommend a management plan for the integrated management of designated noxious weeds and management criteria for noxious weeds and other duties as set forth by C.R.S. §35-5.5-107; and

**WHEREAS,** in order to develop integrated weed management plans, it is critical that the Weed Advisory Board include members from the Town and the City such that management plans may take into account all areas of infestation within Ouray County; and

**WHEREAS,** the County, City and the Town wish to effectively coordinate efforts to address the invasive noxious weeds in the respective jurisdictions; and create a more effective integrated weed management program;

Page 32 of 55

BLM_0066456

**NOW THEREFORE,** in consideration of the mutual promises between the Parties, and other good and valuable consideration, the receipt and sufficiency of which each hereby acknowledge, the Parties agree as follows:

1. On or before January 31 of each year, a designated representative of the Town and the City shall meet with the Ouray County Weed Manager to develop an annual operating plan for the ensuing year for the management of noxious weeds in each respective jurisdiction.  All Parties shall cooperate in the implementation of the annual operating plans.

2. The City and the Town will each appoint a representative as a member of the Weed Board and such representative shall be the liaison between the City or the Town and the County Weed Department.

3. Except as otherwise agreed, all grants and contracts shall be made in the name of Ouray County in accordance with County rules and regulations, and the county weed manager or other individuals designated by the county shall be the responsible party for grant administration, fund accountability and administration of related contractual obligations.   The Town and the City agree to provide supporting letters or other documentation as may be necessary to obtain grants or other funding.

4. All parties agree to work together to inventory, monitor, and prevent the spread of noxious weeds, and, as provided above, to seek funding for weed control as a cooperative weed management area.

5. The Parties may, by subsequent agreement, choose to share resources on a case by case basis or make contributions, reimbursements or transfer funds.

6. This contract shall not be construed to create a financial obligation of any party. All expenditures by any party shall be authorized by the respective party pursuant to a proper appropriation therefore.

7. No party is delegating decision making authority.  Each party is responsible to make decisions within their jurisdictions. This agreement is not creating a legal entity of any sort.

8. This contract and implementation thereof shall be in accordance with all applicable laws and regulations,

9. This agreement does not restrict any party from participating in other public, private, or individual weed control activities which are not destructive of cooperative efforts under this Agreement.

10. Any party may terminate its participation in this Agreement at any time without cause, by giving written notice to the other parties.

11. On an annual basis, the governing bodies of each of the Parties shall meet and determine whether goals of this Agreement are being met and whether any modifications or amendments to this Agreement shall be made.

BOARD OF COUNTY COMMISSIONERS
OURAY COUNTY, COLORADO

BLM_0066457

By: _____

Lynn M. Padgett, Chair

ATTEST:

_____

Michelle Nauer, County Clerk and Recorder
By: Linda Munson-Haley, Deputy Clerk of the Board

CITY OF OURAY

_____

By:_____

ATTEST:

_____

TOWN OF RIDGWAY

_____

By:_____

ATTEST:

_____

Page 34 of 55

BLM_0066458

**EXHIBIT D**
## PUBLIC MEETING OUTLINE AND DETAILS

**Meeting Outline and Timeline**

| Meetings | Date | Purpose |
|---|---|---|
| #1 | Dec 7, 2010 | Establish Process and Identify Resources |
| #2 | Dec 21, 2010 | Describe Property/ Review Inventory<br>*Finalize Map of public properties and known weeds and locations* |
| #3 | Jan 4, 2011 | Develop Land Management Goals and Weed Management Objectives<br>***Guest Speaker: Susan Rose*** |
| #4 | Jan 18, 2011 | Set Priorities<br>*Prioritizing management, target areas, resources available*<br>***Guest Speaker: Kelley Liston*** |
| #5 | Feb 1, 2011 | Open Forum<br>*Scheduled time slots for public comment (schedule with Pam Kraft)*<br>Finalize Management Priorities |
| #6 | Feb 15, 2011 | Summarize Inputs to Date<br>Finalize Goals and Objectives<br>Finalize Priorities |
| #7 | Mar 1, 2011 | Consider Actions<br>*Techniques/methods of control*<br>***Guest Speaker: Jude Sirota** on Management Techniques & Methods of Control* |
| #8 | Mar 15, 2011 | Compile Integrated Weed Management Plan (IWMP)<br>*Bring it all together: Develop Recommendations, methods, short and long term…* |
| #9 | Apr 13, 2011 | Presentation of Draft Plan to Public and Town Council |

**Time and Location**
Meetings are Tuesdays, <u>4:00-6:00 PM in the Ridgway Town Hall</u> Community Center- 201 North Railroad Street.

**Details**
The public is encouraged and welcome to participate in each meeting. Public meetings will be posted and advertised. Guest Speakers will be present at Meetings 3, 4, and 5 (above), and will present information germane to the scheduled workshop topic. The presentation at Meeting #3 will review weed basics: 'Weeds 101'. The presentation at Meeting #4 will review management priorities, identification of priority species and priority infestations targeting areas for weed management, consideration of resources required for weed management. The presentation at Meeting #5 will review management techniques, best practices, environmental conditions, underlying causes, methods of control, etc. Presentations will begin at 4:00 PM and be approximately 30-60 minutes in length. After the presentation, workshop facilitation will begin and public inputs will be solicited and summarized. *Don Batchelder will be present at Meetings #3 through #7 for facilitation. Weed management resources, meeting notes, and plan related information will be available throughout the process at www.town.ridgway.co.us/weedcommittee.html. Committee members will meet after each meeting to summarize inputs and draw conclusions from the meeting. Additional committee meetings may be scheduled if needed.

**Committee Member Roles**
Committee Leads – Pam Kraft, Sheelagh Williams
Community Outreach – Pam Kraft, Ellen Hunter
Technical Resource and Assistance – Dickson Pratt
Meeting Notes – Pam Kraft
Facilitation Assistant – Joanne Fagan

BLM_0066459

**EXHIBIT E**
Meeting Agendas, Objectives, Notes

**WEED MEETING #2 (PROJECT SCOPE AND INVENTORY) – DEC 21, 2010**

**TO:**       WEED COMMITTEE

**FROM:**     JEN COATES

**SUBJECT:**  MEETING #2 OBJECTIVES

**DATE:**     12/21/2010

1.) Project scope and meeting schedule

2.) Describe and Inventory Management Areas
   a.) Define areas of weed management
         Town boundary: public / private lands
         Topography – river, wetlands, pasture
         Uses – public/private, parks, passive use
         Soil types

   b.) Identify resources – *this will aid in developing management goals and objectives*
   Wetlands, streams, ponds, lakes, rivers, riparian areas, vegetation types (prairie, shrub, forest), wildlife range, sensitive plant/animal species, drinking water, fish, flora/fauna, native plant communities, irrigated pasture, livestock, threatened plant communities, parks/developed recreation areas, etc.

   c.) Inventory/define known noxious weed species – *important for prioritizing management From Maps:*
         Spotted Knapweed – B
         Russian Knapweed – B
         Leafy Spurge – B
         Canada Thistle – B
         Hoary Cress – B
         Absinthe Wormwood – B
         Dames Rocket – B
         Oxeye Daisy – B
         Scotch Thistle – B

   d.) Re-inventory in the spring
         Every spring – *May, June?*
         Targeted areas for inventory – *Prioritize: disturbed areas, species most difficult to control, and highest value natural resource areas?*

3.) Next Meeting – Jan 4th at 4PM: Management Goals and Objectives
         Sub-Committee to Develop an Integrated Weed Management Plan

Page 36 of 55

BLM_0066460

December 21, 2010  4:00 p.m.  Ridgway Community Center
Meeting Notes

Members Present:  Heather Bussey, John Clark, Joanne Fagan, Ellen Hunter, Pam Kraft, Jean McDonnell, Dickson Pratt, Sheelagh Williams

Facilitators:  Jen Coates and Don Batchelder
Audience: Ron Mabry and Susan Baker
Discussion: review of map identifying location of noxious weeds

Map identifies noxious weeds on public property within town boundaries and also the water plant and Lake Otonowanda

Weed populations are all Class B by State identifications; Ouray County priorities include two identified plants, knapweed and absinth wormwood

Bike path as shown on map includes Railroad Street to the BLM property

Consolidate the map identifying weed populations on public property with the one used to identify populations on private property and develop one map using different colors for public and private properties

Size and density of populations need to be identified; Jen, Heather and Ron will meet to identify the size and density of populations and incorporate into the map

July 1st perform an inventory to update the map; the plan should state an inventory will be performed annually on July 1st

Plan should state intention to educate citizens regarding private property and the Town Council can address enforcement and requirements for private property owners at a later date

Define which weeds are a priority for eradication and then start removal at the most dense locations

Address in the plan rights of ways are the responsibility of the adjacent property owner (per municipal code regulations)

Important natural resources:   river corridor; wetlands; parks; drinking water; irrigation ditches and streams; landscaped plantings i.e.: trees and shrubs; natural willow populations; wildlife habitat

Place in the plan a requirement for notification to adjacent property owners when eradication work is performed by the town

BLM_0066461

**WEED MEETING #3: MANAGEMENT GOALS AND OBJECTIVES**
**AGENDA AND MEETING OBJECTIVES**
**JANUARY 4TH, 2010 – 4PM AT RIDGWAY TOWN HALL**

**TO:**          WEED COMMITTEE/ PUBLIC PARTICIPANTS
**FROM:**        JEN COATES
**SUBJECT:**     MEETING #3: AGENDA AND OBJECTIVES
**DATE:**        DEC 30, 2010
**EST TIME:**    2.5 - 3 HOURS

**1.) Review of Draft Plan: Weed Inventory/ Map**, from Dec 21, 2010 Meeting – Jen Coates (*10 minutes*)

**2.) Introduction and Meeting Purpose** – Pam Kraft (*5 minutes*)

**3.) Guest Speaker** - Susan Rose (*30-60 minutes*)

**4.) Meeting Process, Structure, Focus** – Don Batchelder (*5 minutes*)

**5.) Establish Land Management Goals** – Don Batchelder *(30 minutes)*
      *\*Describe conditions you wish to create or maintain, not just weed related*
      *\*Focus on human values, natural resources, financial resources*

      <u>Examples</u> *of land management goals:*
        a.)  Provide opportunities for public education
        b.)  Identify and protect natural resources
        c.)  Be a good neighbor
        d.)  Maintain natural habitat, including native plant and animal populations

**6.) Establish Weed Management Objectives** – Don Batchelder *(45 minutes)*
      *\*Specific, measureable, achievable statements with deadlines and specific actions*
      *\*Link the general goal statements to the specific management actions*

      <u>Examples</u> *of weed management objectives (linked to goals above):*
        a.)  Goal: Provide opportunities for public education

          Objective - Insure the Town's weed management plan and weed identification information are readily available on the Town website and at Town Hall by May 2011, and updated as necessary

BLM_0066462

Objective- Work with Ridgway Schools and the Ouray County Weed Manager to develop an educational plan on noxious weed education and management in 2011 for students including annual field trips and experiential outdoor education

b.)   Goal: Identify and Protect Natural Resources

Objective - Develop and implement revegetation plans in conjunction with all weed management efforts, as necessary, to insure native habitats are restored and management efforts and resources are maximized

c.)   Goal: Be a good neighbor

Objective - work collaboratively with private property owners on priority areas for weed management to insure efforts by both public and private parties are effective through shared resources, open dialogue, and targeted management techniques

d.)   Goal: Maintain natural habitat, including native plant and animal populations

Objective -  Prioritize management and employ various techniques such as early season mitigation, that reduce the spread of weed seed within 3 years (by 2013) in heavily populated areas of spotted knapweed, Canada thistle, and other specified noxious weeds where seed management is appropriate to prevent proliferation of weeds that work to choke out native vegetation and natural habitats, and insure management methods will be effective in decreasing these weed populations within 5 years (by 2015)

**7.)  Wrap Up** – Don Batchelder *(25 minutes)*
      Committee will summarize inputs and finalize the goals and objectives for the plan

**8.)  Next Meeting** – Jan 18th at 4PM: *Setting Priorities*

BLM_0066463

Sub-Committee to Develop an Integrated Weed Management Plan
January 4, 2011, 4:00 p.m.  Ridgway Community Center
Meeting Notes

Members Present:  Joanne Fagan, Ellen Hunter, Pam Kraft, Jean McDonnell, Dickson Pratt, Sheelagh Williams

Facilitators:  Jen Coates and Don Batchelder

Audience:  There were 13 people present in the audience

Discussion: Presentation of Weeds 101 and Development of Land Management Goals and Weed Management Objectives

Susan Rose, Horticulture Education Specialist with CSU Extension Tri River Area Office presented a slide presentation and stated she would provide a basic introduction talk to weeds and why they matter and why they are a problem.

Information from the slides included:

What's a weed – a plant where you don't want it; non-native; invasive; plant who's virtues are yet to be discovered.  Weeds are defined by human perspective, there is not scientific definition

Problems associated with crops and in gardening - there can be 50,000 weed seeds in a cubic foot of garden soil; seeds can remain dormant and viable for up to 50 years based upon the species; weeds compete with desirable plants, reduce crop yields and quality and increase labor and production costs; some are hosts for insects and disease to other plants; some are poisonous or irritating to people, animals and livestock

Increase costs for upkeep of homes and maintenance in recreation areas – increase cost of maintaining roadways and irrigation ditches; reduce land values; limit crop choices; increase reforesting and revegetation costs

Weeds affect us by - changing fire cycles; winter annual grasses can ignite easily by lighting strikes; wildfires occur far more often within infested areas; weeds threaten wildlife habitat;  agriculture estimated costs - economic impact exceeds 25 billion annually in US due to crop loss, weeds account for 45% of annual crop loss (insects 30%, disease 20%), without weeds competing with corps world crop production would increase at least 11.5%; roadside and canal maintenance; loss of property value; loss of income from recreation; time lost from work due to allergies

To develop a weed management plan must identify if the plant is a dicot or monocot; annual, winter annual, biennial or perennial

A noxious weed is defined legally by state definitions and are categorized in A, B & C lists and have three different management strategies. Those on the A list must be eradicated wherever detected; are often toxic or have serious undesirable characteristics; some of the weeds on the list are not in the state yet; B list requires management and prevention of further spreading; is typically the largest classification on the noxious weed list;   C list use integrated management methods and provide educational, research and biological control resources

BLM_0066464

Integrative management methods – decision making process that relies heavily on regular monitoring to determine if and when treatment is needed; minimize the use of chemicals; protect the environment and save money

Control methods in integrative management psychology

1) Prevention is the first line of defense for weed control
- always use clean seed
- avoid manures with viable seed
- inspect equipment used during roadside maintenance
- no soil from weed infested areas
- inspect nursery stock
- don't allow existing sources to reseed
2) Cultural methods support prevention
- crop rotation
- good soil preparation
- use mulches
- good watering practices
- monitoring and scouting
3) Control methods
- mechanical – mowing, hoeing, pulling, tilling
- knowing life cycle of weeds helps to know which method to use
- burning is more effective along ditch banks, roadways
- biological control – introduction of insects and diseases brought in from the plants original environment and released in a controlled environment (this is a long term fix and since not a quick fix is not suitable for A list weeds)
- goats
- chemical controls – used in conjunction with other methods (to use need to know the life cycle of the weed, right time to intervene and right chemical for the job); often the most cost effective choice

Weed identification - correct identification is key to successful management; must know if annual, biannual or perennial

If an annual – prevent seed formation and dispersal; mechanical is more effective and should be done after the seed sets  (winter annuals germinate in late summer or fall)
Biannual – form rosette first year, bloom and set seed in the second year; prevent seed spread
Perennials – may spread by rhizomes; most effective management is chemical; tilling and grubbing will need to be used in follow up; treatment most successful in early bloom or in fall; in summer cut seed heads to prevent spread of seeds

Integrated weed management keys – observation and scouting; correct identification; education about lifecycles and points of intervention; timely follow through; evaluation of results; modification of tactics when necessary; prevention is the always the starting point

Jen Coates explained at the previous meeting the committee developed a map which identifies weed populations, the types of plants, where they are located and if on public or private property and natural resources which need to be evaluated. She explained tonight the committee will be working on developing management goals and objectives.

BLM_0066465

Don Batchelder explained the land management goals should describe the conditions to create or maintain and focus on human values, natural and financial resources.  Weed management objectives should be specific, measureable and achievable statements with deadlines and specific actions.

The committee and audience created the following list of items.  There was not enough time to complete the list so members agreed to bring ideas for remaining objectives to the next meeting.

The meeting adjourned at 7:05 pm

BLM_0066466

**WEED MEETING #4: FINALIZE OBJECTIVES/ MANAGEMENT PRIORITIES**
**AGENDA AND MEETING OBJECTIVES**
**JANUARY 18TH, 2010 – 4PM AT RIDGWAY TOWN HALL**

**TO:** WEED COMMITTEE/ PUBLIC PARTICIPANTS
**FROM:** JEN COATES
**SUBJECT:** MEETING #4: AGENDA AND OBJECTIVES
**DATE:** JANUARY 18TH, 2011
**EST TIME:** 2.75 HOURS

**1.) Introduction** – *Pam Kraft* (*5 minutes*)

**2.) Meeting Purpose** – *Don Batchelder (5 minutes)*

**3.) Guest Speaker: Management Priorities** – *Kelley Liston (30 minutes presentation, 10 minutes Q&A)*

**4.) Review of Draft IWM Plan** – *Don Batchelder (10 minutes)*

**5.) Finalize Goals and Objectives**, continued from Jan 4, 2011 Meeting – *Don Batchelder* (*30 minutes*)

**6.) Establish Priorities** – *Don Batchelder (60 minutes)*
     *Focus control efforts on:*
          *- those weed species, which have the greatest impact on resource base*
          *- those which become more difficult to control if action is delayed*
     *Establish priorities by determining priority species and priority infestations in light of objectives*
     *All weed species identified in Ridgway's Plan to date are Colorado B-list (management required)*

   **A. Prioritize the Weed Species and Revisit Objectives to determine if objectives need revised**
   **B. Determine which Infestations have the Highest Priority**

**7.) Wrap Up** – *Don Batchelder (5 minutes)*
     Committee will summarize inputs and finalize the priorities

**8.) Next Meetings** – *(5 minutes)*
     Discussion of meeting dates and timeline changes
     Special Committee Assignments and Public Presentations
     Next Meeting - Feb 01 at 4PM: *Consider Actions/ Management Techniques*
                    Meeting Notes
          Sub-Committee to Develop an Integrated Weed Management Plan
             January 18, 2011  4:00 p.m.  Ridgway Community Center

BLM_0066467

Members Present: Heather Bussey-Patterson, John Clark, Joanne Fagan, Ellen Hunter, Pam Kraft, Jean MacDonald, Dickson Pratt, Sheelagh Williams

Facilitators:  Jen Coates and Don Batchelder

Audience:  There were 15 people present in the audience

Discussion: Presentation of Management Priorities and Establishment of Priority Weed Species

Kelley Liston, Rangeland Management Specialist with Ouray Ranger District, presented a slide presentation on establishing priorities for weed management.  She stated management "is not easy" and involves "complex planning decisions".  Prioritize weeds by targeting species "that posse the largest threat".  This includes identifying which species help meet the objectives, "while not treating them at the expense of something else" and determining "what are the trade offs associated with the addressing the problem area".

Information from the slides included:

1.  Establish Weed Priorities
        - conduct on site inventory (maps, local knowledge, site access)
        - what invasive species are present
        - what threat is created by the invasive species that are present (highly aggressive, poisonous, assets that are threatened)
        - which species are not present but within a specified distance
        - any planning/management documents that exist that address additional resource objectives
        - how feasible is treatment
        - is it on the state/county/local weed lists
2.  Prioritize Weed Species
        - work with the County Weed Manager
        - get familiar with state & county weed lists
        - evaluate weed management objectives to see if they are consistent with the weed species prioritization
3.  High Priority Weed Infestation
        - once priority weed species are identified then determine which infestation is highest
        - small isolated infestations are priority and most easily treated and may be a species that doesn't pose a high threat
        - infestation of high priority weed species would be uncontrollable if left untreated
        - areas of frequent, high disturbance, such as road sides, parking areas, trails, ditches and streams and rivers
        - frequent disturbance creates favorable habitat for weeds to become established
        - weed seeds are spread by vehicles, animals and water

There were questions from the audience for Kelley.

The committee reviewed the goals and objectives from the previous meeting and amended and added items to the lists, with input from the audience.

The committee established a prioritization of weed species as follows:

BLM_0066468

1. Spotted Knapweed
2. Canada Thistle
3. Russian Knapweed
4. Leafy Spurge
5. Hoary Cress
6. Hounds Tongue
7. Scotch Thistle

The following areas which have infestations were identified as having the highest priority:

1. Uncompahgre River Corridor
2. Lake Otonawanda
3. Uncompahgre River Trail
4. Riparian areas and ditches
5. Tackle small patches of noxious weeds first
6. Regional Athletic Park
7. Roadsides and trails

The meeting adjourned at 6:45 p.m.


Submitted by: Pam Kraft

BLM_0066469

**WEED MEETING #5: PUBLIC FORUM**
**AGENDA AND MEETING OBJECTIVES**
**FEBRUARY 1ST, 2010 – 4PM AT RIDGWAY TOWN HALL**

**TO:**          WEED COMMITTEE/ PUBLIC PARTICIPANTS
**FROM:**     JEN COATES
**SUBJECT:**  MEETING #5: PUBLIC FORUM
**DATE:**       FEBRUARY 1, 2011
**EST TIME:**  2.75 HOURS

**1.) Introduction and Meeting Purpose** – *Pam Kraft and Don Batchelder* (10 *minutes*)

**2.) Presentation Schedule –** *each speaker will have 10 minutes to present on their specific topic, offering solutions for the integrated weed managemen, followed by 5 minutes for questions and answers:*

   1.    **Timothy Seastedt**
   2.    **Joanne Fagan**
   3.    **Heather Bussey Patterson**
   4.    **Pam Kraft**
   5.    **Couple from Log Hill (sorry didn't get their name!)**
   6.    **Kimah McCarty**
   7.    **Heidi Comstock**
   8.    **Susan Baker**

**3.) Wrap Up** – *Don Batchelder (5 minutes)*

**4.) Finalize Goals and Objectives** *(if time allows)* **–** *Don Batchelder (20 minutes)*

**5.) Next Meeting** – *(5 minutes)*
        Next Meeting - Feb 15 at 4PM

BLM_0066470

Meeting Notes
Sub-Committee to Develop an Integrated Weed Management Plan
February 1, 2011  4:00 p.m.  Ridgway Community Center


Members Present: Heather Bussey-Patterson, John Clark, Joanne Fagan, Ellen Hunter, Pam Kraft, Jean McDonnell, Dickson Pratt, Sheelagh Williams

Facilitator:  Don Batchelder

Audience:  There were 14 people present in the audience

Discussion: Committee Member and Public Presentations on Control Methods

1.  Tim Seastedt, Professor of Ecology and Evolutionary Biology at the University of Colorado at Boulder spoke via the telephone, and slides were presented for his presentation.  He explained he is a research scientist and in the mid 90's began scientific research to find sustainable solutions for management of regionally abundant invasive weed species.  He has researched sustainable control methods using organisms that harm the weed and management techniques that favor particular species.  The research is intended to find cost effective methods and provide sustainable eco systems.  His projects encompass 150,000 acres of public property in the City and County of Boulder, which is being used as a laboratory to test and research management controls.  He presented background on a study area of 50 acres of spotted knapweed that the CU Invasive Plant Lab has been working with since 2005.  A biological control program was developed which has prevented the spread of the plant and is contributing to its apparent slow decline.

He suggested the Town address the infestation of spotted knapweed along the river corridor with the use of insects and proactive control measures. The first step is to focus on containment and then focus on controls to reduce seed dispersal.  He noted the plant needs seed production to survive and any control measures to minimize seed production will help, including damaging the plants. The use of this method, he said, guarantees that if regrowth occurs, it does not produce more viable seed.  Hand pulling the plant would be the best method along with the planting of competitive plants, as competition with other plants will kill the seedlings, and the use of insects.

On questions from the committee and audience he explained there are four insects which attack spotted knapweed.  Two are usually present with the plant, both species are gull flies, which stop seed production and winter in the seed heads.  The other are weevils, which will over winter in the soil. One type eats the seeds and foliage and the other the root.  Approximately 500 insects are needed for a million plants and will take five to six years to build a colony.  The best competitive plants would be native and non-native grasses.  The Boulder project has had a modest decline with the use of insects and hand pulling.

2.  Joanne Fagan addressed the use of insects for biological weed control.  She contacted an insectory in Palisade, Colorado which shared research on which insects control specific species, and will not affect other species.  The insects act as predators and will control, but not eradicate, a species.  They need to over winter so they can breed and create a population to impact the weed infestation, and it will take between three and five years to have a colony large enough to make an impact.  The cost of obtaining the insects is affordable.

Page 47 of 55

BLM_0066471

3.  Heather Bussey Patterson addressed the use of mushroom spores as a control method.  These products are marketed as soil amendments and they work to control seed populations, and the microorganisms in the product aid the soil.  The spores will feed on woody stocks and seed production.  The cost for application is $70 to 100 an acre.  She reported she has contacted a company that is willing to donate the product for experimental test plots, and a CSU professor would oversee the testing.

4.  Pam Kraft spoke regarding the use of goats for weed management.  She explained the City of Denver has used hired a company that supplies herds of cashmere goats to control weeds in city parks.  Goats eat broadleaf plants, such as thistle and bindweed, and will ignore grasses.  The Canon City Recreation District owns a herd of 16 goats, all of which have been donated to the City and include an eclectic mix of breeds. The goats are used to control weeds in the natural parks and along the river corridor.  Weed management is very successful, the only challenge that has been encountered is perimeter fencing to confine the goats in areas that are being eradiated.  Recently the goats completely cleared a park area of knapweed.  They are also eating the russian olive and tamarisk plants along the river. The city maintenance crew take care of the goats, which are housed in a chain link fenced area at the maintenance yard.  They are visited by the public who come to feed the goats, which will eat anything offered to them.  The Canon City Water Department also has a herd of goats that live up at two settling basins, where the city stores its water supply.

The use of goats to reduce weed populations is an effective bio-control agent and is economical.  They eat 25 percent of their body weight each day; and their hooves till and aerate the soil as they trample in their own manure which becomes fertilizer.  Goats prefer plants that are at eye level and eat weeds, and also poisonous plants.  They will not eat grasses if there are weeds in the area.  The older males prefer different plants then the females and younger goats.  She explained they will eat weeds the committee has identified on the list of priority weeds – canada thistle, leafy spurge, scotch thistle and spotted knapweed.  The way in which the goats eat weeds does not allow the plant to photosynthesize and produce any more seeds.

5.  Kimah McCarty presented an overview of the eradication project undertaken last summer by students who hand pulled knapweed along the river corridor.  She encouraged the committee to continue the Town's policy to disallow the use of herbicides on public property.  She addressed the need to protect soils, encourage organic gardening, and teach youth ways to work in harmony with the land.  She spoke regarding detrimental health effects from exposure to herbicides, and cancer causing agents contained in chemicals.  She explained herbicides can affect the food chain, birds, insects, wildlife and water sources.

6.  Heidi Comstock expressed concerns regarding chemical exposure and public safety.  She reported on new discoveries in photon technology and noted changes in physics are happening so quickly that new technologies may be available before the plan is even prepared.  She encouraged the committee to consider the need to protect the environment and ensure a continuation of tourism.

7.  Susan Baker encouraged educating the public that the use of herbicides on private properties can impact neighbors.  She asked the committee to consider not including the use of herbicides as a control method and chose the use of alternative methods.   She presented documentation on the dangers of toxic chemicals, and expressed concerns if herbicides are used along the river it may have a detrimental affect on the bald eagle population.  Glen Rein explained he is a biochemist and addressed the dangers of chemical toxicity and impacts on humans, wildlife, and water sources.

It was noted the next meeting will be held on February 15th at which time the committee will finalize goals and objectives and management priorities.  At the March 1st meeting a speaker will address control methods for specific weed species.

BLM_0066472

The meeting adjourned at 6:45 p.m.

Submitted by: Pam Kraft

BLM_0066473

**WEED MEETING #6:**
**AGENDA AND MEETING OBJECTIVES**
**FEBRUARY 15TH, 2010 – 4PM AT RIDGWAY TOWN HALL**

**TO:**        WEED COMMITTEE/ PUBLIC PARTICIPANTS
**FROM:**      JEN COATES
**SUBJECT:**   MEETING #6:
**DATE:**      FEBRUARY 15, 2011
**EST TIME:**  2.5 HOURS

**1.) Introduction and Meeting Purpose** *– Pam Kraft and Don Batchelder (10 minutes)*

**2.) Committee Discussion – ** *Don Batchelder (30 minutes)*
*Committee summarize discussions and public inputs to date*

**3.) Finalize Goals and Objectives–** *Don Batchelder (30 minutes)*

**4.) Finalize Priorities for Weed Management -** *Don Batchelder (40 minutes)*

**5.) Review Chemical Application Protocol** *– Don Batchelder (20 minutes)*

**6.) Meeting Schedule** *– Don Batchelder (10 minutes)*
*Next Meeting – March 1st at 4PM: Management Techniques with Guest Speaker, Jude Sirota*
*Meeting Schedule – confirm meeting schedule, remaining dates, scope and summary*

BLM_0066474

Sub-Committee to Develop an Integrated Weed Management Plan
February 15, 2011 4:00pm Ridgway Community Center

Members Present:     John Clark, Joanne Fagan, Ellen Hunter, Pam Kraft, Jean McDonnell, Dickson Pratt, Sheelagh Williams

Facilitators:    Jen Coates and Don Batchelder

Don reminded the committee and public of the reasons for an integrated weed management plan: Colorado State legal requirements, efficient use of the Town Council and the need for river restoration.

The Committee reviewed the Goals and Objectives, including Dickson's proposal for a much simpler set with a focus on noxious weeds.  The consensus was that Dickson's proposal was much simpler, on task and easier for staff to interpret, track and achieve. Jean proposed the addition of an objective to use the "least toxic method to reduce or eliminate priority noxious weeds that is feasible and effective".  Education was also added as an objective.  Staff was directed to revise the draft plan to reflect the consensus.

The Committee discussed what should be included in the Integrated Weed Management Plan.  There was consensus that Purpose should include "restoration, maintenance and beautification of public property".

The Committee then moved to prioritization of location specific noxious weeds.  Before discussion of the specifics, the Committee agreed on a process and criteria which would be used and vetted in this initial evaluation and then included in the Integrated Weed Management Plan for annual use thereafter.  Criteria include town resources (money, labor), additional resources (volunteers, grants, donations), species of noxious weeds present and size and location of infestations.  Joanne agreed to redo the matrix of locations, noxious weed species and priority based on the criteria the Committee developed and make that available at the next meeting to compare it to the matrix based on prior "ad hoc" committee input.  She will also add the likely cost since that was included as a criteria for determining action.

BLM_0066475

**WEED MEETING #7:**
**AGENDA AND MEETING OBJECTIVES**
**MARCH 1ST, 2010 – 4PM AT RIDGWAY TOWN HALL**

**TO:**          WEED COMMITTEE/ PUBLIC PARTICIPANTS
**FROM:**      JEN COATES
**SUBJECT:**   MEETING #7: METHODS AND TECHNIQUES
**DATE:**       MARCH 1, 2011
**EST TIME:**  2.5 HOURS

**1.) Introduction and Meeting Purpose** *– Sheelagh Williams  (10 minutes)*

**2.) Presentation of Methods and Techniques –** *Jude Sirota (30 minutes; 10 minute QA)*

**3.) Review Draft Management Plan and Inputs to Date –** *Don Batchelder (20 minutes)*

**4.) Identify Control Methods for Priority Noxious Weeds -** *Don Batchelder (70 minutes)*
        *Committee will discuss management techniques for priority weeds and then open to public comment*

**5.) Meeting Schedule** *– Don Batchelder (10 minutes)*
        *Next Meeting – March 15th at 4PM: Management Techniques Continued*

BLM_0066476

Sub-Committee to Develop an Integrated Weed Management Plan
March 1, 2011 4:00pm Ridgway Community Center

Members Present:      Heather Bussey, John Clark, Joanne Fagan, Ellen Hunter, Jean McDonnell, Dickson Pratt, Sheelagh Williams

Facilitators:     Jen Coates and Don Batchelder

Jude Sirota gave a presentation on the techniques which can be used to control weeds.  She presented both a general view and then provided specific information on the availability and effectiveness of various control techniques for weeds known to exist in Ridgway.  She also provided some ideas for a volunteer program.  Jude answered questions from the committee and the public.  One point of emphasis was that if herbicides are used, the skill of the licenses applicator is critical to minimizing potential adverse impacts on humans and the environment.

The Committee reviewed the draft Integrated Weed Management Plan and made a few recommendations. Jen and Joanne will make the recommended changes.

Page 53 of 55

BLM_0066477

**WEED MEETING #8:**

**AGENDA AND MEETING OBJECTIVES**

**MARCH 15TH, 2010 – 4PM AT RIDGWAY TOWN HALL**

**TO:**       WEED COMMITTEE/ PUBLIC PARTICIPANTS
**FROM:**     JEN COATES
**SUBJECT:**  MEETING #8: METHODS AND TECHNIQUES/ FINALIZING THE PLAN
**DATE:**     MARCH 15, 2011
**EST TIME:** 2.5 HOURS

**1.)**     **Introduction, Meeting Purpose, Discussion Format** – *Sheelagh Williams* (5 *minutes)*

**2.)**     **Confirm Control Methods for Priority Noxious Weeds -** *Don Batchelder (120 minutes)*
            *Committee will discuss management techniques for each priority weed and location, and then open the public comment period*

**3.)**     **IS IT DONE…** or one last meeting**?!?**

BLM_0066478

Meeting Notes
Sub-Committee to Develop an Integrated Weed Management Plan
March 15, 2011  4:00 p.m.  Ridgway Community Center

Members Present: Heather Bussey-Patterson, John Clark, Joanne Fagan, Ellen Hunter, Pam Kraft, Jean McDonnell, Dickson Pratt, Sheelagh Williams

Facilitator:  Don Batchelder

Audience:  There were 6 people present in the audience

Discussion:  Control methods for priority weeds

At the last meeting the committee asked staff to work with the draft plan and insert Proposed Management Techniques from the Carbondale Integrative Weed Management Plan.  The committee reviewed those inserts which addressed prevention/revegetation; cultural; biological; mechanical and chemical control methods and added, deleted or modified the content. Each identified weed type was addressed (leafy spurge, spotted knapweed, canada thistle and russian knapweed) and then modified for each area that the weed has been located on Town owned property and rights of ways. The committee also amended Attachment C: Chemical Application Protocol.

The meeting adjourned at 7:05 p.m.

Submitted by: Pam Kraft

BLM_0066479



# Ridgway Streetscape Master Plan Report

## Town of Ridgway, Colorado

Master Plan adopted: October 2006
Phase 1 - Design Development: 2008



**TOWN OF RIDGWAY**

THE ELK MOUNTAINS PLANNING GROUP, INC.
PLANNING/HISTORIC PRESERVATION/LANDSCAPE ARCHITECTURE/COMMUNITY DECISION MAKING
*Specializing in Mountain and Resort Communities*



DHM DESIGN
LANDSCAPE ARCHITECTURE   1309 E 3rd Avenue   680 Main Street
LAND PLANNING          Room 11        Suite 110
URBAN DESIGN           Durango, Co 81301   Carbondale, Co 81623
                       970.385.4219    970.963.6520

BLM_0066480

BLM_0066481



Master Plan Report | Ridgway, Colorado | September 2006

Acknowledgements

Adopted by the Town of Ridgway Town Council in October 2006
Mayor Pat Willits

John Clark, Mayor Pro Tem
Rodney Fitzhugh
Eric Johnson
Dave Drew
Paul Hebert
Sheryle Pettet

Recommended for Approval by the Ridgway Planning and Zoning Commission on October 9, 2006

With Assistance from the Following
Town of Ridgway Staff Members
Jen Coates
Assistant Planner and Project Coordinator
Joanne Fagan
Engineer
Greg Clifton
Town Manager/Planner
Mike Jenkins
Public Works/Street Maintenance

Special Thanks to the Ridgway Streetscape Steering Committee
Susan Baker
John Clark
Deedee Decker
Darin Hill
Melissa Johnson
Lynn Kircher
Doug MacFarlane
Shawn McKearnan
Barbara Morss
Sheryle Pettet
Pam Stewart
Roger Schaefer
Marcus Wilson

Project Design Team
Walker Christensen, DHM Design, Project Manager & Designer
Laura Kirk, DHM Design, Principal-in-Charge
Julie Ann Woods, AICP/ASLA, Elk Mountains Planning Group, Inc., Planner and Public Facilitation

Acknowledgements        1

BLM_0066483



Master Plan Report I Ridgway, Colorado I September 2006



## Table of Contents

Page No.

Introduction & Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6
Streetscape Study Area
Project Team
Streetscape Steering Committee
Transportation Element

Streetscape Planning and Design Process . . . . . . . . . . . . . . . . . . . . . . . 7-9
Project Goals
CDOT Coordination
Public Process

Analysis of Issue Areas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-17
Circulation
Parking
Special Event Parking
Hartwell Park
Signage
Lighting
Outdoor Seating
Drainage and Street Materials

Master Plan Design . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18-28
Master Plan
Street Cross-Sections and Plans

Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29-33
Recommended Priorities
General Recommendations
Sustainability Recommendations
Street Furnishings and Materials Recommendations
Statement of Probable Costs
Project Implementation Strategies
Summary

Phase 1: Design Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34-43

Appendix A: Meeting Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44-56

Appendix B: Zoning Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Appendix C: Surface Treatment Options . . . . . . . . . . . . . . . . . . . . . . . . 58

Appendix D: Cost Estimate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59-60

The Ridgway Streetscape Master Plan was developed under a contract between the Town of Ridgway and DHM Design. Elk Mountains Planning Group was a sub-consultant on the Project Team. The ideas, sketches, photos, plans, and elevations provided in this document are intended for master planning purposes only and are not intended to be used for construction. Any errors or omissions from this Master Plan should be brought to the attention of DHM Design at wchristensen@dhmdesign.com or the Elk Mountains Planning Group, Inc. at elkmtnplan@msn.com as soon as they are discovered. All photographs included in this document are the exclusive property of the Project Design Team.

BLM_0066484

BLM_0066485

Master Plan Report I Ridgway, Colorado I September 2006



**Figure 1**. Streetscape Study Area

## Introduction & Background

In February 2006, the Town of Ridgway, Colorado put forth significant effort toward completion of the Transportation Element of the Comprehensive Plan, identifying the need to develop streetscape improvements within the downtown area. The Town hired a team of landscape architects and planners to help them pursue a streetscape design for that portion of the Town that generally includes the Historic Business District (HB Zone).

## Streetscape Study Area

The Streetscape Study Area was generally defined as the geographic area located within the HB Zone. The specific boundaries of the Study Area are depicted in Figure 1.

## Project Team

The Project Team selected by the Town of Ridgway was DHM Design and the Elk Mountains Planning Group, Inc. Members of this team had worked together on previous streetscape and planning projects. The key Project Team members were:
*   Walker Christensen, Landscape Architect and Project Manager, DHM Design
*   Laura Kirk, Landscape Architect and Principal-in-Charge, DHM Design
*   Julie Ann Woods, AICP/ASLA, Planner/Public Facilitator, Elk Mountains Planning Group, Inc.

Working with the Project Team was Jen Coates, Assistant Planner with the Town of Ridgway. Ms. Coates served as the main point of contact between the community and the Project Team.

## Streetscape Steering Committee

In order to ensure the Project Team was on track with their assumptions, plans, and design of the streetscape, a group of local citizens was asked to serve on the Streetscape Steering Committee (SSC). The Steering Committee met with the Project Team prior to each public session, providing valuable input and insight into the community, and generally steering the direction of the project. (Notes from Steering Committee meetings are provided in Appendix A).

Steering Committee members were selected based on the various and multiple roles they played within the Ridgway community. With input from the Town Staff, the following community members agreed to serve on the Streetscape Steering Committee:
*   Susan Baker
*   John Clark
*   Deedee Decker
*   Darin Hill
*   Melissa Johnson
*   Lynn Kircher
*   Doug MacFarlane
*   Shawn McKearnan
*   Barbara Morss
*   Sheryle Pettet
*   Roger Schaefer
*   Pam Stewart
*   Marcus Wilson

In addition to these members, Town Staff members Jen Coates, Town Manger/Planner Greg Clifton, and Town Engineer Joanne Fagan served as resources to the committee. Mike Jenkins, Street Maintenance, met with the Team to share his thoughts and concerns regarding the streetscape improvements and long-term maintenance.

BLM_0066486

Master Plan Report | Ridgway, Colorado | September 2006





### Streetscape Planning & Design Process

The Project Team was given several background documents to review and consider as part of the design process. These included the 2000 Comprehensive Plan, the Transportation Element, the Zoning Code, and a history book entitled <u>The Town That Refused to Die Ridgway Colorado, 1890-1991</u> by Doris H. Gregory. All of this background information allowed the Project Team to quickly get up to speed on the community of Ridgway, and helped in the development of Project Goals. Working closely with the Town Staff, coordination with CDOT was arranged, a public process was developed, and the Master Plan design work began in the Spring of 2006.

### Transportation Element

The following excerpt from the Town of Ridgway's Transportation Element provides an excellent snapshot of the current transportation conditions within the Town:

> "While initially a rail town, Ridgway now relies upon its streets, sidewalks and trails for transportation needs. Through more than a century of growth, Ridgway now manages 12.51 miles of roads within its corporate boundaries. The principle highways include Highway 62 (Sherman Street) and Highway 550. These two stretches of highway were designated as Colorado Scenic Byways in the year 1989. Much of the vehicular traffic utilizing these two highways represents pass-through traffic consisting of work force of the neighboring community of Montrose, which provides needed services to Telluride and other nearby resort communities. Tourism also represents a significant portion of the Ridgway traffic. It is estimated that between 7,000 and 11,000 automobiles and trucks pass through Ridgway on these Byways per day. The Town, in 2004, had an estimated population of around 753 people.

> "It thus becomes readily apparent that Ridgway faces significant transportation issues, even for a town of this size. Growth has been increasing at a quickening pace in recent years, placing some additional burden on the Town's transportation infrastructure. Development is steadily increasing in the residential, commercial and light industrial areas. To note, the population in Ridgway in 1990 was close to what it was seven decades earlier, in 1920. In the fifteen years since 1990, the population has doubled."

The Project Team felt that whatever streetscape design was agreed upon, it should attempt to capture a significant amount of this highway traffic, while making it easy for local residents to get access to the downtown for their basic services.

Introduction & Background

BLM_0066487



## Project Goals

The Steering Committee agreed to the following set of Project Goals that were intended to ensure that the final design would achieve the following purposes:

1.   Enhance the Ridgway streetscape while preserving local character.

2.   Enhance the pedestrian experience into and throughout the Historic Business District for year-round use.

3.   Identify locations for way-finding improvements into the Historic Business District.

4.   Make coming to downtown fun, safe, inviting and memorable.

5.   Create great outdoor spaces to hold events, to meet and greet, or people watch.

6.   Improve and organize vehicular circulation with no net loss of parking and additional locations for parking.

7.   Bring the natural beauty of the area into the heart of the district.

8.   Use sustainable design strategies whenever possible.

9.   Create an interface with CDOT to coordinate streetscapes.






BLM_0066488

Master Plan Report I Ridgway, Colorado I September 2006





## CDOT Coordination

*Create an interface with CDOT to coordinate streetscapes.*

Goal #9 above was added by the Steering Committee because a section of State Highway 62, known locally as Sherman Street, runs through the Study Area. The Project Team met with the Region 5 Engineering staff for CDOT to discuss possible streetscape options for this section of State Highway. (Notes from that meeting are included in Appendix A). Several members of the CDOT team attended the community's Streetscape Open House held on June 28, 2006, and provided valuable insight into possible design options along Highway 62.

The Project Team held significant dialogue with CDOT regarding the raised median and parking along the Highway 62 corridor through town. The CDOT representatives previewing this project were apprehensive about any medians or highway "obstructions" protruding into and on the highway. They did suggest that the Town and CDOT may potentially agree to these types of improvements on and/or along the highway with a Memorandum of Understanding (MOU), which would clearly delineate the responsibilities of both parties. This MOU may include assumptions of responsibilities and financing by the Town for such improvements and maintenance. Something to this effect will require additional comprehensive dialogue with CDOT. CDOT clearly stated that if the Town were to propose a streetscape design different than the division standard, the Town would be responsible for all maintenance of that stretch of highway.

As the Project Team gained consensus on an overall streetscape design for the community, a number of questions came up that required additional CDOT input. Based on e-mail correspondence with CDOT's Mike McVaugh, Region 5 has agreed to the following aspects of the streetscape design:

- Parking along the north portion of Sherman St., south of Hartwell Park is acceptable.

- CDOT is open to bulb-outs (landscape islands) on Lena St. within CDOT right-of-way with an executed Memorandum of Understanding between CDOT and the Town for maintenance.

- CDOT agreed that a material change at the intersections such as colored concrete would be a possibility but there would need to be further discussion with the Town as the project moves forward into Design Development and Construction Documents. CDOT noted that this treatment at the intersections is a substantial cost difference from asphalt and CDOT would ask that the Town pay the difference if they feel strongly that this upgraded treatment is needed. CDOT is not open to a raised intersection (or traffic table) because of maintenance.

- CDOT will approve the proposed Sherman St. cross section and plan with modifications. CDOT would like to reduce the turn lane on both sections to a 12' width. This is in consideration of safety and traffic calming. The drive lanes can be a 14' width, including a Type 2B curb. The extra 2' gained can be distributed to the sidewalk on both sides, making the sidewalks 7' wide.

- An event banner over Hwy 62 is acceptable if it is a minimum of 20' in height to the bottom of the banner. The design of this would have to be submitted to CDOT for review and approval, and paid for by the Town; CDOT is willing to work with the Town on this item.

8    Streetscape Planning and Design Process

BLM_0066489







## Public Process

The Project Team developed a public process that would allow a variety of opportunities for the Ridgway community to provide valuable input and suggestions on how they would like their downtown streetscape to be developed. In addition to an initial start-up meeting with staff, and Steering Committee Meetings, the following public sessions were held to solicit suggestions from the community. (Notes from these meetings are also included in Appendix A):

* Workshop #1 (May 22, 2006)  The Project Team made a PowerPoint presentation on their streetscape and public facilitation credentials; provided an overview of their findings related to the inventory and analysis of the Town's current conditions (challenges and opportunities); reviewed Project Goals; and facilitated a focused discussion with the attendees on what the community thought would be important for the Project Team to know before proceeding with design work. A summary of both the Steering Committee's and community's suggestions are included in Appendix A.

* Workshop #2 (June 28, 2006)  This meeting was set up as the Streetscape Open House to allow community members to see the results of the Project Team's analysis and preliminary street cross-sections. Each Project Team member manned a "station" where various cross-section alternatives were presented. Community members were asked to vote for their preferred circulation plan, cross-sections, and parking layout. The results of this Open House allowed the Project Team to focus on the community's preferences before developing a refined final streetscape design. A summary of these community preferences is provided in Appendix A.

* Work Session with Town Council and Planning Commission (July 12, 2006)  In order to ensure that the Project Team's direction from the community at large was consistent with direction from the Town Council and Planning Commission, an additional public meeting was scheduled with these decision-makers. The Project Team presented the community's preferences from Workshop #2, and sought additional input from the Council before proceeding into the refined final design.

* Workshop #3 (August 8, 2006)  The Project Team presented the refined preferred alternative streetscape design to the community through a PowerPoint presentation and open discussion. Although there was poor attendance by the community at large, there was general agreement on some additional changes to the Streetscape Master Plan design. These included a more pedestrian-friendly cross-section for Clinton St.; an alternative circulation plan that reverses the flow on N. Lena St.; and improved pedestrian connections to the Town Parking Lot.

* Workshop #4 (September 19, 2006)  The final Streetscape Design Master Plan was presented in a joint Work Session of the Town Council and the Planning and Zoning Commission. The design team presented the "draft" final plan and recommendations. There was much public input on losing parking on Sherman St. The Town Council recommended adding verbiage to the report that suggested retaining or creating parking in close proximity to Sherman St.

In addition to these public sessions, the community was encouraged to share their ideas and suggestions through Jen Coates who solicited input during the Brewfest. (Notes from the Brewfest are included in Appendix A). A number of articles were also written before and after each community meeting to ensure the community was kept informed of the Streetscape Master Plan process.

BLM_0066490

**Figure 2**. Preferred Circulation Plan

## Analysis of Issue Areas

In the course of inventorying the pertinent aspects of the community for the streetscape design, it became evident that several issue areas would need to be addressed if a successful design was to be developed. The following are the key issues (with Project Goals that were addressed) that the Project Team analyzed as part of the design process.

### Circulation
*Improve and organize vehicular circulation with no net loss of parking and additional locations for parking.*

*Bring the natural beauty of the area into the heart of the district.*

The Project Team reviewed the Transportation Element in order to evaluate the proposed circulation plan for the downtown area. Although some community members embraced that plan, others asked the Project Team to provide their input on the proposed circulation. The Project Team's initial reaction was that in order to capture significant mountain views within the downtown area (Project Goal #7), the traffic circulation should be in a clockwise movement as opposed to the current counter-clockwise movement starting north on N. Lena St. Although this alternative alignment did not receive the most votes at the Streetscape Open House, the Steering Committee asked the Project Team to include it as an alternative within the Final Master Plan. (See Figure 4).

The pros for existing circulation are that the community is used to going north on N. Lena St., therefore, it should remain northbound. It was also pointed out that unless there was a traffic light at Lena and Sherman St., it would be difficult to make a left turn onto Sherman St. during heavy travel times. Some community members felt that stacking on N. Lena St. to turn left onto Sherman St. would also "trap" parked vehicles on N. Lena St., causing disgruntled visitors from returning to downtown.

The pros for a clockwise circulation are that there would be two ways for westbound traffic to get to N. Lena (the most visible street in downtown) via N. Cora and N. Laura, encouraging more exposure to the entire downtown area. As mentioned earlier, mountain views that bring the natural environment into the town are best when viewed eastbound on Clinton St. and southbound on N. Lena St. Access to the post office can still be achieved via Clinton St. instead of N. Lena St.

Another circulation issue that came up during the design process was the likelihood that the community would see a new traffic light somewhere on Sherman St. (State Highway 62). The community concluded that if a traffic light is installed, it should be located at Railroad St. because it currently serves as a major collector street for the new school and River Park Subdivision.

The Project Team was asked to evaluate the re-alignment of Railroad St. at Sherman (Hwy 62) as part of the Streetscape Master Plan. The Project Team had been informed that previous CDOT staff indicated Railroad St. would need to be aligned on both the north and south sides of Sherman St. before a traffic light would be considered for installation.

BLM_0066491



**Figure 3**. Circulation Plan-Transportation Element

**Figure 4**. Alternate Circulation Plan

Analysis of Issue Areas        11

BLM_0066492

Master Plan Report | Ridgway, Colorado | September 2006



**Figure 5**. Parking Diagram

This topic has been studied by Town Staff and decision-makers for several years with no clear final conclusion being drawn. The goal is to ultimately connect to County Rd. 23 to Ouray via this intersection. At issue are the tennis courts in Hartwell Park that would need to be partially removed if the Railroad St. alignment is to match the right-of-way south of Sherman St.

The Project Team's observations are that the Town will likely encounter resistance from a strong tennis community. Further, our experience has been that any encroachment into, or taking of land from an established park will draw out many community members to oppose the idea. The Town's decision-makers should give careful consideration to these two potential anti-alignment camps. The Project Team believes the most critical issue is to get the Town and CDOT to come to some agreement on this alignment as soon as possible.

### Deliveries

Deliveries will occur wherever space will allow. Currently, most deliveries occur in the middle of the streets with vehicles maneuvering around them. Some (limited) deliveries occur through the alleys. If the town wishes to encourage alley delivery (minimizing vehicle and pedestrian conflicts), then the alley will need to be re-graded and regularly maintained to allow ease of access. Alternatively, the Town could establish specific delivery times (usually before 8 am and after 8 pm). The Project Team expects that delivery trucks will continue to use whatever space is available, even after improvements. If it becomes a problem, the Town will need to determine a way to manage the deliveries in the future.

### Parking
*Improve and organize vehicular circulation with no net loss of parking and additional locations for parking.*

Project Goal #6 calls for no net loss of parking in the downtown area. Without defined parking spaces (due to the dirt streets), it was difficult to determine exactly how many parking spaces each street segment contained. However, the Project Team took measurements from an aerial photo and field checked potential parking spaces to come up with the baseline data (See Figure 5 and Table 1).

The biggest loss of parking will occur along Sherman St. where CDOT has expressed the need to eliminate parking, except along Hartwell Park. Even with the elimination of 40 spaces along Sherman St., through careful alignment and one way traffic flows, and creation of a Town Parking Lot, the Project Team was able to preserve or create 374 out of 330 existing spaces within the downtown area, (not including private parking lots) with the proposed streetscape improvements (a net gain of 44 spaces). The design team recommends creating Town Parking Lots within close proximity to the park and historic core to offset any parking loss.

Several members of the Ridgway community attended the Final Streetscape Master Plan presentation meeting to express concern about the loss of parking on Sherman St. Although the Project Team did indicate that parallel parking could be provided within the Sherman St. right-of-way, it would require the loss of landscaping and the reduction of sidewalk width. Further, CDOT would need to weigh in on this alternative cross-section. Town Council requested that the Project Team indicate that the loss of parking on Sherman St. is an important issue to the community, one that, to the extent possible, additional parking opportunities in proximity to Sherman St. be considered as the project moves forward.

BLM_0066493

With much foresight, the Town has acquired a significant amount of land for overflow parking just north of the Town Library, referred to as the Town Parking Lots. This parking area is just a short walk into downtown and should be considered a potential parking area for employees and shopkeepers on a daily basis, as well as parking for visitors coming to special events.

The Project Team heard from several employees that they won't park in off-street lots if they are too dark and deserted, especially during winter months. Only by creating a pleasant walking experience to and from these lots will the downtown be able to provide adequate parking for customers at all times of the day and evening. To address this concern, the Project Team recommends that a detailed lighting design be developed that will connect downtown with the Town Parking Lots through Hartwell Park via a lighted path and a crosswalk at Charles St.

A parking management strategy for business employees is another recommendation that the Town should consider implementing. The Project Team observed that shopkeepers and employees often park all day in front of their retail shops, thus reducing parking availability for potential customers. Because the Town does not limit parking, there is no reason for employees and shopkeepers not to park there. The Project Team suggests the Town discourage this practice by encouraging employees and shopkeepers to park in the off-street parking lots. This will begin to open up space immediately in front of the businesses, thus ensuring adequate on-street parking even after the streetscape improvements are implemented.

The Project Team further recommended that the town consider leasing parking from the Antique Store and the Church located near Sherman St. These lots are in close proximity to businesses and are only occupied a small amount of time. The town should also consider leasing the vacant lot at N. Laura St. and Clinton St. for special event parking.

**Ridgway Streetscape**
**On-Street Parking Count Comparison**
**Based on Preferred Cross-Section Options**
September 19th, 2006

| | Existing | Preferred Option | Change in Quantity | Reason for Change |
|---|---|---|---|---|
| S. Lena St. | 62 | 54 | -8 | Added landscape islands |
| N. Lena St. | 67 | 70 | 8 | Formalized diagonal parking between Clinton and Charles |
| Sherman St. | 52 | 12 | -40 | Added center turn lane |
| N. Railroad St. | 12 | 12 | 0 | No change at this time |
| Clinton St. | 54 | 39 | -15 | Parallel parking on both sides |
| Cora St. | 22 | 20 | -2 | Formalized sidewalk for connectivity and added landscape islands |
| Laura St. | 24 | 27 | 3 | Changed to one-way street with diagonal parking on one side |
| Charles St. | 18 | 30 | 12 | Formalized diagonal parking on north side and parallel on south |
| Municipal Lot North of Library | 24 | 73 | 49 | Formalize parking lot |
| Municipal Lot NW of Trail | 0 | 37 | 37 | Create new parking lot |
| Totals | 330 | 374 | 44 | |

Potential Public Parking Lot Options:
Lease or Buy Parcel at NE Corner of Clinton & Laura = Approx. 36 spaces

**Table 1**    Does not include south residential streets

**Special Event Parking**
*Make coming to downtown fun, safe, inviting and memorable.*

When the Town of Ridgway has special events such as Brewfest, the Arts and Craft Fair, etc., parking is at a premium. It is not unusual for visitors to park along Railroad St. and in the residential neighborhoods near Hartwell Park. Special Events provide the Town with the opportunity to capture new visitors, enticing them to become returning visitors. By making it easy for visitors to find parking and get them out of their vehicles and on foot quickly, a positive impression of Ridgway can be imprinted on each visitor.

During Special Events, additional signage and flagging personnel should be required to steer visitors to the Town Parking Lots to park their vehicles. This parking area is just a short walk to the Special Event venue (Hartwell Park), and downtown, and should be filled to capacity before overflow parking is allowed along Railroad St. The Town should also require advance advertisements for the Special Events to indicate "park at the Town Parking Lots" as another parking management strategy. With improvements to these off-street lots that will organize and shade the area, visitors won't hesitate to return to Ridgway on an annual basis. Please refer to the plan for the Town Parking Lots (Figures 6 and 7).

**Hartwell Park**
*Enhance the Ridgway streetscape while preserving local character.*

Town Park, or Hartwell Park is a central attraction for the Ridgway community. The stately cottonwood trees offer a shady oasis and a place to stop and stretch legs for visitors. Its location adjacent to downtown will serve the community well by having a permanent connection to the Town's center of commerce, while serving as an outdoor venue for special events. Care must be taken not to overdevelop the park (by placing public buildings within it), and not to "love it to death" with too many activities. The managed use of the park for key special events should remain a priority for the Town.

The streetscape design should reinforce this connection to the park, but not overpower the simple park features. Further, the Project Team feels that the park's character, with its presence of large trees, sets the tone for additional street tree planting throughout Town. Not only should new development be required to preserve existing trees, but it should also provide new street trees consistent with the character and street tree pattern of Town. The Project Team recommends that the Town consider implementing a strong tree preservation regulation that would apply to the entire town. This is what will continue to set Ridgway apart as a jewel in a rural valley setting.

BLM_0066494

NOTES:
– 0.15 MILES FROM MAIN PARKING LOT TO POST OFFICE
– 0.22 MILES FROM SECONDARY PARKING LOT TO POST OFFICE
RAILROAD ST.
MAIN PARKING LOT (73 SPACES)
TOWN HALL
FIRE STATION
LIBRARY
500' FROM PARKING TO TOWN HALL
CHARLES ST.
300' FROM TOWN HALL TO LENA ST.
350'
STRENGTHEN CONNECTION TO PARKING ALONG TRAIL WITH TREE PLANTING AND LIGHTING FOR SAFETY
SECONDARY PARKING LOT (37 SPACES)
POST OFFICE
LENA ST.
APPROX. SCALE: 1"=80'-0"

**Figure 6**. Off-Street Town Parking Lots



**Figure 7.** Main Off-Street Parking Enlargement

BLM_0066496

Master Plan Report I Ridgway, Colorado I September 2006

## Pedestrians and Bicyclists
*Enhance the pedestrian experience into and throughout the Historic Business District for year-round use.*

*Make coming to downtown fun, safe, inviting and memorable.*

In order to make it easy for people to come downtown (Project Goals #2 and #4), improvements to sidewalks and bike paths are critical. The Project Team discovered many existing sidewalks in poor condition, misaligned, or missing altogether. Considering the number of young people in the community, it should be easy for mothers with strollers and small children on bikes to maneuver through town. Further, Ridgway is a popular destination for road cyclists, and many make their way through the community during the height of the summer season. Touring cyclists have different needs than residents, but should be considered, nonetheless.

The Project Team feels strongly that sidewalks throughout the downtown area are critical to a successful streetscape and downtown vitality. New development should be required to implement new sidewalks, consistent with the Streetscape Master Plan, as projects develop. The Team also recommends that bike racks be installed throughout the downtown area to encourage bicycling as an alternative transportation mode by residents for daily errands. Typical locations for bike racks have been indicated on the Furnishings Plan (see Figure 13).

Although the Project Team initially recommended a striped bike lane along Sherman St. for touring bicyclists, the community felt that this would be inconsistent with the remainder of Highway 62, and did not want this shown on the plans. The plans have been drawn to reflect enough width for a touring cyclist to ride safely through Ridgway, but no bike lane stripe is indicated. Community members did not want to encourage school age children to ride their bikes along Sherman St. to the school complex.





## Signage
*Identify locations for way-finding improvements into the Historic Business District.*

Although signage was not part of the project scope, the Project Team recognized that signage is critical to the success of a downtown and streetscape project. The Project Team did a cursory review of the Town's sign code and determined that it is a very lenient sign code. It is our opinion that if a successful streetscape is to occur, the town will need to have more review authority over signage.

It is not unusual for communities to require permits for all signs (except governmental signs and traffic control devices). Further, the Town can charge fees for sign permits, though there are some signs that they may not be able to charge (such as political signs). However, it should be clear that the Town has the ability to review and approve what will be added to the visual public realm. The Project Team recommends that the Town study its sign code to better regulate the size, number and placement of signs within the downtown area, keeping character and economic vitality in mind.

The Project Team also felt it was critical to establish a Project Goal (#3) that dealt with wayfinding. One of the recurring themes the Project Team heard from the community and Steering Committee members was that visitors didn't know that a whole other part of downtown existed beyond Sherman St. and N. Lena St. Though it was not part of the Master Plan design scope to develop specific signage for the downtown area, the Project Team did agree to identify key locations for signage to encourage visitors to find parking and come to downtown.

Two areas that should be considered for "Public Parking" signage with directional arrows to the Town Parking Lots are on Sherman St., east of Railroad St. for westbound traffic and on N. Lena St. near the Post Office. The Town should also consider adding signage at Charles, directing traffic into the lots.

If the Town decides it wants to change traffic circulation in downtown in a clockwise direction, then we suggest that signage on Highway 62 near Railroad St. should indicate "To Downtown and Public Parking". This would be especially useful during special events when visitors will be inclined to park first and discover downtown on foot.

Other critical signage locations on Sherman St. are at key entries to downtown—near N. Railroad St. and Laura St. These locations call for more significant signage, perhaps entry bollards, a kiosk, or other entry artwork of local interest.

Finally, the Project Team recommends that an artistically designed community banner structure be constructed across Sherman St. near Railroad St. CDOT will require that the Town work with them to ensure that CDOT requirements are met, but they are open to the idea of a banner sign across the highway. The Project Team agrees that this should be a signature piece that helps to further define the Ridgway community, while heralding special events and activities that visitors will stop for and participate in. Placement should be just west of Railroad St. so that westbound traffic will be inclined to turn at N. Lena St. and eastbound traffic will still have an opportunity to turn left at Railroad St. to take part in the activity.

BLM_0066497





### Lighting
*Enhance the Ridgway streetscape while preserving local character.*

Throughout the public meetings, community members relayed how important it is to keep Ridgway's rural character, including a night sky visible from Town and not compromised by streetlights. The community and Project Team agree that pedestrian-scaled lights and low bollards should be used in the downtown area as opposed to tall street lamps that emit more light pollution.

### Outdoor Seating
*Create great outdoor spaces to hold events, to meet and greet, or people watch.*

Most successful streetscapes provide plenty of outdoor spaces to sit in the sun, especially during winter months. However, during summer months, the sun can be too hot to enjoy for very long. Therefore, the Project Team is proposing that benches be placed in both the sun and shade between street trees.

As indicated on the Master Plan (see Figure 8), the sunny side of Clinton Street, as an example, is proposed with a wider sidewalk and streetscape amenities area. Restaurants and shopkeepers are encouraged to use this wider area to place outdoor seating for guests, encouraging more vitality in downtown. The town should encourage the use of these public spaces in the Historic Business District by restaurateurs and merchants, provided they don't impede pedestrian traffic.

### Drainage & Street Materials
*Use sustainable design strategies whenever possible.*

One of the most endearing and charming characteristics of Ridgway is its dirt streets. However, during mud season, crossing Ridgway streets can be a challenge, especially for strollers and bikers. Though many community members expressed their desire to maintain the dirt streets, the Steering Committee recommended that it was time to pave the downtown streets.

One of the concerns of the group was how to maintain the Town's character with additional street pavement in the downtown area. The Project Team felt that some portions of the streetscape should be less "engineered" than others in order to keep Ridgway's rural character. The Town Engineer feels that it is time to address renovation of streets, which should likely come from a comprehensive drainage plan. The Streetscape Master Plan design is proposing that the downtown streets be paved for several reasons:

1.    It improves air quality;
2.    It reduces issues with mud, making the downtown accessible year round (Project Goal #2).
3.    It is more pleasant for people-watching when clouds of dust are not kicked up.
4.    It allows maximization of parking by organizing parking areas with striping.
5.    The Town specified that the 6/10th penny tax was intended for street paving.

The next step for the Town is to complete a drainage and engineering study for the downtown to help determine detailed costs for the streetscape improvements.

As with any design, there are pros and cons for various surface materials. Please see Appendix C for the pros and cons on surface materials, including long term costs of maintenance.

BLM_0066498

Master Plan Report | Ridgway, Colorado | September 2006



**Figure 8.** Master Plan

APPROX. SCALE: 1" = 200'-0"

## Master Plan Design

This section presents the refined Streetscape Master Plan design recommended by the Steering Commitee with the community's input.

### Plan Details

1. Traffic calming at intersections along Hwy 62/Sherman.
2. Alignment of Railroad St. for future traffic signal.
3. Landmark/Information Kiosk at Railroad St. and Hwy 62/Sherman.
4. Event Banner west of Railroad St. intersection with Hwy 62/Sherman St.
5. Secondary gateway landmarks at Laura St. and Sherman St.
6. Sidewalks on both sides of every street.
7. Boardwalk extension from alley to Clinton on N. Lena St.
8. Special paving on Clinton St., street can be closed for special events.
9. Street Circulation- One-way loop Lena St. north to Clinton St. west (2 blocks) to Laura St. south.
10. Off-street town parking lot proposed north of Library.
11. Enhance pedestrian connection from Lena St. to parking lot with trees and lighting for way-finding and safety.
12. Special paving at important mid-block crossings to Hartwell Park.
13. Improve sight vision triangle at North Cora St. and Sherman St. by pulling landscaping back and eliminating parking on Sherman St.

### Street Cross-Sections

In early July, the Project Team was able to get clear direction from the Town Council on the final direction for the Streetscape Master Plan and street cross-sections. The following cross-sections for each of the Study Area streets are intended to serve as templates for other streetscape improvements throughout the community:

BLM_0066499

Master Plan Report | Ridgway, Colorado | September 2006



Hwy. 62 / Sherman Street

Scale: NTS

Drainage - Curb and gutter
Parking - None
Landscape - Trees and groundcovers (6' both sides)
Sidewalk - 7' on both sides

**Figure 9**. Hwy 62/Sherman St. Cross Section
Preferred CDOT/Steering Comittee/Public Meetings

Master Plan Design        19



| Walk | Land-scape Strip | Drive Lane | Turn Lane | Drive Lane | Parallel Parking | Walk |
|---|---|---|---|---|---|---|
| 7' | 6' | 14' (incl gutter) | 12' | 12' | 10' (incl gutter) | 10' |

66' ROW

## Hwy. 62 / Sherman Street at Hartwell Park
Scale: NTS

Drainage - Curb and gutter
Parking - Parallel on north side of street only
Landscape - Small trees and groundcovers on south side
Sidewalk - 7' walk on south side and 10' walk on north side;
walk on north side ties into existing walk along park.

Figure 10. Hwy 62/Sherman St. Cross Section at Hartwell Park

Master Plan Report I Ridgway, Colorado I September 2006



Bldg.
W

Park
E

| Boardwalk 10' | Landscape Area 6' | Diagonal Parking 19' | Drive Lane 18' | Diagonal Parking 19' | Walk 8' | Park |

80' ROW

## North Lena Street
Scale: NTS

Drainage - Curb and gutter
Parking - Diagonal on both sides
Landscape - 6' Flower bed on west side
Sidewalk - 10' Boardwalk on west side,
          8' sidewalk on east side

**Figure 11.** North Lena Cross Section

BLM_0066502

Master Plan Report I Ridgway, Colorado I September 2006

Figure 12. S. Lena St. plan view

Scale: NTS

**South Lena Street Plan**

1. Add landscape islands on both sides.
2. Organized parking on east side of street.
3. Added sidewalk on east side.
4. Accommodate access to Mountain Market and other businesses. See Final Master Plan Figure 8.

22    Master Plan Design

BLM_0066503



Light Bollard (typ)
Trash Receptacle (typ, 2 per block)
Planter Pots (near benches)
Bench (typ, 4 per block)

Existing sidewalk (cafe space)
Tree Grate (typ)
16' sidewalk (typ)

Alley

Laura St.

Clinton St.

ONE WAY

Cora St.

Alley

Bike Rack (typ)
Concrete Crosswalk

12' sidewalk (typ)
Special Paving in Roadway (Colored Concrete, Pavers, etc.)

Scale: NTS

**Figure 13.** Clinton Street Enlargement

Master Plan Design      23



S
N

| Walk | Parallel Parking | Drive Lane | Parallel Parking | Walk |
|------|------------------|------------|------------------|------|
| 12' | 9' | 20' | 9' | 16' |

66' ROW

## Clinton Street ( one-way west)

Scale: NTS

Drainage - Curb and gutter
Parking - Parallel on both sides
Landscape - tree grates with street trees on both sides
Sidewalk - 12' on south side and 16' on north side
Paving - special paving on roadway for both blocks
Note - Clinton can be temporarily closed during special events.

**Figure 14**. Clinton St. Cross Section

BLM_0066505

Master Plan Report I Ridgway, Colorado I September 2006



Walk or existing boardwalk

| 8' | Parallel Parking 9' | Drive Lane 12' | Drive Lane 12' | Diagonal Parking 19' | Walk 6' |

66' ROW

## North Cora Street
Scale: NTS

Drainage - Curb and gutter
Parking - Diagonal on east side and parallel on west side
Residential parking shifts to R.O.W. or off-street lots
Landscape - In bulb-out islands on both sides of the street.
Sidewalk - 8' on west side and 6' on east side

**Figure 15**. Cora Street Cross Section

BLM_0066506

Master Plan Report I Ridgway, Colorado I September 2006



**North Laura Street (one-way south)**

Scale: NTS

Drainage - Crowned to landscape strips on both sides
Parking - Parallel on one side, diagonal on one side.
Landscape - Trees and groundcovers (5' both sides)
Sidewalk - 5' on west side, 5' on east side

**Figure 16.** Laura Street Cross Section

26    Master Plan Design

BLM_0066507

Master Plan Report I Ridgway, Colorado I September 2006



**Figure 17**. Charles Street Cross Section

Drainage - Along landscape strip on north side, existing drainage swale on south side
Parking - Diagonal parking on north side and parallel parking on the south side
Landscape - Trees and groundcovers on north side, park on south side.  Potential for additional street trees in drainage swale.
Sidewalk - 8' walk on north side, 5' walk on south side within park

BLM_0066508



**South Residential Street**
Scale: NTS

66' ROW

Drainage - Crowned to landscape on both sides
Parking - Parallel on both sides
Landscape - Trees and groundcovers (6' on both sides)
Sidewalk - 5' walk on both sides

**Figure 18**. South Residential Cross Section

28    Master Plan Design

Master Plan Report l Ridgway, Colorado l September 2006

Intersection of Sherman and Lena



Before



After

## Recommendations

The following are the Project Team's recommendations for project priorities, general concepts, sustainability and furnishings and materials for the Streetscape Master Plan.

### Project Team Recommended Priorities:

As part of the streetscape design process, the Town Staff requested that the Project Team provide their recommendations on priorities for implementation. The Project Team recommends that the Town's top priority should be to work with CDOT to get Sherman St. into the Design Development phase as quickly as possible. It may take several years before funding for this stretch of highway is available, and it is incumbent on the Town to work with CDOT to make the Sherman St. improvements a priority.

The Team suggests the second priority is to implement improvements to Clinton St. and N. Cora St. next. These improvements will breathe new life and vitality into downtown, especially when viewed from Sherman St. Further, improvements to Clinton St. are the same no matter which direction traffic flows, due to the parallel parking layout.

N. Lena St. and N. Laura St. would follow. N. Lena St., adjacent to Hartwell Park, already has a pleasant character that would be strengthened, but does not need to be the highest priority.

### General Recommendations

Throughout the process, the Project Team photographed, studied, and debated the various options for each street, asking the question "what is best for Ridgway in the long run?" In the course of this study, several ideas and suggestions came up that the Project Team believes will ensure that the final Streetscape Master Plan design will be correctly and carefully implemented over the next several years.

One of these suggestions is to revise the Historic Business (HB) Zone district regulations to ensure appropriate land uses will reinforce a successful streetscape and will bring more vitality to the Historic Business District. The Project Team's preliminary review of this zone district's regulations is included in Appendix B.

Implementation of some of the following recommendations will reinforce the success of the streetscape while others may require additional study by the Town. The Project Team is available to assist the Town with this additional work, if requested.

1.  Complete a comprehensive drainage and engineering study of the downtown area to help determine detailed costs for improvements, in partnership with Project Team so the intent of the Master Plan design is followed through.
2.  Work with CDOT to reach an agreement on the preferred Railroad St. alignment as soon as possible.
3.  Develop construction drawing sets in partnership with the Project Team to ensure the streetscape is not over-engineered.

BLM_0066510

Boardwalk along Lena



Before



After



4.  Develop a parking management plan/strategy for employees for daily use as well as for special event parking.
5.  Develop a detailed lighting plan that will connect downtown with the Town Parking Lots through Hartwell Park via a lighted path and a crosswalk at Charles St.
6.  Work with the owners of the lot located at the northwest corner of N. Cora and Sherman Streets and/or the Church (Sherman and N. Laura St.) to lease these parking areas for employees and nearby residents to park in during the day, freeing up on-street parking for visitors and commerce.
7.  Consider leasing the vacant lot located on the northeast corner of N. Laura and Clinton Streets for special event parking as an interim use until the lot is commercially developed.
8.  When development is proposed for this key parcel, it should be for retail/restaurant uses with a zero foot front yard setback and offices or residential uses on the upper floor(s).  (The Project Team feels that all redevelopment along Clinton and Cora Streets should be higher density to ensure vitality in the Historic Business District).
9.  Re-open discussions with the community on required on-site parking (off alleys) or cash-in-lieu (through a special or conditional use review) in the Historic Business District.
10. Require all developments to include a construction management plan that will address parking during and after development.
11. New development should be required to implement new sidewalks, consistent with the Master Plan design, as projects develop.
12. The Town should study its sign code to better regulate the size, number and placement of signs within the downtown area, keeping character and economic vitality in mind.
13. All banner structures, kiosks, and similar landmarks should have a consistent metal, sculptural design theme similar to the sculptural metal work found around town.  The Town should consider holding a design competition for the development of such structures.
14. Formalize the Town Parking Lots north of the Library to maximize parking.  Use hitching post-style fences as edges to organize parking.  Define the edge of the lots with landscaping treatment, including trees to reduce summer heat.
15. As development increases south of Sherman St., the Town should consider developing new parking requirements for these areas that will ensure these future businesses can survive in a competitive environment.
16. Prohibit solid fences in the downtown area.  Fences, if provided, should be open and friendly and kept to a 42" maximum height.
17. Consider a comprehensive review of potential zoning and ordinance changes that could improve economic vitality in the Historic Business District.
18. Investigate the benefits of designating the community as a Certified Local Government (CLG) in order to bring benefits to owners of historic properties within the area, encouraging restoration of key historic buildings.
19. Consider a future shuttle system that will allow safe passage to downtown from outlying parking areas and neighborhoods.
20. Add sidewalk on both sides of the street throughout Historic Core.
21. Close Clinton St. between Laura St. and Lena St. temporarily to provide special event space.
22. Organize parking on streets throughout the Historic Core.
23. Utilize special paving at major intersections to slow traffic.

30    Recommendations

BLM_0066511

Master Plan Report l Ridgway, Colorado l September 2006









## Sustainability Recommendations

1. New trees should be planted between older trees along N. Lena St.
2. A tree preservation ordinance should be developed to ensure a consistent tree canopy is maintained throughout the community to ensure summer shade and reduce heat build-up.
3. As part of this proposed ordinance, new developments should be required to not only preserve existing trees, but to plant new street trees consistent with the Master Plan design.
4. Consider installing solar-powered lighting bollards and irrigation controllers.
5. Evaluate the possibility of using only recycled materials for furnishings.
6. Install bike racks wherever possible to encourage biking as an alternative transportation mode.
7. Where allowed under law, initiate water harvesting to irrigate vegetation.
8. Improve water quality by directing storm water through vegetated swales and detention basins before it flows into the Uncomphagre River.

## Street Furnishings and Materials Recommendations

1. Take pride in the use of indigenous materials; use local materials and local artisans to create street furnishings if feasible (e.g. weathering steel, etc.).
2. Pedestrian-scale lighting and low-bollard lighting should be used instead of tall street lights, consistent with the weathered metal character already present.
3. Develop a consistent theme/appearance throughout the core.
4. Use many benches and bike racks to support pedestrian non-motorized activity.

## Statement of Probable Costs

Included in Appendix D is a statement of probable costs that the Project Team anticipates the Town will incur with the implementation of the Streetscape Master Plan. It should be understood that this is strictly a preliminary estimate and is intended only to provide a broad "ballpark" figure for discussion purposes. It should also be noted that construction costs are very inflationary and that costs at actual time of construction should be expected to escalate. Some estimate that construction costs increase at a rate as high as 1% per month. In order to have a more accurate set of figures to use in the implementation of the streetscape project, the Town will need to complete a detailed drainage and engineering study as recommended by the Project Team.

Although improvements to Sherman Street will be incurred by CDOT, the Project Team included cost estimates for additional improvements because CDOT indicated they are unlikely to pay for more than the "basic model". The Project Team feels that these improvements are important, even at the additional cost to the Town, because they will help to slow traffic, link the south neighborhood to the downtown area, and will mark a sense of arrival to the community. This additional cost should be factored into whatever implementation strategy the Town decides to pursue.

Recommendations        31

BLM_0066512

Master Plan Report | Ridgway, Colorado | September 2006

Cora showing sidewalk connection and street trees



Before



After

## Project Implementation Strategies

There are several options for the Town to pursue in the implementation of the Streetscape Master Plan. The following methods are highlighted only to begin the discussion with the Town's decision-makers and are not intended to prescribe the best method of financing the streetscape project. Town Staff is better able to evaluate what approach would be best for the community, given the community's ability to generate funding.

**Private Developers.** The least expensive approach for implementation is for the Town to adopt the Streetscape Master Plan design and require all subsequent development to conform with the plan. This is feasible for most streetscape improvements except the drainage and street surfacing. These improvements will need to be completed comprehensively to ensure the systems work properly. This approach will take years, if ever, for the final plan to be implemented.

**Increase Taxes.** As mentioned earlier, the Town recently increased its sales tax by 6/10 of a penny in order to raise funds for street paving and downtown streetscape improvements. A substantial increase in sales tax could be instituted, but the Project Team urges caution in doing so, such that locals won't be encouraged to shop elsewhere.

An increase in property tax is another option. However, this is often not popular as residents may feel like they are subsidizing commercial property owners through new public improvements.

**Urban Renewal District.** Many communities have taken this approach to beginning a redevelopment project of public improvements. Steamboat Springs has taken this approach at the base of the ski mountain by identifying the area as blighted, making it eligible to create a Tax Increment Finance District. It is often difficult for a community to get past the term "blighted", and there are State laws that must be followed if the Town wants to pursue this option.

**Tax Increment Finance District.** A TIF district allows the Town to hold the taxes at its current level for a specified time period while public and private improvements are made that will increase the value of property, allowing the "increment" to help fund the improvements. This strategy is often used in Colorado and is worth further investigation. One drawback to a TIF district, however, is that all taxing bodies (including special districts and school districts) must agree to hold the taxes in that designated area (downtown) in abeyance.

**Bonding.** Municipalities are able to raise funds for certain specific public improvements by taking on debt by passing a bond. The Town will need to evaluate several factors, including their credit rating, and will need to get approval from the voters in order to pursue this funding mechanism.

**Business Improvement District.** A BID is a special district created by property owners in a business district for the purpose of raising funds by taxing themselves for improvements. Colorado law specifies requirements for creating a BID, and the majority of land owners must agree before the district can be created. In other words, there has to be general agreement from the business community that they are willing to take on this debt for public improvements. The benefit of this approach is that it affects only the business owners in the district and not all property owners in the community. Only property owners within the district have a vote on matters within the BID.

BLM_0066513

Master Plan Report | Ridgway, Colorado | September 2006



## Summary

The adoption of this Streetscape Master Plan is the first step in order for the Town of Ridgway to begin making significant improvements to their downtown that will attract more visitors and increase vitality and commerce. This Master Plan design sets forth what the community could look like in a 5 to 20 year time frame, depending on the Town's preferred project implementation strategy.

Most communities find that there isn't just one way to implement significant capital improvements. In fact, most communities find that some public investment spurs more private investment within the community. This is why communities "master plan". The Project Team is confident that the community will find a multi-pronged approach that will allow Ridgway to implement the Streetscape Master Plan, spurring economic development that will benefit the entire community, maintaining Ridgway's moniker as "the town that refused to die".





Recommendations     33

BLM_0066514

Master Plan Report I Ridgway, Colorado I September 2006



## Phase 1: Design Development

After the Streetscape Master Plan was adopted by the Town, the design development phase started. The design team, with the addition of a civil engineering firm, took the ideas in the Master plan and applied them specifically to each street throughout the site creating detailed grading and drainage plans.

A planting palette was also created of adapted and native plants that compliment the existing plants. The planting builds off of the rugged plants that are found in old Western towns around Colorado's western slope.

Site furnishings and paving patterns were also looked at more thoroughly in this phase. It is proposed that local and recycled materials be transformed into benches, trash receptacles, bike racks and planter pots by local artisans and craftsman to enhance the Ridgway character. It is recommended that all site furnishings claim one or more of the following qualities: salvaged, reclaimed, recycled, locally manufactured, and low energy materials. Locally crafted materials are given preference over catalog selections. The paving patterns on the sidewalks and streets are meant to be simple. They emulate the style of Western town's paving patterns in the past yet are more durable to stand up to today's traffic demands.

The lighting plan was developed on the basis that lighting would need to be minimal. We would also supplement custom designed bollards between the intersections throughout the core. All lights are dark-skies compliant and will use the most efficient fixtures on the market.

The project is currently in the process of developing funding strategies before construction/bid documents are created.

BLM_0066515



BLM_0066516

Master Plan Report I Ridgway, Colorado I September 2006



BLM_0066517

Master Plan Report I Ridgway, Colorado I September 2006



Clinton Street Planting Plan



VIEW LOOKING WEST ON CLINTON



STREET LIGHT

STREET TREE, TYP

VENDORS SET UP ON
STREET FOR FARMER'S
MARKET AND SPECIAL
EVENTS

BIKE RACK

COLORED CONCRETE
CROSSWALK
COLORED CONCRETE
SIDEWALK
BULB-OUT WITH
PERENNIAL FLOWERS

CONCRETE PAVING ON
STREET

BLM_0066518