Master Plan Report I Ridgway, Colorado I September 2006



LAURA STREET PLANT PALETTE

VIEW LOOKING NORTH ON LAURA ST.

FLUSH CURB
STREET TREE (TYP)
ALLEY
STREET LIGHT (TYP)
COBBLE SWALE WITH NATIVE PLANTS
STONE SLAB PEDESTRIAN CROSSING
HITCHING POST BOLLARD TO MARK EDGE OF ROAD
COLORED CONCRETE SIDEWALK (TYP)
XERIC PERENNIAL FLOWERS
CONCRETE CROSSWALK
HIGHWAY 62/SHERMAN STREET
SCALE IN FEET

STREET TREES
HITCHING POST BOLLARD
STONE CROSSING
FLUSH CURB
COBBLE SWALE
NATIVE PLANTS
5' WIDE COLORED CONCRETE SIDEWALK
CHURCH PARKING LOT
POTENTIAL FOR HEDGE TO BUFFER PARKING

38    Phase 1: Design Development

BLM_0066519

Master Plan Report I Ridgway, Colorado I September 2006



Sherman Street Planting Plan



VIEW LOOKING NORTH ON LENA STREET FROM SHERMAN STREET



Phase 1: Design Development    39

BLM_0066520

Master Plan Report l Ridgway, Colorado l September 2006



40    Phase 1: Design Development

BLM_0066521

Master Plan Report I Ridgway, Colorado I September 2006

### BEAR-PROOF TRASH RECEPTACLES

 

### HITCHING POST BOLLARDS



### CUSTOM BIKE RACKS
### REUSE OLD RAILROAD SPIKES



A          B          C          D

### TREE GRATE
IRON, SIZE: 4'x8'



PLAN VIEW OF TREE GRATE:



### PLANTER POTS





### CUSTOM BENCHES
DESIGNED BY LOCAL ARTISTS



BLM_0066522

Master Plan Report I Ridgway, Colorado I September 2006



LEGEND
● CUSTOM STREET LIGHTS (27)
● CATALOG STREET LIGHTS (5)
● BOLLARDS (9)

STANDARD LIGHT FIXTURE

CLINTON STREET

WEATHERED STEEL MESH

GLASS INSERT

MESH

CUSTOM LIGHT AND BOLLARD

42    Phase 1: Design Development

BLM_0066523

Master Plan Report | Ridgway, Colorado | September 2006



CATALOG LIGHT

LEGEND
● CUSTOM STREET LIGHTS (9)
● CATALOG SREET LIGHTS (6)
▪ BOLLARDS (29)

BLM_0066524

Appendix A
Meeting Summaries

**Ridgway Streetscape Project**
**Steering Committee Summary**
**May 22, 2006  12 Noon**
**(Twelve members attended, including town staff).**

Goals:
Streetscape to have year-round focus (add to goals).
Add "safe" to goals.
Add Sherman/CDOT as a specific goal.
Talk more about safety and additional parking.

Drainage:
Sherman will probably need to be put in a culvert or piped.

Project Boundary:
Expand to include ½ block south of Sherman, ½ block east and west of S. Lena, and from Moffat up to RR/Sherman intersection.

Parking:
Concern with Sherman and losing parking based on CDOT's additional lane.
Cora St. is dangerous; needs organized parking.
Lena works fairly well but one-way may need more signage.
Look at outlying parking areas: north of library, fairgrounds, highway commercial.
Parking consistency and safety are key.
Consider parking management so employees don't use all spaces.
HB Zone does not require any parking except for residential uses.
Consider future shuttle to allow safe passage to downtown from outlying parking areas and neighborhoods.

CDOT:
CDOT needs to be involved in process.
Discuss access point consolidation with CDOT
Coordinate with CDOT soon on traffic calming, parking along Sherman.
Visibility from Cora turning onto Sherman an issue—need to improve vision triangle.
Find more information on San Juan Skyway and how highways are regulated.

Streets
Prefer dirt streets; keep character but improve maintenance.
Generally prefer sidewalk improvements over paving streets.

**Town of Ridgway Streetscape Planning**
**Steering Committee Meeting and Public Forum #1**
**May 22, 2006**

Project Goals:

1) Enhance the Ridgway streetscape while preserving local character.
2) Enhance the pedestrian experience into and throughout the Historic Business District for year-round use.
3) Identify locations for way-finding improvements into the Historic Business District.
4) Make coming to downtown safe, fun, easy and memorable.
5) Create great outdoor spaces to hold events, to meet and greet, or people watch.
6) Improve/organize vehicular circulation with no net loss or an increase in available parking.
7) Bring the natural beauty of the area into the heart of the district.
8) Use sustainable design strategies whenever possible.
9) Create an interface with CDOT to coordinate streetscapes.

Scope
- Increase the scope of the project to the entire Historic Business District, including south of Sherman Street, as opposed to just the Historic Business Core.
- Focus on year-round appeal of Ridgway, not seasonal affections (e.g.: a place to sit in the sun during the winter in downtown).

Drainage
- Address the open ditch on the south side of Sherman Street.
- Materials usage for street infrastructure: gravel/dirt and paved roads; surface treatments: hard-surfacing, magnesium chloride, chip-seal.  What are the options?
- Exercise prudence in considering the potential future paving of roads when planning for current drainage, parking, etc.

CDOT/ Highway 62
- Coordinate with CDOT on highway improvements and plans for the downtown area.
- Consider the addition of a left turn lane on Sherman Street increasing the highway from 2 lanes to 3 lanes.
- Implement traffic calming devices (stop signs, traffic lights, bulb-outs, material changes, textural changes, etc.).
- Access point consolidation in conjunction with improved safety.
- Pursue Town ownership of the Highway 62 section through Town.
- Possible abandonment of the "scenic designation" of the highway through Town.
- Possible decrease of the current highway speed limit through Town.
- Consideration of highway signage directing people into Town.  Where does the Town begin and end?
- Safety concerns about pedestrians crossing the highway and vehicles entering the highway.
- Address the addition of more crosswalks on Sherman Street, namely at Lena, Cora and Railroad.
- Realignment of Railroad Street at Highway 62.
- Signage at the west entrance to Town barring the use of engine brakes coupled with enforcement.

BLM_0066525

Master Plan Report I Ridgway, Colorado I September 2006

**Steering Committee Meeting and Public Forum #1**
**May 22, 2006**
**12 Noon cont.**

Parking
Utilize collector parking in conjunction with pedestrian traffic.

Identify proactive solutions to make parking better instead of simply organizing the parking.

Identify areas where town may acquire land; utilization of "in-lieu of" payments for future parking.

Define the parking throughout Town.  It is currently inconsistent (e.g.: diagonal, parallel, straight, parking blocks, stripes, etc.); specifically: Clinton, Cora, North Lena.

Who is parking where?  Tenant, visitor and commercial parking.

Who is delivering where? Are merchants receiving deliveries via alleys or street frontage?

Safety concerns about vehicle/pedestrian encounters with regard to visibility pulling into and out of parking spaces.

Pedestrian Infrastructure
Possible identification of Clinton Street as a pedestrian mall.

The roads are muddy and messy, but people are more concerned now about sidewalks and pedestrian infrastructure than what the roads look like.

Community Engagement etc.
Need more participation from the community in this process: increase visibility of the design process at the Valley Festival (June 10) and the Arts & Crafts Rendezvous (August 12-13).

Identify a signature for the Town to create a cohesive pattern or look for the entire Town and provide connectivity throughout the Town (e.g. identify xeriscape flowers or mixes that could be planted around the Town).

Use of native species, plants, water capture, grasses, trees to create a sustainable and low-maintenance landscape that provides cohesion (e.g.: multi-seasonal plants, variety of plantings).

Revisit the draft transportation element of the master plan and the Parks, Trails and Open Space findings.

BLM_0066526

**Town of Ridgway Streetscape Planning**
**Meeting with CDOT**
**June 5, 2006  1 PM**

Attending:  CDOT Planning & Engineering, Town of Ridgway Planning, DHM
(Laurie, Mike, Ed, Jen, Walker)

1. Streetscape Master Plan Process

-June 28th (2nd Public Mtg – preliminary alt's, interactive)

CDOT staff was very grateful for the shared information and requests for input regarding Highway 62. They are also interested in being included in the streetscape process for the Town.

CDOT will try to make the next public mtg. If not DHM will send updates of items covered in the meeting and preliminary alt's.

2. Highway 62 (Sherman Street)

-Sight Visibility

Make sure trees are out of sight triangle and that any vegetation is under 30" in triangle.

-Pedestrian Safety

Bulb-outs cause maintenance issues because of equipment CDOT uses.

A signalized intersection(s) would need to be evaluated.  If the intersection meets one of eight criteria it would qualify for a signal.  CDOT would still have final approval.  Signal would probably change the way we are thinking about one-way streets...look at whole system. The MUTCD may be referenced to identify parameters that would need to be met in order to justify a signal through Town. Section 4C-1 of the MUTCD references the warrants for a stoplight on state highways.

Referencing research completed by CDOT prior to the failure of Referendum D, if a 3rd turn lane were to be created it would likely initiate at Liddell Street and continue west to Amelia Street.  This is due to limitations of the bridge east of Liddell over the Uncompahgre River.

At this time there is no funding identified for the addition of a 3rd lane through Ridgway on Highway 62. Funding is focused on improvements along Highway 550.

If improvements to Amelia Street are funded, there will likely be a left turn lane added at the intersection, with no median.  CDOT research has indicated that if a median was used it could only be 4' including curb and gutter. This would allow for only about 1' of pedestrian refuge on the median, which was determined to be unsafe. Additionally, CDOT concluded that the turning radius for the school bus would be hindered by a median at this Amelia Street intersection.

Traffic data for Highway 62 was shared.  It is apparent that the majority of traffic traveling through Ridgway is heading to or returning from Telluride.  With this in mind, the goal for CDOT on this stretch is to keep traffic moving.  Pedestrian safety was stated as a concern for the Town.  Speed limits were discussed.  CDOT indicated that the 25 mph limit is the lowest possible speed limit for this stretch of road. It was noted that there are currently 2 differing speed limits (eastbound and westbound) for the highway through Town.

Realignment of Railroad Street was discussed. Alternatives for the realignment were reviewed including removal of the tennis courts to the north side of the highway, as well as possibly identifying an agreement with the landowner to the south of the highway.  It was suggested that the Town could possibly abandon Railroad Street on the south side of the highway and possibly reach an agreement at a later date with anyone proposing to develop that site.  CDOT staff questioned the need to realign Railroad Street altogether. The realignment was questioned as a possible mandate from CDOT to the Town.

-Drainage
Town street improvements need to be designed to accommodate drainage from Hwy 62.  Underground drainage would require large pipes and a detention pond.  CDOT prefers to tie into Town's drainage system.

Ed articulated that he has identified drainage through Town to be a priority prior to any other improvements.  The streetscape should then be designed to accommodate the drainage plan.

CDOT estimated that to maintain drainage down Highway 62, there would need to be an increase in pipe size from approximately 40" to 80" between Railroad Street and the Uncompahgre River. Additionally, it is likely that a detention pond would be required to filter the water prior to discharge into the river. The preferred alternative for CDOT would be to daylight the water onto Town streets north of Highway 62. Drainage improvement on Town streets should be designed to accommodate this additional runoff from Highway 62. The Division of Authority would then dictate that the Town is responsible for the maintenance of the runoff onto Town streets, with no CDOT involvement.

-Parking
CDOT prefers no parking or parallel parking on one side of the street.

With improvements to the Highway, the Town will assume new parameters for parking.  It is likely that all diagonal parking along Highway 62 will be removed.  Parallel parking would be the best option for highway parking according to CDOT.  Additionally, with right-of-way restrictions it is likely that one side of highway parking will need to be eliminated and the remaining side will likely be mandated as parallel.

-Maintenance
CDOT will require a Division of Authority for maintenance of the improved street.  CDOT would plow to the sides and do street maintenance, the Town would maintain drainage, curb & gutter, landscape, and sidewalk.

If the Town wanted bulb-outs there could be a special agreement for the Town to plow parking areas because CDOT equipment does not maneuver into those spaces.  (San Luis does this and has parallel parking and bulb-outs, also Glenwood may do something similar.)

Alternately, it may be possible to enter an agreement where the Town would plow the strip of Highway through Town, including any parking or CDOT would plow to the center lane (when in existence) and the Town would provide for snow removal.  Any agreement would dictate parameters for the stated arrangement.  This would entail further discussion with CDOT.
3. Proposed Cross-Section Alternative's
CDOT prefers x-sec with (2) 12' drive lanes, (1) 14' turn lane (since changed to 12'), (2) 6' landscape strips, and (2) 8' walks for a total of 66' ROW.
OR
CDOT prefers x-sec with (2) 12' drive lanes, (1) 14' turn lane, (1) 8' parallel parking space, (2) 5' landscape strips, and (2) 5' walks for a total of 66' ROW.
Minimum turn lane is 12' but 14' is recommended by CDOT for visibility.

Ed Archuleta will provide scoping notes to DHM and the Town of Ridgway

BLM_0066527

Master Plan Report I Ridgway, Colorado I September 2006

**Town of Ridgway Streetscape Planning**
**Ridgway Options/Summary**
**Open House Meeting**
**June 28th**

N. Lena St.—Option 2
    Steering Committee preferred option
    2' planting w/sidewalk boardwalk on east
    Formalizes drainage on west side; creates clear edge on both sides
    Change to concrete walk along west edge of park (open curbs with slots for drainage)
    Show 2 options:
        Sidewalk as edge (engineering solution)
        Sidewalk in park w/ landscape strip (sustainable, natural approach)
    Also show bulb out on Lena St. entrance to define first parking spaces
Clinton St.
    One-way west bound, Lena to Laura
    Show plan views: options 3, 4, and new option with parking counts on each block
    Bulb outs at corners
    New option: remove parallel parking, widen north side with landscaping, undulating walk with a
    variety of seating/landscaping areas; 18' drive lane
Laura
    One-way traffic
    Landmark on Sherman, east of Laura
    Change walk width to 6'?
    Cross-section: same as option 3 on Clinton/Cora
Charles
    Option 1
    Two-way traffic is necessary due to fire emergency vehicles
Railroad
    No landscape strip on west side
    Walker to think about this street some more
        Event parking
        Existing conditions/power poles
        Water quality focus
Sherman—Option 2
    People prefer median for aesthetic and safety reasons
    CDOT voiced strong opinion against
    Long-term expense to town with this median option
    Bike lane for regional touring, not to schools

North Lena Street – Option 2
"How about this option without the ramp/walkway- it's overkill with the boardwalk there"
"No matter what you do on this street – the grade needs to be level – and the existing drop on the east
side of the road is dangerous for parking and pedestrians."
"This one is nice but it would be better without the 6' boardwalk"

    Hwy. 62/ Sherman Street
"Safety is our #1 concern median can help!!  Concerned about lack of parking we may need "62"
parking
This is the only way we will ever get the speed limit lowered- do this!"
"I really like this one but I think the bike space could be bigger"

    Laura Street Option 1
"Laura – 2 way using the Option 2 on the Clinton/ Charles/ Cora diagrams" "This one would be better
if the parking was a bit smaller- like 9'- the walk 1' bigger!- which would also allow the landscape to get
a bit bigger"

    North and South Railroad Street
"I like this option with landscaping- but NO PARKING- the road isn't wide enough for parking too-"
    Clinton / Charles / Cora Streets – Existing
"Some parallel parking is necessary on Cora St. to accommodate large delivery trucks safely- I'd like
coordination of individual businesses- not all of any solution is right for all circumstances"

    Clinton/ Charles/ Cora Streets Option 2
"Consider closing Clinton Street between Cora and Laura  and  making this area a pedestrian mall/ open
area" (w/ landscaping; seat areas for outdoor music and community events – even vendors in the summer
months – similar to Pearl St. Mall in Boulder)  -  " ! second this more plants/ outdoor dining- less traffic"

    Clinton/ Charles/ Cora Streets Option 4
"This one is good but would be better if the walk way the same size!  5' and 5'"

    Vehicular and Pedestrian Circulation Plan – One-Way Loop Alt. A
Arrow pointing to Lena St.:  "This is not a good idea-traffic will stack up on Lena waiting to turn onto
Hwy 62 and this will cause safety problems to pedestrians and frustrated drivers who are waiting to pull
out from parking spaces"
Arrow pointing to RR St. and Sherman intersection – "this intersection needs dealing with NOW"
"the realignment of RR St. should be addressed NOW"
Arrow pointing to Sherman St.: "No parking on Sherman St.- Keep cars moving slow and able to see the
businesses- they will want to stop and shop!"
"Please consider Farmer's Market"
"General on Trees/ Plantings:  Proactive concepts in food shelter and harvest festivals for Ridgway: apple
trees, strawberries, rhubarb, asparagus"
"Parking lot and alternative transportation: proactive again"
        -PV panels to feed battery operated vehicles"
        -Bicycling parking areas down town"
        -Parking area: including community bicycles
        -Horse and Buggy Taxi's
Arrow pointing to Clinton St.: "Great idea on View- will have to highly publicize this and push idea"
"Many Town Merchants want at least part time pedestrian mall; music"
Clinton St.: "I'd like to see this closed on weekends to auto traffic but otherwise kept open 2 way
to lessen traffic in front of the Grit on the way to the post office.  For this same reason I think that all of
Clinton and Cora should be kept 2 way – to make sure traffic flow to and from the post office."

Vehicular and Pedestrian Circulation Plan – One-Way Loop Alt. B
"Laura – 2 way traffic, Cora – 1 way out from Clinton to Hwy: maximizes parking, -creates town square
feel"
Arrow pointing to Clinton St., Cora St.: "This is best circulation plan but include more boardwalks"
Arrow pointing to Lena St. and Sherman St. intersection: "4 way stop"
Arrow pointing to Sherman St. intersection with street opposite of RR. St.  "Kiosk there-more visible near
sidewalk"
Arrow pointing to Clinton St.: "One way west-no parking- stream down block- pavers- ability to close off
for events"
Arrow pointing to Clinton St.:"View and Pedestrian Mall with one land of traffic –option to close off"
Arrow pointing to Clinton St. and Laura St.:  "The town should buy this for a parking lot" "purchase and
divide- sell half"

Vehicular and Pedestrian Circulation Plan – Existing Conditions
        No comment
Drainage Plan No Comment
Circulation Plan Transportation Element Option  No comment

BLM_0066528

**Town of Ridgway Streetscape Planning**
**Ridgway Options/Summary**
**Open House Meeting**
**June 28th cont.**

Cora

Bring fence to sidewalk (property line) in front of apartments
Extend sidewalk on east side the entire length to Clinton
Diagonal parking in front of apartments and on entire east side (except corner)
Parallel parking on west side
8' walk on w. side
Bulb out from corner of Sherman and from corners at Clinton
Change diagonal parking to parallel parking in front of Horse Trader Antiques

Questions to ask:
Lena St.—engineered approach or sustainable approach
Keep one way going north?
CDOT—will they allow Banners
Check ADA to verify 6' is needed for sidewalks
CDOT—can we do 12' turn lanes?
CDOT--Is Bike lane okay?
CDOT—can we approach parking differently along the south side of the park?

BLM_0066529

Master Plan Report l Ridgway, Colorado l September 2006

**Town of Ridgway Streetscape Planning**
**Community Meeting—Direction from Town Council**
**July 12, 2006  4:00 - 5:30 PM**
**Attending:  Planning & Zoning, Town Council, Planning, Steering Committee, Public, DHM**

1. Circulation Plan
It was confirmed that Alternate B (one-way north on N. Lena, one-way for two blocks west on Clinton, and one-way south on Laura) was the preferred alternative.  This is based on Steering Committee, Public input from June meeting, and input from this meeting w/Planning and Zoning and Town Council. Making Laura a two-way street was debated; of concern was that with two-way traffic more vehicles would be directed into the residential area. At the joint council/planning and zoning meeting the one-way solution was chosen as the preferred alternative (as the plan shows.)

Alternative B will be presented at the next public meeting as the preferred alternative that will be in the final report/recommendations.

2. Highway 62 (Sherman Street)
The preferred option for Sherman includes 6' sidewalk and 6' landscape strip on both sides of the street, (2) 12' drive lanes, and (1) 14' center turn lane.  On-street parking and bike lanes are not included in this option.

Traffic calming was determined to be very important and the idea of a different material/color/texture at cross walks was supported.  This could include special paving of the entire intersection at Lena and Hwy 62.

The public has requested that parallel parking be retained along the south side of the park on Hwy 62. DHM will pursue this option with CDOT.

3. North Lena St.
The preferred option for N. Lena includes a 4' flower bed between the existing boardwalk and parking. This option keeps (1) one-way drive lane and diagonal parking on both sides of the street.  A new 6' wide boardwalk or sidewalk would be added along the park, this would be determined based on existing trees and the drainage option that is designed in future phases.

4. Clinton St.
Three one-way options for Clinton Street were discussed and a hybrid option was created.  The preferred option after the joint Council/planning and zoning meeting includes:  a 6' walk on the south side adjacent to diagonal parking with landscape bulb-outs, a one-way drive lane, parallel parking on the north side, and a 12' sidewalk with cut-outs for trees and other plantings.  This was a compromise to retain parking while increasing the opportunity for pedestrian space.  What is lost are landscape strips that could possibly serve as water quality swales for cleaning up pollutants from the street. This option will be discussed with the pro's and con's at the next public meeting.

5. Cora St.
The direction on Cora Street has been to improve pedestrian circulation and maintain parking as much as possible while keeping two-way traffic.  The preferred alternative to date includes keeping the existing 8' sidewalk on the west side, parallel parking with bulb-outs on the west side, (2) 12' drive lanes, diagonal parking with bulb-outs on the east side, and a 5' sidewalk on the east.  This option tries to create clear pedestrian space while maintaining as much parking as possible.  Landscape areas are minimized to bulb-outs.

This option will be presented with the pro's and con's at the next public meeting.

6. Laura St.
The preferred option on Laura St. would be (1) one-way drive lane south, diagonal parking on the east side, parallel parking on the west side, and a 5' landscape strip and 5' sidewalk on both sides.

7. Charles St.
The preferred option on Charles St. would include a 5' walk along the park, parallel parking along the park, (2) 11' drive lanes, diagonal parking on the library side with a 5' landscape strip and 8' sidewalk on the north side.

This option will be presented with pro's and con's at the next public meeting.

8. North Railroad St.
The preferred option for N. Railroad St. includes 5' sidewalk on the park side, 18' head-in parking where it exists on the park side, (2) 12' drive lanes, a flexible 10' landscape strip that could accommodate drainage in combination with a storm pipe for larger flood flows or parallel parking, and a 5' sidewalk along the eastern edge of Town property.

BLM_0066530

**Town of Ridgway Streetscape Planning**
**Community Meeting**
**August 8, 2006**

PURPOSE
Preview and discuss proposed final draft of streetscape plan for the Historic Business Core.

I. INTRODUCTION
Preview of Project Goals
1. Streetscape characteristics
2. Pedestrian walkways
3. Fun, safe & inviting experience
4. Wayfinding to mark entrances
5. Create outdoor spaces
6. Improve circulation
7. Appreciate natural beauty
8. Sustainable design
9. Coordination with CDOT

• Recap of the streetscape process to date
• September 19th will be final presentation to Planning & Zoning Commission and Town Council
• Preferred plan is being presented today and tonight
• Color and texture differentiation and slight raising of concrete at crosswalks on Sherman Street
• Major event banner at Railroad Street entering Town from the east
• Secondary landmark at Laura Street entering Town from the west
• Formalize the walk on Lena Street

II. CIRCULATION PATTERN
Preferred Design (Proposed):
• Circulation Pattern for the HB Core: One-way north on North Lena (Sherman to Clinton), One-way west for 2 blocks on Clinton (Lena to Laura), One-way south on North Laura (Clinton to Sherman), Two-way on Cora.
Discussion:
• Significant discussion regarding the reversal of the circulation pattern was dialogued during the public meeting. Reversal of the pattern would be: One-way north on North Laura, One-way east on Clinton and One-way south on North Lena, with Cora remaining open to two-way.
• This reversed pattern may bring more people into the historic core, as Lena is already a popular entry area, entry via Laura Street may open up the historic core.
• Concerns with this circulation include ingress and egress to the post office as well as left turns onto Sherman Street from Lena without a signalized intersection
• DHM may present both options to Council and PZ identifying the pros/cons of each circulation pattern.

III. PARKING
• Aggressively address off-site parking
• Between 5-10 parking spaces will be gained (not including elimination of parking on Sherman Street) due to the organization of the parking throughout the HB Core. These spaces are gained on Charles and Laura Streets
• Potential Parking Areas that the Town may lease from owners to provide for daytime employee parking and residential parking:
    • NW intersection at Cora and 62
    • NE intersection at Laura and 62
• Parking at the north end of the library on Town-owned property (former proposed location for the skate park); possibly utilized for public facilities in the future, may postpone public parking issue
• Exercise caution in implementing so much parking that the pedestrian feel and downtown experience is lost

• Post offices are great for downtown – they bring people into Town. Possibly move the post office to more central area such as Cora/ Clinton.
• Provide some parking for now and also plan for the future (look ahead)
• Look at how to deal with satellite parking with lighting, pathways, trail, etc. and work toward that plan. Need to have a good overall solution.
• Town should require off-street parking. Times have changed and are changing since the ordinance eliminating parking requirements in the HB district was initiated
• Encourage parking off of alleys

IV. STREET CROSS-SECTIONS
RAILROAD STREET
Realignment of Railroad Street (RR St.) across Highway 62
Discussion:
• Leave RR St. unaligned and turn the south side of RR St. into public parking, with egress onto Lena Street
• North RR St. is access road to River Park Subdivision
• South RR St. is the connector to CR 23
• The existing misalignment is a major issue with CDOT
• Without the link to CR 23, access is via Lena Street
• Many pros and cons on all side of the arguments for RR St.
• Lots of work and money to realign on the south side so Town has focused on north side
• SE corner of Hartwell Park is parking, which does not currently ad much to the park
• The current situation is not acceptable and is not an option
• RR St is a north/south connector street and probably will be signalized in the future
• Direction given for RR St. in draft plan
• It should be noted that the realignment of RR St. has been explored in depth with excessive resources to date and continues to be an ongoing debate. Many property owners have been involved in this process and brought to the table for negotiation. Concern about lots in the middle of the block losing access to the highway. The CDOT access permit to the south was onerous as there was not a defined plan for the development south of the highway, so CDOT assumed the maximum density with the most traffic.
• RR Street needs to be aligned
• Efforts on the south side of the highway were inconclusive, but options on both the north and south can be re-explored. Private ownership exists on the south, over which the Town has no control. The Town owns the north side of the highway at the RR St. intersection.
• Development on the south side will dictate the future of RR Street on the south.
• Railroad Street at this time appears to be the most logical place for a traffic control device, if needed.
• Conclusion: Railroad Street should be "fixed" sooner than later and there is a lot of history to consider.

CLINTON STREET
Between Cora and Laura Streets
Preferred Design (Proposed):
• Circulation: One-way, one 18' drive lane, west-bound
• Parking: 10, parallel parking spaces (9' wide) per block on north side (total of 20 spaces for 2 blocks); 16, diagonal parking spaces (19') per block on south side (total of 32 spaces for 2 blocks)
• Drainage: curb and gutter
• Sidewalk: 8' on south side and 12' on north side
• Landscape: bulb-out islands and tree galleries/cut-outs on the north side
• Clinton Street between Cora and Laura can be temporarily closed for special events. Special paving (colored concrete and pavers to add texture and color for pedestrian-friendly feel) on this block.
Discussion
• Will lose 10 spaces per block if eliminate parallel parking on one side (lose 20 spaces if eliminated on 2 blocks)

BLM_0066531

Master Plan Report | Ridgway, Colorado | September 2006

- If make both sides parallel parking, will lose a net of 12 parking spaces for 2 block of Clinton be tween Lena and Laura
- More of a community street for dances, socials, farmer's market, etc.
- Clinton is a key amenity for the Town as it crosses directly into the park
- Utilize both blocks of Clinton (between Lena and Laura) as pedestrian space expanding special paving from Lena to Laura, not just Cora to Laura
- If put parallel parking on both sides of Clinton (as opposed to one side parallel and one side diagonal), gain 10' to increase sidewalk area on both sides of the street and lose a total of 12 parking spaces over a 2 block section (between Lena and Laura)
- If eliminate one side of parallel parking (and keep one side of parallel parking) lose a total of 20 spaces over 2 blocks)
- If do parallel parking on both sides of Clinton, can add tree grates to landscaping, gain pedestrian space and appeal by increasing sidewalk on both sides.
- Presentation to Council and Planning Commission will address pros and cons including gains and losses for parking on Clinton.

### NORTH LENA STREET
Between Sherman Street and Clinton Street
Preferred Design (Proposed):
- Circulation: One-way, one 18' drive lane, north-bound
- Parking: Diagonal parking (19' wide) on both sides of N. Lena between Sherman & Clinton
- Drainage: curb and gutter or under boardwalk on east side
- Sidewalk: Boardwalk on both sides (6' east side and 10' west side), or sidewalk on east side
- Landscape: 6' flower bed on west side
Discussion
- No trees on the west side of North Lena because buildings add to the atmosphere.  Put low plantings on the west side
- Boardwalk vs. sidewalk on the east side of North Lena.  Boardwalk will be more difficult to maintain by the Town.  Sidewalk is easier to manage.  Boardwalk will assist in preservation of tree roots along the park.
- Diagonal parking on both sides

### HIGHWAY 62/ SHERMAN STREET
Preferred Design (Proposed):
- Circulation: Three lane (2 drive lanes and one turn lane); each lane is 14' wide
- Parking: None
- Drainage: Curb and gutter
- Sidewalk: 6' on both sides (north and south)
- Landscape: Trees and groundcover at 6' on both sides
Discussion:
- Is CDOT ok with Lena access to the north and the bulb-outs, decreased lane size etc.?
- Is CDOT ok with colored, textured and slightly raised crosswalks across the highway?
- If the Town changes the surface of the Highway, does the Town assume maintenance of the highway.
- Awaiting answers from CDOT

### HIGHWAY 62/ SHERMAN STREET (PARK OPTION)
Between Railroad Street and Lena Street
Preferred Design (Proposed):
- Circulation: Three-lane (2 drive lanes and one turn lane).  Each lane is 14' wide
- Parking: Parallel on north side of street only
- Drainage: Curb and gutter
- Sidewalk: 6' on south side; 10' walk on north side along the park (walk on the north side ties into existing sidewalk along the park)
- Landscape: Small trees and groundcovers on south side (park is on the north side)

### CORA STREET
Between Clinton and Sherman Street
Preferred Design (Proposed):
- Circulation: Two-way with two 12' drive lanes
- Parking: Diagonal (19') on east side and parallel (9') on west side; existing residential parking area shift to right-of-way
- Drainage: Curb and gutter
- Sidewalk: 6' on east side; 8' on west side (existing boardwalk or sidewalk)
- Landscape: In bulb-out islands on both sides of the road
Discussion:
- Potential for in-fill development on this street; mixed use area with residential on upper stories and commercial on lower
- Parking lot access remains at the southwest end of Cora Street
- 5' sidewalks on Cora are not increased due to limited right-of-way and two way traffic (2 drive lanes)

### CHARLES STREET
Between Railroad Street and North Lena Street
Preferred Design (Proposed):
- Circulation: Two-way with two 12' drive lanes
- Parking: Diagonal (19') on north side (library side) and parallel (9') on south side
- Drainage: Along landscape strip on north side; existing drainage swale on south side
- Sidewalk: 5' on south side within the park; 8' on north side (library side)
- Landscape: Trees and groundcovers on north side; park on south side; potential for additional street trees in drainage swale
Discussion:
- Create a crossing mid-block at Charles where the Uncompahgre Trail crosses the street over to the library; change in texture from the street like a concrete walkway

### LAURA STREET
Between Clinton Street and Sherman Street
Preferred Design (Proposed):
- Circulation: One-way, one 18' drive lane, south-bound
- Parking: Diagonal (19') on east side and parallel (9') on west side
- Drainage: Crowned to landscape strip on both sides
- Sidewalk: 5' on east side; 5' on west side
- Landscape: Trees and groundcovers (5' both sides)
Discussion:
- Possible to do swales here but will default to impending storm water drainage study

### SOUTH RESIDENTIAL STREETS
Preferred Design (Proposed):
- Circulation: Two-way with two 12' drive lanes
- Parking: Parallel parking on both sides (9')
- Drainage: Crowned to landscape on both sides
- Sidewalk: 5' on both sides
- Landscape: Trees and ground covers (6' on both sides)
Discussion:
- South Lena Street landscaping will need irrigation but infrastructure is already in place; in the interim potted plants may work; use of potable water to irrigate may not be ideal
- Delivery to Mountain Market and accessibility for trucks to deliver at the bay should be consid ered

BLM_0066532

**Town of Ridgway Streetscape Planning**
**Community Meeting**
**August 8, 2006 cont.**

V.  MATERIALS
A.  Street Surfacing
Pros and Cons of differing street surface options were reviewed and discussed
Magnesium Chloride
- Gravel roads require significant maintenance
- Health hazards: trees dying, dust particulates
- Regulatory requirements for dust control (Telluride forced to pave to mitigate dust) – there may be potential funding available for communities to pave gravel streets

Asphalt
- Durable
- Enhances commercial activity

Chip Seal
- Difficult to patch
- Strength of gravel (ruts, wear, etc.); not intended for heavy stop-&-go traffic
- May use chip seal on top of asphalt to achieve a more rural feel (durability is questionable)
- Chip seal may be better served for residential areas, whereas asphalt is preferred for commercial areas

Recycled Asphalt
- Large gradient of options and costs associated with this option (perhaps 6 differing options), with quality generally proportional to cost
- CDOT recycles asphalt to maintain road grade without building up
- Requires existing asphalt, which may be an obstacle for the Town
  Gravel roads are approximately 50% permeable; asphalt is 2-3% permeable (storm water plan will vary based on surfacing of roads).

B.  Lighting
  Low-level, solar-powered bollards
  Wood lights have increased maintenance

Materials Discussion
- Members of the public indicated that the sales tax increase was initially brought to the Town with the plan to pave the commercial core.
- Residential streets may be better suited for chip-seal, with the commercial core requiring asphalt.

This discussion centered on the functionality, durability and cost of asphalt and chip seal. Asphalt being better suited to heavy traffic, turning, stop and go, etc. and chip seal not well suited for heavy stop and go traffic, but financially more feasible on less traveled residential streets while serving to mitigate dust and particulates and preserving a more 'rural' feel than asphalt.

VI.  SUMMARY AND RECOMMENDATIONS
General
DHM will provide Town with a ballpark cost estimate for a drainage study including potential funding sources.  Drainage study will provide Town with pipe sizes, funding sources, cost estimates, recommended storm water drainage plan, etc.

Recommend zero residential use in the historic core.

Suggest phasing of streetscape project.  This will tie in with cost and is depends on funding.

Town may wish to prioritize phasing.  Consensus of public in attendance was that Sherman Street / Highway 62 is the top priority with Clinton Street to follow.

Town may have to absorb the cost of the highway intersections streetscaping.

Julie Ann from Elk Mountains will research historic business district funding opportunities associated with being a Certified Local Government (CLG). The Town of Ridgway is not registered as a Certified Local Government.

If Town policy is to not allow tables and chairs on the sidewalks in the HB district, it may be recommended to allow for outdoor patio space (tables & chairs) to create more active space in the core.

Originally, 315 parking spaces were identified in the historic core.  This plan reveals 282 on-street parking spaces, not including the recommended, designated parking lots.

When the post office outgrows the current building, it may be prudent to locate the post office on Clinton/Cora or elsewhere in the core to pull people in and out of their cars to the historic district.  The current area for the post office may be utilized to expand Hartwell Park.

Revisit circulation patterns, possibly converting to a different pattern when the Town acquires a signalized intersection.

Extend special surfacing (texturized concrete) along 2 blocks of Clinton from Lena to Laura.

Recommend low-level lighting (36 – 42" high) for lighting the historic core.  These low-level light will illuminate pathways, provide connectivity throughout the historic core and any adjacent parking areas while preserving the dark skies ordinance.

Narrow the street crossings such that pedestrians have a decreased area of traffic to navigate.

Possible implementation of in-lieu fee in conjunction with some required parking for the historic core.  In-lieu fee must be reasonable and shared.  Parking problems historically have not "gone away" through the payment of in-lieu fees alone.  If parking is required and in-lieu fee may be supplemental perhaps developers will provide some parking and some in-lieu cash for future parking.

Implementation of a construction management plan while streetscape construction is in progress, subject to review by Town Engineer and Emergency Management Services.

Preserve, Protect, Plant and Plan for trees.

Sustainability Recommendations
- Use of solar energy
- Use of recycled materials
- Implementation of bike racks
- Utilization of swales where appropriate
- Water directing for natural irrigation and cleaning
- Local materials and local artisans

BLM_0066533

Modifications to proposed draft plan (presented during these August 8tt meetings)
- Change Clinton Street parking to provide parallel parking on both sides of Clinton Street
- Circulation Pattern – propose both one-way circulation (North on Lena, West on Clinton, South on Laura, 2-way on Cora) and (North on Laura, East on Clinton, North on Laura, 2-way on Cora) representing pros and cons for both circulation patterns.  This recommendation will recognize the input from the public preferring the North on Lena option; but recognizing the benefits of the North on Laura option with future improvements such as a stoplight on Sherman Street and relocation, expansion and/or accommodation of the Post Office.
- Parking lots off-site will include wayfinding and connectivity including signage, light bollards, pathways, etc.
- Revisit the scope of the right-of-way on South Lena: Is there room for sidewalk and parking?
- Cannot do a 5' walk on the east because the road was widened when it was paved
- Continuity of the sidewalk is not good here: there is a lot of in/out driving to the market and the hardware store that crosses over sidewalk areas
- Change the street surface at Moffat and Lena to Drakes and the hardware store.

## APPENDIX
Steering Committee Attendance:
Walker Christensen, Julie Ann Woods, Jen Coates, Greg Clifton, Pam Stewart, Lynn Kircher, Deedee Decker, Rod Fitzhugh, Roger Schaefer, Doug MacFarlane, Joanne Fagan, Sheryle Pettet.

Public Meeting Attendance:
Walker Christensen, Julie Ann Woods, Jen Coates, Pam Stewart, Lynn Kircher, Deedee Decker, Rod Fitzhugh, Roger Schaefer, Doug MacFarlane, Joanne Fagan, Sheryle Pettet, Chris Pike, Michael McCullough, Brian Peters.

BLM_0066534

**Town of Ridgway Streetscape Planning
Community Meeting**
September 19, 2006

NOTE: These are informal notes of the discussion on 9/19. Approved, formal minutes should be obtained from the Town Clerk at Town Hall, Ridgway, CO.

**Attendees**

Council Members Sheryle Pettet, Rod Fitzhugh, Eric Johnson, Paul Hebert, Mayor Pro-Tem John Clark and Mayor Pat Willits

DHM Design and Elk Mountains Planning Group: Walker Christensen and Julie Ann Woods

Town Staff: Greg Clifton, Pam Kraft, Jen Coates, Joanne Fagan

Citizens (signed-in only): Guy Poulin, Robb Magley, Sharon Hindes, Jen Charrette, Sandy Richardson, Rick Weaver, Jeff Badger, Brad Johnson, Rosemary Johnson, Bill Sheppard, Julia Johnson, Susan Prather, Donna Whiskeman, Barbara Fleming, Joshua Kent, Darin Hill, Maria Sylcona, Susan Baker, Ed Folga, Deedee Decker, Brenda Engdahl, John VerStraete, Debra VerStraete, Dick Engdahl, Larry Falk, Larry Ulrich, Walton Dornisch, Tim Pettet, Chris Pike, T.J. McKenney, Brian Peters, Pam Stewart, Priscilla Peters, Gay Leachman, Lynn Kircher, Deborah Lombardo, Tim Patterson, Cris Coates

Comments (from general public, council, staff and design group), not to be construed as factual, simply representative of the dialogue
- Love the plan, how will we pay for it?
- Consider toxicity of magnesium chloride and gravel if going to plant so many trees.
- Discussion last year to pave the core with proposed hard surfacing of streets led us to this process
- Loss of parking on Sherman Street will lead to parking pressure on private property. What will "come and go" services like the liquor store do?
- With growth and 3 lane expansion of the highway, you lose parking on Sherman Street. We did the best we could do.
- CDOT weighed in on the parking on Sherman Street and this was a big part of it.
- This discussion goes back 7 years to the closing of Lupita's lot and the proposed Worlick development
- What about the liquor store, the parking to the west of the liquor store property does not belong to the owner of the liquor store. There is a lot of drive-by business. The lots facing Sherman Street have to park down the street
- Parking at locations so far removed is a concern. Where did the focus go? Why isn't the Town looking at more parking?
- We are.
- Formally approach land owners re: lease/purchase of property proposed for parking.
- Original supporter of parking on Hwy 62 converted parking elimination on the highway because of CDOT and right-of-way / parking on private property
- The sidewalk abutting Hwy 62 at the south side of Hartwell Park is actually outside of the right-of-way and on Town property
- With parallel parking on the highway, the drive lane is blocked, this is a safety concern for the Town and one also voiced by CDOT
- Tourists are lazy and will not walk from a parking lot far from Town of Ridgway
- A petition was presented to Council/PZ re: loss of parking on Hwy 62
- CDOT might consider parallel parking on one side of Hwy 62
- Time to be visionary and look ahead
- Ridgway is on a state-owned highway; Telluride purchased the highway running through their town
- Montrose entry/exit from the highway to Starbucks is odd

- Not opposed to streetscape as a concept, but need to address the fundamental issue of parking, not combat the entire plan
- Can fit parking if you get rid of landscape, but the in/out of vehicles is an issue on the highway and might be a safety issue for people getting in and out of their cars.
- It sounds like CDOT's preference is no parking, but will accommodate one-side.
- Petition requests that the Town not mess with parking until CDOT requires it, preferred alternative to consider all of Sherman, catastrophic to remove all of parking
- What about parking on North side along Sherman Street, is this amenable to owners of business es on the South side of Sherman?
- Ok with either side of Sherman, prefer south side, but north is ok.
- Like the one-way on Clinton, where will the RVs and 18-wheelers, delivery trucks, etc.?
- Can do a loading zone or set delivery times on Clinton; the drive lane is 20' so trucks can park and cars can get by
- Some communities have late night or early morning deliveries only, not all the answers are identified here tonight
- Trucks come through Ridgway with deliveries at all time of day and night.
- Trees are an aesthetic asset; what kind? How big? What is the sight visibility?
- Ash, honey locust, cottonwood, deciduous trees with high trunks
- 16' sidewalk on the north side of Clinton will be a concern with ice; other shop owners on Clinton don't maintain the sidewalk in front of their shop (editor's note: the speaker was actually referring to the 12' sidewalk on the south side, north-facing)
- Drainage study should address ice flows to the sidewalk
- Diagrams in the report have compact cars only, have larger vehicles been accommodated?
- Yes, only have compact representations in software
- The idea to improve the historic core is good, is there a chance of phasing this in? Some areas are over-planned; start with streets and don't get into all fancy stuff or it is "not Ridgway any more"; street paving first, striping and organizing, address concerns of Sharon and Bill, beautiful and lots of work, but don't let it get too contrived
- Keep phasing in mind as we figure out how to pay for it
- This smacks of a mall from L.A.
- Why is there an additional stoplight?
- Stop light will be added only if Railroad Street is aligned; Railroad is the logical artery and this will require "big bucks" to do it; way down the road
- Keep the local character, make it safe, friendly and inviting; must have services (drainage, etc.); work to keep Ridgway, Ridgway; mud season is onerous for business owners
- Balance between welcome and residents being comfortable; without tourists it will be harder for businesses; will beautify the area
- How will we afford this? Operation and maintenance; Create a draw for Ridgway; balance to be struck; viability of businesses is steady stream of people; currently here to eat and raft/guide; need to strike a balance; concern about cost; balance the flowers and parking
- Everything tonight is not absolute; 6 months and Bill has been at no meetings
- Limited opportunity to attend and working around the clock
- Understand that trees and landscape do pay our bills; we are trying to find balance
- If we pave without streetscape this is bad; need enhancements, etc
- Tonight is discussion; there will be hearings later at PZ and Town Council; exciting to come away with a concept about where we are going multi-year plan is good; will make business core viable for the future

54   Appendix A

- I like the landscape plan; must provide parking myself; 5 years ago we had the same conversation; we need to address it now; would love to sell my lots in the HB core and put the parking onus on the Town but I can't
- There was a committee last year that said there was not a parking problem
- This is a good plan; there are people in the community with respiratory problems, if the streetscapes are maintained then people with stop, get out and go around the corner
- We have parking (off Cora Street). Why are we allowing businesses to go in on Highway 62 without providing parking?
- We don't want parking like South Montrose; Dog House has met all the requirements but it is not enough; all cool downtowns have a parking problem; I have put in 14 spaces that I'm not required to have
- Dog House parking is not completed yet
- I have 16 spaces that I completed in 2003 for my business downtown
- Parking is it sufficient or insufficient? This was an issue at council 3 years ago; no one wants to pay; bite the bullet and make it work
- Research any and all available parking in the core of downtown; go beyond the library; if wait longer, it will get worse
- Prioritize parking over the streetscape
- Prefer diagonal on Clinton over parallel
- Rod suggested forward thinking so it is good that we are all here tonight to provide input
- Ok with parking lot at the northeast corner of Laura and Clinton
- Parking at Grady Colby's building is a problem, this is big on the radar screen for the Town
- We have limited resources and limited staff; encouraging to see the turnout tonight
- We need employee parking; the majority of employees need alternatives
- One solution is to force employees to walk ; post a 2-hour parking limit
- The 3rd parking lot in red on the map, has there been any discussion with that person
- There has been preliminary discussion in concept with the owner; some discussion late last year but did not pursue it without a plan; we now have a plan and will pursue it again; we also need funding
- Unicas is a destination; Parking on 1 side of Hwy 62; What are the sizes of the trees? Please pave the streets; How high are the trees? I'm done with dirt streets after 20 years, by the time I dust the store I have to start over again
- Closing comments: artists community, don't expect government to take care of us; we can raise the money, the library raised $35k at an event last week; let's get creative
- Trees add visual element to slow traffic; part of safety
- Financing is a reality, restrictions, etc.
- The Town has a tax of 6/10% and is projected to bring in $60k now; another tax? Statewide resources that we can tap into; budget is broken down in the plan
- Scenic byway funding may be available through the state
- There will likely be multiple sources of funding
- The Yellow Brick Road is playing at the Sherbino this weekend; all 1-way streets with diagonal parking on all of them
- Concern about residences and parking then residents will come to Town Hall and complain
- Acquire land and reshuffle the parking on existing streets
- $3.5 - $4M sounds cheap; (actually ~$5M), still at $5M not much money for this project; good direction, parking is major, this is an issue with emotion
- $4.5 - $5.5M is the estimate
- With only one major issue, this is a successful project; this is a significant change and in the right direction; please don't misconstrue earlier comments
- $5M does not include Town storm water infrastructure
- Address the infrastructure first and then the trees
- What about a multi-level parking structure
- Parking structures are estimated at approximately $30-35K per space
- Ooh, ahh... oh my
- North Cora should be one-way as in the Transportation Plan to solve issues on this block; there was an outcry from local businesses in this vicinity then we hired the consultants

- The concern from Rigs was the access to Lawler's parking area; no traffic study was done; the reality of the net gain was 4 spaces if go to diagonal parking
- Financing of this project is a big issue; Are we putting money away for this?
- Town has a smart budget inherited from the Batcheldor days; there is money put away for specific purposes like the South Lena project and the water/ sewer fund
- With TABOR the Town cannot save money, it has to be given back to the people
- Designation for RV parking is needed
- Not in the plan but informally RV parking is on the north side of Hwy 62 abutting Hartwell Park; the Town will need signage to Town parking lots
- Rafts etc. should go to the Town parking lot as opposed to being on the highway
- The rafts at the store on Hwy 62 generate a 10-15% add on to retail sales by people coming through the store
- Future developers should participate in the cost
- Yes, Council is working on off-street parking, etc.
- Need a balance, the cost cannot be too onerous for the developers
- This plan outlines for future developers what is expected
- As a new developer, I expect to do this; the issue is the in-lieu fee and the increased cost; landscaping and sidewalk are ok; what about a special tax district?
- Next council meeting will discuss a new parking ordinance
- Establish a special improvement district
- Are people really open to a special improvement district?
- Would this be another ½% sales tax?
- Need to look at state tax limits. Town is not there yet.
- Plan looks good, good job.
- One-way streets and diagonal parking may be a good idea; parallel will fill up quickly
- If go to diagonal parking in the residential areas it will be a trade-off to lose all the landscaping for parking
- Businesses want parking close
- Look at the trade-offs
- There will be a hearing at PZ and then PZ will need to make a recommendation to Council re: adopting the plan
- We still need to do an engineering and drainage study
- Likely the PZ hearing will be in October; it is too soon to get updates incorporated into the plan and on the September agenda
- Need to prioritize this plan
- CDOT will have a concern about the parallel parking
- In a previous meeting with CDOT it was expressed that the Town will lose all of the parking on CDOT with the addition of a 3rd turn lane, as designed. At most, the CDOT engineer indicated, the Town may be able to preserve one side of parallel parking, but this is not likely to be the case. Some parking along the south side of Hartwell Park has preliminarily been identified as acceptable because there is additional private property abutting the highway that may be utilized to accommodate the parking.
- Someone needs to speak with Mike McVaugh at CDOT Region 5; the right-of-way is the same along the park as it is along the highway through Town
- The right-of-way is the same; however there is additional room along the south side of Hartwell Park that is private property and is being utilized for parking. Go stand along the south side of the park and look along the highway into downtown, you will see that there is significantly more room along Hartwell Park for cars to park
- Suggest the plan reflect maintaining parking on one side of Highway 62
- A lot of effort has been put into the preferred plan and it may not fly if we put parking on High way 62
- At least get it reflected in the plan
- Run this by CDOT again with parking on one side, if we lose CDOT support then the 1-side of parking along the highway plan is gone
- Revisit the public meetings where it was voted to have a consistent landscape; CDOT and the Town both preferred no parking along Highway 62

BLM_0066536

- Parking along Sherman may impede sight at the intersections; there will be flow issues; get parking as close to Highway 62 as possible, with as little as possible actually on the highway
- There is concern about landscaping; what do we do with the last minute comments?
- Safety is the number 1 priority on Highway 62, this is the focus
- Parking can be calming
- Psychological impact of landscaping on both sides will slow traffic
- When will this happen?
- Well outside of 5 years, several years
- Need a plan to push CDOT, the sooner there is pressure, maybe it won't be a 6-10 year time frame
- I suggest adding parking on 1-side of Highway 62
- Who's preferred alternative is it?  The people who have been working on it and giving input for 6 months, or the ones voicing a separate opinion here tonight.
- Go to a tag system, so there is no employee parking on the streets downtown
- The business owners will drive the parking if required for employees; if you might lose your job, you will park as directed
- Look at the long-range 3-lane proposal and plan for it
- The 3-lane will likely run from Amelia to the bridge, there is no talk of replacing the bridge to make it 3-lane
- It took us 20 years plus one death to get the speed limit dropped from 35 mph to 25 mph
- To facilitate closure tonight we could update the comments in the Master Design Plan to reflect those spoken tonight and address parking, recognize that it will be addressed with CDOT and put this institutional memory into the document
- Leave the preferred alternative as it is currently reflected
- This is a guidance document.  It is not legally binding.  It is like the Master Plan for the Town
- Funding may dictate what it says and how it goes
- Be aggressive and proactive about keeping parking close: getting the business community and employees to park off-site will not solve it all
- Cora Street is all employee parking right now

Council appeared to agree that the preferred alternative of no parking on Highway 62, except as shown on the south side of Hartwell Park, will remain.  However, language will be amended to the plan to reflect concern about this loss of parking and efforts will be made, to the extent possible, to consider additional parking opportunities near Highway 62

BLM_0066537

**APPENDIX B**
**Town of Ridgway HB Zone District Preliminary Review**

Potential Zoning Issues That Can Affect Streetscape and Vitality:

**7-3-8 HB Zone District**
(B) Uses By Right:
(1) Single family homes which meet the requirements of Section 6-6, duplexes, and multi-family residences.
Issue: Residences should be encouraged in the downtown area, but only on the second or third floors of a building to encourage continuity of the downtown streetscape. The HB zone allows 35' in height, which is adequate to build a three (3) story building. Retail stores, business and professional offices and service establishments should be required on the first floor if upper floor residences are provided. Single family and duplex units should not be permitted.
(4) Public utility service facilities.
Issue: These structures tend to occupy prime commercial space and would be better located where they can be serviced by utility trucks. The Town of Ridgway should consider grandfathering existing facilities, but not allowing any new public utility service facilities in the HB zone.
(10) Hotels and motels.
Issue: Hotels are a great use for a downtown area, and in fact, Ridgway had the historic Park Hotel on Lena St. and the Mentone Hotel. A motel use is too automobile-oriented and would break up the streetscape with driveways and would not be appropriate in the HB zone.
(11) Parking facilities, funeral homes , and commercial garages.
Issue: All of these uses require a substantial amount of off-street parking which can be unsightly in the downtown. We recommend that these be moved to the Conditional Uses category so that the aesthetics of the project can be reviewed.

(C). Conditional Uses
(1) Light manufacturing
Issue: Light manufacturing is not appropriate in any downtown or highly pedestrian area. Manufacturing requires truck deliveries which are hazardous in a downtown area where pedestrians are present. We suggest Ridgway eliminate this use in the HB zone and continue to allow it in the GC and I-2 zones.
(3) The outside storage of equipment inventory or supplies, accessory to a business occupying a building on the premises, subject to conditions. . .
Issue: A healthy and vibrant downtown should not allow outside storage of equipment or supplies because they are always unsightly and usually require trucks to deliver and remove the supplies. Although conditional use approval will allow conditions to be placed on such a use, such as fencing, tall solid fences do not create a "welcome" feeling in downtown, even off the alleys. Consider grandfathering what may exist or provide an amortization schedule for their ultimate removal.
(E). Performance Standards:
(3) All manufacturing and industrial activities must take place inside with no noise, smoke, dust or light observable off of the premises.
Issue: The HB zone should not allow these uses in the HB zone (see C-1 above). However, the Town could consider changing "all manufacturing and industrial activities" to "Arts and craft studios". Also, consider including "no fumes" and "no odor" to the performance standard.
(4) (a) Residential uses must provide off-street parking as required by Subsection 7-3-10-C-1-a.
Issue: This standard should remain; however, we are just pointing out again that the goal would be to have residential use on the upper floors. Further, there is no requirement in Subsection 7-3-10-C-1-a. as to where parking should be located. In the HB zone, it is most appropriate to have required off-street parking at the rear of the building (to ensure streetscape continuity) or underground parking with access off of an alley.
(5) Buildings containing more than 10,000 square feet of floor area shall not be allowed.
Issue: What seems like a huge building today, may be an important economic driver for the town in the future. We recommend that this be moved from the performance standards section and placed under the Conditional Use section.

**7-3-10 Dimensional & Off-Street Parking Requirements**
(A) Tabulated Requirements of Uses by Right
Provided snow and drainage can be adequately addressed, the Project Team encourages all new developments to have 0' front and side setbacks. Further, a successful downtown has windows on the street, adjacent to the sidewalk; an 8' front setback creates a maintenance headache and encourages "window shopping".

If you want to encourage parking in the rear, off the alley, you may want to increase the rear setback to 20'. This will force a developer to bring the building to the street edge if more setback is required in the rear. Parking should be allowed in the rear yard setback area.

**7-3-11 Planned Unit Development (PUD)**
Issue: Often, development in a downtown area is constrained due to lot size, proximity to adjacent buildings, parking requirements, etc. The town should consider whether a PUD could provide greater control of development in the downtown area. We are not suggesting that all development in the HB zone be required to go through a PUD, but consider allowing the use of the PUD for projects that are constrained, yet would be an asset to the downtown area. Consider the PUD process as a tool to get the most community benefit out of a project. Currently, the PUD can only be used for golf courses and residential uses. Perhaps adding a third permitted use, "Lots in the HB zone district", could allow the town this additional flexibility and review authority.

**7-3-12 Sign Regulations**
Issue: This is a very lenient sign code. It is our opinion that if a successful streetscape is to occur, the town will need to have more review authority over signage. It is not unusual for communities to require permits for all signs (except governmental signs and traffic control devices); they may not charge a fee for some signs, such as temporary signs, but they have the ability to review what will be added to the visual public realm.

**7-3-13 Supplemental Regulations**
(G) Accessory Dwelling Units
Issue: Accessory Dwelling Units in the HB zone should not be allowed if the single family residential and duplex uses are eliminated from that zone district.

BLM_0066538

Master Plan Report | Ridgway, Colorado | September 2006

## Appendix C
## Surface Treatment Options

### Gravel with Magnesium Chloride
installation cost $1.50/SY
annual maintenance cost: TBD

Pro's
- preserves rural character
- better storm water infiltration
- least expensive

Con's
- dust pollution
- mud season
- health hazard (allergy complaints)
- damage to trees
- ongoing maintenance



### Chip Seal
installation cost $10/SY
annual maintenance cost: TBD

Pro's
- character and color
- year-round activities
- striping organizes parking

Con's
- maintenance/patching
- replacement (3-7 years)
- durability in common areas



### Asphalt
installation cost $30/SY
annual maintenance cost:
- $2700/lane-mile for Region 5
- $1300/lane-mile average for state

Pro's
- enhances commercial activity
- long lifespan
- year-round activities
- striping organizes parking
- durability

Con's
- expensive
- added storm water pipe expense
- new water line expense



### Recycled Asphalt
installation cost $12-$20/SY
annual maintenance cost:
- $2700/lane-mile for Region 5
- $1300/lane-mile average for state

Pro's
- sustainability
- year-round activity
- striping organizes parking

Con's
- shorter life span that asphalt
- need existing asphalt source
- gradient of quality



BLM_0066539

Master Plan Report | Ridgway, Colorado | September 2006

# Appendix D
## Statement of Probable Costs

| CONSTRUCTION ITEM | QTY | UNIT | UNIT COST | TOTAL COST |
|---|---|---|---|---|
| **NORTH LENA ST.** | | | | |
| **Roadway Costs** | | | | $310,000.00 |
| Demolition/Misc | | | | |
| Grading (Assumes 2' of earth moved over roadway area) | | | | |
| Asphalt | | | | |
| Special Paving at Crosswalk | | | | |
| Curb & Gutter | | | | |
| Storm Drainage System | | | | |
| **Streetscape Ammenities** | | | | $150,000.00 |
| Boardwalk | | | | |
| Concrete Sidewalk | | | | |
| Benches | | | | |
| Light Bollards | | | | |
| Trash Receptacles | | | | |
| Bike Racks | | | | |
| Street Trees | | | | |
| Landscape Strip Planting/Irrigation | | | | |
| **Total Estimated Range** | | | | $460,000.00 to $552,000.00 |
| **SHERMAN ST./HWY 62** | | | | |
| **Roadway Costs** | | | | $920,000.00 |
| Demolition/Misc | | | | |
| Grading (Assumes 2' of earth moved over roadway area) | | | | |
| Asphalt | | | | |
| Special Paving at Intersection*** | | | | |
| Curb & Gutter | | | | |
| Storm Drainage System | | | | |
| **Streetscape Ammenities** | | | | $210,000.00 |
| Concrete Sidewalk | | | | |
| Secondary Landmarks*** | | | | |
| Benches*** | | | | |
| Light Bollards*** | | | | |
| Trash Receptacles*** | | | | |
| Bike Racks*** | | | | |
| Street Trees | | | | |
| Landscape Strip Planting/Irrigation | | | | |
| **Total Estimated Range** | | | | $1,130,000.00 to $1,356,000.00 |
| **CLINTON ST.** | | | | |
| **Roadway Costs** | | | | $450,000.00 |
| Demolition/Misc | | | | |
| Grading (Assumes 2' of earth moved over roadway area) | | | | |
| Special Paving on Street | | | | |
| Special Paving at Intersection | | | | |
| Curb & Gutter | | | | |
| Storm Drainage System | | | | |
| **Streetscape Ammenities** | | | | $185,000.00 |
| Concrete Sidewalk | | | | |
| Benches | | | | |
| Light Bollards | | | | |
| Trash Receptacles | | | | |
| Bike Racks | | | | |
| Street Trees | | | | |
| Landscape Strip Planting/Irrigation | | | | |
| **Total** | | | | $635,000.00 to $762,000.00 |
| **CORA ST.** | | | | |
| **Roadway Costs** | | | | $260,000.00 |
| Demolition/Misc | | | | |
| Grading (Assumes 2' of earth moved over roadway area) | | | | |
| Asphalt | | | | |
| Curb & Gutter | | | | |
| Storm Drainage System | | | | |
| **Streetscape Ammenities** | | | | $100,000.00 |
| Concrete Sidewalk | | | | |
| Benches | | | | |
| Light Bollards | | | | |
| Trash Receptacles | | | | |
| Bike Racks | | | | |
| Street Trees | | | | |
| Landscape Strip Planting/Irrigation | | | | |
| **Total** | | | | $360,000.00 to $432,000.00 |
| **CHARLES ST.** | | | | |
| **Roadway Costs** | | | | $190,000.00 |
| Demolition/Misc | | | | |
| Grading (Assumes 2' of earth moved over roadway area) | | | | |
| Asphalt | | | | |
| Storm Drainage System | | | | |
| **Streetscape Ammenities** | | | | $190,000.00 |
| Concrete Sidewalk | | | | |
| Benches | | | | |
| Light Bollards | | | | |
| Trash Receptacles | | | | |
| Bike Racks | | | | |
| Street Trees | | | | |
| Landscape Strip Planting/Irrigation | | | | |
| **Total** | | | | $380,000.00 to $456,000.00 |
| **LAURA ST.** | | | | |
| **Roadway Costs** | | | | $185,000.00 |
| Demolition/Misc | | | | |
| Grading (Assumes 2' of earth moved over roadway area) | | | | |
| Asphalt | | | | |
| Storm Drainage System | | | | |
| **Streetscape Ammenities** | | | | $115,000.00 |
| Concrete Sidewalk | | | | |
| Benches | | | | |
| Light Bollards | | | | |
| Trash Receptacles | | | | |
| Bike Racks | | | | |
| Street Trees | | | | |
| Landscape Strip Planting/Irrigation | | | | |
| **Total** | | | | $300,000.00 to $360,000.00 |

Appendix D   59

Master Plan Report | Ridgway, Colorado | September 2006

| | | | | |
|---|---|---|---|---|
| **SOUTH LENA ST.** | | | | |
| **Streetscape Ammenities** | $60,000.00 | | | |
| Concrete Sidewalk (one side 5' wide) | | | | |
| Street Trees | | | | |
| Landscape Strip Planting/Irrigation | | | | |
| Total | $60,000.00 | to | $72,000.00 | |
| | | | | |
| **HARTWELL PARK** | $75,000.00 | | | |
| Additional Trees along internal walk | | | | |
| Light Bollards | | | | |
| Kiosk/Landmark | | | | |
| Banner Posts | | | | |
| Total | $75,000.00 | to | $90,000.00 | |
| | | | | |
| **TOWN PARKING LOT** | $135,000.00 | | | |
| Grading (Assumes 1' of earth moved over parking area) | | | | |
| Trees | | | | |
| Landscape & Irrigation | | | | |
| Light Bollards | | | | |
| Gravel | | | | |
| Hitching Post Fence | | | | |
| Wheel Stops | | | | |
| Total | $135,000.00 | to | $162,000.00 | |
| | | | | |
| **Subtotal** | $3,535,000.00 | to | $4,242,000.00 | |
| | | | | |
| Contingency - 20% | 707,000.00 | to | 848,400.00 | |
| Design Fees - 10% | 353,500.00 | to | 424,200.00 | |
| **Total Estimated Range** | 4,595,500.00 | to | 5,514,600.00 | |

Notes:

1. Due to inflationary environment of construction costs over recent years, costs at actual time of construction should be expected to escalate.

2. The quantities and costs are estimates only and should be used to define magnitude of cost and are not intended to be an actual estimate of construction costs.

3. Cost information based on recent projects in western Colorado and cost estimating date from the Colorado Dept of Transportation website.

4. Drainage costs are placeholders and should be confirmed and updated at the time a drainage report is completed.

5. Does not include water line replacement if needed.

***These items are in addition to what CDOT would fund for road improvements and would be the responsibility of the Town.

BLM_0066541

BLM_0066542

# NORTHWEST AREA MASTER PLAN

**Town of Ridgway**
**November 25, 2008, as amended**

BLM_0066543

# TABLE OF CONTENTS

I.  **INTRODUCTION**

   1. Background Information
   2. Northwest Area Planning Process
   3. Boundary Definition


II. **LAND USE SUMMARY**

   1. Land Uses
   2. Transportation and Road Networks
      a.  Streets
      b.  Alleys
   3. Parks, Trails, Open Spaces
   4. Pace, Timing, Phasing of Development
   5. Land Use Density
   6. Natural Environment
   7. Open Space
   8. Affordable Housing
   9. Acquisition of Water Rights
   10. 1999 Land Use Maps and 2000 Comprehensive Plan


III. **NORTHWEST AREA PLAN CONCEPTUAL MAP**

BLM_0066544

## I. INTRODUCTION

1. <u>Background Information</u>

   For over a century the Town of Ridgway's central roads, blocks and alleys have remained a traditional grid network.  This network consists of 36 historically platted blocks measuring 300' x 300' arranged in a 6 block x 6 block square grid pattern and encompasses the Historic Residential, Historic Business and Downtown Service Districts.  Subsequent to a number of annexations and subdivisions, the perimeter lots, alleys, streets, and open spaces have expanded the original Town boundary into a varied arrangement of lots, blocks, roads and alleys.  The Town now also consists of residential, commercial and industrial districts surrounding the historic core.

   Commencement of the Northwest Area planning process is subsequent to the Town of Ridgway's 1982 and 1991 Comprehensive Development Plans, the 2000 Master Plan Update and the adoption of both the Transportation Element and Downtown Streetscape Master Plan in 2007.  The 2000 Master Plan Update encompasses the 1999 Land Use Element, outlining goals, policies, implementation measures and growth boundaries for the Town.  This 2000 document is the primary guidance instrument for land use decisions affecting the Town.

2. <u>Northwest Area Planning Process</u>

   At the direction of the Planning Commission, town staff appealed to the community for participation in an Area Planning Task Force.  A group of 13 individuals including community members, elected and appointed officials, property owners and staff convened in early 2008 to identify growth and development patterns in this Northwest Area.  The Task Force was asked to review the 2000 Comprehensive Plan and evaluate the nine land use goals in the 1999 Land Use Element.  Thorough discussion and analysis of these goals resulted in consensus to proceed through a sub-area planning process for the Northwest Area with recognition that the ensuing discussion will contribute significant insight and parallel discussion toward a pending, Town-wide, master plan update.

   The services of the land use planning firm, Design Workshop, Inc., were secured to facilitate a sub-area planning process that included public meetings with the Task Force and the community.  A series of meetings commenced, including interim joint discussions with the Town Planning Commission.

   The boundary for the study area was defined based on developed and undeveloped areas of Town and existing natural boundaries.  Design Workshop presented a variety of visual concept plans during the ensuing meetings, which were based largely on the discussions of the Task Force, natural slopes, drainages, existing development patterns within the Town and adjoining property uses.  In addition, targeted discussion points identified by the group included land use, transportation, infrastructure (water, sewer, roads, storm water, pathways, and connectivity),

BLM_0066545

pace/timing/phasing, density, growth boundaries/ annexation and the natural environment/ open spaces.

The sub-area plan and conceptual map present community preferences and objectives identified during this process and are intended to guide development decisions for this area. However, the plan is also designed with flexibility to accommodate future consideration of unidentified or unknown factors, including environmental constraints and sensitive areas such as wetlands and soil conditions, within the Northwest Area.

3. Boundary Definition

The Northwest Area Plan boundary encompasses approximately 138 rural, undeveloped, agricultural acres. The northern portion, which is roughly 74 acres, abuts the northwest boundary of the Town to the west and lies within the Urban Growth Boundary as defined in the 2000 Master Plan. The remaining 64, or so, acres to the south are within the existing Town boundary with zoning designations of Historic Residential and Future Development. The sub-area is generally defined, without metes and bounds, and described as follows (*see vicinity map below*):

*Southern Boundary*

Town of Ridgway Blocks 8 and 17 abutting Charles Street and bordered by North Elizabeth and North Mary Streets, and Block 19 abutting Frederick Street and bound to the east by North Laura Street

*Western Boundary*

Amelia Street/ CR 5 to Town of Ridgway Block 6, and the western edge of Blocks 7 and 8 abutting Elizabeth Street

*Northern Boundary*

Southern boundary of Eagle Hill Ranch Subdivision and County Road 5 (east/west)

*Eastern Boundary*

Beginning at the north: the western boundaries of The School Addition, Parkside PUD and Ridgway River Park Industrial Park PUD

BLM_0066546



Town of Ridgway Boundary, parcels and Northwest Study Area

BLM_0066547

## II.  LAND USE SUMMARY

1. Land Uses
   General land uses recommended for the Northwest Area are Residential, Mixed Residential/ Commercial, and Parks/Trails/Open Spaces.  Within the residential use areas are High, Medium and Low-Density uses.  Much of the area is recommended for Medium-Density Residential, which is generally consistent with the existing density target for the Historic Residential district.  The Town's existing Residential (R) zoning requires a minimum lot size of 10,000 square feet, which more accurately reflects a Low-Density designation.  The Town may wish to consider developing a Medium-Density zoning district in the future or during a future master planning process.

   Lower residential density is recommended for the northern aspect of the study area as a transitional buffer to lower density development in the county and where topographic and geologic constraints will likely prohibit any higher density development.  High-Density Residential and Mixed Use areas are planned abutting existing open spaces and industrial uses.  Although not defined on the conceptual map for the area, parks, trails and open spaces are to be incorporated into the 138 acre plan, with pedestrian and bicycle pathways creating connectivity throughout the area and into the developed neighborhoods of the Town.

   The land west of the existing River Park Industrial Park is identified as appropriate for mixed commercial and residential uses, incorporating structures up to three stories, with a maximum of 35 feet in height.  The land west of the Town's 6.9 acre Park, which abuts the western boundary of Green Street and the adjoining Parkside Planned Unit Development (PUD), is appropriate for High-Density Residential structures up to two stories, with a maximum of 27 feet in height.  In addition, light commercial uses may be appropriate when planned in conjunction with the Higher-Density Residential area abutting the western edge of the 6.9 acre Town Park west of Green Street, when planned in conjunction with an overall development plan and open spaces.

2. Transportation/ Road Networks
   a. Streets
   While a number of objectives are stated here, the Town's 2007 Transportation Element shall also assist in shaping the transportation network, specifically regarding North Railroad and Amelia Streets (County Road 5).   Goal II of the 2007 Transportation Element proposes some road configurations within and adjoining the Northwest Study Area.  This network includes connectivity between the schools, connectivity of North Railroad Street and County Road 5, and a grid-pattern road network for the southern part of this Northwest Study Area.  The Transportation Element recommends a perimeter and bisect road system for connectivity of the schools and for North Railroad Street to intersect County Road 5.  This connectivity consists of an east/west collector street between North Railroad and County Road 5 and an east/west local street connecting Marion Overlook and County Road 5.

BLM_0066548

Finally, citing continuity and efficiency, the Transportation Element recommends completion of the grid pattern in at least the area of blocks 7, 8, 17, 18, 19, which comprise the southernmost boundary of this Northwest Study Area.



Framework Transportation Plan for Northwest Area from the 2007 Transportation Element

Continuation of the grid (i.e.: the alignment of roads generally in a north/south and east/west pattern) throughout the Northwest Area is recommended in order to provide a natural extension of the existing grid from the historic core exists, at least up to a point where the natural environment may dictate a varied network (e.g.: interruption of slopes and drainages).  Absolute adherence to the grid may be forgiven if the arrangement is designed to calm traffic, including interventions in long, straight sections of road.  Nonetheless, long, curved arrangements of roads and alleys are not advised or desired.  Finally, lot, block, street and alley arrangements shall, to the extent possible, consider maximum solar gain for each of the planned properties.

The Northwest Area Boundary directly intervenes between the elementary and secondary schools, which are located at the southern aspect of North Amelia Street and the northern aspect of Green Street, respectively.  As such, a logical, direct and clearly defined connectivity between these schools, as originally stated in the Transportation Element, shall be present through this Northwest Area.  Having stated this, the recommendations of the Transportation Element to provide accesses to Amelia Street (CR 5) via Marion Overlook and North Railroad Street shall be

BLM_0066549

considered when determining access points along Amelia Street (CR 5) and school connectivity.  In addition, access points to Amelia Street (CR 5) shall occur no more frequently than every 660 feet.  Individual accesses shall not be allowed directly via Amelia Street (CR 5), as it is planned collector street and not conducive to a significant number of access points.

Transitional buffering at Amelia Street from the western edge of the Northwest Plan Area toward the ranchlands to the west received significant discussion throughout the planning process with no clear consensus on the defined transition.  There was general agreement that some buffering should be present in this area.  Ideas for buffering include incorporation of green space, landscaping with berms and trees, and a pedestrian pathway.

b. Alleys
Alley arrangements shall be considered as part of the desired grid network of roads, lots and blocks.  Alleys are beneficial for buried infrastructure as well as general access points, including deliveries for commercial properties.  Design and layout of alleyways should maximize and encourage alley access, where possible, to maintain streetscape features and amenities.

Although alley intersections at Amelia Street are not encouraged, any alley connecting into Amelia Street (CR 5) shall be carefully considered and determined an access point, subject to the minimum 660 feet separation as identified previously for street intersections at Amelia Street.

3. Trails, Parks, Open Spaces
The Town currently has a Parks, Trails and Open Space Task Force that is nearing completion of planning a Town-wide Trails, Parks and Open Space Element for inclusion in the Town's Master Plan.  While this Element is not yet complete, it will consider this Northwest Area and include overall pedestrian and bicycle connectivity to the currently platted, developed areas of Town.  In addition, Goal V of the 2007 Transportation Element addresses desired extensions, linkages and connectivity of pedestrian and bicycle routes and street crossings throughout the Town.  These general objectives and goals defined in the Transportation Element shall also be considered and guide planning efforts as development is planned for this area.

A number of objectives specific to the Northwest Area are defined here to facilitate future detailed planning for parks, trails and open spaces within and connecting through this Northwest Area.  Recognizing the need to further examine specific geologic parameters including soils, topography, drainages, wetlands, slopes and other natural features as well as land use development proposals, this sub-area plan does not provide great detail on locations of these amenities, but does suggest that one primary objective shall be good connectivity from developed areas of Town and throughout the Northwest Area.

BLM_0066550

Pedestrian and bicycle connectivity shall be comprehensively planned throughout the Northwest Area.  Trails and pathways shall connect into the platted area of Town as well as to the schools, parks and commercial/ mixed-use areas.  Ideally natural drainages and slopes may be incorporated as part of the trails and parks network, although a primary objective is to connect parks, schools and residential / commercial uses.

Parks should be designed, sized and located as functional community gathering areas. In particular, higher residential and mixed use developments shall incorporate park spaces such that there is functional buffering and green space for shared recreation. When planning the park network consideration shall be given to connectivity and usability of the parks.

Due to the complexity of open space dedications and a need to identify and consider open space requirements on a town-wide basis there are not specific requirements or locations identified for parks and open spaces.  Rather, it is recommended that the Town proceed with development of a parks / open space dedication policy that identifies and incorporates a linkage between the dedication requirement and the development demand for open space, incorporating community desires.  This requirement should become part of the Town's land use policy such that open space dedications are identified and commensurate with annexation and/or development proposals.

It is also recommended that the policy development consider the National Parks and Recreation Association Standards, which identify parks and open space dedications based on population estimates for planned growth areas.  Generally, in this Northwest Area, larger open spaces are preferred to smaller, narrow strips or boulevards and higher density areas shall abut park and open space uses.

4. <u>Pace/Timing/ Phasing of Development</u>
The first goal of the 1999 Land Use Element is to limit growth at "5% or less per year based on the number of new residential lots approved for development as a percentage of existing residential lots".  Significant, conclusive dialogue on pace, timing and phasing of development in this area has not been had, although it is generally agreed that the Town has adhered to the 5% goal over this last decade and will likely continue with this maximum growth rate until such time there is community need to do otherwise.  It is estimated that between 800 – 1500 dwelling units (based loosely on the proposed land uses with minimum and maximum development densities accounting for the wide range) may eventually occupy this 138 acres.  As such, development in this area is likely to be dependent upon infrastructure availability and existing capacity to serve any proposed development.

While within the Urban Growth Boundary, nearly half of the Northwest Study Area is outside of the Town boundary.  With no pending development proposals for the study

BLM_0066551

area, it is recommended that the pace, timing and phasing of development in this area be considered by the Town upon request for development or annexation.

5. Land Use Density

The northernmost area of the study boundary abutting Eagle Hill Ranch is appropriate for Lower-Density Residential with lots sizes of approximately 10K - 20K sq. ft.  This recommendation is based on the desire for transitional buffering between the denser area of Town and the platted properties in the county to the north.  In addition, within this Lower-Density Residential region there are areas of steep topography as well as areas of apparent moisture where denser development is not desired or practical.  Transitional buffering and open spaces appear to be conducive to the topographic and apparent geologic constraints of this northern area.

Most of the subject area is suited for Medium-Density Residential use with lot sizes of 4K-8K square feet and interspersed with trails, parks and open spaces.  Currently, this Medium-Density Residential is primarily found in the Historic Residential District as well as a handful of planned unit developments within the Town.

High-Density Residential uses consisting of 12-18 dwelling units per acre and limited to 2 stories above grade with a maximum height of 27' may be appropriate when abutting parks and open spaces commensurate with the development.  Higher density uses should be located internal to the overall Northwest Area in order to avoid stark transitions to the rural areas to the north and west.  As such, the preferred location for any High-Density Residential use is abutting the western edge of the 6.9 acre Town Park that is west of Green Street and the Parkside PUD.  Medium and heavy commercial uses do not appear compatible with this area; however, lighter commercial uses such as a neighborhood coffee shop, neighborhood store, or ice cream shop may be considered with an application for development, as appropriate.

Mixed-Use Density (12-18 dwelling units/ acre) includes mixed-use development (residential and commercial) with a maximum height of 3 stories up to 35' when incorporating architectural features and roofline variations.  This use is appropriate for the area west of the existing River Park PUD Industrial Park, to accommodate work/live arrangements and transition from industrial to medium density residential uses.

Strong consideration shall be given to geotechnical information, such that wetlands and other sensitive areas are not planned for inappropriate densities.  Relocation of density may be appropriate to accommodate environmental concerns and sensitive areas, as defined in the 2000 Master Plan.  In particular but not singularly, the northern area of the plan retains natural slopes and drainages as well as apparent wetland areas.  The Town may consider the costs and benefits of full and partial density transfers commensurate with discussions on open space requirements and cluster development.  Regardless, dedications of open spaces and parks shall

BLM_0066552

incorporate useable land for community gatherings and not consist solely of environmentally constrained areas.

It is noted that the preference for higher density uses in much of the Northwest Area, and perhaps other areas within the Urban Growth Boundaries, may illustrate the need for a higher density residential zoning district to be considered as a policy matter by the Town.

6. Natural Environment
Chapter III-2 of the 2000 Comprehensive Plan addresses Environmental Constraints and Sensitive Areas such as riparian areas and wetlands, steep slopes and geological features, wildlife areas and migration corridors, wildfire, agricultural lands, soils, visual resources. As the specific environmental constraints and sensitive areas in this Northwest Area are not known at this time, the sub-area plan does not directly address these town-wide objectives. However, it is understood that these constraint areas will be identified and analyzed as part of a development plan and commensurate with the goals of the Town.

It is apparent that there will need to be consideration for nearly all of the environmental constraint and sensitive areas defined in the 2000 Master Plan. When planning for open spaces, transportation corridors and variable densities, significant consideration shall be given to these constraint areas.

In conformance with the planned street and alley layout, lots should be arranged in a complementary grid fashion at least up to the area where natural drainage(s) interrupt the grid. Ideally, the lot layouts will optimize solar pathways such that homes might be constructed and oriented for active and passive solar benefits.

7. Affordable Housing
Late in 2007 the Town of Ridgway, City of Ouray and Ouray County completed a county-wide housing needs assessment. Coincidentally, the three jurisdictions created a Multi-jurisdictional Housing Authority as a coordinated effort to pursue affordable housing objectives within the County. The Housing Needs Assessment acknowledged a defined housing need and the Town is working to act on the desired recommendations of the report. At this time, there is a county-wide effort to develop a strategic plan for implementing affordable housing programs in follow up to the recommendations of the 2008 report.

Due to the complex nature of affordable housing policy, the need for Town-wide housing considerations and the desire for a comprehensive approach for housing and other policy objectives, the affordable housing in this Northwest Area shall be provided commensurate with Town regulations at the time and/or as determined by the Town based on the affordable housing need for the area.

BLM_0066553

8.  Water and Wastewater Infrastructure Demands
    As with any annexation or development request, the Property Owner(s) will need to identify and demonstrate that sufficient resources are available for the proposed development demand.  In particular, the potential wastewater treatment and water demands in this Northwest Area will certainly impact the Town's existing infrastructure.  The Owner(s) will need to comply with state and local laws governing sufficient water supply and compulsory connectivity to sewer systems.  Specific demands and proposed infrastructure designs have not been addressed for this area, although it is understood that with an estimated growth of between 800-1200 dwelling units in this Northwest Area alone, sufficient infrastructure will need to be provided commensurate with any consideration of development or annexation. Dedication to the Town of existing water rights for this area shall be a consideration.

9.  1999 Land Use Maps and 2000 Comprehensive Plan
    The Urban Growth and Initial Growth Boundaries, as defined on the 1999 Land Use Maps and 2000 Comprehensive Plan, have not been and are not intended to be, relocated by this sub-area plan and map.  The Northwest Area Plan is intended to complement these documents and serve as a guidance document for future development of the Northwest Area and future master planning of the Town.

    This plan does not attempt to relocate, plan or otherwise modify any area outside of the Northwest Area Plan Boundary.  Any inconsistencies, discrepancies or propagated errors between this Northwest Area Conceptual Map and the 6/29/1999 Comprehensive Plan Land Use Map, outside of the Northwest Area Plan Boundary, are not intended to supersede the 1999 Land Use Map.

    Boundaries and lines on the Northwest Area Plan Map are conceptual, not held by metes and bounds, and subject to change.

BLM_0066554

## III. NORTHWEST AREA PLAN CONCEPTUAL MAP



NW Area Plan Boundary
Low Density Residential (10-20K sf lots)
Medium Density Residential (4-8K sf lots)
High Density Residential (12-18 du/ac)
Mixed Use High Density (12-18 du/ac)

*Location of parks and open space shall be determined per the guidance document accompanying this map.

BLM_0066555



# III.A. Town of Ridgway Street Map

**Legend**

**Roads**
Category
- Local
- Arterial
- Collector

**Type**
- Rec Path
- Trail

**Type**
- Parcel
- Collector
- Open Space
- Park
- River

**transportation_element_rds**
Category
- <all other values>
- collector
- local

0   500   1,000   2,000 Feet

BLM_0066558

# RIDGWAY COMPREHENSIVE PLAN

# TRANSPORTATION ELEMENT

**Town of Ridgway**
**February 10, 2007**

BLM_0066557

# TABLE OF CONTENTS

**I.    INTRODUCTION**

    A.     Vision Statement
    B.     Ridgway Comprehensive Plan – related transportation documents
    C.     Regional Transportation Planning – Gunnison Valley TPR

**II.    PURPOSES AND GOALS**

    A.     Develop Streets Plan and Implementation Strategy
    B.     Develop Specific Streets and Circulation Plan for following key areas:
          1.    New School Access
          2.    Railroad Street / HWY 62 Alignment
          3.    Amelia / HWY 62 intersection
          4.    Kolowich property (east / west connection from Cty Rd 5 to Railroad St)
          5.    Cty Rd 23 / Railroad Street
          6.    Vista Terrace entrance / HWY 550
          7.    Vista Terrace connection to Ridgway Village
          8.    Completion of grid pattern
          9.    Connection between Ridgway Village and Cty Rd 12
    C.     Develop Corridor Plan for HWY 62 & HWY 550 inclusive of speed limits
    D.     Develop Plan for Parking in Historic Business Area
    E.     Develop Strategies to address multi-modal transportation
    F.     Develop General Objectives for storm water drainage
    G.     Develop General Objectives to address Dust and Particulates
    H.     Develop General Objectives to address pavement maintenance on Town Roads
    I.     Develop Strategies to balance mobility with safety and welfare

**III.    TRANSPORTATION PLAN**

    A.     Street Map
    B.     Functional Classifications:

        •    Collector Streets
        •    Local Streets
        •    Arterial Streets

BLM_0066558

# I.   INTRODUCTION

## A.   Vision Statement

This component of the Town of Ridgway Comprehensive Plan will assist the Town in keeping its "small town" character while planning for future transportation needs by creating a comprehensive transportation system based upon mobility, safety, efficient traffic flow, relationship with trails, and integration of multi-modal transportation infrastructure.  The transportation system must be aligned with Town values, including the historic nature of Town and the importance of alternative forms of transportation such as walking and biking.

## B.   History of Transportation Planning in Ridgway – related Transportation Documents

Ridgway as a Rail Town
Ridgway had its start as a rail town, providing the depot for rail running from the Uncompahgre Valley to Durango, Colorado.  The Rio Grande Southern Railroad was incorporated in 1889.  The incorporators had envisioned a large depot city with plans to construct a street railway system to transport the Ridgway citizens around the community.[1]  While this did not materialize, the establishment of Ridgway as the headquarters for the Rio Grande Southern Railroad did occur, setting the stage for the development of the Town that followed.

Initial Streets of Ridgway
The initial layout of streets within the Town of Ridgway occurred after the signing of the Articles of Incorporation of the Ridgway Townsite Company in 1890.  The incorporators[2] then set out to have the Town mapped and surveyed, and the original Ridgway street names were established.  Many of the names of the original town streets related to names of family members, spouses, and the town founders themselves. [3]

Current Transportation
While initially a rail town, Ridgway now relies upon its streets, sidewalks and trails for transportation needs.  Through more than a century of growth, Ridgway now manages 12.5 miles of roads within its corporate boundaries.  The principle highways include Highway 62 (Sherman Street) and Highway 550.  These two stretches of highway were designated as Colorado Scenic Byways in the year 1989.  Much of the vehicular traffic utilizing these two highways represents pass-through traffic consisting of work force of the neighboring community of Montrose, which provides needed services to Telluride and other nearby resort communities.  Tourism also represents a significant portion of the Ridgway traffic.  It is estimated that between 7,000 and 11,000 automobiles and trucks pass through Ridgway on these Byways per day.  The Town, in 2004, had an estimated population of around 753 people.

It thus becomes readily apparent that Ridgway faces significant transportation issues, even for a town of this size.  Growth has been increasing at a quickening pace in recent years, placing some additional burden on the Town's transportation infrastructure.  Development is steadily increasing

3

BLM_0066559

in the residential, commercial and light industrial areas. To note, the population in Ridgway in 1990 was close to what it was seven decades earlier, in 1920. In the fifteen years since 1990, the population has doubled. Projections from the State Demographers Office estimate this population to nearly double over the next 25 years.

1982 Comprehensive Plan
Transportation planning has been on the books in Ridgway for some time. In 1982, the Town's Comprehensive Plan incorporated three pages of text lent to the discussion of transportation in general. It is instructive to revisit the "policies" as identified in that document:

1) The town should protect its investment in streets, "clean-up" the appearance of the town, and provide safe transportation for its residents by improving drainage and maintenance of existing streets….

2) The town should pave certain existing streets in order to improve business, and to encourage travel on highly traveled, defined collector streets.

3) The town should encourage off-street parking for commercial and multi-unit residential areas….

4) The town should encourage development of alley-way or other pick-up and delivery areas not on major streets to increase safety and reduce traffic congestion.

5) Developers should be responsible for financial burdens of growth, including extensive street construction.

6) The town should encourage private / public mass transit to serve Ridgway in order to increase its ability to be a service and tourism center.

7) The town should encourage a bikeway system between Ridgway and the Dallas Dam reservoir in order to increase Ridgway's role as a tourist and service center.

The issues found to be important in 1982 have largely not changed over the years, with many accomplishments to show for it.[4]

Ridgway Trails Plan Draft, 1992
The draft trails plan identified several multi-use trails throughout the Ridgway community. The plan was not formally adopted, but some of the provisions within that plan are now incorporated into this Element.

Circulation Element Draft, 2000
Prepared by Town staff in 2000, this draft master plan element attempts to identify a number of mitigation measures to vehicular traffic in general, promoting such concepts as traffic calming devices, traffic circles and significant bicycle and pedestrian improvements. While portions of the draft plan offer good insight into overall traffic mitigation measures, the plan could be characterized as placing too much emphasis on non-vehicular modes and not enough emphasis on traffic efficiency and circulation. The plan was not presented to Town Council has not been adopted, but many provisions within the draft are incorporated herein.

BLM_0066560

Town of Ridgway Streetscape Plan, 2000
The draft is a product of an ad hoc committee that met over several months for the purpose of prioritizing sidewalk and streetscape designs.  The draft accomplishes this task and further addresses issues relating to signage, traffic calming and traffic circulation.  Many elements of the plan are incorporated within this Element.  Some of the recommendations have been pursued.[5]

Town of Ridgway Streetscape Master Plan Report, 2006
In February, 2006, the Town identified the need to develop a master plan report specific to streetscape elements within the Historic Business District, in an overall effort to enhance the District and notably the pedestrian experience within the Ridgway core.  A steering committee was appointed by the Town Council and the Town hired a team of outside architects and planners to oversee the process.  After a rigorous schedule involving numerous public meetings and workshops, a final plan was produced in late summer of 2006, outlining proposed streetscape and pedestrian improvements within the historic core, traffic routing and circulation plans, and various sustainable design strategies to be pursued.  In October, 2006, the Plan was formally approved and is now a master plan report that is incorporated and cross referenced within this Element.   The completion and approval of the Ridgway Streetscape Master Plan Report fulfills the objectives of Goal IV, Policy 1 of this Transportation Element.

## C.           Regional Transportation Planning – Gunnison Valley TPR

In 1991, the Colorado Dept of Transportation (CDOT) initiated a process for transportation planning at the regional level.  This was followed by legislative enactments including the framework for a stateside transportation plan and a statewide transportation improvement program (STIP).  The STIP is a project document that essentially contains those projects within the Regional Transportation Plan that are slated for implementation within a six-year period.  The STIP is updated every two years.

Both the Statewide Transportation Plan and Statewide Transportation Improvement Program are initiated and developed at the regional level.  The Town of Ridgway is included within the Gunnison Valley Transportation Planning Region (GVTPR).[6]

The Town has been well represented at the GVTPR meetings, and through the years, has had considerable success in pursuing transportation projects through the STIP program, as well as through federally-funded programs also administered under the GVTPR process.[7]  In 2004, the Town was successful in having the widening of Highway 62 placed on the 2005-2010 STIP and Statewide 2030 Plan.  It is possible that the project may be slated for funding and implementation within the next six years.  Also included within previous and existing STIP documents is the Hwy 62 County Rd 5 intersection.  The project has been subject to some reductions in appropriated funds and delay in scheduling.  The Town has been lobbying diligently for these improvements, which will allow for some sidewalk access for school children to the elementary school on Amelia Street, and notably a safer highway crossing that what currently exists.  Construction is currently slated for 2007.

BLM_0066561

The GVTPR meetings have also provided a forum for defining and prioritizing local projects to be funded through federal transportation dollars under the TEA21 program ("enhancement" funding). The Town has successfully received an award of $294,000 in 2005 for construction of a pedestrian bridge across the river and parallel to Hwy 62 on the north side, and $265,000 in 2006-2008 for extension of sidewalk from the bridge to and across the Hwy 62 and Hwy 550 intersection.

## II.    PURPOSES AND GOALS

**GOAL I.  To plan for and develop a transportation plan that safely and efficiently meets the needs of residents, businesses and visitors**

POLICIES:

1.    Identify appropriate routes and encourage use of direct vehicular access between major destination/activity areas.

2.    Clearly identify and designate arterial, collector and local streets and establish appropriate standards and traffic speeds accordingly.

3.    Work with CDOT to properly categorize State highways through the Town and establish safe speed limits accordingly.

4.    Continue to work with CDOT and regional transportation planning authorities toward the eventual widening improvements to Highway 62 from Highway 550 to the western edge of Town.   The Town should be an active participant in CDOT's study of traffic growth and improvements.  This may include attendance and participation at the Regional Transportation Planning Meetings and Statewide Transportation Advisory Committee meetings.

5.    Identify specific road improvement projects and control measures, including striping, signalization needs, turn lanes, and transportation improvements which enhance traffic flow and minimize impacts on pedestrians.

6.    Work cooperatively with the County to study the need and feasibility of additional roads to serve a wider area around the community and to determine other effective transportation improvements within the City's area of influence.

7.    Provide pedestrian and bicycle linkages between residential areas and public facilities and commercial areas.

8.    Work with regional towns and counties to explore public transportation and intercept parking programs.

6

BLM_0066562

**GOAL II.     To identify and plan for key transportation areas and street corridors to efficiently manage future development and transportation concerns.**

POLICIES:

1.     Plan, design and construct transportation linkages in the following key areas in a manner that will meet future development and population needs.

   A.     <u>School Addition</u> - Coordinate with School District to ensure that efficient traffic patterns exist between elementary and high school and residential areas.  Create alternative transportation paths between residential areas and schools.  Identify likely connections between Railroad Street and County Rd 5.

   There are at least two connections that are planned to provide needed connection between Railroad Street and County Rd 5.  The first is a collector street that will align with the east-west axis of Railroad Street and allow for good traffic circulation between the two schools, while also providing an alternative east-west connection north of Highway 62.  The second is a proposed local street connection that will align with Marion Overlook (*see* Figure 1).



***Figure 1.***

*Proposed connections between Amelia Street and Railroad Street; proposed completion of Town grid to the south (dashed lines represent approximate locations with actual alignments yet to be determined).*

7

BLM_0066563

The specific alignment of these roads should be determined within the planning phases for undeveloped land west of the new school access road. A third connection to the new school is planned to occur on the northern side of the school facility, extending to Cty Rd 5 through the Eagle Hill Subdivision. This third route is likely to be used for limited access only.

B.   Railroad Street/Hwy 62 Alignment - As Railroad Street is a significant collector and will be the main entrance to the Industrial Park, alignment of this intersection is necessary.   This alignment should be coordinated with Colorado Department of Transportation and their plan to widen the highway.

The Town, in conjunction with numerous property owners to the south of Hwy 62, evaluated a proposal that would have aligned Railroad Street on the south side of the Highway. After careful analysis that spanned a three-year period (2000-2003), the decision was made not to pursue this particular alignment. Since that time the segment of Railroad Street between the Highway and Hyde Street has been improved to Town standards, and accepted as such.

The alternative alignment involves aligning Railroad Street north of Hwy 62. This would necessitate a curve in Railroad Street near its intersection with the Highway, and the removal of at least one of the existing tennis courts located in Hartwell Park (*see* Figure 2). This is currently the preferred alignment alternative, although re-alignment on the south side of Hwy 62 remains a consideration.

The alignment of Railroad Street should precede the eventual widening (three-lane) of Highway 62. The Highway widening project has been placed upon the Gunnison Valley 2030 Strategic Plan. It was also slated as a strategic project for CDOT bond financing contingent upon voter approval (subject to 2005 Statewide Referendum D, which did not pass). While the eventual widening of the Highway 62 remains uncertain in terms of funding and scheduling, the alignment of Railroad Street should occur as a preliminary project.

C.   Railroad Street/County Road 23 Alignment The alignment and continuity of Railroad Street, as a collector, is important to the Town in order to effectively provide for good transportation circulation on a north/south axis. Currently, there is no segment of Railroad Street between Hyde and Moffat Streets, and north/south traffic must use Lena Street as an alternative, or navigate through multiple 90 degree turns. The plan is to connect Railroad Street within this missing segment along a straight alignment (*see* Figure 2).

This will provide direct access to County Rd 23 and the Regional Athletic Park to the south. Because of the straight alignment of Railroad Street south of the Highway, it is recommended that well-planned traffic calming be implemented in order to maintain safe and manageable speed limits.

BLM_0066564



**Figure 2.**

*Proposed realignment of Railroad Street on north side; proposed connection of Railroad Street between Moffat and Hyde Street (approximate locations with actual alignments yet to be determined).*

D.   Hwy 550 / Hunter Parkway – Ridgway Village - Evaluate and assist in design and configuration of transportation linkages within the proposed Ridgway Village Development (formerly "Ridgway U.S.A."), including a safe pedestrian connection across the Hwy 550 / Hwy 62 intersection and possible pedestrian connection by underpass north on HWY 550.

Possible alternatives for design include relocation of commercial business at northwest quadrant of the Hwy 550 / Hwy 62 intersection, allowing sufficient right of way needed to accommodate pedestrian sidewalk and crosswalks. Additional improvements to the intersection include flashing signage to warn motorists of the intersection, medians to calm traffic and provide some safe harbor for crossing pedestrians, strobe warnings to warn motorists of crossing pedestrians, and raised crosswalks.

The safe and efficient pedestrian crossing at the intersection remains a high priority for the Town, as increased growth occurs east of Hwy 550.

9

BLM_0066565

In addition to the intersection improvements, a pedestrian underpass (or overpass) north of the Hwy 550 / Hwy 62 intersection should be evaluated for future recreation path linkage and pedestrian passage to the growing residential area east of Hwy 550.

E.   Reconfiguration of intersection of Redcliff Road and Palomino Drive – The current configuration of Palomino Drive and Hunter Parkway in Ridgway Village poses issues for traffic mobility.  The intersection is not aligned in a perpendicular fashion, and lies only 350 feet from the signalized intersection of Hwy 550 / Hwy 62.  Palomino Drive currently represents the principal access into the commercial planned unit development ("Lot 3").  With the pending development of Lot 3, which is inclusive of several large commercial buildings and parking areas, this access will not be workable and will present significant issues over time related to safety, traffic stacking and congestion.

Analysis should be conducted to evaluate a complete reconfiguration of Palomino Drive so as to align with Redcliff Road, which should then become the principal access point to the pending development in Lot 3.  This should present less congestion and stacking at and near the Hwy 550 / Hwy 62 intersection, and allow for better pedestrian access to the Ridgway Village.

F.   Vista Terrace – The current Vista Terrace Subdivision includes 46 large residential lots, serviced by a singular access road that intersects with Hwy 550 at a fast and dangerous curve.  The current highway speed limit at the intersection is 60 mph, and there is no turn lane, acceleration lane or center auxiliary lane.  There are two outlots in the Vista Terrace Subdivision that could be subject to future development and subdivision, which will exacerbate the access problem.  Moreover, the access road, Vista Terrace Drive, represents a very long dead-end cul de sac, which poses additional safety concerns in terms of emergency access.

Two solutions to this problem should be given strong consideration.  First, the access point on Hwy 550 should be improved to include the necessary acceleration and deceleration lanes, as well as a center auxiliary lane.  Second, a secondary access point to the Vista Terrace community should be sought, likely connecting to the proposed Ridgway Village development to the south (*See* Figure 3).

G.   Completion of grid pattern – The original platting of the Town of Ridgway included a fairly square grid alignment of the original Town roads, blocks and alleys, in July of 1890.  In 1924, the Town unified in one parcel Blocks 7, 8, 17, 18 & 19, and conveyed the internal rights of way to the owners of this parcel.   The parcel is currently subject to agricultural uses.[8]

The eventual development of this parcel will again bring to the forefront the question of whether the grid system should be completed as originally platted.  Without the completion of the grid, there is discontinuance of two east/west local streets (Frederick Street and Otto Street), three north/south local streets (Elizabeth,

10

Charlotte and Mary), as well as the associated alleys between these streets (see
Figure 1).

The completion of the grid layout of the original Town blocks and streets would be
desirable from a planning perspective, enabling the efficient movement of traffic in
both directions, and allowing for the continuity of alleys and streets in a manner
that will be consistent with existing development within the Historic Residential
Zoning District.

H.      <u>Connection between Ridgway Village and County Rd 12</u> – The current
        development proposal for Ridgway Village includes development of Lot 3, as well
        as neighboring vacant lots.  As development of the area east of Hwy 550 unfolds,
        the need to establish future traffic linkages will become paramount.  The eventual
        connection between Ridgway Village (Hunter Parkway, Palomino Drive and
        Redcliff Road) to County Road 12 should be planned within the development
        process, even though the development of these vacant parcels will occur
        incrementally over time (*See* Figure 3).



Figure 3.

Proposed connections between Ridgway Village and County Rd. 12 to the south and Vista Terrace to the north *(approximate locations with actual alignments yet to be determined).*

11

BLM_0066567

I.    <u>Amelia Street / Highway 62 Intersection</u> – Efforts have been taken to have this intersection included as a high priority within CDOT's Statewide Transportation Implementation Plan. Needed improvements include an acceleration lane westbound on Hwy 62, center turn lanes in both directions, and a right turn lane onto northbound Amelia Street. Line-of-sight needs to be improved on the northwest quadrant of the intersection.

CDOT has scheduled this project for construction in 2007. The Town is seeking to integrate connecting sidewalks along Amelia Street on each side of Highway 62, with improved crosswalk at the Highway intersection. The Town is also lobbying CDOT to include (a) a raised median at the crosswalk, (b) lowered eastbound speed limits further up the Ridgway Hill, and (c) improved flashing signage to notify motorists of the pedestrian crossing. Until such time as the connecting sidewalks along Amelia are in place, the utilization of the temporary crossing at Elizabeth Street should continue.

**GOAL III.   To develop a corridor plan for Highways 62 and 550**

<u>POLICIES:</u>

1.    Corridor plans should reflect the different zone districts surrounding Hwy 550 and Hwy 62 as they enter and continue through Town. Hwy 550 enters at the General Commercial District and Highway Commercial zone districts, and generally has a faster speed of vehicular traffic. Although the corridor along Hwy 550 will appear commercial, development should avoid strip development style.

Hwy 62 enters the Town from the west at the Downtown Service zone district, which provides a more residential look. Although from the east, the highway enters at the General Commercial District, it continues through the Historic Business District. Development along Hwy 62 corridor should maintain small-town, residential, historical, and pedestrian friendly feel.

2.    Highway corridors at the entryways to Town should protect the small-town image and preserve mountain vistas, as referenced in the Land Use Element of the Comprehensive Plan (Chapter 111-5 – Gateways). Encourage aesthetic improvements in appearance for existing and new developments bordering highways. A highway corridor plan should include a comprehensive landscaping and streetscaping effort with natural vegetative plantings, trees, street lights and sidewalks.

3.    Identify and protect those scenic vistas that make Ridgway special when viewed from highway corridors within or outside the Town.

4.    Traffic signals within Town boundaries should be avoided unless and until needed as established through traffic studies and infrastructure demands that are carefully evaluated.

BLM_0066568

5.  Work with CDOT to set speed limits on highways within the Town and its 3-miles area of influence, which reflect the residential and pedestrian nature of Town and prioritize safety at pedestrian crossings, near parks, and at school zones. Encourage methods to calm traffic when entering Town as well as within the center of Town.

6.  Improve safety and convenience for pedestrians and bicyclists at intersections. Identify appropriate locations to establish safe highway crossings and provide direct links to bicycle and trail systems. Consider crossings on Hwy 62 at Railroad, Lena, Amelia and Laura streets. Pedestrian crossings at these areas should be highly visible and feature cautionary signage to the motorists, traffic calming improvements such as bulb-outs and raised medians, and adequate striping and markings. Integrate landscaping and plantings into curb extensions. The Town should work with CDOT to construct an underpass crossing at Hwy 550.

7.  Maintain proper signals, signage and crosswalks within the school zone.

8.  Maintain two-lane access through Town on Hwy 62 with non-continuous auxiliary center turn lane on Hwy 62, featuring raised medians and streetscape where possible.

9.  Limit signage, especially in gateway areas, while addressing sign regulations in Highway Commercial zone district that allows for adequate visibility of signage from highway. Adhere to CDOT regulations related to highway signage.

10. Construct sidewalks on both sides of Hwy 62 within Town limits, utilizing the pedestrian bridge to cross the Uncompahgre River. Sidewalks should be 8 ft. in width where allowable. Pedestrian infrastructure and turning lanes should take priority over on-highway parking.

11. Minimize access points and driveways onto highways and combine or eliminate existing access points where possible, in conjunction with applicable CDOT access permit regulations. Ensure that future development does not create traffic volumes or patterns that will create traffic hazards or interrupt traffic flow.

12. Provide appropriate storm water drainage along highways, including the replacement of existing stormwater ditches and culverts with buried pipe and drop inlet structures. Stormwater features to mitigate contaminants and dissipate energy prior to discharge into the river tributary system should be integrated into the overall infrastructure design. Require existing and future development to mitigate storm water drainage impacts. Incorporate vegetation and vegetation swales into storm water management when possible.

13. Exterior lighting is a potential source of visual pollution. Require future development to mitigate the potential adverse visual impacts of such lighting. Public street lighting should be designed to minimize light pollution.

BLM_0066569

**GOAL IV.    To develop a plan for pedestrian infrastructure and parking within the Historic/Business District**

POLICIES:

1.    Comprehensively perform a Streetscape Plan, to be incorporated into this Transportation Element, for the Historic Business District, addressing:

    A.    The possible implementation of one-way streets within the core to maximize on-street parking and pedestrian sidewalks in a manner that enhances traffic mobility. Promote the "town square" image.

    B.    The promotion of streetscape within the Historic Business core inclusive of trees, public art and pedestrian plazas.

    C.    The enhancement of the pedestrian experience within the Town's historic core.

    D.    The preservation of the character of the Town's core, integrating the beauty of the natural environment into a functional core.

    E.    Enhancement of the economic vitality of the Town core area.

2.    Comprehensively address parking needs for the Historic Business District by evaluating future parking demands, in accordance with the following objectives and emphases:

    A.    Centralize public parking areas in areas close to the Historic Business core should be considered as an alternative to numerous and scattered parking areas within the core.  Minimize the need for multiple private accesses within the Historic Business core.  Alley parking should be encouraged, and possibly mandated.

    B.    Maximize on-street parking in the Historic Core with due regard to pedestrian infrastructure and streetscape.

    C.    Development of this Plan should be a priority of the Town as a means to address the existing and future transportation means within the Historic Business core while promoting and enhancing the business community.

3.    Analyze the need for re-instituting the off-street parking requirement within the Historic Business District, with proper examination of alternatives, to help alleviate existing and future parking demands.

**GOAL V.    To develop strategies to address multi-modal transportation that will provide residents and visitors with realistic, safe, and appealing opportunities to use alternative transportation**

14

<u>POLICIES:</u>

1.  Establish a Trails Plan to be incorporated into this Transportation Element and the Trails, Parks and Open Space Element of the Comprehensive Plan.

2.  Extend pedestrian and bicycle routes to connect commercial areas, schools, parks and other public facilities to residential areas, minimizing the frequency of street crossings and maximizing safety and separation from vehicular traffic.

3.  Extend pedestrian sidewalks along an east west alignment along Hyde Street and Clinton Street.

2.  Identify opportunities for adding bicycle lanes on new and existing roads and establish a plan for implementation

3.  Encourage the use of bicycles in the Historic Business district by identifying areas for secure bicycle parking.

4.  Provide for recreational pedestrian and bicycle trails along and through open space corridors, with linkage and continuity as objectives.

5.  Plan for construction of Highway 550 underpass north of Hwy 62 intersection and in proximity to the Ridgway Village residential development.

6.  Provide for continuous pedestrian sidewalks throughout the Historic Business core with safe crossing areas, in a manner that will promote pedestrian use of the core and deemphasize the need for vehicular traffic within the core.

7.  Provide for important linkages of public facilities throughout the Town including the following:

    A.  Establish pedestrian trail connections along Railroad Street to the south of Highway 62 in a manner that will connect the Regional Athletic Park with the center of Town.

    B.  Establish multiple pedestrian connections to the new school site including linkage with the existing Uncompahgre River Way trail, linkage through the River Park development and linkage between the new school site and the Elementary School on Amelia Street.

    C.  Ensure connection of Highway 62 sidewalk to the Fairgrounds facility along Highway 550;

    D.  Develop trail connections to and between Ridgway Library, Hartwell Park, Ridgway Town Hall, Ridgway Public Works facility and Ridgway Post Office;

15

BLM_0066571

**GOAL VI.     To develop general policies and objectives for a storm water drainage policy**

POLICIES

1.      Create a master storm water drainage plan for the entire Town.

2.      Street layouts, grades and site developments shall be designed to avoid excessive runoff concentrations and to minimize the need for storm sewer infrastructure.  On-site natural percolation should be encouraged to minimize the need for off-site infrastructure improvements.

3.      Site grading shall provide for runoff from sites toward the street or storm water conveyances.

4.      If major drainages exist or are proposed through a development, the storm runoff shall be routed to that drainage way.

5.      Ensure that development within Town does not increase historical storm water drainage.

6.      Storm sewers or surface drainage channels and culverts shall be installed when the carrying capacity of the streets is exceeded.

7.      All storm drainage systems, or portions thereof, shall be installed in accordance with the Town's development standards for public improvements.

8.      Use parks, open space and natural areas for storm water detention/retention basins to increase open space and reduce the amount of new impervious surfaces from future development.

9.      Work with CDOT to develop piped storm water infrastructure along Hwy 62 from Amelia Street to the river, utilizing side drainage channels off of the highway corridor when practical.

10.     Incorporate the natural features of waterways into storm water systems, using indigenous vegetation in storm water management to promote filtering and slowing storm water runoff to maximize the settling of particulate pollutants and materials. The following are examples of structural best management practices that encompass the above principles:

   •      Onsite detention

   •      Storm water infiltration systems

   •      Buffer strips

   •      Pollutant traps (e.g. Continuous Deflection Separators)

   •      Grass or reed swale drains

BLM_0066572

- Ponds and wetlands

- Pervious paving materials if practical and technically feasible, balancing the need for dust and particulate control

- Native or xeric landscaping

11.    Provide public information on how to reduce storm water pollution.

12.    Increase street sweeping to remove pollutants before they are washed into the drainage system.

13.    Ensure that storm water drainage does not negatively impact the water quality of local aquifers, tributaries and rivers.

14.    Features that improve water quality that should be incorporated into storm water drainage systems include:

- Native vegetation particularly sedges and grasses should be used to promote filtering of nutrients and sediments;

- Boulders or riffles to improve water aeration and oxygenation;

- Ponds, pools or storm water gullies designed as sediment traps;

- Drain or watercourse profiles that provide a range of fauna habitats.


**GOAL VII.    To develop general policies and objective to address dust and particulates**

<u>POLICIES</u>

1.    Pave and chip/seal high volume traffic areas to reduce dust.  Chip sealing shall be implemented where practical and technically feasible; asphalt surfacing shall be implemented in high volume traffic areas.

2.    Use street sweeping to reduce dust and particulate pollution as well as improve water quality of storm water.

3.    Limit traffic and maintain slow driving speeds on unpaved roads.

4.    Install erosion control measures to prevent silt runoff onto public road ways.

5.    Attempt to find and use the most environmentally friendly chemical dust retardant control measures.

6.    Require all new development to pave roads.

BLM_0066573

**GOAL VIII.   To develop general policies and objectives to address pavement maintenance on Town roads**

POLICIES

1.   Identify preventative maintenance treatment strategies

2.   Street paving and pedestrian surfacing materials should be economical, serviceable, and easy to repair.

3.   Public, commercial, and tourist needs should receive a higher priority for right of way improvements than purely local residential needs.

4.   Priority for road improvement should be given to areas with high density and areas where most lots are already developed.

**GOAL IX.   To develop strategies to balance mobility and safety and welfare.**

1.   Provide an integrated, efficient, and economical transportation system that provides mobility, convenience, and safety for all citizens, including people with disabilities.

2.   Transportation infrastructure need to support anticipated growth and strive to keep traffic levels at an acceptable level with minimizes congestion and maximizes quality of life.

3.   Use traffic control and calming devices where appropriate to enhance automobile, pedestrian and cyclist safety, including raised cross walks, neck-outs, raised medians, landscaping, beacons and signage.

4.   Promote a transportation system, including a cycling and walking network that gives citizens the option to safely walk, bike, or drive throughout the Town.

5.   Where possible, separate bike lanes for cyclists should be developed adjacent to automobile lanes while sidewalks should be separated from roadways by landscaped buffers.

6.   Crosswalks should be clearly marked and designed to minimize pedestrian walking distances across roadways, especially along highway corridors and near schools and parks.

7.   Roadway designs should preclude excessive automobile speeds and ensure pedestrian and bicycle safety.

8.   Promote telecommuting and bicycle/pedestrian commuting, ridesharing and public transportation and identify locations for future park and ride facilities.

9.   Develop a comprehensive parking plan for the business core and related areas.

BLM_0066574

**GOAL X.    To identify key considerations for a possible future traffic bypass**

1)  Consider a planning process to determine the viability of a highway bypass for throughway traffic occurring between Montrose and Telluride.  Any process should consider the following:
- Environmental and economic impacts.
- Location and possibility of reserving land.
- Congestion and public safety issues along current state highways through Town.
- Vitality of existing downtown, business areas and neighborhoods.
- Traffic mobility.
- Quality of life issues.
- Feasibility and cost.
- Regional Linkages

## III.    TRANSPORTATION PLAN

**A.    Ridgway Street Map** (*see* attached Map).

BLM_0066575

## B. Functional Road Classifications

| Design Characteristics | Arterial | Collector | Local |
|---|---|---|---|
| **Function / Character** | Lines communities and urban centers; carries high and moderate volumes of traffic with continuous traffic flow; access tightly controlled; traffic signals may be required | Links arterial and local roads; carries moderate volumes of traffic at low speeds; designed to carry traffic through neighborhoods to arterials; access from individual lots is limited | Provides access to individual lots; carries low volumes of traffic at low speeds; discontinuous; designed to discourage use by through traffic; stop signs at most intersections |
| **Examples** | Hwy 550 & Hwy 62 | Railroad St., Amelia St., Hunter Parkway | River Park Streets; Streets west of Lena, Solar Ranches Street, Vista Terrace |
| **Traffic Lanes (assumes 12 ft. lanes)** | 2 to 6 | 2 to 3 | 2 |
| **Minimum Right of Way Width** | 80' to 100' | 80' (60' width in residential areas if engineering and safety concerns allow) | 60' |
| **Typical Speed Limit** | 25 to 40 mph | 20 to 30 mph | 15 to 25 mph |
| **Side Street Access** | Minimum separation of 360 ft. | Minimum separation of 125 ft. | Minimum separation of 125 ft. |
| **Driveway Access** | Limited to where no other access exists | Limited to where no other access exists | Allowed except where limited by safety considerations |
| **On-Street Parking (minimum 8ft. parking lane)** | Limited parking where engineering and safety concerns allow | Allowed on both sides where 80' right-of-way; where less than 80', parking may be limited to one side | Allowed except where limited by engineering and safety considerations |
| **Turn Lane** | Yes, where needed | At major intersections | None |
| **Maximum Grade** | 5% | 7% | 7% |
| **Min. Horizontal Curve Radii** | 400' | 300' | 200' |
| **Drainage** | Curb, gutter, storm sewers where needed | Curb, gutter, storm sewers where needed | Curb and Gutter or Valley Pan |
| **Sidewalks** | Required on both sides – 16' aggregate where engineering and safety concerns allow, not less than 5' | Required on both sides – 12' aggregate where engineering and safety concerns allow, not less than 5' | Required on both sides – 10' aggregate where engineering and safety concerns allow, not less than 4' |
| **Green Space** | Remaining right-of-way to be used as green space until needed for other public purpose | Remaining right-of-way to be used as green space until needed for other public purpose | Remaining right-of-way to be used as green space until needed for other public purpose |
| **Bike Lane** | Bike lane pursuant to Parks & Trails Master Plan and integrated bike traffic with areas of slower speed limits | Bike lane pursuant to Parks & Trails Master Plan and integrated bike traffic with areas of slower speed limits | Integrated bike traffic with areas of slower speed limits |

BLM_0066576

## C.  Typical Road Profiles





21

BLM_0066577



6 ft                    48 ft                    6 ft

Parking          Driving Lanes          Parking

Valley pan

**Local / Collector
80 feet right-of-way
w/ diagonal parking**



10 ft                    40 ft                    10 ft

6 ft.

Driving Lane      Auxiliary Lane      Driving Lane

**Arterial
66 feet right-of-way**

22



BLM_0066579



BLM_0066580

[1] The Town that Refused to Die:  Ridgway, Colorado 1890-1991, Doris H. Gregory, Second Edition, 1992

[2] Dewitt Clinton Hartwell, Frederick Walsen and Charles Nix

[3] Otto Street was named after Otto Mears, and Mary Street was named in honor of his wife.  Clinton Street represented the middle name of D.C. Hartwell, while Charlotte Street was named after his wife.  And Charles Street was named after Charles Nix, who then named Elizabeth Street in recognition of his wife Elizabeth.  Frederick Walsen had a street named after him, and Amelia Street after his wife.  Moffat Street was named after the president of the Denver and Rio Grande Railroads, David Moffat; Hyde Street was probably named after the Hyde brothers from whom much of the Townsite property was originally purchased.  Sherman Street could have been named after Judge W.A. Sherman.  This leaves three streets within the original townsite unaccounted, all named after women: Lena, Cora, and Laura.  This information is provided in Part 1, The Town that Refused to Die, as authored by Doris H. Gregory

[4] For example, through the efforts of many and specifically the Uncompahgre River Way, Inc., the construction of a multi-use path from Ridgway to the reservoir has been achieved, which now provides year-round recreational opportunities.

[5] As examples, in 2001, the Town implemented the recommendation of a one-way circulation pattern on Lena Street north of Highway 62, and a year later in 2002, installed low-wattage, non-glare street lighting throughout the community.

[6] The Counties included within the Gunnison Valley TPR include Delta, Gunnison, Hinsdale, Ouray, Montrose and San Miguel Counties.

[7] The Transportation Equity Act for the 21st Century (TEA-21) is one such program.  Ridgway has been awarded for a pedestrian bridge project under this funding source, as constructed in 2005.

[8] Ordinance No. 102, as enacted on August 16, 1924, and recorded in the Clerk and Recorder's Office, Ouray County, Book 114, Page 256.

BLM_0066581

# Introduction

## Purpose

This Affordable Housing Action Plan is intended to guide the multi-Jurisdictional work of the newly-formed Ouray County Housing Authority and the cooperative, coordinated efforts of the City of Ouray, Town of Ridgway and Ouray County.  It calls for the responsibility for affordable housing to be broadly shared through a comprehensive combination of strategies scheduled for implementation by 2015.

This Plan represents the next step in a process that started with the inclusion of objectives in the Master Plans of all three jurisdictions calling for efforts to provide affordable housing.  In 2002, both municipalities signed intergovernmental agreements with Ouray County specifying that these homes and other residential development should be located in established urban areas.  In 2008, the three jurisdictions collaboratively formed a county-wide housing authority to address housing needs, and obtained grant funding for a comprehensive assessment of those needs, which was published later that year.  A more detailed chronology of the path leading to this Action Plan is included in the appendix.

## Organization of the Plan

This document consists of five sections:

|      |                                    |
|------|------------------------------------|
| I.   | Update of Housing Needs            |
| II.  | Policies and Guiding Principles    |
| III. | Goals and Objectives               |
| IV.  | Priority Strategies                |
| V.   | Implementation and Administration  |

The appendix includes various materials that supported the development of this Action Plan, such as a review of the legal authority for Colorado municipalities and counties to enact housing programs, and key figures from the Housing Needs Assessment.

## Acknowledgements

This Plan was funded by a grant from the Colorado Department of Local Affairs with matching support from the City of Ouray, Town of Ridgway and Ouray County.  The planning process was coordinated and shaped by the Ouray County Housing Authority (OCHA) Board with Jen Coates, Planner for the Town of Ridgway.  A Task Force consisting of elected and appointed officials and staff considered needs, options, resources and reality when developing the direction embodied in this plan.  Appreciation for their work is extended to:

| | |
|---|---|
| Don Batchelder, Ouray County, OCHA Board | Mike Fedel, Ouray Planner, OCHA Board |
| Mark Castrodale, County Planner | Will Clapsadl, Ouray Planning Commission |
| Rani Guram, Ridgway Planning Commission | Lynn Padgett, Ouray County |
| Betty Wolfe, City of Ouray, OCHA Board | Paul Hebert, Ridgway Town Council, OCHA Board |

BLM_0066582

# I.  Housing Needs Updated

The November 2008 Ouray County Housing Needs Assessment concluded that 149 additional units were needed to address existing or "catch-up" demand for affordable housing. This conclusion was based on surveys conducted the previous year. Of the 149 units needed, 39 were the result of unfilled jobs and 110 were generated by in commuters who want to move into Ouray County where their jobs are located.

Since the publication of the study, economic conditions have dramatically changed. Construction activity has largely come to a halt. The unemployment rate has risen a full percentage point and no longer signals that Ouray County is a labor shortage area. Help wanted notices in the newspaper have sharply declined. Homes that have not sold are being offered for rent, greatly increasing rental availability. Residents are having difficulty obtaining enough work locally and are finding it increasingly necessary to commute to Telluride for jobs. Most construction workers are unemployed, or underemployed. Though hard data are not available, the decline in jobs has also led to a decline in in-commuting. Casual observations suggest that jobs are no longer unfilled. Because of these recent factors influencing housing demand, fewer units are now needed to address existing demand, i.e.: "catch up". Housing needs should be revisited upon publication of 2010 Census data to adjust estimates of existing demand.

The Housing Needs Assessment projected that job growth by the year 2015 would generate demand for 881 additional housing units. It estimated that the private market would affordably address all but 20% to 30% of this workforce-related housing demand leaving between 174 and 264 units that would need to be developed through public efforts to keep-up with demand.

Ouray County along with the rest of the country and much of the world is currently in a recessionary period, making these job projections high. Trending has shown, however, that Ouray County's economy has historically rebounded from recessions faster than the rest of the nation and the state as a whole. While job growth will likely be flat for a year or two, by 2015, new jobs should generate demand for approximately 470 units, which equates to about 53% of the Needs Assessment estimate of 881.

Housing prices have not significantly declined despite the steep drop in the number of sales. The median price of single-family homes sold in 2008 was about 6% lower than the median in 2007. The number sold dropped from 131 to 57. Sales of lower-priced units increased, however. The number of condominiums and townhomes sold grew from 15 in 2007 to 26 in 2008, and the number of mobile homes sold increased from two to seven in the same time period.

Home prices remain beyond the reach of many local residents. As of mid January, the median price for the 195 homes listed for sale (single family, condos/townhomes and mobile homes) was $495,000, with an average of over $690,000. Of these listings, only 11 or 5.6% were at

BLM_0066583

prices affordable for households with incomes at or above 120% AMI. Prices may drop further but it appears that the private market will address only about 40% of the demand, not 70% to 80% as projected by the Housing Needs Assessment. It now appears that the Housing Authority and cooperating jurisdictions will face a "keep-up" demand not served by the private market for approximately 270 units by 2015.

## II.    Policies and Guiding Principles

**Sustainability**

Sustainability is a critical premise of this Action Plan. Sustainability in housing is to be achieved by:

- "Green" designs with energy-efficient appliances, alternative energy sources, non-toxic building materials, solar orientation, and high R-value insulation and windows, which improve long-term affordability and provide a healthier living environment.

- Compact developments, which reduce the amount of land converted into residential use, minimize resources consumed in infrastructure construction and maintenance, lower water consumption, enhance sense of neighborhood and preserve land for agriculture – Ouray is a right-to-farm county.

- Location of housing in population centers in proximity to jobs where infrastructure and services are available.

**Primary/Second Home Relationship**

The use of residential units in Ouray County has been shifting with an increase in the percentage of homes used as second/vacation properties. Continuation of this shift is not desirable as it would drive housing prices even further above levels affordable for local wage earners and lead to undesirable conditions including loss of the sense of community and neighborhood vitality with homes that sit empty much of the year. An interim report funded by the Telluride Foundation on a collaborative research effort of the Harvard Graduate School of Design and MIT projected second home growth in Ouray County will average 7.2% per year over the next 20 years. This would be more than double the rate of growth anticipated for primary homes, and would outpace second home development in San Miguel County (4.4% per year). The economic benefits of residential construction and part-time residents are recognized yet further shift in the relationship between primary and second homes should be minimized.

BLM_0066584

**Jobs/Housing Relationship**

The growth in housing for employees should at least match the rate of growth in employment-generating uses, including residential construction, commercial establishments and public facilities. While the absolute number of in-commuters may increase under this policy, the percentage of the workforce housed in Ouray County should remain constant at about 80%, with 20% of the workforce commuting from outside the County. With the anticipated increase in seniors as "baby boomers" reach retirement age and exit the workforce, it will take proportionately more affordable housing units to maintain this relationship. The overall rate of growth in housing will need to exceed the rate of growth in job-generating uses for the relationship between workforce housing and jobs to be maintained. The current rate of 1 occupied home per 1.4 employees will shift, approaching closer to a 1:1 relationship. In other words, the transition to fewer employees per household will require an increased number of workforce housing units to keep up with an increased demand for employment.

**Priorities and Targeting**

- *Workforce Housing* -- Affordable housing efforts should focus initially on providing units designed for the workforce but with recognition that the retiree population will grow at a disproportionately high rate for at least the next 15 years, and that housing specifically designed for seniors could be a key component of a comprehensive approach. The top priority is the development of homes designed and priced for essential employees including teachers, health care providers and emergency responders.

- *Family Housing* -- Ouray County and its communities are family oriented. This characteristic should be maintained into the future as growth occurs. To preserve this demographic trait, about 70% of new units intended for occupancy as primary residences should accommodate families and about 30% should be designed for singles, with the recognition that it is more affordable and desirable for units developed for single homeowners to have two bedrooms.

- *Income Mix* - The diversity of the county's population should be preserved with an income distribution that reflects the desire for growth in housing opportunities for moderate- and middle-income households, which includes most essential employees, relative to other income groups. The desired mix is roughly one-third for low-income households (≤ 80% AMI), one-third moderate/middle income (81% to 120% AMI) and one-third upper income (121% AMI and greater). The Housing Authority's efforts will focus on households with incomes equal to or less than 120% AMI, based on current housing prices and the assumption that the private market will address the housing needs of households with higher incomes. It is likely that households with incomes between 120% and 150% AMI will need housing assistance in the not too distant future as market prices resume their upward movement. Income targets and goals should be revisited as prices change, and will likely need to be increased over time.

BLM_0066585

- *Owner/Renter Mix* – Both homeownership and rental opportunities are needed. To maintain the existing relationship into the future, about 75% of homes built for occupancy by residents should be for sale and about 25% should be for rent.

**Location**

In accordance with a long-standing policy for residential development embodied in intergovernmental agreements in 2002, and reiterated in the 2009 county-wide RPI/Theobald Study Group recommendations, higher density growth is to be directed toward the incorporated communities and their Urban Growth Boundaries where urban services and infrastructure are available. Production of affordable housing should occur primarily in the towns where it is sustainable, preserving the rural character of the county. Income segregation with only the rich being able to enjoy the county's rural lifestyle and the poor concentrated in town is not desired, however.

Despite policies, development is occurring in the unincorporated area of the county at a faster rate than in the towns -- 59% of residential building permits issued from 2000 through 2007 were for homes in unincorporated Ouray County. This development activity generates demand for workforce housing both in the initial construction and in the ongoing operation and maintenance of the homes. Opportunities to include sustainable workforce housing in ways that would not negatively impact the county's rural character, should be considered.

Given Colona's distance to Ouray and proximity to Montrose, its lack of water and wastewater systems, and the lack of a public transit system connecting Colona with employment centers, it is not a desirable location for the development of housing to serve Ouray County's workforce at this time. If the necessary infrastructure is provided in the future, the development it enables should include affordable housing so that the resulting housing demand does not impact housing needs in the rest of Ouray County. If high-density development on private lands in Colona or elsewhere in unincorporated Ouray County is proposed, a substantial affordable housing component should be included.

**Unit Types and Density**

Single-family homes and duplexes are the most compatible with the existing character of development within the county and towns. Greater diversity in unit types and sizes is needed, however, to achieve affordable price levels. Relatively high density is also needed to make housing affordable. New subdivisions within the towns should allow for mixed density including opportunities for development of multi-family units at densities of 12 - 18 units per acre. Increased density will enable clustering of homes within new development, a recommendation called for in 2009 by the RPI/ Theobald Study Group.

BLM_0066586

Mixed-use developments with multi-family units located above or behind retail and office space are desirable as a way to provide high-density housing without significantly impacting the amount of land available and suitable for commercial uses.  Accessory dwelling units that can be developed on existing lots and in new subdivisions are also desired.

High density is not available in the unincorporated areas of Ouray County where development is mostly limited to one unit per six acres or one per 35 acres, nor is it desired.  Accessory or similar dwellings that provide housing in proportion to the demand generated in the nearby vicinity are desirable.  Appropriate standards and guidelines should be established for these accessory units to insure affordability and maximize rental opportunities in the county. Opportunities to produce single-family homes affordable for middle-income residents through minor up zoning in new rural subdivisions may also be desired in the appropriate application.

**Responsibility**

Responsibility for housing should be broadly shared in the community with a mechanism for the general public to provide financial support.  New residential development should pay its own way and should be held responsible for providing affordable housing to sustain the county's communities and its economy.  Because of the high property taxes paid by commercial properties, and because commercial uses are so vital to the towns and county, commercial developers will be required to provide or fund housing for only a small portion of the housing demand generated by development.  Neither of the towns nor the county is in a position to significantly subsidize housing efforts through general fund revenues in the immediate future but will continue to provide administrative support and sponsor grants as available. Development of public/institutional uses which generate employment and the resulting need for affordable housing, like schools, churches and government agencies, should also address a portion of the housing demand generated.

## III.   Goals and Objectives

This Plan herein establishes distinct goals for affordable housing units to address both existing needs (catch-up) and needs that will arise in the future as growth occurs (keep-up).

- By 2015, up to 50 affordable housing units should be developed or preserved to address catch-up needs.  It is recognized that this goal is less than the actual catch-up need, but it takes into account the uncertainty of current demand given the change in the economy since the 2008 Needs Assessment and resource availability.   It is approximate and should be revisited mid way through the period, or in 2011 after release of 2010 Census data.

BLM_0066587

- Also by 2015, strategies focused on new development should provide 160 affordable housing units that would keep up with approximately 60% of the new demand that is unlikely to be addressed by the free market.  Real estate prices and job growth for this period are uncertain, so this goal is less than 100% of the currently identified need to keep-up with the future workforce housing demand and, as such, this goal should also be revisited as conditions change.

Applying the policies in the previous section of this document on income targeting and location translates into a total goal for the development or preservation of 210 affordable housing units by 2015 as shown on the following table.

### Goals by Type, Income and Area

| Income | Low | Moderate/Middle | Upper |
|---|---|---|---|
| AMI | 0 – 80% AMI | 81% - 120% AMI | 121%+AMI |
| Desired Mix | 1/3 | 1/3 | 1/3 |
| Catch-Up Goal | | | |
| 50 units by 2012 | 25 | 25 | Market |
| Keep-Up Goal | | | |
| 160 units by 2015 | 80 | 80 | Market |
| Total | 105 | 105 | Market |
| Ridgway – 55% | 58 | 58 | |
| Ouray – 28% | 29 | 29 | |
| Ouray County – 17% | 18 | 18 | |

Based on a combination of factors including opportunity and demand, approximately 55% of affordable housing should be developed in Ridgway, 28% in Ouray and 17% in Ouray County. These percentages do not represent a share of the burden to create affordable housing as the responsibility is proposed here to be reasonably distributed.  Rather, these percentages represent factors such as the availability of land, opportunity for new development and mutually desired locations for growth.  Given the level of residential development that has been occurring with unincorporated areas, the County should be able to generate funds from this development to provide support for construction of affordable housing within the towns. In other words, while the goal is for only 17% of the affordable housing units to be located within unincorporated areas, the County should be responsible for subsidizing a larger share to support development within the incorporated areas.

BLM_0066588

## IV.    Priority Strategies

To address existing and future housing needs throughout Ouray County, a comprehensive plan has been developed that calls for the implementation of 12 different types of strategies by 2015.   These strategies are aimed at simultaneously addressing both catch-up and keep-up needs while broadly sharing the responsibility for affordable housing.

Given the uncertain economic times and the changes that have occurred since the 2008 Housing Needs Assessment as stated previously, quantitative objectives for the development of additional units to meet existing or catch-up needs have not been set.  This Action Plan does not ignore existing housing needs but rather outlines a pragmatic approach that focuses immediately on improvements to the existing housing inventory and postpones plans for unit development until market indicators suggest that new construction would be prudent and feasible.

The current lull in development activity provides the time for staff and stakeholders to develop, and elected officials to consider and adopt, regulations aimed at keeping up with housing needs as growth occurs.  In accordance with the policy that development pay its own way, this Action Plan calls for the adoption of measures now that will insure that affordable housing demand generated by new development is at least partially provided by that development.  Since no new units would be built through these methods until such time as growth occurs, waiting for market conditions to stabilize before enacting the requirements is not necessary or appropriate.

The following pages contain a summary of each strategy recommended for implementation by 2015.  The appendix includes a print out of an excel-based model used to estimate the number of affordable units that would be produced/ preserved if the recommendations contained herein are enacted.  The assumptions used to develop the model on the amount of commercial and residential development likely to occur by 2015 were generated by the planners from each jurisdiction using historic levels adjusted downward due to the recession.  These assumptions can be changed as the future unfolds, with the model instantly adjusting the number of affordable housing units likely to be produced.

Rehabilitation and Weatherization - 2009

Providing assistance for weatherization and rehabilitation of units is an immediate priority to address high utility costs, unsafe surroundings, the potential for overcrowding and dissatisfaction due to disrepair and substandard or less than desirable living conditions. Assistance for this work in the form of energy audits, grants and low-interest loans is now available through five different agencies stretching from Durango to Grand Junction.  None of the agencies have offices in Ouray County, however, making it potentially confusing and complicated for residents to take advantage of the assistance available.  To remedy this situation and make weatherization and rehabilitation funding more accessible to the County's residents, the following steps are recommended:

BLM_0066589

- Provide staff support for coordination and administration of program services;

- Identify, confirm and develop a relationship with all existing support services, providers and key stakeholders currently involved in providing these services for Ouray County
- Develop a specific operations plan outlining the scope, initiation, implementation and monitoring of weatherization and rehabilitation programs;

- Identify financial partners for grant and loan administration, including local lending institutions, the Governor's Energy Office, local utility providers and others;

- Identify or develop specific standards for home inspection, insulation, construction/rehabilitation and other services necessary for successful program implementation and solicit qualified providers for these services;

- Initially target efforts to households qualified for assistance from the State of Colorado given funding limitations but expand to serve households earning up to 120/150% AMI as opportunities are identified;

- Rehab and/or weatherize at least 21 units in total by 2015 with roughly seven in each jurisdiction.


Annexation Policy -- 2009

Through policies and practices that the municipalities of Ouray and Ridgway can apply to the annexation of land, new development can be required to address not only the impacts that it directly generates but can be used to improve conditions that currently exist in the communities, including a shortage in the availability of affordably priced housing. Communities often hold development proposed on property that must be annexed to higher standards than projects proposed for land already within municipal limits. Drafting and adoption of a policy for future annexations should be pursued immediately while neither town has an application before them for consideration. To do so, the following actions are recommended:

- The desire to halt the shift from primary to second homes should be taken into consideration when setting the policy with potentially a Resident Occupied (RO – no income or price caps) deed restriction for a portion of the units.

- The ability to use annexations as a means for addressing existing or catch-up needs should be considered and the number of affordable units required should be higher than if imposed under IZ and linkage requirements for in-town parcels, including provisions for housing low income households that require the most significant subsidy.

BLM_0066590

Homeownership Counseling and Mortgage Assistance – 2009/2010

As units are built or become available for sale to moderate- and middle-income employee households, potential buyers will need assistance in order to qualify to purchase the homes. Homebuyer education classes along will not be sufficient.   Personalized credit counseling and down payment or other forms of financial assistance like a shared equity injection are needed.

- In 2009 the OCHA should hold an educational session on housing resources and contact information for Ouray County.  This session may include information from lenders, opportunities with the Colorado Housing and Finance Authority and the OCHA on resources available to homeowners and renters in Ouray County.  This will primarily be a community outreach effort by the OCHA with the support and cooperation of the three jurisdictions to check in with the community on services available and desired.

- OCHA should hire or contract with someone experienced at moving moderate income households into homeownership.  The San Miguel Regional Housing Authority may be a good resource to initiate homebuyer education services in Ouray County.  As the demand increases, the OCHA may wish to retain a certified HUD educator and/or counselor to provide these services.

- A system for Ouray County residents to access down payment assistance through the Delta Housing Authority should be established.

- A grant application should be submitted to the Colorado Housing Division for a down payment assistance allocation.

- A pipeline should be established for accessing CHFA down payment assistance.

- Local mortgage lenders should be involved in the OCHA-initiated effort.

Inclusionary Zoning (IZ) – 2010

Inclusionary zoning is the imposition of a requirement on new subdivisions or PUD's that a portion of all new units be affordable for a targeted group, typically moderate- and middle-income households in the communities in Colorado that have adopted IZ.  Research on IZ programs in urban areas across the country has shown that the higher the income level served, the more units produced.  The most effective IZ programs have been complemented by development incentives.  Recommendations for adoption of IZ requirements are as follows:

- All three jurisdictions should impose the same requirement of 20% though terms and applicability could vary.  A coordinated policy development effort facilitated by the

BLM_0066591

Housing Authority will streamline this process for multi-jurisdictional cohesion and can provide for divergent applications as appropriate.

- Methods for satisfying the requirements should be flexible although building units on site is generally preferred, and could vary by jurisdiction.

- Placement of a permanent voluntary transfer assessment (RETA) on subsequent sales of free market units should be allowed in exchange for a partial reduction in the percentage of affordable units required (in Eagle County, their 35% IZ requirement is reduced to 30% in exchange for a 1% RETA).

- IZ should be used to primarily provide homeownership opportunities for moderate and middle income households (81% - 120% AMI).

- IZ should be enacted in 2010 before additional subdivision applications are received.

Through these steps, IZ applied to new subdivisions between now and 2015 would result in the eventual construction of about 105 affordable homes. Applying a resident-occupied (RO) deed restriction to some percentage of units in new subdivisions, above the 20% requirement for moderate/middle income households, should be considered as a means for slowing the shift in Ouray County from primary to second homes.

<u>Development Incentives – 2010</u>

Incentives are an important strategy for use with IZ and linkage requirements. They are the "carrots" that can make development of affordable housing a win/win experience. Given variations in code requirements, lot sizes, densities and development opportunities, incentives should vary among the jurisdictions in Ouray County. For all three:

- Incentives should be put into place simultaneously with IZ and linkage requirements;

- Stakeholders including developers and property owners should be involved in their structure; and

- Increased density with high utilization should be allowed for affordable housing, as a means to reduce development costs and promote sustainable land use.

In Ridgway, incentives should include:

- Deferral, reduction or waiver of building permit and plan review fees;

- Deferral, reduction or waiver of excise taxes (Excise tax calls for payment of $1500 per new residential units created, enacted at subdivision - n/a to new building permits but due at subdivision);

BLM_0066592

- Density bonuses;

- Expedited development and building permit review;

- Flexible Development and Design Standards (lot size and coverage, street frontage, etc.)

In Ouray, requirements are likely to be similar to Ridgway based on incentives previously offered.

In Ouray County, a minor density bonus should be considered for single-family subdivisions on small acreage, providing rural homeownership opportunities for moderate/middle income families. For example, where one unit per 6 acres is allowed, the ratio could be dropped to 1 per 5 acres if the additional unit(s) is deed restricted. To make this palatable and feasible, open space requirements shall be maintained at levels consistent with the land use code. This effort should be pursued after other affordable housing efforts have established a track record, possibly 2012, although IZ policy development coincident with Town and City efforts is recommended to insure propagation of mutually shared goals.

Residential Linkage - 2010

Residential linkage is a requirement that the construction of new homes contributes to the provision of affordable housing based on the demand that new residential development and the resulting permanent on-site jobs generate for housing. Since most jobs involved in home maintenance and operations are low wage, these requirements are typically designed to provide housing for low-income employees. The requirement can be formula driven where affordable units are required (typically a fraction for single-family homes but more for condominium projects) with a fee in lieu, or as an impact fee as was done and upheld in Gunnison County. Recommendations for residential linkage are as follows:

- A survey of homeowners should be conducted in the summer of 2009 or 2010 to provide the necessary job generation rates for the housing impact formulas that are the basis for a linkage requirement (i.e.: linkage fee study);

- All three jurisdictions in Ouray County should adopt an identical residential linkage requirement, in 2010 while construction activity is minimal;

- The mitigation rate should start out low for small units (5% or about $ .05 per square foot) and escalate with unit size (45% or $4.00 per square foot), stepping up significantly for the large homes being built in unincorporated areas;

- Options should be offered for ways to meet the requirement including payment of a fee, construction of units on or off site, and placement of a permanent voluntary transfer assessment (RETA) on subsequent sales of the free market units;

BLM_0066593

- The program should address the housing needs of low-income households (≤ 80% AMI) to partially keep-up with housing demand generated by future residential growth;

- The program should primarily be used to produce affordable rental housing. Possible uses for the funds include subsidizing the development of tax credit apartments to achieve the quality and design desired, and the cost of ADU incentives;

- A housing support study should be prepared that includes a sample of homeowner surveys to establish residential job generation rates and a reasonable link between residential development and the requirements.

Based upon a series of assumptions about future residential development, a linkage program as proposed would generate total revenue of approximately $1 million by 2015 providing subsidy for the development of seven units. While subject to refinement, examples of the approximate fee for specific free-market units are provided in the following table.

**Residential Linkage Examples**

| Size | 800 | 1200 | 1700 | 2000 | 2500 | 5000 | 7500 |
|---|---|---|---|---|---|---|---|
| Jobs per unit | 0.1 | 0.14 | 0.14 | 0.19 | 0.19 | 0.46 | 0.85 |
| Housing demand | 0.059 | 0.082 | 0.082 | 0.112 | 0.112 | 0.271 | 0.500 |
| **Mitigation rate** | **5%** | **10%** | **13%** | **15%** | **20%** | **35%** | **45%** |
| Units required | 0.003 | 0.008 | 0.011 | 0.017 | 0.022 | 0.095 | 0.225 |
| Fee required | $399 | $1,118 | $1,453 | $2,275 | $3,034 | $12,853 | $30,536 |
| Fee per Sq Ft | $0.50 | $0.93 | $0.85 | $1.14 | $1.21 | $2.57 | $4.07 |

Commercial Linkage – 2010

Commercial linkage is a requirement similar to residential linkage for addressing keep-up needs – it is based on the jobs created by new development and the resulting demand generated for affordable housing. It requires developers of new commercial space (does not apply to existing businesses or existing space) to provide or fund a portion of the affordable housing for which need is generated, usually by building it on site in mixed-use projects. Structuring the requirement as an impact fee also appears to be allowable based on the Gunnison County decision. Recommendations for commercial linkage are as follows:

- Ridgway and Ouray should adopt similar commercial linkage requirements; commercial development in the unincorporated county should be re-evaluated at a later date such that the requirements for commercial development in the unincorporated county may need to be more stringent to encourage job growth within the municipalities;

BLM_0066594

- The requirement should be based on only 5% of the estimated housing demand or impact generated by development in recognition of the importance of commercial uses to sustainability and the existing tax burden on commercial property under the Gallagher Amendment;

- The program should encourage on-site development of units but allow fees in lieu and off site development of affordable housing as options for compliance, based on community benefits, opportunities to utilize and leverage revenue, location and site attributes;

- Affordable housing provided on site should primarily be for moderate/middle income households (average of 100% AMI) such that the subsidy required is less than it would otherwise be to target households earning less than 80% of the AMI;

- A housing support study should establish the link between commercial development and the requirements imposed.

A commercial linkage program as proposed would generate 3.4 units, preferably on site above or behind commercial space. If fees in lieu are allowed, they would equate to $340,000 in total by 2015, or roughly $7.00 per square foot on the construction of new commercial/industrial space. While it is recognized that this fee for commercial development falls far short of the housing demand created by the development, the desire is to broadly share the workforce housing among all sectors while supporting development activity.

### Commercial Linkage Examples

| Size - square feet | 500 | 2000 |
|---|---|---|
| Jobs per 1,000 sq ft | 4 | 4 |
| Total jobs | 2 | 8 |
| Housing demand | 0.98 | 3.92 |
| **Mitigation rate** | **5%** | **5%** |
| Units Required | 0.049 | 0.196 |
| Fee Required (at 100% AMI) | $3,474 | $13,896 |
| Fee per Sq Ft | $6.95 | $6.95 |

BLM_0066595

Updating Needs/Revisiting Goals – 2011

Next year, the economy and housing market conditions may be sufficiently stabilized to determine the housing needs that still exist and to set quantitative objectives for addressing these catch-up needs. Information should be obtained from multiple sources and compared to the 2008 Needs Assessment to calculate changes and gaps. The specific information that should be obtained and considered includes:

- Unemployment rates and job numbers from the Colorado Department of Labor and Employment;

- Regional study with San Miguel County;

- Data from the Census Bureau on housing and commuting;

- MLS listings for home prices and availability;

- County Assessor data for sales in the prior year to determine if prices are stable or declining.

Depending upon conditions, some other goals or objectives of this plan may have shifted as well. This should be considered when revisiting the housing needs.

ADU Incentives – 2010/11

Offering incentives for the development of accessory dwelling units (ADU's) could address both catch-up needs and keep-up needs. In Ouray and Ridgway, possible incentives include:

- Deferral of waivers of tap fees; evaluation of programs in Ridgway and Ouray with possible modification and replication in the County;

- Using linkage fees and IZ fees in lieu to subsidize construction costs with permanent covenants on long-term rental occupancy.

The County does not have tap fees to waive/defer but could allow the construction of accessory units as a means for meeting IZ requirements to offer. Other opportunities for the County include:

- Increase maximum size of ADUs to 1000 sf;

- Eliminate requirement for proximity to primary residential unit;

- Close the employee housing loop hole in the land use code;

BLM_0066596

- Waive building permit fee for ADU if permitted simultaneously with primary residence.

<u>Low Income Housing Tax Credit Apartments - 2012</u>

Tax credits are available on a competitive basis from the Colorado Housing and Finance Authority (CHFA) for apartment projects that target households with incomes no greater than 60% AMI.  Housing authorities, non-profit organizations (like Mercy Housing and the Denver Archdiocese) and private developers can all utilize the credits.  Credits are often used to finance development of rental units by public/private partnerships.   While development of an apartment complex would not be appropriate in rural Ouray County, opportunities exist in both Ouray and Ridgway.  Recommendations include:

- The City of Ouray should set aside town-owned land suitable for the development of at least 10 apartment units and partner with a developer for design and eventual construction.

- Ouray County should consider the feasibility of using some or all of a County-owned parcel in within the City of Ouray for future apartment development.

- The Town of Ridgway should explore opportunities for partnering with a private or non-profit developer for construction of a small apartment project (up to 20 units) perhaps through dedication of future linkage fees to subsidize the development.

- Partnerships should be preferred over strictly private tax credit developments because the additional public subsidies could improve the quality of construction, reduce the number of units needed to be feasible, and influence their location and density. Opportunities may also exist to "package" a site in Ridgway and Ouray so that a single developer could construct both and enjoy some economy of scale.  Early on in the process, a Request for Qualifications should be issued to evaluate a number of firms and identify an appropriate partner for the development that will maximize the funds available for this community asset and consider the character, lifestyle, desires, etc. of the community.

- It is recommended that the OCHA work with all jurisdictions to identify grant, low-interest loan and tax-exempt bond opportunities that will subsidize the LIHTC development.  The OCHA should also create a specific public education and evaluation process for the development.

- Green building or energy-efficiency objectives should be incorporated into the LIHTC development (as well as all affordable housing units); OCHA should research resources whereby energy efficiency improvements are incorporated into the design and construction of buildings and financed over time.

BLM_0066597

- Construction should not be pursued immediately, however, since numerous rentals are now available. While most of these units are homes listed for sale with rents above levels that are affordable for low-income employees, the glut might result in a lowering of rents if allowed to prolong. Also, given economic conditions, new apartments might not be marketable at this time. Partnerships should be formed by 2011 when the timeline for construction dependent upon economic conditions at that time.

Use Tax - 2015

A tax on construction materials purchased outside of Ouray County (usually Montrose) could be used for affordable housing, if approved by voters. The tax could be levied by either or all of the jurisdictions, or by the OCHA. If the housing authority also assesses a sales tax along with the use tax, it could then charge an impact fee of $2.00 per square foot on all new construction. Summit County is the only jurisdiction to approve this tax/fee combination allowed by CRS 29-1-204.5. Reasons to consider a use tax for affordable housing include:

- A tax could provide an income stream for the housing authority that could be used for a variety of purposes including construction, land acquisition/banking, acquisition and buy down of existing units and administration.

- A use tax could pave the way for an impact fee, if a sales tax is also levied.

- Without a use tax, local businesses that sell construction materials are at a disadvantage since Montrose stores are not required to charge a sales tax on materials shipped into Ouray County; it is assumed that a use tax will eventually be passed to address this disparity and housing would be an appropriate beneficiary of the proceeds.

Board Development – 2009 – 2015

Board members need education in and exposure to affordable housing efforts elsewhere. In order to help guide the policies and operations of the housing authority, especially in light of limited resources to devote to staff, they must be knowledgeable about the powers of housing authorities, residential design and development, market conditions, housing needs and financing. Ways to develop the Board's expertise include:

- Memberships in the Colorado Housing and the National Association of Housing and Rehabilitation Officials (NAHRO);

- Attendance at the annual Housing Colorado NOW conference;

BLM_0066598

- Presentations to the Board by representatives of the Colorado Division of Housing and the Colorado Housing and Finance Authority (CHFA).

- Participation in bi-annual Regional Housing Authority Meetings currently facilitated by the San Miguel Regional Housing Authority

Priority Strategies Summarized

With the implementation of the recommendations made by this Action Plan, at least 163 affordable housing units should be produced or preserved by 2015. This estimate does not include a figure for ADU's or for units produced only through the provision of development incentives. It is also conservative in that it estimates only 7 units will result from residential linkage. In practice, fees in lieu of just over $1 million will be paid which, if leveraged by the OCHA, could potentially produce a higher number.

| Strategy | Income Target | Total Units | Ridgway | Ouray | Ouray Co. |
|---|---|---|---|---|---|
| Rehab/Weatherization | Low-Mid | 21 | 7 | 7 | 7 |
| Residential Linkage | Low | 7 | 3 | 1 | 3 |
| Commercial Linkage | Mod/Mid | 3 | 3 | 1 | 0 |
| Inclusionary Zoning | Mod/Mid | 104 | 72 | 8 | 24 |
| Tax Credit Apartments | Low | 27 | 18 | 9 | 0 |
| Total | | 163 | 103 | 26 | 34 |

The assumptions used in these projections should be reconsidered when housing needs are updated in 2011.

## V. Administration

Multi-disciplined expertise and extensive time will be needed to implement the strategies called for in this Action Plan. The most efficient and cost effective method for providing this expertise is through the centralization and coordination of housing programs county wide by the housing authority. Through the Authority, an incremental approach to development of administrative capacity is recommended to:

- Minimize start-up costs with increases in administrative expenditures as funds become available through fees and program income associated with inclusionary zoning, rehab and weatherization grants and loans;

BLM_0066599

- Reach a goal of financial independence from the municipalities and county through revenue generation and cost containment while continuing to offer fee-for-service program administration;

- Leverage local funds to pursue state and federal funding opportunities;

- Develop in-county capacity to administer programs; extensive reliance on regional agencies for program funding and service delivery is not desired long term.

This Plan recommends that all three jurisdictions allocate $26,375 in 2010 to the OCHA to put administrative systems into place and launch revenue-producing strategies. Furthermore, each jurisdiction should provide 51 hours of staff assistance to the effort in 2009 and 2010 on code drafting, supporting the establishment of a coordinated housing rehab and weatherization program, grant writing and general organizational development. A detailed budget is included in the appendix.

A three-phase incremental approach to administration is recommended with a 2-year start-up period followed by a 5-year growth period reaching sustaining levels by 2015. Each task associated with these phases has been identified. In most cases, tasks will carry forward – they are not one-time jobs. As planned, the Housing Authority will be accountable for the entire list of tasks by 2015, and will be responsible for them on an ongoing basis thereafter.

**Start-Up Phase (2009 – 2010)**

Organizational Development Tasks
- Obtain insurance, possibly in the short-term through the Town of Ridgway's CIRSA policy with the objective of carrying an insurance policy specific to the Authority by 2010
- Amend Multi-jurisdictional IGA to provide for an independent Authority not subject solely to fee-for-service parameters as is currently defined but rather to create a sustaining, stand-alone entity; obtain Bond Attorney review for TABOR constraints, amending as applicable
- Develop and execute IGA's/agency agreements with regional organizations through which financial assistance and services are to be obtained
- Put a financial management/accounting system into place with separate accounts for each fee-generating program
- Establish fee collection system
- Support Board meetings – packets, public notices, minutes
- Create and take lead on public relations
- Set up and maintain a web site
- Develop 2010 budget requests for each jurisdiction

Program Implementation

- Coordinate with the three jurisdictions on final design and drafting of code language for IZ, linkage requirements and incentives
- Draft deed restrictions and restrictive covenants including mechanism for keeping rents affordable and for controlling occupancy of accessory dwellings.
- Write and administer grant applications
- Write guidelines for developers and administrative procedures for the sale and rental of affordable units.
- Establish unit tracking system – address, date approved, CO date, # bdrms, sq ft, initial sales price, resale prices, AMI target, # occupants
- Support rehab/weatherization with coordination among funding agencies, public outreach and home inspections
- Provide counseling to residents in need of housing assistance; serve as a clearinghouse for all housing services
- Annually update incomes, prices and fee in lieu amounts

## Growth Phase -- Additional Responsibilities (2011 – 2015)

- Review development applications to determine compliance with IZ and linkage requirements
- Negotiate compliance alternatives – on site, off site, fees in lieu, land in lieu
- Qualify applicants
- Conduct lotteries if needed
- Administer deed restrictions; calculate resale prices
- Manage revenues, report to funding agencies
- Form partnerships for tax credit apartment projects on public land
- Periodically update Action Plan; prioritize allocation of funds

## Sustainable Operations – Long Term

- Develop senior housing
- Monitor IZ/linkage/incentive effectiveness; make modifications as needed
- Comply with quarterly and annual reporting requirements from various funding agencies – HUD, Colorado Div. of Housing, CHFA
- Monitor key community/housing metrics on regular basis; update housing needs assessment as appropriate
- Manage/maintain properties
- Negotiate for the purchase of land as opportunities become available

BLM_0066601

## Timeline Summarized

|  | Strategy Implementation | Administrative Tasks |
|---|---|---|
| 2009 | Rehabilitation & Weatherization<br>Annexation Policies<br>Homeownership Counseling and<br>Mortgage Assistance | IGA's; Insurance<br>Grant applications<br>Financial management system<br>Fee collection system<br>Public relations; web site<br>Set up rehab program |
| 2010 | Inclusionary Zoning<br>Development Incentives<br>Commercial Linkage<br>Residential Linkage | Code drafting – IZ & linkage<br>Deed restrictions<br>Development of guidelines<br>Unit tracking system<br>Update incomes, prices, fees in lieu |
| 2010/11 | ADU Incentives<br>Needs Updating | Clearinghouse for housing assistance<br>Development review/negotiation<br>Applicant qualification/selection |
| 2012 | Tax Credit Apartments | Partnership development |
| 2015+ | Use Tax | Senior housing development<br>Program monitoring<br>Compliance reporting<br>Negotiate land acquisition |

BLM_0066602

# Appendix

A.  Path to Housing
B.  Update to Key Housing Needs Assessment Figures
C.  Strategic Plan Model
D.  Authority of Local Governments to Impose Requirements on Development to Address the Needs for Affordable Housing
E.  Intergovernmental Agreement  between OCHA and Ouray County
F.  2009 Income Median Incomes and Affordable Purchase Prices
G.  Proposed 2010 OCHA Budget

BLM_0066603

# Appendix A
## PATH LEADING TO AFFORDABLE HOUSING IN OURAY COUNTY

Ouray County Master Plan
- Acknowledges attainable housing is more scarce with growth and recognizes the need for a "diverse and varied population" to achieve social and economic balance in the County
- Stated goal "to assure the continuing availability of diverse housing to meet the needs of the County's growing population" and considers land use code changes to address housing needs

2000 Town of Ridgway Master Plan Update
- Arising from survey data and public input Goal IX of the Master Plan states "Encourage the availability of attainable housing within the town"
- In the Master Plan the Town states the objective to work with Ouray County toward establishing attainable housing

City of Ouray Master Plan
- Preserve the existing housing stock to ensure quality residential areas
- Develop regulations to create affordable housing opportunities

2002 Ridgway/ Ouray County and Ouray/ Ouray County IGAs
- Focus growth within established municipal areas to preserve character of the County

2006 Blue Ribbon Panel on Housing
- Statewide study on housing affordability establishes format and criteria for housing assessments and funding for assessment becomes available through DOLA

2007 Ouray County Multi-Jurisdictional Housing Authority Established
- Ouray County, City of Ouray and Town of Ridgway enter into an intergovernmental agreement to actively address county-wide housing needs

2008 Housing Needs Assessment Completed
- 33% of Employees in Ouray commute from outside Ouray
- 75% Ridgway Employees commute from outside Ridgway
- The median sale price for ownership housing has increased 11.6 percent annually since 2003 from $255,000 to $395,000
- In Ouray County Real Wages up only 2.1%  (2000–2006)
- New Residents Pay ~$1600 - 1800/ mo for housing
- No/ Little permanent affordability in Ouray County
- "Catch Up" (149 units); "Keep Up" (176 - 264 units by 2015)
- 73% survey respondents indicate housing options as insufficient
- 85% survey respondents say lack of affordable housing is a problem

2008 Town of Ridgway Housing Task Force Established

2008 Ouray County LIHTC Feasibility Assessment

BLM_0066604

Social and Environmental Costs
- As a result of households commuting across counties to get to work the region surrounding and including Ouray County has completed a Transit Survey and is now looking at Regional Transportation Objectives
- Emergency Service providers are responding from their homes outside of Ouray County, increasing the response time for emergencies
- Etc., etc., etc.

BLM_0066605

## Appendix B
### OURAY COUNTY UPDATE TO KEY HOUSING NEEDS ASSESSMENT FIGURES

### Population, Household and Housing Unit Estimates

| Year | Area | Total Population | Average HH Size | Total Housing Units | Occupied Housing Units | Vacant Housing Units | Vacancy Rate |
|---|---|---|---|---|---|---|---|
| 2009 | Ouray County | 4,738 | 2.37 | 3,196 | 1,987 | 1,209 | 38% |
| | Ouray | 891 | 2.14 | 755 | 412 | 343 | 45% |
| | Ridgway | 1,147 | 2.50 | 613 | 459 | 154 | 25% |
| | Unincorporated | 2,701 | 2.41 | 1,829 | 1,117 | 711 | 39% |
| 2015 | Ouray County | 5,648 | 2.38 | 4,701 | 2,362 | 2,339 | 50% |
| | Ouray | 960 | 2.14 | 951 | 444 | 507 | 53% |
| | Ridgway | 1,581 | 2.50 | 1,157 | 633 | 524 | 45% |
| | Unincorporated | 3,106 | 2.41 | 2,594 | 1,286 | 1,308 | 50% |
| 2015 | EPS – Ouray County | 5,846 | | | 2,703 | | |

### Job/Employment Estimates and Projections

| Job Type | 2000 | 2009 est. | 2015 est. | EPS 2015 Estimate |
|---|---|---|---|---|
| Proprietors* | 648 | 1,089 | 1,539 | 2,617 |
| Wage and Salary Jobs** | 1,338 | 1,909 | 2,419 | 1,168 |
| Total Jobs | 1,986 | 2,998 | 3,959 | 3,785 |

Projections based on rate of growth as between 2000 and 2006/07.
Difference w/ EPS – rate of growth in proprietors 2005 and 2006.

***EPS estimated 3,785 jobs by 2015. One main difference in our higher number is the jump in proprietors between 2005 and 2006, with a total of 127 new in one year (averaged an increase of 28 per year between 2000 and 2005).

BLM_0066606

### *Employment by Industry*

| | 2006 | 2007 | % Change 2006 to 2007 |
|---|---|---|---|
| Accommodation and Food Services | 29.6% | 28.7% | -0.9% |
| Construction | 16.5% | 17.8% | 1.3% |
| Retail Trade | 11.1% | 11.4% | 0.3% |
| Public Administration | 9.0% | 9.4% | 0.4% |
| Educational Services | 8.1% | 8.4% | 0.3% |
| Professional and Technical Services | 2.7% | 3.9% | 1.2% |
| Finance and Insurance | 2.9% | 3.1% | 0.2% |
| Agriculture, Forestry, Fishing & Hunting | 2.8% | 3.0% | 0.2% |
| Health Care and Social Assistance | 2.7% | 2.6% | -0.1% |
| Information | 2.3% | 2.0% | -0.3% |
| Utilities | 1.7% | 1.7% | 0.0% |
| Manufacturing | 2.2% | 1.7% | -0.5% |
| Administrative and Waste Services | 1.6% | 1.7% | 0.1% |
| Real Estate and Rental and Leasing | 1.8% | 1.6% | -0.2% |
| Other Services, Ex. Public Admin | 1.4% | 1.6% | 0.2% |
| Arts, Entertainment, and Recreation | 1.8% | 1.4% | -0.4% |
| Transportation and Warehousing | 0.9% | 0.9% | 0.0% |
| Wholesale Trade | 0.7% | 0.7% | 0.0% |
| Mining | 0.2% | 0.1% | -0.1% |
| Management of Companies and Enterprises | 0.1% | 0.1% | 0.0% |
| | 100.0% | 100.0% | |

Source: QCEW

BLM_0066607

## 2008 Ouray County Employment & Unemployment

| Period | Civilian Labor Force | Employment | Unemployment | Unemployment Rate (%) |
|---|---|---|---|---|
| January | 2,925 | 2,824 | 101 | 3.5 |
| February | 2,833 | 2,724 | 109 | 3.8 |
| March | 2,866 | 2,759 | 107 | 3.7 |
| April | 2,847 | 2,739 | 108 | 3.8 |
| May | 3,105 | 2,987 | 118 | 3.8 |
| June | 3,575 | 3,454 | 121 | 3.4 |
| July | 3,611 | 3,495 | 116 | 3.2 |
| August | 3,555 | 3,442 | 113 | 3.2 |
| September | 3,320 | 3,210 | 110 | 3.3 |
| October | 3,201 | 3,074 | 127 | 4.0 |
| November | 3,098 | 2,958 | 140 | 4.5 |

Source: LAUS

## Workers Commuting into Ouray County

| 1990 – 2000 Trend Projected to 2009 | # commute | % commute |
|---|---|---|
| 1990 | 221 | 22.2% |
| 2000 | 325 | 20.2% |
| 2008 | 442 | 18.7% |
| 2009 | 460 | 18.6% |
| | | |
| EPS Employer Survey - 2006 | 310 | 17.9% |
| | | |
| LEHD* - 2006 | 517 | Not specified |

*Longitudinal Employer Household Dynamics, Census Bureau

BLM_0066608

### Unemployment



| | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | 4.0 | 3.8 | 3.5 | 2.8 | 2.5 | 2.1 | 2.0 | 2.1 | 2.0 | 2.1 | 2.8 | 2.9 |
| 2001 | 3.6 | 3.4 | 3.6 | 3.1 | 2.7 | 2.5 | 2.1 | 2.1 | 2.4 | 3.0 | 3.9 | 4.0 |
| 2002 | 4.9 | 4.4 | 4.2 | 4.8 | 4.1 | 3.8 | 3.4 | 3.1 | 3.5 | 3.7 | 4.8 | 4.6 |
| 2003 | 5.3 | 5.5 | 6.0 | 5.3 | 5.0 | 4.1 | 3.8 | 3.5 | 3.9 | 3.9 | 4.3 | 4.2 |
| 2004 | 5.0 | 5.1 | 4.7 | 4.7 | 4.2 | 3.4 | 3.3 | 2.9 | 3.3 | 3.8 | 4.6 | 4.3 |
| 2005 | 4.4 | 4.4 | 4.3 | 4.4 | 3.8 | 3.1 | 2.9 | 2.7 | 3.0 | 3.3 | 3.8 | 3.1 |
| 2006 | 3.8 | 3.7 | 3.6 | 3.9 | 3.5 | 3.0 | 2.8 | 2.8 | 2.7 | 2.5 | 3.1 | 2.9 |
| 2007 | 3.4 | 3.1 | 3.2 | 3.0 | 3.0 | 2.8 | 2.7 | 2.6 | 2.8 | 3.0 | 3.4 | 3.4 |
| 2008 | 3.5 | 3.8 | 3.7 | 3.8 | 3.8 | 3.4 | 3.2 | 3.2 | 3.3 | 4.0 | 4.5 | |

Source: LAUS

### Unemployment



BLM_0066609

### Ouray County Sales

| | 2007 | 2008 |
|---|---|---|
| **Single-Family** | | |
| Average | $569,375 | $500,724 |
| Median | $397,000 | $374,000 |
| N | 131 | 57 |
| | | |
| **Condo/Townhome** | | |
| Average | $329,767 | $312,040 |
| Median | $330,000 | $295,000 |
| N | 15 | 26 |
| | | |
| **Mobile*** | | |
| Average | $50,000 | $50,457 |
| Median | $50,000 | $50,000 |
| N | 2 | 7 |
| | | |
| **Overall** | | |
| Average | $538,072 | $411,195 |
| Median | $379,450 | $310,000 |
| N | 148 | 90 |

Source: County Assessor website

### Current Listings – Ouray County 1.16.09

| | |
|---|---|
| Average | $690,326 |
| Median | $495,000 |
| High | $7,200,000 |
| Low | $139,000 |
| N | 195 |

Source: MLS

BLM_0066610

**Current Listings by Price Range– Ouray County 1.16.09**

| Current Listings | # | % |
|---|---|---|
| $100,000-$199,999 | 11 | 5.6% |
| $200,000-$299,999 | 28 | 14.4% |
| $300,000-$399,999 | 36 | 18.5% |
| $400,000-$499,999 | 35 | 17.9% |
| $500,000-$599,999 | 17 | 8.7% |
| $600,000-$699,999 | 17 | 8.7% |
| $700,000-$799,999 | 11 | 5.6% |
| $800,000-$899,999 | 7 | 3.6% |
| $900,000-$999,999 | 8 | 4.1% |
| $1,000,000-$1,499,999 | 10 | 5.1% |
| $1,500,000-$1,999,999 | 8 | 4.1% |
| $2,000,000 or more | 7 | 3.6% |
| | 195 | 100.0% |

**Adjustments to Need Estimates**

| Catch Up Need | EPS Estimate - 2006 | Adjustments |
|---|---|---|
| From unfilled jobs | 55 FTE<br>= 39 units | 1 pt increase in unemployment<br>= ? change in unfilled jobs |
| Commuting | 310 commuters<br>= 220 households<br>X 50%**<br>= 110 units | 460 commuters<br>= 225 households*<br>X 50%**<br>= 113 units |
| Total  Catch Up Need | 149 units | |
| | | |
| **Keep Up Need** | | |
| From new jobs | 1,233 more jobs<br>= 881 units | 961 more jobs<br>= 471 units* |
| Not served by market | 20% – 30%<br>=176 – 264 units | 58%<br>= 273 units |
| From Retirement | N/A | ? |

*Based on 1.2 jobs per employee and 1.7 employees per unit – general rule in mountain towns.  ** No basis for assumption

BLM_0066611

# APPENDIX C
## STRATEGIC PLAN MODEL SUMMARY

| Model Summary | Income | Total Units | Ridgway | Ouray | Ouray County |
|---|---|---|---|---|---|
| *Catch-Up Goal* | | 50 | 28 | 14 | 9 |
| Rehab/Weatherization | Low/Mid | 21 | 7 | 7 | 7 |
| Tax Credit Apts | Low | 27 | 18 | 9 | 0 |
| Catch Up | | 48 | 25 | 16 | 7 |
| | | | | | |
| *Keep-Up Goal* | | 160 | 88 | 45 | 27 |
| Residential Linkage | Low | 7 | 3 | 1 | 3 |
| Commercial Linkage | either/both | 3 | 60 | 7 | 20 |
| Inclusionary Zoning | Mod/Mid | 104 | 72 | 8 | 24 |
| Total | | 115 | 135 | 16 | 47 |

BLM_0066612

## Appendix D

### AUTHORITY OF LOCAL GOVERNMENTS TO IMPOSE REQUIREMENTS ON DEVELOPMENT TO ADDRESS THE NEED FOR AFFORDABLE HOUSING

#### Prepared for:  Ouray County Multi-Jurisdictional Housing Authority

PREPARED BY:
BARBARA J.B. GREEN
SULLIVAN GREEN SEAVY
2969 BASELINE RD.
BOULDER, CO 80303
303 355 4405
lawgreen@earthlink.net

March 4, 2009

BLM_0066613

AUTHORITY OF LOCAL GOVERNMENTS TO IMPOSE REQUIREMENTS ON DEVELOPMENT FOR AFFORDABLE HOUSING

I.      **Introduction.**

Several communities in Colorado have developed affordable housing programs that include inclusionary zoning and fee requirements.  Inclusionary zoning is a requirement imposed on new residential development that mandates that a certain portion of the units constructed be "affordable" to some segment of the local population.  Some communities give the developer the option to satisfy this obligation by dedicating land to the local government for the construction of affordable housing or by paying fees in lieu of constructing new units. Fees often consist of a charge that is levied per square foot of new construction and are referred to as linkage fees. Under Colorado law, there is no express statutory authority to implement a program which imposes requirements that are designed to address the need for affordable housing caused by new construction. Nor are there any Colorado cases that directly address the authority of local governments to implement such programs.  Such authority, however, arguably falls within the scope of local government land use and zoning powers.  In addition, some linkage fees may be authorized under the Impact Fee Statute.  Each member of the Ouray County Multi-Jurisdictional Housing Authority should consult with its attorney prior to enacting any affordable housing requirements.

II.     **Authority Derived from General Land Use Authority**

A.      **Inclusionary Zoning.**
No Colorado statute directly confers express authority on local governments to impose requirements on new development to address the need for affordable housing.  Arguably, however, that authority is implied by the General Assembly's grant of authority to regulate the use and development of land.  Under this point of view, inclusionary zoning, and fees assessed in lieu of inclusionary zoning, are efforts to reverse the impact of exclusionary land use policies that have diminished the supply of affordable housing and created an imbalance between jobs and housing availability. (These policies have come to be called "exclusionary zoning" because they have effectively excluded affordable housing, exacerbating patterns of racial and economic segregation.)  Inclusionary zoning and the fees assessed in lieu of such zoning thus are an exercise of zoning and land use power in furtherance of the general welfare.

Although Colorado courts have never considered whether local government authority extends to programs designed to mitigate the impact of new development on the need for affordable housing, such programs have been upheld in other jurisdictions as a proper exercise of land use authority. For example, a court found that a requirement that developers pay into an affordable housing fund was authorized by the same land use authority that allows local

BLM_0066614

governments to enact "inclusionary" zoning ordinances.[1] The United States Supreme Court has takes an expansive view of zoning and land use power so long as it serves the general welfare.[2] And housing needs are related to the general welfare under zoning laws.[3]

B.      **Local Government Planning and Zoning Powers**

The General Assembly has delegated broad land use and zoning authority to local governments.  The County Planning and Building Codes empower counties to plan and zone all or any part of the unincorporated territory within its jurisdiction to provide for its physical development.[4] Similarly, the governing body of each municipality is empowered to regulate and restrict the use of land.[5]   Local governments also have broad authority to address growth-related impacts.  For example, the General Assembly enacted the Land Use Enabling Act in recognition that "rapid growth and uncontrolled development may destroy Colorado's great resource of natural scenic and recreational wealth." [6] Further, "the policy of this state is to clarify and provide broad authority to local governments to plan for and regulate the use of land within their respective jurisdictions." [7]   Colorado's Land Use Act contains a finding and declaration that "the rapid growth and development of the state and the resulting demands on its land resources make new and innovative measures necessary to encourage planned and orderly land use development" and "to provide for the needs of . . . residential communities.[8] Finally, the legislature also promotes the policy of having development help pay its own way. [9]

The provision of affordable housing is clearly among the areas of concern delegated to local governments.  For example, counties may plan for the "general character, location, and extent of community centers, townsites, housing developments, whether public or private, the existing, proposed, or projected location of residential neighborhoods and sufficient land for future housing development for the existing and projected economic and other needs of all current and anticipated residents of the county or region. . ."[10] Statutes also require that a municipality's land use plan address the "harmonious development of the municipality and its environs which will, in accordance with present and future needs, best promote health, safety, order, convenience, prosperity, and general welfare, as well as efficiency and economy in the process of development, including . . . affordable housing."[11] Given the broad scope of land use authority granted to local governments, it is reasonable to assume that local governments have

---

[1]  See *Holmdel Builders 11 Association v. Township of Holmdel*, 121 N.J. 550 (N.J. 1990) (development fees for housing are the "functional equivalent of mandatory set-asides" for affordable housing under zoning authority).
[2]  See *Village of Belle Terre v. Boraas*, 416 U.S. 1, 39 L.Ed. 2d 797 (1974).
[3]  Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98,102, 99 L.Ed. 27, 28 (1954).
[4] C.R.S. § 30--28--101 to ---209
[5] C.R.S. § 31--23--301 et seq.
[6] *Theobald v. Bd. of County Comm'rs,* 644 P.2d 942, 947 (Colo.1982).
[7]  C.R.S. § 29--20—102.
[8]  C.R.S. § 24-65-102.
[9] *See Board of County Comm'rs v. Bainbridge, Inc.,* 929 P.2d 691, 698 (Colo.1996); *Bennett Bear Creek Farm Water & Sanitation Dist. v. City & County of Denver,* 928 P.2d 1254, 1268 (Colo.1996).
[10] C.R.S. § 30-28-106(3)(a)(VII)..
[11]  C.R.S. § 31-23-207.

BLM_0066615

the power to use their zoning authority to enact inclusionary zoning requirements and linkage fees to provide affordable housing necessitated by development.[12]

## C.   Methodology

### 1.   Reasonable relationship to a legitimate governmental purpose.

Assuming that an affordable housing requirement is legislatively-adopted as an exercise of local government zoning and land use authority, the requirement should be upheld if it is reasonably related to a legitimate governmental purpose. Even where the reasonableness of a land use ordinance is fairly debatable, it will be upheld by the court.[13]   The general purpose of a valid housing requirement would be to protect the general welfare by providing for affordable housing.

### 2.   Methodology

a.   The Rough Proportionality Test does not apply to a legislatively adopted housing fee.   The so-called "rough proportionality test" is a reference to a test first established by the United States Supreme Court in *Nollan v. California Coastal Commission*[14] and *Dolan v. City of Tigard*[15] to address development exactions.  Exactions are conditions of approval on land use permits that require the dedication of land to the public. Such "development exactions will be deemed takings requiring just compensation unless they satisfy a two part test: there must be an `essential nexus' between the legitimate government interest and the exaction demanded; and there must be `rough proportionality' between the governmental interest and the required dedication." [16]

In 1999, the General Assembly enacted the Takings Act which addresses regulatory takings associated with exactions as described in *Nollan* and *Dolan.* The Act requires a local government when imposing "conditions upon the granting of land-use approvals" that require the dedication of real property or payment of money "in an amount that is determined on an individual and discretionary basis" to demonstrate that "there is an essential nexus between the dedication or payment and a legitimate local government interest, and the dedication or payment is roughly proportional both in nature and extent to the impact of the proposed use or development of such property."[17] The Act does not apply " to any legislatively formulated assessment, fee, or

---

[12]  See e.g. *Droste v. Board of County Commissioners,* 159 P.3d 601 (Colo. 2007)(General Assembly's grant of land use authority necessarily implies authority to impose moratorium).
[13]  See *Nopro Co. v. Town of Cherry Hills Village,* 180 Colo. 217, 504 P.2d 344 (1972).
[14]  483 U.S. 825 (1987).
[15]  512 U.S. 374 (1994).
[16]  See *Krupp v. Breckenridge Sanitation Dist.,* 19 P.3d 687, 695 (Colo. 2001); *Wolf Ranch, LLC v. City of Colorado Springs*, ___ P.3d___ (Case No. 07CA2184).
[17]  § 29-20-203(1), C.R.S. 2008.

BLM_0066616

charge that is imposed on a broad class of property owners by a local government."[18] Colorado courts are clear that legislatively-adopted fee is not the kind of land use decision that would obligate the local government to perform the type of individualized impact assessment imposed by the rough proportionality test.[19]

   b. <u>The Housing Fee should be reasonable.</u> There are no cases in Colorado that dictate how the amount of inclusionary requirements or linkage fees should be determined.  For charges that are intended to defray the cost of providing services, the court has held that "the amount of the fee must be reasonably related to the overall cost of the service."[20] and "[m]athematical exactitude is not required, however, and the particular mode adopted by the governmental entity in assessing the fee is generally a matter of legislative discretion.[21] This type of test probably would apply to any affordable housing requirement.

## II. <u>The Impact Fee Statute</u>

  In addition to being authorized by general land use and zoning authority, certain linkage fees may be authorized under the Colorado Impact Fee Statute.[22] ( Currently, Gunnison County's workforce housing fee is being challenged under this statute.  The issues in that case is whether Gunnison County's fee was properly calculated and whether the fee is an unlawful tax.) The Impact Fee Statute authorizes local governments to adopt impact fees to defray impacts on capital facilities.  A capital facility is defined as any improvement or facility that (a) is directly related to any service that a local government is authorized to provide; (b) has an estimated useful life of five years or longer; and (c) is required by the charter or general policy of a local government pursuant to a resolution or ordinance.[23]

  A.  **Summary of the Impact Fee Statute**

  The Impact Fee Statute sets forth the requirements for a valid fee:

(1) The impact fees must be "[l]egislatively adopted" C.R.S. § 29-20-104.5(1)(a);
(2) They must be "[g]enerally applicable to a broad class of property" C.R.S. § 29-20-104.5(1)(b);
(3) They must be " [i]ntended to defray the projected impacts on capital facilities caused by proposed development" C.R.S. § 29-20-104.5(1)(c);

---

[18] Id.
[19] See *Krupp* and *Wolf Ranches*, supra, at note 16.
[20]  *Krupp* at 693-694.
[21] Id.
[22] C.R.S. 29-20-104.5
[23] C.R.S. § 29-20-104.5(4)

BLM_0066617

(4) ) The "reasonable impacts of the proposed development on existing capital facilities" must be quantified and established "at a level no greater than necessary to defray such impacts directly related to proposed development" and not imposed fee "to remedy any deficiency in capital facilities that exists without regard to the proposed development." C.R.S. § 29-20-104.5(2) and

(5) The impact fees must "include provisions to ensure that no individual landowner is required to provide any site specific dedication or improvement to meet the same need for capital facilities for which the impact fee or other similar development charge is imposed." C.R.S. § 29-20-104.5(3).

## B.        Supporting Rationale for a Housing Fee under the Impact Fee Statute

Where a local government relies on the Impact Fee Statute to authorize a linkage fee, the amount of the legislatively-adopted fee should be supported by a study that quantifies the projected impacts of development on the need for affordable housing.  The study must ensure that the local government sets the fee "at a level no greater than necessary to defray such impacts [on the availability of affordable housing] directly related to proposed development."[24]

### 1.        No individualized determination required.

The Impact Fee Statute does not require the local government to perform an individualized determination of the impacts of any particular development proposal, it simply requires quantification of the impacts of development in general. An individualized determination would be required only when the amount of the fee is "determined on an individual and discretionary basis. . ."[25] In other words, the local government would not be required to analyze the impacts of a particular development on the availability of affordable housing unless the fee were being imposed on an *ad hoc* basis to a particular development rather than through a legislatively formulated assessment that is imposed on a broad class of property owners by a local government.[26] The reasonableness of the costs to be recovered through the housing fee should be evaluated in relation to the impacts of all development on the availability of affordable housing.[27]

### 2.        Methodology.

The Impact Fee Statute does not dictate a particular methodology which the local government must apply in support of any impact fee.  However, in the case of a linkage fee, a reasonable approach would be to determine the number of workers that would be generated by new development, calculate the demand for affordable housing units associated with those

---

[24] Id at -104.5(2)

[25] C.R.S. § 29-20-203 (1)

[26] *See  Wolf Ranch, LLC v. City of Colorado Springs,* __ P.3d __,(Colo. App. 2008) (imposition of legislatively-adopted fees not the type of land use decision that would trigger an individualized impact assessment).

[27] Carolynne White, *A Municipal Perspective on Senate Bill 15: Impact Fees,* 31 Colo. Law. 93 (May 2002).

BLM_0066618

workers, and then set the fee on the basis of the cost to provide those units.  The local government must be careful that the fee is not used to address the need for affordable housing that already may exist in the community without regard to proposed development.  Thus, the local government should set the amount of the fee to meet some portion of the need for housing generated by new development so that there is no argument that it is using the fee to make up for existing deficiencies in the supply of affordable housing.

III.  **<u>Conclusion</u>**

Although there is no express statutory authority for a local government to impose requirements on new development that are designed to address the need for affordable housing, such authority arguably can be found within the zoning and land use powers that have been granted to local governments.  Under this analysis, the inclusionary requirement would be a simple exercise of zoning power and the linkage fee would be characterized as a few in lieu of inclusionary zoning. This approach has been upheld in other jurisdictions.  The Impact Fee Statute may also provide authority to impose a linkage fee.  As an exercise of zoning authority, a housing requirement should be reasonable and bear a reasonable relationship to the cost of providing affordable housing caused by new development.  Under the Impact Fee Statute, the local government must quantify the reasonable impacts of proposed development and the linkage fee can be no greater than the amount necessary to defray the impacts of proposed development on the availability of affordable housing.

The County and each municipality enacting an affordable housing requirement should be sure to cite to all of the various authorities in state statute when it adopts the resolution or ordinance enacting the housing program.  In addition, a study that draws the link between new development and the need for affordable housing should be conducted.  At a minimum, the study should satisfy the requirements of the Impact Fee Statute if there will be a linkage fee.  To be conservative, the study should be designed to satisfy the "rough proportionality" test even though that test applies only to exactions and the payment of money demanded on an *ad hoc* basis.  By satisfying this more stringent test, the housing requirements should withstand judicial scrutiny.  We will be preparing this type of study for the Ouray County Multi-Jurisdictional Housing Authority.

BLM_0066619

## Appendix E

### INTERGOVERNMENTAL AGREEMENT BETWEEN
### THE CITY OF OURAY, COLORADO
### THE TOWN OF RIDGWAY, COLORADO, AND
### THE BOARD OF COUNTY COMMISSIONERS OF OURAY COUNTY
### ESTABLISHING A MULTIJURISDICTIONAL HOUSING AUTHORITY

**THIS INTERGOVERNMENTAL AGREEMENT** is made and entered into this_____ day of _____, 2007, by and between the **CITY OF OURAY, COLORADO** (hereinafter "Ouray"), a Colorado municipal corporation, the **TOWN OF RIDGWAY, COLORADO** (hereinafter "Ridgway"), a Colorado home rule municipality, and **THE BOARD OF COUNTY COMMISSIONERS OF OURAY COUNTY, COLORADO** (hereinafter "Ouray County"), a Colorado county, collectively referred to in this Intergovernmental Agreement ("IGA") as the "Parties."

### RECITALS

**WHEREAS,** the Parties wish to encourage and support a coordinated effort to provide housing that is affordable to residents of their respective jurisdictions in a manner that will preserve the regional community; and

**WHEREAS,** the Parties have determined that formation of a multijurisdictional housing authority is an appropriate and effective method for pursuing the affordable housing objectives stated above; and

**WHEREAS,** the Parties are each authorized by Article XIV, Section 18 of the Colorado Constitution and the Multijurisdictional Housing Authority Act, Section 29-1-204.5, C.R.S. (hereinafter the "Act') to contract with each other to establish a separate governmental entity known as a multijurisdictional housing authority; and

**WHEREAS,** the Parties desire to establish a multijurisdictional housing authority by and subject to the provisions of this IGA.

**NOW THEREFORE,** in consideration of their mutual covenants and the benefits to be received by each of them, the Parties hereby agree as follows:

### TERMS

### 1. CREATION, NAME, BOUNDARIES, PURPOSE, STATUS

1.1     Creation; Name. The Parties hereby establish a multijurisdictional housing authority named the "Ouray County Housing Authority" (the "Authority").

BLM_0066620

1.2     Boundaries. The boundaries of the Authority shall be coterminous with the boundaries of Ouray County, Colorado.

1.3     Purposes. The Authority is established for the purposes of effecting the planning, financing, acquisition, construction, reconstruction, repair, maintenance, management and operation of existing and new affordable housing together with any other purposes deemed appropriate by the Authority as are now or subsequently permitted or authorized for multijurisdictional housing authorities by applicable law.

1.4     Type of Entity. The Authority shall be a political subdivision and public corporation of the State of Colorado and separate from the City of Ouray, the Town of Ridgway, and Ouray County and shall be a validly created and existing political subdivision and public corporation of the State of Colorado. It shall have the duties, privileges, immunities, rights, liabilities, and disabilities of a public body, political and corporate. The Authority may deposit and invest its moneys in the manner provided in Section 43-4-616, C.R.S. The provisions of Articles 10.5 and 47 of Title 11, Colorado Revised Statutes, shall apply to moneys of the Authority. The Authority shall be an Enterprise as that term is defined in the Taxpayer's Bill of Rights, Article 10, Section 20 of the Constitution of Colorado. In order to retain its Enterprise status under Colorado law, the Authority shall not receive more than 10% of its annual revenues in grants from all Colorado state and local governments combined.

1.5     Functions-General. The Authority shall have any and all powers, duties, rights and obligations as such are set forth in the Act except as specifically provided herein. The Authority shall also have those duties and powers stated below, and any others delegated to the Authority by the Parties to this IGA. The power of the Authority to levy, within the boundaries of the Authority, a sales tax, a use tax, and/or ad valorem tax and/or development impact fee for affordable housing is subject to specific provisions to be negotiated between the Parties in the form of a future Intergovernmental Agreement and any applicable statutory requirements. No action by the Authority to establish or increase any tax or development impact fee shall take effect unless first submitted to a vote of the registered electors of the Authority in which the tax or development impact fee is proposed to be collected.

1.6     No Waiver of Governmental Powers. Nothing contained in this Agreement shall constitute a waiver by the City of Ouray, the Town of Ridgway or Ouray County of any of their respective or joint planning, zoning, land use or other governmental authority or powers. All projects of the Authority shall be subject to the planning, zoning, sanitary, and building laws, ordinances, and regulations applicable to the locality in which a project is situated.

## 2. DUTIES OF THE AUTHORITY

The Authority shall undertake any and all duties and or responsibilities as may from time to time be assigned to it and funded by one, two or all of the Parties.

BLM_0066621

### 3. POWERS OF THE AUTHORITY

In addition to any other powers provided by applicable law, the Authority shall have the following powers:

3.1     To plan, finance, acquire, construct, reconstruct or repair, maintain, manage and operate housing projects and programs pursuant to a multi-jurisdictional plan within the means of families of low or moderate income.

3.2     To plan, finance, acquire, construct, reconstruct or repair, maintain, manage, and operate affordable housing project or programs for employees of employers located within the jurisdiction of the Authority.

3.3.     To identify the need for affordable housing for the population segments identified by the Authority residing, or needing to reside in Ouray County.

3.4     The power, but not the duty or obligation, to develop creative financing and construction methods, as well as incentives, in order to encourage the public or private sector to provide affordable housing for families and individuals in Ouray County.

3.5     To plan, finance, acquire, construct, reconstruct or repair, maintain, manage, own, operate, rent and/or sell housing projects to provide affordable residential facilities and dwelling accommodations intended for use as the sole place of residence by the owners or intended occupants, subject to the applicable governmental requirements (such as zoning, review and approval processes) of the jurisdiction in which the particular property is located.

3.6     To make and enter into agreements, including, without limitation, contracts with local, state or federal agencies, private enterprises, and nonprofit organizations, also involved in providing such housing or the financing for such housing.

3.7     To employ agents and employees.

3.8 To cooperate with state and federal governments in all respects concerning the financing of such housing projects.

3.9     To purchase, acquire, obtain options for, hold, lease (as lessor or lessee), sell or otherwise dispose of any real or personal property, commodity, or service from firms, corporations, the City of Ouray, the Town of Ridgway, Ouray County and other governmental entities or any other person or entities.

3.10     To condemn property for public use, provided such property is not owned by any governmental entity or any public utility and devoted to public use pursuant to state authority; and provided, further, both that the vote of the Board of Directors of the

BLM_0066622

Authority to condemn is unanimous and the Authority has received the prior written consent to the condemnation from the governing body or bodies of the local government or governments having jurisdiction over the property to be condemned.

3.11    To incur debts, liabilities, or obligations; to issue bonds or notes (as provided below); to borrow money, secure mortgages, obtain grants, gifts or otherwise obtain funds, all for the purpose of implementing, completing and operating housing projects. This does not constitute general authority to encumber or pledge any revenues or assets of any participating government without that entity's written consent.

3.12    To sue and be sued in its own name.

3.13    To have and use a corporate seal.

3.14    To fix, maintain, and revise fees, rents, prices, security deposits, and charges for functions, services, or facilities provided by the Authority.

3.15    To adopt, by resolution, regulations respecting the exercise of the Authority's powers and the carrying out of its purposes.

3.16    To exercise any other powers essential to the provision of functions, services or facilities by the Authority.

3.17    To do and perform any acts and things authorized by this IGA under, through, or by means of any agent, or by contracts with any person, firm or corporation.

3.18    To establish enterprises for the ownership, planning, financing, acquisition, construction, reconstruction or repair, maintenance, management, or operation, or any combination of the foregoing, of housing projects or programs subject to the terms specified in the Act.

3.19    To exercise any additional general powers granted to multijurisdictional housing authorities by applicable law, except as specifically provided herein.

3.20    Subject to the specific provisions under Sections 29-1-204.5 (3) (f.1), (f.2) and (f.5), C.R.S., and to specific provisions to be negotiated among the Parties in the form of a future Intergovernmental Agreement, the power to levy a sales tax, a use tax and/or ad valorem tax and/or development impact fee for affordable housing; provided, however, that no action of the Authority to establish or increase any tax or development impact fee shall take effect unless first submitted to a vote of the registered electors of the Authority in which the tax or development impact fee is proposed to be collected.

## 4. BOARD OF DIRECTORS

BLM_0066623

4.1     Number of Directors and Their Appointment

(a)     Board of Directors. The governing body of the Authority shall be its Board of Directors (the "Board") consisting of five members. One member shall be appointed by Ouray; one member shall be appointed by Ridgway; one member shall be appointed by Ouray County; and two members ("Joint Members") shall be appointed by the members appointed by Ouray, Ridgway and Ouray County. The appointment of Joint Members shall be limited exclusively to persons nominated by Ouray, Ridgway or Ouray County after a request by the Authority to all three governments for nominations.

(b)     Qualifications. Each Director shall be a resident of Ouray County.

(c)     Term. With respect to the initial Board of Directors, two Directors shall be appointed for a one year term, and three for two year terms. Thereafter the terms for all Directors appointed shall be two years from the date of appointment or until the appointment of a successor. There shall be no terms limits for Directors.

(d)     Quorum; Voting. A majority of Directors shall constitute a quorum, and a majority of the quorum shall be necessary for any action taken by the Board of Directors.

(e)     Duties. The general power and authority of the Authority shall be vested in the Board. The Board shall elect the officers of the corporation as specified below. The Board shall approve a budget for the continued operation of the Authority. As provided in Sections 29-1-204.5(2)(b)(IV), C.R.S., the Board shall comply with the provisions of parts 1, 5, and 6 of Article I, Title 29 of the Colorado Revised Statutes which, respectively, are known as the Local Government Budget Law of Colorado, the Colorado Local Government Uniform Accounting Law, and the Colorado Local Government Audit Law.

(f)     Vacancies. Any vacancy on the Board shall be filled by the governmental entity that appointed the departing Director, or, in the case of a Joint Member, by vote of the remaining Board of Directors subject to selection procedures described in Section 4.1 (a). If the vacancy being filled is an unexpired term, the appointee shall serve the remainder of that term.

(g)     Removal. Members of the Board shall serve at the pleasure of their appointing governments, or, in the case of Joint Members, at the pleasure of the Board.

(h)     Compensation. Board members shall not be compensated for their services as Directors or officers; however, they may be reimbursed for their expenses and may receive a per diem travel allowance as determined by the Board.

4.2 Officers. The officers of the Authority shall consist of a President, a Vice President, and a Secretary/Treasurer. No person shall hold more than one office.

(a)     Appointment. The officers shall be appointed by the Board and shall hold office for one year or until their successors are elected and qualified.

(b)     President. The President shall preside at all meetings of the Authority. Except as otherwise authorized by resolution of the Authority, the President shall sign all contracts, deeds and other instruments made by the Authority. At each meeting the President shall submit such recommendations and information as he/she may consider proper concerning the business, affairs and policies of the Authority.

(c)     Vice President. The Vice President shall perform the duties of the President in the absence of incapacity of the President; and, in case of vacancy in the office of

BLM_0066624

the President, the Vice President shall perform such duties as are imposed on the President until such time as the Board selects a new President.

(d)    Secretary/Treasurer. The Secretary/Treasurer shall keep the records of the Authority; shall act as secretary to meetings of the Authority; shall have the custody of all funds of the Authority; shall keep regular books of accounts for the same; and shall otherwise perform all duties incident to the office. Any and all duties of the Secretary/Treasurer may be assigned to an Executive Director, if one.

4.3    Duties. The officers of the Authority shall perform the duties and functions of their respective offices, as prescribed in this Agreement; comply with the Local Government Budget Law of Colorado, the Colorado Local Government Uniform Accounting Law, and the Colorado Local Government Audit Law; and perform such other duties and functions as may from time to time be required by the provisions of this IGA, resolutions of the Directors, or by other rules and regulations as may be adopted by the Authority.

4.4    Appointment of an Executive Director. The Board may hire an Executive Director and shall establish the compensation, duties and responsibilities of such position, if created.

4.5    Conflicts of Interest. No member of the Board nor any immediate member of the family of any such member shall acquire or have any interest, direct or indirect, in: (a) any property or project acquired, held, leased or sold by the Authority; or (b) any entity with whom the Authority has contracted to plan, finance, construct, reconstruct, repair, maintain, manage or operate any property, project or program related to the Authority. If any Board member has such an interest, whether direct or indirect, he or she shall immediately disclose the same in writing to the Board of Directors, and such disclosure shall be entered upon the minutes of the Board. Upon such disclosure, such Board member shall not participate in any discussion of or action by the Board affecting the project, property, or contract.

## 5. BONDS, NOTES AND OTHER OBLIGATIONS

5.1    Not Obligations of Parties. The bonds, notes and other obligations of the Authority shall not be the debts, liabilities, or obligations of Ouray, Ridgway, or Ouray County or any other governmental entities that may become members of the Authority in the future.

5.2    Authority to Issue Bonds. To carry out the purposes for which the Authority was established, the Authority is authorized to issue bonds, notes, or other obligations payable solely from the revenues derived or to be derived from the functions, services, or facilities of the Authority or from any other available funds of the Authority. The bonds, notes, or other obligations issued by the Authority shall, as nearly as may be practicable, be substantially the same as those provided by law for any of the contracting parties to this IGA; provided, however, that bonds, notes or other obligations so issued shall not constitute an indebtedness of Ouray, Ridgway, or Ouray County within the meaning of any constitution, home rule charter or statutory limitation or any other provision. Each bond, note or other

BLM_0066625

obligation issued under this subsection shall recite in substance that the bond, note or other obligation, including the interest on it, is payable solely from the revenues or other available funds of the Authority pledged for its payment, and that the bond, note or other obligation does not constitute a debt of Ouray, Ridgway, or Ouray County within the meaning of any constitution, home rule charter, statutory limitations or provisions. Notwithstanding anything in this Section 5 to the contrary, such bonds, notes, and other obligations may be issued to mature at such times not beyond forty (40) years from their respective issue dates, shall bear interest at such rates and shall be sold at such prices, at, above, or below their principal amount, as shall be determined by the Board.

5.3    <u>Indenture</u>. The resolution, trust indenture, or other security agreement under which any bonds, notes or other obligations are issued shall constitute a contract with the holders thereof, and it may contain such provisions as shall be determined by the Board to be appropriate and necessary in connection with their issuance and to provide security for their payment, including, without limitation, any mortgage or other security interest in any revenues, funds, rights or properties of the Authority. The bonds, notes and other obligations of the Authority and the income there from shall be exempt from taxation (except inheritance, estate, and transfer taxes) pursuant to Section 29-1-204.5 (7.3), C.R.S.

## 6. REVENUES

Subject to the limitations herein contained, the Parties may make payments to the Authority from their funds for services rendered or facilities provided by the Authority, or as contributions to defray the cost of any purposes set forth herein.

## 7. BUDGET.

The Authority shall annually prepare a budget pursuant to the terms and provisions of the Local Government Budget Law of Colorado. In expending the budget, the Board (or Executive Director, as the case may be) shall, insofar as practical, devote the time and moneys among the Ouray, Ridgway and Ouray County functions as shown on said budget. All work allocation among Authority personnel shall be the responsibility of the Board, or Executive Director, as the case may be. The Authority shall be required to annually obtain the approval of the budget (as well as any substantial amendments thereto) by the City Council of the City of Ouray, Town Council of the Town of Ridgway, and the Board of County Commissioners of Ouray County.

## 8. ACCOUNTING.

With respect to accounting, reporting, auditing and operational procedures, the Authority shall follow the provisions and guidelines of the Colorado Local Government Uniform Accounting Law and the Colorado Local Government Audit law.

## 9. LEGAL ASSISTANCE.

BLM_0066626

Legal assistance shall be provided for Ouray programs, Ridgway programs and Ouray County programs by the City Attorney of Ouray, the Town Attorney of Ridgway, and the Ouray County Attorney, respectively. In addition, the Authority may retain counsel for the provision of necessary legal services for the operation of the Authority.

**10. INSURANCE**.

The Authority shall purchase and maintain at all times an adequate policy of public entity liability insurance, which insurance shall at a minimum provide the amount of coverage described in Section 24-10-115(1), C.R.S., including errors and omissions coverage. The Authority may purchase such additional insurance as the Board shall determine. The Authority's employees acting within the scope of their employment shall be indemnified pursuant to Section 24-10-110, C.R.S.

**11. MODIFICATION OF THIS IGA**.

This Intergovernmental Agreement may be modified by written amendment approved by the governing bodies of all the contracting parties, acting separately.

**12. TERM AND TERMINATION**

12.1   Term. The term of this IGA shall be from the date first written above through December 31, 2007, and shall automatically renew for successive one-year periods thereafter upon the annual appropriation of funds by Ouray, Ridgway and Ouray County. However, any of the contracting Parties may withdraw from this IGA and membership on the Board of Directors, for any reason, upon thirty (30) days written notice.

12.2 Termination. The withdrawal of any two (2) contracting Parties shall terminate this IGA. Subject to the limitations in Section 12.3, this Agreement may be terminated at any time by written agreement of all of the contracting Parties.

12.3 Limitations. This Agreement may not be terminated or rescinded: (a) as long as the Authority has bonds, notes, or other obligations outstanding unless provisions for full payment of such obligations, by escrow or otherwise, has been made pursuant to the terms of such obligations; and (b) until the completion of the disposition of assets of the Authority as provided for in Section 13.

**13. DISPOSITION OF AUTHORITY ASSETS UPON TERMINATION**.

In the event of termination of this IGA, which termination may only occur in accordance with the requirements and limitations of Paragraph 12 above, and the resulting dissolution of the Authority, the assets of the Authority shall be distributed as follows:

BLM_0066627

(a)     All assets which can be identified which were acquired by contributions from Ouray, Ridgway or Ouray County shall be returned to the contributing Party if said assets are still in existence.

(b)     If identifiable assets contributed to the Authority are not in existence, the contributing party shall have the option of receiving the fair market value of each asset at the time of disposal by the Authority in either cash or assets of the Authority.

(c)     All assets acquired by the Authority after the date of this IGA from funds provided by the Parties shall be distributed to the Parties on the basis of the appraised value of said assets at the time of termination and in the same proportion as the respective contributions of funds by the Parties for acquisition of each asset.

(d)     The Parties may agree in writing to dispose of any assets of the Authority in any other acceptable manner.

(e)     If the Parties cannot agree on the disposition of any assets of the Authority within sixty (60) days, said assets shall be subject to an independent appraisal and shall be sold at public auction with the deed restriction (if any) intact as soon as practicable with the proceeds allocated to Ouray, Ridgway and Ouray County in the same proportion as the total contribution of funds by the respective Parties for acquisition of the asset.

(f)     In the event that a municipality or county shall have been a member of the Authority and contributed assets or funds during that membership but is not a member at the time of termination of the Authority, such municipality or county shall enjoy the same rights to distribution of assets afforded by this Section 13 to those governments participating at the time of termination.

## 14. **ADDITIONAL PARTIES**.

The Authority may be increased to include one or more additional municipalities and/or counties, if each additional municipality and/or county and Ouray, Ridgway and Ouray County agree to an amendment of this IGA authorizing the addition of the municipalities and/or counties and making required amendments to this IGA to provide for their inclusion, including, if agreed to, representation on the Board of Directors.

## 15. **NOTICES**.

Any formal notices, demand or request given under this IGA shall be in writing and shall be deemed properly given if deposited in the United States Mail, postage prepaid, and addressed as described below:

To the City of Ouray:            City Administrator
                                 City of Ouray
                                 Post Office Box 468
                                 Ouray, CO  81427

To the Town of Ridgway:          Town Manager
                                 Town of Ridgway

BLM_0066628

|  | Post Office Box 10 |
|---|---|
|  | Ridgway, CO  81432 |
| To Ouray County | County Administrator |
|  | Ouray County |
|  | Post Office Box C |
|  | Ouray, CO  81427 |

### 16. <u>INTERPRETATION</u>

Subject to the express limitations contained herein, this Agreement shall be liberally construed to permit the Authority, the Parties hereto, and the Board to exercise all powers that may be exercised by a multijurisdictional housing authority pursuant to the Act, and other applicable law. In the event of any conflict between the Act or any other applicable law with respect to the exercise of any such power, the provision that permits the broadest exercise of the power consistent with the limitations set forth in this Agreement shall control.

### 17. <u>GOVERNING LAW</u>.

The laws of the State of Colorado shall govern the construction and enforcement of this Agreement.

### 18. <u>SEVERABILITY.</u>

If any term or provisions of this Agreement shall be adjudicated to be invalid, illegal or unenforceable, this Agreement shall be deemed amended to delete there from the term or provision thus adjudicated to be invalid, illegal or unenforceable and the validity of the other terms and provisions of this Agreement shall not be affected thereby.

**IN WITNESS WHEREOF**, the Parties hereto have entered into this Agreement on the day and year above first noted.

THE CITY OF OURAY, COLORADO              THE TOWN OF RIDGWAY,COLORADO
A Colorado Municipal Corporation              A Colorado Home Rule Municipality

By _____              By _____

ATTEST:                                                      ATTEST:

_____              _____

Approved as to form:                                   Approved as to form:

BLM_0066629

Final Plan 6/22/09

_____          _____
City Attorney                            Town Attorney


THE BOARD OF COUNTY COMMISSIONERS         ATTEST:
OF OURAY COUNTY, COLORADO

By_____          _____


Approved as to form:

_____
County Attorney

BLM_0066630

## Appendix F
### 2009 AREA MEDIAN INCOMES FOR OURAY COUNTY

| 2009 HUD 1-person Household | | | |
|---|---|---|---|
| Target | Low | High | Average |
| 50% AMI | | $22,155 | |
| 60-80% AMI | $26,586 | $35,448 | $31,017 |
| 81-100% AMI | $35,891 | $44,310 | $40,101 |
| 101-120% AMI | $44,753 | $53,172 | $48,963 |
| 121-150% AMI | $53,615 | $66,465 | $60,040 |

| 2009 HUD 2-person Household | | | |
|---|---|---|---|
| Target | Low | High | Average |
| 50% AMI | | $25,320 | |
| 60-80% AMI | $30,384 | $40,512 | $35,448 |
| 81-100% AMI | $41,018 | $50,640 | $45,829 |
| 101-120% AMI | $51,146 | $60,768 | $55,957 |
| 121-150% AMI | $61,274 | $75,960 | $68,617 |

| 2009 HUD 2.5-person Household | | | |
|---|---|---|---|
| Target | Low | High | Average |
| 50% AMI | | $26,903 | |
| 60-80% AMI | $32,283 | $43,044 | $37,664 |
| 81-100% AMI | $43,582 | $53,805 | $48,694 |
| 101-120% AMI | $54,343 | $64,566 | $59,455 |
| 121-150% AMI | $65,104 | $80,708 | $72,906 |

| 2009 HUD 3-person Household | | | |
|---|---|---|---|
| Target | Low | High | Average |
| 50% AMI | | $28,485 | |
| 60-80% AMI | $34,182 | $45,576 | $39,879 |
| 81-100% AMI | $46,146 | $56,970 | $51,558 |
| 101-120% AMI | $57,540 | $68,364 | $62,952 |
| 121-150% AMI | $68,934 | $85,455 | $77,194 |

| 2009 HUD 4-person Household | | | |
|---|---|---|---|
| Target | Low | High | Average |
| 50% AMI | | $31,650 | |
| 60-80% AMI | $37,980 | $50,640 | $44,310 |
| 81-100% AMI | $51,273 | $63,300 | $57,287 |
| 101-120% AMI | $63,933 | $75,960 | $69,947 |
| 121-150% AMI | $76,593 | $94,950 | $85,772 |

BLM_0066631

| 2009 HUD 5-person Household | | | |
|---|---|---|---|
| Target | Low | High | Average |
| 50% AMI | | $34,182 | |
| 60-80% AMI | $41,018 | $54,691 | $47,855 |
| 81-100% AMI | $55,375 | $68,364 | $61,869 |
| 101-120% AMI | $69,048 | $82,037 | $75,542 |
| 121-150% AMI | $82,720 | $102,546 | $92,633 |

| 2009 HUD 6-person Household | | | |
|---|---|---|---|
| Target | Low | High | Average |
| 50% AMI | | $36,714 | |
| 60-80% AMI | $44,057 | $58,742 | $51,400 |
| 81-100% AMI | $59,477 | $73,428 | $66,452 |
| 101-120% AMI | $74,162 | $88,114 | $81,138 |
| 121-150% AMI | $88,848 | $110,142 | $99,495 |

BLM_0066632

# Appendix G
## PROPOSED 2009-2010 OCHA BUDGET
## AND JURISDICTIONAL STAFF CONTRIBUTIONS

| Total Estimated Budget (OCHA Staff, Start Up, 2010 operations) | | 1/3 distributions by jurisdictions | | |
|---|---|---|---|---|
| **Payroll** | **Estimated Total** | **Ouray** | **Ridgway** | **Ouray County** |
| Worker's Compensation | $500 | $167 | $167 | $167 |
| Medicare | $800 | $266 | $266 | $266 |
| Retirement Benefit | | | | |
| Health Insurance (medical, dental, vision) | | | | |
| State Unemployment Tax (SUTA) | $300 | $100 | $100 | $100 |
| **Total Payroll (less services)** | **$1,600** | **$533** | **$533** | **$533** |

| 1st year Capital Investments (2010) | Estimated Total | Ouray | Ridgway | Ouray County |
|---|---|---|---|---|
| **Office Space and Supplies** | | | | |
| Desk and Chair | $500 | $167 | $167 | $167 |
| Phone, Long Distance Services, Fax, Copier | $1,000 | $333 | $333 | $333 |
| Postage | $300 | $100 | $100 | $100 |
| Misc Office Supplies & Expenses | $1,000 | $333 | $333 | $333 |
| Purchase Checks | $100 | $33 | $33 | $33 |
| **Computer Related Investments** | | | | |
| Computer Hard & Software, Installation & Setup | $1,250 | $416 | $416 | $416 |
| Internet Setup and Service (DSL) incl email | $200 | $67 | $67 | $67 |
| Website Development Services | $1,000 | $333 | $333 | $333 |
| Web Domain Name Purchase | $40 | $13 | $13 | $13 |
| Purchase Financial Mgmt System (Q-books) | $350 | $117 | $117 | $117 |
| **Misc Expenditures** | | | | |
| IGA Amendments (change request, record fees) | $480 | $160 | $160 | $160 |
| **Total Capital Investments** | **$6,220** | **$2,071** | **$2,071** | **$2,071** |

| Annual Operating Expenses | Estimated Total | Ouray | Ridgway | Ouray County |
|---|---|---|---|---|
| Insurance *(D&O, General Liability)* | $3,000 | $999 | $999 | $999 |
| Equipment Maintenance & Repair | $500 | $167 | $167 | $167 |
| Software Support Services | $1,000 | $333 | $333 | $333 |
| Web Domain Annual Rental Fees | $15 | $5 | $5 | $5 |
| Website Hosting ($300/yr) and Maintenance | $1,500 | $500 | $500 | $500 |
| Email Annual Rental Fees | $60 | $20 | $20 | $20 |
| Annual Internet Service Provider Fees | $600 | $200 | $200 | $200 |
| Financial Audit (annual) | $6,000 | $1,998 | $1,998 | $1,998 |
| Board Education & Training | $1,000 | $333 | $333 | $333 |
| Staff Education & Training | $1,000 | $333 | $333 | $333 |

BLM_0066633

Final Plan 6/22/09

| | | | | |
|---|---|---|---|---|
| Office Space, Storage, Cleaning | $6,000 | $1,998 | $1,998 | $1,998 |
| PO Box Rental Fees | $78 | $26 | $26 | $26 |
| Legal Services | $5,000 | $1,665 | $1,665 | $1,665 |
| Dues and Memberships | $500 | $167 | $167 | $167 |
| **Total Operating Expenses** | **$26,253** | **$8,742** | **$8,742** | **$8,742** |

| Service Fees/ Program Development | Estimated Total | Ouray | Ridgway | Ouray County |
|---|---|---|---|---|
| Rehabilitation and Weatherization | $5,700 | $1,898 | $1,898 | $1,898 |
| Rehabilitation and Weatherization Grant Match | $25,000 | $8,325 | $8,325 | $8,325 |
| IZ, Linkage Fees and Incentives | $10,620 | $3,536 | $3,536 | $3,536 |
| Linkage Fee Study Grant Match | $2,000 | $666 | $666 | $666 |
| Homebuyer & Renter Education and Outreach | $1,560 | $519 | $519 | $519 |
| Promotional Materials and Handouts for Outreach | $250 | $83 | $83 | $83 |
| **Total Program Services** | **$45,130** | **$15,028** | **$15,028** | **$15,028** |

| **Estimated Budget Total (2010):** | **$79,203** | **$26,375** | **$26,375** | **$26,375** |
|---|---|---|---|---|

BLM_0066634

Final Plan 6/22/09

| Estimated Hours and Expenditures for OCHA Staff Services (2009 - 2010) | Hours/Year | Estimated Cost |
|---|---|---|
| **Grants** | | |
| Complete & Submit Grant/Loan Applications: Rehab | 10 | $300 |
| Administer Rehab Revolving Loan or Grant Fund | 45 | $1,350 |
| Complete & Submit Grant Applications: Linkage Study | 10 | $300 |
| Administer Linkage Fee Grant Funds | 30 | $900 |
| **Financial Management** | | |
| Setup Financial Management System | 8 | $480 |
| Maintain Financial Management System | 208 | $6,240 |
| Establish Bank Acct & Fee Collection System | 10 | $300 |
| **Marketing and Outreach** | | |
| Public Relations | 36 | $1,080 |
| Assist with Web Site development and updates | 24 | $720 |
| Annual Reporting | 16 | $480 |
| Amendments to IGA | 16 | $480 |
| Board Meeting Support Services | 36 | $1,080 |
| **Program Development: Rehab & Weatherization** | | |
| Set Up Program | 80 | $2,400 |
| Marketing, Outreach, Public Education | 104 | $3,120 |
| Develop Unit Tracking System | 6 | $180 |
| **Program Development: IZ, Linkage Fees, Incentives** | | |
| Draft Code: Inclusionary Zoning | 96 | $2,880 |
| Facilitate Linkage Fees study w/contractor | 16 | $960 |
| Draft Code: Linkage Fees | 32 | $960 |
| Draft Code: Development Incentives | 32 | $960 |
| Develop Deed Restrictions/Administrative Guidelines | 80 | $2,400 |
| Develop Unit Tracking System | 6 | $180 |
| Annual Update of Income, Home Prices, Fees In Lieu | 8 | $240 |
| Development Review / Negotiation | 48 | $1,440 |
| Applicant Prequalification/ Qualification/ Selection | 20 | $600 |
| **Program Development: Homebuyer and Renter Education & Outreach** | | |
| Establish Resources for Housing Assistance | 4 | $120 |
| Update Resources for Housing Assistance | 2 | $60 |
| Identify Speakers, Set Agenda, Manage Event | 40 | $1,200 |
| Event Promotion (fliers, PR, etc.) | 6 | $180 |
| **Estimated Staff Totals 2009/ 2010:** | **1029** | **$31,590** |

| | |
|---|---|
| Assumed hourly wage staff person: | $30 |
| Assumed hourly wage for Contract Services: | $60 |

---

Rees Consulting, Inc.                                                                                                54

BLM_0066635

Final Plan 6/22/09

| Estimated Jurisdictional Staff Administration Hours | Total Est. Hours | Ouray | Ridgway | Ouray County |
|---|---|---|---|---|
| IZ Code Drafting (2009) | 24 | 8 | 8 | 8 |
| Linkage Fee Code Drafting (2010) | 24 | 8 | 8 | 8 |
| Housing Rehab & Weatherization Program Assistance | 60 | 20 | 20 | 20 |
| Grant Writing / Grant Assistance | 15 | 5 | 5 | 5 |
| General Organizational Development | 30 | 10 | 10 | 10 |
| Total Staff Administration Hours (2009 - 2010) | 153 | 51 | 51 | 51 |

BLM_0066636

# RIDGWAY COMPREHENSIVE PLAN

## LIGHTING ELEMENT

Town of Ridgway
Final Plan: May 2010

Page 1 of 35

BLM_0066637

# TABLE OF CONTENTS

I.      INTRODUCTION

II.     BACKGROUND INFORMATION

III.    DEFINITIONS

IV.     SCOPE AND PURPOSE

V.      OBJECTIVES

VI.     GENERAL RECOMMENDATIONS

VII.    HIGHWAY CORRIDORS

VIII.   COMMERCIAL AREAS
        A.   Downtown Historic Business
        B.   Highway Commercial
        C.   Light Industrial

IX.     RESIDENTIAL AREAS

X.      PARKS AND TRAILS
        A.  Hartwell Park

XI.     LIFECYCLE COSTS

XII.    RESPONSIBILITY

XIII.   PHASING PLAN AND FINANCING OPPORTUNITIES

XIV.    ATTACHMENTS: EXISTING CIRCUMSTANCES
        A.   Holiday Lighting LED Comparison
        B.   Lighting Inventory: Spreadsheet
        C.   Lighting Inventory: Map
        D.   Lighting Inventory: Photographs
        E.   Light Output Measurements

XV.     EXHIBITS: LIGHTING PLAN
        A.   Conceptual Lighting Plan Map
        B.   Sample Lighting Standards and Specifications
        C.   Conceptual Lighting Plan Map for Downtown Area
        D.   Renditions and Specifications of Proposed Fixtures

BLM_0066638

## I.   Introduction

Ridgway is a dark-skies community valuing the appeal of the night sky with an appreciation for appropriate and efficient illumination for public way-finding and safety.  The majority of lighting throughout the Town complies with these values.  With the variety of fixtures, bulbs, poles and placement patterns that now exist, and the limited resources available to maintain, repair, replace, and inventory these components, there is a desire to standardize illumination on public rights-of-way for both residential and commercial applications and to more clearly define roles and responsibilities.  In addition, as more efficient and cost-effective technologies arise, the Town wishes to be in a position to capitalize on these efficiencies.

In 2006, the Town completed a Downtown Streetscape Plan for the Historic Business District. The plan received significant community input and includes recommendations on street lighting layout with general fixture and pole design concepts for the downtown area.  Pursuant to the plan recommendations, a Lighting Committee was formed to further define lighting preferences for the business core, residential, commercial and highway applications, and pedestrian illumination of the Uncompahgre Trail as it traverses Hartwell Park.  The Committee was tasked with developing town-wide standards, including fixture, bulb, pole, and placement preferences, toward the goal of creating a simple and efficient process for inventory, maintenance, repair and replacement throughout Town.

This plan considers lighting in the public rights-of-way as well as high profile illumination on private property.  The focus is on street, pedestrian, public spaces including parks and trails, and parking lot fixtures.  Provided is a summary of existing lighting followed by a town-wide plan, inclusive of general recommendations and specifications for future lighting.  While the original intent was to provide more specific detail, the current economy and rapidly changing technology with increasing efficiencies and decreasing costs, are more conducive to leaving options open.

It is understood that the current provisions for outdoor lighting in the Municipal Code §6-5 are sufficient whereby existing, private lighting that is affixed to structures or used in landscaping are largely compliant and shall remain at the discretion of the property owner.  As such, smaller-scale, private lighting is not included with this plan.  The term "lighting" is used to loosely refer to poles, fixtures and lamps although many other factors such as location, light distribution, color, spectrum, brightness, and efficiency are considered with the overall evaluation and recommendations.

The Lighting Committee invested a significant amount of time and effort over many months to develop this plan.  Municipal lighting schemes can be very complicated.  There are many factors to consider and evaluate to arrive at a preferred and widely-accepted plan.  Consolidated Electrical Distributors (CED) in Montrose, in collaboration with regional lighting sales representatives provided technical information to the group, to educate the committee on lighting and LED technology.  In addition, Alternative Power Enterprises of Ridgway presented grid-tied solar power information and LED illumination alternatives.  Sensible and cost effective solutions are put forth in a simplified and manageable manner, with respect for a rapidly progressing industry.

BLM_0066639

Committee members include Town Councilors, a Community Member, and Town Staff:

| | | | |
|---|---|---|---|
| Greg Clifton | Debra Hynes | Ellen Hunter | Jen Coates |
| Joanne Fagan | James Kennedy | Eric Johnson | |

This document is organized into 15 sections:

I. Introduction
II. Background Information
III. Definitions
IV. Scope and Purpose
V. Objectives
VI. General Recommendations
VII. Highway Corridors
VIII. Commercial Areas
IX. Residential Areas
X. Parks and Trails
XI. Lifecycle Costs
XII. Responsibility
XIII. Phasing Plan and Financing Opportunities
XIV. Attachments
XV. Exhibits

BLM_0066640

## II.   Background Information

The Town of Ridgway has a variety of light poles, fixtures and lamps on both public and private properties including streets, pathways, parking areas, and other public spaces.  While new development is responsible for the identification, installation, and placement of fixtures, the local power utility provider, San Miguel Power Association (SMPA), coordinates with Town staff to repair and replace street lights.  As needed, the Town contracts with a local electrician to service lighting in the public rights-of-way.  There is no lighting plan, standards or specifications identifying new or replacement lighting (bulbs, fixtures, poles, placement, installation heights, bury depths, etc.).  Town staff is ill-equipped to install, maintain or repair light poles, fixtures and lamps above 10' in height, and relies on SMPA or local contractors for these services.

In 2002 a citizen-initiated effort to promote dark-skies and energy-efficiency brought together the Town, SMPA and community members to replace the inefficient, mercury vapor and ranch-style street lights with more efficient, dark-skies compliant General Electric 250 Cobra Head Luminaries (Cobra Heads) and high-pressure sodium lamps (HPS).  The Cobra Heads in the residential neighborhoods contain 50 watt HPS lamps, and fixtures along the state highways contain 70 watt HPS lamps.  These are now the primary street lights throughout Town, in both residential and commercial areas.

The 2006 Downtown Streetscape Plan provides recommendations for preferred street and pedestrian lighting locations as well as fixture and pole styles for the historic downtown area.  As an initial step toward realization of the Streetscape Plan, and in consideration of a future parking lot, the Town Council prioritized the purchase and installation of pedestrian lighting for the Uncompahgre Trail through Hartwell Park from the Post Office to Town Hall and Charles Street, connecting the downtown area to the public library and public parking.  Although this pedestrian lighting was budgeted for completion in 2009, budget constraints prohibited realization of the project.

Within the past decade there have been efforts to increase the overall efficiency of lighting throughout Town, from replacement of mercury vapor bulbs to the retrofit of a few incandescent bulbs to compact fluorescents in the River Park subdivision.  During the 2008 holiday season, with the support of San Miguel Power, traditional holiday string lighting in Hartwell Park was replaced with light-emitting diode (LED) strands.  The Town realized cost and energy savings with the transition to LED in accordance with other energy savings measures including a decrease in the overall amount of holiday lighting as well as a reduction in the hours of illumination (Attachment A).

116 uniquely located fixtures, including 15 different fixture styles, variably sized metal and wooden poles, and 5 different lamp types are identified within the Town.  The majority of fixtures are GE Cobra Heads on wooden poles approximately 25' above ground, with 50 watt HPS lamps.  67 of the fixtures are located on public property (Town Rights-of-Way), 46 fixtures are on private property and 3 are on property belonging to Ouray County.  The inventory, photos and location map are appended to this plan (Attachments B, C, and D).

BLM_0066641

Generally, in newer residential subdivisions the street lights are located at road intersections although this is not always true.  There are no apparent patterns for spacing, light distribution, or fixture height.  Pedestrian lighting is non-existent, although there are some low-level, non-compliant bollards at the Town Hall parking lot and the pedestrian bridge in Rollans Park.  Vista Terrace, Sweetwater, and RiverSage Subdivisions are more rural in nature, and do not have street or pedestrian lighting, in order to minimize lighting impact in these areas, which are higher in elevation and very visible from the Town core.

Street lights in the Historic Residential and Business Districts are generally located at street intersections and alternating street sides although this is not consistent.  Lights are commonly at least 300' apart with a much greater span in a number of areas.  Street lights along Sherman Street are more luminous and frequent, located about every 140' – 350'. Most alley intersections along Highway 62 through downtown are illuminated, usually alternating between the north and south sides.

The following areas have limited or no functional lighting: Highway 62 from Liddell Street to Highway 550, North Railroad Street, Amelia Street (north of Charles and South of Marie Street), most of Ridgway USA to the north, much of the Historic Residential area between North Amelia and Laura Streets at Otto and Frederick (undeveloped parcels), and the following subdivisions: Cedar Creek Minor, Le Ranch, Cottonwood, Liddell-Stanton, and Solar Ranches.  In general, the Town is quite dark.

BLM_0066642

## III.   Definitions

Color Rendering Index (CRI) – A relative measure of the ability of a lamp to render colors in comparison to an agreed upon "good" color rendering source such as incandescent or daylight.  (i.e.: light that provides the ability to distinguish colors).  A higher CRI yields greater color distinction.

Footcandle – The amount of light falling on a surface; One footcandle is defined as one lumen per square foot and roughly equivalent to the illumination of a full moon on the ground

Lamp – Light emitting device, referred commonly here as a bulb (e.g. (types): High Pressure Sodium, Light Emitting Diode, Incandescent, Compact Fluorescent, etc.)

Lamp Lifetime – Number of hours the lamp will output a desired amount of light or lumens

Leadership in Energy and Environmental Design (LEED) footcandle recommendations:
      LZ1/Light zone 1 Dark (Park and Rural Settings): 0.01 footcandles (fc)
      LZ2/Low (Residential Zones):0 .1 fc
      LZ3/ Medium (Commercial/Industrial, High Density Res): 0.2 fc
      LZ4/ High (Major City Centers): 0.6 fc

Lumens – Unit of luminous flux; used to measure the amount of light emitted by lamps

Lumens per Watt - the amount of light produced for each watt of electricity that is consumed, known as luminous efficacy; high luminous efficacy is desirable (eg: 75)

Luminous Efficacy – see 'lumens per watt'

Pole Height – Vertical distance from the light source to the ground

Watts – A derived unit of power, measuring the rate of energy conversion; volts x amperes = watts

BLM_0066643

## IV.   Scope and Purpose

This plan memorializes the history and presence of lighting in Ridgway, and identifies goals and objectives for Town-wide illumination.  It addresses illumination of residential and commercial streets, pedestrian pathways, parks and trails, parking areas, and public spaces.  Both public and private properties are evaluated with recommendations to guide development, and to encourage compliance for existing, nonconforming lighting.  This is a guidance document, not intended to supersede the existing lighting regulations of the Town, but rather to expand the scope of what has previously been considered, and to formalize community desires.  The Town may wish to consider adoption of standards and specifications pursuant to the recommendations.

Town-wide lighting is inventoried and evaluated for compliance, function, placement, and ownership.  Standards and specifications for residential and commercial lighting are offered to guide future growth and provide direction for replacing noncompliant lighting.  In keeping with the goals of sustainability and efficiency, lamp alternatives and life-cycle costs are presented.  Guidance on responsibilities for installation, inventory, maintenance, repair, and replacement are put forth.  Finally, priorities for implementation of the plan are suggested, including funding opportunities for plan realization.

BLM_0066644

## V.   Objectives

The following objectives, in no particular order, were established to guide the discussion and plan outcomes.  More specific goals are defined within the plan for each area, as appropriate.

Energy-Efficiency and Expenditures
Create a balance between available technologies and efficient layout patterns to maximize desired illumination and energy savings, including calculations and comparisons of energy and monetary costs associated with the technologies and patterns

Regional Cooperation
Cooperate with local utility provider and regional governments for maximum cost and energy savings

Illumination and Dark-Skies
Optimize illumination with Dark Skies and Outdoor Lighting Ordinance compliance, including evaluation of current lamp types and fixture heights for preferred spectrum, color, brightness and distribution

Safety
Optimize safety with appropriate (not necessarily more or brighter) lighting for cars, pedestrians, and bicycles

Aesthetics
Select visually appealing and appropriate lighting for Ridgway

Responsibility
Clarify responsibilities for purchase, installation, maintenance and repair, including delineation of public and private responsibilities

Consistency and Efficiency
Identify standard fixtures for commercial and residential applications to provide clear direction on new street and pedestrian lighting for ease of inventory, installation, maintenance and repair

Inventory
Identify a phasing plan for retrofit of existing fixtures and bulbs to more efficient illumination mechanisms, as appropriate

Location
Identify preferred locations for lighting: curbs, intersections, etc.

Compliance
Provide recommendations on retrofits and modifications for compliance to owners of non-compliant lighting

BLM_0066645

## VI.   General Recommendations

These recommendations are limited to a few lighting options for varied applications, including pedestrian level illumination (bollards or lower-level lighting), residential, and commercial applications (parking lot and street lights).  Vehicular intensity, in accordance with the Town's 2007 Transportation Plan, and general land uses were considered with these recommendations.  The fixture head, pole style, and lamp are nearly identical for each application, excluding bollards, with slight variations in pole height, fixture size, and lumens (light output) to accommodate safety and intensity appropriate for the application.  The style and size selections are limited to facilitate and minimize installation, replacement, and inventory.  The components identified are modular, such that if one component of the lighting fails (e.g.: lamp, pole, fixture, filter, etc.) the entire system is not subject to replacement but may be replaced as a singular component of the whole.  The theme is simple, and locally-crafted where feasible, representing the preferred community options put forth during the 2006 Streetscape Plan.

It is understood that the final fixture style and lamps may differ from what is presented here (Exhibits B, D).  The energy and cost savings achieved in transitioning from current light sources (HPS) and fixtures, the time frame associated with installation of new fixtures in Town, and the rapidly changing technology for street lighting may affect the final product selection.  When implementation is imminent, an updated evaluation of new technologies with lifecycle and investment costs is recommended.  A spreadsheet is available at Town Hall to facilitate this process (page 19).  Additional incentives or grant funding to retrofit existing lamps may also arise to offset investment costs.

At this time, the "warmer" illumination of lower-wattage high pressure sodium bulbs is preferred to the bright or warm white of the current LED, although the transition to the warmer LED or incorporating a colored lens for the LED technology may be practical in the future.  Compact fluorescent (CF) bulbs do not perform effectively or efficiently in Ridgway's cold climate, and are therefore not considered with these outdoor applications.  However, light output measurements for cold cathode bulbs CF are provided in case it becomes a feasible option.

Illumination recommendations for each application (Highway, Commercial, Residential, and Industrial) are put forth, with additional detail located in the Exhibit section of the report.  It is suggested that all fixtures have a minimum 3 year warranty.

Street light locations in residential and commercial areas are based on safety and traffic volume classifications defined in the Town's 2007 Transportation Plan Element, as follows:

> Arterial Streets (e.g.: Highways 550 and 62): Lighting at all roadway intersections with the highways, streets and alleyways

> Collector Streets (e.g.: Railroad and Amelia Streets, Hunter Parkway): Lighting at each street intersection

BLM_0066646

> Local Streets (Streets in residential areas such as Vista Terrace, River Park, Solar Ranches, Cora, Laura, Mary, etc.): Lighting at significant road intersections, but not all intersections

Lighting should be designed and situated such that light is directed downward illuminating the desired intersection or parking area, not adjoining properties or residences.

Replacement of existing, functional cobra-head fixtures, and power poles is a low priority at this time, as removing, replacing, and land-filling fully functional, efficient fixtures is not compatible with environmental stewardship objectives.  At such time it makes financial and ecological sense to replace these fixtures, it is suggested that a singular, town-wide effort occur.  In the alternative, a phasing plan is presented whereby lighting installation in specific areas or streets are completed simultaneously so as to not propagate a multitude of lighting components and/or varied color outputs (e.g.: yellowish HPS light vs. whiter LED light) throughout Town.  Methods of recycling the cobra head fixtures and high-pressure sodium bulbs should be explored.  It is also assumed that the utilities will be undergrounded and the utility poles removed in the future, so adhering to existing pole locations is not a priority.

Today there are a variety of efficient lamp options available, with the technology rapidly changing (e.g.: incandescent, induction, compact fluorescent, LED, high pressure sodium).  More efficient sources are entering the marketplace and existing lamp types are becoming more affordable.

The standards within this plan generally comport with town-wide zoning, with some overlap in residential and commercial uses (e.g.: Downtown Services and Historic Business districts).  In areas of uncertainty, the Conceptual Lighting Plan Map (Exhibit A) clarifies preferred illumination patterns and locations.

Installation of a grid-tied, solar-electric system is recommended to offset electricity use for the street and pedestrian lighting.  In late 2009, the estimated cost of a 215 watt PV system, including installation materials, labor, and monitoring system is $2700, producing 814 kWH annually.  Rebates and funding opportunities to offset this expense may be available through the Governor's Energy Office, and are identified in Section XIII.  The relatively low-cost of the system combined with available incentives may warrant prioritization the grid-tied system to immediately offset other energy demands and maximize financial savings.

BLM_0066647

## VII.   Highway Corridors

This area encompasses the Highway 62 and 550 corridors through Town, addressing lighting on the highway rights-of-way.  The primary purpose is to illuminate these arterial streets for safety as they are the principal roadways through Town.  More frequent and more intensive lighting is recommended here, with fixtures at each street-highway intersection and also each alley along Highway 62 through the Historic Business and Downtown Service Districts (Exhibit A).  To maximize illumination, the recommended pole and fixture height is the highest in the Town at 25', with the Leadership in Energy and Environmental Design (LEED) recommended maximum of .6 footcandles.  Intersections with private driveways or accesses to private property are not considered here.  The street light mid-block on the south side of Highway 62 between Liddell Drive and South Railroad Street should be removed.  New street lights should be located at the Liddell Street and South Railroad Street intersections with Highway 62.

BLM_0066648

## VIII.   Commercial Areas:
### Downtown Historic Business, Highway Commercial, Light Industrial

Three different areas are addressed in this section: Downtown Historic Business District, Highway Commercial (Highway 550 and 62/ Sherman Street), and the Light Industrial zones.

### A. Downtown Historic Business Core

The objectives for the Downtown Business area are to provide appropriate and aesthetic illumination that clearly defines the area from the rest of Town. The plan is for a mix of the recommended street light fixtures and locally-crafted, low-level pedestrian bollards. The mixture of street and bollard illumination was the preferred scheme of the community during the downtown streetscape planning process. This combination provides for unique, commercial illumination while minimizing both energy and financial expenditures.

The 2006 Streetscape Plan defines street light and bollard locations for this area, which are integrated into this plan (Exhibit A). Light poles are located at opposing corners of street intersections with bollards placed in between and along both sides of the streets (Exhibit C). Input from the community was for quality illumination with some local artist participation and appropriate illumination levels for a vibrant downtown.

With two streetlights proposed for each intersection, as opposed to one light at each intersection in the rest of Town, the light source is proposed at the residential level of 3600 lumens (50 watt HPS), and the fixture height at 20'. The LEED recommended maximum of .6 footcandles is proposed for this area. The fixture head is similar to the remainder of Town. The bollards are locally crafted (Exhibits B and D). It is recommended that an assessment and evaluation of the Downtown Historic District lighting plan be completed by a lighting professional prior to purchase and installation of the identified final lighting product(s).

### B. Highway Commercial

This area encompasses the General Commercial district surrounding the intersection of Highways 62 and 550. There are commercial and residential uses within this area. As such, the recommendations are for more intensive lighting on the highway corridors as arterial roadways and less intensive lighting in the more residential areas accessed via collector and local streets. Reference the Conceptual Lighting Plan Map in Exhibit A for specific locations.

There are a significant number of privately-held, non-compliant and non-functional street and pedestrian-level lights in the area east of Highway 550. It is suggested that the property owner(s) be contacted and notified of the non-compliant lighting and the proposed specifications for this area. While there is a significant amount of light in this area (Attachment E), better illumination here could greatly enhance the Town's gateway and facilitate continuity between the Highway Commercial and Downtown Areas. Fixture heights in this area are recommended at 20', just higher than the residential standard, but lower than the Highway Corridor lighting for arterial streets, with the LEED recommended maximum of .6 footcandles. This will provide for greater light distribution on the ground for the commercial area, and also respect the many residential uses here. This area does not include the Highway rights-of-way, which are defined in Section VI, Highway Right-of-Way.

BLM_0066649

C. Light Industrial Park

As the Light Industrial Park is central to Town and adjoins residential neighborhoods on all sides, illumination in this area should comport generally with the rest of Town.  The proposed fixtures, poles, lamps (50 watt HPS, 3600 lumens), and heights (18') are the same as those recommended for the Historic Residential and Residential areas.  The LEED recommendation for industrial areas is a maximum of .2 fc.  Street lights are located at each road intersection.

BLM_0066650

## IX.   Residential Areas

Residential areas are primarily zoned Historic Residential (HR) and Residential (R), and are the focus of this section.  Residential uses within commercial zones are addressed in the Highway Commercial section of the plan.  The rural subdivisions of Vista Terrace, RiverSage, Sweetwater, and other future rural subdivisions within the Town are not considered here.  In order to minimize light pollution, glare and visual impact from the hills surrounding the core of Town, little or no lighting is recommended in these rural areas, although sufficient illumination may be appropriate at major intersections accessing the subdivision(s).

Limited illumination providing for vehicular and pedestrian safety at major road intersections is desired.  The lighting plan generally comports with the arterial, collector, and local street designations previously stated.  Because the residential areas consist mostly of local streets, lighting is planned at significant road intersections only, and no illumination of alleyways.  In the downtown Historic Residential area, where major intersections occur only on the perimeter and along the highway, lighting is proposed at alternating intersections within the district.

To eliminate or minimize trespass onto private properties the pole and fixture height are reduced to a maximum of 18', with the LEED recommended maximum of .1 footcandles.  Light distribution should be sufficient enough to illuminate the intersection while respecting the desire for relative darkness in these areas.

The intersection at Amelia/ Moffat Streets, the entry to Le Ranch Subdivision at South Amelia/ Le Ranch Boulevard, and the intersection at South Lena Street/ Chipeta accessing Solar Ranches should have new street lights.  The non-functional street lights in Solar Ranches should be removed and replaced as recommended for residential lighting.

BLM_0066651

## X.   Parks and Trails

If bollard-style lighting is desired in the parks or improved public spaces, it is recommended that the selected styles and associated specifications be incorporated to establish artful continuity throughout the Town.  Otherwise, the specified pedestrian level (18') illumination may be appropriate.

Where there are significant trail crossings or when a pedestrian trail intersects a roadway, taller, pedestrian lighting (18') should be present. The recommended pole and fixture styles are the same as the residential lighting (Exhibits B and D).  Specifically, these pedestrian lights are to be located at the Uncompahgre Riverway trail intersections with Charles, Otto, and Railroad Streets.  It is also recommended that the existing, non-compliant bollards in the Town Hall parking lot be replaced with these taller (18') pedestrian light fixtures (refer to plan map, Exhibit C).

The recommended maximum height for the bollards is 3.5' (42") with the LEED recommended maximum of .2 footcandles.  The bollards should be visible above winter snow yet low enough to minimize direct lighting at eye-level.  Bollards should be sturdy, without sharp edges and constructed to mitigate vandalism and injury.  Two local designers, Attraction Lights and Issenberg Design, submitted design proposals, which are included here, in part, in Exhibits B and D. Complete proposals for the bollards are available at Town Hall.  It is recommended that the existing, non-compliant bollards at the Uncompahgre River pedestrian bridge connecting Rollans Park to River Bank Minor Subdivision be replaced with these specified bollards.

A. Hartwell Park
The purpose of illuminating the pedestrian trail through Hartwell Park is to provide connectivity between the downtown business district, post office, Sherman Street, Town Hall, and the Ridgway Library.  The bollards should be spaced approximately every 50 linear feet, such that pedestrians can easily follow to the path.  The initial phase will begin at the eastern edge of the post office at Lena and Clinton Streets moving west to the sidewalk intersection at Town Hall and then north along the sidewalk to Charles Street.  This will connect the downtown historic district at the post office to the library and public parking area east of North Railroad Street. When feasible, additional bollards should be placed along the sidewalk from Town Hall to Sherman Street.

BLM_0066652

## XI.   Lifecycle Costs

SMPA has 2 meters on existing streetlights for tracking and billing kWH usage for the Town street lights. One meter measures the power supply for the 70w HPS streetlights and is located at Railroad Street/ Highway 62.  The other meter measures power supply on the 50w HPS streetlights and is located at Cora/Clinton Street.  The usage is then multiplied by the number of fixtures that have 70 watt or 50 watt bulbs in order to arrive at a final usage and invoice total for the Town's 53 streetlights.

The table below displays the average energy usage (kWH) and cost ($) per fixture, and for all fixtures town-wide using a similar wattage (50 or 70) for each of the two meters.  The wattage and cost are the averages as reflected on the SMPA billing statements from August 2008 – July 2009.  The 2009 rate for kWH usage is $0.13 / kWH.

| | | | Per Fixture Costs | | Total Fixture Costs | | | |
|---|---|---|---|---|---|---|---|---|
| Street Light Meter # | Location | Mult* | kWH/ fix (mo. avg) | $/fix (mo.) | Total kWH (mo.) | Total Avg. Cost (mo.) | Total kWH (year) | Total Annual Cost |
| 93100602 | RR St./Hwy 62 (70w HPS) | 14 | 16 | $2.08 | 225 | $29.25 | 2702 | $351.26 |
| 32249709 | Cora/Clinton (50w HPS) | 30 | 18 | $2.38 | 550 | $71.50 | 6600 | $858.00 |

*"Mult" is the multiplier for SMPA, which is equal to the number of street lights in Town that have similar wattage (50 or 70) used to estimate energy use in lieu of having a meter for each street light

At the time of this assessment, the 70 watt HPS light bulb in the Railroad Street/Hwy 62 fixture was at the end of its useful life.  Therefore the 50w HPS monthly average use (kWH) and cost per fixture ($/fix) are greater than the 70w HPS fixture usage and cost at this time.  It is estimated when the 70 watt bulb is replaced, the kilowatt usage and cost will increase accordingly.

Total Annual Energy Use (kWH) for all Town Street Lights:  9,302 kWH
Total Annual Cost ($) for all Town Street Lights:         $1,209.26 (at $0.13 / kWH)

The energy use and cost for the Town's streetlights reflect the darkness of the Town.  Similarly, maintenance costs on the existing cobra head fixtures and HPS bulbs are negligible.  The existing poles are maintained by SMPA.  Some HPS lamps have been replaced since installation and some need replaced at this time.  Replacement costs for the HPS lamps are $10.45 for the 50 watt and $17.35 for the 70 watt, as of September 2009 from CED.

The current efficiency levels of the 50 and 70 watt high pressure sodium lamps and the significant cost of purchasing and retrofitting these lamps and/or fixtures with the LED technology available today, reveals that there is no demonstrated financial or energy conservation benefit for converting to LED technology at this time.

As technology advances, prices decrease, more color options become available, and/or the existing fixtures and lamps begin to reach the end of their useful life, the Town may wish to

BLM_0066653

consider the transition to more efficient lamps such as LEDs.  The LED source with a warm filter may provide efficiency while filtering the bright white nature of the technology.

Incandescent lamps are not considered here as the technology is being phased out pursuant to federal legislation, and therefore, it is not a feasible option for the future.  Likewise, compact fluorescent technology is generally not suitable to the cold temperatures in Ridgway.  In researching lifecycle costs, comparison values for LEDs vs. HPS lamps are not readily available.  Therefore, a comparison has been created using the existing Town lighting and representative LED lighting available on the market today (see Lifecycle Energy and Financial Cost Comparison on page 19).

In the chart on the next page, varied wattages and applications of HPS and LED lamps/fixtures are compared for both energy and cost savings.  Specifications for high-pressure sodium lamps are from Consolidated Electrical Distributors (CED) in Montrose.   Beta LED streetlight specifications and pricing are based on basic streetlights recently installed in the City of Ouray and also from CED.  Note that the Town already owns 39 Cobra Head fixtures; therefore the up front cost of the Cobra Head street light options would be slightly less than indicated.

According to the US Department of Energy (DOE), the energy efficiency of lamps is typically measured in lumens per watt (lm/W), meaning the amount of light produced for each watt of electricity that is consumed. This is known as luminous efficacy.  As such, lumens per watt are presented here to compare each light source or fixture.

The DOE also reports the useful life of a lamp is generally accepted to be at a point where the lumen output of the lamp has degraded by up to 30%.  This is represented as operating at 70% of the initial lamp output level, or providing 70% of the initial lumens, abbreviated as $L_{70}$ for general lighting and $L_{50}$ for decorative lighting.  Because the LED technology for the applications here is relatively new, the demonstrated lifetime hours are estimates from the manufacturer's specifications and have not yet been tested.  More information on lamp life may be found at: http://apps1.eere.energy.gov/buildings/publications/pdfs/ssl/lifetime_white_leds_aug16_r1.pdf

BLM_0066654

*Lifecycle Energy and Financial Cost Comparison of LED and HPS lamps and fixtures*

| | Bollard | | Lower Luminance Street Light | | | Higher Luminance Street Light | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | HPS Bollard (50w HPS) | LED Bollard (Array Par 30 warm) | Existing HPS (50 watt) | Leotek LED SLN-036 | Beta LED 034 Fixture | Existing HPS (70 watt) | Leotek LED SLN-048 | Beta LED 051 Fixture | Sylvania LED Cobra Retrofit | WARP 9 LED Fixture |
| **Watts** | 50 | 7.8 | 50 | 48 | 84 | 70 | 58 | 117 | 40 | 175 |
| **Lumens** | 4000 | 550 | 4000 | 3600 | 4140 | 6300 | 4800 | 6210 | 2800 | 5942 |
| **Lumens/ Watt** | 80 | 71 | 80 | 75 | 49 | 90 | 83 | 53 | 70 | 34 |
| **Color Temperature** | 2100K | 3000K | 2100K | 3500K | 6000K | 1900K | 3500K | 6000K | 5700K | 3500-5100K |
| **Retail Cost of Lamp/Fixture** (Sep/Dec 2009) | $40.75 | $112.50 | $10.45 | $449.00 | $500.00 | $10.45 | $449.00 | $700.00 | $595.00 | $1,100.00 |
| **Actual Lamp Lifetime Hours** | 24,000 | 50,000 | 24,000 | 50,000 | 50,000 | 24,000 | 50,000 | 50,000 | 50,000 | 64,000 |
| **Target Lifetime Hours** | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| **Cost ($)/kWH** (SMPA 2009) | 0.13 | 0.13 | 0.13 | 0.13 | 0.13 | 0.13 | 0.13 | 0.13 | 0.13 | 0.13 |
| **# Lamps Needed for 50K Hours** | 2.08 | 1.00 | 2.08 | 1.00 | 1.00 | 2.08 | 1.00 | 1.00 | 1.00 | 0.78 |
| **Cost of lamps for 50K Hours** | $85 | $113 | $22 | $449 | $500 | $22 | $449 | $700 | $595 | $859 |
| **Retail Cost of Fixture** (Sep 2009) | $450 | $450 | $75 | incl above | incl above | $75 | incl above | incl above | incl above | incl above |
| **Total # Fixtures Town wide** (estimated) | 12 | 12 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 |
| **Lifetime Cost ($): elect.+bulb+fixt** (per lamp) | $860 | $613 | $422 | $761 | $1,046 | $552 | $826 | $1,461 | $855 | $1,997 |
| **kWH Electricity Used over 50K Hrs** (per lamp) | 2500 | 390 | 2500 | 2400 | 4200 | 3500 | 2900 | 5850 | 2000 | 8750 |
| **Total Lifetime Cost ($) - All Fixtures** | $10,319 | $7,358 | $37,959 | $68,490 | $94,140 | $49,659 | $74,340 | $131,445 | $76,950 | $179,719 |
| **Total Lifetime Energy Cost (kWH) -**All Fixtures | 30,000 | 4,680 | 225,000 | 216,000 | 378,000 | 315,000 | 261,000 | 526,500 | 180,000 | 787,500 |

**CHART CLARIFICATIONS:** Bollard pricing ("retail cost of lamp/fixture") includes lamp and housing, but not the decorative bollard.  "Retail cost of the fixture" is the estimated cost of the artistic bollard housing and therefore the same for all lamp sources identified in the chart.  LED street light pricing includes lamp and fixture costs, although the HPS bulbs and Cobra Head fixtures are priced separately.  To accommodate this, the retail cost of the cobra head fixtures are added into the overall cost of the estimated 90 HPS bulbs and fixtures.  This allows for a more accurate comparison of cost.  However, it is noted that cobra head fixture with HPS lamp cost is now inflated as the Town already owns 39 Cobra Head fixtures and HPS bulbs.  For a true comparison, the overall cost of the Cobra head/HPS may be reduced by $2925, excluding the lamps, which is 39*$75 (39=fixtures already owned, $75 is cost of GE Cobra head fixture), although this is quite negligible to overall costs.

2009 specifications and estimates are from Consolidated Electrical Distributors in Montrose, Colorado and manufacturer's specifications.  The Beta LED-034 specifies a lamp life of 121,000 hours and the Beta LED 051 specifies 80,000 hours.  This is significantly higher then other estimates for LED lamp life, which are estimated at 50,000 hours with qualifying language that the life is uncertain at this time as the technology is relatively new.  In order to make a more equitable comparison, the BETA fixtures are specified here at 50,000 hours.  Also of note are the lumens for the LED Par 30 lamp (bollard) and the 2800 lumen output of the Sylvania retrofit, which are significantly lower than the lumens for the other lamps.

In late 2009 AAL, the distributor of the specified street lights, notified the Town that the specified street light fixture (Universe series) will soon be available in LED, at which time additional and updated comparison may be beneficial.  Color temperature on LED fixtures varies from 3000-6000K depending on selection of warm white for higher brightness.

BLM_0066655

Summary of Comparison Chart

The LED / HPS comparison chart is categorized into 3 options: low-level pedestrian bollards, lower-luminance street lights (eg: residential applications), and higher-luminance street lights (commercial applications). The lower-luminance compares the existing 50-watt HPS GE Cobra Head fixtures with two LED fixture options of comparable luminance. The higher-luminance compares the existing 70-watt HPS GE Cobra Head fixtures with three LED fixture options of comparable and higher luminance, as well as a Sylvania LED retrofit option for the existing GE Cobra Head fixtures.

The comparison prioritizes similar light output, or lumens, although there is some fluctuation within each category. When comparing lumens per watt to understand lamp efficiency, the LED lamps are more efficient than the HPS lamps, which is unsurprising. The color temperature also indicates that LED lamps emit a "whiter" light, as compared the "yellowish" illumination of the HPS.

Overall the LED fixtures are much more expensive to purchase than the GE Cobra Head fixtures with HPS lamps. When considering the purchase of 90 street lights in realization of this plan, not including future subdivisions, the cost of purchasing the LED fixtures is about twice as expensive as the HPS GE fixtures. While the lower wattage LED fixtures realize some energy savings over the lifetime of the fixtures when measured in kilowatt hours, the higher wattage LED fixtures appear to use more energy than the existing HPS GE fixtures. The far lower wattage of the LED Par 30-array (10 watts vs. 50 watts) specified for the bollard illustrates this clearly. The lower-wattage Sylvania retrofit also yields significant energy savings over the lifetime of the fixture. Outside of the low-watt LED lamp for the bollard and the Sylvania LED Retrofit Lamp for the cobra head fixtures, the higher wattages of the LED street lights do not result in real energy savings over the existing 50 and 70 watt high pressure sodium lamps. Until such time lower wattage LEDs are available in the desired illumination and fixture style, and at a more reasonable up-front investment cost, there is no apparent or significant benefit to switching from HPS to LED at this time. Of course, subsidization of the investment may offset costs sufficiently to justify a transition to LED technology for street light applications. This opportunity is addressed in the next section.

In the November 2009 report prepared for the US Department of Energy comparing HPS GE fixtures with the Leotek LED street lights, Pacific Northwest National Laboratory reports a 20 year payback period for replacement of 100 watt HPS GE Cobra Head fixtures with a comparable Leotek LED street light luminary, and a 7.6 year payback for new installations.[1]

---

[1] Pacific Northwest National Laboratory. Demonstration Assessment of Light-Emitting Diode (LED) Street Lighting on Lija Loop in Portland, Oregon. November 2009. Page 7. Retrieved February 24, 2010 from: http://apps1.eere.energy.gov/buildings/publications/pdfs/ssl/gateway_lija-loop.pdf

BLM_0066656

## XII.   Responsibility

It is understood that maintenance, repair and replacement of lighting on Town-owned property is the responsibility of the Town, while lighting on private property is the responsibility of the property owner.  It is also understood that all lighting is subject to the regulations of the Town, although there are a number of pre-existing, non-compliant lights.  This plan seeks to present compliant alternatives in order to encourage the phasing out of existing, non-conforming lights with preferred alternatives that meet the goals identified herein.

As stated previously, in consideration of community desires for a dark-skies community, it is recommended that owners of non-compliant fixtures be advised of this Town-wide Lighting Plan and specifications for compliant illumination.

As the Town does not currently have the equipment or expertise to maintain, repair and replace the existing GE Cobra Head fixtures on the SMPA utility poles, the current arrangement with SMPA seems appropriate.  However, at such time the new, street lighting is installed, it is understood that SMPA may not be willing to maintain, repair, and inventory the poles, fixtures, and lamps, as they are doing today.  The Town will need to work with SMPA to identify resources for installation, maintenance, repair and inventory methods.

As new development occurs and street or pedestrian lights are purchased and installed in the Town rights-of-way, with the cooperation of the local electric utility provider, it is recommended that the fixtures be dedicated to the Town, similar to other subdivision improvements required by the Town Code, such as sidewalks, roads, utilities, etc.

BLM_0066657

## XIII.   Phasing Plan and Financing Opportunities

Phasing Plan

The proposed phasing plan, in the order of first priority to last for installation of new lights, considers community inputs during the downtown Historic Streetscape planning in 2006, as well as existing financial feasibility for the Town.

1. Follow up with existing non-compliant lighting to encourage compliance, particularly at the Town Gateway at Highways 62/550
2. Pedestrian Lighting in Town Park with grid-tied solar electric system at Town Hall
3. Historic Business District: Clinton Street, Lena to Laura then remainder of streetscape
4. Remainder of HB District
5. Highway Commercial
6. Highway Rights-of-Way
7. Residential Areas

Financing Opportunities

There are a number of financing opportunities available to the Town for lighting, from a variety of sources.   This is not a comprehensive listing, only a starting point.   Award for some opportunities may be contingent upon demonstrated energy savings.   The installation and utilization of a grid-tied system to offset lighting costs may also assist in securing financing to offset the financial cost of installing the system(s).

1. LOCAL: Town of Ridgway
   Utilize portion of unexpended 0.6% sales tax revenues for pedestrian lighting through Hartwell Park.

2. STATE: Governor's Energy Office - Alternative Energy and Energy Efficiency[2]
   a. Street Lighting Grant - Limited funding for EECBG non-entitled communities to pay for the cost of LED or high-efficiency incandescent streetlights. Funds are for the cost of equipment only and only non-entitled EECBG local governments may apply. This grant opens in mid –April 2010
   b. NEED Grant - Grants for projects that involve installations or programs that lead to the installation of established energy efficiency or renewable energy technology. This grant opens in mid-July 2010.
   c. Additional opportunities – with American Recovery and Reinvestment funding and other GEO initiatives, additional opportunities may arise over time.

3. UTILITIES: SMPA and Tri-State Generation
   a. Net Metering on Grid-tied System/ Power Purchase Agreements
      Pursuant to Colorado law, utilities are required to offer net metering to all eligible renewable energy resources for systems less than 25 kW in size. Any net excess generation is credited to customer's next bill at retail rate. Per current SMPA

---

[2] GEO Grants: http://www.colorado.gov/energy/index.php?/resources/category/funding-opportunities/

BLM_0066658

guidelines, any net excess energy sales to SMPA are paid, through an annual reconciliation process, at SMPA's avoided energy charge (which does not include SMPA's demand charge).

b. Financial Partner – SMPA may also be explored as a financial partner with the Town to assist in reaching the utility's energy goals.

4. PRIVATE:

a. Strategic Environmental Project Pipeline (StEPP) Foundation – a 501(c)(3) non-profit organization operating throughout the United States and "dedicated to helping organizations realize their vision of a clean and safe environment by matching projects with funders". A majority of Foundation awards are made in Colorado.[3]

---

[3] StEPP Foundation - http://www.steppfoundation.org/main.htm

BLM_0066659

## ATTACHMENT A: LED Comparison Charts in Town Park and Town Hall 2008-2009





BLM_0066660

## ATTACHMENT B: LIGHTING INVENTORY SPREADSHEET (Feb 2009)

| Pole | Fixt | Bulb | Pole Ht | Comment | Status | Dark Skies | Property |
|------|------|------|---------|---------|--------|------------|----------|
| wood | #3 | 50wHPS | 23 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 50wHPS | 25 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 50wHPS | 24 | GE250 Cobra Head Luminaries | Not Working | Yes | Public |
| wood | #3 | 50wHPS | 25 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 50wHPS | 25 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 50wHPS | 25 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 50wHPS | 25 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 70wHPS | 25 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 70wHPS | 25 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 70wHPS | 25 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 70wHPS | 25 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 70wHPS | 25 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 50wHPS | 25 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 50wHPS | 24 | GE250 Cobra Head Luminaries | Not Working | Yes | Public |
| wood | #3 | 50wHPS | 22 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 50wHPS | 23 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 70wHPS | 25 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 50wHPS | 25 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 50wHPS | 25 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #4 | UNK | 14 | Solar Ranches Solar Light | Not Working | No | Public |
| wood | #4 | UNK | 14 | Solar Ranches Solar Light | Not Working | No | Public |
| wood | #4 | UNK | 14 | Solar Ranches Solar Light | Not Working | No | Public |
| wood | #3 | 50wHPS | 22 | GE250 Cobra Head Luminaries | Not Working | Yes | Public |
| wood | #5 | UNK | 32 | Land Use Office (mercury?) | Working | Yes | County |
| metal | #7 | UNK | 10 | RUSA 3-5 Head | Working | No | Private |
| metal | #7 | UNK | 10 | RUSA 3-5 Head | Working | No | Private |
| metal | #3 | 70wHPS | 40 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| metal | #7 | UNK | 10 | RUSA 3-5 Head | Working | No | Private |
| metal | #7 | UNK | 10 | RUSA 3-5 Head | Working | No | Private |
| metal | #7 | UNK | 10 | RUSA 3-5 Head | Not Working | No | Private |
| metal | #7 | UNK | 10 | RUSA 3-5 Head | Working | No | Private |
| metal | #7 | UNK | 10 | RUSA 3-5 Head | Not Working | No | Private |
| metal | #8 | UNK | 16 | Christian Center (Single Head) | Working | Yes | Private |
| metal | #8 | UNK | 16 | Christian Center (Single Head) | Working | Yes | Private |
| wood | #9 | UNK | 35 | Fairgrounds | | No | Public |
| wood | #9 | UNK | 35 | Fairgrounds | | No | Public |
| wood | #9 | UNK | 35 | Fairgrounds | | No | Public |
| wood | #9 | UNK | 35 | Fairgrounds | | No | Public |
| wood | #9 | UNK | 35 | Fairgrounds | | No | Public |
| wood | #9 | UNK | 35 | Fairgrounds | | No | Public |
| metal | #8 | UNK | 20 | Ridgway Lodge and Suites | Working | Yes | Private |
| metal | #8 | UNK | 20 | Ridgway Lodge and Suites | Working | Yes | Private |
| metal | #8 | UNK | 20 | Ridgway Lodge and Suites | Working | Yes | Private |
| metal | #6 | Incand | 13 | Parkside | Not Working | Yes | Public |
| metal | #6 | CF | 12 | River Park, hardwire CF 08 | Working | Yes | Public |
| metal | #6 | CF | 13 | River Park, hardwire CF 08 | Working | Yes | Public |
| metal | #6 | CF | 13 | River Park, hardwire CF 08 | Working | Yes | Public |
| metal | #6 | CF | 13 | River Park, hardwire CF 08 | Working | Yes | Public |
| metal | #6 | Incand | 13 | River Park, hardwire CF 08 | Working | Yes | Public |
| wood | #3 | 50wHPS | 22 | GE250 Cobra Head Luminaries | working | Yes | Public |
| wood | #5 | Incand | 28 | Glen Pauls Light | Not Working | Yes | Private |
| wood | #5 | 50wHPS | 30 | Block 31 Alley | Working | Yes | Public |
| wood | #3 | 50wHPS | 22 | GE250 Cobra Head Luminaries | Not Working | Yes | Public |

BLM_0066661

| Pole | Fixt | Bulb | Pole Ht | Comment | Status | Dark Skies | Property |
|------|------|------|---------|---------|--------|------------|----------|
| wood | #3 | 50wHPS | 25 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 50wHPS | 27 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #2 | UNK | 25 | Amelia Street and Charles | Working | No | Public |
| wood | #3 | 50wHPS | 28 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 50wHPS | 24 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 50wHPS | 22 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 70wHPS | 28 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 70wHPS | 25 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 70wHPS | 24 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 70wHPS | 28 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 50wHPS | 27 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 50wHPS | 27 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 50wHPS | 25 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 70wHPS | 35 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #3 | 50wHPS | 25 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| metal | #8 | UNK | 16 | County Fairgrounds County Property | Not Working | Yes | County |
| metal | #8 | UNK | 16 | County Fairgrounds County Property | Not Working | Yes | County |
| metal | #3 | 70wHPS | 40 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| wood | #5 | UNK | 30 | Ingo Entry | Not Working | Yes | Public |
| wood | #5 | UNK | 28 | VT Entry (incand or HPS) | Not Working | Yes | Public |
| metal | #6 | Incand | 13 | Parkside | Not Working | Yes | Public |
| metal | #6 | Incand | 13 | Parkside | Not Working | Yes | Public |
| metal | #1 | Incand | 18 | Grady install 2008 Share Cost with Town | Working | Yes | Private |
| metal | #1 | Incand | 18 | Grady install 2008 Share Cost with Town | Working | Yes | Private |
| metal | #12 | UNK | 10 | RUSA Single | Working | No | Private |
| metal | #12 | UNK | 10 | RUSA Single | Not Working | No | Private |
| metal | #12 | UNK | 10 | RUSA Single | Working | No | Private |
| metal | #12 | UNK | 10 | RUSA Single | Not Working | No | Private |
| metal | #12 | UNK | 10 | RUSA Single | Not Working | No | Private |
| metal | #12 | UNK | 10 | RUSA Single | Working | No | Private |
| metal | #12 | UNK | 10 | RUSA Single | Working | No | Private |
| wood | #3 | 50wHPS | 30 | GE250 Cobra Head Luminaries | Working | Yes | Public |
| metal | #14 | UNK | 23 | Lot 1 River Bank Minor | Working | No | Private |
| metal | #14 | UNK | 23 | Lot 1 River Bank Minor | Working | No | Private |
| metal | #13 | UNK | 23 | Lot 1 River Bank Minor | Working | No | Private |
| wood | #15 | Incand | 3 | Town Bollards | Working | No | Public |
| wood | #15 | Incand | 3 | Town Bollards | Working | No | Public |
| wood | #15 | CF | 3 | Town Bollards | Working | No | Public |
| wood | #15 | CF | 3 | Town Bollards | Working | No | Public |
| wood | #15 | CF | 3 | Town Bollards | Working | No | Public |
| wood | #15 | CF | 3 | Town Bollards | Working | No | Public |
| metal | #10 | Incand | 30 | School Double Arch | Working | Yes | Private |
| metal | #10 | Incand | 30 | School Double Arch | Working | Yes | Private |
| metal | #11 | Incand | 30 | School Single Arch | Working | Yes | Private |
| metal | #11 | Incand | 30 | School Single Arch | Working | Yes | Private |
| metal | #11 | Incand | 30 | School Single Arch | Working | Yes | Private |
| metal | #11 | Incand | 30 | School Single Arch | Working | Yes | Private |
| metal | #10 | Incand | 30 | School Double Arch | Working | Yes | Private |
| metal | #11 | Incand | 30 | School Single Arch | Working | Yes | Private |
| metal | #11 | Incand | 30 | School Single Arch | Working | Yes | Private |
| metal | #11 | Incand | 30 | School Single Arch | Working | Yes | Private |
| wood | #5 | UNK | 30 | Elementary School | Working | Yes | Private |
| metal | #8 | UNK | 16 | Heritage Park | Working | Yes | Public |
| metal | #8 | UNK | 25 | Mountain Market | Working | Yes | Private |
| metal | #8 | UNK | 25 | Mountain Market | Working | Yes | Private |

BLM_0066662

| Pole | Fixt | Bulb | Pole Ht | Comment | Status | Dark Skies | Property |
|------|------|------|---------|---------|--------|------------|----------|
| metal | #14 | UNK | 23 | Lot 1 River Bank Minor | Working | No | Private |
| metal | #16 | UNK | 3 | Alpine Bank Bollards | Working | Yes | Private |
| metal | #16 | UNK | 3 | Alpine Bank Bollards | Working | Yes | Private |
| metal | #16 | UNK | 3 | Alpine Bank Bollards | Working | Yes | Private |
| metal | #16 | UNK | 3 | Alpine Bank Bollards | Working | Yes | Private |
| metal | #16 | UNK | 3 | Alpine Bank Bollards | Working | Yes | Private |
| metal | #16 | UNK | 3 | Alpine Bank Bollards | Working | Yes | Private |

|  | Totals |  | Fixture Types | |
|---|---|---|---|---|
| Total Light Fixtures | 116 | | #1 | 2 |
| On Public Property | 67 | | #2 | 1 |
| On Private Property | 46 | | #3 | 39 |
| On County Property | 3 | | #4 | 3 |
| Fixture/Bulb Working | 90 | | #5 | 6 |
| Fixture/Bulb Not Wrk | 20 | | #6 | 8 |
| Bulb (50W HPS) | 27 | | #7 | 8 |
| Bulb (70W HPS) | 13 | | #8 | 10 |
| Bulb (CF) | 8 | | #9 | 6 |
| Bulb (Incand) | 19 | | #10 | 3 |
| Bulb (UNK) | 49 | | #11 | 7 |
| Pole (metal) | 57 | | #12 | 7 |
| Pole (wood) | 59 | | #13 | 1 |
| Dark Skies Compliant | 81 | | #14 | 3 |
| Dark Skies Non-Compl | 35 | | #15 | 6 |
| Non-Compl (Public) | 16 | | #16 | 6 |
| Non-ComplPrivate) | 19 | | | |
| Non-Compl (Other) | 0 | | Total: | 116 |

BLM_0066663

## ATTACHMENT C: LIGHTING INVENTORY MAP (February 2009)



BLM_0066664

## ATTACHMENT D: LIGHTING INVENTORY PHOTOGRAPHS



BLM_0066665

## ATTACHMENT E: LIGHT OUTPUT MEASUREMENTS

| Location | Distance* | EV | Lux | FC | Lamp | Wattage |
|---|---|---|---|---|---|---|
| North Amelia/ Charles | direct | 1.3 | 6.2 | 0.576 | HPS | 50 |
| | 6' | 1.7 | 8.1 | 0.753 | | |
| | 20' | 1.4 | 6.6 | 0.613 | | |
| Marie / South Amelia | 6' | 1.7 | 8.1 | 0.753 | HPS | 50 |
| South Cora/ Moffat | 6' | 1.7 | 8.1 | 0.753 | HPS | 50 |
| | 12' | 1.5 | 7.1 | 0.659 | | |
| | 28' | 0.4 | 3.3 | 0.307 | | |
| 62/550 (on SW ped island) | direct | 4.3 | 49 | 4.552 | HPS | 70 |
| Rio Grande Western Building (ped light) | direct | 6.7 | 260 | 24.155 | HPS | 50 |
| | 5' | 6.0 | 160 | 14.864 | | |
| | 10' | 5.0 | 80 | 7.432 | | |
| North Railroad / Hwy 62 | direct | 3.1 | 21 | 1.951 | HPS | 70 |
| | 15' | 3.0 | 20 | 1.858 | | |
| | 25' | 2.2 | 12 | 1.115 | | |
| | 40' | 0.8 | 4.4 | 0.409 | | |
| Town Hall Parking Lot Ped Bollard (CC)** | 5' | 1.6 | 7.6 | 0.706 | CC | 8 |
| Town Hall Parking Lot Ped Bollard (CF)*** | 5' | 1.9 | 9.3 | 0.864 | CF | 9 |
| North Railroad/ North Cora (ind.pk) | direct | 3.9 | 37 | 3.437 | CF | 18 |
| | 5' | 3.4 | 26 | 2.415 | | |
| | 10' | 1.9 | 9.3 | 0.864 | | |
| North Railroad / River Park Drive (ind.pk) | direct | 3.4 | 26 | 2.415 | CF | 18 |
| | 5' | 3.0 | 20 | 1.858 | | |
| | 10' | 1.6 | 7.6 | 0.706 | | |
| Clinton/ North Lena | direct | 1.8 | 8.7 | 0.808 | HPS | 50 |
| | 10' | 1.3 | 6.2 | 0.576 | | |
| | 20' | 0.6 | 3.8 | 0.353 | | |
| City of Ouray (north town entry)**** | Direct | 2.4 | 13 | 1.208 | LED | 78 |
| | 25' | 2.0 | 10 | 0.929 | | |
| | 40' | 1.6 | 7.6 | 0.706 | | |
| City of Ouray***** (pole 347: 4th Ave, west of Main) | Direct | 2.6 | 15 | 1.394 | LED | 53 |
| | 25' | .6 | 3.8 | 0.353 | | |
| | 40' | 1.6 | 7.6 | 0.706 | | |

Ridgway Measurements taken April 2010 by Bill Liske and Jen Coates
Ouray Measurements taken May 2010 by Jen Coates
18 watt CF lamps in River Park are equivalent to 100 watt incandescent
Where appropriate, road centerline measurements were targeted
*Distance = distance from nadir; direct= directly under lamp at existing fixture height; 5, 10, 20 etc. is horizontal distance, in feet, from the nadir (nadir is the location directly below the lamp).
**CC = Cold Cathode Compact Fluorescent Lamp
***CF = Compact Fluorescent
****streetlight located ~1/4 mile south of Hot Springs Inn at North Town entry on Hwy 550
*****discrepant measurements may be due to a number of factors, including mounting height (lamp source is closer to ground on side streets), light direction, slope of the land, etc.  The 'direct' measurement may be the most reliable in this circumstance.

BLM_0066666

**EXHIBIT A: 2009 CONCEPTUAL LIGHTING PLAN MAP**



BLM_0066667

## EXHIBIT B: SAMPLE LIGHTING STANDARDS AND SPECIFICATIONS

| | Lamp and Light Output | Fixture Height | Location |
|---|---|---|---|
| **Highway Corridor Lighting** | 70w HPS/6400 lumens* (streets) 50w HPS/3600 lumens (alleys) 0.6 footcandles (fc) | 25' | All public street & alley intersections along Highway 62 through Town; Approximately every 150' |
| **Hartwell Park** | 50w HPS/ 3600 lumens/ 0.2 fc | 3.5' (42") max | Approximately 50' spacing along sidewalk |
| **Downtown Business (Streetlight)** | 50w HPS / 3600 lumens/ 0.6 fc | 20' | 2 opposing streetlights at each intersection except on Hwy 62; Approximately every 300' per block, 75' from bollards; distance across intersections excepted |
| **Downtown Business (Bollard)** | 50w HPS/ 3600 lumens/ 0.2 fc | 3.5' (42") max | 2 opposing bollards each ½ block, centrally located; Approximately every 150', 75' from street lights |
| **Highway Commercial** | 50w HPS/ 3600 lumens/ 0.6 fc | 20' | All public street intersections, including County Roads |
| **Residential** | 50w HPS / 3600 lumens/ 0.1 fc | 18' | Alternating (grid layout) or significant (other layout) intersections as appropriate; Approximately every 666' |
| **Pedestrian Trail / Road Intersections** | 50w HPS / 3600 lumens/ 0.1 fc | 18' | All trail-road intersections *(e.g.: Charles, Otto and Railroad Streets)* |
| **Industrial Park** | 50w HPS / 3600 lumens/ 0.2 fc | 18' | All public street intersections |
| **Commercial Parking Areas** | 50w HPS / 3600 lumens/ 0.2 fc | 18' | Commercial and Public Parking Areas |

BLM_0066668

## EXHIBIT C: CONCEPTUAL LIGHTING PLAN MAP FOR DOWNTOWN AREA



BLM_0066669

## Exhibit D: RENDITIONS AND SPECIFICATIONS OF PROPOSED FIXTURES*

| Location | Serial Number/ Color, Style | Fixture Style & Lamp | Pole Style & Mount | Manufacturer Distributor | 2009 Retail** |
|---|---|---|---|---|---|
| Highway Corridor Lighting | (UCL-SR-STR- DBZ-70HPS-SLA20) Dark Bronze, Full Cutoff | AAI Universe UCL (large) No luminous element Straight Shade | Flat Arm; 5" Round Aluminum Pole | Architectural Area Lighting/ CED | $3268.25 |
| Hartwell Park | | Local, Custom Refer to photos (Exhibit D) | Bollard | Attraction Lights Lamp - CED | |
| Downtown Business (Streetlight) | (UCM-SR-STR- DBZ-50HPS-SLA20) Dark Bronze, Full Cutoff | AAI Universe UCM (medium) No luminous element Straight Shade | Flat Arm; T4P Multi-Post Pole | Architectural Area Lighting/ CED | $2,245.00 |
| Downtown Business (Bollard) | | Local, Custom Refer to photos (Ex D) | Bollard | Issenberg Design Lamp - CED | |
| Highway Commercial | (UCM-SR-STR- DBZ-50HPS-SLA20) Dark Bronze, Full Cutoff | AAI Universe UCM (medium) No luminous element Straight Shade | Flat Arm; 4" Round Aluminum Pole | Architectural Area Lighting/ CED | $2,245.00 |
| Residential | (UCS-SR-STR- DBZ-50HPS-SLA20) Dark Bronze, Full Cutoff | AAI Universe UCS (small) No luminous element Straight Shade | Flat Arm; 4" Round Aluminum Pole | Architectural Area Lighting / CED | $1721.50 |
| Pedestrian Trail / Road Intersections | (UCS-SR-STR- DBZ-50HPS-SLA20) Dark Bronze, Full Cutoff | AAI Universe UCS (small) No luminous element Straight Shade | Flat Arm; 4" Round Aluminum Pole | Architectural Area Lighting / CED | $1721.50 |
| Industrial Park | (UCS-SR-STR- DBZ-50HPS-SLA20) Dark Bronze, Full Cutoff | AAI Universe UCS (small) No luminous element Straight Shade | Flat Arm; 4" Round Aluminum Pole | Architectural Area Lighting / CED | $1721.50 |

*Representative samples only, recognizing the industry is rapidly changing and it is likely the specified fixtures will change as well.

**2009 retail on AAL includes: freight, lamp, fixture, and pole.



Standard Fixture Head



Standard Fixture, Arm, and Pole

e 34 of 35