amenities, three yurts, a swim beach, marina and boat ramp, 1,000 surface acres of water for boating and fishing, 14 miles of developed hiking trails, picnic areas and shelters, and three playgrounds.

<u>Uncompahgre RiverWay Trail</u>



Efforts to build the Uncompahgre RiverWay Trial, which now connects Ridgway Town Park with Ridgway State Park, began in 1989. The original "rails to trails" idea to convert the old abandoned Denver and Rio Western railroad grade to a trail and greenbelt along the river was initially intended to extend the existing trail from Montrose to the south toward Ridgway.

The original concept was presented to the Montrose Chamber of Commerce "Blue Ribbon Committee on Recreation and Tourism" in 1989. The Uncompahgre RiverWay, Inc., a non-profit organization, was established to champion the idea. The mission of Uncompahgre RiverWay, Inc. was to connect Montrose's existing trail along the Uncompahgre River and abandoned railroad grade to Ridgway State Park, which was just coming on line with its state-of-the-art recreation facilities at the reservoir.

The Town of Ridgway was very enthusiastic about the prospect of the trail and greenbelt and the group members were very encouraged by the cooperative attitude of private landowners adjacent to the proposed trail.



In 1994, Uncompahgre RiverWay, Inc. implemented the first of two Intermodal Surface Transportation Efficiency Act (ISTEA) enhancement awards,[5] as well as a Great Outdoors Colorado (GOCO) Grant, a grant from the National Park Service Rivers, and construction assistance from the AmeriCorps program. The RiverWay trail was constructed from Ridgway Town Park to a 40-acre parcel of land administered by the Bureau of Land Management (BLM) north of Ridgway. A year later, in 1995, the BLM and a partnership consisting of the Town of Ridgway, Ouray County, Uncompahgre RiverWay, Inc., Volunteers For Outdoor Colorado (VOC), and numerous other donors and volunteers, worked together to construct the walk-in park and "watchable wildlife" area, located approximately one mile north of town. Additional funding through ISTEA and GOCO allowed for completion of the trail connection to Ridgway State Park in 2000.



In the past ten years, Uncompahgre RiverWay, Inc. negotiated six separate easements with private land owners along the trail and raised approximately $700,000 in actual-construction grant dollars for the project. All planning, negotiations, design, oversight, and maintenance required for the project was undertaken by Uncompahgre RiverWay, Inc. Currently, the Town of Ridgway, BLM, Ouray County, Delta Correction Center, Uncompahgre RiverWay, Inc., and various volunteers are working cooperatively to monitor and maintain the RiverWay Trail.

---

[5] Provided by the Federal Highway Administration and through the State Dept of Transportation

BLM_0066804

Regional Athletic Park

The park area now known as the Ridgway Regional Athletic Park represents a very unique adaptation of land. This parcel, consisting of approximately eighteen acres, has witnessed dramatic change in the landscape environmentally and culturally over the past two centuries. The land has changed hands from Native American Ute occupation to U.S. Federal Government occupancy, to the deeding of, and ultimate use by cattle ranchers in the Ridgway community, and then subject to purchase by the developers of the Solar Ranches project.



A very strange turn of events occurred in the year 2000 that may explain, at least in part, the ultimate usage of this parcel as a Town park. This turn of events also corresponds with a resounding testament to the legitimacy of the 'curse' placed upon the land by Ute Chief Ouray.[6] According to the curse, the land would have no fruitfulness of any measure, until such time as the curse would be lifted by Ute authority. In July of 2000, through the efforts of volunteers from Ouray, San Miguel and Montrose Counties, amends were made between the Southern and Northern Ute tribes. The event marked the first time that the two tribes were united since Ouray had placed his curse. The tribes danced and drummed on the land now named Ridgway Regional Athletic Park, near the Chipeta Sun Lodge[7].

Perhaps, with the curse now lifted, a clear purpose could emerge for use of the land to benefit future generations of community inhabitants and visitors. The eighteen-acre parcel, which had previously been designated for commercial and residential development, had been deeded to the Town for park purposes.[8]

The park was then planned for multi-use sports fields, baseball diamonds, public restrooms, connecting trails, basketball and tennis courts, and parking areas. The Town was successful in obtaining grant funding for the first phase of the park from GOCO,[9] which together with Town matching funds and resources, was used to complete Phase I in 2002 and 2003.[10] Also of significance is the fact that the Town was awarded additional funding through the Energy Impact Assistance to install a raw water irrigation line to the park, which now provides untreated irrigation water to the playing fields.

Phase II of the Ridgway Regional Athletic Park commenced in 2008. The improvements for Phase II included new tennis courts to replace the aging courts in Hartwell Park, whose fate is to be determined with the road realignment of North Railroad Street, a new gazebo, water fountain, connecting and accessible sidewalks, drainage improvements, and landscaping. Phase 2 of the skate park, inclusive of irrigation and landscape improvements was completed in part in 2011 and is planned for completion in

---

[6] Supposedly, Chief Ouray wished his ill will upon the area surrounding what is now named "Orvis Hot Springs". The stretch of land, inclusive of the Solar Ranch area, represented one of the last holdings of a once vast Ute territory.
[7] Named after Chipeta, wife of Chief Ouray.
[8] The property was deeded to the Town in 1998 as a gift.
[9] Approximately $175,000 was awarded in late 1999, and extended into 2001 when the project commenced.
[10] Phase I now includes two soccer fields, a baseball diamond, two parking lots, a public restroom, a concrete trail a basketball court and significant landscaping and turf.

BLM_0066805

2012.  In 2011 the restroom facility was tied into the Town's wastewater system decreasing prior maintenance concerns.  Finally, the Plan includes development of a third soccer field, a sand volleyball court, on-street parking along Chipeta Drive, and a tot lot playground facility.   This Plan was developed by local Ridgway High School students in 2008 with the guidance of a local landscape artist and inputs from the Parks, Trails, and Open Spaces Committee.

Skate Park

The Town, in response to submitted petitions and expressed interests before the Town Council is pursuing the construction of a skate park in FY 2005.  The proposed site for this facility is the vacant ground north of the public parking lot and Ridgway Library.  The skate park will be designed for future additions, with the first phase being suitable for intermediate level usage.

In FY 2005, the Council budgeted $25,000 as cash match for possible grant funding to see the project designed and constructed.  The estimate for the first phase of the skate park was approximately $135,000.  Along with the Town's cash match, $90,000 was sought through GOCO funds, $10,000 through privately raised contributions, and $5,000 attributed to in-kind donations (earth moving and landscaping).

The Town submitted its grant application in December, 2004 and was fully awarded the $90,000 through GOCO in June, 2005.  The project was designed and constructed in 2006.  The Town received a mini grant award from GOCO to design and construct Phase 2 in 2011, with irrigation and landscaping planned for completion in this area in 2012.  A former local resident contributed funds to incorporate a memorial piece at the southern aspect of the park and a local artist/designer is now crafting a memorial plaque for incorporation into this section of the park.  The skate park from start to finish has been a true community effort and now has the look and feel of a true community park.

BLM_0066806

Figure 1:  Coept Plan for Northern Aspect of the Regional Athletic Park



BLM_0066807

<u>Cottonwood Creek Park</u>

Cottonwood Creek is an intermittent creek that flows eastward through the Town and confluences with the Uncompahgre River near Liddell Drive.   The drainage receives its headwaters from Happy Hollow Canyon, south of Miller Mesa.   Cottonwood Creek is partly fed through spring waters and partly fed through surface runoff.



The drainage is not large in terms of total drainage area.   It lies primarily within a steep and narrow canyon.   As such, its discharges are somewhat erratic, changing quickly in storm events that typically occur in the later summer months.   The 25-year storm event in this particular basin exceeds 430 cubic feet per second, according to data supplied by the Colorado Water Conservation Board.   The drainage is indicated in the 100 year flood plain on the FEMA Federal Insurance Rate Map within the Town.

As the creek finds its way through Town, it travels underneath Amelia Street, Lena Street, and an alley way east of Lena Street.   The culverts at these particular crossings appear to be inadequate in size, and some flooding has occurred during significant rain events.   In 2003, the Town was successful in seeking some outside funding through a Mineral Impact Assistance Grant to help construct two large culverts at both the Lena Street and Alley crossings.   The construction of these culverts commenced in the Fall of 2004.   There are two pedestrian bridges crossing Cottonwood Creek near Mary and Cora Streets that were constructed coincident with the Solar Ranches Subdivision.     Both bridges were recently reconstructed in 2009 and 2011, respectively.

Some improvements to the Creek channel have also been performed, removing excess vegetation and dead and diseased trees, to better enable the handling of increased flows from storm events.   Much work is still needed, however, and will be phased over a period of years.

Improvements to mitigate flood occurrences also serve to enhance the overall appearance of the creek, and its use by the public for passive recreational purposes.   Much of the corridor that passes through Town has been donated or dedicated to the Town and is inclusive of creek habitat as well as adjoining open areas that constitute a significant "strip" of parkland lying between County Road 23 and Charlotte Street.   This strip of parkland is known as "Cottonwood Creek Park".   It consists of earthen trails and a number of pedestrian crossings, grassy open areas and dense pockets of Narrowleaf Cottonwood and Box Elder trees along the drainage.   In 2009, an irrigation system was installed on the stretch of the park from Lena Street to the western aspect abutting the Le Ranch Subdivision near what would be the extended stretch of Charlotte Street.

Cottonwood Creek is frequently used by wildlife, notably deer and elk which travel to and from the River corridor in the evening hours.     The dense coverings along the Creek provide some shelter and protection for smaller species.   The trees in Cottonwood Creek Park are in a state of decline as they are heavily infected with fungus and disease.   Much care is needed in terms of thinning and pruning to better enable the stand to survive in good health and this is planned for late 2011 and 2012.   Plantings of more diverse species may also be recommended.   An Urban Forest Management Plan will organize and facilitate the care and maintenance this park needs.

BLM_0066808

Because much of the water in Cottonwood Creek is diverted for irrigation purposes during summer months, the resulting intermittent flows may also be having some negative impact upon the vegetation in the Creek basin.  Long periods of dry conditions are typically followed by significant flows during storm events, creating log jams and erosion along the channel, and at times flooding conditions.  The Town is exploring means of keeping some residual flows in the Creek channel during most of year, to help mitigate flood impact and maintain a better health of the plant and tree species along the corridor.

Recently, the community trails group approached the Council with a request to develop bike trails through the drainage in Cottonwood Park.  This discussion continues and may provide one more additional multi-modal feature on public property.

<u>Green Street Park</u>

This is a 7 acre park that was gifted to the Town with the development of the Parkside Subdivision in 2007.  The park is situated west of Green Street in the northwest area of Town, and has connecting pedestrian sidewalk from the Ridgway Industrial Park and River Park Subdivision to the Ridgway Schools. Currently the park is in its native and organic form, with mowing and some weed management efforts comprising the bulk of maintenance for this park.  The Ridgway Schools pump house is situated within this park, and includes irrigation system controls for the Town to water the trees lining both the east and west sides of Green Street as well as controls for the Parkside Subdivision for trees along Laura Street within the Subdivision.

<u>Dennis Weaver Memorial Park</u>



This 60 acre active and passive use public park was dedicated to the Town by the Dennis Weaver Family in 2009 with the development of the first phase of the RiverSage Planned Unit Development.  The Dennis Weaver Memorial Park is home to multi-use trails along the Uncompahgre River, a developed memorial park with medicine wheel, xeriscape garden, eagle statue, and picnic area along the west side of the Uncompahgre River, all honoring Dennis Weaver.  The Colorado Youth Corps contributed to trail construction along the west side of the river, and in 2011 additional bike and pedestrian trail building has been proposed by the Ridgway Area Trails Group.

BLM_0066809

Cedar Creek Minor Park

This is a one half acre park situated on the north side of County Road 5, just west of South Amelia Street, and was dedicated to the Town for "parks and utilities" as part of the Cedar Creek Minor Subdivision in 1997.  The park is undeveloped, and remains in its native, organic state.

Vista Terrace Open Spaces

There are two public spaces within the Vista Terrace Subdivision that were dedicated to the Town subsequent to the subdivision of the property in 1994.  One open space is approximately 5.4 acres and the other is about .3 acres.  The latter is dedicated for the sole purpose of "common land", pursuant to the warranty deed.  Currently these spaces are in their native, organic state with passive use only.

BMX Park

This loosely developed portion of park is situated at the northern aspect of Hartwell Park along the Uncompahgre River Trail and at the southwest aspect of the intersection Otto and North Railroad Streets, near the Town's Wastewater Treatment Facility.  The BMX park was developed by Town's Public Works Crew many years ago, and was "re-built" in the early 1990s under the supervision and oversight of the Town Public Works employee, Mike Jenkins.  While some noxious weed management continues throughout this park, there are no other imminent plans for improvements to this area, although it does see significant use by local youth.  The improvements in this park require little maintenance; however noxious weeds have moved in over the years and the Town Staff has tried to manage the infestations using non-chemical (except for some vinegar treatments) methods.  If the park is to remain in its current location, some improvements including irrigation may need to be had to control the weeds.

Rollans Park, River Bank Minor Outlot A, and Triangle Subdivision Lease Purchase Parcel

The headwaters of the Uncompahgre River are in the Red Mountain Mining District of southern Ouray County, which includes  the famous Idarado Mine , which has seen significant reclamation activities since the early 1990ss.  The River runs through the three communities in the County and also through Ridgway State Park, where it feeds the Ridgway Reservoir.

Construction of the River Corridor Project commenced in 2002, as a restoration project focusing upon over a mile of corridor within the Ridgway Town limits.  The project was designed to improve water quality by stabilizing riverbanks and reducing sediment pollution.  It is also designed to re-establish a flood plain and enhance aquatic, riparian, wetland and floodplain habitat by re-establishing a stable river morphology and native vegetation.

The Project is planned for completion in three phases.  Phase One of the project involved development of the river park and considerable in-stream re-channelization and improvements.  The park now has a natural trail, wetlands area, parking lot and river access.  Phase One is located a block from the Town Park, Town Hall, Community Center, County Fairgrounds and historic core of Town.

BLM_0066810

**Figure 2:  Uncompahgre River Restoration Project**



Phase Two of the Project is downstream of Phase One, and will allow for the ultimate connection of the River Park with the existing Uncompahgre RiverWay Trail – a 2.3 mile recreation path that connects the Town of Ridgway with the Ridgway State Park.  Unfortunately, the Town encountered resistance from a private property owner, which has stalled the implementation and completion of Phase Two, resulting in a short, dead-end trail along the western aspect of the River, terminating at the end of the Town-owned Rollans Park.  Phase One and Two are both quite visible from Highways 550 and 62 -- the gateway to the Town and a part of the San Juan Scenic Byway Loop.    Phase Three is upstream of the highway bridge on HWY 62, and involved continued river restoration.  It also included construction of a pedestrian bridge, which now connects the Town core with the development east of the river, including the County Fairgrounds.  Phase Three did not include any additional parkland as currently envisioned.

The Town began Phase One of the project in the Fall of 2002.  Re-vegetation of the river banks was provided through the assistance of the Southwest Youth Corps – a youth conservation corps located in Durango.  The Corps were on site twice in 2003 to do the plantings. Phase Two commenced in the Spring, 2004, and for reasons stated earlier, is not completed.  The pedestrian bridge was funded largely through CDOT Enhancement monies and was installed in the summer of 2004.

The most impressive element of the Project is the multiple partnerships and generous contributions that have materialized in recent years.  The Project is subject to considerable participation and partnership at all levels, with the following notable contributions:

- Over $947,000 in grants from Nat'l Park Service, Great Outdoors Colorado, El Pomar Foundation, TEA 21 Colo. Dept of Transportation), Nat'l Fish and Wildlife Foundation.

- In-Kind contributions valued in excess $379,800

- Over $75,000 contributed by the Town of Ridgway for project costs;  additional $200,000 for land acquisition

BLM_0066811

- Private Contribution of $200,000 from Ed and Linda Weitz for project start

- Private land donations of over seven acres by James Rollans and Citizens State Bank valued in excess of $460,000.



From an aesthetic standpoint, a visual corridor has been created, which serves as the gateway to the Town and along the San Juan Skyway Scenic Loop. The site is readily accessible and visible to passers by and people seeking a quick stop or picnic area while they tour the area. The River Park will greatly improve the view corridor of the San Juans from the Highway 550 corridor. The San Juan Scenic and Historic Byway, a Colorado Scenic Highway, is traveled by an estimated peak number of approximately 11, 512 vehicles daily (per Colorado Department of Transportation figures).



The River Corridor Project offers profound educational opportunities. The Ridgway School District will continue to use the site as a living classroom for earth and environmental science classes focusing on collection of data related to vegetation, water quality, stream biota and morphological changes.

With regard to wildlife, the project site is visited by many native species including deer and elk. It is used by waterfowl including blue heron, mallards, Canadian geese, and during the winter months, bald eagles. With the restoration of the native biotic community fish will again thrive in the river, including the spawning Kokanee Salmon, which travel upstream to the project site from Ridgway Reservoir in the Fall months.

The Project is primarily in a maintenance mode with some gravel excavation and river channeling needed. Emphasis will remain on re-vegetation of the wetlands and riparian areas, noxious weed mitigation and native plant restoration.

There is currently discussion of some reconfiguration of the upper in-stream structure, which is being pursued. The Council recently discussed the desire for an Uncompahgre River Master Plan that would stretch the length of the river through Town. It is likely this will happen in the near future.

<u>Solar Ranches Pedestrian Trails</u>

When the Solar Ranches Subdivision was developed in the late 1990s, primitive pedestrian trails were developed throughout the subdivision. Some of these trails were dedicated back to the Town as public trails, while others are private for the use of the subdivision residents. These trails link in to the Regional Athletic Park to the east, and Cottonwood Park to the north.

BLM_0066812

Pump Track

In the summer of 2011 a local resident approached the Council requesting public space for the construction of a pump track.  There was a community fundraising event and funds were utilized to secure the services of a professional pump track designer.  Working with the Parks, Trails and Open Space committee, Town Staff including the Public Works Department, and local volunteers the pump track was constructed at the southern aspect of the Ridgway Athletic Park and an irrigation system for track improvement and noxious weed mitigation is planned for installation in 2012.

40-Acre BLM Parcel

This federally owned parcel is situated outside of the Ridgway municipal boundary although it integral to the Town's connecting trails system as it is surrounded on three sides by the Town boundary, as well as being home to a critical and existing linkage for the Uncompahgre River Way Trail.  The parcel also contains a primitive hiking and biking trail network that connects into trails within the Dennis Weaver Memorial Park, the River Way Trail, and future trail linkage within the RiverSage Planned Unit Development.

During the recent scoping period and plan update process for the BLM's Uncompahgre Field Office, the Town formally expressed an interest both verbally and in writing, to eventually acquire this parcel of land if and when the BLM is prepared to convey it.  At this time the property is home to key amenities including a picnic area with restrooms situated on the east side of the river, as well as a bald eagle roosting area when the salmon are present.

County Road 10, BLM and State Parks Trails Network

The federally-owned BLM lands are on the east side of Highway 550, adjacent to the Town boundary and provide approximately 20 miles of multi-purpose trails, recently developed through efforts of the Ridgway Area Trails Group in conjunction with the BLM.  In the spring of 2011, the BLM initiated a public scoping process to further develop this recreational area at the Request of the Ridgway Trails Group (RTG) and Colorado Plateau Mountain Bike Association (COPMOBA), inclusive of additional single-track trails, a formal trailhead and parking area at County Road 10, just east of the Ridgway Town Boundary, but connecting into the Town's trail system.  The Town Council provided a letter of support in March 2011 to the BLM for the development of this parcel as proposed by the RTG and COPMOBA.  During the scoping process it was revealed that Ouray County is licensed for gravel pit operations within this BLM property, which is subject to a mining permit and associated regulations.

In 2011 the Colorado State Parks came to the table after significant delay with the BLM project and the trail network construction is now focused on coordination with the Colorado State Parks.  The Town is supportive of the efforts to develop the trails in this area, both BLM and State Parks properties, which will link in nicely with the Uncompahgre River Way Trail system and ultimately into the Town of Ridgway.

The Community has expressed a great need for a safe and clear crossing at Highway 550 from the Uncompahgre RiverWay Trail on the west side of the highway to the trail networks on the east side of the highway.  The Town has envisioned for sometime an underpass from the Triangle Subdivision to the Ridgway Land Company property within the Town.  There is also a culvert under the highway to the

BLM_0066813

north of Town that is potentially an opportunity for developing safe pedestrian, bicycle and wildlife access with the State Highway Department.  Working with the owners of Angel Ridge Ranch (currently Second Chance Humane Society) is another opportunity to gain access on the east side of Highway 550.

BLM_0066814

## II.   BACKGROUND INFORMATION

**A.   Summary of Existing Parks, Trails, and Open Spaces**

**TABLE 3: Public Property – Parks, Trails, Open Spaces**

| Town Property (parks, trails, open spaces) | Park | Open Space | Other |
|---|---|---|---|
| Hartwell Park (includes BMX area) | 8.38 | | |
| Vista Terrace OS | | 0.27 | |
| Vista Terrace OS | | 5.37 | |
| Rollans - Park Subdivision Tract B (est. acres) | 7 | | |
| Parkside (Green Street Park) | 6.98 | | |
| Parkside (Open Space) | | 0.803 | |
| Cottonwood Park in Solar Ranches Flg 1 | 3.328 | | |
| Cottonwood Park in Cottonwood Subdivision | 0.716 | | |
| Cottonwood Park in Le Ranch Subdivision | 0.115 | | |
| Regional Athletic Park | 18.4 | | |
| Triangle Subdivision Lot 1 (Weitz Parcel) | | 3.756 | |
| River Bank Minor Outlot A | | 0.43 | |
| Fairgrounds Tracts E/K and Heritage Park | | | 14.42 |
| Dennis Weaver Memorial Park | 60.78 | | |
| Cedar Creek Minor (parks and utilities) | | | 0.51 |
| **SUBTOTALS:** | **105.699** | **10.629** | **14.93** |
| **TOTAL (PUBLIC, in ACRES):** | | | **131.258** |

| Private Open Spaces, Parks, Land Trusts | Park | Open Space | Other |
|---|---|---|---|
| Solar Ranches HOA | | 18.473 | |
| RiverSage HOA OS-1 | | 4.323 | |
| RiverSage HOA OS-2 | | 1.784 | |
| RiverSage HOA OS-3 | | 3.434 | |
| RiverSage HOA OS-4 | | 0.819 | |
| RiverSage HOA OS-5 | | 23.95 | |
| RiverSage HOA OS-6 | | 9.941 | |
| County-owned Fairgrounds Property | | | 6.09 |
| River Park HOA OS-1 (roundhouse park) | 2.322 | | |
| River Park HOA OS-2 | | 1.246 | |
| River Park HOA OS-3 | | 0.09 | |
| River Park HOA OS-4 | | 0.074 | |
| River Park HOA OS-5 | | 0.47 | |
| River Park HOA OS-6 | | 0.217 | |
| Cottonwood Park HOA | | 0.086 | |
| Baseball Field (County & School) Blk 3 & 10 | | | 1.85 |
| Secondary School Soccer Field | | | 5.11 |
| Sweetwater Land Trust (est) | | | 20.15 |
| Cedar Creek Minor Land Trust (existing home) | | | 28.07 |
| Solar Ranches Trails (Public & Private) | | | 6.586 |
| **SUBTOTALS (acres):** | **2.322** | **64.907** | **67.856** |
| **TOTAL (PRIVATE, in ACRES):** | | | **135.085** |

BLM_0066815

## B.      Short-Term Improvements:

Uncompahgre River Master Plan

As mentioned previously, after a number of community requests for additional public access areas and pursuant to the dedication of a large parcel with a developed community park along the river in the northern aspect of Town, the Council has expressed a desire to develop a Master Plan for the river as it runs through Town and as a centerpiece for the community.  A property owner at the southern aspect of Town recently approached the Parks Committee offering a donation of property abutting the river for a dog park.  The value of the river corridor received significant comment and attention during the 2011 Land Use Plan Update process, recognizing the river as a significant community gem and resource requiring protection and care for quality of life as well as economic development opportunities.

Soccer Field

Demand for a third soccer field at the Ridgway Athletic Park has been increasing, with considerable and increasing spring and fall usage on the existing fields, as well as increasing use of the combined soccer / baseball athletic field.  The Ridgway School District constructed an additional soccer field although it is currently not available for use and the school teams are using the public fields at the Athletic Park further increasing demand.  The School District is planning on improving the school field and is hopeful it will be usable in 2012 or 2013 although it is likely the addition of one more field a the school will not meet the current demand.

The Master Plan for the Regional Athletic Park provides for a third field, and an additional baseball field. The location of these playing facilities are depicted in the site plan for the Athletic Park (*see Figure 1*).

The Town and the Ridgway / Ouray Soccer Club partnered together in 2004 to pursue possible grant funding through the Colorado State Youth Soccer Association (CSYSA).  A grant of $7,000 was provided to help fund initial ground work and drainage work for the third field.

Volleyball Court
A soft surface volleyball court is planned for the northeast aspect of the Regional Athletic Park near the tennis courts, basketball court and skate park.  Parking will be improved along Chipeta Drive, and the existing parking lot will be converted into a volleyball court.  This amenity was proposed by the high school students during the park planning process and was received with much support.

Dog Park

During the development of this plan in 2011 a local property owner approached the committee offering to donate land along the Uncompahgre River to the Town for use as a community dog park.  The opportunity was presented to the Town Council during the 2012 budget and strategy process and the Council prioritized the property acquisition for 2012.  The committee is proposing that fundraising efforts commence after the acquisition to build a fence, shade shelters and other amenities as needed for the property.  Trail connectivity along the river to the park and connecting to other Town Parks (Rollans, Dennis Weaver Memorial Park, and Hartwell) is also a priority.

BLM_0066816

Trail Connectivity and Designated Bike and Pedestrian Routes

With recent grassroots efforts toward trail development and multi-modal access town-wide and into Ouray County, the planning and construction of connecting multi-modal trails is a priority for existing trails and sidewalks as well as new development.  Highway crossings for both Highways 550 and 62, inclusive of underpasses where feasible, are a priority development to insure safe passage for people and wildlife regardless of the mode of transportation.  Likewise, context-appropriate way-finding and mapping will facilitate multi-modal objectives and encourage trail development and use for the community.  As new trails develop in the region bringing more people to the area for recreation and quality of life, safe highway passage and designated way-finding are paramount.

Neighborhood Playgrounds and Creative Industry Improvements

With many families moving to Ridgway and the development progressing from the core of Town to the perimeter, additional neighborhood playgrounds are desired.  The playgrounds should be context appropriate and diverse to provide for livable neighborhoods and unique experiences for our children. During the planning process, the committee was approached by a resident mom with the request to consider and prioritize interactive artistic playgrounds.  Recommendations included hand-crafted musical instruments and sculptures on which the children will learn a variety of skills and interact not only with the functional art but with other children.  Likewise another resident presented photos of organic art including sundials that could be incorporated into the natural landscape.  These concepts fit well with the community's desire for local art and creativity as reflected in the 2012 Land Use Plan and also the Town's pursuit of Creative District certification with the State of Colorado Creative Industries initiative in 2012.




Bouldering Area



For many years the community has discussed the development of a bouldering area for various users of all ages.  In 2011, the Town Council discussed a GOCO grant application for this improvement in Town Park to provide a play area during summer concert and festival events.

BLM_0066817

<u>Performing Arts Stage</u>

In 2009 the local government initiated a free Summer Concert Series in Town Park.  The Series has blossomed over the last 3 years into a true community event in partnership with Pickin' Productions of Paonia, CO.  With successful fundraising efforts for the event, the Town is in the process of raising funds and working with students from the University of Colorado-Denver to design and construct a permanent performing arts stage in the central Town Park.  The stage is planned for design in the fall of 2012 and construction in 2013.

## C.    Definitions:

<u>Neighborhood Parks</u>
Less than five acres in size, typically serving a specific neighborhood; usually designed with open areas, playgrounds, landscaping and trails. Intended to be easily accessible by foot or bike.  These parks serve as good buffer areas, with limited use and generally little or no public amenities.

<u>Community Parks</u>

Usually between five and fifty acres, designed primarily with open areas, playgrounds, trails restrooms and other public amenities.  Sports activities and recreational facilities may be included, such as tennis, basketball, and playing fields.
Community parks should be focal points for the community, providing common meeting places and higher-intensity usage than smaller neighborhood parks.  These parks are generally diverse in nature, but are also designed for high-intensity uses such as ball fields.  Since these parks attract a large number of people, they require easy access and extensive parking facilities.  Community parks require a high degree of planning and management.

<u>Regional Parks</u>

Usually greater than fifty acres, and designed primarily for a variety of uses by regional users, as well as community members.  Regional parks are often centered around natural attractions such as water bodies, rivers, wetland areas and views.  Access should be easy, by both vehicular traffic and multi-modal.

<u>Special Use Facilities</u>

Special use areas and facilities play an important role in fulfilling community needs for special outdoor and indoor recreational activities.  These activities are provided for the benefit of the community, but for various reasons have not been incorporated into the community park setting.  Examples may include single purpose recreational activities like golf, amphitheaters and skate parks.

<u>Open Spaces</u>

Open spaces can be generally described as natural areas set aside for preservation of significant natural resources, landscapes, and visual buffering.  These lands consist of natural amenities such as water bodies, river corridors, and lands that may be unsuitable for development (steep terrain, storm water

BLM_0066818

management areas, etc).  In general, open space areas are only readily accessible by trails and paths, with limited parking or vehicular access.  They are not intended for intensive human use.  Open space within the community is both publicly owned (i.e. Cottonwood Creek) and privately owned (i.e. Solar Ranches open space).

BLM_0066819

D.        2009 Ridgway Community Survey Results

In 2009, the Town completed a community survey in preparation for the land use update to the master plan.   A number of questions and responses germane to this plan development include water conservation, environmental preservation and specific questions regarding the acquisition and financing of parks, trails, and open spaces.   Below is a summary of the responses received for these related questions, as it appears in the final survey report dated January 6, 2010:

*Question 24 - The Town has had considerable success in acquiring park lands and open spaces without a strong policy in place regarding park land development. Which of the following options for new parks and open spaces is most important to you? (Please select only one option below)*

The acquisition of strategically located, neighborhood parks and open spaces including a large community park received the most support (44%, 154 respondents), followed by the acquisition of smaller neighborhood parks under 5 acres in size to serve new neighborhoods (21%, 76). Acquisition of a larger 'community park' received the least support (7%, 26 responses). 15% (52 respondents) feel the Town has sufficient parks and opens spaces to accommodate new growth. Open spaces and light use areas received 10% support (36 responses). Responses are relatively consistent regardless of where the respondent lives.

*Question 25 - How should the acquisition and maintenance of additional parks and open spaces be paid for? (Select all that apply)*

Requiring new residential subdivisions to provide parks and open space (69%, 245 support) and the Town pursuing grant dollars (66%, 233 support) for acquisition and maintenance of parks and open spaces received the most support from all respondents. A cash payment to the Town from new residential subdivision developments for acquisition and maintenance of parks and open spaces received moderate support (45%, 158). New taxes received the least general support (16%, 58) although 27% (94 responses) indicated additional tax revenues as an acceptable option. Responses are relatively consistent regardless of where the respondent lives.

Question 33 – What is your opinion on the following approaches to water conservation?

There appears to be significant support for a variety of water conservation efforts with 83% (283) of the respondents supporting provisions for conservation devices and education.  Restructuring of rates and mandatory restrictions received majority support (57%, 195 and 53%, 183, respectively), although a representative number of respondents do not support these measures (37%, 125 and 41%, 141, respectively). 78% (218) disagree with the idea of doing nothing about water conservation. Responses track across populations regardless of residency in the Town or County, although Ouray County respondents are closely divided on implementing mandatory watering restrictions.

Q40 - Rate the importance of each of the following areas where development should be restricted because of environmental impact or other constraints.

There is significant support from all respondents, greater than 75%, for restricting development in environmentally sensitive areas, with the river corridor and wildlife habitats receiving the most support. Responses across the varied respondents are similar. Of 28 'other' responses, 21 generally agree that some restriction is good, and some reference preservation of agriculture, river, wetlands, ridges and wildlife habitat/corridors, etc.

Q41 - Preservation of physical features in and around Ridgway is one way to retain existing community qualities.  Which of the following local features do you feel should be preserved or enhanced? (Check all that apply)

BLM_0066820

There is significant support for preservation and enhancement of all stated local features. 93% (319) of the respondents identified the river corridor, followed by 81% (281) supporting ridgelines and hilltops. All of the options received greater than 60% support (more than 200 respondents indicated the feature should be preserved or enhanced). Of 28 comments on this question, about 1/4 speak generally to cleaning up the Town, and some to improving the Town gateways, and preserving or enhancing parks, trails and open spaces.

BLM_0066821

### E.  Ouray County Land Use Code and 1999 Ouray County Master Plan

While the Ouray County regulations and master plan document do not directly address the creation of parks and trails, it does speak to preserving open space, visual and scenic quality, wildlife corridors, and unique environmental and ecological assets, while providing for context sensitive residential and recreational development.

*Ouray County Land Use Code – Section Six: Planned Unit Developments*

"The Planned Unit Development concept is intended to allow for development of land, subject to those development regulations set forth in this Code. It is intended to allow development of land while protecting unique environmental and/or ecological assets and to allow for residential and recreational developments in which various uses and structures may be grouped in appropriate relationship to each other, to open spaces and to common facilities (Section 6.2)."

"The applicant shall provide common open space as required by the provision of section 6.7. All open space provided within the PUD, including those spaces designated as public and private recreation sites, shall be protected by adequate covenants running with the land or by conveyances or dedication in a manner acceptable to the County (Section 6.6.C)."

The common open space and building/non building requirements stipulate that open space should maintain the visual and scenic quality of Ouray County, be designed to coincide with wildlife corridors and other environmentally critical areas, provide trails parks, or other recreational facilities for current and future residents, have reasonable access, and maintain natural topography, vegetation, and other characteristics. (Section 6.7.A).

The ownership and maintenance of open space must be laid out in a Common Open Space Plan, to be included with the application for a PUD, and should establish an organization for the ownership and maintenance of the common open space or make acceptable provisions for ownership and maintenance (6.7.C).

The PUD requirements and procedures detail that the plan should include a description of the areas to be set aside for permanent open space, and the proposed ownership, maintenance, and use of such areas (6.8.B.4.g). A written and graphic description of the areas to be preserved for community or public uses and all areas dedicated to the County should also be submitted with the plan (6.8.B.4.h).

*1999 Ouray County Master Plan*

Goal 'F' of the Master Plan suggests maintaining the rural character of Ouray County. One policy to support this goal states, "Create open space or low-density development areas around the town, city, and future unincorporated areas to intergovernmental agreements that further the objectives of this master plan."

Goal 'H' of the Plan hopes to promote a transportation network that allows for the orderly flow of traffic on roads in Ouray County and is supported by the policy: "Evaluate the feasibility of accommodating non-motorized modes of transportation, including horse, pedestrian and bicycle, in order to provide multiple modes of mobility to all segments of the population."

BLM_0066822

Goal 'J' of the Ouray County Master Plan states a need to preserve visually significant and sensitive areas of the county that provide scenic backdrops and vistas that both residents and visitors enjoy. Suggested policies support evaluating programs and incentives that encourage placement of land into conservation easements or other protected status.

Goal 'K' advocates for recognition of the importance of protecting all species and habitat types currently found in Ouray County and maintain healthy and diverse wildlife and plant habitats. Supporting policy also suggests evaluation and consideration of programs and incentives that would encourage placement of lands into conservation easements.

BLM_0066823

## F.  Economic Benefits of Parks, Trails, and Open Spaces



It is widely reported that the natural environment and outdoor recreation activities contribute significantly to healthy and vibrant local and regional economies.  The Ridgway community believes in and supports outdoor recreation as a key contributor to develop and sustain a diverse local economy.  In the valley of the San Juan Mountains, our community is extremely wealthy in natural recreation resources.  The community has done great work in acquiring public properties for parks, trails and open spaces.  The community has also succeeded in preserving and developing public spaces to improve the quality of life for residents while providing a variety of amenities, facilities and events that attract visitors who will help sustain the local economy.  One objective of this plan is to provide facts and information on the economic benefits of well-planned public spaces.  *Photo: Ridgway Rendezvous Arts and Crafts Festival in Hartwell "Town" Park, courtesy of Gary Woods, San Juan Balloon Adventures*

The Outdoor Industry Foundation published a report in 2006[11] entitled "The Active Outdoor Recreation Economy", stating the following about the recreation economy:

- Contributes $730 billion annually to the U.S. economy
- Supports nearly 6.5 million jobs across the U.S.
- Generates $88 billion in annual state and national tax revenue
- Provides sustainable growth in rural communities
- Generates $289 billion annually in retail sales and services across the U.S.
- Touches over 8 percent of America's personal consumption expenditures—more than 1 in every 12 dollars circulating in the economy

The report further asserts that over $622 billion is directly infused into the local economy with more than 3 out of 4 Americans participating in "simple, healthy outdoor activities such as hiking, biking, camping or wildlife viewing", and provides the following "Economic Contributions" for the Mountain West (AZ, CO, ID, NM, MT, UT, NV, WY):

- Total Contributions:   $61,496
- Jobs Generated:     617,186
- Gear Retail Sales:    $4,790
- Trip-related Sales:    $34,940
- Taxes (federal,state):  $8,906

---

[11] Retrieved on December 12, 2011 from the Fall 2006 report from the Outdoor Industry Foundation
http://www.outdoorindustry.org/images/researchfiles/RecEconomypublic.pdf?26

BLM_0066824

Case studies in the report include Fruita, CO and Moab, UT, with the BLM attributing outdoor recreation as contributing $1.5 million per year to the local economy in Fruita.

AmericanTrails.org[12] reports the following statistics on real property values and expenditures:

Real Property Values

Many studies demonstrate that parks, greenways and trails increase nearby property values, thus increasing local tax revenues. Such increased revenues often offset greenway acquisition costs.

A. California's Secretary for the State Resources Agency estimated that $100 million would be returned to local economies each year from an initial park bond investment of $330 million (Gilliam, 1980).

B. A greenbelt in Boulder, Colorado increased aggregate property values for one neighborhood by $5.4 million, resulting in $500,000 of additional annual property tax revenues. The tax alone could recover the initial cost of the $1-5 million greenbelt in three years (Cornell, Lillydahl, and Singel, 1978).

C. In the vicinity of Philadelphia's 1,300 acre Pennypack Park, property values correlate significantly with proximity to the park. In 1974, the park accounted for 33 percent of the value of land 40 feet away from the park, nine percent when located 1,000 feet away, and 4.2 percent at a distance of 2,500 feet (Hammer, Coughlin and Horn, 1974).

Expenditures by Residents

Spending by local residents on greenway related activities helps support recreation related business and employment, as well as businesses patronized by greenway and trail users.

A. Residents are increasingly spending vacations closer to home, thus spending increasing amounts of vacation dollars within the boundaries of the state (NPS 1990).

B. In 1988, recreation and leisure was the third largest industry in California. More than $30 billion is spent each year by Californians on recreation and leisure in their state. This amounts to 12 percent of total personal consumption (California Department of Parks and Recreation, 1988).

The local government should also be aware of development and maintenance costs associated with public properties, and the benefits of preserving key areas as open spaces. AmericanTrails.org reports the following on public cost reduction:

The conservation of rivers, trails, and greenways can help local governments and other public agencies reduce costs resulting from flooding and other natural hazards. While greenways have many economic benefits it is important to remember the intrinsic environmental and recreation value of preserving rivers, trails and other open space corridors. Greenways along rivers can help reduce the cost of repairing flood damage and improving water quality.

---

[12] Retrieved on January 28, 2012 from AmericanTrails.org http://www.americantrails.org/resources/economics/GreenwaySumEcon.html

BLM_0066825

A In a study of major land uses in Culpepper County, Virginia, it was found that "for every dollar collected from farm/forest/open space, 19 cents is spent on services'"(Vance and Larson, 1988).

B. In Yarmouth, Maine, an analysis of costs of providing municipal services to a specific parcel proposed for parks showed that the annual costs of those services exceeded revenues generated by taxes by $140,000 annually. This was compared to an annual cost of $76,000 over 20 years to purchase the property (World Wildlife Fund, 1992).

C. In Boulder, Colorado, the 1988 public cost for maintaining developed areas was estimated to be over $2,500 per acre. The cost for maintaining open space in the city was only $75 per acre, or less than three percent the cost of non-open space (Crain, 1988)

There is recognition that preservation and development of public spaces is appropriate and beneficial to not only the quality of life for the Ridgway community but also as a sustainable and diverse economic development driver.  However, the community will want to identify opportunity areas and strike a balance between these sometimes competing priorities.

BLM_0066826

## III.   GOALS, OBJECTIVES and ACTION ITEMS

### GOAL 1 - EXISTING CONDITIONS

Understand and identify existing conditions for parks, trails, and open spaces within, surrounding and linking to the Town of Ridgway.

Objectives

1. Understand and identify needed trail linkages and recreation paths that provide integrated access to existing and future parks, open spaces, public facilities and schools within the Town.

2. Establish areas of environmental and cultural significance to be prioritized for conservation and preservation, including environmentally sensitive areas, view and wildlife corridors, riparian areas and wetlands, river corridor, natural filtration and storm water drainage areas, and other community-valued natural resources.

3. Identify community needs and desires to inform and prioritize new and expanded recreation facilities and amenities.

Action Items

1. Inventory and map existing parks, trails, open spaces, facilities and amenities, to understand linkages and gaps required for an effective interconnected system.

2. Evaluate the 2011 Land Use Map to understand sensitive areas, view corridors, wildlife corridors, riparian areas and wetlands, river corridor and setbacks, natural filtration and storm water drainage areas, and other community-valued natural resources.  Utilize this map in the planning and development of parks, trails, open spaces, and facilities.

3. Create and distribute a local survey for the community to understand current use and demand for recreational facilities and amenities, and to identify priority infrastructure projects for development.

BLM_0066827

**GOAL 2 – SUSTAINABLE FUTURE**

Implement mechanisms and opportunities for developing, constructing and acquiring, desired parks, trails, open spaces and facilities.

Objectives

1.   Convey a clear and consistent message regarding community needs and desires for the development and/or preservation of parks, trails, open spaces and facilities.

2.   Identify and share the economic benefits associated with the development and/or preservation of parks, trails, open spaces and facilities.

3.   Establish an equitable basis for dedicating parks, trails, and open spaces associated with new and proposed development including annexations and subdivisions, with "payment in lieu" and land donation options for dedicated parks, trails, and open spaces that considers land values and park land development costs.

4.   Provide for and encourage increased development density including compact, mixed uses when the development allows for the dedication of open space(s) that preserves sensitive areas, view and wildlife corridors, riparian areas and wetlands, river corridor, natural filtration and storm water drainage areas, and active consideration of other community-valued natural resources.

5.   Preserve open spaces by understanding and investing in the rural economy.

6.   Understand and participate in local and regional efforts outside of direct local government actions, and support public-private partnerships that further this goal of a sustainable future.

7.   Involve the community in the preservation and care of existing facilities and amenities and support efforts to connect existing pathways and trails where appropriate.

8.   Observe, monitor and respond to the Town's growth and community demands for increased or improved services, including the functions and duties of Town personnel to insure efficient and effective operations.

Action Items

1.   Establish and define sustainable development standards and guidelines for new development incorporating community values such as low-maintenance obligations, low-water irrigation systems, noxious weed management, long-term financing, tree and native plant preservation, and other good stewardship and conservation oriented standards.  Development should clearly understand the requirements and benefits of developing parks, trails, open spaces and facilities.  Development standards should be codified and include options and alternatives (payment-in-lieu, etc) for context appropriate development and competing demands. Guidelines should be clear and readily available to inform the process.

BLM_0066828

2. Develop a quick guide or small brochure containing facts and information for the community and future development regarding the economics associated with developing parks, trails and facilities and preserving open spaces.

3. To the extent feasible and possible with existing resources, apply new development standards to existing facilities and amenities (eg: installation of low-water irrigation systems in areas currently requiring hand-watering, etc.) and encourage the construction of trail connections.

4. Continue to pursue outside funding including grant opportunities to supplement efforts for the acquisition and development of desired facilities and amenities.

5. Consult the 2011 Land Use Plan, Land Use Map and the Parks, Trails and Open Spaces map to assist in evaluating development patterns and promoting appropriate development of parks, trails, open spaces and facilities, as well as priority connections.

6. Work with the Ouray County Land Use Department to identify, understand and support the rural economy including small-scale agriculture and farming operations and implementation of appropriate, context-sensitive land uses at the perimeter of the municipal boundary that contribute to a local and regional sustainability.

7. Support the local trails group(s) as appropriate with acquisitions of property and easements for trail development and expansion opportunities and that provide context appropriate linkages into existing and future trails.

8. Identify individual and group partners and organizations to implement community-involvement programs including an "Adopt A Park" program.

9. When appropriate, increase personnel resources including a Parks Department Supervisor/Director and explore the feasibility of a establishing a Special District.

BLM_0066829

**GOAL 3.  MAINTAIN AND SUSTAIN**

Insure sustainable, long-term care and maintenance of existing and future Town parks, trails, open spaces and facilities.

<u>Objectives</u>

1.  Insure new development understands and incorporates long-term management and financing in the planning and development process.

2.  Insure community and town staff understanding of long-term maintenance and financing needs for safe and healthy parks, trails, open spaces and facilities, including urban forest management, appropriate noxious weed management to insure healthy and diverse indigenous and native plant populations and to nurture healthy native wildlife populations.

3.  Continue monitoring and strive to understand and adapt to the dynamic natural environment and changing demands for healthy spaces.

4.  Explore opportunities to create a diverse income portfolio for the acquisition, development and maintenance of parks, trails, and open space amenities and facilities.

<u>Action Items</u>

1.  Inventory the Town's urban forest and implement priority management for these valuable assets, from hazard removal and mitigation to public outreach and education on proper tree care for trees in the rights-of-way adjoining private property, to planting for the future.

2.  Adopt development regulations to incorporate long-term management and financing for new parks, trails, open spaces and facilities, including but not limited to the acquisition and/or dedication of irrigation and water rights when possible and feasible.  These regulations should include low-maintenance priorities so as to keep future maintenance costs as low as possible and within reason for the Town.

3.  Develop a quick guide to preferred trees, native plants and vegetation to inform new development and parks planning efforts for environmentally appropriate plantings and inclusive of low-water management demands.

4.  Insure the Town Parks personnel understand, implement and monitor the Noxious Weed Management and Native Plant Restoration Master Plan, and update the Plan as appropriate to meet the changing demands of a dynamic environment.

5.  Provide continuing education and training of parks staff to assess and care for existing flora and trees in public parks for health and longevity, and plant new flora and trees accordingly to insure long-term growth and healthy canopies.

6.  Perform annual evaluations of public spaces and pay attention to fluctuations in the health of flora and urban forests, evaluating these changes over time, making adjustments as

BLM_0066830

appropriate in response to transformations in climate, environment, or other factors influencing the health of the flora.

7.    Insure regular monitoring of existing and future infrastructure occur and that improvements needed for safe and attractive facilities are appropriately conveyed, budgeted and completed.

8.    Offset maintenance costs through:

   a.   Pursuit of outside funding from the State of Colorado, private foundations, and trust funds
   b.   Supporting land trust partnerships and initiatives
   c.   Community and fundraising events (eg: parks appreciation)
   d.   Implementation of a sales tax, impact fee and/or user fee options. *User fees should be for private reserved events only (e.g.: weddings, soccer tournaments and practices, private use of the gazebos or pavilion, etc.). Otherwise, public spaces for general public use should be at no cost.*
   e.   Engage in the free market through the sale of parks related products, merchandising of specific goods, collecting a portion of the sale of public art pieces, and the establishment of formal donation opportunities through Region 10 Enterprise Zone Tax Credit opportunities, and others.

9.    Identify individual and group partners and organizations to implement community-involvement programs including an "Adopt A Park" program.

BLM_0066831

**GOAL 4 – QUALITY OF LIFE AND ECONOMIC DEVELOPMENT**

Improve the quality of life for residents and visitors in the region through the development, management and care of parks, trails, open spaces and facilities and utilize these community-building improvements as economic drivers for the Town and the region.

Objectives

1.  Understand community desires to capitalize and develop quality of life improvements.

2.  Consistently market and promote parks, trails, and open spaces using diverse and various mechanisms for public outreach and education.

3.  Identify and establish effective regional partnerships to address increasing demands.

4.  Provide educational information and resources on the economic benefits of parks, trails and open spaces for property owners and developers.

5.  Install appropriate and easy way-finding for residents, businesses and visitors.

Action Items

1.  Continually survey the community through various mechanisms to understand priorities and needs for developing parks, trails, open spaces, and facilities.

2.  Continue to orchestrate and promote community events and festivals.

3.  Work with the Ridgway Area Chamber of Commerce, City of Ouray/Ouray Chamber Resort Association, Ridgway State Parks, Ridgway Area Trails Group, Bureau of Land Management, Forest Service, private enterprise and others to promote recreational facilities and amenities within the Town and throughout Ouray County, including the collaborative development of outreach materials and mapping.

4.  Develop and distribute brochures, pamphlets and online resources that convey a consistent theme and message and include with all proposed development applications.

5.  Create and make readily available throughout the Town a public parks and trails user map showing amenities and facilities within each park and existing connectivity within the Town and region.  Maps and way-finding should be available at the Town gateways, public spaces, and private businesses.

6.  Work with community residents and businesses to install appropriate signage and way-finding throughout the Town, targeting gateway areas such as Highways 550 and 62, the Uncompahgre RiverWay Trail, the Regional Athletic Field, Hartwell Park and Town Hall, and other local parks and trails locations.  Involve the State Highway Department to the extent reasonable and feasible to locate and install way-finding along the state highways within the Town.

BLM_0066832

7. Continually monitor existing, changing resources and increasing demands and when appropriate, explore opportunities for the development of a regional Recreation Special District.

BLM_0066833

## IV.    EXHIBITS

A.    Ouray County Map

### Ouray County Map



BLM_0066834

**B.      Ridgway State Park Map[13]**



---

[13] [13] Retrieved on October 10, 2011 from: http://www.parks.state.co.us/parks/ridgway/Pages/RidgwayStateParkHome.aspx

BLM_0066835

## C.      Informal Community Survey

Special use facilities and recreational facilities are intended to fulfill the specific needs of the Ridgway Community. Citizen input into this process is critical in determining additional needs and planning the implementation of future facilities. The Parks, Trails and Open Space Task Force developed the following list as a starting point for the discussion.

|  | Improvement | Priority Ranking |
|---|---|---|
| 1. | Climbing Wall | |
| 2. | Ice Skating Rink | |
| 3. | Additional Soccer Field | |
| 4. | Additional Tennis Courts | |
| 5. | More Playground Areas | |
| 6. | Aquatic Center | |
| 7. | Recreation Center | |
| 8. | Additional Baseball Fields | |
| 9. | Amphitheatre/ Performing Arts Stage | |
| 10. | Interactive Children's Park/ Places (music, art, etc.) | |
| 11. | Connecting pedestrian and bicycle trail network | |
| 12. | Climbing/ Bouldering Area | |
| 13. | Community Gardens | |
| 14. | Hiking and Biking Trails | |
| 15. | Pump Track | |
| 16. | Skate Park – Phase 3 | |

On October 20, 2011 the Town Council met with students at the Ridgway secondary school (grades 6-12) and distributed a brief questionnaire regarding desired facilities for the community. Students were provided a paper copy of the above list and were asked to rank their priorities and add desired facilities if they were not listed on the questionnaire. Here is a brief summary of the survey results:

Rather than trying to total up the "ranking" of each of the 18 improvements on each of the 166 responses the priorities are ranked by the number of times each one was identified as a number one priority. Here are the results based on this methodology:

    1. Aquatic Center
    2. Recreation Center
    3. Amphitheater/Performing Arts Stage
    4. Skate Park Phase 3
    4. Climbing/Bouldering Area

The aquatic center got 40 first place votes and was identified as a number 1 or 2 priority on more than 70 of the responses (the recreation center received 27 #1s and 50 combined mentions as #1s or 2s). It is noted that if you were to combine the rankings of both the skating rink and the hockey rink this option would move up into the tie at #4 (and it moves up to #3 if you look at the total of #1 and 2 rankings). A number of responses identified multiple #1s so that is reflected in the totals and if a "ballot" used check

BLM_0066836

marks or an "x" that were interpreted as a #1 and each of those are also in the totals.  Thanks to Doug Canright for compiling these results and who reported there were no "hanging chads".

Also mentioned and given at least a #1 or 2 priority were the following:

>
> -volleyball courts
> -a running track around the soccer field
> -airsoft or paintball
> -frisbee golf
> -a sledding hill
> -a shopping mall(!)
> -paving town and/or county roads

BLM_0066837

### D. Standards to Determine Needs of the Community

National Recreation and Park Association standards are commonly used as general guidelines when considering current and future park needs for a community.  These standards should not become absolutes, but rather guidelines, as there will be many variables from one community to the next.  The standards do, however, provide a useful benchmark for further analysis, and for formulation of more specific standards to be implemented within the Town's Municipal Code.

|  | Regional Park | Community Park | Neighborhood Park | Special Use Facilities |
|---|---|---|---|---|
| Group Served | Entire Community | Entire Community | Neighborhood | Entire Community |
| Area per 1,000 persons | 7.5 acres per 1,000 (County-wide population) | 6 acres per 1,000 persons | 4 acres per 1,000 persons | Not Applicable |
| Service Area | Region | 1-mile radius | ¼ mile radius | Not Applicable |
| Desired Size | 50+ acres | 10-50 acres | 2-10 acres | Depends upon Facility Type |
| Location | Should be centered around natural attractions such as lakes and rivers; pedestrian /bike trail and vehicular access; educational and cultural opportunities | Centralized; accessed by pedestrian / bike trail and vehicular access; flat areas for general recreation; scenic sites and natural features; | Near intensely developed areas; along recreation paths; dispersed throughout town; easy access for children; | Depends upon use of facility.  Central location is desired, with compatibility to nearby uses |
| Facilities and Features | Wide diversity of uses and recreational features; open lands and natural areas; parking facilities and recreational trails; restroom facilities | Play apparatus and active athletic areas including multiple play fields; some natural areas for walking, picnics, and general recreation; | Playgrounds, waling paths, gardens, benches, turf areas.  May include restrooms and shelters; limited parking | Swimming facilities; skate park; climbing walls; rinks; amphitheatres |

BLM_0066838

**E.   Meeting Notes**

**AGENDA**
Committee Meeting
Parks, Trails, and Open Spaces Plan

**Tuesday, May 3, 2011**
Ridgway Town Hall
5:30-7:30 PM

Committee Members:  Deb Cokes, Deb Read, Deb Willits, Eric Johnson, Joe Ramsey, Kimah McCarty, Rich Durnan, Stephanie Wallin, Wade Parkinson, Jen Coates

I.      Introduction and Meeting Purpose

II.     Community Presentations
        *The presentations are limited to 10 minutes with 5 minute Q&A*

        a.   Interactive Playgrounds - Kellie Day
        b.   Trail Construction in the Dennis Weaver Memorial Park - Rich Durnan
        c.   Public Art and Sundials – Jen Coates

III.    Review Draft Plan dated May 1, 2011

IV.     Meeting Schedule and Plan Completion Timeline

V.      Adjourn – 7:30 PM

BLM_0066839

**MEETING NOTES**
**PARKS, TRAILS, OPEN SPACE MEETING #1**
**TUESDAY, JUNE 14TH**
**5:30 – 7:30 PM**
**RIDGWAY TOWN HALL**

In Attendance: Jen Coates, Sara Ballantyne, Kimah McCarty, Eric Johnson, Rich Durnan, Doug Canright, Rick Weaver, and Paul Donegan

*Sara Ballantyne is interested in developing a pump track somewhere in town for public use*
- Could be placed at current BMX track, but may be temporary due to Fire Department plans for relocation
- Community interest is there according to a petition at the Peak to Peak bike shop (many are interested in helping build), developed by Sara
- Project could be completed with minimal funding: community involvement, town donation of land, and a design/construction donation from an individual in Telluride
- The committee discussed a more permanent location for the pump track in the undeveloped Green Street Park adjacent to the Parkside Subdivision and or the south side of the Regional Athletic Park
- The southern most end of the Athletic Park is a favorable due to proximity to parking and agglomeration of sporting opportunities, and some separation from the skate park
- The issues of accommodating space for the BMX park relocation, irrigation, and weed management were brought up

*Review of Draft Map and Draft Plan dated June 9, 2011*
- Committee reviewed and updated the vision statement for the Parks, Trails, and Open Spaces Plan, inclusive of a reference to the economic development component of the plan
- Review of the Parks and Recreation Map brought up need for more detail to provide more information about current uses in Athletic, Hartwell, and Rollans Parks
- Additional cycling trails were pointed out along east side of Uncompahgre River between River Sage, Eagle Hill, and behind the Secondary School; Jen will provide maps to the committee for editing to include other existing trails and linkages
- The idea of developing a town-wide Parks and Trails map similar to the Montrose Parks Map was suggested, which would be for distribution to tourists and to support economic development
- The Committee recommended adding a goal to promote the concept of economic development for recreational amenities, including both outdoors tourism and long term improvements that enhance quality of life (encouraging development of parks and trails with annexations and new development)
- The issue of how parks, trails, and open spaces would be integrated into new developments was raised and also maintenance and care of existing parks. It was recommended that information be developed and made available to developers about town parks needs and their economic benefits to development

The Committee agreed to the following meeting schedule, which will be posted on the Town Website. Meetings will be held on the 2nd Tuesday of each month at 5:30-7:30PM at Town Hall, as follows:

BLM_0066840

☙ **Meeting #1:**  (June 14):  Review of Plan Draft and prior recommendations - Schedule, Plan Outline/Review, Maps and Vision, and Review and Develop Goals and Objectives

☙ **Meeting #2** (July 12): Review and Develop Goals and Objectives; review the updated map...

☙ **Meeting #3** (August 9): Develop Action Plan – Goals 1 and 2 (*What is it that we want?*)

☙ **Meeting #4** (Sept 13):  Develop Action Plan – Goal 3 and 4 (*How to achieve needs/desires*)

☙ **Meeting #5** (Oct 11):  Develop Action Plan – Goal 5 and Other... (*Maintain and Monitor, and...?*)

☙ **Meeting #6** (Nov 8):  Finalize Plan

☙ Present Plan to Planning Commission – **Nov 29, 2011**

☙ Present Plan to Town Council – **Dec 14, 2011**

**Follow Up:**
Sara will work on documents to propose the pump track idea to the Town Council inclusive of a draft plan for the track, proposed locations, and public works staff resources desired.
The Committee will review and provide feedback to Jen including additional information on existing trails, etc. to update the draft map prior to the next meeting
The Committee will review the existing Goals and Objectives in preparation for discussion and finalization of the goals and objectives during the July 12th meeting.

---

**PARKS, TRAILS, OPEN SPACE MEETING #2**
**MEETING NOTES**
**TUESDAY, JULY 12TH**
**5:30 – 7:30 PM**
**RIDGWAY TOWN HALL**

---

Committee Members Present:
Stephanie Wallin, Sara Ballantyne, Rick Weaver, Doug Canright, Bryan Sampson, Jen Coates

The meeting was called to order at 5:40 PM.

I.  Quick Review of June Meeting
    Jen provided a quick review of the June 14th committee meeting.  Doug Canright commented that the discussion of an ice rink should be added to the meeting notes.  Jen indicated that there will be additional opportunity for discussing the specific improvements recommended, and those improvements will be incorporated into the final plan element.

II.  Review Revised Map
    Parks and amenities should be added to the map.  Trails and sidewalks should be designated as such on the map.  Private trails and public trails should be noted as well.  The committee

BLM_0066841

agreed that some trails along private properties would be discussed in the plan, and that trail linkages surrounding the town should also be incorporated into the plan.  Trails in the Dennis Weaver Memorial Park need updated.

III.     Review and Develop Goals and Objectives
Goal 1 - remove long term management, financing and resource allocation;  Local and regional trails should be included in the plan, identifying linkages outside of the town as well as within the town; Discern between existing and future improvements in the objectives.

Goal 2 – call out recreation facilities and amenities only; understand what we have and what we want; Rick expressed a need for a restroom facility in the Dennis Weaver Memorial Park

Goal 3 – Establish and define required standards (not acceptable); incorporate 'parks, trails, and open space' consistently throughout the document (ie: not just trails, not just parks, not just open space); incorporate maintenance planning and funding within the standards required for development; combine with Goal 4 (acquisition of parks, trails, and os)

Goal 4 – incorporate into Goal 3

Goal 5 – develop a plan to address Urban Forest Management, including long term care and maintenance; plant trees to replace aging ones; insure inclusion of management plans with new parks; include tree trimming and maintenance, and noxious weed management; be proactive with maintenance.

Goal 6 – incorporate economic development information; installation of signage for wayfinding; education of community and visitors; increased awareness of amenities.

The committee requested adding some concepts from the "Better Living Through Trails" presentation should be included in the economic development section of the plan.

IV.     Meeting adjourned at 7:30 PM
Next Meeting – August 9th: Develop Action Plan for Goals 1 and 2

---

**PARKS, TRAILS, OPEN SPACE MEETING #3**
**MEETING NOTES**
**TUESDAY, AUGUST 9TH**
**5:30 – 7:30 PM**
**RIDGWAY TOWN HALL**

---

**TO:**          PARKS, TRAILS AND OPEN SPACE COMMITTEE / PUBLIC PARTICIPANTS
**FROM:**      JEN COATES
**SUBJECT:**   MEETING #3: AGENDA AND OBJECTIVES
**DATE:**       AUGUST 9TH, 2011
**EST TIME:**  2 HOURS

BLM_0066842

Committee Members:   Stephanie Wallin,   Randy Charrette, Bryan Sampson, Kimah McCarty, Doug Canright, Sara Ballantyne, Eric Johnson, Rich Durnan, Rick Weaver, Paul Donegan, Jen Coates

*Attending: Rich, Rick, Eric, Brian, Jen, Doug, Deedee Decker*

I.      **Discussion of Dog Park Opportunities – Deedee Decker**

-owns 3 acres near Adobe Inn with river frontage
-looked at dog park in Cortez (fenced with gates, tables, shade, etc.)
-would like to donate her property to be used as a dog park

Discussion
-fencing and gates, amenities, water, irrigation?, access, parking

Follow-up
-get more info on parks in Cortez, Colorado Springs
-get more info on Decker parcel (actual location, configuration, adjacent properties

II.     **Quick Review of July Meeting**

III.    **Review and Finalize Updated Goals and Objectives**
Committee was OK with current Goals & Objectives as revised by Jen

IV.     **Objectives (action plan) for Goal 1 and Review Revised Map**

Discussion of current trails map
-still issues with configuration of some trails (Weaver existing and proposed, BLM)
-need more clarification of "public" vs "private" trails in and adjacent to Solar Ranch

Follow-up
-Rick and Doug to walk Weaver trails with gps to document actual configuration

Discussion of Goal #1 Objectives
-Eagle Hill HOA might be agreeable to connection from Eagle Hill roadway to Weaver Phase II trail loop
-Dallas Meadows HOA probably not receptive to connection to Weaver trails
-possible linkage across Angel Ridge to BLM
-possible linkage from Vista Terrace to Town

Follow-up

BLM_0066843

-Brian to check with CDOT on status of 550 access to Angel Ridge
-Rich will contact Sarah re Vista Terrace access

Discussion of online poll
-Rich might have time to work on this in the fall

V.      Next Meeting – September 13th:  Goal 2 objectives

VI.     Adjourn – 7:30 PM

---

**PARKS, TRAILS, OPEN SPACE MEETING #4**
**MEETING NOTES**
**TUESDAY, SEPTEMBER 13TH**
**5:30 – 7:30 PM**
**RIDGWAY TOWN HALL**

---

| | |
|---|---|
| **TO:** | PARKS, TRAILS AND OPEN SPACE COMMITTEE / PUBLIC PARTICIPANTS |
| **FROM:** | JEN COATES |
| **SUBJECT:** | MEETING #4: NOTES |
| **DATE:** | SEPTEMBER 13TH, 2011 |
| **EST TIME:** | 2 HOURS |

---

Committee Members:   Stephanie Wallin,   Randy Charrette, Bryan Sampson, Kimah McCarty, Doug Canright, Sara Ballantyne, Eric Johnson, Rich Durnan, Rick Weaver, Paul Donegan, Jen Coates

Attending: Stephanie Wallin, Rick Weaver, Rich Durnan, Eric Johnson, Doug Canright and Jen Coates

I.      Report from Concert Committee on Stage Construction and Placement or Location in Hartwell Park – Rich Durnan

- general discussion about the need to maintain a parks committee after the PTOS component is completed.

Rich/Concert Committee report
- should the concert committee be formalized or be made a subcommittee of the PTOS committee?

- members moving forward with plans for a permanent stage in Hartwell Park and four locations are being considered:

1. just west of town hall

BLM_0066844

2. south of picnic pavilion and bathrooms
3. east of the True Grit along Lena
4. on the east side of the park after the Railroad realignment

- the committee currently has $6K on hand for construction and is working on fundraisers for the fall and next spring.

- tax credits may be available for donations for stage construction

At this time the PTOS committee relocated to the park to look at and discuss the four locations.  It was agreed that site number one was the best choice as this was convenient to the town hall facilities utilized by performers, the embankments adjacent to the post office could be used as seating and the playground and other portions of the south half of the park would not be impacted.  The committee also felt that the possible impacts of the setting sun could be dealt with in the stage design.

II.     Review of August Meeting
        a.   *Dog Park and Decker Property/ Access (Jen)*
             - discussion of potential dog park on Decker parcel
                  -timing of land transfer
                  -need for access along north side for boat launching

        b.   *GPS of Weaver Trails (Doug and Rick)*
             - existing River Sage trails
                  -per Rich new trail almost complete
                  -Doug and Rick to follow-up on GPS documentation

III.    Goal 2:  Objectives (action plan)
             -discussion of objective #2.  How would "standards be applied to existing facilities and amenities"?
             -committee in agreement with other objectives as proposed

IV.     Next Meeting – October 11th:  Goal 3 Objectives, or…
             -look at priorities from 2007 draft plan prior to this meeting
             -Goals 3 and 4 objectives will be discussed.

V.      Adjourn – 7:30 PM

---

**PARKS, TRAILS, OPEN SPACE MEETING #5**
**MEETING NOTES**
**TUESDAY, OCTOBER 11TH**
**5:30 – 7:30 PM**

---

BLM_0066845

**RIDGWAY TOWN HALL**

| | |
|---|---|
| **TO:** | PARKS, TRAILS AND OPEN SPACE COMMITTEE / PUBLIC PARTICIPANTS |
| **FROM:** | JEN COATES |
| **SUBJECT:** | MEETING #5: NOTES |
| **DATE:** | OCTOBER 11TH, 2011 |
| **EST TIME:** | 2 HOURS |

Committee Members: Stephanie Wallin, Randy Charrette, Bryan Sampson, Kimah McCarty, Doug Canright, Sara Ballantyne, Eric Johnson, Rich Durnan, Rick Weaver, Jen Coates

Attending: Stephanie Wallin, Doug Canright, Eric Johnson, Rich Durnan, Rick Weaver, Jen Coates


I.   Review of September 13th Meeting
   c.   *Feedback on priority amenities and facilities*
   d.   *Review of Goal 2 Objectives*

The committee discussed the structure and format of the goals and objectives, and determined some re-working of the goal, objective, action item format is appropriate. General comments include:

Goal 1 is existing circumstances
Goal 2 is future development and maintenance
Goal 3 is management and maintenance
Goal 4 is quality of life, community building and economic development

Regarding the survey completed by some community members and to be completed by students of the Ridgway High School, the committee would like to have a future survey in the plan as an action item but the "results" of the preliminary survey could be an addendum to the plan, which is periodically revisited

General discussion included:
   -breaking out objectives and action items separately
   - staffing for maintenance and operations of the expanded PTOS and facilities inventory
   -the continued need for the PTOS committee as preliminary review and recommendation before Town Council action is requested
   -special districts, fundraising, legal issues, etc.

   -Rec center – the committee talked about options for a recreation center in Ridgway for the region and determined this would not be a stand alone goal, but that a Special District may be considered in the future.

BLM_0066846

The Committee also discussed how we can move forward without major budget commitments and identified the utilization of public/private partnerships (adopt-a-park, volunteers, CSU extension) as an opportunity for the Town.

Jen will re-work goals, objectives, and action items based on inputs today and the Committee will review again in November.

II.     Goals 3 and 4:  Objectives (action plan)

-Discussion of Goals 3 and 4 was wrapped into the overall goals, objectives, action items discussion above.

III.    Next Meeting –
*November 8th: Finalize Plan; Discussion of permanent Parks, Trails, OS Committee*

The Committee discussed the need to have an additional meeting in December and then present the final plan to the Planning Commission in January and the Town Council in February 2012.

IV.     Adjourn – 7:25 PM

---

**PARKS, TRAILS, OPEN SPACE MEETING #6**
**MEETING NOTES**
**TUESDAY, NOVEMBER 8TH**
**5:30 – 7:30 PM**
**RIDGWAY TOWN HALL**

---

**TO:**       PARKS, TRAILS AND OPEN SPACE COMMITTEE / PUBLIC PARTICIPANTS
**FROM:**    JEN COATES
**SUBJECT:** MEETING #6: AGENDA AND OBJECTIVES
**DATE:**    NOVEMBER 8TH, 2011
**EST TIME:** 2 HOURS

---

Committee Members:  Stephanie Wallin,   Randy Charrette, Bryan Sampson, Kimah McCarty, Doug Canright, Sara Ballantyne, Eric Johnson, Rich Durnan, Rick Weaver, Jen Coates

In attendance: Doug Canright, Brian Sampson, Rich Durnan, Rick Weaver, Eric Johnson, Jen Coates

I.      Quick Review of October Meeting
        e.   *Student survey on facilities*

        Discussion of recently completed PTOS public comment forms
            -some forms were collected by PTOS committee members from the general public with additional forms filled out by Ridgway    school students.

BLM_0066847

-Doug will compile results of these surveys and forward to Jen for review by the committee.

II.    Finalize Goals, Objectives, and Action Items

-Jen presented revised goals and objective.  After quick review committee found no issues but members will contact Jen with any comments prior to the next meeting

-plans documents now total about 50 pages including all maps, surveys, lists, appendices, etc.

-Jen will insert goals and objectives into plan prior to the next meeting.

Discussion of permanent stage
    -CU architecture school may consider stage for design/build project.  If this happens stage will not be built until 2013.
    -delay of permanent stage may impact some events planned for 2012.
    -fundraising going very well.

    Discussion of possible action items for 2012 to include in the 2012 strategy - available funding may limit big ticket items, items to be considered:
        -formal survey
        -trail/park maps
        -install signage
        -dog park acquisition
        -create adopt-a-park program
        -additional planters
        -apply for grants

    The committee agreed on recommending to Council the following for 2012:
        -Complete community survey as defined in plan
        -Put together 'adopt a park' program
        -Complete signage installation and mapping
        -Pursue acquisition of property for dog park

    The committee discussed the importance of consistency with branding of the parks, trails and open spaces

    The committee expressed a desire for more parks signage (ie: Town entry sign on the RiverSage easement, Cottonwood, Hartwell and Athletic Field signage to be installed (signs are in the Public Works yard).

III.    Review Revised Map
    f.   *In-town/ out-of-town*

The committee discussed the draft map and discussed the pros and cons of trying to identify all potential linkages within and adjacent to the Town.  It was suggested that existing

BLM_0066848

pathways, parks and open spaces would be included in the map and where possible linkages and other features will be noted, concrete sidewalks removed, the aerial photo removed, the map will be simplified, and a separate layer of future trails will be created but not shown.  The plan text will include guidance on linkages and future improvements.  The committee expressed a desire to have a map for the public art sculptures in town.

IV.     Next Meeting – December 13th: Review and Finalize Plan and Map; Discuss role of Committee into the future

    g.   *January 31st – Present to Planning Commission*
    h.   *February 8th – Present to Town Council*

The committee agreed that the standing committee needs to be diverse and broad with representation including a range of individuals: moms, students, Council, Ouray County resident(s), etc.

V.      Adjourn – 7:30 PM

<div align="center">

**PARKS, TRAILS, OPEN SPACE MEETING #6**
**AGENDA AND MEETING OBJECTIVES**
**TUESDAY, DECEMBER 13TH**
**5:30 – 7:30 PM**
**RIDGWAY TOWN HALL**

</div>

| | |
|---|---|
| **TO:** | PARKS, TRAILS AND OPEN SPACE COMMITTEE / PUBLIC PARTICIPANTS |
| **FROM:** | JEN COATES |
| **SUBJECT:** | MEETING #7: AGENDA AND OBJECTIVES |
| **DATE:** | DECEMBER 13TH, 2011 |
| **EST TIME:** | 2.5 HOURS |

Committee Members:  Stephanie Wallin,   Randy Charrette, Bryan Sampson, Kimah McCarty,  Doug Canright, Sara Ballantyne, Eric Johnson, Rich Durnan, Rick Weaver, Jen Coates

Present – Joanne Fagan, Doug Canright, Jessi Marlatt (Plaindealer); Stephanie Wallin, Eric Johnson, Rich Durnan, Tyler Schultz, Sara Ballentyne, Jen Coates

    I.     **Proposal to construct bike trail in Cottonwood Park – Rod Fitzhugh**

Rod proposed trail construction from Lena to Mary in Cottonwood Creek primarily on the south side of the creek.  The committee had some discussion of wetlands in the drainage.  Joanne indicated there are certain criteria that need to be met and they may or may not be present.  Tyler indicated that cutting into the slope may impact some trees in the park; Eric indicated support for walkthroughs in the spring.  Tyler offered to flag some of the healthy

BLM_0066849

trees to avoid; Rod will give it some more thought and plan for a walkthrough with a plan in the spring with the Committee.  Rich suggested potentially installing.

II.     **Urban Forest Management Discussion – Jen Coates and Tyler Schultz**

Tyler discussed hazard mitigation and the ability to trim or remove trees and presented information to the committee about recent management and tree removal that has been completed in the street rights-of-way and town properties.  Tyler posed the question to the committee about saving trees with structural defects and pruning/maintaining trees or removing them.

Cottonwood Creek –
Tyler discussed the large trees on the east side of Cottonwood Park with some structural defects at the base.   Tyler indicated some of the stress is due to lack of water.   Joanne indicated there is some water in the creek from Mary down to Lena from the non-potable water line.   Tyler recommended managing the new sprouts to become the next good trees instead of having to plant so many new trees.  Tyler recommended a tree inventory in GIS and CO Forest Service would be a resource to have this done.  Tyler estimated loss of 30% of trees in the next 10 years.  Upper foot of soil (mulching) will greatly benefit trees in the long run.

River Corridor – Rollans Park
Tyler recommended caring for new tree sprouts with small diameter fencing in this area as a number of the larger trees are in decline.  The area sees a lot of browsing and could benefit from additional care.

Street Rights-of-Way
Tyler recommends mulching of trees in the rights-of-way as well, and pursuant to the Town's regulations encouraging adjoining property owners to care for and mulch the trees in rights-of-way.    Tyler reported quite a bit of lighting damage in Town.

Dennis Weaver Memorial Park
Cottonwood tree down by the river is declining pretty quick.  It could be pruned and kept (die-back at tips) or could be removed.

Discussion
Eric recommended pursuing an inventory of the trees in Town to understand the existing circumstances, and recommended re-plantings of trees for those that need to be removed in the near future and support with mulching and fencing.  Eric also recommended educational component and outreach to community for maintaining the tree health.

Tyler recommended: International Society of Agriculture at Treesaregood.com and Isa.com. Tyler also suggested possibly passing an ordinance (Telluride since 1995, Lake City, Aspen, Delta, Grand Junction).  American National Standards Institute (ANSI) has a guide for tree care and the ISA has small brochures to distribute to the community.  TCIA has a small brochure on identifying hazard trees that could be distributed.

BLM_0066850

Eric recommended community workshops for tree management and tree care.   Doug indicated the "Adopt a Park" program could also benefit from this training.  Eric asked about a "Master Gardener" –style program for tree management.   Tyler offered that he could assist with a similar program.  Tyler recommended the Town work with the Forest Service in Montrose or Grand Junction.

Rich also recommended baseline inventory to understand the existing circumstances and development of criteria on development of criteria and suggested that if a tree can live an additional 10+ years then maintain it and plant a new tree, or 'under-planting'.   Rich also stressed the importance of public education and outreach.

Tyler stressed the right trees in the right spot.   Tyler offered support to the Town for assisting with community outreach efforts.

Philosophy… if longer life (10+) years can be maintained, then maintain it and do or maintain under-planting.

Priorities – hazard management, inventory, outreach, parks, rights of way… (community outreach for trees in rights of way); Tree recommendations – outreach to utilities "don't top trees";.

III.     **Quick Review of November Meeting**

Discussion of final goals, objectives, action items

IV.     **Review Draft Plan**

The committee reviewed the draft plan and commented on various components to update.

*V.*     **Upcoming Meetings**
i.     *January 31st – Present to Planning Commission*
j.     *February 8th– Present to Town Council*

VI.     **Adjourn – 8:00 PM**

BLM_0066851

# Town of Ridgway
# Source Water Protection Plan



**Ouray County, Colorado**

**September 2012**

Written by Colleen Williams
Source Water Specialist
Colorado Rural Water Association

For the community water providers:
Town of Ridgway: ID # CO0146676

BLM_0066852

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................................. 4

INTRODUCTION ........................................................................................ 5
    Purpose of a Source Water Protection Plan ........................................... 5
    Public Participation in the Planning Process........................................... 5
    Protection Plan Development .............................................................. 6
    Steering Committee Members ............................................................. 7

WATER SUPPLY SETTING ........................................................................... 8
    Location ........................................................................................ 8
    Physical Setting .............................................................................. 9
    Surface Geology ........................................................................... 10
    Land Use and Ownership ................................................................. 11
    Zoning Regulations........................................................................ 13

WATER QUALITY – HYDROLOGIC SETTING .................................................. 14
    Hydrology .................................................................................... 14
    Water Quality Standards ................................................................. 16
    Drinking Water Supply Operations .................................................... 17
    Water Supply/Demands Analysis ...................................................... 18

OVERVIEW OF COLORADO'S SWAP PROGRAM .............................................. 19
    Source Water Assessment Phase ...................................................... 19
    Source Water Protection Phase ........................................................ 19

SOURCE WATER ASSESSMENT RESULTS ...................................................... 20
    Source Water Assessment Area Delineation ........................................ 20
    Contaminant Source Inventory ........................................................ 22
    Susceptibility Analysis.................................................................... 22

DISCUSSION OF ISSUES OF CONCERN ........................................................ 23
    Surface and Groundwater Contaminants ........................................... 23
    Impacts from Transportation on Roads .............................................. 24
    Septic Systems ............................................................................. 26
    Agricultural Activities..................................................................... 27
    Public Lands Management ............................................................... 29
    Climate Change ............................................................................ 33
    Oil and Gas Development ................................................................ 35
    Residential Property Maintenance ..................................................... 36

SOURCE WATER PROTECTION MEASURES .................................................... 37
    Management Approaches ................................................................ 37
    Evaluating Effectiveness................................................................. 37
    Source Water Best Management Practices .......................................... 38

REFERENCES ........................................................................................ 44

BLM_0066853

APPENDICES ........................................................................................ 46

Emergency/Contingency Plans
Source Water Assessment Report and Appendices
Meeting Attendance Roster
Meeting Agendas and Minutes
Contact List of stakeholders
Presentations
Citizen's Guides
Contaminants Health Concerns
Miscellaneous Maps and Reports
Funding Source for Source Water Protection
Additional Resources
Glossary



*Our vision: Ridgway is a welcoming, community-minded, rural town situated in a beautiful mountain valley. We support learning, creativity and culture. We share a deep connection to the outdoors. We are committed to being economically sustainable and ecologically responsible.*

BLM_0066854

## EXECUTIVE SUMMARY

The Town of Ridgway values a clean, high quality drinking water supply and decided to work collaboratively with area stakeholders to develop a Source Water Protection Plan to protect their current water source, groundwater wells and springs. During the months of August 2011 to May 21, 2012, five stakeholder meetings were held at the Ridgway Town Hall in Ridgway, Colorado to encourage local public participation. The planning process attracted interest and participation from 11 people including local citizens, local ditch company, local watershed group, water operators, government, and agency representatives. This group comprised the Ridgway Source Water Protection Planning Team (the Planning Team or Team).

The Team initially reviewed the Source Water Assessment completed by the Colorado Department of Public Health and Environment. The Assessment included the delineation of the source water protection area, potential sources of contaminants, and the potential of these contaminants to degrade the water source. Using this information as a starting point, the Team requested a re-delineation of the protection area based on the updated GIS information regarding the number and location of its current wells and springs. The re-delineated area defines the region where the Team has chosen to focus its source water protection measures to reduce source water susceptibility to contamination.

To develop their management approach, the Planning Team focused on the following issues of concern within the Source Water Protection Area: impacts from transportation on roads, septic systems, agricultural activities, public land management, wildland fires, growth, climate change, forest health, and residential property maintenance.

The Planning Team reviewed and discussed several possible management approaches that could be implemented within and nearby the protection area to help reduce the risks of potential contamination to the community's source water. Voluntary implementation of source water management approaches at the local level (i.e. county and municipal) applies an additional level of protection to the drinking water supply by taking preventive measures to protect the source water. The Planning Team established a "common sense" approach in identifying and selecting the most feasible source water management activities to implement locally. These management practices included in this Plan are recommended by the Team to reduce the risks of potential contaminants to the Source Water Protection Area and protect the drinking water source for the Town of Ridgway.

At the completion of this plan, a Steering Committee was formed to oversee its implementation. Representatives from the Town, community, and government agencies who participated on the Planning Team volunteered to serve on the Steering Committee and meet throughout the year. The first meeting of the Steering Committee is scheduled for October 1, 2012. At this first meeting, the Committee will decide which management approaches to implement during 2012.

The Colorado Rural Water Association's Source Water Protection Specialist, Colleen Williams, helped facilitate the source water protection planning process. The goal of the Association's Source Water Protection Program is to assist rural and small communities served by public water systems to reduce or eliminate the potential risks to drinking water supplies through the development of Source Water Protection Plans, and provide assistance for the implementation of prevention measures.

BLM_0066855

## INTRODUCTION

The Town of Ridgway operates a municipal supply water system that supplies drinking water to +/- 924 (2010 U.S. Census) residents of the town located in Ouray County, Colorado. The Town realizes that in order to protect the source of their drinking water, they need to work together with area stakeholders to develop a protection plan to prevent possible contamination of this valuable resource. Proactive planning and implementing pollution prevention strategies are essential to protect the long-term integrity of their water supply and will limit their costs and liabilities.

### Purpose of the Source Water Protection Plan

The Source Water Protection Plan (SWPP) is a tool for the Ridgway community to ensure clean and high quality drinking water sources for current and future generations.  This Source Water Protection Plan is designed to:

- Create an awareness of the community's drinking water sources and the potential risks to water quality within the watershed;

- Encourage education and identify voluntary solutions to alleviate pollution risks;

- Implement management practices to protect and enhance the drinking water supply;

- Provide for a contingency plan in case of an emergency that threatens or disrupts the community water supply.

Developing and implementing source water protection measures at the local level (i.e. county and municipal) will complement existing regulatory protection measures implemented at the state and federal governmental levels by filling protection gaps that can only be addressed at the local level.

### Public Participation in the Planning Process

Public participation is vitally important to the overall success of Colorado's Source Water Assessment and Protection (SWAP) program.  Source water protection was founded on the concept that informed citizens, equipped with fundamental knowledge about their drinking water source and the threats to it, will be the most effective advocates for protecting this valuable resource. Local support and acceptance of the plan is more likely where local stakeholders have actively participated in the development of their protection plan.

During the months of August 2011 to May 21, 2012, five stakeholders meetings were held at the Ridgway Town Hall in Ridgway, Colorado to encourage local public participation in the planning process. Local stakeholders were sent letters of invitation to participate and email reminders of meeting dates. The source water protection planning process attracted interest and participation from 11 people including local citizens, water operators, government, and agency representatives. Input from the following list of Planning Team participants was greatly appreciated (Table 1).

BLM_0066856

Table 1. Ridgway Source Water Protection Plan Participants

| Participant | Affiliation |
|---|---|
| Joanne Fagan | Town of Ridgway Engineer/Public Works Director |
| Dan Bartashius | Town of Ridgway Utilities Supervisor |
| Jen Coates | Town of Ridgway Town Manager |
| Pat Willits | Town of Ridgway Mayor (now former mayor) |
| John Clark | Town of Ridgway Mayor Pro Tem (now mayor) |
| Denise Gendreau | Ridgway Ouray Community Coalition |
| Rein van West | Ridgway Ouray Community Coalition |
| Bryan Sampson | Ouray County Land Use/Planning |
| Dave Ficco | Ouray County Road & Bridge |
| Matthew Jurjonas | Uncompahgre Watershed Partnership |
| Colleen Williams | Colorado Rural Water Association |

## Protection Plan Development

The source water protection planning effort consisted of public Planning Team meetings and individual meetings with water operators, government, and agency representatives. Information discussed at the meetings helped the Team develop an understanding of the issues affecting source water protection for the Town of Ridgway. The Team then made recommendations for management approaches to be incorporated into a protection plan. In addition to the Planning Team meetings, data and other information pertaining to source water protection areas were gathered via public documents, internet research, phone calls, emails, and field trips to the protection area. A summary of the meetings is presented in Table 2.



Figure 1. Members of the Planning Team.

BLM_0066857

Table 2. Planning Team Meetings

| Date | Purpose of Meeting |
|---|---|
| 8/15/11 | First Planning Team meeting with presentation on the process of developing a Source Water Protection Plan for the Town of Ridgway. Review of the State's Source Water Assessment and discussion of the delineation of the source water protection area. |
| 9/26/11 | Second Planning Team meeting with information sharing about the source water protection area and discussion of the potential sources of contamination within the delineated source water protection areas. |
| 11/15/11 | Third Planning Team meeting to work on identifying issues of concern and develop management approaches to include in the Plan to address these concerns and decrease risk to the source waters. |
| 2/28/12 | Fourth Planning Team meeting to review and edit the Draft Plan and appoint a Steering Committee to implement the Final Plan. |
| 5/21/12 | Fifth Planning Team meeting to review edits to the 2nd Draft Plan, set the date for the first Steering Committee meeting; and implement one of the action items on the Plan. |

## Steering Committee Members

At the completion of this plan, a Steering Committee was formed to implement the management approaches of this Source Water Protection Plan. Members of the Planning Team volunteered to serve on the Steering Committee and meet throughout the year. The first meeting of the Steering Committee is scheduled for October 1, 2012. At this first meeting, the Committee will develop an Action Plan for management approaches to implement during 2012.

Table 3. Steering Committee Members

| Name | Affiliation |
|---|---|
| Joanne Fagan | PW Director/Town Engineer |
| Dan Bartashius | Utilities Supervisor, Fire Chief |
| Emily Galanto | Uncompahgre Watershed Partnership Vista |
| Mark or Brian | Ouray County Land Use |
| Denise or Rein | Ridgway Ouray Community Council |
| Tim Manzagol | Dallas Ditch |
| Gary Shellhorn | U.S. Forest Service |
| TBA | Other Property Owners |
| Colleen Williams | Colorado Rural Water Association |

7

BLM_0066858

## WATER SUPPLY SETTING

### Location

The Town of Ridgway is a small rural community located in Ouray County in the southwestern portion of Colorado. Ridgway is situated in the Uncompahgre River Valley at Latitude 40°5'10''N, Longitude 108°47'53'W at an elevation of 6,985 feet. The Town lies at the junction of U. S. Highway 550 and Colorado Highway 62; is 27 miles south of Montrose, 37 miles east of Telluride, and 10 miles north of Ouray.

Ouray County is one of the least populated counties in the State of Colorado with 4,436 residents, of which 2,512 live in the unincorporated areas outside of the County's two municipalities (Ridgway and Ouray). According to the 2010 U.S. Census, Ouray County saw an 18.55% increase in population from 2000 to 2010.



Figure 2. Regional setting map.

BLM_0066859

**Physical Setting**

Ridgway's source water protection area lies within the southern Rocky Mountains Physiographic Province that encompasses the center of the state and runs its entire north-south length. The northernmost part of the protection area includes Miller Mesa, elevations from 7,800 to 8,800 feet, which was formed from glacial till deposited over the lowlands. The southernmost part includes the mountainous areas of the San Juan Mountains with elevations up to 12,600 feet.

The climate of the area is semiarid. Approximately 30 to 40 percent of the precipitation is snowfall, which accumulates during winter and spring storms. Above 7,000 feet, where part of the Town of Ridgway and its watershed lie, the climate changes to more mountainous conditions with an increase in precipitation and cooler temperatures.



Figure 3. Topography map of the source water protection area.

BLM_0066860

**Surface Geology**

The source water protection area has four distinct geological units of Quaternary, Tertiary and Cretaceous deposits (Fig. 3). Shale of the Mancos Formation, deposited during the Cretaceous Period, underlies a small portion of the Cottonwood Creek SWPA and is a bedrock confining unit. The Mancos Shale (MS) is composed of massive, fossiliferous marine shale with interbedded sandstones, siltstones, and devitrified volcanic ash layers. Mancos shale in particular, is a known contributor of dissolved mineral salt and selenium to the Uncompahgre River. Mancos Shale is also high in clay content and will shrink and swell in response to water. Various anthropogenic activities like sand and gravel extraction, agricultural and urban landscape irrigation accelerate the mobilization and transport of selenium from shale and shale derived soil to surface water. (Thomas, 2007).

The largest portion of the protection area is covered by Quaternary landslide (Ql) deposits. Tertiary volcanic deposits composed of lava (Tpl) and ash (Taf) are located in the southern part of the protection area at higher elevations.



Ql  - Quaternary landslide deposits
Tpl - Tertiary pyroxene latite (andercite)
Taf - Tertiary ashflow tuffs
KM - Mancos Shale

Figure 4. Surface geology map of the Source Water Protection Area.

BLM_0066861



**Land Use and Ownership**

The Town of Ridgway's Source Water Protection area lies within both public and private lands (Fig. 2). The public lands include Uncompahgre National Forest lands managed by the Ouray Ranger District in Montrose, Colorado. The private land includes land within the unincorporated areas of Ouray County south of the town of Ridgway. Land use on private land consists of agricultural and rural residential development.

Land use decisions for Ouray County are made by the Ouray County Board of County Commissioners with recommendations from their Planning Commission. The Ouray County Master Plan, adopted in 1999, provides a framework for decision making and serves as a guide for all decisions regarding land use in Ouray County. The Land Use Department administers Ouray County's land use regulatory system or Land Use Code (Ouray County, 2010). The county seat is located in the town of Ouray, Colorado.

Improvements - Agricultural
Improvements - minor
Residence - Agricultural
Residence - single family
Vacant land - Agricultural
Vacant land - government
Vacant land - residential

SOURCE: OURAY COUNTY LAND USE

Figure 5. Map of land uses within the source water protection area.

BLM_0066862



SOURCE: OURAY COUNTY LAND USE

Figure 6. Map of landowners within the source water protection area.

Table 4. Landowners within the Source Water Protection Area

| NUMBER | LANDOWNER |
|---|---|
| 1 | PECCOLO  VINCE |
| 2 | CLAUSI  ROBERT E |
| 3 | JENSEN GAIL |
| 4 | PHILLIPS HOWELL LLC |
| 5 | MCCULLOUGH ROBERT F II |
| 6 | SAVATH ANNIE VAREILLE |
| 7 | U.S. FOREST SERVICE |
| 8 | J & R LAND AND CATTLE CO |
| 9 | RITCHEY JERRY W |
| 10-13 | HORIZON RANCH LTD. |
| 0,14,16,20,21 | WOLF LAND COMPANY L P |
| 15 | OURAY COUNTY |
| 17 | KUIJVENHOVEN JOHN |
| 18 | ORTMAN LIZA |
| 19 | MILLER MESA LLC |
| 22,35 | ALTA INVESTMENTS LLC |
| 23 | SHEPHERDS SONG LTD LLC |
| 24 | MCCLEMANS DONALD |
| 25 | POSTA GREGORY A |
| 26 | SWEETMAN LIVING TRUST |
| 27 | TSETSILAS ETHEL |
| 28 | MULLINGS DAVID |
| 29 | BURDICK BOB |
| 30,66 | OWENS S W |
| 31,60 | WALTHER RANCH LLC |
| 32 | PHILLIPS KELLY LLC |
| 33 | TOMATO LLC |
| 34 | ENGLISH ENTERPRISES II LLC |
| 36 | TOWN OF RIDGWAY |
| 37,61-65 | ROAD ROA |
| 38 | SAFTLER MICHAEL D |
| 39 | SEARS SHARI L |
| 40 | HEISER MALCOLM A |
| 41,48,52 | BLOTTER-NORTHWAY NANCY |
| 42,43,46 | AVERY TRUST |
| 44,45,47 | CROZIER REBECCA A |
| 49-51 | BLOTTER MICHAEL LYNN |
| 53 | BALOG JAMES D |
| 54 | MORRISON CRAIG S |
| 55 | CLARA C MOORE TRUST |
| 56 | U LAZY S LLC |
| 57 | HARRIS LAND COMPANY |
| 58 | JENNY LEE PHILLIPS  TRUST |
| 59 | REGAN-LOWE ELIZABETH |
| 67 | MCREYNOLDS TRUST |
| 68 | JENSEN FAMILY TRUST |
| 69 | EHLERT A BENJAMIN |
| 70 | BAYLESS CHERYL |
| 71-72 | SILVER PARTNERS LP |

12

BLM_0066863

**Zoning Regulations**

The private land within the source water protection area lies within the unincorporated land of Ouray County. The county has developed zoning districts in accordance with their Master Plan. The source water protection area lies within the Alpine Zone, as identified on the County Zoning District Map. The intent of the Alpine Zone is to preserve the natural beauty, wildlife habitat, and recreational, historic and archeological values of high altitude areas and manage the County's natural resources in a manner that is both environmentally sound and protects private property, while allowing mining, agriculture, forestry, recreation, and limited low density and resort/conference center development.

Uses Allowed By Right
Within the Alpine Zone, the use of land or structures may not require prior review and approval by the Planning Commission or the Board of County Commissioners. The use of land without review is called "Use By Right" and is the principal use(s) permitted on that land.
The Use By right allowed within the Alpine Zone includes:

1. Underground Mining
2. Accessory uses and structure
3. Farming/Ranching
4. Home occupation
5. Non-commercial camping
6. Non-commercial logging
7. Single family dwelling unit (one unit per 35 acres) or parcels not previously  approved by Ouray County as part of a Planned Unit Development

Uses Allowed by Special Use Permit
These include normal uses associated with use by right compliance with certain conditions and after review and approval of a site plan. The Special Uses in the Alpine Zone include:

1. Bed and breakfast
2. Cemetery
3. Church
4. Commercial camping, equestrian activity, logging, outdoor recreation day use
5. Governmental facility
6. Guest ranch
7. Home Business
8. Livery or horse rental operation
9. All mineral extraction & processing operations except those allowed pursuant to Sect 3.4A (1)(a)
10. Oil and gas exploration and facilities
11. Public park or wildlife reserve
12. Public service facility or public utility
13. Sand and gravel operation
14. School
15. Temporary Use

The minimum lot size is 35 acres and the regular Planned Unit Development maximum density is one unit per 35 acres (Ouray County, 2010).

BLM_0066864

## WATER QUALITY – HYDROLOGIC SETTING

### Hydrology

The Town of Ridgway obtains its drinking water supply from surface water intakes off Beaver Creek and Happy Hollow (Cottonwood Creek), tributaries of the Uncompahgre River. The source water protection area includes the watershed areas upstream from the town's intakes as well as the Ridgway ditch that transports water from the Beaver Creek intake. The Beaver Creek watershed (Hydrologic Unit Code 14020006790303) and Cottonwood Creek watershed (HUC 14020006790101) are subwatersheds of the Uncompahgre River watershed and the Gunnison River watershed, tributaries to the Colorado River.

Management of the waters of the Gunnison River basin is under the jurisdiction of Colorado Water Division 4. The Division Engineer and Local Water Commissioner are based in Montrose, Colorado.



SOURCE: GROUND WATER ATLAS OF COLORADO

Figure 7. Map of the Gunnison River Basin in Colorado.

14

BLM_0066865

Beaver Creek
The headwaters of Beaver Creek originate approximately 8.9 miles south of the Town of Ridgway at an elevation of 12,200 in the drainage basin north of Mount Ridgway and the Whitehouse Mountains in the San Juan Mountain range. The Beaver Creek source water protection area drains about 3.21 square miles (2,054 acres). Beaver Creek, the main source of potable water for the Town of Ridgway, flows generally northward. Peak flows in Beaver Creek occur during the months of May and June when runoff flows from the snowpack are at a maximum. Occasional intense thunderstorms may temporarily increase flow during the summer months.

Cottonwood Creek
Cottonwood Creek (aka Happy Hollow) originates approximately 3.7 miles southwest of the Town of Ridgway at an elevation of approximately 8,600 feet in drainages on Miller Mesa. Cottonwood Creek flows 12 miles to its confluence with the Uncompahgre River in the Town of Ridgway. The Cottonwood Creek source water protection area drains about 3.67 square miles (2,349 acres).



Figure 8. Map of streams that provide the drinking water supply for the Town of Ridgway (excluding Town Ditch area).

15

BLM_0066866

**Water Quality Standards**

Under the Clean Water Act, every state must adopt water quality standards to protect, maintain and improve the quality of the nation's surface waters. The State of Colorado's Water Quality Control Commission has established water quality standards that define the goals and limits for all waters within their jurisdictions. Colorado streams are divided into individual stream segments for classification and standards identification purposes (Table 5). Standards are designed to protect the associated designated uses of the streams.

Table 5. Stream Segments within the Source Water Protection Area and Their Designated Uses

| Segment  WBID | Portion of Segment | Designated Use |
|---|---|---|
| COGUUN10<br><br>(Cottonwood Creek) | All tributaries to the Uncompahgre River, including all wetlands, lakes and reservoirs, from a point immediately below the confluence with Dexter Creek to the South Canal near Uncompahgre, except for specific listings in Segments 1 and 11. | Aquatic Life Cold 2<br>Water Supply<br>Agriculture<br>Recreation N (Nov. 1 - April 30)<br>Recreation P (May 1 - Oct. 31) |
| COGUUN11<br><br>(Beaver Creek) | Mainstem of Coal Creek from the source to the Park Ditch, mainstem of Dallas Creek from the source of the East and West Forks to the confluence with the Uncompahgre River; mainstem of Cow Creek, including all tributaries, lakes and reservoirs, from the Uncompahgre Wilderness Area boundary to the confluence with the Uncompahgre River; Billy Creek; Onion Creek and Beaton Creek from their source to their confluences with Uncompahgre River; mainstem of Beaver Creek from source to the confluence with East Fork of Dallas Creek; and mainstem of Pleasant Valley Creek from the source to the confluence with Dallas Creek. | Aquatic Life Cold 1<br>Water Supply<br>Agriculture<br>Recreation N (Nov. 1 - April 30)<br>Recreation P (May 1 - Oct. 31) |

SOURCE: REGULATION 35 (WQCC,2011)

Definitions of Designated Uses
The following definitions are paraphrased from WQCC Regulation 31, sub section 13:

Aquatic Life Cold 1: Refers to waters that are capable of sustaining a wide variety of cold water biota, including sensitive species, or could sustain such biota in correctable water quality conditions.

Aquatic Life Cold 2: These are waters that are not capable of sustaining a wide variety of cold water biota, including sensitive species, due to physical habitat, water flows or levels, or uncorrectable water quality conditions that result in substantial impairment of the abundance and diversity of species.

Water Supply: These surface waters are suitable or intended to become suitable for potable water supplies. After receiving standard treatment (defined as coagulation, flocculation, sedimentation, filtration, and disinfection with chlorine or its equivalent), these waters will meet Colorado drinking water regulations and any revisions, amendments, or supplements.

Agriculture: These surface waters are suitable or intended to become suitable for irrigation of crops usually grown in Colorado and which are not hazardous as drinking water for livestock.

Recreation N: Not Primary Contact Use - These surface waters are not suitable or intended to become suitable for primary contact recreation uses. This classification shall be applied only where a use attainability analysis demonstrates that there is not a reasonable likelihood that primary contact uses will occur in the water segment(s) in question within the next 20-year period.

Recreation P: Primary Contact recreation refers to waters suitable for full-body contact and ingestion (WQCC, 2009).

BLM_0066867

## Drinking Water Supply Operation

The Town of Ridgway operates a municipal water supply system serving the residents and commercial users of the town. The Town of Ridgway has approximately 580 residential dwellings, +/- 924 residents (2010 U.S. Census) and a western town charm.


PHOTO: COLLEEN WILLIAMS

Figure 9. Surface water from the Town's intakes is delivered via ditch and pipeline to three settling ponds prior to treatment.

The Town was incorporated in 1891 and is a home rule municipality. Its municipal affairs are governed by a Town Council who are elected for two-year terms. The Ridgway Municipal Code and its ordinances are the framework by which the Town governs. The Town Office is located at 201 North Railroad Street in Ridgway, Colorado.

The Town of Ridgway's water system consists of surface water intake structures located on Happy Hollow (Cottonwood Creek) and Beaver Creek. Raw water is diverted from an intake off Beaver Creek into the Ridgway Ditch, which delivers the water via gravity for approximately five miles to the Town's three pre-sedimentation ponds near their water treatment plant. Raw water from the Cottonwood Creek intake is diverted from the headgate into a pipe and piped approximately 2,000 feet into the Town's pre-sedimentation ponds. Raw water is settled in the ponds prior to flowing into the water plant (WTP) for treatment for taste and odor and for filtration. The Town uses Microfiltration treatment, which is a membrane process which removes contaminants from the water by passage through fibers with microscopic openings. The filtered water is then chlorinated.

After treatment, the filtered water is pumped into two, 300,000 gallon aboveground storage tanks. There is a third tank in Vista Terrace with a 10,000 gallon capacity, which serves the upper pressure zones in that subdivision. The total water storage capacity is 610,000 gallons (Table 6). The treated water is distributed to their customers via a network of miles of underground pipes to 656 service connections or taps. The size of the service area is approximately 516 acres (Fagan, 2012).

Table 6. Storage of Treated Water

| Name of Storage Facility | Tank # 1 | Tank # 2 | Tank # 3 |
|---|---|---|---|
| Location | WTP | WTP | Vista Terrace |
| Capacity in Gallons | 300,000 gal. | 300,000 gal. | 10,000 gal. |

The Town of Ridgway provides an Annual Drinking Water Quality Report to the public that provides information on the results of their water monitoring program. Consumer Confidence Report for the previous calendar year is available at the Ridgway Town Hall or online at www.town.ridgway.co.us. The Town is currently in compliance with all State water quality regulations and has had no violations in their water quality monitoring.

BLM_0066868

**Water Supply Demands/Analysis**

The Town has water rights to 1,365 acre feet/year of water from Beaver Creek and Happy Hollow. Currently, the Town's water system has an estimated average daily demand of 172,000 gallons of water per day to supply its customers. The average peak (maximum) daily demand of water is approximately 500,000 gallons per day. The Town has the capacity to meet its peak daily demand.

The estimated daily and peak water demand, along with the Town's water rights of 1,365 acre feet/year have been inserted into a Water Demand Estimator provided by the Colorado Department of Public Health and Environment. Based on these estimated, the Town's has a surplus of water to use for both daily and peak demand. A water demand estimator is included in the Appendices of this report.

The Town of Ridgway has evaluated its ability to meet the average daily demand and the average peak daily demand of its customers in the event the water supply from one or more of its water sources becomes disabled for an extended period of time due to potential contamination. The evaluation indicated that the Town of Ridgway may be able to meet the average daily demand of its customers if one of the water sources became disabled for an extended period of time if they implemented conservation measures. The ability of the Town of Ridgway to meet either average daily or peak demand for an extended period of time is also affected by both the flow of the creeks and senior water rights as well as the amount of treated water the water system has in storage at the time a water source becomes disabled.

The Town of Ridgway recognizes that potential contamination of its surface water source could potentially result in having to abandon the water source if treatment proves to be ineffective or too costly. To understand the potential financial costs associated with such an accident, Town of Ridgway evaluated what it might cost to replace one of its water sources (i.e., replacement of the intake structure and the associated infrastructure) if this occurs. The evaluation did not attempt to estimate treatment costs, which can be variable depending on the type of contaminant(s) that need(s) to be treated. The evaluation indicated that it could cost millions in today's dollars to find a new water source.

The potential financial and water supply risks related to the long-term disablement of one or more of the community's water sources are a concern to the Town of Ridgway Steering Committee. As a result, the Steering Committee believes the development and implementation of a source water protection plan for Town of Ridgway can help to reduce the risks posed by potential contamination of its water source.



Figure 10. The operation of the Ridgway water treatment plant is managed by Dan Bartashius, the Town's Water Plant Operator. The Town uses a Microfiltration treatment, which is a membrane filtration process which removes contaminants from the water by passing through microporous fibers bundled in modules.

BLM_0066869

## OVERVIEW OF COLORADO's SWAP PROGRAM

Source water assessment and protection came into existence in 1996 as a result of Congressional reauthorization and amendment of the Safe Drinking Water Act. The 1996 amendments required each state to develop a source water assessment and protection (SWAP) program. The Water Quality Control Division, an agency of the Colorado Department of Public Health and Environment (CDPHE), assumed the responsibility of developing Colorado's SWAP program. The SWAP program is integrated with the Colorado Wellhead Protection Program that was established in amendments made to the federal Safe Drinking Water Act (SDWA, Section 1428) in 1986.

Colorado's SWAP program is a two-phased process designed to assist public water systems in preventing potential contamination of their untreated drinking water supplies.

### Source Water Assessment Phase

The Assessment Phase for all public water systems consists of four primary elements.

1. Delineating the source water assessment area for each drinking water source;

2. Conducting a contaminant source inventory to identify potential sources of contamination within each of the source water assessment areas;

3. Conducting a susceptibility analysis to determine the potential susceptibility of each public drinking water source to the different sources of contamination;

4. Reporting the results of the source water assessment to the public water systems and the general public.

The Assessment Phase involves understanding where the Town of Ridgway's source water comes from, what contaminant sources potentially threaten the water source(s), and how susceptible each water source is to potential contamination.

### Source Water Protection Phase

The Protection Phase is a voluntary, ongoing process to employ preventive measures to protect water supplies from the potential sources of contamination to which it may be most susceptible. The Protection Phase can be used to take action to avoid unnecessary treatment or replacement costs associated with potential contamination of the untreated water supply. Source water protection begins when local decision-makers use the source water assessment results and other pertinent information as a starting point to develop a protection plan. The source water protection phase for all public water systems consists of four primary elements:

1. Involving local stakeholders in the planning process;

2. Developing a comprehensive protection plan for all of their drinking water sources;

3. Implementing the protection plan on a continuous basis to reduce the risk of potential contamination of the drinking water sources;

4. Monitoring the effectiveness of the protection plan and updating it accordingly as future assessment results indicate.

BLM_0066870

## SOURCE WATER ASSESSMENT RESULTS

The Town of Ridgway received their source water assessment report from the Colorado Department of Public Health and Environment in November 2004. During the 2010 Source Water Protection Plan meetings, the assessment report was reviewed by the Planning Team. A copy of the source water assessment summary report can be obtained by contacting the water system or by downloading a copy from the CDPHE's SWAP program web site located at: www.cdphe.state.co.us/wq/sw/swaphom.html. These assessment results were used as a starting point to guide the development of a protection plan. The following sections provide a brief summary of the main findings from the three component phases of the assessment.

### Source Water Assessment Area Delineation

The State's Assessment included a delineated Source Water Assessment Area. Delineation is the process used to identify and map the drainage basin or watershed that supplies water to a surface water source. The delineated watershed begins at the intakes for the Town of Ridgway and includes the entire watershed including its surface, subsurface, and recharge area. The delineated source water assessment area provides the basis for understanding where the community's source water and potential contaminant threats originate, and where the community has chosen to implement its source water protection measures in an attempt to manage the susceptibility of their source water to potential contamination.

Protection Areas

The Planning Team reviewed the State's delineation of the Town of Ridgway's source water assessment area that includes the upper Beaver Creek and Cottonwood Creek (Happy Hollow) watersheds, the Ridgway Ditch, and Lake Otanawanda. The Team provided the State with new information on the location of the Beaver Creek intake and the Ridgway Ditch. The State provided the Town with a revised delineated area that the Town accepted as their Source Water Protection Area (Fig. 11).

The Beaver Creek source water protection area consists of a 3.21 square mile area draining the upper Beaver Creek watershed. The Cottonwood Creek (Happy Hollow) source water protection area consists of a 3.67 square mile area draining the upper Cottonwood Creek watershed and includes the Lake Otanawanda protection area. The protection area for the Ridgway Ditch includes a 1,000 feet zone on either side of the ditch, approximately 2.01 square miles, some of which is included in the Beaver and Cottonwood Creek watersheds. The total source water protection area for the Town is about 8.22 square miles.

Protection Zones

The Source Water Protection Area includes the following protection zones:

1) **Zone 1** is located 1,000 feet on either side of the surface water drainage network, including the Ridgway Ditch. Zone 1 is the most sensitive and important area to protect from potential sources of contamination.

2) **Zone 2** extends outward a distance of one-quarter mile from the boundary of Zone 1. In the case of this SWPA, there are places where Zone 2 does not exist.

3) **Zone 3** includes the rest of the source water assessment area that was not covered by either Zone 1 or Zone 2.

BLM_0066871



Figure 11. Map of the Town of Ridgway's Source Water Protection Area.

BLM_0066872

**Contaminant Source Inventory**

_Notice_
_The information contained in this "Plan" is limited to that available from public records and the water supplier. Other "potential contaminant sites" or threats to the water supply may exist in the source water assessment area that are not identified in this "Plan." Identification of a site as a "potential contaminant site" should not be interpreted as one that will necessarily cause contamination of the water supply._

In 2001 – 2002, a contaminant source inventory was conducted by the Colorado Department of Public Health and Environment to identify selected potential sources of contamination that might be present within the source water assessment areas. The Planning Team field-checked this existing information, added additional potential sources of contaminant based on local knowledge, and developed a current inventory. The contaminant inventory was completed by mapping the potential contaminant sources with the aid of a Geographic Information System (GIS).

Discrete Potential Sources of Contamination
Discrete contaminant sources were inventoried using selected state and federal regulatory databases including: mining and reclamation, oil and gas production, above and underground petroleum tanks, Superfund sites, hazardous waste generators, solid waste disposal, industrial and domestic wastewater dischargers, and water well permits. A discrete source is a facility that can be mapped as a point source of potential contaminant to the water source.

The SWAP report listed the Ridgway Marina as a discrete contaminant source within the source water protection area. The Planning Team reviewed the information and found that this facility was not located within the source water protection areas; therefore, it was removed from the inventory of potential sources of contamination. There are no discrete potential sources of contamination within the Ridgway source water protection areas.

Dispersed Potential Sources of Contamination
Dispersed contaminant sources were inventoried using recent land use/land cover and transportation maps of Colorado, along with selected state regulatory databases. A dispersed source covers a broader area and is called a non-point source of potential contaminant to the water source.

The SWAP report's contaminant source inventory indicates the following types of dispersed contaminant sources were identified within the source water assessment areas analyzed: pasture/hay; deciduous, evergreen and mixed forests; septic systems; and road miles.


**Susceptibility Analysis**

The State conducted an analysis to identify the susceptibility of a water source to contamination from potential sources inventoried within its source water assessment area. The Overall Susceptibility Rating for the water sources was moderate and the Physical Setting rating was moderately high. The ratings were based on the inventory which included the Ridgway Marina (rated high), which was removed from the inventory. The Town will provide CDPHE with the updated inventory and request that the Susceptibility Analysis be adjusted to show this change.

BLM_0066873

## DISCUSSION OF ISSUES OF CONCERN

The Planning Team reviewed the information presented in the State's assessment, discussed other potential sources of contaminants not included in the assessment, and identified areas of concern within the source water protection areas in which to focus their management approaches.

Issues of concern include:

- Impacts from transportation on roads
- Land use: growth, increased development including roads, structures, septics, potential chemical use, etc.
- Agricultural activities: grazing, weed abatement
- Septic systems
- Public land management
- Wildland fires
- Forest health: invasive species
- Climate change
- Residential property maintenance

### Surface and Groundwater Contaminants

Many types of land uses have the potential to contaminate source waters: spills from tanks, trucks, and railcars; leaks from buried containers; failed septic systems, buried or injection of wastes underground, use of fertilizers, pesticides, and herbicides, road salting, as well as urban and agricultural runoff. While catastrophic contaminant spills or releases can wipe out a water resource, source water degradation can result from a plethora of small releases of harmful substances. According to the USEPA, nonpoint-source pollution (when water runoff moves over or into the ground picking up pollutants and carrying them into surface and groundwater) is the leading cause of water quality degradation (GWPC, 2008).



Figure 12. Schematic drawing of the potential sources of contaminants to surface and groundwater.

BLM_0066874

## Impacts from Transportation on Roads

The source water protection area is located outside the boundaries of the Town and is accessed by two-lane gravel roads: County Road 5 and County Road 5A or Aspen Road. The roads within the protection area are maintained by Ouray County Road and Bridge Department. Cottonwood Creek lies adjacent to sections of County Road 5. Ridgway Ditch, that conveys water from Beaver Creek to the Town's settling ponds, crosses County Road 5A. The roads in the source water protection area are used for residential and recreational access.

Contaminant Pathways
Motor vehicles, roads and parking facilities are a major source of water pollution to both surface and groundwater. An estimated 46% of US vehicles leak hazardous fluids, including crankcase oil, transmission, hydraulic, and brake fluid, and antifreeze, as indicated by oil spots on roads and parking lots, and rainbow sheens of oil in puddles and roadside drainage ditches. An estimated 30-40% of the 1.4 billion gallons of lubricating oils used in automobiles are either burned in the engine or lost in drips and leaks, and another 180 million gallons are disposed of improperly onto the ground or into sewers. Runoff from roads and parking lots has a high concentration of toxic metals, suspended solids, and hydrocarbons, which originate largely from automobiles (Gowler and Sage, 2006). Storm water runoff over these roads can deliver contaminants from the road surface into the nearby ground and surface water.

Vehicular spills may occur along the transportation route within the source water protection areas from trucks that transport fuels, waste, and other chemicals that have a potential for contaminating the source waters. Chemicals from accidental spills are often diluted with water, potentially washing the chemicals into the soil and infiltrating into the groundwater. Roadways are also frequently used for illegal dumping of hazardous or other potentially harmful wastes.

Dust Abatement
Twice a year, during June and September, the County applies a dust abatement that contains magnesium chloride to parts of the roadway within the protection area (Ficco, 2012). Dust suppressants abate dust by changing the physical properties of the road surface by creating a hard, compact surface that resists potholing, rutting and loss of aggregate. The use of chemical dust suppressants prevents road particulates from becoming airborne.

Magnesium chloride, used in dust abatement, is highly soluble in water and has the potential to move through the soil with water. The movement is dependent on the rate and frequency of rainfall, the drainage characteristics, and soil type. If the soil surface is not bound together well or if the rain event is extreme, dust suppressant treated soil particles can be carried by overland flow into streams, rivers, and ditches. Potential water quality impacts include elevated chloride concentrations in streams downstream of application areas and shallow groundwater contamination (EPA, 2002).



Figure 13. Application of dust suppressants on roadways is less likely to be carried by water runoff or soil leachate if it is applied during dry periods.

BLM_0066875

**Transportation Corridor Recommendations:**

1. Educate the public on how to call "911" to report any spills or dumping within the SWPA both on public and private lands.

2. Work with local emergency response teams to ensure that any spill within the protection areas can be effectively contained.

3. Keep informed on road maintenance practices and schedules within the SWPA including: grading and dust abatement and Best Management Practices (BMPs) used.

4. Provide a copy of the Source Water Protection Plan to Ouray County Road and Bridge Department and encourage them to use Best Management Practices to prevent road materials from entering the source waters.

5. Use the following BMPs to reduce the risk of contaminating the drinking water source with dust abatement chemicals:

   - Properly grade gravel roads prior to application of dust abatement.

   - Apply dust abatement on the road surface and avoid going over the road edge. Applying abatement at a low rate are two methods to ensure material remains on the road surface.

   - Use a 1-foot buffer zone on the edge of the road if the road width allows.

   - Machinery used to apply dust abatement should carry adequate spill protection equipment during application.

   - Avoid applying dust abatement while raining. Preferable, a 3-day forecast of clear weather should follow any application.

   - Dispose of excess materials at designated an approved locations.

   - Consider not using dust abatement in areas of the roadway that are close to the Ridgway Ditch or along the Cottonwood Creek intake area.

BLM_0066876

## Septic Systems

Within the source water protection areas there are properties that rely on septic systems to dispose of their sewage. A septic system is a type of onsite wastewater system consisting of a septic tank that collects all the sewage and a leach field that disperses the liquid effluent onto a leach field for final treatment by the soil.

Septic systems are the second most frequently cited source of groundwater contamination in our country. Unapproved, aging, and failing septic systems have a large impact on the quality and safety of the water supply. The failure to pump solids that accumulate in the septic tank will also eventually clog the lines and cause untreated wastewater to back up into the home, to surface on the ground, or to seep into groundwater. If managed improperly, these residential septic systems can contribute excessive nutrients, bacteria, pathogenic organisms, and chemicals to the groundwater.



Figure 14. Schematic of a septic tank system.

In Ouray County individual sewage disposal systems are permitted by their Land Use/Building Department. The County administers and enforces the minimum standards, rules, and regulations outlined in the state of Colorado's Revised Statutes (CRS 25-10-105). These regulations include among other requirements minimum setback requirements from streams, ditches and other waterways. The minimum setback from the Ridgway Ditch is 25-50 ft. depending on the type of sewage disposal system. Where soil, geological or other conditions warrant, greater distances may be required by the local board of health or by the Water Quality Control Commission pursuant to C.R.S. 25-8-206 in accordance with the authority prescribed by law and rules and regulations (WQCD, 2000). The Town of Ridgway may consider asking the County to add more stringent setback requirements from the Ridgway Ditch and/or Cottonwood Creek.

---

**Septic System Recommendations:**

1. Develop a public education program for property owners within the SWPA to provide basic information on the source water protection plan. Public education will include: the proper use and maintenance of their septic systems and how the source of their drinking water can be affected by an inadequate functioning septic system.

2. Encourage the County Land Use Department to educate property owners when they apply for a septic permit on the link between good septic practices and protecting groundwater.

3. Encourage the County to increase septic system setbacks from the Ridgway Ditch and/or Cottonwood Creek, set inspection requirements and pumping if needed.

4. Encourage title companies to include information on proper Operation and Maintenance of septic systems with real estate transfer.

---

BLM_0066877

## Agricultural Activities

<u>Livestock and Wildlife Use</u>
Livestock grazing occurs within the private and federal lands in the source water protection area. On land within the Uncompahgre National Forest, livestock operators are authorized grazing use on areas called allotments through an approved grazing permit/lease. Grazing is managed by the terms and conditions specified for each allotment on permit/lease, e.g., kind and number of livestock, season of use, and amount of use permitted each grazing year. Permit/leases are generally issued for a term of 10 years. When they expire, before being renewed, they undergo a review for conformance with land use plans and compliance with environmental documentation requirements.



Figure 15. The Ridgway Ditch that delivers water from Beaver Creek runs across private ranch land used for grazing cattle.

Within the source water area, livestock grazing can impact riparian health, stream-channel conditions and water quality. The most common water quality impacts include pathogen contamination, sedimentation, and increased water temperatures from loss of vegetative stream coverage. Livestock grazing activities with the highest potential for direct and indirect impacts to water resources include long-term concentrated grazing in riparian areas, and trampling/trailing near water sources. Direct bank damage may add large amounts of sediment directly into streams, especially in wet meadow streams or erosive topography that is prone to gully formation.

Animal waste contains many pollutants that can contaminate surface and ground waters used as drinking water sources. Pathogens found in animal waste can infect humans if ingested. Organisms like *Cryptosporidium*, *Giardia lamblia*, and *Salmonella* can induce symptoms ranging from skin sores to chest pain. *E. coli*, which causes diarrhea and abdominal gas, can cause serious illness and even death. *Cryptosporidium* is of particular concern because it is highly resistant to disinfection with chlorine. This protozoan causes gastrointestinal illness that lasts 2 to 10 days in healthy individuals but can be fatal in people with weakened immune systems.

Animal wastes can contribute to nitrates in drinking water. Consumption of nitrates can cause methemoglobinemia (blue baby syndrome) in infants, which reduces the ability of the blood to carry oxygen. If left untreated, methemoglobinemia can be fatal. Because of this health risk, EPA set a drinking water maximum contaminant level (MCL) of 10 milligrams per liter or parts per million for nitrate measured as nitrogen (EPA, 2001).

While the Town's water treatment is designed to remove these contaminants, there are costs and risks associated with high concentrations of nutrients, bacteria and protozoa, and sediment. Regulations, adopted by the Water Quality Control Commission, set standards for nutrients in high mountain streams to help reduce the costs of higher nutrient concentrations for water treatment plants. These regulations will be implemented over time.

BLM_0066878

Weed Abatement

Pesticides are widely used in Colorado to protect crops and livestock from losses due to insects, weeds, and diseases. The major groups of pesticides include insecticides, herbicides, and fungicides. Because herbicides are the most widely used class of agricultural and urban use pesticides, they are the pesticides most frequently found in ground and surface water. Improper pesticide use has led to human illness, wildlife losses, and water quality degradation. The development of extremely sensitive detection methods has led to the discovery that commonly used management practices may lead to small amounts of pesticide that contaminate ground and surface water supplies. Since we depend on these water supplies for drinking water, pesticide users need to exercise a high level of care and sound pesticide use management to avoid contamination. Contamination from normal pesticide application is typically considered nonpoint contamination (CSU, 2010).

Herbicides are used by Ouray County to control noxious weeds within the source water protection area. The County weed manager spot sprays during early spring along County Road 5 up to CR 5A. The types of herbicides used for weed abatement include Plateau and Perspective for leafy spurge; and Milestone for thistle (Mabry, 2012). The Town of Ridgway's Happy Hollow intake on Cottonwood Creek is adjacent to CR 5. Herbicide application along this stretch of road has the potential for entering Cottonwood Creek. These chemicals can enter the water source through direct application, runoff, and wind transport.

The goal is to prevent contamination of water supplies by considering the use of non-herbicide alternatives, a 50 foot buffer restriction near drinking water intakes, and using the following best management practices (BMPs). Where the Town has control, the Town's integrated weed management plan requires at least a 30' buffer around Lake Otanawanda for any chemical applications except for vinegar based treatments.

**Agricultural Practices Recommendations:**

1. Develop public outreach for area residents within the SWPA on agricultural BMPs for grazing management, manure management, chemical use and storage, preventing weed infestations and animal rendering. Education outreach may include: mailings and personal communication to promote watershed stewardship to minimize water quality impacts.

2. Encourage the use of effective alternative management strategies (see the Town's integrated weed management plan).

3. Provide the County weed manager a copy of the source water protection plan, a map of the source water protection area and location of water intakes. Encourage the use of non-herbicide alternatives in a 50 foot buffer zone around drinking water supplies.

4. Encourage the safe use of herbicides in accordance with U.S. EPA label instructions and restrictions which include: Personal Protective Equipment; User Safety; First Aid; Environmental Hazards; Directions for Use: Storage and Disposal; General Information; Mixing and Application Methods; Approved Uses; Weeds Controlled; and Application Rates.

5. Encourage timing herbicide application in relation to soil moisture, anticipated weather conditions, and recommended measures to protect water supplies. Monitor the weather (temperature, wind speed, wind direction, and humidity) and avoid application of herbicide when heavy rains are forecast to prevent runoff of herbicide into nearby waterways. Avoid application during windy weather to prevent drift of herbicide into waterways or buffer zone.

6. Encourage the keeping of detailed records of location of noxious weeds, amount and type of herbicide used, and results of application. Consider using GPS/GIS technology to aid in mapping herbicide application.

BLM_0066879

## Public Land Management

Public lands within the Source Water Protection Area are owned by the federal government with lands managed by the U.S. Department of Agriculture's Forest Service. The source waters for the Beaver Creek watershed originate on Uncompahgre National Forest land managed by the Ouray Ranger District in Montrose, Colorado.

Protecting Water Resources

A principal purpose for which the Forest Reserves (predecessor to the National Forest System) were established was to "secure favorable conditions of water flows". Throughout its history, the Forest Service has had a very diverse and broad mission of multiple use management outlined by the Federal Land Policy and Management Act. This means that they balance outdoor recreation and preservation of wildlife habitat, air and water, and other scenic and historical values with environmentally responsible commercial development of the land and its resources. The Forest Service's mandate to manage lands for multiple-use requires balancing present and future resource use with domestic water supply needs as well as many other needs. The greater the proportion of National Forest System lands in a source water area, the greater the potential to be directly affected by Forest Service land use and management activities. It is the desired condition of the National Forest System land managers to "maintain favorable conditions of flow and sustain supplies of high quality raw water while providing for multiple-use management" (GMUG, 2006).

One of the long-term management goals of the Rocky Mountain Region is to manage the forest for water resources:

*"Protect the resource. Maintain, and where opportunities exist, restore watershed and forest health to ensure full watershed function exhibiting high geomorphic, hydrologic, and biotic integrity. Ensure that forest management activities occur in a manner that adequately protects the integrity of watersheds (USFS, 2010)."*

In October 2009, the Forest Service Rocky Mountain Region and the State of Colorado Department of Public Health and Environment signed a Memorandum of Understanding (MOU) to establish a framework to work together on issues regarding the management and protection of water quality on state defined Source Water Assessment Areas on National Forest System lands in Colorado. Under this agreement, the Forest Service recognizes a CDPHE-delineated Source Water Area as a "Municipal Supply Watershed" per definition in FSM 2542 (MOU, 2009). The source water protection area for the Town of Ridgway that lies within these National Forest lands, will be included in future Revised Forest Plans as a municipal supply watershed.

Forest Plan

At the District level, the Ouray Ranger District adheres to the management directives established under the 1983 Land and Resource Management Plan (1983 Forest Plan) for the Grand Mesa, Uncompahgre, and Gunnison (GMUG) National Forest. The Proposed Forest Plan, developed under the 2005 Planning Rule, has been suspended indefinitely due to a ruling of the U.S. District Court in 2007. Therefore, the 1983 Forest Plan is still in effect at the time of this report.

The current management area prescriptions within the source water protection area includes: 2A – Semi-primitive motorized recreation opportunities in a natural appearing environment. Range management will reduce conflicts between recreation and livestock. Vegetation treatment will enhance plant and animal diversity; and 3A - Semi-primitive non-motorized recreation opportunities (Fig. 16). Vegetation treatment will maintain visual quality and plant and animal diversity. User density is controlled by access (GMUG, 1991).

BLM_0066880



Figure 16. Map of the 1983 Forest Plan's management area prescriptions within the Beaver Creek source water protection area. The Beaver Creek protection area is the southernmost portion of Ridgway's SWPA that lies mostly within U.S. Forest Service land.

Proposed Wilderness Area

On September 26, 2011, Senators Udall and Bennet introduced Senate Bill 1635: San Juan Wilderness Act in the Senate. This bill, designating certain lands in San Miguel, Ouray, and San Juan Counties, Colorado as wilderness, was referred to the Senate Energy and Natural Resources committee. The proposed legislation would add approximately 13,000 acres in the GMUG National Forest to the existing Mt. Sneffels Wilderness Area by the Whitehouse addition (GovTrack, 2011). The addition of this area to the existing Mt. Sneffels Wilderness has numerous benefits including protecting headwaters of major streams and tributaries to the Uncompahgre River.

The Town of Ridgway passed a Resolution in 2011 endorsing the Whitehouse Expansion for the Mt. Sneffels Wilderness Area. The Town considered these public lands as "important watershed areas for domestic and agricultural water sources including Beaver Creek, the Town of Ridgway's source of potable water" (Ridgway, 2011). Figure 16 identifies the area of the Beaver Creek watershed proposed for wilderness designation. The proposed GMUG Forest Plan has identified adding Wilderness within the same Whitehouse area, which the Forest Service has labeled the inventoried roadless area Whitehouse Mountain Unit #54.

30

BLM_0066881

<u>Wildfires</u>
The forests throughout Colorado are dense with fuel build-up from a century of fire suppression and thus more vulnerable to high-intensity fires than it was historically. Most of Colorado's wildfires are caused by lightning strikes from the many thunderstorms that pass through the state on a regular basis during the summer months.

The potential of a watershed to deliver sediments following wildfire depends on forest and soil conditions, the physical topography of the watersheds, and the sequence and magnitude of rainfall on the burned area. High-severity fires can cause changes in watershed conditions that are capable of dramatically altering runoff and erosion processes in watersheds. Water and sediment yields may increase as more of the forest floor is affected by fire. Even though the Town's treatment is capable of removing the sediment, it would increase the cost of operations and could require more advanced treatment technologies if sediment levels became too high. Changes in runoff patterns could affect when water runs off. The main source of supply for the Town is a flow right. Temporal changes in the flow could have significant impacts on the Town's supply. For instance, if the impact of a fire was to make the ground surface less permeable as well as reducing the vegetative cover, runoff could have a higher peak and a shorter duration, reducing the availability of water in the summer months.

In 2008, the Town of Ridgway participated in the development of the Ouray County Multi-Hazard Mitigation Plan. This Plan identifies wildland urban interface areas and their fire risk as well as strategies to mitigate wildfire risks including the development of Community Wildfire Protection Plans for specific areas (Fig. 17).



SOURCE: OURAY COUNTY MULTI-HAZARD MITIGATION PLAN, 2008

Figure 17. Fire risk areas identified in the source water protection area.

31

Forest Health Conditions
The overly dense forests throughout the Rocky Mountains are concentrated with older age classes of trees that lack diversity in age and size. This lack of diversity, along with intense competition for resources has left many forest stands vulnerable to insect and disease attacks and widespread damage. The U.S. Forest Service Rocky Mountain Region 2 has conducted aerial and ground surveys annually over western conifer and aspen forest to detect damage caused by defoliating insects (Harris, et al, 2011). The aerial detection survey conducted in 2011 provides us with current information on insect damage in Ouray County as indicated in Fig. 18 below.

Although Mountain Pine Beetle is considered an epidemic throughout the west, it is not currently a problem in Ouray County. The 2011 survey showed small pockets of the following damage causing agents in the conifer and aspen forest: Douglas-fir Beetle, Western Spruce Budworm, Sudden Aspen Decline, Mountain Pine Beetle; and Pinon Pine Mortality and Sub Alpine Fir Mortality from both insects and disease (Fig. 18).



SOURCE: U.S. FOREST SERVICE REGION 2

Figure 18. Map of damage from defoliating insects in Ouray County from the 2011 U.S. Forest Service aerial and ground survey.

BLM_0066883

> **Public Land Recommendations:**
>
> 1. Keep informed on public land management issues within the source water protection area.
>
> 2. Participate in public land planning activities at the district and regional level including: Forest Plan Revisions, Fuels Reduction Plan, Timber Management Plan, Wilderness designations, and other outreach opportunities.
>
> 3. Provide written comments to public land managers on source water protection concerns.
>
> 4. Develop partnerships and open communication with public land managers.
>
> 5. Support efforts to improve watershed conditions (i.e. fuels reduction activities, wildfire assessment, and other reclamation projects).
>
> 6. Support efforts to mitigate wildfire risks within the urban interface areas as identified in the Ouray County Multi-hazard Mitigation Plan including the development of Community Wildfire Protection Plan.
>
> 7. Continue monitoring forest health (disease, die-off).
>
> 8. Work with Uncompahgre Watershed Partnership to help protect water quality with in the watershed.

## Climate Change

Changes in Colorado's climate and implications for water resources are occurring in a global context. The accumulation of greenhouse gases in the atmosphere is very likely the cause of most of the increase in global average temperature. Elevated temperatures combined with changes in precipitation and stream flow will impact the ecosystems and socioeconomics of Colorado. Climate projections and the impacts to Colorado's water resources include:

- Temperature increases: In Colorado, temperatures have increased by approximately $2^0F$ between 1977 and 2006. Climate models project Colorado will warm $2.5^0F$ by 2025, and $4^0F$ by 2050.

- Precipitation and snowpack: A projected seasonal shift in precipitation may result in more mid-winter precipitation throughout the state and, in some areas, a decrease in late spring and summer precipitation. Lower elevation snowpack (below 8200 ft.) is likely to decline, with modest declines for high elevation snowpack.

- Runoff: Warmers spring temperatures will lead to earlier snowmelt, runoff, and peak natural stream flows. There will be a reduction in late summer stream flows.

- Evaporation rates: Warmer temperatures will increase the evaporation rates in our rivers, streams and reservoirs, perhaps making less water available for beneficial use. There is a potential for decreased annual streamflow volume.

Secondary changes within the watershed will occur as a result of the climate projections. These include earlier drying of soil moisture and riparian habitats; increase in fire risk and insect outbreaks; elevational shifts in plant and animal communities; a reduction or loss of alpine tundra; and potential for more extreme weather events (e.g. droughts, floods, more intense summer storms) (CWCB, 2008).

BLM_0066884



SOURCE: USFS, 2010

Figure 19. Examples of potential direct and indirect effects of climate change on the hydrologic cycle.

Future Management Challenges for Water Supply Entities

Climate change will affect Colorado's use and distribution of water resulting in substantial water supply shortages for Colorado communities. Although the total annual water supply available to municipal users is not projected to change significantly under global warming, seasonal availability will likely shift (Clarke, et al, 2008)

A key management challenge for water suppliers is anticipating the potential long-term shifts in annual precipitation and water availability and planning for the flexibility to address those shifts. Many water providers are adapting to these potential future challenges by:

(1) Understanding the vulnerability of their water supply;

(2) Acquiring additional water rights;

(3) Building additional storage;

(4) Implementing ongoing water conservation measures;

(5) Involving the community in discussions about various options related to adaptation to changes;

(6) Preparing plans for rapid response to severe wildfire, flood, and drought;

(7) Developing source water protection plans.

BLM_0066885

## Oil and Gas Development

Although many areas of Colorado are experiencing an oil and gas boom, there is currently no oil and gas drilling within the Town of Ridgway's source water protection area. The potential for oil and gas development in the protection area is low.

Colorado Oil and Gas Conservation Commission: Rule 317

The oil and gas industry in Colorado is regulated by the Colorado Oil and Gas Conservation Commission (COGCC). The mission of the COGCC is "To promote responsible development of Colorado's oil and gas natural resources."  The Colorado legislature passed House Bill 1341 in spring 2007 to increase environmental and public health protections in the face of unprecedented oil and gas development. House Bill 1341 directed the Colorado Oil and Gas Conservation Commission to make and enforce rules consistent with the protection of the environment, wildlife resources, and public health, safety, and welfare. In 2008, the COGCC developed and passed new rules that became effective on May 1, 2009 on federal land and April 1, 2009 on all other land.

One of the new rules, Rule 317, protects public water systems by protecting the source of their drinking water. It creates protection zones, or buffer zones, combined with performance requirements applicable within 5 miles upstream of the surface water intake. The most protected Internal Buffer Zone is located within 300 feet of a water segment and is a drilling excluding zone. The purpose for protecting this zone is that a significant release in these areas would likely contaminate surface water used as a drinking water source. Enhanced drilling and production requirements also apply in areas ½ mile from the water supply segment, in an Intermediate and Extended Buffer Zone (Fig. 20) (COGCC, 2008).



SOURCE: COGCC

Figure 20. COGCC Rule 317 buffer zones in the source water protection area.

BLM_0066886

## Residential Property Maintenance

The Town of Ridgway's Source Water Protection Area includes rural residential dwellings. Common household practices may cause pollutants to runoff residential property and enter the surface or groundwater as indicated in the picture below. Prevention of surface and groundwater contamination requires education, public involvement, and people motivated to help in the effort. Public education will help people understand the potential threats to their drinking water source and motivate them to participate as responsible citizens to protect their valued resources. The Town will need to coordinate with the County since all the lands within the protection area are under county jurisdiction.



SOURCE: COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

Figure 21. Common household practices may cause pollutants to runoff residential property and enter the surface or groundwater.

**Recommendations for Residents:**

1. Properly Dispose of Chemicals and Motor Oil – Never pour on the ground, down the drain, or toilet. Participate in household hazardous waste collection events.

2. Use Fertilizers, Herbicides and Pesticides Properly - Apply chemicals according to label instructions and avoid runoff. Do not exceed recommended application rates. Use only if necessary and when weather conditions are favorable.

3. Properly Dispose of Drugs and Personal Care Products – Pour medications into a sealable plastic bag and add kitty litter, sawdust, coffee grounds, or glue and deposit in the trash along with unused personal care products. Participate in medication drop off campaigns.

4. Dispose of Pet Waste Properly – Flush pet waste down the toilet, put into the garbage, or bury under 8 inches of soil. Pick up your pet waste when walking your dog.

5. Use Water Wisely **–** Check for plumbing leaks, use water-saving showerheads and faucets, water laws morning or evenings, avoid over watering, and direct runoff onto vegetative buffers.

6. Purchase Safer Alternative Products – Choose natural alternatives or Green Products.

BLM_0066887

## SOURCE WATER PROTECTION MEASURES

### Management Approaches

The Planning Team reviewed and discussed several possible management approaches that could be implemented within the Source Water Protection Area to help reduce the potential risks of contamination to the community's source water. The Planning Team established a "common sense" approach in identifying and selecting the most feasible source water management activities to implement locally. The focus was on selecting those protection measures that are most likely to work for our community.

The Planning Team recommends the management practices listed in Table 7, "Source Water Protection Best Management Practices" be considered for implementation by:

- Town of Ridgway
- Ouray County
- U.S. Forest Service Ouray Ranger District
- Uncompahgre Watershed Partnership
- Colorado Rural Water Association
- Citizens of the Town of Ridgway and Ouray County

### Evaluating Effectiveness of Management Approaches

The Town of Ridgway is committed to developing a tracking and reporting system to gauge the effectiveness of the various source water management approaches that have been implemented.  The purpose of tracking and reporting the effectiveness of the source water management approaches is to update water system managers, consumers, and other interested entities on whether or not the intended outcomes of the various source water management approaches are being achieved, and if not, what adjustments to the protection plan will be taken in order to achieve the intended outcomes.  It is further recommended that this Plan be revised at a frequency of once every 3-5 years or if circumstances change resulting in new source water protection areas or new risks are identified (new water source developed or changes in land use).

The Town of Ridgway is committed to a mutually beneficial partnership with the Colorado Department of Public Health and Environment in making future refinements to their source water assessment and to revise the Source Water Protection Plan accordingly based on any major refinements.

BLM_0066888

Table 7. Source Water Protection Best Management Practices

| Issue | Management Approach | Implementer |
|---|---|---|
| *Transportation on Roads* | | |
| Road Maintenance | 1. Become informed on the road maintenance practices and schedules within the SWPA including: grading and dust abatement. | Town of Ridgway |
| | 2. Provide a copy of the Source Water Protection Plan and map of the protection area to Ouray County Road and Bridge Department. Encourage them to use road Best Management Practices to prevent road materials from entering the source waters. | Steering Committee Town of Ridgway |
| | 3. Recommend using the following BMPs to reduce the risk of contaminating the drinking water source with dust abatement chemicals: | Ouray County Road and Bridge Department |
| | • Properly grade gravel roads prior to application of dust abatement. | |
| | • Avoid applying dust abatement over the edges of the roads. Apply abatement at a low rate to ensure material remains on the road surface. | |
| | • Use a 1-foot buffer zone on the edge of the road if the road width allows. | |
| | • Machinery used to apply dust abatement should carry adequate spill protection equipment during application. | |
| | • Avoid applying dust abatement while raining. Preferable, a 3-day forecast of clear weather should follow any application. | |
| | • Dispose of excess materials at designated approved locations. | |
| | • Consider not using dust abatement in areas of the roadway that are close to the Ridgway Ditch or along the Cottonwood Creek intake area. | |
| Vehicular Spills | 1. Meet with the local fire department to discuss their emergency response plans for responding to vehicular spills within the SWPA. Provide information to the fire department: source water protection plan, location of intakes and the protection area, personnel to be notified in the event of a spill. | Steering Committee Town of Ridgway |
| | 2. Send a letter to the local Sheriff's department requesting to be notified in the event of a vehicular spill within the source water protection area. | Town of Ridgway |
| | 3. Educate the public on how to call "911" to report any spills within the SWP area both on public and private lands. | Town of Ridgway |

BLM_0066889

Table 7. Source Water Protection Best Management Practices

| Issue | Management Approach | Implementer |
|---|---|---|
| *Land Use* | | |
| Land Use Planning | 1. Provide Ouray County with a copy of the source water protection plan and GIS mapping information of the SWP area. Encourage them to overlay this area on their land use maps. | Colorado Rural Water Association |
| | 2. Encourage local and county government officials to consider source water protection of the SWPA when making land use decisions or zoning laws. Land use controls may include: subdivision growth controls, zoning and land use restrictions, adoption of more stringent setbacks for septic systems, and integrating weed management including no chemical applications within 50 ft. of the Town water supplies. | Town of Ridgway Ouray County Commissioners |
| | 3. The Town of Ridgway will request to be notified by Ouray County officials of land use hearings or meetings regarding land within the SWPA and will have the opportunity to participate in the process. Work with the County to develop a process that ensures notification to the Town. | Town of Ridgway |
| Land Acquisitions | 1. Keep informed of land acquisitions within the SWPA and provide information to new residents on the source water protection area about its importance. | Town of Ridgway |
| Land Conservation | 1. Provide information to landowners within the SWPA to educate them on the opportunities of placing a conservation easement on their land. | Steering Committee |
| Watershed Protection District | 1. Provide information to the Ridgway Town Council on the opportunity of protecting the drinking water source for the Town through the use of an ordinance that develops a watershed district. | Colorado Rural Water Association |
| *Residential Practices* | | |
| Public Education and Outreach | 1. Conduct public education and outreach programs for SWPA residents to encourage practices that will protect their drinking water source. Topics may include: source water protection, household hazardous waste storage and disposal, fertilizer usage, pet waste cleanup, water conservation, car washing, and secondary containment for above ground fuel storage tanks. | Steering Committee |
| | 2. Opportunities for public education include: newspaper articles, poster displays at local utility offices and public buildings, water bill inserts, flyers, creek festivals, public forums, workshops and community events. | |
| | 3. Participate in local hazardous waste collection program for residents within the SWPA. | |

BLM_0066890

Table 7. Source Water Protection Best Management Practices

| Issue | Management Approach | Implementer |
|---|---|---|
| *Agricultural Activities* | | |
| Public Outreach and Communication | 1. Develop public outreach for area residents within the SWPA on agricultural Best Management Practices for grazing management, manure management, animal rendering, chemical use and storage.<br><br>2. Education techniques may include: mailings and personal communication. | Town of Ridgway |
| Weed abatement | 1. Provide the County weed manager a copy of the source water protection plan, a map of the source water protection area and location of water intakes. Encourage the use of non-herbicide alternatives in a 50 foot buffer zone around drinking water intakes ditches and streams.<br><br>2. Encourage the safe use of herbicides in accordance with U.S. Environmental Protection Agency label instructions and restrictions. Label information and requirements include: Personal Protective Equipment; User Safety; First Aid; Environmental Hazards; Directions for Use: Storage and Disposal; General Information; Mixing and Application Methods; Approved Uses; Weeds Controlled; and Application Rates.<br><br>3. Encourage timing herbicide application in relation to soil moisture and anticipated weather conditions. Monitor the weather (temperature, wind speed, wind direction, and humidity) and avoid application of herbicide when heavy rains are forecast to prevent runoff of herbicide into nearby waterways. Avoid application during windy weather to prevent drift of herbicide into waterways or buffer zone.<br><br>4. Encourage the keeping of detailed records of location of noxious weeds, amount and type of herbicide used, and results of application. Consider using GPS/GIS technology to aid in mapping herbicide application. | Steering Committee<br><br><br><br>Ouray County weed manager |

BLM_0066891

Table 7. Source Water Protection Best Management Practices

| Issue | Management Approach | Implementer |
|---|---|---|
| *Public Lands Management* | | |
| Management Plans | 1. Keep informed on public land management issues within the SWPA. | Town of Ridgway |
| | 2. Actively participate in public land planning activities at the district and regional level including: Forest Plan Revisions, Fuels Reduction Plan, Timber Management Plan, Wilderness designations, and other outreach opportunity. | Town of Ridgway |
| | 3. Provide written comments to public land managers on source water protection concerns. | Town of Ridgway |
| | 4. Develop partnerships with public land managers. | Steering Committee |
| | 5. Support efforts to improve watershed conditions (i.e. fuels reduction activities, wildfire assessment, and other reclamation projects). | |
| | 6. Support efforts to mitigate wildfire risks within the source water protection area as identified in the Ouray County Multi-hazard Mitigation Plan including the development of Community Wildfire Protection Plan. | |
| *Septic Systems* | | |
| Public Education | 1. Develop a public education program for property owners within the SWPA to provide basin information on the source water protection plan. Public education will include: the proper use and maintenance of their septic systems and how the source of their drinking water can be affected by an inadequate functioning septic system. | Steering Committee |
| | 2. Encourage the County Land Use Department to educate property owners when they apply for a septic permit on the link between good septic practices and protecting groundwater. | Steering Committee |
| | 3. Encourage the County to increase septic system setbacks from the Ridgway Ditch, mandatory maintenance and inspection requirements | Town of Ridgway |
| | 4. Encourage title companies to include information on proper Operation and Maintenance of septic systems with real estate transfer. | |

BLM_0066892

Table 7. Source Water Protection Best Management Practices

| Issue | Management Approach | Implementer |
|---|---|---|
| *Municipal Utility* | | |
| Water Supply Intakes | 1. Perform regular inspection of water intakes. | Public Works Director |
| Water Operations | 1. Ensure that the water treatment plant is properly managed, operated and maintained to prevent contamination of the drinking water.<br><br>2. Store chemicals properly at the treatment plant.<br><br>3. Ensure that all employees are familiar with the Source Water Protection Plan, emergency and contingency plan, and hazardous spill response. | Water Plant Operator |
| Public Education | 1. Provide Information concerning the SWPP in the annual Consumer Confidence Report (CCR).  Insert a paragraph in the CCR about the completed SWPP and information on how they can help prevent pollutants from entering the source waters. | Water Plant Operator |
| Water Quality Monitoring | 1. Conduct water quality monitoring of surface water upstream of the intakes as part of the River Watch program. Work together with the Uncompahgre Watershed Partnership on water quality monitoring. | Water Plant Operator Uncompahgre Watershed Partnership |
| Climate Change Adaptation | 1. Understand the vulnerability of the Town's water supply.<br><br>2. Consider acquiring additional water rights.<br><br>3. Assess the need to build additional water storage.<br><br>4. Implement ongoing water conservation measures.<br><br>5. Involve the community in discussions about various options related to adaptation to changes.<br><br>6. Prepare plans for rapid response to severe wildfire, flood, and drought. | Town of Ridgway |

BLM_0066893

Table 7. Source Water Protection Best Management Practices

| Issue | Management Approach | Implementer |
|-------|---------------------|-------------|
| *Oil and Gas Development* | | |
| Information sharing | 1. The Town will stay informed on oil and gas development within and around the source water protection area by using the State's COGCC website, attending Oil and Gas Regional Forums quarterly, contacting County Planners and meeting with industry representatives.<br><br>2. The Town will encourage industry to educate all employees and subcontractors on the location of the source water protection areas, Emergency Response Plans, Storm Water Management Plans, and Spill Response Plans. | Town<br><br><br><br>Town |
| Planning | 1. Ensure industry conducts geologic and hydrologic mapping and risk analysis to identify underground fractures and faults that may provide pathways for gas and fluids to groundwater.<br><br>2. Ensure industry identifies existing wellbores in or near the protection area and determine the integrity of the casings, cement, plugs.<br><br>3. Ensure industry assesses the potential impacts to ground water used to supply hydraulic fracturing base fluid.<br><br>4. Conduct baseline water testing of Town's water sources and ongoing monitoring of potentially affected source waters.<br><br>6. Ensure adequate buffer zones from surface water sources. | Industry<br><br><br>Industry<br><br><br>Industry<br><br><br>Town<br><br><br>Town |
| Operations | 1. Industry will provide the Town disclosure of all chemical planned for a fracking operation at least 30 days beforehand, and a report on chemicals actually used within 30 days following fracking.<br><br>2. Industry will comply with and implement all actions in the approved Storm Water Management Plan to prevent or minimize impacts from storm water to the source waters.<br><br>3. Industry will adequately treat wastewater before discharge; no discharge to publicly owned treatment works; and no road or ground spreading of wastewater.<br><br>4. Industry will use routine and preventative maintenance to help prevent spills and immediately notify the Town of any spills. | Industry<br>Town<br><br>Industry<br><br><br>Industry<br><br><br>Industry |

BLM_0066894

# REFERENCES

Bartashius, Dan (2012). *Information about the Town of Ridgway's Water Usage*. Ridgway, Colorado, January 2012.

Clarke, S.; Crandall, K.; Emerick, J.; Fuller, M.; Katzenberger, J.; Malone, D.; Masone, M.; Slap, A.; Thomas, J.; (2008). *State of the Roaring Fork Watershed Report*. Ruedi Water & Power Authority. November 2008.

CWCB (2008). *Climate Change in Colorado - A Report for the Colorado Water Conservation Board*. University of Colorado. Boulder, Colorado.

COGCC (2008). *House Bill 1341*. Colorado Oil and Gas Conservation Commission. Denver, Colorado. (On line at COGCC.state.co.us/rulemaking/ruleslegislation/HB07-1341.pdf).

CSU (2010). *Best Management Practices for Agricultural Pesticide Use to Protect Water Quality*. Colorado State University Extension. Fort Collins, Colorado. February 2010.

EPA (2001). Managing Livestock, Poultry, and Horse Waste to Prevent Contamination of Drinking Water. U. S. Environmental Protection Agency. July 2001.

EPA (2002). *Potential Environmental Impacts of Dust Suppressant: "Avoiding Another Times Beach".* U. S. Environmental Protection Agency. Las Vegas, Nevada. May 2002.

Fagan, Joanne (2012). *Information About the Town of Ridgway's Water System*. Ridgway, Colorado, January 2012.

Ficco (2012). *Information about Road Maintenance*. Dave Ficco, Ouray County Road and Bridge Department. Ridgway, Colorado. January 18, 2012.

GMUG (1991*). Land and Resource Management Plan, as amended*. Grand Mesa, Uncompahgre and Gunnison National Forests, Delta, Colorado. 1991.

GovTrack (2011). *Senate Bill 1635: San Juan Mountain Wilderness Act of 2011*. (On line at www.govtrack.us). September 26, 2011.

Gowler A.and Sage R. (2006) *Traffic and Transport: Potential Hazards and Information Needs*. In O. Schomoll, J. Howar, J. Chilton, I. Chorus, Protecting Groundwater Health. IWA Publishing. London, UK.

GWPC (2008). *Ground Water Report to the Nation: A Call to Action*. Ground Water Protection Council. Oklahoma City, Oklahoma. (On line at www.gwpc.org/calltoaction).

Harris, J. L. and R2 FHP staff (2011). *Forest Health Conditions, 2009 – 2010, in (R2) Rocky Mountain Region.* USDA Forest Service. Renewable Resources, Forest Health Protection, R2-11-RO-31. 108pp.

Mabry, 2012. *Information on the Use of Herbicides in Ouray County*. Phone conversation with Ron Mabry, Ouray County. January 26, 2012.

MOU (2009). *Memorandum of Understanding Between State of Colorado Department of Public Health and Environment and United States Forest Service Rocky Mountain Region*. U. S. Forest Service Rocky Mountain Region. Golden, Colorado. October 9, 2009.

Ouray County (2008). *Ouray County Multi-Hazard Mitigation Plan*. Ouray, Colorado. July 2008.

Ouray County (2010). *Ouray County Land Use Code*. Revised December 2010. Ouray, Colorado. (online at ouraycountyco.gov/landusecode).

BLM_0066895

Ridgway (2011). *Resolution No. 11-02: Resolution of the Town Council of Ridgway, Colorado Endorsing the Proposed Whitehouse Additions to the Mount Sneffels Wilderness*. Town Council of Ridgway. Ridgway, Colorado. March 9, 2011.

Topper, R.; Spray, K. L.; Bellis, W. H.; Hamilton, J. L.; & Barkmann, P. E. (2003). *Ground Water Atlas of Colorado*. Colorado Geological Survey. Denver, Colorado.

USFS (2010). *Water: Rocky Mountain Region – Water Emphasis*. USDA Forest Service Region 2, Rocky Mountain Region. Golden, Colorado.

USFS (2010). *Water, Climate Change, and Forest*. United States Department of Agriculture Forest Service. Pacific Northwest Research Station. Portland, Oregon. June 2010.

Wikipedia (2011). Information About Ridgway. Wikipedia. November 2011. (On line at www.en.wikipedia.org/wiki/Ridgway.

WRCC (2011). *Ridgway, Colorado 1981-2010 Monthly Climate Summary*. Western Regional Climate Center. Reno, Nevada. OOnline at wrcc.dri.edu).

WQCC (2011). Regulation 35: Classification and Numeric Standards for Gunnison and Lower Dolores River Basin amended 6/13/11. Colorado Department of Public Health and Environment Water Quality Control Commission. Denver, Colorado. June 13, 2011.

WQCD (2000). *State Board of Health Guidelines on Individual Sewage Disposal Systems - 5 CCR 1003-6.* Colorado Department of Public Health and Environment Water Quality Control Division. Denver, Colorado. Amended September 20, 2000.

BLM_0066896

## APPENDICES

Emergency/Contingency Plan *

Source Water Assessment Report and Appendices

Meeting Attendance Roster

Meeting Agendas and Minutes

Contact List of Stakeholders

Presentations

Citizen Guides

Contaminants Health Concerns

Miscellaneous Maps and Reports

Funding Sources for Source Water Protection

Additional Resources

Glossary

*Notice: This public document will only include information that is not deemed sensitive to the safety and operation of the individual community's water plan operation. Appendices marked with a * are only included in the Public Utility's report or kept on file at their office. All other documents are included on the CD located in the back pocket of this report. All documents can be reprinted.*

BLM_0066897



BLM_0066898



TOWN OF RIDGWAY: FUTURE LAND USE FRAMEWORK MAP

LEGEND

- Ridgway Town Boundary
- Historic Town Core
- Initial Growth Boundary
- Urban Growth Boundary
- Key Gateways
- River Gateways
- Enhanced Pedestrian/Bike Connections
- Uncompahgre Riverway Trail
- River Buffer Zone
  100' from bank, or the floodplain, whichever is greater
- Floodplain (estimated)

FUTURE LAND USE

- Commercial
- Mixed Use Business
- Mixed Use Residential
- High Density Residential
- Medium Density Residential
- Low Density Residential
- Very Low Density Residential
- Institutional
- Parks/Open Space
- Industrial
- Green Enterprise
- Future Development

*While this map reflects very low density residential in the areas between the IGB and UGB, the community has expressed a desire that in the longer term, the lower-lying valley areas be developed at higher densities (ie: medium or mixed use densities) where appropriate. In order to focus growth in and from the core of Town in a concentric manner from existing infrastructure. These areas are reflected as 'very low density residential' will likely transition to higher density development zones with future land use plans; however, for the life of this plan (10 years), the densities should remain very low as indicated.*

0   0.25   0.5
Miles

SE GROUP

BLM_0066899



Town of Ridgway: Parks, Trails, Open Spaces Map (June 9, 2011)

Proposed Trails
Existing Trails and Sidewalks
Uncompahgre RiverWay Trail
Town Parks, Open Spaces
Ridgway Town Boundary
HOA /Private OS/Common/LandsTrust
Ridgway Schools Athletic Fields
Ouray County Owned Property
Uncompahgre River

BLM_0066900



http://www.town.ridgway.co.us/org_docs_2010/2000compplann/maps/Ridgway_Official_Zoning_Map_July_2007.jpg[7/7/2014 2:28:42 PM]

# THE EFFECTS OF FIRE ON ROCK ART: MICROSCOPIC EVIDENCE REVEALS THE IMPORTANCE OF WEATHERING RINDS

*Alice M. Tratebas*
**Bureau of Land Management**
**1101 Washington Boulevard**
**Newcastle, Wyoming 82701**

*Niccole Villa Cerveny*
**Cultural Sciences Department**
**Mesa Community College**
**7110 East McKellips Road**
**Mesa, Arizona 85207**

*Ronald I. Dorn*
**Department of Geography**
**Arizona State University**
**Tempe, Arizona 85287-0104**

*Abstract:* This paper presents results of the first study of pre-fire and post-fire samples collected from rock engravings and adjacent sandstone joint faces. A 2001 wildfire at Whoopup Canyon, Wyoming, stimulated a comparison of 1991 and 2003 samples. Optical microscopy of ultra-thin sections, backscattered electron microscopy, x-ray (energy dispersive and wavelength dispersive) analysis of cross sections, and high-resolution transmission electron microscopy reveal that fires create some thermal fractures that enhance panel erosion, but most of the fire-induced erosion occurs along weathering rinds that form long before petroglyph manufacturing. In addition, rock varnish on top of petroglyphs experiences spalling, and fire ash with a clear potassium spike strongly adheres to rock varnish on petroglyphs and spalled sandstone. In the past, site managers assumed minimal damage away from massive spalls and other macrodamage on fire affected petroglyphs, an assumption no longer tenable. Since it is difficult to protect rock art after a fire starts, mitigation efforts can include identification of areas of intense weathering-rind development as locales most susceptible to erosion, and clearing trees and shrubs near rock art by hand. [Key words: geomorphology, fire, rock art, sandstone, weathering.]

## INTRODUCTION

Fire alters the appearance of landscapes in a dramatic fashion. Rock art panels are not excluded from fire damage (Kelly and McCarthy, 2001). Consider how fire changes soil formation and erosion processes (Morris and Moses, 1987; Prosser and Williams, 1998; Mazhitova, 2000) that then move fire-altered sediment over panels. Fire-induced episodic sediment erosion even modifies loci and timing of possible panel burial in downstream areas (Germanosky and Miller, 1995; Cerda, 1998).

313

*Physical Geography*, 2004, **25**, 4, pp. 313–333.
Copyright © 2004 by V. H. Winston & Son, Inc. All rights reserved.

A tremendous potential exists in rock art research to explore fire-altered deposits in and around panels using pedoanthracological methods (Carcaillet and Thinon, 1996; Carcaillet, 1998; Harrison and Frink, 2000; Frink and Dorn, 2002). Maceral, sedimentological, organic geochemistry analyses of organic remains in soil, regolith, and nearby deposits also facilitate understanding of ancient fires (Siffedine et al., 1994; Lichtfouse et al., 1997; Lichtfouse, 1999; Laird and Campbell, 2000) in and around rock art sites. Many interfaces between physical geography, fire, and rock art research remain unresearched.

The specific aspect that we explore here rests in the study of weathering processes. Unfortunately for rock art researchers, the specialized literature on fire as a weathering process is in its infancy. Geomorphologists have long known of the importance of fire in rock weathering (Blackwelder, 1927), and rock-art researchers have begun to recognize the overall importance of fire (Kelly and McCarthy, 2001). However, the fire weathering literature suffers from a paucity of good data, since it consists primarily of semi-quantitative observations (Emery, 1944; Ollier, 1983; Dragovich, 1993). Consider the importance of burning epilithic organisms such as lichens that form on panels. Even though excellent review papers exist on biological weathering (Viles, 1995, 2001), only one paper examined the influence of fire on rock surface organisms or lithobionts (Garty, 1992). The state of field knowledge is so poor that quantitative observations on rates of fire-induced erosion are decades apart (Zimmerman et al., 1994; Dorn, 2003).

Archaeologists, ecologists, and experimental geomorphologists provide rock art researchers with the first glimpse of theory by which the potential impact of fire on rock art panels might be understood. Archaeologists contribute models of therm-olithofractography as a means to characterize and interpret "fire cracked" rock (House and Smith, 1975; McFarland, 1977; Kritzer, 1995; Rapp et al., 1999; Wilson, 1999). Ecologists offer rock art research insight into changes in nutrient cycles such as potassium (Brais et al., 2000) used in cation-ratio dating (Pineda et al., 1990; Zhang et al., 1990; Whitley and Annegarn, 1994; Plakht et al., 2000). Geomorphologists provide insight from laboratory experiments on fire (Goudie et al., 1992; Allison and Goudie, 1994; Nealson, 1995; Allison and Bristow, 1999), elucidating that erosion of rocks after a fire depends heavily on rock physical properties, varies with different rock types, and increases with the water content of the rock. Geomorphologists also offer perspectives on the importance of prior "inherited" weathering on erosion processes (Pope, 2000; Pope et al., 2002; Gordon and Dorn, 2005).

Given the aforementioned general state of empirical knowledge and theory of how fires might impact rock art panels, we offer this first contribution on a wildfire's effect on rock art where pre-fire samples can be compared with post-fire collections. We believe that fire and its effects can be part of a productive dialogue among physical geographers, archaeologists, and site managers.

The traditional organization of a scientific paper separates methods from results and discussions. We disembark from that constraint, because we utilize a wide variety of methods to understand the change brought about by fire. We feel it is best if the reader is able to balance methodological limitations with findings, side-by-side,

BLM_0066903



**Fig. 1.** Oblique helicopter photograph of Whoopup Canyon, Wyoming, after the fire. Sandstone joint faces on the canyon walls host petroglyph panels.

in the same section. We first start, however, with the traditional study site description, along with an explanation of our sample selection strategy.

## STUDY SITE

A wildfire damaged the Whoopup Canyon petroglyph site in 2001. Petroglyphs extend along 9.6 km of a canyon that cuts through sandstone cuestas on the western flank of the Black Hills, Wyoming (Fig. 1). The fire was typical for the western Black Hills in initiation by lightning with a fast run across several miles of terrain in the first two days. Petroglyph panels in the narrow sections of the canyon escaped the burning of nearby fuels although trees on the rims and ridgetops above them burned. Petroglyphs on cliffs in wider openings of the canyon experienced a blasting fire storm. The south end of the site escaped the fire storm. Petroglyphs there, however, were affected by a back burn, that was allowed to move to within 6 m of the petroglyphs, despite instructions to keep flames at least 0.8 km.

The site has 150 petroglyph panels. Most are Early Hunting style pecked images that depict game animals, hunting scenes, and humans conducting ceremonies (Tratebas, 1993; Tratebas, 2000). Experimental dating in 1991 by cation-ratio and [14]C methods suggested that the petroglyphs spanned thousands of years, ranging back possibly to more than 11,000 yrs. The most severe fire damage was to the largest cluster of panels at the site. Almost half of the cation-ratio and radiocarbon

BLM_0066904

samples in the earlier research came from these panels. We believe it is fortunate that the panels were sampled and analyzed prior to the fire, rather than waiting a decade or two for rock-art dating methods to be refined, or we would not have obtained pre-fire insight into the nature of weathering at these panels. Macroscopic observations after the fire showed small scale spalling of petroglyphs and ash deposits that raised the issues of: whether the fire damaged the varnish and rock substrate in ways not visible to the eye, and whether ash and carbon deposits from the fire contaminated the glyphs for dating.

## SAMPLE SELECTION

We used two strategies in post-fire sampling. One was to sample panels where damage was obvious—spalls, visible ash deposits, burned lichen next to motifs, and fire-reddened areas. Most of these panels rest in close proximity to burned trees, and data on distance to burned trees permits comparisons between fuels burned and observed petroglyph damage. The second strategy involved collecting samples from the same glyphs sampled in 1991. These paired pre- and post-fire samples enable us to examine the effect of the fire by the study of thin-sections and cross-sections of the rock coatings and the underlying rock.

We use here a numbering sequence of petroglyph panels and sample numbers. Petroglyph panels are sequential numbers assigned as panels are discovered. Adjacent panels are indicated by decimals. For example three adjacent panels might be 6.1, 6.2, and 6.3. Sample numbers have three parts: (1)WC designates the site, (2) 91 or 03 represents the year of collection, and (3) the last number is the sequential sample number.

## INDUCTIVELY COUPLED PLASMA CHEMICAL ANALYSES

We wanted to understand the chemistry of the fine particulate matter that flowed as suspended load over panel faces after the fire. Thus, we sampled the latest flash-flood deposits from Whoopup Creek banked up against the base of Panel 17.1. The remainder of the samples included gray-white ash mixed with inorganic fines. We did not exclude any particular particle size from the analyses, but 95% of the oven dry weight of each sample contained fine sand and smaller particles.

Inductively-coupled plasma (ICP) atomic emission spectroscopy data reveal that the chemistry of the "fire ash" that flowed over panel faces (last three columns in Table 1) has a similar signature. The most notable result is high concentration of potassium (K) relative to other elements. K is highest in the ash-filled last stage flood deposit and is only slightly less common in overland-flow deposits draped over panel faces. This is in contrast with a much lower elemental abundance of K in the flash flood deposits that contain little ash.

Potassium is a key component of cation-ratio (CR) dating (Pineda et al., 1990; Zhang et al., 1990; Whitley and Annegarn, 1994; Plakht et al., 2000), and potassium anomalies were seen in optical and electron micrographs discussed later. Since ICP is a "bulk" chemical analysis technique, ICP data strongly suggest that the place-specific microscope observations reflect a general process operating after the

BLM_0066905

**Table 1.** Inductively Coupled Plasma Atomic-Emission Spectroscopy Elemental Analyses of Sediments Deposited on Tops of Panels and Petroglyphs[a]

| | Panel number, sample identification number, and sample | | | | |
|---|---|---|---|---|---|
| | 17.1 | 17.1 | 52.1 | 20.2 | 20.1 |
| | WC-03-28 | WC-03-28 | WC-03-27 | WC-03-08 | WC-03-05 |
| Sediment | Early flood stage | Last flood stage | Panel face | Panel face | Ash in pockets on slender-leg deer |
| K % | 1.50 | 6.47 | 4.59 | 4.21 | 4.67 |
| Al % | 3.34 | 1.15 | 3.49 | 3.38 | 3.80 |
| Ca % | 5.32 | 0.56 | 5.52 | 5.90 | 5.37 |
| Fe % | 1.54 | 0.85 | 1.56 | 1.01 | 1.64 |
| Mg % | 1.08 | 0.16 | 1.13 | 0.86 | 1.20 |
| Na % | 0.33 | 0.12 | 0.35 | 0.24 | 0.37 |
| S % | 0.10 | 0.07 | 0.11 | 0.03 | 0.14 |
| Ti % | 0.19 | 0.09 | 0.19 | 0.13 | 0.21 |
| Ag ppm[b] | 0.08 | 0.07 | 0.07 | 0.06 | 0.09 |
| As ppm | 6.10 | 4.80 | 5.80 | 4.10 | 5.80 |
| Ba ppm | 360.00 | 170.00 | 370.00 | 280.00 | 400.00 |
| Be ppm | 0.90 | 0.35 | 0.81 | 0.63 | 0.93 |
| Bi ppm | 0.20 | 0.11 | 0.19 | 0.09 | 0.21 |
| Cd ppm | 0.41 | 0.19 | 0.43 | 0.23 | 0.48 |
| Ce ppm | 42.30 | 25.40 | 42.00 | 29.90 | 43.40 |
| Co ppm | 5.70 | 2.80 | 5.60 | 3.90 | 5.80 |
| Cr ppm | 152.00 | 228.00 | 126.00 | 74.00 | 130.00 |
| Cs ppm | 2.80 | 0.97 | 2.80 | 1.86 | 3.09 |
| Cu ppm | 14.00 | 7.40 | 13.00 | 8.50 | 13.20 |
| Ga ppm | 7.21 | 2.77 | 7.21 | 4.97 | 7.72 |
| Ge ppm | 0.24 | 0.13 | 0.24 | 0.18 | 0.23 |
| Hf ppm | 0.10 | 0.10 | 0.10 | 0.10 | 0.10 |
| In ppm | 0.02 | 0.01 | 0.02 | 0.01 | 0.02 |
| La ppm | 21.70 | 12.10 | 22.40 | 14.90 | 22.50 |
| Li ppm | 18.80 | 8.60 | 19.40 | 13.70 | 20.30 |
| Mn ppm | 353.00 | 136.00 | 365.00 | 239.00 | 399.00 |
| Mo ppm | 2.68 | 1.14 | 2.22 | 1.44 | 2.71 |
| Nb ppm | 3.60 | 1.60 | 3.50 | 2.20 | 3.70 |
| Ni ppm | 17.60 | 11.60 | 15.20 | 11.10 | 17.10 |
| P ppm | 450.00 | 260.00 | 480.00 | 280.00 | 540.00 |
| Pb ppm | 14.80 | 13.10 | 14.90 | 8.10 | 16.80 |
| Rb ppm | 49.20 | 17.00 | 50.60 | 35.40 | 52.80 |
| Sb ppm | 0.38 | 0.27 | 0.39 | 0.24 | 0.40 |

(*table continues*)

**Table 1.** (Continued)

| | Panel number, sample identification number, and sample | | | | |
|---|---|---|---|---|---|
| | 17.1 | 17.1 | 52.1 | 20.2 | 20.1 |
| | WC-03-28 | WC-03-28 | WC-03-27 | WC-03-08 | WC-03-05 |
| Sediment | Early flood stage | Last flood stage | Panel face | Panel face | Ash in pockets on slender-leg deer |
| Se ppm | 1.00 | 1.00 | 1.00 | 1.00 | 2.00 |
| Sn ppm | 0.90 | 0.60 | 0.90 | 0.50 | 1.00 |
| Sr ppm | 161.00 | 358.60 | 367.00 | 327.50 | 377.00 |
| Th ppm | 6.80 | 3.00 | 6.60 | 4.30 | 7.00 |
| Tl ppm | 0.35 | 0.13 | 0.31 | 0.22 | 0.36 |
| U ppm | 2.00 | 0.90 | 1.90 | 1.50 | 2.00 |
| V ppm | 45.00 | 16.00 | 46.00 | 30.00 | 50.00 |
| W ppm | 0.70 | 0.40 | 0.50 | 0.40 | 0.60 |
| Y ppm | 10.40 | 4.80 | 10.30 | 7.50 | 10.80 |
| Zn ppm | 45.00 | 24.00 | 45.00 | 24.00 | 50.00 |
| Zr ppm | 4.20 | 3.00 | 4.20 | 2.60 | 5.90 |

[a]Sediment that was draped over panels as a result of the fire greatly increased the abundance of potassium.

[b]Ppm refers to parts per million.

fire. Our preliminary conclusion is that the fire ash probably has a high concentration of potassium, and that the fire ash does appear to pose a complication to future attempts at dating petroglyphs by the cation-ratio method.

## OPTICAL MICROSCOPY

*Overview*

Light microscopy of ultra-thin sections allowed us to see the bigger "microscopic picture" before delving into higher magnification electron microscope methods. The technique is simple in description and very difficult to carry out in the laboratory. Small chips are mounted in epoxy where the surface of the rock is "normal" to the cross-sectional surface. The chip is polished until it is possible to see through rock varnish. Since rock varnish is usually opaque in typical geological thin sections, the polishing process ends up being an art form where just a little too much abrasion erodes the cross section away while too little abrasion leaves the varnish completely opaque. This is the same technique used to see layering patterns within varnish (Dorn, 1992; Dorn, 2000; Liu, 2003).

Four general observations stand out. First, fire ash appears to adhere to panel faces, even though the ash is not visible to the observer in the field. Second, chalk applied to petroglyphs by uninformed visitors survived thermal stresses of the fire. Third, internal structures within rock varnish provided surfaces of fire spalling, and

BLM_0066907



**Fig. 2.** Optical thin-section view of ash adherance to spalled surfaces. (A) Sample WC-03-43 derives from Panel 3.1, a fire spall where the pre-existing weathering rind formed the detachment surface. The ash survived two yrs. on the panel face by mixing with fragments of weathered quartz. The granular appearance of the quartz can be seen *in situ* within intact weathering rinds. (B) Sample WC-03-06 is from Human With Staff petroglyph. The pre-fire varnish was much thicker with a complete microlamination sequence, but the fire spalled most of the varnish. The varnish detached in zones of porosity weakened by cation leaching. Then, post-fire soil erosion washed sediment over the petroglyph, and a mixture of potassium-rich ash and inorganic sediment now adsorbs onto the eroded-varnish surface.

the apparent weakness comes from porous zones of cation leaching; thus, it is ironic that the very process that permits cation-ratio dating opened up a weakness to spall varnish and prevents the applicability of future dating in places of varnish erosion. Fourth, the fire appears to have generated fractures in the underlying rock that might accelerate future erosion of panels.

*Ash Adherence*

Ash adheres to joint faces newly exposed by fire (Fig. 2A). Ash also attaches to petroglyphs (Fig. 2B). These ultra-thin sections exemplify several potential consequences of the fire to petroglyphs. Ash adherence appears to be fairly firm in that the extant ash adsorbs to porous surfaces. The porous surfaces inside rock varnish are sites of cation-leaching (Dorn and Krinsley, 1991). When we put these thin sections in an electron microscope column, energy-dispersive x-ray analyses reveal that the ash had a strong potassium signal, consistent with ICP measurements of the ash discussed in a later section. Since K is an important part of cation-ratio (CR) dating, the presence of ash prevents use by this calibrated dating method.

In addition to the presence of adsorbed ash, Fig. 2B demonstrates that spalling of the panel took place within previously weathered rinds. Large fresh quartz grains that would be produced by thermal fracturing are not in evidence; rather, the chaotic and irregularly-shaped fragments of quartz indicate that the ash may be preserved by mixing with the pre-existing weathering rind fragments.

The source of the ash could have derived from two sources. The fire storm itself may have blasted ash onto surfaces, accounting for the strong adherence. Alternatively, ash settling onto surfaces above the panel may have been transported later



**Fig. 3.** Optical thin section image of chalk applied to petroglyph surfaces survived the fire. Sample WC-03-30, from a Round-Bodied Human petroglyph, reveals that chalk adhered to the surface of the varnish so strongly that it took erosion of the entire sequence of rock and varnish to remove this foreign material. According to Liu's (2003) calibration, this section displays a Holocene (only orange-yellow) varnish microlamination sequence.

over rock faces from overland flow. We cannot discern from these analyses whether a firestorm or overland flow source is more likely.

*Chalking Survives Fire*

Samples collected prior to the fire revealed a strong chalking signal, both in electron microscope observations and in chemical analyses undertaken for CR dating. We anticipated that the thermal effects of the fire might have dislodged chalk applied to petroglyphs by uneducated prior observers. However, we encountered enough chalk in the post-fire thin sections (e.g., Fig. 3) to reveal the legacy of those attempting to improve their photographs. The identification of chalk in these optical sections was confirmed by energy dispersive x-ray analyses showing an overwhelmingly strong calcium spike.

*Intravarnish Erosion*

The fire appears to have increased the erosion of varnish. Sometimes, the erosion surface occurs within the varnish itself, as seen in Fig. 2B. At other times, the erosion surface appears to be within the weathering rind underneath the varnish, where only deep pockets of varnish survived (Fig. 4). In both circumstances, the net effect leaves behind pockets of partially preserved varnish. An incomplete varnish, of course, invalidates varnish chronometry.

*Grain Fractures*

In addition to erosion along previously weathered material, there is evidence of increased mechanical fracturing in minerals that did not erode as a consequence of

Case No. 1:20-cv-02484-MSK   Document 49   filed 04/28/21   USDC Colorado   pg 107 of 110



**Fig. 4.** The wildfire appears to have caused, in some cases, the varnish to separate from the under-lying weathering rind. In these optical thin section examples, erosion of the pre-weathered rock resulted in a pattern where remnants of varnish exist only in tiny pockets. Arrows point to quartz that eroded on surfaces decayed over a long period of time, well before the fire event. Mechanical fire weathering, in contrast, generates much cleaner fractures (Dorn, 2003). The scale bar applies to all photomicrographs, where the petroglyph samples from top to bottom are WC-03-30 (Round Bodied Human), WC-03-32 (Cat), and WC-03-15 (Ball-Footed Animal).

the fire (Fig. 5). In counts of 30 quartz grains in pre-fire and post-fire samples, sub-parallel fractures inside the quartz increased in abundance from the pre-fire (1991) to the post-fire (2003) samples by a factor of about three. These cracks appear to be mechanical fractures, cutting across relatively unweathered and weathered grains. We speculate that fire-induced thermal fracturing might play a role in the development of weathering rinds. These fractures could increase surface area suffi-ciently to enhance the granular quartz weathering patterns seen in electron micros-copy.

BLM_0066910



**Fig. 5.** Optical thin section sample WC-03-12 from a panel that acted like a fire chimney. Detachment surfaces are in the weathering rind. Two potential consequences of the fire can be seen. First, the host quartz appears to have undergone thermal fracturing. The linear fracturing, exemplified by the arrows, appears to cut across both relatively fresh and more weathered grains. Certainly, we saw grain fractures in the 1991 pre-fire samples. However, the abundance of these subparallel fractures appears to have increased dramatically. Second, rock varnish on the panel appears to have experienced spalling.

## ELECTRON MICROSCOPY

We used several electron microscope methods. High resolution transmission electron microscopy (HRTEM) facilitated an analysis of weathering of the quartz at very high magnifications, while scanning electron microscopy (SEM) allowed us to examine fire erosion at magnifications between optical and HRTEM. We used two different types of SEM detectors. Backscattered electron microscopy (BSE) images the chemistry of the cross section by allowing us to see average atomic number and porosity (Dorn, 1995), while secondary electron microscopy (SE) allows us to image the topography of these same sections. *In situ* chemical analysis by energy-dispersive and wavelength-dispersive analysis of X-rays (Reed, 1993) provided supplemental information.

*High-Resolution Transmission Electron Microscopy*

An important issue is whether the fire altered the fundamental structure of the host quartz mineral grains. This is different from the creation of the mechanical fractures. The question asked in this section is whether the quartz grains were altered at a mineralogical level. HRTEM has been used successfully, for example, to understand natural quartz decrystallization (Pope, 1995) as part of a smaller-scale process of quartz weathering. HRTEM has also been used to understand the layering structure and biological signals in rock varnish (Krinsley et al., 1995).

BLM_0006911



**Fig. 6.** Comparison of (A) 1991 pre-fire and (B) 2003 post-fire samples of a "hobbled deer" petro-glyph (pre-fire sample WC-91-16 at panel 24.1; post-fire sample WC-03-16). The same types of crystal defects and decrystallization occur in pre-fire and post-fire imagery. These HRTEM views also illustrate that Whoopup varnish starts to form on quartz surfaces with an irregular topography—helping in varnish nucleation (Dorn, 1988).

We examined two pairs of pre-fire and post-fire samples, a loopline petroglyph (pre-fire sample WC-91-2 at panel 20.2; post-fire sample WC-03-09) and a hobbled deer petroglyph (pre-fire sample WC-91-16 at panel 24.1; post-fire sample WC-03-16). In each case, the focus rests with quartz grains at the very top of the petroglyph surface where we used the varnish to orient ourselves.

Based on this limited sample set, the Whoopup fire did not appear to alter the basic nature of the quartz grains. Careful qualitative examination of the HRTEM imagery failed to reveal clear mineralogical changes (e.g., Fig. 6). We found the same basic defects in pre-fire and post-fire samples.

It is important, however, to understand a limitation of this method. HRTEM does not reveal chemical insights, but only structural information. Chemical changes could have taken place and would not be discernible through this approach. Still, HRTEM is a difficult and very time-consuming method in terms of sample preparation and can yield important mineralogical insights at very high spatial resolution.

*Backscattered Electron Microscopy*

BSE imagery provides the greatest insight into processes by which panels and petroglyphs survive or erode. Case hardening is the key agent of preservation, while the development of porous weathering rinds underneath the case hardening is the key agent of erosion.

Four main types of case-hardening agents help preserve panels and petroglyphs: (1) silica glaze (Dorn, 1998) cementation of the quartz grains; (2) a mixture of silica glaze and rock varnish acting as the cementing agent; (3) iron films with minimal porosity bind quartz grains together; and (4) rock coatings (Dorn, 1998) of iron films, rock varnish and oxalate crusts also act as a case-hardening agent, not by strengthening the host rock—but through the action of being a strong enough rock coating to inhibit detachment of quartz grains.

BLM_0066912



**Fig. 7.** This panel (20.2) BSE sample WC-03-11 came from an unexposed joint face, approximately 40 cm up into a joint still covered by an overlying block of sandstone. The sample displays the weakest of the case-hardening cements, a relatively porous silica glaze. Composed of mostly silicon, with minor amounts of aluminum and potassium, this silica glaze is typical of coatings found on the walls of sandstone joint faces at Whoopup. This "inherited" silica glaze displays two textures, disoriented platelets (left) and granular forms (right). Left image is 210 μm across and the right is 260 μm across.

Silica glaze (Dorn, 1998) is the weakest case-hardening agent, but it is porous enough to permit capillary water to flow in and out of a panel face. Silica glaze originally forms along the surfaces on joint planes (cf. Pentecost, 1991) prior to exposure as a panel face (Fig. 7). When the overlying sandstone spalls into talus, the "inherited" case hardening helps preserve joints long enough for stronger case-hardening agents to accumulate.

A slightly stronger case-hardening agent occurs where rock varnish cations are leached from the subaerial coating (Dorn and Krinsley, 1991) and reprecipitate within the underlying silica glaze. A mixture of silica glaze and rock varnish forms this most common type of case-hardening cementing agent (Fig. 8).

Iron films (Figs. 9 and 10) are the strongest type of case-hardening agent at Whoopup. These iron films most commonly occur in a stratigraphic sequence underneath subaerial rock varnish and also underneath a subsurface mixture of varnish redeposition and silica glaze (Fig. 9). However, iron films can sometimes occur at or close to the panel surface (Fig. 10).

The iron films seen at Whoopup are very similar to those observed at Karkevagge in the Arctic (Dixon et al., 2002; Thorn et al., 2001), requiring abundant acidity to mobilize the iron and silica. Iron precipitation can occur abiotically or with the aid of iron-oxidizing bacteria. We speculate that the abundant silica, from quartz dissolution, mixes with iron to form this case-hardening agent.

Iron films, however, can also act to accelerate panel erosion in two ways. First, the iron films mechanically fracture quartz grains. Comparable to Karkevagge in the Arctic (Dixon et al., 2002; Thorn et al., 2001), Figs. 10D, 10E, and 10F display mechanical fracturing of quartz grains by the precipitating iron films. This physical weathering is similar to "salt weathering" where chloride and carbonate precipitation fractures rock. Iron fracturing of quartz grains occurs in other settings in the Black Hills where intermittent water flow contains acidic discharges. As long as the

BLM_0006913