

**Fig. 8.** These BSE images from a Big Elk Petroglyph (WC-03-34, WC-91-38, Panel 6.2) focus on case hardening by a mixture of silica glaze and rock varnish. Images A1, B1/B2, and C1/C2 all show case hardening of the petroglyph's quartz by a mix of silica glaze and rock varnish, where the silica could be "inherited" from subsurface cementation (Fig. 7). Rock varnish would then be added after the panel face is exposed by spalling. Images A2 and D1/D2 illustrate how the fire and microenvironment complicates varnish dating of petroglyphs. Image A2 displays a covering of clays and ash adhered reasonably well to the varnish. This ash covering contains a spike in potassium (K). The topographic (secondary) image D1 highlights the presence of lichens growing on top of the varnish. The chemical (backscatter) D2 image shows erosion and enhanced cation leaching of the rock varnish resulting in a much lower cation ratio than varnishes not influenced by lichens. Image widths: A1 (600 μm); A2 (140 μm); B1 (560 μm); B2 (180 μm); C1 (360 μm); C2 (110 μm); D1 (330 μm); D2 (330 μm). Image A2 is a close-up of the letter "C" in image A1.

iron films do not remobilize from an acidic event, the physical fracturing of the quartz would remain frozen glued together by the iron films. However, if the iron were to remobilize, a very porous weathering rind would result.



**Fig. 9.** BSE samples from the Human petroglyph (Panel 30.1, WC-03-49m, WC-91-38), exemplify case-hardening by iron films. Image A1 displays the full stratigraphy from top to bottom of: surficial layer of rock varnish; case hardening by a mixture of silica glaze and rock varnish; case hardening by iron film (a water-flow deposit containing silicon and iron); and a weathering rind underneath the iron film characterized by decayed quartz. Images A2 and A3 show progressive close-ups of the top three layers. Note the greater porosity of the varnish/Si-glaze case-hardening cement, compared with the iron film. Also note how the iron film is thickest towards the top and thins progressively further away from the panel surface. Image C3 presents the reasonably-distinct contact between these two case-hardening zones. Images C1 and C2 present the prevalent condition at the base of the samples: thorough decay of the quartz minerals. The quartz grains appear to be dissolving and undergoing granular decay. Such a condition could occur if acidic, iron-rich waters were dammed behind the iron film. Image B2 (and the lower magnification B1) illustrates a relatively common correlation: where lichens appear, the varnish appears to be completely eroded or in a state of erosion. The acid released by lichens dissolves the manganese and iron "glue" that holds the varnish together—resulting in the loss of varnish. The source of the iron could derive, in part, from lichen-generated acidity. Image widths: A1 (2200 μm); A2 (1400 μm); A3 (530 μm); B1 (240 μm); B2 (150 μm); C1 (250 μm); C2 (200 μm); C3 (600 μm).

A second way that iron films accelerate panel erosion is more problematic. The iron films are far less porous than case hardening by the mixture of varnish/Si-glaze. This means that water inside the sandstone would remain in the pores, just behind



**Fig. 10.** These BSE images from a Dog petroglyph (Panel 6.2, WC-03-37, WC-91-39) illustrate where case hardening by iron films is right next to the surface. Images A, B, and C show iron film, alone, case hardening the sandstone. The varnish/Si-glaze case hardening appears to be missing, perhaps pecked away during petroglyph manufacturing. The rock varnish can be seen accreting directly on top of the iron film in images B and C. The iron film is thickest at the top and thins into micron threads at a depth of a few millimeters. Images D, E, and F display mechanical fracturing of the quartz grains by the precipitating iron films. Image widths: A (2200 μm); B (110 μm); C (270 μm); D (100 μm); E (100 μm); F (110 μm).

the iron film, for long periods of time. Water can escape from the rock along capillaries in the pores occupied by varnish/Si-glaze cementing. The tighter iron seal means intrasandstone water is able to weather the quartz. The result could be responsible for the observed intense quartz weathering (Fig. 9C1, 9C2) creating a very weak weathering rind.

Fire-induced spalling occurs most commonly within the pre-existing weathering rind. In a sampling of 10 spall chips from a panel, we did not observe "clean fractures" on the underside of any of the spalls (Fig. 11), as would be expected by purely thermal weathering. While case hardening held the very surface of the fire-impacted panel in place, the future erosion surface was already in a state of decay—ready to spall when fire generated thermal stress. Any capillary water stored in the weathering rind, even after weeks of drought, would have contributed to the fire spalling, since we know that moisture present in the rock greatly increases rates of fire decay (Goudie et al., 1992; Dorn, 2003).

The weathering rind represents centuries to millennia of decay underneath the surficial rock coatings (Gordon and Dorn, 2005). Even though quartz is a mineral very resistant to chemical weathering, quartz decay and the weathering of other rock minerals is evident throughout the site. The decay took place underneath the



Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 4 of 301

**Fig. 11.** From WC-03-43 (panel 3.1), these BSE images of spalled fragments illustrate the typical pattern of detachment in the weathering rind. Image A maintains a sequence of rock varnish underlain by quartz grains cemented by a combination of silica glaze and rock varnish. Image B presents a higher magnification view of the varnish/Si-glaze mixture case hardening the panel. Images C, D, E, and F display views of the underside of spalls; all detachments took place along chemically-weathered surfaces. Image widths: A (1800 μm); B (140 μm); C (180 μm); D (140 μm); E (150 μm); F (150 μm).

surficial rock coatings and mixtures of rock coating and rock material making a case hardening. Even under the mixture of varnish/Si-glaze case hardening, quartz grains decayed in the weathering rind. The decay is most extensive underneath the less porous iron film, and weathering has reached the point where failure occurs by disintegration of the weathered quartz. The fire spalls studied here appear to have failed extensively in this already-decayed weathering rind.

## CONCLUDING THOUGHTS RELATED TO MANAGEMENT

This is the most complete study yet undertaken analyzing the effects of fire on petroglyphs. We are not aware of another study where pre-fire samples could be

BLM_0066917

compared with post-fire samples. As such, we have an obligation to present insights to those responsible for managing sites that could experience a wildfire. The reader should keep in mind, however, that our observations are based on analyses of only a few dozen samples in a particular lithologic and fire context. With these qualifications in mind, we make a number of management recommendations.

An important result of this research is that casual inspection is not sufficient for fire damage assessments. Considerable damage may be present, but cannot be seen with the eye. In consequence, site managers cannot assume that the rock art is unharmed if they do not see large scale spalls. In addition, managers should not assume that ash deposited in a fire will quickly erode away. Samples collected 2 yrs. after the fire had tightly adhering ash. This research also shows that fire damage to rock art occurs at much greater distances from burned trees than we would have guessed, particularly for ash deposits.

As a result, it is important to prevent wildfires from reaching rock art panels. It is important to avoid prescribed fires to reduce fuel loads where rock art is present. We do not know yet how much distance should be maintained between fires and rock art, because we have not conducted microscope analyses on enough fire-damaged rock art to draw reliable inferences on the distances between burned fuels and various kinds of fire damage. Certainly, wherever ash can settle out on rock art and soil surfaces that can wash onto rock art, damage from ash can be expected.

The severity of damage that is revealed by microscopy indicates that it is vital to cut trees and shrubs near rock art. Again we need a larger sample size to recommend how far back fuels should be removed, but we did observe varnish spalling where burned trees were not directly in front of rock art panels. Fuel reduction near rock art should always be effected by hand tools, since chain saws spew out carbon-rich fumes and flip oil off the chain, adding the potential to contaminate rock art for future dating. Constructing a permanent fire break or fire line, such as a wide sandy path around rock art panels, would also help prevent fire damage in fire prone areas. Managers must often weigh the desire to keep a vegetation screen to reduce visitor damage with the certainty of fire damage in a wildfire. The chalking damage shown in thin sections shows that some research may still be possible despite the chalk. On the other hand, fire has the potential to remove both the varnish data and the petroglyphs themselves if fuels are especially close.

In most cases where managers have not identified massive spalls and other macrodamage on fire-affected petroglyphs, they have assumed that the rock art was not badly damaged and have walked away, doing nothing about the fire-damaged surfaces that will now decay at a rapidly accelerated rate. For most panels at the Whoopup Canyon site, managers would have made this assumption. Microscopy, however, shows extensive damage to the rock varnish and outer rock surfaces, and ash deposits that will accelerate quartz-grain decay and contaminate the glyphs for cation-ratio dating. The damage is a conservation problem that must be taken into consideration in future site management. Probably, most fire-damaged rock art sites fit into this category, in which the full extent of the damage has never been recognized. It is difficult to impossible to protect rock art after a fire starts. In fire-prone areas, we should record the rock art extensively to mitigate future damage. For

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 6 of 301

some sites, it would be advisable to sample rock coatings if they are appropriate for dating, as part of mitigating against fire.

*Acknowledgments*: Special thanks to the late James Clark for assistance in electron microscopy. Research was supported by the Bureau of Land Management and in part by sabbatical support from Arizona State University.

## REFERENCES

Allison, R. J. and Bristow, G. E. (1999) The effects of fire on rock weathering: Some further considerations of laboratory experimental simulation. *Earth Surface Processes and Landforms*, Vol. 24, 707–713.

Allison, R. J. and Goudie, A. S. (1994) The effects of fire on rock weathering: An experimental study, in D. A. Robinson and R. B. G. Williams, eds., *Rock Weathering and Landform Evolution*. Chichester, UK: Wiley, 41–56.

Blackwelder, E. (1927) Fire as an agent in rock weathering. *Journal of Geology*, Vol. 35, 134–140.

Brais, S., David, P., and Ouimet, R. (2000) Impacts of wildfire severity and salvage harvesting on the nutrient balance of jack pine and black spruce boreal stands. *Forest Ecology and Management*, Vol. 137, 231–243.

Carcaillet, C. (1998) A spatially precise study of Holocene fire history, climate and human impact within the Maurienne valley, North French Alps. *Journal of Ecology*, Vol. 86, 384–396.

Carcaillet, C. and Thinon, M. (1996) Pedoanthracological contribution to the study of the evolution of the upper treeline in the Maurienne valley (North French Alps): Methodology and preliminary data. *Review of Palaeobotany and Palynology*, Vol. 91, 399–416.

Cerda, A. (1998) Relationships between climate and soil hydrological and erosional characteristics along climatic gradients in Mediterranean limestone areas. *Geomorphology*, Vol. 25, 123–134.

Dixon, J. C., Thorn, C. E., Darmody, R. G., and Campbell, S. W. (2002) Weathering rinds and rock coatings from an Arctic alpine environment, northern Scandinavia. *Geological Society of America Bulletin*, Vol. 114, 226–238.

Dorn, R. I. (1992) Paleoenvironmental signals in rock varnish on petroglyphs. *American Indian Rock Art*, Vol. 18, 1–17.

Dorn, R. I. (1995) Digital processing of back-scatter electron imagery: A microscopic approach to quantifying chemical weathering. *Geological Society of America Bulletin*, Vol. 107, 725–741.

Dorn, R. I. (1998) *Rock Coatings*. Amsterdam, Netherlands: Elsevier.

Dorn, R. I., (2000), Chronometric techniques: Engravings. In D. S. Whitley, ed., *Handbook of Rock Art Research*. Walnut Creek, CA: AltaMira, 167–189.

Dorn, R. I. (2003) Boulder weathering and erosion associated with a wildfire, Sierra Ancha Mountains, Arizona. *Geomorphology*, Vol. 55, 155–171.

Dorn, R. I. and Krinsley, D. H. (1991) Cation-leaching sites in rock varnish. *Geology*, Vol. 19, 1077–1080.

Dragovich, D. (1993) Fire-accelerated boulder weathering in the Pilbara, Western Australia. *Zeitschrift für Geomorphologie N.F.*, Vol. 37, 295–307.

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 7 of 301

Emery, K. O. (1944) Brush fires and rock exfoliation. *American Journal of Science*, Vol. 242, 506–508.

Frink, D. S. and Dorn, R. I. (2002) Beyond taphonomy: Pedogenic transformations of the archaeological record in monumental earthworks. *Journal of the Arizona-Nevada Academy of Sciences*, Vol. 34, 24–44.

Garty, J. (1992) The postfire recovery of rock-inhabiting algae, microfungi, and lichens. *Canadian Journal of Botany—Revue Canadienne de Botanique*, Vol. 70, 301–312.

Germanosky, D. and Miller, J. R. (1995) Geomorphic response to wildfire in an arid watershed, Crow Canyon, Nevada. *Physical Geography*, Vol. 16, 243–256.

Gordon, S. J. and Dorn, R. I. (in press) In situ weathering rind erosion. *Geomorphology*, Vol. 65.

Goudie, A. S., Allison, R. J., and McClaren, S. J. (1992) The relations between modulus of elasticity and temperature in the context of the experimental simulation of rock weathering by fire. *Earth Surface Processes and Landforms*, Vol. 17, 605–615.

Harrison, R. and Frink, D. S. (2000) The OCR carbon dating procedure in Australia: New dates from Wilinyjibari Rockshelter, southeastern Kimberley, Western Australia. *Australian Archaeology*, Vol. 51, 6–15.

House, J. H. and Smith, J. W. (1975) Experiments in the replication of fire-cracked rock. *Arkansas Archaeological Survey Research Series* [*The Cache River Archeological Project, assembled by M. B. Shiffer and J. H. House*], Vol. 8, 75–80.

Kelly, R. and McCarthy, D. F. (2001) Effects of fire on rock art. *American Indian Rock Art*, Vol. 27, 169–176.

Krinsley, D. H., Dorn, R. I., and Tovey, N. K. (1995) Nanometer-scale layering in rock varnish: implications for genesis and paleoenvironmental interpretation. *Journal of Geology*, Vol. 103, 106–113.

Kritzer, K., 1995, Thermolithofractography: A Comparative Analysis of Cracked Rock from an Archaeological Site and Cracked Rock from a Culturally Sterile Area. M.S. Thesis, Anthropology. Master's thesis, Department of Anthropology, Ball State University, Muncie, Indiana.

Laird, L. D. and Campbell, I. D. (2000) High resolution palaeofire signals from Christina Lake, Alberta: A comparison of the charcoal signals extracted by two different methods. *Palaeogeography, Palaeoclimatology, Palaeoecology*, Vol. 164, 111–123.

Lichtfouse, E. (1999) Temporal pools of individual organic substances in soil. *Analusis*, Vol. 27, 442–444.

Lichtfouse, E., Bardoux, G., Mariotti, A., Balesdent, J., Ballentine, D. C., and Macko, S. A. (1997) Molecular, C-13, and C-14 evidence for the allochthonous and ancient origin of C-16-C-18 n-alkanes in modern soils. *Geochimica et Cosmochimica Acta*, Vol. 61, 1891–1898.

Liu, T. (2003) Blind testing of rock varnish microstratigraphy as a chronometric indicator: results on late Quaternary lava flows in the Mojave Desert, California. *Geomorphology*, Vol. 53, 209–234.

Mazhitova, G. G. (2000) Pyrogenic dynamics of permafrost-affected soils in the Kolyma Upland. *Eurasian Soil Science*, Vol. 33, 542–551.

McFarland, P. (1977) Experiments in the firing and breaking of rocks. *Calgary Archaeologist*, Vol. 5, 31–33.

Morris, S. E. and Moses, T. (1987) Forest-fire and the natural soil-erosion regime in the Colorado Front Range. *Annals of the Association of American Geographers*, Vol. 77, 245–254.

Nealson, E. (1995) Fire as a Geomorphic Agent in Rock Weathering: The Effect of Rock Size on Weathering Efficiency Under Simulated Forest Fire Conditions. Master's thesis, Department of Geography, University of Iowa, Iowa City, Iowa.

Ollier, C. D. (1983) Fire and rock breakdown. *Zeitschrift für Geomorphologie*, Vol. 27, 363–374.

Pentecost, A. (1991) The weathering rates of some sandstone cliffs, central Weald, England. *Earth Surface Processes and Landforms*, Vol. 16, 83–91.

Pineda, C. A., Peisach, M., Jacobson, L., and Sampson, C. G. (1990) Cation-ratio differences in rock patina on hornfels and chalcedony using thick target PIXE. *Nuclear Instruments and Methods in Physics Research*, Vol. B49, 332–335.

Plakht, J., Patyk-Kara, N., and Gorelikova, N. (2000) Terrace pediments in Makhtesh Ramon, central Negev, Israel. *Earth Surface Processes and Landforms*, Vol. 25, 29–30.

Pope, G. A. (1995) Newly discovered submicron-scale weathering in quartz: Geographical implications. *Professional Geographer*, Vol. 47, 375–387.

Pope, G. A. (2000) Weathering of petroglyphs: Direct assessment and implications for dating methods. *Antiquity*, Vol. 74, 833–843.

Pope, G. A., Meierding, T. C., and Paradise, T. R. (2002) Geomorphology's role in the study of weathering of cultural stone. *Geomorphology*, Vol. 47, 211–225.

Prosser, I. P. and Williams, L. (1998) The effect of wildfire on runoff and erosion in native Eucalyptus forest. *Hydrological Processes*, Vol. 12, 251–265.

Rapp, G. J., Balescu, S., and Lamothe, M. (1999) The identification of granitic fire-cracked rocks using luminescence of alkali feldspars. *American Antiquity*, Vol. 64, 71–78.

Reed, S. J. B. (1993) *Electron Microprobe Analysis*. (2nd edition). Cambridge, UK: Cambridge University Press, 326.

Siffedine, A., Bertrand, P., Fournier, M., Martin, L., Servant, M., Soubies, F., Suguio, K., and Turcq, B. (1994) The lacustrine organic sedimentation in tropical humid environment (Carajas, eastern Amazonia, Brazil)—Relationship with climatic changes during the last 60,000 years BP. *Bulletin de la Societe Geologique de France*, Vol. 165, 613–621.

Thorn, C. E., Darmody, R. G., Dixon, J. C., and Schlyter, P. (2001) The chemical weathering regime of Karkevagge, arctic-alpine Sweden. *Geomorphology*, Vol. 41, 37–52.

Tratebas, A. M. (1993) Stylistic chronology versus absolute dates for early hunting style rock art on the North American Plains. In M. Lorblanchet and P. Bahn, eds., *Rock Art Studies: The Post-Stylistic Era*. Oxford, UK: Oxbow, 163–177.

Tratebas, A. M. (2000) Evidence of Paleo-Indian and Archaic hunting techniques. *American Indian Rock Art*, Vol. 24, 65–75.

Viles, H. (1995) Ecological perspectives on rock surface weathering: towards a conceptual model. *Geomorphology*, Vol. 13, 21–35.

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 9 of 301

Viles, H. A. (2001) Scale issues in weathering studies. *Geomorphology*, Vol. 41, 61–72.

Whitley, D. S. and Annegarn, H. J. (1994) Cation-ratio dating of rock engravings from Klipfontein, Northern Cape Province, South Africa. In T. A. Dowson and J. D. Lewis-Williams, eds., *Contested Images: Diversity in Southern African Rock Art Research*. Johannesburg, South Africa: University of the Witwatersrand Press, 189–197.

Wilson, D. C. (1999) The experimental reduction of rock in a Camas Oven: Towards an understanding of the behavioral significance of fire-cracked rock. *Archaeology in Washington*, Vol. 7, 81–89.

Zhang, Y., Liu, T., and Li, S. (1990) Establishment of a cation-leaching curve of rock varnish and its application to the boundary region of Gansu and Xinjiang, western China. *Seismology and Geology (Beijing)*, Vol. 12, 251–261.

Zimmerman, S. G., Evenson, E. B., Gosse, J. C., and Erskine, C. P. (1994) Extensive boulder erosion resulting from a range fire on the type-Pinedale moraines, Fremont Lake, Wyoming. *Quaternary Research*, Vol. 42, 255–265.

BLM_0066922



TRI-COUNTY WATER

Home
About Us
Information
Links
Contact Us
Billing & Payment

647 North 7th Street
Montrose, Colorado 81401

(970) 249-3369
(970) 249-8277 Fax

Click Here to email Tri-County

Welcome to the Tri-County Water Hydro Power Project

What is the Hydro Power Project? How does it work?

Check out these 360° views of the dam and generating station. When the image loads, click and drag the picture to the right or left with your mouse or let it play on it's own.

A view from the top of the dam looking at the reservoir and the valley below

The view of the river after it is discharged from the facility

The generator spillway up close and personal

Main valves on the penstock just before water enters the turbines

Inside the powerhouse showing the generators and control panels

Copyright © 2015
Tri-County Water Conservancy District

# Frequently Asked Questions:

## What is the Tri-County Water Hydropower Project?

The hydropower potential at Ridgway Dam and Reservoir was recognized by the Tri-County Water Conservancy District (Tri-County) decades ago, but it wasn't until just recently that the project became feasible and its construction permitted by the federal government. The dam and reservoir, located between Ridgway and Montrose on Highway 550, are owned by the United States Bureau of Reclamation, but the District stores its water rights in the reservoir. Tri-County was awarded a Lease of Power Privilege (LOPP) from the Bureau to develop the hydropower resource on Feb. 6, 2012. As part of that process, Tri-County had to prove its water rights, perform public scoping and demonstrate that it could pay for the project. The project was first studied by Tri-County in 1984, during dam construction and periodically thereafter to determine if the project was economically feasible. In 2002, the City of Aspen approached the District about purchasing the power and plans moved forward. The hydropower plant consists of two turbines and two generators — a 0.8-megawatt system that operates in the winter months during lower flows, and a 7.2-megawatt system that will run during the high-flow months in the summer. The energy created is transmitted via an interconnection to Tri-State Generation and Transmission Association's (Tri-State) switch yard. Tri-State is a wholesale power distributor which provides electricity throughout our region.

## How much electricity will be generated by the project?

The hydropower plant consists of two turbines and two generators — a 0.8-megawatt system and a 7.2-megawatt system. The smaller 0.8 MW unit will produce power efficiently on winter time flows of 30-60 cubic feet per second (cfs). The larger 7.2 MW turbine and generator will handle flows at 500 cfs during the summer. A megawatt hour (Mwh) is equal to 1,000 Kilowatt hours (Kwh). It is equal to 1,000 kilowatts of electricity used continuously for one hour. The project will not significantly change historic operations or the flows in the Uncompahgre River. The hydroelectric plant produces about 24,000 megawatt -hours of energy per year. Depending on annual water availability, the amount of energy produced could provide about 2500 homes a year with all electricity needs. The carbon offset is equivalent to removing 50 million pounds from the atmosphere or about 4400 cars from the road each year.

## Who will use the power generated by the project?

Tri-County entered into agreements with the City of Aspen and Tri-State to purchase the power produced at the dam. These Power Purchase Agreements (PPA) alloted the bulk of the electricity created by the project to be sold to the two entities. The funding created by these commitments allowed the project to move forward. The Town of Telluride signed a contract agreeing to purchase Renewable Energy Credits (RECs) created by the project during the summer months. A renewable energy credit is an environmental commodity that represents the added value, environmental benefits and cost of renewable energy above conventional methods of producing electricity. Revenues generated from the sale of the electricity will be used to repay loans on the project for the first 30 years and then will be used to offset Tri-County operating expenses.

## How much did the Ridgway Dam Hydropower Project cost to construct?

The hydroelectric power plant project spearheaded by Tri-County cost about $18 million to construct and utilizes water stored in the Ridgway Reservoir. Tri-County obtained a 30-year loan from the Colorado Water Conservation Board for an amount of $13 million. Another $2 million, 20-year loan also has been approved from the Colorado Water Resources and Power Development Authority. Those loans and other expenses will be funded by the sale of the power the project produces. The rate at which power can be sold has been one of many deciding factors on whether to create a hydropower facility at the dam for several decades.

## Who did the design and construction of the project?

Mountain States Hydro, LLC along with key subcontractors including Riverside, Inc., Caribou Construction Inc., Sorenson Engineering, Inc. and China Huadian Engineering Co. Ltd. completed the project. They work throughout the United States on projects much like this one. In addition to doing design-build on the project, Mountain States oversaw the construction of the powerhouse and the tranmission line. The line and a substation boost the 4.16 kilovolt (Kv) output from the generator to the 115 Kv transmission voltage. The transmission line conveys the power produced at the plant to the interconnection switch yard. The switch yard, owned and operated by Tri-State, meters or measures the power delivered to the station and then relays it to the transmission grid. Key figures to consider: 1,699 cubic yards of concrete were used to construct the foundation of the powerhouse.140,000 pounds of reinforcing steel were used to construct the foundation of the powerhouse.18.31 miles of locally purchased wire were used to construct the project. The small turbine assembly weighs 30,357 pounds. The small generator weighs 36,442 pounds. The large turbine assembly weighs 72,752 pounds and the large generator tips the scales at 160,385 pounds.

## When was the Ridgway Dam built?

Construction on the dam began in 1978 and lasted until 1987. It was filled by 1990. The project was constructed to aid in irrigation and domestic water needs of the Uncompahgre Valley and for flood control. The reservoir can hold 84,600 acre-feet.

## What is Tri-County Water?

The Tri-County Water Conservancy District was created August 19, 1957. The main purpose for the organization of the District was to provide an official agency to promote participating projects of the Colorado River Storage Project Act in the counties covered by the District. The original area to be served consisted of the Uncompahgre drainage in Ouray, Montrose and Delta counties. In the early days of the District, in addition to planned projects such as what would become the Ridgway Reservoir, there was an intent to create a valley-wide domestic water distribution system. Today, Tri-County, in co-operation with the Project 7 Water Authority, serves water to more than 6500 meters through 500+ miles of pipeline.



GENERATOR
Hydroelectric energy is produced when the potential energy in the pool of water in the reservoir is conveyed through the penstock (pipe). This force created by the moving water spins the turbine and generator which produces electricity.
TURBINE
PENSTOCK
DRAFT TUBE
The project includes two generators.
Pictured here is the 7.2 megawatt unit.



# New Horizon Mine reaches agreement with miners' union, will cease mining operations and begin reclamation activities

Share This

June 8, 2017

New Horizon Mine, located in Nucla, Colorado, and owned and operated by Tri-State Generation and Transmission Association, will cease coal mining and begin reclamation activities. To help employees with the transition, Tri-State negotiated a memorandum of understanding with representatives and members of the United Mine Workers of America that will be in place during the reclamation process and the retirement of the mine.

"For many years, our employees have done outstanding work to safely mine and steward the land," said Tri-State CEO Mike McInnes. "We've addressed key issues and reached a fair agreement that provides continuity for employees wishing to work during the reclamation process, while being flexible to accommodate the needs of those seeking other opportunities."

The mine currently employs 23 people. Staffing levels are subject to fluctuation

depending on reclamation activities and retirements of employees.

The decision to end mining operations was driven by several factors, including the amount of coal currently available at Nucla Station and the cost of producing additional coal at New Horizon Mine compared to other lower-cost options for coal supply in the region. Tri-State could bring in coal from other sources to maintain the fuel supply, as needed. Nucla Station will remain in operation in a “ready to run” status.

Tri-State has also informed the Colorado Division of Reclamation, Mining and Safety of its intentions to end mining operations and initiate reclamation activities. A reclamation plan will guide initial reclamation activities over the next few years; however complete reclamation and release of bonds could take 10-15 years.

With the announcement that coal production at the mine will end, local communities may have the opportunity to qualify for grant funding to assist with the transition. Tri-State will continue to work with affected communities to support their needs.

In September 2016, Tri-State announced the mine and the 100-megawatt Nucla Station, which received coal from the mine, would be retired as part of an agreement with the Colorado Department of Public Health and Environment, WildEarth Guardians and the National Parks Conservation Association to propose revisions to the Colorado Visibility and Regional Haze State Implementation Plan (SIP). Nucla Station will be retired by December 31, 2022.

## Page Features:

News

BLM_0066929

# Review of Ecological Effects of Roads on Terrestrial and Aquatic Communities

STEPHEN C. TROMBULAK* AND CHRISTOPHER A. FRISSELL†

*Department of Biology, Middlebury College, Middlebury, VT 05753, U.S.A., email trombulak@middlebury.edu
†Flathead Lake Biological Station, University of Montana, 311 Bio Station Lane, Polson, MT 59860-9659, U.S.A.

**Abstract:** *Roads are a widespread and increasing feature of most landscapes. We reviewed the scientific literature on the ecological effects of roads and found support for the general conclusion that they are associated with negative effects on biotic integrity in both terrestrial and aquatic ecosystems. Roads of all kinds have seven general effects: mortality from road construction, mortality from collision with vehicles, modification of animal behavior, alteration of the physical environment, alteration of the chemical environment, spread of exotics, and increased use of areas by humans. Road construction kills sessile and slow-moving organisms, injures organisms adjacent to a road, and alters physical conditions beneath a road. Vehicle collisions affect the demography of many species, both vertebrates and invertebrates; mitigation measures to reduce roadkill have been only partly successful. Roads alter animal behavior by causing changes in home ranges, movement, reproductive success, escape response, and physiological state. Roads change soil density, temperature, soil water content, light levels, dust, surface waters, patterns of runoff, and sedimentation, as well as adding heavy metals (especially lead), salts, organic molecules, ozone, and nutrients to roadside environments. Roads promote the dispersal of exotic species by altering habitats, stressing native species, and providing movement corridors. Roads also promote increased hunting, fishing, passive harassment of animals, and landscape modifications. Not all species and ecosystems are equally affected by roads, but overall the presence of roads is highly correlated with changes in species composition, population sizes, and hydrologic and geomorphic processes that shape aquatic and riparian systems. More experimental research is needed to complement post-hoc correlative studies. Our review underscores the importance to conservation of avoiding construction of new roads in roadless or sparsely roaded areas and of removal or restoration of existing roads to benefit both terrestrial and aquatic biota.*

Revisión de los Efectos de Carreteras en Comunidades Terrestres y Acuáticas

**Resumen:** *Las carreteras son una característica predominante y en incremento de la mayoría de los paisajes. Revisamos la literatura científica sobre los efectos ecológicos de las carreteras y encontramos sustento para la conclusión general de que las carreteras están asociadas con efectos negativos en la integridad biótica tanto de ecosistemas terrestres como acuáticos. Las carreteras de cualquier tipo ocasionan siete efectos generales: mortalidad ocasionada por la construcción de la carretera; mortalidad debida a la colisión con vehículos; modificaciones en la conducta animal; alteración del ambiente físico; alteración del ambiente químico; dispersión de especies exóticas e incremento en el uso de áreas por humanos. La construcción de carreteras elimina a organismos sésiles y a organismos de lento movimiento, lesiona a organismos adyacentes a la carretera y altera las condiciones físicas debajo ella misma. Las colisiones con vehículos afectan la demografía de muchas especies tanto de vertebrados como invertebrados; las medidas de mitigación para reducir la pérdida de animales por colisiones con vehículos han sido exitosas solo de manera parcial. Las carreteras alteran la conducta animal al ocasionar cambios en el rango de hogar, movimientos, éxito reproductivo, respuesta de escape y estado fisiológico. Las carreteras cambian la densidad del suelo, temperatura, contenido de agua en el suelo, niveles de luz, polvo, aguas superficiales, patrones de escurrimiento y sedimentación, además de agregar metales pesados (especialmente plomo), sales, moléculas orgánicas, ozono y nutrientes a los ambientes que atraviesan. Las carreteras promueven la dispersión de especies exóticas al alterar los hábi-*

*Paper submitted February 8, 1999; revised manuscript accepted July 21, 1999.*

Conservation Biology, Pages 18–30
Volume 14, No. 1, February 2000

BLM_0066930

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 18 of 301

*tats, al estresar a las especies nativas y proveer corredores para movimiento. Las carreteras también promueven el incremento de la caza y la pesca, el hostigamiento pasivo de animales y modificaciones del paisaje. No todas las especies ni todos los ecosistemas son afectados por las carreteras de igual forma, pero en general la presencia de carreteras está altamente correlacionada con cambios en la composición de especies, los tamaños poblacionales y los procesos hidrológicos y geomorfológicos que afectan a la estructura de sistemas acuáticos y reparios. Se necesita más investigación experimental para complementar estudios correlativos post-hoc. Nuestra revisión hace énfasis en que en trabajos de conservación es importante evitar la construcción de nuevas carreteras en áreas carentes de ellas o en áreas con pocas carreteras, además de remover o restaurar carreteras existentes con la finalidad de beneficiar tanto a la biota acuática como la terrestre.*

## Introduction

Among the most widespread forms of modification of the natural landscape during the past century has been the construction and maintenance of roads (Diamondback 1990; Bennett 1991; Noss & Cooperrider 1994). As conservation biologists seek to understand the forces that influence the viability of populations and the overall health of ecosystems, it is important that we understand the scope of the ecological effects of roads of all types, especially important as conservation biologists are asked to participate in the development and implementation of strategies to protect or restore elements of biological diversity and integrity.

Roads of all kinds affect terrestrial and aquatic ecosystems in seven general ways: (1) increased mortality from road construction, (2) increased mortality from collision with vehicles, (3) modification of animal behavior, (4) alteration of the physical environment, (5) alteration of the chemical environment, (6) spread of exotic species, and (7) increased alteration and use of habitats by humans. These general effects overlap somewhat. In some cases animals modify their behavior and avoid roads because of concentrated human activity along roads. Roads may facilitate the spread of invasive species by disrupting native communities and changing physical habitats. Roads may fragment populations through roadkill and road avoidance. Despite the difficulty of categorizing discretely the causal basis in every example, these seven categories provide a useful framework for assessing what is known and unknown about the ecological effects of roads.

Selective road removal, relocation, or remediation may provide ecological benefits in certain situations. Yet, although roads are commonly identified as important correlates or indicators of loss of ecological health (e.g., Noss & Cooperrider 1994), the specific mechanisms by which biota are affected are often complicated or uncertain. Therefore, mitigation or treatment of specific effects, whether during road design or in post-construction remediation, can be costly and fraught with uncertainty.

## Mortality from Road Construction

Road construction kills any sessile or slow-moving organism in the path of the road. The extent to which road construction contributes to direct mortality has not been estimated as has direct mortality from other forms of habitat destruction (e.g., Petranka et al. 1993). The fact that road construction kills individual organisms is obvious, however. The magnitude of such construction is not trivial; the 13,107,812 km of road lanes of all types in the conterminous United States, with an average width of 3.65 m per lane, have destroyed at least 4,784,351 ha of land and water bodies that formerly supported plants, animals, and other organisms (U.S. Department of Transportation 1996). The actual number is likely much higher because this estimate does not include shoulder pavement and land peripheral to the roadbed that is cleared during construction.

Construction may physically injure organisms adjacent to the path of construction. Roads built for extraction of white fir result in damage to trees that is visible up to 30 m from the road (Trafela 1987). Such damage contributes to a decline of up to 30% in forest productivity per rotation, due in part to a decline in growth of damaged trees. Construction also alters the physical conditions of the soil underneath and adjacent to the road. Riley (1984) showed that road construction increases soil compaction up to 200 times relative to undisturbed sites. These changes likely decrease the survival of soil biota that are not killed directly. Direct transfer of sediment and other material to streams and other water bodies at road crossings is an inevitable consequence of road construction (Richardson et al. 1975; Seyedbagheri 1996). High concentrations of suspended sediment may directly kill aquatic organisms and impair aquatic productivity (Newcombe & Jensen 1996).

## Mortality from Collision with Vehicles

Mortality of animals from collision with vehicles is well documented. Many reviews of the taxonomic breadth of the victims of vehicle collision have been published (e.g., Groot Bruinderink & Hazebroek 1996). Few if any terrestrial species of animal are immune. Large mammals ranging in size from moose (*Alces alces*) to armadillos (*Dasypus novemcinctus*) are the best-documented roadkills, probably due to interest in their demography and to their size (Bellis & Graves 1971; Puglisi et al. 1974;

BLM_0066931

Reilly & Green 1974; Holroyd 1979; Wilkins & Schmidly 1980; Bashore et al. 1985; Davies et al. 1987; Bangs et al. 1989; Palomares & Delibes 1992).

Roadkill among many other species includes American Kestrels (*Falco sparverius*; Varland et al. 1993), Barn Owls (*Tyto alba*; Newton et al. 1991), Northern Saw-whet Owls and Eastern Screech Owls (*Aegolius acadicus and Otis asio*; Loos & Kerlinger 1993), tropical forest birds (Novelli et al. 1988), garter snakes (Dalrymple & Reichenbach 1984), granivorous birds (Dhindsa et al. 1988), American crocodile (*Crocodylus acutus*; Kushlan 1988), green iguanas (*Iguana iguana*; Rodda 1990), desert snakes (Rosen & Lowe 1994), toads (van Gelder 1973), plus a wide range of invertebrates, especially insects (H. C. Seibert & Conover 1991).

This form of mortality can have substantial effects on a population's demography. Vehicle collision is the primary cause of death for moose in the Kenai National Wildlife Refuge in Alaska (Bangs et al. 1989) and for Barn Owls in the United Kingdom (Newton et al. 1991), the second highest form of mortality for Iberian lynx (*Felis pardina*) in southwestern Spain (after hunting; Ferreras et al. 1992), and the third highest form for white-tailed deer (*Odocoileus virginianus*) in New York (Sarbello & Jackson 1985) and wolves (*Canis lupus*) in Minnesota (Fuller 1989). Roadkill is a limiting factor in the recovery of the endangered American crocodile in southern Florida (Kushlan 1988) and is contributing to the endangerment of the prairie garter snake (*Thamnophis radix radix*; Dalrymple & Reichenbach 1984). Roadkill is often nonspecific with respect to age, sex, and condition of the individual animal (e.g., Bangs et al. 1989).

Amphibians may be especially vulnerable to roadkill because their life histories often involve migration between wetland and upland habitats, and individuals are inconspicuous and sometimes slow-moving. Roads can be demographic barriers that cause habitat and population fragmentation (Joly & Morand 1997). In the Netherlands, for example, roads with high traffic volume negatively affect occupancy of ponds by moor frogs (*Rana arvilis*; Vos & Chardon 1998). In Ontario, the local abundance of toads and frogs is inversely related to traffic density on adjacent roads, but the incidence of roadkill relative to abundance is higher on highly trafficked roads (Fahrig et al. 1995). Thus, even though populations in high-traffic areas have apparently already been depressed from cumulative road mortality, they continue to suffer higher proportionate rates of roadkill.

Mitigation measures have been employed in different locations with varying degrees of success (e.g., Yanes et al. 1995). For example, underpasses on Interstate 75 have been only partially successful in reducing roadkill of Florida panthers (*Felis concolor coryi*; Foster & Humphrey 1991). Despite mitigation efforts, roads are likely to be a persistent source of mortality for many species.

In general, mortality increases with traffic volume (e.g., Rosen & Lowe 1994; Fahrig et al. 1995). Some species are less likely to be killed on high-speed roads than on medium-speed roads because the former usually have vegetation cleared back further from the road's shoulder, creating less attractive habitat and greater visibility for both animals and drivers. Other species, however, are attracted to the modified habitat alongside and in the meridians of high-speed roads (Cowardin et al. 1985), making them population sinks.

## Modification of Animal Behavior

The presence of a road may modify an animal's behavior either positively or negatively. This can occur through five mechanisms: home range shifts, altered movement patterns, altered reproductive success, altered escape response, and altered physiological state.

Black bears (*Ursus americanus*) in North Carolina shift their home ranges away from areas with high road densities (Brody & Pelton 1989), as do grizzly bears in the Rocky Mountains (*Ursus horribilis*; McLellan & Shackleton 1988). Elk (*Cervus elaphus*) in Montana prefer spring feeding sites away from visible roads (Grover & Thompson 1986), and both elk and mule deer (*Odocoileus hemionus*) in Colorado in winter prefer areas >200 m from roads (Rost & Bailey 1979). Wolves will not establish themselves in areas with road densities greater than a region-specific critical threshold (Jensen et al. 1986; Thurber et al. 1994), probably as a result of a relationship between road density and hunting pressure. Mountain lion (*Felis concolor*) home ranges are situated in areas with lower densities of improved dirt roads and hard-surface roads (Van Dyke et al. 1986), suggesting that either mountain lions avoid these areas or road construction tends to avoid their prime habitat. Elephants (*Loxodonta africana*) in northeastern Gabon preferentially locate in forests away from both roads and villages (Barnes et al. 1991). Both Black Vultures (*Coragyps atratus*) and Turkey Vultures (*Cathartes aura*), on the other hand, preferentially establish home ranges in areas with greater road densities (Coleman & Fraser 1989), probably because of the increase in carrion.

Roads may also alter patterns of animal movement. Caribou (*Rangifer tarandus*) in Alaska preferentially travel along cleared winter roads that lead in the direction of their migration (Banfield 1974). Although the road may enhance caribou movement, it results in increased mortality from vehicle collisions and predation by wolves. After calving, female caribou with calves avoid roads (Klein 1991). The land snail *Arianta arbustorum* avoids crossing roads, even those that are unpaved and as narrow as 3 m (Baur & Baur 1990), and extend their movements along road verges. Reluctance to cross roads is also seen in white-footed mice (*Peromyscus*

BLM_0066932

*leucopus*; Merriam et al. 1989) and many other rodent species (Oxley et al. 1974), even when the road is narrow and covered only with gravel. Cotton rats (*Sigmodon hispidus*) and prairie voles (*Microtus ochrogaster*) avoid roads as narrow as 3 m (Swihart & Slade 1984). Black bear almost never cross interstate highways in North Carolina (Brody & Pelton 1989) but will cross roads with less traffic volume. Roads act as barriers to gene flow in the common frog (*Rana temporaria*) in Germany, leading to significant genetic differentiation among populations (Reh & Seitz 1990). Other animals that show a reluctance to cross roads include pronghorn antelope (*Antilocapra americana*; Bruns 1977) and mountain lions (Van Dyke et al. 1986).

Some animals seem unaffected by the presence of roads, at least at some spatial scales. Based on a study of 20 wolverines, Hornocker and Hash (1981) concluded that the sizes and shapes of home ranges of wolverines where they are still found in northwestern Montana are independent of the presence of highways. Similarly, the presence of highways explained none of the allelic differentiation among populations of brown hares (*Lepus europaeus*) in Austria (Hartl et al. 1989).

Roads may affect an animal's reproductive success. Productivity of Bald Eagles (*Haliaeetus leucocephalus*) in Oregon (Anthony & Isaacs 1989) and Illinois (Paruk 1987) declines with proximity to roads, and they preferentially nest away from roads. Golden Eagles (*Aquila chrysaetos*) also prefer to nest away from human disturbances, including roads (Fernandez 1993). The reduced nesting success of eagles in proximity to roads may be more a function of the presence of humans than of the road itself; nesting failure by Golden Eagles in Scotland correlates with how easy it is for people to approach but not with proximity to roads themselves (Watson and Dennis 1992). Relative to habitat availability, Sandhill Cranes (*Grus canadensis*) avoid nesting near paved and gravel public roads (Norling et al. 1992); they do not avoid private roads with low-traffic volume (Norling et al. 1992) and can habituate to roads over time (Dwyer & Tanner 1992). Mallards (*Anas platyrhynchos*) in North Dakota, on the other hand, prefer road rights-of-way for nesting (Cowardin et al. 1985), perhaps because of a lower level of predation there.

Roads can also alter escape responses. Pink-footed Geese (*Anser brachyrhynchus*) in Denmark are more easily disturbed when feeding near roads, flying away when humans approach within 500 m, a greater distance than when feeding in areas without roads (Madsen 1985). Both the Lapwing (*Vanellus vanellus*) and Black-tailed Godwit (*Limosa limosa*) are more easily disturbed near roads and have disturbance distances of 480–2000 m depending on traffic volume (Van der Zande et al. 1980). Less well known is the effect of roads and vehicles on an animal's physiological state. MacArthur et al. (1979) showed that heart rate and therefore metabolic rate and energy expenditure of female bighorn sheep (*Ovis canadensis*) increase near a road independent of any use of the road. Roads contribute to fragmentation of populations through both increased mortality and modification of behavior that makes animals less likely to cross roads. Fragmentation may be accelerated by roads when spatially critical habitat patches (e.g., "stepping stones") become unoccupied as a result of increased local mortality or reduced recolonization.

## Disruption of the Physical Environment

A road transforms the physical conditions on and adjacent to it, creating edge effects with consequences that extend beyond the time of the road's construction. At least eight physical characteristics of the environment are altered by roads: soil density, temperature, soil water content, light, dust, surface-water flow, pattern of runoff, and sedimentation.

Long-term use of roads leads to soil compaction that persists even after use is discontinued. Soil density on closed forest roads continues to increase, particularly during winter months (Helvey & Kochenderfer 1990). Increased soil density can persist for decades: logging skid trails in northeastern California over 40 years old have soil that is 20% more compacted than soil in nearby areas that have not been used as trails (Vora 1988).

The reduction of water vapor transport on a road with a hard surface increases the surface temperature of a road compared to bare soil, an effect that increases with thickness of the road surface (Asaeda & Ca 1993). The heat stored on the road surface is released into the atmosphere at night, creating heat islands around roads. Animals respond to these heat islands: small birds (Whitford 1985) and snakes, for example, preferentially aggregate on or near warm roads, increasing their risk of being hit by cars and, at their northern range limits, reducing energetic demands for breeding.

During the dry season, the moisture content of soils under roads declines even if the roads are not in use (Helvey & Kochenderfer 1990), probably in response to changes in soil porosity. Roads through forests also increase the amount of light incident on the forest floor. The amount of increase depends on how much of the original canopy and lower strata remain, which depends in turn on the width of the road and roadside verge. The increase in light increases the density of species that preferentially grow where light levels are high, such as early-successional, disturbance-adapted species such as the North American orchid *Isotria medeoloides* (Mehrhoff 1989).

Road traffic mobilizes and spreads dust, which when settled on plants can block photosynthesis, respiration, and transpiration and can cause physical injuries to plants (Farmer 1993). These effects are sufficient to alter

BLM_0066933

plant community structure, especially in communities dominated by lichens and mosses (Auerbach et al. 1997). Although most sediment enters water bodies through overland flow or mass failure, dust from highly trafficked roads can serve as a source of fine sediments, nutrients, and contaminants to aquatic ecosystems (Gjessing et al. 1984).

Roads and bridges can alter the development of shorelines, stream channels, floodplains, and wetlands. Because of the energy associated with moving water, physical effects often propagate long distances from the site of a direct road incursion (Richardson et al. 1975). Alteration of hydrodynamics and sediment deposition can result in changes in channels or shorelines many kilometers away, both down- and up-gradient of the road crossing. The nature of such responses to channel and shoreline alteration is not always predictable; it may depend on the sequence of flood and sedimentation events after the alteration is made. Roads on floodplains can redirect water, sediment, and nutrients between streams and wetlands and their riparian ecosystems, to the detriment of water quality and ecosystem health. Roads are among the many human endeavors that impair natural habitat development and woody debris dynamics in forested floodplain rivers (Piégay & Landon 1997).

Road crossings commonly act as barriers to the movement of fishes and other aquatic animals (Furniss et al. 1991). Although many headwater populations of salmonid fishes are naturally migratory, they often persist today as fragmented headwater isolates, largely because of migration barriers created by road crossings and other human developments that fail to provide for fish passage (Kershner et al. 1997; Rieman et al. 1997). Salmonids and other riverine fishes actively move into seasonal floodplain wetlands and small valley-floor tributaries to escape the stresses of main-channel flood flows (Copp 1989), but valley-bottom roads can destroy or block access to these seasonally important habitats (Brown & Hartman 1988). Persistent barriers may encourage local selection for behaviors that do not include natural migration patterns, potentially reducing both the distribution and productivity of a population.

Roads directly change the hydrology of slopes and stream channels, resulting in alteration of surface-water habitats that are often detrimental to native biota. Roads intercept shallow groundwater flow paths, diverting the water along the roadway and routing it efficiently to surface-water systems at stream crossings (Megahan 1972; Wemple et al. 1996). This can cause or contribute to changes in the timing and routing of runoff (King & Tennyson 1984; Jones & Grant 1996; Ziemer & Lisle 1998), the effects of which may be more evident in smaller streams than in larger rivers (Jones & Grant 1996). Hydrologic effects are likely to persist for as long as the road remains a physical feature altering flow routing—often long after abandonment and revegetation of the road surface. By altering surface or subsurface flow, roads can destroy and create wetland habitats.

Changes in the routing of shallow groundwater and surface flow may cause unusually high concentrations of runoff on hillslopes that can trigger erosion through channel downcutting, new gully or channel head initiation, or slumping and debris flows (Megahan 1972; Richardson et al. 1975; Wemple et al. 1996; Seyedbagheri 1996). Once such processes occur, they can adversely affect fishes and other biota far downstream for long periods of time (Hagans et al. 1986; Hicks et al. 1991). Roads have been responsible for the majority of hillslope failures and gully erosion in most steep, forested landscapes subject to logging activity (Furniss et al. 1991; Hagans et al. 1986). Because most of these more catastrophic responses are triggered by the response of roads during infrequent, intense storm events, lag times of many years or decades pass before the full effects of road construction are realized.

Chronic effects also occur, however. The surfaces of unpaved roads can route fine sediments to streams, lakes, and wetlands, increasing the turbidity of the waters (Reid & Dunne 1984), reducing productivity and survival or growth of fishes (Newcombe & Jensen 1996), and otherwise impairing fishing (Buck 1956). Existing problem roads can be remediated to reduce future erosion potential (e.g., Weaver et al. 1987; Harr & Nichols 1993). The consequences of past sediment delivery are long-lasting and cumulative, however, and cannot be effectively mitigated (Hagans et al. 1986).

## Alteration of the Chemical Environment

More has been written about the effects of roads on the chemical environment than on all other effects combined. Maintenance and use of roads contribute at least five different general classes of chemicals to the environment: heavy metals, salt, organic molecules, ozone, and nutrients.

A variety of heavy metals derived from gasoline additives and road deicing salts are put into the roadside environment. The most widely documented is lead, but others include aluminum, iron, cadmium, copper, manganese, titanium, nickel, zinc, and boron (Garcia-Miragaya et al. 1981; Clift et al. 1983; Gjessing et al. 1984; Oberts 1986; Araratyan & Zakharyan 1988).

Heavy metal contamination exhibits five patterns. First, the amount of contamination is related to vehicular traffic (Goldsmith et al. 1976; Dale & Freedman 1982; Leharne et al. 1992). Second, contamination of soils, plants, and animals decreases exponentially away from the road (Quarles et al. 1974; Dale & Freedman 1982). Most studies indicate that contamination declines within 20 m but that elevated levels of heavy metals often occur 200 m or more from the road. The pattern of decline is influenced

by prevailing wind patterns (Haqus & Hameed 1986). Once metals reach aquatic environments, transport rates and distances increase substantially (Gjessing et al. 1984).

Third, heavy metals can be localized in the soil, either close to the surface if downward transport has not occurred (Indu & Choudhri 1991) or deep below the surface if pollution levels in the past exceeded those in the present (Byrd et al. 1983). Transportation and localization is largely affected by the physical properties of the soil (Yassoglou et al. 1987). Metals and other persistent chemicals fixed to soils may become remobilized once they are inundated or transported to freshwater environments by wind, water, or gravity.

Fourth, heavy metals accumulate in the tissues of plants (Datta & Ghosh 1985; Beslaneev & Kuchmazokova 1991) and animals (Collins 1984; Birdsall et al. 1986; Grue et al. 1986). As with soil, contamination of plant tissue occurs up to at least 200 m from a road and is greatest for individuals along roads with high traffic volume.

Fifth, heavy metal concentrations in soil decline over time where use of leaded gasoline has been stopped and surface-water flow carries the metal ions away (Byrd et al. 1983; Tong 1990). After they leave the terrestrial environment, however, the mobilized metals may cause additional harm to aquatic biota. Also, some of the processes of metal demobilization may be reversed rapidly if environmental conditions, such as acidity of the soils, sediments, or water, change (Nelson et al. 1991).

Deicing salts, particularly NaCl but also $CaCl_2$, KCl, and $MgCl_2$, contribute ions to the soil, altering pH and the soil's chemical composition (Bogemans et al. 1989). As with lead, discontinuation of the use of deicing salts allows plants damaged by salt stress to recover (Leh 1990). The effects on aquatic biota of temporary surges of salt that often accompany runoff from roads to surface and groundwaters have received little study. Deicing salts on roadways elevate chloride and sodium concentrations in streams (Molles & Gosz 1980; Hoffman et al. 1981; Peters & Turk 1981; Mattson & Godfrey 1994) and in bogs, where road salts can alter patterns of succession in aquatic vegetation (Wilcox 1986). Accumulation of salts from chemicals used for road deicing or dust control can disrupt natural stratification patterns and thus potentially upset the ecological dynamics of meromictic lakes (Hoffman et al. 1981; Kjensmo 1997).

Organic pollutants such as dioxins and polychlorinated biphenyls are present in higher concentrations along roads (Benfenati et al. 1992). Hydrocarbons may accumulate in aquatic ecosystems near roads (Gjessing et al. 1984). In one stream along a British highway, numerous contaminants were present at elevated levels in the water column and sediments, including copper, zinc, and various hydrocarbons, but polycyclic aromatic hydrocarbons associated with stream sediments accounted for most of the observed toxicity to aquatic amphipods (Maltby et al. 1995). Comparatively little research has focused on the questions of the fate and effects of the organic chemicals associated with roads.

Vehicles produce ozone, which increases the concentration of this harmful molecule in the air, especially in areas where vehicle exhaust accumulates (Flueckiger et al. 1984). Roads are also especially important vectors of nutrients and other materials to aquatic ecosystems, because the buffering role normally played by riparian vegetation (Correll et al. 1992) is circumvented through direct runoff of materials in water and sediment where roads abut or cross water bodies. Water moving on and alongside roadways can be charged with high levels of dissolved nitrogen in various forms, and sediment brings a phosphorus subsidy when it reaches surface waters. Road deicing salts are an additional source of phosphorus (Oberts 1986). The degree to which roads directly contribute to eutrophication problems in aquatic ecosystems has been little investigated. Because roads deliver nutrients that originate in the contributing slope area, the nutrient burden is probably largely controlled by surrounding vegetation and land use. An increased density of road crossings of water bodies can be expected to increase delivery of nutrients.

The alteration of the chemical environment by roads results in a number of consequences for living organisms. First, in the terrestrial environment the chemical composition of some woody plants changes in response to pollution. These changes include increased concentrations of chemicals produced by plants, such as terpenoids, which help them resist the toxic effects of pollution (Akimov et al. 1989) and salts (Bogemans et al. 1989), and decreased production of other chemicals, such as soluble protein and chlorophyll *a*, which are necessary for plant function (Banerjee et al. 1983).

Second, organisms may be killed or otherwise displaced as a result of chemical exposure. Virtually all measures of soil biotic diversity and function decline in contaminated soil, including abundance, number of species, species composition, index of species diversity, index of equability, and bulk soil respiration (Muskett & Jones 1981; Guntner & Wilke 1983; Krzysztofiak 1991).

Third, the growth (Petersen et al. 1982) and overall physical health (Flueckiger et al. 1984; Moritz & Breitenstein 1985) of many plants is depressed, even to the point of death (Fleck et al. 1988). The sensitivity of plants to pollutants may change during development; for example, seedlings are more sensitive to salt than are adults (Liem et al. 1984), which influences juvenile recruitment. Pollutants may affect plant health by damaging fine roots, mycorrhizae (Majdi & Persson 1989), and leaves (Simini & Leone 1986) and by changing salt concentrations in plant tissues (Northover 1987). Secondary effects on plant health include decreased resistance to pathogens (Northover 1987), causing further declines. In aquatic environments, plant (and animal) assemblages

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 23 of 301

may change due to direct and indirect responses to nutrient increases and due to growth suppression or mortality caused by other chemicals introduced by roads.

Fourth, plants (Graham & Kalman 1974; Nasralla & Ali 1985; Dickinson et al. 1987; Guttormsen 1993) and animals (Robel et al. 1981; Collins 1984; Harrison & Dyer 1984; Krzysztofiak 1991; Marino et al. 1992), including those cultivated or raised for agriculture, may accumulate toxins at levels that pose health hazards, including those for humans that consume exposed organisms (Jarosz 1994).

Fifth, increased concentrations near roadsides of some pollutants, particularly salt, attract large mammals, putting them more at risk of being killed by vehicles (Fraser & Thomas 1982). Spills of edible products from trucks and trains also attract wildlife to roadsides. Finally, evolutionary processes may be affected through altered selection pressures that result in local differentiation of populations of both plants (Kiang 1982) and animals (Minoranskii & Kuzina 1984).

## Spread of Exotic Species

Roads provide dispersal of exotic species via three mechanisms: providing habitat by altering conditions, making invasion more likely by stressing or removing native species, and allowing easier movement by wild or human vectors. It is often difficult to distinguish among these factors. Soils modified during road construction can facilitate the spread of exotic plants along roadsides (Greenberg et al. 1997). Some exotic plants establish themselves preferentially along roadsides and in other disturbed habitats (Wester & Juvik 1983; Henderson & Wells 1986; Tyser & Worley 1992; Wein et al. 1992). The spread of exotic diseases (Dawson & Weste 1985; Gad et al. 1986) and insects (Pantaleoni 1989; Schedl 1991) is facilitated by increased density of roads and traffic volume. Road construction that alters the canopy structure of forests promotes invasion by exotic understory plants, which affects animal communities (Gaddy & Kohlsaat 1987). Some roadside verges have been invaded by maritime plants because of their ability to tolerate saline soil (Scott & Davison 1982). Feral fruit trees are found preferentially along roadsides, and some populations are maintained solely by seeds in fruit waste thrown from vehicles (Smith 1986).

Exotic species are sometimes introduced along roadsides for the purpose of erosion control (Niordson 1989). Native species are now more widely preferred for this purpose, but Dunlap (1987) argues that in some cases the need for rapid establishment of plant cover requires the use of exotic species.

In another form of deliberate introduction, roads provide easy access to streams and lakes for fishery managers to stock nonnative hatchery fish (Lee et al. 1997), which adversely affect native biota and disrupt aquatic ecosystems in many ways (Allan & Flecker 1993). Unsanctioned, illegal, and unintentional introductions of fishes, mollusks, plants, and other aquatic organisms also occur frequently (Allan & Flecker 1993), and they are facilitated by public road access to water bodies.

The dispersal of a biological agent such as a pathogen along a roadway can affect both terrestrial and aquatic ecosystems far from the road. In northern California and southwest Oregon, for example, vehicle traffic and roadway drainage along logging and mining roads during the wet season disperse spores of an exotic root disease (*Phythoptera lateralis*) that infects the endemic Port Orford cedar (*Chamaecyparis lawsoniana*; Zobel et al. 1985). Transfer of the water-borne spores from forest roads into headwater stream crossings can result in the infection and nearly complete mortality of Port Orford cedars along a much larger network of downstream channel margins and floodplains, even deep inside otherwise roadless areas. The progressive loss of this important conifer species from riparian ecosystems may engender substantial long-term consequences for the integrity of stream biota, including endangered salmon species, for which the Port Orford cedar provides shade, large and long-lasting coarse woody debris, and stabilization of channels and floodplains.

## Changes in Human Use of Land and Water

Roads facilitate increased use of an area by humans, who themselves often cause diverse and persistent ecological effects. New roads increase ease of access by humans into formerly remote areas. Perhaps more important, roads often increase the efficiency with which natural resources can be exported. At least three different kinds of human use of the landscape, made increasingly possible by roads, can have major ecological effects: hunting and fishing, recreation, and changes in use of land and water.

Roads open up areas to increased poaching and legal hunting. Hunting reduces population sizes of many game species, including brown bear (*Ursus arctos*; Camarra & Parde 1990), Iberian lynx (Ferreras et al. 1992), wolves (Fuller 1989), black bear (Manville 1983), and Egyptian mongooses (*Herpestes ichneumon*; Palomares & Delibes 1992). Roads also increase both legal and illegal fishing in streams and lakes. Native fish populations in previously inaccessible areas are often vulnerable to even small increases in fishing effort. Increased fishing then often gives rise to public demand for fish stocking as an attempt to artificially compensate for the effects of unsustainable harvest, at the further expense of native fishes and other species (e.g., Gresswell & Varley 1988).

BLM_0066936

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 24 of 301

Visitors increase when roads make areas more accessible, leading to increased passive harassment of animals—such as elk on Mount St. Helens in Washington State (Czech 1991) and the Oregon Coast Range (Witmer & DeCalesta 1985), brown bear in Europe (Del Campo et al. 1990), and mountain goats (*Oreamnos americanus*) in Montana (Pedevillano & Wright 1987)—and damage to plant communities (Matlack 1993).

Roads are often built into areas to promote logging, agriculture, mining, and development of homes or industrial or commercial projects. Such changes in land cover and land and water use result in major and persistent adverse effects on the native flora and fauna of terrestrial (Van Dyke et al. 1986; Karnefelt & Mattsson 1989; P. Seibert 1993) and freshwater ecosystems (Schlosser 1991; Allan & Flecker 1993; Roth et al. 1996).

Numerous studies have demonstrated declines in stream health associated with roads. Because the nature and extent of land use within a region tend to be highly correlated with road networks, however, it is often difficult or impossible to separate the direct ecological effects of roads from those of the accompanying land-use activities. For example, Eaglin and Hubert (1993) reported that trout biomass and streambed habitat quality in Wyoming streams declined in relation to the number of road crossings and to the proportion of area logged in the contributing catchment. Findlay and Houlahan (1997) found that herptile species diversity in wetlands declined in relation to the density of roads within 2 km of the perimeter. Among streams in the Pacific Northwest, the status or abundance of bull trout populations has been inversely correlated to road density (Rieman et al. 1997; Baxter et al. 1999); these studies used roads as the best available general proxy of cumulative effects associated with land use and human access. On the other hand, some studies (e.g., Roth et al. 1996) have demonstrated correlations of stream biotic integrity with land-use patterns across large catchments but did not investigate the specific roles that roads might play in mediating the causes and effects.

It appears that roads can serve as useful indicators of the magnitude of land-use changes, but it remains unclear to what degree the associated ecological responses result directly from roads themselves. If roads are largely responsible, effects could be ameliorated through altered road design, placement, remediation, or road removal. Strong interactions between roads and land use are likely, however. Forest roads in Idaho, for example, are less prone to erosion when the surrounding landscape remains in natural forest cover (Seyedbagheri 1996).

## Discussion and Conclusions

Roads have diverse and systemic effects on many aspects of terrestrial and aquatic ecosystems. The ecological effects of roads can resonate substantial distances from the road in terrestrial ecosystems, creating habitat fragmentation and facilitating ensuing fragmentation through support of human exploitative activities (Fig. 1a). Habitat deterioration is not widely appreciated as an aspect of ecological fragmentation in aquatic ecosystems. At the scale of an extensive landscape or stream network, however, roads produce a pattern of aquatic habitat loss that differs from the terrestrial pattern yet nevertheless results in the ecological fragmentation of aquatic ecosystems (Fig. 1b). We coin the term *hyperfragmentation* to describe the multidimensional view of ecological fragmentation and habitat loss that emerges when the consequences of roads or any habitat alteration for terrestrial and aquatic ecosystems are considered simultaneously (Fig. 1c). Hyperfragmentation is the result of a spatial footprint of ecological effect that propagates across the landscape differently in freshwater and

a) Upland habitat alteration and fragmentation

b) Aquatic and riparian habitat alteration and fragmentation

c) Cumulative extent of habitat alteration and "hyperfragmentation"
Direct habitat impact (roads and cutting units)
Zone of indirect or off-site impact
Unaltered habitat

*Figure 1. Spatial pattern of direct and indirect habitat alteration caused by human disturbance in a forested watershed: (a) classical forest edge effects contributing to terrestrial habitat fragmentation, (b) downstream-propagating hydrologic and biotic effects leading to large-scale fragmentation of freshwater habitats and populations, (c) combined terrestrial-aquatic view of landscape alteration that we term* hyperfragmentation *because it considers multiple ecosystem dimensions on the same landscape. Arrows indicate predominant spatial vector of effects.*

BLM_0066937

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 25 of 301

aquatic ecosystems than in terrestrial systems. Even where only a small percentage of the land's surface is directly occupied by roads, few corners of the landscape remain untouched by their off-site ecological effects. The breadth of these effects cannot be appreciated unless one takes a broadly transdisciplinary view of ecosystems and biological communities.

Road design, management, and restoration need to be more carefully tailored to address the full range of ecological processes and terrestrial and aquatic species that may be affected. Deliberate monitoring is necessary to ensure that projects have robust ecological benefits and minimal adverse effects and that they are cost-efficient relative to their actual benefits (e.g., Weaver et al. 1987). Of course, such assessments require time and money that are usually unavailable. Most funds used to remediate problem roads are earmarked for actual field operations and are not available to support such assessment and monitoring. Few of the experts building roads or "restoring" them are trained to recognize and address the full spectrum of ecological issues that we have identified. Moreover, by their nature roads have systemic ecological effects that, even if recognized, cannot be overcome.

If a broad view of the ecological effects of roads reveals a multiplicity of effects, it also suggests that it is unlikely that the consequences of roads will ever be completely mitigated or remediated. Thus, it is critical to retain remaining roadless or near-roadless portions of the landscape in their natural state. Because of the increasing rarity of roadless areas, especially roadless watersheds, conservation efforts cannot rely entirely on protection of existing natural areas. But neither can conservation efforts depend entirely on tenuous and unexamined assumptions about the capability of site- and species-specific mitigation and remediation measures to reduce the ecological consequences of existing and proposed roads.

## Acknowledgments

We thank M. Hourdequin for organizing the symposium at the 1997 annual meeting of the Society for Conservation Biology at which we originally presented much of this material and for her patience during the preparation of this manuscript. We also thank R. Noss and an anonymous reviewer for improvement of the paper. The second author's contribution to this paper and his participation in the symposium were supported by The Pacific Rivers Council.

### Literature Cited

Akimov Y. A., V. V. Pushkar, and S. I. Kuznetsov. 1989. The content and composition of volatile terpenoids in woody plants under conditions of air pollution. Sbornik Nauchnykh Trudov **109**:70-79.

Allan, J. D., and A. S. Flecker. 1993. Biodiversity conservation in running waters. BioScience **43**:32-43.

Anthony, R. G., and F. B. Isaacs. 1989. Characteristics of bald eagle nest sites in Oregon. Journal of Wildlife Management **53**:148-159.

Araratyan, L. A., and S. A. Zakharyan. 1988. On the contamination of snow along main highways. Biologicheskii Zhurnal Armenii **41**: 514-519.

Asaeda, T., and V. A. Ca. 1993. The subsurface transport of heat and moisture and its effect on the environment: a numerical model. Boundary Layer Meteorology **65**:159-179.

Auerbach, N. A., M. D. Walker, and D. A. Walker. 1997. Effects of roadside disturbance on substrate and vegetation properties in arctic tundra. Ecological Applications **7**:218-235.

Banerjee, A., R. K. Sarkar, and S. Mukherji. 1983. Reduction in soluble protein and chlorophyll contents in a few plants as indicators of automobile exhaust pollution. International Journal of Environmental Studies **20**:239-243.

Banfield, A. W. F. 1974. The relationship of caribou migration behavior to pipeline construction. Pages 797-804 in V. Geist and F. Walther, editors. The behavior of ungulates and its relation to management. International Union for the Conservation of Nature Press, Morges, Switzerland.

Bangs, E. E., T. N. Bailey, and M. F. Portner. 1989. Survival rates of adult female moose on the Kenai Peninsula, Alaska. Journal of Wildlife Management **53**:557-563.

Barnes, R. F. W., K. L. Barnes, M. P. T. Alers, and A. Blom. 1991. Man determines the distribution of elephants in the rain forests of northeastern Gabon. African Journal of Ecology **29**:54-63.

Bashore, T. L., W. M. Tzilkowski, and E. D. Bellis. 1985. Analysis of deer-vehicle collision sites in Pennsylvania. Journal of Wildlife Management **49**:769-774.

Baur, A., and B. Baur. 1990. Are roads barriers to dispersal in the land snail *Arianta arbustorum*? Canadian Journal of Zoology **68**:613-617.

Baxter, C. V., C. A. Frissell, and F. R. Hauer. 1999. Geomorphology, logging roads, and the distribution of bull trout (*Salvelinus confluentus*) spawning in a forested river basin: implications for management and conservation. Transactions of the American Fisheries Society **128**:854-867.

Bellis, E. D., and H. B. Graves. 1971. Deer mortality on a Pennsylvania interstate highway. Journal of Wildlife Management **35**:232-237.

Benfenati, E., S. Valzacchi, G. Maniani, L. Airoldi, and R. Farnelli. 1992. PCDD, PCDF, PCB, PAH, cadmium and lead in roadside soil: relationship between road distance and concentration. Chemosphere **24**:1077-1083.

Bennett, A. F. 1991. Roads, roadsides, and wildlife conservation: a review. Pages 99-118 in D. A. Saunders and R. J. Hobbes, editors. Nature conservation 2: the role of corridors. Surrey Beatty and Sons, Chipping Norton, New South Wales, Australia.

Beslaneev, V. D., and F. A. Kuchmazokova. 1991. The effect of motorways on the accumulation of toxic substances in walnuts. Sadovodstvo i Vinogradarstvo **5**:38.

Birdsall, C. W., C. E. Grue, and A. Anderson. 1986. Lead concentrations in bullfrog *Rana catesbeiana* and green frog *Rana clamitans* tadpoles inhabiting highway drainages. Environmental Pollution Series A Ecological and Biological **40**:233-248.

Bogemans, J., L. Nierinck, and J. M. Stassart. 1989. Effect of deicing chloride salts on ion accumulation in spruce (*Picea abies* (L.) sp.). Plant and Soil **113**:3-11.

Brody, A. J., and M. R. Pelton. 1989. Effects of roads on black bear movements in western North Carolina. Wildlife Society Bulletin **17**:5-10.

Brown, T. G., and G. F. Hartman. 1988. Contribution of seasonally flooded lands and minor tributaries to coho (*Oncorhynchus kisutch*) salmon smolt production in Carnation Creek, a small coastal stream in British Columbia. Transactions of the American Fisheries Society **117**:546-551.

Bruns, E. H. 1977. Winter behavior of pronghorns in relation to habitat. Journal of Wildlife Management **41**:560-571.

Buck, D. H. 1956. Effects of turbidity on fish and fishing. Transactions of the North American Wildlife Conference **21**:249-261.

BLM_0066938

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 26 of 301

Byrd, D. S., J. T. Gilmore, and R. H. Lea. 1983. Effect of decreased use of lead in gasoline on the soil of a highway. Environmental Science and Technology **17:**121-123.

Camarra, J. J., and J. M. Parde. 1990. The brown bear in France—status and management in 1985. Aquilo, Serie Zoologica **27:**93-96.

Clift, D., I. E. Dickson, T. Roos, P. Collins, M. Jolly, and A. Klindworth. 1983. Accumulation of lead beside the Mulgrave Freeway, Victoria. Search **14:**155-157.

Coleman, J. S., and J. D. Fraser. 1989. Habitat use and home ranges of Black and Turkey Vultures. Journal of Wildlife Management **53:** 782-792.

Collins, J. A. 1984. Roadside lead in New Zealand and its significance for human and animal health. New Zealand Journal of Science **27:**93-98.

Copp, G. H. 1989. The habitat diversity and fish reproductive function of floodplain ecosystems. Environmental Biology of Fishes **26:**1-27.

Correll, D. L., T. E. Jordan, and D. E. Weller. 1992. Cross media inputs to eastern US watersheds and their significance to estuarine water quality. Water Science and Technology **26:**2675-2683.

Cowardin, L. M., D. S. Gilmer, and C. W. Shaiffer. 1985. Mallard recruitment in the agricultural environment of North Dakota. Wildlife Monographs **92:**1-37.

Czech, B. 1991. Elk behavior in response to human disturbance at Mount St. Helens National Volcanic Monument. Applied Animal Behavior Science **29:**269-277.

Dale, J. M., and B. Freedman. 1982. Lead and zinc contamination of roadside soil and vegetation in Halifax, Nova Scotia. Proceedings of the Nova Scotian Institute of Science **32:**327-336.

Dalrymple G. H., and N. G. Reichenbach. 1984. Management of an endangered species of snake in Ohio, USA. Biological Conservation **30:**195-200.

Datta, S. C., and J. J. Ghosh. 1985. A study of the distribution pattern of lead in the leaves of banyan trees (*Ficus benghalensis*) from different traffic density regions of Calcutta. Ecotoxicology and Environmental Safety **9:**101-106.

Davies, J. M., T. J. Roper, and D. J. Shepherdson. 1987. Seasonal distribution of road kills in the European badger (*Meles meles*). Journal of Zoology (London) **211:**525-530.

Dawson, P., and G. Weste. 1985. Changes in the distribution of *Phytophthora cinnamomi* in the Brisbane Ranges National Park between 1970 and 1980-81. Australian Journal of Botany **33:**309-315.

Del Campo, J. C., J. L. Marquinez, J. Naves, and G. Palomero. 1990. The brown bear in the Cantabrian Mountains. Aquilo, Serie Zoologica **27:**97-101.

Dhindsa, M. S., J. S. Sandhu, P. S. Sandhu, and H. S. Toor. 1988. Roadside birds in Punjab (India): relation to mortality from vehicles. Environmental Conservation **15:**303-310.

Diamondback. 1990. Ecological effects of roads (or, the road to destruction). Pages 1-5 in J. Davis, editor. Killing roads: a citizen's primer on the effects and removal of roads. Biodiversity special publication. Earth First!, Tucson, Arizona.

Dickinson, N. M., N. W. Lepp, and G. T. K. Surtan. 1987. Lead and potential health risks from subsistence food crops in urban Kenya. Environmental Geochemistry and Health **9:**37-42.

Dunlap, D. W. 1987. Development of grass-seeding specifications for use on Texas highway rights-of-way: erosion control—you're gambling without it. International Erosion Control Association **18:**161-172.

Dwyer, N., and G. W. Tanner. 1992. Nesting success in Florida Sandhill Cranes. Wilson Bulletin **104:**22-31.

Eaglin, G. S., and W. A. Hubert. 1993. Effects of logging roads on substrate and trout in streams of the Medicine Bow National Forest, Wyoming. North American Journal of Fisheries Management **13:** 844-846.

Fahrig, L., J. H. Pedlar, S. E. Pope, P. D. Taylor, and J. F. Wenger. 1995. Effect of road traffic on amphibian density. Biological Conservation **73:**177-182.

Farmer, A. M. 1993. The effects of dust on vegetation—a review. Environmental Pollution **79:**63-75.

Fernandez, C. 1993. The choice of nesting cliffs by golden eagles *Aquila chrysaetos:* the influence of accessibility and disturbance by humans. Alauda **61:**105-110.

Ferreras, P., J. J. Aldama, J. F. Beltran, and M. Delibes. 1992. Rates and causes of mortality in a fragmented population of Iberian lynx *Felis pardina* Temminck, 1824. Biological Conservation **61:**197-202.

Findlay, C. S., and J. Houlahan. 1997. Anthropogenic correlates of species richness in southeastern Ontario wetlands. Conservation Biology **11:**1000-1009.

Fleck, A. M., M. J. Lacki, and J. Sutherland. 1988. Response of white birch (*Betula papyrifera*) to road salt applications at Cascade Lakes, New York. Journal of Environmental Management **27:**369-377.

Flueckiger, W., H. Fluckiger Keller, and S. Braun. 1984. Untersuchungen ueber waldschaeden in der Nordwestschweiz. Schweizerische Zeitschrift fuer Forstwesen **135:**389-444.

Foster, M. L., and S. R. Humphrey. 1991. Effectiveness of wildlife crossing structures on Alligator Alley (I-75) for reducing animal/auto collisions. Report. Florida Game and Fresh Water Fish Commission and Florida Department of Transportation, Tallahassee.

Fraser, D., and E. R. Thomas. 1982. Moose-vehicle accidents in Ontario: relation to highway salt. Wildlife Society Bulletin **10:**261-265.

Fuller, T. 1989. Population dynamics of wolves in north-central Minnesota. Wildlife Monographs **105:**1-41.

Furniss, M. J., T. D. Roeloffs, and C. S. Yee. 1991. Road construction and maintenance. Pages 297-323 in W. R. Meehan, editor. Influences of forest and rangeland management on salmonid fishes and their habitats. Special publication 19. American Fisheries Society, Bethesda, Maryland.

Gad, A. M., F. M. Feinsod, I. H. Allam, M. Eisa, A. N. Hassan, B. A. Soliman, S. El Said, A. J. Saah, S. El Said, R. F. Sellers, and H. Hoogstraal. 1986. A possible route for the introduction of Rift Valley fever virus into Egypt during 1977. Journal of Tropical Medicine and Hygiene **89:**233-236.

Gaddy, L. L., and T. L. Kohlsaat. 1987. Recreational impact on the natural vegetation, avifauna, and herpetofauna of four South Carolina barrier islands (USA). Natural Areas Journal **7:**55-64.

Garcia-Miragaya, J, S. Castro, and J. Paolini. 1981. Lead and zinc levels and chemical fractionation in road-side soils of Caracas, Venezuela. Water, Air and Soil Pollution **15:**285-297.

Gjessing, E., E. Lygren, L. Berglind, T. Gulbrandsen, and R. Skanne. 1984. Effect of highway runoff on lake water quality. Science of the Total Environment **33:**247-257.

Goldsmith, C. D., P. F. Scanlon, and W. R. Pirie. 1976. Lead concentrations in soil and vegetation associated with highways of different traffic densities. Bulletin of Environmental Contamination and Toxicology **16:**66-70.

Graham, D. L., and S. M. Kalman. 1974. Lead in forage grass from a suburban area in northern California. Environmental Pollution **7:**209-215.

Greenberg, C. H., S. H. Crownover, and D. R. Gordon. 1997. Roadside soil: a corridor for invasion of xeric scrub by nonindigenous plants. Natural Areas Journal **17:**99-109.

Gresswell, R. E., and J. D. Varley. 1988. Effects of a century of human influence on the cutthroat trout of Yellowstone Lake. Pages 45-52 in Symposium 4. American Fisheries Society, Bethesda, Maryland.

Groot Bruinderink, G. W. T. A., and E. Hazebroek. 1996. Ungulate traffic collisions in Europe. Conservation Biology **10:**1059-1067.

Grover, K. E., and M. J. Thompson. 1986. Factors influencing spring feeding site selection by elk in the Elkhorn Mountains, Montana. Journal of Wildlife Management **50:**466-470.

Grue, C. E., D. J. Hoffman, W. N. Beyer, and L. P. Franson. 1986. Lead concentrations and reproductive success in European starlings, *Sturnus vulgaris*, nesting within highway roadside verges. Environmental Pollution Series A Ecological and Biological **42:**157-182.

Guntner, M., and B. M. Wilke. 1983. Effects of de-icing salt on soil enzyme activity. Water, Air and Soil Pollution **20:**211-220.

Guttormsen, G. 1993. The content of lead, cadmium and PAH in vegetables and strawberries alongside the E18 motorway. Norsk Landbruksforsking **7:**175-189.

BLM_0066939

Hagans, D. K., W. E. Weaver, and M. A. Madej. 1986. Long-term on-site and off-site effects of logging and erosion in the Redwood Creek Basin, northern California. Pages 38–65 in Papers presented at the American Geophysical Union meeting on cumulative effects. Technical bulletin 490. National Council for Air and Stream Improvement, New York.

Haqus, M. D., and H. A. Hameed. 1986. Lead content of green forage growing adjacent to expressways and roads connecting Erbil City (Northern Iraq). Journal of Biological Science Research **17:**151–164.

Harr, R. D., and R. A. Nichols. 1993. Stabilizing forest roads to help restore fish habitat: a northwest Washington example. Fisheries **18:** 18–22.

Harrison, P. D., and M. I. Dyer. 1984. Lead in mule deer forage in Rocky Mountain National Park, Colorado. Journal of Wildlife Management **48:**510–517.

Hartl, G. B., F. Suchentrunk, R. Willing, and M. Grillitsch. 1989. Biochemical-genetic variability and differentiation in the brown hare (*Lepus europaeus*) of lower Austria. Wiener Tieraerztliche Monatsschrif **76:**279–284.

Helvey, J. D., and J. N. Kochenderfer. 1990. Soil density and moisture content on two unused forest roads during first 30 months after construction. Research paper NE-629. U.S. Forest Service, Northeast Forest Experiment Station, Broomhall, Pennsylvania.

Henderson, L., and M. J. Wells. 1986. Alien plant invasions in the grassland and savanna biomes. Pages 109–117 in I. A. W. Macdonald, F. J. Kruger, and A. A. Ferrar, editors. The ecology and management of biological invasions in southern Africa. Oxford University Press, Capetown.

Hicks, B. J., J. D. Hall, P. A. Bisson, and J. R. Sedell. 1991. Response of salmonids to habitat change. Pages 483–518 in W. R. Meehan, editor. Influences of forest and rangeland management on salmonid fishes and their habitats. Special publication 19. American Fisheries Society, Bethesda, Maryland.

Hoffman, R. W., C. R. Goldman, S. Paulson, and G. R. Winters. 1981. Aquatic impacts of deicing salts in the central Sierra Nevada Mountains, California. Water Resources Bulletin **17:**280–285.

Holroyd, G. L. 1979. The impact of highway and railroad mortality on the ungulate populations in the Bow Valley, Banff National Park. Environment Canada, Canadian Wildlife Service, Edmonton, Alberta.

Hornocker, M. G., and H. S. Hash. 1981. Ecology of the wolverine in northwestern Montana. Canadian Journal of Zoology **59:**1286–1301.

Indu, B., and G. N. Choudhri. 1991. Impact of automobile effusion on plant and soil. International Journal of Ecology and Environmental Sciences **17:**121–127.

Jarosz, W. 1994. Heavy metals contamination of grass growing at the road edges. Medycyna Weterynaryjna **50:**23–26.

Jensen, W. F., T. K. Fuller, and W. L. Robinson. 1986. Wolf, *Canis lupus*, distribution on the Ontario-Michigan border near Sault Ste. Marie. Canadian Field Naturalist **100:**363–366.

Joly, P., and A. Morand. 1997. Amphibian diversity and land-water ecotones. Pages 161–182 in J.-P. Bravard and R. Juge, editors. Biodiversity in land-water ecotones. Man and biosphere series. Volume 18. United Nations Educational, Scientific and Cultural Organization, Paris.

Jones, J. A., and G. E. Grant. 1996. Cumulative effects of forest harvest on peak streamflow in the western Cascades of Oregon. Water Resources Research **32:**959–974.

Karnefelt, L, and J. E. Mattsson. 1989. *Cetraria cucullata* and *Cetraria nivalis*, two vanishing lichens from southernmost Sweden. International Journal of Mycology and Lichenology **4:**299–306.

Kershner, J. L., C. M. Bischoff, and D. L. Horan. 1997. Population, habitat, and genetic characteristics of Colorado River cutthroat trout in wilderness and nonwilderness stream sections in the Uinta Mountains of Utah and Wyoming. North American Journal of Fisheries Management **17:**1134–1143.

Kiang, Y. T. 1982. Local differentiation of *Anthoxanthum odoratum* L. populations on roadsides. American Midland Naturalist **107:**340–350.

King, J. G., and L. C. Tennyson. 1984. Alteration of streamflow characteristics following road construction in north central Idaho. Water Resources Research **20:**1159–1163.

Kjensmo, J. 1997. The influence of road salts on the salinity and the meromictic stability of Lake Svinsjøen, Norway. Oecologia **347:** 151–158.

Klein, D. R. 1991. Caribou in the changing North. Applied Animal Behavior Science **29:**279–291.

Krzysztofiak, L. 1991. The effect of habitat pollution with heavy metals on ant populations and ant-hill soil. Ekologia Polska **39:**181–202.

Kushlan, J. A. 1988. Conservation and management of the American crocodile. Environmental Management **12:**777–790.

Lee, D. C., et al. 1997. Broadscale assessment of aquatic species and habitats. Pages 1057–1496 in T. M. Quigley and S. J. Arbelbide, editors. An assessment of ecosystem components in the interior Columbia River Basin and portions of the Klamath and Great Basins. Volume 3. General technical report PNW-GTR-405. U.S. Forest Service, Portland, Oregon.

Leh, H. O. 1990. Investigations on health conditions of street trees after discontinued use of de-icing salts on streets in Berlin. Nachrichtenblatt des Deutschen Pflanzenschutzdienstes **42:**134–142.

Leharne, S., D. Charlesworth, and B. Chowdhry. 1992. A survey of metal levels in street dusts in an inner London neighbourhood. Environment International **18:**263–270.

Liem, A. S. N., A. Hendriks, H. Kraal, and M. Loenen. 1984. Effects of de-icing salt on roadside grasses and herbs. Plant and Soil **84:**299–310.

Loos, G., and P. Kerlinger. 1993. Road mortality of saw-whet and Screech Owls on the Cape May peninsula. Journal of Raptor Research **27:**210–213.

MacArthur, R. A., R. H. Johnston, and V. Geist. 1979. Factors influencing heart rate in free ranging bighorn sheep: a physiological approach to the study of wildlife harrassment. Canadian Journal of Zoology **57:**2010–2021.

Madsen, J. 1985. Impact of disturbance on field utilization of pink-footed geese in West Jutland, Denmark. Biological Conservation **33:**53–64.

Majdi, H., and H. Persson. 1989. Effects of road-traffic pollutants (lead and cadmium) on tree fine-roots along a motor road. Plant and Soil **119:**1–5.

Maltby, L., A. B. A. Boxall, D. M. Farrow, P. Calow, and C. I. Betton. 1995. The effects of motorway runoff on freshwater ecosystems. 2. Identifying major toxicants. Environmental Toxicology and Chemistry **14:**1093–1101.

Manville, A. M. 1983. Human impact on the black bear in Michigan's lower peninsula. International Conference on Bear Research and Management **5:**20–33.

Marino, F., A. Ligero, and D. J. Diaz Cosin. 1992. Heavy metals and earthworms on the border of a road next to Santiago (Galicia, Northwest of Spain): initial results. Soil Biology and Biochemistry **24:**1705–1709.

Matlack, G. R. 1993. Sociological edge effects: spatial distribution of human impact in suburban forest fragments. Environmental Management **17:**829–835.

Mattson, M. D., and P. J. Godfrey. 1994. Identification of road salt contamination using multiple regression and GIS. Environmental Management **18:**767–773.

McLellan, B. N., and D. M. Shackleton. 1988. Grizzly bears and resource-extraction industries: effects of roads on behavior, habitat use and demography. Journal of Applied Ecology **25:**451–460.

Megahan, W. F. 1972. Subsurface flow interception by a logging road in mountains of central Idaho. Pages 350–356 in Proceedings of a national symposium on watersheds in transition. American Water Resources Association, Bethesda, Maryland.

Mehrhoff, L. A. 1989. Reproductive vigor and environmental factors in populations of an endangered North American orchid, *Isotria medeoloides* (Pursh) Rafinesque. Biological Conservation **47:**281–296.

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 28 of 301

Merriam, G., M. Kozakiewicz, E. Tsuchiya, and K. Hawley. 1989. Barriers as boundaries for metapopulations and demes of *Peromyscus leucopus* in farm landscapes. Landscape Ecology **2**:227–236.

Minoranskii, V. A., and Z. R. Kuzina. 1984. Effect of environmental pollution by motor transport on the reproduction and development of *Opatrum sabulosum.* Biologicheskie Nauki (Moscow) **11:**43–47.

Molles, M. C., Jr., and J. R. Gosz. 1980. Effects of a ski area on the water quality and invertebrates of a mountain stream. Water, Air, and Soil Pollution **14:**187–205.

Moritz, K., and J. Breitenstein. 1985. Damage by spreading salt on West German federal trunk roads and possibilities of avoiding it. Allgemeine Forstzeitschrift **44:**1192–1193.

Muskett, C. J., and M. P. Jones. 1981. Soil respiratory activity in relation to motor vehicle pollution. Water, Air and Soil Pollution **23:**231–242.

Nasralla, M. M., and E. A. Ali. 1985. Lead accumulation in edible portions of crops grown near Egyptian traffic roads. Agriculture Ecosystems and Environment **13:**73–82.

Nelson, R. L., M. L. McHenry, and W. S. Platts. 1991. Mining. Pages 425–457 in W. R. Meehan, editor. Influences of forest and rangeland management on salmonid fishes and their habitats. Special publication 19. American Fisheries Society, Bethesda, Maryland.

Newcombe, C. P., and J. O. T. Jensen. 1996. Channel suspended sediment and fisheries: a synthesis for quantitative assessment of risk. North American Journal of Fisheries Management **16:**693–727.

Newton, I., I. Wyllie, and A. Asher. 1991. Mortality causes in British barn owls *Tyto alba*, with a discussion of aldrin-dieldrin poisoning. Ibis **133:**162–169.

Niordson, N. 1989. *Glyceria grandis* found in south Sweden. Svensk Botanisk Tidskrift **83:**357–360.

Norling, B. S., S. H. Anderson, and W. A. Hubert. 1992. Roost sites used by Sandhill Crane staging along the Platte River, Nebraska. Great Basin Naturalist **52:**253–261.

Northover, J. 1987. NaCl injury to dormant roadside peach trees and its effect on the incidence of infections by *Leucostoma* spp. Phytopathology **77:**835–840.

Noss, R. F., and A. Y. Cooperrider. 1994. Saving nature's legacy. Island Press, Washington, D.C.

Novelli, R., E. Takase, and V. Castro. 1988. Study of birds killed by collision with vehicles in a stretch of Highway BR-471, between Quinta and Taim, Rio Grande do Sul, Brazil. Revista Brasileira De Zoologia **5:**441–454.

Oberts, G. L. 1986. Pollutants associated with sand and silt applied to roads in Minnesota. Water Resources Bulletin **22:**479–483.

Oxley, D. J., M. B. Fenton, and G. R. Carmody. 1974. The effects of roads on population of small mammals. Journal of Applied Ecology **11:**51–59.

Palomares, F., and M. Delibes. 1992. Some physical and population characteristics of Egyptian mongooses (*Herpestes ichneumon* L., 1758) in southwestern Spain. Zeitschrift fuer Saeugetierkunde **57:**94–99.

Pantaleoni, R. A. 1989. Ways of invasion of a new area by *Metcalfa pruinosa* (Say, 1830) (Auchenorrhyncha, Flatidae). Bollettino Dell'istituto Di Entomologia Della Universita Degli Studi Di Bologna **43:**1–8.

Paruk, J. D. 1987. Habitat utilization by Bald Eagles wintering along the Mississippi River (USA). Transactions of the Illinois State Academy of Science **80:**333–342.

Pedevillano, C., and R. G. Wright. 1987. The influence of visitors on mountain goat activities in Glacier National Park, Montana. Biological Conservation **39:**1–11.

Peters, N. E., and J. T. Turk. 1981. Increases in sodium and chloride in the Mohawk River, New York, from the 1950s to the 1970s attributed to road salt. Water Resources Bulletin **17:**586–598.

Petersen, A., D. Eckstein, and W. Liese. 1982. Holzbiologische Untersuchungen ueber den Einfluss von Auftausalz auf Hamburger Strassenbaeume. Forstwissenschaftliches Centralblatt **101:**353–364.

Petranka, J. W., M. E. Eldridge, and K. E. Haley. 1993. Effects of timber harvesting on Southern Appalachian salamanders. Conservation Biology **7:**363–370.

Piégay, H., and N. Landon. 1997. Promoting ecological management of riparian forests on the Drôme River, France. Aquatic Conservation: Marine and Freshwater Ecosystems **7:**287–304.

Puglisi, M. J., J. S. Lindzey, and E. D. Bellis. 1974. Factors associated with highway mortality of white-tailed deer. Journal of Wildlife Management **38:**799–807.

Quarles, H. D., R. B. Hanawalt, and W. E. Odum. 1974. Lead in small mammals, plants and soil at varying distances from a highway. Journal of Applied Ecology **11:**937–949.

Reh, W., and A. Seitz. 1990. The influence of land use on the genetic structure of populations of the common frog *Rana temporaria.* Biological Conservation **54:**239–249.

Reid, L. M., and T. Dunne. 1984. Sediment production from forest road surfaces. Water Resources Research **20:**1753–1761.

Reilly, R. E., and H. E. Green. 1974. Deer mortality on a Michigan interstate highway. Journal of Wildlife Management **38:**16–19.

Richardson, E. V., B. Simons, S. Karaki, M. Mahmood, and M. A. Stevens. 1975. Highways in the river environment: hydraulic and environmental design considerations training and design manual. U.S. Department of Transportation, Federal Highway Administration, Washington, D.C.

Rieman, B. E., D. C. Lee, and R. F. Thurow. 1997. Distribution, status, and likely future trends of bull trout within the Columbia River and Klamath River Basins. North American Journal of Fisheries Management **17:**1111–1125.

Riley, S. J. 1984. Effect of clearing and roading operations on the permeability of forest soils, Karuah catchment, New South Wales, Australia. Forest Ecology and Management **9:**283–293.

Robel, R. J., C. A. Howard, M. S. Udevitz, and B. Curnutte, Jr. 1981. Lead contamination in vegetation, cattle dung, and dung beetles near an interstate highway, Kansas. Environmental Entomology **10:**262–263.

Rodda, G. H. 1990. Highway madness revisited: roadkilled *Iguana iguana* in the llanos of Venezuela. Journal of Herpetology **24:**209–211.

Rosen, P. C., and C. H. Lowe. 1994. Highway mortality of snakes in the Sonoran desert of southern Arizona. Biological Conservation **68:**143–148.

Rost, G. R., and J. A. Bailey. 1979. Distribution of mule deer and elk in relation to roads. Journal of Wildlife Management **43:**634–641.

Roth, N. E., J. D. Allan, and D. L. Erickson. 1996. Landscape influences on stream biotic integrity assessed at multiple spatial scales. Landscape Ecology **11:**141–156.

Sarbello, W., and L. W. Jackson. 1985. Deer mortality in the town of Malone. N. Y. Fish and Game Journal **32:**141–157.

Schedl, W. 1991. Invasion of the American buffalo treehopper (*Stictocephala bisonia* Kopp and Yonke, 1977) into Austria (Homoptera, Auchenorrhyncha, Membracidae). Anzeiger fuer Schaedlingskunde, Pflanzenschutz, Umweltschutz **64:**9–13.

Schlosser, I. J. 1991. Stream fish ecology: a landscape perspective. BioScience **41:**704–712.

Scott, N. E., and A. W. Davison. 1982. De-icing salt and the invasion of road verges by maritime plants. Watsonia **14:**41–52.

Seibert, H. C., and J. H. Conover. 1991. Mortality of vertebrates and invertebrates on an Athens County, Ohio, highway. Ohio Journal of Science **91:**163–166.

Seibert, P. 1993. Vegetation and man in South America from a historical perspective. Phytocoenologia **23:**457–493.

Seyedbagheri, K. A. 1996. Idaho forestry best management practices: compilation of research on their effectiveness. General technical report INT-GTR-339. U.S. Forest Service, Intermountain Research Station, Ogden, Utah.

Simini, M., and I. A. Leone. 1986. Studies on the effects of de-icing salts on roadside trees. Arboricultural Journal **10:**221–231.

Smith, J. M. B. 1986. Feral fruit trees on New England roadsides. Page 158 in R. H. Groves and J. J. Burdon, editors. Ecology of biological invasions. Cambridge University Press, New York.

Swihart, R. K., and N. A. Slade. 1984. Road crossing in *Sigmodon hispidus* and *Microtus ochrogaster.* Journal of Mammalogy **65:**357–360.

Thurber, J. M., R. O. Peterson, T. D. Drummer, and S. A. Thomasma. 1994. Gray wolf response to refuge boundaries and roads in Alaska. Wildlife Society Bulletin **22:**61–68.

BLM_0066941

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 29 of 301

Tong, S. T. Y. 1990. Roadside dusts and soils contamination in Cincinnati, Ohio, USA. Environmental Management **14:**107-114.

Trafela, E. 1987. The influence of the construction of forest roads on forest production. Zbornik Gozdarstva Lesarstva **29:**85-140.

Tyser, R. W., and C. A. Worley. 1992. Alien flora in grasslands adjacent to road and trail corridors in Glacier National Park, Montana (USA). Conservation Biology **6:**253-262.

U.S. Department of Transportation. 1996. Highway statistics 1996. FHWA-PL-98-003. U.S. Department of Transportation, Office of Highway Information Management, Washington, D.C.

Van der Zande, A. N., W. J. ter Keurs, and W. J. Van der Weijden. 1980. The impact of road on the densities of four bird species in an open field habitat—evidence of a long-distance effect. Biological Conservation **18:**299-321.

Van Dyke, F. G., R. H. Brocke, and H. G. Shaw. 1986. Use of road track counts as indices of mountain lion presence. Journal of Wildlife Management **50:**102-109.

van Gelder, J. J. 1973. A quantitative approach to the mortality resulting from traffic in a population of (*Bufo bufo*) L. Oecologia **13:**93-95.

Varland, D. E., E. E. Klaas, and T. M. Loughin. 1993. Use of habitat and perches, causes of mortality and time until dispersal in post-fledging American Kestrels. Journal of Field Ornithology **64:**169-178.

Vora, R. S. 1988. Potential soil compaction forty years after logging in northeastern California. Great Basin Naturalist **48:**117-120

Vos, C. C., and J. P. Chardon. 1998. Effects of habitat fragmentation and road density on the distribution pattern of the moor frog, *Rana arvilis.* Journal of Applied Ecology **35:**44-56.

Watson, J., and R. H. Dennis. 1992. Nest-site selection by Golden Eagles in Scotland. British Birds **85:**469-481.

Weaver, W. E., M. M. Hektner, D. K. Hagans, L. J. Reed, R. A. Sonneville, and G. J. Bundros. 1987. An evaluation of experimental rehabilitation work, Redwood National Park. Technical report 19. Redwood National Park, Arcata, California.

Wein, R. W., G. Wein, S. Bahret, and W. J. Cody. 1992. Northward invading non-native vascular plant species in and adjacent to Wood Buffalo National Park, Canada. Canadian Field Naturalist **106:**216-224.

Wemple, B. C., J. A. Jones, and G. E. Grant. 1996. Channel network extension by logging roads in two basins, western Cascades, Oregon. Water Resources Bulletin **32:**1195-1207.

Wester, L., and J. O. Juvik. 1983. Roadside plant communities on Mauna Loa, Hawaii. Journal of Biogeography **10:**307-316.

Whitford, P. C. 1985. Bird behavior in response to the warmth of blacktop roads. Transactions of the Wisconsin Academy of Sciences Arts and Letters **73:**135-143.

Wilcox, D. A. 1986. The effects of deicing salts on vegetation in Pinhook Bog, Indiana. Canadian Journal of Botany **64:**865-874.

Wilkins, K. T., and D. J. Schmidly. 1980. Highway mortality of vertebrates in southeastern Texas. Texas Journal of Science **4:**343-350.

Witmer, G. W., and D. S. DeCalesta. 1985. Effect of forest roads on habitat use by Roosevelt elk. Northwest Science **59:**122-125.

Yanes, M., J. M. Velasco, and F. Suárez. 1995. Premeability of roads and railways to vertebrates: the importance of culverts. Biological Conservation **71:**217-222.

Yassoglou, N., C. Kosmas, J. Asimakopoulos, and C. Kallianou. 1987. Heavy metal contamination of roadside soils in the Greater Athens (Greece) area. Environmental Pollution **47:**293-304.

Ziemer, R. R., and T. E. Lisle. 1998. Hydrology. Pages 43-68 in R. J. Naiman and R. E. Bilby, editors. River ecology and management: lessons from the Pacific coastal ecosystem. Springer-Verlag, New York.

Zobel, D. B., L. F. Roth, and G. M. Hawk. 1985. Ecology, pathology, and management of Port Orford cedar (*Chamaecyparis lawsoniana*). General Technical report PNW-184. U.S. Forest Service, Portland, Oregon.

BLM_0066942

**Spreadsheet Placeholder(file available in native format)**

**File Name:** 0_Trujillo1999.xlsx

# BIOSTRATIGRAPHY OF DINOSAURS IN THE UPPER JURASSIC MORRISON FORMATION OF THE WESTERN INTERIOR, U.S.A.

*Christine E. Turner and Fred Peterson*
*U. S. Geological Survey,*
*Box 25046, MS-939,*
*Denver, CO 80225-0046*

## ABSTRACT

The biostratigraphy of dinosaur remains in the Upper Jurassic Morrison Formation and related beds was studied throughout the Western Interior in an effort to place as many dinosaur localities as possible in their relative chronostratigraphic positions. First, we established a regional stratigraphic framework for the Morrison Formation throughout the Western Interior. Three primary stratigraphic markers in the formation aided in regional correlations. An important marker in about the middle or upper middle part of the formation, known as the clay change, marks the abrupt transition from predominantly non-smectitic clays below to predominantly smectitic clays above. This surface, as well as the J-5 unconformable to conformable surface at the base of the Morrison and the K-1 unconformity at the top of the Morrison, comprise the basis for most of the correlations.

After the stratigraphic framework was established, a total of 128 dinosaur sites were placed in the stratigraphic framework and then were correlated to a primary reference section (DQW) near the Carnegie Quarry at Dinosaur National Monument in northeastern Utah. Where the clay change is not evident (Black Hills and Montana), the correlations are more tenuous so the 13 localities in these areas are treated separately, even though other evidence from the regional stratigraphy and calcareous microfossils help relate these sites to the primary reference section.

The biostratigraphic distribution of the dinosaurs allows the Morrison Formation and related beds to be divided into four biozones, numbered one through four from oldest to youngest. The zones are based on the stratigraphic (vertical) distribution of long-ranging taxa (mostly genera and species), which are taxa that extend through two or more different stratigraphic positions in the formation. Single-site taxa that are only found at one locality in one stratigraphic level are not used in the zonation. Dinosaur Zone 1 extends from the base of the formation to the middle of the Salt Wash Member. Dinosaur Zone 2 extends upward to about 30 ft (9.1 m) above the clay change in the primary reference section

(DQW). Dinosaur Zone 3 extends up to about the middle of the upper part of the Brushy Basin Member. Dinosaur Zone 4 extends to the top of the formation. Based on age information from palynomorphs, charophytes and ostracodes, isotopic dates, and paleomagnetic studies, Dinosaur Zones 1, 2, and 3 are Kimmeridgian in age and the Kimmeridgian-Tithonian boundary is in the lower part of Dinosaur Zone 4.

The biostratigraphic distribution shows a vertical trend of increasing faunal diversity followed by decreasing diversity during deposition of the Morrison Formation. First, it is noteworthy that dinosaurs were scarce during earliest Morrison deposition—the earliest fauna consists of only a few taxa (Zone 1, Tidwell and lower Salt Wash Members). Diversity increased dramatically near the middle of the Salt Wash Member (low in Zone 2) and continued to increase, reaching a peak in diversity just above the clay change (high in Zone 2, near the base of the upper part of the Brushy Basin Member) where the first of the long-ranging taxa began to die out. Diversity continued to decrease gradually to about the middle of the upper Brushy Basin Member where a fairly sharp decline occurred (high in Zone 3). Another fairly sharp decline in diversity occurred higher in the same member (middle of Zone 4), followed by a gradual decline, with the few remaining taxa dying out toward the end of Morrison deposition.

The changes in diversity low in Zone 2, high in Zone 3, and toward the middle of Zone 4 coincide fairly well with similar changes in the diversity of charophytes and ostracodes. This suggests that any environmental changes that occurred at these stratigraphic positions were ubiquitous and of sufficient character to exert a strong influence on markedly different types of organisms.

The scarcity of dinosaurs at the beginning of Morrison deposition may reflect a continuation of the harsh conditions that persisted during Middle Jurassic time. Dinosaurs were scarce just before Morrison deposition, or at least only sparse footprint evidence exists in Middle Jurassic rocks. It is likely that the arid climate that per-

sisted during deposition of the eolian ergs and evaporites of the Middle Jurassic was inimical to the dinosaurs. Conditions during earliest Morrison deposition may have remained inhospitable to the dinosaurs, judging from the presence of eolian and evaporite deposits in the lowermost part of the Morrison. The development of the extensive river systems of the Salt Wash Member may have established a more equable habitat, enticing dinosaurs into the area. They seem to have flourished and reached their heyday at about the middle of the Morrison. The change from greater to lesser diversity occurs just above the clay change and thus coincides with the tremendous increase in the outpnt of volcanic ash in the source area. What role the increase in volcanic ash may have played in dinosaur diversity, either direct or indirect, is uncertain.

Taken together with the biostratigraphic data from some of the other organisms in the Morrison ecosystem (for example, charophytes and ostracodes), the newly established biostratigraphic synthesis forms the basis for evaluating widespread paleoecological changes in the Western Interior during the Late Jurassic. Moreover, this synthesis provides, for the first time, a biostratigraphic foundation for the evaluation of taxonomic lineages and evolutionary trends among the dinosaurs in the Morrison Formation.

## INTRODUCTION

Two of the more perplexing problems related to the numerous dinosaur remains recovered from the Upper Jurassic Morrison Formation of the Western Interior (figure 1) have been their age in terms of the standard geologic time scale and their relative age with respect to each another. The age of the formation has been resolved rather well in several recent publications (Kowallis and others, 1998; Litwin and others, 1998; Schudack and others, 1998), but the relative stratigraphic position of the numerous dinosaur quarries and sites that are scattered throughout seven of the Western Interior states remained an enigma. Recent advances in understanding the stratigraphy of the Morrison Formation and related beds as well as its lower and upper boundaries (Peterson and Turner, 1998) now allow many of the quarries and sites to be placed in a relative stratigraphic framework. Although new sites are discovered with each field season, we estimate that perhaps as many as about 30 presently known and mostly minor sites remain to be positioned stratigraphically and the data from most if not all of these probably would not significantly change the findings given in the present report. Thus, for this investigation, we present the results of data thus far accumulated in which 141 dinosaur quarries and sites throughout the Western Interior are positioned within the formation and with respect to each other. The information presented here may prove helpful in understanding and distinguishing evolutionary relationships and biogeographic diversity, as well as in making paleoecological reconstructions.

## METHODOLOGY

The goal of positioning Morrison dinosaur localities is hampered considerably by the numerous facies changes that are common in continental deposits, by the scarcity of reliable and widespread isochronous or nearly isochronous stratigraphic markers, and by the lack of abundant micropaleontological material that could aid in establishing a detailed microfossil-based biostratigraphy of the formation. Although there are a fair number of local stratigraphic markers in the formation (Peterson and Turner, 1998), most of these vary too much in stratigraphic position or are regionally too discontinuous to be useful for positioning the quarries and were only used where other means of correlation were not available. The primary stratigraphic markers that we used are the J–5 surface (Pipiringos and O'Sullivan, 1978) and the K–1 unconformity (Peterson, 1988cd, 1994) at the base and top, respectively, of the Morrison Formation (and related beds where other stratigraphic units are involved) and a prominent vertical change in clay mineralogy at or near the middle of the formation (Owen and others, 1989; Turner and Fishman, 1991). The J–5 surface is an unconformity in some localities and its correlative conformity in other places; the K–1 surface is an unconformity at the base of Lower Cretaceous rocks, but in some places, Lower Cretaceous rocks are missing and the K–2 unconformity at the base of uppermost Lower Cretaceous or lowermost Upper Cretaceous strata must be used. The vertical change in clay mineralogy within the Morrison is from largely nonsmectitic mudstone below to predominantly smectitic mudstone above (Owen and others, 1989). X-Ray analyses indicate that the clay minerals below the clay change may include some swelling (smectitic) clays but, if present, they are much less abundant and generally do not produce the "popcorn" texture in soils that typically develop on claystones and mndstones that contain abundant smectite-rich clays. An additional stratigraphic marker found by Demko and others (1996) is a persistent and well developed paleosol zone in the lowermost strata of the lower part of the Brushy Basin Member and in correlative strata in other areas. Because it was discovered after many of the

BLM_0066945

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 33 of 301

dinosaur localities had been positioned, it has not been used extensively in this report although it has considerable potential as another widespread stratigraphic marker that could aid in extending correlations into areas where the clay change is not present.

For convenience of discussion, we refer to the entire assemblage of strata between the J–5 surface and the K–1 unconformity (or the K–2 unconformity in some places) as the Morrison package of beds or the Morrison Formation and related beds. Also for convenience, all strata between the J–5 surface and the clay change are herein referred to informally as the lower Morrison and all strata between the clay change and the K–1 unconformity are referred to informally as the upper Morrison. We use the term "site" for a place where a few bones identifiable to genus level were picked up or otherwise

*Figure 1. Index map of the Western Interior showing dinosaur localities (dots), local reference sections (crosses), and lines of stratigraphic sections.*

BLM_0066946





*Figure 2. A, Stratigraphic section showing stratigraphic position of dinosaur localities in New Mexico, Oklahoma, and eastern Colorado. Line of section shown on figure 1. B, The explanation applies to this and figures 3, 4, 5, 6, 7, 10, 11, 12, and 13.*



***Figure 3.*** *Stratigraphic section showing stratigraphic position of dinosaur localities in western Colorado and southeastern Utah. Line of section shown on figure 1.*

easily extracted from the rock with minimal digging, or in rare cases where bones were identified in place by a competent paleontologist, and we use the term "locality" for either a site or a quarry where moderate to considerable excavation has occurred.

Complete or partial sections of the Morrison Formation were measured at each of the locations we recovered. In rare cases, dinosaur localities were adequately located geographically and stratigraphically in the published literature so no additional work was required; those sections not measured by us are cited in appendix 1. Throughout most of the region where the clay change is present, we measured a complete section of the Morrison, or at least a partial section from the clay change to the appropriate upper or lower contact of the part of the formation that included the dinosaur locality. Where it was only possible to measure a partial section, the locality was positioned with respect to one of the three key marker surfaces or, rarely, to some other stratigraphic marker and then correlated to the nearest available measured section. The nearest available measured section with the correlated dinosaur locality was then tied to the nearest local reference section that was more complete or representative of the local area. The local reference sections are shown in figures 2-6.

Correlating the various quarries in the local reference sections to the primary reference section at Dinosaur National Monument (designated as the DQW or Dinosaur Quarry West section) was accomplished by positioning the quarries in proportion to their stratigraphic positions within the lower Morrison or upper Morrison units. This was done largely by graphic correlation methodology (Shaw, 1964), which is simply a way of doing it proportionately. Because we employ the proportional method of correlating the localities, it does not matter that some of the measured sections on various figures in this report are plotted at different scales.

There are obvious shortcomings in the methodology we used in trying to correlate the dinosaur localities to a single master reference section, but, given that the thickness of the Morrison was influenced by slight but nevertheless significant crustal movements, and that widespread stratigraphic markers are scarce, it is the best that can be accomplished at present.

At the base, the lowermost strata of the Morrison onlap paleotopographic highs in some places, which could lead to incorrect positioning of a locality. Fortunately, the areas where this occurs are fairly well known and appropriate measures can be taken to correct for it. A good example of this is the Cabin Creek Quarry (CO-48) near Gunnison, Colorado, where the Morrison onlapped Precambrian crystalline rocks and only the



Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 36 of 301

*Figure 4. Stratigraphic section showing stratigraphic position of dinosaur localities in eastern Utah. Line of section shown on figure 1.*

upper strata of the lower Morrison are present and exposed. The quarry is in the Salt Wash Member. The overlying Brushy Basin Member is concealed by a deep cover of alluvium so that the locality could not be positioned with respect to the clay change and could only be positioned with respect to the Salt Wash elsewhere. Because of the known onlap in this area and known pinchout of the lower part of the Salt Wash Member farther west (up the depositional slope) of the Gunnison area, we knew that the lowermost strata of the Salt Wash were not present there, and therefore only the uppermost beds of the Salt Wash Member were present. With this knowledge, we could position the quarry with respect to the upper contact of the Salt Wash Member and then we correlated that contact to the local reference section.

The upper contact of the Morrison is more intractable for a variety of reasons, depending on the locality. It is difficult to estimate the amount of scour beneath Lower Cretaceous rocks. An important clue is the thick, locally present, paleosol zone at the top of the Morrison Formation that is most likely at places where deep scour did not occur (T.M. Demko, oral communication, 1996). This suggests that the areas with the paleosols retained the greatest original thickness of the upper Morrison. Because we tried to refer the localities to the thickest local reference sections, an area that has a thick paleosol at the top of the formation was considered ideal. These were also the areas where we felt most confident in our identification of the upper contact.

The "Breakfast Bench beds" at the top of the upper Morrison in the Como Bluff region of Wyoming deserve special mention because of their important dinosaur fauna and the thought that they could be Early Cretaceous in age (Bakker and others, 1990). The beds are as much as 71 ft (21.6 m) thick and consist largely of black mudstone that is smectitic to nonsmectitic and carbonaceous or noncarbonaceous. We found that the carbonaceous mudstone strata (zero to about 15 ft or zero to about 4.6 m thick) locally present at the top of the Morrison Formation in the Como Bluff area interfinger with the basal fluvial sandstone bed of the Lower Cretaceous Cloverly Formation and therefore are Early Cretaceous in age and not part of the Morrison Formation. However, we also found a paleosol beneath the carbonaceous black mudstone beds that separates them from noncarbonaceous black mudstone below. This suggests that the black noncarbonaceous mudstone beds are Late Jurassic in age and part of the Morrison Formation whereas the black carbonaceous mudstone beds above are Early Cretaceous in age and more closely allied to the Cloverly Formation. Because the Breakfast Bench fauna is restricted to the noncarbonaceous strata below the pale-

BLM_0066949



*Figure 5. Stratigraphic section showing stratigraphic position of dinosaur localities in Wyoming and South Dakota. Line of section shown on figure 1. WY omitted from locality codes on Ninemile Hill section for space considerations.*

osol, we suggest that the Breakfast Bench fauna is Late Jurassic in age. Black mudstone beds are locally present at or near the top of the Morrison at scattered localities from Montana south through Wyoming and into central Colorado near the town of Morrison so their occurrence at Como Bluff is not unusual. An important clarification here is that black carbonaceous mudstone does occur locally in beds that we consider Morrison, even though noncarbonaceous black mudstone is more commonly found at the top of the Morrison. This is based on other criteria, mentioned earlier in this report, that are used to identify the upper contact of the Morrison Formation.

Another problem with the upper contact is abrupt regional beveling to the east and west beneath Lower Cretaceous rocks. No dinosaur localities are close to the western edge of the Upper Jurassic Western Interior depositional basin and thus westward beveling is not a problem. However, localities in westernmost Oklahoma and in the Black Hills are near the eastern limit of the Morrison depositional basin and the degree of eastward beveling at the top of the formation in some of those areas, especially the Black Hills, is difficult to evaluate. In western Oklahoma, a fairly thick series of fluvial sandstone beds is present at the top of the Morrison above a thick series of smectitic mudstone beds. The fluvial beds appear to correspond in stratigraphic position to an interval in the uppermost Morrison farther west that also includes several thick fluvial sandstone

BLM_0066950



***Figure 6.*** *Stratigraphic section showing stratigraphic position of dinosaur localities in north-central Wyoming and southern Montana. Line of section shown on figure 1.*

beds, such as the Jackpile Sandstone Member in the southern San Juan Basin of northwestern New Mexico and the fairly thick sandstone unit at the top of the undifferentiated Morrison in northeastern New Mexico (Holbrook and others, 1987). This suggests that the entire Morrison thins eastward in the western Oklahoma area and that no inordinate amount of beveling has occurred at the top of the formation near the dinosaur localities.

Regional eastward thinning of the Morrison in the Black Hills is more difficult to evaluate. Thick fluvial sandstone beds generally are lacking at the top of the formation there, so sandstone petrology cannot be used as a guide. Furthermore, the clays throughout the formation in the Black Hills area lack smectite, so that the most reliable stratigraphic marker in the middle of the formation—the clay change—is absent. However, another basis for stratigraphic correlation permits evaluation of Morrison stratigraphy in the Black Hills area. Eolian sandstone units are fairly common in the Morrison of Wyoming and especially on the Colorado Plateau; thus far they have only been found in lower Morrison strata and not above the clay change. This suggests that the eolian Unkpapa Sandstone Member of the Morrison in the Black Hills also is entirely within the lower Morrison and that the horizon in the Black Hills that is equivalent to the clay change elsewhere should be above the Unkpapa. Thus, we speculate that the Morrison is reasonably complete on the east side of the Black Hills where the Wonderland local reference section was measured (figure 5) and that the distinct thinning of the formation on the west side of the Black Hills is a local phenomenon.

The ostracode *Theriosynoecum wyomingense* apparently is restricted to Morrison strata below the clay change (Sohn and Peck, 1963). More recent studies by Schudack and others (1998) support this conclusion and indicate that this species occurs in their charophyte/ostracode Zones 1-3 below the clay change. The stratigraphically highest known occurrence of this species in the Black Hills is in the northeastern part of that region where it was estimated to be about 45 ft (13.7 m) below the top of the Morrison (Sohn and Peck, 1963, p. A8, Locality 11) in the lower part of the first "limy" unit. Based on correlation to a nearby measured section of the Morrison about 3 mi (5 km) southeast of the fossil locality (Foster, 1996a, Figure 4, Sturgis Area section), the lowest limestone unit is about 60 ft (18.3 m) below the

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 39 of 301

top of the formation. When projected into our Wonderland local reference section (figure 11), that position is about 3 ft (1 m) above the projected position indicated for dinosaur locality WY-11 and, therefore, within uppermost strata of the Unkpapa Sandstone Member. [It should be noted that the thickness of the Wonderland section reported by Foster (1996a, Figure 4) is in error (J.R. Foster, oral communication, 1997)]. We measured the Morrison Formation at the same locality (figure 5) and obtained 176 ft (53.6 m) for the entire Morrison, including the Unkpapa Sandstone and Windy Hill Members.

The foregoing suggests that the horizon equivalent to the clay change elsewhere is above the top of the Unkpapa Sandstone Member in the Black Hills area, but how much higher is uncertain. We collected two samples for calcareous microfossils 1 ft (0.3 m) and 11 ft (3.4 m) above the top of the Unkpapa at the Wonderland section. These samples yielded an excellent suite of nine charophyte and ostracode species (Schudack, 1994) that indicate charophyte/ostracode Zone 3 or the lower part of Zone 4 (see figure 7). Neither sample contained *Theriosynoecum wyomingense*, which suggests that the samples most likely indicate the lower part of charophyte/ostracode Zone 4, the base of which is at the clay change elsewhere in the Western Interior (Schudack and others, 1998). This interpretation also suggests that the top of the calcareous strata there is within and not at the base of the upper Morrison. As discussed in a later section, the biostratigraphy of the dinosaur fauna of the Black Hills, when compared with the biostratigraphy of the dinosaur fauna elsewhere in the Western Interior, also tends to support these correlations. If correct, our analysis suggests that the top of the Morrison is not excessively beveled on the east side of the Black Hills.

Szigeti and Fox (1981, p. 344) reported *Theriosynoecum wyomingense* from the level of the Wonderland Quarry (SD-4), which is higher stratigraphically than reported by Schudack and others (in press). If correctly identified, this would suggest that the stratigraphic horizon equivalent to the clay change is higher in the Black Hills area and perhaps at the level of the highest calcareous beds. This may also suggest that there was some significant amount of eastward regional beveling at the top of the Morrison in the Black Hills region. This contrast with the tentative conclusions of our research cannot be resolved without further study.

Our tentative analysis of Morrison stratigraphy on the west side of the Black Hills suggests that the uppermost part of the formation was rather deeply eroded prior to deposition of Lower Cretaceous strata. The Windy Hill Member is present at the base of the Morrison there, which indicates that thinning of the Morrison cannot be attributed to onlap against a significant paleotopographic high. The top of the calcareous mudstone strata appears to correlate with the top of the calcareous mudstone beds farther east at the Wonderland section (figure 5), which suggests that this horizon is above the base of upper Morrison strata. We arbitrarily positioned the horizon of the clay change at the top of the thin sandstone bed near the upper-middle part of the Morrison at Little Houston Creek (figure 5) because sandstone is more commonly found below the clay change than just above it in other areas. If our tentative assignment is correct, based largely on correlation of the top of the calcareous strata, a significant amount of pre-Cretaceous erosion occurred at the top of the Morrison on the west side of the Black Hills, which would largely but not entirely account for the considerable thinning of the formation there. These correlations suggest that some degree of internal thinning also occurred within the Morrison in this area. Accordingly, we correlated all of the dinosaur localities on the west side of the Black Hills to the Little Houston Creek local reference section (figure 5) and suggest that the top of the formation was truncated more there than elsewhere. The dinosaur localities were then correlated to the Wonderland local reference section on the east side of the Black Hills (figure 11).

A somewhat similar problem exists in Montana, but that area lacks the charophyte and ostracode information that helps to determine the internal stratigraphy of the Morrison Formation. The localities we studied are near the middle of the depositional basin where regional beveling at the top of the formation is most likely minimal. We also found a thick zone of paleosols in the upper-middle part of the formation in the section near Bridger, Montana, which most likely correlates with the middle Morrison paleosol zone farther south. Another guide to the stratigraphy in Montana is that most of the thick fluvial sandstone beds in the middle of the formation tend to occur below the clay change in areas where the clay change is present. A final guide is that black, carbonaceous mudstone beds associated with the coal deposits in the Great Falls-Lewistown Coal Field appear to correlate reasonably well with black carbonaceous and(or) black noncarbonaceous mudstone beds that are locally present at or near the top of the Morrison elsewhere in Montana and Wyoming, and as far south as Morrison, Colorado. Although the dinosaur fauna in Montana has not yet been well analyzed or described, the biostratigraphy of those genera that have been identified also supports the conclusion that the formation is more or less complete there and is neither significantly older nor younger than elsewhere in the Western Interior.

BLM_0066952



Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 40 of 301

*Figure 7. Primary reference section (DQW) in western Dinosaur National Monument, Utah, showing dinosaur zonation of this report and other age-diagnostic criteria. Charophyte-ostracode zonation from Schudack and others (1998), Kimmeridgian-Tithonian boundary from Litwin and others (1998), isotopic dates from Kowallis and others (1998).*

BLM_0066953

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 41 of 301

Several illustrations in this report show the stratigraphic positions of the dinosaur localities as correlated to the primary reference section DQW at Dinosaur National Monument (figures 7-9). We plotted the localities as the methodology dictated, but the close vertical spacing of the localities on some of those illustrations implies a greater accuracy in stratigraphic positioning than is merited by the methodology. Although it is difficult to evaluate the degree of error that is involved in the methodology, we estimate that the error should be less than about plus or minus 20 ft (6 m) in most cases. The error should be less for those localities near the clay change, but it could be more in Montana and the Black Hills where the clay change is not present.

Quite often, where numerous bones are present, they are within an interval as much as 3 to 6 ft (1-2 m) in stratigraphic thickness. For this study, we used the lowest level of the bones or the quarry floor as the quarry level. In some cases, such as Cope's Quarries 2-8 at Cope's Nipple in Garden Park near Cañon City, Colorado (CO-2), we grouped all of the quarries into a single locality because the quarries are at the same stratigraphic level adjacent to each other. In other cases, such as the Bone Cabin Quarries in Wyoming where two quarries are present at the same stratigraphic level but separated laterally by a few hundred feet (about a hundred meters), we gave each quarry a separate designation, in this case WY-78 and WY-79, because they were excavated at significantly different times by entirely different parties.

One source of error that could not be compensated for adequately, but may not be a serious concern, is the stratigraphic position of the quarries in the lowermost parts of fluvial channel sandstone beds, such as the Dry Mesa and Carnegie Quarries. We positioned these and similar quarries where they occurred in the overall stratigraphy of the formation, but to be more accurate, one would have to position them with respect to a slightly higher stratigraphic level because the fluvial channels had scoured down into preexisting strata, generally overbank floodplain beds. In many cases, the depth of scour is unknown, either because the upper half or more of the fluvial channel sandstone bed is missing or concealed, as at the Carnegie Quarry, or detailed correlation of the bone-bearing strata within the channel with overbank floodplain strata outside the channel cannot be determined precisely, as at the Dry Mesa Quarry. We estimate that in most of these situations, the resulting error in positioning the quarry floor could be as much as 10 ft (3 m) too low stratigraphically.

The Carnegie Quarry (UT-18) deserves special mention because it is well known to be within a fluvial sandstone bed and this aspect is not indicated on the master reference section (figure 10), which was measured nearby but not directly at the quarry. The master reference section (DQW) was measured about 2,000 ft (610 m) west of the Carnegie Quarry in a small drainage locally known as "Douglass Draw." Although the quarry is in a fluvial channel sandstone bed, that bed is not the same fluvial channel sandstone bed that is present at “Douglass Draw” at the higher stratigraphic level shown on figure 10. We positioned the quarry with respect to its true stratigraphic position as correlated to the master reference section DQW in “Douglass Draw” despite the fact that there is no fluvial sandstone bed at the precise level of the quarry in the master reference section.

Some of the localities are on private land and, in most cases, access was freely given by the landowners. Unfortunately, we were denied access to the land that includes the two quarries on the Red Fork of the Powder River, which accounts for why those important localities were not included in this study.

The location of the famous Stego 99 Quarry in the Como Bluff region of Wyoming has been lost, according to R.T. Bakker (oral communication, 1993). Several more recently opened quarries are in the vicinity and one of these could be the site of the old quarry.

An alphabetical list of all the dinosaur species included in this study is in appendix 2. A complete listing of the quarries and sites with their faunas and credits for the identifications are in appendix 3. Tables 1 and 2 contain a checklist of the dinosaur genera and species (including some higher taxonomic categories where necessary) found at the localities and arranged as closely as possible in their stratigraphic order.

The figure showing diversity of genera and species (figure 13) requires an explanation because both formally named species and informally named species (for example, *Allosaurus* sp.) were included in the count. If the range of a genus extended vertically across any particular locality, that locality was considered to represent a species even though the first occurrence of a formally named species was above that locality (for example, *Allosaurus* sp. below the lowest horizon of *A. fragilis* was considered as a species). In contrast, if a formally named species is present at any particular locality, no additional count was given for an identification only to genus level (for example, if a locality includes dinosaurs identified as *Allosaurus* sp. and *A. fragilis*, only the latter was counted).

In many cases, it is inappropriate to publish a scientific report without locations, but we follow procedures established by the vertebrate paleontology community by not publishing the detailed locations of the sites because of the possibility that bone hunters, rock hounds, or van-

BLM_0066954

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 42 of 301

dals would recover the locations and either remove any remaining material or destroy it. Also, many people freely contributed the site locations with the provision that those locations would not be published. Accordingly, no locations other than state and county are given in this report. Following accepted procedures, the locations have been given to responsible institutions or appropriate federal land-holding agencies so that responsible researchers can contact those institutions or agencies for this information.

## STRATIGRAPHY

The Upper Jurassic Morrison Formation is recognized throughout most of the Western Interior of the United States (figure 1), extending from central New Mexico northward into Canada where correlative strata exist but are given different names. The formation consists predominantly of sandstone and mudstone, but it also includes a wide variety of other lithologies including conglomerate, claystone, tuff (including bentonite beds), limestone, dolomite, gypsum, anhydrite, and coal. The formation has been divided into members or other stratigraphic units in several areas. Thus far ten formally named members have been proposed on the Colorado Plateau (Brushy Basin, Bluff Sandstone, Fiftymile, Jackpile Sandstone, Junction Creek, Recapture, Salt Wash, Tidwell, Westwater Canyon, and Windy Hill Members). Along the east side of the Black Hills in South Dakota, Szigeti and Fox (1981) recognize the Unkpapa Sandstone Member at the base of the Morrison. Three other members were proposed for central Wyoming (from oldest to youngest these are the Lake Como, Talking Rocks, and Indian Fort Members of Allen, 1996) but, for the present, they must be considered informal units because type localities were never specified, type measured sections were not given, and because the publication medium has a highly restricted distribution.

### Lower Contact

The lower contact of the sequence of beds that includes the Morrison Formation and related beds is the J-5 unconformity of Pipiringos and O'Sullivan (1978) or an equivalent conformable surface where evidence suggests that deposition was continuous. On the Colorado Plateau, slightly angular truncation of underlying strata has been documented at this contact in several places by Gilluly and Reeside (1928, p. 81), Pipiringos (1972), Pipiringos and O'Sullivan (1976, 1978), and Peterson (1988a). Broadly angular southward beveling of strata beneath the J-5 unconformity along the east front of the Rocky Mountains in eastern Colorado and Wyoming was documented by Pipiringos and O'Sullivan (1976). Near Denver, the J-5 unconformity separates the Upper Jurassic Ralston Creek Formation, which correlates with basal Morrison strata elsewhere, from the underlying Triassic(?) and Permian Lykins Formation. We thus include the Ralston Creek Formation in the Morrison package of beds (Peterson and Turner, 1998).

### Upper Contact

The upper contact has been enigmatic ever since the Morrison Formation was established by Cross in 1894. Under ideal circumstances, this contact is placed at the top of a thick paleosol zone (Demko and others, 1996). Because this zone was removed by erosion prior to deposition of overlying Lower Cretaceous beds at many localities, the position of the contact is based largely on a combination of other characteristics summarized by Peterson and Turner (1998).

In many places, especially northeastern New Mexico and eastern Colorado, the upper contact of the Morrison is between sandstone beds and is difficult to identify for those not familiar with the distinguishing characteristics of these lithologies. We follow Holbrook and others (1987) who showed that upper Morrison sandstone beds tend to be clay-rich, feldspathic sandstones, more properly called feldspathic wackes, whereas basal Cretaceous sandstone beds tend to be quartz rich with little feldspar or interstitial clay and may be classified as quartz arenites. The feldspar in Morrison sandstones tends to weather to clay, thereby filling the pore spaces in upper Morrison sandstone beds with clay, whereas basal Cretaceous sandstone beds tend to have considerably less interstitial clay and are more porous and permeable. Locally, as at Garden Park near Cañon City, Colorado, the basal Cretaceous sandstone bed contains appreciable quantities of interstitial clay. However, this clay is white (kaolinite?) and contrasts markedly with the light brown color of interstitial clay in the Morrison Formation.

In Montana and northern Wyoming, the upper contact is traditionally placed at the base of the lowest thick and laterally continuous sandstone bed above Morrison mudstone strata, especially if the bed is a "salt and pepper" type sandstone bed containing abundant black chert grains. However, our studies suggest that this is not a valid criterion. For example, carbonaceous mudstone is a common component of the coal zone at the top of the Morrison in the Great Falls-Lewistown Coal Field of west-central Montana. At the town of Belt, which is about 20 mi (30 km) east of Great Falls, we found car-

BLM_0066955

bonaceous mudstone interbedded with sandstone beds that contain abundant black chert grains and the sandstone beds are beneath a prominent (15.0 ft or 4.6 m thick) paleosol that we consider to mark the upper contact of the Morrison Formation. Similar findings elsewhere have lead us to conclude that fluvial sandstone beds, with or without appreciable quantities of black chert grains, may be present at or near the top of the Morrison in Wyoming and Montana, similar to the upper Morrison farther south on the Colorado Plateau, and in eastern Colorado, northeastern New Mexico, and western Oklahoma.

### Other Stratigraphic Units

Throughout most of the southern part of the study area, the J-5 and K-1 surfaces define the lower and upper limits of the Morrison Formation. However, locally, some units historically assigned to other formations now are recognized as part of the interval between the J-5 and K-1 surfaces, and thus are Morrison equivalents.

Near the type locality of the Morrison Formation just west of Denver, Colorado, the type Ralston Creek Formation lies above the J–5 unconformity. Age determinations for the Ralston Creek Formation in the Denver area that are based on calcareous microfossils (charophytes and ostracodes; Scott, 1963, p. 92; M.E. Schudack, unpublished data, written communication, 1996) indicate that the type Ralston Creek Formation is Kimmeridgian (middle Late Jurassic) in age. This age designation, together with recognition of stratigraphic markers found in the Ralston Creek and the lower part of the Morrison Formation elsewhere, suggests that the Ralston Creek Formation correlates with the lower part of the Morrison Formation elsewhere (Peterson and Turner, 1998).

South of Denver in the vicinity of Cañon City, and in southeastern Colorado, the term Ralston Creek has been misapplied to include Middle Jurassic strata. Instead, we assign the Middle Jurassic strata to the Bell Ranch Formation and the Upper Jurassic strata, which contain recognizable stratigraphic markers, to the Morrison Formation (Peterson and Turner, 1998).

The lowest beds of the Burro Canyon Formation, formerly considered entirely Early Cretaceous in age, interfinger in some localities in southwestern Colorado and southeastern Utah with the uppermost beds of the Morrison Formation (Ekren and Houser, 1959, 1965) and lie below stratigraphic markers that indicate the top of the Morrison elsewhere (Aubrey, 1996). Accordingly, some beds, traditionally included in the lowermost Burro Canyon, are here included in the Morrison.

North of northern Utah and northern Colorado, where lower Morrison beds include marine strata of the Windy Hill Member, it is unclear if an unconformity separates lower Morrison beds from underlying strata. In many places, the marine beds of the lower Morrison appear to be part of a conformable sequence of a shoaling upward package of marine strata.

Because marine beds of the Swift Formation in Montana and northernmost Wyoming are thought to be conformable or interfinger with basal Morrison strata (Imlay, 1980, p. 82; Richards, 1955, p. 41; Way and others, 1994) and have an unconformity at their base (Imlay, 1980), we include the Swift in the Morrison package of beds and use the unconformity at the base of the Swift as the basal surface of the Morrison package of beds.

## AGE

The age of the Morrison Formation and related beds has been debated considerably in the literature but is now rather well understood. One of the objectives of the recent research on the Morrison Formation and related beds by us and our associates was to determine the age of the formation independently from what the dinosaurs might suggest. The results of those studies were recently published and are only briefly discussed below. In figure 7, we show a summary of the various age-determination studies by using the same methodology that was employed for positioning the dinosaur localities.

Palynological studies by Litwin and others (1998) indicate that the Morrison Formation and related beds are largely Kimmeridgian in age and that only the uppermost part is early Tithonian in age (figure 7). The Kimmeridgian-Tithonian boundary is within the upper part of the Brushy Basin Member of the Morrison as shown in figure 7.

The calcareous microfossils (charophytes and ostracodes) were studied by Schudack (1994, 1995) and Schudack and others (1998) who proposed five charophyte and ostracode zones shown in figure 7. The age determined by these organisms is similar to that obtained from the palynomorphs. The calcareous microfossils indicate that Zones 1-4 of Schudack and others (1998), which comprise the bulk of the formation, are Kimmeridgian in age. The Kimmeridgian-Tithonian boundary could not be identified clearly but the calcareous microfossils indicate that charophyte and ostracode Zone 5 at the top of the Morrison is definitely not Cretaceous in age and therefore could only be Kimmeridgian and (or) Tithonian in age. Charophyte and ostracode Zone 5 was tentatively considered Tithonian(?) in age based on fairly close correspondence of its lower boundary with the

Kimmeridgian-Tithonian boundary as determined by palynomorphs.

Isotopic age determinations on sanidine separates from bentonite beds were made by Kowallis and others (1998); these dates are shown in their correct stratigraphic position in figure 7. Dating was by the single-crystal laser-fusion $^{40}Ar/^{39}Ar$ methodology, although the $^{40}Ar/^{39}Ar$ plateau methodology was used for a few duplicate samples. The dates indicate that the Morrison package of beds spans a period of time of about 8 million years and ranges in age from about 155 to 148 Ma (figure 7). The Jurassic-Cretaceous boundary is about 141 Ma (Bralower and others, 1990) so these studies indicate that the top of the Morrison is about 7 million years older than the end of the Jurassic Period.

Paleomagnetic data, when evaluated in light of recent paleontologic and isotopic age determinations as well as the regional stratigraphic correlations, can be reinterpreted to be consistent with the paleontologic data. That is to say, we find some of the paleomagnetic data useful when reinterpreted, but we disagree with some of the paleomagnetic age conclusions drawn in the literature because the earlier workers did not have the benefit of the most recent paleontologic age assignments.

Several magnetostratigraphic sections through parts or most of the Morrison Formation on or near the Colorado Plateau are given by Steiner and others (1994), the most important of which are those measured at Norwood and Slick Rock, Colorado. They interpret the approximately lower third of the formation as Oxfordian in age in these sections whereas the age evidence from palynomorphs and calcareous microfossils cited above demonstrates that the lower third of the formation is Kimmeridgian in age.

The inferred paleomagnetic age for approximately the upper fourth of the formation at Slick Rock is Tithonian (Steiner and others, 1994), which is consistent with the palynological age determinations by Litwin and others (1998). The magnetic anomaly at the top of the Morrison in the Slick Rock magnetostratigraphic section correlates best with the M-22 magnetochron in the marine magnetic anomaly sequence. Because the Jurassic-Cretaceous boundary (that is, the end of the Tithonian Age) is at or very near the base of magnetochron M-18, the paleomagnetic studies suggest that about three latest Jurassic magnetochrons are missing at the Slick Rock section and therefore that the top of the Morrison there is significantly older than the end of the Jurassic Period. It should be noted that the clay change within the Morrison Formation is about 486 ft (148 m) above the base of the Salt Wash Member in their Norwood section and about 535 ft (163 m) above the base of the Salt Wash in their Slick Rock section. Assuming, as we do, that the clay change marks an isochronous or nearly isochronous surface, the magnetostratigraphic correlations between the Norwood and Slick Rock sections as proposed by Steiner and others (1994) are not tenable. We suggest that the uppermost Morrison at the Norwood section is anomalously thin and has only Kimmeridgian strata remaining. This may be the result of any of several causes or combination of causes: the upper part of the Brushy Basin Member may have been more deeply eroded during development of the K-1 unconformity, the top of the Morrison may not have been sampled or included when the section was measured for paleomagnetic studies, or the upper Morrison there may be more compressed than is apparent.

Another paleomagnetic study of the Morrison Formation was undertaken in north-central Wyoming by Swierc and Johnson (1996) in which they concluded that the Morrison Formation there is entirely Tithonian in age. It appears that they were influenced by a fission-track date of 149 Ma near the base of the Morrison in one of their measured sections and this date is within the Tithonian Age according to the time scale of Harland and others (1990). Based on problems with fission-track dates in the Morrison Formation (B.J. Kowallis, oral communication, 1997) and the greater reliability of the $^{40}Ar/^{39}Ar$ dates (Kowallis and others, 1998), we discount the fission-track dates and rely, instead, on the $^{40}Ar/^{39}Ar$ dates elsewhere in the Morrison Formation, which are more consistent with the paleontological age designations. Furthermore, the clay change can be identified in most of Wyoming and permits correlation with the better dated Morrison on the Colorado Plateau. The clay change occurs in essentially the same measured section northeast of Greybull, Wyoming, (the Greybull NE section in figure 6) as one of the sections studied by Swierc and Johnson (1996, their South Sheep Mountain section SS). The clay change there is 95 ft (29.0 m) above the base of the Morrison and the entire Morrison is 175 ft (53.3 m) thick. The microfossil studies by Litwin and others (1998) and Schudack and others (1998) indicate that the clay change is about middle Kimmeridgian in age (figure 7), which conflicts considerably with the inferred Tithonian age for the entire Morrison that was suggested by Swierc and Johnson (1996) for strata in north-central Wyoming. Reevaluating the paleomagnetic studies in north-central Wyoming in light of the age and position of the clay change on the Colorado Plateau leads us to conclude that magnetochron M-22 is at the top of the formation in north-central Wyoming and that the Morrison in Wyoming includes both Kimmeridgian and lower Tithonian strata.

## DEPOSITIONAL ENVIRONMENTS

The Morrison Formation was deposited in a wide variety of depositional environments. It is commonly thought of as an entirely nonmarine formation, but the presence of marine organisms and glauconite in Morrison strata suggests otherwise. Marine dinoflagellates were recovered from the Tidwell Member near the Carnegie Quarry in western Dinosaur National Monument, Utah (R.J. Litwin, oral communication, 1994). Glauconite occurs in sandstone beds in about the middle of the formation in northern Montana (Knechtel, 1959). The Windy Hill Member (Pipiringos, 1968; Peterson, 1994) locally contains glauconite, oolites, and brackish-water to marine bivalves that indicate deposition in shallow marine waters (this is member A of the Sundance Formation of Pipiringos, 1957). Most of the formation is interpreted to have been deposited in a variety of continental environments including eolian dune fields, sabkhas, fluvial channels, overbank floodplains, alluvial plains, saline-alkaline and freshwater lakes or ponds, evaporite basins, and coal swamps (Turner and Fishman, 1991; Turner-Peterson, 1986; Peterson, 1994). Summaries of the geology and paleogeography during deposition of the Morrison Formation and related beds were published recently by Turner and Fishman (1991), Peterson (1994) and Brenner and Peterson (1994). A good impression of the stratigraphy of the Morrison Formation and related beds throughout the region can be obtained from the various stratigraphic sections in this report (figures 2-6).

## BIOSTRATIGRAPHY OF THE DINOSAURS

### Localities Where the Clay Change is Present

The clay change within the Morrison Formation is recognizable in most of the Western Interior and thus in most of the areas that contain dinosaur quarries. The area in which the clay change is readily identified includes New Mexico, Colorado, Utah, and Wyoming excluding the northeast corner of that state around the Black Hills. Recognition of the clay change facilitates considerably the relative positioning of the dinosaur localities in these areas.

Although dinosaur bones have been recovered from nearly all stratigraphic levels in the Morrison Formation, the majority of the localities are in about the middle or upper middle half of the formation (figure 8). Ten quarries indicated on figure 10 dominate Morrison biostratigraphy and are the quarries that contain, or at least appear to have the potential to contain, about a thousand or

*Figure 8. Number of correlated dinosaur localities in each 30 ft (9.1 m) increment of stratigraphic thickness at the primary reference section (DQW) in western Dinosaur National Monument, Utah. Localities in the Black Hills and Montana not included. CC = clay change.*

more bones, judging from an estimate by us or by our colleagues. For the most part, these are well-known and famous quarries that include, from lowest to highest stratigraphic position, Reed's Quarry 13 at Como Bluff (WY-46), Howe Quarry (WY-62), Bone Cabin Quarry (WY-78,79), Marsh-Felch Quarry (CO-3), Dry Mesa Quarry (CO-58), Mygatt-Moore Quarry (CO-21), Cleveland-Lloyd Quarry (UT-7), Carnegie Quarry (UT-18), Stovall's Pit 1 (OK-1), and Cope's Quarries at the Nipple in Garden Park (CO-2). Additional work may demonstrate that two additional localities, the Poison Creek Quarries (WY-71, 73) and Mother's Day Quarry (MT-1), have the potential to also be included in this category. Although these ten quarries dominate Morrison biostratigraphy, there are approximately 131 other localities in the formation that have yielded bones identifiable to genus or species level. According to the numbers of dinosaur taxa recovered from each of the localities, about two-thirds of the localities contain only one or two taxa and nearly half contain only a single taxon (figure 9).

We divided the taxonomic units into several broad groupings to facilitate discussion: 1, Long-ranging taxa (mostly genera and species but also including the ankylosaurs), and 2, Single-locality species occurrences. Long-ranging taxa are those that range stratigraphically through two or more different stratigraphic levels in the master reference section (figure 7). Single-locality species are those that have only been reported from one locality and, hence, are rare and extremely restricted stratigraphically and geographically. The ankylosaurs (undivided) are also included in the long-ranging category because they are a fairly recent addition to the Morrison fauna and some have not yet been described to the genus or species level.

The stratigraphic distribution of the dinosaurs is divided most logically into four faunal zones (figure 10).

### Zone 1

Zone 1 is poorly defined and marked by the beginning of the three long-ranging genera *Allosaurus*, *Stegosaurus*, and *Haplocanthosaurus*. It also includes the rare occurrence of *Dystrophaeus viaemalae* and the new allosaurid from Dinosaur National Monument (UT-20) that is currently under study by D.J. Chure (oral communication, 1997).

### Zone 2

Zone 2 is marked by the abrupt beginning of many new long-ranging taxa and by the end of the ranges of several taxa toward the top of the zone. New taxa at the genus or higher level include: *Torvosaurus, Coelurus, Diplodocus, Camptosaurus, Camarasaurus, Apatosaurus, Barosaurus, Brachiosaurus,* the ankylosaurs, *Dryosaurus, Elaphrosaurus, Othnielia, Ceratosaurus, Supersaurus, Marshosaurus*, and *Edmarka* (figure 10). In addition, Zone 2 includes the lowest occurrences of 17 new long-ranging species and 14 single-site taxa shown in figure 10. The highest known occurrences of several taxa in Dinosaur Zone 2 include those of *Brachiosaurus, Elaphrosaurus, Supersaurus, Edmarka*, and *Edmarka rex*. Thus, Zone 2 marks the addition of many new taxa to the Morrison dinosaur fauna and, toward the top, the beginning of a decline in the taxa.

### Zone 3

Zone 3 contains several new additions to the dinosaur fauna but, more importantly, it includes the end ranges of many taxa. The new long-ranging higher taxa are *Mymoorapelta* and *Drinker* and the new species are *Apatosaurus ajax*, *Mymoorapelta maysi*, *Marshosaurus bicentesimus*, and *Drinker nisti*. The highest levels of the following long-ranging taxa are in the upper part of this zone: *Haplocanthosaurus, Torvosaurus, Coelurus, Barosaurus*, the ankylosaurs, *Othnielia, Ceratosaurus, Marshosaurus*, and *Mymoorapelta*. In addition, 17 species die out before the end of the zone and there are five single-site taxa within it (figure 10).

### Zone 4

Zone 4 marks the end of the stratigraphic ranges of the remaining dinosaur genera and species in the Morrison. *Amphicoelias* is the only new long-ranging genus to appear in this zone. The genera whose ranges end in Zone 4 include *Allosaurus, Stegosaurus, Diplodocus, Camptosaurus, Camarasaurus, Apatosaurus, Dryosaurus, Drinker*, and *Amphicoelias*. Five single-site species are also present.

***Figure 9.*** *Number of different dinosaur genera at each of the localities studied. Includes the broader category of ankylosaurs if no ankylosaur genus was identified. Fifty-one percent have only one genus identified, 67 percent have only one or two genera identified.*

### The Black Hills and Montana

Dinosaur material recovered from Montana and the Black Hills region of northeastern Wyoming and western South Dakota occurs where a lack of smectitic clays in the upper Morrison does not permit accurate positioning with respect to the clay change. We attempted to determine a stratigraphic position that might correlate with the clay change elsewhere (figures 5, 6), but the result must be considered tentative.

The biostratigraphic distribution of the dinosaurs in areas where the clay change is present (figure 10, Table 1) offers clues to the dinosaur zonation in areas such as the Black Hills, where the clay change is not readily identified (figure 11). The ranges of the following genera in the Black Hills begin in Zone 2 in areas where the clay change is present: *Dryosaurus, Apatosaurus, Camarasaurus, Barosaurus*, and *Diplodocus*. Furthermore, *Othnielia*, present in the Black Hills (figure 11), is questionably identified low in Zone 2, although the first appearance where it is clearly identified is high in Zone 2. The highest occurrences of *Othnielia* and *Barosaurus* extend no higher than near the top of Zone 3 in areas that contain the clay change, and thus the top of Zone 3 in the Black Hills should be above the highest occurrence of these genera. *Barosaurus* extends highest in the Wyoming part of the Black Hills (locality WY-9) where it has been identified as cf. *Barosaurus*. Assuming the generic identification is satisfactory, Zone 3 in the Black Hills should extend upward to at least the position of that locality, which is why we tentatively place the upper boundary of Zone 3 as indicated on figure 11. Such a correlation accords with our earlier conclusion that the top of the Morrison in the eastern part of the Black Hills has not been eroded more deeply than most of the other localities in the Western Interior. Hence, the positioning of the eastern Black Hills dinosaur localities with respect to the projected horizon of the clay change as well as to the upper or lower boundaries of the Morrison seems reasonable.

The zonal stratigraphy of the dinosaurs in Montana is more difficult to determine for several reasons: the clay change is absent, many of the dinosaur remains that have been recovered have not yet been identified, and there is a scarcity of age-diagnostic microfossils in much of the formation. All three of the dinosaur localities are in the lower half of the Morrison and below the stratigraphic level that we tentatively correlate with the clay change farther south (figure 12). The stratigraphically highest calcareous microfossil collection that we obtained came from at or very near the level of dinosaur locality MT-2 (figure 12). The most stratigraphically restricted charophyte species that this sample contained was *Aclistochara obovata*, which ranges from the upper half of dinosaur Zone 1 through dinosaur Zone 3 in the Morrison elsewhere in the Western Interior (Schudack and others, 1998). Most of the dinosaurs recovered from Montana are long ranging. However, the lowest dinosaur collection (MT-1) yielded one individual tentatively identified as either *Diplodocus* or *Barosaurus*, both of which range from dinosaur Zone 2 upward through Zone 3 (*Barosaurus*) or Zone 4 (*Diplodocus*). Taken together, the calcareous microfossils and dinosaurs could only coexist in dinosaur Zones 2 and 3, which are of Kimmeridgian age. The uppermost strata of the Morrison are Tithonian in age because the carbonaceous mudstone and coal unit at the top of the Cinnabar Mountain local reference section (figure 12) correlates with the Tithonian age palynomorph collections obtained from a similar carbonaceous mudstone and coal unit at the top of the Morrison about 37 miles (60 km) farther northeast at West Boulder Creek, Montana (Litwin and others, 1998). Putting all of this together, a tentative evaluation of the dinosaur zonation at Cinnabar Mountain is illustrated in figure 12.

## DISCUSSION AND CONCLUSIONS

The role of the major quarries in the biostratigraphy of the dinosaurs in the Morrison and related beds is considerable. Because most of these quarries have yielded numerous bones and have been studied extensively, they account for the dramatic increase in the taxonomic diversity at or near the base of Zone 2. The major quarries also account for significant increases in the faunal diversity higher in Zone 2 (figures 10, 13). The taxonomic diversity reaches a maximum high in Zone 2 (figure 13). The diversity begins to decline gradually near the top of Zone 2 and rather abruptly declines near the top of Zone 3 and again in the middle of Zone 4. Because the major quarries above the point of maximum diversity high in Zone 2 (figure 13) contain a substantial number of taxa, these quarries tend to confirm that the decline in diversity is real and probably is not biased by the numerous sites containing only one or a few taxa.

An important question is whether or not the dramatic increase in taxonomic diversity at or near the base of Zone 2 reflects a sharp change in the composition of the dinosaur fauna or if the change is largely if not entirely a function of the lack of major quarries below that level. Quite likely the marked increase in diversity largely reflects the lack of major quarries in Zone 1, but this is not necessarily the entire explanation. It seems noteworthy that the boundary between dinosaur Zones 1 and 2

94 Vertebrate Paleontology in Utah Utah Geological Survey

DQW MASTER REFERENCE SECTION

MORRISON FORMATION

Stratigraphic Units

Windy Hill Mbr

Tidwell Member

Salt Wash Member — Lower part | Upper part

Brushy Basin Member — Lower part | Upper part

ft: 100, 200, 300, 400, 500, 600

Lithology

Biostratigraphic Positions

STRATIGRAPHIC RANGES OF

Long-ranging taxa

Allosaurus
Stegosaurus
Haplocanthosaurus
Torvosaurus
Coelurus
Diplodocus
Camptosaurus
Camarasaurus
Apatosaurus
Barosaurus
Brachiosaurus
Ankylosaurs
Dryosaurus
Elaphrosaurus
Othnielia
Ceratosaurus
Supersaurus
Marshosaurus
Edmarka
Mymoorapelta
Drinker
Amphicoelias
Coelurus fragilis
Camarasaurus lentus
Stegosaurus stenops
Stegosaurus ungulatus
Stegosaurus armatus
Camarasaurus grandis
Allosaurus fragilis
Apatosaurus excelsus
Dryosaurus altus
Elaphrosaurus sp.

Biostratigraphy of Dinosaurs - Turner, Peterson

BLM_0066961



***Figure 10.*** *Biostratigraphic ranges of dinosaurs in the Morrison Formation from localities that can be correlated to the primary reference section (DQW). The four dinosaur faunal zones are indicated on the right.*

BLM_0066962

LONG-RANGING TAXA

| TAXON | Allosaurus | Stegosaurus | Haplocanthosaurus | Torvosaurus | Coelurus | Diplodocus | Camptosaurus | Camarasaurus | Apatosaurus | Barosaurus | Brachiosaurus | Ankylosaurus | Dryosaurus | Elaphrosaurus | Othnielia | Ceratosaurus | Supersaurus | Marshosaurus | Edmarka | Mymoorapelta | Drinker | Amphicoelias | Coelurus fragilis | Camarasaurus lentus | Stegosaurus stenops | Stegosaurus ungulatus | Stegosaurus armatus | Camarasaurus grandis | Allosaurus fragilis | Apatosaurus excelsus | Dryosaurus altus | Elaphrosaurus sp. | Othnielia rex | Ceratosaurus nasicornis | Diplodocus longus | Camarasaurus supremus | Torvosaurus tanneri | Edmarka rex | Diplodocus carnegii | Apatosaurus ajax | Mymoorapelta maysi | Marshosaurus bicentesimus | Drinker nisti |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TAXON IDENTITY NO | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 | 51 |
| CO-71 | | | | | | | | | | | | | | | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | |
| WY-82 | | | | | | | | | | | | | | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | |
| WY-64 | | X | | | | | | | ? | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CO-1 | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | X | | | | | | | |
| UT-26 | X | X | | | | X | X | X | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CO-25 | | | | | | | | | X | | | | X | | | | | | | | | | | | | | | | | | ? | | | | | | | | | | | | |
| UT-26 | X | X | | | | X | X | X | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-25 | | | | | | | | | | | | | | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | X |
| UT-19 | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CO-2, WY-41 | ? | | | | | | X | X | X | | | | | | | | | | | | X | X | | | | | | | | | | | | | | X | | | | | | | X |
| UT-9 | X | ? | | | | | | ? | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-3 | | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-24 | | | | | | | | | | | | | | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | X |
| WY-42 | | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-98 | X | | | | | ? | | X | ? | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| UT-17 | | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-99 | | ? | | | | | ? | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| UT-24, WY-100 | | | | | | ? | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-26, CO-63 | | | | | | X | | | X | | | | X | | | | | | | | | | | | | | | | | | X | | | | | | | | | X | | | |
| WY-16, 18 | X | X | | | | | | | X | | | | | | | | | | | | | | | | | X | | | | X | | | | | | | | | | | | | |
| CO-52 | X | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | x | | | |
| OK-1, WY-17 | X | X | | | | X | X | ? | Xc? | | | | | | | | | | | | | | | | | | | | | X | | | | | | | | | | | | | |
| CO-24 | X | X | | | | | | | | | ? | | | | ? | | | | | | | | | | ? | | | | | | | | | | | | | | | | | | |
| NM-6 | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-40 | X | X | | | | | | X | X | X | | | | | | | | | | | | | | | | | | | X | | | | | | | | | | | | | | |
| WY-28 | | | | | | | | | | | | | | | X | | | | | | | | | | | | | | | | | | X | | | | | | | | | | |
| WY-101 | | | | | | | | ? | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-29 | X | X | | | X | X | | X | | | | | ? | | ? | | | | | | | | | | | X | | | | | | | | | | | | | | | | | |
| UT-16, WY-84 | XX | X | | X | | XX | | XX | X | X | | | X | | | X | | X | | | ? | | | X | X | X | | | X | | X | | | X | X | | X | | | | | X | |
| WY-63 | | | | | | ? | | | | ? | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-15 | X | X | | | X | | X | X | | | | | X | | X | | | | | | X | | X | | | | | | X | | | | X | | | | | | | | | | X |
| WY-80 | X | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CO-57 | X | | | | | | | | | | | X | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | X | | |
| NM-3 | X | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | X | | | | | | | |
| NM-4 | cf | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-102 | | | | | | ? | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-20 | X | | | | | | | X | | | | | | | | | | | | | | | | | | | | X | X | | | | | | | | | | | | | | |
| NM-5 | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CO-22 | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-21, NM-7 | X | | | | | XX | | X | | | | | | | | | | | | | | | | | | | | X | X | | | | | | | | | | | | | | |
| UT-7, OK-2 | XX | X? | X | | | ? | X? | XX | ? | X | | X | | | | X | | X | | | | ? | | X | X | | | | X | | | | | | | | | | | | | X | |
| WY-23 | | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CO-21 | X | | | | | X | | X | X | X | | X | | | | X | | | | X | | | | | | | | | | | | | | | | | | | | | X | | |
| WY-81 | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CO-46, 47 | X | X | | | | | | | | | ? | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CO-70, WY-43 | X | | | | | | ? | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-19, 91 | X | XX | | | ? | XX | | XX | X | | | | | | | | | | | | | | ? | | | X | | X | | X | | | | | | | | | X | | | | |
| CO-77 | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-30 | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | X | | | | | | | | | | | | | | |
| CO-35, 36 | | X | | | | X | | | X | | | | | | | | | | | | | | | | | | | | | X | | | | | | | | | | | | | |
| WY-31 | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CO-51 | | X | | | | X | | X | X | | | | | | | | | | | | | | | | | | X | | | | | | | | | | | | | x | | | |
| WY-22 | X | ? | | | | | | X | X | | | | | | | | | | X | | | | | | | | | | | | | | | | | | | X | | | | | |
| CO-45, OK-3 | X | | | | | X | X | ? | X | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-85 | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CO-26, WY-47 | | X | | | | X | X | | | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | X | | | | |
| CO-69, UT-1 | | | | | | | | | X | | | | X | | | | | | | | | | | | | | | | | | X | | | | | | | | | | | | |
| CO-11 | | X | | | | | | | X | | | ? | X | X | | | | | | ? | | | | | X | | | | | X | X | | | | | | | | | | | | |
| CO-23, 33 | X | X | | | | X | X | X | X | | X | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-39 | X | X | | | | X | | X | X | | | | | | | | | | X | | | | | | | | | | | | | | | | | | | X | | | | | |
| CO-60 | | | | | | | | | | | ? | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NM-2 | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CO-59 | X | | | | | | X | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CO-6,55,56,58, OK-4 | X | XX | | X | ? | XX | X? | 3X | XX | | X | X | X | | | X | X | X | | | | | | | | | | | | | | | | | x | | x | | | | | | |
| CO-8 Clay | X | | | | | | | X | | | | | | | | | | | | | | | | | | | | X | X | | | | | | | | | | | | | | |
| WY-2 Change | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CO-3, 4 | XX | X | X | | X | X | | | X | | X | | X | X | X | X | | | | | | | X | | X | | X | | X | | X | X | X | X | X | | | | | | | | |
| CO-34 | | | | | | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| UT-8, CO-27 | X | X | | | | | | | | | | | | | | X | | | | | | | | | | X | | | | | | | | X | | | | | | | | | |
| CO-16 | | | | | | | | | | | | | | | | | | ? | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-86 | | | | | | X | | X | | ? | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CO-7, 9, 17, 75, 76 | XX | 3X | | | | X | | XX | | | | | | | X | | | | | | | | | | Xc | | | | | | | | X | | | | | | | | | | |
| CO-40 NM-1 | XX | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| UT-14 | X | | | | | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CO-72 | | | | | | | | | | | | | ? | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| UT-12, 13 | | X | | | | | | X | X | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-27 | X | | | | | | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-45 | | | | | | ? | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-92 | | X | | | | X | | | X | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-71, 73 | X | X | X | | | X | X | XX | X | ? | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-4 | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-72, CO-74 | X | ? | | | | XX | | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-61 | X | ? | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-44 | | | | | | | | | X | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-74 | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-1, 78, 79 | XX | XX | | | | XX | XX | XX | XX | | X | X | XXc | | | | | | | | | | | | XX | | | X | XX | X | X | | | | | | | | | | | | |
| WY-62 | X | | | | | X | X | X | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CO-48 | | | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-46 | | X | | | X | X | X | X | | | | | ? | | ? | | | | | | | | X | X | | X | X | | | | | | | | | | | | | | | | |
| CO-5, 73 | X | | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | cf | | | | | | |
| UT-20 | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CO-10 | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WY-83 | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NM-10 | | ? | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| UT-4 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |



SINGLE-LOCALITY TAXA

| No. | Taxon | Zone 1 | Zone 2 | Zone 3 | Zone 4 |
|---|---|---|---|---|---|
| 61 | *Dystrophaeus viaemalae* | X | | | |
| 62 | *Allosaurus* n. sp. | X | | | |
| 63 | *Haplocanthosaurus delfsi* | | X | | |
| 64 | *Camptosaurus dispar* | | X | cf | |
| 65 | *"Apatosaurus" minimus* | | X | | |
| 66 | *Ornitholestes* sp. | | X ? | ? | |
| 67 | *Ornitholestes hermanni* | | X | | |
| 68 | Ankylosaur n. gen. & sp. | | | | |
| 69 | *Apatosaurus yahnapin* | | X | | |
| 70 | *Camptosaurus amplus* | | X | | |
| 71 | *Haplocanthosaurus priscus* | | X | | |
| 72 | *"Morosaurus"* sp. | | X | | |
| 73 | *Camarasaurus lewisi* | | X | | |
| 74 | *Dystylosaurus edwini* | | X | | |
| 75 | *Supersaurus vivianae* | | X | | |
| 76 | *Echinodon* sp. | | X | | |
| 77 | *Brachiosaurus altithorax* | | ? X | | |
| 78 | *Stokesosaurus clevlandi* | | | X | |
| 79 | *Seismosaurus hallorum* | | | X | |
| 80 | *Barosaurus lentus* | | | X | |
| 81 | *Apatosaurus louisae* | | | X | |
| 82 | *Saurophaganax maximus* | | | X | |
| 83 | *Hypsirophus* sp. | | | | X |
| 84 | *Amphicoelias fragillimus* | | | | X |
| 85 | *Koparion douglassi* | | | | X |
| 86 | Troodontid second sp. | | | | X |
| 87 | *Amphicoelias altus* | | | | X |

***Table 1.*** *Biostratigraphy of dinosaur taxa at various localities in the Morrison Formation of the Western Interior excluding the Black Hills and Montana. XX or 3X indicate the number of localities that have the indicated taxon at a stratigraphic level that includes two or three localities, respectively; c represents cf where space is crowded.*

BLM_0066964

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 52 of 301

***Table 2.** Biostratigraphy of dinosaur taxa at various localities in the Morrison Formation in the Black Hills and Montana. The clay change is not present in these areas but its tentatively correlated position is indicated.*

| | BLACK HILLS (WY & SD) | | | | | | | | | | MONTANA | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TAXON | Allosaurus | Stegosaurus | Diplodocus | Camarasaurus | Apatosaurus | Barosaurus | Dryosaurus | Othnielia | Diplodocus or Barosaurus | Barosaurus lentus | | Allosaurus | Stegosaurus | Diplodocus or Barosaurus |
| TAXON IDENTITY NO. | 1 | 2 | 5 | 7 | 8 | 9 | 13 | 14 | 22 | 84 | | 1 | 2 | 22 |
| SD-2 | X | | | X | X | | | | | | | | | |
| SD-1 (Tithonian?) | | | | | X | | | | | | (Tithonian?) | | | |
| SD-3 (Kimmeridgian?) | X | | | | | X | | | | X | (Kimmeridgian?) | | | |
| WY-9 | | | | | | cf | | | | | | | | |
| SD-5 | | | X | | | | | | | | | | | |
| SD-4 | X | | | X | | X | | | | X | | | | |
| WY-8 (Clay) | ? | | | | | | | | | | (Clay) | | | |
| WY-10 (Change?) | | | | | | | | X | | | (Change?) | | | |
| WY-11 | X | X | | X | X | | X | X | X | | | | | |
| | | | | | | | | | | | MT-2 | X | | |
| WY-12 | | | | | | ? | | | | | | | | |
| | | | | | | | | | | | MT-6 | ? | | |
| | | | | | | | | | | | MT-1 | X | ? | X |

coincides with the change in the calcareous microfossil assemblages at the boundary between charophyte and ostracode Zones 2 and 3 of Schudack and others (1998). Also noteworthy is a lithostratigraphic change in the Salt Wash Member at the boundary between dinosaur Zones 1 and 2. This is marked by the change from fluvial sandstone beds that lack pebbles or contain very few pebbles to overlying fluvial strata that contain pebbly or conglomeratic sandstone beds or conglomerate. This occurs in the Salt Wash throughout a large part of the Colorado Plateau and is present at measured section DQW at Dinosaur National Monument (Figure 10). The lithologic change apparently correlates with the boundary between the middle and upper sequences of the Salt Wash Member farther south on the west side of the Colorado Plateau (Peterson, 1980, 1984). The lithologic change also coincides with the boundary between the upper sandstone-dominated interval and the middle mudstone-dominated interval of the Salt Wash on the east side of the Colorado Plateau (Peterson and Turner-Peterson, 1987). The coincidence of vertical sedimentologic changes with other biostratigraphic changes, such as with the charophytes and ostracodes, suggests that a marked evolutionary change may have occurred at this horizon. These evolutionary changes may have been in response to changes in habitat, depositional environment, climate, or a combination of these factors. The lithologic change at this horizon is thus far only recognized in the Salt Wash Member, which is restricted to the Colorado Plateau. An analogous lithologic change elsewhere in the Western Interior has not yet been recognized.

The biostratigraphic distribution of the dinosaurs shows a vertical trend of increasing faunal diversity followed by decreasing diversity during deposition of the Morrison Formation. It is noteworthy that dinosaurs were scarce during earliest Morrison deposition—the earliest fauna consists of only a few taxa (Zone 1, Tidwell and lower Salt Wash Members). Diversity increased dramatically near the middle of the Salt Wash Member (low in Zone 2) and continued to increase, reaching a peak in diversity just above the clay change (high in Zone 2, near the base of the upper part of the Brushy Basin Member) where the first of the long-ranging taxa began to die out. Diversity continued to decrease gradually to about the middle of the upper part of the Brushy Basin Member where a fairly sharp decline occurred (high in Zone 3). Another fairly sharp decline in diversity occurred higher in the same member (middle of Zone 4), followed by a gradual decline, with the few remaining taxa dying out toward the end of Morrison deposition.

The changes in diversity low in Zone 2, high in Zone

BLM_0066965



*Figure 11. Biostratigraphic ranges of dinosaurs in the Morrison Formation of the Black Hills of South Dakota and Wyoming. The correlated position of the clay change (CC?) is conjectural.*

*Figure 12. Biostratigraphic ranges of dinosaurs in the Morrison Formation of southern Montana. The correlated position of the clay change (CC?) is conjectural.*

3, and toward the middle of Zone 4 coincide fairly well with similar changes in the diversity of charophytes and ostracodes. This suggests that any environmental changes that occurred at these stratigraphic positions were ubiquitous and of sufficient character to exert a strong influence on markedly different types of organisms.

The scarcity of dinosaurs at the beginning of Morrison deposition may reflect a continuation of the harsh conditions that persisted during Middle Jurassic time. Dinosaurs were scarce just before Morrison deposition, or at least only sparse footprint evidence exists in Middle Jurassic rocks. It is likely that the arid climate that persisted during deposition of the eolian ergs and evaporites of the Middle Jurassic was inimical to the dinosaurs. Conditions during earliest Morrison deposition may have remained inhospitable to the dinosaurs, judging from the presence of eolian and evaporite deposits in the lowermost part of the Morrison. The development of the extensive river systems of the Salt Wash Member may have established a more equable habitat, enticing dinosaurs into the area. They seem to have flourished and reached their heyday at about the middle of the Morrison. The change from greater to lesser diversity occurs just above the clay change and thus coincides with the tremendous increase in the output of volcanic ash in the source area. What role the increase in volcanic ash may have played in dinosaur diversity, either direct or indirect, is uncertain.

Taken together with the biostratigraphic data from some of the other organisms in the Morrison ecosystem (for example, the charophytes and ostracodes), the newly established biostratigraphic synthesis forms the basis for evaluating widespread paleoecological changes in the Western Interior during the Late Jurassic. Moreover, this synthesis provides a biostratigraphic foundation for the evaluation of taxonomic lineages and evolutionary trends among the dinosaurs in the Morrison Formation.

The data suggest that there was essentially no change in the dinosaur fauna at the Kimmeridgian-Tithonian boundary (figures 10, 13), but with so little Tithonian Age strata preserved in the Morrison, we cannot rule out the possibility that a change in the fauna would be apparent if more specimens were available from dinosaur Zone 4.

The foregoing conclusions, based largely upon the

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 54 of 301

*Figure 13. Taxonomic diversity at the genus and species levels for dinosaurs in the Morrison Formation at localities correlated to the primary reference section (DQW).*

BLM_0066967

biostratigraphic distribution of the entire dinosaur fauna throughout an extensive region (figure 10), are biased considerably by the faunas thus far recovered from the ten major quarries. In view of the well-known biogeographic diversity of modern but pre-human faunas in a similarly large area, such as the Great Plains region of the United States, a single major quarry, no matter how large and diversified the recovered fauna, may contain a poor representation of the overall fauna that existed throughout the Western Interior during any specific time of Morrison deposition.

On the other hand, the fauna recovered from a major quarry could be fairly representative of the overall fauna if the factors that were responsible for the demise of the animals encouraged them to congregate in a few places just before their deaths. The most plausible scenario for this would be the concentration of animals, who ordinarily ranged over a broad area, around the last of the waterholes before those too dried up during a major drought. Extensive droughts are plausible in light of the overall semi-arid interpretation for much of the Morrison Formation. Evidence of overall dryness includes extensive evaporite deposits (gypsum-anhydrite) in the lowermost part of the Morrison and related beds in the Colorado Plateau and eastern Colorado (O'Sullivan, 1992; Peterson and Turner, 1998), large eolian dune fields in the lower Morrison in the central and southern parts of the Colorado Plateau and smaller dune fields as far north as north-central Wyoming and western South Dakota (Szigeti and Fox, 1981; Blakey and others, 1988; Peterson, 1988b, 1994), and extensive saline-alkaline or playa lake deposits in the upper Morrison (Brushy Basin Member) on the east side of the Colorado Plateau (Turner and Fishman, 1991).

With additional study by paleontologists, it may become clear that some faunal trends in this report indicate evolutionary progressions, and other taxonomic relationships may come to light. For example, the biostratigraphic ranges of *Stegosaurus stenops* , *S. ungulatus*, and *S. armatus* are so similar as to suggest an unusually close relationship between the three species. Apparently sexual dimorphism does not appear to be a reasonable explanation for some of this (P.M. Galton, oral communication, 1997). Also, more work might establish that *Hypsirophus* is an evolutionary descendant of one of the stegosaurs. Our study also shows an upward progression in the first occurrences of species in some of the genera, a progression that might reflect evolutionary lineages, which can only be clarified by further and more detailed examination by specialists. These include the vertical progression of first occurrences of the camarasaurs, including *Camarasaurus lentus, C. grandis, C. supremus*, and *C. lewisi* (figure 10). Similarly, in the genus *Diplodocus*, the vertical progression is *D. longus*, and *D. carnegii* (the relative position of *D. hayi* is unknown because we were unable to obtain permission to enter the property containing the quarry that yielded that species). In the allosaurs, the vertical progression is *Allosaurus* n. sp. (from Dinosaur National Monument) followed by *A. fragilis*. In the genus *Apatosaurus*, the vertical progression of first appearances is *A. excelsus*, *A. yahnapin, A. ajax*, and *A. louisae*. "*Apatosaurus*" *minimus* is considered "a valid species, but not belonging to *Apatosaurus*" (J.S. McIntosh, written communication, 1997).

The ten major quarries, either singly or grouped, are positioned at about six different stratigraphic levels, which is intriguingly periodic. The various stratigraphic positions with their included major quarries are shown on figure10 and are, from oldest to youngest: 1, Reed's Quarry 13 (WY-46), Howe Quarry (WY-62), and Bone Cabin Quarries (WY-78, 79); 2, Marsh-Felch Quarry (CO-3); 3, Dry Mesa Quarry (UT-58), 4, Mygatt-Moore Quarry (CO-21) and Cleveland-Lloyd Quarry (UT-7); 5, Carnegie Quarry (UT-18), and Stovall Pit 1 (OK-1); and 6, Cope's Nipple Quarries (CO-2). The six stratigraphic positions marked by these groupings of the major quarries could mark periodic recurrences of prolonged or intermittent environmental stress. The periodicity may have been related to Milankovitch cycles (De Boer and Smith, 1994), but insufficient time resolution precludes drawing any conclusions along these lines. Clearly, further research on this aspect is necessary.

## RECOMMENDATIONS

A valuable contribution to understanding Morrison dinosaur faunas would be for more paleontologic research to be focused on Zone 1. Excavation of localities already known in that part of the formation and searching for more sites to enlarge the faunal base would be most helpful. The goal would be to enlarge the number of taxa to the extent that it would be sufficient to adequately represent that part of the formation. In this regard, the East Canyon (UT-4) and Meilyn (WY-83) Quarries seem most promising. A similar need exists for new sites or additional work on existing sites high in Zone 4, but the need is not as great as with Zone 1.

Additional paleontologic work is also needed in Montana, so that sufficient information becomes available to provide the basis for interpreting biogeographic diversity or paleolatitudinal variations in the overall fauna.

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 56 of 301

## ACKNOWLEDGMENTS

Numerous individuals generously contributed their knowledge of the quarry locations or furnished up-to-date faunal lists in the interest of helping us determine the biostratigraphic relationships of the dinosaur fauna in the Morrison Formation and related beds. Others freely contributed additional information that helped considerably, one way or another, in facilitating this endeavor. To these many individuals we express our thanks. They include: H.J. Armstrong, W.M. Aubrey, R.T. Bakker, B.L. Bartleson, M.K. Brett-Surman, B.B. Britt, George Callison, Kenneth Carpenter, D.J. Chure, R.L. Cifelli, M.V. Connely, J.T. Cooley, B.S. Currie, Kristi Curry, L.E. Davis, T.M. Demko, Ann Elder, D.J. Engard, G.F. Engelmann, B.R. Erickson, B.J. Filla, A.R. Fiorillo, J.R. Foster, D.D. Gillette, J.T. Gregory, Daniel Grenard, J.R. Horner, Vivian Jones, J.I. Kirkland, R.L. Kolb, B.J. Kowallis, P.E. Kvale, R.J. Litwin, David Lopez, S.G. Lucas, J.H. Madsen, Jr., S.K. Madsen, J.E. Masura, J.S. McIntosh, W.E. Miller, Pat Monaco, C.A. (Bjoraker) Naus, M.T, Naus, P.D. Redman, R.D. Scheetz, R.J. Schiller, M.E. Schudack, J.D. Siegwarth, Matthew Smith, E.H. Southwell, K.L. Stadtman, C.J. Weege, and T.E. Williamson. We also thank the many private landholders who kindly gave us permission to enter their land. The report was improved by thoughtful and constructive technical reviews by K. Carpenter, J.R. Foster, J.S. McIntosh, and D.J. Nichols. The figures were drafted by cartographer Jim Parker (UGS).

The research was done in 1990 through 1996 and supported under a cooperative agreement between the U.S. Geological Survey and the U.S. National Park Service under Contract Number CA-1463-5-0001 and Interagency Agreement Number 1443-IA-1200-94-003.

BLM_0066969

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 57 of 301

## REFERENCES

Allen, Al, 1994, The dinosaur beds of the Morrison Formation (Jurassic), Alcova Lake, Wyoming: Tate Museum Publication, Casper College, Wyoming, 35 p. (includes Cross Sections 1 and 2 as separates).

—1996, Morrison Formation stratigraphy between the classic Como Bluff and Thermopolis areas, Wyoming, *in* Hunter, R.A., editor, Tate '96-- paleoenvironments of the Jurassic: Casper, Wyoming, Tate Geological Museum, Tate Museum Guidebook No. 1, p. 19-28.

Anderson, O.J., and Lucas, S.G., 1996, Stratigraphy and depositional environments of Middle and Upper Jurassic rocks, southeastern San Juan Basin, New Mexico, *in* Goff, F., Kues, B.S., Rogers, M.A., McFadden, L.D., and Gardner, J.N., editors, The Jemez Mountains Region: New Mexico Geological Society Guidebook, 47th Annual Field Conference, p. 205-210.

Armstrong, H.J., and McReynolds, E.S. 1987, Stratigraphic correlation of dinosaur quarries near Grand Junction, Colorado, *in* Averett, W.R., editor, Paleontology and geology of the Dinosaur Triangle: Grand Junction, Colorado, Grand Junction Geological Society Guidebook, p. 103-106.

Aubrey, W.M., 1996, Stratigraphic architecture and deformational history of Early Cretaceous foreland basin, eastern Utah and southwestern Colorado, *in* Huffman, A.C., Jr., Lund, W.R., and Godwin, L.H., editors, Utah Geological Association Guidebook 25, p. 211-220.

Bakker, R.T., Galton, Peter, Siegwarth, James, and Filla, James, 1990, A new latest Jurassic vertebrate fauna, from the highest levels of the Morrison Formation at Como Bluff, Wyoming, part IV-- the dinosaurs-- a new *Othnielia*-like hypsilophodontoid: Hunteria, v. 2, no. 6, p. 8-19.

Bakker, R.T., Siegwarth, James, Kralis, Donald, and Filla, James, 1992, *Edmarka rex*, a new, gigantic theropod dinosaur from the middle Morrison Formation, Late Jurassic of the Como Bluff outcrop region, with comments on the evolution of the chest region and shoulder in theropods and birds, and a discussion of the five cycles of origin and extinction among giant dinosaurian predators: Hunteria, v. 2, no. 9, 24 p.

Bartleson, B.L., and Jensen, J.A., 1988, The oldest (?) Morrison Formation dinosaur, Gunnison, Colorado: The Mountain Geologist, v. 25, no. 3, p. 129-139.

Bilbey, S.A., and Hamblin, A.H., 1992, An articulated partial skeleton of *Stegosaurus* from the Salt Wash Member of the Morrison Formation near Jensen, Utah: Geological Society of America, Abstracts with Programs, v. 24, no. 6, p. 4.

Bjoraker, C.A., and Naus, M.T., 1996, A summary of Morrison Formation (Jurassic: Kimmeridgian-Tithonian) geology and paleontology, with notice of a new dinosaur locality in the Bighorn Basin (USA), *in* Bowen, C.E., Kirkwood, S.C., and Miller, T.S., editors, Resources of the Bighorn Basin: Wyoming Geological Association, 47th Guidebook, p. 297-303.

Blakey, R.C., Peterson, Fred, and Kocurek, Gary, 1988, Synthesis of late Paleozoic and Mesozoic eolian deposits of the Western Interior of the United States: Sedimentary Geology, v. 56, p. 3-125.

Bollan, H.R., 1991, The Bollan *Stegosaurus*, *in* Averett, W.R., editor, Guidebook for dinosaur quarries and tracksites tour: Grand Junction, Colorado, Grand Junction Geological Society, p. 53-54.

Bralower, T.J., Ludwig, K.R., Obradovich, J.D., and Jones, D.L., 1990, Berriasian (Early Cretaceous) radiometric ages from the Grindstone Creek section, Sacramento Valley, California: Earth and Planetary Sciences Letters, v. 98, no. 1, p. 62-73.

Brenner, R.L., and Peterson, J.A., 1994, Jurassic sedimentary history of the northern portion of the Western Interior Seaway, USA, *in* Caputo, M.V., Peterson, J.A., and Franczyk, K.J., editors, Mesozoic systems of the Rocky Mountain Region: Rocky Mountain Section of the SEPM (Society for Sedimentary Geology), p. 217-232.

Britt, B.B., 1991, Theropods of Dry Mesa Quarry (Morrison Formation, Late Jurassic), Colorado, with emphasis on the osteology of *Torvosaurus tanneri*: Brigham Young University Geology Studies, v. 37, p. 1-72.

Callison, George, 1987, Fruita-- a place for wee fossils, *in* Averett, W.R., editor, Paleontology and geology of the Dinosaur Triangle: Grand Junction, Colorado, Grand Junction Geological Society, Guidebook, p. 91-96.

Carpenter, Kenneth, 1998, Vertebrate biostratigraphy of the Morrison Formation near Cañon City, Colorado: Modern Geology v. 28, pt. 2, p. 407-426.

Chenoweth, W.L., 1953, The variegated member of the Morrison Formation in the southeastern part of the San Juan Basin, Valencia County, New Mexico: Albuquerque, University of New Mexico, M.S. thesis, 86 p.

—1987, The Riggs Hill and Dinosaur Hill sites, Mesa County, Colorado, *in* Averett, W.R., editor, Paleontology and geology of the Dinosaur Triangle: Grand Junction, Colorado, Grand Junction Geological Society, Guidebook, p. 97-100.

Chure, D.J., 1989. The fauna of the Morrison Formation in Dinosaur National Monument, *in* Flynn, J.J., and McKenna, M.C., leaders, Mesozoic/Cenozoic vertebrate paleontology-- classic localities, contemporary approaches: 28th International Geological Congress, Field Trip T-322, p. 8-14.

—1994, *Koparion douglassi*, a new dinosaur from the Morrison Formation (Upper Jurassic) of Dinosaur National Monument-- the oldest troodontid (Theropoda: Maniraptora): BrighamYoung University Geology Studies, v. 40, p. 11-15.

—1995, A reassessment of the gigantic theropod *Saurophagus maximus* from the Morrison Formation (Upper Jurassic) of Oklahoma, USA, *in* Sun, Ailing L., and Wang, Y, editors, Sixth symposium on Mesozoic terrestrial ecosystems and biota, short papers: Beijing, China Ocean Press, p. 103-106.

Chure, D.J., Turner, C.E., and Peterson, Fred, 1994, An embryo of *Camptosaurus* from the Morrison Formation (Jurassic, Middle Tithonian) in Dinosaur National Monument, Utah, *in* Carpenter, Kenneth, Hirsch, K.F., and Horner, J.R., editors, Dinosaur eggs and babies: New York, Cambridge University Press, p. 298-311.

Cooley, J.T., 1993, Fluvial systems of the Upper Jurassic Morrison Formation, northern Beartooth and Gallatin Ranges, southwest Montana: Bozeman, Montana State University, M.S. thesis, 55 p.

Cope, E.D., 1877, On a dinosaurian from the Trias of Utah: American Philosophical Society, Proceedings, v. 16, p. 579-584.

Craig, L.C., Holmes, C.N., Freeman, V.L., Mullens, T.E., and others, 1959, Measured sections of the Morrison and adjacent formations: U.S. Geological Survey Open-File Report.

Cross, Whitman, 1894, Pikes Peak Folio, Colorado: U.S. Geological Survey Folio 7, 5 p., 4 maps (1:125,000).

Curtice, B.D., and Wilhite, D.R., 1996, A re-evaluation of the Dry Mesa Dinosaur Quarry sauropod fauna with a description of juvenile sauropod elements, *in* Huffman, A.C., Jr., Lund, W.R., and Godwin, L.H., editors, Geology and resources of the Paradox Basin: Utah Geological Association Guidebook 25, p. 325-338.

Curtice, B.D., Stadtman, K.L., and Curtice, L.J., 1996, A reassessment of *Ultrasauros macintoshi* (Jensen, 1985), *in* Morales, Michael, The continental Jurassic: Museum of Northern Arizona Bulletin 60, p. 87-95.

De Boer, P.L., and Smith, D.G., 1994, Orbital forcing and cyclic sequences: International Association of Sedimentologists Special Publication 19, p. 1-14.

Demko, T.M., Currie, B.S., and Nicoll, K.A., 1996, Paleosols at sequence boundaries in the Upper Jurassic Morrison Formation, Colorado Plateau and Rocky Mountain regions, USA: Geological Society of America, Abstracts with Programs, v. 28, no. 7, p. A-185.

Dodson, Peter, Behrensmeyer, A.K., and Bakker, R.T., 1980, Taphonomy of the Morrison Formation (Kimmeridgian-Portlandian) and Cloverly Formation (Aptian-Albian) of the western United States: Mémoires de la Société Géologique de France (Nouvelle Série), Mémoire No. 139, Ecosystémes Continentaux du Mésozoïque, p. 87-93.

Ekren, E.B., and Houser, F.N., 1959, Relations of Lower Cretaceous and Upper Jurassic rocks in the Four Corners area, Colorado: American Association of Petroleum Geologists Bulletin, v. 43,

BLM_0066970

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 58 of 301

no. 1, p. 190-201.

—1965, Geology and petrology of the Ute Mountains area, Colorado: U.S. Geological Survey Professional Paper 481, 74 p.

Filla, B.J., and Redman, P.D., 1994, *Apatosaurus yahnahpin* - a preliminary description of a new species of diplodocid dinosaur from the Late Jurassic Morrison Formation of southern Wyoming, the first sauropod dinosaur found with a complete set of "belly ribs," *in* Nelson, G.E., editor, The dinosaurs of Wyoming: Wyoming Geological Association Guidebook, 44th Annual Field Conference, p. 159-178.

Fiorillo, A.R., and May, C.L., 1996, Preliminary report on the taphonomy and depositional setting of a new dinosaur locality in the Morrison Formation (Brushy Basin Member) of Curecanti National Recreation Area, Colorado, *in* Morales, Michael, editor, The continental Jurassic: Museum of Northern Arizona Bulletin 60, p. 555-561.

Foster, J.R., 1992, Fossil vertebrates of the Morrison Formation (Upper Jurassic) of the Black Hills, South Dakota and Wyoming: Rapid City, South Dakota School of Mines and Technology, M.S. thesis, 178 p.

—1996a, Fossil vertebrate localities in the Morrison Formation (Upper Jurassic) of western South Dakota, *in* Morales, Michael, editor, The continental Jurassic: Museum of Northern Arizona Bulletin 60, p. 255-263.

---1996b, Sauropod dinosaurs of the Morrison Formation (Upper Jurassic), Black Hills, South Dakota and Wyoming: Contributions to Geology, University of Wyoming, v. 31, no. 1, p. 1-25.

Foster, J.R. and Martin, J.E., 1994, Late Jurassic dinosaur localities in the Morrison Formation of northeastern Wyoming, *in* Nelson, G.E., editor, The dinosaurs of Wyoming: Wyoming Geological Association Guidebook, 44th Annual Field Conference, p. 115-126.

Fraser, G.D., Waldrop, H.A., and Hyden, H.J., 1969, Geology of the Gardiner area, Park County, Montana: U.S. Geological Survey Bulletin 1277, 118 p.

Galton, P.M., 1990, Stegosauria, *in* Weishampel, D.B., Dodson, Peter, and Osmólska, Halszka, editors, 1990, The Dinosauria: Berkeley, University of California Press, p. 435-455.

Galton, P.M., and Jensen, J.A., 1973, Small bones of the hypsilophodontid dinosaur *Dryosaurus altus* from the Upper Jurassic of Colorado: The Great Basin Naturalist, v. 33, no. 2, p. 129-132.

Gillette, D.D., 1991, *Seismosaurus halli*, gen. et sp. nov., a new sauropod dinosaur from the Morrison Formation (Upper Jurassic/Lower Cretaceous) of New Mexico, USA: Journal of Vertebrate Paleontology, v. 11, no. 4, p. 417-433.

—1996a, Origin and early evolution of the sauropod dinosaurs of North America-- the type locality and stratigraphic position of *Dystrophaeus viaemalae* Cope 1877, *in* Huffman, A.C., Jr., Lund, W.R., and Godwin, L.H., editors, Geology and resources of the Paradox Basin: Utah Geological Association Guidebook 25, p. 313-324.

—1996b, Stratigraphic position of the sauropod *Dystrophaeus viaemalae* Cope and implications, in Morales, Michael, editor, The continental Jurassic: Museum of Northern Arizona Bulletin 60, p. 59-68.

Gilluly, James, and Reeside, J.B., Jr., 1928, Sedimentary rocks of the San Rafael Swell and some adjacent areas in eastern Utah: U.S. Geological Survey Professional Paper 150-D, p. 61-110.

Goodknight, C.S., Chenoweth, W.L., and Girdley, W.A., 1991, First day road log from Grand Junction to Moab, *in* Averett, W.R., editor, Guidebook for dinosaur quarries and tracksites tour: Grand Junction, Colorado, Grand Junction Geological Society, p. 71-81.

Harland, W.B., Armstrong, R.L., Cox, A.V., Craig, L.E., Smith, A.G., and Smith, D.G., 1990, A geologic time scale 1989: New York, Cambridge University Press, 263 p.

Holbrook, J.M., Wright, Robyn, and Kietzke, K.K., 1987, Stratigraphic relationships at the Jurassic-Cretaceous boundary in east-central New Mexico, *in* Lucas, S.G., and Hunt, A.P., editors, Northeastern New Mexico: New Mexico Geological Society Guidebook, 38th Annual Field Conference, p. 161-165.

Holt, E.L., 1940, The Morrison and Summerville Formations of the Grand River Valley and their vertebrate and invertebrate fauna: Boulder, University of Colorado, M.S. thesis, 71 p.

Imlay, R.W., 1980, Jurassic paleobiogeography of the conterminous United States in its continental setting: U.S. Geological Survey Professional Paper 1062, 134 p.

Jensen, J.A., 1985, Three new sauropod dinosaurs from the Upper Jurassic of Colorado: The Great Basin Naturalist, v. 45, no. 4, p. 697-709.

—1987, New brachiosaur material from the Late Jurassic of Utah and Colorado: The Great Basin Naturalist, v. 47, no. 4, p. 592-608.

—1988, A fourth new sauropod dinosaur from the Upper Jurassic of the Colorado Plateau and sauropod bepedalism: The Great Basin Naturalist, v. 48, no. 2, p. 121-145.

Kirkland, J.I., and Carpenter, Kenneth, 1994, North America's first pre-Cretaceous ankylosaur (Dinosauria) from the Upper Jurassic Morrison Formation of western Colorado: Brigham Young University Geology Studies, v. 40, p. 25-42.

Knechtel, M.M., 1959, Stratigraphy of the Little Rocky Mountains and encircling foothills, Montana: U.S. Geological Survey Bulletin 1072-N, p. 723-752.

Kolb, R.L., Davis, L.E., and Gillette, D.D., 1996, The theropod dinosaur *Allosaurus* Marsh from the upper part of the Brushy Basin Member of the Morrison Formation (Upper Jurassic) near Green River, Utah, *in* Huffman, A.C., Jr., Lund, W.R., and Godwin, L.H., editors, Geology and resources of the Paradox Basin: Utah Geological Association Guidebook 25, 1996 field symposium, p. 339-349.

Kowallis, B.J., Christiansen, E.H., Deino, A.L., Peterson, Fred, Turner, C.E., Kunk, M.J., and Obradovich, J.D., 1998, The age of the Morrison Formation, *in* Carpenter, Kenneth, Chure, D.J., and Kirkland, J.I., editors, The Upper Jurassic Morrison Formation - an interdisciplinary study: Modern Geology v. 23, pt. 1, p. 235-260.

Langston, Wann, Jr., 1989, A history of vertebrate paleontology at the University of Oklahoma: Norman, Oklahoma, University of Oklahoma, Museum of Paleontology, unpublished document, 92 p., plus Appendix IV of 24 p.

Litwin, R.J., Turner, C.E., and Peterson, Fred, 1998, Palynological evidence on the age of the Morrison Formation, Western Interior U.S.: a preliminary report, *in* Carpenter, Kenneth, Chure, D.J., and Kirkland, J.I., editors, The Upper Jurassic Morrison Formation - an interdisciplinary study: Modern Geology v. 23, pt. 1, p. 292-319.

Lucas, S.G., and Hunt, Adrian, 1985, Dinosaurs from the Upper Jurassic Morrison Formation in New Mexico: New Mexico Journal of Science, v. 25, p. 1-12.

Lucas, S.G., Kietzke, K.K., and Hunt, A.P., 1985, The Jurassic System in east-central New Mexico, *in* Lucas. S.G., editor, Santa Rosa-- Tucumcari region: New Mexico Geological Society Guidebook, 36th Annual Field Conference, p. 213-242.

Lull, R.S., 1919, The sauropod dinosaur *Barosaurus* Marsh: Connecticut Academy of Arts and Sciences, New Haven, v. 6, 42 p.

Madsen, J.H., Jr., 1976, *Allosaurus fragilis* - a revised osteology: Utah Geological and Mineral Survey Bulletin 109, 163 p.

Maxwell, C.H., 1976, Geologic map of the Acoma Pueblo quadrangle, Valencia County, New Mexico: U.S. Geological Survey Geologic Quadrangle Map GQ-1298, scale 1:24,000.

McIntosh, J.S., 1981, Annotated catalogue of the dinosaurs (Reptilia, Archosauria) in the collections of Carnegie Museum of Natural History: Bulletin of Carnegie Museum of Natural History, no. 18, 67 p.

—1990a, Sauropoda, *in* Weishampel, D.B., Dodson, Peter, and Osmólska, Halszka, editors, The Dinosauria: Berkeley, University of California Press, p. 345-401.

—1990b, The second Jurassic dinosaur rush: Earth Sciences History, v. 9, no. 1, p. 22-27.

McIntosh, J.S., Miller, W.E., Stadtman, K.L., and Gillette, D.D., 1996, The osteology of *Camarasaurus lewisi* (Jensen, 1988): Brigham Young University Studies in Geology, v. 41, p. 73-115.

Meyers, J.H., and Schwartz, R.K., 1994, Summary of depositional environments, paleogeography, and structural control on sedimentation in the Late Jurassic (Oxfordian) Sundance foreland basin, western Montana, *in* Caputo, M.V., Peterson, J.A., and Franczyk, K.J., editors, Mesozoic systems of the Rocky Mountain Region: Rocky Mountain Section of the SEPM (Society for

BLM_0066971

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 59 of 301

Sedimentary Geology), p. 331-349.

Miller, W.E., Baer, J.L., Stadtman, K.L., and Britt, B.B., 1991, The Dry Mesa dinosaur quarry, Mesa County, Colorado, *in* Averett, W.R., editor, Guidebook for dinosaur quarries and tracksites tour: Grand Junction, Colorado, Grand Junction Geological Society, p. 31-46.

Miller, W.E., Horricks, R.D., and Madsen, J.H., Jr, 1996, The Cleveland-Lloyd Dinosaur Quarry, Emery County, Utah-- a U.S. Natural Landmark (including history and quarry map): Brigham Young Univeristy Studies in Geology, v. 41, p. 3-24.

Molnar, R.E., Kurzanov, A.M., and Dong, Zhiming, 1990, Carnosauria, *in* Weishampel, D.B., Dodson, Peter, and Osmólska, Halszka, editors, The Dinosauria: Berkeley, University of California Press, p. 169-209.

Norman, D.B., and Weishampel, D.B., 1990, Iguanodontidae and related ornithopods, *in* Weishampel, D.B., Dodson, Peter, and Osmólska, Halszka, editors, 1990, The Dinosauria: Berkeley, University of California Press, p. 510-533.

Osborn, H.F., and Mook, C.C., 1921, *Camarasaurus*, *Amphicoelias*, and other sauropods of Cope: American Museum of Natural History, Memoir, New Series, v. 3, part 3, p. 247-387.

Ostrom, J.H., and McIntosh, J.S., 1966, Marsh's dinosaurs-- the collections from Como Bluff: New Haven, Yale University Press, 388 p.

O'Sullivan, R.B., 1980, Stratigraphic sections of Middle Jurassic San Rafael Group from Wilson Arch to Bluff in southeastern Utah: U.S. Geological Survey Oil and Gas Investigations Chart OC-102.

—1992, The Jurassic Wanakah and Morrison Formations in the Telluride-Ouray-western Black Canyon area of southwestern Colorado: U.S. Geological Survey Bulletin 1927, 24 p.

Owen, D.E., Turner-Peterson, C.E., and Fishman, N.S., 1989, X-Ray diffraction studies of the <0.5-$\mu$m fraction from the Brushy Basin Member of the Upper Jurassic Morrison Formation, Colorado Plateau: U.S. Geological Survey Bulletin 1808-G, p. G1-G25.

Paul, G.S., 1988, The small predatory dinosaurs of the Mid-Mesozoic - the horned theropods of the Morrison and Great Oolite - *Ornitholestes* and *Proceratosaurus* - and the sickle-claw theropods of the Cloverly, Djadokhta and Judith River-- *Deinonychus*, *Velociraptor* and *Saurornitholestes*: Hunteria, v. 2, no. 4, 9 p.

Peterson, Fred, 1980, Sedimentology of the uranium-bearing Salt Wash Member and Tidwell unit of the Morrison Formation in the Henry and Kaiparowits basins, Utah, *in* Picard, M.D., editor, Henry Mountains symposium: Utah Geological Association Publication 8, p. 305-322.

—1984, Fluvial sedimentation on a quivering craton-- influence of slight crustal movements on fluvial processes, Upper Jurassic Morrison Formation, western Colorado Plateau: Sedimentary Geology, v. 38, no. 1/4, p. 21-49.

—1988a, Stratigraphy and nomenclature of Middle and Upper Jurassic rocks, western Colorado Plateau, Utah and Arizona: U.S. Geological Survey Bulletin 1633-B, p. 17-56.

—1988b, Pennsylvanian to Jurassic eolian transportation systems in the western United States: Sedimentary Geology, v. 56, p. 207-260.

—1988c, A synthesis of the Jurassic System in the southern Rocky Mountain region, *in* Sloss, L.L., editor, Sedimentary cover-- North American craton, U.S.: Geological Society of America, The Geology of North America, v. D-2, p. 65-76.

—1988d, Sedimentologic and paleotectonic analysis of the Henry, Kaiparowits, and Black Mesa Basins, Utah and Arizona, *in* Sloss, L.L., editor, Sedimentary cover-- North American craton, U.S.: Geological Society of America, The Geology of North America, v. D-2, p. 134-144.

—1994, Sand dunes, sabkhas, streams, and shallow seas-- Jurassic paleogeography in the southern part of the Western Interior Basin, *in* Caputo, M.V., Peterson, J.A., and Franczyk, K.J., editors, Mesozoic Systems of the Rocky Mountain Region: Rocky Mountain Section of the SEPM (Society for Sedimentary Geology), p. 233-272.

Peterson, Fred, and Turner-Peterson, C.E., 1987, The Morrison Formation of the Colorado Plateau-- recent advances in sedimentology, stratigraphy, and paleotectonics: Hunteria, v. 2, no. 1, 18 p.

Peterson, Fred and Turner, C.E., 1998, Stratigraphy of the Ralston Creek and Morrison Formations (Upper Jurassic) near Denver, Colorado, *in* Carpenter, Kenneth, Chure, D.J., and Kirkland, J.I., editors, The Upper Jurassic Morrison Formation - an interdisciplinary study: Modern Geology v. 23, pt. 1, p. 3-38.

Pillmore, C.L., and Mapel, W.J., 1963, Geology of the Nefsy Divide quadrangle, Crook County, Wyoming: U.S. Geological Survey Bulletin 1121-E, p. E1-E52.

Pipiringos, G.N., 1957, Stratigraphy of the Sundance, Nugget and Jelm Formations in the Laramie Basin, Wyoming: Geological Survey of Wyoming Bulletin No. 47, 63 p.

—1968, Correlation and nomenclature of some Triassic and Jurassic rocks in south-central Wyoming: U.S. Geological Survey Professional Paper 594-D, p. D1-D26.

—1972, Upper Triassic and pre-Morrison Jurassic rocks, *in* Segerstrom, Kenneth, and Young, E.J., General geology of the Hahns Peak and Farwell Mountain Quadrangles, Routt County, Colorado: U.S. Geological Survey Bulletin 1349, p. 18-29.

Pipiringos, G.N., and O'Sullivan, R.B., 1976, Stratigraphic sections of some Triassic and Jurassic rocks from Douglas, Wyoming, to Boulder, Colorado: U.S. Geological Survey Oil and Gas Investigations Chart OC-69.

—1978, Principal unconformities in Triassic and Jurassic rocks, Western Interior United States-- a preliminary survey: U.S. Geological Survey Professional Paper 1035-A, p. A1-A29.

Richards, P.W., 1955, Geology of the Bighorn Canyon–Hardin area, Montana and Wyoming: U.S. Geological Survey Bulletin 1026, 93 p.

Richmond, D.R., and Stadtman, K.L., 1996, Sedimentology of a *Ceratosaurus* site in the San Rafael Swell, Emery County, Utah: Brigham Young University Geology Studies, v. 41, p. 117-124.

Rigby, J.K., Jr., 1982, *Camarasaurus* cf. *supremus* from the Morrison Formation near San Ysidro, New Mexico-- the San Ysidro dinosaur, *in* Callender, J.F., editor, Albuquerque country II: New Mexico Geological Society Guidebook, 33rd Annual Field Conference, p. 271-272.

Riggs, E.E., 1903, *Brachiosaurus altithorax*, the largest known dinosaur: American Journal of Science, v. 4, p. 15, p. 299-306.

Scheetz, R.D., 1991, Progress report of juvenile and embryonic *Dryosaurus* remains from the Upper Jurassic Morrison Formation of Colorado, *in* Averett, W.R., editor, Guidebook for dinosaur quarries and tracksites tour: Grand Junction, Colorado, Grand Junction Geological Society, p. 27-29.

Schmude, D.E., and Weege, C.J., 1996, Stratigraphic relationship, sedimentology, and taphonomy of Meilyn, a dinosaur quarry in the basal Morrison Formation of Wyoming, *in* Morales, Michael, editor, The continental Jurassic: Museum of Northern Arizona Bulletin 60, p. 547-554.

Schudack, M.E., 1994, Die ostracoden und charophyten der Morrison-Formation (Oberjura, westliche USA)-- systematik, biostratigraphie, ökologie, biogeographie: Deutsche Forschungsgemeinschaft, Abschlußbericht zur DFG–Sachbeihilfe Schu 694/4-1, Institut für Paläontologie der Freien Universität Berlin, 139 s.

—1995, Neue mikropälontologische beitrage (ostracoda, charophyta) zum Morrison- ökosystem (Oberjura des Western Interior, USA): Berliner Geowiss. Abh, E. 16, Gundolf-Ernst-Festschrift, s. 389-407.

Schudack, M.E., Turner, C.E., and Peterson, Fred, 1998, Biostratigraphy, paleoecology, and biogeography of charophytes and ostracodes from the Upper Jurassic Morrison Formation, Western Interior, U.S.A, *in* Carpenter, Kenneth, Chure, D.J., and Kirkland, J.I., editors, The Upper Jurassic Morrison Formation - an interdisciplinary study: Modern Geology v. 23, pt.1, p. 379-414.

Schwartz, H.L., and Manley, Kim, 1992, Geology and stratigraphy of the Seismosaurus locality, Sandoval County, New Mexico: New Mexico Geology, v. 14, no. 2, p. 25-30.

Scott, G.R., 1963, Bedrock geology of the Kassler Quadrangle, Colorado: U.S. Geological Survey Professional Paper 421-B, p. 71-125.

Shaw, A.B., 1964, Time in stratigraphy: New York, McGraw-Hill Publishing Co., 365 p.

Shepard, J.D., Galton, P.M., and Jensen, J.A., 1977, Additional speci-

BLM_0066972

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 60 of 301

mens of the hypsilophodontid dinosaur *Dryosaurus altus* from the Upper Jurassic of western North America: Brigham Young University Geology Studies, v. 24, pt. 2, p. 11-15.

Sohn, I.G., and Peck, R.E., 1963, *Theriosynoecum wyomingense* (Branson, 1935), a possible guide ostracode to the Salt Wash Member of the Morrison Formation: U.S. Geological Survey Bulletin 1161-A, p. A1-A10.

Steiner, M.B., Lucas, S.G., and Shoemaker, E.M., 1994, Correlation and age of the Upper Jurassic Morrison Formation from magnetostratigraphic analysis, *in* Caputo, M.V., Peterson, J.A., and Franczyk, K.J., editors, Mesozoic Systems of the Rocky Mountain Region: Rocky Mountain Section of the SEPM (Society for Sedimentary Geology), p. 315-330.

Swierc, J.E., and Johnson, G.D., 1996, A local chronostratigraphy for the Morrison Formation, northeastern Bighorn Basin, Wyoming, *in* Bowen, C.E., Kirkwood, S.C., and Miller, T.S., editors, Resources of the Bighorn Basin: Wyoming Geological Association, 47th Guidebook, p. 315-327.

Sues, H.-D., and Norman, D.B., 1990, Hypsilophodontidae, Tenontosaurus, Dryosauridae, *in* Weishampel, D.B., Dodson, Peter, and Osmólska, Halszka, editors, The Dinosauria: Berkeley, University of California Press, p. 498-509.

Szigeti, G.J., and Fox, J.E., 1981, Unkpapa Sandstone (Jurassic), Black Hills, South Dakota-- an eolian facies of the Morrison Formation, *in* Ethridge, F.G., and Flores, R.M., editors, Recent and ancient nonmarine depositional environments-- models for exploration: Society of Economic Paleontologists and Mineralogists, Special Publication No. 31, p. 331-349.

Turner-Peterson, C.E., 1986, Fluvial sedimentology of a major uranium-bearing sandstone-- a study of the Westwater Canyon Member of the Morrison Formation, San Juan Basin, New Mexico, *in* Turner-Peterson, C.E., Santos, E.S., and Fishman, N.S., editors, A basin analysis case study-- the Morrison Formation, Grants Uranium Region, New Mexico: American Association of Petroleum Geologists, Studies in Geology No. 22, p. 47-75.

Turner, C.E., and Fishman, N.S., 1991, Jurassic Lake T'oo'dichi'-- a large alkaline, saline lake, Morrison Formation, eastern Colorado Plateau: Geological Society of America Bulletin, v. 103, no. 4, p. 538-558.

Ver Ploeg, A.J., 1991, Rare dinosaur skeleton found near Greybull: Wyoming Geo-Notes, no. 32, p. 40-41.

Way, J.N., O'Malley, P.J., Furer, L.C., Suttner, L.J., Kvale, E.P., and Meyers, J.H., 1994, Correlations of the Upper Jurassic- Lower Cretaceous nonmarine and transitional rocks in the northern Rocky Mountain foreland, *in* Caputo, M.V., Peterson, J.A., and Franczyk, K.J., editors, Mesozoic Systems of the Rocky Mountain Region: Rocky Mountain Section of the SEPM (Society for Sedimentary Geology), p. 351-364.

Weege, Christopher, and Schmude, D.E., 1996, The stratigraphic relationship, sedimentology, and taphonomy of Meilyn-- a dinosaur quarry in the basal Morrison Formation of Wyoming, *in* Hunter, R.A., editor, Tate '96-- paleoenvironments of the Jurassic: Tate Museum Guidebook No. 1, Casper, Wyoming, p. 52-58.

West, E.S., 1978, Biostratigraphy and paleoecology of the lower Morrison Formation of Cimarron County, Oklahoma: Wichita, Kansas, Wichita State University, M.S. thesis, 61 p.

BLM_0066973

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 61 of 301

# APPENDIX 1

Credits for sections measured by others that were used in the compilation.

## MONTANA

The Cinnabar Mountain local reference section is from Fraser and others (1969, p. 93-95) and partly revised in further work by us.

The position of the T and J Quarry (MT-6) was correlated to a nearby section of the entire Morrison Formation that was measured by J.T. Cooley (unpublished data) and was used in figure 6 as the Toston local reference section.

The Tithonian palynomorph samples were positioned in a partial section at the top of the Morrison Formation measured by us and tied in to a complete section of the Morrison measured in essentially the same area by Cooley (1993, p. 39, section B at West Boulder River).

## NEW MEXICO

The localities at Acoma (NM-1) and Concho Springs (NM-2) were correlated to measured sections in Chenoweth (1953) by Lucas and Hunt (1985), which were then correlated by us to the Cuchillo Arroyo local reference section of Craig and others (1959, section 49).

## OKLAHOMA

A measured section through the lower part of the Morrison Formation by West (1978, measured section 1) was used along with our measured sections through the remainder of the Morrison Formation to help with the initial positioning of sites in western Oklahoma. These were then correlated to our Travesser Park local reference section in northeastern New Mexico.

## SOUTH DAKOTA

Measured sections by Foster (1996a,b) were used to initially position several sites in the eastern Black Hills. These were then correlated to our Wonderland local reference section.

## UTAH

The Green River Quarry (UT-9) was positioned in a measured section by Kolb and others (1996, p. 341, figure 2, section 3) and correlated by us to our nearby Hatt Ranch section.

## WYOMING

The Thermopolis local reference section is from Bjoraker and Naus (1996, p. 303, Column 5).

We correlated the Little Houston Creek Quarry (WY-11) to a nearby and more complete local reference section in Pillmore and Mapel (1963, Plate 2, section 42). Other sites on the west side of the Black Hills were related to measured sections by Foster (1992) and Foster and Martin (1994) and correlated by us to the Little Houston Creek local reference section.

The Meilyn (WY-83) and Lynn (WY-84) sites were positioned in measured sections by Weege and Schmude (1996, Figure 2, sections A and B) and Schmude and Weege (1996, p. 550, Figure 2, sections A and B) and correlated by us to our nearby measured section at Ninemile Hill.

BLM_0066974

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 62 of 301

# APPENDIX 2

Alphabetical list of taxa, with identification number. See table 1 for a listing by numerical order that also includes selected genera.

| Taxon Identity No. | Species |
|---|---|
| 37 | *Allosaurus fragilis* Marsh |
| 62 | *Allosaurus* n. sp. (N.A.A.) |
| 87 | *Amphicoelias altus* Cope |
| 84 | *Amphicoelias fragillimus* Cope |
| 68 | Ankylosaur new genus and species |
| 48 | *Apatosaurus ajax* Marsh |
| 38 | *Apatosaurus excelsus* Marsh |
| 81 | *Apatosaurus louisae* Holland |
| 69 | *Apatosaurus yahnapin* Filla and Redman |
| 65 | *"Apatosaurus" minimus* Mook |
| 80 | *Barosaurus lentus* Marsh |
| 77 | *Brachiosaurus altithorax* Riggs |
| 36 | *Camarasaurus grandis* (Marsh) |
| 32 | *Camarasaurus lentus* (Marsh) |
| 73 | *Camarasaurus lewisi* (Jensen) |
| 44 | *Camarasaurus supremus* Cope |
| 70 | *Camptosaurus amplus* (Marsh) |
| 64 | *Camptosaurus dispar* (Marsh) |
| 42 | *Ceratosaurus nasicornis* Marsh |
| 31 | *Coelurus fragilis* Marsh |
| 47 | *Diplodocus carnegii* Hatcher |
| 43 | *Diplodocus longus* Marsh |
| 51 | *Drinker nisti* Bakker, Galton, Siegwarth, and Filla |
| 39 | *Dryosaurus altus* (Marsh) |
| 61 | *Dystrophaeus viaemalae* Cope |
| 74 | *Dystylosaurus edwini* Jensen |
| 76 | *Echinodon* sp. |
| 46 | *Edmarka rex* Bakker, Siegwarth, Kralis, and Filla |
| 40 | *Elaphrosaurus* sp. |
| 63 | *Haplocanthosaurus delfsi* McIntosh and Williams |
| 71 | *Haplocanthosaurus priscus* (Hatcher) |
| 83 | *Hypsirophus* sp. |
| 85 | *Koparion douglassi* Chure |
| 50 | *Marshosaurus bicentesimus* Madsen |
| 72 | *"Morosaurus"* sp. |
| 49 | *Mymoorapelta maysi* Kirkland and Carpenter |
| 66 | *Ornitholestes* sp. |
| 67 | *Ornitholestes hermanni* Osborn |
| 41 | *Othnielia rex* (Marsh) |
| 82 | *Saurophaganax maximus* Chure |
| 78 | *Seismosaurus hallorum* Gillette |
| 35 | *Stegosaurus armatus* Marsh |
| 33 | *Stegosaurus stenops* Marsh |
| 34 | *Stegosaurus ungulatus* Marsh |
| 79 | *Stokesosaurus clevelandi* Madsen |
| 75 | *Supersaurus vivianae* Jensen |
| 45 | *Torvosaurus tanneri* Galton and Jensen |
| 86 | Troodontid second sp. |

BLM_0066975

# APPENDIX 3

## Morrison dinosaur sites and faunal lists.

The various dinosaur sites are listed by state and general locality within that state. This is followed by a code having the accepted two-letter abbreviation for the state, followed by an identifying number (for example, CO-11), the name(s) applied to the locality, and the county. The sites are listed sequentially by their identifying numbers but the numerical sequence may be broken to allow for flexibility in compilation. Credits for the identifications and faunal lists are included. Brief notes are added in places for clarity and understanding. Abbreviations follow: **AMNH**: American Museum of Natural History, **CMNH**: Cleveland Museum of Natural History; **DMNH**: Denver Museum of Natural History; **DNM**: Dinosaur National Monument, **FPA**: Fruita Paleontological Area, **LACM**: Los Angeles County Museum, **RVRNA**: Rabbit Valley Research Natural Area.

## COLORADO

### CAÑON CITY (Garden Park area)

**CO-1** Cope's Quarry 8 (about 500 feet southwest of Cope's Nipple) Fremont County, CO; Carpenter (1998); according to K. Carpenter, (oral communication, 1997), this locality is Quarry 8 in Cope's original notes. Cope also referred to it as Camarasaurus Quarry No. 2. Osborn and Mook (1921) incorrectly called it Cope Quarry No. 1.
Sauropoda: *Camarasaurus supremus*

**CO-2** Cope's Quarries 1-7 (at Cope's Nipple, or Saurian Hill) Fremont County, CO; Carpenter (1998); Osborn and Mook (1921) incorrectly called this Cope Quarry No. 2.
Theropoda: *Allosaurus*? sp.
Sauropoda: *Camarasaurus* sp., *Camarasaurus supremus*, *Amphicoelias fragillimus*, *Apatosaurus* sp.
Thyreophora: *Hypsirophus* sp. (stegosaur genus tentatively accepted pending further study; Carpenter, 1998)
Ornithopoda: *Camptosaurus* sp.

**CO-3** Marsh-Felch Quarry 1, Fremont County, CO; K. Carpenter (1998; oral communication, 1991, 1997), Ostrom and McIntosh (1966)
Theropoda: *Ceratosaurus nasicornis*, *Allosaurus fragilis*, *Elaphrosaurus* sp., *Coelurus fragilis*
Sauropoda: *Haplocanthosaurus priscus*, *Brachiosaurus* sp., "*Morosaurus*" sp., *Diplodocus longus*, *Apatosaurus* sp.
Thyreophora: *Stegosaurus armatus*, *Stegosaurus stenops*,
Ornithopoda: *Othnielia rex*, *Dryosaurus altus*

**CO-4** Marsh-Felch Quarry 2, Fremont County, CO; K. Carpenter (oral communication, 1991), J.S. McIntosh (written communication, 1997)
Theropoda: *Allosaurus* sp.

**CO-5** CMNH Quarry (Delfs' Quarry), Fremont County, CO;K. Carpenter (oral communication, 1991)
Sauropoda: *Haplocanthosaurus delfsi*

**CO-6** DMNH Quarry 1 (Dall DeWeese's 1915 Quarry), Fremont County, CO; K. Carpenter (oral communication, 1991)
Sauropoda: *Diplodocus longus*

**CO-7** DMNH Quarry 2 (Kessler's 1937 Quarry), Fremont County, CO; K. Carpenter (1998; oral communication, 1991)
Theropoda: *Allosaurus* sp.
Thyreophora: *Stegosaurus stenops*

**CO-8** DMNH Quarry 3 (Lindsey's 1977 Quarry), Fremont County, CO; K. Carpenter (1998; oral communication, 1991)
Theropoda: *Allosaurus fragilis*
Sauropoda: *Camarasaurus grandis*

**CO-9** DMNH Quarry 4 (Carpenter's 1990 Quarry or Valley of Death 5 Quarry), Fremont County, CO; K. Carpenter (1998; oral communication, 1991)
Sauropoda: *Diplodocus* sp.
Ornithopoda: *Othnielia rex*

**CO-10** DMNH Quarry 5 (Carpenter's 1991 Quarry, or Shaw's Park 1 Quarry), Fremont County, CO; K. Carpenter (1998; oral communication, 1992)
Sauropoda: *Haplocanthosaurus* sp.

**CO-11** DMNH Quarry 6 (Small's Quarry), Fremont County, CO; K. Carpenter (oral communication, 1992, 1997)
Theropoda: *Elaphrosaurus* sp.
Sauropoda: *Apatosaurus excelsus*
Thyreophora: *Stegosaurus stenops*, ?*Mymoorapelta* sp.
Ornithopoda: *Dryosaurus altus*

### DINOSAUR NATIONAL MONUMENT EAST

**CO-16** Homestead Quarry, Moffat County, CO; D.J. Chure (oral communication, 1993)
Theropoda: *Marshosaurus*(?) sp.

**CO-17** Wolf Creek Quarry, Moffat County, CO; J.R. Foster (oral communication, 1997)
Theropoda: *Allosaurus* sp.
Sauropoda: *Camarasaurus* sp., indeterminate diplodocid
Thyreophora: *Stegosaurus* sp.

### GRAND JUNCTION-FRUITA AREA

### (Rabbit Valley locality)

**CO-21** Mygatt-Moore Quarry (M&M Quarry), Mesa County, CO; Kirkland and Carpenter (1994)
Theropoda: *Ceratosaurus* sp., *Allosaurus* sp.,
Sauropoda: *Camarasaurus* sp., *Diplodocus* sp., *Barosaurus* sp., *Apatosaurus* sp.
Thyreophora: *Mymoorapelta maysi*

**CO-22** RVRNA-2 (Trail Through Time Stop 2), Mesa County, CO; Armstrong and McReynolds (1987)
Sauropoda: *Camarasaurus* sp.

**CO-23** RVRNA-13 (Trail Through Time Stop 13), Mesa County, CO; K. Carpenter (written communication, 1997)
Ornithopoda: *Camptosaurus* sp.

**CO-24** Lower Split Rock Site 1 (in lower sandstone bed), Mesa County, CO; J.I. Kirkland (oral communication, 1993)
Theropoda: *Allosaurus* sp.
Sauropoda: *Brachiosaurus*(?) sp.
Thyreophora: *Stegosaurus* sp., *Stegosaurus stenops*(?)
Ornithopoda: *Othnielia*(?) sp.

**CO-25** Upper Split Rock Site 2 (in upper sandstone bed), Mesa County, CO; J.I. Kirkland (oral communication, 1993)
Sauropoda: *Apatosaurus* sp.
Ornithopoda: *Dryosaurus altus*(?)

**CO-26** Rabbit Valley-E Site, Mesa County, CO; J.I. Kirkland (oral communication, 1993)
Sauropoda: *Supersaurus* sp.

**CO-27** Bollan's Site, Mesa County, CO; Bollan (1991), J.I. Kirkland (oral communication, 1993)
Theropoda: *Allosaurus* sp. (tooth)
Thyreophora: *Stegosaurus ungulatus*

## FRUITA PALEONTOLOGICAL AREA

**CO-33** Callison's Quarries (includes four sites at same stratigraphic level, all nearby), Mesa County, CO; (Callison 1987), J.I. Kirkland (oral communication, 1993, 1997)
Theropoda: *Ceratosaurus* sp., *Allosaurus* sp., undetermined coelurosaur
Sauropoda: *Brachiosaurus* sp., *Camarasaurus* sp., *Diplodocus* sp., *Apatosaurus* sp.
Thyreophora: *Echinodon* sp., *Stegosaurus* sp.

**CO-34** Fruita Paleontological Area Dryosaur Nesting Site, Mesa County, CO; J.I. Kirkland (oral communication, 1993)
Ornithopoda: *Dryosaurus* sp.

**CO-35** LACM Quarry (Clark's Quarry), Mesa County, CO; J.I. Kirkland (oral communication, 1993)
Thyreophora: *Stegosaurus* sp

**CO-36** Riggs' Quarry 15 (Dinosaur Hill Quarry), Mesa County, CO; Chenoweth (1987), Goodknight and others (1991)
Sauropoda: *Diplodocus* sp., *Apatosaurus excelsus*

## RIGGS HILL AREA

**CO-45** Riggs' Quarry 13 (Riggs Hill), Mesa County, CO; Riggs (1903)
Sauropoda: *Brachiosaurus altithorax*

**CO-46** Holt's Quarry 1, Mesa County, CO; Holt (1940)
Thyreophora: *Stegosaurus* sp.

**CO-47** Holt's Quarry 2, Mesa County, CO; Holt (1940)
Theropoda: *Allosaurus* sp.
Sauropoda: *Brachiosaurus*(?) sp.

## GUNNISON AREA

**CO-48** Cabin Creek Quarry, Gunnison County, CO; Bartleson and Jensen (1988)
Sauropoda: *Apatosaurus* sp.

**CO-49** Curecanti-Red Creek Quarry, Gunnison County, CO; Fiorillo and May (1996)
Theropoda: *Allosaurus* sp.
Sauropoda: *Apatosaurus*(?) sp.

## MORRISON AREA

**CO-51** Lake's Quarries 1, 5, 8, Jefferson County, CO; Ostrom and McIntosh (1966), J.S. McIntosh (written communication, 1997)
Sauropoda: *Camarasaurus* sp., *Diplodocus* sp., *Apatosaurus ajax*
Thyreophora: *Stegosaurus armatus*

**CO-52** Lake's Quarry 10-L (in black mudstone bed), Jefferson County, CO; Ostrom and McIntosh (1966)
Theropoda: *Allosaurus* sp.
Sauropoda: *Apatosaurus ajax*

**CO-53** Lake's Quarry 10-U (in buff sandstone bed), Jefferson County, CO; Ostrom and McIntosh (1966)
Sauropoda: *Apatosaurus ajax*

## UNCOMPAHGRE PLATEAU

**CO-55** Cactus Park Quarry (of J.A. Jensen), Mesa County, CO; J.R. Foster (written communication, 1997), J.S. McIntosh (written communication, 1997)
Sauropoda: *Camarasaurus* sp., *Apatosaurus* sp.
Thyreophora: *Stegosaurus* sp.

**CO-56** Dominguez-Jones Quarry (Pit 1 of J.A. Jensen), Mesa County, CO; Jensen (1988), McIntosh and others (1996)
Sauropoda: *Camarasaurus lewisi*

**CO-57** Hups' Cactus Park Quarry, Mesa County, CO; K. Carpenter (written communication, 1997), J.R. Foster (written communication, 1997)
Theropoda: *Allosaurus* sp.
Thyreophora: *Mymoorapelta maysi*

**CO-58** Dry Mesa Quarry 1, Mesa County, CO; Jensen (1985, 1987), Britt (1991), Miller and others (1991), W.E. Miller (oral communication, 1992), Curtice and Wilhite (1996), Curtice and others (1996)
Theropoda: *Ceratosaurus* sp., *Allosaurus* sp., *Torvosaurus tanneri*, ?*Ornitholestes* sp. and (or) *Coelurus* sp., *Marshosaurus* sp.
Sauropoda: *Brachiosaurus* sp., *Dystylosaurus edwini*, *Camarasaurus* sp., *Diplodocus* sp., *Apatosaurus* sp., *Supersaurus vivianae*
Thyreophora: *Stegosaurus* sp., ankylosaur undetermined
Ornithopoda: *Dryosaurus* sp., *Camptosaurus* sp.

**CO-59** Dry Mesa Quarry 2 (Jones Hole Quarry); Mesa County, CO; W.E. Miller (oral communication, 1992), J.S. McIntosh, written communication, 1997)
Theropoda: *Allosaurus* sp.
Sauropoda: *Barosaurus* sp.
Ornithopoda: *Camptosaurus* sp.

**CO-60** Potter Creek Quarry, Montrose County, CO; Jensen (1985, 1987)
Sauropoda: ?*Brachiosaurus altithorax*

## URAVAN AREA

**CO-66** Sheetz' Quarry 1, Montrose County, CO, Galton and Jensen (1973), Scheetz (1991)
Ornithopoda: *Dryosaurus altus* (baby)

## CAÑON CITY (Garden Park area)

**CO-70** to **CO-77** from Carpenter (1998)

**CO-70** Shaw's Park 3, Fremont County, CO
Theropoda: *Allosaurus* sp.

**CO-71** Cope's Quarry 12, Fremont County, CO
Sauropoda: *Amphicoelias altus*

**CO-72** Egg Gulch, Fremont County, CO
Ornithopoda: *Dryosaurus*? sp.

**CO-73** Meyer Sites 1 and 2, Fremont County, CO
Theropoda: *Allosaurus* sp., *Torvosaurus* cf. *T. tanneri*

**CO-74** Meyer Site 3, Fremont County, CO
Sauropoda: *Diplodocus* sp.

**CO-75** Kenny's Stegosaurus Site, Fremont County, CO
Thyreophora: *Stegosaurus* cf. *S. stenops*

**CO-76** Cope's Quarry 15 (Oil Tract), Fremont County, CO; stratigraphic position approximate
Sauropoda: *Camarasaurus* sp.

**CO-77** Gregg's Bone Site, Fremont County, CO
Thyreophora: *Stegosaurus* sp.

BLM_0066977

# MONTANA

## BRIDGER AREA

**MT-1** Mothers Day Quarry, Carbon County, MT; Kristi Curry (oral communication, 1996)
Theropoda: *Allosaurus* sp., dromaeosaur (tooth)
Sauropoda: *Diplodocus* or *Barosaurus* (not *Apatosaurus*)
Thyreophora: *Stegosaurus*(?) sp.

## LIVINGSTON AREA

**MT-2** Upper Strickland Creek Quarry, Park County, MT; Matthew Smith (oral communication, 1992)
Theropoda: *Allosaurus* sp.
Sauropoda: Family Diplodocidae (genus and species undetermined)

## TOSTON AREA

**MT-6** T and J Quarry (Ted and Jane Quarry), Gallatin County, MT; R.D. Scheetz (oral communication, 1995)
Theropoda: *Allosaurus*? sp.
Sauropoda: small mature sauropods

# NEW MEXICO

## SOUTHEASTERN SAN JUAN BASIN AREA

**NM-1** Acoma Quarry, Cibola County, NM; Chenoweth (1953), Lucas and Hunt (1985)
Theropoda: *Allosaurus* sp.

**NM-2** Concho Springs Quarry, Cibola County, NM; Chenoweth (1953), Lucas and Hunt (1985)
Thyreophora: *Stegosaurus* sp.

**NM-3** San Ysidro Camarasaur Quarry, Sandoval County, NM; Rigby (1982), Lucas and Hunt (1985)
Theropoda: *Allosaurus* sp. (teeth)
Sauropoda: *Camarasaurus supremus*

**NM-4** Seismosaur Quarry, Bernalillo County, NM; Gillette (1991), Schwartz and Manley (1992)
Theropoda: cf. *Allosaurus* sp. (teeth)
Sauropoda: *Seismosaurus hallorum*

**NM-5** Boney Canyon Quarry, Bernalillo County, NM; T.E. Williamson (oral communication, 1997)
Theropoda: large allosaurid (partial skeleton)
Sauropoda: diplodocid (partial skull), *Camarasaurus* sp. (partial skull)

**NM-6** Boney Canyon-NE Site, Bernalillo County, NM; T.E. Williamson (oral communication, 1997)
Sauropoda: *Camarasaurus* sp. (tooth)

**NM-7** San Ysidro Diplodocid Quarry, Bernalillo County, NM; Anderson and Lucas (1996), T.E. Williamson (oral communication, 1997)
Sauropoda: *Diplodocus* sp.

## NORTHEASTERN NEW MEXICO AREA

**NM-10** Bull Canyon Site, Guadalupe County, NM; Lucas and others (1985)
Thyreophora: ?*Stegosaurus* sp.

# OKLAHOMA

## KENTON AREA

OK-1 Stovall's Pit 1, Cimarron County, OK; Langston (1989), Chure (1995)
Theropoda: *Allosaurus* sp., *Saurophaganax maximus*
Sauropoda: *Diplodocus* sp., *Diplodocus* or *Barosaurus* sp. (may pertain to *Amphicoelias* sp.), cf. *Apatosaurus* sp., *Apatosaurus*? sp. or *Camarasaurus*? sp.
Thyreophora: *Stegosaurus* sp.
Ornithopoda: *Camptosaurus* sp.

**OK-2** Stovall's Pit 5, Cimarron County, OK; Langston (1989)
Theropoda: *Allosaurus* sp.
Sauropoda: *Camarasaurus* sp., ?*Diplodocus* sp., ?*Apatosaurus* sp.
Thyreophora: ?*Stegosaurus* sp.
Ornithopoda: ?*Camptosaurus* sp.

**OK-3** Stovall's Pit 6, Cimarron County, OK; Langston (1989)
Theropoda: *Allosaurus* sp.
Sauropoda: ?*Camarasaurus* sp., *Diplodocus* sp., *Apatosaurus* sp.
Ornithopoda: *Camptosaurus* sp.

**OK-4** Stovall's Pit 8, Cimarron County, OK; Langston (1989)
Theropoda: ?Coelurosaurian dinosaur
Ornithopoda: ?*Camptosaurus* sp.

# SOUTH DAKOTA

## BLACK HILLS EAST AREA

**SD-1** Bear Butte Quarry, Meade County, SD; Foster (1996a,b)
Sauropoda: *Apatosaurus* sp.

**SD-2** Fuller's 351 (Spearfish) Quarry, Lawrence County, SD; Foster (1996a,b), J.R. Foster (written communication, 1997)
Theropoda: *Allosaurus* sp.
Sauropoda: *Camarasaurus* sp., *Apatosaurus* sp.

**SD-3** Piedmont Quarry, Meade County, SD; Lull (1919), Dodson and others (1980)
Theropoda: *Allosaurus* sp.
Sauropoda: *Barosaurus lentus*

**SD-4** Wonderland Quarry, Meade County, SD; Foster (1996a,b)
Theropoda: *Allosaurus* sp., unidentified theropod (ilium, resembles *Stokesosaurus* or *Marshosaurus*)
Sauropoda: *Camarasaurus* sp. (teeth), *Barosaurus lentus*

**SD-5** Wonderland North Quarry, Meade County, SD; Foster (1996a,b)
Sauropoda: *Diplodocus* sp.

# UTAH

## HANKSVILLE AREA

**UT-1** Hanksville Quarry, Wayne County, UT; J.S. McIntosh (written communication, 1997)
Theropoda: unidentified new(?) theropod
Sauropoda: *Apatosaurus* sp. (originally thought to be *Camptosaurus* sp. according to J.T. Gregory, written communication, 1992)

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 66 of 301

### MOAB AREA

**UT-4** East Canyon Quarry, San Juan County, UT; Cope (1877), D.D. Gillette (oral communication, 1995, 1996a,b)
Sauropoda: *Dystrophaeus viaemalae*

### SAN RAFAEL SWELL AREA

**UT-7** Cleveland-Lloyd Quarry, Emery County, UT; Madsen (1976), J.H. Madsen (written communication, 1994, oral communication, 1997), Miller and others (1996)
Theropoda: *Ceratosaurus* sp., *Allosaurus fragilis*, *Stokesosaurus clevelandi*, *Ornitholestes*?, *Marshosaurus bicentesimus*
Sauropoda: *Haplocanthosaurus* sp., *Camarasaurus lentus*, *Barosaurus* sp., *Amphicoelias*? sp.
Thyreophora: *Stegosaurus stenops*, nodosaur undetermined
Ornithopoda: *Camptosaurus* cf. *C. dispar*

**UT-8** Sand Bench Site, Emery County, UT; Richmond and Stadtman (1996)
Theropoda: *Ceratosaurus nasicornis*

**UT-9** Green River Quarry, Emery County, UT; Kolb and others (1996), L.E. Davis (oral communication, 1996)
Theropoda: *Allosaurus* sp.
Sauropoda: *Camarasaurus*(?) sp.
Thyreophora: *Stegosaurus*(?) sp.

### DINOSAUR NATIONAL MONUMENT WEST
(South of Green River)

**UT-12** Jensen/Jensen Quarry, Uintah County, UT; Jensen (1987), D.J. Chure (oral communication, 1993)
Sauropoda: *Brachiosaurus* sp., *Camarasaurus* sp., *Apatosaurus* sp.

**UT-13** Utah Field House of Natural History Quarry, Uintah County, UT; Bilbey and Hamblin (1992), D.J. Chure (oral communication, 1993)
Thyreophora: *Stegosaurus* sp.

**UT-14** DNM-5, Uintah County, UT; D.J. Chure (oral communication, 1993)
Theropoda: *Allosaurus* sp.
Ornithopoda: *Dryosaurus* sp.

### DINOSAUR NATIONAL MONUMENT WEST
(Near Carnegie Quarry)

**UT-17** DNM-15, Uintah County, UT; D.J. Chure (oral communication, 1993)
Sauropoda: *Apatosaurus* sp.

**UT-18** Carnegie Quarry, Uintah County, UT; D.J. Chure (written communication, 1991), J.S. Mcintosh (written communication, 1997)
Theropoda: *Ceratosaurus nasicornis*, *Allosaurus fragilis*, *Torvosaurus tanneri*, *Marshosaurus bicentesimus*
Sauropoda: *Camarasaurus lentus*, *Diplodocus longus*, *Barosaurus lentus*, *Apatosaurus louisae*
Thyreophora: *Stegosaurus ungulatus*, *Stegosaurus stenops*
Ornithopoda: *Dryosaurus altus*; ornithischian, unidentified

**UT-19** DNM-315, Uintah County, UT; Chure and others (1994)
Ornithopoda: *Camptosaurus* sp. (embryo)

**UT-20** DNM-116 (N.A.A. Quarry), Uintah County, UT; D.J. Chure (oral communication, 1997)
Theropoda: *Allosaurus* n. sp. (possibly new genus)

### DINOSAUR NATIONAL MONUMENT WEST
(Rainbow Park area)

**UT-24** DNM-8 (Soft Sauropod Quarry), Uintah County, UT; D.J. Chure (oral communication, 1991)
Sauropoda: *Apatosaurus* sp.

**UT-25** DNM-94 (Quarry 94, Rainbow Park microsite), Uintah County, UT; Chure (1989; 1994), D.J. Chure (oral communication, 1997)
Theropoda: *Allosaurus* sp., *Koparion douglassi*, Troodontid second sp.
Sauropoda: *Camarasaurus* sp., *Diplodocus* sp.
Thyreophora: *Stegosaurus* sp.
Ornithopoda: *Dryosaurus* sp., *Camptosaurus* sp.

**UT-26** DNM-96 (Quarry 96, Rainbow Park microsite), Uintah County, UT; D.J. Chure (oral communication, 1997)
Theropoda: *Allosaurus* sp.
Sauropoda: *Camarasaurus* sp., *Diplodocus* sp.
Thyreophora: *Stegosaurus* sp.
Ornithischia: *Dryosaurus* sp., *Camptosaurus* sp.

## WYOMING

### ALCOVA AREA

**WY-1** Cottonwood Creek Site-1, Natrona County, WY; Allen (1994)
Ornithopoda: cf. *Dryosaurus* sp.

**WY-2** Cottonwood Creek Site-2, Natrona County, WY; Allen (1994)
Sauropoda: *Camarasaurus* sp.

**WY-3** Cottonwood Creek Site-3, Natrona County, WY; Allen (1994)
Sauropoda: *Diplodocus* sp.

**WY-4** Allen's (1994) Allosaur Site, Natrona County, WY; Allen (1994)
Theropoda: *Allosaurus* sp.

### BLACK HILLS NORTHWEST

**WY-8** Lower Dillon's Corner Site, Crook County, WY; Foster and Martin (1994)
Theropoda: ?*Allosaurus* sp.

**WY-9** Upper Dillon's Corner Site, Crook County, WY; Foster and Martin (1994)
Sauropoda: cf. *Barosaurus* sp.

**WY-10** Lightning Rod Butte Quarry, Crook County, WY; Foster and Martin (1994)
Ornithopoda: *Othnielia* sp.

**WY-11** Little Houston Quarry, Crook County, WY; Foster and Martin (1994), Foster (1996a,b)
Theropoda: *Allosaurus* sp.
Sauropoda: *Camarasaurus* sp. *Diplodocus* or *Barosaurus* sp., *Apatosaurus* sp.
Thyreophora: *Stegosaurus* sp.
Ornithopoda: *Othnielia* sp., *Dryosaurus* sp., ornithischian indeterminate

**WY-12** MIA Quarry, Crook County, WY; Foster and Martin (1994), J.R. Foster, written communication (1997)
Sauropoda: *Barosaurus* sp.

### COMO BLUFF WEST (West of Marshall Road)

**WY-15** Reed's Quarry 9, Albany County, WY; Ostrom and McIntosh

BLM_0066979

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 67 of 301

(1966), Bakker and others (1990), Sues and Norman (1990)
Theropoda: *Allosaurus fragilis*, *Coelurus fragilis*
Sauropoda: *Camarasaurus* sp.
Thyreophora: *Stegosaurus* sp.
Ornithopoda: *Othnielia rex* (may not be from this quarry), *Drinker nisti*, *Dryosaurus* sp., *Camptosaurus* sp.

**WY-16** Reed's Quarry 14, Albany County, WY; Ostrom and McIntosh (1966)
Theropoda: *Allosaurus* sp.

**WY-17** Reed's Quarry 10, Albany County, WY; Ostrom and McIntosh (1966)
Sauropoda: *Apatosaurus excelsus*

**WY-18** Reed's Quarry 11, Albany County, WY; Ostrom and McIntosh (1966), Galton (1990), J.S. McIntosh (written communication, 1997)
Sauropoda: *Apatosaurus excelsus*
Thyreophora: *Stegosaurus ungulatus*

**WY-19** Reed's Quarry 8, Albany County, WY; Ostrom and McIntosh (1966)
Theropoda: *Allosaurus* sp., "*Coelurus fragilis*"
Sauropoda: *Camarasaurus* sp., *Diplodocus* sp.
Thyreophora: *Stegosaurus* sp.

**WY-20** Reed's Quarry 3, Albany County, WY; Ostrom and McIntosh (1966), Molnar and others (1990)
Theropoda: *Allosaurus fragilis*
Sauropoda: *Camarasaurus grandis*

**WY-21** Reed's Quarry 1, Albany County, WY; Ostrom and McIntosh (1966), Molnar and others (1990)
Theropoda: *Allosaurus fragilis*
Sauropoda: *Camarasaurus grandis*, *Diplodocus* sp.

**WY-22** Louise Quarry, Albany County, WY; Bakker and others (1992), J. Filla (oral communication, 1993)
Theropoda: *Allosaurus* sp., *Edmarka rex*
Sauropoda: *Camarasaurus* sp., *Apatosaurus* sp.
Thyreophora: *Stegosaurus*(?) sp.

**WY-23** Reed's Quarry 2 (Fishplate Quarry), Albany County, WY; Ostrom and McIntosh (1966)
Sauropoda: *Apatosaurus* sp.

**WY-24** Drinker Nisti Quarry-L (Lower Big Nose Quarry?), Albany County, WY; Bakker and others (1990)
Ornithopoda: *Drinker nisti*

**WY-25** Drinker Nisti Quarry-U (Upper Big Nose Quarry?), Albany County, WY; Bakker and others (1990)
Ornithopoda: *Drinker nisti*

**WY-26** Reed's Quarry 5, Carbon County, WY; Ostrom and McIntosh (1966)
Sauropoda: *Diplodocus* sp.
Ornithopoda: *Dryosaurus altus*

**WY-27** Lake's Quarry 1A (Big Canyon Quarry), Carbon County, WY; Ostrom and McIntosh (1966)
Theropoda: *Allosaurus* sp.
Sauropoda: *Camarasaurus* sp.
Ornithopoda: *Camptosaurus amplus*

**WY-28** Reed's Quarry 7 (Three Trees Quarry), Carbon County, WY; Ostrom and McIntosh (1966)
Ornithopoda: *Othnielia rex*

**WY-29** Reed's Quarry 12, Carbon County, WY; Ostrom and McIntosh (1966), (Galton (1990), J.S. McIntosh (written communication, 1997)
Theropoda: *Allosaurus* sp., *Coelurus* sp.
Sauropoda: *Camarasaurus* sp., *Diplodocus* sp.
Thyreophora: *Stegosaurus ungulatus*
Ornithopoda: *Othnielia*? sp. or *Dryosaurus*? sp.

**WY-30** Reed's Quarry 1½, Carbon County, WY; Ostrom and McIntosh (1966), Molnar and others (1990)
Theropoda: *Allosaurus fragilis*
Sauropoda: unidentified taxon

**WY-31** Cope's Quarry 3, Carbon County, WY; J.S. McIntosh (oral communication, 1997)
Theropoda: *Allosaurus* sp.

## COMO BLUFF EAST (East of Marshall Road)

**WY-39** Nail Quarry, Albany County, WY; Bakker and others (1992)
Theropoda: *Allosaurus* sp., *Edmarka rex*
Sauropoda: *Camarasaurus* sp., *Diplodocus* sp., *Apatosaurus* sp.
Thyreophora: *Stegosaurus* sp.

**WY-40** Reed's Quarry 4 (Truckstop Quarry), Albany County, WY; Ostrom and McIntosh (1966)
Theropoda: *Allosaurus fragilis*
Sauropoda: *Camarasaurus* sp., *Barosaurus* sp., *Apatosaurus* sp.
Thyreophora: *Stegosaurus* sp.

**WY-41** Two Thigh Quarry, Albany County, WY; R.T. Bakker (oral communication, 1993)
Ornithopoda: *Drinker nisti*

**WY-42** Bernice Quarry, Albany County, WY; J. Filla (oral communication, 1993)
Sauropoda: *Diplodocus* sp.

**WY-43** Cam Bench Quarries (West, Middle, and East Sites), Albany County, WY; J. Filla (oral communication, 1993)
Sauropoda: *Camarasaurus* sp.
Ornithopoda: *Camptosaurus*(?) sp.

**WY-44** Bertha Quarry, Albany County, WY; J. Filla (oral commun, 1993), R.T. Bakker (oral communication, 1993), Filla and Redmond (1994)
Sauropoda: *Apatosaurus yahnahpin*
Ornithopoda: *Dryosaurus* sp.

**WY-45** Zippy Quarry, Albany County, WY; J. Filla (oral communication, 1993)
Sauropoda: *Diplodocus*? sp.

**WY-46** Reed's Quarry 13, Albany County, WY; Ostrom and McIntosh (1966), Norman and Weishampel (1990), K. Carpenter (oral communication, 1997), J.S. McIntosh (written communication, 1997)
Theropoda: *Coelurus fragilis*
Sauropoda: *Camarasaurus lentus*, *Diplodocus* sp.
Thyreophora: *Stegosaurus armatus*, *Stegosaurus ungulatus*
Ornithopoda: *Othnielia*? sp. or *Dryosaurus*? sp., *Camptosaurus dispar*

**WY-47** E.P. Thompson's Quarry, Albany County, WY; R.T. Bakker (oral communication, 1993)
Sauropoda: *Diplodocus carnegii*
Thyreophora: *Stegosaurus* sp.
Ornithopoda: *Camptosaurus* sp.

## GREYBULL-SHELL AREA

**WY-61** Big Al Quarry, Big Horn County, WY; D. Maxwell (oral communication, 1992), R. Harmon (oral communication, 1993), Ver Ploeg (1991)
Theropoda: *Allosaurus* sp.
Sauropoda: *Diplodocus* sp.
Thyreophora: *Stegosaurus*(?) sp.

**WY-62** Howe Quarry, Big Horn County, WY; Dodson and others (1980)

BLM_0066980

Theropoda: *Allosaurus* sp.
Sauropoda: *Camarasaurus* sp., *Diplodocus* sp., *Barosaurus* sp.
Ornithopoda: *Camptosaurus* sp.

**WY-63** Little Butte Quarry (Smithsonian "Quarry 2"), Big Horn County, WY; M. Brett- Surman (oral communication, 1997)
Sauropoda: *Barosaurus*? sp. or *Diplodocus*? sp.

**WY-64** Big Butte Quarry (Smithsonian "Quarry 4"), Big Horn County, WY; M. Brett- Surman (oral communication, 1997)
Sauropoda: *Apatosaurus*? sp.
Thyreophora: *Stegosaurus* sp.

## KAYCEE

**WY-71** Poison Creek (Erickson) Quarry, Johnson County, WY; B.R. Erickson (written communication, 1994), J.R. Foster (written communication, 1997)
Theropoda: *Allosaurus* sp., *Elaphrosaurus* sp.
Sauropoda: *Haplocanthosaurus* sp., *Camarasaurus* sp., *Diplodocus* sp., diplodocid genus and species undetermined, *Barosaurus*(?) sp., *Apatosaurus* sp.
Thyreophora: *Stegosaurus* sp.
Ornithopoda: *Camptosaurus* sp.

**WY-72** Poison Creek (Flynn) Quarry-1, Johnson County, WY; J.R. Foster (written communication, 1997)
Theropoda: *Allosaurus* sp.
Sauropoda: *Camarasaurus* sp., *Diplodocus* sp., *Apatosaurus* sp.
Thyreophora: ?*Stegosaurus* sp.

**WY-73** Poison Creek (Flynn) Quarry-2, Johnson County, WY; J.R. Foster (written communication, 1997)
Theropoda: large theropod (huge tooth) possibly megalosaurid or large allosaur
Sauropoda: *Camarasaurus* sp.

**WY-74** Poison Creek (Flynn) Quarry-3, Johnson County, WY; J.R. Foster (written communication, 1997)
Theropoda: *Allosaurus* sp.

## MEDICINE BOW ANTICLINE (also called Flat Top Anticline)

**WY-78** Bone Cabin Quarry, Albany County, WY; Shepard and others (1977), Dodson and others (1980), McIntosh (1981, 1990a), Paul (1988)
Theropoda: *Allosaurus fragilis*, *Ornitholestes hermanni*
Sauropoda: *Camarasaurus* sp., *Diplodocus* sp., *Apatosaurus excelsus*, "*Apatosaurus*" *minimus* "...a valid species, but not belonging to *Apatosaurus*" according to J.S. McIntosh (1997, written communication); also, McIntosh, 1990)
Thyreophora: *Stegosaurus stenops*
Ornithopoda: *Dryosaurus altus*, *Camptosaurus* sp.

**WY-79** Bone Cabin Quarry-E (eastward extension of old Bone Cabin Quarry), Albany County, WY; Jeff Parker (oral communication, 1997), K. Carpenter (written communication, 1997)
Theropoda: *Allosaurus fragilis*
Sauropoda: *Brachiosaurus* sp., *Camarasaurus grandis*, *Diplodocus* sp., *Apatosaurus* sp.
Thyreophora: *Stegosaurus stenops*, ankylosaur new genus and new species (K. Carpenter, oral communication, 1997)
Ornithopoda: *Dryosaurus* sp., *Camptosaurus* sp.

**WY-80** Jeff Parker's Quarry (near Stego 99 site), Albany County, WY; Jeff Parker (oral communication, 1992, 1997)
Theropoda: *Allosaurus* sp. (teeth)
Sauropoda: *Camarasaurus* sp.

**WY-81** Pat McSherry's Quarry, Albany County, WY; R.T. Bakker (oral communication, 1992)
Sauropoda: *Camarasaurus* sp.

**WY-82** Ninemile Hill Site, Carbon County, WY; R.T. Bakker (oral communication, 1992)
Ornithopoda: *Drinker* sp. (tooth)

**WY-83** Meilyn Quarry, Carbon County, WY; C.J. Weege (written communication, 1997)
Theropoda: *Allosaurus* sp.
Thyreophora: *Stegosaurus* sp.

**WY-84** Lynn Quarry, Carbon County, WY; C.J. Weege (written communication, 1997)
Theropoda: *Allosaurus* sp.
Sauropoda: *Camarasaurus* sp., *Diplodocus* sp.
Ornithopoda: *Drinker*? sp.

**WY-85** Weege Boys Quarry, Carbon County, WY; C.J. Weege (written communication, 1997)
Thyreophora: *Stegosaurus* sp.

**WY-86** Camarasaurus 1993 Quarry, Carbon County, WY; C.J. Weege (oral communication, 1997)
Sauropoda: *Camarasaurus* sp., *Diplodocus* sp., *Barosaurus*? sp.

## SHEEP CREEK AREA

**WY-91** AMNH Sheep Creek Quarry D, Albany County, WY; McIntosh (1981, 1990b), J.S. McIntosh (written communication, 1997)
Sauropoda: *Camarasaurus grandis*, *Diplodocus carnegii*, *Apatosaurus excelsus*
Thyreophora: *Stegosaurus ungulatus*

**WY-92** Zane Quarries 1- 4, Albany County, WY; R.T. Bakker (oral communication, 1992, 1993, Bakker and others, 1992). The quarries are at four stratigraphic levels within a 16.5 ft (5.0 m) thick interval; a faunal list for the individual quarries was not available.
Theropoda: megalosaurid
Sauropoda: *Apatosaurus* sp., *Diplodocus* sp.
Thyreophora: *Stegosaurus* sp., nodosaur genus and species undetermined

## THERMOPOLIS AREA

**WY-98** BS (Beside Sauropod) Quarry, Hot Springs County, WY; Bjoraker and Naus (1996), C.A. Naus (written communication, 1997)
Theropoda: *Allosaurus* sp. (teeth)
Sauropoda: *Camarasaurus* sp., ?*Diplodocus* sp., ?*Apatosaurus* sp.

**WY-99-102** RB (RoadBone) Quarries Hot Springs County, WY The name applies to the locality as well as to one of the producing stratigraphic levels. Bjoraker and Naus (1996), C.A. Naus (written communication, 1997)

**WY-99** PL Site
Thyreophora: ?*Stegosaurus* sp.
Ornithopoda: ?*Camptosaurus* sp.

**WY-100** AD Site
Sauropoda: ?*Diplodocus* sp.

**WY-101** RB Site
Sauropoda: ?*Camarasaurus* sp.,

**WY-102** TH Site
Sauropoda: ?*Diplodocus* sp.

Books

Add to my library

Write review

GET PRINT BOOK

No eBook available

AbeBooks
Amazon

Find in a library
All sellers »

Get Textbooks on Google Play

Rent and save from the world's largest eBookstore. Read, highlight, and take notes, across web, tablet, and phone.

Go to Google Play Now »

My library

My History

Books on Google Play

# Fishes of the Upper Colorado River System, Present and Future: Proceedings of a Symposium Presented at the Annual Meeting of the American Fisheries Society in Albuquerque, New Mexico, September 18, 1981

William H. Miller, Harold M. Tyus, Clarence A. Carlson

Western Division, American Fisheries Society, 1982 - Endangered species - 131 pages

0 Reviews

G+1 0

## From inside the book

Search

## What people are saying - Write a review

We haven't found any reviews in the usual places.

## Related books

An evaluation of th...
Western Energy an

An Indexed, Annot...
Timothy W. Joseph

The Gre
William

Home > List of Issues > Table Of Contents > Distribution, Reproduction, and Habitat Use of the Razorback Sucker in the Green River, Utah, 1979–1986

Browse journal

View all volumes and issues

Current issue

Most read articles

Most cited articles

Authors and submissions

Subscribe

About this journal

Visit the AFS website

Contact us

Join AFS

**Transactions of the American Fisheries Society**

**Volume 116, Issue 1, 1987**

Select Language ▼

Translator disclaimer

Transactions of the
American Fisheries Society

# Distribution, Reproduction, and Habitat Use of the Razorback Sucker in the Green River, Utah, 1979–1986

PreviewDownload full text
Access options

**DOI:**

10.1577/1548-8659(1987)116<111:DRAHUO>2.0.CO;2

Harold M. Tyus[a]

pages 111-116

**Publishing models and article dates explained**

- Received: 19 Sep 1986
- Accepted: 2 Feb 1987
- Published online: 09 Jan 2011

**Article Views:** 21
Alert me

- TOC email alert
- TOC RSS feed
- Citation email alert
- Citation RSS feed

## Abstract

Distribution, habitat use, and relative abundance of the rare razorback sucker Xyrauchen texanus were evaluated by the capture of 323 of the fish and by the use of radiotelemetric data from six fish. Razorback suckers in the Green River were not uniformly distributed; they were most abundant in flat-water sections, and none were collected in white-water canyons. Razorback suckers displayed spawning movements in spring, and three spawning reaches were identified by the collection of 101 fish in breeding condition. Larval razorback suckers were collected downstream of the spawning reaches, but no juveniles were collected, indicating little or no successful recruitment. Spawning preferences were deduced from the capture of 52 ripe razorback suckers, between May 3 and June 15, 1984, and between April 22 and June 5, 1986, over sand and gravel substrates. Water temperatures at the points of capture ranged from 10 to 18°C, averaging 15°C. Catch data suggested that the razorback sucker population is small, and that the species is more rare than the endangered Colorado squawfish Ptychocheilus lucius. Low numbers, little growth, and no apparent recruitment suggest that this species will disappear in nature as old fish die and are not replaced.

- Download full text
-

**Related articles**

BLM_0066983

View all related articles

- Add to shortlist
- Link

**Permalink**

http://dx.doi.org/10.1577/1548-8659(1987)116<111:DRAHUO>2.0.CO;2

- Download Citation

- Recommend to:
- A friend

## First page preview

Close
Download full text

*Transactions of the American Fisheries Society* 116:111–116, 1987

# Distribution, Reproduction, and Habitat Use of the Razorback Sucker in the Green River, Utah, 1979–1986

HAROLD M. TYUS

*U.S. Fish and Wildlife Service, 1680 West Highway 40, Room 1210*
*Vernal, Utah 84078, USA*

*Abstract.*—Distribution, habitat use, and relative abundance of the rare razorback sucker *Xyrauchen texanus* were evaluated by the capture of 323 of the fish and by the use of radiotelemetric data from six fish. Razorback suckers in the Green River were not uniformly distributed; they were most abundant in flat-water sections, and none were collected in white-water canyons. Razorback suckers displayed spawning movements in spring, and three spawning reaches were identified by the collection of 101 fish in breeding condition. Larval razorback suckers were collected downstream of the spawning reaches, but no juveniles were collected, indicating little or no successful recruitment. Spawning preferences were deduced from the capture of 52 ripe razorback suckers, between May 3 and June 15, 1984, and between April 22 and June 5, 1986, over sand and gravel substrates. Water temperatures at the points of capture ranged from 10 to 18°C, averaging 15°C. Catch data suggested that the razorback sucker population is small, and that the species is more rare than the endangered Colorado squawfish *Ptychocheilus lucius*. Low numbers, little growth, and no apparent recruitment suggest that this species will disappear in nature as old fish die and are not replaced.

The razorback sucker *Xyrauchen texanus* is endemic to the Colorado River basin and is one of its rarest species (Tyus et al. 1982). Although this species was once abundant and widely distributed (Seethaler et al. 1979), its riverine existence is limited primarily to the upper Colorado River basin, where it occupies the mainstem of the Green and upper Colorado rivers (McAda and Wydoski 1980; Tyus et al. 1982). Recruitment may be limited because young razorback suckers have seldom been found (McAda and Wydoski 1980; Wick et al. 1982). The razorback sucker remains in mainstem reservoirs in the lower Colorado River, but those stocks appear to be relict subpopulations of very old individuals (Minckley 1983; McCarthy 1986).

Rigorous sampling of fish populations in the Green and upper Colorado rivers was begun by the U.S. Fish and Wildlife Service (FWS) in 1979 also obtained in seine and trammel nets. Two main sampling programs were employed: a "standardized" program conducted from April to November 1979–1981 and a "spring" program conducted only from April to June 1984–1986. Both programs covered the mainstem of the Green River between river kilometers 512 and 35, or from Dinosaur National Monument (DNM) to a point 35 km above the confluence of the Green and Colorado rivers (Figure 1). The standardized program also included the lower 224 km of the Yampa River and the lower 240 km of the White River. The spring program extended another 40 km up the Green River to the Yampa River (km 552) each year and also included the mouths of major tributaries.

The standardized sampling program incorporated a design that divided the mainstem of the

to determine the distribution, abundance, and life history requirements of endangered fishes. Data collected during this work constitute the largest current body of knowledge for the razorback sucker in its native riverine environment. I present data collected by me and by FWS coworkers in the Green River basin of Colorado and Utah from 1979 to 1986, in an effort to document the biology, status, and habitat use of this unique species.

## Methods

*Collections.*—Razorback suckers were collected primarily by electrofishing, although a few were

Green River into six relatively homogeneous sections on the basis of general river geomorphology (A–F in Figure 1). Within each section, an 8.8-km reach was selected from a table of random numbers. Habitats within two 0.8-km stations were sampled for 1 d each, either by boat electrofishing or with seines, trammel nets, and wire traps (depending on gear suitability). Electrofishing was conducted alongshore throughout the 8.8-km reach. Sampling was done during prerunoff, runoff, and postrunoff flows.

The spring sampling program incorporated only alongshore electrofishing in the prerunoff period

Click to decrease image size

- Information
- Citations
- Reprints & permissions

## Details

- **Citation information:** Web of Science ®
- **Received:** 19 Sep 1986
- **Accepted:** 2 Feb 1987
- **Published online:** 09 Jan 2011

Taylor & Francis
Taylor & Francis Group

### Author affiliations

- [a] U.S. Fish and Wildlife Service, 1680 West Highway 40 , Room 1210, Vernal , Utah , 84078 , USA



**US Department of the Interior**
**Bureau of Land Management**
**Uncompahgre Field Office, Colorado**

Resource Management Plan Revision and Environmental Impact Statement

# FINAL SCOPING SUMMARY REPORT
# JULY 2010



BLM_0066987

# TABLE OF CONTENTS

Section — Page

**SUMMARY** .......... **S-1**

**1. INTRODUCTION** .......... **1-1**

1.1 Purpose of and Need for the Resource Management Plan .......... 1-1
1.2 Description of the RMP Planning Area .......... 1-2
1.3 Overview of Public Involvement Process .......... 1-4
1.4 Description of the Scoping Process .......... 1-5
1.4.1 Newsletter and Mailing List .......... 1-5
1.4.2 Press Release and Newspaper Advertisements .......... 1-5
1.4.3 Newspaper Articles .......... 1-6
1.4.4 Flyer .......... 1-6
1.4.5 Project Website .......... 1-7
1.4.6 Scoping Open Houses .......... 1-7
1.4.7 Notice of Intent .......... 1-8
1.5 Collaborative Involvement Process .......... 1-8
1.5.1 Community Assessment .......... 1-8
1.5.2 Economic Strategy Workshops .......... 1-8
1.5.3 Cooperating Agencies .......... 1-9
1.5.4 Resource Advisory Council .......... 1-9
1.5.5 Collaboration and Consultation with Tribes .......... 1-11

**2. COMMENT SUMMARY** .......... **2-1**

2.1 Method of Comment Collection and Analysis .......... 2-1
2.2 Summary of Public Comments Received .......... 2-2
2.2.1 Written Submissions by Affiliation .......... 2-2
2.2.2 Written Submissions by Geographical Area .......... 2-2
2.2.3 Number of Comments by Process Category .......... 2-5
2.2.4 Number of Comments by Planning Issue Category .......... 2-6

**3. ISSUE SUMMARY** .......... **3-1**

3.1 Planning Issue Development .......... 3-1
3.2 Planning Issue Statements .......... 3-2
3.3 Summary of Public Comments by Resource Planning Issue Category .......... 3-4
3.3.1 Issue 1 .......... 3-4
3.3.2 Issue 2 .......... 3-7
3.3.3 Issue 3 .......... 3-8
3.3.4 Issue 4 .......... 3-11
3.3.5 Issue 5 .......... 3-11
3.3.6 Issue 6 .......... 3-12

## TABLE OF CONTENTS *(continued)*

Chapter Page

3.3.7 Other Issues to Be Addressed in the RMP ........ 3-12
3.4 Issues That Will Not Be Addressed in the RMP ........ 3-12
3.5 Anticipated Decisions ........ 3-13
3.5.1 Future Land Use Plan-level Decisions ........ 3-13
3.5.2 Future Implementation-level Decisions ........ 3-14
3.6 Valid Existing Management ........ 3-14
3.7 Special Designations, Including Nominations ........ 3-14

**4. PLANNING CRITERIA ........ 4-1**

4.1 Preliminary Planning Criteria ........ 4-1
4.2 Additional Suggestions for Planning Criteria ........ 4-3

**5. DATA SUMMARY/DATA GAPS ........ 5-1**

**6. FUTURE STEPS ........ 6-1**

6.1 Future Steps and Public Participation Opportunities ........ 6-1
6.2 Contact Information ........ 6-2

**7. REFERENCES ........ 7-1**

## APPENDICES

A Scoping Materials
B List of Commenters
C Comments by Resource Planning Issue

## FIGURES

Page

1-1 Uncompahgre RMP Planning Area ........ 1-3
2-1 Comments by Commenter Affiliation ........ 2-3
2-2 Commenters by Geographic Area ........ 2-4

## TABLES

Page

1-1 Newspaper Advertisement Publication Dates and Location ........ 1-6
1-2 Newspaper Articles ........ 1-6
1-3 Scoping Open Houses ........ 1-7

## TABLES *(continued)*

Page

1-4 Cooperating Agency Participation .......... 1-10
2-1 Comments by Commenter Affiliation[1] .......... 2-3
2-2 Commenters by Geographic Area[1] .......... 2-4
2-3 Commenter Location within the Planning Area[1] .......... 2-5
2-4 Comments by Process Category .......... 2-6
2-5 Comments by Planning Issue .......... 2-6

## ACRONYMS AND ABBREVIATIONS

| Acronym | Full Phrase |
|---|---|
| ACEC | Areas of Critical Environmental Concern |
| BLM | United States Department of the Interior, Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| EIS | environmental impact statement |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| NCA | National Conservation Area |
| NEPA | National Environmental Policy Act |
| planning area | all lands, regardless of ownership, within the United States Department of the Interior, Bureau of Land Management, Uncompahgre Field Office, Colorado, excluding the Dominguez-Escalante and Gunnison Gorge National Conservation Areas |
| public lands | lands administered by the United States Department of the Interior, Bureau of Land Management |
| RAC | Resource Advisory Council |
| RMP | resource management plan |
| UFO | Uncompahgre Field Office |
| US | United States |

# SUMMARY

The United States Department of the Interior, Bureau of Land Management (BLM), Uncompahgre Field Office is preparing a resource management plan (RMP) to revise management direction for BLM-administered lands. The Uncompahgre Field Office is responsible for the management and stewardship of approximately 675,760 surface acres of BLM-administered land and 2,140,720 million acres of subsurface federal mineral estate within the Uncompahgre RMP planning area in southwestern Colorado. The planning area excludes the Gunnison Gorge and Dominguez-Escalante National Conservation Areas. The environmental effects of the RMP will be evaluated in an environmental impact statement (EIS) prior to plan implementation.

Public involvement is a vital component of an effective RMP/EIS process. Public involvement for the Uncompahgre RMP includes public scoping and outreach; outreach to local communities in the form of a community assessment; collaboration with federal, state, local, and tribal governments and a Resource Advisory Council; and public review of and comment on the Draft RMP/EIS. This report documents the results of the public and agency scoping and outreach process.

## PUBLIC SCOPING ACTIVITIES

Public outreach for the Uncompahgre RMP/EIS during the public scoping period has included: 1) a newsletter mailed in December 2009 to over 350 agency officials, organizations, and members of the public; 2) seven scoping open houses in January and February 2010 in Hotchkiss, Delta, Montrose, Ridgway, Norwood, Naturita, and Telluride, Colorado; 3) notices published in six newspapers in Delta, Montrose, Norwood, Ouray, Ridgway, and Telluride, Colorado; and 4) a public Web site, http://www.uformp.com, which provides access to materials distributed at scoping meetings, as well as information on the public involvement process. The formal public comment period as required by the National Environmental Policy Act of 1969 (Public Law 91-190) began on February 25, 2010, with the publication of a Notice of Intent in the *Federal Register* and ended on March 29, 2010.

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 80 of 301

## Public Scoping Results

The BLM received 214 unique written submissions and 13 different form letters including a total of 2,496 unique comments during the public scoping period. Comments were categorized, coded, entered into a database, tallied, and analyzed. Categories included RMP process categories, planning issues, and commenter affiliation.

Members of the general public provided written 155 submissions (72.4 percent) during the scoping period, organizations or non-profit groups submitted 23 comments (10.7 percent), and businesses submitted 18 comments (8.4 percent). Federal agencies submitted 5 written submissions (2.3 percent), state agencies submitted 5 written submissions (2.3 percent), and local governmental agencies submitted 7 written submissions (3.3 percent), for a total of 7.9 percent of the submissions from government. One comment (0.5 percent) was received from an educational institution. No written submissions were received from tribal governments or organizations or elected officials.

## Issue Summary

Based on internal (within the Uncompahgre Field Office) and external scoping, the following planning issues have been identified. Comments received were classified into the planning issues below and into subcategories for each issue.

Issue 1. How will vegetative resources, terrestrial and aquatic habitat, water resources, and special management areas be managed while maintaining biological diversity and native species populations?

Issue 2. How will energy and minerals resources be managed?

Issue 3. How will human activities and uses be managed?

Issue 4. How will land tenure, withdrawals, and utility/energy corridors be managed or adjusted?

Issue 5. How will cultural, historical, and paleontological resources, and Native American religious concerns be managed and protected?

Issue 6. How do population growth and an expanding urban interface affect the management of public lands and resources, including authorized and permitted land uses, while considering community values and needs?

The BLM will use the planning issues to help guide the development of a reasonable range of alternative management strategies for the RMP. In addition to planning issues, comments also addressed issues that are policy or administrative actions; issues that have been or will be addressed by the Uncompahgre Field Office outside of the RMP; and issues that are outside the scope of the RMP.

## Future Steps

Scoping is the first opportunity for public involvement in the RMP process. The Uncompahgre Field Office will use the information collected during the scoping period to formulate alternatives and prepare the Draft RMP/EIS, which is anticipated to be published in 2012. Release of the Draft RMP/EIS will be announced in a Notice of Availability in the *Federal Register* and in

BLM_0066993

the local media, and additional public meetings will be held to solicit public comment on the draft document. At the conclusion of the public comment period, the Draft RMP/EIS will be revised, and a Proposed RMP/Final EIS will be published and made available for public review. While these are the specific opportunities for public involvement during the RMP process, the BLM welcomes input from the public throughout the RMP process.

This page intentionally left blank.

# SECTION 1 INTRODUCTION

The United States (US) Department of the Interior, Bureau of Land Management (BLM), Uncompahgre Field Office (UFO) is preparing a resource management plan (RMP) to revise management direction for BLM-administered (public) lands. The UFO is responsible for the management and stewardship of approximately 675,760 surface acres of public land and 2,140,720 million acres of subsurface federal mineral estate within the Uncompahgre RMP planning area in southwestern Colorado. The planning area includes all lands, regardless of ownership, with the BLM UFO, excluding the Gunnison Gorge and Dominguez-Escalante National Conservation Areas. In conjunction with the RMP, an environmental impact statement (EIS) will be prepared to analyze the environmental effects that could result from implementing the alternatives addressed in the RMP. The affected lands are currently managed under the San Juan/San Miguel RMP (BLM 1985), as amended, and the Uncompahgre Basin RMP (BLM 1989), as amended.

Under the National Environmental Policy Act (NEPA) of 1969 (Public Law 91-190) and the Council on Environmental Quality's (CEQ) regulations implementing NEPA (40 Code of Federal Regulations [CFR] 1500-1501), federal agencies are required to consider the environmental effects of their actions prior to taking such actions. Actions that are subject to NEPA include projects and programs that are entirely or partially financed, assisted, conducted, regulated, or approved by federal agencies; new and revised agency rules, regulations, plans, policies, or procedures; and legislative procedures (40 CFR 1508.18). The actions proposed by the BLM as part of the Uncompahgre RMP are subject to the requirements of NEPA.

## 1.1 PURPOSE OF AND NEED FOR THE RESOURCE MANAGEMENT PLAN

An RMP is a land use plan that describes broad multiple-use direction for managing public lands administered by the BLM. The Federal Land Policy and Management Act of 1976 (FLPMA) directs the BLM to develop such land use plans to provide for appropriate uses of public land. Decisions in land use plans guide future land management actions and subsequent site-specific implementation decisions. These decisions establish goals and objectives (desired outcomes) for resource management and the measures needed to achieve them. These measures are

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 84 of 301

expressed as actions and allowable uses (i.e., lands that are open or available for certain uses, including any applicable restrictions, and lands that are closed to certain uses).

The BLM-administered public lands within the Uncompahgre RMP planning area are currently managed in accordance with the decisions in the 1985 San Juan/San Miguel Basin RMP (BLM 1985) and the 1989 Uncompahgre Basin RMP (BLM 1989). The BLM has completed approximately 50 maintenance actions, 10 plan amendments, and 2 activity plans since the 1985 and 1989 Records of Decision were signed. Since the dissolution of the Montrose District, the San Juan/San Miguel RMP has been used by both the Uncompahgre Field Office and the San Juan Public Lands Center (Dolores Field Office). The San Juan Public Lands Center is in the draft stage of their RMP revision and is revising the portion of the San Juan/San Miguel RMP that falls under their jurisdiction.

Although the 1985 and 1989 RMPs have been subsequently amended, they do not satisfactorily address new and emerging issues. Laws, regulations, policies, and issues regarding management of these public lands have changed during the life of the plan. The BLM is developing a new RMP to ensure compliance with current mandates and to address current issues. The RMP will establish new land use planning decisions to address issues identified through public scoping and, where appropriate, may incorporate decisions from the 1989 Uncompahgre Basin RMP (BLM 1985) and 1985 San Juan/San Miguel RMP (BLM 1989), as amended.

To support the RMP preparation, the BLM will prepare an EIS that provides a comprehensive evaluation of the environmental issues and impacts. The NEPA requires the BLM to consider a range of alternatives in its planning process and to analyze and disclose the potential environmental impacts of proposed RMP decisions. The alternatives and impact analysis are documented in the EIS. The EIS process also provides opportunities for participation by the public; other federal agencies, state, and local governments; and tribal governments in RMP development. The RMP and EIS will be combined into one document.

## 1.2 Description of the RMP Planning Area

The planning area encompasses approximately 3,097,500 million acres of federal, state, and private lands primarily in six counties—Montrose, Delta, Mesa, Gunnison, Ouray, and San Miguel. Refer to **Figure 1-1**, Uncompahgre RMP Planning Area. Twenty-five distinct and diverse communities exist within the UFO; the communities have very different economic bases, values, and resources, and include high-end resort communities, farm and ranching communities, coal mining towns, and others. Management direction outlined in the RMP will apply to 675,760 surface acres of public lands administered by the BLM. In addition the plan will provide management direction for 2,140,720 million acres of subsurface federal mineral estate, including 1,269,720 acres of federal minerals under other federal land, as well as 295,000 acres of federal minerals under private and state lands. The RMP will not provide management direction for the Gunnison Gorge or Dominguez-Escalante National Conservation Areas (NCA), as these NCAs are outside the Uncompahgre RMP planning area and are or will be covered under separate RMPs.

BLM_0066997



Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 85 of 301

Colbran
Grand Junction
Colorado
Cedaredge
Paonia
Hotchkiss
Delta
Dominguez Escalante NCA Planning Area
Gunnison Gorge NCA Planning Planning Area
Crawford
Olathe
Montrose
Nucla
Naturita
Ridgway
Norwood
Ouray
Sawpit
Telluride
Mountain Village
Ophir
N W E S
10
Miles

Uncompahgre RMP Planning Area
Uncompahgre Field Office
National Conservation Area
County Boundaries
City
Bureau of Land Management
National Park Service
Other Federal
Private
State
State, County, or City Areas
US Forest Service
BLM Wilderness
Forest Service Wilderness
NPS Wilderness
BLM Wilderness Study Area

***Uncompahgre RMP Planning Area***

*No warranty is made on the accuracy, reliability and completeness of these data for individual use or aggregate use with other data. Spatial data may not meet National Map Accuracy Standards. This information may be updated without notification.*

Figure 1-1

BLM_0066998

## 1.3 OVERVIEW OF PUBLIC INVOLVEMENT PROCESS

Public involvement is a vital and legal component of both the RMP and EIS processes. Public involvement vests the public in the decision-making process and allows for full environmental disclosure. Guidance for implementing public involvement under NEPA is codified in 40 CFR Section 1506.6, thereby ensuring that federal agencies make a diligent effort to involve the public in the NEPA process. Section 202 of FLPMA directs the Secretary of the Interior to establish procedures for public involvement during land use planning actions on public lands. Guidance for implementing public involvement during land use planning actions on public lands can be found in the BLM's Land Use Planning Handbook (H-1601-1) (BLM 2005). Public involvement requirements of both NEPA and FLPMA will be satisfied through this joint RMP/EIS process.

Public involvement for the Uncompahgre RMP/EIS is being conducted in the following four phases:

- Public scoping before NEPA analysis begins to determine the scope of issues and alternatives to be addressed in the RMP/EIS;
- Public outreach via newsletters, news releases, and newspaper advertisements;
- Collaboration with federal, state, local, and tribal governments; the BLM Colorado Southwest Resource Advisory Council (RAC); and cooperating agencies; and
- Public review of and comment on the Draft RMP/EIS, which analyzes likely environmental effects and identifies the BLM's preferred alternative.

This scoping summary report documents the results of the first two phases of the public involvement process beginning with public scoping and provides information about the ongoing collaboration process.

Scoping is an early and open process for determining the scope of issues to be addressed and identifying the significant issues related to a proposed action. Information collected during scoping may also be used to develop the alternatives to be addressed in a NEPA document. The process has two components: internal scoping and external scoping. Internal scoping is conducted within an agency or cooperating agencies to determine preliminary and anticipated issues and concerns. An interdisciplinary team of BLM UFO resource specialists held internal scoping meetings to identify the anticipated planning issues and the methods, procedures, and data to be used in compiling the RMP/EIS.

External scoping is a public process designed to reach beyond the BLM and attempts to identify the concerns of high importance to the public. External scoping helps ensure that real problems are identified early and properly studied, that issues of no concern do not consume time and effort, and that the proposed action and alternatives are balanced, thorough, and able to be implemented.

In accordance with 43 CFR 1610.2(d), the BLM must document the scoping results. The BLM's land use planning guidance (Handbook H-1601-1 [BLM 2005]) requires the preparation of a Scoping Summary Report to capture public input in one document. This report must summarize the separate comments received during the formal external scoping period. It also must describe

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 87 of 301

the issues and management concerns from public scoping meetings, internal scoping meetings, and the pre-plan analysis and must include a discussion of how these comments will be incorporated into the RMP.

## 1.4 Description of the Scoping Process

The BLM follows the public involvement requirements documented in CEQ regulations implementing NEPA (40 CFR 1501.7 for scoping and 1506.6 for public involvement). The BLM also follows public involvement requirements described in the BLM's planning regulations (43 CFR 1601-1610). The BLM solicits comments from relevant agencies and the public, organizes and analyzes all comments received, and then distills them to identify issues that will be addressed during the planning process. These issues define the scope of analysis for the RMP and are used to develop the project alternatives.

### 1.4.1 Newsletter and Mailing List

In December 2009, the BLM mailed a newsletter announcing the start of the public scoping period for the Uncompahgre RMP/EIS to more than 350 individuals from the public, agencies, and organizations who had participated in past UFO activities and had been included on past UFO distribution lists. The newsletter provided the dates and venues for the original six scoping open houses (Hotchkiss, Delta, Montrose, Ridgway, Norwood, and Naturita) (see **Section 1.4.6**, Scoping Open Houses), included an insert with a comment form for submitting scoping comments, and described the various methods for submitting comments, including dedicated e-mail and postal addresses. The BLM will publish future newsletters at major project milestones and will mail them to individuals and organizations that have requested to remain on or be added to the project mailing list. All newsletters will be posted on the project Web site (http://www.uformp.com). Participants may request to receive newsletters and other project information through electronic or postal mail. The newsletter is included in **Appendix A**, Scoping Materials.

### 1.4.2 Press Release and Newspaper Advertisements

A press release was posted on the project Web site (http://www.uformp.com) on January 5, 2010, announcing the scoping period for the Uncompahgre RMP/EIS process. It also provided information on the original six scoping open houses (see **Section 1.4.6**, Scoping Open Houses) and described the various methods for submitting comments.

A second press release was posted on the project Web site on March 2, 2010, announcing the extension of the public scoping period to March 29, 2010.

A newspaper advertisement was published in six local newspapers in December 2009 and January 2010 prior to the scoping meetings. **Table 1-1**, Newspaper Advertisement Publication Dates and Location, displays the date each newspaper published the advertisement. This newspaper advertisement announced the original six scoping open houses (see **Section 1.4.6**, Scoping Open Houses). The newspaper article and press releases are included in **Appendix A**, Scoping Materials.

BLM_0067000

**Table 1-1**
**Newspaper Advertisement Publication Dates and Location**

| Newspaper | Location (Colorado) | Date(s) Advertisement Appeared |
|---|---|---|
| Delta County Independent | Delta | December 23, 2009<br>January 6, 2010 |
| Montrose Daily Press | Montrose | December 30, 2009<br>December 31, 2009<br>January 6, 2010<br>January 10, 2010 |
| Norwood Post | Norwood | December 30, 2009<br>January 20, 2010 |
| Ouray Plaindealer | Ouray | January 8, 2010 |
| Ridgway Sun | Ridgway | January 6, 2010<br>January 13, 2010 |
| Telluride Daily Planet | Telluride | January 20, 2010<br>February 2, 2010 |

### 1.4.3 Newspaper Articles

Six local newspapers are known to have published their own articles covering the RMP revision and scoping period. **Table 1-2**, Newspaper Articles, displays each newspaper's publication date of the articles.

**Table 1-2**
**Newspaper Articles**

| Newspaper | Date(s) Article(s) Appeared |
|---|---|
| Delta County Independent | January 20 and 27, 2010 |
| Montrose Daily Press | January 15 and February 3, 2010 |
| Norwood Post | January 23, 2010 |
| Ridgway Sun | January 13, 2010 |
| San Miguel Basin Forum | January 21 and 28, 2010 |
| Telluride Daily Planet | January 17 and February 2, 2010 |

### 1.4.4 Flyer

A flyer announcing the dates and locations of the original six scoping open houses (see **Section 1.4.6**, Scoping Open Houses) was posted in various public locations in Delta, Hotchkiss, Montrose, Naturita, Norwood, Nucla, Paonia, and Redvale, Colorado, on January 8 and 12, 2010. The flyer is included in **Appendix A**, Scoping Materials.

### 1.4.5 Project Website

A public Web site was launched and is regularly updated to provide the public with the latest information about the RMP/EIS process. The Web site, available on the Internet at http://www.uformp.com, provides background information about the project, a public involvement timeline and calendar, maps and photos of the planning area, and copies of public information documents such as the newsletter and Notice of Intent. The site also provides a link to the scoping comment form for submitting comments about the RMP process. The dates and locations of all seven scoping open houses were announced on the Web site.

### 1.4.6 Scoping Open Houses

The BLM hosted seven open houses to provide the public with opportunities to become involved, learn about the project and the planning process, meet the Uncompahgre RMP team members, and offer comments. The seventh open house in Telluride was added in response to a special request from the San Miguel County Commissioners. The six originally scheduled open houses were advertised via press release, newspaper advertisements, the project newsletter, the project Web site, and a flyer posted in various towns throughout the planning area. The locations of the open houses are provided in **Table 1-3**, Scoping Open Houses.

**Table 1-3**
**Scoping Open Houses**

| Location (Colorado) | Venue | Date | Number of Attendees | Number of Completed Comment Forms Received |
|---|---|---|---|---|
| Hotchkiss | Memorial Hall | January 12, 2010 | 99 | 11 |
| Delta | Bill Heddles Recreation Center | January 13, 2010 | 42 | 0 |
| Montrose | Montrose Pavilion | January 14, 2010 | 84 | 1 |
| Ridgway | Town Hall | January 19, 2010 | 41 | 3 |
| Norwood | Town Hall | January 20, 2010 | 26 | 0 |
| Naturita | Community Building | January 21, 2010 | 60 | 2 |
| Telluride | Miramonte Building | February 3, 2010 | 17 | 0 |
| **Total** | | | **369** | **17** |

Note: Meetings were from 4:30 to 7:30 pm, except in Delta and Montrose where meetings were from 4:30 to 8:00 pm, and Telluride where the meeting was from 2:00 to 4:00 pm.

Scoping meetings were held in an open house format to encourage participants to discuss concerns and questions with BLM staff representatives. Copies of the first issue of the project newsletter, as well as blank scoping comment forms and a guide to providing substantive comments, were available at the sign-in station. A Microsoft PowerPoint presentation that provided an overview of the RMP process and presented information about public involvement opportunities was played continuously on a large screen. Eight resource stations displayed resource maps and information to illustrate the current situation and management techniques practiced among different resources and land areas. At those stations, 16 fact sheets for various resources provided an overview of current management practices and issues. At the recreation

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 90 of 301

station, information regarding the recreation public focus group meetings to be held in February 2010, including a sign-up sheet for those meetings, was provided. As shown in **Table 1-3**, Scoping Open Houses, 369 people attended the open houses.

### 1.4.7 Notice of Intent

The Notice of Intent notifies the public of the BLM's intent to develop the Uncompahgre RMP. It also initiates the formal scoping public comment period as required by NEPA, which extends 30 days following publication in the *Federal Register*. The Notice of Intent was published on February 25, 2010, and the official scoping comment period ended on March 29, 2010. Comments received on or before April 9, 2010, are included in this report. The BLM will consider all comments received during the planning process, both before and after the publication of the Notice of Intent. The Notice of Intent is posted on the project Web site (http://www.uformp.com).

## 1.5 Collaborative Involvement Process

In addition to formal scoping, the BLM has implemented an extensive collaborative outreach and public involvement process that has included conducting a community assessment and will include working closely with cooperating agencies and the Southwest RAC via a specially created subgroup of the RAC. These efforts are summarized below. The BLM will continue to meet with interested agencies and organizations throughout the planning process, as appropriate, and will coordinate closely with cooperating partners.

### 1.5.1 Community Assessment

The BLM, assisted by a community facilitator and contractor staff, held 22 community assessment meetings from late October to mid-December 2008. This pre-planning process gathered input from communities about their vision for the landscape and benefits they seek from public lands, identified strategic planning options, and laid the foundation for an on-going collaborative relationship with communities for the RMP effort. Results of this process were published in the Community Assessment of the Uncompahgre Planning Area (BLM 2009). This report is available for review on the RMP website (http://www.uformp.com) and available from the BLM upon request.

### 1.5.2 Economic Strategy Workshops

On March 9, 10, 16, and 17, 2010, the UFO hosted six economic strategies workshops in Montrose, Delta, Hotchkiss, Ridgway, Norwood, and Naturita, Colorado. In total, 90 citizens, local government representatives, and local interest group representatives attended the workshops. These workshops provided an opportunity for stakeholders from local communities to participate in the planning process. Attendees discussed economic trends in the region, viewed current and historical socioeconomic data, and developed visions for the economic future of their communities. The attendees also discussed how BLM management of public lands is tied to the economy in local communities and in the region as a whole. The socioeconomic baseline report detailing existing socioeconomic conditions in the planning area and the results of the economic strategy workshops will be available for review on the RMP website (http://www.uformp.com) and available from the BLM upon request when complete in the summer of 2010.

BLM_0067003

### 1.5.3 Cooperating Agencies

A cooperating agency is any federal, state, or local government agency or Indian tribe that enters into a formal agreement with the lead federal agency to help develop an environmental analysis. More specifically, cooperating agencies "work with the BLM, sharing knowledge and resources, to achieve desired outcomes for public lands and communities within statutory and regulatory frameworks" (BLM Land Use Planning Handbook H-1601-1 [BLM 2005]). The benefits of enhanced collaboration among agencies in preparing NEPA analyses are:

- Disclosing relevant information early in the analytical process;
- Applying available technical expertise and staff support;
- Avoiding duplication with other federal, state, tribal, and local procedures; and
- Establishing a mechanism for addressing intergovernmental issues.

On January 23, 2009, the BLM wrote to 40 local, state, federal, and tribal representatives, inviting them to participate as cooperating agencies for the Uncompahgre RMP. As of April 2010, 19 agencies have agreed to participate in the RMP as designated cooperating agencies, and all have signed Memoranda of Understanding with the UFO (**Table 1-4**, Cooperating Agency Participation).

The first cooperating agency meeting was held on May 27, 2010. Meetings will be held monthly through October 2010 and less frequently after October. Cooperating agencies were also encouraged to attend the scoping meetings and provide comments during the scoping period. These agencies will be engaged throughout the planning process, including during alternatives development.

### 1.5.4 Resource Advisory Council

A RAC is a committee established by the Secretary of the Interior to provide advice or recommendations to BLM management (BLM Land Use Planning Handbook H-1601-1 [BLM 2005]). A RAC is generally composed of 15 members of the public, representing different areas of expertise. The Colorado Southwest RAC includes members appointed to represent constituent public land users and provides input on public management issues to the BLM's Southwest RAC Designated Federal Officers and Western Slope Center Manager. Recommendations are based on consensus building and collaboration.

The Colorado Southwest RAC has been involved in the preliminary planning issues for the Uncompahgre RMP. In addition, a nine-member RAC subgroup has been established to participate in the planning process, and in particular to assist the BLM with creating a range of reasonable alternatives for the EIS. The first RAC subgroup meeting was held on May 27, 2010. Meetings will be held monthly through October 2010 and less frequently after October. It is anticipated that meetings will continue throughout the development of alternatives and the draft RMP. Future meeting dates will be posted on the project website (http://www.uformp.com).

**Table 1-4**
**Cooperating Agency Participation**

| Agencies and Tribes Invited to be Cooperators | Accepted as of July 2010 |
|---|---|
| US Department of the Interior, Fish and Wildlife Service | ✓ |
| US Department of the Interior, Bureau of Reclamation | ✓ |
| US Department of the Interior, National Park Service – Black Canyon National Park | |
| US Department of Agriculture, National Forest Service – Grand Mesa, Uncompahgre, and Gunnison National Forests | ✓ |
| US Department of Agriculture, National Forest Service – San Juan National Forest | |
| US Department of Agriculture, National Resource Conservation Service – Colorado State Office | |
| US Department of Agriculture, Animal and Plant Health Inspection Service | |
| US Department of Energy | |
| Western Area Power Administration | |
| Colorado Department of Natural Resources (Division of Wildlife, State Parks, Natural Heritage Program, State Forest Service, Reclamation Division, Mining and Safety) | ✓ |
| Colorado Department of Transportation | |
| Colorado State Historical Preservation Office | |
| Colorado State Parks | |
| Delta County | ✓ |
| Gunnison County | ✓ |
| Mesa County | |
| Montrose County | ✓ |
| Ouray County | ✓ |
| San Miguel County | ✓ |
| City of Delta | |
| City of Montrose | ✓ |
| City of Ouray | |
| Town of Cedaredge | ✓ |
| Town of Crawford | |
| Town of Hotchkiss | ✓ |
| Town of Mountain Village | ✓ |
| Town of Naturita | |
| Town of Norwood | ✓ |
| Town of Nucla | ✓ |
| Town of Olathe | ✓ |

**Table 1-4** *(continued)*
**Cooperating Agency Participation**

| Agencies and Tribes Invited to be Cooperators | Accepted as of July 2010 |
|---|---|
| Town of Orchard City | ✓ |
| Town of Paonia | ✓ |
| Town of Ridgway | ✓ |
| Town of Sawpit | |
| Town of Telluride | |
| Navajo Nation | |
| Northern Ute Indian Tribe | |
| Southern Ute Indian Tribe | |
| Ute Mountain Ute Indian Tribe | |

### 1.5.5 Collaboration and Consultation with Tribes

The UFO has initiated consultation with tribes that are identified as having interests or Traditional Cultural Properties in the planning area. Consultation will be that required by the National Historic Preservation Act and the American Indian Religious Freedom Act. The identified tribes are Northern Ute, Southern Ute, and Ute Mountain Ute.

No written comments were received from tribal agencies during the scoping period; tribal concerns or issues have been typically presented in oral format. Government-to-government consultation will continue throughout the RMP process to ensure that the concerns of tribal groups are considered in development of the RMP.

Case No. 1:20-cv-02484-MSK   Document 49-1   filed 04/28/21   USDC Colorado   pg 94 of 301

This page intentionally left blank.

BLM_0067007

# CHAPTER 2
# COMMENT SUMMARY

## 2.1    METHOD OF COMMENT COLLECTION AND ANALYSIS

All written submissions received on or before April 9, 2009, were evaluated and are documented in this Scoping Summary Report. All comments received during the RMP process will be considered in alternative formulation and project planning.

A total of 214 unique written submissions, resulting in 2,496 unique comments, were received during the public scoping period. The most common format used for submissions was electronic mail. Submissions were also hand-delivered to the UFO, mailed via US Mail, or faxed. In addition, comment forms were completed at the public scoping meetings.

In addition to unique submissions, letter campaigns from non-profit organizations and individuals resulted in form letter submissions for a number of topics. Details of form letter submission are included in **Appendix B** (List of Commenters), **Table B-2**, Form Letter Submissions. Letters that represented slight variations of the form letter without significant additional information were treated as form letters. When significant unique comments were added to the form letter, these comments were entered into the comment-tracking database. In total, 13 different form letters were received. Out of the 13 form letters, 11 were submitted by between 2 and 28 people. The remaining 2 letters were submitted by more substantial numbers of people; a letter campaign by The Wilderness Society resulted in 20,831 electronic submissions, and 117 submissions resulted from a letter campaign by Citizens for a Healthy Community. Form letters are not included in the calculations of affiliation and geographic location percentages.

A list of commenters and the dates of submittal are provided in **Appendix B**, List of Commenters. Most written submissions included more than one comment, so the 214 submissions and form letters yielded 2,496 discrete comments. The comment forms provided instructions for requesting confidentiality and for withholding individual names or addresses from public review or from disclosure under the Freedom of Information Act. One comment was submitted anonymously.

BLM_0067008

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 96 of 301

To ensure that public comments were properly registered and that none were overlooked, a multi-phase management and tracking system was used. First, written submissions were logged and numbered. Once all comments were received and documented, the BLM assigned a planning classification to each issue. These classifications detail which issues raised will be resolved through the current planning effort. Planning classifications are as follows:

1: Issues that will be resolved in the RMP;

2: Issues that will be addressed through BLM policy or administrative action (National and BLM policy);

3: Issues that are beyond the scope of this RMP that will be considered but not addressed; and

4: Issues that have already been addressed by the UFO but should be better communicated to the issue holder.

To assist with the analysis, the BLM entered comments into the Public Input and Comment Tracking database and organized comments by planning issue categories and affiliation of the commenter. Finally, these identifiers were queried and tallied to provide information on planning and other issue categories. Details of comments received by planning issue are included in **Section 2.2.4**, Number of Comments by Planning Issue Category.

## 2.2 Summary of Public Comments Received

### 2.2.1 Written Submissions by Affiliation

**Table 2-1**, Comments by Commenter Affiliation, and **Figure 2-1**, Comments by Commenter Affiliation, show the number and proportion of written submissions received from each type of affiliation. Letters on business, agency, or organization letterhead, or where the commenter signed using their official agency title, were considered to represent that organization. All other letters were considered to represent individuals. Members of the general public provided 72.4 percent of the comments received during the scoping period, representatives from businesses submitted 8.4 percent, and non-profit or citizen groups submitted 10.7 percent. Federal agencies submitted 5 written submissions (2.3 percent), state agencies submitted 5 written submissions (2.3 percent), and local governmental agencies submitted 7 written submissions (3.3 percent), for a total of 7.9 percent of the submissions from government. No written submissions were received from tribal governments or organizations or elected officials. A list of commenters, their affiliations, and the submittal date of their comments are listed in **Appendix B**, List of Commenters.

### 2.2.2 Written Submissions by Geographical Area

**Table 2-2,** Commenters by Geographic Area, and **Figure 2-2**, Commenters by Geographic Area, show the number and proportion of written submissions received by the geographic location of the sender. A total of 140 commenters (67.3 percent) were from counties within the planning area. Of the remaining submissions, 29 (13.9 percent) were from commenters in other counties in Colorado, primarily on the Front Range. Seven commenters (3.4 percent) were from other states. Ten (15.4 percent) of the 32 written submissions received did not indicate a geographic origin. Note that these calculations do not include form letters submissions. In

BLM_0067009

**Table 2-1**
**Comments by Commenter Affiliation[1]**

| Affiliation | Number of Comment Letters | Percentage of Total Comment Letters |
|---|---|---|
| Government | 17 | 7.9 |
| *Federal* | *5* | *2.3* |
| *State* | *5* | *2.3* |
| *Local* | *7* | *3.3* |
| Educational Institutions | 1 | 0.5 |
| Businesses | 18 | 8.4 |
| Organizations/Non-profits | 23 | 10.7 |
| Individuals | 155 | 72.4 |
| **Total** | **214** | **100** |

[1]Calculations do not include form letters submissions.

**Figure 2-1**
**Comments by Commenter Affiliation[1]**

[1]Calculations do not include form letters submissions.

addition, some commenters made multiple submissions and some letters had more than one signatory, therefore the total for commenters by geographic area is not equal to the total letter submissions.

**Table 2-2**
**Commenters by Geographic Area**[1]

| Location | Number of Commenters | Percentage of Total Commenters |
|---|---|---|
| Within Planning Area | 140 | 67.3 |
| Outside Planning Area, within Colorado | 29 | 13.9 |
| Outside Colorado | 7 | 3.4 |
| Unknown | 32 | 15.4 |
| **Total** | **208** | **100** |

[1]Calculations do not include form letters submissions.

**Figure 2-2**
**Commenters by Geographic Area**[1]

[1]Calculations do not include form letters submissions.

Commenter location within the planning area was further examined by city of commenter. In the planning area, Montrose (21.4 percent), Paonia (16.4 percent), Nucla (12.9 percent), Hotchkiss (11.4), and Delta (10.7 percent) had the highest number of commenters. Refer to **Table 2-3**, Commenter Location within the Planning Area.

**Table 2-3**
**Commenter Location within the Planning Area[1]**

| Location | Number of Commenters | Percentage of Total Commenters |
|---|---|---|
| Montrose | 30 | 21.43 |
| Paonia | 23 | 16.43 |
| Nucla | 18 | 12.86 |
| Hotchkiss | 16 | 11.43 |
| Delta | 15 | 10.71 |
| Ridgway | 10 | 7.14 |
| Austin | 6 | 4.29 |
| Crawford | 4 | 2.86 |
| Naturita | 4 | 2.86 |
| Telluride | 4 | 2.86 |
| Norwood | 3 | 2.14 |
| Somerset | 3 | 2.14 |
| Olathe | 2 | 1.43 |
| Cedaredge | 1 | 0.71 |
| Paradox | 1 | 0.71 |
| **Total** | **140** | **100** |

[1]Calculations do not include form letters submissions.

### 2.2.3 Number of Comments by Process Category

**Table 2-4**, Comments by Process Category, shows the number of issues raised that will or will not be addressed in the RMP. Of the 2,496 comments received, 2,176 (87.2 percent) were related to a planning issue that will be addressed in the RMP. While some comments addressed multiple planning issues, one primary category was selected for analysis. These comments are discussed in detail below and in **Section 3**, Issue Summary. In addition, 63 comments (2.5 percent) were related to issues that will be addressed in the RMP but do not fall within a specific planning issue category. These comments included general comments on the RMP planning process, alternatives development, collaboration, and requirements of NEPA and other regulations (see **Section 3.3.7**, Other Issues to Be Addressed in the RMP). The remaining 10.3 percent of the comments were: 1) issues beyond the scope of the RMP (2.5 percent); 2) issues that will be resolved through national policy or administrative action (0.8 percent); or 3) comments related to implementation-level decisions (1.6 percent). See **Section 3.4**, Issues That Will Not Be Addressed in the RMP, for more detail.

Comments are provided in **Appendix C**, Comments by Resource Planning Issue. Comment letters can be viewed in their entirety at the UFO in Montrose, Colorado.

**Table 2-4**
**Comments by Process Category**

| Process Category Code | Percent of Comments | Number of Comments |
|---|---|---|
| General comment related to project | 7.9 | 197 |
| Planning issue | 87.2 | 2,176 |
| General issue beyond the scope of the RMP | 2.5 | 63 |
| Implementation-level decisions | 1.6 | 40 |
| Issue resolved through national policy | 0.8 | 20 |
| **Total** | **100** | **2,496** |

### 2.2.4   Number of Comments by Planning Issue Category

**Table 2-5**, Comments by Planning Issue, show the number and proportion of comments received by planning issue category. The BLM received 2176 planning issue comments and categorized them into the 6 planning issue categories and the appropriate sub categories. **Section 3**, Issue Summary, provides a detailed analysis of the comments received for each planning issue category and subcategory.

Of the planning issue comments, 942 (43.3 percent) related to those in Issue 1, natural resource management. Within this category, the most comments were received for special designation areas (664 comments, 30.5 percent of planning issue comments). The Issue with the second highest number of comments was Issue 3, management of human activities, with 660 comments (30.3 percent). In this category, Recreation (300 comments, 13.8 percent of planning issue comments) and Travel Management (243 comments, 11.2 percent of planning issue comments) received the most comments. Planning Issue 2, concerned with energy development and mineral extraction, received the third highest number of comments with 410 (18.9 percent of planning issue comments). Issue 6, concerned with social and economic considerations and public health, received 72 comments (3.3 percent of planning issue comments). Issue 4, Lands and Realty, received 71 comments (3.3 percent). Finally, Issue 5, cultural resources, received the fewest comments with 20 (0.9 percent of planning issue comments).

**Table 2-5**
**Comments by Planning Issue**

| Planning Issue and Subcategory | Number of Comments | Percent of Comments |
|---|---|---|
| **ISSUE 1** | **942** | **43.3** |
| All Water, Air and Soil | 85 | 3.9 |
| *Geology and Soils* | *5* | *0.2* |
| *Air Quality* | *30* | *1.4* |
| *Water Resources* | *50* | *2.3* |
| All Special Status Species | 32 | 1.5 |
| *Special Status Fish* | *5* | *0.2* |

**Table 2-5** *(continued)*
**Comments by Planning Issue**

| Planning Issue and Subcategory | Number of Comments | Percent of Comments |
|---|---|---|
| *Special Status Plants* | *5* | *0.2* |
| *Special Status Species General* | *15* | *0.7* |
| *Special Status Wildlife* | *7* | *0.3* |
| All Special Designation Areas | 664 | 30.5 |
| *Special Designation Areas General* | *24* | *1.1* |
| *Areas of Critical Environmental Concern* | *38* | *1.7* |
| *Wild and Scenic Rivers* | *314* | *14.4* |
| *Wild and Scenic Rivers in Dominguez-Escalante NCA* | *22* | *1.0* |
| *Wilderness and Wilderness Study Areas* | *251* | *11.5* |
| *Wilderness Characteristics* | *8* | *0.4* |
| *National Trails and Byways* | *7* | *0.3* |
| All Vegetation | 79 | 3.6 |
| *Vegetation (general comments)* | *43* | *2.0* |
| *Weeds* | *25* | *1.1* |
| *Wetland and Riparian Areas* | *11* | *0.5* |
| Fish and Wildlife | 68 | 3.1 |
| Drought Management and Climate Change | 14 | 0.6 |
| **ISSUE 2** | **410** | **18.9** |
| Energy Development (general comments) | 99 | 4.6 |
| Non-renewable Energy Development | 225 | 10.3 |
| Minerals and Mining | 72 | 3.3 |
| Renewable Energy Development | 14 | 0.6 |
| **ISSUE 3** | **660** | **30.3** |
| Recreation | 300 | 13.8 |
| Travel Management | 243 | 11.2 |
| Noise | 4 | 0.2 |
| Visual Resources | 22 | 1.0 |
| Forestry | 16 | 0.7 |
| Livestock Grazing | 64 | 2.9 |
| Fire Management | 11 | 0.5 |
| **ISSUE 4** | **71** | **3.3** |
| Lands and Realty | 71 | 3.3 |
| **ISSUE 5** | **20** | **0.9** |
| Cultural and Heritage Resources | 18 | 0.8 |
| Paleontological Resources | 2 | 0.1 |

BLM_0067014

**Table 2-5** *(continued)*
**Comments by Planning Issue**

| Planning Issue and Subcategory | Number of Comments | Percent of Comments |
|---|---|---|
| **ISSUE 6** | **72** | **3.3** |
| Social, Economic, and Environmental Justice Concerns | 62 | 2.9 |
| Public Health and Safety | 10 | 0.5 |

# CHAPTER 3
# ISSUE SUMMARY

Issue identification is the first of the nine-step BLM planning process. As defined in the BLM Land Use Planning Handbook (H-1601-1) (BLM 2005), planning issues include concerns or controversies about existing and potential land and resource allocations, levels of resource use, production, and related management practices. Issues include concerns, needs, and resource use, development, and protection opportunities to consider in RMP preparation. These issues may stem from new information or changed circumstances and from the need to reassess the appropriate mix of allowable uses.

## 3.1 PLANNING ISSUE DEVELOPMENT

The BLM enacted a multi-step issue identification process for the Uncompahgre RMP planning effort. The process began with the creation of a Preparation Plan for the Uncompahgre RMP/EIS in January 2008. This plan, used by the interdisciplinary team to begin the planning process, summarized the purpose of and need for the RMP. It also highlighted anticipated planning issues, management concerns, and preliminary planning criteria developed by the BLM interdisciplinary team during internal scoping.

Public scoping began with the release of the first project newsletter in December 2009, followed by scoping workshops in January and February 2010. In February 2010, the BLM issued the Notice of Intent to prepare the RMP, which initiated the formal scoping period as required by NEPA, and solicited written comments from the public (further discussed in **Section 1.4**, Description of the Scoping Process). Scoping is a collaborative public involvement process implemented to identify and refine planning issues to address in the planning process. During the scoping period, the BLM also engaged tribes and cooperating agencies, as discussed in **Section 1.5**, Collaborative Involvement Process. The BLM hosted seven open houses and solicited written comments from the public during the scoping period. The scoping period provided the BLM additional information on the public's concerns and suggestions regarding the planning area.

Information accepted during internal and external scoping was compiled to develop discrete planning issue statements; these are discussed in **Section 3.2**, Planning Issue Statements. The purpose of these planning issue statements is to highlight the key issues distilled from these

initial planning and scoping processes. The issues are also discussed in **Section 3.3**, Summary of Public Comments by Resource Planning Issue Category, according to the various issue categories and associated comments received from interested individuals, agencies, elected officials, businesses, and organizations. The BLM will use the planning issues and associated statements, planning criteria, and other information collected in the early planning and scoping phases of the RMP process to help formulate a reasonable range of alternative management strategies that will be analyzed during the RMP/EIS process.

## 3.2 PLANNING ISSUE STATEMENTS

A planning issue is a conflict or dispute over resource management activities, allocations, or land use that is well defined or topically discrete and entails alternatives between which to choose.

The planning issue statements presented below are preliminary and are based on the best information known to date. The process of developing this RMP will afford many opportunities for collaboration with local, state, federal, and tribal governments; land-management agencies; public interest groups; and public land users. As a result, these issues and concerns may need to be modified and perfected to reflect public comments and concerns. The overarching planning issues the UFO will address in the plan are listed below. Each overarching issue, in turn, has several sub-topics, issue questions, and management concerns which address more specific uses and resources. As applicable, items listed in Appendix C of the Land Use Planning Handbook (H-1601-1) (BLM 2005) will be addressed and decisions will be made. Planning issue statements include the following:

- Issue 1. How will vegetative resources, terrestrial and aquatic habitat, water resources, and special management areas be managed, while maintaining biological diversity and native species populations?

- Issue 2. How will energy and minerals resources be managed?

- Issue 3. How will human activities and uses be managed?

- Issue 4. How will land tenure, withdrawals, and utility/energy corridors be managed or adjusted?

- Issue 5. How will cultural, historical and paleontological resources and Native American religious concerns be managed and protected?

- Issue 6. How do population growth and an expanding urban interface affect the management of public lands and resources, including authorized and permitted land uses, while considering community values and needs?

Each planning issue as defined above encompasses a number of subcategories. Comments received during the public scoping period were classified into these subcategories as follows:

Issue 1: How will vegetative resources, terrestrial and aquatic habitat, water resources, and special management areas be managed, while maintaining biological diversity and native species populations?

- Soil, air, and water resources

BLM_0067017

- Special management areas, including Areas of Critical Environmental Concern (ACEC), wild and scenic rivers, wilderness, and Wilderness Study Areas
- Vegetation, including riparian and wetland areas and noxious weeds
- Fish and wildlife
- Special status species
- Drought management and climate change

Issue 2: How will energy and minerals resources be managed?

- Non-renewable energy development (e.g., oil and gas, coal)
- Renewable energy development
- Minerals and mining (locatable minerals and saleable mineral materials)

Issue 3: How will human activities and uses be managed?

- Recreation
- Travel management
- Livestock grazing
- Visual resources
- Noise
- Forestry
- Wildland fire management

Issue 4: How will land tenure, withdrawals, and utility/energy corridors be managed or adjusted?

- Lands and realty

Issue 5: How will cultural, historical, and paleontological resources and Native American religious concerns be managed and protected?

- Cultural resources and heritage resources
- Paleontological resources
- Native American religious concerns

Issue 6: How do population growth and an expanding urban interface affect the management of public lands and resources, including authorized and permitted land uses, while considering community values and needs?

- Socioeconomic and environmental justice concerns
- Public health and safety

These preliminary issue categories were expected to encompass most public issues and concerns and to serve as a starting point to spark public consideration; they were not meant to be all inclusive.

## 3.3 Summary of Public Comments by Resource Planning Issue Category

Each comment received during public scoping was reviewed and coded. Of the 2,496 comments received, 2,176 comments (87.2 percent) were related to one of the planning issues defined above. In addition, 197 comments (7.9 percent) were related to issues that will be addressed in the RMP but do not fall within a specific planning issue category. See **Table 2-5**, Comments by Planning Issue, for a breakdown of the number of comments received for each planning issue and subcategory. Summaries of the scoping comments received for each planning issue category, as well as general RMP comments, are provided in **Sections 3.3.1**, Issue 1, through **3.3.7**, Other Issues to Be Addressed in the RMP, below. These summaries provide details only on comments related to issues that will be resolved in the RMP. Tables with all comments for each planning issue, as well as tables for issues that will not be addressed in the RMP, are included in **Appendix C**, Comments by Resource Planning Issue. Adjustments or additions may be made to the planning issues as the planning process proceeds and the BLM continues to review information, meet with the interdisciplinary team, and talk with the public.

### 3.3.1 Issue 1

***Soil, Air, and Water Resources***

Eighty-five comments were received about air, soil, and water issues, representing 3.9 percent of the comments received on planning issues. Comments are included in **Appendix C** (Comments by Resource Planning Issue), **Table C-5**, Air Quality, Water and Soil

Fifty comments were received on water resources issues (2.3 percent of planning issue comments). Concerns included salinity and selenium control, impacts to surface and ground water quality and quantity from development activities, water rights, source protection for drinking and irrigation water, and management for healthy watersheds.

Five comments were received on soil and geology issues, representing approximately 0.2 percent of the total planning issue comments. Comments primarily related to concerns about soil erosion.

Thirty comments were received about air quality in the planning area, representing 1.4 percent of the total planning issue comments. The US Environmental Protection Agency, San Miguel County Commissioners, Trout Unlimited, and the Wilderness Society all urged the BLM to thoroughly address air quality issues in the RMP. The majority of the commenters requested monitoring and evaluations of air quality in the planning area. Additionally, commenters requested that the expertise, technology, and software to analyze air quality are present to ensure proper baseline data. Commenters were particularly concerned with the contribution of oil and gas production to local air pollutants. In addition, multiple comments requested additional dust-minimization requirements or best management practices.

***Special Management Areas, Including Areas of Critical Environmental Concern, Wild and Scenic Rivers, Wilderness, and Wilderness Study Areas***

Six hundred sixty-four comments (30.5 percent of the total planning issue comments received) were about special designations; see **Appendix C** (Comments by Resource Planning Issue), **Tables C-10** Special Designation Areas – General to **C-13** Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics for comments. Special designation area comments pertained to ACECs, wild and scenic rivers, backcountry byways, and National Historic Trails. Wilderness Study Areas and wilderness comments, including those on areas with wilderness characteristics, were also included in this section. In total 24 comments were received for non-specific special management area concerns. In general individuals opposed to additional special designation areas cited conflicts with uses such as energy development, recreation, and the associated impacts on the local economy. Those in favor of additional areas requested more protection to preserve wild places and areas with sensitive resources.

A total of 38 comments (1.7 percent of planning issue comments) were received on ACEC issues. Multiple commenters urged the UFO to offer maximum protection for all ACECs and continue to identify and protect other imperiled areas. One state government agency, environmental groups, and some individuals urged the BLM to expand areas protected under special designation status. The Colorado Natural Heritage Program recommends that the BLM retains the ACEC designations for both existing ACECs and that 2 potential conservation areas receive ACEC status. Trout Unlimited stated support for re-affirmation of ACECs at Adobe Badlands, Needle Rock, Fairview, and San Miguel. Other recommended additions or expansions include expanding the Fairview South ACEC to include all populations of Clay-loving wild buckwheat, expanding the San Miguel ACEC, and adding ACECs in areas with archeological significance or important habitat for particular species, including Gunnison and white-tailed prairie dog, Gunnison sage grouse, and Paradox Valley lupine. Individuals and environmental groups also called for the limitation of oil, gas, and mineral leasing in ACECs. Commenters from a recreation group asked that the UFO consider use of designated trails and other measures to limit impacts on ACECs rather than close access and to be cautious of being unduly influenced from the anti-motorized community in protecting significant values.

The wild and scenic rivers study process was mentioned in 314 comments (14.4 percent of planning issue comments). Commenters discussed the eligibility findings in the draft eligibility report. Multiple comments were received opposing the designation of additional wild and scenic rivers in the planning area and to the eligibility findings in the draft report in particular, to the findings of Escalante Creek and the San Miguel River as eligible for wild and scenic river status. Commenters state that the historic land uses, such as farming and ranching, and local economies would suffer from additional restrictions on these rivers. Conversely other commenters supported the eligibility findings in the draft eligibility report. Multiple comments were received noting the importance of protecting the Dolores River in particular. An additional 22 comments (1 percent of the planning issue comments) were related to wild and scenic rivers for segments in the Dominguez-Escalante NCA. Additional comments related either to general background information, management of eligible or suitable segments, or suitability. Some comments also proposed alternative management strategies to wild and scenic river listings to manage planning area rivers. It should also be noted that the wild and scenic river eligibility and suitability

designation process was the primary subject of 4 of the 13 form letters received during the scoping period, with letters both in favor and opposed to designation of area rivers as eligible or suitable for wild and scenic river status.

Seven comments were received on national scenic byways, representing .3 percent of planning issue comments. Representatives of the West Elk Loop Scenic and Historic Byway asked the BLM to recognize the byway as a state designated Byway in the RMP revision. These representatives also ask that the byway remain relatively natural in appearance, including the viewshed. A corridor along the road was requested for portions of the project area.

Two hundred fifty-one comments (11.5 percent) were received about Wilderness Study Areas and wilderness. An additional 8 comments (.4 percent) were received for lands with wilderness characteristics. Non-Profit organizations and some individuals expressed the desire for the BLM to appropriately protect existing Wilderness Study Areas and lands with wilderness characteristics and to consider and evaluate additional lands for wilderness characteristics. Areas specifically discussed include Roubideau (Camel Back), Adobe badlands, Sewemup Mesa, Norwood Canyon, and Dolores River Canyon. The Wilderness Society stated that the current regulations prohibiting the addition of Wilderness Study Areas do not preclude the BLM from an obligation to protect lands. In addition they provided management suggestions for these areas including the limitation of energy development, transmission lines, and motorized recreational use. Some individuals expressed the desire to restrict the management of lands with wilderness characteristics to the currently specified areas, others questioned the validity of the current classifications. These commenters cited the public use mandate and limitations to recreation and potential economic impacts as reasons to limit expansion.

***Vegetation, Including Wetlands, Riparian areas, and Noxious Weeds***

Forty-three comments (2.0 percent of planning issue comments) were received regarding general vegetation concerns, and an additional 25 comments (1.1 percent of planning issue comments) were received for noxious weeds and 11 comments ( 0.5 percent of planning issue comments) for riparian and wetland areas. Comments are included in **Appendix C** (Comments by Resource Planning Issue), **Table C-8**, Vegetation. Commenters included individuals, environmental groups, and the US Environmental Protection Agency. Comments included concerns over the spread of noxious weeds such as Russian knapweed, cheatgrass, and tamarisk. Alternatives to aerial spraying for weed control were requested and support for the controlled use of fire as a vegetation management tool was voiced. Several comments were related to having a balance of seral stages and age classes as seen in pre-settlement times. The importance of later seral stage growth, including in pinyon juniper habitat, was also noted. Commenters urged the BLM to actively manage the land for optimum conditions, noting that these conditions will not only improve habitat for wildlife but also reduce the risk of wildfire risk. In addition, individuals, the US Environmental Protection Agency, and environmental organizations all requested that riparian and wetland areas be given special protection in the RMP. Suggested protection measures included limitations on livestock grazing, trail and road development, and energy development

***Fish and Wildlife***

Sixty-eight comments were received on this issue, which represents 3.1 percent of the total number of planning issue comments received. See **Appendix C** (Comments by Resource Planning Issue), **Table C-7**, Fish and Wildlife, for representative comments. Individuals, environmental organizations, and government entities, including the US Environmental Protection Agency and the town of Ridgway, expressed support for the protection of wildlife habitat. Commenters asked that the BLM consider management at the landscape scale. Others listed specific habits and populations to protect and manage. Commenters also asked that the BLM utilize the best available science to determine essential habitat areas to protect and best management practices that should be incorporated. These respondents also expressed concerns about conflicts between protection for wildlife and other land uses, such as recreation and oil and gas development.

***Special Status Species***

Individuals, environmental groups, and one state agency commented on the management of listed species or candidates for listing at the agency, state, or federal level. Thirty-two comments were received, about 1.5 percent of the total planning issue comments. Comments are included in **Appendix C** (Comments by Resource Planning Issue), **Table C-9**, Special Status Species. The majority of commenters expressed concern for the continued existence or preservation of habitat for a particular species or group of species. The Gunnison's sage grouse was a species of concern for many commenters; comments included suggestions of management practices, such as the adoption of the statewide Gunnison Sage Grouse Conservation Plan, as well as recommended habitat areas to protect. Other species mentioned in multiple comments included burrowing owls, white-tailed and Gunnison's prairie dogs, sage grouse, multiple aquatic species, including the Colorado cutthroat trout, and Clay-loving buckwheat (*E. pelinophilum*). Commenters also asked that ACECs and other special management areas and tools be utilized to protect rare plant and animal habitat.

***Drought Management/Climate Change***

Fourteen planning issue comments, (.6 percent) related to issues of drought management or climate change. Comments are included in **Appendix C** (Comments by Resource Planning Issue), **Table C-6**, Drought Management/Climate Change. Commenters included individuals and non-profit organizations. Most comments were general in scope and asked that the BLM take climate change into consideration in the RMP revision and consider the impacts of climate change for resources and resource uses such as water resources, fish and wildlife, vegetation management, wildland fire management, and livestock grazing,

### 3.3.2 Issue 2

***Non-renewable Energy Development (Oil and Gas) and Minerals and Mining (Locatable Minerals and Saleable Mineral Materials)***

The BLM received 99 comments on general energy development, 225 comments specifically related to non-renewable energy development, and 72 comments related to minerals and mining, comprising 4.6, 10.3, and 3.3 percent of total planning issue comments, respectively. Comments are included in **Appendix C** (Comments by Resource Planning Issue), **Table C-15**, Energy Development – General, **Table C-16** Non-renewable Energy Development, and **Table**

**C-17** Minerals and Mining. Comments about energy development on BLM lands were mixed; many commenters supported such development, while some commenters opposed energy development. Most of the comments on energy development pertained to oil and gas, coal, or uranium development. Commenters had multiple affiliations, including individuals, environmental groups, energy companies, and one Colorado state agency.

Commenters in favor of and opposed to energy development on public lands stated the importance of careful consideration of energy development in the RMP. Many commenters stated that a reasonably foreseeable development would aid in the RMP revision.

Area energy development companies, including Nuvemco and West Elk Mines, and some individuals urged the BLM to allow for extraction of mineral resources in the project area. In addition, companies stated the importance of recognizing valid existing rights and the role of mining in the local economy.

Opposition to and concerns about the environmental effects of energy development were expressed by multiple individuals, one environmental group, and one Colorado state agency. Individuals and the environmental organization stated the need for the BLM to place limits on mining to protect water and air quality, fish and wildlife, and special designation areas. Commenters asked that the BLM analyze both long- and short-term impacts of energy development and address the need for remediation after extraction is finished. Multiple comments related specifically to uranium mining were concerned with the venting of methane gas from mines.

***Renewable Energy Development***

The BLM received 14 total comments on renewable energy development, comprising 0.6 percent of total planning issue comments. Comments are included in **Appendix C** (Comments by Resource Planning Issue), **Table C-18**, Renewable Energy Development. Some commenters requested that renewable energy development receive close examination and that stipulations and limitations similar to those used in oil and gas development should be employed as needed. In addition, commenters recommended that zones for renewable energy projects should be developed and that renewable energy development should be limited to those zones.

### 3.3.3 Issue 3

***Recreation***

At total of 300 comments (13.8 percent of planning issue comments) were received regarding recreation issues. Refer to **Appendix C** (Comments by Resource Planning Issue), **Table C-19**, Recreation Management. Commenters included individuals, representatives of recreational user groups, such as rock climbers, off-highway vehicle enthusiasts, and environmental organizations. The primary concerns expressed included continued access to and availability of recreation sites and recreational opportunities. Commenters stated the importance of continued access of motorized recreation to allow everyone, including those not physically capable of hiking, to experience the area. A related issue was conflict between different types of recreational users, especially motorized and nonmotorized uses. Numerous commenters expressed the importance of opportunities for quiet recreation on BLM lands and concern for resource degradation from

recreational activities. Additionally non-profit groups provided suggestions for management and regulations to reduce resource damage and user conflicts. A number of commenters expressed the importance of continued opportunities for hunting and fishing and target shooting in the planning area, while others stated the need to regulate activities for public safety and resource protection. The desire for additional dispersed camping and designated campground facilities was also expressed by some individuals, as was the importance of limitation on the locations of these activities. Standards for issuance of special recreation permits were also discussed in multiple comments.

Commenters provided detailed suggestions for the designation of Special Recreation Management Areas in particular areas in the planning area, notably Jumbo Mountain outside of the town of Paonia.

***Travel Management***

The BLM received 243 comments, or 11.2 percent of the total comments received on planning issues, on travel management and transportation issues. Comments are included in **Appendix C** (Comments by Resource Planning Issue), **Table C-20**, Travel Management. Commenters included numerous individuals, environmental organizations, the US Environmental Protection Agency, local town and government groups, and representatives of recreational user groups. It should be noted that travel management planning will be addressed outside of the Uncompahgre RMP revision effort. One issue discussed by respondents was the decision to complete comprehensive travel management planning separately from the RMP revision. The Wilderness Society suggested that the RMP should include a discussion of the criteria to be utilized in travel management planning decision.

Commenters asked that the BLM work with local stakeholders in the travel management process; one comment requested quarterly meeting with the off-highway vehicle community, and other suggestions included seeking input from local communities and other land management agencies such as the US Forest Service and US Bureau of Reclamation.

Multiple commenters noted the importance of establishing a true and accurate inventory of existing trails, roads, and pathways to aid in future travel management planning decisions. Another primary concern of commenters related to use designations on particular routes and trails, specifically which routes should be designated for motorized versus nonmotorized use, and which routes should be closed versus open. Conflicts between motorized and nonmotorized users for particular trails or areas were also discussed. Some respondents were concerned about the BLM limiting access to public lands. Comments stated that closing trails would limit recreational opportunities or access for development. Conversely, other commenters noted the importance of roadless areas and requested limits on roads and trail development.

Another primary issue was habitat degradation due to unregulated use of trails and roads, redundant routes, and user-created routes. Concerns included the impacts on wildlife and sensitive plant and animal species. The US Environmental Protection Agency requested that the RMP address water quality and fish and wildlife concerns. Other resource concerns include the spread of noxious weeds and erosion. Commenters also asked that sensitive areas be examined

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 112 of 301

and closed to motorized, mechanized, or all uses as needed to protect resources. In addition, the Rocky Mountain Recreation Initiative and others stated specific concerns about road density and urged the BLM to include an analysis of road and trail density in travel management analysis.

#### *Livestock Grazing*

Sixty-four planning issue comments were received about livestock grazing, range health, or upland management, representing 2.9 percent of the comments received on planning issues. Comments are included in **Appendix C** (Comments by Resource Planning Issue), **Table C-23**, Livestock Grazing. Commenters included individuals and ranch owners, as well as government agencies and non-profit organizations. Many comments supported the continuation of livestock grazing in the planning area. Commenters noted the importance of grazing for the local economies and the historic presence of grazing in the area. The San Miguel County Commissioners requested that the BLM commit more resources to ongoing monitoring of their lands to ensure achievement of the BLM Standards for Public Land Health (BLM 1997). Individuals and non-profit groups requested that riparian areas and special designation areas have limitations on livestock grazing and utilize best management practices to protect sensitive resources. Western Watersheds Project comments provided specific concerns about livestock grazing impacts and recommended methods of analysis to utilize in the EIS to determine the impacts of management decision on land health.

#### *Visual Resources*

Twenty-two comments (1.0 percent of planning issue comments) were related to visual resources. Refer to **Appendix C** (Comments by Resource Planning Issue), **Table C-22**, Visual Resources. Comments from individuals and non-profit groups asked that the BLM recognize the importance of viewsheds when making land management decisions in the RMP revision, including the impacts of energy development and recreation on viewsheds. Specific comments were provided for areas determined to have sensitive viewsheds. Commenters representing commercial interests stated that the disruptions to the natural viewshed from oil and gas and other development are temporary and that restrictions on development and recreation for visual concerns should not be overly restrictive.

#### *Noise*

Four planning issue comments (0.2 percent) were received related to noise. Comments are included in **Appendix C** (Comments by Resource Planning Issue), **Table C-21**, Noise. The Wilderness Society, Rocky Mountain Recreation Initiative, and Western Colorado Congress were concerned with the preservation of the natural soundscape and desired restrictions on activities, such as off-highway vehicle use, that would alter the quiet, natural environment.

#### *Forestry*

Sixteen comments (0.5 percent) were related to forestry management. Comments are included in **Appendix C** (Comments by Resource Planning Issue), **Table C-24**, Forestry. Commenters stated the importance of maintaining public access to forestry materials, especially firewood, poles, and posts. Additional comments related to the importance of forestry management for forest health and wildfire control.

BLM_0067025

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 113 of 301

***Wildland Fire Management***

Eleven comments (0.5 percent) related to wildland fire management. Comments are included in **Appendix C** (Comments by Resource Planning Issue), **Table C-25**, Wildland Fire Management. Numerous individuals, one recreation group, and one commercial business asked that the BLM actively address the management of fuels to prevent wildfire. Additionally, they ask that the RMP include a policy to continue fire use where it meets all resource objectives.

### 3.3.4 Issue 4

***Lands and Realty***

Approximately 3.3 percent of planning issue comments (71 comments) pertained to this issue category. Representative comments are included in **Appendix C** (Comments by Resource Planning Issue), **Table C-26**, Lands and Realty. Many comments referred to specific land tenure adjustment proposals or withdrawals. Comments from the US Bureau of Reclamation, San Miguel County, Town of Ridgway, and individuals all discussed particular parcels for disposal, for retention under BLM ownership, or for transfer to BLM ownership. The Wilderness Society and others recommended that the BLM should only pursue land tenure decisions if they support key values and resources, such as protecting ecologically important areas and providing open space. Additional commenters urged the BLM to recognize the valid exiting rights of area landowners.

Comments from energy and communications company representatives noted the importance of permitting for right-of-way corridors, electric transmission lines, pipelines for natural gas transportation, and other energy corridors, as well as access roads. These commenters stated that rights-of-way should receive high priority for consideration and that the BLM should work with companies and utilities to identify potential energy corridors. Additionally, some commenters noted that the West-wide Energy Corridors Programmatic EIS provides important information, but additional local information is needed to support that information.

### 3.3.5 Issue 5

***Cultural, Heritage, and Paleontological Resources***

Twenty comments were received on cultural, heritage, or paleontological resources, representing 0.9 percent of the planning issue comments received. Comments are included in **Appendix C** (Comments by Resource Planning Issue), **Tables C-27**, Cultural and Heritage Resources, and **C-28**, Paleontological Resources. Eighteen comments (0.8 percent) were received on cultural resource issues. Commenters recommended that the RMP preserve areas with cultural significance. Suggested protections include interpretive signs and limitations on development. Some commenters noted that public access to sites should be maintained to allow for enjoyment of the resource. Additional comments related to ACECs recommended the creation of additional special management areas to protect archeological resources. The two comments received related to paleontological resources stated the importance of preserving paleontological resources in the planning area. No comments were received related to Native American religious concerns.

BLM_0067026

### 3.3.6 Issue 6

***Socioeconomic and Environmental Justice Concerns***

Sixty-two comments on social and economic considerations were received, representing 2.9 percent of comments received on planning issues. Comments are included in **Appendix C** (Comments by Resource Planning Issue), **Table C-29**, Social and Economic Considerations. Commenters include individuals, one non-profit organization, local government representatives, and representatives of the oil and gas industry. Many comments were general in nature and requested that the BLM consider the impacts of the RMP on the local community. Numerous commenters stated the importance of energy development and extractive resources for local communities. Others mentioned the importance of tourism and recreation, as well as livestock grazing. Local government representatives recommended that the BLM work closely with area communities in developing the RMP revision. In addition, The Wilderness Society set out a detailed recommended approach for socioeconomic analysis.

***Public Health and Safety***

Ten comments were received related to issues of public health and safety, which represents 0.5 percent of the total planning issue comments. Comments are included in **Appendix C** (Comments by Resource Planning Issue), **Table C-30**, Public Health and Safety. A number of comments were received on the issue of dumping of trash materials on public lands. A number of individuals were also concerned about the health and safety issues related to oil and gas development and mining and associated waste material from these activities. In addition the US Environmental Protection Agency expressed concerns with this subject and advised the BLM to prepare a Health Impact Assessment as part of the EIS.

### 3.3.7 Other Issues to Be Addressed in the RMP

Of the 2,496 comments received, 87.2 percent were related to planning issues that will be addressed in the RMP (as discussed above). Another 197 comments (7.9 percent) focused on other topics, such as the planning process in general, alternatives, or the public involvement process. These topics will be addressed in the RMP but do not fit within any particular planning issue category. Comments are displayed in **Appendix C** (Comments by Resource Planning Issue), **Table C-4**, General Comments Related to the RMP.

## 3.4 Issues That Will Not Be Addressed in the RMP

Approximately 4.9 percent of the comments related to issues that will not be addressed in the RMP. These include issues resolved through policy or administrative action, implementation issues that have already been addressed or will be addressed by the UFO independent of the RMP, and issues beyond the scope of the RMP that have been considered but will not be included. These comments are represented in **Appendix C** (Comments by Resource Planning Issue), **Table C-1**, General Comments Outside the Scope of the RMP, **Table C-2**, Comments Related to Issues to Be Solved by National Policy, and **Table C-3**, Comments Related to Implementation Actions.

Administrative or policy issue comments included issues pertaining to national BLM policy that will not be addressed during the Uncompahgre RMP process. Comments include the BLM

standards used to classify recreational areas, as well as policies for management of lands with wilderness characteristics.

Implementation issues that have been or will be addressed by the UFO outside of the RMP process include decisions that require on-the-ground action following the RMP decisions. Comments in this category include requests for additional facilities and signage at recreation areas. Other comments request completion of additional surveys and education of local communities and user groups.

Issues outside the scope of the RMP include comments about land management on areas outside the planning area. Examples include comments on management actions in the Gunnison Gorge or Dominguez-Escalante NCAs. This category also included comments on issues in which the BLM has limited or no administrative authority.

## 3.5 Anticipated Decisions

The FLPMA requires the BLM to manage public lands using the principles of multiple use and sustained yield. Management direction resulting from the planning process for the RMP needs to be adaptable to changing conditions and demands over the life of the RMP. The RMP will provide management direction and guide decision making for determining appropriate multiple uses and allocation of resources. It will also include strategies to manage and protect resources and systems to monitor and evaluate the status of resources and the effectiveness of management practices. The BLM is reviewing the condition of the environment and the current management situation to identify which management directions should be continued, which should be modified, and which should be developed and added.

This scoping report does not make any decisions, nor does it change current management direction set forth in the 1989 and 1985 RMPs. Instead it summarizes those issues identified during the scoping period. The BLM will use planning issues summarized in this scoping report, along with subsequently identified issues, planning criteria, and other information (such as occurrence and development potential for minerals), to help formulate a reasonable range of alternatives during the next phase of the RMP process. Each identified alternative (including continuation of existing management practices) will represent a complete and reasonable plan for managing the UFO. Future decisions will occur at two levels: the RMP (or land use plan) level, and the implementation level. These decision types are described below. In general, only land use plan-level decisions will be made as part of the RMP process. The BLM's evaluation of identified alternatives will be documented in an EIS prepared as part of the RMP process, as required under NEPA.

### 3.5.1 Future Land Use Plan-level Decisions

Future RMP-level decisions will be made on a broad scale. These decisions will identify management direction and guide actions for the coming decades within the planning area. The RMP will provide a comprehensive yet flexible framework for managing the numerous demands on resources located on public lands.

The vision for the UFO will be described in the RMP in terms of two categories of RMP-level decisions: 1) desired outcomes; and 2) allowable uses and actions to achieve desired outcomes.

Desired outcomes will be expressed in terms of specific goals, standards, and objectives. Goals are broad statements of desired outcomes, such as ensuring sustainable development. Standards are descriptions of conditions or the degree of function required, such as land health standards. Objectives are specific, quantifiable, and measurable desired conditions for resources, such as managing sagebrush communities to achieve a certain canopy cover by 2020.

Allowable uses and actions to achieve desired outcomes will be expressed in the RMP as allowable uses, actions needed, and land tenure decisions. Livestock grazing, administrative designations (for example, ACECs), and land disposal are examples of some RMP-level decisions in this category.

### 3.5.2 Future Implementation-level Decisions

The RMP will contain broad-scale decisions that guide future land management actions. Subsequent site-specific implementation, often characterized as project-level or activity-level decisions, will require the BLM's final approval of on-the-ground actions. Implementation decisions require a more-detailed, site-specific environmental analysis that tiers off of the EIS prepared for the RMP. These decisions generally constitute final approval of on-the-ground actions to proceed (BLM Land Use Planning Handbook H-1601-1, Section IV[B] [BLM 2005]). An example of an implementation decision is the development and management of a recreation site. They may be incorporated into implementation plans (activity or project plans) or may exist as stand-alone decisions.

These types of decisions require site-specific planning and NEPA analysis. Where implementation decisions are made as part of the land use planning process, they are still subject to the appeals process or other administrative review as prescribed by specific resource program regulations after the BLM resolves the protests to land use plan decisions and makes a decision to adopt or amend the RMP (High Desert Multiple Use Coalition, Inc. et al. Keith Collins, 142 IBLA 285 [1998]).

## 3.6 Valid Existing Management

The BLM-administered public lands in the planning area are managed with direction from the 1985 San Juan/San Miguel RMP (BLM 1985) and 1989 Uncompahgre Basin RMP (BLM 1989) and subsequent amendments. Preparation of an updated RMP is necessary to respond to changing resource conditions and to respond to new issues and federal policies. The RMP will establish new land use planning decisions to address issues identified through public scoping and, where appropriate, may incorporate decisions from the 1985 and 1989 RMPs, as amended. Determining which existing management decisions to carry forward is part of the planning process. The BLM will review the existing management situation to determine which decisions to carry forward and will identify where new management guidance should be developed. This review will be documented in the Analysis of the Management Situation.

## 3.7 Special Designations, Including Nominations

The RMP will include a discussion of special designation areas including ACECs, Wilderness Study Areas, and national trails and byways. The Uncompahgre planning area has four ACECs designated, contains all or portions of four Wilderness Study Areas, and has one congressionally designated special area, the Tabeguache Area.

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 117 of 301

In addition, the RMP will address new special management areas designations. At the writing of this scoping report, the UFO has completed a draft wild and scenic rivers inventory, including identification of free-flowing segments and outstandingly remarkable values. As part of the RMP effort, UFO will finalize eligibility and potential classification and will determine suitability. While determining eligibility and suitability, UFO is working with two water roundtables, the San Miguel Watershed Coalition, and other interested parties.

New ACEC designations and management of lands with wilderness characteristics will also be considered in the development of the RMP. An ACEC report is currently being prepared by the UFO and will document the relevance and importance criteria findings of nominated ACECs. Its findings will be incorporated into the RMP alternatives. A report of lands with wilderness characteristics outside Wilderness Study Areas is scheduled for completion in summer 2010. The report will document the public lands within the planning area outside of Wilderness Study Areas that contain wilderness characteristics. Its findings will be incorporated into the RMP alternatives.

The Dominguez-Escalante and Gunnison Gorge NCAs are not included in the planning area and are covered under separate completed or to-be-completed management plans.

BLM_0067030

3. Issue Summary

This page intentionally left blank.

3-16 *Uncompahgre Resource Management Plan Revision and EIS*
*Final Scoping Summary Report* July 2010

BLM_0067031

# CHAPTER 4
# PLANNING CRITERIA

During its initial planning sessions, the BLM UFO staff developed preliminary planning criteria. Planning criteria establish constraints, guidelines, and standards for the planning process. They help planners define the scope of the process and estimate the extent of data collection and analysis. Planning criteria are based on standards prescribed by applicable laws and regulations; agency guidance; results of consultation and coordination with the public, other federal, state, and local agencies, and Indian tribes; analysis of information pertinent to the planning area; and professional judgment. The plan will be completed in compliance with the FLPMA, NEPA, and all other applicable laws, regulations, and policies. Impacts from the management alternatives considered in the revised RMP will be analyzed in an EIS developed in accordance with regulations at 43 CFR 1610 and 40 CFR 1500.

The following preliminary criteria were developed internally for the UFO and presented for public comment. After public input is analyzed, the criteria become proposed criteria and can be added to or changed as the issues are addressed or as new information is presented. The UFO managers will approve the issues and criteria, along with any changes. Additional suggested criteria received in public scoping comments are provided in **Section 4.2**, Additional Suggestions for Planning Criteria.

## 4.1 PRELIMINARY PLANNING CRITERIA

- Where practicable and timely for the planning effort, current scientific information, research, and new technologies will be considered.
- The proposed RMP will comply with the FLPMA and all other applicable laws, regulations, and policies.
- Impacts from the management alternatives considered in the revised RMP will be analyzed in an EIS developed in accordance with regulations at 43 CFR 1610 and 40 CFR 1500.
- Lands covered in the RMP will be public land and split estates managed by the BLM. No decisions will be made relative to non-BLM administered lands.

- For program specific guidance of land use planning level decisions, the process will follow the Land Use Planning Manual 1601 and Handbook H-1601-1 (BLM 2005), Appendix C.
- Broad-based public participation will be an integral part of the planning and EIS process.
- The planning team will work cooperatively with the State of Colorado, tribal governments, county and municipal governments, other federal agencies, the Southwest RAC, cooperating agencies, and all other interested groups, agencies, and individuals.
- Decisions in the plan will strive to be compatible with the existing plans and policies of adjacent local, state, and federal agencies, as long as the decisions are consistent with the purposes, policies, and programs of federal law and regulations applicable to public lands.
- The BLM will consult with the Colorado Division of Wildlife. The RMP will recognize the State's responsibility and authority to manage wildlife.
- The RMP will recognize the Office of Surface Mining's responsibility and authority to regulate coal activities.
- The BLM will recognize the State's responsibility for permitting related to oil and gas activities and in regulating air quality impacts.
- The BLM will recognize the State's responsibility for permitting related to uranium, coal, and sand and gravel activities, and in regulating water quality impacts.
- The National Sage-grouse Strategy requires that impacts to sagebrush habitat and sagebrush-dependent wildlife species be analyzed and considered in BLM land use planning efforts for planning area public lands with sagebrush habitat.
- The RMP will recognize valid existing rights.
- The planning process will incorporate Colorado's Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997).
- Wilderness Study Areas will continue to be managed under the Interim Management Policy for Lands under Wilderness Review (BLM 1995) until Congress either designates all or portions of the Wilderness Study Area as wilderness or releases the lands from further wilderness consideration. It is no longer the policy of the BLM to make formal determinations regarding wilderness character, to designate additional Wilderness Study Areas through the RMP process, or to manage any lands other than existing Wilderness Study Areas in accordance with the Interim Management Policy.
- The planning process will involve American Indian tribal governments and will provide strategies for the protection of recognized traditional uses.
- Any location-specific information pertaining to cultural resources (either map, description, or photo) is proprietary to the BLM and will not become the property of any contractors working on the EIS or attached to any document (paper or

electronic), nor is this information subject to any public release or Freedom of Information Act requests (36 CFR 7.18).

- The RMP will include adaptive management criteria and protocol to deal with future issues.
- A reasonable foreseeable development scenario for fluid minerals, and reports for uranium and coal, will be developed from analysis of past activity, production, and other sources, which will aid in developing alternatives and in the environmental consequences analysis.

## 4.2 Additional Suggestions for Planning Criteria

It was suggested that the planning criteria include the incorporation of the Colorado Cutthroat Trout Conservation Agreement or Strategy.

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 122 of 301

This page intentionally left blank.

BLM_0067035

# CHAPTER 5
# DATA SUMMARY/DATA GAPS

As part of the RMP planning, evaluation, and data-collection process, the BLM has inventoried available information and has identified data needs for energy development, recreation, socioeconomics, the potential designation of wild and scenic rivers and special designation areas, Class I cultural data, and Native American consultation. A summary is as follows:

- A draft oil and gas reasonably foreseeable development report will be completed in June 2010; its findings will be incorporated into the RMP/EIS.
- Recreation focus groups provide the public with an opportunity to tell the BLM which recreational places, activities, and outcomes are important and why. In February 2010, the BLM and Mesa State Natural Resource and Land Policy Institute held a series of these community-based meetings to better learn about and consider public perspectives regarding recreation across the planning area.
- Economic strategy workshops to complement the community assessment completed in 2009 (BLM 2009) were conducted in March 2010 to involve the local community in the land use planning process and to determine their visions for local economy and its tie to public land management.
- Wild and scenic rivers eligibility and suitability studies are underway to determine the suitability of eligible river segments within the planning area.
- Pending reports for other special designation areas include an ACEC report and a report on lands with wilderness characteristics outside of Wilderness Study Areas.
- A Class I cultural resources survey is underway. Issues and management considerations provided in this survey will be included in the RMP.
- Information obtained in the ongoing Ute Ethnohistory Project, conducted in coordination with the BLM Grand Junction and Glenwood Springs Field Offices, and through additional tribal consultation, will be used in formation of management alternatives in the RMP.

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 124 of 301

Both new data and existing resource information will be used in formulating resource objectives and management alternatives in the RMP. To facilitate this process, information is being compiled and put into digital format for use in analysis and map production using Geographic Information Systems. Because this information is imperative to quantify resources, to update maps, and to manipulate information during alternative formulation, this process must be completed before actual analysis can begin. New data generated during the RMP process will be used to address planning issues and will meet applicable established standards.

BLM_0067037

# CHAPTER 6
# FUTURE STEPS

## 6.1 FUTURE STEPS AND PUBLIC PARTICIPATION OPPORTUNITIES

The next phase of the BLM's planning process is to develop draft management alternatives based on the issues presented in **Sections 3.2,** Planning Issue Statements, and **3.3,** Summary of Public Comments by Resource Planning Issue Category, of this scoping report. These alternatives will address planning issues identified during scoping and will meet goals and objectives to be developed by the BLM's interdisciplinary team. In compliance with NEPA, CEQ regulations, and BLM planning regulations and guidance, alternatives should be reasonable and capable of implementation. The BLM will also meet with cooperating agencies, interested tribes, the RAC subgroup, and community groups and individuals. A detailed analysis of the alternatives will be completed, and the BLM's preferred alternative will then be identified. The preferred alternative is often made up of a combination of management option components from various alternatives to provide the best mix and balance of multiple land and resource uses to resolve the issues.

The analysis of the alternatives will be documented in a Draft RMP/EIS. Although the BLM welcomes public input at any time during the planning process, the next official public comment period will begin when the Draft RMP/EIS is published, which is anticipated in 2012. The draft document will be widely distributed to elected officials, regulatory agencies, and members of the public, and it will be available on the project Web site (http://www.uformp.com). The availability of the draft document will be announced via a Notice of Availability in the *Federal Register*, and a 90-day public comment period will follow. Public meetings will be held throughout the project area during the 90-day comment period.

At the conclusion of the public comment period, the Draft RMP/EIS will be revised. A Proposed RMP/Final EIS will then be published. The availability of the proposed document will be announced in the *Federal Register*, and a 30-day public protest period will follow regarding the proposed planning level decisions (43 CFR Part 1610.5.2). If necessary, a notice will be published in the *Federal Register* requesting comments on significant changes made as a result of protest. Concurrently, the Governor of Colorado will review the document for consistency with approved state and local plans, policies, and programs.

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 126 of 301

At the conclusion of the public protest period and the Governor's consistency review, the BLM will resolve all protests and any inconsistencies, and the approved RMP and Record of Decision will be published. The availability of these documents will be announced in the *Federal Register*. Any implementation-level decisions in the RMP, such as travel route designations, are not subject to the protest process but instead are subject to administrative remedies set forth in regulations applicable to the specific resource management program. These remedies generally take the form of appeals to the Office of Hearings and Appeals within 30 days of the effective date of the Record of Decision or in accordance with the provisions of 43 CFR 4.4.

All publications, including this report, newsletters, the Draft RMP/EIS, and the Notice of Availability, will be published on the Uncompahgre RMP Web site (http://www.uformp.com). In addition, pertinent dates regarding solicitation of public comments will be published on the Web site.

## 6.2 Contact Information

The public is invited and encouraged to participate throughout the planning process for the RMP. Some ways to participate include:

- Reviewing the progress of the RMP at the Uncompahgre RMP project Web site: http://www.uformp.com, which will be updated with information, documents, and announcements throughout the duration of the RMP preparation; and
- Requesting to be added to or to remain on the official Uncompahgre RMP project mailing list in order to receive future mailings and information. (e-mail uformp@blm.gov)

Anyone wishing to be added to or deleted from the distribution list, wishing to change their contact information, or requesting further information may email a request to uformp@blm.gov or contact Mr. Bruce Krickbaum, RMP Project Manager, BLM, UFO, 2505 South Townsend Avenue, Montrose, CO 81401, phone 970-240-5300. Please provide name, mailing address, and e-mail address, as well as the preferred method to receive information.

BLM_0067039

# CHAPTER 7
# REFERENCES

BLM (US Department of the Interior, Bureau of Land Management). 1995. Handbook H-8550-1—BLM Interim Management Policy for Lands under Wilderness Review. BLM, Washington, DC.

_____. 1997. BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado. BLM, Colorado State Office, Lakewood, CO. February 3, 1997.

_____. 2005. Handbook H-1601-1—Land Use Planning Handbook. BLM, Washington, DC. March 11, 2005. 161 pp.

_____. 2009. Community Assessment of the Uncompahgre Planning Area. BLM, Uncompahgre Field Office, Montrose, CO. 224 pp.

BLM_0067040

Case No. 1:20-cv-02484-MSK   Document 49-1   filed 04/28/21   USDC Colorado   pg 128 of 301

This page intentionally left blank.

BLM_0067041

# Appendix A
## Scoping Materials

BLM_0067042

This page intentionally left blank.

BLM_0067043

# APPENDIX A
# SCOPING MATERIALS

Public scoping for the Uncompahgre RMP/EIS has included a newsletter, seven scoping open houses, press releases, notices in local newspapers, and a public Web site, http://www.uformp.com. Although mailing of the newsletter in December 2009 initiated an informal scoping period, the formal public comment period as required by NEPA began on February 25, 2010, with the publication of a Notice of Intent in the *Federal Register*, and ended on March 29, 2010.

Information provided to the public during the public scoping period and a record of attendees at public meetings is included in this appendix. Material includes the following:

1. Notice of Intent
2. Project Newsletter 1
3. Press Releases
4. Newspaper Advertisement
5. Scoping Flyer
6. Scoping Comment Form

Case No. 1:20-cv-02484-MSK   Document 49-1   filed 04/28/21   USDC Colorado   pg 132 of 301

This page intentionally left blank.

BLM_0067045

The plat, in four sheets, representing the dependent resurvey and survey in Township 5 South, Range 13 West, of the Indian Meridian, accepted September 24, 2009, for Group 80 OK.

The plat, in three sheets, representing the dependent resurvey and survey, in Township 5 South, Range 15 West, of the Indian Meridian, accepted September 24, 2009, for Group 82 OK.

The plat, in two sheets, representing the dependent resurvey and survey, in Township 24 North, Range 2 East, of the Indian Meridian, accepted November 19, 2009, for Group 159 OK.

If a protest against a survey, as shown on any of the above plats is received prior to the date of official filing, the filing will be stayed pending consideration of the protest. A plat will not be officially filed until the day after all protests have been dismissed and become final or appeals from the dismissal affirmed.

A person or party who wishes to protest against any of these surveys must file a written protest with the New Mexico State Director, Bureau of Land Management, stating that they wish to protest.

A statement of reasons for a protest may be filed with the notice of protest to the State Director, or the statement of reasons must be filed with the State Director within thirty (30) days after the protest is filed.

**FOR FURTHER INFORMATION CONTACT:** These plats will be available for inspection in the New Mexico State Office, Bureau of Land Management, P.O. Box 27115, Santa Fe, New Mexico 87502–0115. Copies may be obtained from this office upon payment. Contact Marcella Montoya at 505–438–7537, or *Marcella_Montoya@nm.blm.gov*, for assistance.

**Stephen W. Beyerlein,**

*Acting, Chief, Branch of Cadastral, Survey/GeoSciences.*

[FR Doc. 2010–3828 Filed 2–24–10; 8:45 am]

BILLING CODE 4310–FB–P

## DEPARTMENT OF THE INTERIOR

## Bureau of Land Management

**[LLCOS05000 2009]**

## Notice of Intent To Prepare a Resource Management Plan for the Uncompahgre Field Office and Associated Environmental Impact Statement

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of Intent.

**SUMMARY:** In compliance with the National Environmental Policy Act (NEPA) of 1969, as amended, and the Federal Land Policy and Management Act (FLPMA) of 1976, as amended, the Bureau of Land Management (BLM) Uncompahgre Field Office (UFO), Montrose, Colorado intends to prepare a Resource Management Plan (RMP) with an associated Environmental Impact Statement (EIS) for the UFO and by this notice is announcing the beginning of the scoping process to solicit public comments and identify issues. The RMP will replace the existing 1985 San Juan/San Miguel RMP and the 1989 Uncompahgre Basin RMP.

**DATES:** This notice initiates the public scoping process for the RMP and the associated EIS. Comments on issues and planning criteria may be submitted in writing until March 29, 2010

Scoping meetings were held recently in the following locations:
Hotchkiss, CO, January 12, 2010.
Delta, CO, January 13, 2010.
Montrose, CO, January 14, 2010.
Ridgway, CO, January 19, 2010.
Norwood, CO, January 20, 2010.
Naturita, CO, January 21, 2010.
Telluride, CO, February 3, 2010.
The dates and locations of all scoping meetings were announced 15 days in advance through local media, a newsletter and the BLM Web site at: *http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.* Comments received during scoping meetings held in January and February, 2010 will be incorporated in the record and considered by the BLM. In order to be included in the Draft EIS, all comments must be received prior to the close of the 30-day scoping period. The BLM will provide additional opportunities for public participation upon publication of the Draft EIS.

**ADDRESSES:** You may submit comments on issues and planning criteria by any of the following methods:

- *Web site: http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.*
- *E-mail: uformp@blm.gov.*
- *Fax:* (970) 240–5367.
- *Mail:* BLM Uncompahgre Field Office, RMP Project Manager, 2465 S. Townsend Ave., Montrose, Colorado 81401.

Documents pertinent to this proposal may be examined at the UFO during regular business hours (from 8 a.m. to 4:30 p.m. Monday through Friday, except holidays).

**FOR FURTHER INFORMATION CONTACT:** For further information and/or to have your name added to our mailing list, contact Bruce Krickbaum, RMP Project Manager, telephone (970) 240–5300; address BLM Uncompahgre Field Office 2465 South Townsend Ave, Montrose, Colorado 81401; e-mail *uformp@blm.gov.*

**SUPPLEMENTARY INFORMATION:** This document: provides notice that the BLM UFO, Montrose, Colorado, intends to prepare an RMP with an associated EIS for the UFO; announces the beginning of the scoping process; and seeks public input on issues and planning criteria. The planning area is located in Delta, Gunnison, Mesa, Montrose, Ouray and San Miguel counties, Colorado, encompasses approximately 675,677 acres of public land, and excludes the Gunnison Gorge National Conservation Area and the Dominguez-Escalante National Conservation Area, which are managed under separate RMPs.

The purpose of the public scoping process is to determine relevant issues that will influence the scope of the environmental analysis, including alternatives, and guide the planning process. Preliminary issues for the planning area have been identified by BLM personnel, Federal, State, and local agencies, and other stakeholders. The issues include:

- Managing vegetative and water resources, terrestrial and aquatic habitat and special management areas, while sustaining biological diversity and native species populations;
- Managing mineral, renewable and nonrenewable energy resources;
- Managing increasing numbers and types of human activities and uses;
- Managing land tenure adjustments, withdrawals and utility/energy corridors;
- Managing and protecting cultural, historical and paleontological resources and Native American religious concerns; and
- Managing public lands and resources, including authorized and permitted land uses, for a growing population and expanding urban interface, with consideration for community values and needs.

Preliminary planning criteria include:

- Compliance with the FLPMA, the NEPA and other applicable laws and regulations.
- Incorporation of the Colorado BLM Standards for Public Land Health.
- Continued management of Wilderness Study Areas under the Interim Management Policy for Lands under Wilderness Review until Congress acts on a designation or releases lands from consideration.
- Decisions will be made that affect all BLM lands, including the subsurface mineral estate, within the planning area.
- Recognition of valid existing rights.

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 134 of 301

• Inclusion of adaptive management criteria to deal with future issues.

Public participation will be encouraged throughout the process. The BLM will collaborate and build relationships with tribes, State and local governments, Federal agencies, local stakeholders and others within the community of interest for the RMP.

You may submit comments on issues and planning criteria in writing to the BLM at any public scoping meeting, or you may submit them to the BLM using one of the methods listed in the **ADDRESSES** section above. To be most helpful, you should submit comments within the 30-day scoping period. Before including your address, phone number, e-mail address, or other personal identifying information in your comment, you should be aware that your entire comment—including you personal identifying information—may be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so. The BLM will evaluate identified issues to be addressed in the plan and place them into one of three categories:

1. Issues to be resolved in the plan;
2. Issues to be resolved through policy or administrative action; or
3. Issues beyond the scope of this plan.

The BLM will provide an explanation in the Draft RMP/EIS regarding why an issue was placed in category two or three. The public is also encouraged to help identify any management questions and concerns that should be addressed in the plan. The BLM will work collaboratively with the interested parties to identify the management decisions that are best suited to local, regional, and national needs and concerns.

The BLM will use an interdisciplinary approach to develop the plan in order to consider the variety of resource issues and concerns identified. Specialists with expertise in the following disciplines will be involved in the planning process: Wildlife; Threatened and Endangered Species; Vegetation; Riparian and Wetlands; Soils; Invasive and Noxious Weeds; Rangeland Management; Fire Ecology and Management; Cultural Resources and Native American Concerns; Hydrology; Geology and Minerals; Lands and Realty; Recreation; Visual Resource Management; Public Safety; Law Enforcement; and Geographic Information Systems.

**Authority:** 40 CFR 1501.7 and 43 CFR 1610.2.

**Dave Hunsaker,**
*Acting State Director.*

[FR Doc. 2010–3846 Filed 2–24–10; 8:45 am]
BILLING CODE P

## DEPARTMENT OF THE INTERIOR

### National Park Service

### Notice of Intent to Repatriate a Cultural Item: Peabody Museum of Archaeology and Ethnology, Harvard University, Cambridge, MA

**AGENCY:** National Park Service, Interior.

**ACTION:** Notice.

Notice is here given in accordance with the Native American Graves Protection and Repatriation Act (NAGPRA), 25 U.S.C. 3005, of the intent to repatriate a cultural item in the possession of the Peabody Museum of Archaeology and Ethnology, Harvard University, Cambridge, MA, that meets the definition of "unassociated funerary object" under 25 U.S.C. 3001.

This notice is published as part of the National Park Service's administrative responsibilities under NAGPRA, 25 U.S.C. 3003 (d)(3). The determinations in this notice are the sole responsibility of the museum, institution, or Federal agency that has control of the cultural items. The National Park Service is not responsible for the determinations in this notice.

The item is a coiled, cylindrical basket with black linear designs.

At an unknown date, this basket was collected by Grace Nicholson at an unknown locality, but likely in California. It was donated to the Peabody Museum by Lewis Farlow in 1905. Museum documentation states that this item was "rescued from pyral fire." The description of "pyral fire" indicates that this item was intended to be burned as part of a funeral rite. The Peabody Museum is not in possession of the human remains.

Museum documentation describes this item as "probably Moquelumnan stock." The term "Moquelumnan" was used to describe Miwok people. Consultation evidence indicates that present-day groups which represent Miwok people are the Buena Vista Rancheria of Me-Wuk Indians of California; California Valley Miwok Tribe, California; Chicken Ranch Rancheria of Me-Wuk Indians of California; Federated Indians of Graton Rancheria, California; Ione Band of Miwok Indians of California; Jackson Rancheria of Me-Wuk Indians of California; Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California; Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California; United Auburn Indian Community of the Auburn Rancheria of California; and Wilton Rancheria, California.

Officials of the Peabody Museum of Archaeology and Ethnology have determined that, pursuant to 25 U.S.C. 3001 (3)(B), the one cultural item described above is reasonably believed to have been placed with or near individual human remains at the time of death or later as part of the death rite or ceremony and is believed, by a preponderance of the evidence, to have been removed from a specific burial site of an Native American individual. Officials of the Peabody Museum of Archaeology and Ethnology also have determined that, pursuant to 25 U.S.C. 3001 (2), there is a relationship of shared group identity that can be reasonably traced between the unassociated funerary object and the Buena Vista Rancheria of Me-Wuk Indians of California; California Valley Miwok Tribe, California; Chicken Ranch Rancheria of Me-Wuk Indians of California; Federated Indians of Graton Rancheria, California; Ione Band of Miwok Indians of California; Jackson Rancheria of Me-Wuk Indians of California; Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California; Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California; United Auburn Indian Community of the Auburn Rancheria of California; and Wilton Rancheria, California.

Representatives of any other Indian tribe that believes itself to be culturally affiliated with the unassociated funerary object should contact Patricia Capone, Repatriation Coordinator, Peabody Museum of Archaeology and Ethnology, 11 Divinity Ave., Cambridge, MA 02138, telephone (617) 496–3702, before March 29, 2010. Repatriation of the unassociated funerary object to the Buena Vista Rancheria of Me-Wuk Indians of California; California Valley Miwok Tribe, California; Chicken Ranch Rancheria of Me-Wuk Indians of California; Federated Indians of Graton Rancheria, California; Ione Band of Miwok Indians of California; Jackson Rancheria of Me-Wuk Indians of California; Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California; Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California; United Auburn Indian Community of the Auburn Rancheria of California; and Wilton Rancheria, California may



US Department of the Interior
Bureau of Land Management
Issue 1, December 2009

# The Uncompahgre RMP Newsletter

## Introduction

The Bureau of Land Management (BLM) Uncompahgre Field Office (UFO) is preparing a comprehensive Resource Management Plan (RMP) and associated Environmental Impact Statement (EIS). The RMP will be prepared as a flexible plan to allow evolving management to reflect the changing needs of the planning area over the next two decades. It will replace the current plans that were developed in 1985 and 1989. The BLM requests input from you to help identify issues and concerns within and adjacent to the planning area. Your input is also sought regarding the planning criteria that will be used to evaluate these issues.

## BLM Uncompahgre RMP Planning Area

The BLM is an agency in the US Department of the Interior that administers 258 million surface acres of America's public lands, located primarily in 12 western states. The BLM is separated into state offices and further into district and field offices. The RMP is being prepared by the UFO in southwestern Colorado.

The boundary of the planning area encompasses lands in six Colorado counties (see map insert): Montrose, Delta, Mesa, Gunnison, Ouray, and San Miguel. Management direction outlined in the RMP will apply only to the approximately 675,000 acres of public land (surface) and 2.2 million acres of federal mineral estate (subsurface) within the planning area. The planning area excludes the Gunnison Gorge and Dominguez-Escalante National Conservation Areas.

The BLM-administered lands within the UFO are currently managed in accordance with the decisions in the San Juan/San Miguel RMP (1985) and the Uncompahgre Basin RMP (1989).

Preparation of the Uncompahgre RMP is necessary in order to respond to changing resource conditions, new issues, and federal policies, as well as to prepare a comprehensive framework for managing public lands administered by the UFO. The RMP will establish new land use planning decisions to address issues identified through public scoping and, where appropriate, may incorporate decisions from the existing San Juan/San Miguel and Uncompahgre Basin RMPs, as amended.

## Newsletter Index

Introduction........1
BLM Uncompahgre RMP Planning Area........1
What is an RMP?........2
What is Public Scoping and How Can You Participate?........2
Preliminary Planning Issues........2
Wild and Scenic Rivers........3
Preliminary Planning Criteria........3
Planning Process Timeline........3
Mark your Calendar........4
How to Contact Us........4

## Commonly Used Acronyms

| | |
|---|---|
| BLM | Bureau of Land Management |
| EIS | Environmental Impact Statement |
| NOI | Notice of Intent |
| RAC | Resource Advisory Council |
| RMP | Resource Management Plan |
| UFO | Uncompahgre Field Office |
| WSA | Wilderness Study Area |

# What is an RMP?

An RMP, similar to a county master plan, is a land use plan that describes broad multiple-use guidance for managing public lands administered by the BLM. The Federal Land Policy and Management Act directs the BLM to develop such land use plans and to provide for appropriate uses of public lands. Decisions in land use plans guide future land management actions and subsequent site-specific implementation decisions. The RMP will:

- ✓ Establish goals and objectives for resource management and the measures needed to achieve them;
- ✓ Identify lands that are open and available for certain uses, including any restrictions, and lands that are closed to certain uses; and
- ✓ Provide comprehensive management direction for and/ or allocate use of all resources.

# What is Public Scoping and How Can You Participate?

Public involvement is an integral part of preparing the Uncompahgre RMP. This public scoping period gives the public and interested agencies and organizations the opportunity to provide comments on issues to be addressed and methods to be used in the RMP before BLM begins drafting it. The official scoping period will begin with the publication of the Notice of Intent (NOI) in the *Federal Register* and will continue for 60 days. During the scoping period, the BLM will host six public open houses in Hotchkiss, Delta, Montrose, Ridgway, Norwood, and Naturita. Notices providing information about these meetings will be published in local newspapers; also see page 4 of this newsletter.

The public is formally invited and encouraged to participate in the planning process for the RMP during the public scoping period. Some ways in which you can participate are:

- ✓ Attending one or more of the open house meetings (see back page) to learn about the project and planning process and to meet BLM representatives;
- ✓ Reviewing the progress of the RMP on-line at the Uncompahgre RMP Web site: *http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html*. The Web site will be updated with information, documents, and announcements during the initial scoping process and throughout the duration of the RMP preparation; and
- ✓ Joining the Uncompahgre RMP mailing list in order to receive future mailings and information by:
  - Returning the comment form on the insert of this newsletter by mail;
  - E-mailing us at uformp@blm.gov; or
  - Contacting Bruce Krickbaum at (970) 240-5300.

# Preliminary Planning Issues

A planning issue is a matter of controversy over a resource management topic that is well defined and entails alternative actions or decisions. Based on the lands and resources that we manage, the BLM has identified categories of issues, or issue statements (see box below). We expect most public issues and concerns to fall within one of these statements; however, we do not presume that they are all-encompassing. The issue statements may be revised based on the comments we receive and new issue statements may be added. The BLM requests your comments on these or other issues on BLM-administered lands within the Uncompahgre planning area.

### *Issue Statements*

***Issue 1.*** *How will vegetative resources, terrestrial and aquatic habitat, water resources, and special management areas be managed, while maintaining biological diversity and native species populations?*

***Issue 2.*** *How will energy and minerals resources be managed?*

***Issue 3.*** *How will human activities and uses be managed?*

***Issue 4.*** *How will land tenure, withdrawals, and utility/energy corridors be managed or adjusted?*

***Issue 5.*** *How will cultural, historical, and paleontological resources and Native American Religious Concerns be managed and protected?*

***Issue 6.*** *How do population growth and an expanding urban interface affect the management of public lands and resources, including authorized and permitted land uses, while considering community values and needs?*

*BLM staff answer questions from the public during a public meeting.*

# Wild and Scenic Rivers

## Notice of Availability of the Draft Wild and Scenic River Eligibility Study

Congress authorized the National Wild and Scenic Rivers (WSR) Act in 1968 to preserve certain rivers with outstanding natural, cultural, and recreational values in a free-flowing condition for the enjoyment of present and future generations. The WSR Act requires the BLM to assess river segments under its management as part of its land use planning (RMP) process. The study and designation of rivers consists of a multi-step process: **eligibility, suitability,** and **congressional action**. Only Congress or, in certain circumstances, the Secretary of the Interior, may designate a river for inclusion in the National Wild and Scenic Rivers System.

The first step in the WSR evaluation process is to determine which river segments meet eligibility criteria. A draft WSR Eligibility Study is available for review on the Uncompahgre RMP Web site: *http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html*. The eligibility report provides an inventory of the river and stream segments on BLM lands that are eligible for inclusion in the National Wild and Scenic Rivers System.

The draft report found 19 rivers and creeks separated into 28 segments eligible. In addition, the San Juan Public Lands Draft Land Management Plan identifies a segment of the Dolores River as eligible, a portion of which is managed by the UFO and will be evaluated during the suitability phase. Until a suitability study is completed, river segments determined to be eligible for inclusion in the National Wild and Scenic Rivers System are afforded interim protective management measures to protect their free-flowing nature and identified outstandingly remarkable values under BLM authorities.

At this stage, the BLM is specifically looking for information regarding free-flowing condition and outstandingly remarkable values, including vegetation, wildlife, cultural, recreation, hydrologic, geologic, and scenic. Comments are also welcome for segments not considered eligible. Comments on the draft report will be accepted through February 26, 2010, via the comment form included in this newsletter.

The second step in the WSR evaluation process is a suitability study that determines which, if any, of the eligible segments are suitable for inclusion in the National Wild and Scenic Rivers System based on criteria set forth in the WSR Act. The suitability process will begin in Spring 2010 and will involve an interdisciplinary study of each eligible segment. The public may provide the BLM additional information pertaining to the suitability criteria in order for the BLM to make an informed determination on the suitability of the eligible stream segments.

During RMP alternatives development, the BLM will consider alternative approaches to managing water-related values, recognizing that WSR designation may not be the only way to protect these values. The draft suitability study will be included in the Draft RMP/Draft EIS and made available for public comment at that time.

For more information on the WSR Act, designation into the National Wild and Scenic Rivers System, and many other management-related issues, visit *http://www.rivers.gov*.

*Two segments of the Gunnison River were found eligible for inclusion in the National Wild and Scenic Rivers System.*

# Preliminary Planning Criteria

During its initial planning sessions, the Uncompahgre BLM staff developed preliminary planning criteria. Planning criteria establish constraints, guidelines, and standards for the planning process. They help planners define the scope of the process and estimate the extent of data collection and analysis. The BLM requests your input and may modify these criteria based on your comments. For a complete list of criteria, please visit the Uncompahgre RMP Web site: *http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html*.

| **January 2010** | **January – February 2010** | **Spring 2010 – Fall 2011** | **Winter 2011 – 2012** | **Fall 2012** | **Spring 2013** |
|---|---|---|---|---|---|
| NOI Published in *Federal Register* | Public Scoping | Formulate Alternatives and Prepare Draft RMP/ Draft EIS | Draft RMP/Draft EIS Available for 90-day Public Review & Comment | Proposed RMP/Final EIS Available for 30-day Public Review & Protest | Record of Decision & Approved RMP |



## *Mark Your Calendar!*
## Upcoming Open Houses

**Tuesday, January 12, 2010**
4:30 to 7:30pm
Memorial Hall
175 N 1st Street, Hotchkiss, Colorado

**Wednesday, January 13, 2010**
4:30 to 8:00pm
Bill Heddles Recreation Center
530 Gunnison River Drive, Delta, Colorado

**Thursday, January 14, 2010**
4:30 to 8:00pm
Montrose Pavilion
1800 Pavilion Drive, Montrose, Colorado

**Tuesday, January 19, 2010**
4:30 to 7:30pm
Ridgway Community Center
201 N Railroad Street, Ridgway, Colorado

**Wednesday, January 20, 2010**
4:30 to 7:30pm
Norwood Town Hall
1670 Naturita Street, Norwood, Colorado

**Thursday, January 21, 2010**
4:30 to 7:30pm
Naturita Library
411 W 2nd Avenue, Naturita, Colorado

*The BLM must plan and manage for multiple uses on public lands.*

To conserve paper, may we e-mail you future newsletters?
If so, please e-mail us at uformp@blm.gov.

Printed on Recycled Paper

**How to contact us**

For more information, visit our Web site: http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html

With questions about the RMP or to be added to or removed from the mailing list, contact:
Mr. Bruce Krickbaum
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
(970) 240-5300
uformp@blm.gov

**BLM Uncompahgre Field Office**
**RMP/EIS Newsletter**

**Official Business**
**Penalty for Private Use, $300**

US Department of the Interior
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

FIRST-CLASS MAIL
U.S. POSTAGE & FEES PAID
BUREAU OF LAND MANAGEMENT
PERMIT NO. G-76

Bureau of Land Management 2465 S. Townsend Ave. • Montrose, Colorado 81401
BLM UNCOMPAHGRE NEWS

**January 5, 2010**
**Contact: Erin Curtis, Public Information Officer, (970) 244-3097**

## BLM Uncompahgre Launches Public Process to Revise Resource Management Plan

**Montrose, CO** -- The Bureau of Land Management Uncompahgre Field Office is seeking public input as it begins revising its Resource Management Plans (RMP).

The new RMP will provide overall management direction for the next two decades for the almost 700,000 surface acres of public lands and 2 million subsurface acres of federal mineral estate in Mesa, Montrose, Ouray, San Miguel, Gunnison and Delta counties managed by the BLM. The revisions are necessary because the demands on these public lands have increased and uses have become more varied since the original plans were completed in 1985 and 1989. An Environmental Impact Statement will be developed during the planning process.

In this first opportunity for public comment, called "scoping," the BLM is asking the public to help identify issues to be addressed in the plan revisions, as well as offer potential solutions. The BLM will use the information it receives during scoping as it prepares the Draft RMP revisions and associated Draft EIS.

"Public involvement is critical to crafting a land use plan that reflects local, regional and national values," said Uncompahgre Field Manager Barb Sharrow. "Scoping is only the first of many instances that we'll seek public input as part of this planning effort."

The scoping period runs through February 26, 2010. Six open house meetings will be held in local communities. The public is encouraged to visit, speak with BLM employees, learn more about the planning process and major issues, and share their comments and concerns. Open houses will be held:

**January 12 in Hotchkiss**
Memorial Hall, 175 1st St.
4:30 p.m. to 7:30 p.m.

**January 13 in Delta**
Bill Heddles Rec. Center, 530 Gunnison River Drive
4:30 p.m. to 8 p.m.

**January 14 in Montrose**
Montrose Pavilion, 1800 Pavilion Drive
4:30 p.m. to 8 p.m.

**January 19 in Ridgway**
Community Center at Town Hall, 201 N Railroad Street
4:30 p.m. to 7:30 p.m.

**January 20 in Norwood**
Community Meeting Rm, Norwood Town Hall, 1670 Naturita St.
4:30 p.m. to 7:30 p.m.

**January 21 in Naturita**
Naturita Community Center Library, 411 West 2nd Ave.
4:30 p.m. to 7:30 p.m.

During this initial scoping period, the BLM is seeking ideas about the uses of public lands managed by the UFO, possible protection measures, and recommendations on special designations such as potential special recreation management areas or areas of critical environmental concern. The public may also comment on the preliminary planning criteria, which help guide the planning process.

The Gunnison Gorge and Dominguez-Escalante National Conservation Areas are excluded from this planning effort. The management plan for the Gunnison Gorge NCA was completed in 2004. The newly designated Dominguez-Escalante NCA RMP process will begin early next year.

It is not necessary to attend an open house in order to submit scoping comments to the BLM. For further information about the planning process, visit our Land Use Planning webpage at www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html, or contact the project manager, Bruce Krickbaum, at (970) 240-5300.

Scoping comments provide the greatest benefit when they are specific, and received by the BLM prior to the close of public scoping on February 26, 2010. Comments may be:

- **Mailed to BLM Uncompahgre RMP, 2465 S Townsend Ave, Montrose, CO 81401**
- **Faxed to 1-970-240-5367**
- **Emailed to uformp@blm.gov**

## BLM ##

******************************************

Erin Curtis
Public Affairs Specialist, Western Colorado
Bureau of Land Management
2815 H Rd, Grand Junction, CO 81506
Voice: (970) 244-3097
Cell: (970) 210-2126

BLM Uncompahgre Extends Public Scoping for Resource Management Plan Revision (02-26-10)

NATIONAL SYSTEM OF PUBLIC LANDS U.S. DEPARTMENT OF THE INTERIOR **BUREAU OF LAND MANAGEMENT NEWS RELEASE**

**Release Date:** 02/26/10
**Contacts:** Erin Curtis, Public Information Officer, (970) 244-3097

## BLM Uncompahgre Extends Public Scoping for Resource Management Plan Revision

Montrose, CO -- The Bureau of Land Management Uncompahgre Field Office has extended a public scoping period for the revision of its Resource Management Pians (RMP).

The new RMP wiii provide overaii management direction for the next two decades for the aimost 700,000 surface acres of pubiic lands and 2 million subsurface acres of federal mineral estate in Mesa, Montrose, Ouray, San Miguel, Gunnison and Delta counties managed by the BLM.

A scoping period that began in January has now been extended through March 29, 2010.

During this first opportunity for pubiic comment, the BLM is asking the pubiic to heip identify issues to be addressed in the pian revisions, as well as offer potential solutions. The BLM will use the information it receives during scoping as it prepares the Draft RMP revisions and associated Draft EIS.

"Public involvement is critical to crafting a land use plan that reflects local, regional and national values," said Uncompahgre Field Manager Barb Sharrow. "Scoping is only the first of many instances that we'll seek public input as part of this planning effort."

BLM held six open house meetings in January in local communities to gather comments. The comments received at the open house meetings will also be incorporated into the RMP revision process.

For further information about the planning process, visit the Uncompahgre Field Office Land Use Planning webpage at www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.htmi, or contact the project manager, Bruce Krickbaum, at (970) 240-5300.

Comments may be: Maiied to BLM Uncompahgre RMP, 2465 S Townsend Ave, Montrose, CO 81401
Faxed to 1-970-240-5367
Emaiied to uformp@bim.gov

The BLM manages more land - 253 million acres - than any other Federal agency. This land, known as the National System of Public Lands, is primariiy iocated in 12 Western states, inciuding Aiaska. The Bureau, with a budget of about $1 biiiion, aiso administers 700 million acres of sub-surface mineral estate throughout the nation. The BLM's multiple-use mission is to sustain the heaith and productivity of the pubiic iands for the use and enjoyment of present and future generations. The Bureau accomplishes this by managing such activities as outdoor recreation, livestock grazing, mineral development, and energy production, and by conserving naturai, historicai, cuiturai, and other resources on pubiic iands.

--BLM--

2465 South Townsend Avenue Montrose, CO 81401

Last updated: 02-26-2010

USA.GOV | No Fear Act | DOI | Disclaimer | About BLM | Notices | Get Adobe Reader®
Privacy Policy | FOIA | Kids Policy | Contact Us | Accessibility | Site Map | Home

http://www.blm.gov/co/st/en/BLM_Information/newsroom/2010/blm_uncompahgre_extends.html[2/26/2010 10:17:03 AM]

BLM_0067053



# BLM UNCOMPAHGRE FIELD OFFICE

## INVITES YOU TO VISIT AN

## OPEN HOUSE PUBLIC MEETING

The Bureau of Land Management Uncompahgre Field Office is revising its Resource Management Plan that will provide management direction for the public lands and minerals within the field office for the next two decades. We want to hear from you!

We are holding six open houses to get input from the public as we begin this process. Stop by at any time during the time shown, learn more about the planning process, and share your comments and concerns.

- **Tuesday, January 12**
  Hotchkiss, 4:30 – 7:30 p.m.
  Memorial Hall
  175 N 1st St
- **Wednesday, January 13**
  Delta, 4:30 – 8:00 p.m.
  Bill Heddles Recreation Center
  530 Gunnison River Dr
- **Thursday, January 14**
  Montrose, 4:30 – 8:00 p.m.
  Montrose Pavilion
  1800 Pavilion Dr
- **Tuesday, January 19**
  Ridgway, 4:30 p.m. – 7:30 p.m.
  Ridgway Community Center
  201 N Railroad St
- **Wednesday, January 20**
  Norwood, 4:30 – 7:30 p.m.
  Norwood Town Hall
  1670 Naturita St
- **Thursday, January 21**
  Naturita, 4:30 – 7:30 p.m.
  Naturita Library
  411 W 2nd Ave

**For more information,** or to comment online, please visit the project website www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html, or contact the project manager, Bruce Krickbaum, at (970) 240-5300. **Written comments should be received by February 26, 2010**: Mail to BLM Uncompahgre RMP, 2465 S. Townsend Ave., Montrose, CO 81401; Fax to 1-970-240-5368; or E-mail to uformp@blm.gov.

NATIONAL SYSTEM OF PUBLIC LANDS



# Uncompahgre Resource Management Plan

We encourage you to provide your comments by filling out and submitting this comment form by **February 26, 2010. To** submit your comments, print your completed form and fax it to 1-970-240-5367 or mail it to US Bureau of Land Management, Uncompahgre Field Office, Attn: Bruce Krickbaum, RMP Project Manager, 2465 S. Townsend Avenue, Montrose, CO 81401.

First Name ______________ Last Name ______________ Date ________

Mailing Address ______________________________

City ______________ State ________ Zip ________

E-mail Address: ______________________________

Would you like to be added to this project's mailing list to receive future project-related information (your name will not be shared)? Yes: ☐ e-mail materials only ☐ e-mail and hard-copy materials ☐ No

Please indicate your affiliation by checking the following boxes (check all that apply):

☐ Individual (no affiliation) ☐ Non-profit Organization ☐ Citizen's Group

☐ Federal, State, or Local Government ☐ Elected Representative ☐ Regulatory Agency

Name of organization, government, group, or agency (if applicable) ______________

*Please answer the following four questions about your relationship to the Uncompahgre RMP Planning Area:*

Do you live within the planning area? ☐ Unit 1 ☐ Unit 2 ☐ Unit 3 ☐ Unit 4 ☐ Unit 5 ☐ No
*(Refer to map for unit numbers)*

If you do not live in the planning area, do you live in: ☐ Colorado (west slope) ☐ Colorado (front range or plains)
☐ Another State (which): ______________ ☐ Another Country (which): ______________

If you do live in the planning area, how long have you lived here? Months: ________ Years: ________

Why do you live here? ☐ Occupation ☐ Family ☐ Proximity to public lands ☐ Recreational Opportunities
☐ Other ______________

***The BLM wants to hear from you! The Uncompahgre Field Office is committed to listening to and learning from our neighbors, friends, and stakeholders. Your answers to the following questions will be helpful at this point in the planning process, as are any other comments. When answering the following questions, where applicable please reference the planning units in the map available for download by clicking here. Please note that if your comments exceed 11 lines and begin scrolling, you will not be able to print all of your comments. Thank you for taking the time to provide your input.***

What issues or concerns do you have regarding public land resources or uses within the Uncompahgre RMP planning area?

*Respondents' comments, including their names and street addresses, will be available for public review at the Uncompahgre Field Office during regular business hours from 8:00am to 4:30pm, Monday through Friday, except holidays, and may be published as part of the environmental impact statement. Individual respondents may request confidentiality. If you wish to withhold your name or street address from public review or from disclosure under the Freedom of Information Act, you must state this prominently at the beginning of your written comments. Such requests will be honored to the extent allowed by law. All submissions from organizations and businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, will be available for public inspection in their entirety.*

Keeping in mind the issues above, what changes would you make physically to the landscape (such as what should it look like, modifications, etc.)?

Keeping in mind the issues above, what changes would you make to administration (such as management actions, rules, regulations, etc.)?

Keeping in mind the issues above, what changes would you make to social characteristics (such as number of users, size of groups, behavior of users, etc.)?

Please provide any additional comments that you have regarding this project.

# Appendix B
## List of Commenters

BLM_0067057

This page intentionally left blank.

BLM_0067058

# APPENDIX B
# LIST OF COMMENTERS

The scoping process informally began in December 2009, when the UFO published the first project newsletter. The formal public comment period as required by NEPA began on February 25, 2010, with the publication of a Notice of Intent in the *Federal Register*, and ended on March 29, 2010. **Table B-1**, Commenters, lists the commenters who submitted written submissions to the BLM for the Uncompahgre RMP/EIS as part of the public scoping process. All comments received on or before April 9, 2009, were included in this scoping report. The commenters are listed in chronological order of when their comments were received. Form letters submissions are not included in **Table B-1**, Commenters. **Table B-2**, Form Letter Submissions, includes a brief description of the form letters received, including number of letters received.

**Table B-1**
**Commenters**

| | Commenter Name[1] | Affiliation | Date Received (Month/Day/Year) |
|---|---|---|---|
| | | **Federal Government Agency** | |
| 1. | Kathleen Ozga | Bureau of Reclamation, Upper Colorado Region | 3/16/2010 |
| 2. | Kathleen Ozga | Bureau of Reclamation, Upper Colorado Region | 3/29/2010 |
| 3. | Susan Starcevich | Department of Energy, Western Area Power Administration | 3/29/2010 |
| 4. | Ken Stahlnecker | National Park Service | 3/29/2010 |
| 5. | Larry Svoboda | US Environmental Protection Agency | 4/5/2010 |
| | | **State Government Agency** | |
| 1. | Dennis Kalvels | Colorado Info Tech Services | 2/17/2010 |
| 2. | Jennifer Gimbel | Colorado Water Conservation Board | 2/26/2010 |
| 3. | Robert P. Billerbeck | Colorado Natural Areas Program | 3/26/2010 |
| 4. | R. Eric Kuhn | Colorado River District | 3/29/2010 |
| 5. | Dave Roberts | West Elk Loop Scenic and Historic Byway Steering Committee | 3/29/2010 |

**Table B-1** *(continued)*
**Commenters**

| | Commenter Name[1] | Affiliation | Date Submitted (Month/Day/Year) |
|---|---|---|---|
| | | **Local Government Agency** | |
| 1. | Doug Fritz | Hotchkiss Fire District | 2/22/2010 |
| 2. | | Town of Norwood | 2/24/2010 |
| 3. | Linda Luther-Broderick and Peter Mueller | San Miguel County Open Space Commission | 3/23/2010 |
| 4. | Lela J. McCracken | Delta County, Board of County Commissioners | 3/26/2010 |
| 5. | Art Goodtimes | San Miguel County Commissioners | 3/29/2010 |
| 6. | Greg Clifton | Town of Ridgway | 3/30/2010 |
| 7. | Linda Luther-Broderick | San Miguel County Open Space Commission | 4/6/2010 |
| | | **Business/Commercial Sector (if applicable)** | |
| 1. | Jack Barnett | Colorado River Basin Salinity Control Forum | 12/28/2009 |
| 2. | Scott Hill | Sleeping Indian Ranch | 1/22/2010 |
| 3. | Robert Guinn | SG Interests, Ltd. | 2/19/2010 |
| 4. | | Oxbow Mining, LLC | 2/22/2010 |
| 5. | Roy Kirkman | Exploration Research, Development and Analysis | 2/23/2010 |
| 6. | Karla Tschoepe | Wildwood Ranch | 2/24/2010 |
| 7. | Marc Stimpert | Brown, Schottelkotte, Stimpert & Vaughn, LLC | 2/25/2010 |
| 8. | Lee Fyock | Gunnison Energy Corporation | 2/25/2010 |
| 9. | Anne Sievers | Barney & Co., LLC | 2/26/2010 |
| 10. | Hank and Edith Davis | Davis Ranch | 3/1/2010 |
| 11. | Karen Budd-Falen | Budd-Falen Law Offices, LLC | 3/2/2010 and 4/2/2010 (errata) |
| 12. | R. Lance Wade | Western Fuels-Colorado, LLC | 3/24/2010 |
| 13. | Dan McClendon | Delta-Montrose Electric Association | 3/29/2010 |
| 14. | Richard White | Energy Resources Corporation | 3/29/2010 |
| 15. | Philip (Wink) Davis | Mesa Winds Farm | 3/29/2010 |
| 16. | Paul Szilagyi | Nuvemco LLC | 3/29/2010 |
| 17. | Karl Myers | Tri-State Generation and Transmission Association | 3/29/2010 |
| 18. | Mark LeValley | Black Canyon Ranch Property Lease, LeValley Ranch | 4/5/2010 |
| | | **Educational Institution** | |
| 1. | Kevin Bergstrom | National Outdoor Leadership School | 1/11/2010 |
| | | **Organization (non-profit, citizen's group)** | |
| 1. | Jack Barnett | Colorado River Basin Salinity Control Forum | 12/28/2009 |
| 2. | Grady Harper | North Fork River Improvement Association | 1/12/2010 |
| 3. | Walt Blackburn | Thunder Mountain Wheelers | 2/5/2010 |
| 4. | Jonathan B Ratner | Western Watersheds Project | 2/7/2010 |

**Table B-1** *(continued)*
**Commenters**

| | Commenter Name[1] | Affiliation | Date Submitted (Month/Day/Year) |
|---|---|---|---|
| 5. | John Schnorr | Wisconsin Off-Highway Vehicle Association | 2/9/2010 |
| 6. | Bill Day | Black Canyon Audubon | 3/5/2010 |
| 7. | | Citizens for a Health Community | 3/12/2010 |
| 8. | Andrea Robinsong | Public Lands Committee of Western Colorado Congress | 3/28/2010 |
| 9. | Rein van West | Ridgway-Ouray Community Council (ROCC), Air and Water Committee | 3/28/2010 |
| 10. | Brian Hawthorne | BlueRibbon Coalition | 3/29/2010 |
| 11. | Amber Kelley<br>Steve Smith<br>Andrea Robinsong<br>Bill Dvorak<br>Hilary White<br>John Weisheit<br>Kate Graham<br>Veronica Egan | Dolores River Coalition<br>The Wilderness Society<br>Public Lands Committee of Western Colorado Congress<br>Colorado River Outfitters Association<br>Sheep Mountain Alliance<br>Colorado Riverkeeper<br>Colorado Environmental Coalition<br>Great Old Broads for Wilderness | 3/29/2010 |
| 12. | Stu Krebs | Uncompahgre Valley Association | 3/29/2010 |
| 13. | Roz McClellan | Rocky Mountain Recreation Initiative | 3/29/2010 |
| 14. | Nicholas Payne | Theodore Roosevelt Conservation Partnership | 3/29/2010 |
| 15. | Matt Reed | High Country Citizens' Alliance | 3/29/2010 |
| 16. | Elizabeth Roscoe | Friends of the River Uncompahgre | 3/29/2010 |
| 17. | Steve Smith<br>Kate Graham<br>John Weisheit<br>The Sheep Mountain Alliance<br>Bill Dvorak<br>Andrea Robinsong<br>Amber Kelley | The Wilderness Society<br>Colorado Environmental Coalition<br>Colorado Riverkeepers<br>Sheep Mountain Alliance<br>Colorado River Outfitters Association<br>Public Lands Committee of Western Colorado Congress<br>Dolores River Coalition | 3/29/2010 |
| 18. | Jim Stephenson | Ridgway Ouray Community Council (ROCC) | 3/29/2010 |
| 19. | Heather Tischbein<br>Robert Peters | Western Colorado Congress<br>Western Slope Environmental Resource Council | 3/29/2010 |
| 20. | Corey Fisher | Trout Unlimited | 3/30/2010 |
| 21. | Roz McClellan | Rocky Mountain Recreation Initiative | 3/30/2010 |
| 22. | Claire M. Moseley | Public Lands Advocacy | 3/30/2010 |
| 23. | Steve Smith<br>Bethany Gravell<br>Amber Kelley<br>Bryan Martin | The Wilderness Society<br>Center for Native Ecosystems<br>Dolores River Coalition<br>Conservation Colorado Mountain Club | 3/30/2010 |

**Table B-1** *(continued)*
**Commenters**

| | Commenter Name[1] | Affiliation | Date Submitted (Month/Day/Year) |
|---|---|---|---|
| | Christine Canaly | San Luis Valley Ecosystem Council | |
| | Robert Peters | Western Slope Environmental Resource Council | |
| | Hilary White | Sheep Mountain Alliance | |
| | Kate Graham | Colorado Environmental Coalition | |
| | Mike Chiropolos | Western Resource Advocates | |
| | Peter Hart | Wilderness Workshop | |
| | Roz McClellan | Rocky Mountain Recreation Initiative | |
| | Tom Sobal | Quiet Use Coalition | |
| | Rocky Smith | Colorado Wild | |
| | | **Individual** | |
| 1. | David Kuntz | | 12/27/2009 |
| 2. | Adam Mehlberg | | 1/7/2010 |
| 3. | s Robert Haynes | | 1/11/2010 |
| 4. | William Bear | | 1/12/2010 |
| 5. | Andrew Coonan | | 1/12/2010 |
| 6. | Bill Ela | | 1/12/2010 |
| 7. | Gene Goffin | | 1/12/2010 |
| 8. | Ashley Krest | | 1/12/2010 |
| 9. | Indra Leu | | 1/12/2010 |
| 10. | Bill McKernan | | 1/12/2010 |
| 11. | Cynthia Wutchiett | | 1/12/2010 |
| 12. | Millicent Young | | 1/12/2010 |
| 13. | William Jardon | | 1/13/2010 |
| 14. | Ket Redding | | 1/13/2010 |
| 15. | Rick Weaver | | 1/14/2010 |
| 16. | Hank Masterson | | 1/15/2010 |
| 17. | Barry Schreckengast | | 1/16/2010 |
| 18. | Martin Luitefield | | 1/18/2010 |
| 19. | George Greenbank | | 1/19/2010 |
| 20. | Tim Patterson | | 1/19/2010 |
| 21. | Gordon Reichard | | 1/19/2010 |
| 22. | Wendell Koontz | | 1/20/2010 |
| 23. | Greg Lehr | | 1/20/2010 |
| 24. | Laurie Brandt | | 1/21/2010 |
| 25. | William Lobato | | 1/21/2010 |
| 26. | Laurie Smith | | 1/21/2010 |
| 27. | Spencer Rylaude | | 1/22/2010 |

**Table B-1** *(continued)*
**Commenters**

| | Commenter Name[1] | Affiliation | Date Submitted (Month/Day/Year) |
|---|---|---|---|
| 28. | Paul Koski | | 1/27/2010 |
| 29. | David Hurr | | 1/29/2010 |
| 30. | Ralph D'Alessandro | | 1/31/2010 |
| 31. | Lloyd Stahl | | 2/3/2010 |
| 32. | Judy Nobles | | 2/5/2010 |
| 33. | Harold Hillis | | 2/6/2010 |
| 34. | Garry Baker | | 2/8/2010 |
| 35. | Barney and Shawn Mock | | 2/9/2010 |
| 36. | Nobles | | 2/9/2010 |
| 37. | Kevin Clark | | 2/10/2010 |
| 38. | Joe Garvey | | 2/11/2010 |
| 39. | Peter Winn | | 2/14/2010 |
| 40. | Anonymous | | 2/17/2010 |
| 41. | Laurie Taylor | | 2/17/2010 |
| 42. | Ilene Lewis | | 2/18/2010 |
| 43. | Duane Renfrow | | 2/18/2010 |
| 44. | Alan Malcolm | | 2/19/2010 |
| 45. | Judy Nobles | | 2/19/2010 |
| 46. | Jerry Ahrens | | 2/22/2010 |
| 47. | James Dowell | | 2/22/2010 |
| 48. | Keith Fellin | | 2/22/2010 |
| 49. | Debra Littlefield | | 2/22/2010 |
| 50. | Willis Olson | | 2/22/2010 |
| 51. | Roman Rourd | | 2/22/2010 |
| 52. | Mike Shults | | 2/22/2010 |
| 53. | Guy Wright | | 2/22/2010 |
| 54. | Ron Applebach | | 2/24/2010 |
| 55. | David Congour | | 2/24/2010 |
| 56. | SamanthaLyn Samuelson | | 2/24/2010 |
| 57. | Valerie Crespin | | 2/25/2010 |
| 58. | Art Etter | | 2/25/2010 |
| 59. | Calvin Nobles | | 2/25/2010 |
| 60. | Tawnia Welch | | 2/25/2010 |
| 61. | Kevin Anderson | | 2/26/2010 |
| 62. | Jeff Campbell | | 2/26/2010 |
| 63. | Danell Carter | | 2/26/2010 |
| 64. | Mike Clarke | | 2/26/2010 |

**Table B-1** *(continued)*
**Commenters**

| Commenter Name[1] | Affiliation | Date Submitted (Month/Day/Year) |
|---|---|---|
| 65. Sherry Craig | | 2/26/2010 |
| 66. Pat Enstrom | | 2/26/2010 |
| 67. Daniel Hunt | | 2/26/2010 |
| 68. Michael and JoEllen Morgan | | 2/26/2010 |
| 69. Lowell Watson | | 2/26/2010 |
| 70. Jody Weimer | | 2/26/2010 |
| 71. Zene Weimer | | 2/26/2010 |
| 72. Ernie Etchart | | 2/27/2010 |
| 73. Dave Abbott | | 3/1/2010 |
| 74. Harold Cressler | | 3/1/2010 |
| 75. Winona Cressler | | 3/1/2010 |
| 76. Holly Davis | | 3/1/2010 |
| 77. Kent Davis | | 3/1/2010 |
| 78. Nicholas McCracken | | 3/1/2010 |
| 79. Thomas Torres | | 3/1/2010 |
| 80. John Wool | | 3/1/2010 |
| 81. Millicent Young | | 3/1/2010 |
| 82. Sally Kichelmann | | 3/2/2010 |
| 83. Brian Hoefling | | 3/3/2010 |
| 84. Sharon Beard | | 3/4/2010 |
| 85. Constantine Hirschfeld | | 3/4/2010 |
| 86. Nancy Franklin | | 3/5/2010 |
| 87. Brandon Siegfried | | 3/5/2010 |
| 88. Craig Grother | | 3/7/2010 |
| 89. Kent Sundgren | | 3/8/2010 |
| 90. Rosemary Bilchak | | 3/9/2010 |
| 91. Bob and Donna Green | | 3/9/2010 |
| 92. Josh Roberts | | 3/9/2010 |
| 93. Donald Hart | | 3/10/2010 |
| 94. Neil Michael Wilson | | 3/10/2010 |
| 95. Constantine Hirschfeld | | 3/11/2010 |
| 96. Susan and Gordon Hickle | | 3/15/2010 |
| 97. Allison Elliot | | 3/17/2010 |
| 98. Ronald Henderson | | 3/17/2010 |
| 99. Peggy Lyon | | 3/17/2010 |
| 100. Karl Hanzel | | 3/18/2010 |
| 101. Kent Brakken | | 3/19/2010 |

**Table B-1** *(continued)*
**Commenters**

| Commenter Name[1] | Affiliation | Date Submitted (Month/Day/Year) |
|---|---|---|
| 102. Dan Auerbach | | 3/22/2010 |
| 103. Linda Van der Veer | | 3/22/2010 |
| 104. Phyllis Swackhamer | | 3/23/2010 |
| 105. Coen Dexter | | 3/24/2010 |
| 106. James Harden | | 3/24/2010 |
| 107. Barbara Hill | | 3/24/2010 |
| 108. Roy Johnson | | 3/24/2010 |
| 109. Marty Warner | | 3/24/2010 |
| 110. Ed Neil | | 3/24/2010 |
| 111. William Berry | | 3/25/2010 |
| 112. Gregory Craig | | 3/25/2010 |
| 113. Ali Lightfoot | | 3/25/2010 |
| 114. Mary Pfalzgraff | | 3/25/2010 |
| 115. Andy Goldman | | 3/26/2010 |
| 116. Robert Haynes | | 3/26/2010 |
| 117. Mike Jackson | | 3/26/2010 |
| 118. Tim Johnson | | 3/26/2010 |
| 119. Indra Leu | | 3/26/2010 |
| 120. Brenda Miller | | 3/26/2010 |
| 121. Kirk Morgan | | 3/26/2010 |
| 122. Dale Reed | | 3/26/2010 |
| 123. Amber Kleinman | | 3/27/2010 |
| 124. Joe Brinton | | 3/28/2010 |
| 125. Rosemary Esty | | 3/28/2010 |
| 126. James Graziano | | 3/28/2010 |
| 127. Paul Herbert | | 3/28/2010 |
| 128. John Hollrah | | 3/28/2010 |
| 129. Julia Johnson | | 3/28/2010 |
| 130. Robin Nicholoff | | 3/28/2010 |
| 131. Maxwell Aley | | 3/29/2010 |
| 132. Smythe Boone | | 3/29/2010 |
| 133. Chris Carrier | | 3/29/2010 |
| 134. Michael Cassidy | | 3/29/2010 |
| 135. Bart Eller | | 3/29/2010 |
| 136. Galley Stan | | 3/29/2010 |
| 137. La Vonne Glanville | | 3/29/2010 |
| 138. William Hamann | | 3/29/2010 |

**Table B-1** *(continued)*
**Commenters**

| Commenter Name[1] | Affiliation | Date Submitted (Month/Day/Year) |
|---|---|---|
| 139. Bill Hamman | | 3/29/2010 |
| 140. Tom Hanel | | 3/29/2010 |
| 141. Roy High | | 3/29/2010 |
| 142. Carl Johnson | | 3/29/2010 |
| 143. Pete Kolbenschlag | | 3/29/2010 |
| 144. Steve and Leah Morris | | 3/29/2010 |
| 145. Barb Poole | | 3/29/2010 |
| 146. Earl Reams | | 3/29/2010 |
| 147. Jim Riddell | | 3/29/2010 |
| 148. David Schneck | | 3/29/2010 |
| 149. Joel Sorenson | | 3/29/2010 |
| 150. Michael Tarbell | | 3/29/2010 |
| 151. Marv Ballantyne | | 3/30/2010 |
| 152. Randolph and Jennifer Parker | | 3/30/2010 |
| 153. Nancy Winkler | | 3/30/2010 |
| 154. Bonnie Beach | | 3/31/2010 |
| 155. Dan Auerbach | | 4/5/2010 |

[1]Table does not include form letters submissions; refer to Table B-2, Form Letter Submissions.

**Table B-2**
**Form Letter Submissions**

| Date First Letter Received (Month/ Day/Year) | Organization Identified (if any) | Number of Form Letters Received | Number of Form Letters with at Least One Unique Comment | Description of Form Letter Contents |
|---|---|---|---|---|
| 2/2/2010 | Western Colorado Chapter of the Gold Prospectors Association of America | 17 | 0 | Comments in favor of placer mining on the San Miguel River |
| 2/4/2010 | Western Colorado Chapter of the Gold Prospectors Association of America | 18 | 0 | Comments in support of maintaining accessibility on public lands |
| 2/12/2010 | Western Colorado Chapter of the Gold Prospectors Association of America | 6 | 3 | Comments opposed to designation of the San Miguel River in the National Wild and Scenic Rivers System |
| 2/22/2010 | (none identified) | 6 | 0 | Comments opposed to Wild and Scenic River designation in the project planning area |
| 2/23/2010 | Citizens for a Healthy Community | 117 | 12 | General conservation-oriented comments |
| 2/24/2010 | (none identified) | 13 | 1 | Wild and scenic river comments |
| 2/24/2010 | (none identified) | 4 | 0 | Comments opposed to wild and scenic river designation in planning area |
| 2/25/2010 | Motorcycle Trail Riding Association and Trails Preservation Alliance | 2 | 0 | Recreation-orientated comments |
| 3/16/2010 | (none identified) | 10 | 0 | Comment stating opposition to revision of the RMP |
| 3/18/2010 | (none identified) | 28 | 18 | Comments in favor of protections for Dolores River Basin |
| 3/25/2010 | (none identified) | 12 | 9 | General conservation-oriented comments |
| 3/29/2010 | (none identified) | 2 | 0 | Comments in support of maintaining accessibility on public lands |
| 3/30/2010 | The Wilderness Society | 20,831 | 37 | General conservation -oriented comments |

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 155 of 301

This page intentionally left blank.

BLM_0067068

# Appendix C
## Comments by Resource Panning Issue

BLM_0067069

This page intentionally left blank.

BLM_0067070

# APPENDIX C
# COMMENTS BY RESOURCE PLANNING ISSUE

The BLM received 2,496 discrete comments during the Uncompahgre RMP scoping period. These comments were classified by RMP process category and by planning issue. Comments for each the RMP process categories and for planning issue categories are included in this appendix. Comments are included verbatim from the comment letters; however, information in letters that was not considered a comment is not included here. Comment letters can be viewed in their entirety at the UFO in Montrose, Colorado. Comments are included for the following groups:

***Comments by Process Category:***

Table C-1 General Comments Outside the Scope of the RMP

Table C-2 Comments Related to Issues to Be Solved by National Policy

Table C-3 Comments Related to Implementation Actions

***Comments by Planning Issue:***

Table C-4 General Comments Related to the RMP

*Issue 1:*

Table C-5 Air Quality, Water, and Soil

Table C-6 Drought Management/Climate Change

Table C-7 Fish and Wildlife

Table C-8 Vegetation

Table C-9 Special Status Species

Table C-10 Special Designation Areas – General

Table C-11 Special Designation Areas – Areas of Critical Environmental Concern

Table C-12 Special Designation Areas – Wild and Scenic Rivers

Table C-13 Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics

Table C-14 Special Designation Areas – National Scenic Byways

*Issue 2:*
Table C-15 Energy Development – General

Table C-16 Non-renewable Energy Development

Table C-17 Minerals and Mining

Table C-18 Renewable Energy Development

*Issue 3:*
Table C-19 Recreation Management

Table C-20 Travel Management

Table C-21 Noise

Table C-22 Visual Resources

Table C-23 Livestock Grazing

Table C-24 Forestry

Table C-25 Wildland Fire Management

*Issue 4:*
Table C-26 Lands and Realty

*Issue 5:*
Table C-27 Cultural and Heritage Resources

Table C-28 Paleontological Resources

*Issue 6:*
Table C-29 Social and Economic Considerations

Table C-30 Public Health and Safety

**Table C-1**
**Comments Beyond the Scope of the RMP**

| Comment ID | Comment |
|---|---|
| 1619 | Put $ into carbon capture technologies. |
| 1009 | I am concerned that the supreme court's ruling declaring corporations as people with the same rights to contribute to certain public officials and campaigns as they choose seriously endangers our health, through the self interests of high rollers such as Exxon. Do unto other generations as you would have them do unto you (ours)." |
| 809 | Reduce red tape and cost for drilling and mining |
| 401 | The trail from the Cashin Mine to the Bedrock Store via La Sal Creek and the Dolores River is the old road from Colorado to Utah. Both ends of the closed road have had motorized travelers lately. They have not been able to get all the way through because of their inability to cross La Sal Creek. Signs need to be posted on the trail heads, one at Cashin Mine and one south of the Bedrock boat ramp. It may take physical barriers to prevent motorized travel. |
| 2376 | There is a problem here--it is postmodernists: those who refuse, for whatever reason, to accept the reality of space-time. The subportion of space here is that of a wilderness ecozone. This is a habitat for wildlife, not for offroading thrillseekers, noisemakers and scofflaws. |
| 803 | We spend time out there every week of the year. We would like to organize a clean up day and have a big party at our house at the end. |
| 1324 | As mentioned, we are a uranium company. Part of our decision to conduct a business central to the ubiquitous natural element is its use as fuel for clean, cost efficient nuclear power. Another part is the reality the U.S. currently generates over 20% of its electrical power via nuclear power plants, yet imports over 90% of the uranium fuel such power plants use. This obviously cannot continue without undue and unnecessary reliance on foreign sources. Similarly, the current rate of production worldwide is roughly 60% of what is consumed, pointing out the need for increased mining. |
| 510 | Signage and enforcement should be priorities for any budget requests. Regarding dispersed camping, off road game and shed antler retrieval |
| 175 | I truthfully believe that the BLM and National Forest bureaucracies have morphed into organized policies of terror against the citizens of this country. This first came to my attention when the BLM started intimidating senior citizens for picking up arrowheads (even though it is their right to do so according to the Congressional Record). Most recently this was further confirmed by the debacle in Blanding Utah among others that I know of. How can the federal government implant a felon to entrap citizens using government money and bribes with any degree of integrity! Then, go beyond that and "attack" in assault gear en masse on these people and their families, both physically and verbally. I thought an American citizen was innocent until charged and then proven guilty. The compounding arrogance was visited upon us by Ken Salazar who with glee on television denounced these citizens as scum. As government bureaucrats BLM employees were hired to manage the citizens property. Now they have co-opted to insert themselves as police against the citizens. |
| 176 | Stop this insult and deception that your new policies are good for the people and the environment. You have more than enough legal authority by which to manage the land. You don't need more corrosive laws that take away constitutional and inalienable rights. |
| 747 | Today with the speed the world is changing global warming, earth changes, contaminations of our water sources, overpopulation etc. values have to change! |
| 515 | My wife and I own Monitor Mesa Ranch, which is located on Monitor Mesa in the Dominguez-Escalante National Conservation Area on the Uncompahgre Plateau. We are concerned about the use of the public lands which surround our ranch and, in particular, the proposed construction of additional roads into this area. |
| 504 | Regarding the already existing Dry Creek Travel Management Plan (TMP): The BLM is to be commended on its adoption of the Dry Creek TMP. It should not reconsider its decision to close Monitor Creek Canyon to motorized use by creating a connector for motorized travel from 25 Mesa Road going into the canyon system. Its proximity to the Camel Back WSA and the Forest Service Roubideau WSA demands its management as a primitive backcountry area for wildlife and quiet use. |
| 281 | The area included in the RMP boundaries contains some fantastic "wild places". In a West that continues to urbanize and develop rapidly, these places (especially those outside of the rocky mountain ridges that often fall under USFS jurisdiction) are increasingly valuable. I would like to see an end to further road construction; better designation of OHV use and non-use areas; the elimination of non-renewable energy development and |

**Table C-1**
**Comments Beyond the Scope of the RMP**

| Comment ID | Comment |
|---|---|
| | careful consideration of the footprint associated with any renewable energy projects such as solar or wind installations; and continued maintenance of facilities such as the (very much appreciated) picnic/camp areas on the San Miguel. |
| 2441 | The program doesn't work. New administration promised to rid programs that do not work. Oil and gas profit at the expense of our lands, our wildlife, our waterways. |
| 2650 | Please note, refusal to respond sincerely, effectively, and totally to my letter, which constitutes an act of participatory democracy, is considered by me a termination of the social contract between myself and the United States Government. |
| 428 | Keep the RAC activities to promote public - private collaboration and education. |
| 2447 | The Bushian Nightmare is over! Let the policies based on real science, solid logic, good reasoning, and common sense begin! |
| 2449 | After 8 years of the Bush administration's assault on America's natural lands, we have much repair work to do. |
| 449 | We need signage, parking and staging areas as appropriate for each entrance. |
| 1094 | Environmental Assessment conducted at Windy Point (confluence overlook) for a trail to the upper and lower overlook, with interpretive signage, parking, turnaround, safety railing, etc. |
| 1096 | Trail Feasibility Assessment along Unaweep-Tabeguache Scenic and Historic Byway |
| 2348 | Thank you for helping to save these executives why saving the Western Gray Whale important. Thank you for considering my comments. I look forward to your swift action to ensure a complete ban on whaling in Iceland. Thank you for your consideration of this issue. Thank you for considering my views on this issue. I look forward to your reply. Sincerely, thank you for considering my views on this issue. I look forward to your reply. Yours truly, Thank you for considering my comments. Thank you for taking my concerns into consideration. Sincerely, thank you for considering my comments. P.S. I Love Wildlife |
| 223 | More effort should be expended to protect the Gunnison sage grouse north of Black Canyon of the Gunnison National Park (we realize that this area is outside of the area currently being considered for revision). |
| 473 | Access and use of public lands should remain free. Fees for use and access to public lands should not be increased without public input. Enjoyment of our local public lands should remain available to people with the most limited of financial means, especially during our current tough economic times. |
| 230 | No specific recommendation at this time; however, should Curecanti NRA be legislatively established, at that time work with NPS to develop/amend agreements. |
| 793 | Somehow stopping the lawsuits when a government decision does not give you 100% of what you want. These are (illegible text) |
| 2701 | What we as a nation do from today forward, creates the legacy we leave our children and the future of the Earth. Anyone 60 years or older sees, feels and lives on an Earth facing problems you and I have caused by taking the short term, easiest, most lucrative way. We're told, by those with greed to gain, there's no price to pay for our disregard for the future... but you and I and any thinking person knows differently. You and I, our families, and their families of the future are going to pay the price for our choice to look the other way... Please, let's start today to choose the path that will bring goodness to us all, rather than ruin to the planet upon which we're all blessed to live. I trust you will choose what is right for us all… |
| 795 | Stop letting the EPA and "environmental protectionist" groups control what happens. |
| 766 | Maintain and continue to support BLM minerals staff. Don't become a "recreation" agency at expense of other functions. |
| 765 | Vigorously support Colorado Roadless Initiative |
| 2675 | Just wondering how much lobby money John Salazar is reaping from all this.....better be NONE!!!!!!!! |
| 228 | Nominate the C-77 Road Gunnison sage grouse habitat as an ACEC to increase protection for this species (we realize that this area is outside of the area currently being considered for revision). This could involve restricting some types of use during critical seasons (such as OHV use). |
| 2376 | Do we not hear of extreme weather conditions constantly? Newly forming deserts? Floods? And yet humans have known for generations. Cut down trees, cover the land with asphalt and sprawl development, fossil fuels - |

**Table C-1**
**Comments Beyond the Scope of the RMP**

| Comment ID | Comment |
|---|---|
| | the list goes on. What do we get? mudslides, floods, deserts . When will we learn that we MUST protect what wild, natural and nurturing areas that we have left. |
| 1694 | No roads should be constructed in Forest Service Inventoried Roadless Areas for energy extraction. |
| 862 | The BLM wants to make more rules for the public, but rarely do I see them being able to enforce them on the ground. Staff are bogged down in paperwork in offices, and there is no funding to staff appropriately for law enforcement. These are the two main comments I get when I ask personnel why something hasn't been taken care of, or why something is moving slowly. |
| 861 | Management actions should always be neighborly towards private property owners adjacent to BLM lands. Being neighborly also includes attitudes towards ranchers with BLM grazing allotments, and any other party who may have a permit to use BLM lands. Meeting with people on the land instead of in offices. |
| 2471 | This has got to stop we need to keep our lands the way the Lord created them. Please save them We are hurting everything else the people getting turned down for help for food and people in the United States suffering because no one will help them so please let the starving people and homeless people know are lands are safe. |
| 927 | The BLM administration should by all accounts should communicate in the field and attend our meetings. |
| 926 | How about the BLM office police the area until we arrive. |
| 2549 | What shall we drink when the water is polluted with heavy metals and other toxic substances? What shall we breathe when the air is choked with pollution and particulates? Where will we go to escape the stress and darkness of our urban areas if no wild places remain? God guide your decision as a steward of this Earth and its inhabitants |
| 889 | Six miles below my ranch is a subdivision that has very easy access to public lands. Residents drive, ATV and motorcycle at all hours up the numerous roads. They dump their trash, litter out their vehicle windows, dump fireplace ashes, target practice and poach. All because they abut public lands, and access is so easy. They have never been taught what goes on in the environment while they're not present. They are not thinking about what the consequences are of their ATV's traveling off road=spreading weeds, others follow their tracks, air and noise pollution, erosion. These people encourage wildlife to come into the subdivision by placing all kinds of food out for creatures. |
| 2513 | Thank you for the opportunity to comment on the Uncompahgre RMP revision. Although I only agree with rather than actually prepared these comments, let me add personally how deeply I sense the interconnections between nature as God originally granted us and the incredibly harsh impact on health, morality, and spiritual evolution that our know-it-all approach to revising nature in our industrial image has caused. The economic issues attached to our past, present and future must be thought of accordingly. The economy is (in reality) more abstract than the conflicts within humanity. |
| 2433 | I can hope Tennessee and other areas in the south does these things also to preserve our natural heritage and possibly learn from your great example. |
| 820 | Off-road vehicle use: Require all vehicles to stay on designated roads and trails, and close excess roads and trails in the Escalante-Dominguez NCA. |
| 2413 | We are losing our wild lands and national parks in alarming numbers to gas, oil and mining interest who destroy the lands for future generations. Shell Oil is already plowing through the Alaskan seas, once a protected area. Tongass rain forest is being open to clear cutting old timber which is why when I go to the lumber yard all that is to be bought qualifies as a poor grade of lumber due to the lack of proper growth. You can not quick fix nature, That Is A fact. ONCE IT IS GONE WE CAN NOT THERE IS NO MORE. We need these wild areas to fight Global Warming, preserve wildlife and to leave something besides rust and pollution for the next generation. |
| 1616 | Create jobs that clean and strengthen our environment, Not trash us. |
| 1719 | An over-arching concern of mine is that Americans--and the gov't agencies we fund--can't keep allowing the "privatization" if not "corporatization" of the oversight/management of the commons and other public interests. People/entities focusing on short-term privatized financial gain, who don't believe in government and the purpose of government, including the long-term management of the commons. |

**Table C-1**
**Comments Beyond the Scope of the RMP**

| Comment ID | Comment |
|---|---|
| 354 | If the following withdrawals have not been examined and eliminated they should be (this is from ACEC Record of Decision): Most of the lands in the canyon bottom, between Placerville and the town of Pinon were withdrawn under Powersite Classification in 1925. An estimated 12,040 acres remain withdrawn. Withdrawals within the proposed ACEC total 8,600 acres, and an additional 3,440 acres in the remainder of the propsed SRMA. These withdrawals have not yet been reviewed or modified. |
| 1553 | This whole process seems to be a politically correct land and water rights grab by the BLM using the department of Ecology and the United States Congress as the sledge hammers to push us "little people" off of our claims. |
| 867 | 3.1 BLM Recreation &Visitor Services: I think it is necessary to charge fees in some areas because of heavy use, and repetitive use by the same people. Since the BLM cannot keep up with maintenance of what it already has in place, fees are necessary. Pay to Play. |
| 715 | Enact regulations that would make it impossible for anti-human organizations like Western Slope environmental or Green Peace to economically attack the good people of western Colorado. Using the rise or fall of ATV sales as an excuse. |
| 1338 | We would like to point out that if not mining here, then where? If not under the stringent BLM regulations and worker protections, then in what country where neither is provided to the level of provided in the U.S.? |
| 289 | would also like to see more law enforcement funds allocated, or a plan that allows for more law enforcement out and about. The people that abuse the dispersed use areas should be confronted. |
| 1382 | we are all entitled to the royalties that come from their sale. |
| 347 | Eliminate the following, as found in San Miguel ACEC Record of Decision: Trails in Saltado and Beaver Creek Canyons may be constructed as well as a boat ramp on the San Miguel at Beaver Creek. If feasible, a bicycle and foot trail. |
| 2478 | So good old Big Oil and Gas is at it again. We all know that all energy products like uranium is also owned by this same group. |
| 929 | Again attend our meetings and also communicate in the field. |
| 2746 | Pres. obama is supposed to upend all the damage done by Bush . Include this in that restoration . thank u . |
| 374 | A program of trimming out every old, diseased or too thick vegetation, and the Gov. guy the lumber and ship it to Haiti for foreign Aid. |
| 887 | 8.2 Wildland-Urban Interface: To manage recreation in these areas, we must begin by educating our children in the classroom. They take info home to their parents furthering the education process. We must teach an entire generation to care for public lands. Communities that abut public lands need to take responsibility for the lands. Getting school children out of the classroom and onto the land to carry out projects is necessary for them to care about their surrounding environment, and feeling ownership. Civic groups also need to take on projects, even if its as simple as maintaining one sign or a kiosk, a trail, picking up trash, etc. If people will begin to care for the land, and understand what is going on everyday, they will feel possession of it, and will take action to protect it. Examples: an eye out for poachers, trash dumping, dogs chasing wildlife, weed invasion. |
| 844 | Rules and regulations are set back in Washington and influenced by the interest groups. What I would like to see doesn't matter unless it falls in line with those top down rules. |
| 2417 | While I would like to see all our wilderness lands completely protected from ALL forms of commerce, economics is going to win, as always. |

**Table C-2**
**Comments Related to Issues Solved by National Policy**

| Comment ID | Comment |
|---|---|
| 966 | Education within the local school systems. Teach the kids the science and management of our public lands. Give them the opportunity to have some inherent ownership. |
| 1005 | Let me stress: Informing and educating users and the public should be very high BLM priorities. |
| 2345 | This is my second letter to the BLM this morning. And both letters are telling you to manage the land for the sake of the land and its wildlife. I do not pay taxes for my lands to be farmed out to ranchers or devastated by energy companies. Neither ranchers nor energy companies are going to give me price breaks. And both are going to totally ruin the public lands and not restore them after doing so. Steward the land rather than constantly renting it to special interests. |
| 642 | In the interest of safety, as well as in protection of a fantastic community asset, signs should be installed to clearly identify on which trails motorized vehicles are not permitted |
| 1175 | EPA supports efforts to address motorized-use resource damage, user conflicts, and enforcement issues. To meet the goals of wildlife protection, vegetation management, erosion and sedimentation minimization, and user satisfaction with the recreational experience, education and enforcement of travel requirements should be a priority. Maps and signage to promote public understanding of travel restrictions can improve compliance. |
| 187 | Again, I am against more Wilderness or Wilderness Study Areas, we have enough. For example, take the dominguez/escalante area that was recently turned into a NCA and includes 66,000 more acres of Wilderness. Many people will never be able to enjoy the scenic beauty of this area due to it now being inaccessible unless you are the hardiest of hiker or horseback rider. I feel land can be protected without locking everyone out. This area was not being damaged by over use or rampant ATV or motorcycle use. Many canyons and special places I enjoy are now totally off limits unless I can hike for several days to access them. I feel this is wrong and unnecessary and caters to that vocal minority of ultra-conservative, well funded, environmentalist who probably never visited this area in the first place. |
| 1828 | Management should enforce rules and laws already in place instead of trying to implement new ones that prohibit public use and access. |
| 1549 | Apparently there are no actual written guidelines about what happens to an active but unpatented placer claim. This appears to be done with the intent to deny access to the claims utilizing any flimsy excuse that can be dreamed up by the BLM personnel. There seems to be a national trend in the BLM management to exclude local water rights and local water users in favor of tourists, fishermen, rafters and other so-called ECO friendly groupies. |
| 1101 | We would also like BLM to consider preservation of the old highways and make bike and hiking trails from them. This would allow for industrial trucking to occur, and keep the biking/hiking people out of danger, as well as preserve "what used to be" for generations to come. |
| 847 | Educate the users. Constantly work to keep in the users face about the right way to recreate on public land |
| 1336 | But we would ask the BLM to add this to its education agenda to blunt the fear mongering and get back to adult discussions framed in reality. We could go as far as saying BLM is asking for input on how things used to be, not on the current remediation requirements; BLM may well be asking for a problem when the solution already is in place. |
| 630 | Being a member of the subdivision I hear and see many off-road motorcycles and ATVs driving on our streets to access the BLM through an unbuilt lot in our subdivision. While I don't like the noise and speed at which they travel our streets I am also dismayed by the damage that they incur on the trails, especially when the trails are muddy and they ride anyway. The access that they use (mostly) is through a cul-de-sac at the top of the subdivision and I don't believe this is a legal access. The trail there keeps getting wider and more eroded by this steep entry. From time to time I see their tracks on the single track walking trails which is dangerous to the non motorized traffic that mostly uses those trails. There are some roads that are established that they could use that already have a double track, but the entry off our subdivision should be cut off. The off-road vehicles are illegal to be using public streets anyway and my neighbors complain about the noise of them screaming up the big hill that leads to the unfortunate access through the unbuilt lot. I would ask you to consider having an access for motorized travel off the Minnesota Creek Road. Maybe a staging area could be built so they could legally trailer the off-road vehicles to a parking lot and start from there. |
| 1333 | Lastly, we question why there are not fees charged to those who appeal mining permits consistent with the costs of annual assessments and permit applications, or at a minimum of a waiver of such costs when the |

**Table C-2**
**Comments Related to Issues Solved by National Policy**

| Comment ID | Comment |
|---|---|
| | holders of such claims are prevented from the benefits of their mineral rights. |
| 1323 | We further hope that more time is spent educating the public of the legal rights of mineral rights owners; we suspect an improved understanding will make everyone's life easier and consensus easier to reach when everyone's wishes and unconstrained desires are tempered with reality. |
| 2460 | They should also make sure that American citizens receive royalties for any resources taken from our public lands. |
| 2428 | Tax dollars should support wildlife and tranquility, not RV's and land-tearing machines. |
| 1332 | We would also encourage the BLM and the Colorado Department of Reclamation, Mining and Safety to return to coordinated efforts on permitting. It makes no sense to us to have two sets of standards, two sets of regulations, two sets of approvals, etc. that seems to add little to the process except duplication of everything, costs more than double and the time frame to get anything done more than four - fold. |
| 843 | Solve resource issues instead of closing system routes that are not up to standard with the hope of replacing them |
| 653 | We need more education about trail maintenance and teach people to stay on the trails and not tear up the land by irresponsible use. I believe most people that do ride off trail or enter sensitive wetlands do so not out of disrespect for the land but out of ignorance, not even realizing the consequences of their actions, to curb this we need better education regarding responsible land use. |

**Table C-3**
**Comments Related to Implementation Actions**

| Comment ID | Comment |
|---|---|
| 1100 | Widen Y-11 to make the road safer, pullouts, room for interpretation. Best up close views of Hanging Flume are from Y-11. |
| 587 | Signage to designate what activities are suitable in specific areas would be desirable, including where target shooting can occur. A safe environment for all users is desirable. |
| 1641 | If possible, enhance the experience for boaters by creating accessible put ins and take outs along with clear signs as to how to get there. We ended up winching our boat with several cables under a train bridge which I doubt many have done before or since. |
| 808 | Do more maintenance on existing access. |
| 905 | Enforce rules you already have |
| 1098 | Boat put in/take out in Naturita |
| 1106 | Carry trash in - carry trash out! |
| 220 | Single track trails would need to be signed to educate the public about how to keep them narrow and sustainable. If the trails are non-motorized, they need to be signed clearly and occasionally "policed" by BLM rangers to educate the motorized public and enforce the designation. Maps would also need to clearly indicate the status of trails for appropriate users. There would probably need to be fines for violators. |
| 1103 | Do not fence the river. It is not wide enough and any time there is disturbance - weeds will come in. |
| 646 | I feel some areas need better signage as to what is an open trail and what mode of transportation is allowed on that trail. |
| 1072 | River trip boat ramps |
| 763 | Road maintenance schedule and performed regularly. |
| 1097 | Camping facility around Naturita/Nucla similar to between Placerville and Norwood |
| 916 | Part of my land and that of neighbors adjoins BLM land. The 1979 RMP referred to the need for BLM to fence the southern border between BLM and private land to prevent livestock trespass, which is a perennial problem. When queried about this, then Range Con officer Jim Sasma said there were no funds available to accomplish this goal. I would like to propose a joint project, perhaps using solar-powered electric fence along this boundary, with cost and maintenance shared by private landowners, the permitee (Jim Patterson), and BLM. |
| 79 | Hire more field personnel to monitor the activities including ongoing reclamation of oil and gas development on BLM lease land. |
| 563 | There is a group of 100+ people in the Paonia area who want to put signage up and preserve the non - motorized single track experience and we urge the BLM to work with them. This would get it all out in the open to the public and allow for good communication to address trail ethics, trail maintenance, caution signs etc, as well as stop any new unauthorized trails. This group has purchased signs to mark some of the trails "Open to hikers, bikers, horses" but "Closed to ATV's & motorcycles." |
| 863 | Although no one likes to see a sign in the middle of no where, sometimes its necessary, as sometimes a sign might change the behavior of a few people. It provides a visible regulation, so action can be taken against someone who violates the rule posted by the sign. |
| 201 | A system of wayfinding signage should be implemented to assist recreational use of BLM lands near the city. |
| 764 | Additional signage for BLM access/trails. |
| 600 | Provide information via signage and brochures as to who has the right of way on trails when there are multiple uses (i.e., hikers, bikers, equestrians, OHV riders). Most people are very courteous, but some people create hazardous conditions for other users. |
| 778 | Trailhead development for the WSA and SMA areas in Unit 5 so visitors have better access into those places and have more information about those unique areas. |
| 837 | Keep trails in better condition to limit off trail use. |
| 603 | Users need to respect other users and other uses. Public education such as signage at trailheads can help. |
| 1099 | River clean up to make rafting possible and safer from Uravan to Confluence of San Miguel and Dolores Rivers. |

**Table C-3**
**Comments Related to Implementation Actions**

| Comment ID | Comment |
|---|---|
| 183 | I would like to see more areas developed for recreation such as what the BLM has done at Peach Valley. This is a model of controlled recreation, proper signage is in place and this is a great resource to many families in our area. On any sunny weekend you'll find hikers, bicyclist, horseback riders, ATV riders and motorcycles all enjoying our public land in harmony. There are trails for all groups, great job BLM! I feel the Delta adobes could be developed in a similar way, people come from all over the state to enjoy these types of areas, it brings money to our area and promotes outdoor recreation. |
| 199 | Trailheads should be built on large BLM tracts near the Montrose city limits (Unit 3) to allow recreational access without requiring driving to the trailheads. Some of these trailheads will require access across private lands. |
| 841 | Properly marking routes and maintaining maintenance levels, or challenge levels on those routes. |
| 851 | Any time there is private property bordering BLM, and BLM is doing something to the land near this private property, the BLM should notify property owners in advance of any weed spraying, chaining, seeding, mineral extraction, studies of wildlife, plants, erosion, water etc. Everyone needs to practice neighborly manners. |
| 776 | Create permanent camp facilites similar to those along the San Miguel River corridor at Tabeguache Creek/Z-26 Rd. N. Fork Mesa Creek/P-12 Rd and "Biscuit Rock" are along Hwy 141 north of the Hanging Flue. All three areas see heavy seasonal usage and high impacts and should be considered for resource protection. |
| 777 | Post a local BLM representative in the West End for resource information, development and enforcement. |
| 857 | And, assemble volunteers. Amazing how many people will show up to do work outdoors if they're provided a free lunch. How about reinstating the Civilian Conservation Corps? |
| 1090 | A restroom and trash can on Y-11 at the confluence of the Little Dolores and San Miguel Rivers, This is frequently used by many people to fish and camp, and increases annually. As I personally pick up a lot of trash from this area, it would be nice to encourage people to use a container. A toilet facility would probably be a good idea as well. |
| 1091 | Trash cans at East Creek day use area. |
| 1092 | Rest rooms at Hanging Flume Overlook with trash cans. |
| 1093 | A pull out by the coke oven to providing tourist viewing without trodding on the private land that surrounds the site. |
| 1530 | Impacts from uses can be minimized by provision of information in the form of signage and pamphlets in high use areas to educate novices as to what is allowed verses what is not allowed (i.e. impacting riparian habitat). Most prospectors are concerned about the environment. Many clean trash, left by others. If informed of what impacts to avoid prospectors will generally comply and remind others. |
| 594 | I would like to see areas made available for horse trailer parking. |
| 219 | Signs at intersections and maps at trailheads would be needed. |
| 1095 | Rock climb trail signs out by Uravan |
| 618 | Official access points for ATV's and motorcycles need to be developed with signs showing motor approved trails. |

**Table C-4**
**General Comments Related to the RMP**

| Comment ID | Comment |
|---|---|
| 2660 | This earth is ours to protect from us... please do the right thing for the future of our planet and our country. It is of the utmost importance. |
| 1703 | Thank you for your consideration of my comments. I sincerely appreciate this opportunity to be involved in determining management practices that will affect UFO lands for the next 20 years. Our Western lands are very precious, and every effort should be made to protect them, now and for future generations. |
| 1063 | Before the BLM begins making rules for the use of publicly owned land based on political correctness, it should make sure it has taken a deep and serious look at the biological sciences, the physical sciences, and human nature. In the long run, you will be administering this land for the landowners, and we will cooperate with your administration of the restrictions of use on this land, if it is reasonable and justified. |
| 1030 | The impacts associated are significantly reduced or eliminated through site specific stipulations identified through the NEPA process. |
| 1074 | Include the potential for Memorandums of Understanding such as that between BLM and Wilderness Inquiry or NPS and the Wounded Warrior Project. |
| 2661 | We must act NOW to stop the destruction of our planet. |
| 273 | As a former San Miguel County resident and frequent Western Slope visitor who has hiked and climbed on BLM land and floated much of the proposed Wild and Scenic sections of the river, I am very pleased that the agency is making the effort to include non-consumptive use values. While I am aware of the mandate associated with the agency's enabling legislature, it is exciting to see the Bureau considering the long-term benefits provided by lands managed principally for ecosystem services and mixed recreation. |
| 305 | Please listen to the locals, and use common sense when making your decision. |
| 2137 | As mentioned the BLM as a multiple-use agency, meaning that management will be accomplished on the basis of multiple-use and sustained yield unless otherwise specified by law, and states that: ...a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output. All alternatives should retain sufficient management discretion for the BLM to permit development of oil, gas and other minerals without improperly committing itself to wholesale conversion of the area from lands containing wildlife habitat, rangeland, watershed, and energy resources into a single-use, industrialized zone, effectively committed to mineral extraction and excluding other uses. The UFO RMP should avoid this single-use situation by recognizing and incorporating the mandate of multiple-use and sustained yield described in the FLPMA. |
| 2682 | There are far too many destroyers running things in our land and our government. Help us change that. We must protect our land! |
| 1044 | The local residents opinions should be given more consideration than those who do not Jive within the area. Local resident's lives are effected more because of the decisions made by government officials who lack understanding of the area. |
| 303 | I feel that you are limiting the farmers, ranchers, and landowners. By this proposed limitation you are impacting the economy in a negative way. This is a depressed area anyway, and your proposals would make it worse. |
| 416 | The governments logic is, if there is a complaint from some environmental whacko is to close an area down from and human activity. We need some common sense in taking care of our public lands and some common sense stewardship on the-publics part. |
| 2664 | It is not just these lands that are under pressure from such endeavors. Consider the larger impact of multiple sites like this throughout the country. It is like a plague on the countryside. NO. This destruction must stop! |
| 326 | changes to administration? To many people in the management department. Make information more public knowingly, make suggestion on changes. |
| 419 | I think that all the users of our recreational public lands should use common sense stewardship of the land and water on our public lands. |

**Table C-4**
**General Comments Related to the RMP**

| Comment ID | Comment |
|---|---|
| 1057 | I believe that in order to have compliance with regulations, the regulations must be reasonable and understandable. In order to understand regulations, the proposals for such regulations must articulate who, what, how, when, and where of the purpose for regulation. |
| 327 | changes to social characteristics? People user's should not have to put on it. Behavior of the people should be leave it like you found it or in better shape. |
| 225 | The National Park Service and BLM should continue to share information, partner on projects, and otherwise cooperate on issues that affect the lands we administer near our common boundaries. |
| 2666 | If each new government or even generation of people takes large chunks of what is left of our natural resources, there will be little left of any of it. |
| 2662 | Geez Louise, can't we leave Mother Nature well enough alone for once? |
| 106 | We appriciate the opportunity to operate on public lands. |
| 290 | Over all, I think the BLM is doing a good job managing our public lands. |
| 2731 | All I am asking for is a balanced use of the area, with the unique features of each district takend into account. |
| 2663 | As a Wyoming graduate and longtime Wyo resident, I hope someone will supervise BLM in this process. They have never shown any determination to protect the American public's natural resources, hence, the name management in their title, not protection. Don't expect anything from BLM! |
| 2729 | You can protect our one and only Earth. Please think of all that depends on your decisions. |
| 1062 | It has been more years than I care to count since I studied the science of ecology, but I do remember and have observed, over the last fifty years, that the earth is always in the process of re-balancing itself. The physical law that says that for every action there is an equal and opposite reaction also applies to biology. The BLM is administering both a physical and biological entity in the Uncompahgre Planning Area. |
| 325 | changes to landscape? None leave everything in it natural way. |
| 1019 | no changes |
| 1633 | My husband and I have started visiting the Dolores River Basin area much more frequently in the last few years, and really enjoy it. Last fall we visited 3 times, going to Gateway, Naturita, Sewemup Mesa and the collapsed Salt Dome area there, and the Uncompahgre Mesa. It was wonderful! It is really a great place for outdoor visiters of all types. Please take care of these wonderful places for all who like to visit there and get away from the crowds and see the beautiful canyons and mesas. |
| 241 | Coordination and cooperation Whenever possible, Reclamation and BLM should coordinate and cooperate in resource management across administrative and jurisdictional lines. Supplemental agreements and Memorandums of Understanding (MOU) may be appropriate documents to foster such cooperation. The following areas of general resource management could benefit from such coordination and cooperation: • Wildland fire management • Noxious weeds and invasive species management • Soil management • Riparian and wetland areas • Wildlife habitat • Sensitive species habitat • Recreation • Selenium management |
| 411 | I take issue with the government catering only to a small minority of environmental whacko's that want to close access to our public lands because of a fish, bugs, birds, and animals that may or may not live in a certain areas of a river or canyon. |
| 237 | Including adaptive management criteria and protocol to deal with future issues. |
| 362 | All of the regulations, rules, and management are in place to date to manage the well being and health of our public lands. |
| 2775 | b. Cooperating Agencies Based on the BLM's current regulations governing cooperating agencies (43 C.F.R. Part 1600), cooperating agencies will have a very strong presence throughout the Uncompahgre RMP planning process. In order to permit the public to better understand the roles of these agencies, we request that BLM identify those agencies and tribal and local government entities that have been granted cooperating agency status, and disclose the areas of expertise or other qualifications that form the basis of their cooperating agency status. Recommendation: The BLM should identify the agencies and tribal and local government entities granted cooperating agency status and post this information on the RMP revision website. |
| 363 | There's no need for over regulating our public lands. |

**Table C-4**
**General Comments Related to the RMP**

| Comment ID | Comment |
|---|---|
| 2682 | No one is making any more land--this is it. |
| 364 | It should stay looking as it has for all these years. If you make modifications to the landscape physically, it is no longer what it once was. |
| 1720 | I urge you to seriously consider the comments of Western Colorado Congress and similar citizen advocacy groups, who speak collectively for many of us individual citizens. |
| 2774 | a. Public Participation Opportunities We encourage BLM to maximize public involvement in preparation of the revised Uncompahgre RMP. In addition to the public comment periods required by the National Environmental Policy Act (NEPA) and BLM's regulations, there are other opportunities throughout the planning process for public involvement, which are used by many BLM offices. Public involvement allows the public to provide useful information and bring concerns to BLM's attention throughout the planning process. In its scoping notice, the Uncompahgre Field Office already stated its intent to make public participation and collaboration an integral part of the planning process and we commend BLM on this approach. However, we would also encourage the BLM to provide for public input into the management situation analysis and identification of planning issues, and on a preliminary range of alternatives prior to preparing the Draft RMP, steps other BLM offices have taken to expand opportunities for public comment. The Uncompahgre Field Office will need to ensure sufficient data is available in preparation of the RMP. In this context, we would also note that other BLM offices have made inventory data available to the public to assist in identifying new data needs and also made base data available for public use, and encourage the Uncompahgre Field Office to take similar action. By way of example, along with its release of the Draft RMP, the BLM's Arizona Strip Field Office provided zipped GIS files for all data layers needed to create the maps contained in the Draft RMP (and can be viewed on-line at http://www.blm.gov/az/GIS/files.htm#strip). The server space required for this operation is minimal and without this information, effective public participation in this process is severely hampered. This type of public participation is also consistent with the BLM's Land Use Planning Handbook (H-1601-1), which states that, "Documentation supporting the AMS [analysis of the management situation) should be maintained in the field office for public review" (Section III.A.4) and that, "Alternatives should be developed in an open, collaborative manner, to the extent possible" (Section III.A.5). Making analyses available before issuing the Draft RMP is another excellent way to increase public understanding of and participation in the RMP revision. The Kemmerer (Wyoming) Field Office, for example, made their analysis of comments submitted on the Draft RMP and their ACEC evaluations public by posting them on their website months before they issued the Proposed RMP/FEIS(1). Making such analyses available to the public before the publication of the Draft RMP will better prepare participants to understand the complex analyses and large amounts of data in the Draft RMP and increase the relevance and usefulness of comments and other public participation. We hope to see these types of opportunities provided to the many members of the public who are interested in the development of the Uncompahgre RMP. Recommendation: The BLM should make every attempt to encourage the public to participate in the RMP revision including holding workshops, making a preliminary range of alternatives available for public comment prior to preparing a Draft RMP, providing interim information regarding inventories of routes and visual resources, posting GIS files, and posting analyses such as ACEC evaluations and analysis of comments submitted on the Draft RMP to the RMP revision website. |
| 396 | There are few places in western Colorado that Brenda and I have not been. One of the reasons for our complete coverage is the great number of roads. There are very few areas left that do not have roads. Of the 48 priority blocks in Region 7, Colorado Breeding Bird Atlas II, in Montrose and San Miguel County there is not one of these approximately 3 mile square areas that does not have a least one road. In checking out maps it is very difficult to find a location in which there is not a road within four miles. |
| 1055 | As one of the owners of the land administered by the BLM, I have read through the literature provided at the Montrose, Colorado "Scoping Session." The information does not seem to be well focused but, rather, a compilation of unrelated information. I found references to Federal Code Sections, BLM Regulation numbers, BLM Policy Names, and references to agreements with other agencies. I must admit that I have not even tried to research all the references mentioned. It would take more time to research and digest the information in the references than I have energy and time to expend. I believe this feeling could be expanded to include all the BLM Public Land Users (Owners) that do not have a financial interest in using their land. It might have been easier for me to understand had the various sections included an executive summary of the current plan for each of the sections. |
| 366 | Same as it is today and has been for many generations. These are public lands, shouldn't people be able to enjoy |

**Table C-4**
**General Comments Related to the RMP**

| Comment ID | Comment |
|---|---|
| | them? |
| 371 | Get rid of the office Drones in the BLM and Forest Service and put the rest in the field instead of pushing papers. Men AND women! |
| 242 | - Reclamation's Managing Entities- Reclamation has several managing entities that manage our projects and/or various aspects of land or resource use on our lands. These entities should be included in the coordination/cooperation aspects of the RMP. • Project Management • Uncompahgre Project- Uncompahgre Valley Water Users Association • Dallas Creek Project- Tri-County Water Conservancy District • Paonia Project- North Fork Water Conservancy District and Fire Mountain Canal and Reservoir Company • Lower Gunnison Salinity Unit (CRBSCP)- Uncompahgre Valley Water Users Association • Smith Fork Project- Crawford Water Conservancy District • Aspinall Unit, CRSP- Reclamation, Curecanti Field Office Division (Montrose) and Western Colorado Area Office (Grand Junction) • Paradox Unit (CRBSCP)- Reclamation, Western Colorado Area Office (Durango) • Bostwick Park- Bostwick Park Water Conservancy District • Fruitgrowers Reservoir- Orchard City Irrigation District • Recreation Management • Curecanti National Recreation Area- National Park Service • Crawford Reservoir, Smith Fork Project- Colorado State Parks • Paonia Reservoir, Paonia Project- Colorado State Parks • Ridgway Reservoir, Dallas Creek Project- Colorado State Parks • Mitigation Land Management • Aspinall Unit- BLM and Colorado Division of Wildlife |
| 251 | Community Growth and Expansion- Some of BLM's and Reclamation's lands are at the wildland urban interface. Community growth and expansion is putting more pressure on both Reclamation and BLM to provide lands for open space, recreation, and community infrastructure. |
| 2706 | I would also like to examine the EA/DN/and FONSI or the DEIS for the plan. The blm is not exempt from NEPA. |
| 304 | Less government regulations. |
| 2776 | c. Protection of Natural Resources The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 et seq., imposes a duty on BLM to identify and protect the many natural resources found in the public lands governed by the Uncompahgre RMP. FLPMA requires BLM to inventory its lands and their resource and values, "including outdoor recreation and scenic values." 43 U.S.c. § 1711(a). FLPMA also obligates BLM to take this inventory into account when preparing land use plans, using and observing the principles of multiple use and sustained yield. 43 U.S.C. § 1712(c)(4); 43 U.S.c. § 1712(c)(1) (http://www.blm.gov/rmp/kemmerer/docs.htm). Through management plans, BLM can and should protect wildlife, scenic values, recreation opportunities and wilderness character in the public lands through various management decisions, including by excluding or limiting certain uses of the public lands. See 43 U.S.c. § 1712(e). This is necessary and consistent with the definition of multiple use, which identifies the importance of various aspects of wilderness characteristics (such as recreation, wildlife, natural scenic values) and requires BLM's consideration of the relative values of these resources but "not necessarily to the combination of uses that will give the greatest economic return." 43 U.S.c. § 1702(c). Under FLPMA, BLM is also obligated to "give priority to the designation and protection of areas of critical environmental concern [ACEC]." 43 U.S.c. § 1712(c)(3). ACECs are areas "where special management is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes." 43 U.S.c. § 1702(a). For potential ACECs, management prescriptions are to be "fully developed" in the RMP. Manual 1613, Section .22 (Develop Management Prescriptions for Potential ACECs). ACECs also include Research Natural Areas (RNAs), established for their significant biological and physical features, including plant or animal species or geological, soil or water features. RNAs have "ecological or other natural history values of scientific interest" and are managed for research and educational purposes. Outstanding Natural Areas (ONAs) are another type of ACEC, established to preserve scenic values and natural wonders. ONAs contain unusual natural characteristics and are managed primarily for educational and recreational purposes. The resources in the Uncompahgre planning area include many values that merit protection through special designations. Protection of existing ACECs and due consideration of proposed ACECs, including RNAs and ONAs, must be a priority in the Uncompahgre RMP planning process. In addition, there is no per se bar to managing and protecting the many values of these lands through overlapping designations, such as Wilderness Study Areas (WSAs) and ACECs or Special Recreation Management Areas (SRMA) and Wild and Scenic River Segments. For example, BLM's Jarbidge RMP (and subsequent amendments) in southern Idaho designated the Bruneau/Jarbidge River ACEC and the Salmon Falls Creek ACEC, which overlap the Bruneau River-Sheep Creek WSA, Jarbidge River WSA, and lower Salmon Falls Creek WSA, and |

**Table C-4**
**General Comments Related to the RMP**

| Comment ID | Comment |
|---|---|
| | includes the Salmon Falls Creek, deemed eligible for inclusion in the National Wild and Scenic Rivers System. See BLM, Jarbidge Field Office, Idaho, Analysis of the Management Situation for the Jarbidge Resource Management Plan: Resource Management Plan/Environmental Impact Statement at 212-216 and Figure 39 (locations of Current ACECs) (July 2007), available at http://www.blm.gov/pgdata/etcfmedialib/blm/id/plansfjarbidge rmp/documents/analysis of the management.Par.59385.File.datlpart13.pdf; Figure 40: Wilderness Study Areas, available at http://www.blm.gov/pgdata/etc/medialib/blm/id/plans/jarbidge rmp/documents/analysis of the rnanagement.Par.18048.File.dat/part14.pdf (excerpts attached to these comments). These overlapping designations ensure that BLM protects both the relevant and important values associated with the ACECs and the wilderness character of the WSAs, both through current management and in the event WSAs are released during the life of the plan. In certain situations, overlapping designations are needed to fully protect the resources, for example IMP management of WSAs might differ greatly from the special management attention envisioned for the relevant and important values of a particular ACEC or in the event of congressional WSA release. In addressing objections to "layering" of designations (through "establishment of ACECs or SRMAs over WSAs and Wild and Scenic Rivers") raised in connection with the Monticello (Utah) RMP, the BLM responded, appropriately: "Layering" is planning. Under FLPMA's multiple use mandate, BLM manages many different resource values and uses on public lands. Through land use planning BLM sets goals and objectives for each of those values and uses, and prescribes actions to accomplish those objectives. Under the multiple use concept, BLM doesn't necessarily manage every value and use on every acre, but routinely manages many different values and uses on the same areas of public lands. The process of applying many individual program goals, objectives, and actions to the same area of public lands may be perceived as "layering". BLM strives to ensure that the goals and objectives of each program (representing resource values and uses) are consistent and compatible for a particular land area. Inconsistent goals and objectives can lead to resource conflicts, failure to achieve the desired outcomes of a land use plan, and litigation. Whether or not a particular form of management is restrictive depends upon a personal interest or desire to see that public lands are managed in a particular manner. All uses and values cannot be provided for on every acre. That is why land use plans are developed through a public and interdisciplinary process. The interdisciplinary process helps ensure that all resource values and uses can be considered together to determine what mix of values and uses is responsive to the issues identified for resolution in the land use plan. Layering of program decisions is not optional for BLM, but is required by the FLPMA and National BLM planning and program specific regulations. FLPMA directs BLM to manage public lands for multiple use and sustained yield (Section 102(a)(7)). As a multiple-use agency, the BLM is required to implement laws, regulations and policies for many different and often competing land uses and to resolve conflicts and prescribe land uses through its land use plans. BLM's Land Use Planning Handbook requires that specific decisions be made for each resource and use (Planning Handbook "H-1601-1"). Specific decisions must be included in each of the alternatives analyzed during development of the land use plan. As each alternative is formulated, each program decision is overlaid with other program decisions and inconsistent decisions are identified and modified so that ultimately a compatible mix of uses and management prescriptions result. Monticello Proposed RMP, Response to Comments, comment no. 007-48 (attached). As clarified by the BLM, because different designations serve different purposes, and management is often limited to protect only those values relevant to those particular designations, the fact that an ACEC may lie within a WSA does not justify failing to designate the ACEC and the fact that a proposed SRMA may overlap with an ACEC does not obviate the need for the SRMA. Recommendation: The BLM must uphold its responsibility to protect the abundant natural values present in the Uncompahgre planning area when developing management alternatives in the Uncompahgre RMP and evaluating their environmental consequences, as required by both FLPMA and NEPA, 42 U.S.c. § 4321 et seq. |
| 1031 | Enforce the procedures already on the books. |
| 386 | I am born and raised in the country and/or on ranches my entire life. I have always had a deep respect for the outdoors, wildlife, the ranching heritage I come from, and the enjoyment of the areas I have lived in being available for the public to utilize and appreciate as well. I have always had a deep respect for the BLM and Forest Service agencies that my family has worked closely with over the years as they are official stewards of the land as we as the public and livelihoods are as well. There was a time that these Government entities worked closely with all who are involved in these public lands and waterways, having respect for the economy boosting ranchers and farmers that make their modest living from these lands as well as genuine respect for the land in question for reasons of benefit to the land, and a genuine desire to allow all involved fair and just consideration in any decisions made on the lands. It seems however that these days, the BLM has shifted to |

**Table C-4**
**General Comments Related to the RMP**

| Comment ID | Comment |
|---|---|
| | making their proposals geared towards tourism and recreational purposes solely and leaving behind realistic beneficial proposals for the wildlife, the local economy, local ranching heritage and local history. It seems that particular interests are being catered to, and the rest of all of our interests are no longer acknowledged. |
| 240 | Effects on or by Reclamation projects- The above listed projects and their associated withdrawals, facilities and resources are valid existing rights pursuant to Reclamation law. The potential effects of BLM decisions on the operation, maintenance, and protection of Reclamation projects, and associated ands, facilities and resources need to be recognized and addressed. Also, the effects of these projects and their associated withdrawals, facilities, and resources on your decisions should be considered |
| 1017 | No changes - leave it the way it is - in its natural state. |
| 276 | Given the unique recent and ancient history of human habitation in the area and the hardy and vibrant native flora and fauna, I strongly support RMP directives that encourage sustainable use of this landscape over extraction or exploitation of its resources. While the latter tends to produce immediate and lasting degradation of scenic beauty and ecosystem function, the stewardship of the former can support both healthy local economies and future generations' enjoyment of the Uncompahgre Plateau. |
| 412 | I am concerned about the lack of common sense in managing our public lands. |
| 1614 | Leave the landscape alone! |
| 1029 | The RMP and EIS will go beyond the current NEPA process will become so restrictive that business and recreation will no longer be possible on BLM lands. |
| 1656 | I understand the Public Lands mission of multiple use. However, it is equally important to weight use of resources with the ultimate loss of resources. |
| 375 | Natural resources are for our use, not to be closed off from the public to "preserve" them. |
| 1713 | I am one-half owner of three miles of property bordering both banks of the Dolores River in Montrose County. It goes without saying that I am intensely concerned about protecting the integrity of the area, its natural beauty and its geological resources. |
| 1654 | The above letter is obvious. Its amazing to me though how easy it is to be swayed by lobbiest perswasive desires. I remind you there is only one earth so please take utmost care to see that its FOREVER useful. Not just temporaraly exploited for short term energy gone quickly leaving behind a scar that lasts much longer. |
| 235 | The preliminary planning criteria identified in the Preparation Plan help identify and explain the respective roles and responsibilities of Reclamation and BLM with regard to the RMP and the respective management of their lands within the planning area. Planning criteria related to Reclamation lands and resources include, but are not necessarily limited to: - Compliance with the Federal Land Policy and Management Act (FLPMA) and all other applicable laws, regulations, and policies. - Lands covered in the RMP include public land, and split estates managed by BLM. No decisions will be made relative to non-BLM administered lands. - Working cooperatively with the State of Colorado, tribal governments, county and municipal governments, other federal agencies, the Southwest RAC, cooperating agencies and all other interested groups, agencies, and individuals. - Striving for compatibility with existing plans and policies of adjacent federal agencies as long as decisions are consistent with the purposes, policies, and programs of federal law, and regulations applicable to public lands |
| 270 | Delta County appreciates the opportunity to submit general comments in response to the Uncompahgre Field Office's (UFO) request as part of its scoping for the Resource Management Plan (RMP) revision process. The County's comments address the importance of continuing to manage resources on the BLM lands in our County and neighboring counties for multiple use opportunities. The public lands are an integral part of Delta County's social fabric, local economy and healthy environment. BLM lands comprise a significant portion of Delta County's open space and resource area, a fact that places a need for a greater awareness of the potential impacts any revisions may have on current uses as they impact our local economy and quality of life. Revisions which may in one way or another permanently restrict or change the available usage and access to BLM lands or mineral interests should be carefully considered. |
| 413 | I am concerned about our government view that if your not an environmental whacko you shouldn't have access to our recreation lands such as receational prospecting, and fishing. |
| 1032 | Public lands are just that public everyone has the right to use. |

**Table C-4**
**General Comments Related to the RMP**

| Comment ID | Comment |
|---|---|
| 356 | In the 1991UFO RMP it was unclear what map/data sources were used for energy potential ratings. Later on (see David Burgess et al v. BLM IBLA No. 2006-117) it was not clear where BLM was drawing its rating of oil and gas potential for the area from. Several different conflicting and inappropriate scale data sources were cited. All data sources used as underlying significant data for the RMP should be clearly documented, readily available to the public and such documentation should include caveats on the data or its use. |
| 2798 | The BLM should consider input from regional conservation plans. Several regional conservation plans have been developed which include this field office. The BLM should consult the following sources during the RMP revision: Southern Rockies Ecosystem Project's Southern Rockies Wildland Network Design The Nature Conservancy's Colorado Plateau Ecoregional Plan The Nature Conservancy's Southern Rocky Mountains Ecoregional Plan Heart of the West Conservation Plan Roadless areas, Citizens' Proposed Wilderness, wildlife corridors identified by Southern Rockies Ecosystem Project, and Colorado Natural Heritage Program Networks of Conservation Areas not mentioned above are also important resources that the BLM should consider in this round of planning. |
| 1682 | All places that hold special value should be managed for the future. |
| 278 | The area included in the RMP boundaries contains some fantastic "wild places". In a West that continues to urbanize and develop rapidly, these places (especially those outside of the rocky mountain ridges that often fall under USFS jurisdiction) are increasingly valuable. I would like to see an end to further road construction; better designation of OHV use and non-use areas; the elimination of non-renewable energy development and careful consideration of the footprint associated with any renewable energy projects such as solar or wind installations; and continued maintenance of facilities such as the (very much appreciated) picnic/camp areas on the San Miguel. |
| 274 | Increasingly we hear of potential conflicts among the various uses on public lands; however it is critical to the well being of our constituents and our local economy that the concept of multiple use is protected and a balance in the management of resources is sought as the UFO commences its RMP revision process. |
| 232 | We would remind you the current 1983 National Interagency Agreement (IA) between the Bureau of Reclamation (Reclamation) and the Bureau of Land Management (BLM). The 1983 IA spells out the role and responsibilities of Reclamation and BLM on Reclamation's acquired and withdrawn lands. The RMP should identify and help enforce those roles and responsibilities through all alternatives. A copy of the IA is attached for your information. |
| 234 | We would also remind you that Reclamation's land management focus is not the same as BLM's. Our main focus is management of lands and resources for Reclamation project purposes pursuant to Reclamation law and policies, plus other nationwide laws such as the National Environmental Policy Act, and the Endangered Species Act. Non-project uses of Reclamation lands must be compatible with the authorized Reclamation project purposes and be approved by Reclamation. |
| 361 | All of the regulations, rules, and management are in place to date to manage our public lands for multiple use, |
| 496 | I believe the way the current BLM administration is managing the resources in this unit is a win/win for the public and the caretakers. |
| 1043 | We live here because it has been our home for generations, we love the lifestyle and want to preserve it. |
| 2338 | All of these resources are finite, and essential to the survival of our species. They should not be squandered for the private gain of a few individuals. |
| 810 | Open public lands to all uses. Reduce regulation. |
| 2337 | Protecting these areas should be a national priority because, as the songwriter, Joni Mitchell, wrote, "...You don't know what you've got, 'til it's gone". |
| 2335 | Only when the last tree has died and the last river has been poisoned & the last fish has been caught will we realize that we cannot eat money. |
| 896 | Public land should remain just that. Multiple uses should be the way to go. |
| 756 | Exactly as the Good Lord meant it to look like |
| 893 | Leave it alone as it is. |
| 2332 | Please help protect this amazingly beautiful part of this country. Our wilderness areas are becoming more |

**Table C-4**
**General Comments Related to the RMP**

| Comment ID | Comment |
|---|---|
| | precious as the country becomes more populated, and these areas should not be put in jeapordy. |
| 890 | Closing Comments: In reviewing all of the information in this project, it is overwhelming. I wish I had more time to further research these topics by talking to BLM staff and finding info on the internet. As it is, I have spent14 hours reading the website and info I picked up at the Pavilion and typing up my comments. |
| 29 | Personally, I would make no changes to the landscape. |
| 2275 | Engineering guidelines. Because gas production practices change rapidly, the BLM Gold Book should be updated frequently to ensure that it mandates best practices. |
| 619 | In reference to the recent proposal to further restrict the public use of BLM-controlled land, I would like to encourage the BLM to continue to allow responsible use of public lands. |
| 1179 | Energy development, recreational use, grazing, and related activities are among the planning activities requiring management, mitigation, and monitoring. Various impacts can be minimized or potentially eliminated if BMPs and other mitigation measures are properly implemented. Details should be provided for accomplishing these activities in the RMP/EIS. Also, it is important to specifically designate what entity (e.g., BLM, the proponents, resource organizations, or some combination) will be in charge of which activities, and which will have specific and enforceable accountability. In addition, the BMPs, mitigation measures, and other related activities require inspection, documentation, and recordkeeping. A "paper" documentation trail must exist to determine what was monitored, inspected, maintained, and completed. All management, mitigation, and monitoring should be verifiable, and an agency/entity needs to be held accountable for performance oversight, throughout the entire project construction and operating life. It may be appropriate for the proponents to fund an account from which 3rd party contractors can perform inspections and monitoring, and/or the implementation of some of the mitigation measures. Please provide details on these issues in the EIS, preferably in a separate monitoring plan. It may also be appropriate to have commitment for these activities placed in the Record of Decision. |
| 1830 | The Uncompahgre Field Office encompasses some of Colorado's most beloved wilderness-quality lands, wild rivers, and opportunities for quiet, backcountry recreation. |
| 2509 | Earth is a CLOSED BIOSYSTEM. The destruction and contamination resulting in habitat destruction severely impacts our planet's ability to survive. Thus human survival. |
| 2061 | We urge the BLM to work with other agencies as well. Some of the outstandingly remarkable values identified in the Dolores River Corridor -fish species, plant species, and recreational boating -depend on a healthy functioning ecosystem, adequate stream flows, and well managed spills from McPhee Reservoir. We urge the Uncompahgre Field Office of the BLM to work with water managers (including the Bureau of Reclamation and the Dolores Water Conservancy District) as well as adjacent BLM field offices, The Dolores River Dialogue, conservation groups, boaters (both private and commercial), and other stakeholders to ensure that outstandingly remarkable values of the Dolores are maintained and enhanced and that viable flow regimes are developed for both the benefit of the ecosystem and boating. |
| 1403 | I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. |
| 2547 | Please help ensure a complete and healthy ecosystem for our children and grandchildren! The Woodzy Family |
| 2539 | Theodore Roosevelt dubbed the Uncompahgre "Incomparable." Only one thing can keep it that way: protection. |
| 2535 | In a very general way, we should strive to be the very best possible stewards of the resources entrusted to us. |
| 2066 | The Dolores River corridor requires coordinated management in order to preserve these resources for the future. |
| 2531 | We must take our individual and agency responsibilities for protection of the physical and spiritual resources of these lands seriously, and use that to guide our decisions. It is sometimes not so much that we don't know what to do, but that we lack the moral energy to stand firm in the face of opposition. These lands deserve the very best human protection. Please act accordingly. |
| 806 | restricted access and over regulation |
| 575 | Working together, we can mutually promote and direct the activity that takes place on the BLM Lands in |

**Table C-4**
**General Comments Related to the RMP**

| Comment ID | Comment |
|---|---|
| | Montrose County to the benefit of the largest portion of potential participants. Montrose County can be most especially helpful to the BLM by working in and with the private sector promoting communication and information. |
| 634 | Since the purpose behind revising land management plans is to account for new inventories, changed circumstances, and new information—all broadly defined at this level of NEPA—and to manage all the public's resources in a manner that promotes sustainability, restores healthy ecosystems, stabilizes and strengthens area wildlife populations, and safeguards sensitive species, including sensitive plants, BLM must give top priority to these outcomes. |
| 900 | Largely a waste of time and tax payer money. Colorado needs to focus attention on the Russian Olive Invasion. Nothing will be scenic after they take over. |
| 590 | Non-recreational uses should also be managed to minimize impact to the environment. |
| 2515 | I have spent priceless days in southwestern Colorado. I hope others will be allowed to experience similar time there. This place is too special to be mistreated. |
| 2342 | Again thank you for your careful consideration. As you know, and we all have learned from past experience, once gone these valuable resources are hard to restore. |
| 592 | BLM should be able to collect sufficient fees/income from non-recreational users to cover administration costs and impact to the land. |
| 892 | Many places just have to be left alone. People need to do nothing else except walk in and out, NO extraction of minerals, hunting, renewable energy, collecting, harvesting, outfitting, fishing, motor vehicle or boat use, spraying of pesticides or herbicides, livestock grazing. We have to have some places that are sacred! |
| 757 | As few (changes) as possible |
| 573 | Mission critical communications is key to our partnership. Mutual recognition of the value of what can be gained from a closely communicated relationship would and is a powerful tool. |
| 1947 | The planning process and RMP will endeavor to serve as a platform for cross-boundary cooperation. The Plan will provide a foundation for collaborative efforts with many stakeholders that may extend beyond planning to cooperative land management and grant funding. |
| 1351 | That public lands administered by BLM within the RMP be managed for multiple uses |
| 2435 | WE MUST BE THE STEWARDS OF THE LAND!!! |
| 698 | No changes need to be made to the landscape. It should be left as it is. |
| 2415 | We need to preserve this earth for future generations, your grand-children and mine. |
| 84 | Please continue to provide the multiple users of these natural resources [mineral deposits] the opportunity to make comments on the behalf of the constituency. |
| 1287 | LeValley Ranch, Ltd has worked cooperatively with the UFO for many years and views this as a mutually beneficial partnership |
| 1917 | Citizens For A Healthy Community was informed by Bureau of Land Management (BLM) staff at the January 12 Open House on the Resource Management Plan (RMP) revision, and again in a meeting with BLM staff at the Uncompaghre Field Office (UFO) in Montrose on January 19 that comments made during a public comment period are not considered a vote. Citizens For A Healthy Community can't help but ask why BLM has gone out of its way to make this statement on two occasions? What message are we to take from this statement? While we understand that public comments are not weighed strictly by a vote tally, this statement raises a red flag to all Americans who have a right to participate in the National Environmental Policy Act (NEPA) process and feel their voices are not only heard, but also reflected in the Record of Decision (ROD). A particularly egregious example of ignoring the voices of the American public occurred in 2003, when the National Park Service (NPS) prepared an Environmental Impact Statement (EIS) on winter use in Yellowstone National Park. In one of the largest turnouts of public comment in NEPA history, approximately 360,000 people submitted comments on the draft EIS. More than 80 percent of the comments supported an alternative calling for the phase-out of snowmobile use in the park. In the ROD, the NPS ignored public comment and selected an alternative that continued snowmobile use in the park. This practice of federal agencies seeking public comment and then ignoring the will of the American people makes a mockery of public involvement and violates both the spirit |

**Table C-4**
**General Comments Related to the RMP**

| Comment ID | Comment |
|---|---|
| | and letter of the law. While marking the 40th anniversary of NEPA on January 4 of this year, President Obama said: Today, my Administration will recognize NEPA's enactment by recommitting to environmental quality through open, accountable, and responsible decision making that involves the American public. Our Nation's long-term prosperity depends upon our faithful stewardship of the air we breathe, the water we drink, and the land we sow. With smart, sustainable policies like those established under NEPA, we can meet our responsibility to future generations of Americans, so they may hope to enjoy the beauty and utility of a clean, healthy planet. The President went on to say: I call upon all executive branch agencies to promote public involvement and transparency in their implementation of the National Environmental Policy Act. Rather than promoting public involvement, BLM's statement that public comments are not considered a vote has just the opposite effect. This remark has the potential for reducing the number of public comments because it encourages apathy. After all, why should citizens submit comments if they are not going to be counted? In particular, this statement appears to be aimed at citizens' groups that urge their members to submit similar or identical comments on form letters, postcards, or via email. BLM apparently wants these groups to know in advance that these types of comments do not have any influence on the agency. The message to citizens' groups is loud and clear, "Don't bother inspiring your supporters to participate in the public comment period because the BLM isn't listening." Citizens For A Healthy Community calls on BLM to cease telling the public their comments are not considered a vote and instead ensure the public's voices are not only heard, but also reflected in its decisions. |
| 1217 | It is our hope that the recommendations we provide will assist the BLM in protecting some of the most sensitive, beautiful and scientifically valuable features that occur within the UFO. |
| 1914 | Data Quality Act. BLM's preliminary issues are deficient in excluding consideration of the Data Quality Act, Section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001, and related Department of Interior Information Quality Guidelines and BLM Information Quality Guidelines. The DOI guidelines provide at II.5 that during public comment procedures, requests for correction will be considered and provide at III.4 that a request for correction not made during the draft stage may be considered "to have no merit" if the bureau or office determines that the requester had the opportunity to comment ... BLM's Preliminary Planning Issues fail to advise the public of its opportunity to comment regarding data quality. In order to comply with the Data Quality Act, draft alternatives must be based upon data of "sufficient transparency and methodology." In order for the public to comment on proposed alternatives, it must know the information bases for specific actions proposed therein. Therefore, the agency must, at the draft stage, publicly document the scientific literature or other information upon which it intends to support each alternative, if it is adopted. The public must be allowed to challenge insufficient data before a final alternative is selected. |
| 2398 | We speak for those who cannot. All creatures big and small deserve a place on our planet. Thanks you. |
| 2396 | Thank you for providing the regulation in your plan that was shortchanged by the last administration in its headlong rush with ONLY economic objectives in mind. |
| 730 | The rules and regulations are fine with me as they are. |
| 732 | Maybe people should have more education on how to use not abuse our public lands. Also do not listen to people do not live in the area. That includes environmentalists and mountain bikers who do not want other groups to use our public lands. These lands belong to all of the people, not just a select group of people. |
| 2329 | I urge you to think "Open Space First" as you proceed with this process. |
| 735 | I don't think you should change anything. It works well now. |
| 736 | Unreasonable prohibitions against using public lands. Current and proposed policy prevents the use and enjoyment of public land. These restrictions allow only bureaucrats (you) and the young wealthy to enjoy the land. Your current and proposed policy and restrictions promise disaster and economic hardship. If huge fires, diseased trees, wildlife to numerous for the land to support, wasted natural resources are your goals, then you are right on track. |
| 717 | It is clear that the groups pushing this plan are more interested in hurting people than caring for the land. |
| 1899 | BLM should not allow redundant planning issues and planning criteria narrow the range of Alternatives and/or diminish the agency's multiple-use/sustained yield mandate. Our understanding is that a planning issue is a matter of controversy or dispute over resource management activities or land use that is well defined and |

**Table C-4**
**General Comments Related to the RMP**

| Comment ID | Comment |
|---|---|
| | entails alternatives among which to choose. Planning issues may be a concern expressed by the public, state/local government or other stakeholder, and may include concerns about potential serious deterioration of public land, significant impacts or conflict, or uses that may not be in the best public interest. Planning criteria are different, usually described as "sideboards" or parameters established by laws, regulation, policy or other planning guidance. When examining the UFO's preliminary planning issues and planning criteria we find quite a few of them are redundant. For example, management of native species and protecting cultural and historic resources are directed by existing law, regulation and other planning guidance. The UFO has properly identified the relevant regulations in the planning criteria that address these "issues." In reality, there are really very few, if any, alternatives from which to choose. Controversy over the management of these issues is moot, at least insofar as the development of the RMP. The concern our members have is that redundant planning issues and criteria serve to diminish the focus on the agency's multiple-use and sustained yield mandate, and, perhaps more importantly, unlawfully narrow the range of Alternatives. FLPMA Sec. 202, particularly subsection (c)(1) that specifically requires development and revision of land use plans on the basis of "principles of multiple-use and sustained yield." FLPMA section 102(a)(7) also specifically requires that "goals and objectives be established by law as guidelines for public land use planning, and that management be on the basis of multiple-use and sustained yield unless otherwise specified by law." 43 C.F.R. 1601.0-8 provides, "The development, approval, maintenance, amendment and revision of resource management plans will provide for public involvement and shall be consistent with section 202 of the Federal Land Policy and Management Act of 1976. ..." 43 C.F.R. 1610.4-4 states, "The analysis of the management situation shall provide, consistent with multiple-use principles, the basis for formulating reasonable alternatives, including the types of resources for development or protection." 43 C.F.R. 1610.4-5 states: "All reasonable resource management alternatives shall be considered and several complete alternatives developed for detailed study..." We know we are droning on a bit here, but we hope the planning team will not let multiple, redundant planning issues and criteria stop them from developing alternatives which embrace the multiple-use sustained yield mandate place upon the Bureau by Congress. |
| 1189 | The County Open Space Commission works to protect and conserve open space for people, natural habitat for flora and fauna, and agricultural lands for the farming and ranching communities throughout San Miguel County for this and future generations. To date, we have facilitated conservation easements on 10,520 acres of high quality open space, habitat and agricultural lands. We are very grateful to BLM personnel who have for many years championed protection of the San Miguel and its many resource values. |
| 1337 | Not to mention NIMBY. We recognize you will hear specious arguments from those who simply desire no such activity to happen here. While some residents will be amongst the objectors, many will not be area residents whose livelihoods and supper depend upon mining, but rather outsiders who basic needs are more than met and have made this a cause celeb. |
| 644 | I would also like to see the BLM take a role of using our public lands for the common good of the people, and not just a conservation/preservation agenda. |
| 1895 | The OHV community also supports the need to revise Land Use Plans in response to changing conditions. |
| 651 | I would encourage the BLM to consider the average citizen when making land management decisions. Many people who use public lands are not aware of Travel Management Plans or any other changes in how land is managed. The typical citizen might only use public lands few times a year and doesn't have the resources or knowledge on how to get involved in these types of decisions. It would seem the well organized and well funded conservationist/environmentalist groups are the most vocal and are always pressuring the BLM and Forest Service to further restrict the public from public lands, while the public is unaware of these changes until it is too late and the land is already locked up. Every single year there is yet another Wilderness proposal before congress, this year alone there are at least 3 major pushes for more Wilderness in Colorado alone. |
| 2030 | The entire river basin spans numerous BLM and US Forest Service offices and should be cooperatively managed to ensure that the river's serenity and beauty can continue to be enjoyed and explored but never exploited or taken for granted. |
| 685 | San Miguel County has a long-standing recognition of the contribution of agriculture and ranching to the traditions and character of our county. This is reflected in our land use policy and taxpayer funded preservation efforts. However, mining and agriculture combined account for only 2% of the jobs in San Miguel County according to the study cited earlier. Consequently, we request that BLM include in the alternatives to be considered a true land health and restoration alternative. This alternative should have as its guiding principle |

**Table C-4**
**General Comments Related to the RMP**

| Comment ID | Comment |
|---|---|
| | that management decisions must result in moving toward the goal of all BLM lands meeting the Rangeland Health Standards for Soils, Riparian Areas, Healthy Communities, Threatened and Endangered Species, and Water Quality. Adherence to this principle should shape and inform other management decisions regarding travel management, requirements placed on oil and gas and mining development, and appropriate levels of use by domestic livestock. Particular attention should be devoted to improving plant communities. Improving plant communities to match site potential protects soils, water quality, visual attributes, wildlife populations and diversity, and air quality. BLM should work to restore biological soils crusts to their historic role in desert ecosystems. BLM needs to develop within this policy a robust monitoring and evaluation system to measure movement in achieving these goals. The system must be able to validate management decisions in a timely manner. BLM must be able to provide defensible justification for changes in management that restore a fully functioning landscape. This alternative should also include provision for assessing the impacts of climate change (as should all alternatives) and identifying what changes in management will be made to mitigate the impacts of these changes on BLM lands. We look forward to working with BLM throughout the process to create such an alternative. |
| 1329 | Not that BLM won't hear a thousand great ideas from non - residents of how something else can work or why residents should do something else. We would ask if that such is in fact the case, then why hasn't it happened already? Not to mention just who are they to say how another American should live and what their dreams and aspirations for their families should be? And where is the investment and business plans supporting these great ideas? |
| 593 | I am not opposed to fees for recreational users if they are also needed. |
| 1900 | Concern over the diminished role the multiple-use sustained yield mandate over current land use plans. (Important note: Our suggested issue number 1 is based on the assumption that the agency will not amend any of its preliminary planning issues pursuant to our comment in Section E above.) The agency, as well as numerous academic studies have documented the controversy over multiple-use sustained yield mandate and society's increasing value of conservation and preservation of public lands. In addition, over the last two or three decades, a lot of land has been removed from multiple-use management via land use planning and legislation. Like the amount of routes available for motorized uses, the of lands under true multiple-use management has reached a critical mass. Every single acre that is removed from multiple-use management is extremely important. And as noted above, many of the preliminary planning issues and planning criteria are redundant and will server to further diminish the agency's multiple-use sustained yield mandate. We request "The Diminished Role of Multiple-use Sustained Yield Management" be identified as a planning issue and brought forward for analysis. The BLM should briefly discuss the role of multiple-use sustained yield had in the passage of The FLPMA, and its importance to states that are "blessed" with huge amounts of federally managed lands. In response to this issue, at least one Alternative should seek to enhance multiple-use sustained yield management across the planning area. |
| 1902 | We have a few comments on potential planning issues identified in BLM's Notice of Intent. Regarding: - Managing vegetative and water resources, terrestrial and aquatic habitat and special management areas, while sustaining biological diversity and native species populations; - Managing mineral, renewable and nonrenewable energy resources; - Managing and protecting cultural, historical and paleontological resources and Native American religious concerns; All of the "issues" above are already addressed withing the agency's planning criteria (law, regulation and other planning guidance). Inclusion of these issues only serve to provide "another bite at the apple" for preservationist interests who are unhappy with the BLM's lawful multiple-use sustained yield mandate. These "issues" should be removed. |
| 1904 | Regarding: - Inclusion of adaptive management criteria to deal with future issues. The public would benefit from a clear understanding of what adaptive management is, and how the criteria is applied, and what changes they may require insofar as future management decisions. |
| 1906 | The BLM has a Congressionally-mandated multiple-use mission, which must be upheld and not compromised by the single-use land management objectives promoted by certain interest groups. |
| 2452 | If we don't act to protect the land, air, and water, we're doomed to pollute ourselves as well as what we eat and drink and breathe. |
| 2450 | My father was born and raised o the Western Slope. To my family this land is very special, alsmost sacred. The Black Canyon of the Gunnison is unlike any place in this country |

**Table C-4**
**General Comments Related to the RMP**

| Comment ID | Comment |
|---|---|
| 2442 | This is the time to stand for a sustainable future for our children and grandchildren. |
| 1898 | We understand that this is water under the bridge, but the public would benefit by more detailed discussion regarding the difference between a planning criteria and planning issue in the scoping materials. |
| 1829 | I think the public should be able to use the land, roads, etc. openly under the rules and laws already in place. |
| 1087 | When preparing the Uncompahgre RMP the BLM should not attempt to make site-specific decisions, but should develop only broad management goals and objectives. |
| 124 | The BLM lands of Western Colorado mostly consist of the lower lying geographical areas prior to the start of the National Forests. These areas have been successfully managed by the BLM for years as multiple use area for all user groups. TMW major concern during the Resource Management Plan process is the tendency of the current Federal agencies to stray from the multiple use concepts of public land management. Recent history has show the acceleration of the land management agencies toward the more restrictive environmental concept that sometimes is factually questioned by science, past history or on the ground experience. TMW encourages the BLM to be cognizance of such concerns in RMP planning and future TMP. |
| 1089 | Based on the BLM's own policies and binding legal precedent, the BLM should ensure that the agency does not utilize the land use planning process to impose site-specific conditions of approval or unreasonably limit future management actions. |
| 1137 | When creating the purpose and need statement for this project, please describe how the resource management issues to be addressed have evolved since the existing 1985 and 1989 plans were developed. The purpose and need statement should remain broad enough to encompass an appropriate range of alternatives to meet a defined project purpose, including the proposed action and other methods available |
| 188 | I would truly like for everyone to be more tolerant of other user groups, treat each other with respect and realize we all enjoy the same outdoors for the same reasons. This goes for both motorized users and non-motorized users. |
| 184 | I would also like to see the BLM take a role of using our public lands for the common good of the people, and not just a conservation/preservation agenda. |
| 790 | I wish it would not take a full 4 years to complete. |
| 2187 | We urge the UFO to control and strictly limit gas production, mining, motorized recreation, and other uses that threaten the long-term health of natural ecosystems |
| 2193 | We note that multiple use of public land should not be interpreted to mean that all uses can or should coincide in all areas. The "natural" values listed above are generally lost when lands are opened to commodity production. Therefore, land must be set aside specifically for natural ecosystems in which degrading uses are prohibited |
| 976 | Promote respect for the land's intrinsic values - wildlife, solitude, clean air and water. |
| 1775 | Please make wild-life and wild-lands a priority because it is these resources that sustain human life. It is our responsibility to protect that which sustains us! |
| 1104 | No modifications are needed. |
| 1105 | The fewer rules and regulations, the better off the river will be. |
| 1086 | When preparing the Uncompahgre RMP the BLM must clearly understand the role and purpose of a land use plan. Pursuant to the Federal Land Policy and Management Act of 1976 ("FLPMA"), the BLM is required to develop land use plans to guide the agency's management of federal lands under its administration. |
| 499 | Education is the key to good management of our lands. Whether it is recreational 4-wheelers, jeeps, or motorcycles staying on existing roads, trash haulers dumping trash, hunters being ethical, cattle grazers using holistic approaches, it all begins with education and respect for the land. |
| 2352 | Private industries should find privately owned property to mine, drill, etc. America has sold its mineral rights too cheaply to shameless profiteers. Countries that were more wise do not have federal deficits like ours, nor do they have reckless polluters like Exxon that tie up our courts for decades rather than responsibly cleaning up their messes. We hold our public lands in trust for future generations of Americans. They are not ours to diminish or destroy. |

**Table C-4**
**General Comments Related to the RMP**

| Comment ID | Comment |
|---|---|
| 2580 | Having explored this area one summer with my husband, Larry, and delighted in its beauty, we consider it a treasure. |
| 178 | I believe the BLM has a difficult job in finding a balance between recreation, conservation and use for the good of the public. |
| 2584 | Two years ago I was constantly assured that the Bush administration was responsible for the degradation of our national environmental heritage. The Obama administration would reverse that. Here's a chance to prove something. |
| 2585 | Thank you for the opportunity to comment on the Uncompahgre RMP revision. This is the 21st century, there is no more west to run to, and whatever can be done to protect what is left, will be a plus for all life on this planet, including us. |
| 967 | I believe everyone should experience the outdoors, so let em' all come. Negative environmental behavior will change through education based in fact, and opportunities for the public ownership to police its ranks. |
| 501 | Currently, the management plan allows for multiple use of our BLM lands. I would not change any or existing management policies, except the Tabeguache Wilderness Study area. Why Red Flag area for human exploitation. The United States needs to be able to grow and develop natural resources if we are going to continue to be a world power and maintain a great quality of life. |
| 964 | I am concerned about the environment, the health and welfare of the land, animals and all who (comment cut off in PDF) |
| 2598 | Please protect nature!!! |
| 2604 | Western Watersheds Project is concerned with the lack of any meaningful requirements or direction in RMP's developed over the last decade. We hope the Uncompahgre Field Office does not take that approach. |
| 489 | In general, I feel that our public lands are a precious resource, to be stewarded with the goal to maintain healthy natural environments for the plants and animals (including humans) who live and visit there. |
| 158 | On another note, the BLM must confine the analysis to issues and standards of conduct that BLM has clear authority to regulate. As an example, BLM clearly has authority to define locations suitable for the collection of gravel. BLM does not have authority to determine the season of use for hunting. |
| 481 | Physical changes to the landscapes do not apply. |
| 2570 | Please remember that economic cost-benefit analysis is not the most important measure of value. |
| 2594 | NO MORE DEVELOPMENT. Too much is enough already |
| 192 | I also feel more land needs to be made available for the publics good, including resource exploration, powerline construction, and general community uses. |
| 30 | Open space, agriculture, grazing, and wildlife is important to me and to the Colorado's future. |
| 1142 | The EIS should examine the cumulative impacts of development. In determining whether a project may have a significant effect on the human environment, it should analyze direct and indirect effects, including past, present, and reasonably foreseeable future activities. The impacts should be analyzed according to airsheds and watersheds, for example, rather than political boundaries. The purpose of a cumulative impacts analysis is to assess the incremental impacts on each resource of concern due to connected and unconnected actions that take place in a geographic area over time (i.e., past, present, and future) no matter which entity (public or private) undertakes the actions. A cumulative analysis aids in identifying the level of significance of those impacts on a particular resource and the appropriate type and level of mitigation required to offset the current proposal's contribution to these impacts. In the analysis of present and reasonably foreseeable future actions, it is appropriate to examine anticipated activity trends in the study area, not just already approved "on-the-ground" projects. Examining activity trends in other areas with similar uses and contributory metrics can be useful in this analysis. Also, the appropriate area of consideration and the time frame to use when assessing cumulative impacts will vary for each resource under consideration. The cumulative effects analysis should take into account the effects of reasonably foreseeable growth in energy development in the area and its effects on the air and aquatic resources. The indirect impacts of development should also be analyzed. The project may not affect the location of the expected growth, but it may affect the timing and. Amount of growth. |
| 1141 | The EIS should examine the RMP's direct, indirect and cumulative impacts to the cultural, recreational, and |

**Table C-4**
**General Comments Related to the RMP**

| Comment ID | Comment |
|---|---|
| | resource characteristics of the Uncompahgre Field Office planning area. Among other things, this review should assess any impacts to airsheds in mandatory Class I Federal areas (e.g., Black Canyon of the Gunnison National Park and Wilderness Area, West Elk Wilderness Area, and Maroon-Bells-Snowmass Wilderness Area), watersheds under special management considerations (e.g., Wild and Scenic Rivers), and threatened, endangered and/or sensitive species. |
| 1819 | Same as it is today and has been for generations. These are public lands shouldn't people be able to enjoy them. |
| 1140 | Each alternative in the EIS should explicitly include identification of appropriate mitigation where impacts are expected. The description should include designation of the entity responsible for implementing the mitigation, the funding source, and specific temporal milestones to meet rehabilitation standards. |
| 997 | In general, I believe that our public lands should be managed first and foremost for preservation of the resources they contain, and secondly for uses such as recreation, hunting and grazing, and thirdly for extractive uses like mineral extraction and wildlife and timber harvest. Public lands should be a legacy for future generations, and I want them passed on in as good a condition as possible. The need for nature and natural areas will only grow as our population expands--it will not become obsolete. But nature must not be seen as a collection of specimens to be kept in a museum. Nature is an interconnected web, and as such should be protected in systems. Watersheds, migratory corridors, soundscapes, viewsheds, riparian zones, etc. should be protected as systems. Although many people think the public lands in the UFO are just rocks and bushes, they are rich with life, and in places easily damaged and slow to heal. |
| 797 | My name is Ali Lightfoot and I live on the edge of the BLM in Paonia at 65 Cedar Drive. The BLM is basically our backyard. For the most part I think the land is perfect and how it's managed is fine. |
| 2346 | Have you ever seen an Otter close up? They are adorable!! No one with a heart could resist them. Or a multitude of other creatures, just trying to live in a world run by people, most of whom think of making money firsthand the health and well being of people, animals and the rest of the Earth SECOND. Don't be callous and selfish. Be humane and caring. Don't pollute and destroy |
| 1817 | Same as it looks today and has looked for many years. If you make modifications to a landscape physically it is no longer what it was. |
| 2367 | As a photographer and environmentalist whose family has vacationed in Colorado, this issue matters to us personally. Do the right thing and preserve this unique area for our children and grandchildren to enjoy! |
| 1139 | Special attention should be given to the development of the current environmental baseline (as opposed to the No Action alternative). Current environmental conditions need to be described in the document as a baseline so that future changes to environmental resources can be measured for all alternatives, including the No Action alternative. |
| 2366 | We have been coming here since I was a child. It is important to me and all Coloradans that we protect this beautiful area |
| 2347 | I Love Wildlife |
| 2361 | We humans can not just go on over producing and ravaging the planet of its life, or it won't last |
| 1754 | I oppose the Uncompahgre Resource Management Plan. Do not change the Uncompaghre management policy. |
| 2363 | You may think that a person from Georgia has no knowledge or understanding of things in Colorado. I am a retired EPA program manager and have made frequent trips to Colorado on business and pleasure and care a great deal about environmental issues there. Please place resource protection at the top of your concerns |
| 1138 | The EIS should summarize the criteria and process that were used to develop the range of alternatives, including any environmental criteria used to identify and/or screen potential sites involved in the proposed alternatives. The EIS should carefully consider the screening criteria used to eliminate alternatives and also disclose the reasoning used to eliminate alternatives. |
| 651 | I would encourage the BLM to consider the average citizen when making land management decisions. Many people who use public lands are not aware of Travel Management Plans or any other changes in how land is managed. The typical citizen might only use public lands a few times a year and doesn't have the resources or knowledge on how to get involved in these types of decisions. It would seem the well organized and well funded conservationist/environmentalist groups are the most vocal and are always pressuring the BLM and Forest Service to further restrict the public from public lands, while the public is unaware of these changes until |

**Table C-4**
**General Comments Related to the RMP**

| Comment ID | Comment |
|---|---|
| | it is too late and the land is already locked up. Every single year there is yet another Wilderness proposal before congress, this year alone there are at least 3 major pushes for more Wilderness in Colorado alone. |
| 2652 | Our environment needs all the help it can get. Whether the air, the water or the land. From climate change to ever growing pollution to logging, to destruction of habitat or species, there are so many threats to our country's environment. |

**Table C-5**
**Issue 1: Air Quality, Water, and Soil**

| Comment ID | Comment |
|---|---|
| | ***Air Quality*** |
| 2797 | Dust abatement is a growing concern on BLM lands. With the explosion of surface-disturbing activities on BLM lands in Colorado} we are increasingly concerned about indirect effects} including dust deposition. Dust may harm rare species and/or their pollinators, or facilitate the establishment of non-natives. The RMP should thoroughly address dust abatement requirements, and BLM should actively monitor dust deposition associated with surface disturbance as well as the effects on imperiled species, pollinators, and noxious weed proliferation. |
| 669 | As a former non-attailll llent area for National Ambient Air Quality Standards (NAAQS) for Pm 10, air quality is of particular concern to us. Local governments have expended hundreds of thousands of dollars implementing measures to reduce air pollution, which we have been successful in accomplishing. However, activities on BLM lands, such as grazing, oil and gas development, and OHV use have the potential to undermine these gains. In addition, EPA is promulgating a new NAAQS for Ozone. Depending on where the standard is set, areas within the planning region may already exceed the new standard. We therefore believe it is BLM's responsibility to analyze and disclose the potential environmental and economic impacts of management decisions. For example, if BLM is making lands available for leasing for oil and gas development, it needs to consider and disclose the reasonably foreseeable consequences of its development. San Miguel County is already adversely impacted by activity on BLM lands outside our boundaries with regard to ozone and particulate pollution. Recent dust events exacerbated by disturbed soils on public lands have had profound impacts on the timing and duration of the snowmelt in the county. This adversely impacts our skiing dependent tourist economy, our agricultural and municipal water users, and the timing of natural ecosystem processes. |
| 1124 | Based on the general information available for review, our initial areas of concern for this upcoming resource management plan include impacts to air quality from energy development, impacts to wetlands, and protection of water resources. We are also concerned with the potential cumulative effects of the increased energy development in the region. Along with identifying direct impacts, the EIS should include a rigorous analysis of indirect and cumulative impacts. The EIS should disclose the impacts of all reasonably foreseeable actions on environmental resources in a way for decision-makers and any participating counties/municipalities to be able to effectively plan to reduce impacts on such resources as much as possible. |
| 1128 | EPA is particularly concerned with air quality impacts associated with emissions from the potential increase in energy development in the planning area, as well as the cumulative impacts that may be occurring as a result of increased energy development in the surrounding western slope area of the state. Planning-level NEPA analyses, such as RMPs, provide direction for broad resource management and may be the basis for future leasing decisions. These plans provide the how, when and where for oil and gas operations. At the resource management level, a quantitative approach which includes air dispersion modeling may be necessary to provide the decision-maker with the level of information necessary to support the decision-making process. The air quality analysis should provide the decision-maker with the information to guide planning decisions, including the following: whether additional leasing (and the likely development associated with such leasing) can proceed without impacting the National Ambient Air Quality Standards (NAAQS), Prevention of Significant Deterioration (PSD) increments, and Air Quality Related Values (AQRVs), such as visibility; the rate of oil and gas leasing or development; appropriate leasing stipulations; and/or necessary mitigation measures to include in drilling permits. The appropriate level of air quality analysis at the management planning stage will help to ensure that proper, proactive steps are taken to minimize adverse impacts to air quality. |
| 1129 | In RMPs that plan for significant oil and gas development, EPA maintains that air quality modeling should be conducted to assess the direct and cumulative impacts of projected energy development on air quality within and outside of the planning area. The qualitative emission comparison approach is not specific enough to adequately address and predict air quality impacts from oil and gas development. While the qualitative emission comparison approach provides a means to compare the total predicted emissions of each alternative to a baseline year, it does not provide any indication of the potential for exceedances of the NAAQS or potential adverse impacts on PSD increments or AQRVs (e.g., visibility) in nearby Class I areas. |
| 1130 | In reviewing planning-level NEPA documents, EPA typically considers the following factors in determining the appropriate level of air quality analysis. These factors, although not exclusive and may vary from project to project, provide some indication of the potential for air quality impacts to occur from management plans that provide for oil and gas leasing and/or development.<br>• Number of projected oil and gas wells based on estimated energy resources and reasonable well density. |

**Table C-5**
**Issue 1: Air Quality, Water, and Soil**

| Comment ID | Comment |
|---|---|
| | • Distance of the planning area or projected well development areas from Class I airsheds.<br>• Distance from other sensitive receptors (e.g., National Parks, Class II areas, and population centers).<br>• Distance from areas approaching an exceedance of a NAAQS. This is particularly important in the West for ozone and fine particulate matter (PM2s).<br>• Availability of recent, relevant, and comprehensive air quality modeling data prior to preparation of a management planning draft EIS.<br>• Whether a relevant, comprehensive, and cumulative air quality analysis is concurrently completed with a project-specific EIS in the management planning area.<br>• Potential for cumulative adverse impacts to air quality from projects in adjacent planning areas. |
| 1131 | While energy development appears to be a key issue to be addressed by the RMP, no estimate of the reasonably foreseeable development (RFD) is included. Until the RFD for the RMP is estimated, it is difficult to definitively identify the appropriate level of air quality analysis. As the NEPA analysis proceeds, EPA would like to continue discussions with BLM regarding the air quality analysis planned for this RMPIEIS. |
| 1143 | The current air quality conditions in the area covered by the RMP should be presented. The amount of stationary, mobile and non-road source emission activities should be quantified and disclosed. Then, air quality impacts should be identified for activities addressed under the RMP, including energy development, wildland fire management, and road dust. Particulate emissions from related construction activities should be addressed. Any significant concentrations of hazardous air pollutants (HAPs) should be evaluated, including those that may be emitted during the drilling, completion and production of the oil and gas wells (e .g., formaldehyde, benzene, toluene, ethyl benzene, xylene, n-hexane, and formaldehyde). This analysis should address and disclose the potential affect on National Ambient Air Quality Standards (NAAQS) and Prevention of Significant Deterioration (PSD) increments across the planning area. Specific pollutants of concern include nitrogen oxides (NOx), sulfur dioxide (S02), and fine particulate contributions to regional haze, as well as PMIO related to road dust emissions. In addition, disclosure should be made of potential impacts to air quality-related values (AQRVs) at any affected Class I Federal areas designated under the Clean Air Act (CAA), including Black Canyon of the Gunnison National Park and Wilderness Area, West Elk Wilderness Area, and Maroon Bells-Snowmass Wilderness Area. |
| 1144 | Since the State of Colorado is in the process of completing work on its Regional Haze State Implementation Plan (SIP), BLM should ensure that activities addressed under the RMP will not interfere with any requirements of the Regional Haze SIP. |
| 1145 | Finally, the RMP may include areas that have a CAA maintenance plan for particulate matter (e.g., Telluride). Under the General Conformity Rule, federal agencies must work with State governments in non attainment or maintenance areas to ensure that a federal action conforms to any relevant SIP. |
| 1146 | While EPA understands broad assumptions are made at the RMP stage, the air quality analysis should include reasonable estimates of full development, including wells, compressors, drilling rigs and other surface facilities, as well as associated transportation activities. For most planning-level air quality analyses, estimates of the total number of sources can be made based on geological estimates of the recoverable oil and gas resources. Approximate locations of emission sources may be projected and sited into specific zones of the planning area based on USGS probability maps. Such estimates should be adequate to evaluate potential visibility and AQRV impacts on Class land Class II areas and the potential impacts to air quality standards, including regional ozone and particulate matter. Site specific impacts can be analyzed when specific development plans are identified in a more detailed, subsequent, project-specific EIS. |
| 1147 | EPA recommends that BLM fund an inter-agency air quality workgroup for this RMP to specifically discuss the planned approach to the air quality analysis, the results of the analysis, and appropriate mitigation measures. An air quality workgroup might include members from EPA, the State, and any other Federal or Tribal agency with management responsibilities in the area. One of the primary purposes of an air quality workgroup would be to provide feedback to BLM at the earliest stages of EIS development. EPA believes stakeholder involvement is important at all stages of the air quality analysis including the emission inventory, the modeling protocol, analysis of results, and if necessary, identification of appropriate mitigation. |
| 1148 | In preparing the EIS, we recommend BLM's approach to analyze and predict air quality impacts should be documented in an Air Quality Modeling Protocol and fully vetted with the air quality workgroup. An Air Quality Modeling Protocol provides a "roadmap" for how the air analysis will be conducted and the results presented. It describes the model that will be used for analysis, including model settings, modeling boundaries, and important |

**Table C-5**
**Issue 1: Air Quality, Water, and Soil**

| Comment ID | Comment |
|---|---|
| | model inputs such as meteorology, background data, and emissions inventories. The Protocol also should generally describe the standards to which the air impact results will be compared. EPA recommends that a Draft Air Quality Modeling Protocol be circulated among the air quality workgroup for comment and discussion. As part of this discussion, we recommend workgroup members discuss and reach agreement on the emissions inventories that will be used and the alternatives that will be modeled. If significant disagreements persist, EPA recommends those issues be elevated within the respective agencies for resolution. By discussing the model, emissions inventories, and alternatives up front, BLM may avoid additional costly and time-consuming air quality modeling analysis revisions at a later date. |
| 1149 | EPA would like to meet with BLM to discuss the air quality impact analysis planned for this RMP/EIS. By proactively working together early in the RMPIEIS process, we hope to assist BLM with the development of an air quality analysis which will adequately address potential air quality impacts and identify appropriate mitigation measures. |
| 1150 | The level of air quality analysis may range from a qualitative emission inventory approach to an air quality dispersion model to a full robust photochemical grid model analysis. Until the reasonably foreseeable development for the Uncompahgre Field Office RMP is calculated, it is difficult to definitely identify the appropriate level of air quality analysis. Qualitative Emissions Inventory Approach: A qualitative emissions inventory approach may be appropriate in some cases to complete the NEPA analysis. For this approach, projected emissions of key pollutants are estimated for each of the alternatives analyzed in the NEPA document. While the emissions inventory approach provides a means of relative comparison between alternatives, it does not provide an estimate of the potential impacts to the NAAQS or AQRVs. This method falls short of predicting the likely air quality impacts associated with these emissions, especially if there is an increasing inventory. Usually, the most appropriate use of the emissions inventory approach is to demonstrate that emission changes will be negligible as a result of the federal action contemplated within the NEPA document. For NEPA documents that use this approach, we typically recommend the following:<br>• The emissions inventory should include all criteria pollutants and key hazardous air pollutants, including benzene, formaldehyde, toluene, ethylbenzene, exylenes, n-hexane, and methanol.<br>• The emissions inventory should include quantifiable pollutant emissions from all activities or sources, including pad construction, drilling, well completion, hydraulic fracturing, production, wellhead abandonment, mobile sources, fugitive volatile organic compounds, and fugitive particulate matter.<br>• The mobile sources category should include all traffic anticipated during the lifetime of the project, including support vehicles, condensate trucks, and diesel fuel tanker traffic.<br>• Estimates of emissions are performed using commonly accepted methodologies and assumptions. Methods typically used include actual stack sampling, continuous emission monitoring, AP-42 emissions factors (see http://www.epa.gov/ttn/chief/ap42), calculation programs such as TANKS (see http://www.epa.goy/ttn/chief/software/tanks), and engineering calculations.<br>• Detailed emissions inventory calculations and assumptions (e.g., drilling time, completions, etc.) should be transparent and provided as an appendix. |
| 1151 | Air Quality Modeling Approaches: To ensure that an adequate level of consistency is met for the various air quality analyses conducted nationally, EPA promulgated a Guideline on Air Quality Models ("Guideline"). See 40 CFR 51, Appendix W. The Guideline recommends air quality modeling techniques that should be applied to SIP revisions for existing sources and to new source reviews, including PSD. Applicable only to criteria air pollutants, it is intended for use by EPA Regional Offices in judging the adequacy of modeling analyses performed by EPA, State, and local agencies and by industry. The Guideline is appropriate for use by other Federal agencies and by State agencies with air quality and land management responsibilities. See 40 CFR 51, Appendix W, Section I (a). The modeling techniques described in the Guideline are peer reviewed and used commonly to ensure consistency throughout the nation. It is generally understood that regulatory requirements and model technology undergo routine changes which necessitate that the Guideline periodically be reviewed and updated. Accordingly, EPA recommends that modeling techniques described in the Guideline be used whenever determining pollutant impacts for NEPA-related projects. |
| 1152 | For NEPA purposes, air quality impacts are typically determined from project specific impacts coupled with reasonable foreseeable development (RFD) sources then added to a "background" source of data (usually actual monitored data) to obtain the total impacts to the modeling domain. While this method results in accurate project specific impacts, the cumulative results are very dependent on the background data used. Whenever |

**Table C-5**
**Issue 1: Air Quality, Water, and Soil**

| Comment ID | Comment |
|---|---|
| | possible, EPA recommends the following:<br>• Background data should be collected from actual monitoring locations near the modeling domain boundary. Monitored data should represent current background pollutant concentrations and not data impacted from localized sources.<br>• Modeled background data should be used only when no monitored data is found. |
| 1153 | Near-Field Air Quality Modeling: Industrial Source Complex (ISCST3) was the air dispersion model used nationally for near-field air quality impacts for over 20 years. The discussion in the Guideline, Section 4.1 (d), describes advances made to air dispersion modeling since ISCST3 was developed. To better characterize plume behavior, the American Meteorological Society/EPA Regulatory Model Improvement Committee developed its AERMOD model. The AERMOD air dispersion model has the capability to better account for interaction near the earth's surface, which can include complex terrain in the near field and local scale meteorology factors. Accordingly, AERMOD is EPA's preferred method to determine criteria pollutant impacts up to 50 lan downwind and is referenced in the Guideline. EPA recommends that AERMOD should generally be used for determinations of criteria pollutant impacts (AERMOD is not applicable for determining ozone concentrations; since it does not contain a photochemical algorithm), hazardous air pollutants, and PSD increments in Class I and II areas. EPA also recommends that meteorological data used in the analysis should be a collection of at least one year's data from an onsite measurement station or three to five years of data from a nearby National Weather Service station or from another nearby meteorological monitoring station conforming to the Meteorological Monitoring Guidance for Regulatory Modeling Applications, February 2000, EPA-454/R-99-005 (http://www.epa.gov.scram001/guidance/metlmmgrma.pdf). |
| 1154 | Far-Field Air Quality Modeling: Neither the ISCST3 nor the AERMOD models are capable of determining chemical transformations or particle deposition. It is generally necessary to account for chemical transformations to accurately determine regional haze, visibility, and deposition of aerosol impacts from emissions of NOx, SOx, and volatile organic compounds (VOCs). Further, the near field models do not account for distant pollutant transport longer than 50 km. The Guideline references CALPUFF as the preferred model method to predict pollutant impacts from long-range (more than 200 km) transport from a large number of sources. The CALPUFF model includes chemical transformation and deposition algorithms that enable predictions of visibility and deposition impacts, in addition to criteria pollutants. CALPUFF is not applicable for determining ozone concentrations because the model lacks a photochemical algorithm. For NEPA analyses, EPA believes it is appropriate to use the CALPUFF model to characterize visibility impacts for a group of sources. Meteorological grid spacing should be set to maximize the accuracy of the predicted impacts near the project center. Consideration should be made to the terrain surrounding the project area. More complex terrain may require the higher resolution, such as 4 km grid spacing areas as has been the practice in many of the recent CALPUFF Regional Haze BART modeling applications in the western U.S. It is common to "nest" grid spacing to obtain accurate impact results and minimize computing run times. A typical nesting arrangement may consist of a 36,12 and 4 km horizontal gridded resolution. When using the CALPUFF model, EPA recommends that monthly ozone monitored data for nitrate conversion calculations should be used from sites located near the modeling domain boundary. EPA also recommends that monthly ammonia (NH3) monitored data for nitrate conversion calculations should be used from sites located near the modeling domain boundary. If no data are available, 1.0 ppb should be used for NH3 as the default value for the western U.S. A significant level of computing requirements may be needed for CALPUFF, including three-dimensional wind profiling that considerably increases the amount of data preparation, analysis time and computer support necessary. However, in some cases, previously processed wind/meteorology data may be applicable and available for use in the new analysis. Screening models are also available and may be used in appropriate circumstances. A screening version of CALPUFF, known as CALPUFF-Lite, has been successfully utilized to determine visibility and depositions impacts from smaller numbers of sources. To calculate visibility impacts from a very small number of sources in a limited domain area, another screening model, VISCREEN, may be used in lieu of CALPUFF. VISCREEN requires far less data preparation and computer analysis time than the CALPUFF model; however, it is limited in predicted impacts to a range of 50 km. If CALPUFF-Lite or VISCREEN predict air quality impacts, then more refined ' modeling and/or mitigation measures may be recommended. |
| 1155 | Photochemical Grid Modeling: CMAQ and CAMx were designed to have multi-scale capabilities so that separate models were not needed for urban and regional scale air quality modeling. EPA recommends photochemical grid modeling for larger project areas where ozone is of concern and in some applications for AQRVs and visibility. EPA notes that until the reasonable foreseeable development for the Uncompahgre Field |

**Table C-5**
**Issue 1: Air Quality, Water, and Soil**

| Comment ID | Comment |
|---|---|
| | Office RMP area is calculated, it is difficult to definitely identify the appropriate level of air quality analysis and whether this approach should include a photochemical grid model. |
| 1156 | Since screening-level ozone models are not available, a new modeling analysis for the proposed project would likely be resource intensive. Time and resources could be minimized by tiering off the analysis from a recent ozone study in a nearby area, or including the proposed project in a regional-scale ozone planning study such as those conducted for SIP purposes. Where such analyses are not available, estimates of the proposed project's emissions of ozone precursors should be made and compared to existing local and regional emissions inventories of these pollutants. |
| 1157 | The EIS should disclose the direct, indirect and cumulative impacts of a proposed action to air quality. EPA recommends that predicted impacts from the direct, indirect, and cumulative sources on the surrounding areas be compared against the NAAQS, PSD increments, AQRVs, and HAPs Relative Exposure Limits and chronic inhalation exposure guidelines. Comparisons of modeled impacts to the State air quality standards should also be considered. |
| 1158 | The Clean Air Act requires special protection of visibility in the nation's large National Parks and Wilderness Areas (identified as mandatory Class I federal areas) and establishes a national goal for "the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory Class I federal areas which impairment results from man-made air pollution." EPA's implementing regulations require states to submit implementation plans that contain such measures as are necessary to make reasonable progress toward the national goal, including improvement in visibility on the worst days and prevention of visibility degradation on the best days. See 40 CFR 51.300-309. Actions by Federal Land Managers (FLMs) that lack adequate mitigation of potential visibility impacts could interfere with a state's reasonable progress goals and impede ability to meet Clean Air Act requirements. In addition to its visibility provisions, the Clean Air Act contains general provisions for a PSD program designed to protect Class I areas from air quality degradation. The PSD program places an affirmative responsibility on FLMs to protect air quality from human-caused pollution in Class I federal areas. The Wilderness Act further directs the FLMs to protect the wilderness character of those areas designated as wilderness. Congress recognized the importance of preserving designated areas in their natural condition and declared a policy to "secure for the American people of present and future generations the benefits of an enduring resource wilderness." For this RMP's air quality analysis to adequately consider impacts to visibility in Class I areas or other sensitive airsheds, EPA recommends the following:<br>• The analysis should be performed using CALPUFF, at a minimum, with appropriate regulatory methodology using visibility Methods 2 and 6. The recently proposed Method 8 also may be considered.<br>• The air quality analysis should include predicted impacts at both 0.5 deciview and 1.0 deciview. A 0.5 deciview change in visibility is considered the level at which a proposed action contributes to visibility impairment. A 1.0 deciview change in visibility is the level at which a proposed action causes visibility impairment.<br>• Screening-level models such as CALPUFF-Lite or VISCREEN may be used for visibility and deposition analysis for projects where more extensive air quality modeling is not required (e.g., an exploratory well near a Class I area). However, if impacts are shown using these types of screening models, more refined modeling and mitigation may be required to fully disclose the impacts of the proposed action. These methodologies and impacts should be summarized in the main body of the EIS. |
| 1159 | If this RMP's air quality analysis discloses significant, adverse impacts to air quality, then the EIS should include specific and detailed mitigation measures to address the impacts. The EIS should also include modeled demonstrations that the mitigation measures will be effective. A significant, adverse impact to air quality may include predicted violations of a NAAQS and/or predicted adverse impacts on AQRVs (i.e., visibility impacts to a Class I area). For air quality analyses that predict impacts that approach a NAAQS, it may be prudent to consider and implement appropriate mitigation. Air quality mitigation measures may include, but are not limited to:<br>• Tier II or better drilling rig engines (e.g., natural gas drilling rigs);<br>• Electric drilling rigs;<br>• Selective catalytic reduction or other secondary emission controls on drilling rig engines;<br>• Fuel additives;<br>• Electric or natural gas-fired compression; |

**Table C-5**
**Issue 1: Air Quality, Water, and Soil**

| Comment ID | Comment |
|---|---|
| | • Reduced pace of development;<br>• Phased development;<br>• Low or no flow pneumatic valves or solar-electric pumps;<br>• Centralization of gathering facilities;<br>• Emission offsets;<br>• Green completions; and<br>• Additional EPA Gas Star program measures. |
| 1160 | EPA recommends the EIS include an analysis and disclosure of greenhouse gas emissions and climate change. While methane represents only 8 percent of the U. S. greenhouse gas emissions, it is 23 times more effective as a greenhouse gas than carbon dioxide (C02). Oil and natural gas systems are the biggest contributor to methane emissions in the U.S. , accounting for 26 percent of the total (EPA' s Natural Gas Star Program and the U.S. Emissions Inventory 2007: Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2005). For the Draft EIS, EPA suggests a three step approach: 1. Consider the future needs and capacity of the proposed action to adapt to projected climate change effects. 2. Characterize and quantify the expected annual cumulative emissions that would occur as a result of the resource management plan's implementation, and use C02-equivalent as a metric for comparing the different types of greenhouse gases emitted. 3. Briefly discuss the link between GHGs and climate change, and the potential impacts of climate change. 4. Discuss potential means to mitigate plan-related emissions. One voluntary mitigation effort targeted at the oil and gas industry is EPA's GasST AR program. Through the program, EPA technical experts help identify and promote the implementation of cost-effective technologies and practices to reduce greenhouse gas emissions. |
| 1161 | Dust particulates from construction, vehicle travel on unpaved roads, and ongoing operations are an important concern. Airborne dust may not be only a visual nuisance, but can potentially be dangerous to asthma sufferers. Sedimentation from storm water run-off can also severely impact the aquatic environment. The EIS should include plans for addressing dust control. At a minimum, the plans should include dust suppression methods, inspection schedules, and documentation and accountability processes. |
| 2163 | Air quality in Colorado continues to be a challenge. New policy guidelines and practices implemented by the EPA should be included in the RMP revision. This is particularly important as it applies to emission sources in oil and gas fields. Particulate deposition impacts not only air quality but water and land resources as well. These in turn, affect the status of: wildlife, fish and human heath |
| 2164 | Mitigation options for any potential development plans should include requirements for substantive air quality modeling and visibility plans, implementation parameters and monitoring processes. |
| 2835 | Fugitive Dust Oil and gas development, mining, grazing, and off-road vehicle use are activities managed by the BLM that can destabilize soils and make them susceptible to windborne erosion. The resulting dust can cause impacts to wildlife, air quality, climate, and human health. The Monticello and Richfield (Utah) Proposed RMPs declare that surface disturbing activities such as oil and gas development and motorized vehicles contribute to fugitive dust (see, e.g. Richfield PRMP at 4-6, Monticello PRMP at 4-17,3-13). The Uncompahgre RMP should also recognize this impact, analyze it in each of the alternatives, and adopt management actions that minimize pollution from fugitive dust emissions. a. Impacts to Ecosystems Fugitive dust suspended in the air has the potential to impact more total area than any other impact of roads (paved or unpaved), and it can have significant effects on ecosystems and wildlife habitat. Forman et 01.,2003; Westec, 1979. Motorized vehicles create fugitive dust by travelling on unpaved roads and through cross country travel; it is then dispersed along roadsides or carried further afield via wind currents. An example of fugitive dust plumes caused by ORV traffic is documented in 1973 satellite photos. These photos show six dust plumes in the Mojave Desert covering more than 1,700 km2 (656.2 mi2). These plumes were attributed to destabilization of soil surfaces resulting from ORV activities. Nakata et al., 1976; Gill 1996. Fugitive dust can have serious consequences for plant and animal species. One study of Alaskan roads heavily traveled by various types of vehicles found that dust had buried mosses and very low-statured vegetation in the 10-m-wide area adjacent to each side of the road; dust blankets measured up to 10 cm (3.9 in) deep. Walker and Everett 1987. According to the EPA, Dust can cause both physical and chemical effects. Deposition of inert PM [Le., particulate matter] on above-ground plant organs sufficient to coat them with a layer of dust may result in changes in radiation received, a rise in leaf temperature, and the blockage of stomata. Crust formation can reduce photosynthesis and the formation of carbohydrates needed for normal growth, induce premature leaf-fall, damage leaf tissues, inhibit growth of new tissue, and reduce starch storage. Dust may decrease photosynthesis, respiration, and transpiration; and it may |

**Table C-5**
**Issue 1: Air Quality, Water, and Soil**

| Comment ID | Comment |
|---|---|
| | result in the condensation and reactivity of gaseous pollutants with PM, thereby causing visible injury symptoms and decreased productivity. EPA, Draft Integrated Science Assessment for Particulate Matter, at 9-108 to 9-109 (Dec. 2008), available at http://oaspub.epa.gov/eims/eimscomm.getfile?p download id=485679. The BLM should address the impact of fugitive dust on vegetation in and near the Uncompahgre Field Office, including the disruption of photosynthetic and respiration processes and resulting reduced plant growth, reproduction, and survivorship. It should also evaluate the impacts of dust on wildlife. b. Climate Change A hard look at impacts from fugitive dust is also necessary in order to understand and disclose to the public the likely contributions to regional climate change caused by this plan. In September 2009, Dr. Jayne Belnap of the United States Geological Survey gave a presentation to the Colorado Water Conservancy District.25 Dr. Belnap's presentation addressed the connection between increased temperature, disturbance, invasive species and dust. This presentation focused much attention on the impacts from ORVs and noted the cycle of increasing temperatures, which increases dust, which is exacerbated by ORV use, which increases the effects of climate change (temperature increases), with the key indicator of these problems being earlier snowmelts. Of particular concern is the amount of dust that results from motorized routes, which settles upon snow pack and alters the melt rate which, in turn, alters the availability of warm season infusion of water into streams and lakes, when such water is critical to wildlife. For example, in 2005 and 2006, disturbed desert dust melted snow cover 18 to 35 days earlier in the San Juan Mountains.26 In 2009, disturbed desert dust melted snow cover 48 days earlier in the San Juans. 27 Neff, et.al, (2008) found that "dust deposition onto snow cover in the western United States has recently been shown to accelerate melt and reduce snow-cover duration by approximately one month, a finding that has broad implications for water resources in mountainous regions of the United States" (citing Painter, T. H. et 01. The impact of disturbed desert soils on duration of mountain snow cover. Geophys. Res. Lett. 24 (2007), attached). c. Air Quality Fugitive dust is also a significant contributor to air quality impairment. In fact, according to the National Emissions Inventory, road dust is the single greatest source of PMIO• EPA, Draft Integrated Science Assessment for Particulate Matter, at 3-171 (Dec. 2008), available at http:Uoaspub.epa.gov/eims/eimscomm.getfile?p download id=485679. Fugitive dust accounts for approximately 50% of primary PM2.5, with 40% of that arising from unpaved roads. EPA, Air Quality Criteria for Particulate Matter, at 3-94 (Oct. 2004), available at http:Uoaspub.epa.gov/eims/eimscomm.getfile?p download id=435945. Further, a recent California study clearly demonstrates that ORV activity is a major contributor to high particulate matter concentrations in nearby airsheds because of destruction of soil crusts and vegetation. Craig, Cahill, and Ono 2010, available at http:Uwww.slocieanair.org/pdf/PM2-final report.pdf. The RMP should discuss impacts the travel system and ORV use can have on air quality in the resource area and airsheds outside the resource area. d. Human Health In addition to the concerns raised above, we are worried that increased levels of particulate matter will have negative effects on human health inside and outside the resource area. According to the EPA, "[n]umerous scientific studies have linked particle pollution exposure to a variety of problems, including increased respiratory symptoms, such as irritation of the airways, coughing, or difficulty breathing, for example; decreased lung function; aggravated asthma; development of chronic bronchitis; irregular heartbeat; nonfatal heart attacks; and premature death in people with heart or lung disease." http://www.epa.gov/pm/heatth.htmt, last accessed March 9, 2010. In fact, recently a group of doctors in Utah cited increased dust due to climate change, which, as noted above, is exacerbated as a result of ORV use on fragile soils, as a top public health concern in the arid West. (See attached article.) The BLM should analyze the effects of fugitive dust on human health in the resource area, including the potential for airborne fugitive dust to travel and affect human health beyond the boundaries of the Uncompahgre Field Office. Recommendations: BLM should analyze the amount of dust that will be generated from the road system, including for ORV use and energy development, through the use of readily available modeling techniques and sampling for particulate matter generated along a representative sample of routes proposed for designation. This has been done for BLM projects (the West Tavaputs Plateau Natural Gas Full Field Development Plan, DEIS February 2008 and the Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal, FEA December 2007), and the models for these projects demonstrate that fugitive dust from vehicular travel on unpaved roads can create significant levels of ambient pollution. The Uncompahgre RMP should complete a similar analysis, which comprehensively inventories and describes fugitive dust emissions and models near-field, far-field, and cumulative effects of fugitive dust. The RMP should limit surface disturbing activities as necessary to reduce windborne soil erosion. 25 PowerPoint presentation given September 18, 2009 at the Colorado River Water Conservancy District seminar, attached as Appendix C and available online at http://www.crwcd.org/page 305). 26 Thomas H. Painter et al., Impact of Disturbed Desert Solis on Duration of Mountain Snow Cover, Geophysical Research letters.. Vol. 24, 112502 (June 23, 2007). 27 Thomas H. Painter, Presentation, Colorado River District Water Seminar, September 18, 2009, Grand Junction, Colorado (Painter Grand Junction |

**Table C-5**
**Issue 1: Air Quality, Water, and Soil**

| Comment ID | Comment |
|---|---|
| | Presentation). |
| 2833 | The RMP must thoroughly analyze impacts of each alternative on air quality, especially in the context of oil and gas development. The Environmental Protection Agency is currently proposing to lower the National Ambient Air Quality Standard (NAAQS) to better protect human health. The EPA's proposal would strengthen the 8-hour "primary" ozone standard to a level within the range of 0.060-0.070 parts per million (ppm). EPA is also proposing to establish a seasonal "secondary" standard, designed to protect sensitive vegetation and ecosystems, including forest and wilderness areas, set within the range of 7-15 ppm-hours. Although non-attainment is most frequently expected and witnessed in large urban areas, rural counties with high levels of oil and gas development have experienced startlingly high levels of ozone pollution. The RMP should analyze air quality in the context of the new NAAQS, which should be finalized before the draft RMP is released. In addition to ozone pollution, oil and gas development activities contribute to CO, NOx" SOz, HAPs and volatile organic compound (VOCs) pollution, through activities like flaring, drilling, processing plants, and wellhead compressors and compressor stations, to name a few. Additionally, recreational ORV use cause fugitive dust emissions, particulate matter and contribute CO, NOx" and hydrocarbon emissions. Furthermore, deterioration of air quality is shown to have substantial economic costs, and good air quality provides many economic benefits. Attached please find a fact sheet (incorporated into these comments by reference), prepared by The Wilderness Society, entitled, "Assessing Costs Associated with Impacts to Air Quality." The Wilderness Society reviewed three studies: two Reports to Congress prepared by the EPA and one recent peer-reviewed article whose principal author is a researcher employed by the EPA. 21 These three studies summarize nearly all of the extant epidemiological and economic research related to the health consequences of ozone exposure and the economic values of reducing such exposure.22 The studies, released in 1997, 1999, and 2005, show five patterns clearly: 1. Improvements in air quality result in substantial economic benefits well in excess of economic costs. 2. The range of known and scientifically-valid health consequences from polluted air in general, and elevated ozone levels in particular, is increasing. 3. The increasing breadth and depth of valuation research in economics provides evidence that can be used to quantify and monetize the health-related benefits of reduced air pollution. 4. High levels of inflation for goods and services related to health care suggest that the economic costs of ozone exposure will grow rapidly in the future, even if NAAQS standards are not further tightened. 5. There is a well-stocked tool box available to BLM to use in estimating the economic cost of the increased air pollution likely to result from accelerated oil and gas development and other pollution-generating activities on BLM lands. In making land use decisions, federal agencies have an obligation under NEPA to take a "hard look" at the environmental consequences of a proposed action, and the requisite analysis "must be appropriate to the action in question." 42 U.S.C. § 4321 et seq.; Meteallv. Daley, 214 F.3d 1135, 1151 (9th Cir. 2000); Robertson v. Methow Valley Citizens Council, supra. The impacts and effects of a proposed action, such as oil and gas development, that federal agencies are required to assess include: "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8. Under the Data Quality Act, federal agencies are required to use information that is of high quality and that is objective, useful, and verifiable by others.23 Agencies must also use "sound statistical and research" methods.24 In order to complete a sufficient analysis of air quality, the data provided with this fact sheet should be incorporated into the BLM's air quality analysis. Protecting air quality should be a priority in the Uncompahgre RMP. FLPMA requires BLM to consider the relative value of the various resources, and clean air is quickly becoming (along with undeveloped landscapes) a most valued, yet dwindling resource. Therefore, BLM should take a proactive approach to managing air quality by, among other things: setting aggressive standards (beyond that simply found in existing regulations); requiring any actions on public lands to meet those standards (i.e. no flaring, no two-stroke engine use on public lands, etc); analyzing the cumulative impact of any proposed action with other past, present, and reasonably foreseeable actions; establishing an effective monitoring program; and halting any actions that contribute to air pollution if such monitoring reveals that standards have been exceeded. Furthermore, NEPA requires BLM to analyze both adverse and beneficial impacts of its decisions. Therefore, the RMP should assess not only negative impacts to air quality from activities such as oil and gas development, but also the potential benefits of controlling those effects. Recommendations: BLM should analyze impacts to air quality using the EPA's proposed NAAQS, and include management actions and best management practices in the RMP that minimize and mitigate those impacts. BLM should consider economic and other benefits of protecting air quality. 21 This review was originally conducted by Dr. Joe Kerkvliet as part of his comments on the Final Supplemental Environmental Impact Statement for the Pinedale Anticline all and Gas Exploration and Development Project. 22 The Hubbell, et al., paper is attached to these comments. The EPA reports are too voluminous to attach to this letter, but can be accessed at |

**Table C-5**
**Issue 1: Air Quality, Water, and Soil**

| Comment ID | Comment |
|---|---|
| | http:Uyosemite.epa.gov!EE!epa!eerm.nsf/vwRepNumLookuP/EE-0295?OpenDocument and http://www.epa.gov!oar!sect812/19902010/fullrept.pdf. Last accessed Mar. 26, 2010. 23 Treasury and General Government Appropriations Act for Fiscal Year 2001, Pub.L.No. 106-554, § 515. See 0150, Office of Management and Budget "Information Quality Guidelines," available at http://www.whitehouse.gov/omb/inforeg/igg_oct2002.pdf and individual "Agency Information Quality Guidelines," available at http:/www.whltehouse.gov/omb/inforeg/agencYJnfo_qualitYJinks.html. 24 Ibid. |
| | ***Water Resources*** |
| 76 | I find that your issue statements miss a major issue. Salinity and selenium control in the Uncompahgre drainage is a major issue, and BLM lands are major contributors. None of the issues stated directly address water quality. |
| 77 | The Colorado River Basin Salinity Control Forum is composed of members appointed by the Colorado River Basin States governors. I serve as the Executive Director of that organization. Our organization does not fit into being easily involved in the grass roots open house type of opportunity for exchanges. We often work through state directors or BLM staff in Washington D.C. BLM has been given a charge by Congress to address the salinity issue. There is a full time BLM Salinity Coordinator by the name of Heidi Hadley. Her phone and email are as follows: (801) 524-3886 Heidi_Hadley@BLM.gov I have written to her asking her help in getting this issue into the study effort. You may want to contact her. |
| 112 | Any reserve Federal appropriative water rights for drainages along the south flank of the Grand Mesa, should clearly be identified in the RMP. This information would be useful so that future coal operations within those drainage basins could recognize and address those I rights. Then mine plans can be developed to ensure that any reserved water rights are managed appropriately. |
| 143 | We are addressing the planed gas drilling on Oak Mesa. Wildwood Ranch is located in Unit 1, and lies at the base of Oak Mesa's southeastern slope. Our concerns are that toxic chemicals could get into our water sources-- reservoirs, wells, springs, and irrigation systems. |
| 144 | The North Fork Valley is noted for its many organic growers and contaminated water sources coud put them and us out of business. |
| 243 | Water quality- As a minimum, current water quality should be maintained and, where feasible, it should be improved. Reclamation, other Interior agencies and the Department of Agriculture are currently working to reduce selenium and salinity loads within the Colorado River Basin. |
| 244 | Water availability- The RMP should reflect that available water is limited and may not be sufficient for all desired uses; even more so during droughts or as a result of climate change. Recommendations and decisions should recognize water rights, agreements, allocations, and allotments. |
| 376 | Farmers and ranchers need water for crops and animals. The ditch water and rights are important to our community. |
| 405 | If public lands are going to maintain both animal and plant diversity, management is critically important. We need to be closing roads not making new ones. We need to be protecting water sources, springs, streams and rivers. We need to return to a more natural rhythm in fire control. |
| 495 | I also believe it is very detrimental to retain the right and ability to file for new water rights on the Tabeguache parks in Nucla. |
| 525 | No dams please. Put that myth to sleep. |
| 687 | The Norwood LHA finds all the waters analyzed to meet water quality standards. Some sampling data is presented to support this conclusion. There is no discussion of compliance with the other water quality standards that underlie CDPHE Water Quality Control Division use classifications, for example the microbiological standards for Recreation la waters. Has BLM determined these standards are consistently met on all the stream segments and through what mechanism? |
| 706 | I am cognizant of the fact that BLM manages its public lands under the principle of multiple use and sustained use, and must provide a balance between usage, and protection of its resources. It is my observation that BLM is doing a good job in managing livestock grazing, vegetation management for both logging and wildlife habitat, and in watershed protection. |
| 753 | We want to keep all our grazing rights, water rights, hunting rights and any other rights we were born with in this great country known as the "Land of the Free." |

**Table C-5**
**Issue 1: Air Quality, Water, and Soil**

| Comment ID | Comment |
|---|---|
| 834 | Concerned about water quality of streams and river, lakes for fishing. |
| 914 | My domestic water source is from springs on BLM land, Sec 4, 14S,92W. My concern is that oil& gas drilling (or any other mineral extraction) on the south flank of Grand Mesa might contaminate these springs. Ideally, I would like to see a withdrawal of these lands from mineral leasing and development. If this is not possible, then extraction activities should be located as far as possible, but at the minimum one mile, from these and other domestic water sources. |
| 1047 | Water development such as reservoirs, ponds, spring development and wells should be a priority. |
| 1078 | This industry uses billions of gallons of water in its production. Where are billions of gallons of water coming from? In a dry year here in the North Fork Valley, some irrigation ditches are shut down in mid-summer because there is not enough water. How can there be enough water to force down wells to fracture the Earth? And then how are billions of gallons of poisoned water going to be disposed of? What are WETHE PEOPLE supposed to drink and water our crops with? |
| 1126 | Based on the general information available for review, our initial areas of concern for this upcoming resource management plan include impacts to air quality from energy development, impacts to wetlands, and protection of water resources. We are also concerned with the potential cumulative effects of the increased energy development in the region. Along with identifying direct impacts, the EIS should include a rigorous analysis of indirect and cumulative impacts. The EIS should disclose the impacts of all reasonably foreseeable actions on environmental resources in a way for decision-makers and any participating counties/municipalities to be able to effectively plan to reduce impacts on such resources as much as possible. |
| 1135 | For areas with significant energy development, water source protection may be a key issue. The RMPIEIS should analyze the potential impacts to surface water, groundwater, existing and potential drinking water, and irrigation waters. Impacts to consider include water quality, water quantity, and any adverse change to current water quality of any rivers, streams, and their tributaries. Water source protection is particularly important for oil and gas development on split estates (federal mineral/private surface) that are used for farming and ranching and where property owners may be reliant on groundwater and/or surface water for drinking and irrigation. The RMP/EIS should identify all relevant, reasonable monitoring and mitigation measures to protect these water sources even if they are outside the jurisdiction of BLM. |
| 1136 | EPA recommends BLM consider whether NSO lease stipulations would be appropriate to protect current or potential drinking water sources. In un-leased areas, terms and conditions (including NSO lease stipulations as appropriate) should be considered to protect non-mineral resources. For leased areas, Best Management Practices (BMPs) and mitigation measures should be used to protect these resources and designed into the alternatives under consideration. |
| 1166 | EPA recommends the RMPIEIS include an accurate description of surface and groundwater resources, as both are essential to understanding the potential effects of any management alternative. The RMP/EIS should clearly describe water bodies within the analysis area that may be impacted by resource management activities. Using maps to identifying affected watersheds of the various alternatives helps convey their relationship with project activities. |
| 1167 | The RMPIEIS should also disclose the extent to which aquatic habitat could be impaired by potential activities, including effects on surface and subsurface water quality and quantity, aquatic biota, stream structure and channel stability, streambed substrate (including seasonal and spawning habitats), stream bank vegetation, and riparian habitats. Particular attention should be directed at evaluating and disclosing the cumulative effects of increased levels of erosion and sedimentation. Water quality parameters such as conductivity, dissolved and suspended solids, metals, pH, temperature, dissolved oxygen and physical aquatic habitat parameters may also be important monitoring indicators for determining stream or lake impairment or stress, as well as its sensitivity to further impacts. Existing water quality standards applicable to the affected water bodies should be presented to provide a basis for determining whether existing uses will be protected and water quality standards met. |
| 1168 | For areas with significant energy development, water source protection may be a key issue. The RMP/EIS should analyze the potential impacts to surface water, groundwater, existing and potential drinking water, and irrigation waters. Impacts to consider include water quality, water quantity, and any adverse change to current water quality of any rivers, streams, and their tributaries. Water source protection is particularly important for oil and gas development on split estates (federal mineral/private surface) that are used for farming and ranching and where property owners may be reliant on groundwater and/or surface water for drinking and irrigation. The |

**Table C-5**
**Issue 1: Air Quality, Water, and Soil**

| Comment ID | Comment |
|---|---|
| | RMP/EIS should identify all relevant, reasonable monitoring and mitigation measures to protect these water sources even if they are outside the jurisdiction of BLM. NSO lease stipulations may be appropriate to protect current or potential drinking water sources. In unleased areas, terms and conditions (including NSO lease stipulations as appropriate) should be considered to protect non-mineral resources. For leased areas, Best Management Practices (BMPs) and mitigation measures should be used to protect these resources and designed into the alternatives under consideration. |
| 1228 | In addition to the Wild & Scenic Rivers eligibility there are several areas within the RMP planning process which warrant additional comment. Travel Management, Water Quality and Soils are of concern to the River District. |
| 1230 | Ongoing and future land use decisions have the ability to exacerbate natural erosion within the UFO. The River District is a cooperator in the Colorado River Basin Salinity Control Program and the Selenium Task Force. As such, the River District supports ongoing and future salinity and selenium control projects. Land use management decisions (including the disposition of, or transfer of federal land ownership) need to carefully be analyzed to prevent increased erosion, sediment transport and/or deep percolation of water that can mobilize salts and selenium. In addition, land disturbance has been linked to increase in dust storms which can directly and adversely affect the timing and amount of snowmelt runoff |
| 1624 | The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities. |
| 1638 | My wife and I love to go rafting, but as you know the Dolores has been mostly a trickle since McPhee was completed. We would like to see water returned to this important ecosystem. |
| 1937 | Assessment of management issues on a watershed basis is important to identify and adequately address conservation needs. Rivers and watersheds cross jurisdictional and political boundaries. Riparian areas support the vast majority of biological species during some portion of their lifecycle. And rivers are the lifeblood for local communities' health, recreation, and aesthetic enjoyment. For these reasons, we recommend that the Plan include a separate assessment section to consider the conservation needs of rivers and wetlands on a watershed basis, and to analyze impacts of management decisions on rivers and watersheds as distinct natural systems. |
| 1938 | Certain types of land use are known to have significant potential to affect water quality, wetlands and riparian systems. We request that analysis of impacts explicitly consider potential effects on groundwater and riparian systems, particularly for potential energy exploration and development. Energy development that may have particular impacts on water quality and riparian function include hardrock mining, oil and gas extraction, and large-scale geothermal extraction. |
| 1939 | In addition, we request that the Plan address the potential impacts of recreational use and grazing on water quality and riparian systems. Analysis of any such impacts should include the potential for the spread of invasive species along waterways. |
| 1940 | Long-term and cumulative effects of management decisions will be considered. |
| 1946 | Analysis of impacts will consider the potential of certain types of land use to shift ecological systems from those that are unique with high biodiversity and healthy natural function, to systems that are poorly functioning, or with common and generalist species and low biodiversity. Analysis of impacts on riparian systems will consider aspects of integrated natural function, including factors such as geomorphology, invertebrate and vertebrate species, and vegetation; and the role of riparian areas and wetlands to support movement, migration and reproduction for wildlife and birds. |
| 1962 | We encourage BLM coordination with other agencies, including the Forest Service (USFS) and Fish and Wildlife Service (FWS), to ensure protection of the extended riparian ecosystem. A guideline for inter-agency coordination is presented in the Unified Federal Policy for a Watershed Approach to Federal Land and Resource Management (UFP). Effective since October 2000, this policy is "intended to provide a framework to enhance watershed management for the protection and the health of ecosystems on Federal lands" (2). The UFP is not a regulation, nor does it establish a regulatory program. However, it does call on inter-agency collaboration to restore and protect water resources within the framework of existing laws and regulations. Because many of the eligible segments originate on USFS lands before flowing through BLM lands, we ask that the two agencies work together to ensure the protection and enhancement of water resources and aquatic ecosystems. Furthermore, the presence of endangered species in many segments should involve the FWS in the |

**Table C-5**
**Issue 1: Air Quality, Water, and Soil**

| Comment ID | Comment |
|---|---|
| | decision-making process. This collaboration would facilitate conservation practices that consider the entire riparian ecosystem, not just the individual BLM-administered segments. The RMP revision process is an opportune time for the BLM, USFS and FWS to work together to better protect and enhance the riparian ecosystems and their wildlife. |
| 2052 | All permitted mines must: prove that there will be no harm to both surface and ground water quality and quantity; prove that the long-term ecological health of the area will not be jeopardized; |
| 2151 | Water: Protecting water quality requires more than the conservation efforts of headwater stream, mainstem conservation efforts. Or development avoidance of riparian zones. Climate change discussion and management implications should be included in the revised RMP. In Colorado, air temperatures have already warmed by -2 degrees F in the past 30 years (Colorado Water Conservation Board. 2008. Colorado climate change: A synthesis to support water resource management and adaptation. Climate Change in Colorado. University of Colorado at Boulder. http://cwch.state.co.IlslHomeiClimateChange/ClimateChangeInColoradoReport;D. By conserving and using water more efficiently, restoring riparian and stream areas, managing water quality, and providing management guidelines for protecting sensitive trout and aquatic species, we will increase the ability to adapt to climate change fluctuations and dissipations (Williams, J .E.. A.L. Haak, N.G.Giliespie, H.M. Neville, and W.T. Colyer. 2007. Healing troubled waters: preparing trout and salmon habitat for a changing climate. Trout Unlimited, Arlington, Virginia. Available: www.tu.org; Williams, .LE .. A.L. Haak, H.M. Neville, and W.T. Colyer. 2009. Potential consequences of climate change 10 persistence of cutthroat trout populations. North American Journal of Fisheries Management 29:533-548. 2009). |
| 2153 | Water impacts due to abiotic threats Should also be discussed in the revised RMP and include updated management restrictions that protect. Colorado' s waters. Water quality degradation, flow reduction impacts. grazing, energy development, and impacts from droughts and/or floods should all be part of the discussion under water issues. As an example of industry' s affect on water quantity, it is estimated by the Environmental Protection Agency (2002) that for every barrel of oil or gas extracted. an average of 7.5 barrels of water is required. |
| 2155 | The management for healthy watersheds will directly contribute to other connected resource management successes. Healthy watersheds will be more resistant and resilient to other stressors mentioned above. From TU' s perspective and interest, maintaining strong and vibrant watershed systems typically results in healthy fisheries, thus preventing unnecessary population declines, future endangered species listings, and a strong recreational vale for the angling public. |
| 2157 | River systems within the UFO contain populations (including · conservation populations) of the Colorado River cutthroat trout (CRCT). This species has declined in that last century and now occupies less than 14% of its historic habitat and only 8% of the historic habitat range is occupied by unhybridized or ecologically significant populations (CRCT Coordination Team. 2006. Conservation Strategy for Colorado River cutthroat trout (Oncorhynchus clarkii pleuriticus ) in the states of Colorado, Utah. and Wyoming. Colorado Division of Wildlife, Ft. Collins. 24 pp.: Young, M.K. 2008. Colorado River cutthroat trout: a technical conservation assessment. General Technical Report RMRS-GTR · 207-WWW. USDA Forest Service, Rocky Mountain Research Station, Ft. Collins, Colorado.). The CRCT Conservation Strategy is very specific in its (illegible) to manage for the conservation of this species. Strategy 7 under Physical Conservation Activities states: Manage entire watersheds: Impacts outside the riparian zone should be considered as part of CRCT management. Land m01 Iagement agencies should work to mitigate adverse impacts of watershed activities on water quality, instream habitat, channel morphology, riparian areas, and population stability (CRCT Conservation Strategy, page 18). While No Surface Occupancy (NSO) stipulations within a set distance of a stream occupied by cutthroat trout or a stream suitable for reintroduction are a good sta I t, a "setback" stipulation is limiting in its accountability toward stream integrity. A stream is only as good as the integrity of its watershed, from ridge-top to ridge top. By only protecting streamside (illegible), we fail to acknowledge that upland land uses - along with surface disturbances along tributary streams - can have serious negative impacts to water quality and in turn aquatic biota in larger, trout bearing streams. The Beaverhead-Deerlodge National Forest (BHDLNF) in Montana recognized this reality and recently adopted a watershed management approach in its 2009 Revised Forest Plan Revised (Beaverhead-Deerlodge Revised Land and Resource Management Plan, January, 2009). In doing so, the BHDLNF implemented for all Key Watersheds' with cutthroat trout, an NSO stipulation that covers the entire drainage. For watersheds containing conservation populations of cutthroat trout outside of Key Watersheds. the BHDLNF put in place a CSU stipulation that requires no net sediment increase over existing conditions. |

**Table C-5**
**Issue 1: Air Quality, Water, and Soil**

| Comment ID | Comment |
|---|---|
| 2159 | Agricultural demands and impacts to water remains high and 92% of the water in Colorado is diverted from streams and aquifers and used for agriculture (Thomas S.2007. Water under pressure: Colorado's threatened water resources. Environment Colorado Research and Policy Center, Denver.). By implementing more adaptable and stronger riparian management actions in the RMP revision, livestock grazing impacts to stream habitat would be lessened. Currently it is estimated that livestock grazing is considered a nonpoint source pollution and is known to negatively affect the habitat of 33% of pure CRCT populations( www.fws.gov/mountain-prairie/species/fish/crct/Petitiontolist.pdf). |
| 2160 | TU suggests that the RMP revision include strong language that mandates Best Management Practices for stormwater runoff, road construction, agricultural and energy development activities. By incorporating these practices, erosion and pollutants associated with energy and agricultural operations can be minimized. |
| 2161 | Finally, please include the latest extensive water quality report for southwest Colorado being prepared by the Colorado Oil and Gas Conservation Commission staff (http://cogcc.state.co.us/staffreport) |
| 2162 | For all the reasons identified above, Colorado TV urges the UFO RMP Planning Team to analyze the benefits and implement a watershed management approach similar to the one taken by the Beaverhead - Deerlodge National Forest, especially within watersheds that contain conservation populations of Colorado River cutthroat trout or watersheds that are suitable for reintroducing Colorado River cutthroat trout and provide protections in the form of NSOINGD stipulations. |
| 2322 | As our nation's population grows, it will be ever more important to protect our wild lands and watersheds, to insure that we have clean water and space to "recharge" ourselves away from populated areas. |
| 2326 | Please, don't allow development that can pollute the ground water and streams. Many companies say they don't cause pollution but don't follow through on that promise. |
| 2378 | The RMP's scientists should also self-evidently impose strict limits upon uranium and other mining, to protect our land, air and water from atmospheric and water emissions, run-off and other poisonings. |
| 2401 | I recently watched a TV documentary on the "fracking" method of extracting gas and oil in Colorado and other states that is highly hazardous to the health of residents due to the resulting water supply contamination. The devaluation of homes and property in the affected areas was devastating, but the worst ramification was the severe, chronic and irreversible health issues suffered by humans and animals. PLEASE do not allow unrestricted mining! |
| 2482 | The RMP should impose strict limits on uranium and other mining to protect our land, air (need to impose strict air quality standards in addition to Federal requirements), and water, especially our subsurface water aquifers. |
| 2618 | Maintenance of water tables in riparian and wetland areas should be a mandate because water is precious in arid environments and BLM should not sacrifice soil and ground water storage to activities such as grazing and trampling of livestock or OHVs. Buffers for all uses must be established to restore these degraded systems. They should be closed to livestock to control coliform pollution, provide a buffer to protect water quality, limit erosion and sedimentation and due to the importance for wildlife. |
| 2668 | We need to conserve our wilderness and our area of clean water. |
| | ***Soil Resources*** |
| 602 | In areas where there are soil erosion concerns or other environmental concerns, activities may need to be restricted. |
| 1229 | In addition to the Wild & Scenic Rivers eligibility there are several areas within the RMP planning process which warrant additional comment. Travel Management, Water Quality and Soils are of concern to the River District. |
| 2146 | The UFO RMP Preparation Plan identifies sedimentary rocks throughout the planning area that erode into soils containing gypsuro and selenium minerals. Dissolved concentration and loads of these two $I I Its in local rivers can create water quality concerns for humans, animals, and plants. Ttl requests that complete and update soil profiles be included in the new RMP. There is considerable research available that illustrates the negative and long-term impacts sedimentation and erosion have on a resource, whether it is to plants, air quality, riparian areas or streams, rivers, and lakes. |
| 2147 | In the interest of future energy development in these areas, TU suggests stronger setback implementations using No Surface Occupancy/No Ground Disturbance stipulations (NSO/NGD) and reclamation standards that |

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 197 of 301

**Table C-5**
**Issue 1: Air Quality, Water, and Soil**

| Comment ID | Comment |
|---|---|
| | prevent disturbance to sensitive soils while incorporating stipulations for other less sensitive but erodible areas. |
| 2148 | The presence of coldwater fisheries, including the Colorado River cutthroat trout which occupy this resource area, arc vulnerable to soil erosion and sedimentation. Effects on fish include direct and sub-lethal effects that could threaten the existence of coldwater fisheries. Mortality, disease, reproduction, growth and behavioral impacts, and impacts to the fisheries food supply can be linked to sedimentation issues. The control of sedimentation dynamics is once of the most beneficial services that can occur with successful management of sensitive soil areas. This includes the management of riparian areas adjacent to coldwater fishery systems (C.F. Rabeni. and M.A. Smale. 1995. Effects of Siltation 011 Stream Fishes and the Potential Mitigaring Role of the Buffering Riparian Zone. Hydrobiologia. 303(1-3):p. 211-219). By implementing larger riparian setbacks or buffer zones into the RMP in sensitive areas, the UFO will be able to maintain biological diversity, native species populations, and provide opportunity for the diverse multiple uses which occur within this resource planning area. Further discussion and suggestions for riparian and stream protection follows. |

BLM_0067110

**Table C-6**
**Issue 1: Drought Management/Climate Change**

| Comment ID | Comment |
|---|---|
| 156 | In addition, an accurate analysis of climate, precipitation and land health must be considered for a meaningful analysis. |
| 260 | Drought Management/Climate Change- Drought and climate change and management actions dealing with those situations may have an adverse effect on our ability to provide water for our projects. |
| 283 | I would like to see further expansion of an adaptive management paradigm that seeks to balance stakeholder input with the scientific and technical expertise of agency staff (botanists, hydrologists, archaeologists and range managers). This could include: adjusting stocking rates to buffer against projected increases in mean air temperature and evapotranspiration; restricting or eliminating non-renewable energy and mineral extraction that threatens ground and surface water with contamination; and controlling invasive species where they directly threaten native ecosystem integrity. |
| 971 | Increasing need to protect lands due to increasing drought and increasing demand and use by OHV's by restricting and limited OHV's and restricting and limiting livestock grazing. |
| 1941 | Analysis of impacts will consider potential interaction between management decisions and changes in the larger social and ecological context. In particular, impacts will be analyzed to consider potential interaction with larger-scale dynamics such as climate change; proliferation of invasive species, insects, disease and wildfire; exurban development; changing recreational patterns, and the like. |
| 2022 | Climate Change and wildlife corridors Among the many initiatives addressing climate we note an interagency Forest Service/BLM effort, focused on the Gunnison Gorge and coordinated by Betsy Neely of the Nature Conservancy. The group is looking at the science and apparently meeting regularly. Wildlife connectivity is being addressed by, among many others, Paul Beier of the University of Arizona. |
| 2152 | Protecting water quality requires more than the conservation efforts of headwater stream (illegible) conservation efforts. Or development avoidance of riparian zones. Climate change discussion and management implications should be included in the revised RMP. In Colorado, air temperatures have already waned by -2 degrees F in the past 30 years (Colorado Water Conservation Board. 2008. Colorado climate change: A synthesis to support water resource management and adaptation. Climate Change in Colorado. University of Colorado at Boulder. http://cwch.state.co.IlslHomeiClimateChange/ClimateChangeInColoradoReport;D. By conserving and using water more efficiently, restoring riparian and stream areas, managing water quality, and providing management guidelines for protecting sensitive trout and aquatic species, we will increase the ability to adapt to climate change fluctuations and dissipations (Williams, J .E.. A.L. Haak, N.G.Giliespie, H.M. Neville, and W.T. Colyer. 2007. Healing troubled waters: preparing trout and salmon habitat for a changing climate. Trout Unlimited, Arlington, Virginia. Available: www.tu.org; Williams, .LE .. A.L. Haak, H.M. Neville, and W.T. Colyer. 2009. Potential consequences of climate change 10 persistence of cutthroat trout populations. North American Journal of Fisheries Management 29:533-548. 2009). |
| 2315 | I would also ask you, as managers of our public lands, to take into consideration the larger picture of global warming. I quote Amory Lovins from Rocky Mtn. Institute "We have the technology now for solving this issue of global warming." I am wondering why we continue to pursue drilling for fossil fuels, when we clearly need to change our energy sources to renewable. When, if not now, can this vital issue be addressed? I am asking you to please take this larger issue into consideration during your current resource management plan revision. |
| 2613 | Drought management should close all allotments during years of below normal precipitation due to the long recovery times for native plants when grazed and during dry years. This is especially the case for plant communities and soils that are already damaged. Forage should be allocated 100% to wildlife and watershed protection during below normal years, which occur more than half the time. |
| 2838 | Climate Change The Uncompahgre planning area will undoubtedly experience real effects of climate change during the 20 year period that the RMP is in effect. The RMP must analyze climate change both in terms of mitigating contributions to climate change from management decisions and adapting to inevitable impacts of climate change. We strongly encourage BLM to address the impacts of climate change both from land management actions and to the resource area in this planning revision. There is a global scientific consensus that human-induced climate change is currently altering the landscape and ecological functions at an unprecedented rate. According to the U.S. Climate Change Science Program, the Southwest landscape could be greatly transformed due to drought, wildfire, invasive species, and rising temperatures (4°F to 10°F above the historical baseline). It is imperative that BLM, as the primary landowner in the area, consider, analyze, and mitigate the impacts of global climate change in this management plan revision. |

**Table C-6**
**Issue I: Drought Management/Climate Change**

| Comment ID | Comment |
|---|---|
| 2839 | BLM must take a hard look at climate change impacts to the ecosystem from climate change include shrinking water resources; dust-covered snowpack causing earlier, faster snowmelt; invasion of more flammable non-native plant species; soil erosion; loss of wildlife habitat; and larger, hotter wildfires. Many of these impacts have been catalogued in recent studies by federal agencies showing the impacts of climate change specifically in the United States such as the recent report entitled Global Climate Change Impacts in the United States, available at http://www.globalchange.gov/publications/reports/scientific-assessments/us-impacts. On September 14, 2009, Interior Secretary Salazar issued Secretarial Order (S.O.) No. 3289. This order unequivocally mandates all agencies within the Department of Interior to "analyze potential climate change impacts when undertaking long-range planning exercises, setting priorities for scientific research and investigations, developing multi-year management plans, and making major decisions regarding potential use of resources under the Department's purview." S.O. 3289, incorporating S.O. 3226 (emphasis added). The Uncompahgre RMP revision falls squarely under this guidance and BLM must assess impacts from the proposed actions that may directly, indirectly, or cumulatively result in exacerbating climate change within this document. The BLM must fully analyze the cumulative and incremental impacts of the proposed decisions in the RMP. Center for Biological Diversity v. National Travel Safety and Highway Administration, 538 F.3d 1172,1217 (9th Cir. 2008). In CBD v. NTSHA, the NTSHA failed to provide analysis for the impact of greenhouse gas emissions on climate change and was rebuked by the U.S. Court of Appeals for the Ninth Circuit, which observed that "[the impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." 538 F.3d at 1217. For example, off-road vehicle designations, oil and gas management stipulations, and renewable energy development may significantly increase or reduced greenhouse gas emissions contributing to climate change and must be analyzed under NEPA. Further, NEPA regulations require that NEPA documents address not only the direct effects of federal proposals, but also "reasonably foreseeable" indirect effects. These are defined as: Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b). For example, the U.S. Climate Change Science Program working group published a report on September 11, 2007 which predicts and elaborates on the widespread impact of climate change on public lands arid regions. See U.S. Department of Agriculture, The effects of climate change on agriculture, land resources, water resources and biodiversity, available at http:Uwww.c1imatescience.gov/Library/sap/sap4-3/default.php. That report notes that "the climate changes that we can expect are very likely to continue to have significant effects on the ecosystems of the United States." Id. at 3 (emphasis added). These significant impacts include:<br>• Climate effects on disturbances such as fire, insect outbreaks and wind and ice storms are very likely important in shaping ecosystem structure and function;<br>• Grasslands will transform into woody shrublands with reduced capacity for water absorption and greater vulnerability to channelization and erosion;<br>• Droughts early in the 21st Century are likely to increase rates of perennial plant mortality in arid lands, accelerate rates of erosion and create opportunities for exotic plant invasions;<br>• Proliferation of non-native annual and perennial grasses are virtually certain to predispose sites to fire. The climate-driven dynamics of the fire cycle is likely to become the single most important feature controlling future plant distribution in U.S. arid lands;<br>• Climate change is likely to result in shrinking water resources and place increasing pressure on montane water sources to arid land rivers, and increase competition among all major water depletions in arid land river and riparian ecosystems;<br>• Major disturbances like floods and droughts that structure arid land river corridors are likely to increase in number and intensity (with associated increases in erosion and native plant loss);<br>• Land use change, increased nutrient availability, increasing human water demand and continued pressure from exotic species will act synergistically with climate warming to restructure the rivers and riparian zones of arid lands;<br>• Climate change will increase the erosive impact of precipitation and wind;<br>• Surface soils will become more erodible;<br>• Increases in wind speed and gustiness will likely increase wind erosion. Id. at 9.<br>While these findings are dramatic, the report further notes that "[i]t is likely that these changes will increase over the next several decades in both frequency and magnitude, and it is possible that they will accelerate." 'd. at 23. A report released last year by the Bipartisan Policy Center and edited by the Wildlife Management |

**Table C-6**
**Issue 1: Drought Management/Climate Change**

| Comment ID | Comment |
|---|---|
| | Institute, provides detailed information about the impacts of climate change on fish and game. See http://www.seasonsend.org/downloads/SeasonsEnd.pdf. The Season's End report is not only edited by the Wildlife Management Institute, 28 but quotes a number of biologists in various state fish and game agencies. It is clear from this report that it is indeed possible to use modeling to determine losses of stream habitat for various temperature and climate scenarios. 'd. at 31. Finally, the BLM should take advantage of the special conditions of the landscape to advance the important study of global climate change. Due to the fact that BLM is the primary landowner in the area, it is well-suited to provide a scientific model in ongoing research on global climate change by regularly monitoring and reporting on the ecological conditions of the area. This RMP revision provides BLM with the opportunity to collect vital data on climate change in the region to inform the global scientific community. Recommendation: Pursuant to agency policy and case law, BLM must address the impacts of climate change from the proposed action. We recommend that the EIS for this plan incorporate a landscape-level analysis of how the proposed management decisions may contribute to or assuage climate change. The BLM must also evaluate how predicted shifts in climate may lead to an altered management regime in the future. 28 According to its website, the Institute's work is done by "resource personnel [who] are highly trained and experienced wildlife science and management professionals, typically working away from the public limelight to catalyze and facilitate strategies, actions, decisions and programs to benefit wildlife and wildlife values:' http://www.wildlifemanagementinstitute.org{. It has been in existence for nearly 100 years. |
| 2840 | BLM must develop a range of reasonable alternatives minimizing the adverse effects of climate change from the proposed action In addition to the agencies' duty to take a hard look at the impacts of climate change to and from the proposed vegetation management plan, the agencies must also include a range of alternatives that includes a strategy for mitigating these impacts. CEQ regulations instruct agencies to consider alternatives to their proposed action that will have less of an environmental impact. 40 C.F.R. § ISOO.2(e) states that "[f]ederal agencies shall to the fullest extent possible:: Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." A June 2008 report, prepared by the Environmental Protection Agency, specifically "identifies strategies to address management challenges posed by climate change for a subset of federally protected lands and waters. These strategies can also be broadly applied to other lands and waters managed by governmental or nongovernmental entities." U.S. Climate Change Science Program Final Report, Synthesis and Assessment Product 4.4, "Preliminary Review of Adaptation Options for Climate-Sensitive Ecosystems and Resources" (June 2008), available at http://www.epa.gov/ord/npd/pdfs/gcrpfactsheet SAP-4-4.pdf. This information should be included in the analysis of the proposed action in order to craft a reasonable range of management alternatives for addressing climate change. Recommendations: Proposed alternatives for the RMP should include those that help public lands and resources or proposed projects mitigate climate change or build resiliency to the potential effects of climate change. The RMP should incorporate adaptive management solutions that include monitoring of ecosystem conditions and changing strategies in order to protect the resources of the area and ensure the preservation of important ecosystem services in the face of climate change. |
| 2841 | BLM must take steps to prevent unnecessary or undue degradation from climate change In addition to consideration of impacts from climate change, BLM must also minimize adverse impacts from climate change under FLPMA. FLPMA provides that BLM must "take any action necessary to prevent unnecessary or undue degradation to managed resources." 43 U.S.C. §1732(b). Intertwined with this provision is a similar responsibility for BLM to manage public lands "without permanent impairment to the productivity of the fond and the quality of the environment. "43 U.S.C. §1702(c). These provisions combine to necessitate on-the-ground implementation of climate change policies. Recommendations: Under FLPMA's mandate to prevent unnecessary or undue degradation, BLM must consider how prescriptions in the RMP will minimize adverse impacts of climate change to the resource area. |
| 2842 | BLM must develop adequate monitoring strategy to address unforeseen management challenges in the face of climate change In order to respond to the land management challenges presented by climate change, the agencies must have the best available data as well as a strategy in place to respond to uncertainties as they arise. A vigilant science-based monitoring system should be set out in the RMP in order to address unforeseeable shifts to the ecosystem. A detailed monitoring approach is also required under the BLM's planning regulations: The proposed plan shall establish intervals and standards, as appropriate, for monitoring and evaluation of the plan. Such intervals and standards shall be based on the sensitivity of the resource to the decisions involved and shall provide for evaluation to determine whether mitigation measures are satisfactory, whether there has been significant change in the related plans of other Federal agencies, State or local governments, or Indian tribes, or |

**Table C-6**
**Issue 1: Drought Management/Climate Change**

| Comment ID | Comment |
|---|---|
| | whether there is new data of significance to the plan. The Field Manager shall be responsible for monitoring and evaluating the plan in accordance with the established intervals and standards and at other times as appropriate to determine whether there is sufficient cause to warrant amendment or revision of the plan. 43 C.F.R. § 1610.4-9 (emphasis added). Such vigilant monitoring is absolutely necessary in order to create an effective adaptive management framework in the face of climate change. Recommendation: A vigilant science-based monitoring system should be set out in the RMP in order to address unforeseeable shifts to the ecosystem due to the best available information on climate change. This should include coordination with the DOI's Climate Change Response Council, Regional Climate Change Response Centers, and landscape Conservation Cooperatives as established in S.O. 3289. |

**Table C-7**
**Issue I: Fish and Wildlife**

| Comment ID | Comment |
|---|---|
| 2789 | Wildlife Viability Science-based wildlife management Given the sizable land management challenges of the coming decades- including federal land management agencies' response to climate change and the complex natural resource dilemmas associated with climate change (Le. species adaptation, extreme variability in natural processes)-it is imperative that the BLM, the Uncompahgre Field Office and this RMP employ effective and efficient science-based planning and analysis methods to support robust and legitimate decision-making processes. The effective application of science to land management planning and decision-making requires three "essential ingredients":<br>• Well-defined, measurable standards (e.g. wildlife population or habitat condition targets), developed via robust public involvement processes<br>• The employment of science-based analytical tools to evaluate compliance with the standards (e.g. population viability analysis, or the spatially explicit Decision Support System recommended by the Western Governors' Association)<br>• Consistent implementation of science-based analysis and decision-making (i.e. dedicated funding for monitoring and science-based adaptive management processes)<br>The Uncompahgre RMP should consider these essential elements as it moves forward with efforts to respond to the pressing land management challenges of the coming decades. Well-defined standards Providing functioning habitat for wildlife and ensuring the long-term persistence of wildlife populations are part of the BLM's responsibilities to manage the public lands for multiple use and sustained yield. FLPMA specifically directs that management of public lands "takes into account the long-term needs of future generations" for Wildlife, as well as other resources, and is implemented toward "achievement and maintenance in perpetuity" 43 U.S.c. §§ 1712(c)(1); 1702(c) and (h). Achieving these goals for wildlife can best be realized by establishing well-defined, measurable standards. The use of well articulated concepts and operational planning practices associated with the literature and practice of population viability assessment may provide Uncompahgre land managers with effective and efficient means of applying science-based conservation methods to wildlife planning decisions. Science-based analytical tools In order to adopt a legitimate, efficient and effective science-based planning framework, the Uncompahgre Field Office should look to the well-established conservation planning and population viability assessment literature, as well as models employed by other BLM units and neighboring agencies. 12 For example, the neighboring Grand Mesa, Uncompahgre and Gunnison (GMUG) National Forests monitor populations of "management indicator species" to measure the effects of management activities on unmeasured species and to provide insights into the integrity of the ecological systems to which they belong. The use of an indicator or focal species approach, in combination with robust knowledge of the link between species and habitats, allows managers an effective means to apply science-based principles to resource management decisions. Species such as the Red-naped sapsucker and northern goshawk (ponderosa pine ecosystems), Brewer's sparrow (sagebrush) and Colorado River cutthroat trout (aquatic) have been identified as key indicator species by the GMUG and have also been identified by Colorado's Comprehensive Wildlife Conservation Strategy and Wildlife Action Plans as species of greatest conservation concern. Indeed, to meet the challenges of 21st century land management and conservation, agencies will need to cooperate on vital management planning activities, including the sharing and co-generation of biological information. Another example of a comprehensive monitoring approach can be found in Appendix 2 "Implementation, Monitoring, and Evaluation Process" - of the Jack Morrow Hills Coordinated Activity Plan, prepared by the Wyoming BLM, available at: http://www.blm.gov/pgdata/etc/medialib/blm/wy/fieldoffices/ rock springs/imhcap/rod.Par.76416.File.dat/31apx02.pdf (and attached). We particularly note the following, as examples of the sort of detail that should be contained in the Uncompahgre RMP:<br>• Table A17-1 Resource Management Indicators - p. 8<br>• Table A17-2 Indicator Detail- pp. 9-11<br>• Table A17-3 Measurement Detail-pp. 12-14<br>• Figure A17-3 CAP Management Process - p. 16<br>• Discussion of the JMH CAP - pp. 20-21 Landscape-level planning<br>The adoption of a science-based approach to RMP development is also consistent with the agency's commitments in the Health lands Initiative (HLI). HLI is premised on the BLM's recognition of major changes to the landscape arising from population growth, energy development and global warming. The goal of HU is "to preserve the diversity and productivity of public and private lands across the landscape." HLI is to be implemented through specific projects, which will "enable and encourage local BLM managers to set priorities across a broader scale and mitigate impacts to an array of resources in ways not previously available to them" |

**Table C-7**
**Issue 1: Fish and Wildlife**

| Comment ID | Comment |
|---|---|
| | and "give managers flexibility to identify lands where a particular resource might be emphasized in order to encourage sustained health and balance across a broader ecosystem or landscape." See, generally, HLI Factsheet at: http://www.blm.gov/pgdata/etc/medialib/blm/wo/Communications Directorate/public affairs/healthy lands initiative.Par.80058.File.dat/HII-National FY09.pdf. Implementation of the management approach described above will further support efforts to address habitat fragmentation and climate change, as discussed in later sections of these scoping comments. Recommendations: The Uncompahgre RMP should adopt planning and decision-making processes (including data collection, analysis, and monitoring) that employ measurable planning objectives at multiple biological scales (i.e. fish and wildlife populations, habitat and ecosystem conditions) to ensure viable wildlife populations. This recommendation is strongly echoed by the Western Governors' Association's Wildlife Corridor Initiative (http://www.westgov.org/index.php?option=com content&view=article&id=123&Itemid=68) and the Sportsmen for Responsible Energy Development's Recommendations for Responsible Oil and Gas Development (www.sportsmen4responsibleenergy.org). 11 Rohlf, D.J. 2004. Science, Law, and Policy in Managing Natural Resources: Toward a Sound Mix Rather than a Sound Bite. Pages 127·142 in K. Arabas and J. Bowersox, editors. Forestfutures: science, politics, and policy for the next century. Rowman and Littlefield, Lanham, Maryland, USA. 12 See U.S. Department of Agriculture, Committee of Scientists. (March 15, 1999). Sustaining the People's Lands: Recommendations for Stewardship of the National Forests and Grasslands into the Next Century, from http://www.fs.fed.us!emc!nfma!includes!cosreport!Commlttee%20of%20Sclentists%20Report.htm. |
| 31 | Many of these questions and concerns relate to our belief- which is supported by the Prep Plan and H-1601- that the RMP should consider landscape scale planning of conservation of wildlife habitat and non damaging uses much more strongly than has been done in the past. This should mean considering core areas of natural habitat and corridors connecting them, especially when planning for travel management and extractive resource development, such as oil and gas development with surface occupancy. |
| 48 | Management of remaining wildlife on public lands has become more important with the inevitable fragmentation of adjoining private land. This has to be considered by land management agencies and they must take a larger scale approach to planning. Any possible action to help plan, encourage or fund conservation easements on adjoining land is now worth it. |
| 49 | Priority species could include the remaining predators (mountain lion, bear, raptors), migratory big game (deer, elk), and some obligates (Pinyon Jay) of the habitat for which UFO is primarily responsible. |
| 50 | All of the bats from the State BLM Sensitive list that are in the UFO area Should be protected by protecting caves, shafts and structures and by improving and protecting riparian areas. |
| 51 | Current or historic Peregrine Falcon nests should be undisturbed. |
| 52 | In the case of obligate species for each habitat type, it might be easier to focus on the habitat. In either case, all of the UFO habitat types are important. In addition to riparian, sage, and semi-desert mentioned above, PJ and mountain shrub are very important for a variety of wildlife. |
| 56 | It is the responsibility of all land management agencies to monitor bird populations. |
| 57 | Planning for wildlife habitat and less damaging human uses, and preserving BLM land for future generations should be as high or higher priority as extractive uses and motorized recreation. |
| 58 | This planning [for wildlife habitat] should consider core areas of important habitat, and how to connect them, not just shunting wildlife onto what is left over from other uses. Not all uses can occur in all areas. |
| 337 | Saltado Creek Canyon is a spectacular steep sided, deep and wild canyon adjoining the San Miguel River canyon. It is the only major tributary canyon/stream to SMR that has no roads or bridges. It is a key wildlife corridor connecting Uncompahgre Plateau to the Delores Mountains and wilderness areas to south. The current level of access should be maintained and no further development of access should occur. It should be designated a "wild" river section as proposed in the WSR Eligibility Report. Hunting and grazing should be maintained with the possible exception of better protection for riparian habitat from cattle. No motorized access, other than emergency vehicles or maintenance, should be allowed. This area should be managed with wildlife being the predominant management goal. It is also prime Lynx habitat. |
| 344 | Wolves: some serious thought should be given to management of wolf populations now that there is evidence that wolves are likely beginning to penetrate the state from the northwest. While a future issue it is likely that within the life span of the RMP this issue will crop up. It would also be a very positive development as it might |

**Table C-7**
**Issue 1: Fish and Wildlife**

| Comment ID | Comment |
|---|---|
| | naturally and positively impact many issues in our region such as destruction of riparian areas, over population of elk, etc. |
| 349 | Specie Creek Canyon/Creek would benefit from habitat restoration. |
| 395 | The canyons with water often have good riparian habitat where bird density and diversity reaches its highest point anywhere on the Colorado Plateau. |
| 400 | I have a complete list of birds that Brenda and I observed for Colorado Breeding Bird Atlas I that we did twenty years ago. We are currently doing it all over again for Colorado Breeding Bird Atlas II. The bird study area includes parts of Nyswonger Mesa, lower La Sal Creek, part of Dolores Canyon, lower Wild Steer Canyon and the northwest corner of Skein Mesa. Our atlas work is available to anyone that would like the data or can use it. A direct comparison over a twenty year period gives this bird data a particular value. |
| 493 | Ranching, placer mining, uranium mining, wildlife developments, recreation are among some of the areas for growth. |
| 517 | Furthermore, the Monitor Creek drainage is a sanctuary for resident elk herds as well as bear. Any improved access to the Monitor Creek drainage in the vicinity of Monitor Mesa would destroy this habitat. |
| 530 | Finally, wildlife corridors should be maintained whenever new development of any kind is contemplated. The barriers resulting from new roads and structures can be devastating to migrating animals. |
| 555 | The UFO also supports populations of both Rocky Mountain and Desert bighorn sheep. Rocky Mountain bighorn are present on and adjacent to BLM lands near Sawpit and Deep Creek. Desert bighorn occupy portions of the Uncompahgre Plateau from Big Dominguez Creek to the Roubideau. Science and research demonstrate that wild sheep can acquire various diseases through contact with domestic sheep. The most damaging is 6 pasturella which can lead to massive die offs of bighorn. There are presently active domestic sheep allotments that overlap with both Rocky Mountain and Desert bighorn herds within the UFO. The RMP should include policy and direction to complete risk assessments for these sheep allotments that determine the potential of contact between wild and domestic sheep. Any risk of contact should be eliminated by removing the domestic sheep from the allotments or implementing management actions that will prevent or minimize contact between wild and domestic sheep. Primary ranges for wild sheep should be identified and managed for these native species. Any active or inactive domestic sheep allotments that overlap these wild sheep habitats should be closed to sheep grazing or trailing. Placing a time limit of five years to complete this action should be included in the RMP to resolve any conflicts before we loose the wild sheep. |
| 588 | Disturbance to wildlife should be minimized. |
| 614 | I would like to support any of your efforts that would maintain the natural habitat of the BLM areas under review. I think the unfragmented habitat and ecosystem are important for the wildlife, as well as human enjoyment. |
| 801 | My husband and I love the fact that we live on the edge of this great public land. We love hearing the coyotes howling out there. |
| 970 | Need for seasonal closures to protect big game winter range and provide security areas for wildlife. |
| 1000 | Many uses can be compatible with preserving these systems if done carefully. Grazing, hunting and wildlife management should be done with more attention given to the health of the ecosystem than to the size of the "harvest." |
| 1171 | The effects of resource management activities on area ecology, including vegetation, wildlife and its habitats, as well as recreational hunting and fishing activities, should be disclosed and evaluated in the RMPIEIS. This is particularly important for the WSAs and ACECs contained in the planning area. Important vegetative issues include reclamation activities supportive of pre-existing land uses (e.g., wildlife habitat), noxious weed management, and any adverse impacts to BLM State sensitive plants, and/or compliance with executive orders concerning invasive species, flood plains, or wetlands and riparian zones. Important wildlife issues include compliance with BLM, USFWS, or State wildlife management objectives, wildlife mortality, crucial wildlife habitat, adverse impacts to breeding or nesting activities, disruption of migratory routes, increased wildlife harassment, hunting pressure, wildlife displacement, and/or any adverse effects to Endangered Species Act listed threatened or endangered species, USFWS listed or proposed species, or BLM State sensitive wildlife or fish species. BLM should examine these issues together with cumulative impacts from other development. The RMP/EIS should include mitigation measures that may be undertaken to minimize or eliminate adverse impacts |

**Table C-7**
**Issue 1: Fish and Wildlife**

| Comment ID | Comment |
|---|---|
| | from the alternatives considered. Monitoring and routine inspections of the restored areas should occur. If necessary, watering may. Temporarily be needed to ensure successful re-vegetation. |
| 1195 | With regard to the 40-acre tract that straddles the Uncompahgre River and includes the RiverWay Trail, the Town notes the specific importance of this tract in terms of trail connectivity, wildlife (the site is occupied by many species including deer, fox, badger, herons and roosting bald eagles), and passive recreational uses including picnicking, hiking and wildlife viewing. Notably, the parcel abuts a Town owned park (Dennis Weaver Memorial Park) and trail connectivity and possible pedestrian bridge access may be enhanced between these two parcels. The Town would like to partner with BLM in meaningful ways to explore these ideas and assist in the needed stewardship of this 40-acre parcel. |
| 1942 | Analysis of impacts will consider potential interaction between management decisions and changes in the larger social and ecological context. In particular, impacts will be analyzed to consider potential interaction with larger-scale dynamics such as climate change; proliferation of invasive species, insects, disease and wildfire; exurban development; changing recreational patterns, and the like. |
| 1963 | We encourage BLM coordination with other agencies, including the Forest Service (USFS) and Fish and Wildlife Service (FWS), to ensure protection of the extended riparian ecosystem. A guideline for inter-agency coordination is presented in the Unified Federal Policy for a Watershed Approach to Federal Land and Resource Management (UFP). Effective since October 2000, this policy is "intended to provide a framework to enhance watershed management for the protection and the health of ecosystems on Federal lands" (2). The UFP is not a regulation, nor does it establish a regulatory program. However, it does call on inter-agency collaboration to restore and protect water resources within the framework of existing laws and regulations. Because many of the eligible segments originate on USFS lands before flowing through BLM lands, we ask that the two agencies work together to ensure the protection and enhancement of water resources and aquatic ecosystems. Furthermore, the presence of endangered species in many segments should involve the FWS in the decision-making process. This collaboration would facilitate conservation practices that consider the entire riparian ecosystem, not just the individual BLM-administered segments. The RMP revision process is an opportune time for the BLM, USFS and FWS to work together to better protect and enhance the riparian ecosystems and their wildlife. |
| 1990 | Reducing route densities UFO wildlife populations in the UFO are increasingly stressed by human access spreading into previously less-used places via ORV and mountain bike proliferation, shed anterling, lion hunting, rock climbing, etc., in combination with mining, grazing and other traditional uses. |
| 2004 | Seasonal closures These are important, follow DOW recommendations |
| 2058 | Wildlife Habitat & Sensitive Species Management Given the diversity of flora and fauna range and habitat found in this portion of the Dolores basin -Mule Deer, Elk, and Wild Turkey winter range as well as Gunnison Prairie Dog colonies and the location of three CNHP Potential Conservation Areas (Dolores Canyon South, Dolores River -Slick Rock to Bedrock, and Dolores River-Uravan to Roc Creek) -great care should be taken to follow the planning and management guidance for these resources as outlined in the "Wildlife Viability", "Special Status Species/Plants", and "Travel Management" sections of the broader conservation group comments referenced earlier. We also encourage the incorporation of directives outlined by the Center For Native Ecosystems in their scoping comments. |
| 2063 | This is an outstanding natural landscape, which includes several unique plant and animal communities and provides one of the most spectacular recreational boating experiences in the country |
| 2082 | Plus, the overwhelming need on this particular landscape is not for ~motorized routes, but for more unroaded, undisturbed backcountry for wildlife and quiet users alike! |
| 2084 | Next Steps Identifying less roaded areas like this could be a first step in identifying other values that make these lands worth protecting. As an example, we visually correlated the highlighted areas with maps of deer severe winter range and elk winter concentration areas, to hone in on their wildlife values. Several of the areas for example are used by wintering big game. |
| 2091 | Final Step The final step involves management direction, giving the areas non motorized and perhaps nonmechanized management prescriptions, identifying levels of protection for plants and wildlife, levels and intensities of quiet use, whether the areas will be identified as ERMAs or SRMAs, finding citizen adopt groups, etc. |

**Table C-7**
**Issue 1: Fish and Wildlife**

| Comment ID | Comment |
|---|---|
| 2101 | Saw Tooth Ridge is in mule deer severe winter range. |
| 2103 | The area contains an elk winter concentration area according to the enclosed elk map. |
| 2105 | The PCA doubles as an elk winter concentration area according to the enclosed map. The combined areas have a diversity of vegetation and rare plants, and likely many other worthwhile values that could be identified by overlaying GIS resource maps. |
| 2108 | Rock Creek/Carpenter Flats North of Saucer Basin is a steep southern wall of Rock Creek Canyon that appears to be roadless and worthy of study. Deep canyons and tributaries like these are epicenters of biodiversity on this exposed landscape harboring a rich diversity of birds including cliff-dwelling raptors and unique plant and riparian communities. Regarding biodiversity in western states one estimate is that 98% is found in riparian corridors. |
| 2113 | Nyswonger Mesa is an example of an area that should be actively analyzed by the BLM for its forage and wildlife values and for its potential to be set aside as a rare and needed quiet use area. |
| 2116 | Sharp Canyon West of Nyswonger Mesa another roadless area is marked on the map in the vicinity of Sharp Canyon. This area is in an elk winter concentration area and further GIS analysis would likely show other values that would benefit from keeping the area non-motorized. |
| 2119 | Wray Mesa While not roadless, we note that this area is Desert big horn sheep habitat with good condition grasslands. It needs to have a spring seasonal motorized closure to protect big game. |
| 2134 | The BLM should detail in the UFO RMP how public lands within the UFO management unit will be managed for a balance of uses, as required by the Federal Land Policy and Management Act (FLPMA). The FLPMA mandates multiple-use on BLM administered lands. The RMP must address the current and future effects of management and development on outdoor recreation and fish and wildlife conservation with regard to several key species including elk, mule deer, trout, bighorn sheep, pronghorn antelope, turkey, black bear and mountain lion |
| 2141 | Under CEQ NEPA regulations, BLM must make use of all the best available scientific information to assess the effects of land management actions, including cumulative effects from existing, proposed, or foreseeable development projects in the resource management area. Referenced below are peer-reviewed scientific studies on the impacts on sage grouse, elk, and mule deer from vehicle traffic, roads, and oil and gas development. The information from these studies should be incorporated into the UFO draft RMP and DEIS. |
| 2142 | Sage Grouse: Connelly, J. W., S. T. Knick, M. A. Schroeder, and S. J. Stiver. 2004. Conservation assessment of greater sage-grouse and sagebrush habitats. Western Association of Fish and Wildlife Agencies, Cheyenne, Wyoming, USA. Colorado Greater Sage-Grouse Conservation Plan Steering Committee. 2008. The Colorado Greater Sage-Grouse Conservation Plan. Colorado Division of Wildlife. Denver, CO. Unpublished Report. Holloran, Matt J. 2005. Greater sage-grouse (Centrocercus urophaisianus) population response to natural gas field development in western Wyoming. PhD Dissertation, Univ. of Wyoming. Laramie, WY. 211 pp. Available at: http://www.sagebrushsea.org/ Walker, B. L., D. E. Naugle, and K. E. Doherty. 2007. Greater sage-grouse population response to energy development and habitat loss. Journal of Wildlife Management. Available at: http://www.forestry.umt.edu/personnel/faculty/dnaugle/pdfs/Sage-grouse%20Lek%20Analysis_JWM(in_press).pdf Doherty, K. E., D. E. Naugle, B. L. Walker, and J.M. Graham. 2008. Greater sage- grouse winter habitat selection and energy development. Journal of Wildlife Management. Available at: http://www.forestry.umt.edu/personnel/faculty/dnaugle/pdfs/Sagegrouse%20winter%20habitat%20and%20energy_JWM(in_press).pdf Stiver, S.J., A.D. Apa, J.R. Bohne, S.D. Bunnell, P.A. Deibert, S.C. Gardner, M.A. Hilliard, C.W. McCarthy, and M.A. Schroeder. 2006. Greater sage-grouse comprehensive conservation strategy. Western Association of Fish and Wildlife Agencies. Unpublished report. Cheyenne, Wyoming |
| 2143 | Moving forward with the RMP and EIS process we expect the specific comments and recommendations found in this document to be addressed. We also expect the UFO RMP to directly address the ecological requirements of several key game species including mule deer, elk, turkey, mountain lion, desert and rocky mountain bighorn sheep, black bear, pronghorn antelope, sage-grouse and trout in relation to BLM administered lands in the management unit. These species' ecological requirements should be addressed by a specific plan of action in the form of a habitat and/or species management plan or similar and should occur on all relevant spatial scales to ensure proper management and coordination over the short- and long-term. Special considerations must be given to the high-valued and often-used hunting areas outlined earlier. |
| 2144 | In our view, there needs to be a new strategy to conserve fish and wildlife habitat and associated hunting and |

**Table C-7**
**Issue 1: Fish and Wildlife**

| Comment ID | Comment |
|---|---|
| | fishing recreation while minerals are being extracted from all federal public lands, including BLM lands. The current strategy employed by BLM in Wyoming, Colorado, Utah and other states, has and is resulting in unreasonable losses of fish and wildlife resource values that hunters and anglers believe are avoidable with a new approach to public lands management. The TRCP stands ready to assist the UFO in devising a RMP that balances the needs of fish, wildlife and their habitat with responsible energy development. |
| 2171 | We have provided specific considerations for native fish habitat (both occupied and potential habitat) management that includes the enhancement, protection and landscape or watershed scale habitat recognition. Incorporating updated mapping scenarios, wildlife and fish data from state resource management agencies, and applying best management practices to energy and livestock development activities all lend themselves to better fish and wildlife management. |
| 2172 | Identification of big game migration corridors will be key to protecting the integrity of big game populations and providing the hunting public some measure of assurance for future hunting opportunities. |
| 2173 | Similarly, by increasing buffers within riparian zones to protect fisheries and associated ecosystems, anglers can expect continued fishing Success and quality fishing experiences. |
| 2191 | We urge you to preserve BLM land for future generations and to favor the following low-impact uses: Large blocks of undisturbed, unfragmented habitat. Corridors of natural habitat that protect core areas. Integrity of ecosystems and wildlife habitat. |
| 2234 | Prairie dogs and associated species. The UFO can play a major role in recovering prairie dogs and species dependent on prairie dogs by managing to increase prairie dog numbers and to increase the area occupied by large prairie dog towns. Burrowing owl, (wintering) feruginous hawk, golden eagle, long-nosed leopard lizard, and kit fox could be preserved by good conservation of the two prairie dog species' habitats. Management actions could include restrictions on motorized travel, restrictions on shooting in prairie dog habitat, prohibiting surface disturbance due to oil and gas drilling, and managing vegetation to benefit prairie dogs, notably control of cheat grass and other weeds. |
| 2237 | Bighorn sheep The UFO supports populations of both Rocky Mountain and desert bighorn sheep. Rocky Mountain bighorn are present on and adjacent to BLM lands near Sawpit and Deep Creek. Desert bighorn occupy portions of the Uncompahgre Plateau from Big Dominguez Creek to the Roubideau. Research demonstrates that domestic sheep can give wild sheep disease, including pasturella, which can cause massive die offs of bighorn. There are presently active domestic sheep allotments that overlap both Rocky Mountain and desert bighorn herds within the UFO. The RMP should plan to gradually phase out allotments that overlap wild sheep habitat. |
| 2239 | Yellow-Billed Cuckoo The BLM should protect all riparian areas that are capable of supporting any cottonwood species in order to increase the low population of Yellow-Billed Cuckoos. The desired outcome for Yellow-Billed Cuckoo would be protection of all riparian areas that are capable of supporting any cottonwood species, and increasing the low population of cuckoos. This would require eliminating tamarisks and Russian knapweed, (and replacing them with native species), encouraging regeneration of cottonwoods, and maintaining large areas of large shrubs beneath and adjacent to the cottonwoods. This would also benefit countless other species of birds, bats and other wildlife. Willows may not affect cuckoos but are critical for other species. |
| 2240 | Fish, Wildlife and Migratory Birds: Management of remaining wildlife on public lands has become more important with the inevitable fragmentation of adjoining private land. This has to be considered by land management agencies and they must take a larger scale approach to planning. Any possible action to help plan, encourage or fund conservation easements on adjoining land is now worth it. |
| 2241 | Priority species and habitats (in addition to SSS): Priority species could include the remaining predators (mountain lion, bear, raptors), migratory big game (deer, elk), and some obligates (Pinyon Jay) of the habitat for which UFO is primarily responsible. All of the bats from the State BLM Sensitive list that are in the UFO area should be protected by protecting caves, shafts and structures and by improving and protecting riparian areas. Current or historic Peregrine Falcon nests should be undisturbed. In the case of obligate species for each habitat type, it might be easier to focus on the habitat. In either case, all of the UFO habitat types are important. In addition to riparian, sage, and semi-desert mentioned above, PJ and mountain shrub are very important for a variety of wildlife. Desired conditions of all of these habitats are more late seral stages than usually exist now, less fragmentation and better connectivity, and fewer weeds. The shrubs/understory are very important to wildlife in PJs and riparian areas. Non-native weeds are especially important in riparian areas and semi-desert |

**Table C-7**
**Issue 1: Fish and Wildlife**

| Comment ID | Comment |
|---|---|
| | shrub habitat. Rocky Mountain Bird Observatory studies being done for the Tamarisk Coalition on the Colorado Plateau Rivers show that all bird species are less common when tamarisk make up most of the understory. Literature that indicates tamarisk may not be quite as bad may be comparing them to no understory, rather than to native shrubs. Any management activity that affects native vegetation seems to affect some wildlife species. |
| 2356 | Thank you for the opportunity to comment on the Uncompahgre RMP revision. i have on these lands during my early middle years. I remember the Uncompahgre Field Area and I I was enamored of its wilderness-quality lands, wild rivers, and opportunities for quiet, backcountry recreation. The resource area is also home to important and imperiled wildlife, such as Gunnison sage grouse, that rely on large intact tracts of habitat free from roads and other infrastructure. |
| 2358 | We want our kids to see the animals we have seen. |
| 2403 | I recently watched a TV documentary on the "fracking" method of extracting gas and oil in Colorado and other states that is highly hazardous to the health of residents due to the resulting water supply contamination. The devaluation of homes and property in the affected areas was devastating, but the worst ramification was the severe, chronic and irreversible health issues suffered by humans and animals. PLEASE do not allow unrestricted mining! |
| 2407 | There are also endangered wildlife here that need us to protect this place. |
| 2473 | Colorado the Beautiful....but not for long. If all the unique landscape is changed and all the wildlife with it. Think about it. |
| 2586 | I can't tell you how important it is to me and to the wildlife to protect this unique area. |
| 2619 | Predator Control should be eliminated and let natural processes occur. Owners of livestock grazed on public lands must accept this risk. It is time to allow coyotes, foxes, badgers, ravens, mountain lions and others to function in their role of keeping deer out of riparian zones, controlling rodent populations, consuming carrion and providing the ecosystem benefits that come with predators. Livestock owners should not be allowed to kill predators as there are many methods they can use to protect their livestock that don't result in killing of predators. |
| 2628 | The DEIS must analyze the role and values of predators in controlling rodent populations and fulfilling their role in a healthy ecosystem. This is addressed here under Livestock issues because the reason predators are persecuted is the failure of the livestock industry to manage their livestock and the blame is placed on predators for losses. Studies have documented the importance of predators to restoration of plant communities, particularly riparian and aspen areas. These have correlated loss of cottonwood recruitment with extirpation of wolves and increased elk browsing in Yellowstone NP; demonstrated the loss of cottonwood recruitment and riparian degradation in Zion NP where cougar populations have been eliminated, resulting in deer consumption of cottonwood seedlings, while in areas with cougars, healthy riparian areas and cottonwood recruitment occur; postulated the elk/wolf relationship in YNP will rebalance plant community structure, including aspen; in Banff NP, wolf exclusion decreased aspen recruitment, willow production and increased browsing intensity; and documented aspen decline associated with removal of wolves in YNP. In addition to the role of predators in restoring ecosystem function, predator control efforts cost lives in helicopter crashes and other means; disturb non-target wildlife with helicopters, airplanes, off-road vehicles and human disturbance; and place humans and their pets at risk from M44s, snares, leg-hold traps and other obnoxious means. BLM must take a pro-active stance in eliminating this practice as it represents a basic conflict between livestock, wildlife and recreational users |
| 2637 | Road densities must be analyzed nor have their effects on wildlife been analyzed. Researchers, including those with the Forest Service have documented the effects of roads and OHVs on wildlife and the benefits of roadless areas. For example, Gilbert , Noss and Wisdom et al describe the detrimental effects of road density and human activity on large mammals causing large displacements away from roads and mechanized activity. |
| 2670 | We are losing species every day to extinction. |
| 2750 | Our wildlife is essential to everyone, please do not let anyone or anything destroy it. |
| 2773 | Support wildlife in their struggle to survive. |

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 209 of 301

**Table C-8**
**Issue 1: Vegetation**

| Comment ID | Comment |
|---|---|
| | ***Vegetation- General*** |
| 60 | All of the UFO's habitat types are important for some species, and most of those species need more larger, older vegetation. Both the overstory and understory should be in the historic range of variability of age classes. |
| 36 | Desired outcomes for vegetation would be to have a pre-settlement variety of age classes. |
| 37 | Late seral/old growth should not be disturbed, since it is almost always underrepresented and is required for most obligate bird species in all habitat types. |
| 40 | Natural fire regimes and protection from motorized travel and oil and gas surface occupancy should be considered in landscape scale planning for natural vegetation. |
| 53 | Desired conditions of all of these habitats [all UFO habitat types] are more late seral stages than usually exit now, less fragmentation / better connectivity, and much fewer weeds. |
| 54 | The shrubs/understory are very important to wildlife in PJs and riparian areas. |
| 285 | I would like to see further expansion of an adaptive management paradigm that seeks to balance stakeholder input with the scientific and technical expertise of agency staff (botanists, hydrologists, archaeologists and range managers). This could include: adjusting stocking rates to buffer against projected increases in mean air temperature and evapotranspiration; restricting or eliminating non-renewable energy and mineral extraction that threatens ground and surface water with contamination; and controlling invasive species where they directly threaten native ecosystem integrity. |
| 553 | The UFO has done an excellent job of actively managing vegetation diversity and production through wildfire rehab, prescribed burning, and mechanical treatments such as roller chopping, mowing, and harrowing. The RMP should include policy to continue these vegetation treatments on big game winter ranges to maintain carrying capacity on public lands. As I mentioned before, this program needs to include closing the project area roads and firelines to OHV's to maintain habitat effectiveness of these treatments. The UFO also needs to institute seasonal restrictions on all motorized vehicles on big game winter ranges in coordination with the US Forest Service to fully achieve the benefits of these vegetation treatments. |
| 596 | The BLM should attempt to improve the condition of lands within the planning area that do not meet standards. Since it is generally less costly to prevent problems, "lands that meet standards, but with problems" should also be considered for improvement to problem areas. Where there is a large amount of public impact, areas shouldn't be left to function "naturally" because they will be degraded over time. Public usage in these areas may need to be restricted. |
| 598 | Keeping land in optimum condition can also minimize wildfire risk. |
| 656 | Western is currently conducting tree removal activities along its rights-of-way and within its stationary facilities to ensure we are in compliance with national standards for electric reliability. These standards were established by the North American Electric Reliability Council under provisions of the Energy Policy Act of2005. Western developed a transmission vegetation management program to address reliability and designed a desired condition where vegetation within the transmission line right-of-way is maintained as a stable, low growth plant community, and the edges of the right-of-way are feathered to blur or diminish the linear characteristic of the right-of-way itself. In addition Western's program provides allowances for taller trees in riparian areas, viewsheds, and as traffic screens. We are available to meet with the Uncompahgre Field Office staff to discuss working together in a collaborative and cooperative manner to achieve outcomes desirable to both agencies. We believe our vegetation management program can support the BLM in reaching its vegetation and resource management goals. |
| 704 | I am cognizant of the fact that BLM manages its public lands under the principle of multiple use and sustained use, and must provide a balance between usage, and protection of its resources. It is my observation that BLM is doing a good job in managing livestock grazing, vegetation management for both logging and wildlife habitat, and in watershed protection. |
| 813 | As the Western Slope Botanist of Colorado Natural Heritage Program (CNHP), and a resident of Ridgway, this plan is personally important to me. My major interest is management of vegetation and rare plants. |
| 816 | Continue to survey for rare plants and update existing records. Require private contractors who conduct rare plant surveys to submit element occurrence records to CNHP as part of their contract. |
| 818 | Vegetation management: Recognize the value and scarcity of old growth pinyon-juniper woodlands, and refrain |

BLM_0067122

**Table C-8**
**Issue I: Vegetation**

| Comment ID | Comment |
|---|---|
| | from treatments to set them back to an earlier seral stage. |
| 819 | Proceed cautiously with vegetation treatments, and require pre-and post-treatment monitoring to measure the success of treatments. |
| 822 | Make every effort to require re-seeding with only native species. |
| 823 | Continue efforts to collect native seed in situ. |
| 859 | After weeds have been eradicated, native seed needs planted. Having read many of the local history books, and speaking to so many ranching families that have been in the area for several generations, I believe there used to be a lot more grass on the plateau. |
| 877 | Areas the BLM allows dispersed collection of vegetation products or public harvest need to be monitored, on the ground during and after a season of harvest is allowed. |
| 878 | Currently, no one monitors Christmas tree cutting on BLM lands north of the Transfer Road. It is very disheartening to see the beautiful, old juniper and cedar trees that are cut down each year and hauled out. Some of the trees have just been topped, tall stumps left behind and trash. People drive off road, right up to the tree they cut. The Pinion have died from the IPS beetle, is it really necessary to take more trees out? Very few of the trees we see removed have a tag on them, so we assume the cutters do not have a permit. Many years there are very few pinion nuts. Last year they had a fungus. Maybe 1 in 100 was good. (I took a sampling in to the USFS to find this out) Deer, elk, jays, and rock squirrels are just a few of the creatures who eat them in the late summer and fall, winter too if there's no snow on the ground covering them. Along with acorns, pinion nuts provide fat in the diet of wildlife. It can't be that an area is only monitored every ten years, as nature changes course sometimes in just one season. Deer and elk hang out heavily on lower BLM lands in the winter. These areas are close to town, so they are the places where people go to collect. This consistently takes food away from wildlife year after year. It's OK to bring a halt to harvesting. Yes, some people will scream. Education is crucial to help people understand the necessity of closures. Have to get people to "feel ownership" of public lands, by caring for them. |
| 879 | Waterways should be a priority, as invasive weed seeds are carried by water, and weed growth spreads quickly along the banks. |
| 880 | Areas also need addressed quickly, as in road construction, mineral extraction. |
| 1048 | More areas should be roller chopped and seeded to provide a better habitat for deer and elk. |
| 1170 | The effects of resource management activities on area ecology, including vegetation, wildlife and its habitats, as well as recreational hunting and fishing activities, should be disclosed and evaluated in the RMPIEIS. This is particularly important for the WSAs and ACECs contained in the planning area. Important vegetative issues include reclamation activities supportive of pre-existing land uses (e.g., wildlife habitat), noxious weed management, and any adverse impacts to BLM State sensitive plants, and/or compliance with executive orders concerning invasive species, flood plains, or wetlands and riparian zones. Important wildlife issues include compliance with BLM, USFWS, or State wildlife management objectives, wildlife mortality, crucial wildlife habitat, adverse impacts to breeding or nesting activities, disruption of migratory routes, increased wildlife harassment, hunting pressure, wildlife displacement, and/or any adverse effects to Endangered Species Act listed threatened or endangered species, USFWS listed or proposed species, or BLM State sensitive wildlife or fish species. BLM should examine these issues together with cumulative impacts from other development. The RMP/EIS should include mitigation measures that may be undertaken to minimize or eliminate adverse impacts from the alternatives considered. Monitoring and routine inspections of the restored areas should occur. If necessary, watering may. Temporarily be needed to ensure successful re-vegetation. |
| 2005 | Close vegetation treatment roads Vegetation treatments should not be done without the necessary resources and a plan to close all new roads. A new policy is urgently needed on this. |
| 2021 | Rare plants we encourage the BLM to protect Montane riparian forest Narrowleaf cottonwood/skunkbrush San Rafael Milkvetch Naturita Milkvetch Hellebonne Sage Sparrow Gray Vireo Peregrine falcon Canyon Treefrog Payson lupine Mariposa lily |
| 2023 | BLM Land Health Standards The Land Health Standard RMP Handout appeared to indicate the majority of UFO lands meeting standards, which is great if true. We recommend the UFO meet or exceed CO BLM state Land Health Standards for maintaining healthy watersheds, riparian areas, upland vegetation, water quality, soils and functioning habitat. A robust weed program is essential and we appreciate the weeding and restoration of |

**Table C-8**
**Issue I: Vegetation**

| Comment ID | Comment |
|---|---|
| | cottonwood and willow riparian ecosystem the UFO has been doing. |
| 2062 | This is an outstanding natural landscape, which includes several unique plant and animal communities and provides one of the most spectacular recreational boating experiences in the country |
| 2070 | Importance of less-roaded lands Due to their less roaded condition these areas may be among the few left on the landscape where vegetation is relatively intact, where forage, soil, water courses, archeologic, paleontologic and historic resources are relatively undisturbed and where wildlife security, silence, solitude, quiet use, hunting, wildlife viewing and other such qualities can still can be found. |
| 2106 | The PCA doubles as an elk winter concentration area according to the enclosed map. The combined areas have a diversity of vegetation and rare plants, and likely many other worthwhile values that could be identified by overlaying GIS resource maps. |
| 2109 | Rock Creek/Carpenter Flats North of Saucer Basin is a steep southern wall of Rock Creek Canyon that appears to be roadless and worthy of study. Deep canyons and tributaries like these are epicenters of biodiversity on this exposed landscape harboring a rich diversity of birds including cliff-dwelling raptors and unique plant and riparian communities. Regarding biodiversity in western states one estimate is that 98% is found in riparian corridors. |
| 2112 | Nyswonger Mesa is an example of an area that should be actively analyzed by the BLM for its forage and wildlife values and for its potential to be set aside as a rare and needed quiet use area. |
| 2168 | The BLM should include stronger management prescriptions for upland and riparian vegetation management. Dm: to the sensitive soil regimes that exist within this resource area, increasing the surface management stipulations to minimi7.e erosion, sedimentation, and weed infestation will benefit the sensitive and threatened and endangered fish, wildlife and plant species identification of critical habitat and management applications and mitigation parameters will help guide future energy development activities and livestock management activities. |
| 2192 | Undisturbed late seral stages of vegetation, which are increasingly rare, and upon which many species depend. |
| 2238 | Clay-loving buckwheat. All populations should have total protection from any damaging uses, especially travel |
| 2243 | All of the UFO's habitat types are important for some species, and many of those species need advanced seral stages or mature trees and other vegetation. Management should strive to ensure that both the overstory and understory of any vegetation type should be in the historic range of variability of age classes. Our primary concern is that the BLM maintain and restore healthy, functioning ecosystems and wildlife habitat. The UFO should meet or exceed the State BLM Land Health Standards pertaining to "Upland soils," "Riparian Systems," "Healthy, productive plant and animal communities," Threatened and Endangered species, and "Water quality." |
| 2244 | Vegetative treatments, such as prescribed burning and mechanical brush removal, should focus on areas that are degraded because of past heavy grazing and that need improvement to support continued grazing |
| 2250 | Harvesting by people of vegetative products should be directed toward areas slated for treatment, and/or close to well-used roads |
| 2487 | This comment on the Uncompahgre RMP revision supports adding an option calling for complete habitat restoration in the Uncompahgre RMP revision. |
| 2612 | Rangeland Health is used as a goal, yet RH, like PFC is subjective, has not been documented to result in improved conditions and is a subjective measure with great bias. Reference areas should be the standard and these should be ungrazed, and their characteristics used to judge conditions in areas grazed or used for mining, oil and gas, oil shale, tar sands, and other extractive or land disturbing uses. |
| 2824 | Retaining and Restoring Natural Forest Ecosystems Section 201 of FLPMA mandates that BLM inventory the resources of the public lands, their resources and values. 43 U.S.C. § 1711. The Preparation Plan for the RMP revision states that "[t]he Uncompahgre Field Office manages small areas of spruce/fir forests and ponderosa pine forests, and large areas of pinyon-juniper woodlands." The BLM must carefully inventory its forest resources and evaluate alternatives that do not cause adverse environmental impacts and unnecessary and undue degradation. The RMP should analyze impacts to forest resources and identify ways to minimize and mitigate these impacts for each type of forest ecosystem. We discuss management recommendations for each forest type in relevant detail below. Pinyon-Juniper Ecosystem a. Ecology According to recent research, pinyon-juniper (p-j) forests can be classified as one of the tree types as follows: 1) Persistent p-j. Canopy can range from sparse, with only scattered trees, to a fairly dense, closed canopy. Soils may be rocky and unproductive to |

**Table C-8**
**Issue 1: Vegetation**

| Comment ID | Comment |
|---|---|
| | deeper and moderately productive, but this type is more often found on the former. Understory can consist of a variable cover of gasses, forbs, and shrubs, but in the dense canopied stands, any understory will be sparse. Fires probably varies in frequency, but rotations were usually quite long (440+ years), and most fires were stand-replacing. 2) P-j savanna. This type has a low to moderate density and cover of p-j, with a well-developed and nearly continuous understory of grass, along with some forbs. Shrubs, if they exist, are usually only a minor component. This type is most often found where summer precipitation constitutes a high proportion of the average annual total. The natural disturbance regime for this type is not well understood. 3) Wooded shrubland. The p-j component in this type varies from sparse to relatively dense. Shrubs constitute the main portion of the understory, and there are varying amounts of grasses and forbs. This type is most often found where winter precipitation is dominant. Fires tended to be high intensity events that killed all or most of the trees and top-killed all of the shrubs. See Romme et al, 2008, and Romme et al, 2009. It is not likely that the area covered by the Uncompahgre Field Office has or had much of type 2. See Romme et al, 2009, at 126. Extensive field research is needed to determine which types exist and what the disturbance, composition, and structural history is of each stand or area containing p-j. It is commonly thought that the increase in density and coverage of p-j forests since the beginning of the 20th Century has been caused by fire suppression, i.e., that the lack of low-intensity fire that formerly burned off young trees has allowed p-j forests to grow much more dense. In reality, the situation is more complicated than this simple scenario, and in the planning area, it does not appear to be true at all. In the persistent p-j type, fire suppression cannot be said to be responsible for any increase in density of p-j because fire was very infrequent in this type. Romme et al, 2008, 2009. It is also likely that that there are factors other than fire suppression that are helping to drive increases in p-j densities in all three of its types, including: climate change (warming since the end of the little ice age 12,000 years ago) that is favorable to tree growth; recovery from past disturbances (such as intensive logging, especially during the mining era14; chaining, a common practice in the 1950s and '60s; and periodic, and often intense, insect-caused mortality in pinyon pine); and livestock grazing, which probably favors tree persistence and increased tree density15, as has occurred on the Uncompahgre Plateau16. The relative importance of each of these in shaping our current p-j ecosystems is unknown. Romme et al, 2008. Increased atmospheric carbon dioxide, occurring from human use of fossil fuels, would also favor growth of trees, once established, over other vegetation. If fire was frequent in any of the p-j types, fire scars and dead trees would likely be easy to find. But, according to Romme et al 2008, they are quite rare or absent in areas where studies have been done. This would tend to indicate that fire may not have been frequent in any of the p-j types. Shinneman and Baker, in a study on the Uncompahgre Plateau published in 2009 (a), confirmed these findings. These researches found no fire scars on live trees, but they did find charred snags and charcoal in 41 percent of the plots they surveyed. This strongly indicates that low-intensity fires never or seldom occurred (or were so minor in coverage and frequency that any evidence of them has disappeared), while higher-severity, stand-replacement type fires did occur. Based on the data they gathered and analyzed, a fire return interval of 400-600 years in areas with p-j stands on the Plateau is suggested by the researchers. Id. Shinneman and Baker, id., also found considerable establishment of pinyon following an extended, and often severe, drought in the area that lasted from about 1620 to 1820. In other words, pinyon is responding to more favorable conditions in the last 200 years to reestablish itself on the landscape. It is important to note that the beginning of this period well precedes human settlement, which is said to have begun in earnest around 1880. Pinyon may also be have started recovering from heavy mortality from drought and from attacks of ips con/usus, a bark beetle that ravaged pinyon pine in Colorado in 2002 through about 2004. Romme et al, 2008, noted that any net increase in p-j trees may be small when viewed over a long time period, as periods of increasing density are balanced by periods of extensive mortality. In the planning area, this is much more true for pinyon than juniper, as the latter species seemed to maintain a relatively steady density over 500 years. shinneman and Baker, 2009a. b. Effects From Human Use While fire suppression does not appear to have affected vegetation in the planning area, other factors have, especially livestock grazing. Shinneman et al, 2008 found that the semi-arid ecosystems of the Uncompahgre Plateau have experienced significant declines in grass and forb cover, biological soil crust cover, native species richness, compositional evenness, and relative species abundance, occurring at both stand- and landscape-levels. Shinneman et al, 2008, at 223. This research also found that sites with the heaviest p-j overstory removal via chaining were among the most degraded, while sites that had a light thinning of p-j were less degraded. Shinneman and Baker, 2009b, cite numerous studies linking sites degraded by grazing to cheatgrass invasion. c. Restoration Needs Restoration should focus on: a) retaining existing sites with minimal degradation from natural conditions, b) removal or reduction of activities causing degradation, such as livestock grazing, and c) active restoration of some of the most degraded sites by restoring native gasses, forbs, and shrubs and eliminating or reducing non-native species. Restoring native plant species will not be easy. First, removal of non-native plant species will be necessary, especially cheatgrass (Bromus |

**Table C-8**
**Issue 1: Vegetation**

| Comment ID | Comment |
|---|---|
| | tectorum). However, complete eradication of this species is not likely. See Goodrich and Huber, 1999. See also Goodrich and Rooks, 1999, who stated that cheatgrass is "explosively invading" and "highly competitive" against native species. They recommend use of non-natives to reduce the invasion of cheatgrass, especially after a large fire. However, Shinneman and Baker, 2009b, found no difference in cheatgrass coverage in areas seeded versus those not seeded after fires on the Uncompahgre Plateau. Introduced, non-native species almost always outcompete native species. See Walker, 1999. See also Erskine and Goodrich, 1999, who found dominance by introduced annuals or seeded species after fire in p-j stands with closed canopies. That means that introduced species will tend to dominate such sites, making it harder, and maybe impossible, to restore native biological diversity. It may not be possible to completely remove or greatly reduce livestock grazing. If so, other strategies can be employed such as: exclusion of stock from the most sensitive areas, seasonal closures, reduction of time that grazing is allowed in certain areas, and reduction in the number of animals allowed to graze. If native plant species are not present, removal of livestock alone will not restore these species. Seeding will be necessary. However, seeding could cause undesirable impacts, if e. g., motorized equipment or even humans walking over large areas destroyed or damaged biological crust while dropping or drilling seed. Therefore, lower-impact methods should be used, such as aerial seeding. The same seed mix should not be used over a large area, even if it consists solely of native species, as this could reduce diversity of native plant over the area seeded. See Shinneman et al, 2008. Old-growth stands should be retained. Old growth p-j stands are more structurally complex than other stands and provide habitat for many bird species. See Miller et al, 1999. It is hard to say how p-j old growth stands should be defined, but Mehl, 1992 provides a good start. It may be necessary to consider site-specific data on stand history in determining what constitutes p-j old-growth in any location. d. Management Recommendations 1. Inventory the planning area's p-j stands. To properly manage p-j, whether that means active management or not, information on the current condition (composition and structure) and the historical disturbance regimes of these areas is essential. A considerable amount of data has already be gathered for the Shinneman and Baker, 2009 study discussed above; this data can be used along with other data that is gathered. Since there is much uncertainty about the history of most p-j stands, any stands where any manipulation will be allowed should be thoroughly field surveyed. Manipulation includes, but is not limited to: commercial and non-commercial wood cutting, thinning, prescribed fire, fire use (prescribed fire after natural ignitions), extensive and/or heavy livestock grazing, roller chopping, and chaining or cabling of pj. The ever present danger is that without site-specific knowledge, any management, no matter how well intended, could result in the affected areas becoming even further outside the range of historical variability, thus making any future restoration efforts even more difficult or impossible. 2. Collect seed of native grasses, forbs, and shrubs. Use these seeds in restoration projects, or after large fires, as appropriate. 3. Reduction of pinyon and juniper via chaining, cabling, and/or logging is not necessary, and would not in any way aid restoration of native species or historical stand structures and composition. Trees whose origin pre-date human settlement (beginning around 1880) should not be killed for any reason unless they constitute a hazard (such as falling across a road open to public use). 4. Eradicate exotic species to the degree practicable. Areas open to public motor vehicle use and those that have been heavily and/or persistently grazed by livestock will be the areas most likely to have weeds. Management should be directed to favor establishment and persistence of native plant species over introduced non-natives. The most important weed to eradicate or control is cheatgrass. Native species should be used for reseeding to the maximum degree possible. 5. Consider reducing or eliminating livestock grazing in areas where continuation of it: would further ecologically degrade vegetation, damage soils, damage riparian areas, or hinder active or passive restoration efforts. Grazing must not be allowed in areas with the best representations of native grasses, forbs, and shrubs, i..., those sits with Rank 1 in Shinneman and Baker, 2oo9a. 6. Retain old-growth stands. See discussion above under RESTORATION NEEDS. 7. Do not allow large commercial sales of any products from p-j stands. Light activity, such as fuelwood gathering, is acceptable. Any logging should be confined to areas accessible by or very near existing roads. Logging for any purpose should generally be limited to trees that have established since human settlement, but not all such trees should be cut in anyone stand or area. 8. Restore stands toward historical conditions where possible. This would include reestablishment of native vegetation. Where such vegetation is present, prohibiting activities that tend to harm vegetation, such as livestock grazing, motor vehicle use, and commercial logging, may be sufficient to start achieving restoration of native species. In severely degraded areas, reseeding and/or planting will be necessary. 9. Closely monitor all activities, using appropriate control sites for before and after comparisons. Monitoring is particularly necessary to assess the effectiveness of any restoration efforts. It is also very important after fire, to assess cheatgrass invasion, establishment of native species, and soil stability. 14 See Young and Svejcar, 1999. 15 See Goodrich and Reid, 1999. 16 See Shinneman, 2006. |
| 2826 | Ponderosa Pine Ecosystem Ponderosa pine ecosystems in Colorado were shaped by fire. Fires likely burned at |

**Table C-8**
**Issue 1: Vegetation**

| Comment ID | Comment |
|---|---|
| | variable intervals and intensities, i.e., some fires were low-severity, burning ground vegetation and small trees and maintaining open, park-like tree stands, while others were stand-replacing events. A study of ponderosa pine and mixed conifer stands on the Uncompahgre Plateau found that fire suppression over the last 125 years has likely increased the density of ponderosa pine stands somewhat. See Binkley et al, 2008, but see cautionary note for application on p. 11 of that publication. a. Management Recommendations 1. The Uncompahgre Field Office should inventory its ponderosa pine stands for the following attributes: tree species composition, tree stand structure and density, old growth characteristics (see Mehl, 1992), percent of trees with origin after human settlement, evidence of fire (such as scars on live trees), native versus non-native understory plant composition, and wildlife species' presence. 2. Dense ponderosa pine stands composed primarily of trees of post-settlement origin can be thinned to reduce the threat of an unnaturally hot stand-replacing fire. Generally, only some (not all- see below) of the younger (origin after 1879 ^17), smaller trees should be removed. This would be most appropriate in the lower-elevation ponderosa-dominated stands, as these stands likely had the most frequent fire and thus likely have been changed the most by fire suppression. At the higher elevations of ponderosa pine, stands may have historically been dense at times, and if so, they should have minimal to no thinning. 18 3. Old growth stands must be conserved. A light thinning of young trees may be appropriate in such stands, if post-settlement trees are dense. 4. Fire should be gradually reintroduced into ponderosa-dominated stands, to the extent feasible, over time. To avoid a very hot, stand replacing fire in dense stands that would be outside the range of natural variability, some stands will have to first be thinned. Again, removal should concentrate on smaller diameter trees, particularly those that form fire ladders into the crowns of large, older trees. Also, gambel oak (known as oakbrush) may have to be reduced where it exists with ponderosa pine prior to any burning to avoid post-fire domination of the sites by oakbrush. See Binkley et al, id., at 10. 5. Large Douglas-fir trees should be retained, as they likely existed prior to fire suppression. Some small Douglas-fir should also be retained to ensure retention of conifer trees in case ponderosa pine become infested by bark beetles. Some smaller, younger ponderosa should also be retained for the same purpose. 6. Results of all activity must be monitored. Items to look for include: weed infestation and/or spread, conifer tree regeneration, gambel oak sprouting, effects of any livestock grazing, and ground vegetation response to activities. Control areas will need to be established prior to any activity to allow before and after comparisons. 17 This corresponds to the time of settlement of the area by European descendants, and it is also, according to Binkley et al, Id., the year of a major fire on the Plateau. 18 Binkley et al note that the mixed-conifer forests on the Plateau they sampled appear to be largely within the range of historic variability (HRV). Id. at 9,13. It thus stands to reason that some of the highest elevation stands dominated by ponderosa pine would also be within the HRV. |
| 2827 | Spruce-Fir Ecosystem This ecosystem occurs at the higher elevations of forested areas in Colorado, generally above about 9,000 feet. These ecosystems have not been affected by fire suppression, as the fire return interval is in the hundreds of years. Due to the short growing season and harsh conditions, recovery from disturbances, natural and human, takes a very long time. No active management is needed or justified in this ecosystem. The one exception might be after a large, stand-replacement fire, where soil stabilization might be needed in a few areas to help conserve water quality. |
| | ***Vegetation- Noxious Weeds*** |
| 2795 | The RMP revision must address noxious weeds and propose mitigation strategies. Noxious weeds are a real threat throughout the West, and this is especially true in areas that may become infested with cheatgrass, and in places where soils are actively being disturbed. The BLM must limit surface disturbance whenever possible and implement Integrated Pest Management strategies in conjunction with all surface-disturbing activities in order to contain noxious weeds. The agency must monitor the efficacy of noxious weed containment after surface disturbance, and use the results of the monitoring to both provide realistic analyses of the effects of disturbance in planning for future projects, and to design projects that are more resistant to noxious weed proliferation. RMP revision should seriously address this threat. |
| 59 | Non-native weeds have transformed important habitat to much less productive habitat. This serious problem deserves more attention. |
| 38 | No reasonable expense should be spared in combating non-native weeds. Priority should be given to those which totally transform landscapes and habitat, such as cheatgrass and tamarisks. |
| 39 | Weed control should use the best available science, and is a good place to mention adaptive management, rather than detail how to do it in the RMP. |
| 55 | Non-native weeds are especially important in riparian areas and semi-desert shrub habitat. Rocky Mountain Bird |

**Table C-8**
**Issue 1: Vegetation**

| Comment ID | Comment |
|---|---|
| | Observatory studies being done for the Tamarisk Coalition on the Colorado Plateau Rivers show that /all/ bird species are less common when tamarisk make up most of the understory. Literature that indicates tamarisk may not be quite as bad may be comparing them to no understory, rather than to native shrubs. Any management activity that affects native vegetation seems to affect some wildlife species. |
| 597 | Weed management is important. |
| 821 | Aggressively control weeds, especially Russian knapweed, cheatgrass and tamarisk. |
| 852 | The BLM's use of herbicides. As a licensed wildlife rehabilitator for the CO Div. of Wildlife (CDOW) and US Fish and Wildlife Service (USFWS) I have personally cared for poisoned wildlife. The majority that have been poisoned are raptors and songbirds, but raccoons, cottontails, mice, mink, waterfowl, deer, elk, amphibians, reptiles, beneficial insects, and many others can all be poisoned by herbicides. These creatures come in extremely ill, they smell, have abnormal feces, vomiting, dehydrated. It is rare that one can be saved. Herbicides also kill insects= food for many creatures. Because of my direct experience in dealing with the consequences of poisons, I am not in favor of the massive use of herbicides, pesticides or chemical fertilizers on public or private lands. |
| 854 | Beneficial Bugs can also be used to control noxious weeds. They have already been proven useful on tamarisk and knapweed. There are 3 weevils that are known to help control knapweed. |
| 855 | As much as possible, BLM should use PRISON workers to manually pull or mow weeds. Using prison labor is positive for them. It puts our tax dollars to work. It spares the environment and wildlife the severe consequences of using herbicides. Prison labor can dig, cut or pull cocklebur, burdock, oxeye daisy and others. |
| 856 | I have been very successful on our ranch and grazing allotments (except for Marsh reservoirs 1 & 2) hand pulling cocklebur (annual) and cutting burdock down in its second year (biennial) around all ponds. Cattle will graze the tops off knapweed in flowering stage. I would also like to see the use of goats to selectively graze weeds. There are several people in the Montrose area who already move their goats to different pastures needing weed management, just for the purpose of having pasture to feed them. Some people hire the herd out. Americorps also does weed abatement projects. |
| 858 | Selective burning also works on some weeds, such as cocklebur in ponds. * (My comments here also apply to section 6.2 "Managing for Livestock and Against Weeds") |
| 1042 | I always like to end my emails to the BLM with the friendly reminder that removing cattle from public lands will not affect the price of cattle by 1 cent in our grocery stores and that the noxious weeds are spreading at a rate of 5,000 acres per day. |
| 1172 | EPA supports the goal of preventing the introduction and spread of invasive plants and noxious weeds. Among the greatest threats to biodiversity is the spread of noxious weeds and exotic (non-indigenous) plants. Many noxious weeds can out-compete native plants and produce a mono culture that has little or no plant species diversity or benefit to wildlife. Noxious weeds tend to gain a foothold where there is disturbance in the ecosystem. Oil and gas development activities, grazing, and off highway vehicle (OHV) use can cause such a disturbance. While we support integrated weed management, including the effective mix of education and prevention with biological, mechanical, and chemical management, we encourage prioritization of management techniques that focus on non-chemical treatments first. Reliance on herbicides should be a last resort. Early recognition and control of new infestations is essential to stopping the spread of infestation and avoiding future widespread use of herbicides, which could correspondingly have more adverse impacts on biodiversity and nearby water quality. There are a number of prevention measures available, such as reseeding disturbed areas as soon as possible and cleaning equipment and tires prior to transportation to an un-infested area. The RMP/EIS should list the noxious weeds and exotic plants that occur in the resource area. In cases where noxious weeds are a threat, EPA recommends the document detail a strategy for prevention, early detection of invasion, and control procedures for each species. |
| 1191 | Specific to the Community Assessment, we would like to emphasize the Partnership Opportunities that have been articulated. The Assessment provides the following: * Most groups would like municipal and county governments, community residents, and organizations and clubs to cooperate with BLM on trail planning (including the route designation process) and maintenance, as well as on noxious weeds management. * Some groups would like municipal governments and community residents to work with BLM on improving access from towns to BLM public lands. These are indeed points raised and supported by the Town of Ridgway. |

**Table C-8**
**Issue 1: Vegetation**

| Comment ID | Comment |
|---|---|
| 1698 | The RMP should prohibit aerial spraying of pesticides and toxicants on public land. Avoid application of herbicides to broad areas (>80 acre patches) in any single season. |
| 1701 | I am particularly concerned about gas development and pesticide use on public lands. I live in Oregon, but I use natural gas in my home, and we are being told that we don't liquefied natural gas terminals on the Columbia River (I agree with this!) because our gas can come from the Rockies! However, I'm aware that gas drilling in that area comes with huge potential costs, including water pollution. Although gas is relatively clean burning, the other costs to drilling are often not paid attention to. BLM lands are public lands, therefore I request that they be managed in a way that preserves them as much as possible in their natural state and that minimizes effects on climate change. |
| 1708 | Please strongly consider alternatives to aerial spraying. |
| 2245 | Areas with infestations of weeds should not be burned or mechanically treated until pretreatments have been done to prevent further infestations during or after the treatment. |
| 2246 | The RMP should prohibit aerial spraying of pesticides and toxicants on public land. |
| 2247 | Avoid application of herbicides to broad areas (>80 acre patches) in any single season |
| 2248 | If APHIS becomes involved in pest control on adjoining private lands, the UFO's default/starting position for pest control on public lands should be "No Aerial Spray," regardless of whether APHIS has met NEPA requirements. |
| 2249 | Areas that should be left untreated include those that are far from roads, have minimal human and/or grazing intrusion, and have high vegetation diversity and populations of sensitive plants/animals. (See CNHP database to assist in identifying such areas). |
| 2251 | Weed and pest control terms should be defined in the RMP, including the following: Pesticides are chemicals used to control undesirable arthropods; toxicants are chemicals used to control troublesome vertebrates; herbicides are chemicals used to control weeds and/or to adjust the relative competitive advantage of various plants on a site. BLM has some good rules about the use of herbicides, which are not as dangerous as pesticides and toxicants. Nonetheless, the UFO should use herbicides as a last resort when other management options will not suffice. |
| 2256 | Grazing permitees and recreational users should be taught to identify problem weed areas so they can be control before weeds spread. Contact local recreation and environmental groups to solicit volunteers for weed identification and inventory. |
| | ***Wetlands and Riparian Areas*** |
| 1125 | Based on the general information available for review, our initial areas of concern for this upcoming resource management plan include impacts to air quality from energy development, impacts to wetlands, and protection of water resources. We are also concerned with the potential cumulative effects of the increased energy development in the region. Along with identifying direct impacts, the EIS should include a rigorous analysis of indirect and cumulative impacts. The EIS should disclose the impacts of all reasonably foreseeable actions on environmental resources in a way for decision-makers and any participating counties/municipalities to be able to effectively plan to reduce impacts on such resources as much as possible. |
| 1132 | EPA believes wetlands should be afforded the highest level of protection, either through closing certain lands to leasing or through the use of No Surface Occupancy (NSO) stipulations. This is especially true for wetlands and riparian areas of Wilderness Study Areas (WSAs), Areas of Critical Environmental Concern (ACECs), and areas under consideration for Wild and Scenic Rivers designation. We suggest that lease stipulations to protect wetlands be strongly considered. |
| 1134 | EPA recognizes the challenges facing BLM in analyzing, understanding, and ultimately managing wetland resources in such a large planning area. However, the RMP/EIS should describe specifically how wetlands will be identified, avoided, or ultimately mitigated at the project-specific level |
| 1162 | EPA considers the protection, improvement, and restoration of wetlands and riparian areas to be a high priority. Wetlands increase landscape and species diversity and are critical to the protection of designated water uses. Possible impacts on wetlands include damage or improvement to water quality, habitat for aquatic and terrestrial life, channel and bank stability, flood storage, groundwater recharge and discharge, sources of primary production, and recreation and aesthetics. Road and pipeline construction, grazing, land clearing, and |

**Table C-8**
**Issue 1: Vegetation**

| Comment ID | Comment |
|---|---|
| | earthwork generally include sedimentation and hydraulic impacts which at some level may cause changes to surface and subsurface drainage patterns and, ultimately, wetland integrity and function. Riparian habitats, similar to wetlands, are important ecological areas supporting many species of western wildlife. Riparian areas generally lack the amount or duration of water usually present in wetlands, yet are "wetter" than adjacent uplands. Riparian areas increase landscape and species diversity, and are often critical to the protection of water quality and beneficial uses. |
| 1163 | EPA encourages BLM to identify wetlands in the resource management planning area and to plan for appropriate mitigation. We suggest BLM require delineation and marking of perennial seeps, springs and wetlands on maps and on the ground before any activity occurs, so efforts may be made to protect them. We also recommend establishment of wetland and riparian habitat 100-foot buffer zones to avoid adverse impacts to streams, wetlands, and riparian areas. Due to the time it can take to adequately reclaim some disturbed wetlands, EPA suggests that BLM require mitigation of wetland disturbance during the project operating time, and that mitigation for any particular wetland or riparian area begin concurrent with the disturbance, or even prior to project construction, if possible. As studies indicate that traditional mitigation is generally not successful in fully restoring wetland function, BLM should require a minimum of two-to-one mitigation of wetland disturbance. The EIS should specify general mitigation requirements, and require any specific projects to generate a wetland mitigation plan. |
| 1164 | EPA believes wetlands should be afforded the highest level of protection, either through closing certain lands to leasing or through the use of No Surface Occupancy (NSO) stipulations. This is especially true for wetlands and riparian areas of Wilderness Study Areas (WSAs), Areas of Critical Environmental Concern (ACECs), and areas under consideration for Wild and Scenic Rivers designation. We suggest that lease stipulations to protect wetlands be strongly considered. In addition, for travel management in the planning area, EPA recommends BLM give preference to routes that do not have sensitive soils, wetlands, stream crossings, critical habitat, meadows, etc. |
| 1165 | EPA recognizes the challenges facing BLM in analyzing, understanding, and ultimately managing wetland resources in such a large planning area. However, the RMP/EIS should describe specifically how wetlands will be identified, avoided, or ultimately mitigated at the project-specific level. The discussion should address situations with private land/federal minerals and federal land/federal minerals. In order to illustrate effects to wetlands in the area, the EIS should specifically include the following analyses or descriptions:<br>• Clear maps, including wetland delineation and regional water features;<br>• Wetland delineation and descriptions including wetlands function analysis if there is any potential that the project will cause impacts;<br>• Detailed analysis of the direct, indirect and cumulative impacts to all wetlands in the system [immediate, directly impacted, or potentially hydrologically impacted but spatially removed from the actual construction footprint (EO 11990, Protection of Wetlands)]. This analysis should also include the cumulative impacts to wetlands from future development scenarios based on population and growth estimates; and<br>• Potentially adverse impacts to aquatic resources from reasonably foreseeable development should be analyzed. |
| 2110 | Rock Creek/Carpenter Flats North of Saucer Basin is a steep southern wall of Rock Creek Canyon that appears to be roadless and worthy of study. Deep canyons and tributaries like these are epicenters of biodiversity on this exposed landscape harboring a rich diversity of birds including cliff-dwelling raptors and unique plant and riparian communities. Regarding biodiversity in western states one estimate is that 98% is found in riparian corridors. |
| 2369 | Don't destroy those wetlands. Keep them preserved and protected. |
| 2611 | The riparian goal of PFC is totally inadequate because PFC is only a minimal hydrologic evaluation, is highly subjective and biased. PFC does not address habitat or water quality. Regarding stubble height standards, they are ineffective because they are typically not enforced, do not represent use in riparian areas and little strips of sedges do not filter sediment. For filtering sediment, intact riparian areas with vegetated stream banks and fully vegetated riparian areas are needed to reduce erosion and filter sediment. These deficiencies should be addressed by closing all riparian areas to livestock. |
| 2643 | In particular, the Dolores River Valley offers some of the most pristine riparian resources in the entire |

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 218 of 301

**Table C-8**
**Issue 1: Vegetation**

| Comment ID | Comment |
|---|---|
| | Uncompahgre Plateau. |

BLM_0067131

**Table C-9**
**Issue 1: Special Status Species**

| Comment ID | Comment |
|---|---|
| 2792 | We anticipate that the recent changes to the BLM Manual weakening protections for special status species will be overturned by the Obama administration. Therefore we encourage the Uncompahgre Field Office to ensure that it meets the obligations outlined in the special status species portion of the Manual as it appeared before it was weakened and note that these measures are still consistent with the direction of the manual as revised. BLM Manual 6840.06.D set forth the policy for management of Sensitive species: State Directors, usually in cooperation with state wildlife agencies, may designate sensitive species. By definition, the sensitive species designation includes species that could easily become endangered or extinct within a state. Therefore, if sensitive species are designated by a State Director, the protection provided by the policy for candidate species shall be used as the minimum level of protection. Therefore, the BLM must provide Sensitive species with a minimum of candidate-level protection. Candidate species were to be managed as follows: BLM shall carry out management, consistent with the principles of multiple use, for the conservation of candidate species and their habitats and shall ensure that actions authorized, funded, or carried out do not contribute to the need to list any of these species as threatened/endangered. Specifically, BLM shall: Determine the distribution, abundance, reasons for the current status, and habitat needs for candidate species occurring on lands administered by BLM, and evaluate the significance of lands administered by BLM or actions in maintaining those species. For those species where lands administered by BLM or actions have a significant effect on their status, manage the habitat to conserve the species by: - Including candidate species as priority species in land use plans. - Developing and implementing rangewide and/or site-specific management plans for candidate species that include specific habitat and population management objectives designed for recovery, as well as the management strategies necessary to meet those objectives. - Ensuring that BLM activities affecting the habitat of candidate species are carried out in a manner that is consistent with the objectives for those species. - Monitoring populations and habitats of candidate species to determine whether management objectives are being met. Request technical assistance from FWS/NMFS, and any other qualified source, on any planned action that may contribute to the need to list a candidate species as threatened/endangered. BLM Manual 6840.06.C During the RMP revision, the BLM must take a hard look at whether it is meeting these obligations, and make any necessary changes to ensure that special status species are being adequately managed so that the agency is complying with the Manual. The BLM has special duties toward special status species when conducting land use planning. First, BLM must "identify watersheds that may need special protection from the standpoint of human health concerns, aquatic ecosystem health, or other public uses." BLM Land Use Planning Handbook H-1601-1, Appendix Cat 2. For riparian areas within these watersheds, BLM must also identify desired width/depth ratios, streambank conditions, channel substrate conditions, and large woody material characteristics." /d. Second, BLM must "designate priority plant species and habitats, including Special Status Species and populations of plant species recognized as significant for at least one factor such as density, diversity, size, public interest, remnant character, or age." BLM Land Use Planning Handbook H1601-1, Appendix Cat 3. Finally, BLM must "designate priority species and habitats, including Special Status Species, and populations of fish or wildlife species recognized as significant for at least one factor such as density, diversity, size, public interest, remnant character, or age./1 BLM Land Use Planning Handbook H-1601-1, Appendix Cat 7. BLM must also identify the measures necessary for protecting each of these priority areas and species: For priority watersheds and riparian areas, Identify measures, including filing for water rights under state permit procedures, to ensure water availability for multiple use management and functioning, healthy riparian and upland systems. BLM Land Use Planning Handbook H-1601-1, Appendix Cat 2. For priority plant species and habitats, Identify the actions and area-wide use restrictions needed to achieve desired vegetative conditions." BLM Land Use Planning Handbook H-1601-1, Appendix Cat 3. For priority populations, species, or habitats of fish and wildlife, Identify actions and area-wide use restrictions needed to achieve desired population and habitat conditions while maintaining a thriving natural ecological balance and multiple-use relationships." BLM Land Use Planning Handbook H-1601-1, Appendix Cat 7. Also, BLM must Identify site-specific actions, such as riparian fencing, guzzler placement, etc., needed to manage ecosystems for all species and habitat for special status species. BLM land Use Planning Handbook H-1601-1, Appendix Cat 7. Additionally, BLM must: Identify strategies and decisions to conserve and recover special status species. Given the legal mandate to conserve threatened or endangered species and BLM's policy to conserve all Special Status Species, land use planning strategies and decision should result in a reasonable conservation strategy for these species. Land use plan decisions should be clear and sufficiently detailed to enhance habitat or prevent avoidable loss of habitat pending the development and implementation of implementation-level plans. This may include identifying stipulations or criteria that would be applied to implementation actions. Land use plan decisions should be consistent with BLM's mandate to recover listed species and should be consistent with objectives and recommended actions in approved recovery plans, conservation agreements and strategies, MOUs, and applicable biological opinions for threatened and endangered species. BLM Land Use Planning Handbook H- |

**Table C-9**
**Issue 1: Special Status Species**

| Comment ID | Comment |
|---|---|
| | 1601-1, Appendix Cat 5. The BLM Manual's definition of a "Conservation Strategy states: A strategy outlining current activities or threats that are contributing to the decline of a species, along with the actions or strategies needed to reverse or eliminate such a decline or threat. Conservation strategies are generally developed for species of plants and animals that are designated as BLM Sensitive species or that have been determined by the Fish and Wildlife Service or National Marine Fisheries Service to be Federal candidates under the Endangered Species Act. BLM Manual § 1601, Glossary at 2. |
| 41 | The Prep Plan choices of Gunnison Sage-Grouse, Gunnison's and white-tailed prairie dogs, and clay-loving buckwheat are good choices. |
| 42 | If one more [Special Status Species] were added, Yellow-Billed Cuckoo would be a good choice, especially since it represents a different, important habitat. |
| 43 | Burrowing Owl, (wintering) Feruginous Hawk, Golden Eagle, long-nosed leopard lizard, and kit fox could be preserved by good conservation of the two prairie dog species' habitats. |
| 45 | DO would be increase in occupied habitat area and quality of habitat, increase in population of GUSG, increase in connectivity between populations (between the San Miguel Basin population and the Pinon Mesa, Cerro, and Monticello populations, for example) and increased potential for use by GSUG of historic habitat areas that may not be used now. Strategies include reversing permanent loss of habitat trends on private land through conservation easements or fee acquisitions, reducing fragmentation of occupied, potential, and historically used sage habitat by strict travel management policies and by not allowing O&G development, and reducing or eliminating antler hunting in occupied habitat. Quality of habitat should be improved using best science regarding, increase of forbs, reduction of PJs, and protecting wet areas. (Recommendations on connectivity using historic habitat, oil and gas development, and habitat vegetation are addressed in the /San Miguel Basin GUSG Working Group Conservation Plan/ from 2010.) New transmission or other utility lines should not be allowed in Priority Habitats or Special Status Species habitats, but GUSG are probably the most sensitive of any species to them. |
| 47 | DO for Yellow-Billed Cuckoo would be protection of all riparian areas that are capable of supporting any cottonwood species, and increasing the low population of cuckoos. This would require eliminating tamarisks and Russian knapweed, (and replacing them with native species), encouraging regeneration of cottonwoods, and maintaining large areas of large shrubs beneath and adjacent to the cottonwoods. This would also benefit countless other species of birds, bats and other wildlife. Willows may not affect cuckoos but are critical for other species. |
| 551 | The BLM should have an active habitat management program that is focused on landscapes that provide healthy, diverse, native vegetation and protection of key/critical plant/wildlife habitats from the impacts of vehicles, OHV's, mineral exploration and development, recreation activities, or livestock grazing. |
| 876 | Managing Special Status Plant and Wildlife Species: The BLM needs to work closely with CDOW and USFWS and ranchers on wildlife. People doing weed eradication, erosion work, etc. are probably also noticing the wildlife habitat while they're working. Maybe they could keep a daily log of what they see while they're out and about. We ranchers are outside all the time, and many of us notice what's going in certain areas with wildlife and plant life, erosion, etc. |
| 1169 | EPA recommends engaging the Fish and Wildlife Service as early in the analysis as possible, in order to assure that the proposed alternatives responsibly account for, or are in compliance with, the following:<br>• Endangered Species Act;<br>• Habitat fragmentation regarding species' habitat requirements;<br>• Migratory Bird Treaty Act; and<br>• Special status species management. |
| 1203 | On occurrences of federally listed or candidate species and BLM species of concern, we recommend protective habitat management with no surface disturbance. Such management actions would both address the need to recover listed species and make strides to keep BLM sensitive species off of federal lists. In order to address this issue, we recommend that the UFO manage sensitive and listed species with habitat protection as the primary goal. This is particularly important for many of the rare plant species found in the UFO, many of which are primarily dependent on UFO BLM property for survival. |
| 1290 | We provide water to the guzzlers for the Gunnison Sage Grouse and the pipeline provides water to all wildlife |

**Table C-9**
**Issue 1: Special Status Species**

| Comment ID | Comment |
|---|---|
| | in the area. We have a deferred rotation in place that is consistently monitored to meet objectives. We have participated in treatment projects to benefit the habitat for not only the Gunnison Sage Grouse but big game also. All of this has been done in concert with a multiple use resource plan that acknowledges the livestock industry in the Uncompahgre area boundaries. |
| 1295 | The RMP should be written in a manner that allows for flexibility and adaptive management to determine what happens on the ground. Too many times, plans are written that are rigid, and do not allow changes to be made and this opens up the UFO to even more litigation. Specifically, new research is being published regarding the Gunnison Sage Grouse (GSG). To write the RMP with rigid guidelines regarding the GSG would not allow changes to be made on the ground that may benefit the grouse. |
| 1297 | The Green Mountain allotment is home to the Crawford population of the GSG. Monitoring results indicate that the GSG vegetation guidelines are being met under our deferred rotation plan for cattle grazing. Additional permit reductions are not needed to meet guidelines. We are active members of the Crawford Sage Grouse Working Group and have been since the inception. The RMP should be written to acknowledge that livestock grazing is being managed in GSG habitats and objectives are still being met. |
| 2183 | Our members value intact natural ecosystems that maintain their pre-Columbian constituent species in natural abundances. Protected natural ecosystems on public lands are the last refuges of many threatened, endangered, and dwindling species. These ecosystems provide valuable natural resources and ecosystem services, such as water collection and purification systems and carbon sinks that protect against global warming. For the communities in and nearby the UFO, they are the basis of a renewable, vibrant recreation economy. |
| 2233 | Sensitive Plant and Animal Species The UFO should strive to identify new special status plant or wildlife areas or species needing special protection or likely to need special protection in the future. The UFO should be proactive in establishing ACECs for such areas and/or species likely to be threatened in the future. ACECs could be designated for all sensitive sites in the UFO area. Special status species include Gunnison Prairie Dog, Gunnison Sage Grouse, Uinta Basin Hookless Cactus, and Yellow-billed Cuckoo |
| 44 | DO would be increased in area occupied by large PD towns and in numbers of prairie dogs and their associated species. An increase in Burrowing Owls is especially desirable. Actions could include motorized travel restrictions, O&G surface occupancy stipulations, shooting restrictions in prairie dog habitat, and veg management actions, especially weed (cheatgrass) control, and occasionally, large shrub removal. The BLM should realize that they must assume responsibility for the survival of all of the PD dependent species. |
| 552 | The BLM needs to utilize the best available science in developing management standards and guidelines for TES species. In the case of the Gunnison sage grouse, I would like to see the UFO adopt the management guidelines in the Statewide GSG conservation plan in to the RMP so that subsequent grazing, minerals, and OHV decisions will further incorporate and implement these comprehensive management practices. The RMP should include policy to resolve cases of conflict with TES species in favor of special status species. Uncertain impacts should conserve TES species and their habitats rather than cause irretrievable losses. |
| 688 | San Miguel County has been actively involved in conservation efforts for Gunnison Sage Grouse for over 13 years. The Norwood LHA states (pg 35) "These lek counts indicate the trend for the overall population appears stable through this time frame (1992-2005). However, it is believed that the current population is much lower than in historic times". This conclusion needs to be updated as since this time, Gunnison Sage Grouse populations have plummeted. A new listing decision may result in protection for the Gunnison Sage Grouse under the endangered Species Act. |
| 1184 | This parcel [shown in map] appears to be mapped Gunnison sage grouse habitat. Our recommendation would be to discuss this parcel with CDOW biologist Jim Gamer. The parcel could be conveyed to CDOW or the Forest Service for Gunnison sage-grouse habitat or as a buffer to habitat. |
| 2236 | Gunnison Sage Grouse. The UFO should incorporate the management guidelines in the statewide Gunnison Sage Grouse Conservation Plan into the RMP so that subsequent grazing, mineral extraction, and travel management decisions will be based on these guidelines. The UFO should manage to increase occupied habitat area and quality of habitat, increase population sizes, increase connectivity between populations (between the San Miguel Basin population and the Pinon Mesa, Cerro, and Monticello populations, for example) and increase potential for Gunnison Sage Grouse to reoccupy historic habitat that is not used now. Strategies include reversing permanent loss of habitat trends on private land through conservation easements or fee acquisitions, reducing fragmentation of occupied, potential, and historically used sage habitat by strict travel management |

**Table C-9**
**Issue 1: Special Status Species**

| Comment ID | Comment |
|---|---|
| | policies and by not allowing oil and gas development, and by reducing or eliminating antler collecting in occupied habitat. Quality of habitat should be improved using best science regarding increase of forbs, reduction of PJs, and protecting wet areas. (Recommendations on connectivity using historic habitat, oil and gas development, and habitat vegetation are addressed in the San Miguel Basin GUSG Working Group Conservation Plan from 2010.) New transmission or other utility lines should not be allowed in Priority Habitats or Special Status Species habitats, but GUSG are probably the most sensitive of nearly any species to them. |
| 2516 | I urge you to make the protection of threatened and endangered species the highest priority and identify critical habitat to protect and a plan to ensure their survival |
| 2679 | Thank you for the opportunity to comment on the Uncompahgre RMP revision. The Uncompahgre Field Office encompasses some of Colorado's most beloved wilderness-quality lands, wild rivers, and opportunities for quiet, backcountry recreation. The resource area is also home to important and imperiled wildlife, such as Gunnison sage grouse, that rely on large intact tracts of habitat free from roads and other infrastructure. Although the grouse was not added to the ESA list it was noted as a species of concern, thus its preservation, and thus preservation of the wild character of the habitat it requires should still be an item of BLM management planning. |
| 254 | Threatened or endangered Colorado River fish- Reclamation is actively involved in the recovery of endemic fishes in the Colorado River Basin. A programmatic biological opinion has been prepared by the Fish and Wildlife Service that addresses operations of the Wayne N. Aspinall Unit as well as all water depletions in the Gunnison Basin, including depletions of BLM projects and BLM permitted projects. This opinion calls for a selenium management program to reduce selenium concentrations in the Gunnison and Colorado rivers. BLM actions, including land disposals and changes in land use, can have significant effects on selenium loading and this must be addressed in the RMP planning. |
| 2156 | River systems within the UFO contain populations (including conservation populations) of the Colorado River cutthroat trout (CRCT). This species has declined in that last century and now occupies less than 14% of its historic habitat and only 8% of the historic habitat range is occupied by unhybridized or ecologically significant populations (CRCT Coordination Team. 2006. Conservation Strategy for Colorado River cutthroat trout (Oncorhynchus clarkii pleuriticus) in the states of Colorado, Utah and Wyoming. Colorado Division of Wildlife, Ft. Collins. 24 pp.: Young, M.K. 2008. Colorado River cutthroat trout: a technical conservation assessment. General Technical Report RMRS-GTR · 207-WWW. USDA Forest Service, Rocky Mountain Research Station, Ft. Collins, Colorado.). The CRCT Conservation Strategy is very specific in its (illegible) to manage for the conservation of this species. Strategy 7 under Physical Conservation Activities states: Manage entire watersheds: Impacts outside the riparian zone should be considered as part of CRCT management. Land management agencies should work to mitigate adverse impacts of watershed activities on water quality, instream habitat, channel morphology, riparian areas, and population stability (CRCT Conservation Strategy, page 18). While No Surface Occupancy (NSO) stipulations within a set distance of a stream occupied by cutthroat trout or a stream suitable for reintroduction are a good sta l t, a "setback" stipulation is limiting in its accountability toward stream integrity. A stream is only as good as the integrity of its watershed, from ridge-top to ridge top. By only protecting streamside (illegible), we fail to acknowledge that upland land uses - along with surface disturbances along tributary streams - can have serious negative impacts to water quality and in turn aquatic biota in larger, trout bearing streams. The Beaverhead-Deerlodge National Forest (BHDLNF) in Montana recognized this reality and recently adopted a watershed management approach in its 2009 Revised Forest Plan Revised (Beaverhead-Deerlodge Revised Land and Resource Management Plan, January, 2009). In doing so, the BHDLNF implemented for all Key Watersheds' with cutthroat trout, an NSO stipulation that covers the entire drainage. For watersheds containing conservation populations of cutthroat trout outside of Key Watersheds. the BHDLNF put in place a CSU stipulation that requires no net sediment increase over existing conditions. |
| 2158 | TU stresses the need to protect both existing and potential CRCT habitat. In order to ensure the long term viability of CRCT, it is critical that state wildlife agencies, federal land management agencies, anglers and concerned citizens do not accept the current status of CRCT as "good enough". Recovery of this species requires that it is reintroduced into suitable habitat within the historic range of CRCT. In order to maximize reintroduction opportunities, it is important to ensure that streams meet the habitat requirements of CRCT and that water quality impacts do not occur that would forsake opportunities to re-introduce CRCT. As noted above, the CRCT Conservation Strategy states that "Land management agencies agree to protect existing and potential cutthroat trout waters from adverse effects of other land uses." (Emphasis added) It is important to note that "potential habitat" is not synonymous with "historic habitat". In 2005, the CRCT Conservation Team |

**Table C-9**
**Issue 1: Special Status Species**

| Comment ID | Comment |
|---|---|
| | developed the Range-wide Status of CRCT2 ; the CRCT Conservation Team is the body charged with administering the CRCT Agreement. In Range-wide Stanis, the CRCT Conservation Team assessed restoration and expansion opportunities in unoccupied historic habitat based on four attributes: 1.) past stocking of nonnative trout that would genetically contaminate CRCT; 2.) relative quality of habitat; 3.) Significance of existing fisheries Within the suitable stream segments; and 4.) relative complexity of removal of non-native fish present within the stream segment. Based upon these attributes and considerations, the CRCT Conservation Team evaluated currently unoccupied "historic habitat" and determined "suitable habitat" (Le., stream segments that are suitable for reintroduction of CRCT). TU's information is summarized on pages 53-54 of the Range-wide Status. Using data from the Range Wide Status, TU has mapped this information and Figures 1 and 2 in the Appendix C of our scoping comments shows stream segments currently occupied by conservation populations, historic habitat, and suitable habitat. As these maps show, lands or lands over minerals managed by the UFO only contain a few conservation populations of CRCT, but there are many miles of streams that are suitable for CRCT reintroductions. The Planning Team should ensure that the RMP revision takes into account the need to not only protect existing populations of CRCT, but also protect potential habitat that is suitable for the reintroduction of CRCT. This is a critical element of the CRCT Conservation Agreement and Strategy. The UFO can ensure that it is protecting suitable habitat for CRCT by restricting activities that would degrade the quality of these habitats so as to ensure that future cutthroat reintroduction efforts are not compromised. Several supportive examples of management actions that have been implemented to protect potential native trout habitat are provided here. In April 2009 the Butte BLM Field Office in Montana issued an RMP Record of Decision that requires half-mile NSO stipulations for streams with cutthroat trout of 90% or higher genetic purity and a half-mile mile NSO would also be applied for streams with the potential for restoration of cutthroat trout. Additionally, in April of 2009, the BLM's Fillmore Field Office in Utah issued a Decision Record for an Environmental Assessment that specifically excluded leasing in cutthroat trout occupied habitat and historical habitat because they had not analyzed the impacts of oil and gas leasing on reintroduction opportunities for cutthroat trout. |
| 2169 | Special Status Species: CRCT arc native to streams and rivers in the UFO. The state of Colorado has identified the CRCT as a Species of Concern and the BLM has identified the CRCT as a Sensitive Species. Both these status rankings accentuate the importance of this species and they should be included as a Special Status Species in the UFO RMP revision. Conservation and restoration efforts to reduce and eliminate threats that could lead to listing under the Endangered Species Act are being implemented under the Conservation Agreement for Colorado River Cutthroat Trout in Utah, Colorado, and Wyoming (June 2006). Colorado BLM is a signatory of this agreement and a partner in the associated strategy. On page 12 of the Preparation Plan for the UFO, there are several questions listed relative to Special Status Species. With regard to CRCT, most of these questions can be answered by reviewing the CRCT Conservation Strategy and Agreement Despite commitments made by BLM in the CRCT Conservation Agreement and Strategy, the Preparation Plan for the UFO RMP docs not discuss CRCT in Issue I , Part D (Special Status Species) or Pan E (Fish and Wildlife). Additionally, the Preliminary Planning Criteria section of the Preparation Plan does not list the CRCT Conservation Agreement or Strategy as a planning criterion. TU feels that this is a critical omission. The Preparation Plan states that Planning Criteria arc: "constraints or ground rules that are developed to guide and direct the development of the plan and determine bow the planning team approaches the development of alternatives and ultimately, selection of a Preferred Alternative." Given commitments made in the CRCT Conservation Agreement, and due to the presence of CRCT habitat and potential habitat4 that could be affected by decisions made in the RMP revision, TU strongly encourages the Planning Team. to include the CRCT Conservation Agreement as a Planning Criteria under the Plan |
| 2170 | Fish and Wildlife (Including Migratory Birds): The Preparation Plan for the UFO RMP does not discuss CRCT in Issue I, Part E (Fish and Wildlife). Additionally, the Preliminary Planning Criteria section of the Preparation Plan does not list the CRCT Conservation Agreement or Strategy as a planning criteria. |
| 2790 | Special Status Species/Plants This section includes recommendations for managing special status species to best protect viable populations and habitats while still adequately managing the other resources in the Uncompahgre Field Office. BLM should manage threatened, endangered, and special status species so as to: 1) maintain healthy ecosystems and native biodiversity, 2) maintain and restore thriving populations of rare and imperiled species, and 3) meet BLM's obligations regarding special status species. We ask that BLM make the conservation and preservation of rare and imperiled species, and the habitat and movement corridors necessary to sustain healthy populations of such species, an explicit goal of the revised RMP. We ask that this goal be clearly reflected in the objectives and standards set forth by the new plan. BLM should identify crucial habitat, including |

**Table C-9**
**Issue I: Special Status Species**

| Comment ID | Comment |
|---|---|
| | movement corridors, necessary to sustain healthy populations of all of the rare and imperiled species present in the Uncompahgre Field Office. Additionally, crucial habitat for rare and imperiled species, and particularly biologically rich areas, should be protected through ACEC designations. ACECs should be managed such that protection of rare and imperiled species and the ecosystems of which they are a part is emphasized above all other uses. Activities that have the potential to negatively impact rare and imperiled species, or degrade ecosystem health, should not be allowed in ACECs. In addition to protecting key habitat with ACEC designations, the RMP should avoid making habitat for rare and imperiled species available to activities, such as oil and gas development, off road vehicle use, and livestock grazing, that have the potential to negatively impact rare and imperiled species. The new plan should also strive to apply minimization and mitigation measures that will clearly ensure that activities authorized on BLM lands through the plan will not contribute to declines of rare and imperiled species. |
| 2800 | Rare Plant Habitat - The BLM is a partner of the Center for Native Ecosystems in the Colorado Rare Plant Initiative, which recently finalized a set of best management practices for oil and gas drilling in rare plant habitat. Those BMPs can be accessed at http://conserveonline.org/workspaces/corareplantinitiative!documents/recommended-bestmanagement-practices-for-plants!view.html. We also encourage the BLM to adopt the following prescriptions in ACECs designated because of their rare plant values, and to consider applying these in other rare plant habitats as well:<br><br>Fluid-Mineral Development (including but not limited to oil and gas development):<br>• Make all areas that have not yet been leased throughout the entire ACEC unavailable for fluid mineral leasing, or apply No Surface Occupancy (NSO) stipulations to all such areas, with no opportunity for modification, waiver, or exception under any circumstances.<br>• Make all existing fluid-mineral leases within the ACEC unavailable for future leasing following expiration; or, when existing fluid-mineral leases expire, apply NSO stipulations (with no opportunity for modification, waiver, or exception under any circumstances) prior to reissue of such leases.<br>• Apply right-of-way exclusion throughout the entire ACEC.<br>• Consider buying back existing fluid-mineral leases within the ACEC.<br><br>Site Inventories:<br>• When surface disturbing projects are proposed within the ACEC, site specific inventories should be conducted prior to NEPA analysis, and prior to initiation of any project activities.<br>• These site-specific surveys should be required in any known or potential habitats, and must take place when the plants can be detected, for example, during the flowering period.<br>• Surveys should document both individual plant locations and suitable habitat distributions.<br>• All surveys should be conducted by qualified individuals.<br>• Survey data should also be reported to the Colorado Natural Heritage Program.<br><br>Monitoring:<br>• Surface disturbing activities should be monitored throughout the duration of the project, and measures designed to minimize impacts should be evaluated to ensure that desired results are being achieved.<br><br>Project design:<br>• Establish a buffer of a minimum of 300 feet between individuals or groups of rare plants/lichens and any ground disturbing activities.<br>• Translocation of rare plants/lichens shall not be used as a substitute for avoidance.<br>• Construction should occur down slope of rare plants/lichens, and all project activities should be designed to avoid concentrating water flows or sediments into rare plant/lichen occupied habitat.<br>• Visibly identify areas that are to be avoided during and post-construction with temporary fencing and flagging<br>• For surface pipelines use a 300-foot buffer from any rare plant/lichens locations. If on a slope, use stabilizing construction techniques to ensure the pipelines don't move toward the population.<br>• Ensure that water extraction or disposal practices do not result in change of surface or subsurface hydrologic regime.<br>• Limit disturbances to and within suitable habitat by staying on designated routes |

**Table C-9**
**Issue 1: Special Status Species**

| Comment ID | Comment |
|---|---|
| | • Limit new access routes created by the project, minimize the length and environmental impact of new roads constructed to service well locations, and utilize existing roads to the maximum degree possible.<br>• Place signing to limit motorized travel in sensitive areas.<br>• Require implementation of dust abatement practices near occupied rare plant/lichen habitat.<br>• For interim reclamation, either require that all disturbed areas be revegetated with native species comprised of species indigenous to the area (ideally from local genetic stock), or if there are major problems with preventing establishment of noxious weeds, require that disturbed areas be revegetated with either sterile F1 hybrids or with locally appropriate early successional native species capable of outcompeting weeds while also seeding for indigenous natives at the same time.<br>• For final reclamation, require that the area be revegetated with native species indigenous to the area and that vegetative structure, species composition, and percent cover have returned to baseline conditions (or improved, for sites in poor condition to begin with).<br>• Require post construction monitoring for invasive species, and specific measures for the control of noxious weeds. Enforce these measures through use of fines and suspension of activities when failure to control noxious weeds is documented.<br>• Require use of directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in rare plant/lichen habitat. Ensure that such directional drilling does not intercept or degrade alluvial aquifers.<br>• Restrict the total area of each pad to the least amount of acreage required to drill the wells planned for that pad.<br>• Close and reclaim roads as soon as they are no longer needed, and gate them to prevent unauthorized use.<br>• Use busing or van transportation of crews and remote monitoring of wells to minimize truck traffic and associated dust.<br>• Identify rare plant pollinators, and develop mitigation and minimization measures that provide adequate protection to pollinator species.<br>• Conduct routine site visits for permit compliance, set timelines for fixing permit violations, and issue fines for not meeting requirements.<br>• In addition to requiring the above as conditions of approval for APDs, ask operators to undertake any additional voluntary measures that would further minimize or mitigate the negative impacts of their activities on rare plant populations and the ecological integrity of the ACEC.<br>Other ground-disturbing activities:<br>• Apply a No Ground Disturbance restriction to the entire ACEC with specific authorization for an exception only for management activities that are necessary to conserve the ecological integrity of the ACEC and that further conservation goals for the values for which the ACEC was designated. For example, an exception could be made for construction of fencing/exclosures when needed to further rare plant conservation goals.<br>• Designate the entire ACEC as a right-of-way Exclusion Area.<br>Non-fluid mineral development:<br>• Withdraw the ACEC from mineral entry.<br>• Apply the No Ground Disturbance restriction discussed above to existing non-fluid mineral leases.<br>Travel management:<br>• limit use of roads to designated routes.<br>• Close routes that affect important habitat for these rare plants/lichens in order to limit dust, invasion of habitat by noxious weeds, and illegal off-road vehicle (ORV) use.<br>• Close the entire ACEC to ORV use.<br>Non-motorized recreation:<br>• Encourage those engaging in non-motorized recreation to use designated roads and trails, and to avoid important habitat for these rare plants.<br>• Prohibit overnight camping and campfires within 300 feet of rare plant/lichen populations. |

**Table C-9**
**Issue 1: Special Status Species**

| Comment ID | Comment |
|---|---|
| | Grazing:<br>• Retire grazing allotments within the ACEC whenever possible<br>• Prohibit treatments designed to increase forage for livestock, including seeding and irrigation.<br>• If trampling by livestock is identified as a concern where grazing allotments exist, create cattle exclosures around rare plant/lichen populations, and include a 300 foot buffer within the exclosure to minimize indirect effects of grazing on rare plant populations.<br>• Manage livestock grazing within occupied or potential habitat for rare plants/lichens to promote plant health, maintain sufficient residual vegetation, minimize potential for trampling, minimize potential for invasion of non-native plant species, and sustain overall watershed functions.<br>Lands and realty:<br>• Work towards acquisition of private inholdings.<br>• Apply right-of-way exclusion to entire ACEC.<br>• Establish memorandums of understanding with willing landowners to encourage private land management actions that enhance protection of ACEC values on and adjacent to private inholdings (e.g., control of noxious weeds).<br>Management of noxious weeds:<br>• Promote natural processes and healthy native plant/lichen communities to deter noxious weeds.<br>• Minimize fragmentation of habitat and associated risk of invasion by noxious weeds and other aggressive non-native species.<br>• Develop an integrated weed management program that emphasizes prevention, inventory, detection and monitoring, and includes control techniques (e.g., mechanical and hand-applied herbicides) that will not damage rare plant/lichen species, or other non-target species.<br>• Where practicable, eliminate any existing human-caused disturbance that is contributing to the spread of noxious weeds.<br>• Continue and expand public education.<br>Other:<br>• Prohibit collection of plants, plant materials and seeds, except for scientific or research purposes. Such collection must have no detrimental impact on long-term survival and reproduction of rare species or significant communities.<br>• Where practicable, restore to a naturally functioning state any existing human-caused disturbance that is impairing natural ecosystem processes affecting habitat for rare plant species or significant plant communities.<br>• Cooperate with the Colorado Natural Heritage Program to develop and carry out a plan to inventory and monitor plant/lichen species, unique natural communities, and to monitor the overall ecological integrity of the ACEC.<br>• Cooperate with the Colorado Natural Heritage Program and other entities to allow for and facilitate additional research on rare and imperiled species and unique natural communities.<br>• If monitoring identifies new threats or suggests that the management recommended above is not adequately protecting rare plant/lichen populations and/or unique natural communities from significant negative impacts (including indirect or cumulative impacts), take appropriate action to prevent such negative impacts. d. Rare and Imperiled Species and Watchable Wildlife in the Planning Area The Center for Native Ecosystems is submitting detailed comments regarding rare and imperiled species, big game and watchable wildlife in the Uncompahgre planning area that would benefit from ACEC designations and/or special management. We herein reference and support those comments. |
| 46 | All clay-loving buckwheat populations should have total protection from any damaging uses, especially travel. |
| 255 | Rare Plants- Some of the known rare plant areas coincide with Reclamation lands and/or facilities. |
| 1204 | Of particular note is the habitat protection of the federally-endangered *Eriogonum pelinophilum* in and around the Fairview South Natural Area/ACEC. Inspection of recent surveys for *E. pelinophilum* around the Fairview South ACEC that have occurred since the last RMP was adopted show that the current boundary of the ACEC does not contain all identified sub-occurrences of the listed plant on BLM land in this area. CNAP recommends |

**Table C-9**
**Issue 1: Special Status Species**

| Comment ID | Comment |
|---|---|
| | that the ACEC boundaries be extended to the east and south to provide protection for these additional occurrences, and to allow for more comprehensive conservation planning for what may be the most significant population of this species in the world. The Colorado Natural Areas Program owns and cooperatively manages the Wacker Ranch Natural Area, which was purchased to protect the listed species and is directly adjacent to the Fairview South ACEC. We have a direct interest in providing special management considerations to the whole 'Fairview' population of *E. pelinophilum*, and expansion of the ACEC to encompass the whole population on BLM land would be a great stride in providing more comprehensive protection for this irreplaceable rare plant habitat. |

**Table C-10**
**Issue 1: Special Designation Areas – General**

| Comment ID | Comment |
|---|---|
| 262 | Areas of Critical Environmental Concern (ACEC), Research Natural Areas (RNA), etc. Depending on their locations, the management focus, and their associated terms and conditions, such designations may have an adverse effect on our ability to effectively manage our projects and facilities. However, they may also complement some of our wildlife mitigation areas. |
| 398 | Dolores River Canyon is a very special area and deserves all the protection possible. To underscore the point, in our hike down to the wash from Wray Mesa we found a large hanging garden which had lots of the rare Eastwood monkey flower. |
| 399 | Nyswonger Mesa is an area that needs protection. It is bounded by Paradox Valley on the north, Dolores River on the south and east, and La Sal Creek on the west . At the present time there is not access for motorized travel to the mesa. There is an old road, now a pack trail, that was used during the Uranium days. The track is very, very steep and completely washed out in several places. This road should be permanently closed as this would limit access except by foot and pack travel. The road is downright dangerous for anyone trying to drive up it at this time. The road is closed at the BLM property line just south of CO□90 and west of Bedrock, however a four-wheeler did drive up to near the top last year. The pinyon/juniper forest and its birds may be the main wildlife values. Hikers can enjoy solitude and great vistas looking down 1500 feet to the Dolores River, Paradox Valley and La Sal Creek below. This is a wonderful, quiet place and will away remain that way unless a road is again constructed to the top. During the past Uranium boom little or no Uranium was found on Nyswonger Mesa. I do not know if there are present claims. I do believe most of Nyswonger Mesa belongs in the Dolores River Canyon Wilderness Study Area. |
| 403 | The part of Saw Tooth Ridge that qualifies for consideration is not a large area. It is valuable for wildlife, mountain lions, bear, western spotted skunk, gray fox and many smaller mammals. This is the only place in western Colorado that I have seen western spotted skunk. I have completed the Atlas II priority block. Other field workers did the work 20 years ago and the data is available. There were 58 species of birds using the area during Atlas II. The area lies in the Uranium belt but there are no mines in the area. I am not sure about claims, however. |
| 464 | I also don't want to see any more improved recreation outside the existing NCA areas. Special land designations lower the quality of habitat not only for livestock, but wildlife as well. It also takes away flexibility of management for any lands. We also have 2 NCA areas that provide that improved recreational opportunity for people that desire such. |
| 582 | The following areas adjacent to The Tabeguache SMA should be added to the SMA. Shavano, Campbell, and Burro Creek drainages north of the Tabeguache. |
| 633 | Thanks for considering these. In general, I hope that the UFO prioritizes maximum protection for all its natural lands to maintain their natural character—Wilderness Study Areas and other lands with wilderness qualities, in all the places and in whatever combination they exist; roadless lands; non-motorized, quiet used areas; Areas of Critical Environmental Concern; Outstanding Natural Areas; and other important landscapes. |
| 815 | Payson's lupine (Lupinus crassus): Designate an ACEC or initiate other special management to protect the populations of Payson's lupine in Paradox Valley. Refer to CNHP's Potential Conservation Areas and surveys to be conducted in 2010 for plants' distribution. |
| 969 | Lack of protection for areas that are non-motorized and unroaded. |
| 1007 | Other precious and fragile areas within the UFO that deserve more protection include the Dolores River Canyon, areas adjacent to the Adobe Badlands WSA near Delta and the Tabeguache Special Management Area near Nucla, and the Uranium- Vanadium belt, especially if mining resumes with construction of a processing mill in the Paradox Valley. |
| 1214 | As mentioned at the beginning of the 'Recommendations' section, CNAP recommends that the BLM retains the special management area designations for the existing ACECs and Natural Areas within the Uncompahgre Field Office. In addition, CNAP recommends that all areas designated as a special management area in the revised RMP would be available for listing on the state's Natural Areas Program administered by the Colorado Department of Natural Resources. |
| 2040 | Dolores River Canyon Special Recreation Management Area (SRMA) The 1985 San Juan/San Miguel Planning Area RMP designated the Dolores River Canyon as a Special Recreation Management Area. The boundary took in the entire corridor from the McPhee Reservoir to Bedrock, and included the Dolores River Canyon WSA. |

**Table C-10**
**Issue 1: Special Designation Areas – General**

| Comment ID | Comment |
|---|---|
| | Since BLM management boundaries have since been changed, a portion of the SRMA is now within the San Juan FO and a portion is within the Uncompahgre FO. We recommend that The Dolores River Canyon SRMA retain its special management status, including the portion within the Uncompahgre Field Office. The San Juan Public Lands Draft Land Management Plan released in 2007 maintains a special designation for the portion of the corridor in their jurisdiction. |
| 2047 | Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values associated with wild and scenic suitability or the existing Special Recreation Management Area Designation. |
| 2060 | The Dolores Corridor should be managed in close cooperation with adjacent BLM Field Offices. For example, the Dolores River Canyon Wilderness Study Area is bisected by the UFO and the San Juan FO, but requires consistent and close management, especially considering issues with motorized incursions from the Utah. The Sewemup Mesa CWP expansions to the existing WSA also overlap the Grand Junction and Uncompahgre BLM field offices. Significantly, the river itself crosses boundaries between the San Juan, Uncompahgre, and Grand Junction Field Offices. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities. We urge the Uncompahgre Field Office to adopt a broad vision of the landscape in approaching the cooperative management of these areas. |
| 2077 | The current RMP is a one-time opportunity to set aside these less roaded areas for the uses above, by closing the remaining roads and establishing the areas as unroaded, non motorized quiet use or just plain wildlife areas. |
| 2087 | We also sketched impressionistic boundaries around several of Colorado Natural Heritage Program Potential Conservation Areas to see if there was any overlap. This showed that in at least two cases PCAs intersect or are adjacent to unroaded areas and could be combined to make a larger protected area. |
| 2089 | The overlay process will also help define appropriate and manageable boundaries including whether the areas should be combined with adjoining Special Management Areas, PCAs or other special areas. We would be happy to work with the BLM on further defining logical boundaries, closure points and other planning needs. |
| 2327 | Please Please Please do not allow harmful mining or drilling in the wildlife habitat regions. PLEASE |
| 2517 | I am particularly concerned that on your maps the San Miguel Area of Critical Environmental Concern appears to overlap extensively with oil and gas leases. All of the ACECs deserve protection. |
| 2523 | Development in this region for uranium, oil and gas, or off road vehicle recreation must be appropriately sited outside of sensitive lands. |
| 2525 | To the extent that any new oil and gas development is going to occur-and we need to keep it at an absolute bare minimum-it MUST be kept securely FAR AWAY from sensitive areas like the Dolores River Basin and the Uncompahgre. |
| 2641 | Man must permit free areas for nature to protect the environment and all life forms in the protected areas and permit limited projects in areas determined to have energy production possibilities!!! As these are protected areas owned by the American public, the companies should pay a fair price for the use of public resources as they are for profit companies. No more free resources to for profit companies!!! |
| 2697 | Thank you for the opportunity to comment on the Uncompahgre RMP revision. I wish to support the view that any development for resources or motorized use be kept separate from critically sensitive lands that warrant protection for their natural values and for the wildlife dependent upon them. |
| 2777 | Special Management Proposals As noted above, the BLM has a variety of tools for protecting natural values. Included with these scoping comments is an inventory of areas suitable for wilderness designation (citizens' wilderness proposal - or CWP), which we have proposed for protection as new WSAs and/or through management of their wilderness characteristics. We also encourage the BLM to use designation of special recreation management areas and areas of critical environmental concern to protect natural values as part of an overall management approach to creating, enhancing, and protecting quiet recreation experiences, protecting critical species habitats, and providing needed expansions of protections around current WSAs, ACECs, and SRMAs. In addition to our CWPs, we will submit expanded proposals, including more detailed descriptions and management prescriptions, in the near future and look forward to discussing these proposals with you. e. Analysis of Environmental Consequences NEPA requires federal agencies to assess the direct, indirect and cumulative environmental impacts of proposed actions, taking a "hard look" at environmental consequences and performing an analysis commensurate with the scale of the action at issue. 42 U.S.C § 4321 et seq; 40 CF.R. § |

**Table C-10**
**Issue 1: Special Designation Areas – General**

| Comment ID | Comment |
|---|---|
| | 1508.8; see also Metcalf v. Daley, 214 F.3d 1135, 1151 (9th Cir. 2000); Robertson v. Methow Valley Citizens Council. 490 U.S. 332,348 (1989). NEPA defines "cumulative impact" as: the impact on the environment which results from the incremental impact of the action when added to other past/ present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. 40 CF.R. § 1508.7. (emphasis added). Throughout these comments, we have identified analyses required to evaluate the direct, indirect and cumulative impacts of decisions made in the RMP, such as health impact assessments and air quality modeling. Recommendation: The analyses discussed in these scoping comments must be completed prior to authorizing activities that will contribute to these impacts, such as oil and gas leasing, in order to determine whether and under what conditions they can be approved, such that significant impacts on the environment can be prevented. To the extent that the BLM defers any of the recommended analyses, we request that the RMP commit to a time period for completion and confirm that they will be completed prior to approval of contributing activities. |

**Table C-11**
**Issue 1: Special Designation Areas – Areas of Critical Environmental Concern**

| Comment ID | Comment |
|---|---|
| 2791 | ACEC Designation Both FLPMA and the BLM's ACEC Manual (1613) emphasize the BLM's important duty to designate and protect Areas of Critical Environmental Concern. For example, FLPMA states: The Congress declares that it is the policy of the United States that - ... regulations and plans for the protection of public land areas of critical environmental concern be promptly developed...FLPMA Title I Sec.102(a) [43 USC 1701] The Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern. FLPMA Title II Sec. 201(a) [43 USC 1711] In the development and revision of land use plans, the Secretary shall- ... give priority to the designation and protection of areas of critical environmental concern.... FLPMA Title II Sec. 202(c) [43 USC 1712] Therefore, ACEC designation and protective management are supposed to be a high priority within the BLM's mission. ACEC designation provides an important mechanism for the BLM to actively conserve and recover imperiled species so that the protections afforded by the Endangered Species Act and the designation of Critical Habitat are less necessary. Choosing not to conserve ACECs may contribute to the need to list species under the Act, and is inconsistent with the BLM's special status species obligations. |
| 2799 | The BLM should retain existing ACECs and consider strengthening the protective management attached to them. BLM should carefully review existing management of ACECs, ensure that the agency is meeting its obligations under the BLM Manual, and strengthen protections in these areas if necessary. Again, ACEC protection is one of the main tools at the BLM's disposal to conserve imperiled species, and the agency must take this responsibility seriously. |
| 32 | All existing ACECs should be kept. The Fairview area should be enlarged to whatever size is required to protect the buckwheat. |
| 33 | Other rare plants such as the Paradox Valley lupine, deserve their own ACEC. |
| 34 | The most obvious need for ACECs to protect wildlife habitat is the best remaining large areas of semi desert/salt desert habitat for the two prairie dog species and their associated species. The most obvious place for this is the east side of Highway 50, across from the Escalante Canyon turn off. This would fit the CDOW to "Work with public land agencies and other affected stakeholders to identify management emphasis areas (MEAs) (within the GUPD and WTPD IPAs) where intensive management can focus on landscape scale conservation for the entire prairie dog ecosystem." from their /Grand Val and Uncompahgre Valley Action Plan/ for white-tailed prairie dogs. If there is a similar area of Gunnison's prairie dogs in the UFO's west end, it could be considered as an ACEC, too. Management of these would be mainly travel management and weed control. |
| 132 | TMW ATV club is very knowledgeable about the inventory of different ACECs on public lands within the planning area. We are active in preserving these resources and work tirelessly, and contribute literally hundreds of thousands of dollars from our grant funds to protect them. We acknowledge the fact that some areas of the UFO possess significant historic, cultural, or scenic values, fish or wildlife resources, or natural hazards. |
| 133 | TMW specifically recognizes the North Delta Adobes area as an area of critical environmental concern. We are aware of the many trails in the area that may contribute to resource proliferation. We strongly feel that the resource damage can be mitigated and believe the continued use of the area can be utilized via a designated trail system. |
| 134 | We ask the RMP Planning Team to be cautious of being unduly influenced from the anti-motorized community in Protecting Significant Values. We remind the Planning Team that these restrictions are designed to protect the values and/or serve the purposed for which the designation is made. Management prescriptions are developed expressly to protect the important and relevant values of an area NOT from the undue influence from the environmental community. |
| 341 | The entire ACEC and adjacent areas of the San Miguel River Canyon is a scenic and natural treasure and its scenic, natural, wildlife, habitat, species and recreational value should all be protected as the highest and best use of the area. Surface energy development of any sort including oil and gas, solar and geothermal should be minimized, tightly restricted or eliminated. The current level of access and facilities for recreation in this area is very good and should be maintained at current levels. |
| 346 | Restrict any further development of access to Saltado Canyon. Eliminate the following, as found in San Miguel ACEC Record of Decision: Trails in Saltado and Beaver Creek Canyons may be constructed as well as a boat ramp on the San Miguel at Beaver Creek. If feasible, a bicycle and foot trail. |
| 351 | The entire San Miguel River ACEC and the entire BLM holdings in Saltado and Specie Creek Canyons should be |

**Table C-11**
**Issue 1: Special Designation Areas – Areas of Critical Environmental Concern**

| Comment ID | Comment |
|---|---|
| | "No Surface Occupancy" stipulations for O&G and other energy development to protect scenic values and natural values. Given the low probability of any O&G development ever occurring there is little or no cost to such actions. Geothermal leasing should NOT be allowed in this area until very tight regulations are developed, if at all. |
| 556 | All existing ACECs should be kept. Additional ACECs are recommended by the Colorado Natural Heritage Program within the UFO to protect rare and imperiled plants. I support the designation of all ACECs recommended by the CNHP. |
| 557 | The Fairview area should be enlarged to whatever size is required to protect the buckwheat. Other rare plants such as the Paradox Valley lupine deserve their own ACEC. |
| 558 | In addition, I would like to see the BLM designate known Gunnison sage grouse Lek sites and concentrated nesting/brood rearing habitat as an ACEC. Specific sites are displayed in the Gunnison Sage Grouse plan for the San Miguel Basin. |
| 559 | To protect the significant values present within the ACECs I would like to see the BLM withdraw all mineral leases from these areas. The development of gravel mines in the San Miguel River occurred in the past and should now be prohibited in order to protect the unique riparian vegetation communities, wildlife, and recreation/scenic values. Similarly, oil and gas leases should be withdrawn from all of the ACECs to prevent irreparable damage to existing resource values from these activities. |
| 689 | In the RMP revision process, BLM should consider special management designation and policies for occupied and historic Gunnison Sage Grouse habitat as Areas of Critical Environmental Concern (ACECs). These policies should maintain and improve this habitat. |
| 712 | Also, continued protection is needed for designated ACECs , such as Fairview, Needle Rock, Adobe Badlands, and San Miguel. |
| 814 | Clay-loving wild buckwheat (Eriogonum pelinophilum): Expand the Fairview South ACEC to the south to encompass all populations on BLM land. Also add other areas of the UFO that support the buckwheat, even if they are not contiguous with existing ACECs |
| 875 | The Roubideau area contains historic places of a couple of old homesteads and cattle trails. Cultural places of petroglyphs. Scenic, wow, the whole place, stand anywhere along the east rim and look over the canyon to the west, or east to the Uncompahgre River valley. Walk up Roubideau Creek from the end of the road in the bottom of the canyon and stand in awe of the spectacular cliffs on each side of you. Look up at caves, and the erosion by wind. Somewhere in this special drainage there must be plants that need protected. The entire area is abundant with wildlife. There are bears and mountain lions year round. Lots of raptors raise their young in this drainage. Has anyone checked on the fish? Locals tell me 30 years ago there were lots of fish in the Roubideau and Potter Creeks, but now it's not worth even trying to fish. |
| 920 | I believe all Areas of Critical Environmental concern should be afforded continued protection. There are probably other areas that should be identified as ACEC, but I have not yet found the time to locate them. |
| 996 | I was relieved and grateful to see in the Travel Management Plan recently adopted, that Potter and Monitor were maintained for foot and horse travel only. This decision should be preserved, and if possible, I encourage the BLM to add a more formal status to the areas, such as designating them Areas of Critical Environmental Concern. For recommended boundaries, I would refer you to maps prepared for the Colorado's Canyon Country Wilderness Proposal: Roubideau Addition (http://www.canyoncountrywilderness.org/maps/hires/roubideau_0706.jpg) on which I helped with field reconnaissance and map creation. |
| 1197 | Within the land managed by the Bureau of Land Management's Uncompahgre Field Office, and included in the RMP revision, there are two such designated Natural Areas with the aforementioned examples of statewide significance. (See attached Articles of Designation for legal descriptions and conditions of these agreements.) The Natural Areas and their attributes are listed below.<br><br>• Fairview South Natural Area, 205 acres: This area was designated a state Natural Area in 1992 because it contains a significant portion of one of the largest populations of the federally endangered plant, Eriogonum pelinophilum (clay-loving buckwheat). This species is endemic to the Adobe badlands of Montrose and Delta counties, with the known range restricted to less than 35 square miles. The |

**Table C-11**
**Issue 1: Special Designation Areas – Areas of Critical Environmental Concern**

| Comment ID | Comment |
|---|---|
| | area also contains native plant communities representative of the sparsely vegetated adobe badlands and a population of Penstemon retrorsus (Adobe beardtongue, a globally vulnerable G3-S3 plant). This Natural Area actually encompasses two parcels that make up 347 acres, however, the portion that we are commenting on is 205 acres known as Fairview South. The 142 acre Fairview North parcel is within the Gunnison Gorge National Conservation Area and is not considered within this UFO RMP. This site was collectively referred to as 'Management Unit 13' in the 1989 Uncompahgre RMP.<br>• Needle Rock Natural Area, 83 acres: This area was designated a state Natural Area in 1992 to protect a volcanic geological structure with high value scientific, interpretive and scenic characteristics. Needle Rock towers 1100 feet above the Smith Fork of the Gunnison. It originated during volcanic activity 28 million years ago (Oligocene) as molten rock intruded between existing sedimentary formations. This Natural Area also protects a population of Penstemon retrorsus (Adobe beardtongue, a globally vulnerable G3-S3 plant). This site was referred to as 'Management Unit 14' in the 1989 Uncompahgre RMP. It should be noted that all 4cres of designated state Natural Areas occur on sites that also have been designated as 'Areas of Critical Environmental Concern' (ACECs) for their valuable features. Hence, the importance of both of these sites to the state of Colorado and to the federal government is well-supported. |
| 1198 | Based on the significance of these properties and the Colorado Natural Areas Program's interest in cooperatively protecting the natural features on each site, CNAP would like to provide the Uncompahgre Field Office with several recommendations that would assure that the state Natural Areas are protected for the benefit of current and future Coloradans. First and foremost, CNAP recommends that the BLM retains the ACEC designations for both existing Natural Areas within the Uncompahgre Field Office that are mentioned above. These sites were originally given special designations to provide special management that would protect and prevent irreparable damage to significant natural features. CNAP recommends that the revised RMP specifically mention the values of these sites and include management prescriptions that would assure they are protected under the new management plan. CNAP would also like to see the revision of the RMP reflect the components of each agreement as stated in the Articles of Designation of each Natural Area |
| 1215 | In relation to this topic [Special Management Areas], CNAP would like to point out areas on BLM property to be considered for ACEC designation and that are on CNAP's identified list of potentially suitable Natural Areas within the UFO:<br>• Coyote Wash, 3500 acres: Coyote Wash is a tributary to the Dolores River Canyon and is incorporated within the Dolores Canyon Wilderness Study Area. Populations of Erigeron kachinensis (Kachina daisy), a G2/S1 BLM Sensitive Species, occur along drainages feeding into the wash and canyon; hanging gardens in the canyon walls support Mimulus eastwoodiae (Eastwood monkeyflower); another BLM sensitive species. Isolated benches in the canyon support Great Basin grassland communities in excellent condition.<br>• La Sal Creek, 11,715 acres: La Sal Creek cuts a spectacular canyon of entrenched meanders through red Triassic and Jurassic sandstones and siltstones. The narrow floodplain supports a unique riparian community of box elder, river birch and red-osier dogwood. Eroding shale slopes support populations of the rare plants Pediomelum aromaticum, a G3/S2 BLM Sensitive Species, and Lupinus crassus (Payson lupine, a G2/S2, BLM Sensitive Species).<br>• Young Egg Locality, 120 acres: This scenic area, at the mouth of Wells Gulch near the Gunnison River, consists of a section of the upper Jurassic Morrison Formation containing thousands of black eggshell fragments. The site represents a nesting site used repeatedly by dinosaurs. The site may benefit from protection from unsanctioned quarrying and vandalism. CNAP recommends that the UFO take the significant values of these areas into consideration when drafting the RMP revision. |
| 1684 | Offer maximum protection for all Areas of Critical Environmental Concern (ACECs) and continue to identify and protect other imperiled areas. |
| 1724 | Offer maximum protection for all Areas of Critical Environmental Concern (ACECs) and continue to identify |

**Table C-11**
**Issue 1: Special Designation Areas – Areas of Critical Environmental Concern**

| Comment ID | Comment |
|---|---|
| | and protect other imperiled areas. In an area so vast, the BLM must offer special protection to any sensitive places that might be examples of disappearing landscapes and ecosystems [the whole San Miguel River corridor is an example.] Without the special treatment ACEC designation offers, species that are becoming imperiled will continue to get lost. I urge the BLM to aggressively search the UFO for special places that will need extra protection in the future and to use the ACEC designation to protect them. |
| 2051 | We request that the RMP prohibit mining related activities in areas of ecological significance such as river corridors, WSA's and ACEC's as well as SRMA's to protect quiet recreational experiences |
| 2165 | Six Areas of Critical Environmental Concern (ACEC) exist within the UFO planning area but two to those have been designated National Conservation Areas since the publication of the 2008 Preparation Plan and thus has been removed from the UFO plan revision. The four remaining ACECs are the Adobe Badlands, Needle Rock, Fairview, and San Miguel. The first three contain special management unit designations for their unique characteristics ill supporting federally listed threatened and endangered plant species, recreational importance, and high-value scientific, interpretive and scenic characteristics. The BLM is asking whether these current ACECs should be re-affirmed, expanded, or dropped under the new planning revision process. TU supports the current designation of the three ACECs mentioned above and requests the BLM re-affirm their ACEC status. |
| 2166 | TU supports this ACEC designation and wishes to request that the BLM consider the following recommendations: 1) enlarge the ACEC area to equal the SRMA, thereby enlarging the San Miguel ACEC to 32,641 acres; 2) to close the designated ACEC area to oil and gas leasing, place NSO restrictions as Conditions of Approval on most areas that have been leased, and close the area to geothermal leasing; and 3) as described below, include segments of the San Miguel that arc deemed appropriate for Wild and Scenic designation. Increasing the ACEC reach to include additional BLM lands in the San Miguel drainage would increase the protection of critical winter range for big game, would further protect fisheries habitat, would help protect bald eagle habitat and would encourage connectivity maintenance and protection of big game migration corridors; these fish and wildlife qualities all meet relevance criteria for ACEC designation. With regard to importance criteria, expanding the San Miguel ACEC would include in the ACRC stream reaches that have been identified as suitable reintroduction habitat for CRCT populations (Figure 2), helping to preserve opportunities to expand populations of CRCT in the watershed. As noted above on page 5, the CRCT Conservation Strategy that the BLM is a signatory of states that "Land management agencies agree to protect existing and potential cutthroat trout waters from adverse effects of other land uses." This CRCT Conservation Strategy and the associated Conservation Agreement represent multi-party and multi-state efforts to conserve and restore CRCT, and because the BLM is a party to this agreement and strategy, suitable reintroduction habitat for CRCT meets the importance criteria for ACEC designation. Additionally, the San Miguel River is a well-recognized recreational trout fishery that attracts anglers' both locally for Telluride and other communities and regionally for tourism, meeting importance criteria for the trout fisheries in the San Miguel. Considerable interest and activity has occurred in oil and gas development and in geothermal development since the 1993 decision. The entire San Miguel River corridor and adjacent landscape is identified by BLM as high geothermal potential and high oil and gas potential. Though the 1993 ROD indicated low to moderate energy development potential (ROD, page 10), this scenario has arguably changed with a new energy development appetite and new technologies or accessing previously access-challenged reservoirs. In addition to providing important habitat for CRCT, this area also provides significant roosting sites for wintering bald eagles and provides sever winter range for elk and mule deer. TU believes that the San Miguel River ACEC should not only be reaffirmed based on its unique, high quality riparian vegetation resources, the scenic values of the corridor, the importance of wildlife and fisheries habitat, and the preservation of relic riparian communities, but we recommend that BLM enlarge the San Miguel ACEC to match the boundaries of the SRMA. We strongly believe that enlarging the ACRC will still meet the relevance and importance criterion required to be designated as such. |
| 2226 | All existing ACECs should be kept. There are four ACECs in the UFO: Fairview, Needle Rock, Adobe Badlands, and San Miguel. The Fairview ACEC protects only part of the habitat of the endemic clay-loving buckwheat. This ACEC should be enlarged for greater protection |
| 2227 | To protect the significant values present within the ACECs, the BLM should withdraw all mineral leases from these areas, including oil and gas leases. The development of gravel mines in the San Miguel River occurred in the past and should now be prohibited in order to protect the unique riparian vegetation communities, wildlife, recreation, and scenic values. |
| 2228 | The Colorado Natural Heritage Program has recommended additional ACECs within the UFO to protect rare |

**Table C-11**
**Issue 1: Special Designation Areas – Areas of Critical Environmental Concern**

| Comment ID | Comment |
|---|---|
| | and imperiled plants. We support designation of all ACECs recommended by the CNHP. |
| 2229 | Some areas to consider for ACEC status:  Tabeguache Pueblo and Tabeguache Caves. These contain important archaeological sites that show a relationship between the Fremont and Anasazi cultures. There is some evidence of farming (corn production). |
| 2230 | Some areas to consider for ACEC status: Paradox/Long Valley: important rock art and archaeological area. Investigate possible conflicts between peregrine falcons and hang gliders on the cliffs above Paradox. The Paradox Valley lupine, deserves ACEC. |
| 2231 | Some areas to consider for ACEC status: Lower Uncompahgre Plateau Area. There are many scattered important archaeological sites that include archaic to Ute occupation in the 1880s, e.g. the Harris Site, rock art sites, and wickiups. |
| 2232 | Some areas to consider for ACEC status: Gunnison sage grouse sites. The UFO should designate known Gunnison sage grouse lek sites and concentrated nesting and brood rearing habitat as an ACEC. Specific sites are displayed in the Gunnison Sage Grouse plan for the San Miguel Basin. |
| 2235 | There is a need for ACECs to protect wildlife habitat in the best remaining large areas of semi desert/salt desert habitat for the two prairie dog species and their associated species. The most obvious place for this is the east side of Highway 50, across from the Escalante Canyon turn off. This would fit the CDOW plan to "Work with public land agencies and other affected stakeholders to identify management emphasis areas (MEAs) (within the GUPD and WTPD IPAs) where intensive management can focus on landscape scale conservation for the entire prairie dog ecosystem." from their Grand Valley and Uncompahgre Valley Action Plan for white-tailed prairie dogs. If there is a similar area of Gunnison's prairie dogs in the UFO's west end, it could be considered as an ACEC, too. Management of these would be mainly travel management and weed control. |
| 2610 | All the ACECs should be closed to livestock grazing. No new leasing for oil, gas and minerals should occur in these areas and in all other areas until the current leases expire and/or are being developed. The low percentage of active leases relative to those leased dictates no further leasing during this planning period and former leases are closed and restored. |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| 61 | On behalf of Mika Ag Corporation d/b/a the Escalante Ranch, the purpose of this letter is to provide comments related to certain proposed river segments included in the Uncompahgre Field Office Draft Wild and Scenic Rivers eligibility study. This Draft report is being completed based upon the Wild and Scenic Rivers Act. The Wild and Scenic Rivers Act ("WSRA"), 16 U.S.C. § 1273(b) defines wild, scenic and recreational river areas. The statute requires that "[e]very wild, scenic or recreational river' in its free-flowing condition, or upon restoration to this condition, shall be considered eligible for inclusion in the National Wild and Scenic Rivers system and, if included, shall be classified, designated, and administered as [either a wild, scenic, or recreational river area]." The definitions of each are as follows: (1) Wild river areas--Those rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted. These represent vestiges of primitive America. (2) Scenic river areas--Those rivers or sections of rivers that are free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads. (3) Recreational river areas--Those rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past. 16 U.S.C. § 1273(b). The river segments described below do not meet the above definitions and should not be withdrawn from further consideration under the WSRA. |
| 62 | In considering whether a river segment is "free-flowing" and eligible for inclusion in the Wild and Scenic River System, the statute states: existing or flowing in natural condition without impoundment, diversion, straightening, rip-rapping, or other modification of the waterway. The existence, however, of low dams, diversion works, and other minor structures at the time any river is proposed for inclusion in the national wild and scenic rivers system shall not automatically bar its consideration for such inclusion. 16 U.S.C. § 1286(b). The BLM manual further explains that with respect to the "free-flowing" requirement: Congress did not intend to require rivers to be "naturally flowing," i.e., flowing without any upstream manipulation except by nature. The presence of impoundments above and/or below the segment (including those that may regulate the flow regime through the segment), existing minor dams, and diversion structures within the [area] shall not by themselves render a river ineligible .... A river need not be "boatable or floatable" in order to be eligible. For purposes of eligibility determination, the volume of flow is sufficient if it is enough to maintain the outstandingly remarkable values identified within the segment. 2004 - 196 Memorandum at 16. In addition there is no length requirements in order for a river or river segment to be eligible. Draft report at 8. |
| 63 | The second requirement for eligibility within the System is the presence of "outstandingly remarkable values." The Wild and Scenic River Act does not define any of the "outstandingly remarkable values" in section in section 1273. Nor does it appear that there is a minimum number of ORVs that have to be present. If there is one found within the river corridor and the river is considered "free-flowing" that river may be eligible for inclusion. Any qualifying ORV "should be located in the river or on its immediate shorelands, contribute substantially to the functioning of the river ecosystem, and/or owe their location or existence to the presence of the river." 2004-196 Memorandum at 2. The Draft report explained that the ORVs have to be river related and to be "outstandingly remarkable" the value "must be unique, rare, or exemplary, as well as significant within a defined 'region of comparison.'" Draft report at 9. This definition was created by the National Park Service and has been upheld. Friends of Yosemite Valley v. Norton, 194 F.Supp.2d 1066,1086 (E.D. Cal. 2002). The Draft report explained that a "region of comparison:" is used to compare the special values for which a river is being considered against comparable elements within a defined geographic area. The area, region, or scale used for comparison is not fixed, and should be that which best serves as a basis for meaningful analysis-it might vary, depending on the value being considered. |
| 64 | The 8351 manual provides explanations and descriptions of the "outstandingly remarkable values." Those are: 1. Scenic: The landscape elements of land form, vegetation, water, color, and related factors must result in notable or exemplary visual features and/or attractions within the geographic region. The exemplary visual features and/or attractions within the geographic region .... When analyzing scenic values, additional factors Such as seasonal variations in vegetation, scale of cultural modifications, and length of time negative intrusions are viewed may be considered. Scenery and visual attractions may be highly diverse over the majority of the river segment length and not common to other rivers in the geographic region. 2. Recreational: Recreational opportunities are or have the potential to be unusual enough to attract visitors to the geographic region. Visitors are willing to travel long distances to use the river resources for recreational purposes. Recreation-related opportunities could include, but not be limited to, sightseeing, wildlife observation, camping, photography, hiking, fishing, hunting and boating. Interpretive opportunities may be exceptional and attract or have the potential to attract visitors from outside the geographic area. The river may provide or have the |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | potential to provide settings for national or regional commercial usage or competitive events. In addition, the river may be eligible if it is determined to provide a critically important regional recreation opportunity, or be a significant component of a regional recreation opportunity spectrum setting. 3. Geologic: The river or the area within the river corridor contains example(s) of a geologic feature, process, or phenomenon that is rare, unusual, or unique to the geographic region. The feature(s) may be in an unusually active stage of development, represent a textbook example and/or represent a unique or rare combination of geologic features (erosional, volcanic, glacial, and other geologic structures). 4. Fish: Fish values may be judged on the relative merits of either fish populations or habitat, or a combination of these river related conditions. a. Populations. The river is nationally or regionally one of the top producers of resident, indigenous, and/or anadromous fish species. Of particular significance may be the presence of wild or unique stocks, or populations of State, federally listed, or candidate threatened and endangered species. b. Habitat. The river provides exceptionally high quality habitat for fish species indigenous to the region. Of particular significance is habitat for State, federally listed, or candidate threatened and endangered species. 5. Wildlife: Wildlife values may be judged on the relative merits of either wildlife populations or habitat, or a combination of these conditions. a. Populations. The river or area within the river corridor contains nationally or regionally important populations of resident or indigenous wildlife species dependent on the river environment. Of particular significance may be species considered to be unique or populations of State, federally listed, or candidate threatened and endangered species. b. Habitat. The river or area within the river corridor provides exceptionally high quality habitat for wildlife of national or regional significance, or may provide unique habitat or a critical link in habitat conditions for State, federally listed, or candidate threatened and endangered species. Contiguous habitat conditions are such that the biological needs of the species are met. 6. Cultural: The river or area within the river corridor contains a site(s) where there is evidence of occupation or use by Native Americans. Sites must be rare, have unusual characteristics, or exceptional human-interest value(s). Sites may have national or regional importance for interpreting prehistory; may be rare; may represent an area where culture or cultural period was first identified and described; may have been used concurrently by two or more cultural groups; or may have been used by cultural groups for rare or sacred purposes. 7. Historic: The river or area within the corridor contains a site(s) or feature(s) associated with a significant event, an important person, or a cultural activity of the past that was rare, or unusual in the region. A historic site(s) and/or feature(s) in most cases is 50 years old or older. Sites or features listed in, or eligible for inclusion in, the National Register of Historic Places, may be of particular significance. 8. Other Similar Values: While no specific evaluation guidelines have been developed for the "other similar values" category, additional values deemed relevant to the eligibility of the river segment should be considered in a manner consistent with the foregoing guidance -- including, but not limited to, hydrologic, ecologic/biologic diversity, paleontologic, botanic, and scientific study opportunities. The Draft Eligibility Report for the Uncompahgre Planning Area included a ninth ORV called "vegetation" which explains that the "segment supports a riparian vegetation community that is a superior occurrence or is rare on a global basis." Draft report at 12. In applying these criteria to portions of the rivers included in the Uncompahgre Draft Eligibility Report, certain river segments do not meet the above requirements and should be withdrawn from further consideration. |
| 65 | The Dry Fork Escalante Creek Segment 2, particularly the lower portion which flows through the Escalante Ranch private property, does not meet the eligibility requirements under the WSRA. Although the draft plan notes the ORV for this section as "vegetation," the portion of the creek that flows through the Escalante Ranch private property is actually part of a hay meadow and orchard. The Ranch's private property is located on both sides of the creek. The creek physically flows less than 10 days per year. There are water rights and man-made diversions in this segment of the creek and livestock pasture fencing across the creek. There is a system of culverts that carry water that span the creek bed. A significant amount of brush has been removed from the private land and pushed up against the creek as rip-rap or berms to keep the creek from flowing into the orchard. Although the BLM draft plan claims that the ORV vegetation is "globally imperiled," there are thousands of acres of this same vegetation in this local area, including a significant portion on acreage that is not included in this draft report. |
| 66 | Escalante Creek Segment 1 also flows through the private property of the Escalante Ranch, as well as through BLM grazing allotments permitted to the Escalante Ranch. As with the Dry Fork Escalante Creek Segment 2, there are water rights and man-made diversions in this section of Escalante Creek as well as livestock pasture fencing and cattle water gaps across the creek. There is a privately owned cabin located directly on the bank of the creek, and a county road fords the creek bed. This creek also is not free-flowing year around and in fact completely dries during certain periods of the year. Although the draft plan claims that the ORV vegetation is |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | "globally rare," there are thousands of acres of this same vegetation in this local area, including a significant portion on lands that are not included in this draft report. With regard to the recreation ORV, kayacking already occurs on the BLM managed portions of the creek segment. |
| 67 | Escalante Creek Segment 2 flows through approximately 8 1/2 miles of Escalante Ranch's private property with less than 1 mile of this proposed segment flowing through BLM managed lands. This segment does not meet the eligibility criteria for a wild and scenic river as it contains eight dams and water diversions which cross the creek, most of which are 4 to 6 feet tall. During certain times of the year, no water flows in the creek after the last diversion. There is a system of culverts that carry water that also span the creek bed. There are dozens of fences and water gaps across the creek used as pasture fences for the Ranch's livestock grazing operation. There are five homesteads on the creek bank. There are also cattle working facilities located on the creek bank and a significant amount of rip-rap and other berm materials have been placed in and along the bank to keep these corrals, scales and other working facilities from washing out. A significant amount of work has been done on the creek to keep the water from cutting into the fields and orchard. This work includes man-made brush berms. There is no public recreation access to this part of the creek on the Ranch's private property. There is one diversion constructed by the county as a pool to get water for the county's use. Irrigation ditches parallel the creek for between one to two miles to get irrigation water to the Ranch's irrigated meadows and pasture land. County roads cross the creek in numerous places, and private ranch roads ford the creek in four additional places. There are basically no fish in this segment. |
| 68 | With regard to the ORVs, there are no Colorado hookless cactus or Eastwood's monkeyflowers in this section of Escalante Creek, although there is an ACEC to protect the monkeyflower in Segment 1. As with Dry Fork Escalante Creek Segment 2, although the draft plan claims that the ORV vegetation is "globally imperiled," there are thousands of acres of this same vegetation in this local area, including a significant portion on lands that are not included in this draft report. The owners of the Escalante Ranch have never viewed a falcon in this area in 20 years and the small band of Big Horn sheep that have recently moved into the area are located on the Ranch's alfalfa fields, and are not using the creek. |
| 69 | The Gunnison River Segment 3 also flows through portions of the Escalante Ranch's private lands. There is a bridge that crosses the River and the railroad right-of-way parallels a significant length of the proposed segment. The railroad has done a significant amount of man-made work in the river and on its banks to keep the river from washing out the right-of-way. There are several homes on the river bank. A large number of people camp within the railroad right-of-way and "calling attention" to this area by designating a wild and scenic river will simply compound this problem. |
| 70 | Although the map shows this [the] proposed segment stopping at the state land boundary, there is no explanation as to why. The lands owned by the state contain exactly the same components as those proposed by the eligibility report. |
| 71 | Although the draft plan notes the petroglyphs in the area, two of those are located on private land and there is no public access to these lands. There are 10 homesteads along this segment, two gravel quarries, many significant water diversions including at least four water pumping stations one of which is mounted on a man-made pier which extends into the river. The private land impacted by the proposed segment includes several orchards, irrigated pasture and cropland. |
| 72 | There is also a question about how the percent ownership of this segment was calculated in the draft plan. These percentage ownership calculations are misleading in favor of the BLM and must be corrected. |
| 73 | The Escalante Ranch appreciates the ability to comment on this proposal and requests notification of all other documents related to this proposal. Again, because the four segments listed above [Dry Fork Escalante Creek Segment 2 Escalante Creek Segment 1 and 2, and Gunnison River Segment 3], do not meet the criteria for inclusion under the WSRA and because any inclusion of these lands may have a detrimental impact on the current survey work and proposed land exchange relating to the recent wilderness designation, the four segments listed above should be withdrawn from further consideration. Should you have any questions please do not hesitate to contact me. |
| 78 | This is a letter of opposition regarding the Wild and Scenic eligibility of the Gunnison River including Escalante Creek, Roubideou Creek and their tributaries. Our family and friends have worked and enjoyed these areas for generations and we don't want the Gunnison River and its segments to be eligible for Wild and Scenic. |
| 164 | I have also read comments regarding the Draft W.S.R. Eligibility Report submitted by Marc Stimpert, on behalf |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | of Richard Miller and the Escalante Ranch. I find his comments and reservations to be sound reasons for removing Escalante Creek for eligibility status. |
| 165 | Further, I have a real tangible problem with the encouragement of kayakers through private land sections (particularly mine!). I have no problem with people running the creek down through public land sections, including the Potholes. However, for the past 8 years, I have had an increasing problem each spring (high C.F.M.S.) with kayakers who show no regard or respect for private property or conservation consciousness. They have driven around my posted gates; cut fences and destroyed pristine areas on and around my private land. They cut ugly tire marks through the cryptogamic soil that do not come back readily as they do when grazed on and tracked by cattle, sheep, and wildlife. The kayakers who "put in" between my southern boundary and the Escalante Forks consistently defecate and leave toilet paper along my portion of the creek. There is no management of this recreational use, even in the Public land portions. |
| 166 | For these reasons and due to private land and water ownership, I (and the other private land owners) would like to see at least the private sections of Escalante Creek removed from Eligibility status for the W.S.R. |
| 167 | I am part of the Western Chapter of the G.P.A.A. and do not believe that the San Miguel River should be part of the Scenic River Amendment. We take good care of the river by keeping it clean and trash free. All the panning for gold that we do does not affect the river flow as spring runoff puts it back as it has always been. |
| 168 | The government is getting to large as it is. We do not need this in Western Colorado as water rights are the most important thing in the west. |
| 261 | Wild and Scenic River Designation- Wild and scenic river suitability, designation and subsequent management actions should consider potential effects on water uses in the basin and cannot affect operation and maintenance of our water projects without Reclamation's concurrence. |
| 263 | We have no comment or recommendation regarding the proposed eligibility of the various stream segments. However, we will take another look at these segments during the suitability determination phase. |
| 264 | We suggest ranking the vegetative Outstanding Resource Value (ORV) based on the relation of a specific vegetative community to its historic range. That would appear to be more appropriate than the use of global rarity/importance rankings. The use of global rarity/importance rankings for vegetation ORVs seems misleading. In general, all endemic western Colorado riparian vegetation is going to be rare and likely considered imperiled on a global basis primarily because it only exists within a very small portion of the globe. The more specific endemic riparian communities and their components in western Colorado are even more globally rare, because they are an even smaller portion of the general western Colorado riparian classification. |
| 265 | Page 50, Map 5-11 Deep Creek: The map should be revised to show Bureau of Reclamation's (Reclamation) withdrawn lands at Paonia Reservoir. The current map shows Reclamation 's withdrawn land as BLM land. These withdrawn lands are Section 5A lands (Reclamation jurisdiction) pursuant to the 1983 BOR/BLM Interagency Agreement. |
| 266 | Page 51 , River Segment Ownership and Land Ownership Tables: These tables should be revised to include Reclamation 's ownership. |
| 267 | Page 94, Upper Dolores Hydrologic Unit Map: We recommend that the Dolores River Segment 1 be shown as eligible on this map. |
| 268 | We also recommend that you include a summary of the eligibility determination from the San Juan Public Lands (SJPL) Draft Land Management Plan here. The summary should be only for the 11.8 mile UFO portion of the larger 109 mile long McPhee Dam to Bedrock segment. You should use the same format used in this draft report (i.e., identify the location, length, ownership, ORVs, and preliminary classification). An eligibility summary of this segment in the same format as the rest of this document would help readers to visualize the eligibility of this segment without the clutter of the original SJPL analysis. As a part of this summary, a statement to the fact that the San Juan Public Land Center determined this segment eligible in their Draft RMP would be appropriate. |
| 269 | Pg. 97, 5) Wildlife - The narrative regarding peregrine falcons should be revised to reflect the actual status. How does the statement that peregrine falcon pairs were observed in Escalante Canyon relate to the wildlife Outstanding Resource Value (ORV) for this segment? Are peregrines, in fact, nesting/breeding within this segment? |
| 273 | The same principles of historic multiple use apply to private property rights along the segments of stream identified as eligible for Wild and Scenic River designation. In Colorado, water rights are private property rights |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | according to the Doctrine of Prior Appropriation. Ranches efficiently use and reuse water many times for irrigating crops and watering livestock along private stretches of streams and rivers. |
| 282 | I wholeheartedly support Wild & Scenic designation for the San Miguel within the RMP boundaries. |
| 298 | My main concern is when is -the Government going to wake up and realize they are broke, no money. This is just more governmental land grabs, that will end up costing tax payers more money. Nothing good will come from the change of designation for the San Miguel. The process you are going through right now is costing a bankrupt government more money. |
| 299 | We hold claims on the river, multiple families could eek out a livening if necessary, We pay fees every year to the BLM for being a claim holders, it makes no sense to take more money out of the BLMs coffers to add more regulation, plus take away more of our public lands. |
| 300 | The BLM needs to generate income, not add more employs and regulations. Look around , tax revenue is down and your wasting more tax dollars for what. Please wake up, the San Miguel isn't broken stop trying to fix it. |
| 310 | The Wild and Scenic River Act of 1968 was enacted during a time that dam-building was rampant. The act called for rivers with "outstandingly remarkable" characteristics to be preserved in their "free-flowing condition" for the enjoyment of present and future generations. According to Maggie Kelsey, Wild and Scenic Rivers coordinator for the BLM, "The purpose of the act was to have vestiges of rivers that weren't going to be totally industrialized, so that some rivers could just be rivers." Times and laws have changed dramatically in the 42 years since the act's enactment. Lands currently held by Federal agencies through which these waters flow are protected by proven existing laws and acts already in place. Development cannot take place, dams cannot be constructed without Federal approval, roads, trails, paths, and basically any improvement cannot be constructed nor used without Federal agency approval. The State owned land that these waters flow through should be under the jurisdiction of the State. |
| 311 | States' interests' need to be protected. This act could thwart Colorado's effort to develop its water supplies. |
| 312 | This then, leaves only the private properties through which the waters flow. This act usurps the property owner's rights in regard to their livelihood.. be it ranching, mining or just someone who wants to live without neighbors a stone's throw from their porches. |
| 313 | Our area is very arid; water is scarce and has been a major point of contention since man walked upright. The interpretation of this act may jeopardize water rights in areas that every drop of water is accounted for and used. Water utilization in the last 42 years has grown and is realized as an extremely valuable asset. An asset that human, livestock, bird, mammals, fish essentially every breathing thing depends on. |
| 314 | There are no guarantees through time and administrations on how these acts will be interpreted or used. This designation in other states has led to restriction in grazing and agricultural uses. It is my fear that awaiting Congressional approval our public lands agencies will manage these rivers as if they were wild and scenic, restricting water development, grazing, mining as well as promoting the recreational uses. |
| 315 | Your Eligibility Report has wonderful graphics, flowing language, tugging at heartstrings, envisioning a wonderful panoramic view ---BUT it does not address the people, the pioneers that have carved out their homes and ranches along these corridors. Your act will have far reaching economic impacts and personal hardships on these families. By using the ¼ mile each side of the water channel as your base, the percentage of federally owned lands versus private looks wonderful, appearing as if this act will not affect but a tiny percentage of small family lands. This report does not in fact address the fact that the private land is enormously affected as being the closest to the channel, affected the most. I think a good example would be like a large park in an inner city...beautiful, used by the multitudes, then a new act; lets' call it the Scenic and Wild Park act goes into effect: all of houses abutting the park will now be under park authority; types of lawns, how you mow them, fertilize or take care of those pesky grubs, if you drive your car down the street, can park by your house, maybe your dog will be too large or your children too loud, what your roof can look like and on and on. Wait a minute...aren't those little items already covered in building and municipal codes as well as covenants? |
| 316 | A great many of these river segments in the inventory flow through an area well documented holding a tremendous amount of uranium. In the years to come this uranium and the nuclear power plants may very well be our main source of energy. How will this act affect that industry? The Clean Air Act, Mining Act and a multitude of laws and acts already protect our environment. |
| 317 | As an aside, in your report, the old mining buildings are used as an example of cultural and historic remarkable |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | values, are these same buildings that in other reports are considered an eye sore, unsafe and need to be torn down and the sites returned to "native"? |
| 318 | The wild and scenic designation will not protect, it will only harm in the long term. I ask you to look at the laws and acts already in place and to utilize those tools. Use the federal resources in a positive way to make our environment better; not by more legislation, but by actual work, cleaning up trashed areas, building trails and improvements to lead the public where their use makes less of an impact. Education on the areas to "Leave no Trace", weed and invasive species eradication and patrolling will all do more to help our environment than another piece of unnecessary legislation that sure resembles a "takings" type legislation. |
| 319 | I am opposed to the utilization of this act on our rivers. I do not believe that this landscape has any more "outstandingly remarkable values" than any other part of the area. I am against designation of the Wild and Scenic designation of any of the river segments listed in appendix C Uncompahgre Rivers Inventory. |
| 338 | Saltado Creek Canyon is a spectacular steep sided, deep and wild canyon adjoining the San Miguel River canyon. It is the only major tributary canyon/stream to SMR that has no roads or bridges. It is a key wildlife corridor connecting Uncompahgre Plateau to the Delores Mountains and wilderness areas to south. The current level of access should be maintained and no further development of access should occur. It should be designated a "wild" river section as proposed in the WSR Eligibility Report. Hunting and grazing should be maintained with the possible exception of better protection for riparian habitat from cattle. No motorized access, other than emergency vehicles or maintenance, should be allowed. This area should be managed with wildlife being the predominant management goal. It is also prime Lynx habitat. |
| 342 | The San Miguel River corridor should be designated "scenic" as proposed. |
| 359 | In my opinion we do not need any more wild or scenic designations in this area. The local economy really needs to use this land. I do not believe there is damage being done so much that we need to not use the land at all. What good is the land to anyone if it can not be used for anything? God made the earth for man to use, he did not make it just to just look at. This area around Nucla needs to use this land!! |
| 360 | We do not need WSR Act in Colo. The San Miguel River doesn't need the WSA act. Designations. |
| 367 | We do not need any WSR designation in Colo. Public lands should remain multiple uses. Management is in place today, it works well now, it will work well into the future. |
| 379 | The use of our natural resources for livelihood is more important than for "wild," "scenic," or "recreation." |
| 387 | I have seen firsthand the effects of tourism pushing, as I watch the pristine archeological sites along our private areas and on the public areas along the Gunnison River and the Escalante Canyon, as they are falling victim at an alarming rate to vandalism and the need for all the tourists to leave their initials over the top of the sites. I have seen the trash scattered all around, cigarette butts lying amongst dry grasses, dirty diapers strung out on the road, our historical sites being vandalized and irreplaceable historical equipment and antiques stolen, Historical buildings have been burned to the ground. Along the Gunnison River, I am no longer comfortable with taking my children for walks along the river paths along the private property we live on due to the increasing run ins with rafters in the nude on our sides of the river banks, stepping in their defecation, picking up their beer bottles and trash, and the general lack of landowner respect whereas they camp wherever they like on the property leaving their trash for us to clean. Our cattle have had glass in their hooves, our property has been defaced and our livelihoods are interrupted by the influx of those who seem to think we need to relinquish our rights as property owners for the mere sake of an "aesthetic" experience. |
| 388 | Speaking of aesthetic experience, we put a lot of sweat and blood in to making that happen, as it is due to our toils on the lands that the deer, elk, desert bighorn, and countless other wild species flourish along this river and creek presenting magnificent "aesthetic" viewing opportunities to the tourists. We are the ones with the true, genuine love and respect for this land as we live in it, make our livings from it and work year round without paid vacations, sick leave, holidays, 401K plans, etc to steward it. We do not make decisions for it from our computer desks thousands of miles away in a Government office based on "studies" conducted by highly paid book educated environmentalists. We are in it and on it every day of the year, with no reimbursement for our contributions to it other than the enormous attorney fees out of our pocket to protect it. We do not have government or tax funded contributions for our efforts, and we are the ones watching it being taken away from us. The public is being given less and less opportunity to aid in the stewardship and decisions concerning these lands, and the entities promoting these proposals are bullying their way into the passing of such proposals. |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| 389 | I feel that to cater to special interests only is wrong and un fair, and I feel that should this proposal be allowed to pass, the history of this area, the pristine of this area, the wildlife, the families and economy of this area are jeopardized strongly. I have seen first hand the crooked ways used to accomplish agendas by the BLM in the last couple of years (i.e. bold faced lying and the willingness to leave out important information regarding agendas) which has resulted in the growing lack of respect and desire to work with the BLM from local interests of all types, namely those being affected the most. I strongly oppose the WSR proposals for these areas, and will do my best to educate the public on what I have had the opportunity to witness during this process and other related processes in the recent last couple of years, so that they (public) have the right to know what all these kind of proposals actually entail. I do not support governmemal land grabbing. |
| 390 | This letter is to express my concern and opposition to the eligibility report for the Wild and Scenic River Act. Namely, the Gunnison River Segment(s) between Escalante Canyon and the Mesa/Delta county line, and the entire stretches of Escalante Creek and its tributaries. More importantly, the private property stretches involved. I believe these segments should be excluded completely from the inventory; the majority of these segments are along private property owned and operated by Dick Miller/ Escalante Ranch. The BLM grazing permits also belong to Dick Miller and Escalante Ranch. I do not believe that the entire segments that have been evaluated by the BLM without trespassing on the private property. Being manager of Escalante Ranch, I know permission was not given to the BLM to trespass on these private segments. The majority of the water rights along these segments also belong to Dick Miller/Escalante Ranch. When the water is being diverted to irrigate, the Escalante Creek can and/or is completely dried up, leaving no water for the in-stream flows being proposed by the BLM for WSR's. |
| 391 | There is also wording in the BLM manual that gives the BLM rights to acquire land along the segments in the WSR. The ability to acquire land also describes condemnation of water rights and private property as a BLM option should it deem necessary. That makes the WSR act on these segments unacceptable to me and likely the majority of the public. |
| 392 | If the eligibility passes, it could potentially jeopardize the well being of this ranch(s) along Escalante Creek and the Gunnison River. The Escalante Ranch employs as many as a dozen people along with their families that live and help out on the ranch. It would not be beneficial to the community to have these families displaced because the ranch could no longer sustain itself due to the restrictions of the BLM and the WSR. |
| 393 | When the NCA was designated, it was supposed to protect whatever was inside its boundaries, if protection is what the BLM was seeking, then why include these segments in the inventory? It is my understanding that if protective measures are already in place along these segments then there is no further need for these segments to be in the WSR inventory. |
| 394 | In conclusion, I am completely opposed to any WSR designations along the Gunnison River segments from the Escalante Creek to the Mesa/Delta county line, and also Escalante Creek and all it's tributaries in their entirety. I am also opposed to these segments being in the eligibility inventory. I would hope these segments be released from consideration before the suitability stage. |
| 420 | I personally think our tax dollars would have been better spent on road and trail maintenance not drawing up a plan of attack on the ordinary citizens that use public lands for recreation. The plan was put together to limit and drive out certain recreational groups such as fisherman and recreational dredgers that have legitimate placer claims on the San Miguel River or any other river that have placers on them. And last but not least my comment form is going to be sent to every conservative Governor, Senator, Representative and prospecting club in the state. |
| 450 | I am not in favor of converting the San Miguel River into a Wild and Scenic River. |
| 451 | I am not in favor of wild and scenic classifications for rivers anywhere ... this is public land ... leave it as it is! |
| 452 | Overall, we would ask you to make sure that all potential wild and scenic river corridors in the area be preserved and that any energy related development in those areas be avoided. We specifically are referring to the San Miguel River corridor, the Dolores River Basin and to Norwood Canyon. |
| 478 | This comment is regarding the implications of Wild and Scenic River designations. I have concern with Wild and Scenic River designations impacting existing and future water uses in the upstream watersheds. Wild and Scenic Rivers require minimum water quality and quantity standards. It should be clearly defined that a Wild and Scenic River designation can not impact upstream water users. If minimums water flows are established this could force municipalities, farmers, and mineral and energy development users to restrict their uses, which |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | would result in drastic economic hardships especially within the communities of the North Fork of Gunnison River. |
| 488 | In general, I support designations of "wild and scenic" to those stretches of water that warrant it and would hope that the few cases of private ownership of adjacent land that would be negatively affected could be dealt with individually. |
| 490 | With the current state of our economy, I believe the Wild and Scenic Act would be very harmful for the development of the West End on Montrose County. We need as a community, to be able to develop along the San Miguel River. |
| 519 | Rubideux Creek needs federal protection to prevent the State of Colorado Prison Camp from totally taking and interesting area fully of pre-historic Indian sites, wildlife, and scenic values. |
| 521 | The whole of the San Miguel River needs and deserves Wild & Scenic designation. The steep canyon side provide essential wildlife habitat and scenic values. |
| 522 | Saltado Creek is the wildest accessible (if you wade the river) area in this region. The Bill Carstens subdivisions of the properties on the mesa above provide good protection. |
| 523 | Beaver Creek while logged in the 60s still provides good over habitat and scenic values, plus amazing fishing. |
| 574 | The possible designation of Wild And Scenic Rivers on the San Miguel as it flows through Montrose County would be a huge blow to maintaining the agricultural/ranching flavor found there as well as impairing municipal and commercial growth and/or maintenance in that area of Montrose County. |
| 610 | For me specifically I kayak both the San Miguel and Doloras rivers many times a year. The San Miguel river from Norwood bridge to just above Pinyon bridge is currently being petitioned for a new wilderness area. As you know the area is mostly roadless and the experience is of isolation and seclusion. I hope you consider this proposal in the RMP revision process. I also understand that Congress designates wilderness solely but it may be a good idea to include in the new RMP as a study area for wilderness. The second area is the Doloras river. This river may qualify as a wild and scenic river. I hope you consider this as a possibility. |
| 611 | To me, oil and gas surface occupancy does not fit the character of these river systems. Oil and gas surface operations are industrial in nature and these rivers currently do not exhibit those traits. New exploration would likely reduce the current character of the river and thus likely change the experience one would have on both rivers. |
| 665 | We are concerned that the 2006 field season was not long enough to collect the needed data for the draft Wild and Scenic River Eligibility Report. |
| 666 | We are concerned that segment classifications will hinder Norwood Water Commissions future development of a Conditional ? Water ? On the San Miguel River. |
| 686 | The San Miguel River Corridor is an important natural and economic asset to San Miguel County. The scenic byway, fishing, and rafting use make it one of the most appreciated natural features in the county. The BOCC has reviewed the Wild and Scenic eligibility analysis developed by BLM. We concur with your findings of eligibility as they relate to waters within San Miguel County. We look forward to working with BLM to complete the suitability analysis and develop a management strategy that provides the San Miguel corridor with comprehensive and durable protection. |
| 697 | I am concerned about the San Miguel River being designated a wild and scenic river. This designation would put too much control of the river in the hands of the government and environmentalists. |
| 699 | Any decisions about management of the river should be kept away from environmentalists. People making the decisions, not some person in an office somewhere that hears a story about a fish or a bush and thinks they know what is best for the area. |
| 700 | Public lands should be just that, "Public." Road closures and limitations on river use should not be controlled by the government. It should be controlled by local groups that know the area. |
| 701 | A wild and scenic river designation is totally ridiculous. This is just another example of people in government trying to control things they know nothing about. This designation would be detrimental to our community and way of life. |
| 726 | If the San Miguel River is made a wild/scenic river what will be the dispositions of existing gold claims on the |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | river? Will motorized equip, eg dredges and high bankers be prohibited? |
| 727 | I would change nothing and keep the river as it is, and keep its many uses intact w/o further designation. |
| 755 | Please leave our rivers as they are. |
| 758 | River rafters and hunters are fine along with grazing and farming. |
| 759 | We all need to be able to use the rivers as intended. Drinking, flushing and irrigation. |
| 796 | I am writing to express my concern for more restrictions regarding the San Miguel River. I am a prospector and current placer claim holder on the San Miguel. It has been proven that dredging with a small dredge (4" or less) not only cleans the sediment left from snow melt and storms and enhances fishing habitat, but also cleans the river of harmful mercury and lead from fishing. We as prospectors live by a code of ethics leaving the area cleaner than we found it, many times cleaning up trash and feces left by kayakers and rafters. We fill in our holes. We are good stewards of the land. We do not interfere with kayakers and rafters as they require high water and we require low water. Please protect our freedom to access and use this river that we love, respect and protect. |
| 804 | As a gold prospector who has gold claims on the San Miguel River we are concerned that there was no information given about our rights as prospectors. All that was mentioned was boaters and fishermen. We don't want it to be part of the WSR system. We are not doing any damage to the river. We feel we are cleaning up the river. We have picked up trash (from the boaters) we have gotten mercury out, broken glass, lead weights. |
| 805 | We also feel that it will affect the water rights of the people in Nucla. |
| 812 | I am a prospector on the San Miguel River and I feel that I have no representation from anyone on this plan. All anyone can talk about is the rafters, kyakers and fishermen. I feel the wild and scenic that is being considered is not needed and should be dropped. |
| 817 | Rivers: Pursue Wild and Scenic River designation, or failing national designation take steps locally to protect the high quality riparian areas that were deemed eligible by the study group that met in March, 2009. |
| 824 | I am very concerned about the decision to turn the Gunnison River and Escalante Creek areas into the wild and scenic. I am strongly opposed to the decision to do so as it poses great threat to my job in provision for my family of five if Mica AG Inc/Escalante Ranch is terminated. Please consider the livelihood of those who live on and around the Gunnison River and the Escalante Creek areas.. We are concerned citizens who exercise our rights as American citizens in voting processes and legal matters. |
| 874 | Wild and Scenic Rivers: Did anyone take a look at the Roubideau and it's tributaries? |
| 894 | Stop the wild and scenic designation process. |
| 908 | Our concerns are with the Wild River Scenic Issue. We are against the proposal. We want the San Miguel River left like it has been for years in the past. |
| 909 | There should be no landscape changes because the width along the river does not allow for any. |
| 910 | Keep the River on the multi-use concept. |
| 911 | We are ALL against the Dustream Flow! |
| 913 | Please do not do anything that would cause the people to lose some more of their great heritage such as being able to use and enjoy our lands. This includes fishing. camping: floating the rivers or the pursuit of finding a small amount of gold or a bigger amount if able. |
| 919 | Please continue to manage wilderness study areas as such and maintain them as suitable for inclusion as Wilderness Areas. However, I question some of the wilderness characteristics of Adobe Badlands because of the noise from air and auto traffic. |
| 924 | Leave this area alone. Let us do what we have been doing for so many years. |
| 925 | Make no physical modifications or otherwise. What is wrong with what it looks like now? This is nature at its finest. |
| 928 | All is needed for regulations is to enforce what is on the books. No need adding more regulation that is not enforced now. |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| 930 | Number of users is not a issue. Size of user groups is not a issue. Behavior of the Early Spring Group. As follows, lack of consideration land owners and others, the frame of mind to use, abuse and let someone else take care of what is left behind. Lack of consideration for wild life and environmental impact. |
| 931 | If this project should go forward, this will become a place that will not be dealt with and become a wasteland with more regulation, closing of the area. Far reaching outside the scope of this. Loss of jobs and businesses within the affected area. This club has also sent 3 Cancer kids to a camp every years. This club will dissolve will no longer send these kids to camp. |
| 933 | Reading the literature that pertains to this project, I find that this is inclusive completely up to personal interpretation by few for their personal gain. This will only benefit a few and not everyone. Lack of knowledge and education of endangered species by the few that will have access. Without diversity of the users there will be no options for diversity. Open Space will become a private playground for a few special groups, excluding the real stewards. Again lack of knowledge and education of historical and archeological surrounding by the few that want change. As for historical meaning, I went to school in Uravan. Lived my entire life in Colorado. Of all the changes in this area, this has to be the worst. |
| 934 | History will tell you that this is a bad idea and destined for failure for wild life, archeological, endangered species, biological and preservation of open space. Living in the back country most of my life, I can see where there is a lot of loop holes in this project. It is very obvious who and what has started this project. |
| 935 | What is wrong with the Uncompahgre as it is now. This has been a great place for local people, along with the wild life and purity of the water shed. Why change this with a study being done by non-locals. If this takes effect, I believe that a video camera to show the infractions on abuse of wild life and purity of trash. Recreational by several groups and limited to a few. This seems like discrimination. Leave this area alone. Leave as is for all. |
| 936 | If there is have a area protected maybe you should find a more populated place for protection. Not this area where there has been no changes in 50 thus years. |
| 937 | This exhibits discrimination to 95% of the public. The other 5% that would be allowed to use this area, canoes, kayakers, and rafters are the ones that show no respect for the river banks or wildlife. |
| 938 | I see no change needed. Nature made it the way it is. It is beautiful the way it is. Don't mess with Mother Nature. |
| 939 | Enforce regulations already on the books. No need to add new ones when the ones you have are not being enforced. BLM should keep an eye on this area, it would allow you to see who is throwing trash and pollutes the river. |
| 940 | Lack of cleaning up after one's self and lack of caring that someone else has to clean up after you. Lack of respect and consideration for wildlife and landowners. |
| 941 | The number of people in a party makes no difference as long as they respect everything. |
| 942 | The BLM has done its best to keep this plan as secretive as possible from the public for its own gain. This project needs to be forgotten and let the people, 100% of them enjoy the river and what nature has put there. Let the wildlife live in what they are used to and what nature gave them. Everyone, including the BLM, knows that this unreasonable and discriminating project will not stop where it starts. I feel that this is just a way to deprive the public and land owners make this a playground for a handful of groups. Again discrimination. |
| 943 | The BLM will eventually deter farms, ranches, fruit orchards, vineyards along with our organization which sense three children a year to Camp Wapiyapi which is a camp for children with cancer. |
| 944 | I am asking you to forget this project for the good of us all. |
| 945 | This plan for the San Miguel and Dolores River area is very disturbing to me. I strongly oppose any plan like this to our public lands which would revoke our freedom to use them. |
| 946 | Our country desperately needs a clean source of renewable energy and hydropower is a clean source. At the time we have no other real resources and until we get some and it becomes plentiful, our country needs gas, oil and mineral such as uranium. |
| 947 | Please! Do not restrict or revoke our freedom to use our public lands for clean responsible mineral extraction and please do not restrict our Uncompahgre BLM resource with a Wild and Scenic designation. |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| 948 | I am writing this is support of maintaining the present RMP governing the San Miguel river. I do not believe that putting the section from Placerville to the Pinyon bridge into the "Wild and Scenic Rivers" act will benefit the largest amount of the river users and the public at large. Putting this section into the WSA really only benefits fisherman, rafters and tourists at the expense of the local water users and the domestic water supply for Nucla. |
| 949 | This all appears to be done with the intent to deny access to the claims utilizing any flimsy excuse that can be dreamed up by the BLM personnel. There seems to be a national trend in the BLM management to exclude local water rights and local water uses in favor of tourists, fishermen , rafters and other so-called eco-friendly groupies. |
| 950 | Please leave the San Miguel River alone, there is already enough regulations in effect as it stands. |
| 980 | Reams Ranch is opposed to such designation because of but not limited to reasons herein, including that Naturita Creek should not be considered eligible or suitable for WSR designation. |
| 981 | The Draft Wild and Scenic River Eligibility Report finds Naturita Creed to be a perennially flowing tributary of the lower San Miguel River, with no roads running parallel to it, two county road bridge crossings, two state highway bridge crossings, and one unimproved road crossing. The report also mentions water diversions along its reach, but no impoundments. Research finds adjudicated water and ditch rights dating back to 1897 (Maverick Draw Ditch) and water calls on Naturita Creek 11 times in the last 19 years. Evaluation of flaws should focus on normal water years with consideration of drought or wet years during the inventory. Naturita Creek dries up at least every other year. This segment does not contain regular and predictable flows therefore should render it unsuitable for designation under perennially flow. Although no information about easements in the Draft Report there are 4 powerlines crossing Naturita Creek and 2 crossing permitted, and one natural gas line. Naturita Creek is considered to be eligible for designation with a "scenic" classification. Criteria for scenic classifications: largely primitive and underdeveloped, no substantial evidence of human activity. Powerline easements and natural gas line easement should be considered a disqualification for "scenic classification." |
| 982 | This Draft Report finds "Fish" as an outstanding remarkable value. Three fish are named in the draft report, Flannel mouth sucker, Blue head sucker and Roundtail Chub; all on Colorado BLM state Director's Sensitive Species list (2000). Only one, Roundtail Chub is on CDOW's list and not as a statutory category (updated 6-12-2009). CDOW fish studies were requested from: Harry Vermillian, IT Pro II Governor's Office of Information Technology Aquatices Database Manager Colorado Division of Wildlife it appears occurrences are too irregular, transitory and/or dispersed to be reliably identified, mapped and be considered for ORV eligibility. |
| 983 | Approximately 60% of the 24.97 mile length considered remains in private ownership. The Act requires that the agency consider, among other factors in determining suitability (1) the current status of land ownership; (2) characteristics which would not make the area a worth addition to the National System; (3) the reasonably foreseeable potential uses of the land and water that would be enhanced, foreclosed or curtailed if designated; (4) the estimated cost to the United States of acquiring necessary interests from private landowners and of administering the area if designated. In this instance, the extensive private ownership, water diversions that dry up the stream channel, power and natural gas easements, irregular and unreliable fish occurrences, and the substantial cost of acquiring interest to foreclose such privately maintained uses if designated, justify the conclusion that Naturita Creek is not suitable for designation as a WSR. |
| 984 | Reams Ranch is opposed to inclusion of recommendations for designation as WSR of Naturita Creek. Reams Ranch opposition can be summarized as follows: - Perennially Flow - Naturita Creed has gone dry 11 of the last 19 years as a result of the 1897 water right "call." - Powerlines and natural gas easements - Identified easements existing within this reach disqualify this segment for scenic classification. - Fish - Lack of reliable and regular occurrences to be considered for ORV eligibility, along with the fact that only one (roundtail churb) is on CDOW's list and not as a statutory category. Taking all factual data presented at face value, there may not be an ORV to protect. - Ownership - Naturita Creek is predominantly privately owned. Sixty percent of the 24.97 mile river segment identified is owned privately. Designation as part of NWSRS would affect area use, including incompatible uses for the public on private lands. This designation would potentially create serious socioeconomic impact to the private land owner. It could curtail reasonably foreseeable potential uses of the land and related waters if the area were included in the NWSRS. Historical existing rights such as adjusted water rights, mineral extraction rights such as gravel pits, stone, oil, gas and coal, rights of the private land owner could be adversely affected. Scenic easements through private property would encumber the existing regular use of the private land owners such as grazing, irrigating, farming and hunting. Significant potential for |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | jurisdictional disputes over administrative roles and or presence in an area predominantly privately owned exist. |
| 985 | In addition after careful review and consideration of such designation which has no specific management tools to be utilized, such as condemnation, unfairly act to cloud the title of private land owners within the designated area and negatively impacts Reams ranch property rights. As such Reams Ranch suggests that the BLM should find Naturita Creek to be ineligible and/or unsuitable for designation as Wild and Scenic Rivers, and remove recommendations for the same from all pending or future Draft land Management Plans. |
| 987 | We take better care of our claims area and the river than thereafter and kayakers. And our mining activities do not interfere with them. |
| 988 | I do not believe that putting the river area that we lose into the "Wild and Scenic Rivers" Act will benefit the public at large. |
| 989 | I'm 67 years old and a native of Western Colorado and I think that I should have a right to enjoy the water areas in question without somebody telling me that I can't. |
| 1014 | As the owner of a BLM mining claim on the San Miguel River above the Pinyon Bridge, I find it unbelievable that you do not have anything in your brochure about prospecting on the river and have not included our interest in any of the findings. |
| 1015 | Please take the time to familiarize yourself with our group and understand what we do. |
| 1021 | Three pictures with the following captions: Ducks on the San Miguel in Placerville, Colorado American Dipper on the San Miguel River Eagle along the Delores River |
| 1022 | I am writing in support of designating the parts of the San Miguel and Delores Rivers that are being considered as Wild and Scenic. These rivers are truly a great part of the heritage of this area and they are so unique with their wildlife and with their views...absolutely awesome views and absolutely awesome wildlife. And they are so unique rivers rolling though these mountains and canyons. The wild life and the views are just SO outstanding THAT THEY need to be preserved for future generations. I would send you lots of photos in support of my stand for I am a great fan of these awesome rivers and have photographed extensively for our great outdoors is a gift. I am so, so, so fortunate to be able to photograph along the rivers! |
| 1023 | The rivers need this protection to keep them healthy and keep them out of some commercial venture for personal profit (such as the experimental water playgrounds for kayakers where tons and tons of cement is poured in our rivers so a few elite folks can "play" on their toys in the river!). |
| 1024 | The wildlife along the rivers is so unique. |
| 1025 | The canyons are so unique as in the red soil of the San Miguel River Canyon from Deep Creek onward |
| 1026 | The San Miguel is used for awesome fly fishing from April thru November (if the snow doesn't interfere!). |
| 1027 | The San Miguel is used for awesome fly fishing from April thru November (if the snow doesn't interfere!). The river is a place to just pull over such as one can do in the county parks along the San Miguel and just breath some fresh air, listen to the river and be among the beauty of the river. |
| 1033 | I am an owner of a placer daim on the San Miguel River above the Pinyon Bridge. I wanted to write and let you know about the good things I am doing to improve the river and the quality of the fish population. Not only do I remove lead from the river, I remove old mercury from 1900 mining habits. |
| 1034 | By creating temporary fish gabions there is a better area for fish to spawn. |
| 1035 | I also clean the campground areas and am a good steward of the river. |
| 1045 | Do not designate any segment of the San Miguel/Dolores river as "wild and scenic". This river does not flow enough water consistently throughout the year to even allow access to it. We feel this steals the rights of ownership of land owners bordering the river and endangers the existing water rights of citizens. The river is what it is, whether it is designated by a government agency to be "scenic" or "wild". The only reason to designate it as so, is to take rights away from people who own them and to redistribute them. We do not have the infrastructure to support more people. Designation of this sort should be for rivers with consistently higher flow rates and near more populated areas to benefit more people with less environmental impact. |
| 1050 | It is my understanding that the San Miguel River provides irrigation for fanners and ranchers in the area. Having grown up on a farm near Cortez, CO, I can understand how disruption of a water supply is lethal to |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | agriculture, especially here in the arid West. Agriculture is a marginal enterprise at best, but BLM has historically worked closely with farmers and ranchers in any manner they can. I would like to see this support and cooperation continue. I think the question needs to be asked as to whether destroying dams and ditches, thereby depriving farmers and ranchers of an asset (water rights) is moral or legal. Does it conflict with Colorado Water law, since water laws in Colorado are not riparian? If this area is designated in the WSR, it will narrow multiple use of the area by the people. i.e., gold mining hobbyists would be prohibited from filing claims for their various clubs. The public lands should be for the use and enjoyment of all people, not just a few chosen groups. |
| 1051 | There shouldn't be any changes made physically to the landscape. One reason it is even being considered to be part of the WSR is because of its beauty. Why would we want to modify it? If it is included in WSR, the dam and ditch that provides water to farmers and ranchers would have to be destroyed. Along with it, their livelihood would be destroyed. It should be left as it is. |
| 1052 | BLM 's resources are already strained without adding this additional administrative and management responsibility. At a time when the national economy is in shambles, additional personnel and money may not be available to BLM field offices. To put it bluntly, the local field offices do not need to have more duties piled on. Although it is the responsibility of BLM to care for and safeguard our public lands, it would be better to keep it manageable than to add more and more until all of it becomes unmanageable. Plus this let's be honest. Don't we already have enough rules, laws, regulations and restrictions? |
| 1054 | Presently the ACEC & SRMA management plan protects the habitat, the river, and the public land users. Due to the nature of Colorado Water law, putting the river under WSRA may open a contingency of problems not foreseen. While there may be tributaries that should be placed under WSRA, this section of the San Miguel does not need to be included in it. |
| 1083 | Regarding the change in management of the San Miguel River and Dolores River corridors I fret that going to a scenic or more may be too restrictive. The potential loss of private property rights would be costly to a large number of people. The recreational value would not be increased and the scenery cannot be improved. Keeping the management as it has been would be best, I feel. |
| 1084 | I'm writing today because I'm concerned about the law passing that would make the Gunnison river wild. This would negatively impact Escalante ranch and everyone who works there. Several homes would have to be removed and several jobs would be lost. All so people floating down the river don't have to look at the homes of people who work for the ranch. That doesn't sound right to me. Some places along the river are used for agriculture and ranching and have been for a long time. And to try to change that is not very realistic. In my opinion, the Gunnison river is wild enough. |
| 1110 | The Wild River commitment is ridiculous. I love this the way it has been done historically why all the changes now! Forget this thought now!! I object to this Wild River plan. |
| 1111 | My comments are with the Wild and Scenic River issue. I'm completely against the proposal. Leave the San Miguel River like it's been in the past. Weimer Ranch owns land on both sides of Dolores River at Mesa Creek. |
| 1112 | Due to the nature of the canyon width along with the river, there is no room for any landscape changes. Any time you disturb the soils you introduce weeds. |
| 1113 | Keep the river on the multi-use concept. |
| 1114 | Weimer Ranch is completely against the instream flow. |
| 1115 | My concern is regarding the BLM's misrepresentation of Dry Creek (Hydrologic Unit - San Miguel River Section 15) Dry creek is not free flowing It is a dry creek bed 90% of the time in a normal year. The other 10% it is a flash flood, dry in 3-4 days! If you move sage grouse here they will die of thirst! The BLM even refers to it as "intermittent" then later refers to the area as having "low precipitation." |
| 1116 | For this area to be considered "wild" it should not contain a uranium mill reclamation site, as it is far from scenic. The scenic geological features will not be changed or harmed by leaving the area open to the public. Hecla mining at the south end of the valley. |
| 1117 | I would leave the area as it is. The public uses the area for hunting and OHV use. |
| 1118 | There is no sage grouse population here, but if there was, then I would halt importing predators such as the lynx, and I would permit trapping of larger predators such as coyotes. |

**Table C-12**
**Issue I: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| 1119 | The dry creek area is inherently remote. Access is limited to ORV's and hikers. I would not pave any roads to the area, nor would I limit access in anyway, as the existing users are few, and season, ie hunters and cattle ranchers. |
| 1120 | Please consider the economy of Nucla/Naturita area before limiting our resources. We live off of mining and cattle and cannot remain self-sustaining with our lands and rights (to hunt, water rights) given to the Government. |
| 1122 | Current landowners and land use do not interfere with public use and enjoyment of these water systems, as we personally witness hundreds of people every year partaking in recreational activities in and around these areas. |
| 1123 | It must be recognized that a substantial number of hard working American citizens will lose their jobs and their homes as a direct result of this pursuit. Furthermore, adjacent land, landowners, and land use which will be affected, currently support our nation's agricultural production and food supply. Be it known that I believe it is wrong to hinder and intrude upon tax-paying citizens, causing them to uproot their children who are settled in local school systems and communities, forcing these families into unemployment and out of their homes. The area of contention is not a wilderness area, but an area of residents and livelihood. Including the above named waterways in the WSRA, will rob 11 families, just of Whom we know personally, of their incomes and homes; notwithstanding, numerous others who also reside and earn a living along these waterways. I strongly oppose any such threat, now or in the future, to these US citizens. |
| 1186 | We agree with the preliminary classifications as stated in the draft report and think the report accurately represents the values found along the river and its tributaries, as follows:<br>• Beaver Creek: 14.25 miles: Classification -Scenic: Outstandingly Remarkable Values -Vegetation.<br>• Dry Creek: 10.49 miles: Classification -Wild: Outstandingly Remarkable Values -Scenic, Geologic, Wildlife.<br>• Fall Creek: 5.56 miles: Classification -Recreational: Outstandingly Remarkable Values -Wildlife.<br>• Naturita Creek: 24.97 miles: Classification -Scenic: Outstandingly Remarkable Values -Fish.<br>• Saltado Creek: 5.56 miles: Classification -Wild: Outstandingly Remarkable Values -Vegetation.<br>• San Miguel River, Segment I: 27.23 miles: Classification -Recreational: Outstandingly Remarkable Values -Scenic, Recreational, Wildlife, Historic, Vegetation, Paleontology. |
| 1187 | We are pleasantly surprised to have this opportunity to support the possibility of wild and scenic status for portions of our home river. |
| 1218 | I am submitting comments on the Wild and Scenic River Eligibility Report ("Eligibility Report") of the Resource Management Plan ("RMP") for the Uncompahgre Field Office (UFO) on behalf of the Colorado River Water Conservation District ("River District"). The River District appreciates the opportunity to comment on this important piece of the RMP and, in particular, on feasible management alternatives to the eligibility of segments of the Dolores, Uncompahgre, North Fork of the Gunnison and Gunnison Rivers pursuant to the Wild and Scenic River Act ("WSRA") in the UFO. |
| 1219 | Because the River District is charged with conservation, use and development of the water resources of the State of Colorado, we are concerned about the potential that the Eligibility Report and an eventual WSRA Suitability Report ("Suitability Report") might adversely impact our constituents', ability to put water to beneficial use. Therefore, we urge that great caution be used in the process to potentially designate rivers in the Gunnison River Basins under WSRA, and that management alternatives to WSRA be explored and implemented. Historically, the WSRA process has been contentious due to potential impacts to private property rights (water and land), water supplies and related facilities. Although the River District recognizes the need to provide protection for the values that Wild and Scenic designation offers on selected rivers and streams, we believe there are better and more cooperative approaches that may be employed. Our principal concern is that designation, or even eligibility or suitability determination, pursuant to WSRA may be too stringent and restrictive and may reduce critical flexibility to meet future water demands in the Gunnison and Uncompahgre River basins. The Colorado General Assembly and State water users have spent considerable time, effort and money ensuring that Colorado's water law system contains sufficient flexibility. The state's instream flow and recreational in-channel diversion programs are excellent examples of this flexibility. We believe the BLM should employ these approaches first to protect potential Outstandingly Remarkable Values ("ORV") and/or to achieve the desired management objectives. Because the Gunnison River system is already over-appropriated (meaning there are more demands than naturally available supplies), we cannot afford to lose |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | flexibility in the system. Therefore, we encourage the BLM to act cautiously, by not designating as eligible, nor as suitable, all of the segments included in the Eligibility Report. |
| 1220 | In our opinion, there are two categories of river segments in the eligibility report: 1) Those river segments that are not eligible for designation due to a variety of factors (e.g., appropriateness and/or manageability); and 2) Those river segments that have ORVs but where those values should be protected using strategies other than WSRA designation. In addition, the River District further examined the segments included in the Eligibility Report based on whether the segments are appropriate and manageable for purposes of the WSRA and divided the segments into the following categories: A.) Segments with non-federal water rights that will likely be impacted by designation; B.) Segments that are too short (one mile or less); C.) Segments whose flows are predominantly determined by releases from upstream reservoirs; D.) Segments where private lands predominate; and E.) Segments that may need some level of protection but for which designation is not appropriate and for which alternative management should be employed. We have applied these categories to the list of segments of the Eligibility Report and discuss our specific recommendations below. |
| 1221 | Nearly all segments have water rights, both perfected and conditional rights including both direct diversion and storage rights within, or proximal to, the proposed segments. The River District is willing and able to assist with the identification and disclosure of these rights and the associated segments. It is, however, beyond the scope of our resources at this time to identify all such water rights and meet the deadline for comment. |
| 1222 | Although we recognize that there is no length requirement to designate a river as Wild and Scenic, there are many segments listed in the Eligibility Report that are exceptionally short and non-contiguous. In our opinion, such segments are not manageable and do not meet the goals of the WSRA and therefore should be removed from the Eligibility Report and dropped from further consideration and study. These exceptionally short segments include:<br>• Gunnison River, Segment 2 (BLM segment 13.02 miles and private segment 2.59 miles)<br>• Escalante Creek, Segment 1 (BLM 5.75 miles and private 2.69 miles)<br>• Escalante Creek, Segment 2(BLM 0.90 miles and private 5.07 miles)<br>• Deep Creek (BLM 0.58 miles and private 1.97 miles)<br>• West Fork Terror Creek (BLM 0.47 miles and private 0.74 miles)<br>• Dry Fork Escalante Creek, Segment 2 (BLM 2.43 miles and private 0.46 miles)<br>• Rose Creek (BLM 3.9 miles)<br>• North Fork Mesa Creek (BLM 5.81 miles and private 2.72 miles) |
| 1223 | Free-flowing is defined by Section 16(b) of the WSRA as "existing or flowing in natural condition without impoundment, diversion, straightening, rip-rapping, or other modification of the waterway." While the River District understands that the existence of small dams, diversion works, or other minor structures at the time the river segment is being considered does not automatically disqualify a segment, we believe that the dominant influence on flows from large upstream impoundments should disqualify segments from further consideration. Downstream calls and deliveries of water to water users downstream typically control the release schedule of reservoirs in Colorado. These releases are made pursuant to state law and reservoir operators have little discretion about the quantity or timing releases. The River District urges the BLM to drop such segments from the eligibility report since the BLM will have no control over the releases or flows through these reaches. The following segments should be deemed ineligible and not studied for suitability due to the presence of significant upstream water control facilities: • Gunnison River Segment 1 • Gunnison River Segment 2 |
| 1224 | Many of the proposed segments in the Eligibility Report include non-contiguous segments that are adjacent to, or isolated by, large parcels of land that are not owned or managed by the BLM. The River District believes such segments are impractical, if not impossible, for the BLM to manage. Designation of such small, non-contiguous segments will inevitably lead to unnecessary conflicts in federal/non-federal land use and management. Therefore, the River District requests that the following segments not be considered eligible and removed from further study: Escalante Creek, Segment 1; Escalante Creek, Segment 2; Deep Creek; West Fork Terror Creek; Dry Fork Escalante Creek, Segment 2; Gunnison River, Segment 3; Roubideau Creek, Segment 2; North Fork Mesa Creek |
| 1225 | Many of the segments identified as eligible may be appropriate for alternative management plans in lieu of designation or determination of suitability. We believe this is particularly true of all segments which lie within the Dominguez-Escalante NCA. In addition there are 4 segments in the Lower Gunnison which would benefit from an alternative management plan. • Monitor Creek • Potter Creek • Rose Creek • Roubideau Creek, |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | Segment 14 While we believe these segments may deserve some level of protection for their ORVs, we strongly recommend that the BLM find alternative mechanisms for this protection. Such alternative management approaches have been successfully employed on other streams and rivers in Colorado and, in fact, the BLM is actively developing an alternative management program for mainstem reaches on the Colorado River upstream of the Grand Junction area. Another example of an alternative management is the South Platte Protection Plan ("SPPP") that the U.S. Forest Service created in the Upper South Platte River basin in lieu of Wild and Scenic designation. The SPPP provides benefits and protection while maintaining flexibility for water supply operations and potential future development. The SPPP was developed cooperatively with multiple stakeholders. The River District supports a similar approach on the Gunnison, Dolores and Colorado River mainstems and will be convening a group of stakeholders to explore this possibility. For these reasons the following segments should be managed outside of WSRA and thereby be removed from the eligibility list and not be considered for suitability: • Big and Little Dominguez Creeks • Dry Fork Escalante Creek, Segment 2 • Cottonwood Creek • Escalante Creek, Segment 1 & 2 • Roubideau Creek In summary, due to the success of alternative management processes and the multiple demands and highly regulated nature of most of the segments in the Eligibility Report, the River District strongly recommends the BLM work with local stakeholders to create and adopt alternative management strategies, such as the SPPP, to protect the ORVs of the listed segments without the inflexible strictures of the WSRA. As with the Upper Colorado and GJFO stakeholders processes, the River District is committed to participate in such a process for the UFO. |
| 1226 | In addition, due to the political sensitivity related to this issue, we recommend that the BLM UFO proceed with caution and keep water users well informed regarding the process as the BLM moves forward with the RMP and WSRA processes. |
| 1232 | The CWCB has a substantial interest in the efficient management and wise administration of the river segments inventoried and evaluated in the Draft Report. The CWCB is authorized to, among other things, "cooperate with the United States and the agencies thereof ... for the purpose of bringing about the greater utilization of the water of the state of Colorado ...," and "to confer with and appear before the officers, representatives, boards, bureaus, committees, commissions, or other agencies of ... the federal government, for the purpose of protecting and asserting the authority, interests, and rights of the state of Colorado and its citizens with respect to the waters of the interstate streams in this state." Furthermore, the CWCB has the exclusive authority to appropriate instream flow water rights, and its Instream Flow Program has proven to be very successful, protecting over 8,500 miles of streams and 480 natural lake levels in Colorado. The BLM has successfully relied on this program in dozens of situation to protect water resources located within or adjacent to BLM lands. |
| 1233 | The CWCB appreciates the Draft Report's express acknowledgement that the eligibility analysis is an initial phase of the Wild and Scenic River investigation, intended to identify the BLM's opinion regarding the free-flowing nature and outstanding and remarkable values of the inventoried river segments. Although the CWCB may dispute or disagree with some of the BLM's findings in the Draft Eligibility Report if it conducted its own field investigation and review, the CWCB recognizes the Draft Report is the result of a federal administrative inventory and evaluation that will undergo further impact analysis, consultation and coordination with interested stakeholders during the suitability phase. |
| 1234 | The CWCB appreciates the Draft Report's commitment to collaborating with non-federal stakeholders during the suitability phase of Wild and Scenic River analysis for the Uncompahgre Planning Area and portions of the Dominguez-Escalante National Conservation Area. The CWCB has been and continues to be actively involved in a number Of non-federal stakeholder groups coordinating with the BLM and US Forest Service as appropriate urging the suitability analysis for stretches of the Upper and Lower Colorado River, the Do ores River, and the San Juan River basins. These stakeholder efforts are attempting t develop management plans to protect the values associated with the various segments, as identified by the federal agencies as being eligible for wild and scenic rivers designation, while allowing Colorado to fully use its entitlements under the Colorado River and Upper Colorado River Basin Compacts. Between 2007 and 2009, the CWCB was also able to provide resources and funds to explore reasonable and acceptable alternatives to wild and scenic designation by federal agencies. The CWCB looks forward to a similar collaboration, to the extent resources are available, during the suitability phase of the Wild and Scenic River investigation for the Uncompahgre Planning Area to furthest evaluate the eligibility classifications of the inventoried river segments and identify whether and to what extent there are plausible alternatives to designation of eligible segments as suitable. |
| 1235 | The CWCB recommends the UFO coordinate with the San Juan Public Lands Center, the Dolores River |

## Table C-12
## Issue 1: Special Designation Areas – Wild and Scenic Rivers

| Comment ID | Comment |
|---|---|
| | Dialogue stakeholder group and Lower Dolores Plan Working Group when conducting the suitability analysis for the Dolores river segment within the UFO's jurisdiction. These entities have been working together for the past 24 months to identify potential methods for securing needed protections of the outstandingly remarkable values without limiting reasonable water development along the Dolores River segment between McPhee Dam and Bedrock, Colorado. The UFO should incorporate and build upon these past and ongoing consultations to develop consistent management strategies for the contiguous stretch of the Dolores River. |
| 1236 | The Comments provided herein focus on the primary interests of the CWCB with regard to the Draft Report. Lack of additional comments should not be construed as agreement with or an admission of all factual and legal assertions made therein. Nor should silence on factual and legal characterizations in the Report be deemed a waiver of any of rights for the purposes of any future legal, administrative, or other proceeding. |
| 1237 | Finally, the CWCB would like to thank the BLM for its efforts in developing the Draft Eligibility Report and willingness to consult the public before finalizing it. This has not occurred with all other Eligibility Reports issued by different BLM field offices, and we appreciate this opportunity to comment. We look forward to continuing our excellent relationship with the BLM on water rights issues during the next phases of the Wild and Scenic investigation for the Uncompahgre Planning Area and portions of the Dominguez-Escalante National Conservation Area. |
| 1258 | Energy Fuels Resources Corporation (EFRC) welcomes the opportunity to comment on the Draft Wild and Scenic River Eligibility Report. Our main concern stems from the fact that any stream segments deemed 'eligible' will be afforded protection during evaluation for 'suitability'. We believe a few of the segments should not be considered eligible for a variety of reasons. The main reason for most of these segments not qualifying, in our opinion, is they lack Outstandingly Remarkable Values (ORV). Even though we appreciate the scenic aspects of the area and our employees enjoy recreation in the region, we do not agree that the segments in question meet the criteria of unique, rare, or exemplary, nor are they significant within the region of comparison. Furthermore, we notice numerous inconsistencies in the reasoning for the classification used from one segment to another |
| 1259 | Segment 15-Dry Creek: This 10.4 mile section is too long to include. There is nothing unique (scenic or geologic), except only 2 miles (where it crosses the anticline). Even though the full segment 'may provide' habitat, that does not make it unique |
| 1260 | 19-San Miguel River Segment 1: This section certainly does not qualify as Scenic, being highly impacted by numerous houses, roads, and power lines. It does not need 'designation' to allow for the current level of recreation. This segment is already included for protection in the San Miguel ACEC, therefore it does not need designation for vegetation. The geologic description of the Morrison Formation is poor resulting in overstating the paleontological significance-this outcropping is not unique nor have any significant fossils been found. |
| 1261 | 21 San Miguel River Segment 3: No need for designation here since it is already protected in the Cottonwood Creek Conservation Area. It does not meet the criteria of 'scenic' since it has roads, power lines, irrigation diversions, and it becomes nearly dry during summer. |
| 1262 | 22 San Miguel River Segment 5: Land ownership of this segment is so fragmented it will make management impractical. The 'historic' aspect is no longer a qualifying criteria since the entire 'historic' value has been completely reclaimed-there is nothing left to see. The Hanging Flume historic evidence is all downstream of Atkinson Creek. Although vegetation is mentioned in the study, the noxious tamarisk is not. There are historic and active uranium mining properties on the cliffs above this segment on both sides. Remaining reserves and the U.S. need for increasing its reliance on domestic supplies of uranium for nuclear power generation should make the mineral value of this and other similar segments more important than the non-unique scenic value. The fishes listed are all non-game species, therefore of limited recreational value. |
| 1263 | 23 San Miguel Segment 6: The rationale for designation here is sound. However, designation must not lead to any road closures. Same mining aspect as Segment 5. |
| 1264 | 26 Dolores River: The description of this segment does not include any mention of the past gravel mining, nor the uranium-vanadium mining obvious along the banks and adjacent cliffs. All these deposits have the potential to resume production. This needs considered in connection to the scenic designation. The geology here is not unique in that the incised meanders continue for many miles downstream and the exposed stratigraphy covers many hundreds of square miles in the region of comparison. |
| 1265 | 27 North Fork of Mesa Creek: The road near the stream for much of this segment is the only truck route for |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | ore haulage from mines in the upper part of this and adjacent basins (Blue Mesa, Outlaw Mesa, Calamity Mesa, and Tenderfoot Mesa) as well as a few in the lower part of the Mesa Creek. Any designation here cannot preclude this access. |
| 1266 | 28 Dolores River Segment 2: When discussing scenic values, the BLM mentions 'exceptional views of the adjacent scenery' for this and other segments throughout the report. Our concern (also mentioned above in #22) is the possible restriction of future mining on the mesa edges outside the designation (i.e. greater than ¼ mile) if they can be seen from the segment. The stratigraphy is not unique within the region. From the recreation standpoint, boaters-use in this reach is extremely rare because of the slow flow and their use will be unaffected, regardless of designation. The vegetation is not unique, as the report mentions similar vegetation on most segments discussed. |
| 1267 | 29 Ice Lake Creek: An access road to uranium mines is less than ¼ mile from the stream for part of this segment. The scenic aspect is impacted by mines on the cliffs easily visible across La Sal Creek, to the south. This classified as scenic is inconsistent with similar segments (#30 and #34 being recreation while #33 is classified as scenic, but for different reasons). |
| 1268 | 30 La Sal Creek Segment 1: The fishes listed are mostly not game fish, so they do not impart the recreation aspect mentioned. Almost the entire length of this segment is private land; this fragmentation makes it unmanageable if classified recreation. The scenic aspects are not mentioned, as with Ice Lake Creek, with or without respect to the uranium mines. |
| 1269 | 31 La Sal Creek Segment 2: This is the only access to the Cashin Mine on private land. The rest of La Sal Creek downstream has all the same criteria mentioned for this segment and is already protected in the Dolores WSA. |
| 1270 | 33 Lion Creek: The only ORV is vegetation, yet is classified scenic, in spite of the area being impacted by past uranium mining. As mentioned above, this area is likely to see renewed mining activity soon. |
| 1271 | 34 Spring Creek: Again, there seems to be a stretch in the search for qualifying criteria and inconsistencies with similar areas in an attempt to include this and other small segments. The description is almost the same as Lion Creek (#33) but the classification is recreation rather than scenic. |
| 1272 | To summarize, EFRC requests the BLM to reconsider the inclusion of the above listed segments as 'eligible'. It is believed they do not meet the requirements of 'suitability'. Since they will be managed as if already designated during the suitability review, there is concern that other legitimate activities will be unnecessarily limited or prohibited. |
| 1276 | More importantly, the WSRA does not list "vegetation" as an ORV. Id. While the WSRA does permit ORVs which are "similar" to the ORVs expressly listed in the WSRA, nowhere does the BLM's report specifically link the presence of the particular vegetation found within this creek segment, or more particularly found on Mr. Miller's private land , with an expressly stated ORV. 16 U.S.C. § 1271; Report at 26. The BLM cannot arbitrarily create new ORVs which are not found within the WSRA. At a minimum, the BLM must explain how the presence of the particular vegetative community in question, which must be present specifically on Mr. Miller' s private property, is "similar" to an expressly permitted ORV category, and why such vegetation qualifies as "outstanding." Moreover, even if the specific vegetative community at issue could qualify as an ORV, then the fact that Mr. Miller's half mile of stream segment is wholly in private ownership and control would make it impossible for the BLM to manage said vegetation, thereby precluding the land from suitability as a WSR. BLM guidance states that the: Status of land ownership .. . including the amount of private land involved ... must be taken into account to the extent that management would be affected. In situations where there is limited public lands (shoreline and adjacent lands) administered by the BLM within an identified river study area, it may be difficult to ensure those identified outstanding remarkable values could be properly maintained and afforded adequate management protection over time. Accordingly, for those situations where the BLM is unable to protect or maintain any identified outstanding remarkable values, or through other mechanisms (existing or potential), river segments may be determined suitable only if the entity with land use planning responsibility supports the finding and commits to assisting the BLM in protecting the identified river values. BLM Manual 8351 -Wild and Scenic Rivers at § 0.33(A)(2). In this case, there is no legal mechanism whereby the BLM could manage or control vegetation use on Mr. Miller's private land. Mr. Miller could, for example, cut for firewood any of the commonly found Fremont cottonwood trees found thereon. |
| 1517 | Please do not restrict our Uncompahgre BLM resources by a Wild and Scenic designation or closure through the Resource Management Plan. |

**Table C-12**
**Issue I: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| 1518 | Hydropower is a clean source of renewable energy which our country desperately needs. |
| 1527 | Gold prospecting by panning, high banking, and dredging have been occurring on the San Miguel River for many decades. Currently it has an important recreational value to the community. Every weekend prospectors from the local communities and occasionally prospectors from out of state seek gold on many sections of the River. We do this for many reasons: 1. the recreational value, 2. enjoyment of the outdoors, 3. the exercise, 4. for profit. Please do not impact our abilities to prospect for gold or other metals by this planning process. |
| 1528 | In addition, as mining on federal lands is a federal statutory right and a mining claim is site specific, blanket closures could constitute a physical property takings. |
| 1529 | I would prefer the San Miguel not be designated a Wild and Scenic River but if it is the recreational classification would be the only acceptable designation. |
| 1531 | Suction dredging produces excellent spawning habitat by breaking up hard packed material and depositing it as loose gravel. The holes I have dredged are generally occupied by fish the following day as areas of protection from the current. However the holes are refilled every year by spring runoff. |
| 1532 | Below I have provided references to studies concerning the effects of suction dredging on fish and aquatic species that should be taken into consideration in the planning process. The following are a few quotes to summarize their findings: The California Department of Fish and Game (CDFG, 1997) concluded, "Suction dredging can have significant short-term and localized adverse impacts on local benthic invertebrate abundance and community composition. However, over the long-term, the impacts appear to be less than significant. Colonies of invertebrates generally re-colonize areas disturbed by suction dredges within a relatively short period of time ranging from one to two months." "Impacts to benthic invertebrate communities of suction dredging with 6 inch or smaller sized nozzles appear to be less than significant." "Effects to benthic and/or invertebrate communities, turbidity and water quality appear to be less than significant. They are usually localized and temporary in duration." A U.S. Army Corps of Engineers study on suction dredge mining found de minimus impact on aquatic resources and provided "official recognition of what suction dredgers have long claimed: that below a certain size [4 inches], the effects of suction dredging are so small and so short-term as to not warrant the regulations being imposed in many cases." A recent 2003 study by Peter B. Bayley, Response offish to cumulative effects of suction dredge and hydraulic mining in the Illinois sub-basin, Siskiyou National Forest, Oregon, concluded: "The statistical analyses did not indicate that suction dredge mining has no effect on the three responses measured, but rather any effect that may exist could not be detected at the commonly used Type I error rate of 0.05. The fact that the analysis was able to detect a negative effect of another mining process, HM, on native salmonids, is an indication of the long-lasting effect that hydraulic mining has had on the environment, particularly on riparian zones and floodplain sections in geomorphically unconstrained reaches." "The reader is reminded of the effect of scale. Localized, short-term effects of suction dredge mining have been documented in a qualitative sense. However, on the scales occupied by fish populations such local disturbances would need a strong cumulative intensity of many operations to have a measurable effect..." Attached is a list of additional studies that have been done concerning the effects of suction dredge mining on fish and aquatic species.. The following are a few quotes to summarize their findings: "The results from Resurrection Creek indicated that there was no difference in the macroinvertebrate community between the mining area and the locations downstream of the mining area in terms of macroinvertebrate density and taxa richness. The sampling was done 35 days after mining had been completed for the season and shows a rapid recovery of the mined areas." (The U.S. Environmental Protection Agency - 2001.) "Dredge tailings are often referred to as good salmonid spawning substrate. In the Trinity River, chinook salmon have been observed spawning in the tailing piles of suction dredges ( E. Miller pers. comm. ). Steelhead in Idaho streams have been reported to spawn in gravels recently disturbed by human activities (Orcutt et al. 1968 ). In the American River , Prokopovich and Nitzberg ( 1982 ) have shown salmon spawning gravels have mostly originated from old placer mining operations." (Hassler, Somer & Stem 1986) "Anadramous salmonids held and spawned in Canyon Creek in close proximity to suction dredge activity. During the 1984-1985 spawning season, fall-run chinook salmon, coho salmon and steelhead spawned in areas actively dredged during the 1984 dredge season (fig.). In August 1985, spring-run chinook salmon and summer-run steelhead were holding near areas where suction dredges were being operated (fig. 23). During the 1985 spawning season, fall and spring-run chinook salmon spawned in areas actively dredged during the 1985 dredge season (fig. 24)." (Hassler, Somer & Stem 1986I |
| 1547 | I am writing this in support of maintaining the present RMP governing the San Miguel river. I do not believe that putting the section from Placerville to the Pinon bridge into the "Wild and Scenic Rivers" act will benefit the |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | largest amount of the river users and the public at large. Putting this section into the WSR really only benefits fishermen, rafters, and tourists at the expense of the local water users and the domestic water supply for Nucla. |
| 1548 | I am a member of the Colorado GPAA prospectors club from Olathe. We have several claims in this area. We have tried to find out what changes to our claims that the WSR designation would cause. We have not received any concrete answers to our questions, only ideas and "maybe this or that could occur" types of answers. |
| 1550 | We maintain that responsible prospecting does not harm the public land and water ways. Our club has a strict code of ethics which we follow and which you can see at: www.wescogpaa.org. We actually take better care of our claim lands than the vaulted fishermen and rafters. After the rafting season is over in the area from the diversion dam down to the Pinon bridge we have to clean up their trash and human excrement that they leave. |
| 1551 | Our mining activities do not interfere with other users. Most mining occurs after the diversion dam diverts 90% of the river water, when that section is not used by rafters or fishermen. |
| 1552 | I am attaching some references to research that shows that suction dredging does little harm to fish and gravel spawning beds. Also I have attached an article from the ICMJ magazine about Oregon Suction Dredging which shows the standards that the Army Corps of Engineers uses to evaluate suction dredging. Also on page 22 of your 1989 San Miguel River ACEC & SRMA RMP Amendment it states that "Within the past ten years placer mining activity has had little effect on the section of the river from Deep Creek, downstream to Horsefly Creek." |
| 1554 | I completely disagree with this effort to put so much water and land off limits to Coloradoans just to keep tourists and PC politicians happy. That would be a poor decision on your departments part. |
| 1555 | In conclusion, I would rather that your group left most of the mainstream of the San Miguel out of the WSR designation and continued to manage the resource under the present ACEC and SRMA. I do not see a good reason to change the status quo for that section of the river from Telluride to Naturita. It is protected well enough as things stand now. Don't create more problems by changing the status of the river. |
| 1556 | Do not take any action that would adversely affect our ability to pursue placer mining on the San Miguel River. |
| 1559 | Mineral development. including pipelines and other infrastructure should be managed responsibly to minimize resource conflicts. The Mining Law of 1872 provides the legal framework (rights) for mining and prospecting activities on public land. Small-scale placer miners on the San Miguel River do not present a resource conflict. |
| 1560 | Public lands, especially in the Pinion Bridge area of the San Miguel River, should remain open to placer gold prospecting; this activity does not conflict with other land uses. |
| 1564 | Special conditions of approval should not be placed on mineral development because existing regulations would make such conditions redundant and unnecessarily cumbersome. |
| 1566 | There are visual considerations with respect to public land use. That is one reason I am a proud member of the Western Colorado Chapter of the Gold Prospectors Association of America. Our club members adhere to a code of ethics that obligate us to leave the land better than we found it. Please see www.wescogpaa.org to review this code in detail. |
| 1567 | Mineral development provides exceptionally positive social and economic effects and should be facilitated. Current regulations present more than enough restrictions. Planning decisions to facilitate the development of mining operations present significant positive opportunity for communities in southwest Colorado. Please do not restrict us from the right and heritage of placer mining. |
| 1585 | The purpose of this letter is to voice my strong support of maintaining accessibility, and usability of our public lands. As a citizen prospector, I strongly oppose any designation to public lands that would inhibit our freedoms to utilize them in the American spirit we both know very well: "with liberty and happiness." As your office works through the Resource Management Plan process for the Uncompahgre planning area, we strongly and sincerely urge you: do not further restrict our ability to prospect on our public lands! |
| 1587 | Of specific interest to me and many others, the San Miguel river, especially the Pinon Bridge area, should remain open to placer gold prospecting. We are acutely concerned that your office may be preparing to designate this area such that our liberty to enjoy the spirit, heritage and traditions of our gratifying hobby could be restricted. |
| 1589 | Responsible prospecting is not detrimental to public lands. As a member of the Western Colorado Chapter of |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | the Gold Prospectors Association of America, my fellow club members and I are bound by a strict code of ethics that evidences our commitment to responsible land stewardship. Further, it has been demonstrated repeatedly that suction dredging enhances the biological viability of waterways. |
| 1590 | Please take a moment review our code of ethics at www.wescogpaa.org. Put simply, if we do not follow club rules we are not allowed the privilege of prospecting club claims. We have good reason to believe our club members take better care of the area than the public at large -by virtue of our demonstrated integrity, not governmental restriction. |
| 1591 | Prospecting does not interfere with other land uses. Most waterway prospecting occurs after water levels have receded to the extent rafting, kayaking, fishing and other activities are not practicable or otherwise out-of-season. |
| 1592 | Protect and maintain our freedom. Allow prospecting on our public lands. |
| 1611 | I am writing to oppose the plans that the BLM is wanting to make the rivers around here a very limited use situation. That is not the best interest of all the people that live here in Colorado. Especially the ones that work and actually mostly support the income of these Government and State agencies. |
| 1625 | The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection. Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update. Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River. |
| 1683 | Work for Wilderness designation for the five Wilderness Study Areas (WSAs) in the UFO: Camelback, Adobe Badlands, Dolores River Canyon, Sewemup Mesa, and Tabeguache Creek Area. |
| 1690 | Wild and Scenic Rivers: Please protect as many eligible rivers and tributaries as possible. All of the river segments listed in the BLM's draft Wild & Scenic Rivers Eligibility Report should retain their eligibility for inclusion in the National Wild and Scenic Rivers System, and should be carefully evaluated for the next level of protection. |
| 1729 | San Miguel River section from the irrigation diversion dam near Horsefly Creek down to the Pinon bridge. I do not believe it should become part of the WSR system for several reasons: 1. The river bed below the diversion dam is almost dry from June to November due to local water needs. 2. Presence of a 30" trans-Colorado gas pipeline crossing under the river near the diversion dam. 3. Overhead power line crossing about a quarter mile upstream (S) of the Pinon bridge. 4. A road extending up the east side of the river that is used to access and maintain: 2 campgrounds, the diversion dam, the gas pipeline, the power line, private land alongside the river, and the water ditch. 5. A water ditch (CCC ditch managed by Mustang Water) that runs from the dam along the east side of the river above the road for this entire section of the river. Ditch is inside the WSR 114 mile river bank zone. 6. Presence of extensive old placer mining activity above the Ledges Campground done in the 1950's. 7. Negative effects that the WSR designation would have on the ability of Mustang Water to provide water for Nucla and its other customers, and for any maintenance or improvements to the dam and ditch system. 8. No outstanding geologic formations, absence of rare or endangered plants, no historical sites. 9. Negative impact on private ranchers grazing livestock and raising hay on their land in the 114 mile zone. |
| 1730 | This section of the river is not outstanding, it would take too many changes to make it fit the intent of the WSR act. It would require destroying the dam and ditch to make this section a good candidate for the WSR classification. This would negatively impact the domestic water supply for Nucla and the livelihoods of the farmers and ranchers who depend on the Mustang Water Authority who operate the diversion dam and CCC ditch. |
| 1731 | It would be best to remove this section of the river from consideration for inclusion in the WSR, just like the next section of the river below the Pinon bridge that flows past Nucla and through Naturita. |
| 1732 | The simple way to manage this section of the river is to exclude it from the WSR designation and manage it with the present (1989) ACEC / SRMA regulations. This section of the river is very much like-the section of the river that runs from the Pinon bridge downstream through Naturita. |
| 1733 | It seems as though this whole effort by the BLM to include so much of the San Miguel river system into the WSR is meant only to satisfy the wants and desires of a few fishermen, rafters, kayakers, and tourists. The BLM does not seem to care about the water needs of, or the hardships and negative effects on: local ranchers, farmers, Nucla townspeople, and miners, that would result if this section of the river is included in the WSR. |

**Table C-12**
**Issue I: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| 1734 | This section of the river is only used by the rafters, fishermen, and kayakers during spring runoff. Around the middle of June after water diversion has started, the water flow drops too low for boating and fishing. Then the gold miners clean up the trash and feces left on their claims by the boaters and fishermen. The miners use the river bed for placer mining into the month of November. In addition to cleaning up the boating and fishing refuse, the miners also remove hazardous mercury and lead (lost fishing weights and bullets) from the river bottom environment which benefits fish and whoever eats the fish. |
| 1735 | Townspeople, local farmers, and ranchers utilize the resource throughout most of the year. The present management system provides the best access and use of the valuable water resources for the most people without negatively impacting the area. |
| 1736 | The present ACEC & SRMA plans provide protection for the habitat, the river, and the many water users. It is also compatible with private landowners. Putting this section of the river into the WSR system will only cause water problems with townspeople, private landowners, ranchers, and farmers. To me, the WSR is a bad plan for most of the main stream of the San Miguel. |
| 1737 | It might make sense to put some of the river's tributaries into the WSR such as Horsefly and Beaver Creeks. Also some more remote sections of the river could be included, such as the river between Clay Creek and upstream of the diversion dam. But a lot of the San Miguel downstream from Telluride is too developed and settled to meet the original intent of the WSR act. |
| 1738 | The BLM's money and people could be better utilized working in other more pressing areas of land management. Trying to put most of the watercourses in the Uncompahgre management area into a WSR designation isn't wanted or needed, and doing this just to please some tourists isn't wise. |
| 1740 | I am writing to voice my opinion in regard to the Wild and Scenic River Act. There is no sensible reason to turn the San Miguel River into a Wild and Scenic River. |
| 1741 | As a member of the Western Colorado chapter of the GPAA, I do not want to be treated the same way the government treated the American Indian. We have claims on the river that have been granted by you, and now you are threatening to take them back. Too often the government took back lands granted to the Native Americans. |
| 1742 | The water ditch managed by Mustang Water would have to be destroyed under your plan. This ditch serves ranchers and the Town of Nucla. Would the utilities that currently cross the river have to be rerouted, and at whose expense? |
| 1743 | Let's keep this river the way it is now so that all Americans can use the river the way we have been able to use it. |
| 1748 | We have visited that portion of the San Miguel and there was not enough water in the river to raft, canoe, or kayak. The setting was serene and beautiful and should be enjoyed by all, including gold prospectors. We have just started learning to pan for gold, not in hopes of hitting vast riches but in the enjoyment of being outdoors in an enjoyable hobby. |
| 1749 | We would hate to see the BLM pursue their program of turning the San Miguel into a Wild and Scenic River. Contrary to what our state governor believes about Colorado loving California, we totally disagree with him and those supporters. Following their example of shutting down all personal dredging for gold is totally unacceptable to our state. Please remember that your logo at the top of the enclosed papers says that it is a National System of Public Lands. Keep it open to all activity including gold prospecting. |
| 1751 | The proposed action to turn the San Miguel River into Wild and Scenic is preposterous. I am a small time recreational prospector who enjoys my time on the river. While there I clean up behind myself and others. In my opinion I do more good than harm to the river and its adjacent land as well as influenced the economy of the local area. |
| 1769 | Those lands, as well as potential wild and scenic river corridors, should be closed to all forms of energy development and transmission. Protecting these lands has the added benefit of helping protect wildlife habitat, cultural resources, and mitigating the impacts of climate change. |
| 1789 | The draft Wild and Scenic Eligibility Report for the BLM Uncompahgre Planning Area (issued as a component of the field office's RMP revision process), provides helpful base information about area streams with potential for inclusion in the National Wild and Scenic Rivers System. In particular, the draft report's detailed background |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | data, maps, and initial analysis of flows and values in the streams considered is very helpful. |
| 1790 | Eligibility determinations for streams flowing through the UFO Planning Area and through adjacent federal land planning areas should provide protective status equal to or stronger than that provided in adjacent planning areas. That is, any UFO streams with segments found eligible in adjacent areas should also be found eligible. Any stream segments not found eligible in adjacent areas should still be considered for eligibility in the UFO area. |
| 1791 | The Dolores River, in particular, fits this situation. This regionally significant river warrants consistent and coordinated status, management, and protection through its entire public lands reach. Eligibility status for Dolores segments in the Grand Junction Field Office and in the San Juan Public Lands planning area warrant eligibility status and protection for segments in the UFO planning area. |
| 1792 | Similarly, eligibility status for Roc Creek segments in the Manti-La Sal National Forest management plan warrant eligibility status and protection for segments in the UFO planning area, where Roc Creek traverses unique and sensitive areas with wilderness characteristics and other unique stream-related features. |
| 1793 | The San Miguel River is another regionally significant and iconic stream that flows through the UFO planning area. In addition to the San Miguel's inherent stream-related outstandingly remarkable features, the river also provide an important contribution to stream flows in the Dolores River downstream of the confluence of the two rivers. This contribution to Dolores flows is particularly important when those flows are constricted by operation of the McPhee Dam. With recently identified imperiled fish populations identified as surviving just below the confluence, San Miguel flows reflecting as natural hydrograph, as much as possible in the context of existing water diversion rights, need to be protected. Eligibility determination for the full length of the San Miguel through the UFO planning area, and for significant tributaries to the river, is a key initial component of protection of the river itself and of unique natural features downstream. |
| 1795 | Streams not included in draft Eligibility Report A general flaw in the draft report is the low number of stream segments proposed as eligible in the requirements and definitions of The Wild and Scenic Rivers Act of 1968. Any of the 173 river segments initially considered by the BLM that even possibly meet the simple and basic definition of eligible—generally free-flowing and possessing at least one outstandingly remarkable value—should be carried forward to complete eligibility analysis. |
| 1796 | Meanwhile, we respectfully request that the BLM make available details of the agency's review of streams identified for review but not included in the draft Eligibility Report. This information should be subject to public review and comment before final decisions are made about those streams not currently included in the draft Eligibility Report. |
| 1797 | The complete absence of eligible segments of the regionally significant Uncompahgre River warrants reconsideration or, at least, thorough explanation. Similarly, the absence of eligible segments in the upper Gunnison River warrants reconsideration or explanation. |
| 1798 | Specific stream segments in the draft Eligibility Report Each stream segment included in the draft Eligibility Report should remain in the report for more complete analysis of its eligibility and subsequent suitability analysis. Each stream segment provides important stream flows and unique values that warrant additional analysis and related protection. Several stream segments are especially important because of their regional significance, connection and complement to other streams and stream corridors, and connection to other public lands values. |
| 1801 | Gunnison River, segments 2 and 3 This regionally significant river warrants careful review and enduring protection as an important recreational opportunity and as the hydrologic heart of unique adjacent public lands. |
| 1803 | Monitor Creek This stream is an important feature associated with adjacent lands with wilderness character and included in citizen wilderness proposal lands. Those wilderness values should be considered as part of this streams wild and scenic evaluation. |
| 1804 | Potter Creek This stream is an important feature associated with adjacent lands with wilderness character and included in citizen wilderness proposal lands. Those wilderness values should be considered as part of this streams wild and scenic evaluation. |
| 1805 | Roubideau Creek, segments 1 and 2 This stream is an important feature associated with adjacent lands with wilderness character and included in citizen wilderness proposal lands and included in congressionally recognized national forest lands upstream. Those wilderness values should be considered as part of this |

**Table C-12**
**Issue I: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | streams wild and scenic evaluation. |
| 1806 | San Miguel Unit Beaver Creek Traversing a narrow corridor of public land, this stream holds important potential for preserving and enhancing stream-related natural values for a broad, otherwise private-land, geography. The creek is also an important contributing tributary to the San Miguel River. |
| 1807 | Saltado Creek Traversing a relatively narrow corridor of public land, this stream holds important potential for preserving and enhancing stream-related natural values for a broad, otherwise private-land, geography. The creek is also an important contributing tributary to the San Miguel River. |
| 1808 | Dry Creek This stream traverses a uniquely un-roaded public landscape, providing important wildlife support and general ecological vibrancy. |
| 1809 | San Miguel River, segments 1, 2, 3, 5, and 6 As noted above, all segments of this river are inherently significant, and the river provides important contribution to flows in the Dolores River. |
| 1810 | In addition to ensuring strong and enduring protection for the public lands segments of the river, the BLM should engage landowners and other land managers in Segment 4 to ensure cooperative measures to a) protect a continuous healthy stream corridor and b) to ensure natural-hydrograph flow contributions to the Dolores River. |
| 1811 | Tabeguache Creek, segment 1 This stream traverses a uniquely un-roaded public landscape, providing important wildlife support and general ecological vibrancy along the stream itself, and complementing congressionally recognized national forest lands upstream. |
| 1812 | Tabeguache Creek, segment 1 This stream traverses a uniquely un-roaded public landscape, providing important wildlife support and general ecological vibrancy along the stream itself, and complementing congressionally recognized national forest lands upstream. |
| 1813 | Lower Dolores Unit Dolores River Few rivers in the southwestern United States boast the stunning scenery, distinctive and colorful geology, and outstanding recreation opportunities as those found along the Dolores River. The heart of a broader landscape of ecologically rich public lands (well beyond a one-quarter-mile-each-side wild and scenic study corridor), the Dolores River is an essential element of larger land values and of management decisions affecting those values. Because this iconic river is already significantly diminished and threatened by river impoundment upstream of the UFO study area, every possible protection must be applied to the river and to its corridor. A decisive finding of eligibility is the first step in toward that protection. Meanwhile, recent eligibility findings for segments of the Dolores downstream of the UFO planning area, and long-standing eligibility recently affirmed for river segments upstream, warrant equal or stronger management status and protection for this key mid-stream segment. |
| 1814 | La Sal Creek, segments 2 and 3 This stream traverses a distinctive canyon corridor, affording a stunning backdrop to outstanding recreation opportunities. The stream itself provides rare water source and riparian environment in an otherwise arid area. |
| 1815 | Lion Creek This stream traverses important un-roaded geography, including distinctive canyon features on both sides. |
| 1816 | We do not need WSR Act in Colorado. The San Miguel River does not need the WSR Act designations. All of the regulations, rules, management are in place to date to manage our public lands for multiple use. And the well being and health of our public lands. Theirs no need for over regulations of our public lands. |
| 1820 | We do not need any WSR designation in Colorado. Public lands should remain multiple use. Management is in place today, it works well now, it will work well into the future. |
| 1826 | The San Miguel River should remain the way it is and has been- open for public use and for agricultural purposes. |
| 1843 | San Miguel River Corridor--- Has been preserved as a well used recreation corridor for fishing and boating. With the partnering of The Nature Conservancy this river corridor should continue to be protected as it is. |
| 1856 | The Dolores River Corridor is a special place in need of special consideration. The Lower Dolores River carves one of America's premier wild river canyons. The 170 - mile segment from below McPhee Reservoir to the river's confluence with the Colorado River in Utah traverses some of the most remarkable landscapes in the desert Southwest. Renowned features of the Dolores River include magnificent stands of old - growth ponderosa pine, thrilling whitewater rapids such as Snaggletooth, sheerwalled sandstone canyons, and hidden |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | archeological treasures. The Dolores River's scenic grandeur and ecological richness have been found suitable for Wild and Scenic designation since 1975. Whitewater enthusiasts, naturalists, and other backcountry users of all stripes value the rugged beauty, wildlife, quiet solitude, and connection to history these canyons offer. The river's scenery, geology, fish, wildlife, plant communities, and human history are woven into a continuum of ever changing wonders as one travels the 170 miles downriver from McPhee dam to the river's confluence with the Colorado River in Utah. Here, the geological and biological transformation from Southern Rocky Mountains to Colorado Plateau is compacted and therefore unparalleled among other great rivers of the Southwest. Along the river's journey, four anticlines reveal deep, pristine canyons. Exposed is a nearly complete depositional record of Mesozoic times, from the cream-colored, cross - bedded Dakota Sandstone, to rainbow pastels of Morrison rock, to the oldest cliff forming red rocks of Triassic age. Trees are a prominent feature, and include upland riparian cottonwood, old growth ponderosa pine and Douglas fir mixed with alder and dogwood, high desert pinon and juniper with intervening boxelder, and the willows, privet, wild rose and cactus gardens of Slickrock Canyon. Visitors often are rewarded with sightings of river otter and desert bighorn. The river, too, ranges from meandering Class I water with deep back eddy trout pools to raging Class IV whitewater. A hike to the rim anywhere affords unmarred vistas of westward dipping tablelands framed by snowclad peaks of the La Sal Mountains. On the human side, traces remain of ancient hunter - gatherer and Puebloan societies: rock art panels, stone granaries, and cave shelters. Few other river segments in the west offer such extraordinary variety. |
| 1857 | The river supports a variety of economic and recreational activities that benefit nearby communities. Working farms and ranches, professional outfitters anglers, historians, river runners, hikers, archeologists and recreationists all share an interest in preserving the Dolores River Basin. |
| 1858 | The entire river basin spans numerous BLM and US Forest Service offices and should be cooperatively managed to ensure that the river's serenity and beauty can continue to be enjoyed and explored but never exploited or taken for granted. As more people move into the communities around the Lower Dolores and as more recreationists learn about the area, the potential for increased development, both recreational and commercial, threatens to chip away at and permanently alter the amazing resource we all have in the Dolores Basin. Action needs to be taken now to ensure that the numerous qualities of the Lower Dolores River are sustained into the future, or it will be too late. Planning processes such as this one are the first step in ensuring that the Lower Dolores will be enjoyed by generation to come. |
| 1859 | The Dolores River Coalition is committed to finding a long-term solution for protection of this landscape. To that end we have participated in the RMP revision process for both the San Juan and the Grand Junction Field Offices, as well as river focused processes such as the Wild and Scenic Suitability Stakeholder Process for rivers and streams in the GJFO and the Lower Dolores River Management Plan Working Group process focused on wild and scenic and alternatives to wild and scenic for the portion of the Dolores in the San Juan FO. While the UFO contains a much smaller swath of the Dolores River Corridor's public lands and a shorter stretch of the river than the other two field offices, it is the core part of the river ecosystem. We therefore urge the UFO to consider the portion of the Dolores River Corridor within its jurisdiction to be an integral part of the larger Dolores River ecosystem as you make management decisions for the area. |
| 1864 | Wild and Scenic River Suitability As part of the RMP revision process the BLM is required to determine the eligibility and suitability of rivers and streams under the Wild and Scenic Rivers Act. Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update. The Dolores has been found suitable in the past and still maintains the same qualities. Few streams boast the unique natural values as are found along the Dolores River. The river itself, and all its eligible tributaries, should receive immediate, thorough, and enduring protection. |
| 1865 | Oil and Gas Leasing and Development Oil and gas leasing, exploration, and development should be prohibited in the Dolores River Corridor, certainly within visual proximity of the river itself. Any existing or future leases should maintain non-waiveable No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values associated with wild and scenic suitability or the existing Special Recreation Management Area Designation. Not only is the river spectacular from an ecological, scenic, and recreational standpoint, the Dolores has also been found suitable for W&S designation since the 1970s. It has been the practice of the BLM to apply NSO stipulations per the BLM's 1990 Dolores River Corridor Management Plan. |
| 1869 | Wildlife Habitat & Sensitive Species Management Given the diversity of flora and fauna range and habitat found |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | in this portion of the Dolores basin - Mule Deer, Elk, and Wild Turkey winter range as well as Gunnison Prairie Dog colonies and the location of three CNHP Potential Conservation Areas (Dolores Canyon South, Dolores River - Slick Rock to Bedrock, and Dolores River - Uravan to Roc Creek) - great care should be taken to follow the planning and management guidance for these resources as outlined in the "Wildlife Viability", "Special Status Species/Plants", and "Travel Management" sections of the broader conservation group comments referenced earlier. We also encourage the incorporation of directives outlined by the Center For Native Ecosystems in their scoping comments. Please see attached spreadsheet (UFO_Dolores Basin PCA Species.xls) for a list of the species associated with the three CNHP Potential Conservation Areas noted above. |
| 1870 | Socioeconomic Analysis The Socioeconomic comments and studies submitted within the broader conservation group comments should be considered for the relevant portion of the basin within the UFO's jurisdiction. |
| 1871 | Cooperation with adjacent BLM Field Offices and Other Agencies The Dolores Corridor should be managed in close cooperation with adjacent BLM Field Offices. For example, the Dolores River Canyon Wilderness Study Area is bisected by the UFO and the San Juan FO, but requires consistent and close management, especially considering issues with motorized incursions from the Utah. The Sewemup Mesa CWP expansions to the existing WSA also overlap the Grand Junction and Uncompahgre BLM field offices. Significantly, the river itself crosses boundaries between the San Juan, Uncompahgre, and Grand Junction Field Offices. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities. We urge the Uncompahgre Field Office to adopt a broad vision of the landscape in approaching the cooperative management of these areas. We urge the BLM to work with other agencies as well. Some of the outstandingly remarkable values identified in the Dolores River Corridor - fish species, plant species, and recreational boating - depend on a healthy functioning ecosystem, adequate stream flows, and well managed spills from McPhee Reservoir. We urge the Uncompahgre Field Office of the BLM to work with water managers (including the Bureau of Reclamation and the Dolores Water Conservancy District) as well as adjacent BLM field offices, The Dolores River Dialogue, conservation groups, boaters (both private and commercial), and other stakeholders to ensure that outstandingly remarkable values of the Dolores are maintained and enhanced and that viable flow regimes are developed for both the benefit of the ecosystem and boating. This is an outstanding natural landscape, which includes several unique plant and animal communities and provides one of the most spectacular recreational boating experiences in the country. Most of the land bordering the river is under public ownership and river flows are highly regulated by the McPhee Dam. The Dolores River corridor requires coordinated management in order to preserve these resources for the future. |
| 1948 | HCCA would like to see effective protection extended to all of the river segments identified in the Draft Report. We support WSRA designation for the permanent security the Act affords to riparian ecosystems, including adjacent habitat, water quality and quantity, and wildlife. The Act has preserved forever in a free-flowing condition some of America's most valued rivers and maintained their outstandingly remarkable values. We feel that it strikes an equitable balance between recreation, water use and environmental concerns, while providing a proven instrument for achieving long-term river sustainability. |
| 1949 | However, we recognize that WSRA designation may not be necessary for every segment identified in the Draft Report. In light of this, we feel strongly that other protective mechanisms should be applied to non-designated streams to protect their free-flowing character and Outstandingly Remarkable Values (ORVs). We would like to see every river segment identified in the Draft Report protected in one of three ways: (1) eligible, suitable and recommended for WSRA protection; (2) eligible, suitable, not recommended, but given ongoing suitability protections; or (3) eligible, not suitable, and returned to general Resource Management Plan (RMP) administration, but with strong protection mechanisms that maintain eligibility and all ORVs. We hope to see an updated RMP that includes recommendations for Wild and Scenic designations for several segments, as well as management schemes for non-designated segments that incorporate numerous protections contained in the WSRA. |
| 1950 | We believe that all of the river segments listed in the BLM's Draft Wild and Scenic Rivers Eligibility Report should retain their eligibility for inclusion in the National Wild and Scenic Rivers System (NWSRS). |
| 1951 | We also support the report being finalized so that evaluation for suitability can commence |
| 1952 | During the interim while the rivers are being analyzed for suitability, it is imperative that BLM manage all eligible segments protectively, as mandated under the WSRA and BLM policy. The BLM's Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, and Management states: When a river segment is determined eligible and given tentative classification . . . its identified outstandingly remarkable values shall be |

**Table C-12**
**Issue I: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | afforded adequate protection, subject to valid existing rights, and until the eligibility determination is superseded, management activities and authorized uses shall not be allowed to adversely affect either eligibility or the tentative classification . . . . (BLM Manual 8351.32(C)). If necessary, BLM should consider heightened monitoring of river segments to ensure that the values that make them eligible for designation under WSRA are not compromised during this interim period. |
| 1953 | Segments Found Eligible and Suitable that are Not Recommended for WSRA Designation For those segments determined to be suitable, but not recommended, HCCA would like the BLM to manage the segment through the RMP in order to maintain the suitability of each segment. Under this strategy, non-recommended segments would be managed so that no action could interfere with eligibility or downgrade suitability standing. We would like to see these segments protectively managed in perpetuity as suitable rivers. Alternative management strategies, including securing instream flow rights, should be explored as a way to provide realistic protection of the specific ORVs associated with the suitability finding. To establish alternatives, the BLM will be required to request appropriation or acquisition of instream flows that consider all limbs of the natural hydrograph. Where instream flow rights cannot be secured, substantive land management prescriptions should be incorporated into the RMP to ensure long-term protection (i.e. protect the riparian resources without a water right). We encourage the BLM to manage each suitable segment to preserve the river's free-flowing quality, as well as to protect and enhance the values for which it was initially designated. |
| 1954 | Segments Found Eligible and Suitable that Are Recommended for WSRA Designation As an initial criterion, a determination of suitability and subsequent recommendation should be encouraged for those segments with continuous and majority BLM surface ownership. Recommendation should also be pursued where there are federally protected lands (i.e. designated wilderness, Wilderness Study Areas, National Conservation Areas, etc.) overlapping or in close proximity to the segment. Other factors that would be conducive to WSRA designation include the presence of endangered fish, wildlife and/or species of concern; the likelihood of establishing an effective buffer zone along the segment; the ability to limit off-highway vehicle (OHV) travel to designated routes only (and to exclude such use in wild segments); the ability to establish No Surface Occupancy (NSO) restrictions; and few or no stream crossings in the segment (except in areas given tentative "recreational" status). If all or a majority of these factors are satisfied, then a suitability determination and recommendation for inclusion in the NWSRS should be seriously considered. |
| 1955 | Segments Found Eligible but Not Suitable for WSRA Designation For a variety of reasons, it is unlikely that BLM will find every segment suitable for inclusion in the NWSRS. We are especially concerned with what happens to river segments that the BLM determines to be non-suitable. The Draft Report states: Once a record of decision is approved, segments identified as not suitable will revert to management according to the prevailing RMP. (4). See also 115. In broad terms, this reversion policy might not ensure adequate long-term protection of the rivers and their ORVs. To accomplish such protection, we would like the RMP to contain specific management prescriptions that provide protection for every non-suitable segment's free flowing-values and river-related values (i.e. ORVs). We ask that the BLM incorporate directives and land use prescriptions into the RMP that protect and enhance both the segments and their ORVs. This would preclude the BLM from authorizing any use that would substantially degrade the river. We encourage BLM to develop an RMP that maintains and augments each segment's current natural condition. Through thoughtful planning and coordination, this could be accomplished for those rivers that are not found suitable. |
| 1956 | The WSRA is valuable not only because it protects the river segment itself, but also because it ensures protection of surrounding habitat. Buffer zones are essential for maintaining the integrity of the eligible river segments. Thus, to accomplish the goals outlined above, RMP guidance should adequately protect not only the river segment, but also the adjacent physical landscape. We would like to see the WSRA's buffer zone protections included in the RMP for non-suitable segments, and we encourage flexible boundaries to accommodate specific features and river values. The preliminary boundary (and final boundary, once designated) is generally one-quarter mile from the ordinary high water mark on both sides of the river. This boundary, by section 3(b) of the WSRA, may vary on either side of the river and be narrower or wider so long as the total corridor width averages no more than 320 acres per river mile. (BLM Manual 8351.25(B)). Any management strategies should maintain or exceed this level of protection to fully safeguard the riparian ecosystem's health and integrity. This is especially true where there are upstream water quality issues that fall outside of the traditional 320-acre per mile buffer zone, per section 3(b) of WSRA. For example, selenium contamination and oil and gas development are two upstream water quality problems that could negatively impact river segments. The RMP must address these and similar threats and contain proactive management |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | strategies. Examples of selenium mitigation measures that could be included in the RMP are provisions for eliminating unlined ditches and unlined stock ponds. Oil and gas development is another significant threat, especially in the North Fork area. The RMP should mandate that specific Best Management Practices be used in oil and gas development that minimize impacts on watershed health. OHV use within and around river segments is a third concern. Unregulated OHV use damages riparian ecosystems. Because of this, we encourage the BLM in their RMP to restrict OHV travel to designated routes only. Even without suitability determination, permanent protection of river values can be assured through effective measures contained in the RMP. |
| 1957 | Suitability We encourage the BLM to begin the suitability review process. This is the final step in the evaluation procedure, and concludes with a determination of suitability or non-suitability. This phase also results in a suitability report and record of decision (ROD), which must be detailed with maps and consider a number of factors (16 USC § 1275(a); BLM Manual 8351.33(A)). The final report should provide the public with information detailing the criteria that BLM used to determine suitability status. Specifically, we would like to see detailed information explaining the strategies employed in the determination process, as well as the individual resource conditions that led BLM to choose suitability or non-suitability. Factors to consider include, but are not limited to: the need to protect threatened, endangered and sensitive species; status of landownership; reasonably foreseeable potential uses of the water and lands; federal, state, local and public interests; costs of acquiring necessary lands; the ability of the agency to manage the segments and their uses; historical and existing water rights; and instream flow requirements, including state appropriated instream flow rights. |
| 1958 | In analyzing instream flow, we ask that the BLM quantify instream flow protection requirements related to ORVs and other resource values identified through the RMP process. Under the WSRA, water rights claimed or asserted are based on the amount of water required to protect the ORVs identified on the particular segments. During suitability study, BLM should "conduct a comprehensive, interdisciplinary, resource value-based assessment in order to delineate resource values, relate flows to resource conditions, and formulate flow protection strategies which incorporate legal, technical and administrative aspects in order to secure instream flows which address values associated with the . . . segment" (BLM Manual 8351.51(B)(2)(K)). As a component of the suitability process, it is essential that the BLM quantify the amount of water necessary to protect the segments and their surrounding riparian habitats. |
| 1959 | WSRA designation may not be desirable for all river segments. For example, recommendation may not be appropriate where the majority of a segment is under mixed ownership (private/federal). Even where designation is desirable, competing interests and local water user concerns may preclude a segment from being recommended for the NWSRS. As in other BLM Field Offices, there may be some desire to form a local stakeholder group, out of concerns, questions or interest in exploring all options for protecting eligible streams. If such a group is created, strategies which focus on management efforts that protect selected streams and their associated values should be pursued, rather than an effort which focuses solely on avoidance of federal designation or federally reserved water rights. One option to explore is the State Wild and Scenic Rivers Fund. Enacted in 2008, the fund appropriates $400,000 annually from the Colorado Water Conservation Board's construction fund to develop stakeholder-based management alternatives. |
| 1960 | Another strategy to consider could be designating segments as Areas of Critical Environmental Concern (ACEC). There are currently four ACECs within the Uncompahgre Field Office planning area: Needle Rock, Fairview, Escalante Canyon and Adobe Badlands, each adding an additional layer of environmental protection within the RMP. To be considered a potential ACEC, an area must meet criteria of both relevance and importance (BLM Manual 1613.1.11). ACEC designations highlight areas where special management attention is needed to protect and prevent irreparable damage to important historical, cultural and scenic values, fish or wildlife resources, or other natural systems or processes. This management scheme could be incorporated into the RMP to protect ORVs for non-recommended segments. |
| 1961 | In considering alternatives, it is essential that there be effective stakeholder participation at all levels of the process, from local to state to federal interests, encompassing conservation organizations, water-rights holders, recreational interests, water providers, and state and federal agencies. Diversified participation is necessary to explore a variety of alternatives for protecting ORVs without compromising Colorado's ability to fully use its compact entitlements. We understand the responsibilities that BLM has under the Act and do not want BLM to lose focus on those duties. We ask that any alternative strategies be written into the RMP with clear provisions that BLM can enforce. In addition, any stakeholder plan must run on the same timeline as the RMP process. It is essential that a timeframe be developed with a clear desired outcome and completion date. Finally, given the often directly competing interests of various stakeholders, third-party enforcement of any alternative is |

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 264 of 301

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | necessary. |
| 1964 | In conclusion, HCCA and the undersigned organizations ask that the BLM finalize the eligibility report and include all identified segments in the final report. We would like to see each segment classified as either (1) eligible, suitable and recommended, (2) eligible, suitable, not recommended, but given permanent suitability protections, or (3) eligible, not suitable, and returned to RMP management with strong protection mechanisms. |
| 1965 | For segments where opposition to WSRA designation may exist, please initiate a process to determine if an alternative management strategy would be appropriate. If so, there must be clear guidelines and timelines for developing these alternatives in the RMP. |
| 1982 | A focus for our group these past years has been the health of our Uncompahgre watershed, its tributaries, and the riparian areas with their wildlife. We are familiar with the 35 segments on 23 rivers that the BLM has inventoried for Wild and Scenic eligibility status and we are in full support that all 35 segments qualify. All 35 segments deserve to be evaluated for suitability status. Each segment possesses one or more outstandingly remarkable values including riparian habitat, important native plants, seasonal range for wildlife, characteristics for watershed health, and more. |
| 1983 | When looking at the size of the BLM area, these 35 segments constitute a relatively small portion of our waterways. But only with the additional protection that these segments deserve, can we add to the health of our watershed. We urge that all 35 segments be evaluated for suitability status in the next phase of your RMP |
| 1984 | As stakeholders, we would be pleased to help with analyzing various management prescriptions and the positive and negative impacts of various designations for each segment. In this manner we hope to be part of a process to consider potential impacts to other values such as water supply. |
| 2026 | The Dolores River Corridor is a special place in need of special consideration |
| 2032 | While the UFO contains a much smaller swath of the Dolores River Corridor's public lands and a shorter stretch of the river than the other two field offices, it is the core part of the river ecosystem. We therefore urge the UFO to consider the portion of the Dolores River Corridor within its jurisdiction to be an integral part of the larger Dolores River ecosystem as you make management decisions for the area. |
| 2043 | Wild and Scenic River Suitability As part of the RMP revision process the BLM is required to determine the eligibility and suitability of rivers and streams under the Wild and Scenic Rivers Act. Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update. The Dolores has been found suitable in the past and still maintains the same qualities. Few streams boast the unique natural values as are found along the Dolores River. The river itself, and all its eligible tributaries, should receive immediate, thorough, and enduring protection. |
| 2167 | Wild and Scenic: The UFO's Draft Wild and Scenic Rivers Act Eligibility Report identifies 35 segments within BLM's Uncompahgre Planning Area as eligible for Wild and Scenic Rivers Act (WSRA) designation. TU supports the BLM's proposed eligibility determinations for all of these streams. We especially support eligibility findings for Deep Creek, the West Fork of Terror Creek, and Segments 1,2 and 3 of the San Miguel River. Deep Creek and the West Fork of Terror Creek harbor genetically pure populations of greenback cutthroat trout, a listed threatened species under the Endangered Species Act. Segments 1, 2 and 3 of the San Miguel River support highly prized recreational fisheries. It is our understanding that, though not formally designated. Trout fisheries in the lower portions of these segments support Gold Medal quality trout. In addition to these designations, TU believes Doug Creek should be found eligible for designation as, based on our information, it supports a conservation population of CRCT (see Figures 1 and 2). Taking this step toward additional protection of this conservation population would support the interagency Conservation Strategy (2006). TU believes these segments are also suitable for designation. We will comments regarding suitability once the draft suitability analysis available by the UFO. |
| 2215 | Protect as many eligible rivers and tributaries as possible. All of the river segments listed in the BLM's draft Wild & Scenic Rivers Eligibility Report should retain their eligibility for inclusion in the National Wild and Scenic Rivers System, and should be carefully evaluated for the next level of protection. Particularly deserving are those with unusually good understories of buffalo berry, New Mexico privet, or box elder, or stands of cottonwoods |
| 2216 | Cottonwood Creek, Monitor Creek, Potter Creek, and Roubideau Creek. These creeks provide and complement wildlife habitat and ecological diversity near the rich country along Monitor Mesa and the |

BLM_0067177

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | surrounding or nearby Roubideau/Camel Back Wilderness Study Area |
| 2217 | Escalante Creek. Escalante Creek and its tributaries define the surrounding country; protecting these streams will ensure healthy wildlife, productive agriculture, and stable water tables. |
| 2218 | Gunnison River. The Gunnison River itself contains segments that should be carefully evaluated to ensure enduring protection for the important fish habitat and recreation opportunities there, whether through wild & scenic river measures or other approaches. Protection strategies should recognize and integrate the protections already in place in the Dominguez-Escalante National Conservation Area and should ensure that no new dams or major water diversions occur on the Gunnison above its confluence with the Colorado River |
| 2220 | North Fork of the Gunnison. This watershed faces increasing development and recreation pressure. All eligible streams there should be carefully reviewed for protection |
| 2221 | San Miguel River. This watershed is nearly incomparable across the western United States for its intimate ecological settings, remote and thriving backcountry, naturally varying and flowing river and streams, contribution to important water systems in several states, and scenic wonder. Every eligible stream segment in this watershed should receive prompt, extensive, and reliable protection, both through wild & scenic suitability findings and through clear and firm management prescriptions in the BLM's resource management plan |
| 2222 | Beaver Creek, Dry Creek, Fall Creek, Naturita Creek, and Saltado Creek. These creeks are important contributors to the flows and health of the San Miguel itself and provide essential riparian habitat and geographically important streamflows in their own rights. |
| 2223 | San Miguel River. Segments of this river warrant the most thorough analysis and the highest level of protection for habitat, riparian health, and avoidance of industrial intrusions. |
| 2224 | Tabeguache Creek. This creek should be designated in keeping with the surrounding lands status as a congressionally designated area for preserving wilderness values. |
| 2225 | Dolores River. Few streams boast the unique natural values-and extent of threats to those values-as are found along the Dolores River. The river itself, and all its eligible tributaries, should receive immediate, thorough, and enduring protection. As larger conversations, among a diverse and extensive collection of experts, local governments, and stakeholders, are now proceeding toward a more natural and reliable regime of streamflows in the Dolores River, it is both timely and essential that the BLM provide the interim protection afforded under wild & scenic suitability. This action, and correspondingly protective measures in an update resource management plan, will both contribute to, and provide opportunity for, those broader conversations to reach successful conclusion. |
| 2648 | The Dolores River Valley is one of the last great places; please help protect it. |
| 2667 | We need to conserve our wilderness and our area of clean water. |
| 2687 | Please protect the Dolores River Basin, it's spectacular scenery and habitat for many of the wild animals. |
| 2829 | 11. Wild & Scenic Rivers We are submitting separate, detailed comments on the Wild and Scenic Rivers Eligibility Report; however, we want to include some general comments on protecting streams and segments within the Uncompahgre Field Office as part of this RMP revision. Rivers deemed eligible for inclusion in the Wild and Scenic Rivers System must be managed to protect their values until the suitability determination is made, and suitable rivers must be managed so as to protect their qualities until Congress has an opportunity to designate the river as part of the System. Given that water is relatively sparse and that riparian areas are scarce in the study area, each stream is of tremendous value, and the BLM should fully protect these priceless resources via the Wild and Scenic Rivers Act and the Uncompahgre RMP. Protect all eligible segments Whether found suitable or not, all segments found eligible must, under the provisions of the Wild and Scenic Rivers Act and accompanying regulations, be managed in order to preserve the characteristics that make those segments eligible. Protective measures must be specific to wild and scenic eligibility and suitability Protective management prescriptions and requirements-specific to segments' values that prompt findings of wild and scenic eligibility and suitability-must be included the final RMP and so must be carefully analyzed in preparation of the draft plan. Consideration other management prescriptions or designations that could, by coincidence, help protect features that contribute to the segments' eligibility and suitability are helpful (wilderness study areas, areas of critical environmental concern, visual resource management classes, mineral Withdrawals, etc.). Those coincidental protections and designations must, in the final RMP and in its implementation, must specifically supplement wild and scenic river purposes, or similar measures must be provided in the final plan |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | exclusively for wild and scenic river purposes. Similarly, the BLM can protect river values through other special management designations. Such management designations should supplement, and not replace, complete consideration of wild and scenic river values or complete protection under the terms of the Wild and Scenic Rivers Act and its provisions for study and for interim protection. Apply available protections specific to wild and scenic Whatever the ultimate collection of stream segments found to be suitable, BLM should consider the following management options for protecting each segment and apply those that are necessary for adequate protection:<br>• closed to off-highway vehicle use;<br>• withdrawn from mineral entry;<br>• as VRM Class I or Class II areas;<br>• as right-of-way exclusion areas;<br>• subject to remedial actions to ensure sensitive species habitat is maintained or enhanced;<br>• subject to extensive and reliable no-surface-occupancy stipulations for all activities;<br>• with related ACECs closed to off-highway vehicle use; • with related ACECs closed to oil and gas exploration and development;<br>• among other appropriate measures.<br>Reconsider and expand eligibility determinations The criteria for eligibility evaluation are clear. The Department of the Interior's Bureau of Land Management Manual chapter "8351-Wild and Scenic Rivers Policy and Program Direction for Identification, Evaluation, and Management (BLM Manual). Section .31A of that manual states: Basis for Determination. To be eligible, a river segment must be "free-flowing" and must possess at least one river-related value considered to be "outstandingly remarkable." These factors are summarized in Illustration 1. No other factors are considered in determining the eligibility of a river segment. All other factors are considered in determining suitability." (emphasis added) Since more detailed management decisions about stream segments would be made later in the suitability determination phase, as part of the current RMP revision or in subsequent amendments, it makes sense to list as eligible all segments that have any variation of the primary eligibility criteria, including even one outstandingly remarkable value. When in doubt, include them as eligible. Further, the BLM must disclose the scope of the outstandingly remarkable values (ORV) inventory process used in the draft eligibility report, and the BLM must extend that analysis to include all stream related ORVs and study corridors wide enough to incorporate those ORVs. We note that some past wild and scenic have relied too heavily and arbitrarily on a one-quarter-mile "buffer" around identified segments in its initial identification of ORVs. BLM guidance is clear that such a "buffer" is not the appropriate measure for an ORV's association with a river. For example, ORVs can "owe their location or existence to the presence of the river" (IM 04-196), a standard on which it would be arbitrary for BLM to place a numerical value. We are concerned that if BLM uses this arbitrary buffer, the agency will overlook significant ORVs that are tied to a segment. Geologic and scenic ORVs, as examples, could easily extend or originate from distances greater than one-quarter-mile from a segment. In an arid western slope climate, important cultural and historic values that are directly tied to segments used as water sources and migration routes for historic human populations are likely to exist a variety of distances from a segment yet "owe their location or existence to the presence of the river." Id. With vast amount of BLM land having never undergone formal cultural survey, it is important that BLM employ generous and inclusive boundaries in their inventory. Recommendation: The Uncompahgre RMP must carefully study all potentially eligible stream segments, adopt requirements to ensure eligible and suitable rivers are protected pending decisions on their designation, and ensure any designated rivers and river corridors are managed to preserve their values. |
| | ***Wild and Scenic River Comments for Dominguez-Escalante NCA*** |
| 163 | I am quite surprised to find Escalante Creek as one of the proposed segments (Escalante Creek Segment 1; Segment 2; and the Dry Fork of the Escalante segment 2). As a private landowner and rancher/farmer with property on both sides of the creek in segment 1 (one), I feel I need to comment on the Report. Having read the report thoroughly; I am dismayed by the ambiguous language which gives the BLM/ Dept. of Interior the say over management, use and development of 1/2 mile corridor of land through privately owned sections of the Creek. |
| 520 | Rubideux Creek needs federal protection to prevent the State of Colorado Prison Camp from totally taking and interesting area fully of pre-historic indian sites, wildlife, and scenic values. The same goes for Escalante Creek. A plan could help preserve the ranching way of life. |

**Table C-12**
**Issue 1: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| 833 | I strongly oppose any wild and scenic river along the Escalante Creek and the Gunnison River. |
| 1273 | The following stream segments are of concern to Mr. Miller: * Dry Fork Escalante Creek, Segment 2. Report at 25-26_ * Escalante Creek, Segments I and 2. Report al 27-33. * Gunnison River, Segment 3. Rep0l I at 36-38. As specifically noted herein, due to private land and water ownership and use, and various man-made physical structures, these segments are not eligible for Wild and Scenic River status. |
| 1274 | Dry Fork Escalante Creek, Segment 2_The BLM classifies this 2.89 mile stream segment as eligible, with a preliminary "recreational" classification. Report at 26. Of the 2.89 stream miles, an uninterrupted 0.46 mile stretch lies solely on land owned by Mr. Miller. The Report correctly notes that the stream channel is bisected by an unimproved road and by several fences to delineate livestock grazing. The Report incorrectly states that there are no water diversions within this segment. The Report fails to mention that there are also several culverts and pipes which convey water across the creek, the presence of hay fields on private land, and the presence of annual livestock grazing. The Report also fails to mention that the stream is highly intermittent, flowing for, on average, only one to two weeks per year. The Report lists the outstandingly remarkable val ue ("OR Y") of this segment at "vegetation," noting that the area contains Fremont cottonwood/skunkbrush sumac riparian vegetation. |
| 1275 | Mr. Miller's private land does not meet the criteria for eligibility as a WSR. The stream segment which crosses his private land is subject to heavy agricultural use, including grazing and haying, and is repeatedly bisected by pipes and fences, inconsistent with the WSRA's requirement that qualifying values be "outstanding" and that shoreline development be minimal. 16 u.s.c. §§ 1271 , 1273. |
| 1277 | Given Mr. Miller's heavy agricultural use, his many agricultural improvements, his exclusive management and control of vegetation located upon his private land, and the fact that "vegetation," in and of itself, does not legally qualify as an ORV, then Mr. Miller' s nearly half mile of stream segment should be excluded from the BLM's list of stream segments which are eligible for WSR designation. |
| 1278 | Escalante Creek, Segment 2_The BLM classifies this 8.48 mile stream segment as eligible, with a preliminary "recreational" classification. Report at 32-33. Of the 8.48 stream miles, 5.07 miles lie solely on private land, much of which is owned by Mr. Miller, and 2.51 miles lie on State controlled land, much of which is leased for grazing use by Mr. Miller. There are several water diversions and dams along this segment, and water is appropriated and diverted by Mr. Miller for irrigation use. At least a dozen fences cross the creek within this section. Man-made brush berms are located adjacent to the creek to control erosion. The creek has been channelized in several places. Livestock grazing occurs along the creek, and livestock drink directly from the creek. There is no public recreational access. The road often parallels or crosses the creek. The county built a staging area for road building. Irrigation ditches parallel the creek in places. Grain bins and corrals are found adjacent to the creek. Rip rap is found on the bank in various locations. A number of power lines cross the creek. Irrigation use in the summer utilizes all or nearly all flows, minimizing habitat for fish, desert bighorn sheep and other wildlife. There are a total of five farmsteads directly adjacent to the creek. In addition to the foregoing, Mr. Miller believes that the BLM is mistaken in reporting that monkey flowers and hookless cactus currently exist in this stream segment. For the reasons noted above, including the numerous water diversions, agricultural improvements and uses, and nearly exclusive private and State control of these lands, this stream segment is not eligible for WSR status. |
| 1279 | Moreover, BLM guidance precludes the BLM from designating stream segments which are predominately non-federal in ownership: In cases where a particular river segment is predominately non-federal in ownership, and contains interspersed BLM-administered lands, BLM shall evaluate only its segment as to eligibility and defer to the State or to the private landowners' discretion as to their determination of eligibility. BLM Manual 8351 - Wild and Scenic Rivers at § 0.06(B). In the case of this particular segment, nearly 90% of the creek is in State and private ownership. In such circumstances, the BLM cannot designate a stream segment as eligible without the landowner's permission. Mr. Miller, in his discretion, deems this stream segment to be ineligible for designation as a WSR. |
| 1280 | Gunnison River, Segment 3_The BLM classifies this 17.48 mile stream segment as eligible, with a preliminary "recreational" classification. Report at 37-38. Of the J 7.48 stream miles, the BLM claims that only 2.59 miles lie on private land, most of which is owned by Mr. Miller, and 0.87 miles lie on State controlled land. The BLM's river segment ownership is inaccurate, in that the majority of what the BLM claims to "own," and therefore control, is only owned and controlled on one side of the river, with ownership and control on the opposite bank being private. The BLM only acknowledged private ownership when both banks of the river were private |

Case No. 1:20-cv-02484-MSK Document 49-1 filed 04/28/21 USDC Colorado pg 268 of 301

**Table C-12**
**Issue I: Special Designation Areas – Wild and Scenic Rivers**

| Comment ID | Comment |
|---|---|
| | land. A total often private residences lie adjacent to the river. A privately owned abandoned gravel quarry lies adjacent to the river. Moreover, the BLM failed to recognize that the railroad corridor is private property. Given these facts, the majority of the segment, from the County line to its confluence with Escalante creek, is partially or wholly privately owned and controlled. As noted above, in such circumstances, the BLM cannot designate a stream segment as eligible without the landowner's permission. Mr. Miller, in his discretion, deems this stream segment to be ineligible for designation as a WSR. BLM Manual 8351 -Wild and Scenic Rivers at § 0.06(B). |
| 1281 | Moreover, the river segment does not qualify as "free flowing," given the many diversions of water (a total offour pumping plants located on private land along this segment) divert water from the river, and the presence of rip-rap on the banks in various locations. J 6 U.s.C. § I286(b) (precluding from the definition of"free-flowing" any river section subject to "diversion" or which includes "rip-rap"). The segment is also subject to livestock grazing, a lack of public access, includes a low water dam, includes an orchard, and includes a railroad adjacent to the entire river segment. Given the diversions of water, rip-rap, many agricultural improvements and uses, and predominate private access and of these lands, then this segment does not qualify for WSR status. |
| 1282 | Given the nature of the above noted stream segments, they should not be listed as eligible for WSR designation. Disqualifying characteristics may include: I) "vegetation," in and of itself, does not qualify as an ORV; 2) lands which are predominately owned and controlled by private parties are generally not eligible or suitable for designation; 3) river segments which are subject to "diversion," or which include "rip-rapping" are not eligible for designation; and 4) lands which include numerous agricultural improvements and uses may not qualify for "scenic" or even "recreational" status. Each of the above noted stream segments include one or more of these disqualifying characteristics. At a minimum, the private lands located within the above noted stream segments should not be designated as eligible for WSR status. |
| 1283 | While 2000 people access the Gunnison River each year, there are approximately 1000 canoes, boats and other water craft. |
| 1284 | Dominguez-Escalante National Conservation Area streams It is appropriate to exclude from eligibility analysis under the Uncompahgre RMP revision streams found in the Dominguez-Escalante National Conservation Area, deferring that analysis to planning processes and RMP for that NCA, so long as the NCA plan does thoroughly analyze those streams. If the NCA planning processes fails to adequately implement that analysis, those streams must be added to the Uncompahgre RMP planning analysis. Any wild and scenic analysis for NCA streams, whether conducted through the NCA plan or the UFO plan, should not assume that the streams are sufficiently protected by the NCA or (within the NCA) wilderness designations. |
| 1285 | Lower Gunnison Unit Cottonwood Creek This stream is an important feature associated with adjacent lands with wilderness character and included in citizen wilderness proposal lands. Those wilderness values should be considered as part of this streams wild and scenic evaluation. |
| 1286 | Escalante Creek, segments I and 2 This stream boasts unique eligible features of its own, and it contributes to geographically significant segments and public lands adjacent and downstream. |
| 1317 | Gunnison River, segments 2 and 3 This regionally significant river warrants careful review and enduring protection as an important recreational opportunity and as the hydrologic heart of unique adjacent public lands. |
| 1794 | Gunnison River. The Gunnison River itself contains segments that should be carefully evaluated to ensure enduring protection for the important fish habitat and recreation opportunities there, whether through wild & scenic river measures or other approaches. Protection strategies should recognize and integrate the protections already in place in the Dominguez-Escalante National Conservation Area and should ensure that no new dams or major water diversions occur on the Gunnison above its confluence with the Colorado River |

BLM_0067181

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | ***Wilderness and Wilderness Study Areas (WSAs)*** |
| 35 | All of the 35 segments in UFO's WSR eligibility report appear to be deserving of WSR status, especially those with unusually good understory or buffaloberry /Forestiera/ New Mexico privet, or box elder, or stands of cottonwoods. |
| 179 | Currently Colorado has over 66 million acres of designated Wilderness areas, several new proposals for additional Wilderness are working their through congress. While I support conservation and the concept of a Wilderness area, I also believe there needs to be a balance with multiple use. |
| 186 | I feel some areas need better signage as to what is an open trail and what mode of transportation is allowed on that trail. |
| 288 | I am in favor of WSA lands becoming wilderness, but dispersed use areas which allow dispersed camping are important to me. Please resist the urge to improve facilities, access, etc. and manage every recreational experience on every piece of BLM land. |
| 432 | Also I do not support these areas even being considered as wilderness. |
| 456 | Any lands that have wilderness characteristics should be preserved and closed to future development of any kind including gas, oil, or mineral exploration. |
| 497 | I would not change any existing policies, except the Tabeguache Wilderness Area. |
| 498 | I believe the Tabeguache Wilderness Study Area is unconstitutional. If this area was voted down by Congress in 1992, then why do we still treat it as wilderness? The BLM Field Office does a good job protecting all of our interests in all areas. Make this piece of ground the same as other areas. |
| 500 | I would not change any or existing management policies, except the Tabeguache Wilderness Study area. |
| 508 | The BLM should identify other areas within the UFO which are worthy of being managed as roadless or nonmechanized, nonmotorized, and designate them for wildlife habitat. Looking at topo maps of the area, Saucer Basin on the north side of Paradox Valley has this quality and could be extended to include the CNHP Potential Conservation Area below; Saw Tooth Ridge on the southern end of Long Mesa could provide an unfragmented wildlife refuge if kept non motorized between Highway 90 to the south and where the roads begin; Similarly Skein Mesa and Wild Steer Mesa west of the Dolores River SMA have the same less roaded qualities; Nyswonger Mesa on the south side of Paradox as well as the less roaded portions of Dry Creek Basin extending south into San Miguel County might also deserve such treatment; |
| 548 | All existing wilderness and WSA's within the UFO provide extraordinary places for various wildlife species to thrive in the absence of intense human activities. They also provide us with wild places to explore on foot or on horseback. The BLM needs to retain all of the existing WSA's and to enhance them wherever possible by retaining adjacent unroaded lands in a roadless condition. |
| 550 | Even though FLPMA grandfather's in existing livestock grazing, mining, and mineral leasing in these areas, I would like to see the BLM make it a priority to retire these uses whenever the opportunity arises. If permits or leases expire, it would seem right not to reauthorize these uses again. In my opinion, mining and mineral leasing are particularly incompatible with wilderness values. |
| 567 | Please pursue wilderness designation for the Dolores River Basin. |
| 581 | The following areas should be managed as WSA's and preserved as quiet use 1.BLM land immediately adjacent to Canyon Wilderness. 2. Adobe Badlands north east of Delta. 3. Norwood Canyon. 4. Roubideau (Camel Back). 5. Potter Canyon/Monitor Creek. 6.The Dolores River Basin |
| 583 | Please consider that any lands with wilderness characteristics should be managed in such a way to preserve those characteristics. |
| 607 | When considering the Uncompahgre Resource Management Plan, please be mindful that our wild areas are shrinking. Please make the land, and the animals that inhabit it a priority. I think that it is essential for the well-being of humankind to be able to experience the beauty of nature without the intrusion of the modern world. |
| 609 | I think that we as western Americans would like to keep open the lands that are open for us and everybody that wants to visit our lands and kept open to all people. No more wilderness. Thank you Con Hirschfeld |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | Paonia Co. 81428 Constantine37@ tds.net |
| 627 | I'm writing today to ask that you preserve the Dolores basin and the wilderness attributes that it has. My two daughters should have the privilege to experience that wildenress experience, and be able to share it with the children born years from now. |
| 635 | In addition to managing WSAs to preserve the prerogative of Congress and protect wilderness suitability, the agency should manage other lands with wilderness character in a manner that does not jeopardize their consideration for wilderness. |
| 636 | As for WSAs, the Camel Back/Roubideau area deserves special consideration and additional management attention. This area deserves to be recommended for wilderness protection—and the agency should use its maximum discretion to ensure these lands get the special attention they deserve. Contiguous with already protected national forest lands above, the Roubideau Canyon system (together with Potter and Monitor) provide critical habitat and undeveloped migration routes from montane forests into desert riparian habitat. Given the changed status of the USFS lands above the WSA (since the current UFO RMP and the 1991 wilderness recommendations) the matter of how to ensure the entire wild Roubideau system—separate from issues of agency jurisdiction—must be re-visited. |
| 637 | The Adobe Badlands is an incredible landscape that remains as a wild landscape in a developed region of the county. The opportunities for solitude and backcountry recreation area outstanding. Even if it were not a WSA—and it is—the agency should be compelled to better protect the area's sensitive soils and rare plants. It is an WSA, and the BLM is legally obligated to do so. Damage from illegal ORV use is prevalent in the area, and additional management attention—for the WSA and the ONA—is needed. |
| 641 | Currently Colorado has over 66 million acres of designated Wilderness areas, several new proposals for additional Wilderness are working their through congress. While I support conservation and the concept of a Wilderness area, I also believe there needs to be a balance with multiple use. I feel that a silent minority of vocal anti access groups have pressured the BLM to restrict resource exploration including gas and coal at a time when our nation needs these resources to reduce our dependency on foreign resources purchased from countries that don't particularly like Americans. We need monitoring and governance but we need to continue/increase our use of these resources in a way that is beneficial to all Americans and will help us reduce our dependency on foreign resources. |
| 647 | Again, I am against more Wilderness or Wilderness Study Areas, we have enough. For example, take the dominguez/escalante area that was recently turned into a NCA and includes 66,000 more acres of Wilderness. Having grown up in the Delta area I am very familiar with this area and can tell you that since this action, many, many people will never be able to enjoy the scenic beauty of this area due to it now being inaccessible unless you are the hardiest of hiker or horseback rider. I feel land can be protected without locking everyone out. This area was not being damaged by over use or rampant ATV or motorcycle use, in fact the landscape there hasn't changed much at all in the 30 years I've been visiting it. Many canyons and special places I enjoy are now totally off limits unless I can hike for several days to access them. I feel this is wrong and unnecessary and caters to that vocal minority of ultraconservative, well funded, environmentalist who probably never visited this area in the first place. |
| 711 | The second priority should be in protecting the integrity of existing WSAs, such as Sewemup Mesa, Adobe Badlands, Delores River Canyon, and Tabaguache Creek Area. And backcountry areas in general. |
| 788 | More wilderness protection, study areas, etc. |
| 872 | I do not know of any specific lands in the planning area that possess wilderness characteristics as the BLM may define them. My own idea of a wilderness is any area that man has hardly touched. But, I also see places that were once a wilderness, but man has left his mark, but by limiting mans disturbance of the area or stopping it all together, it could become a wilderness again. |
| 873 | I view the Camel Back area as one such place that if left alone, could be wilderness again. The same for the Roubideau. This would mean ending the grazing leases, closing the numerous roads that criss cross it, and limiting hunting. |
| 895 | No more wilderness or national parks, either. |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| 960 | My primary concern is that of protecting wilderness areas. In wilderness is the preservation of the world. |
| 993 | The Camelback WSA is a little-known treasure which we are so lucky to have in our backyard. It is both beautiful and isolated. Drive a short distance, then walk up Roubideau Creek from the lower end, or descend into the canyon from above, and it is easy to imagine being a hundred miles from civilization. Around each corner is a new gem to discover, whether a rock formation, a bend in the creek, an archeological fragment or petroglyph, an old grazer's cabin, animal or bird footprints in the mud, a beautiful tree or wildflower, a brilliantly colorful lizard or a flock of bighorn sheep. In spite of occasional illegal entry by motorized or mechanized users, this area feels enchanted, and I'm so grateful Congress has protected it, and hope it will someday receive the permanent protection it deserves. I have worked closely with the Uncompahgre Valley Association, the Western Colorado Congress, the Colorado Environmental Coalition, the Colorado Mountain Club, the Friends of Greater Dominguez and the Colorado Wilderness Network on efforts to get legislation passed to make the Camelback area into a permanent wilderness. |
| 994 | Spend any significant time in the Roubideau area, or fly over either by plane or on Google Earth, and it is obvious that the Camelback is only a portion of the area that deserves protection. Roubideau Canyon is really part of a three canyon system that also includes Potter Canyon and Monitor Canyon, and Monitor Mesa in between. When the Camelback WSA was created, a road existed up Potter Canyon, that was closed very soon afterwards at the request of the Division of Wildlife to offer more solitude to bighorn sheep, and has remained closed in the decades since. It is because of that road that the Camelback did not originally include all of Potter and Monitor Canyons. The road has disintegrated in many places, and is still subject to illegal incursions, but clearly all three canyons deserve to be left wild. |
| 995 | Potter and Monitor Canyons are still wild and pristine and share all of the same qualities as the more protected portions of the Roubideau Canyon system, and rightfully should be included into the Camelback WSA. To preserve the solitude, I also believe that much of the lower (northern) end of Monitor Mesa should also be kept non-motorized as well. In addition to being special places for human foot and horse travel, these areas also contain at least four ecosystems identified as threatened by the Southern Rockies Ecosystem Project, and contain precious archeological resources like the wikiup site the Boyds showed me on Monitor Mesa, where I believe archeologists identified thirteen separate wikiups. |
| 1053 | Public lands are just that. Public lands, and use should be available to the largest number of people possible without compromising the integrity of the areas. Rafters, fishermen, boaters, farmers, ranchers, gold miners, should all be allowed to use it as long as they are not doing undue harm to the resources. Although not all users are "greenies," I think most people are very cognizant of the importance of keeping our public areas as pristine as possible without over-regulating them. |
| 1082 | Additionally, I personally see many hikers, joggers, and mountain bikers enjoying the Camel Back area, and believe it should forever be protected from gas development and grazing. Additionally, I believe the Adobe Badlands Wilderness Study Area and Tabeguache Area should be designated as "suitable" for wilderness. |
| 1411 | Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness. |
| 1622 | Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO). At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics. |
| 1623 | The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics. |
| 1630 | We ask BLM to give high priority in your new RMP to protecting the lands that have wilderness characteristics in the Dolores River watershed. Both the existing wilderness study area and the citizens' proposed additions should be managed to protect their wilderness character. Offroad vehicles should be excluded from these areas, and oil/gas leasing should be prohibited. Maps in the draft plan/EIS should show the citizens' proposed areas as well as WSA, so all readers will understand which lands are being discussed. |
| 1636 | As someone who has spent some time recreating in the Dolores River Basin I value this area and want to keep |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | it as pristine as possible. |
| 1640 | A few years ago, my husband and I went on a boating trip down the Dolores River and had a great time. Our only problems were difficult access sites for our drift boat and an upset orchard grower/land owner we met on our quest to find a put in. The trip was one of the most memorable ones for us because of the amazing scenery and peace of the river. I encourage you to protect the quality of the water, the pristine air quality itself, and the surrounding natural formations. |
| 1643 | Wilderness lost cannot be regained! |
| 1648 | I live in Grand Junction Co. and am quite familiar with the Dolores River and the danger and ruin of uranium and its processing and mining. This must not happen to this region. |
| 1658 | I feel the Dolores River Canyon Wilderness Study Area and citizen recommended additions should be managed for the protection of the area's wilderness characteristics. The area offers great scenic beauty, wildlife and opportunities for remote wilderness experience. |
| 1660 | Protecting the Dolores River basin is important to my and my family. One of our pursuits is bird-watching and this river corridor has many interesting species such as the Black Phoebe which until the past ten years are so was not common in Colorado. |
| 1663 | I have never seen the Dolores River Basin, but one of my friends has. He wrote and told me about it's beauty and when I heard that it is in danger from mining and other activities, I had to write and add my voice to those asking for its preservation. I would like to see the beauty my friend spoke of some day. |
| 1665 | I have rafted the Dolores three times, and have hiked in the Coyote Wash area. I have also visited Sewemup and Granite Creek. I urge BLM to evaluate protecting all of these areas from mineral leasing and development, and from motorized recreation. |
| 1667 | Thank you for this opportunity to participate! There should be absolutely no uranium mining allowed in the Dolores River Basin and motorized vehicles should be kept to a minimum and not allowed in the back country at all. We do not need to destroy every sacred and beautiful landscape we have access to, just for capital gain. |
| 1669 | I just turned 40 last weekend and my wife and myself took a 4- day trip in and around the Delores river basin!! What a magnificent place - it's beauty and pristine wilderness refreshes the soul and made me feel like I was a young kid! Let's make sure that beauty is around for generations to come. It is like a fountain of youth in our backyard!! |
| 1671 | The Dolores corridor, the Dolores River Canyon Wilderness Study Area must be managed for the protection of the area's vast wilderness characteristics. We U.S. citizens that value such characteristics recommend that you focus upon these protections as you proceed. Other interests must be considered secondary as far as me and my friends here in Iowa are concerned. We'll support your plan providing this be the case. |
| 1710 | Regarding the RMP, I would hope your long range objectives would work toward: 1) Wilderness designation for the five Wilderness Study Areas: Camelback, Adobe Badlands, Dolores River Canyon, Sewemup Mesa, and Tabeguache Creek Area. 2) Minimize/eliminate new motorized trails in remote areas that have few or no access points. In these two comments I think you appreciate the value I place on "wilderness" within our region. |
| 1722 | In the past I agreed with the UFO's assessment of Adobe Badlands as unsuitable for wilderness protection because of noise encroachment. I have reversed my thoughts about this small but pristine example of a unique ecosystem complete with endemic species. The BLM needs to reconsider the value of wilderness protection in light of the probability of energy development in the area. Without maximum protection we may lose the Adobe Badlands...the best example left of a disappearing landscape. I urge the UFO to reconsider its recommendation to congress and to give the Adobe Badlands WSA a suitable designation. |
| 1723 | I worked for the FS marking timber at the top of the Tabeguache basin. I have climbed and hiked most of the Tabeguache drainage and consider it to be an area deserving of maximum protection. I commend the BLM for protecting this area. and want to see it continued to be off-limits for mechanized as well as motorized travel. |
| 1747 | It is with great concern that we have recently learned of the BLM plan to put a large portion of the San Miguel River into a Wild and Scenic program. We do not agree with the BLM plans to place that section into a WSR program. The enclosed papers express our views and total dissatisfaction with the BLM plan. In addition we also believe that the plan is being published by a few who believe that public land should be used only by them in |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | their own method. This is basically discrimination on their part and by the BLM if this plan continues. |
| 1767 | Those lands, as well as potential wild and scenic river corridors, should be closed to all forms of energy development and transmission. Protecting these lands has the added benefit of helping protect wildlife habitat, cultural resources, and mitigating the impacts of climate change. |
| 1768 | Those lands, as well as potential wild and scenic river corridors, should be closed to all forms of energy development and transmission. Protecting these lands has the added benefit of helping protect wildlife habitat, cultural resources, and mitigating the impacts of climate change. |
| 1835 | There are many areas in the UFO that many of our members are familiar with and would like to comment on. We would ask the BLM to review and protect the wilderness characteristics of each of the following areas, and propose as Wilderness Study Areas those that are not WSAs already. - BLM land immediately adjacent to Canyon Wilderness, along Camp Ridge and Sowbelly Ridge. These sweeping unroaded uplands provide important wildlife habitat and dramatically scenic views, thus would be an appropriate addition to the existing wilderness. |
| 1836 | All lands in Uncompahgre Field Office that are also components of Colorado's Canyon Country Wilderness Proposal (the citizen's BLM wilderness inventory), including: -- Adobe Badlands--This absolutely unique, sparse landscape northeast of Delta. The fragile soils and striking scenery here, rare in that it has not been damaged by motor travel, needs to be preserved. -- Norwood Canyon--This rugged and ecologically vibrant area in the heart of the San Miguel River corridor provides some of the better and more diverse habitat anywhere for mountain lions, hawks, eagles, and both rare and familiar native fish. This riparian area along the river has been classified as one of two most important river systems needing protection in Colorado. -- Roubideau (Camel Back)--This maze of colorful and intricate canyons provide the obvious complement to the national forest Roubideau Area, already designated by Congress to protect its wilderness values. The downstream portion should receive the same protection from the BLM until Congress can complete the watershed's designation. |
| 1838 | The Monitor Creek Canyon is being recommended in the DeGette bill and also by the conservation community to be added to the Camel Back WSA and the Roubideau Special Management Area on FS lands. Altogether these would make a great, large roadless, non-motorized, rugged, remote wildlife and quiet use area. |
| 1839 | Potter Canyon/Monitor Creek--Due to their relatively undeveloped character in a heavily roaded landscape, Subregions A and B lend themselves to a "Quiet Use" designation and should include horse and hiking trails only, along with places where trails are absent altogether. This will reduce habitat fragmentation and preserve the silence and remoteness of these canyons. We do not believe that introducing ATVs and mountain bikes into this area is appropriate given how difficult it is to contain the spread of these vehicles, how relatively wild the area still is, and the availability of ample motorized and mountain bike opportunities nearby. Potter/Monitor is also prime big horn sheep habitat. A small herd is frequently spotted here. We understand the Potter Creek Road was closed by the DOW in 1991 to protect the sheep. |
| 1840 | The Dolores River Basin-- These river lands represent some of the most colorful and spectacular wild lands in the state. Geological formations millions of years in the making, healthy river systems and unspoilt desert all provide a pristine environment for wildlife, including the endangered peregrine falcon, mountain lions and river otters. Much of this land has been identified by Colorado conservationists as prime lands for Wilderness protection. These lands are prized for their outstanding natural values and recreation opportunities by people across the nation. But their future is uncertain, threatened by uranium mining, oil and gas development, and growing off road vehicle use which could permanently damage the land's natural character. We urge you to take the necessary steps to protect this area. |
| 1841 | Tabequache SMA--We would recommend that the SMA be expanded to add the Shavano, Campbell, and Burro Creek drainages north of the Tabeguache Special Management Area to the SMA. This would be a logical extension of the SMA and, combined with the large roadless area on adjacent Forest Service lands, would create a sizable chunk of unfragmented wildlife habitat. Closing a few existing roads and a nonmnotorized/nonmechanized prescription would make the area an enjoyable hiking and horse area and provide more security to wildlife. Local mtn. bike groups are pressing for trails inside the Tabequache SMA even though the BLM is actively managing it like actual wilderness, with horse/hiking use only. We thank the BLM for their current nonmechanized policy and ask to reinforce them and keep the policy in place. |
| 1842 | Sewemup Mesa Ð 9,253 Acres Within Uncompahgre Resource Area. The majority of this CWP falls within the |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | Grand Junction Field Office; however, nearly 10,000 acres are managed by the Uncompahgre Field Office. Sewemup Mesa is one of the most ecologically pristine areas in western Colorado, having been isolated from development and most human activity throughout history. The Colorado Division of Wildlife has identified the area as suitable habitat for Mexican spotted owl, southwest willow flycatcher, whooping crane, and the western burro owl. |
| 1844 | Nyswonger Mesa-- Has remarkable possibilities of archeological importance as well as scenic and quiet recreational opportunities. Energy exploration and OHV activities are real threats to the environmental qualities of the area and the BLM RMP should recognize the importance of keeping such development contained in such a way that possible disturbance is not a threat. |
| 1845 | Lands with wilderness characteristics should be closed to motorized and mechanized use. Those lands, as well as potential wild and scenic river corridors, should be closed to all forms of energy development and transmission. Protecting these lands has the added benefit of helping protect wildlife habitat, cultural resources, and mitigating the impacts of climate change. |
| 1860 | Wilderness Quality Lands in the Dolores River Corridor. BLM has both the obligation and the authority to protect lands with wilderness characteristics. The BLM's Uncompahgre Field Office contains portions of one Wilderness Study Area (WSA), the Dolores River Canyon WSA, as well as proposed additions, in the form of Citizen's Wilderness Proposals (CWPs) to both the Dolores River Canyon and Sewemup Mesa WSA. Both the WSA lands and the proposed additions should managed in order to protect their wilderness characteristics. If managed in this recommended manner, WSAs and CWP lands in the Uncompahgre FO will not only remain available for possible future designation as Wilderness, but will also ensure and expand the opportunities for backcountry recreationists to experience a sense of adventure and discovery. Inventory reports of these areas are attached, which include maps. |
| 1861 | Dolores River Canyon WSA & CWP Expansions: This heart of the stunning and wild Dolores corridor, the Dolores River Canyon Wilderness Study Area, with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience must gain the highest possible level of protection. The portion of the Dolores River Canyon Wilderness Study Area within the Uncompahgre Field Office should continue to be managed to protect its wilderness qualities, and BLM should also analyze and manage the Citizen Proposed additions to the WSA so as to protect their wilderness characteristics. In the1985 San Juan/San Miguel Planning Area Resource Management Plan, the BLM recommended the Dolores River Canyon WSA as suitable for wilderness designation. The area possesses the same qualities now that led to the suitability finding in the past. We urge to the BLM to reaffirm the recommendation of the Dolores River Canyon WSA for designation. On page 15 the 1985 RMP states: The Dolores River Canyon WSA is being recommended as preliminarily suitable for wilderness designation, primarily because it possesses highly outstanding characteristics for primitive and unconfined recreation, solitude, and naturalness, as well as scenic grandeur and superb wilderness characteristics. It is a nationally unique area and is worthy of preservation in its natural state. The nationally significant values associated with Dolores River Canyon WSA include: (1) Formerly a Wild and Scenic River candidate as recommended by an interagency study report in 1976 and recommended to Congress for protection on several occasions; (2) Outstanding primitive and unconfined recreation opportunities associated with the river, canyons, and mesas; (3) Unique plant and animal communities found within the WSA that contain threatened and endangered species habitat; and (4) Extremely diverse topography and geology that create outstanding scenery, vistas and excellent solitude opportunities. This unique combination of factors, found only in the Dolores River Canyon WSA, creates the specific need and rational for BLM to recommend this area as preliminarily suitable for wilderness designation. |
| 1862 | The Sewemup Mesa WSA & CWP Expansions: The Sewemup Mesa CWP combines the Sewemup Mesa WSA with citizen proposed expansions. While the WSA itself falls in the Grand Junction Field Office, a significant proposed addition crosses into the Uncompahgre FO, including Carpenter Flats and Beehive Canyon. The boundaries have been drawn to exclude significant land impacts and to aid in manageability. While citizens did identify a number of routes (most likely developed by prospectors) within the Carpenter Flats and Beehive Canyon portions of the CWP, it was determined that these routes do not meet the criteria of a road as they are not maintained or regularly used. A detailed account of these routes can be found on pages 10 and 11 of the "Sewemup Mesa Citizens' Wilderness Proposal: Wilderness Inventory Report" which has been previously submitted to your office, and also is included as an attachment. The Sewemup Mesa CWP expansions create a cohesive landscape of diverse canyon systems with smaller systems such as Beehive Canyon offering the most |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | intimate of wilderness experiences. Portions of this CWP expansion falling within the boundary of the Uncompahgre Field Office should be considered in combination with wilderness quality lands in the Grand Junction FO and be managed for their wilderness characteristics. In the 1987 Grand Junction Field Office Resource Management Plan, the agency found the majority of the Sewemup Mesa WSA to be suitable for Wilderness designation, including the very small portion in the Uncompahgre Field Office. The area possesses the same qualities now that led to the suitability finding in the past. We urge the UFO to reaffirm their support of the GJFO's findings that the portions of the Sewemup Mesa WSA with the UFO are suitable for Wilderness designation. On page 37 the 1987 RMP states: "Sewemup Mesa WSA (18,835 acres) [including acreage in Montrose County] is recommended preliminarily suitable for wilderness designation wilderness because [it] possess outstanding wilderness characteristic including sufficient size, naturalness and outstanding opportunities for both solitude and primitive and unconfined recreation. Additionally, [this] WSA possess high quality ecological, geological, scientific, educational, scenic and cultural values. [This] WSA will be outstanding representatives of the Colorado Plateau Physiographic Province in adding to the landform and ecological diversity of the National Wilderness Preservation System. [The area has] minimal resource UFO Scoping Comments, Dolores River Corridor 5 conflicts. Very strong public support, from both the region and nation, has been shown for wilderness designation of [this] WSA. Specific boundaries for this WSA are shown in Appendix I of the draft RMP EIS." |
| 1908 | Many stakeholders believe BLM should embed a ongoing inventory and protection of lands with wilderness characteristics. Unlike the US Forest Service, where direction from Congress provides the direction to inventory for wilderness during the revision of each Land Use Plan, this is a very controversial idea for BLM lands. |
| 1909 | Comment: Congress gave very specific instructions to the BLM regarding Wilderness. Those instructions are contained in Section 603 of FLPMA. Congress instructed the agency to inventory all of their lands, identify which were definitely not of wilderness quality and then to begin an intensive inventory and analysis to determine which of the remaining lands would be recommended for inclusion into the National Wilderness Preservation System. The process was completed in 1991. All stakeholders (including Wilderness Advocacy Groups) have exhausted the protest and appeal options. After 10 years the "603 Process" left Utah with approximately 3.2 million acres designated as Wilderness Study Areas. Of those, approximately 1.9 million acres were deemed "suitable and manageable" and were recommended to Congress for Wilderness designation. Section 603 requires the BLM to manage WSAs in such a manner so as to not impair the suitability of such areas for preservation as Wilderness, subject to existing uses. There is no justification, no mandate in FLPMA and no process requirement for engaging in an ongoing wilderness inventory and review. Once the "603 Process" was completed, the agency is done. The question of which lands should be included in the National Wilderness Preservation System is now between Congress and the American People. Other than the management of existing WSAs, the BLM should have no part in this issue. To do so is a tragic loss of management resources. |
| 1910 | Comments regarding the potential utilization of the 1999 Preliminary Wilderness Character Inventory Evaluation. The BLM may attempt to utilize the 1999 Inventory in this RMP revision. BRC advises caution. The lack of public involvement in formulating the inventory criteria as well as lack of public involvement in the inventory itself, has produced a flawed result. Please see comments below. |
| 1911 | It is improper to make decisions based upon an inventory for a single resource value. BRC acknowledges that the agency can inventory to its heart's delight. This includes inventorying for resources or values associated with Wilderness. Our concern is how the inventory will be used in the decision making process for the Bangs Canyon Implementation Plan. Whenever making any land use planning decisions, the agency must comply with its congressional mandate to inventory for the "global" range of resources. The agency must not make decisions based on incomplete inventories, or inventories based on a single resource value. Making a decision to manage an area in a primitive recreation class because the area has been identified to have "Wilderness Character" via the 1999 Inventory is no less appropriate than making a decision to implement a full field development for oil and gas based solely on inventories for mineral and oil and gas resources. It is improper to make decisions based upon an inventory for a single resource value, in this case 'Wilderness character'. Section 201 directs the Secretary to: "prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern." It is clear from this language that all resource and other values on the public |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | lands were to be part of a single inventory. When planning, there is no authorization for the agency to engage in inventories for a small segment (Wilderness) of only part of the spectrum of "resources and other values" (recreation). It is clear from the parenthetical phrase inserted in this section by Congress that Congress wanted the broadest range of resources and values considered, and listed specifically two among the many which were to be included. |
| 1912 | Regarding the lack of public involvement in the 1999 inventory. One serious concern with utilizing the 1999 Inventory has to do with the lack of public involvement in the development of inventory criteria. These are not merely semantic arguments. These concerns are directly related to the agency's Congressional mandates and obligations to the public when developing management plans. BRC understands that the criteria used in the 1999 Inventory was identical to the "Utah Wilderness Review Procedures." Those procedures were modeled after the original Wilderness inventory, which had a number of requirements for public and local government involvement. In fact, the 1999 Wilderness review process was so closely modeled after the original one that large parts of the original inventory handbook are reproduced verbatim. Yet the term "public involvement" and similar terms have been purged from the review document. In fact, although the original Wilderness Inventory Handbook acknowledged the importance of public involvement when inventorying for Wilderness characteristics, the 1999 Wilderness inventory criteria and procedures went out of its way to eliminate public involvement. The original Wilderness Inventory Handbook (The Wilderness Inventory Handbook formulated for the inventory pursuant to FLPMA § 603, hereafter referred to as the WIH) on page 5 notes that: "The wilderness inventory process requires full public involvement." This public involvement "is particularly important because the criteria in the wilderness inventory process call for judgments that can be highly subjective. In recognition of that fact, the BLM wilderness inventory process will be conducted as openly as possible with the broadest opportunity for input from all concerned, in order to arrive at a sound decision." This is precisely correct, and it's also precisely why the 1999 Inventory is fatally flawed. The agency, when formulating inventory criteria during the original Wilderness inventory, understood that, unlike inventories for plant and animal species, or oil and gas potential, qualities that make up "Wilderness characteristics" are extremely subjective. The process had become no less subjective and the task of doing a professional inventory no less difficult in 1999. Full public and intergovernmental comment, review and involvement were every bit as necessary as they were in the first inventory. The BLM's claim that the only section of FLPMA that applied during their re-inventory for "Wilderness character" was section 201, and therefore these important public involvement provisions do not apply, is clearly wrong. Numerous sections of FLPMA and NEPA require full public involvement and participation of State, Local and Tribal officials. The lack of public involvement in formulating the criteria for the 1999 Inventory has produced a flawed result. |
| 1913 | The 1999 inventory criteria and procedures contained significant changes from the original WIH, and should have been open for public review and comment. Changing the criteria and procedures without public involvement resulted in a flawed inventory. Secretary Babbitt stated that his re-inventory team "is explicitly instructed to apply the same legal criteria that were used in the original inventory." The re-inventory procedures document clearly shows that was not done. The "Utah Wilderness Review Procedures" adopt some of the guidelines and requirements laid out in the original WIH and the Organic Act Directives (OADs). The Interior Department maintains that the re-inventory procedures are the same as the previous ones, thereby fulfilling Secretary Babbitt's commitment to the Utah's Congressional Delegation that the re-inventory team "is explicitly instructed to apply the same legal criteria that were used in the original inventory" to his re-inventory effort. However, the "Utah Wilderness Review Procedures" selectively adopts certain paragraphs and sentences from the original documents, and even then often changing their arrangement or dropping and adding sentences. Secretary Babbitt had in fact created in the "Utah Wilderness Review Procedures" a new document without any public involvement or opportunity for review and comment. A fundamental question should be asked of the BLM: if you were committed to using the same legal criteria as in the original inventory, why did you not use the original Wilderness Inventory Handbook? Why come up with something new? Looking at the new re-inventory document, there appears to be a simple answer. Secretary Babbitt never intended to do the inventory under the same legal criteria used in the first one. These factors, along with handpicking a re-inventory team led by, and heavily loaded with, BLM bureaucrats who are unabashed Wilderness advocates, underscores yet again that the 1999 Inventory was a purely political exercise. It simply was not designed to result in a useful or accurate review of the land being re-inventoried. Two Examples: Two examples, one dealing with "naturalness" and the other dealing with "outstanding opportunities for solitude," illustrate the major deficiencies in the 1999 inventory as a result of changing the criteria and procedure without public review |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | and comment: The WIH and OADs misapplied the Wilderness Act by giving emphasis to appearing natural as opposed to being natural, which was the prerequisite condition in the Wilderness Act. In determining naturalness, the WIH focuses on the requirement that it must be possible to "observe the area as being generally natural," This trend away from the intent of the Act is virtually complete with the "clarification" in OAD number 2, page 4, for field personnel to use in determining naturalness: "There is an important difference between an area's natural integrity and its apparent naturalness. Natural integrity refers to the presence of absence of ecosystems that are relatively unaffected by man's activities. Apparent naturalness refers to whether or not an area looks natural to the average visitor who is not familiar with the biological composition of natural ecosystems versus man-affected ecosystems in a given area. As reflected in the handbook, the presence or absence of apparent naturalness (i.e., do the works of man appear to be substantially unnoticeable to the average visitor) is the question the inventory must assess." The re-inventory document continues the move away from the original intent of the Wilderness Act with one significant change. The re-inventory document rewrites the last sentence: "The presence or absence of naturalness (i.e., do the works of humans appear to be substantially unnoticeable to the average visitor?) is the question the Wilderness Act directs the review to assess." At the stroke of a pen, the re-inventory document redefines the general term "naturalness" (as opposed to "apparent naturalness" in the OAD) to be whether "the works of humans appear to be substantially unnoticeable to the average visitor" and then attempts to make it the sole test the Wilderness Act requires for an area to pass the naturalness test. This evolution (or more properly devolution) in the standard of what is natural has obvious advantages to those wishing to find Wilderness characteristics where the Wilderness Act standard would recognize none. The subjective problems with determining "naturalness" pale beside those the BLM inventory procedures create for determining whether an area has the required "outstanding opportunities for solitude or a primitive and unconfined type of recreation" as the Wilderness Act requires. By its nature, the determination of "outstanding" requires some type of comparison. The WIH defines the term "outstanding" as "standing out among others of its kind; conspicuous; prominent; superior to others of its kind; distinguished; excellent." Yet the Utah review document specifically prohibits comparing areas. Page 6, 3 (b) of the re-inventory procedures document states: "Each review unit must be assessed on its own merits as to whether an outstanding opportunity exists; there must be no comparison among units. It is not permissible to use any type of rating system or scale--whether numerical, alphabetical, or qualitative (i.e., high-medium-low)--in making the assessment. Good judgment must be used in determining that outstanding opportunities either do or do not exist in each unit. This is a subjective determination and should be made only after a careful assessment of a unit." So, in total contradiction of the clear intent of the Wilderness Act, which defines Wilderness as "an area of undeveloped federal land...which...has outstanding opportunities for solitude or a primitive and unconfined type of recreation," the BLM manuals specifically prohibit the comparisons which are the only way to determine if an area truly does offer outstanding opportunities! On p. 5 of the re-inventory document in the section dealing with "naturalness," paragraphs 2 (a) (1) and (2) are reproduced almost word for word. In the original WIH, however, there was a paragraph between these two: "Those parts of the inventory unit where the imprint of man's work is substantially noticeable will be eliminated unless the area meets all the other qualifications required and could, under certain conditions, be returned to a natural state. This instance is described later on in these procedures." The first sentence in the next paragraph in the WIH reads: "Therefore, to qualify as Wilderness, an area may include some imprints of man's work provided they are substantially unnoticeable." The re-inventory document presents this sentence as: "An area may include some human impacts provided they are substantially unnoticeable in the unit as a whole." Note the addition of the phrase "in the unit as a whole." The closest thing to that in the previous inventory document is a sentence in OAD 2, page 5: "Minor imprints of man must be evaluated as to whether individually they are substantially unnoticeable in the overall unit." The sentence, which followed in the OAD, was also omitted from the re-inventory document. However, it offers additional guidance which was used on the first inventory and which unquestionably would make a difference in evaluating an area depending on whether it was part of the re-inventory directive or not. It states: "Such minor impacts must also be evaluated as to their cumulative affect on an overall unit, both in connection with major impacts or by themselves." Clearly, the re-inventory document has a much lower threshold for what qualifies as "natural" than the one applied in the original inventory. A similar situation is the exclusion of two key paragraphs in the WIH. The re-inventory document reproduces the intent of this paragraph from page 13 of the WIH nearly word for word when it states: "Human impacts outside the review unit will not normally be considered in assessing naturalness of a unit. However, if an outside impact of major significance exists, it should be noted in the overall unit description and evaluated for its direct affects on the review unit. Human impacts outside the area should not automatically lead to a conclusion that a review unit |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | lacks wilderness characteristics." However, the WIH continues with the following two paragraphs: "The number, size and distribution of the imprints of man's work to the overall size of the unit should be considered in making the final naturalness determination. For example, in larger roadless areas, more or greater impacts may be more acceptable than in smaller areas. After all impacts are considered, a determination must be made as to whether their overall impact on the landscape is or is not substantially unnoticeable. Photographs supporting impact descriptions and evaluations will be beneficial." The significance of omitting the first of these two paragraphs is that it clearly introduces a "dilution component" to the Wilderness inventory. It states that the size of the unit is a key factor in determining the significance of a human imprint to the over all unit. The corollary is that the outstandingness of an area in terms of offering opportunities for solitude and a primitive and unconfined recreation is also affected by the size of the area, as outlined in the example of the 900 acres of outstanding land in a 1000 acre unit and 100,000 acre unit explained above. Another example occurs in the re-inventory document on page 8 at 4 (C). The first sentence is taken almost word for word from OAD 2, page 5. It reads in the re-inventory document: "Where substantially noticeable human caused impacts occur within a review unit, reviewers should consider the opportunity to adjust the unit boundary to exclude the human impacts." The OAD goes on to direct that: "Major imprints of man which are substantially noticeable should not be carried forward as part of an inventory unit receiving further Wilderness review." This sentence was dropped from the re-inventory document. |
| 1935 | BLM should remove the following areas from the "not suitable" for wilderness category and place them in the "suitable" for wilderness category in the revised RMP: • Adobe Badlands Wilderness Study Areas (WSA); • Camel Back WSA; and • the section of the Tabeguache Area that is in the UFO. We urge BLM to actively work with Congress to promote passage of legislation to designate these WSAs and the Tabeguache Area as wilderness. |
| 1936 | The UFO encompasses approximately 900,000 acres of publicly owned lands. These lands are required by law to be managed for multiple use and sustained yield, such as grazing, mining, timber harvesting, and recreation. One popular form of recreation includes the use of wilderness to provide opportunities for solitude and primitive, unconfined recreation in protected roadless areas. Wilderness users enjoy hiking, camping, fishing, hunting, horseback riding, wildlife viewing, and photography. Wilderness designation also provides BLM with a tool for protecting rare plant communities and wildlife habitat. Currently 83,520 acres, or nine percent, of the UFO have been designated as wilderness. If the Adobe Badlands WSA, Camel Back WSA, and the Tabeguache Area are designated as wilderness, total wilderness acreage will increase to 121,587 acres, or 14 percent, of the total UFO acreage. At the RMP Open House held in Hotchkiss on February 12, Citizens for a Healthy Community learned that with the exception of the currently designated wilderness areas, WSAs, and the Tabeguache Area, no location in the remaining 780,000 acres of BLM land in the UFO is farther than approximately 1 mile from a road. With 86 percent of the landscape available for grazing, mining, timber harvesting, and off-road recreation, it seems reasonable and prudent that a management plan that emphasizes balanced multiple uses would include 14 percent of the landscape for non-motorized activities in a roadless landscape. |
| 2019 | Wilderness/WSAs Add Monitor Creek to Camel Back WSA RMRI recommends adding Monitor Creek and the rest of Potter Creek Canyon to the Camel Back WSA and Forest Service Roubideau SMA. This interconnected canyon system is one of the wildest, quietest, most untrammeled areas in the region and deserves the highest level of protection. We very much appreciate that Preferred Alternative 2 in the Dry Creek TMP kept these canyons in their wild, unmotorized state and strongly urge you to keep them so, as we believe the highest and best use of these canyons is to retain their silence and solitude as a future wilderness. |
| 2031 | As more people move into the communities around the Lower Dolores and as more recreationists learn about the area, the potential for increased development, both recreational and commercial, threatens to chip away at and permanently alter the amazing resource we all have in the Dolores Basin. Action needs to be taken now to ensure that the numerous qualities of the Lower Dolores River are sustained into the future, or it will be too late. Planning processes such as this one are the first step in ensuring that the Lower Dolores will be enjoyed by generation to come. |
| 2033 | Wilderness Quality Lands in the Dolores River Corridor BLM has both the obligation and the authority to protect lands with wilderness characteristics. The BLM's Uncompahgre Field Office contains portions of one Wilderness Study Area (WSA), the Dolores River Canyon WSA, as well as proposed additions, in the form of Citizen's Wilderness Proposals (CWPs) to both the Dolores River Canyon and Sewemup Mesa WSA. Both the |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | WSA lands and the proposed additions should managed in order to protect their wilderness characteristics. |
| 2035 | The portion of the Dolores River Canyon Wilderness Study Area within the Uncompahgre Field Office should continue to be managed to protect its wilderness qualities, and BLM should also analyze and manage the Citizen Proposed additions to the WSA so as to protect their wilderness characteristics. |
| 2036 | In the1985 San Juan/San Miguel Planning Area Resource Management Plan, the BLM recommended the Dolores River Canyon WSA as suitable for wilderness designation. The area possesses the same qualities now that led to the suitability finding in the past. We urge to the BLM to reaffirm the recommendation of the Dolores River Canyon WSA for designation |
| 2037 | The Sewemup Mesa WSA & CWP Expansions; The Sewemup Mesa CWP combines the Sewemup Mesa WSA with citizen proposed expansions. While the WSA itself falls in the Grand Junction Field Office, a significant proposed addition crosses into the Uncompahgre FO, including Carpenter Flats and Beehive Canyon. The boundaries have been drawn to exclude significant land impacts and to aid in manageability. While citizens did identify a number of routes (most likely developed by prospectors) within the Carpenter Flats and Beehive Canyon portions of the CWP, it was determined that these routes do not meet the criteria of a road as they are not maintained or regularly used |
| 2038 | The Sewemup Mesa CWP expansions create a cohesive landscape of diverse canyon systems with smaller systems such as Beehive Canyon offering the most intimate of wilderness experiences. Portions of this CWP expansion falling within the boundary of the Uncompahgre Field Office should be considered in combination with wilderness quality lands in the Grand Junction FO and be managed for their wilderness characteristics. |
| 2039 | In the 1987 Grand Junction Field Office Resource Management Plan, the agency found the majority of the Sewemup Mesa WSA to be suitable for Wilderness designation, including the very small portion in the Uncompahgre Field Office. The area possesses the same qualities now that led to the suitability finding in the past. We urge the UFO to reaffirm their support of the GJFO's findings that the portions of the Sewemup Mesa WSA with the UFO are suitable for Wilderness designation. |
| 2048 | Not only is the river spectacular from an ecological, scenic, and recreational standpoint, the Dolores has also been found suitable for W&S designation since the 1970s |
| 2069 | The boundaries nevertheless show how rare and isolated these less roaded lands are, suggesting in itself that they bear further study as potential wildlife and quiet use areas. |
| 2094 | This Forest Service roadless area in combination with the Tabeguache SMA forms one large, undeveloped wildlife security area that includes Spruce Mountain and a prized big game hunting area adjacent to the SMA on the north. The area is in Game Management Unit 61, one of the most sought after hunting units in Colorado. And much of the area appears to border an elk winter concentration area on the GIS elk map enclosed. |
| 2097 | The western boundary drawn on the map has been extended to Long Mesa to incorporate a piece of the Potential Conservation Area. Providing a nonmnotorized/nonmechanized prescription for this entire area represents an important opportunity to safeguard an unusually large and rare chunk of diverse and unroaded land, as BLM and Forest Service lands surrounding Tabegache are densely roaded everywhere else. |
| 2122 | As mentioned, the boundaries sketched on the map are highly impressionistic and conceptual. They are presented merely as a suggestion for how the BLM could set aside less roaded lands as a way of mitigating the severe habitat fragmentation that characterizes this region |
| 2188 | We urge you to preserve BLM land for future generations and to favor the following low-impact uses: Wide open, rugged, remote backcountry/landscapes/open spaces. |
| 2190 | We urge you to preserve BLM land for future generations and to favor the following low-impact uses: All wilderness study areas |
| 2211 | Camel Back Camel Back needs permanent protection by wilderness designation. Camel Back supports bighorn sheep and is as remote and beautiful as Dominguez Canyon. Consideration should be given to incorporating adjacent Roubideau Forest Service lands into the wilderness area. This is one of the most important areas to our members. |
| 2212 | Although we are aware that the UFO did not find the Adobe Badlands suitable for wilderness designation, we believe there is enough significance to this remnant landscape that it is deserving of permanent wilderness |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | protection. It contains imperiled endemics, and fragile Mancos shale formation. The Adobe Badlands WSA is the last untouched example of this habitat type in the UFO and possibly anywhere on the Western Slope. If not protected by wilderness designation, then none of this type of landscape will be protected. Because of increasing development pressure, particularly from gas development, this area will be heavily degraded without wilderness protection |
| 2213 | Dolores River Canyon and Sewemup Wilderness Study Areas We continue to recommend that the BLM advise Congress, when the opportunity arises, to grant full wilderness protection to these areas. |
| 2214 | Tabeguache Special Management Area We commend the BLM's management of this area as non-motorized and non-mechanized. The Tabeguache Special Management Area overlaps with a Potential Conservation Area recommended by the Colorado Natural Heritage Program for protection of sensitive plant communities. It is not suitable for mechanized travel and should be managed for its valuable wildlife habitat and hiking opportunities. |
| 2298 | It has come to my attention that the Uncompahgre field office seems to agree with extending wilderness into potter basin. TMW put a lot of time and grant money into establishing a new trail through Chriswell basin Forest service land. This trail is totally dependent on an approximately 2 mile BLM access around the north end of 7N mesa. This and the Jeep-ATV road through Potter Basin is the link to this trail loop. Please help us stop this travesty from becoming reality. This rout was part of my comments on the Dry Creek travel plan so I know you were aware of this if you read my comments. |
| 2321 | Perhaps some day we can develop the technique to take a peak at these wonders and not damage nature and our heritage at the same time. Please work toward that day! |
| 2323 | As our nation's population grows, it will be ever more important to protect our wild lands and watersheds, to insure that we have clean water and space to "recharge" ourselves away from populated areas. |
| 2324 | The protection of wild places should be at the center of the BLMs focus every day. |
| 2334 | The Dolores River Basin in southwestern Colorado represents some of the most colorful and spectacular wild lands in the state. Geological formations millions of years in the making, healthy river systems, and unspoilt desert all provide a pristine environment for wildlife, including the endangered peregrine falcon, mountain lions, and river otters. Much of this land has been identified by Colorado conservationists as prime lands for Wilderness protection. |
| 2336 | Even if every person can not make a pilgrimage to such sacred places, they must be protected, in perpetuity, as a powerful source of solace in this increasingly polarized and unstable world. The important thing to remember is that once these areas are mangled by so-called "development", they can never again offer these important natural resources. There will be no escaping the madness of civilization, no way of determining an understanding of where we have come from, and where we are going. Certainly, there are those, few to which these concerns are seen as mere impediments to the amassing of private fortunes, but at what cost to the spiritual and emotional health of the nation? |
| 2343 | I am concerned about Colorado's wild lands. I have been to Colorado twice in my life (Denver and Colorado Springs), and it is absolutely beautiful and worthy of conservation. |
| 2350 | This is my backyard, and I know and love this part of the world. I realize that some energy development is necessary, but when all the resources have been sucked dry, it is essential that this area will have retained it ecological integrity and its wild and remote beauty. |
| 2353 | This most beautiful, soul restoring, place must not be SOLD OUT. Please.. |
| 2355 | This land needs protection from short term profiteers that will surely spoil the land in their use of it. They always have, no matter what they claim. Please let this area be left wild and free. |
| 2360 | It is imperative that we protect these beautiful wildlands for future generations. Thank you for your consideration. |
| 2362 | It is very unlikely that I will ever visit this area. However, I realize how important it is to keep areas like this for environmental benefits as well as a place for wildlife to survive and people to regenerate themselves. There are so few areas like this left it is critical that the few remaining be untouched. |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| 2368 | These areas, like others scattered throughout the U.S., that have escaped development due to their remove from centers of industrialization, now have a value far beyond what anyone might have thought in previous times. They represent the original patrimony of the States in which they are located, and an irreplaceable resource for the citizens of the State. Do not allow temporary short term monetary benefits to tempt those responsible for protecting the lands, into selling out to a process which will degrade and devalue these places, and leave the citizens of the state with a huge pollution, erosion, and water quality problem, and wipe out the wildlife and natural plant life of these fragile ecosystems. |
| 2370 | Most people will ask you to emphasize resource protection in this RMP, while I would like to see us leave the place alone completely |
| 2374 | This is a unique natural resource. Once it is developed it is gone. Please keep this uppermost in you thinking while making this decision. |
| 2375 | Please help preserve these lands for future generations. |
| 2377 | There is a problem here--it is postmodernists: those who refuse, for whatever reason, to accept the reality of space-time. The sub-portion of space here is that of a wilderness ecozone. This is a habitat for wildlife, not for offroading thrill-seekers, noisemakers and scofflaws. |
| 2379 | This is an eco-zone, so designated long since and in need of major protection for the animals, birds, reptiles, plants, insects and organisms living there so these can be preserved in perpetuity as the denizens or a wild area that humans can also enjoy on its terms, not those of minds lacking respect for the special character of a 'reserved" region. |
| 2383 | Our wild places are getting rarer and rarer. I love the wild areas of Colorado |
| 2386 | It is absolutely essential that we protect our wild lands and all the living creatures that call them home. |
| 2387 | As I have aged I have seen many large partials of open land become housing tracks, shopping malls or just mowed over in the name of progress. I think every square inch of open land is in need of protection at this point in time. Our population grows and our resources dwindle. It's a matter of survival for us and other species to live on |
| 2388 | The whole point of wilderness is just that WILD-NESS. Its too late to fix things when they go bad. Best to protect our national treasures. We need quiet, as close to unused spaces as we can get. Its important to our souls and to the future health and care of our planet, to which we owe a great deal, in case you wondered. Any added benefits? Great. The resource first, people second. We have our houses, cities and workplaces. Profits are not the point of wildness. Its kindergarten decisions. I hope you've all been to kindergarten |
| 2390 | As civilization spreads across the land, we need natural areas for wildlife, for quiet, for plants and native animals to live |
| 2392 | I'm commenting on the Uncompahgre RMP revision. My wife and I want a large part of this area set aside to protect wilderness-quality lands, wild rivers, and opportunities for quiet, backcountry recreation. |
| 2397 | Wildlife habitat, native lands, and wild rivers are also important aspects of this part of Colorado. I was fortunate to visit it a couple of years ago while on my honeymoon. It was a treasured experience. |
| 2404 | We have been reckless, careless, selfish, and thoughtless up to this point in our use of natural resources. Thank you for helping us sustain our wildlife sanctuaries areas with your protection of these marvelous lands while we still have some. Thank you so very much. |
| 2411 | The BLM needs a thorough management plan as part of the RMP to make sure that planning is done carefully with wilderness and wildlife in mind. Lands with wilderness characteristics should be closed to motorized and mechanized use. These lands should not be open for drilling of any kind. |
| 2412 | I spent time years ago...in/around Paradox, CO to Gunnison, CO. What makes these areas special is the lack of human development. |
| 2414 | I have written to you even though I do not live in the United States of America because natural areas and native species have an intrinsic value and are of importance to the whole world. |
| 2416 | Protecting our once bountiful now diminishing flora and fauna should be a priority to anyone who loves our |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | land. |
| 2421 | Thank you for your attention and interest in this matter. It is important to preserve our wilderness areas and protect them from over-development. |
| 2422 | We implore you to give very serious and thorough consideration to the issues raised by The Wilderness Society and other conservation groups and concerned individuals. The Uncompahgre is one of the most outstanding natural areas in this country and one of the last of such relatively pristine quality. Any approved uses which compromise its beauty and wildness will cause irreparable and irreversible harm and result in devastating losses not just to our species but to the many species which will be affected and possibly decimated by ill-advised human decisions. |
| 2423 | Thank you for allowing me to send in my comments to you about the Uncompahgre revision plan: please focus on preserving the environmental riches of that area, along with the wildlife and the chance for many people to enjoy that wonderful area in peace. |
| 2424 | IN the long term, protection of these valuable lands will yield more public and financial benefit than short term exploitation which causes irreparable harm to the ecosystem and is not a sustainable enterprise. |
| 2425 | In Wilderness lies the Preservation of the World. |
| 2426 | We must save the wilderness for future generations to enjoy. |
| 2427 | I grew up in Colorado and cherish the beauty of it's wild places |
| 2429 | These are precious and irreplaceable natural resources. |
| 2430 | Let's protect the few remaining pristine lands that we have. Minimal encroachment is just a foot in the door for more encroachment. Lock it down now or we'll lose it forever! |
| 2432 | Once this wild and beautiful place is lost it is gone forever. We have a major responsibility to protect this land for its value as wild land, an allly against global warming, preservation of species and a mecca of peace and quiet in an increasingly noisy world. Please do all in your power to protect this area from all development, road building, energy development. We cannot ever get it back so we must protect it now. |
| 2434 | We Coloradoans need this land to be maintained as intact as possible. I understand there are many opinions you must weigh, but wilderness can never be restored. It is important to protect as much as we possibly can. We won't get another chance. |
| 2436 | I am reminded of a quote from Stewart Udall, "Plans to protect air and water, wilderness and wildlife are in fact plans to protect man." |
| 2437 | Once lost, wilderness cannot be recovered. And haven't we lost enough already? |
| 2440 | I have visited and loved the Uncompahgre for many years. It is crucial to protect it's special qualities |
| 2444 | We now live in FL and long for the beauty, peace and solitude of the Colorado Rockies. Please do not diminish the few wild spaces left! |
| 2445 | Please understand, that once development is permitted, the wilderness characteristics will be permanently destroyed. |
| 2446 | Please preserve this precious lands. |
| 2448 | Please help ensure that the long-term management plan for the Uncompahgre Plateau of southwest Colorado includes strong provisions for the protection of wild places, wildlife habitat, and wild rivers. |
| 2454 | These are crucial concerns that need to be addressed with wilderness preservation and sustainability in mind. |
| 2455 | I used to life in Colorado and loved the beauty and serenity of the area. Please protect the land and water for my children to see and future generations. Thank you for listening. |
| 2458 | I have vacationed in this area with my family for over 20 years and would like to have unspoiled places to take my grandchildren and their children in the future. |
| 2461 | Once this land is developed and exploited, it can't be returned to its previous condition. Please do what is necessary to protect this area, not just for us, but for future generations. |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| 2462 | I consider all of these points to be of paramount importance. Protected wilderness is essential to our long-term well being, something we must pass down to future generations in the spirit and tradition of Teddy Roosevelt and Ansel Adams. |
| 2465 | Progress has it's setbacks. Once you remove trees and change the Landscaping, more than likely, you can never put it back to it's original God's plan when you realize that you made another mistake called human error. Please leave what God made alone. Thanks for your time and consideration in this matter. |
| 2466 | Sir, I strongly urge you to consider that mining & oil & gas development & Off Road Vehicles are highly destructive towards such a wilderness area. |
| 2468 | Once land is opened to development or drilling it is lost. You can't put land back to its original condition when you admit a mistake was made in not leaving it alone in the first place. |
| 2469 | Wild areas are a necessity for OUR survival too ... not just for the plant and animal life that depends on our management of this earth that we all live on. PLEASE protect these lands. Thanks for all you do ... I know it's a tough job! |
| 2474 | Destroying our ecosystems so a chosen few can profit from the non-renewable resources; when all is destroyed, then what? |
| 2475 | Prime wilderness lands should be forever. If we compromise them in the face of pressure for extraction of resources and uses that degrade the peaceful and scenic values, we will end up with no wilderness, and no resolution to the insatiable demand for more development. |
| 2476 | We have lost so much of our natural Wilderness to development and oil and gas drilling. We must protect what little remains. |
| 2480 | As a devoted taxpayer and enthusiast of wilderness, I recognize the critical role that healthy wilderness plays in our nation and our world, both for the sake of wild flora and fauna and for the sake of our human experience. |
| 2483 | I have traveled through this breathtakingly beautiful area myself in 2001 and the thought of any kind of commercial use of this amazing wilderness is totally not in keeping with our highest ideals. I urge all of your efforts to protect this incredible jewel for future generations. |
| 2484 | I am writing to you today urging that you ensure that the long-term management plan for the Uncompahgre Plateau of southwest Colorado includes strong provisions for the protection of wild places, wildlife habitat, and wild rivers. We would all do well to recall the words of Stewart Udall: "Plans to protect air and water, wilderness and wildlife, are in fact plans to protect man." |
| 2485 | Our nation has a severe shortage of pristine wild lands, and they are by far the most valuable resource the Uncompahgre Field Office can deliver to the American public from its jurisdiction |
| 2490 | Please continue to do all you can to protect and preserve our precious wildlands. Please! |
| 2491 | As a landowner in southwest Colorado, I am very much against further development of wild lands. |
| 2493 | Because of the growth of our population, which includes immigration, it is of paramount importance that we keep and maintain our wild spaces just as they are. They provide many benefits from providing a filter for our air; housing what's left of our wild life, to providing solace for our spirit. All forms of pollution should be strictly prohibited!!! |
| 2497 | We need to put serious effort into protecting the wilderness and the delicate ecosystems |
| 2499 | Please act intelligently by not destroying some of the most beautiful land and wildlife in this country. Thank you. |
| 2502 | It is not necessary to sacrifice sensitive lands for the sake of development |
| 2506 | I live in Alaska now but come from Colorado. I certainly support protection of all wildlands and wild river systems. Resource development cannot waste our precious wilderness for the riches underground. The riches above ground are ours to enjoy and keep life as we know it around for our children and their children to enjoy. When it is all gone is too late. We have to live by the idea that GOOD PLANETS ARE HARD TO FIND. Which means we must take care of the one we have. Please read the following and act environmentally responsibly. Thank you. |
| 2508 | I am writing to urge you to protect the wild lands that are left to us. Thank you for the opportunity to |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | comment on the Uncompahgre RMP revision. The Uncompahgre Field Office encompasses some of Colorado's most beloved wilderness-quality lands, wild rivers, and opportunities for quiet, backcountry recreation. The resource area is also home to important and imperiled wildlife, such as Gunnison sage grouse, that rely on large intact tracts of habitat free from roads and other infrastructure. |
| 2514 | I was raised in the Rocky Mountains in this beautiful pristine state. Please keep it wild and free from exploitation |
| 2522 | This is your moment. This is the time you can be an American hero, and e the man your grandchildren and great grandchildren will honor. Save the wildlands and creatures for future Americans. Be brave, stand up and do the right thing |
| 2529 | As humankind keeps developing the world to sustain it's reckless burgeoning population growth, our wild places are being sacrificed to greed and short-sightedness. We must preserve what we have now or it will be gone. When we have irrevocably destroyed the balance of nature on this planet, we will have condemned ourselves to become as extinct as the Dodo. Please consider this in all that you do. |
| 2530 | While I live in Indianapolis, I have relatives in Colorado. Enjoying the wilderness of that state is always a big part of my visits. Please take all necessary steps to protect these beautiful areas so that we can all continue to enjoy them. |
| 2532 | My family came into southwest Colorado in the 1800s. Please protect the incredibly beautiful wild lands and natural areas remaining there |
| 2536 | the next RMP plan is of critical importance to protection of habitat and wilderness areas from development, from expanded use of off road vehicles and destruction of fauna in pursuit of natural resources |
| 2538 | So many of our public lands, forests, and open spaces have already been ruined by development, drilling, OTV/ATV use, and roads! Enough is enough! Our wilderness, forests. and public lands are under threat from so many angles. They desperately need to be protected. Our parks and forests are supposed to be a place of peace and quiet, for us and for the animals who live there. PLEASE let our public lands stay as beautiful and peaceful as Mother Nature intended!! Their future is in your hands! PLEASE help save the wilderness for ALL future generations!! |
| 2540 | If we do not save what little wilderness we have left NOW, it will simply be too late. We need this for a true quality of life in a very overpopulated world |
| 2542 | We have so many wild areas now threatened by the general population and those who want to make a profit off these lands. Please protect them. |
| 2543 | As an avid recreational user of the Uncompahgre area in southwestern Colorado, I urge the BLM to put recreation and preservation first in this area of incomparable beauty |
| 2545 | We need land that does not have human greed involved. Big business already has more then enough land to 'harvest' their products. We also have millions of roads to drive on. The thrills of driving on wild land, needs to be curbed. For a small amount of time of thrill driving, we lose lots of life in the forest, desert, and ocean land. There needs to be land that we can't just destroy for our personal pleasure. |
| 2546 | I personally believe that any messing with these sensitive wildlands is not acceptable! Leave some land wild and free! |
| 2548 | These lands are our legacy to the next generations. What is once developed can never be pristine again. Let's use some common sense, and act as Teddy Rosevelt would have hoped.. or Stuart Udall. |
| 2550 | I spend the summer months in this area and know first hand of its beauty and resources and the problems caused by off-road vehicles and over grazing. |
| 2552 | Please help preserve our wilderness for our children! Thank you for your consideration. |
| 2554 | There are fewer and fewer wilderness areas left in the world. |
| 2556 | I prefer extensive unroaded areas where quiet-use recreationists like myself can experience solitude and natural soundscapes and viewsheds. |
| 2561 | This is your chance to protect some of Colorado's best wilderness-quality lands for all time. The rivers, the quiet, the critters all are deserving of he Uncompahgre Field Office's attention as prime resource for recreation |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | & habitat for wildlife |
| 2563 | Please protect, conserve and revive the environment, biodiversity, and humanity common habitat. We thank you. |
| 2564 | PLEASE, do your best to protect and preserve these wild and pristine areas for us, our children and future generations, not to mention the wildlife that call it "home". |
| 2565 | Please keep our wilderness (or near wilderness) natural. NO development, please. |
| 2566 | Thank you for updating the Uncompahgre Plateau RMP and for the opportunity to comment. The Uncompahgre includes high-quality wild-lands, pristine rivers, wilderness-level recreation opportunities, and large, tracts of un-fragmented wildlife habitat. It represents the best of the ever-diminishing wild west. |
| 2567 | Please conduct a comprehensive, landscape-level analysis of potential Bureau-permitted activities on the Plateau; forever protect irreplaceable, high-quality, terrestrial, riparian, and aquatic habitat; and preserve existing opportunities for low-impact, wilderness-quality recreation. |
| 2568 | Please identify all wilderness-quality lands and potential wild-and-scenic river corridors; and close these areas to activities which could compromise their status. |
| 2571 | I want MORE quiet wild lands, NOT less, and NO mining of any kind. This land belongs to WE the PEOPLE, NOT greedy developers, who rape our lands for their own greedy PROFIT! |
| 2573 | Not just ours, but the world's unspoiled natural resources are vanishing by the minute, and short term exploitation for the profit of the few at the expense of the many as well as our increasingly precious and imperiled environment is unacceptable. |
| 2574 | I look forward to applauding the BLM for taking a leadership role in environmental stewardship of our precious wild lands, specifically the Uncompahgre RMP. |
| 2575 | We need the quiet wild places much more than we need any of the results of mining. |
| 2576 | Let's leave functioning ecosystems to the next generation, so burgeoning populations on earth may be supported. |
| 2578 | I urge you to protect the unique and irreplaceable wild land resource. We treasure the solitude, quiet and beauty and the rich wildlife |
| 2582 | Please manage the Uncompahgre Plateau with strong provisions for the protection of wild places, wildlife habitat and wild rivers! |
| 2587 | We need to save what little remains of America's wildlands for our grandchildren. |
| 2588 | I thoroughly believe in keeping all destructive activities Outside the wild areas. The Uncompahgre Plateau is much too beautiful and full of wildlife to be ruined to the point where people cannot go for peaceful enjoyment of what God has given us. We must keep that something that our grandchildren's grandchildren can enjoy as well. |
| 2590 | I urge you to preserve this unique area for the future generations. I personally, as a geologist, have spent much time in the Norwood, Dove Creek, Delores, and adjacent environs , all of which would be easily destroyed with the advent of commercialization. |
| 2591 | I am a part time resident and all of my close family live in Colorado, this makes it even more important to me to preserve all wildlife and land. I agree with the above. Thank you. |
| 2593 | As a former Coloradoan, I know this area and understand the jeopardy it now faces. You have the opportunity to make all the difference on how we move ahead environmentally. Remaining secured, protected, and undeveloped is critical at this point in time. |
| 2595 | I mean, aren't there enough loud and garish amusement parks, theme parks, and Disneyland-type attractions around already? Hands off our wild lands! |
| 2596 | I have been a resident of the Uncompahgre region at various moments of my life totaling about 15 years in all. This area is so beautiful and still retains a minimum of human impact. |
| 2597 | Preserve our wild life and forests, say no to environmental ruination because of economic greed. |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| 2599 | I have written so many times in support of preserving our precious western wildlands. It troubles me greatly that we still do not understand how important our wilderness areas & the creatures & plants that live within & around them are. Our environment supports us, we cannot live without its intricate wilderness. We must find new ways to live our good lives in cooperation with each other & with our environment. We are all connected, humans, mountains, canyons, ravens & mountain goats. |
| 2600 | PLEASE PROTECT OUR LAST REMAINING WILD PLACES, WILDLIFE AND RIVERS. |
| 2603 | Please keep our remaining, fragmented wilderness wild, and free from abuse and exploitation by the irresponsible and greedy. |
| 2607 | Western Watersheds Project supports conservation and protection of our public lands and asks that, restrictions and analyses as specifically outlined below (bullet points) and based on the science provided in the attachments to these comments. • Protect all wilderness quality lands by closing them to off road vehicles and livestock |
| 2639 | Please think of our children and grandchildren when considering protection for these areas. Please don't let short-sighted activities such and oil and gas development mar this amazing landscape. |
| 2642 | But then, who am I to tell YOU that our natural resources have to be preserved. We have only one earth with only one land, air and water supply. Once we give away what we have, it is gone forever...unless you have billions of years for the earth to restore itself. |
| 2646 | Keep the Uncompahgre clean and prostine. |
| 2651 | I vacation here, escaping the big cities in Texas and the noise and pollution caused by tapping the Barnett Shale in my area, because if its beauty. The streams already run reddish here because of our past resource exploitation. Don't ruin it's already fragile beauty. |
| 2653 | Let's try to preserve a few traces of our undisturbed public lands please. |
| 2654 | As former residents of Colorado, we return frequently for vacations. The Uncompahgre is a favorite place for us. I encourage you to do everything possible to protect it. |
| 2655 | As a former resident of Colorado, I would like to comment on the Uncompahgre RMP revision. I know and love this corner of Colorado very well, having worked hard for its conservation and explored much of its backcountry in the 1960s and 1970s. I know that this place is unique and special, and I encourage the BLM to protect its wild places and wildlife to the maximum extent possible |
| 2674 | I ask you Dear Mr. Krickbaum.. what legacy will we leave to the future generations? We must save what is left of our wilderness.. no off road vehicles ..no to development for oil.. uranium.. or gas or anything else that would bring any kind of change to this ecosystem it is a world all of it's own.. we know this now.. we are intelligent we are aware of what we do here Sir.. no excuses will be good enough, if we allow destruction to take place. |
| 2676 | What we have seen in the past is that private companies that do mining in particular leave the land they have mined in a terrible situation, with residues toxic to the flora and fauna, and so of course to other citizens who cherish the wilderness area. While we realize the need to meet many challenges for our country, we need to keep some set aside as wilderness to sustain our lives along with livelihoods. |
| 2677 | Our wild public lands should not be sacrificed for short term corporate profits. Once destroyed, we cannot rebuild wilderness or extinct species.<br><br>I hope that the BLM will consider fully the need to preserve wild habitats for posterity as they proceed with developing a plan for the area. |
| 2680 | On a personal note, I did visit Colorado many years ago and I still tell people about the beauty of the Big Thompson River and Estes Park. I remember feeling like I had been transported back in time. Colorado has created and preserved so much natural beauty. Please do all that you can to see that this does not become undone by those whose interests are not for the good of the land. |
| 2681 | On a personal note, I did visit Colorado many years ago and I still tell people about the beauty of the Big Thompson River and Estes Park. I remember feeling like I had been transported back in time. Colorado has created and preserved so much natural beauty. Please do all that you can to see that this does not become undone by those whose interests are not for the good of the land. |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| 2683 | BLM has a duty to protect these landscapes and resources for future generations and long term adaptability to climatic changes, especially in light of the work done by the Western Governor's Association and others - our survival depends on careful consideration of these issues now. |
| 2684 | Every wilderness area, each and every species is vital to the preservation of our great nation's backcountry. Please be knowledgeable and responsible stewards of these resources. |
| 2686 | If I had MY WAY, this pristine treasure would be kept pristine to help us and wildlife and natural flora survive… |
| 2688 | The bottom line is we owe it to our grandchildren to protect as much wilderness as possible. After all we have borrowed this land from them. It IS the right thing to do. |
| 2696 | Please protect this area from ANY type of development!! |
| 2698 | I hope all planning will prioritize preservation since that addresses a natural world we cannot replace or do without. I hope decisions made in this process will ensure that future generations can know Colorado's wild lands as we have. |
| 2699 | Do the right thing and protect these incomparable lands. |
| 2700 | At this point in time any and all efforts need to be taken to PRESERVE our resources |
| 2703 | Please keep in mind the protection of these lands as wilderness. |
| 2708 | As a wildlife rehabilitator I believe that habitat protection and preservation is the responsible action in a world of increasing human population. The UN projections for 2050 range from about 8 billion to 10.5 billion. |
| 2710 | The Uncompahgre resource area is home to some of our most beloved wild places. The BLM must inventory for lands with wilderness characteristics and consider protecting them in the RMP. Lands inventoried as Citizens' Wilderness Proposals, such as the Dolores River Canyon and Adobe Badlands must be safeguarded, and I am asking the BLM to include in the RMP protections for their wilderness values, including closing all wilderness-quality lands to ORVs and energy development. |
| 2712 | It would be best if all this development was cancelled altogether. The least they can do is to minimize as much as possible all damaging development. |
| 2716 | I bought my home in Dolores, CO because of the diversity, beauty and relatively pristine quality of much of this incomparable part of the San Juan Mts |
| 2718 | Thank you for the opportunity to comment on the Uncompahgre RMP revision. I have seen photographs of this area and I was moved by the beauty to be found there. |
| 2721 | This land was enjoyed by my Father...who was born in 1895...I hope that we will never see unconscionable development which destroys the beauty and value of the land and animals which depend upon that land for their subsistence. We need to cherish, not destroy through greed and insensitivity to our planet. |
| 2723 | We absolutely need to keep this land as pristine as possible for future generations ! |
| 2725 | I was backpacking in this area 40 years ago and I cannot imagine mining uranium or despoiling it in any way. This cannot be replaced. Nuclear power and uranium are dead. Do the right thing and close these areas to any development. |
| 2727 | The Uncompahgre is unique and its quiet and wild backcountry should be preserved as wilderness for future generations. |
| 2733 | Protect this unique area! Please do not allow it to be degraded by careless development. Thanks! |
| 2735 | I grew up in the Dolores/San Miguel water shed and I can personally attest to the beauty and wildness of the area. I strongly implore that we find a way to protect this area. |
| 2739 | We must do everything in our power to preserve habitat and wild natural areas in our country, both for the wild life and for the benefit of those citizens who seek a natural, un-mechanized environment. The Uncompahgre is not exception. |
| 2742 | As a child I spent countless summer days hiking and camping in the Uncompahgre wilderness. It is the most beautiful, pristine, and wild part of Colorado. Now, as a parent with two daughters of my own, we return to Colorado, and to that part of the state specifically, to give our daughters the opportunity to experience wild |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | places at their best and most beautiful. This land needs to be preserved for their children as well. |
| 2752 | Colorado is my favorite vacation place--mainly because of the beauty of the state. Please leave it alone for future generations to enjoy. |
| 2754 | wilderness-quality lands, wild rivers ? important and imperiled wildlife ? the human/nature interface |
| 2757 | Please preserve, & protect this precious land & it's creatures from useless, & senseless purposes. It just would be so heart breaking to see all they beauty of our planet disappear that the Almighty created, for life is just so beautiful knowing we have such places on earth. |
| 2761 | I have worked on the Uncompahgre Plateau as a biologist and understand the importance of the area to sustaining western Colorado's biodiversity. I urge you to protect the biological resources of this area with strong management protections written into the plateaus management plan. |
| 2763 | There are still lands in Colorado and other western states whose wilderness-qualities should take precedence over other possible uses. This includes the lands being studied as part of the Uncompahgre Field Office RMP. |
| 2769 | There are too many places being destroyed now. We've got enough room to live without taking more from wildlife. We need land to sustain our fresh water and air. We land for lots of trees to help with our HUGE carbon footprint. Please stop destroying the wild. Once it's gone, it's gone. We need these wild places for our children and their children and their children. |
| 2771 | Too much land has already been taken away by human interests. We need to preserve all that we can. |
| | ***Lands with Wilderness Characteristics*** |
| 2779 | BLM must inventory for wilderness character and consider protecting wilderness characteristics in the RMP. The lands governed by the Uncompahgre RMP contain pristine wildlands, including those identified in Congresswoman Diana DeGette's Colorado Wilderness Act. Section 201 of FLPMA mandates that BLM inventory the resources of the public lands, their resources and values. 43 U.S.C. § 1711. In the land use planning process, including revision of RMPs, Section 202 of FLPMA requires that BLM take into account the inventory and determine which multiple uses are best suited to which portions of the planning area. 43 U.S.C. § 1712. BLM's mandate of multiple use and sustained yield, as well as other relevant law and BLM's current guidance, provides for inventory and protection of wilderness values. Wilderness character is a resource for which BLM must keep a current inventory. As the U.S. Court of Appeals for the Ninth Circuit recently held: wilderness characteristics are among the 'resource and other values' of the public lands to be inventoried under § 1711. BLM's land use plans, which provide for the management of these resources and values, are, again, to "rely, to the extent it is available, on the inventory of the public lands, their resources, and other values." 43 U.S.C. § 1712(c)(4). Oregon Natural Desert Ass'n v. Bureau of land Management, 531 F.3d 1114, 1119 (9th Cir. 2008). Therefore, BLM is required to consider "whether, and to what extent, wilderness values are now present in the planning area outside of existing WSAs and, if so, how the Plan should treat land with such values." Id. at 1143. These obligations also apply to WSAs released by Congress, which BLM found to have wilderness characteristics. As the court stated: "wilderness characteristics are a value which, under the FLPMA, the Bureau has the continuing authority to manage, even after it has fulfilled its 43 U.S.C. § 1782 duties to recommend some lands with wilderness characteristics for permanent congressional protection." Id. at 1142. Nationally, BLM has acknowledged the need for new guidance on inventorying for and managing lands with wilderness characteristics and committed to releasing such guidance in the near future. An interdisciplinary DOI review team released its final report and recommendations on the 77 contested leases issued in Utah BLM's December 2008 lease sale2 ("Stiles Report") in October 2009. The Stiles Report noted the lack of national guidance on managing lands with wilderness characteristics and found that this lack of guidance contributes to uninformed 011 and gas leasing decisions, and recommended the guidance be issued soon. The report further recommended that "BLM-Utah review the [recently completed RMPs] in light of this new guidance and make necessary modifications." (pp. 32-33). The Stiles Report includes significant recommendations regarding additional protections that should be considered, including not leasing at all, based on the presence of wilderness characteristics. Specific recommendations include: "Adding an NSO stipulation could allow both mineral development and protection of the wilderness characteristics this land has in common with the contiguous Natural Area" (p. 6); "This parcel should be reviewed using the soon-to-be-released new Wilderness Characteristics Inventory Manual...Additional stipulations may be found necessary after completion of a revised inventory of wilderness characteristics" (p. 7); and "The team recommends deferral to reconsider the impacts |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | on documented wilderness characteristics" (p. 9). Per FLPMA and BLM's current guidance, and in light of the Stiles Report and upcoming guidance, BLM is obligated to inventory for and consider a range of alternatives to protect lands with wilderness characteristics. |
| 2780 | Wilderness character is a valuable resource and important multiple use of the lands governed by the Uncompahgre RMP. As discussed above, wilderness is a resource to be inventoried and managed under BLM's multiple use mandate. BLM has identified "wilderness characteristics" to include naturalness or providing opportunities for solitude or primitive recreation. See, Instruction Memoranda (IMs) 2003-274 and 2003-275. Through this planning process, BLM should recognize the wide range of values associated with lands with wilderness characteristics: (a) Scenic values - FLPMA specifically identifies "scenic values" as a resource of BLM lands for purposes of inventory and management (43 U.S.C. § 1711(a)), and the unspoiled landscapes of lands with wilderness characteristics generally provide spectacular viewing experiences. The scenic values of these lands will be severely compromised if destructive activities or other visual impairments are permitted. (b) Recreation - FLPMA also identifies "outdoor recreation" as a valuable resource to be inventoried and managed by BLM. 43 U.S.C. § 1711(a). Lands with wilderness characteristics provide opportunities for primitive recreation, such as hiking, camping, hunting and wildlife viewing. Most, if not all, primitive recreation experiences will be foreclosed or severely impacted if the naturalness and quiet of these lands are not preserved. (c) Wildlife habitat and riparian areas - FLPMA acknowledges the value of wildlife habitat found in public lands and recognizes habitat as an important use. 43 U.S.C. § 1702©. Due to their unspoiled state, lands with wilderness characteristics provide valuable habitat for wildlife, thereby supporting additional resources and uses of the public lands. As part of their habitat, many species are also dependent on riparian and other wetland habitats, especially during either seasonal migrations or seasons and years when surrounding habitats are dry and unproductive. Wilderness quality lands support biodiversity, watershed protection and overall healthy ecosystems. The low route density, absence of development activities and corresponding dearth of motorized vehicles, which are integral to wilderness character, also ensure the clean air, clean water and lack of disturbance necessary for productive wildlife habitat and riparian areas (which support both wildlife habitat and human uses of water). The report can be found at http://www.doLgov/documents/BIM_Utah77LeaseParcelReport.pdf. Further, inventorying lands with wilderness characteristics will also provide important data on existing large blocks of habitat and how BLM can restore these blocks of habitat to better match the historic range of variability. Swanson et al. (1994) contend that managing an ecosystem within its range of variability is appropriate to maintain diverse, resilient, productive, and healthy ecosystems for viable populations of native species. Using the historical range of variability, they believe, is the most scientifically defensible way to meet society's objective of sustaining habitat. Patrick Daigle and Rick Dawson, Extension Note 07; Management Concepts for Landscape Ecology (Part 1 of 7). October 1996. http://www.for.gov.bc.ca/hfd/pubs/docs/en/en07.pdf; citing Swanson, F. 1; Jones, J. A.; Wallin, D.O.; Cissel,l H. 1994. Natural variability--implications for ecosystem management. In: Jensen, M. E.; Bourgeron, P. S., tech. eds. Eastside Forest Ecosystem Health Assessment--Volume II: Ecosystem management: principles and applications. Gen. Tech. Rep. PNW-GTR-318. Portland, OR: U.S. Dept. of Agriculture, Forest Service, Pacific Northwest Research Station: pp 89-106. Identifying, restoring and protecting substantial road less areas in the lands governed by the Uncompahgre RMP can provide crucial benefits to wildlife, especially to endangered and sensitive species. (d) Cultural resources - FLPMA also recognizes the importance of "historical values" as part of the resources of the public lands to be protected. 43 U.S.C. § 1702©. The lack of intensive human access and activity on lands with wilderness characteristics helps to protect these resources. The scoping notice for the Uncompahgre RMP identifies managing and protecting cultural, historical and paleontological resources as an issue to be addressed in the RMP. Managing lands to protect wilderness qualities will also help protect cultural and archaeological sites. (e) Economic benefits - The recreation opportunities provided by wilderness quality lands also yield direct economic benefits to local communities. According to the U.S. Fish & Wildlife Service, in 2006 State residents and non-residents spent $3 billion on wildlife recreation in Colorado. (USFWS 2006, National/Survey of Hunting, Fishing and Wildlife-associated Recreation http://www.census.gov/prodl2008pubs/fhw06-co.pdf). In addition, local communities that protect wildlands reap measurable benefits in terms of employment and personal income. For instance, a recent report by the Sonoran Institute (Sonoran Institute 2004, Prosperity in the 21st Century West · The Role of Protected Public Lands) found that: Protected lands have the greatest influence on economic growth in rural isolated counties that lack easy access to larger markets. From 1970 to 2000, real per capita income in isolated rural counties with protected land grew more than 60 percent faster than isolated counties without any protected lands. These |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | findings confirm earlier research, showing that wilderness is in fact beneficial for local economies. Residents of counties with wilderness cite wilderness as an important reason why they moved to the county, and long-term residents cite it as a reason they stay. Recent survey results also indicate that many firms decide to locate or stay in the West because of scenic amenities and wildlife-based recreation, both of which are strongly supported by wilderness areas. (Morton 2000, Wilderness: The Silent Engine of the West's Economy). Other "non-market" economic values arise from the ability of wildlands to contribute to recreation and recreation-related jobs, scientific research, scenic viewsheds, biodiversity conservation, and watershed protection. (Morton 1999, The Economic Benefits of Wilderness: Theory and Practice; Loomis 2000, Economic Values of Wilderness Recreation and Passive Use: What We Think We Know at the Turn of the 21 st Century). All of these economic benefits are dependent upon adequate protection of the wilderness characteristics of the lands. (f) Quality of life - The wildlands located within the Uncompahgre planning area help to define the character of this area and are an important component of the quality of life for local residents and future generations, providing wilderness values in proximity to the burgeoning urban and suburban areas of Montrose and other growing population centers. Their protection enables the customs and culture of this community to continue. (g) Balanced use - The vast majority of BLM lands are open to motorized use and development. FLPMA recognizes that "multiple use" of the public lands requires "a combination of balanced and diverse resource uses" that includes recreation, watershed, wildlife, fish, and natural scenic and historical values (43 U.S.C. § 1702©). FLPMA also requires BLM to prepare land use plans that may limit certain uses in some areas (43 U.S.C. § 1712). Many other multiple uses of public lands are compatible with protection of wilderness characteristics - in fact, many are enhanced if not dependent on protection of wilderness qualities (such as primitive recreation and wildlife habitat). Protection of wilderness characteristics will benefit many of the other multiple uses of BLM lands, while other more exclusionary uses (such as off-road vehicle use and timber harvesting) will still have adequate opportunities on other BLM lands. |
| 2781 | 2. BLM must consider alternatives in the Uncompahgre RMP for managing lands to protect their wilderness characteristics. The range of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. NEPA requires BLM to "rigorously explore and objectively evaluate" a range of alternatives to proposed federal actions. See 40 C.F.R. §§ 1502.14(a) and 1508.25(c). NEPA's requirement that alternatives be studied, developed, and described both guides the substance of environmental decision-making and provides evidence that the mandated decision-making process has actually taken place. Informed and meaningful consideration of alternatives -- including the no action alternative -- is thus an integral part of the statutory scheme. Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1228 (9th Cir. 1988), cert. denied, 489 U.S. 1066 (1989) (citations and emphasis omitted). An agency violates NEPA by failing to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. City of Tenakee Springs v. Clough, 915 F.2d 1308, 1310 (9th Cir. 1990) (quoting 40 C.F.R. § 1502.14). This evaluation extends to considering more environmentally protective alternatives and mitigation measures. See, e.g., Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094,1122-1123 (9th Cir. 2002) (and cases cited therein); see also Envtl Defense Fund., Inc. v. U.S. Army Corps. of Engrs, 492 F.2d 1123, 1135 (5th Cir. 1974); City of New York v. Dept. of Transp.• 715 F.2d 732, 743 (2nd Cir. 1983) (NEPA's requirement for consideration of a range of alternatives is intended to prevent the EIS from becoming "a foreordained formality."); Utahns for Better Transportation v. U.S. Dept. of Transp.• 305 F.3d 1152 (10th Cir. 2002), modified in part on other grounds, 319 F3d 1207 (2003); Or. Envtl. Council v. Kunzman, 614 F.Supp. 657,659-660 (D. Or. 1985) (stating that the alternatives that must be considered under NEPA are those that would "avoid or minimize" adverse environmental effects). NEPA requires that an actual "range of alternatives is considered, such that the Act will "preclude agencies from defining the objectives of their actions in terms so unreasonably narrow that they can be accomplished be only one alternative (i.e. the applicant's proposed project)." Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1174 (loth Cir. 1999), citing Simmons v. United States Corps of Engineers, 120 F.3d 664, 669 (7th Cir. 1997). This requirement prevents the EIS from becoming "a foreordained formality." City of New York v. Department of Transp., 715 F.2d 732, 743 (2nd Cir. 1983). See also, Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002). Given the broad purpose of the preparation of the Uncompahgre RMP and the information compiled by the public regarding lands with wilderness characteristics, the range of alternatives for these lands should include a number of alternatives to protect their wilderness values. This range of alternatives is also consistent with BLM's FLPMA obligations to inventory its lands and their resources, which includes wilderness character. FLPMA also obligates BLM to take this inventory into account when preparing land use plans, using and observing the principles of multiple use and sustained yield. 43 U.S.C. § 1712(c)(4); 43 U.S.C. § 1712(c)(1). |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | Through management plans, BLM can and should protect wilderness character and the many uses that wilderness character provides on the public lands through various management decisions, including by excluding or limiting certain uses of the public lands. See, 43 U.S.C. § 1712(e). This is necessary and consistent with the definition of multiple use, which identifies the importance of various aspects of wilderness character (such as recreation, wildlife, natural scenic values) and requires BLM's consideration of the relative values of these resources but "not necessarily to the combination of uses that will give the greatest economic return." 43 U.S.C. § 1702(c). |
| 2782 | BLM should consider designating new Wilderness Study Areas. We are aware of the April 2003 settlement agreement (Utah Settlement) between Secretary of the Interior Norton and the State of Utah in which BLM abdicated its authority to designate any additional WSAs, and we maintain that this agreement is invalid and will ultimately be overturned in pending litigation. The federal court in Utah revoked its approval of the Utah Settlement, stating that its approval of the initial settlement was never intended to be interpreted as a binding consent decree. Recognizing that the court's decision undermined the legal ground for the Utah Settlement, the State of Utah and the Department of Interior have now formally withdrawn the settlement as it was originally submitted. See, Motion to Stay Briefing and for a Status Conference, September 9, 2005, attached. This casts serious doubt upon BLM's current policy not to consider designating new WSAs. There is no binding consent decree and the BLM has not even issued any updated guidance seeking to continue applying this misguided, and illegal, policy. In addition, the Utah Settlement is based on an interpretation of FLPMA §§ 201, 202, and 603 that is contrary to FLPMA's plain language. Section 603 did not supersede or limit BLM's authority under § 201 to undertake wilderness inventories, but rather relies explicitly on BLM having exactly that authority under § 201. Nor did § 603 in any way limit BLM's discretion under § 202 to manage its lands as it sees fit, including managing areas as § 202 WSAs in accordance with the Interim Management Policy (IMP). Every prior administration has created WSAs under § 202 and they plainly had authority to do so. This administration has such authority as well, making this a reasonable alternative deserving of consideration in this NEPA process. The Utah Settlement is also illegal because the court in Utah lacked jurisdiction to prohibit designation of new WSAs nationwide, including in Colorado. Recommendation: In light of the most recent ruling and subsequent action of the parties, we emphasize that the BLM can and should continue to designate new WSAs in this planning process, including the areas identified with this submission. Further, if BLM fails to fulfill these obligations, it risks violating both FLPMA and NEPA, and jeopardizing the validity of this entire planning process. |
| 2783 | BLM should also consider other management alternatives for protecting lands with wilderness characteristics. The Utah Settlement does not affect BLM's obligation to value wilderness character or, according to BLM directives, the agency's ability to protect that character, including in the development of management alternatives. BLM's recent acknowledgment of this obligation in the Stiles Report and the related court rulings provide important direction in this regard. Further, in previous guidance, BLM has not only claimed that it can continue to protect wilderness values, but has also committed to doing so. On September 29, 2003, BLM issued IMs 2003-274 and 2003-275, formalizing its policies concerning wilderness study and consideration of wilderness characteristics in the wake of the Utah Settlement. In the IMs and subsequent public statements, BLM has claimed that its abandonment of previous policy on WSAs would not prevent protection of lands with wilderness characteristics. The IMs contemplate that BLM can continue to inventory for and protect land "with wilderness characteristics," such as naturalness or providing opportunities for solitude or primitive recreation, through the planning process. The IMs further provide for management that emphasizes "the protection of some or all of the wilderness characteristics as a priority," even if this means prioritizing wilderness over other multiple uses. This guidance does not limit its application to lands suitable for designation of WSAs; for instance, the guidance does not include a requirement for the lands at issue to generally comprise SOOO-acre parcels or a requirement that the lands have all of the potential wilderness characteristics in order to merit protection. IM 2003-274 states that " BLM may continue to inventory public lands for resource or other values, including wilderness characteristics" and that the agency can "manage them using special protections to protect wilderness characteristics." (emphasis added). Further, IM 2003-275, Change 1, reads: The BLM can make a variety of land use plan decisions to protect wilderness characteristics, such as establishing Visual Resource Management (VRM) class objectives to guide the placement of roads, trails, and other facilities; establishing conditions of use to be attached to permits, leases, and other authorizations to achieve the desired level of resource protection; and designating lands as open, closed, or limited to Off Highway Vehicles (OHV) to achieve a desired visitor experience. (emphasis added). Accordingly, administrative protection can and should be considered for lands with wilderness characteristics that are not currently protected. The Draft RMP should |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | also consider management alternatives that provide administrative protection for the wilderness characteristics of those lands currently designated as WSAs if they are not ultimately designated as Wilderness by Congress; their wilderness characteristics are already acknowledged by the BLM. Further, BLM is obligated to evaluate the potential impacts on wilderness values from its management decisions. In the most recent ruling on the Utah Settlement challenge (State of Utah v. Norton, Case No. 2:96-CV0870, Order and Opinion (D. Utah September 20, 2006)), Judge Benson found against the Conservation Groups for a number of reasons, including agreeing with the legal interpretation of FLPMA put forth by the State of Utah and the BLM (a finding we continue to dispute). However, the ruling also justifies the court's interpretation by finding that the agency can provide virtually the same protection for lands with wilderness characteristics through administrative decisions as it can through designation of new WSAs, with the only material difference being that, while the agency can alter its own management decisions, only Congress can change a WSA designation. The court stated: "Both Utah and the BLM acknowledge that the BLM has the discretion to manage lands in a manner that is similar to the non-impairment standard by emphasizing the protection of wilderness characteristics as a priority over other potential uses." Order and Opinion, p. 41 (emphasis added - excerpt attached). In a subsequent briefing to the U.S. Court of Appeals for the 10th Circuit, the Department of the Interior and the BLM reiterated that "the settlement does not preclude BLM from inventorying public lands for wilderness-associated characteristics" and that "the land management decision obtained through FLPMA § 202 process may resemble management under FLPMA § 603's non-impairment standard." In discussing how BLM will manage lands with wilderness characteristics, the brief refers to the "BLM's discretion under FLPMA § 202 to preserve their wilderness-associated characteristics." Brief of the Federal Appellees, State of Utah v. Kempthorne, Case No. 06-4240 (February 26, 2007), pp. 40,43 (emphases added - excerpt attached). Similarly, the Uncompahgre Field Office can and should protect lands with wilderness characteristics from the damage likely to result from energy development and uncontrolled off-road vehicle (ORV) use, both of which the BLM has acknowledged are likely to occur if these activities are permitted to occur on lands with wilderness characteristics. In addition, the information submitted regarding citizen-proposed wilderness constitutes significant new information that must be addressed in this RMP revision. This information has not yet been analyzed in the existing land use plan, so NEPA requires analysis of the potential environmental direct, indirect and cumulative effects of oil and gas development on these areas and consideration of protection for them. See, 40 C.F.R. § 1502.9(c); Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 374 (1989). In a recent decision, the U.S. District for the District of Utah found that information regarding wilderness characteristics that was not considered in the existing land use plan was: a textbook example of significant new information about the affected environment (the wilderness attributes and characteristics of the Desolation Canyon, Floy Canyon, Flume Canyon, Coal Canyon, and Flat Tops unit) that would be impacted by oil and gas development; information that was not reflected in BLM's existing NEPA analyses. Southern Utah Wilderness Alliance v. Norton, 457 F. Supp. 2d 1253 (D. Utah 2D06) (attached). A compliant NEPA analysis requires not only assessment of potential impacts but also a consideration of potential mitigation measures, such as protecting lands with wilderness characteristics. 40 C.F.R. §§ 1502.14,1502.16. The Uncompahgre RMP must consider protective measures tailored specifically to protect lands with wilderness characteristics. BLM's Arizona State Office has issued guidance that elaborates upon the BLM's national guidance by providing for identification of lands with wilderness characteristics and development of management prescriptions to protect and enhance these values (1M No. AZ-2005-D07 - attached). The Proposed RMP for the Arizona Strip includes land use allocations for lands with wilderness characteristics in every alternative and sets out protective management prescriptions (Table 2.10). This RMP also includes a detailed discussion of how BLM identified and assessed wilderness characteristics and the need for protective management (Appendix 3.0). The process is consistent with FLPMA's direction that BLM inventory for the many values of the public lands and consider ways to protect them (i.e., not all uses are appropriate in all places) in the RMP. 43 U.S.C. §§ 1711, 1712. The recently-released Records of Decision for this planning area all include protection for lands with wilderness characteristics (available on-line at: http://www.blm.govlaz/stlen/info/nepa/environmentallibrary/arizonaresourcemanagement.html). Other RMPs that are being prepared in Colorado, Arizona, New Mexico and Utah include identification of lands with wilderness characteristics and include management of certain areas to maintain and enhance these values in management alternatives under consideration. For example, the Preliminary Draft Alternatives for the TriCounty RMPs (prepared by the BLM's Las Cruces, NM Field Office) also provide for protection of citizen-proposed wilderness, stating that these areas "would be managed to maintain wilderness characteristics." See, TriCounty RMPs/EIS Newsletter, p. 3 (available on-line at: http://www.nm.blm.gov/lcfoltricounty/tricounty.html). The Preliminary Goals and Objectives set out a management approach specific to lands with wilderness |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | characteristics, including: • Goal: Maintain naturalness, outstanding opportunities for solitude, and unconfined recreation. • Objectives: - Manage areas with wilderness characteristics to maintain the natural qualities of the landscape where the imprint of human activity is substantially unnoticeable; where the sights, sounds, and evidence of other people are rare or infrequent; and where visitors can be isolated, alone, or secluded from others. - Provide management direction for assessing site specific impacts from proposals that fall within identified areas with wilderness characteristics based on the long-term effect on naturalness, ability to restore the impacted area to its natural state, compatibility with VRM objectives, loss of opportunity for solitude and primitive recreation, and potential for proposed use to be accommodated outside of the area. In addition, the Draft RMP for the Little Snake Field Office (released February 9, 2007 and available online at: http://www.co.blm.gov/lsra/rmp/index.htm) addressed management of lands with wilderness characteristics and/or backcountry characteristics. Most of the lands at issue in the Little Snake Draft RMP were identified as part of a citizens' wilderness proposal, which the BLM re-inventoried and considered for management of their naturalness and/or opportunities for primitive recreation or solitude. The Draft RMP identifies two specific management approaches, one for "Lands with Wilderness Characteristics Outside Existing WSAs" and another for "Lands with Backcountry Characteristics Outside Existing WSAs." See, Draft RMP, pp. 2-158 - 2-161; 2-199 - 2-201. Management prescriptions include: Lands with Wilderness Characteristics: • Objective: "to protect naturalness, opportunities for semi-primitive recreation and solitude"; • closed to oil and gas operations and other minerals activities; • off-road vehicles (ORVs) limited to designated routes; • Class II or Class III Visual Resource Management (VRM) classification; and • Some areas may be managed as a Special Recreation Management Area (SRMA) to "provide quality primitive recreation experiences in a largely natural setting.": - closed to oil and gas leasing (or to new oil and gas leasing); - closed to ORVs; - VRM Class II. Lands with Backcountry Characteristics: • Described as "backcountry areas"; • Objective: "to provide backcountry recreation experience in predominantly natural settings"; • closed oil and gas leasing; • closed to ORVs; and • VRM Class II. |
| 2784 | To ensure that wilderness values receive proper and sufficient attention as a critical aspect of land management in preparation of the Uncompahgre RMP, BLM must address wilderness as a separate and unique issue in the planning process including in its Planning Criteria, in the Analysis of the Management Situation and in each section of the RMP. Protection of lands with wilderness character should be identified as a major issue in the scoping report. This will assist the public in understanding the values of Wilderness-quality lands and the potential effects of other multiple uses on wilderness character, as well as in communicating comments or concerns regarding the management of these lands to BLM. Because comments on protection of wilderness values will be clearly identified, BLM will be in a better position to clarify any misconceptions and provide complete responses. In preparing the revised RMP and accompanying EIS, BLM should clearly present management alternatives in the context of protecting wilderness character and analyze environmental consequences to that character. BLM has been aware of these proposed wilderness areas for some time, and the agency must attend to them. In the "Alternatives" section of the RMP, BLM must include various ways to protect these lands in each of the management alternatives. In addition to considering designation of new WSAs, BLM should propose protective management prescriptions or other protective status (including mineral withdrawals, non-motorized recreation prescriptions, ACEC designations, and prohibitions on new road construction and erection of structures such as cell towers) for these lands. The Alternatives section must also discuss the implications of each alternative for the wilderness-quality lands governed by the Uncompahgre RMP. Finally, BLM must specify the "Environmental Consequences" of the resource management decisions on the wilderness-quality lands in the planning areas. This discussion should include, but not be limited to, an analysis of the cumulative impacts of other activities (including those undertaken by non-federal entities) within the planning areas on these unique lands. In short, in every major section of the RMP, BLM must address wilderness-quality lands and citizen-proposed wilderness areas. BLM should then take appropriate actions to protect wilderness character in the preferred management alternative. We look forward to seeing inventory for and protection of wilderness qualities comprehensively addressed as the preparation of the Uncompahgre RMP proceeds. Additionally, we realize that the newly-designated Dominguez-Escalante National Conservation Area will not be included in this RMP, but we would like to reiterate that the NCA plan must fully evaluate potential wilderness lands within the NCA. The Uncompahgre RMP should address potential impacts to the adjacent NCA lands, including wilderness-quality lands. Recommendations: BLM should include protection of lands with wilderness characteristics in the RMP's management alternatives and thoroughly analyze this issue throughout the planning process. To ensure that wilderness values receive proper and sufficient attention as a critical aspect |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | of land management in preparation of the RMP, BLM must inventory for lands with wilderness characteristics (including those lands identified below as citizens' proposed wilderness), consider alternatives for protecting lands with wilderness characteristics (including for those lands currently designated as WSAs if they are not ultimately designated as Wilderness by Congress) and address wilderness character outside of WSAs as a separate and unique issue in the planning process in each section of the RMP, as described above. |
| 2785 | Specific lands to be protected We are submitting a map of citizens' wilderness proposals that should be inventoried and considered for management to protect their wilderness characteristics. These lands should be inventoried for wilderness characteristics and management alternatives for protecting the wilderness resource present on these lands should be evaluated, including the opportunities they provide for primitive recreation and otherwise experiencing solitude, naturalness and scenic beauty. The following areas have been identified as citizen-proposed wilderness. (Acreages are approximate.) We have included more detail on each of these areas with the map in Appendix 3. 1) Roubideau (Camel Back) - 20,059 Acres This maze of colorful and intricate canyons provides the obvious complement to the national forest Roubideau Area, already designated by Congress to protect its wilderness values. The downstream portion should receive the same protection from the BLM until Congress can complete the watershed's designation. 2) Adobe Badlands - 10,323 Acres This absolutely unique, sparse landscape northeast of Delta is rare in that it has not been damaged by motor travel. The area is home to an endangered species of cactus, desert reptiles, and geologic wonders. The fragile soils and striking scenery need to be preserved. 3) Sewemup Mesa - 9,253 Acres Within Uncompahgre Resource Area The majority of this CWP falls within the Grand Junction Field Office; however, nearly 10,000 acres are managed by the Uncompahgre Field Office. Sewemup Mesa is one of the most ecologically pristine areas in western Colorado, having been isolated from development and most human activity throughout history. The Colorado Division of Wildlife has identified the area as suitable habitat for Mexican spotted owl, southwest willow flycatcher, whooping crane, and the western burro owl. 4) Norwood Canyon -4,867 Acres This rugged and ecologically vibrant area in the heart of the San Miguel River corridor provides some of the better and more diverse habitat anywhere for mountain lions, hawks, eagles, and both rare and familiar native fish. This riparian area along the river has been classified as one of two most important river systems needing protection in Colorado. 5) Dolores River Canyon -17,282 Acres This heart of the stunning and wild Dolores corridor, with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience must gain the highest possible level of protection. We discuss this area in further detail below. Recommendations: The above areas, and any other areas that the Uncompahgre Field Office inventories and finds to possess wilderness characteristics, should be managed to protect their wilderness values. Management prescriptions for these areas should include: closed to motorized vehicles; VRM Class I; closed to all forms of energy development; ROW exclusion areas; and other protective measures. |
| 2786 | Dolores River Corridor The Dolores River Canyon Wilderness Study Area and surrounding wilderness-quality lands, with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experiences, must gain the highest possible level of protection. The Dolores River Corridor includes the river corridor itself (river, riverbanks and immediately adjacent land alongside the river including to the canyon rims), as well as adjacent wilderness study areas and citizens' wilderness proposal areas. The RMP should commit to continuing to manage the Dolores River Canyon WSA to protect its wilderness qualities even if it is released by Congress. BLM should also manage the citizen-proposed additions to the WSA so as to protect their wilderness characteristics. Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the RMP revision. It has been found suitable in the past and still maintains the same qualities. Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River. The river itself, and all its eligible tributaries, should receive immediate, thorough, and enduring protection. Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area designation. The RMP also needs to prohibit uranium mining within the river corridor. All permitted mines in the resource area must prove that there will be no harm to both surface and ground water quality and quantity; prove that the long-term ecological health of the area will not be jeopardized; have viable reclamation plans in place before permits can be granted; and have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation. BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. These management actions are |

**Table C-13**
**Issue 1: Special Designation Areas – Wilderness, Wilderness Study Areas, Lands with Wilderness Characteristics**

| Comment ID | Comment |
|---|---|
| | necessary to protect the Dolores River and the WSA. The Dolores Corridor should be managed in close cooperation with adjacent BLM Field Offices. For example, the Dolores River Canyon Wilderness Study Area is bisected by the Uncompahgre Field Office and the San Juan Field Office, but requires consistent and close management, especially considering issues with motorized incursions from the Utah state line. The Sewemup Mesa CWP expansions to the existing WSA also overlap the Grand Junction and Uncompahgre Field Offices. Significantly, the river itself crosses boundaries between the San Juan, Uncompahgre, and Grand Junction Field Offices. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities. We urge the Uncompahgre Field Office to adopt a broad vision of the landscape in approaching the cooperative management of these areas. Recommendations: The Dolores River Corridor should be managed as an entire ecosystem with the goal of protecting its outstanding natural, historical, ecological and recreational values. The Dolores River Coalition is submitting detailed scoping comments addressing this area, and we herein reference and support those comments. |
| 1781 | I used to be a backpacker and hiker, and I know that roads lead to litter and a destruction of the wilderness experience. |
| 2258 | The Dry Creek area identified in earlier plans as available for coal mining is not only in one of these areas but represents one of the few areas of aspen and oak brush, i.e. lower elevation habitats within the UFO that may be considered nearly "wilderness" in character. On terms of maintaining a "multiple use" focus in the UFO and GMUG this parcel is of prime importance to grazers and outfitters. Both of these activities would be impacted by coal mine development |

**Table C-14**
**Issue I: Special Designation Areas - National Scenic Byways**

| Comment ID | Comment |
|---|---|
| 1239 | The BLM should fully recognize the West Elk Loop Scenic and Historic Byway as a state designated Byway that was established with the full support of five counties, several communities, two state agencies, and three federal agencies, including BLM. |
| 1240 | One of the primary concerns of the Byway is protection of the viewshed and other intrinsic resources for which the Byway was established (i.e., scenic, wildlife, historic, and cultural values). |
| 1241 | Rather than identifying modifications, the Byway requests that the area along the Byway remain relatively natural in appearance. |
| 1242 | With the exception of the mining developments between Paonia and Somerset (part of the cultural landscape), we request that a ½ mile overlay corridor be identified on the public lands along Highways 92 (east and south of Hotchkiss) and 133 (east and north of Hotchkiss) where development considers the impact to Byway resources, including the viewshed. Thus, the location of developments such as open mines, oil and gas wells, etc. should be sited whereas they are not generally visible to byway travelers. The use of topography and vegetative screening can help reduce the visual impacts. |
| 1243 | Apply an overlay zone ¼ mile on either side of the above referenced highways wherein visual and other resource impacts receive a higher level of scrutiny before development approval |
| 1244 | Notify the Byway of planning opportunities where actions might affect Byway resources/travelers. |
| 1245 | Related to industrial activities (such as oil and gas development), insert in permitting documents restrictions designed to minimize conflicts between lease-related trucking activities and Byway travelers. |

**Table C-15**
**Issue 2: Energy Development – General**

| Comment ID | Comment |
|---|---|
| 2796 | The BLM must have a proven track record of successful reclamation before considering disturbances to be "temporary." The BLM has shown interest lately in phased or rolling development, but this framework assumes that managers are able to successfully reclaim areas that have been disturbed. We consider successful reclamation to consist of a return to baseline conditions, which would mean a return to the pre-disturbance vegetative composition and structure} retention of the original soil type, and re-colonization by the animals that used an area prior to disturbance. We remain concerned that these results may be very difficult to achieve here in the arid West, where lack of precipitation and an abundance of invasive species may prevent even the best management practices or Conditions of Approval from being effective. Before the BLM adopts this approach, or even uses it to calculate acres of "temporary" versus "permanent" disturbance, it should be able to point to a proven track record of mature, successful reclamation projects demonstrating that this is possible and that the BLM has the ability (including funding) to make this an outcome with a reasonable expectation of being fulfilled. RMP revision should clearly state reclamation standards including necessary monitoring, and should define success in an ecologically sound way. |
| 238 | Development of a reasonable foreseeable development scenario for fluid minerals, uranium, and coal to aid in the environmental consequences analysis |
| 271 | Revisions which may in one way or another permanently restrict or change the available usage and access to BLM lands or mineral interests should be carefully considered. |
| 280 | The area included in the RMP boundaries contains some fantastic "wild places". In a West that continues to urbanize and develop rapidly, these places (especially those outside of the rocky mountain ridges that often fall under USFS jurisdiction) are increasingly valuable. I would like to see an end to further road construction; better designation of OHV use and non-use areas; the elimination of non-renewable energy development and careful consideration of the footprint associated with any renewable energy projects such as solar or wind installations; and continued maintenance of facilities such as the (very much appreciated) picnic/camp areas on the San Miguel. |
| 284 | I would like to see further expansion of an adaptive management paradigm that seeks to balance stakeholder input with the scientific and technical expertise of agency staff (botanists, hydrologists, archaeologists and range managers). This could include: adjusting stocking rates to buffer against projected increases in mean air temperature and evapotranspiration; restricting or eliminating non-renewable energy and mineral extraction that threatens ground and surface water with contamination; and controlling invasive species where they directly threaten native ecosystem integrity. |
| 296 | I would like to encourage decision makers to remember the importance of resource development for the well-being of the people here. Please continue to honor the objective of resource extraction. |
| 297 | None-accept to allow for road building where needed for mineral extraction. |
| 335 | Allow all drillable leases to expire and ensure public land trust(s) to remain. |
| 352 | The entire San Miguel River ACEC and the entire BLM holdings in Saltado and Specie Creek Canyons should be "No Surface Occupancy" stipulations for O&G and other energy development to protect scenic values and natural values. Given the low probability of any O&G development ever occurring there is little or no cost to such actions. Geothermal leasing should NOT be allowed in this area until very tight regulations are developed, if at all. |
| 353 | All mesa top and mesa rim O&G leasing should include No Surface Occupancy restrictions to protect scenic values. Similarly the same region should be either closed to or extremely restrictive on the sale/disposal of saleable materials. |
| 357 | The BLM should include in the RMP the exact energy potential maps and data source citations that underlie BLM maps and will be used for decision making for the RMP. If this is not possible an appendix should list all caveats, notes and specific citations for underlying data to document what was used and to avoid confusion. The following specific information should be included in the RMP to allow readers to understand what data was used for energy potential, also ALL disclaimers from underlying data should be included: 1. Source map used to create any energy potential mapping of any type or that will be relied on for leasing or mineral disposition related decisions. Example; oil and gas potential maps, geothermal potential maps, etc. 2. In appendix include accompanying .XML source data for any maps include citation, restrictions, limitations of data (e.g., Colorado Geothermal Gradient Map for CO State Geology Service, caveats like "data points are often clustered with |

**Table C-15**
**Issue 2: Energy Development – General**

| Comment ID | Comment |
|---|---|
| | wide areas of sparse data') See the attached example confusing map cited by BLM in David Burgess et al v. BLM. |
| 358 | Particularly for energy related data/mapping the BLM should make sure that use of such data in the RMP follows its own data quality guidelines: "2. Ensuring and Maximizing Information Quality defined BLM is issuing these guidelines to ensure and maximize the quality, including objectivity, utility and integrity, of disseminated information. Objectivity, integrity, and utility are defined here, consistent with the OMB guidelines. "Utility" refers to the usefulness of the information to the intended users. "Objectivity" focuses on whether the disseminated information is being presented in an accurate, clear, complete, and unbiased manner, and as a matter of substance, is accurate, reliable, and unbiased. "Integrity" refers to the protection of information from unauthorized access or revision, to ensure that the information is not compromised through corruption or falsification. Transparency and Reproducibility BLM recognizes that influential information should be subject to a high degree of transparency about data and methods to facilitate the reproducibility of such information by qualified third parties, to an acceptable degree of precision. It is important that analytic results have a high degree of transparency regarding (1) the source of the data used, (2) the various assumptions employed, (3) the analytic methods applied, and (4) the statistical procedures employed. It is also important that the degree of rigor with which each of these factors is presented and discussed be scaled as appropriate, and that all factors be presented and discussed. In addition, if access to data and methods cannot occur due to compelling interests such as" |
| 384 | Relative to Issue 2, as well as Issue 1, as a Quid Pro Quo for being given a lease and/or access to the public lands under the BLM's management, entities should be required to disclose at least 30 days in advance of use all chemicals contacting the soil and subsurface in their operations, including those used in fracturing in a drilled downhole, despite any alleged "trade secret" formulations. Chemicals potentially harmful to human, animal and plant life should be limited in use and, in the case of potential intrusion into the Planning Area's watershed(s) and aquifers, not be permitted at all. Such a requirement will protect the public's aquifers and watershed(s) within and possible outside the Planning Area and still not restrict access to potential energy resources. Water is obviously a limited and precious commodity in the West and preserving the quality and quantity of that available for human and animal consumption and use should be a paramount purpose of any Resource Management Plan. BLM should maintain sufficiently well trained personnel to screen chemicals intended for use to access potential energy and mineral resources and ban the use of any such potentially harmful chemicals in the Planning Area. Promptly upon request, the identity of all of the chemicals used in the Planning Area by an entity being given a lease or access to the public lands under the BLM's management related to energy and mineral resources should be provided to members of the public. Drilling and fracturing should not be permitted within 0.5 miles of a water source. |
| 385 | Upon completion of use at an extraction site, the site shall be returned to its pre-extractive condition as much as possible. |
| 407 | Mining and roads are a threat. If the Uranium mill is not built mining will never return to its former days. If it is then we need to brace ourselves for a big increase in population, lots more motorized vehicles and a lot more roads, mostly unofficial. Just look to what has happen in Mesa, Delta and the east end of Montrose counties. Our saving grace has been little increase in population. High gasoline prices have kept a lot of off road vehicles a little closer to home and away from western Montrose County. |
| 438 | I don't support drilling in these areas. I would like there to be more cooperation with. I think what is happening in Utah is a model of what not to do. |
| 457 | If there is to be any mining or drilling on BLM lands then these developers must meet all local, state, and federal requirements and activities of these operations must be continually monitored to make sure all regulations are complied with. |
| 468 | This comment is regarding how energy and mineral development, including pipelines and other infrastructure, will be managed to protect the environment and wildlife. When weighing the impacts of energy and mineral development on the environment and wildlife the impacts should be viewed as temporary. Development usually includes construction of native surface roads & pads and occasionally small structures. When Best Management Practices are followed, the impact to the environment and wildlife is minimal and after reclamation is complete the surface disturbances can result in habitat improvement (ex. clearing of dense oak brush). A clear definition of the term temporary for energy and mineral development should be defined as; use for a length of time up to 10 years. Energy and mineral development is temporary in nature because the resources in a local area will not last forever. With a defined temporary designation the unnecessary burden on BLM staff and the energy and |

**Table C-15**
**Issue 2: Energy Development – General**

| Comment ID | Comment |
|---|---|
| | mineral leasees from an extended NEPA process may be avoided with the use of well defined Best Management Practices and Categorical Exclusion designations. |
| 469 | There would be no long term changes to the landscape after disturbances have been reclaimed. |
| 470 | By defining development uses as temporary and establishing a set of Best Management Practices to be incorporated into development projects you would be able to reduce the workload and permitting time required for both the BLM and Leasees of the resource. |
| 471 | Also, by looking at the long term disturbance when performing a Biologic Assessment or Opinion the assessor should be allowed to determine the outcome of the assessment based on what the effects will be in future after the sites are reclaimed. Yes, there will be initial disturbance but with adequate Best Management Practices in place, the long term impacts after reclamation are typically negligible. |
| 472 | The number of users should not be affected by energy and mineral development. |
| 482 | By defining development uses as temporary and establishing a set of Best Management Practices to be incorporated into development projects you would be able to reduce the workload and permitting time required for both the BLM and Leasees of the resource. |
| 486 | I am deeply concerned about the procedures and chemicals that are being used in methane gas extraction. The negative impacts on land, air, and water under current regulations are irresponsible and unacceptable. Before further drilling leases are issued, it is vital for us- specifically, our government- to address the well-documented damages that continue to accumulate as a result of corporate indifference and dominance. |
| 503 | Regulation of toxic drilling fluids and fluids is necessary. |
| 528 | Controls on mineral exploitation, especially pertaining to oil and gas should be rigidly enforced. There should be no possibility of aquifer contamination and sufficient bonding should be mandatory to insure adequate cleanup at the site when it is abandoned. Leases should not be granted in environmentally sensitive regions and the utmost concern should be given to nearby residents. |
| 591 | Reclamation should be required. |
| 601 | Reclamation of natural resource areas (coal, gas, oil, uranium) is important after the mining is complete. BLM revenue from mining/grazing activities should be increased if needed so that government isn't subsidizing mining/grazing activities in any way. |
| 621 | Disallowing the use of roads, grazing land, mineral and energy development, as well as recreational use, would be a poor use of public land. The point of public land is that it belongs to the people. Public lands should be available to all people. The combination of grazing lands and mineral/energy exploitation allows business and employment growth for our county, and recreational use should also be encouraged, not restricted. |
| 639 | Any un-leased lands inside municipal, or other culinary, watersheds should be withdrawn from mineral entry, or—at a minimum—placed under No Surface Occupancy stipulations. Certainly the agency must include an alternative that considers closing some lands to oil and gas development— watersheds, sensitive habitats, natural landscapes, and important recreational and community lands. |
| 650 | I also feel more land needs to be made available for the publics good, including resource exploration, powerline construction and general community uses. |
| 692 | No leasing should occur until Congress can act to remove exemptions for oil & gas. |
| 719 | Minimize physical disturbance. |
| 728 | The only issue I have is keep the public lands open to all companies that want to drill for or dif for gas, oil, coal. These resources are needed for the survival of the people of the USA. |
| 740 | Public land should be used for the good of the public. Drill holes for coal mining, gas wells, logging should be allowed. Drill sites reclaimed, trees replanted. Grazing of cattle, sheep and the hunting of wild game encouraged. |
| 744 | Unlimited commercial enterprises should reclaim sites, replant trees, repair damage. The same for large groups. |
| 787 | I am concerned about having any more leasing of Oil and gas (or development of) until there is accountability to all Fed and State environmental regulations *Clean Water Act, Clean Air Act, etc.) by the industry and the end of injection of harmful chemicals into the group for 'fracing' purposes until alternatives are explored. I request a |

**Table C-15**
**Issue 2: Energy Development – General**

| Comment ID | Comment |
|---|---|
| | moratorium until these issues have been addressed and our communities health and environment is protected. |
| 811 | These lands have survived many years of mining, drilling exploration and recreation use. They will continue. |
| 881 | Coal, Oil and Gas Resources: I have seen how drilling rigs and buildings have been visually "hidden". By doing so a lot of people driving down I-70 never notice the drilling operations, in turn they don't think about the consequences of what's going on. I do not feel any visual considerations of disguising drilling and mining operations should be done. "Out of sight, out of mind" is not good for the public. |
| 882 | There are public lands that should be withdrawn from energy development. Any place where there is a conflict with wildlife, the safety of drinking water for wildlife and humans could be threatened, biological diversity could be threatened. Any area that could not be quickly and properly reclaimed back to its natural setting. Places that are sacred to a majority of people such as Arches, Yellowstone, Native American heritage areas, even the smallest local area that may be special to a majority of people in a community for one reason or another. |
| 883 | Always there should be conditions /monitoring of oil and gas development. Some places may require conditions different from others. Over all guidelines/regs must be in place. But each individual site should be monitored. If any extraction occurs near private property, the owners should be involved. The use of volunteers to daily monitor an extraction process could be used. I do not know of any resource conflicts with solar or wind. Unless solar panels were covering an area that someday someone wanted to drill under. Renewable energy construction would make temporary jobs, but once installed panels require very little monitoring. The wind genies require more maintenance. |
| 884 | There are lands that should be excluded from renewable energy development and extraction industries; places that are sacred, cared for, loved by a community or a nation. |
| 891 | The Uncompahgre Plateau is my backyard. It is special to me. I cherish the life I live on it everyday. I am fortunate to be completely surrounded by public lands. I want these lands to be around for my children to explore with their children, as I have with mine. I would be devastated if an extraction operation was anywhere near my home. I would notice every change in wildlife movements, erosion, weed spread, the impacts of humans on the land everyday causing a huge disturbance. A lot of stress on myself and the environment. |
| 901 | I believe it should be open to mining, logging, ranching & drilling. |
| 915 | Similarly, my irrigation water for my organic farm originates in the headwaters of the North Fork of the Gunnison where oil & gas activity is increasing. In the early 1980's an "oil slick" was observed on the water in the Paonia Reservoir. This was at a time when a gas well was active just upstream on the bank of Muddy Creek. This is precisely the scenario that needs to be avoided by whatever means necessary. |
| 922 | There should be no leasing of minerals or oil and gas in inventoried roadless areas, nor should roads be allowed to access such on existing leases. |
| 961 | Secondly, I am concerned about limiting and regulating gas and mining…..including uranium. How typical that my husband returned to his favorite hunting area last year only to find a noisy gas rig and certainly no animals. Not only do they destroy our recreational areas I am concerned about their effects on public |
| 965 | Work closer with industry on a technical, and financial level to keep resource development to the lowest ecological impact possible. |
| 1046 | Exploration and development of oil, gas, and minerals should be encouraged under an environmentally responsible plan. Permitting should be streamlined and affordable. We desperately need the revenues and jobs created by this industry. |
| 1068 | NO NEW ROADS in inventoried Roadless Areas to support energy extraction; |
| 1905 | BRC supports reasonable development of our natural resources including minerals and oil and gas. Generally, there is support among our members and supporters for development mineral resources and of oil and gas resources in the planning area. There is a high degree of confidence in BLM's ability to regulate this activity so that it is both economically feasible and environmentally sound. A significant percentage of our members live in rural areas of Utah and Colorado. The jobs associated with oil and gas development are highly valued. Indeed, many of our members make their living either directly involved in the oil and gas business, or in related "service" businesses. Oil and gas development has important social and economic benefits at the national and state level as well. These benefits are reduced or eliminated when natural gas and oil development is prohibited or severely restricted. BRC believes that oil and gas development are compatible with semi-primitive |

**Table C-15**
**Issue 2: Energy Development – General**

| Comment ID | Comment |
| --- | --- |
| | recreational values and opportunities. We have seen where the oil and gas industry operates with little or no impacts on other resource values. There is a relatively high tolerance for oil and gas activities among those who enjoy OHV recreation. We do not support a no-lease or no-surface-occupancy stipulation for areas allocated to semi-primitive recreation. |
| 1928 | All unit agreements approved by BLM's Authorized Officer during the life of the revised plan should contain a provision requiring energy companies to adhere to federal regulations for all activities within the unit regardless of ownership of the surface property and subsurface mineral rights. Unit agreements contain language that require BLM to extend federal leases within a unitized area if an energy company drills a successful well anywhere within the unit, including on land in which both the surface property and subsurface mineral rights are privately owned. In return for the benefit of receiving an extension of federal leases based on activity on privately owned subsurface minerals, this provision should require energy companies to comply with federal regulations on all properties within a unitized area. |
| 1966 | It is important for mineral resources to be considered at an equal level with all other resource values. As such, it is necessary for these resources to be represented equitably in not only the planning criteria, but also factors which will be considered by alternative, effects to be addressed in the analysis of environmental consequences and determinations used to select a preferred alternative. |
| 1973 | The application and viability of reasonable mitigation. |
| 1974 | Limit the study to any residual effects that may be present after standard lease terms and conditions have been imposed. (For example, under the 43 CFR 3101 regulations, a two-month occupancy restriction can be imposed under standard terms and conditions of a lease for purposes of protecting critical habitat. Therefore, if the typical restriction used to protect calving areas is two months, no stipulation is needed because the BLM has the authority to restrict an operator, if necessary, to protect such areas under the standard terms of the lease. A lease notice apprising the lessee that calving grounds exist on the lease would be sufficient.) |
| 1975 | According to IM-2001-191: "When a RMP is being amended or revised, BLM will continue to process site-specific permits, sundry notices, and related authorizations on existing leases in an expeditious manner while ensuring compliance with NEPA and other laws, regulations, and policies. The BLM has the authority and discretion to condition its approval of proposed actions (APDs and other site specific activities) with reasonable measures (including relocation, redesign or delays in the proposed action) so as to reduce the effect of actions on other resource values and uses, consistent with the lease rights granted (see 43 CFR 3101.1-2). That is, BLM can use its authority and discretion to condition its approval of proposed actions to not constrain alternatives under consideration in a RMP revision or amendment consistent with the lease rights granted. Actions that may appear to reduce a lessee's right to reasonably develop a lease should be cleared through the State Director and Regional Solicitor's Office." We urge BLM to follow the requirements in the Instruction Memorandum during the planning process. |
| 1978 | We recommend that, in addition to directly contacting operators and lessees in the area for their geological input, BLM use a method that incorporates historical data on what types of impacts have typically occurred in the area. It will be impossible to determine exactly how many miles of roads will be needed or how big a specific well pad may be until an Application for Permit to Drill is filed. Therefore, the agency should use a local average for these types of uses. Furthermore, the discussion of cumulative impacts related to possible development should include not only possible impacts of oil and gas activities, but also the measures available to mitigate adverse effects. In addition, we support an approach for defining reasonably foreseeable development that addresses acceptable levels of surface disturbance rather than the number of wells in then planning area. This gives both BLM and industry needed flexibility in future development opportunities, such as drilling multiple wells from a single pad or taking into consideration wells that have been plugged and abandoned. |
| 1981 | We support BLM's statement in the scoping notice that valid existing lease rights will be honored in the new plan. Nevertheless, BLM needs to specify in the planning documents if and how valid existing lease rights could be impacted by new leasing or surface management decisions. Specifically, potential conditions of approval for operations and other changes should be identified. For example, if BLM modifies its Visual Resource Management land classifications as a result of the planning process, it is critical that the impacts on existing leasing and development be addressed. However, we recommend against modifying VRM classes in developed areas to a more restrictive classification in order to avoid potential conflicts with valid existing lease rights. |
| 2045 | Any existing or future leases should maintain non-waiveable No Surface Occupancy Stipulations. |