**Table C-15**
**Issue 2: Energy Development – General**

| Comment ID | Comment |
|---|---|
| 2046 | Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values associated with wild and scenic suitability or the existing Special Recreation Management Area Designation. |
| 2049 | It has been the practice of the BLM to apply NSO stipulations per the BLM's 1990 Dolores River Corridor Management Plan. |
| 2115 | The mesa appears to have few development conflicts likely due to access problems and little uranium potential. |
| 2124 | We are concerned about how energy development has impacted fish and wildlife in Colorado and other Western states. If pursued irresponsibly, oil and gas development can significantly reduce hunting and angling opportunities for the public. We need a responsible approach to energy development within the UFO management unit. |
| 2128 | The TRCP FWEWG has put together recommendations and priorities regarding federal management of energy development on public lands and organized them under the five areas of Funding, Accountability, Coordination, Transparency and Science. In terms of funding, appropriations for fish and wildlife management should be used to manage habitats and populations proactively. Any increase in federal funding for energy development should be matched by funding to deal with the consequences this development has on fish and wildlife populations. |
| 2129 | Regarding accountability, lands in the UFO management unit should be managed equally for multiple uses and resources, maintaining a balance of energy development and fish and wildlife habitat. For each energy field or project, a specific "conservation strategy" should be used and should go beyond the NEPA-level evaluations and plans currently being completed. These strategies should be used to proactively address the management and needs of fish and wildlife populations before development starts and must provide specific recommendations and actions to minimize impacts, establish plans for mitigation, use detailed monitoring and utilize adaptive management strategies. Managers and others must be held accountable for following all applicable laws, regulations and policies including processes included in the National Environmental Policy Act (NEPA). A process for accountability should be built into the UFO RMP that allows for the public tracking of the BLM's compliance with these laws, regulations and policies. All mineral leasing in the UFO management unit should be done in a manner that explicitly takes into account the future impacts from development on fish and wildlife resources before leasing occurs. |
| 2130 | In terms of coordination, the UFO should continue, and work to improve, coordination with all interested parties when planning and implementing energy development. Public involvement from all stakeholders, including local and state governments, Resource Advisory Councils, non-governmental organizations, industry, sportsmen and others is vitally important and should be assured by addressing it in the UFO RMP. Adaptive management based on the best available monitoring information, and coordination with the CODOW and USFWS, must be used to ensure continuity and mutual agreement which will help to lessen or avoid the impacts of energy development on fish and wildlife. The UFO should work with the USFWS and CO DOW to coordinate the efforts of The Hunting Heritage Action Plan being developed by the Wildlife Management Institute and the Association of Fish and Wildlife Agencies. An effective adaptive management process should also include regular reviews of both state and federal findings from research and monitoring, active consideration of alternative energy field management and the means for making such management changes for future development where needed to lessen impacts on fish and wildlife. A lack of coordination and data-sharing often means that the same approach to development is continued despite monitoring that has shown it is detrimental to wildlife. |
| 2131 | In regard to transparency, the development of the UFO RMP, and the decision-making process involved in energy development on lands administered by the UFO, should be clear and transparent and follow administrative law and policy. The UFO RMP should incorporate extensive public input throughout the process and use the most up-to-date information and strategies available. Decisions made by BLM officials and the processes leading to them must be transparent and should follow the most current laws, policies and procedures at all times. This includes opening all cooperator meetings held by the UFO and others to the public for participation in these key conversations. Sufficient information about proposed leases and development must be provided to the public to allow for understanding and reasonable comments, and the time provided for public comments should be commensurate with the complexity of the proposals. All meetings related to energy development in the UFO management unit should be part of the public record |
| 2132 | In terms of the science aspects of the FACTS principles, the best scientific information must be used to inform the UFO on all management decisions, particularly when specific research has been conducted on the impacts of |

BLM_0067215

## Table C-15
## Issue 2: Energy Development – General

| Comment ID | Comment |
|---|---|
| | energy development on fish and wildlife (see below for a list of research and guidelines relevant to the UFO management unit). Subsequently, adaptive management processes should be used and based upon monitoring data so that a systematic approach to adjusting development can be made when other natural resources are affected. The energy development planning process should include science-based mitigation. This mitigation must be planned by using rigorous methods and an adaptive management process as described above. Offsite mitigation is essential when on-site mitigation cannot be effectively used or is not appropriate to offset resource values impacted at the project location. Certain special and unique places in the UFO management unit should be recognized in the RMP based on their high value fish and wildlife resources, special habitats and/or ability to sustain sensitive species. The best available science and data should be used to help recognize these places and these places should be entirely off-limits, or extremely limited, to any development. |
| 2135 | Oil, gas and mineral extraction projects within the UFO management unit must balance the multiple-use sustained yield mandate in the FLPMA with the development of extractable resources |
| 2138 | The UFO should consider geographically-phased energy development prior to the leasing stage to responsibly balance the needs of fish and wildlife with oil, gas and mineral extraction. Large geographic areas to be offered for development should first be subdivided into smaller units– each with the necessary crucial habitat and migration corridors to maintain fish and wildlife populations and the ecological processes of the area. The subdivided units should be developed fully and completely restored (with respect to fish and wildlife habitat) one at a time before subsequent subdivided units are developed. This will help to minimize the impacts on wildlife that may be displaced from the developed unit. When the wildlife habitat on the larger, fully-developed unit is restored, the next unit can be made available for development. In this way, smaller units are developed and restored over a longer period of time, not in the current mode of field development that is too fast and leaves large areas of land unusable for wildlife. Geographically-phased development can occur on multiple scales including landscape, field or single leased parcel. Species of interest to hunters that could be helped particularly by geographical phasing are mule deer, pronghorn antelope, elk, bighorn sheep and sage grouse. For geographical phasing to be effective in reducing adverse impacts on wildlife populations, the species-specific life-stage habitat requirements must be known for the impact area so that all life-stage requirements are provided for, even in the face of unit subdivision and development. Baseline conditions and future objectives also should be known before development proceeds. Migration routes providing wildlife with access to seasonally-required habitat must remain intact and functional at a level acceptable to sustain populations. The area to be developed should be determined for each geographic area based on the species present and an assessment of overall habitat conditions in a larger, surrounding area, including what is needed to sustain the populations on a large scale. |
| 2149 | TU suggests that the UFO incorporate the latest management strategies for topsoil salvage in energy development areas. |
| 2150 | Additionally, the current Oil and Gas Plan for this resource area (October 1991. Record of Decision. Oil and Gas Plan Amendment to the San Juan/San Miguel Resource Management Plan Environmental Impact Statement (EIS) is outdated and should be amended to reflect the significant changes that have occurred with respect to energy development and resource management. |
| 2154 | As previously urged, we again request an updated Oil and Gas 'plan. Additionally. the use of hydraulic tracking in energy development has significant impacts to water quality. The RMP should contain updated and appropriate management language that incorporates the state of Colorado's oil and gas conservation rules and any new federal guidelines that dictate management prescriptions. |
| 2176 | The Preparation Plan also asks "Do constraints identified for new leases also apply to areas currently under lease?" This question needs to be divided into constraints in the form of conditions of approval and constraints in the form of stipulations. Existing leases would not be subject to new stipulations; however, existing leases would he Subject to "reasonable conditions of approval. Constraints in the form of stipulations that are developed as part of a new leasing decision should apply to all new leases considered for sale in the UFO. The RMP, as part of a new .leasing decision, should also make it clear that the same constraints applied to new leases, will be applied to existing leases in the form of conditions of approval unless the authorized officer determines that such as constraint would not be "reasonable" under 43 C.F.R. § 3101.1-2. In doing so, the UFO will ensure that old leases in the FO will be subject to the most current resource information and protections, while still recognizing the rights of lessees. |
| 2177 | The Preparation Plan also asks "For each lease stipulation, what are the circumstances for granting an exception, |

**Table C-15**
**Issue 2: Energy Development – General**

| Comment ID | Comment |
|---|---|
| | waiver, or modification? What are the general documentation requirements and public notification associated with granting exceptions, waivers, or modifications?" Any lease waiver, exemption, or modification should be subject to an environmental assessment and public comment. |
| 2178 | On page 16 of the Preparation Plan questions are asked: "What are the pertinent issues surrounding split-estate lands and impacts to surface owners? What can be done to resolve these issues in the RMP?" The most critical issue surrounding split estate lands is how to balance private property rights of the land owner with rights of the lessee. For new leases, the UFO should consider an approach that recognizes that landowners should have a say how development occurs on their lands by implementing a CSU stipulation requiring that the surface landowner agree to a surface use plan of operations before an application to drill is approved. If this stipulation was included in all leases, it would be a condition of the leases and as such the rights of the lessee to explore for and extract oil and gas would be encumbered by it. This would level the playing field for the landowner and the lessee and help to ensure that the BLM is able to lease federal minerals while being a good split estate neighbor. |
| 2185 | We urge the UFO to control and strictly limit gas production, mining, motorized recreation, and other uses that threaten the long-term health of natural ecosystems |
| 2331 | Unroaded areas are needed where wildlife and wild rivers can thrive unimpeded by noisy, dust-creating off-road vehicles or energy development. |
| 2349 | This is my backyard, and I know and love this part of the world. I realize that some energy development is necessary, but when all the resources have been sucked dry, it is essential that this area will have retained it ecological integrity and its wild and remote beauty. |
| 2351 | BLM should designate zones for renewable energy development in the RMP, and limit renewable energy projects to those zones. Any oil and gas development allowed under the RMP should be carefully constrained, subject to phased development that minimizes damage to unique natural features, essential wildlife habitat, and other sensitive areas. The RMP should impose strict limits on uranium and other mining to protect our land, air and water these extractive industries have not worked the lands which they were previously awarded and now they want to grab more permits. what is their agenda? |
| 2372 | "Management" so often amounts to an excuse for development, whereas this area would be best served if it remained entirely free of human interference, including off-road vehicles, energy development, and especially mining, which is always very nasty |
| 2384 | There is enough land in the West which has been used for oil and gas development and that allows ORV use. |
| 2395 | Most BLM land is open to vehicles, off-road sports and oil, gas, grazing, mining and other tear-the- land-up uses. In this Plan revision I ask for as much land to be set aside as roadless as possible. As time marches on this will become the most valuable part of the area. |
| 2402 | I recently watched a TV documentary on the "fracking" method of extracting gas and oil in Colorado and other states that is highly hazardous to the health of residents due to the resulting water supply contamination. The devaluation of homes and property in the affected areas was devastating, but the worst ramification was the severe, chronic and irreversible health issues suffered by humans and animals. PLEASE do not allow unrestricted mining! |
| 2419 | Those lands, as well as potential wild and scenic river corridors, should be closed to all forms of energy development and transmission. |
| 2492 | All you have to do is drive west on the interstates to the north (towards the Utah border) to see what development has done - the lights and noises of the natural gas / oil rigs rip through the night like cannons. ENOUGH ALREADY!!! Leave something for our children's children's children. |
| 2526 | Energy development is great in the correct setting, not destroying wonderful natural feature and wildlife habitat. |
| 2533 | Development and wrong use has wrecked so many places we must now protect them strongly, with roadless rules in place, and resource 'development' stopped before it starts. Stop the threat of devastation of the Uncompahgre Plateau and the surrounding habitats. |
| 2537 | We can achieve Energy Independence without sacrificing America's Pristine Wilderness! |
| 2579 | Meeting our energy needs is important, preserving and maintaining our environment is crucial. Every effort must |

BLM_0067217

**Table C-15**
**Issue 2: Energy Development – General**

| Comment ID | Comment |
|---|---|
| | be made to keep our lands as clean and habitable as possible. There are no other options. |
| 2602 | We can find other forms of energy rather than mine this area, we can recreate on motorized vehicles in allowed areas, but we simply cannot replace the Uncompahgre Plateau. |
| 2647 | IT'S PRETTY DAMN SIMPLE: KEEP THE ENERGY INDUSTRY OUT OF THE WILD PLACES YOU CONTROL. |
| 2690 | While there are alternatives to uranium, oil and gas, there is no alternative to the Uncompahgre Plateau. Once it's damaged or destroyed, it's ruined or gone. It cannot be restored or replaced. |
| 2693 | Let's get real. Development of this area will only temporarily enrich the CEOs of uranium, oil and gas companies. Is that worth sacrificing the priceless and irreplaceable resource that is the Uncompahgre Plateau? Of course it isn't. |
| 2704 | I encourage BLM to emphasize resource protection in this RMP. This area is unique and should be protected forever as wilderness with no motorized intrusion or any mineral development including both mining and oil & gas. Also there should be no pipelines or transmission lines crossing the area. |
| 2748 | Do we really need the energy that destroys the land? |
| 2837 | Energy Corridors As part of the process to designate West-wide Energy Corridors mandated by the Energy Policy Act of 2005, the Department of Energy's Final Programmatic Environmental Impact Statement (PEIS) designates several energy corridors for pipelines and powerlines through the Uncompahgre Field Office. Especially of note is corridor 130-131 (5), which intersects the northern edge of our Norwood Canyon CWP. This corridor could have significant and lasting impacts to the area. Public comments on the Draft PEIS, attendees at public meetings held by the Department of Energy and cooperating agencies, and Congressmen, utility companies, renewable energy experts, and representatives from state and local governments participating in an oversight hearing held by the House Natural Resources Committee, Subcommittee on National Parks, Forests, and Public Lands and Subcommittee on Energy and Minerals all voiced major concerns about the corridor designation process. These concerns included:<br><br>• lack of adequate consultation with Native American tribes, state and local governments and communities, and local citizens;<br>• lack of access for renewable energy transmission;<br>• failure to analyze the opportunity to reduce transmission need and the need to designate new corridors with increased efficiency, distributed generation, and new technologies;<br>• lack of analysis of cumulative impacts;<br>• failure to analyze impacts to non-federal lands; and<br>• inadequate protection for special places, protected lands, wildlife habitat, cultural resources, and recreation opportunities.<br><br>Many of these concerns were largely ignored in the formulation of the Final PEIS. During the RMP revision, BLM should evaluate potential impacts from corridor 130-131 as well as other corridors within the field office to determine if these corridors are found to be compatible with appropriate resource management. Recommendation: To ensure a sustainable and reliable transmission infrastructure while limiting negative impacts, BLM should designate corridor locations and widths that are based on BLM's local expertise, appropriately account for concerns of local communities, and protect field office resources. |
| 2764 | Development of such lands should be held to an absolute minimum if at all, especially where such development is of the destructive nature as oil and gas exploration and development, uranium mining, and off-road vehicle use. |

BLM_0067218

**Table C-16**
**Issue 2: Non-renewable Energy Development**

| Comment ID | Comment |
|---|---|
| 2793 | BLM must manage oil and gas development in a way that retains special status species and moves them toward recovery. As we have noted in our citations of FLPMA and the BLM Manual above, the BLM has a mandate to conserve imperiled species. The agency cannot prioritize oil and gas drilling or recreation at the expense of meeting its duties toward special status species. This includes all aspects of oil and gas development and off-road vehicle use - the BLM must ensure that its authorized activities do not compromise air quality, water quality, opportunities for solitude, plant and wildlife habitat, cultural resources, soil crusts, or any of the other resources that the agency must conserve under its multiple use mandate. The RMP must provide a blueprint for how the BLM will ensure that oil and gas development (all phases, including leasing, exploration, infrastructure construction, drilling, and reclamation) and travel management will be made compatible with the other aspects of its mission. In some cases, this may mean disallowing development activity or motorized vehicle use altogether. |
| 74 | I am extremely concerned about the negative health impacts from oil and gas production. |
| 75 | I do not want the BLM to lease any more land for oil and gas development or issue permits to drill in the Delta City region until: all exemptions to environmental laws currently provided to the natural gas industry are eliminated. |
| 80 | The oil and gas development as it exits today in Colorado is socially irresponsible and must be stopped until responsible behavior practices can be assured. |
| 81 | I do not want the BLM to lease any more land for oil and gas development or issue permits to drill in the Delta City region until: Injecting toxic, hazardous, or carcinogenic fluids into the ground is prohibited by state and federal law. |
| 82 | ERDA, a Colorado firm dedicated to aiding the mineral exploration business with finding new mineral deposits and the valuation of existing mineral rights for the purpose of proving or disproving existing resources, has deep concerns regarding its historic access to mineralized lands on the Uncompahgre Plateau. I personally own acreage at 56320 Holly Road, Olathe, Colorado, from which I launch personalized exploration investigations for coal, oil and gas, uranium, and base and precious metals utilizing jeeps, ATV's and other small wheel based vehicles. We take care to use existing traveled paths so as to minimally disturb any natural resources, but we do need continuing access to these lands via vehicle in order to minimize timely access and transport heavy, single bodied exploration equipment such as surveying tools, gravimeters, magnetometers, etc. Both forest service and BLM lands are accessed from my existing access. Please do not effectuate any management plans or operations which would minimize my existing access to these lands via small wheel based four-wheel drive vehicles, or the use of commonly utilized exploration equipment and techniques. |
| 83 | The mineral deposits located under the Uncompahgre Plateau are of vital interest, concern, employment opportunity, and tax-base of the United States, State of Colorado, Montrose County, and surroundings. |
| 85 | Gunnison Energy Corporation ('GEC') appreciates the opportunity to comment to Uncompahgre Field Office on the proposed Resource Management Plan. GEC has been involved in natural gas exploration in the northern portions of the Uncompahgre Resource Area since 2000. We hold numerous federal as well as fee oil and gas leases in the southern end of the Piceance Basin and we are actively exploring for and producing natural gas from these same leases. The Piceance Basin extends from the North Fork Valley northward into Wyoming and has been an active and very productive oil and gas producing source, especially along the I-70 corridor. The southern end of the basin has been explored as far back as the 1950's. Only now has the technology and to some extent the infrastructure become available to fully explore and determine the real potential of the southern end of the Basin. We believe the North Fork Valley has very high potential to contribute to not only Colorado's energy requirements but to the nation as a whole. We, therefore, encourage the BLM to work with the State of Colorado, local governments and the oil and gas industry to make the natural resources available the nation needs so badly. |
| 86 | GEC and other natural gas exploration companies have invested millions of dollars of capital to obtain the rights to explore and hopefully develop resources. Coal mining companies in the North Fork Valley have done the same. Both extractive industries are key to the future of economic development in the area. BLM must take this into consideration when re-writing the Plan. |
| 87 | Radical changes in the direction of the Plan [Resource Management Plan] would potentially upset years of planning and millions of dollars of investment from all the various industries present in the Valley. |

BLM_0067219

**Table C-16**
**Issue 2: Non-renewable Energy Development**

| Comment ID | Comment |
|---|---|
| 88 | Plan changes specifically changes in lease stipulations, should be made carefully so they do not adversely affect existing lease stipulations whether on BLM, US Forest or split estate. Stipulations as finalized in the 1991 Oil and Gas leasing Amendment should be left as they currently are. Oil and gas exploration is not an overnight event. Serious long term planning is required to evaluate and produce oil and gas no matter where the operations occur. This requires years of planning which includes designing operations for existing stipulations that are in place during the planning phase. Changes in any stipulations can be very disruptive, cost millions of dollars and consume years. Therefore, GEC recommends the BLM take a very cautious look at any stipulation changes from the 1991 document. |
| 89 | Access is key to an oil and gas operation. Planning for operations includes determining what existing access is available and designing along the access to reduce surface disturbance, reduce habitat fragmentation and cost of construction. GEC discourages the closure of public roads and rights of way. Thousands of acres of valid existing oil and gas leases exist and can only be reached by existing access at this time. BLM must closely evaluate any changes to access roads to avoid conflicts with developing these valid rights. |
| 92 | The RMP process must update the Reasonable Foreseeable Development Scenario for the Recourse Area. New exploration and development technology has begun to prove up reserves of natural gas through out the Rocky Mountain States. The scenarios of 1991 are severely under stated. |
| 107 | Coal mining is and has been a major source of employment and has been a significant part of the multiple-use of the Federal lands in the North Fork Valley for over 100 yrs. |
| 108 | As current minable reserves begin to reach their economic and safe mining limits in the next 10 to 20 years, it will be necessary to explore and open new areas along the Grand Mesa. |
| 109 | Many of the areas identified by the BLM as containing potential coal mining resources have been previously identified by the USGS (Hettinger, et al., 2000 and 2004). Many of the areas identified as containing coal resources are also located under lands managed by the USFS. According to the Colorado Historical Society, some 300 coal mines once operated in the North Fork Valley. Many of these small, historic underground "wagon" mines supplied coal for local homes, communities and ranchers. Coal, while not looked upon kindly by the Obama Administration, is and will continue to play a major role in powering this country as it attempts to transition to other forms of energy over the next 50 to 100 yrs. Because of this, the resource management plan should continue to consider coal as a major participant in the multiple-use planning of this resource management area and all areas previously considered as containing mineable coal resources (including USFS managed lands) should continue to be included in the revised RMP. |
| 111 | Changes to the management plan should be considered carefully, specifically changes in lease stipulations on BLM, Forest Service, or Split Estate. Changes to the Stipulations can have major adverse impacts to the costs and long term planning of a coal operation, and changes should be analyzed for long-term effects on recovery and use of these resources in the Uncompahgre Resource Area. |
| 114 | In particular, the RMP could simply acknowledge that the identified potential coal resource areas located on the south flank of the Grand Mesa will also need access ROW'S. |
| 116 | In the development of the RMP for the Uncompahgre Resource Area, we would like the BLM to consider the capital investment SG and other energy development companies have made in the legal purchase of federal and private mineral interests under the assumption that we would be able to develop these resources. If we had believed that there was a restriction or change in policy that curtailed this development, we would have likely considered other alternatives. Changing of policy at this time Would be unfair, arbitrary, and would have significant impacts on energy companies, local businesses and their families. |
| 118 | We would like the BLM to consider the environmental benefit of developing national energy resources, which are done under the highest environmental scrutiny and highest standards in the world, as opposed to the development of energy resources in other countries which do not have our standards of environmental protection and stewardship. Global impacts of energy development are extremely complex and nuanced, and natural gas is still considered one of the most abundant, environmentally benign and attainable resources. We contend that development of energy resources here in the U.S. will have less of a global impact compared to the environmental costs of development in other countries, and the subsequent transportation of those resources to the U.S. and we would like the BLM to consider this in their Environmental Impact Statement for the RMP. |

*Uncompahgre Resource Management Plan Revision and EIS*
*Final Scoping Summary Report*

BLM_0067220

**Table C-16**
**Issue 2: Non-renewable Energy Development**

| Comment ID | Comment |
|---|---|
| 119 | We would like the BLM to consider SG's and our partner, Gunnison Energy Corporation's contributions to local projects designed to enhance and improve habitat for big game on our public lands, which have not only benefited wildlife, but also benefited the public land users that enjoy wildlife for hunting opportunities, but also for non-consumptive uses. These habitat improvement projects have been completed, or are near completion at this time, and show how local energy companies are committed to on-the-ground benefits and can cooperate with local land management agencies and land owners. |
| 120 | We would like the BLM to consider how we are required to follow and/or obtain permits from the following related to mitigating environmental impacts of oil and' gas exploration and development: BLM's Onshore Orders, Gold Book Standards and Guidelines and Best Management Practices; CDOW's Standards for Oil and Gas Operations; Gunnison County's Temporary Regulations for Oil and Gas Operations; sections 401 and 404 of the Clean Water Act; the Clean Air Act; Colorado Oil and Gas Conservation Commissions' Rules, Orders and Permit stipulations; Colorado Department of Public Health and Environment Air Quality Control Division permits; CDPHE Water Quality Control division for stormwater permits; NPDES Temporary Discharge Permit and Minimal Industry Discharge Permit; Department of Transportation's Office of Pipeline Safety; National Historic Preservation Act; Endangered Species Act; and full disclosure under NEPA along with any conditions of approval, terms and conditions, or project design criteria desired by these regulatory and permitting bodies, not to mention the adherence to the Code of Federal Regulations enforced by the BLM, USFS, US Army Corps of Engineers, Environmental Protection Agency and US Fish and Wildlife Service. |
| 122 | We have witnessed many occasions where opponents of natural gas exploration and development have claimed that we are not required to follow any environmental regulation and that development of federal minerals will therefore have undue environmental impacts because our industry is unregulated. We humbly and strongly contend otherwise. |
| 145 | There is a lot of private land on Oak Mesa but the mineral rights are federally owned. It has been shown in other places in western Colorado where drilling has been done, that the drillers have treated land owners in a very cavalier manner. No regard for their property or their persons. We hope this will not happen on Oak Mesa. |
| 146 | We would expect the Bureau of Land Management to have diligent oversight on all operations conducted on Oak Mesa. -- Settling ponds for toxic waste water, water procurement. Road construction and road use on private property. |
| 147 | With a heavy heart, I envision Oak Mesa being destroyed as other places have been by the gas drilling. |
| 208 | This letter is to advise you that I am totally in favor of gas and oil wells in Delta County as long as they are supervised and managed in a reasonable manner. I have recently been contacted by Citizens For A Healthy Community asking that I write to you about my feelings on this issue. So I am complying with their request. |
| 210 | BLM planning must balance a lot of conflicting wants. But BLM needs to preserve access to minerals, coal, oil and gas, uranium and sand and gravel. These minerals are used to provide needs to the nation, jobs to residents tax revenue to governments. Land removed from development reduces all of the above. |
| 213 | The Issue: The BLM needs to stiffen its criteria for deciding whether a natural gas operator has successfully drilled a test well on soon to be expiring lease acreage which exhibits "potential production" if hooked up to a gathering line. If the operator succeeds in passing that test, the BLM will categorize the acreage as "held by production" and will not allow it to expire. The Problem: As far as we know, there is no adequate economic dimension to this test. A well must be economically productive when tested to be a valid indicator of whether the well would ever be actually hooked up to a pipeline, and therefore allow the acreage to be meaningfully "held by production." This question has serious bite today: A wellhead test volume that was economic two years ago when gas sold for $13/Mcf is meaningless today when gas is going for $5/Mcf. The Answer: So the BLM must hire in-house personnel qualified of judging whether a given wellhead test volume is meaningfully economic at prevailing gas prices, including the dimension of how quickly the well's initial output would decline. Or at least outsource that task to qualified consultants. The Danger from rampant attempts to prove acreage: Otherwise, opportunistic operators will start to drill great numbers of wells--on leases that are either close to expiration or even where that is far off--to hold acreage because they know they will have an irrelevant, easy test to pass. They will do that now because drilling costs are very low--the flip side of low sales prices for the product. They will not have to run the risk of putting the gas on production and wasting it by selling into a cheap market because they have no need to do that. All they need to do is to hold acreage for the future--five, |

BLM_0067221

## Table C-16
## Issue 2: Non-renewable Energy Development

| Comment ID | Comment |
|---|---|
| | ten years or more down the road-- when hopefully gas prices will be higher. |
| 214 | The tragedy for forest users and wildlife is that in this case national forest and wild and scenic **BLM** land will start to be littered with roads and pads for wells the leaseholder does not intend to use because, realizing the production won't be economic for the foreseeable future, he only wants to hold the leases from expiring. Examples: The two Petrox Resources APDs on the Springhouse Park IRA in the Gunnison NF, and the Gunnison Energy proposal for a well on **BLM** lands on Oak Mesa near Paonia. The operators would have hesitated to ask to drill those wells if they knew they would have to show enough production to make the well(s) economic at prevailing low prices. |
| 328 | I don't have anything against responsible extraction and use of natural gas, but the methods used recently throughout the state by the gas industry have been damaging to our natural resources. It is clear when one travels the I-70 corridor that the oil and gas industry have ruined the landscape in that area for centuries to come. It is even more clear when you look at the area from an airplane. |
| 329 | Use of hydraulic fracturing is ruining one of our most precious resources: fresh water. It is clear that, in pursuit of their short term profits, the industry is ruining our water tables **IN PERPETUITY!** Once these water resources are ruined, there is no hope of repairing them. The industry wont even say what they are using for hydraulic fracturing fluids, that should raise a red flag to any reasonable person. What will future generations think of our stewardship of this precious resource when they have to distill their water in order to use it safely? |
| 330 | Roads, drill pads, and all of the other construction in otherwise natural areas of the state destroy the pristine nature of these areas for centuries for all Coloradoans. The profits gained from the extraction of the natural gas benefit a relatively small number of people, and even those profits, along with the tax revenues that they generate, won't last for long. |
| 331 | In the rush to drill for gas, the industry is running roughshod over the interests of property owners, and is ruining their property. |
| 332 | Our unspoiled natural areas are this state's most precious resource. The short-term increase in tax revenues is no excuse, in my opinion, for continuation of policies that are ruinous to our natural resources and the beauty of our state. |
| 334 | Please, please, please ensure the viability of agriculture and clean water by not allowing oil and gas development drilling. |
| 502 | There is no need to lease more oil and gas areas- so much has been leased that hasn't been developed. |
| 661 | Coal, Oil and Gas: I would strongly recommend effective regulations for wildfire prevention and protection for drill sites and gas prep buildings in the Oak Mesa and Leroux Creek areas. Leroux Creek is the watershed source for the Town of Hotchkiss, and is a critical infrastructure asset. |
| 664 | Town of Norwood/Norwood Water Commission urges the **BLM** to respect the Town of Norwood's Source Water Protection Area by not approving Gas and Oil leases within the boundary. |
| 670 | We believe that **BLM** should require all oil and gas development to use the best available control technology to minimize Volatile Organic Carbon (**VOC**) production and require drilling equipment that maximizes the number of wells per pad. |
| 671 | All development should be required to develop Comprehensive Development Plans that minimize soil disturbance and disturbance for infrastructure development. |
| 672 | In addition, the demand created for and availability of water, as well as water quality impacts should be considered in **BLM**'s planning. |
| 673 | An enforceable plan that restores vegetation in impacted areas to pre-disturbance conditions and prevents spread of exotic plant species should be required. |
| 674 | **BLM** must create a bonding mechanism to provide for adequate enforcement and develop policy and staffing to ensure compliance. |
| 675 | In light of recent disclosures on the nature and volume of chemical chemicals used in oil and gas development, **BLM** needs to monitor the use of and consider the effects of these chemicals on the surface and sub-surface environment. |

**Table C-16**
**Issue 2: Non-renewable Energy Development**

| Comment ID | Comment |
|---|---|
| 676 | The policy of allowing residual well development and production wastes to be disposed of on public lands should be revisited. BLM should require these wastes to be removed from public lands and disposed of in a proper facility consistent with the character of the wastes. |
| 694 | I oppose any further drilling without tightening up the regulations for safety and adverse environmental impacts in connection with further drilling for oil and gas in our area. In particular, I mention the recent action by the EPA to re-examine the negative impacts of hydro-fracking after the study by the City of New York showing the adverse impacts. I would urge the BLM to restudy the problem, as well, in the light of the of the New York Study. That study was directed in particular to impacts on the NYC watershed of gas drilling in the Marcellus Shale. Please refer to the article published in the March 26,2010 issue of Yale Environment at page 360. The conclusions of the study are applicable anywhere else. |
| 695 | I also direct your attention to the studies by Theo Colburn, PhD. on dangerous effects of the fracking chemicals on animal bio-systems, namely endocrine disruption. |
| 696 | The BLM needs to suspend approval of drilling until it has made a further study in light of this new information. |
| 718 | That irresponsible drilling does not happen similar to Garfield County. |
| 720 | Encourage use of directional drilling to minimize surface disturbance. |
| 723 | Keeping this environment clean and safe water and air. The north fork valley is the largest concentration of organic growing in Colorado. Oil and gas production will cause growers to lose their "organic" standard. Then it's just another industrial region. |
| 724 | After attending the wserc gas symposium on 3/20, we were led to believe that all is safe with 8000' wells. Please look at this article, if you haven't already done so. "...examination of the methane problem in western Colorado is offering a strong scientific repudiation of that argument. Released in December by Garfield County, one of the most intensely drilled areas in the nation, the report concludes that gas drilling has degraded water in dozens of water wells (PDF). The three-year study used sophisticated scientific techniques to match methane from water to the same rock layer where gas companies are drilling -- a mile and a half underground" http://www.propublica.org/feature/officials-in-three-states-pin-water-woes-on-gas-drilling-426 |
| 725 | In populated areas and agricultural areas, particularly here in the North Fork valley with it's high number of organic food growers, contamination of the water WILL cause irreversible consequences. With many places to extract natural gas - away from population and agricultural areas - why take the chance of damaging environmental, property, and human health? |
| 748 | To live in a valley like the North Fork Valley that is pristine and could potentially grow healthy and nutritious food for the bigger part of Colorado is a privilege. It should be the biggest priority to protect it, especially its watershed. It is a lack of responsibility to lease any land close to or above the watershed of this valley to the gas industry. |
| 749 | Think about the risk and how any contaminations or accidents can impact the whole community. The evidence of Garfield County shows that there is now guarantee. Once the damage is done, not even money could make it reversible. |
| 750 | My concerns are about leasing and developing BLM land to gas and oil companies, which then contaminate watershed, air and land of the North Fork Valley, the biggest organic growing area in Colorado. Once it is contaminated, it is to late to reverse the impact issues about food and populations. |
| 751 | In order to keep the valley clean, no oil and gas industry. |
| 825 | Existing gas and oil exploration, drilling, and extraction have had inadequate government regulation and supervision to protect surrounding landowners and to protect existing resources. |
| 826 | Current federal, state and local regulations are inadequate |
| 827 | Baseline environmental monitoring and research prior to exploration, drilling and extraction are inadequate or non-existent. |
| 828 | Adequate comprehensive baseline studies of existing water, soil and air quality in proposed and existing lease areas must be completed prior to any activities related to resource extraction. Physical changes to the landscape necessary for the completion of baseline studies may be needed. |
| 829 | Scientific peer reviewed baseline studies must be completed prior to new leasing and prior to allowing resource |

BLM_0067223

**Table C-16**
**Issue 2: Non-renewable Energy Development**

| Comment ID | Comment |
|---|---|
| | extraction activities on public lands. The required monitoring of water, soil and air quality must continue throughout the exploration, extraction and reclamation process. |
| 830 | The cost of the baseline studies and monitoring must be the responsibility of the lease holders - but must be conducted by the independent regulators. Baseline studies must be the basis of determining the level of resource extraction activities. Ongoing monitoring of such activities must be used to make modifications (as needed to allowed extraction activity, including suspension of such activities if necessary. |
| 831 | Fracing chemicals must be regulated more strictly by governmental agencies. A) All chemical ingredients in MSDS^15 must be included - Proprietary claims for secrecy cannot be allowed because this information has to be available to properly assess risks and to conduct adequate monitoring. B) Proper storage and handling of fracing fluids is required. |
| 832 | Water used and produced during the fracing process must be tested and continuously monitored. Proper disposal/purification must be required. |
| 835 | Oil and gas drilling effects on that quality. |
| 1008 | My primary concerns revolve around the pollution of our rain and water by methane ("natural") gas drilling operations. |
| 1010 | First of all ask: is it necessary to physical change the landscape; for who's benefit - and why. Why make it easier for nearly unregulated industry to abuse our lands. |
| 1011 | The oil and gas industry (in my opinion) presents the greatest danger to the health of our environment and community and yet have used legislation to manipulate the regulations. |
| 1012 | Regulate those porters who may be bringing in tankerfulls of fracking fluids to inject who may pollute surface and ground water through drilling, who pollute the air with gases which are only visible with infra-red (benzine, etc. (I could go on and on and on) |
| 1013 | Stand up for what is right, stand up for future generations, take a precautionary approach (an ounce of prevention is worth a pound of cure) Protect the land, air, water from the potential destruction by huge multinational methane gas companies. |
| 1070 | NO FRACKING for gas extraction without a complete inventory of the chemicals used, and complete liability for water contamination. |
| 1076 | It is imperative that the BLM recognize the seriousness of decisions made in leasing mineral rights to gas, oil, and mining industries. |
| 1077 | How many seeps are ENOUGH? Does the BLM think that poisoning our water, our air, and our land is acceptable? You will note in the enclosed information that "Fracking" which is done in about 90% of gas wells across the country finds extremely reputable geologists saying that there is almost no research on fracking, and it is an emerging PROBLEM. Additionally, a leading expert has seen methane seep underground for more than seven miles, and to quote him, "There is no such thing as impossible in terms of migration." Given this information which I'm sure is contrary to what the industry wants people to believe, I do not see how the BLM can manage the lands OF THE PEOPLE-in their best interests-and allow the gas industry to inject at least 278 chemicals into the Earth as well as pollute the air with ground ozone, benzene, and other noxious chemicals. The vast majority of these chemicals cause harm to the health of humans and other living things. The ramifications here are so much greater than the boundaries of BLM land. Polluted water and poisonous air do not stop at anyone's boundaries. |
| 1079 | I know that the oil and gas industry is very powerful and can control and manipulate information. It is also evident that they seem to have little understanding of the ramifications of this all-out assault on the planet and all that inhabit it. It has become quite clear that water is made toxic, air quality is drastically affected, and land is polluted by the processes used in the production of natural gas. Your agency stands at a crossroads in decision making for a future for humans on this planet. If that sounds fanatical to you, please ask yourself what poisoning one's Home sounds like. To me Poisoning one's Home is certainly one definition of Insanity. If status quo or people higher up the ladder stop you from doing what is right, I implore you to use your common sense to change minds and policies. Our future depends on your just work. |
| 1080 | I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live on and around those |

*Uncompahgre Resource Management Plan Revision and EIS*
*Final Scoping Summary Report*

BLM_0067224

**Table C-16**
**Issue 2: Non-renewable Energy Development**

| Comment ID | Comment |
|---|---|
| | lands. I believe the only way to do that is to have a moratorium on all natural gas leasing and permitting until the plan revision is completed. It is my understanding that leasing and permitting of natural gas development must be done with an environmental review and public input as called for under the National Environmental Policy Act. So until such environmental reviews show that there is no possibility of contamination of our water, land, or air; i.e. that toxic chemicals are not injected into our Earth, that future generations will not be left with a dying planet, I maintain that all areas your office now has open to future leasing should be closed to gas, oil, and mining exploitation. |
| 1081 | In regard to the revised RMP, I believe it must not allow further natural gas leasing and permitting unless and until:<br><br>• Once again, that there can be a way to ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.<br><br>• Air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.<br><br>• Private property rights can be protected by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.<br><br>• All natural gas leases and permits protect wildlife habitat from fragmentation |
| 1088 | Further, the BLM should not expend unnecessary resources attempting to analyze the potential impacts of oil and gas development on a site specific basis. Individual development projects will be analyzed on a case-by-case basis if and when operations are actually proposed. |
| 1102 | I personally understand the economic needs of milling and mining, but am working hard to develop other possibilities for the West End of Montrose County. I for one, do not wish to see forests of oil rigs and hope that consideration will be made in the permitting process to avoid degradation of the scenic beauty of the area. |
| 1108 | Also, please allow oil & gas & uranium exploration and extraction to proceed with reasonable environment controls. |
| 1127 | Based on the general information available for review, our initial areas of concern for this upcoming resource management plan include impacts to air quality from energy development, impacts to wetlands, and protection of water resources. We are also concerned with the potential cumulative effects of the increased energy development in the region. Along with identifying direct impacts, the EIS should include a rigorous analysis of indirect and cumulative impacts. The EIS should disclose the impacts of all reasonably foreseeable actions on environmental resources in a way for decision-makers and any participating counties/municipalities to be able to effectively plan to reduce impacts on such resources as much as possible. |
| 1200 | The 1989 Uncompahgre Basin RMP assigned both the Fairview and Needle Rock ACECs to leasing with a no surface occupancy stipulation. CNAP recommends continuing to keep these areas closed to surface occupancy. We have not thoroughly researched the sub-surface rights in these areas, but due to the sensitive nature of the rare plants and aesthetic features that occur on Fairview and Needle Rock ACECs, respectively, we encourage the BLM to consider closing these areas to oil and gas leasing to provide even greater protection for the irreplaceable features which occur there. |
| 1201 | In a broader scope, we would also like to submit a set of Best Management Practices (BMPs) for oil and gas development in areas with rare plants (see attached) that may be considered in the revision of the RMP. These BMPs have been developed by a group of federal, state and non-profit representatives that collaborate on the Colorado Rare Plant Conservation Initiative. We believe there may be potential to include some or all of these BMPs in future oil and gas lease stipulations; for example that currently occur in Appendix A of the Uncompahgre Basin RMP, under 'Threatened, Endangered and Candidate Plant Areas. The inclusion of some or all of the rare plant oil and gas BMPs in lease stipulations would allow for oil and gas development with limited impacts to sensitive and listed species, and would assure that Natural Areas with rare plant populations do not become refugia for species that may be impacted by oil and gas development. |
| 1299 | I attended the very informative symposium on natural gas development sponsored by Western Slope Environmental Resource Council on March 20, 2010, in Hotchkiss. While the industry representatives made an effort to minimize the risk, it is irrefutable that accidents and spills do happen. They have happened in Garfield County with devastating results for the people affected. Threats are not just from what occurs, invisibly, deep in the earth: trucks hauling toxic chemicals have run off canyon roads and spilled their loads into surface waters, improper cementing of casings has allowed drilling mud to escape and contaminate ground and surface |

BLM_0067225

**Table C-16**
**Issue 2: Non-renewable Energy Development**

| Comment ID | Comment |
|---|---|
| | water. |
| 1302 | The only sure way to protect our property rights and our right to a clean environment is to prohibit gas exploration in the drainages surrounding the North Fork of the Gunnison River. |
| 1303 | If, however, this is not politically tenable, then the Resource Management Plan should: Provide that activities on BLM land, including those of permittees and licensees and their agents, etc. will result in no detectable reduction in environmental values (air, water, noise, etc.) on private land in the air sheds and water drainage basins in which the activity takes place; |
| 1304 | Require comprehensive, independent and qualified air- and water-quality baseline data collection (for groundwater as well as surface) at the applicant's expense (perhaps through a substantial application fee). Such data should be publicly available. This would enable landowners to obtain redress in the event of loss or damage as well as to put the applicant on notice that we are serious about protecting the quality of our Valley, our property rights, and the viability of our agriculture. |
| 1305 | Hold the permittee or licensee strictly liable for any and all loss of environmental quality that occurs during the period of operation, and for a substantial period thereafter, without the aggrieved party being required to prove causation, under the established legal principle of 'res ipsa loquitor' (the thing speaks for itself). |
| 1306 | Provide that if a private landowner must sue for damages, or to enforce his/her property rights, and wins, that all costs and attorney fees are paid by the permittee in addition to damages. |
| 1307 | Require the permittee to provide a bond sufficient to cover all foreseeable damages, including attorney fees, to all private claimants who may be affected by profit-seeking activities on BLM land. |
| 1308 | In our particular case, Mesa Winds Farm's water comes from the Leroux Creek basin. Our organic certification relies on the quality of this water. Any contamination by drilling mud or 'frac-ing' fluids into Leroux Creek or its aquifers, tributaries, or reservoirs would result in the loss of our certification, loss of trust of our customers, and the loss of our established markets. We would be put immediately out of business. My wife and I put everything we have into growing delicious, healthy fruit and building our customer base. For an out-of-region energy speculator to eliminate those years of hard work toward a healthful and sustainable future simply because BLM regulations were too lax would be a tragedy. After-the-fact restitution would be cold comfort. |
| 1330 | Clearly, people have and will continue to invest in uranium. The demand realities of today, coupled with the projected doubling of the consumption of electricity worldwide by 2030 and the numerous nuclear plants underway throughout other countries, should clearly soften the peaks and valleys of the boom and bust cycle historically experienced. |
| 1367 | Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions by mandating that any leasee hire an independent company to monitor their practices and maintain water purity control. |
| 1368 | Create a publicly approved list of companies and/or agencies that can provide the necessary monitoring skills and manpower to closely regulate the impacts of drilling and transportation of gas on air, water, land, wildlife and humans in the regions of any drilling, wells and/or transportation pipelines and facilities. |
| 1369 | Mandate as part of a leasing agreement that such agencies be hired and maintained by the gas and oil companies and that their reports are maintained on file for public review and published in the main media of a given area. Regular public review opportunities shall be scheduled into the leasing agreements with the caveat that all activity must cease if there are breaches of the contracts or of regulatory standards. |
| 1370 | Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area and require that any leasee hire an independent company from a publicly approved list of monitoring agencies to ensure such adherence to strict standards. |
| 1371 | Require energy companies to fully disclose all drilling and hydraulic fracturing fluids. It has been my personal observation that such full disclosures are not currently nor have they been in the past adequately made. The practices of withholding vital information from the public for review is not acceptable. |
| 1372 | Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or W1itization decisions and requiring all leasees to hire a third party approved independent monitoring company to ensure such air quality protection. |

BLM_0067226

**Table C-16**
**Issue 2: Non-renewable Energy Development**

| Comment ID | Comment |
|---|---|
| 1374 | How can a government entity fail to protect its people and their resources. Air and water, to list a couple, are more precious resources than gas. Simply because the gas industry has more money (by earning it off of our lands) , and therefore more lobbyists should not mean that they are above some basic expectations. Please hold them accountable. |
| 1376 | I have been very concerned about the prospect of 011 and gas leasing in and about the North Fork Valley. While recognizing that energy production is a mandate given to the BLM, I would like this done with the highest level or responsibility possible and in such a manner that protections to human and wildlife health and habitat are given the highest priority. |
| 1377 | The NEPA was put in place to provide proper and legally mandated environmental reviews in the protection of my interests and I ask the BLM to see to it that they are. |
| 1378 | I understand well that energy Is needed and I have no issue in principle with obtaining it. I merely request that it be done with precautionary principles firmly established in leasing, regulation and enforcement. Ruining public lands in the name of short term private profits is folly. This has gone on for too long and things must change. |
| 1384 | Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions. This would adversely affect my business as an ORGANIC FARMER, which would set up possible legal action. |
| 1386 | I am a general contractor and sportsman and the affect I have seen on the movement of the elk herds and the changes in the natural landscape due to the drilling is alarming. I have a concern about the long term affect it will have upon the hunting and herd health in Delta County. |
| 1388 | These gas wells will likely contaminated the domestic springs and wells in the North Fork. When that happens, what is our recourse? |
| 1389 | Please don't allow hydraulic fracturing. |
| 1391 | We recommend that the Bureau of Land Management conduct the necessary planning and take into account the best available information so as to ensure that: Local wells, springs and potable ground water aquifers, currently developed and available in the future will not be contaminated or adversely affected by natural gas drilling and development; |
| 1392 | [Ensure that] US citizens, local and distant, will not see their water resources, potable and otherwise, adversely affected by the short-term access to the natural gas resource. |
| 1393 | [Ensure that] Drilling pads, access roads and all areas disturbed in order to access the natural gas resource are planned accordingly to prevent soil erosion and require the best available and most appropriate reclamation and remediation following natural gas drilling and development. |
| 1394 | [Ensure that] Compressor- and pump-stations are effectively planned and located so as not pose a safety threat to local residents, both within and without the federal land boundary, and not present adverse visual, noise or reasonable land use impacts. |
| 1395 | [Ensure that] Access roads are effectively planned so as to prevent and avoid dust and hazard as the natural gas resource is developed and produced |
| 1396 | The Bureau through its planning and and resource management role, that the energy companies through their planning role and the regulatory authority through its permitting and enforcement role will ensure that air, water and wildlife habitat quality and general natural resource health and welfare will not be degraded as a result of natural gas leasing, permitting, or unitization decisions; |
| 1397 | [Ensure that] The Bureau will protect private property rights by allowing affected private property and private surface rights owners, in the case of split estates, be actively involved in the planning and permitting process. |
| 1398 | [Ensure] That the Bureau will do its best within the flexibility of federal, state and local laws and regulations to prohibit oil and gas development on private land within a unitized area without the written permission of the surface property owner. |
| 1400 | I am not current resident in Delta County though I am planning on becoming one. The only way I would feel comfortable investing in the Delta County region would be to know that there is action against blindly continuing gas drilling on watersheds that feed the North Fork Valley i.e. Bull Mountain |
| 1404 | I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed |

BLM_0067227

**Table C-16**
**Issue 2: Non-renewable Energy Development**

| Comment ID | Comment |
|---|---|
| | because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. |
| 1405 | Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions. |
| 1406 | Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area. |
| 1407 | Require energy companies to fully disclose all drilling and hydraulic fracturing fluids. |
| 1408 | Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions. |
| 1409 | Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner. |
| 1410 | Require all natural gas leases and permits to protect wildlife habitat from fragmentation. |
| 1412 | Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely. |
| 1519 | Until other real, economical, and renewable resources become plentiful, we will need uranium, oil, and gas. Plentiful energy resources equal security, prosperity, and peace for America. |
| 1520 | I strongly oppose any designation to our public lands that would inhibit our freedoms to utilize them for responsible mineral extraction or energy development. |
| 1612 | I am very concerned that oil and gas companies will destroy the quality of life here. Fracking is toxic. The drillers are exempt from Clean Air and Water Acts. Why? I'm not exempt. |
| 1613 | Also, the proposed evaporation ponds near Domniguez are a threat to health. Garfield County should keep the poison it has created. |
| 1615 | The drilling companies should provide full disclosure about the chemicals used and their effects. Rules should dictate that they cannot poison our environment AT ALL. |
| 1617 | Slow down until the technologies are SAFE. Note Maybe safe in a perfect world. |
| 1618 | Develop wind power here. It's cleaner. |
| 1620 | The proposed (and current) gas drilling is a direct assault on the well-being of citizens of Western Colorado. It is degrading the environment, including the water, air, animal and human habitat. The damage done to roadways and the loss of tourist income pale in comparison to the long term effects of the primitive technologies at work here, thoughtlessly polluting our beautiful land. It would be a shame to ignore scientific evidence for the sake of a quick money grab. |
| 1621 | I ask you to put a stop to gas drilling until (and if) safe technologies are put to use. Do not squander our precious resources. Consider your children and grandchildren. You can make a difference |
| 1626 | Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation. |
| 1700 | I am particularly concerned about gas development and pesticide use on public lands. I live in Oregon, but I use natural gas in my home, and we are being told that we don't liquefied natural gas terminals on the Columbia River (I agree with this!) because our gas can come from the Rockies! However, I'm aware that gas drilling in that area comes with huge potential costs, including water pollution. Although gas is relatively clean burning, the other costs to drilling are often not paid attention to. BLM lands are public lands, therefore I request that they be managed in a way that preserves them as much as possible in their natural state and that minimizes effects on climate change. |
| 1711 | However, I also favor coal, gas, oil, uranium extraction. But, when managing resource development, I would like the BLM to carefully consider the health and safety of the land and people when considering rates of mineral extraction, lease locations, methane venting, water quality and general development - particularly in roadless areas. |

BLM_0067228

### Table C-16
### Issue 2: Non-renewable Energy Development

| Comment ID | Comment |
|---|---|
| 1717 | I want to say that I am particularly concern about the oil and gas development and about the chemicals used in the hydraulic fracturing process. I have worked with Xylene and Toluene before in a laboratory and the procedures we used with these chemicals were very stringent. Now the oil and gas industry states there is no proven harm to wells, air, water, and wildlife. How stupid do they think we are! Their "studies" I am sure have been skewed as well as the data. Anyone can do what ever it takes to back a certain desired result. Someone needs to read CIVIL Action. Please do what you can to lessen the defilement of my beautiful country. |
| 1771 | Any oil and gas development allowed under the RMP should be carefully constrained, subject to phased development that minimizes damage to unique natural features, essential wildlife habitat, and other sensitive areas. |
| 1787 | This is one of the most beautiful places I have ever been, and it would be a disgrace to our National Heritage if we exploit it for uranium, oil, gas, and destructive off road recreational vehicle use. |
| 1918 | The BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. With regards to oil and gas leasing and permitting, this means the revised RMP should state that BLM is fully committed to ensuring that no domestic, irrigation, surface, or ground water within the UFO shall become contaminated as a result of any leasing, permitting, or unitization decision. While we are cognizant of the fact that the risk of water contamination from natural gas production is low due to the depth of drilling, any risk to our water supply is unacceptable. Contrary to the claims made by industry, contamination of water supplies by benzene or related chemicals associated with drilling is not just a theoretical risk. According to Drilling Around the Law, a recent report published by the Environmental Working Group: In the summer of 2008, in one of the few government tests ever conducted on water contamination near natural gas fields, the Bureau of Land Management found benzene in drinking water wells in Sublette County, Wyoming. The researchers did not identify where the contamination came from, but the only likely source in the otherwise rural area is intensive natural gas drilling involving hydraulic fracturing. The report also states that in 2008: Garfield County, Colorado officials released a study that linked methane contamination in local water wells to methane in the same rock layer a mile and a half underground, where gas companies are drilling. The scientists who conducted the study did not determine how the gas reached the wells, but their results provide evidence that gas or other contaminants from drilling can work their way to the surface from deep underground. If all lands in the Delta County region that are open to federal leasing were developed for natural gas production, the water sources of most private wells and the 25 domestic water suppliers in Delta, Cedaredge, Crawford, Hotchkiss, Paonia, and the county's rural areas would be at risk of contamination. |
| 1919 | Citizens For A Healthy Community is also concerned that drilling may contaminate irrigation water in our county. For example, leases on Bull Mountain and surrounding Paonia Reservoir run the risk of contaminating the Reservoir, which feeds the Fire Mountain Canal. This Canal is the largest agricultural irrigation canal in the North Fork Valley. Delta County's ranchers and their 37,000 head of cattle rely on irrigation as do the county's produce farmers. Delta County has 281,000 acres dedicated to agriculture and produces $45 million in agricultural products annually while employing approximately 1,109 people, or 13 percent of the County's workforce. As a fruit growing region alone, Delta County produces:<br><br>• 77 percent of the apples in grown in Colorado;<br><br>• 71 percent of the cherry's grown in Colorado (nearly half of these orchards are organic);<br><br>• 53 percent of the state's pears;<br><br>• 21 percent of the peaches grown in Colorado; and<br><br>• the second-largest grape crop in Colorado.<br><br>Contamination of our irrigation water in any of the dozens of canals in the County would have a devastating affect on the local economy. If BLM is fully committed to ensuring the health of the land and the people who live in Delta County, then it will make protection of our communities' water supply a top priority. |
| 1920 | Citizens for a Healthy Community believes the best way for BLM to demonstrate it is taking care of the health of the land and the people is to include a statement that the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground on any federally leased, permitted, or unitized area will be prohibited throughout the 20-year implementation period of the revised RMP. |

BLM_0067229

**Table C-16**
**Issue 2: Non-renewable Energy Development**

| Comment ID | Comment |
|---|---|
| 1921 | BLM should place a moratorium on all leasing and permits for the development of any oil and gas facility (e.g., well pad, compressor station, pipeline, etc.) until the completion of the revised RMP. |
| 1922 | All areas that are open to oil and gas leasing in the current RMP should be closed to oil and gas leasing in the revised RMP. This is the wise and prudent course of action to take given the problems that are surfacing around the country regarding the hydraulic fracturing process. The issue of oil and gas leasing can be revisited in 20 years when the next plan revision is written. Hopefully, during the intervening years the industry will have sufficient time to development new technology for extracting natural gas in a manner that no longer threatens human health and the environment. This 20-year period will also provide Congress the opportunity to get up to speed on the issues and pass legislation to protect the community from the irresponsible natural gas development that is taking place. |
| 1923 | Citizens for a Healthy Community requests BLM make a commitment not to renew any leases that expire during the life of the revised RMP. |
| 1924 | The revised RMP should include language stating that prior to approving any permit for an oil or gas facility (e.g., well pad, compressor station, pipeline, etc.), BLM will conduct a NEPA EA or EIS. While this comment may seem unnecessary since the 2007 Surface Operating Standards and Guidelines for Oil and Gas Development already requires this, it should be noted that there have been times in the past when the UFO has failed to conduct a NEPA review prior to approving drilling permits. |
| 1925 | Citizens For A Healthy Community would like to remind BLM that all future NEPA analyses for proposed oil and gas facilities shall follow the U.S. EPA's recent aggregation policy. On September 22, 2009, Gina McCarthy, U.S. EPA Assistant Administrator of the Office of Air and Radiation, sent a Memorandum to all EPA Regional Administrators. This memorandum, with the subject heading Withdrawal of Source Determinations for Oil and Gas Industries, reversed a 2007 EPA memo that discouraged states from aggregating emissions. By doing so, U.S. EPA recognized that focusing on only one of the three regulatory criteria (adjacent or contiguous) for source determinations was insufficient. The memorandum states: Permitting authorities should therefore rely foremost on the three regulatory criteria for identifying emissions activities that belong to the same "building," "structure," "facility," or "installation." These are (1) whether the activities are under the control of the same person (or person under common control); (2) whether the activities are located on one or more contiguous or adjacent properties; and (3) whether the activities belong to the same industrial grouping 40 C.F.R. 52.21(b)(6). On October 27, 2009, WildEarth Guardians and twenty-two public health and environmental organizations sent a letter to Paul Tourangeau Director, Colorado Air Pollution Control expressing their concerns regarding EPA's aggregation policy. While this letter was not addressed to BLM, the concepts expressed apply to the UFO when considering permitting of natural gas drilling, compressor stations, evaporation ponds, etc. This letter stated: The issue of aggregation is extremely important to ensuring long-term protection and restoration of air quality, public health, and the environment across the United States. Many of you have seen the impact that increased oil and gas development has had on both rural and urban air quality. Rising ozone levels, regional haze, and air toxics are but a few. Many of these observed impacts are linked to the fact that oil and gas operations are individually small, yet collectively large, sources of air pollution. Aggregation provides an important opportunity to more accurately recognize integrated source operations under the Clean Air Act and ensure that oil and gas operations are regulated on a cumulative basis under PSD and Title V. In particular, it provides an opportunity to determine whether individually small sources of air pollution should be aggregated together as larger sources. To this end, the EPA's recent guidance and Title V petition ruling provide an important opportunity to immediately begin assessing whether and to what extent pollutant emitting activities related to oil and gas development should be aggregated as single sources in accordance with the "fundamental criteria for making source determinations." While we recognize that the question of whether to aggregate two or more pollutant emitting activities into a single major stationary source under PSD and Title V is a case-by-case determination, we urge you to conduct a full analysis for oil and gas operations that considers:

    • An evaluation of system maps for oil and gas operations, which shows all emission sources owned or operated by individual companies in producing oil and gas fields;

    • A determination as to whether and to what extent the various pollution emitting activities are contiguous or adjacent to, and under common control with, permitted or proposed to be permitted facilities;

    • An assessment of flow diagrams that show movement of oil and gas from the well sites to processing |

BLM_0067230

**Table C-16**
**Issue 2: Non-renewable Energy Development**

| Comment ID | Comment |
|---|---|
| | facilities so that you may determine the nature of the sources' emissions and determine the interdependency of operations; and |
| | • An analysis of business information regarding the nature of control of operations to determine whether various pollution emitting activity should be considered under common control for purposes of making the source determination. |
| 1926 | All NEPA analyses conducted under the revised RMP should require energy companies to fully disclose all drilling and hydraulic fracturing fluids. |
| 1927 | All oil and gas leases offered under the revised RMP should contain a provision reserving the right of the federal government to impose any additional stipulations necessary to protect human health and the environment, including, but not limited to, no surface occupancy stipulations. |
| 1929 | The revised RMP should protect private property rights by prohibiting oil and gas development on private land within a unitized area without the express written permission of the surface property owner. The natural gas industry has a history of abusing private property rights. Currently, surface property owners have few rights to protect their homes or land from damage when the federal government leases the subsurface mineral rights. In fact, the law places the rights of the subsurface mineral owner above those of the surface landowner. No surface owner should be forced to accept an oil or gas well on their property without their permission. |
| 1930 | The revised RMP should require all oil and gas leases and permits to contain provisions to protect wildlife habitat from fragmentation. |
| 1931 | The revised RMP should require energy companies to pay financial assurance with sufficient funds to pay to restore the land to its original condition when wells are no longer producing. According to The Gold Book, companies are required to put up a minimum bond of $10,000 for oil and gas lease operations. In lieu of a $10,000 lease bond, a bond of not less than $25,000 for statewide operations may be required. According to Oil and Gas at Your Door? A Landowner 's Guide to Oil and Gas Development: A recent study indicates that the costs of plugging and reclaiming a single orphaned well site in the western states can range from $19,000 to $75,000. Based on these numbers, it appears that in most states financial assurance bonds are inadequate to cover the costs of properly plugging and restoring well sites . ... According to industry statistics, approximately 2% of the three million wells (i.e., 60,000 wells) that have been drilled in the United States are considered orphaned. As already mentioned, it can cost between $19,000 and $75,000 to properly plug and abandon a single well. That means that at the present time $1.1 billion to $4.5 billion of taxpayers' money will have to be spent to properly plug and abandon all of the orphaned wells in the U.S. With the actual cost of reclaiming a well ranging from $19,000 to $75,000, financial assurance requirements need to be increased to reflect this reality. In addition, the cap on the amount of money put into financial assurance regardless of the number of wells the company has drilled should be removed. With these measures in place, there will be some assurance that energy companies-not the American public-will bear the cost of adequately plugging and reclaiming well sites. |
| 1932 | The revised RMP should require oil and gas companies to install and/or retrofit their well pads and all other facilities with dark sky lighting that cannot be viewed from any neighboring property. Prevention of light pollution shall be accomplished by various means such as pointing lights down, shielding that lights only the ground, and automatic switches on non-essential lights that automatically turn off lights between 9 p.m. to 6 a.m. |
| 1933 | The revised RMP should require much of the recovered or produced water resulting from natural gas drilling to be reclaimed, purified, and made available for use by local communities. According to What You Need To Know About Natural Gas Production (a DVD produced by The Endocrine Disruption Exchange), one million gallons of fluids (mostly water) are typically used each time a well undergoes hydraulic fracturing. Each well can be fracked as many as ten times, and each well pad may contain up to 28 - 30 wells. Thus one well pad has the potential for contaminating and wasting 300 million gallons of water. Just seven well pads have the potential of contaminating and wasting 2.1 billion gallons of water, more than the 1.9 billion gallons of fresh water Delta County uses annually. In the arid west, it is inconceivable that BLM permits energy companies to contaminate and waste so much water in the process of extracting natural gas. A reasonable and prudent requirement of BLM would ensure much of this water is reclaimed, purified, and made available for use by the local communities as compensation for having to bear the brunt of natural gas activities. |
| 1934 | The revised RMP should require energy companies to provide site specific air quality monitoring data for a one- |

BLM_0067231

**Table C-16**
**Issue 2: Non-renewable Energy Development**

| Comment ID | Comment |
|---|---|
|  | year period prior to commencing construction of any new oil or gas facility and continue monitoring throughout the life of the facility. Further, the revised RMP should state that BLM is fully committed to ensuring that air quality in our region will not be degraded as a result of any leasing, permitting, or unitization decision. The industrialization of our wild areas by the natural gas industry is rapidly resulting in large increases in nitrogen oxides and volatile organic compounds being released in the air. When these two compounds combine in the presence of sunlight, ground ozone is produced similar to urban smog. This air pollution poses a serious threat to human health. In What You Need To Know About Natural Gas Production, Theo Colborn states: One molecule of ozone can burn a hole in the deep alveolar tissue in human lungs. It is well documented that daily exposure to ozone leads to early aging in the lungs. They become brittle and dry out. The lungs cannot repair this kind of damage. Every exposure incident builds on the damage that was already there. Chronic ozone exposure can cause asthma, chronic obstructive pulmonary disease, and other pulmonary diseases. Children are especially vulnerable. While ozone was always thought to be only an urban problem, today in rural and wild areas of Delta County and the Grand Mesa, we are experiencing urban levels of air pollution as a result of natural gas production. Deleterious health effects will likely increase in the future in our community if BLM does not protect our air quality. |
| 1967 | Management options that would protect or enhance opportunities to explore for and develop oil and gas resources will be examined. |
| 1968 | Management options for surface resource management that are compatible with oil and gas resource management objectives |
| 1969 | Reasonable mitigation measures designed to limit or avoid impacts to surface resources as a means to lessen restrictions on access to public lands for leasing |
| 1970 | Lack of oil and gas resource potential or current industry interest will not be used as a basis for closing lands or imposing constraints on exploration and development activities |
| 1971 | The effects on oil and gas opportunities from surface management is only tied to - not limited to - economic impacts. Access to public lands for purposes of exploring for and producing oil and gas resources must be considered a separate issue from economic impacts. It is necessary to explain how surface management constrains the availability of public lands for leasing, exploration and potential development. Moreover, compliance with the various leasing laws that require all lands to be evaluated for lease is an access issue that has nothing to do with economics. |
| 1972 | Effects on opportunities to explore for, lease, and develop oil and gas resources resulting from restrictive surface management decisions. |
| 1977 | BLM is responsible for assessing the potential for occurrence of oil and gas resources during the analysis process. The mere lack of potential or lack of current industry interest must not be considered a basis for closing lands or imposing severe constraints on future development. Levels of interest can change overnight, rendering an area previously considered to have low potential highly prospective due to new information, technology or economics. It is important that future opportunities to explore for and develop oil and gas resources not be indiscriminately foreclosed. |
| 1979 | Section 1502 of the Council on Environmental Quality Regulations on the National Environmental Policy Act directs that mitigation measures be identified in the EIS which may be employed to reduce or entirely avoid impacts to other resource values. While this could be construed to mean that only lease stipulations need to be identified, it is also important to discuss other types of mitigation which may be utilized at the time of oil and gas drilling, both exploration and development, such as area-wide standards and guidelines for oil and gas operations. This information is necessary because it illustrates that with appropriate mitigation, oil and gas activities are compatible with other resource uses, including those in sensitive areas. |
| 1980 | Many past BLM planning documents have discussed the impacts oil and gas activities may have on other resource values, but they have failed to adequately describe the effects surface resource management decisions may have on future subsurface opportunities and activities. Therefore, we strongly urge BLM to specifically describe the impacts of surface management decisions and trade-offs as they relate to future oil and gas leasing and development opportunities. |
| 2044 | Oil and Gas Leasing and Development Oil and gas leasing, exploration, and development should be prohibited in the Dolores River Corridor, certainly within visual proximity of the river itself. |

BLM_0067232

**Table C-16**
**Issue 2: Non-renewable Energy Development**

| Comment ID | Comment |
|---|---|
| 2139 | In January of this year Secretary of the Department of the Interior (DOI) Ken Salazar issued Secretarial Order 3294 that states: It is the policy of the Department to take affirmative steps to improve the efficiency, effectiveness, and accountability of its management of energy resources on Federal lands and the Outer Continental Shelf (OCS). Coordinating, reforming, and planning energy development and oversight activities among the MMS, BLM, and OSM and other Federal agencies are necessary to ensure that we effectively carry out our statutory, regulatory, and ethical responsibilities; remain responsible stewards of the public resources that we manage; and obtain fair value for resources owned by the public. Instructions for BLM field offices are among the proposed leasing reform policies and include: a greater detail of analysis regarding the impacts of leasing and development in the proposed area; ensuring greater public involvement; identifying key issues such as protection of air quality, watersheds, wilderness, wildlife and nearby land uses; and identifying appropriate leasing and development mitigation measures to protect the environment. Some other differences between current policy and the proposed reforms include the requirement of field offices to: use interdisciplinary teams to carefully conduct a comprehensive review of proposed parcels, conduct an on-the-ground reconnaissance of parcels, identify interested groups and individuals to seek their involvement and prepare an environmental review document to evaluate existing, revised and/or new stipulations and invite the public to review and comment on the draft document. The BLM will use the environmental and public review to address important resource values and to identify appropriate mitigation measures for protection of the environment. The DOI is expected to issue an instructional memorandum shortly to mandate the proposed reforms and the UFO RMP should incorporate these changes which will provide the opportunity for more public participation, allow for more thorough determinations regarding lease sales and will reduce the need for protesting and litigation to have parcels removed from consideration for lease sales. These reforms will be crucial to ensuring the proper management of fish and wildlife in the face of energy development and, in turn, the stability and opportunity for fishing and hunting in the UFO management unit. |
| 2174 | On page 16 of the Preparation Plan for the UFO, there are numerous questions relative to oil and gas, including which areas should be open to leasing, closed to leasing, open with moderate constraints, open with major constraints, and which lease stipulations should be employed. These questions should all be answered in a new leasing decision for the UFO. |
| 2175 | The 1991 Oil and Gas Leasing Decision and accompanying EIS are outdated and in need of revision. A new oil and gas leasing decision should be part of the UFO RMP revision. This new oil and gas leasing decision should make a determination whether specific lands are open or closed to leasing and if specific lands are open to leasing, what leasing stipulations will apply. While these decisions should account for valid existing leases, rights, decisions made regarding availability for oil and gas leasing and stipulations should be new decisions and not amendments to the old 1991 Oil and Gas Leasing Decision and EIS. In addition, new Administrative leasing policy has significantly changed to where a new oil and gas leasing decision should be undertaken. |
| 2179 | Also with regard to split estate oil and gas, stipulations developed for resource protection should apply to all new leases regardless of who owns the surface. In order to meet the consistency requirements of Federal Land Policy and Management Act (FLPMA), the BLM should apply the same standard of environmental protection to split estate lands as to federal surface. Also, the BLM has responsibilities to apply stipulations under the National Environmental Policy Act (NEPA) because the issuance of a lease and potential approval of applications for permit to drill are federal actions. |
| 2260 | Directional drilling. Gas producers should be required to drill multiple wells from single pads whenever possible to decrease surface disturbance. |
| 2261 | Well pad density. The allowed density of well pads should be determined on a case-by-case basis to decrease negative effects on the air, water, wildlife, views, and quiet. |
| 2262 | Clustering of pads. Clustering of pads should be considered because in some cases clustered pads may cause less overall surface impact than the same number of pads evenly distributed over more acreage. |
| 2263 | Comprehensive plans. Please continue your excellent efforts to encourage development of comprehensive plans. APDs should not be approved unless the proposed wells are included in a long-term area-wide plan |
| 2264 | Cumulative impacts. When making decisions as to lease stipulations or APDs, the BLM should consider total impact of drilling including associated roads, road traffic, pipelines, lights, noise, etc. |
| 2265 | GMUG IRAs. No leases that allow surface occupancy should be sold in GMUG Inventoried Roadless Areas (IRAs). No leases should be sold in the 300-foot setback zone on either side of existing roads in GMUG IRAs. If |

BLM_0067233

## Table C-16
## Issue 2: Non-renewable Energy Development

| Comment ID | Comment |
|---|---|
| | there are already leases in the setback zones, these should not be permitted for drilling |
| 2266 | Split-estate. On split-estate lands, landowners have most problems with water quality, air quality, and noise, and the BLM should do all possible to minimize such problems. |
| 2267 | Set backs from residences. At the very least the set back requirements of pads and other facilities from residences should be increased to 200 meters. |
| 2268 | Environmental monitoring. Air, water, and noise monitoring should be ongoing with remote reporting so problems can be detected quickly and rectified. |
| 2269 | Visual and noise pollution. Require vegetative buffers or constructed barriers to block noise and hide eyesores. Require mitigation of noise from trucks, heavy equipment, and compressors, etc. in populated areas or wildlife birthing and nesting areas. |
| 2270 | Ground-water contamination. Ground-water contamination is perhaps the most crucial issue since once an aquifer is compromised it cannot be recovered. Any failure of well casings or any other occurrence that introduces drilling materials, frac fluids, fuels, produced water or any other potential contaminant into domestic or livestock wells should be prevented by state-of-the-art engineering. |
| 2271 | Bonding. Bonds should be sufficient to cover the value of any public lands or private property harmed by gas activities, including water pollution and loss of agricultural production. The size of such bonds should be based on an accurate assessment of possible harm, and should not be limited to the minimum set forth in the Gold Book (p. 13). It is not an adequate response for the operator to simply provide an alternative source of water. These bonding requirements need to be passed on to any subsequent owners of wells. |
| 2272 | Watershed protection. The Water Conservation Service (WCS) has defined setbacks that exceed the COGCC rules for protection of these water sources and delivery systems. The BLM should stipulate no-surface-occupancy (NSO) within these WCS-determined watershed setbacks. Moreover, dependent on the watershed, larger areas might need to be stipulated as NSO for adequate protection. Each watershed needs to be fully characterized in terms of recharge area, slope characteristics, vegetative cover, etc. so as to safely determine how |
| 2273 | Air quality protection. In areas where air flow could transport dust, other particulates, or gases that could be annoying or hazardous to health, the BLM should consider NSO stipulations on leases. |
| 2274 | Evaluation guidelines. The RMP should state clearly what BMP's, lease stipulations, and conditions of approval will be employed in areas open to leasing. |
| 2276 | Fracing fluids and produced water. Conditions of approval for drilling should include full disclosure of chemical constitution of fracing fluids. Likewise, there should be regular analysis and disclosure of the chemical composition of produced water because of the possibility it contains chemicals like toluene and benzene. If such volatile carcinogenic materials are present they should not be stored in such a way that they contaminate air. Requiring closed loop drilling may help prevent spillage and leaks from surface storage of drilling muds, fracing fluids, and produced water |
| 2277 | Water protection. As a condition of approval, the BLM should require the developer of a well to collect baseline data on all ground water and surface water sources that could possibly be contaminated. Continued monitoring should continue during the lifetime of the well. This obligation should transfer to any new owners of such wells. Irrigation water sources and canals are essential to our agricultural base and need protection from contamination. |
| 2278 | Storm water management. Runoff from well sites must be managed in a more effective way than using straw bales or the plastic sheeting that collapses under snow conditions. |
| 2279 | Restoration versus reclamation. Well pads or other areas where native plants have been disturbed should be restored to natural conditions, including similar mixes of species and several stages. Roads created for development should be obliterated and made impassable to off-road vehicles when no longer needed |
| 2280 | Holding leases by production. The BLM needs to apply valid economic criteria in determining whether a lease is held by production. Simply drilling a well should not be grounds for "holding by production." Instead, there must be a realistic likelihood, based on the production of gas and the cost to connect to a pipeline, that the well will eventually be connected to a pipeline, i.e. that it will eventually be producing in the sense of getting gas to market. Because drilling costs are currently low, operators may be tempted to drill wells to hold leases that |

BLM_0067234

## Table C-16
## Issue 2: Non-renewable Energy Development

| Comment ID | Comment |
|---|---|
| | they have little or no likelihood of bringing into production. To make such economically-based assessments, the BLM must have access to personnel qualified to judge whether a given test volume is meaningfully economic at prevailing gas prices, including consideration of how quickly the well's initial output would decline. |
| 2303 | I am very concerned that the Bureau not make irrevocable decisions adversely affecting our limited long-term water supply in order to promote the short-term access to the more temporary energy resource. When the natural gas is developed and gone, we will find other energy resources; but when the water is exhausted, or polluted, we may not be able to replace that water resource. However, I clearly recognize that the Bureau, representing the USA, take all reasonable and prudent steps to reasonably develop the nation's energy resources in order to meet the nation's energy needs, but do so effectively balancing, planning and protecting the many other resources it is responsible to manage and protect. |
| 2304 | I am very concerned that the Bureau conduct the necessary planning and take into account the best available information to so as to ensure that: That local wells, springs and potable ground water aquifers, currently developed and available in the future will not be contaminated or adversely affected by natural gas drilling and development |
| 2305 | That all US citizens, local and distant, will not see their water resources, potable and otherwise, adversely affected by the short-term access to the natural gas resource |
| 2306 | Drilling pads, access roads and all areas disturbed in order to access the natural gas resource are planned accordingly to prevent soil erosion and require the best available and most appropriate reclamation and remediation following natural gas drilling and development |
| 2307 | Compressor- and pump-stations are effectively planned and located so as not pose a safety threat to local residents, both within and without the federal land boundary, and not present adverse visual, noise or reasonable land use impacts |
| 2308 | Access roads are effectively planned so as to prevent and avoid dust and hazard as the natural gas resource is developed and produced |
| 2309 | The Bureau through its planning and resource management role, that the energy companies through their planning role and the regulatory authority through its permitting and enforcement role will ensure that air, water and wildlife habitat quality and general natural resource health and welfare will not be degraded as a result of natural gas leasing, permitting, or unitization decisions |
| 2310 | That the Bureau will do its best within the flexibility of federal, state and local laws and regulations to prohibit oil and gas development on private land within a unitized area without the written permission of the surface property owner |
| 2312 | I am writing to express my deep concerns about continuing to sell permits for oil and gas drilling within the public lands in which you manage. |
| 2314 | My first concern is for the safety of the water within our watershed of the North Fork of the Gunnison River. If the water within this watershed is contaminated in any way my livelihood will be gone. When I watched presentations by the oil and gas companies last weekend, I was deeply concerned by the issues they failed to address. Even if the depth of drilling is different than the surface water sources, there was no discussion of evaporation ponds, spillage, or transportation of fracturing fluids, to name a few. Given the current record of mistakes around western Colorado by this industry, I ask that protection of water resources as well as air quality be number one on your priority list for resource management. If the air and/or water quality in our area are compromised in any way, that will greatly affect the management of all other resources! |
| 2317 | I would like to voice my concerns about the current coal bed methane gas leasing and production on public land. I like to hike and ski in the Colorado back country and am saddened to see so much of the land I love be under lease for gas drilling. I do not believe this land should be leased for drilling until it can be proven absolutely safe. |
| 2389 | Drilling, drilling and more drilling until every patch of our federal land is spoiled with stinking oil or gas operations, cut up with roads and pimpled with pits and dumps...Not the way to go. |
| 2399 | I recently watched a TV documentary on the "fracking" method of extracting gas and oil in Colorado and other states that is highly hazardous to the health of residents due to the resulting water supply contamination. The devaluation of homes and property in the affected areas was devastating, but the worst ramification was the severe, chronic and irreversible health issues suffered by humans and animals. PLEASE do not allow |

BLM_0067235

**Table C-16**
**Issue 2: Non-renewable Energy Development**

| Comment ID | Comment |
|---|---|
| | unrestricted mining! |
| 2409 | Please protect this area as much as possible from off road use and drilling for oil and gas. This is a great place for people who want peace and quiet. |
| 2451 | Must we pave all the parks? Please allow for some natural areas devoid of mining and drilling. |
| 2477 | We have lost so much of our natural Wilderness to development and oil and gas drilling. We must protect what little remains. |
| 2479 | Thank you for giving me the opportunity to comment on the Uncompahgre RMP revision. The Uncompahgre Field Office encompasses some of Colorado's most beloved wilderness-quality lands, wild rivers, and opportunities for quiet, backcountry recreation. The resource area is also home to important and imperiled wildlife, such as Gunnison sage grouse, that rely on large intact tracts of habitat free from roads and other infrastructure. Please keep Big Oil out of this land as these lands are dwindling every day by the greed of the Oil Industry to control our public lands and our government with this obscene profiteering to keep us addicted to their product and prevent us from finding and developing alternative energy sources that don't contribute to the acceleration of global warming. |
| 2486 | Any oil and gas development is comparatively meager in its usefulness and value over the long run, especially when the carbon dioxide liability is subtracted |
| 2489 | No oil or gas development should allowed under the RMP should be allowed, because even if oil and gas development is carefully constrained, the idiots who run those things will create a hazardous environmental threat, even if BLM leaseholds agree to be subject to phased development that minimizes damage to unique natural features, essential wildlife habitat, and other sensitive areas |
| 2494 | The thought of allowing uranium mining or gas and oil development is just wrong - and off-road vehicles should never be allowed. All of these things will destroy the magic that was millions of years in the making. It makes me shudder to even think that this is being considered |
| 2504 | Thank you for the opportunity to comment on the Uncompahgre RMP revision. No off-road vehicle use, fossil fuel drilling, or mining should be allowed. Protect the land's biological integrity. |
| 2518 | Any oil and gas development allowed under the RMP should be carefully constrained so that it minimizes damage to unique natural features, essential wildlife habitat, and other sensitive areas. |
| 2524 | To the extent that any new oil and gas development is going to occur-and we need to keep it at an absolute bare minimum-it MUST be kept securely FAR AWAY from sensitive areas like the Dolores River Basin and the Uncompahgre. |
| 2615 | No mineral, oil and gas leasing or development should occur in roadless and/or wilderness quality lands or habitats for sensitive species |
| 2616 | No new leasing should be allowed until existing leases expire or are developed. |
| 2692 | If you can put a stop to this, do it. This country has GOT to get serious about weaning itself off fossil fuels and developing green alternatives. We just have to. To allow the pillaging of this precious natural resource merely to stall the arrival of the inevitable -- the end of fossil fuels -- is unconscionable. (And we still don't know what to do with nuclear waste.) |
| 2830 | Oil and Gas Management a. Scope of Oil and Gas leasing BLM must consider the following when deciding which areas to allow fluid mineral leasing and development: 1) the BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for oil and gas development. 43 U.S.C. § 1712(c)(1); 2) BLM must consider a reasonable range of alternatives in regards to areas open to oil and gas leasing. 40 C.F.R. § 1502.14; and 3) any decision which leaves the vast majority of the field office open to oil and gas development will preclude the effectiveness or long term viability of any conservation measures as there is always the potential that those conservation measures could be jeopardized by oil and gas development, regardless of how low the potential for development is currently. 1. The BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for oil and gas development. FLPMA obligates the BLM to abide by the principles of multiple use and sustained yield, especially during the land use planning process. Specifically, multiple-use is defined as: ...the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and |

BLM_0067236

## Table C-16
## Issue 2: Non-renewable Energy Development

| Comment ID | Comment |
|---|---|
| | fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output. 43 USC. § 1702(c). The definition of multiple use makes it clear that the BLM is obligated to manage the land for a number of resources other than oil and gas leasing, and states specifically that the BLM should manage some land for less than all of the resources and should not always be concerned with managing the land in order to receive the greatest economic return. The definition of multiple-use makes it clear that simply because a particular resource exists does not mean that the BLM needs to be able to extract that resource for a profit. It is well within the realm of BLM's multiple-use mandate to not have a significant portion of the Uncompahgre Field Office open to oil and gas leasing. Further, BLM should consider alternatives which choose not to re-lease areas formerly leased when those leases expire or are terminated. Areas where there are specific resource concerns or that are identified as important habitat should be considered for other uses besides oil and gas leasing. These areas may include, but are not limited to: Areas of Critical Environmental Concern, Special Recreation Management Areas, Potential Conservation Areas, critical habitat, areas with cultural resources, proposed wilderness and lands with wilderness characteristics. BLM's answer to charges that it is not adequately protecting resources from oil and gas impacts is often to provide leasing with No Surface Occupancy (NSO) stipulations. While NSO stipulations are a marked improvement over offering leases with standard lease terms, it is important to note that NSO stipulations do not necessarily resolve the wildlife and other resource concerns associated with oil and gas leasing. There are adverse consequences to wildlife associated with oil and gas development, regardless of whether or not there is an NSO stipulation on the lease. An example of this, noted by Clait Braun (2006) in A Blueprint for Sage-grouse Conservation and Recovery, a copy of which is attached to these comments, is that "oil and gas development influenced the rate of nest initiation of sage-grouse in excess of 3 km of construction activities.- Clearly, the amount and (likely) frequency of noise associated with development has major negative effects on greater sage-grouse." Further, BLM often offers companies exceptions, modifications or waivers from the application of NSO stipulations. Having NSO stipulations on a majority of the lands within the field office is better than allowing surface occupancy in terms of wildlife and resource concerns, but that does not supplant the BLM's obligation to manage for a variety of resources, of which oil and gas is only one. 2. NEPA requires the BLM to consider and evaluate a reasonable range of alternatives for oil and gas development. The range of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. NEPA requires BLM to "rigorously explore and objectively evaluate" a range of alternatives to proposed federal actions. See 40 C.F.R. §§ 1502.14(a) and 1508.25(c). "An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action." Northwest Envtl Defense Center v. Bonneville Power Admin., 117 F.3d 1520, 1538 (9th Cir. 1997). An agency violates NEPA by failing to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. City of Tenakee Springs v. Clough, 915 F.2d 1308, 1310 (9th Cir. 1990) (quoting 40 C.F.R. § 1502.14). This evaluation extends to considering more environmentally protective alternatives and mitigation measures. See, e.g., Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094,1122-1123 (9th Cir. 2002) (and cases cited therein). For this Draft RMP, the consideration of more environmentally protective alternatives is consistent with the requirement of FLPMA to "minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved." 43 U.S.C. §1732(d)(2)(a). NEPA requires that an actual "range" of alternatives is considered, such that the Act will "preclude agencies from defining the objectives of their actions in terms so unreasonably narrow that they can be accomplished by only one alternative (i.e. the applicant's proposed project)." Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1174 (10th Cir. 1999), citing Simmons v. United States Corps of Engineers, 120 F.3d 664, 669 (7th Cir. 1997). This requirement prevents the EIS from becoming "a foreordained formality." City of New York v. Department of Transp.• 715 F.2d 732, 743 (2nd Cir. 1983). See also, Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002). In order to comply with NEPA, BLM must consider a broad spectrum of alternatives in regards to which lands will be available for oil and gas leasing. A Draft RMP which leaves all the lands within the planning area open to oil and gas leasing or only allows for very slight differences between the alternatives in this regard fails to meet the "reasonable range of alternatives" directive. BLM has an obligation to rigorously explore and evaluate a range of alternatives. 3. A decision which leaves the vast majority of the Field Office open to oil and gas development necessarily negates the effectiveness or long term viability of any conservation measures as there is always the potential that those conservation measures could be jeopardized by oil and gas development. regardless of how low the potential for development is. BLM has an opportunity in this RMP to make great strides in conservation and habitat restoration. However, the |

BLM_0067237

**Table C-16**
**Issue 2: Non-renewable Energy Development**

| Comment ID | Comment |
|---|---|
| | long term viability of these strategies, programs and goals could be severely impacted by oil and gas development. Oil and gas development is known to cause a variety of problems that are detrimental to wildlife, and by leaving nearly the entire planning area open to leasing, the BLM may undermine any conservation efforts or goals it identifies in the RMP. The West is pockmarked with many places which were left open to oil and gas leasing based on the belief that these areas had low potential for development. As a result, when an economically recoverable reservoir of oil and/or gas was discovered, the area had insufficient protection measures in place. This lack of forethought has created many problems for wildlife and other resources. The impacts from oil and gas development are now well known, as such, areas of high ecological or cultural resource density should simply not be available for leasing. For example, Clait Braun, a leading researcher on sage grouse in the west, has stressed the impacts that oil and gas development can have on sage grouse populations: Road building, well pad construction, and noise disturbance associated with oil and gas development can fragment effective sage grouse habitat and compromise the quality of seasonal use areas. In addition, by creating more linear areas and smaller habitat patches, energy development can boost predation rates on sage grouse. So, for a variety of reasons, major oil and gas development reduces the area useable by sage grouse, which often leads to greater isolation of populations and a reduced ability to handle droughts, severe winters, or other natural disturbances20 BLM simply cannot expect to have ecologically effective sage grouse habitat, or any other type of important wildlife habitat, and unlimited oil and gas development in the same area. A situation arrives in which the goals, programs, and designations BLM uses to protect a valuable resource is only effective until such time that the right technology and/or price of oil and gas reaches a point that a previously non-economically extractable supply becomes economically extractable, or until a previously unknown supply not thought to exist is discovered. History tells us that BLM must consider the impacts of oil and gas development across the planning area and close areas which have important wildlife, cultural, or wilderness values. Recommendations: In order for the BLM to comply with FLPMA and NEPA the agency should, at a minimum, consider and "rigorously explore" the possibility and design alternatives which do not leave a significant portion of the Field Office open to oil and gas leasing. See 43 U.S.C. § 1712(c)(1) and 40 C.F.R. §§ 1502.14(a) and 1508.25(c). We recommend, at a minimum, that the areas identified as having "low" oil and gas potential be removed from consideration for leasing. Further, BLM must consider a range of alternatives that will address what to do with currently leased lands which are not developed and are either terminated or expire. Not allowing oil and gas leasing in these areas would help the BLM move towards meeting its goal of managing the federal lands within its jurisdiction for a variety of uses, not primarily for oil and gas leasing. For lands which area identified as appropriate for leasing, a variety of non-waivable stipulations, conditions of approvals (COAs), and Best Management Practices (BMPs discussed later) should be developed to protect the many resources present in the planning area. 20 This paragraph is adapted from detailed scoping comments on Upper Green sage grouse population trends and management issues prepared by Dr. Braun and submitted to the Pinedale BLM in October, 2002. Contact Linda Baker, Upper Green River Valley Coordinator (307-360-7198) to receive a copy of his 14 page comment letter. |
| 2831 | Additional Impacts of Oil and Gas leasing NEPA requires that federal agencies take a "hard look" at the direct and indirect environmental impacts of oil and gas development before any action that will lead to such development takes place. See, e.g., Pennaco Energy, Inc. v. U.S. Department of the Interior, 377 F.3d 1147 (10th Cir. 2004); Conner v. Burford, 848 F.2d 1441 (9th Cir. 1988); Sierra Club v. Peterson, 717 F.2d :1.409 (D.C. Cir. 1983). NEPA's regulations further provide that the "effects" on the environment that agencies must consider include those that are "direct, indirect, or cumulative." 40 C.F.R. § 1508.8. The NEPA regulations define "cumulative impact" as: the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. 40 C.F.R. § 1508.7. (emphasis added). The analysis of impacts included in the FEIS must adequately address the cumulative impacts of oil and gas operations within the region or the impacts inherent in the proposed action. Federal case law amplifies that agencies must disclose the direct and indirect environmental effects a federal action will have on non-federal lands. See City of Davis v. Coleman, 521 F.2d 631, 677-81 (9th Gr. 1975) (where federal approval of highway project likely to have impacts on development of surrounding area, agency must analyze development impacts in EIS); Coalition for Canyon Preservation v. Bowers, 632 F. 2d 774, 783 (9th Cir. 1980) (same); Sierra Club v. Marsh, 769 F.2d 868, 877-89 (1st Cir. 1985) (striking down EA where agency failed to account for private development impacts likely to result from its approval of causeway and port facility); Mullin v. Skinner, 756 F.Supp 904, 920-22, (E.D. N.C. 1990) (striking down EA where agency failed to account for private development impacts likely to result from agency approval of bridge). Such impacts must be disclosed, |

BLM_0067238

**Table C-16**
**Issue 2: Non-renewable Energy Development**

| Comment ID | Comment |
|---|---|
|  | particularly where facilitating private development may be the project's "reason for being." See Citizens Comm. Against Interstate Route 575 v. Lewis, 542 F.Supp. 496, 562 (S.D. Ohio 1982). BLM must consider impacts of region-wide development and also consider impacts on private lands. Existing development from neighboring planning areas as well as development within the field office affects the Uncompahgre planning area. Similarly, although the BLM may not have formal control over adjacent private lands, these lands can also be affected by oil and gas development. The impacts of oil and gas development do not recognize management boundaries. Recommendation: In considering the need and ways to manage these lands to protect the many resources of these public lands, the agency must consider the cumulative impacts from regional oil and gas development and the cumulative impacts to adjacent lands from oil and gas development. This analysis should inform the manner in which BLM allocates lands as available or unavailable for oil and gas development and the conditions under which development may be permitted. |
| 2832 | Best Management Practices Significant portions of the Uncompahgre RMP planning area will likely remain open to oil and gas development. As discussed with respect to the many other values of the lands within the planning area, many of these lands should not be open to leasing and others require non-waivable lease stipulations to protect their resources, such as wildlife habitat, water quality and wilderness characteristics. It is vital that the RMP require the use of best management practices (BMPs) for oil and gas exploration and development, which can drastically reduce the impacts of oil and gas development on the other natural resources of the public lands. BLM's guidance requires consideration of BMPs for oil and gas development. BLM's Instruction Memorandum 2004-194 directs consideration of BMPs and both the IM and the recently updated Gold Book provide examples of BMPs that can be applied to both new and existing leases, in order to limit the damage from oil and gas development. It is critical that the RMPs consider and make BMPs mandatory in order to comply with BLM's guidance and obligations to protect the many natural values of these lands. Recommendations: The Uncompahgre RMP must identify BMPs and make them mandatory, especially in sensitive areas. BMPs should include:<br><br>• Phased or strategic development - in terms of timing (developing one area, then restoring before moving to another), location (such as staying out of big game corridors), limiting amount of equipment in use at any given time, limiting amount of surface disturbance on a lease at any given time and requiring successful restoration before permitting additional disturbance;<br>• directional drilling;<br>• clustered drilling;<br>• closed loop drilling;<br>• interim reclamation;<br>• restoration standards;<br>• unitization; and<br>• increased bonding. |

BLM_0067239

**Table C-17**
**Issue 2: Minerals and Mining**

| Comment ID | Comment |
|---|---|
| 180 | I feel that a vocal minority of anti-access groups have pressured the BLM to restrict resource exploration including gas and coal at a time when our nation needs these resources to reduce our dependency on foreign resources purchased from countries that don't particularly like Americans. We need monitoring and governance but we need to continue/increase our use of these resources in a way that is beneficial to all Americans and will help us reduce our dependency on foreign resources. |
| 190 | I also feel more land needs to be made available for the publics good, including resource exploration, powerline construction, and general community uses. |
| 209 | BLM planning must balance a lot of conflicting wants. But BLM needs to preserve access to minerals, coal, oil and gas, uranium and sand and gravel. These minerals are used to provide needs to the nation, jobs to residents tax revenue to governments. Land removed from development reduces all of the above. |
| 256 | Locatable minerals- Reclamation lands are generally closed to location of minerals, but there may be some valid existing rights related to locatable minerals that should be addressed |
| 257 | Leasable minerals- Where Reclamation lands are underlain by federal leasable minerals or resources, Reclamation determines whether or not leasing is permissible. Also, BLM will not issue permits, leases, or licenses on lands under Reclamation management without Reclamation's consent and concurrence on all conditions and stipulations |
| 258 | Mineral materials- The sale of mineral materials on Reclamation lands falls within the responsibility of Reclamation. |
| 485 | My family came to Ouray Colo. In the late 1890's and helped develop and mold Colorado as we know it today just like the timber and cattle industry did, so… …In my opinion there are to many regulations and imposition on our lands today, please continue to let us protect in a recreational way and enjoy our out doors the way the good lord has intended for us to do. |
| 492 | Ranching, placer mining, uranium mining, wildlife developments, recreation are among some of the areas for growth. |
| 568 | Uranium should be left in the ground… it's a non-renewable resource and mining it can't go on forever anyway. |
| 628 | Finally, I'm hoping you'll take a hard look at uranium development in that area, and protect land, water, wildlife and residents with sensible development. |
| 767 | Coal resources exist in the RMP that are in jeopardy of being locked up by overzealous regulation by Roadless and other regulatory devices. These resources will be needed by future generations and should be kept available. Coal Creek Leroux Creek, NF Valley, Huntsman Ridge, Raggeds Field. |
| 921 | There should be no new coal leases unless the land is adjacent to an existing active coal lease. Capture of methane from coal mines should be strongly encouraged, perhaps as a stipulation of coal leases. |
| 923 | Uranium mining should not occur near domestic or irrigation water sources or near any flowing or subsurface water. |
| 1069 | NO OPEN VENTING OF METHANE from coal mines; |
| 1199 | The 1989 Uncompahgre Basin RMP proposed that both Fairview and Needle Rock ACECs be withdrawn from mineral entry and location to assure that mineral exploration and development do not result in the degradation of their natural features. CNAP recommends the continuation of mineral entry withdrawals. |
| 1202 | Both Natural Areas have been closed to disposal of mineral materials in the 1989 Uncompahgre Basin RMP. We recommend continuation of this closure. |
| 1319 | We are a Colorado limited liability company in the uranium and vanadium business with significant property holdings, much of which is mineral rights on BLM-administered lands. We appreciate the opportunity to provide input for your revisions to the RMP. |
| 1322 | We know that many people either choose to ignore legal mineral rights or simply do not understand the laws of our land. We are confident that the BLM does understand the law and trust that any revisions to the RMP will not be an attempt to take away legally existing and acquired property rights (nor be a defacto takings by making access or development of mineral rights unnecessarily delayed, overly cumbersome or unjustifiably cost prohibitive). |

BLM_0067240

## Table C-17
## Issue 2: Minerals and Mining

| Comment ID | Comment |
|---|---|
| 1326 | So, while you ask for input via RMP Planning Fact Sheet 7.2 "Are public lands that should be withdrawn from mineral entry because of conflicts with other public land uses?" we candidly wonder why the question isn't "why aren't public lands so uniquely mineralized with such an important resource not withdrawn from other public land uses and reserved solely for mineral extraction?" We hope this is not a BLM bias against mineral activities. |
| 1327 | In any event, there is no other area like this in the rest of the U.S. Given the planned development of the DOE lease blocks, and given the inability to mine uranium where it wasn't deposited (contrasted with many alternatives for most recreation uses), we think it makes sense for BLM to develop a uranium district as the highest and best use of the land in the western end of the RMP and for our entire country. |
| 1331 | If BLM wishes facilitate economic growth in the uranium sector, we have a few thoughts that begin and end with anything that streamlines the permitting process. You may be aware that Behre Dolbear Group Inc., a prominent worldwide minerals industry advisory firm founded in 1911, just released their annual ranking of countries for mining investment. The U.S. was dead last in the world for permitting delays (for clarification, "the issue addressed here is not the strength of the regulations but the timeframe involved in obtaining permits"). Any positive change will encourage investment. |
| 1335 | That said, when this topic is discussed, we would encourage BLM to distinguish between the standards of today and the standards of yesteryear. Clearly, the mining industry was not perfect. Clearly, our government encouraged rapid extraction at any cost when our nation was trying to defeat our enemies and tyranny in WWII and has a great deal of responsibility they assumed then (but which seems to get forgotten now). Clearly the governmental standards were different back when. |
| 1352 | That public lands, containing potential coal resources of the Dakota Formation, be recognized, made ·available for potential leasing, and delineated on the revised RMP maps. |
| 1353 | That coal exploration drilling be recognized and spelled out as an allowable and expected activity on public lands containing potential coal resources. |
| 1354 | Coal exploration drilling could be conducted under the purview and stipulations of such authorizations as the old "special land use permit" (SLUP), the Federal "Coal Exploration License", or Colorado DRMS's Notice of Intent (NOI) to Conduct Coal Exploration. |
| 1355 | The desire to explore for potential coal resources on public land, be it one hole or dozens, should not trigger a full-blown Environmental Assessment. |
| 1380 | Recognize that the minerals contained in our public lands belong to all of us and that no one should be allowed to extract them except as a service provided to the public. |
| 1381 | Recognize that mineral resources have a much greater value than the cost of extracting them from our public lands, and that we are all entitled to the royalties that come from their sale. |
| 1627 | Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor. BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:<br><br>• prove that there will be no harm to both surface and ground water quality and quantity;<br>• prove that the long-term ecological health of the area will not be jeopardized;<br>• have viable reclamation plans in place before permits can be granted; and<br>• have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation. |
| 1631 | For the entire planning area, BLM should prescribe strict conditions for uranium mining, to make sure the damage to the natural values are minimized. Provisions should be included for disposal of any radioactive or contaminated waste materials, so miners will not leave these toxic wastes for the taxpayers to clean up, as often happened in the past. BLM must be sure all mining operations are properly bonded under applicable state and federal laws. |
| 1645 | Have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation. This last point is so important after CO citizens have been saddled with a billion dollars in clean-up due to past inadequate bonding. |

BLM_0067241

**Table C-17**
**Issue 2: Minerals and Mining**

| Comment ID | Comment |
|---|---|
| 1646 | I am part of a large group of CO citizens that believes there is NO viable long-term plan for materials taken from radioactive geologic strata, and that allowing more such mining to occur is very unwise. |
| 1650 | Western Colorado is an important area for me as a hiker and camper. I have recently visited the old uranium mining area south of the current area in question. It was horrifying to me to see the state of the land left by the miners in SW Colorado. Once beautiful country is now torn up by the miners and their vehicles. This damage will take millenia to heal. |
| 1652 | As someone seeking the beauty nature provides, I do not find solace here. Nor can I walk anywhere without worrying about radiation exposure. PLEASE do not turn more of Colorado's beautiful land into another disaster zone. Can you not see how irreplaceable it is???? |
| 1691 | The BLM must put the health and safety of the land and people ahead of mineral extraction. |
| 1692 | The BLM should not allow new coal leases in areas not adjacent to existing mines. |
| 1693 | The BLM should find a way to ensure that methane vented from coal mines can be captured and used. |
| 1695 | The BLM must ensure that uranium mining does not jeopardize the surface and ground water quality or the long-term ecological health of the area. |
| 1705 | It would be really fantastic for the BLM to insure sufficient regulation to encourage miners and companies to also be good stewards of our land, including exploring technologies for re-using and recycling, such as methane capture and re-use, to minimize human impacts relative to resource extraction. Please limit creating additional roads for natural resource mining as well, and look very strongly at water conservation and contamination. |
| 1772 | The RMP should impose strict limits on uranium and other mining to protect our land, air and water. |
| 1866 | Uranium Mining The revised management plan needs to address conditions that will be placed on future uranium mining in the planning area. There is established federal case law that mining operations must comply with land management plans, and that federal agencies have the authority to restrict or prevent mining based on compliance with land management plans. We request that the RMP prohibit mining related activities in areas of ecological significance such as river corridors, WSA's and ACEC's as well as SRMA's to protect quiet recreational experiences. All permitted mines must: prove that there will be no harm to both surface and ground water quality and quantity; prove that the long - term ecological health of the area will not be jeopardized; have viable reclamation plans in place before permits can be granted; and have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation. BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. The BLM must follow up with a regular inspection and monitoring program to ensure that violations are not occurring or not allowed to occur over a long period of time. |
| 1867 | We also urge reclamation and restoration of past uranium mining scars within the planning area. |
| 2024 | Rock extraction We question the advisability of permitting rock operations that extract rocks from Dakota Sandstone rim rocks. Rocks hold soil in place and provide scenic value to these lands that should not be shipped to Aspen. |
| 2050 | The revised management plan needs to address conditions that will be placed on future uranium mining in the planning area. There is established federal case law that mining operations must comply with land management plans, and that federal agencies have the authority to restrict or prevent mining based on compliance with land management plans. |
| 2053 | All permitted mines must have viable reclamation plans in place before permits can be granted; and have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation. |
| 2054 | BLM must ensure that all state and federal laws are applied to any permitted mines. |
| 2257 | The BLM should only allow new coal leases in Inventoried Roadless Areas where the leases would be adjacent to existing mines. The pristine sections of the Grand Mesa National Forest on the south slope of the Grand Mesa that have been designated as IRA represent the only remaining link for wildlife travel/migration between the wilderness areas of the Elk Mountains and the Grand Mesa. Linkages such as these are crucial to maintaining genetic diversity among resident populations of all species in this area. |
| 2259 | The BLM should find a way to ensure that methane vented from coal mines is captured and used. |

BLM_0067242

C. Comments by Resource Planning Issue

**Table C-17**
**Issue 2: Minerals and Mining**

| Comment ID | Comment |
| --- | --- |
| 2281 | The revised management plan needs to address how uranium mining will occur to ensure proper protections and prohibit leasing within the river corridors. BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. |
| 2282 | All permitted mines must: Prove that there will be no harm to both surface and ground water quality and quantity |
| 2283 | All permitted mines must: Prove that the long-term ecological health of the area will not be jeopardized; |
| 2284 | All permitted mines must: Have viable restoration plans in place before permits can be granted; |
| 2285 | All permitted mines must: Have an adequate bonding mechanism in place sufficient enough to cover the entire cost of restoration. |
| 2505 | Thank you for the opportunity to comment on the Uncompahgre RMP revision. No off-road vehicle use, fossil fuel drilling, or mining should be allowed. Protect the land's biological integrity. |
| 2510 | Mining activities should be carefully restricted in order to prevent damage. |
| 2511 | Better yet, ban all mining that destroys our America's natural wonders. |
| 2519 | The RMP should impose strict limits on uranium and other mining to protect our land, air and water from the toxic as well as unsightly byproducts of mining. |
| 2544 | Enough of the permanent damage wrought by mining and other extractive industries. Let's keep this breathtaking spot safe from the profit motive. Our children's children will thank us if you have the courage to act as responsible stewards, as you should. |
| 2551 | Please tell me that you did learn from history. Remember the silver and gold mining in the past and what it did to the waterways with arsenic contamination. |
| 2559 | The Uncompahgre RMP revision should, in my opinion, include: 3. Limit resource extraction |
| 2569 | I expect that, consistent with the above, the Bureau may identify areas within the Plateau that are suitable for energy and mineral development. Any such development should be limited to those areas, and the RMP should identify state-of-the-art regulatory requirements to ensure minimal direct and indirect adverse impacts to land, air, and water media. |
| 2572 | I want MORE quiet wild lands, NOT less, and NO mining of any kind. This land belongs to WE the PEOPLE, NOT greedy developers, who rape our lands for their own greedy PROFIT! |
| 2657 | Mining of all sorts should be carefully limited and renewable energy sources should be encouraged. |
| 2659 | Thanks for taking comments on the Uncompahgre RMP revision. When I first explored this area nearly 25 years ago I fell in love with it and was simultaneously dismayed by the obvious signs of resource extractions of all sorts. The effects of such extractions don't stay put neatly onsite, as you know. |
| 2669 | Mining and off road vehicles will only contaminate its waters and do untold damage to the environment |
| 2702 | Please keep extractive industries out as much as possible so as not to eliminate the publics choice in the matter in the future |
| 2711 | Another issue in this area is uranium mining, which has the potential to seriously impair the most basic of our natural resources such as air and water. Thousands of residents of southwest Colorado are hoping that such uranium development is not the continuation of unchecked energy expansion, which has cost Colorado over $1 billion in clean-up so far. |
| 2834 | Uranium The history of uranium mining and milling in the United States (and indeed, around the globe) is replete with environmental damage, serious worker safety and health abuses, and harm to entire communities. Many remote and unique landscapes continue to suffer the effects of an industry characterized by several years of speculation-driven booms followed by decades-long periods of inactivity. The affected communities have been both low income and in great measure comprised of rural and indigenous populations, representative of an all too common pattern of environmental injustice. Additionally, most of the environmentally damaged sites have not received adequate stabilization, let alone cleanup of past harms. Where cleanup and decontamination of the radioactive and toxic effects has been carried out, most of the cost has been borne by taxpayers rather than the owners of the largely Canadian-based companies who are engaged in the uranium mining and milling |

BLM_0067243

**Table C-17**
**Issue 2: Minerals and Mining**

| Comment ID | Comment |
|---|---|
| | industry, including Energy Fuels Inc, the Canadian based company proposing the Piñon Ridge Uranium Mill in the Paradox Valley. The RMP and NEPA analysis provides the opportunity and the duty for BLM to inventory these un-reclaimed mines and contaminated lands and to present the direct, indirect, and cumulative impacts of uranium mining, along with a robust set of alternative courses of action and mitigation measures which will guide the BLM in its ongoing attempts to handle abandoned mines in the Uncompahgre Field Office, while simultaneously attempting to consider and approve the industry's attempts to open new mines. The boom and bust of the uranium mining industry in the Uravan Mineral Belt has left un-reclaimed, abandoned and mining operations "temporarily on hold" waiting for the next boom. Many of these operations are using these sites as long-term storage for uranium ore, resulting in unnecessary and undue degradation of the land, air, water, and wildlife on which multiple uses of these lands depend. In addition to imposing strict standards for the handling and stockpiling of ore, wasterock, and overburden during actual mining operations, the RMP should impose an outright ban on the ongoing practice of using mine pads for the long-term storage of uranium ore. The BLM should acknowledge in the RMP that it has the authority to deny mining claims altogether to comply with FLPMA's requirement that, [i]n managing the public lands the Secretary [of the Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). The requirement to avoid unnecessary or undue degradation is the "heart of FLPMA [and] amends and supersedes the Mining Law." Mineral Policy Center, 292 F. Supp. 2d 30, 33 (D.D.C. 2003). Congress explicitly recognized that this requirement would "impair the rights of any locators or claims under the Act, including, but not limited to, rights of ingress and egress." 43 U.S.C. § 1732(b). Specifically concerning the Department of Energy Lease Program in the UFO the RMP should recognize that the BLM continues to have management authority over the lease tracts. The RMP must make management decisions in accordance with the public land laws, all of which still apply on uranium lease tracts co-managed by the BLM and DOE. Our review finds no applicable NEPA analysis of the BLM's past decisions or the BLM management duties as they apply to the ongoing activities on these lease tracts. Because of the unique and significant impacts posed by each of the uranium mines in the Uncompahgre Field Office, the RMP must include specific commitment that, for any proposed uranium mining projects, the BLM will evaluate all necessary, site-specific information within the requirements of an EIS. The process and analyses required in an EIS is necessary to protect the environment and public health, ensure that any recovery minimizes and mitigates negative impacts to sensitive resources like wilderness quality lands, clean air and water, wildlife habitat, cultural resources, and recreation opportunities. No federal agency has prepared a NEPA-compliant analysis of the cumulative impacts past, present, and future - of the uranium mining and milling activity in the Uncompahgre Field Office, which includes the Uravan Mineral Belt and the area shown by the map published by Energy Fuels to demonstrate the geographic scope of the uranium mining and milling activities in the Uncompahgre region. Such a cumulative impacts analysis should at a minimum include the cumulative impacts of uranium mining and milling on the quantity and quality of regional groundwater supplies, the cumulative impacts on regional airsheds, and the cumulative impacts on regional surface water supplies. Impacts to wildlife, and necessary restrictions and mitigation measures must be considered, especially the impacts to threatened and endangered species, sensitive species, and bats, which are attracted to mine sites. Additionally, in the RMP, the BLM should evaluate and identify practices that can be required to minimize the impacts on the other natural resources of the planning area by limiting water use and surface disturbances. Last, because circumstance may arise at the site-specific level where the impacts cannot be adequately mitigated, the RMP must recognize that field offices must consider a "no action alternative" and may choose to deny a mining or exploration request in such situations. Recommendation: BLM should protect areas from uranium mining where appropriate, thoroughly analyze the cumulative impacts of any proposed uranium. |

BLM_0067244

**Table C-18**
**Issue 2: Renewable Energy Development**

| Comment ID | Comment |
|---|---|
| 343 | Geothermal and solar power generation need close examination and strict rules before being allowed. Similar to O&G development this form of energy development should be strictly controlled in areas of outstanding scenic, natural or recreation value. Similar "no surface occupancy" and other stipulations should be developed for these energy activities. |
| 885 | We live completely off the grid with a solar electric system, and a solar thermal system that provides all our domestic hot water and some heat. My husband, Kerry Kalarney is an expert in this field, please refer to his comments. My knowledge of large-scale renewable is convincing enough to me that there is less impact on the environment than extraction of resources. |
| 1346 | Potential social and economic benefits and impacts from renewable energy development abound, however, it should be noted that a determining factor for the siting of renewable energy resources is the proximity and distance to roads and transmission lines. Utility transmission lines and associated facilities require access, which is fundamentally tied into renewable energy development. Tri-State requests that utility considerations continue to be incorporated in the decision-making process as a fundamental public health and safety requirement, partner in environmental stewardship, and a critical component of renewable energy development. |
| 1770 | BLM should designate zones for renewable energy development in the RMP, and limit renewable energy projects to those zones. |
| 2286 | Although we support the development of a strong renewable energy sector, we caution that large-scale alternative energy development projects, such as wind farms, solar arrays, or geothermal plants can cause the same types of harm to natural ecosystems as gas and other traditional energy projects. Therefore any proposed alternative energy projects should receive the same scrutiny and restrictions that we advocate for gas development herein. |
| 2459 | This land should also be protected from the encroachment of windmill power generation farms as they are no more than industrial development. |
| 2488 | Under the resource protection option of the RMP, if BLM should designate zones for renewable energy development in the RMP, and limit renewable energy projects to those zones, that is the most acceptable to me, in the absence of complete habitat restoration |
| 2501 | RENEWABLE ENERGY IS AT THE HEART OF AMERICA'S ENVIRONMENTAL PROTECTION DUTIES. MUCH BETTER THAN COAL, OTHER MINING, AND OIL EXPLOITATION OF OUR WILDLANDS |
| 2560 | The Uncompahgre RMP revision should, in my opinion, include: 4. Allow renewable energy activities but within boundaries. |
| 2640 | There have been and will always continue to be increasing demands on our wild resources. To simply give in and open up more and more of these areas to development at the expense of clean water, clean air, and natural areas is to continue to strangle our very existence. We must shift our attention to ALTERNATIVES, ALTERNATIVES, ALTERNATIVES. Not after we have exhausted our resources and destroyed our planet but NOW!! |
| 2658 | Mining of all sorts should be carefully limited and renewable energy sources should be encouraged. |
| 2672 | If you can stop all oil and gas development for the medium term we can scale up renewable and non-destructive forms of energy and save this unique region form the hideous destruction that always accompanies extractive industry |
| 2836 | Renewable Energy - The RMP should identify zones for renewable energy projects and limit all renewable energy development to those zones. Zones should be based on high-resource, low-conflict areas that are on already-degraded lands and near existing infrastructure. The BLM is already taking a similar approach in the ongoing Programmatic Environmental Impact Statement for Solar Energy Development and this RMP should designate zones for all types of renewable energy and then limit development to those zones. In addition, within the zones, BLM should prioritize lands that are most suitable for development, ensure adequate protective measures are imposed on development, and require both onsite and off-site mitigation of impacts to resources, as well as loss of uses (such as recreation). For off-site mitigation, we also direct BLM's attention to IM 2008-204, which describes the broad type of actions that may be taken to address both direct impacts of a project and greater cumulative effects that development is having on a landscape. IM 2008-204 identifies and elaborates on the types of offsite mitigation that can be used, stating: • Offsite mitigation may include, as appropriate: - In-kind: Replacement or substitution of resources that are of the same type and kind as those being impacted. -- |

*Uncompahgre Resource Management Plan Revision and EIS*
*Final Scoping Summary Report*

BLM_0067245

**Table C-18**
**Issue 2: Renewable Energy Development**

| Comment ID | Comment |
|---|---|
| | Example: For every acre of new, long-term surface disturbance in important sage-grouse nesting/early brood-rearing habitat in Area (A), (X) acres of unsuitable habitat in Area (B) is reclaimed, treated, or planted to create new or suitable nesting/early brood-rearing sage-grouse habitat. - Out-of-kind: Replacement or substitute resources that, while related, are of equal or greater overall value to public lands. -- Example: For every acre of new, long-term surface disturbance in important sage-grouse nesting/early brood-rearing habitat in Area (A), the project proponent agrees to bury (V) miles of existing power lines and remove the power poles used as hunting perches by raptors in Area (B). - In-lieu-fee: Payment of funds to the BLM or a natural resource management agency, foundation, or other appropriate organization for performance of mitigation that addresses impacts of a project. -- Example: The applicant may make payment to the BLM or a conservation group based on the amount of acres that will be disturbed in exchange for commitment from the recipient to apply the funds toward local sage-grouse core habitat protection/restoration projects. In the context of renewable energy development, there may be additional conservation priorities that can be pursued to mitigate the impacts of individual projects and BLM could being discussions with interested stakeholders to identify these potential targets for off-site mitigation efforts or funding. Recommendations: The Uncompahgre RMP should identify zones for all types of renewable energy development that prioritize high potential for energy development areas that contain degraded lands and are in close proximity to new transmission, while excluding sensitive conservation lands, such as citizen-proposed wilderness areas and ACECs. The RMP should also specifically preclude development outside the designated zones. Within the zones, the RMP should also set out prioritization criteria, which direct development to degraded lands and identifies other areas where development is more likely to lead to conflict, as well as setting out protective stipulations to safeguard other resources. We have provided a proposed "Sensitivity Based Prioritization for Development Areas Within Renewable Energy Zones" (attached to these comments) to be used by the Uncompahgre Field Office in implementing these recommendations. For off-site mitigation, BLM should provide for addressing a wide range of options to address the cumulative, far-reaching impact of renewable energy development (as set out in IM 2008-204) and should design a process to reach out to stakeholders and develop a set of conservation priorities to target in connection with off-site mitigation. |

BLM_0067246

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| 2807 | Recreation and Special Recreation Management Areas Using the language of Benefits Based Management, which emphasizes user "experience" rather than recreation "activity" or "resources," we would like to identify ourselves as representing a range of Quiet Use organizations whose hundreds of thousands of members are passionate about preserving traditional forms of recreation such as hiking, backpacking, non-motorized hunting, angling, horseback riding, and birdwatching. On BLM lands we and our members want to experience naturalness, quiet natural soundscapes, undeveloped scenery, an undisturbed natural landscape, the timelessness and geological sweep of the BLMs remote and rugged landscapes, a low level of facilities and management presence, and opportunities for uncrowded and solitary experiences. We want to be able to recreate in primitive, undeveloped, natural appearing settings. The experiences we are looking for are closeness to nature, a contemplative relationship with the natural world, savoring the total sensory experience of a natural landscape, escape from crowds, quieting our minds by escaping urban traffic and crowding, and a sense of humanity's place in the larger universe, as well as improved outdoor knowledge, independence, self reliance and a sense of adventure. We and our members are whole-hearted participants in these types of experiences with a keen interest in preserving for future generations these time-honored traditional experiences of the outdoors. |
| 2808 | Preservation, creation and enhancement of opportunities for quiet recreation. The recreation resource on public lands is becoming increasingly valuable: more people want to recreate on a finite amount of public land. As mentioned above, the vast majority of recreationists and other public land visitors desire solitude, clean air, clean water, vast undeveloped landscapes, and a place to witness healthy natural systems thriving with native plants and wildlife. The Uncompahgre Resource Area can provide a wealth of these types of experiences, encompassing many natural and scenic landscapes. The RMP should accommodate those desires as they are consistent with BLM Colorado's strategy for recreation management and the national BLM publication "Priorities & Goals for Recreation & Visitor Services." |
| 2809 | FLPMA and Off-Road Vehicle (ORV) Regulations Applicable to Noise: As discussed above, FLPMA requires the BLM to manage the multiple uses and resources of the public lands, which include fish and wildlife, watersheds, scenic values, recreation opportunities, scientific and historic values, and other natural values, such as wilderness characteristics. FLPMA also provides for the agency to do so by excluding or limiting certain uses of these lands. BLM's regulations relating to management of off-road vehicles, similarly acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." 43 C.F.R. § 8342.1 (emphasis added). Providing a "quiet" recreation experience, as also discussed in reference to opportunities for primitive, unconfined recreation and for solitude provided by lands with wilderness characteristics, also requires thoughtful management to provide for a quiet soundscape. Much research exists on the importance of natural sound to public land visitors. Noise impacts on the recreational experience have become a looming issue in today's noisy urban world. A recent study by the National Park Service showed that 91% of park visitors consider enjoyment of natural quiet and the sounds of nature as compelling reasons for visiting National Parks (McDonald, Baumgartner, and khan 1995). We recommend the UFO conduct a soundscape analysis to guide formulation of intended user experiences, for example by analyzing how canyon topography and vegetation might reflect or propagate vehicular sound and how that might affect quiet users, neighboring homeowners and wildlife habitat effectiveness. We ask that the alternatives specifically compare impacts of, and the potential for the increase of ORV noise on natural sound and other resources, consistent with the BLM's regulations. We have included a more detailed discussion on soundscape management later in these comments. The BLM's ORV regulations also provide for protection of other values that are critical parts of not only a healthy ecosystem on BLM lands, but also of enjoying quiet recreation activities, such as hunting, photography and bird-watching, requiring that management minimize "damage to soil, watershed, vegetation, air, or other resources of the public lands" and harassment of wildlife or disruption of habitat; and to prevent impairment of wilderness suitability or adverse affects on natural areas. 43 C.F.R. § 8342.1. Landscape level planning, including through use of the travel planning template attached to these comments and assessing road density, as described in more detail above, is another important tool for ensuring that quiet recreation opportunities are preserved. |
| 105 | NOLS is a SRP holder for rock climbing in the Uncompahgre RA. One of our primary concerns is continued access to climbing areas, specifically Paradox Valley, Unaweep Canyon, and Escalante Canyon. |
| 115 | Trails in the Ridgway area for Hiking and Biking. |
| 140 | TMW commends the effort of the BLM to encourage public participation during the revising of the RMP. The |

### Table C-19
### Issue 3: Recreation Management

| Comment ID | Comment |
|---|---|
| | opportunity for public input is appreciated giving us input into the planning process. While we find the Mesa State College community-based focus group meetings that are designed to better understand the public's desires for recreational planning are no doubt fruitful, we do however feel that individual meetings with the various user groups would be more beneficial in the planning process where you could hear first hand on the specific user groups concerns. |
| 148 | Motorized recreation is the fastest growing type. of recreational activity in the country and WOHVA appreciates the stress that this growth is putting on the roads and trails in all of our National Forests. WOHVA encourages all OHV enthusiasts to recreate responsibly and enjoy the great outdoors. This increase in use has put additional congestion on already crowded roads and trails. |
| 149 | With this additional and growing demand for motorized recreational opportunities, WOHVA does not support any Forest Plan which does not list as an alternative the expansion of motorized recreational riding opportunities. |
| 150 | WOHVA encourages the Forest Service to work with motorized recreational groups to develop a partnership with these groups. It is our belief that by working with motorized recreational volunteer groups the Forest Service can find solutions to some of their financial and budgetary restrictions. |
| 151 | The geographic scope of the RMP in the recreation section must include many recreation opportunities not located in the FO. For example: Those wishing a non motorized experience have many opportunities within a short distance from the towns and villages near the BLM lands. Black Canyon of the Gunnison National Monument, The Gunnison Gorge NCA, Dominguez Escalante NCA and Wilderness, McInnis Canyons Wilderness, and the numerous Wilderness areas in the neighboring National Forests. All existing, previously designated recreation zones for each type of experience must be taken into account during the analysis |
| 153 | We feel that the team must look at the recreation portion of the plan with a scope of all of western Colorado. The Uncompahgre FO surely is a regional recreation resource. |
| 154 | A well executed EIS must rely on a complete and accurate inventory of recreation opportunities and routes. A through description of the activities and the benefits to the participants and the community is essential for a meaningful analysis. Real visitor numbers of participants in the activities and the seasons of use are essential data needed to make statistically relevant decisions and determine the scale of effects by alternative. |
| 155 | An accurate representation of the current management situation is essential. The scale of effects can only be analyzed if an accurate no action alternative is presented. |
| 157 | We suggest that due to the seasonal availability of land within the FO boundaries and the broad spectrum of recreational activities combined with the low visitor counts: the segregation of visitors and the zoning of activities is not an appropriate scheme for recreation management in the FO. Rather the FO can rely on the good sense of the public to decide which locations and seasons are best suited to their chosen activity. |
| 159 | Of particular interest to us is the southwestern portion of the FO. Beginning at Blue Mesa and continuing southwest to the intersection of highways 141 and 145.and east to the Utah border. The area north of 141 is open to cross country travel. It contains many miles of low-grade roads that are very high value recreation resources to our members. Similarly, the area south of 141 has many miles of high value recreation roads as well as beautiful slick rock formations. We hope to continue to be able to access these routes and slick rock formations that are important for scenic value and high skill riding opportunity. We recommend that these areas be managed as dispersed recreation areas with an emphasis on motorized recreation. |
| 160 | The Dry Creek area just west of Montrose works well as an urban interface multiple use recreation area. We hope it will retain the present character. |
| 171 | This discriminatory segregation of historically shared multiple use routes is my main concern. I request the RMP planning team to be cautious of influence from the anti-multiple use community towards protecting/outlawing said routes from their historical uses. |
| 172 | The non-mechanized public land visitors have multiple choices of recreation opportunities within a short distance from the towns and villages near these BLM lands. These lands have been set aside specifically for these visitors. |
| 174 | I also believe the multiple use designation of public lands within the UFO is a huge asset towards current and future economies of the surrounding communities. Lots of businesses rely on multiple use access granted |

BLM_0067248

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| | towards these lands. |
| 181 | Regarding recreation, it seems that there are user conflicts between motorized recreation and non-motorized recreation. I enjoy hiking, fishing and hunting on public lands, if I am hiking on a motorized trail, I take this into consideration and expect to encounter motorized vehicles, this does not bother me, if it did bother me, I would simply hike on a non-motorized trail. |
| 182 | On several occasions we have come upon hikers and horseback riders who have scowled and cast unpleasant looks our way and refused to return our friendly wave. All I can say is I hope these hikers or horse owners never become old or ill because if/when they do, the might find themselves on a dreaded ATV, getting nasty glares from a new generation of hiker or horseback rider. For these reasons I would encourage the BLM to increase motorized opportunities and clearly mark trails as either open or closed to motorized travel. During my many hikes I have NEVER seen a motorized vehicle on a non-motorized trail. Motorized recreation is a legitimate use of public lands, just as horseback riding and hiking are. |
| 185 | I would like to see more land developed and opened for recreation of all forms. |
| 189 | It seems more and more areas are either closed or the size reduced, which concentrates all users into smaller and smaller areas where conflict is more likely to arise. If we have more land open to recreation, then we will have fewer conflicts. |
| 195 | Today's kids are glued to electronic gadgets and spend most of their time on a couch and will never get an appreciation for the outdoors if all the land is locked up and the only way for them to enjoy being outside is to go for a hike. Today's youth need places to ride mountain bikes, motorcycles and ATVs, however, I do believe we need to increase peoples awareness about proper trail etiquette. We need more education about trail maintenance and teach people to stay on the trails and not tear up the land by irresponsible use. I believe most people that do ride off trail or enter sensitive wetlands do so not out of disrespect for the land but out of ignorance, not even realizing the consequences of their actions, to curb this we need better education regarding responsible land use. Thank you for allowing me to comment. |
| 196 | I'm concerned with the lack of active management of the "forgotten lands" directly east and southeast of Montrose (Unit 3). These areas are close to town, and have a lot of potential for convenient recreational opportunities like hiking/biking trails. Unfortunately these lands are unmanaged-there is little signage, no formal trailheads, few apparent BLM patrols, etc. Trash dumping and numerous use trails detract from the quality of these lands. |
| 198 | The BLM should reconsider the tracts near the City of Montrose identified for disposal (Unit 3). These tracts should be kept under public ownership, and used for open space and non-motorized recreation. |
| 202 | This would be a great place for singletrack hiking/biking trails that could connect all the way east to Shinn Park and south to Buckhorn Rd. (Unit 3) |
| 204 | In general, non-motorized travel near the City of Montrose should be encouraged (Unit 3). Non motorized travel near populated areas is more compatible than the nuisances associated with motorized travel (noise, dust, and fumes). |
| 205 | I would like to see increased visitation and use of areas near Montrose (Unit 3) by users who follow the rules and respect the land. Increasing carefully managed recreational opportunities near the City of Montrose will have economic benefits. Compared to other towns Montrose has few "backyard" outdoor recreational opportunities. Managing lands near town for recreation will encourage people to visit Montrose and stay a few days instead of just picking up supplies. |
| 211 | Secondly the BLM needs to provide access for ATV and motor sports to the citizens. |
| 212 | These are public lands so individuals should have access but organized groups need to be monitored. This would include commercial, and other organized groups even if it is something as simple as a boy scout group. |
| 216 | We don't think of ourselves as mechanized users either. We are self-propelled, quiet users who want challenging and beautiful terrain that single track trails provide. Non-motorized trails are also more environmentally sustainable, as they are more congruent with terrain, rather than going straight up or straight down steep slopes. Our trails don't get rutted, bermed, and over-widened by heavy and motorized vehicles. |
| 221 | Single track naturally limits the number of users. I don't think you need to limit the size of groups. No one wants to get flat tires, so mountain bikers will stay on the trails. We also don't want to ride in the mud, so when |

BLM_0067249

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
| --- | --- |
| | resource degradation can occur due to wet trails, we naturally stay off of them. |
| 222 | Our area has the potential, given the amount of BLM land and the type of terrain within that land, to have the quality of excellent mountain biking that is found in Grand Junction. That area has become a destination site for mountain bikers, just like Moab. The UFO Planning Area has great potential for single track trails throughout the area, but the trails will need to be protected, signed, and promoted. We need to offer self-propelled recreational opportunities to our region to not only promote this quiet use of public land but also to encourage the health and fitness of our population. |
| 252 | Recreation- Decisions regarding recreation on public lands may affect Reclamation lands and resources, and could affect public safety. BLM should work cooperatively with Reclamation and its managing entities regarding recreation in close proximity to Reclamation lands and facilities. Areas of particular concern, though not necessarily limited to those listed, include: • Areas adjacent to active Reclamation facilities and Reclamation/BLM boundaries adjacent to our active projects. |
| 286 | The remoteness and isolation of the area are part of its appeal, and ensuring that access remains challenging will do a great deal to preserve this appeal and the self-reliant atmosphere of the area. |
| 287 | I would like to express my opinion regarding ERMA designated land. I don't wish to see more areas that are managed as dispersed use areas changed to SRMA designation. I am in favor of WSA lands becoming wilderness, but dispersed use areas which allow dispersed camping are important to me. Please resist the urge to improve facilities, access, etc. and manage every recreational experience on every piece of BLM land. |
| 291 | I am an avid outdoor enthusiast and would like to see the Jumbo Mountain area become more of a user-friendly area for visitors, mountain bikers, hikers, runners and local people walking with their families. I understand that this area has numerous uses and I think that we can manage the area to make everyone happy. A majority of the uses conflict with motor sports and loaded weapons and I think it would be nice if the BLM's assessment/plan reflected this for the safety and enjoyment of everyone. |
| 292 | After doing some local research, it appears that the main users in the area are mountain bikers. It makes sense to me that the trails that are already established as singletrack should stay that way. It would be great to have signage and trail specific info that separates the various uses. It would be great to see non-motorized signs on the singletrack trails. The local biking group is interested in managing the area with clean up and trail maintenance days. The mountain bikers are also very helpful when it comes to putting out fires. The fire dept. even uses the singletrack trails to get to the fires. |
| 293 | The current accesses do not really encourage motor sports and I would like to see the accesses stay that way. |
| 294 | If the current ATV trails stay marked for that specific use, I think all groups using the area will be happy. Hunters use the area in the fall and I think that communication between the hunters and bikers would be easy to facilitate which can create a compromise that all sides can agree on. |
| 295 | The main thing is that all groups get represented and have as much use of our public lands as possible with respect for the differing uses amongst us. In my opinion, we can all accommodate each other and I hope that all of the uses get their proper attention creating a peaceful, many use area that works for everybody. |
| 301 | I am writing to encourage the BLM to strongly consider creating a SRMA for the BLM lands adjacent to the Town of Paonia on Jumbo Mtn. This area is has a long historical usage as a recreation area by hikers, runners, hunters, ATV riders and since 2000 by mountain bikers. Its proximity to town make it an ideal recreational area for all these groups. However there are many issues that need to be addressed to avoid resource damage, user conflicts, access issues. Many folks in our community are ready to work with the BLM to make this happen. |
| 302 | I would also like to express to you the need for very thorough permitting and oversight of all gas and oil drilling and mining activities. These activities should be permitted in nonrecreational areas only. They should also be permitted only with absolute assurance and proof from the private companies that surface or subsurface waters will not be contaminated and that all surface damage will be fully restored. |
| 306 | I urge the plan to protect large undisturbed tracts of land for the quiet activities I do often such as hiking, backpacking, photography and fishing. |
| 307 | My photography focuses on wild landscapes and wildlife. It is crucial that substantial habitat is maintained for our photogenic wildlife species such as the large big game deer, elk, mountain lions as well as the many birds of our area including the sage grouse to have free migration and grazing routes as well as breeding grounds. |

*Uncompahgre Resource Management Plan Revision and EIS*          July 2010
          *Final Scoping Summary Report*

BLM_0067250

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| 308 | I urge you to prioritize these type of uses over the intrusive motorized uses. ATV and snowmobile access should be restricted to existing routes in non-sensitive areas so that significant tracts can be preserved for quiet, solitude and the protection of our wildlife. |
| 309 | I am particularly concerned about the areas near the Dominquez canyon wilderness area, the Norwood canyon area including the San Miguel and the Dolores River Canyon both because of their importance to me as places to photograph and for the two rivers because I am a fly fisherman. |
| 321 | issues/concerns? ATV access, snowmobiling, hunting & fishing, camping |
| 409 | I have great concerns about the government regulating and managing of our recreational and public lands. We as tax paying citizens of this great country know that all this management plan is no more than a government expansion and control over the private sector just more regulations and rules to limit our recreational use of our lands. |
| 415 | As far as management changes are to start working with claims holders, fishermen and all kinds of recreation list's on access to the rivers and streams of our public land. |
| 417 | I personally think the regulation on camping time on our BLM and Forest Service lands should be changed from 14 days to 30 days. |
| 418 | There should be no restrictions on the size of the groups that are using the resources for recreation. |
| 429 | My primary public land uses are hiking, mountainbiking, motorcycle/OHV, and camping. In order of use of BLM land I use the Hotchkiss dobies, Jumbo Mountain trail system, North Delta OHV area, and Paonia/Crawford dobies primarily. |
| 430 | I did not realize that the deadline for comments was already here so the opinions expressed are my own but I will try to have the rec district board create an official position of cooperation at the next meeting. As we recently did a survey for our own Master Plan that some what surprisingly found BLM/public lands as the primary place that our residents recreate. The residents overwhelmingly wanted us to develop trails as the top priority. The rec district owns aprx. 160 acres at our Cross Roads Park which is adjacent to BLM-Hotchkiss Dobies. |
| 433 | For clarity I will try to comment on each area concisely below. Hotchkiss dobies- Superb close motorcycle, ATV, and OHV area. Could use a designated shooting "range" to reduce danger to other users. Little or no value for bicycles due to soft dirt and steep hills. The large numbers of trails / open riding = big family fun. Simply regarding the most used trails every 3-5 years would keep them from getting ever wider as people try to avoid big bumps. Might be nice to have a couple of single track only trails. |
| 434 | Jumbo trails- The best mountain bike trail system in the region. A true gem. Great for hiking also. The powerline road(really the whole area)is good for OHV use but I don't ride my motorcycle there for fear of hitting a cyclist. I support this being a non-open riding area if a good trails plan was in place. I would support trails development in this area though. Live stock does the most trail damage in this area. |
| 435 | North Delta OHV World class motorcycle/OHV area. I've met people from Denver who come there with 20+ people and have been coming for 22 years. The power lines are a major scenery bummer but the dobies are probably the best place for them. Once again the freedom of open riding is a rare experience, although 99% of the time I'm on an existing trail. The parking area could use gravel. The big bumps need fixed every 3-5 years. I don't totally understand the point of The Adobe Badlands study area but it blocks a number of the best loop trails. |
| 436 | Paonia/Crawford dobies- Good multi use area. It would be nice if the powerline road could more easily connect with the Crawford Youngs Peak area. Would also be great if there was a connection to the Hotchkiss dobies, which on a map of BLM lands seems almost possible. |
| 440 | In an over all way, our experience tells us that separating different uses by creating different access points for different activities is needed. |
| 441 | We feel that motorized activities should not be allowed near town because of concerns for pedestrian, bike and horse rider safety as well as noise considerations for the near by homes. We would recommend that motorized vehicle access and hunting only be allowed at a much further distance away from town. Such as near Minnesota Reservoir where there are existing roads and the oak brush will discourage vehicles from driving across the landscape. |

BLM_0067251

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| 442 | Also, because of terrain, it is less likely that hunters will make there way toward town. There is a "power line road" that is near town. ATVs and other vehicles use this access, which is across private property, and is too close to town for safe hunting. Access to motorized vehicles at this point should be stopped. |
| 443 | Safe hunting is a growing concern. There have been some rather close calls here recently. I have encouraged those involved to write to you directly. When people look at a map, they can see that a public road comes right up to the BLM, so they head out there not realizing that they cannot drive onto BLM. They get up-set and we look bad for limiting their access. |
| 446 | The public needs more access and better access. |
| 447 | There needs to be different access for different activities. |
| 474 | Every effort should be made to keep areas managed as Extensive Recreation Management Areas allowing users the freedom to use the land with good judgment and common sense. |
| 483 | The number of users should not be affected by energy and mineral development. The number of users should never be restricted by a Wilderness designation. |
| 494 | Ranching, placer mining, uranium mining, wildlife developments, recreation are among some of the areas for growth. |
| 507 | Drainages north of Tabeguache Creek SMA including Shavano, Campbell, Spring Creek and Burro Creek should be managed as non motorized and non mechanized. Additionally, the management of Tabeguache SMA itself should continue to exclude all mechanized vehicles from within its boundaries. These lands in their totality, combined with the large adjacent Forest Service roadless area, would create a large expanse of intact wildlife habitat. This would provide protection to big game in Management Unit 61, one of Colorado's most prized hunting areas. |
| 511 | Dispersed camping should be limited to established campgrounds as well as adjacent to established roadways no more than one vehicle length . |
| 512 | Off road game retrieval should be prohibited by OHVs |
| 513 | Shed antler collection should be by permit, allowed by foot only off road, and prohibited in the spring months when big game are at their weakest and least able to deal with the stress associated with antler harvest techniques. |
| 514 | Regarding recreation permits for competitive events. Events such as extreme Jeep crawls which occur in the Dry Creek area should be managed to have low impact or be disallowed. Permits without the ability for follow-up monitoring and enforcement should not be issued. |
| 532 | There are legions of scientific studies that demonstrate the adverse effects of human activities on big game. As one example, exhaustive studies have been conducted on the US Forest Service's Sharkey Experimental Forest and Range in Oregon that clearly demonstrate the impact of various human activities on elk and mule deer. Spanning 40 square miles of prime elk habitat in the Blue Mountains of Oregon, Starkey has enabled ecologists to study wildlife and range on a landscape scale for the past 20 years. During the Starkey project, Michael Wisdom (2002-2004) researched the effects of ATV's, mountain bikes, horses, and hikers on collared elk. The results of the study were telling. Elk ran faster and farther when encountering humans on ATV's or mountain bikes than on horses or afoot. And the elk stayed gone. The study also showed that elk kept on the move even when ATV's or mountain bikes had left. The results of the other studies are very similar. The experiences I and other public land and wildlife managers have had in our careers further support the findings of these studies. It is clear that motorized vehicles affect big game populations, security, distribution, and reduce habitat effectiveness. The BLM needs to utilize this science and the experience of professionals in making travel management decisions. |
| 560 | The primary activity I engage in on BLM lands is hiking, both on-trail and off trail. I hike, in part for exercise for myself and my dog, and to experience new areas. Observing wildlife, flowers and trees, geology, various land forms, and nature in its undisturbed state are a great attraction for me. Perhaps more important is the opportunity to have a solitary, quiet use experience; a spiritual change of pace. These are the things I value most while visiting public lands. |
| 561 | We are property owners east of Paonia with 40 acres and BLM access to the Jumbo Mtn area. This access is private and as you know the Jumbo BLM area has very few public access points. It is bisected by the power line |

*Uncompahgre Resource Management Plan Revision and EIS*
*Final Scoping Summary Report*

BLM_0067252

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| | road but both ends are on private property. We have lived at this location for 27 years and have seen usage of BLM change from rarely seeing anyone back there to multiple use by - in order of highest number of users - Mountain Bikers, Hikers, Runners, Horses, Hunters, ATV's and Motorcycles. During the year I'm back there @ 5 times per week from late March thru Nov so I see a lot of users. The system of single track trails has become very special to us and we would like to see certain trails remain single path only with no motor vehicles. The vast majority of BLM users back there are Mtn bikers and hikers with the few ATV's and motorcycles generally staying on the power line road and "The Ridge Of Doom". |
| 577 | Non motorized quiet use of these areas is preferred. I.small parcel of land on the east side of Highway 550 and north of Cutler Creek. My kids have both used this area for rock climbing and it is quite unique geologically. |
| 578 | parcel across Highway 550 from the State Park. It is already being used for mountain biking and as a councilman in Ridgway I know that it brings many recreationists. There is a slight problem with Bike/ Horse encounters but that can be worked out with proper signage. |
| 579 | McKenzie Butte. |
| 580 | Chaffee Creek drainage. |
| 584 | I live in the Gunnison Gorge NCA Planning area. My interests are mainly recreational. I would like to see existing routes for equestrians, hikers, campers, sight-seers and Nordic skiers maintained. |
| 585 | The improvements made in the Peach Valley area of the Gunnison Gorge NCA Planning Area are wonderful – specifically the updated maps, trail markers, picnic & sanitary facilities. I would like to see this done in the Uncompahgre Planning area. There may be specific areas that are more appropriate for certain activities and SRMAs should be considered in those areas to encourage the right kinds of activities in the right places. |
| 586 | Ecologically or wildlife sensitive areas may not be appropriate for motorized vehicles or target shooting. |
| 595 | Formal sights for viewing rock art, fossil exposures, etc. should be developed in order to enhance public involvement and sight-seeing. |
| 605 | Recreation in the wildland-urban interface areas should be allowed, but perhaps access to BLM land should be restricted or channeled to less environmentally sensitive, healthier land areas. |
| 608 | I agree that there need to be places of recreation for people to ride motorized vehicles and mountain bikes, etc. But many such places already exist. It is my opinion that we need more places where humanity can experience the beauty of nature without the noise of the modern world. |
| 612 | Recreation around Norwood Colorado is increasing very quickly. I think that when the U.S. census comes out you will find that there has been a demographic shift in the population. It has become much younger and what they do for recreation has changed somewhat in the last ten years, this population trend should be a consideration to help guide the overall vision of the RMP. Both winter and summer recreation is extensive and growing. As for the rivers they are very special attributes to the area and draw traffic through the area on the West End of San Miguel and Montrose Counties. Change is inevitable but should be managed. Do you have specific data on recreational uses along each river systems i.e. trends, types, and quantities of uses? Do they include rafting, kayaking, hiking, mt. biking, rock climbing, motorized use, swimming, camping, or fishing? These are the uses I see everytime I go out to the rivers. |
| 613 | I personally want to see the RMP area on the West End stay a more recreational destination. Any opportunities that would expand this recreational character would be beneficial to the local towns. |
| 617 | Hunting should be limited to the area east of the powerline road to keep it a safe distance from houses. |
| 622 | Disallowing the use of roads, grazing land, mineral and energy development, as well as recreational use, would be a poor use of public land. The point of public land is that it belongs to the people. Public lands should be available to all people. The combination of grazing lands and mineral/energy exploitation allows business and employment growth for our county, and recreational use should also be encouraged, not restricted. |
| 623 | This letter is simply to provide input in favor of a nonmotorized designation for the singletrack trails located on jumbo mountain. |
| 625 | I moved to Ridgway because of the magnitude of opportunities for hiking, biking, skiing and enjoying the wildlife that still exists across these magnificent surrounding areas. Already in the short time that I have been here, three years, I have seen far less wildlife and more and more motorized vehicles. This would lead one to |

BLM_0067253

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| | conclude that the motorized vehicles need to have their specific areas of use, both summer and winter. |
| 629 | I wanted to respond to the comment period on Jumbo Ridge in Paonia. I am a home owner in the Pan American subdivision where there is access to the trails. It is such as asset to have hiking and biking trails so close to town. My husband and I go there regularly to enjoy the trails and I see many others from my community there as well. I would like to see the trail system preserved for the use of non motorized traffic. The hikers and mountain bikers seem to coexist well on the single-track. |
| 632 | On the point of hunting. I was surprised to even see hunters there. They should not be able to shoot guns that close to a subdivision. They are above us on a ridge, bullets can travel too close for comfort into our neighborhood and Hawks Haven. Please direct hunting further back from town. It seem ridiculous to me to see hunters that close to houses. |
| 638 | In addition, the Jumbo Mountain area outside of Paonia should be designated as a Special Recreation Management Area. All motorized and mechanized use should be on designated trails only. User-created trails should not be brought into the travel system—even on an interim basis— unless and until they have gone through site-specific NEPA planning. All unleased lands in the SRMA should be withdrawn from mineral entry, and BLM should impose additional conditions on any future wells permitted for the area on existing leases. |
| 642 | Regarding recreation, it seems that there are user conflicts between motorized recreation and nonmotorized recreation. I enjoy hiking, fishing and hunting on public lands, if I am hiking on a motorized trail, I take this into consideration and expect to encounter motorized vehicles, this does not bother me, if it did bother me, I would simply hike on a non-motorized trail. Recently my father became ill and can no longer hike or hunt like he used to so he purchased an ATV and truly enjoys getting outside on the ATV. On several occasions we have come upon hikers and horseback riders who have scowled and cast unpleasant looks our way and refused to return our friendly wave. All J can say is I hope these hikers or horse owners never become old or ill because if/when they do, they might find themselves on a dreaded ATV, getting nasty glares from a new generation of hiker or horseback rider. For these reasons I would encourage the BLM to increase motorized opportunities and clearly mark trails as either open or closed to motorized travel. During my many hikes I have NEVER seen a motorized vehicle on a non-motorized trail. Motorized recreation is a legitimate use of public lands, just as horseback riding and hiking are. |
| 643 | I would like to see more areas developed for recreation such as what the BLM has done at Peach Valley. This is a model of controlled recreation, proper signage is in place and this is a great resource to many families in our area. On any sunny weekend you'll find hikers, bicyclist, horseback riders, ATV riders and motorcycles all enjoying our public land in harmony. There are trails for all groups, great job BLM! I feel the Delta adobes could be developed in a similar way, people come from all over the state to enjoy these types of areas, it brings money to our area and promotes outdoor recreation. |
| 645 | I' would like to see more land developed and opened for recreation of all forms. |
| 648 | I would truly like for everyone to be more tolerant of other user groups, treat each other with respect and realize we all enjoy the same outdoors for the same reasons. This goes for both motorized users and non-motorized users. It seems more and more areas are either closed or the size reduced, which concentrates all users into smaller and smaller areas where conflict is more likely to arise. If we have more land open to recreation, then we will have fewer user conflicts. |
| 652 | Today's kids are glued to electronic gadgets and spend most of their time on a couch and will never get an appreciation for the outdoors if all the land is locked up and the only way for them to enjoy being outside is to go for a hike. Today's youth need places to ride mountain bikes, motorcycles and ATVs, however, I do believe we need to increase peoples awareness about proper trail etiquette. |
| 702 | The primary activity I engage in on BLM lands is hiking, both on-trail and off trail . I hike, in part. for exercise for myself and my dog. and to experience new areas. Observing wildlife, flowers and trees, geology, various land forms, and nature in its undisturbed state are a great attraction for me. Perhaps more important is the opportunity to have a solitary, quiet use experience; a spiritual change of pace. These are the things I value most while visiting public lands. |
| 709 | In spite of their significant growth in numbers , ATVs owners are still a relatively small percentage of recreational users on public lands (yet create most of the damage, and usually generate most of the complaints to BLM about being shut out). Their contribution to the economy of nearby communities is much smaller than quiet-use advocates (Just pick up a tourist promotion brochure from GJ, Delta, Montrose, Ridgeway, Norwood); |

*Uncompahgre Resource Management Plan Revision and EIS*
*Final Scoping Summary Report*

BLM_0067254

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| | the emphasis is on encouraging, hiking, fishing, hunting, skiing, and other quiet use activities-I have never seen them promote ATV activities. |
| 716 | Proper use and stewardship of the land is vital to us all. Groups should be made to clean up after themselves. |
| 721 | Encourage responsible recreation ie leave no trace. |
| 731 | These lands belong to the people all of the people not just to the people who do not want the use of the land. The only restrictions would be for the people to not abuse the right to recreate on public lands. |
| 737 | Access to public land needs to be open to all taxpayers. Not just bureaucrats, the young and wealthy. |
| 743 | Public land should be used for the good of the public. Drill holes for coal mining, gas wells, logging should be allowed. Drill sites reclaimed, trees replanted. Grazing of cattle, sheep and the hunting of wild game encouraged. |
| 745 | Unlimited. Commercial enterprises should reclaim sites, replant trees, repair damage. The same for large groups. |
| 754 | We want to keep all our grazing rights, water rights, hunting rights and any other rights we were born with in this great country known as the "Land of the Free." |
| 762 | Maintaining access for BLM lands for hunting, recreation. |
| 771 | Permanent camp ground facilities be planned along the Paradox Trail at locations including Tabeguache Creek and Z-26 Rd North Fork Mesa Creek and P-12 Rd and at "Biscuit Rock" Area Hwy 141, North of the Hanging Flume site. |
| 779 | Manage mountain bikes as non-motorized users similar to hikers and equestrians as outlined in the 2002 BLM document "National Mountain Bike Strategy" |
| 782 | Ease the permitting requirements for field trip groups from our public schools on to public lands including local WSA and SMA. |
| 784 | Since this area sees a small about of users I see no immediate need for restrictions of the type or number of user groups. This could change if certain areas become very popular but I believe it will be many years, if ever, we see that occur. There are specific areas that have been popular for camping that could use permanent facilities as a way of resource protection that were outlined earlier. |
| 786 | As a stakeholder (COPMOBA, MWR, WESB) in our public lands here in the West End I want to expand the opportunities for locals and visitors to our area to use this great resource we call wilderness. Its unique characteristics, vast area and remote nature add up to a potential backcountry, wilderness experience that most people never have an opportunity to have. For economic development, this holds much promise for our small communities. I believe this kind of resource development (tourism) is compatible with the traditional ranching/mining/milling uses of this area. It's big enough for all of us to use and enjoy. If we all remain open to other's needs I think we can co-exist. |
| 794 | 4-wheeler control during hunting seasons. |
| 798 | I have some concerns about multi use- the fact that people can hunt out there is very strange to me. I don't like hearing gunshots so close to our kids and pets and house. I have nothing against hunting at all, but why would you combine shooting guns with children and joggers and hikers on the same land? |
| 799 | I'm not a huge fan of the ATVs either. Again -I'm not against ATVs, but I don't like being around them when I'm hiking with my kids. And I don't like it when they crash into my neighbor's house by accident (which one did). |
| 800 | Dogs are fine. I don't care if there are dogs running around out there as long they are on a leash. |
| 802 | The ditch paths are so perfect for cross country skiing in the winter. |
| 836 | Quality of area for recreational hiking. |
| 838 | Try to limit gas engines on rivers, lakes. |
| 839 | Limit trail for motorized vehicles (off road) |
| 845 | (But for the fun of it, I would like to see users who tolerate multi-use rewarded with larger systems and networks of access and those |
| 846 | Kind of answered that above. Group size is a problem because a group of 50 will impact resources more than one from a time snapshot, but it is more a bout volume of use to an area, not PAOT |

BLM_0067255

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| 864 | A sign can also protect the health of the user, such as an area that has been sprayed, people then know to steer clear, and keep their pets away too. God help the wildlife in the area. |
| 865 | # of users in certain areas need limited, and time spent in an area, and sometimes this needs to change during certain times of the year. Someone needs to take a serious look at the impact of rifle hunting seasons on the Uncompahgre Plateau, the impact to all wildlife, roads/erosion, watersheds, spread of weeds, road damage to the forest, new road closures that are affecting how this massive amount of people is moving during rifle seasons. |
| 866 | Behavior of users starts by teaching children in the classroom about public lands. We have to change the thinking of an entire generation of people |
| 868 | Target shooting should be done in very specific areas, not places that are way out from town, but closer in so they can be more easily monitored--trash kept up with, facilities, a watchful eye by a volunteer or staff, and hopefully less wildlife is disturbed. There is a target shooting area at the bottom of the "west transfer rd" at the county rock pile. Just below it is a dumping ground. At the rocks people leave all their trash, and targets along with spent shells. Another area like this exists on Hwy 90 in an off road parking area above the Shavano Valley. It to is littered. These are the only target shooting areas I know of. These two places give me the impression that target shooters don't care much about the land they are using to shoot on, therefore target practicing areas should require an access fee so someone can be paid to clean up after the shooters. Users could pay for a permit to use a specific area= It adheres to their vehicle or they carry it in their wallet. Or, they volunteer to care for the area by monitoring its use, picking up trash, maintenance. In exchange for their services, they get to use the area free of charge. |
| 897 | Permit large groups so that they can be monitored. |
| 898 | Discourage massive bike tours. They ruin it for the rest of us. |
| 899 | Snow mobiles are made too noisy. |
| 907 | I live, work and play in western Colorado next to coal mines. Where I hunt around mining and drilling there is more game where they have done seeding, roads, ponds, etc. |
| 951 | Our preferred form of recreation is hiking. What we care most about on Uncompahgre BLM lands is the quiet and undisturbed enjoyment of these lands. It is our hope that you intend to protect the backcountry silence and solitude, large blocks of undisturbed natural habitat together with the integrity of the ecosystems and wildlife habitat. We are confident that you will have as you highest priority these values over the high impact and damaging effects of motorized recreation, new road and motorized trail development together with extractive uses of uranium, coal mining and logging. |
| 952 | Regarding motorized recreation, we hope that you will restrict or close ORV use in sensitive habitat, sensitive watersheds, big game winter range, remote areas that cannot easily be enforced. We believe that we can count on you to protect these precious areas and experiences and resist the temptation to extend the use of the wilderness to ORV use. |
| 953 | Failure to address a proper permit allocation system on the San Miguel River. |
| 954 | Modification to current outfitter to permit system allowing new outfitters to participate in areas where management objectives are not being met by existing outfitters - non-use, use it or lose it. |
| 955 | Permit re-allocation implemented for rafting & fishing outfitters |
| 956 | Follow penalties for non-use issues regarding existing outfitters |
| 957 | Explore different "launch times" in order to spread out peak time use |
| 958 | increase access points and user groups in surrounding communities |
| 959 | Allow for regional outfitters with ability to run trips for localized visitors as opposed to non-regional outfitters which cannot serve the general public's goal of guided access. |
| 962 | Thirdly, I am concerned about additional trails for motorized vehicles in remote areas. ATVs and dirt bikes!!!! They are rampant, destructive, and their damage is irreparable. Their access needs to be severely limited. |
| 963 | I very much enjoy the outdoors, as does my entire family we use these public lands in some basic ways. We enjoy camping, boating, and snowmobiling and with these activities we have the whole year covered. |

BLM_0067256

## Table C-19
## Issue 3: Recreation Management

| Comment ID | Comment |
|---|---|
| 968 | An alarming increase in motorized use and an increase in the size and carrying capacities of OHV's and their ability to travel terrain regardless of conditions. |
| 972 | Increasing need to protect lands due to increasing drought and increasing demand and use by OHV's by restricting and limited OHV's and restricting and limiting livestock grazing. |
| 990 | I have lived near Montrose (about 8 miles south of your offices) for 11 years, and a major reason why I live here is to enjoy the natural, open and wild spaces that surround the more developed areas of the Uncompahgre Valley. While I understand that there are many different demands placed on our public lands, my personal use is largely in on- and off-trail hiking, photography and camping, and to a lesser extent mountain biking and exploring four-wheel drive roads. |
| 999 | Many uses can be compatible with preserving these systems if done carefully. Grazing, hunting and wildlife management should be done with more attention given to the health of the ecosystem than to the size of the "harvest." |
| 1001 | Camping and travel should be allowed in durable areas, and restricted in more fragile ones. |
| 1002 | Quiet uses like birdwatching, hiking, horseback riding, skiing, and photography can have minimal impact, but should be restricted if they are causing conditions to deteriorate. |
| 1003 | Trails and roads can be intrusive, or can funnel impacts away from vulnerable areas to less fragile areas. Maintain the roads and trails that help preserve the resource (including views), and close the others. |
| 1004 | I encourage the BLM to provide access to visitors which helps people appreciate the natural systems, and create adequate interpretive materials like brochures and signage to help people understand how to minimize their impacts and maximize their enjoyment and the enjoyment of others. |
| 1049 | It is irresponsible to designate hunting units as trophy hunt areas, while at the same time constructing facilities such as OHV parks that will increase pressure on the wildlife. Keep them separate. |
| 1075 | BLM needs to create an allocation and river use application process for organizations that provide river trip support to people with disabilities. These allocations and processes are available in Canyonlands National Park and Dinosaur National Park (this latter has an excellent model for allowing access for people with disabilities to river segments which require restrictions on public use to avoid overuse). BLM, as another division of the Department of Interior, should communicate with these parks for advice on special population allocations. |
| 1181 | It is very important to San Miguel County residents and government programs to be able to work with BLM to plan and hopefully build recreational trails. It is a long standing goal to connect San Miguel County to Ouray County and beyond via a trail for hiking and bicycling over Dallas Divide. Parts of the trail are in place on the San Miguel side. This trail would connect to the regional Galloping Goose Trail which connects Telluride and Lizard Head Pass. |
| 1183 | In addition, the Norwood Rec District is interested in developing a mtn biking trail system in an area near Naturita Creek west of Norwood. All of these trail concepts would depend on a partnership with BLM. |
| 1188 | We believe such designations support the economy of San Miguel County which depends largely on the natural beauty and natural values of the area for tourism and recreation-based business. The designations also support a culture of outdoor recreation and conservation awareness. |
| 1193 | The Town recognizes that some motorized use in this particular area is occurring even though there is signage that purports to restrict it. The Town feels that motorized uses should be limited in a manner that ensures good stewardship of the land and compatibility of these numerous and at times competing uses. This may require possible evaluation under a Special Recreation Management Area designation. We encourage good partnerships and collaborative planning to foster these outcomes. |
| 1315 | General ATV use should be considered and the safety of the traveling public and the Ranch should be considered. |
| 1316 | As the BLM knows, between 2000 to 3000 canoes, boats and other water craft use the Gunnison River [correction noted from follow-up letter to replace Uncompahgre River by Gunnison River] recreation. The Uncompahgre RMP should specifically discuss this use, including the location of where these recreationists can access the River. Currently much of this access includes the railroad right-of-way across from the Escalante Ranch property. That location poses a danger to the recreating public and causes a use of the right-of-way that |

BLM_0067257

## Table C-19
## Issue 3: Recreation Management

| Comment ID | Comment |
|---|---|
| | is not intended. |
| 1651 | The ORV's obviously enjoy recreating in this area, and they add to the upheaval. |
| 1661 | In addition, we are hikers and wilderness backpackers. So many areas we used to hike near Grand Junction are now too crowded. Specifically, ORV use in the area is already too high. Please do not permit more ORV use and control existing use to maintained trails. |
| 1685 | Limit all dispersed camping to existing campsites. |
| 1687 | Jumbo Mountain near Paonia is a popular recreation area. It should be managed exclusively for recreation with trails designated for specific uses. The BLM should investigate new access points. |
| 1715 | I live in Ridgway and have enjoyed the area east of Ridgway State Park. I support the local mountain biking group TRED which wishes to manage this area for mountain biking and hiking. Motorized use of this area would be at cross purposes to Ouray County's needs |
| 1746 | My wife and I are lifelong residents of Colorado. We enjoy camping, hiking, fishing, hunting, rock-hounding, and most recently gold prospecting. |
| 1765 | Encourage BLM to emphasize resource protection in this RMP, providing extensive unroaded areas where quiet-use recreationists can experience solitude and natural soundscapes and viewsheds, and where wildlife and wild rivers can thrive unimpeded by off-road vehicles or energy development. BLM should complete a comprehensive travel management plan as part of the RMP to ensure that planning is done at a landscape level, accounting for impacts of all uses. |
| 1777 | ORV may be fun for the user but they destroy the area for all others, including erosion & excessive noise, which of course if what they like the most. |
| 1832 | Another area is the parcel across Highway 550 from the State Park. This is being proposed as a mountain bike and hiking recreation area. ROCC is in support of this proposal and sees this as a possible positive attribute to the economy of the area and as a bonus to campers in the State Park. We would urge the management of this area to be used as proposed and closed to motorized use to avoid user conflicts. It would also be wise to put a seasonal closure for biking activity to protect wildlife habitat during wildlife calving season. |
| 1833 | A third area of interest is the McKenzie Butte. This area has some historical significance as well as a recreational possibility. There is an old roadbed, (possibly stagecoach) a railroad bed and some very striking scenic values. Because of the proximity to the State Park it would seem that there are some easily developed recreational possibilities for quiet use activities. |
| 1834 | Across Highway 550 from McKenzie is the Chaffee Creek drainage that abuts Billy Creek DOW area. This area is reputed to contain a burial tree and may contain some historically and archeologically significant sites. It would also be a suitable area to be developed for quiet uses such as bird and wildlife viewing as well as hiking. |
| 1848 | Other portions of the field office should be studied and designated as primitive and undeveloped SRMAs (Special Recreation Management Areas) to protect the remote and rugged landscapes the BLM is famous for, as well as the quiet use experience! Keep back country primitive and un-crowded, limit trail densities to reduce habitat fragmentation and maintain open space. No new trail build-up in WSAs and areas that have wilderness or natural character. |
| 1863 | Dolores River Canyon Special Recreation Management Area (SRMA) The 1985 San Juan/San Miguel Planning Area RMP designated the Dolores River Canyon as a Special Recreation Management Area. The boundary took in the entire corridor from the McPhee Reservoir to Bedrock, and included the Dolores River Canyon WSA. Since BLM management boundaries have since been changed, a portion of the SRMA is now within the San Juan FO and a portion is within the Uncompahgre FO. We recommend that The Dolores River Canyon SRMA retain its special management status, including the portion within the Uncompahgre Field Office. The San Juan Public Lands Draft Land Management Plan released in 2007 maintains a special designation for the portion of the corridor in their jurisdiction. Pertaining to specific SRMA planning and management procedures we ask the UFO to refer to the broader conservation community's comments we incorporated above regarding "Recreation and Special Recreation Management Areas." |
| 1879 | We briefly polled a few of our members who regularly visit the UFO who live in the Grand Junction, Delta and Montrose areas and they were very specific insofar as what they would like to see in a new Land Use Plan: More Single Track Trails (motorized and mountain bike)!! More ATV trails!! More 4x4 trails!! More Rock Crawling |

BLM_0067258

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| | Trails!! (They asked me to make that point with BRC's characteristic gusto, so that you folks on the planning team would incorporate this important comment into the decision making process.) |
| 1880 | Clearly, there is an increasing demand for OHV recreation opportunities on public lands and National Forests. BLM's OHV Strategy states, "Motorized off-highway vehicle use on public lands administered by the Bureau of Land Management (BLM) has increased substantially in recent years... Some of [the factors contributing to growing OHV popularity] are: ·greater public interest in unconfined outdoor recreational opportunities ·rising disposable income ·advances in vehicle technology ·the rapid growth of the West's cities and suburbs ·a population with an increasing median age with changing outdoor recreational interests This [growing OHV] popularity is evidenced by the fact that recreational enthusiasts are buying OHVs at the rate of 1,500 units per day nationwide, with nearly one-third of them doing so as first-time buyers. National Management Strategy for Motorized Off-Highway Vehicle Use on Public Lands, U.S. Department of Interior Bureau of Land Management, January 21, 2001, p. 1- 2. "[BLM's OHV] Strategy recognizes, as does policy outlined in BLM Manual 8340 (May 25, 1982), that off-road vehicle use is an 'acceptable use of public land wherever it is compatible with established resource management objectives.' As established by the Federal Land Policy and Management Act of 1976 (FLPMA), the BLM is required to manage public lands on the basis of multiple-use and sustained yield, while protecting natural values... Motorized OHV use is now firmly established as a major recreational activity on BLM-administered public lands." National Management Strategy for Motorized Off-Highway Vehicle Use on Public Lands, U.S. Department of Interior Bureau of Land Management, January 21, 2001, p. 2-3. At least one Alternative should seek to meet the need to provide for increase motorized recreation experience. |
| 1881 | BLM planning should take into account the substantial already existing non-motorized opportunities in balancing the input from conservation groups who desire that motorized recreation be drastically reduced. BLM should also take this into consideration when/if the consideration of minimizing recreation conflict is addressed in the revised RMP. BLM must recognize the abundant opportunities already present for "non-motorized" solitude. Wilderness advocacy groups often assert that there are conflicts in values anywhere and everywhere that involve OHV access. But BLM must balance the many venues presently available for wilderness experiences and the limited numbers of people who recreate in wilderness areas. The relative minority cannot be allowed to destroy the recreational opportunities of the majority, especially where they already have abundant non-motorized recreational opportunities. The Planning Team will, no doubt, get many letters from members of Wilderness advocacy groups indicating the overwhelming need for a non-motorized recreational experience. When considering the input of people who desire an experience away from those who use vehicles for recreational access, the Planning Team must consider the already abundant recreational opportunity available to those persons both within and adjacent to the planning area. |
| 1882 | All of the Alternatives should focus on educational opportunities to eliminate, minimize or reduce user conflict. The Planning Team should consider management alternatives with a strong public land user educational component. |
| 1885 | The Planning Team should look for management alternatives that provide for mitigation and management of these "staging areas" or "Tot Lots" instead of closure. |
| 1886 | The Planning Team should seek input from county and local governments, individuals and OHV clubs for input on where popular play areas are located and how they could be better managed. |
| 1887 | BRC emphasizes the need to provide for trials motorcycle and 4x4 rock-crawling opportunities in the new RMP. Trials motorcycling and rock-crawling are very popular in the area. There are many areas in the UFO where providing this type of use can be provided in a sustainable and manageable manner. |
| 1888 | Permitted and Competitive events should be planned for in the RMP. In anticipation of Special Recreation Permit requirements for organized recreation activities as well as to streamline the permitting process for mountain bike events and off highway motorcycle races, BRC suggests the UFO consider developing an Alternative that would evaluate certain routes/areas for competitive and permitted events. |
| 1892 | There is a need to provide for commercial motorized tour operators. Yet another popular activity that is expected to grow, motorcycle and ATV tour operators provide a needed service and economic benefit to adjacent communities. Similar to our recommendations regarding permitted and competitive events, we strongly encourage the BLM to consider evaluating commercial activities, as much as possible, within the programmatic land use plan, thereby streamlining the permitting process and reducing staff workload. |
| 1893 | BRC emphasizes the need to follow through on existing activity plans. BRC appreciates the efforts made to |

BLM_0067259

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| | implement the existing UFO RMP over the years. All too often, BLM planning seems to be an academic exercise, with little site-specific implementation resulting from the plans. Where possible, the BLM should consider the RMP revision an opportunity to expedite the implementation of the existing recreation activity plans. |
| 1896 | And the OHV community also understands that not every area is appropriate for OHV use, and areas need to be provided for non-motorized and primitive recreation opportunity. |
| 1897 | What we do not support is being presented with a "range" of management alternatives which all represent a significant reduction in OHV and other recreation opportunity. NEPA imposes a mandatory procedural duty on federal agencies to consider a reasonable range of alternatives or preferred alternatives analyzed during a NEPA process. 40 C.F.R. § 1502.14; 40 C.F.R. § 1508.9. "[A]gencies shall rigorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14. The alternatives section is considered the "heart" of the NEPA document. 40 C.F.R. § 1502-14 (discussing requirement in EIS context). There is a need for, and BRC strongly encourages the UFO to develop, an Alternative that focuses on providing a wide range of diverse recreation opportunity, including an Alternative that provides a wide range of diverse opportunity for motorized and mountain bike enthusiasts. |
| 1901 | Cumulative loss of OHV recreational opportunity The cumulative loss of OHV related recreational opportunity is a significant issue that should be incorporated into the analysis and into the decision making process. NEPA requires federal agencies to properly analyze the direct, indirect, and cumulative effects of the proposed action. 40 C.F.R. § 1508.8. Cumulative effects include "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions..." 40 C.F.R. § 1508.7. In NEPA, the term "environment" includes the "human environment" which "shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14. Thus, the agency's duty to analyze impacts does not end with impacts to the physical environment, but includes all of the effects on the human environment, including the effects by vehicle-assisted visitors. Discussion: BRC emphasizes the need to provide sustainable travel routes for motorized recreation. This need has resulted from both an increase in the popularity of OHV use and the elimination of OHV opportunities in the area. It is necessary to develop an Alternative that will focus on the designation and development of motorized trails in the UFO. Motorized recreational opportunity has been and will be drastically reduced throughout the region. Travel management plans on adjacent BLM and National Forest lands have reduced opportunity for motorized recreationists, while at the same time provided additional opportunity for those who prefer a non-motorized experience. Future restrictions, including road and trail closures pursuant to the recently finalized Moab District Office RMP and Travel Plan, as well as adjacent USFS offices in Colorado, will amplify this situation. It should be noted, and incorporated into the decision-making process, the fact that in recent years much in the way of world class recreational opportunity has been provided for nonmotorized public lands visitors. Here are just a few examples: - Changes made to Travel Management resulted in the loss of traditional motorized access in order to provide for an increase in popularity of non-motorized recreation. - There is a new National Conservation Area with a new management plan. - There is a new designated Wilderness Area. - New non-motorized emphasis areas near Fruita via the 21 Road route designation plan. - New mountain bike trails across the UFO, including the planning area. The amount of motorized route and area closures has reached a critical mass. Every single mile of motorized route that is open today is extremely important. Further closures will have a larger impact than those in the past. |
| 1903 | Regarding: - Managing public lands and resources, including authorized and permitted land uses, for a growing population and expanding urban interface, with consideration for community values and needs. - Managing increasing numbers and types of human activities and uses; In increased population and development adjacent to the planning area and the controversy over how the agency should respond make these excellent planning issues. We aren't clear as to what exactly the distinction between the two issues are, so it seems logical to recommend the planning team put a bit of effort into better descriptions, or if warranted, combining the two issues. Like every good planning issue, these come with classic "opportunities and constraints." From the perspective of BRC's members and supporters, regional population growth increase the importance of recreational uses on adjacent public lands. Population growth increases the need to provide a diverse range of recreational opportunities. BRC's members also understand and support the need to increase management when the adjacent communities are growing. We note that the vast majority of our members supported the recent travel management activities in the UFO, even though they reduced our opportunity for access and recreation. This has resulted in an interesting conflict. Increased population has increased the need to provide motorized recreation – recent planning process significantly reduced recreation. What to do? In response, we |

BLM_0067260

### Table C-19
### Issue 3: Recreation Management

| Comment ID | Comment |
|---|---|
| | formally request that at least one Alternative should seek to enhance a diverse range of outdoor recreation opportunities in response to this issue. |
| 1915 | BRC intends to challenge alternatives, or elements thereof, that are based on junk science or anecdotes. For example, we have observed and documented big horn sheep choosing to pasture immediately next to Highway 91 just north of Moab. We have observed deer choosing to pasture near roads and even residential roads. We are aware of studies that show that wildlife are not disturbed by motorized vehicles but are more likely to be disturbed by walking persons. Therefore, we intend to vigorously challenge any proposed seasonal restrictions on motorized uses of roads and trails. The agency must document a nexus between any alleged need to protect and any resulting decision to restrict motorized travel. The alternatives and analyses must consider the useless effects of restricting motorized travel. For example, if protection of deer fawning is supposedly an issue, the discussion must acknowledge that humans will still be present who are mountain biking, hiking or horseback riding. By acknowledging the continuation of these activities, the agency will have no quality basis to discriminate against motorized travel. |
| 1916 | When developing Alternatives, the BLM should recognize the public's desire to keep existing opportunities open. BRC participated in two surveys conducted by Public Opinion Strategies, Inc. Both studies show substantial widespread public support for managing recreational uses, but also for keeping existing roads and trails open, as well as substantial public opposition to proposals made by preservationist groups that would eliminate a vast majority of the motorized access. Although questions were not asked regarding the UFO specifically, we believe the surveys provide some valid information that should be considered as you develop the Final Plan. PSI Utah Poll Summary: OHVs are by far the most desired and utilized means to obtain solitude in nature. A poll conducted in April, 2000 by Public Opinion Strategies, Inc. (POSI), a nationally respected polling firm located in Alexandria, Virginia, found that nearly two-thirds of Utahans use public lands for recreation either "a lot" (27%) or "some" (38%). Only 13% of Utahans said they never recreated on public lands. An overwhelming eighty-six per cent (86%) of Utahans said they used motorized vehicles to travel to Utah's federal lands or when they use the lands for recreation. Of the eighty-six per cent, two-thirds said they utilized a truck or four-wheel drive. In response to the POSI poll, 82% of Utahans said they "strongly" favored (48%) or "somewhat" (34%) maintaining roads and trails to disperse use and address environmental concerns. Sixty-eight percent (68%) strongly agreed with the statement "Roads and trails on federal lands in Utah which have historically been open to public use should remain open to public use." An additional 23% somewhat agreed, bringing the total support of the statement to 91%. BLM must recognize that providing for OHV use and protecting the environment means fully utilizing the inventory of existing roads and trails. In some areas providing that reasonable balance may require additional access and additional recreational opportunities. PSI Western Slope Summary: Public Opinion Strategies conducted a survey of 500 registered voters in the eight counties in or surrounding the Grand Mesa, 1. Those counties are Gunnison, Hinsdale, Montrose, Ouray, San Miguel, Delta, and Mesa. Interviews were collected March 21-23, 2006. The margin of error associated with a sample of this type is + 4.38%. Nearly three-quarter of the region's voters reject Forest Service changes that could limit public access. - Fully 73% of local voters say the Forest Service should not change the current regulations to reduce public access on the Grand Mesa, Uncompahgre and Gunnison National Forest. A majority of 58% say they strongly feel this way. More than six-in-ten voters in every single county oppose efforts to reduce public access, with opposition most pronounced in Delta County (78% should not change regulations), Mesa (74%), and Montrose (72%). Opposition is across the political spectrum, as 65% of Democrats, 76% of Independents and 74% of Republicans oppose these proposed changes. Sportsmen are particularly opposed, as 81% of hunters and 76% of anglers say the Forest Service should not change regulations to reduce access. - Opposition to reducing access is HIGHER among the 45% of the electorate who say they had heard about these proposed changes already. Fully 78% oppose the Forest Service reducing access among those who have seen "a lot" or "some", as compared to 69% opposition among those who have seen little or nothing about the issue. - Even when voters are provided with greater detail about the potential changes, a majority of resident stand firm in their opposition. Voters were told that... One proposal being considered by the Forest Service would more than double the area that would be closed to residents who choose to use a motorized vehicle to access the back country. Residents would still be able to hike, bike or horseback ride on trails. Having heard this additional information, six-in-ten (59%) continues to believe the Forest Service should not change the current regulations to reduce public access, with 49% strongly feeling this way. Perhaps most stunning is the fact that a majority (52%) of self-described environmentalists oppose these proposed changes. Voters in the GMUG area are much more inclined to support a plan that features a variety of uses and recreation opportunities than the priorities stated in the Mountains to Mesa (M2M) proposal. [ see: http://www.hccaonline.org/page.cfm?pageid=2059 ] - |

BLM_0067261

## Table C-19
## Issue 3: Recreation Management

| Comment ID | Comment |
|---|---|
| | Two-thirds of respondents choose a plan that emphasizes balanced uses, while rejecting an exact description of the priorities detailed in the executive summary of the M2M plan. When asked what the most important priority for the National Forest Service should be, by greater than a two-to-one margin, voters select... 65% Ensure a balanced approach that allows many uses of the land by maintaining access residents have now to the trails, natural areas and streams, and allowing diverse recreation and human uses of the forest 27% Protect and restore the native biological diversity of this area, through stopping the fragmentation of the forest, allowing natural processes like wildfires, and recognizing that recreational and other uses are less important than the primary goal of sustainable ecological management A plurality of voters in every single county supports the multiple-uses approach. Moreover, a majority of self-described environmentalists side with maintaining access (50%) versus the goals from the M2M plan (40%). In addition to access, voters also place personal importance on energy independence and economic vitality. - The personal importance of maintaining access on National Forest land is 24 points higher than increasing the amount of National Forest land set aside as wilderness. As seen below, the percentage of the electorate which places strong personal importance on energy and economic issues far exceeds other concerns: Reducing our nation's reliance on foreign energy imports 75% very important issue to me personally Increasing the number of good-paying year-round jobs in our communities 74% very important issue to me personally Maintaining access to trails, streams, and natural areas on National Forest land owned by the federal government 65% very important issue to me personally Helping small businesses grow and expand, so they can provide more people with benefits 62% very important issue to me personally Increasing the amount of National Forest land which is set aside as pristine wilderness with limited access 41% very important issue to me personally Even when faced with a purely economic rationale for preserving access to public lands, local residents are more likely to side with tourism, energy and economic uses. - There is very strong agreement with a number of economic reasons for maintaining access, including... 80% agree, 53% strongly agree The ability to drive into the back country to hunt and fish is important to the rural economy. Hunters and anglers spend millions of dollars every year in Colorado. We should not risk making changes that could negatively affect many small towns who rely on hunting, fishing and tourism for their local economy. 62% agree, 35% strongly agree The ability to drive on existing roads is necessary for energy companies to explore and produce energy in this area. Imposing these so-called Clinton roadless rules could mean the loss of many good paying jobs, and a multi-million dollar hit to the area's economy. We should not risk making changes that could negatively affect our regional economy. This is not to say that local voters are anti-conservation - significant numbers take part in outdoor activities. However, the data demonstrates that they believe that access to public lands is an important element in preserving a conservation ethic. - The vast majority of respondents take part in outdoor activities, with one-third having engaged in motorized recreation recently. 79% Visited a natural area, forest or park to take part in non-motorized recreation such as hiking, rafting, horseback riding, fishing, or mountain biking in the last year 70% Visited a natural area, forest or park to view wildlife or for bird watching in the last year 50% Purchased a hunting or fishing license in the last three years 33% Visited a natural area, forest or park to take part in motorized recreation, such as riding off road vehicles or snowmobiles - Thus, it is not surprising that regional voters support encouraging access to the outdoors - not limiting access. 87% agree, 44% strongly agree Whether it is from the backseat of a jeep or hiking with their family, the more children get out in the outdoors, the greater their appreciation for nature will be. We should be encouraging people to visit the forest, not limiting access to it. 72% agree, 44% strongly agree The best way to instill a love for our area's natural beauty, wildlife and special places is to encourage people to visit it. Limiting access to over one million acres will backfire in the long run, as people who do not experience the outdoors do not value and want to protect it. In summary, voters strongly resist the proposed changes in the GMUG, which could limit public access to National Forest land. Voters in this area are accessing the outdoors for a number of reasons. Voters go so far as to agree that the National Forest Service should be encouraging access instead of contemplating limits on access. In addition, the electorate in this region is more likely to place emphasis on protecting access for industry and energy production, and views those interests as personally important to them. These results are meaningful for the UFO and are consistent with the documented increase in the popularity of vehicle-based recreation. Please consider this information as you develop Alternatives. |
| 1945 | Analysis of impacts will consider potential interaction between management decisions and changes in the larger social and ecological context. In particular, impacts will be analyzed to consider potential interaction with larger-scale dynamics such as climate change; proliferation of invasive species, insects, disease and wildfire; exurban development; changing recreational patterns, and the like. |
| 1985 | The Uncompahgre Field Office appears to be leading the charge in creative management of high-impact uses such as off-road vehicles. Based on Peach Valley, we have a high level of confidence that, with adequate |

**Table C-19**

**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| | resources, the UFO will develop creative approaches for other parts of the field office as well. |
| 1986 | RMRI's main perspective in these comments is exploring how recreational trails can be designed to reduce habitat fragmentation for wildlife and restore a sense of wildness to the land. RMRI is also interested in, but doesn't have a solution to, the dilemma of how to maintain the uncrowded backcountry feeling of UFO lands even as they become more popular. The only obvious solutions we can think of are confining high impact trail uses to contained areas, and leaving trail opportunities unpublicized. |
| 1987 | The 2007 Colorado BLM Recreation and Visitors' Strategy emphasizes the importance of maintaining the "distinctive character" and "wide open spaces" of Colorado BLM lands (p.3). The Strategy emphasizes the "need to maintain the distinctively undeveloped and open space character of [the BLM's] recreation settings" (p. 7). The new Benefits-Based Management approach is intended to retain "more primitive, natural-looking and undeveloped recreation settings" and acknowledges that the traditional "activity-focused approach" has been "diminishing the character of the lands that produced beneficial outcomes to the public" (p. 4). Some portions of the Uncompahgre FO not just WSAs and Citizen Proposed Wilderness still retain their primitive, undeveloped character but are at risk for losing their naturalness. The BLM should identify and actively manage these lands to protect and enhance their primitive, backcountry character. For example, in the Nucla/Naturita/Paradox Valley area, we encourage the UFO to use the RMP to reverse the downsliding of recreational settings that is occurring with the increased motorized use . |
| 1988 | The 2007 State BLM Instruction Memorandum directs managers to: "Ensure that travel management decisions...maintain prescribed setting character..." (p. 2). We recommend that the RMP maintains---and even restores---less developed recreation settings wherever they are found. Returning impacted areas to a more natural condition is justified because so much of the ROS downsliding has occurred only in the last 3 – 5 years. |
| 1989 | Tools exist for preventing ROS slippage in the future. For example, the 2007 State Director's Instruction Memorandum states on page 2 that: "For areas with Limited and Open categories, managers may impose several different kinds of limitations including vehicle numbers, types, use times or seasons, permitted use......" etc. The notion of limiting numbers of motorized users is new, but it may not be too early to look ahead to this possibility to maintain remote backcountry settings. Besides setting user thresholds, other ways to maintain open space as mentioned above are: a) reducing route densities that take the wildness out of lands b) containing and more intensively managing high impact recreation uses such as ORVs and shed antlering c) identifying and protecting the last wild places land. RMRI sent a letter separately postmarked March 29, suggesting a method for doing this last. |
| 1994 | Reducing motorized recreation impacts As trail machines get faster and more versatile the land shrinks accordingly. Recreational trail expansion is on a collision course with land health; the land base, vast as it is, is too small to accommodate indefinitely expanding trail systems. The trick is to accommodate more use and provide satisfying opportunities on less acres and less miles of trails, something the UFO has commendably managed to do in Peach Valley. Other examples that could be studied are the Oregon Dunes, Arizona Strip, and OHV areas in California |
| 1995 | Principles for sustainable motorized trail systems:<br><br>• Concentrate use in a contained areas and corridors near population centers where it can be managed and patrolled<br>• Make loops, destinations, close or tie together dead end spurs, eliminate parallel routes, avoid tempting off-trail areas<br>• Use intensive---and expensive—management in the form of signage, fencing, field presence<br>• Make paper maps and kiosks the basis for enforcement, not signs, as signs are torn down<br>• Publicize a policy that if a route is not signed or found on a map it is closed---create a "culture of compliance"<br>• A final tool for maintaining quiet settings is limiting numbers of motorized vehicles, as authorized by the 2007 State Director's IM quoted above. This is not yet common but is a tool that will become more so as competition for trails increases. Other tools for preserving less crowded, more natural-feeling settings are quotas, or even alternating days for types of use. |
| 2000 | Capacity We support the capacity recommendations in the SRCA letter. See Price, Utah, permit process. |
| 2001 | Event promotion There can be a disconnect between the outside world's unfettered promotion of BLM lands and the BLM's ability to accommodate the demand this generates. Widespread publication of new mountain bike |

BLM_0067263

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| | and motorized tail systems invites unanticipated increases in use adding to management burdens. Events also attract new attention to an area. In response to this problem, Appendix C of the LUP Handbook and the State Recreation and Visitors Strategy contain guidance on how to manage marketing so as to maintain targeted recreation settings. For example, the SRMA definitions section in Appendix C includes "appropriate restrictions on marketing" as one of several implementation actions to be done on SRMAs. This can apply to events as well. Group events should be approved contingent on the BLM's proven ability and resources to manage them, and a formal framework established whereby all the components of a well-managed, low-impact event are in place prior to the event. The Calamity Pass Enduro in the Parks Ranger District in North Park is an example of a permitted event where the Forest Service set conditions sufficient to allow the agency to keep the initiative in the negotiations and to somewhat protect the land. |
| 2002 | Dispersed Camping Motorized use off roads and trails should be discontinued except for designated parking and pull-out areas. Dispersed camping should be restricted to designated campgrounds Off-road parking should be allowed one car-width from a road or motorized trail Disallow ATV game retrieval |
| 2003 | Consistent management with adjacent FS lands Manage motorized use to be consistent with management on adjacent jurisdictions, for example Tabeguache and Camel Back/Roubideau where management on both sides of the boundary need to match. |
| 2006 | Set limits on new technology As mentioned above, ORV and mountain bike technology is on a collision course with the limits of the land. Long distance, go-anywhere vehicles have out-paced the ability of BLM lands to meet the need. Unlike grazing, mining, and logging, no laws provide a safety net for the land from new trail technologies. We recommend the RMP include a field office-wide permanent closure to any new technologies that crop up in the future such as rhinos, segways and others, until their impacts can be analyzed under NEPA. Another example is ATVs wider than 50 inches. These too should be banned until their impacts are studied. In any case they should be limited to full size vehicle roads. The definition of a trail should not be altered to include them. It is not the BLMs responsibility to accommodate indefinitely the spread of a use that has no upper limit. The BLM needs to establish a threshold for the number of vehicles it can accommodate based on carrying capacity, and for anything more, trust the industry to fall back on itself. |
| 2007 | Concentrate, do not disperse trail use Many arguments have been put forward against closing motorized routes on the theory that dispersing use on more miles of trails reduces crowding, resource damage and user conflict. This would be true if there were an upper limit to growth in motorized use. Since there appears to be no upper limit and since resource damage is already exceeding Land Health standards, motorized use needs to be concentrated in defined, well maintained corridors. The bottom line is the land, not endlessly expanding recreational access. The BLM cannot be expected to accommodate open-ended growth indefinitely. |
| 2009 | Special Recreation Permits - Outfitter-guides, fund-raising, competitive events In granting permits, put the needs of the land and of the general visitor public ahead of the demands of outfitter guides. Retaining remote settings, meeting land health standards, protecting wildlife and non-outfitted activities should come first. Set capacity limits as the Price Utah BLM did to establish limits for commercial outfitter guides and Special Recreation Permits. Allow competitive recreation events only if they can be managed to have low impacts. |
| 2010 | Mountain bike management: Much of the above applies to mountain bike trails We recommend some trails for horse-hiking only Do not locate mountain bike trails in difficult-to-patrol areas with easy off-trail access/ For example with the Paradox Trail, avoid wildlife areas, sensitive plant communities, grasslands, riparian, cryptogamic soils, etc. Trails stay open contingent on users staying on trail |
| 2011 | Shed Antlering: In this activity the ATVs move in a grid pattern going off roads cross-country, disrupting and displacing big game at a critical time in the spring when their body reserves are down and forage is not yet greened up and producing nutrition. In addition to disturbing animals, antlering damages sage brush, grasses, soils, and causes erosion and other unacceptable resource damage. The RMP is an opportunity to enact strict new regulations; and the use should be permitted like lion hunting, fishing and other highly damaging or depleting activities Antler hunters should be restricted to existing routes like other motorized users and ATV antler gathering should be prohibited altogether with a March-April seasonal closure. Like anyone else, antler gatherers should park and walk to protect the fragile soils and vegetation. Even if ATV antlering is restricted to "existing" routes, so many existing routes are out there that further closures are necessary to eliminate the impacts of this damaging activity. |
| 2012 | SRMAs/ ERMAs: ERMAs are used when there is no perceived "desire" for "structured recreation activities." We believe the Benefits Based Management outlook may be overestimating how much "structured recreation" |

BLM_0067264

## Table C-19
## Issue 3: Recreation Management

| Comment ID | Comment |
|---|---|
| | people want or how universally on the landscape they want it. Mesa State and other studies show that most BLM recreationists want a natural setting and experience. SRMAs, emphasizing "structured recreation," may also be at variance with the 2007 State Recreation and Visitors Strategy that calls for maintaining the BLM's wide open spaces. SRMAs are appropriate in concentrated areas where high impact recreation threatens to overwhelm the environment, but most places in the UFO more appropriately lend themselves to ERMAs. Undeveloped SRMAs may in rare cases be appropriate for hiking and other low impact uses where these uses need intensive management to prevent incursions and loss of primitive settings. |
| 2013 | Setting visitor numbers too high: Because the life of an RMP is 15 to 20 years, there is an incentive to set visitor encounters and group sizes artificially high on the Recreation Settings Matrix to accommodate increased recreation use over time without amending the RMP. Specifying use numbers higher than those reflecting the current situation can become a self-fulfilling prophecy, especially if a community or destination SRMA is widely advertized. We recommend instead that settings, visitor encounters and group sizes be adjusted from less crowded to more crowded incrementally over time through Adaptive Management as was done in Jack Morrow Hills. |
| 2014 | Recreation in balance with natural values: We also question a perception inherent in BBM that BLM lands are primarily for recreation, rather than recreation being presented equally with biodiversity. Mesa State studies that focus on human uses, experience and connections to the land may not have fully teased out the segment of the public who either will never go to remote lands but want to know they are protected, or those who feel that human use is not the only goal of land management but rather that landscape integrity has value in and of itself independent of its use as a recreation experience. |
| 2015 | SRMA promotion and advertising: Another contradiction that may be built into the SRMA framework is that the fact of designating a SRMA can potentially attract use that downgrades the very settings the SRMA is intended to protect. Entities such as the Colorado Tourism Bureau may also promote shoulder season" recreation on BLM lands and other opportunities that are not in sync with the BLM's intentions and capabilities. The 2007 State Recreation Strategy suggests a potential conflict between the high recreation demand generated by a "vigorous Colorado Tourism Office promotion budget" and the BLM's "fundamental duty to meet or exceed land health standards" (p. 6). "Recreation tourism demand" (p. 6) and "tourism industry promotion... sends increasing numbers of outdoor adventurers to BLM public lands," challenging the BLM's ability to "maintain the distinctively undeveloped and open-space character of its recreation settings" (p. 7.) In response to this dilemma, Objective 2 in the Recreation Strategy says the BLM will "Encourage Sustainable Tourism Collaboration" with business and tourism entities. The Recreation Strategy encourages BLM field offices to "engage the business community and local governments in ....managing....use of public lands that meet or exceed land health standards" (p. 9). We recommend measures that will allow the UFO to implement Objective 2 on page 9 of the Strategy and help outside promoters "understand approved recreation setting prescriptions and management objectives" and "market public lands responsibly." For example, the Glenwood Springs Field Office, has obtained an agreement from local government to limit marketing efforts to ensure its Community SRMAs do not morph into Destination SRMAs. |
| 2016 | MOUs/collaboration: We understand that recreation partnerships expand management capability and provide higher service delivery levels. However, in the same way that unmanaged promotion can get off track, MOUs with non-BLM entities risk stretching the BLM's land stewardship mission toward that of the partner. RMRI recommends that the BLM's mission always come first |
| 2017 | Lion Hunting: While for the most part lion hunter trucks stay on roads this activity is damaging sage grouse habitat and other sensitive resources some parts of the UFO. There are numerous lion hunting permit applications showing on the UFO website. Because lion outfitters cover so much terrain with trucks, dogs and people, up to 200 miles a day, we recommend caution in approving too many new permits on top of existing ones. We recommend that DOW lion quotas be generously accommodated. |
| 2018 | Rock Climbing: This is yet another sport that impacts plants and wildlife. Cliffs and ridges are concentrated areas for raptors, bats, and a host of bird, plant and other species. The UFO has many cliff and canyon areas and we encourage the BLM to take a strong stand in support of cliff ecosystems and place adequate constraints and regulations on this increasingly demanding sport. |
| 2027 | Whitewater enthusiasts, naturalists, and other backcountry users of all stripes value the rugged beauty, wildlife, quiet solitude, and connection to history these canyons offer. |

BLM_0067265

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| 2029 | The river supports a variety of economic and recreational activities that benefit nearby communities. Working farms and ranches, professional outfitters anglers, historians, river runners, hikers, archeologists and recreationists all share an interest in preserving the Dolores River Basin. |
| 2034 | If managed in this recommended manner, WSAs and CWP lands in the Uncompahgre FO will not only remain available for possible future designation as Wilderness, but will also ensure and expand the opportunities for backcountry recreationists to experience a sense of adventure and discovery |
| 2041 | Dolores River Canyon Special Recreation Management Area (SRMA): The 1985 San Juan/San Miguel Planning Area RMP designated the Dolores River Canyon as a Special Recreation Management Area. The boundary took in the entire corridor from the McPhee Reservoir to Bedrock, and included the Dolores River Canyon WSA. Since BLM management boundaries have since been changed, a portion of the SRMA is now within the San Juan FO and a portion is within the Uncompahgre FO. We recommend that The Dolores River Canyon SRMA retain its special management status, including the portion within the Uncompahgre Field Office. The San Juan Public Lands Draft Land Management Plan released in 2007 maintains a special designation for the portion of the corridor in their jurisdiction. |
| 2042 | Pertaining to specific SRMA planning and management procedures we ask the UFO to refer to the broader conservation community's comments we incorporated above regarding "Recreation and Special Recreation Management Areas." |
| 2064 | This is an outstanding natural landscape, which includes several unique plant and animal communities and provides one of the most spectacular recreational boating experiences in the country |
| 2073 | Importance of less-roaded lands: Due to their less roaded condition these areas may be among the few left on the landscape where vegetation is relatively intact, where forage, soil, water courses, archeologic, paleontologic and historic resources are relatively undisturbed and where wildlife security, silence, solitude, quiet use, hunting, wildlife viewing and other such qualities can still can be found. |
| 2074 | To underscore the importance of less roaded and trailed land, we trust the UFO has access to the large bibliography of studies that show the negative impacts of roads and trails on wildlife and natural resources---- research which applies to mountain bike and hiking trails as well, not just to motorized trails! |
| 2079 | Designating these areas nonmotorized is further justified by the fact that these areas have managed to stay roadless for so many decades of mining, grazing and logging that there are likely good reasons why nonmotorized designations will not preempt other uses. For the most part these areas are mesas or ridge tops with poor access or little uranium potential. |
| 2083 | Plus, the overwhelming need on this particular landscape is not for ~motorized routes, but for more unroaded undisturbed backcountry for wildlife and quiet users alike! |
| 2085 | Next Steps: Identifying less roaded areas like this could be a first step in identifying other values that make these lands worth protecting. As an example, we visually correlated the highlighted areas with maps of deer severe winter range and elk winter concentration areas, to hone in on their wildlife values. Several of the areas for example are used by wintering big game. |
| 2092 | Final Step: The final step involves management direction, giving the areas non motorized and perhaps nonmechanized management prescriptions, identifying levels of protection for plants and wildlife, levels and intensities of quiet use, whether the areas will be identified as ERMAs or SRMAs, finding citizen adopt groups, etc. |
| 2095 | This Forest Service roadless area in combination with the Tabeguache SMA forms one large, undeveloped wildlife security area that includes Spruce Mountain and a prized big game hunting area adjacent to the SMA on the north. The area is in Game Management Unit 61, one of the most soughtafter hunting units in Colorado. And much of the area appears to border an elk winter concentration area on the GIS elk map enclosed. |
| 2099 | Mountain Bike Management: The BLM Tabeguache Special Management Area is a wilderness area in everything but name and as such needs to be managed for horse and hiking use only, not for motorized or mountain bike use. We understand the BLM has been actively managing it this way and we would like to thank you and strongly recommend that mountain bikes continue to be disallowed. |
| 2114 | Nyswonger Mesa is an example of an area that should be actively analyzed by the BLM for its forage and wildlife values and for its potential to be set aside as a rare and needed quiet use area. |

*Uncompahgre Resource Management Plan Revision and EIS*
*Final Scoping Summary Report*

BLM_0067256

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
| --- | --- |
| 2121 | Skein Mesa and Wild Steer Mesa: It is not clear if these areas are inside the UFO boundaries, but like the other areas highlighted on the map, they appear to have potential nonmotorized, quiet use areas. |
| 2125 | The UFO management unit contains some of the most heavily used and productive Colorado Division of Wildlife (CODOW) game management units (GMU) in the state. Any development within the UFO TRCP Scoping Comments: Uncompahgre Field Office RMP 2 management unit should be planned to uphold and maintain the wildlife and sportsmen's values of these GMUs. |
| 2126 | The eleven GMU's (52, 53, 60-65, 70, 411 and 521) that partially or wholly fall within the UFO management unit are used by sportsmen to hunt mule deer, elk, turkey, mountain lion, desert and rocky mountain bighorn sheep, black bear and pronghorn antelope. In 2009 24,239 elk hunters (12% of the total elk hunters in the state) frequented the GMU's falling within the UFO management unit and this activity accounted for 125,364 recreation days (12% of the total elk hunting recreation days in the state). These GMU's also hosted 8,007 mule deer hunters amounting to 36,495 recreation days last year. In terms of harvest, a total of 6,364 elk (13% of the state total) and 4,508 mule deer were harvested within these GMU's. Out of the 185 GMU's in the state, GMU 62 ranked first for total number of elk hunters and total elk hunting recreation days while ranking fifth for total elk harvested in 2009. GMU 70 ranked fourth in the state for total number of elk hunters, third for total elk hunting recreation days and second for total elk harvested in 2009. These two GMU's were also extremely productive for mule deer hunters as shown in the harvest data from 2009. GMU 70 ranked second in the state for total number of mule deer hunters and total mule deer hunting recreation days while ranking first for mule deer harvest. GMU 62 ranked third in the state for total number of mule deer hunters, total mule deer hunting recreation days and total number of mule deer harvested. The BLM lands that fall within these two highly touted and productive GMU's (primarily San Miguel, Montrose and Ouray counties) should be given special consideration in the UFO Resource Management Plan (RMP). It is also worth noting that only three GMU's in Colorado were licensed for desert bighorn sheep hunting last year, two (GMU's 62 and 64) of which occur within the UFO management unit. Montrose, Delta, Gunnison and Mesa counties were very productive for turkey hunters in 2009, accounting for 16% of the total statewide turkey harvest. |
| 2133 | The BLM should detail in the UFO RMP how public lands within the UFO management unit will be managed for a balance of uses, as required by the Federal Land Policy and Management Act (FLPMA). The FLPMA mandates multiple-use on BLM administered lands. The RMP must address the current and future effects of management and development on outdoor recreation and fish and wildlife conservation with regard to several key species including elk, mule deer, trout, bighorn sheep, pronghorn antelope, turkey, black bear and mountain lion |
| 2136 | The UFO RMP should recognize the areas of significant value for outdoor recreation and plan accordingly. |
| 2140 | The UFO should take close consideration of Executive Order 13443, issued on Aug. 16, 2007 and Instructional Memorandum No. 2008-006 issued Nov. 12, 2007. (Available at: http://www.blm.gov/nhp/efoia/wo/fy08/IM2008-006.htm) According to Bureau of Land Management (BLM) Instruction Memorandum No. 2008-006, Implementation of Executive Order 13443, Facilitation of Hunting Heritage and Wildlife Conservation, the Bureau of Land Management directed State Directors to:  Evaluate trends in hunting participation and implement actions that expand and enhance hunting opportunities for the public; Establish short and long term goals to conserve wildlife and manage wildlife habitats to ensure healthy and productive populations of game animals in a manner that respects state management authority over wildlife resources and private property rights;  Seek the advice of state fish and wildlife agencies, and, as appropriate, consult with the Sporting Conservation Council (SCC) in respect to Federal activities to recognize and promote the economic and recreational values of hunting and wildlife conservation. The Order also directs the Chairman of the Council on Environmental Quality, in coordination with federal agencies and in consultation with the SCC, state fish and wildlife agencies and the public, to convene, within one year after this Executive Order is signed, and periodically thereafter, a White House Conference on North American Wildlife Policy to facilitate the exchange of information and advice needed to fulfill the purposes of the Order. In addition, the Order calls for a comprehensive 10-year Recreational Hunting and Wildlife Conservation Plan that will set forth an agenda for implementing the actions called for in the Order. <br><br> 1. Presidential E.O. 13443 and BLM Instruction Memorandum No. 2008-006 further requires the BLM to take the following actions: To carry out the Order, the BLM must collaborate with a diverse cross-section of state, local and tribal governments, scientists, landowners, individual sportsmen, non-profit organizations and other interested parties (Non-Federal Partners). To facilitate collaboration, it is important that we identify the near-term and long-term actions currently ongoing or under consideration throughout the agency. This will result in a coordinated approach to implementation, |

BLM_0067267

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| | while also giving due consideration to the missions, policies and authorities unique to each agency. |
| | 2. Furthermore, according to Executive Order 13443, which states that the United States Department of Agriculture, and the Department of Interior shall: |
| | • Evaluate the effect of agency actions on trends in hunting participations and, where appropriate to address declining trends, implement actions that expand and enhance hunting opportunities for the public; |
| | • Consider the economic and recreational values of hunting in agency actions, as appropriate; |
| | • Manage wildlife and wildlife habitats on public lands in a manner that expands and enhances hunting opportunities, including through the use of hunting in wildlife management planning; |
| | • Work collaboratively with State Governments to manage and conserve game species and their habitats in a manner that respect private property rights and State management authority over wildlife resources; |
| | • Ensure that agency plans and actions consider programs and recommendations of comprehensive planning efforts such as the State Wildlife Action Plans, the North American Waterfowl Management Plan and other range-wide management plans for big game and upland birds. |
| | 3. UFO RMP should adhere to the direction of the President and the director of the BLM by implementing the instructions of this order and instructional memo. These actions will help ensure that planning and development within the UFO is better balanced with the needs of fish and wildlife and sportsmen. |
| 2145 | In our view, there needs to be a new strategy to conserve fish and wildlife habitat and associated hunting and fishing recreation while minerals are being extracted from all federal public lands, including BLM lands. The current strategy employed by BLM in Wyoming, Colorado, Utah and other states, has and is resulting in unreasonable losses of fish and wildlife resource values that hunters and anglers believe are avoidable with a new approach to public lands management. The TRCP stands ready to assist the UFO in devising a RMP that balances the needs of fish, wildlife and their habitat with responsible energy development. |
| 2180 | Some of our members are natives, others are decades-long residents, still others are more recent arrivals; but all have increasing concerns about the proliferation of vehicle travel off established routes and into previously undisturbed country. Before and during WW II much off-road travel was related to managing livestock operations. During the 1950's tracks were bulldozed in a variety of locations looking for uranium. And in the 1960's The BLM undertook the chaining of pinyon-juniper stands, and the disc plowing of sagebrush flats in vegetation management efforts. The transportation net produced by these activities was consolidated each Fall by an influx of big game hunters (increasingly mechanized) throughout BLM lands, but especially on the Uncompahgre Plateau |
| 2181 | In reviewing the categories to be addressed in the RMP which were presented at the open house sessions, with few exceptions the impact of unrestricted machine travel on the subject of those categories was an important, and sometimes crucial element in the problems identified or management actions contemplated. Cultural and paleontological resources can in some cases actually be damaged by machine wheels or tracks, but in any case, unrestricted and uncontrolled travel can increase the opportunities and probability of vandalism. Wilderness Study Areas not only require control, but exclusion of vehicles. In many of the other categories vegetation is the crucial landscape element whether special-status plant and wildlife species or wildlife habitat in general, livestock management, weed control or water and soils are concerned. And it is the vegetation and often the soil that is most immediately and destructively impacted by machine travel. |
| 2186 | We urge the UFO to control and strictly limit gas production, mining, motorized recreation, and other uses that threaten the long-term health of natural ecosystems |
| 2189 | We urge you to preserve BLM land for future generations and to favor the following low-impact uses: Backcountry silence and solitude. Areas for bird watching, hiking, quiet use, nonmotorized hunting. Quiet, natural soundscapes and landscapes, free of motorized noise |
| 2197 | Recreation Permits: Allow competitive recreation events only if they can be managed to have low impacts and if they do not significantly increase overall use. Set carrying capacity limits and other restrictions on commercial outfitter guides and Special Use Permits |

BLM_0067268

## Table C-19
## Issue 3: Recreation Management

| Comment ID | Comment |
|---|---|
| 2198 | Antler collection: Continue to implement and enforce prohibitions on elk and deer antler collection to stop impacts on soils, vegetation, watersheds and wildlife. |
| 2199 | Dispersed camping: All motorized travel should be restricted to existing roads and trails and designated parking and pull-out areas. Dispersed camping should be restricted to existing campgrounds, which should be designated as official campsites. The BLM should not allow vehicular camping anywhere else. |
| 2204 | Limit off-road vehicles to areas where they will have minimal impacts on wildlife habitat, quiet users and the solitude of BLM backcountry. According to retired Forest Service wildlife biologist Craig Grother, "It is clear that motorized vehicles affect big game populations, security, distribution, and reduce habitat effectiveness |
| 2293 | The fact that TMW member ship is 55 + years should give the planning team the Idea that we have not always been motorized users. Most of our members ride ATVs because we are not able to enjoy public land any other way. This does not mean that we want exclusive use for motorized users. Instead we as a user group want to protect the rite for anyone to use public land as long as they respect and protect the recourses. |
| 2294 | Further through the availability of grant funds(from registration fees through state parks) the motorized community brings more monetary clout to the table than any other user group. |
| 2295 | I have concerns about the methods of control presently used by public land managers in their decisions. Too often it seems that scientific data is often used in misleading ways to reach a desired goal. Example !! motorized use is detrimental to wild life. In my experience and in most studies a man walking with a dog is the most disruptive to wild life. Motorized is in most cases listed quite a ways down the list. Also too often the protection of plant species when used to restrict use is often only a front for the obstruction groups. |
| 2296 | The increase of ATV use and extreme Jeeps is on the increase while over night and extended camping is decreasing. This trend needs to be addressed in this planning process. |
| 2340 | Although most of this letter is a "standard" letter composed by The Wilderness Society, I wanted to stress my personal impression of the importance and value of the Uncompahgre lands. I have hiked and climbed in this area, and marveled at the unbroken expanse of wild beauty. Please ensure that the RMP maximizes protection, and prohibits development, of the remarkable wilderness characteristics of Uncompahgre. Thank you! |
| 2357 | Although what follows is essentially a form letter, I have backpacked in the Uncompahgre area numerous times, & I feel strongly that permanent protection is well deserved. |
| 2359 | I travel from New Mexico to the Uncompahgre area every year to enjoy the wilderness |
| 2364 | I have rights too!!! I and others who enjoy quiet hikes and camping in our national parks should not be subjected to the noise and pollution of orv's!!!!! Their rights do not trump mine!!!!!!!!!!!!!! |
| 2373 | Recreational use should be carefully controlled as well, and be of the quiet type. |
| 2382 | Please don't allow this land to be exploited. Low impact backcountry recreation is rapidly becoming more popular and that is an environmentally sensitive way this land could contribute to the economy. Please don't allow development and non-human-powered recreation which will irreversibly damage another great tract of land. |
| 2385 | There is enough land in the West which has been used for oil and gas development and that allows ORV use. |
| 2391 | And for people to hike, camp, observe and breath in quiet |
| 2393 | I'm commenting on the Uncompahgre RMP revision. My wife and I want a large part of this area set aside to protect wilderness-quality lands, wild rivers, and opportunities for quiet, backcountry recreation. |
| 2406 | The Uncompahgre Field Office includes some of Colorado's best wilderness-quality lands, wild rivers, and places to go hiking and bird watching. |
| 2410 | The BLM needs a thorough management plan as part of the RMP to make sure that planning is done carefully with wilderness and wildlife in mind. Lands with wilderness characteristics should be closed to motorized and mechanized use. These lands should not be open for drilling of any kind. |
| 2431 | Aloha, My husband & I vacation in Colorado and truly enjoy your wild areas. We both enjoy the wild areas; hiking, fishing and wildlife viewing. |
| 2438 | I grew up in Colorado, climbing its mountains and fishing its lakes and streams. As a student in Forest Recreation at Colorado State University, I wrote my first letter to Congressman Wayne Aspinall, begging him to spare the |

BLM_0067269

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| | Gunnison from development. |
| 2439 | My husband and I camped in the Delores Canyon area last October and we were pleasantly surprised. What a beautiful and hidden gem of Colorado. |
| 2456 | An excellent way to ensure that taxpayers have environmentally-safe access to these lands is to encourage mountain biking. This method of travel on trails allows users access without damaging ecosystems. Compared to allowing people on horses, for instance, mountain biking does not damage trails and mountain bikers are typically very environmentally aware individuals. |
| 2464 | Additionally, my kids and I enjoyed rafting in one of Colorado's rivers with a Wipe-Out turn. Lots of fun and we got drenched. LOL!! Good times!! |
| 2467 | I strongly support wilderness, just last year I traveled to that area to recreate. I am a hunter an outdoorsman & a taxpayer & I support wilderness and protections for wildlife. |
| 2496 | I go to these places of peace to seek the solitude of my soul. To me it's like going to the highest church in our lands. We must remain the stewards of these spiritual environs and protect the wild life that live there. The Uncompahgre must stay in its pristine state. We must leave it as God's country |
| 2500 | My family and I are outdoors recreationists -- hike, backpack, paddle. There are 10 voting age Davidsons, from WV, MD, GA, and TN. Our comment is unanimous: We have all been in the Uncompahgre, we know it is rugged and gorgeous country. We all support its protection at highest levels. Wild rivers, roadless areas, wildlife corridor protection -- all of that. |
| 2521 | As the BLM has noted, recreation is the predominant activity on these lands. Protecting these lands for non-destructive recreational uses has the added benefit of helping protect wildlife habitat, cultural resources, and mitigating the impacts of climate change. Use fees should be avoided where possible, but particularly in an age of tight budgets, affordable user fees are a responsible way to let the public contribute to the management of the resources they value and allow planners more options for thoughtful protection and utilization of BLM lands |
| 2527 | Having walked up to the peak of Uncompahgre and camping in the meadows below, I can say first-hand that this place is one of the most peaceful places I have ever been. It deserves to remain so. |
| 2541 | Thank you for the opportunity to comment on the Uncompahgre RMP revision. As a former New Mexico resident, I enjoyed many of my vacations hiking and enjoying the Uncompahgre. Those days are some of the most blessed and treasured of my entire life. |
| 2553 | Though I currently live in Texas, I have spent at least one month every summer since 2000 in southwest Colorado. Some of my finest outdoor memories come from hiking, camping and fishing in the region near and around the Dolores River. I urge you to increase protections for this vital region. |
| 2555 | As active outdoors enthusiast - by active I mean getting out there with my own two feet, across Colorado's natural areas, I encourage the BLM to emphasize resource protection in this Resource Management Plan. |
| 2577 | We love and have enjoyed many spectacular hikes in the Uncompahgre |
| 2589 | The lands to be covered by this plan are lands that I do visit for recreational purposes because I am fortunate enough to live relatively close. As such, I truly appreciate these lands' incredible scenic and recreational values-- values that your new plan, as its highest priority, should protect. Thank you for considering these comments. |
| 2632 | Motorized recreation has been and remains largely unpatrolled, unenforced and is bordering on an outlaw activity because riders of ATVs, dirt bikes, etc understand there is none to minimal enforcement. In view of the President's declaration that our dependence on foreign oil is a National Security issue and we must engage in conservation, BLM should take this mandate seriously to minimize greenhouse gases, soil erosion and noise pollution. The science on this issue as presented in the new book, Thrillcraft by George Wuerthner is a comprehensive source that BLM must consult in evaluating any alternatives regarding Motorized Recreation |
| 2633 | The BLM should at a minimum, analyze alternatives including No Action (status quo), No ATVs, Dirt Bikes or Snowmobiles, or the new experimental playtoys, Personal Aerial Vehicles, and the level of use allowed in the current set of alternatives. Some of the science regarding this issue is presented in the following paragraphs. |
| 2634 | Enforcement: The USU Institute for Outdoor Recreation and Tourism has conducted studies showing that nearly 40% of riders admit going off legal trails on their last ride. The Forest Service published a Technical Report in 2005 (RWU – 2905) that recognized there is a lack of evidence that educational programs lead to |

*Uncompahgre Resource Management Plan Revision and EIS*
*Final Scoping Summary Report*

BLM_0067270

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| | behavioral changes in motorized users. The DEIS must provide evidence that any proposed mitigation and enforcement efforts will be effective for those alternatives that allow any level of use by these machines. |
| 2635 | Noise and Safety: The DEIS must address safety and noise effects to non-motorized users and wildlife. Quiet environments are becoming extremely rare. In a recent study by a professional sound recorder who visited 15 western and Midwestern states, it was found that quiet periods longer than a minute and a half without the sound of motors were difficult to find. Another study pointed out that in 1999, the decibel levels of conversation among Americans had risen to 65 decibels, up 10 decibels from a decade earlier, or a doubling of volume due to elevation of background noise levels. While it is recognized by OSHA and other health officials that exposure to noise of 85 decibels and higher leads to hearing loss, noise at even lower levels can lead to physiological changes in blood pressure, sleep, digestion, and other stress-related disorders. Former U.S. Surgeon General William H. Stewart stated that, "Calling noise a nuisance is like calling smog an inconvenience." , , , . Loud noise, even within established health guidelines, can lead us to feel, angry, frustrated, annoyed and prone to violence in addition to contributing to hearing loss. In the period between 1982 and 2000, the incidence of measurable hearing loss increased by 15 to 60%, depending on the age group. In 1999, the U.S. Census Bureau rated noise as the single biggest neighborhood problem among those surveyed. More than one in ten people cited traffic noise as of concern and nearly half of those said they had considered moving as a way of escaping such noise. The EPA has found that 20% of those surveyed are "highly annoyed" when sound levels reach 55 decibels. Federal regulations for highways dictate that if a new or expanded road will yield noise levels of 67 decibels or higher, efforts must be made to bring about a substantial reduction in noise levels. Generally this involves construction of sound barriers. After Zion National Park banned private vehicles and instituted a low pollution shuttle bus system, visitors commented that the absence of RVs with generators running, buses with clouds of diesel fumes and noise were noticeable and that they could now hear birds calling, streams running, and other low-volume sounds of nature that were previously obliterated by "vehicle noise". Noise is a particularly objectionable aspect of snowmobile use. A Park Service report showed that even "quiet" snowmobiles could be heard more than two miles away, thus affecting a four-mile wide area adjacent to travel corridors or use areas. This means that a snowmobile traveling 50 miles in one day, which they can easily do, can affect an area of 200 square miles. A visitor survey at Grand Teton National Park found that 96% thought snowmobiles had a negative impact on the park because of noise, air pollution and negative effects on wildlife. |
| 2636 | Air and Water Pollution: Public Lands and National Forests should function primarily as the watershed for local communities and for preserving natural stream flows and water quality. The combined effects of sediments from watershed uses such as roads, OHVs, grazing and logging, have not been addressed in a comprehensive analysis. No evaluation has been done for the contribution of hazardous pollutants to the air and watersheds where motorized vehicles are used. Atmospheric inversions and canyon environments can trap and hold these hazardous air pollutants and raise exposures to people and wildlife. Fuel and lubricants used in these machines spill on the ground and are carried out in exhaust streams and then deposited into the snow and soils wherever they go. They contain benzene, xylene, toluene, polycyclic aromatic hydrocarbons and other hazardous organic chemicals. As the Montana DEQ states, "A portion of the air/fuel/lubricant charge escapes directly to the atmosphere with the combustion products, producing poor fuel economy and releasing high levels of hydrocarbons as air pollutants. This phenomenon is known as "short circuiting." EPA models and emission factors should be used to determine the impacts on the environment and exposures to cross country skiers and snowmobile users from these machines. Other information is available showing that noise levels of both two-cycle and four-cycle engines reach levels up to 110 dB even in four stroke engines. EPA and the Montana Department of Environmental Quality have provided research on this issue. The EPA and Montana DEQ websites provide links to much of this information and EPA has modeling protocols to allow prediction of emissions from these vehicles . Accumulations of motorized hydrocarbon pollutants from rubber tires, fuel and motor oils collect on rocks and within pothole waters within streams and canyon (USDI, 2005 Jeep Safari EA) which can support and adversely affect wildlife, growth of amphibians and invertebrates used for prey bases (Lefcort et al, 1997). Vehicle disturbance within streams can also negatively affect reproduction of amphibians where eggs and growth occur in warm pools which can be fatally crushed or covered with silt as vehicles pass (Schelz, Salt Creek Report 2001). Limitations on the number of motorized uses and areas of use need to be included in the BLM Preferred alternative of the DRMP/EIS to reduce these motorized impacts. The pollutants emitted by these machines are carcinogenic to humans and highly persistent in the environment, adversely affecting terrestrial and aquatic organisms, including reduced plant productivity, tree mortality and making plants susceptible to disease and pests. |

BLM_0067271

## Table C-19
## Issue 3: Recreation Management

| Comment ID | Comment |
|---|---|
| 2638 | Western Colorado is one of the most beautiful and fragile regions in the West. I have spent many days exploring the wild Uncompahgre Plateau, floating the Delores and Gunnison Rivers, and enjoying the solitude and peace found on these lands |
| 2644 | In addition, many hikers/campers travel to this region to enjoy the solitude and lack of travel and resources infrastructure. Their recreational dollars add to the region's economy. |
| 2649 | I live in Maryland, but vacation frequently in Colorado. We have rafted on several occasions in the area that you manage and have also hiked many wilderness areas in Colorado. |
| 2678 | I'm a recreational hiker and believe Colorado contains some of the most beautiful hiking areas in the world |
| 2685 | We live much of the year near Placerville, Colorado and drive, raft and hike this area often. |
| 2689 | I have hiked in, backpacked in, camped in, mountain climbed in, loved, appreciated & been awed & inspired by these lands since I was a teenager - and I'm 54 now. Please protect these precious, irreplaceable lands for our kids and theirs! |
| 2694 | Hello, I have rafted 100 miles of the Dolores River and I believe that it is a truly rare and wonderful part of our country and Colorado |
| 2707 | As a sportsman that applies annually for the opportunity to pursue game in Colorado, thank you for the opportunity to comment on the Uncompahgre RMP revision. The unspoiled wildlands of Colorado are the main draw that brings me and the money I spend in local economies back to Colorado each year. |
| 2713 | I appreciate the opportunity to comment on the Uncompahgre RMP revision. The Uncompahgre is the one place in this entire country that I fell in love with as a youngster and to which i now return over and over again. Though I now live in Pennsylvania, nonetheless I still take my own kids back to the area and in fact we're coming once again this summer for backpacking on the Continental Divide Trail. |
| 2741 | As a child I spent countless summer days hiking and camping in the Uncompahgre wilderness. It is the most beautiful, pristine, and wild part of Colorado. Now, as a parent with two daughters of my own, we return to Colorado, and to that part of the state specifically, to give our daughters the opportunity to experience wild places at their best and most beautiful. This land needs to be preserved for their children as well. |
| 2744 | As a hiker and camper I have thoroughly enjoyed my family visits to the Uncompahgre |
| 2759 | Almost 30 years ago, my son and I hiked to the summit of Uncompahgre Peak. It remains, for both of us, a peak father-son adventure in several senses of the word. I want future generations to have a chance for the same kinds of adventures. |
| 2810 | National Visitor Use Monitoring Program: The Moab Field Office completed a National Visitor Use Monitoring Program (NVUM) as a pilot project for visitor use monitoring on BLM lands. The NVUM for the Moab Field Office was developed through an interagency agreement with the Forest Service to be useful, in part, for making decisions during the planning process. BLM's website on the program explains the NVUM's relevance and applicability: Such visitor monitoring information enables BLM to incorporate statistically valid visitor use monitoring information into planning and management decisions as well as long-term monitoring assessment. The FS NVUM system provides BLM with accurate data with high confidence levels for reporting to Congress and constituents, thereby building credibility and establishing legal protection in decision-making. BLM, Visitor Use Surveys &Research, http://www.blm.gov/wo/st/en/prog/Recreation/nationalrecreation/visitorusesurveys.html. The information provided from the NVUM shows that motorized use is a small portion of recreation activity on public lands in the Moab Field Office. The NVUM states: "In terms of total participation, the top five recreation activities of the visits to the Moab Field Office were viewing natural features, hiking/walking/trail running, relaxing (hanging out, escaping heat and noise), viewing wildlife and driving for pleasure (Table 16)." The Uncompahgre Field Office should conduct a similar survey in preparation of the RMP. If the UFO also finds that quiet-use recreation is the most prevalent type of activity on public lands within the field office, it should ensure the RMP reflects that finding and adequately accommodates quiet users. |
| 2811 | Colorado BLM Instruction Memorandum CO-2007-020: This guidance acknowledges the importance of comprehensive recreation and ORV management to "facilitate attainment of management objectives and maintain prescribed setting character-which is also essential to achieving Benefits-Based Management objectives." The IM also restates BLM's commitment to generally limiting motorized use to designated roads and trails, such that "open areas will be limited to a size that can be realistically managed and geographically identifiable" and "expansive open areas allowing cross-country travel, without a corresponding and identified user need/demand, |

### Table C-19
### Issue 3: Recreation Management

| Comment ID | Comment |
|---|---|
| | will not be designated in RMP revisions." Further, the guidance provides for designating routes to dispersed camping and day use sites and limiting use of motorized vehicles to these routes, only providing for use off of these routes where "needed" and "appropriate," and then subject to specified distances and time periods; in this context the IM refers to being "consistent with the policies of the United States Forest Service OHV Rule." Since the Forest Service has been updating its guidance, we wanted to clarify the manner in which dispersed camping should be handled to be both consistent with this policy and with BLM's other goals for management of the public lands in the Uncompahgre Field Office. The Forest Service Travel Management Rule (36 C.F.R. § 212.51(b)) provides, in relevant part: The responsible official may include in the designation the limited use of motor vehicles within a specified distance of certain designated routes solely for the purposes of dispersed camping or big game retrieval. Such designations represent site-specific decisions associated with specific roads and trails or road or trail segments, rather than a blanket exception to the rule. Designations under 36 CFR 212.51(b) will be applied sparingly to avoid undermining the purposes of the rule and to promote consistency in implementation. (emphasis added). The Forest Service Travel Management Directives, proposed March 9, 2007, and finalized December 8, 2008, reinforces that the allowance for dispersed camping is a designation of motorized use, as opposed to a blanket exception to designation of motorized use. FSM 7715.64 provides, in relevant part: 2. [This authority] should be used sparingly to avoid undermining the purposes of the travel management rule and to promote consistency in its implementation. 4. Responsible officials should consider providing designating [sic] routes to dispersed camping sites as an alternative to authorizing off-route cross... Accordingly, as stated in the rule and directives, any dispersed camping allowance must be treated as a specific designation and consistent with other travel planning regulation and guidance, which is also consistent with the provisions of Colorado IM CO-2007-020. The Southern Rockies Conservation Alliance recommendations on application of the Forest Service approach are similarly applicable here: BLM should allow visitors to disperse camp generally, but restrict motor vehicle travel for the purposes of dispersed camping according to a combination of the following options, as dictated by resource, safety, and private property concerns: a) Forest visitors may park a motor vehicle within one vehicle length from the edge of the road surface when it is safe to do so and without causing damage to the resources of the public lands (campers walk to access a backcountry camp of their choosing), and/or b) Motor vehicles may access signed campsites via designated camp spur routes that are signed and demarcated on a travel management map. In certain places or certain times, the BLM may need to restrict dispersed camping altogether. These provisions should be incorporated in the Uncompahgre RMP. We recognize that the Uncompahgre Field Office has recently become a leader on this issue and we commend the UFO for the dispersed camping policy established in 2009 in the Dry Creek TMP. The Dry Creek EA seemed to describe the situation clearly and due to this established a very strong and well-supported policy. For example, page 184 of the EA stated: Off-Route Parking, Camping, and Game Retrieval Policy: For BLM Public Lands and National Forests the distance that OHVs are currently permitted to drive off existing or designated routes for parking, camping and game retrieval is 300 feet. This regulation applies generally to most BLM and Forest Service-managed lands, with the exception of developed recreation facilities and other areas of concentrated use where parking or camping is restricted to designated parking areas and camping spurs. Due to higher levels of public use on the Public Lands and National Forests, BLM and Forest Service managers are concerned that the longstanding 300 foot regulation is outdated and no longer provides adequate protection of vegetation and other resources. One of the major concerns with the 300 foot regulation is that new routes are often created through repeated use, and these new routes in turn become the starting points for additional 300-foot long or longer extensions. As a result of these concerns, both the Forest Service and BLM are revising their regulations to decrease or eliminate the distance that motor vehicles can legally drive off routes to park, camp, and retrieve game.) The Dry Creek Record of Decision CO-150-2008-33 EA, Page 3, states: Parking In order to minimize resource impacts and help prevent new user-created routes, users are allowed to park motorized or mechanized modes of travel immediately adjacent and parallel to available designated routes for any purpose. Parking is limited to one vehicle-width from the edge of the route. Users are encouraged to park motorized or mechanized modes of travel in already disturbed areas whenever possible, consider safety, and keep routes passable for other users. Camping Short spur routes leading to popular dispersed campsites are designated and identified. Dispersed camping is allowed in other areas, consistent with parking requirements described above. We fully support this policy and therefore request that this policy be carried over on the entire Uncompahgre Field Office in this RMP. The Dry Creek EA acknowledges the many impacts to resources associated with routes created for dispersed camping. The RMP should not ignore those impacts which BLM already found to be significant and lasting; the RMP should assess those impacts field office-wide and take comparable steps to mitigate them. |

BLM_0067273

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| 2812 | Land Health Standards: Healthy lands are a critical part of recreation experience, and it is equally important that recreation not degrade the quality of the public lands, as acknowledged by FLPMA and the regulations discussed above. We recommend that the recreation portion of the RMP take as one of its primary objectives to meet or exceed the 1996 Colorado BLM Land Health Standards (approved in February 1997 by the Secretary of Interior) pertaining to "Upland Soils and Riparian Systems," "Healthy Plant and Animal Communities," "Special Status and Threatened and Endangered Species," and "Water Quality, The Colorado BLM's Recreation Management Guidelines, issued in December of 2000 by the Resource Advisory Councils of Colorado in partnership with the agency, commit to management of recreation "while at the same time minimizing and preventing adverse impacts to land health, ecosystems, and cultural or natural resources" and specifically incorporate and attach the Land Health Standards. |
| 2813 | Colorado BLM Recreation and Visitors' Strategy: The 2007 Colorado BLM Recreation and Visitors' Strategy directs managers to consider impacts on "land health standards" (p. 4) and the need to "uphold our [BLM's] fundamental duty to meet or exceed land health standards" (p. 6). This strategy also provides an approach that will maintain the open spaces on the lands managed by the Uncompahgre Field Office. Many portions of Uncompahgre BLM lands, not just WSAs and proposed wilderness, fall into the more primitive category of BLM lands that are at particular risk for losing their naturalness. The 2007 Colorado BLM Recreation Strategy emphasizes the importance of maintaining the "distinctive character" and "wide open spaces" of Colorado BLM lands (p.3). The Strategy emphasizes the "need to maintain the distinctively undeveloped and open space character of its [BLM's] recreation settings" (p. 7). The BLM should commit to actively managing these lands to protect and enhance the primitive, backcountry experience. |
| 2814 | Guidelines for Managing Access between BLM and Private Lands: Attached to these comments are guidelines that have been adopted by the Royal Gorge Field Office and endorsed by the BLM's Front Range Resource Advisory Council. The guidelines provide generally that: "Other than for foot and horse uses, entry to public lands from private lands must comply with the designated transportation system and be limited to the same means of travel that the general public uses from public access points." These guidelines were developed to address a substantial increase in user-created motorized roads and trails leading from private lands onto the adjoining public lands that did not comply with federal management. These guidelines should be incorporated into the Uncompahgre RMP. |
| 2816 | Standards for Issuance of Special Recreation Permits: BLM should adopt unambiguous, protective criteria for issuance of special recreation permits (SRPs) in order to effectively manage the increase in commercial and competitive group activities that can have a significant impact on the lands in the Uncompahgre Field Office. The BLM Handbook on Recreation Permit Administration (H-29301) clearly states that field offices can and should develop guidelines for issuing SRPs. The Handbook states: "Field Offices are encouraged to develop thresholds through land use planning for when permits are required for organized groups and events for specific types of recreation activities, land areas, or resource settings" H-2930-1 at 13. On the issue of Special Area Permits, the Handbook states: "Applications for Special Area Permits issued to individuals are processed according to the area-specific land use and/or business plan, or guidelines approved by the State Director." H-29301 at 17. The Uncompahgre Field Office therefore must provide clear guidelines for processing Special Area Permits, because in this situation the Handbook directs that permit issuance will tier to the RMP.13 The Price Field Office Draft RMP, Appendix 14, (attached to these comments) provides an excellent example for evaluating SRP applications and issuing such permits. It classifies SRPs into four distinct classes, ranging from least intensive to most intensive, based on specific factors such as type of equipment, size of area used, number of participants, etc. These factors are defined and then compared in a simple permit classification matrix consisting of Classes I through IV (with I being for smaller and less impacting events and IV being for larger, more impacting events). Each Class also has an example of the type of event that may fit into the category. After the Class is determined, the BLM can then look to see how permit types fit into Recreation Opportunity Spectrum Classifications and/or Special Recreation Management Area (SRMA) or Extensive Recreation Management Area. Various SRMAs can be broken into classes and it is easy to see what types of uses and events should be permitted for each area. Because the standards set out in the Price Draft RMP are very specific (for example, surface disturbance of 5-40 acres ranks as "medium intensity"), BLM can easily determine whether to issue an SRP and where, and can better estimate cumulative impacts from such permits. The Uncompahgre RMP should use the model provided by the Price Draft RMP for classification of SRPs to define which uses may be appropriate or inappropriate in specific areas. BLM has not only the discretion to establish SRP guidelines, but also the obligation to do so in order to protect the resources that the RMP is intended to protect and sustain. 13 Analysis of the Impacts of permits on a cumulative basis Is also best accomplished in the RMP, since it will provide for a more |

*Uncompahgre Resource Management Plan Revision and EIS*
*Final Scoping Summary Report*

BLM_0067274

## Table C-19
## Issue 3: Recreation Management

| Comment ID | Comment |
|---|---|
| | comprehensive, Informed analysis that can look at both cumulative and site-specific environmental consequences, as required by NEPA. |
| 2817 | Criteria for Addition of New Motorized Trails: In order to ensure that priority ORV management is addressed, the BLM should implement a prioritization hierarchy in which new construction is secondary to and incumbent upon successful restoration and prior achievement of other ORV related management goals. Management activities such as restoration and rehabilitation of existing impacts, signage and achieving compliance should take precedence over approving new motorized construction or adding motorized system trails that further increase the agency's management burden and might further retard other resource actions that are critical if not addressed first. The goal of this priority hierarchy is to 1) take care of the resource impacts from past ORV related activities; 2) establish conditions to prevent new and/or reoccurring ORV related impacts; 3) secure long term commitments, stipulations, and thresholds of new and existing system routes; and (4) once above priorities have been met, new proposals can be considered and reviewed through NEPA. Thus, in assessing whether additional motorized trails are to be considered, and if appropriate, approved, we recommend the following set of principles which builds upon the Royal Gorge Field Office's criteria set out in the Arkansas River Travel Management Plan Environmental Assessment, Appendix 6 (pp. 225-227). To provide for appropriate motorized uses, while also protecting the area's resources, the BLM should establish the following criteria for addition of new motorized trails to help guide future management and development of the ORV activities on the Uncompahgre FO:

Approve construction of new or additional trails only after the following conditions have been met:

    a.   The decision to approve the trail(s) has been authorized under a site specific EA or EIS that analyzes the site-specific environmental effects of the proposal.
    b.   The proposal would further the goals and desired future conditions (DFCs) identified by the agency.
    c.   Priority implementation of effective on-the-ground closures (Le. barriers, gates, berms) and restoration work (i.e. ripping/seeding, decommissioning, re-contouring, re-vegetation) has been completed and adequate funding and grants, partnerships/volunteer commitments, staff time allocations has been secured and employed.
    d.   Implementation of all necessary signage (for closed and open routes) has been fully installed and adequate funding and staff/volunteer time for installment has been committed to.
    e.   The proposal is sponsored under a partnership agreement that includes a plan for securing the necessary funds and/or volunteer commitments to construct and maintain the trail to accepted standards.
    f.   The proposal is accompanied by long-term commitments, and stipulations and thresholds are agreed to that if surpassed, corrective management actions will be taken to protect resource health.

A significant factor in approving new trails depends on the ability to maintain existing trails to agreed standards. With the participation of cooperating partners, develop accepted standards and guidelines for constructing and maintaining new and existing trails.

With the participation of cooperating partners, establish a system and procedures for monitoring trail conditions and performing necessary maintenance work.

Continue and strengthen long-term partnerships with motorized user groups for the purposes of maintaining existing trail networks. Note that new construction does not include incidental construction in order to reroute, mitigate, and/or prevent resource impacts as this would be included under number 1 (c); rather, this refers to new ORV opportunities that are considerable and are added to the current system and agency burden. This approach is consistent with the letter and the spirit of BLM's obligation to minimize impacts from ORVs to other users and resources. As discussed previously in these comments, Executive Orders (EO No. 11644 (1972) as amended by Executive Order No. 11989 (1977)} and the BLM's regulations (43 C.F.R. § 8342.1) require BLM to ensure that areas and trails for off-road vehicle use are located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability; to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands; and to minimize distress and other impacts to wildlife. |
| 2818 | Recommendations: In managing recreation on the lands of the Uncompahgre Field Office, the RMP should |

BLM_0067275

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| | ensure that quiet recreation opportunities are given sufficient attention and that management of motorized recreation, in general, is also designed to protect the experiences of other public land visitors. Comprehensive travel management planning, including landscape level planning and road density analysis, as well as compliance with land health standards, will also ensure healthy ecosystems that can support positive recreation experiences. Further, coordinated BLM and Forest Service guidance on management of motorized vehicles and dispersed camping, managing access between public and private lands, issuance of special recreation permits, and strict criteria for addition of motorized trails will also help the agency to maintain the distinctive open space character of Uncompahgre BLM lands. |
| 2819 | In the Uncompahgre RMP we encourage the BLM to use special recreation management areas to reverse the ongoing downslide of recreational settings into more developed categories and preserve or restore settings to the primitive and backcountry category - providing a prescriptive approach to creating, enhancing and protecting quiet recreation experiences on our public lands, using the tools and guidance set out above. The land Use Planning Handbook (in Appendix C and as further defined in the Glossary) provides for BLM to establish special recreation management areas (SRMAs) in the lands governed by the Uncompahgre RMP. Depending upon the anticipated use of each SRMA, BLM should adopt different management strategies. The Handbook identifies the following general types of recreational use:

• Undeveloped - These areas are managed to support dispersed recreation, maintaining their highly-valued, distinctive, undeveloped recreation setting character. Within the bounds of legal requirements and sound management practices, resource and visitor management actions exercise minimal regulatory constraint and exclude major investments in facilities and visitor assistance to preserve the visitor's freedom to choose where to go and what to do.
• Community - These areas adjoin communities and are managed to provide structured recreation opportunities in response to recreation-tourism demand generated by community and/or tourism growth and development. The areas are managed to maintain natural resource and/or community setting character, with appropriate restrictions on marketing, administration and other management actions.
• Destination -These areas have distinctive, highly visible, or otherwise outstanding resource attractions that are managed to provide structured recreation opportunities in response to demonstrated national or regional recreation-tourism demand. The areas are managed to maintain natural resource and/or community setting character, with appropriate restrictions on marketing, administration and other management actions.

In the context of the BLM's Benefits Based Management (BBM) framework, it is critical that the range of SRMAs, including recreation management zones (RMZ), and their management prescriptions are written to enhance the other values that ultimately contribute to the benefits and experiences of the area and provide significant opportunities for primitive recreation experiences. SRMAs should include those with an "Undeveloped" market and, even though they will not be managed by extensive facilities, require active management to protect their lands from other uses and activities that will destroy the undeveloped recreation setting and experience. Some of the supporting materials for analysis of recreation settings set out standards for primitive physical settings that appear to unreasonably limit the lands that could be considered to provide a remote, primitive recreation "experience." Accordingly, the BLM should not use those standards as a "bright-line test" to disqualify areas which are or could in the future provide a primitive recreation experience. Rather, the standards should be used as a goal which proper management could help the areas achieve and focus on the experience that can be achieved. IM CO-2007-020 directs BLM managers to: "Ensure that travel management decisions...maintain prescribed setting character..." (p. 2). The IM specifies tools to be used for maintaining settings, stating on page 2 that: "For areas with Limited and Open categories, managers may impose several different kinds of limitations including vehicle numbers, types, use times or seasons, permitted use " (emphasis added). The notion of limiting numbers of recreation users needs to be incorporated into the adaptive management measures adopted for all recreation planning in the Uncompahgre Field Office, particularly for portions of the field office where growth in recreation use should not be the goal. Prescriptions to ensure primitive recreation opportunities are provided should also include soundscapes, special recreation permits, and road density. In this manner and as part of achieving the goals of a BBM system, areas which have primitive character should be managed for that experience and desired future condition, even if they do not currently meet all of the criteria that the BLM has set for primitive physical settings or designation. By adopting such a prescriptive, or aspirational management approach, as opposed to a more descriptive or reactive approach of just basing the management of the zones on perceived evidence of human presence or an expectation of more people wanting to use the area, the BLM can |

*Uncompahgre Resource Management Plan Revision and EIS*
*Final Scoping Summary Report*

BLM_0067276

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| | ensure that some level of existing disturbance does not disqualify areas which do provide a primitive experience from a decision to manage them to protect and enhance such qualities and provide this important experience. Recommendations: BLM should adopt a range of SRMAs and management prescriptions which provide adequate opportunities for non-motorized or quiet recreational experiences and are written to enhance the other values that ultimately contribute to the benefits and experiences of the area. BLM should use an aspirational approach which allows the agency to ensure that some level of existing disturbance does not disqualify areas which do provide a primitive experience from a decision to manage them to protect and enhance such qualities and provide this important experience. The SRMA proposals and wilderness inventory submitted under separate cover identify key areas for protecting primitive recreation experiences. |
| 2820 | Preserving the "Backcountry" recreation setting One of the factors the BLM uses to determine setting prescriptions is "distance from an improved road," or the "remoteness" criterion found in the Settings Classification Matrix. Greater distances from roads will put an area into a less developed setting on the Settings Classification Matrix. The developed or undeveloped character of a physical setting in turn helps determine the level of development a setting will have in the social and managerial settings of the matrix. We have noticed a tendency for "distance from a road" to be justification for classifying an area as more developed on paper than the actual conditions on the ground warrant. This in turn makes it easier for social and administrative settings to be similarly skewed toward a more developed management goal. Like many Colorado BLM lands, the Uncompahgre Resource Area contains historic "constructed" roads that get little or no use and therefore do not interfere with the essential backcountry character and feel of the land. Visitors may experience a remote, backcountry feeling, even in the presence of seldom used roads. Spatially analyzing "distance from a road" and using the criterion for determining a landscape's remoteness does not take into account other subjective qualities of the landscape and does not give the BLM an accurate frame of reference from which to make a decision on the undeveloped and backcountry nature of an area. Another reason that existing settings may be upgraded to a more developed setting within the matrix may be due to the long lifespan of an RMP. Managers anticipate increased recreation demand over the life of an RMP, and assign Front Country or Rural settings to areas that are currently Backcountry in character. Upgrading existing settings in this manner becomes a self-fulfilling prophecy. Setting high numbers of encounters and group sizes up front opens up an area to increased use, leading in turn to further setting upgrades down the line. Recommendations: Despite the likelihood of increased demand and the physical proximity of a road, we feel it is important to make every effort to preserve the undeveloped and backcountry experience wherever possible. We recommend that settings, visitor encounters and group sizes be adjusted from less crowded to more crowded settings incrementally over time through adaptive management, rather than up front, before recreation demand has actually materialized. Adaptive management strategies need to be based on comprehensive and statistically rigorous monitoring based on defined levels of acceptable change, as was done in the Jack Morrow Hills plan in Wyoming. This approach can be used to limit use of an area for primitive recreation and to limit facilities unless or until certain criteria are met - such as increased demand and a determination that more visitors can be accommodated without undermining targeted recreation values. Again, the Jack Morrow Hills plan in Wyoming is a good example of how the BLM could implement adaptive management with specific monitoring of key resources, targets for management, and triggers for action. We recommend that the RMP include specifics on the monitoring and metrics that will be used to evaluate successful meeting of targets for SRMAs and other recreation areas. We understand that experiential outcomes and setting retention are the end goals of the Benefits Based Management "Chain of Causality" (experiential outcomes result from settings and activities which result from market demand, user groups, and activities). For this reason the RMP needs to be specific about the metrics to be used for evaluating the attainment of the experiential "Outcomes." Examples of Adaptive Management responses could be: reduced marketing, smaller trailheads and parking, fewer improved trails, more challenging trails, and other ways of limiting vehicle numbers as referenced previously in the 2007 Colorado BLM IM, p. 2. Setting motorized use levels through permits, in desired but overcrowded settings such as rocking crawling areas and other intensive motorized use areas in Dry Creek, should not be ruled out. This recommendation applies not just to places where motorized use is occurring under a formal Special Recreation Permit, but to areas where general public use is occurring not under any permit. In applying adaptive management, we caution against resorting too quickly to the common solution of dispersing use to other areas. This merely spreads resource impacts more broadly across the land and invites more growth, more off-trail use, more trail maintenance expense and more management and enforcement challenges over a greater expanse of land. It is not the BLM's job to indefinitely absorb an unlimited expansion in recreation demand. Setting limits on recreational use to protect BLM resources and experience will lead to other providers stepping forward to |

BLM_0067277

**Table C-19**
**Issue 3: Recreation Management**

| Comment ID | Comment |
|---|---|
| | absorb increased demand. |
| 2821 | Managing promotion and marketing: A key aspect of implementing SRMAs is marketing (H-1601-1- Land Use Planning Handbook, Appendix C, pp. 15-17, Recreation and Visitor Services, C, 4). Experience shows that designating new trail systems and other recreation opportunities can lead to unanticipated increases in use, potentially straining BLM resources and shifting less crowded settings into more crowded ones. The 2007 State Recreation and Visitor Services Strategy points to the inconsistency between the "recreation tourism demand" generated by a "vigorous Colorado Tourism Office promotion budget" and the BLM's "fundamental duty to meet or exceed land health standards" (p.6). The Recreation Strategy goes on to state: "tourism industry promotion... sends increasing numbers of outdoor adventurers to BLM public lands," challenging the BLM's ability to "maintain the distinctively undeveloped and open space character of its recreation settings" (p. 7). In response to this problem, both Appendix C of the LUP Handbook and the State Recreation Strategy direct the BLM to manage marketing so as to maintain targeted recreation settings. For example, the SRMA definitions section in Appendix C includes "appropriate restrictions on marketing" as one of several implementation actions to be done on SRMAs. Objective 2 in the Recreation Strategy similarly calls upon businesses and local governments to "agree" to the BLM's "approved recreation setting prescriptions and management objectives" and to "market public lands responsibly" (p. 9). For example, the Glenwood Springs Field Office, has obtained an agreement from local government to limit marketing efforts to ensure its Community SRMAs do not evolve into Destination SRMAs. The Recreation Strategy further directs BLM field offices to "engage the business community and local governments in .....managing....use of public lands that meet or exceed land health standards" (p. 9). Recommendations: In accordance with this direction, we recommend that the Uncompahgre RMP be specific about the marketing strategies it will use for each new SRMA and recreation area. The marketing strategies should be designed to hold use levels down to those that are manageable within budgets, and that will maintain the "distinctive, open-space character" of BLM settings referred to above. The BLM should obtain specific agreements/MOUs laying out the nature and extent of the publicity that will be done on each SRMA or other recreation area. |
| 2822 | Areas needing special attention to recreation management. In addition to designating new SRMAs and protecting lands with wilderness characteristics in accordance with our separate proposals, certain areas in the Uncompahgre Field Office merit special attention for management of recreation. At this time, we would like to highlight the following areas:<br><br>• Adobe Badlands: The lands immediately adjacent to the Adobe Badlands WSA and citizen-proposed wilderness area are severely degraded by intense motorized use, causing noise and dust pollution and impacting the WSA. The revised Uncompahgre RMP should give special attention to managing this area to reduce and minimize impacts to the WSA or the citizen-proposed wilderness from motorized vehicles.<br>• Tabequache: The Tabeguache area managed by the Forest Service was congressionally designated to protect its Wilderness values. The BLM should close motorized and mechanized routes in the adjacent BLM lands in order to avoid motorized or mechanized intrusions into the Tabeguache area and to otherwise ensure preservation of the wilderness values there. Specifically, the relatively unroaded, unmotorized BLM lands north of the Tabeguache Creek Special Management Area, including the Shavano, Campbell, and Burro Creek drainages, should be closed to motorized recreation.<br>• Roubideau: The Roubideau Area managed by the Forest Service was congressionally designated to protect its wilderness values. The Uncompahgre Field Office closed a deteriorated jeep trail in the Monitor Creek area, creating a large contiguous area adjacent to the FS Roubideau Area, covering over 20,000 acres on BLM land which includes the Camel Back WSA and citizen-proposed wilderness. The RMP should reaffirm this closure and manage recreation in this area to protect natural values. |

BLM_0067278

**Table C-20**
**Issue 3: Travel Management**

| Comment ID | Comment |
|---|---|
| 2794 | BLM must manage oil and gas development in a way that retains special status species and moves them toward recovery. As we have noted in our citations of FLPMA and the BLM Manual above, the BLM has a mandate to conserve imperiled species. The agency cannot prioritize oil and gas drilling or recreation at the expense of meeting its duties toward special status species. This includes all aspects of oil and gas development and off-road vehicle use - the BLM must ensure that its authorized activities do not compromise air quality, water quality, opportunities for solitude, plant and wildlife habitat, cultural resources, soil crusts, or any of the other resources that the agency must conserve under its multiple use mandate. The RMP must provide a blueprint for how the BLM will ensure that oil and gas development (all phases, including leasing, exploration, infrastructure construction, drilling, and reclamation) and travel management will be made compatible with the other aspects of its mission. In some cases, this may mean disallowing development activity or motorized vehicle use altogether. |
| 2801 | Travel management decisions should be made in the RMP. BLM's internal guidance states that "each RMP will divide planning areas into OHV area designations that are open, limited or closed." IM No. 2004-005; see also 43 C.F.R. § 8342.2(b). This internal guidance was also incorporated into the updated version of BLM's Land Use Planning Handbook. H1601, Appendix C, Section 11.0 (Comprehensive Trails and Travel Management). The Land Use Planning Handbook states that BLM should: Complete a defined travel management network (system of areas, roads and/or trails) during the development of the land use plan, to the extent practical. If it is not practical to define or delineate the travel management network during the land use planning process, a preliminary network must be identified and a process established to select a final travel management network. (emphasis added) Furthermore, Colorado BLM IM No. CO-2007-020 directs Colorado BLM Field Offices to complete comprehensive travel management plans as part of the RMP process: Nationally, BLM is moving towards a system of limiting use to designated roads, primitive roads and trails/areas and not encouraging extensive cross-country travel by motorized and mechanized vehicles. Current planning guidance (H-1601-1, land Use Planning Handbook Appendix C, Section 0, attachment 2) requires identifying a defined travel management network system of areas, roads, primitive roads and trails, in all land Use Plans. It is our expectation that each RMP Record of Decision will include a system of designated routes for those areas in the limited category. The Land Use Planning Handbook (Appendix C, Section II.D) also sets out requirements for travel management at both the land use and implementation planning levels: • At the land use plan level, BLM must identify areas for use based on program goals and objectives, primary users, reason for "allowing travel" into an area, setting character to be maintained (including Visual Resource Management and Recreation Opportunity Spectrum classifications), and primary means of travel appropriate to meet objectives and keep setting character; and • At the implementation level, BLM must define a detailed travel management network, "establish a process" to identify roads, trails, etc. with criteria for selections, guidelines for management, monitoring and maintenance, and indicators for future plan maintenance. |
| 2802 | We understand that BLM is not planning to complete comprehensive travel management planning as part of the Uncompahgre RMP revision. We also note that the Dry Creek area has a travel plan in place, and the Field Office-wide travel plan for the remainder of the field office is in progress. In this context, we would like to provide comments for travel planning to be incorporated in the RMP, as well as comments for the future comprehensive travel plan. The Land Use Planning Handbook provides guidelines for addressing travel planning in the RMP even if comprehensive travel planning is deferred. Appendix C, pp 18-19 states: If the final travel management network is to be deferred in the RMP, then the RMP should document the decision-making process used to develop the initial network, provide the basis for future management decisions, and help set guidelines for making road and trail network adjustments throughout the life of the plan. The identification of the uncompleted travel management networks should be delineated in the land use plan and the following tasks completed for each area: 1) Produce a map of a preliminary road and trail network; 2) define short-term management guidance for road and trail access and activities in areas or sub-areas not completed; 3) outline additional data needs, and a strategy to collect needed information; 4) provide a clear planning sequence, including public collaboration, criteria and constraints for subsequent road and trail selection and identification; 5) provide a schedule to complete the area or sub-area road and trail selection process; and 6) identify any easements and rights-of-ways (to be issued to the BLM or others) needed to maintain the preliminary or existing road and trail network. If the decision on delineating travel management networks is deferred in the land use plan to the implementation phase, the work normally should be completed within 5 years of the signing of the ROD for the RMP. Colorado IM 2007-020 further instructs that: "limited to existing roads, primitive roads and trails" designations should be used only as an interim measure prior to your next scheduled RMP revision. Where the Field Offices choose an interim designation of "limited to existing roads, primitive roads and trails", a map showing the existing travel and transportation network is required. • An inventory and map of roads, primitive roads and trails is necessary to assess and evaluate the need for individual routes as part of the travel and transportation network. • Without baseline inventory the Field |

BLM_0067279

**Table C-20**
**Issue 3: Travel Management**

| Comment ID | Comment |
|---|---|
| | Offices will not be able to confirm and document when new routes have been created or adequately monitor resource conditions. Baseline inventory maps are essential to effectively respond to the issue of user created route proliferation. • Inventory and baseline data is needed to provide supporting rationale to justify management actions such as closures and rehabilitation of routes created after the interim designation is made. • The BLM needs to provide the public clear and consistent information regarding access opportunities and provide a map showing the location of existing roads, primitive roads and trails that are available for public use and access. The Uncompahgre RMP must set out the process that will be used to complete a comprehensive field office-wide travel management plan. The RMP should also provide a baseline route inventory and use that data to institute road closures that cannot wait until the full travel plan is completed. The RMP should also set travel management prescriptions for special management areas, such as lands with wilderness characteristics and ACECs. The Little Snake Field Office did not complete comprehensive travel planning as part of its recent RMP revision; however, the RMP (available online at http://www.co.blm.gov/lsra/rmp/index.htm) identified priorities for sub-regions to receive comprehensive travel management planning, which can also be useful for guiding implementation. Appendix F of the Little Snake Draft RMP (attached) sets out criteria for prioritizing areas to receive comprehensive travel management planning, including: • Special management areas • Areas identified as "limited to designated roads and trails" • Areas that meet fragile soil criteria • User and resource conflicts • Excessive complaints • Wildlife/wild horse population trends • Evidence of trail/road proliferation • Areas with high road densities • Impacts on cultural resources • Unacceptable erosion • Degradation of water quality • Impacts on visual resources • Loss of trail integrity • Habitat fragmentation and damage • Impacts on sensitive plants • Need to provide a variety of user experiences We encourage the Uncompahgre RMP to prioritize areas in this manner. One additional type of subregion that should be prioritized for travel planning is areas with low road densities that have the potential to be managed as primitive, backcountry, nonmotorized wildlife or quiet use areas. The RMP should identify specific areas that will be prioritized for travel planning and establish time commitments for completing each specific area, in addition to the 5-year deadline for completing travel planning for the entire field office. Travel and recreation planning are inextricably linked, and recreation planning decisions affect travel planning (and vice versa). The comprehensive travel plan for the Uncompahgre Field Office must be coordinated with recreation planning efforts in this RMP. Recommendations: The Uncompahgre RMP should establish the methodology for comprehensive travel planning, establish interim travel management, and identify priorities for completing travel management planning. Special management areas, such as ACECs, special recreation management areas and citizen-proposed wilderness, will include travel designations within their boundaries. The RMP must identify not only areas for use, but also reasons for permitting travel into an area and appropriate criteria for determining routes that will be made available for different uses, taking into account such factors as undeveloped recreation opportunities available and natural settings. |
| 2803 | 2. Landscape level planning. Travel planning requires the agency to manage human travel across the landscape. The land use planning process, which addresses the broader landscape within a planning area, provides one of the best opportunities to make travel planning decisions in the appropriate context. While we understand that BLM does not have authority to close or relocate highways, major roads, or County roads, BLM must include these routes when analyzing the transportation network as they have a great impact on habitat fragmentation and reduction in core area size (discussed in length later in these comments and in Appendix I). The placement and design of travel routes defines which areas will remain or become roadless, and which areas will be disturbed and how. In other words, route decisions determine the fragmentation of the landscape, and, thus, how naturally or unnaturally a landscape will behave in terms of water flow and quality, wildlife migration, and species composition and function. NEPA requires federal agencies to assess the direct, indirect and cumulative environmental impacts of proposed actions, taking a "hard look" at environmental consequences and performing an analysis commensurate with the scale of the action at issue. 42 U.S.C. § 4321 et seq; 40 C.F.R. § 1508.8; see also Metcalf v. Daley, 214 F.3d 1135, 1151 (9th Cir. 2000); Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348 (1989). Travel planning affects the entire landscape and can only be thoroughly and properly assessed by considering potential impacts and making decisions at a comparable level. In terms of how to evaluate the potential impacts of travel management decisions, NEPA's definition of "cumulative impact" is instructive: the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. 40 C.F.R. § 1508.7. (emphasis added). BLM must account for the direct, indirect, and cumulative impacts of all roads in the Uncompahgre Field Office when completing a comprehensive travel management plan. Recommendation: BLM should address travel management on a landscape-wide basis by addressing the impacts of all roads in the |

BLM_0067280

**Table C-20**
**Issue 3: Travel Management**

| Comment ID | Comment |
|---|---|
| | planning area and accounting for the landscape-wide impacts of these roads. |
| 2804 | 3. Mapping of routes. As part of comprehensive travel management planning, we anticipate that BLM will produce route maps to illustrate a base travel network, to generate various route designation proposals, and for purposes of receiving public comments. In these contexts, it is vital that the agency clearly mark on all maps or proposed maps areas with existing restrictions on motorized use, such as: wilderness areas, WSAs, primitive non-motorized designations, Wild and Scenic Rivers, and ACECs. Depicting existing restrictions will ensure that public comments are informed by the knowledge that additional routes will not be permitted in certain areas. Further, maps should indicate resources that could be affected by motorized use, such as wilderness characteristics and wildlife habitat. Public comments will then be informed by the potential resource conflicts and the best opportunities for designating areas for non-motorized recreation. Route maps should also distinguish user-created routes from roads that were created and are maintained by the BLM to serve planned transportation needs. Also, user-created routes in areas that have motorized restrictions should only be shown as closed and/or for prioritizing restoration. To be added to the transportation system, user-created routes must go through NEPA analysis to ensure they are not damaging resources and comply with BLM regulations, such as the minimization criteria for ORV use discussed in these comments. In addition, as part of designating routes, BLM should use consistent definitions of roads, primitive roads, and trails. IM 2006-173 ("Implementation of Roads and Trails Terminology Report"), sets out and defines these terms, and includes a definition of a road as: A linear route declared a road by the owner, managed for use by low-clearance vehicles having four or more wheels, and maintained for regular and continuous use. It is important that BLM use these terms to distinguish both the types of routes and the appropriate types of motorized use. Recommendations: BLM should identify both existing restrictions on motorized access and other areas that can be damaged by motorized use on all maps used in travel planning. User-created routes should be distinguished from legitimate roads on travel planning maps, and, where they were created illegally, should be excluded from the baseline inventory. |
| 2805 | 4. Habitat fragmentation. As mentioned in the beginning of this section of our comments, BLM must address travel management on a landscape level to ensure that BLM meets its responsibility as stewards of the public land and mitigates against habitat fragmentation. We have included "he Wilderness Society's recent Science and Policy Brief, "Habitat Fragmentation from Roads: Travel Planning Methods to Safeguard BLM lands" (Appendix 1). Also included in Appendix 1 are four scientific reports prepared by TWS and discussed in the habitat fragmentation report. These include Fragmenting Our Lands: The Ecological Footprint from Oil and Gas Development, Protecting Northern Arizona's National Monuments: The Challenge of Transportation Management, Wildlife at a Crossroads: Energy Development in Western Wyoming, and Ecological Effects of a Transportation Network on Wildlife. In addition to summarizing the four reports included, "Habitat Fragmentation from Roads: Travel Planning Methods to Safeguard BLM Lands" provides a summary of available scholarly and government reports and studies on the impact of habitat fragmentation on wildlife, provides methods for calculating habitat fragmentation, and provides recommendations on how to integrate fragmentation analysis into travel management. We also recommend you look at the travel planning criteria set out in the Record of Decision for the Dillon (MT) RMP (relevant sections attached and also available on-line at: http://www.mt.blm.gov/dfo/rod/contents.htm). as an example of criteria that incorporate key aspects of BLM's ORV regulations as well as ecological metrics. This field office did not complete a comprehensive travel management plan as part of its RMP revision; however, it included road density targets and included an appendix outlining the principles it will use when completing a comprehensive travel management plan during implementation. The Uncompahgre Field Office should adopt a similar approach. Recommendation: BLM should use the information provided in Appendix 1 to measure habitat fragmentation, conduct a thorough fragmentation analysis, and inform decisions regarding road closure and other limitations on use in the Uncompahgre RMP. Specific fragmentation analysis can be done as part of the future comprehensive travel plan; route density targets and roads in need of immediate closure should be addressed in the RMP. |
| 2806 | 5. Principles of travel management. When completing a comprehensive travel management plan, it is vital to complete it in a systematic and transparent manner. Key principles of travel planning (1) Travel management is part of land use planning and should address both recreation and transportation needs from a landscape perspective; therefore, travel planning must be coordinated with recreation management planning. (2) Prior to conducting an inventory or designation of routes, BLM should assess the present resources, requirements for protection, and which uses for recreation and development are compatible with these resources, requirements and other users. (3) BLM should use a legal definition of "road" when designating routes. (4) BLM's consideration of ORV use should take into account its potential damage to resources and other uses, including exclusion of other users. (5) Where BLM presents a baseline travel system, it must present route maps in a responsible manner that does not legitimize or misrepresent the official status of the existing network of unauthorized |

BLM_0067281

**Table C-20**
**Issue 3: Travel Management**

| Comment ID | Comment |
|---|---|
| | ways/routes routes. (6) BLM should include a detailed closure and restoration schedule in the plan. (7) BLM should include and implement a monitoring plan. (8) BLM should include and implement education and outreach in the plan. Furthermore, Colorado IM No. CO-2007-020 instructs Field Offices to select roads and trails based on comprehensive travel management goals: Design a travel system with RMP and transportation network goals in mind rather than just choosing from inherited roads, primitive roads and trails. Instead of a decision-making process to only decide which individual routes should be closed or left open, design a travel system with a desired goal of sustainable routes that meet patrons' needs (i.e. loops) and varying levels of difficulty. Also, consider a broader range of management options that include reroutes, reconstruction or new construction, as well as closures. The RMP revision and future comprehensive travel plan provide opportunities for BLM to evaluate its travel system goals and whether the current system of roads and trails is furthering or hampering these goals. BLM should create a travel network that best serves the many resources which the agency is tasked with managing and does not inadvertently do a disservice to any other resource or public land visitor. The Wilderness Society and the Colorado Mountain Club have developed a template for conducting travel management planning, including a detailed discussion of these key principles of travel planning, which we have attached and recommend that the BLM incorporate into the RMP as the process for future travel planning. Recommendations: BLM should follow the eight travel planning principles detailed above to ensure that only routes which truly serve a valid purpose for the public remain open. BLM should also create comprehensive travel and recreation management goals and designate routes accordingly. |
| 90 | Not only is the access useful for oil and gas exploration and production it benefits other resource uses such as 4-wheeling, mountain bike riding, snowmobiling, coal mining and timber harvest to name only a few. Basically, the closure of roads and off road access is not considering multiple use of the many resources in the Resource Planning Area. GEC encourages a strong multi-resource approach with the new Plan. |
| 125 | TMW ATV club fully supports the concept of the transformation from "ride anywhere" to "designate trails". Our paramount concern with the implementation of the new concept of public land resources is the inventory of current and existing OHV trails and Jeep roads. The long lasting effect of an accurate and complete inventory is essential in the success of future Travel Management Planning (TMP) in the upcoming specific areas. |
| 126 | TMW would like to re-visit the complications of substantive public input created by the BLM on the Dry Creek TMP when the trail numbers were left off the public maps presented to the public for comment. This omission substantially hindered the ability of the responding public to accurately submit proper and meaningful input. Please consider such in the RMP for such action in the future. |
| 127 | Motorized OHV travel on the UFO has a verity of user groups ranging from standard passenger vehicles driving on maintained roads to off-highway vehicles (OHV's) traveling on primitive roads and specialized trails. Present day there is little to no signage of such routes making it very confusing for the traveling public. TMW encourages the proper posting of RMP/TMP results immediately on completion of the appropriate process. |
| 128 | OHV travel is an integral part of virtually every activity that occurs on BLM public lands. Many anti-motorized user actually use either full size vehicles or OHV to gain access to the non-motorized areas. TMW strongly suggests that during the RMP the planning team have a high priority on establishing a true and accurate inventory of existing trails, roads, and pathways. |
| 129 | There is a multitude of HISTORIC routes throughout the UFO management area. TMW asks that the RMP team accurately GPS the existing travel routes and be aware of these treasured travel pathways and pre-plan your future TMP to reflect such concerns. An accurate inventory is of existing trails is paramount it public input. One of the most contentious OHV issues generally comes from the removal of a HISTORIC route from the designated OHV inventory. |
| 130 | With the continued onset of housing developments and private property in the low regions of BLM lands we ask that the RMP planning team take special note of areas that are open to motorized use, but are only accessible thru private property. Generally this has created user-created routes starting from existing routes and sometimes causes unnecessary resource damage. Pre-planning allowing access would be fruitful in the RMP/TMP process. |
| 141 | We strongly suggest for future planning purposes during and after the TMP process, the BLM take a page from the Forest Service's travel management local initiative of the District Rangers and have quarterly meeting with the OHV community. These meeting have been invaluable in continued collaborative relations and successful in understanding and acting on both parties concerns. This has provided the vehicle to get the travel management decisions implemented and then collaboratively address site specific situations or concerns. |

BLM_0067282

**Table C-20**
**Issue 3: Travel Management**

| Comment ID | Comment |
| --- | --- |
| 161 | The Tabeguache Trail is a valuable corridor. By connecting Montrose to Grand Junction on a historic route the trail is a centerpiece of the backcountry in south west Colorado. It is used by all means of backcountry visitors. It should remain open to all. |
| 169 | First is the fact that the Colorado OHV program has grown from 55,000 registrations in 2000 to 133,000 registrations in 2009. With the amount of growth within the public wanting to recreate in this area utilizing off road vehicles it would make sense to me that our public land manager would recognize the demand and carefully plan for this increase by providing better access and more loop system trails for this growing demand. |
| 170 | There exists a multitude of historic multiple use routes throughout the UFO management area. I believe the OHV community deserves the RMP team accurately GPS all existing travel routes. An accurate inventory of existing routes is paramount towards the outcome of multiple use routes being evaluated. The most contentious OHV issue comes from the removal of any historic multiple use route without any justifiable scientific bias. |
| 173 | I really appreciate the fact the RMP is looking at recommending the Adobes north of Delta as an open multiple use area. I adamantly commend the BLM for seeing the value of this type of multiple use for the future. I'm proud to share this Adobe land with the county landfill and look forward to sharing it in the future. |
| 177 | I live in a suburb of Denver yet ride all over the state and look forward to riding peach valley in Montrose. Unless its closed for OHV use. |
| 203 | I recommend a travel management plan and the creation of managed, new single-track trails in these areas (Unit 3). |
| 207 | The BLM should actively solicit input and involvement by the Montrose Economic Development Council, the Montrose Chamber of Commerce, and the Montrose Visitor's and Convention Bureau. These organizations should more actively promote the recreational opportunities near Montrose, which would encourage sustainable and economically beneficial uses. |
| 215 | I am a mountain biker and I want to see more trails designated and protected as single track. There are no trails that I am aware of that are both single track, and non-motorized currently in the UFO. I would like to see some non-motorized single track. The Grand Junction area has many miles of non-motorized single track on BLM land, but we don't have any. I like being on trails with other non-motorized users. We like the quiet experience, the slower speed, the lack of exhaust in the air, and less disruption to wildlife. |
| 217 | My main concern is that we have more single track trails, with some of them being non-motorized. |
| 218 | Regarding single track trails, they should not be intensely developed. We will need trailheads with parking and restroom facilities, but a well built single track leaves a minimal scar on the land and is sustainable. If properly constructed, it shouldn't either cause erosion around it or provide a pathway for erosion within it. |
| 227 | Where appropriate, agencies should work together to identify trail systems where it makes sense to incorporate areas of different jurisdiction, rather than planning such systems only on one agencies jurisdiction. |
| 231 | Seek out other agency comment when considering trail systems near those agency's lands. |
| 253 | Travel management- Reclamation's operations and maintenance roads and interior park roads should not be included as public travel routes without Reclamation's concurrence. Also, Reclamation lands are closed to off-highway vehicle (OHV) use until special areas or trails are specifically opened for OHV use by Reclamation through a public involvement process. |
| 279 | The area included in the RMP boundaries contains some fantastic "wild places". In a West that continues to urbanize and develop rapidly, these places (especially those outside of the rocky mountain ridges that often fall under USFS jurisdiction) are increasingly valuable. I would like to see an end to further road construction; better designation of OHV use and non-use areas; the elimination of non-renewable energy development and careful consideration of the footprint associated with any renewable energy projects such as solar or wind installations; and continued maintenance of facilities such as the (very much appreciated) picnic/camp areas on the San Miguel. |
| 320 | issues/concerns? road closures |
| 339 | Saltado Creek Canyon is a spectacular steep sided, deep and wild canyon adjoining the San Miguel River canyon. It is the only major tributary canyon/stream to SMR that has no roads or bridges. It is a key wildlife corridor connecting Uncompahgre Plateau to the Delores Mountains and wilderness areas to south. The current level of access should be maintained and no further development of access should occur. It should be designated a "wild" river section as proposed in the WSR Eligibility Report. Hunting and grazing should be maintained with the |

*Uncompahgre Resource Management Plan Revision and EIS*
*Final Scoping Summary Report*

BLM_0067283

**Table C-20**
**Issue 3: Travel Management**

| Comment ID | Comment |
|---|---|
| | possible exception of better protection for riparian habitat from cattle. No motorized access, other than emergency vehicles or maintenance, should be allowed. This area should be managed with wildlife being the predominant management goal. It is also prime Lynx habitat. |
| 355 | Maintain the following policies on OHV restrictions: Designations of OHV areas is primarily directed at maintenance or restoration or riparian areas and scenic values. Roads will be designated at the time the activity plan for the SRMA is developed. Beaver Creek Canyon, Saltado Creek, and the San Miguel River Canyon from the Sanborn Park road to Horsefly Creek, would be closed to off-highway vehicles. The access road in lower Beaver Canyon must remain usable for utility line maintenance, but would be closed to public vehicle use. Within the remainder of the ACEC, vehicle use would be limited to designated roads or trails. Designation of the roads to remain open will occur in the Recreation Area Management Plan (Integrated Resource Management Plan). |
| 378 | Closing roads or areas from being used is not right. |
| 381 | Roads that have been in use for many years should be left open. |
| 383 | Relative to Issues 1, 3, 4 and 5 it is suggested that access to the Uncompahgre Planning Area be limited to existing roads and trails. No new roads should be created . This approach will protect vegetation and help to preserve the extant terrestrial and aquatic habitat, as well as minimizing the potential deleterious effects to the water resources as a result of potential increased human access or use of the area. This approach will also assist in managing the human activities in the area, as well as defining permissible lanes of travel in the utility/energy corridors while still permitting public and commercial access and use of the Planning Area. |
| 397 | The following describes an area that at the present time does not have any roads. The Dolores River Canyon is a pristine slickrock desert canyon area. I bring this area to your attention because on two visits this fall to Coyote Wash we found motorized vehicle tracks at two locations. We hiked into Coyote Wash from Silvey's Pocket and were surprised to find a vehicle had driven all the way into Coyote Wash and then up the wash. It may have been a Hummer gauging by tire tracks. The signs at the wilderness boundary are knocked down. It may be possible to barricade the side canyon to stop motorized travel. A second visit to the area was from Wray Mesa. We walked down a side canyon to Coyote Wash and found tracks from a motor bike. Access may have been gained via Utah where a road crossed the wash. Uranium mining in the area may be part of the problem. Montrose County reopened several of the roads in the area, which had become impassable due to disuse. The county spent several days doing road work on Wray Mesa and in other Uranium mining areas. |
| 402 | There are several locations where native art work can be found along La Sal Creek and along the Dolores River. One large rock has a good number of dinosaur tracks near the trail. I have a difficult time recommending any type of wheel travel in special areas but this is an exception. Bicycling could be made possible if a few small bridges could be placed across the La Sal Creek. Hikers could use these bridges also. Some bridge design would be needed to keep out motorcycles. Just look to what has happen in Mesa. Many hikers are discouraged because of the stream crossings. Bridges would increase hiker use. Bicyclers could do a round trip. Hikers would need to make other arrangements as a round trip would be nearly 20 miles. |
| 404 | If public lands are going to maintain both animal and plant diversity, management is critically important. We need to be closing roads not making new ones. We need to be protecting water sources, springs, streams and rivers. We need to return to a more natural rhythm in fire control. |
| 408 | Mining and roads are a threat. If the Uranium mill is not built mining will never return to its former days. If it is then we need to brace ourselves for a big increase in population, lots more motorized vehicles and a lot more roads, mostly unofficial. Just look to what has happen in Mesa, Delta and the east end of Montrose counties. Our saving grace has been little increase in population. High gasoline prices have kept a lot of off road vehicles a little closer to home and away from western Montrose County. |
| 410 | I have concerns about the illegal closing of access roads and trails in certain areas of our public lands. |
| 414 | As far as physical changes to the landscape of our public lands is open up all the access trails and roads and maintain them instead of sitting at a desk wasting our tax dollars on regulating our public lands through a management plan to keep us off the recreational land. |
| 423 | Issues/concerns? Travel plans. |
| 427 | Definite limits on all motorized travel & to some extent motor biking- except on designated routes carefully signed and enforced- consider use of a crime stoppers regimen. |

**Table C-20**
**Issue 3: Travel Management**

| Comment ID | Comment |
|---|---|
| 437 | The valley wants more connecting/destination trails. I share this view. I don't want to close trails. |
| 444 | As you know, there is a growing network of social trails that are being created by hikers and bikers in on the south slope of Jumbo Mt. near town. Ideally, those trails will get formalized with proper signage, easements and liability covered. |
| 445 | We also need to develop some trails appropriate for hiking/walking that are separate from the bike trails. Currently, many people walk on our road (a private road) because it is a gentler grade and is an all weather access. We also need consideration for horseback riders. |
| 448 | Those access points should be separated by distance and topography so that the activities do not conflict. |
| 455 | ORV and other motorized activities should be strictly monitored and encouraged to operate in specifically defined and limited zones. All efforts should be made to keep the backcountry in a primitive state. |
| 484 | If mechanized or motorized equipment has been historically used and significant off-road damage to the resource has not occurred existing forms of access should not be restricted. |
| 487 | I'm also concerned about the vulnerability of roadless areas, and encourage you to limit expansion of trails for off-road vehicles, and any additional roads in public lands. |
| 505 | Regarding motorized recreation: Since there is to be a serious amount of lag time between the announcement of "limited to existing" and specification of designated routes, the BLM should actively close all damaging routes in sensitive ecological and riparian areas, as well as sign, close and barricade any new user created routes in the Field Office jurisdiction which have come into existence since the initial announcement |
| 506 | Preserve the less roaded areas of the UFO which can serve as intact and undisturbed wildlife refuges especially those which are adjacent to already established Wilderness Study Areas (WSA) and Special Management Areas (SMA). Specifically areas adjacent to Dominguez Canyon Wilderness, the Adobe Badlands, the Dolores River Canyon SMA, as well as Norwood Canyon. |
| 509 | The RMP should mitigate the effects of noise pollution from OHV so as not to impact wildlife and quiet users. When establishing OHV routes consideration should be given to the effects of vehicle noise pollution in adjacent areas set aside for wildlife habitat, hiking, birding and horseback riding. |
| 516 | We have been the victims of trespassing, poaching of elk on our ranch, and motorize traffic tearing up our access roads. A significant amount of private investment, in the form of grading and addition of gravel, was made in this road in 2001 to make the road more passable. Since then the roads have been rendered impassable during wet weather by motorized vehicles gouging tracks and ruining the drainage. In addition, motorized vehicles have failed to stay on the marked roads and have torn up the under-story vegetation on top of Monitor Mesa and near the Lee Bench Reservoirs. |
| 518 | We are opposed to improving motorize vehicle access in this area and would prefer to close many side roads in this area and limit the access to areas that have been subject to abuse, including Monitor Mesa as well as our irrigation structures, including the Lee Bench Reservoirs. |
| 524 | A trail for pedestrians could help restore the logging damage and give the public access to a wonderful canyon experience. |
| 526 | Off-road vehicle access should be more closely controlled. We have witnessed significant destruction of terrain due to irresponsible ATV travel. The principle of no access to an area unless specifically designated as open should be applied Areas should be clearly designated and rules enforced as much as possible. This would also prevent intrusion of vehicles into existing roadless regions and reduce the negative effect on wildlife. |
| 531 | While we have done excellent work to improve habitat conditions and productivity of our public lands, I feel there is a great need to reduce the impact of indiscriminate OHV use on BLM lands. The GMUG National Forest spent 6 years conducting travel management planning for the Uncompahgre NF. Since the 2002 travel plan decision was signed I have spent much of my time implementing that decision for the benefit of our big game species. I would really like to see the UFO implement similar actions on your public lands that will further enhance wildlife habitat and provide non-motorized opportunities for the public. |
| 533 | In general, I recognize the need for BLM to provide a spectrum of motorized and nonmotorized recreational opportunities on public lands but the BLM needs to demonstrate that those uses are compatible with each other and the resource values of the lands upon which those uses occur. I sincerely hope the BLM recognizes the values of unroaded, primitive backcountry areas with no motorized use and that you will provide areas within the UFO |

BLM_0067285

**Table C-20**
**Issue 3: Travel Management**

| Comment ID | Comment |
|---|---|
|  | that are managed for wildlife habitat effectiveness and security, backcountry hunting and recreation opportunities, and solitude for people. These areas should include, but not be limited to the five WSA's within the UFO. |
| 534 | Apparently your regulations require you to "designate all public lands as open, closed, or limited to OHV use." In addition, Colorado BLM policy is to "restrict all OHV use within limited areas to designated routes rather than designate areas as limited to existing routes". |
| 535 | I strongly support the continued designation of closed to all lands currently included in the five WSA's and portions of the San Miguel River and Adobe Badlands ACEC within the planning area. Additional closures should be designated for proposed ACECs, T&E plant or animal habitats, or environmentally sensitive areas included in the RMP. |
| 536 | I would like to see the UFO conduct an inventory of BLM lands that will identify areas of roadless or low road-density (< 1 mile per section) within the UFO and manage them as primitive backcountry areas with no motorized uses. The lands identified would be designated as closed to OHV's. |
| 538 | The BLM should also carefully evaluate the use of mountain bikes within these areas. Mountain biking is not a benign use free of any impacts. Just because they do not have a motor that does not mean they are entirely compatible with the land, wildlife, or people hiking or riding horses in the area. |
| 539 | One area that should be closed to motorized uses includes the upper Little Dominguez, Rose Creek, and Open Draw drainages, and the Camp Ridge and Sowbelly Ridge areas adjacent to the Dominguez Canyon WSA. Closing the entire Gunnison Trail and McCarty Trail systems to all motorized vehicles would provide an excellent horse and foot trail system that would compliment the Big Dominguez/Little Dominguez Canyon trails. Closing the area to all motorized vehicles and mountain bikes would provide solitude for people and wildlife, security for big game animals, and a large enough area for people to enjoy peace, quiet, and backcountry hunting opportunities. |
| 540 | Another area that should be closed to OHV's for non-motorized uses is the Monitor Creek, Potter Creek, and Criswell Creek Canyons adjacent to the Camel Back WSA. Closing the existing trails and old roads within this area to all motorized vehicles would provide an excellent backcountry area for non-motorized recreation and hunting. It would also compliment roadless values of the Roubideau Canyon Special Management Area on the adjacent Uncompahgre National Forest. |
| 541 | Another area I would strongly recommend for closure to OHV's are the BLM lands north of the Tabeguache Creek WSA/Special Management Area which include the Shavano, Campbell, and Burro Creek drainages. This area has very high wildlife values as well as excellent opportunities for non-motorized recreation and hunting. |
| 542 | The UFO has experienced several large wildfires in the last 20 years in the west end of Montrose and San Miguel Counties. You have done an excellent job of seeding and revegetating these fires. There were also several roller chops done in burned areas, old P/J chainings, and other sites to improve vegetation condition, induce mosaics for wildlife habitat, increase forage, and to reduce the risk of large-scale wildfires. Many of these projects have created or reestablished roads and OHV trails into areas that were previously inaccessible by motorized vehicles. During the time I have lived and worked here I have watched a steady progression of user-developed OHV trails become established in these areas that have opened up large areas that were previously inaccessible with four-wheel-drives and ATV's. The UFO needs to implement an active program of road closures to eliminate these routes and restore the benefits of the vegetation treatments as well as the hunting experience in these areas. The primary areas I know of are associated with the Burn Canyon fire, including Hamilton Creek, Hamilton Mesa, Callan Draw, Burn Canyon, and McKee Draw. Also the Campbell Creek fire opened up portions of Campbell Creek and Shavano Creek to motorized vehicles. The Bramiers Draw and Wickson Draw areas are additional examples. Another area that has been greatly altered is Mailbox Park. |
| 543 | The RMP should include management policy to immediately close fire lines and roads used to suppress wildfires, implement vegetation treatments such as roller chopping and prescribed burns, or for mineral exploration activities. When closing these roads and trails the BLM should leave a small parking area for pickup trucks and horse trailers to facilitate horse and foot access to the backcountry. |
| 544 | The BLM's travel management planning process should achieve a management designation of restricting all OHV use to designated routes within the remainder of the UFO. There is no reason to have any areas within the UFO designated as open to indiscriminate OHV use. |
| 545 | addition I would like to see the BLM institute seasonal restrictions on lands classified as big game winter range. The seasonal closures need to be coordinated with the areas currently restricted on adjacent National Forest |

BLM_0067286

**Table C-20**
**Issue 3: Travel Management**

| Comment ID | Comment |
|---|---|
| | lands as depicted on the 2008 visitor map for the Uncompahgre National Forest. The seasonal closures apply to all motorized vehicles including snowmobiles. Big game winter ranges on the National Forest are closed from December 1 through April 15 each year, regardless of snow conditions. This seasonal restriction, in combination with vegetation treatments and proper livestock grazing use, is primarily intended to encourage elk and deer to remain on public lands. Specific areas within the UFO that should be seasonally restricted to protect big game winter ranges include the area associated with the Burn Canyon wildfire – Hamilton Creek, Callan Draw, Burn Canyon, McKee Draw and the Flatiron. Another significant big game winter range area is Dry Park and Little Bucktail Creek outside of Nucla. On the other side of the Plateau, seasonal restrictions need to be implemented on the Roat Cap, Monitor Mesa, and Dry Mesa portions of the UFO. These areas all provide big game winter range habitat that needs to be managed in coordination with the adjacent National Forest lands to reduce disturbance and stress to wintering big game animals and to enable them to utilize preferred winter range areas located on public lands. |
| 546 | Open public meetings and a systematic NEPA process should be initiated to determine which existing routes are clearly needed for resource management, private land access, utility corridors, irrigation ditches, etc. Recreational OHV trails should not be the focus of the subsequent travel plan nor dominate the use of the UFO. Unroaded areas, seasonal restrictions for management and protection of wildlife and to provide areas of solitude, backcountry hunting, and non-motorized recreational opportunities must also be included in the final decision. |
| 547 | In addition, one criteria that I would like to see the BLM utilize for travel management is that if monitoring or public input indicates repeated or chronic violations of authorized motorized use occur, those areas or trails will be closed and/or further restricted by the BLM. There is no reason to reward bad behavior or abuse of our public lands. |
| 549 | There should be an effort to reduce and eliminate OHV use within or adjacent to the WSA's to preserve the wilderness and backcountry character and values. In addition, I would like to see the BLM prevent the establishment of mountain bike trails within the WSA's and adjacent backcountry areas. I do not believe that mountain bikes are compatible with this primitive setting and use. |
| 564 | I'm 60 and as I get older I would think someday I'd rather be on an ATV than a Mtn bike so I feel for the motorized folks yet don't know how public access for them could be worked out. It seems the best solution for them would be some public access thru or on to the power line road. I understand years ago there was dirt road access from Minnesota Creek Road to the power line road through what is to become Whistling Acres Estates Subdivision, but initially they're saying this would be for lot owners only. Perhaps Arch Coal would give access thru their property off of Minnesota Creek Road. |
| 565 | But for now let's start by preserving the trails that are there and have been since 2000, 2001. The trails allow a person to walk without getting cheat grass in their socks and give good access for firefighting (Mtn Bikers have put out 2 lightening strike fires in the last few years). |
| 566 | The part of our property where a BLM trail joins it, is part of a 16 acre conservation easement with a building site on it and then the trail exits onto Hawk Haven Subdivision's property. So, what would enhance our single path places and make for a long-term outstanding recreational opportunity for mountain bikers and hikers would be for BLM management to sign and declare certain trails for non-motorized use and many of is can help this occur. |
| 599 | Restrict target shooting and motorized travel to specific areas. |
| 615 | I say this because just about everyone I know prefers a quiet soundscape of the remote back-country. As such, it would be a good idea to lessen or not increase the use of motorized vehicles. |
| 616 | As a mountain bike user of the Jumbo area in Paonia I would like to express my interests. I believe that some trails (single-track) should be closed to motorized travel. |
| 626 | I would ask that you give this matter your utmost consideration and attention. As a long-time snowmobile rider, I would submit that this requirement would effectively eliminate snowmobiles on BLM Lands. A majority of riding time is spent on wide open meadows and other kinds of terrain that are a challenge to ride. There is no challenge in riding along on a road, like you would in a car or pickup. Roads and a few trails are used to get to the riding areas-they are not a destination. Snowmobiles travel on snow--Rarely do they ever touch soil or waterways. In all the snowmobile rides we've participated in, there has never been any harassment of wildlife nor abuse of terrain. Such a regulation would eliminate 90% or more of snowmobile riding on BLM Public Lands. would encourage you to keep Public Lands open to the Public. |

BLM_0067287

## Table C-20
## Issue 3: Travel Management

| Comment ID | Comment |
|---|---|
| 631 | In the interest of coexisting I would give them the ability to ride the Powerline road and the existing double track, But all of the single track should stay motor free. |
| 655 | In addition to the current RMP effort, Western is aware that the Uncompahgre Field Office intends to prohibit "open" travel and require that all motorized travel be limited to designated roads and trails. Western's only concern related to the limitation on off-road travel is that some of our access to the transmission line structures is off designated roads and would be considered off-trail travel. Western needs access to its facilities on a continual basis to properly operate and maintain them. We have geographic data that show the location of our facilities and access routes and can provide shape files so that this information is included in your travel management planning effort. We typically conduct our own road maintenance activities and can assist the Uncompahgre Field Office with the use, repair and maintenance of roads or trails used by Western to access its facilities. We can also work with BLM to identify areas where gates or other types of barriers can be used to restrict access for administrative purposes only. |
| 682 | As stated previously, San Miguel County believes the interests of the County and the public at large are best served by BLM lands maintaining their natural ecological integrity. Extractive uses of BLM lands have resulted in boom and bust cycles and left indelible scars on our public lands. Historic, and perhaps current, livestock management practices have also contributed to degrading or perpetuating the degradation of our public lands. These activities, along with travel management, have all contributed to the conditions described in the LHAs. |
| 684 | We also agree with the recommendation that BLM complete a road and trail map, identify road-caused soil loss, change travel (as you have) from open to limited to existing routes and where necessary, further limit travel to designated routes. As suggested in the LHA, BLM should close and rehab abandoned roads and trails to prevent further erosion. |
| 707 | My biggest concern for the revised Plan is how BLM will handle travel management, particularly motorized recreation uses, both on trail and off trail. When the Plan had its last revision in 1989,4 wheel ATV s and similar OHV vehicles were a relatively minor consideration. Since then, there has been considerable growth in usage of these machines on public lands. I have observed over the years substantial increases in resource damage wherever OHVs and particularly ATVs are used- soil erosion, destroyed vegetation, disturbance of wildlife, an- and water pollution, etc . . ATV users have created hundreds of miles of illegal trails and travel illegally on quiet use trails. They present a safety concern for other users because of the high speed at which they can travel, and adversely impact backcountry enjoyment by other users. |
| 708 | I recognize that BLM has an obligation to provide a balance between providing recreational opportunities, and protecting resources from degradation by these users. Certainly, ATVs can provide a fun, enjoyable excursion into public lands and if used properly can minimize its impact. There are certainly many responsible A TV users. However, the resource damage created by many A TV users far exceeds the value of recreation experiences received, particularly when compared to other users. Much of this can be attributed to the very nature of the design and operation of the machine- it weighs 5 to 20 times more than a person (500 to 1500 lbs) and it can generate 100 times more horsepower, all of which is applied to spinning, knobby tires, similar to a rototiller. Its impact is generally more severe than other types of OHV s (dirt bikes, jeeps, etc) because of its ability to travel over rough country, maneuverability, size and relative stability. There is also the fact that many ATV (and some other OHV uses) are interested primarily in challenging the natural terrain; i.e' can I cut across that switchback or get over that obstacle or beat my buddy down the trail' .(as opposed to going out for a nature ride). If one had set out purposefully to design a machine to create havoc in the backcountry, they could not have done a better job. Sometimes it seems that BLM feels it is obligated to provide recreational opportunities to whatever type travel machine humans can devise; A TV s, rock crawlers, etc. What will be next: the Dalles D-4 bulldozer club. |
| 710 | All OHV s should be restricted to designated trails approved by BLM, and the number and mileage of A TV trails should be based on person- user days (not milage traveled) , balanced against the resource damage they create and impacts on other uses. Which would greatly reduce their designated trail mileage. There is an absolute need for better management of motorized use users; this should be the number one priority in the new Plan. |
| 713 | Obliterate old or unauthorized roads. |
| 714 | Clearly mark usable motorized trails and fine those going off of them. |
| 722 | designated off road trails |
| 729 | The only changes would be to maintain the roads that are in the BLM areas. |

**Table C-20**
**Issue 3: Travel Management**

| Comment ID | Comment |
|---|---|
| 733 | Snowmobils should not be restricted to trails like other OHVs. If you have never rode a snowmobile and would like to see what it is all about I would gladly go with you so you would see what it is about. If you do not have a snowmobile to ride I have an extra one for you. |
| 768 | That all existing trails and roads remain open and recognized for multiple use including Mtn. Biking in the West End (Unit 5) |
| 769 | The Paradox Trail is able to retain its original corridor as publicized by COPMOBA/BLM brochures. That a "hike your bike" option is considered for that southern portion of the Tabeguache SMA boundary (800') to allow the hike a bike option. |
| 770 | New routes in the east and north sections outside of Nucla proposed by COPMOBA (Sprabin Park bypass, Oct. 2009) for multiple use be allowed for development including almost 2 miles single track to link up existing two track. |
| 772 | The new BLM Nucla Section 1:100,00 maps contain many omissions and inaccuracies. It needs to be reviewed and corrected. The older maps are much better for the information they contain. The Paradox Trail should be marked on new maps such as the Tabeguache Trail is. |
| 774 | Allow for trail designations for multiple use within Unit 5 specifically along the Paradox Trail corridor but also around the communities of Nucla and Naturita. This would include trail markers, publications, and possible trailhead signage outside or within town. |
| 775 | Develop loop routes for multiple users in the West End. |
| 780 | Allow for a boundary trail on the South side of the Tabeguache SMA for use of hikers and those wanting to hike their bikes through along the Paradox Trail (800') North of Spradlin Park. |
| 781 | Allow for the development of more mtn. biking opportunities around the communities of Nucla and Naturita. |
| 783 | Map 3.1 Recreation and Travel Management Plan does not show the Paradox Trail and should be included as is the Tabeguache Trail. |
| 789 | Less irresponsible road development and usage of existing roads. |
| 807 | Open road that you have closed |
| 840 | Continued access to public lands by motorized recreation. Maintaining a managed motorized system (OHC and full size vehicle) that is distributed to unique areas throughout the planning area. |
| 842 | Maintain the existing systems. |
| 850 | I just want to keep all the 4WD roads open. They are the best multi-use system for people of tolerance, everybody is welcome, just have to learn to share. |
| 860 | There are places where roads have caused severe soil erosion. Many of these roads will eventually be closed, according to the BLM Travel Management Plan, but until then, if ever, the erosion continues. |
| 869 | 3.2 Where should BLM leave areas open to OHV use? Main routes only. Poaching has increased drastically since ATV's have been able to go wherever they want. Weeds have also spread along roadways as the seeds are carried on the tires of the ATV and people's clothing, gear and pets. Although the travel management plan has been finished, I've seen no one out making road closures. ATV use should be limited to certain times of the year, as they cause road damage during muddy seasons in the spring and fall. Since they are newer on the scene than hiking, they should not be allowed on trails that were originally just hiked. They should be kept out of remote areas--walking only. They should not be allowed in canyons or near water, as their bush whacking starts new roads and causes erosion. They should not be allowed on grazing allotments when cattle are present. Too many times we've had to confront people on ATV's chasing our cattle on public lands. |
| 888 | Access to these areas may need to be a maintained trail for walking, or footpath. Encouraging easy access is detrimental to the wildlife and vegetation. |
| 912 | My wife and I are avid users of the single-track trail system known as Jumbo Mtn BLM area near Paonia. We regularly run, hike and mountain bike on the Jumbo Mtn. trails almost year-round, and we are concerned about the dangers and impact of allowing motorized vehicles on the bulk of these trails. Due to the terrain in this area, the many of the trails offer very narrow sight lines and little passing space, a situation only exacerbated by allowing motorized use on traditionally non-motorized trails. We are also very concerned about the erosive impact of heavy vehicles too large for narrow, steep trails over loose soil. Some of the double-track areas already show |

BLM_0067289

**Table C-20**
**Issue 3: Travel Management**

| Comment ID | Comment |
| --- | --- |
| | significant signs of erosion. As homeowners in the town of Paonia and very avid outdoor enthusiast and athletes who use the Jumbo Mtn. single-track trails regularly, we ask BLM's support in preventing the further encroachment of motorized vehicles on these single-track trails by clearly designating the existing trails for only nonmotorized travel. |
| 918 | ATV travel on BLM lands in the area from Jay Creek east past Love Gulch and north onto Oak Mesa needs to be confined to marked routes. It appears from your website "Route Map" that there are no routes in this area. When I try to access the "Existing Road Inventory" maps, I get a message that the requested URL was not found on this server. I recall seeing a map at the Hotchkiss scoping open house showing this area to have travel restriction, but do not recall if restriction was to existing routes or designated routes. At any rate, every year, especially during hunting seasons, there are ATVs in the area, some of which trespass onto private lands. I believe resource damage is occurring from these vehicles in the form of soil erosion, compaction and rutting when soil is wet and spreading of noxious weeds. The above mentioned fencing project might help with the trespass situation. I believe off-road vehicle use on all BLM lands should be restricted to existing or designated routes, though I see no way for adequate enforcement given existing funding levels. |
| 974 | I would like to see roads closed permanently - obliterated and revegetated. Roads that are not closed permanently could be seasonally closed with gates. Main routes would remain open. |
| 975 | Priority on improving and protecting wildlife habitat and secure areas by decreasing human activity on public lands by implementing and enforcing motorized and seasonal closures. |
| 977 | Encourage recreational uses to travel by non-motorized and non-mechanical means. |
| 978 | Less motorized users traveling in smaller groups with more respect for the resource by packing out trash, respecting closures and seasonal restrictions and respecting the value of solitude and wild-primitive nature of publics lands. |
| 979 | I encourage BLM to make the bold management decisions needed to limit motorized use thereby decreasing the amount of human activity that negatively impacts wildlife. |
| 986 | Several times I have hiked in Roubideau Canyon area. I sincerely believe it would be a big mistake to open that area of Patter and Monitor Canyons to Motorized vehicles. For sake of today and future hikers, I urge you protect this great resource from the damage motor traffic causes. |
| 1006 | The attitudes of the users is vital to the success of any resource management. In that regard, while I applaud the decision to restrict unlimited travel to a few specially designated areas, I hope the BLM will recognize that a designation of "Limited to Existing Routes" is unenforceable and encourages people to claim, "other people drove there, so it must be existing." I encourage the UFO to move to "Designated Routes Only" as quickly as possible throughout your territory, and to continue to stress informing and educating people about such restrictions. Yes, we all wish we could go wherever we wanted, but that won't work in this populous an area. |
| 1016 | Closing those areas to public access and use. |
| 1018 | The only changes would be to construct roads to make it more accessible to the public. |
| 1020 | In heavily used areas where there is environmental damage taking place, limit the number of users, size of groups, behavior of users, etc. but do not close the areas to no access. |
| 1036 | I would like to see more ATV access and trails versus the current assault on motorized access on public lands. In the past 10 years you have only closed accessed during a time when more and more people are starting to enjoy the use of ATV's on our PUBLIC lands. It is my opinion that the only groups that enjoy more access to our public lands are Cattle and Gas Rigs. I've see the damage that is done by both and it far out ways anything I've seen by ATV riders. |
| 1037 | I can't believe you actually want to limit pedal bikes to designated trails as well. Where will this madness end. |
| 1038 | Here is a question: How many new trails have been opened in the past 10 years vs. how many (undesignated and designated) have been closed. |
| 1039 | I rarely use my 4 wheeler while hunting anymore, most of the trails in my area have been closed because they were not "designated". The trails had been there for 20-30 years but they did not have the magic number on someone's map. |
| 1040 | In my opinion any established trails should be given a "designated" number  -  -  not closed because it does not |

*Uncompahgre Resource Management Plan Revision and EIS*
*Final Scoping Summary Report*

BLM_0067290

## Table C-20
## Issue 3: Travel Management

| Comment ID | Comment |
|---|---|
| | have a number. Give it number, give us more access, give us more access just like you give cattle and gas rigs. My favorite is when I watch gas rigs drive down perfectly good gravel roads on public land and the sign says that I have to walk or ride a horse on that very same gravel road. That scenario shows me the BLM's and National Forests true attitude toward the average American. |
| 1056 | After reading each of the sections, it seems to me that the Travel Management (Regulation), section -3.2 may be the key to all the other sections. Travel on Public Land is no doubt going to be one of the "hot button" issues that will have proponents for every scheme of regulation that might be devised. |
| 1058 | Travel is as old as the earth. Since the beginning of human societies travel was the means that brought them together and provided them with food and shelter. If the BLM thinks it necessary to regulate the travel of we citizens, it must overcome the human desire to travel when and where we want and how we want. So -- let's start with why. Why is any restriction of travel necessary? Is there a calving, fawning, nesting area that would be disturbed by the travel of humans? How will human travel affect the species involved? What period of time will the restriction be in effect -- seasonally or permanently? If this is the case, what kind of travel will be restricted? Will it be foot traffic, horse traffic, ATV traffic, snowmobile traffic, or automobile traffic? Where will the traffic be restricted, in a general area, or a specific area? How will the owners know that traffic is restricted by type and place? Who is going to enforce the travel restrictions and what will be the offense? |
| 1059 | If there is something that currently requires a travel restriction, who is going to make that determination? Is that what the scoping is about? If that is the case, I would vote for no restrictions to any kind of travel. I must be convinced that there is a problem that can be solved only by a travel restriction of some sort. For example, if equestrians are using a developed trail and mountain bike riders are using the same trail, there may be no conflict; however, if the terrain and vegetation are such that a horse cannot see a mountain bike coming until it is almost upon it -- a conflict may exist. The conflict can, however, be solved without a total restriction of either mode of transportation. Give the horse the right-of-way, and put up signs for the mountain bike riders to walk their bicycles in those areas. Since the trails and roads on most of the BLM administered land will not be under constant patrol, the signs will put the liability on the bike riders if they do not comply with the warnings. An official sign creates a civil liability in the event of injury to the rider or the horse if the biker ignores the sign. This will require no policing on the part of the BLM. It is a matter of awareness and common sense. |
| 1060 | As I've said, restrictions must be justified for motorized travel as well as non-motorized travel. Travel on rivers and lakes should not be restricted unless justified, the same as ground travel. |
| 1061 | I'm sure you will get all sorts of excuses for restricting every kind of travel on every acre of BLM administered land. Do not accept excuses. I doubt, however, that you will get much response from the "general public." I'm guessing that most of the responses you get will be from "special interest groups" that will be looking for excuses to close our land to any use that requires travel--except foot travel. Don't be led down the path of believing that damage by erosion will be caused if any kind of wheeled vehicle is allowed on the land. Erosion is part of the life force of the organism called "earth." What little erosion is caused by wheeled vehicles is minuscule in the grand scheme of the life of this earth. In truth, erosion occurs all the time across the landscape, with or without the presence of humans or their machines. Our rich and fertile valleys are the result of erosion, most of which occurred prior to human habitation. The landscape administered by the Uncompahgre Field Office of the BLM is just a small part of the greatness of the total landscape that has been formed by forces other than man. More erosion will be caused by the earthquake in Haiti than all the human travel that will occur in the next fifty years on the lands administered by the Uncompahgre Field Office of the BLM. The Yellowstone National Park fire allowed more erosion than vehicular traffic will cause here in the next fifty years. As the earth breathes, it moves. Man can do nothing to stop it or have any significant effect on its breathing and changing. When a tree dies, it is replaced, not necessarily by another tree but by some vegetation that takes its space for growth. As animals eat and trample vegetation it is replaced. The earth will put forth new growth--whether or not it is what man desires is of no matter. Today's vehicles do much less to initiate erosion than the vehicles of our ancestors. The wagons used by the pioneers going west dug great trenches in the earth. The travois used by the earliest people in North America dug large gouges in the earth. Since the sixteenth century, horses have trampled the earth in most of the western United States. The elk, deer, antelope and buffalo have been trampling the earth for eons and now cattle are trampling the earth. All of this trampling increases the likelihood of some increased erosion. I doubt the BLM wants to get rid of all the hoofed wildlife on the Publics' land. |
| 1064 | Guiding the use and travel routes for this land will be much more effective than imposing restrictions. |
| 1065 | More access for ALL users, not less. Expand trails, disperse users, improve relations with all users and among all |

BLM_0067291

**Table C-20**
**Issue 3: Travel Management**

| Comment ID | Comment |
|---|---|
| | users. |
| 1066 | Cutting down on the miles and number of trails is WRONG. |
| 1067 | Restrict all off-road motorized traffic to WELL-ESTABLISHED existing routes; |
| 1071 | Limited access for people with disabilities. See the 1990 Americans with Disabilities Act and the BLM's MOU with Wilderness Enquiry for ideas. BLM should take the initiative to improve access to lands and river segments it manages (via land access) for people with disabilities. |
| 1107 | Please maintain public access to existing ATV trails that provide opportunities for those with limited hiking ability to enjoy public lands. |
| 1121 | I have lived in this area, close to Dry Creek, since 1981 and have watched with interest the increase in the amount o fuse this area has been and is currently getting. The Off-Road traffic has really increased in the last ten years. It has been my observation living here and hiking here that there is a problem with these vehicles. That problem being that they do not remain on the numerous roads that are available to them, but instead choose to bully their way up the small rocky canyons here. In doing so they are destroying the small amount of vegetation that is present in these areas and they are tearing up the general landscape. We all know that the desert landscape is fragile and the effect of one vehicle driving over the cactus is visible for many years. In addition they camp down near Dry Creek and leave their trash for others who do not consider this land a wasteland to clean up. I wish I knew the answer for this problem, but I am sorry I don't. Perhaps this planning committee could use the plan that was devised for Peach Valley as a template for Dry Creek Canyon. |
| 1133 | In addition, for travel management in the planning area, EPA recommends BLM give preference to routes that do not have sensitive soils, wetlands, stream crossings, critical habitat, meadows, etc. |
| 1173 | Road related problems and environmental impacts are often identified as significant elements that impact aquatic and terrestrial resources and affect water quality, stream and wetland processes, fish and wildlife through erosion, sedimentation, and/or fragmentation of habitat. The travel management analysis for the RMP/EIS should include a structured, systematic road inventory, including identification of the road/trail network needed for management objectives and public access, as well as what can be adequately maintained to address water quality, fish and wildlife concerns. Specific attention should be paid to road density, number of road stream crossings, road drainage and surface erosion, culvert sizing and potential for washout, culvert allowance for fish migration, effects on stream structure and seasonal and spawning habitats, and impacts to riparian habitats. |
| 1174 | The popularity of Off-Highway Vehicles (OHVs) has increased dramatically and is expected to continue due to population growth, advances in recreation technology, increased availability of information and improved access to remote areas. OHVs, such as off-road vehicles, trail bikes, all-terrain vehicles, and snowmobiles, are able to access areas much further into isolated public lands than was possible historically. EPA supports the transition from unmanaged motorized recreation to restricted travel. Restricted or limited travel is necessary to ensure that resources are protected and that other non-motorized recreation is accommodated. Unmanaged OHV use on federal lands has resulted in numerous adverse impacts, including: unplanned roads and trails; erosion; spread of noxious weeds; damage to water quality, riparian and wetland habitat, stream channels and fisheries; reduced migration corridors and wildlife habitat; and degradation of recreational experiences such as horseback riding and hunting. The RMP/EIS should provide a thorough analysis of impacts from OHV use. The analysis should include prevention or mitigation of adverse impacts from OHV s to soils, watersheds, vegetation, wildlife habitat, water quality, cultural resources, and other assets of the planning and decision areas. |
| 1180 | It is very important to San Miguel County residents and government programs to be able to work with BLM to plan and hopefully build recreational trails. It is a long standing goal to connect San Miguel County to Ouray County and beyond via a trail for hiking and bicycling over Dallas Divide. Parts of the trail are in place on the San Miguel side. This trail would connect to the regional Galloping Goose Trail which connects Telluride and Lizard Head Pass. |
| 1182 | Recently, the County Open Space program began exploring the concept of connecting Norwood/Wrights Mesa to the Placerville area. The idea was to try to utilize the old mine roads on the north side of Colorado 145 and the mesa top in some places. |
| 1190 | Specific to the Community Assessment, we would like to emphasize the Partnership Opportunities that have been articulated. The Assessment provides the following: * Most groups would like municipal and county governments, community residents, and organizations and clubs to cooperate with BLM on trail planning (including the route |

BLM_0067292

**Table C-20**
**Issue 3: Travel Management**

| Comment ID | Comment |
|---|---|
|  | designation process) and maintenance, as well as on noxious weeds management. * Some groups would like municipal governments and community residents to work with BLM on improving access from towns to BLM public lands. These are indeed points raised and supported by the Town of Ridgway. |
| 1192 | There are several BLM parcels that lie within close proximity to the Town, and one 40-acre parcel that is surrounded by the Town on three sides. With regarding to the outlying parcel located on the east side of Hwy 550 and directly adjoining the Bureau of Reclamation property and the Ridgway State Park, the Town would like to see trail connectivity both to and within this particular parcel. This land is seeing considerable usage for multiple recreational purposes including hiking, mountain biking, horseback riding, hunting and wildlife watching. The usage of the parcel for single track trail is of particular interest to the Town as the topography is well suited for this activity, the area is connected to this community by the RiverWay Trail, and this would present a recreational opportunity that we feel greatly compliments existing uses at the adjoining Ridgway State Park. |
| 1194 | With regard to the 40 – acre tract that straddles the Uncompahgre River and includes the RiverWay Trail, the Town notes the specific importance of this tract in terms of trail connectivity, wildlife (the site is occupied by many species including deer, fox, badger, herons and roosting bald eagles), and passive recreational uses including picnicking, hiking and wildlife viewing. Notably, the parcel abuts a Town owned park (Dennis Weaver Memorial Park) and trail connectivity and possible pedestrian bridge access may be enhanced between these two parcels. The Town would like to partner with BLM in meaningful ways to explore these ideas and assist in the needed stewardship of this 40-acre parcel. |
| 1210 | CNAP recommends that Fairview South ACEC Natural Area remain designated as 'Closed' to motorized use. The continuing closure of this area to motorized use would assure that the sensitive and rare features that occur will not be compromised by primary and secondary impacts (e.g. dust) from motorized vehicles. For the areas directly adjacent to Fairview South, CNAP recommends a 'Limited to Designated Roads and Trails' OHV designation. As part of this process, CNAP recommends that an implementation plan be prepared that incorporates open road designations for the areas indicated. |
| 1211 | Additionally, CNAP recommends that vehicle use within Needle Rock ACEC continue to be limited to designated roads and trails yearlong. |
| 1227 | In addition to the Wild & Scenic Rivers eligibility there are several areas within the RMP planning process which warrant additional comment. Travel Management, Water Quality and Soils are of concern to the River District. |
| 1318 | as the BLM knows, much of this land was designated as wilderness. Such designation has increased tourism and traffic to the wilderness boundaries. That increased traffic is now going through the private lands belonging to the Escalante Ranch. The Uncompahgre RMP should address the issue of increased traffic, tourism and access to the wilderness so as to not impact the Escalante Ranch private lands. |
| 1343 | Motorized cross-country travel should be allowed in areas designated as open, limited to existing roads and trails, limited to designated roads and trails, and closed to motorized use, for maintenance of existing and planned transmission lines and associated facilities. The BLM should leave areas open for OHV use where an existing use or ROW grant is issued, or for those areas designated as critical to the health and safety of the public. |
| 1686 | BLM should not allow new motorized trails in remote areas that have few or no trails. |
| 1688 | The North Delta Open Area should remain open to ATVs and should be managed to the standard of the Gunnison Gorge NCA. No new open areas should be created in the UFO. |
| 1689 | The UFO should continue to manage the Tabeguache Area as wilderness and should not allow mountain bike trails. |
| 1766 | Lands with wilderness characteristics should be closed to motorized and mechanized use. |
| 1782 | The experience convinced me that we need to keep roads out of wilderness areas. It would not have been as easy for me to get a kayak to that lake, but it would have been impossible for my harassers to get jet skis there. Roads give pure evil a convenient way to the wilderness, and destruction follows. |
| 1788 | This is one of the most beautiful places I have ever been, and it would be a disgrace to our National Heritage if we exploit it for uranium, oil, gas, and destructive off road recreational vehicle use. |
| 1825 | The closing of roads for public use, mining use and agricultural purposes, keep them open and available. |
| 1827 | I think the BLM should leave the roads that are open and used open, there would be less travel off the roads if |

BLM_0067293

**Table C-20**
**Issue 3: Travel Management**

| Comment ID | Comment |
|---|---|
| | there were more roads. |
| 1837 | We thank BLM for their decision in the Dry Creek Travel Plan to not accede to a request from the motorized groups to designate an ATV loop trail that would descend into Monitor Creek from the 25 Mesa Road and completely change the character of this now wild canyon and urge the BLM to stick with this decision. |
| 1846 | Manage for natural soundscapes in the Uncompahgre RMP, crafting a travel plan that incorporates sound management in backcountry, primitive recreation settings. The RMP should include a soundscape policy that acknowledges the impact of off-road vehicle and other noise on wildlife and Quiet Users. The policy should confine noisy uses to selected portions of the field office. Off-road vehicles should be restricted to areas where they will have minimal impacts on wildlife habitat, quiet users and the quiet solitude of BLM back-country. |
| 1847 | Institute a policy that designated ORVs routes remain open subject to compliance.. If resource damage and off-route use can not be controlled these routes would be closed. |
| 1883 | There are areas that have long been used for cross-country OHV activities with no adverse environmental impacts. Chief among these are: some "play areas," sand dunes, mancos shale hill climb areas, and other areas with little or no vegetation. Some open areas are recognized for their high OHV popularity and should be kept available for those who value this type of recreation. Other examples of valued "open" designated areas are staging areas that provide recreationists to gather before and after traveling on OHV trails. "Tot Lots" where children and young adults can recreate with their friends in an area close to parental supervision are highly valued. Some OHV events, such as trials competitions, require the "open" designation to be viable. Staging areas for competitive and other commercial events are another example. |
| 1884 | The Planning Team is cautioned not to segregate users who value the "open" designation into smaller and smaller areas. Crowding users who require the "open" areas can increase safety risks to the public as increasing numbers of OHV enthusiasts are compacted into ever-smaller areas |
| 1889 | It would provide a public benefit to all trail users, both motorized and non-motorized, to approve routes for permitted events in the programmatic travel planning process. We also believe this would benefit the agency by helping to reduce the future workload when processing permit applications. |
| 1890 | Need for "point-to-point" recreation opportunity. Long distance, "point-to-point" recreation is becoming increasingly popular with motorized and mountain bike enthusiasts. The UFO is a key hub for this type of recreation. Several routes exist between Loma and Moab, between Fruita and De Beque and between Clifton and Delta are becoming quite popular. BRC strongly encourages the plan to acknowledge this need and direct activity planning to meet the current and future need. |
| 1891 | Need for connecting existing routes and areas in the UFO and adjacent offices. Similar to the concern mentioned above, BRC encourages the agency not to "land lock" trails or areas. Long term planning that allows, or at least does not restrict, connecting recreation opportunities within the UFO and beyond should be considered. |
| 1894 | BLM should develop a wide range of Alternatives responding to Issues raised by the public. BRC supports active recreation management on all public lands and National Forests. Insofar as active management of OHV use, the OHV community generally supports the "travel limited to designated roads, trails and areas" paradigm. |
| 1991 | Set route density targets In the uranium zone we also recommend that the BLM use methods recommended by The Wilderness Society (see SRCA letter), setting road density targets based on studies (and observations) of plant and wildlife sensitivities to roads. |
| 1992 | Close spurs/duplicate routes Reducing densities could also be done by examining route maps to identify obvious duplicate routes and spurs for closure. As mentioned in RMRI scoping letter # 2, this should be done in the RMP rather than waiting for the subsequent travel plan. The Land Use Planning Regulations, as repeated in UFO RMP Travel Management Handout, state that a RMP "will delineate Travel Management Areas….[and]..a map of a preliminary road and trail network." In other words the RMP can do a lot to reduce route densities without waiting for the travel plan. |
| 1993 | Reduce habitat fragmentation in the west end of UFO On the West End Route Inventory Map 2, produced with the proposed 2008 RMP Amendment, very high road densities needing reduction appear in the following locations: • A proliferation of routes and spurs SW and NE of the Opera Box Mine on Road DD19 • A dense concentration of routes branching north off Road EE22, north of Long Park and the Honey Moon Mine • Route proliferation east of Hieroglyphic Canyon and west of the canyon in the vicinity of Tramp Mine west • Comparing the West End Inventory Map with the 1999 BLM topo map, there are many new routes north and south of the San Miguel River |

BLM_0067294

## Table C-20
## Issue 3: Travel Management

| Comment ID | Comment |
|---|---|
| | west of Nucla, on which more use may have become recently established and which need to be looked at for closure • There is also a dramatic increases in route development on the BLM parcels west of Norwood, including Spring Draw, Callan Draw, Burn Canyon and McGee Draw. While some of this could have been missed in 1991, some routes appear to be new roads built in association with prescribed burning and vegetation treatments. Such roads should long since have been closed, let alone being shown on publicly distributed maps. This landscape does not need more roads There may be a similar high density area south of the Dry Creek travel planning unit but RMRI did not have time to look into it. |
| 1996 | Less miles, more saddle time - Accommodating more use on fewer miles and acres The National OHV Conservation Coalition (NOHVCC?) is developing motorcycle trail guidelines to allow more opportunity on fewer miles of trails, in response to closing opportunities everywhere. How can riders obtain an enjoyable day's experience on fewer miles of trail? One way is to retain the difficulty level not just of motorcycle trails, as well as 4WD roads, ATV, and even mountain bike trails. This includes avoiding heavy maintenance on level 2 roads and preventing single track trails from being widened by ATVs. Land management agencies and counties have a tendency to improve roads and trails that the motorized community prefers keeping rough and rugged to retain the desired challenge/rock crawling experience. When challenge routes get upgraded ORV users forge into new areas to find these opportunities, perpetuating the cycle of route proliferation. For this reason the RMP should include a policy of not widening single track or ATV trails and not upgrading challenge level motorcycle trails and 4WD roads except to address resource damage. Keeping high challenge levels in motorcycle trails can also reduce user numbers to more manageable levels and even keep shared-use trails with hikers from becoming high traffic motorcycle corridors that displace hikers. Not just remote settings but trails themselves can be kept more natural and less "improved" thereby creating a more natural user experience. |
| 1997 | Compliance as a condition for keeping trails open Use compliance and minimal impacts as conditions for keeping motorized trails open—placing the burden of enforcement on users, which will be helpful in remote areas not frequently patrolled. The Salida Ranger District is exploring an OHV patrol position that would be jointly funded by the Forest Service and non-profit recreation groups. As an example of a "keeping motorized areas open conditionally" policy, we point to the UFO's closure of a damaging rock crawl area. Other conditions for opening new trails should be a commitment up front on the part of ORV users for long-term funding for maintenance and patrol. Such conditions are laid out in Appendix 6 of the Royal Gorge BLM's Arkansas River TMP EA as follows: • The [trail] proposal would further the Desired Future Conditions of the sub area • The proposal is sponsored under a partnership agreement that includes a plan for securing the necessary funds and/or volunteer commitments to construct and maintain the trail to accepted standards. • The specific location of the proposed trail has been flagged on the ground • The decision has been authorized under a site-specific NEPA RMRI recommends these conditions be in place prior to trail designation, rather than trails being approved with these conditions remaining a mere wish list for the future. |
| 1998 | Process for designating motorized and mountain bike trails The Pikes Peak District of the Forest Service is working with a consulting firm, (EDAW, but has a new name) on mapping decision constraints on motorized trails, such as permitted activities (grazing), topography, private property and other access barriers, WSA, ACECs, PCAs, management on adjacent jurisdictions, and resource constraints such as sensitive wildlife habitat, watersheds or soils. We recommend an approach like this for UFO travel planning. Of course in remote areas enforceability should be the bottom line criterion for new trail locations. |
| 1999 | Interim Management Interim management is a challenge. Below are some ideas on managing motorized use until travel planning can occur:<br><br>• Close and sign everything not on the "existing route" inventory<br>• Physical closures<br>• Emergency closures of damaging routes where terrain allows<br>• The Field Office Wide Route Inventory map appearing on the RMP website appears to show recently established user-created trails –in color. Although they are "existing" on the ground, displaying user-created trails publicly will ensure they get more use and will be harder to close in a final decision. RMRI also supports the interim management recommendations in the SRCA letter. |
| 2067 | The areas highlighted in red on enclosed 1999 Nucla BLM topo map (copy) are areas on the west side of the UFO that appear on the topo map to be less roaded than surrounding lands, or to have no roads at all. |
| 2068 | The boundaries nevertheless show how rare and isolated these less roaded lands are, suggesting in itself that they |

BLM_0067295

**Table C-20**
**Issue 3: Travel Management**

| Comment ID | Comment |
|---|---|
|  | bear further study as potential wildlife and quiet use areas. |
| 2075 | To underscore the importance of less roaded and trailed land, we trust the UFO has access to the large bibliography of studies that show the negative impacts of roads and trails on wildlife and natural resources----research which applies to mountain bike and hiking trails as well, not just to motorized trails! |
| 2076 | The current RMP is a one-time opportunity to set aside these less roaded areas for the uses above, by closing the remaining roads and establishing the areas as unroaded, non motorized quiet use or just plain wildlife areas. |
| 2078 | It is especially appropriate that this be done in the RMP rather than waiting for the travel plan because, as the UFO RMP Travel Management (illegible), the RMP (illegible)Travel Management Areas .... [and]..a map of a preliminary road and trail network." In other words, the Land Use Planning Regulations mean the RMP needs to identify both motorized and nonmotorized areas as a basis for later motorized trail designations, as well as a preliminary route network where roads and trails will and---presumably---will not go. |
| 2088 | We recommend the BLM recommend this overlay process, adding cultural and paleontologic layers, visual/scenic resource, soil, slope and vegetation layers, CNHP element occurrences, existing and potential ACECs, big horn sheep and other big game layers, Breeding Bird Atlas layers, first hand observation, and soundscape analysis to identify levels of natural quiet. This analysis will flesh out the values these less roaded areas have that make them worth protecting for future generations. |
| 2090 | Final Step The final step involves management direction, giving the areas non motorized and perhaps nonmechanized management prescriptions, identifying levels of protection for plants and wildlife, levels and intensities of quiet use, whether the areas will be identified as ERMAs or SRMAs, finding citizen adopt groups, etc. |
| 2093 | The area delineated in red on the map forms a needed extension of the Tabeguache SMA because it fills in a corner necessary to connect the SMA with the large Forest Service roadless area to the east. This roadless area was included in a core reserve proposal RMRI helped design in the 1990s in conjunction with the Uncompahgre Travel Plan. A Forest Service map attached here shows this area as clearly unroaded and, thanks to RMRI's and other groups' efforts, the area was designated as a Closed Travel Area" in the final TMP. |
| 2096 | The western boundary drawn on the map has been extended to Long Mesa to incorporate a piece of the Potential Conservation Area. Providing a nonmotorized/nonmechanized prescription for this entire area represents an important opportunity to safeguard an unusually large and rare chunk of diverse and unroaded land, as BLM and Forest Service lands surrounding Tabeguache are densely roaded everywhere else. |
| 2098 | Mountain Bike Management The BLM Tabeguache Special Management Area is a wilderness area in everything but name and as such needs to be managed for horse and hiking use only, not for motorized or mountain bike use. We understand the BLM has been actively managing it this way and we would like to thank you and strongly recommend that mountain bikes continue to be disallowed. |
| 2100 | Saw Tooth Ridie Sawtooth Ridge on the southern tip of Long Mesa is virtually unroaded on the 1999 top map. This map was done only 11 years ago, suggesting that the roads appearing on the Field Office-wide Road Inventory on the website are recent, user-created and, not having a long history of use, can be closed to create an important quiet use and habitat area. Saw Tooth Ridge is in mule deer severe winter range. The northern boundary could be drawn along the road that dissects Section 8 to the north. |
| 2102 | South of Saw Tooth Ridge there appears to be a less roaded area in the upper reaches of Dry Creek canyon. As with Saw Tooth Ridge, some of the routes appearing on the RMP inventory map appear to be recent incursions and should be closed, as they are not appearing on the 1999 topo map. |
| 2104 | Saucer Basin Saucer Basin is across the Paradox Valley to the north. The boundary drawn on the map includes lands that appear roadless on the 1999 topo map even though a few, likely user-created, routes that could be closed, have cropped up on the RMP inventory map. |
| 2107 | Altogether, we recommend the BLM give this entire combined area extending from the Dolores River on the north to the vicinity of Honeymoon Mine to the south, a non-mechanized, nonmotorized management prescription. |
| 2117 | Sharp Canyon West of Nyswonger Mesa another roadless area is marked on the map in the vicinity of Sharp Canyon. This area is in an elk winter concentration area and further GIS analysis would likely show other values that would benefit from keeping the area nonmotorized. |
| 2118 | Lion Creek And just north of Route 90 is another area that is clearly roadless on the RMP inventory map, |

BLM_0067296

**Table C-20**
**Issue 3: Travel Management**

| Comment ID | Comment |
|---|---|
| | between Spring Creek and Lion Creek. Like Sharp Canyon, Lion Creek should be studied by the BLM as a unique if small example of roadless land. If these areas are roadless now after so many decades of uranium exploration, that in itself is worthy of note. |
| 2120 | Wray Mesa While not roadless, we note that this area is Desert big horn sheep habitat with good condition grasslands. It needs to have a spring seasonal motorized closure to protect big game. |
| 2123 | Other solutions of course are reducing road densities by setting road density targets, closing spurs and duplicative routes and narrowing motorized use down to a few logical, linked loops and travel ways that provide opportunities without the broad scale cross-country impacts that are now occurring. |
| 2182 | UVA supports in most respects present efforts in managing the various categories, but feels that in developing the new RMP that significant travel restrictions specifically restrictions to established routes, and in some cases the closing of routes, will be necessary for management plans to succeed in preserving and improving resources. We feel that the Dry Creek Travel Management Plan can serve as a useful model for the entire area administered by the UFO. And in this regard it is essential that the Dry Creek Plan remain intact and that the road and track closures in the Potter and Monitor drainages be maintained. The Dry Creek Plan was not quick, or easy or without controversy, but the systematic, unwavering commitment to public involvement, input, consultation, compromise and collaboration have laid the groundwork for a successful formulation of a new RMP. We send our best wishes for a successful outcome. The welfare of our home territory depends on it. |
| 2194 | North Delta Designated OHV Play Area. On the basis of the excellent signing, fencing, patrolling and other management that the UFO has implemented in the OHV open areas in Peach Valley/Gunnison NCA, we recommend that the North Delta motorized open area remain open with management practices in place that are equivalent to Peach Valley/Gunnison NCA. |
| 2195 | We do not want other OHV Play Areas created because of likely damage to native ecosystems. |
| 2196 | Jumbo Mountain. Historically Jumbo Mountain, near Paonia, was sparsely used, primarily by hikers. However, use has increased greatly in the past 20 years, with ATV users and mountain bikers appearing as new user groups. Because Jumbo Mountain is so close to Paonia and because it is used intensely for recreation, it should be used exclusively for recreation. For safety reasons, BLM should exclude mountain bikes and ATVs from trails designated for hiking and horse riding. The BLM should investigate whether new access points might be developed that would decrease conflict between user groups. Several of our members are adjacent property owners and we urge the BLM to work closely with them on access issues |
| 2200 | Limit motorized use in the UFO to existing trails. |
| 2201 | As soon as possible complete ORV route designations on all UFO areas where this has not been done. |
| 2202 | In the interim, make a plan for how to contain expanding use. |
| 2203 | In the interim, close all damaging routes |
| 2205 | Identify and close sensitive areas • Sensitive areas/habitat needed by elk, deer, big horn sheep, antelope, rare and sensitive plant and animal species such as Gunnison sage grouse, prairie dogs and burrowing owls • Sensitive watersheds, riparian areas • Erosive soil areas • Fragile vegetation types • Big game winter range, calving, lambing and fawning areas. Studies, for example those by Michael Wisdom, have shown that deer and elk are disturbed and leave areas frequented by both ATV's and mountain bikes. • Remote areas that cannot easily be enforced • Areas where motorized noise will disturb wildlife and Quiet Users. • Some of these areas also may need to be closed to mountain biking or even hiking in the case of highly sensitive areas. • Any sensitive sites should be closed (seasonally, if appropriate) to antler collection, as is now being done on UFO to protect sage grouse habitat |
| 2206 | Close or keep closed the following places to motorized recreation • BLM lands north of the Tabeguache Creek WSA/Special Management Area including the Shavano, Campbell, and Burro Creek drainages. • Monitor Creek, Potter Creek, and Criswell Creek Canyons adjacent to the Camel Back WSA. • Portions of San Miguel River Corridor. • Undeveloped areas in and adjacent to all WSAs. • Camp Ridge and Sowbelly Ridge, Rose Creek, and Open Draw drainages, adjacent to Dominguez Canyon Wilderness, • Close the Gunnison and McCarty Trail systems to ORVs and mountain bikes and set them aside as horse and foot trails. • Dolores River Canyon. This area has red sandstone cliffs, river otters, peregrine falcons, etc. WCC supports the more detailed recommendations as outlined in the Dolores River Coalition's comments. • Norwood Canyon. This portion of the San Miguel River corridor provides habitat for mountain lions, hawks, eagles, and both rare and familiar native |

BLM_0067297

**Table C-20**
**Issue 3: Travel Management**

| Comment ID | Comment |
|---|---|
| | fish. ● Roubideau/Potter/Monitor canyon system west of Delta. Maintain existing road closures and do not build a new ATV loop into Potter and Monitor Canyons. These areas are relatively undisturbed and provide excellent habitat. ● BLM lands north of the Tabguache Creek WSA/Special Management Area which include the Shavano, Campbell, and Burro Creek drainages. This area has very high wildlife values and excellent opportunities for non-motorized recreation and hunting. ● Conduct road closures of user-developed OHV trails in the west end of Montrose and San Miguel Counties where they were established following vegetation treatments (e.g. chainings) and post-fire revegetation projects. Areas associated with the Burn Canyon fire include Hamilton Creek, Hamilton Mesa, Callan Draw, Burn Canyon, and McKee Draw. The Campbell Creek fire opened up portions of Campbell Creek and Shavano Creek to motor vehicles. Other examples include Bramiers Draw, Wickson Draw, and Mailbox Park. |
| 2207 | Conduct an inventory to identify areas of roadless or low road-density (< 1 mile per section) and manage them as primitive backcountry areas with no motorized uses. An evaluation should be done as to whether to close these areas to mountain bikes as well. |
| 2208 | Keep routes open conditional on user compliance Institute a policy that designated OHVs routes remain open subject to compliance. If resource damage and off-route use can not be controlled these routes would be closed |
| 2288 | I am writing to oppose the idea of allowing an ATV loop in Potter & Monitor Canyons, southwest of Delta, Colorado. As a hiker, I have enjoyed exploring these areas from the Roubideau Canyon access off of 25 Road, and I can't imagine---don't want to---the impact of ATV traffic there. From excessive noise to disruption to wildlife to damage to the land itself, allowing ATVs and the numerous people who ride them is an all-around bad concept. |
| 2289 | Please continue to prevent the allowance of an ATV loop in Potter & Monitor Canyons.. We want these areas saved and NOT open to ATV users. |
| 2290 | Roubideau/Potter/Monitor canyon system west of Delta. Currently Roubideau Canyon has pretty thorough protection as does one side of Potter Canyon (the left side of the stream as you hike up the canyon from below). But flowing into Potter Creek, a mile above where Potter flows into Roubideau is Monitor Creek, and that 10-mile long, mile wide, 750 foot deep canyon is in some ways the wildest of the three. It is currently protected only by road closures. A year ago the BLM UFO completed a Travel Management Plan (TMP) revision, which reaffirmed the road closures in that area, and designated the entire Dry Creek management region "Designated Routes Only," which was a huge step toward keeping vehicles from tearing up fresh terrain. Under pressure from motorized users to build a new ATV loop into Potter and Monitor Canyons, met with opposite pressure from quiet users and wilderness advocates, the office reaffirmed the road closures in 2009 and did not allow new routes to be built. PLEASE CONTINUE TO DISALLOW!! |
| 2291 | As an avid rider and an environmentalist (unlike the obstructionists) I want to see and mingle with all users of public land. This said I have found that loop routs have the effect of preventing user produced trails. |
| 2292 | Also foot traffic and horse back riders do not in most cases need established trails. |
| 2297 | On aspect of planning that needs special attention is wild land and urban interface. This phenomenon is being used by special interest groups to provide themselves with a private playground on public land. Historic use of these lands |
| 2325 | Off-road vehicles and energy development projects do not belong in sensitive areas. |
| 2330 | Unroaded areas are needed where wildlife and wild rivers can thrive unimpeded by noisy, dust-creating off-road vehicles or energy development. |
| 2339 | Over time, nature tends to self-regulate and ultimately serve humanity best when it is largely left alone - have you noticed ? I can't think of a single example in which a given patch of the earth was better off with ATVs and oil rigs all over it. |
| 2344 | Quite frankly, I do not see where these offroad vehicles have the right to desecrate this beautiful land. There are more of us who visit these wild lands in order to enjoy the solitude and the voice of Nature....not the roar of engines. Relegate them to a fenced-in area somewhere away from this beautiful area and let them play in their own manmade sand box. |
| 2365 | I have rights too!!! I and others who enjoy quiet hikes and camping in our national parks should not be subjected to the noise and pollution of orv's!!!!! their rights do not trump mine!!!!!!!!!!!!!!! |
| 2371 | "Management" so often amounts to an excuse for development, whereas this area would be best served if it |

BLM_0067298

**Table C-20**
**Issue 3: Travel Management**

| Comment ID | Comment |
|---|---|
|  | remained entirely free of human interference, including off-road vehicles, energy development, and especially mining, which is always very nasty |
| 2394 | Most BLM land is open to vehicles, off-road sports and oil, gas, grazing, mining and other tear the- land-up uses. In this Plan revision I ask for as much land to be set aside as roadless as possible. As time marchs on this will become the most valuable part of the area. |
| 2408 | Please protect this area as much as possible from off road use and drilling for oil and gas. This is a great place for people who want peace and quiet |
| 2418 | Lands with wilderness characteristics should be closed to motorized and mechanized use. |
| 2420 | I have seen the effects of motorized off road vehicles such as ATVs and snowmobiles on our own piece of river property in Northern Minnesota. Just one uncaring ATVer made ruts in the land which may mar the pristine quality forever. Imagine what many could do to the wildlands. Lets not allow this carnage. |
| 2443 | Although the text is 'boiler plate' I have read and agree it with it wholeheartedly, particularly the plea to prevent motorized and mechanized use. Wheeled vehicles belong on roads AND NOWHERE ELSE. |
| 2457 | An excellent way to ensure that taxpayers have environmentally-safe access to these lands is to encourage mountain biking. This method of travel on trails allows users access without damaging ecosystems. Compared to allowing people on horses, for instance, mountain biking does not damage trails and mountain bikers are typically very environmentally aware individuals. |
| 2495 | The thought of allowing uranium mining or gas and oil development is just wrong - and off-road vehicles should never be allowed. All of these things will destroy the magic that was millions of years in the making. It makes me shudder to even think that this is being considered |
| 2498 | Species are disappearing at an alarming rate, due to over-mining, privileges granted to ATVs (which I feel are extremely destructive), and unnecessary destruction of the wilderness. |
| 2503 | Thank you for the opportunity to comment on the Uncompahgre RMP revision. No off-road vehicle use, fossil fuel drilling, or mining should be allowed. Protect the land's biological integrity. |
| 2507 | Off-road vehicles and energy development need to be very strictly limited and roadless areas for quiet-use recreation should be given top priority. |
| 2528 | Motorized vehicles and energy development will spoil this otherwise pristine place that should be preserved for all future generations. |
| 2557 | There is nothing worse than hiking along and having to deal with off-road vehicles, the ilk they contain, and the noise and destruction they cause. |
| 2558 | The Uncompahgre RMP revision should, in my opinion, include: 1. Limitation on off-road vehicles as much as possible, keeping them in areas where they do the least damage. 2. Emphasize roadless areas. |
| 2562 | As part of resource protection in this RMP, extensive unroaded areas must be salvaged for quiet use recreationists and wildlife, ie, it must not be opened for off-road vehicles or energy development. |
| 2592 | PLEASE, keep roadless areas roadless! |
| 2601 | My family has had a cabin in this region for many years and the impact of increased off road travel has been disturbing to say the least. Please protect this unique and fragile region. |
| 2614 | Off-road vehicles including dirt bikes, ATVs, aerial vehicles should be banned from the RA. Four wheel drive vehicles (Trucks, SUVs) should be limited to main roads and dispersed camping areas adjacent to roads. Self-powered recreation should be emphasized. No new dispersed camping locations should be allowed |
| 2656 | Please make sure that motorized vehicles are restricted to areas that do not have wilderness characteristics, important wildlife populations, or unsuitable soils or slopes. |
| 2665 | We actually need less roads & more habitat for other species, in my opinion. |
| 2671 | Off road vehicles should not be allowed. BLM should complete a comprehensive travel management plan. Planning needs to consider all aspects of land use. |
| 2691 | As for off road recreation, is it really worth it to wreck this jewel of natural beauty and habitat for endangered species for a few hours of unnecessary, testosterone fueled off road foolishness? Come on... |

BLM_0067299

**Table C-20**
**Issue 3: Travel Management**

| Comment ID | Comment |
|---|---|
| 2695 | You need to limit off highway vehicle use, and support wild and scenic protecti0ons for the Dolores River. |
| 2709 | Nothing disturbs me more than having my tranquility and enjoyment of nature disrupted by loud, obnoxious machines. I escape the city for the quiet of the wilderness and do not wish to have my quiet ruined by people with loud, offroad vehicles and motorcycles. When that happens the animals move to other areas and I will not have a chance again to see or enjoy them in their natural habitat. I don't believe that people or animals always have to have their quiet lives interrupted in such a way. There is a time and place for such vehicles but I don't believe our wilderness is one of them. |
| 2737 | Surely we can create a sensible way to protect the environment while utilizing the natural resources. The off road pleasure vehicles must go somewhere else. We're talking about the environment here. |
| 2755 | PLEASE! Emphasize resource protection in the Uncompahgre RMP revision: ? provide extensive unroaded areas (MAINTAIN natural soundscapes, viewsheds, where wildlife and wild rivers can continue THEIR natural ways) ? Yes, I'm saying that off-road vehicles/rallies/jamborees etc have NO PLACE in these precious and fragile ecosystems |
| 2765 | Development of such lands should be held to an absolute minimum if at all, especially where such development is of the destructive nature as oil and gas exploration and development, uranium mining, and off-road vehicle use. |

## Table C-21
## Issue 3: Noise

| Comment ID | Comment |
|---|---|
| 454 | In general, we would ask that you place the preservation of views and maintenance of silence as very high priorities for lands managed by the BLM. |
| 2008 | Protect Natural Soundscapes The RMP should include a soundscape policy that acknowledges the impact of off-road vehicle and other noise on wildlife and Quiet Users. The policy should confine noisy uses to selected portions of the field office. See new TWS GIS sound analysis methods |
| 2242 | Noise policy for wildlife The BLM should institute a noise control policy that minimizes the impact of off-road vehicles, extractive industries, and other producers of noise on wildlife and quiet users. Sources of noise should not be allowed in habitat that is critical to noise-sensitive species. |
| 2823 | Natural Soundscapes Evaluating and protecting natural soundscapes is essential to the land use planning process. As part of providing opportunities for quiet recreation, BLM must consider activities that interfere with the soundscape associated with quiet recreation opportunities. Research shows that for many people, especially quiet recreationists, the primary reason for visiting primitive landscapes is to attain a sense of solitude and tranquility, which are interrupted by non-natural noises. A study performed by psychologists at Colorado State University found that acoustic stressors impact visual landscape quality, meaning non-natural noise actually affects the perceived naturalness of a landscape (Mace 1999). Therefore, in order to preserve the naturalness of an area, BLM must preserve the natural soundscape. Furthermore, the authors of the study note that "tranquility" and "solitude" are explicitly addressed in the Wilderness Act as values that must be preserved by land management agencies. BLM guidance directs the preservation of "naturalness" in Wilderness Study Areas, Visual Resource Management I zones, and other areas managed to protect wilderness qualities. All of these values are negatively impacted when the natural soundscape is impacted; therefore, BLM must retain the natural soundscape in wilderness-quality lands and primitive recreation areas. A. BLM's Obligation to Preserve Natural Soundscapes Executive Order 11644 (1972), as amended by E.O. 11989 (1977), orders the BLM to locate areas and trails to Minimize conflicts between off-road vehicle use and other existing or proposed recreation uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors. BLM regulations at 43 C.F.R. Sec. 8342.1 reiterate this E.O. In order to effectively and appropriately achieve this goal, the Colorado BLM issued "A Recreation and Visitor Services Strategy" ("Recreation Strategy") to help field offices provide quality recreation experiences for all users. The Recreation Strategy recognizes that BLM's obligation to provide recreation areas for many user types requires designation of quiet recreation zones. It defines "quiet recreation" as "Outdoor recreation enthusiasts such as hikers, skiers, mountain bikers, equestrians, bird watchers, hunters and anglers who seek the opportunity to enjoy natural soundscapes" (P. 17) (Emphasis added). We encourage the Uncompahgre Field Office to similarly implement BLM guidance for minimizing conflict between user groups by establishing quiet use areas and mitigating potential noise impacts on these areas. Additionally, courts have upheld the responsibility of federal land management agencies to evaluate noise impacts on the natural soundscape. See Izaak Walton v. Kimbell, 516 F. SUpp. 2nd 982,985,995-96 (D. Minn. 2007). (EA prepared by USDA Forest Service for plan to construct snowmobile trail adjacent to Boundary Waters Canoe Area Wilderness failed to properly analyze noise impacts from snowmobile use, as required by NEPA; EA provided no quantitative evidence of analysis of decibel levels to be projected by snowmobile use of the trail into adjoining wilderness.) B. Effective Soundscape Analysis In order to effectively preserve the natural soundscape in quiet recreation areas, BLM must quantitatively measure (1) the decibel (dB) levels of the natural soundscape; and (2) ORV dB levels on the natural soundscape. Quantification of ORV traffic volume, duration, and frequency are thus necessary components of soundscape analysis. There are many tools available to BLM to adequately measure noise impacts and set prescriptions to prevent negative impacts. The Wilderness Society recently created a GIS model based on the System for the Prediction of Acoustic Detectability (SPreAD), a workbook issued by the Forest Service and Environmental Protection Agency for land managers to "evaluate potential ... acoustic impacts when planning the multiple uses of an area." The Wilderness Society adapted the SPreAD model to a GIS environment so that potential noise impacts could be integrated with other variables being considered in the planning process. We believe the Uncompahgre Field Office has an up-to-date version of this software, and we would be happy to provide more information at your request. The SPreAD-GIS model can be implemented in your existing ArcGIS software at no additional cost. The SPreAD-GIS model was developed for the Forest Service, but its applicability extends seamlessly to BLM lands, as the inputs include vegetation and topography. The Uncompahgre Field Office should use the SPreAD-GIS model to determine what sounds will impact visitors in each segment of the planning area, and what steps must be taken to mitigate these impacts. It is important to note that the original SPreAD operates under the premise that in primitive recreation areas, no noise should be audible above the natural soundscape. We envision this model as eventually being used throughout the field office, but at this stage believe BLM should at least apply it to special management areas and/or other strategically prioritized |

BLM_0067301

**Table C-21**
**Issue 3: Noise**

| Comment ID | Comment |
|---|---|
| | portions of the field office. Recommendations: The preservation of natural soundscapes is important to provide visitors with adequate opportunities for quiet recreation. The USGS finds that dissatisfaction with recreational opportunities can "diminish public support for land-management programs" (Douglas xiii). We encourage BLM to utilize the SPreAD-GIS model to analyze and preserve the natural soundscape of the Uncompahgre planning area, especially in special management areas managed for quiet use recreation. |

BLM_0067302

**Table C-22**
**Issue 3: Visual Resources**

| Comment ID | Comment |
| --- | --- |
| 137 | TMW strongly encourages a comprehensive inventory and analyst of the many scenic values in the UFO. |
| 138 | Assigning the inventory one of the BLM Visual Resource Inventory Class Objectives is very important. Very few areas are Class 1 areas. Most are Class 2 & 3. |
| 139 | The assignment of these areas obviously dictates the travel management criteria in or around the various sites. In the RMP processes please remember that such areas are historic and should be enjoyed by the public with the appropriate restrictions of preservation. A hand's on viewing is not required to still be open and available to the public. TMW would collaboratively work with the BLM in signage and education for such areas |
| 453 | In general, we would ask that you place the preservation of views and maintenance of silence as very high priorities for lands managed by the BLM. |
| 475 | This comment pertains to the management of sensitive viewsheds and corridors. Sensitive viewsheds and corridors should not affect energy or mineral development. Energy and mineral development is temporary in nature. When the resource is gone so will the development. Visual considerations imposed on energy and mineral development should not create a significant economic impact or restrict the development of the resource. |
| 476 | Existing mechanized or motorized use, dispersed camping and other recreational uses should not be restricted due to sensitive viewsheds and corridors. |
| 589 | View sheds should be protected |
| 660 | Hotchkiss Area seems good, but I would bump up the area N. of Town to Class 1, and add Leroux Creek to the Class 2 level. That's a value judgment I place on those lands. (not data driven) |
| 870 | This information was very interesting, as I had not given this much thought. Thank you for thinking of how people feel about open space in their neighborhoods and the views. This is important to healthy living for humans, and wildlife. |
| 992 | I am also thrilled with the amazing archaeological remains found in the area, and the spectacular views, and wish to see them preserved as much as possible. |
| 1176 | Visual impacts associated with the resource management activities may affect the visual character and scenic resources of the area, including the aesthetic and/or functional quality of recreational experiences. This may include impacts out of character with the setting, including the visual impact of equipment and crews during construction and operational activities. The severity of these effects depends on a number of factors, including whether the surrounding landscape can integrate visual changes without attracting attention, how far the activities are from sensitive viewing areas and/or roadways, how much disturbance will occur, what mitigation efforts are put forth to integrate activities and structures with the area, and/or the potential to reclaim disturbed landscapes. The RMP/EIS should evaluate these aspects, and detail mitigation steps that will be taken to minimize associated impacts. Interim and final reclamation work should allow disturbed sites to blend into the natural surroundings, to the extent possible. |
| 1208 | CNAP recommends retention of the VRM Class I designation for the Needle Rock ACEC to retain the existing character of the landscape that appears unaltered by man. |
| 1209 | We also recommend consideration of VRM Class II designation for the Fairview ACEC. |
| 1334 | As for visual considerations you desired input on, much of beauty is in the eye of the beholder. The land where uranium has been mined for a century is rugged country. |
| 1784 | BLM should also be aware of the visual damage done by oil and gas development. These lands are rare and precious. Please act to protect them. |
| 2111 | Nyswonger Mesa South across the valley is another less roaded mesa top that appears to have stunning views of the Dolores River Canyon and surrounding lands |
| 2333 | The Dolores River Basin in southwestern Colorado represents some of the most colorful and spectacular wild lands in the state. Geological formations millions of years in the making, healthy river systems, and unspoilt desert all provide a pristine environment for wildlife, including the endangered peregrine falcon, mountain lions, and river otters. Much of this land has been identified by Colorado conservationists as prime lands for Wilderness protection. |
| 2341 | Although most of this letter is a "standard" letter composed by The Wilderness Society, I wanted to stress my personal impression of the importance and value of the Uncompahgre lands. I have hiked and climbed in this area, |

BLM_0067303

**Table C-22**
**Issue 3: Visual Resources**

| Comment ID | Comment |
|---|---|
| | and marveled at the unbroken expanse of wild beauty. Please ensure that the RMP maximizes protection, and prohibits development, of the remarkable wilderness characteristics of Uncompahgre. Thank you! |
| 2354 | I have been in the mountains there, and found the beauty to be as grand as anywhere in the US. |
| 2472 | Colorado the Beautiful....but not for long. If all the unique landscape is changed and all the wildlife with it. Think about it. |
| 2481 | I lived in Colorado for sixteen years and love how beautiful, wild and open it is. Please do all you can to keep it that way. Thank you for the opportunity to comment on the Uncompahgre RMP revision. The Uncompahgre Field Office encompasses some of Colorado's most beloved wilderness-quality lands, wild rivers, and opportunities for quiet, backcountry recreation. The resource area is also home to important and imperiled wildlife, such as Gunnison sage grouse, that rely on large intact tracts of habitat free from roads and other infrastructure. |
| 2512 | My family just last week drove through the lands in question. I get home and discover that this beautiful area is threatened. I am a flatlander who believes that sometimes those who have mountains simply take their beauty and the scenery for granted. Please protect this wonderful place. |

BLM_0067304

**Table C-23**
**Issue 3: Livestock Grazing**

| Comment ID | Comment |
|---|---|
| 226 | The National Park Service and BLM should continue to share information, partner on projects, and otherwise cooperate on issues that affect the lands we administer near our common boundaries. This would include grazing allotments where allotments bleed across our administrative boundaries. |
| 322 | issues/concerns? grazing, |
| 340 | Saltado Creek Canyon is a spectacular steep sided, deep and wild canyon adjoining the San Miguel River canyon. It is the only major tributary canyon/stream to SMR that has no roads or bridges. It is a key wildlife corridor connecting Uncompahgre Plateau to the Delores Mountains and wilderness areas to south. The current level of access should be maintained and no further development of access should occur. It should be designated a "wild" river section as proposed in the WSR Eligibility Report. Hunting and grazing should be maintained with the possible exception of better protection for riparian habitat from cattle. No motorized access, other than emergency vehicles or maintenance, should be allowed. This area should be managed with wildlife being the predominant management goal. It is also prime Lynx habitat. |
| 345 | Protection of riparian areas from grazing impacts in Saltado Canyon to protect willow and other species. Continue grazing but fence or otherwise protect Saltado Creek riparian areas. Note the following for ACEC Record of Decision: There is no indication that current livestock grazing levels and methods are detrimental to the majority of riparian systems in the amendment area. One known exception occurs on Saltado Creek, where livestock are concentrating to the detriment of the riparian system. |
| 380 | Ranchers need pasture in the high country. |
| 458 | My family has a ranch within the planning area Unit 3 in which we also have grazing allotments for sheep. We have lived and worked in this area for more than 50 years. The allotments we operate or graze are as follows: Dave Wood, Shavano Mesa, Cushman, Big Sandy Wash and Canal allotments. I would like to be involved in the RMP process to make certain that livestock grazing continues in the same manner within the Planning Area with no net loss of AUM's or livestock numbers. |
| 459 | I also want to encourage that the use of grazing allotments continue to have the main emphasis for the units within the planning area. |
| 460 | Grazing allotments help maintain our lands for not only for our own operational needs but also open spaces for wildlife and open space that people seem to have high esteem for. |
| 461 | Livestock are also a very important economic base for Montrose/Delta/San Miguel counties |
| 462 | The overall land health standards of grazing allotments within the Planning Area are of an upward trend. I believe that ranchers and range technicians have worked well together over the years to maintain these lands. Grazing has many benefits to rangelands by providing anything from better seed germination to increase plant vigor. |
| 463 | Again, I ask that grazing remains as the major emphasis for the Plan. Area, with no net loss of AUMs. |
| 491 | Ranching, placer mining, uranium mining, wildlife developments, recreation are among some of the areas for growth. |
| 620 | Disallowing the use of roads, grazing land, mineral and energy development, as well as recreational use, would be a poor use of public land. The point of public land is that it belongs to the people. Public lands should be available to all people. The combination of grazing lands and mineral/energy exploitation allows business and employment growth for our county, and recreational use should also be encouraged, not restricted. |
| 677 | We have reviewed the Norwood Land Health Assessment (LHA), which covers the BLM lands in San Miguel County. We also compared the results of this LHA to the results summarized in the table found on handout 6.1 for vegetation that was distributed at the scoping open houses. We assume the other LHA were done with similar methodologies to those described on page 47 of the Norwood LHA. We recognize BLM's limitations in resources for monitoring the condition of the lands they manage, and in fact these assessments represent a great effort for BLM staff. However, these are very coarse, qualitative evaluations that are extremely subjective. According to the table on RMP Planning Fact Sheet 6.1, the current assessments were done between 1999 and 2009. The next assessments in each unit will not be done until 10 years later. We believe that BLM needs to commit more resources to ongoing monitoring of their lands to ensure achievement of the five Public Rangeland Health Standards. BLM needs better data to be able to make more defensible and timely management and policy decisions. The Norwood LHA was conducted in 2005-2006. There is no reference to when the lands were assessed last and if the same points were evaluated. "Problems" were defined as a score of 1 or 2 for various health indicators. There is no description of how the presence or absence of these indicators results in an area |

BLM_0067305

**Table C-23**
**Issue 3: Livestock Grazing**

| Comment ID | Comment |
|---|---|
| | "on balance" meeting a health standard and being classified as "meeting with problems" rather than judged to be "not meeting" the Rangeland Health Standard. |
| 678 | In addition, there is no description of trends in meeting the Rangeland Health Standards. As there has been a requirement for BLM to achieve these standards or modify management practices to move toward their achievement for over 15 years, it seems critical to know if you are moving toward or away from achievement of the standards to appropriately modify land management as required by BLM policy. If there is additional information that is to be the basis of deciding management policy in the RMP revision, its source, indications, and conclusions should be disclosed and discussed in the RMP EIS. |
| 679 | However the conclusions on compliance with the Rangeland Health Standard were developed, hundreds of thousands of acres of BLM lands in the planning area have "problems" or are "not meeting" the five Rangeland Health Standards BLM is obligated to manage its lands to achieve. BLM should identify and discuss its conclusions on why lands are not meeting land health standards in the RMP and develop a specific road map to ensure progress toward compliance. |
| 681 | As stated previously, San Miguel County believes the interests of the County and the public at large are best served by BLM lands maintaining their natural ecological integrity. Extractive uses of BLM lands has resulted in boom and bust cycles and left indelible scars on our public lands. Historic, and perhaps current, livestock management practices have also contributed to degrading or perpetuating the degradation of our public lands. These activities, along with travel management, have all contributed to the conditions described in the LHAs. |
| 683 | We agree with the recommendation in the Norwood LHA that BLM "implement grazing practices that leave more litter on the soil surface, prevent grazing on re-growth by limiting the time of use to two weeks or less, and minimize the instances where livestock graze the same areas in both spring and fall seasons". The "most common problems" identified in the LHA involving lack of perennial forbs, low levels of warm and cool season grasses need to be corrected. Also the problems with the presence of noxious weeds, and other invasive alien species, particularly cheatgrass needs to be more actively addressed. |
| 703 | I am cognizant of the fact that BLM manages its public lands under the principle of multiple use and sustained use, and must provide a balance between usage, and protection of its resources. It is my observation that BLM is doing a good job in managing livestock grazing, vegetation management for both logging and wildlife habitat, and in watershed protection. |
| 739 | Grass should be grazed to prevent height to curtail fire damage. |
| 742 | Public land should be used for the good of the public. Drill holes for coal mining, gas wells, logging should be allowed. Drill sites reclaimed, trees replanted. Grazing of cattle, sheep and the hunting of wild game encouraged. |
| 752 | We want to keep all our grazing rights, water rights, hunting rights and any other rights we were born with in this great country known as the "Land of the Free." |
| 791 | Must put multiple use first! More and more we are forgetting about the Taylor Grazing Act. Read that and remember that is why your agency was created. |
| 903 | I believe it should be open to mining, logging, ranching & drilling. |
| 917 | Another problem of BLM grazing allotments is that livestock are damaging riparian areas, specifically, in Jay Creek and Love Gulch. I'm not sure what can be done about this, short of temporary fencing which also has drawbacks, but would like to discuss with BLM and see alternatives in the RMP. |
| 973 | Increasing need to protect lands due to increasing drought and increasing demand and use by OHV's by restricting and limited OHV's and restricting and limiting livestock grazing. |
| 998 | Many uses can be compatible with preserving these systems if done carefully. Grazing, hunting and wildlife management should be done with more attention given to the health of the ecosystem than to the size of the "harvest." |
| 1028 | I request BLM consider the retirement of a vacant grazing allotment. The allotment for which this request is being made is the San Miguel Rim allotment located about six miles north of Norwood along the San Miguel Canyon Rim within the portion of the BLM currently designated as an Area of Critical Environmental Concern (see attached map). The allotment was last active in 1986, so there would be no impact on any current operations. As the map indicates, at the time the allotment was active the permitee owned the adjacent land and had an ongoing livestock operation. These lands were subdivided about 1985 by the permitee and sold off as 35-acre residential parcels |

BLM_0067306

**Table C-23**
**Issue 3: Livestock Grazing**

| Comment ID | Comment |
|---|---|
| | and one larger 300 plus acre parcel, which is used as a residential parcel as well. About 10 of these parcels have an unfenced boundary with the BLM lands in this allotment. There are 709 acres of BLM lands included in the allotment, most of which are on very steep slopes that are not really suitable for grazing. It is likely that this allotment was created not because the lands within it were suitable for grazing, but as a matter of convenience for BLM and the permitee. The canyon rim created a natural boundary for the private land used in the livestock operation, but there was a narrow strip of BLM land between the private and the rim. In order to not have ongoing trespass issues between BLM and the permitee, this allotment was probably created. This was a reasonable management decision at the time. There are only about 130 acres of relatively flat land contained in the allotment. Most of this land has mature Pinion Juniper forest or sagebrush cover. Only about 40 acres has predominantly grassland cover. The rest has patchy and cool season bunch grasses intermixed in the sage and P J, which is heavily used by wintering mule deer and elk. The useable forage accessible to livestock is probably about 10 AUMs. The forage in these areas and on the hillsides is annually cropped close to the ground by deer and elk during the spring green-up. This, along with inevitable trespass conflicts with residential property owners, probably explains why there has been little interest expressed in this allotment since it was vacated 24 years ago and none in the last 15 years in which most of the residential development has occurred. The Norwood Land Health Assessment contains additional support for the retirement of this allotment. Although there were apparently no survey points located within this allotment during the LHA to characterize its current condition, some of the conditions noted in areas nearby upstream, may also apply. These include low perennial cool season grass cover (P. 63), low forb cover (P. 66), and cheatgrass (P. 70). It is not known if these situations occur on The San Miguel Rim allotment or if livestock were the causal factor in the adjacent areas, but I think the allotment in question could be valuable to BLM as a comparative to evaluate the impacts on allotments that are in use. As it has been largely vacant of livestock for 24 years, it could be used in evaluating differences in soil stability, plant density and diversity, and wildlife use in an area not used by livestock. Its value as a reference area exceeds this value as a livestock production area. In the ongoing RMP analysis, this area of BLM lands has been found to be eligible for Wild and Scenic designation with the most high quality "Wild" designation. One of the ORV s found in this segment is wildlife. The eligibility analysis states" The area in and around this section has been identified as an Important Bird Area by the Audubon Society, supporting a diversity of birds and containing regionally outstanding habitat for the Yellow-billed Cuckoo (*Coccyzus americanus*), a federal candidate species". This finding directs BLM to manage to protect this ORV to the extent possible. On the Norwood LHA (pg. 39) Biodiversity Focal Areas map, CNHP has also identified this area as a Biodiversity Conservation Area. The Norwood LHA (pg. 75) notes "winter range quality and quantity is declining in some key winter concentration areas ... " The area in this allotment is identified in the LHA figure 1.10 depicting crucial deer and elk winter range and bighorn sheep range as both Deer and elk severe winter range. In addition to not being cost effective for BLM to provide the staff resources to administer this allotment given it minimal utility for grazing, reactivation of this allotment would result in adjacent private property having to install miles of fencing in this important winter range to control trespass to the detriment of wildlife and at a cost to property owners of tens of thousand of dollars. Livestock also competes with wildlife for available forage. The combined use by livestock with the existing heavy use by wildlife risks overuse of the plant community leading to a decline in its value as wildlife habitat. Also, the allotment has significant amounts of weeds present, particularly in the dryland pasture area historically most used by livestock. The allotment has patches of Musk Thistle, Canada Thistle, Whitetop, and cheatgrass. Use of the allotment by livestock will increase the opportunity for weedy species to be spread along the canyon rim and potentially move from the rim down into the canyon. Another complicating factor is there is no access to this allotment except through another allotment or private lands, which further limits its utility. For the reasons elaborated above, I believe the use of this area, as an allotment should be re-evaluated. I believe it is no longer suitable as a grazing allotment and it would be more cost effective and better meet BLM management goals if it were retired. |
| 1041 | I always like to end my emails to the BLM with the friendly reminder that removing cattle from public lands will not affect the price of cattle by 1 cent in our grocery stores and that the noxious weeds are spreading at a rate of 5,000 acres per day. |
| 1205 | The 1989 Uncompahgre Basin RMP proposed that Needle Rock ACEC be unalloted for livestock grazing. CNAP recommends the continuation of this assignment. |
| 1206 | At Fairview ACEC, livestock grazing has been allowed to occur unless studies determine that endangered plant species or their potential habitats are being degraded. Sheep grazing on the ACEC was renewed as part of the 2008 renewal of grazing permits within the Colona Land Health Assessment. As part of this renewal, BLM has been conducting quantitative monitoring on Fairview South over the past two years to assess potential impacts to |

*Uncompahgre Resource Management Plan Revision and EIS*
*Final Scoping Summary Report*

BLM_0067307

**Table C-23**
**Issue 3: Livestock Grazing**

| Comment ID | Comment |
|---|---|
| | *E.pelinophilum* from sheep grazing. The Colorado Natural Areas Program was part of the team advising the design and implementation of this monitoring due to our involvement in monitoring of *E. pelinophilum* on the adjacent Wacker Ranch. Preliminary BLM monitoring results seem to indicate that sheep grazing on the ACEC may be having some negative impacts to both *E. pelinophilum* populations and their potential habitat (Charlie Sharp, pers. comm.). Additionally, the lessee who was grazing sheep on the Fairview South ACEC and surrounding BLM land accidentally trespassed onto state land by driving his sheep onto Wacker Ranch in early 2009. The impacts of having his sheep enclosed in the small 43-acre parcel are uncertain, but were not deemed beneficial to the rare plant preserve and were not within the Wacker Ranch management prescription. |
| 1207 | Livestock grazing can be a beneficial tool for land management, and CNAP generally supports multiple uses on Natural Areas as long as those uses are compatible with the protection of the significant features on the properties. However, it is our belief, based on both quantitative monitoring performed by the BLM and direct qualitative observations, that sheep grazing on the Fairview ACEC is detrimental to the *E. pelinophilum* population and its potential habitat in this case. Given that *E. pelinophilum* is subject to a wide array of threats throughout its range including development pressures, OHV incursions and climatic change, we believe that any additional pressures on this highly important population should be minimized or eliminated. Therefore, we recommend that the Fairview South ACEC (and any lands included in a potential expansion) be unalloted for livestock grazing. |
| 1288 | We graze our cattle on the Green Mountain and Grizzly Gulch allotments. |
| 1289 | We provide water to the guzzlers for the Gunnison Sage Grouse and the pipeline provides water to all wildlife in the area. We have a deferred rotation in place that is consistently monitored to meet objectives. We have participated in treatment projects to benefit the habitat for not only the Gunnison Sage Grouse but big game also. All of this has been done in concert with a multiple use resource plan that acknowledges the livestock industry in the Uncompahgre area boundaries. |
| 1293 | These data are mentioned to stress the importance of the livestock grazing and maintain economic viable ranches within the UFO. Livestock grazing is a sustainable use of the resource and it should be viewed as a program and not a problem. Too many times, because livestock grazing is the only controllable variable, it is penalized. The allotments have to maintain their economic viability or the entire ranch is in jeopardy. The credit crisis that faces this area worsens when the tenure of allotments become questioned. While we realize that grazing is not being eliminated in this plan, there is constant movement to reduce livestock grazing and to eliminate its importance on the landscape. This plan should acknowledge the importance of the constant presence that permittees have on the allotments, the economic contribution, the tie between the ability to use public land and open space of private ranch lands, the sustainability of livestock grazing on our grazing evolved ecosystems and the importance of many of the range improvements to wildlife populations. |
| 1296 | The Green Mountain allotment is home to the Crawford population of the GSG. Monitoring results indicate that the GSG vegetation guidelines are being met under our deferred rotation plan for cattle grazing. Additional permit reductions are not needed to meet guidelines. We are active members of the Crawford Sage Grouse Working Group and have been since the inception. The RMP should be written to acknowledge that livestock grazing is being managed in GSG habitats and objectives are still being met. |
| 1298 | Finally, our history of partnership, cooperation and willingness to work with the BLM has benefitted not only our livestock but the wildlife and the resource. This happens because of the commitment to the land and the resource that we have. The RMP should maintain that livestock grazing is an important use of the area; livestock grazing should not always be trumped by all other uses and should not be used as the only management tool that can be controlled. |
| 1311 | The Escalante Ranch is permitted use of numerous grazing allotments within the Uncompahgre Resource Area. Continued use of these grazing allotments is essential to the stability of the Ranch's operation. The Uncompahgre RMP should ensure that the Ranch's grazing preference rights and permits are fully protected. |
| 1312 | Along with protecting permitted livestock numbers, the Uncompahgre RMP should ensure that the Ranch has adequate access to its improvements on the federal lands, including fences, water developments, water rights, etc. It is important for the Ranch to be able to maintain these improvements to manage its use of the federal lands. |
| 1634 | Hopefully you will also consider grazing at some time during the future, many areas along the river are heavily overgrazed and overtaken with weeds. |
| 1697 | The UFO needs to make sure livestock grazing is done with best management practices, improving rather than degrading native ecosystems. Special care needs to be taken in riparian areas that are easily degraded by cattle, for |

BLM_0067308

**Table C-23**
**Issue 3: Livestock Grazing**

| Comment ID | Comment |
|---|---|
| | instance Jay Creek and Love Gulch in the North Fork area. |
| 1707 | Please manage livestock grazing with great care. When hiking in the wilderness, these impacts are easily seen without effort, and visually appear devastating in a number of areas. Please work to protect these sensitive areas from over-grazing, while being sensitive to and understanding the needs of the ranchers. |
| 1853 | Grazing allotments should be managed with best range management principles in mind. The Management plan should incorporate Colorado's Standards for Public Land Health and Guidelines for Livestock Grazing Management. Sheep grazing should not occur where the spread of disease could be transmitted to the Bighorn Sheep herds. |
| 2020 | Grazing RMRI recommends that the RMP revise standards for grazing allotments to assure that AUMs do not exceed those necessary to meet or exceed Land Health Standards pertaining to vegetation and grasslands, as well as to assure that range is healthy enough to sustain wild ungulates, especially in times of drought. In a time of increasing climate change-induced drought it is critical that wildlife populations not be sacrificed by livestock overgrazing. Grazing allotments should be adjustable, according to changes in moisture conditions, and rotated if necessary. Cattle should be off the range in winter months. |
| 2080 | Designating these areas nonmotorized is further justified by the fact that these areas have managed to stay roadless for so many decades of mining, grazing and logging that there are likely good reasons why nonmotorized designations will not preempt other uses. For the most part these areas are mesas or ridge tops with poor access or little uranium potential. |
| 2252 | Grazing is a historical use that we value however a balance needs to be struck between the economics of grazing and land health and impact. We recommend that BLM increase its monitoring and managing of lands that are leased for grazing to impede negative impacts to water and vegetation. |
| 2253 | Ensure livestock grazing is done with best management practices, improving rather than degrading native ecosystems. Special care needs to be taken in riparian areas that are easily degraded by cattle, for instance the Jay Creek and Love Gulch in the North Fork area. |
| 2254 | Impact of grazing should be reduced where grazing degrades high-quality watersheds or wildlife habitat (e.g. winter concentration areas, fawning areas). Examples would be the San Miguel watershed and McDonald Mesa area between Crawford and Paonia. |
| 2255 | Unallocated and vacant allotments should remain such. More than 7% of land should be unallocated, and priority should be given to un-allocating lands that have had minimal grazing and that have good vegetation diversity and few weeds. |
| 2605 | We are currently litigating 18 RMP's for a wide range of defects including such basic issues is failure to consider a no-grazing alternative. The attachment Utilization Review looks at the common 50% utilization rate allowed and shows it is excessive. We also attach a review of livestock weights and forage utilization that must be taken into account in the analyses |
| 2606 | There must be an analysis of the impacts of the thousands of water developments for livestock, the thousands of miles of fences and their impacts on wildlife, the loss of riparian and wetland areas due to water developments nor the thousands of acres of watershed and plant community degradation that occur around livestock water developments. There must be an analysis of the watershed impacts from livestock grazing including the degree of loss of ground cover, the accelerated rate of erosion compared to natural conditions with intact plant and biological crust communities, the loss of ground water and watershed storage or the impacts on the Colorado River System and its endangered species. The Colorado River Salinity Control Act must be directly addressed in regards to livestock, erosion, sedimentation and salinity. |
| 2608 | Address livestock grazing and the science of management including that in the Appendices. Livestock have the most significant impacts on soil, water, wildlife and plant communities and ecosystems due to its near universal presence across the RA. |
| 2609 | No reallocation of forage should occur for livestock in allotments that have not been grazed except to reallocate that forage to watershed protection and wildlife. |
| 2620 | Fire and Fuels Management should include recognition of the role of livestock in fostering cheatgrass, juniper expansion, sagebrush expansion, weeds and invasives, and loss of biological crust. Livestock should not be grazed in areas where cheatgrass exists or areas that are susceptible to cheatgrass invasion. |

*Uncompahgre Resource Management Plan Revision and EIS*
*Final Scoping Summary Report*

BLM_0067309

**Table C-23**
**Issue 3: Livestock Grazing**

| Comment ID | Comment |
| --- | --- |
| 2621 | Lands not available for livestock grazing should include areas with soils subject to moderately high to high erosion by wind and water and slopes over 30% in addition to the areas listed. Riparian areas should be placed off limits to livestock due to the severe degradation and the need to "accelerate restoration" as required by FLPMA. Tinkering around with Rangeland Health and PFC assessments with their inherent subjectivity and bias or riparian stubble height measures which are universally abused and have not proved effective is a flawed approach. These should be abandoned in favor of definitive actions and quantitative based monitoring with comparisons to reference areas instead of kicking the can down the road while the land, water supply and wildlife suffer for more decades. |
| 2622 | 10% of the Field Office should be excluded from permitted livestock grazing in order to serve as controls. |
| 2623 | The following sections provide additional comments and scientific information which the RMP must consider in its planning and analysis. Livestock Grazing In 2004, WWP submitted a review of livestock grazing management science to all Field Offices and the State Office in an effort to have BLM incorporate the best available science into its range management. A copy of that document is included with these comments. In addition, an update of the AUM forage consumption value to reflect current livestock weights was completed in 2009. This analysis is also attached. It shows that the forage values BLM uses underestimate forage consumption by livestock such that taking into account the most current information on livestock weights would automatically reduce current permitted numbers in each allotment and pasture by 1/3. WWP has also reviewed the impacts of livestock on water quality, watersheds and riparian areas showing that the impacts are well understood. |
| 2624 | Additional concerns with livestock grazing are the destruction of soil crusts and removal of soil stabilizing vegetation, thus impairing soil and microbiotic function. Such functions as nutrient cycling, water infiltration and storage are drastically altered. By grazing livestock on the sensitive and erodible soils found in the RA, BLM is impairing watershed function, creating salinity problems in the Colorado River, which is in opposition to the Colorado River Salinity Control Act. This also results in the impairment of habitat for sensitive, threatened and endangered fish. It is BLM's obligation to research and provide citations and a summary of this research that clearly documents the role of livestock grazing within upland and riparian ecosystems in altering watershed function as well as water quality, and delineate what particular practices will be followed to protect water quality, including effectiveness monitoring. For example, sediment load and turbidity increase from watershed inputs, instream trampling, disturbance and erosion from denuded streambanks, reduced sediment trapping by riparian and instream vegetation, loss of bank stability and increased peak flows from compaction. Fine sediments increase in depositional environments (pools, quiet water areas) from the increased erosion and spawning gravels are made unusable due to high sediment content (Belsky and Uselman, 1999 ). White et al (1983) found sediment yield 20-fold higher in a grazed watershed when compared to an ungrazed watershed. USDA (1981) reported that topsoil erosion rates from grazed forest and rangeland were 4.2 tons/acre-year and 3.1 tons/acre-year compared to less than 1 ton for healthy forest and range. Packer (1998) documented that loss of soil in Utah and Idaho watersheds through erosion and runoff increased as ground cover decreased. A decrease in ground cover from 40% to 16% resulted in 6 times more runoff and 5.4 times more sediment yield. Trimble and Mendel (1995) estimated that peak storm runoff from a 120 ha basin in Arizona would be 2 to 3 times greater when heavily grazed than when lightly grazed. |
| 2625 | Even under moderate stocking rates, grazing contributes to the deterioration of soil stability in deserts (Warren et al. 1985) , thus leading to increased soil erosion. Soil erosion is further exacerbated by increased surface runoff triggered by loss of vegetative cover and litter (Ellison 1960) , both of which have been shown by numerous studies to be reduced by livestock grazing. Numerous studies have observed severe erosion in the western United States when comparing heavily grazed areas to ungrazed sites (e.g. Cottam and Evans 1945 , Gardner 1950 , Lusby 1979 , and Kauffman et al. 1983 ). Furthermore, there are a number of extensive literature reviews on this topic that describe the indisputable impact of livestock grazing on soil stability and erosion (see Gifford and Hawkins 1978 , Fleischner 1994 , and Jones 2000 ). The Lusby study cited here was conducted on tributaries of the Colorado River and demonstrated the significant change in sediment delivery and runoff in a watershed that was closed to livestock grazing when compared to its paired watershed that continued to be grazed. |
| 2626 | The effects of surface disturbance by livestock on soils, biological crusts and plant communities as they interact with wind must be analyzed in an appropriate model that takes into account ground cover, shrub and forest cover, erosion factor, wind patterns and speed to determine the impacts on ambient air quality and human health in nearby communities, National Parks and the region from particulate pollution. This analysis must include consideration of all other surface disturbing activities such as recreational vehicles, normal traffic, oil, gas and mineral exploration, development and production activities. In addition, the release of greenhouse gases ($CO_2$ and $CH_4$) and other organic or inorganic pollutants must be calculated and modeled to determine the impacts on air |

*Uncompahgre Resource Management Plan Revision and EIS*
*Final Scoping Summary Report*

BLM_0067310

**Table C-23**
**Issue 3: Livestock Grazing**

| Comment ID | Comment |
|---|---|
| | quality, climate change and global warming, wildlife and human health in a like manner. For example the report recently released by the United Nations, Livestock's Long Shadow, shows that the greenhouse gas emissions from livestock are greater than that from transportation. |
| 2627 | The BLM should conduct a capability analysis to determine the areas that might be available for livestock grazing, excluding steep slopes >30%, low forage production |
| 2629 | The role of livestock grazing in establishing infestations of cheatgrass or other flammable conditions such as increasing juniper expansion, sagebrush expansion and increasing fuel loads must be addressed and the costs and benefits evaluated. The recent book, Wildfire, by George Wuerthner explores this topic in great detail and its content should be included in the analysis. |
| 2630 | As described above, stocking rates and grazing systems must take into account the precipitation and forage production elements with proper stocking rates based on utilization rates that are sustainable. The DEIS must present an allotment by allotment summary of current monitoring information that describes the trend or condition as compared to the existing RMP. Claims of streams and riparian areas in PFC ignore that PFC is a minimal classification that does not address the wildlife habitat attributes of these most important areas, water quality or instream habitat for fish. In addition, springs, seeps and wetlands condition and trend are not described. Where is the analysis of utilization and annual stocking rates? The DEIS must propose science based utilization standards for upland and riparian areas, stream bank stability standards or other critical livestock management mechanisms. The DEIS must provide specific monitoring requirements to satisfy the FLPMA mandate for effectiveness monitoring. |
| 2631 | Livestock grazing within arid regions of the west have damaged 80% of streams and riparian ecosystems (USDI 1994a) . Impacts from livestock grazing include affects to soils, vegetation, stream hydrology, channel morphology, fisheries, riparian-dependent wildlife, water quality, water temperature, and sedimentation (Belsky 1999) . However, between 60-80% of birds and other wildlife species are dependent on support from riparian habitats for food, nesting, cover, shade, shelter, breeding and water sources (Ohmart 1996 , Chaney et al. 1990 , Thomas et al. 1979 ). With similar attractions, studies have found cattle spend between 5-30 times as much time in these highly productive riparian zones which can supply up to 81% of the forage consumed from only 1.9% of the allotment by area (Roath and Krueger 1982 , Skovlin 1984 ). Saab et al (1995) concluded that 46% of the 68 neotropical migrant birds which utilize riparian habitat declined in abundance in response to livestock grazing. Nutrient concentrations from livestock urine and manure can accumulate within grazed streams, reducing dissolved oxygen and aquatic species composition (Schepers et al. 1982 , , Taylor et al. 1989 ). Livestock trampling and vegetative removal along streambanks results in increased erosion, wider channel widths, and sedimentation of streams also reducing habitat quality and biodiversity of fisheries, amphibians, and invertebrates which serve as prey bases for other wildlife (Belsky 1999). Studies have found that use of proper grazing systems such as rest-rotation, seasonal, or deferred grazing, reduced stocking rates and fencing away from stream corridors can reduce grazing impacts from cattle within riparian areas unless topographic limitations force them to remain in riparian zones (e.g., Clary and Webster 1989 , Elmore and Kauffman 1994 , Burton and Kozel 1996 , Weller 1996 ), but no grazing system was compatible with a healthy aquatic ecosystem (Meehan and Platts (1978) . |

BLM_0067311

**Table C-24**
**Issue 3: Forestry**

| Comment ID | Comment |
|---|---|
| 324 | issues/concerns? wood cutting, |
| 368 | Since the 1980's I bought Green sheet, commercial firewood permits and pole permits, furnishing all my own expenses until I got too old to work. Now the Government is going pay other people to do what I paid them to do. |
| 369 | If Beetle Kill is not harvested within 2 or 3 years it will be too rotten, even for wood, esp. if it goes to the ground. In summary I would suggest you give it to people, instead of destroying it w/ fire. Thanks |
| 370 | Clear cut anywhere old or bug infested trees, including pinon by giving people the wood to cut it! FREE, no expense to Government. Also clear cut all cedars or junipers infected with mistletoe that is spreading fast, killing trees. |
| 372 | Put the timber and trees to sawmills or timber cutters to utilize the products by subsidizing the sawmills- wood-processing plants etc./ Give to any one- individual or group, whatever they could cut & haul. |
| 377 | Firewood and timber are also important for our community. |
| 382 | People should be allowed to get firewood from standing dead trees, or downed timber. |
| 422 | Issues/concerns? Future of biomass as alternative fuel source for energy. |
| 424 | Beetle kill- no action unless usable for biomass future. |
| 425 | SAD- action before root kill as best science I'm aware of. |
| 705 | I am cognizant of the fact that BLM manages its public lands under the principle of multiple use and sustained use, and must provide a balance between usage, and protection of its resources. It is my observation that BLM is doing a good job in managing livestock grazing, vegetation management for both logging and wildlife habitat, and in watershed protection. |
| 738 | Old growth should be harvested before it burns or spreads disease. |
| 741 | Public land should be used for the good of the public. Drill holes for coal mining, gas wells, logging should be allowed. Drill sites reclaimed, trees replanted. Grazing of cattle, sheep and the hunting of wild game encouraged. |
| 792 | After 100 years of fire suppression and the belief of a few that older is better we must stall more timber use, fire use brush control to get back to what is truly natural, i.e. varying ages of trees. |
| 902 | I believe it should be open to mining, logging, ranching & drilling. |
| 2081 | Designating these areas non-motorized is further justified by the fact that these areas have managed to stay roadless for so many decades of mining, grazing and logging that there are likely good reasons why non-motorized designations will not preempt other uses. For the most part these areas are mesas or ridge tops with poor access or little uranium potential. |

**Table C-25**
**Issue 3: Wildland Fire Management**

| Comment ID | Comment |
|---|---|
| 131 | TMW encourages the BLM to actively address the managing of fuels in order to prevent wildfires. Protecting the Values should be aggressively pursued with prescribed burnings and mechanical fuel reduction that will directly affect the current fuel conditions and future fire behavior. |
| 348 | Wildfire risk mitigation work in Specie Creek Road area on BLM lands adjacent to road to create egress. This is the only egress from Specie Mesa should a wildfire occur in the Saltado/Specie Creeks/Specie Mesa region. Also some invasive species in this are including mistletoe. |
| 373 | Stop burning up natural resources as it has NOT stopped the Beetles. |
| 406 | If public lands are going to maintain both animal and plant diversity, management is critically important. We need to be closing roads not making new ones. We need to be protecting water sources, springs, streams and rivers. We need to return to a more natural rhythm in fire control. |
| 421 | Issues/concerns? Revamping fire management plans |
| 426 | Fire control- limit to 1/4 mile at public land-private land interface- at mandatory shared expanses (govt. and private owners). Limits on logging, mining, etc.- that interfere with natural fire cycles. No action without request by private owners. |
| 465 | I would encourage the use of land treatments for management of wildfires and to increase habitat for wildlife and livestock. There are many areas within the Plan. Area that could benefit from Pinyon/Juniper control etc. Of course any treatment would have to be evaluated upon individual merits of each treatment. |
| 554 | I commend the UFO on their use of fire use on BLM lands. This policy has greatly benefited big game in the UFO. The RMP should include policy to continue fire use where it meets all resource objectives. The RMP should also specify that all wildfires and prescribed burns that occur in areas that lack a sufficient natural seed source should be reseeded with a mix of native grass, forb, and shrub seed. The reseeded areas must then be rested from livestock grazing for a minimum of two years following the fire to ensure successful seedling establishment. Areas with known infestations of aggressive invasive species should not be treated with fire or mechanically treated until pretreatments have been successfully done to prevent further infestations. Any projects that create or aggravate infestations of invasive species should be aggressively treated to control those infestations. |
| 662 | WUI: We are thankful for the good working relationship between the Hotchkiss Fire Dist. and BLM, and acknowledge both organizations have worked to build this partnership. Some areas of improvement can be achieved: BLM should follow NIMS practices by better accommodating and utilizing local resources on WUI incidents, and actively engage in integrating local management personnel into their system. Also, we have been working for years to begin fuel reduction projects near Hotchkiss, and lack a sufficient natural seed source should be reseeded with a mix of native grass, forb, and shrub seed. The reseeded areas must then be rested from and presently. HFD is going to provide them as much support as is asked for, and trusts BLM will also support this team and effort. |
| 663 | Consider becoming more NIMS compliant, not by edict, but by stepping up to integrate local resources. By leadership. |
| 1943 | Analysis of impacts will consider potential interaction between management decisions and changes in the larger social and ecological context. In particular, impacts will be analyzed to consider potential interaction with larger-scale dynamics such as climate change; proliferation of invasive species, insects, disease and wildfire; exurban development; changing recreational patterns, and the like. |

BLM_0067313

## Table C-26
## Issue 4: Lands and Realty

| Comment ID | Comment |
|---|---|
| 2778 | Land Tenure Decisions: BLM has identified land tenure decisions as an issue to be addressed in the Uncompahgre RMP revision. In light of present circumstances, BLM should review the previous plans and decisions and look at future land tenure decisions with an eye towards providing adequate open space for the growing public, maintaining key viewsheds and taking into consideration new proposals for open space and trails and special management areas. Section 102(a)(1) of FLPMA requires that BLM -managed lands be retained in federal ownership unless BLM determines through the land use planning process that disposal of a particular parcel will serve the national interest. 43 U.S.C 1701. land tenure decisions must achieve the goals, standards, and objectives outlined in the land use plan. With the growing population has come a desire to develop more land, some of which may be appropriate. However, the BLM must retain land near sensitive and ecologically important areas, including those within existing or proposed ACECs or other special management areas, and including specifically citizen-proposed special management areas. lands identified in new citizen proposals for open space and/or other special management that include lands not owned by BLM should be given priority for acquisition. BLM should only pursue land tenure decisions if they will serve the national interest by supporting key values and resources, such as protecting ecologically important areas and providing open space. In addition, disposal or exchange may be appropriate where the BLM determines that lands will be dedicated to renewable energy development, if those lands are already degraded, closest to the load served for siting development, and can be sold or exchanged with a commitment to obtain lands with higher conservation values (such as wildlife corridors). Given the current population trends within the region, BLM should reconsider all previous decisions in the Uncompahgre RMP for disposal of public lands and re-evaluate whether or not those decisions still meet the needs of the public. As the agency moves forward it will be crucial that consideration be given to providing adequate open space and trails on public lands. Furthermore, as local entities are in the process of developing plans for such uses, the relationship between the RMP and these plans will be important, since BLM's decisions can affect local open space, parks and trail plans. Particular care should be taken to prevent sale or exchange of BLM parcels highly valued by local communities for the open space, wildlife habitat, and recreation opportunities they provide. Recommendations: The BLM should work with local governments and Tribes when identifying areas where disposal of public lands may be appropriate. However, BLM should identify areas such as ACECs, citizen wilderness proposals, or sensitive species habitat for retention and acquisition. BLM should not dispose of parcels valued by local communities for their open space, wildlife habitat, and recreation opportunities. |
| 91 | Energy throughout the Western US is heavily dependent upon delivery which means access to and from the energy sources whether it be natural gas, coal or even wind farms. Corridors for railroads, electric transmission lines, pipelines for natural gas transportation and access roads should receive high priority for consideration and evaluation. Permitting of these rights of ways can and does take years. GEC encourages BLM to develop procedures to evaluate and approve energy related access in an efficient and timely manner. |
| 27 | Please keep me apprised of all information concerning Land Disposal Parcels included in the new RMP. I am an adjacent private landowner of an isolated parcel which was identified in the previous RMP for disposal. It is identified in Appendix B, Category I Disposal Tracts #26, a total of 240 acres identified as difficult and uneconomic to manage. More specifically: T. 14 S., R 93 W., Sec 17: SW 1/4SW 1/4; Sec 19: E 1/2NE 1/4; Sec 20; NE 1/4NW 1/4 and W1/2NW 1/4. I Below is personal information: Landowner Name: Barney & Co., LLC Anne K. Sievers, manager Address: 29504 Redlands Mesa Road Hotchkiss, CO 81419 Telephone #: (970)872-3438 Email Address: x7rranch@tds.net Email is acceptable format for corresponding with me concerning this. |
| 28 | If possible, BLM inholdings, specifically tracts which are isolated and surrounded by private property should be sold. Adjacent landowners to these parcels should have first priority in purchase. This would eliminate BLM cost in administering these isolated small parcels. As stated above, adjacent landowners should have priority for purchase. This action would remove the public access to the isolated parcels. This would eliminate conflict between private and public lands, such as trespassing and fencing. |
| 113 | While exact locations for ROWs for utilities, roads, railroads, cannot be specifically identified until an exact facility location is identified, these ROW's will be necessary, and should be considered as this resource management plan proceeds. |
| 123 | We would like to identify a parcel of land for disposal. The description of the BLM land is NW1/4 NW1/4 Section 24 T.46N. R.8.W located in Ouray County. It is our understanding we need to identify the parcel before it can be traded or sold. |
| 142 | land tenure adjustments working in conjunction with the Wildland-Urban Interface process can solve many access issues that arise from urban encroachment. We have experienced many situations where if the possibility |

BLM_0067314

**Table C-26**
**Issue 4: Lands and Realty**

| Comment ID | Comment |
|---|---|
| | to secure key property necessary by land trades or purchase would greatly enhance recreational opportunities and preserve open spaces for recreation. Active participation in land trades or selling BLM property would solve and alleviate many land use issues. |
| 191 | I also feel more land needs to be made available for the publics good, including resource exploration, powerline construction, and general community uses. |
| 193 | I am aware of the proposed powerline from Peach Valley to Flat Top and know several property owners who have had a constant battle with the power company and the BLM regarding where this line will be located. I have been told the BLM wanted the power line to cross PRIVATE land and not go on BLM land. This is very questionable as the power line will cost more to construct as easements will need to be purchased from all the private land owners, landowners will have a power line in their back yards, thus reducing the value of their property. All these additional costs will be passed on to the consumers, who as the economy stumbles, are in no shape to absorb un-necessary increases in their power bills. By putting this on adobe BLM land, everyone wins, with the exception of the ultra-conservative environmentalist who favors plants over people, hardship over prosperity. |
| 197 | The BLM should reconsider the tracts near the City of Montrose identified for disposal (Unit 3). These tracts should be kept under public ownership, and used for open space and non-motorized recreation. |
| 200 | Trailheads should be built on large BLM tracts near the Montrose city limits (Unit 3) to allow recreational access without requiring driving to the trailheads. Some of these trailheads will require access across private lands. The BLM and local government jurisdictions should work to acquire, or re-acquire these accesses (some may be public roads that have been encroached upon). |
| 224 | Lands within the proposed Curecanti National Recreation Area boundary in areas 2 and 4 should not be authorized for disposal or leased for oil, gas, or mineral development. |
| 229 | The lands being proposed for addition to Curecanti National Recreation Area should be appropriately classified so they are not disposed of or otherwise leased until such time as Congress can act (please refer to the Report to Congress for the Curecanti Resource Protection Study). |
| 233 | All or portions of eleven (11) Reclamation projects are within the planning area and could be affected by decisions made during this RMP or could affect your decisions. These are all valid existing rights pursuant to the Reclamation Act of 1902, as amended and supplemented. The following project have been constructed and are in operation: the Uncompahgre Project; the Lower Gunnison Salinity Unit (Gunnison Unit) of the Colorado River Basin Salinity Control Project (CRBSCP); the Aspinall Unit of the Colorado River Storage Project (CRSP); the Smith Fork Project; the Paonia Project; the Dallas Creek Project; the Fruitgrowers Dam Project; and the Paradox Valley Unit (CRBSCP). Two Projects, the Fruitland Mesa Project (authorized for construction) and the Dominguez Project (not authorized for construction), were never constructed but have outstanding land withdrawals associated with them. Reclamation's management goal for the nine active projects is the continued operation, management, and protection of those projects and their associated features and resources. We will continue to periodically review the current withdrawals for our authorized projects and assess the potential need for those lands. We would like to revoke the withdrawals associated with the Dominguez and Fruitland Mesa projects and return those lands to the public domain. |
| 236 | Recognizing valid existing rights. |
| 239 | Identification of Reclamation lands- The table on page 3 of the Preparation Plan did not list any Reclamation lands within the planning area. However, a portion of the listed BLM, Forest Service, National Park Service, and State lands are, in fact, Reclamation lands. |
| 245 | Authorized and constructed projects- In general, Reclamation will retain sufficient withdrawals and rights-of-way for our authorized and constructed project purposes and features. Reclamation may need to obtain some additional rights-of-way or withdrawals to properly cover its facilities. BLM should help ensure that Reclamation lands, both acquired and withdrawn, are properly identified with the respective agency roles and responsibilities pursuant to the 1983 IA. |
| 246 | Authorized, but not constructed projects- The Fruitland Mesa Project was authorized but not constructed and has about 22,780 acres of associated withdrawn public domain lands. Pursuant to the 1983 IA, these lands are under Reclamation's administrative jurisdiction, however, BLM has been managing these lands since their withdrawal. Reclamation continues to recommended revocation of these withdrawals. Pending the revocation |

BLM_0067315

**Table C-26**
**Issue 4: Lands and Realty**

| Comment ID | Comment |
|---|---|
| | of the withdrawals, we would like to provide for continued BLM management of these lands without the need to consult with Reclamation. |
| 247 | Not-authorized projects- Reclamation continues to recommended revocation of the approximately 12,220 acres of withdrawals for the Dominguez Project within the planning area and the return of those lands to the public domain. |
| 248 | Withdrawals- The RMP should address how Reclamation withdrawn lands will be managed upon their return to the public domain. Reclamation will continue to conduct periodic reviews of its withdrawals and assess the potential need for those lands. Currently within the field office area, there are about 45,790 acres of land withdrawn for Reclamation purposes. |
| 249 | Disposals- Some of the proposed disposal tracts from the current RMP are withdrawn for Reclamation purposes. Disposal of Reclamation withdrawn land is subject to a Reclamation determination that the lands are no longer necessary for its purposes and subsequent action to make the land available for disposal. The effects of any disposals on potential selenium loading to area waterways should be a primary consideration |
| 250 | Rights-of-way- Reclamation has several rights-of-way on BLM administered lands and needs to acquire additional rights-of-way. Non-project use of these rights-of-way should be compatible with Reclamation project purposes and have Reclamation concurrence for such use. |
| 259 | Energy transmission corridors- Reclamation and BLM should coordinate routing of energy transmission rights-of-way in a manner that minimizes effects to Reclamation facilities and resources |
| 350 | Small, non-contiguous parcels of sub-surface mineral estate owned by the federal government should be examined for disposal in the region. For instance, just west of Saltado Canyon in the Specie Mesa area there are numerous fractured parcels that are not large enough to allow creation of a oil/gas unit and access issues will also prevent development. Further, most recent lease prices have been very low for these parcels with few bidders. This is all before the onset of massive development of unconventional shales in Marcellus, Barnett and elsewhere. In summary these subsurface parcels are essentially useless to the federal government. They should be identified for disposal to the highest bidder, or exchange, and the revenue used for much higher value BLM uses. |
| 439 | In recent years there has been increased activity through our access point. It is the only one that people can walk or ride their bikes to directly from town. There are other entrances across private land but they do not have formal easements. Ours is limited in what is allowed to cross. The previous owner limited the access to pedestrians and bike riders only. We have no problem with limiting motorized access and hunting access through this gate. We are sorry that dogs are limited, though. |
| 466 | I have concerns with gas pipeline and powerline right of ways and the surface disturbance that it causes. Many of these right of ways are not properly rehabilitated and need further work done on them as far as reseeding and weed control is concerned. |
| 529 | Energy corridors should be planned as narrow as feasible and, when possible, should coincide with existing routes to minimize environmental damage. |
| 562 | We would be agreeable to and have allowed bikers and hikers to access and exit the BLM thru a single trail on our property as long as they stay on the trail and stay out when muddy. Mountain bikers are colorful, quiet and gone in seconds - this is good and bad as a horserider/hiker like my wife may not always see or hear a biker approaching. In general people have been respectful of each other. |
| 570 | I am concerned about tenure plans relating to a tract of BLM land in Section 4, T 50 N, R 6 W and sections 33 and 34, T 51 N, R 6 W in Montrose County, Colorado. We own and ranch about 2200 acres adjacent to this BLM tract on its west, south and east. We currently hold the Adobe Grazing Allotment (#5027) for 24 AUM's of cattle grazing on this tract. I urge the BLM to retain this tract for the following reasons: 1. A plant species that is ranked as "imperiled both at global and state levels" exists on this tract. (See attached sheet that is a page from a Baseline Documentation Report prepared in 2007 by Rare Earth Science, LLC on our deeded property adjacent to this tract.) The plant is known as Rocky Mountain Thistle (Cirsium perplexans). The Baseline Study covered only our deeded land, but the existence of the species is widespread on the BLM tract. 2. After a 300-acre Conservation Easement donation that should close this month, 1,295 acres of our 2,200-acre ranch will be limited to agricultural use FOREVER with no sub-division or residential structures permitted. It is our plan to restrict development on most of the rest of our ranch with similar conservation easements. Much has been |

BLM_0067316

**Table C-26**
**Issue 4: Lands and Realty**

| Comment ID | Comment |
|---|---|
|  | invested to preserve this sizeable block of property for agricultural, wildlife and visual values. Federal tax deductions and state tax credits are publically-supported encouragements to preserve special lands such as this. The public has a vested interest in preserving this ranch. The 340-acre tract of BLM land referenced above is an integral part of this ranch. We graze it in May when it is most important for us to keep stock off our irrigated hay meadows. While our Adobe Allotment is for only 24 AUM, the fenced parcel provides a corridor from our more productive House pasture in sections 32 and 33, T51N R6W, with our Tyler pasture in sections 3 and 4, T50N R6W. The BLM property also fulfills critical habitat requirements of some of the multitude of wildlife species that inhabit this ranch. Species found here include mountain lion, black bear, elk, mule deer, bobcat, badger, coyote, red fox, beaver, muskrat, raccoon, mink, shorttail weasel , porcupine, whitetail prairie dog, mountain cottontail rabbit, sandhill crane, wild turkey, ringnecked pheasant, bald eagle, golden eagle, red tail hawk, raven, turkey vulture, magpie, great horned owl, Canadian geese, mallard duck and cinnamon teal, great blue heron. This ranch is also historically significant. Enclosed is a copy of our 2009 family Christmas letter. In it we relate some of the ranch history that we have been able to verify. In the event the above-referenced BLM tract was divested, we would try to acquire it, but most likely it would go for subdivision prices. It would be difficult, probably impossible for us to pay development prices for 24 AUM of pasture, but the loss would be great for Rocky Mountain Thistle, the Double H Ranch, wildlife and the public. |
| 649 | I also feel more land needs to be made available for the publics good, including resource exploration, powerline construction and general community uses. I am aware of the proposed powerline from Peach Valley to Flat Top and know several property owners who have had a constant battle with the power company and the BLM regarding where this line will be located. I have been told the BLM wanted the power line to cross PRIVATE land and not go on BLM land. This is very questionable as the power line will cost more to construct as easements will need to be purchased from all the private land owners, landowners will have a power line in their back yards, thus reducing the value of their property. All these additional cost will be passed on to the consumers, who as the economy stumbles, are in no shape to absorb un-necessary increases in their power bills. By putting this on adobe BLM land, everyone wins, with the exception of the ultraconservative environmentalist who favors plants over people, hardship over prosperity. |
| 654 | A number of Western's facilities, including transmission lines, communications sites, and switchyards, as well as the access to them, are located within the administrative boundaries of the Uncompahgre Field Office. The locations of these various facilities are shown on the enclosed map series. Western asks that the Uncompahgre Field Office recognize these facilities in the RMP as existing valid uses of public lands including the right of ingress and egress, and where the possibility of replacing, upgrading, or reconstructing these facilities will continue to be allowed. As renewable energies are developed and brought to market, some or all of the new generation will require the addition of new or upgraded transmission lines. Western's facilities could be impacted by the growth of this new energy industry, so we want to ensure we can make any upgrades or add new transmission facilities as they are needed. |
| 657 | Finally, some of our linear transmission line rights-of-way continue beyond the boundaries of the Uncompahgre Field Office and are subject to the management decisions of other BLM field offices or US Forest Service ranger districts. Western requests that decisions made by the Uncompahgre Field Office be consistent with similar decisions concerning utility rights-of-way and energy corridors made by adjacent field offices or ranger districts. Decisions related to our facilities need to be seamless from one office to the next and local solutions should be integrated as a whole for transmission line rights-of-way or corridors that traverse more than one administrative jurisdiction. The problem is a real one when different field offices/ranger districts do not recognize and manage a transmission line corridor consistently from one jurisdiction to another. |
| 658 | Land Transfer: Most of the areas around Hotchkiss depicted by the map showing potential land disposal parcels are fine. The parcels chosen are surrounded by private lands, have access, and can be developed or purchased by citizens for conservation purposes resulting in better land stewardship than BLM has been able to provide. Ownership of lands, particularly the hodgepodge of public and private lands in this area complicates firefighting. One parcel chosen needs to be examined closely with the Town of Hotchkiss, and may be taken out of the proposed sale because there may be a needed ROW to correct water problems. (Map within text could not be saved here) |
| 659 | Making these lands [areas around Hotchkiss depicted by map] available to ownership by private citizens will increase the local tax base, and will allow for better management of the lands than BLM has been able to provide. |

BLM_0067317

**Table C-26**
**Issue 4: Lands and Realty**

| Comment ID | Comment |
|---|---|
| 690 | The recently designated Westwide Energy Corridor may intersect or impact Gunnison Sage Grouse habitat. If so, the RMP should consider and disclose how protection of grouse will be reconciled with uses approved in this corridor. |
| 691 | The BOCC has reviewed a map provided by BLM of the parcels identified for disposal in San Miguel County. A review of ownership of some of the disposal parcels by our GIS staff suggests several of these parcels are no longer in BLM ownership. As some of the disposal parcels are in Gunnison Sage Grouse habitat or otherwise may be of interest/concern to the county, we would like to arrange a meeting with your realty staff to confirm the current status of these parcels. This would aid the County in making specific recommendations to the BLM going forward. |
| 734 | I don't like the idea of you regulating or changing my property. |
| 886 | Land Tenure: An area unsuitable for major utilities and road rights of way is the Roubideau. This canyon area is a water source, historic site of petroglyphs and other ancient artifacts, heavily used and overgrazed by livestock and contains a very diverse range of wildlife inhabitants up and down the entire ecosystem including bear, mountain lion, numerous year round and migrating raptors, songbirds, reptiles and amphibians, deer, elk, and rodents. I haven't even begun to look at the amazing plant life. |
| 1196 | Finally, one thought should be mentioned here, but please don't misconstrue our underlying intention in doing so. Because of the small and isolated nature of the 40 acre parcel, its physical connection to the Town, and considering the Town's interest in protecting and enhancing this portion of the river corridor as a contiguous passive use area, the Town would be amenable to discussing possible ownership of the tract if and when BLM should ever elect to dispose of it. We offer this for consideration only because of the resource constraints that may challenge the federal agency in maintaining such an isolated parcel. Very simply, the municipality may be better positioned to provide the maintenance and stewardship. |
| 1212 | CNAP supports the continuation of closure of Needle Rock ACEC to the development of major utility facilities. |
| 1213 | Fairview ACEC is designated as open to development of major utility facilities, except pipelines, so long as there would be no disturbance of threatened or endangered plant species or their potential habitat. Given the range-wide threats to *E. pelinophilum* that were described above, CNAP would encourage the BLM to review this designation and consider whether any potential developments within what may be the most significant population in the world of this listed plant should be allowable. If, however, major utility facilities are allowed in the Fairview South ACEC, CNAP would be available to assist with providing mitigations to minimize potential impacts to *E. pelinophilum*. |
| 1216 | CNAP recommends that tracts including existing Natural Areas and occupied habitat for sensitive and listed species not be included in the proposals of tracts considered for disposal under the revised RMP. Additionally, CNAP would like to introduce the idea of potential acquisition of the Wacker Ranch Natural Area by the BLM to consolidate the management of this significant population of *E. pelinophilum*. This idea is one that CNAP would be interested in discussing with BLM staff to assure that it was appropriate for all parties involved and would result in better protection of the federally listed plant. |
| 1231 | Land use management decisions (including the disposition of, or transfer of federal land ownership) need to carefully be analyzed to prevent increased erosion, sediment transport and/or deep percolation of water that can mobilize salts and selenium. |
| 1238 | State of Colorado in cooperation with Federal, State, Local and Tribal agencies operates a statewide public safety communications system known also as Digital Trunked Radio (OTR) system covering the Uncompahgre RMP area. DTR provides capability for public safety interoperable communications for many agencies in the RMP area. It may be important to include the DTR system capabilities and requirements in the RMP. DTR provides capability for public safety interoperable communications for multiple jurisdictions and governmental agencies (Emergency Medical Services, Law enforcement, fire protection and other governmental activities) in the RMP area. Concern is providing locations on BLM lands throughout the RMP area for communications sites and vehicle access to these sites. |
| 1247 | Tri-State Generation and Transmission Association, Inc (Tri-State), is the wholesale electric power producer/supplier to DMEA. DMEA is adamantly opposed to any restrictions which may result in unnecessary and increased costs to Tri-State, and ultimately DMEA consumers, for the access, maintenance and repair of existing transmission facilities, and unreasonable limitations of siting new facilities on public lands. |

BLM_0067318

## Table C-26
## Issue 4: Lands and Realty

| Comment ID | Comment |
|---|---|
| 1248 | DMEA electrical facilities are not depicted on the utility corridor maps provided on the RMP website. DMEA requests that all existing electrical facilities and infrastructure, whether they are distribution, subtransmission or transmission; or owned by DMEA or Tri-State; be mentioned and given consideration in the RMP revision planning process. DMEA can provide system maps of distribution facilities within our service territory for inclusion in the planning process. |
| 1249 | Private lands located within the Uncompahgre RMP area have the potential need of electrical service sometime in the next 20 years. Many of these private lands are either adjacent to or surrounded by public lands, and electric utility rights-of-way for the private lands should be considered and provided for in the revised RMP |
| 1251 | To allow existing ROWs to be used to the greatest extent possible while limiting the proliferation of separate utility ROWs, we request that the revised RMP contain language which allows existing lines and facilities be considered for future upgrade and/or expansion. |
| 1252 | DMEA requests that the revised RMP contain language which allows for the consideration of future electric facilities within the boundaries of the revised Plan area. Working with DMEA on both the Delta County Transmission Improvement Project and the East Montrose Electric System Improvement Project, you are aware that the public strongly desires public utilities serving the public good be constructed on public lands wherever possible. Through individual landowner contacts, public communications & meetings, the public has been strongly opposed to providing private property ROW for a public improvement project such as ours when public lands are relatively nearby and available. We request that BLM include provisions in the RMP revision which allows new utility projects be considered with appropriate and reasonable mitigation measures. |
| 1253 | DMEA has joint use on numerous communication sites on public land within the Uncompahgre RMP planning area. Communication is vital in providing and maintaining a safe, reliable and secure interconnected electric system. All existing telecom sites must be protected in the revised RMP, along with the access roads getting to those sites. Also, the expansion of existing communication sites, or the addition of communication sites associated with utility facilities, should be open to consideration through the ROW grant application process. |
| 1254 | As you know, DMEA is in the preliminary design phase of a hydro-generation facility to be located along the South Canal. When constructed, a transmission/sub-transmission line will be required between this renewable energy resource and the new East Montrose Substation (near Project 7 and Miguel Road). It is too early in the planning and design phase of the project to hold public meetings to site the line, but DMEA requests that this project be given consideration in the Uncompahgre RMP revision process. |
| 1255 | DMEA also recognizes that other potential renewable energy projects may exist within our service territory, such as wind and solar. DMEA requests that rights-of-way grant consideration be given to connect them to the existing electrical infrastructure. |
| 1256 | Although long range growth forecasts are available, it is impractical to predict if and when that growth will actually occur, what the power needs will be for businesses coming in to support the growth, and at what locations the growth might actually occur. Therefore, DMEA strongly requests that BLM work closely with all utilities to identify potential energy corridors, to recognize that future energy requirements can change over time, and that if identified corridors do not meet the actual delivery needs at that time, thoughtful and careful consideration to a more suitable route will be given. |
| 1257 | DMEA appreciates the opportunity for comments to be considered and included in the revised Uncompahgre Resource Management Plan. As the process moves forward, we respectfully request that DMEA be contacted to discuss any potential issues that may directly impact our ability to construct, maintain, and/or repair electric lines to provide safe, reliable service to our members. We look forward to working with the BLM through the revision of its Resource Management Plan. |
| 1292 | In addition, ranches associated with public lands own 24% of the private land in the above mentioned counties. That is a significant number of acres of open space, public land buffers and wildlife habitat. Private ranch lands allows for even greater benefit to be realized from the public 'lands due to the economic contribution, open space and buffer zones. |
| 1313 | As the BLM knows, the boundary lines between the BLM lands and the Escalante Ranch private lands have not been adequately surveyed. The BLM's RMP should address this issue and should include authorization for the BLM to respond to survey land and boundary corrections through land exchanges, purchases, and other land adjustments. |

BLM_0067319

**Table C-26**
**Issue 4: Lands and Realty**

| Comment ID | Comment |
|---|---|
| 1314 | Access to private land surrounded by BLM lands should be protected through the RMP process. |
| 1320 | We are a Colorado limited liability company in the uranium and vanadium business with significant property holdings, much of which is mineral rights on BLM-administered lands. We appreciate the opportunity to provide input for your revisions to the RMP. |
| 1321 | Our largest concern is the protection of property rights under the laws of the land. |
| 1325 | As pointed out in your fact sheet, the U.S. Department of Energy (DOE) has 32 lease tracts containing ~25,000 acres located within the Uravan Mineral Belt in southwestern Colorado. There is an obvious reason; the land is uniquely mineralized with uranium and vanadium. |
| 1339 | Western Area Power Administration (WAPA) transmission lines, Kinder Morgan TransColorado Pipeline, and West Wide Energy Corridors are depicted on the Utility Corridors map provided on the RMP website. Tri-State wholly and partially owned and maintained transmission facilities encompassing varying mile lengths within the UFO RMP boundaries, and approximately 156 total miles of transmission line are situated within the boundaries of the UFO study area. |
| 1340 | Tri-State and other utility corridors within the planning area are not depicted on the utility corridor maps. As a major stakeholder in the RMP revisions, Tri-State believes that mention or depiction of Tri-State facilities, as well as, those of our Member cooperative Delta Montrose Electric Association should be considered for planning purposes and identified on the utility maps. Tri-State would be willing to send the BLM our facility GIS data files to be included in the planning process and analysis. |
| 1341 | Tri-State would like to actively engage with the BLM on any and all planned and future utility or electric infrastructure construction and maintenance projects to ensure an open dialogue and thorough review of the issues. |
| 1342 | It is critical that Tri-State is able to maintain access rights to our transmission and substation facilities within the Planning Area. |
| 1344 | Access should be allowed in coordination with the BLM for new facilities and ROWs within the planning area. As a manner of standard operating procedure and as per requirements, Tri-State minimizes disturbance to the greatest extent feasible. |
| 1345 | Existing transmission lines and associated facilities are located within the boundaries of the planning area. We urge the BLM to continue to allow valid existing rights and uses, such as existing and planned utilities to be considered with appropriate and reasonable mitigation measures. |
| 1347 | Additional utility corridors and communication sites associated with utility facilities should be considered and open to consideration through the current ROW Grant application process. Tri-State would like to engage with the BLM early and often on this RMP revision to identify areas that should be restricted from major utility and road rights-of-way (ROW) in order to preserve natural and cultural resources, as well as, limiting impacts to viewshed and public recreation areas. Tri-State and other energy development should be allowed to continue in appropriate areas within the planning area. Energy development is critical to public safety and interest and the continuous, reliable, low-cost availability of electric power so vital to our member distribution cooperatives. |
| 1348 | Special consideration should be given to utility facilities because of their critical role in public health and safety, and the Wildland Urban Interface and fire hazard potential. Care must be taken to protect the forest from transmission line fires and protect the transmission lines from fire as mandated by NERC/FERC vegetation management authority. Tri-State would like to engage the BLM in these discussions to foster a greater understanding of the other federal compliance standards for generation and transmission facilities and to allow for effective, efficient, and consistent standards for operating and maintaining transmission rights-of-way. |
| 1349 | The RMP scoping materials include reference to land swaps for utility ROWs to preserve other areas that have higher biological resource value. Would the BLM begin, as a part of this process, to identify potential or existing utility corridors and areas of private land that could be swapped for utility corridors? How would this be determined and how would this affect permitting of new facilities and land rights? How would this coincide with the West-Wide Energy Corridors? Would the BLM facilitate land swaps for the utilities? Tri-State encourages the BLM to work closely with the utilities as these potential areas are identified to ensure any alternatives selected are feasible, given the utilities planned and future energy requirements with the understanding that energy requirements can change over time in different regions. It is important to understand that corridors identified by the BLM, may not meet the utilities delivery needs. Tri-State encourages the BLM to engage all |

*Uncompahgre Resource Management Plan Revision and EIS*
*Final Scoping Summary Report*

BLM_0067320

**Table C-26**
**Issue 4: Lands and Realty**

| Comment ID | Comment |
|---|---|
|  | stakeholders early in the planning process when identifying areas where development might be unsuitable because of other resource objectives. The RMP should balance resource protection and the need for energy development. |
| 1350 | The West-Wide Energy Corridor Programmatic EIS identified corridors for the supposed use of electric utilities. Ultimately, the corridors selected did not coincide with the input from electric utilities and generally appeared to be locations that agencies deemed as acceptable based on their land use constraints. Although the efforts to identify corridors for multiple uses and co-location are appreciated, many of the corridors were disconnected and not situated with geographical regions that Tri-State and members would deem useful. The West-Wide Energy Corridors identification effort was a large and noble endeavor, but has not yielded any meaningful opportunities for the location or construction of electric facilities and should continue to be assessed by including electric utilities in a cooperative and coordinated effort. |
| 1849 | Utility corridors should be aligned with respect to ACECs, WSAs and any other environmentally sensitive areas. |
| 2065 | Most of the land bordering the river is under public ownership and river flows are highly regulated by the McPhee Dam. |
| 2287 | We encourage the BLM to hold preliminary discussions with local jurisdictions (including fire departments) about land parcels BLM is considering offering for sale or exchange. |

BLM_0067321

**Table C-27**
**Issue 5: Cultural and Heritage Resources**

| Comment ID | Comment |
|---|---|
| 135 | TMW is well aware of the multitude of cultural resource sites within the UFO. Sometimes the management practices applied toward the ACECs also apply to cultural & paleontological areas. We would like too strongly point out that to enjoy along with preserving such sites does not always consist of boots on the ground in the immediate area of such sites. Many of these sites can remain preserved and still be viewed from a distance. |
| 136 | TMW would entertain a collaborative effort in helping the BLM in signage and educational tools in and around such areas. For the most part our experience shows that vandalism of sites is much less likely to occur with proper education and information. |
| 527 | Because of the numerous archeological sites on the slopes of the Uncompahgre Plateau, care should be taken to preserve these areas. It has been demonstrated that development of trail heads to major points of interest as well as interpretive signage serve to protect them from vandalism. Greater use of the volunteer adoption program already in place would be of considerable advantage. |
| 871 | Cultural & Paleontological Areas & Sites: To manage and protect them, I think areas close to town need supervision, even if this means high fencing with concertina wire and locked gate, open only at specific times of the year. If a civic group took charge of caring for the area on a volunteer basis, they promote its value to others, and it means a great deal to them. People become passionate about something they are caring for. A program similar to the highway cleanup might work----where a family or group of people take responsibility for a section of highway and cleanup trash--they get a sign posted on the highway. There are many sites that are difficult to access by road and then walking, they can stay that way. I have found that these remote/hard to get to areas do not have as many human visitors, and those that make it to these special places tend to treat them with respect. |
| 991 | I am also thrilled with the amazing archaeological remains found in the area, and the spectacular views, and wish to see them preserved as much as possible. |
| 1185 | This parcel on Oak Hill is surrounded on three sides by a purchased conservation easement on Jim Young's property. This was the first conservation easement in the county's Land Heritage Program. The county open space program would appreciate an opportunity to work with the adjacent land-owner and BLM to try to protect this parcel. If it were developed it could have an impact on the surrounding easement. |
| 1868 | Cultural Resources There are a number of archeological sites with significant cultural value found within the portion of the Dolores Corridor within the planning area. As an example, a number of immense petroglyph panels can be found on a few boulders and in a small finger canyon of Wingate Sandstone along the northern side of the Paradox Valley west of Bedrock. BLM should inventory this area, if it hasn't already, and should develop management prescriptions designed to protect these resources. The broader conservation group comments we referenced and incorporated earlier contain extensive recommendations on planning and management guidance for cultural resources. |
| 2057 | Cultural Resources There are a number of archeological sites with significant cultural value found within the portion of the Dolores Corridor within the planning area. As an example, a number of immense petroglyph panels can be found on a few boulders and in a small finger canyon of Wingate Sandstone along the northern side of the Paradox Valley west of Bedrock. BLM should inventory this area, if it hasn't already, and should develop management prescriptions designed to protect these resources. The broader conservation group comments we referenced and incorporated earlier contain extensive recommendations on planning and management guidance for cultural resources. |
| 2071 | Importance of less-roaded lands Due to their less-roaded condition these areas may be among the few left on the landscape where vegetation is relatively intact, where forage, soil, water courses, archeologic, paleontologic and historic resources are relatively undisturbed and where wildlife security, silence, solitude, quiet use, hunting, wildlife viewing and other such qualities can still can be found. |
| 2086 | We also sketched impressionistic boundaries around several of Colorado Natural Heritage Program Potential Conservation Areas to see if there was any overlap. This showed that in at least two cases PCAs intersect or are adjacent to unroaded areas and could be combined to make a larger protected area. |
| 2209 | The BLM did an excellent job addressing management of cultural and paleontological resources in its management plan for the Gunnison Gorge NCA. The UFO RMP should mimic that management approach. Cultural resources are non-renewable and should be managed for permanent protection |
| 2299 | Cultural an Paleontological resources have very little meaning if access is denied to view or enjoy these links to |

BLM_0067322

**Table C-27**
**Issue 5: Cultural and Heritage Resources**

| Comment ID | Comment |
|---|---|
| | our history. This is also true when considering historic travel routs. This is dear to my heart. I like to travel and observe thing from the past. The national plan seems to want to restrict public enjoyment of these kinds of historic sights. What use is preserving this heritage if only special interest groups or people are allowed access. |
| 2405 | In 1976 I first travelled through this area, a memorable journey on Highway 90 that took me from the San Juan Mountains to the canyon country of southern Utah. Since that time the natural and cultural values of Southwestern Colorado have been dear to me. For the family it goes back farther than that as my grandfather first visited the area around 1910 working on the railroads and continued to return to fish the Gunnison river until his death in the 1980's. |
| 2520 | Particular attention should be paid to preserving cultural and paleontological resources. I support a limited and thoughtful development of public displays of cultural artifacts such as rock art and paleontological resources such as fossils and dinosaur trackways to encourage public appreciation for and involvement in the protection of these resources, if such development is careful not to unnecessarily expose these resources to possible vandalism and loss of scientific value. |
| 2581 | So little of The West is still in the state when Lewis and Clark and the other explorers journeyed the frontier. We must preserve what little is left of our natural and national heritage for the enjoyment and benefit of our children, grandchildren and all future generations of Americans. I t is ours and their link with our history. |
| 2645 | I have walked these and other national wilderness and national park areas since I was a young teenager. I am carrying on this legacy by ensuring that both of my children are active in not only enjoying these areas but in efforts to protect and expand them. Our natural areas are our true legacies to our progeny and we must remain ever vigilant lest we lose these areas forever. |
| 2720 | This land was enjoyed by my Father...who was born in 1895...I hope that we will never see unconscionable development which destroys the beauty and value of the land and animals which depend upon that land for their subsistence. We need to cherish, not destroy through greed and insensitivity to our planet. |
| 2828 | FLPMA obligates the BLM to protect cultural, geologic, and paleontologic resource values (43 U.S.C. §§ 1701(a)(8) 1702(c)). In the context of historical and cultural resources, the National Historic Preservation Act of 1966 ("NHPA") (16 U.S.C. § 470 et seq.) affords heightened protection to these resources, establishing a cooperative federal-state program for the protection of historic and cultural resources. In particular, the review process set out in Section 106 (16 U.S.C. § 47Of) obligates the BLM to consider the effects of management actions on historic and cultural resources listed or eligible for inclusion under NHPA. Additionally, Section 106 requires the BLM to consider the effects of its management actions on all historic resources and to give the Advisory Council on Historic Preservation an opportunity to comment before the BLM takes action. Section 110 of the NHPA requires the BLM to assume responsibility for the preservation of historic properties it owns or controls (16 U.S.C. § 470h2( a)(1)), and to manage and maintain those resources in a way that gives "special consideration" to preserving their historic, archaeological, and cultural values. Section 110 also requires the BLM to ensure that all historic properties under the jurisdiction of the field office are identified, evaluated, and nominated to the National Register of Historic Places. Id. § 470h-2(a)(2)(A). Further, the President's "Preserve America" initiative (See Exec. Order 13287, March 3, 2003) requires the BLM to advance the protection, enhancement, and contemporary use of its historic properties. The BLM must ensure that "the management of historic properties in its ownership is conducted in a manner that promotes the long-term preservation and use of those properties as Federal assets." Therefore, the Uncompahgre Field Office must carefully consider the effects of all RMP decisions on the archaeological and cultural values located in the planning area. Since it will be difficult to evaluate the effect of decisions when the location of cultural resources is unknown, the BLM should undertake an archaeological inventory wherever necessary. One area within the Uncompahgre Field Office with known cultural resources is the northern side of the Paradox Valley west of Bedrock. A number of immense Petroglyph panels can be found on a few boulders and in a small finger canyon of Wingate Sandstone there. BLM should inventory this area, if it hasn't already, and protect these resources in the RMP. In regards to travel planning, the BLM should consider where motorized and non-motorized routes are directing people, inventory cultural resources along those routes, and carefully consider the potential impacts to those resources. Specifically, BLM should evaluate whether dust from vehicle use, energy development, and other authorized uses is impacting Petroglyph panels. Furthermore, dust suppressants have been shown to impact rock art in Nine Mile Canyon, Utah. 19 These impacts must be analyzed and minimized. Recommendations: BLM's goal should be to protect, conserve, and where appropriate restore archeological and historical sites and landscapes. To that end, BLM should: |

BLM_0067323

**Table C-27**
**Issue 5: Cultural and Heritage Resources**

| Comment ID | Comment |
|---|---|
| | • Survey all known or discoverable cultural and historic sites, or those adjacent sites may be adversely affected. |
| | • Determine the sites or areas that are most vulnerable to current and future impact and adopt management actions necessary to protect, conserve, and restore cultural resources. |
| | • Complete a Cultural Resource Management Plan that coordinates with the objectives of the RMP and seeks to provide for an appropriate proactive process of inventorying for cultural resources, making determinations of eligibility for the National Register, and seeking to nominate eligible properties to the National Register. The RMP should establish a timeline for completing the Cultural Resources Management Plan, and prioritize areas to be inventoried for cultural resources. |
| | • Outline specific management actions, such as stabilization, fencing, signing, closures, or interpretative development, to protect, conserve, and where appropriate restore cultural resources. • Adopt measures to protect cultural resources from artifact collectors, looters, thieves, and vandals. |
| | • Consult with the Native American community to determine whether there are sites or specific areas of particular concern, including sites of traditional religious and cultural significance. 19 Kloor, Keith. "Dust Storm Rising Over Threat to Famed Rock Art in Utah." Science 319 (2008): 394. Available online at http://www.ninemilecanyoncoalition.org/ninemilestudy.pdf. |

BLM_0067324

**Table C-28**
**Issue 5: Paleontological Resources**

| Comment ID | Comment |
|---|---|
| 2072 | Importance of less-roaded lands Due to their less roaded condition these areas may be among the few left on the landscape where vegetation is relatively intact, where forage, soil, water courses, archeologic, paleontologic and historic resources are relatively undisturbed and where wildlife security, silence, solitude, quiet use, hunting, wildlife viewing and other such qualities can still be found. |
| 2210 | The BLM did an excellent job addressing management of cultural and paleontological resources in its management plan for the Gunnison Gorge NCA. The UFO RMP should mimic that management approach. Cultural resources are non-renewable and should be managed for permanent protection |

BLM_0067325

**Table C-29**
**Issue 6: Socioeconomics and Environmental Justice**

| Comment ID | Comment |
|---|---|
| 93 | This is also true for the social and economic evaluations for the area. Both resource quantities and economics for the Resource Area should receive a thorough evaluation. |
| 110 | NEPA requires that both the environmental and economic effects of identified activities be analyzed within a resource area. While the environmental effects are often most closely scrutinized during the NEPA process, the economic effects and impacts of resources decisions must also be considered equally with the environmental effects. We encourage the BLM to conduct a thorough economic analysis of current coal and other minerals activities in the RMP to document what we believe are very positive effects to the custom, culture and economic vitality of the communities in this resource area. |
| 117 | We would like the BLM to consider the economic benefit that natural gas exploration and extraction has on local, regional, and national economies, and the benefit from having a broad-based economy for the North Fork of the Gunnison River valley, the Roaring Fork valley, the Uncompahgre River valley, and the Grand Valley. |
| 152 | In the same way, the economic and social benefits must be quantified and weighed by the I.D. team and the deciding officer in order to reach a quality Record of Decision. |
| 206 | The BLM should actively solicit input and involvement by the Montrose Economic Development Council, the Montrose Chamber of Commerce, and the Montrose Visitor's and Convention Bureau. These organizations should more actively promote the recreational opportunities near Montrose, which would encourage sustainable and economically beneficial uses. |
| 272 | Historically, the County's economy and way of life have been very dependent on the extractive resources available on public lands. This historic economic dependency continues in the areas of mineral extraction, agriculture and timber harvesting. More recently, natural gas development, tourism and recreation have increased and contributed to a more diverse local economy. The degree and manner of public and working access to the BLM lands and mineral resources will undoubtedly be changed through revisions to the BLM management plan. The County would like the BLM to respect the economic dependency on the current level of these diverse uses and access to BLM property and minerals. The County would request that a comprehensive cost benefit analysis be conducted as part of the RMP revision process to address the impacts of various resource management policies and practices on the local economy and surrounding areas. The multiple use of BLM lands and development of BLM minerals is important to Delta County residents to insure continued support of the basic economic foundation of Delta County. |
| 277 | Given the unique recent and ancient history of human habitation in the area and the hardy and vibrant native flora and fauna, I strongly support RMP directives that encourage sustainable use of this landscape over extraction or exploitation of its resources. While the latter tends to produce immediate and lasting degradation of scenic beauty and ecosystem function, the stewardship of the former can support both healthy local economies and future generations' enjoyment of the Uncompahgre Plateau. |
| 333 | This area is the only preserved land area that is able to support uncontaminated agricultural economic development, i.e. orchards remaining in the state. |
| 336 | Ensure community and agricultural development. Not oil and gas development. They're all economic development. Please start with com. & ag. |
| 365 | Administration should work more with the local communities; towns; counties, and state. To help sustain local needs and multiple use. |
| 477 | This comment is referring to the economic effect of energy and mineral development on local communities. Energy and mineral development has an economic benefit to local communities. Development typically provides well paying jobs and pays local and federal taxes, royalties, and fees. Dollars spent locally stay within the community helping to build up local businesses not directly associated with the development companies. Employees of the development companies and the associated contractors and consultants enjoy local restaurants, buy groceries, shop in local stores, buy or rent homes, which all helps to keep money within the community. |
| 479 | This comment is regarding economic implications associated with both the permitting process for energy or mineral development and the selection criteria for Wilderness and Wilderness Study Areas. When reviewing the impacts of energy and minerals development on the environment the economic benefit to the local and federal economies should be weighted in the decision to allow or restrict the development. There is a great economic benefit to local communities and government from taxes, royalties, and employment whether it is |

BLM_0067326

**Table C-29**
**Issue 6: Socioeconomics and Environmental Justice**

| Comment ID | Comment |
|---|---|
| | from employees of the development company or the numerous associated suppliers, contractors, or consultants. |
| 480 | The economic value of lands selected as Wilderness Study Areas or Wilderness should also be considered and weighted as part of the selection criteria for Wilderness designation. The economic value should consider, but not be limited to the minerals, energy (coal, gas, oil, solar, biomass, wind, etc.), merchantable timber, guided tours (jeep, hiking, fishing, hunting, etc), and livestock grazing. Both the current and future economic values should be considered. |
| 569 | Closing off roads and ending construction of new roads in the proposed areas would eventually kill off all Natural gas development, coal mining and logging in western Colorado, resulting in the loss of around 3000 jobs in the mining industry alone. It is necessary for these industries to build primitive roads on BLM land just like they have been doing for many years to drill small bore, exploratory test wells to tell them which way to proceed. To block the use of BLM land for these things would eventually turn Western Colorado into an economic wasteland. Yes I do object to this plan. |
| 571 | Thank you for including Montrose County Government in your considerations for Montrose County Socio-Economic impacts of Montrose County on the BLM, and the BLM on Montrose County. The two are deeply intertwined and in fact, inseparable both as to the lifestyle we enjoy as well has several business ramifications using the resources of the BLM on the West and East flanks of the Uncompahgre National Forest. In these contemporary times, it is increasingly clear that Montrose County has not fully arrived at Montrose County's practical potential as a legitimate recreational playground for the local population. Montrose County can be a destination recreational site for the traveling USA, World, public, seeking that which they cannot find anywhere but in Montrose County BLM Lands. You and the Uncompahgre Forest account for 74+% of the land-mass in Montrose County. The BLM and Montrose County have, for example:<br>• Mineral sources +Various biomass sources (timber->chips)<br>• Remarkable variety of recreational uses (motorized->bicycle->foot) & Hunting<br>• Ecological preservation & continuance of flora and fauna<br>• Scenic Vista's<br>• Grazing for domestic and wild creatures Water Management Montrose<br>• County's transportation plan (connectivity of the East and West portions of Montrose County)<br>• Catastrophe mitigation on BLM, National Forest, and the East and West portions of Montrose County proper.<br>• AND much more. |
| 572 | This being said, the BLM Lands are an integral part of Montrose County becoming a destination vacation area as well as our trademark lifestyle. Using that which is given and made available on the BLM and the National Forest connected by a all season road from the West of Montrose County to the East thoroughly enhances recreational and commercial ventures in all of the BLM and Private Lands in Montrose County. The BLM Lands in Montrose County will contribute to a strong national, state, and local economy through the holistic use of the resources available now and soon to be in the future. Our security as a nation is also tied to these very concepts. To put a price on these values is not possible, their value is immeasurable for obvious reasons. To create jobs that originate in Montrose County have a much larger multiplier impact than those that don't, but secondary jobs are an essential contributor. |
| 576 | Montrose County is completing our own socio-economic study which will be available soon which Montrose County will gladly provide a copy of said. |
| 604 | The Uncompahgre RMP Planning should be coordinated with Montrose County in order to be compatible with the Montrose County Master plan revision currently underway. |
| 606 | Fees for business uses (mining, grazing) should more than compensate BLM for administrative and land maintenance costs involved. I am not opposed to fees for recreational users, but believe fees/costs to businesses should be increased first because private profit is being made off of public land. BLM should be treated as a "shareholder" by collecting some additional dollar amount on the resources consumed or extracted from public land. |
| 667 | San Miguel County is sixty-two percent public lands, much of which the surface or subsurface estate is managed by BLM. Public lands playa critical role in our economy and in defining the character of our county. Our economy is largely dependent on, and substantially a result of, the public lands in our county. According to 2003 |

BLM_0067327

**Table C-29**
**Issue 6: Socioeconomics and Environmental Justice**

| Comment ID | Comment |
|---|---|
| | Region 10 economic data (published in a 2006 Region 10 report by Levy), 23% of our jobs are from tourism, 13% derived from second home spending, 20% from construction (of which 9% is second homes), and 21% from services which includes real estate services. This constitutes most of our economy. Our ability to attract tourists, service professionals, and entrepreneurs that use cyber technology to support their businesses, depends on maintaining the character of the region. These are the people that support the services, real estate, and construction industries. Access to natural amenities is frequently cited as the reason these people chose to locate in or visit San Miguel County. |
| 668 | San Miguel County is committed to working with BLM to maintain the character of our region. BLM management policy plays a key role in this endeavor. We believe a sustainable economy in San Miguel County is best served by a BLM management policy the places a priority on maintaining the natural integrity of BLM lands and the lands their sub-surface ownership has influence over. Local governments have expended great effort to protect air quality, water quality, visual character, wildlife, and natural systems where they have jurisdiction. We hope BLM will set the same priorities in the management of their lands. |
| 680 | As stated previously, San Miguel County believes the interests of the County and the public at large are best served by BLM lands maintaining their natural ecological integrity. Extractive uses of BLM lands have resulted in boom and bust cycles and left indelible scars on our public lands. Historic, and perhaps current, livestock management practices have also contributed to degrading or perpetuating the degradation of our public lands. These activities, along with travel management, have all contributed to the conditions described in the LHAs. |
| 760 | Roadless regulations are poor management practices for continued economic sustainability of Western Slope. Same for WSA. |
| 761 | Economic development of coal resources should be encouraged for local, state and national energy security. |
| 853 | Also, our ranch has a USDA All Natural Grass Fed Beef label. This label goes on all of our retail cuts sold in stores. The use of poisons on surrounding grazing allotments conflicts with the sustainability of the ranch and its economic well being. |
| 906 | Support jobs |
| 932 | If this project should go forward, this will become a place that will not be dealt with and become a wasteland with more regulation, closing of the area. Far reaching outside the scope of this. Loss of jobs and businesses within the affected area. This club has also sent 3 Cancer kids to a camp every year. This club will dissolve will no longer send these kids to camp. |
| 1177 | The RMP/EIS should consider socio-economic impacts to the local communities. The reasonably foreseeable development evaluation should address the additional loading that could be placed on local communities' abilities to provide necessary public services and amenities. Such impacts may include housing and school needs for project workers and families, burdening existing waste and wastewater handling facilities, and increased road traffic with associated dust and hazardous material spill potential. Methods to avoid or minimize such impacts should be discussed. |
| 1178 | Executive Order 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations," applies to federal agencies that conduct activities that substantially affect human health or the environment. In accordance with this order, the RMP/EIS should disclose and evaluate any environmental justice concerns associated with impacts to rural low-income communities from the resource management activities and the potential build-out for the reasonably foreseeable development analysis. Close coordination with any potentially impacted Native American tribes is encouraged. If there are no applicable environmental justice considerations, then that should be disclosed. |
| 1246 | Within this service territory [Delta County (excluding the City of Delta) and in portions of Montrose, Gunnison, Mesa and Ouray Counties] DMEA currently operates and maintains 3,213 miles of energized line (distribution and transmission). In the last ten years alone, the number of active meters has grown nearly 25% from 25,893 to 32,321. |
| 1291 | The livestock industry within the boundaries of the UFO contributes millions of dollars to the Montrose, Mesa, Delta, Ouray and San Miguel counties. This industry is steady in its contribution to the economy and is not victim to the boom and bust cycle often experienced in other sectors of the economy. |
| 1294 | These data are mentioned to stress the importance of the livestock grazing and maintain economic viable ranches within the UFO. Livestock grazing is a sustainable use of the resource and it should be viewed as a |

### Table C-29
### Issue 6: Socioeconomics and Environmental Justice

| Comment ID | Comment |
|---|---|
| | program and not a problem. Too many times, because livestock grazing is the only controllable variable, it is penalized. The allotments have to maintain their economic viability or the entire ranch is in jeopardy. The credit crisis that faces this area worsens when the tenure of allotments become questioned. While we realize that grazing is not being eliminated in this plan, there is constant movement to reduce livestock grazing and to eliminate its importance on the landscape. This plan should acknowledge the importance of the constant presence that permittees have on the allotments, the economic contribution, the tie between the ability to use public land and open space of private ranch lands, the sustainability of livestock grazing on our grazing evolved ecosystems and the importance of many of the range improvements to wildlife populations. |
| 1300 | Any such event in our watershed would be devastating to our private property rights and our agricultural enterprise. My wife and I raise certified organic fruit on 36 acres on Rogers Mesa west of Hotchkiss, in Delta County. Our pristine irrigation water flows from the flanks of Grand Mesa where gas exploration is anticipated. I know we speak for many of our neighbors and other farmers - organic and conventional, fruit, vegetable, and animal. We are all potentially adversely affected by natural gas development on Grand Mesa. |
| 1301 | Responsible management of BLM resources includes protecting the needs and interests of private landowners who might be affected by activities occurring on your land. We request that the Resource Management Plan revision protect our right to continue to earn a living from our land; a way of life that, not incidentally, is healthy for the environment, our neighbors, and our community. |
| 1309 | Historically significant. For more than a century, the North Fork Valley has been renowned for our exceptional fruit that was shipped across the Nation. More recently the North Fork has been recognized as a region of national significance for organic agriculture, second only to the entire State of California. The quality of our air, water, and soils, as well as the skill, tenacity, industriousness, and ingenuity of our farmers, are largely responsible for our premier fruit. Nevertheless, agriculture is threatened in the North Fork largely by competing land uses. |
| 1310 | Endangered species protection. Natural gas exploration on BLM land is yet one more such threat. Were the farmers of the North Fork 'four-leggeds' we might very well be regarded as 'endangered' and significant efforts to protect our habitat and survival would be mandated in BLM's process. We are animals, too; we should not be discriminated-against simply because we walk on two legs. I urge you to give protection to the existing, historic, and environmentally compatible land uses of your private-landowning neighbors. |
| 1328 | More locally, we know you have heard loud and clear the desire for increased uranium mining from people who actually live in western Montrose and San Miguel counties. Their economic livelihood has been dependent upon uranium for generations. Frankly, there is not anything else that can be reasonably expected to replace the basic "bread and butter" economic activity of uranium. |
| 1696 | There are economic benefits to the community in preserving wild lands. These benefits need to be evaluated and quantified when considering impacts on present and future generations. |
| 1706 | The Town of Ridgway and surrounding community benefits greatly from our open lands and recreation areas, in all respects. Please consider these lifestyle, quality of life, and business/economic impacts and opportunities for our region. |
| 1779 | Any oil and gas development allowed under the RMP should be carefully constrained, subject to phased development that minimizes damage to unique natural features, essential wildlife habitat, and other sensitive areas and restores the land to its original condition once it is exploited. The RMP should impose strict limits on uranium and other mining to protect our land, air and water including restoration to its original condition. |
| 1786 | I guess the first that comes to mind is the decision to dam the Hetch Hetchy valley in Yosemite National Park. Then there was the attempt to dam the Green River in Dinosaur National Monument. There has been the continued exploitation of redwood trees and the creation of Lake Powell to name just a few. In all these cases, short term goals took precedent over long term ideals. Even though the examples above are different than what is proposed here, the decision to enter these pristine lands and exploit them for their natural resources was based on short sighted interests with no attention paid to what would be lost. |
| 1818 | Administration should work more with the local communities and towns, counties, state. To help sustain local needs and multiple use. |
| 1907 | A comprehensive analysis of the socio-economic benefits of natural gas and oil development activities in the area should be included in the analysis. It may seem counter-intuitive to BLM's planning team, but oil and gas |

BLM_0067329

### Table C-29
### Issue 6: Socioeconomics and Environmental Justice

| Comment ID | Comment |
|---|---|
| | development on public lands actually improves the environment in numerous ways. Royalty revenues from oil and gas development underwrite the conservation of wildlife habitat, national parks, refuges and recreation areas. In fact, the oil, natural gas and mineral programs fund virtually all of the conservation and preservation work of the Department of Interior! The analysis of alternative must include a comprehensive analysis of the benefits of oil and gas development. |
| 1944 | Analysis of impacts will consider potential interaction between management decisions and changes in the larger social and ecological context. In particular, impacts will be analyzed to consider potential interaction with larger-scale dynamics such as climate change; proliferation of invasive species, insects, disease and wildfire; exurban development; changing recreational patterns, and the like. |
| 1976 | A comprehensive analysis of the socio – economic benefits of oil and gas development activities in the area should be included in the review. In addition to lease rentals and royalty payments, state and local taxes also need to be identified and incorporated into the benefits analysis. Specifically, a discussion analyzing the costs of administering the minerals program and industry's financial contributions to local, state and federal treasuries is necessary. |
| 2025 | Economics The SRCA letter cites numerous studies supporting the economic benefits of undeveloped land. It is recognized that recreation opportunities provided by wilderness quality lands yield direct economic benefits to local communities. According to the U.S. Fish & Wildlife Service, in 2006 State residents and non-residents spent $3 billion on wildlife recreation in Colorado. (USFWS 2006, National Survey of Hunting, Fishing and Wildlife-associated Recreation - http://www.census.gov/prod/2008pubs/fhw06-co.pdf). In addition, local communities that protect wildlands reap measurable benefits in terms of employment and personal income. For instance, a report by the Sonoran Institute (Sonoran Institute 2004, Prosperity in the 21st Century West -The Role of Protected Public Lands) found that: Protected lands have the greatest influence on economic growth in rural isolated counties that lack easy access to larger markets. From 1970 to 2000, real per capita income in isolated rural counties with protected land grew more than 60 percent faster than isolated counties without any protected lands. These findings confirm earlier research, showing that wilderness is in fact beneficial for local economies. Residents of counties with wilderness cite wilderness as an important reason why they moved to the county, and long-term residents cite it as a reason they stay. Recent survey results also indicate that many firms decide to locate or stay in the West because of scenic amenities and wildlife-based recreation, both of which are strongly supported by wilderness areas. (Morton 2000, Wilderness: The Silent Engine of the West's Economy). Other "non-market" economic values arise from the ability of wildlands to contribute to recreation and recreation-related jobs, scientific research, scenic viewsheds, biodiversity conservation, and watershed protection. (Morton 1999, The Economic Benefits of Wilderness: Theory and Practice; Loomis 2000, Economic Values of Wilderness Recreation and Passive Use: What We Think We Know at the Turn of the 21st Century). All of these economic benefits are dependent upon adequate protection of the wilderness characteristics of the lands. |
| 2028 | The river supports a variety of economic and recreational activities that benefit nearby communities. Working farms and ranches, professional outfitters anglers, historians, river runners, hikers, archeologists and recreationists all share an interest in preserving the Dolores River Basin. |
| 2056 | We also urge reclamation and restoration of past uranium mining scars within the planning area. |
| 2059 | Socioeconomic Analysis The Socioeconomic comments and studies submitted within the broader conservation group comments should be considered for the relevant portion of the basin within the UFO's jurisdiction. |
| 2127 | In terms of the economic impacts of hunting and fishing within the six counties partially or wholly falling within the UFO management unit, the total impact (defined as direct expenditures and CDOW expenditures in support of hunting and fishing) reached $165,400,000 (11% of the state total) in 2002. Hunting and fishing in these six counties also accounted for 2,180 jobs (11% of the state total) in 2002. These robust numbers for hunting and fishing opportunity and economic impacts elucidate the tremendous value of public lands in the UFO management unit. It is of vital importance that the UFO RMP includes a strong commitment to maintaining the invaluable fish and wildlife habitat and hunting and fishing opportunities for all lands within the management unit administered by the BLM. |
| 2184 | Our members value intact natural ecosystems that maintain their pre-Columbian constituent species in natural abundances. Protected natural ecosystems on public lands are the last refuges of many threatened, endangered, and dwindling species. These ecosystems provide valuable natural resources and ecosystem services, such as water collection and purification systems and carbon sinks that protect against global warming. For the |

BLM_0067330

## Table C-29
## Issue 6: Socioeconomics and Environmental Justice

| Comment ID | Comment |
|---|---|
|  | communities in and nearby the UFO, they are the basis of a renewable, vibrant recreation economy. The economic benefits to the community of preserving wild lands should be evaluated and quantified, and possible harm to these benefits should be carefully evaluated when considering mineral extraction, logging, grazing, or other projects that disturb wild lands. |
| 2313 | I have been an organic gardener here, in Paonia, for the past 15 years. I moved here because of the clean water and air, the growing season and the close proximity to road less and wilderness lands. |
| 2328 | What is done in the Pisceance is ENOUGH. |
| 2380 | And finally what land is opened for exploration etc. must be restored to something approaching its original condition under supervision from the wilderness society with enforcement provisions. |
| 2705 | The BLM and Forest Service have code words that disguise their plans to serve corporate America: 1) enhance social values, 2) community stability and 3) job creation. If any of these 3 terms are mentioned in the Uncompahgre RMP, please send me the electronic link to the RMP. |
| 2843 | Socioeconomic Analysis The BLM must do a full analysis of all of the socioeconomic consequences of each alternative for the Uncompahgre RMP. We previously submitted detailed comments to EMPSi for consideration in the socioeconomic analysis for the Uncompahgre RMP revision. Those comments, which are attached to this letter in Appendix 2, address a wide range of often overlooked socioeconomic issues that the BLM must consider in addition to estimating jobs and income from commodity extraction on the lands in the Uncompahgre Field Office. The attached comments provide detailed discussions of several socioeconomic issues that must be considered when the BLM does its analysis for the Uncompahgre RMP. These include a discussion of the issues associated with economic-base theory and its application for predicting impacts from land management, recommendations that the BLM look at trends in total personal income and employment in order to see a more complete picture of the Uncompahgre region's evolving economy, a discussion of the importance of using economically recoverable resource estimates for oil and gas in order to avoid overstating the potential impacts of such development, a discussion of the economic benefits of wilderness-quality lands, and a recommendation that the agency do all planning analysis based on realistic budget assumptions. These socioeconomic analyses are necessary for the BLM to adequately and equitably assess the socioeconomic impacts of the Uncompahgre RMP alternatives. We recommend that the BLM use a total economic value approach that includes the estimation of nonmarket values for the wildlands and open spaces in the Uncompahgre planning area. BLM recently affirmed its commitment to this approach in draft IM 2010-061, which explicitly directs managers to evaluate non-market values in RMP analyses. We will be submitting comments to BLM on this draft IM, and we will be happy to provide the Uncompahgre Field Office with a copy of our comments because this issue is especially relevant to western Colorado communities. The total economic value analysis should include the full range of non-market values, including use values - such as recreation - as well as non-use values such as existence value (the benefit one gains just knowing wildlands are protected), option values (the benefit of knowing that one can visit a wildland for recreation) and bequest values (the benefit gained from knowing that wildlands are protected for future generations). Also included in Appendix 2 are two socioeconomic scoping briefs and The Wilderness Society's recent report, Natural Dividends: Wildland Protection and the Changing Economy of the Rocky Mountain West. The first scoping brief, entitled "Socio-Economic Framework for Public land Management Planning: Indicators for the West's Economy," details our expectations for the baseline analysis of the region's economy as well as the analysis of the potential impacts of proposed management alternatives on the area. This brief describes the changing economy of the Rocky Mountain West, and the role that public lands can play in bringing economic diversity to the communities of the Uncompahgre planning area. The second brief, entitled "The Economic and Social Impacts of Oil and Gas Development," describes the significant and often hidden costs associated with oil and gas drilling. The analysis in the RMP must include an assessment of these costs in order to describe net (rather than gross) benefits of any proposed oil and gas leasing. We request that your analysis of socioeconomic considerations in the Uncompahgre Resource Area follow the approach set out in these documents, as well as the more specific considerations detailed in our attached comments. Recommendations: The RMP should evaluate non-market values provided by wildlands, per BLM's commitment set out in draft IM 2010-061. BLM should utilize the materials included in Appendix 2 to inform the RMP's socioeconomic analysis and ensure a full accounting of the costs and benefits of each of the alternatives. |
| 2767 | Please do not let the BLM make any plans. Some of their employees have taken bribes from big oil/profiteers. Americans do not trust these agencies anymore, which are in the pocket of big time profiteers who are out to |

BLM_0067331

**Table C-29**
**Issue 6: Socioeconomics and Environmental Justice**

| Comment ID | Comment |
|---|---|
| | ruin America. American taxpayers spent years paying to buy this land and **BLM** is only listening these days to these rich profiteers to ruin it. |

BLM_0067332

**Table C-30**
**Issue 6: Public Health and Safety**

| Comment ID | Comment |
|---|---|
| 2787 | Health Impact Assessment The BLM Should Conduct a Health Impact Assessment. In February, 2008, the Environmental Protection Agency provided the BLM with its comments on a revised drilling plan for the Pinedale Anticline in Wyoming, citing concerns about human health issues including elevated ozone levels and groundwater contamination, as well as visibility impacts in nearby Wilderness Areas. Consistent with its responsibilities under Section 309 of the Clean Air Act, EPA reviewed the analysis of impacts and gave the plan its worst possible rating. EPA recommended that BLM revise the plan to correct the problems identified by EPA. In its decision, the EPA stated: "it is of utmost importance that the Revised Draft SEIS identify effective and enforceable mitigation strategies to ensure environmental and public health protection as the proposed 4,399 additional wells on the Pinedale Anticline are developed."3 The BLM should do the same in the EIS for the Uncompahgre RMP and any other major decision document where oil and gas operations will have a significant impact on human health. Oil and gas development is acknowledged to have potentially severe impacts on human health, as noted below, and the Draft EIS should incorporate a formal methodology to evaluate all health issues and potential mitigations. We therefore request that the BLM incorporate a Health Impact Assessment (HIA), which is a systematic, comprehensive methodology for assessing human health impacts, as part of the EIS. A HIA looks at all the possible health effects from a decision, including contaminants and air pollutants but also water contamination, accidents and injuries, alcoholism and substance abuse, mental health impacts, and more. Not only is this approach used by U.S. and international health agencies, but it is used by the oil and gas industry itself in overseas operations.4 Just last year, the BLM incorporated a full HIA into an oil and gas Draft EIS in Alaska. 5 A comparable approach should also be undertaken for oil and gas development for the Uncompahgre Field Office. The National Environmental Policy Act (NEPA) intends that human health be thoroughly considered in any Environmental Impact Statement. Congress stated that It , "... it is the continuing responsibility of the Federal Government to use all practicable means...to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may....assure for all Americans safe, healthful, productive and aesthetically and culturally pleasing surroundings.." and "...attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences..."6 NEPA implementing regulations direct agencies to consider "the degree to which the proposed action affects public health or safety."7 These regulations also state that Federal agencies shall to the fullest extent possible "Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment."8 3 letter from EPA Regional Administrator, Region 8, to State Director, Bureau of land Management, Wyoming State Office regarding Revised Draft Supplemental Environmental Impact Statement for the Pinedale Anticline Oil and Gas Exploration and Development Project Sublette County, Wyoming (CEQI/20070542), February 14, 2008: http://www.epa.gov/region8/compliance/nepa/nepadocs/FinalEPACommentsOnPinedaleAnticline14Feb08.pdf 4 International Petroleum Industry Environmental Conservation Association and the International Association of Oil and Gas Producers, A Guide to Health Impact Assessments in the Oil and Gas Industry, (London 2005): http://www.ipieca.org/aetlvities/health/health publications.php 5 See The Northeast National Petroleum Reserve-Alaska Draft Supplemental Integrated Activity Plan Environmental Impact Statement, available at : http://www.blm.gov/aklst/en/prog/planning/nprageneral/nenpra/nenprafeis.html 6 42 USC § 4331 7 40 CFR 1508.27(b)2 Two recent papers authored by environmental health experts at the University of Colorado's School of Public Health recently examined available information regarding the health effects of oil and gas drilling and production. Among their findings is that: "Most of the hazardous chemicals associated with oil and gas production are well documented to produce adverse health effects in individuals." 9 They also looked at information specific to Garfield County, Colorado, which can serve as a model to other western Colorado counties. 10 Some of their conclusions that are specifically relevant to the upcoming RMP revisions include:<br><br>• Air and water quality studies conducted to date indicate that potential exposures to hazardous emissions exist.<br>• Many air toxics are essentially unmeasured in Garfield County and current plans for further air sampling may not be comprehensive enough to enable public health officials to determine the community health impact of oil and gas development.<br>• Preliminary testing results indicate that ozone levels in some places are exceeding National Ambient Air Quality Standards and may be hazardous to humans.<br>• There are no plans for comprehensive and systematic monitoring of surface and subsurface waters.<br>• Environmental monitoring must be relevant to the areas where oil and gas development activity is |

BLM_0067333

**Table C-30**
**Issue 6: Public Health and Safety**

| Comment ID | Comment |
|---|---|
|  | occurring and the results must be readily available to the public. Unbiased interpretation of the results must occur in a timely manner and be made available to the public. |
|  | • It is important not to ignore what is already known. There is an immediate need for specific information on exposures and the impact from oil and gas development on all aspects of human health. |
|  | • An adequate monitoring program should be developed through a rigorous scientific process that addresses all currently recognized data gaps and health risks. This process should be developed in a transparent and explicitly unbiased way. |
|  | • A Health Impact Assessment (HIA) is a practical tool to evaluate future impacts, alternatives and appropriate strategies to promote and protect human health. Recommendation: BLM should incorporate a Health Impact Assessment (HIA) into the Draft RMP for the Uncompahgre RMP. 8 40 CFR 1500.2(f) 9 Witter, R. et al, " Potential Exposure-Related Human Health Effects of Oil and Gas Development: A Literature Review (2003-2008)/ August 1, 2008, hea 08091702b.pdf. 10 Witter, R. et al, "Potential Exposure-Related Human Health Effects of Oil and Gas Development: A White Paper," September 15, 2008, hea 08091702a.pdf. |
| 431 | The general problems are the dumping of household trash in these areas, (which has slowed down but there is little or no removal) and lack of trail maintenance/erosion control. It is my opinion that if directed by the BLM, local organizations such as our own or others, could garner and manage plenty of volunteer labor to clean trash and maintain trails and control erosion. I think this might also inspire more local pride in these areas. |
| 467 | Many of the lands within the Plan Area were County dumps and have not been properly cleaned up and rehabilitated. I would like to see these areas get addressed. Some people continue to dump trash, animal carcasses etc. on these lands that I would like to address through the revision process. |
| 693 | Health effects from oil and gas are serious - ozone and other airborne substances - since wholesale development of oil and gas my allergies are getting worse and friends who never had allergies now have them. My eyes are often irritated. |
| 773 | There are more than a few areas that locals have used over the years as their personal dumping ground on public lands. Some effort should be made to identify and clean them up. |
| 785 | Educate locals that dumping their trash on public lands is not a good thing and that there are cheaper and environmentally better options. |
| 1250 | The revised RMP must recognize the need for safe passage of equipment and personnel performing routine maintenance and repair -and especially the immediate passage of equipment and personnel responding to emergency electric outages-along the length of the existing electrical system located on public lands. Maintaining access rights to all electrical infrastructure within the planning area is critical. |
| 1831 | The first is a small parcel of land on the east side of Highway 550 and north of Cutler Creek. This area has some geologic interest as it contains a large rare rock dike and is an interesting area for a short hike. It has a road that can connect to adjoining forest lands. This area could be of interest to hikers but it has become a de-facto dump and currently has trash (old furniture, tvs, appliances etc) scattered. |
| 2055 | The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. The BLM must follow up with a regular inspection and monitoring program to ensure that violations are not occurring or not allowed to occur over a long period of time. |
| 2400 | I recently watched a TV documentary on the "fracking" method of extracting gas and oil in Colorado and other states that is highly hazardous to the health of residents due to the resulting water supply contamination. The devaluation of homes and property in the affected areas was devastating, but the worst ramification was the severe, chronic and irreversible health issues suffered by humans and animals. PLEASE do not allow unrestricted mining! |

BLM_0067334

# Horsefly Coordinated Weed Management Area Plan



**Prepared by:** The Uncompahgre Plateau (UP) Project

**In coordination with**:
Montrose County
U.S. Forest Service – GMUG Forest
Bureau of Land Management – Uncompahgre Field Office
Colorado State University Extension

BLM_0067335

**Table of Contents**

I.      Introduction……………………………………………………………..Page 1
II.     Purpose ………………………………………………………………Page 1
        1.  Goals
III.    Horsefly WMA Description……………………………………………Page 4
IV.     Objectives………………………………………………………….... Page 7
V.      Weeds of Concern in the Horsefly WMA……………………….……..Page 8
        1.  List of High Priority Species
        2.  List of Other Priority Species
        3.  Species on Early Detection List
VI.     Priorities for Horsefly WMA………………………………………… Page 10
VII.    Integrated Weed Management Techniques…………………………….Page 11
        1.  Implement Weed Prevention Best Management Practices
        2.  Keep Inventoried Weed Free Areas – Weed Free
        2.  Early Detection – Rapid Response
        3.  Eradicate or suppress roadside, ditches, gravel pits, utility Row's, livestock
            concentration areas, high use areas and critical areas
        4.  Eradicate or suppress inventoried isolated, small infestations of High Priority
            species
        5.  Eradicate or suppress inventoried isolated, small infestations of Other Priority
            species
        4.  Manage large infestations of High Priority species by area
        5.  Manage large infestations of Other Priority species by area
VIII.   Appendix……………………………………………………………....Page 22
        1.  Best Management Practices Flyer
        2.  Early Detection Flyer
        3.  Resources and References
        4.  List of Invasive Species – Best management strategies for each species
        5.  Contacts for team members
        6.  Integrated Weed Management Techniques
        7.  Annual Operating Plan
        8.  Monitoring Techniques
        9.  Reporting Form
        10. Cost Share Program for Montrose County West End
        11. Maps
                a.  Boundary of Horsefly WMA
                b.  High Priority Areas
                c.  Map of current infestations by species
                        1.  Spotted knapweed
                        2.  Russian knapweed
                        3.  Tamarisk
                        4.  Oxeye daisy
                        5.  Houndstounge
                        6.  Musk, Bull and Canada thistle
                        7.  Chicory
                        8.  Burdock
                        9.  Cheatgrass

BLM_0067336

**Horsefly Coordinated Weed Management Area Plan**

## I.   Introduction

The Horsefly Weed Management Area is 148,303 acres located on the southwest part of the Uncompahgre Plateau in western Colorado.  The Horsefly watershed, the main drainage of the Weed Management Area (WMA), starts on the west side of Horsefly Peak at 10,350 feet and drains westerly for over 30 miles into the San Miguel River at 6,100 feet in elevation.

The Horsefly WMA is located in Montrose County and contains 27,595 acres of private lands.  The majority of the private land is located at the top of the watershed making this unusual compared to the typical situation of federal lands at the higher elevations and private in the valley bottoms.   The Uncompahgre National Forest makes up the majority of the area at over 70%.  The Bureau of Land Management lands are located at the lower elevation of the watershed along the San Miguel River.

The watershed is very popular for outdoor activities, receiving abundant traffic from local, recreational and industrial uses. The private lands have been managed as rangelands for livestock and wildlife for several decades. An estimated 86% of private land is still classified as agriculture lands.  In the last decade, the highest and best value for the private land has trended toward subdividing ranches into 40 acres or less for second home development. The majority of the private lands owners are absentee owners.  Four subdivisions currently exist that contain around 50 homes with two others in the development stage.  It is estimated that there will be more than 600 homes in the next 20 years in the WMA.

The Uncompahgre Plateau itself is the watershed to four major drainages of the Colorado River: the Dolores, Gunnison, San Miguel and Uncompahgre Rivers.  The Uncompahgre Plateau (UP) Project is attempting to understand the impacts of human activity on the 1.5 million acre landscape and focus on ecosystem restoration in a manner that involves and best serves the interests of the local communities. Invasive species are a major non-native intrusion that prevents effective land restoration.   The vision for the Uncompahgre Plateau is to divide it into weed management areas that control and suppress the invasive species populations that are currently established, as well as to prevent new infestations.

## II.   Purpose of the WMA Plan

In 2005, a Uravan Mill Natural Resources Damage Fund Grant was awarded through Montrose County for natural conservation and reclamation through weed management.  Additional benefactors of the grant money include: the US Forest Service, the Nature Conservancy and the Bureau of Land Management.   The Uncompahgre Plateau (UP) Project received grant money from the National Forest Foundation and the USDA Forest Service to develop a Collaborative Weed

1

BLM_0067337

Management Area Plan and Treatment Program.  Because of the varied land status of the Uravan Area and the awarding of funds to the different land managers, it was agreed that resources would be pooled for a collaborative effort.

The area of interest determined by the partners was over a half million acres.  In order to develop a site specific plan and be able to start a program by 2006, the area was divided up into four WMAs with the Horsefly WMA being the first.  The boundary of the areas were developed using hydrologic divides and geographic features that had similar landscape characteristics, eliminating jurisdictional barriers.

The establishment of the WMA enhances and unites the partners for a weed program.  The partners collaboratively established the goals, objectives, and priorities for treatment in the WMA.  The partners are committed to helping each other accomplish a Coordinated Weed Management Area Plan using Integrated Weed Management techniques.

Integrated Weed Management (IWM) is a systems approach to the management of undesirable plants.  It involves the use of the best control techniques described for the target weed species in a planned, coordinated program to limit the impact and spread of the invasive species.   An IWM (as defined in the Federal Noxious Weed Act) is a: "system for the planning and implementation of a program, using an interdisciplinary approach, to select a method for containing or controlling an undesirable plant species or group of species using all available methods including: education, prevention, physical or mechanical methods, biological control agents, herbicide methods, cultural methods and general land management practices."

The value of using an IWM approach in a WMA is to make more efficient and effective use of limited resources by creating one weed management plan that focuses time, money and resources toward agreed upon priorities. By pooling resources available from the different partners in the group and eliminating political boundaries, we hope to prevent, contain, reduce, suppress, or eradicate invasive species in the Horsefly WMA.

Weed infestations are widespread and affect many aspects of our lives.  Weeds can drastically alter the ecological checks and balances that have developed over thousands of years.

**The Horsefly WMA Partners include:**

- Montrose County

- Montrose County Weed Commission

- Uncompahgre Valley Pest Control District

- Grand Mesa, Gunnison, Uncompahgre National (GMUG) Forest – Norwood District

- Bureau of Land Management – Uncompahgre Field Office

- CO State University Extension

- The Nature Conservancy

- The Uncompahgre Plateau (UP) Project

- Private Landowners

2

BLM_0067338

| Advantages of a Coordinated Weed Management Area Plan: |
| --- |

**Advantages of a Coordinated Weed Management Area Plan:**

- Encourages cooperation between agencies, private landowners, organizations, and interest groups.
- Increases the effectiveness of weed management by basing control efforts on biological and geographical factors rather than legal divisions.
- Creates the most effective and environmentally sound weed management plan for a geographic area.
- Establishes priority weed species within the individual WMA.
- Increases public awareness of the seriousness of invasive species.
- Facilitates the prevention of future weed infestations within the WMA.
- Combines the knowledge and resources of agencies, organizations and individuals involved.
- Identifies and prevents the spread of weeds into the WMA from neighboring areas.
- Offers a channel of communication for everyone involved.
- Provides the ability to secure and pool funds for weed programs.

Cheatgrass has so altered the fire regime of the Great Basin that re-establishing native plant communities in some areas is essentially impossible (Mosely et al. 1999). One study showed that runoff increased by 56% on areas infested by spotted knapweed and that sediment yield increased by 192% (Lacey et al. 1989). A Montana study showed a 98% decrease in elk use of a bunchgrass range and a 67% decline in carrying capacity after spotted knapweed took over (Hakim 1979). It is estimated that Russian knapweed has pushed out native plant species on more than a million acres of land in the United States (Whitson 1999). Some non-native species release substances in the soil that prevent re-establishment of native species. For example, tamarisk can increase the salinity of soils to the point that native willows and cottonwoods can no longer grow.

Numerous invasive species presently not found in the WMA are within striking distance. With the easy access to this WMA and the general increase of all types of activities, introduction of these invasive species will occur. A typical occurrence will be along roads and waterways, soil disturbances at construction sites, areas affected by wildfire, areas affected by resource management activities, residences, feeding areas for livestock, cultivated fields, recreation trailheads, and areas affected by improper grazing resulting in the decline of the healthy vegetation. It will take the eyes of everyone to protect the quality of life that we have enjoyed.

The Horsefly WMA contains an estimated 12,656 acres of inventoried invasive species. Many studies have documented the rate of spread to be 8 – 12 % per year for many invasive species. This translates to over 1,000 acres of additional lands being infested by invasive species annually within the WMA.

**Goals for the Horsefly WMA**

- Restore the species, age diversity and quality/productivity of native plant and animal communities by removing or preventing invasive species establishment.

- To facilitate a better understanding of the social and economic impacts of noxious weed invasions for the users, community leaders, landowners, developers, and resource managers.

3

- Increase and expand community, landowner and inter-agency involvement, education and collaboration regarding invasive species management.

- Develop and instill the understanding that Weed Prevention Best Management Practices need to be part of everyone's daily land ethics.

- Retain a healthy landscape that provides the goods and services that benefit our communities today and in the future.

- Be a good neighbor and contribute to accomplishing the objectives of the weed management plan.

## III.   Horsefly WMA Description

Horsefly Peak is the tallest peak on the Plateau at 10,350 feet and is the headwaters of the Horsefly WMA that flow to the west into the San Miguel River.  The Horsefly WMA also contains the following watersheds that flow directly into the San Miguel River: Clay Creek, Cottonwood Creek, and Little and Big Bucktail Creeks.  All of these drainages feed into the San Miguel River with the Horsefly drainage being the largest watershed.  Each of these drainages has created canyons that dissect the landscape at the lower elevations and form large mesas. Over 17 miles of the San Miguel River flow through the west part of the WMA.   The river's elevation at Montrose County line is 6,400 feet and 5,150 feet in elevation at the confluence of Big Bucktail Creek where it leaves the WMA.

The slope aspect of this landscape is west to southwest and this aspect has a strong influence on the moisture regime and therefore the vegetation. Along the San Miguel River pinyon pine and Utah juniper are generally the dominant vegetation types. Pinyon-juniper (PJ) communities give way to sagebrush, mountain shrub, and Gamble oak plant communities by 7,000 feet in elevation. Ponderosa pine dominates the over story on the mesas above 8,000 feet. Pine and Gamble oak are communities that are commonly found together and transition into aspen and open meadows at higher elevations. Slopes at the higher elevations that have the south and southwest aspect have a much drier moisture regime allowing the typical lower elevation plant communities to thrive. Even though Horsefly Peak is the highest point on

**WMA Boundary Description:**

Starting at Horsefly Peak the WMA follows the Horsefly hydrologic divide NW along the top of the Uncompahgre Plateau.  When it intersects with the South Divide Road (FDR 402) it follows this road until it intersects with the Hooser Road (FDR 603); then follow this road until it intersects with the Delta – Nulca Road (FDR 503); then it follows west along this road for approximately three miles until it intersects the main drainage of Big Bucktail Creek; then it turns south following down the creek bottom to the San Miguel River. The boundary crosses the river to the top of the ridge just above the river on the South side.  It follows the river up on the SW side until it intersects with Montrose / San Miguel county line. It then follows the county line east for 10 ½ miles were it intersects with the Horsefly hydrologic divide and follows it back to the top of Horsefly Peak.
(See map in Appendix 9a.)

4

BLM_0067340

the plateau the aspect allows for only a small percent of the spruce/fir plant communities.



**Horsefly WMA Boundary**

This WMA has some of the highest wild fire frequency on the Plateau.  In the PJ stands fires are infrequent, but are stand-replacing. Wildfires occurring in the ponderosa pine cover type are generally mixed in severity, but high in frequency. Fires burn as a ground fire in more open areas and then increase in intensity where tree stands are denser.  Fires typically are short in duration and last for only a few days.  The majority of the fires are caused by lightening.

The Uncompahgre National Forest represents 105,472 acres of the WMA and is managed by the Norwood District of the Grand Mesa, Uncompahgre, and Gunnison (GMUG) Forest.  The BLM is located along the San Miguel River with 15,236 acres and is managed by the Uncompahgre Field Office.  The private land represents over 25,595 acres with over 50% located in the upper part of the Horsefly watershed outside the National Forest Boundary.

5

BLM_0067341

The remaining private lands are categorized as in-holdings inside the National Forest and the BLM. Two large private in-holdings are located at Sanborn Park with about 1,980 acres and at Ute with about 2,500 acres of private land. The majority of these acres are still in agriculture. This area is made of flat to rolling hills and attracted early homesteaders. The common crops raised on these homesteads were hay for livestock and small grains production. Livestock and logging were the main cash crops.

The private lands are under more than 200 different ownerships. There are six (existing and/or proposed) subdivisions within the WMA: Horsefly, San Juan Ranch, Telluride Land CO, Paxton Lake, Cornerstone, and High Point Ranch. Approximately 50 residences currently exist in subdivisions in the WMA. Paxton Lake and Cornerstone are in the beginning phases of development and have been designed for approximately 540 homes collectively. There are over 600 approved lots and over 5,000 acres of land within the six subdivisions. It can be assumed that the majority of these lots will be improved upon within the next 20 years.

The WMA contains a high density of all types of public roads but more importantly is surrounded or dissected by graveled, collector roads that provide the main access across and to the south end of the Plateau. Three major routes have a Forest Highway designation across the Plateau: Delta/Nucla Road (FSR 503), the Sanborn/Dave Wood Road (FDR510) and Highway 90 (FDR 540). These routes provide direct access into the Horsefly WMA, are graveled, maintained for passenger cars, and have shown a steady increase in traffic volume for several years. These routes have not been plowed in the past years for winter travel except to Sanborn Park from the San Miguel River side. All other routes are closed by snow and traffic stopped at the lower elevations. The developments of the private property on the south end of the Plateau have been successful in getting Montrose County approval for plowing the Dave Wood Road down Sam's Road to highway 62 for all-year access.

The Average Daily Traffic counts have been monitored on these roads and show a significant and steady increase in traffic every year. The increase of traffic counts over the last 5 years has shown a 30 to 50% increase in traffic volume for all the roads. This trend will continue as local population increases, recreation use increases, and construction of second homes increases. Motorized trails are also common within the WMA and are defined as single track and/or ATV trails.

Recreational use on the Plateau has steadily changed over the decades. Hunting and fishing have been surpassed by ATVing, snowmobiling, mountain biking, river running, camping and sightseeing. The Uncompahgre Travel Management Plan has been completed for the National Forest part of the Plateau. It restricts motorized travel to designated routes for all motorized travel. This landscape is very open and user-created trails have increased many-fold over the last 10 years. These high concentration areas and trailheads are areas of high potential for new weed invasions.

6

Commercial logging has occurred for 130 years in the area. Ponderosa Pine was heavily logged during the settlement years. Aspen stands have been harvested in the last 15 years. Timber sales in general have decreased, but small sales of logs and firewood are common activities. Several ponderosa plantations have been planted over the years. The ponderosa pine forests were impacted by a substantial mountain pine beetle epidemic outbreak in the 80's and salvage harvesting followed.

Livestock grazing is the most common annual activity that has taken place on this WMA for the last 130 years. The higher elevations are seasonally grazed from June to October, while the lower elevations and some private lands have livestock present all year. The grazing practices have changed over the years to promote healthy, vigorous plant communities, but improper past grazing has caused the single most significant decline in healthy rangelands. It is estimated that native grasses make up less than 7% of the total canopy cover. Water rights to divert and store water for irrigation and livestock are an important part of the farming and ranching industry. The Forest Service has 12 allotments, 16 permittees, and 30,000 AUM's in the WMA. The BLM has 5 allotments, 4 permittees, and 1,066 AUM's.

Prominent wildlife species in this area include mule deer, elk, black bear, mountain lions, Merriam's turkeys, and a wide variety of other aquatic, reptile, avian, and mammal species. Wildlife species that are of concern at the federal or state level would be: Gunnison's sage grouse, Canada lynx and the river otter in the San Miguel River. Wildlife surveys and biological opinions are required for all proposed management practices on public lands to mitigate any impacts on these species.


## IV.    Objectives for the Horsefly WMA

The following objectives will be completed by the UP Project under the direction of the WMA Partners.

1. Initial Inventory:
   Will be completed from existing databases of the federal land managers, prior knowledge of weed infestations, and field reconnaissance by 11/1/2005. The data will be maintained in a GIS format with SW Data Center at www.southwestdata.org.

2. Mapping:
   Will be completed for each of the invasive species by 11/1/2005.

3. Coordinated Weed Management Area Plan:
   Will be completed for the Horsefly WMA by 2/15/2006. The Plan will set the priorities and strategies for management of invasive species.

4. Weed Prevention Best Management Practices:

7

Will be developed by 12/20/05 as part of the Weed Management Plan and used as outreach efforts.

5.  Operating Plan:
    Will be developed for implementing the Coordinated WMA Plan for the next three years by 4/1/2006.

6.  Private Land Cost-Share Program:
    Will be developed for implementation by 4/1/2006.

7.  Reporting:
    Will be submitted each year by December 1 by the WMA partners summarizing the project's accomplishments.

8.  Monitoring:
    Of the treatment activities and invasive species infestations will take place periodically and used to improve or make changes in the inventories and strategies within the Operating Plan.

9.  Program Effectiveness:
    Will be evaluated each year by the WMA Partners with changes or modifications to the plan made by March 1 of the next year.

## V.    Weeds of Concern in the Horsefly WMA

The State of Colorado defines a noxious weed as a non-native species to the state that meets one or more of the following criteria:

(a) Aggressively invades or is detrimental to economic crops or native plant communities;
(b) Is poisonous to livestock;
(c) Is a carrier of detrimental insects, diseases or parasites; or
(d) The direct or indirect effect of the presence of this plant is detrimental to the environmentally sound management of natural or agricultural ecosystems.

The State of Colorado has classified noxious weeds into three prioritized categories or lists (List A, B and C).

- List A Species
  List A noxious weeds have minimal distributions or have not yet been detected within the state.  They have demonstrated an ability to spread rapidly or cause significant harm.  Eradication is the mandatory management objective.

8

BLM_0067344

- List B Species
  List B noxious weed species have varying distribution within the state and are subject to eradication, containment or suppression. The development and implementation of noxious weed management plans designed to stop the continued spread of these species is mandated.  If possible, eradication of the species is most desirable.

- List C Species
  List C noxious weed species are the lowest priority because their populations are widespread throughout the state. If possible, suppression of the species is most desirable.

1. **List of High Priority Invasive Species within the Horsefly WMA**

   - Spotted knapweed. State List B.
     - State requires that all populations be eliminated prior to seed development by 2006 in all counties except for La Plata.
   - Russian knapweed. State List B.
   - Tamarisk (Saltcedar). State List B.
     - State requires elimination of all populations above the confluence of Horsefly Creek and the San Miguel River.
   - Whitetop (Hoary Cress). State List B.
   - Oxeye daisy. State List B.
   - Houndstongue. State List B.
   - Russian Olive. State List B.

2. **List of Other Priority Invasive Species within the Horsefly WMA**

   - Musk thistle.  State List B.
   - Bull thistle.  State List B.
   - Canada thistle.  State List B.
   - Chicory.  State List C.
   - Burdock.  State List C.
   - Cheatgrass.  State List C.

3. **Species on the Early Detection – Rapid Response list**

   - Purple loosestrife.  State List A.
   - Yellow starthistle. State List A.
   - Leafy spurge. State List B.
   - Yellow toadflax. State List B.

BLM_0067345

Horsefly Coordinated Weed Management Area Plan

### VI.    Priorities For Weed Management

A valid management strategy is to start at the top of the watershed and move down stream to prevent infestations of weed species being disturbed by water movement or human activities.  The Horsefly WMA; however, is open on every boundary with roads, waterways and with many private land in-holdings.  Therefore, having an anchor point and working outward from this will not be practical strategy.  It becomes necessary to let the following priorities direct the program to achieve the goal of retaining and maintaining healthy plant communities for future generations.

The following priorities were developed for the invasive species in the WMA because limited resources need to be focused on those weed species which have the greatest impact to our well being and those which become more difficult to control if action is delayed. Weeds with a propensity to spread to other uninfected areas have been given a high priority for immediate treatment with the goal of containment.

Some landowners may have only one or two low priority noxious weed species on their property. In this case it may be feasible to control any and all the noxious weeds on the property. At the other extreme, weed infestations may be extensive on a property, prompting one to decide which weed species are most important to control. Anytime treatment is being accomplished for an area, all noxious weeds should be treated while you are at the site. In general, weed species that are rare on the WMA or have a small isolated infestation should be eradicated while large populations of common weed species should be contained with a long-term plan.

---

**The priorities for the Horsefly WMA are as follows:**

1. **Implement Weed Prevention Best Management Practices (BMPs)**
2. **Keep Inventoried Weed Free Areas – Weed Free**
3. **Implement Early Detection – Rapid Response**
4. **Eradicate or suppress invasive species along roadsides, ditches, gravel pits, utility Row's, livestock concentration areas, high use areas and critical areas.**
5. **Eradicate or suppress inventoried small, isolated infestations of High Priority species**
6. **Eradicate or suppress inventoried small, isolated infestations of Other Priority species**
7. **Manage large infestations of High Priority species by area**
8. **Manage large infestations of Other Priority species by area**

---

10

BLM_0067346

Horsefly Coordinated Weed Management Area Plan

## VII.    Integrated Weed Management Techniques (IWM):

The partners have organized the invasive species present in the Horsefly WMA into priority categories in Section V and agreed upon the "Priorities for Weed Management" in Section VI.  With the inventories of these invasive species and knowledge of the effective Weed Management strategies for the individual species, one can determine the general management control objective of eradication, suppression or containment. The above priorities were taken and each known species infestation was applied to this list to create specific Integrated Weed Management Techniques. Because prevention measures will be the most cost effective and ecologically sound techniques to employ, the top three priorities are prevention techniques.  The following six steps are active management strategies.

An integrated weed management approach attempts to focus on using multiple techniques to control the spread of invasive species and, therefore, in the long run will lead to greater success compared to simply focusing on controlling weeds without a special strategy.  (See Detailed IWM Techniques in Appendix 5.)  Small, isolated infestations are managed differently than large, dense infestations.  The small infestations are less than 1/10th of an acre and the IWM techniques are recommended in Categories 5 and 6 of this Section.  The large area infestations have been delineated and the IWM techniques for these infestations are recommended in Categories 7 and 8 of this Section.


**Priority #1:  Implement Weed Prevention Best Management Practices:**

Develop an Outreach Plan to educate users on BMPs.  Pamphlets will be created and distributed to the various user groups.  Representatives of the UP Project will speak to user groups regarding the importance of weed infestation prevention. BMP flyers will be posted at major trailheads and other locations within the WMA where signage currently exists.  (See Appendix 1 for BMPs)

1. Public Land User Groups
2. Home Owner Associations
3. Real Estate Industry
4. Utility / Energy Companies
5. Federal Resource Managers–All Levels
6. County Departments: Weed/Road/Planning
7. Public Land Permit and/or Easement Holders

**Priority #2:  Keep Inventoried Weed Free Areas – Weed Free**

There are areas within the Horsefly WMA that are not infested with invasive weeds.  With the knowledge that prevention is the most cost effective strategy,

11

BLM_0067347

Horsefly Coordinated Weed Management Area Plan

---

**Early Detection Species for 2006:**

- Purple loosestrife
- Yellow starthistle
- Leafy spurge
- Yellow toadflax

---

**Definitions:**

- Tap-root:
  A primary root that grows vertically downward and gives off small lateral roots.

- Rhizome:
  A thick underground horizontal stem that produces roots and has shoots that develop into new plants.

- Annual:
  A plant that flowers, produces seed, and dies in one growing season.

- Biennial:
  A plant that lives for two years and produces flowers and fruit in the second year.

- Perennial:
  A plant that last for more that two growing seasons.

---

these areas will be viewed as priority areas. Any weed infestations within these areas will be treated immediately.

1. Determine and map general weed free areas.
2. Identify responsible party for early detection of all invasive species and deliver Weed Free maps to these individuals.
3. Assign contact persons to confirm species, denote GIS location and submit information to the inventory data base:
   i. Montrose County: Laurie Felix  (All private lands, county roads, and special use areas such as gravel pits.)
   ii. Bureau of Land Management: Dean Stindt
   iii. USFS – Norwood District: Brian Hoefling
4. Implement Rapid Response with eradication objective by public land manager, private landowner, homeowner association, and county.
5. Report treatment by 11/20 each year.

**Priority #3:  Implement Early Detection – Rapid Response**

All species on the Early Detection List will be eradicated upon detection within the WMA.  The strategy is to prevent these species from producing a seed crop.

A. Determine and specify in the Operating Plan species to be included in this category annually. Each year three to four new species will be highlighted.
B. Assign responsibility for early detection of all invasive species to: permittee's, landowners, user groups, government works, contractors, etc.
C. Assign contact persons to confirm species, denote GIS location and submit information to the inventory data base:
   Montrose County: Laurie Felix (All private lands, county roads, and special use areas such gravel pits.)
   Bureau of Land Management: Dean Stindt
   USFS – Norwood District: Brian Hoefling
D. Implement Rapid Response with eradication objective by public land manager, private landowner, homeowner association, and county.
E. Monitor the site periodically.
F. Report treatment by 11/20 each year.

12

BLM_0067348

**Management Strategies:**

• Eradicate:
Complete elimination of all weed plants including: live roots, rhizomes and seeds. Eradicating a weed species on a given site is very difficult and could take more than one year and/or several treatments.

• Suppress:
Reduction of the abundance of a weed species - typically as measured or estimated in terms of canopy cover or plant density.

• Contain:
Confinement of an infestation to prevent expansion. It does not mean reducing the current infestation in terms of canopy cover or plant density.

• **Small Infestations:**
1/10th acre or less. These species have been delineated and are addressed in Priority 5 and 6.

• **Large infestations:**
Over 1/10th acre. These species have been delineated and are addressed in Priority 7 and 8.

G. Reward private citizens on the identification of new infestations of invasive species on the Horsefly Early Detection List and the Colorado State List A.

**Priority #4:  Eradicate or suppress invasive species along roadsides, ditches, gravel pits, utility ROW's, livestock concentration areas, high use areas, and critical areas**

The Horsefly WMA contains a high density of roads, heavy traffic volume, resource management activities and real estate development.  These areas have a high potential for the infestation and spread of noxious weeds.

A. Delineate these sites on a map.
B. Assign responsible party by site.  Each party defines the species needing treatment.
C. Develop treatment schedule – (See Appendix 3 for IWM for each species.)  Schedule multiple treatments that accomplish specific, effective control needs for the species present.
D. Monitor sites periodically
E. Report treatment by 11/20 each year.

**Priority #5: Eradicate or suppress inventoried, small, isolated infestations of High Priority species.**

Eradication or suppression of small infestations will save considerable time and money in the future. Each species growth characteristics, keys to control, and appropriate control actions are in Appendix 3.

**Spotted knapweed:** (see map in Appendix 9.c.1.)
1. Management Objective: Eradication of all isolated infestations.
2. Area of eradication:  Entire WMA except for the known large infestations in the Ute Area.
3. Biological Characteristics: It is a tap-rooted perennial plant that reproduces only by seed.  Seed is viable for up to eight years. Plant grows as rosette for at least one year while root growth occurs.
4. Controls: Herbicides or mechanical methods will be used.  Hand pulling of small infestations may also be employed, ensuring that the entire plant, including the root, is pulled out.  Seed production will be controlled.

13

BLM_0067349

---

**High Priority Species:**

- Spotted knapweed

- Russian knapweed

- Tamarisk (Saltcedar)

- Whitetop

- Oxeye daisy

- Houndstongue

- Russian Olive

**Directory of Maps:**
(Appendix 9)

a. Boundary of Horsefly WMA
b. High Priority Areas
c. Map of Current Infestations by Species
   1. Spotted knapweed
   2. Russian knapweed
   3. Tamarisk (Saltcedar)
   4. Whitetop (Hoary Cress)
   5. Oxeye Daisy
   6. Houndstongue
   7. Musk, Bull, Canada thistle
   8. Chicory
   9. Burdock
   10. Cheatgrass

**Russian knapweed**: (see map in Appendix 9.c.2.)
1. Management Objective: Eradication of all isolated infestations.
2. Area of eradication:  Entire WMA except for the known large infestations in the San Miguel and Pinion Areas.
3. Biological Characteristics: Plant is a deep-rooted rhizomatous perennial.  It reproduces primarily by the root system, secondarily by seed.  It is very persistent and a strong competitor in disturbed areas.  The seed is viable for up to eight years.
4. Controls: Herbicides will be used on isolated infestations. Spraying beyond the immediate area of individual plants will be done to combat extensive rhizomatous system.

**Tamarisk (Saltcedar):** (see map in Appendix 9.c.3.)
1. Management Objective: Eradication of all infestations outside the San Miguel River corridor.
2. Area of eradication:  Entire WMA except for the known large infestations in the San Miguel River corridor.
3. Biological Characteristics: Tamarisk is a small tree that reproduces from seed, the root crown, rhizomes, and submerged or buried stems.
4. Controls: Plants will be treated with an herbicide applied directly to the foliage. It is known that the best method of control is to cut the tree at the base and immediately apply a herbicide to the cut portion of the stump.  Isolated trees may be dug or pulled up- removing the entire root system.

**Whitetop  (Hoary Cress):** (see map in Appendix 9.c.4.)
1. Management Objective: Suppression of small infestations.
2. Area of suppression:  Entire WMA above 7,500 in elevation.
3. Biological Characteristics: Whitetop is a deep-rooted  rhizomatous  perennial.   The plant reproduces by seed or the root system.  Seeds are viable for up to three years.

BLM_0067350

4. Controls: Herbicides will be used on isolated infestations. Disturbed areas will be replanted with desirable plant species, establishing a healthy plant community.

**Oxeye Daisy:** (see map in Appendix 9.c.5.)
1. Management Objective: Suppression of small infestations.
2. Area of suppression:  Entire WMA above 7,500 in elevation.
3. Biological Characteristics: Oxeye daisy is a perennial that reproduces from seed and short rootstocks.  The seed is viable for at least 3 years.
4. Controls: Herbicides will be used on isolated infestations. Hand pulling or digging made be used for small infestations as long as the entire plant and roots are removed. Nitrogen fertilizer may be applied-promoting the growth of grasses that can out compete oxeye daisy. Disturbed areas will be replanted with desirable plant species, establishing a healthy plant community.

**Houndstongue:** (see map in Appendix 9.c.6.)
1. Management Objective: Suppression of small infestations.
2. Area of suppression:  Entire WMA outside of the Hands Valley area.
3. Biological Characteristics: Houndstongue is a tap-rooted biennial. Eliminating the seed production and depleting the seed bank are the keys to controlling a biennial species.  Seed has burs that stick to fur or clothing and may be widely dispersed.
4. Controls: Herbicide will be applied in the spring and fall to control the rosettes.  When applicable, plants will be mechanically removed before they flower and produce seed.

**Russian Olive**
1. Management Objective: Eradication of all isolated infestations.
2. Area of eradication: The entire WMA.
3. Biological Characteristics:  Russian olive is a small tree or shrub.  It is a deep rooted perennial.  Reproduces by seed or vegetatively from stump sprouts, stem cuttings and root pieces.  Seed can remain viable for up to three years.  Russian olive grows well and becomes invasive in wet-saline environments and certain riparian environments.
4. Controls:  Top growth will be removed and re-growth suppressed.  After cutting, the stumps will be removed or treated to prevent re-sprouting.

**Priority #6:  Eradicate or suppress inventoried, small, isolated infestations of Other Priority species**
Eradication or suppression of small infestations will save considerable time and money in the future. Each species growth characteristics, keys to control, and appropriate control actions are in Appendix 3.

**Musk thistle:** (see map in Appendix 9.c.7.)
1. Management Objective: Eradication of all isolated infestations.

15

**Other Priority Species:**

- Musk thistle
- Bull thistle
- Canada thistle
- Chicory
- Burdock
- Cheatgrass

**What would success look like in 5 years?**

- Early Detection and Rapid Response eradicate all new infestations of new invasive species.
- Weed Free Areas have increased in size.
- Inventoried acres of existing infestations have declined in size and a reduction in canopy cover or plant density has been demonstrated.
- Weed Prevention BMP's are common practices. Because motorized travel and waterways are the most common agents for spreading weeds these areas become important for treatment.

2. Area of eradication: The entire WMA.
3. Biological Characteristics: Musk thistle is a tap rooted biennial. Musk thistle reproduces solely by seed. Seed remains viable for up to 10 years.
4. Controls: Herbicide will be applied in the spring and fall to control the rosettes. When applicable, plants will be mechanically removed before they flower and produce seed. Disturbed areas will be replanted with desirable plant species, establishing a healthy plant community.

**Bull Thistle:** (see map in Appendix 9.c.7.)
1. Management Objective: Eradication of all isolated infestations outside of the Spring Creek area.
2. Area of eradication: The entire WMA outside of the Spring Creek area.
3. Biological Characteristics: Bull thistle is a tap rooted biennial. Bull thistle reproduces only by seed. Seed may remain viable for three years.
4. Controls: Herbicide will be applied in the spring and fall to control the rosettes. When applicable, plants will be mechanically removed before they flower and produce seed. Disturbed areas will be replanted with desirable plant species, establishing a healthy plant community.

**Canada Thistle:** (see map in Appendix 9.c.7)
1. Management Objective: Suppression of isolated infestations.
2. Area of suppression: Entire WMA.
3. Biological Characteristics: Canada thistle is a deep-rooted rhizomatous perennial. Seed is dispersed by wind. The majority of seeds are viable for at least three years. Plants are dioecious (male and female flowers are produced on separate plants).
4. Controls: Suppression of isolated infestations of Canada thistle would primarily be done with herbicides. Mowing of Canada thistle will eliminate seed production but will not eliminate the plant because the root system is still intact.

**Chicory:** (see map in Appendix 9.c.8.)
1. Management Objective: Eradication of isolated infestations.

16

2. Area of eradication:  Entire WMA outside of known large infestations in the San Miguel River drainage.
3. Biological Characteristics: Chicory is a tap-rooted perennial plant.  It reproduces solely by seed.
4. Controls: Chicory will be controlled by cutting, mowing, or pulling plants before seed production.  Cultural control will be conducted several times a year over several years to exhaust the root reserves.  Herbicides will also be used to control chicory. Disturbed areas will be replanted with desirable plant species, establishing a healthy plant community.

**Burdock:** (see map in Appendix 9.c.9.)
1. Management Objective: Eradication of isolated infestations outside of the San Miguel River drainage.
2. Area of eradication:  Entire WMA outside of known large infestations in the San Miguel River drainage.
3. Biological Characteristics: Burdock is a biennial that reproduces entirely by seed.  Because it is a biennial, it is important to eliminate seed production and seed in the seed bank.  Seed has burs that stick to fur or clothing and may be widely dispersed.
4. Controls: Herbicides will be applied before seed production to control the spread of the weed.  First year rosettes will be pulled or the plant mowed after it has bolted to eliminate seed production.

**Cheatgrass:** (see map in Appendix 9.c.10)
1. Management Objective:  Treatment of small infestations in coordination with the treatment of other invasive species.
2. Area of treatment: Entire WMA
3. Biological Characteristics: Cheatgrass is an annual grass that reproduces by seeds.  It is characterized by early maturation, high seed production, and vigorous growth in disturbed areas.
4. Control: Maintaining healthy desirable plant communities will help reduce the spread of cheatgrass.

**Priority # 7:  Manage large infestations of High Priority species by area**
It is not possible to eradicate large infestations of High Priority species in the first year of treatment.  Therefore, a multi-year strategy must be used.  The short-term objective is to manage and contain High Priority species that have a propensity to spread.   The long-term objective is the eradication of High Priority species within the entire WMA.

**Spotted knapweed:** (see map in Appendix 9.c.1.)
1. Management Objective: Containment of the large infestation inside of the Ute Area.
2. Area of containment:  Entire Ute Area: north of Old Highway 90, east of FSR 605, west of Hanks Valley Trail Road, and south of FSR 603.

17

BLM_0067353

3. Status: Spotted knapweed has been inventoried in the Ute area along the natural gas pipe line and into the forest plantations on USFS land. It is estimated that spotted knapweed has a canopy cover of between 10% and 20% on USFS land.

4. Control: Herbicides will be used to contain large infestations.  There are no known biocontrol agents for spotted knapweed. Fire may be used to reduce spotted knapweed.

**Russian knapweed:** (see map in Appendix 9.c.2.)

1. Management Objective: Containment of all large infestations inside of the Pinion and San Miguel areas.

2. Area of containment:  Two areas along the San Miguel River corridor have been mapped. The first area is the San Miguel area.  The area's northern boundary will be the USFS and BLM boundaries, the southern boundary will be the southern boundary of the WMA, on the east side the boundary will be the Montrose country line at the BLM and FS boundary between Section 17 and 18 in R12W and T45N, the west boundary will be the WMA boundary in Sections 3, 4 in R13W and T45N.  The second area is the Pinion area.  The northern boundary is the BLM and FS boundary to Big Bucktail Creek and south to the southern WMA boundary, this will include the private land in Section 6 R13W and T46N and Section 1 in R14W and T46N, the southern boundary will be the WMA boundary.

3. Status: Most of the inventoried Russian knapweed infestations are along the San Miguel River and the lower Cottonwood Creek drainage. The irrigated land downstream from Pinion has Russian knapweed infestations.  The canopy cover ranges from 0% to 100%.  The CC ditch below Pinon has a canopy cover of 100%.

4. Control: Herbicides will be used to contain large infestations. To prevent Russian knapweed from spreading, competitive grasses will be seeded in disturbed areas.  There are no known biocontrol agents for Russian knapweed.

**Tamarisk (Saltcedar):** (see map in Appendix 9.c.3.)

1. Management Objective: Eradication of all large infestations.

2. Area of containment:  San Miguel River corridor.

3. Status: The Nature Conservancy has developed a plan to treat tamarisk along the San Miguel River corridor.  The following as an excerpt from their publication:

*The project's goal is to establish the San Miguel as the only naturally functioning, non-native tree-free river in the Upper Colorado River Basin, through federal, state and private landowner partnership activities.*

*The eradication effort involves assigning trained crews and leaders to different tributaries. The crew starts at the upstream reach of tamarisk infestation for each tributary and works*

BLM_0067354

*downstream on all properties where private landowners have allowed permission for the removal of non-native trees. Crews use the cut-stump method of eradication because it is the most effective and protects desirable native vegetation. This method requires cutting down all non-native trees and applying the herbicide Garlon 4 directly to the cut tamarisk, olive, and elm stumps. Cut trees will be left in brush piles or run through a chipper where possible. The Nature Conservancy will conduct follow-up work within twelve months, but long-term control will be the responsibility of landowners.*

4. Control: Herbicides will be used to contain large infestations. There are two insects that show promise to control and, therefore, may be used. Fire may be used to open dense stands so that treatment can be done.

**Whitetop (Hoary Cress):** (see map in Appendix 9.c.4.)
1. Management Objective: Containment of large infestations.
2. Area of containment:  The WMA below 7,500 in elevation.
3. Status:  Inventories will be made in Spring 2006.
4. Control: Herbicides will be used to contain large infestations.  There are no known biocontrol for whitetop.

**Oxeye Daisy:** (see map in Appendix 9.c.5.)
1. Management Objective: Containment of large infestations.
2. Area of containment:  The WMA below 7,500 in elevation.
3. Status:  Inventories will be made in Spring 2006.
4. Control: Herbicides will be used to contain large infestations. There are no known biocontrol agents for oxeye daisy.

**Houndstongue:** (see map in Appendix 9.c.6.)
1. Management Objective: Containment of large infestations.
2. Area of containment: Hanks Creek, Clear Creek, and Horsefly Creek drainages.
3. Status: The boundaries are Horsefly Creek on the south, Red Canyon on the west, Divide and South Divide Roads on the north, and the Dave Wood Road on the east.
4. Control: Herbicides will be used to contain large infestations. Maintaining a healthy population of desirable perennials is the best way to prevent the establishment and spread of houndstongue.  There are no known biocontrol agents for houndstongue.

**Russian Olive**
There are no large inventoried infestations of Russian olive in the WMA.

BLM_0067355

**Priority #8:  Mange large infestations of Other Priority species by area**
It is not possible to suppress large infestations of Other Priority species in the first year of treatment.  Therefore, a multi-year strategy must be used.  The short-term objective is to manage and contain these species. The long-term objective is the suppression of these species within the entire WMA.

**Musk Thistle:** (see map in Appendix 9.c.7.)
There are no large inventoried infestations of musk thistle in the WMA.

**Bull Thistle:** (see map in Appendix 9.c.7.)
1. Management Objective: Containment of large infestations.
2. Area of containment:  Clear Creek area.
3. Status: Inventoried areas of bull thistle are in Sections 14, 15, 22, 23, 26, 27 in R11W and T46N- north of the Hanks Creek Road.
4. Controls for large infestations: Insects will be released in the center of the Spring Creek area. An insect can be released that may reduce seed production by 80% on bull thistle.  Bull thistle will be contained on the perimeter of the area with herbicides.  Once this is accomplished, we will begin working toward the center of the area with herbicides.  These areas have been clear-cut of aspen.  Cultural control methods will not be used due to the amount of slash on the ground.

**Canada Thistle:** (see map in Appendix 9.c.7.)
1. Management Objectives: Containment of large infestations.
2. Area of containment: Entire WMA.
3. Status:  Canada thistle is the noxious weed with the largest population in the WMA.
4. Controls of large infestations: This weed will be treated when other weeds are being treated in the same area.  Canada thistle will be contained to keep from spreading. Seed production will be limited by the use of insects or mowing the plant several times a year. There are insects that provide limited control of Canada thistle.   Any large area will be treated with herbicides from the outside of the infestation toward the center of the infestation.

**Chicory:** (see map in Appendix 9.c.8.)
There are no large inventoried infestations of chicory in the WMA.

**Burdock:** (see map in Appendix 9.c.8.)
There are no large inventoried infestations of burdock in the WMA.

**Cheatgrass:** (see map in Appendix 9.c.10)
1. Management Objective; Containment of large infestations.
2. Area of containment: Entire WMA.
3. Status:  Cheatgrass is widespread throughout the WMA. Disturbances (fire, roads, etc.) have led to the spread of cheatgrass.

BLM_0067356

4. Control: An integrated approach will be used on large infestations of cheatgrass. Maintaining healthy desirable plant communities will also help reduce the spread of cheatgrass.

**Mitigation measures to be considered if IWM Techniques have not been successful in 3 years.**

- High infestations of high priority species (40% or greater canopy cover) in an area mean a loss in carrying capacity. Grazing by domestic livestock will be prevented in order to allow native vegetation to increase in vigor after weed treatment strategy has been implemented.

- Trails, trailheads, and secondary roads with high infestations of high priority species will be closed to public until treatment objectives can be met.

- The County will develop a penalty for developers not following their Noxious Weed Plan and Best Management Practices.

- Vegetation treatments (prescribed fire, shrub manipulation, reforestation, logging, range improvements) will not be authorized by federal line officers if invasive species are present and have not been treated to prevent their spread.

- Livestock movement from infested rangelands to weed free areas will be restricted.

- All disturbed areas will be seeded using desirable species that provide forage or cover for wildlife, protect soil, and prevent weed infestations.

- Any hay/straw or mulch used in the WMA will be certified and tagged as noxious weed or noxious weed seed free.

- All seed sources used in the WMA will be certified and tagged as noxious weed seed free.

- Livestock grazing will be scheduled to avoid weed seed dispersal.

BLM_0067357

Horsefly Coordinated Weed Management Area Plan

**VIII. Appendix**
1.  Best Management Practices Flyer
2.  Early Detection Flyer
3.  Resources and References
4.  List of Invasive Species – Best Management Strategies for Each Species
5.  Contacts for team members
6.  Integrated Weed Management Techniques
7.  Annual Operating Plan
8.  Monitoring Techniques
9.  Reporting Form
10. Cost Share Program for Montrose County West End
11. Maps
- I.      Boundary of Horsefly WMA
- I.      High Priority Areas
- II.     Map of current infestations by species
  1.  Spotted knapweed
  2.  Russian knapweed
  3.  Tamarisk (Saltcedar)
  4.  Whitetop
  5.  Oxeye daisy
  6.  Houndstongue
  7.  Musk, Bull and Canada thistle
  8.  Chicory
  9.  Burdock
  10. Cheatgrass

22

# *Tabeguache Coordinated Weed Management Area Plan 2007*





**Prepared by:**
The Uncompahgre Plateau (UP) Project

**In coordination with**:
Montrose County
U.S. Forest Service – GMUG Forest
Bureau of Land Management – Uncompahgre Field Office
Colorado State University Extension

BLM_0067359

BLM_0067360

The Tabeguache Coordinated Weed Management Area Plan is a collaborative effort to restore the species, age diversity and quality/productivity of native plant and animal communities by removing or preventing invasive species establishment within the WMA. The Tabeguache WMA Partners have united in the development of this plan to meet the interests and needs of everyone involved.

_____
Barbara Sharrow, Field Office Manager
Uncompahgre Field Office
Bureau of Land Management

_____
Judy Schutza, Norwood District Ranger
Grand Mesa, Uncompahgre, and Gunnison National Forests
U.S. Forest Service

_____
Bill Patterson, County Commissioner
Montrose County

_____
Jim Free, Technical Coordinator
Uncompahgre Plateau Project

BLM_0067361

BLM_0067362

**Tabeguache Coordinated Weed Management Area Plan**

**Table of Contents:**

| | | |
|---|---|---|
| I. | Introduction | p. 1 |
| II. | Purpose of the WMA Plan | p. 2 |
| | Goals for the Tabeguache WMA | p. 3 |
| III. | Tabeguache WMA Description | p. 4 |
| IV. | Objectives for the Tabeguache WMA | p. 7 |
| V. | Weeds of Concern in the Tabeguache WMA | p. 8 |
| VI. | Priorities For Weed Management | p. 9 |
| VII. | Integrated Weed Management Techniques | p. 10 |
| VIII. | Possible Mitigation Measures | p. 20 |
| IX. | Appendix | p. 22 |
| | A. Best Management Practices Flyer | p. 24 |
| | B. Early Detection Flyer | p. 26 |
| | C. Resources and References | p. 28 |
| | D. List of Invasive Species – Best Management Strategies for Each Species | p. 29 |
| | E. Contacts for Team Members | p. 76 |
| | F. Integrated Weed Management Techniques | p. 77 |
| | G. Annual Operating Plan | p. 93 |
| | H. Monitoring Techniques | p. 112 |
| | I. Reporting Form | p. 114 |
| | J. Cost Share Program for Montrose County West End | p. 116 |
| | K. Maps | |
| |    1. Boundaries of current WMAs | p. 122 |
| |    2. Map of current infestations within the Tabeguache WMA by species | p. 124 |

BLM_0067363

**The Tabeguache WMA Partners include:**

- Montrose County

- Montrose County Weed Commission

- Uncompahgre Valley Pest Control District

- Grand Mesa, Gunnison, Uncompahgre National (GMUG) Forest – Norwood District

- Bureau of Land Management – Uncompahgre Field Office

- CO State University Extension

- The Nature Conservancy

- The Uncompahgre Plateau (UP) Project

- Private Landowners

## I.    Introduction

The Tabeguache Weed Management Area (WMA) consists of 213,816 acres located on the southwest part of the Uncompahgre Plateau in western Colorado. The WMA is in Montrose County and is bound on the west by the San Miguel and Lower Dolores Rivers and extends eastward to the hydrologic divide on top of the Uncompahgre Plateau. The area extends southward from the Mesa County line on the North to the town of Naturita on the South.   The WMA is comprised of all or parts of three Level 5 watersheds: Mesa Creek, Atkinson Creek, and Tabeguache Creek.

The majority of the WMA is public lands: 97,862 acres of BLM administered by the Uncompahgre Field Office and 81,640 acres of the Grand Mesa, Uncompahgre & Gunnison (GMUG) National Forest, administered by the Norwood and the Grand Valley Districts. The WMA encompasses 34,314 acres of private lands.  The private lands are located mainly along the rivers, streams and on the mesas above the San Miguel River. Agriculture crops are raised where irrigation water can be delivered. The CC ditch is diverted from the San Miguel River and is the major source of water for agriculture irrigation. The CC ditch is approximately 15.8 miles from its head gate to the Nucla Reservoir.  It crosses mainly BLM administered lands. Nucla also receives its domestic water from this water diversion system.  The CC ditch feeds into 26.6 miles of lateral ditches that deliver water to agriculture property on First and Second Mesas.

An open pit coalmine is located adjacent to the Town of Nucla. The coal produced is used in the Tri-State Power Plant located at the south end of the WMA along the San Miguel River. Uravan is located along the lower San Miguel River, and has seen extensive Uranium mining activity.   Reclamation of soil disturbances from 50 years of Uranium mining has been taking place for several years.   Uranium has become a mineral of interest again in the 21st century and exploration has begun again within the WMA along with several leases for oil and gas exploration.

The WMA contains 17,278 acres of the Tabeguache Special Management Area located in the headwaters of Tabeguache drainage, designated by Congress with specific management direction similar to wilderness management.

BLM_0067364

The Uncompahgre Plateau itself is the watershed to four major drainages of the Colorado River : the Dolores, Gunnison, San Miguel and Uncompahgre Rivers. The UP Project is attempting to understand the impacts of human activity on the 1.5 million acre landscape and focus on ecosystem restoration in a manner that involves and best serves the interests of the local communities. Invasive species are a major non-native intrusion that prevents effective land restoration. The vision for the Plateau is to divide it into Weed Management Areas that control and suppress the invasive species populations that are currently established, as well as prevent new infestations.

## II.      Purpose of the WMA Plan

In 2005, a Uravan Mill Natural Resources Damage Fund Grant was awarded through Montrose County for natural conservation and reclamation through weed management. Additional benefactors of the grant money included: the US Forest Service, the Nature Conservancy and the Bureau of Land Management. The Uncompahgre Plateau (UP) Project received grant money from the National Fish and Wildlife Foundation "Pulling Together" Grant and Center for Invasive Plant Management Grant to develop a Coordinated Weed Management Area Plan and Treatment Program for this area. Because of the varied land status of the Uravan Area and the awarding of funds to the different land managers, it was agreed that a collaborative effort was needed in order to accomplish an effective and efficient program.

The area of interest determined by the partners was nearly a half million acres. In order to develop a site-specific plan and be able to start a program by 2006, the area was divided up into Weed Management Areas (WMA). The boundaries of the areas were developed using hydrologic divides and geographic features that had similar landscape characteristics, eliminating jurisdictional boundaries. The three WMAs are: Horsefly, Tabeguache, and Paradox.

The establishment of the WMA enhances and unites the partners for the development of a weed management program. The partners collaboratively established the goals, objectives, and priorities for treatment in the WMA. The partners are committed to helping each other accomplish a Coordinated Weed Management Area Plan using Integrated Weed Management techniques.

Integrated weed management (IWM) is a systems approach to management of undesirable plants. It involves the use of the best control techniques described for the target weed species in a planned, coordinated program to limit the impact and spread of the invasive species. An IWM (as defined in the Federal Noxious Weed Act) is:

> *"A system for the planning and implementation of a program, using an interdisciplinary approach, to select a method for containing or controlling an undesirable plant species or group of species using all*

BLM_0067365

*available methods including: education, prevention, physical or mechanical methods, biological control agents, herbicide methods, cultural methods and general land management practices".*

The value of using an IWM approach in a WMA is to make more efficient and effective use of limited resources by creating one weed management plan that focuses time, money and resources toward agreed upon priorities. By pooling resources available from the different partners in the group and eliminating political boundaries, we hope to prevent, contain, reduce, suppress, or eradicate invasive species in the Tabeguache WMA.

Weed infestations are widespread and affect many aspects of our lives. Weeds can drastically alter the ecological checks and balances that have developed over thousands of years. Cheatgrass has so altered the fire regime of the Great Basin that re-establishing native plant communities in some areas is essentially impossible (Whisenant 1989, Mosely et al. 1999). A spotted knapweed study showed that runoff increased by 56% on areas infested by spotted knapweed and that sediment yield increased by 192% (Lacey et al. 1989). A Montana study showed a 98% decrease in elk use of a bunchgrass range and a 67% decline in carrying capacity after spotted knapweed took over (Hakim 1979). It is estimated that Russian knapweed has pushed out native plant species on more than a million acres of land in the United States (Whitson 1999). Some non-native species release substances in the soil that prevent re-establishment of native species. For example, tamarisk can increase the salinity of soils to the point that native willows and cottonwoods can no longer grow.

Numerous invasive species presently not found in this WMA are within striking distance. First, Second, and Third Mesa are largely private land and have many activities that will provide an opportunity for the introduction of new invasive species. A typical occurrence will be along roads and waterways, soil disturbances at construction or mining sites, areas affected by wildfire, areas affected by resource management activities, residences, feeding areas for livestock, cultivated fields, previous farmlands that are not being correctly managed, recreation trailheads, and areas impacted by improper grazing resulting in the decline of the healthy vegetation. It will take the eyes and energy of everyone to find and stop the spread of weeds. Many studies have documented the rate of spread to be 8 – 12 % per year for most invasive species. This translates to thousands of acres per year being infested annually with invasive species.

**Goals for the Tabeguache WMA**

- Restore the species, age diversity, quality and productivity of existing plant and animal communities by removing or preventing   the   establishment   of invasive species.

BLM_0067366

- To facilitate a better understanding of the social and economic impacts of noxious weed invasion to the users, community leaders, landowners, developers, and resource managers.

- Develop and instill the understanding that Weed Prevention Best Management Practices (BMP's) need to be part of everyone's daily land ethic values.

- Retain a healthy landscape that provides the goods and services that benefit our communities today and in the future.

- Increase and expand community, landowner and inter-agency involvement, education and collaboration regarding invasive species management.

- Be a good neighbor and participate in accomplishing the objectives of the Tabeguache Weed Management Plan.

## III.    Tabeguache WMA Description

The Tabeguache WMA contains the following watersheds that flow directly into the San Miguel River: Atkinson, Tabeguache, and Big Bucktail –with the Tabeguache drainage being the largest watershed. Mesa Creek flows directly into the Lower Dolores River.   Each of these drainages has created canyons that dissect the landscape at the lower elevations and form large mesas. Over 37 miles of the San Miguel and Lower Dolores Rivers flow along the south and west sides of the WMA. The rivers elevation at the mouth of Big Bucktail Creek is 5,760 feet and 4,800 feet in elevation where Mesa Creek flows into the Lower Dolores River at the NE corner of the WMA. The highest point in this WMA is Spruce Mountain at 9,731 feet, at the headwaters of Tabeguache Creek.

The general aspect of this landscape is west to southwest and this aspect has a strong influence on the moisture regime and therefore the vegetation. At the lower elevations pinyon pine - Utah juniper (PJ) are the dominant vegetation types.  The PJ community gives way to sagebrush, mountain shrub, and Gambel oak plant communities by 7,000 feet in elevation depending on the aspect.  Ponderosa pine dominates the overstory on the mesas above 8,000 feet. Pine and Gambel oak are communities that are commonly found together and transition into aspen and open meadows at higher elevations. South and southwest aspect slopes at the higher elevations have a much drier moisture regime, allowing the typical lower elevation plant communities to thrive.  For more information on this landscape refer to the BLM's Land Health Assessment Report of this area in 2003 / 2004 and the GMUG Forest Plan developed in 2005 / 2006.

This WMA has some of the highest wild fire frequency on the Plateau.  Wildfires occurring in the ponderosa pine cover type have generally been mixed in severity. Fires burn as a ground fire in more open areas and then increase in intensity where tree stands are denser.  Fires typically are short in duration and last for only a few

BLM_0067367

**WMA Boundary Description:**

Starting at the town of Naturita, the WMA follows Highway 141 down the San Miguel River in a northeasterly direction toward Uravan. It continues past Uravan, on Highway 141, past the confluences of the San Miguel River and the Little Dolores River until it intersects with Mesa Creek. It then turns east up Mesa Creek for approximately 2 ½ miles where it proceeds up the hydrologic divide between North and South Fork of Mesa Creek in a NE direction. It stays on this hydrologic divide for several miles until it intersects with the Divide Road (FDR 402) on top of the Uncompahgre Plateau. It follows the Divide Road south over looking the watersheds to the west past Windy Point, past the Delta-Nucla Road (FDR 503), until it intersects with the Hooser Road (FDR 603). It follows FDR 603 westerly until it intersects the Delta-Nucla Road (FDR 503); then it follows west along FDR 503 for approximately three miles until it intersects the main drainage of Big Bucktail Creek; at which point it turns south following down the creek bottom to the San Miguel River. The boundary crosses the San Miguel River to the top of the ridge just above the river on the south side. It follows the river down stream, intersecting with Highway 141, and back to Naturita.

days. Lightening causes the majority of the fires. If invasive species exist in the area, the fire creates an opportunity for the spread of weeds.

The majority of the private acres is still being farmed or has been farmed. Most of private lands on First Mesa are under irrigation, using water from the San Miguel River via the CC ditch. The common crops raised on these homesteads are hay for livestock, pasture for grazing, and small grains. Mining continues to be a major economic driver for this area. An open pit coal mine is located near Nucla. Uranium mining was very active in the area during the first half of the 20th century. Soil disturbance caused by mining, roads, abandoned agriculture fields and over-grazed parcels has lead to the establishment of invasive species.

The WMA contains a high density of all types of public roads, but more importantly is dissected by graveled, collector roads that provide the main access across the Plateau and up the main drainages. The collector roads such as the Delta/Nucla Road (FSR 503) are graveled, maintained for passenger cars, and have shown a steady increase in traffic volume for several years. The Average Daily Traffic counts have been monitored for several years on these roads and show a significant and steady increase in traffic. The increase of traffic counts over the last 5 years has shown a 30 to 50% increase in traffic volume for all levels of roads. This trend will continue as local population numbers, recreation use, and mining activities increase. These activities bring an increase in road maintenance needs leading to greater ground disturbance. These ground disturbances lead to the spread of invasive species infestations. In fact, the majority of known infestations are being spread first along the transportation routes. The road base material used on many of the county roads is also a source of weed seeds and has helped the spread of infestations. One can also find specific weed species located where the county has hauled road material into a remote location.

Recreational use in this area has steadily changed over the decades. ATVing, snowmobiling, mountain biking, river running, camping and sightseeing over the last 10 years have surpassed hunting and fishing. The Uncompahgre Travel Management Plan for the National Forest has been completed for the Plateau. It restricts motorized travel to designated routes for all motorized travel. The BLM land has

BLM_0067368

numerous old mining roads and trails currently being used for recreation purposes. Areas of high use or soil disturbance are areas of high potential for new weed invasions.

Commercial logging has occurred for 130 years in the area. Ponderosa pine was heavily logged during the settlement years. Aspen stands have been harvested in the last 15 years.   Timber sales in general have decreased, but small sales of commercial timber and firewood are common activities.  The ponderosa pine forests on the national forest were impacted by a substantial mountain pine beetle epidemic outbreak in the 80's and salvage harvesting followed.

Uranium mining and exploration in the mineral belt located around Uravan, CO are major soil disturbing activities that have occurred over the past 100 years in this area. The open pit coalmine near Nucla creates large amounts of soil disturbance, but management of these infestations is possible due to the fact that they are confined to a specific area. Future landscape activities that create large soil disturbances are expected to increase significantly in the next several years.  Uranium claims have increased significantly in the past year with the speculation of a new mill in the area. Several leases for Oil and Gas are also in progress. A new open pit coal mine is being proposed for Third Mesa on public lands.

Livestock grazing is the most common annual activity that has taken place on this WMA continually for the last 130 years.  The higher elevations are seasonally grazed from June to October, while the lower elevations and some private lands have livestock present all year.  The grazing practices have changed over the years to promote healthy, vigorous plant communities, but past improper grazing has caused the most single significant decline in healthy rangelands over the years. Water rights to divert and store water for irrigation and livestock are an important part of the farming and ranching industry. The Forest Service has 7 allotments and 9 permittees. The BLM has 12 allotments, 7 permittees, and 6,348 AUM's within the WMA.

Prominent wildlife species in this area include mule deer, elk, black bear, mountain lions, Merriam's turkeys, and a wide variety of other aquatic, reptile, avian, and mammal species.   Wildlife species that are of concern at the federal or state level are: Gunnison sage grouse, Canada lynx and the river otter in the San Miguel River. Wildlife surveys and biological opinions are required each time management practices are proposed on public lands to mitigate any impacts on these species. The WMA is in Game Unit 61 and is considered a high quality hunt requiring several preference points to obtain hunting privileges. The WMA is both summer and critical winter range for big game. Plant communities that provide winter browse plants are aging, resulting in fewer, older browse plants and less forage production. This trend has been addressed by resetting succession to earlier serial stages in some areas of the WMA.   Although these treatments are successful in improving the carrying capacity of the rangeland, preventing the invasion of invasive species has become a major concern.

BLM_0067369

## IV.   Objectives for the Tabeguache WMA

The following objectives will be completed by the UP Project under the direction of the WMA Partners.

1.   Inventory:
> Will be field collected using GIS field data dictionary; field mapping of private land weed infestations and inputted into existing databases of the federal land managers by 11/1/2006.

2.   Mapping:
> Will be completed for each of the invasive species by 3/31/2007.  The data will be assembled into a GIS files by SW Data Center at www.southwestdata.org.

3.   Coordinated Weed Management Area Plan:
> Will be completed for the Tabeguache WMA by 3/31/2007.  The Plan will set the priorities and strategies for management of invasive species.

4.   Weed Prevention Best Management Practices:
> Will be developed by 3/31/2007 as part of the Weed Management Plan and used as outreach efforts.

5.   Operating Plan:
> Will be developed for implementing the Coordinated WMA Plan for the next three years by 5/1/2007.

6.   Private Land Cost-Share Program:
> Outreach efforts will be used to inform landowners of the current Montrose County Cost Share Program with the goal of participation by 4/1/2007.

7.   Reporting:
> An annual report will be submitted each year by December 1 by the WMA partners summarizing the project's accomplishments.

8.   Monitoring:
> Monitoring of the treatment activities and invasive species infestations will take place periodically and used to improve or make changes in the inventories and strategies within the Operating Plan.

9.   Program Effectiveness:

BLM_0067370

Effectiveness of the program will be evaluated each year by the WMA Partners with changes or modifications to the plan made by March 1 of the next year.

## V.  Weeds of Concern in the Tabeguache WMA

The State of Colorado defines a noxious weed as a non-native species to the state that meets one or more of the following criteria:

> (a) Aggressively invades or is detrimental to economic crops or native plant communities;
> (b) Is poisonous to livestock;
> (c) Is a carrier of detrimental insects, diseases or parasites; or
> (d) The direct or indirect effect of the presence of this plant is detrimental to the environmentally sound management of natural or agricultural ecosystems.

The State of Colorado has classified noxious weeds into three prioritized categories or lists (List A, B and C).

- List A Species
  List A noxious weeds have minimal distributions or have not yet been detected within the state.  They have demonstrated an ability to spread rapidly or cause significant harm.  Eradication is the mandatory management objective.

- List B Species
  List B noxious weed species have varying distribution within the state and are subject to eradication, containment or suppression. The development and implementation of noxious weed management plans designed to stop the continued spread of these species is mandated.  If possible, eradication of the species is most desirable.

- List C Species
  List C noxious weed species are the lowest priority because their populations are widespread throughout the state. If possible, suppression of the species is most desirable.

### 1.  List of High Priority Invasive Species within the Tabeguache WMA

- Purple loosestrife.  State List A.
  - Eradication is the mandated by the State of Colorado.
- Spotted knapweed. State List B.
  - State requires that all populations be eliminated prior to seed development by 2006 in all counties except for La Plata.
- Russian knapweed. State List B.
- Tamarisk (Saltcedar). State List B.

BLM_0067371

- o State requires elimination of all populations above the confluence of Horsefly Creek and the San Miguel River.
- Whitetop (Hoary Cress). State List B.
- Oxeye daisy. State List B.
- Houndstongue. State List B.
- Russian olive. State List B.

## 2. List of Other Priority Invasive Species within the Tabeguache WMA

- Musk thistle.  State List B.
- Bull thistle.  State List B.
- Canada thistle.  State List B.
- Chicory.  State List C.
- Burdock.  State List C.
- Cheatgrass.  State List C.

## 3. Species on the Early Detection – Rapid Response list

- Yellow starthistle. State List A.
- Leafy spurge. State List B.
- Yellow toadflax. State List B

## VI.   Priorities For Weed Management

A valid management strategy is to start at the top of the watershed and move down stream to prevent infestations of weed species being disturbed by water movement or human activities.  It becomes necessary to let the following priorities direct the program to achieve the goal of retaining and maintaining healthy plant communities for future generations.

The following priorities were developed for the invasive species in the WMA because limited resources need to be focused on those weed species which have the greatest impact to our well being and those which become more difficult to control if action is delayed. Weeds with a propensity to spread to other uninfected areas have been given a high priority for immediate treatment with the goal of containment.

Some landowners may have only one or two low priority noxious weed species on their property. In this case it may be feasible to control any and all the noxious weeds on the property. At the other extreme, weed infestations may be extensive on a property, prompting one to decide which weed species are most important to control. Anytime treatment is being accomplished for an area, all noxious weeds should be treated while you are at the site. In general, weed species that are rare on the WMA or have a small isolated infestation should be eradicated while large populations of common weed species should be contained with a long-term plan.

BLM_0067372

**The priorities for the Tabeguache WMA are as follows:**

1. **Implement Weed Prevention Best Management Practices (BMPs)**
2. **Keep Inventoried Weed Free Areas Weed Free**
3. **Implement Early Detection – Rapid Response**
4. **Eradicate or suppress invasive species along roadsides, ditches, gravel pits, utility ROWs, livestock concentration areas, high use areas and critical areas.**
5. **Eradicate or suppress inventoried, small, isolated infestations of High Priority species**
6. **Eradicate or suppress inventoried, small, isolated infestations of Other Priority species**
7. **Manage large infestations of High Priority species by area**
8. **Manage large infestations of Other Priority species by area**

## VII.    Integrated Weed Management Techniques (IWM):

The partners have organized the invasive species present in the Tabeguache WMA into three priority categories in Section V and agreed upon the "Priorities for Weed Management" in Section VI.   With the inventories of these invasive species and knowledge of the effective weed management strategies for the individual species, one can determine the general management control objective of eradication, suppression or containment. Because prevention measures will be the most cost effective and ecologically sound techniques to employ, the top three priorities are prevention techniques.  The following five priorities are active management strategies to control the spread of invasive species.  For each of these five priorities, specific Integrated Weed Management Techniques were developed for known species infestations.

An integrated weed management approach attempts to focus on using multiple techniques to control the spread of invasive species and, therefore, in the long run will lead to greater success compared to simply focusing on controlling weeds without a special strategy.   (See Detailed IWM Techniques in Appendix F.)  Small, isolated infestations are managed differently than large, dense infestations.   The small infestations are less than 1/10th of an acre and the IWM techniques are recommended in Priorities 4 and 5 of this Section.  The large area infestations have been delineated and the IWM techniques for these infestations are recommended in Priorities 6 and 7 of this Section.

### Priority #1:    Implement Weed Prevention Best Management Practices:

Develop an Outreach Plan to educate users on BMPs. Representatives of the UP Project will speak to user groups regarding the importance of weed infestation prevention.  BMP flyers will be posted at major trailheads and other locations within the WMA.  Target audiences are:  (See Appendix A for BMPs)

BLM_0067373

Tabeguache Coordinated Weed Management Area Plan

**Integrated Weed Management Techniques:**

- Chemical: The use of herbicides to control noxious weeds.

- Biocontrol: The use of organisms to control noxious weeds.

- Cultural: The use of mulching, rotational grazing, and establishing good vegetation cover.

- Mechanical: The use of cutting, mowing, disking, etc.

**Management Strategies:**

- Eradicate:
Complete elimination of all weed plants including: live roots, rhizomes and seeds. Eradicating a weed species on a given site is very difficult and could take more than one year and/or several treatments.

- Suppress:
Reduction of the abundance of a weed species - typically as measured or estimated in terms of canopy cover or plant density.

- Contain:
Confinement of an infestation to prevent expansion. It does not mean reducing the current infestation in terms of canopy cover or plant density.

1. Public Land User Groups
2. Real Estate Industry
3. Utility / Energy Companies
4. Federal Resource Managers–All Levels
5. County Departments: Weed/Road/Planning
6. Public Land Permit and/or Easement Holders

**Priority # 2    Keep Inventoried Weed Free Areas – Weed Free**

There are areas within the Tabeguache WMA that are not infested with invasive weeds. With the knowledge that prevention is the most cost effective strategy, these areas will be viewed as priority areas. Any weed infestations within these areas will be treated immediately.

1. Determine and map general weed free areas.
2. Identify responsible party for early detection of all invasive species and deliver Weed Free maps to these individuals.
3. Assign contact persons to confirm species, denote GIS location and submit information to the inventory data base:
    I.      Montrose County: Laurie Mingen (All private lands, county roads, and special use areas such as gravel Pits.) 252-4528
    II.     BLM: Dean Stindt  327-4261
    III.    USFS: Brian Hoefling  327-4261
4. Implement Rapid Response with eradication objective by public land manager, private landowner, homeowner association, and county.
5. Report treatment to UP by 11/20 of each year.

**Priority #3   Implement Early Detection – Rapid Response**

All species on the Early Detection List will be eradicated upon detection within the WMA. The strategy is to prevent these species from producing a seed crop.

A.   Determine and specify in the Operating Plan species to be included in this category annually. Each year new species will be highlighted.
B.   Assign responsibility for early detection of all invasive species to: permittee's, landowners, user groups, government works and contractors.

11

BLM_0067374

C. Assign contact persons to confirm species, denote GIS location and submit information to the inventory data base:

> Montrose County: Laurie Mingen (All private lands, county roads, and special use areas such gravel pits.)
> Bureau of Land Management: Dean Stindt
> USFS – Norwood District: Brian Hoefling

D. Implement Rapid Response with eradication objective by public land manager, private landowner, homeowner association, and county.

E. Monitor the site periodically.

F. Report treatment by 11/20 each year.

G. Reward private citizens on the identification of new infestations of invasive species on the Tabeguache Early Detection List and the Colorado State List A.

**Priority #4:  Eradicate or suppress invasive species along roadsides, ditches, gravel pits, utility ROW's, livestock concentration areas, high use areas, and critical areas.**

The Tabeguache WMA contains a high density of roads, heavy traffic volume, resource management activities and real estate development.  These areas have a high potential for the infestation and spread of noxious weeds.

A. Delineate these sites on a map.

B. Assign responsible party by site.  Define the species needing treatment.

C. Develop treatment schedule – (See Appendix F for IWM for each species.) Schedule multiple treatments that accomplish specific, effective control needs for the species present.

D. Monitor sites periodically

E. Report treatment by 11/20 each year.

**Priority #5: Eradicate or suppress inventoried, small, isolated infestations of High Priority species.**

Eradication or suppression of small infestations will save considerable time and money in the future. Each species growth characteristics, keys to control, and appropriate control actions are in Appendix D.

**Purple loosestrife:**
1. Management Objective: Eradication of all isolated infestations.
2. Area of eradication: Entire WMA.
3. Biological Characteristics: It is a perennial that can be found in moist wetland sites.  It is a highly aggressive invader.  If left unchecked, a wetland will become a monoculture of loosestrife.
4. Controls: Montrose County has been treating the known infestations of Purple loosestrife for several years.  Because it is found in very wet soils, it is important to use the correct herbicide.

BLM_0067375

**Spotted knapweed:**
1. Management Objective: Eradication of all isolated infestations.
2. Area of eradication: Entire WMA.
3. Biological Characteristics: It is a tap-rooted biennial plant that reproduces only by seed. Seed is viable for up to eight years. Plant grows as rosette for at least one year while root growth occurs. It is adapted to a wide range of environmental conditions and elevations.
4. Controls: Herbicides or mechanical methods will be used. Hand pulling of small infestations may also be employed, ensuring that the entire plant, including the root, is pulled out. Seed production will be controlled. Biological control agents have been released in the Ute area to help slow the spread.

**Russian knapweed**:
1. Management Objective: Eradication of all isolated infestations.
2. Area of eradication: Entire WMA.
3. Biological Characteristics: Plant is a deep-rooted rhizomatous perennial. It reproduces primarily by the root system, secondarily by seed. It is very persistent and a strong competitor in disturbed areas, roadways and rangeland sites. The seed is viable for up to eight years.
4. Controls: Herbicides will be used on isolated infestations. Spraying beyond the immediate area of individual plants will be done to combat extensive rhizomatous system.

**Tamarisk (Saltcedar):**
1. Management Objective: Eradication of all isolated infestations.
2. Area of eradication: Entire WMA except for the known large infestations in the San Miguel River.
3. Biological Characteristics: Tamarisk is a small tree that reproduces from seed, the root crown, rhizomes, and submerged or buried stems. It thrives in wetlands, riparian areas and around stock ponds.
4. Controls: Plants will be treated with an herbicide applied directly to the foliage. It is known that the best method of control is to cut the tree at the base and immediately apply an herbicide to the cut portion of the stump. Isolated trees may be dug or pulled up-removing the entire root system.

**Whitetop (Hoary Cress):**
1. Management Objective: Suppression of small infestations.
2. Area of suppression: Entire WMA.
3. Status: Infestations are at the Uravan Office rehab site, small infestations between Nucla and Naturita, and near the power plant on the Silverhawk Ranch.

BLM_0067376

4. Biological Characteristics: Whitetop is a deep-rooted rhizomatous perennial. The plant reproduces by seed or the root system. Seeds are viable for up to three years. It is one of the earliest perennial weeds to emerge in the spring. Flowers are produced in late April and May.
5. Controls: Herbicides will be used on isolated infestations. Disturbed areas will be replanted with desirable plant species, establishing a healthy plant community.

**Oxeye Daisy:**
1. Management Objective: Suppression of small infestations.
2. Area of suppression: Entire WMA.
3. Biological Characteristics: Oxeye daisy is a perennial that reproduces from seed and short rootstocks. The seed is viable for at least 3 years. It thrives at high elevations in the west.
4. Controls: Herbicides will be used on isolated infestations. Hand pulling or digging made be used for small infestations as long as the entire plant and roots are removed. Nitrogen fertilizer may be applied- promoting the growth of grasses that can out-compete oxeye daisy. Disturbed areas will be replanted with desirable plant species, establishing a healthy plant community.

**Houndstongue:**
1. Management Objective: Suppression of small infestations.
2. Area of suppression: Entire WMA.
3. Biological Characteristics: Houndstongue is a tap-rooted biennial. Eliminating the seed production and depleting the seed bank are the keys to controlling a biennial species. Seed has burs that stick to fur or clothing and may be widely dispersed. Houndstongue has a wide range of elevation and can be found in all range and forest plant communities.
4. Controls: Herbicide will be applied in the spring and fall to control the rosettes. When applicable, plants will be mechanically removed before they flower and produce seed.

**Russian Olive:**
1. Management Objective: Suppression of all isolated infestations.
2. Area of suppression: Entire WMA.
3. Biological Characteristics: Russian olive is a small tree or shrub. It is a deep-rooted perennial. Reproduces by seed or vegetatively from stump sprouts, stem cuttings and root pieces. Seed can remain viable for up to three years. Russian olive grows well and becomes invasive in well-watered pasturelands and certain riparian environments.

BLM_0067377

4. Controls:  Top growth will be removed and re-growth suppressed. After cutting, the stumps should be removed or chemically treated to prevent re-sprouting.

## Priority #6:  Eradicate or suppress inventoried, small, isolated infestations of Other Priority species

Eradication or suppression of small infestations will save considerable time and money in the future. Each species growth characteristics, keys to control, and appropriate control actions are in Appendix D.

### Musk thistle:
1. Management Objective: Eradication of all isolated infestations.
2. Area of eradication: The entire WMA.
3. Biological Characteristics: Musk thistle is a tap rooted biennial. Musk thistle reproduces solely by seed.  Seed remains viable for up to 10 years.
4. Controls: Herbicide will be applied in the spring and fall to control the rosettes.  When applicable, plants will be mechanically removed before they flower and produce seed. Disturbed areas will be replanted with desirable plant species, establishing a healthy plant community.

### Bull Thistle:
1. Management Objective: Eradication of all isolated infestations.
2. Area of eradication: The entire WMA.
3. Biological Characteristics: Bull thistle is a tap rooted biennial.  Bull thistle reproduces only by seed.  Seed may remain viable for three years.
4. Controls: Herbicide will be applied in the spring and fall to control the rosettes.  When applicable, plants will be mechanically removed before they flower and produce seed. Disturbed areas will be replanted with desirable plant species, establishing a healthy plant community.

### Canada Thistle:
1. Management Objective: Suppression of isolated infestations.
2. Area of suppression: Entire WMA.
3. Biological Characteristics: Canada thistle is a deep-rooted rhizomatous perennial.  Seed is dispersed by wind.  The majority of seeds are viable for at least three years.  Plants are dioecious (male and female flowers are produced on separate plants).
4. Controls: Suppression of isolated infestations of Canada thistle would primarily be done with herbicides. Mowing of Canada thistle will eliminate seed production but will not eliminate the plant because the root system is still intact.

BLM_0067378

**Chicory:**
1. Management Objective: Eradication of isolated infestations.
2. Area of eradication: Entire WMA.
3. Biological Characteristics: Chicory is a tap-rooted perennial plant. It reproduces solely by seed.
4. Controls: Chicory will be controlled by cutting, mowing, or pulling plants before seed production. Cultural control will be conducted several times a year over several years to exhaust the root reserves. Herbicides can also be used to control chicory. Disturbed areas will be replanted with desirable plant species, establishing a healthy plant community.

**Burdock:**
1. Management Objective: Eradication of isolated infestations.
2. Area of eradication: Entire WMA in conjunction with treatment of other invasive species.
3. Biological Characteristics: Burdock is a biennial that reproduces entirely by seed. Because it is a biennial, it is important to eliminate seed production and seed in the seed bank. Seed has burs that stick to fur or clothing and may be widely dispersed.
4. Controls: Herbicides will be applied before seed production to control the spread of the weed. First year rosettes will be pulled or the plant mowed after it has bolted to eliminate seed production.

**Cheatgrass:**
1. Management Objective: Suppress small isolated infestations.
2. Area of suppression: Entire WMA.
3. Biological Characteristics: Cheatgrass is an annual grass that reproduces by seeds. It is characterized by early maturation, high seed production, and vigorous growth in disturbed areas.
4. Control: Maintaining healthy desirable plant communities will help reduce the spread of cheatgrass. Effectively seed any new disturbance area, graze at proper season and manage livestock use on disturbed areas until seeding has been established, and use Best Management Practices in road maintenance operations. Do not mechanically treat native vegetation stands that will encourage the spread of cheatgrass. Small areas of cheatgrass infestation can be effectively and economically controlled with chemical and seeding.

## Priority #7: Manage large infestations of High Priority species by area

It is not possible to eradicate large infestations of High Priority species in the first year of treatment. Therefore, a multi-year strategy must be used. The short-term objective is to manage and contain High Priority species that have

BLM_0067379

a propensity to spread. The long-term objective is the eradication of High Priority species within the entire WMA.

**Purple loosestrife:**
1. Management Objective: All known isolated infestations will be aggressively treated.
2. Area of eradication: Entire WMA.
3. Status: There are no known large infestations of spotted knapweed in the WMA.
4. Control: Montrose County has been treating the known infestations of Purple loosestrife for several years.  Because it is found in very wet soils, it is important to use the correct herbicide.

**Spotted knapweed:**
1. Management Objective: Eradication of all infestations.
2. Area of containment: Entire WMA.
3. Status: There are no known large infestations of spotted knapweed in the WMA.
4. Control: Herbicides are the preferred method of eradicating infestations in this WMA. The biocontrol insect (Larinus Minutus) is available for large infestations. Fire may be used to reduce seed crops for large infestations of spotted knapweed.

**Russian knapweed:**
1. Management Objective: Montrose County is best positioned to treat the roadways.  The agencies will start their treatments at the top of the watersheds and move down towards the San Miguel and Dolores Rivers.
2. Area of containment: This invasive species is the most wide spread invasive species found in the WMA. The priority #3 areas will be the first areas to be treated to slow its spread. Remote isolated patches will be treated starting at the top of each watershed and working them to the valley floor. Each year this containment strategy will be adjusted determining on treatment success.
3. Status: Highest concentrations of this species are on the private lands and along the CC ditch. The canopy cover is some areas are as high as 100%.
4. Control: Herbicides will be used to treat infestations. To prevent the spread, Best Management Practices must be followed.  There are no known biocontrol agents for Russian knapweed.

**Tamarisk (Saltcedar):**
1. Management Objective: Eradication of all infestations in the San Miguel River corridor.
2. Area of containment: San Miguel River corridor and its tributaries.

BLM_0067380

3. Status: It is found across the WMA in most wetland environments. The main concentrations are along the San Miguel River and up the side drainages followed by the private irrigated lands where the wastewater accumulates. The following is an excerpt from the The Nature Conservancy plan for treating Tamarisk:

*The project's goal is to establish the San Miguel as the only naturally functioning, non-native tree-free river in the Upper Colorado River Basin, through federal, state and private landowner partnership activities. The eradication effort involves assigning trained crews and leaders to different tributaries. The crew starts at the upstream reach to tamarisk infestation for each tributary and works downstream on all properties where private landowners have allowed permission for the removal of non-native trees. Crews use the cut-stump method of eradication because it is the most effective and protects desirable native vegetation. This method requires cutting down all non-native trees and applying the herbicide Garlon 4 directly to the cut tamarisk, olive and elm stumps. Cut trees will be left in brush piles or run through a chipper where possible.  The Nature Conservancy will conduct follow-up work within twelve months, but long-term control will be the responsibility of the landowners.*

4. Control: Cutting tamarisk trees and applying herbicide to the stump has been found to be the most effect control. Re-treatment with herbicides of the whips or sprouts needs to follow within three years. A trial biological control release is being planned in 2007 by the BLM in the Dolores River Drainage. If these trials are deemed successful these insects will become an important tool in the management of Tamarisk. Fire may be used to open dense stands so that treatment can be done.

**Whitetop (Hoary Cress):**
1. Management Objective: Containment of any infestations and prevent seed production.
2. Area of containment: Entire WMA.
3. Status: No large infestations have been delineated. As infestations are inventoried treatment strategy will be developed.
4. Control: Herbicides are the most effective method to control the spread of whitetop.

**Oxeye Daisy:**
1. Management Objective: Containment of infestations.
2. Area of containment: Entire WMA.
3. Status: No large infestations have been delineated. As infestations are inventoried treatment strategy will be developed.
4. Control: Herbicides are the best treatment option. No known biocontrol agents are available for Oxeye Daisy.

BLM_0067381

**Houndstongue:**
1. Management Objective: Containment of infestations.
2. Area of containment: Entire WMA.
3. Status: Houndstongue is wide spread across the WMA and is not concentrated in any specific area.
4. Control: Herbicides are the most effective tool available. There are no known biocontrol agents for houndstongue. Implementing Best Management Practices is the best practice to stop its spread.

**Russian Olive:**
1. Management Objective: Containment of infestations.
2. Area of containment: Entire WMA.
3. Status: Russian olive is common in the irrigated private lands in the WMA, along fencerows, and sites that receive good moisture.
4. Control: Effective control includes removing top growth, suppressing regrowth with herbicides, and maintaining a healthy ground cover. Russian olive is shade intolerant.

**Priority #8:  Manage large infestations of Other Priority species by area**
It is not possible to suppress large infestations of Other Priority species in the first year of treatment.  Therefore, a multi-year strategy must be used.  The short-term objective is to manage and contain these species. The long-term objective is the suppression of these species within the entire WMA.

**Musk Thistle:**
1. Management Objective: Contain large infestations.
2. Area of containment: Entire WMA.
3. Status: There are no large infestations that encompass specific areas, but this species is found in significant patches on private lands.
4. Control: Herbicides will be applied in the spring and fall to control the rosettes on this biennial.  Treatment to remove seed heads will be implemented from June to September to prevent seed production.

**Bull Thistle:**
1. Management Objective: Contain large infestations.
2. Area of containment: Entire WMA.
3. Status: There are no large infestations that encompass specific areas, but this species is found in significant patches on private lands.
4. Control: Herbicides will be applied in the spring and fall to control the rosettes on this biennial. Treatment to remove seed heads will be implemented from June to September to prevent seed production.

**Canada Thistle:**
1. Management Objective: Containment of large infestations.
2. Area of containment: Entire WMA.

BLM_0067382

3.  Status: This species in commonly found across the WMA.
4.  Control: This weed will be treated when other priority weeds are being treated in the same area. Canada thistle will be contained to keep from spreading by using Best Management Practices. Herbicides will be used to control infestation from the outside toward the center. Biological control agents can be used, but are marginally effective.

**Chicory:**
There are no large inventoried infestations of chicory in the WMA.

**Burdock:**
There are no large inventoried infestations of burdock in the WMA.

**Cheatgrass:**
1.  Management Objective: Manage the spread of cheatgrass in all activities.
2.  Area of containment: Entire WMA.
3.  Status: Cheatgrass is widespread throughout the WMA.  Disturbances (fire, roads, grazing, etc) have led to the spread of cheatgrass.
4.  Control: An integrated approach will be used on large infestations of cheatgrass. Maintaining healthy desirable plant communities will also help reduce the spread of cheatgrass. Effectively seed any new disturbance area, graze at proper season and manage livestock use on disturbed areas until seeding has been established, and use Best Management Practices in road maintenance operations. Do not treat native vegetation stands that will encourage the spread of cheatgrass. Small areas of cheatgrass infestation can be effectively and economically controlled with chemical and seeding.

## VIII.  Possible Mitigation Measures

Measures to be considered if IWM Techniques have not been successful in 3 years.

- High infestations of high priority species (40% or greater canopy cover) in an area mean a loss in carrying capacity.  Grazing by domestic livestock may be prevented in order to allow native vegetation to increase in vigor after weed treatment strategy has been implemented.

- Trails, trailheads, and secondary roads with high infestations of high priority species may be closed to public until treatment objectives can be met.

- The County may develop a penalty for developers not following their Noxious Weed Plan and Best Management Practices.

BLM_0067583

- Vegetation treatments (prescribed fire, shrub manipulation, reforestation, logging, range improvements) will be designed to inventory and treat invasive species before the treatment takes place and develop mitigation measures that reduce the spread of invasive species.

- Livestock movement from infested rangelands to weed free areas should be restricted.

- All disturbed areas should be seeded using desirable species that provide forage or cover for wildlife, protect soil, and prevent weed infestations.

- Any hay/straw or mulch used in the WMA must be certified and tagged as noxious weed or noxious weed seed free.

- All seed sources used in the WMA should be certified and tagged as noxious weed seed free.

- Livestock grazing should be scheduled to avoid weed seed dispersal.

BLM_0067384

# Paradox Coordinated Weed Management Area Plan 2008





**Prepared by:**
The Uncompahgre Plateau (UP) Project

**In coordination with**:
Montrose County
Bureau of Land Management – Uncompahgre Field Office
U.S. Forest Service – GMUG Forest
Colorado State University Extension

BLM_0067385

## *Table of Contents*

I.   Introduction...................................................................................................... 4

II.  Purpose of the WMA Plan ................................................................................. 5

III. Paradox WMA Description ................................................................................. 8

IV.  Objectives for the Paradox WMA ..................................................................... 11

V.   Weeds of Concern in the Paradox WMA ......................................................... 12

    1.   List of High Priority Invasive Species within the Paradox WMA ................... 12

    2.   List of Other Priority Invasive Species within the Paradox WMA.................. 13

    3.   Species on the Early Detection – Rapid Response list.................................. 13

VI.  Priorities for Weed Management....................................................................... 13

VII. Integrated Weed Management Techniques (IWM): ......................................... 14

    Priority #1: Implement Weed Prevention Best Management Practices (BMP) ................. 14

    Priority # 2: Keep Inventoried Weed Free Areas – Weed Free .......................................... 15

    Priority #3: Implement Early Detection – Rapid Response................................................. 15

    Priority #4: Eradicate or suppress invasive species along roadsides, ditches, gravel pits, utility ROW's, livestock concentration areas, high use or other critical areas................... 16

    Priority #5: Eradicate or suppress inventoried, small, isolated infestations of High Priority species. ............................................................................................................................ 17

    Priority #6: Eradicate or suppress inventoried, small, isolated infestations of Other Priority species ............................................................................................................................. 19

    Priority #7: Manage large infestations of High Priority species by area............................ 21

    Priority #8: Manage large infestations of Other Priority species by area .......................... 24

VIII. Possible Mitigation Measures ......................................................................... 26

## *Appendices*

A.   Best Management Practices and Flyer ......................................... A-2

B.   Early Detection Flyers ................................................................... B-1

C.   Resources and References ............................................................ C-1

D.   Detailed Information of Invasive Species ...................................... D-1

E.   Contact List .................................................................................. E-1

F.   Integrated Weed Management Techniques .................................... F-1

G.   Monitoring Techniques .................................................................. G-1

H.   Reporting  Form ............................................................................ H-1

I.   Cost Share Program for Montrose County West End ...................... I-1

J.   Annual Operating Plan ................................................................... J-1

K.   Maps ............................................................................................ K-1

BLM_0067386

The Paradox Coordinated Weed Management Area Plan is a collaborative effort to restore the species, age diversity and quality/productivity of native plant and animal communities by removing or preventing invasive species establishment within the WMA.  The Paradox WMA Partners have united in the development of this plan to meet the interests and needs of everyone involved.

_Barbara Sharrow_                8-2-08

Barbara Sharrow, Field Office Manager
Uncompahgre Field Office
Bureau of Land Management

_Gary Ellis_                     8/18/08

Gary Ellis, County Commissioner
Montrose County

_James Free_                     8-5-08

James Free, Technical Coordinator
Uncompahgre Plateau Project

3

BLM_0067387

**The Paradox WMA Partners include:**

- Montrose County
- Bureau of Land Management – Uncompahgre Field Office
- US Forest Service – Grand Mesa, Gunnison and Uncompahgre National Forests
- Colorado State University Extension
- The Nature Conservancy
- Natural Resources Conservation Service
- The Uncompahgre Plateau (UP) Project
- Montrose County Weed Commission
- Uncompahgre Valley Pest Control District
- Private Landowners

## I.  Introduction

The Paradox Weed Management Area (WMA) is approximately 116,000 acres located in western Colorado. The WMA is in Montrose County and lies west of the San Miguel and Lower Dolores Rivers and extends westward across the Paradox Valley.  Paradox Valley is oriented southeast to northwest, with the Dolores River flowing perpendicular to the valley, dissecting it in the middle.  The valley is framed by the high, sloping mesa country of Monogram, Davis and Nyswonger Mesas to the southwest and by Sawtooth Ridge and Carpenter Ridge to the northeast. The area boarders the Manti La Sal National Forest on the north and extends 28 miles across the Paradox Valley to its hydrologic divide on the south. Elevations range from about 4,800 to above 7,000 feet.

The area is typical of the Colorado Plateau with its gently dipping sedimentary rocks. Erosion has produced innumerable escarpments, benches and incisions of deep canyons. The climate is semi-arid to arid, Average annual precipitation at the town of Paradox is just over 16 inches but ranges from 7 to 19 inches. Precipitation is distributed relatively evenly throughout the year with monthly averages between 1 to 2 inches, except for June which is the driest month.

The majority of the WMA, 82,000 acres, is public lands, administered by the BLM - Uncompahgre Field Office. The WMA also encompasses 31,000 acres of private lands. The private lands are located in the Paradox Valley floor and in scattered mining claim areas. Currently there are 178 different private landowners within the WMA.  Several of these landowners own multiple parcels. This rural area is sparsely populated with two small communities of Bedrock and Paradox lying in the valley north of the Dolores River. Ranching makes up the majority of the livelihood.

The Uncompahgre Plateau, a major landform on the northeastern boundary of the WMA, is the watershed to four major drainages of the Colorado River (Dolores, Gunnison, San Miguel and Uncompahgre Rivers).  The UP Project is attempting to understand the impacts of human activity on the landscape and focus on ecosystem restoration in a manner that involves and best serves the interests of the local communities.  Invasive species are a major non-native intrusion that prevents effective land restoration.  The vision for the UP Project is

4

BLM_0067388

to divide the landscape on and surrounding the Plateau into Weed Management Areas in order to control and suppress the invasive species populations that are currently established, as well as prevent new infestations.



Map of the Paradox WMA

## II.   *Purpose of the WMA Plan*

In 2005, a Uravan Mill Natural Resources Damage Fund Grant was awarded through Montrose County for natural conservation and reclamation through weed management. Additional benefactors of the grant money included: the US Forest Service, the Nature Conservancy and the Bureau of Land Management. The Uncompahgre Plateau (UP) Project received grant money from the National Fish and Wildlife Foundation "Pulling Together" Grant, the National Forest Foundation "Centennial Grant",  and the Center for Invasive Plant Management Grant to develop Coordinated Weed Management Area Plans and Treatment Programs for this half million acre area.   Because of the varied land status of the Uravan Area and the awarding of funds to the different land managers, it was agreed that a collaborative effort was needed in order to accomplish an effective and efficient multi-year program.    The UP Project received additional funding for the Paradox Basin Weed

BLM_0067389

> **Advantages of a Coordinated Weed Management Area Plan:**
>
> - Encourages cooperation between agencies, private landowners, organizations, and interest groups.
> - Increases the effectiveness of weed management by basing control efforts on biological and geographical factors rather than legal divisions.
> - Creates the most effective and environmentally sound weed management plan for a geographic area.
> - Establishes priority weed species within the individual WMA.
> - Increases public awareness of the seriousness of invasive species.
> - Facilitates the prevention of future weed infestations within the WMA.
> - Combines the knowledge and resources of agencies, organizations and individuals involved.
> - Identifies and prevents the spread of weeds into the WMA from neighboring areas.
> - Offers a channel of communication for everyone involved.
> - Provides the ability to secure and pool funds for weed programs.

Management Area Plan from a second National Fish and Wildlife Foundation "Pulling Together" Grant and the EnCana corporation.

The area of interest determined by the partners was nearly a half million acres. In order to develop a site-specific plan and be able to start a program by 2006, the area was divided into three Weed Management Areas (WMA's). The boundary of the areas were developed using hydrologic divides and geographic features that had similar landscape characteristics, eliminating jurisdictional boundaries. The three WMAs are Horsefly, Tabeguache, and Paradox.

The establishment of the WMA enhances and unites the partners for the development of a weed management program. The partners collaboratively established the goals, objectives, and priorities for treatment in the WMA. The partners are committed to helping each other accomplish a Coordinated Weed Management Area Plan using Integrated Weed Management techniques.

Integrated Weed Management (IWM) is a systems approach to the management of undesirable plants. It involves the use of the best control techniques described for the target weed species in a planned, coordinated program to limit the impact and spread of the invasive species. IWM (as defined in the Federal Noxious Weed Act) is:

> *"A system for the planning and implementation of a program, using an interdisciplinary approach, to select a method for containing or controlling an undesirable plant species or group of species using all available methods including: education, prevention, physical or mechanical methods, biological control agents, herbicide methods, cultural methods and general land management practices".*

The value of using an IWM approach in a WMA is a more efficient and effective use of limited resources by creating one weed management plan that focuses time, money and resources toward agreed upon priorities. By pooling resources available from the different partners in

BLM_0067390

the group and eliminating political boundaries, we hope to prevent, contain, reduce, suppress, or eradicate invasive species in the Paradox WMA.

Weed infestations are widespread and affect many aspects of our lives.   Weeds can drastically alter the ecological checks and balances that have developed over thousands of years.   Cheatgrass has so altered the fire regime of the Great Basin that re-establishing native plant communities in some areas is essentially impossible (Whisenant 1989, Mosely et al. 1999). Cheatgrass is an annual that quickly develops an extensive fibrous root system, which removes moisture from the soil that is critical for the growth of native plants. One study of spotted knapweed showed that runoff increased by 56% on areas infested by spotted knapweed and that sediment yield increased by 192% (Lacey et al. 1989).  A Montana study showed a 98% decrease in elk use of a bunchgrass range and a 67% decline in carrying capacity after spotted knapweed infestation (Hakim 1979).   It is estimated that Russian knapweed has pushed out native plant species on more than a million acres of land in the United States.   Some non-native species release substances in the soil that prevent re-establishment of native species.   For example, tamarisk can increase the salinity of soils to the point that native willows and cottonwoods can no longer grow.

Numerous invasive species presently not found in this WMA are within striking distance. Paradox Valley is largely private land and has many activities that will provide an opportunity for the introduction of new invasive species.   A typical occurrence will be along roads and waterways, in wetlands, soil disturbances, mining sites, areas affected by wildfire, areas affected by resource management activities, residences, feeding areas for livestock, cultivated fields, previous farmlands that are not being correctly managed, recreation trailheads, and areas impacted by improper grazing resulting in the decline of the healthy vegetation.   It will take the eyes and energy of everyone to find and stop the spread of weeds.  Many studies have documented the rate of spread to be 8 – 12 % per year for most invasive species.  This translates to hundreds of acres per year being infested annually with invasive species.

**Goals for the Paradox WMA**

- Restore the species and age diversity and quality/productivity of existing plant and animal communities by removing or  preventing invasive species establishment.

- To facilitate a better understanding of the social and economic impacts of noxious weed invasion to the users, community leaders, landowners, developers, and resource managers.

- Develop and instill the understanding that Weed Prevention Best Management Practices need to be part of everyone's daily land ethic.

- Retain a healthy landscape that provides the goods and services that benefit our communities today and in the future.

BLM_0067391

**WMA Boundary Description:**

Starting at the junction of CO State Highway 141 and 90 the WMA boundary follows Highway 141 down the San Miguel River. The WMA lies to the west and/or northwest of the highway. It continues on Highway 141, past Uravan, past the confluences of the San Miguel River and the Dolores River until it intersects with Mesa Creek. This boundary coincides with Tabeguache WMA on the east side of the highway. The Paradox WMA stays on Highway 141 past where Rock Creek dumps into the Dolores River from the west. The boundary then goes westerly along the north rim of Rock Creek until it meets the Manti La Sal National Forest Boundary. It follows the National Forest Boundary ½ mile south, 4 miles west, 4 miles south and 2 miles west until it reaches the hydrologic boundary between West Paradox Creek and La Sal Creek. It follows this hydrologic divide in a southeasterly direction to the Dolores River. It cross the Dolores River above Bedrock and continues in a southeasterly direction following the hydrologic divide that encompasses East Paradox Creek and the Paradox Valley. The boundary at the south end of the valley follows the hydrologic divide between East Paradox Creek and Dry Creek to the south. This hydrologic divide comes out at the intersection of CO Highway 141 and 90 and back to the start.

• Increase and expand community, landowner and inter-agency involvement, education and collaboration regarding invasive species management.

• Be a good neighbor and participate in accomplishing the objectives of the Paradox Weed Management Plan.

## III.   *Paradox WMA Description*

The Paradox WMA includes the entire Paradox Valley. It is over 28 miles long running northwest to southeast and varies in width from 2.5 miles to 4.5 miles. The remaining and larger part of the WMA lies to the northeast of Paradox Valley from Sawtooth Ridge on the south end of Paradox Valley to the San Miguel River and from Carpenter Ridge on the north end of Paradox Valley to the Dolores River. The Dolores River dissects Paradox Valley in the middle.   All the watersheds in this WMA drain directly into the Dolores River or into the lower part of the San Miguel River. Elevations range from about 4,800 to above 7,000 feet.

Paradox Valley is characterized by gentle topography along most of the valley bottom.  Impassable cliffs and steep slopes frame the sides of the valley. The majority of the non-cultivated land in Paradox Valley is made up of grass/forb, sagebrush, and sage/grass plant communities. Lack of adequate perennial forbs and cool season grasses are the primary problems encountered within these vegetation types resulting in a high percentage of bare soil. Cheatgrass dominates many sites throughout the valley and results in soil erosion, decrease in herbivore carrying capacity, and decline in overall land health or resource value. Riparian vegetation is found next to the Dolores and San Miguel Rivers. Much of the riparian vegetation is made up of tamarisk, which is having long-term effects on water quantity and soil productivity.  At the higher elevations   pinyon-juniper,   pinyon-juniper/sagebrush, and  grassland  communities  are  the  primary  plant

BLM_0067392

communities. Stringers of mountain shrub vegetation occur in many of the draws scattered throughout the WMA. Additional information can be found in the East Paradox Area Land Health Assessment report completed in 1999 and located at the BLM –Uncompahgre Field Office, Montrose, CO.

The private lands in the valley have been dedicated to livestock production for several decades. The common crops raised are hay for livestock, pasture for grazing and small grains. Abandoned agriculture fields and over-grazing have lead to the establishment of invasive species. The thistle complex (Canada, musk and bull) and Russian knapweed were the most commonly found invasive species in the valley.

Livestock grazing is the most common annual activity and has taken place on this WMA continually for the last 130 years.  The higher elevations are seasonally grazed from June to October, while the lower elevations and some private lands have livestock present all year. The BLM has 18 allotments, 10 permittees, and 6,155 AUM's within the WMA. The grazing practices have changed over the years to promote healthy, vigorous plant communities, but past improper grazing has caused the most single significant decline in healthy rangelands over the years. Water rights to divert and store water for irrigation and livestock are an important part of the farming and ranching industry.

Uranium and Vanadium mining was very active in the area during the first half of the 20th century. Soil disturbance caused by mining, roads, and milling opened up the land to the establishment of invasive species. Roads have been and continue to be the main vector in which invasive species move into the backcountry.  Invasive species have also been transported into the backcountry with road base material and on construction equipment. Future potential landscape activities that will create large soil disturbances are the establishment of a Uranium Mill in Paradox Valley and the reactivation of Uranium mining in the surrounding landscape.

Oil and Gas development is also active within the WMA.  There are currently wells west of the Town of Paradox on the Red Ranches property.  It is expected that these activities will expand significantly over the next few years, increasing the threat of invasive species infestations.  It will be imperative for land managers to require timely remediation and reseeding of disturbed soil at drilling sites.

The WMA contains a high density of all types of public roads. The increase of traffic counts over the last 5 years has shown a 20 to 30% increase in traffic volume for all levels of roads. This trend will continue as local population numbers grow, and recreation use and mining activities increase.  These activities bring an increase in road improvement needs and utility corridors leading to more ground disturbance.  These ground disturbances lead to the spread of invasive species infestations.  In fact, the majority of known infestations are being spread first along the transportation routes.  The road base material used on many of the county roads has also been a source of weed seeds and has helped the spread of infestations.

BLM_0067393

Wildfires occurring in this WMA have generally been mixed in severity. Fires burn as a ground fire fed by dried out cheatgrass in more open areas and then increase in intensity where shrub and tree stands exist. Fires typically are short in duration and last for only a few days. Lightening causes the majority of the fires. If invasive species exist in the area, the fire creates an opportunity for the spread of weeds.

Recreational use in this area has steadily changed over the decades. Activities such as climbing, ATVing, mountain biking, river running, camping and sightseeing have surpassed hunting and fishing in popularity over the last 10 years. The BLM land has numerous old mining roads and trails currently being used for recreation purposes. These areas of high use or soil disturbance are areas of high potential for new weed invasions.

This area supports an undetermined variety of wildlife species. Some species are year-round residents, while others are migratory. Habitat variety is great and is created by diversity in topography, slope, aspect, vegetation, soils, and climate. Prominent wildlife species in this area include mule deer, elk, mountain lion, coyote, prairie dog (white-tailed), raptors and a wide variety of other aquatic, reptile, avian, and small mammal species. Wildlife species that are of concern at the federal or state level would be Gunnison sage grouse and the river otter in the San Miguel River. Wildlife surveys and biological analysis of effects are required each time management practices are proposed on public lands, and measures are designed to mitigate any impacts to these species. The WMA is in Game Units 60 and 70. The WMA is both summer and critical winter range for big game. Plant communities that provide winter browse plants are aging, resulting in fewer, older browse plants and less forage production. This trend has been addressed by resetting succession to earlier serial stages in some areas of the WMA by land managers. Although these treatments are successful in improving the carrying capacity of the rangeland, preventing the invasion of invasive species has become a major concern.

There is no designated Critical Habitat identified by USFWS in the area. The area provides winter habitat for the bald eagle which was delisted in 2007. It is still protected under the Bald Eagle Protection Act (1940, as amended, 16 USC 688 et seq.) and the Migratory Bird Treaty Act (1918, as amended, 16 USC 703 et seq.). The area also provides habitat for the Gunnison prairie dog, but for the Prairie portion of the population. The Montane population was recently found to be "warranted but precluded" from listing by the USFWS. Potential habitat for the yellow-billed cuckoo (Candidate) may be found in the riparian habitats of the area. There are no other listed, candidate, or proposed plant species within the WMA. Rare plants within the WMA are the San Rafael milkvetch (*Astragalus rafaelensis*), Paradox Valley lupine (*Lupinus carassus*), and Paradox breadroot (*Pediomelum aromaticum*). Within Paradox valley, the breadroot is often found in the same habitats as the lupine. Both plants are reported to be doing well in these sites.

BLM_0067394

## IV.    Objectives for the Paradox WMA

The following objectives will be completed by the UP Project under the direction of the WMA Partners.

1.  Inventory:
    Will be field collected using a GIS field data dictionary. Private land weed infestations will be field mapped.    All data will be inputted into existing databases of the federal land managers by 11/1/2007.

2.  Mapping:
    Will be completed for each of the invasive species by 12/1/2007. The data will be assembled into a GIS file by SW Data Center at www.southwestdata.org.

3.  Coordinated Weed Management Area Plan:
    Will be completed for the Paradox WMA by 3/31/2008. The Plan will set the priorities and strategies for management of invasive species.

4.  Weed Prevention Best Management Practices:
    Will be developed by 3/31/2008 as part of the Weed Management Plan and used  for outreach efforts.

5.  Operating Plan:
    Will be developed for implementing the Coordinated WMA Plan for the next three years by 5/1/2008.

6.  Private Land Cost-Share Program:
    Outreach efforts will be used to inform landowners of the current Montrose County Cost Share Program with the goal of participation by 4/1/2008.

7.  Reporting:
    An annual report will be submitted each year by December 1 by the WMA partners summarizing the project's accomplishments.

8.  Monitoring:
    Monitoring of the treatment activities and invasive species infestations will take place periodically and used to improve or make changes in the inventories and strategies within the Operating Plan.

9.  Program Effectiveness:
    Effectiveness of the program will be evaluated each year by the WMA Partners with changes or modifications to the plan made by March 1 of the next year.

BLM_0067395

## V.  *Weeds of Concern in the Paradox WMA*

The State of Colorado defines a noxious weed as a non-native species to the state that meets one or more of the following criteria:

(a) Aggressively invades or is detrimental to economic crops or native plant communities;
(b) Is poisonous to livestock;
(c) Is a carrier of detrimental insects, diseases or parasites; or
(d) The direct or indirect effect of the presence of this plant is detrimental to the environmentally sound management of natural or agricultural ecosystems.

The State of Colorado has classified noxious weeds into three prioritized categories or lists (List A, B and C).

- List A Species
  List A noxious weeds have minimal distributions or have not yet been detected within the state.  They have demonstrated an ability to spread rapidly or cause significant harm.  Eradication is the mandatory management objective.

- List B Species
  List B noxious weed species have varying distribution within the state and are subject to eradication, containment or suppression. The development and implementation of noxious weed management plans designed to stop the continued spread of these species is mandated.  If possible, eradication of the species is most desirable.

- List C Species
  List C noxious weed species are the lowest priority because their populations are widespread throughout the state. If possible, suppression of the species is most desirable.

To learn more about the following weeds of concern, see Appendix D.

1. **List of High Priority Invasive Species within the Paradox WMA**

   - Purple loosestrife.  State List A.
   - Russian knapweed. State List B.
   - Spotted knapweed. State List B.
   - Tamarisk (Saltcedar). State List B.
   - Whitetop (Hoary Cress). State List B.
   - Oxeye daisy. State List B.
   - Houndstongue. State List B.
   - Russian olive. State List B.

BLM_0067396

2.  **List of Other Priority Invasive Species within the Paradox WMA**

    - Musk thistle.  State List B.
    - Bull thistle.  State List B.
    - Canada thistle.  State List B.
    - Chicory.  State List C.
    - Burdock.  State List C.
    - Cheatgrass.  State List C.

3.  **Species on the Early Detection – Rapid Response list**

    - Yellow starthistle. State List A.
    - Leafy spurge. State List B.
    - Yellow toadflax. State List B
    - Sulfur cinquefoil. State List B
    - Diffuse knapweed. State List B

## VI.   *Priorities for Weed Management*

A valid management strategy is to start at the top of the watershed and move down stream to prevent infestations of weed species being disturbed by water movement.  It is beneficial to follow these priorities in a coordinated effort.

The following priorities were developed for the invasive species in the WMA because limited resources need to be focused on those weed species which have the greatest impact on our well being and those which become more difficult to control if action is delayed. Weeds with a propensity to spread to other uninfected areas have been given a high priority for immediate treatment with the goal of containment.

Some landowners may have only one or two low priority noxious weed species on their property. In this case it may be feasible to control any and all the noxious weeds on the property. At the other extreme, weed infestations may be extensive on a property, prompting one to decide which weed species are most important to control.  Anytime treatment is being accomplished for an area, all noxious weeds should be treated while you are at the site. In general, weed species that are rare on the WMA or have a small isolated infestation should be eradicated while large populations of common weed species should be contained with a long-term plan.

BLM_0067397

**The priorities for the Paradox WMA are as follows:**

1. **Implement weed prevention Best Management Practices (BMPs)**
2. **Keep inventoried weed free areas – weed free**
3. **Implement early detection – rapid response**
4. **Eradicate or suppress invasive species along roadsides, ditches, gravel pits, utility Row's, livestock concentration areas, and other high use or critical areas**
5. **Eradicate or suppress inventoried small, isolated infestations of High Priority species**
6. **Eradicate or suppress inventoried small, isolated infestations of Other Priority species**
7. **Manage large infestations of High Priority species by area**
8. **Manage large infestations of Other Priority species by area**

## VII.     Integrated Weed Management Techniques (IWM):

The partners have organized the invasive species present in the Paradox WMA into three priority categories in Section V and agreed upon the "Priorities for Weed Management" in Section VI.  With the inventories of these invasive species and knowledge of the effective weed management strategies for the individual species, one can determine the general management control objective of eradication, suppression or containment. Because prevention measures will be the most cost effective and ecologically sound techniques to employ, the top three priorities are prevention techniques.  The following five priorities are active management strategies to control the spread of invasive species.  Within each of these five priorities, specific Integrated Weed Management Techniques were developed for known species infestations.

An integrated weed management approach attempts to focus on using multiple techniques to control the spread of invasive species and, therefore, in the long run will lead to greater success compared to simply focusing on controlling weeds without a special strategy.  (See Detailed IWM Techniques in Appendix F)  Small, isolated infestations are managed differently than large, dense infestations.  Small infestations are defined as less than 1/10th of an acre and the IWM techniques are recommended in Priorities 5 and 6 of this Section.  The large area infestations have been delineated and the IWM techniques for these infestations are recommended in Priorities 7 and 8 of this Section.

**Priority #1:     Implement Weed Prevention Best Management Practices (BMP)**

An outreach plan to educate users on BMPs will be developed. Representatives of the UP Project will speak to user groups regarding the importance of weed infestation prevention.

14

BLM_0067398

BMP flyers will be posted at major trailheads and other locations within the WMA, targeting the following groups.  (See Appendix A for BMPs and BMP flyer)

1. Public Land User Group
2. Real Estate Industry
3. Utility / Energy Companies
4. Federal Resource Managers–All Levels
5. County Departments: Weed/Road/Planning
6. Public Land Permit and/or Easement Holders
7. Private Landowners

**Priority # 2      Keep Inventoried Weed Free Areas – Weed Free**

There are areas within the Paradox WMA that are not infested with invasive weeds.  With the knowledge that prevention is the most cost effective strategy, these areas will be viewed as priority areas. Any weed infestations within these areas will be treated immediately.

1. General weed free areas will be delineated and mapped.
2. The following is a list of contact people.  These individuals will  confirm new infestations, record locations (GIS) and submit information to the partners:
    I. Montrose County: Laurie Mingen (All private lands, county roads, and special use areas such as gravel Pits.) 249-5216
    II. BLM: Dean Stindt   327-4261
    III. UP Staff: Jim Free 275-0752
3. Once a new infestation is located and confirmed, Rapid Response with an eradication objective will be implemented by: public land manager, private landowner, homeowner association, and/or county.
4. All treatments will be reported to the UP Project by 11/20 of each year.

**Priority #3      Implement Early Detection – Rapid Response**

**Early Detection Species:**

- Yellow starthistle
- Leafy spurge
- Yellow toadflax
- Sulfur cinquefoil
- Diffuse knapweed

All species on the Early Detection List will be eradicated upon detection within the WMA.  The strategy is to prevent these species from producing a seed crop. (See Appendix B for Early Detection flyers)

A.   Early Detection species will be determined and specified in the Annual Operating Plan. Each year new species will be highlighted.
B.   Responsibility for early detection of all invasive species will be assigned to: permittee's, landowners, user groups, government works and contractors.
C.   The following is a list of contact people.  These individuals will confirm species, denote GIS location and submit information to the inventory data base:

BLM_0067399

> - **Small Infestations:**
>   1/10th acre or less. These species have been delineated and are addressed in Priority 5 and 6.
>
> - **Large infestations:**
>   Over 1/10th acre. These species have been delineated and are addressed in Priority 7 and 8.

- Montrose County: Laurie Mingen (All private lands, county roads, and special use areas such gravel pits.) 249-5216
- Bureau of Land Management: Dean Stindt 327-4261
- UP Project: 275-0752

D.   Once a new infestation is located and confirmed, Rapid Response with an eradication objective will be implemented by: public land manager, private landowner, homeowner association, and/or county.

E.   The site will be monitored periodically.

F.   All treatments will be reported to the UP Project by 11/20 of each year.

G.   Private citizens will be given a $50 reward for the identification of new infestations of invasive species on the Paradox Early Detection List and the Colorado State List A.  (For a listing of State A species, visit the Colorado Weed Management Association website at: www.cwma.org.)

**Priority #4:  Eradicate or suppress invasive species along roadsides, ditches, gravel pits, utility ROW's, livestock concentration areas, high use or other critical areas.**

> **Management Strategies:**
>
> - Eradicate:
>   Complete elimination of all weed plants including: live roots, rhizomes and seeds. Eradicating a weed species on a given site is very difficult and could take more than one year and/or several treatments.
>
> - Suppress:
>   Reduction of the abundance of a weed species - typically as measured or estimated in terms of canopy cover or plant density.
>
> - Contain:
>   Confinement of an infestation to prevent expansion.  It does not mean reducing the current infestation in terms of canopy cover or plant density.

The Paradox WMA contains a high density of roads, resource management activities and energy development.  These areas have a high potential for the infestation and spread of noxious weeds. Land managers, ranchers, private landowners, outdoor enthusiasts and road managers should understand the hot spots where weeds will occur first and be on the lookout.

A.   These sites will be delineated on a map.

B.   The responsible party will be assigned to monitor the sites.

C.   As species are inventoried, a treatment schedule will be developed. (See Appendix D for IWM for each species.) Multiple treatments will be scheduled that accomplish specific, effective control needs for the species present.

D.   The sites will be monitored periodically.

E.   All treatments will be reported to the UP Project by 11/20 of each year.

BLM_0067400

**High Priority Species:**

- Purple loosestrife
- Russian knapweed
- Spotted knapweed
- Tamarisk (Saltcedar)
- Whitetop
- Oxeye daisy
- Houndstongue
- Russian Olive

**Priority #5: Eradicate or suppress inventoried, small, isolated infestations of High Priority species.**

Eradication or suppression of small infestations will save considerable time and money in the future. Each species growth characteristics, keys to control, and appropriate control actions are listed in Appendix D.

**Purple loosestrife:**
1.  Management Objective: Eradication of all isolated infestations.
2.  Area of eradication: Entire WMA.
3.  Biological Characteristics: It is a perennial that can be found in moist wetland sites.  It is a highly aggressive invader.  If left unchecked, a wetland will become a monoculture of loosestrife.

4.  Controls: Montrose County has been treating the known infestations of Purple loosestrife for several years.  Because it is found in very wet soils, it is important to use the correct herbicide.


**Russian knapweed:**
1.  Management Objective: Eradication of all isolated infestations.
2.  Area of eradication: Entire WMA.
3.  Biological Characteristics: The plant is a deep-rooted rhizomatous perennial. It reproduces primarily by the root system, secondarily by seed.  It is very persistent and a strong competitor in disturbed areas, roadways and rangeland sites.  The seed is viable for up to eight years.
4.  Controls: Herbicides will be used on isolated infestations. Spraying beyond the immediate area of individual plants will be done to combat the extensive rhizomatous system. Hand pulling or digging to prevent plants from spreading can be effective on small infestations.

**Spotted knapweed**
1.  Management Objective: Eradication of all isolated infestations.
2.  Area of eradication: Entire WMA.
3.  Biological Characteristics: It is a tap-rooted biennial plant that reproduces only by seed.  Seed is viable for up to eight years. The plant grows as a rosette for at least one year while root growth occurs. It is adapted to a wide range of environmental conditions and elevations.

BLM_0067401

**Definitions:**

- **Tap-root:**
  A primary root that grows vertically downward and gives off small lateral roots.

- **Rhizome:**
  A thick underground horizontal stem that produces roots and has shoots that develop into new plants.

- **Annual:**
  A plant that flowers, produces seed, and dies in one growing season.

- **Biennial:**
  A plant that lives for two years and produces flowers and fruit in the second year.

- **Perennial:**
  A plant that last for more than two growing seasons.

4. Controls: Herbicides or mechanical methods will be used. Hand pulling or digging of small infestations may also be employed, ensuring that the entire plant, including the root, is pulled out. Seed production must be controlled.

**Tamarisk (Saltcedar):**
1. Management Objective: Eradication of all isolated infestations.
2. Area of eradication: Entire WMA except for the known large infestation in the San Miguel River.
3. Biological Characteristics: Tamarisk is a small tree that reproduces from seed, the root crown, rhizomes, and submerged or buried stems. It thrives in wetlands, riparian areas and around stock ponds.
4. Controls: Plants will be treated with an herbicide applied directly to the foliage. It is known that the best method of control is to cut the tree at the base and immediately apply an herbicide to the cut portion of the stump. Isolated trees may be dug or pulled up, removing the entire root system.

**Whitetop (Hoary Cress):**
1. Management Objective: Suppression of small infestations.
2. Area of suppression: Entire WMA. Status: Infestations are located at the Uravan Office rehab site, and other small infestations in Paradox Valley.
3. Biological Characteristics: Whitetop is a deep-rooted, rhizomatous perennial. The plant reproduces by seed or the root system. Seeds are viable for up to three years. It is one of the earliest perennial weeds to emerge in the spring. Flowers are produced in late April and May.
4. Controls: Herbicides will be used on isolated infestations. Disturbed areas will be replanted with desirable plant species, establishing a healthy plant community.

**Oxeye Daisy:**
1. Management Objective: Suppression of small infestations.
2. Area of suppression: Entire WMA.
3. Biological Characteristics: Oxeye daisy is a perennial that reproduces from seed and short rootstocks. The seed is viable for at least 3 years. It thrives at high elevations in the west.
4. Controls: Herbicides will be used on isolated infestations. Hand pulling or digging may be used for small infestations as long as the entire plant and roots are removed. Nitrogen fertilizer may be applied, promoting the growth of grasses that

BLM_0067402

out compete oxeye daisy.  Disturbed areas will be replanted with desirable plant species, establishing a healthy plant community.

**Houndstongue:**
1.  Management Objective: Suppression of small infestations.
2.  Area of suppression: Entire WMA.
3.  Biological Characteristics: Houndstongue is a tap-rooted biennial.  Eliminating the seed production and depleting the seed bank are the keys to controlling a biennial species.  The seed have burs that stick to fur or clothing and may be widely dispersed. Houndstongue has a wide range of elevations and can be found in all range and forest plant communities.
4.  Controls: Herbicide will be applied in the spring and fall to control the rosettes. When applicable, plants will be mechanically removed before they flower and produce seed.

**Russian Olive:**
1.  Management Objective: Suppression of all isolated infestations.
2.  Area of suppression: Entire WMA.
3.  Biological Characteristics:  Russian olive is a small tree or shrub.  It is a deep-rooted perennial.  It reproduces by seed or vegetatively from stump sprouts, stem cuttings and root pieces.  The seed can remain viable for up to three years.   Russian olive grows well and becomes invasive in well-watered pasturelands and certain riparian environments.
4.  Controls:  Top growth will be removed and re-growth suppressed.  After cutting, the stumps should be removed or chemically treated to prevent re-sprouting.

**Priority #6:  Eradicate or suppress inventoried, small, isolated infestations of Other Priority species**

Eradication or suppression of small infestations will save considerable time and money in the future. Each species growth characteristics, keys to control, and appropriate control actions are in Appendix D.

**Musk Thistle:**
1.  Management Objective: Eradication of all isolated infestations.
2.  Area of eradication: The entire WMA.
3.  Biological Characteristics: Musk thistle is a tap-rooted biennial.  Musk thistle reproduces solely by seed.  Seed remains viable for up to 10 years.
4.  Controls: Herbicide will be applied in the spring and fall to control the rosettes.  When applicable, plants will be mechanically removed before they flower and produce seed. Disturbed areas will be replanted with desirable plant species, establishing a healthy plant community.

BLM_0067403

> **Other Priority Species:**
>
> - Musk thistle
> - Bull thistle
> - Canada thistle
> - Chicory
> - Burdock
> - Cheatgrass

**Bull Thistle:**

1. Management Objective: Eradication of all isolated infestations.
2. Area of eradication: The entire WMA.
3. Biological Characteristics: Bull thistle is a tap-rooted biennial. Bull thistle reproduces only by seed. Seed may remain viable for three years.
4. Controls: Herbicide will be applied in the spring and fall to control the rosettes. When applicable, plants will be mechanically removed before they flower and produce seed. Disturbed areas will be replanted with desirable plant species, establishing a healthy plant community.

**Canada Thistle:**

1. Management Objective: Suppression of isolated infestations.
2. Area of suppression: Entire WMA.
3. Biological Characteristics: Canada thistle is a deep-rooted rhizomatous perennial. Seed is dispersed by wind. The majority of seeds are viable for at least three years. Plants are dioecious (male and female flowers are produced on separate plants).
4. Controls: Suppression of isolated infestations of Canada thistle would primarily be done with herbicides. Mowing of Canada thistle will eliminate seed production but will not eliminate the plant because the root system is still intact.

**Chicory:**

1. Management Objective: Eradication of isolated infestations.
2. Area of eradication: Entire WMA.
3. Biological Characteristics: Chicory is a tap-rooted perennial plant. It reproduces solely by seed.
4. Controls: Chicory will be controlled by cutting, mowing, or pulling plants before seed production. Cultural control will be conducted several times a year over several years to exhaust the root reserves. Herbicides can also be used to control chicory. Disturbed areas will be replanted with desirable plant species, establishing a healthy plant community.

**Burdock:**

1. Management Objective: Eradication of isolated infestations.
2. Area of eradication: Entire WMA in conjunction with treatment of other invasive species.
3. Biological Characteristics: Burdock is a biennial that reproduces entirely by seed. Because it is a biennial, it is important to eliminate seed production and

BLM_0067404

seed in the seed bank.  The seeds have burs that stick to fur or clothing and may be widely dispersed.
4. Controls: Herbicides will be applied before seed production to control the spread of the weed.  First year rosettes will be pulled or the plant mowed after it has bolted to eliminate seed production.

**Cheatgrass:**
1. Management Objective: Suppress small isolated infestations.
2. Area of suppression: Entire WMA.
3. Biological Characteristics: Cheatgrass is an annual grass that reproduces by seeds.  It is characterized by early maturation, high seed production, and vigorous growth in disturbed areas.
4. Control: Maintaining healthy desirable plant communities will help reduce the spread of cheatgrass. New disturbance areas should be effectively reseeded. Grazing should be done at the proper season and livestock use on disturbed areas should be prevented until seeding has been established. Best Management Practices should be employed in road maintenance operations. Native vegetation stands should not be treated if it will encourage the spread of cheatgrass.  Small areas of cheatgrass infestation can be effectively and economically controlled with chemical and seeding.

**Priority #7:  Manage large infestations of High Priority species by area**

It is not possible to eradicate large infestations of High Priority species in the first year of treatment.  Therefore, a multi-year strategy must be used.  The short-term objective is to manage and contain High Priority species that have a propensity to spread.   The long-term objective is the eradication of High Priority species within the entire WMA.

**Purple loosestrife:**
1. Management Objective: All known isolated infestations will be aggressively treated.
2. Area of eradication: Entire WMA.
3. Status: There are no known large infestations in the WMA.
4. Control: Montrose County has been treating the known infestations of Purple loosestrife for several years.  Because it is found in very wet soils, it is important to use the correct herbicide.

**Russian Knapweed:**
1. Management Objective: Containment of known large infestations.  Prevent its spread into weed free areas. County and CDOT are best positioned to treat the roadways within the WMA.  The agencies will start their treatments at the top of the watersheds and move down towards the San Miguel and Dolores Rivers.

BLM_0067405

2. Area of containment: Russian knapweed is the most wide spread invasive species found in the WMA. Remote isolated patches will be treated starting at the top of each watershed and working down to the valley floor. Each year this containment strategy will be adjusted depending on treatment success.
3. Status: The highest concentrations of this species are on the private lands in yards, roadways, ditches and abandoned fields. The canopy cover is some areas are as high as 100%.  It is important to prevent its spread into weed free areas through uncleaned equipment, livestock, or weed-infested forage.
4. Control: Herbicides will be used to treat infestations. To prevent the spread, Best Management Practices must be followed.  There are no known biocontrol agents for Russian knapweed.

**Spotted knapweed:**
1. Management Objective: Containment of any infestations and prevention of seed production.
2. Area of containment: Entire WMA.
3. Status: No large infestations have been delineated.  If large infestations are inventoried, a treatment strategy will be developed.
4. Control: Herbicides are the best treatment option for large infestations. No known bio-control agents are available.

**Tamarisk (Saltcedar):**
1. Management Objective: Eradication of all infestations in the San Miguel River corridor and containment in the remainder of the WMA. The Nature Conservancy will take the lead in developing a plan to accomplish eradication in the San Miguel drainage.
2. Area of containment: The San Miguel and  Dolores River corridors and their tributaries. Large infestations are also found in Paradox Valley.
3. Status: It is found across the WMA in most wetland environments. The main concentrations are along the rivers and up the side drainages.  It is also found in private irrigated lands where the wastewater accumulates. The following is an excerpt from The Nature Conservancy plan for treating Tamarisk:

> *The project's goal is to establish the San Miguel as the only naturally functioning, non-native tree-free river in the Upper Colorado River Basin, through federal, state and private landowner partnership activities.*

> *The eradication effort involves assigning trained crews and leaders to different tributaries. The crew starts at the upstream reach to tamarisk infestation for each tributary and work downstream on all properties where private landowners have allowed permission for the removal of non-native trees.  Crews*

*use the cut-stump method of eradication because it is the most effective and protects desirable native vegetation. This method requires cutting down all non-native trees and applying the herbicide Garlon 4 directly to the cut tamarisk, olive and elm stumps. Cut trees will be left in brush piles or run through a chipper where possible. The Nature Conservancy will conduct follow-up work within twelve months, but long-term control will be the responsibility of the landowners.*

4. Control: Cutting tamarisk trees and applying herbicide to the stump has been found to be the most effect control. Re-treatment with herbicides of the whips or sprouts needs to follow within three years. A trial biological control release was initiated in 2007 by the BLM in the Dolores River Drainage. If these trials are deemed successful, these insects will become an important tool in the management of tamarisk. Fire may also be used to open dense stands so that treatment can be done.

**Whitetop (Hoary Cress):**
1. Management Objective: Containment of any infestations and prevention of seed production.
2. Area of containment: Entire WMA.
3. Status: No large infestations have been delineated. If large infestations are inventoried, a treatment strategy will be developed.
4. Control: Herbicides are the most effective method to control the spread of whitetop.

**Oxeye Daisy:**
1. Management Objective: Containment of infestations.
2. Area of containment: Entire WMA.
3. Status: No large infestations have been delineated. If large infestations are inventoried, a treatment strategy will be developed.
4. Control: Herbicides are the best treatment option. No known biocontrol agents are available for Oxeye Daisy.

**Houndstongue:**
1. Management Objective: Containment of infestations.
2. Area of containment: Entire WMA.
3. Status: No large infestations have been delineated. If large infestations are inventoried, a treatment strategy will be developed.
4. Control: Herbicides are the most effective tool available. There are no known biocontrol agents for houndstongue. Implementing Best Management Practices will help to reduce its spread.

BLM_0067407

**Russian olive:**
1. Management Objective: Containment of infestations.
2. Area of containment: Entire WMA.
3. Status: Russian olive is common in the irrigated private lands in the WMA, along fencerows, and in sites that receive good moisture.
4. Control: Effective control includes removing top growth, suppressing regrowth with herbicides, and maintaining a healthy ground cover.  Russian olive is shade intolerant.


**Priority #8:  Manage large infestations of Other Priority species by area**

It is not possible to suppress large infestations of Other Priority species in the first year of treatment.  Therefore, a multi-year strategy must be used.  The short-term objective is to manage and contain these species. The long-term objective is the suppression of these species within the entire WMA.

**Musk Thistle:**
1. Management Objective: Contain large infestations.
2. Area of containment: Entire WMA.
3. Status: There are no known large infestations, but this species is found in significant patches on private lands.
4. Control: Herbicides will be applied in the spring and fall to control the rosettes on this biennial. Plants should be treated before seed production in June to September.

**Bull Thistle:**
1. Management Objective: Contain large infestations.
2. Area of containment: Entire WMA.
3. Status: There are no known large infestations, but this species is found in significant patches on private lands.
4. Control: Herbicides will be applied in the spring and fall to control the rosettes on this biennial. Plants should be treated before seed production in June to September.

**Canada Thistle:**
1. Management Objective: Containment of large infestations.
2. Area of containment: Entire WMA.
3. Status: This species in commonly found across the WMA.
4. Control: This weed will be treated when other priority weeds are being treated in the same area. Canada thistle will be contained to keep from spreading by using Best Management Practices. Herbicides will be used to control infestation from the outside toward the center. Biological control agents can be used, but are marginally effective.

BLM_0067408

**Chicory:**
1. Management Objective: Contain infestations.
2. Area of containment: Entire WMA
3. Status: There are no known large infestations, but this species can quickly get out of control in cultivated fields if not dealt with early.
4. Control: It can be controlled by mowing, cutting or pulling plants before seed production. Herbicides are also effective on chicory.

**Burdock:**
1. Management Objective:  Contain infestations.
2. Area of containment: Entire WMA
3. Status: There are no known large infestations, but it is commonly found along roadsides, ditch banks, and waste areas.
4. Control:  The establishment of new infestations and seed reproduction on existing infestations will be prevented. Rosettes will be treated in the first year and the stem cut or mowed in the second year to prevent seed production. Herbicides are effective on burdock.

**Cheatgrass:**
1. Management Objective: Manage the spread of cheatgrass in all activities.
2. Area of containment: Entire WMA.
3. Status: Cheatgrass is widespread throughout the WMA.  Disturbances (fire, roads, grazing, etc) have led to the spread of cheatgrass.
4. Control: An integrated approach will be used on large infestations of cheatgrass. Maintaining healthy desirable plant communities will also help reduce the spread of cheatgrass. New disturbance areas should be effectively reseeded. Grazing should be done at the proper season and livestock use on disturbed areas should be prevented until seeding has been established. Best Management Practices should be employed in road maintenance operations. Native vegetation stands should not be treated if it will encourage the spread of cheatgrass.  Small areas of cheatgrass infestation can be effectively and economically controlled with chemical and seeding.

BLM_0067409

**What would success look like in 5 years?**

- Early Detection and Rapid Response eradicate all new infestations of new invasive species.

- Weed Free Areas have increased in size.

- Inventoried acres of existing infestations have declined in size and a reduction in canopy cover or plant density has been demonstrated.

- Weed Prevention BMP's are common practices. Because motorized travel and waterways are the most common agents for spreading weeds these areas become important for treatment.

## VIII. Possible Mitigation Measures

Mitigation measures *to be considered* if IWM Techniques have not been successful in 3 years.

- Infestations of high priority species (40% or greater canopy cover) in an area leads to a loss in carrying capacity. In situations where aggressive, high priority weed species become established, consideration will be given to limited livestock grazing deferment to allow existing native vegetation to increase in vigor after a weed treatment strategy has been implemented. Where the weed treatment strategy involves reseeding, livestock grazing will be deferred for two growing seasons.

- Trails, trailheads, and secondary roads with high infestations of high priority species will be closed to public until treatment objectives can be met.

- The County will develop a penalty for developers not following their Noxious Weed Plan and Best Management Practices.

- Vegetation treatments (prescribed fire, shrub manipulation, reforestation, logging, range improvements) will be designed to inventory and treat invasive species before the treatment takes place and mitigation measures developed that reduce the spread of invasive species.

- Livestock grazing will be managed in a way that does not encourage the establishment or spread of noxious weeds or other invasive plants, or significant degradation of the native plant community.

- All disturbed areas will be seeded using desirable species that provide forage or cover for wildlife, protect soil, and prevent weed infestations.

- Any hay/straw or mulch used in the WMA will be certified and tagged as noxious weed or noxious weed seed free.

- All seed sources used in the WMA will be certified and tagged as noxious weed seed free.

BLM_0067410

- The BLM will take appropriate action with energy companies such as Oil, Gas and Uranium if they are not in compliance with stipulations that mandate re-seeding disturbed soil with an appropriate perennial seed mix or to clean all equipment and vehicles prior to entering the WMA.

BLM_0067411

This page has been left blank intentionally.

BLM_0067412

# UNITED NATIONS
DEPARTMENT OF ECONOMIC AND SOCIAL AFFAIRS
## (HTTPS://WWW.UN.ORG/DEVELOPMENT/DESA/EN/)



*Search UN DESA*

Home (https://www.un.org/development/desa/en/) » News (https://www.un.org/development/desa/en/news.html)
» World population projected to reach 9.8 billion in 2050, and 11.2 billion in 2100

## News



## World population projected to reach 9.8 billion in 2050, and 11.2 billion in 2100

21 June 2017, New York

The current world population of 7.6 billion is expected to reach 8.6 billion in 2030, 9.8 billion in 2050 and 11.2 billion in 2100, according to a new United Nations report being launched today. With roughly 83 million people being added to the world's population every year, the upward trend in population size is expected to continue, even assuming that fertility levels will continue to decline.

The *World Population Prospects: The 2017 Revision*, published by the UN Department of Economic and Social Affairs, provides a comprehensive review of global demographic trends and prospects for the future. The information is essential to guide policies aimed at achieving the new Sustainable Development Goals.

Shifts in country population rankings

The new projections include some notable findings at the country level. China (with 1.4 billion inhabitants) and India (1.3 billion inhabitants) remain the two most populous countries, comprising 19 and 18% of the total global population. In roughly seven years, or around 2024, the population of India is expected to surpass that of China.

Among the ten largest countries worldwide, Nigeria is growing the most rapidly. Consequently, the population of Nigeria, currently the world's 7th largest, is projected to surpass that of the United States and become the third largest country in the world shortly before 2050.

Most of the global increase is attributable to a small number of countries

BLM_0067413

From 2017 to 2050, it is expected that half of the world's population growth will be concentrated in just nine countries: India, Nigeria, the Democratic Republic of the Congo, Pakistan, Ethiopia, the United Republic of Tanzania, the United States of America, Uganda and Indonesia (ordered by their expected contribution to total growth).

The group of 47 least developed countries (LDCs) continues to have a relatively high level of fertility, which stood at 4.3 births per woman in 2010-2015. As a result, the population of these countries has been growing rapidly, at around 2.4 % per year. Although this rate of increase is expected to slow significantly over the coming decades, the combined population of the LDCs, roughly one billion in 2017, is projected to increase by 33 % between 2017 and 2030, and to reach 1.9 billion persons in 2050.

Similarly, Africa continues to experience high rates of population growth. Between 2017 and 2050, the populations of 26 African countries are projected to expand to at least double their current size.

The concentration of global population growth in the poorest countries presents a considerable challenge to governments in implementing the 2030 Agenda for Sustainable Development, which seeks to end poverty and hunger, expand and update health and education systems, achieve gender equality and women's empowerment, reduce inequality and ensure that no one is left behind.

Slower world population growth due to lower fertility rates

In recent years, fertility has declined in nearly all regions of the world. Even in Africa, where fertility levels are the highest of any region, total fertility has fallen from 5.1 births per woman in 2000-2005 to 4.7 in 2010-2015.

Europe has been an exception to this trend in recent years, with total fertility increasing from 1.4 births per woman in 2000-2005 to 1.6 in 2010-2015.

More and more countries now have fertility rates below the level required for the replacement of successive generations (roughly 2.1 births per woman), and some have been in this situation for several decades. During 2010-2015, fertility was below the replacement level in 83 countries comprising 46 % of the world's population. The ten most populous countries in this group are China, the United States of America, Brazil, the Russian Federation, Japan, Viet Nam, Germany, the Islamic Republic of Iran, Thailand, and the United Kingdom (in order of population size).

Lower fertility leads also to ageing populations

The report highlights that a reduction in the fertility level results not only in a slower pace of population growth but also in an older population.

Compared to 2017, the number of persons aged 60 or above is expected to more than double by 2050 and to more than triple by 2100, rising from 962 million globally in 2017 to 2.1 billion in 2050 and 3.1 billion in 2100.

In Europe, 25% of the population is already aged 60 years or over. That proportion is projected to reach 35% in 2050 and to remain around that level in the second half of the century. Populations in other regions are also projected to age significantly over the next several decades and continuing through 2100. Africa, for example, which has the youngest age distribution of any region, is projected to experience a rapid ageing of its population. Although the African population will remain relatively young for several more decades, the percentage of its population aged 60 or over is expected to rise from 5% in 2017 to around 9% in 2050, and then to nearly 20% by the end of the century.

Globally, the number of persons aged 80 or over is projected to triple by 2050, from 137 million in 2017 to 425 million in 2050. By 2100 it is expected to increase to 909 million, nearly seven times its value in 2017.

Population ageing is projected to have a profound effect on societies, underscoring the fiscal and political pressures that the health care, old-age pension and social protection systems of many countries are likely to face in the coming decades.

Higher life expectancy worldwide

Substantial improvements in life expectancy have occurred in recent years. Globally, life expectancy at birth has risen from 65 years for men and 69 years for women in 2000-2005 to 69 years for men and 73 years for women in 2010-2015. Nevertheless, large disparities across countries remain.

Although all regions shared in the recent rise of life expectancy, the greatest gains were for Africa, where life expectancy rose by 6.6 years between 2000-2005 and 2010-2015 after rising by less than 2 years over the previous decade.

The gap in life expectancy at birth between the least developed countries and other developing countries narrowed from 11 years in 2000-2005 to 8 years in 2010-2015. Although differences in life expectancy across regions and income groups are projected to persist in future years, such differences are expected to diminish significantly by 2045-2050.

The increased level and reduced variability in life expectancy have been due to many factors, including a lower under-five mortality rate, which fell by more than 30 % in 89 countries between 2000-2005 and 2010-2015. Other factors include continuing reductions in fatalities due to HIV/AIDS and progress in combating other infectious as well as non-communicable diseases.

Large movements of refugees and other migrants

BLM_0067414

There continue to be large movements of migrants between regions, often from low- and middle-income countries toward high-income countries. The volume of the net inflow of migrants to high-income countries in 2010-2015 (3.2 million per year) represented a decline from a peak attained in 2005-2010 (4.5 million per year). Although international migration at or around current levels will be insufficient to compensate fully for the expected loss of population tied to low levels of fertility, especially in the European region, the movement of people between countries can help attenuate some of the adverse consequences of population ageing.

The report observes that the Syrian refugee crisis has had a major impact on levels and patterns of international migration in recent years, affecting several countries. The estimated net outflow from the Syrian Arab Republic was 4.2 million persons in 2010-2015. Most of these refugees went to Syria's neighbouring countries, contributing to a substantial increase in the net inflow of migrants especially to Turkey, Lebanon and Jordan.

About the report

The 2017 Revision of World Population Prospects is the 25th round of official UN population estimates and projections that have been prepared by the Population Division of the United Nations Department of Economic and Social Affairs.

The 2017 Revision builds on previous revisions by incorporating additional results from the 2010 and 2020 rounds of national population censuses as well as findings from recent specialized sample surveys from around the world. The 2017 Revision provides a comprehensive set of demographic data and indicators that can be used to assess population trends at the global, regional and national levels and to calculate other key indicators for monitoring progress toward the Sustainable Development Goals.


Related information
▸ World Population Prospects: The 2017 Revision (https://esa.un.org/unpd/wpp/)


NEWS BY YEAR

▸ 2018 (https://www.un.org/development/desa/en/news/2018) (37)
▸ 2017 (https://www.un.org/development/desa/en/news/2017) (177)
▸ 2016 (https://www.un.org/development/desa/en/news/2016) (155)
▸ 2015 (https://www.un.org/development/desa/en/news/2015) (173)
▸ 2014 (https://www.un.org/development/desa/en/news/2014) (136)
▸ 2013 (https://www.un.org/development/desa/en/news/2013) (133)
▸ 2012 (https://www.un.org/development/desa/en/news/2012) (138)
▸ 2011 (https://www.un.org/development/desa/en/news/2011) (140)
▸ 2010 (https://www.un.org/development/desa/en/news/2010) (68)


NEWS BY KEY ISSUE

▸ Economic and Social Council (https://www.un.org/development/desa/en/categories/ecosoc)
▸ Sustainable Development (https://www.un.org/development/desa/en/categories/sustainable)
▸ Population (https://www.un.org/development/desa/en/categories/population)
▸ Public Administration (https://www.un.org/development/desa/en/categories/administration)
▸ Financing for Development (https://www.un.org/development/desa/en/categories/financing)
▸ Social Development (https://www.un.org/development/desa/en/categories/social)
▸ Statistics (https://www.un.org/development/desa/en/categories/statistics)
▸ Policy Analysis (https://www.un.org/development/desa/en/categories/policy)
▸ Forests (https://www.un.org/development/desa/en/categories/forest)

---

**About UN DESA (https://www.un.org/development/desa/en/about.html)**

Who we are (https://www.un.org/development/desa/en/about/who-we-are.html)
What we do (https://www.un.org/development/desa/en/about/what-we-do.html)
ECESA (https://www.un.org/development/desa/ecesa/)
UN 70 (https://www.un.org/development/desa/en/about/history.html)
Conferences & Summits (https://www.un.org/development/desa/en/about/conferences.html)

**Leadership (https://www.un.org/development/desa/statements/leadership.html)**

BLM_0067415

USG Liu Zhenmin (https://www.un.org/development/desa/statements/usg-liu.html)
USG Statements (https://www.un.org/development/desa/statements/mr-liu/)
ASG Statements (https://www.un.org/development/desa/statements/asg/statements.html)

**UN DESA Divisions (https://www.un.org/development/desa/en/about/desa-divisions.html)**

Office for ECOSOC Support and Coordination (https://www.un.org/ecosoc/en/node/454160)
Division for Sustainable Development (http://sustainabledevelopment.un.org/)
Population Division (http://www.un.org/esa/population/)
Division for Public Administration and Development Management (http://publicadministration.un.org/en/)
Financing for Development Office (http://www.un.org/esa/ffd/)
Division for Social Policy and Development (http://www.un.org/development/desa/dspd/)
Statistics Division (http://unstats.un.org/unsd/default.htm)
Development Policy and Analysis Division (https://www.un.org/development/desa/dpad/)
United Nations Forum on Forests (http://www.un.org/esa/forests/)
Capacity Development Office (https://www.un.org/development/desa/capacity-development/)

**Key Issues (https://www.un.org/development/desa/en/key-issues.html)**

Economic and Social Council (https://www.un.org/development/desa/en/key-issues/ecosoc.html)
Sustainable Development (https://www.un.org/development/desa/en/key-issues/sustainable.html)
Population (https://www.un.org/development/desa/en/key-issues/population.html)
Public Administration (https://www.un.org/development/desa/en/key-issues/administration.html)
Financing for Development (https://www.un.org/development/desa/en/key-issues/financing.html)
Social Development (https://www.un.org/development/desa/en/key-issues/social.html)
Statistics (https://www.un.org/development/desa/en/key-issues/statistics.html)
Policy Analysis (https://www.un.org/development/desa/en/key-issues/policy.html)
Forests (https://www.un.org/development/desa/en/key-issues/forest.html)

**Multimedia (https://www.un.org/development/desa/publications/)**

Multimedia Library (https://www.un.org/development/desa/publications/)

**UN DESA Voice (https://www.un.org/development/desa/undesavoice/)**

Feature (https://www.un.org/development/desa/undesavoice/feature/2018/04)
Highlights (https://www.un.org/development/desa/undesavoice/highlights/2018/04)
Get involved (https://www.un.org/development/desa/undesavoice/get-involved/2018/04)
Expert voices (https://www.un.org/development/desa/undesavoice/expert-voices/2018/04)
In case you missed it (https://www.un.org/development/desa/undesavoice/in-case-you-missed-it/2018/04)
More from UN DESA (https://www.un.org/development/desa/undesavoice/more-from-undesa/2018/04)
All issues (https://www.un.org/development/desa/undesavoice/)

---

**Follow Us**

(http://twitter.com/intent/follow?source=followbutton&variant=1.0&screen_name=undesa)

(http://www.facebook.com/joinundesa)          (http://www.youtube.com/user/UnitedNationsDESA?sub_confirmation=1)

(https://plus.google.com/+UNDESA)          (https://www.un.org/development/desa/en//feed)

# UNITED NATIONS (//WWW.UN.ORG/EN/)

Copyright (//www.un.org/en/aboutun/copyright/) | Fraud Alert (//www.un.org/en/aboutun/fraudalert/) | Privacy Notice (//www.un.org/en/aboutun/privacy/) |
Site Index (//www.un.org/en/siteindex/) | Terms of Use (//www.un.org/en/aboutun/terms/)

BLM_0067416

| Drought Monitor | Forecasts | What's New | Current Conditions Home | About Us | Archive | Contact Us | Links |

# Drought Monitor: State-of-the-Art Blend of Science and Subjectivity

### What You See

**D0-D4:** The Drought Monitor summary map identifies general drought areas, labelling droughts by intensity, with D1 being the least intense and D4 being the most intense. D0, drought watch areas, are either drying out and possibly heading for drought, or are recovering from drought but not yet back to normal, suffering long-term impacts such as low reservoir levels.

**A and H:** Since "drought" means a moisture deficit bad enough to have social, environmental or economic effects, we generally include a description of what the primary physical effects are:

  A = agricultural (crops, pastures, and grasslands)
  H = water supplies (rivers, groundwater and reservoirs)

## The Thinking Behind the Map

Drought intensity categories are based on five key indicators and numerous supplementary indicators. The accompanying drought severity classification table shows the ranges for each indicator for each dryness level. Because the ranges of the various indicators often don't coincide, the final drought category tends to be based on what the majority of the indicators show. The analysts producing the map also weight the indices according to how well they perform in various parts of the country and at different times of the year. Also, additional indicators are often needed in the West, where winter snowfall has a strong bearing on water supplies.

| Drought Severity Classification | | | | | | | |
|---|---|---|---|---|---|---|---|
| | RANGES | | | | | | |
| Category | Description | Possible Impacts | Palmer Drought Index | CPC Soil Moisture Model (Percentiles) | USGS Weekly Streamflow (Percentiles) | Standardized Precipitation Index (SPI) | Objective Short and Long-term Drought Indicator Blends (Percentiles) |
| D0 | Abnormally Dry | Going into drought: short-term dryness slowing | -1.0 to -1.9 | 21-30 | 21-30 | -0.5 to -0.7 | 21-30 |

BLM_0067417

Explanation of the US Drought Monitor

| | | planting, growth of crops or pastures. Coming out of drought: some lingering water deficits; pastures or crops not fully recovered | | | | | |
|---|---|---|---|---|---|---|---|
| D1 | Moderate Drought | Some damage to crops, pastures; streams, reservoirs, or wells low, some water shortages developing or imminent; voluntary water-use restrictions requested | -2.0 to -2.9 | 11-20 | 11-20 | -0.8 to -1.2 | 11-20 |
| D2 | Severe Drought | Crop or pasture losses likely; water shortages common; water restrictions imposed | -3.0 to -3.9 | 6-10 | 6-10 | -1.3 to -1.5 | 6-10 |
| D3 | Extreme Drought | Major crop/pasture losses; widespread water shortages or restrictions | -4.0 to -4.9 | 3-5 | 3-5 | -1.6 to -1.9 | 3-5 |
| D4 | Exceptional Drought | Exceptional and widespread crop/pasture losses; shortages of water in reservoirs, | -5.0 or less | 0-2 | 0-2 | -2.0 or less | 0-2 |

BLM_0067418

| | | streams, and wells creating water emergencies | | | | | |
|---|---|---|---|---|---|---|---|

Short-term drought indicator blends focus on 1-3 month precipitation. Long-term blends focus on 6-60 months. Additional indices used, mainly during the growing season, include the USDA/NASS Topsoil Moisture, Keetch-Byram Drought Index (KBDI), and NOAA/NESDIS satellite Vegetation Health Indices. Indices used primarily during the snow season and in the West include snow water content, river basin precipitation, and the Surface Water Supply Index (SWSI). Other indicators include groundwater levels, reservoir storage, and pasture/range conditions.

## Reality Check

Though the maps are based on the key indices and other measures of moisture, the final maps are tweaked to reflect real-world conditions as reported by numerous experts throughout the country.

## The Partners

A partnership consisting of the U.S. Department of Agriculture (Joint Agricultural Weather Facility and National Water and Climate Center), the National Weather Service's Climate Prediction Center, National Climatic Data Center, and the National Drought Mitigation Center at the University of Nebraska Lincoln produces the Drought Monitor. However, advice from many other sources is incorporated in the product, including virtually every government agency dealing with drought.

## This Does Not Replace Local Information

The Drought Monitor is intended to provide a general and up-to-date summary of current drought conditions across the 50 states, Puerto Rico, and the Pacific possessions. This national product is designed to provide the "big picture" so the general public, media, government officials, and others can see what is happening around the country. To keep the map from becoming too complex, the drought categories shown represent typical drought intensities, not every drought intensity, within the area. The map is not designed to depict local conditions or to replace drought warnings and watches issued by local or regional government entities. Local or state entities may be monitoring different indicators than those used in the Drought Monitor to meet specific needs or to address local problems. As a consequence, there could be water shortages or crop failures within an area not designated as drought, just as there could be locations with adequate water supplies in an area designated as D3 or D4 (extreme or exceptional) drought.

Updated January 2, 2008

BLM_0067419

*UTAH GEOLOGICAL AND MINERALOGICAL SURVEY*
*affiliated with*
*THE COLLEGE OF MINES AND MINERAL INDUSTRIES*

# GEOLOGY OF
# UINTAH COUNTY

*Bulletin 72* • *Price $2.00* • *June 1964*



# UTAH GEOLOGICAL AND
# MINERALOGICAL SURVEY

103 Civil Engineering Building
University of Utah
Salt Lake City, Utah 84112

THE UTAH GEOLOGICAL AND MINERALOGICAL SURVEY since 1949 has been affiliated with the College of Mines and Mineral Industries at the University of Utah. It operates under a director with the advice and counsel of an Advisory Board appointed by the Board of Regents of the University of Utah from organizations and categories specified by law.

The survey is enjoined to cooperate with all existing agencies to the end that the geological and mineralogical resources of the state may be most advantageously investigated and publicized for the good of the state. The *Utah Code, Annotated, 1953 Replacement Volume 5, Chapter 36, 53-36-2*, describes the Survey's functions.

Official maps, bulletins, and circulars about Utah's resources are published. (Write *to the Utah* Geological and Mineralogical Survey for the latest list of publications available).

THE LIBRARY OF SAMPLES FOR GEOLOGIC RESEARCH. A modern library for stratigraphic sections, drill cores, well cuttings, and miscellaneous samples of geologic significance has been established by the Survey at the University of Utah. It was initiated by the Utah Geological and Mineralogical Survey in cooperation with the Departments of Geology of the universities in the state, the Utah Geological Society, and the Intermountain Association of Petroleum Geologists. This library was made possible in 1951 by a grant from the University of Utah Research Fund and by the donation of collections from various oil companies operating in Utah.

The objective is to collect, catalog, and systematically file geologically significant specimens for library reference, comparison, and research, particularly cuttings from all important wells driven in Utah, and from strategic wells in adjacent states, the formations, faunas, and structures of which have a direct bearing on the possibility of finding oil, gas, salines or other economically or geologically significant deposits in this state. For catalogs, facilities, hours, and service fees, contact the office of the Utah Geological and Mineralogical Survey.

THE SURVEY'S BASIC PHILOSOPHY is that of the U. S. Geological Survey, i.e., our employees shall have no interest in Utah lands. For permanent employees this restriction is lifted after a 2-year absence; for consultants employed on special problems, there is a similar time period which can be modified only after publication of the data or after the data have been acted upon. For consultants, there are no restrictions beyond the field of the problem, except where they are working on a broad area of the state and, here, as for all employees, we rely on their inherent integrity.

DIRECTORS:
William P. Hewitt, 1961-
Arthur L. Crawford, 1949-1961

# GEOLOGY OF
# UINTAH COUNTY

*by G. E. and B. R. Untermann*





*Utah Geological & Mineralogical Survey
affiliated with
The College of Mines & Mineral Industries
University of Utah, Salt Lake City, Utah*

BULLETIN 72 • PRICE $2.00 • JUNE 1964

BLM_0067422

# UNIVERSITY OF UTAH
*J. Ray Olpin, Ph.D., President*

## BOARD OF REGENTS

| | |
|---|---|
| Royden G. Derrick | Chairman |
| Carvel Mattsson | Vice Chairman |
| Reed W. Brinton | Member |
| Wilford W. Clyde | Member |
| John A. Dixon | Member |
| Richard L. Evans | Member |
| Leland B. Flint | Member |
| Mitchell Melich | Member |
| Blanche T. Miner | Member |
| John L. Strike | Member |
| Brant Stringham | Member |
| A. Ray Olpin | President, Univ. of Utah, Ex-officio Member |
| Lamont F. Toronto | Secretary of State, Ex-officio Member |
| Glen M. Hatch | Alumni Assoc., Ex-officio Member |
| George S. Eccles | Treasurer |
| Rulon L. Bradley | Secretary |

# UTAH GEOLOGICAL AND MINERALOGICAL SURVEY

## ADVISORY BOARD

| | |
|---|---|
| John M. Ehrhorn, Chairman | U.S. Smelting, Refining, & Mining Co. |
| Carl J. Christensen | University of Utah |
| Ballard H. Clemmons | U.S. Bureau of Mines |
| R. LaVaun Cox | Utah Petroleum Council |
| Armand J. Eardley | University of Utah |
| Lowell S. Hilpert | U.S. Geological Survey |
| Lehi F. Hintze | Brigham Young University |
| Walker Kennedy | Liberty Fuel Co., Utah-Wyo. Coal Oper. Assoc |
| Ezra C. Knowlton | Utah Sand and Gravel Product Corp. |
| Elwood I. Lentz | Western Phosphates Inc. |
| E. Jay Mayhew | Apex Exploration Co. |
| William T. Nightingale | Mountain Fuel Supply Co., R.M.O.G.A. |
| John C. Osmond | Consulting Geologist, I.A.P.G. |
| Dean F. Peterson | Utah State University |
| Miles P. Romney | Utah Mining Association |
| Alvin J. Thuli | Kennecott Copper Corp., A.I.M.E. |
| Richard S. Stone | U.S. Steel Corporation |
| James W. Wade | Retired |
| J. Stewart Williams | Utah State University |

## STAFF

| | |
|---|---|
| William P. Hewitt | Director |
| Arthur L. Crawford | Assistant Director |
| Robert E. Cohenour | Research Geologist |
| Hellmut H. Doelling | Geologist |
| Janice A. King | Office Manager |
| Linda V. Robinett | Bookkeeper |

## TABLE OF CONTENTS

ABSTRACT .............................................. 9

INTRODUCTION AND ACKNOWLEDGMENTS .................. 11

PREHISTORIC SETTLERS .................................. 11

EXPLORATION AND WHITE SETTLEMENT ..................... 12

PHYSICAL GEOGRAPHY ................................... 13
    The Uinta Range ................................... 13
    The Uinta Basin ................................... 15
    The Tavaputs Plateau .............................. 16

FAUNA ................................................ 17

ECONOMIC DEVELOPMENT ................................ 17

STRATIGRAPHY ......................................... 19
    General Statement ................................. 19

PRECAMBRIAN .......................................... 22
    Uinta Mountain Group ............................. 22

CAMBRIAN ............................................. 23
    Lodore Formation ................................. 23

EARLY PALEOZOIC SYSTEMS .............................. 23

CARBONIFEROUS SYSTEMS ............................... 25
    Mississippian (Lower Carboniferous) ............... 25
        General Statement ............................. 25
        Madison Limestone ............................. 25
        Deseret Limestone ............................. 25
        Humbug Formation .............................. 26
        Manning Canyon Formation ...................... 26
    Pennsylvanian (Upper Carboniferous) .............. 27
        General Statement ............................. 27
        Morgan Formation .............................. 27
        Weber Sandstone .............................. 29

PERMIAN SYSTEM ....................................... 29
    Park City Formation (Phosphoria) ................. 29

BLM_0067424

TRIASSIC SYSTEM .................................................... 30
    General Statement ................................................. 30
    Moenkopi Formation ............................................. 31
    Shinarump Conglomerate .................................... 32
    Chinle Formation ................................................ 33

JURASSIC SYSTEM .................................................. 34
    General Statement ................................................. 34
    Navajo Sandstone ................................................. 35
    Carmel Formation ................................................ 36
    Entrada Sandstone ............................................... 36
    Curtis Formation ................................................ 37
    Morrison Formation ............................................. 37

LOWER CRETACEOUS SYSTEM ................................... 41
    General Statement ................................................. 41
    Buckhorn Conglomerate (Lakota) ........................ 42
    Cedar Mountain Shale (Fuson) ........................... 42
    Dakota Sandstone ............................................... 43

UPPER CRETACEOUS SYSTEM .................................. 43
    General Statement ................................................. 43
    Mowry Shale (Aspen, in part) ............................ 43
    Frontier Sandstone ............................................. 45
    Emery Sandstone ................................................ 46
    Mancos (Upper Shale) Formation ....................... 46
    Mesaverde Group ................................................ 46

TERTIARY SYSTEM .................................................. 49
    General Statement ................................................. 49
    Eocene Series .................................................... 50
    Paleocene-Wasatch Formation ............................ 50
    Green River Formation ....................................... 51
    Uinta Formation ................................................ 59
    Oligocene Series ................................................ 61
    Duchesne River Formation ................................. 61
    Miocene? Series ................................................. 63
    Bishop Conglomerate-Browns Park Formation .......... 63

QUATERNARY SYSTEM ............................................ 66
    Quaternary Alluvium ........................................... 67

METAMORPHIC ROCKS ............................................ 69

IGNEOUS ROCKS .................................................... 71

STRUCTURAL GEOLOGY ........................................... 71
    Folds ................................................................ 71
    Age of Deformation ............................................ 71

4

FAULTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
      South Flank Fault Zone . . . . . . . . . . . . . . . . . . . . . . . 74
      Deep Creek Fault Zone . . . . . . . . . . . . . . . . . . . . . . . . 74
      Island Park Fault . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
      Red Rock Fault . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
      Yampa Fault . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
      Miners Draw-Wolf Creek Fault . . . . . . . . . . . . . . . . . . 78
      Trail Creek Fault Zone . . . . . . . . . . . . . . . . . . . . . . . . 78
      Faults Confined to Tertiary Beds . . . . . . . . . . . . . . . . . 78

AGE OF FAULTING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

JOINTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

GEOMORPHOLOGY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
      Erosion Surface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

GLACIATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
      Correlation with Other Areas . . . . . . . . . . . . . . . . . . . . 89
      Age Relations Between Stream and Glacial Erosion . . . . . . 89

ECONOMIC GEOLOGY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
      General Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
      Hydrocarbons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
      Oil and Gas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
      Oil Shale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
      Gilsonite . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
      Asphalt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
      Coal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
    Other Minerals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
      Phosphate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
      Sand and Gravel . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94
      Bentonite . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94
    Metallic Minerals . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94
      Copper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94
      Iron . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94
      Uranium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

WATER RESOURCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

FOSSILS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

CITED REFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

INDEX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

BLM_0067426

9

## LIST OF ILLUSTRATIONS

Figure 1   Index Map of the Area .............................. 14

Figure 2   Looking south toward the Uinta Basin from
Blue Mountain ..................................... 16

Figure 3   Correlation Chart of the Uinta Basin and
Mountain area ..................................... 18

Figure 4   Correlation Sections from Duchesne River
Area to Lily Park, Colorado ....................... 20

Figure 5   Lodore Canyon, Green River, Upper Precambrian,
Uinta Mountain Group .............................. 22

Figure 6   Mississippian (CMm) and Cambrian upper Lodore
(€l) formations, "Mouth of Jones Hole Creek near
confluence with Green River. ...................... 24

Figure 7   Basal Cambrian, Lodore sandstone (€lss), Mouth
of Jones Hole near confluence with Green River ..... 24

Figure 8   Pennsylvanian (Morgan) upper center distance.
Mississippian and Cambrian below and right.
Mouth of Jones Hole Creek, near confluence with
Green River. ...................................... 26

Figure 9   Morgan formation, Whirlpool Canyon (center) and
Wild Mountain (distance). Capped by Weber in
center and foreground ............................. 28

Figure 10  Park City (Ppc) and Weber (Cpw) formations. ..... 30

Figure 11  Brush Creek area, north of Vernal.
Permian, (left), and Triassic (right) formations.
Looking east from Highway 44, north of Vernal. ..... 31

Figure 12  Chinle formation with Shinarump in foreground.
Diamond Mountain rim in background. ............... 32

Figure 13  Navajo sandstone showing tangential cross-
bedding, Cliff Creek area, east of Jensen, Utah. ... 34

Figure 14  Navajo sandstone, showing curves formed by wind
and water erosion. Steinaker Draw, north of Vernal. 35

Figure 15  Navajo (jn), Carmel (jca), and Entrada (je) for-
mations in foreground. Curtis and Morrison, left
center. Uinta Range in distance. Cub Creek-Bonnie
May Ranch road, northeast of Jensen. .............. 36

Figure 16  Basal Curtis sandstone - Entrada sandstone contact,
center. Gray upper Curtis shale (left), Carmel
(right). South of Island Park road. .............. 37

Figure 17  Geologic Map of Dinosaur Quarry, Dinosaur
National Monument, Utah. .......................... 38

Figure 18  Dinosaurs and other reptiles typical of those
found in the Morrison formation at Dinosaur Quarry,
Dinosaur National Monument. Painting by Ernest
Untermann, Sr. .................................... 40

Figure 19   Dinosaur femur (thigh bone). Morrison formation.. 40
Figure 20   Morrison and Dakota formations.................. 42
Figure 21   North-south cross-section facing westerly,
through Split Mountain and the Jensen and
Island Park synclines............................ 44
Figure 22   Sections showing Tertiary-Cretaceous rela-
tionship along north side of Uinta Basin.
(Modified from P.T. Walton)..................... 48
Figure 23   Mesaverde formation, Cretaceous, (left)
partially overlapped by Uinta, Eocene (center
right)........................................... 50
Figure 24   Wasatch-Green River (Eocene) contact. Snake
John area, east of Jensen, Utah, south of
Highway No. 40 ................................ 52
Figure 25   Green River formation: Evacuation Creek (top),
Parachute with Mahogany ledge oil-shale bed,
Garden Gulch (lower half of picture) members.
Hells Hole Canyon, southeast of Bonanza ........ 52
Figure 26   Generalized cross section of the Uinta Basin
showing Tertiary overlap ....................... 54
Figure 27   Evacuation Creek member (saline facies) of
the Green River formation showing solution
cavities where minerals have been leached out,
south of Bonanza, Utah ......................... 56
Figure 28   Fluctuations of Lake Uinta shorelines during
deposition of members of the Green River for-
mation. (Modified from M. D. Picard).......... 58
Figure 29   Green River, Evacuations Creek member--
Basal Uinta ("A") contact ...................... 60
Figure 30   Uinta ("B") (Eocene), northeast of Ouray, Utah .... 60
Figure 31   Diagrammatic cross-section showing distri-
bution and intertonguing relationships of
Eocene beds.................................... 62
Figure 32   Browns Park formation, conglomerate. Inter-
bedded with tuffaceous sandstones exposed
at edge of plateau rim, head of Diamond
Mountain road ................................ 64
Figure 33   Browns Park white tuffaceous sandstone.
Crouse Canyon, north of Pot Creek .............. 64
Figure 34   Terrace levels (Jensen, Vernal, and Thorn-
burg) developed in Mancos shale near Ashley
Creek, east of Vernal........................... 68
Figure 35   Late terrace levels along Cliff Creek, east of
Jensen, developed on channel fill alluvium ....... 68

BLM_0067428

Figure 36   Glacial lake, Lake Shore area, southwest
            side of Leidy Peak.  Looking toward north
            slope of Marsh Peak area......................... 70
Figure 37   Morainal debris, west shoulder of Leidy
            Peak.  Quartzite from the Uinta Mountain
            Group (Precambrian) plucked loose by
            movement of glacial ice......................... 70
Figure 38   Generalized Tectonic Map of Uinta
            Mountains and Uinta Basin....................... 72
Figure 39   Island Park fault.  Whirlpool Canyon,
            center, between Harpers Plateau, right,
            and Little Split Mountain (left)................. 75
Figure 40   Looking west from Round Top toward
            Harpers Plateau (Blue Mountain).  Red
            Rock fault on right, Mitten Park fault
            upper right corner.  Yampa fault on left,
            diagonally across photo......................... 77
Figure 41   North-south cross section in Colorado near the
            Utah-Colorado line, facing westerly showing
            step-faulting with repetition of beds............ 79
Figure 42   Lodore Canyon, Green River, showing Uinta
            Mountain Group, Precambrian (PCU)............... 83
Figure 43   Split Mountain Canyon, Green River, looking
            southwest toward mouth of Canyon.  Weber at
            top, Morgan forming most of canyon walls.
            Mississippian in floor of canyon at center....... 85
Figure 44   Mouth of Split Mountain Canyon at the "Gorge".
            Weber (Pennsylvanian), Park City (Permian),
            Moenkopi, Shinarump, Chinle (Triassic) ......... 85
Figure 45   Reliefed partial skeletons in Dinosaur Quarry.
            (Vertebrae, pelvic bones, leg bones, and ribs).... 97
Figure 46   Gastropods (left); Inoceramus pelecypods (clams)
            center;  Crustacean claw, right.  Mancos for-
            mation--Upper Cretaceous.  (Courtesy of Utah
            Field House of Natural History)................. 98
Figure 47   Curtis formation.  Upper Jurassic.  Cephalopods;
            ammonites (left) and Belemnites (right).......... 98
Figure 48   Cretaceous (Frontier) ammonite, Mortoniceras cf.
            shoshonense Niobrara.  (Courtesy of Utah Field
            House of Natural History)....................... 99
Figure 49   Dinosaurs from Dinosaur National Monument
            Quarry.  Left to right:  Laosaurus - Camarasaurus;
            Camptosaurus - Dryosaurus; Glyptops, turtle;
            Hoplosuchus kayi, small reptile (lower left) ...... 99
Geologic Map of Uintah County, Utah - North and South Halfs . (in back pocke

8

# GEOLOGY OF UINTAH COUNTY

*by G. E. and B. R. Untermann*

ABSTRACT

Uintah County, athwart the geographic center of the Uinta Mountains and the parallel Uinta Basin, embraces a topography that ranges from more than 12,000 feet to less than 4,800 feet. Its land forms vary from those typical of high mountains to the badland terrain of a semi-arid region. The master stream, the Green River, flows from north-east to southwest; its main tributaries, the easterly flowing Duchesne River and the westerly flowing White River, follow the topographic low of the Uinta Basin and join the Green River scarcely two miles apart in the center of the county.

The Uinta Mountains, 150 miles in length, the largest individual east-west range in the western hemisphere, contain the highest elevations in Utah. Structurally, they represent a comparatively flat-topped asymmetrical anticlinal fold with similar minor flank folds.

Formations in Uintah County range from Precambrian (Uinta Mountain group) to late Tertiary (Browns Park, Miocene?). Tertiary fluviatile and lacustrine sediments fill the Uinta Basin to a depth of more than 10,000 feet. They abut against the Uinta Mountains with angular discordance on eroded pre-Tertiary beds, although at higher elevations Miocene (?) Browns Park beds nonconformably overlie older strata.

Cretaceous time marked the beginning of folding which continued during the Tertiary with intermittent uplift and large-scale faulting. Maximum uplift of 45,000 feet probably at no time raised the range higher than at present -- erosion keeping pace with uplift. There is indication that elevation still continues.

None of the major faults are continuous across the county, but occur intermittently or as en echelon fractures. Latest major displacement, probably early Pliocene and often occurring along pre-existing fault zones, formed the Uinta Mountain graben in the eastern end of the range.

9

BLM_0067430

During late Pliocene or early Pleistocene, superposition of the major streams greatly influenced the modern drainage pattern; while continental uplift and tilting with attendant stream piracy and entrenching of meanders, resulted in many of the spectacular scenic features of the entire Uinta Mountain and Basin area.

During Quaternary time Uintah County witnessed active denudation and continued faulting, successive periods of elevation or subsidence, renewal of stream activity, arid climates, and torrential storms and flash floods that accumulated poorly sorted fanglomerate material. During the Pleistocene, glaciation of the higher portions of the Uinta Mountains occurred principally west of Longitude $109^{\circ}$ 40' (Ashley Canyon, northwest of Vernal). During recent times, glacial debris, as well as late Tertiary and early Quaternary stream deposits, has been greatly reworked and redistributed farther down the slopes, thus forming terrace gravels of successively younger stages of erosion. The Browns Park (Miocene ?) conglomerates have acted as a source of much of this material.

10

BLM_0067431

## INTRODUCTION AND ACKNOWLEDGEMENTS

Compilation of this bulletin began in 1957 with the mapping of several areas of Uintah County. As time permitted, this mapping was followed by a reconnaissance of the entire county to familiarize the writers with areas in which they had not made a detailed study. It is hoped that the resulting map and bulletin will aid geologists and the public generally.

Uintah County topography varies from high glaciated mountain scenery, through deeply incised canyon country of the Green River drainage, to highly colored badlands of the Uinta Basin. The county has among its outstanding scenic and geologic features a portion of Dinosaur National Monument, with its visitor center and unusual quarry-in-place exhibit of dinosaur skeletons and other displays (Untermann, 1954, p. 1-221). The vivid colors, the fantastic erosion and spectacular attitude of the formations, readily accessible from Vernal, are such that they elicit enthusiastic comment from practically all visitors.

The writers are greatly impressed by the fine work of early geologists in the West who were handicapped by slower means of travel over great distances and rugged terrain, and are much indebted to them and to more recent geologists, oil companies, and others for their individual published reports and information, without which this compilation would not have been possible.

The writers express their appreciation to Arthur L. Crawford, Assistant Director of the Utah Geological and Mineralogical Survey (under whose direction the project began), to the present Director, William P. Hewitt, to Hellmut H. Doelling for his excellent drafting, and to the Survey's staff for their cooperation. The Survey deserves much credit for its achievements and it is to be applauded for the high quality of its work.

## PREHISTORIC SETTLERS

Ancient man arrived in the Uinta Basin and eastern Utah much earlier than is generally believed. A descendant of primitive human immigrants who came to the North American continent across the Bering Strait during late Pleistocene time, he developed in Uintah County, as in most of Utah and the Great Basin, a special culture adapted to an arid region -- the earliest period of which is known as the Desert Culture. It was a time of nomadic life with temporary campsites located along routes where food and water were most easily obtainable. It is believed that later cultures of this region

11

BLM_0067432

originated from the Desert people, whose techniques were carried over, contributing to those of the Basketmakers and Pueblos and to their modifications called the Fremont, thus bridging the gap between the first hunters and farmers and the Ute Indians who later occupied the area.

Indians of Uintah County are now represented by three principal bands of Utes: Uintahs, White Rivers, and Uncompahgres, numbering approximately 1,700, largely confined to the Uintah and Ouray reservations centering around Whiterocks, Ft. Duchesne, and Ouray. The White River and Uncompahgre Utes were transferred to these areas following the Meeker, Colorado, Massacre of 1879.

## EXPLORATION AND WHITE SETTLEMENT

First known white men to enter the Uinta Basin were members of the famous Escalante Expedition of 1776, headed by two Franciscan monks, Fray Silvestre Velez de Escalante, missionary at Zuni in New Mexico, and Fray Francisco Atanasio Dominguez, a contact missionary from Sonora, Mexico. Assigned the task of finding a route through hostile Indian country from Sante Fe, New Mexico, to a new mission at Monterey, then capitol of California, their venture was unsuccessful (Bolton, 1950).

William Henry Ashley, the first of the fur trappers to enter the Uinta Basin, boated down the Green River in 1824. A trading post, established by Antoine Robidoux in 1832 near the site of the present town of Whiterocks (located adjacent to the northwestern boundary of Uintah County), is usually credited as the first "permanent" settlement in Utah. However, an earlier post is claimed by descendants of one of its founders, Jim Reed, to have been established prior to Fort Robidoux and only a few yards to the west. Fort Robidoux survived until 1844 when it was burned by Indians.

Although Mormon pioneers came to Utah in 1847, no attempt was made to colonize the Uinta Basin until late in the summer of 1861, when a scouting party sent out by Brigham Young reported unfavorably on the area. Southwestern Utah was settled instead.

A large part of the Uinta country was proclaimed an Indian reservation by President Abraham Lincoln on October 3, 1861, and Indian agencies were established at various points from Daniels Canyon to Whiterocks between 1864 and 1868. In the early seventies, white personnel from the Indian agency became the first settlers to take up homesteads off the reservation. By 1880 the population justified organization of Uintah County, which then also included the present Daggett County.

12

## PHYSICAL GEOGRAPHY

Uintah* County, centrally located in the extensive Uinta* Mountain and Basin area, is the sixth largest county in Utah, comprising 4,501 square miles. Except for Daggett County adjoining on the north (the Uintah-Daggett county line follows the crest of the Uinta Range), Uintah County occupies the northeastern corner of Utah. Grand County borders Uintah County on the south, Carbon and Duchesne Counties on the west, and the State of Colorado on its eastern border.

Uintah County consists of three geographic provinces which are, from north to south: the Uinta Range, the Uinta Basin, and the Tavaputs Plateau. A discussion of these provinces follows:

### The Uinta Range

The Uinta Range, approximately 150 miles long by 50 miles wide, extends eastward from the Heber area to Cross Mountain, Colorado, and southward from approximately the Utah-Wyoming line to the northern boundary of the Basin. Kings Peak (13,498 feet), in Duchesne County, is the highest peak in Utah. There are 11 peaks more than 13,000 feet in the western half of the range, but the highest in Uintah County (Marsh Peak) is 12,219 feet. These peaks are named for famous paleontologists and geologists such as Marsh, Leidy, Emmons, Gilbert, King, Hayden, and others, who worked in the Western Territories following the Civil War.

The south slope of the Uintas is dissected by many deep, steep-walled, north-south trending canyons. The most important of these are the spectacular rugged canyons of the Green River carved chiefly in Paleozoic formations (Whirlpool, Split Mountain and Jones Hole in Dinosaur National Monument), and Brush Creek Gorge, north of Vernal, Ashley and Dry Fork, to the northwest, and Whiterocks and Uinta in the extreme northwest. Most of these are easily reached over improved roads.

The Uinta Mountains are host to a variety of plant types. Edward H. Graham (1937) in a study for the Carnegie Museum, recognized seven zones and more than 1,100 species. Some of these are:

---

\* The National Board of Geographic Names applies the spelling "Uintah" to political subdivisions, such as counties, reservations, etc., and the spelling "Uinta" to mountains, streams, and other geographic features. The word "Uintah" is believed to mean "that (country) at the foot of long-leaf timber pines, clear stream flowing." (Dillman, 1948, p. 8).

13



Figure 1. Index Map of the Area.

14

BLM_0067435

ALPINE ZONE (11,000 feet and above) -- above timber line meadow (especially where Spruce-Fir zone overlaps the zonal boundary), Lichen.

SPRUCE-FIR ZONE (11,000-10,000 feet) -- White Fir, Douglas Fir, Englemann Spruce, Blue Spruce.

LODGEPOLE PINE ZONE (10,000-8,700 feet) -- Lodgepole Pine, some Ponderosa Pine, and overlapping Quaking Aspen.

QUAKING ASPEN ZONE (8,700-8,000 feet) -- Quaking Aspen, some Ponderosa Pine, and overlapping Lodgepole Pine.

LOWER SLOPES AND PLATEAU ZONES (8,000-7,000 feet) -- Submontane Shrub Associations Artemesia (sagebrush), Amelanchior (serviceberry), Cercocarpus (buck brush - mountain mahogany), Purshia (antelope brush), shrubby cinquefoil, Ribes (wild gooseberry), willows, Ponderosa Pine in parks and moist open areas in canyons.

FOOTHILL ZONE (7,000-5,500 feet) -- dense Piñon-Juniper association (the latter known as Utah "cedar").

Annual precipitation in the mountain zones averages approximately 30 inches. Several feet of snow accumulate during the winter months. Dry years occur occasionally. These greatly reduce the water table and flow of springs, and result in restricted irrigation and livestock use.

### The Uinta Basin

The Uinta Basin, a structural depression paralleling the range on the south, comprises the lowland stream bottoms and badland country (4,800 to 6,000 feet) lying between the Uinta Range and the Tavaputs Plateau. Green River, largest tributary of the Colorado, crosses Uintah County diagonally from northeast to southwest. Duchesne River enters the Green River from the west, and White River from the east just below Ouray. These major drainages and their tributaries have produced a highly developed badland terrain dominated by colorful mesas, buttes, cliff-bench topography, and other typical features formed in the younger and softer rock formations of the Basin. Annual precipitation averages about 9 inches. Vegetation is sparse, but comprises many species of some plant families: Artemesia (sagebrush), salt bush types, Chrysothamnus (rabbit brush), and those typical of the Mixed Desert Shrub Zone: cottonwoods, boxelders, willows, and

15

BLM_0067436

birch dominate stream bottoms; _Atriplex_ (shadscale), _Tetradymia_ (horsebrush), _Sarcobatus_ (greasewood), and _Grayia_ (salt bushes) dominate dry lowland areas (especially alkaline, poorly-drained soils). These together with Artemesia which occurs over a wide range of elevations make excellent browse for livestock. Following winters of considerable precipitation, wild flowers blossom from May to September in a profusion of brilliant hues.



Figure 2. Looking south toward the Uinta Basin from Blue Mountain.

### The Tavaputs Plateau

The Tavaputs Plateau extends into southern Uintah County as a north-ward sloping area, bounded on the south by outward-facing retreating escarpments known as the Roan and Book Cliffs. Elevation at the county line attains 8,000 feet. Vegetation consists of salt bushes, greasewood, shadscale and similar types in the lower reaches and principally sagebrush and juniper-piñon at higher elevations.

16

BLM_0067437

## FAUNA

The fauna overlap the plant zonal boundaries: deer, porcupines, beaver, and marmots are found in most zones; conies (rock rabbits) are observed in the Alpine zone; goshawks, chipmunks, gray squirrels, pine marten, cougar, bear (quite rare), etc., occupy the Spruce-Fir-Lodgepole Pine zones; mountain sheep may be seen in rugged canyons; sage chickens are common in the Submontane Shrub zone; and prarie dogs, badgers, rabbits, ground squirrels, kangaroo rats, lizards, and snakes are common in the lower zones.

## ECONOMIC DEVELOPMENT

Cattle, sheep, dairying and agricultural pursuits, augmented by lumbering, mining, and oil, represent the basic economy of Uintah County (population 12,000). Millions of board feet of timber are cut annually on the Ashley National Forest. Most of this timber lies at elevations between 7,500 and 10,500 feet and is cut for mine props as well as lumber.

From 1888 to 1961, mining was chiefly confined to gilsonite. Early in 1961, however, the development of vast phosphate deposits by the San Francisco Chemical Company began 13 miles north of Vernal. A several hundred year reserve of phosphate ore has been explored on the 14,000+ acres of patented land comprising the property.

The rediscovery of oil on September 18, 1948, in the Ashley Valley Field, 10 miles east of Vernal (first commercial well in Utah) initiated oil and gas production which still has not reached its crest (Crawford, 1963). Red Wash and Ashley fields are now being supplemented by newer discoveries. The impact of the petroleum industry is having a profound beneficial effect on the county's finances.

In 1904 the narrow guage Uintah Railway was constructed from the Denver and Rio Grande Western at Mack, Colorado, over the Book Cliffs to Dragon, Utah, for the purpose of hauling gilsonite to the mainline. In 1911 the tracks were extended down Evacuation Creek to Watson and westward to the mines at Rainbow. The railroad became "extinct" in 1938, after 34 years of operation, because truck transportation of gilsonite over highways paved with bituminous sand from the massive deposits four miles west of Vernal (U.S. Bureau of Mines estimates 2-3 billion tons reserve) became more economical. Furthermore, principal mining operations were now in the Bonanza area and the tracks had never been extended that far. The present auto road over Baxter Pass, out of the Basin to Mack, is partly laid on the old Uintah Railway grade. Rotting ties are still visible along the shoulders.

17



Figure 3. Correlation Chart of the Uinta Basin and Mountain area.

BLM_0067439

Today Vernal, "metropolis" of the Basin and county seat of Uintah County (population 4,500-5,000), remains more than 100 miles from the nearest railroad. The Uintah narrow-guage never got closer to Vernal than 60 miles. Nearest railheads are now 110 miles to Helper, Utah; 122 miles to Craig, Colorado; 125 miles to Green River, Wyoming; and 130 miles to Heber, Utah. The present development of the phosphate deposits near Vernal might become a modern incentive for introducing a railroad into Uintah County. A route from Craig, Colorado, with its relatively low grades has been proposed, at an estimated cost of $14,000,000. Pipeline transportation of concentrates has also been considered.

## STRATIGRAPHY

### General Statement

In Uintah County most rock formations are sedimentary, ranging in age from Precambrian to Tertiary. They represent periods of marine and continental (delta, floodplain, lake, eolian, etc.) origin, and of both geosynclinal and foreland character.

In general, the stratigraphic history of the Uinta Mountain and Basin region is one of great regularity and stability. Noticeable unconformities are rare, indicating that throughout the sedimentations which gave rise successively to the immense thickness of Precambrian Uinta Quartzite (Kinney, 1955, p. 22; Hansen, 1956, p. 52) and the deposits of Paleozoic and Mesozoic time, there was little or no orogenic deformation until near the close of the latter. Breaks are mostly faunal and lithologic rather than stratigraphic.

The most conspicuous erosional surfaces prior to Laramide folding are between the Precambrian (Uinta Mountain group) and Cambrian (Lodore formation), between the Mississippian (Manning Canyon shale) and Pennsylvanian (Morgan), and between Moenkopi and Shinarump formations of the Triassic. Even the absence of three periods (Ordovician, Silurian, and Devonian) does not reveal a profound erosional unconformity.

Following the Devonian, Carboniferous sediments of shallow shelf origin derived from the southeast and contributed by the rising Uncompahgre Range of the Ancestral Rockies (Eardley, 1950, p. 120), intertongued westerly with thicker marine deposits. During Pennsylvanian time, vast quantities of clear quartz sand, derived from the northwest and shed from "Cascadia" (Heaton, 1933, p. 138) were distributed over western Montana and Wyoming, eastern Idaho, northern Utah, and northern Nevada. The Weber sandstone and equivalents may owe their origin to this source.

19

BLM_0067440



Figure 4. Correlation Sections from Duchesne River Area to Lily Park, Colorado.

20

BLM_0067441

Under similar conditions Triassic sediments furnished from highlands to the east (Ancestral Rockies) graded into marine facies which thicken westerly; whereas during the Jurassic, the rising of the "Nevada Mountains" on the west and southwest probably supplied much of the sediments which resulted in the widespread accumulation of coarser clastics of the Upper Jurassic and Lower Cretaceous series. Thick Upper Cretaceous marine deposition to the southeast graded laterally into coarser sediments (Current Creek) derived from the west.

South and north of the Uinta Range, downwarping of the Uinta and Bridger basins developed small Paleocene and Wasatch lakes, which in time became extensive fresh-water bodies wherein accumulated thousands of feet of fine sediments. These are now believed to be a source of some of the oil of the region. The lake basins were gradually filled by streams, creating extensive flood plains on which additional thousands of feet of conglomerate, sandstone, and shale accumulated to form the Bridger and Washakie (north of the Range) and the Uinta and Duchesne River formations (south of the Range) which have been the source of vast quantities of fossil material, including mammal, reptile, bird, insect, and plant remains.

Later Tertiary and Quaternary deposits consist of sandstone and coarse gravels, chiefly of stream origin, with some glacial debris in the western half of the Uinta Range.

Approximate maximum total deposition of known sediments from Precambrian to Tertiary time, inclusive, amounts to 45,000 feet in eastern Uinta Mountain and Basin areas, and 63,000 feet in the western part of the region.

The Uinta geosyncline, an east-west arm of the Wasatch trough, remained fairly stable until late Cretaceous time. Receiving sediments from the surrounding highland areas, this marine basin had its deepest parts in the west, shallowing eastward, producing a broad foreland shelf on which sediments of increasingly shallow marine character graded into continental deposits derived from the east or southeast. Conversely, during the Upper Cretaceous thick marine Mancos shales intertongue westward with shallow-water sandstones and conglomerates derived from the rising mountains to the west.

The only igneous rock observed in Uintah County is a gabbroid dike, with a maximum width of 60 feet, cutting the Precambrian Uinta Mountain group in the northwestern corner of the county and outcropping intermittently from Lake Shore Basin at the south foot of Leidy Peak westward to the head of Uinta River in western Duchesne County.

21

BLM_0067442

## PRECAMBRIAN

### Uinta Mountain Group

The oldest rocks exposed in Uintah County are dark-red to buff, cross-bedded, medium- to coarser-grained quartzitic sandstones, red and green phyllitic shales, and conglomerates, some of which become arkosic westward (Untermann, 1954, p. 187-192). Metamorphism, accomplished chiefly through the addition of silica and ferruginous cements, has been less intense than in the Red Creek metaquartzite on the northeast side of the range. These quartzites retain their grain outline (Untermann, 1954, p. 23). Vertical joints give a blocky character to the formation and desert varnish commonly coats columnar masses. Where thin-bedded it becomes ledgy, and often has a darker color than beds of the overlying Cambrian formation (Lodore) from which it is difficult to distinguish.

Powell (1876, p. 144) estimated a thickness of more than 13,000 feet, but recent work by Hansen (1956) indicates greater than 20,000 feet for the Uinta Mountain group. It outcrops chiefly along the crest of the main Uinta arch, and is exposed down dip in the upper canyons for some distance along the mountain slopes. In the western



Figure 5. Lodore Canyon, Green River. Upper Precambrian, Uinta Mountain Group.

BLM_0067443

part of the county, the formation is overlain directly by Mississippian limestone. Kinney observed that the upper shale member of the Uinta Mountain group thinned eastward from 3,000 feet in Uinta Canyon to 265 feet north of Diamond Mountain and was entirely missing farther east at Lodore Canyon; that sandstones in the thick shale unit in Whiterocks Canyon are glauconitic, and therefore probably of marine origin (Kinney, 1955, p. 21-22). No fossils have been found.

Conglomerates increase in thickness and coarseness to the east, where Hansen (1957, p. 52) believes a highland source occurred. Marine conditions probably prevailed to the west (Kinney, 1956, p. 22) with offshore sub-aerial conditions occurring to the east. Williams (1953, p. 2737-2738) correlated the Uinta Mountain group with the Big Cottonwood series of the Wasatch Mountains.

## CAMBRIAN SYSTEM

### Lodore Formation

In the Jones Hole area, near Whirlpool Canyon in the northwestern corner of Dinosaur National Monument, the writers studied 450 feet of Lodore white to red quartzitic sandstone, greenish-gray siltstones and sandstones, frequently glauconitic, and interbedded green to red silty shales containing mudcracks, ripple marks, and occasional fossils. A few trilobites were found (Untermann, 1954, p. 25, 129-132) and identified as upper Cambrian age. Some of the sand-stones contain minor amounts of feldspar and white mica. At the base of the formation is a red to white, ledgy, shelf-making quartzitic sandstone, 150+ feet thick, containing white "vermicelli" (worm borings?); also purple to green sericitic and ripple marked shale partings and a basal conglomerate. The contact between the Cambrian and the underlying Uinta Mountain group (Precambrian) is one of pronounced erosion with slight angular discordance of 4 to 5 degrees (Untermann, 1954, p. 133). The Lodore formation appears to thin to the west. West of Brush Creek, it was not observed (Kinney, 1955, p. 22); but, still farther west, in the Rock Creek area of Duchesne County, Huddle collected poorly preserved fossils of Late Cambrian age from sandy shales above the Pine Valley conglo-merate (Kinney, 1955, p. 23).

## EARLY PALEOZOIC SYSTEMS

In Uintah County, Ordovician, Silurian, and Devonian time is marked by a great hiatus, and these rocks are absent (Untermann, 1954, p. 17-18).

BLM_0067444

Cm
Ꞓl

Figure 6. Mississippian (CM) and Cambrian upper Lodore (Ꞓl) formations. Mouth of Jones Hole Creek near confluence with Green River.

Cm
Ꞓlss

Figure 7. Basal Cambrian, Lodore sandstone (Ꞓlss). Mouth of Jones Hole near confluence with Green River.

BLM_0067445

# CARBONIFEROUS SYSTEMS

## Mississippian (Lower Carboniferous)

### General Statement

Mississippian formations directly overlie Upper Cambrian (Lodore). These consist of limestone and dolomite at the base. Believed to be Lower Mississippian (Madison), they are overlain by limestones, calcareous sandstones, and black shales which may be equivalent to the Upper Mississippian Deseret and Humbug formations and Manning Canyon shale (Baker, et al., 1949, p. 1161-1197), and outcrop along the south flank of the Uinta Mountains where the section comprises between 1,000 and 1,500 feet of marine sediments laid down in a shallow-water near-shore environment. The entire Mississippian system increases in thickness from less than 900 feet in the eastern part of Uintah County to 1,231 feet at Whiterocks River in the western part.

Strike ridges of gray cliff-forming limestone show long southward dipping "scalloped," rocky slopes, which at a distance appear massive in canyon walls, but upon closer examination are quite thin-bedded. Where brecciated, they produce much angular talus. In contrast, the Manning Canyon shale is a slope-forming unit.

### Madison Limestone

The Madison consists of thin-bedded, light- to dark-bluish gray, dense, fine-grained limestones, in part dolomitic. Fossil corals, brachiopods, Euomphalus-type gastropods are occasionally round, and Kinney (1955, p. 30) identified a "typical Madison limestone assemblage..." from the west side of Whiterocks River. In Dinosaur National Monument, the lower 20 or 30 feet of the Madison is sandy, ripple-marked, minutely crossbedded, with poorly sorted pink quartz pebbles, less than one-half inch in length, apparently derived from the underlying Lodore. There is a gradation upward into gray limestone. In the Jones Hole-Whirlpool Canyon area, it is 175 feet thick (Untermann, 1954, p. 127-129).

### Deseret Limestone

The massive Deseret limestone, usually exposed in buff, maroon-appearing cliffs of porous, light-colored, intricately-banded sandy limestones and dolomites (the latter more numerous in the upper part) contains small crinoid stem plates, cup corals, and other fossil forms. Dark gray-and-white banded chert nodules and lenses are common along bedding planes. At Jones Hole, there is approximately 450 feet of these beds.

## Humbug Formation

The Humbug, a tan-weathering, pink, gray, or brownish formation, is composed of marly, calcareous beds with dense gray limestone. It is commonly brecciated, ripple-marked, and crossbedded. Light-colored cherts occur in round or elliptical nodules and lenses. Calcite veins and cavities lined with dog tooth spar are common. At Jones Hole there is approximately 250 feet of these beds, or a total of 875 feet of pre-Manning Canyon Mississippian limestone in eastern Uintah County.



Figure 8. Pennsylvania (Morgan) upper center distance. Mississippian and Cambrian below and right. Mouth of Jones Hole Creek, near confluence with Green River.

## Manning Canyon Formation

This predominantly black, slope-forming formation occurs along the south flank of the Uinta Mountains and is 279 feet thick at Whiterocks Canyon in western Uintah County (Baker, et al., 1949, p. 1177-1178). It thins eastward to 185 feet at Whirlpool Canyon (Untermann, 1954, p. 31), where the main shale member is 87 feet thick. Underlying the shale member is 35 feet of white to yellow cross-bedded quartz-sandstone, in places friable, and containing black shale laminae. These beds are underlain by 3 feet of heavily hematitized gravelly sandstone and 20 feet of quartz-sandstone which locally exhibits evidence of erosion. Beneath is a thin limestone layer which over-lies 30 feet of red to brown angular conglomeratic sandstone. Facies

26

BLM_0067447

thin and become coarser in an eastward direction. In eastern Uintah
County, a persistent marker bed locally carries noncommercial con-
centrations of iron and copper oxides and other minerals (Untermann,
1954, p. 31-32). Sadlick has identified spores from the Manning
Canyon (personal communication).

## Pennsylvania (Upper Carboniferous)

### General Statement

The Pennsylvanian formations of Uintah County are as follows: from
oldest to youngest, the Morgan formation, which is divided into
three members, the Round Valley (Morrow), the Hells Canyon (Atoka),
and the upper Morgan (Lower Des Moines); and the Weber sandstone.

### Morgan Formation

The Morgan, conformably overlying the Manning Canyon shale and
grading upward into the Weber sandstone, is 1,384 feet thick at
Whiterocks Canyon (Baker, et al., 1949, p. 1181-1182), 1,266 feet
at Whirlpool Canyon, and is divisible at the latter place, lithologi-
cally and faunally, into three members: from top to bottom, Lower
Des Moines (660 feet), Atoka (372 feet), and Morrow (234 feet).
(Untermann, 1949, p. 219-232; 1954, p. 33). At the Whirlpool
Canyon locality, Sadlick placed contacts at somewhat different posi-
tions, obtaining 489 feet for the upper Morgan, 258 feet for Hells
Canyon (Atoka), and 313 feet for Round Valley (Morrow). He has
shown that the Hells Canyon formation interfingers westward with
the Morgan, and he proposes that the Hells Canyon, Morgan, and
overlying Weber formations, which represent shelf deposits with
gradational facies change deposited in response to "basin formation
and rising highlands", be included in the "Durst group" (Sadlick,
1957, p. 61, 70, 74).

The upper part of the Morgan contains thin layers of compact, fossil-
iferous gray limestone, often cherty, which weathers reddish; alter-
nating with massive, fine-grained, buff to red sandstones that are
slightly crossbedded and non-fossiliferous. On a basis of studies
of the fusuline fauna of these limestones by Lloyd G. Henbest
(Untermann, 1949, p. 225), they are placed in the lower half of the
Des Moines section. West of Whiterocks River (Kinney, et al.,
1955, p. 40), 1,084 feet of Pennsylvanian beds lie below the Weber.
In this sequence, calcareous, fine- to medium-grained sandstones,
overly intercalated beds of red sandy shale, fine-grained sandstone,
and argillaceous limestone.

27

SRM 0067449

The Middle mauve-colored member (Hells Canyon) consists of argil-
laceous limestone, shale, and light- to dark-gray, dense to coarse
limestone, red-weathering, abundantly fossiliferous, and frequently
cherty. At Whirlpool Canyon the basal beds are a dark-colored
limestone containing vari-colored chert and a thin black pebble-
conglomerate.

The lower part (Round Valley) consists of gray to black fine- to
medium-textured, occasionally dolomitic thin-bedded limestones,
and mauve to gray argillaceous limestones and shales containing
fossils of Morrow age. In the Whiterocks area it is thin to thick
bedded and contains gray to red chert.

Sadlick (1957, p. 72, 75) placed the contact between the Morgan
and the overlying Weber at the base of the gray-buff sandstone-
limestone beds, above the first red sandstones of the upper Morgan,
as in the type section in Weber Canyon, east of Morgan, Utah;
whereas the writer's placed it above the limestones at the base of
the massive sandstones. The Morgan formation (unrestricted), as it
occurs in the Uinta Mountain area, is at least in part equivalent in
age to the Amsden and Quadrant formations of Wyoming, Maroon of
Colorado, Wells of Idaho, and Paradox of southern Utah.



Figure 9. Morgan formation, Whirlpool Canyon (center) and Wild Mountain (distance). Capped by Weber in center and foreground.

28

## Weber Sandstone

At its type locality in Weber River Canyon, northern Utah, it was named Weber Quartzite by Clarence King (1876, p. 477-480). Although locally a quartzite, it is more often a fine-grained, massive to thin-bedded quartz sandstone with calcareous cement (Untermann, 1954, p. 36, 37). In the upper portion, it is strongly crossbedded, possibly wind deposited, and is often concretionary and coarse. Calcite seams are numerous in places. Though unfossiliferous in Uintah County, the transitional nature of the Morgan (lower Des Moines, Pennsylvanian) into the overlying Weber, and the latter's position beneath the Park City formation (Permian) suggests that the Weber is of upper or middle Des Moines age. In Duchesne County, J. Stewart Williams (1943, p. 604) found Desmoinesian fossils near the top of the Weber in Duchesne River Canyon. In western Uintah County, the Weber is 1,200 feet thick, but thins eastward to 1,000 feet at Split Mountain. East of Duchesne County, Sadlick describes a lower member of sandstone interbedded with less than 10 to 20 per cent limestone, and an upper member of crossbedded sandstone with bedding planes that truncate the crossbeds. A similar two-fold subdivision is in evidence at the type locality in Weber Canyon (Sadlick, 1957, p. 76).

Erosion produces deep steep-walled gorges which are among the outstanding scenic features of the county. The Ashley Valley oil field produces from the upper part of the formation.

## PERMIAN SYSTEM

### Park City Formation (Phosphoria)

Type locality is the Park City mining district east of Salt Lake City, Utah (Boutwell, 1912, p. 443-444). In western Uintah County the basal member of the Park City consists of greenish-gray beds rich in rock phosphate that lie on Weber sandstone, and it thins eastward from about 22 feet at the site of the San Francisco Chemical Company's mining operations on Brush Creek to a few inches on the north side of Split Mountain and about one inch on the south slope. The upper calcareous member, about 195 feet thick in the Whiterocks area (Kinney, 1954, p. 50), consists of interbedded light-gray cherty limestone and shale. Within the shale are two thin tongues of red silty sandstone known as the Mackentire "red beds" tongue. In the Red Mountain-Brush Creek area, 100 feet of cherty limestone are separated in the upper part of the formation by a 27-foot "red beds" layer, and at the base by a 17-22 foot bed of shale and commercial oolitic fossiliferous phosphate rock. Eastward the Park City, composed of light gray to yellow calcareous shale with small nodules

29

BLM_0067450

and seams of chert, diminishes to 40-60 feet in thickness; the Mackentire tongue lenses out between Brush Creek and Split Mountain; and the lower part of the formation consists of gray, thinly bedded, cherty, fossiliferous limestone, calcareous sandstone, and nodules and vugs of calcite. The chert is light-gray to light blue. Calcite and blue-, purple-, and green-chalcedony geodes are characteristic.



Figure 10. Park City (Ppc) and Weber (Cpw) formations. Brush Creek area, north of Vernal.

The eastward-thinning marine Park City formation generally forms the lower juniper-covered mountain slopes, and where well exposed, exhibits "flat-iron" erosion with Weber sandstone exposed in intervening canyons. The color transition in the "flat-irons" -- from gray to yellow of the upper Park City into red of the overlying Moenkopi formation -- is a striking physiographic feature formed by erosion (Untermann, 1954, p. 38-39).

## TRIASSIC SYSTEM

### General Statement

The gradational nature of the Permian and overlying non-fossiliferous Triassic beds makes the Paleozoic-Mesozoic boundary difficult to recognize. Cherty limestones grading upward through yellowish gray shales to red arenaceous beds were deposited over an area of low relief by an eastward-shallowing sea. Subsequently, the area was not exposed to rapid erosion at the close of the Permian, and deposition of shallow-water on-shore, near-shore deposits continued into early Triassic time. The boundary was drawn arbitrarily between

30

BLM_0067451

the buff cherty Park City limestones and the Moenkopi-like variegated shales. In eastern Uintah County (Untermann, 1954, p. 41-45) Moenkopi has been applied to the lower and middle Triassic (?) (Stewart, 1957, p. 442), and Shinarump and Chinle to the upper Triassic. Triassic beds, 1,100 feet thick at Whiterocks River and 1,200 feet at Island Park, were measured. Source for these beds is believed to have been the Ancestral Rockies to the southeast, and highlands to the south and southwest (Stokes, 1950, p. 98).



Figure 11. Permian (left), and Triassic (right) formations. Looking east from Highway 44, north of Vernal. Diamond Mountain ran in background.

## Moenkopi Formation

In the Whiterocks River area, a three-fold division (Woodside, Thaynes, and Ankareh), consisting of fine-grained sandstone and shale, separated by a fossiliferous limestone, changes to a series of red silty shales and gypsiferous fine-grained sandstones for which the name Moenkopi has been used.

In eastern Uintah County, the Moenkopi, up to 950-feet thick, consists of calcareous shales, siltstones, and fine-grained sandstones, commonly micaceous; the lower half brick-red, the upper half a darker red. The formation grades downward into alternating red and grayish-yellow beds at the base. Gypsum, prevalent throughout the formation as thin veins and as layers as thick as 4 feet, indicates evaporative basin environment. It is believed that

31

gypsiferous beds near the middle of the series correspond to the marine Thaynes limestone unit west of Whiterocks River (Kinney, 1955, p. 56); the upper part of the Moenkopi in Uintah County corresponds to the Ankareh farther west; the lower portion to the Woodside.

Footprints and trackways of a reptilian vertebrate, possibly <u>Chirotherium</u> ("hand reptile"), similar to those found in southern Utah and northern Arizona, have been found interbedded in light gray-green shales and red sandstones at Brush Creek, north of Vernal (Peabody, 1948).



Figure 12. Chinle formation with Shinarump in foreground. Island Park area.

### Shinarump Conglomerate

In the Whiterocks area Kinney (1955, p. 64-65) measured 93 feet of Shinarump, 53 feet of grayish tan crossbedded sandstone above, and 40 feet of tan conglomeratic sandstone below. In eastern Uintah County, the Shinarump varies from 35 to 75 feet of buffish, poorly sorted, conglomeratic quartz sandstone, containing varicolored "sugary" quartz pebbles up to 2 inches in length, strongly crossbedded and lensy, whereas eastward it thins and appears to grade into fairly resistant fine-grained red sandstone, resembling the Chinle. It forms strike ridges and long dip-slopes, on which potholes and oval basins are locally well developed.

32

BLM_0067453

The Shinarump often fills channels on the Moenkopi with which it appears otherwise conformable, as it is also with the overlying Chinle, for which it has been interpreted as a basal conglomerate (Untermann, 1954, p. 43; Stewart, 1957, p. 411-446). Its uniformity over thousands of square miles indicates flood plain subaerial conditions with a possible pre-Cambrian quartzite highland source (Gregory, 1917, p. 41). A slight elevation to the east could have brought to a close the evaporating-basin environment of Moenkopi time, renewed stream gradients and covered the area with the thin subaerial gravelly sands of the Shinarump. Twenhofel (1950, p. 61) is of the opinion this formation originated in possibly the middle or lower areas of a piedmont environment under desert conditions.

Silicified wood, belonging to a primitive conifer, probably Araucaria, up to 40 feet long and 3 feet in diameter, is abundant. It is similar to that found in the Chinle formation, but less colorful.

### Chinle Formation

The upper two-thirds of the Chinle consists of red calcareous shales, siltstones, and sandstones. Ripple marks and mud cracks are common. Mud pebbles and thin mud-silt conglomerate lenses occur. Thin seams of aragonite are abundant locally. In the Red Mountain area, the writers observed 4-toed dinosauroid tracks.

The lower third is composed of varicolored calcareous silty shales, at the top of which is a prominent mustard-yellow layer grading downward into blue and purple beds and containing botryoidal geodes lined with calcite. The purple shales contain light-gray sandstone lenses bearing reptilian teeth and amphibian bone fragments. Quartz-lined geodes, reddish silicified wood, and manganiferous iron oxide nodules occur in the lower 10 feet. Where the wood is absent, banded jasper is often present. Analcite was also found in small amounts by W. D. Keller (Untermann, 1954, p. 45) in the ocherous beds at Brush Creek. The Chinle formation varies from 276 feet at Red Mountain, northwest of Vernal (Kinney, 1955, p. 70) to 235 feet in the eastern part of the county (Untermann, 1954, p. 116). The formation is slope-forming and probably of shallow lake, delta and stream origin.

33

## JURASSIC SYSTEM

### General Statement

The Jurassic, initiated by arid conditions, includes the Navajo sand-stone, the Carmel formation, the Entrada sandstone, the Curtis and Morrison formations. Two marine invasions followed the Navajo and are represented by the Carmel (Twin Creek) and Curtis (Sun-dance, in part) and separated by the continental Entrada and equi-valents. The Jurassic period was closed by deposition of the exten-sive lake, flood-plain, delta, and lagoonal sediments of the Morri-son formation. The source of most Jurassic sediments in Uintah County appears to have been highland areas to the west and south-west. Western marine equivalents grade into terrestrial facies to the east in the Uinta Mountain region.

An unconformity probably separates the Jurassic from the Triassic, but is not generally apparent. Chinle beds are truncated locally by Navajo (Untermann, 1954, p. 47) north of Vernal. The Colorado plateau formations, Wingate and Kayenta, may extend northward mid way under the Uinta Basin. Deep wells east of Green River in the Hill Creek area penetrate undifferentiated Glen Canyon sedi-ments. Southwest terminology and correlation (Baker, et al., 1936, p. 41, and correlation table number 6) are here used. Jurassic sedi-ments total 2,693 feet near Whiterocks and 2,211 feet in the Dino-saur headquarters area.



Figure 13. Navajo sandstone showing tangential crossbedding. Cliff Creek area, east of Jensen, Utah.

34

Navajo Sandstone

The Navajo, 1,028 feet thick in the mouth of Whiterocks Canyon (where it is impregnated with bitumen), thins eastward to 700 feet at Dinosaur National Monument and to 577 feet at Island Park. It is massive, locally thin-bedded, uniformly light-gray to buff, red, fine- to medium-grained, generally well sorted and poorly cemented. It breaks down readily into an unconsolidated fine sand which is frequently redeposited by wind in the form of small dunes and sand "flats" on lower surfaces. The Navajo is a good aquifer. Springs often occur along its contact with the overlying impervious Carmel. The Navajo exhibits large-scale tangential crossbedding. West of Little Brush Creek is a 6 to 8 feet lentil of gray sandy limestone in the middle of the formation (Kinney, 1955, p. 74). Navajo weathering produces rounded backs, isolated domed masses, and sheer walls. Iron and calcareous sandy concretions are common, and pitted quartzite ventifacts occur in places at the top of the formation.



Figure 14. Navajo sandstone, showing caves formed by wind and water erosion. Steinaker Draw, north of Vernal.

35

BLM_0067456

## Carmel Formation

Topographically, the Carmel occupies depressions between ridges of Navajo and Entrada. Near Whiterocks it consists of 383 feet of soft reddish-brown sandy shale and fine-grained sandstone, interbedded light-gray calcareous mudstone, with light-gray fossiliferous limestone of Middle and Upper Jurassic age at the base (Kinney, 1955, p. 77). In eastern Uintah County, the Carmel is 125 feet thick. North of Vernal it contains a 4-foot gypsum layer. *Trigonia quadrangularis* Hall and Whitfield, *Arctica* cf. *A. occidentalis* Whiteaves, and *Natica* cf. *N. williamsi* Cragin are common fossils.



Figure 15. Navajo (Jn), Carmel (Jca), and Entrada (Je) formations in foreground. Curtis and Morrison, left center. Uinta Range in distance. Cub Creek–Bonnie May Ranch road, northeast of Jensen.

## Entrada Sandstone

The unfossiliferous, gray to buff, locally reddish medium-grained, clear quartz Entrada sandstone forms conspicuous strike-ridges and weathers into smooth rounded backs and knobs. It is 240 feet thick (Kinney, 1955, p. 82) to the west, thins to 165 feet in the Split Mountain area, and to 135 feet at Island Park (Untermann, 1954, p. 115). The Entrada grades upward into the fossiliferous Curtis sandstone, but occasionally the boundary is marked by a thin mud-pebble conglomerate and a slight wavy line.

36

BLM_0067457

## Curtis Formation

The Curtis consists of a basal sandstone member, overlain by an upper series of interbedded bluish-weathering gray carbonaceous shales, thin-bedded to platy, sparingly glauconitic sandstones, and gray to brownish gray oolitic sandy limestones. Near Whiterocks it is 150 feet thick; at Split Mountain, 262 feet. Near the top of the Curtis, in the eastern part of Uintah County 10 to 15 feet below the Morrison contact, occurs a persistant coral-pink to white, minutely concretionary 3- to 6-inch calcareous bed that makes an excellent marker. It lies above a platy glauconitic sandstone which contains Rhynchonella gnathophora (?) Meek, a small brachiopod (Untermann, 1954, p. 52). The writers placed the contact (apparently gradational) between the Curtis and the overlying Morrison at the top of the thin, platy sandstones above the coral marker bed. The abundant marine invertebrate fossils including Belemnites densis (Meek) are of middle Upper Jurassic age (Reeside, 1925, p. 43-44).



Figure 16. Basal Curtis sandstone — Entrada sandstone contact, center. Gray upper Curtis shale (left), Carmel (right). South of Island Park road.

## Morrison Formation

This colorful series of strata of Upper Jurassic age (Baker, et al., 1936, p. 63) contains the world-famous assemblage of dinosaur fossils at Dinosaur National Monument Quarry, 7 miles north of Jensen, Utah. Here the Morrison is a succession of pink to white lensing sandstones, containing silicified wood, in part bentonitic;

37

BLM_0067458



Figure 17. Geologic Map of Dinosaur Quarry, Dinosaur National Monument, Utah.

38

varicolored soft-weathering calcareous and bentonitic mudstones; claystones; and shales containing interbedded fossil-bearing brown to green conglomeratic sandstones and conglomerates. An abundance of aragonite, often in large concretions, is a common constituent. These beds represent lagoonal, deltaic, lacustrine, and fluviatile sediments deposited near sea level on a broad, uneven plain formed by gradual elevation of the floor and withdrawal of the Curtis sea. The climate may have been somewhat arid (Stokes, 1944, p. 975-976). Some streams had sufficient velocity to transport relatively coarse gravel -- pebbles occasionally up to 4 inches, but generally less than 1 inch (Untermann, 1954, p. 54).

The conglomerates consist largely of subangular light-to-dark-gray, occasionally red or black, quartzite, and some black flint pebbles. Occasional orthoquartzites grade into more widespread calcareous sandstones and jasperoid facies cemented by amorphous silica. Weathered-rock surfaces are frequently dark brown or black due to a coating of desert varnish. The upper conglomerate, which at Dinosaur National Monument Quarry, occurs between two thick bentonitic claystone and shale beds, is the principal dinosaur bone-bearing layer. It has produced an abundance of well preserved skeletal remains representing many species. At the present writing, 26, more or less, complete skeletons have been recovered from the vast quantities of bone material. The following is a list of the fauna recovered from the quarry:

CLASS REPTILIA

    Order Saurischia (Dinosaurs)
        Apatosaurus (Brontosaurus) louisae Holland
        Barosaurus sp.
        Camarasaurus lentus (Marsh)
        Camarasaurus sp.
        Diplodocus longus Marsh
        Pleurocoelus sp.
        Antrodemus (Allosaurus) valens Leidy
        Ceratsaurus sp.
        Coelurus sp. (an Ornitholestes type)

    Order Ornithischia (Dinosaurs)
        Camptosaurus medius Marsh
        Dryosaurus altus Marsh
        Laosaurus gracilis Marsh
        Stegosaurus ungulatus Marsh

    Order Crocodilia
        Goniopholis sp. (Goniopholidae)
        Hoplosuchus kayi Gilmore (Aetosauria, Stegomu –
           suchidae, a thecodont, Gilmore, 1926; Atopo-
           suridae?, Romer, 1945, p. 597).

    Order Chelonia (Turtles)
        Glyptops utahensis Gilmore

39

BLM_0067460



Figure 18. Dinosaurs and other reptiles typical of those found in the Morrison formation at Dinosaur Quarry, Dinosaur National Monument. Painting by Ernest Untermann, Sr.



Figure 19. Dinosaur femur (thigh bone), Morrison formation.

40

BLM_0067461

A few invertebrate forms also are present. Most abundant are the fresh water bivalve, *Unio* cf. *felchi* White and other species of this genus. A very small gastropod, closely resembling *Valvata scabrida* Meek and Hayden, was found by the writers at the base of the shale bed overlying the main bone-bearing layer.

Near the base of the shale-claystone unit referred to above is a 3- to 5-foot bed of multicolored chert (agate, flint, jasper, opal and other varieties of the quartz family). Associated silicified fossil bone varies in color. Frequently the bone is black, denoting burial under swamp conditions. Usually this is confined to the lower conglomerate lenses, is softer, and in part is replaced by calcite, barite, or limonite.

The lower portion of the Morrison in Uintah County is predominantly finely arenaceous material probably the equivalent of the Salt Wash member of east central Utah (Stokes, 1944, p. 987). The upper two-thirds largely represents the Brushy Basin member. No sharp ero-sional contact separates it from the Lower Cretaceous beds in this area. The contact was placed by the writers (1954, p. 56) between the yellow quartzitic sandstone (Buckhorn) and the underlying vari-colored shales and claystones. Near the Utah-Colorado line the Mor-rison has been let down against Navajo and Triassic beds along the Miners Draw Fault. In this locality, remnants of a gray conglomerate layer cap the low-dipping varicolored shale, claystone, and quartzite unit. A short distance to the south, the writers noted up to 75 feet of quartzite pebble-conglomerate, in a light gray sandstone matrix. The bed passes locally into a crossbedded, pebbly sandstone. This conglomerate is believed to represent a lens in upper Morrison and not Buckhorn (Lower Cretaceous--Lakota) as the latter outcrops a short distance to the west where it is less coarse and is of a con-trasting yellow color.

Kinney (1955, p. 91) measured 892 feet of Morrison at Mosby Moun-tain. The writers measured 859 feet in Dinosaur National Monu-ment and 745 feet at Island Park.

## LOWER CRETACEOUS SYSTEM

### General Statement

The Cretaceous is represented by three units: a lower sandstone (in places conglomeratic), a middle shale, and an upper conglomeratic sandstone. These resemble in lithology and stratigraphic position the Lakota (Buckhorn), Fuson shale (Cedar Mountain), and Dakota, respectively.

41

BLM_0067462

### Buckhorn Conglomerate (Lakota)

Overlying a varicolored Morrison shale and claystone bed which contains a thin white ortho-quartzite layer that grades upward into gray and yellow soft shale near the contact, the Buckhorn is a fine- to coarse-grained, locally conglomeratic and moderately crossbedded "sugary" sandstone, composed of subangular quartz, feldspar, and gray to black chert. It is yellow to buff, frequently weathering brown. The cementing material is usually siliceous, but becomes clayey or limonitic. White well-silicified fossil wood occurs in some areas. The thickness is 18 feet in the Dinosaur National Monument and 32 feet at Island Park (Untermann, 1954, p. 83, 112).

### Cedar Mountain Shale (Fuson)

This unit is a soft, dark-gray to brown or greenish-gray and maroon clay-shale that weathers gray. Near the top occurs a thin fine-grained green sandstone bed. The thickness is 36 feet at Dinosaur National Monument; 41 feet at Island Park.



Figure 20. Morrison and Dakota formation.

BLM_0067463

## Dakota Sandstone

The Dakota consists of crossbedded, ripple-marked sandstone lenses, often becoming a pebble conglomerate at the top. Typical yellow to white, light-gray or reddish, it is frequently brown-weathering. It is cavernous, blocky, ridge-forming, and is composed of varying amounts of cherty material. Igneous pebbles occur infrequently. The sandstone lenses are often limonitic and concretionary. More siliceous phases contain quartz veinlets. Clayey portions disintegrate readily. Silicified wood is common. The thickness is 48 feet in the Dinosaur area; 50 feet at Island Park; 34 feet at Mosby Mountain.

## UPPER CRETACEOUS SYSTEM

### General Statement

Eastward thinning Upper Cretaceous, fluviatile and marine sandstone tongues are the Frontier (Ferron), Emery (Walton, 1957, p. 98), and Mesaverde. Shale tongues are Mowry (Aspen); a middle shale underlying the Frontier sandstone; and a very thick upper shale, the Mancos (Hilliard, in part). These members comprise the Mancos group (Walton, 1944). They are accorded formational status, being persistent and mappable units over extensive areas.

### Mowry Shale (Aspen, in Part)

The Mowry is a prominent ridge- and slope-forming bed of hard, gray, silver-weathering siliceous shale. It cleaves into thin plates that contain cycloid fish-scales and small bones of teleost types. Carbonized wood fragments are fairly common. Leaves are rare. A persistent brown-weathering, limestone layer, 18 inches to 2 feet thick with cone-in-cone structure occurs near the middle of the formation. In the eastern part of Uintah County, the writers found one small ammonite, the identity of which was established by Lloyd G. Henbest and J. B. Reeside as *Neogastroplites wyomingensis* Reeside and Weymouth. Selenite and 2 to 6 inch bentonite layers can be seen where road cuts or quarries expose good sections of this formation. At the base of the Mowry a few feet of soft brownish gray shale, quite unlike the Mowry, may represent an equivalent of the Thermopolis formation of Wyoming which occupies this stratigraphic position. Kinney (1955, p. 100) reported 123 feet of Mowry in the Deep Creek area, west of Vernal, 90 feet north of Vernal, and 31 feet to the northeast at Little Brush Creek. The writers measured 125 feet at Dinosaur National Monument Quarry and 95 feet at Island Park in the eastern part of Uintah County. This irregularity in thickness may represent an erosional unconformity between the Mowry and the Frontier.

43

BLM_0067464

BLM 0067465



Figure 21. North-south cross-section facing westerly, through Split Mountain and the Jensen and Island
Park synclines.

Because of its siliceous composition, scattered yellow (Ponderosa) pine often follows Mowry shale outcrops, even at elevations far below its normal zone (Untermann, 1954, p. 61).

### Frontier Sandstone

The Frontier, the oldest eastward-lensing sandstone member of the Mancos group and a prominent ridge and slope-forming unit, is gray, tan, or white, uniformly fine- to medium-grained, calcareous, and slightly arkosic. Brown-weathering, frequently ripple marked, and lightly crossbedded, it lends itself to cavernous weathering. Limonitic iron often forms intricate thin, hard bands, and seams. The uniformity of the sandstone in some places makes for good building stone. The lower part of the formation thickens westward from 37 feet in the eastern side of the county to 87 feet at Dinosaur quarry and to 92 feet north of Vernal. Above this basal sandstone bed occurs gray to brownish carbonaceous, lignitic, and sandy shales, and thin lensing coal seams which reach 15 to 50 feet in the western part of the area. Coal seams from 18 inches to 6 or 7 feet were mined for many years prior to the discovery of oil and gas. The coal varies from soft to hard bituminous varieties; but is difficult to mine because of the thin interbeds of clay and sand. Numerous formerly-worked mines occur north and west of Vernal, and to the east in the Brush Creek area (see mineral section of this paper; and Pruitt, 1961). The coal is overlain by an upper fossiliferous sandstone bed which ranges in thickness from 25 to 50 feet in the eastern part of the county and contains large "cannon ball" limestone concretions, many of which are more than 10 feet in diameter and contain a nucleus of invertebrate fossils, such as bivalves, gastropods, and ammonites (Untermann, 1954, p. 80, 111). Shark teeth and small oyster shells are common in some layers.

The Frontier sandstone, as exposed on the north side of the Uinta Basin, correlates with the Ferron on the south side (Walton, 1957, p. 98) but is slightly older, containing fossils of Greenhorn age, while those of the Ferron are of Carlisle age. The tan, silty Middle Shale member of the Mancos was mapped by the writers as Frontier. These eastward thinning sediments represent an environment varying from littoral to brackish-water swamp conditions. At Island Park, the writers measured 138 feet of Frontier sandstone, and 125 feet of the Middle shale; at Dinosaur National Monument, 146 feet of Frontier, and 80 feet of the shale. Kinney and Rominger measured 94 feet of Frontier sandstone and 177 feet of the Middle Shale northwest of Coal Mine Basin in the Deep Creek area.

45

BLM_0067466

### Emery Sandstone

This medial sandstone member was not observed by the writers, but was recognized by Walton (1957, p. 98) in the well logs of Uinta Basin oil wells. Its best development is in the Wasatch Plateau area, where it carries an Eagle Fauna and is therefore of Montana age.

### Mancos (Upper Shale) Formation

The Mancos, a soft clay shale formation that weathers typically light-gray in the lower part and yellow buff in the upper part, conformably overlies the Frontier. Near Jensen, Walton (1944, p. 105) measured 1,235 feet of dark-blue to bluish gray clay in the lower one-fourth, followed by 730 feet of drab clay shale, 2,360 feet of yellowish gray, sandy clay shales, and 747 feet of drab to yellow clay shale contain—ing numerous thin beds (less than 7 foot) of brown, hard, fine-grained calcareous sandstone. The total of 5,072 feet is probably maximum for this area. Calcite geodes and selenite seams are abundant in many beds. The shales erode easily and lend themselves to "badland" development. The rich agricultural lands of the Ashley and Jensen valleys are formed on Mancos shale. Because of the high alkali con-tent, particularly in places where drainage is poor, vegetation on the Mancos is chiefly greasewood, shadscale, horsebrush, with some sagebrush and rabbit brush, producing good winter grazing for live-stock.

The Mancos contains numerous types of marine invertebrates, most characteristic of which are species of Inoceramus, Baculites, and Scaphites, of Benton, Niobrara, and lower Montana age (Walton, 1944, p. 105). The absence of the lower Carlile shale equivalent (Reeside, 1944, map 5) suggests that a stratigraphic break may be present between Frontier sandstone and Mancos shale, although no physical evidence for such a break is known (Kinney, 1955, p. 108). The overlying Mesaverde group is largely Niobrara in age in the western part of the Uinta Basin and post-Niobrara in the eastern part.

### Mesaverde Group

The Mesaverde in this area consists of a lower series of marine sandstones, the Asphalt Ridge and Rim Rock members, and an upper succession of sandstones, sandy shales, carbonaceous shale, and coal-bearing beds of chiefly brackish- and fresh-water origin -- the Williams Fork formation. These beds thin toward the east where they interfinger with Mancos shale.

Asphalt Ridge Member: The Asphalt Ridge, basal member of the Mesa-verde, consists of gypsiferous, yellow to white, poorly cemented

46

BLM_0067467

sandstone that is approximately 100 feet thick. It somewhat resembles the Trout Creek (?) sandstone of the Axial Basin area to the east in western Colorado (Walton, 1944, p. 116). This unit does not contain bituminous material, but sandstone beds both above and below it are saturated. Except for a local occurrence of thin-bedded argillaceous sandstone below, the Asphalt Ridge member itself lies directly on Mancos.

Rim-Rock Sandstone: The Rim Rock sandstone forms a prominent hog-back from Asphalt Ridge to the Utah-Colorado line, a distance of 30 miles. It represents a near-shore facies of gray poorly-cemented crossbedded sandstone that frequently has a speckled appearance due to the presence of numerous minute chert fragments. At Asphalt Ridge, four miles southwest of Vernal, the Rim Rock member is 112 feet thick. It attains a maximum thickness of 416 feet 9 miles east of Green River, from which point it gradually thins eastward. Asphaltic bitumen of commercial value saturates much of the Rim Rock sandstone. It is separated from the underlying Asphalt Ridge member by a thin tongue of shale. The Rim Rock sandstone along Asphalt Ridge is partially overlapped by Tertiary formations, the Duchesne River and Uinta north and west of Green River and by Uinta, Green River and Wasatch east of the river. As beds both above and below the Tertiary-Cretaceous boundary are saturated with bituminous material, there is apparently a definite relationship between the saturation and this unconformity along which the asphaltic material has migrated.

Williams Fork Formation: The Upper portion of the Mesaverde (Williams Fork) is composed of varicolored shales; buff, gray and brown sandstones; and coal beds. East of Green River at the junction of State Road No. 45 (Bonanza Road) and U.S. Highway 40, it is approximately 1,000 feet thick. About 60 per cent of the formation is shale. Both brackish- and fresh-water fossils have been found. Extensive swamps, formed near the end of this period, produced coal deposits of considerable economic value (Pruitt, 1961). Burning of some of the coal layers has given rise to reddish indurated shales. Regional correlation of the coal-bearing beds, undertaken by Reeside and others, places the Adaville formation of southwestern Wyoming in the same faunal zone as the Blackhawk and lower Price River (upper Pierre) of the Book Cliff-Wasatch Plateau area (Walton, 1944, p. 115-117), whereas Walton states that the lithologies of the Williams Fork in this region, the Blackhawk, and the lower part of the Price River are similar, and on that basis these three formations may be correlated and are believed to occupy the same stratigraphic position. It is also believed that the Mesaverde of this area includes, in addition to the Williams Fork, beds equivalent to the Iles formation at the base and Lewis (?) shale, which is possibly Fox Hills in age, at the top.

47



Figure 22. Sections showing Tertiary-Cretaceous relationship along north side of Uinta Basin. (Modified from P. T. Walton.)

BLM_0067469

West of Vernal, the Mesaverde outcrops in various places. Thus, at Red Creek, near the western boundary of Duchesne County, it has a thickness of 3,000 feet which may be divided into a lower series of massive marine sandstones 878 feet thick, and an upper series of fresh- to brackish-water sandstones, sandy shales, and coal beds, 2,132 feet thick. From several wells in the southern part of the Uinta Basin, shales of dark-gray color similar to the Lewis (?) are known to interfinger with the upper part of the Williams Fork, but are several hundred feet lower in the section than the Lewis shale of the Axial Basin area in western Colorado. In some of the wells, shales overlying the Lewis (?) are believed to be equivalent to the North Horn formation of late Cretaceous and early Paleocene age which outcrops in the southwestern part of the Uinta Basin.

During Upper Cretaceous time, the thickest marine deposition (Mancos shale) took place to the southeast and spread westward grading laterally into coarser sediments of post-Colorado age, and of continental origin.

## TERTIARY SYSTEM

### General Statement

As a result of the initial uplifting of the Uinta Range, the Cretaceous sea withdrew from northeastern Utah and marine shales grade laterally and are interbed with continental sandstones, shales and coal seams of flood-plain and lagoonal character. Fluviatile sediments, the Currant Creek, North Horn, and Colton formations to the west and southwest, representing both late Cretaceous and early Tertiary, cross time boundaries and interfinger with their Paleocene and Wasatch equivalents to the east.

Two periods of lacustrine sedimentation, the Flagstaff limestone and the Green River formation, followed the early flood-plain deposition. Of these, the latter, deposited by Lake Uinta, is the more extensive. That Lake Uinta (estimated to have existed for 8 to 10 million years) underwent many fluctuations is indicated (Bradley, 1931, p. 55) by the complex interfingering of marginal fluviatile and deltaic beds with those of lacustrine origin in the central part of the Uinta Basin. Thus, above the Wasatch (Colton) tongue, a second lacustral facies, a delta facies, an oil shale facies, and a saline facies at the top comprise the Green River formation. In its later stages, the lake, whose greatest depth was in the west-central part of the Basin, increased in salinity, and finally gave way to an interfingering of fluviatile and lacustrine sediments during Uinta, Eocene time.

49

BLM_0067470