## Table 5. U.S. uranium in-situ-leach plants by owner, location, capacity, and operating status at end of the year, 2011-16

| In-Situ-Leach Plant Owner | In-Situ-Leach Plant Name | County, State (existing and planned locations) | Production Capacity (pounds U₃O₈ per year) | Operating Status at End of the Year | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
| AUC LLC | Reno Creek | Campbell, Wyoming | 2,000,000 | - | - | Developing | Developing | Partially Permitted and Licensed | Partially Permitted and Licensed |
| Azarga Uranium Corp | Dewey Burdock Project | Fall River and Custer, South Dakota | 1,000,000 | Undeveloped | Developing | Developing | Partially Permitted and Licensed | Partially Permitted and Licensed | Partially Permitted and Licensed |
| Cameco | Crow Butte Operation | Dawes, Nebraska | 1,000,000 | Operating | Operating | Operating | Operating | Operating | Operating |
| Hydro Resources, Inc. | Church Rock | McKinley, New Mexico | 1,000,000 | Partially Permitted And Licensed | Partially Permitted And Licensed | Partially Permitted And Licensed | Partially Permitted And Licensed | Partially Permitted And Licensed | Partially Permitted And Licensed |
| Hydro Resources, Inc. | Crownpoint | McKinley, New Mexico | 1,000,000 | Partially Permitted And Licensed | Partially Permitted And Licensed | Partially Permitted And Licensed | Partially Permitted And Licensed | Partially Permitted And Licensed | Partially Permitted And Licensed |
| Lost Creek ISR LLC | Lost Creek Project | Sweetwater, Wyoming | 2,000,000 | Partially Permitted And Licensed | Under Construction | Operating | Operating | Operating | Operating |
| Mestena Uranium LLC | Alta Mesa Project | Brooks, Texas | 1,500,000 | Producing | Producing | Producing | Producing | Standby | Standby |
| Power Resources Inc., dba Cameco Resources | Smith Ranch-Highland Operation | Converse, Wyoming | 5,500,000 | Operating | Operating | Operating | Operating | Operating | Operating |
| South Texas Mining Venture | Hobson ISR Plant | Karnes, Texas | 1,000,000 | Operating | Operating | Operating | Operating | Operating | Standby |
| South Texas Mining Venture | La Palangana | Duval, Texas | 1,000,000 | Operating | Operating | Operating | Operating | Operating | Standby |
| Strata Energy Inc | Ross CPP | Crook, Wyoming | 375,000 | Developing | Partially Permitted And Licensed | Partially Permitted And Licensed | Under Construction | Changing License to Operational | Operating |
| URI, Inc. | Kingsville Dome | Kleberg, Texas | 1,000,000 | Standby | Standby | Restoration | Restoration | Restoration | Restoration |
| URI, Inc. | Rosita | Duval, Texas | 1,000,000 | Standby | Standby | Restoration | Restoration | Reclamation | Reclamation |
| URI, Inc. | Vasquez | Duval, Texas | 800,000 | Restoration | Restoration | Restoration | Restoration | Restoration | Restoration |
| Uranerz Energy Corporation | Nichols Ranch ISR Project | Johnson and Campbell, Wyoming | 2,000,000 | Under Construction | Under Construction | Under Construction | Producing | Operating | Operating |
| Uranium Energy Corp. | Goliad ISR Uranium Project | Goliad, Texas | 1,000,000 | Partially Permitted And Licensed | Permitted And Licensed | Permitted And Licensed | Permitted And Licensed | Permitted And Licensed | Standby |
| Uranium One Americas, Inc. | Jab and Antelope | Sweetwater, Wyoming | 2,000,000 | Developing | Developing | Developing | Developing | Developing | Developing |
| Uranium One Americas, Inc. | Moore Ranch | Campbell, Wyoming | 500,000 | Permitted And Licensed | Permitted And Licensed | Permitted And Licensed | Permitted And Licensed | Permitted And Licensed | Permitted And Licensed |
| Uranium One USA, Inc. | Willow Creek Project (Christensen Ranch and Irigaray) | Campbell and Johnson, Wyoming | 1,300,000 | Producing | Producing | Producing | Operating | Operating | Operating |
| **Total Production Capacity:** | | | **26,975,000** | | | | | | |

- = No data reported.

Notes: Production capacity for 2016. An operating status of "Operating" indicates the in-situ-leach plant usually was producing uranium concentrate at the end of the period. Hobson ISR Plant processes uranium concentrate that came from La Palangana. Hobson and La Palangana are part of the same project. ISR stands for in-situ recovery. Christensen Ranch and Irigaray are part of the Willow Creek Project. Uranerz Energy has a tolling arrangement with Cameco Resources. Uranium is first processed at the Nichols Ranch plant and then transported to the Smith Ranch-Highland Operation plant for final processing into Uranerz's uranium concentrate. CPP stands for central processing plant.

Source: U.S. Energy Information Administration: Form EIA-851A, "Domestic Uranium Production Report" (2011-16).

BLM_0070235

**Table 6. Employment in the U.S. uranium production industry by category, 2003-16**

person-years

| Year | Exploration | Mining | Milling | Processing | Reclamation | Total |
|------|-------------|--------|---------|------------|-------------|-------|
| 2003 | W | W | W | W | 117 | **321** |
| 2004 | 18 | 108 | W | W | 121 | **420** |
| 2005 | 79 | 149 | 142 | 154 | 124 | **648** |
| 2006 | 188 | 121 | W | W | 155 | **755** |
| 2007 | 375 | 378 | 107 | 216 | 155 | **1,231** |
| 2008 | 457 | 558 | W | W | 154 | **1,563** |
| 2009 | 175 | 441 | W | W | 162 | **1,096** |
| 2010 | 211 | 400 | W | W | 125 | **1,073** |
| 2011 | 208 | 462 | W | W | 102 | **1,191** |
| 2012 | 161 | 462 | W | W | 179 | **1,196** |
| 2013 | 149 | 392 | W | W | 199 | **1,156** |
| 2014 | 86 | 246 | W | W | 161 | **787** |
| 2015 | 58 | 251 | W | W | 116 | **625** |
| 2016 | 38 | 255 | W | W | 98 | **560** |

W = Data withheld to avoid disclosure of individual company data.

Note: Totals may not equal sum of components because of independent rounding. A large, one-time reclamation project needed to be withheld and was not included in 2016 data.

Source: U.S. Energy Information Administration: Form EIA-851A, "Domestic Uranium Production Report" (2003-16).

**Figure 3. Employment in the U.S. uranium production industry by category, 2004-16**

person-years



Source: U.S. Energy Information Administration: Form EIA-851A, "Domestic Uranium Production Report" (2004-16).

BLM_0070236

## Table 7. Employment in the U.S. uranium production industry by state, 2003-16

person-years

| State(s) | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wyoming | 134 | 139 | 181 | 195 | 245 | 301 | 308 | 348 | 424 | 512 | 531 | 416 | 343 | 323 |
| Colorado and Texas | 48 | 140 | 269 | 263 | 557 | 696 | 340 | 292 | 331 | 248 | 198 | 105 | 79 | 61 |
| Nebraska and New Mexico | 92 | 102 | 123 | 160 | 149 | 160 | 159 | 134 | 127 | W | W | W | W | W |
| Washington | 47 | 40 | 75 | 120 | 245 | 360 | 273 | 281 | W | W | W | W | W | W |
| Alaska, Michigan, Nevada, and South Dakota | 0 | 0 | 0 | 16 | 25 | 30 | W | W | W | W | W | 0 | 0 | 0 |
| Dakota, Oklahoma, Oregon, and Virginia | 0 | 0 | 0 | 0 | 9 | 17 | W | W | W | W | W | W | W | W |
| **Total** | **321** | **420** | **648** | **755** | **1,231** | **1,563** | **1,096** | **1,073** | **1,191** | **1,196** | **1,156** | **787** | **625** | **560** |

W = Data withheld to avoid disclosure of individual company data.

Note: Totals may not equal sum of components because of independent rounding.

Source: U.S. Energy Information Administration: Form EIA-851A, "Domestic Uranium Production Report" (2003-16).

## Table 8. U.S. uranium expenditures, 2003-16

million dollars

| Year | Drilling [1] | Production [2] | Land and Other [3] | | | | Total Expenditures |
|---|---|---|---|---|---|---|---|
| | | | Total Land and Other | Land | Exploration | Reclamation | |
| 2003 | W | W | 31.3 | NA | NA | NA | **W** |
| 2004 | 10.6 | 27.8 | 48.4 | NA | NA | NA | **86.9** |
| 2005 | 18.1 | 58.2 | 59.7 | NA | NA | NA | **136.0** |
| 2006 | 40.1 | 65.9 | 115.2 | 41.0 | 23.3 | 50.9 | **221.2** |
| 2007 | 67.5 | 90.4 | 178.2 | 77.7 | 50.3 | 50.2 | **336.2** |
| 2008 | 81.9 | 221.2 | 164.4 | 65.2 | 50.2 | 49.1 | **467.6** |
| 2009 | 35.4 | 141.0 | 104.0 | 17.3 | 24.2 | 62.4 | **280.5** |
| 2010 | 44.6 | 133.3 | 99.5 | 20.2 | 34.5 | 44.7 | **277.3** |
| 2011 | 53.6 | 168.8 | 96.8 | 19.6 | 43.5 | 33.7 | **319.2** |
| 2012 | 66.6 | 186.9 | 99.4 | 16.8 | 33.3 | 49.3 | **352.9** |
| 2013 | 49.9 | 168.2 | 90.6 | 14.6 | 21.6 | 54.4 | **308.7** |
| 2014 | 28.2 | 137.6 | 74.0 | 11.6 | 10.7 | 51.7 | **239.7** |
| 2015 | 28.7 | 118.5 | 76.2 | 12.1 | 4.7 | 59.4 | **223.5** |
| 2016 | 22.3 | 98.0 | 49.6 | 9.9 | 2.5 | 37.2 | **169.9** |

NA = Not available.   W = Data withheld to avoid disclosure of individual company data.

[1] Drilling: All expenditures directly associated with exploration and development drilling.

[2] Production: All expenditures for mining, milling, processing of uranium, and facility expense.

[3] Land and Other: All expenditures for land; geological research; geochemical and geophysical surveys; costs incurred by field personnel in the course of exploration, reclamation and restoration work; and overhead and administrative charges directly associated with supervising and supporting field activities.

Notes: Expenditures are in nominal U.S. dollars. Totals may not equal sum of components because of independent rounding.

Source: U.S. Energy Information Administration: Form EIA-851A, "Domestic Uranium Production Report" (2003-16).

BLM_0070237

### Figure 4. U.S. uranium expenditures, 2004-16

million dollars



Source: U.S. Energy Information Administration: Form EIA-851A, "Domestic Uranium Production Report" (2004-16).

BLM_0070238

## Table 9. Summary production statistics of the U.S. uranium industry, 1993-2016

| Year | Exploration and Development Surface Drilling (million feet) | Exploration and Development Drilling (million dollars) | Mine Production of Uranium (million pounds $U_3O_8$) | Uranium Concentrate Production (million pounds $U_3O_8$) | Uranium Concentrate Shipments (million pounds $U_3O_8$) | Employment (person-years) |
|---|---|---|---|---|---|---|
| 1993 | 1.1 | 5.7 | 2.1 | 3.1 | 3.4 | 871 |
| 1994 | 0.7 | 1.1 | 2.5 | 3.4 | 6.3 | 980 |
| 1995 | 1.3 | 2.6 | 3.5 | 6.0 | 5.5 | 1,107 |
| 1996 | 3.0 | 7.2 | 4.7 | 6.3 | 6.0 | 1,118 |
| 1997 | 4.9 | 20.0 | 4.7 | 5.6 | 5.8 | 1,097 |
| 1998 | 4.6 | 18.1 | 4.8 | 4.7 | 4.9 | 1,120 |
| 1999 | 2.5 | 7.9 | 4.5 | 4.6 | 5.5 | 848 |
| 2000 | 1.0 | 5.6 | 3.1 | 4.0 | 3.2 | 627 |
| 2001 | 0.7 | 2.7 | 2.6 | 2.6 | 2.2 | 423 |
| 2002 | W | W | 2.4 | 2.3 | 3.8 | 426 |
| E2003 | W | W | 2.2 | 2.0 | 1.6 | 321 |
| 2004 | 1.2 | 10.6 | 2.5 | 2.3 | 2.3 | 420 |
| 2005 | 1.7 | 18.1 | 3.0 | 2.7 | 2.7 | 648 |
| 2006 | 2.7 | 40.1 | 4.7 | 4.1 | 3.8 | 755 |
| 2007 | 5.1 | 67.5 | 4.5 | 4.5 | 4.0 | 1,231 |
| 2008 | 5.1 | 81.9 | 3.9 | 3.9 | 4.1 | 1,563 |
| 2009 | 3.7 | 35.4 | 4.1 | 3.7 | 3.6 | 1,096 |
| 2010 | 4.9 | 44.6 | 4.2 | 4.2 | 5.1 | 1,073 |
| 2011 | 6.3 | 53.6 | 4.1 | 4.0 | 4.0 | 1,191 |
| 2012 | 7.2 | 66.6 | 4.3 | 4.1 | 3.9 | 1,196 |
| 2013 | 3.8 | 49.9 | 4.6 | 4.7 | 4.7 | 1,156 |
| 2014 | 1.3 | 28.2 | 4.9 | 4.9 | 4.6 | 787 |
| 2015 | 0.9 | 28.7 | 3.7 | 3.3 | 4.0 | 625 |
| 2016 | 0.8 | 22.3 | 2.5 | 2.9 | 3.0 | 560 |

E = Estimated data, except for employment.  W = Data withheld to avoid disclosure of individual company data.

[1] Expenditures are in nominal U.S. dollars.

Note: The 2003 annual production and shipment amounts were estimated by rounding to the nearest 200,000 pounds to avoid disclosure of individual company data. A large, one-time reclamation project needed to be withheld and was

Source: U.S. Energy Information Administration: 1993-2002-Uranium Industry Annual 2002 (May 2003), Table H1 and Table 2. 2003-15-Form EIA-851A, "Domestic Uranium Production Report" (2003-16).

BLM_0070239

### Figure 5. U.S. mine production of uranium, 1993-2016

million pounds $U_3O_8$



E = Estimated data.
Sources: U.S. Energy Information Administration: 1993-2002-Uranium Industry Annual 2002 (May 2003), Table H1 and Table 2. 2003-15-Form EIA-851A, "Domestic Uranium Production Report" (2003-16).

### Figure 6. U.S. uranium concentrate production and shipments, 1993-2016

million pounds $U_3O_8$



— Uranium Concentrate Production          — Uranium Concentrate Shipments

E = Estimated data.
Sources: U.S. Energy Information Administration: 1993-2002-Uranium Industry Annual 2002 (May 2003), Table H1 and Table 2. 2003-15-Form EIA-851A, "Domestic Uranium Production Report" (2003-16).



BLM_0070240

### Figure 7. Employment in the U.S. production industry, 1993-2016

person-years



Sources: U.S. Energy Information Administration: 1993-2002-Uranium Industry Annual 2002 (May 2003), Table H1 and Table 2. 2003-15-Form EIA-851A, "Domestic Uranium Production Report" (2003-16).



BLM_0070241

## Table 10. Uranium reserve estimates at the end of 2015 and 2016

million pounds $U_3O_8$

| Uranium Reserve Estimates[1] by Mine and Property Status, Mining Method, and State(s) | End of 2015 | | | End of 2016 | | |
|---|---|---|---|---|---|---|
| | Forward Cost [2] | | | | | |
| | $0 to $30 per pound | $0 to $50 per pound | $0 to $100 per pound | $0 to $30 per pound | $0 to $50 per pound | $0 to $100 per pound |
| Properties with Exploration Completed, Exploration Continuing, and Only Assessment Work | 24.3 | W | 151.6 | 24.3 | W | 136.9 |
| Properties Under Development for Production and Development Drilling | W | 38.2 | W | W | W | W |
| Mines in Production | W | 16.4 | W | 17.1 | W | W |
| Mines Closed Temporarily, Closed Permanently, and Mined Out | W | W | 135.2 | W | 28.4 | W |
| **Total** | **66.2** | **165.8** | **361.8** | **59.9** | **159.5** | **339.2** |
| In-Situ Leach Mining | W | W | 148.6 | W | 115.3 | W |
| Underground and Open Pit Mining | W | W | 213.2 | W | 44.2 | W |
| **Total** | **66.2** | **165.8** | **361.8** | **59.9** | **159.5** | **339.2** |
| Arizona, New Mexico and Utah | 0 | W | 212.0 | 0 | W | 209.6 |
| Colorado, Nebraska and Texas | W | 39.2 | 44.3 | W | 39.2 | W |
| Wyoming | W | W | 105.6 | W | W | W |
| **Total** | **66.2** | **165.8** | **361.8** | **59.9** | **159.5** | **339.2** |

W = Data withheld to avoid disclosure of individual company data.

[1] Reserve estimates on 70 mines and properties for end of 2015 and on 68 mines and properties for end of 2016. These uranium reserve estimates cannot be compared with the much larger historical data set of uranium reserves that were published in the July 2010 report U.S. Uranium Reserves Estimates at http://www.eia.gov/cneaf/nuclear/page/reserves/ures.html. Reserves, as reported here, do not necessarily imply compliance with U.S. or Canadian government definitions for purposes of investment disclosure.

[2] Forward Cost: The operating and capital costs still to be incurred in the production of uranium from in-place reserves. By using forward costing, estimates for reserves for ore deposits in differing geological settings and status of development can be aggregated and reported for selected cost categories. Included are costs for labor, materials, power and fuel, royalties, payroll taxes, insurance, and applicable general and administrative costs. Excluded from forward cost estimates are prior expenditures, if any, incurred for property acquisition, exploration, mine development, and mill construction, as well as income taxes, profit, and the cost of money. Forward costs are neither the full costs of production nor the market price at which the uranium, when produced, might be sold.

Note: Totals may not equal sum of components because of independent rounding.

Source: U.S. Energy Information Administration: Form EIA-851A, "Domestic Uranium Production Report" (2013-16).

BLM_0070242

2016 Uranium Marketing Annual Report
Release Date: June 19, 2017
Next Release Date: May 2018

**Table S1b. Weighted-average price of uranium purchased by owners and operators of U.S. civilian nuclear power reactors, 1994-2016**
dollars per pound $U_3O_8$ equivalent

| Delivery year | Total purchased (weighted-average price) | Purchased from U.S. producers | Purchased from U.S. brokers and traders | Purchased from other owners and operators of U.S. civilian nuclear power reactors, other U.S. suppliers, (and U.S. government for 2007) [1] | Purchased from foreign suppliers | U.S.-origin uranium (weighted-average price) | Foreign-origin uranium (weighted-average price) | Spot contracts [2] (weighted-average price) | Short, medium, and long-term contracts [3] (weighted-average price) |
|---|---|---|---|---|---|---|---|---|---|
| 1994 | 10.40 | 13.72 | 9.34 | 8.04 | 10.43 | 12.08 | 9.97 | 9.01 | NA |
| 1995 | 11.25 | 14.84 | 9.83 | 12.52 | 11.40 | 14.20 | 10.84 | 10.30 | NA |
| 1996 | 14.12 | 14.20 | 13.36 | 14.98 | 14.45 | 14.62 | 14.02 | 14.22 | NA |
| 1997 | 12.88 | 13.60 | 12.31 | W | 12.91 | 13.36 | 12.78 | 11.61 | NA |
| 1998 | 12.14 | 13.61 | 11.95 | W | 11.97 | 13.37 | 11.90 | 10.56 | NA |
| 1999 | 11.63 | 13.93 | 11.54 | W | 11.47 | 12.24 | 11.47 | 9.52 | NA |
| 2000 | 11.04 | 14.81 | 11.28 | 10.45 | 10.65 | 11.52 | 10.88 | 8.54 | 11.70 |
| 2001 | 10.15 | 13.26 | 10.44 | 9.98 | 9.86 | 10.50 | 10.05 | 7.92 | 10.96 |
| 2002 | 10.36 | 13.03 | 10.21 | W | 10.37 | 10.89 | 10.29 | 9.29 | 10.58 |
| 2003 | 10.81 | 14.17 | 11.05 | 10.16 | 10.82 | 10.81 | 10.81 | 10.10 | 10.94 |
| 2004 | 12.61 | - - | 12.08 | 11.30 | 13.15 | 11.87 | 12.76 | 14.77 | 12.24 |
| 2005 | 14.36 | W | 13.76 | W | 14.70 | 15.11 | 14.21 | 20.04 | 13.70 |
| 2006 | 18.61 | - - | 20.49 | W | 18.62 | 17.85 | 18.75 | 39.48 | 16.38 |
| 2007 | 32.78 | - - | 34.10 | W | 32.36 | 28.89 | 33.05 | 88.25 | 24.45 |
| 2008 | 45.88 | 75.16 | 39.62 | W | 48.49 | 59.55 | 43.47 | 66.95 | 41.59 |
| 2009 | 45.86 | W | 41.88 | W | 46.68 | 48.92 | 45.35 | 46.45 | 45.74 |
| 2010 | 49.29 | 47.13 | 44.98 | 42.24 | 51.30 | 45.25 | 49.64 | 43.99 | 50.43 |
| 2011 | 55.64 | 58.12 | 53.29 | 52.50 | 56.60 | 52.12 | 55.98 | 54.69 | 55.90 |
| 2012 | 54.99 | W | 54.44 | W | 54.40 | 58.44 | 54.07 | 51.04 | 55.65 |
| 2013 | 51.99 | W | 50.44 | W | 51.93 | 56.37 | 51.13 | 43.83 | 54.00 |
| 2014 | 46.16 | W | 42.90 | W | 47.62 | 48.11 | 46.03 | 36.64 | 49.73 |
| 2015 | 44.13 | 52.35 | 44.67 | W | 44.66 | 43.86 | 44.14 | 36.80 | 46.04 |
| 2016 | 42.43 | 48.86 | 50.56 | W | 44.85 | 43.92 | 42.26 | 29.62 | 46.11 |

- - = Not applicable.  W = Data withheld to avoid disclosure of individual company data.  NA = Not available.

[1] Includes purchases between owners and operators of U.S. civilian nuclear power reactors along with purchases from other U.S. suppliers which are U.S. converters, enrichers, and fabricators.

[2] Spot Contract: A one-time delivery (usually) of the entire contract to occur within one year of contract execution (signed date).

[3] Short, Medium, and Long-Term Contracts: One or more deliveries to occur after a year following contract execution (signed date).

Notes: "Other U.S. Suppliers" are U.S. converters, enrichers, and fabricators.  Totals may not equal sum of components because of independent rounding. Weighted-average prices are not adjusted for inflation.

Sources: U.S. Energy Information Administration: 1994-2002-Uranium Industry Annual, Tables 10, 11 and 16. 2003-16-Form EIA-858, "Uranium Marketing Annual Survey".

**Figure S2. Weighted-average price of uranium purchased by owners and operators of U.S. civilian nuclear power reactors, 1994-2016 deliveries**
dollars per pound $U_3O_8$ equivalent



Sources: U.S. Energy Information Administration: 1994-2002-Uranium Industry Annual reports. 2003-16-Form EIA-858, "Uranium Marketing Annual Survey".



BLM_0070243

**Spreadsheet Placeholder(file available in native format)**

**File Name:**                    0_USEnergyInfoAdministration2018a.xlsx

BLM_0070244



# Environment

## Carbon Dioxide Emissions Coefficients

**Release Date:** February 2, 2016 | Also available in
spreadsheet

### Carbon Dioxide Emissions Coefficients by Fuel

| Carbon Dioxide (CO$_2$) Factors: | Pounds CO$_2$ Per Unit of Volume or Mass | Kilograms CO$_2$ Volume or Mass | Pounds CO$_2$ Million Btu | Kilograms CO$_2$ Million Btu |
|---|---|---|---|---|
| **For homes and businesses** | | | | |
| Propane | 12.70/gallon | 5.76/gallon | 139.05 | 63.07 |
| Butane | 14.80/gallon | 6.71/gallon | 143.20 | 64.95 |
| Butane/Propane Mix | 13.70/gallon | 6.21/gallon | 141.12 | 64.01 |
| Home Heating and Diesel Fuel (Distillate) | 22.40/gallon | 10.16/gallon | 161.30 | 73.16 |
| Kerosene | 21.50/gallon | 9.75/gallon | 159.40 | 72.30 |
| Coal (All types) | 4,631.50/short ton thousand cubic | 2,100.82/short ton | 210.20 | 95.35 |
| Natural Gas | 117.10/feet | 53.12/thousand cubic feet | 117.00 | 53.07 |
| Gasoline | 19.60/gallon | 8.89/gallon | 157.20 | 71.30 |
| Residual Heating Fuel (Businesses only) | 26.00/gallon | 11.79/gallon | 173.70 | 78.79 |
| **Other transportation fuels** | | | | |
| Jet Fuel | 21.10/gallon | 9.57/gallon | 156.30 | 70.90 |
| Aviation Gas | 18.40/gallon | 8.35/gallon | 152.60 | 69.20 |
| **Industrial fuels and others not listed above** | | | | |
| Flared natural gas | 120.70/thousand cubic feet | 54.75/thousand cubic feet | 120.60 | 54.70 |
| Petroleum coke | 32.40/gallon | 14.70/gallon | 225.10 | 102.10 |
| Other petroleum & miscellaneous | 22.09/gallon | 10.02/gallon | 160.10 | 72.62 |
| **Nonfuel uses** | | | | |
| Asphalt and Road Oil | 26.34/gallon | 11.95/gallon | 166.70 | 75.61 |
| Lubricants | 23.62/gallon | 10.72/gallon | 163.60 | 74.21 |
| Petrochemical Feedstocks | 24.74/gallon | 11.22/gallon | 156.60 | 71.03 |
| Special Naphthas (solvents) | 20.05/gallon | 9.10/gallon | 160.50 | 72.80 |
| Waxes | 21.11/gallon | 9.57/gallon | 160.10 | 72.62 |
| **Coal by type** | | | | |
| Anthractie | 5,685.00/short ton | 2,578.68/short ton | 228.60 | 103.70 |
| Bituminous | 4,931.30/short ton | 2,236.80/short ton | 205.70 | 93.30 |
| Subbituminous | 3,715.90/short ton | 1,685.51/short ton | 214.30 | 97.20 |

*Source: U.S. Energy Information Administration estimates.*

*Note: To convert to carbon equivalents multiply by 12/44. Coefficients may vary slightly with estimation method and across time.*

BLM_0070245

Case No. 1:20-cv-02484-MSK   Document 50-2   filed 04/28/21   USDC Colorado   pg 12 of 434

| Carbon Dioxide (CO$_2$) Factors: | Pounds CO$_2$ Per Unit of Volume or Mass | Kilograms CO$_2$ Volume or Mass | Pounds CO$_2$ Million Btu | Kilograms CO$_2$ Million Btu |
|---|---|---|---|---|
| Lignite | 2,791.60/short ton | 1,266.25/short ton | 215.40 | 97.70 |
| Coke | 6,239.68/short ton | 2,830.27/short ton | 251.60 | 114.12 |
| **Other fuels** | | | | |
| Geothermal (average all generation) | NA | NA | 16.99 | 7.71 |
| Municiple Solid Waste | 5,771.00/short ton | 2,617.68/short ton | 91.90 | 41.69 |
| Tire-derived fuel | 6,160.00/short ton | 2,794.13/short ton | 189.54 | 85.97 |
| Waste oil | 924.0/barrel | 419.12/barrel | 210.00 | 95.25 |

*Source: U.S. Energy Information Administration estimates.*

*Note: To convert to carbon equivalents multiply by 12/44. Coefficients may vary slightly with estimation method and across time.*

Detailed factors (discontinued)

BLM_0070246



**U.S. Energy Information Administration**

# Environment

## Carbon Dioxide Emissions Coefficients

**Release Date:** February 2, 2016 | Also available in
spreadsheet

**Carbon Dioxide Emissions Coefficients by Fuel**

| Carbon Dioxide (CO$_2$) Factors: | Pounds CO$_2$ Per Unit of Volume or Mass | Kilograms CO$_2$ Volume or Mass | Pounds CO$_2$ Million Btu | Kilograms CO$_2$ Million Btu |
|---|---|---|---|---|
| **For homes and businesses** | | | | |
| Propane | 12.70/gallon | 5.76/gallon | 139.05 | 63.07 |
| Butane | 14.80/gallon | 6.71/gallon | 143.20 | 64.95 |
| Butane/Propane Mix | 13.70/gallon | 6.21/gallon | 141.12 | 64.01 |
| Home Heating and Diesel Fuel (Distillate) | 22.40/gallon | 10.16/gallon | 161.30 | 73.16 |
| Kerosene | 21.50/gallon | 9.75/gallon | 159.40 | 72.30 |
| Coal (All types) | 4,631.50/short ton thousand cubic | 2,100.82/short ton | 210.20 | 95.35 |
| Natural Gas | 117.10/feet | 53.12/thousand cubic feet | 117.00 | 53.07 |
| Gasoline | 19.60/gallon | 8.89/gallon | 157.20 | 71.30 |
| Residual Heating Fuel (Businesses only) | 26.00/gallon | 11.79/gallon | 173.70 | 78.79 |
| **Other transportation fuels** | | | | |
| Jet Fuel | 21.10/gallon | 9.57/gallon | 156.30 | 70.90 |
| Aviation Gas | 18.40/gallon | 8.35/gallon | 152.60 | 69.20 |
| **Industrial fuels and others not listed above** | | | | |
| Flared natural gas | 120.70/thousand cubic feet | 54.75/thousand cubic feet | 120.60 | 54.70 |
| Petroleum coke | 32.40/gallon | 14.70/gallon | 225.10 | 102.10 |
| Other petroleum & miscellaneous | 22.09/gallon | 10.02/gallon | 160.10 | 72.62 |
| **Nonfuel uses** | | | | |
| Asphalt and Road Oil | 26.34/gallon | 11.95/gallon | 166.70 | 75.61 |
| Lubricants | 23.62/gallon | 10.72/gallon | 163.60 | 74.21 |
| Petrochemical Feedstocks | 24.74/gallon | 11.22/gallon | 156.60 | 71.03 |
| Special Naphthas (solvents) | 20.05/gallon | 9.10/gallon | 160.50 | 72.80 |
| Waxes | 21.11/gallon | 9.57/gallon | 160.10 | 72.62 |
| **Coal by type** | | | | |
| Anthractie | 5,685.00/short ton | 2,578.68/short ton | 228.60 | 103.70 |
| Bituminous | 4,931.30/short ton | 2,236.80/short ton | 205.70 | 93.30 |
| Subbituminous | 3,715.90/short ton | 1,685.51/short ton | 214.30 | 97.20 |

*Source: U.S. Energy Information Administration estimates.*

*Note: To convert to carbon equivalents multiply by 12/44. Coefficients may vary slightly with estimation method and across time.*

| Carbon Dioxide (CO$_2$) Factors: | Pounds CO$_2$ Per Unit of Volume or Mass | Kilograms CO$_2$ Volume or Mass | Pounds CO$_2$ Million Btu | Kilograms CO$_2$ Million Btu |
|---|---|---|---|---|
| Lignite | 2,791.60/short ton | 1,266.25/short ton | 215.40 | 97.70 |
| Coke | 6,239.68/short ton | 2,830.27/short ton | 251.60 | 114.12 |
| **Other fuels** | | | | |
| Geothermal (average all generation) | NA | NA | 16.99 | 7.71 |
| Municiple Solid Waste | 5,771.00/short ton | 2,617.68/short ton | 91.90 | 41.69 |
| Tire-derived fuel | 6,160.00/short ton | 2,794.13/short ton | 189.54 | 85.97 |
| Waste oil | 924.0/barrel | 419.12/barrel | 210.00 | 95.25 |

*Source: U.S. Energy Information Administration estimates.*

*Note: To convert to carbon equivalents multiply by 12/44. Coefficients may vary slightly with estimation method and across time.*

Detailed factors (discontinued)

BLM_0070248



## Frequently Asked Questions
## What is U.S. electricity generation by energy source?

In 2017, about 4,015 billion kilowatthours (kWh) (or 4.01 trillion kWh) of electricity were generated at utility-scale facilities in the United States.[1] About 63% of this electricity generation was from fossil fuels (coal, natural gas, petroleum, and other gases). About 20% was from nuclear energy, and about 17% was from renewable energy sources. The U.S. Energy Information Administration estimates that an additional 24 billion kWh of electricity generation was from small-scale solar photovoltaic systems in 2017.[2]

**U.S. electricity generation by source, amount, and share of total in 2017[1]**

| Energy source | Billion kWh | Share of total |
|---|---|---|
| **Total - all sources** | 4,015 | |
| **Fossil fuels (total)** | 2,495 | 62.7% |
| Natural gas | 1,273 | 31.7% |
| Coal | 1,208 | 30.1% |
| Petroleum (total) | 21 | 0.5% |
| Petroleum liquids | 13 | 0.3% |
| Petroleum coke | 9 | 0.2% |
| Other gases | 14 | 0.4% |
| **Nuclear** | 805 | 20.0% |
| **Renewables (total)** | 687 | 17.1% |
| Hydropower | 300 | 7.5% |
| Wind | 254 | 6.3% |
| Biomass (total) | 64 | 1.6% |
| Wood | 43 | 1.1% |
| Landfill gas | 11 | 0.3% |
| Municipal solid waste (biogenic) | 7 | 0.2% |
| Other biomass waste | 3 | 0.1% |
| Solar (total) | 53 | 1.3% |
| Photovoltaic | 50 | 1.2% |
| Solar thermal | 3 | 0.1% |
| Geothermal | 16 | 0.4% |
| Pumped storage hydropower[3] | -6 | -0.2% |
| **Other sources** | 13 | 0.3% |

[1] Preliminary data for 2017. Includes utility-scale electricity generation, which is electricity generation from power plants with at least one megawatt (or 1,000 kilowatts) of total electricity generating capacity.

[2] Small-scale solar photovoltaic systems are electricity generators with less than one megawatt of electricity generating capacity that are usually at or near the location where the electricity is consumed. Most small-scale solar photovoltaic systems are installed on building rooftops.

[3] Pumped storage hydroelectricity generation is negative because most pumped storage electricity generation facilities use more electricity than they produce on an annual basis.

Learn more:
Energy Explained: Electricity in the United States
*Electric Power Monthly*: Chapter 1: Net Generation
*Monthly Energy Review*: Electricity

BLM_0070249

Last updated: March 7, 2018

## Other FAQs about Nuclear

Does EIA have projections for energy production, consumption, and prices for individual states?
How many nuclear power plants are in the United States, and where are they located?
How many power plants are there in the United States?
How much does it cost to generate electricity with different types of power plants?
How much electricity does a nuclear power plant generate?
How much of U.S. carbon dioxide emissions are associated with electricity generation?
How old are U.S. nuclear power plants, and when was the newest one built?
What is U.S. electricity generation by energy source?

BLM_0070250



**U.S. Fish & Wildlife Service**

# Birding in the United States: A Demographic and Economic Analysis

*Addendum to the 2001 National Survey of Fishing, Hunting and Wildlife-Associated Recreation*

**Report 2001-1**

BLM_0070251



BLM_0070252

## U.S. Fish & Wildlife Service

# Birding in the United States: A Demographic and Economic Analysis

*Addendum to the 2001 National Survey of Fishing, Hunting and Wildlife-Associated Recreation*

**Report 2001-1**



Genevieve Pullis La Rouche
Division of Federal Aid
U.S. Fish and Wildlife Service
Washington, D.C.

Division of Federal Aid
U.S. Fish and Wildlife Service
Washington, D.C. 20240
Director, Steve Williams
Chief, Division of Federal Aid, Kris La Montagne
http://fa.r9.fws.gov/

*This report is intended to complement the National and State Reports for the 2001 National Survey of Fishing, Hunting and Wildlife-Associated Recreation. The report's opinions are the author's and do not represent official positions of the U.S. Fish and Wildlife Service.*

The author thanks Sylvia Cabrera, Richard Aiken, Grant La Rouche, John Charbonneau and Jim Caudill for reviewing earlier drafts of this report.

BLM_0070253

# Introduction

In January 2002 an unprecedented major media event unfolded in a Louisiana swamp. A team of top ornithologists set out to find the ivory-billed woodpecker, a bird last seen in the United States in 1943 and, until a recent credible citing by a turkey hunter, considered extinct in the U.S. The expedition, funded by a corporate sponsor, received worldwide media attention including coverage by the New York Times, USA Today, and National Public Radio.

This high-profile search for the ivory-billed woodpecker is just one indicator of the growing popularization of birds and birding. Other evidence abounds. A field guide, *Sibley's Guide to Birds*, became a New York Times bestseller. And a quick search of the Internet yields numerous birding sites, some of which list hundreds of birding festivals held around the country each year.

**"For me, the thrill of bird-watching is catching the glimpse of alien consciousness — the uninflected, murderous eye, the aura of reptilian toughness under the beautiful soft feathers, the knowledge that if I were the size of a sparrow, and a sparrow were as big as I am, it might rip my head off without a second's hesitation."**

Jonathan Rosen. The Ghost Bird.
*The New Yorker.* 5/14/01.

This growing awareness of birding comes at an odd time; birds are in jeopardy. According to 35-year trend data (1966-2001) from the U. S. Geological Service, almost one-in-four bird species in the United States show "significant negative trend estimates" (Sauer et al. 2003). This decline is attributed primarily to the degradation and destruction of habitat resulting from human population growth and short-sighted environmental practices such as the razing of wetlands



American Kestral *(Falco sparverius)* by Dave Menke, USFWS

BLM_0070254

needed by migratory birds. Although there is a certain irony in people becoming enthusiastic about birds as they disappear, it also presents an opportunity: birders may be the economic and political force that can help save the birds.

The following report provides up-to-date information so birders and policy makers can make informed decisions regarding the protection of birds and their habitats. This report identifies who birders are, where they live, how avid they are, where they bird and what kinds of birds they watch. In addition to demographic information, this report also provides two kinds of economic measures. The first is an estimate of how much birders spend on their hobby and the economic impact of these expenditures. The second is the net economic value of birding, that is, the value of birding to society.

By understanding who birders are, they can be more easily educated about pressures facing birds and bird habitats. Conversely, by knowing who is likely *not* a birder, or who is potentially a birder, information can be more effectively tailored. The economic values presented here can be used by resource managers and policy makers to demonstrate the economic might of birders, the value of birding — and by extension, the value of birds. In fact, research shows that these kinds of values help wildlife managers make better decisions and illustrate the value of wildlife to American society (Loomis 2000).

All data presented here is from the wildlife-watching section of the 2001 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation (FHWAR). It is the most comprehensive survey of wildlife recreation in the U.S. Overall, 15,300 detailed wildlife-watching interviews were completed with a response rate of 90 percent. The Survey focused on 2001 participation and expenditures by U.S. residents 16 years of age and older.



Jim Hudgins, USFWS

### Birding Trends

Is birding increasing? Despite recent popularization (high visibility within the media and popular culture and increased recognition of the sport within American homes) of birding, past FHWAR Survey results point to a more complicated story. A comparison of results from the 1991, 1996, and 2001 estimates show that bird-watching around the home has decreased rather than increased over that 10-year period (USFWS). In 1991, 51.3 million people reported observing birds around their homes. In 1996 that number dropped to 42.2 million and in 2001 to 40.3 million. Because the 2001 Survey is the first time people were asked if they specifically watched birds on trips away from home, it cannot be said conclusively if this activity increased or decreased. However, in all three Surveys, people were asked if they observed, fed, or photographed birds away from home. These numbers indicate a net decrease in away-from-home birding from 24.7 million in 1991 to 18.5 million in 2001 but a slight uptick from 1996 (17.7 million) to 2001.

BLM_0070255

# Birders

In 2001 there were 46 million bird-watchers or birders, 16 years of age and older, in the United States — a little over one in five people. What is a birder? The National Survey uses a conservative definition. To be counted as a birder, an individual must have either taken a trip a mile or more from home for the primary purpose of observing birds and/or closely observed or tried to identify birds around the home. So people who happened to notice birds while they were mowing the lawn or picnicking at the beach were not counted as birders. Trips to zoos and observing captive birds also did not count.

Backyard birding or watching birds around the home is the most common form of bird-watching. Eighty-eight percent (40 million) of birders are backyard birders. The more active form of birding, taking trips away from home, is less common with 40 percent (18 million) of birders partaking.



Red-winged Blackbirds (*Agelaius phoeniceus*) by John and Karen Hollingsworth, USFWS

**Chart 1. Birders in the United States: 2001**
(16 years of age and older.)



| | |
|---|---|
| Total Birders | 46 million |
| Around-the-home | 40 million |
| Away-from-home | 18 million |

BLM_0070256

**Table 1. Age Distribution of the U.S. Population and Birders: 2001**
(Population 16 years of age and older. Numbers in thousands.)

| Age | U.S. Population | Number of Birders | Participation Rate |
|---|---|---|---|
| 16 and 17 | 7,709 | 1,043 | 14% |
| 18 to 24 | 22,234 | 1,894 | 9% |
| 25 to 34 | 35,333 | 5,990 | 17% |
| 35 to 44 | 44,057 | 10,414 | 24% |
| 45 to 54 | 40,541 | 10,541 | 26% |
| 55 to 64 | 25,601 | 7,177 | 28% |
| 65 plus | 36,823 | 8,893 | 24% |

**Chart 2. Birders' Participation Rate by Age**



U.S. Average: 22% ▼

| | |
|---|---|
| 16 and 17 | 14% |
| 18 to 24 | 9% |
| 25 to 34 | 17% |
| 35 to 44 | 24% |
| 45 to 54 | 26% |
| 55 to 64 | 28% |
| 65 plus | 24% |

The average birder is 49 years old and more than likely has a better than average income and education. She is slightly more likely to be female, and highly likely to be white and married. There is also a good chance that this birder lives in the northern half of the country in a small city or town. Does this paint an accurate picture of a birder? Like all generalizations the description of an "average" birder does not reflect the variety of people who bird, with millions falling outside this box. The tables and charts show in numbers and participation rates (the percentage of people who participate) birders by various demographic breakdowns.

The tendency of birders to be middle-age or older is reflected in both the number of birders and participation rates. Looking at the different age breakdowns in Table 1, the greatest number of birders were in the 35 to 44 and 45 to 54 age groups. People age 55 to 64 had the highest participation rates while the participation rate was particularly low for people ages 18 to 24. Birders who take trips away from home to pursue their hobby were on average slightly younger at 45 years old compared to backyard birders who were on average 50 years old.



Tina Watson, USFWS

BLM_0070257

The higher the income and education level the more likely a person is to be a birder. Twenty-seven percent of people who live in households that earn $75,000 or more were bird-watchers — 5 percent above the national average of 22 percent. Education, which is often highly correlated with income, shows the same trend. People with less than high school education participated at 14 percent — far below the national average — while people with five or more years of college had the highest participation rate at 33 percent. See Tables 2 and 3 for more information.

**Table 2. Income Distribution of the U.S. Population and Birders: 2001**
(Population 16 years of age and older. Numbers in thousands.)

| Income | U.S. Population | Number of Birders | Participation Rate |
|---|---|---|---|
| Less than $10,000 | 10,594 | 2,212 | 21% |
| $10,000 to $19,000 | 15,272 | 2,754 | 18% |
| $20,000 to $24,000 | 10,902 | 2,335 | 21% |
| $25,000 to $29,000 | 11,217 | 2,392 | 21% |
| $30,000 to $34,000 | 11,648 | 2,618 | 22% |
| $35,000 to $39,000 | 9,816 | 2,005 | 20% |
| $40,000 to $49,000 | 16,896 | 4,116 | 24% |
| $50,000 to $74,000 | 31,383 | 7,476 | 24% |
| $75,000 to $99,000 | 17,762 | 4,771 | 27% |
| $100,000 or more | 19,292 | 5,224 | 27% |

Detail does not add to total due to non-response.

**Chart 3. Birders' Participation Rate by Income**



U.S. Average: 22% ▼

| | |
|---|---|
| Less than $10,000 | 21% |
| $10,000 to $19,000 | 18% |
| $20,000 to $24,000 | 21% |
| $25,000 to $29,000 | 21% |
| $30,000 to $34,000 | 22% |
| $35,000 to $39,000 | 20% |
| $40,000 to $49,000 | 24% |
| $50,000 to $74,000 | 24% |
| $75,000 to $99,000 | 27% |
| $100,000 or more | 27% |

**Table 3. Educational Distribution of the U.S. Population and Birders: 2001**
(Population 16 years of age and older. Numbers in thousands.)

| | U.S. Population | Number of Birders | Participation Rate |
|---|---|---|---|
| 11 years or less | 32,820 | 4,627 | 14% |
| 12 years | 73,719 | 13,933 | 19% |
| 1 to 3 years college | 49,491 | 11,363 | 23% |
| 4 years college | 34,803 | 8,922 | 26% |
| 5 years or more college | 21,646 | 7,107 | 33% |

**Chart 4. Birders' Participation Rate by Education**



U.S. Average: 22% ▼

| | |
|---|---|
| 11 years or less | 14% |
| 12 years | 19% |
| 1 to 3 years college | 23% |
| 4 years college | 26% |
| 5 years or more college | 33% |

BLM_0070258

**Chart 5. Percent of Birders — by Gender**
(Population 16 years of age and older. Numbers in thousands.)



Male 46%                                    54% Female

Unlike hunting and fishing where men were overwhelmingly in the majority, a slightly larger percent of birders were women — 54 percent in 2001. And most birders, 72 percent, were married.

**Chart 6. Percent of Birders — by Marital Status**



Widowed 7%                                    72% Married

Divorced/separated 9%

Never married 13%



Tami Heilemann, DOI

Excepting Native American participation, birders are not a racially or ethnically diverse group. Ninety-four percent of birders identified themselves as white. The scarcity of minority birders is not just a reflection of their relatively low numbers in the population at large, it's also a function of low participation rates. The participation rates of African-Americans, Asians, and Hispanics were all 9 percent or lower while the rate for whites, 24 percent, was slightly above the 22 percent national average. Native Americans on the other hand had a participation rate (22 percent) on par with the national average.

The sparser populated an area, the more likely its residents were to watch birds. The participation rate for people living in small cities and rural areas was 28 percent — 6 percent above the national average. Whereas large metropolitan areas (1 million residents or more) had the greatest number of birders, their residents had the lowest participation rate, 18 percent. See Table 5.

**Table 4. Racial and Ethnic Distribution of the U.S. Population and Birders: 2001**
(Population 16 years of age and older. Numbers in thousands.)

|  | U.S. Population | Number of Birders | Participation Rate |
|---|---|---|---|
| Hispanic | 21,910 | 1,880 | 9% |
| White | 181,129 | 43,026 | 24% |
| African American | 21,708 | 1,243 | 6% |
| Native American | 1,486 | 321 | 22% |
| Asian | 7,141 | 436 | 6% |
| Other | 833 | 55 | 7% |

**Chart 7. Birders' Participation Rate by Race and Ethnicity**



U.S. Average: 22% ▽

- Hispanic 9%
- White 24%
- African American 6%
- Native American 22%
- Asian 6%
- Other 7%

**Table 5. Percent of U.S. Population Who Birded by Residence: 2001**
(Population 16 years of age and older. Numbers in thousands.)

| Metropolitan Statistical Area (MSA) | U.S. Population | Number of Birders | Participation Rate |
|---|---|---|---|
| 1,000,000 or more | 112,984 | 20,868 | 18% |
| 250,000 to 999,999 | 41,469 | 8,991 | 22% |
| 50,000 to 249,000 | 16,693 | 4,622 | 28% |
| Outside MSA | 41,151 | 11,470 | 28% |



Prothonotary Warbler (*Prothonotaria citrea*) by John and Karen Hollingsworth, USFWS

BLM_0070260

**Chart 8. Birding Participation Rates by State Residents: 2001**
(Population 16 years of age and older)



U.S. Average: 22% ▼

| State | Rate |
|-------|------|
| Montana | 44% |
| Vermont | 43% |
| Wisconsin | 41% |
| Washington | 36% |
| Minnesota | 36% |
| Maine | 36% |
| Alaska | 36% |
| Kentucky | 35% |
| Oregon | 35% |
| New Hampshire | 34% |
| Wyoming | 34% |
| Iowa | 34% |
| South Dakota | 33% |
| Idaho | 29% |
| Indiana | 29% |
| New Mexico | 28% |
| Virginia | 28% |
| Utah | 27% |
| Oklahoma | 27% |
| Pennsylvania | 27% |
| Missouri | 26% |
| Colorado | 25% |
| Tennessee | 25% |
| Nebraska | 25% |
| Connecticut | 25% |
| West Virginia | 24% |
| Arkansas | 24% |
| Kansas | 24% |
| Michigan | 23% |
| Maryland | 22% |
| Arizona | 22% |
| Massachusetts | 22% |
| South Carolina | 20% |
| Ohio | 20% |
| Rhode Island | 19% |
| North Carolina | 18% |
| Illinois | 18% |
| New Jersey | 18% |
| Delaware | 18% |
| Mississippi | 18% |
| Alabama | 18% |
| North Dakota | 17% |
| New York | 17% |
| Florida | 16% |
| Louisiana | 16% |
| Georgia | 15% |
| Nevada | 15% |
| Texas | 14% |
| California | 14% |
| Hawaii | 9% |

When measured in terms of the percent of state residents participating, states in the northern half of the United States generally had higher levels of participation than did states in the southern half. While 44 percent of Montanans and 43 percent of Vermonters watched birds, only 14 percent of Californians and Texans did. See Chart 8.



Jim Hudgins, USFWS

BLM_0070261

**Figure 1. Birders' Participation Rates by Region of Residence: 2001**
(Population 16 years of age and older. Numbers in thousands.)

## U.S. 22%



The participation rate was highest (30%) in the West North Central region of the United States (see Figure 1). The New England states had the second highest participation rate at 27 percent with a close third going to the Rocky Mountain states (26 percent). The West South Central states had the lowest rate of 17 percent while the Pacific and South Atlantic states yielded slightly higher rates, both 19 percent. However, in terms of sheer numbers, the Pacific and South Atlantic states had the most resident birders — 7 million and 8 million respectively, while New England had the least, 3 million.

BLM_0070262

**Table 6. Birding by State Residents and Nonresidents: 2001**
(Population 16 years of age and older. Numbers in thousands.)

| State | Total Birders | Percent State Residents | Percent Nonresidents |
|---|---|---|---|
| Alabama | 703 | 90 | 10 |
| Alaska | 321 | 51 | 49 |
| Arizona | 1,168 | 70 | 30 |
| Arkansas | 548 | 88 | 12 |
| California | 3,987 | 91 | 9 |
| Colorado | 1,077 | 74 | 26 |
| Connecticut | 732 | 88 | 12 |
| Delaware | 172 | 63 | 37 |
| Florida | 2,363 | 80 | 20 |
| Georgia | 1,063 | 84 | 16 |
| Hawaii | 164 | 48 | 52 |
| Idaho | 478 | 60 | 40 |
| Illinois | 1,815 | 90 | 10 |
| Indiana | 1,423 | 94 | 6 |
| Iowa | 813 | 93 | 7 |
| Kansas | 569 | 87 | 13 |
| Kentucky | 803 | 91 | 9 |
| Louisiana | 608 | 86 | 14 |
| Maine | 595 | 61 | 39 |
| Maryland | 1,068 | 82 | 18 |
| Massachusetts | 1,263 | 86 | 14 |
| Michigan | 1,961 | 88 | 12 |
| Minnesota | 1,471 | 90 | 10 |
| Mississippi | 437 | 88 | 12 |
| Missouri | 1,299 | 85 | 15 |
| Montana | 558 | 55 | 45 |
| Nebraska | 386 | 83 | 17 |
| Nevada | 343 | 63 | 37 |
| New Hampshire | 569 | 57 | 43 |
| New Jersey | 1,335 | 85 | 15 |
| New Mexico | 531 | 70 | 30 |
| New York | 2,802 | 88 | 12 |
| North Carolina | 1,296 | 80 | 20 |
| North Dakota | 134 | 60 | 40 |
| Ohio | 1,899 | 93 | 7 |
| Oklahoma | 760 | 91 | 9 |
| Oregon | 1,187 | 77 | 23 |
| Pennsylvania | 2,721 | 91 | 10 |
| Rhode Island | 193 | 76 | 25 |
| South Carolina | 742 | 84 | 16 |
| South Dakota | 271 | 68 | 32 |
| Tennessee | 1,420 | 76 | 24 |
| Texas | 2,268 | 94 | 6 |
| Utah | 616 | 67 | 33 |
| Vermont | 383 | 53 | 47 |
| Virginia | 1,818 | 86 | 14 |
| Washington | 1,877 | 86 | 14 |
| West Virginia | 428 | 80 | 20 |
| Wisconsin | 1,944 | 86 | 14 |
| Wyoming | 388 | 33 | 67 |

Bird watching by state residents tells only part of the story. Many people travel out-of-state to watch birds and some states are natural birding destinations. Wyoming reaped the benefits of this tourism with a whopping 67 percent of their total birders coming from other states. The scenic northern states of New Hampshire, Vermont, Montana, and Alaska also attracted many birders — all had more than 40 percent of their total birders coming from other states.

BLM_0070263

## Where and What Are They Watching?

Backyard birding is the most prevalent form of birding with 88 percent of participants watching birds from the comfort of their homes. Forty percent of birders travel more than a mile from home to bird, visiting a variety of habitats on both private and public lands.

Of the 18 million Americans who ventured away from home to watch birds, public land rather than private land was visited more frequently, although many visited both. Eighty-three percent of birders used public land such as parks and wildlife refuges, 42 percent used private land, and 31 percent visited both. See Chart 9.

The most popular setting to observe birds was in the woods (73%), followed by lakes and streamside areas (69%) and brush-covered areas and fields (62% and 61%). Less popular sites were the ocean (27%) and manmade areas (31%) such as golf courses and cemeteries. See Table 7.

What kinds of birds are they looking at? Seventy-eight percent reported observing waterfowl, making them the most spied on type of bird. Songbirds were also popular with 70 percent of birders watching them, followed in popularity by birds of prey (68%) and other water birds such as herons and shorebirds (56%). See Chart 10.

### Table 7. Sites Visited by Away-From-Home Birders: 2001
(Population 16 years of age and older. Numbers in thousands.)

| | Number of Birders | Percent |
|---|---|---|
| Total, all birders | 18,342 | 100 |
| Woodland | 13,405 | 73 |
| Lake and Streamside | 12,615 | 69 |
| Brush-covered areas | 11,324 | 62 |
| Open field | 11,184 | 61 |
| Marsh, wetland, swamp | 8,632 | 47 |
| Man-made area | 5,770 | 31 |
| Oceanside | 4,921 | 27 |
| Other | 2,418 | 13 |

\* Detail does not add to total because of multiple responses.

### Chart 9. Percent of Away-From-Home Birders — by Public and Private Land Visited



| | |
|---|---|
| Total, all birders | 100 |
| Private Land | 42 |
| Public Land | 83 |
| Both Public and Private | 31 |

### Chart 10.  Percent of Away-From-Home Birders — by Type of Birds Observed



| | |
|---|---|
| Total, all birders | 100 |
| Waterfowl | 78 |
| Songbirds | 70 |
| Birds of prey | 68 |
| Other water birds* | 56 |
| Other birds** | 43 |

*shorebirds, herons, etc.
**pheasants, turkeys, etc.



Kathryn Trusten, USDA FS

BLM_0070264

**Chart 11. Percent of Around-the-Home Birders Who Can Identify Birds by Sight or Sound**



21-40 bird species  13%
41 or more bird species  6%
N.A.  7%

74%  1-20 bird species

**Chart 12. Percent of Away-From-Home Birders Who Can Identify Birds by Sight or Sound**



21-40 bird species  16%
41 or more bird species  10%
N.A.  7%

67%  1-20 bird species

## Avidity

All people identified as birders in this report said that they took an active interest in birds — defined as trying to closely observe or identify different species. But what is the extent of their interest? In order to determine their "avidity" the following factors were considered: the number of days spent birdwatching; the number of species they could identify; and if they kept a bird life list.

Presumably because of the relative ease of backyard birding, birders around the home spent nine times as many days watching birds as did people who traveled more than a mile from home to bird watch. In 2001, the median number of days for backyard birders was 90 and for away-from-home birders it was 10.

Although birders are investing a fair amount of time pursuing their hobby, most do not appear to have advanced identification skills. Seventy-four percent of all birders could identify only between 1 to 20 different types of bird species, 13 percent could identify 21 to 40 birds and only 8 percent could identify more than 41 species. Skill levels are higher for birders who travel from home to bird watch compared to backyard birders — 10 percent of away-from-home birders could identify 41 or more birds as opposed to 6 percent of backyard birders.

Tallies of birds seen during a birder's life, sometimes called birding life lists, were kept by only 5 percent of birders. This was roughly the same for backyard birders and away-from-home birders alike.

### Avidity Trends

If we can't say there are more birders can we say that birders are more knowledgeable about their hobby than in the past? In order to gauge birders' avidity and level of expertise, the 2001 Survey asked birders how many birds they can identify — a question last asked in the 1980 Survey* (USFWS). A comparison of responses show that skill levels did not change much in that 20 year time period. For both years, the same percent, 74, was in the beginner category (1 to 20 species of birds) and roughly the same percent, 13 and 14, respectively, fell into the intermediate (21 to 40 birds) level. A slightly higher percentage of expert birders, however, (41 or more species) was found in the 2001 Survey, 8 percent versus 5 percent in the 1980 Survey. Yet in another sign that the more things change the more they stay the same, almost the same portion, 4 and 5 percent, kept birding life lists.

**Table 8. Percent of Birders* Who Can Identify Birds by Sight or Sound and Who Kept Birding Life Lists: 1980 and 2001 Comparison**

|  | 1980 | 2001 |
|---|---|---|
| 1-20 bird species | 74% | 74% |
| 21-40 bird species | 14% | 13% |
| 41 or more bird species | 5% | 8% |
| Kept bird life list | 4% | 5% |

* In 1980 the question was asked of all wildlife-watchers (formerly called non-consumptive) and in 2001 the question was asked of only birders.

BLM_0070265

# The Economics of Bird Watching

## Measures of Economic Value

Putting a dollar figure on birding can appear a tricky business. How can dollars be used to value something as intangible as the enjoyment of birds and birding? Looked at from a practical perspective we live in a world of competing resources and dollars. Activities such as golfing and industries such as computer software are regularly described in terms of jobs generated and benefits to consumers. The same economic principles that guide the measure of golf and software apply also to birding.

Expenditures by recreationists and net economic values are two widely used but distinctly different measures of the economic value of wildlife-related recreation. Money spent for binoculars in a store or a sandwich in a deli on a trip has a ripple effect on the economy. It supplies money for salaries and jobs which in turn generates more sales and more jobs and tax revenue. This is economic output or impact, the direct and indirect impact of birders' expenditures and an example of one of two economic values presented in this paper. Economic impact numbers are useful indicators of the importance of birding to the local, regional, and national economies but do not measure the economic benefit to an individual or society because, theoretically, money not spent on birding (or golf, or software) would be spent on other activities, be it fishing or scuba diving. Money is just transferred from one group to another. However, from the perspective of a given community or region, out-of-region residents spending money for birding represents real economic wealth.

Another economic concept is birding's economic benefit to individuals and society: the amount that people are willing to pay over and above what they actually spend to watch birds. This is known as net economic value, or consumer surplus, and is the appropriate economic measure of the benefit to individuals from participation in wildlife-related recreation (Bishop, 1984; Freeman, 1993; Loomis et al., 1984;

McCollum et al. 1992). The benefit to society is the summation of willingness to pay across all individuals.

Net economic value is measured as participants' "willingness to pay" above what they actually spend to participate. The benefit to society is the summation of willingness to pay across all individuals. There is a direct relationship between expenditures and net economic value, as shown in Figure 2. A demand curve for a representative birder is shown in the figure. The downward sloping demand curve represents marginal willingness to pay per trip and indicates that each additional trip is valued less by the birder than the preceding trip. All other factors being equal, the lower the cost per trip (vertical axis) the more trips the birder will take (horizontal axis). The cost of a birding trip serves as an implicit price for birding since a market price generally does not exist for this activity. At $60 per trip, the birder would choose not to watch birds, but if birding were free, the birder would take 20 birding trips.

At a cost per trip of $25 the birder takes 10 trips, with a total willingness to pay of $375 (area acde in Figure 2). Total willingness to pay is the total value the birder places on participation. The birder will not take more than 10 trips because the cost per trip ($25) exceeds what he would pay for an additional trip. For each trip between zero and 10, however, the birder would actually have been willing to pay more than $25 (the demand curve, showing marginal willingness to pay, lies above $25).

The difference between what the birder is willing to pay and what is actually paid is net economic value. In this simple example, therefore, net economic value is $125 (($50 − $25) 10 ÷ 2) (triangle bcd in Figure 2) and birder expenditures are $250 ($25 × 10) (rectangle abde in Figure 2). Thus, the birder's total willingness to pay is composed of net economic value and total expenditures. Net economic value is simply total willingness to pay minus expenditures. The relationship between net economic value and

---

**Figure 2. Individual Birder's Demand Curve for Birding Trips**



*Cost per Trip ($)*

*Trips per Year*

BLM_0070266

**Table 9.** Birders' Expenditures for Wildlife Watching: 2001
(Population 16 years of age and older. Thousands of dollars.)

| Expenditure item | Expenditures ($) |
|---|---|
| **Total, all items** | **31,686,673** |
| **Trip-Related Expenditures** | |
| Total, trip-related | 7,409,679 |
| Food | 2,646,224 |
| Lodging | 1,851,206 |
| Public transportation | 682,202 |
| Private transportation | 1,790,951 |
| Guide fees, pack trip or package fees | 110,374 |
| Private land use fees | 48,999 |
| Public land use fees | 108,414 |
| Boating costs | 135,381 |
| Heating and cooking fuel | 35,928 |
| **Equipment and Other Expenses** | |
| Total, equipment and other expenses | 24,276,994 |
| Wildlife-watching equipment, total | 6,010,141 |
| Binoculars, spotting scopes | 471,264 |
| Cameras, video cameras, special lenses, and other photographic equipment | 1,431,807 |
| Film and developing | 837,868 |
| Bird food | 2,239,259 |
| Nest boxes, bird houses, feeders, baths | 628,060 |
| Daypacks, carrying cases and special clothing | 288,648 |
| Other wildlife-watching equipment (such as field guides, and maps) | 113,235 |
| Auxiliary equipment, total | 523,700 |
| Tents, tarps | 163,999 |
| Frame packs and backpacking equipment | 121,217 |
| Other camping equipment | 238,835 |
| Other auxiliary equipment (such as blinds) | 117,267 |
| Special equipment, total | 11,158,302 |
| Off-the-road vehicle | 5,512,624 |
| Travel or tent trailer, pickup, camper, van, motor home | 4,657,752 |
| Boats, boat accessories | 946,688 |
| Other | 41,238 |
| Magazine | 297,780 |
| Land leasing and ownership | 4,197,666 |
| Membership dues and contributions | 808,101 |
| Plantings | 639,986 |

**Facts-at-a-Glance**

*46* Million Birders

*$32* Billion in Retail Sales

*$85* Billion in Overall Economic Output

*$13* Billion in State and Federal Income Taxes

*863,406* Jobs Created

expenditures is the basis for asserting that net economic value is an appropriate measure of the benefit an individual derives from participation in an activity and that expenditures are not the appropriate benefit measure.

Expenditures are out-of-pocket expenses on items a birder purchases in order to watch birds. The remaining value, net willingness to pay (net economic value), is the economic measure of an individual's satisfaction after all costs of participation have been paid.

Summing the net economic values of all individuals who participate in an activity derives the value to society. For our example let us assume that there are 100 birders who bird watch at a particular wildlife refuge and all have demand curves identical to that of our typical birder presented in Figure 2. The total value of this wildlife refuge to society is $12,500 ($125 × 100).

**Birders' Expenditures and Economic Impact**

Birders spent an estimated $32 billion (see Table 9) on wildlife-watching in 2001. This estimate includes money spent for binoculars, field guides, bird food, bird houses, camping gear, and big-ticket items such as boats. It also includes travel-related costs such as food and transportation costs, guide fees, etc.

*When using the numbers in Tables 9 and 10 it is important to know that these dollar figures represent the money birders spent for all wildlife-watching recreation — not just birding.* The 2001 Survey collected expenditure data for people who fed, photographed, or observed wildlife. Expenditure data was not collected solely for birding. It is possible that people who watched birds in 2001 may have spent money on other

BLM_0070267

**Table 10. Economic Impact of Birders: 2001***
(Population 16 years of age and older.)

| | |
|---|---|
| Retail Sales (expenditures) | $31,686,673,000 |
| Economic Output | $84,931,020,000 |
| Salaries and Wages | $24,882,676,000 |
| Jobs | 863,406 |
| State Income taxes | $4,889,380,000 |
| Federal Income taxes | $7,703,308,000 |

* Amount that birders spent on all wildlife watching.

types of wildlife-related recreation such as binoculars for whale-watching or gas for a moose-watching trip rather than only bird-watching. Therefore, these estimates for birding expenditures may be overestimates.

This $32 billion that birders spent generated $85 billion in economic benefits for the nation in 2001. This ripple effect on the economy also produced $13 billion in tax revenues and 863,406 jobs. For details on economic impact estimation methods see Appendix A.

The sheer magnitude of these numbers proves that birding is a major economic force, driving billions in spending around the county. On a local level, these economic impacts can be the life-blood of an economy. Towns such as Cape May, New Jersey, and Platte River, Nebraska, attract thousands of birding visitors a year generating millions of dollars — money that would likely otherwise be spent elsewhere.

**Estimated Net Economic Values**
As stated earlier, the willingness to pay above what is actually spent for an activity is known as net economic value. This number is derived here by using a survey technique called contingent valuation (Mitchell and Carson, 1989). Respondents to the 2001 Survey were asked a series of contingent valuation (CV) questions to determine their net willingness to pay for a wildlife watching trip. *Please note that the data presented here are net economic values for wildlife watching trips — not for bird watching trips solely.* However, since the vast majority of away-from-home wildlife watchers are birders (84 percent), the values presented here are acceptable for use in valuing birding trips. For details on net economic value estimation methods please see Appendix A.

As seen in Table 11, the net economic value per year for a wildlife watcher in their resident state is $257 per year or $35 per day. Wildlife watchers who travel outside their state have a different demand curve (they generally take fewer trips and spend more money) and therefore have their own net economic values of $488 per year and $134 per day.

When and how can these values be used? These numbers are appropriate for any project evaluation that seeks to quantify benefits and costs. They can be used to evaluate management decisions (actions) that increase or decrease participation rates. In a simple example, if a wildlife refuge changed its policies and allowed 100 more birders to visit per year, the total benefit to society due to this policy change would be $25,700 ($257 × 100) per year (assuming all visitors are state residents). This value, however, assumes that these 100 birders could and would watch birds only at this refuge and that they would take a certain number of trips to this refuge. In a more realistic example, if the refuge changed its policy and stayed open two more weeks a year and knew that 100 people visited each day during this period then the benefit to society could be estimated by multiplying the number of people by days (100 × 14) by the average value per day ($35) for a total of $49,000. If the refuge had data on the number of in-state and out-of-state visitors then the numbers could be adjusted to reflect their appropriate value.

Net economic values also can be used to evaluate management actions that have a negative affect on wildlife watching. For example, if a wildlife sanctuary was slated for development and birders were no longer able to use the site, and if the sanctuary manger knew the number of days of birding over the whole year (e.g, 2,000 days) it is possible to develop a rough estimate of the loss from this closure. This estimate is accomplished by multiplying net economic value per day ($35) by the days of participation (2,000) for a value of $70,000 per year.

Two caveats exist to the examples above: (1) if bird watchers can shift their birding to another location then the values are an over-estimate; and (2) if a loss of wildlife habitat causes an overall degradation in the number of birds and in the quality of birding then the values are an under-estimate.

**Table 11. Net Economic Values for Wildlife Watching: 2001**
(Population 16 years of age and older.)

| | Net economic value per year | Standard error of the mean | 95 percent confidence interval | Net economic value per day of birdwatching | Standard error of the mean | 95 percent confidence interval |
|---|---|---|---|---|---|---|
| State Residents | $257 | 12 | $233 – 282 | $35 | 2 | $32 – 39 |
| Nonresidents | $488 | 37 | $415 – 561 | $134 | 12 | $110 – 158 |

BLM_0070268

# Conclusion

Back in Louisiana, the search for the ivory-billed woodpecker ended in disappointment. After an exhaustive two week search, none were found. Optimism, however, continues to prevail. In a group statement the expedition team said they think the bird may exist based on the availability of good quality habitat and other evidence.

This optimism of always looking hopefully into the next tree is the esprit-de-corps of birders. As this report shows, birders come from many walks of life and watch a variety of birds in different settings. Their enthusiasm for birding also translates into spending, thereby contributing significantly to national and local economies. The high values birders place on their birding trips is a solid indicator of birding's benefit to society.

While the numbers of birders may not have grown statistically, the power of a mobilized birding community and the willingness of mass media sources and the general public to give play to birding issues has an impact felt deeply in the economy and promotes the sustainability of bird habitats. Hopefully, the information in this report will allow resource managers and policy makers to make informed management decisions when birds and birding are involved.



Grant La Rouche

BLM_0070269

# References

Bishop, Richard C. 1984. "Economic Values Defined." In *Valuing Wildlife: Economic and Social Perspectives*, D.F. Decker and G.R. Goff (eds), Westview Press, Boulder, CO.

Freeman, A. Myrick. 1993. *The Measurement of Environmental and Resource Values: Theory and Methods.* Resources for the Future, Washington, D.C.

Loomis, John B., George L. Peterson, and Cindy Sorg. 1984. "A Field Guide to Wildlife Economic Analysis." Transactions of the Forty-ninth North American and Natural Resources Conferece: 315-324.

Loomis, John B., 2000. "Can Environmental Economic Valuations Techniques Aid Ecological Economics and Wildlife Conservation?" *Wildlife Society Bulletin* 28:52-60.

McCollum, Daniel W., George L. Peterson, and Cindy Swanson. 1992. "A Managers Guide to Valuation of Nonmarket Resources: What do you really want to know?" In *Valuing Wildlife Resources in Alaska*, G.L. Peterson, C.S. Swanson, D.W. McCollum and M.H. Thomas (eds), and Westview Press Boulder, CO.

Sauer, J. R., J. E. Hines, and J. Fallon. 2003. *The North American Breeding Bird Survey, Results and Analysis 1966—2002. Version 2003.1, USGS Patuxent Wildlife Research Center, Laurel, MD.*

Rosen, Jonathan. 2001. "The Ghost Bird." In *The New Yorker.* 5/14/01: 61-67.

U.S. Fish and Wildlife Service. 1982. *1980 National Survey of Fishing Hunting and Wildlife Associated Recreation.* 4401 North Fairfax Drive, Division of Federal Aid Suite 4020. Arlington, VA 22203.

U.S. Fish and Wildlife Service. 1993. *1991 National Survey of Fishing Hunting and Wildlife Associated Recreation.* 4401 North Fairfax Drive, Division of Federal Aid Suite 4020. Arlington, VA 22203.

U.S. Fish and Wildlife Service. 1997. *1996 National Survey of Fishing Hunting and Wildlife Associated Recreation.* 4401 North Fairfax Drive, Division of Federal Aid Suite 4020. Arlington, VA 22203.

U.S. Fish and Wildlife Service. 2002. *2001 National Survey of Fishing Hunting and Wildlife Associated Recreation.* 4401 North Fairfax Drive, Division of Federal Aid Suite 4020. Arlington, VA 22203.



Cape May Warbler (*Dendroica tigrina*) by Steve Maslowski, USFWS

BLM_0070270

# Appendix A. Methods

**Economic Impact Methods**

The 2001 National Survey contains estimates of annual travel and equipment expenditures by wildlife-watching participants. Travel expenditures were obtained only for away-from-home participants while equipment expenditures were obtained for both around-the-home and away-from-home wildlife watchers. To obtain the economic impact figures, these expenditures were used in conjunction with an economic modeling method known as input-output analysis. The estimates of economic activity, jobs, and employment income were derived using IMPLAN, a regional input-output model and software system. State and federal tax impacts are based on industry-wide averages for each industrial sector.

**Contingent Valuation Methods**

Using expenditure and trip data collected from respondents earlier in the survey, respondents were presented with their average number of wildlife-watching trips in 2001 and average cost per trip. If the respondents did not think this information was accurate they were allowed to change it to what they thought was the accurate number of trips and/or an accurate cost per-trip. The respondent was then asked how much money would have been too much to pay per trip. This question was reiterated in another form in case there was misunderstanding (the full series of questions is in Appendix B). Assuming a linear demand curve, annual net economic value was then calculated using the difference between current cost and the maximum cost at the intercept and the number of trips taken in 2001.

The valuation sequence was posed in terms of numbers of trips and cost per trip because respondents were thought more likely to think in terms of trips. The economic values here are reported in days to facilitate their use in analysis.

Outliers were deleted if respondents answered in a way that resulted in zero or negative willingness to pay. Observations were also dropped from the sample if the CV responses resulted in an annual net economic value for an activity that exceeded 5 percent of an individual's household income.



Grant La Rouche

BLM_0070271

# Appendix B. Contingent Valuation Section from the 2001 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation

**RESIDENT STATE**

Note: These series of questions were asked about ALL trips taken for the PRIMARY PURPOSE of observing, photographing, or feeding wildlife during the ENTIRE calendar year of 2001 in the respondent's state of residence.

You reported taking [X] trips for the PRIMARY PURPOSE of observing, photographing, or feeding wildlife in [RESIDENT STATE]. Is that correct?

1—Yes
2—No

[IF NO] How many trips did you take for the PRIMARY PURPOSE of observing, feeding or photographing wildlife in [RESIDENT STATE] (from Wave 1) during 2001?

*Zero was allowed as a valid response.*

In your current and/or previous interview(s), you reported that you spent on average $[X] per trip during 2001 where your PRIMARY PURPOSE was to observe, photograph, or feed wildlife in [RESIDENT STATE]. Would you say that cost is about right?

1—Yes
2—No

[IF NO] How much would you say is the average cost of your current and/or previous trip(s) during 2001 where your PRIMARY PURPOSE was to observe, photograph, or feed wildlife in [resident state]? If you went with family or friends, include ONLY YOUR SHARE of the cost.

*Zero was allowed as a valid response.*

What is the most your trip(s) to observe, photograph, or feed wildlife in [RESIDENT STATE] could have cost you per trip last year before you would NOT have gone at all in 2001, not even one trip, because it would have been too expensive? Keep in mind that the cost per trip of other kinds of recreation would not have changed.

*Zero was allowed as a valid response.*

So, in other words, [X] would have been too much to pay to take even one trip to observe, photograph, or feed wildlife in 2001 in [RESIDENT STATE]?

1—Yes
2—No

[IF NO] How much would have been too much to pay to take even 1 trip to feed, photograph, or observe wildlife in 2001 in [RESIDENT STATE]?

*Zero was allowed as a valid response.*

**RANDOM STATE NOT EQUAL TO RESIDENT STATE**

Note: These series of questions were asked about ALL trips taken for the PRIMARY PURPOSE of observing, photographing, or feeding wildlife during the ENTIRE calendar year of 2001 in a state other than the respondent's state of residence. If the respondent took a trip in more than one state as a nonresident, one state was randomly chosen.

You reported taking [X] trip(s) for the PRIMARY PURPOSE of observing, photographing, or feeding wildlife in [STATE]. Is that correct?

1—Yes
2—No

[IF NO] How many trips did you take for the PRIMARY PURPOSE of observing, feeding and photographing wildlife in [STATE] during 2001?

*Zero was allowed as a valid response.*

In your current and/or previous interview(s), you reported that you spent on average $[X] per trip during 2001 where your PRIMARY PURPOSE was to observe, photograph, and feed wildlife in [STATE]. Would you say that cost is about right?

1—Yes
2—No

How much would you say was the average cost of your current and/or previous trip(s) during 2001 where your PRIMARY PURPOSE was to observe, photograph, and feed wildlife in [STATE]? If you went with family or friends, include ONLY YOUR SHARE of the cost.

*Zero was allowed as a valid response.*

What is the most your trip(s) to observe, photograph, or feed wildlife in [STATE] could have cost you per trip last year before you would NOT have gone at all in 2001, not even one trip, because it would have been too expensive? Keep in mind that the cost per trip of other kinds of recreation would not have changed.

*Zero was allowed as a valid response.*

So, in other words, [X] is too much to pay to take even one trip to observe, photograph, or feed wildlife in 2001 in [STATE]?

1—Yes
2—No

[IF NO] How much would be too much to pay to take even 1 trip to feed, photograph, or observe wildlife in 2001 in [STATE]?

*Zero was allowed as a valid response.*

BLM_0070272



BLM_0070273

**U.S. Fish & Wildlife Service**
**Division of Federal Aid**
**Washington, DC 20240**
**http://federalaid.fws.gov**

**August 2003**

 



Cover photo: Dickcissel *(Spiza americana)*
by Steve Maslowski, USFWS

BLM_0070274

**RULES AND REGULATIONS**

16343

## SUPPLEMENTARY INFORMATION:

### BACKGROUND

On September 26, 1977, the Service published a proposed rulemaking in the FEDERAL REGISTER (42 FR 48901–48902) advising that sufficient evidence was on file to support a determination that the greenback cutthroat trout was a Threatened species pursuant to the Endangered Species Act of 1973, 16 U.S.C. 1531, et seq. That proposal summarized the factors thought to be contributing to the likelihood that this fish could become Endangered within the foreseeable future, specified the prohibitions which would be applicable if such a determination was made, and solicited comments, suggestions, objections, and factual information from any interested person. Section 4(b)(1)(A) of the Act requires that the Governor of each State or Territory, within which a resident species of wildlife is known to occur, be notified and be provided 90 days to comment before any such species is determined to be a Threatened species or an Endangered species. A letter was sent to Governor Lamm of the State of Colorado on September 29, 1977, notifying him of the proposed rulemaking for the greenback cutthroat trout. On September 29, 1977, letters were sent to other Federal agencies notifying them of the proposal and soliciting their comments and suggestions.

### SUMMARY OF COMMENTS AND RECOMMENDATIONS

Section 4(b)(1)(C) of the Act requires that a summary of all comments and recommendations received be published in the FEDERAL REGISTER prior to adding any species to the List of Endangered and Threatened Wildlife and Plants.

In the September 26, 1977, FEDERAL REGISTER proposed rulemaking (42 FR 48901–48902) and associated Press Release, all interested parties were invited to submit factual reports or information which might contribute to the formulation of a final rulemaking.

All public comments received during the period September 26, 1977, to December 31, 1977, were considered.

The Colorado Department of Natural Resources, Division of Wildlife, responded for the State. They supported the proposed reclassification of the greenback cutthroat trout as Threatened. They also expressed confidence in the recovery of the trout through the implementation of the Greenback Cutthroat Trout Recovery Plan.

The U.S. Forest Service and the National Park Service submitted comments concurring with the proposed reclassification of the greenback cutthroat trout.

---

[4310–55]

**Title 50—Wildlife and Fisheries**

**CHAPTER I—UNITED STATES FISH AND WILDLIFE SERVICE, DEPARTMENT OF THE INTERIOR**

**PART 17—ENDANGERED AND THREATENED WILDLIFE AND PLANTS**

**Listing of the Greenback Cutthroat Trout as a Threatened Species**

AGENCY: Fish and Wildlife Service, Interior.

ACTION: Final rule.

SUMMARY: The Service determines the greenback cutthroat trout (*Salmo clarki stomias*) to be a Threatened species. This action will reclassify the greenback cutthroat trout from Endangered to Threatened. Conservation efforts by State and Federal agencies on behalf of this species have restored it to the point where it is no longer Endangered. Threats from hybridization and habitat alteration exist but are not serious enough to require an Endangered status; they do indicate, however, that the trout is Threatened. The greenback cutthroat trout occurs only in Colorado, and this rule would permit the species to be taken in accordance with the laws of that State.

DATE: This rule becomes effective May 18, 1978.

FOR FURTHER INFORMATION CONTACT:

Mr. Keith M. Schreiner, Associate Director, Federal Assistance, Fish and Wildlife Service, U.S. Department of the Interior, Washington, D.C. 20240, 202–343–4646.

BLM_0070275

16344

**RULES AND REGULATIONS**

One national conservation organization submitted comments and expressed concern that the proposed regulation did not expressly limit taking to areas which have reached carrying capacity nor limit such taking to non-commercial purposes. The State of Colorado will determine which populations would benefit from sport fishing and limit taking to those areas. State regulations prohibit taking of trout for commercial purposes.

CONCLUSION

After a thorough review and consideration of all the information available, the Director has determined that the greenback cutthroat trout is threatened throughout all or a significant portion of its range due to one or more of the factors described in Section 4(a) of the Act. This review amplifies and substantiates the description of those factors and are described as follows:

1. *The present or threatened destruction, modification, or curtailment of its habitat or range.*—The greenback cutthroat trout is less tolerant of adverse conditions than are other trouts such as brown trout or rainbow trout. Optimum conditions of oxygen, temperature, and water purity for the greenback cutthroat trout appear to be more stringent than for other trouts. The original distribution of the greenback cutthroat trout was the headwaters of the South Platte and Arkansas River basins. Permanent populations were restricted to the mountains and foothills because the warm, turbid conditions in the South Platte and Arkansas Rivers in the plains did not provide suitable habitat. The extirpation of the greenback cutthroat trout proceeded very rapidly due to competition and hybridization with introduced trouts and loss and degradation of habitat from mining, logging, grazing, and irrigation projects. By 1930, the greenback cutthroat trout in its pure form was commonly assumed to be extinct.

Protection of presently occupied habitat varies. Como Creek and Black Hollow Creek are on Roosevelt National Forest lands with the exception of a few hundred yards of the head of Como Creek, which is on the grounds of the Arctic and Alpine Research Institute of the University of Colorado. Bear Lake, Forest Canyon, Hidden Valley, and Caddis Lake are on lands of the Rocky Mountain National Park; Island Lake and the Boulder watershed lakes are on land owned by the city of Boulder. The headwaters of the Little South Platte River is on the Roosevelt National Forest and Rocky Mountain National Park. South Huerfano Creek is on a private ranch surrounded by the San Isabel National Forest and Florence Creek is on the Uintah and Ouray Indian Reservations. The habitats on public lands appear to be safe from degradation. Waters on private land either known to contain greenback cutthroat trout or in the historic range and possibly containing undiscovered populations continue to be threatened by habitat destruction due to logging, mining, grazing, or water development projects.

5. *Other natural or manmade factors affecting its continued existence.*—The greenback cutthroat trout is not likely to coexist successfully with other species of trout. The introduction of non-native trout within the range of the greenback cutthroat trout presents the most serious threat to its continued existence. Hybridization usually occurs with other subspecies of cutthroat trout and with rainbow trout. Eastern brook trout do not hybridize with greenback cutthroat trout wherever the two species occur together. Introduction of non-native trout into greenback cutthroat trout habitat by fishermen is a threat to the species, as is destruction of barrier dams.

EFFECT OF THE RULEMAKING

The effects of this determination and rulemaking include, but are not necessarily limited to, those discussed below.

Endangered species regulations already published in Title 50 of the Code of Federal Regulations set forth a series of general prohibitions and exceptions which apply to all Endangered species. All of these prohibitions and exceptions also apply to any Threatened species unless a special rule pertaining to the Threatened species has been published and indicates otherwise. In the case of the greenback cutthroat trout, the special regulation will allow "take" of the species in accordance with State laws.

This rule will not change the eligibility of the greenback cutthroat trout for the protection provided by Section 7 of the Act. That Section reads as follows:

INTERAGENCY COOPERATION

The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this Act. All other Federal departments and agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this Act by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 4 of this Act and by taking such action necessary to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of such endangered species and threatened species or result in the destruction or modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with the affected States, to be critical.

Although no Critical Habitat has yet been determined for this species, the other provisions of Section 7 are applicable.

Provisions for Interagency Cooperation were published at 50 CFR Part 402 on January 4, 1978, in the FEDERAL REGISTER (43 FR 870-876) to assist Federal agencies in complying with Section 7 of the Endangered Species Act of 1973.

EFFECT INTERNATIONALLY

In addition to the protection provided by the Act, the Service will review the greenback cutthroat trout to determine whether it should be proposed to the Secretariat of the Convention on International Trade in Endangered Species of Wild Fauna and Flora for placement upon the appropriate Appendix(ices) to that Convention or whether it should be considered under other, appropriate international agreements.

NATIONAL ENVIRONMENTAL POLICY ACT

An environmental assessment has been prepared and is on file in the Service's Washington Office of Endangered Species. It addresses this action as it involves the greenback cutthroat trout. The assessment is the basis for a decision that this determination is not a major Federal action which would significantly affect the quality of the human environment within the meaning of Section 102(2)(C) of the National Environmental Policy Act of 1969.

The primary author of this rule is Dr. James D. Williams, Office of Endangered Species, 202-343-7814.

REGULATIONS PROMULGATION

1. Accordingly, § 17.11 of Part 17 of Chapter I of Title 50 of the U.S. Code of Federal Regulations is amended by adding the greenback cutthroat trout, alphabetically under "Fishes," as follows:

BLM_0070276

**RULES AND REGULATIONS**

16345

§ 17.11  Endangered and threatened wildlife.

| Species | | | Range | | | | |
|---|---|---|---|---|---|---|---|
| Common name | Scientific name | Population | Known distribution | Portion of range where threatened or endangered | Status | When listed | Special rules |
| Fishes Trout, greenback cutthroat. | *Salmo clarki stomias.* | N/A | U.S.A. (Colorado) ...................... | Entire................. | T ....................... | 1, 38 .................. | 17.44(f)........... |

2. Section 17.44 is amended by adding a new paragraph (f) as follows:

§ 17.44  Special rules—fishes.

* * * * *

(f) Greenback cutthroat trout (*Salmo clarki stomias*).

(1) All provisions of § 17.31 apply to this species, except that it may be taken in accordance with applicable State law.

(2) Any violation of State law will also be a violation of the Act.

NOTE.—The Service has determined that this document does not contain a major requiring preparation of an Economic Impact Statement under Executive Order 11949 and OMB Circular A-107.

Dated: April 6, 1978.

LYNNE A. GREENWALT,
*Director, Fish and*
*Wildlife Service.*

[FR Doc. 78-10089 Filed 4-17-78; 8:45 am]

BLM_0070277

**CLAY-LOVING WILD-BUCKWHEAT**

Eriogonum pelinophilum Reveal

**RECOVERY PLAN**

Prepared by:
Region 6
U.S. Fish and Wildlife Service
Denver, Colorado

APPROVED: *Gale L Butterbaugh*

Regional Director, Region 6, U.S. Fish and Wildlife Service

DATE: *NOV. 10, 1988*

BLM_0070278

BLM_0070279

This is the completed Clay-loving Wild-buckwheat Recovery Plan. It has been approved by the U.S. Fish and Wildlife Service. It does not necessarily represent official positions or approvals of cooperating agencies and does not necessarily represent the views of all individuals who played a role in preparing this plan. This plan is subject to modification as dictated by new findings, changes in species status, and completion of tasks described in the plan. Goals and objectives will be attained and funds expended contingent upon appropriations, priorities, and other constraints.

Acknowledgments should be as follows:

The Clay-loving Wild-buckwheat Recovery Plan, dated November 10, 1988, prepared by the U.S. Fish and Wildlife Service, Fish and Wildlife Enhancement Office, Grand Junction, Colorado.

Literature Citations should read as follows:

U.S. Fish and Wildlife Service. 1988. Clay-loving Wild-buckwheat Recovery Plan. U.S. Fish and Wildlife Service, Denver, Colorado. 15 pp.

Additional copies may be purchased from:

Fish and Wildlife Reference Service
6011 Executive Boulevard
Rockville, Maryland  20852
301/770-3000
         or
1-800-582-3421

The fee for the plan varies depending on the number of pages of the plan.

i

BLM_0070281

# TABLE OF CONTENTS

**PART I.**    **INTRODUCTION** ............................................. 1

       History ............................................... 1

       Description ........................................... 1

       Past and Present Distribution ......................... 1

       Habitat .............................................. 3

       Threats .............................................. 3

**PART II.**   **RECOVERY** ................................................ 5

       Objective ............................................ 5

       Stepdown Outline ..................................... 5

       Narrative ............................................ 7

       LITERATURE CITED ..................................... 11

**PART III.**  **IMPLEMENTATION SCHEDULE** ................................. 12

**PART IV.**   **APPENDIX** ................................................ 15

BLM_0070282

BLM_0070283

## PART I

## INTRODUCTION

### History

Based on a 1958 collection by Harold Gentry, Reveal (1971) determined that a new species of <u>Eriogonum</u> occurred in western Colorado. Repeated searches were required before he rediscovered it in 1972. Reveal (1973) then described <u>Eriogonum</u> <u>pelinophilum</u> in 1973. At the time of listing as an endangered species on July 13, 1984 (49 FR 28565), <u>E</u>. <u>pelinophilum</u> was only known from the population at the type locality, which was estimated to be 120 acres in size and to contain 10,000 individuals. Surveys that summer by Dr. Elizabeth Neese for the Colorado Natural Heritage Inventory, and in 1985 by Betsy Neely for The Nature Conservancy, and Steve O'Kane, Jr., of the Colorado Natural Areas Program, disclosed additional occurrences on the adobe hills between the communities of Delta and Montrose, Colorado (see Figure 1). Six meta-populations consisting of a total of 20 sites are now known. Four of the sites are on land administered by the Bureau of Land Management (Bureau), and the remainder are on private land. The total population estimated for the species is between 45,000-50,000 individuals existing on a total land area of 450 to 500 acres.

### Description

The clay-loving wild-buckwheat is a low, rounded subshrub 5-10 cm (4 inches) high and 8-15 cm (6 inches) across, with woody stems at the base and herbaceous stems above. The short linear leaves (5-12 mm long and 1-2 mm wide) are dark green above and densely woolly below. Clusters of small white to cream flowers are found at the ends of the herbaceous branches. <u>E</u>. <u>pelinophilum</u> differs from the similar <u>E</u>. <u>clavellatum</u> in that the former is an herbaceous perennial 5-10 cm high and has floccose to glabrous stems and involucres 3.0-3.5 mm long, while the latter is a subshrub 10 to 20 cm high and has glabrous stems and involucres 4.0-4.5 mm long (Weber 1987).

### Past and Present Distribution

The area inhabited by the clay-loving wild-buckwheat has a hopscotch pattern of agriculture (mainly irrigated hay meadows), residential development, and the remaining adobes. Consequently, the habitat of <u>E</u>. <u>pelinophilum</u> has been fragmented, and several of the occurrences on private land are less than 10 acres in size with only 300 plants or less. These remnant sites may no longer be viable for recovery, especially if they are surrounded by agricultural fields and residential developments. Although only four sites are on Bureau land, these larger rangeland sites contain nearly half of the total population. One large Bureau site located 5 km (3 miles) southeast of Montrose, the Wacker Ranch/South Canal site, contains a third of the total numbers. However, while several new sites have been discovered since the final listing, approximately half of the total numbers are contained at only the two largest sites, the type locality and Wacker Ranch/South Canal.

1

BLM_0070284



Figure 1.  GEOGRAPHY OF AREA CONTAINING CLAY-LOVING
WILD-BUCKWHEAT

BLM_0070285

## Habitat

The type locality is on the gray adobe badlands of Mancos Shale between the communities of Delta and Hotchkiss.  Here, E. pelinophilum grows on a whitish strata in low, rolling hills at 5,270 feet in a salt desert shrub community with Atriplex confertifolia (shadscale) and Atriplex corrugata (mat saltbush).

With the discovery of several additional sites of E. pelinophilum, its edaphic habitat and vegetative community type are better understood.  The clay-loving wild-buckwheat grows in a mixed desert shrub community with shadscale, black sage (Artemisia nova), bud sage (Artemisia spinescens), and woody aster (Xylorhiza venusta).  Penstemon retrorsus, a Federal candidate species, occurs at several of the sites.  Another Federal candidate species, Lomatium concinnum, also occurs on the adobes.  Between Delta and Montrose, the Mancos Shale forms a ring on the east side of the valley along the base of the rim of the Black Canyon of the Gunnison.  Alluvial soils, where most of the agriculture occurs, are located farther out in the valley along the floodplains of Loutsenhizer Arroyo and the Uncompahgre River.  The clay-loving wild-buckwheat's habitat generally occurs in a band along the toe slopes of Mancos Shale hills between steep barren slopes of residual soil above and broad flatlands with mat saltbush below.  This more or less concentric banding of soil microhabitats is apparently the result of a similar degree of erosion and distance of transport of material from the receding residual shale hills (Potter et al. 1985a).  There is a correlation between the often abrupt ecotone across a few meters from shadscale, a common associate of E. pelinophilum, to mat saltbush and dramatically higher soil sulfate level from less than 100 ppm upwards to 1,650 ppm (Potter et al. 1985b).  Sodium level also increases across this ecotone.  While the adobes form an extensive band between Delta and Montrose, the clay-loving wild-buckwheat evidently only occurs within a specific microhabitat in the adobes.

## Threats

Occurring in a broad river valley setting, E. pelinophilum is impacted by agriculture and its secondary impacts from increased use of adjacent nonagricultural land for residential development, road networks, and off-road and all-terrain vehicles.  Much of the actual agriculture of irrigated hay meadows and pastures occurs on the alluvial soils, but farming also encroaches onto the Mancos Shale and clay-loving wild-buckwheat habitat on the east side of the valley.  However, the associated secondary impacts may have an equal or larger impact.  Irrigation canals tend to follow the contour of the toe slopes, which is the microhabitat of E. pelinophilum.  Farm houses and livestock pastures tend to be on low shale ridges of potential habitat between the irrigated fields or mat saltbush flatlands.  Rural residential housing tracts are expanding onto sites of E. pelinophilum, particularly on the east side of Montrose.  The close proximity of agricultural and residential development to the clay-loving wild-buckwheat and its microhabitat leads to subsequent impacts from road building and off-road and all-terrain vehicle use.

3

BLM_0070286

The sites on public land are not subject to farming or housing development, but, if they are adjacent to private land, they are still vulnerable to secondary impacts of right-of-way development and destruction from increased off-road and all-terrain vehicle use.  Some of the Bureau sites are open to livestock grazing, but the effect of this use has not been studied.  Livestock use appears to have little effect on *E. pelinophilum* if it is single-season use and at proper stocking rates.  Season-long grazing, year-long grazing, high-density stocking, and use of sheep bed grounds are likely to impact the species.  In general, grazing use on public land currently does not appear to be affecting the populations, but long-term studies are as yet inadequate to provide a definitive answer to this question.

Overall, the fragmentation of habitat into small units of possibly nonviable population size may be the most significant, although subtle, impact.

4

PART II

RECOVERY

Objective

Due to agricultural and residential development within its range, E. pelinophilum has a fragmented distribution pattern, and several of its sites are only 5 acres or less in size. Because of the mixture of public and private ownership, different strategies are needed for protection at individual sites. Minimum viable population modeling may be needed to determine whether the reduced sites containing E. pelinophilum may be too small to be viable and contribute significantly to recovery (Menges 1986).

The objective of this recovery plan is to secure a sufficient number of healthy populations (sites) in their natural habitat to warrant delisting. The initial goal will be to secure ten populations (sites) for downlisting and twenty populations for delisting. These criteria are to be evaluated for adequacy upon attainment prior to downlisting or delisting.

Stepdown Outline

1.  Initiate scientific research on known and potential habitat and the biology of the species.

    11.  Inventory all potential habitat.

    12.  Monitor populations and habitat.

    13.  Conduct minimum viable population modeling.

    14.  Study feasibility of population augmentation, if desirable.

2.  Remove threats to the clay-loving wild-buckwheat and secure populations and their ecosystems.

    21.  Protect populations on land administered by the Bureau of Land Management.

        211.  Develop a Bureau Habitat Management Plan.

        212.  Establish Areas of Critical Environmental Concern and/or State Natural Areas on viable sites.

        213.  Eliminate off-road and all-terrain vehicle use within populations.

            2131.  Designate areas closed to off-road and all-terrain vehicles.

            2132.  Conduct intensive management in problem areas.

5

BLM_0070288

214. Consider mineral withdrawals and no-surface-occupancy stipulations for leases.

215. Investigate the advantages of establishing critical habitat on Federal sites.

22. Protect populations on private land.

221. Use Habitat Management Plan generated under 211 above as format for protecting private land.

222. Establish State Registered and/or Designated Natural Areas through contact with private landowners by Colorado Natural Areas Program.

223. Contact private landowners in an attempt to limit or eliminate off-road vehicle activity on and near sites.

23. Determine need for habitat acquisition exchange and conservation easements.

231. Work with the Bureau and private landowners on a land exchange program to place viable populations under Federal jurisdiction.

232. Work with private land conservation organizations and the Service on habitat acquisition and/or conservation easements for viable populations.

3. <u>Develop public awareness and appreciation for the "adobes" habitat on which the clay-loving wild-buckwheat grows</u>.

BLM_0070289

Narrative

1.  Initiate scientific research on known and potential habitat and the biology of the species.

    As a basis for setting overall recovery goals, the status of all populations should be documented and monitored.

    11.  Inventory all potential habitat.

         A systematic inventory of the entire adobe ecosystem between Delta, Paonia, Crawford, and Montrose should be conducted.

    12.  Monitor populations and habitat.

         Selected populations, especially those threatened by significant actual and/or potential impacts, need to be monitored for trend. Then, the degree of management needed for recovery can be correlated to the degree of trend (negative or positive).

    13.  Conduct minimum viable population modeling.

         The habitat of E. pelinophilum has been fragmented, resulting in several remnant populations. These small populations may already be susceptible to extinction through environmental stochasticity (random events) even with protection. To determine which populations are still large enough to remain viable and contribute to recovery, minimum viable population modeling will be necessary.

    14.  Study feasibility of population augmentation, if desirable.

         For those remaining populations found to be below the minimum viable population size, augmentation may be desirable for recovery. This determination should be based on the importance of a population's location within the species' range (in contributing to a more continuous distribution and gene flow), its current density, the amount of available surrounding acreage, and the land status.

2.  Remove threats to the clay-loving wild-buckwheat and secure populations and their ecosystems.

    For species recovery, populations need to be secured from threats which are primarily surface-disturbing activities. This involves protection from both continuous disturbances (e.g., off-road vehicles and all-terrain vehicles) as well as one-time disturbances (e.g., pipelines).

BLM_0070290

21. <u>Protect populations on land administered by the Bureau of Land Management</u>.

Federal regulations such as Section 7 of the Endangered Species Act are applicable on land administered by the Bureau and should be enforced.

211. <u>Develop a Bureau Habitat Management Plan</u>.

The Bureau is currently preparing their Draft Resource Management Plan for the Uncompahgre Resource Area, which encompasses the entire range of <u>E. pelinophilum</u>. They are proposing Areas of Critical Environmental Concern, which include portions of the Wacker Ranch/South Canal and La Sal Road sites. A Bureau Habitat Management Plan should be written for <u>E. pelinophilum</u> to incorporate recovery actions and goals into the Bureau's planning process.

212. <u>Establish Areas of Critical Environmental Concern and/or State Natural Areas on viable sites</u>.

To ensure future population viability, priority management for <u>E. pelinophilum</u> through special land use designations, such as Areas of Critical Environmental Concern and State Registered and Designated Natural Areas, should be established.

213. <u>Eliminate off-road and all-terrain vehicle use within populations</u>.

Continuous surface-disturbing impacts such as off-road and all-terrain vehicles are the most damaging.

2131. <u>Designate areas closed to off-road and all-terrain vehicles</u>.

The use of off-road and all-terrain vehicles should be officially eliminated from sites containing viable populations on land administered by the Bureau through the designation of off-road vehicle closure areas. The larger Bureau sites have been closed. Enforcement is the next step.

2132. <u>Conduct intensive management in problem areas</u>.

Problem areas receiving intensive off-road and all-terrain vehicle use, such as sites near communities and residential developments, will need fencing and patrolling of areas closed to off-road vehicle use. If necessary, a Bureau ranger with law enforcement capabilities should be hired.

8

BLM_0070291

214.   Consider mineral withdrawals and no-surface-occupancy
       stipulations for leases.

       The degree of surface disturbance from mining and energy use
       and its impacts to the species need to be investigated by the
       Bureau.  The Bureau should utilize mineral withdrawals and no-
       surface-occupancy designations on leases they issue in order to
       protect sites harboring E. pelinophilum.  Mineral withdrawals
       are called for on the Research Natural Area sites in the
       Resource Management Plan.

215.   Investigate the advantages of establishing critical habitat on
       Federal sites.

       Determine whether any population, but especially the Fairview
       Research Natural Area, will benefit from critical habitat
       designation.

22.   Protect populations on private land.

      Applicable recovery strategies described above for Federal land
      should be considered for private land.

221.   Use Habitat Management Plan generated under 211 above as format
       for protecting private land.

       Use of the Bureau's Habitat Management Plan will provide
       consistency for recovery and eliminate duplication of paperwork
       and effort.

222.   Establish State Registered and/or Designated Natural Areas
       through contact with private landowners by Colorado Natural
       Areas Program.

       The State of Colorado is involved in the management of
       E. pelinophilum sites on both public and private lands through
       the registration and designation of State Natural Areas.
       Section 9 protection is not applicable on private land and
       these sites are, therefore, inherently more vulnerable.*

223.   Contact private landowners in an attempt to limit or eliminate
       off-road vehicle activity on and near sites.

       Adjacent landowners, particularly in subdivisions built on or
       next to the adobes, should be contacted and informed of the
       need to limit off-road vehicle activity.

_____
* Postscript:   The Endangered Species Act Amendments of 1988 now provide
                limited protection to listed plants on private land.

BLM_0070292

23. Determine need for habitat acquisition exchange and conservation easements.

Realty actions may be necessary to bring significant sites into Federal ownership, management, and protection and to ensure implementation of the mandates of Section 7 of the Endangered Species Act.

231. Work with the Bureau and private landowners on a land exchange program to place viable populations under Federal jurisdiction.

Because of the intermingled Federal and private ownership between Delta and Montrose, land exchanges may be strategic in the recovery of E. pelinophilum.

232. Work with private land conservation organizations and the Service on habitat acquisition and/or conservation easements for viable populations.

Private conservation organizations provide another avenue for the protection of clay-loving wild-buckwheat sites by obtaining conservation easements, offering tax incentives, implementing land acquisition, and other conservation strategies. In lieu of land exchanges, the Service and private conservation organizations can work together to establish conservation easements and/or acquisition of habitat to secure populations on private land.

3. Develop public awareness and appreciation for the "adobes" habitat on which the clay-loving wild-buckwheat grows.

The clay-loving wild-buckwheat is part of the adobe ecosystem, which also includes candidate plant species. Black-footed ferret sightings have been reported from the adobes near Hotchkiss. Recovery of the clay-loving wild-buckwheat must be based on management of the entire adobe ecosystem. Educational programs should stress the fragility and uniqueness of this desert ecosystem rather than emphasizing only one element of it, such as the clay-loving wild-buckwheat.

10

# LITERATURE CITED

Menges, E.S.  1986.  Predicting the future of rare plant populations: demographic monitoring and modeling.  Natural Areas J. 6(3):13-25.

Potter, L.D., R.C. Reynolds, Jr., and E.T. Louderbaugh.  1985a.  Mancos Shale and plant community relationships:  field observations.  J. of Arid Environ. 9:137-145.

Potter, L.D., R.C. Reynolds, Jr., and E.T. Louderbaugh.  1985b.  Mancos Shale and plant community relationships:  analysis of shale, soil, and vegetation transects.  J. of Arid Environ.  9:147-165.

Reveal, J.L.  1971.  Notes of _Eriogonum_-VI.  A revision of the _Eriogonum microthecum_ complex (Polygonaceae).  Brigham Young Univ. Science Bull., Biol. Series 13(1):1-45.

Reveal, J.L.  1973.  A new subfruticose _Eriogonum_ (Polygonaceae) from western Colorado.  Great Basin Natur. 33:120-122.

Weber, W.A.  1987.  Colorado flora:  Western Slope.  Colorado Associated University Press.  530 pp.

BLM_0070294

# PART III

## IMPLEMENTATION SCHEDULE

### Definition of Priorities

Priority 1:   All actions that must be taken to prevent extinction or to prevent the species from declining irreversibly in the foreseeable future.

Priority 2:   All actions that must be taken to prevent a significant decline in species population/habitat quality, or some other significant negative impact short of extinction.

Priority 3:   All actions necessary to provide for full recovery (or reclassification) of the species.

### Abbreviations Used in Implementation Schedule

FWS         U.S. Fish and Wildlife Service

SE          Division of Endangered Species and Environmental Contaminants, U.S. Fish and Wildlife Service

LE          Law Enforcement, U.S. Fish and Wildlife Service

RE          Division of Realty, U.S. Fish and Wildlife Service

BLM         Bureau of Land Management

CNAP        Colorado Natural Areas Program

TNC         The Nature Conservancy

ACEC        Areas of Critical Environmental Concern

HMP         Habitat Management Plan

BLM_0070295

## General Categories for Implementation Schedule

Information Gathering - I or R (research)

1. Population status
2. Habitat status
3. Habitat requirements
4. Management techniques
5. Taxonomic studies
6. Demographic studies
7. Propagation
8. Migration
9. Predation
10. Competition
11. Disease
12. Environmental contaminant
13. Reintroduction
14. Other information

Management - M

1. Propagation
2. Reintroduction
3. Habitat maintenance and manipulation
4. Predator and competitor control
5. Depredation control
6. Disease control
7. Other management

Acquisition - A

1. Lease
2. Easement
3. Management agreement
4. Exchange
5. Withdrawal
6. Fee title
7. Other

Other - O

1. Information and education
2. Law enforcement
3. Regulations
4. Administration

13

BLM_0070296

PART III - IMPLEMENTATION SCHEDULE
Clay-loving Wild-buckwheat

| GENERAL CATEGORY | PLAN TASK | TASK # | PRIORITY # | TASK DURATION | RESPONSIBLE AGENCY | | | FISCAL YEAR COSTS (EST.) | | | COMMENTS/NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | FWS | | OTHER | FY-01 | FY-02 | FY-03 | |
| | | | | | REGION | PROGRAM | | | | | |
| (1) | (2) | (3) | (4) | (5) | (6) | (6a) | (7) | | (8) | | (9) |
| I14 | Inventory potential habitat | 11 | 1 | 3 years | 6 | SE | BLM | 2,000 2,000 | 2,000 2,000 | 2,000 2,000 | in house in house |
| I6 | Monitor populations | 12 | 2 | ongoing | | | CNAP | 2,000 | 2,000 | 2,000 | |
| R1 | Conduct minimum viable population modeling | 13 | 1 | 4 years | 6 | SE | | 5,000 | 5,000 | 5,000 | |
| M2 | Population Augmentation | 14 | 2 | | | | | | | | Dependent on result of 11 |
| M7 | Develop HMP | 211 | 2 | 1 year | | | BLM | 1,000 | | | in house |
| M3 | Establish ACEC's & State Natural Areas | 212 | 1 | 2 years | | | BLM CNAP | 1,000 1,000 | 1,000 1,000 | | in house in house |
| M5 | Eliminate off-road & all terrain vehicle use | 213 | 1 | ongoing | 6 | LE | BLM | 2,000 5,000 | 2,000 5,000 | 2,000 5,000 | |
| A5 | Mineral withdrawals | 214 | 3 | ongoing | | | BLM | 1,000 | 1,000 | 1,000 | in house |
| I2 | Critical habitat | 215 | 3 | 1 year | 6 | SE | | 1,000 | | | |
| M7 | Use HMP for private land | 221 | 2 | 2 years | 6 | SE | | 1,000 | 1,000 | | |
| A3 | Establish State Natural Areas | 222 | 2 | 2 years | | | CNAP | 2,000 | 2,000 | | in house |
| O1 | Contact private landowners | 223 | 3 | ongoing | | | CNAP | 1,000 | 1,000 | 1,000 | |
| A4 | Land exchange | 231 | 2 | ongoing | 6 | RE | BLM | 2,000 | 2,000 | 2,000 | in house |
| A7 | Land acquisition & easement | 232 | 2 | ongoing | 6 | RE | TNC | 2,000 | 2,000 | 2,000 | in house |
| O1 | Public education | 3 | 2 | 2 years | 6 | SE | | 5,000 | 5,000 | | Develop AV program for schools |

14

BLM_0070297

**APPENDIX**

Commenters on the Technical/Agency Draft of the Clay-loving Wild-buckwheat Recovery Plan:

James Ferguson
Wildlife Biologist
Uncompahgre Basin Resource Area
Bureau of Land Management
2505 S. Townsend
Montrose, Colorado  81401

Robert Lichvar
2009 E. Oakfield Road
Grand Island, New York  14702

Steve O'Kane
Missouri Botanical Garden
St. Louis, Missouri  63166
and
Department of Biology
Washington University
St. Louis, Missouri  63130

15

BLM_0070298

BLM_0070299

# BLACK-FOOTED FERRET DRAFT RECOVERY PLAN



## Second Revision

## February 2013

BLM_0070300

# Recovery Plan for the

# Black-footed Ferret

# (*Mustela nigripes*)

## Second Revision

**Original Recovery Plan Approved in 1978**

**First Revision Approved 1988**

**Region 6**
**U.S. Fish and Wildlife Service**
**Denver, Colorado**

Approved: _____

*Deputy* Regional Director, Region 6, U.S. Fish and Wildlife Service

Date: APR  3 2013 _____

Concurred: _____

*Acting* Regional Director, Region 2, U.S. Fish and Wildlife Service

Date: MAR 2 1 2013 _____

2

BLM_0070301

# DISCLAIMER

Recovery plans delineate such reasonable actions as may be necessary, based upon the best scientific and commercial data available, for the conservation and survival of listed species. Plans are published by the U.S. Fish and Wildlife Service (Service or USFWS), sometimes prepared with the assistance of recovery teams, contractors, State agencies, tribes and others. Recovery plans do not necessarily represent the views, official positions, or approval of any individuals or agencies involved in the plan formulation, other than the Service. They represent the official position of Service only after they have been signed by the Regional Director. Recovery plans are guidance and planning documents only; identification of an action to be implemented by any public or private party does not create a legal obligation beyond existing legal requirements. Nothing in this plan should be construed as a commitment or requirement that any Federal agency obligate or pay funds in any one fiscal year in excess of appropriations made by Congress for that fiscal year in contravention of the Anti-Deficiency Act, 31 U.S.C. 1341, or any other law or regulation. Approved recovery plans are subject to modification as dictated by new findings, changes in species' status, and the completion of recovery actions.

**Literature Citation should read as follows:**

U.S. Fish and Wildlife Service. 2013. Recovery plan for the black-footed ferret (*Mustela nigripes*). U.S. Fish and Wildlife Service, Denver, Colorado. 130 pp.

Additional copies of the draft document can be obtained from:

U.S. Fish and Wildlife Service

National Black-footed Ferret Conservation Center

P.O. Box 190

Wellington, CO  80549

Phone:  (970) 897-2730

**Recovery plans can be downloaded from**:

http://www.fws.gov/endangered/recovery/index.html

3

BLM_0070302

# ACKNOWLEDGMENTS

This revised recovery plan was prepared through collaborative efforts between the U.S. Fish and Wildlife Service (Service) National Black-footed Ferret Conservation Center Office, the Service's South Dakota Ecological Services Office, and the Service's Mountain-Prairie Regional Office. Many other Service offices also contributed to this effort. Special thanks are extended to the members of the Black-footed Ferret Recovery Implementation Team, who have provided input through recovery plan reviews, and who have contributed to on the ground ferret recovery efforts over the past 16 years, as well as their predecessors who initiated conservation actions in 1981 to save this species from extinction. Black-footed ferret artwork was contributed by Brian Maxfield, Utah Division of Wildlife Resources.



BLM_0070303

# EXECUTIVE SUMMARY

**Current Species Status:**  The black-footed ferret (*Mustela nigripes*) was listed as endangered in 1967 pursuant to early endangered species legislation in the United States (U.S.) and was "grandfathered" into the Endangered Species Act of 1973 (ESA).

We estimate that the average minimum number of breeding adult ferrets in the wild is approximately 364 animals (Table 3), with a minimum of 270 of those animals at self-sustaining sites.  Approximately 280 additional animals are managed in captive breeding facilities.  At this time, the downlisting criteria may be 40 percent complete with regard to establishing 10 successful populations and approximately 18 percent complete with regard to the goal of 1,500 breeding adults at successful sites.  Four reintroduction sites (Aubrey Valley, Arizona; Cheyenne River Reservation, South Dakota; Conata Basin, South Dakota; and Shirley Basin, Wyoming) are considered self-sustaining at present.  The species remains vulnerable to several threats, including sylvatic plague and inadequate regulatory mechanisms.

**Habitat Requirements and Limiting Factors:**  The black-footed ferret depends on prairie dogs for food and on their burrows for shelter.  The historical range of the ferret coincided with the ranges of the black-tailed prairie dog (*C. ludovicianus*), Gunnison's prairie dog (*C. gunnisoni*), and white-tailed prairie dog (*C. leucurus*).  The ferret's close association with prairie dogs was an important factor in the ferret's decline.  From the late 1800s to approximately the 1960s, prairie dog occupied habitat and prairie dog numbers were dramatically reduced by the effects of both temporal and permanent habitat loss caused by conversion of native grasslands to cropland, poisoning, and disease.  The ferret population declined precipitously as a result.

**Recovery Strategy:**  In preparing this revised recovery plan, we solicited extensive partner review from the Black-footed Ferret Recovery Implementation Team (BFFRIT).  The BFFRIT was established by the Service in 1996.  One of its guiding principles has been its focus on involvement by many partners across the historical range of the ferret, including tribes, States, Federal land management agencies, non-governmental organizations, Canada, and Mexico.  Recovery will be achieved by establishing a number of ferret populations where appropriate habitat exists and by ameliorating threats impacting the species so as to allow the ferret's persistence.  Although ferret habitat has been dramatically reduced from historical times, a sufficient amount remains, if its quality and configuration is appropriately managed.  This management, for the most part, is likely to be conducted by traditional State, tribal, and Federal fish and wildlife and land management agencies.  Additionally, private parties, including landowners and conservation organizations, must continue to support ferret recovery.  Many partners contributing to ferret recovery in many places will help minimize the risk of loss of wild populations.

**Recovery Goal:**  The goal of this plan is to recover the black-footed ferret such that it no longer meets the ESA's definition of endangered or threatened and can be removed from the Federal List of Endangered and Threatened Wildlife (i.e., delisted).

BLM_0070304

**Recovery Objectives:**  The recovery of black-footed ferrets will depend upon: (1) the continued efforts of captive breeding facilities to provide animals of suitable quality and quantity for release into the wild; (2) the conservation of prairie dog habitat adequate to sustain ferrets in several populations distributed throughout their historical range; and (3) the management of sylvatic plague to minimize impacts to ferrets at reintroduction sites.

**Recovery Criteria:**  This recovery plan revision provides reasonable biological and logistically achievable criteria that may be used to realize downlisting and delisting objectives.  In particular, we believe that we can achieve recovery of the ferret through more proactive management of existing prairie dog habitat.

**Downlisting Criteria:**

- Conserve and manage a captive breeding population of black-footed ferrets with a minimum of 280 adults (105 males, 175 females) distributed among multiple facilities (at least 3).
- Establish free-ranging black-footed ferrets totaling at least 1,500 breeding adults, in 10 or more populations, in at least 6 of 12 States within the historical range of the species, with no fewer than 30 breeding adults in any population, and at least 3 populations within colonies of Gunnison's and white-tailed prairie dogs.
- Maintain these population objectives for at least three years prior to downlisting.
- Maintain approximately 247,000 acres (ac) (100,000 hectares (ha)) of prairie dog occupied habitat at reintroduction sites (specific actions are described in Part II of this plan) by planning and implementing actions to manage plague and conserve prairie dog populations.

**Delisting Criteria:**  Delisting criteria are new since the 1988 Recovery Plan.  Delisting may occur when the following recovery criteria are met.

- Conserve and manage a captive breeding population of black-footed ferrets with a minimum of 280 adults (105 males, 175 females) distributed among multiple facilities (at least 3).
- Establish free-ranging black-footed ferrets totaling at least 3,000 breeding adults, in 30 or more populations, with at least one population in each of at least 9 of 12 States within the historical range of the species, with no fewer than 30 breeding adults in any population, and at least 10 populations with 100 or more breeding adults, and at least 5 populations within colonies of Gunnison's or white-tailed prairie dogs.
- Maintain these population objectives for at least three years prior to delisting.
- Maintain approximately 494,000 ac (200,000 ha) of prairie dog occupied habitat at reintroduction sites by planning and implementing actions to manage plague and conserve prairie dog populations (specific actions are described in Part II of this plan).
- Complete and implement a post-delisting monitoring plan, in cooperation with the States and tribes, to ensure recovery goals are maintained.

BLM_0070305

**After Delisting:**
- Conserve and manage a reduced captive breeding population of black-footed ferrets in order to maintain knowledge, incorporate developing technologies, and address potential population extirpations.

**Actions Needed:**  We believe the single, most feasible action that would benefit black-footed ferret recovery is to improve prairie dog conservation.  If efforts were undertaken to more proactively manage existing prairie dog habitat for ferret recovery, all other threats to the species would be substantially less difficult to address.  Several States within the historical range of the species do not manage prairie dogs in a manner that supports ferret recovery.  Some of these States have disease-free areas that would be especially valuable to ferret recovery.  We recommend that the following actions be undertaken.  These actions are not listed in order of priority, but all tasks and subtasks are prioritized in Table 7.

1. Conserve and manage a captive ferret population of reasonable size and structure to support genetic management and reintroduction efforts.
2. Identify prairie dog habitats with the highest potential for supporting future free-ranging populations of ferrets.
3. Establish free-ranging populations of ferrets to meet downlisting and delisting goals.
4. Ensure sufficient habitat to support a wide distribution of self-sustaining ferret populations.
5. Reduce disease-related threats in wild populations of ferrets and associated species.
6. Support partner involvement and conduct adaptive management through cooperative interchange.

**Date of Recovery:**  We believe that downlisting of the black-footed ferret could be accomplished in approximately 10 years if conservation actions continue at existing reintroduction sites and if additional reintroduction sites are established.  Downlisting and delisting could occur more quickly if additional partners became involved in recovery efforts.

**Estimated Cost of Recovery Actions ($1,000s) (not adjusted for inflation):**  The following table summarizes the costs by decade of the various recovery actions that are described by individual task in Part II and prioritized in Part III of this revised recovery plan.  Costs through 2020 address downlisting of the black-footed ferret.  Subsequent costs address delisting the ferret.

**Estimated Cost of Recovery Actions ($1,000's) (not adjusted for inflation)**

| Years | Action 1 | Action 2 | Action 3 | Action 4 | Action 5 | Action 6 | Total |
|-------|----------|----------|----------|----------|----------|----------|-------|
| 2010-2020 | 7,000 | 90 | 9,950 | 23,000 | 8,110 | 6,990 | 55,140 |
| 2021-2030 | 5,000 | 60 | 10,960 | 22,000 | 4,940 | 5,040 | 48,000 |
| 2031-2040 | 5,000 | 60 | 10,960 | 22,000 | 4,940 | 5,040 | 48,000 |
| **Total** | **17,000** | **210** | **31,870** | **67,000** | **17,990** | **17,070** | **151,140** |

7

# TABLE OF CONTENTS

DISCLAIMER………………………………………………………...………….……3
ACKNOWLEDGMENTS…………………...……………………….……….4
EXECUTIVE SUMMARY……………………………………………………5
TABLE OF CONTENTS……………………………………………………8
ACRONYMS…………………………………………………………..…..........10
GLOSSARY……………………………………………………………....11

**PART I.  BACKGROUND**
     INTRODUCTION…………………………………………………......12
     SPECIES STATUS……………………………………………….………13
     TAXONOMY………………………………………………………14
     SPECIES DESCRIPTION……………………………………………15
     LIFE HISTORY…………………………………………………......15
     HABITAT REQUIREMENTS………………………………….………16
     DISTRIBUTION AND RANGE………………………………….……16
     POPULATION TRENDS…………………………………………19
     THREATS AND REASONS FOR LISTING…………………………......23

**PART II.  RECOVERY**
     RECOVERY GOAL………………………………………………………52
     RECOVERY CRITERIA……………………………………………......52
     RECOVERY STRATEGY………………………………………..…….71
     RECOVERY ACTIONS……………………………………………72

**PART III.  IMPLEMENTATION SCHEDULE**…………………………………99

**PART IV.  LITERATURE CITED**……………………………………..…......116

**FIGURES AND TABLES**

Figure 1. Probable historical range of the black-footed ferret (shaded) and current
     reintroduction sites………………………………………………..18

Figure 2. Western U.S. counties impacted by plague (USGS)…...…………………31

Figure 3. Number of adult black-footed ferret and corresponding acres of prairie dog
     occupied habitat at successful recovery sites in 2008 and projected requirements
     for downlisting (2020) and delisting (2040)………………………..………68

Table 1.  Recovery priorities………………………………………….…………14

Table 2.  Black-footed ferret reintroduction efforts through 2012.................…………...20

Table 3.  Numbers of black-footed ferrets in the wild .................………….…………..22

8

Table 4. Black-footed ferret threat matrix ……………………...…………………..……..51

Table 5. Downlisting and delisting criteria and threats addressed………………....……57

Table 6. Black-footed ferret recovery guidelines by State………………….…………68

Table 7. Implementation Schedule for the Black-footed Ferret Recovery Plan …........101

9

# ACRONYMS

| | |
|---|---|
| APHIS: | Animal and Plant Health Inspection Service |
| AZA: | Association of Zoos and Aquariums |
| BFFRIT: | Black-footed Ferret Recovery Implementation Team |
| BLM: | U.S. Bureau of Land Management |
| CBSG: | Conservation Breeding Specialist Group (SSC/IUCN) |
| CS: | Conservation Subcommittee under BFFRIT |
| EPA: | U.S. Environmental Protection Agency |
| ES: | Executive Subcommittee under BFFRIT |
| ESA: | Endangered Species Act of 1973 |
| IS: | Incentives Subcommittee under BFFRIT |
| IUCN: | International Union for the Conservation of Nature |
| NEPA: | National Environmental Policy Act |
| NPS: | U.S. National Park Service |
| OIS: | Outreach and Information Subcommittee under BFFRIT |
| PDMS: | Prairie Dog Management Subcommittee under BFFRIT |
| SCTAG: | Small Carnivore Taxon Advisory Group of the AZA |
| Service: | U.S. Fish and Wildlife Service |
| SPVS: | Sylvatic Plague Vaccine Subcommittee |
| SSC: | Species Survival Commission of the World Conservation Union |
| SSP®: | Species Survival Plan |
| USFS: | U.S. Forest Service |
| USFWS: | U.S. Fish and Wildlife Service |
| USGS: | U.S. Geological Survey |

BLM_0070309

# GLOSSARY

**Beringia:** a land bridge that joined Alaska and Siberia during the Pleistocene ice ages

**endemic:** native to a particular region

**enzootic:** a disease outbreak causing a low level of mortality, persistent over a long time period

**epizootic:** a disease outbreak causing a high level of mortality, persistent over a short time period

**fossorial:** adapted to digging and life underground

**heterozygosity:** having different forms of genes present for a particular trait

**homozygosity:** having similar forms of genes present for a particular trait

**mustelid:** of the weasel family in the order Carnivora (carnivorous mammals)

11

BLM_0070310

# PART I.   BACKGROUND

**INTRODUCTION**

The black-footed ferret recovery program is one of the oldest endangered species recovery programs in the U.S. (Biggins et al. 1997).  The first recovery plan was published in 1978 (Linder et al. 1978), when no wild ferrets were thought to exist.  A second recovery plan was completed in 1988 (U.S. Fish and Wildlife Service 1988) when captive breeding efforts had begun, but no reintroduction efforts had yet been initiated.  The objective of the 1988 plan was to ensure the immediate survival of the ferret by: (1) increasing the captive population to 200 breeding adults by 1991, (2) establishing a pre-breeding population of 1,500 free-ranging adults in 10 or more populations with no fewer than 30 breeding adults in any population by 2010, and (3) encouraging the widest possible distribution of reintroduced populations for risk management purposes.  These three objectives were further divided into numerous actions, tasks, and subtasks.  Most of the original tasks associated with objective 1 have been achieved.  Some related tasks are no longer relevant, such as searching for additional wild populations (Hanebury and Biggins 2006).  Since 1988, ongoing efforts have highlighted the need for a new recovery plan that addresses additional considerations under objectives 2 and 3.  Tasks associated with objectives 2 and 3 will require added emphasis as the recovery program matures.  In particular, these new considerations include: (1) the availability of a sufficient quantity and quality of prairie dog habitat to support recovery of the species, (2) the impacts of disease, especially sylvatic plague, on reintroduced populations and their habitat, and (3) the adequacy of proactive management efforts and existing regulatory mechanisms in addressing the preceding two considerations.  The tasks in this recovery plan have been discussed extensively between the Service and BFFRIT partners.

Part I of this recovery plan includes the evolving biological species status information pertinent to recovering the black-footed ferret.  Part II outlines a general strategy for long-term recovery of the ferret in the wild, presents criteria for downlisting and delisting the species, and describes specific actions and recovery tasks.  Part III provides a

12

BLM_0070311

schedule for implementing recovery tasks. The recovery plan will continue to be revised as needed to reflect changes in information, strategies, and actions.

This recovery plan relies extensively on several black-footed ferret status reviews (CBSG 1992, Hutchins et al. 1996, CBSG 2004, Garelle et al. 2006, U.S. Fish and Wildlife Service 2008), Service evaluations of tasks identified in the 1988 Black-footed Ferret Recovery Plan, and extensive review and input by parties associated with the BFFRIT. In particular, the "Annotated Recovery Plan Outline for the Black-footed Ferret" (Ray 2006) thoroughly examined all prior recovery tasks and existing literature. This outline contributed significantly to this recovery plan and is frequently referenced.

**SPECIES STATUS**

The black-footed ferret was listed as endangered in 1967 (32 FR 4001; March 11, 1967) and again in 1970 (35 FR 8491; June 2, 1970) under early endangered species legislation and was "grandfathered" into the ESA in 1973. Critical habitat was not designated for the species; the species was listed prior to amendments that added critical habitat provisions. We assigned the ferret a recovery priority number of 2C on a scale of 1C-18, with 1C equaling the highest priority. This number indicates that the ferret faces a high degree of threat, with potential economic conflicts regarding the ferret's obligatory dependence on prairie dogs, which are viewed as pests by some parties (U.S. Fish and Wildlife Service 2008). The high degree of threat is largely due to inadequate management and conservation of prairie dogs, and is described in detail in the section "Threats and Reasons for Listing." The ranking also reflects the ferret's taxonomic status as a full species. Table 1 further describes recovery prioritization. Notably, this species continues to have a high potential for recovery despite the management challenges noted.

BLM_0070312

Table 1.  Recovery priorities

| Degree of Threat | Recovery Potential | Taxonomy | Priority | Conflict |
|---|---|---|---|---|
| **High** | **High** | Monotypic Genus | 1 | 1C |
| | | **Species** | **2** | **2C** |
| | | Subspecies/DPS | 3 | 3C |
| | Low | Monotypic Genus | 4 | 4C |
| | | Species | 5 | 5C |
| | | Subspecies/DPS | 6 | 6C |
| Moderate | High | Monotypic Genus | 7 | 7C |
| | | Species | 8 | 8C |
| | | Subspecies/DPS | 9 | 9C |
| | Low | Monotypic Genus | 10 | 10C |
| | | Species | 11 | 11C |
| | | Subspecies/DPS | 12 | 12C |
| Low | High | Monotypic Genus | 13 | 13C |
| | | Species | 14 | 14C |
| | | Subspecies/DPS | 15 | 15C |
| | Low | Monotypic Genus | 16 | 16C |
| | | Species | 17 | 17C |
| | | Subspecies/DPS | 18 | 18C |

The above ranking system for determining Recovery Priority Numbers was established in 1983 (48 FR 43098; September 21, 1983 as corrected in 48 FR 51985; November 15, 1983).

**TAXONOMY**

The black-footed ferret is in the Order Carnivora, Family Mustelidae, Genus *Mustela*, and Subgenus *Putorius*.  No subspecies are recognized (Hillman and Clark 1980, Anderson et al. 1986).  The species is one of five members of the genus *Mustela* in North America that also includes the ermine (*M. erminea*), long-tailed weasel (*M. frenata*), least weasel (*M. nivalis*), and American mink (*M. vison*) (Wilson and Ruff 1999).  The black-footed ferret is the only ferret species native to the Americas.  Other ferret species in the subgenus are the Siberian polecat (*M. eversmanni*) and the European ferret (*M. putorius*) (Hillman and Clark 1980, Anderson et al. 1986), which has been domesticated and is sold as a pet.  The black-footed ferret is most closely related to the Siberian polecat (Hillman and Clark 1980, Anderson et al. 1986).  The earliest fossil record of the black-footed ferret is from approximately 100,000 years ago (Anderson et al. 1986).  The species was first formally described in 1851 by J.J. Audubon and J. Bachman (Anderson et al. 1986, Clark 1986).

14

**SPECIES DESCRIPTION**

The black-footed ferret is a medium-sized mustelid, typically weighing 1.4–2.5 pounds (645–1125 grams) and measuring 19–24 inches (479–600 millimeters) in total length. Upper body parts are yellowish buff, occasionally whitish; feet and tail tip are black; and a black "mask" occurs across the eyes (Hillman and Clark 1980, Anderson et al. 1986).

**LIFE HISTORY**

Four populations of the black-footed ferret have been studied intensively including: (1) Mellette County, South Dakota (1964–1974), (2) Park County, near Meeteetse, Wyoming (1981–1986), (3) a reintroduced population at UL Bend National Wildlife Refuge, Montana (1994 to present), and (4) a reintroduced population in Conata Basin, South Dakota (1996-present). Much of the information pertaining to the species' life history, survival, and behavior has been obtained from these four populations.

The ferret breeds at one year of age from mid-March through early April in the wild (Wilson and Ruff 1999). Gestation is about 42–45 days, and litter size averages approximately 3.5 individuals (Wilson and Ruff 1999). The ferret is solitary, except for breeding and the period when mother and young are together (Forrest et al. 1985). It is generally a nocturnal predator, appearing above ground at irregular intervals and for irregular durations (Clark et al. 1986). The ferret is an extreme specialist that depends on prairie dogs for food and shelter (Biggins 2006). Forrest et al. (1985) concluded that ferret densities at the last known wild population near Meeteetse, Wyoming, were linearly correlated with white-tailed prairie dog (*Cynomys leucurus*) colony size, with an average density of one adult ferret per 99–148 ac (40–60 ha) of occupied prairie dog habitat. Information on ferret life expectancy is sparse. However, mustelids typically have short mean life expectancies and 50 percent or greater juvenile mortality (Clark 1989). The mean life expectancy of free-ranging ferrets in the Meeteetse population was 0.9 years (Biggins et al. 2006).

15

BLM_0070314

## HABITAT REQUIREMENTS

The black-footed ferret was historically found throughout the Great Plains, mountain basins, and semi-arid grasslands of North America wherever prairie dogs occurred (Hillman and Clark 1980, Figure 1). The species depends on prairie dogs (*Cynomys spp.*) for food and on prairie dog burrows for shelter (Biggins 2006). Field observations by Hillman (1968) indicate that ferrets feed entirely on prairie dogs. Diet samples support this, although other species of vertebrate prey have occasionally been reported (Oldemeyer et al. 1993, Miller et al. 1996).

## DISTRIBUTION AND RANGE

The black-footed ferret is endemic to North America. The species entered North America from Siberia approximately 1–2 million years ago, spread across Beringia, and then advanced southward through ice-free corridors to the Great Plains by approximately 800,000 years ago (Wisely 2006). The species was probably common historically, contrary to early characterizations that addressed its natural history. However, its secretive habits (nocturnal and often underground) probably made it difficult to observe (Forrest et al. 1985, Anderson et al. 1986, Clark 1989).

The historical habitat of the black-footed ferret coincided with the ranges of the black-tailed prairie dog, Gunnison's prairie dog, and white-tailed prairie dog. These prairie dog species collectively occupied approximately 100 million ac (40.5 million ha) of intermountain and prairie grasslands extending from Canada into Mexico (Anderson et al. 1986, Biggins et al. 1997). The habitat occupied by prairie dogs existed within a range of an estimated 562 million ac (228 million ha) (Ernst 2008). There has been no documented occurrence of the ferret within the range of either the Utah prairie dog (*C. parvidens*) or the Mexican prairie dog (*C. mexicanus*), which have small, disjunct ranges (Lockhart et al. 2006). Ferrets from Arizona, Colorado, Kansas, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, South Dakota, Texas, Utah, Wyoming, Alberta, and Saskatchewan have been collected as museum specimens since the late 1800s (Anderson et al. 1986). Ferrets also likely occurred in Mexico in recent times, as

16

BLM_0070315

evidenced by:  (1) the fairly contiguous historical distribution of prairie dogs between Arizona, New Mexico, and Mexico, (2) the similarity of biological communities in these areas, (3) the presence of a museum specimen from a site just north of the Mexico and U.S. border, and (4) fossil records further south in Mexico (Lockhart 2001).

Ernst (2008) utilized a geographic information system database to identify the likely distribution of prairie dog habitat where the black-footed ferret probably occurred historically in the United States.  She concluded that 85 percent of all ferrets may have occurred in black-tailed prairie dog habitat, 8 percent in Gunnison's prairie dog habitat, and 7 percent in white-tailed prairie dog habitat.  Although potential biases are possible in this characterization of the historical distribution of ferrets, most ferrets probably occurred in black-tailed prairie dog habitat based on the more expansive extent of their distribution and the higher quality ferret habitat they represent in terms of prairie dog densities.  Figure 1 depicts both the historical and current distribution of the species.  Current ferret populations are all the result of reintroduction efforts.

BLM_0070316



Figure 1.  Probable historical range of the black-footed ferret (shaded) and current reintroduction sites.  The locations of reintroduction sites are portrayed in their chronological order of implementation as follows:  (1) Shirley Basin, WY (1991); (2) Badlands National Park, SD (1994); (3) UL Bend National Wildlife Refuge, MT (1994); (4) Conata Basin, SD (1996); (5) Aubrey Valley, AZ (1996); (6) Fort Belknap Indian Reservation, MT (1997); (7) Coyote Basin, UT (1999); (8) Cheyenne River Indian Reservation, SD (2000); (9) Wolf Creek, CO (2001); (10) BLM "40 Complex", MT (2001); (11) Janos, Chihuahua, Mexico (2001); (12) Rosebud Indian Reservation, SD (2004); (13) Lower Brule Indian Reservation, SD (2006); (14) Wind Cave National Park, SD (2007); (15)  Espee Ranch, AZ (2007); (16) Logan County, KS (2007); (17) Northern Cheyenne Indian Reservation, MT (2008); (18) Vermejo Ranch (black-tailed prairie dog habitat), NM (2008); (19) Grasslands National Park, Saskatchewan, Canada (2009); and (20) Vermejo Ranch (Gunnison's prairie dog habitat), NM (2012).

18

BLM_0070317

## POPULATION TRENDS

The black-footed ferret's close association with prairie dogs was an important factor in its decline. From the late 1800s to approximately 1960, both prairie dog occupied habitat and prairie dog numbers were reduced by the effects of: (1) habitat destruction from conversion of native prairie to cropland, (2) poisoning, and (3) disease. The ferret population declined precipitously as a result (Biggins 2006). These effects are described in more detail in the following section, "Threats and Reasons for Listing." The ferret was considered possibly extinct before a small population was located in Mellette County, South Dakota, in 1964 (Henderson et al. 1969). Breeding attempts with a few captured animals failed to produce surviving young. The last wild animals in the Mellette population were observed in the field in 1974 (Clark 1989). The last captive animal from the Mellette population died at Patuxent Wildlife Research Center in 1979 (U.S. Fish and Wildlife Service 1988) and again the ferret was presumed extinct. In 1981, a remnant population was discovered near Meeteetse, Wyoming (Clark et al. 1986, Lockhart et al. 2006). Disease outbreaks occurred at Meeteetse in the early 1980s. All surviving wild ferrets at Meeteetse were removed during 1985–1987. These ferrets were used to initiate a captive breeding program. Of the 18 remaining ferrets captured from Meeteetse, 7 produced a captive population lineage that is the foundation of present recovery efforts (Hutchins et al. 1996, Garrelle et al. 2006). Extant populations, both captive and reintroduced, descend from these "founder" animals.

No wild populations of black-footed ferrets have been found following the final capture of the last known Meeteetse ferret in 1987, despite extensive and intensive searches rangewide. It is very unlikely that any undiscovered wild populations remain (Hanebury and Biggins 2006, Lockhart et al. 2006).

There have been 20 specific black-footed ferret reintroduction projects, beginning in 1991 (Figure 1). These projects include: Shirley Basin, Wyoming, in 1991; Badlands National Park, South Dakota, in 1994; UL Bend National Wildlife Refuge, Montana, in 1994; Conata Basin, South Dakota, in 1996; Aubrey Valley, Arizona, in 1996; Fort Belknap Indian Reservation, Montana, in 1997; Coyote Basin, Utah, in 1999; Cheyenne

19

River Indian Reservation, South Dakota, in 2000; Wolf Creek, Colorado, in 2001; Bureau of Land Management 40 Complex, Montana, in 2001; Janos, Mexico, in 2001; Rosebud Indian Reservation, South Dakota, in 2004; Lower Brule Indian Reservation, South Dakota, in 2006; Wind Cave National Park, South Dakota, in 2007; Espee Ranch, Arizona, in 2007; Logan County, Kansas, in 2007; Northern Cheyenne Indian Reservation, Montana, in 2008; Vermejo Ranch (black-tailed prairie dog habitat), New Mexico, in 2008; Grasslands National Park, Saskatchewan, Canada, in 2009; and Vermejo Ranch (Gunnison's prairie dog habitat), New Mexico, in 2012.

Black-footed ferret reintroduction projects have experienced a range of success that we categorize in the following table. A site must meet the specified criteria in order to meet a particular classification. A site's classification may change over time. For example, both Badlands National Park, South Dakota, and Shirley Basin, Wyoming, were considered unsuccessful for several years, but are now considered as improving and successful, respectively.

Table 2. Black-footed ferret reintroduction efforts through 2012

| Classification | Criteria | Site |
|---|---|---|
| Successful | <ul><li>Self-sustaining</li><li>30 or more breeding adults</li><li>Can support other sites with translocations</li><li>Multiple litters documented annually</li></ul> | <ul><li>Aubrey Valley, AZ</li><li>Cheyenne River, SD</li><li>Conata Basin, SD</li><li>Shirley Basin, WY</li></ul> |
| Improving | <ul><li>Increasing population</li><li>Litters documented annually</li></ul> | <ul><li>Badlands NP, SD</li><li>Logan County, KS</li><li>Lower Brule, SD</li><li>Rosebud, SD</li><li>Wind Cave NP, SD</li></ul> |
| Marginal | <ul><li>Performing minimally with no evidence of increasing populations</li><li>Few litters documented annually</li></ul> | <ul><li>Coyote Basin, UT</li><li>Janos, Mexico</li><li>UL Bend NWR, MT</li><li>Wolf Creek, CO</li></ul> |
| Unsuccessful | <ul><li>Populations declining or extirpated</li><li>No recent litters documented</li></ul> | <ul><li>Espee Ranch, AZ</li><li>BLM 40 Complex, MT</li><li>Fort Belknap, MT</li></ul> |

BLM_0070319

| Recent | • Initiated within the past 5 years | • Grasslands NP, Canada<br>• Northern Cheyenne, MT<br>• Vermejo Ranch (btpd habitat), NM<br>• Vermejo Ranch (gpd habitat), NM |
|---|---|---|

Black-footed ferret populations are difficult to enumerate due to their remote locations, difficult accessibility, nocturnal habits, and logistical problems and costs associated with the requisite field work.  Accordingly, ferret populations at some reintroduction sites are not regularly or even accurately assessed.  We view ferret population estimates at most sites as only approximate minimum numbers because of the aforementioned issues and because additional variables such as weather, intensity of search effort, and length of search effort may provide different perspectives.  One striking example of the difficulty of enumerating ferret populations is Shirley Basin, Wyoming, where approximately 200 individuals were estimated to occur in the fall of both 2008 and 2010 on only one-seventh of the prairie dog habitat—the amount of habitat surveyed.  This ferret population may or may not be larger than estimated, but does indicate the general difficulties of estimating ferret populations in the wild.

We have derived our best estimate of adult ferrets extant in the wild at this time as an average of the collective observations in 2008 and 2011.  We recognize that ferret populations at some sites likely declined between 2009 and 2012, but conversely, populations at other sites likely increased during this same period.  The following table summarizes recent information regarding the cumulative number of black-footed ferrets released and minimum numbers documented at the reintroduction sites.  Note that the rounding to derive estimates of breeding populations results in estimates that are not exactly 50 percent of the fall populations.  The most significant change in population in recent years is the decline in ferret numbers at Conata Basin due to sylvatic plague (see discussion in section on "Disease or predation").

21

BLM_0070320

Table 3.  Numbers of black-footed ferrets in the wild, 1991 - 2012

| Site (year initiated) | Prairie dog spp. | Ferrets released | Minimum fall population[1] 2008 | Estimated breeding adults[2] 2009 | Minimum fall population 2011 | Estimated breeding adults 2012 | Average estimate of breeding adults |
|---|---|---|---|---|---|---|---|
| Shirley Basin, WY (1991) | Wtpd | 301 | 196 | 98 | 203 (in 2010) | 102 (in 2011) | 100 |
| UL Bend NWR, MT (1994) | Btpd | 208 | 13 | 7 | 20 | 10 | 9 |
| Badlands NP, SD (1994) | Btpd | 175 | 20 | 10 | 33 | 17 | 14 |
| Aubrey Valley, AZ (1996) | Gpd | 206 | 66 | 33 | 75 | 38 | 35 |
| Conata Basin, SD (1996) | Btpd | 150 | 292 | 146 | 72 | 36 | 91 |
| Ft. Belknap, MT (1997) | Btpd | 167 | 0 | 0 | 0 | 0 | 0 |
| Coyote Basin, UT (1999) | Wtpd | 249 | 25 | 13 | 3 | 1 | 7 |
| Cheyenne River, SD (2000) | Btpd | 219 | 150 | 75 | 25 (partial survey) | >13 | 44 |
| BLM 40complex, MT (2001) | Btpd | 95 | 3 | 3 | No data | No data | 2 |
| Wolf Creek, CO (2001) | Wtpd | 209 | 16 | 8 | No data | No data | 4 |
| Janos, Mexico (2001) | Btpd | 282 | 13 | 7 | No data | No data | 4 |
| Rosebud, SD (2003) | Btpd | 99 | 30 | 15 | No data | No data | 8 |
| Lower Brule, SD (2006) | Btpd | 87 | 26 | 13 | 12 | 6 | 10 |
| Wind Cave NP, SD (2007) | Btpd | 49 | 26 | 13 | 46 | 23 | 18 |
| Espee Ranch, AZ (2007) | Gpd | 44 | Recent release | No data | No data | No data | No data |
| Logan County, KS (2007) | Btpd | 36 | 15 | 7 | 38 | 19 | 13 |
| N. Cheyenne, MT (2008) | Btpd | 8 | Recent release | No data | No data | No data | No data |
| Vermejo Ranch, NM (2008) | Btpd | 77 | Recent release | No data | 5 | 3 | 2 |
| Grasslands NP, Canada (2009) | Btpd | 45 | Recent release | No data | 12 | 6 | 3 |
| Vermejo Ranch, NM (2012) | GPD | 20 | Recent release | No data | No data | No data | No data |
| **Total** | | **2726** | **891** | **448** | **544** | **274** | **364** |

[1] Minimum fall population counts are derived from spotlight surveys and trapping efforts except in Shirley Basin, WY, where a model was used to estimate fall population.
[2] Breeding adult figures are estimated to be one-half minimum fall population counts from the previous yr.

22

## THREATS AND REASONS FOR LISTING

Black-footed ferret populations declined for three principal reasons.  First, a major conversion of native range to cropland, particularly in the eastern portion of the species' range, began in the late 1800s.  Second, poisoning of prairie dogs as a means of reducing competition with domestic livestock for forage began in the early 1900s.  Third, the exotic disease sylvatic plague first impacted prairie dogs in the 1930s (Eskey and Hass 1940).  Each of these resulted in a substantial loss of prairie dogs, which in turn led to an even greater decline in ferret populations due to the species' dependency on large expanses of habitat occupied by prairie dogs (Lockhart et al. 2006).  Additionally, even a temporal loss of prairie dog habitat can create a population bottleneck for ferrets, despite the subsequent recovery of the prairie dog population.

Section 4 of the ESA (16 U.S.C. 1533) and implementing regulations (50 CFR, part 424) set forth procedures for adding species to, removing species from, or reclassifying species on the Federal Lists of Endangered and Threatened Wildlife and Plants.  Under section 4(a)(1) of the ESA, a species may be determined to be endangered or threatened based on any of the following five factors:  (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence.  We discuss each of these factors affecting the status of the black-footed ferret in more detail below.

### Present or threatened destruction, modification or curtailment of habitat or range

The black-footed ferret's historical range (Figure 1) coincided with the ranges of the black-tailed, white-tailed, and Gunnison's prairie dogs.  Historically, these prairie dog species occupied approximately 100 million ac (40.5 million ha) of intermountain and prairie grasslands rangewide (Anderson et al. 1986, Biggins et al. 1997).  This occupied habitat existed within a range of approximately 562 million ac (228 million ha) (Ernst

23

2008) within the U.S.  This is a minimum estimate of historical range because Ernst (2008) did not evaluate the ferret's range in Canada and Mexico.  Occupied habitat likely shifted somewhat over time in response to drought, fire, and grazing by bison (*Bison bison*) and other animals, along with other factors.

In 1986, Anderson et al. (1986) estimated a 90 percent decrease in the amount of habitat occupied by all species of prairie dogs.  Mac et al. (1998) estimated a 98 percent decline in numbers of prairie dogs throughout North America.  Prairie dog occupied habitat reached a low point in the early 1960s when approximately 1.4 million ac (570,000 ha) were estimated to exist in the United States for black-tailed, white-tailed, and Gunnison's prairie dogs (Bureau of Sport Fisheries and Wildlife 1961).  These low estimates likely continued for a decade thereafter, until Executive Order 11643 prohibited the use of certain toxicants that might cause secondary poisoning on Federal lands or through federally funded programs.  The most recent Service estimates of prairie dog occupied habitat in the U.S. include 2,400,000 ac (972,000 ha) of black-tailed prairie dog occupied habitat (74 FR 63343; December 3, 2009), 841,000 ac (341,000 ha) of white-tailed prairie dog occupied habitat (69 FR 64889; November 9, 2004), and 340,000–500,000 ac (136,000–200,000 ha) of Gunnison's prairie dog occupied habitat (73 FR 6660; February 5, 2008) for a total of approximately 3,700,000 ac (1,500,000 ha) of occupied habitat.  This is a decrease of approximately 96 percent from historically occupied habitat.

As prairie dog occupied habitat declined due to conversions from native prairie to cropland, poisoning, and disease during the late 19th century and the first half of the 20th century, black-footed ferret populations likewise declined (Fagerstone and Biggins 1986, Cully 1993, Biggins 2006, Lockhart et al. 2006).  Prairie dog occupied habitat has increased approximately 250 percent since the 1961 estimate.  However, by the 1960s, only two remnant ferret populations (in Mellette County, South Dakota, and Meeteetse, Wyoming) remained, and ferrets were unable to repopulate expanding prairie dog habitat.

**Native Prairie Conversion:**  The conversion of native prairie to cropland is the primary, largely permanent, cause of habitat destruction within the historical range of the black-footed ferret.  Approximately 112 million ac (45 million ha) of native prairie have been

24

converted to agricultural land within the ferret's historical range (Ernst et al. 2006). However, we estimate that approximately 400 million ac (163 million ha) of non-cultivated rangeland remain within the historical range of the ferret (U.S. Department of Agriculture 2005), and represent potential habitat for the prairie dog and ferret (Ernst et al. 2006). Rates of conversion from native prairie to cropland have slowed substantially in recent years, and we do not consider the present or threatened habitat loss due to cropland conversion as significant as historical levels of impact. Approximately 3.7 million ac (1.5 million ha) of prairie dog occupied habitat are currently available. It appears that sufficient potential habitat still occurs within the ferret's historical range to accommodate increases in occupied habitat when the 3.7 million ac (1.5 million ha) of currently occupied prairie dog habitat are contrasted with the 400 million ac (163 million ha) of current rangeland. Moreover, we project that less than 15 percent of currently occupied prairie dog habitat is necessary to recover the ferret, if this habitat is appropriately configured and managed (see Part II). We do not consider the present or threatened destruction of habitat or range due to conversion of native prairie to cropland a threat to ferret recovery at the present time. Cropland conversion no longer appreciably reduces survival or reproduction at the current level of cultivated land. In the absence of ESA protections, effects from cropland conversion at the current rate would not require regulation and would not be a threat.

**Urbanization:** Approximately 3.3 million ac (1.3 million ha) of historical black-footed ferret habitat have been lost to urbanization (Ernst 2008). However, it appears that sufficient potential habitat still occurs within the ferret's historical range to accommodate increases in occupied habitat when the 3.3 million ac (1.3 million ha) of urban lands are contrasted with the 400 million ac (163 million ha) of current rangeland. We describe the amount of prairie dog occupied habitat necessary to support a self-sustaining ferret population in more detail in Part II. We do not consider the present or threatened destruction of habitat or range due to urbanization a threat to ferret recovery at the present time. In the absence of ESA protections, effects from urbanization in their current state would not require regulation and would not be a threat.

BLM_0070324

**Disease and Poisoning:**  We discuss the present or threatened modification of habitat or range due to sylvatic plague under factor C "Disease or predation" and the  present or threatened curtailment of habitat or range due to poisoning of prairie dogs under factor E "Other natural manmade factors."

**Overutilization for Commercial, Scientific, and Educational Purposes:**  All black-footed ferrets are located either in captive breeding facilities or at managed reintroduction sites.  No black-footed ferrets are being utilized for commercial purposes.  ESA permits may be provided for specific scientific or educational activities, but other uses are illegal and subject to law enforcement actions.

The captive black-footed ferret population is guided by the Association of Zoos and Aquariums (AZA) Black-footed Ferret Species Survival Plan (SSP®) to conserve a breeding population of a minimum of 240 ± 35 animals of optimum sex and age ratio to maximize productivity and genetic diversity (Hutchins et al. 1996).  Captive ferrets in excess of SSP® needs are allocated each year for reintroduction or for scientific and educational purposes.  Animals used for scientific or educational purposes are often older animals that are past prime breeding age, although some kits have also been allocated for research purposes.  For example, some ferrets have been used for research and development of a plague vaccine (Rocke et al. 2006).  Some individuals are also used as display animals for educational purposes at zoos.

Free-ranging black-footed ferrets occur only at managed reintroduction sites.  Wild-born kits from successful reintroduction sites are sometimes trapped and released on other reintroduction sites (Lockhart 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, Larson 2008a).  However, they remain part of the reintroduced population.  Ferrets at some reintroduction sites are also trapped, given a plague vaccination, and promptly released.  In very limited circumstances, studies that involve trapping and measuring various characteristics of ferrets in order to identify differences between captive and wild born ferrets have been authorized.  No other collections of free-ranging ferrets for scientific or educational purposes are permitted.

BLM_0070325

We do not consider the overutilization for commercial, scientific, or educational purposes a threat to black-footed ferret recovery at the present time. It does not appreciably reduce survival or reproduction at present. In the absence of ESA protections, the SSP® would continue to appropriately allocate captive ferrets for purposes of captive breeding, reintroduction, scientific research, and education. State and Federal agencies do not allow take of free-ranging ferrets for purposes other than translocation or vaccination. In the absence of ESA protections, overutilization for commercial, scientific, or educational purposes would need to continue to be regulated.

**Recreational Purposes:**  The interest in and the intensity of recreational prairie dog shooting has increased over the past decade at some black-footed ferret reintroduction sites. Depending on its intensity, shooting can impact local prairie dog populations, and the resulting loss in prey base likely affects black-footed ferret reintroduction sites (Pauli 2005, Reeve and Vosburgh 2006). Incidental take of ferrets by prairie dog shooters is also a potential, but as yet undocumented, source of ferret mortality. Recreational shooting of prairie dogs may contribute to the problem of lead accumulation in wildlife food chains that include prairie dogs (Pauli and Buskirk 2007). Killing large numbers of animals, not removing carcasses from the field, and using expanding bullets containing lead may present potentially dangerous amounts of lead to scavengers and predators of prairie dogs. However, no impacts from ingesting lead have been reported in ferrets.

Prairie dog shooting is presently managed at varying levels (seasonal to full closure) on all active black-footed ferret reintroduction areas by State wildlife agencies, Federal land management agencies, or tribes. Recreational shooting has not been intense enough to warrant suspension of recovery efforts at any site but was suspected of impacting ferrets at one site (Krueger 2008a). Recreational shooting of white-tailed prairie dogs at Wolf Creek, Colorado, appeared to restrict prairie dog densities and limit the carrying capacity or reproductive success for ferrets at this site (Krueger 2008b and Krueger 2008c). Recovery success at this site could likely be improved through the implementation of appropriate regulatory measures.

27

Prairie dog populations can recover from very low numbers following intensive shooting (Knowles 1988, Vosburgh 1996, Dullum et al. 2005, Pauli 2005, Cully and Johnson 2006). It appears that a typical scenario is either: (1) once populations have been reduced, shooters go elsewhere and populations recover; or (2) continued shooting maintains reduced population size at specific sites (Knowles 1988, Vosburgh 1996, Dullum et al. 2005, Pauli 2005, Cully and Johnson 2006). Some landowners maintain black-tailed prairie dog populations and derive income from charging people for recreational shooting. Monetary gain from shooting fees may motivate landowners to preserve prairie dog colonies for future shooting opportunities, which is preferable to eradicating them by poisoning (Vosburgh and Irby 1998, Reeve and Vosburgh 2006).

We do not consider overutilization of prairie dogs for recreational purposes a threat to black-footed ferret recovery at reintroduction sites at the present time, except in certain very limited circumstances. While recreational shooting of prairie dogs may occasionally limit the carrying capacity for ferrets, it does not appreciably reduce survival or reproduction at present. In the absence of ESA protections, recreational shooting would need to continue to be regulated at reintroduction sites by State and Federal agencies and tribes.

**Disease or predation**

Native canine distemper and nonnative sylvatic plague have seriously impacted both wild and captive populations of the black-footed ferret. Several other native diseases, including coccidiosis, cryptosporidiosis, and hemorrhagic syndrome also affect captive populations (Hutchins et al. 1996), but are not common in the wild.

**Canine distemper:** Canine distemper can significantly adversely impact the black-footed ferret. It was originally believed to have been the primary cause of the demise of the last wild population of ferrets at Meeteetse, Wyoming, in the mid-1980s (Clark 1989). At that time, it was believed that plague did not directly impact the species because many carnivore species, including other ferret species, were resistant (Cully 1993, Godbey et al.

28

2006).  However, it is now believed that epidemics of both canine distemper and plague were likely responsible for the decline of the Meeteetse ferrets (Lockhart et al. 2006).

The canine distemper virus causes a systemic disease that is highly virulent to carnivore species, including the black-footed ferret.  It is endemic in the United States and initially made reintroduction of ferrets more difficult (Wimsatt et al. 2006).  Efforts in 1972 to breed ferrets from the Mellette County, South Dakota population were ultimately unsuccessful due to vaccine-induced canine distemper.  Although safe in domestic ferrets, the vaccine induced fatal distemper in 4 of 6 vaccinated black-footed ferrets that were removed from the wild Mellette population for captive breeding purposes (Lockhart et al. 2006).  Some ferrets in the Meeteetse population also succumbed to distemper in the mid-1980s (Clark 1989).  More recently, an effective commercial distemper vaccine has become available and is widely employed in both captive and some wild ferret populations (Marinari and Kreeger 2006).  Canine distemper vaccination can substantially reduce the threat of catastrophic population losses of ferrets.  However, it is not practical to vaccinate all wild-born ferrets to protect them from periodic distemper events.  Accordingly, wild populations may require monitoring and periodic augmentation.

We do not consider canine distemper a threat to black-footed ferret recovery at the present time.  The distemper vaccine protects captive and newly released ferrets, and wild-born ferrets are monitored and managed to avoid long-term adverse impacts.  Canine distemper does not appreciably reduce ferret survival or reproduction.  In the absence of ESA protections, management for distemper would need to continue.

**Sylvatic plague:**  Sylvatic plague infections are caused by the bacterium *Yersinia pestis.*  Fleas acquire the bacterium from biting infected animals and can then transmit it to other animals in a similar manner.  The disease can also be transmitted pneumonically (via the respiratory system) among infected animals or via the consumption of contaminated tissues (Godbey et al. 2006, Abbott and Rocke 2012).  Recovery efforts for the black-footed ferret are hampered because both ferrets and prairie dogs are extremely susceptible to plague (Barnes 1993, Gage and Kosoy 2006).  Plague can impact ferrets directly via

29

infection and subsequent mortality. It can also indirectly impact ferrets through the disease's effects on prairie dogs and the potential for dramatic declines in the ferret's primary prey base. The high densities and high rates of social contact of black-tailed and Gunnison's prairie dogs particularly enhance the spread of plague (Cully 1993).

The complex dynamics of sylvatic plague are not well understood. The potential significance of plague impacts on black-footed ferret populations underscores the value of establishing spatially separated reintroduction sites across the widest possible distribution of the species' historical range. Plague management tools and strategies are being developed (see following paragraphs and section on "Recovery Actions"). Releases in disease-free habitat should be prioritized whenever possible.

Sylvatic plague is a nonnative disease foreign to the evolutionary history of North American species. It did not exist on the North American continent prior to 1900, when it was inadvertently introduced into San Francisco (Gage and Kosoy 2006). It was first observed in prairie dogs in 1932 in Arizona (Cully 1993). Plague had been detected in prairie dogs in all States within the historical range of the black-footed ferret by 2005. The disease is currently present throughout the entire range of the white-tailed and Gunnison's prairie dogs and in at least the western two-thirds of the range of black-tailed prairie dogs (Barnes 1993, Lockhart et al. 2006). Figure 2 illustrates recent information regarding plague occurrence in the U.S. available from the U.S. Geological Survey (Abbott and Rocke 2012).

30

BLM_0070329



Figure 2. Western U.S. counties with plague-positive animal or flea samples (Abbott and Rocke 2012)

Plague in prairie dogs has been documented at or within 25 miles (40 kilometers) of all black-footed ferret reintroduction sites except for Rosebud Indian Reservation in South Dakota, Logan County in Kansas, and Janos in northern Chihuahua, Mexico (Lockhart 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007). Recent discussions with personnel at Rosebud Indian Reservation have indicated the possibility of plague at this site as well. However, it has not yet been confirmed in prairie dogs at this site.

Conata Basin, South Dakota, has been regarded as the most successful black-footed ferret reintroduction site. Until very recently, it supported the largest self-sustaining ferret population documented since the listing of the species in 1967, and perhaps for decades

31

BLM_0070330

before.  Conata Basin has provided a surplus of kits for translocation to other reintroduction sites since 2000 (Lockhart 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, Larson 2008a).  Plague was detected in prairie dogs approximately 25 miles (40 kilometers) south of Conata Basin in 2005.  Approximately 3,500 pounds (1,600 kilograms) of the insecticide Deltamethrin (a powder formulation registered for flea control) were applied (dusted) on 7,000 ac (2,800 ha) of prairie dog burrows in known ferret habitat during the late summer and fall of 2005 in an effort to eliminate fleas. Despite continued dusting efforts, plague was identified at Conata Basin in May 2008.

Following detection of plague at Conata Basin, South Dakota, several Federal agencies undertook a dusting effort that targeted approximately 10,000 ac (4,000 ha) of prairie dog colonies on U.S. Forest Service (USFS) and National Park Service (NPS) lands (Griebel 2008a).  Regardless, approximately 10,000 ac (4,000 ha) of untreated prairie dog colonies were impacted by plague (Griebel 2008b).  Plague in Conata Basin continued into 2009 and removed approximately 5,000 additional acres (2,000 ha) of prairie dogs for a two-year reduction in occupied prairie dog acreage from 31,000 ac (12,600 ha) to 16,000 ac (6,500 ha) (Griebel 2009).  Dusting at Conata Basin has continued annually to the present.  Conata Basin and Badlands National Park ferret reintroduction sites have used techniques such as dusting and vaccination to actively manage ferret habitat in the midst of this plague outbreak and have maintained approximately 11,000 ac (4,455 ha) of ferret occupied prairie dog colonies (Griebel 2009).  The precise extent of ferret mortality at Conata Basin is not known, but is presumed to be as much as 75 percent of the population, based upon recent surveys and the number of acres impacted at this site.

Sylvatic plague can be present in a prairie dog colony in either an enzootic (persistent, low level of mortality) or epizootic (high level of mortality over a shorter period of time) state.  Most of the information we have regarding impacts from plague is from data collected during epizootic events.  However, a recent study has expanded the understanding of enzootic plague and impacts to black-footed ferret recovery (Matchett et al. 2010).  In that study, ferret survival significantly improved when plague vaccinations were given to ferrets or when Deltamethrin was applied to prairie dog burrows, even in the absence of a discernable die-off of prairie dogs.  The researchers concluded that

32

BLM_0070331

increased ferret mortality associated with enzootic plague was hindering ferret recovery and fleas were a key component in transmission (Matchett et al. 2010).

In one instance, black-footed ferrets appear to have prospered despite the periodic presence of plague. In 1991, Shirley Basin, Wyoming, was the first site where ferrets were reintroduced. This site is occupied by white-tailed prairie dogs. Ferret releases at Shirley Basin were suspended in 1994 due to prairie dog population declines caused by plague. The small ferret population present at the site was expected to have been lost by the late 1990s. Only five ferrets were observed in 1997 (Grenier et al. 2007). However, 52 ferrets were observed in 2003. Thereafter, the Shirley Basin ferret population received additional augmentation and has grown rapidly (Lockhart et al. 2006, Grenier et al. 2007). White-tailed prairie dog complexes are less densely populated than typical complexes of black-tailed or Gunnison's prairie dogs. Apparently, scattered populations of prairie dogs avoided contracting plague and were able to sustain a small ferret population. However, ferrets and white-tailed prairie dogs at other reintroduction sites have not demonstrated similar resiliency, so Shirley Basin may be unique in this regard.

Rocke et al. (2006) are involved in research and development of vaccines to prevent plague in black-footed ferrets and prairie dogs. Ferrets immunized by a series of two subcutaneous injections had significantly higher antibody titers than un-immunized animals. Eleven of 16 vaccinated individuals survived when challenged with plague 6 months after immunization. All eight control animals died. The 11 survivors were again challenged by ingestion of a plague-infected mouse 2 months later and all survived. One vaccine under development may eventually be useful in protecting ferrets from habitat reduction due to plague, particularly if oral delivery to prairie dogs becomes feasible. Vaccine distributed via oral baits to protect prairie dogs has recently been shown to be effective in a laboratory setting (Rocke et al. 2008, Abbott and Rocke 2012). The use of a similar product in the field could protect habitat and prey base for ferrets, and provide long-term habitat stability. Most captive ferrets, including all of those provided for reintroduction, are currently vaccinated for plague. Many wild ferrets at Conata Basin are also vaccinated annually in an effort to minimize impacts from the ongoing plague epizootic. However, maximum protection is difficult to achieve in wild ferrets, which

33

BLM_0070332

must be trapped twice, two to four weeks apart, to receive an effective dose of the vaccine.

We consider sylvatic plague a medium magnitude, imminent threat to black-footed ferret recovery at the present time. Sylvatic plague affects the ferret both directly by causing mortality to ferrets and indirectly by causing mortality to prairie dogs. The recent encroachment of plague into South Dakota may pose a significant risk at reintroduction sites in that State. However, we believe that the threat from plague can be ameliorated by insecticidal dusting, ferret vaccine, prairie dog vaccine, and the maintenance of more reintroduction sites. Ferret recovery objectives could then be achieved despite periodic losses to plague. In the absence of ESA protections, management for plague would need to continue.

**Predation:** Natural levels of predation typically do not adversely impact overall population stability in healthy wildlife populations. However, if a population is vulnerable due to other factors, predation may become a contributing and ultimately limiting factor. Predation was a concern at early black-footed ferret reintroduction sites. Predation may have caused up to 95 percent of ferret mortality on some reintroduction sites without active plague before preconditioning became standard (Breck et al. 2006). Coyotes were a primary cause of predation-related death to ferrets at three reintroduction sites in Arizona, Montana, and South Dakota (Biggins et al. 2006). However, lethal control of coyotes may further impact ferret survival, possibly due to rapid rates of recolonization of coyotes after removal (Breck et al. 2006). Great-horned owls (*Bubo virginianus*) can also cause significant ferret mortality in some circumstances. Removal of predating great-horned owls benefited ferret survival in some instances (Breck et al. 2006).

Reintroductions into the wild of many captive-bred wildlife species are often less successful than reintroductions using wild-born individuals (Jule et al. 2008, Aaltonen et al. 2009, Maran et al. 2009). This lack of success is typically due to unsuccessful predator/competitor avoidance, starvation, and disease (Jule et al. 2008, Aaltonen et al. 2009, Maran et al. 2009). Behaviors critical to survival in the wild may be altered in

34

BLM_0070333

black-footed ferrets during generations in captivity.  Trials showed increased boldness in ferrets through successive generations in captivity (Biggins 2000).  This behavior could increase predation rates on released animals due to more time spent above ground.  The author noted that quasi-natural rearing environments seemed to counteract some negative effects of captivity.  Survival at several release sites from 1992–1995 was 10-fold higher for ferrets reared in outdoor pens than for ferrets raised in indoor cages (Biggins 2000). Increased preconditioning through outdoor pen rearing of captive-born ferrets in recent years has likely enriched learning of important natural behaviors.  Outdoor pen rearing appears to have increased survival rates when those animals have been released in the wild (Biggins et al. 2011).  Predation now has insignificant effects on ferrets at most sites, as evidenced by the reintroduction sites where ferret populations are apparently either stable or increasing, despite predators not being removed.

We do not consider predation a threat to black-footed ferret recovery at the present time because of the positive effects of preconditioning through outdoor pen rearing on survival of ferrets released into the wild.  Predation no longer appreciably reduces ferret survival or reproduction.  In the absence of ESA protections, recovered populations would be naturally sustained with wild-born kits, and predation would not be a threat.

**Inadequacy of existing regulatory mechanisms**

In analyzing whether the existing regulatory mechanisms are adequate, the Service reviews relevant Federal, State, and tribal laws, plans, regulations, memorandums of understanding, cooperative agreements, and other factors that influence conservation. Strongest weight is given to statutes and their implementing regulations, and management direction that stems from those laws and regulations.  Other regulatory mechanisms (memorandums and agreements) are more voluntary in nature; in those cases we analyze the specific facts for that mechanism to determine the extent to which it can be relied on in the future.  We consider all pertinent information, including the efforts and conservation practices of State and tribal governments.  Existing regulatory mechanisms include all mechanisms that are pertinent to a comprehensive regime designed to conserve a wildlife population, whether or not they are enforceable.

35

BLM_0070334

**Endangered Species Act:**  The ESA is the primary Federal law that provides protections for the black-footed ferret.  It provides several tools to conserve the species.  The establishment of multiple reintroduction sites throughout the species' range provides added resilience in the presence of threats such as sylvatic plague and poisoning that can periodically impact sites.

Section 4 of the ESA requires that, subsequent to listing, a review of the species be conducted to evaluate the status of the listed species.  We completed the most recent 5-year review of the black-footed ferret in 2008.  Section 4 also requires that we develop and implement recovery plans for the conservation and survival of listed species.  This document is the second revision of a recovery plan for the ferret.

Section 6 of the ESA allows for cooperation between the Service and States in the management and funding of projects designed to enhance the conservation of federally listed species.  Several States have received section 6 funding to either initiate black-footed ferret reintroductions or conduct monitoring at existing reintroduction sites.  For example, in 2010, we funded section 6 proposals in Utah ($40,000 to support ferret releases and monitoring efforts) and Wyoming ($45,500 to support ferret recovery efforts).

Tribal wildlife grants (TWGs), administered by the Service, are used to provide technical and financial assistance to tribes for the development and implementation of programs that benefit fish and wildlife resources and their habitat, including species of Native American cultural or traditional importance and species that are not hunted or fished.  A number of tribes have received TWG funding for black-footed ferret conservation.  For example, in 2008-2009, we supported TWG projects for the Cheyenne River Sioux Tribe ($133,890 in 2008 to begin a ferret recovery program and $116,059 to survey for ferrets in 2009) and the Lower Brule Sioux Tribe ($200,000 in 2008 to conduct research and management on ferrets and prairie dogs and $24,450 in 2009 to protect ferrets from plague).

36

Section 7(a)(1) of the ESA requires Federal agencies utilize their authorities in furtherance of the purposes of ESA by carrying out programs for the conservation of listed species such as the black-footed ferret. Several Federal agencies, including the U.S. Bureau of Land Management (BLM), the USFS, and the NPS, have worked cooperatively with the Service to reintroduce ferrets onto lands they manage (more detailed information is provided in following paragraphs).

Section 7(a)(2) of the ESA requires Federal agencies to consult with the Service to ensure that any project funded, authorized, or carried out by such agency does not jeopardize the continuing existence of a listed species, or result in the destruction or adverse modification of designated critical habitat for the species. The black-footed ferret is exempt from critical habitat designation as it was listed prior to the critical habitat amendments to ESA. Numerous formal and informal section 7 consultations have been carried out in all States within the historical range of the ferret. The large number of informal consultations eventually led to the concept of block clearing large expanses of prairie dog occupied habitat to avoid redundant ferret surveys for each proposed project. All reintroduction sites in the United States require formal section 7 consultation. A formal section 7 was also conducted in 1994 with the U.S. Bureau of Indian Affairs regarding large-scale prairie dog control on Rosebud Sioux and Cheyenne River Sioux Reservations. A formal section 7 with the U.S. Environmental Protection Agency (EPA) regarding potential impacts to ferrets and other threatened and endangered species from the use of the pesticide chlorophacinone (trade name: Rozol) to poison prairie dogs was completed in 2012.

Section 9 of the ESA provides for direct protection of a federally-listed species by prohibiting "take" (i.e., to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct) by any person.

Section 10 of the ESA provides certain exceptions for otherwise prohibited actions. Most reintroduced black-footed ferrets have been released into nonessential experimental population areas as set forth in section 10(j). Under section 10(j), a listed species reintroduced outside of its current range, but within its historical range, may be

37

BLM_0070336

designated as "experimental." This designation increases the Service's flexibility and discretion in managing reintroduced endangered species and allows promulgation of regulation deemed appropriate for conservation of the reintroduced species. Additional management flexibility is possible if the experimental population is also designated "nonessential". This tool has been successfully used to address concerns of other parties for reintroductions of California condors, gray wolves, whooping cranes, and many other species in addition to ferrets. Section 10(j) populations located in National Parks or National Wildlife Refuges are treated as threatened for the purposes of ESA section 7 consultations. Other section 10(j) populations are treated as a "proposed" species for the purposes of ESA section 7 consultations. Reintroduced ferrets in section 10(j) areas are protected by the specific regulations promulgated for the experimental population and section 9 of ESA.

Black-footed ferrets reintroduced into Canada and Mexico are regulated by their respective governments. Ferrets reintroduced at Espee Ranch, Logan County, Lower Brule Indian Reservation, Northern Cheyenne Indian Reservation, Vermejo, and Wind Cave National Park were authorized via scientific recovery permits issued by the Service under section 10(a)(1)(A) of ESA. Conditions stipulated under these permits and supporting ESA documents were developed to achieve State, tribal, and/or local support. Reintroduced ferrets in section 10(a)(1)(A) areas are protected by section 9 of ESA.

Timely establishment of wild ferret populations is critical in order to minimize deleterious effects resulting from too many generations of captive breeding. These effects include reduced reproductive fitness, physical abnormalities, behavioral abnormalities, and loss of natural selection. Many fewer black-footed ferret reintroductions would have been initiated during the past 20 years without the added flexibility of nonessential experimental designations. The Service is making progress toward achieving recovery goals. Progress toward downlisting and delisting will continue if active participation in reintroduction efforts by Federal, State, tribal, and local partners continues.

BLM_0070337

Without the protections and funding support provided by the ESA, progress toward black-footed ferret recovery would likely be much more limited than it is at present. However, once delisting criteria are achieved, we do not anticipate that the absence of ESA protections will reduce ferret survival or reproduction because the species will continue to be managed by other Federal, State, and tribal regulations.

**National Environmental Policy Act (NEPA):**  NEPA requires all Federal agencies to participate in evaluations of Federal projects and their potential significant impacts to the human environment.  Agencies must include a discussion of the environmental impacts of the various project alternatives, any adverse environmental effects which cannot be avoided, and any irreversible or irretrievable commitments of resources.  Activities on non-Federal lands are also subject to NEPA if there is a Federal nexus.  Cooperating agencies and the public can provide recommendations to the action agency for project modifications to avoid impacts or enhance conservation of the black-footed ferret or other wildlife species.  NEPA provides an opportunity to negotiate conservation measures. However NEPA is a disclosure law, and does not require subsequent minimization or mitigation measures by the lead Federal agency.  Evaluation of ferrets under NEPA would occur regardless of the species' listing status.

**U.S. Bureau of Land Management:**  The BLM's mission is set forth in the Federal Land Policy and Management Act of 1976, which mandates that BLM manage public land resources for a variety of uses, such as energy development, livestock grazing, recreation, and timber harvesting, while protecting the natural, cultural, and historical resources on those lands.  The BLM manages listed and sensitive species under guidance provided by their MS-6840 Manual - Special Status Species Management.  The 6840 Manual directs BLM to proactively conserve special status and ESA-listed species and the ecosystems upon which they depend, ensure that all actions authorized or carried out by BLM are in compliance with the ESA, and cooperate with the planning and recovery of listed species.  Four black-footed ferret reintroduction sites occur at least in part on BLM lands including: Shirley Basin in Wyoming, Coyote Basin in Utah, Wolf Creek in Colorado, and the BLM 40 Complex in Montana.  Management of these reintroduction sites would likely continue regardless of the species' listing status.

BLM_0070338

**U.S. Forest Service:**  Under the National Forest Management Act of 1976, as amended (16 U.S.C. §§ 1600-1614), the USFS shall strive to provide for a diversity of plant and animal communities when managing national forest lands.  Conata Basin occurs on USFS land (Buffalo Gap National Grasslands) in South Dakota.  Management of this reintroduction site would need to continue regardless of the species' listing status.

**U.S. National Park Service:**  The NPS Organic Act (39 Stat. 535, 16 U.S.C. 1, as amended) states that NPS "shall promote and regulate the use of the Federal areas known as national parks, monuments, and reservations…to conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  The black-footed ferret occurs in Badlands and Wind Cave National Parks in South Dakota, where they and their habitats are protected from large-scale loss or degradation due to NPS mandate.  Management of these reintroduction sites would need to continue regardless of the species' listing status.

**State Mechanisms:**  All States within the historical range of the black-footed ferret have produced State Comprehensive Wildlife Conservation Strategies.  These strategies describe priorities for management of wildlife species, but do not result in any protection for the species.  Three of the 12 States within the historical range of the species (Nebraska, New Mexico, and Oklahoma) do not identify the ferret as a management priority species.  However, one of these States (New Mexico) supported a reintroduction effort in 2008.  Management of these reintroduction sites would need to continue, regardless of the species' listing status.

**Tribal Mechanisms:**  Black-footed ferrets have been reintroduced on five reservations since 1997 (Cheyenne River, Lower Brule, and Rosebud Sioux Tribes in South Dakota; Gros Ventre and Assiniboine Tribes in Fort Belknap, Montana; and Northern Cheyenne Sioux Tribe in Montana).  In all instances all pertinent tribal fish and wildlife regulations have been followed by project managers.  Any subsequent reintroductions on tribal lands

40

BLM_0070339

will adhere to this policy, and project proponents will be advised that all applicable tribal regulations must be followed during reintroduction activities.

**Black-footed Ferret Recovery Implementation Team:** The BFFRIT is a coalition of approximately 30 Federal and State agencies, tribes, and conservation organizations that was established in 1996. It is not regulatory in nature, but provides the Service with recommendations related to conservation and recovery of the black-footed ferret, with individual members often participants in ferret reintroductions. The BFFRIT consists of a policy and resource support body (the Executive Committee (EC)) and six technical subcommittees (the Conservation Subcommittee (CS), the Outreach and Information Subcommittee (OIS), the Incentives Subcommittee (IS), the Prairie Dog Management Subcommittee (PDMS), the Sylvatic Plague Vaccine Subcommittee (SPVS), and the SSP® Subcommittee). Functions of the EC include addressing broad-based policy issues, resource support, political problem-solving, review of overall organizational structural efficiency, and recommendations for Service decision-making purposes. The CS provides a forum for discussion and recommendations regarding field conservation issues. The OIS supports public relation and education efforts for the Black-footed Ferret Recovery Program. The IS supports the development of incentives that encourage private landowner participation in ferret recovery. The PDMS focuses on potential boundary control issues at recovery sites. The SPVS is investigating the development and application of vaccines to combat plague. The SSP® Subcommittee provides a forum for cooperation in the management of captive breeding programs.

The organization and activities of these committees have changed over time, and their effectiveness has varied. However, it is important to have a strong and effective BFFRIT to maintain overall coordination between program partners. Although BFFRIT is not directly involved in regulatory actions, many team members work with their respective agencies and constituencies on issues pertinent to ferret management and recovery. Without the BFFRIT, progress toward ferret recovery would likely be more limited than it is at present. Once delisting criteria are achieved, the BFFRIT would continue to maintain remaining captive breeding facilities and plan and conduct post-delisting monitoring.

41

BLM_0070340

**Prairie Dog Management:**  Few protective regulations are in place for the prairie dog (which the black-footed ferret depends upon for food and shelter) in comparison to the ferret.  The most recent reviews by the Service for the black-tailed prairie dog (74 FR 63343; December 3, 2009), white-tailed prairie dog (69 FR 64889; November 9, 2004), and Gunnison's prairie dog (73 FR 6660; February 5, 2008) all concluded that inadequate regulatory mechanisms were not likely to cause any of these species to become threatened or endangered within the foreseeable future.  Prairie dogs appear able to persist in smaller, more fragmented populations than were common historically.  However, most prairie dog populations may no longer be large and stable enough (due to plague, poisoning, and the lack of proactive management) to support recovery of the ferret, and the lack of regulatory mechanisms to support large prairie dog populations is a threat.  More protective regulations for prairie dogs, particularly those related to poisoning (discussed below under Factor E) and maintenance of large prairie dog complexes, could improve opportunities for ferret recovery at sites with marginal potential at present.  Ferret recovery is biologically possible; however, the restoration of adequate prairie dog habitats will take more time, patience, and commitment by Federal, State, tribal, and private land managers than has occurred to date.

Proactive management of prairie dogs, with regard to maintenance of sufficient quantity and quality of prairie dog habitat to support black-footed ferret recovery, is critical.  Support is needed from Federal and State agencies and tribal governments for prairie dog conservation and management.  For example, new recovery projects could be undertaken on National Grasslands in Colorado, Kansas, Nebraska, New Mexico, Oklahoma, Texas, and Wyoming.  Tribal lands represent some of the best remaining potential habitat for ferrets due to the complexities involved with recovering ferrets on other land ownerships.  In addition, many tribal lands offer larger, less-developed habitat for ferrets and are subjected to less frequent or intense prairie dog control efforts than lands managed by other entities.  Development of additional cooperative tribal, State, and Federal partnerships for ferret recovery is needed.  The development of partnerships, reintroduction projects, and prairie dog conservation on private lands is also essential for future ferret recovery.  Prairie dog control programs may be necessary at the boundary of

42

BLM_0070341

ferret recovery areas in order to maintain local support. A prototype of such an effort has been initiated in Logan County, Kansas; similar efforts may be essential at other sites as well. Prairie dog management requires careful monitoring to maintain a balance between recovery needs and landowner needs.

Black-tailed, white-tailed, and Gunnison's prairie dogs are not threatened by inadequate regulatory mechanisms because they can continue to persist in smaller, more fragmented populations if they do not succumb to plague. However, we consider the lack of regulatory mechanisms that conserve stable, relatively large prairie dog populations a high magnitude, imminent threat to black-footed ferret recovery at the present time. It may be the single, most limiting factor regarding successful recovery of the ferret. Without large, stable prairie dog complexes, ferret recovery in the wild cannot be achieved. The lack of regulatory mechanisms for prairie dogs would persist regardless of the listing status for the ferret. However, we believe that this threat can be ameliorated through the development and implementation of adequate conservation measures by affected tribal, State, and Federal agencies. For example, a conservation plan for the black-tailed prairie dog has been developed and is supported by most States within the range of the prairie dog. It established objectives with regard to the size and number of prairie dog complexes that should be maintained by each State. However, at this point, only three States (Colorado, South Dakota, and Wyoming) have met those objectives. These objectives need to be supported and achieved by most States.

The successful establishment of black-footed ferret recovery sites that result in the eventual downlisting and delisting of the species will require coordinated management of prairie dogs including: (1) the successful control of flea vectors that transmit plague, including development of appropriate vaccines; (2) increased partner participation through regulatory assurances; (3) boundary control of prairie dogs as needed, and (4) grazing management assistance when necessary. In the absence of ESA protections, appropriate management of prairie dogs will need to remain in effect.

**Memorandum of Understanding:** A Memorandum of Understanding was recently signed by the Service, the Natural Resources Conservation Service (NRCS), USGS,

BLM_0070342

Animal and Plant Health Inspection Service (APHIS) Wildlife Services, and the Western Association of Fish and Wildlife Agencies (WAFWA). Its purpose is to facilitate cooperative conservation efforts among the parties in concert with willing landowners so as to maintain ranch land in prairie habitats, and to maintain the livestock operations that they support, while providing for the conservation and recovery of several wildlife species associated with prairie dogs, especially the ferret. While participation in this MOU is voluntary, it indicates the intention of several federal and state agencies to continue to contribute to ferret recovery.

**Other natural or manmade factors**

Other natural or manmade factors affecting recovery of the black-footed ferret include: poisoning of its principal prey (prairie dogs), climate change, and genetic fitness of the ferret.

**Poisoning:** Poisoning of prairie dogs is regarded as a major factor in the historical decline of prairie dogs and black-footed ferrets (Forrest et al. 1985, Cully 1993, Forrest and Luchsinger 2005). Similar to many of the other factors limiting ferret recovery, poisoning can affect the ferret directly, through inadvertent secondary poisoning of the ferret caused by consumption of poisoned prairie dogs, or indirectly, through the loss of the prairie dog prey base. The historical estimate of prairie dog occupied habitat was approximately 100 million ac (40 million ha). Concerns regarding competition for available forage between livestock and prairie dogs led to the development of extensive government sponsored prairie dog poisoning programs early in the 20th century. Organized prairie dog control gained momentum from 1916–1920, when prairie dogs were poisoned on tens of millions of acres of western rangeland (Bell 1921). By the 1960s, prairie dog occupied habitat reached a low of approximately 1.4 million ac (570,000 ha) in the United States (Bureau of Sport Fisheries and Wildlife 1961, Berryman and Johnson 1973). However, our most recent estimate of prairie dog occupied habitat is approximately 3.7 million ac (1.5 million ha) (74 FR 63343, December 3, 2009; 69 FR 64889, November 9, 2004; 73 FR 6660, February 5, 2008), an increase of 250 percent from its low point.

44

BLM_0070343

From the late 1800s to the early 1940s, strychnine was the primary substance used to poison prairie dogs (Bell 1921). Between World War II and 1972, Compound 1080 was the preferred poison for prairie dog control. In 1972, Executive Order 11643 prohibited the use of certain toxicants that might cause secondary poisoning on Federal lands or in federally funded programs. This order was revoked by Executive Order 12342 in 1982. However, poisoning prairie dogs with strychnine and Compound 1080 did not resume. Zinc phosphide became the preferred poison for prairie dog control by 1976, and its use continues to the present (Hanson 1993, Forrest and Luchsinger 2005). In recent years, manufacturers have promoted the use of the anticoagulant rodenticides chlorophacinone (Rozol) and diphacinone (Kaput) for control of prairie dogs (Bruening 2007, Lee and Hygnstrom 2007). These chemicals pose a much greater risk than zinc phosphide of secondary poisoning to non-target wildlife that prey upon prairie dogs, such as the black-footed ferret (Erickson and Urban 2004).

Poisoning on or adjacent to black-footed ferret recovery sites is of particular concern. The legal use of Rozol has occurred at one reintroduction site (Logan County, Kansas), and its illegal use occurred at another reintroduction site (Rosebud Indian Reservation, South Dakota). It is not known if any ferret mortalities occurred as a direct result of these two incidences. The ability to verify impacts to non-target species such as the ferret is quite limited due to the fossorial nature of ferrets, vegetative cover, possible consumption of poisoned ferrets by other predators, and delayed action of the rodenticide. Only a very small percentage of animals that die from secondary poisoning are ever located. However, the loss of prairie dog occupied habitat that resulted from these poisoning incidences reduced the quality and quantity of habitat available to support ferrets. In May, 2009, the EPA authorized the use of Rozol throughout the range of the black-tailed prairie dog via a Federal Insecticide, Fungicide, and Rodenticide Act Section 3 registration. We have recommended that the EPA withdraw its registration for Rozol and not issue a registration for Kaput (Gober 2006, Slack 2006, Arroyo 2009). The Western Association of Fish and Wildlife Agencies similarly requested that EPA reconsider use of anticoagulants for prairie dog control (Koch 2008). We have also funded two research projects to further investigate the secondary impacts from the use of anticoagulants for

BLM_0070344

control of prairie dog—one project is a laboratory study by the National Wildlife Research Center studying the retention time of Rozol in prairie dogs exposed to the poison; the other project is a study by the U.S. Geological Survey characterizing non-target hazards following poisoning of prairie dogs in the field. However, Rozol use to control prairie dogs is now legal in most of the western United States.

With the decline in prairie dogs, there was a concurrent decline in black-footed ferrets. Poisoning, if thorough enough, may result in permanent loss of prairie dogs, such as occurred in the extirpation of black-tailed prairie dogs in Arizona, though they were later reintroduced (Hoffmeister 1986, Arizona Game and Fish Department 1988). This loss can preclude ferret recovery opportunities. More typically, prairie dog numbers are reduced temporarily, but long enough for ferrets to disappear.

Prairie dog poisoning occurs on private, State, tribal, and Federal lands rangewide, but with more limited and localized efforts than occurred in past decades. The total acreage of prairie dog occupied habitat being poisoned annually has decreased dramatically since the 1960s. However, the amount of prairie dog occupied habitat available for poisoning has also been reduced, from approximately 100 million ac (40 million ha) historically to 3.7 million ac (1.5 million ha) at present. Consequently, the percentage of prairie dog occupied habitat being poisoned on an annual basis remains relatively high. For example, the South Dakota Bait Station, which is only one of several sources for zinc phosphide, has sold enough of this poison since 2004 (over 1 million pounds (400,000 kilograms)) to potentially poison all prairie dog occupied habitat in the United States (Kempema 2007, Larson 2008b). This scenario does not address the possibility of individuals stockpiling poison, re-applying poison at the same site, or applying poison at greater than the recommended rates. Poisoning of prairie dogs remains a concern with regard to impacts to black-footed ferrets.

Prairie dog control to address boundary encroachment issues from expanding prairie dog acreage at the Conata Basin black-footed ferret reintroduction site in South Dakota began in 2004 and peaked in 2006, with a 94 percent reduction in toxicant use by 2009 (Griebel 2010). The USFS, in response to local concerns about the impacts of drought and prairie

BLM_0070345

dogs, suggested a need to poison prairie dogs in interior portions of the ferret reintroduction area at Conata Basin in order to reduce alleged prairie dog damage to native grasslands and balance multiple use needs (U.S. Forest Service 2008). Proposed poisoning in the interior of the site could significantly reduce the viability of this ferret recovery site, reduce the number of wild-born kits available for translocation to other recovery sites, and slow progress towards the achievement of downlisting and delisting goals. The decision whether to allow expanded toxicant use on prairie dog colonies in the interior portion of Conata Basin has been deferred due to a recent plague epizootic.

We consider the poisoning of prairie dogs with zinc phosphide at black-footed ferret recovery sites a medium magnitude, imminent threat to ferret recovery at the present time due to the loss of habitat. We consider the poisoning of prairie dogs at ferret recovery sites with anticoagulants a high magnitude, imminent threat to ferret recovery at the present time due to the loss of habitat and the potential for secondary poisoning of the ferret. We consider large-scale poisoning of prairie dogs that curtails potential ferret habitat for future recovery sites a low magnitude, imminent threat to ferret recovery. The threat due to poisoning could be ameliorated by adequate regulatory mechanisms that provide management objectives for a sufficient amount of prairie dog habitat to achieve ferret recovery and limit the type of poison used at ferret recovery sites so as to preclude secondary impacts. In the absence of ESA protections, management of prairie dog poisoning would need to continue.

**Climate change:** Climate change could potentially impact the black-footed ferret. According to the Intergovernmental Panel on Climate Change (IPCC 2007), "Warming of the climate system is unequivocal, as is now evident from observations of increases in global average air and ocean temperatures, widespread melting of snow and ice, and rising global average sea level." Average Northern Hemisphere temperatures during the second half of the 20th century were very likely higher than during any other 50-year period in the last 500 years and likely the highest in at least the past 1,300 years (IPCC 2007). It is very likely that over the past 50 years cold days, cold nights, and frosts have become less frequent over most land areas, and hot days and hot nights have become more frequent (IPCC 2007). It is likely that heat waves have become more frequent over

47

BLM_0070346

most land areas, and the frequency of heavy precipitation events has increased over most areas (IPCC 2007).

Changes in the global climate system during the 21st century are very likely to be larger than those observed during the 20th century (IPCC 2007). For the next two decades, a warming of about 0.2 degrees Celsius (°C) (0.4 degrees Fahrenheit (°F)) per decade is projected (IPCC 2007). Afterward, temperature projections increasingly depend on specific emission scenarios (IPCC 2007). Various emissions scenarios suggest that by the end of the 21st century, average global temperatures are expected to increase 0.6–4.0 °C (1.1–7.2 °F), with the greatest warming expected over land (IPCC 2007).

The IPCC (2007) report outlines several scenarios that are virtually certain or very likely to occur in the 21st century including: (1) over most land, there will be warmer and fewer cold days and nights, and warmer and more frequent hot days and nights, (2) areas affected by drought will increase, and (3) the frequency of warm spells/heat waves over most land areas will likely increase. The IPPC concludes that the resiliency of many ecosystems is likely to be exceeded this century by an unprecedented combination of climate change, associated disturbances (e.g., flooding, drought, wildfire, and insects), and other global drivers. With medium confidence, IPPC predicts that approximately 20–30 percent of plant and animal species assessed so far are likely to be at an increased risk of extinction if increases in global average temperature exceed 1.5–2.5 °C (3–5 °F).

The black-footed ferret, along with its habitat, likely will be affected in some manner by climate change. A shift in the species' geographic range may occur due to an increase in temperature and drought. Though drought could reduce vegetation and therefore prairie dog abundance in some locations, the net effect these changes will have on the distribution and abundance of ferret habitat is unclear. However, climate change would likely not pose as great a risk to ferrets and their habitat as it would to species in more restricted polar, coastal, or montane ecosystems.

A strong relationship between plague outbreaks and climatic variables has been established (Parmenter et al. 1999, Enscore et al. 2002, Stapp et al. 2004, Ray and

48

Collinge 2005, Stenseth et al. 2006, Snall et al. 2008). The key climatic variables appear to be maximum daily summer temperature (plague is enhanced by cooler summer temperatures) and late winter precipitation (plague is enhanced by increased precipitation).

Modeling efforts indicate that shifts in plague distribution may be a result of shifts of pathogen, vector, or host distribution following climate change (Nakazawa et al. 2007). The authors also suggest that the distribution of plague may expand north and east. The recent expansion of plague into South Dakota supports this theory. However, variables associated with climate change and increased plague activity conflict. Plague is enhanced by cooler summer temperatures and by increased precipitation. With climate change, summer temperatures are anticipated to be warmer rangewide and precipitation is anticipated to decrease throughout much of the ferret's historical range. Consequently, the extent to which plague may shift due to climate change versus expand or contract is supposition. The species is adaptable to a wide array of climes, as evidenced by a geographic range that includes 12 States, Canada, and Mexico. Unlike vulnerable species in polar, coastal, and montane ecosystems, we believe that the ferret could accommodate to a possible shift in climate change or to a possible shift in plague distribution.

We do not consider climate change a threat to black-footed ferret recovery at the present time. Although the ferret will likely be affected by climate change, and drought could reduce vegetation, prairie dogs, and consequently ferrets, it is not apparent that a net loss in occupied habitat or a significant impact to the status of the species will result. There is no indication that climate change has reduced ferret survival or reproduction.

**Genetic fitness:** Genetic fitness of the black-footed ferret has been a concern in the captive breeding program due to the extreme bottleneck that the species experienced (Groves and Clark 1986, U.S. Fish and Wildlife Service 1988, CBSG 1992, Hutchins et al. 1996, CBSG 2004, Garelle et al. 2006, Howard et al. 2006, Wisely 2006). The current captive breeding program began with the lineage of seven founder animals from the last wild population at Meeteetse, Wyoming (Hutchins et al. 1996, Wisely 2006). The magnitude of loss of genetic diversity was exacerbated by the especially isolated nature

49

BLM_0070348

of this last population.  Meeteetse is located on the periphery of the historical ferret range and was likely a refugium during the last glacial period that subsequently remained isolated (Wisely 2006).

Two types of genetic effects can impact a population's survival: (1) inbreeding depression, caused by increased genetic homozygosity (uniformity) and the subsequent expression of deleterious genes; and (2) genetic drift, the random loss of genetic diversity in small populations (Clark 1989).  In some species, genetic diversity of less than 90 percent of that in founder populations has been associated with compromised reproduction due to lower birth weights, smaller litter size, and greater neonatal mortality.  Genetic diversity in the current black-footed ferret population is estimated to be 87 percent of that in the founder population (Garelle et al. 2006).  Some periodic abnormalities observed in captive ferrets (reduced sperm viability, renal aplasia, and kinked tails) may be a result of inbreeding (Hutchins et al. 1996, Howard et al. 2006).  A primary goal of the SSP® is to optimize genetic management of the captive population by maintaining 80 percent of the genetic diversity present in the founder population for the next 25 years (Marinari and Kreeger 2006).

The genetic uniformity of the black-footed ferret is unprecedented and rivaled by perhaps only one other carnivore, the African cheetah (*Acinonyx jubatus*) (Wisely 2006).  However, carnivores typically have less genetic variability than other mammalian taxa (Kilpatrick et al. 1986).  Felines are more susceptible to inbreeding than most taxa (Wisely 2006), and yet the cheetah continues to survive in the wild.  The use of artificial insemination in ferret captive breeding programs has been effective and has helped preserve genetic diversity from an underrepresented male lineage (Howard et al. 2006).  Approximately 7,500 ferret kits have been produced at captive breeding facilities (Marinari 2011).  Ferret populations appear to flourish despite reduced genetic diversity where ample plague-free habitat exists (Wisely 2006).  The species will likely persist with continued careful management of remaining genetic resources (Wisely 2006).

Successful reproduction has been documented in black-footed ferrets at almost all reintroduction sites.  In 1999, a study detected no difference in genetic diversity between

BLM_0070349

captive-reared releases and their wild descendants at UL Bend, Montana and Conata Basin, South Dakota reintroduction sites (Wisely 2006). Nevertheless, the translocation of wild-born ferrets that have been exposed to natural selection processes that do not occur in a captive breeding program may aid with overall recovery and is being utilized in the establishment of new reintroduction sites. Ferret recovery has consistently emphasized releasing captive-bred animals to the wild as quickly as possible, as well as encouraging the translocation of wild-born ferrets to initiate new recovery sites.

Smaller populations are more susceptible to extinction from various causes (Shaffer 1981). In order to address the risks from loss of genetic diversity, and other possible threats such as disease, poisoning, and natural catastrophes, the downlisting and delisting criteria require a minimum number of black-footed ferrets at reintroduction sites, as well as multiple sites distributed throughout the historical range of the species. Captive ferret populations are also widely distributed at multiple facilities in order to protect against unforeseen events. These criteria are discussed in more detail in the following section on "Recovery."

We do not consider genetic fitness a threat to black-footed ferret recovery at the present time, inasmuch as successful reproduction has occurred in the wild at all reintroduction sites. Although the ferret experienced a severe bottleneck in the 1980s, the species will likely persist with continued management of remaining genetic resources. In the absence of ESA protections, efforts to maximize genetic diversity would continue through captive breeding policies developed by the SSP® Subcommittee.

The following table summarizes factors affecting the black-footed ferret and the magnitude and immediacy of any threats.

51

BLM_0070350

Table 4.  Black-footed ferret threat matrix

| Listing Factor | Stressor | Magnitude | Immediacy |
|---|---|---|---|
| Present or threatened destruction, modification or curtailment of habitat or range | Present or threatened destruction of habitat or range via conversion of rangeland to cropland or urbanization | Not a threat | Not a threat |
| Overutilization for commercial, recreational, scientific, or educational purposes | Commercial use of ferrets | Not a threat | Not a threat |
|  | Scientific, educational, and recreational shooting of prairie dogs | Not a threat with continued management | Not a threat with continued management |
| Disease or predation | Canine distemper | Not a threat with continued management | Not a threat with continued management |
|  | Sylvatic plague (both direct impact to ferrets and indirect impact of modification of habitat through loss of prairie dogs) | Medium, additional management needed | Imminent |
|  | Predation | Not a threat | Not a threat |
| Inadequacy of existing regulatory mechanisms | Prairie dog management sufficient for ferrets | High, additional management needed | Imminent |
|  | Other regulatory mechanisms | Not a threat with continued management | Not a threat with continued management |
| Other natural or manmade factors | Poisoning of prairie dogs at ferret sites (with zinc phosphide) | Medium, additional management needed | Imminent |
|  | Poisoning of prairie dogs at ferret sites (with anticoagulants) | High, additional management needed | Imminent |
|  | Present or threatened curtailment of potential | Low, additional management | Imminent |

BLM_0070351

| | | | |
|---|---|---|---|
| | habitat or range due to conflicts with large-scale poisoning | needed | |
| | Climate Change | Not a threat | Not a threat |
| | Genetic fitness | Not a threat, with continued management | Not a threat, with continued management |

# PART II.  RECOVERY

This section presents a strategy to recover the black-footed ferret, including actions and specific tasks that must be undertaken.

## RECOVERY GOAL

The goal of the actions proposed in this recovery plan is to recover the black-footed ferret to the point where the species can be reclassified to a threatened status (downlisted) and ultimately removed from the lists of Threatened and Endangered Species (delisted). Downlisting could be achieved by 2020 if aggressive reintroduction efforts continue and conservation measures produce positive responses at most reintroduction sites.  We believe that delisting could be realized by 2040 if the tasks specified in the following section are accomplished.  Moreover, we believe that delisting could occur by 2022, if current and additional recovery actions were accelerated to facilitate six new reintroduction sites per year annually for the next 10 years.

## RECOVERY CRITERIA

The ESA establishes policies and procedures for identifying, listing, and protecting species of wildlife and plants that are endangered or threatened with extinction.  The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range."  A "threatened species" is defined as

53

BLM_0070352

"any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."

The goal of this plan is to recover the black-footed ferret such that it no longer meets the ESA definition of threatened and can be removed from the Federal List of Endangered and Threatened Wildlife (i.e., delisted). Changes in status require consideration of the same five categories of threats specified in section 4(a)(1) of the ESA. These factors are:

Factor A – the present or threatened destruction, modification, or curtailment of its habitat or range;

Factor B – overutilization for commercial, recreational, scientific, or educational purposes;

Factor C – disease or predation;

Factor D – the inadequacy of existing regulatory mechanisms; and

Factor E – other natural or manmade factors affecting its continued existence.

As required by section 4(f) of the ESA, this recovery plan includes objective, measurable criteria that, when met, will allow the species or populations to be removed from the Federal List of Threatened and Endangered Species. Section 4(f) of the ESA also requires that recovery plans include site-specific management actions thought necessary to achieve these criteria as well as provide time and cost estimates.

It is important to note that recovery plans are not regulatory documents and are instead intended to provide guidance to the Service, States, tribes and other partners on methods of minimizing threats to listed species and on criteria that may be used to determine when recovery is achieved. There are many paths to accomplishing recovery of a species and recovery may be achieved without all criteria being fully met. For example, one or more criteria may be exceeded while other criteria may not be accomplished. In that instance, the Service may judge that the threats have been minimized sufficiently, and the species is robust enough to reclassify from endangered to threatened or to delist. In other cases, recovery opportunities may be recognized that were not known at the time the recovery plan was finalized. These opportunities may be used instead of methods identified in the

BLM_0070353

recovery plan. Likewise, information on the species may be learned that was not known at the time the recovery plan was finalized. The new information may change the extent that criteria need to be met for recognizing recovery of the species. Recovery of a species is a dynamic process requiring adaptive management that may, or may not, fully follow the guidance provided in a recovery plan.

**Downlisting Criteria:** To reclassify the black-footed ferret from endangered to threatened status, the following criteria, originally established in the 1988 Recovery Plan, and expanded (as noted in italics) must be met:

- Conserve and manage a captive breeding population of black-footed ferrets with a minimum of *280 adults (105 males, 175 females) distributed among at least three facilities.*
- Establish free-ranging black-footed ferrets totaling at least 1,500 breeding adults, in 10 or more populations, *in at least 6 of 12 States within the historical range of the species*, with no fewer than 30 breeding adults in any population.
- *Maintain these population objectives for at least three years prior to downlisting.*
- *Maintain approximately 247,000 ac (100,000 ha) of prairie dog occupied habitat at reintroduction sites by planning and implementing actions to manage plague and conserve prairie dog populations.*

**Delisting Criteria:** Delisting may occur when the following recovery criteria are met:

- Conserve and manage a captive breeding population of black-footed ferrets with a minimum of 280 adults (105 males, 175 females) distributed among at least three facilities.
- Establish free-ranging black-footed ferrets totaling at least 3,000 breeding adults, in 30 or more populations, with at least one population in each of at least 9 of 12 States within the historical range of the species, with no fewer than 30 breeding adults in any population, and at least 10 populations with 100 or more breeding adults.
- Maintain these population objectives for at least three years prior to delisting.

55

BLM_0070354

- Maintain approximately 494,000 ac (200,000 ha) of prairie dog occupied habitat at reintroduction sites by planning and implementing actions to manage plague and conserve prairie dogs.
- Complete and implement a post-delisting monitoring plan, in cooperation with the States and tribes, to ensure recovery goals are maintained.

**After Delisting:**

- Conserve and manage a reduced captive breeding population of black-footed ferrets in order to maintain knowledge, incorporate developing technologies, and address potential population extinctions.

The following table describes which threats are addressed by each of the downlisting and delisting criteria and briefly summarizes how those threats will be ameliorated.

56

Table 5.  Downlisting and delisting criteria and threats addressed

| Criteria | Downlisting or Delisting | Threat Addressed | Explanation |
|---|---|---|---|
| Conserve and manage a captive breeding population among at least 3 facilities | Both | Factor C (Plague) | Multiple facilities minimize risk of plague outbreak affecting captive ferrets, provide ferrets for disease research, and provide ferrets for augmentation at plague impacted sites. |
| | | Factor D (Prairie dog management) | Captive population provides ferrets for release as prairie dog management improves existing reintroduction sites and creates new sites. |
| | | Factor E (Poisoning of prairie dogs) | Captive population provides ferrets for release as poisoning becomes better regulated. |
| | | Factor B (Use for scientific or educational purposes) | Captive population provides excess ferrets under SSP® protocol. |
| | | Factor C (Distemper) | SSP® protocol includes vaccination of captive ferrets. |
| | | Factor E (Genetic fitness) | SSP® protocol addresses maximizing genetic diversity in captive populations. |
| Establish free-ranging ferrets of ≥1,500 adults, in ≥10 populations, in ≥6 States, with ≥30 breeding adults in any population | Downlisting | Factor C (Plague) | This number and distribution of ferrets would minimize likelihood of an epizootic affecting multiple populations simultaneously. |
| | | Factor D (Prairie dog management) | This number and distribution of ferrets would maximize flexibility of various management options. |
| | | Factor E (Poisoning prairie dogs) | This number and distribution of ferrets would minimize risk of affecting multiple populations simultaneously. |

BLM_0070356

|  |  | Factor B (Recreational shooting of prairie dogs) | This number and distribution of ferrets would minimize risk of affecting multiple populations regulated by different States, tribes, and Federal agencies. |
|  |  | Factor D (Other regulatory mechanisms) | This number and distribution of ferrets would increase flexibility of States, tribes, and Federal agencies using their authorities to manage ferrets on their lands. |
|  |  | Factor E (Genetic fitness) | Multiple sites of adequate size distributed across the range will help maintain genetic diversity. |
| Maintain these population objectives for ≥ 3 years | Both | Factor C (Plague) | This will provide evidence of population stability in the presence of plague. |
|  |  | Factor D (Prairie dog management) | This will provide evidence of population stability under current management. |
|  |  | Factor E (Poisoning prairie dogs) | This will provide evidence of population stability in the presence of any poisoning. |
|  |  | Factor B (Recreational shooting of prairie dogs) | This will provide evidence of continued active management by States, tribes, and Federal agencies. |
|  |  | Factor D (Other regulatory mechanisms) | This will provide evidence of continued active management by States, tribes, and Federal agencies. |
| Maintain approximately 247,000 ac (100,000 ha) of prairie dog occupied habitat | Downlisting | Factor C (Plague) | Multiple sites of adequate size distributed across the range will minimize likelihood of an epizootic affecting multiple populations simultaneously and add management flexibility. |

58

| | | | |
|---|---|---|---|
| at reintroduction sites by planning and implementing actions to manage plague and conserve prairie dog populations. | | Factor D (Prairie dog management) | Multiple sites of adequate size distributed across the range will provide adequate habitat for current and future reintroduction sites. |
| | | Factor E (Poisoning prairie dogs) | Multiple sites of adequate size distributed across the range will add management flexibility by providing adequate habitat for current and future reintroduction sites. |
| | | Factor E (Genetic fitness) | Multiple sites of adequate size distributed across the range will help maintain genetic diversity. |
| Establish free-ranging ferrets of ≥3,000 adults, in ≥30 populations, in ≥9 States, with ≥30 breeding adults in any population, and ≥10 populations with ≥100 breeding adults | Delisting | Factor C (Plague) | This number and distribution of ferrets would minimize likelihood of an epizootic affecting multiple populations simultaneously. |
| | | Factor D (Prairie dog management) | This number and distribution of ferrets would maximize flexibility of various management options. |
| | | Factor E (Poisoning prairie dogs) | This number and distribution of ferrets would minimize risk of affecting multiple populations simultaneously. |
| | | Factor B (Recreational shooting of prairie dogs) | This number and distribution of ferrets would minimize risk of affecting multiple populations regulated by different States, tribes, and Federal agencies. |
| | | Factor D (Other regulatory mechanisms) | This number and distribution of ferrets would increase flexibility of States, tribes, and Federal agencies using their authorities to manage ferrets on their lands. |
| | | Factor E (Genetic fitness) | Multiple sites of adequate size distributed across the range will help maintain genetic diversity. |

BLM_0070358

| | | | |
|---|---|---|---|
| Maintain approximately 494,000 ac (200,000 ha) of prairie dog occupied habitat at reintroduction sites by planning and implementing actions to manage plague and conserve prairie dogs. | Delisting | Factor C (Plague) | Multiple sites of adequate size distributed across the range will minimize likelihood of an epizootic affecting multiple populations simultaneously and add management flexibility. |
| | | Factor D (Prairie dog management) | Multiple sites of adequate size distributed across the range will provide adequate habitat for current and future reintroduction sites. |
| | | Factor E (Poisoning prairie dogs) | Multiple sites of adequate size distributed across the range will add management flexibility by providing adequate habitat for current and future reintroduction sites. |
| | | Factor E (Genetic fitness) | Multiple sites of adequate size distributed across the range will help maintain genetic diversity. |
| Complete and implement a post-delisting monitoring plan, in cooperation with the States and tribes, to ensure recovery goals are maintained | Delisting | All threats | A robust monitoring plan (including a regulatory framework) developed by the Service and State, tribal, and Federal partners will ensure recovery is maintained after the species is delisted. |
| Conserve and manage a reduced captive breeding population of black-footed ferrets in order to maintain knowledge, incorporate | Post-delisting | Factor C (Plague) | A post-delisting captive population will allow: (1) opportunity for continued research into better disease management and (2) ability to more quickly augment wild populations if needed following an epizootic or other unforeseen stochastic event. |

60

BLM_0070359

| developing technologies, and address potential population extinctions | | Factor E (Genetic fitness) | Captive population will allow opportunity for continued research into maintaining genetic diversity. |
|---|---|---|---|

**Justification for the Downlisting and Delisting Goals**

**Captive Breeding Population:** Captive black-footed ferret breeding populations are currently housed at the U.S. Fish and Wildlife Service National Black-footed Ferret Conservation Center near Wellington, Colorado; the Cheyenne Mountain Zoological Park in Colorado Springs, Colorado; the Louisville Zoological Garden in Louisville, Kentucky; the Smithsonian Biology Conservation Institute in Front Royal, Virginia; the Phoenix Zoo in Phoenix, Arizona; and the Toronto Zoo in Toronto, Ontario (Marinari and Kreeger 2006). The Henry Doorly Zoo in Omaha, Nebraska previously participated in captive breeding efforts. In addition to the principal captive populations, intermittent field breeding facilities have been managed by the Arizona Fish and Game Department in Seligman, Arizona, by the Turner Endangered Species Fund in Cimarron, New Mexico (Garelle et al. 2006), and by the Bowdoin National Wildlife Refuge in Malta, Montana. More than 50 percent of all captive ferrets are housed at the National Black-footed Ferret Conservation Center (Marinari and Kreeger 2006).

The 1988 Black-footed Ferret Recovery Plan set a goal of 200 breeding adults in captive populations by 1991 to ensure adequate genetic fitness of captive ferret populations and provide surplus animals for release. In 1996, the Small Carnivore Taxon Advisory Group (SCTAG) of the AZA recommended modification of this goal to at least 240 ± 35 breeding adults of optimum sex ratio (90 male:150 female), with surplus animals provided for reintroduction purposes (Hutchins et al. 1996). In 2004, the SSP® recommended that consideration be given to further increasing the size of the captive population in order to promote retention of gene diversity and increase production potential (CBSG 2004). Thereafter, SCTAG recommended a total target captive population of 350 individuals (Garelle et al. 2006). However, the target population of

61

BLM_0070360

350 includes non-reproductive display animals and the possibility of future increases in the number of breeding facilities.

The captive population has expanded to approximately 280 animals at present. We consider this number of animals necessary to ensure maintenance of the 240 animals previously specified. We believe that the emphasis of our recovery strategy should be on expanding black-footed ferret recovery in the wild. Therefore, further expansion of the captive population is not appropriate because it would result in fewer animals being released into the wild. The potential limited advantages of expanding the captive program are also offset by the added financial costs to the program. As previously explained, the more time that ferrets spend in captivity, the more that wild behaviors are lost, and the more difficult reintroduction becomes. Additionally, as wild populations continue to expand, the translocation of wild-born kits to developing reintroduction areas will become increasingly important. Survivorship of wild-born kits is much greater than that of reintroduced animals of captive origin. Therefore, the importance of maintaining a large captive population will diminish somewhat as the availability of wild kits increases. Consequently, we adopt a goal of a minimum of 280 captive breeding adults for the purpose of this recovery plan.

The black-footed ferret was considered possibly extinct twice in recent years. Therefore, we do not intend to immediately disband the captive breeding program following delisting. There will not be a need for as many captive ferrets after the species is delisted. However, a reduced number of animals should be maintained at some facilities to enhance opportunities for continued research, particularly related to plague and genetic fitness. Additionally, captive animals could be used to augment wild populations in the event of a plague epizootic or other unforeseen stochastic event.

**Free-ranging Population:** The goal of the 1988 Recovery Plan was to establish 1,500 breeding adult black-footed ferrets in the wild in 10 or more populations, with a minimum of 30 adults in each population. An additional qualitative goal was to space these populations as widely as possible across the historical range of the species. This distribution would provide for multiple recovery opportunities (and partners) and serve as

BLM_0070361

a risk management strategy to guard against adverse impacts and potential periodic population losses.

The goal of 1,500 breeding adult ferrets was derived based upon a general agreement among geneticists that populations require an effective size of approximately 500 breeding adults to retain genetic heterozygosity sufficient for evolution in an idealized or carefully controlled population (U.S. Fish and Wildlife Service 1988). The 1988 Recovery Plan further noted that in wild populations, which experience less control, the actual number of breeding adults ranges from 20-50 percent of all potential breeders. Consequently, we assume that approximately one-third of all potential breeders will actually breed in a given year due to adverse individual and population impacts. Therefore, a goal of 1,500 breeding adults was derived. This will ensure that at least 500 adult ferrets will actually breed in a given year. Due to habitat fragmentation, inter-population transfers of individuals will likely be necessary in perpetuity.

These downlisting goals are readopted for this revision of the species' recovery plan but are further refined. Specifically, jurisdictional entities by State are encouraged to provide contributions to recovery goals in proportion to the amount of historical ferret habitat (i.e., prairie dog colonies) that once occurred on these lands (see subsequent discussion of "Recovery Guidelines by State").

Reintroductions in Mexico and Canada are also important in reestablishing black-footed ferret populations across the species' historical range proportional to the distribution and abundance of historical prairie dog habitat. However, recovery opportunities outside of the United States are restricted due to limited potential habitat that is at the extreme periphery of the ferret's historical range. Based upon the most recent estimates of prairie dog habitat (74 FR 63343, December 3, 2009; 69 FR 64889, November 9, 2004; and 73 FR 6660, February 5, 2008), approximately 41,000 ac (16,600 ha), or one percent of the total prairie dog occupied habitat rangewide, occurs in Canada and Mexico. Additionally these lands are not managed under U.S. regulatory mechanisms; consequently, it is more difficult to engage agencies with regard to regulatory mechanisms. Therefore, we do not consider them in the numeric downlisting and delisting criteria for wild populations.

63

However, we do consider them with regard to maximizing recovery throughout the historical range of the ferret.

We believe that the 1,500 breeding adult black-footed ferrets downlisting criteria and 3,000 breeding adults delisting criteria are achievable with proactive management actions, including completion of the tasks proposed in the section, "Recovery Actions." These goals appear to be consistent with methodologies explored by both Gedir et al. (2004) and Ray (2006). These methodologies used guidelines established by the International Union for the Conservation of Nature to identify recovery needs for various species. For both of these methodologies, the degree of management effort needed was inversely proportional to the population size required to ensure conservation. In other words, lower, less stringent recovery goals are possible if more conservation assurances are provided. We believe the recovery criteria for the ferret strike a balance between the difficulties of establishing more large populations in the wild and the greater management needs associated with maintaining fewer and/or smaller wild populations.

The scientific community has debated whether a single large or several small reserves are more appropriate for conserving biodiversity in a fragmented habitat. Initially, a single large reserve was considered preferable; however, more recently, ecologists have concluded that either management approach can be appropriate (Soule and Simberloff 1986). The authors note that several small reserves can contain as many individuals as a single large one. Reserves should be large enough to sustain a population, and there should be many of them in order to minimize the probability of extinction due to any of threats facing the species (Soule and Simberloff 1986). Recovery criteria for the black-footed ferret address these concerns by requiring a minimum number of 30 breeding adults at each of many widely distributed sites. These scattered reintroduction sites will be managed as a metapopulation through immigration and emigration at a few adjacent sites as well as through translocation of wild-born ferrets at more widely separated sites.

Black-footed ferret reintroduction efforts started in 1991 and will continue in the future. There have been ferret reintroduction efforts at 20 different sites over the past 22 years. For the purpose of evaluating reintroduction efforts collectively, the relative success of

BLM_0070363

these sites was categorized in Table 2 as successful, improving, marginal, unsuccessful, or recent (too new to adequately assess). It is important to recognize that this basic categorization is current as of the date of this recovery plan, but can change quickly. Two reintroduction sites that were thought to be doing poorly in the past have shown substantial growth in recent years. The ferret population of Shirley Basin, Wyoming was regarded as unsuccessful a few years ago, but is considered large and successful today. Similarly, Badlands National Park, South Dakota has improved markedly in the past 2–3 years. Conversely, some successful sites could falter if disease or other factors affect habitat quality. Additionally, some currently unsuccessful sites may show promise in the future with progressing innovation, such as disease vaccines.

The availability of suitable reintroduction sites is a key limiting factor on the rate and success of black-footed ferret recovery. Estimates of large potential reintroduction areas available for ferret recovery efforts range from 3–5 (Lockhart et al. 2006, Luce 2006). However, Luce (2008) suggests that there are possibly 181 sites throughout the historical range of the ferret with intermediate potential (available in the next 3–10 years) for ferret reintroduction. These intermediate sites would require increased management to enhance occupied prairie dog habitat before ferrets could be reintroduced.

The precise total number of breeding adult black-footed ferrets currently extant in the wild is unknown because of monitoring limitations. However, we estimate that a minimum of 274 breeding adult ferrets occurred in the wild in 2012 (Table 3). Accordingly, it appears that downlisting efforts may be 40 percent complete with regard to establishing 10 successful populations and approximately 18 percent complete with regard to the goal of 1,500 breeding adults (see Tables 2 and 3). Approximately 1,230 additional breeding adults are needed at existing or new sites to meet the downlisting goals. It has taken 20 years of reintroduction efforts to reach this point in ferret recovery. Accordingly, we are modifying the year of achieving downlisting goals estimated in the 1988 Recovery Plan from 2010 to 2020. Additionally, we estimate meeting delisting goals by 2040. These estimates assume continued progress similar to what has been achieved in recent years. More aggressive recovery efforts could result in delisting by 2022.

65

To inform our recovery criteria, we determined the amount of prairie dog occupied habitat needed to achieve recovery of the black-footed ferret. Approximately 75 ac (30 ha) of black-tailed prairie dog occupied habitat or approximately 100–150 ac (40–60 ha) of white-tailed or Gunnison's prairie dog occupied habitat are required to support one female black-footed ferret (Biggins et al. 2006). Male ferrets have overlapping ranges with female ferrets and do not require additional prairie dog habitat beyond that considered for the females (Biggins et al. 2006). The male:female sex ratio in wild ferrets at Meeteetse was approximately 1:2 (Forrest et al. 1988). At Conata Basin, South Dakota, at least 146 adults (including 97 females) were estimated to occur on 21,000 ac (8,500 ha) in 2009. This approximates the previously reported sex ratio. However, this equates to 1 female per 216 ac (88 ha), which is nearly 3 times the acreage anticipated by Biggins et al. (2006). There are many possible explanations for this higher than anticipated acreage including undercounting ferrets, climatic factors, poisoning, and disease. In recognition of these variables, we suggest that a more conservative estimate of black-tailed prairie dog habitat required to support ferrets should be 225 ac (90 ha) per female ferret based upon the Conata Basin data, or 3 times the 75 ac (30 ha) estimated by Biggins et al. (2006). Using an average of 125 ac (50 ha) of white-tailed and Gunnison's prairie dog habitat required to support one female black-footed ferret (Biggins et al. 2006), a similar three-fold adjustment would result in an estimate of 375 ac (150 ha) needed to support a female ferret in white-tailed or Gunnison's prairie dog habitat.

A population of 1,500 wild adult black-footed ferrets could be assumed to contain approximately 1,000 females. Eighty-five percent of ferrets are anticipated to occur in black-tailed prairie dog habitat (850 females). Therefore, downlisting may require approximately 191,000 ac (77,000 ha) of black-tailed occupied prairie dog habitat (850 female ferrets x 225 ac/90 ha per female ferret) and 56,000 ac (23,000 ha) of white-tailed and Gunnison's habitat (150 female ferrets x 375 ac/150 ha per female ferret). This represents a minimum of 247,000 ac (100,000 ha) of prairie dog occupied habitat to achieve downlisting of the ferret. A similar calculation would result in a minimum of 494,000 ac (200,000 ha) of prairie dog occupied habitat to achieve delisting of the ferret. We recognize that these acreage figures may change if further monitoring determines that

66

BLM_0070365

ferrets require less habitat than our conservative approach estimates.  To provide some perspective on the size of the area necessary for recovery, delisting could be supported by careful management of approximately 15 percent of existing prairie dog occupied habitat, which is 0.5 percent of lands within the ferret's historically occupied habitat, or 0.08 percent of lands within the ferret's historical range.  The intent of this discussion is to point out that recovery of ferrets will not require that more lands be occupied by prairie dogs than at present, but it will require better management of existing prairie dog occupied habitat.

The following figure illustrates the past rate of recovery and the average future rate needed to achieve downlisting and delisting goals in the suggested timeframe.  It should be noted that in a real world situation black-footed ferret and prairie dog populations will fluctuate from year to year due to sylvatic plague and other factors.



Figure 3.  Number of adult black-footed ferret and corresponding acres of prairie dog occupied habitat at successful recovery sites in 2010 and projected requirements for downlisting (2020) and delisting (2040)

BLM_0070366

Meeting our downlisting goal of 1,500 breeding adult black-footed ferrets by 2020 will require significant population expansion at existing sites where habitat is unfilled and/or reintroduction into new sites. Realistically, the addition of approximately 1,300 breeding adult ferrets in populations with 30 or more breeding adults over the next 10 years would require large population increases at most existing sites in Arizona, western Colorado, Kansas, Montana, New Mexico, South Dakota, Utah, and Wyoming. Ferret populations at several existing sites have been established in habitat modified by disease and/or where there is likely to be ongoing political opposition to substantial prairie dog population increases. New sites will need to be initiated in States and portions of States not yet participating in reintroduction efforts (Nebraska, North Dakota, Oklahoma, Texas, and eastern Colorado). Downlisting by 2020 would require six additional successful sites in the next 10 years. Delisting by 2040 would require 20 additional successful sites or one new successful site achieved annually. We believe that this level of population expansion is possible, if aggressive management is pursued via prairie dog occupied habitat conservation and disease management. Failing these efforts, downlisting and delisting goals should be readdressed after 2020. However, even more aggressive recovery efforts could result in delisting much sooner.

Participation by all States within the historical range of the black-footed ferret is important to maximize the redundancy, representation, and resilience of the ferret and result in equitable recovery goals for all States. There are many uncertainties inherent in recovery projections. Therefore, we recommend that each of the 12 States within the historical range of the black-footed ferret consider initiating and maintaining some combination of the following types of reintroduction efforts, to provide the numbers of ferrets suggested to meet recovery guidelines:

- One or more large size ferret reintroduction sites with the potential for more than 100 adult breeding ferrets,
- One or more medium size ferret reintroduction sites with the potential for 50–100 adult breeding ferrets, and
- One or more small size ferret reintroduction sites with the potential for 30–50 adult breeding ferrets.

68

BLM_0070367

Furthermore, we recommend that at least two black-footed ferret reintroduction sites be initiated per year from 2021–2040 to successfully establish at least 20 additional sites for attaining the delisting goal of 30 successful populations. These efforts will require the continued success or expansion of existing reintroduction sites. Moreover, all initiated sites that prove successful must be maintained. If more partners and resources are provided for recovery, we recommend the establishment of six new reintroduction sites for each of the next 10 years, which could result in delisting the species by 2022.

The following table is adapted from Ernst (2008). It proposes recovery guidelines by State for the number of adult breeding black-footed ferrets required to meet rangewide recovery goals and the estimated amount of prairie dog habitat that would be needed to support that number of animals. Note that rounding of numbers results in downlisting and delisting goals slightly higher than 1500 and 3000 breeding adults respectively, as well as slightly higher acreage goals. Data from Canada and Mexico are not included. It should also be noted that breeding adults would not be counted toward a downlisting or delisting goal unless they are in a population of at least 30 breeding adults.

Table 6. Black-footed ferret recovery guidelines by State

| State | Breeding adults established to date | Adults/acres to downlist | Adults/acres to delist |
|---|---|---|---|
| Arizona | 35 | 74 adults/17,000 ac | 148 adults/34,000 ac |
| Colorado | 4 | 149 adults/29,000 ac | 288 adults/58,000 ac |
| Kansas | 13 | 123 adults/18,500 ac | 246 adults/37,000 ac |
| Montana | 11 | 147 adults/22,000 ac | 294 adults/44,000 ac |
| Nebraska | 0 | 134 adults/20,000 ac | 268 adults/44,000 ac |
| New Mexico | 2 | 220 adults/39,000 ac | 440 adults/78,000 ac |
| North Dakota | 0 | 38 adults/6,000 ac | 76 adults/12,000 ac |
| Oklahoma | 0 | 70 adults/10,500 ac | 140 adults/21,000 ac |
| South Dakota | 185 | 102 adults/15,000 ac | 204 adults/30,000 ac |
| Texas | 0 | 254 adults/38,000 ac | 508 adults/76,000 ac |
| Utah | 7 | 25adults/6,000 ac | 50 adults/12,000 ac |
| Wyoming | 100 | 171 adults/35,000 ac | 341 adults/70,000 ac |
| **Total** | 357 | 1,507 adults/256,000 ac | 3,004 adults/512,000 ac |

BLM_0070368

These guidelines are provided to assist planning needs and encourage broader recovery support across the black-footed ferret's historical range. The Service and BFFRIT regard such expanded participation as the most useful approach to overall species recovery and eventual State and tribal management of the ferret after delisting. These guidelines are a means of improving risk management and ensuring more uniform equity of recovery responsibilities across State boundaries. Species recovery has more likelihood of timely achievement if the currently non-participating or minimally-participating States engage in ferret reintroductions and recovery. However, recovery goals should not be subject to individual State efforts. The species may be downlisted and delisted if population and habitat objectives identified above are met by some other configuration than the one outlined above.

**Management of Sylvatic Plague and Prairie Dogs:** As previously noted, plague can impact the black-footed ferret directly via infection and subsequent mortality, and indirectly through the disease's effects on prairie dogs and the potential for dramatic declines in the ferret's prey base. Current management techniques include dusting prairie dog burrows with flea control powder and vaccinating ferrets prior to release. At Conata Basin in South Dakota, wild ferrets are also being trapped and vaccinated in the field as protection against the ongoing epizootic. Research is currently investigating the potential of supporting ferrets by providing vaccine to protect wild prairie dogs via oral bait. This has the potential to limit periodic plague cycles more effectively and economically than direct vaccination of ferrets. Specific tasks are described under "Recovery Actions." We believe that the threat from plague can be ameliorated by dusting, vaccines, and the maintenance of more reintroduction sites.

In addition to management of prairie dogs for better control of sylvatic plague, actions are needed to conserve prairie dogs in complexes of sufficient size and stability to support reintroduction of black-footed ferrets. We believe that in some cases control at the periphery of reintroduction sites may be appropriate to facilitate cooperation of adjacent landowners. However, the type of poison applied to control prairie dogs and the extent of its use can impact the ability of a prairie dog complex to sustain ferrets. As

70

BLM_0070369

previously noted, anticoagulant poisons can result in secondary impacts to any wildlife that consumes a poisoned prairie dog.  In 2012, the Service completed formal consultation with the EPA to evaluate potential impacts to threatened and endangered species, including the black-footed ferret, from the use of the anticoagulant Rozol to poison prairie dogs.  The final biological opinion prohibits application of Rozol within current and future ferret recovery sites.

## RECOVERY STRATEGY

### Key Facts and Assumptions

Recovery under the ESA is the process by which listed species and their ecosystems are restored and their future is safeguarded to the point that protections under the ESA are no longer needed.  The primary biological constraint for the endangered black-footed ferret is its nearly complete dependency on prairie dogs, for both food and shelter. Consequently, if we safeguard prairie dogs, we will greatly facilitate ferret recovery.

### Overarching Strategy

In preparing this revised recovery plan, we solicited extensive partner review from the BFFRIT.  One of its guiding principles has been a focus on extensive and intensive involvement by many partners, including tribes, States, Federal land management agencies, and non-governmental organizations across the historical range of the black-footed ferret.  Recovery will be achieved by establishing a number of ferret populations where appropriate habitat exists and by ameliorating threats impacting the species so as to allow the ferret's persistence.  Although ferret habitat has been dramatically reduced from historical times, a sufficient amount of habitat persists, if its quality and configuration are appropriately managed.  This management, for the most part, is likely to be conducted by traditional State, tribal, and Federal fish and wildlife and land management agencies.  Additionally, private parties, including landowners and conservation organizations, must continue to support ferret recovery.  Many partners

71

BLM_0070370

contributing to ferret recovery in many places will help minimize the risk of loss of all wild populations simultaneously from stochastic events such as disease.

## Primary Objectives

There are two primary objectives for achieving recovery of the black-footed ferret, which to some extent overlap: (1) improve management of prairie dogs and (2) protect against sylvatic plague.

## Other Considerations

The most expedient means of improving management of prairie dogs and protecting against sylvatic plague will require the continued active efforts of the BFFRIT. Cooperation between the many affected Federal, State, tribal, and private parties is essential to the eventual recovery of the black-footed ferret.

## RECOVERY ACTIONS

Since the 1988 Recovery Plan, there have been several major reviews of black-footed ferret recovery efforts including reviews by the Conservation Breeding Specialist Group (CBSG) of the Species Survival Commission of the World Conservation Union (CBSG 1992), Hutchins et al. (1996), CBSG (2004), Ray (2006), and U.S. Fish and Wildlife Service (2008). There have been other reviews somewhat narrower in scope that also addressed recovery including COSEWIC (2000), Esch et al. (2005), and Garelle et al. (2006). The conclusions and recommendations of this recovery plan are generally consistent with the findings of these reviews. Ray (2006) addressed major reviews through 2006 in her descriptions of recovery actions and tasks. We relied on her evaluations to address conclusions from other review efforts. However, in some cases the Service has adopted positions which consider all viewpoints, but do not specifically endorse the precise conclusions of any particular evaluation.

BLM_0070371

The recovery goals should ameliorate threats to the black-footed ferret (see Table 5) if successful recovery is to be achieved.  The following actions address these threats.

1.  Conserve and manage a captive ferret population of reasonable size and structure to support genetic management and reintroduction efforts.
2.  Identify prairie dog habitats with the highest potential for supporting future free-ranging populations of ferrets.
3.  Establish free-ranging populations of ferrets to meet downlisting and delisting criteria.
4.  Ensure sufficient habitat to support a wide distribution of self-sustaining ferret populations.
5.  Reduce disease-related threats in wild populations of ferrets and associated species.
6.  Support partner involvement and conduct adaptive management through cooperative interchange.

The specific listing factors addressed by each action are described in the text below.  The actions and accompanying tasks outlined in this strategy represent a general consensus derived from several years of meetings, reviews, and comments by members of BBFRIT. The conclusions from these ongoing efforts are summarized below.

**Action 1.  Conserve and manage a captive ferret population of reasonable size and structure to support genetic management and reintroduction efforts.**  Demographic and genetic management of the captive population is carried out under the guidance of the AZA Black-footed Ferret SSP® and includes maintaining a core breeding population of 280 animals of optimum sex ratio (105 males:175 females) and age (1-3 years) for a stable captive population, with a high level of genetic diversity, and a sustainable source of ferrets for reintroduction.  Six captive breeding facilities produce approximately 250 juvenile ferrets annually.  Currently, approximately 80 juveniles (30 male:50 female) are retained annually in SSP® facilities for future captive breeding purposes.  The remaining juveniles are considered excess to the SSP®, and are allocated annually for reintroduction, or occasionally for research.

73

BLM_0070372

This action and its associated tasks will promote management of a sufficient number of animals with maximum genetic diversity to maintain a captive breeding population that will provide animals for reintroduction into suitable habitat throughout the historical range of the black-footed ferret.  This action addresses all of the factors considered a threat to the species by providing ferrets for reintroduction into habitat where it was previously extirpated due to the destruction, modification, or curtailment of habitat, disease, inadequate regulatory mechanisms for prairie dogs, or poisoning of prairie dogs.

1.1.    **Maintain a SSP® Husbandry Manual that provides up-to-date protocols for the care, propagation, preconditioning, and transportation of captive ferrets.**  A SSP® Husbandry Manual will be used at all captive breeding facilities participating in the black-footed ferret SSP®.  Some variability in protocols is appropriate among facilities due to specific facility circumstances.  Protocol adjustments are regularly discussed during conference calls and summarized during annual meetings.  The protocols are dynamic and provide for development of adaptive husbandry procedures.

1.2.    **Ensure adequate facilities for breeding ferrets in captivity pursuant to Husbandry Manual guidelines.**  Approximately 55 percent of all captive black-footed ferrets are located at the Service's National Black-footed Ferret Conservation Center near Wellington, Colorado.  The remaining captive breeding populations are housed at the Smithsonian Biology Conservation Institute in Front Royal, Virginia; Louisville Zoological Garden in Louisville, Kentucky; Cheyenne Mountain Zoological Park in Colorado Springs, Colorado; Phoenix Zoo in Phoenix, Arizona; and the Toronto Zoo in Toronto, Ontario.

1.3.    **Provide a description of research needs related to genetic and demographic management of captive populations.**  Research needs are discussed and prioritized at annual meetings of the BFFRIT and its subcommittees.

BLM_0070373

1.4 **Minimize the potential for disease outbreaks and other potential catastrophes in captive ferret populations.** Disease continues to pose a threat to ferret recovery. Protocols are in place at all breeding facilities to limit the prevalence of diseases such as coccidiosis and cryptosporidiosis that can sometimes impact captive populations. Canine distemper has also notably impacted ferret populations in the past. However, a commercial distemper vaccine has become available and is now widely employed in both captive and wild ferret population management. Sylvatic plague is considered a major threat to ferret recovery due to its devastating effects on both ferrets and their obligate prey (prairie dogs). Therefore, efforts to improve plague prevention and management such as vaccination of captive ferrets and research into field vaccination are ongoing.

1.4.1. **Maintain multiple captive populations located in at least three separate geographic locations to avoid catastrophic loss at a single facility.** As noted in Action 1.2, there are six SSP® breeding facilities.

1.4.2. **Follow protocols for disease prevention described in the Husbandry Manual.** All breeding facilities shall employ disease prevention protocols as specified in the SSP® Husbandry Manual.

1.4.3. **Develop disease outbreak contingency plans.** Guidelines for quick action in the event of a disease outbreak in a facility (evacuation, isolation, veterinary care, convalescence, disposal of tissues, and disease containment) are considered in the SSP® Husbandry Manual.

1.4.4. **Maintain a list of disease research contacts.** A list of plague researchers has been compiled with contact information. This list will be regularly updated. Contact lists for other diseases and concerns should also be updated regularly by the BFFRIT.

BLM_0070374

1.4.5. **Support appropriate disease research.** Plague vaccines are available or under development by the National Wildlife Health Lab for both reintroduced ferrets and prairie dogs. Plague vaccines are routinely used for some captive ferret populations. Potential outbreaks of other infectious diseases should be considered as appropriate to determine effects on ferret recovery.

1.5. **Implement breeding strategies to maintain genetic diversity in the captive population while providing suitable genetic and demographic stock for reintroduction programs.** Management goals for captive breeding have progressed from largely demographic (i.e., initial population expansion) to the optimal management of genetic, demographic, and institutional resources. The current core population bred annually under the SSP® should maintain 80 percent of the genetic diversity present in the founders of the captive population for at least 25 years. This genetic management strategy balances the need to maintain genetic diversity with the demographic demands of producing animals for reintroduction.

1.5.1. **Conduct regular reviews of breeding strategies.** Breeding protocols will be updated as necessary. Breeding vigor may be lower in captivity than in free-ranging ferret populations. Research to obtain information for improving breeding success is supported, such as consideration of costs and benefits of including wild ferrets in the captive breeding program, evaluation of sperm viability in captive vs. wild populations, and consideration of possible links between chronic stress and reproductive functioning in captive ferrets.

1.5.2. **Conduct and evaluate efforts to improve reproductive output to support genetic management and reintroduction efforts.** Increase the number of animals available for release from pen facilities through husbandry and management practices that promote reproduction and kit survival. These practices should consider improved breeding strategies

76

BLM_0070375

and enhanced artificial means of conserving the genetic contribution of individuals who do not reproduce by natural means.

**1.5.3. Continue management efforts to balance the genetic representation of founders in the captive population.** The genetic contribution of the 7 founders could be substantially reduced or lost if they are inadequately represented in future generations or are represented through only one sex. The genetic contribution of the 7 founders remains disproportionate. Efforts by the captive breeding program to balance representation of all founders will continue and periodically be evaluated. These efforts include minimizing genetic relatedness among mates, transferring ferrets between SSP® facilities to maintain heterozygosity, and continuing development of techniques for cryopreservation of ferret semen for use in artificial insemination.

**1.5.4. Evaluate the reproductive fitness, genetics, and demography of the captive population.** Reproductive fitness is evaluated annually and compared under different breeding scenarios. The SSP® includes adaptive genetic and demographic management strategies to maintain the reproductive fitness and productivity of the captive population. Records will be kept on all captive ferrets, as described in the Husbandry Manual.

**1.5.5. Provide optimal stock for reintroduction purposes.** The most genetically valuable ferrets will be retained for captive breeding. Animals intended for reintroduction should receive adequate preconditioning.

**1.6. Establish policies for the use and handling of dead, non-reproductive, or otherwise excess ferrets.** Use current Service guidelines to dispose of ferrets that are considered surplus to the SSP®. Surplus animals not suitable for reintroduction should be used for research or live educational exhibit. All carcasses should be made available for scientific research or educational display. Ferret tissue samples should also be made available for scientific research.

77

**Action 2.  Identify prairie dog habitats with the highest potential for supporting future free-ranging populations of ferrets.**  No remnant wild black-footed ferrets have been found outside of reintroduction areas since the extinction of the Meeteetse, Wyoming population in 1987.  Searches of potential habitats are no longer considered a high priority given the extensive searches completed with negative results, the substantial resources required to continue such efforts, and the degraded and fluctuating status of remaining prairie dog habitat in North America.  Therefore, targeted searches for remnant wild ferret populations have been discontinued.  Consequently, some tasks related to searches that were described in earlier recovery plans have been discontinued.  However, search methodologies originally designed to locate wild ferrets continue to be critical for selecting future reintroduction sites (described below) and monitoring reintroduced populations (described under task 3.6).

This action and its associated tasks address the threat from inadequate existing regulatory mechanisms by encouraging participation from State, tribal, and Federal governments.

2.1.   **Use recent prairie dog surveys to identify and prioritize habitats with potential as future ferret reintroduction sites.**  State wildlife agencies within the range of prairie dogs have agreed to complete prairie dog surveys at 3–5 year intervals.  Results from these surveys can be useful in the identification of potential ferret reintroduction sites.

2.2.   **If a remnant ferret population is located, develop a plan to integrate any population into the recovery program.**  The likelihood of finding wild ferrets outside of reintroduction areas diminishes with time.  However, if this occurred, the Service would immediately consult with members of the BFFRIT and take actions appropriate to the situation.  Once discovered, new populations should be integrated into the monitoring and captive breeding programs to the extent possible.

78

**Action 3.  Establish free-ranging populations of ferrets to meet downlisting and delisting criteria.**  There have been 20 black-footed ferret reintroduction projects (see Figure 1, Tables 2 and 3).  One of the downlisting objectives from the Recovery Plan is to establish a pre-breeding population of 1,500 free-ranging adults in 10 or more populations with no fewer than 30 breeding adults in any population by 2020.  Current ferret reintroduction efforts are approximately 40 percent successful with regard to the number of established populations.  A minimum of approximately 270 breeding adults occur in these four populations, which is 18 percent of the 1,500 free-ranging adult population goal.  The geographic distribution of attempted ferret reintroduction effort is fairly well distributed across the species' historical range (with the notable exception of much of the eastern one-third of the range).  The four successful sites are in Arizona, Wyoming, and South Dakota (contains two successful sites).

This action and its associated tasks will identify the sites best suited to maximizing black-footed ferret recovery, allocate animals for reintroduction accordingly, and require follow-up monitoring to facilitate adaptive management.  This action addresses all of the factors considered a threat to the species by reintroducing ferrets into habitat where it was previously extirpated due to the destruction, modification, or curtailment of habitat, disease, inadequate regulatory mechanisms for prairie dogs, or poisoning of prairie dogs.

**3.1.   Maintain a list of research needs related to reintroduction and population monitoring.**  The most important research questions that remain, and their priorities, will be considered by the Service and technical subcommittees of the BFFRIT.

**3.2.   Maintain a standardized ranking procedure for allocating ferrets to candidate reintroduction sites.** The Service uses a standardized ranking procedure for allocating ferrets to reintroduction sites.  Reintroduction sites are ranked according to many site-specific criteria including project background and justification, involved agencies/parties, habitat conditions, ferret population information, predator management, disease monitoring and management,

79

BLM_0070378

contingency plans, potential for preconditioning of released ferrets, veterinary and husbandry support, and research contributions. Site-specific values for each criterion are entered into an allocation matrix that allows sites to be ranked based on overall contribution to ferret recovery efforts. Reintroduction proposals and the Service's rankings of the proposals are reviewed by BFFRIT members. The Service determines ferret allocations by mid-summer and incorporates site visit information to resolve any outstanding concerns regarding specific reintroduction projects.

3.3. **Develop and approve new reintroduction sites.** The limited number of ferrets available for release each year requires that they be efficiently allocated. The number of new sites will be carefully considered.

   3.3.1. **Work with site managers, landowners, and stakeholders to develop long-term site management assurances for potential new reintroduction sites.** Management agreements are established for each reintroduction area. Land ownership patterns differ between sites. Agreements should stipulate the responsibilities of all parties for long-term commitments to ferret management. Management of candidate sites is necessary before recovery activities can proceed. The management of reintroduced populations is primarily the responsibility of the agency or tribe originally involved in establishment of the population.

   3.3.2. **Collect information for site screening and baseline data purposes.** Habitat data are collected prior to evaluation of each reintroduction site. Data collection typically continues annually or on an intermittent basis over early project years and should include prairie dog occupied habitat and density, plague history, presence of canine distemper, and predator occurrence.

   3.3.3. **Include site-specific prairie dog management plans in evaluation of new recovery sites.** Prairie dog colonies at existing and proposed

80

BLM_0070379

reintroduction sites should be characterized, managed at appropriate levels, monitored and managed for plague, and managed for grazing as appropriate.

**3.3.4.  Conduct site-specific monitoring of ferret populations and environmental variables.**  Post-release monitoring should identify causes and degree of mortality, characterize dispersal, and refine recovery strategies.  Although the level of monitoring employed during initial reintroduction efforts may not be sustained on a permanent basis, some systematic monitoring of demographic, genetic, and environmental variables should continue throughout the duration of each recovery effort. Information from monitoring efforts is shared with the Black-footed Ferret Recovery Coordinator and members of the CS.

**3.3.5.  Standardize annual site monitoring and reporting to the extent practical.**  Standardization of survey methods increases opportunities for comparisons between sites and years.  Standards are needed to: (1) define general requirements for future reintroduction sites, (2) provide consistent feedback from participants, and (3) refine methods (e.g., radio-telemetry, dog searches, aerial survey, and snow-tracking).

**3.4.  Complete site and ferret preparations for releases.**  Specific guidance appears below.

**3.4.1.  Comply with obligations of the ESA, NEPA, and other laws.**  State and Federal statutes, tribal statutes and resolutions, and other legal requirements will be evaluated and completed prior to implementing reintroduction projects.

**3.4.2.  Assess site conditions prior to ferret releases.**  Plague screening will be conducted prior to release.  Allocation requests and site visits will be used to determine specific release locations.

BLM_0070380

**3.4.3.  Schedule and prepare ferrets for releases.**  Each ferret released will have a record of studbook identification number, transponder tag numbers, birth date, facility of origin, preconditioning treatment, and recommended schedule of release.  To the extent possible, ferrets should be released in numbers and sex ratios that will optimize long-term survival and reproduction.

**3.5.  Release ferrets into approved reintroduction sites as capacity and production permit.**  Specific guidance appears below.

**3.5.1.  Release sufficient numbers of ferrets to meet downlisting criteria of establishing 1,500 free-ranging adults distributed among at least 10 populations, with no less than 30 breeding adults in each population.**  Based on the best information available, it appears that four reintroduction sites (Aubrey Valley, Cheyenne River Indian Reservation, Conata Basin, and Shirley Basin) currently meet these criteria.  Reintroduction efforts will continue at other existing sites as appropriate and at new sites with downlisting criteria in mind.

**3.5.2.  Continue releases to meet the delisting criteria.**  The delisting criteria include the establishment of a pre-breeding census population of 3,000 free-ranging breeding adult ferrets in 30 or more populations with no fewer than 30 breeding adults in any population.  Reintroduction efforts will continue following downlisting, with the goal of delisting the ferret.

**3.5.3.  Represent all founders as equally as possible in each released population.**  All founders are currently represented among animals released at reintroduction sites.  However, founder genes may be lost from wild populations due to chance, selection, and natural breeding patterns.  Genetic monitoring of reintroduced populations should be considered to

82

determine the rates at which diversity is lost, and to guide genetic management strategies.

**3.5.4. Support the use of wild-born ferrets for reintroduction at other sites.** All ferret reintroduction programs are authorized under the principle that if a population becomes established, contributions of excess ferrets will be used to manage other recovery sites. As reintroduced ferret populations grow, the translocation of wild-born ferret kits to new reintroduction sites is expected to become increasingly important as a tool for ferret recovery. Disease-prevention protocols for translocation of wild-born stock will be updated as needed based on protocols for transfer of captive-born stock.

**3.6. Implement management and monitoring prescriptions for each reintroduction site.** The Service and the BFFRIT support long-term monitoring of all ferret reintroduction sites to evaluate success and provide information of value to other reintroduction sites.

**3.6.1. Monitor ferrets.** Local recovery partners will maintain a high level of monitoring for five years following the last release (see task 3.3.4.). This should include analysis of annual reproduction and survival. Other parameters such as short-term survival, a pre-breeding census, recruitment, and home range size can be evaluated as resources permit. Thereafter, demographic and genetic surveys should be completed periodically to track population status.

**3.6.2. Monitor and evaluate changes in prairie dog density and distribution.** Monitoring habitat conditions is an ongoing requirement of reintroduction programs and is critical to the success of reintroduction efforts. Aspects of habitat conditions other than plague also should be considered.

**3.6.3. Monitor disease dynamics.** Readily available carcasses will be collected and submitted to the National Black-footed Ferret Conservation Center for

83

BLM_0070382

detailed necropsy when monitoring at reintroduction sites reveals deceased ferrets.  Necropsy reports also should be held at this facility for subsequent data analysis and use by program participants.

**3.6.4.   Monitor and evaluate changes in the site environment.**  Environmental change associated with reintroduction may give valuable clues to recovery success and will be considered.

**3.7.   Use release and monitoring opportunities to improve ferret management.**
Preconditioning prior to release substantially increases ferret survival and is now a standard protocol.  Efforts to breed ferrets in naturalistic pen environments have been undertaken in Arizona, Colorado, Montana, and New Mexico, but none are currently in operation.  Several different release procedures have been employed, such as encircling release sites with temporary anti-predator (electric) fencing, which may increase ferret survival during the critical period immediately following release.  At present, all releases are "hard releases" wherein ferrets are simply released into suitable habitat without protection from predators.  Annual management plans should be developed by all reintroduction sites to determine whether additional ferrets are to be released.  Allocation requests should be submitted as appropriate.

**3.7.1.   Continue the use of ferret preconditioning techniques**.  Research has demonstrated that preconditioning is beneficial to post-release survival.

**3.7.2.   Optimize release methods and timing.**  Release strategies continue to be refined and investigated.  Release methods should be considered for publication in wildlife journals.  New literature will be reviewed and incorporated into reintroduction plans and reports.

**3.7.3.   Continue to improve ferret monitoring techniques.**  Post-release monitoring is essential to judge the overall success of individual

BLM_0070383

reintroduction projects, and is a required element of all reintroduction projects.

**3.7.4. Continue to improve survey techniques.** Reintroduction partners should continue efforts to improve spotlight survey efficacy and investigate alternative survey techniques.

**3.7.5. Continue to evaluate methodologies for counting or estimating ferrets at recovery sites.** A method for accurately estimating ferret numbers is critical to assessing progress at each recovery site, which will in turn allow the reassessment of objectives, priorities and allocation of resources for each site. As recovery sites expand or resource availability changes, it is likely that methods or rigor for estimating ferrets at individual sites will change. The Service and BFFRIT will continue to refine survey methodologies and estimation parameters to assess progress towards recovery goals.

**3.7.6. Continue to improve telemetry equipment and techniques.** Radio-telemetry is the only technique that has provided meaningful data on causes of mortality for free-ranging ferrets. Nevertheless, telemetry is problematic due to costs, short transmitter life, and increased risks of injury to individuals. Improved telemetry should be considered to address specific questions at certain reintroduction areas.

**3.7.7. Continue to improve techniques for habitat monitoring and habitat evaluation.** The principal technique for determining how many ferrets can be supported by a given prairie dog complex is to survey active prairie dog burrows by standardized transects, estimate how many prairie dogs are present, and how many ferret families could exist. An understanding of the relationship of prairie dog density and the associated spatial use of prairie dog complexes by ferrets will continue to be evaluated.

85

BLM_0070384

**3.7.8.  Support disease monitoring and management capabilities.**  Methods of controlling plague in free-ranging populations through the use of vaccines, flea powders, growth inhibitors, or sterilants will continue to be explored. Regular monitoring for canine distemper in sympatric predators at reintroduction sites should continue.

**3.7.9.  Improve understanding of ferret demography and genetics.**  The benefits of translocation of wild animals into other recovery areas are important program considerations.  Program partners need to ensure adequate monitoring of donor, recipient, and control populations and coordinate such activities with the Service through the Black-footed Ferret Recovery Coordinator.

**3.7.10.  Consider population viability, including potential effects of inbreeding, interspecific interactions, and disease.**  Data are accumulating from reintroduction sites that could be used to identify different habitat effects.

**3.8.  Enforce all laws protecting established populations.**  Most ferrets have been reintroduced in non-essential experimental population areas as set forth in section 10(j) of the ESA.  More recently, ferrets have been released under provisions of recovery permits (section 10(a)(1)(A) of ESA).  Other ESA tools such as Safe Harbor Agreements are under development and should be considered as potential ferret reintroduction options.  All applicable State, Federal, and tribal laws regarding the protection of ferrets will be followed.

**3.9.  Review the reintroduction program annually.**  An evaluation of reintroduction success is required for each site on an ongoing basis.  The ultimate measure of reintroduction success is the documented growth of a population through natural recruitment to a level that becomes self-sustaining and requires no further augmentation or fully occupies the available habitat.  Success is evaluated via post-release monitoring of the reintroduced population and varies among

86

BLM_0070385

reintroduction sites.  Post-release monitoring is necessary to identify causes and rates of mortality, characterize dispersal, and refine current recovery strategies. Information from monitoring efforts should be shared.

**3.9.1.  Produce annual site reports.**  Recovery partners will summarize monitoring data and research results, evaluate the efficacy and efficiency of their efforts, and make appropriate modifications to their procedures based on new information.

**3.9.2.  Include demographic and/or genetic manipulation needs for each population.**  Individual recovery partners should be involved with day-to-day management for established ferret populations.  A broad management strategy should also be employed to ensure that ferrets are managed in a metapopulation context.  Wild-born ferrets may be periodically exchanged between reintroduced populations to achieve demographic and/or genetic management goals.  Demographic manipulations may include stocking, translocation, or removal of individuals from donor populations.

**3.9.3.  Evaluate and update site monitoring and research efforts.**  A routine level of periodic ferret population monitoring is required in a long-range management plan for each reintroduction site.  The Service will periodically reviews site plans and monitoring efforts.

**3.9.4.  Update reintroduction strategy and protocols as needed.**  The Service will update the reintroduction program and protocols as necessary based upon successful results from individual reintroduction sites.

**Action 4.  Ensure sufficient habitat to support a wide distribution of self-sustaining ferret populations.**  Black-footed ferret habitat is synonymous with areas occupied by several species of prairie dogs.  Ferret habitat has been destroyed, modified, and curtailed through conversion for agricultural use, eradication of prairie dog populations through poisoning, and introduction of sylvatic plague.  These combined impacts have resulted in

87

the loss of approximately 96 percent of prairie dog occupied habitat and consequently the loss of approximately 96 percent of potential ferret habitat.

Since the early 1980s, program partners have invested considerable resources in the recovery of this species.  To date, ferret reintroduction projects have predominantly occurred on Federal or tribal lands.  The development of recovery partnerships with more private landowners is essential to recovery of the species.  The Service and BFFRIT partners should continue to support and manage established ferret reintroduction sites, whether or not reintroduction efforts are presently active.  In addition, new partnerships are encouraged, to expand reintroduction opportunities across the historical range of the species into additional sites in other States and on other tribal lands.

Some loss of breeding vigor may be occurring in the captive breeding program, in part due to the inherent limitations of captive breeding.  Individuals breeding in the wild likely have a higher breeding vigor.  Therefore, we believe it essential to the survival of the species to establish additional sites as quickly as possible to allow wild breeding.  This will require use of sites in the near term that may not have yet gained sufficient size or may not yet have the potential for sufficient numbers of prairie dogs to support a viable self-sustaining ferret population over the long term.

This action and its associated tasks will identify and conserve current and potential habitat for the black-footed ferret.  This action addresses all of the factors considered a threat to the species by managing habitat to minimize potential adverse impacts from plague, poisoning, and inadequate management; and by encouraging participation from Federal, State, tribal, and private landowners.

**4.1**     **Estimate the amount and configuration of habitat required to support ferret populations that meet downlisting and delisting criteria.**  We estimate that a minimum of approximately 191,000 ac (77,000 ha) of black-tailed prairie dog occupied habitat and 56,000 ac (23,000 ha) of white-tailed and Gunnison's prairie dog occupied habitat will be required to meet downlisting criteria.  Similarly, a minimum of 383,000 ac (154,000 ha) of black-tailed prairie dog occupied habitat

BLM_0070387

and 112,000 ac (46,000 ha) of white-tailed and Gunnison's prairie dog occupied habitat will be required to meet delisting criteria (see discussion on pp. 65–66). These estimates will be adjusted as necessary.

**4.1.1. Improve guidelines for determining ferret habitat requirements.** It is crucial to establish and maintain as many ferret populations as possible in native habitats. For example, in cases where the amount of available habitat is smaller, or subject to periodic effects of plague, more on-going human intervention and management may be required to maintain populations. The Service should consider the density of prairie dogs needed to support ferrets, the effects of territoriality on ferret density, and the effect of patchiness of prairie dog habitat on ferret density.

**4.1.2. Assess progress toward meeting downlisting and delisting criteria.** In order to estimate the amount of additional purposefully managed habitat required for recovery, partners will evaluate progress toward recovery objectives. This action will require estimates of purposefully managed habitat and an assessment of demographic data of reintroduced populations.

**4.1.3. Estimate the amount and configuration of habitat necessary to support downlisting and delisting objectives.** Analyzing ferret population growth based on data from each reintroduction site can provide a means for determining progress toward reintroduction goals and coordinating between ferret population objectives and supporting habitat objectives. Preliminary estimates of the amount of habitat required to downlist and delist the ferret are provided in Table 6.

**4.2. Identify and manage ferret habitats to support recovery goals.** Managing habitat for ferret recovery does not necessarily preclude other habitat uses. Efforts to fund incentive programs for expanding existing habitat on private and tribal lands will be identified and implemented.

89

BLM_0070388

**4.2.1. Consult Federal, State, tribal, and private entities with jurisdiction over historical ferret habitats to develop jurisdiction-specific habitat goals and habitat management plans.** In order to achieve recovery objectives for distributing sufficient numbers of ferret populations across the historical range of the species, large recovery areas that can be managed as long-term ferret reintroduction sites will be identified. Many sites currently supporting only small prairie dog populations could ultimately be expanded to create suitable ferret reintroduction areas. Other areas that historically supported prairie dog populations but are currently unoccupied could be restored via prairie dog translocations. State and Federal land and wildlife management agencies and tribes have ultimate authority and responsibility for implementing habitat conservation measures needed to recover the ferret. Close coordination will be maintained between the Service, the BFFRIT, and prairie dog management groups. The BFFRIT and land and wildlife management agencies will investigate opportunities to develop cooperative reintroduction efforts with private landowners.

**4.2.2. Recover and maintain sufficient ferret habitat to support recovery goals.** Ferret recovery depends on the conservation and management of prairie dog populations. Many State and Federal agencies and tribes have developed management plans to maintain viable prairie dog populations. Efforts to manage prairie dogs will continue to be evaluated. States and tribes should describe the impact of prairie dog population control activities on ferret management objectives. EPA label restrictions on rodenticide application should be enforced.

**4.2.3. Engage relevant government agencies currently not participating in ferret recovery.** A few State and Federal agencies have participated minimally in ferret recovery efforts. Fiscal or administrative constraints

90

BLM_0070389

may have kept some tribes, with suitable habitat, from participating more fully.  The Service and other active members of BFFRIT will continue to reach out to these agencies and tribes.  They will be invited to annual BFFRIT committee meetings and their input and review will be requested on potential recovery efforts within their jurisdictions.

**Action 5.  Reduce disease-related threats in wild populations of ferrets and associated species.**  Disease continues to be a primary factor inhibiting recovery of the black-footed ferret in the wild.  The threat of catastrophic loss of prairie dogs and ferrets from sylvatic plague is significant.  Plague may also periodically impact reestablished populations.  Increasing evidence suggests that some levels of enzootic plague may result in negative growth rates for prairie dog and ferret populations.  Ferret populations that are otherwise self-sustaining may require intervention where plague maintains a chronic effect.  Other diseases such as canine distemper, coccidiosis, and cryptosporidiosis are less likely to threaten ferret persistence.  There are several methods currently employed to monitor plague and other diseases.

This action and its associated tasks will improve plague management and encourage appropriate disease research.  This action addresses the threat of modification of habitat due to plague and the direct threat of disease to ferrets and prairie dogs.

**5.1.**  **Maintain a clearinghouse for disease research and information related to ferrets and associated species.**  Currently, there are many agencies, institutions and individuals researching various aspects of plague.  A clearinghouse/repository of plague-related data, possibly internet based, should be developed to promote continued coordination and define further research needs.

**5.1.1.  Develop a list of disease research needs.**  The coordination of ongoing studies and data sharing to further research needs will be considered by the BFFRIT.

91

BLM_0070390

**5.1.2.  Develop a list of bibliographies of relevant publications and projects relative to disease.**  As noted in task 1.4.4., a list of plague researchers has been compiled with contact information.

**5.1.3.  Synthesize relevant information and research results.**  Periodic literature reviews and syntheses regarding the ecology of sylvatic plague will continue.

**5.1.4.  Report epizootics to the Centers for Disease Control, the National Wildlife Health Laboratory, and other appropriate disease research facilities.**  Coordination will be maintained with research institutions to follow-up on any case histories of disease outbreaks in prairie dog populations and ferret recovery areas as noted in task 1.4.5.  Field biologists should characterize the extent of impact and recovery of areas affected by any apparent diseases.  Additional background investigations will be considered at sites experiencing significant losses.

**5.2.  Minimize the threat of sylvatic plague in ferrets and associated species.**
Plague remains a significant factor in the direct mortality of black-footed ferrets and the loss of habitat.  Many plague issues need further research including flea ecology, mammalian reservoirs, management methods (e.g., vaccines), effects on ferrets (both direct and indirect), methods to control fleas (e.g. insecticides, growth inhibitors, biological factors), and effects of plague on different species of prairie dogs.

**5.2.1.  Develop and implement as appropriate prophylactic methods for controlling sylvatic plague.**  Methods for prophylactic control of plague now focus on flea control and protective vaccines.  Flea control via use of Deltamethrin powder inserted into prairie dog burrows appears to provide an effective deterrent for transmission of both enzootic and epizootic plague, but the application of insecticidal dust is costly and highly labor-intensive.  Recent testing indicates a prairie dog bait containing

92

BLM_0070391

Imidacloprid (insecticide) provided some flea reduction in prairie dogs. Research is ongoing to determine field management applicability of this product. An experimental plague vaccine based on the F1 and V antigens provides effective protection for ferrets. However, its delivery under field conditions is currently limited. Development of a bait-deliverable vaccine for prairie dogs is underway, and field trials have been conducted. Development of this vaccine has implications for future management of prairie dog habitats and recovery of the ferret. Obtaining funds for plague research is an ongoing effort.

**5.2.2. Develop and implement ecological methods for control of sylvatic plague in ferret recovery areas, including methods based on manipulation of ferret habitats or associated species communities.** Research into the ecology of plague in prairie dog communities should be expanded to help identify reservoir hosts, identify low levels of plague, determine factors in the geographic expansion of plague, measure transmission modes and speed, determine differential susceptibility among hosts, investigate the varying roles of different flea species in plague ecology, and determine the potential impacts from climate change. This task will require collaboration of partners from reintroduction sites and research institutions.

**5.3. Continue to address the threat of canine distemper in ferrets and associated species and take management actions as appropriate.** Canine distemper research will continue as part of ongoing widespread vaccination efforts.

**5.3.1. Continue to implement prophylactic methods for control of canine distemper.** An effective canine distemper vaccine has been developed and is in widespread use in the ferret recovery program, both in captivity and at some sites in the field. We will continue to employ vaccination as a management strategy unless the best available information indicates vaccination is no longer necessary or appropriate.

BLM_0070392

**5.3.2. Continue to implement ecological methods for control of canine distemper in ferret recovery areas, including methods based on manipulation of ferret habitats or associated carnivore communities.** Natural epizootics should be fully documented to provide a greater understanding of disease flow through ferret populations. Reintroduction sites should be regularly monitored for canine distemper through predator surveys.

**5.4. Periodically synthesize available disease data and disease research results, and re-evaluate disease management strategies.** Continue to adapt management procedures as new information becomes available.

**5.4.1. Conduct periodic symposia and workshops to exchange information on diseases.** Such workshops will encourage synergism between disease research being conducted on ferret habitat and research being conducted on other species worldwide. This is especially true of plague, which has received much attention in other countries.

**5.4.2. Maintain public support for ferret reintroduction efforts at sites with disease issues.** Public support can be lost due to confusion about why ferrets are being released into areas where they are at risk of being infected with diseases. Public education about the nature of the disease issues facing ferrets and other species in the prairie ecosystem, as well as humans, will help maintain support in the face of disease related mortalities.

**Action 6. Support partner involvement and conduct adaptive management through cooperative interchange.** This action addresses the need for continued development of recovery partnerships and strategies. Progress toward black-footed ferret recovery requires sustained program momentum. Among listed species, the ferret has one of the longest histories of endangerment and cooperative recovery efforts. The conservation of

94

sufficient habitat will require increased efforts by many Federal, State, tribal, and private entities. Continued public and private involvement should be encouraged through frequent communication of recovery program status. The historical ferret range included lands now within the jurisdiction of Mexico, Canada, 12 States, several tribes, several Federal agencies, many local governments, and myriad private landowners. Currently, ferrets have been reintroduced on Federal, State, tribal, and private lands within eight States, on private and communal lands within Chihuahua, Mexico, and on Federal and private lands in Canada.

This action and its associated tasks will encourage participation by Federal, State, tribal, private, and foreign entities. This action addresses the threat to the black-footed ferret from a lack of proactive management.

6.1.  **Engage partners in review, analysis, and updates to program direction on a regular basis.** Participants in the recovery program will continue an open process for review of recovery activities.

6.1.1.  **Support review and analysis of program progress.** Research objectives and priorities will be assessed and competitive proposals from outside groups will be encouraged and evaluated. Regular evaluation of the progress in captive breeding, disease monitoring and management, habitat recovery and management, reintroduced ferret populations, and outreach efforts will be conducted.

6.1.2.  **Coordinate program components and update program direction as appropriate based on reviews addressed in task 6.1.1.** This revised recovery plan will provide a framework for adaptive management, based on rapid and reasoned response to population needs, rather than specific protocols. Communication between the Service, the SSP® and the BFFRIT to coordinate kit production and supply animals for reintroduction efforts will continue.

95

BLM_0070394

**6.1.3.   Formally report on progress toward recovery objectives on a five-year basis.** Progress on the actions specified in this plan will be assessed on a regular basis. External review will occur at longer intervals. Responsibility of assigning tasks is left to the funding entities and is coordinated by the Service. The most recent 5-year review was completed by the Service in 2008.

**6.1.4.   Use the Black-footed Ferret Recovery Implementation Team to help identify problems and solutions.** The Service consults with the BFFRIT to address specific problems and solutions. The structure and operations of the BFFRIT will be periodically reviewed and appropriate changes implemented. Annual meetings for the EC and all subcommittees are arranged by the Service.

**6.1.5.   Encourage the formation of jurisdictional and topical working groups to identify problems and solutions.** State working groups are site-specific implementation teams that provide recommendations on the management of local ferret recovery projects. The establishment of the BFFRIT has promoted improved technical support and the exchange of information by both involved partners and interested/affected parties, including tribes. Partners and other interested parties will be updated as appropriate on activities undertaken by various subcommittees.

**6.2.   Communicate program status, direction, and needs to potential recovery partners.** Communication is an important function of the Service. All partners should be kept informed of the latest developments and important issues facing the program. Public, political, and private support will be maintained to the extent possible through appropriate education and public relations efforts, including demonstration of progress toward ferret recovery. All ferret recovery activities will be organized on an annual basis. Recovery Program priorities and activities may change from year to year based on analysis of new data. Therefore, the organization and coordination of recovery activities may also change from

96

year to year.  Administrators should be aware of these dynamics and be prepared to coordinate and administer the program accordingly.

**6.2.1.   Maintain an up-to-date website describing the ferret recovery program and partnership opportunities.**  Ferret-related websites are maintained by the Service as well as many other affected agencies and organizations.  Current information regarding the ferret is available from websites maintained by the Service (*www.fws.gov/endangered/*) and by the BFFRIT (*www.blackfootedferret.org*).

**6.2.2.   Promote recovery partnerships through the formation of jurisdictional and topical working groups.**  Working groups will be organized to address local recovery efforts and specific research tasks as appropriate.

**6.2.3.   Encourage the exchange of scientific information and technical advice.**  The Service encourages sound experimental approaches and broad partner input to help ensure an effective and cost-efficient recovery program.  Scientific exchange is facilitated by broad distribution of pertinent planning documents, recovery program progress, technical research results, and accurate information on the effect of reintroduction projects on area land uses and other points of program controversy.  Technical meetings are conducted annually by each of the BFFRIT subcommittees.  Workshops on disease management, field techniques, anesthesia, breeding techniques, etc. are regularly conducted to meet program needs.

**6.3.   Support site-specific ferret reintroduction efforts and develop an outreach plan to stakeholders that support ferret recovery.** The BFFRIT OIS should facilitate the exchange of ferret recovery information through web sites, media contacts, and other means.

97

**6.3.1.** **Support the efforts of States, tribes, and other organizations to recover the ferret.**  Community education and outreach programs have been established in most States that are active in ferret reintroductions. Partnerships among agencies and organizations can increase the visibility of ferret recovery efforts and will be encouraged.

**6.3.2.** **Encourage public support for ferret recovery through strategically focused outreach efforts.**  Outreach activities provide information on the status of the ferret, its history and habitat, and the unique efforts to save it. Emphasis should be placed on generating interest, understanding, and appreciation among active recovery participants.  Specific constituencies will also be targeted according to their proximity to and possible involvement in the Recovery Program (i.e., western States, tribes, ranchers, policy makers, and educators).  Constituencies who are adverse to the Recovery Program should also be identified.  The benefits of maintaining this ecosystem and the species it supports should be conveyed.

**6.3.3.** **Provide ferret recovery information to Non-Government Organizations currently supporting recovery and solicit the assistance of other NGOs who could aid species recovery.**  Conservation organizations have participated in ferret recovery activities since before the discovery of the last wild population at Meeteetse and are vital to the continued success of ferret recovery.  Other organizations with similar wildlife and habitat conservation charters could potentially become involved to help accelerate public awareness and physical recovery efforts. The Service and the BFFRIT should frequently update national conservation organizations through personal contact and seek additional support or assistance where warranted.

**6.3.4.** **Support participation and coordination among government agencies with jurisdiction over programs related to ferret recovery.**  The

98

Service will encourage appropriate Federal, State, and tribal government agencies to participate in ferret recovery.  All Federal government agencies should be aware of ESA section 7 responsibilities, including the affirmative conservation mandate found in section 7(a)(1) of the Act directing all Federal agencies to use their authorities to conserve listed species.

**6.3.5.   Maintain updated information on the contributions of SSP® captive breeding facilities.**  Annual assessment of the expenditures and contributions of animals in terms of SSP® management and field recovery efforts will be conducted.

**6.4.   Consider funding needs for national and international ferret recovery.**
Funding needs for ferret recovery will be prioritized and updated as appropriate.

## PART III.  IMPLEMENTATION SCHEDULE

The Implementation Schedule outlines actions and estimated costs for recovery of the black-footed ferret, as set forth in this recovery plan.  It is a guide for meeting the recovery goals outlined in this plan.  This schedule indicates action priorities, action numbers, action descriptions, duration of actions, parties responsible for actions (either funding or carrying out), and estimated costs.  Parties with authority, responsibility, or expressed interest to implement a specific recovery action are identified in the Implementation Schedule.  When more than one party has been identified, the proposed lead party is indicated by an asterisk (*).  The listing of a party in the Implementation Schedule does not require the identified party to implement the action(s) or to secure funding for implementing the action(s).

Recovery priorities (column 1) are defined as follows:

BLM_0070398

Priority 1:    An action that should be taken to prevent extinction or to prevent the species from declining irreversibly in the foreseeable future.

Priority 2:    An action that should be taken to prevent a significant decline in species population or habitat quality, or to prevent some other significant negative impact short of extinction.

Priority 3:    All other actions to consider during reclassification and eventual full recovery of the species.

Responsible parties (column 4) include:

USFWS    U.S. Fish and Wildlife Service

BFFRIT    Black-footed Ferret Recovery Implementation Team (comprised of State and Federal agencies, tribes, and conservation organizations)

SSP®    American Zoo Association Species Survival Plan Partners

States    State wildlife agencies with ongoing or proposed reintroduction sites

Tribes    Tribes with ongoing or proposed reintroduction sites

NPS    U.S. National Park Service

USFS    U.S. Forest Service

BLM    U.S. Bureau of Land Management

USGS    U.S. Geological Survey – Biological Resources Division

APHIS    Animal and Plant Health Inspection Service

100

BLM_0070399

Table 7.  Implementation schedule for the Black-footed Ferret Recovery Plan

| PRIORITY # | TASK # | ACTION DESCRIPTION | LEAD* & RESPONSIBLE PARTIES | COST ESTIMATES ($1,000'S) | | | |
|---|---|---|---|---|---|---|---|
| | | | | FY 10-20 | FY 21-30 | FY 31-40 | TOTAL |
| 1 | 1.1 | Maintain an SSP Husbandry Manual that provides up-to-date protocols for the care, propagation, preconditioning, and transportation of captive ferrets | SSP®*, BFFRIT, USFWS | 250 | 200 | 200 | 650 |
| 1 | 1.2 | Provide adequate facilities for breeding ferrets in captivity, pursuant to Husbandry Manual guidelines | USFWS*, SSP®* | 1400 | 1000 | 1000 | 3400 |
| 1 | 1.4.1 | Maintain multiple captive populations located in at least three separate geographic locations to avoid catastrophic loss at a single facility | SSP®*, USFWS | 1370 | 980 | 980 | 3330 |
| 1 | 1.4.2 | Follow protocols for disease prevention described in the Husbandry Manual | SSP®*, USFWS* | 400 | 300 | 300 | 1000 |
| 1 | 1.4.3 | Develop disease outbreak contingency plans | SSP®*, USFWS, BFFRIT | 550 | 400 | 400 | 1350 |
| 1 | 1.4.5 | Support appropriate disease research | BFFRIT*, USFWS, USGS, APHIS | 800 | 600 | 600 | 2000 |

BLM_0070400

| PRIORITY # | TASK # | ACTION DESCRIPTION | LEAD* & RESPONSIBLE PARTIES | COST ESTIMATES ($1,000'S) | | | |
|---|---|---|---|---|---|---|---|
| | | | | FY 10-20 | FY 21-30 | FY 31-40 | TOTAL |
| 1 | 1.5.5 | Provide optimal stock for reintroduction purposes | USFWS*, SSP® | 700 | 500 | 500 | 1700 |
| 1 | 2.1 | Use recent prairie dog surveys to identify and prioritize habitats with potential as future ferret reintroduction sites | USFWS* | 90 | 60 | 60 | 210 |
| 1 | 3.3.1 | Work with site managers, landowners, and stakeholders to develop long-term site management assurances for potential new reintroduction sites | USFWS*, NPS, USFS, BLM, States, Tribes | 300 | 240 | 240 | 780 |
| 1 | 3.3.3 | Include site-specific prairie dog management plans in evaluation of new recovery sites | USFWS*, NPS, USFS, BLM, other Federal agencies, States, Tribes | 1050 | 840 | 840 | 2730 |
| 1 | 3.3.4 | Conduct site-specific monitoring of ferret populations and environmental variables | USFWS*, BFFRIT | 300 | 240 | 240 | 780 |

102

BLM_0070401

| PRIORITY # | TASK # | ACTION DESCRIPTION | LEAD* & RESPONSIBLE PARTIES | COST ESTIMATES ($1,000'S) | | | |
|---|---|---|---|---|---|---|---|
| | | | | FY 10-20 | FY 21-30 | FY 31-40 | TOTAL |
| 1 | 3.4.2 | Assess site conditions prior to ferret releases | USFWS*, BFFRIT | 600 | 480 | 480 | 1560 |
| 1 | 3.5.1 | Release sufficient numbers of ferrets to meet downlisting criteria of establishing 1500 free-ranging adults distributed among at least 10 populations, with no less than 30 breeding adults in each population | USFWS*, BFFRIT | 1140 | 0 | 0 | 1140 |
| 1 | 3.5.2 | Continue releases to meet the delisting criteria | USFWS*, BFFRIT | 0 | 1140 | 1680 | 2820 |
| 1 | 3.5.3 | Represent all founders as equally as possible in each released population | USFWS*, BFFRIT, SSP® | 300 | 240 | 240 | 780 |
| 1 | 3.5.4 | Support the use of wild-born ferrets for reintroduction at other sites | USFWS*, BFFRIT, SSP® | 900 | 720 | 720 | 2340 |

BLM_0070402

| PRIORITY # | TASK # | ACTION DESCRIPTION | LEAD* & RESPONSIBLE PARTIES | COST ESTIMATES ($1,000'S) | | | |
|---|---|---|---|---|---|---|---|
| | | | | FY 10-20 | FY 21-30 | FY 31-40 | TOTAL |
| 1 | 3.6.1 | Monitor ferrets | USFWS*, BFFRIT, NPS, USFS, BLM, USGS, States, Tribes | 1500 | 1200 | 1200 | 3900 |
| 1 | 3.6.2 | Monitor and evaluate changes in prairie dog density and distribution | USFWS*, BFFRIT, NPS, USFS, BLM, States, Tribes | 300 | 240 | 240 | 780 |
| 1 | 3.6.3 | Monitor disease dynamics | USFWS*, USGS, NPS, USFS, APHIS, BLM, States, Tribes | 300 | 240 | 240 | 780 |
| 1 | 3.6.4 | Monitor and evaluate changes in the site environment | USFWS*, BFFRIT, NPS, USFS, BLM, States, Tribes | 300 | 240 | 240 | 780 |

BLM_0070403

| PRIORITY # | TASK # | ACTION DESCRIPTION | LEAD* & RESPONSIBLE PARTIES | COST ESTIMATES ($1,000'S) | | | |
|---|---|---|---|---|---|---|---|
| | | | | FY 10-20 | FY 21-30 | FY 31-40 | TOTAL |
| 1 | 3.7.7 | Support disease monitoring and management capabilities | USFWS*, USGS, APHIS | 400 | 920 | 920 | 2240 |
| 1 | 3.7.8 | Improve understanding of ferret demography and genetics | USFWS*, BFFRIT, USGS, SSP® | 350 | 280 | 280 | 910 |
| 1 | 3.7.9 | Consider population viability, including potential effects of inbreeding, interspecific interactions, and disease | USFWS*, USGS, SSP®, BFFRIT | 350 | 280 | 280 | 910 |
| 1 | 3.8 | Enforce all laws protecting established populations | USFWS*, NPS, USFS, BLM, other Federal agencies, States, Tribes | 300 | 840 | 840 | 1980 |
| 1 | 3.9.1 | Produce annual site reports | USFWS*, BFFRIT | 300 | 240 | 240 | 780 |
| 1 | 3.9.2 | Include demographic and/or genetic manipulation needs for each population | USFWS*, SSP® BFFRIT, USGS | 300 | 840 | 840 | 1980 |

BLM_0070404

| PRIORITY # | TASK # | ACTION DESCRIPTION | LEAD* & RESPONSIBLE PARTIES | COST ESTIMATES ($1,000'S) | | | |
|---|---|---|---|---|---|---|---|
| | | | | FY 10-20 | FY 21-30 | FY 31-40 | TOTAL |
| 1 | 3.9.4 | Update reintroduction strategy and protocols | USFWS*, BFFRIT | 300 | 240 | 240 | 780 |
| 1 | 4.1.1 | Improve guidelines for determining ferret habitat requirements | USFWS*, BFFRIT, USGS | 2000 | 1600 | 1600 | 5200 |
| 1 | 4.1.3 | Estimate the amount and configuration of habitat necessary to support downlisting and delisting objectives | USFWS*, BFFRIT, USGS | 1000 | 800 | 800 | 2600 |
| 1 | 4.2.1 | Consult Federal, State, tribal, and private entities with jurisdiction over historical ferret habitats to develop jurisdiction-specific habitat goals and habitat management plans | USFWS*, BFFRIT, NPS, USFS, BLM, other Federal agencies, States, Tribes | 10000 | 10000 | 10000 | 30000 |

106

BLM_0070405

| PRIORITY # | TASK # | ACTION DESCRIPTION | LEAD* & RESPONSIBLE PARTIES | COST ESTIMATES ($1,000'S) | | | |
|---|---|---|---|---|---|---|---|
| | | | | FY 10-20 | FY 21-30 | FY 31-40 | TOTAL |
| 1 | 4.2.2 | Recover and maintain sufficient ferret habitat to support recovery goals | USFWS*, BFFRIT, NPS, BLM, USFS, other Federal agencies, States, Tribes | 5500 | 4400 | 4400 | 14300 |
| 1 | 4.2.3 | Engage relevant government agencies currently not participating in ferret recovery | USFWS*, BFFRIT, NPS, USFS, BLM, other Federal agencies, States, Tribes | 4000 | 4800 | 4800 | 13600 |
| 1 | 5.2.1 | Develop and implement prophylactic methods for controlling sylvatic plague | USGS*, USFWS, APHIS, | 3800 | 2700 | 2700 | 9200 |

107

BLM_0070406

| PRIORITY # | TASK # | ACTION DESCRIPTION | LEAD* & RESPONSIBLE PARTIES | COST ESTIMATES ($1,000'S) | | | |
|---|---|---|---|---|---|---|---|
| | | | | FY 10-20 | FY 21-30 | FY 31-40 | TOTAL |
| 1 | 5.2.2 | Develop and implement ecological methods for control of sylvatic plague in ferret recovery areas, including methods based on manipulation of ferret habitats or associated species communities | USFWS*, BFFRIT, NPS, USGS, USFS, BLM, other Federal agencies, States, Tribes | 3500 | 1700 | 1700 | 6900 |
| 1 | 5.4.2 | Maintain public support for ferret reintroduction efforts at sites with disease issues | USFWS*, BFFRIT, USGS | 150 | 100 | 100 | 350 |
| 2 | 1.5.2 | Conduct and evaluate efforts to improve reproductive output to support genetic management and reintroduction efforts | SSP®*, USFWS | 270 | 180 | 180 | 630 |
| 2 | 1.5.3 | Continue management efforts to balance the genetic representation of founders in the captive population | SSP®*, USFWS | 450 | 300 | 300 | 1050 |
| 2 | 1.5.4 | Evaluate the reproductive fitness, genetics, and demography of the captive population | USFWS*, SSP® | 510 | 340 | 340 | 1190 |

BLM_0070407

| PRIORITY # | TASK # | ACTION DESCRIPTION | LEAD* & RESPONSIBLE PARTIES | COST ESTIMATES ($1,000'S) | | | |
|---|---|---|---|---|---|---|---|
| | | | | FY 10-20 | FY 21-30 | FY 31-40 | TOTAL |
| 2 | 3.1 | Maintain a list of research needs related to reintroduction and population monitoring | BFFRIT*, USFWS | 50 | 40 | 40 | 130 |
| 2 | 3.2 | Maintain a standardized ranking procedure for allocating ferrets to candidate reintroduction sites | USFWS*, BFFRIT | 50 | 40 | 40 | 130 |
| 2 | 3.3.2 | Collect information for site screening and baseline data purposes | USFWS*, NPS, USFS, BLM, other Federal agencies, States, Tribes | 225 | 180 | 180 | 585 |
| 2 | 3.3.5 | Standardize annual site monitoring and reporting to the extent practical | USFWS*, BFFRIT | 150 | 120 | 120 | 390 |
| 2 | 3.4.1 | Comply with obligations of the ESA, NEPA, and other laws | USFWS*, NPS, USFS, BLM, USGS, other Federal agencies, States, Tribes | 50 | 40 | 40 | 130 |

109

BLM_0070408

| PRIORITY # | TASK # | ACTION DESCRIPTION | LEAD* & RESPONSIBLE PARTIES | COST ESTIMATES ($1,000'S) | | | |
|---|---|---|---|---|---|---|---|
| | | | | FY 10-20 | FY 21-30 | FY 31-40 | TOTAL |
| 2 | 3.4.3 | Schedule and prepare ferrets for releases | USFWS*, SSP® | 150 | 120 | 120 | 390 |
| 2 | 3.7.1 | Continue the use of ferret preconditioning techniques | USFWS*, SSP® | 50 | 40 | 40 | 130 |
| 2 | 3.7.2 | Optimize release methods and timing | USFWS*, BFFRIT | 50 | 40 | 40 | 130 |
| 2 | 3.7.3 | Continue to improve ferret monitoring techniques | USFWS*, BFFRIT, NPS, USGS, USFS, BLM, other Federal agencies, States, Tribes | 50 | 40 | 40 | 130 |
| 2 | 3.7.6 | Continue to improve techniques for habitat monitoring and habitat evaluation | USFWS*, BFFRIT, USGS, USFS, BLM, other Federal agencies, States, Tribes | 50 | 40 | 40 | 130 |

110

BLM_0070409

| PRIORITY # | TASK # | ACTION DESCRIPTION | LEAD* & RESPONSIBLE PARTIES | COST ESTIMATES ($1,000'S) | | | |
|---|---|---|---|---|---|---|---|
| | | | | FY 10-20 | FY 21-30 | FY 31-40 | TOTAL |
| 2 | 3.9.3 | Evaluate and update site monitoring and research efforts | USFWS*, BFFRIT, USGS | 100 | 80 | 80 | 260 |
| 2 | 4.1.2 | Assess progress toward meeting downlisting and delisting criteria | USFWS*, BFFRIT | 500 | 400 | 400 | 1300 |
| 2 | 5.1.2 | Develop a list of bibliographies of publications and projects relevant to disease | USGS*, USFWS | 30 | 20 | 20 | 70 |
| 2 | 5.1.3 | Synthesize relevant information and research results | USFWS*, USGS | 30 | 20 | 20 | 70 |
| 2 | 5.1.4 | Report epizootics to the Centers for Disease Control, the National Wildlife Health Laboratory, and other appropriate disease research facilities | USFWS*, BFFRIT | 60 | 40 | 40 | 140 |
| 2 | 5.4.1 | Conduct periodic symposia and workshops to exchange information on diseases | USFWS*, BFFRIT, USGS | 150 | 100 | 100 | 350 |
| 2 | 6.1.1 | Support review and analysis of program progress | USFWS*, SSP®, BFFRIT | 4000 | 2900 | 2900 | 9800 |

BLM_0070410

| PRIORITY # | TASK # | ACTION DESCRIPTION | LEAD* & RESPONSIBLE PARTIES | COST ESTIMATES ($1,000'S) | | | |
|---|---|---|---|---|---|---|---|
| | | | | FY 10-20 | FY 21-30 | FY 31-40 | TOTAL |
| 2 | 6.1.2 | Coordinate program components and update program direction as appropriate based on reviews addressed in task 611 | USFWS*, BFFRIT, USGS, SSP® | 1340 | 940 | 940 | 3220 |
| 2 | 6.1.3 | Formally report on progress toward recovery objectives on a five-year basis | USFWS | 60 | 60 | 60 | 180 |
| 2 | 6.1.4 | Use the BFFRIT to help identify problems and solutions | USFWS*, BFFRIT | 350 | 250 | 250 | 850 |
| 2 | 6.4 | Consider funding needs for national and international ferret recovery | USFWS*, BFFRIT | 290 | 210 | 210 | 710 |
| 3 | 1.3 | Provide a description of research needs related to genetic and demographic management of captive populations | USFWS*, SSP®, BFFRIT, USGS | 60 | 40 | 40 | 140 |
| 3 | 1.4.4 | Maintain a list of disease research contacts | USFWS*, SSP®, BFFRIT, USGS | 60 | 40 | 40 | 140 |
| 3 | 1.5.1 | Conduct regular reviews of breeding strategies | SSP®*, USFWS, BFFRIT | 120 | 80 | 80 | 280 |

112

BLM_0070411

| PRIORITY # | TASK # | ACTION DESCRIPTION | LEAD* & RESPONSIBLE PARTIES | COST ESTIMATES ($1,000'S) | | | |
|---|---|---|---|---|---|---|---|
| | | | | FY 10-20 | FY 21-30 | FY 31-40 | TOTAL |
| 3 | 1.6 | Establish policies for the use and handling of dead, non-reproductive, or otherwise excess ferrets | USFWS | 60 | 40 | 40 | 140 |
| 3 | 2.2 | If a remnant population is located, develop a plan to integrate any population into the recovery program | USFWS | 0 | 0 | 0 | 0 |
| 3 | 3.7.4 | Continue to improve survey techniques | USGS*, USFWS | 175 | 140 | 140 | 455 |
| 3 | 3.7.5 | Continue to improve telemetry equipment and techniques | USGS*, USFWS | 50 | 40 | 40 | 130 |
| 3 | 5.1.1 | Consider development of a list of disease research needs | USGS*, USFWS | 30 | 20 | 20 | 70 |
| 3 | 5.3.1 | Continue to implement prophylactic methods for control of canine distemper | USGS*, USFWS | 150 | 100 | 100 | 350 |

113

BLM_0070412

| PRIORITY # | TASK # | ACTION DESCRIPTION | LEAD* & RESPONSIBLE PARTIES | COST ESTIMATES ($1,000'S) | | | |
|---|---|---|---|---|---|---|---|
| | | | | FY 10-20 | FY 21-30 | FY 31-40 | TOTAL |
| 3 | 5.3.2 | Continue to implement ecological methods for control of canine distemper in ferret recovery areas, including methods based on manipulation of ferret habitats or associated carnivore communities | BFFRIT*, USGS, USFWS | 210 | 140 | 140 | 490 |
| 3 | 6.1.5 | Encourage the formation of jurisdictional and topical working groups to identify problems and solutions | USFWS*, BFFRIT | 60 | 40 | 40 | 140 |
| 3 | 6.2.1 | Maintain an up-to-date website describing the ferret recovery program and partnership opportunities | USFWS*, BFFRIT | 60 | 40 | 40 | 140 |
| 3 | 6.2.2 | Promote recovery partnerships through the formation of jurisdictional and topical working groups | USFWS*, BFFRIT | 60 | 40 | 40 | 140 |
| 3 | 6.2.3 | Encourage the exchange of scientific information and technical advice | USFWS*, BFFRIT | 120 | 80 | 80 | 280 |

114

BLM_0070413

| PRIORITY # | TASK # | ACTION DESCRIPTION | LEAD* & RESPONSIBLE PARTIES | COST ESTIMATES ($1,000'S) | | | |
|---|---|---|---|---|---|---|---|
| | | | | FY 10-20 | FY 21-30 | FY 31-40 | TOTAL |
| 3 | 6.3.1 | Support the efforts of States, tribes, and other organizations to recover the ferret | USFWS*, BFFRIT | 90 | 60 | 60 | 210 |
| 3 | 6.3.2 | Encourage public support for ferret recovery through strategically focused outreach efforts | USFWS*, BFFRIT | 440 | 300 | 300 | 1040 |
| 3 | 6.3.3 | Provide ferret recovery information to Non-Government Organizations currently supporting recovery and solicit the assistance of other NGOs who could aid species recovery | USFWS*, BFFRIT | 60 | 40 | 40 | 140 |
| 3 | 6.3.4 | Support participation and coordination among government agencies with jurisdiction over programs related to ferret recovery | USFWS*, BFFRIT | 60 | 40 | 40 | 140 |
| 3 | 6.3.5 | Maintain updated information on the contributions of SSP® captive breeding facilities | USFWS*, BFFRIT, SSP® | 60 | 40 | 40 | 140 |

BLM_0070414

## PART IV.  LITERATURE CITED

Aaltonen, K., A. Bryant, J. Hostetler, and M. Oli.  2009.  Reintroducing endangered
    Vancouver Island marmots: survival and cause-specific mortality rates of captive-
    born versus wild-born individuals.  Biological Conservation 142: 2181–2190.

Abbott, C. and T. Rocke.  2012.  Plague: U.S. Geological Survey Circular 1372.  79 pp.

Anderson, E., S.C. Forrest, T.W. Clark, and L. Richardson.  1986.  Paleobiology,
    biogeography, and systematics of the black-footed ferret, *Mustela nigripes*
    (Audubon and Bachman), 1851.  In Great Basin Naturalist Memoirs No. 8 The
    Black-footed Ferret. S.L. Wood Editor.  Brigham Young University.  Pp. 11–62.

Arizona Game and Fish Department.  1988.  Threatened native wildlife in Arizona.
    Arizona Game and Fish Department Publication.  Phoenix, AZ.  32 pp.

Arroyo, B.  2009.  Request to EPA dated Sept. 9, 2009 to withdraw Rozol registration for
    prairie dog control.  In litt.

Barnes, A.M.  1993.  A review of plague and its relevance to prairie dog populations and
    the black-footed ferret.  In Proceedings of the Symposium on the Management of
    Prairie Dog Complexes for the Reintroduction of the Black-footed Ferret.  U.S.
    Fish and Wildlife Service Biological Report 13. Pp. 28–37.

Bell, W.  1921.  Death to the rodents.  U.S. Department of Agriculture.  1920 Yearbook.
    Pp. 421–438.

Berryman, J.H. and N.C. Johnson.  1973.  Ferret and prairie dog programs on public
    lands: a perspective and some facts.  In Proceedings of the Black-footed Ferret
    and Prairie Dog Workshop, Sept. 4–6, 1973, Rapid City, SD.  Prepared by R.L.
    Linder and C.N. Hillman.  Pp. 109–125.

BLM_0070415

Biggins, D.E.  2000.  Predation on black-footed ferrets (*Mustela nigripes*) and Siberian polecats (*M. eversmannii*): conservation and evolutionary implications.  Colorado State University.  PhD Dissertation.  201 pp.

Biggins, D.E.  2006.  The symposium in context.  In Recovery of the Black-footed Ferret: Progress and Continuing Challenges.  Edited by J.E. Roelle, B.J. Miller, J.L. Godbey, and D.E. Biggins.  U.S. Geological Survey.  Pp. 3–5.

Biggins, D.E., B.J. Miller, T.W, Clark, and R.P. Reading. 1997.  Management of an endangered species: the black-footed ferret.  In Principles of Conservation Biology.  Edited by G.K. Meffe and C.R. Carroll. Pp. 420–436.

Biggins, D.E., J.L. Godbey, T.M. Livieri, M.R. Matchett, and B.D. Bibles.  2006.  Post-release movements and survival of adult and young black-footed ferrets.  In Recovery of the Black-footed Ferret:  Progress and Continuing Challenges.  Edited by J.E. Roelle, B.J. Miller, J.L. Godbey, and D.E. Biggins.  U.S. Geological Survey.  Pp. 189–198.

Biggins, D.E., J.L. Godbey, B.M. Horton, and T.M. Livieri.  2011.  Movements and survival of black-footed ferrets associated with an experimental translocation in South Dakota.  Journal of Mammalogy 92(4):742–750.

Breck, S.W., D.E. Biggins, T.M. Livieri, M.R. Matchett, and V. Kopcso.  2006.  Does predator management enhance survival of reintroduced black-footed ferrets?  In Recovery of the Black-footed Ferret:  Progress and Continuing Challenges.  Edited by J.E. Roelle, B.J. Miller, J.L. Godbey, and D.E. Biggins.  U.S. Geological Survey.  Pp. 203–209.

BLM_0070416

Bruening, J.J.  2007.  Field efficacy of Kaput-D® prairie dog bait for controlling black-tailed prairie dogs (*Cynomys ludovicianus*).  Scimetrics Ltd., Corporation, Wellington, CO.  108 pp.

Bunnell, K.  2008.  Utah Division of Wildlife Resources.  BFFRIT Conservation Subcommittee meeting minutes.  Personal Communication with BFFRIT. February 6–7, 2008.

Bureau of Sport Fisheries and Wildlife.  1961.  1961 Prairie Dog Inventory.  Unpublished report by Bureau of Sport Fisheries and Wildlife.  Washington D.C.

CBSG.  1992.  Black-footed ferret recovery plan review.  IUCN/SSC Conservation Breeding Specialist Group: Apple Valley, MN.  44 pp.

CBSG.  2004.  Black-footed ferret population management planning workshop.  Final Report.  IUCN/SSC Conservation Breeding Specialist Group: Apple Valley, MN. 130 pp.

Clark, T.W.  1986.  Technical introduction.  In Great Basin Naturalist Memoirs No. 8 The Black-footed Ferret. S.L. Wood Editor.  Brigham Young University.  Pp. 8–10.

Clark, T.W.  1989.  Conservation biology of the black-footed ferret *Mustela nigripes*. Wildlife Preservation Trust Special Scientific Report No. 3.  175 pp.

Clark, T.W., S.C. Forrest, L. Richardson, D.E. Casey, and T.M. Campbell. 1986. Description and history of the Meeteetse black-footed ferret environment.  In Great Basin Naturalist Memoirs No. 8 The Black-footed Ferret. S.L. Wood Editor.  Brigham Young University.  Pp. 72–84.

BLM_0070417

COSEWIC.  2000.  COSEWIC assessment and status report on the black-footed ferret
*Mustela nigripes* in Canada.  Committee on the Status of Endangered Wildlife in
Canada.  14 pp.

Cully, J.F.  1993.  Plague, prairie dogs, and black-footed ferrets.  In Proceedings of the
Symposium on the Management of Prairie Dog Complexes for the Reintroduction
of the Black-footed Ferret.  U.S. Fish and Wildlife Service Biological Report 13.
Pp. 38–49.

Cully, J.F. and T.L. Johnson.  2006.  2005 Annual Report: A summary of black-tailed
prairie dog abundance and occurrence of sylvatic plague.  19 pp.

Dullum, J.L.D., K.R. Foresman, and M.R. Matchett.  2005.  Efficacy of translocations for
restoring populations of black-tailed prairie dogs.  Wildlife Society Bulletin 2005,
33(3):842–850.

Enscore, R.E., B.J. Biggerstaff, T.L. Brown, R.F. Fulgham, P.J. Reynolds, D.M.
Engelthaler, E.E. Levy, R.R. Parmenter, J.A. Montenieri, J.E. Cheek, R.K.
Grinnel, P.J. Ettestad, and K.L. Gage.  2002.  Modeling relationships between
climate and frequency of human plague cases in the southwestern United States,
1960–1997.  American Journal of Tropical Medicine and Hygiene 66(2):186–196.

Erickson, W. and D. Urban.  2004.  Potential risks of nine rodenticides to birds and
nontarget mammals: a comparative approach.  U.S. Environmental Protection
Agency.  224 pp.

Ernst, A.E., A.L. Clark, and D.R. Gober.  2006.  A habitat-based technique to allocate
black-footed ferret recovery among jurisdictional entities.  In Recovery of the
Black-footed Ferret:  Progress and Continuing Challenges.  Edited by J.E. Roelle,
B.J. Miller, J.L. Godbey, and D.E. Biggins.  U.S. Geological Survey.  Pp. 89–95.

BLM_0070418

Ernst, A.E.  2008.  Retired U.S. Fish and Wildlife Service.  E-mail regarding ferret habitat calculations.  Personal Communication with Pete Gober.  August 4, 2008.

Esch, K.L., G.P. Beauvais and D.A. Keinath.  2005.  Species conservation assessment for black footed ferret (*Mustela nigripes*) in Wyoming.  Prepared for Bureau of Land Management.  50 pp.

Eskey, C. and V. Haas.  1940.  Plague in the western part of the United States.  United States Public Health Bulletin 254:1–83.

Fagerstone, K.A. and D.E. Biggins.  1986.  Comparison of capture-recapture and visual count indices of prairie dog densities in black-footed ferret habitat.  In Great Basin Naturalist Memoirs No. 8 The Black-footed Ferret. S.L. Wood Editor.  Brigham Young University.  Pp. 94–98.

Forrest, S.C., T.W. Clark, L. Richardson, and T.M. Campbell III. 1985.  Black-footed ferret habitat: some management and reintroduction considerations.  Wyoming BLM Wildlife Technical Bulletin No. 2.  49 pp.

Forrest, S.C., D.E. Biggins, L. Richardson, T.W. Clark, T.M. Campbell III., K.A. Fagerstone, and E.T. Thorne.  1988.  Population attributes for the black-footed ferret (*Mustela nigripes*) at Meeteetse, Wyoming, 1981–1985.  Journal of Mammalogy 69(2):261–273.

Forrest, S.C., and J. Luchsinger.  2005.  Past and current chemical control of prairie dogs.  In Conservation of the Black-tailed Prairie Dog, J. Hoogland, ed., Island Press, NY.  Pp. 115–128.

BLM_0070419

Gage, K.L. and M.Y. Kosoy. 2006. Recent trends in plague ecology. In Recovery of the Black-footed Ferret: Progress and Continuing Challenges. Edited by J.E. Roelle, B.J. Miller, J.L. Godbey, and D.E. Biggins. U.S. Geological Survey. Pp. 213–231.

Garelle, D., P. Marinari, and C. Lynch. 2006. Black-footed ferret species survival plan. American Zoo and Aquarium Association Population Management Center. 29 pp.

Gedir, J.V., T. Everest, and A. Moehrenschlager. 2004. Evaluating the potential for species reintroductions in Canada. In Proceedings of the Species at Risk 2004 Pathways to Recovery Conference. March 2–6, 2004, Victoria, B.C. 28 pp.

Gober, P. U.S. Fish and Wildlife Service. Jan. 24, 2006. Letter to SD Dept. of Agriculture. In litt.

Godbey, J.L., D.E. Biggins, and D. Garrelle. 2006. Exposure of captive black-footed ferrets to plague and implications for species recovery. In Recovery of the Black-footed Ferret: Progress and Continuing Challenges. Edited by J.E. Roelle, B.J. Miller, J.L. Godbey, and D.E. Biggins. U.S. Geological Survey. Pp. 233–237.

Grenier, M.B., D.B. McDonald, S.W. Buskirk. 2007. Rapid population growth of a critically endangered carnivore. Science Vol. 317:779.

Griebel, R.L. 2008a. U.S. Forest Service. E-mail update on plague at Conata Basin. Personal Communication with BFFRIT. September 3, 2008.

Griebel, R. G. 2008b. Wall Ranger District 2008 plague management report. Unpublished Report. U.S. Department of Agriculture, Forest Service, Rocky Mountain Region, Nebraska National Forest, Wall Ranger District, Wall, South Dakota. 11 pp.

BLM_0070420

Griebel, R. G. 2009.  Wall Ranger District 2009 plague management report.  Unpublished Report.  U.S. Department of Agriculture, Forest Service, Rocky Mountain Region, Nebraska National Forest, Wall Ranger District, Wall, South Dakota.  13 pp.

Griebel, R. G. 2010. Wall Ranger District boundary and interior management zone report 2009 Monitoring Report.  Unpublished Report.  U.S. Department of Agriculture, Forest Service, Rocky Mountain Region, Nebraska National Forest, Wall Ranger District, Wall, South Dakota.  6 pp.

Groves, C.R. and T.W. Clark.  1986.  Determining minimum population size for recovery of the black-footed ferret.  In Great Basin Naturalist Memoirs No. 8 The Black-footed Ferret.  S.L. Wood Editor.  Brigham Young University.  Pp. 150–159.

Hanebury, L.R. and D.E. Biggins.  2006.  A history of searches for black-footed ferrets.  In Recovery of the Black-footed Ferret:  Progress and Continuing Challenges.  Edited by J.E. Roelle, B.J. Miller, J.L. Godbey, and D.E. Biggins.  U.S. Geological Survey.  Pp. 47–65.

Hanson, R.  1993.  Control of prairie dogs and related developments in South Dakota.  In Proceedings of the Symposium on the Management of Prairie Dog Complexes for the Reintroduction of the Black-footed Ferret.  U.S. Fish and Wildlife Service Biological Report 13.  Pp. 5–7.

Henderson, F.R., P.F. Springer and R. Adrian.  1969 (revised 1974).  The black-footed ferret in South Dakota.  South Dakota Dept. of Game, Fish and Parks Technical Bulletin No. 4.  37 pp.

Hillman, C.N.  1968.  Field observations of black-footed ferrets in South Dakota.  In Thirty-Third North American Wildlife Conference.  Pp. 433–443.

BLM_0070421

Hillman, C.N. and T.W. Clark.  1980.  Mustela nigripes.  In Mammalian Species No. 126.  The American Society of Mammalogists.  3 pp.

Hoffmeister, D.F.  1986.  Mammals of Arizona.  The University of Arizona Press and The Arizona Game and Fish Department.  Unpaginated.

Howard, J., R.M. Santymire, P.E. Marinari, J.S. Kreeger, L. Williamson, and E.E. Wildt. 2006.  Use of reproductive technology for black-footed ferret recovery.  In Recovery of the Black-footed Ferret:  Progress and Continuing Challenges. Edited by J.E. Roelle, B.J. Miller, J.L. Godbey, and D.E. Biggins.  U.S. Geological Survey.  Pp. 28–36.

Hutchins, M, R.J. Wiese, and J. Bowdoin.  1996.  Black-footed ferret recovery program analysis and action plan.  American Zoo and Aquarium Association.  137 pp.

Intergovernmental Panel on Climate Change.  2007.  Synthesis Report.  52 pp.

Jule, K., L. Leaver, and S. Lea.  2008.  The effects of captive experience on reintroduction survival in carnivores: a review and analysis.  Biological Conservation 141: 355–363.

Kempema, S.  2007.  South Dakota black-tailed prairie dog colony acreage and distribution, 2006.  South Dakota Department of Game, Fish and Parks Wildlife Division Report Number 2007-07, Pierre, South Dakota.  21 pp.

Kilpatrick, C.W., S.C. Forrest, and T.W. Clark.  1986.  Estimating genetic variation in the black-footed ferret—a first attempt.  In Great Basin Naturalist Memoirs No. 8 The Black-footed Ferret. S.L. Wood Editor.  Brigham Young University.  Pp. 145–149.

BLM_0070422

Knowles, C.  1988.  An evaluation of shooting and habitat alteration for control of black-tailed prairie dogs.  In Eighth Great Plains Wildlife Damage Control Workshop Proceedings, April 28–30, 1987, Rapid City, South Dakota.  U.S. Forest Service General Technical Report RM-154.  Pp. 53–56.

Koch, D.  Aug. 19, 2008.  Letter from WAFWA to U.S. EPA regarding use of anticoagulants for prairie dog control.  In litt.

Krueger R.  2008a.  U.S. Fish and Wildlife Service.  E-mail regarding shooting at the Wolf Creek black-footed ferret reintroduction site in NW Colorado.  Personal Communication with Scott Larson.  June 25, 2008.

Krueger R.  2008b.  U.S. Fish and Wildlife Service.  E-mail regarding shooting at the Wolf Creek black-footed ferret reintroduction site in NW Colorado.  Personal Communication with Scott Larson.  July 9, 2008.

Krueger R.  2008c.  U.S. Fish and Wildlife Service.  E-mail regarding shooting at the Wolf Creek black-footed ferret reintroduction site in NW Colorado.  Personal Communication with Scott Larson.  July 16, 2008.

Larson, S. 2008a.  U.S. Fish and Wildlife Service.  E-mail summarizing allocation requests.  Personal Communication with BFFRIT.  April 22, 2008.

Larson, S.  2008b.  U.S. Fish and Wildlife Service.  Animal Damage Control meeting notes.  Personal Communication with Joy Gober.  February 27, 2008.

Lee, C.D. and S.E. Hygnstrom.  2007.  Field efficacy and hazards of rozol bait for controlling black-tailed prairie dogs (*Cynomys ludovicianus*).  Liphatech, Inc., Milwaukee, WI.  56 pp.

BLM_0070423

Linder, R.L., M.E. Anderson, E.M. Brigham, III, C.N. Hillman, D.L. Lengkeek, A.L. Lovaas, J.K. McDowell, W.W. Paintner. 1978. Black-footed ferret recovery plan. U.S. Fish and Wildlife Service. 146 pp.

Lockhart, J.M. U.S. Fish and Wildlife Service. May 29, 2000. Letter to Black-footed Ferret Recovery Implementation Team. In litt.

Lockhart, J.M. U.S. Fish and Wildlife Service. 2001. Preliminary allocation of black-footed ferret for 2001. Personal Communication with BFFRIT. June 20, 2001.

Lockhart, J.M. U.S. Fish and Wildlife Service. 2002. Email of preliminary allocation of ferrets for 2002. Personal Communication with BFFRIT. June 27, 2002.

Lockhart, J.M. U.S. Fish and Wildlife Service. June 10, 2003. Letter to Black-footed Ferret Recovery Implementation Team. In litt.

Lockhart, J.M. U.S. Fish and Wildlife Service. June 12, 2004. Letter to Black-footed Ferret Recovery Implementation Team. In litt.

Lockhart, J.M. U.S. Fish and Wildlife Service. 2005. Email of preliminary allocation of ferrets for 2005. Personal Communication with BFFRIT. June 26, 2005.

Lockhart, J.M. U.S. Fish and Wildlife Service. 2006 draft. Email of preliminary allocation of ferrets for 2006. Personal communication with BFFRIT. June 21, 2006.

Lockhart, J.M. U.S. Fish and Wildlife Service. 2007 draft. Email of preliminary allocation of ferrets for 2006. Personal communication with BFFRIT. April 4, 2007.

BLM_0070424

Lockhart, J.M., E.T. Thorne, and D.R. Gober.  2006.  A historical perspective on recovery of the black-footed ferret and the biological and political challenges affecting its future.  In Recovery of the Black-footed Ferret:  Progress and Continuing Challenges.  Edited by J.E. Roelle, B.J. Miller, J.L. Godbey, and D.E. Biggins.  U.S. Geological Survey.  Pp. 6–19.

Luce, R.J.  2003.  A multi-state conservation plan for the black-tailed prairie dog, Cynomys ludovicianus, in the United States.  79 pp.

Luce, R.J.  2006.  Areas where habitat characteristics could be evaluated to identify potential black-footed ferret reintroduction sites and develop conservation partnerships.  In Recovery of the Black-footed Ferret:  Progress and Continuing Challenges.  Edited by J.E. Roelle, B.J. Miller, J.L. Godbey, and D.E. Biggins.  U.S. Geological Survey.  Pp. 69–88.

Luce, R.J.  2008 (draft).  Potential black-footed ferret reintroduction sites, 2008.  49 pp.

Mac, M.J., P.A. Opler, C.E. Puckett Haecker, and P.D. Doran.  1998.  Status and trends of the nation's biological resources.  2 volumes.  U.S. Department of the Interior, U.S. Geological Survey, Reston, Va.  964 pp.

Maran, T., M. Podra, M. Polma, and D. Macdonald.  2009.  The survival of captive-born animals in restoration programmes—case study of the endangered European mink Mustela lutreola.  Biological Conservation 142: 1685–1692.

Marinari, P.E.  2011.  U.S. Fish and Wildlife Service.  E-mail update on captive breeding. Personal Communication with Joy Gober.  May 6, 2011.

BLM_0070425

Marinari, P.E. and J.S. Kreeger.  2006.  An adaptive management approach for black-footed ferrets in captivity.  In Recovery of the Black-footed Ferret:  Progress and Continuing Challenges.  Edited by J.E. Roelle, B.J. Miller, J.L. Godbey, and D.E. Biggins.  U.S. Geological Survey.  Pp. 23–27.

Matchett, M.R., D.E. Biggins V. Carlson, B. Powell and T. Rocke.  2010.  Enzootic plague reduces black-footed ferret (*Mustela nigripes*) survival in Montana.  Vector Borne Zoonotic Diseases. 10:27–35.

Miller, B., R.P. Reading, and S. Forrest.  1996.  Prairie Night, Black-footed Ferrets and the Recovery of an Endangered Species.  Smithsonian Institution Press.  Washington and London.  Pp. 54–55.

Nakazawa, Y., R. Williams, A.T. Peterson, P. Mead, E. Staples, and K.L. Gage.  2007.  Climate change effects on plague and tularemia in the United States.  Vector-Borne and Zoonotic Diseases 7(4): 529–540.

Oldemeyer, J.L., D.E. Biggins, B.J. Miller, and R. Crete.  1993.  Introduction In Proceedings of the Symposium on the Management of Prairie dog Complexes for the Reintroduction of the Black-footed Ferret.  Biological Report 13.  Pp. 1–3.

Parmenter, R.R., E.P. Yadav, C.A. Parmenter, P. Ettestad, and K.L. Gage.  1999.  Incidence of plague associated with increased winter-spring precipitation in New Mexico.  American Journal of Tropical Medicine and Hygiene 61(5):814–821.

Pauli, J.N.  2005.  Ecological studies of the black-tailed prairie dog (*Cynomys ludovicianus*): implications for biology and conservation.  Master thesis.  University of Wyoming.  77 pp.

BLM_0070426

Pauli, J.N. and S.W. Buskirk.  2007.  Recreational shooting of prairie dogs:  a portal for lead entering wildlife food chains.  Journal of Wildlife Management.  71:103–108.

Ray, C.  2006.  Annotated recovery plan outline (ARPO) for the black-footed ferret.  238 pp.

Ray, C. and S.K. Collinge.  2005.  Chapter 14, Potential effects of a keystone species on the dynamics of sylvatic plague.  In Disease Ecology.  Pp. 202–216.

Reeve, A.F. and T.C. Vosburgh.  2006.  Shooting prairie dogs.  In Recovery of the Black-footed Ferret:  Progress and Continuing Challenges.  Edited by J.E. Roelle, B.J. Miller, J.L. Godbey, and D.E. Biggins.  U.S. Geological Survey.  Pp. 119–128.

Rocke, T., S. Smith, D. Stinchcomb, and J. Osorio.  2008.  Immunization of black-tailed prairie dog against plague through consumption of vaccine-laden baits.  Journal of Wildlife Diseases 44(4):930–937.

Rocke, T.E., P. Nol, P.E. Marinari, J.S. Kreeger, S.R. Smith, G.P. Andrews, and A.W. Friedlander.  2006.  Vaccination as a potential means to prevent plague in black-footed ferrets.  In Recovery of the Black-footed Ferret: Progress and Continuing Challenges.  Edited by J.E. Roelle, B.J. Miller, J.L. Godbey, and D.E. Biggins.  U.S. Geological Survey.  Pp. 243–247.

Shaffer, M.L.  1981.  Minimum population sizes for species conservation.  BioScience 31(2):131–134.

Slack, J.  U.S. Fish and Wildlife Service.  May 5, 2006.  Letter to U.S. EPA.  In litt.

Snall, T., R. O'Hara, C. Ray, and S. Collinge.  2008.  Climate-driven spatial dynamics of plague among prairie dog colonies.  American Naturalist 171(2):238–248.

BLM_0070427

Soule, M.E. and D. Simberloff.  1986.  What do genetics and ecology tell us about the design of nature reserves?  Biological Conservation 35:19–40.

Stapp, P., M.F. Antolin, and M. Ball.  2004.  Patterns of extinction in prairie dog metapopulations: plague outbreaks follow El Niño events.  Frontiers in Ecology 2(5):235–240.

Stenseth, N.C., N.I. Samia, H. Viljugrein, K.L. Kausrud, M. Begon, S. Davis, H. Leirs, V.M. Dubyanskiy, J. Esper, V.S. Ageyev, N.L. Klassovskiy, S.B. Pole, and K.S. Chan.  2006.  Plague dynamics are driven by climate variation.  Proceedings of the National Academy of Sciences 103(35):13110–13115.

U.S. Department of Agriculture.  2005.  Major uses of land in the United States.  (*http://www.ers.usda.gov/Data/MajorLandUses/*).  Accessed Oct. 17, 2008.

U.S. Fish and Wildlife Service.  1988.  Black-footed ferret recovery plan.  U.S. Fish and Wildlife Service, Denver, Colorado. 154 pp.

U.S. Fish and Wildlife Service.  2008.  Black-footed ferret (*Mustela nigripes*) 5-year status review: summary and evaluation.  38 pp.

U.S. Forest Service.  2008.  Record of Decision on final environmental impact statement for black-tailed prairie dog management on the Nebraska National Forest and associated units.

Vosburgh, T.  1996.  Impacts of recreational shooting on prairie dog colonies.  M.S. Thesis.  Montana State University, Bozeman.  50 pp.

Vosburgh, T. and L. Irby.  1998.  Effects of recreational shooting on prairie dog colonies.  Journal of Wildlife Management 62(1):363–372.

BLM_0070428

Wilson, D.E. and S. Ruff.  1999.  The Smithsonian book of North American mammals.  Smithsonian Institution Press, Washington and London.  Pp. 168–175.

Wimsatt, J., D.E. Biggins, E.S. Williams, and V.M. Becerra.  2006.  The quest for a safe and effective canine distemper virus vaccine for black-footed ferrets.  <u>In</u> Recovery of the Black-footed Ferret:  Progress and Continuing Challenges.  Edited by J.E. Roelle, B.J. Miller, J.L. Godbey, and D.E. Biggins.  U.S. Geological Survey.  Pp. 248–266.

Wisely, S.M.  2006.  The genetic legacy of the black-footed ferret:  past, present, and future.  <u>In</u> Recovery of the Black-footed Ferret:  Progress and Continuing Challenges.  Edited by J.E. Roelle, B.J. Miller, J.L. Godbey, and D.E. Biggins.  U.S. Geological Survey.  Pp. 37–43.

BLM_0070429

Federal Register / Vol. 56, No. 205 / Wednesday, October 23, 1991 / Rules and Regulations    54957

**50 CFR Part 17**

**RIN 1018–AB42**

**Endangered and Threatened Wildlife and Plants; the Razorback Sucker (Xyrauchen texanus) Determined To Be an Endangered Species**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** The U.S. Fish and Wildlife Service determines the razorback sucker (*Xyrauchen texanus*) to be an endangered species under the authority of the Endangered Species Act of 1973, as amended. This native fish is found in limited numbers throughout the Colorado River basin. Little evidence of natural recruitment has been found in the past 30 years, and numbers of adult fish captured in the last 10 years demonstrate a downward trend relative

BLM_0070430

**54958**   **Federal Register** / Vol. 56, No. 205 / Wednesday, October 23, 1991 / Rules and Regulations

to historic abundance. Significant changes have occurred in razorback sucker habitat through diversion and depletion of water, introduction of nonnative fishes, and construction and operation of dams. Further changes are anticipated as these activities continue. Listing the razorback sucker as endangered will afford this species full protection under the Endangered Species Act.

**EFFECTIVE DATE:** November 22, 1991.

**ADDRESSES:** The complete file for this rule is available for inspection, by appointment, during normal business hours at the U.S. Fish and Wildlife Service Field Office, 2060 Administration Building 1745 West 1700 South, Salt Lake City, Utah 84104–5110.

**FOR FURTHER INFORMATION CONTACT:** Patricia A. Schrader, Fish and Wildlife Biologist, U.S. Fish and Wildlife Service, 529–25½ Road, suite B–113, Grand Junction, Colorado 81505/6199, (303) 243–2778.

**SUPPLEMENTARY INFORMATION:**

**Background**

The razorback sucker was described by Abbott (1861) from a single mounted specimen captured from the Colorado River. He placed it in the genus *Catostomus*, but Eigenmann and Kirsch, after further study, assigned it to its own genus, *Xyrauchen* (Kirsch 1889). Also known as the humpback sucker, the adult razorback sucker is readily identifiable by the abrupt sharp-edged dorsal keel behind its head and a large fleshy subterminal mouth that is typical of most suckers. Adult fish are relatively robust, often exceeding 3 kg (6 lbs.) in weight and 600 mm (2 ft.) in length. Although traces of the developing keel have been observed externally on some cultured specimens as small as 85 mm (3.3 in.) (Snyder and Muth 1990), the dorsal keel of juvenile razorback suckers may not be obvious in other individuals, making them difficult to distinguish from other sucker species.

The razorback sucker was once abundant throughout 5,635 km (3,500 mi.) of the Colorado River basin, primarily in the mainstem and major tributaries in Arizona, California, Colorado, Nevada, New Mexico, Utah, and Wyoming; and in the States of Baja California Norte and Sonora of Mexico (Ellis 1914, Minckley 1973). The Colorado River was divided into upper and lower basins at Lee Ferry, Arizona (approximately 14 km (9 mi.) below Glen Canyon Dam), by the Colorado River Compact of 1922. There are many accounts of razorback suckers during early settlement of the lower basin (Gilbert and Scofield 1898, Minckley 1973) and a significant

commercial fishery for them existed in southern Arizona in the early 1900's (Hubbs and Miller 1953, Miller 1964). In the upper basin, Jordan (1891) reported razorback suckers to be very abundant at Green River, Utah, in 1889. Residents living along the Colorado River near Clifton, Colorado, observed several thousand razorback suckers during spring runoff in the 1930's and early 1940's (account in Osmundson and Kaeding 1989a).

In recent times, razorback sucker distribution has been reduced to about 1,208 km (750 mi.) in the upper basin (McAda and Wydoski 1980, Holden and Stalnaker 1975, Ecology Consultants 1978). In the lower basin a substantial population exists only in Lake Mohave, but they do occur upstream in Lake Mead and the Grand Canyon and downstream sporadically on the mainstem and associated impoundments and canals (Marsh and Minckley 1989). Marsh and Minckley (in press) estimated approximately 60,000 adult razorback suckers still occur in Lake Mohave, and Lanigan and Tyus (1989) estimated that 758 to 1,138 razorback suckers still inhabit the upper Green River. In the upper Colorado River subbasin most razorback suckers occur in the Grand Valley area (Valdez et al. 1982). Observations in other areas are spotty and inconsistent and are generally viewed as incidental captures. The number of adult captures in the Grand Valley had declined appreciably since 1975 (Osmundson and Kaeding 1991). No significant recruitment to any population has been documented in recent years (Tyus 1987a, McCarthy and Minckley 1987, Osmundson and Kaeding 1989a).

Information on behavior and habitat needs of the razorback sucker is limited. Until recently, it has not been a major objective of most upper basin investigations and it is rarely collected in fisheries investigations directed at the three endangered Colorado River fishes: The Colorado squawfish (*Ptychocheilus lucius*); humpback chub (*Gila cypha*); and bonytail chub (*Gila elegans*). However, information has been accumulated in conjunction with other studies, and some specific studies have been conducted.

In 1981, the U.S. Fish and Wildlife Service (Service) and the Arizona Game and Fish Department began a reintroduction and monitoring program in historic razorback sucker habitats of the Gila, Salt, and Verde Rivers. The State of California initiated a similar effort on the Colorado River mainstem in 1986 (Minckley et al. in press). In the past 10 years, over 13 million razorback suckers were stocked in 57 sites in

Arizona, primarily in the Verde, Gila, and Salt Rivers and their tributaries (Duane Shroufe, Director, Arizona Game and Fish Department, *in litt.* 1990). Recaptures from these stocking efforts have been scarce because most fish stocked were fry (which normally experience high attrition), stocked fish were heavily preyed upon, and there were inadequate survey efforts for the large reintroduction area (Brooks 1986). There are indications that populations are being established in isolated habitats and in the uppermost reservoirs of the drainages being stocked (Duane Shroufe, Director, Arizona Game and Fish Department, *in litt.*, 1990).

Some adult razorback suckers migrate considerable distances to specific areas to spawn (Tyus 1987a. Tyus and Karp 1990). Spawning occurs in the lower basin from January through April (Ulmer 1980, Langhorst and Marsh 1986, Mueller 1989). In the upper basin, ripe razorback suckers were observed in suspected spawning areas in the Green River from April 20 to June 14, from 1981 to 1989 (Tyus 1987a, Tyus and Karp 1990). Osmundson and Kaeding (1991) summarized captures by various investigators of razorback suckers in the Grand Valley, and report that 40 of the 42 running ripe adults captured were captured between May 24 and June 17. Water temperatures during spawning in the lower basin ranged from 11.5–18°C (52.7–64.4°F) (Douglas 1952, Ulmer 1980, Langhorst and Marsh 1986) while temperatures recorded in the upper Green River ranged from 9–17°C (48–63°F) (Tyus and Karp 1990). Spawning is usually accomplished over gravel bars that are swept free of silt by currents and several males accompany a single female (Jonez and Sumner 1954, Ulmer 1980). In Lake Mohave and Senator Wash Reservoir, spawning takes place on gravel bars swept clean by wave action (Ulmer 1980, Bozek et al. 1984). Tyus (1987a) collected ripe adults over coarse sand substrates and in the vicinity of gravel or cobble bars, but direct observation of spawning was not possible because of high turbidities prevalent during that time of year. In Senator Wash Reservoir and Lake Mohave, the eggs apparently settled onto gravel and into interstices swept clean by the spawning activity; larvae remained in the gravel until swim-up (Ulmer 1980, Mueller 1989).

A number of investigators have collected viable fertilized eggs and larvae in the areas of observed spawning activity (Bozek et al. 1984, Ulmer 1980, Marsh and Langhorst 1988, Tyus 1987a), but few have collected larvae larger than 14 mm (0.6 in.) in the

BLM_0070431

wild. This indicates little or no successful recruitment of wild razorback suckers (Tyus 1987a). Marsh and Langhorst (1988) recovered larvae up to 20 mm (0.8 in.) total length in an isolated backwater in Lake Mohave where predators had been previously eradicated, and growth to 20 cm (7.9 in.) was reported for juvenile razorback suckers in the same location (Minckley et al., in press). However, these fish disappeared within a month following reinvasion of the backwater by predators. Most investigators have reported concentrations of carp (*Cyprinus carpio*), green sunfish (*Lepomis cyanellus*), bluegill (*Lepomis macrochirus*), channel catfish (*Ictalurus punctatus*), and largemouth bass (*Micropterus salmoides*) in razorback sucker spawning areas (Jonez and Sumner 1954, Marsh and Langhorst 1988, Ulmer 1980, Bozek et al. 1984). Larvae and larger razorback suckers have been found in stomachs of predatory fishes such as green sunfish, warmouth (*Lepomis gulosus*), channel catfish, flathead catfish (*Pylodictis olivaris*), and threadfin shad (*Dorosoma petenense*) (Marsh and Langhorst 1988, Langhorst 1989, Brooks 1986).

Habitat needs of young and juvenile razorback suckers in the wild are largely unknown because they rarely have been encountered by researchers, particularly in native riverine habitats (Tyus 1987a). Marsh and Langhorst (1988) observed that larval razorback suckers in Lake Mohave remained near shore after hatching but either disappeared or migrated to depths in excess of 15 m (49 ft.) within a few weeks. Most juveniles have been collected from irrigation canals in southern California and Arizona (Marsh and Minckley 1989). Substantial numbers of razorback suckers have been reared through the juvenile and adult stages in hatcheries (Toney 1974, Hamman 1985) and in isolated ponds (Langhorst 1989, Osmundson and Kaeding 1989b), providing some information on growth rates and food habits.

Diets of razorback sucker larvae have been studied in Lake Mohave (Marsh and Langhorst 1988) and under experimental conditions (Papoulis 1988, Tyus and Severson 1990). Larvae from reservoirs selected *Bosmina* spp. (Cladocera) and avoided Copepoda, while larvae from backwaters or Lake Mohave selected *Bosmina* and avoided Rotifera (Marsh and Langhorst 1988). Dietary studies in controlled conditions indicated wide differences in their response to commercial fish foods (Tyus and Severson 1990). Information is not available on food habits of razorback

sucker larvae from natural riverine habitats.

Only limited information has been accumulated on the food habits of adult razorback suckers, primarily due to their rarity and protected status under State law. Marsh (1987) examined the stomachs of 34 adult specimens from Lake Mohave and found contents dominated by planktonic crustaceans, diatoms, filamentous algae, and detritus. Jonez and Sumner (1954) reported midge larvae as the dominant food item in their stomach analysis of Lake Mohave razorback suckers. They also reported algae as the most common food item found in razorback sucker stomachs from Lake Mead, followed by plankton, insects, and decaying organic matter. Vanicek (1967) examined eight adult razorback sucker stomachs from the Green River and found them packed with mud or clay containing chironomid larvae, plant stems and leaves.

Using scales, Minckley (1983) estimated annual growth rates in the wild Lake Mohave population to be less than 10 mm (0.4 in.) per year after their seventh year of life. Recently, researchers have demonstrated the inadequacies of using scales to determine the age of razorback suckers and have shown that most razorback suckers captured in recent times are much older than their scales would indicate (McCarthy and Minckley 1987). Using sectioned otoliths, McCarthy and Minckley (1987) computed the ages of Lake Mohave razorback suckers collected in 1981–83 to be 24 to 44 years. Eighty-nine percent of the 70 fish sampled were estimated to have hatched prior to or coincident with impoundment. Disappearance of razorback suckers from lower basin reservoirs 40 to 50 years after impoundment was documented by Minckley (1983). McCarthy and Minckley (1987) predicted the Lake Mohave population is following this trend and may be extirpated before the year 2000. Tyus (1987a) concluded that razorback suckers in the Green River were substantially smaller and younger than those found in the lower basin, but no recent recruitment to the adult population was evident.

Adult razorback suckers are more vulnerable to capture during the spawning season. Tyus (1987b) reported them to be 10 times more prevalent in standardized electrofishing collections during the spring than during the remainder of the year. During spawning season, razorback suckers have been found in runs with coarse sand, gravel, and cobble substrate; flooded bottomlands and gravel pits; and large

eddies formed by flooded mouths of tributary streams and drainage ditches (Tyus 1987a, Osmundson and Kaeding 1989a). Tyus (1987a) tracked six radio-implanted adult razorback suckers for 2 years, and found that they utilized the main channel of the Green and Duchesne Rivers. During non-breeding season, the fish were found in depths of 0.6 to 3.4 m (2.0 to 11.0 ft.), used sand or silt substrates, and water velocities of 0.1 to 0.6 m per second (0.33 to 2.0 ft. per second). Razorback suckers also selected near shore runs during the spring, but shifted to relatively shallow waters off mid-channel sandbars during the summer months. Except for spawning migrations, razorback suckers are fairly sedentary, moving relatively few kilometers over several months (Tyus 1987a, Tyus and Karp 1990). Valdez and Masslich (1989) tracked 17 razorback suckers throughout the winter on the Green River. They found that most of the radio-telemetered fish moved less than 5 km (3 mi.) throughout the winter. They also reported localized diel movement patterns that increased with fluctuating flows which they attributed to changes in water velocities. The radio-telemetered razorback suckers used slow run habitats, slack waters, and eddies. They selected depths of 0.6 to 1.4 m (2.0 to 4.6 ft.) and velocities of 0.03 to 0.33 m per second (0.1 to 1.1 ft. per second). Osmundson and Kaeding (1989a) reported the year-round movement and habitat use of one to four radio-telemetered adult razorback suckers over a 3-year period in the Grand Valley region of the upper Colorado River. They reported that pools and slow eddy habitats were predominantly used from November through April, runs and pools from July through October, runs and backwaters during May, and backwaters and flooded gravel pits during June. Selection of habitats of various depths changed seasonally; use of relatively shallow water occurred during spring and use of deep water during winter. Mean depths were 0.9 to 0.99 m (3.0–3.3 ft.) during May and June, and 1.62 to 1.65 m (5.3–5.4 ft.) from August through September, and 1.83 to 2.16 m (6.0–7.1 ft.) from November through April.

The razorback sucker was proposed for listing as a threatened species on April 24, 1978, in the **Federal Register** (43 FR 17375). The proposal was withdrawn on May 27, 1980, in accordance with provisions of the 1978 amendments to the Endangered Species Act (Act) of 1978, as amended (16 U.S.C. 1531 *et seq.*). These provisions required the Service to include critical habitat in the listing of most species and to complete

the listing process within 2 years or withdraw the proposal from further consideration. The Service did not complete the listing process within 2 years.

A petition dated March 14, 1989, was received from the Sierra Club, National Audubon Society, The Wilderness Society, Colorado Environmental Coalition, Southern Utah Wilderness Alliance, and Northwest Rivers Alliance on March 15, 1989. The petition requested the Service to list the razorback sucker as an endangered species. A positive finding on this petition was made in June 1989 and subsequently published by the Service in the Federal Register on August 15, 1989 (54 FR 33586). This notice also stated that a status review was in progress and that the Service was seeking information until December 15, 1989. A proposed rule to list the razorback sucker as endangered was published in the Federal Register on May 22, 1990 (55 FR 21154). A public hearing was held on August 14, 1990, in Farmington, New Mexico.

**Summary of Comments and Recommendations**

In the May 22, 1990, proposed rule (55 FR 21154) and associated notifications, all interested parties were requested to submit factual reports or information that might contribute to the development of a final rule. The initial comment period closed on July 23, 1990, but was reopened on July 27 and closed on August 27, 1990 (55 FR 30727). Appropriate State agencies, county governments, Federal Agencies, scientific organizations, and other interested parties were contacted and requested to comment. Newspaper notices inviting general public comment were published in the following papers between June 7 and June 14, 1990: Denver Post, Colorado; Rocky Mountain News, Colorado; Daily Sentinel, Colorado; Durango Herald, Colorado; Northwest Colorado Daily Press, Colorado; Times Independent, Utah; Vernal Express, Utah; Sun Advocate, Utah; Salt Lake City Tribune, Utah; Deseret News, Utah; Southern Utah News, Utah; Ogden Standard Examiner, Utah; and Casper Star Tribune, Wyoming. Newspaper notices were published on June 21, 1990, in the following papers: Mohave Miner, Arizona; Mohave Valley News, Arizona; and Farmington Times, New Mexico. Sixty-two written and eighteen oral comments were received (including duplicates from several commenters) and are discussed below. Comments (sometimes several from an organization) were received from 11

Federal and 7 State agencies, 10 local governments, and 47 private organizations, companies, and individuals. Forty-one comments supported listing, twenty-four comments were neutral, and nine comments were opposed to listing.

A public hearing was requested and held in Farmington, New Mexico, on August 14, 1990. Approximately 60 people attended the public hearing and 18 people presented oral statements.

It should be noted that many commentors surfaced issues or questions that concerned the razorback sucker but that were not pertinent to the two decisions that are the subject of this rulemaking, i.e., whether the razorback sucker merits listing and whether critical habitat should be designated. Predominant among these concerns was the potential impact of the proposed Animas-LaPlata Project on the Animas River and the razorback sucker, and the potential impact of listing and/or critical habitat designation on the proposed Animas-LaPlata Project and future water development. Copies of these letters were referred to the appropriate Service offices. Other commentors raised questions regarding the specifics of how the species would be protected or recovered and the impacts likely to ensue, for example, the impact of species listing on agricultural practices, operation of federally controlled dams, recreational opportunities, and other human activities; whether stocking of nonnative fishes would be impacted by listing; the extent of the species' range that would be protected; the degree of State-Federal partnership in species' protection; the need for additional research on the species; the use of hatcheries to recover the species; and how critical habitat designation might restrict current water-related management practices.

Though such concerns are understandable, they only can be addressed after the species is listed. The Act's amendments of 1982 made it clear that decisions to list a species must be made solely on biological considerations, and that economic or other nonbiological factors are not to be taken under consideration in the decision of whether to list. However, economic considerations are relevant if critical habitat is designated. Specifics on how the species would be protected and the impacts of such protection are more properly addressed on a case-by-case basis after the species is listed, i.e., during the course of Section 7 consultation and as specific recovery actions are proposed.

Written and oral comments pertinent to this rulemaking that were received during the comment periods are covered in the following summary. Comments of a similar nature or point are grouped into a number of general issues. These issues and the Service's response to each are discussed below.

*Issue 1:* All commentors who supported listing the razorback sucker supported listing it as endangered, except two Regions of the Bureau of Reclamation and the State of Nevada. The Bureau of Reclamation recommended listing the razorback sucker as threatened throughout its range. The State of Nevada recommended threatened status in the lower basin and endangered status in the upper basin. The Bureau of Reclamation stated that listing the razorback sucker as endangered could jeopardize or delay positive programs initiated in the upper and lower basins. They state that listing the species as threatened would allow more active management of the species.

*Response:* According to section 3 of the Act, a threatened species is defined as any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. An endangered species is defined as any species which is in danger of extinction throughout all or a significant portion of its range. After reviewing the biological data, the Service finds that the razorback sucker is clearly in danger of extinction throughout all of its range, due to its greatly reduced range, the extensive alteration of its natural habitats through impoundment and altered flow and temperature regimes, its apparent inability to recruit successfully in the wild, and the introduction of nonnative fish species. Therefore the razorback sucker qualifies as endangered.

*Issue 2:* One individual representing water development interests stated that the razorback sucker should not be listed as threatened or endangered in the Upper Colorado River Basin because he believes the razorback suckers in the upper basin are a distinct subpopulation, and that no data are available to indicate the upper basin population has experienced a serious decline. This individual also states that the Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin (Recovery Implementation Program) is adequate for recovery of the razorback sucker and listing would not provide any additional benefits.

*Response:* The Service has determined that the razorback sucker is in danger of extinction throughout all of its range, which includes the upper and lower basins. This rule presents information on the rarity of and threats to razorback suckers in the upper basin (see Factors A, C, and E, and "Background"). Factor D and "Available Conservation Measures" discuss the capabilities and limitations of the Recovery Implementation Program in protecting the razorback sucker and the additional benefits provided by listing the species.

*Issue 3:* Fourteen commentors expressed concern about critical habitat designation. Ten commentors supported designation of critical habitat; four commentors opposed designating critical habitat or including areas within critical habitat that might adversely impact their economic interests. Among the commentors supporting critical habitat designation, the following reasons or concerns were surfaced:

a. Five commentors believed critical habitat was capable of being determined and/or would provide habitat protection benefits to the species.

b. Two commentors thought it would limit the area that would need to be evaluated in determining impacts to the species.

c. Two commentors thought it would help in protecting against further introduction of nonnative fishes.

d. One commentor thought conservation measures could not be implemented without such designation.

e. One commentor questioned whether designation of critical habitat would preclude restoration efforts.

*Response:* There appears to be some misunderstanding regarding what designation of critical habitat means, and what benefits designation of critical habitat might provide for the razorback sucker.

Under section 3 of the Act, critical habitat is defined as "(i) the specific areas within the geographical area occupied by the species at the time it is listed * * *, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and (ii) specific areas outside the geographical area occupied by the species at the time it is listed * * *, upon a determination by the Secretary that such areas are essential for the conservation of the species." "Designation" means identification of critical habitat via rulemaking. Economic and any other relevant impacts must be taken into consideration prior to designation of

critical habitat. After critical habitat has been designated, Federal Agencies must insure that their actions are not likely to result in the destruction or the adverse modification of this habitat, per section 7(a)(2) of the Act.

Critical habitat is not always designated for a listed species. It is not designated at the time of species listing if it is not determinable (i.e., if the biological needs of the species are not well known enough to permit identification of critical habitat or if sufficient information is not available to perform the required impact analysis). It is not designated if it is not prudent (i.e., if designation would increase the threat of taking or vandalism or it would not be beneficial to the species). The "Critical Habitat" section of this rulemaking explains why critical habitat designation is considered not determinable for the razorback sucker at this time.

With regard to the reasons or concerns surfaced by commenters supporting critical habitat designation:

(a) *Because it is determinable and/or would provide habitat protection benefits:* The Service does not find critical habitat to be determinable at this time for the reasons explained in the "Critical Habitat" section of this rulemaking. The Service will review existing data and the protections provided by listing the species, the Recovery Implementation Program, and other activities to determine whether determination and designation of critical habitat would provide habitat benefits over and above the protection provided to the razorback sucker following species listing.

(b) *Because it would limit the area of evaluation:* Designation of critical habitat highlights specific areas where special management considerations or protections are needed; however, it does not limit the area of evaluation for determining impacts to a listed species. Once a species is listed, it is protected throughout its range. Even if critical habitat was designated such that it was coincident with the razorback sucker's current range, proposed Federal actions that would alter flows or water quality upstream of this habitat would still need to be evaluated.

(c) *Because it would protect against further introduction of nonnative fishes:* At this time, it is not clear whether designation of critical habitat would deter future stocking of nonnative fishes beyond any deterrent resulting by listing the species as endangered. This point will be examined during the review of data and existing protections following species listing. As noted under Factor D, the Service can limit the introduction of

nonnative species through agreements with the States or by withholding Federal funds or fish from Federal hatcheries for stocking proposals with potential to adversely impact the razorback sucker.

(d) *Because conservation measures could not be implemented:* It is not necessary to designate critical habitat in order to implement conservation measures. Conservation measures, which are used to avoid jeopardy to listed species, are currently provided in biological opinions for three species of endangered fish in the Colorado River basin which do not have critical habitat designated.

(e) *Whether it would preclude restoration efforts within existing habitat:* If critical habitat were to be designated, only federally authorized, permitted, or funded restoration efforts that would destroy or adversely modify critical habitat would be precluded. Because the purpose of any restoration effort would be to benefit the species and/or habitat, it is unlikely that designation of critical habitat would preclude restoration efforts.

*Issue 4:* One county in Utah stated that the introduction of the river otter into the Colorado River could be a threat to razorback suckers.

*Response:* The river otter's historic range included the Colorado River and its tributaries in Utah and Colorado. River otters and native fishes coexisted historically. The Utah Division of Wildlife Resources recently prepared an environmental assessment that examined potential conflicts between the reintroduction of the river otter and the rare and endangered fishes in the Colorado River system. It concluded that reintroducing the river otter would not have a significant impact on rare and endangered fish species. Diet studies conducted in Colorado found that crayfish and channel catfish comprised a major portion of the river otter's diet. If a negative impact on rare and endangered fishes is detected, river otter numbers could be controlled.

*Issue 5:* The Denver Water Department stated that the Two Forks project underwent section 7 consultation and was found not to be a threat to razorback suckers.

*Response:* The section 7 consultation conducted for the Two Forks project was for three species currently listed as endangered: The Colorado squawfish; humpback chub; and bonytail chub. The razorback sucker was a candidate for Federal listing at the time of the subject section 7 consultation. Candidate species receive no legal protection under the

Act, and the razorback sucker was not addressed in the biological opinion issued for the Two Forks project. Therefore, the Service has not determined whether the Two Forks project is likely to jeopardize the continued existence of the razorback sucker.

*Issue 6:* One farm bureau asked that adverse impacts to private property owners be considered during the listing process.

*Response:* Only biological factors may be used in our decision on whether to list a species.

*Issue 7:* Several commentors asked whether the razorback suckers stocked in the lower basin during the last 10 years would be considered endangered if the species were listed. Also, one Federal Agency recommended that the razorback suckers stocked in the Gila, Salt, and Verde Rivers be designated as an experimental population.

*Response:* All razorback suckers, regardless of their origin or where they occur, would be fully protected under the Act upon listing. The Service cannot designate an existing naturally-occurring population as experimental. Once the razorback sucker is listed, any future reintroduction or augmentation would require a permit, or a rule could designate the stocked fish as an experimental population if the future reintroduction site is unoccupied habitat within historic range.

## Summary of Factors Affecting the Species

After a thorough review and consideration of all information available, the Service has determined that the razorback sucker should be classified as an endangered species. Procedures found at section 4(a)(1) of the Act and regulations (50 CFR part 424) promulgated to implement the listing provisions of the Act were followed. A species may be determined to be an endangered or threatened species due to one or more of the five factors described in section 4(a)(1). These factors and their application to the razorback sucker (*Xyrauchen texanus*) are as follows:

### A. The Present or Threatened Destruction, Modification, or Curtailment of Its Habitat or Range

Once abundant and widely distributed throughout the Colorado River basin, the razorback sucker now inhabits approximately 25 percent of its original range. The razorback is considered rare, and of the four rare and endangered large-river native Colorado River basin fishes, only the bonytail chub (*Gila elegans*) is considered less

common (McAda 1987). In the Lower Colorado River Basin, the razorback sucker occurs in substantial numbers only in Lake Mohave, in Arizona and Nevada. These fish are thought to represent the largest remaining population in the basin (Minckley 1983) but are expected to decline in numbers as they die and are not replaced. Razorback suckers are very rare and sporadic in the Colorado River, reservoirs, and canals downstream of Davis Dam (Marsh and Minckley 1989). In the Upper Colorado River Basin, razorback suckers are rare in the upper Green River, Utah; lower Yampa River, Colorado (Tyus 1987a, Tyus and Karp 1990); and mainstem Colorado River near Grand Junction, Colorado (Kaeding and Osmundson 1989). The razorback sucker is very rare throughout the remaining warmwater reaches of the Green, San Juan, and upper Colorado Rivers. Small numbers also occur in the Colorado, Dirty Devil, and San Juan arms of Lake Powell (Persons and Bulkley 1982, McAda 1987, Roberts and Moretti 1989).

Since 1910, 15 dams have been constructed on the lower Colorado River and its major tributaries, the Gila, Verde, and Salt Rivers. These dams have dewatered, cooled, or impounded most of the lower basin system so that little natural riverine habitat exists today. Glen Canyon Dam has reduced water temperatures for 364 km (236 mi.) through the Grand Canyon. Spawning has been observed in several reservoirs in the lower basin (Jonez and Sumner 1954, Loudermilk 1985) and razorback sucker larvae have been collected in Lake Mohave, Lake Havasu, Senator Wash Reservoir, and the Central Arizona Project canal (Bozek et al. 1984, Marsh and Langhorst 1988, Marsh and Minckley 1989). However, only four juvenile razorback suckers (33 to 54 mm, or 1.3 to 2.1 in.) have been collected from Lake Mohave since the 1950's, which indicates insufficient recruitment to the population (Marsh and Minckley 1989). In the upper basin, Lake Powell and Flaming Gorge Reservoir have impounded 500 km (310 mi.) of razorback sucker habitat and lowered water temperatures in another 105 km (65 mi.) of the Colorado and Green Rivers. Other upper basin reservoirs also have altered natural flow and temperature regimes. The last report of juvenile razorback suckers collected from the upper Colorado River was that of Taba et al. (1965) who collected eight individuals 90–115 mm (3.5–4.5 in.) in length downstream of Moab, Utah, during 1962–1964.

Dams and diversions also obstruct razorback sucker migration. Although

little is known of the location of razorback sucker spawning areas prior to the construction of these facilities, it is believed that they have obstructed access to or impounded once important spawning areas. Early investigators frequently referred to spawning concentrations in small tributaries in the lower basin (Jordan 1891, Hubbs and Miller 1953). More recently, Tyus (1987a) and Tyus and Karp (1990) observed concentrations of razorback suckers near three suspected spawning areas in the upper Green River and lower Yampa River. Ulmer (1980) also observed spawning in Senator Wash Reservoir and Mueller (1989) did so in the tailwaters of Hoover Dam. Spawning has been observed in Lake Mead and Lake Mohave (Jonez and Sumner 1954, Minckley 1983, Langhorst and Marsh 1986). Radio-tracking and recapture of tagged razorback suckers demonstrates that some fish migrate considerable distances to spawn. Tyus (1987a) recaptured 21 adult razorback suckers in suspected spawning areas that had been previously tagged in other locations over a period of 8 years. Ulmer (1980), utilizing SCUBA gear and sonic tags, followed five adult razorback suckers in Senator Wash Reservoir to two specific areas where congregations of spawning razorback suckers were observed.

Storage and diversion of natural flows have resulted in an 18 percent reduction in mean annual discharge at the Green and Colorado river confluence 26 km (16 mi.) upstream of Lake Powell (U.S. Geological Survey (USGS) flow records, 1906–1982). Storage of high flows during the spring and releases of more water during the remainder of the year have reduced spring runoff by 28 percent in the Green River and 37 percent in the Colorado River during May and June (USGS flow records, 1906–1982). Reduction of these high spring flows has altered the natural flooding cycle and reduced the area of off-stream habitats used by razorback suckers (McAda 1977, Osmundson and Kaeding 1991). Tyus and Karp (1989) believed that flooding of bottomland during spring runoff was important to adults and rearing of young. Osmundson and Kaeding (1991) suggested that flooded bottomlands in the Grand Valley were historically the primary spawning habitats. The lack of recruitment of razorback suckers in the upper basin may be associated with losses of these inundated habitats (Osmundson and Kaeding 1989a and 1990, Tyus and Karp 1989).

Dam operations also can cause changes in daily flow regimes. Peaking power operations at Flaming Gorge

produced a 400 percent increase in daily flow fluctuations at Jensen, Utah (USGS flow records, 1906–1982). Tyus and Karp (1989) recommend low, stable flows for razorback suckers during summer, fall, and winter, after finding that such flows are necessary for growth and survival of young native fishes. Stable flows through ice breakup also were important for overwinter survival of young and adult native fishes.

Cooler water temperatures, as a result of dam operations, may have excluded the razorback sucker from portions of its original range (Vanicek 1967). Bulkley and Pimentel (1983) showed that adult razorback suckers preferred water temperatures between 22–25°C (71.6–77°F) and avoided water temperatures below 14.7°C (58.5°F) and above 27.4°C (81.3°F). Whereas winter temperatures drop well below this reported preference range throughout most of occupied razorback sucker habitat, summer temperatures are generally within the preferred range. During the day, riverine temperatures can vary greatly between off-stream and mainstream habitats. Grabowski and Hiebert (1989) recorded summer and fall water temperatures in backwaters of the Green River to be 2.5 to 3.8°C (4.5 to 6.8°F) warmer than the mainstream. While water temperature is dynamic and influenced by many variables, there are two reaches of the Green and Colorado Rivers where spring and summer temperatures are clearly below the preferred range of razorback sucker. These reaches occur directly below Flaming Gorge Reservoir for 105 km (65 mi.) where summer temperatures average less than 13°C (59°F) (USGS Water Resource Data), and below Lake Powell for 384 km (238 mi.) where summer water temperatures rarely exceed 15°C (59°F) (Carothers and Minckley 1981). Razorback suckers have rarely been captured in these reaches since completion of these dams (Vanicek 1967, Carothers and Minckley 1981).

The alteration of temperatures caused by the construction and operation of dams also may affect incubation time and survival of razorback sucker embryos. Incubation time to hatching varies inversely with water temperature, with longer hatching times required at lower temperatures. Gustafson (1975) reported that 5.5 days were required at 20°C (68°F), while Bozek et al. (1984) reported the following incubation periods: 19.4 days at 10°C (50°F); 11.1 days at 15°C (59°F); and 6.6 days at 20°C (68°F). Marsh (1985) found it required 9 days for larvae to hatch at 15°C (59°F) and 3.5 days at 25°C (77°F). Most investigators reported poor hatching

success at temperatures below 15°C (59°F) and total mortality of eggs below 10°C (50°F). However, Bozek et al. (1984) noted only slightly lower survival rates at 10°C (50°F) than at 15 and 20°C (59 and 68°F).

Alteration of razorback sucker habitat will likely continue because several major reservoirs and water diversions are in the planning process or are under construction (e.g., Animas-La Plata Project, Muddy Creek Reservoir, Sandstone Reservoir, Central Utah Project). Further loss of flooded bottomland habitat important for spawning is likely to occur as landowners continue diking the Colorado River, particularly in the Grand Valley. Other, less direct influences such as decreased flow, alteration in stream hydrology, increased dissolved solids, altered temperatures, and other water quality changes may adversely affect the razorback sucker by reducing or degrading its habitat, interrupting spawning, and increasing competition for food and space by creating conditions favorable to nonnative fish species. Development activities that most threaten the razorback sucker occur in the upper basin where most of the remaining riverine habitats occur. Since 1980, the Service has conducted consultations under section 7 of the Act on over 100 federally funded or regulated projects in the upper basin that involved water depletions. Several transbasin diversions are planned or are under construction. The most prominent is the Central Utah Project which would divert 165,000 ac. ft. of water from the Green River to the Bonneville Basin.

### B. Overutilization for Commercial, Recreational, Scientific, or Educational Purposes

Though once extensively used for food when available in large number (Minckley 1973), the razorback sucker is no longer abundant and markets are no longer engaged in such enterprises. In the lower basin, there were once enough razorback suckers to support a commercial fishery (Hubbs and Miller 1953) but all States within its current range now have laws that protect it from harvest (Minckley et al. in press). Therefore, overutilization is not considered to be a threat today.

### C. Disease or Predation

There is no evidence that disease is a significant factor in the current status of the razorback sucker. However, Minckley (1983) reported many old individuals captured in Lake Mohave were blind in one or both eyes and showed other signs of disease or injury.

Several investigators have recently isolated pathogens from razorback suckers, but none have concluded that they were a serious threat to the existing stocks (Mpoame and Rinne 1983, Flagg 1982).

Several researchers have observed predation of razorback sucker eggs and larvae by carp, channel catfish, smallmouth bass (Micropterus dolomieui), largemouth bass, bluegill, green sunfish, and redear sunfish (Lepomis microlophus) (Jonez and Sumner 1954, Ulmer 1980, Langhorst 1989, Marsh and Langhorst 1988). Other researchers hypothesized that predation is a major cause underlying the lack of recruitment to the adult razorback sucker population throughout the basin (McAda and Wydoski 1980, Minckley 1983, Tyus 1987a). Loudermilk (1985) observed that young razorback sucker larvae inhabited the upper water column for the first few days after swim-up and exhibited no defensive behavior from potential predators. Marsh and Langhorst (1988) found larval razorback suckers in Lake Mohave survived longer and grew larger in the absence of predators. Marsh and Brooks (1989) demonstrated that channel catfish and flathead catfish were major predators of razorback suckers stocked into the Gila River. They concluded that predation by these fish had potential to result in total loss of those stocks. Langhorst (1989) reported channel catfish and largemouth bass predation on juvenile razorback suckers averaging 171 mm (6.7 in.) total length stocked in isolated coves along the Colorado River in California. Two additional predaceous species, the walleye (Stizostedion vitreum) and northern pike (Esox lucius) have recently become prominent inhabitants of the Green River (Tyus and Beard 1990).

Though nonnative fish species were and are introduced by man, the ability of these nonnative fish to survive and become established in the Colorado River basin is, in part, due to the alteration of natural riverine habitat described under Factor A. Alteration of historic flow regimes and construction of reservoirs has created favorable conditions for some nonnative fishes (Seethaler 1978, McAda and Keeding 1989, Minckley 1983). Thus the threat of predation is, to some extent, associated with habitat modification.

### D. The Inadequacy of Existing Regulatory Mechanisms

As discussed in Factors A and C, the razorback sucker has declined substantially in the past 80 years because of major alterations in its

habitat, dissection of the river system with dams, and the introduction of many new species to the ecosystem. Although the razorback sucker has been included on the protected list of all Colorado basin States, except Wyoming (where they are extirpated) and New Mexico (though evidence suggests the species was probably historically native to the State, no specimen-substantiated records of razorback sucker exist in New Mexico) (Minckley *et al.* in press), it has continued to decline. It is presently one of the most endangered fishes in the Colorado River basin (Minckley 1983, Tyus 1987a).

Most State regulations protect the razorback sucker from take and possession. They do not, however, address the major problems of habitat destruction or the introduction of competitive and predacious species. All States prohibit transportation and stocking of any fish species without prior consent of the respective State agencies. State agencies do, however, introduce new species which may compete with or prey upon the endangered Colorado River fishes. The Service has an informal agreement with the State of Colorado to review all stocking proposals in the Colorado River within Colorado. The Service is attempting to develop a similar arrangement with the State of Utah. However, Service agreements with other States with habitats occupied by razorback sucker have not been formulated. The Service can, to some extent, influence State stocking actions by withholding Federal funds or fish from Federal hatcheries for stocking proposals with potential to adversely impact the razorback sucker.

State water quality and streamflow regulations do not assign stringent criteria to waters inhabited by the razorback sucker. Regulations permit desilting and cooling because such water quality changes are generally deemed beneficial. However, the razorback sucker and other native fish species are adapted to the Colorado River's highly turbid, turbulent, and warm conditions. Most Federal regulations also consider water clarity, low temperatures, and "purity" desirable water quality standards, and they assign criteria that enhance or preserve these conditions even though they may not provide the best conditions for native ecosystems. Water discharges associated with development, such as oil and gas, may not have adequate regulations to assure that water quality standards are met.

The presence of any one or all of the other listed Colorado River fishes in the same reaches as the razorback sucker does not necessarily lend adequate protection to the razorback sucker because its life history and habitat requirements are different than those of the other species (Tyus and Karp 1989). Although Federal Agencies are mandated to consider the other listed fishes relative to their actions, they were not mandated to do so for the razorback sucker. Therefore, unless the razorback sucker is listed, Federal Agencies may take actions and implement programs which avoid jeopardy to other endangered fishes while adversely affecting the razorback sucker.

The Recovery Implementation Program has a goal of managing the razorback sucker so that it does not need the protection of the Endangered Species Act. The management goal adopted by the Recovery Implementation Program for the razorback sucker is to establish and protect self-sustaining populations and natural habitat. Substantial funds and resources have been provided by the Recovery Implementation Program to meet the goals for this and other listed Colorado River fishes. Although actions by the Recovery Implementation Program will provide benefits to the razorback sucker, these actions alone do not provide permanent protection because the Recovery Implementation Program is not a regulatory mechanism. Instead, it is a cooperative effort agreed to by public and private entities that have an interest in how the Upper Colorado River Basin and its resources are managed. The Cooperative Agreement that binds these parties may be amended or terminated by agreement of the parties, or any party may withdraw upon written notice. Section 7 of the Act requires that all Federal Agencies insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any threatened or endangered species. The Recovery Implementation Program does not have the force and effect of law to mandate that the effect of any Federal action on the razorback sucker be considered. And finally, the Recovery Implementation Program only applies to the upper basin (excluding the San Juan River), and therefore does not protect the species throughout its range.

*E. Other Natural or Manmade Factors Affecting Its Continued Existence*

Of great concern is the fact that significant recruitment of young fish to these populations has not been evident for at least 30 years. There is considerable evidence that existing populations are composed primarily of old individuals that are slowly dying off (McCarthy and Minckley, 1987, Tyus 1987a). Only a few naturally reproduced juveniles have been reported from Lake Mohave, the Colorado River, and off-stream canal systems downstream of Lake Mohave (Marsh and Minckley 1989) and from the Green River (Holden 1978) in the past 15 years.

The introduction and establishment of nonnative fish species into the Colorado River system is believed by many researchers to have negatively impacted the razorback sucker. Tyus *et al.* (1982) recorded 42 species that have become established in the upper Colorado River basin, and Minckley (1979) listed 37 nonnative species in the lower basin. Many of these may be innocuous or inhabit areas not occupied by razorback suckers but several are considered serious competitors or predators (Minckley 1983, Loudermilk 1985). In addition to direct predation (see Factor C), competition may result in negative impacts to the razorback sucker, but impacts from competition are more difficult to detect than predation impacts. Although these interactions are not fully understood, nonnative fish species are hypothesized to impact the razorback sucker due to their considerable numbers, the sharing of common foods, and occupation of the same habitats (Jonez and Sumner 1954).

The threat of competition continues as nonnative species continue to be introduced and their ranges continue to expand. The triploid grass carp (*Ctenopharyngodon idella*) has been legalized for importation into California and Arizona. In the lower basin, two tilapia species (*Tilapia* spp.) have become established, and, along with the flathead catfish, have become the dominant fish species in the lower Colorado River (W.L. Minckley, Arizona State University, pers. comm. 1989). The rainbow smelt (*Osmerus mordax*) recently has been proposed for introduction into Lake Powell (Gustaveson et al. 1990).

Marsh and Langhorst (1988) studied food availability and consumption by larval razorback suckers in Lake Mohave and found that larval razorback suckers consumed a variety of the zooplankters available in the area. Papoulias (1986) found, under experimental conditions, that food items needed to be present at a density of 10 organisms per liter within 10 days of absorption of the yolk sac. Death occurred at about 20–30 days of age if insufficient numbers of zooplankton were present. Marsh and Langhorst's (1988) research on Lake Mohave showed an average of 1.5 zooplankters per liter.

BLM_0070437

and they reported the disappearance of larvae at about 20 days of age. Papoulias' (1986) results indicate low availability of food organisms may explain the absence of fishes greater than 10.6 mm (0.4 in.) in Lake Mohave. However, Marsh and Langhorst (1988) report that low availability of larval foods does not account for the apparent total mortality of larvae in Lake Mohave.

Intercrossing between razorback suckers and flannelmouth suckers (*Catostomus latipinnis*) was first reported by Hubbs and Miller (1953). Vanicek et al. (1970) and Holden (1973) reported a high incidence of intercrossing between razorback and flannelmouth suckers in the upper basin. They found ratios of 16 intercrosses to 73 razorback suckers and 40 intercrosses to 53 razorback suckers, respectively. McAda and Wydoski (1980) reported 8 razorback sucker x flannelmouth sucker intercrosses collected with 95 razorback suckers in the upper basin. All of the above reports of intercrossing were based on an examination of morphological characteristics. The reports of intercrossing are suggestive, but not conclusive, evidence that intercrossing may be a threat to the species. Therefore, until additional scientific data are gathered, it is premature to conclude that intercrossing is a significant threat to the species. Recent electrophoretic analyses of Lake Mohave razorback suckers revealed less than a 5 percent incidence of flannelmouth sucker genes, and Buth et al. (1987) considered this level of introgression to be insignificant.

A pre-impoundment poisoning project in the Green River where Flaming Gorge Reservoir is now located is often cited as at least a partial cause for the loss of native fishes immediately downstream of the reservoir. While many razorback suckers were undoubtedly lost, a comparison of fish species composition in Dinosaur National Monument before and after the program (Binns et al. 1963, Vanicek and Kramer 1966, Vanicek et al. 1970) supports the premise that the effect of the poisoning was short term and not responsible for the current status of the razorback sucker. A similar pre-impoundment study and treatment program was conducted on the San Juan River in New Mexico where Navajo Reservoir is located. No razorback suckers were collected before or after the treatment program (Platania 1990).

The Service has carefully assessed the best scientific and commercial information available regarding the past, present, and future threats faced by the razorback sucker in determining to make this rule final. Based on this evaluation, the preferred action is to list the razorback sucker as endangered. Endangered status, which means that the species is in danger of extinction throughout all or a significant portion of its range, is appropriate for the razorback sucker because of its greatly reduced range, the extensive partitioning of its range by dams, the extensive alteration of its natural habitats through impoundment and altered flow and temperature regimes, its apparent inability to recruit successfully in the wild, and the introduction of nonnative fish species. A decision to take no action would constitute failure to properly classify the razorback sucker pursuant to the Act and would exclude the razorback sucker from protection provided by the Act. A decision to determine threatened status, which means the species is likely to become endangered within the foreseeable future, would not adequately reflect the status of the razorback sucker. The small number of old fish that currently represent the virtually nonrecruiting population indicate the razorback sucker is in danger of extinction throughout its range. Critical habitat is not being proposed for the reasons stated below.

Critical Habitat

Section 4(a)(3) of the Act, as amended, requires that, to the maximum extent prudent and determinable, the Secretary designate critical habitat at the time the species is determined to be endangered or threatened. In the proposed rule, the Service indicated that the designation of critical habitat was not determinable or prudent at that time for the razorback sucker. However, several commenters responding to the proposed rule recommended that critical habitat be designated. Another development since the proposed rule was published was a court decision (*Northern Spotted Owl* v. *Lujan*) regarding the designation of critical habitat for the spotted owl. That decision has caused the Service to scrutinize its critical habitat findings more closely. The Service finds that critical habitat for the razorback sucker is not presently determinable. The Service will reexamine the question of whether critical habitat designation is prudent during the period that the Service is attempting to determine critical habitat.

Critical habitat is defined in section 3(5)(A) of the Act as the specific areas within the geographical area currently occupied by a species on which are found those physical or biological features essential to the conservation of the species and that may require special management considerations or protection. Provisions also are included for designating critical habitat outside areas currently occupied. Designations of critical habitat must be based on the best scientific data available and must take into consideration the economic and other relevant impacts of specifying any particular area as critical habitat (Section 4(b)(2)).

The Service's regulations (50 CFR 424.12(a)(2)) state that critical habitat is not determinable if information sufficient to perform required analyses of the impacts of the designation is lacking or if the biological needs of the species are not sufficiently well known to permit identification of an area as critical habitat. Though it is likely that there are areas very important to the razorback sucker, we are unable to adequately determine at this time the precise constituent elements within specific areas that are essential to its survival and recovery. As noted earlier, there is limited information on the specific habitat needs of the razorback sucker. Though habitat occupied by the razorback sucker has been identified and spawning has been documented in several areas, it is questionable as to whether these areas are adequately meeting the life history needs of the razorback if there has been little or no recruitment. The razorback sucker cannot perpetuate itself in the wild if there is little or no recruitment to the adult population. It would not be in the best interest of the species to identify or use the characteristics of existing habitats as the basis for critical habitat when we are unable to identify those specific areas and precise habitat characteristics needed to bring about recruitment. Hence, the Service finds that critical habitat is not determinable at this time.

Section 4(b)(6)(C) further indicates that a concurrent critical habitat determination is not required, and that the final decision on designation may be postponed for 1 additional year from the date of publication of the proposed rule, if the Service finds that a prompt determination of endangered or threatened status is essential to the conservation of the species involved. The Service considers that a prompt determination of endangered status for the razorback sucker is essential. As a proposed species, the razorback sucker would be eligible only for the limited consideration given under the conference requirement of section 7(a)(4) of the Act, as amended. This does not require a limitation on the commitment of resources on the part of

concerned Federal Agencies or applicants for Federal permits. Therefore, to ensure that the full benefits of Section 7 and other conservation measures under the Act will apply to the razorback sucker, prompt determination of endangered status is essential.

Pursuant to section 4(b)(6)(C)(ii) of the Act, as amended, it critical habitat is not determinable at the time of listing, within 2 years of the proposed rule the Secretary must designate critical habitat to the maximum extent prudent on the basis of whatever data are available at that time. That determination will be due for the razorback sucker on May 22, 1992.

## Available Conservation Measures

Conservation measures provided to species listed as endangered or threatened under the Act include recognition, recovery actions, requirements for Federal protection, and prohibitions against certain practices. Recognition through listing encourages and results in conservation actions by Federal, State, and private agencies, groups, and individuals. The Act provides for possible land acquisition and cooperation with the States and requires that recovery actions be carried out for all listed species. The protection required of Federal Agencies and the prohibitions against taking and harm are discussed, in part, below.

Section 7(a) of the Act, as amended, requires Federal Agencies to evaluate their actions with respect to any species that is proposed or listed as endangered or threatened and with respect to its critical habitat, if any is being designated. Regulations implementing this interagency cooperation provision of the Act are codified at 50 CFR part 402. Section 7(a)(2) requires Federal Agencies to insure that activities they authorize, fund, or carry out are not likely to jeopardize the continued existence of a listed species or to destroy or adversely modify its critical habitat. If a Federal action may affect a listed species or its critical habitat, the responsible Federal Agency must enter into formal consultation with the Service.

The Green and Colorado Rivers have been extensively developed through several Federal programs for power generation, flood control, salinity control, and irrigation. As a result, many Federal Agencies are involved with activities which may affect the razorback sucker. Flow conditions in the Green and Colorado Rivers are influenced by power generation and flood control at several Bureau of Reclamation projects. Power generated

by the Colorado River Storage Project reservoirs is marketed by the Western Area Power Administration, whose marketing program has considerable influence on discharges from those reservoirs. Other Bureau of Reclamation projects involving diversions and storage for irrigation or municipal and industrial uses and salinity control are in various stages of planning, construction, or operation. The Soil Conservation Service has salinity control programs which affect flows and water quality in the Colorado River system. The Corps of Engineers would consider the razorback sucker in their administration of Section 404 of the Clean Water Act, and the Environmental Protection Agency also would consider the fish in administration of the Clean Water Act, the National Environmental Policy Act, and other pollution and pesticide control programs. Several Federal land and resource management agencies including the National Park Service, the U.S. Forest Service, and the Bureau of Land Management would have to consider the needs of the razorback sucker in programs under their jurisdiction.

The interagency Recovery Implementation Program coordinates the recovery of currently listed species (Colorado squawfish, humpback chub, and bonytail chub) and the management of the razorback sucker in the upper basin, excluding the San Juan River. The Recovery Implementation Program considers the razorback sucker an imperiled species that may require listing in the future unless actions are taken to reverse its downward population trend. Listing the razorback sucker as endangered will give it equal status with the other three listed species in the Recovery Implementation Program's recovery efforts.

Listing the razorback sucker as endangered would influence the stocking of nonnative fish species and the management of recreational sportfishing in a similar manner as the other three listed fish species in the Colorado River basin. If a stocking or sportfishing program involved Federal funds or permits, or received fish from Federal hatcheries, the action would be reviewed under section 7 of the Act. In addition, control of nonnative fishes is an element of the Recovery Implementation Program. This program would confine stocking of nonnative fishes to areas where no conflict with endangered fishes can be demonstrated. When feasible and effective, nonnative fishes would be selectively removed from areas considered essential to recovery of the listed species.

Participants in the Recovery Implementation Program also would review State sportfishing practices and regulations for compliance with Federal law and impacts on endangered fish species. As noted previously, the Service has an informal agreement with the State of Colorado to review all stocking proposals, and is seeking a similar arrangement with the State of Utah.

The Act, and its implementing regulations in 50 CFR 17.21, set forth a series of general prohibitions and exceptions that apply to all endangered wildlife. These prohibitions, in part, make it illegal for any person subject to the jurisdiction of the United States to take (includes harass, harm, pursue, hunt, shoot, wound, kill, trap, or collect; or attempt any of these), import or export, ship in interstate commerce in the course of commercial activity, or sell or offer for sale in interstate or foreign commerce any listed species. It also is illegal to possess, sell, deliver, carry, transport, or ship any such wildlife that has been taken illegally. Certain exceptions apply to agents of the Service and State conservation agencies.

Permits may be issued to carry out otherwise prohibited activities involving endangered wildlife species under certain circumstances. Regulations governing permits are at 50 CFR 17.22 and 17.23. Such permits are available for scientific purposes, to enhance the propagation or survival of the species, and/or for incidental take in connection with otherwise lawful activities. In some instances, permits may be issued for a specified time to relieve undue economic hardship that would be suffered if such relief were not available. With respect to the razorback sucker, it is anticipated that few, if any, trade permits would ever be sought or issued, since the species is not in trade or common in the wild. Requests for copies of the regulations on animals and inquiries regarding them may be addressed to the Office of Management Authority, U.S. Fish and Wildlife Service, room 432, 4401 N. Fairfax Drive, Arlington, Virginia 22203, (703) 358–2093; FTS 921–2093.

## National Environmental Policy Act

The Fish and Wildlife Service has determined that an Environmental Assessment, as defined under the authority of the National Environmental Policy Act of 1969, need not be prepared in connection with regulations adopted pursuant to section 4(a) of the Endangered Species Act of 1973, as amended. A notice outlining the

**Federal Register** / Vol. 56, No. 205 / Wednesday, October 23, 1991 / Rules and Regulations   54967

Service's reasons for this determination was published in the **Federal Register** on October 25, 1983 (48 FR 49244).

**References Cited**

A complete list of all references cited herein, as well as others, is available upon request from the Service's Utah Field Office (see **ADDRESSES** above).

**Authors**

This rule was prepared by P.A. Schrader, U.S. Fish and Wildlife Service (see **FOR FURTHER INFORMATION CONTACT** above), with assistance from

D.L. Archer, formerly with the U.S. Fish and Wildlife Service.

**List of Subjects in 50 CFR Part 17**

Endangered and threatened species, Exports, Imports, Reporting and recordkeeping requirements, and Transportation.

**Regulation Promulgation**

**PART 17—[AMENDED]**

Accordingly, part 17, subchapter B of chapter I, title 50 of the Code of Federal Regulations, is amended as set forth below:

1. The authority citation for part 17 continues to read as follows:

Authority: 16 U.S.C. 1361–1407; 16 U.S.C. 1531–1544; 16 U.S.C. 4201–4245; Pub. L. 99–625, 100 Stat. 3500, unless otherwise noted.

2. Amend § 17.11(h) by adding the following, in alphabetical order under "FISHES," to the List of Endangered and Threatened Wildlife:

**§ 17.11   Endangered and threatened wildlife.**

*       *       *       *       *

(h) * * *

| Species | | Historic range | Vertebrate population where endangered or threatened | Status | When listed | Critical habitat | Special rules |
|---|---|---|---|---|---|---|---|
| Common name | Scientific name | | | | | | |
| *       *       *       *       *       *       *       *       |||||||| 
| FISHES | | | | | | | |
| Sucker, razorback | *Xyrauchen texanus* | U.S.A. (AZ, CA, CO, NM, NV, UT, WY), Mexico. | Entire | E | 447 | NA | NA |
| *       *       *       *       *       *       *       *       |||||||| 

Dated: October 15, 1991.

Richard N. Smith,

*Acting Director, Fish and Wildlife Service.*

[FR Doc. 91–25471 Filed 10–22–91; 8:45 am]

BILLING CODE 4310-55-M

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

#### 50 CFR Part 17

RIN 1018–AB91

**Endangered and Threatened Wildlife and Plants; Determination of Critical Habitat for the Colorado River Endangered Fishes: Razorback Sucker, Colorado Squawfish, Humpback Chub, and Bonytail Chub**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** The Fish and Wildlife Service designates critical habitat for four species of endemic Colorado River Basin fishes: Razorback sucker (*Xyrauchen texanus*), Colorado squawfish (*Ptychocheilus lucius*), humpback chub (*Gila cypha*), and bonytail chub (*Gila elegans*). These species are listed as endangered under the Endangered Species Act of 1973, as amended. The critical habitat designated is located primarily on Federal land and, to a lesser extent, on tribal, State, and private lands. The designation provides additional protection required under section 7 of the Act with regard to activities that require Federal agency action. The Service designates 3,168 km (1,980 mi) of critical habitat for the four Colorado River endangered fishes in portions of Colorado, Utah, New Mexico, Arizona, Nevada, and California. The areas designated for each species also overlap some areas designated for the other species.

**EFFECTIVE DATE:** April 20, 1994.

**ADDRESSES:** The complete file for this rule is available for public inspection, by appointment, during normal business hours at the office of the Field Supervisor, Ecological Services, U.S. Fish and Wildlife Service, 2060 Administration Building, 1745 West 1700 South, Salt Lake City, Utah 84104.

**FOR FURTHER INFORMATION CONTACT:** Reed E. Harris, Field Supervisor, at the above address, telephone 801/975–3630.

**SUPPLEMENTARY INFORMATION:**

### Background

The four endangered fishes are endemic to the Colorado River Basin (Basin), which consists of portions of seven Western States. The Basin drains approximately 627,000 km² (242,000 mi²) within the United States and has been politically divided into an Upper and Lower Basin. The Upper Basin consists of portions of the States of Colorado, New Mexico, Utah, and Wyoming. The Lower Basin consists of portions of the States of Arizona, California, and Nevada. An additional 5,000 km² (2,000 mi²) of the Basin lies within Mexico.

Historically, the native fish fauna of the Basin was dominated by the minnow (cyprinids) and sucker (catostomids) families (Minckley et al. 1986). The four species of concern, the razorback sucker (*Xyrauchen texanus*), Colorado squawfish (*Ptychocheilus lucius*), humpback chub (*Gila cypha*), and bonytail chub (*Gila elegans*) are listed as endangered under the Endangered Species Act) of 1973, as amended (16 U.S.C. 1531 *et seq.*). These fishes are threatened with extinction due to the cumulative effects of environmental impacts that have resulted in habitat loss (including alterations to natural flows and changes to temperature and sediment regimes), proliferation of nonnative introduced fish, and other man-induced disturbances (Miller 1961; Minckley 1973; U.S. Fish and Wildlife Service [USFWS] 1987; Carlson and Muth 1989).

Natural Colorado squawfish populations survive only in the Upper Basin, where their numbers are relatively high only in the Green River Basin of Utah and Colorado (compared with other rivers in the Upper Basin) (Tyus 1991). Razorback sucker and bonytail chub populations throughout the Basin consist predominately of old adult fish. Populations persist primarily because of the longevity of these species (USFWS 1990a; Minckley et al. 1991), although some experimental and augmentation programs have stocked fish in the Basin. Humpback chub populations in the Little Colorado River, Black Rocks, and Westwater Canyon in the Colorado River appear relatively stable in the number of fish, but declines have occurred in other locations (USFWS 1990b).

The historical ranges of the four endangered fishes have been fragmented by construction of dams and water diversions throughout the Basin (Carlson and Muth 1989). The Fish and Wildlife Service (Service) believes that it is important to the survival and recovery of these species to maintain and reestablish populations in geographically distinct areas within their historic range that provide varying thermal, chemical, geological, and physical parameters required for maintenance of genomes.

Conservation of these four species will require the identification and management of water resources and habitat components that are considered important to any fish species, such as spawning areas, nursery grounds, and interactions with predators and competitors. However, because the four endangered fishes are present in such low numbers, basic life history and habitat use information has been difficult to obtain. Changes to the historical Colorado River Basin ecosystem that have resulted in a lack of reproduction and/or recruitment have been hypothesized as factors in their endangerment (USFWS 1990a, 1990b, 1991; Minckley et al. 1991). In this case, not only would a lack of successful recruitment lead to small numbers of fish, but over time, remnant stocks may lose genetic diversity. Ultimately, extinction could result because the loss of genetic diversity may make populations less able to adjust to environmental change.

### Habitats and Status of Endangered Fish

#### Affected Environment

The four Colorado River endangered fishes evolved in the Colorado River Basin (Basin) and were adapted to the natural environment that existed prior to the beginning of large-scale water development and introduction of nonnative species. This natural environment was characterized by highly fluctuating seasonal and annual flows, distinctly different habitat types (i.e., whitewater, lower gradient and meandering main channels, off-channel backwaters, and others) and varying water quality (i.e., sediment load, temperature, salinity, etc.). Recent population declines and disappearances of endemic Basin fish species from much of their former range have been associated with the onset of rapid and widespread anthropogenic changes to the natural environment. The cumulative environmental impact of these changes has resulted in alteration of the physical and biological characteristics of many rivers in the Basin. These impacts presumably occurred so rapidly that the fish could not adapt to them (Carlson and Muth 1989). Dams and diversions have fragmented former fish habitat and restricted fish movement. As a result, genetic interchange (emigration and immigration of individuals) between some fish populations is no longer possible. High flood flows were once normal in the Basin and provided food and nutrient exchange between river channels and shallow-water flood plain habitats. These high flows are now controlled by numerous dams. As a result of these dams, major changes also have occurred in water quality, quantity, temperature, sediment load

BLM_0070441

and nutrient transport, and other characteristics of the aquatic environment (Carlson and Muth 1989). The altered river conditions that have resulted now provide suitable habitats for introduced, nonnative fish. Some of these nonnative fish species have flourished in the Basin (Minckley et al. 1982; Tyus et al. 1982; Carlson and Muth 1989). These physical and biological changes have impacted the river environment to the extent that no completely unaltered habitat remains in the Basin for the four Colorado River endangered fish species.

### Razorback Sucker

This species once was abundant and widely distributed in rivers of the Basin (Jordan and Evermann 1896; Minckley 1973). In the Lower Basin, the razorback sucker remains in the Colorado River from the Grand Canyon to near the border with Mexico. With the exception of the relatively large stock of razorback suckers remaining in Lake Mohave (an estimated 25,000 individuals), these populations are small and recruitment is virtually nonexistent (Minckley et al. 1991). The formerly large Lower Basin populations have been virtually extirpated from other riverine environments (Minckley et al. 1991). In the Upper Basin, this species remains in the lower Yampa and Green Rivers, mainstream Colorado River, and lower San Juan River (Tyus et al. 1982; Minckley et al. 1991; Platania et al. 1991); however, there is little indication of recruitment in these remnant stocks. The largest extant riverine population occurs in the upper Green River Basin. It consisted of only about 1,000 fish in 1989 (Lanigan and Tyus 1989); recent information suggests that this population may have declined to less than 500 fish (USFWS unpublished data). In the absence of conservation efforts, it is presumed that all wild populations in the Basin would soon be lost as old fish die without sufficient natural recruitment.

Reproduction and habitat use of razorback suckers has been studied in Lower Basin reservoirs, especially in Lake Mohave. Fish reproduction has been visually observed along reservoir shorelines for many years. The fish spawn over mixed substrates that range from silt to cobble and at water temperatures ranging from 10.5 to 21° C (51 to 70° F) (reviewed by Minckley et al. 1991).

Habitat use and spawning behavior of adult razorback suckers in riverine habitats has been studied by radiotelemetry in the Green River Basin (Tyus and Karp 1990) and in the upper Colorado River (Osmundson and

Kaeding 1989). Fish in the Green River Basin spawn in the spring with rising water levels and increasing temperatures. Razorback suckers move into flooded areas in early spring and begin spawning migrations to specific locations as they become reproductively active, and spawning occurs over rocky runs and gravel bars (Tyus and Karp 1990).

In nonreproductive periods, adult razorback suckers occupy a variety of habitat types, including impounded and riverine areas, eddies, backwaters, gravel pits, flooded bottoms, flooded mouths of tributary streams, slow runs, sandy riffles, and others (reviewed by Minckley et al. 1991). Summer habitats used include deeper eddies, backwaters, holes, and midchannel sandbars (Osmundson and Kaeding 1989; Tyus and Karp 1990; Minckley et al. 1991). During winter, adult razorback suckers use main channel habitats that are similar to those used during other times of the year, including eddies, slow runs, riffles, and slackwaters (Osmundson and Kaeding 1989; Valdez and Masslich 1989; Tyus and Karp 1990).

Habitats used by young razorback suckers have not been fully described because of the low number of young fish present in the Basin. However, most studies indicate that the larvae prefer shallow, littoral zones for a few weeks after hatching, then disperse to deeper water areas (reviewed by Minckley et al. 1991). Laboratory studies indicated that in a riverine environment, the larvae enter stream drift and are transported downstream (Paulin et al. 1989).

Based on available data, Tyus and Karp (1989) and Osmundson and Kaeding (1989) considered that cumulative environmental impacts from interactions with nonnative fish, high winter flows, reduced high spring flows, seasonal changes in river temperatures, and lack of inundated shorelines and bottom lands are factors that potentially limit the survival, successful reproduction, and recruitment of this species.

### Colorado Squawfish

This species is the only living representative of the genus *Ptychocheilus* endemic to the Basin. Fossils from the Mid-Pliocene epoch (about 6 million years ago) indicate that early *Ptychocheilus* had physical characteristics that were similar to modern forms. Native populations of the Colorado squawfish are now restricted to the Upper Basin in Wyoming, Colorado, Utah, and New Mexico. Colorado squawfish populations have been extirpated from the Lower Basin.

Colorado squawfish spawning has been documented in canyons in the Yampa and Green Rivers (Tyus 1991). This reproduction is associated with declining flows in June, July, or August and average water temperatures ranging from 22 to 25 °C (72 to 77 °F) depending on annual hydrology. River mile 130 on the Colorado River, near the Colorado-Utah State line, also has been identified as a spawning site, and radio-tagged adults have moved to a specific 0.2 km (0.1 mi) area in four different years (Osmundson and Kaeding 1989; USFWS unpublished data 1992–1993). In the mainstream Colorado River, McAda and Kaeding (1991) stated that spawning occurs at many locations. They also suggested that Colorado squawfish spawning in the Colorado River may have been adversely impacted by construction of mainstream dams and a 48 percent reduction in peak discharge. On the San Juan River, a spawning reach has been identified between river mile 133.4 and 129.8, near the confluence of the Mancos River (Ryden and Pfeifer 1993).

After spawning, adult Colorado squawfish utilize a variety of riverine habitats, including eddies, backwaters, shorelines, and others (Tyus 1990). During winter, adult Colorado squawfish use backwaters, runs, pools, and eddies, but are most common in shallow, ice-covered shoreline areas (Osmundson and Kaeding 1989; Wick and Hawkins 1989). In spring and early summer, adult squawfish use shorelines and lowlands inundated during typical spring flooding. This natural lowland inundation is viewed as important for their general health and reproductive conditioning (Osmundson and Kaeding 1989; Tyus 1990). Use of these habitats presumably mitigates some of the effects of winter stress, and aids in providing energy reserves required for migration and spawning. Migration is an important component in the reproductive cycle of Colorado squawfish. Tyus (1990) hypothesized that migration cues, such as high spring flows, increasing river temperatures, and chemical inputs from flooded lands and springs, may be important to successful reproduction.

In the Green River Basin, larval Colorado squawfish emerge from spawning substrates and enter the stream drift as young fry (Haynes et al. 1989). The larval fish are actively or passively transported downstream for about 6 days, traveling an average distance of 160 km (100 mi) to reach nursery areas in lower gradient reaches (Tyus and Haines 1991). These areas are nutrient-rich habitats that consist of

BLM_0070442

ephemeral along-shore embayments that develop as spring flows decline.

### Humpback Chub

Remains of humpback chub have been found in archaeological sites dated to about 4000 B.C. (USFWS 1990b). This Colorado River native fish was not described as a species until 1946 (Miller 1946). This has been attributed to its presently restricted distribution in remote, white water canyons (USFWS 1990b). The historical abundance and distribution of the species is not well known. In the Lower Basin, the humpback chub occurs in the Little Colorado and Colorado Rivers in the Grand Canyon. This population is the largest remaining in the Basin. In the Upper Basin, humpback chub are found in the Black Rocks/Westwater Canyon and Cataract Canyon of the Colorado River, Desolation and Gray Canyons of the Green River, and Yampa and Whirlpool Canyons in Dinosaur National Monument, Green and Yampa Rivers (USFWS 1990b).

Humpback chub in reproductive condition are usually captured in May, June, or July, depending on location. Spawning occurs soon after the highest spring flows when water temperatures approach 20° C (68° F) (Karp and Tyus 1990; USFWS 1990b). The importance of spring flows and proper temperatures for humpback chub is stressed by Kaeding and Zimmerman (1983), who implicated flow reductions and low water temperatures in the Grand Canyon as factors curtailing successful spawning of the fish and increasing competition from other species.

Populations of humpback chub are found in river canyons, where they utilize a variety of habitats, including pools, riffles, and eddies. Most of the existing information on habitat preferences has been obtained from adult fish in the Little Colorado River, the Grand Canyon, and the Black Rocks of the Colorado River (Holden and Stalnaker 1975; Kaeding and Zimmerman 1983; Kaeding et al. 1990). In these locations, the fish are found associated with boulder-strewn canyons, travertine dams, pools, and eddies. Some habitat-use data also are available from the Yampa River Canyon where the fish occupy similar habitats and also use rocky runs, riffles, rapids, and shoreline eddies (Karp and Tyus 1990). This diversity in habitat use suggests that the adult fish are adapted to a variety of habitats, and studies of tagged fish indicated that they move between habitats, presumably in response to seasonal habitat changes and life history needs (Kaeding and Zimmerman 1983; Karp and Tyus 1990).

Reduced spring peak flows, availability of shoreline eddy and deep canyon habitats, and competition and predation by nonnative fish were reported as potential limiting factors for humpback chub in the Yampa River (Tyus and Karp 1989). The impact of hybridization with other species is currently being evaluated.

### Bonytail Chub

The bonytail chub (also known as the bonytail) is the rarest native fish in the Basin. Historically reported as widespread and abundant in rivers throughout the Basin (Jordan and Evermann 1896), its populations have been greatly reduced. The fish is presently represented in the wild by a low number of old fish (i.e., ages of 40 years or more), and recruitment is virtually nonexistent. In the Lower Basin, a small population persists in the Colorado River in Lake Mohave, and there are recent records from Lake Havasu (USFWS 1990a). In the Upper Basin, recent captures have been from Dinosaur National Monument on the Yampa River, Desolation and Gray Canyons on the Green River, and Black Rocks and Cataract Canyon on the Colorado River (Kaeding et al. 1986; Tyus et al. 1987; Valdez 1990; USFWS 1990a).

The bonytail chub is adapted to mainstream rivers, where it has been observed in pools and eddies (Minckley 1973; Vanicek 1967). In reservoirs, the fish occupies a variety of habitat types (Minckley 1973). In Lake Mohave, Wagner (1955) observed the fish in eddy habitats. Spawning requirements have never been documented in a river, but Vanicek and Kramer (1969) reported that spawning occurred in June and July at water temperatures of about 18° C (64° F). The available data suggest that habitats required for conservation of the bonytail chub include, river channels, and flooded, ponded, or inundated riverine habitats that would be suitable for adults and young, especially if competition with nonnative fishes is reduced (USFWS 1990a).

### Previous Federal Actions

#### Listing Chronology

The Colorado squawfish and humpback chub were listed as endangered species on March 11, 1967 (32 FR 4001) and the bonytail chub was listed as endangered on April 23, 1980 (45 FR 27713). Critical habitat for these species was not designated at the time of their listing. On May 16, 1975, the Service published a notice of its intent to determine critical habitat for the Colorado squawfish and the humpback

chub, and other species (40 FR 21499). On September 14, 1978, the Service proposed 1,002 km (623 mi) of the Colorado, Green, Gunnison, and Yampa Rivers as critical habitat for the Colorado squawfish (43 FR 41060). The proposal was for 1,002 km (623 mi) of the Colorado, Green, Gunnison, and Yampa Rivers. This proposal was later withdrawn (44 FR 12382; March 6, 1979) to comply with the 1978 amendments to the Act (16 U.S.C. 1531 et seq.).

The razorback sucker was first proposed for listing as a threatened species on April 24, 1978 (43 FR 17375). The proposal was withdrawn on May 27, 1980 (45 FR 35410), to comply with provisions of the 1978 amendments to the Act. These provisions required the Service to include consideration of designating critical habitat in the listing of species, to complete the listing process within 2 years from the date of the proposed rule, or withdraw the proposal from further consideration. The Service did not complete the listing process within the 2-year deadline.

On March 15, 1989, the Service received a petition from the Sierra Club, National Audubon Society, The Wilderness Society, Colorado Environmental Coalition, Southern Utah Wilderness Alliance, and Northwest Rivers Alliance to list the razorback sucker as endangered. The Service made a positive finding in June 1989 and subsequently published a notice in the **Federal Register** on August 15, 1989 (54 FR 33586). This notice also stated that the Service was completing a status review and was seeking additional information until December 15, 1989. A proposed rule to list the razorback sucker as endangered was published in the **Federal Register** on May 22, 1990 (55 FR 21154).

The final rule listing the razorback sucker as an endangered species was published on October 23, 1991 (56 FR 54957), but critical habitat was not proposed. In the final rule, the Service concluded that critical habitat was not determinable at the time of listing and questioned whether it was prudent to designate critical habitat.

On October 30, 1991, the Service received a 60-day notice of intent to sue from the Sierra Club Legal Defense Fund. The subject of the notice was the Service's failure to designate critical habitat concurrent with listing of the razorback sucker pursuant to section 4(b)(6)(c) of the Act. The Sierra Club Legal Defense Fund followed this with a second notice of intent to sue dated January 30, 1992. At a meeting on December 6, 1991, the Service concluded that designation of critical

habitat was prudent and determinable and therefore in compliance with the Act. The Service had no alternative but to designate critical habitat for the razorback sucker. Because the intent of the Act is "* * * to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved * * *," the Service also decided to propose critical habitat for the Colorado squawfish, humpback chub, and bonytail chub. The four endangered Colorado River fish species coexist in the Basin and much of their habitat overlaps.

On May 7, 1992, the Sierra Club Legal Defense Fund on behalf of the Colorado Wildlife Federation, Southern Utah Wilderness Alliance, Four Corners Action Coalition, Colorado Environmental Coalition, Taxpayers for the Animas River, and Sierra Club filed a lawsuit in the U.S. District Court (Court), Colorado, against the Service for failure to designate critical habitat for the razorback sucker. On August 18, 1992, a motion for summary judgment was filed requesting the Court to order publication of a final rule to designate critical habitat within 90 days. On October 27, 1992, the Court ruled that the Service had violated the Act by failing to designate critical habitat when the razorback sucker was listed. The Court ordered the Service to publish a proposed rule within 90 days designating critical habitat for the razorback sucker using presently available information, and to publish a final rule at the earliest time permitted by the Act and its regulations. To take no action towards designation of critical habitat would continue to place the Service in violation of the Act and was not a feasible alternative.

The Service published the proposed rule to designate critical habitat on January 29, 1993 (58 FR 6578). At that time, the Service had not completed an economic analysis or a biological support document. The Service published the Draft Biological Support Document for public review on September 15, 1993, and reopened the public comment period (58 FR 48351). On September 21, 1993, the Court held a hearing on the Sierra Club Legal Defense Fund "Motion For A Timetable For Publication Of Final Rule" on the designation of critical habitat. On November 19, 1993, the Court directed the Service (1) not to submit an interim final rule, (2) to provide a 60-day comment period for the economic analysis, (3) to provide notice of the exclusion process and request comments, and (4) to publish the final rule by March 15, 1994.

Notice of availability of the Economic Analysis, an Overview of the Proposed Critical Habitat Designation, and a request for public comments were made in the **Federal Register** on November 12, 1993 (58 FR 5997), and in a November 9, 1993, letter sent to interested parties. The public comment period closed on January 11, 1994. On January 18, 1994, the Service conducted the exclusion process, assessing all the information pertinent to a decision to exclude areas from designation as critical habitat for economic or other relevant reasons.

*Recovery Planning*

Recovery plans have been written for three of the four listed Colorado River fishes. The Colorado Squawfish Recovery Plan was approved on March 16, 1978, and revised on August 6, 1991 (USFWS 1991). The Humpback Chub Recovery Plan was approved on August 22, 1979, with a first revision on May 15, 1984, and a second revision on September 19, 1990 (USFWS 1990b). The Bonytail Chub Recovery Plan was approved on May 16, 1984, with a revised plan approved September 4, 1990 (USFWS 1990a). Recovery goals contained in these recovery plans have been used in identifying and evaluating critical habitat for these three species. A recovery plan for the razorback sucker has not been completed.

**Determination of Critical Habitat**

*Definition of Critical Habitat*

"Critical habitat," as defined in section 3(5)(A) of the Act, means: "(i) the specific areas within the geographical area occupied by the species at the time it is listed * * *, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and (ii) specific areas outside the geographical area occupied by a species at the time it is listed * * *, upon a determination by the Secretary that such areas are essential for the conservation of the species."

The term "conservation," as defined in section 3(3) of the Act, means: "* * * the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." In the case of critical habitat, conservation represents the areas required to recover a species to the point of delisting (i.e., the species is recovered and is removed from the list of endangered and threatened species). In this context, critical habitat

preserves options for a species' eventual recovery. Section 3(5)(C) further states that: "Except in those circumstances determined by the Secretary, critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species."

*Role of Critical Habitat in Species Conservation*

The designation of critical habitat will not, by itself, lead to recovery but is one of several measures available to contribute to conservation of a species. Critical habitat helps focus conservation activities by identifying areas that contain essential habitat features (primary constituent elements) regardless of whether or not the areas are currently occupied by the listed species. Such designations alert Federal agencies, States, the public, and other entities about the importance of an area for the conservation of a listed species. Critical habitat also identifies areas that may require special management or protection. Areas designated as critical habitat receive protection under section 7 of the Act with regard to actions carried out, funded, or authorized by a Federal agency that are likely to adversely modify or destroy critical habitat. Section 7 requires that Federal agencies consult on their actions that may affect critical habitat and insure that their actions are not likely to destroy or adversely modify critical habitat.

Designation of an area as critical habitat only affects Federal actions that may occur in the area. Designation does not create a management plan for a listed species. Designation does not automatically prohibit certain actions, establish numerical population goals, prescribe specific management actions (inside or outside of critical habitat), nor does it have a direct effect on habitat not designated as critical habitat. However, critical habitat may provide added protection for areas designated and thus assist in achieving recovery.

*Areas Outside of Critical Habitat*

Areas outside of critical habitat that contain one or more of the primary constituent elements may still be important for conservation of a species. Also, some areas do not contain all of the constituent elements and may have those missing elements restored in the future. Such areas also may be important for the long-term recovery of the species even if they were not designated as critical habitat. Areas not designated as critical habitat also may be of value in maintaining ecosystem integrity and supporting other species,

indirectly contributing to recovery of a species.

Areas outside of critical habitat are still subject to section 7 consultation on whether or not an action is likely to jeopardize the continued existence of a species, and section 9 "take" prohibitions for an action that may affect Colorado River endangered fishes or their habitat. The Service anticipates that the importance of areas outside of critical habitat to the conservation of the Colorado River endangered fishes will be addressed through section 7, section 9, and section 10 permit processes, the recovery planning process, and other appropriate State and Federal laws.

*Primary Constituent Elements*

In determining which areas to designate as critical habitat for a species, the Service considers those physical and biological attributes that are essential to species conservation (i.e., constituent elements). Such physical and biological features are stated in 50 CFR 424.12 and include, but are not limited to, the following items: (1) Space for individual and population growth and for normal behavior;

(2) Food, water, air, light, minerals, or other nutritional or physiological requirements;

(3) Cover or shelter;

(4) Sites for breeding, reproduction, rearing of offspring, germination, or seed dispersal; and generally;

(5) Habitats that are protected from disturbance or are representative of the historical geographical and ecological distributions of a species.

In addition, the Act stipulates that the areas containing these elements may require special management considerations or protection.

Detailed descriptions and the biological basis for the constituent elements were presented in the Draft Biological Support Document (Maddux et al. 1993). In considering the biological basis for determining critical habitat, the Service focused on the primary physical and biological elements essential to the conservation of the species. The primary constituent elements are interrelated in the life history of these species. This relationship was a prime consideration in the designation of critical habitat. The Service is required to list the known primary constituent elements together with a description of any critical habitat that is designated.

The primary constituent elements determined necessary for survival and recovery of the four Colorado River endangered fishes include, but are not limited to:

**Water**

This includes a quantity of water of sufficient quality (i.e., temperature, dissolved oxygen, lack of contaminants, nutrients, turbidity, etc.) that is delivered to a specific location in accordance with a hydrologic regime that is required for the particular life stage for each species.

**Physical Habitat**

This includes areas of the Colorado River system that are inhabited or potentially habitable by fish for use in spawning, nursery, feeding, and rearing, or corridors between these areas. In addition to river channels, these areas also include bottom lands, side channels, secondary channels, oxbows, backwaters, and other areas in the 100-year flood plain, which when inundated provide spawning, nursery, feeding and rearing habitats, or access to these habitats.

**Biological Environment**

Food supply, predation, and competition are important elements of the biological environment and are considered components of this constituent element. Food supply is a function of nutrient supply, productivity, and availability to each life stage of the species. Predation and competition, although considered normal components of this environment, are out of balance due to introduced nonnative fish species in many areas.

*Additional Selection Criteria for the Razorback Sucker*

Because a recovery plan for the razorback sucker has not been completed, additional selection criteria were developed to assist the Service in making a determination of areas to propose as critical habitat. Previous Service findings, published and unpublished literature sources, and discussions with individual members of the Colorado River Fishes Recovery Team were utilized to develop the constituent elements and additional selection criteria.

Adult razorback suckers have displayed a degree of versatility in their ability to survive and spawn in different habitats. However, razorback sucker populations continue to decline and are considered below the survival level. Thus, as versatile as the adult life stage of razorback sucker appears to be in selecting spawning habitat, there has been little or no recruitment of young to the adult population. Therefore, special consideration was given to habitats required for reproduction and recruitment.

The following selection considerations were used by the Service to help determine areas necessary for survival and recovery of the razorback sucker.

1. Presence of known or suspected wild spawning populations, although recruitment may be limited or nonexistent.

2. Areas where juvenile razorback suckers have been collected or which could provide suitable nursery habitat (backwaters, flooded bottom lands, or coves).

3. Areas presently occupied or that were historically occupied that are considered necessary for recovery and that have the potential for reestablishment of razorback suckers.

4. Areas and water required to maintain rangewide fish distribution and diversity under a variety of physical, chemical, and biological conditions.

5. Areas that need special management or protection to insure razorback survival and recovery. These areas once met the habitat needs of the razorback sucker and may be recoverable with additional protection and management.

The primary constituent elements were identified throughout the historical range of the Colorado River endangered fishes. In addition, the five selection considerations described above were also used to evaluate potential razorback sucker critical habitat areas. The critical habitat designations were based on the primary constituent elements, published and unpublished sources of information, Service reports and other findings, recovery plans (for Colorado squawfish, humpback chub, and bonytail chub), the additional selection considerations, and the Service's preliminary recovery goals for the razorback sucker.

*Adjustments to Boundaries*

The 100-year flood plain is generally included as part of the critical habitat designation; however, only those portions of the flood plain that contain the constituent elements are considered part of critical habitat. Specific areas in the flood plain must be evaluated on a case-by-case basis to determine if the areas constitute critical habitat. The Service stresses that, although critical habitat may only be seasonally occupied by the fish, such habitat remains important for their conservation. Protection of such seasonally occupied habitats contributes to the conservation of the species.

As a result of obtaining additional biological information and review of comments received during the public

BLM_0070445

comment period, the Service has determined that some areas are not required for the survival and recovery of the fishes because they do not contain the constituent elements, meet the additional selection criteria, or are not in historical habitat. In addition, other areas may contain constituent elements but may contribute little to the prospect of recovery for one or more of the four fishes. Some of these areas are within sections of designated critical habitat and will be evaluated on a case-by-case basis. Five stream sections are separable and have been removed from consideration as part of critical habitat because of a lack of biological importance. These five areas are:

• Davis Dam to the upstream end of Topock Marsh on the mainstem Colorado River (AZ, CA, NV) (bonytail chub)

• Bonita and Eagle Creeks, tributaries to the Gila River (AZ) (razorback sucker)

• Cherry and Canyon Creeks, tributaries to the Salt River (AZ) (razorback sucker)

• Sycamore, Oak, and West Clear Creeks, tributaries to the Verde River (AZ) (razorback sucker)

• The Verde River from Sullivan Lake to Perkinsville (AZ) (razorback sucker)

The Service reiterates that any or all of these sections could contribute to the recovery of one or more of the fishes; however, they do not provide a primary recovery area and are considered only marginally important. The Service also notes that some of these areas may not have been historical habitat for the razorback sucker, a further indication that these areas may have only limited value in the recovery of these fishes.

**Economic Impacts**

*Introduction*

Section 4(b)(2) of the Act directs the Secretary of the Interior (Secretary) to consider economic and other relevant impacts in determining whether to exclude proposed areas from the final designation of critical habitat. The Service, as delegated by the Secretary, may exclude areas from critical habitat designation when the benefits of exclusion outweigh the benefits of inclusion, provided that exclusion will not result in extinction of a species. An economic analysis (Brookshire et al. 1994) was conducted on the consequences of this action (critical habitat designation).

The study region for the economic analysis includes the seven States of the Basin: Arizona, California, Colorado, New Mexico, Nevada, Utah, and Wyoming. The timeframe chosen for the study, 1995 through 2020, encompasses

the time period projected for the recovery of the endangered fishes.

Linkages between the biological requirements for recovering the endangered fishes and economic activities in the region formed the basis for the economic analysis. As an index of these biological requirements, adjustments made in the operations of Federal reservoirs in the Basin and/or mitigation of nonflow related activities along the river's 100-year flood plain were included. The effects of recovery efforts on future water depletions in the Basin also were taken into consideration. The direct and indirect impacts of these possible changes on current and prospective economic activities were then estimated for each State, the region, and the national economy.

It is impossible to predict the outcome of future section 7 consultations involving endangered fishes in the Basin. If the Upper Basin and San Juan Recovery Implementation Programs (RIP) do not show sufficient and timely progress in recovering the endangered fishes, some planned water developments may be modified, scaled back, delayed, or foregone. This assumption provides an upper bound on the potential magnitude of economic impacts associated with the critical habitat designation. If the RIP's are successful in achieving their objectives, many of the negative economic impacts can be avoided.

*Economic Modeling*

Two types of economic effects are of interest when considering the economic impacts of critical habitat designations: regional economic impacts and national economic efficiency impacts. Regional economic impacts refer to the direct and indirect impacts of the critical habitat designations on specific geographic regions, such as States or other subregions of the country.

Regional economic impacts were analyzed using input-output (I–O) models that organize the basic accounting relationships that describe the production sector of the economy (Brookshire et al. 1993). The I–O method is based on the assumption that all sectors of the economy are related, and the production of a good or service can be described by a recipe whose ingredients are the outputs from other sectors of the economy. The primary inputs are labor, capital, and other raw resources. Through its multiplier analysis, the I–O model is capable of generating estimates of the changes in output for economic sectors, changes in employment, and changes in income due to the critical habitat designation.

The models report total impacts resulting from interactions among the sectors of the economy.

National economic efficiency impacts refer to the overall net impacts on the national economy after the effects of interregional transfers have been accounted for. The goal of a national efficiency analysis is to determine whether an action would have an overall positive or negative impact on the national economy.

National economic efficiency impacts were analyzed in this study using a Computable General Equilibrium (CGE) model. The CGE model captures the economic interactions of consumers, the production sectors, and the government sectors. The CGE model also analyzes resource reallocations (e.g., changes in river flows as represented by increased or decreased hydroelectric generation) in a manner such that the net effects, not just the total effects, are calculated. Given this capability, the CGE model is able to estimate net national efficiency impacts.

*Modeling Approach*

A separate I–O model was developed for each State, and focused on the direct and indirect impacts generated by the critical habitat designation (Brookshire et al. 1993). In most cases, impacts in a given State generated impacts in neighboring States. Thus, it was necessary to investigate potential offsetting impacts. As a result, an I–O model was constructed that investigated the impacts of the entire region (all seven States). In addition to the State and regional I–O models, a CGE model was developed for the economies of the seven-State area and the rest of the United States. This model provided a comprehensive aggregate assessment of the national economic efficiency impacts.

Economic activity for the models was estimated using Impact Analysis for Planning (IMPLAN) 1982 data sets that were updated and projected through the year 2020, using data from the Bureau of Economic Analysis of the U.S. Department of Commerce. The IMPLAN data set contains 528 economic sectors that were aggregated to 20 sectors (Brookshire et al. 1994).

*Without Fish and With Fish Scenarios*

Two scenarios were used to evaluate economic activities associated with the critical habitat designation (Brookshire et al. 1994). The "without fish" economic scenario consisted of projections of the level of economic activities that would be observed over the study period if no action was taken to recover the endangered fishes. The

BLM_0070446

**13380**     **Federal Register** / Vol. 59, No. 54 / Monday, March 21, 1994 / Rules and Regulations

"with fish" scenario was constructed by analyzing potential changes in economic activity that may occur due to the critical habitat designations and/or other protection and recovery efforts for endangered fish.

### Economic Setting

*Economic Output*

Economic output measures the value of all goods and services produced and/or consumed in a regional economy. The seven State Basin region generates about $1.3 trillion annually in economic output. This output is dominated by the combined manufacturing and the finance, insurance, and real estate sectors, which produce 18.4 percent and 14.9 percent of total output, respectively. The recreation services sector produces 7.7 percent of the total output and the combined agricultural sectors are responsible for 3.0 percent of the total output (Brookshire et al. 1993).

*Employment*

Approximately 22.0 million people are employed in the Basin economy. The largest employment sectors within the Basin States are the public sector (16.9 percent of total employment), and the combined manufacturing sector (15.4 percent of total employment). The recreation services sector is also a very significant part of total employment at 10.5 percent. Combined agricultural employment is approximately 4.3 percent of total employment (Brookshire et al. 1993).

*State and Regional Economic Impacts*

Three conclusions were obtained from the economic analysis (Table 1): First, regional economic impacts associated with critical habitat designation are positive for the Basin. Second, the State-level impacts are not distributed evenly over States in the Basin. Finally, the percent deviation in the economy from the "without fish" scenario is small.

TABLE 1.—ANNUALIZED IMPACTS ($1991 MILLIONS) OF CRITICAL HABITAT DESIGNATION IN EACH STATE AND THE COLORADO RIVER BASIN. PARENTHESES ( ) = PERCENT CHANGE IN THE STATE AND REGIONAL ECONOMIES DUE TO DESIGNATION. (AFTER BROOKSHIRE ET AL. 1994)

| State | Output (% change) | Earning (% change) | Indirect business taxes (% change) | Personal income taxes (% change) |
|---|---|---|---|---|
| Arizona | −1.049 (.0008) | −0.201 (.0004) | −0.048 (.0006) | −0.050 (.0004) |
| California | +16.751 (.0013) | +2.880 (.0007) | +0.521 (.0008) | +0.720 (.0007) |
| Colorado | −0.848 (.0006) | +0.850 (.0020) | −0.111 (.0020) | +0.213 (.0020) |
| Nevada | +7.014 (.0148) | +3.369 (.0164) | +0.582 (.0182) | +0.842 (.0164) |
| New Mexico | −12.273 (.0279) | −1.511 (.0110) | −0.586 (.0204) | −0.378 (.0110) |
| Utah | −3.628 (.0060) | −0.718 (.0039) | −0.281 (.0090) | −0.180 (.0040) |
| Wyoming | −0.359 (.0020) | −0.048 (.0008) | −0.023 (.0020) | −0.012 (.0008) |
| Basin | +6.470 (.0003) | +3.704 (.0006) | +0.136 (.0002) | +1.049 (.0006) |

The projected impacts on the economies of various States ranged from about −$12.273 million in New Mexico to about +$16.751 million in California measured as annualized values (Table 1). However, projected negative impacts that could occur in the various State economies were so small when compared to the base economies that they are probably nonexistent, ranging from 0.0008 percent in Arizona to 0.0279 percent in New Mexico. Some States could experience small but positive impacts (e.g., California and Nevada).

Impacts on earnings, indirect business taxes, and personal income taxes are organized in the same way as those for output (Table 1). The conclusions expressed for output hold also for the earnings, indirect business taxes, and personal income taxes impacts (Brookshire et al. 1994).

**Employment**

Table 2 presents State and regional incremental impacts on employment over the 25-year period of the study. The values in the table represent the deviation in employment, measured as jobs, between the without fish and with fish scenarios. As with other aspects of the economy, employment impacts are both positive and negative both across

States and over time. For New Mexico, the employment impact is approximately 2 jobs foregone in 1995 and this figure rises to 613 jobs foregone by the year 2020. On the other hand, for California there is a gain of approximately 20 jobs in 1995 and this positive impact increases to a projected 1,162 jobs by 2020. For the Basin as a whole, the employment impacts are positive through the study period. In 1995, the projected gain is approximately 60 jobs. By 2020, the gains in employment are projected to be approximately 393 jobs.

TABLE 2.— IMPACTS OF THE CRITICAL HABITAT DESIGNATION ON EMPLOYMENT IN EACH STATE AND THE COLORADO RIVER BASIN. EMPLOYMENT IMPACTS REPRESENT JOBS FOREGONE OR GAINED IN THE FUTURE THROUGH THE YEAR 2020. (AFTER BROOKSHIRE ET AL. 1994)

| State | 1995 | 2000 | 2005 | 2010 | 2015 | 2020 |
|---|---|---|---|---|---|---|
| Arizona | −1.85 | −4.68 | −7.77 | −12.08 | −18.86 | −25.83 |
| California | +19.99 | +92.57 | +258.48 | +475.86 | +781.18 | +1161.93 |

TABLE 2.— IMPACTS OF THE CRITICAL HABITAT DESIGNATION ON EMPLOYMENT IN EACH STATE AND THE COLORADO RIVER BASIN. EMPLOYMENT IMPACTS REPRESENT JOBS FOREGONE OR GAINED IN THE FUTURE THROUGH THE YEAR 2020. (AFTER BROOKSHIRE ET AL. 1994)—Continued

| State | 1995 | 2000 | 2005 | 2010 | 2015 | 2020 |
|---|---|---|---|---|---|---|
| Colorado | +8.91 | +5.16 | −6.93 | −19.69 | −36.86 | −55.60 |
| Nevada | +34.86 | +71.52 | +108.03 | +143.22 | +177.25 | +208.69 |
| New Mexico | −2.17 | −27.98 | −110.71 | −239.60 | −415.21 | −612.64 |
| Utah | −10.91 | −22.30 | −34.56 | −47.71 | −61.06 | −74.13 |
| Wyoming | −0.40 | −1.40 | −2.41 | −3.45 | −4.35 | −5.22 |
| Colorado River Basin | +59.94 | +116.15 | +178.70 | +230.02 | +294.76 | +392.67 |

## National Economic Impacts

The results below are from the Computable General Equilibrium model and represent economic output for the Basin (Table 3). Although the projected national economic impacts were positive for all variables, there is almost no change in the regional economy.

TABLE 3.—RESULTS OF COMPUTABLE GENERAL EQUILIBRIUM MODEL FOR THE COLORADO RIVER BASIN. (AFTER BROOKSHIRE ET AL. 1994)

| Variable | Economic impact | Percent change in economy |
|---|---|---|
| Regional Product. | +$7.92 million ... | 0.0013 |
| Employment .... | +710 jobs ........... | 0.0047 |
| Earnings .......... | +$6.62 million ... | 0.0017 |
| Govt Revenue . | +$3.20 million ... | 0.0016 |

## Exclusion Process

*Background*

Pursuant to section 4(b)(2) of the Act, critical habitat is designated by using the best scientific data available, and in full consideration of economic and other impacts of designation. The determination on whether to exclude a reach or portion of a reach considers: (1) The benefits of including that reach, (2) the benefits of excluding a reach, and (3) the effect of that reach, or the cumulative effect of excluding more than one reach, on the probability of species extinction. If the exclusion of a river reach or portion of a reach would result in the eventual extinction of a species, the exclusion is prohibited under the Act.

Exclusion of an area as critical habitat would eliminate the protection provided under the destruction or adverse modification provision of section 7 for critical habitat. However, it would not remove the need to comply with other requirements of the Act for that area, such as the "likely to jeopardize" prohibition of section 7 consultation (for Federal actions) and

section 9 (take). Section 7 consultation requirements apply to Federal actions regardless of whether or not critical habitat is designated for a particular area.

The Service determined whether the benefits of inclusion of critical habitat areas would outweigh the benefits of their exclusion, by using five sequential steps:

*Step 1*—Identify areas that meet the definition of critical habitat in section 3(5) of the Act and that are considered essential to the conservation of the species. This was accomplished, and the areas needed for conservation were published in the proposed rule to designate critical habitat on January 29, 1993 (58 FR 6578). Justifications for these areas were presented in the Draft Biological Support Document, which was made available to the public on September 15, 1993 (58 FR 48351).

*Step 2*—Conduct an economic analysis to determine the anticipated economic consequences of designating areas as critical habitat. A draft report on the economic analysis was completed and made available to the public for comment on November 12, 1993 (58 FR 59979).

*Step 3*—Develop economic criteria or thresholds to help identify those areas that would be significantly affected by the critical habitat designation. Comments were requested from the public to aid in developing the criteria (November 12, 1993; 58 FR 59979).

*Step 4*—Compile the biological information that should be considered to determine whether excluding an area would result in extinction. Primary consideration was given to information contained in published recovery plans. The Service determined whether exclusion of an area will result in the extinction of a species.

*Step 5*—Conduct the exclusion process. The Service has evaluated which areas, if any, should be excluded due to economic or other relevant impacts. Prior to this evaluation, economic criteria in the form of thresholds (Step 3) were developed to provide a method by which the severity

of economic impacts could be assessed. Those areas that exhibited economic impacts above the thresholds were then examined to determine if the biological threshold of extinction would be exceeded (Step 4) if the specific area in question was dropped from consideration as critical habitat.

*Benefits and Costs of Designation*

A public sector analysis examined the allocation of scarce resources regarding economic efficiency and distribution or equity (Brookshire et al. 1993, 1994). The efficiency criterion addressed whether designating areas as critical habitat produces greater net benefits than costs. The equity criterion looks at the resulting distribution of gains and losses. The Act requires the Service to protect threatened and endangered species for all citizens, now and in the future. This mandate falls under the national economic efficiency concern, where policy adjustments seek to minimize economic efficiency losses for society while preserving endangered species.

The Service does not have a mandated requirement to conduct an efficiency-based benefit-cost analysis when carrying out its resource protection activities. This is particularly true for species listing activities under the Act, where economic considerations are explicitly prohibited. During critical habitat designation, however, consideration of benefits and costs can occur when "economic and other relevant impacts" are specifically included as part of the process of final determination.

The economic analysis (Brookshire et al. 1994) only addressed market-related benefits and costs. No attempt was made to estimate nonmarket values associated with the preservation of the endangered fishes. However, the Service recognizes that the benefits of preservation are positive. The extant literature addressing the value of wildlife resources documents positive benefits for consumptive and nonconsumptive uses of wildlife species. The legislative history of the Act indicates that

Congress believed that the "worth" or value of a species is incalculable and invaluable. This is supported by the Supreme Court interpretation of the Act in *TVA* v. *Hill*, 437 U.S. 153, 178 (1978). This concept is applicable to the Basin as it represents one of the most distinctive collections of flora and fauna in North America.

The economic analysis and data used during the exclusion process addressed impacts to: river basin or sub-basin by State, each State as a whole, the region, and the Nation. Direct and indirect impacts on employment, wages, and State and Federal revenues from business and personal income taxes also were considered during the exclusion process.

### Threshold of Significant Economic Impact

To establish the threshold for significant economic impact, impacts were evaluated in the context of the normal fluctuations of the economy (Brookshire et al. 1994). Over the period 1959–1991, the growth rate of the national economy (measured as percentage change in Gross Domestic Product) varied from −2.2 percent to 6.2 percent. The mean growth rate was 2.85 percent (with a standard deviation (SD) of 2.26 percent). Over the same period, the average unemployment rate was 5.95 percent (SD=1.52 percent). Impacts that lie within this range are within the normal fluctuations of the economy and are able to be absorbed by the economy. A conservative threshold for significant impacts would be a 1 percent SD from the projected baseline. If changes in employment or output due to critical habitat at a State level exceed this threshold, then that area of critical habitat should be considered for economic exclusion.

Various flow and nonflow impacts were evaluated in the economic analysis (Brookshire et al. 1993, 1994). Impacts associated with providing flows for fishes, including reoperation of mainstream dams, constituted the greatest monetary impacts. Flows in one reach may be dependent on the flows from reaches upstream. Therefore, even though a reach may be excluded for economic reasons, those economic impacts may not disappear due to downstream flow requirements of the fish. Thus, the smallest unit examined for economic impact was an individual river except for the mainstem Colorado River, which was by river reach.

Many of the critical habitat reaches were designated for more than one of the endangered fishes. Therefore, some reaches were needed for the eventual recovery of one species, and also needed to prevent extinction of another. The dual nature of many of the designated reaches and other issues made the exclusion process complex.

### Conservation and Extinction as Factors in Designating Critical Habitat

The Act defines "conservation" to include the use of all means necessary to bring about the recovery of an endangered or threatened species. Section 7(a)(2) prohibitions against the destruction or adverse modification of critical habitat apply to actions that would impair survival and recovery of a listed species. As a result of the link between critical habitat and recovery, these prohibitions should protect the value of critical habitat until recovery. Survival and recovery, mentioned in the definitions of adverse modification and jeopardy, are conceptually related. The survival of a species may be viewed, in part, as a progression between extinction and recovery of the species. The closer a species is to recovery, the greater the certainty of its continued survival. The terms "survival" and "recovery" differ by the degree of confidence about the ability of a species to persist in nature over a given period.

Critical habitat consists of areas that contain elements that are essential to the conservation of a listed species. Critical habitat identifies areas that should be considered in the conservation effort and provides additional protection to those areas through section 7 consultation. Critical habitat is designated to contribute to a species' conservation; however, not all areas proposed as critical habitat may be necessary to prevent extinction. Consequently, some areas or portions of areas may be excluded due to economic considerations, provided that such exclusions would not result in the extinction of the species.

In its designation of critical habitat for the four Colorado River fishes, the Service has identified habitat required for recovery of each species and delineated reaches that contain habitat features needed for spawning, rearing, feeding, and migration. Species conservation is related to a number of factors, such as the number of individuals, the amount of habitat, the condition of the species and its habitat, the species' reproductive biology, and the genetic composition of the remaining populations. Through its previous efforts (e.g., section 7 consultation, research), the Service also has identified biologically important areas that still support these endangered fish. Additionally, important reaches have been identified in recovery plans for the Colorado squawfish, humpback

chub, and bonytail chub. The Recovery Implementation Programs in the Upper Colorado River and San Juan River Basins have also identified essential reaches for these species. Although all areas proposed are important to conservation, those areas currently supporting the largest remaining populations may be key to the long-term survival of these species. Additionally, the physical and ecological relationships between these areas are an important consideration.

Extinction of the four Colorado River fishes would most likely occur as a result of the presence and continued introductions of nonnative fishes, significant changes in the hydrologic cycle, increased fragmentation and channelization of their habitat, and decreased water quality. Although a single action could result in extinction, the cumulative reduction in suitable habitat resulting from many actions also could lead to species extinction. Because these species are long-lived, the specific effects of some impacts are difficult to establish. Therefore, the exclusion analysis focuses not only on specific rivers and/or reaches, but also on their relationship to other reaches in evaluating whether or not extinction would be probable if a reach were excluded. Such factors as: (1) Current population status, (2) habitat quality (e.g., presence of spawning sites, nursery areas, and condition of the habitat), (3) geographical distribution of the populations, (4) genetic variability within the population, and (5) the relationship between critical habitat units were considered.

In order to determine river reaches required to prevent extinction (ensure survival) of these fishes, the Service relied upon available biological information and approved recovery plans. Information relating to the species' biological and ecological needs, such as habitat, reproduction, rearing, and genetics, was used in determining if an area was needed to prevent extinction of the species. Where enough information was available, specific recovery plans presented downlisting and delisting criteria. Downlisting criteria were generally equated to the survival level; delisting criteria were related to the recovery level. Because no recovery plan has been prepared for the razorback sucker, reaches required for its survival (downlisting) and recovery (delisting) may change as a recovery plan is developed by the Service and the Colorado River Fishes Recovery Team.

### Exclusion

After considering the economic and other factors that may be pertinent to

BLM_0070449

any decision to exclude areas from designation as critical habitat, including information provided during the public comment period, the Service determined that no exclusions were justified due to economic and other relevant impacts.

**Critical Habitat Designation**

Critical habitat for each species is shown by State in Figure 1 and summarized in Table 4. The 100-year flood plain delineates the lateral boundary of the critical habitat for the razorback sucker and Colorado squawfish. This boundary encompasses the productive areas adjacent to the rivers, including the confluence of smaller tributaries and other habitats that provide essential fish habitat when inundated.

Figure 1. Map of combined critical habitat for the four Colorado River endangered fishes.

BILLING CODE 4310-55-P



BILLING CODE 4310-55-C

TABLE 4.—RIVER KILOMETERS (MILES) OF CRITICAL HABITAT FOR FOUR ENDANGERED COLORADO RIVER FISHES

| State | Razorback sucker | Colorado squawfish | Humpback chub | Bonytail chub | Total [1] |
|---|---|---|---|---|---|
| Colorado | 349 (217) | 583 (362) | 95 (59) | 95 (59) | 583 (362) |
| Utah | 1107 (688) | 1168 (726) | 224 (139) | 224 (139) | 1172 (728) |
| New Mexico | 63 (39) | 97 (60) | ............ | ............ | 97 (60) |
| Arizona | 832 (517) | ............ | 291 (181) | ............ | 832 (517) |
| AZ/Nevada | 209 (130) | ............ | ............ | 103 (64) | 209 (130) |
| AZ/California | 214 (133) | ............ | ............ | 80 (50) | 294 (183) |
| Basin Total [2] | 2776 (1724) | 1848 (1148) | 610 (379) | 502 (312) | 3188 [3] (1980) |

[1] Total—Distances include all overlapping critical habitat reaches by State for all four Colorado River endangered fish.
[2] Basin Total—Distances include total extent of critical habitat by species for the entire Basin.
[3] Total Basin Total—Note that the sum of critical habitat by species is greater than actual river distance due to extensive overlap.

*Razorback Sucker*

The Service is designating 15 reaches of the Colorado River system as critical habitat for the razorback sucker. These reaches total 2,776 km (1,724 mi) as measured along the center line of the river within the subject reaches (Table 4). This represents approximately 49 percent of the historical habitat for the species. In the Upper Basin, critical habitat is designated for portions of the Green, Yampa, Duchesne, Colorado, White, Gunnison, and San Juan Rivers. Portions of the Colorado, Gila, Salt, and Verde Rivers are designated in the Lower Basin. These reaches flow through a variety of landownerships, both public and private. The amount of critical habitat for the razorback sucker by landownership in kilometers of shoreline is presented in Table 5.

TABLE 5.—OWNERSHIP OF SHORELINE IN KILOMETERS (MILES) FOR CRITICAL HABITAT FOR THE ENDANGERED COLORADO RIVER FISHES [1]

| Ownership [2] | Razorback sucker | Colorado squawfish | Humpback chub | Bonytail chub |
|---|---|---|---|---|
| NPS | 1,955 (1,215) | 900 (559) | 545 (338) | 676 (420) |
| BLM | 1,140 (708) | 1,119 (695) | 203 (126) | 114 (71) |

TABLE 5.—OWNERSHIP OF SHORELINE IN KILOMETERS (MILES) FOR CRITICAL HABITAT FOR THE ENDANGERED COLORADO RIVER FISHES [1]—Continued

| Ownership[2] | Razorback sucker | Colorado squawfish | Humpback chub | Bonytail chub |
|---|---|---|---|---|
| USFS | 380 (236) | 0 | 0 | 0 |
| USFWS | 159 (99) | 35 (22) | 0 | 40 (25) |
| Tribal | 894 (555) | 451 (280) | 444 (276) | 97 (60) |
| State Lands | 63 (39) | 79 (49) | 1 (<1) | 40 (25) |
| Private | 960 (596) | 1,112 (691) | 27 (17) | 37 (23) |
| Total | 5,551 (3,448) | 3,696 (2,296) | 1,220 (758) | 1,005 (624) |

[1] The river distances shown in this table were compiled using total shoreline kilometers (assuming 1 kilometer of river centerline has 2 kilometers of shoreline) for each critical habitat reach. There is considerable overlap of critical habitat reaches between species; thus, total miles of designated critical habitat for all four Colorado River endangered fish cannot be obtained from this table.

[2] NPS—National Park Service; BLM—Bureau of Land Management; USFS—U.S. Forest Service; USFWS—U.S. Fish and Wildlife Service.

*Colorado Squawfish*

The Service designates six reaches of the Colorado River System as critical habitat for the Colorado squawfish. These reaches total 1,848 km (1,148 mi) as measured along the center line of each reach (Table 4). This represents about 29 percent of the historical habitat of this species. Critical habitat is designated in portions of the Colorado, Green, Yampa, White, and San Juan Rivers in the Upper Basin. There is no critical habitat designated for this species in the Lower Basin. The approximate number of shoreline miles of critical habitat by landownership for the Colorado squawfish is presented in Table 5.

*Humpback Chub*

The Service designates seven reaches of the Colorado River system as critical habitat for the humpback chub. These reaches total 610 km (379 mi) as measured along the center line of the subject reaches (Table 4). This represents approximately 28 percent of the historical habitat of this species. Critical habitat for the humpback chub is designated for portions of the Colorado, Green, and Yampa Rivers in the Upper Basin and the Colorado and Little Colorado Rivers in the Lower Basin. The approximate extent of critical habitat by landownership of shoreline for the humpback chub is presented in Table 5.

*Bonytail Chub*

The Service is designating seven reaches of the Colorado River system as critical habitat for the bonytail chub. These reaches total 499 km (312 mi) as measured along the center line of the subject reaches (Table 4). This represents approximately 14 percent of the historical habitat of the species. Critical habitat for the bonytail chub is designated for portions of the Colorado, Green, and Yampa Rivers in the Upper Basin and the Colorado River in the Lower Basin. The approximate extent of critical habitat for the bonytail chub is presented by landownership of shoreline in Table 5.

*Available Conservation Measures*

Conservation measures provided to species listed as endangered or threatened under the Act include recognition, recovery actions, requirements for Federal protection, and prohibitions against certain practices. Recognition through listing encourages and results in conservation actions by Federal, State, local and private groups, and individuals. The Act provides for possible land and water acquisitions in cooperation with States and requires that recovery actions be carried out for all listed species. The requirements for Federal agencies with respect to protection of designated critical habitat of a federally listed species and prohibitions against taking are discussed below.

The Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin (RIP) is a cooperative effort to recover the endangered fish in the Upper Basin (Green and Colorado Rivers only) while providing for water development to proceed in a manner compatible with applicable State and Federal laws. The RIP was implemented in January 1988 by a Cooperative Agreement signed by the Governors of Colorado, Utah, and Wyoming; the Secretary of the Interior; and the Administrator of the Western Area Power Administration. The

process for conducting section 7 consultations on water projects was outlined in the RIP and further clarified by an October 15, 1993, final agreement on section 7 consultation.

The RIP provides the reasonable and prudent alternative to avoid the likelihood of jeopardy to the continued existence of the endangered fishes due to depletion impacts of new projects, and all existing or past impacts related to historical projects (with the exception of the discharge of pollutants by historical projects). Program participants also intend that the RIP will provide the reasonable and prudent alternative that will avoid the likely destruction or adverse modification of critical habitat currently being designated for the endangered fishes. A Recovery Action Plan (RIPRAP) that identifies specific actions and time frames needed to recover the endangered fishes was developed by the RIP. The RIPRAP will be used by the Service in determining if the RIP is achieving sufficient progress as a reasonable and prudent alternative to jeopardy. The RIP intends to analyze and amend the RIPRAP as appropriate, so that it can serve as the reasonable and prudent alternative to avoid the likely destruction or adverse modification of critical habitat. The Service considers that the RIP has made sufficient progress to serve as a reasonable and prudent alternative to jeopardy for projects that deplete less than 3.7 cubic hectometers ($hm^3$)(3,000 acre-feet). For projects depleting more than 3.7 $hm^3$ (3,000 acre-feet), the Service identifies actions in the RIPRAP that must be completed to avoid jeopardy.

As a result of reasonable and prudent alternatives to the Animas-LaPlata Project provided in the Biological

Opinion issued on October 25, 1991 by the Service, the Bureau of Reclamation agreed to fund 7 years of research and to develop a Recovery Implementation Program for the San Juan River. On October 24, 1991, a Memorandum of Understanding was signed by the Service, the Bureau of Reclamation, the Bureau of Indian Affairs, States of Colorado and New Mexico, the Ute Mountain Indian Tribe, the Southern Ute Indian Tribe, and the Jicarilla Apache Indian Tribe to set forth certain agreements and to establish a San Juan Recovery Implementation Program (SJRIP). The SJRIP provides the basis for the recovery of the endangered fishes of the San Juan River.

The 7-year research effort focuses on observing the biological response of endangered fish populations to habitat conditions after the reoperation of Navajo Dam to meet the needs of the Colorado squawfish and razorback sucker. The recovery elements define the major categories of activities that will be conducted to recover endangered fish species and maintain the native fish community in the San Juan River Basin. Intensive studies are being conducted by the SJRIP to determine the relative abundance and distribution of endangered fishes and other native and nonnative fishes. Modification and loss of habitat, fish poisoning, and nonnative fishes have contributed to the decline of the Colorado squawfish and razorback sucker in the San Juan River Basin. Regulating structures, such as Navajo Dam, can be operated to control river flow and temperatures to affect the quantity and quality of habitats in certain river reaches during periods when they are most critical to endangered fish species. After determining appropriate flow needs, the Biology Committee of the SJRIP, with input from the Bureau of Reclamation, will recommend specific flow regimes to the Service. It is anticipated that the water for habitat improvement will be provided by the reoperation of Navajo Dam.

The Bureau of Reclamation has agreed that it will operate Navajo Dam to provide a more natural hydrograph, if the research shows this type of hydrograph is beneficial to recovery of endangered species and the native fish community. If habitat and flow needs are identified that cannot be met by reoperation of Navajo Dam, additional sources of water to meet those needs will be identified on a case-specific basis. The success of the SJRIP is contingent upon the legal protection of water released for habitat flows

pursuant to Federal, State, and tribal laws.

To date, 15 years of research and $18 million have been spent in fish stocking and research on these fish species in the Lower Basin. A combined research and management effort continues in the Lower Basin. This effort involves researchers from Arizona State University, Arizona Game and Fish Department, Nevada Department of Wildlife, California Fish and Game Department, Bureau of Reclamation, Bureau of Land Management, and the Service. These groups are currently developing protected grow-out areas in lakes Mohave and Havasu for razorback sucker and bonytail. To date, this effort has shown great potential. Additionally, there was a 10-year effort to restore razorback suckers and Colorado squawfish into the Gila River drainage.

An extensive research program has been initiated as part of the Glen Canyon Environmental Studies (GCES) to determine life history and ecology of the humpback chub in the Grand Canyon. The humpback chub was one of the initial species listed under the Act. In 1978, the Service issued a jeopardy Biological Opinion on the existing operation of Glen Canyon Dam, but needed further research to determine what actions are needed to benefit the listed fish. At that time, limited information existed on the distribution, abundance, life history, and habitat use for the Grand Canyon populations in the Colorado River mainstem and its associated tributaries. The inception of these studies is an outcome of the initial GCES/Phase I effort and Service conservation measures developed as part of long-term recovery effort for the species. The research program involves a coordinated effort among four principal entities (Arizona State University, Arizona Game and Fish Department, Bureau of Reclamation, and the Service), each addressing specific study objectives. This program is part of the short-term experimental research for the Glen Canyon Dam Environmental Impact Statement. A commitment to a long-term research and monitoring program exists and will function as a conduit for the culmination of additional information generated through the endangered species research.

## Relationship of Critical Habitat to Other Provisions of the Act

### Introduction

The purpose of the Act, as stated in section 2(b), is to provide a means to conserve the ecosystems upon which endangered and threatened species

depend, and to provide a program for the conservation of listed species. Section 2(c)(1) of the Act states that "* * * all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act." Conservation requirements of species listed as endangered or threatened under the Act include recovery actions, requirements for Federal protection, and prohibitions against certain practices.

The Act provides for the conservation of listed species through several mechanisms, such as section 5 (land acquisition); section 6 (Federal grants to States, and research); section 7 (requiring Federal agencies to further the purposes of the Act by carrying out conservation programs, and insuring that Federal actions will not likely jeopardize the continued existence of the listed species or result in the destruction or adverse modification of critical habitat); section 9 (prohibition of taking of listed species); and section 10 (permits for scientific purposes or to enhance propagation and survival of listed species and habitat conservation planning on non-Federal lands).

Critical habitat designation is primarily intended to identify the habitat needed for survival and recovery. Such designation is not a management or conservation plan, and designation of critical habitat does not offer specific direction for managing habitat. That type of direction, as well as any change in management priorities, will come through the administration of other parts of the Act (e.g., section 7, section 10 permit process, and recovery planning) and through development of management plans for specific species or areas. However, the designation of critical habitat in an area can result in additional protection for that area through administration of section 7 of the Act.

### Recovery Planning

Recovery plans developed under section 4(f) of the Act guide much of the Service's recovery activities and promote conservation and eventual delisting of species. Recovery plans address the steps needed to recover a species throughout its range and provide a mechanism for implementation. Recovery plans provide guidance, which may include population goals, and usually include identification of areas in need of protection or special management. Recovery plans can include management recommendations for areas proposed or designated as critical

habitat. Recovery plans for the Colorado River endangered fishes may be modified to include specific recommendations for managing critical habitat. A recovery plan is not a regulatory document, but a plan may identify recommendations for implementing actions and managing critical habitat on Federal lands, and considerations for management of critical habitat on other land.

In compliance with section 7(a)(1) of the Act, Federal agencies should incorporate recommendations and goals provided within recovery plans for these species into land and water management plans. Biologically sound plans offer opportunities for resolving conflicts between development interests and endangered species conservation and provide a basis for present and future management decisions. Valid and acceptable management prescriptions contained in land and water development plans can help guide the Service and other agencies in managing critical habitat for the Colorado River endangered fishes and other listed and nonlisted species.

*Section 7 Consultation*

Section 7(a)(2) of the Act applies only to Federal agencies and requires them to insure that activities they authorize, fund, or carry out are not likely to destroy or adversely modify critical habitat. This Federal responsibility accompanies, and is in addition to the requirement in section 7(a)(2) of the Act that Federal agencies insure that their actions are not likely to jeopardize the continued existence of any listed species. Jeopardy is defined in the section 7 regulations (50 CFR 402.02) as any action that would be expected to appreciably reduce the likelihood of survival and recovery of a species in the wild by reducing its numbers, reproduction, or distribution. Destruction or adverse modification of critical habitat is defined at 50 CFR 402.02 as a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. The regulations also state that such alterations include, but are not limited to, alterations destroying or adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical. The requirement to consider potential adverse modification of critical habitat is necessary and in addition to the review necessary to evaluate the likelihood of jeopardy in a section 7 consultation.

As required by 50 CFR 402.14, a Federal agency must consult with the Service if one of its actions may affect either a listed species or its critical habitat. Federal action agencies are responsible for determining whether or not to consult with the Service. The Service will review agencies' determinations on a case-by-case basis and may or may not concur with the agencies' determination of "no effect" or "may affect" for critical habitat, as appropriate. Section 7 consultation is initiated by a Federal agency when its actions may affect critical habitat by impacting any of the primary constituent elements or reduce the potential of critical habitat to develop these elements. The consultation also would take into consideration Federal actions outside of critical habitat that also may impact a critical habitat reach (e.g., water management, water quality, water depletions, and nonnative fish stocking or introductions). Though a Federal action may not destroy or adversely modify critical habitat, it still may affect one or more of the Colorado River endangered fishes and their habitat and could be subject to consultation under section 7 of the Act to determine the likelihood of jeopardy to the species.

A number of Federal entities fund, authorize, or carry out actions that may affect areas the Service has designated as critical habitat. Among these are the Western Area Power Administration, Federal Energy Regulatory Commission, Fish and Wildlife Service, Bureau of Land Management, National Park Service, Bureau of Indian Affairs, Bureau of Mines, Bureau of Reclamation, Forest Service, Corps of Engineers, Army, Air Force, Environmental Protection Agency, Housing and Urban Development, Federal Emergency Management Agency, and Federal Highway Administration.

*Basis for Section 7 Analysis*

Designation of critical habitat focuses on the primary constituent elements within the defined areas and the contribution of these elements to the species' recovery, based on consideration of the species' biological needs and factors that contribute to survival and recovery. The evaluation of actions that may affect critical habitat for the Colorado River endangered fishes should consider the effects of the action on any of the factors that were the basis for determining the habitat to be critical. These include the primary constituent elements of water, physical habitat, and biological environment, as well as the contribution of the reach and the local sites to recovery. The desired outcome of section 7 compliance should

be to avoid further reductions in the capability of the habitat to support Colorado River endangered fishes (e.g., the type of activities that led to listing, such as depletions, predation, competition, fragmentation, and habitat degradation).

For wide-ranging species, such as the Colorado River endangered fishes, where multiple critical habitat reaches are designated, each reach has a local and a rangewide role in contributing to the conservation of the species. The loss of a single piece of habitat may not jeopardize the continued existence of the species, but it may reduce the ability of critical habitat to contribute to recovery. In some cases, the loss of a site containing a primary constituent element could result in local population instability. This could have a detrimental effect on the reach or that portion of the reach where the loss occurred and could preclude recovery or reduce the likelihood of survival of the species. Each critical habitat reach is dependent upon conditions in adjacent reaches, whether or not those reaches were designated critical habitat. Consideration must therefore be given to Federal actions that would take place both within and outside of a critical habitat reach. Degradation of a critical habitat reach, regardless of the source of that degradation, may impact the survival and recovery of the species.

The level of disturbance a particular critical habitat reach could withstand and still fulfill its intended purpose is variable for each species and each area of the Basin. Any proposed activity will need to be reviewed in the context of affected species, habitat condition, and project location. Because of the habitat overlap among these species, it may be difficult to completely separate out the effects of a particular action on any one species.

The designation of seasonally unoccupied habitat to provide for the conservation (recovery) of a listed species adds another dimension to the analysis. Because listed species are not always present in these habitats, it may not be possible to reach a "jeopardy" finding for actions affecting that habitat. However, it may be possible to conclude "destruction or adverse modification" for a species if designated critical habitat is affected and its value for conservation of the species is diminished.

*Examples of Proposed Actions*

For any final regulation that designates critical habitat, section 4(b)(8) of the Act requires a brief description and evaluation of those activities (public or private) that may

adversely modify such habitat or may be affected by such designation. Destruction or adverse modification of critical habitat is defined as a direct or indirect alteration that appreciably diminishes the value of critical habitat for both survival and recovery of a listed species. Some activities may disturb or remove the primary constituent elements within designated critical habitat for the Colorado River endangered fishes. These activities may include, among others, actions that would reduce the volume and timing of water, destroy or block off spawning and nursery habitat, prevent recruitment, adversely impact food sources, contaminate the river, or increase predation by and competition with nonnative fish. In contrast, other activities may have no effect on the critical habitat's primary constituent elements. Activities such as recreation (boating, hiking, hunting, etc.), some types of farming, and properly managed livestock grazing may not adversely modify critical habitat.

Areas designated as critical habitat for the Colorado River endangered fishes support a number of existing and proposed commercial and noncommercial activities. Some of the commercial and governmental activities that may destroy or adversely modify critical habitat include construction and operation of hydroelectric facilities, irrigation, flood control, bank stabilization, oil and gas drilling, mining, grazing, stocking or introduction of nonnative fishes, municipal water supplies, and resort facilities. Commercial activities not likely to destroy or adversely modify critical habitat include nonconsumptive activities such as river float trips, guided sport fishing, and excursion boat tours. Noncommercial activities are largely associated with private recreation and are not considered likely to adversely affect critical habitat. Such activities include boating, fishing, and various activities associated with nature appreciation. However, it must be emphasized that section 7 of the Act only applies to Federal actions (projects, permits, loans, etc.) and that each Federal action must be evaluated on a case-by-case basis.

Some activities could be considered a benefit to Colorado River endangered fishes habitat, such as the Colorado River and San Juan River Recovery Implementation Programs and, therefore, would not be expected to destroy or adversely modify critical habitat. Examples of activities that could benefit critical habitat in some cases include protective measures such as instream flow protection,

development of backwater or cove habitat that benefits native species, or eradication of nonnative fish. However, these activities should be evaluated on a case-by-case basis.

Federal actions related to fisheries management in general require close evaluation by the Service. The introduction or stocking of nonnative fish may require evaluation under section 7 for both the jeopardy and adverse modification standards and to determine whether it would constitute taking under section 9. Although the significance of predation on eggs, larvae, and juvenile endangered fish species by nonnative fish has not been quantified throughout the Basin, this impact has been documented for many species of endangered fishes in the Basin and is considered a key factor in their decline. Nonnative fishes may have other effects on individual fish and critical habitat through competition, changes in habitat, and incidental mortality.

Endangered fish research and management activities are likely to affect individual fish or improve the quality and usefulness of habitat for the endangered fishes. These types of activities are addressed through the section 10 permit process, which includes a section 7 evaluation to determine the effects of the action.

*Reasonable and Prudent Measures*

In cases where destruction or adverse modification is indicated (with or without the likelihood of jeopardy), a portion of the economic impacts may result from complying with terms and conditions in the incidental take statement of a Biological Opinion. An incidental take statement is provided in a biological opinion if the Service anticipates incidental loss of individuals of the species as a result of habitat alteration resulting from a Federal action. The incidental take statement outlines the number of individuals and/or amount of habitat the Service anticipates will be lost due to the Federal action. The Service then identifies reasonable and prudent measures necessary to minimize such take and sets forth terms and conditions that the Federal agency and/or applicant must comply with to implement the reasonable and prudent measures. In some cases, the requirements to minimize incidental take (terms and conditions) may be similar to reasonable and prudent alternatives developed under an adverse modification or jeopardy finding.

*Reasonable and Prudent Alternatives*

If the Service concludes in a biological opinion that an action would

likely result in the destruction or adverse modification of critical habitat, the Service is required to provide reasonable and prudent alternatives, if any, to the proposed action in its biological opinion. By definition, reasonable and prudent alternatives allow the intended purpose of the proposed action to go forward while avoiding the conditions that would adversely modify critical habitat. To increase the potential for identifying such alternatives, the Service recommends that the agencies initiate discussions early in the planning process before plans have advanced to the point where alternatives may not be as feasible. If discussions are initiated early, more opportunities to reduce impacts may be available. If an adverse modification was anticipated, examples of possible reasonable and prudent alternatives provided in a biological opinion include those noted in Table 6.

TABLE 6.—EXAMPLES OF POSSIBLE REASONABLE AND PRUDENT ALTERNATIVES

| Example Alternatives |
| --- |
| Relocate the proposed activity to another location within or outside of critical habitat to avoid destruction or adverse modification of habitat. |
| Modify the project (physically/operationally) to avoid adverse modification of critical habitat. |
| Provide offsetting measures to either Colorado River endangered fishes or the critical habitat area by actions such as: A. acquiring water or securing water rights for Colorado River endangered fishes from other sources to offset a proposed depletion; B. implementing water conservation measures so that no net loss of water occurs; C. enhancing constituent element areas so that a net benefit to Colorado River endangered fishes occurs, i.e., acquiring bottom lands and removal or large-scale reductions of nonnative fish within a critical habitat reach; or D. undertaking other recovery actions identified in recovery plans, Recovery Implementation Programs, or other approved management plans or activities. |

Some reasonable and prudent alternatives may only require minor modifications to construction and/or operational plans. As an example, a proposed boat ramp may need to be relocated a short distance to avoid impacting a spawning or nursery area. Projects resulting in more significant impacts may require major changes to the original proposal. A large irrigation diversion project, as an example, may be likely to affect most of the constituent elements of a critical habitat reach and

BLM_0070454

**13388**   **Federal Register** / Vol. 59, No. 54 / Monday, March 21, 1994 / Rules and Regulations

also impact adjacent and downstream reaches. The Service may recommend reduction in the scope of the project, seasonal timing constraints on depletions and operation, and reservoir releases to provide required instream flows.

**Expected Impacts of Designation**

The Service anticipates that the factors described in this rule and the Draft Biological Support Document will be used as a basis for determining the environmental impacts of various activities on critical habitat. The Service also will use Recovery Action Plans developed within the Recovery Implementation Programs of the Upper Basin and the San Juan River Basin and recovery plans for the razorback sucker (when developed), Colorado squawfish, humpback chub, and bonytail chub during consultation to evaluate actions within a critical habitat reach. The Service also will use new information as it becomes available.

Federal actions proposed in critical habitat reaches may or may not adversely modify critical habitat, depending on the current condition of the area and the degree of impact anticipated from implementation of the project. The potential level of allowable impacts or habitat reduction in critical habitat reaches will be determined on a case-by-case basis during section 7 consultation.

**Summary of Public Comment**

The Service published the proposed rule to designate critical habitat on January 29, 1993 (58 FR 6578). At that time, the Service requested comments on all aspects of the proposal including the scope of impacts and benefits of the designation. A public comment period was opened from January 29, 1993, to March 30, 1993. On March 5, 1993, the public comment period was extended to April 15, 1993 (58 FR 12573). During this initial 75-day comment period, 686 written or oral comments were received by the Service. During the comment period, the Service held public hearings on the proposed rule at San Bernardino, California, on March 29, 1993; Phoenix, Arizona, on March 30, 1993; and Denver, Colorado, on March 31, 1993. In addition to the announcement of the public hearings in the **Federal Register** (58 FR 12573), notices were published in the following newspapers: Wyoming—Casper Star-Tribune; Colorado—Denver Post, Rocky Mountain News, Northwest Colorado Press, Grand Junction Daily Sentinel, Durango Herald; Utah—Salt Lake Tribune, Deseret News, Ogden Standard-Examiner, Sun Advocate,

Moab Times-Independent, Vernal Express, Southern Utah News; Arizona—The Arizona Republic, Today's Daily News, Eastern Arizona Courier, Arizona Daily Sun, Lake Powell Chronicle, Yuma Daily Sun; New Mexico—Farmington Times, Santa Fe New Mexican, Albuquerque Journal; Nevada—Las Vegas Review Journal; California—San Diego Union Tribune and San Bernardino Sun.

On September 15, 1993, the Service released the Draft Biological Support Document to the public for comment (58 FR 48351). The comment period on the proposed designation was reopened. On November 12, 1993, the Service published a notice announcing the availability of the Economic Analysis, the Overview Document, the closing date for public comment, a request for information to be used during the exclusion process and development of economic exclusion criteria, and the dates and locations of additional public hearings (58 FR 59979). The public comment period on the proposed rule, the Draft Biological Support Document, and the Economic Analysis ended on January 11, 1994. Public hearings were held on: November 29, 1993, in Salt Lake City, Utah, and Las Vegas, Nevada; November 30, 1993, in Cheyenne, Wyoming, and Globe, Arizona; December 1, 1993, in Grand Junction, Colorado, and Flagstaff, Arizona; December 2, 1993, in Farmington, New Mexico; and December 3, 1993, in San Bernardino, California. In addition to the announcement in the **Federal Register** and notices in newspapers, a letter was sent to all interested parties announcing the dates of the public hearings and January 11, 1994, as the closing date for public comment. During this comment period 399 written or oral comments were received. Issues presented by the public during the comment periods are discussed below.

Economic and biological information received during the comment periods was reviewed and considered. In cases where the information or data provided was determined to be valid, changes were made in the economic analysis or to the boundaries of the critical habitat designation. Significant economic data received from the public were incorporated into the economic models prior to the exclusion process. Many economic comments received were used to improve the accuracy and readability of the Economic Analysis.

Of the 1,085 written and oral statements received during the public comment periods, 599 were form letters that provided little additional information on the proposed designation. Fifty respondents stated

their support for the critical habitat designation, 947 expressed their opposition, and the remainder were neutral. A summary of the issues brought forth from these comments and the Service's response is provided below.

*Administrative Issues*

*Issue 1:* Numerous respondents stated that the comment period for the Draft Biological Support Document, Overview Document, and Economic Analysis was not of sufficient length to allow adequate review; respondents suggested 120 days or more for adequate review. Respondents suggested that public hearings should be held in more locations including all areas potentially impacted by the proposed designation.

*Service Response:* On any proposal to designate critical habitat, the Service is required to provide a minimum comment period of 60 days. When a comment period is reopened, it is generally for up to 30 days. The Service opened a 60-day comment period on the proposed rule to designate critical habitat for the four endangered Colorado River fishes. The comment period was extended for an additional 15 days.

Because the Draft Biological Support Document and Economic Analysis were not complete at the time of the proposed rule, the Service reopened the comment period for an additional 60 days rather than the more usual 30 days. Therefore, in total the comment period was 192 days. A longer comment period was not possible because of the court order to publish a final rule by March 15, 1994.

Three public hearings were held after publication of the proposed rule, and an additional eight public hearings were held to receive comment on the proposal including the economic analysis; one in each of the seven Basin States and an additional hearing in Arizona. Any additional hearings would not have met fiscal and time constraints of the critical habitat designation.

*Issue 2:* A few respondents suggested that the Service publish a revised proposed rule to allow for additional public comment before making a final decision or that the Service should prepare a draft final rule and make that available to the public before finalizing the critical habitat designation.

*Service Response:* The standard rulemaking process requires preparation of a proposed rule followed by a final rule. Publishing a revised proposed rule or a draft final rule is not required unless revisions are necessary that will result in an increased regulatory burden in the revised rule. Furthermore, on November 19, 1993, the Court directed the Service not to publish an interim

final rule. Publishing the Draft Biological Support Document and Economic Analysis for public comment provided additional opportunities for public involvement. All comments received on the Draft Biological Support Document and the Economic Analysis were analyzed, considered, and where appropriate those comments were considered during the exclusion process and included in the final rule.

*Issue 3:* Some respondents questioned whether critical habitat should have been proposed without first completing the biological and economic analyses and stated that it was difficult to comment on the proposed rule until these documents were made available to the public.

*Service Response:* Designation of critical habitat normally would have allowed preparation of the Draft Biological Support Document and Economic Analysis prior to publishing the proposed rule. The Service argued in court that the biological support information and economic analysis should be completed for release with the proposed rule. However, a court order compelled the Service to focus exclusively on development of the proposed rule. The Service recognized that the sequence would make substantive comments on the proposed rule difficult to prepare. For this reason the Service provided an Overview, a Draft Biological Support Document, and an Economic Analysis for public review and comment prior to preparation of a final rule. The Service considered all public comments on these documents and the proposed rule during the exclusion process and final rule preparation.

*Issue 4:* Many respondents stated that the Service should prepare an Environmental Impact Statement (EIS) and comply with the National Environmental Policy Act (NEPA) because the designation would have significant impact on the human environment.

*Service Response:* The United States District Court for the District of Oregon in *Douglas County* v. *Manuel Lujan* (Civil No. 91–6423–HO) ruled that critical habitat designations should be analyzed under NEPA. However, such decision is stayed pending appeal to the Ninth Circuit.

The 1981 Sixth Circuit Court decision in *Pacific Legal Foundation* v. *Andrus* (657 F.2d 829) held that an EIS is not required for listings under the Act. The decision noted that preparing an EIS on a listing action would not further the goals of NEPA. The Service believes that the reasoning behind this decision is sound and that preparing an EIS on the proposed critical habitat designation would not further the goals of NEPA or the Act. The NEPA documentation should be done on management plans and activities that involve critical habitat; section 7 consultation is conducted on those actions. Additionally, the Service believes that the Draft Biological Support Document and Economic Analysis provide the public and decision makers the same information that is generally supplied in a NEPA document (environmental impact statement or environmental assessment).

*Issue 5:* Many respondents were concerned that critical habitat designation would result in "takings" of water rights and other private property.

*Service Response:* The Service prepared a "Takings Implications Assessment" under provisions of Executive Order 12630 to address this issue. The Service has concluded that the promulgation of the rule designating critical habitat will not take water rights or other private property. Although there may be cases where land or water use may be conditioned, it is unlikely that use would be prohibited. Moreover, the Service does not anticipate any takings implications associated with other Federal agency actions resulting from the designation and if there were to be any, it is unlikely that they would be significant.

*Issue 6:* Tribal representatives stated that tribal lands are sovereign and therefore should not be designated.

*Service Response:* The Endangered Species Act of 1973, as amended, applies to any entity or individual subject to the jurisdiction of the United States. No area or entity within the boundaries of the United States is exempt from the Act. The Act requires that the Service base designation of critical habitat on the best scientific information, taking into consideration economic and other relevant impacts, and that areas be excluded only if the benefits of exclusion outweigh the benefits of inclusion. The Act does not provide for categorical exemption of tribal lands from critical habitat designation, or other provisions, when scientific studies indicate the lands contain important habitat. Section 9 prohibits take of listed fish or wildlife on private and tribal lands, including destruction of habitat that results in the take of such wildlife. Section 7 applies to any Federal agency that authorizes, funds or carries out actions that are likely to jeopardize the continued existence of a species or destroy or adversely modify critical habitat. This includes Federal actions involving tribal lands that may affect critical habitat.

*Issue 7:* Representatives of tribal governments stated that designating critical habitat on tribal lands violates the Federal Government's trust responsibility.

*Service Response:* As stated above, the Endangered Species Act of 1973, as amended, applies to all areas of the United States, including tribal lands. The Service does not agree that inclusion of tribal lands violates the Federal Government's trust responsibility. Mere designation of critical habitat does not affect tribal lands unless a Federal action is likely to destroy or adversely modify critical habitat. The requirement to consider adverse modification of critical habitat is an incremental section 7 consideration above and beyond review to evaluate jeopardy and incidental take of the species. The Service will work with tribes to develop reasonable and prudent alternatives for any adverse modification finding and to live up to the Federal Government's trust responsibility and to maintain compliance with the Act.

*Issue 8:* Several respondents stated that critical habitat should not be designated until a recovery plan is completed for the razorback sucker.

*Service Response:* The Act requires that critical habitat be designated concurrently with a species' listing or within 2 years of the proposal to list the species. Only if the Service determines that identification of critical habitat is "not prudent" (i.e., will not be of net benefit to the species) is designation not required by the Act. The Service has determined that critical habitat for these species is determinable and that designation is prudent. The Service proposed listing of the razorback sucker on May 22, 1990 (55 FR 21154); therefore, the designation of critical habitat for this species should have been completed by May 22, 1992. The Act also requires the Service to prepare a recovery plan for any listed species likely to benefit from one; although no timeframe is mandated, Service policy provides that such plans shall be completed within 30 months following listing. Therefore, the timeframes imposed by the Act usually necessitate the designation of critical habitat before a recovery plan can be approved. Finally, the Court has ordered designation by March 15, 1994.

*Issue 9:* A few respondents suggested that critical habitat should only have been designated for the razorback sucker and not for all four species at the same time.

*Service Response:* The Service was ordered by the Court to designate critical habitat for the razorback sucker

BLM_0070456

**13390**   **Federal Register** / Vol. 59, No. 54 / Monday, March 21, 1994 / Rules and Regulations

with no mention of the other three endangered Colorado River fish. However, because the intent of the Act is "* * * to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved * * *," the Service also decided to propose critical habitat for the Colorado squawfish, humpback chub, and bonytail chub. These fishes coexist in the Basin and much of their habitats overlap. However, for species that do not have a requirement to designate critical habitat, the Service may designate critical habitat at any time. The designation of critical habitat for four species in a single rule is more cost- and time-effective than designating critical habitat separately for each species.

*Issue 10:* The public believed that they should be more involved in the decision process and suggested that workgroups be established to designate critical habitat that involved affected groups.

*Service Response:* Through comments provided on the proposed rule, Draft Biological Support Document, and Economic Analysis, the public provided information considered by the Service in the decision process. The Service, acting through its economic contractors, obtained additional information from affected groups needed to complete the Economic Analysis. The process of asking for comments and holding hearings is the Service's standard procedure for involving the public in decision making regarding listing of species and designation of critical habitat.

*Issue 11:* Various groups involved in recovery efforts for the four fishes asked how critical habitat will relate to existing RIP's.

*Service Response:* Critical habitat is an inventory of habitat needed for survival and recovery and not a plan providing goals or guidance toward achieving recovery. The Recovery Implementation Programs for the Colorado and San Juan Rivers (RIP's) have, as their goal, recovery of these four fish species. Therefore, the designation of critical habitat is not in conflict with the stated goal of the RIP's. It is the intent of the Service that recovery actions under the auspices of the RIP's will serve as reasonable and prudent alternatives to adverse modification.

*Issue 12:* A few respondents believed that the designation included so much area that it would not be manageable.

*Service Response:* The Service's designation includes many miles of the Basin's major rivers covering the areas needed for the survival and recovery of the species involved. Extensive areas are required to meet all the life history requirements of these four fishes.

*Issue 13:* A few respondents stated that critical habitat designation is not "prudent and/or determinable."

*Service Response:* On October 27, 1992, the Court ruled that the Service had violated the Act in failing to designate critical habitat when the razorback sucker was listed. The Court ordered the Service to have a proposed rule designating critical habitat for the razorback sucker published by January 25, 1993, using presently available information and to have a more complete final rule published at the earliest time permitted by the Act and its regulations.

The language in the Act and Service regulations at 50 CFR 424.12 for determining prudency indicate that unless the designation will not be of net benefit to the species, it is prudent to designate critical habitat. If the Service finds that critical habitat is not determinable at the time, then it must collect the information needed to determine it and complete designation within 2 years of the proposed listing. The Service has determined that designation in this situation is both prudent and determinable.

*Issue 14:* Many respondents questioned the effect of critical habitat on existing water laws, compacts (including compact entitlements), treaties, etc., and indicated that the Service had ignored the "Law of the River."

*Service Response:* Critical habitat designation for the four fishes does not modify or nullify any existing State water law, compact agreement, or treaty. It is the Service's opinion that the Act, as well as other Federal statutes, are part of what is commonly referred to as the "Law of the River". Impacts to water development opportunities within any State are adequately addressed in the Economic Analysis.

It is the intent of the Service to fully consider State water law, interstate compact agreements, and treaties in protecting and recovering the four endangered fishes. As an example, the Service has worked to establish and to support the Upper Colorado River and San Juan River Recovery Implementation Programs, whose participants have committed to recover the four endangered fish consistent with State water laws and other agreements.

*Issue 15:* A few respondents believe that the economic impacts of listing the Colorado River fishes as endangered should be accounted for in the economic analysis as impacts of designating critical habitat.

*Service Response:* The listing of a threatened or endangered species is considered a different action than determination of critical habitat. At the time of listing, the Service considered biological factors in determining to list the four species as endangered. Regarding critical habitat, section 4(b)(2) of the Act places requirements on the Secretary to consider the economic impact and any other relevant impact of specifying any particular area as critical habitat. Economic impacts that result from other requirements of the Act that are distinct from critical habitat designation are not required to be considered during the economic analysis for critical habitat.

*Issue 16:* Some respondents were concerned the Service did not seek adequate consultation with affected groups.

*Service Response:* The Service provided all interested groups as much time to comment on the proposed designation as Court orders allowed. The timeframes required that existing information be used to develop the economic impact model. Economic information has been obtained from existing sources and also was requested at the time of publication of the proposed rule, Draft Biological Support Document, and the Economic Analysis.

*Issue 17:* Some individuals believed that private property should not be included in the designation.

*Service Response:* The Endangered Species Act applies to all areas within the United States and contains no biological or legal justification for the categorical exclusion of private lands from critical habitat designation. The Service designated critical habitat based on biological information regarding whether or not an area contains the primary constituent elements for critical habitat for the four fishes, after taking into account the economic costs associated with the critical habitat designation. Critical habitat designation only impacts private property if there is an action by a Federal agency (permit, funding or other action) that is likely to destroy or adversely modify critical habitat. The requirement to consider adverse modification of critical habitat is an incremental section 7 consideration above and beyond section 7 review to evaluate jeopardy and incidental take of the species.

*Issue 18:* A few agencies were concerned that critical habitat designation will increase administration/implementation costs of doing section 7 consultation.

*Service Response:* Section 7 consultation is already being done on all Federal projects and other activities in

river reaches proposed for designation as critical habitat, because all reaches are occupied by the endangered fishes. Many of the effects of designation on the physical and biological features of the habitat are already considered in the analysis of effects of the action to determine if the project is likely to jeopardize the continued existence of the species. For most projects, the additional analysis required to determine destruction or adverse modification of critical habitat would be small and would not significantly increase existing workloads.

*Issue 19:* Several respondents stated that the Service was in violation of the Endangered Species Act (Act) for designating critical habitat more than two years after species, and the Federal Land Policy Management Act (FLMA) for failure to comply with required procedures in implementing a major management action.

*Service Response:* On October 27, 1992, the Court ruled that the Service was in violation of the Act because critical habitat had not been designated concurrently with the listing of the razorback sucker. This designation of critical habitat for the Colorado River endangered fishes brings the Service into full compliance with the requirements of the Act. In addition, the Service has followed procedural requirements for the designation. The Act does not stipulate that critical habitat cannot be designated after the initial two year period has passed.

Designation of critical habitat is not a management action under the FLPMA, but an action required by section 4 the Act. Actions authorized, funded or carried out by Federal agencies must undergo section 7 consultation if they may affect a listed species or critical habitat. The Service will determine if such actions are likely to jeopardize the continued existence of these four endangered fishes or destroy or adversely modify their critical habitat. Plans developed under FLPMA would be subject to section 7 consultation if it is determined that the action may affect the endangered fishes or their habitat. Because the designation of critical habitat does not by itself create a management plan or automatically exclude certain activities, FLPMA does not apply to designation.

*Issue 20:* One respondent believed that providing a comment period after the Draft Biological Support Document/ Economic Analysis was made available did not allow for meaningful public comment on the rule.

*Service Response:* While the Service would have preferred that the Draft Biological Support Document and

Economic Analysis be available to the public at the time the proposed rule was published, that was not possible because of the Court's order. Although not released concurrently with the proposed rule, the two documents were written to support it, and comments were requested on these documents and considered in the exclusion process and in preparation of the final rule.

*Issue 21:* Several letters requested that the Service provide for public comment on the balancing/exclusion process, including holding additional public hearings.

*Service Response:* The exclusion process is conducted immediately prior to preparing a final rule and does not provide for any additional public input. All available information is used in the exclusion process. This includes information obtained during the public comment period. Additional information supplied during the public comment period could change the economic costs to certain areas or provide additional biological information as to the significance of an area to the species. Information relating to the Exclusion Process was provided in the "Overview of the Critical Habitat Designation for the Colorado River Endangered Fish: Draft" published November 1993 (Fish and Wildlife Service, Salt Lake City) and made available to the public (58 FR 59979). That document stated that "* * * information and comments are welcome on the overall exclusion process, recommendations on economic criteria for use in the exclusion determination, any other benefits associated with exclusion, benefits of including proposed areas as critical habitat, and information on which areas, if excluded, would result in the extinction of any of the four endangered fishes."

*Issue 22:* A few respondents stated that there are no economic impacts from listing; therefore, all impacts associated with having endangered fish in the Basin should be attributed to critical habitat.

*Service Response:* Once a species is listed as endangered or threatened, protections under sections 7 and 9 of the Act come into force. Section 7 protections are based on the provisions in the Act that require all Federal agencies to insure that their actions do not jeopardize the continued existence of listed species. During formal consultation under the Act, reasonable and prudent alternatives contained in biological opinions require agencies to insure they do not violate the jeopardy standard. Also, implementation of reasonable and prudent alternatives in biological opinions may require

additional costs. The reasonable and prudent measures and terms and conditions covering incidental take included in the biological opinion also may require the agency incur costs. The Act also provides direction for all Federal agencies to use their authorities to seek to recover threatened and endangered species in section 7(a)(1). Providing for recovery actions also incurs costs. These costs are all associated with listing of a species and are not critical habitat costs.

*Issue 23:* One letter stated a concern that the delay in designating critical habitat has harmed the endangered fishes.

*Service Response:* The Service does not believe that delay in designating critical habitat has contributed to the decline of any of these four fish species. All four fishes enjoy the protection of the Act by virtue of their listing and, in accordance with section 7(a)(4), publishing of the proposed critical habitat rule required Federal agencies and the Service to confer on potential impacts of any Federal action upon proposed critical habitat. Additionally, prior to the designation of critical habitat, Federal actions that may affect the endangered fish required review for possible jeopardy to the species under section 7 of the Act, which reflect to large degree, if not completely, the same issues presented by adverse modification of critical habitat.

*Issue 24:* Several respondents indicated that the Service should set recovery goals based on numbers of fish so that it is evident when recovery is achieved.

*Service Response:* Critical habitat designation is not a management or recovery plan. Critical habitat serves to identify those areas where conservation efforts should be concentrated but does not dictate what those efforts should be, or set goals to measure the success of such efforts.

Recovery goals are appropriately contained in recovery plans. Recovery plans generally identify specific actions needed for the conservation of the species. Criteria for downlisting or delisting contained in recovery plans function as goals to be met to achieve species conservation. In the development of recovery plans, species experts determine the level of specificity of these goals, based on the status of the species and its biology. Goals based on specific numbers of individuals are only set if the biology of the species warrant it and in cases where reliable population estimates can be made.

BLM_0070458

*Biological Comments*

*Issue 25:* Some respondents indicated that little or no historic information exists that these fish species were ever found in some areas proposed for designation. Some believed that razorback suckers were not native to Arizona's interior rivers but were introduced there.

*Service Response:* The Service selected river reaches for this designation that are part of the historical range of these species. Historical or recent records regarding the existence and/or presence of these fish exist for almost all of these areas. For those few that do not have a historical or recent record, information from species experts was used, in addition to examination of nearest known locations and of the predevelopment river system to determine if the species was likely to have been present. Historical records indicate that Arizona's interior rivers were inhabited by the razorback sucker, but razorback suckers were extirpated by the 1960's. Efforts to reintroduce razorback suckers in these areas continue. Convincing evidence was presented during the comment period that some areas proposed for designation were outside of historical range of the subject species. This resulted in a change in boundaries as discussed elsewhere in this final rule.

*Issue 26:* Many respondents were concerned that the razorback sucker is found in some river reaches only because of stocking (reintroduction) programs and that these programs may not have been successful.

*Service Response:* Natural populations of the razorback sucker were extirpated from historical habitats in the Gila, Salt, and Verde Rivers by the 1960's. During the late 1970's and into the 1980's, efforts were made to reestablish these populations using hatchery reared fish. These efforts have not been as successful as hoped, but the Service believes that some of the introduced fish have survived in these systems where the razorback historically was a native fish.

*Issue 27:* A few individuals believed that these species should be allowed to go extinct because they cannot adapt to changes in the river systems.

*Service Response:* The Act provides the means to conserve the ecosystems upon which endangered species and threatened species depend. In section 2(a), the Act finds that wildlife and plant species have intrinsic values (aesthetic, ecological, educational, historical, recreational, and scientific values) that are worth preserving for the benefit of all citizens. The Act charges Federal agencies with insuring that their actions do not jeopardize the continued existence of the species. To fulfill that responsibility, Federal actions that affect these fish must provide for the habitat and biological needs of the species. Allowing a species to go extinct because it has not adapted to rapid habitat changes caused by human development is not permissible under the Act.

*Issue 28:* Many respondents commented that the Service needs more biological data to determine critical habitat and therefore no areas should be designated.

*Service Response:* The Act specifies that "The Secretary shall designate critical habitat * * * on the basis of the best scientific data available * * * ." The Service has determined that the quantity and quality of existing biological data for these species is adequate for designation of critical habitat. These fishes have been the subject of intense study for over 10 years and a significant amount of information has been collected. The Service is confident that the best available commercial and scientific data has been used as required by the Act and that data is more than adequate to determine critical habitat.

*Issue 29:* Numerous respondents stated that the designation of critical habitat would not benefit these species.

*Service Response:* Designation of critical habitat provides an avenue to recognize and inventory areas important for the survival and recovery of a species. It also provides additional protection under section 7 consultations, especially for those areas not continuously occupied by individuals of the species, or from the effects of Federal actions upstream of the critical habitat.

*Issue 30:* Several respondents stated that all habitat in the Basin has been degraded and therefore should not be designated as critical habitat. Degradation may include seasonal drying of the river or portions thereof, changes to temperature and silt/sediment load, changes to the historical hydrograph, construction of dams and reservoirs, and introduction of nonnative fishes.

*Service Response:* The Service agrees that there are no remaining pristine river systems in the Basin to designate as critical habitat. However, while physical changes to the habitat have occurred, the areas proposed for designation maintain or have the potential to continue to support populations of these species. The four Colorado River endangered fishes species are adaptable to many physical conditions, and their survival in modified habitats such as reservoirs is an example. Furthermore, management actions to restore areas of physical habitat also are possible, so degradation may not be permanent.

*Issue 31:* Numerous respondents stated that nonnative fish species have adversely affected the endangered species, that the Service was primarily responsible for their introduction, and that this effect is more important to the survival of these species than changes to physical habitat. These respondents maintained that the presence of nonnative fish species in an area should preclude that area from designation as critical habitat.

*Service Response:* The Service recognizes and is concerned about the problems with and implications of the presence of nonnative fish species in the Basin. There are no river systems in the Basin that do not have established populations of nonnative fish species. In areas with more natural habitat conditions, the native fish are better able to compete with nonnatives. Over time, as habitat is restored, management actions to provide for recruitment of native fish to local populations can be taken to eliminate or reduce the effects of nonnative fish. The Service has and must consider the impacts of stocking nonnative fish prior to doing so or funding such actions. In the Upper Colorado River Basin, the Service is working with State agencies and others to protect these endangered fishes by developing a stocking policy for nonnative fishes.

*Issue 32:* Respondents indicated that additional areas should be included in the designation. Additions were suggested for proposed reaches and to rivers currently not included in designation.

*Service Response:* The Administrative Procedure Act requires Federal agencies to provide appropriate notification of proposed actions prior to making final determinations. Therefore, the Service cannot adopt a final rule that is significantly more restrictive than the proposed rule without first offering the public an opportunity to comment on the differences. Notice and public comment may only be waived in special cases, such as emergencies or in instances where a proposed amendment makes only minor technical changes in a rule. Some of these additional areas may warrant designation, and the Service will consider designating them at a later date through the rulemaking process with proper notice and comment. These areas include the Little Colorado River up to Blue Springs for humpback chub, additional areas for

humpback chub in the Grand Canyon, the Lower Colorado River for Colorado squawfish, and the Duchesne River up to the confluence with the Uintah River for razorback sucker and Colorado squawfish.

*Issue 33:* Many respondents questioned the need to designate flood plain areas. Reasons provided include: the river is too regulated to allow floods; agricultural, mining, oil and gas, residential, transportation facilities, and municipal development has occurred; and there will be considerable economic impact. They stated that inclusion of flood plain is not biologically supportable. Others recommended alternate flood plain elevations.

*Service Response:* Large river systems are composed of the mainstream channels and adjacent habitats that are inundated during the higher water levels that are usually associated with spring flows. These seasonally flooded habitats are major contributors to the natural productivity of the river system by providing nutrient inputs and making terrestrial food sources available to aquatic organisms. The extent of flooded wetlands in the Colorado River has been reduced by the construction and operation of water resource development projects. The remaining flood plain areas have great importance for recovery of endangered fish.

Recent studies in the Colorado River system have shown that the life histories and welfare of native riverine fishes are linked with the maintenance of a natural or historical flow regimen (i.e., a hydrological pattern of high spring and low autumn-winter flows that vary in magnitude and duration, depending on annual precipitation patterns and runoff from snowmelt). Ichthyologists have predicted that stream regulation that results in loss of flooding will result in extirpation of native fish species in the Colorado River system.

Inundated flood plains (bottom land habitats) are important for razorback sucker, Colorado squawfish, and perhaps the bonytail and humpback chubs. Wooded bottom lands, side and secondary channels, oxbow lakes, and flood plain wetlands provide nutrients, food, cover, and other features necessary for various life stages of these fish. In order to delineate such areas in designating critical habitat, the Service used the 100-year flood elevation (100-year flood plain). In no way is this determination meant to include all land within the 100-year flood plain as critical habitat nor does it imply a specific frequency of flooding will be required as part of the rule. Only those areas that provide one or more of the

constituent elements can be considered for inclusion as critical habitat. Areas within the 100-year flood plain that have been previously developed are not likely to provide constituent elements when flooded.

*Issue 34:* Several respondents believed that the four fish species do not have enough in common biologically (habitat use, life history, etc.) to be included in this single designation. It will be too difficult to manage all four fish together.

*Service Response:* The historical ranges of the four species overlap. While the specific habitat components required by each species may not be identical, historical conditions create a variety of acceptable habitats within a reach of the river. This variety of habitats enabled more than one of the four species to use the area. Because the fish naturally coexisted together over much of their ranges, management efforts to restore habitats will likely provide the diversity of habitat components needed to support these species without having to provide discrete and separate management programs.

*Issue 35:* Many respondents stated that the area proposed for designation was too large.

*Service Response:* The size of the critical habitat areas is required to ensure that the life history requirements for species can be met. Larval drift, migratory behavior, and the need to maintain genetic diversity within species necessitates large reaches of river be designated. The Draft Biological Support Document provided life history information that discusses in detail those aspects that influence the amount of habitat required for survival and recovery. The designation meets the intent of the Act in not designating the entire historic ranges of these species.

*Issue 36:* Several respondents maintained that management of these areas should be the responsibility of the land owning agency, tribal governments, or private property owners, and that other laws provide for the management of wildlife and fish, making designation of critical habitat unnecessary.

*Service Response:* Federal agencies are responsible under the Act to insure that their actions do not jeopardize the continued existence of or adversely modify or destroy the critical habitat of a listed species. They are required to consider the presence of these species in their management. No other Federal or State law provides this level of protection for these resources. Non-Federal entities (States, tribes, or individuals) are not bound to consider critical habitat unless they are receiving

Federal funding or permits to undertake a management action on their lands. In that case, the Federal agency's responsibility is invoked.

*Issue 37:* Some letters indicated that the selection of boundaries appeared related to landmarks rather than strictly for biological reasons.

*Service Response:* Exact reach endpoints and/or boundaries were indeed chosen for landmarks recognizable to an on-the-ground observer. The Service believes that it is important that the boundaries of critical habitat be as evident as possible. While each reach may have been adjusted in a minor way to landmarks at the upper and lower termini, the biological basis for reach selection was not compromised.

*Issue 38:* A few respondents indicated that the designation of critical habitat will improve water quality.

*Service Response:* Maintaining the flows, habitat, and chemical parameters required by these fish species may have an influence on the changes in water quality that can be allowed within the critical habitat area. It is not certain how much, if any, change to existing water quality would result.

*Issue 39:* Some respondents asked questions regarding the designation of reservoirs and regarding full pool elevation.

*Service Response:* Data indicates that adult razorback suckers and bonytail chubs can survive in reservoirs. Large populations of these fish can be maintained in reservoirs, allowing for maintenance of genetic variability and providing stock for reintroduction and research. The full pool level in a reservoir is defined as the water surface elevation at full capacity. This does not mean that reservoirs should be maintained at full pool elevations, but that habitat is protected regardless of reservoir pool elevation.

*Issue 40:* Some respondents believed that the flow requirements for fish used in the economic analysis had an inadequate biological base.

*Service Response:* The best available commercial and scientific data were used in developing the flow scenarios used in the economic analysis. Flows for several river reaches have been developed by the Service as part of project reviews or RIP activities. These flow recommendations have been published by the Service in reports or biological opinions. For those river reaches with no published flow recommendation, the Service developed flow scenarios using the best available hydrological and biological information.

*Issue 41:* Several respondents believed the Service did not address the

**13394**   **Federal Register** / Vol. 59, No. 54 / Monday, March 21, 1994 / Rules and Regulations

role of the Colorado River native fish eradication programs on listed fish in the San Juan and Green Rivers.

*Service Response:* The Draft Biological Support Document contains a section that describes State and Federal fish removal projects on the San Juan and Green Rivers These projects were an attempt to temporarily remove native and nonnative fishes from new reservoir storage pools prior to sportfish stocking. These projects were not expected to permanently eradicate those species nor were they intended to remove those species from entire river systems. These projects probably had little net effect on listed species.

*Issue 42:* Two respondents indicated that the Upper Basin Recovery implementation Program was not a substitute for designation of critical habitat.

*Service Response:* The RIP is not a substitute for the designation of critical habitat; however, the ultimate goal of both the RIP and the designation is the recovery (delisting) of these endangered fish. It is the intent of the Service to analyze and amend the section 7 Agreement and Recovery Implementation Program Recovery Action Plan of the RIP, as needed, in order for it to be a reasonable and prudent alternative for the destruction or adverse modification of critical habitat for all activities addressed by the RIP.

*Issue 43:* Some respondents indicated that the additional selection criteria for razorback sucker were too broad.

*Service Response:* The additional criteria used to aid the Service in selecting areas for proposal as critical habitat for the razorback sucker were broad to account for the various habitat conditions, geographic areas, and life history requirements throughout the species' range. The species has been shown to use a variety of habitats depending on geographic location and other factors such as nonnative fish interactions that affect their habitat. Given the wide variety of habitats used by various life stages of razorback sucker, the Service does not believe the additional selection criteria were too broad.

*Issue 44:* One respondent indicated that the final rule should include specified flows as constituent elements.

*Service Response:* The Service does not believe it would be appropriate to have specific flows included as constituent elements because: (1) Flow recommendations based upon site- or river-specific research are unavailable for most critical habitat areas, and (2) even though flow recommendations could be made for some critical habitat

areas, these flows must be evaluated and perhaps adjusted in the future. Including specific flows as constituent elements would require the rulemaking process be followed to make changes in recommended flows as research became available. This would create administrative delays to respond to fishery research recommendations. The flows used in Brookshire et al. (1993) were developed solely for use in the economic analysis. In reviewing the impacts of future Federal actions on critical habitat, the Service will use the best scientific and commercial information available at that time, as required by the Act.

*Issue 45:* Several respondents were concerned that the Service intended to poison all the rivers to remove nonnative fish and that the poison would harm people, animals, plants, and the soil. They also indicated their displeasure concerning the loss of sportfish to recover the endangered fish.

*Service Response:* As stated previously, the designation of critical habitat does not require any particular management action or actions to occur. Critical habitat serves to identify and inventory those areas where conservation activities should occur. In the development of any specific plan to implement conservation actions in a particular critical habitat reach, the agency involved is required to follow all Federal and State laws and regulations prior to implementing the action.

The Service has identified the introduction of nonnative fish species into the Basin as a significant cause of the decline of native fish species. It is likely that the implementation of conservation actions may result in proposals to reduce the numbers of nonnative fish in a particular area. Techniques to reduce nonnative fish numbers include netting, trapping, electrofishing, liberalization of creel limits and equipment restrictions, physical habitat alterations or restoration, as well as the use of toxicants.

The Service, or any other agency, is required to follow Federal and State laws and regulations in order to use fish toxicants. These laws and regulations are in place to protect nontarget organisms (including people, animals, plants, and soils) from adverse effects of the toxicant. Fish toxicants in use today have been used safely in rivers, ponds, and reservoirs for many years.

*Issue 46:* A few respondents stated that unoccupied areas should not be designated as critical habitat, but designated experimental nonessential.

*Service Response:* The Service did not include any unoccupied habitat in this

designation of critical habitat. All areas designated have recently documented occurrences of these fish and/or are treated as occupied habitat in section 7 consultations. There are two experimental nonessential populations for the Colorado squawfish in the Salt and Verde Rivers in Arizona. It is hoped that the species can be reestablished in Arizona through work under this designation. Protection of the fishes and their habitat is greater under section 7 of the Act compared with those provided by the experimental nonessential population classification, which is intended to provide management flexibility.

*Issue 47:* Several respondents questioned why the San Juan River critical habitat for the razorback sucker ended at the Hogback Diversion and extended to Farmington, New Mexico, for the Colorado squawfish.

*Service Response:* Biological information on the razorback sucker indicates that this species has an affinity for low velocity habitats such as backwaters and secondary channels. The geomorphology of the San Juan River below the Hogback Diversion provides these types of habitats. Upstream of the Hogback Diversion, the river channel is more restricted with faster-flowing, deeper water habitats, and few backwaters or secondary channels are found. Thus, for the razorback sucker, the area upstream from the diversion did not sufficiently possess the primary constituent elements to justify its inclusion as being necessary for this species' conservation.

Biological information on the Colorado squawfish indicates that the adult fish use low velocity areas, but not as much as younger life stages. Adult Colorado squawfish often use more high-velocity or deep water river sections, similar to those available in the reach of the San Juan River above the Hogback Diversion upstream to Farmington, New Mexico. This reach has been identified in the Colorado Squawfish Recovery Plan as being needed for downlisting of this species.

*Economic Issues*

*Issue 48:* Many respondents raised questions regarding the level of geographic disaggregation in the economic analysis.

*Service Response:* The direct impacts of critical habitat designation were determined at the river reach level. Economic data were available at the county level in the IMPLAN data sets and formed the basis of the analysis. However, it is inappropriate to conduct the economic analysis at the county level or tribal lands level because the

direct impacts in almost all cases extended beyond those immediate boundaries. Further, the indirect effects were State-wide and region-wide.

*Issue 49:* Concern was expressed that tribal economics are distinctly different than surrounding economics in that factor mobility (such as employment) is limited.

*Service Response:* While it is true that there are fewer opportunities for displaced workers on tribal lands, very few of the direct impacts, other than the Navajo Indian Irrigation Project, are tied to tribal economics. In the case of the Navajo Tribe, the impacts are reported in the New Mexico results.

*Issue 50:* Small distributors and users of hydroelectric power expressed concerns regarding the computation of and the use of the electric power impacts in the economic analysis, as well as issues regarding sunk cost, thermal replacement (fuel substitution), and the amount of thermal replacement required.

*Service Response:* The electric impacts were computed by Stone and Webster Management Consultants, Inc., utilizing a model developed for the Glen Canyon Dam. The model development effort was funded by the Bureau of Reclamation. The Service chose to use this model after determining this was the most up-to-date and comprehensive model available. Shut-in hydroelectric capacity is treated as a sunk cost in the analysis following accepted economic theory. Gas and coal activities are projected to expand to provide thermal power replacement. Existing excess capacity in these sectors means that this expansion is a benefit to the regional economy. The analysis of Stone and Webster yielded a result that 121 megawatts of additional thermal generation capacity would be required to offset the reduction of hydrogeneration capacity.

The small systems impacts were not available for inclusion in the Economic Analysis released November 12, 1993. The economic analysis was updated to include impacts associated with small systems as well as large system impacts. The updated results were used in the exclusion process and are included in the final rule.

*Issue 51:* Public comments expressed concern that all economic sectors and impacts of designating critical habitat were not addressed in the economic analysis.

*Service Response:* All models used in the economic analysis are general equilibrium in nature. That is, all impacts are represented through linkages among economic sectors. For example, both the direct impacts to

hydropower production and the indirect effects on all other sectors such as agriculture, manufacturing, mining, and finance are represented. Thus, changes to one sector of the economy and the resulting impacts within all other sectors are fully captured in the economic results as indirect impacts.

*Issue 52:* Questions were raised concerning the reallocation of water and the sectors that were projected to utilize the reallocated water.

*Service Response:* In all cases, the reallocated water represented a benefit and thus was placed in a relatively low value use. For instance, in California, which incurs positive impacts, the choice for the sector to receive the reallocated water was the agricultural sector. If municipal and industrial had been chosen, then the positive impacts would have been much larger.

*Issue 53:* Concern was expressed regarding the lack of economic impacts resulting from flood plain designation.

*Service Response:* Information received during the public comment periods and previously available data did not indicate any major economic impacts related to flood plain designation. The Service recognizes that individual projects located in the flood plain may experience economic impacts.

*Issue 54:* Concern was raised by the Navajo Nation and its representatives regarding the expansion of the Navajo Indian Irrigation Project (NIIP).

*Service Response:* Based upon information provided during the public comment period, the New Mexico analysis was revised to include an additional 52,000 acre-feet of future water depletions foregone. Additionally, cropping patterns and yields for NIIP were adjusted based on information supplied by the Navajo Nation and the Bureau of Indian Affairs during the comment period. Likewise, when data provided during the comment periods seemed reasonable, those economic data were incorporated into the models.

*Issue 55:* Concerns were raised by several commenters about the lack of economic impacts identified in the Lower Basin. In some cases, hypothetical changes to existing Lower Colorado, Salt, Verde, and/or Gila River operations were provided to estimate economic impacts to agriculture and mining activities.

*Service Response:* At present, the Service does not foresee changes in current hydrological operations of these rivers occurring as a result of recovery efforts for these fishes. The impacts predicted by the commenters and the scenarios used to generate those impacts are not envisioned by Service biologists

in the Lower Basin as necessary for recovery and survival of these fish.

*Issue 56:* One commenter indicated that the transfer of Colorado Eastern Slope agricultural water rights to municipal use would be impracticable or impossible due to endangered species constraints on the Platte River system.

*Service Response:* Construction of conveyance facilities to transfer Eastern Slope agricultural water to municipalities may require section 7 consultation with regard to Platte River endangered species. However, several such transfers have already occurred without any Federal action, demonstrating the feasibility of such transfers.

*Issue 57:* Concern was expressed regarding the comparability of the Input-Output (I–O) and Computable General Equilibrium (CGE) results.

*Service Response:* The underlying model assumptions differ. CGE models allow for greater factor mobility and substitution. I–O models do not permit impacts to communicate and adjust with geographic areas outside the State or region; thus negative impacts are overestimated. Therefore, due to these differences, results from these models are not directly comparable.

*Issue 58:* Concerns were raised regarding changes in governmental revenue flows from hydropower impacts.

*Service Response:* Such revenues represent transfers of economic resources, not real resource costs. The models capture changes in government revenues.

*Issue 59:* Concern was raised regarding a variety of projects planned for the region that were not specifically addressed in the analysis.

*Service Response:* Projects not specifically identified in the economic analysis were presumed to be undertaken and appear in the baseline projections. Further, some future projects have already undergone section 7 consultation and as such do not represent an impact. Future projects for which little or no information is currently available will be subject to section 7 consultation and as such it is premature to judge whether they will be affected.

*Issue 60:* Concerns were raised regarding the omission of the cost of capital facilities to use water such as planned municipal diversions.

*Service Response:* These costs would be incurred regardless of whether critical habitat is designated and as such are not an appropriate cost for inclusion in the analysis.

*Issue 61:* Respondents recommended that the economic benefits of listing and

**13396**     **Federal Register** / Vol. 59, No. 54 / Monday, March 21, 1994 / Rules and Regulations

critical habitat designation must be addressed.

*Service Response:* The economic analysis addresses both monetary cost and the benefits of designating critical habitat. Monetary values associated with the benefits of the existence of the species are not within the framework of the economic evaluation of critical habitat designation nor is such an evaluation required by the Act. These types of economic data would require extensive research and debate prior to being used in the evaluation of critical habitat.

*Issue 62:* A few respondents indicated that changing flows to benefit the endangered fish would be detrimental to people along the rivers.

*Service Response:* Designation of critical habitat is not a management plan for the recovery of these endangered fish. Specific management actions such as changing flows to benefit these fish will result from the RIP's, other recovery programs, and actions or project-specific requirements of biological opinions. Effects of flow changes due to Federal actions that benefit the endangered fish will be addressed through the NEPA process.

*Issue 63:* Several respondents questioned why only 10 percent of the cost of recovering these fish was attributed to critical habitat. Others were confused on how the Service arrived at the 90/10 percent split between species listing and critical habitat designation.

*Service Response:* The Act requires that the economic and other relevant impacts of designation of critical habitat be determined. This provision requires that the Service separate those costs specific to designation of critical habitat from the costs associated with the listing of these species. The Service used the extensive history of section 7 consultations that used the "jeopardy" standard to estimate the level of additional protection that might be provided by "adverse modification." Although the increased protection provided by critical habitat varies by impact type (flood plain activities, depletions, etc.), overall the Service determined that increased protection provided by critical habitat would account for approximately 10 percent of the total cost identified.

*Issue 64:* A few respondents questioned the selection of 1967–1985 for the hydrologic period to be used in preparation of the economic analysis. Some also indicated that using average flow years did not give an accurate portrayal of impacts.

*Service Response:* The Service selected the 1967–1985 period because

it reflected the hydrology of the system with major water developments in place and operating without any operational changes due to endangered fish needs. Thus, this period was the most accurate one available for determining the full economic impact of reoperation of the river system for recovery of the endangered fish. Average, above average, and below average flow years were modeled.

*Social Comments*

*Issue 65:* Some respondents believed that humans are the real endangered species. Fish should not be considered more important than people. There is no benefit to people from these species.

*Service Response:* The Act strives to protect species that are in danger of becoming extinct in the immediate or foreseeable future. Humans are not in such danger. On the contrary, the number of humans has increased in the last 100 years at a rapid rate. Humans have, at times, believed that some other species may be of little or no value, when in fact the same species later has been determined to be of great value. In the past, the Colorado River fishes were of value to man for subsistence food, and they were widely taken for recreational and commercial reasons.

The four endangered fishes are considered of value to different segments of the human population for widely different reasons. As a case in point, one species, the Colorado squawfish, has been valued by humans for several different reasons, including: (1) Historic value—it has been suggested that the food provided by this fish was of importance in the early settlement of portions of the West, and it was certainly used as food by American Indians; (2) food for humans—the literature is full of accounts of humans catching and eating Colorado squawfish, and its culinary qualities have been widely attested; (3) scientific—the potamodromous migrations and unique life cycle of this largest North American minnow is of great scientific interest and importance; and (4) ecological—as the top native predator of the Colorado River, it has a valid place in the natural Colorado River ecosystem.

*Issue 66:* Many respondents believed that the designation would adversely affect the quality of life in communities adjacent to critical habitat because loss of water rights, elimination of flood plain developments, prevention of new flood control projects and similar issues may result in destruction of communities.

*Service Response:* The designation will not take existing water rights nor will it require the removal of existing

flood plain developments. Any new flood control project or other water development project would likely be subject to section 7 consultation, and if destruction or adverse modification of critical habitat were found, reasonable and prudent alternatives would be developed to address the project purposes. Actions without Federal involvement are not affected by the designation of critical habitat.

*Issue 67:* Several letters indicated that designation would adversely affect historic use of resources and lands.

*Service Response:* Existing development and use of water rights and non-Federal lands will not be affected by the designation of critical habitat except in cases where a Federal project or funding is required. Actions without Federal involvement are not affected by the designation of critical habitat.

*Issue 68:* Some respondents wondered how the designation would affect use of these rivers and reservoirs for recreation.

*Service Response:* The direct effects of critical habitat designation upon reservoir and river-based recreation are expected to be minor. Few Federal actions related to recreation are likely to "destroy or adversely modify" critical habitat. Power boating, rafting, swimming, fishing, and similar uses do not significantly impact or destroy the physical habitat of these species. However, these types of activities (flow changes, sport fish management, etc.) may be affected by specific efforts to recover these species. The Economic Analysis provided data on the potential economic impacts to recreational activities due to designation of critical habitat for these species. This information can be used to evaluate the significance of the effect of critical habitat will have upon the various recreation activities in and along the Colorado River system.

*Issue 69:* A few respondents stated that decisions affecting the quality and way of life in a community should be made locally and for the benefit of the local community.

*Service Response:* Congress has determined that endangered species consideration is of national importance and should be evaluated in a wider context. Effects to the local community are recognized in the process of designating critical habitat. However, the economic analysis and the exclusion process, according to the Act, only consider national and regional impacts. An area can be removed from the critical habitat designation if the economic costs of the designation are greater than the benefits to the species

and if exclusion is not likely to result in the extinction of the species.

*Issue 70:* Many respondents stated the need for balance between economic and environmental issues.

*Service Response:* The Economic Analysis and public comments were used by the Service during the exclusion process to achieve a balance between the needs of these species and economic and other concerns. The exclusion process allows for areas to be excluded from critical habitat designation if economic and other impacts exceed benefits for the listed species of concern, provided that exclusion will not result in the extinction of the species. The exclusion process allows economic and other issues to be weighed against the requirements of critical habitat under the Act.

**National Environmental Policy Act**

The Service has determined that an Environmental Assessment, as defined under the authority of the National Environmental Policy Act of 1969, need not be prepared in conjunction with regulations adopted pursuant to section 4(a) of the Act. A notice outlining the Service's reasons for this determination was published in the **Federal Register** on October 25, 1983 (48 FR 49244).

**Executive Order 12866 and Regulatory Flexibility Act**

This rule was reviewed by the Office of Management and Budget under Executive Order 12866. Based on the information discussed in this rule concerning public projects and private activities within critical habitat areas, there are no significant economic impacts resulting from the critical habitat designation. There are a limited number of actions on private land that have Federal involvement through funds or permits that may be affected by critical habitat designation. Also, no direct costs, enforcement costs, information collection, or recordkeeping requirements are imposed on small entities by this designation. Further, the rule contains no recordkeeping requirements as defined by the Paperwork Reduction Act of 1990.

**Taking Implications Assessment**

The Service has analyzed the potential taking implications of designating critical habitat for the razorback sucker, Colorado squawfish, humpback chub, and bonytail chub in a Takings Implications Assessment prepared pursuant to requirements of Executive Order 12630, "Governmental Actions and Interference with Constitutionally Protected Property

Rights." The Takings Implications Assessment concludes that the designation does not pose significant takings implications.

**References Cited**

A complete list of all references cited herein is available upon request from the Service's Utah Field Office (see **ADDRESSES** above).

**Authors**

The primary authors of this rule are Henry R. Maddux, U.S. Fish and Wildlife Service, Utah Field Office (see **ADDRESSES** section); William R. Noonan, U.S. Fish and Wildlife Service, Colorado Field Office; Lesley A. Fitzpatrick, U.S. Fish and Wildlife Service, Arizona Field Office; and Harold M. Tyus, U.S. Fish and Wildlife Service, Region 6, Denver, Colorado.

**List of Subjects in 50 CFR Part 17**

Endangered and threatened species, Exports, Imports, Reporting and recordkeeping requirements, and Transportation.

**Regulations Promulgation**

Accordingly, part 17, subchapter B of chapter I, title 50 of the Code of Federal Regulations is hereby amended as set forth below:

**PART 17—[AMENDED]**

1. The authority citation for part 17 continues to read as follows:

**Authority:** 16 U.S.C. 1361–1407; 16 U.S.C. 1531–1544; 16 U.S.C. 4201–4245; Pub. L. 99–625, 100 Stat. 3500, unless otherwise noted.

**§ 17.11   [Amended]**

2. Section 17.11(h) is amended by revising the Critical Habitat column for the entries "Chub, bonytail," "Chub, humpback," "Squawfish, Colorado," and "Sucker, razorback," under FISHES, to read "17.95(e)".

3. Section 17.95(e) is amended by adding critical habitat of the bonytail chub *(Gila elegans),* humpback chub *(Gila cypha),* Colorado squawfish *(Ptychocheilus lucius),* and razorback sucker *(Xyrauchen texanus),* in the same alphabetical order as each species occurs in § 17.11(h).

**§ 17.95   Critical habitat—fish and wildlife.**

\*　　\*　　\*　　\*　　\*

(e) \* \* \*

\*　　\*　　\*　　\*　　\*

Bonytail Chub *(Gila elegans)*

Description of areas taken from the Bureau of Land Management (BLM) 1:100,000 scale maps (available from BLM State Offices): Rangely, CO 1989; Canyon of Lodore, CO 1990; Seep Ridge,

UT/CO 1982; La Sal, UT/CO 1985; Hite Crossing, UT 1982; Parker, AZ/CA 1980; Davis Dam, AZ/NV/CA 1982; Boulder City, NV/AZ 1978; Needles, CA 1986.

Colorado: Moffat County. The Yampa River from the boundary of Dinosaur National Monument in T.6N., R.99W., sec. 27 (6th Principal Meridian) to the confluence with the Green River in T.7N., R.103W., sec. 28 (6th Principal Meridian).

Utah: Uintah County; and Colorado: Moffat County. The Green River from the confluence with the Yampa River in T.7N., R.103W., sec. 28 (6th Principal Meridian) to the boundary of Dinosaur National Monument in T.6N., R.24E., sec. 30 (Salt Lake Meridian).

Utah: Uintah and Grand Counties. The Green River (Desolation and Gray Canyons) from Sumner's Amphitheater in T.12S., R.18E., sec. 5 (Salt Lake Meridian) to Swasey's Rapid in T.20S., R.16E., sec. 3 (Salt Lake Meridian).

Utah: Grand County; and Colorado: Mesa County. The Colorado River from Black Rocks in T.10S., R.104W., sec. 25 (6th Principal Meridian) to Fish Ford in T.21S., R.24E., sec. 35 (Salt Lake Meridian).

Utah: Garfield and San Juan Counties The Colorado River from Brown Betty Rapid in T.30S., R.18E., sec. 34 (Salt Lake Meridian) to Imperial Canyon in T.31S., R.17E., sec. 28 (Salt Lake Meridian).

Arizona: Mohave County; Nevada: Clark County; and California: San Bernardino County. The Colorado River from Hoover Dam in T.30N., R.23W., sec. 3 (Gila and Salt River Meridian) to Davis Dam in T.21N., R.21W., sec. 18 (Gila and Salt River Meridian) including Lake Mohave up to its full pool elevation.

Arizona: Mohave County; and California: San Bernardino County. The Colorado River from the northern boundary of Havasu National Wildlife Refuge in R.22W., T.16N., sec. 1 (Gila and Salt River Meridian) to Parker Dam in T.11N., R.18W., sec. 16 (Gila and Salt River Meridian) including Lake Havasu up to its full pool elevation.

Known constituent elements include water, physical habitat, and biological environment as required for each particular life stage for each species.

**BILLING CODE 4310-55-C**

BLM_0070464

**13398** **Federal Register** / Vol. 59, No. 54 / Monday, March 21, 1994 / Rules and Regulations



BILLING CODE 4310-55-P

\* \* \* \* \*

Humpback Chub (*Gila cypha*)

Description of areas taken from BLM 1:100,000 scale maps (available from BLM State Offices): Rangely, CO 1989; Canyon of Lodore, CO 1990; Seep Ridge, UT/CO 1982; Vernal, UT/CO 1982; Grand Junction, CO 1990; Moab, UT/CO 1985; La Sal, UT/CO 1985; Tuba City, AZ 1983; Peach Springs, AZ 1980; Grand Canyon, AZ 1980; Mt. Trumbull, AZ 1979.

Colorado: Moffat County. The Yampa River from the boundary of Dinosaur National Monument in T.6N., R.99W., sec. 27 (6th Principal Meridian) to the confluence with the Green River in T.7N., R.103W., sec. 28 (6th Principal Meridian).

Utah: Uintah County; and Colorado: Moffat County. The Green River from the confluence with the Yampa River in T.7N., R.103W., sec. 28 (6th Principal Meridian) to the southern boundary of Dinosaur National Monument in T.6N., R.24E., sec. 30 (Salt Lake Meridian).

Utah: Uintah and Grand Counties. The Green River (Desolation and Gray Canyons) from Sumner's Amphitheater in T.12S., R.18E., sec. 5 (Salt Lake Meridian) to Swasey's Rapid in T.20S., R.16E., sec. 3 (Salt Lake Meridian).

Utah: Grand County; and Colorado: Mesa County. The Colorado River from Black Rocks in T.10S., R.104W., sec. 25 (6th Principal Meridian) to Fish Ford River in T.21S., R.24E., sec. 35 (Salt Lake Meridian).

Utah: Garfield and San Juan Counties. The Colorado River from Brown Betty Rapid River in T.30S., R.18E., sec. 34 (Salt Lake Meridian) to Imperial Canyon in T.31S., R.17E., sec. 28 (Salt Lake Meridian).

Arizona: Coconino County. The Little Colorado River from river mile 8 in T.32N., R.6E., sec. 12 (Salt and Gila River Meridian) to the confluence with

the Colorado River in T.32N., R.5E., sec. 1 (Salt and Gila River Meridian).

Arizona: Coconino County. The Colorado River from Nautiloid Canyon in T.36N., R.5E., sec. 35 (Salt and Gila River Meridian) to Granite Park in T.30N., R.10W., sec. 25 (Salt and Gila River Meridian).

Known constituent elements include water, physical habitat, and biological environment as required for each particular life stage for each species.

BILLING CODE 4310-55-P



BILLING CODE 4310-55-C

\* \* \* \* \*

Colorado Squawfish (*Ptychocheilus lucius*)

Description of areas taken from BLM 1:100,000 maps (available from BLM State Offices): Canyon of Lodore, CO 1990; La Sal, UT/CO 1995; Rangely, CO 1989; Delta, CO 1989; Grand Junction, CO 1990; Hite Crossing, UT 1982; Vernal, UT/CO 1990; Craig, CO 1990; Bluff, UT/CO 1985; Moab, UT/CO 1985; Hanksville, UT 1982; San Rafael Desert, UT 1985; Huntington, UT 1982; Price, UT 1989; Farmington, NM 1991; Navajo Mountain, UT/AZ 1982. The 100-year flood plain for many areas is detailed in Flood Insurance Rate Maps (FIRM) published by and available through the Federal Emergency Management Agency (FEMA). In areas where a FIRM is not available, the presence of alluvium soils or known high water marks can be used to determine the extent of the flood plain. Only areas of flood plain containing constituent elements are considered critical habitat.

Colorado: Moffat County. The Yampa River and its 100-year flood plain from the State Highway 394 bridge in T.6N., R.91W., sec. 1 (6th Principal Meridian) to the confluence with the Green River in T.7N., R.103W., sec. 28 (6th Principal Meridian).

Utah: Uintah, Carbon, Grand, Emery, Wayne, and San Juan Counties; and Colorado: Moffat County. The Green

River and its 100-year flood plain from the confluence with the Yampa River in T.7N., R.103W., sec. 28 (6th Principal Meridian) to the confluence with the Colorado River in T.30S., R.19E., sec. 7 (Salt Lake Meridian).

Colorado: Rio Blanco County; and Utah: Uintah County. The White River and its 100-year flood plain from Rio Blanco Lake Dam in T.1N., R.96W., sec. 6 (6th Principal Meridian) to the confluence with the Green River in T.9S., R.20E., sec. 4 (Salt Lake Meridian).

Colorado: Delta and Mesa Counties. The Gunnison River and its 100-year flood plain from the confluence with the Uncompahgre River in T.15S., R.96W., sec. 11 (6th Principal Meridian) to the confluence with the Colorado River in T.1S., R.1W., sec. 22 (Ute Meridian).

Colorado: Mesa and Garfield Counties; and Utah: Grand, San Juan, Wayne, and Garfield Counties. The Colorado River and its 100-year flood plain from the Colorado River Bridge at exit 90 north off Interstate 70 in T.6S., R.93W., sec. 16 (6th Principal Meridian) to North Wash including the Dirty Devil arm of Lake Powell up to the full pool elevation in T.33S., R.14E., sec. 29 (Salt Lake Meridian).

New Mexico: San Juan County; and Utah: San Juan County. The San Juan River and its 100-year flood plain from the State Route 371 Bridge in T.29N., R.13W., sec. 17 (New Mexico Meridian) to Neskahai Canyon in the San Juan arm of Lake Powell in T.41S., R.11E., sec. 26 (Salt Lake Meridian) up to the full pool elevation.

Known constituent elements include water, physical habitat, and biological environment as required for each particular life stage for each species.

BILLING CODE 4310-55-P



BILLING CODE 4310-55-C

\* \* \* \* \*

BLM_0070465

Razorback Sucker (*Xyrauchen texanus*)

Description of areas taken from BLM 1:100,000 scale maps (available from BLM State Offices): Rangely, CO 1989; Canyon of Lodore, CO 1990; Seep Ridge, UT/CO 1982; La Sal, UT/CO 1985; Westwater, UT/CO 1981; Hite Crossing, UT 1982; Glenwood Springs, CO 1988; Grand Junction, CO 1990; Delta, CO 1989; Navajo Mountain, UT/AZ 1982; Vernal, UT 1990; Craig, CO 1990; Bluff, UT/CO 1985; Moab, UT/CO 1985; Hanksville, UT 1982; San Rafael Desert, UT 1985; Huntington, UT 1982; Price, UT 1989; Tuba City, AZ 1983; Lake Mead, NV/AZ 1981; Davis Dam, AZ/NV/CA 1982, Parker, AZ/CA 1980; Yuma, AZ/CA 1988; Safford, AZ 1991; Globe, AZ 1980; Clifton, AZ/NM 1975; Prescott, AZ 1982; Theodore Roosevelt Lake, AZ 1982, Grand Canyon, AZ 1980; Mt. Trumbull, AZ 1979; Boulder City, NV/AZ 1978; Blythe, CA/AZ 1976; Trigo Mountains, AZ/CA 1988; Sedona, AZ 1982; Payson, AZ 1988; and U.S. Forest Service map: Tonto National Forest, Phoenix, AZ. The 100-year flood plain for many areas is detailed in Flood Insurance Rate Maps (FIRM) published by and available through the FEMA. In areas where a FIRM is not available, the presence of alluvium soils or known high water marks can be used to determine the extent of the flood plain. Only areas of flood plain containing constituent elements are considered critical habitat.

Colorado: Moffat County. The Yampa River and its 100-year flood plain from the mouth of Cross Mountain Canyon in T.6N., R.98W., sec. 23 (6th Principal Meridian) to the confluence with the Green River in T.7N., R.103W., sec. 28 (6th Principal Meridian).

Utah: Uintah County; and Colorado: Moffat County. The Green River and its 100-year flood plain from the confluence with the Yampa River in T.7N., R.103W., sec. 28 (6th Principal Meridian) to Sand Wash in T.11S., R.18E., sec. 20 (6th Principal Meridian).

Utah: Uintah, Carbon, Grand, Emery, Wayne, and San Juan Counties. The Green River and its 100-year flood plain from Sand Wash at T.11S., R.18E., sec. 20 (6th Principal Meridian) to the confluence with the Colorado River in T.30S., R.19E., sec. 7 (6th Principal Meridian).

Utah: Uintah County. The White River and its 100-year flood plain from the boundary of the Uintah and Ouray Indian Reservation at river mile 18 in T.9S., R.22E., sec. 21 (Salt Lake Meridian) to the confluence with the Green River in T.9S., R.20E., sec. 4 (Salt Lake Meridian).

Utah: Uintah County. The Duchesne River and its 100-year flood plain from river mile 2.5 in T.4S., R.3E., sec. 30 (Salt Lake Meridian) to the confluence with the Green River in T.5S., R.3E., sec. 5 (Uintah Meridian).

Colorado: Delta and Mesa Counties. The Gunnison River and its 100-year flood plain from the confluence with the Uncompahgre River in T.15S., R.96W., sec. 11 (6th Principal Meridian) to Redlands Diversion Dam in T.1S., R.1W., sec. 27 (Ute Meridian).

Colorado: Mesa and Garfield Counties. The Colorado River and its 100-year flood plain from Colorado River Bridge at exit 90 north off Interstate 70 in T.6S., R.93W., sec. 16 (6th Principal Meridian) to Westwater Canyon in T.20S., R.25E., sec. 12 (Salt Lake Meridian) including the Gunnison River and its 100-year flood plain from the Redlands Diversion Dam in T.1S., R.1W., sec. 27 (Ute Meridian) to the confluence with the Colorado River in T.1S., R.1W., sec. 22 (Ute Meridian).

Utah: Grand, San Juan, Wayne, and Garfield Counties. The Colorado River and its 100-year flood plain from Westwater Canyon in T.20S., R.25E., sec. 12 (Salt Lake Meridian) to full pool elevation, upstream of North Wash and including the Dirty Devil arm of Lake Powell in T.33S., R.14E., sec. 29 (Salt Lake Meridian).

New Mexico: San Juan County; and Utah: San Juan County. The San Juan River and its 100-year flood plain from the Hogback Diversion in T.29N., R.16W., sec. 9 (New Mexico Meridian) to the full pool elevation at the mouth of Neskahai Canyon on the San Juan arm of Lake Powell in T.41S., R.11E., sec. 26 (Salt Lake Meridian).

Arizona: Coconino and Mohave Counties; and Nevada: Clark County. The Colorado River and its 100-year flood plain from the confluence with the Paria River in T.40N., R.7E., sec. 24 (Gila and Salt River Meridian) to Hoover Dam in T.30N., R.23W., sec. 3 (Gila and Salt River Meridian) including Lake Mead to the full pool elevation.

BLM_0070466

Arizona: Mohave County; and Nevada: Clark County. The Colorado River and its 100-year flood plain from Hoover Dam in T.30N., R.23W., sec. 1 (Gila and Salt River Meridian) to Davis Dam in T.21N., R.21W., sec. 18 (Gila and Salt River Meridian) including Lake Mohave to the full pool elevation.

Arizona: La Paz and Yuma Counties; and California: San Bernardino, Riverside, and Imperial Counties. The Colorado River and its 100-year flood plain from Parker Dam in T.11N., R.18W., sec. 16 (Gila and Salt River Meridian) to Imperial Dam in T.6S., R.22W., sec. 25 (Gila and Salt River Meridian) including Imperial Reservoir to the full pool elevation or 100-year flood plain, whichever is greater.

Arizona: Graham, Greenlee, Gila, and Pinal Counties. The Gila River and its 100-year flood plain from the Arizona-New Mexico border in T.8S., R.32E., sec. 34 (Gila and Salt River Meridian) to Coolidge Dam in T.3S., R.18E., sec. 17 (Gila and Salt River Meridian).

including San Carlos Reservoir to the full pool elevation.

Arizona: Gila County. The Salt River and its 100-year flood plain from the old U.S. Highway 60/State Route 77 bridge (unsurveyed) to Roosevelt Diversion Dam in T.3N., R.14E., sec. 4 (Gila and Salt River Meridian).

Arizona: Yavapai County. The Verde River and its 100-year flood plain from the U.S. Forest Service boundary (Prescott National Forest) in T.18N., R.2E., sec. 31 to Horseshoe Dam in T.7N., R.6E., sec. 2 (Gila and Salt River Meridian), including Horseshoe Lake to the full pool elevation.

Known constituent elements include water, physical habitat, and biological environment as required for each particular life stage for each species.

BILLING CODE 4310-55-P



BILLING CODE 4310-55-C

* * * * *

Dated: March 10, 1994.

**George T. Frampton,**
*Assistant Secretary for Fish and Wildlife and Parks, Department of the Interior.*
[FR Doc. 94-6508 Filed 3-16-94; 11:26 am]
BILLING CODE 4310-55-P

BLM_0070467



# Greenback Cutthroat Trout Recovery Plan

BLM_0070468

# Greenback Cutthroat Trout Recovery Plan

Prepared by:
Greenback Cutthroat Trout Recovery Team

for

Region 6
U.S. Fish and Wildlife Service
Denver, Colorado

DEPUTY Regional Director

March 1998

BLM_0070469

# Table of Contents

DISCLAIMER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

ACKNOWLEDGEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PART I INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Historic Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Type Specimens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Taxonomy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4
Current Distribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Reasons for Decline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Habitat Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Reproduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Food and Feeding. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Size and Growth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Disease and Parasites . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Sensitivity to pH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Heavy Metals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Management Practices (Fish Culture, Stocking, Angling). . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

PART II RECOVERY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
Objective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
Stepdown Outline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Narrative Outline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

PART III IMPLEMENTATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

LITERATURE CITED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

PUBLIC REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

PART IV FIGURES, TABLES, AND APPENDICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
Figure 1.  Mature South Platte drainage greenbacks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Figure 2.  Historic distribution of greenback cutthroat trout . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Figure 3.  Comparison of selected parameters for various Colorado subspecies of
O. clarki and rainbow trout . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Table 1.  Summary of Known Historic Greenback Cutthroat Trout Sites and Stability
of Population. 1970-1997. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45
Table 2.  Summary of South Platte Greenback Cutthroat Trout Restoration Projects,
1970-1997. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
Table 3.  Summary of Arkansas River Greenback Cutthroat Trout Restoration Projects,
1970-1997. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
Table 4.  Summary of Greenback Historic Populations, Restoration Projects, Areas
Open to Angling and Stable Populations.  1997. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51
Table 5.  Hybrid Populations of Greenback Cutthroat Trout. 1994. . . . . . . . . . . . . . . . . . . . . . 52
Table 6.  South Platte Greenback Restoration Projects and Stocking Schedule. . . . . . . . . . . . . . .53
Table 7.  Arkansas River Greenback Restoration Projects and Stocking Schedule. . . . . . . . . . . . 54
Table 8.  South Platte River Drainage Greenback Research Cutthroat Trout Stocking
Sites.  1994-2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
Table 9.  Arkansas River Drainage Research Greenback Cutthroat Trout Stocking
Sites.  1994-2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
Appendix 1.  Summary of Recovery History, 1959-1994 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .59



# Disclaimer

Recovery plans delineate reasonable actions which are believed to be required to recover and/or protect the species. Plans are prepared by the U.S. Fish and Wildlife Service, sometimes with the assistance of recovery teams, contractors, State agencies, and others. Objectives only will be attained and funds expended contingent upon appropriations, priorities, and other budgetary constraints. Recovery plans do not necessarily represent the views, official positions, or approvals of any individuals or agencies, other than the U.S. Fish and Wildlife Service, involved in the plan formulation. They represent the official position of the U.S. Fish and Wildlife Service only after they have been signed by the Regional Director, or Director as approved. Approved recovery plans are subject to modification as dictated by new findings, changes in species status, and the completion of recovery tasks.

Literature citations should read as follows:

U.S. Fish and Wildlife Service. 1998. Greenback cutthroat trout recovery plan. U.S. Fish and Wildlife Service, Denver, Colorado.

Additional copies may be purchased from:

Fish and Wildlife Reference Service
5430 Grosvenor Lane, Suite 110
Bethesda, Maryland   20814
(301) 492-6403 or 1-800-582-3421

*The fee for the plan varies with the number of pages of the plan.*

Illustrations by: Bill Border, Nederland, Colorado.
Layout Design by: Renee Garfias, Bureau of Land Management



BLM_0070471

# Acknowledgements

We gratefully acknowledge the dedication of Dr. Robert Behnke for years of service to the greenback program, and Colorado Trout Unlimited for their interest and funding of greenback restoration projects. We also acknowledge the Bozeman Fish Cultural Development Center, Saratoga National Fish Hatchery and Colorado Division of Wildlife Fish Research Hatchery for their work in developing the captive rearing techniques for South Platte and Arkansas River drainage greenbacks, and to Mr. McAlpine and the U.S. Army, Ft. Carson, for providing habitat for the early Arkansas River broodstock program.  Also, Mr. Jim Bennett, Colorado Division of Wildlife, for his long service as Team Leader.

The Greenback Cutthroat Trout Recovery Team is also grateful to its consultants who aided in the preparation of this plan, and former members who aided in the preparation of previous versions of this plan:

| | |
|---|---|
| Robin Knox | Colorado Division of Wildlife |
| David Langlois | Colorado Division of Wildlife |
| Rolf B. Nittman | Colorado Division of Wildlife |
| James R. Bennett | Colorado Division of Wildlife |
| Larry E. Harris | Colorado Division of Wildlife |
| Steve J. Puttmann | Colorado Division of Wildlife |
| Douglas Krieger | Colorado Division of Wildlife |
| Rick Anderson | Colorado Division of Wildlife |
| Greg A. Policky | Colorado Division of Wildlife |
| Phillip J. Goebel | Colorado Division of Wildlife |
| Robert Behnke | Colorado State University |
| Leo Gomolchak | Colorado Trout Unlimited |
| Tim Devine | National Park Service |
| David R. Stevens | National Park Service |
| John Gold | Texas A&M University |
| Thomas L. Warren | U.S. Army, Fort Carson |
| Don Prichard | U.S. Bureau of Land Management |
| David Gilbert | U.S. Bureau of Land Management |
| James W. Mullan | U.S. Fish and Wildlife Service |
| Pat Dwyer | U.S. Fish and Wildlife Service |
| James Hammer | U.S. Fish and Wildlife Service |
| Terry Hickman | U.S. Fish and Wildlife Service |
| Jane Roybal | U.S. Fish and Wildlife Service |
| Patty Worthing | U.S. Fish and Wildlife Service |
| Richard Moore | U.S. Forest Service |
| Bob Stuber | U.S. Forest Service |
| Albert Collotzi | U.S. Forest Service |
| Dave Gerhardt | U.S. Forest Service |
| David Winters | U.S. Forest Service |
| Denny Bohon | U.S. Forest Service |
| Mike Young | U.S. Forest Service |

Current Greenback Cutthroat Trout Recovery Team Members:

| | | |
|---|---|---|
| Therese Johnson | 1994-present | National Park Service |
| Bruce D. Rosenlund | 1977-present | U.S. Fish and Wildlife Service |
| Brenda Mitchell | 1981-present | Bureau of Land Management |
| Gordon Sloane | 1989-present | U.S. Forest Service |
| Tom Nesler | 1992-present | Colorado Division of Wildlife |



BLM_0070472

# Executive Summary

**Current Species Status:** The greenback cutthroat trout *(Oncorhynchus clarki stomias)* is the only trout endemic to both the headwaters of the South Platte and Arkansas River drainages. Although once abundant, their numbers declined in the late 1800's due to loss of habitat caused by mining and agriculture, over-harvest, and the introduction of non-native trout species. The greenback was extirpated from most of its native range by the early 1900's, and Greene (1937) considered the subspecies extinct. In 1973, two small populations were confirmed that represented approximately 2,000 greenbacks in 4.6 km of stream. The subspecies was listed as "endangered" in 1973, and downlisted to "threatened" in 1978. As a result of recovery efforts, captive broodstocks were established, non-native trout were removed from suitable habitat, greenbacks were reintroduced, stable populations were developed and catch-and-release fisheries were initiated.

Greenback cutthroat trout are present in 62 sites that total 179 hectares (442 acres) of lakes and ponds and 164 kilometers (102 miles) of stream habitat. Forty seven sites are open to catch-and-release fishing and 20 populations are considered to be stable. Seventeen stable populations are located in the South Platte drainage, and three stable populations are located within the Arkansas drainage. These numbers may change as new projects are accomplished.

**Habitat Requirements and Limiting Factors:** This species inhabits cold water streams and cold water lakes with adequate stream spawning habitat present in the spring of the year. Limiting factors include other spring spawning trout species that hybridize with greenbacks, and fall spawning species that compete with greenbacks for food and space, combined with over-harvest of greenbacks.

**Recovery Objective:** Delisting.

**Recovery Criteria:** The goal of this Plan is to restore the greenback cutthroat trout to non-threatened status within its native range. Delisting of this subspecies is considered to be possible by the year 2000. This may be accomplished through maintaining at least 20 stable greenback populations occupying at least 50 hectares (124 acres) of lakes and ponds and 50 kilometers (31 miles) of stream. At least five of the stable populations should occur in the Arkansas drainage.

**Actions Needed:**
1. Maintain existing populations of greenbacks.
2. Establish or document, 20 stable populations of greenbacks.
3. Establish captive and wild greenback broodstocks within Colorado.
4. Conduct research on greenback angling programs and hatchery programs.
5. Conduct greenback information and education programs.
6. Promote partnerships, and expand efforts to obtain non-agency funding.
7. Prepare a long-term greenback management plan and cooperative agreement.

**Date of Recovery:** 2000.

**Cost of Recovery:** $634,000.



BLM_0070473

This Recovery Plan for the greenback cutthroat trout (greenback) was developed by the Greenback Cutthroat Trout Recovery Team, an interagency group of scientists operating under the sponsorship of the U.S. Fish and Wildlife Service.

The original Greenback Recovery Plan was written in 1978, revised in 1983 and is superseded by this Plan.  This latest edition contains updated information and recovery objectives completed by researchers since 1973.

## The Plan is organized into four sections:

I.  <u>Introduction</u> - Historic distribution, type specimens, taxonomy, current distribution, reasons for decline, habitat requirements, reproduction, food and feeding, size and growth, disease and parasites, sensitivity to pH, heavy metals, management practices, fish culture, stocking and angling.

II.  <u>Recovery</u> - Recovery objectives, and tasks considered vital to the successful recovery of the greenback.

III.  <u>Implementation Schedule</u> - An itinerary of scheduled recovery tasks assigning agency responsibility and estimated costs.

IV.  <u>Figures, Tables and Appendices</u>

We sincerely hope that this document will be used by agencies involved with greenback cutthroat trout management to coordinate their efforts to most effectively work toward our common goal.

Revisions of this Plan will occur as often as is feasible and appropriate.



BLM_0070474

# Part I  Introduction

The greenback cutthroat trout, (*Oncorhynchus clarki stomias*, formerly *Salmo clarki stomias*), is one of the most colorful subspecies of cutthroats (Figure 1), and was one of the rarest.  At the time of the enactment of the Endangered Species Act in 1973, only two small historic populations of greenback cutthroat trout were known to exist - Como Creek and South Fork, Cache La Poudre River - that conformed to the meristics of the type specimens.  These two small headwater streams of the South Platte River drainage collectively represented 4.6 kilometers of stream habitat and supported less than 2,000 greenbacks.  Since then, seven additional historic populations have been identified, five populations in the South Platte River drainage and two populations in the Arkansas River drainage.  The historic populations are listed in Table 1.

Contrary to the common name of the fish, the back of the greenback is not especially green in color.  In older age classes (4 years or more), mature males display crimson red colors along the ventral region during the spring spawning season, especially in lake environments.

## Historic Distribution

The greenback is native to the headwaters of the South Platte and Arkansas river drainages within Colorado and a small segment of the South Platte drainage within Wyoming.  The greenback and the Rio Grande cutthroat trout (*Oncorhynchus clarki virginalis*), represent the easternmost limits of native trout

distribution in the western United States, (Behnke, 1984).  The greenback declined so rapidly in the 1800's that the original distribution of the subspecies is not precisely known.  Behnke and Zarn (1976) assumed the original distribution included all mountain and foothill habitats of the Arkansas and South Platte drainages (Figure 2).  The greenback was known to occur within these drainages at lower elevations than it occupies today, however, little is known of its exact historic lake and stream distribution and the range in elevation it once occupied.  The only other trout thought to have occurred within the greenback's native range was the yellowfin cutthroat (*Oncorhynchus clarki macdonaldi*) collected from Twin Lakes (Arkansas River drainage) in 1889 (Behnke 1979).  The yellowfin cutthroat became extinct in the early 1900's.

## Type Specimens

According to Behnke (1979), "There is considerable confusion concerning the name stomias in regard to where the original type specimens actually came from.  It is possible that the specimens on which the name is based were not greenback trout taken from the South Platte drainage.  Cope (1872), in the same publication in which he names *S. pleuriticus*, named *Salmo stomias* from specimens collected from:  "The South Platte River at Fort Riley, Kansas."  The South Platte River drainage does not enter the State of Kansas.  In later publications, Cope stated that the "type locality" of *S. stomias* is the Kansas River at Fort Riley, Kansas.



BLM_0070475

**Figure 1.  Mature South Platte drainage greenbacks from stream and lake environments. Rocky Mountain National Park. 1992.**



Mature female greenback with typical non-spawning coloration and spotting pattern from a small  stream environment, Hunters Creek, RMNP



Mature male greenback with typical spawning coloration and spotting pattern from a lake environment, Bear Lake, RMNP



BLM_0070476

**Figure 2.  Historic distribution of greenback cutthroat trout, (Behnke and Zarn, 1976) and location of historic sites and stable reproducing populations.  1994.**



BLM_0070477

The Kansas River, however, has no native trout. The confusion originated with an Army expedition under the command of Lt. F. T. Bryant, traveling from Fort Riley, Kansas, to Fort Bridger, Wyoming, and back again in 1856. A surgeon, Dr. W. R. Hammond, accompanied the expedition and made natural history collections; among his collections were two specimens of cutthroat trout. The expedition traversed parts of the Kansas, North Platte, South Platte, and Green River drainages in Kansas, Nebraska, Wyoming and Colorado. Cutthroat trout could have been collected only in the Green River or South Platte drainages. The problem is that all of the specimens collected on the expedition were simply labeled 'Fort Riley, Kansas' (the terminus of the expedition) and shipped to the Philadelphia Academy of Sciences, where Cope later saw the cutthroat trout specimens and named *Salmo stomias*."

Jordan (1891) redefined stomias and limited its use to the cutthroat trout native to the South Platte and Arkansas River drainages. Jordan also appears to be the first person to use the common name "greenback" for this trout in the literature. All cutthroat trout are currently placed in the genus *Oncorhynchus*, with the current scientific name of the greenback being *Oncorhynchus clarki stomias*.

## Taxonomy

The cutthroat trout, *Oncorhynchus clarki* (formerly *Salmo clarki*), is a prime example of a polytypic species. Trout referred to as *O. clarki* are found in both coastal and inland streams from Alaska to New Mexico, and within this range the species has evolved into numerous subspecies or geographic races. Many subspecies undoubtedly are polyphyletic, having evolved directly from other subspecies rather than (monophyletically) from a centrally localized stem group. This evolutionary pattern, coupled with the declining abundance of "pure" inland trout, and extensive hybridization with introduced species (e.g. rainbow trout *O. mykiss*), has made it difficult to unravel the myriad of systematic problems within inland *O. clarki* (Gold 1977).

The taxonomy of the greenback cutthroat trout (*O. c. stomias*) has been described by Wernsman (1973), Behnke (1973, 1979), and Behnke and Zarn (1976). The following description of the subspecies is from Behnke and Zarn (1976):

> "Taxonomic criteria for *S. clarki stomias* remain tentative due to the extreme rareness of pure populations and to the scarcity of ancient museum specimens. Even so, scale counts (180-230) made from available specimens consistently exhibit the highest values of any cutthroat trout, or any trout in the genus *Salmo*. It may be assumed that extremely high scale counts are characteristic of pure populations of *S. c. stomias*, with some suggestion that those populations native to the South Platte Basin may show slightly higher counts than those native to the Arkansas drainage. The greenback cutthroat trout displays typically lower numbers of pyloric caeca and vertebrae than most other subspecies of *S. clarki*, but much overlap occurs in these characters.
>
> *Salmo clarki stomias* undoubtedly derived via an ancient headwater transfer of the Colorado River basin to the South Platte



BLM_0070478

River drainage (and then to the Arkansas River drainage) and for this reason shares many similarities with the Colorado River cutthroat, *S. c. pleuriticus*. The striking spotting pattern and intense coloration which can develop in mature fish are the most diagnostic field characteristics of the greenback trout. *S. c. stomias* typically displays the largest and most pronounced spots of any cutthroat trout. Round to oblong in shape, the spots appear concentrated posteriorly on the caudal peduncle area. Coloration is similar to that found in *S. c. pleuriticus* and tends toward blood-red over the lower sides and ventral region, especially in mature males. Although a genetic basis exists to express characteristic color patterns, the actual manifestation of color intensity and pattern depends upon age, sex, and diet" (see Figure 1).

A summary of meristic characteristics for various Colorado subspecies of *O. clarki* (*Salmo clarki*) are provided in Figure 3.

Although there is a close relationship between greenbacks and Colorado River cutthroat trout, recent mitochondrial DNA studies indicate that both the Arkansas River and South Platte River greenbacks are more closely related to each other, than to populations of Colorado River cutthroat. Greenbacks from the Arkansas and South Platte River drainages are nearly identical in DNA fragment patterns (Proebstel 1993). However, because of the geographic separation of the drainages, greenbacks from the two drainages should not be mixed for restoration purposes.

Since greenback cutthroat trout hybridize with other species and subspecies of *Oncorhynchus*, populations can range phenotypically from "essentially pure" to obvious hybrids. The Colorado Division of Wildlife (CDOW) has adopted a rating system developed by Binns (1977) as a means of rating population purity. Each population is assigned a letter ranging from A (pure) to C (obvious hybrids).

Only Type A populations are considered for recovery purposes in this plan (Tables 1-4). However, known type B and C greenback populations (Table 5) are also included in hopes that information obtained from research on types A through C populations will be of value in formulating management plans for all cutthroat trout subspecies.



BLM_0070479

## Comparison of Selected Parameters for
## Various Colorado Subspecies of *Salmo clarki* and Rainbow Trout
### (From Johnson 1976)

| | Number vertebrae | Number pyloric ceaca | Number gill-rakers | Number basibranchial teeth | Lateral line scale count (2 rows above lateral line) | Scale count from lateral line to dorsal fin | Spots |
|---|---|---|---|---|---|---|---|
| | mean (range) | mean (range) | mean (range) | mean (range) | mean (range) | mean (range) | |
| *S. clarki stomias* (Greenback Cutthroat Trout)* | 60.6 (59-62) | 29.4 (24-42) | 20.5 (17-22) | usually present (0-15) | 195.0 (175-214) | 48.0 (46-53) | Large, absent from head |
| *S. clarki virginalis* (Rio Grande Cutthroat Trout)* | 61.7 (60-63) | 46.0 (33-59) | 19.5 (18-21) | 7.3 (4-12) | 164.0 (146-186) | 41.9 (39-47) | Medium size concentrated posteriorly |
| *S. clarki pleuriticus* (Colorado Cutthroat Trout)* | 61.2 (60-63) | 35.0 (23-46) | 19.0 (16-21) | usually present (0-15) | 180.0 (159-202) | 43.0 (31-51) | Large spots concentrated posteriorly |
| *S. clarki macdonaldi* (Yellowfin Cutthroat Trout)* | 60.6 (60-61) | 42.0 (32-49) | 21.3 (20-22) | 15.5 (15-16) | 161.7 (149-172) | 41.3 (38-46) | Spots small irregular shape |
| *S. clarki lewisi* (Yellowstone Cutthroat Trout) | 61.6 (60-63) | 41.2 (31-51) | 20.6 (18-23) | 24.0 (9-46) | 179.2 (161-187) | 40.6 (37-46) | |
| *S. gairdneri* (Rainbow Trout) | 63.0 (62-65) | 55.0 (40-70) | 19.0 (18-21) | absent | 130.0 (120-140) | 27.0 (24-30) | Small, equally distributed |

*Counts from populations thought to be pure strains and typical of the subspecies.

6



BLM_0070480

## Current Distribution

The greenback cutthroat trout currently occurs in 61 sites that total 166 hectares of lakes and 165 kilometers of stream habitat in the upper tributaries of the South Platte and Arkansas river drainages. Nine "historic" populations remain that have been identified through recovery efforts conducted since 1973. Pure greenbacks have been introduced into 52 additional streams and lakes within the species historic range (as described in Objective 2, Part II of the Recovery section).

At present, twenty populations (including both historic and restoration populations) are believed to be stable self-sustaining populations (See definition in Part II), but only three of these stable populations occur in the Arkansas River drainage. The "historic" populations are located in the higher elevations of the species' historic range, probably because of less habitat disturbance and less accessibility to humans than occurred in the lower elevations.

## Reasons for Decline
### Fate of Historic Populations

Four cutthroat trout subspecies are known to have existed in Colorado when European settlers first arrived: greenback cutthroat trout, yellowfin cutthroat trout, Rio Grande cutthroat trout, and the Colorado River cutthroat trout. The yellowfin cutthroat occurred in the upper Arkansas River drainage in Twin Lakes, the Rio Grande cutthroat occurred in the Rio Grande drainage, and the Colorado River cutthroat occurred in the Colorado River drainage. Unfortunately, all four cutthroat trout subspecies proved quite susceptible to negative influences associated with 19th century development of Colorado. Land and water exploitation, mining, agriculture, logging, and unregulated fishing all took their toll in reducing the numbers and habitat of endemic trout populations. However, no action had more long-term impacts on the endemic trout subspecies than the introduction of non-native salmonids which hybridized and competed with native fishes. Shortly after the turn of the century, greenbacks had declined to a point that Greene (1937) believed them to be extinct.

The fate of the greenback population native to Twin Lakes, in the Lake Creek drainage, illustrates the effects of subsistence harvest and stocking of nonnative fish, and typifies the response of the greenback trout in general. According to Behnke (1979), "Twin Lakes was noted for its abundance of greenback trout in the nineteenth century. In the 1890's rainbow trout, brook trout, lake trout (*Salvelinus namaycush*), and Atlantic salmon were introduced. When Juday sampled Twin Lakes in 1902-1903, rainbow trout were dominant (Juday 1906). Although Juday collected specimens of greenback trout (some of these were identified as hybrids when examining Juday's specimens at the National Museum), he found no "yellowfin" cutthroat trout. The greenback disappeared from Twin Lakes shortly thereafter. Twin Lakes is now primarily noted for its lake trout fishery."

### Introduction of Non-native Fish

The major factor in the decline of the greenback cutthroat trout was the introduction of non-native salmonid species



BLM_0070481

(rainbow trout, brook trout, brown trout and Yellowstone cutthroat trout), within the South Platte and Arkansas River drainages.

The 1800's began with the greenback cutthroat as the dominant salmonid of these two drainages. However, the arrival of the railroad and the emergence of fish culture combined to make large numbers of fish eggs and fry readily available and transportable in a relatively short period of time. The greenback's failure to respond to early fish culture practices soon led to other fish species, such as brook trout and rainbow trout, being reared and stocked throughout the greenback's limited native range.

## Hybridization

Greenbacks hybridize readily with rainbow trout and other subspecies of cutthroat. Several hybridized populations known to occur in Colorado are shown in Table 5.

## Competition

<u>Brook Trout</u>. The ability of brook trout to displace a pure greenback population was dramatically demonstrated by events in Black Hollow Creek, Arapaho/Roosevelt National Forest. Brook trout were removed from this small montane stream in 1967 prior to restocking with 50 pure greenback cutthroat trout, which later established a reproducing population. However, in 1973, two brook trout were found above the barrier, and by 1977, electrofishing for more than one mile above the barrier produced only brook trout (Behnke and Zarn 1976, 1979).

The mechanism by which brook trout displace greenbacks is not thoroughly understood. However, in colder habitats, it probably includes an advantage gained through a one year earlier sexual maturation by brook trout and through larger brook trout young-of-the-year (YOY). Brook trout spawn in the fall. Their fry emerge from the redds much earlier in the year than do the spring spawning greenbacks, and the YOY brook trout can be 30 mm longer than YOY greenbacks by their first October. In Hidden Valley Creek, Rocky Mountain National Park (RMNP), YOY brook trout (65 mm) and YOY greenbacks (35 mm) are usually found in the shallow stream habitat by October and appear to compete for food and space during winter minimum flows. Fausch and Cummings (1986), found brook trout juveniles to occupy more energetically favorable positions than greenbacks in stream habitats when the two were found in sympatry within Hidden Valley Creek, RMNP, and indicated that brook trout juveniles were dominant over juvenile greenbacks (probably due to their larger size). However, Fausch and Cummings found aggression between adult (>150 mm) brook trout and greenbacks to be minimal.

Although brook trout dominate greenbacks and represent 60%-90% of the fish population in Black Hollow and Hidden Valley Creeks, greenback hybrids and Colorado River cutthroats have successfully co-existed for over 40 years and/or dominate (50% to 90% of fish numbers) over brook trout within Lake-of-Glass, Thunder Lake and Willow Creek, Rocky Mountain National Park (RMNP). Greenbacks have also demonstrated that they can invade dense brook trout populations in some circumstances, such as in the North Fork of the Big Thompson River. Greenbacks were introduced into a fishless habitat above an un-named falls on the upper North Fork of the Big



BLM_0070482

Thompson River, RMNP in 1970, and established a reproducing population. By 1986, greenbacks had drifted downstream, and represented 14.5 percent of the fish over 50 mm in length in the stream section from Lost Falls to the unnamed falls. In this section, brook trout did not exceed 280 mm in length, though greenbacks reached 304 mm.

Arkansas River greenbacks in Lytle Pond (U.S. Army, Ft. Carson) successfully coexist with brook trout, with brook trout numbers declining. However, spawning habitat at Lytle pond is less favorable in the fall than in the spring, and may provide greenbacks with a competitive advantage over brook trout at this location.

Brown trout. Wang (1989) observed the behavior and competition of yearling South Platte greenbacks and brown trout in an indoor stream aquarium. Brown trout were found to be more aggressive than equal-sized greenbacks. Brown trout even outcompeted greenbacks that were 1.27 times longer and 1.69 times heavier. Slow current combined with dim light significantly increased attack frequency of brown trout on greenbacks. Few greenback restoration projects involve former brown trout habitat. However, the dominance of brown trout over greenbacks (as indicated by Wang's study) is evident in George and Cornelius Creeks, where brown trout appear to be displacing greenbacks (Steve Puttmann, Colorado Division of Wildlife, pers. comm., 1991).

## Angler Harvest

The removal of adult greenbacks by anglers, may have had a negative impact upon greenbacks, especially when non-native salmonids were present. Cutthroat trout are more easily caught than other species. Removal of the older, larger greenbacks might favor brook trout, which reproduce at smaller sizes and younger ages. Changes in fishing regulations in effect since 1982 within RMNP that limited the harvest of non-native cutthroats and Colorado River cutthroat to two fish over 250 mm, and catch-and-release only for greenbacks, appears to be allowing for the downstream expansion of cutthroats into brook trout populations in some streams within RMNP (North Fork of the Big Thompson River, North Inlet and North St. Vrain). However, in other areas, (Ouzel, Hidden Valley, George and Cornelius Creeks) brook trout continue to expand into populations of greenbacks despite no legal angler harvest of greenbacks.

## Habitat Requirements

Habitat requirements of greenback cutthroat trout appear little different from other species of trout. Bulkley (1959) gathered information on age, growth, food habits, and movement of a slightly hybridized population in the headwaters (3,200 m) of the Big Thompson River, Rocky Mountain National Park (RMNP). Nelson (1972) provided data on age, growth, and fecundity of a dense, unexploited, and slightly hybridized greenback population in Island Lake, Boulder Creek watershed.

Restoration efforts should be directed to habitats that are capable of supporting a



BLM_0070483

minimum of 20 kg/ha of fish. Habitats occupied by non-native trout will require their removal prior to the introduction of greenbacks to prevent hybridization and competition.

Stable reproducing populations of greenbacks in Colorado are rarely found above timberline since cold water temperatures do not allow for sufficient time for spring spawning, hatching and establishment of fry during the short ice-free period. Currently, the highest known elevation of a long-term reproducing population is the Upper Hutcheson Lake population at 3,402 m. Due to the availability of surplus greenbacks, experimental introductions are being conducted in high elevation fishless waters to document the effect of elevation as a limiting factor on greenbacks. Two timberline lakes that were stocked with non-native cutthroats in RMNP, but became fishless after the termination of the non-native fish stocking, were subsequently stocked with native greenbacks. In one of these lakes (Lake Odessa at 3,048 m), greenbacks spawned from late June to early July and established a reproducing population. Greenbacks stocked in the other lake, Crystal Lake (3,511 m) spawned by mid-July, but survival past the egg stage was not documented through 1995.

The lower elevation limit of greenback survival is not known. However, greenbacks stocked in a low elevation lake (1,889 m) on Fort Carson, Colorado, have survived and attained a size of 2.0 kg. Future experimental stocking should involve lower elevation projects to determine greenback survival in low elevation habitats, and in association with native non-salmonid forage species in low elevation habitats.

## Reproduction

Spawning is generally initiated in the spring when water temperatures reach 5C-8C. Due to the influence of elevation on water temperatures, greenbacks in Lytle Pond on Ft. Carson (1,889 m) spawn by early April, greenbacks in Hunters Creek (2,896 m) spawn in mid-June, and greenbacks in Upper Hutcheson Lake (3,402 m) spawn by mid-July. Although greenbacks are spring spawners, older greenback males in high elevation streams (Hunters Creek and the headwaters of the North Fork of the Big Thompson River within RMNP), were observed to be in spawning colors and running milt in mid-September.

Although Como Creek greenbacks can produce eggs at age 2 in the hatchery, females in small subalpine streams within Colorado appear to mature after their third to fourth summer of life when they reach lengths of approximately 180 mm.

The fecundity of seven females from Island Lake (Type B), averaging 270+mm in length, had a mean value of 299 eggs per fish (Nelson 1972). Como Creek greenbacks (Type A) held at the USFWS Fish Technology Center (FTC) at Bozeman, Montana, produced 1.5 eggs per gram of female weight for 2-year-old greenbacks weighing 254 grams, and 1.4 eggs per gram of female weight for 3-year-olds weighing 357 grams (Dwyer 1981).

In the Big Thompson River (Forest Canyon), RMNP at an elevation of approximately 3,200 m, Bulkley (1959) observed slightly hybridized (Type B) greenback fry emerging on August 26.



BLM_0070484

## Food and Feeding

Jordan (1891) mentioned that *O. c. stomias* fed on invertebrates when held in the Leadville NFH, but were reluctant to accept fish flesh as food. Bulkley (1959) reported that the slightly hybridized greenbacks in Forest Canyon, RMNP (3,200 m), fed upon terrestrial organisms during the summer, primarily adult Hymenoptera and adult Diptera. Fausch and Cummings (1986) found greenbacks in Hidden Valley Creek, RMNP (2,690 m), fed opportunistically on a wide variety of organisms. In Hidden Valley Creek, analysis of greenback stomach contents revealed that terrestrial invertebrates comprised a relatively constant proportion of the diet through September, but the proportion of terrestrial invertebrates in the diet declined rapidly in October as temperatures declined. None of the stomachs contained YOY greenbacks.

The stomach of an 1.19 kg pure (type A) Cascade Creek greenback, illegally taken from Lytle Pond, Fort Carson contained a 114 mm tiger salamander (*Amystoma tigrinum*) in 1982. Variations in the Arkansas darter population that co-exists with the greenbacks in Lytle pond indicate that greenbacks eat these native darters, although this observation has not been confirmed by stomach analysis of the greenbacks.

## Size and Growth

Behnke (1979) stated that, "Historically, it appears that the greenback seldom attained a large size. About 1-2 pounds seems to be typical maximum size given by old timers. In Twin Lakes, Colorado, during the late 1800's, the greenback did not exceed a foot in length, while the yellowfin cutthroat (now extinct) attained a size of 10-12 pounds."

Nonetheless, the size and growth of greenbacks varies, based upon the elevation and population size. In small headwater habitats, the greenback has attained a relatively large size of 356-380 mm as observed in the headwaters of the South Fork, Cache La Poudre River, where it is much larger than most brook trout in similar habitat.

In September 1981, 40 pure (type A) Cascade Creek greenbacks were transferred to the fishless 0.4 ha Lytle Pond at an elevation of 1,889 m to establish a wild broodstock. Although none of these greenbacks exceeded 250 mm in September 1981, one male attained a total length of 510 mm and a weight of 2.00 kg by November 1983. Studies of tagged greenbacks in Lytle pond have shown a 79 mm and 410 g increase for male greenbacks, and a 86 mm and 315 g increase for pre-spawning females from April 1991 to April 1992.

The growth rate of adult greenbacks at higher elevations can be much lower depending on a variety of factors including population density. This is demonstrated by two alpine lakes in RMNP (Sandbeach and Pear) where the non-native trout population had been removed. The lakes were stocked with 161 mm greenbacks at the rate of 22.7 to 26.0 kg/ha on June 30, 1989. After 10 weeks, the fish increased in length by an average of 57 mm (range 47-68 mm). Both populations began to spawn by 1990, with growth averaging only 20 mm for Sandbeach from September 1989 to September 1991, and 16 mm for Pear from September 1989 to July 1991.



BLM_0070485

Tag studies conducted on the Hunters Creek historic population, indicated that growth for six greenbacks (178-252 mm in length), averaged only 6 g from June 1988 to June 1989, with no measurable change in length. Hunters Creek is 2,896 m in elevation, and has a large (118 kg/ha) stable fish population that is used for egg collections and is closed to fishing.

## Disease and Parasites

The first modern fish pathology work on wild greenbacks was conducted prior to the transfer of 64 Como Creek greenbacks to the USFWS, Fish Technology Center in 1977. Fecal material, ovarian fluid and seminal fluid from 78 Como Creek pre-and post-spawning greenbacks failed to show any viral activity when inoculated onto susceptible tissue cultures. One moribund greenback collected from Como Creek on June 22, 1977, had numerous *Gyrodactylus* spp. and *Glossatella* spp. covering the body, with *Hexamita* spp. and *Crepidostomum farionis* within the intestinal tract. Although bacteria were present within the kidney, they were nonobligate to salmonids. Following the transfer of the Como Creek greenbacks to the FTC, 11 greenbacks were lost within six months. Examination of these fish revealed no viral activity, and no clinical bacterial infection was found although *Pseudomonas* spp. and *Aeromonas hydrophilia* were isolated. Additional non-lethal fish disease samples (fecal, seminal fluid, ovarian fluid) collected from Hunters Creek, Upper Hutcheson Lake and South Fork of the Poudre River from 1983 to 1996, found no viral activity and no obligate fish bacterial infections. Fish diagnostics work was performed by the USFWS, Fish Disease Control Center, Fort Morgan, Colorado.

Due to the concern over the recent introduction of whirling disease (*Myxobolus cerebralis*) to Colorado, experiments were conducted on the response of greenbacks to whirling disease at the USFWS, National Fish Heath Research Laboratory, in conjunction with the Colorado Division of Wildlife. The experimental exposure of two to three month old greenbacks to a light exposure of whirling disease (*Myxobolus cerebralis*), indicated that greenbacks produced 7.5 times less *M. cerebralis* spores than rainbow trout after three months, and 15.6 times less spores than rainbows after six months. However, infected greenbacks weighed about 45% less than the infected rainbows, with greenback mortalities 26% to 32%, compared to 3 percent to 4 percent for infected rainbows. These results indicate that although greenbacks showed no overt signs of infections (skeletal deformities and tail chasing), mortalities for infected greenbacks were higher than for infected rainbow trout. Mortalities of unexposed controls were one percent for both species (Markiw 1990).

## Sensitivity to pH

Research conducted by Woodward, Farag, Little, Steadman, and Yancik (1991), indicated that the threshold concentration on greenbacks in the absence of aluminum was pH 5.0. However, adverse effects were observed at pH 6.0 when 50 ug/l of aluminum was present. Greenback alevin and swim-up larva were found to be more sensitive to acidic pH and elevated aluminum than eggs and embryos. However, growth of greenbacks was



BLM_0070486

not reduced at low pH, as was observed in Snake River and Yellowstone cutthroats. Reduced pH is a concern, because most of the historic greenback populations and greenback restoration projects are located in alpine habitats that are susceptible to acid precipitation.

## Heavy Metals

Bard Creek was a fishless montane stream that was known to have elevated levels of heavy metals due to past mining activity. Experimental stocking of greenbacks into the fishless habitat of Bard Creek indicated that greenbacks stocked at over 25 mm in length will survive to maturity and spawn despite elevated concentrations of heavy metals. However, eggs from mature fish deposited by late June did not survive to the fall in Bard Creek. As Woodward found with low pH and elevated aluminum levels, the swim-up and alevin stages may be the most sensitive to elevated levels of heavy metals.

## Management Practices

### Fish Culture

Although the stocking of cultured nonnative salmonids almost resulted in the extinction of the greenback, the greenback was one of the earliest fish to be reared in Federal hatcheries. In 1889, the Leadville National Fish Hatchery was established near Leadville Colorado, and some of its original objectives were to rear greenbacks and yellowfins. Both subspecies were obtained from waters adjacent to the hatchery and moved by wagon to the hatchery to be used as broodstock. Eggs of both subspecies were taken from Twin Lakes. However, the greenback and yellowfin

cutthroat trout did not adapt well to captive rearing, and local citizens were so displeased with the hatchery spawning traps in Twin Lakes that they were "blown out with dynamite" (Tulian 1896). The availability of other species (brook and rainbow trout) more adaptable to hatchery rearing, and the large scale availability of Yellowstone cutthroat (*O. c. bouvieri*) from Yellowstone Lake, led to the abandonment of the greenback by early fish culturists as a source of trout for stocking purposes.

A second attempt to rear greenbacks at the Leadville National Fish Hatchery was attempted in 1957 and 1958 using 50 slightly hybridized greenbacks from the Big Thompson River in Forest Canyon, RMNP, and 26 pure greenbacks from the now extirpated Albion Creek population. This project was abandoned due to fish mortality in the hatchery and asynchronous maturation of the remaining males and females. The project terminated with the stocking of the surviving broodstock into Florence Creek, Uinta and Ouray Indian Reservation, Utah. The greenbacks in Florence Creek were almost totally displaced by brook trout by 1978.

South Platte Drainage Broodstock. As part of the Recovery Plan, another attempt to rear South Platte drainage greenbacks was initiated in 1977, with the transfer of 64 Como Creek greenbacks to the USFWS, Fish Culture Development Center, Bozeman Montana. This broodstock initially encountered the same problems with asynchronous maturation of males and females, the loss of males due to fungus, and the failure to accept feed in a captive situation. In 1978, males produced



BLM_0070487

milt in April and May, but the females matured in July and August. Asynchronous maturation problems were overcome by allowing water temperatures to decline to near 2 C, then allowing the temperature to rise again in the spring. Fungus was controlled with malachite green. The use of variable temperatures and malachite green allowed for successful spawning, with 160,000 fry shipped to Colorado from 1981 to 1988. Milt from wild greenbacks from Como Creek, Hunters Creek, Hidden Valley Creek and the Poudre River was also collected and used to fertilize ova from Bozeman females (Dwyer and Rosenlund, 1988). This action also helped enhance the genetic diversity of the broodstock. An attempt was also made to establish a Poudre River greenback broodstock at the Saratoga NFH in 1984 and 1985. Eggs collected in 1984 did not survive, but 47% of the eggs collected in 1985 survived to swim-up. None of the young accepted feed, and all died. Interestingly, eggs from the Poudre River population required much less time to develop and hatch than did those of the greenbacks from the Arkansas River drainage's Cascade Creek at the Saratoga NFH. At 8 C, eggs from the Poudre River fish required only 16 days to reach the eyed egg stage and 32 days to hatch, compared to 29 days to the eyed stage and 39 days to hatch for eggs from Cascade Creek (J. Hammer, Saratoga NFH, personal communication).

New South Platte and Arkansas greenback broodstocks were initiated at the CDOW Experimental Hatchery at Ft. Collins to replace the aging and unfunded USFWS broodstocks. During 1989, a total of 5,419 eggs were collected from Bear Lake, Como Creek, Hunters Creek and the Poudre River. In 1990, about 200 eggs were collected from Upper Hutcheson Lake. Fish were produced from all areas except the Poudre River, and eggs were collected again from the Poudre River in July 1992. Eggs were collected from the CDOW Experimental Hatchery broodstock in 1991 and 1992, with problems of asynchronous spawning experienced during 1992. Malachite green could not be used to control fungus in 1992, and all the 1989 year class of broodstock did not survive past the spawning season.

Arkansas Drainage Broodstock. The Greenback Recovery Plan also calls for development of an Arkansas River greenback broodstock. To develop this broodstock, greenbacks from Cascade Creek were introduced into McAlpine Pond (privately owned) and Lytle Pond (on Ft. Carson Army Base). In 1984, eggs were collected from the greenbacks spawning in McAlpine Pond and in Lytle Pond and were sent to Saratoga NFH. Fry and catchable-sized greenbacks were produced at Saratoga NFH from 1987 through 1992. Due to FWS funding problems and the predominance of old adults within the Saratoga broodstock, the Arkansas River broodstock program was transferred from Saratoga NFH to the CDOW Experimental Hatchery. To facilitate establishment of the new broodstock at the CDOW Experimental Hatchery, 3,200 eggs from South Apache Creek and 10,000 eggs



BLM_0070488



**Leadville National Fish Hatchery Egg Collection, Circa 1890**

from Saratoga NFH were shipped to the CDOW Experimental Hatchery in 1992. Following the collection of eggs at the Saratoga NFH in 1992, the remaining greenbacks at Saratoga NFH were lost due to water problems at the hatchery.

## Stocking

A wide range of stocking rates and methods have been used to re-introduce greenbacks into historic habitats. Early methods usually involved stocking low numbers (64 to 84) of adult and sub-adult greenbacks into renovated habitats during the fall of the year. Only small numbers of greenbacks were stocked due to the limited number of fish available from

Como Creek. Unfortunately, colonization of the habitat was slow and genetic diversity was impaired due to the limited numbers of fish stocked. These problems also undermined confidence in the ability to establish fishable populations. The captive broodstock programs were initiated to allow more rapid establishment of new populations, to protect the small historic populations from over utilization as broodstock sources, and to allow for genetic management. The captive broodstock program produced enough greenback fry to support stocking within each restoration site for at least three consecutive years. This multi-year stocking facilitated establishment of several year classes within the new restoration sites, and, by using milt from different historic populations to fertilize the hatchery eggs, enhanced the genetic diversity of the reestablished populations.

BLM_0070489

Initially, stocking rates for hatchery fry were 2,500 fry/ha per year in fishless lakes, and 1.666 fry/1.0 km per year in fishless streams, with each area to be stocked for three consecutive years. These rates were believed to be necessary to compensate for the stress and mortality of 12 hours of trucking required to move the fish from Bozeman, Montana to Ft. Collins, Colorado, followed by final stocking by horseback or helicopter. However, the stocking rates for fry in lakes were found to be excessive, and were reduced to 1,000 fry/ha per year. The reduced stocking rate facilitated increased growth rates and the production of catchable size fish within four years.

Stocking of sub-adult (161 mm) greenbacks in June 1989 facilitated more rapid reestablishment of fishable populations, and allowed these areas to be reopened to angling the following year. However, there were logistical problems in transporting the larger fish (over 386 total kg of fish) into inaccessible alpine lakes within the RMNP. To resolve these problems, helicopter fire buckets aerated with oxygen were used to transport the fish. These lakes were stocked at the rate of 18.5 to 36 kg of fish/ha. This same technique was used on the Rock Creek drainage, above the Leadville National Fish Hatchery in 1991. Stocking in the Rock Creek drainage used larger greenbacks (234 mm), and allowed the area to immediately be reopened to catch-and-release angling.

## Angling

As with most subspecies of cutthroat trout, the greenback is easily caught by sport anglers. This feature makes the greenback a good fish for catch-and-release fisheries today,

but severely impacted the abundance and distribution of the subspecies during the 1800's. Wiltzius quoted Bell (1887) "The fish is so easily caught, it is so unwary and confiding, that the fish in a moderate-sized stream can be taken out in one season with a hook and line and a grasshopper. Without the modern hereditary instincts of self-preservation, apparently, it cannot hold its own against the fisherman". As part of the recovery program, studies on the performance of greenbacks in sport fishing management areas have been conducted since 1982. A few of these studies are described below:

<u>South Platte drainage, mixed-trout fisheries.</u>
In September 1973, brook trout and longnose suckers were removed from Hidden Valley Creek, RMNP, using antimycin. This was followed by the stocking of 82 greenbacks from Como Creek in October 1973. The greenbacks established a reproducing population in both ponded (beaver ponds) and non-ponded stream habitats; but by 1976, brook trout were once again collected in Hidden Valley. Brook trout numbers continued to increase in the beaver pond habitats within the creek through 1981 even with the removal of brook trout by fyke nets. By the end of 1981, it was feared that brook trout would soon displace greenbacks in the beaver ponds if a more efficient method of brook trout removal could not be found. As an alternative to the expensive netting program, an experimental angling program (catch-and-release for greenbacks and catch-and-kill for brook trout) was opened on August 1, 1982. Angling was limited to barbless artificial lures only, and a daily possession limit of 18 brook trout of which 10 must be 203 mm or less in length.



BLM_0070490

Prior to the start of the experimental Hidden Valley angling program, fyke nets were set throughout the beaver ponds. Greenbacks were captured at an overall ratio of one greenback to every three to four brook trout captured; however the ratio varied between ponds from 1:1 to 1:50. During the first week of fishing in 1982, anglers fishing in the beaver ponds caught an average rate of 0.86 greenbacks and 0.40 brook trout per hour. In 1983, anglers caught an average of 0.78 greenbacks per hour and 0.25 brook trout per hour during the first week of angling. This demonstrated that although greenbacks were the minority of the fish in the ponds, they represent the majority of the fish caught. Fifteen percent of the greenbacks captured in fyke nets during September 1983 exhibited visible damage attributed to angler's hooks.

It was hoped that anglers would keep all brook trout caught, but interviewed anglers reported releasing 60 percent of all brook trout caught in 1982 and 1983, and 45-100% of all brook trout caught from 1984-1993. Although anglers must release all greenbacks, as many as seven percent of the greenbacks were kept due to mistaken identification of subspecies in 1986.

South Platte drainage, greenback-only fisheries. Several lakes and streams within the Roosevelt National Forest and RMNP are open to catch-and-release angling for greenbacks (see Tables 1-4). Greenback biomass in restoration projects is usually greater under catch-and-release regulations than that found under the previous catch-and-kill regulations. Angler success rates for greenbacks ranged from 0.3 to 6.4 fish per hour in streams within RMNP in the period from 1986-1989, and ranged from 1.7 to 12 fish per hour on National Forest and RMNP waters in the period from 1990 to 1993.

Arkansas River drainage. The first catch-and-release greenback fishery in the Arkansas River drainage opened at the 0.4 ha Lytle Pond on Ft. Carson in 1989. A limit of 25 annual greenback permits are sold at a cost of $20.00 for this pond. Prior to obtaining a greenback permit, all greenback anglers are required to hold a $10.00 Ft. Carson general fishing permit, a Colorado State fishing permit and attend a Ft. Carson safety briefing. Angler success, satisfaction and experience was measured by a self-conducted creel census. In this census anglers ranked themselves as "experienced" anglers, and indicated the following angler success and satisfaction:

BLM_0070491

**Fort Carson Creel Census, 1990-1991**

| Year | Average Fish/Hour | Length | % Anglers Satisfied with: | | |
|------|------|------|------|------|------|
| | | | Number | Length | Overall Program |
| 1990 | 1.52 | 307mm | 72 | 78 | 81 |
| 1991 | 0.47 | 353mm | 52 | 77 | 100 |

As in RMNP, about 16% of the fish examined showed some signs of hooking or hooking damage. Although brook trout were present in Lytle Pond, none were reported caught in the 1990-1991 creel census. This again demonstrates the greater susceptibility to angling exhibited by greenbacks.



BLM_0070492



The purpose of this plan is the reestablishment of pure greenback cutthroat trout to population levels where the subspecies will not likely become extinct throughout all or a significant portion of their historic range.  Overall, an ecosystem management approach will be used, with special considerations for impacts to listed species, other native species, water quality and public use.  For a summary of previous recovery accomplishments and activities, please see Appendix 1.

## Objective

*THE OBJECTIVE OF THE GREENBACK CUTTHROAT TROUT RECOVERY PLAN IS THE REMOVAL OF THIS SUBSPECIES FROM THE LIST OF THREATENED AND ENDANGERED SPECIES.  THIS SUBSPECIES WILL BE CONSIDERED RECOVERED WHEN 20 STABLE GREENBACK CUTTHROAT TROUT POPULATIONS ARE DOCUMENTED REPRESENTING A MINIMUM OF 50 HECTARES OF LAKES AND PONDS AND 50 KILOMETERS OF STREAM HABITAT WITHIN ITS NATIVE RANGE.  A MINIMUM OF FIVE OF THESE POPULATIONS WILL EXIST IN THE ARKANSAS RIVER DRAINAGE.  ONCE RECOVERY OBJECTIVES HAVE BEEN MET, A LONG RANGE MANAGEMENT STRATEGY WILL BE IMPLEMENTED FOR THE CONTINUED RESTORATION OF THE SPECIES.*

For delisting purposes, a stable self-sustaining greenback cutthroat trout population is defined as a population of greenbacks that maintains a minimum of 22 kilograms of greenbacks per hectare of habitat through natural reproduction.  The population should contain a minimum of 500 adults (individuals greater than 120 mm in total length), and represent a minimum of two year classes within a five-year period that are established through natural reproduction.  A minimum of 120 breeding pairs (240 adult fish) was considered necessary to maintain genetic diversity within a population (Leary, pers com), and the team has set a minimum of 500 adults as necessary to insure maximum genetic diversity for each wild greenback population.  Twenty stable reproducing populations, along with the above population criteria, are needed to quantify an adequate population to meet the stated recovery objectives.  This strategy distributed into two separate drainages (the Arkansas and the South Platte), will provide a minimum viable population goal that can be monitored and maintained.

A population of greenbacks cannot be considered stable unless the population is separated by physical or biological barriers from other salmonids.  Although fall-spawning trout species will not hybridize with greenbacks, the presence of brook trout and brown trout is not considered to be conducive to stable greenback populations.  Fall-spawning species will most likely displace greenbacks, or prevent the greenbacks from meeting the requirements for biomass and reproduction.



BLM_0070493

Highly glaciated drainages, with multiple hanging valleys, can contain more than one stable self-sustaining population. However, each stable population should contain at least two hectares of habitat that is separated by barriers to upstream fish migration. Each stable population within a drainage must meet the previously stated requirements for biomass, population size and reproduction.

The locations the team has selected for recovery sites have concentrated on headwater streams and high elevation lakes. These sites provide the most likely sites for successful recovery of this species due 1) to presence of barriers; 2) ease of removing non-native fish; 3) inaccessibility which reduces problems with reintroduction of non-native species; and 4) the fact that existing remnant populations were discovered in headwater habitats. As the recovery progresses, both larger and lower elevation habitats may be renovated.

Previous editions of the Greenback Cutthroat Trout Recovery Plan identified recovery actions that have resulted in significant improvements in the status of the greenback. Twenty stable populations now exist, however only three stable populations occur in the Arkansas River drainage. Two major actions that need to be accomplished before the species can be delisted are:

1.   **The establishment of two additional stable populations in the Arkansas River drainage and**

2.   **The preparation of a long-term management plan and a cooperative management agreement for greenback cutthroat trout to guide management of the greenback after delisting.**



BLM_0070494

## Stepdown Outline

1. Maintain or enhance all known Type A greenback cutthroat trout populations and their habitats.
   - 1.1. Conduct population and habitat monitoring.
   - 1.2. Enhance or restore habitat.
   - 1.3. Maintain stream barriers.
   - 1.4. Prevent introduction of non-native species.
   - 1.5. Promote sound land and water use guidelines.
   - 1.6. Enforce regulations.

2. Establish or document the existence of 20 stable populations of pure (Type A) greenback cutthroat trout within the subspecies' historic range.
   - 2.1. Conduct surveys for historic populations.
   - 2.2. Prepare and maintain a list of candidate habitats.
   - 2.3. Consult with land owners and management agencies.
   - 2.4. Prepare habitats listed in Tables 6 and 7 for reintroduction.
     - 2.41. Conduct habitat manipulation.
     - 2.42. Construct or improve barriers.
     - 2.43. Remove all non-native salmonids.
   - 2.5. Introduce pure (Type A) greenback cutthroat trout.
     - 2.51. Use appropriate stocking rates for fish from wild populations.
     - 2.52. Use appropriate stocking rates for larval hatchery fish.
     - 2.6 Monitor and document the success of each introduction.
     - 2.7. Annually update greenback cutthroat trout population status.

3. Establish hatchery and wild populations of pure (Type A) greenback trout for broodstock.
   - 3.1. Establish a South Platte River wild broodstock.
   - 3.2. Establish an Arkansas River wild broodstock.
   - 3.3. Establish captive broodstocks.
     - 3.31. Collect and utilize milt from wild populations.
     - 3.32. Establish South Platte River and Arkansas River greenback broodstocks at Colorado Division of Wildlife hatcheries.
     - 3.33. Prepare reports on the status of the hatchery program.
     - 3.34. Provide fish culture information necessary for the development of the long-term management plan and cooperative agreement.



4. Document response to angler pressure, stocking rates, fish diseases, fishing regulations, and native non-salmonids.

    4.1   Assess mixed greenback/non-native salmonid recreational fisheries under a variety of harvest regulations.

    4.2.   Implement catch-and-release greenback fisheries programs on public lands.

    4.3.   Complete research on fish diseases, stocking, and angling programs.

    4.4.   Complete research on stocking of greenbacks into waters with native non- salmonids, or, introduce native non-salmonids to greenback projects.

5. Conduct an information and education program.

    5.1.   Encourage information and education programs.

    5.2.   Promote interagency cooperation and understanding of recovery activities whenever possible.

    5.3.   Present current activities at professional and public meetings.

    5.4.   Promote watchable greenbacks programs.

    5.5.   Promote the adoption of the greenback as the Colorado State Fish.

    5.6.   Prepare a greenback display.

6. Promote partnerships with conservation groups and explore alternative management and funding strategies.

    6.1.   Increase the use of non-traditional agency funds and private funds.

    6.2.   Market art work.

    6.3.   Produce a greenback brochure.

7. Prepare a long-term management plan and cooperative management agreement for the greenback cutthroat trout.

    7.1.   Prepare a long-term management plan

    7.2.   Prepare a cooperative agreement



BLM_0070496

# Narrative Outline of Greenback Cutthroat Trout Recovery Plan



## 1. Maintain or enhance all known Type A greenback cutthroat trout populations and their habitats.

*Type A greenback populations are those that are considered to be genetically pure. Other populations (Type B-C) are believed to have varying degrees of hybridization with non-native trout species. All known Type A populations and their habitats will need to be maintained to ensure the continued health and survival of greenback populations. This will involve regular censusing of populations, restoration and enhancement of habitat, and maintenance of stream barriers.*

1.1. <u>Conduct population and habitat monitoring.</u> All streams that contain populations of pure (Type A) greenback trout should be censused at least once every 3 years. Numbers, age and condition of fish, and condition of the habitat should be evaluated. The presence of any non-native species or habitat degradation should be noted and appropriate management action taken.

1.2. <u>Enhance or restore habitat.</u> When necessary and appropriate, restore habitat quality that is below its potential through physical manipulation of the damaged habitat using sound land and water management practices.



BLM_0070497

1.3. <u>Maintain stream barriers</u>. Stream barriers are essential to prevent invasions of undesirable fish into the habitat of greenback cutthroat trout. Natural barriers should be inspected periodically for their effectiveness and stability. Although natural barriers are strongly preferred, artificial barriers may be constructed when necessary and should be inspected regularly for needed repairs.

1.4. <u>Prevent the introduction of non-native species</u>. It is extremely important to prohibit the introduction of non-native fish into greenback cutthroat trout habitat. Such introductions foster competition and hybridization. Increased public education as described in Objective 5 will help to meet this objective.

1.5. <u>Promote sound land and water use guidelines</u>. Promote and support mining, grazing, logging, and agricultural and silvicultural techniques that do not adversely affect the greenback cutthroat trout habitat. The establishment and maintenance of buffer strips along streams should be encouraged to help protect habitat from human and livestock impacts. The land use practices listed below should be reviewed to ensure that they are not negatively affecting greenback populations:

   a. Grazing practices.
   b. Maintaining riparian vegetation.
   c. Silvicultural practices.
   d. Mining activities.
   e. Instream flow maintenance.
   f. Water diversion and reservoir operations.
   g. Road construction.

1.6. <u>Enforce regulations</u>. Following the development of special angling regulations (see Task 4.0) or habitat closures, strict enforcement by the Colorado Division of Wildlife, Forest Service, Bureau of Land Management, Rocky Mountain National Park, Fish and Wildlife Service, U.S. Army, Ft. Carson and U.S. Air Force, Air Force Academy is necessary to ensure that the populations are protected from overharvest.



BLM_0070498



## 2. Establish or document the existence of 20 stable populations of pure (Type A) greenback cutthroat trout within the subspecies' historic range.

*In order to meet the recovery goal for delisting the subspecies, the existence of 20 stable populations of pure (Type A) greenback populations, representing a minimum of 50 hectares of lakes and ponds and 50 kilometers of stream habitat which has a minimum biomass of 22 km/ha, will need to be established or documented within the subspecies historic range. A minimum of five populations will be in the Arkansas River drainage.*

*This Task has largely been completed, with 20 stable populations documented, representing 53.9 hectares of lake habitat and 50.7 kilometers of stream habitat, Table 4. However, only three stable populations currently exist within the Arkansas River drainage.*

*Thus, the major task that needs to be accomplished under this revision of the Greenback Cutthroat Trout Recovery Plan is the documentation of at least five stable reproducing populations within the Arkansas River drainage (see Tables 3 and 4).*

2.1. <u>Conduct surveys for historic populations.</u> Continue to search systematically for historic populations of greenback cutthroat trout that may still exist within its historic range. Verify such populations by field collections and analysis by qualified taxonomists.

2.2. <u>Prepare and maintain a list of candidate habitats.</u> Prepare and maintain a list of candidate aquatic habitats that delineates areas that could, with or without



25

BLM_0070499

modification, support populations of pure (Type A) South Platte and Arkansas River greenback cutthroat trout. A list of candidate habitats has been developed (see Tables 6 and 7). These tables will need to be updated as new habitat areas are identified. The selection of candidate aquatic habitats is based upon the following criteria:

1. Presence of barriers.
2. Ease of removing non-native fish.
3. Water temperature of 5-8C by early July.
4. Adequate water flows.
5. Ability to sustain more than 500 adult fish and 22 kg/ha of biomass.
6. Ability to sustain reproduction.

2.3. <u>Consult with landowners or agencies responsible for land management of candidate habitats</u>. Determine if the establishment of a greenback cutthroat trout population in a candidate area would be compatible with landowner or agency management goals.

2.4. <u>Prepare habitats listed in Tables 6 and 7 for reintroduction</u>. Carry out remedial actions necessary and appropriate to make candidate waters listed in Tables 6 and 7 suitable for the introduction of pure (Type A) greenback cutthroat trout. Aquatic habitats that have been selected for the introduction of greenbacks may be lacking in some phase of preferred or essential habitat requirements. Special emphasis should be given to Arkansas River projects (Table 7), since only three stable reproducing populations currently exist in this drainage.

2.41. <u>Conduct habitat manipulation</u>. If necessary and appropriate, enhance candidate habitat to restore pool/riffle ratios, riparian vegetation, spawning habitat, water quality and protection from excessive disturbance.

2.42. <u>Construct or improve barrier(s)</u>. Although natural fish migration barriers are preferred, some areas may require the construction of artificial barriers or improvement of existing barriers.

2.43. <u>Remove all non-native salmonids</u>. Use piscicides to remove all non-native salmonids from the candidate habitats. Review the success of this removal and repeat the application of piscicides, if necessary. Special emphasis should be given to completing removal of non-native salmonids in candidate habitats within the Arkansas River drainage. Allow treated habitats to remain fishless for a minimum of 6 months prior to proceeding with the reintroduction of greenbacks and other native fish (Task 2.5).



BLM_0070500

2.5.   <u>Introduce pure (Type A) greenback cutthroat trout.</u>  Introduce pure (Type A) greenback cutthroat trout into the candidate waters using the greenbacks most representative of the drainage being stocked.  Greenback cutthroat trout populations introduced within the South Platte drainage (Table 6) should be established with trout from Como Creek, South Fork of the Cache La Poudre River, Hunters Creek, Upper Hutcheson Lake, their descendants, or from yet to be determined Type A South Platte populations.

Greenback cutthroat trout populations established within the Arkansas drainage (Table 7) should be established with trout from Cascade Creek, South Fork Apache Creek, their descendants, or from yet to be determined Type A Arkansas River populations.

2.51.   <u>Use appropriate stocking rates for fish from wild populations.</u>  Stocking rates for greenbacks from wild populations should be 240-500 sub-adults or adults per site, with 500 being the most desirable number.  Removal of any greenbacks from pure (type A) populations will require approval from the Service and from responsible management agencies.

2.52.   <u>Use appropriate stocking rates for larval hatchery fish.</u>  Annual stocking rates for hatchery fry should be 1,000, 25mm fish per hectare of lake and 1,000, 25mm fish per 1.6 km of stream.  Areas should be stocked for three consecutive years following the removal of non-native fish to maximize heterozygosity and the establishment of multi-year class populations capable of supporting recreational fisheries.

2.6.   <u>Monitor and document the success of each introduction of greenbacks into candidate waters.</u>  Greenback trout reintroduction projects should be examined annually for the first 3 years following stocking and then once every two to three years until the candidate water meets its management goal and meets the criteria defining stability.  Monitoring and reporting of each project's success will be the responsibility of the lead agency on the project.

2.7.   <u>Annually update greenback cutthroat trout population status.</u>  Prepare annual updates of the list of historic populations (Table 1), the restoration projects (Tables 2 and 3), the summary of total greenback populations (Table 4), list of hybrid populations (Table 5), the candidate list of restoration projects (Tables 6 and 7), and the list of research stocking projects, (Tables 8 and 9).



## 3. Establish hatchery and wild populations of pure (Type A) greenback cutthroat trout for broodstock.

*Efforts will be pursued to establish greenback trout populations in captivity and to identify wild greenback populations that can be used as broodstock to support the establishment of additional greenback populations within the subspecies' historic range.*

3.1.   <u>Establish a South Platte River wild broodstock</u>.  Establish/maintain at least one lake/stream environment within the South Platte River drainage to function as a wild broodstock source.  These broodstocks can also constitute one or more of the 20 stable populations under Task 2.0.  This Task has been completed; wild greenback populations in Como Creek, Hunters Creek, Bear Lake and Upper Hutcheson Lake are identified as suitable egg sources.  Zimmerman Lake was renovated in 1995, and will serve as a wild broodstock lake.

3.2.   <u>Establish an Arkansas River wild broodstock</u>.  Establish one lake/stream environment within the Arkansas River drainage to function as a practical wild broodstock source.  This broodstock may constitute one or more of the 20 stable populations under Task 2.0.  This task has been completed.  Eggs have been collected from Lytle Pond on Ft. Carson, from South Apache Creek and Boehmer Reservoir.

3.3.   <u>Establish captive broodstocks</u>.  Demonstrate the successful use of a hatchery propagation program at the USFWS, Bozeman Fish Technology Center, (FTC) Bozeman, Montana, using pure (type A) greenback cutthroat trout.  Movement of greenback fry and milt between Bozeman FTC and restoration sites in Colorado will be done in accordance with current State and Federal fish disease policies and good fisheries management practices.  Use greenback fry from this source to reintroduce greenbacks into candidate habitats as outlined in Task 2.4.



BLM_0070502

In addition to the Bozeman program, another successful hatchery program ᵥ
demonstrated at the Saratoga NFH in Wyoming. Both of these greenback ha
programs ended in 1992. A hatchery program at the CDOW Experimental H
was initiated in 1989.

3.31. <u>Collect and utilize milt from wild populations</u>. Collect and utilize milt
wild populations of pure (Type A) greenbacks for fertilization of hatch
to minimize genetic drift within the hatchery. This task has been comp
milt from Hidden Valley Creek, Como Creek, Poudre River and Hunters
have been used since 1982.

3.32. <u>Establish South Platte River and Arkansas River greenback broodstocks a</u>
<u>Colorado Division of Wildlife hatcheries</u>. These broodstocks will be base
mixture of historic populations within their respective drainages.

Eggs from historic populations of South Platte greenbacks were shipped tc
CDOW experimental hatchery in 1989, 1990 and 1992. Eggs from the Sar
NFH and South Apache Creek were shipped to the CDOW Experimental
Hatchery in 1992. Greenback eggs and fry have been produced at the
Experimental Hatchery, but fungus infections have eliminated a substantial
number of the mature broodstock, now that malachite green cannot be use
the control of fungus on hatchery fish. Recently, raceways have been cover
to provide shade, with the shading of raceways appearing to greatly reduce
fungus problems.

3.33. <u>Prepare reports on the status of the hatchery program</u>. Annual reports have
been prepared by each hatchery operating a greenback broodstock.

3.34. <u>Provide information necessary for development of a long-term management pl</u>
<u>and cooperative agreement</u>. The Bozeman FTC and the CDOW Experimental
Hatchery should prepare a report which addresses management topics
pertinent to the long-term management plan discussed in Task 7.0, and provide
additional information detailing hatchery aspects of managing greenbacks.



**4. Document response to angler pressure, stocking rates, fish diseases, fishing regulations, and native non-salmonids.**

*Prior to delisting, at least one population of pure greenback cutthroat trout will be open to angling, using special regulations, over a period of years to adequately document the subspecies' response to angling pressure and other factors. Angling for greenbacks is authorized under 50 CFR 17.44 (f).*

4.1.  <u>Assess a mixed greenback/non-native salmonid recreational fisheries under a variety of harvest regulations</u>.  This task is completed.  A mixed brook trout-greenback cutthroat trout fishery exists within the beaver pond habitat of Hidden Valley Creek, RMNP.  This area was opened to artificial lure catch-and-kill angling for brook trout and catch-and-release angling for greenbacks to determine if such special regulations give a competitive edge to greenbacks.  This angling program did not result in a significant long-term improvement in the Hidden Valley greenback population, although it may have slowed the decline of the greenback population.

4.2.  <u>Implement catch-and-release greenback fisheries programs on public lands</u>.  This task is completed.  Areas opened to catch-and-release fishing are listed in Tables 1-4.  Monitoring is needed in these areas to determine angler success rates and population status.  The purpose of this task is to allow sport fishing for greenbacks, and therefore engender public support for further reintroductions of greenbacks, without impacting the stability of greenback populations.



BLM_0070504

4.3. <u>Complete research in fish diseases, stocking, and angling resolutions</u>. Research on fish diseases, stocking, and angling programs will be conducted using surplus captive reared greenbacks to explore their response to a wide range of habitat types, estimated fish diseases, angler pressures, and appropriate angling regulations. Research stocking sites are listed in Tables 8 and 9.

4.4. <u>Complete research stocking of greenbacks into waters with native non-salmonids, , or, introduce native non-salmonids to greenback projects</u>. The purpose of this research is to evaluate the opportunity for greenbacks and other native non-salmonids to coexist, and to provide information on survivability of greenbacks in lower elevation waters. One project has been completed at Lytle Pond, U.S. Army, Ft. Carson, Colorado. In this project, Arkansas darters were released in 1980, into an area occupied by greenbacks. Both species have coexisted since 1980. Other proposed projects include evaluation of greenback survival with white suckers and creek chubs in Monument Creek and Crow Creek. However, due to the proximity of these streams to urban areas and the increased potential for harm to any introduced greenbacks from increased human intrusion, these projects may have to be completed after delisting to prevent conflicts due to the current listed status of the subspecies.



BLM_0070505

## 5. Conduct an information and education program.

*An information and education program is needed to promote public support. This program should explain the goal, objectives, recovery activities, and public fishing programs for the greenback cutthroat trout.*



5.1.    Encourage I&E programs. Make newsworthy activities available to media outlets, particularly when these activities mark the completion of objectives of the Recovery Plan. These activities include the opening of lakes and streams to sport fishing, local hatchery greenback activities, and watchable fish programs. Public understanding and support of propagation, reintroduction, and angling management needs, as discussed in Tasks 2, 3 and 4 of this Plan, will promote efforts to recover the greenback cutthroat trout.

5.2.    Promote interagency cooperation and understanding of recovery activities. Whenever possible, efforts should be made to promote interagency cooperation and understanding of activities needed for recovery of the greenback cutthroat trout. This should include sponsoring interagency coordination meetings, preparing agency reports and publications, and providing cooperative funding of recovery efforts.

5.3.    Present current recovery activities at professional and public meetings. This should include papers presented at American Fisheries Society and Wildlife Society meetings, and to interested public groups, such as Trout Unlimited, The Nature Conservancy and the National Wildlife Federation.

5.4.    Promote watchable greenback programs. Programs to provide viewing opportunities for the public to view greenback trout and their habitats should be promoted throughout watchable greenback programs. This should include viewing areas during the spawning season, and programs such as the boardwalk at the Hidden Valley beaver ponds, RMNP.



BLM_0070506

5.5. <u>Promote the adoption of the greenback as the Colorado State Fish</u>. Colorado Trout Unlimited supports this proposal, and has taken a lead role in contacting representatives to sponsor a bill. This task was completed in 1994.

5.6. <u>Prepare a greenback display.</u> Develop a greenback display for use in public relations and education programs describing the history, biology, and ecology of greenback cutthroat trout and of sympatric native species. This task was completed in 1993.



BLM_0070507

## 6. Promote partnerships with conservation groups and explore alternative management and funding strategies.



6.1.   <u>Increase the use of non-traditional agency funds and private funds.</u>  Explore opportunities to increase funds available for completion of greenback recovery programs, by using non-traditional or private sources, such as inter-agency funding, challenge grants, and Fish American funding of restoration work.

6.2.   <u>Market art work.</u>  Produce art work based upon greenbacks that promote public awareness and support for the recovery of the subspecies.  Market art work such as a limited edition greenback print, postcards and shirts to produce funds for greenback restoration activities. This task has been completed.

6.3   <u>Produce a greenback brochure.</u>  Produce a greenback brochure with funding from Colorado Trout Unlimited.  This task has been completed.



BLM_0070508

## 7. Prepare a long-term management plan and cooperative management agreement for the greenback cutthroat trout.



*Prior to delisting the greenback cutthroat trout, a long-term management plan and cooperative agreement for the management of greenback cutthroat trout will need to be prepared. This plan should be approved and utilized by all participating agencies (Colorado Division of Wildlife, U.S. Bureau of Land Management, U.S. Forest Service, U.S. Fish and Wildlife Service, and National Park Service) having proprietorship over the populations of type A and B greenbacks.*

*The 1992 Amendments to the Endangered Species Act require delisted species to be monitored for a period of five years following their delisting. A monitoring program describing how the greenback will be monitored after delisting will be included in the long-term management plan.*

7.1.  Prepare a long term management plan.  A management plan should be prepared that will incorporate all the information obtained through completion of the recovery plan tasks.  All agencies will need to maintain records on their recovery activities and provide pertinent information in development of the management plan.  The purpose of this management plan is to ensure that adequate regulatory mechanisms and management programs remain in existence after delisting to ensure that adequate populations of greenback cutthroat trout are maintained.  The plan will need to provide pertinent biological and management information on the greenback for use in maintaining greenback populations.  It must identify how populations will be monitored to document the status and condition of populations and habitats, and should identify conditions that would warrant relisting the greenback.  The plan



BLM_0070509

should also address interagency cooperation and agency responsibilities and cooperative agreements established under Task 7.2. The plan should be developed before the delisting of the greenback is proposed. The plan should be reviewed and approved by all parties with jurisdiction over greenback trout populations before the greenback is delisted. The plan should be written based on the following outline:

I. Life History and Ecology
- a. Habitat requirements
- b. Reproduction
- c. Food preference
- d. Community ecology
- e. Fish diseases

II. Present Status of Greenbacks
- a. Brief history of recovery
- b. List of current Type A and B populations
- c. Criteria for stable populations

III. Management Goals and Objectives
- a. Conservation Management
  - 1. Future population goal and objectives
  - 2. Population monitoring
  - 3. Isolated population concern/action
  - 4. Genetic monitoring of wild population
  - 5. Habitat
  - 6. Future populations (Metapopulations)
  - 7. Impacts
- b. Recreation/Public Use
  - 1. Quality fisheries
  - 2. Limited harvest fisheries
  - 3. Protected areas
  - 4. Watchable fisheries programs
  - 5. Aquatic education programs

IV. Maintenance
- a. Habitat management guidelines
  - 1. Resource management activities
  - 2. Habitat improvement structures



BLM_0070510

b. Species Management
   1. Broodstock maintenance
   2. Stocking
   3. Angling regulations
   4. Methods for removing non-natives
      a) with greenbacks present
      b) for new sites

V. Implementations Strategies
   List of activities, dates, and responsibilities


7.2.   <u>Prepare a cooperative agreement</u>.  Cooperative management agreements should be
       prepared to define the role of the management agencies in maintaining populations
       of pure greenback cutthroat trout established or documented under Task 2.0 of this
       Plan.  This agreement will need to be approved and signed by all involved management
       agencies with greenback populations on areas under their jurisdiction.  Review of this
       cooperative agreement and an evaluation of the status of the subspecies can be
       reviewed at interagency coordination meetings.



BLM_0070511



The Implementation Schedule that follows outlines actions and costs for the recovery program. It is a guide for meeting the objective and tasks outlined in Part II of the plan. This schedule indicates the general category for implementation, recovery plan tasks, corresponding outline numbers, task priorities, duration of tasks ("ongoing") denotes a task that, once begun should continue on an annual basis, the responsible agencies, and estimated costs. These actions, when accomplished should bring about the recovery of the greenback cutthroat trout and protect its habitat. Tasks will only be completed and funds expended contingent upon appropriations, priorities, and other budgetary constraints that apply to each agency or organization.

Priority 1 - All actions that are absolutely essential to prevent the extinction of the subspecies.

Priority 2 - All actions necessary to maintain the subspecies' current population status.

Priority 3 - All other actions necessary to provide for full recovery of the subspecies.

Agency Abbreviations Used in Implementation Schedule and Tables:

| | |
|---|---|
| ARNF | - Arapaho Roosevelt National Forests |
| CCBLM | - Canon City District of BLM |
| CDOW | - Colorado Division of Wildlife |
| CTU | - Colorado Trout Unlimited |
| DOD | - Department of Defense (Fort Carson) |
| FS | - U.S. Forest Service |
| BLM | - Bureau of Land Management |
| FWS | - U.S. Fish and Wildlife Service |
| P&SINF | - Pike & San Isabel National Forests |
| Priv | - Private property |
| RMNA | - Rocky Mountain Nature Association |
| RMNP | - Rocky Mountain National Park |

Fish Abbreviations Used in Tables:

| | |
|---|---|
| BKT | - Brook Trout |
| GBC | - Greenback Cutthroat Trout |
| RBT | - Rainbow Trout |
| BNT | - Brown Trout |

## Other Definitions:

On-going, task or action which will need to be conducted on a regular basis throughout the Recovery program.



BLM_0070512

PART III - IMPLEMENTATION SCHEDULE FOR RECOVERY OF THE GREENBACK CUTTHROAT TROUT FROM 1995 TO 2000

| Task Number | Priority | Task Description | Task Duration | Cost Estimates (X $1,000) | | | | | | | | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | FWS | FS | BLM | RMNP | CDOW | DOD | RMNA | CTU | |
| 1.1 | 1 | Conduct population and habitat monitoring | Ongoing | 20.0 | 10.0 | 5.0 | 40.0 | 30.0 | | | | |
| 1.2 | 1 | Enhance or restore habitat | Ongoing | | | | | | | | | Costs will be determined as needs are identified. |
| 1.3 | 1 | Maintain stream barriers | Ongoing | | | | | | | | | Costs will be determined as needs are identified. |
| 1.4 | 1 | Prevent introduction of non-native species | Ongoing | | | | | | | | | Will be conducted as part of ongoing agency programs. |
| 1.5 | 1 | Promote sound land and water use. | Ongoing | 5.0 | 12.0 | 5.0 | 5.0 | 5.0 | | | | Will be conducted as part of ongoing agency programs. |
| 1.6 | 1 | Enforce regulations | Ongoing | 5.0 | | | 5.0 | 5.0 | | | | Will be conducted as part of ongoing agency programs. |
| TASK 1 - Maintain/enhance known populations | | | SUBTOTAL | 30.0 | 22.0 | 10.0 | 50.0 | 40.0 | 0.0 | 0.0 | 0.0 | 152.0 |
| 2.1 | 3 | Survey for historic populations | Ongoing | | 5.0 | 2.0 | 10.0 | 8.0 | | | | |
| 2.2 | 3 | Maintain list of candidate habitats | Ongoing | 5.0 | 5.0 | 1.0 | 5.0 | 5.0 | | | | Agencies will need to maintain and update the list as necessary. |
| 2.3 | 3 | Consult with landowners and agencies | Ongoing | 5.0 | 10.0 | | | 5.0 | | | | |
| 2.41 | 3 | Manipulate habitat of reintroduction areas | Ongoing | | 5.0 | 5.0 | | 5.0 | | | | Some costs cannot be determined until needed projects are identified. |
| 2.42 | 3 | Improve barriers in reintroduction areas | Ongoing | | | | | | | | | Costs cannot be determined until projects are identified. |
| 2.43 | 3 | Remove non-native salmonids in reintroduction areas. | Ongoing | 5.0 | | | 50.0 | 15.0 | | | | |
| 2.51 | 3 | Use stocking rates for wild populations | Ongoing | | | | | | | | | Will be conducted as part of ongoing agency programs. |
| 2.52 | 3 | Use stocking rates for larval hatchery fish | Ongoing | | | | | | | | | Will be conducted as part of ongoing agency programs. |
| 2.6 | 3 | Monitor success of greenback reintroductions | Ongoing | 5.0 | 5.0 | 2.0 | 25.0 | 15.0 | | | | |

BLM_0070513

| Task Number | Priority | Task Description | Task Duration | Cost Estimates (X $1,000) | | | | | | | | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | FWS | FS | BLM | RMNP | CDOW | DOD | RMNA | CTU | |
| 2.7 | 3 | Annually update greenback population status | Ongoing | 10.0 | 10.0 | 3.0 | 5.0 | 5.0 | | | | |
| TASK 2 - Establish/document 20 stable populations | | | SUBTOTAL | 30.0 | 40.0 | 13.0 | 95.0 | 58.0 | 0.0 | 0.0 | 0.0 | 236.0 |
| 3.1 | 3 | Establish South Platte River wild broodstock | complete | | | | | | | | | Involved agencies will need to conduct regular monitoring of the wild broodstock populations. |
| 3.2 | 3 | Establish Arkansas River broodstock | complete | | | | | | | | | Involved agencies will need to conduct regular monitoring of the wild broodstock populations. |
| 3.31 | 3 | Collect milt from wild populations | Ongoing | | 5.0 | | 5.0 | 20.0 | | | | |
| 3.32 | 3 | Establish broodstocks at CDOW hatcheries | Ongoing | | 60.0 | | 15.0 | | | | | Work will be accomplished by CDOW with funding from other involved agencies. |
| 3.33 | 3 | Prepare reports on status of hatchery program | Ongoing | | | | 5.0 | | | | | Will be conducted as part of hatchery programs. |
| 3.34 | 3 | Provide information for long-term management plan and cooperative agreement | 1 year | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | | | | To be completed prior to species delisting. |
| TASK 3 - Establish populations for broodstocks | | | SUBTOTAL | 1.0 | 66.0 | 1.0 | 26.0 | 21.0 | 0.0 | 0.0 | 0.0 | 115.0 |
| 4.1 | 3 | Assess mixed recreation fisheries | complete | | | | | | | | | |
| 4.2 | 3 | Implement catch-and-release programs on public lands | complete | | | | | | | | | |
| 4.3 | 3 | Complete research stocking, angling regulations, etc. | Ongoing | 10.0 | | | 10.0 | 5.0 | | | | |
| 4.4 | 3 | Complete research stocking of greenbacks into waters with native non-salmonids | Ongoing | 5.0 | | | | | 5.0 | | | Additional costs will be incurred in later years as restoration projects are identified. |
| TASK 4 - Document response to angler pressure, etc. | | | SUBTOTAL | 15.0 | 0.0 | 0.0 | 10.0 | 5.0 | 5.0 | 0.0 | 0.0 | 35.0 |
| 5.1 | 3 | Encourage I&E programs | Ongoing | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | | | |
| 5.2 | 3 | Promote interagency cooperation | Ongoing | | | | | | | | | Will be conducted as part of ongoing agency programs. |
| 5.3 | 3 | Present recovery information at meetings | Ongoing | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | | | Will be conducted as part of ongoing agency programs. |

40

BLM_0070514

| Task Number | Priority | Task Description | Task Duration | Cost Estimates (X $1,000) | | | | | | | | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | FWS | FS | BLM | RMNP | CDOW | DOD | RMNA | CTU | |
| 5.4 | 3 | Promote watchable greenback programs | Ongoing | | | | | | | | | Will be conducted as part of ongoing agency programs. |
| 5.5 | 3 | Promote adoption of greenback as Colorado State fish. | Complete | | | | | | | | | Accomplished with sponsorship by CTU. |
| 5.6 | 3 | Prepare a traveling greenback display | Complete | | | | | | | | | Funding provided by FS & BLM. |
| TASK 5 - Conduct an information/education program | | | SUBTOTAL | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 0.0 | 0.0 | 60.0 |
| 6.1 | 3 | Increase use of non traditional agency and public funds | Ongoing | | | | | | | | | Part of agency programs |
| 6.2 | 3 | Market art work | Ongoing | | 2.0 | | | | | 1.0 | 1.0 | |
| 6.3 | 3 | Produce a greenback brochure | complete | | | | | | | | | Accomplished with assistance from CDOW, BLM, FS, & FWS. |
| TASK 6 - Promote partnerships and alternative funding | | | SUBTOTAL | 0.0 | 2.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.0 | 1.0 | 4.0 |
| 7.1 | 3 | Prepare a long term management plan | 2 years | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | | 3.0 | To be completed prior to delisting. |
| 7.2 | 3 | Prepare a cooperative agreement | 1 year | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | | 1.0 | To be completed prior to delisting. Costs will be part of ongoing agency programs. |
| TASK 7 - Prepare a long-term management plan | | | SUBTOTAL | 4.0 | 6.0 | 4.0 | 4.0 | 4.0 | 4.0 | 1.0 | 5.0 | 32.0 |
| TOTAL | | | | 90.0 | 146.0 | 38.0 | 195.0 | 138.0 | 19.0 | 2.0 | 6.0 | 634.0 |

41

# LITERATURE CITED

Behnke, R. J. 1973. The greenback cutthroat trout Salmo clarki stomias. Status report. U.S. Fish and Wildlife Service, Albuquerque, New Mexico.

Behnke, R. J. and M. Zarn. 1976. Biology and management of threatened and endangered western trout. USDA Forest Service, Rocky Mountain Forest and Range Experimental Station, General Technical Report RM-28.

Behnke, R. J. 1979. Monograph of the native trouts of the genus Salmo of western North America. U.S. Fish and Wildlife Service, Denver, Colorado.

Behnke, R.J. 1984. Greenback cutthroat trout, *Salmo clarki stomias*. Trout.

Binns, N. A. 1977. Present status of indigenous populations of cutthroat trout, Salmo clarki in southwest Wyoming. Wyoming Game and Fish Department, Cheyenne, Fish Technical Bulletin 5.

Bulkley, R. V. 1959. Report on 1958 fishery studies in Rocky Mountain National Park. Bureau of Sport Fisheries and Wildlife, Logan, Utah.

Cope, E. D. 1872. Report on the reptiles and fishes obtained by the naturalists of the expedition. U.S. Geological Survey Wyoming: 432-442.

Dwyer, W. P. 1981. Greenback cutthroat trout broodstock annual report for 1981. USFWS, Fish Cultural Development Center, Bozeman, Montana.

Dwyer, W.P., and B.D. Rosenlund. 1988. Role of fish culture in the reestablishment of greenback cutthroat trout. American Fisheries Society Symposium 4:75-80

Fausch, K.D., and T.R. Cummings. 1986. Effects of brook trout competition on threatened greenback cutthroat trout.

Gold, J. T. 1977. Proposal for the morphological analysis of S. c. stomias and S. c. pleuriticus populations. Texas A&M University, College Station.

Greene, W. S. 1937. Colorado trout. Colorado Museum of Natural History Popular Series No. 2.

Johnson, J. E. 1976. Status of endangered and threatened fish species in Colorado. USDI, BLM Technical Note 280.

Jordan, D. S. 1891. Report on explorations in Colorado and Utah during the summer of 1889 with an account of the fishes found in each of the river basins examined. Bulletin U.S. Fish Commission, 9:1-40.

Juday, C. 1906. A study of Twin Lakes, Colorado, with special consideration of the foods of the trouts. Bulletin U.S. Bureau of Fisheries, 26:147-178.



BLM_0070516

Markiw, M.E.  1990.  Unpublished letter to Colorado Division of Wildlife.
USFWS, National Fish Health Research Laboratory, Kearnesyville, WV.

Nelson, W. S.  1972.  An unexploited population of greenback trout.  Colorado
Division of Wildlife, Fort Collins, CO.

Proebstel, D.  1993.  Genetic variability of greenback cutthroat trout
(Oncorhynchus clarki stomias): as determined by analysis of meristic characters and restriction
fragment length polymorphisms of mitochondrial DNA.  Unpublished report.  Department of
Fishery and Wildlife Biology, Colorado State University, Fort Collins.  10 pp.

Rosenlund, B.D. and D.R. Stevens.  Use of antimycin for the restoration of
greenback and Colorado River cutthroat trout within the Leadville National Fish Hatchery and
Rocky Mountain National Park.  In press.

Stuber, R.J., B.D. Rosenlund, and J.R. Bennett.  1988. Greenback cutthroat
trout recovery program: management overview. American Fisheries Society Symposium 4:70-74.

Tulian, E.A. 1896.  Annual report of the operations at the Leadville station
for the year ending 30 June 1896.  Leadville National Fish Hatchery, Leadville, CO.

Wang, L. 1989.  Behavior and microhabitat competition of brown trout and greenback cutthroat
trout in an artificial stream.  Masters thesis, Montana State University, Bozeman.

Wernsman, G.  1973.  Systematics of native Colorado trout.  Master's thesis.
Colorado State University, Fort Collins.

Wiltzius, W. J.  1985.  Fish culture and stocking in Colorado, 1872-1978.
Colorado Division of Wildlife, Fort Collins, CO.

Woodward, D.F., A.M. Farag, E.E. Little, B. Steadman and R. Yancik.  1991.
Sensitivity of greenback cutthroat trout to acid pH and elevated aluminum.  Transactions of the
American Fisheries Society 120:34-42

# PUBLIC REVIEW

This recovery plan was made available to the public for comments as required by the 1988
amendments to the Endangered Species Act of 1973.  The public comment period was
announced in the Federal Register 29 April 1993, and closed 28 June 1993.  Press releases were
sent to the print media.

During the public comment period, five letters were received.  The comments provided in these
letters have been considered, and incorporated as appropriate.  Comments that address recovery
tasks that are the responsibility of an agency other than the U.S. Fish and Wildlife Service have
been sent to that agency as required by the 1988 amendments to the Act.  The recovery plan was
prepared in 1993, updated to reflect current population status through 1997, signed and printed
in 1998.

BLM_0070517





BLM_0070518

Table 1.  Summary of Known Historic Greenback Cutthroat Trout Sites and Stability of Population, 1970-1997.

| LOCATION | HABITAT | | CRITERIA | | | | | | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|
| | km | ha | Survey | Kg/Ha | > 500 fish | GBC Repro-duction | Other species present | Stable as of Last Survey | |
| South Platte Drainage | | | | | | | | | |
| Como Creek, ARNF | 2.9 | | 1991 | 46.0 | Y | Y | N | Y | |
| Hunters Creek, RMNP | 2.0 | | 1996 | 118.0 | Y | Y | N | Y | |
| Up. Hutch. Lake, RMNP | 0.5 | 3.0 | 1997 | 50.0 | Y | Y | N | Y | Open to C&R angling |
| Mid. Hutch. Lake, RMNP | 0.2 | 1.7 | 1990 | 50.0 | Y | Y | N | Y | Open to C&R angling |
| SUBTOTAL South Platte Drainage -stable | 5.6 | 4.7 | | | | | | | |
| S.F. Poudre R., ARNF, RMNP | 1.7 | | 1991 | 17.8 | N | Y | N | N | Population is improving |
| Upper Hague Creek, RMNP | 2.0 | | 1990 | Unk | N | Y | N | N | Very few fish |
| Tarryall Creek, near Boreal Pass, private | 2.0 | | 1991 | Unk | N | Unk | BKT | N | Below private mining claims. |
| SUBTOTAL South Platte Drainage | 11.3 | 4.7 | | | | | | | |
| Arkansas River Drainage | | | | | | | | | |
| Cascade Creek, P&SINF | 2.8 | | 1995 | 38.3 | Y | Y | N | Y | |
| S. Apache Creek, P&SINF, Priv, CCBLM | 12.2 | | 1995 | 127.1 | Y | Y | N | Y | 3900 GBC estimate |
| SUBTOTAL Arkansas Drainage | 15.0 | 0 | | | | | | | |
| TOTAL | 26.3 | 4.7 | | | | | | | |

45

BLM_0070519

Table 2. Summary of South Platte Greenback Cutthroat Trout Restoration Projects, 1970-1997.

| LOCATION | | HABITAT | | STOCKED | CRITERIA | | | | | | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | km | ha | | Survey date | Kg/Ha | >500 fish | GBC Reprod-tion | Other species present | Stable as of last survey | |
| **Stable Habitats** | | | | | | | | | | | |
| N.F. Thompson Creek, RMNP | NF Thompson Ck, above 3274 m | 1.7 | 1.0 | 1970 | | 62.0 | Y | Y | N | Y | Opened to C&R angling, 1990. GBC to 400mm |
| | Lake Louise | | 2.6 | 1989 | 1993 | 55.0 | Y | N | N | | . |
| Bear Lake, RMNP | | 0.1 | 4.5 | 1975-1987 | 1991 | 50.0 | Y | Y | N | Y | No angling due to heavy use of lake trail. |
| Williams Gulch, ARNF | | 2.0 | | 1981-1982 | 1993 | 84.0 | Y | Y | N | Y | Closed to angling |
| E.& W. Forks Sheep Creek ARNF | | 11.2 | | 1982-1987 | 1993 | 67.0 | Y | Y | N | Y | Opened to C&R angling, 1988. |
| Fern Lake Fern Creek, RMNP | | 1.4 | 3.7 | 1982-1984 | 1991 | 45 24 | Y N | Y Y | N N | Y | Opened to C&R angling, 1986. |
| Odessa Lake, RMNP | | 0.2 | 4.5 | 1984-1989 | 1993 | 27.0 | Y | Y | N | Y | Opened to C&R angling in 1987. |
| Lawn Lake, and inlet below Big Crystal Lake, RMNP | | 0.9 | 9.5 | 1984-1986 | 1992 | 60.0 | Y | Y | N | Y | Opened to C&R angling in 1988. |
| Roaring River, RMNP | | 6.5 | | 1984-1986 | 1991 | 81.0 | Y | Y | N | Y | Opened to C&R angling, 1991. |
| Lower Hutch. Lake and outlet stream above 3048 m, RMNP | | 1.0 | 1.7 | 1986-1991 | 1991 | 138.0 | Y | Y | N | Y | Opened to C&R angling in 1991. |
| Pear Lake, RMNP | | 1.2 | 6.1 | 1989-1990 | 1991 | 80.0 | Y | Y | N | Y | Opened to C&R angling in 1991. |
| Sandbeach Lake, RMNP | | 0.1 | 4.0 | 1989-1990 | 1992 | 69.0 | Y | Y | N | Y | Opened to C&R angling, 1991. |
| Cony Creek, RMNP | | 3.5 | | 1989-1990 | 1996 | 25 | Y | Y | N | Y | Opened to C&R angling, 1991. |
| Spruce Lake, RMNP | | 0.3 | 1.5 | 1991-1992 | 1995 | 60.0 | Y | Y | N | Y | Opened to C&R angling, 1993. |
| SUBTOTAL - Stable Habitat | | 30.1 | 39.1 | | | | | | | | |
| **Potentially Stable Habitats** | | | | | | | | | | | |
| Hidden Valley Creek, and beaver ponds RMNP | | 1.6 | 2.5 | 1973 | 1989 | 50.0 | Y | Y | BKT | P | Brook trout dominate beaver pond habitat. Opened to angling 1982. |

46

| LOCATION | HABITAT | | STOCKED | CRITERIA | | | | | | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| | km | ha | | Survey date | Kg/Ha | >500 fish | GBC Reprod-tion | Other species present | Stable as of last survey | |
| West Creek, above West Creek Falls, RMNP | 2.4 | | 1979-1987 | 1996 | | | Y | N | P | |
| May Creek, ARNF | 1.7 | | 1980-1987 | 1994 | 50.0 | N | Y | N | P | |
| Ouzel Creek above Ouzel Falls, RMNP | 4.7 | | 1981-1983 | 1991 | 34-229 | Y | Y | BKT | P | Opened to C&R angling, 1986. |
| Ouzel Lake and Stream below Bluebird Lake, RMNP | 1.4 | 2.6 | 1981-1983 | 1996 | 69.0 | Y | Y | Y | P | Opened to C&R angling, 1986. |
| Lost Lake N.F. Big Thompson Creek, above Lost Falls, RMNP | 3.0 | 3.7 | 1987-1989 1987-1990 | 1993 1993 | 30.0 15.0 | Y Y | Y Y | Y Y | P | Opened to C&R angling, 1990. |
| Loomis Lake and Pond, RMNP | 0.4 | 1.5 | 1991-1992 | 1995 | 28 | Y | N | N | P | Opened to C&R angling, 1993. |
| Zimmerman Reservoir, ARNF | 0.4 | 4.6 | 1996 | 1997 | | | | N | P | Opened to C&R angling, 1997. |
| Husted Lake, RMNP | 0.1 | 4.1 | 1991 | 1993 | | | | N | P | Open to C&R angling, 1995 |
| Dream Lake, RMNP | 0.1 | 2.2 | 1997 | 1997 | | | | N | P | Open to C&R angling, 1998. |
| SUBTOTAL - Potentially Stable Habitats | 15.8 | 21.2 | | | | | | | | |
| Unstable Habitats | | | | | | | | | | |
| Black Hollow, ARNF | 5.2 | | 1981-1983 | 1994 | 8.5 | N | N | BKT, RBT | N | |
| Hourglass Creek, ARNF | 2.0 | | 1981-1982 | 1992 | 0 | N | N | N | N | Unsuccessful project. GBC no longer present. |
| Bard Creek, ARNF | 6.1 | | 1982-1986 | 1994 | 43.0 | Y | N | N | N | Opened to C&R angling, 1993. No reproduction due to heavy metals. Maintained as GBC fishery through stocking. |
| Cornelius Creek, ARNF | 6.9 | | 1983-1985 | 1993 | 5.0 | N | N | BKT, BNT | N | Opened to C&R angling, 1988. Population declining due to competition with exotics. Unsuccessful project. |
| George Creek, ARNF | 12.7 | | 1983-1985 | 1993 | 3.6 | N | Y | BKT, BNT | N | Opened to C&R angling, 1988. Population declining due to competition with exotics. Unsuccessful project. |

47

BLM_0070521

48

| LOCATION | HABITAT | | STOCKED | CRITERIA | | | | | | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| | km | ha | | Survey date | Kg/Ha | > 500 fish | GBC Reprod-tion | Other species present | Stable as of last survey | |
| Big Crystal Lake, RMNP | 0.2 | 10.0 | 1984-1986 | 1995 | 114.0 | Y | N | N | N | High elevation experimental population opened to C&R angling, 1990. No reproduction documented. Still under evaluation. |
| N. Fork Jackson Creek, P&SINF | | 0.3 | 1985-1987 | 1991 | 2.0 | N | N | BKT | N | BKT dominate, opened to standard regulations., 1993. Unsuccessful project. |
| Bruno Gulch, P&SINF | 9.0 | 1.4 | 1986-1990 | 1991 | 8.0 | N | N | BKT | N | No reproduction due to heavy metals. Opened to standard regulations., 1993. Unsuccessful project. |
| Lily Lake, RMNP | | 6.8 | 1980-1992 | 1997 | | Y | N | N | N | Experimental fisheries, maintained by stocking. |
| Pennock Creek, ARNF | 8.0 | | 1986-1988 | 1993 | 9.4 | N | Y | BKT | N | Unsuccessful project. |
| SUBTOTAL - Unstable Habitats | 50.1 | 18.5 | | | | | | | | |
| TOTAL - South Platte Basin | 96.0 | 78.8 | | | | | | | | |

BLM_0070522

Table 3.  Summary of Arkansas River Greenback Cutthroat Trout Restoration Projects, 1970-1997.

| LOCATION | | HABITAT | | STOCKED | CRITERIA | | | | | | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | km | ha | | Survey date | Kg/Ha | >500 fish | GBC Reproduction | Other species present | Stable as of last survey | |
| **Stable Habitats** | | | | | | | | | | | |
| Boehmer Res., City, Co Springs | | | 10.1 | 1985-1989 | 1996 | 20.0 | Y | Y | N | Y | City of Co Springs water supply. Closed to angling. |
| SUBTOTAL - Stable populations | | 0.0 | 10.1 | | | | | | | | |
| **Potentially Stable Habitats** | | | | | | | | | | | |
| Ft. Carson | Lytle pond | | 0.4 | 1981-1993 | 1994 | 50.0 | N | Y | BKT, DART | P | Opened to C&R angling 1989. |
| | Lytle inlet | 1.0 | | | | | | | | | |
| | Duck Pond | | 1.7 | | | | | | | | |
| LAKE FORK COMPLEX, P&SINF | Virginia Lake, | | 1.2 | 1987-1990 | 1991 | 20.0 | N | Y | N | P | Open to C&R angling, 1990 and harvest, 1993. |
| | Timberline Lake, | | 10.1 | 1987-1990 | 1991 | 20.0 | Y | Y | BKT | N | BKT 25% of population above 3200 m. Open to angling, 1990. |
| | Timberline Inlet | 0.4 | | 1987-1990 | | | | | | | Open to C&R angling, 1990. |
| | Lake Fork Cr. & 3 lks. Trib. | 4.8 | | 1987-1996 | 1991 | 35.0 | Y | Y | BKT | N | |
| | Zac Bog, | 1.0 | | 1987-1990 | 1991 | 35.0 | Y | Unk | N | P | |
| ROCK CREEK COMPLEX Leadville NFH & P&SINF | Rainbow Lake, | | 3.5 | 1991-1996 | 1995 | 20.0 | N | Unk | N | P | Opened to C&R angling, 1991. |
| | Native Lake, and inlet/outlet | 1.0 | 2.3 | 1991-1996 | 1995 | 12.0 | N | Y | BKT | P | Opened to C&R angling, 1991. |
| | Swamp Lake & outlet | 1.1 | 2.5 | 1991-1992 | 1994 | 10.0 | N | Y | BKT | P | BKT only in stream below the lakes by 1995 |
| | Rock Creek | 5.8 | | 1991-1996 | 1994 | 5.0-35.0 | Y | Y | BKT | P | Opened to C&R angling, 1991. |
| | Elk Creek | 1.2 | | 1991-1996 | 1995 | 22.1 | N | Y | BKT | P | |
| | Cascade Creek | 0.9 | | 1991-1992 | 1993 | 37.9 | N | Y | N | P | |
| | Bog Creek | 0.3 | | 1991 | 1991 | Unk | Unk | Unk | BKT | Unk | |

BLM_0070523

| LOCATION | HABITAT | | STOCKED | CRITERIA | | | | | | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| | km | ha | | Survey date | Kg/Ha | >500 fish | GBC Reproduction | Other species present | Stable as of last survey | |
| Greenhorn Creek P&SINF | 3.2 | | 1988-1989 | 1995 | 65.0 | Y | Y | N | P | Fishless area prior to 1988. No reproduction, until 1994. Uncertain spawning habitat. Poor habitat conditions. May conduct habitat improvement project in the future. |
| Sayres Gulch, P&SINF | 2.4 | | 1996 | | | | | | P | Fishless stream prior to 1996. |
| Mason Reservoir, CCS | 4.8 | 55.0 | | | | | | | P | Treated in 1996 |
| Hunt Lake Basin, PS&NF | 2.4 | 8.5 | | | | | | | P | Treated in 1997 |
| Newlin Creek, P&SINF | 2.4 | | 1997 | | | | | | P | Fishless stream prior to 1997 |
| North Apache Creek | 2.4 | | 1996-1997 | | | | | | P | Fishless stream prior to 1996 |
| SUBTOTAL - Potentially Stable populations | 35.1 | 85.2 | | | | | | | | |
| Unstable Habitats | | | | | | | | | | |
| Cottonwood Creek P&SINF | 6.4 | | 1983-1989 | 1995 | 39.5 | Y | N | N | N | Open to angling |
| SUBTOTAL - Unstable populations | 6.4 | 0.0 | | | | | | | | |
| TOTAL- Arkansas Basin | 41.5 | 95.3 | | | | | | | | |

50

Table 4.  Summary of Greenback Historic Populations, Restoration Projects, Areas Open to Angling and Stable Populations.  1997.

| TYPE OF POPULATION | | NUMBER | HECTARES | KILOMETERS |
|---|---|---|---|---|
| **SOUTH PLATTE RIVER DRAINAGE** | | | | |
| Restoration Projects | Total Restoration Projects | 33 | 78.8 | 96.0 |
| | Open to Angling | 31 | 74.3 | 93.9 |
| | Stable Restoration Projects | 13 | 39.1 | 30.1 |
| Historic Populations | Total Historic Populations | 7 | 4.7 | 11.3 |
| | Open to Angling | 2 | 4.7 | 0.0 |
| | Stable Historic Populations | 4 | 4.7 | 5.6 |
| South Platte Summary | Total Populations | 40 | 83.5 | 107.3 |
| | Open to Angling | 33 | 79.0 | 93.9 |
| | Stable Populations | 17 | 43.8 | 35.7 |
| **ARKANSAS RIVER DRAINAGE** | | | | |
| Restoration Projects | Total Restoration Projects | 20 | 95.3 | 41.5 |
| | Open to Angling | 14 | 21.7 | 25.3 |
| | Stable Restoration Projects | 1 | 10.1 | 0.0 |
| Historic Populations | Total Historic Populations | 2 | 0.0 | 15.0 |
| | Open to Angling | 0 | 0.0 | 0.0 |
| | Stable Historic Populations | 2 | 0.0 | 15.0 |
| Arkansas Summary | Total Populations | 22 | 95.3 | 56.5 |
| | Open to Angling | 14 | 21.7 | 25.3 |
| | Stable Populations | 3 | 10.1 | 15.0 |
| GRAND TOTAL | Total Populations | 62 | 178.8 | 163.8 |
| | Open to Angling | 47 | 100.7 | 119.2 |
| | Stable Populations | 20 | 53.9 | 50.7 |

BLM_0070525

Table 5. Hybrid Populations of Greenback Cutthroat Trout. 1994.

| SITE NAME/DRAINAGE | | RIVER DRAINAGE | OWNERSHIP | COMMENTS |
|---|---|---|---|---|
| TYPE B POPULATIONS: Essentially pure, with a trace of influence from other spring spawning trout species: | | | | |
| Arkansas River | South Fork of the Arkansas River | Arkansas River | P&SINF | |
| | Strawberry Creek | Huerfano River | P&SINF | |
| | Dutch Creek | Huerfano River | P&SINF | |
| | Deep Creek | Huerfano River | P&SINF | |
| South Platte River | Island Lake | Boulder Creek | City of Boulder | Still awaiting DNA analysis |
| | Goose Lake | Boulder Creek | City of Boulder | Still awaiting DNA analysis |
| | Forest Canyon | Big Thompson River | RMNP | |
| | Caddis Lake | Fall River | RMNP | transplant of Forest Canyon greenbacks |
| | Sawmill Creek | Poudre River | ARNF | |
| | Roaring Creek | Poudre River | ARNF | |
| TYPE C POPULATIONS: Good representatives of greenback stock, both with noticeable influences from other spring spawning trout species: | | | | |
| South Platte River | Rabbit Creek | N.F. Poudre River | Private | |

BLM_0070526

Table 6.  South Platte Greenback Restoration Projects and Stocking Schedule.  Includes year proposed for renovation (R), year and number of greenback fry to be stocked, and year to open to catch-and-release (C&R) angling based upon the stocking of fry.  1995-2007.

| SITE | Habitat | | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | km | ha | | | | | | | | | | | | | |
| Sandbeach Creek, RMNP | 1.5 | | | | | R | 2000 | 2000 | 2000 | C&R | | | | | |
| Hidden Valley Creek, RMNP | | 2.5 | | | | R | 1500 | 1500 | 1500 | C&R | | | | | |
| | 1.6 | | | | | R | 1600 | 1600 | 1600 | C&R | | | | | |
| Mummy Pass Creek, RMNP | 1.0 | | | | | | R | 1000 | 1000 | 1000 | C&R | | | | |
| Poudre Lake, RMNP | | 3.0 | | | | | R | 5000 | 5000 | 5000 | C&R | | | | |
| Lake Haiyaha, RMNP | | 6.3 | | | | | R | 6300 | 6300 | 6300 | C&R | | | | |
| | 1.5 | | | | | | R | 1500 | 1500 | 1500 | C&R | | | | |
| Hague Creek, RMNP | 1.0 | | | | | | | R | 2000 | 2000 | 2000 | C&R | | | |
| Black Lake, RMNP | | 3.7 | | | | | | | | | R | 3700 | 3700 | 3700 | C&R |
| Willow Creek, RMNP | 5.0 | | | | | | | | | | | R | 5800 | 5800 | 5800 |
| Cow Creek, RMNP | 2.0 | | | | | | | | | | | | R | 2000 | 2000 |
| Thunder Lake and | | 6.7 | | | | | | | | | | | | R | 6700 |
| Lion Creek, RMNP | 1.5 | | | | | | | | | | | | | R | 1500 |
| SUMMARY | 15.1 | 22.2 | 0 | 0 | 0 | 0 | 5,100 | 18,900 | 20,900 | 15,800 | 2,000 | 3,700 | 9,500 | 11,500 | 16,000 |

BLM_0070527

Table 7. Arkansas River Greenback Restoration Projects and Stocking Schedule. Includes year proposed for renovation (R), year and number of greenback fry to be stocked, and year to open to catch-and-release (C&R) angling based upon the stocking of greenback adults* and fry. 1995-2007.

| SITE | Habitat | | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| | km | ha | | | | | | | | | | | | | |
| Greenhorn Creek, P&SINF | 3.2 | | | * | | | | | | | | | | | |
| N. Apache Creek, P&SINF | 1.9 | | | 1000 | 1000 | | | | | | | | | | |
| Cottonwood Creek, P&SINF | 6.4 | | | 1000 | | | | | | | | | | | |
| Turkey Creek, P&SINF | 9.7 | | | | | R | 6000 | 6000 | 6000 | | | | | | |
| Stanley Canyon Res | | 3 | | | | | | R | 3000 | 3000 | 3000 | | | | |
| Stanley Canyon Creek, W. Monument Creek | 2.7 | | | | | | | R | 2000 | 2000 | 2000 | | | | |
| | 5.2 | | | | | | | R | 2500 | 2500 | 2500 | | | | |
| Lake Fork Creek Timber Lake | 6.0 | 10 | | | | R | 7000 | 7000 | 7000 | | | | | | |
| Severly Creek Graneros Creek | 1.6 4.8 | | | | | | ? ? | | | | | | | | |
| SUMMARY | 41.5 | 13 | 0 | 2,000 | 1,000 | 0 | 13,000 | 13,000 | 20,500 | 7,500 | 7,500 | 0 | 0 | 0 | 0 |

* - stock from S. Apache

54

BLM_0070528

55

Table 8.  South Platte River Drainage Greenback Research Cutthroat Trout Stocking Sites.  1995-2007.

| SITE | Habitat km | Habitat ha | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ROCKY MOUNTAIN NATIONAL PARK:** | | | | | | | | | | | | | | | |
| Lily Lake | | 6.8 | 500 | | 500 | | 500 | | 500 | | 500 | | 500 | | 500 |
| Arrowhead Lake | | 14.8 | 2000 | | 2000 | | 2000 | | 2000 | | 2000 | | 2000 | | 2000 |
| Subtotal, RMNP | 0.0 | 21.6 | 2,500 | | 2,500 | | 2,500 | | 2,500 | | 2,500 | | 2,500 | | 2,500 |
| **PRIVATE PROPERTY:** | | | | | | | | | | | | | | | |
| Manchester Lake | | 5.0 | 500 | | 500 | | | | | | | | | | |
| Subtotal, Private | 0.0 | 5.0 | 500 | | 500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **PIKE & SAN ISABEL NATIONAL FOREST/ ARAPAHO & ROOSEVELT NATIONAL FOREST , FORMER CDOW CENTRAL REGION** | | | | | | | | | | | | | | | |
| Upper Diamond Lake | | 2.4 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| North Iceberg Lake | | 4.0 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 |
| Heart Lake | | 6.9 | 1700 | 1700 | 1700 | 1700 | 1700 | 1700 | 1700 | 1700 | 1700 | 1700 | 1700 | 1700 | 1700 |
| Upper Crater Lake | | 3.4 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 |
| Ice Lake | | 4.9 | 1100 | 1100 | 1100 | 1100 | 1100 | 1100 | 1100 | 1100 | 1100 | 1100 | 1100 | 1100 | 1100 |
| Caroline Lake | | 3.5 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 |
| Ethel Lake | | 2.0 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Silver Dollar Lake | | 7.5 | 1850 | 1850 | 1850 | 1850 | 1850 | 1850 | 1850 | 1850 | 1850 | 1850 | 1850 | 1850 | 1850 |
| Dorothy Lake | | 6.5 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 |
| Bob Lake | | 3.4 | 1275 | 1275 | 1275 | 1275 | 1275 | 1275 | 1275 | 1275 | 1275 | 1275 | 1275 | 1275 | 1275 |
| King Lake | | 4.6 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 |
| Deep Lake | | 2.0 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 |
| Abyss Lake | | 7.3 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 |
| Frozen Lake | | 2.8 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Shelf Lake | | 3.4 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 |

| SITE | Habitat | | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | km | ha | | | | | | | | | | | | | |
| Upper Roosevelt Lake | | 0.7 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 |
| Byron Lake | | 1.1 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Lower Roosevelt Lake | | 0.6 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 |
| Upper Chicago Lake | | 4.0 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 |
| Upper Bear Track Lake | | 1.8 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Bard Creek | | 6.1 | 5000 | 5000 | 5000 | 5000 | 5000 | 5000 | 5000 | 5000 | 5000 | 5000 | 5000 | 5000 | 5000 |
| SUBTOTAL | 0.0 | 78.9 | 24,625 | 24,625 | 24,625 | 24,625 | 24,625 | 24,625 | 24,625 | 24,625 | 24,625 | 24,625 | 24,625 | 24,625 | 24,625 |
| ARAPAHO ROOSEVELT NATIONAL FOREST, FORMER CDOW NE REGION | | | | | | | | | | | | | | | |
| Upper Agnes Lake | | 1.2 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Upper Carey Lake | | 1.6 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| Clear Lake | | 4.0 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Iceberg Lake | | 2.4 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Island Lake | | 5.7 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 |
| Kathleen Lake | | 1.2 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| Lower Longs Lake | | 0.8 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Upper Longs Lake | | 0.8 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Rock Hole Lake | | 2.4 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Rolfs Lake #1 | | 6.4 | 1600 | 1600 | 1600 | 1600 | 1600 | 1600 | 1600 | 1600 | 1600 | 1600 | 1600 | 1600 | 1600 |
| Rolfs Lake #2 | | 4.4 | 1100 | 1100 | 1100 | 1100 | 1100 | 1100 | 1100 | 1100 | 1100 | 1100 | 1100 | 1100 | 1100 |
| Upper Roxy Ann Lake | | 1.6 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| Ruby Jewel Lake | | 1.6 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| Seven Lakes #1 | | 5.6 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 | 1400 |
| Slip Lake | | 1.2 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |

56

BLM_0070530

| SITE | Habitat | | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| | km | ha | | | | | | | | | | | | | |
| Snow Lake | | 6.9 | 1700 | 1700 | 1700 | 1700 | 1700 | 1700 | 1700 | 1700 | 1700 | 1700 | 1700 | 1700 | 1700 |
| SUBTOTAL | 0.0 | 47.8 | 11,500 | 11,500 | 11,500 | 11,500 | 11,500 | 11,500 | 11,500 | 11,500 | 11,500 | 11,500 | 11,500 | 11,500 | 11,500 |
| TOTAL | 0.0 | 151.5 | 41,325 | 40,825 | 41,325 | 40,825 | 40,825 | 40,825 | 40,825 | 40,825 | 40,825 | 40,825 | 40,825 | 40,825 | 40,825 |

57

BLM_0070531

Table 9.  Arkansas River Drainage Research Greenback Cutthroat Trout Stocking Sites.  1995-2007.

| SITE | Habitat | | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | km | ha | | | | | | | | | | | | | |
| **US ARMY, FORT CARSON:** | | | | | | | | | | | | | | | |
| Fort Carson | | 21 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| Air Force Academy | | 26 | 51,000 | 51,000 | 51,000 | 51,000 | 51,000 | 51,000 | 51,000 | 51,000 | 51,000 | 51,000 | 51,000 | 51,000 | 51,000 |
| Subtotal US ARMY | 0.0 | 47.0 | 91000 | 91,000 | 91,000 | 91,000 | 91,000 | 91,000 | 91,000 | 91,000 | 91,000 | 91,000 | 91,000 | 91,000 | 91,000 |
| **PIKE & SAN ISABEL NATIONAL FOREST/ SOUTHEAST REGION, CDOW:** | | | | | | | | | | | | | | | |
| Little Dry Lake | | 1.6 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| Middle Dry Lake | | 2.4 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Upper Dry Lake | | 1.2 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Kroenke Lake | | 12.1 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 |
| Arthur Lake | | 2.4 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Upper Hancock Lake | | 2.8 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 |
| Grassy Lake | | 2.4 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Lower Venerable Lake | | 3.6 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 |
| Upper Venerable Lake | | 2.0 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Horn Lake | | 9.7 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 |
| North Horn Lake | | 1.2 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Lower Macey Lake | | 3.6 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 |
| South Macey Lake | | 5.7 | 1200 | 1200 | 1200 | 1200 | 1200 | 1200 | 1200 | 1200 | 1200 | 1200 | 1200 | 1200 | 1200 |
| West Macey Lake | | 4.9 | 2000 | 2000 | 2000 | 2000 | 2000 | 2000 | 2000 | 2000 | 2000 | 2000 | 2000 | 2000 | 2000 |
| SUBTOTAL | 0.0 | 55.6 | 14400 | 14400 | 14400 | 14400 | 14400 | 14400 | 14400 | 14400 | 14400 | 14400 | 14400 | 14400 | 14400 |
| TOTAL | 0.0 | 102.6 | 105400 | 105400 | 105400 | 105400 | 105400 | 105400 | 105400 | 105400 | 105400 | 105400 | 105400 | 105400 | 105400 |

58

BLM_0070532

# Appendix 1. Summary of Recovery History, 1959-1994.

## Recovery History

Conservation efforts started in 1959, and have resulted in considerable accomplishments in the preservation of the greenback. Additional detail of some subjects discussed in this recovery history can be found in Part 1.

Recovery, 1959 to 1972. Prior to the enactment of the Endangered Species Act, conservation efforts commenced in 1959, when greenback trout from the headwaters of the Big Thompson River in Forest Canyon of Rocky Mountain National Park (RMNP) were stocked into Fay Lakes of the Park after removal of non-native trout with rotenone. A greenback population was not establish in Fay Lakes, but the descendants established a reproducing population in Caddis Lake. Unfortunately, the Forest Canyon population was later classified as slightly hybridized with Yellowstone cutthroat trout, therefore both the Forest Canyon and Caddis Lake greenback populations are now classified as B populations (see Table 5).

Analysis of all specimens obtained prior to 1970 indicated only two pure populations, one in Como Creek, an isolated tributary of North Boulder Creek, Boulder County, and one in the very headwaters of the South Poudre River, above a barrier falls in Larimer County.

In 1967, a cooperative project between the FS, Colorado Cooperative Fishery Unit and the CDOW resulted in the removal of brook trout above a barrier on Black Hollow Creek and the introduction of Como Creek greenbacks. Unfortunately, brook trout were reestablished, and displaced the greenback population. However, a 1971 transplant of 50 Como Creek greenbacks into the fishless headwaters of the North Fork of the Big Thompson River, RMNP, was successful and resulted in the establishment of a stable greenback population by the early 1980's.

Recovery, 1973-1975. With the enactment of the Endangered Species Act in 1973, the greenback was classified as Endangered.

Hidden Valley Creek in RMNP was treated to remove brook trout, and greenbacks were introduced in 1973. In 1975, brook trout were removed and greenbacks were introduced into Bear Lake in RMNP. This population is considered to be stable.

Recovery, 1976-1982. A Recovery Plan was completed in 1977, and an Arkansas River population of pure greenbacks was confirmed in 2.8 km of Cascade Creek. The Recovery Team recommended downlisting the subspecies to allow for angling opportunities and to assist in habitat acquisition. The Federal classification of the greenback changed from endangered to threatened in 1978.

A total of 64 adult and sub-adult Como Creek greenbacks were shipped to the FWS, Bozeman Fish Cultural Development Center, Montana, to establish a captive South Platte broodstock in 1977. This project was successful, with 630 greenback sub-adults and 16,579 greenback fry stocked into restoration projects in the South Platte River drainage in 1981. Milt from wild South



BLM_0070533

Platte populations was taken from wild populations and shipped to Bozeman by 1982. The taking of milt from wild fish was originally used to compensate for asychronization of males and females at the hatchery, and later to improve heterozygosity of the captive stock due to the small number of fish available to found the broodstock.

Semi-wild Arkansas River broodstocks were initiated in 1980 and 1981 at McAlpine Pond (private) and Lytle Pond ( U.S. Army, Ft. Carson).

Since restoration projects could now be restocked with greenbacks at the rate of 1000 fry/ha, and the areas opened to catch-and-release fishing within four years, restoration projects increased. Restoration projects were completed, and greenbacks were stocked into Black Hollow (second restoration), May Creek, Hourglass Creek, Williams Creek, Sheep Creek, and Bard Creek on the Arapaho/Roosevelt National Forest lands, and into West Creek, Ouzel Lake and Ouzel Creek and Fern Lake and Fern Creek within RMNP.

Hidden Valley Creek in RMNP opened to catch-and-release fishing for greenbacks and catch-and-kill for brook trout in August of 1982.

<u>Recovery, 1983-1986</u>.  A new Recovery Plan was completed in 1983 that capitalized upon the successes of the broodstock programs and the chemical techniques for removing non-native fish species. This recovery plan identified an objective for delisting the subspecies upon establishment of 20 stable reproducing populations. The plan identified six recovery goals. Achievements for these goals are described below:

1.  <u>Protect Historic Populations and Stable Populations</u>.  New historic populations were confirmed in Hunters Creek and the Hutcheson Lakes in RMNP (see Table 1). These historic populations probably were established by transfers of greenbacks above natural barriers in the late 1800's.

2.  <u>Establish 20 Stable Populations</u>.  Using the South Platte broodstocks, greenbacks were introduced into George Creek, Cornelius Creek, Pennock Creek and Bruno Gulch within Arapaho/Roosevelt and Pike National Forests, and into Odessa Lake, Lawn Lake, Roaring River and Big Crystal Lake, Rocky Mountain National Park. Within the Arkansas River drainage, Cascade Creek greenbacks were introduced in Cottonwood Creek and Boehmer Reservoir and exotic fish were removed from Virginia Lake, Timberline Lake, Zac Bog and Lake Fork Creek within the Pike/San Isabel National Forests.

3.  <u>Establish Wild and Captive Broodstocks</u>.  Poudre River greenback eggs were shipped to the Saratoga NFH, Wyoming in 1985. The Poudre River greenbacks hatched, but did not accept feed and all died. Milt from the Poudre River fish was later shipped to Bozeman to increase the heterozygosity of the South Platte broodstock.

Cascade Creek/Lytle Pond greenback eggs were shipped to the Saratoga NFH in 1984. The Cascade Creek (Arkansas River) stock was established, and sub-adults and fry were shipped to Colorado to restock restoration projects by 1987.



BLM_0070534

4. <u>Document Response to Angling.</u>  In addition to the Hidden Valley fisheries, Ouzel Lake and Ouzel Creek, and Fern Lake and Fern Creek, Rocky Mountain National Park, opened to catch-and-release angling for greenbacks in 1986.

5. <u>Increase I&E Program.</u>  In 1984, the Recovery Team was awarded the Colorado National Wildlife Federation Researcher of the Year Award in recognition of the success of the greenback recovery program.

6. <u>Long Range Management Plan.</u>  To be completed upon delisting of the subspecies.

<u>Recovery 1987-1994.</u>  Had the pre-1987 pace of restoration work continued, it would have been possible to completely delist the greenback by 1990-1992.  Unfortunately, Section 6 funding for CDOW recovery activities and FWS funding of FWS activities did not extend past 1986.  Reorganization of the FWS and the CDOW compounded funding problems, and resulted in no greenback restoration projects completed outside of Rocky Mountain National Park and the Leadville National Fish Hatchery since 1987.  Problems with fish control permits further complicated the problem of completing restoration projects.

The recovery plan was revised and public reviewed in 1993, and used the six goals established in the 1983 Recovery Plan.  (This plan was updated, signed and printed in 1998).

1. <u>Protect Historic Populations and Stable Populations.</u>  New historic populations were confirmed in South Apache Creek (Leary, 1987) in the Arkansas River drainage, and in Upper Hague Creek in the South Platte River drainage (see Table 1).  Tarryall Creek in the South Platte River drainage has a small greenback population that is believed to be historic.  Additional genetic research is being conducted on this population.  A site near Rollinsville, also in the South Platte River drainage, needs to be evaluated as a possible historic population.

2. <u>Establish 20 stable populations.</u>  Due to funding problems, restoration projects were limited to Rocky Mountain National Park and the Rock Creek drainage above the Leadville National Fish Hatchery (NFH).  In the South Platte drainage, Rocky Mountain National Park restoration projects conducted through 1990, included Lost Lake, North Fork Big Thompson River, Husted Lake, Lower Hutcheson lake, Pear Lake, Coney Creek, Sandbeach Lake, Loomis Lake and Spruce Lake.  No additional South Platte restoration projects were completed from 1991 through 1994.

In the Arkansas River drainage, the occurrence of a fish disease, introduced by infected non-native salmonids, within the watershed of the Leadville NFH resulted in the removal of fish from this area in August 1990.  This was accomplished with funding from Colorado Trout Unlimited, Texaco Foundation and with assistance from the Forest Service and Colorado Division of Wildlife.  20.4 ha of lakes and ponds and 10.3 km of stream habitat in the Rock Creek  drainage above the Leadville NFH was restocked with catchable greenbacks from the Saratoga NFH in June 1991, and immediately opened to catch-and-release fishing.  No additional Arkansas restoration projects were completed from 1991 through 1994.



BLM_0070535

3. <u>Establish Wild and Captive Broodstocks</u>. Due to the expense of maintaining native Colorado fish in National Fish Hatcheries in Wyoming and Montana, and the limited use of these fish outside of Rocky Mountain National Park, the decision was made to abandon these stocks as soon as they could be replicated within Colorado. Activities at these hatcheries were funded by the FS and BLM, while their function was transferred to the CDOW Experimental Hatchery, Ft. Collins, Colorado.

Eggs were collected from Hunters Creek, Upper Hutcheson Lake, Bear Lake and the Poudre River in 1989, from Upper Hutcheson Lake in 1990, and the South Fork of the Poudre in 1992 to begin a new CDOW South Platte broodstock at Ft. Collins. Eggs were taken from the 1989 year class in 1991, with 447 greenbacks surviving to December 1991. Malachite green could not be used to control fungus in 1992, and the entire 1989 year class of greenback broodstock was lost.

Attempts were made to start a CDOW Arkansas broodstock at Ft. Collins by collecting eggs from Cascade Creek in 1991. However, the Cascade Creek egg collection was not successful. In 1992, 3,200 eggs were collected from South Apache Creek. In addition to South Apache Creek eggs, 10,000 eggs were shipped from the Saratoga NFH to Ft. Collins in August 1992. These two groups of eggs led to the successful establishment of an Arkansas River drainage greenback broodstock. Due to problems associated with construction at the Saratoga NFH in 1992, the majority of their adult Arkansas greenback broodstock was lost, and the Saratoga program was terminated by September 1992.

4. <u>Response to Angling</u>. Within Arapaho/Roosevelt National Forest, catch-and-release fishing for South Platte greenbacks opened in Sheep Creek, Cornelius Creek and George Creek. Within Rocky Mountain National Park, Odessa Lake, Lawn Lake, Roaring River, Big Crystal, Lost Lake, North Fork Big Thompson River, Lower Hutcheson Lake, Pear Lake, Sandbeach Lake and Coney Creek opened to catch-and-release angling by 1990. Spruce and Loomis Lakes opened to catch-and-release angling by 1993.

Catch-and-release fishing for Arkansas River greenbacks is allowed on Ft. Carson, and in the Pike National Forest at Virginia Lake, Timberline Lake, Zac Bog, Lake Fork Creek, Rainbow Lake, Native Lake, Swamp Lakes and Rock Creek above the Leadville NFH by 1991.

5. <u>Improve I&E Programs</u>. The team increased its involvement with conservation groups, particularly Colorado Trout Unlimited (CTU). The CTU partnership resulted in increased educational opportunities due to CTU publications and chapter meetings, and a funding partnership for the greenback restoration work above the Leadville NFH. Work was also initiated with school groups and Colorado Trout Unlimited by 1991, to make the greenback the Colorado State Fish. In 1994, the greenback replaced the non-native rainbow trout as the official Colorado State Fish.

6. <u>Long Range Management Plan</u>. To be completed upon delisting of the subspecies.



BLM_0070536

**U.S. Fish & Wildlife Service**

# Razorback Sucker
# *(Xyrauchen texanus)*
# Recovery Plan



RECEIVED

MAR – 1 1999

U.S. FISH & WILDLIFE SERVICE
ES FIELD OFFICE - PHOENIX, AZ

BLM_0070537

# RAZORBACK SUCKER
## (*Xyrauchen texanus*)

### Recovery Plan

### Prepared by:

**Harold M. Tyus**
**Center for Limnology**
**University of Colorado at Boulder**
**Boulder, CO 80309-0334**

**for**
**Region 6**
**U.S. Fish and Wildlife Service**
**Denver, Colorado**

Approved: _Ralph O. Morgenweck_____

Regional Director,  Region 6,  U. S. Fish and Wildlife Service

Date: _12/23/98_____

BLM_0070538

## DISCLAIMER PAGE

Recovery plans delineate reasonable actions that are believed to be required to recover and or protect listed species.  The U.S. Fish and Wildlife Service publishes these plans, which may be prepared with the assistance of recovery teams, contractors, State agencies, and others.  Attainment of the objectives, and provision of any necessary funds are subject to priorities, budgetary, and other constraints affecting the parties involved.  Recovery plans do not necessarily represent the views nor the official positions or approval of any individuals or agencies involved in the plan formulation, other than the U.S. Fish and Wildlife Service.  Recovery plans represent the official position of the U.S. Fish and Wildlife Service **only** after they have been signed by the Regional Director or Director as **approved**.  Approved recovery plans are subject to modification as dictated by new findings, changes in species status, and the completion of recovery tasks.

BLM_0070539

## CITATION FOR THIS PLAN

**This recovery plan should be cited as follows:**

U.S. Fish and Wildlife Service. 1998.  Razorback sucker *(Xyrauchen texanus)* Recovery Plan. Denver, Colorado.  81 pp.

Additional copies may be purchased from:

Fish and Wildlife Reference Service:

5430 Grosvenor Lane, Suite 110
Bethesda, Maryland  20814
Telephone 1-800-582-3421, or 301-492-6403.

The fee for the plan varies depending on the number of pages it contains.

iii

BLM_0070540

## PREFACE

The Colorado River of the American West supports a mainstream fish community that is classified as the "Big River" fishes.  Four of these fishes are listed as endangered under provisions of the Endangered Species Act of 1973, as amended. Three fishes  (i.e., Colorado pike minnow *Ptychocheilus lucius*, humpback chub *Gila cypha*, and bonytail *G. elegans*) have been listed for over 10 years, and they have recovery plans that were prepared prior to designation of critical habitats.   Recently the Colorado squawfish was renamed by the American Fisheries Society and hereafter will be refered to in this document as the Colorado pike minnow.   A fourth fish, the razorback sucker *Xyrauchen texanus* was listed in 1991.  Critical habitats for all four fishes were designated by the U.S. Fish and Wildlife Service in 1994.

The listing of these four fishes, and the potential endangerment of others suggest that this large river ecosystem is at risk.  When such major environmental problems exist, present policy and philosophies have resulted in the decision to consider the recovery of more than one species, and thus to prepare multispecies or ecosystem recovery plans. The razorback sucker recovery plan has been prepared in the spirit of this philosophy.  In addition, the recovery plan has been drafted more as a strategic plan to allow flexibility in its implementation.  Presently, recovery of the fish is being accomplished by formal recovery implementation programs conducted in important geographic areas.  It is anticipated that these recovery implementation programs will develop very site-specific work plans under the broad guidance provided in the razorback sucker recovery plan.

iv

BLM_0070541

## ACKNOWLEDGMENTS

This recovery plan was prepared under contract by Dr. Harold M. Tyus, Center for Limnology, Cooperative Institute for Research in Environmental Sciences, University of Colorado at Boulder.  The plan has benefitted from comments received from the U.S. Fish and Wildlife Service, Regions 2 and 6, Colorado River Fishes Recovery Team, Dr. W. L. Minckley, Dr. P.B. Marsh, and other endangered fish experts.  Biologists of the U. S. Fish and Wildlife Service, including O.E. Bray, H.R. Maddux, R.S. Wydoski, and R.T. Muth added additional information, including an implementation schedule and projected recovery costs.  Preparation of this plan was greatly aided by review of written reports by K.R. Bestgen (1990), W.L. Minckley et al. (1991), and Maddux et al. (1993).  Dr. James F. Saunders, III of the Center for Limnology provided suggestions to the draft manuscript.

The Colorado River Fishes Recovery Team approved a draft of this plan on 11 December 1996.  The team is composed of the following individuals:  J. Petersburg, Team Leader, National Park Service; T.A. Burke, U.S. Bureau of Reclamation; L.W. Crist, U.S. Bureau of Reclamation; T.J. Foreman, California Department of Fish and Game; L.D. Lentsch, Utah Division of Wildlife Resources; C.W. McAda, U.S. Fish and Wildlife Service; C.O. Minckley, U.S. Fish and Wildlife Service; T.P. Nesler, Colorado Division of Wildlife; D.L. Propst, New Mexico Division of Fish and Game; J.C. Sjoberg, Nevada Division of Wildlife; and K.L. Young, Arizona Department of Fish and Game.

BLM_0070542

## EXECUTIVE SUMMARY

**Current Status**:  The razorback sucker, *Xyrauchen texanus* (Abbott), was listed as endangered on October 23, 1991 (56 FR 54957).  A final rule designating critical habitat was published on March 21, 1994 (59 FR 13374).  An endemic fish of mainstream rivers in the Colorado River basin, the razorback sucker was once abundant and widely distributed.  It now occurs only in remnant populations in a few lakes and river reaches.  The largest extant population occurs in Lake Mohave, Arizona, and the largest riverine population occurs in the Green and Yampa rivers, near Vernal, Utah.

**Habitats and Limiting Factors**:  Razorback sucker populations have been declining for much of this century.  This decline is a result of major alterations to the historical physical and biological environment.  Extensive water development projects have depleted flow, altered flow regimes, changed water quality, and fragmented habitat.  At the same time, the nature and composition of the fish community has been altered dramatically by the introduction of many nonnative fish species.  Predation by nonnative fishes and loss of habitat are primary reasons for the virtual failure of recruitment in razorback sucker populations.

**Recovery Objectives**:  Protection and expansion of three existing populations, and establishment of five new ones from remnant stocks or reintroductions.

**Recovery Criteria**:  The three steps for recovery of the razorback sucker to a less endangered status are: prevent immediate extinction, downlist to threatened, and delist.  The short-term goal, which is to prevent extinction of the razorback sucker, will be considered accomplished when decline of extant stocks in Lake Mohave, the middle Green River and the lower Yampa river has been reversed, those populations are stabilized, and target population sizes are maintained or exceeded for at least 5 years.  The long-term goal is to sufficiently recover the fish to allow down listing and then delisting.  Down listing to a threatened status would signify that immediate extinction in the wild has been averted, and will be possible when a remnant  population has been reestablished in the lower Green River, one additional population has been established in the upper basin, and one additional population has been established either in the upper or lower basin.  Delisting will be possible after the fish has been down listed to threatened, and two additional populations have been established and protected.  One of these additional populations shall be in the upper and one shall be in the lower basin.

**Actions Needed**:  (1) Maintain existing genetic diversity in hatchery refugia and increase diversity if possible. (2) Reverse the decline, increase, and stabilize three existing populations by management actions: Lake Mohave, middle Green River, and lower Yampa River.  (3) Protect habitats of these populations from further degradation. (4) Restore habitats to make them compatible with recovery goals. ( (5) Augment or reestablish five additional populations of the fish in its critical habitat.

vi

BLM_0070543

**Date of Recovery**:     The three major populations should be stabilized and the immediate threat of extinction avoided by the year 2000.  Down listing may be possible by 2010.  Delisting could occur as soon as 2020, if recovery criteria have been met.

vii

BLM_0070544

# TABLE OF CONTENTS

**TITLE/APPROVAL PAGE**     i

**DISCLAIMER PAGE**     ii

**CITATION FOR THIS PLAN**     iii

**PREFACE**     iv

**ACKNOWLEDGMENTS**     v

**EXECUTIVE SUMMARY**     vi

**LIST OF TABLES AND FIGURES**     x

**PART I.   INTRODUCTION**     1

    **History**     1

    **General Description**     3

    **Distribution and Abundance**     4

       Historic     4
       Present     6

    **Life History**     8

       General     8
       Reproduction     8
          *Lacustrine habitats*     8
          *Riverine habitats*     9
       Habitat Preferences     10
          *Adults*     10
          *Larvae and juveniles*     11
       Movement and Migrations     13
       Diet     13
       Age and Growth     14
       Genetic Diversity     15

BLM_0070545

**Reasons for Decline**      16

    Changes in Physical Environment      17
    Chemical Changes      19
    Changes in the Biological Environment      20
    Relative Importance of Physical and Biological      22
        Factors

**Conservation and Recovery**      24

    Recovery Planning      24
    Review of Recovery Actions      24
    Critical Habitat      26
    Target Population Numbers      33
    Ecosystem Recovery      34

**PART II.**      **RECOVERY**      35

    **Organization and Priorities**      35

    **Recovery Goals**      35

    **Recovery Criteria**      36

    **Recovery Priorities**      37

    **Stepdown Outline**      39

    **Narrative**      42

**PART III.**      **IMPLEMENTATION SCHEDULE**      59

**LITERATURE CITED**      64

BLM_0070546

## LIST OF TABLES AND FIGURES

Table 1.   Summary of citations for direct evidence of predation by nonnatives on razorback sucker in the Colorado River basin.   23

Figure 1.   Colorado River basin in the United States   2

Figure 2.   Historic distribution of the razorback sucker   5

Figure 3.   Critical habitat of the razorback sucker   29

x

BLM_0070547

BLM_0070548

## PART I.  INTRODUCTION

### History

The razorback sucker, *Xyrauchen texanus* (Abbott), an endemic fish of the Colorado River basin of the American West (Figure 1), is a member of the sucker family (Catostomidae: Catostominae).  Catostomids, a diverse and successful group of freshwater fishes, are abundant in North America (Moyle and Cech 1996).  Catostomids occur in northeastern Siberia, Alaska, and from northern Canada to Mexico (Nelson 1994).  The origins of North American suckers remains somewhat obscure due to an incomplete fossil record.  Oldest known North American catostomid specimens come from Paleocene formations (ca. 53-65 mya; Cavender 1986).  However, the Catostomidae may have occurred earlier in northern latitudes where fossil records may have been destroyed or covered by glaciers.  The razorback sucker arose from an ancient form that diverged very early from the main line of catostomid evolution (Miller 1958).  *Xyrauchen* presumably originated by Pliocene and one "well-preserved" Pleistocene specimen from Salton Sea, California has been identified as *Xyrauchen texanus* (Miller 1958, Minckley et al. 1986).

The razorback sucker is placed in the monotypic genus *Xyrauchen*, one of four genera in the tribe Catostomini (Nelson 1994).  The species was originally described in 1860 as *Catostomus texanus* by Abbott (1861), who mistakenly believed that the stuffed specimen came from the Colorado River of Texas.  The fish also was described as *C. cypho* by Lockington (1881).  Eigenmann and Kirsch (in Kirsch 1889) recognized the unusual features of this species and assigned it to a new genus *Xyrauchen* (literally, "razornape"; Jordan and Evermann 1896).  LaRivers (1962) redescribed the species and provided a complete synonymy.  He also corrected the identity of the type locality, which was the "Colorado and New Rivers" in Arizona.  The New River is tributary to the Gila River in Central Arizona.

The razorback sucker was known to humans in prehistoric times and used by them as food.  Common names, including "tsa'xnap" and "suxyex" were given to the fish by American Indians (reviewed by Minckley et al. 1991).  Other common names include "humpback sucker", "buffalo" and "buffalofish" (Jordan and Evermann 1896; Sigler and Miller 1963; Minckley 1973).  Presently, the American Fisheries Society recognizes the common name of razorback sucker (Robins et al. 1991).

1

BLM_0070549



Figure 1.  Colorado River basin in the United States.

2

BLM_0070550

Razorback sucker populations have declined markedly in the last 50 years. At one time it was thought that the razorback sucker was "holding its own" and perhaps even expanding in large impoundments (Wallis 1951; Miller 1961), but most of these populations have almost entirely disappeared. Extant populations consist primarily of old fish believed to be nearing their maximum life expectancy (Minckley et al. 1991). There are no historic population estimates for this fish, but it is presumed that extant populations represent a 90% decline in historic range and abundance.

## General Description

Adult razorback suckers may grow to a total length of about 1 m and a weight of 5-6 kg. However, most specimens of the fish are smaller. The largest fish presently occur in the warmer climate of the lower Colorado River, and sizes of 470-740 mm are reported in Lake Mojave, Arizona (Minckley 1983). In the upper Colorado River basin, sizes of 405 to 597 mm were reported (Tyus and Karp 1990). Females are generally larger than males of the same age. Females ranged in size from 470 to 740 mm and males ranged in size from 370 to 640mm in the lower basin (Minckley 1983). In the upper basin, females captured on spawning grounds averaged 547mm and males averaged 507 mm (Tyus and Karp 1990).

The razorback sucker shares many characters with other catostomid, but is distinguished from all other catostomid by a pronounced bony keel that grows from the dorsal surface of its back (i.e., behind the occiput). Formed mostly from enlarged neural and interneural bones, this relatively thin, sharp-edged keel is the basis for its common name. The species also is distinguished by well-developed, elongated filaments on its gill rakers, an adaptation for feeding on zooplankton. Characteristics shared with other members of its family include an intermediate number of moderately compressed pharyngeal teeth arranged in comb-like fashion, which is presumably an adaption to benthic feeding (Eastman 1977; Sublette et al. 1990). Its bony dorsal keel, heavily ossified caudal skeleton, and thickened and foreshortened caudal rays are thought to be adaptations to the strong river currents in which the fish lives (La Rivers 1962, Eastman 1980, Moyle and Cech 1996).

The razorback sucker has an elongated head with a flattened dorsal surface and a well-developed fontanelle. The moderate-sized ventral mouth has a cleft lower lip, with lateral margins continuous and rounded. Meristics include: dorsal fin rays usually 14-15 (13-16), anal fin rays 7, total vertebrae 45-50, lateral line scales 68-87, and gill rakers 44-50 on the first arch. Pharyngeal teeth are 64-74 per arch and occur in a single row (Minckley 1973, Sublette et al. 1990).

Razorback sucker coloration ranges from dark brown to olivaceous dorsally and yellow to white ventrally, but color and morphology differ due to a sexual dimorphism that is especially obvious during reproductive seasons. Breeding males are dark colored dorsally and bright yellow to orange on lateral and ventral surfaces. Pelvic and anal fins are generally longer in males than in females, whereas the reverse is true for the

3

BLM_0070551

urogenital papillae. Females are generally longer and heavier than males and usually have a broader, or lower dorsal keel (reviewed by Minckley et al 1991). Tubercles are produced as secondary sex characteristics during the breeding season, and are more abundant and pronounced in males. Tubercles occur on the anal and caudal fins and on the ventral surface of the caudal peduncle.

Suckers are mainly detritivores or herbivores, and thus occupy a crucial position at the base of the consumer food chain. Although sometimes regarded as "trash fish," suckers are important food for other fishes and have been widely used for food by humans. Numerous razorback sucker bones have been excavated from prehistoric camps of Native Americans, and numerous records authenticate its use as human and animal food. Early settlers used many tons of razorback suckers as food (Minckley et al. 1991, Quartarone 1993).

## Distribution and Abundance

Historic

The razorback sucker was once widely distributed and abundant in mainstream and the major tributary rivers of the Colorado River basin (Ellis 1914; Jordan and Evermann 1896; Minckley 1973, 1983; Figure 2). In the lower Colorado River basin, razorback suckers occurred from the Colorado River delta upstream to Lees Ferry, Arizona (Gilbert and Scofield 1898). Archeological evidence indicates that razorback suckers were common periodically in the Salton Sea area (Minckley 1983; Minckley et al. 1991). They invaded the Salton Sea when it last filled in 1904-1907, but increasing salinity made this habitat marginal to uninhabitable for freshwater fishes after 1929 (Evermann 1916, Coleman 1929). Razorback suckers occurred in most of the Gila River drainage (reviewed by Bestgen 1990) and may have been common in the Gila River mainstream upstream nearly to the New Mexico border (Kirsch 1889), however Huntington (1955) did not document presence of the fish in New Mexico. The fish was abundant in the lower Salt River, and occurred in lower Tonto Creek and in the Verde River to Perkinsville, Arizona (Hubbs and Miller 1953, Minckley 1973). Upstream distribution in the Salt River may have been limited by extensive canyon habitat (Bestgen 1990), but no surveys were made before the 1960s.

In the upper Colorado River basin, razorback suckers occurred in the Colorado, Green, and San Juan river basins. Razorback suckers occurred in the Colorado River from Lee's Ferry, Arizona to Rifle, Colorado, and in the Gunnison River to Delta, Colorado (Hubbs and Miller 1953, Wiltzius 1978, Minckley 1983). Razorback suckers once occurred in the Green River from its confluence with the Colorado River upstream to Green River, Wyoming (Jordan 1891, Evermann and Rutter 1895, Simon 1946, Sigler

4

BLM_0070552



Figure 2.  Historic distribution of razorback sucker (after Maddux et al. 1993)

5

BLM_0070553

and Miller 1963, Baxter and Simon 1970, Vanicek et al. 1970). Razorback suckers also have been captured in the lower few miles of the Duchesne River (Tyus 1987) and in the lower White River near Ouray, Utah (Sigler and Miller 1963). Razorback suckers occurred in the lower Yampa and Little Snake rivers of Colorado (McAda and Wydoski 1980, Lanigan and Tyus 1989, John Hawkins, Colorado State University, pers. comm., 1995). Historic status of the razorback sucker in the San Juan drainage is not well documented (Bestgen 1990), but there is ample evidence that the fish historically occurred there. Early accounts that razorback suckers "ran" up the tributary Animas River in spring (Jordan 1891) presumably represent spawning migrations. Koster (1960) reported anecdotal evidence of razorback suckers captured by anglers in the Animas River, and in 1992, anglers identified razorback sucker pictures as the fish they had captured in the Animas River during the 1940s. Anecdotal accounts indicate that razorback suckers were observed in irrigation ponds and perhaps in the mainstream river near Bluff, Utah, in 1977 (Minckley et al. 1991). The first verified record of razorback suckers from the San Juan River consisted of a 571mm adult in spawning condition captured in 1988 from the mainstream river near Bluff (Platania et al. 1991).

Present

In the lower basin, razorback sucker apparently began to decline shortly after impoundment of Lake Mead in 1935 (Dill 1944, Miller 1946, Wallis 1951, Jonez and Sumner 1954, Allen and Roden 1978). Larval and juvenile razorback suckers have been reported widely from the lower basin, and larvae are regularly captured in Lake Mojave (reviewed by Minckley et al. 1991). The largest extant population occurs in Lake Mojave, where the population consisted of approximately 60,000 adults in 1988 (Minckley et al. 1991). By 1995, that population had declined to about 25,000 fish (Marsh 1995). Small numbers of razorback suckers occur in Lake Mead and in the Grand Canyon, where individuals are found sporadically downstream on the mainstream river, and associated impoundments and canals (Marsh and Minckley 1989).

In the upper basin, the present range of the razorback sucker is much less than its historical distribution (Holden and Stalnaker 1975, McAda and Wydoski 1980, Tyus et al. 1982). Adults and larvae are widely distributed in the Green River basin; the largest concentration is in the upper Green River, in a reach that extends from the mouth of the Duchesne River upstream to the lower 4 miles of the Yampa River. Lanigan and Tyus (1989) estimated that about 1,000 adult razorback suckers (x̄=948, 95% confidence interval: 758-1,138) inhabited the upper Green River basin. A more recent analysis suggests that this population is "precariously low," consisting of only about 500 fish (x̄=524, 95% confidence interval: 351-696)(Modde et al. 1996). A small, reproducing population of razorback suckers exists in the lower Green River; 18 adult fish and numerous larvae have been captured there from 1980-1996 (Tyus et al. 1987; McAda et al. 1994; 1996; Muth et al. 1998). Although the fish regularly occurs in the lower Yampa, it is rarely found upstream as far as the Little Snake River (McAda and

6

BLM_0070554

Wydoski 1980, Lanigan and Tyus 1989, John Hawkins, Colorado State University, pers. comm., 1995).

In the upper Colorado River, most razorback suckers occurred in the Grand Valley (Valdez et al. 1982), but captures of wild fish have declined (Osmundson and Kaeding 1990).  Razorback suckers also have been captured in the mainstream Colorado River downstream of the Green River confluence, including Cataract Canyon, and in Lake Powell (Minckley et al. 1991).  Individuals of the fish have been captured in the flooded San Juan River arm of Lake Powell, but few specimens have been confirmed  in the riverine portion of the San Juan River upstream of Lake Powell (Platania et al. 1991, Minckley et al. 1991).  Fifteen adults have been captured and removed from Lake Powell (11 from the San Juan arm of the lake and 4 from the Colorado River arm; unpublished U.S. Fish and Wildlife Service [USFWS] permitting records, Denver, CO), and a few individuals presumably remain there.

Larval and juvenile razorback suckers have been captured in different locations of the upper Colorado River basin, and especially in the Green River in the last 20 years (Tyus 1987, Gutermuth et al. 1994, Muth et al. 1998), but identification of razorback sucker larvae has been difficult or impossible when other catostomid larvae were present.  Recent advances in taxonomic techniques have made it possible to identify razorback sucker larvae, even in the presence of other catostomid (Muth et al. 1998).  Using these new techniques the Larval Fish Laboratory at Colorado State University conducted an intensive survey of the Green River from 1992 to 1996.  During this period,  1,735 larval razorback suckers (99% of captures) were taken from the "middle" portion of the Green River, including the Escalante, Jensen, and Ouray reaches, and 440 larvae were identified from samples taken from the Labyrinth and  Stillwater canyons, near the confluence of the San Rafael River, Echo Park, and Green River valley (Muth et al. 1998).   The exact origin of these larval fishes is unknown due to larval drift, but is presumed to be nearby in upstream areas.  Despite the presence of these larvae, no significant recruitment to any population has been documented (Tyus and Karp 1990, Minckley et al. 1991, Modde et al. 1996).

Razorback suckers have been reintroduced at several locations in the upper and lower Colorado River basin.  More than 12 million young and juvenile razorback suckers were reintroduced into riverine habitats in Arizona and California from 1981 to 1990, but indications are that most of these stocked fish were consumed by nonnative predatory fishes (Marsh and Brooks 1989; Minckley et al. 1991; Mueller 1995).  More recent stockings completed or planned in the Salt and Verde rivers, Lake Mojave, Lake Havasu, and the Imperial Division (unpublished USFWS stocking records) have utilized larger fish to reduce predation risks.  Some small-scale augmentation stockings also have occurred in the Green, Colorado, Gunnison, and San Juan rivers upper basin (unpublished records).  Recapture results indicate that some fish survive, and thus these stockings have been successful in the short term (e.g., Ryden and Pfeifer 1995).

7

BLM_0070555

**Life History**

<u>General</u>

The razorback sucker and other endemic Colorado River fishes are adapted to the fluctuating hydrologic environment of the historic Colorado River (Minckley 1973, 1983; Carlson and Muth 1989), with its periodically extreme flow conditions and high turbidities.  Historic riverine systems provided a wide variety of habitats including backwaters, sloughs, oxbow lakes, and seasonally inundated flood plains, which were used to satisfy various life history requirements (Holden and Stalnaker 1975; Minckley 1983; Lanigan and Tyus 1989).  The fish also occurs in reservoirs, where it is capable of surviving for many years. Although the fish has been successfully propagated in hatcheries, some of the life history needs of the fish in nature, including certain habitat requirements of the various life stages, and other attributes of this fish remain unknown.

<u>Reproduction</u>

Razorback suckers have been captured in breeding condition in many different habitats and environmental conditions.  Spawning has been documented in mainstream rivers, riverine-influenced areas of large impoundments, and wave-washed shorelines of reservoirs.  The ability to use a variety of habitats and flow conditions may reflect adaptations to conditions in the historic Colorado River system, which may now be changed. Absence of any substantial level of recruitment makes it difficult to determine if the present habitat and flows are the most suitable for recovery efforts.  It is not known whether all life history requirements can be met in either the mainstream river or an impoundment.  For clarity, the following discussion of what is known about reproductive requirements and habitat use is separated into lacustrine and riverine habitats.

*Lacustrine habitats.*  The largest surviving stock of razorback suckers exists in Lake Mojave in the lower Colorado River basin.  Successful spawning has been documented in Lake Mojave and numerous larvae have been collected (Bozek et al. 1990, Marsh and Langhorst 1988).  However, juveniles have been extremely rare in collections (Minckley et al. 1991).  Spawning in Lake Mojave occurs early in the year, from January through April/May (Langhorst and Marsh 1986, Mueller 1989).  Water temperatures during spawning ranged from 11.5-18°C (52.7-64.4°F) (Douglas 1952, Langhorst and Marsh 1986).  Spawning fish congregate and spawn in flat or gently sloping shoreline areas over gravel, cobble, or mixed substrate types (Douglas 1952, Bozek et al. 1990, Minckley et al. 1991).  Medel-Ulmer (1983) observed similar spawning activity in Senator Wash Reservoir in water depths of 10 to 18 m.  In Lake Mojave, razorback suckers were observed spawning in several locations water up to 5 m deep, with most fish in less than 2 m of water.  Minckley et al. (1991, p. 320) summarized spawning in Lake Mojave as follows:

BLM_0070556

"In Lake Mojave, males stage over coarse, wave washed cobble in water 0.5-5 m deep.  Groups of up to several hundred fish ... move slowly a meter or less from the bottom or lie immobile near or on the substrate for hours.  Based on trammel netting, females remain in deeper water until ripe, then appear singly on the spawning grounds ...  When she is ready to spawn, a female, flanked by two or more males, separates from a group and moves to the bottom  The males press closely against the female's posterior abdomen and caudal peduncle, and all contact and agitate the substrate for three to five seconds in apparent spawning convulsions after which they typically return to a larger group...  The entire sequence lasts from a few seconds to three minutes, usually the former.  Females recognizable because of an injury or some other distinctive feature have been observed to spawn repeatedly in a given hour and day, and on successive days within a week."

*Riverine habitats*.  The reproductive ecology of riverine razorback suckers has been most intensively studied in the Green and Yampa rivers (McAda and Wydoski 1980, Tyus 1987, Tyus and Karp 1990, Modde and Irving 1998).  Staging occurs in flooded lowlands and eddies formed in the mouths of tributary streams, and then the fish move to main-channel sand, gravel and cobble bars for egg deposition (Tyus 1987, Tyus and Karp 1990).  Radiotracking and recaptures of tagged fish indicated that fish were homing to two spawning sites in Dinosaur National Monument: one in the Green River near Jensen, Utah, and one at the mouth of the Yampa River (Tyus and Karp 1990).  Larval razorback suckers recently have been captured below these two areas, and in others (Muth et al 1998).  Although some radiotagged fish have been monitored on more than one known or suspected spawning areas (Tyus and Karp 1990, Modde and Irving 1998), it is not known if individual fish actually spawn at more than one site, or whether fish residing in locations distant from their preferred spawning area are only moving through one spawning area in route to another (noted by Tyus and Karp 1990).

Ripe razorback suckers were captured in suspected spawning areas in the Green River from mid to late April through May (Tyus 1987, Tyus and Karp 1990).  In the Grand Valley, near Grand Junction, Colorado, 40 of 42 running ripe adults were captured between May 24 and June 17 (Osmundson and Kaeding 1990).  Spawning movements and the appearance of ripe fish were associated with increasing spring flows and average water temperatures of 14°C. (range 9-17°C or 48-63°F; Tyus and Karp 1990).  Thus, the time of spawning is later than that observed for the lower basin populations, but the temperature range is very similar.  Tyus (1987) and Tyus and Karp (1990) collected ripe adults over coarse sand substrates and in the vicinity of gravel or cobble bars submersed by an average depth of water of 0.63 m.  Average velocity of water over the bars was 0.74 m/s.  Direct observation of spawning behavior and gametic release was precluded by high turbidity prevalent during spring flows.

9

BLM_0070557

Razorback sucker spawning also has been observed in riverine sections of the Colorado River below Hoover Dam (Minckley 1983). Mueller (1989) gave the following account of reproductive behavior in that riverine habitat:

> "Spawning behavior was similar to that reported for populations in reservoirs. However, spawning appeared to be less mobile in the river. The majority of fish, which appeared to be "small" (approximately 40 cm total length) males, maintained stationary positions on the downstream end of the site. This behavior was different from the roving nature previously observed and reported for reservoir-spawning groups (Minckley, 1983). Larger fish, presumably females, periodically moved into the area from the adjacent river, attracting some of the otherwise stationary males to form spawning groups of three to eight fish. These groups, composed of one female and several males, would spawn over depressions or swim around the area before dispersing. The spawning act only took a few seconds and, other than orienting with the current was similar to that reported elsewhere. However, on several occasions spawning groups appeared to seek shelter downstream of large boulders and, while maintaining their position, would roll in mass for several seconds."

Habitat Preferences

*Adults.* Habitat selection by adult razorback suckers changes seasonally. Tyus and Karp (1990) detected movements of adult fish into flooded areas in early spring, and suggested that flooding of bottomland during spring runoff was important to adults for feeding and for temperature regulation. The flooding of bottomland also supplies allochthonous input to the river, which may subsequently provide food for one or more life stages.

Radiotelemetry showed that adult fish in the Green and Duchesne rivers, Utah, selected deeper near-shore runs during the spring, but shifted to relatively shallow waters of submerged mid-channel sandbars during the summer months. The fish occupied locations with water depths ranging from 0.6 to 3.4 m (2.0 to 11.0 ft), water velocities of 0.3 to 0.4 m/s (1.3 to 2.0 ft/s), substrates of sand or silt (Tyus 1987). During summer, the fish occupied midchannel sand bars where the water was less than 2 m deep and velocity averaged 0.5 m/s (Tyus 1987). These bars consisted of small, underwater dunes and depressions in which the fish may have been feeding on trapped allochthonous material (Tyus 1987). In winter, radio-tagged razorback suckers used slow runs, "slack waters" and eddies, in depths of 0.6 to 1.4 m (2.0 to 4.6 ft) and velocities of 0.03 to 0.33 m/s (0.1 to 1.1 ft/s; Valdez and Masslich 1989).

In the upper Colorado River, near Grand Junction, Osmundson and Kaeding (1989) reported similar habitat use: pools and slow eddies from November through April, runs and pools from July through October, runs and backwaters during May, and backwaters, eddies, and flooded gravel pits during June. Selection of depths changed

10

BLM_0070558

seasonally; use of relatively shallow water occurred during spring and use of deeper water during winter. Mean depths were 0.9 to 0.99 m (3.0-3.3 ft) during May and June, 1.62 to 1.65 m (5.3-5.4 ft) from August through September, and 1.83 to 2.16 m (6.6-7.1 ft) from November through April (Osmundson and Kaeding 1989).

Adult razorback suckers use a great variety of habitats, including lower gradient, low-velocity riverine sections of canyon-bound areas. The fish also have been tracked moving through whitewater habitats (Tyus and Karp 1990), but spent little time there. There are few historic records of razorback suckers in Grand and Marble canyons of the lower Colorado River, possibly due to lack of historic sampling in these inaccessible whitewater canyons (Minckley et al. 1991). Lanigan and Tyus (1989) suggested that razorback sucker distribution in the Green River may be constrained by whitewater canyons that either impede migration or do not have suitable habitat. Although the fish has been extirpated from its historic riverine habitats in the lower Colorado River basin, the species never may have been common in whitewater canyons there (Bestgen 1990). As an example, historic locations occupied by the fish in the Gila and Verde rivers lacked extensive whitewater areas.

Razorback suckers also utilize reservoir habitat, where the adults may survive for many years and habitat use of adults and larvae have been thoroughly studied (Minckley et al. 1991). The fish move throughout Lake Mojave and other reservoirs, where they use a variety of habitats (e.g., Medel-Ulmer 1983, Minckley 1983, Marsh and Minckley 1989, Minckley et al. 1991). Habitat preferences of adult razorback suckers reared in hatcheries and implanted with ultrasonic transmitters also have been studied in the complex environment of the lower Imperial Division of the Colorado River in Arizona and California. The fish used all habitat types, but preferred backwaters and the main impoundment (Bradford et al. 1998).

*Larvae and juveniles.* Habitat use of small life stages of the razorback sucker have not been studied in riverine environments. Marsh and Langhorst (1988) observed that larval razorback suckers in Lake Mojave remained near shore after hatching, but disappeared within a few weeks. Young hatchery-produced fish remain along shorelines, in embayments along sandbars, or in tributary mouths, and later disperse into the main channel or larger backwaters (Minckley et al. 1991). One laboratory study indicated that 2-week old larval razorback suckers actively, rather than passively, entered the drift and moved primarily at night (Paulin et al. 1989). The tendency to enter the drift suggests that the species takes advantage of downstream transport for moving from spawning to nursery habitats, which are presumed to be ephemeral shoreline habitats. Tyus (1987) reported captures of young razorback sucker larvae from a backwater immediately downstream of a known spawning area, and during a four year period (1992-1996), 1,735 drifting larvae were captured from the mid and lower Green River using a variety of sampling gear (Muth et al. 1998).

Habitat needs of juvenile razorback suckers are not well known because juveniles are not commonly encountered, especially in riverine habitats (Tyus 1987). Most

11

encounters involve just a few individuals, although R.R. Miller seined 6,600 larvae and small juveniles along warm, shallow margins of the Colorado River at Cottonwood Landing, Nevada in 1950 (Sigler and Miller 1963). Taba et al. (1965) collected a few juveniles from backwaters in the Colorado River near Moab. Smith (1959) caught two young fish on the Colorado River in Glen Canyon, one from a backwater and one from a creek mouth. Gutermuth et al. (1994) captured two small juvenile razorback suckers in a silty backwater in the lower Green River in 1991. Juveniles also have been collected in the middle Green River. Two juveniles (59 and 29 mm) were collected in a main channel backwater in 1993 and 28 juveniles (74-124 mm) were collected from Old Charley Wash, a wetland adjacent to the Green River, in October 1995 (Modde 1996). Another 45 juvenile razorback suckers were collected from Old Charley Wash in August 1996 (T. Modde, USFWS, pers. comm., 1996).

Additional information about the movement of juvenile razorback suckers has been obtained from 55 hatchery-reared fish that were tagged with sonic transmitters and released into lakes Mojave and Powell. These fish utilized backwaters and coves, and more than half of the tracked fish utilized flooded and emergent vegetation, and rock cavities as cover (Mueller and Marsh 1998). In another study, 33 juvenile razorback suckers were tagged with sonic transmitters and released in Neskahi Wash and Zahn Bay of the San Juan arm of Lake Powell (23 and 42 miles, respectively, above the historic river mouth). Twenty three of these fish were located in the upper 32 miles of the Lake Powell-San Juan River inflow area and were found in association with flooded vegetation. Eight individuals of the fish were tracked for 21 months, and exhibited an overall upstream movement to reach and occupy the lake-reservoir mixing zone (near Paiute Farms, river mile 42 to 62) (C. Karp, U.S. Bureau of Reclamation, pers. comm., 1998).

Young razorback suckers presumably require quiet, warm, shallow water (e.g., eddies and backwaters) for nursery habitats in riverine environments. Backwaters provide quiet, warm water where there is a potential for increased food availability. During higher flows, flooded bottomland and tributary mouths may provide still water. Tyus and Karp (1989, 1990) identified the importance of flooded bottomland for the growth of young fish. Many of these off-channel habitats have been eliminated in the Colorado River basin by construction of mainstream dams, diking of floodlands, and channelization (Beland 1953, Tyus and Karp 1989, Osmundson and Kaeding 1990). Gravel-pit ponds connected to the river may provide a substitute for inundated riparian cottonwood bottomland, other wetlands, and oxbow channels. However, these habitats also support nonnative predatory fish, such as largemouth bass, catfish, and green sunfish, which feed on young razorback suckers, or other smaller nonnative fishes such as red shiner and fathead minnow that are known to consume the larvae or display agonistic behaviors (Minckley et al. 1991, Mueller 1995, Tyus and Saunders 1996). In reservoirs, coves can provide warm, shallow shorelines suitable for nursery habitat (Minckley et al. 1991).

12

BLM_0070560

## Movement and Migrations

Historical accounts document spring spawning movements of razorback suckers in various locations in the basin (Jordan 1891, Hubbs and Miller 1953, Sigler and Miller 1963). Spawning migrations and other movements presumably evolved in the context of flow regimes, pluvial events, and the diversity of available habitats (Smith 1981; Tyus 1986, 1987; Tyus and Karp 1989, 1990). Similar spawning migrations have been studied for other riverine catostomid and appear to be a major part of their reproductive ecology (Dence 1948, Breder and Rosen 1966, Werner 1979). The factors controlling migratory behavior and homing in the razorback sucker have not been studied, but there is some evidence that learned behaviors (e.g., imprinting) may have an influence (Scholz et al. 1992, Modde et al. 1995).

Razorback suckers may travel long distances in both lacustrine and riverine environments during the spawning season, and exhibit some fidelity to specific spawning areas. In Lake Mojave, razorback suckers move throughout the lake, which is about 100 km long (Marsh and Minckley 1989). Spawning migrations of 30 to 106 km (one way) have been recorded in the Green River near Jensen, Utah, and in the lower Yampa River in Dinosaur National Monument (Tyus 1987, Tyus and Karp 1990). Extensive movements also have been observed in juvenile razorback suckers stocked in Lakes Mojave and Powell, and rapid dispersal was observed in sonic-tagged fish (Mueller and Marsh1998). Fish stocked in the San Juan River arm of Lake Powell displayed a preference for the river inflow area, which they moved into and remained for an extended period (C. Karp, pers. comm., 1998).

Razorback suckers travel mainly during the spring spawning season and are more sedentary during the remainder of the year. In summer, razorback suckers in the Green River were relatively sedentary, traveling only a few kilometers upstream or downstream (Tyus 1987, Tyus and Karp 1990). Little is known about movements of razorback suckers in winter, but Valdez and Masslich (1989) reported a net movement of less than 5 km (3 mi) between 1 December and 31 March. Valdez and Masslich (1989) also documented that changing flows stimulated fish movements in winter.

## Diet

Razorback sucker diet varies depending on life stage, habitat, and food availability. When larvae hatch, the mouth is terminal, which appears to facilitate great diversity in feeding behavior. In the laboratory, larvae may feed at the surface, in the water column, and on the surface of the substrate (unpublished USFWS records, Vernal, Utah). In Lake Mojave, larvae begin exogenous feeding at about 9-10 mm total length, and feed mostly on phytoplankton and small zooplankton (Minckley and Gustafeson 1982, Marsh and Langhorst 1988, Papoulias and Minckley 1990). However, larvae stocked in a backwater in the Salt River, Arizona, consumed mainly chironomid larvae (J.E. Brooks, USFWS, pers. comm., 1994). No information is available regarding food habits of larval razorback suckers in riverine habitats. However, larvae of other

13

BLM_0070561

southwestern catostomid (flannelmouth sucker, Sonora sucker, desert sucker, bluehead sucker) in riverine conditions feed almost exclusively on benthic larval Chironomidae and early instar Ephemeroptera (Maddux et al. 1987; R.T. Muth, Colorado State University, pers. comm., 1992).

As razorback sucker larvae grow, the mouth changes and becomes inferior, and the fish feed on more benthic foods. Unfortunately, few details are known about the diet of juvenile razorback suckers because fish of this age are rarely encountered. The only study known reports "algae and bottom ooze" from the digestive tract contents of eight juvenile (90-115 mm) razorback suckers taken from a Colorado River backwater (Taba et al. 1965).

The diet of adult razorback suckers taken from riverine habitat consisted chiefly of immature Ephemeroptera, Trichoptera, and Chironomidae, along with algae, detritus, and inorganic material (Jonez and Sumner 1954, Banks 1964, Vanicek 1967). The diet was of benthic origin, but may have been taken from drift. Diets of reservoir-dwelling adults were dominated by planktonic crustaceans, but also contained some algae and detritus (Minckley 1973; Marsh 1987).

Larval and juvenile razorbacks in hatchery ponds at Dexter, New Mexico (Hamman 1987) and Vernal, Utah (Lanigan and Tyus 1988) have been reared successfully on natural foods (i.e., phytoplankton and small zooplankton). They also have been reared in aquaria using brine shrimp (*Artemia* sp.; Papoulias and Minckley 1990). In addition, razorback sucker larvae have been successfully reared on selected, dry commercial diets (Tyus and Severson 1990, Severson et. al. 1991).

<u>Age and Growth</u>

Estimates of growth rates for individuals captured in the wild have been hampered by difficulties in determining age. McCarthy and Minckley (1987) evaluated seven different morphological structures, and determined that otoliths gave the most reliable ages. Their results indicated that razorback suckers are long-lived fish: individuals from Lake Mojave were 24 to 44 years of age in the 1980s (McCarthy and Minckley 1987).

Razorback suckers grow rapidly during the first six years, but growth is very slow for older individuals in extant populations (McCarthy and Minckley 1987, Minckley et al. 1991). Adults in the Lake Mojave population have shown little or no growth for a period of at least 20 years (Minckley et al. 1991). Tyus (1988) found slow growth (average of 2.2 mm/year) for 39 adult razorback suckers recaptured 1-8 years after tagging, and Modde et al. (1996) reported similar results. Adults from the San Juan River recaptured one year after tagging had grown an average 3.1 mm (Roberts and Moretti 1989).

Most of the information on the growth of early life stages is from hatchery-produced fish, or fish spawned in human-influenced environments. Growth under these controlled conditions may reflect growth potential rather than the rates that might occur

14

BLM_0070562

in more natural habitats. Very little information exists concerning growth rates of young razorback suckers in natural environments because survival rates are negligible (Minckley et al. 1991, Marsh 1995, Mueller 1995).

Growth rates of razorback suckers that have been spawned and reared under hatchery conditions can be rapid. Newly-hatched larvae are generally 7-9 mm TL (e.g., Hamman 1985, Papoulias and Minckley 1990, Tyus and Severson 1990). Larvae fed brine shrimp reached an average length of 23.2 mm after 50 days (Papoulias and Minckley 1990). Larvae (i.e., swim-up fry) produced from ripe females in the Green River and reared on natural foods in ponds at Ouray, Utah, grew to an average total length of 127 mm (range: 49-205 mm) during the 1987 growing season (i.e. April to October) and 156 mm (range: 40-271 mm) in 1988 (unpublished data on file with the USFWS, Vernal, Utah).

In Lake Mojave, growth of razorback sucker larvae has been studied in isolated backwaters from which other fishes have been removed. In one study, fish grew as much as 35 cm between January and November, 1992 (N=296; Mueller 1995). In other studies, larvae hatched in late March attained average length of 18.9 cm by December (N=12; Minckley et al 1991). Marsh and Langhorst (1988) evaluated the feeding and fate of wild razorback sucker larvae in Lake Mojave and also found that fish placed in a backwater free of predaceous fishes survived and grew rapidly.

Rapid growth also has been documented for juveniles that have been stocked in ponds and streams. Osmundson and Kaeding (1989) reported growth from 55 mm to 307 mm TL in 6 months for fish stocked in a small pond near Clifton, Colorado. Two years and seven months after this stocking, the survivors had a mean length of 422 mm. Juveniles of 40 mm TL that were stocked in two stream locations, where they grew an average of 43.4 and 47.5 mm in two months (Brooks 1986). Growth of fish stocked in two isolated backwaters on Bonita Creek Arizona, averaged 6 and 36 mm respectively, in three months (Brooks 1986).

Genetic Diversity

With any rare or endangered species, there is concern about loss of genetic diversity in small or isolated populations. A reduction of genetic diversity is a concern for the razorback sucker not only for extant populations, but also for hatchery stocks as well. Reduced genetic diversity and adaptation to captivity could impair prospects for successful reintroduction of the species.

In a recent study of genetic diversity in hatchery and Lake Mojave stocks, Dowling et al. (1996) found the large stock in Lake Mojave had a high degree of mitochondrial (m,DNA) diversity (0.97) with all known genotypes of the fish are represented there. This suggests that the Lake Mojave stocks are descended from a large panmictic population. An earlier, preliminary study (Dowling and Minckley 1993) also examined haplotypes, finding evidence of some genetic isolation between Lake Mojave stocks

15

BLM_0070563

and stocks in the upper basin. Hatchery stocks had lower, but adequate $m_l$DNA diversity (0.71-0.91;  Dowling et al. 1996). Recent monitoring studies of razorback suckers taken as larva from Lake Mojave and repatriated there as older fish indicate that the repatriates represent the same high genetic diversity as the wild stocks (P. Marsh, pers. comm. 1998).

Concern also has been raised about possible genetic introgression in brood stocks proposed for use in reintroduction efforts (Minckley et al. 1991).  Allozyme studies of Lake Mojave brood fish and their progeny from Dexter National Fish Hatchery indicated that the degree of hybrid introgression between the razorback sucker and other suckers was no higher than that reported for other catostomid species, i.e., introgression was rare (Buth et al. 1987).

**Reasons for Decline**

Decline of the razorback sucker has been associated with major changes in its riverine ecosystem. The native fish fauna of the Colorado River basin evolved in a river system characterized by a diverse mix of riverine, floodplain, and lacustrine habitats (Maddux et al. 1993), and an extreme seasonal variation in flow and turbidity (Carlson and Muth 1989).  The geographical isolation of the basin led to a high degree of endemism in the fish fauna, especially within the big river fish community  (Miller 1961, Minckley et al. 1986).  Several of the big river fishes, including the razorback sucker, are now threatened with extinction (Minckley et al. 1991).  Decline of the razorback sucker has been so extensive that it now occupies only a small fraction of its historic range. Continuing decline is expected for the near future because there is virtually no recruitment to wild populations, despite successful spawning and dispersal of larval razorback suckers in some locations.

The decline in abundance of the big river fishes has occurred at the same time that major changes occurred in their physical, chemical, and biological environment. Physical changes were primarily a consequence of the construction and operation of the many dams and diversions in the Colorado River basin since 1905.  These structures deplete water, alter flow regimes, change water quality, and fragment habitat. Chemical changes are primarily contaminants, which mainly have increased in reservoirs,  and increases in the concentration of selenium in impounded areas and in irrigation return flows. At the same time the physical and chemical attribute of the riverine environment was being altered  by human actions, the nature and composition of the fish community was altered dramatically by the introduction of nonnative species, many of which did well in the changed environments.  As a result, native fish species were confronted with competitors and predators with which they had no evolutionary "experience" (Molles 1980, Johnson et al. 1993).  The complexity of the new system, both physically and biologically suggests that recovery of the razorback sucker may necessitate a new viewpoint that considers management of the riverine ecosystem as a whole.

16

BLM_0070564

Changes in Physical Environment

Construction of water development projects beginning after 1900 has had a major impact on the physical habitat of the native fishes of the Colorado River basin (Fradkin 1984, Carlson and Muth 1989). More than 20 major dams have been constructed on mainstream rivers beginning with Roosevelt Dam on the Salt River in 1911 and ending with closure of Glen Canyon Dam in 1963. By 1963, much of the mainstream river had been converted into a system of dams and diversions. Extensive flow regulations altered the timing, duration, and magnitude of annual flood flows. Modification by impoundment resulted in increasing water clarity and lower water temperatures in downstream sections. In addition, peak discharges in many areas of the Colorado River system have been reduced by about 50% since 1942, and base flows have been increased by 21% (Fradkin 1984).

Diversions from the river systems begin at or above tree line in most sub-basins. In the upper Colorado basin, transmountain diversions take water out of the basin. This water is diverted for agricultural, municipal, and industrial uses, and is also lost from the system by evaporation from reservoirs. Consumptive use data for the river system suggest that, if water usage equates to habitat, fish have to survive on 60% less basinwide, and much less than 60% at specific locations within the system (Brookshire 1993; Maddux et al. 1993).. Flow depletions constitute a major threat to endangered fishes in some areas. For example, historic aquatic habitats once maintained in important tributaries, such as the Salt and Gila, may now be dry.

Construction of large impoundments has changed the distribution of riverine and lacustrine habitats in the basin over a very short time period. The effect is more pronounced in the lower basin. Historically, portions of the Colorado River system have had extensive flood plains that were inundated seasonally. The seasonally flooded bottomland, marshes, and oxbow lakes once were a normal feature of the river system, and presumably were important habitats in the life cycle of the razorback sucker.

By reducing the magnitude and duration of peak flows, impoundments have greatly reduced the extent and duration of seasonal flooding. Channelization and construction of dikes, especially in valleys near human population centers and agricultural areas, also have reduced seasonal inundation of the floodplain (Bestgen 1990). For example, many of the flooded pastures or oxbow lakes in the Grand Valley near Grand Junction have been filled or access has been blocked with dikes (Osmondson and Kaeding 1989). Access has also been blocked on the Green River, where several waterfowl management units have been created by constructing levees along the river and filling the wetlands with water from the river or from irrigation ditches. Through channelization, dams, and diversions, the Gila River drainage has lost much of the habitat that once supported razorback suckers.

Changes in the hydrologic regime also have had more subtle influences on physical habitats. Closure of mainstream impoundments has altered sediment transport and

17

BLM_0070565

resulted in channel degradation (Lyons 1989). As the river cuts down into the bed of the channel, wetlands and riparian areas can lose their hydrologic connection to the river. Loss of this connection can dry up the riparian areas or reduce water levels so that floodplain habitats are unavailable to the fish.

Changes in the hydrograph also can lead to changes in channel geometry. Reduction in channel width has increased the average velocity in the main channel and decreased the number of low-velocity backwaters (Wick et al. 1982). Important backwater and low-velocity shoreline habitats have been eliminated through siltation and subsequent vegetative growth (Wick et al. 1982). In particular, river shorelines have been altered by establishment of the exotic plant tamarisk (*Tamarix chinensis*). In Canyonlands National Park, the establishment of tamarisk on islands, sandbars, and river shorelines has decreased channel width by an average of 25% (Graf 1978).

Physical structures that have altered flow regime also may be barriers to fish movement. In the Colorado and Green rivers above Glen Canyon Dam, there are five structures which completely block fish movement and two others that block fish movement either partially or seasonally (Burdick and Kaeding 1990). On the San Juan River in New Mexico, there are five diversion structures with the potential to impede fish movement (Platania et al. 1991). The lower basin has at least 15 mainstream dams that block fish movement on the Colorado, Gila, Verde, and Salt Rivers. This accounting is by no means complete, but demonstrates that water development projects have greatly fragmented fish habitat, thus interrupting life cycles.

Flow regulation has had indirect, but significant, effects on water quality in the Colorado River system. The native fish fauna evolved in a warmwater system in which there was extreme seasonal variation in suspended sediment concentration. Reservoirs in the system now trap large quantities of sediment and release clear water. The reduction of sediment load may have effects on the fish fauna that go beyond the alteration of channel geometry. Increased water clarity may have increased vulnerability of younger life history stages of the razorback sucker through predation by introduced, visual predators.

The large impoundments also have had a significant effect on river temperatures. The impounded lakes stratify seasonally and typically release cold hypolimnetic water. The cooler water temperatures resulting from dam operations may exclude endangered fishes from portions of their original range (Vanicek 1967). For example, adult razorback suckers prefer water temperatures between 22-25°C (71.6-77°F) and may avoid water temperatures below 14.7°C (58.5°F) and above 27.4°C (81.3°F) (Bulkley and Pimental 1983). Winter water temperatures drop well below this reported preference range throughout most habitat occupied by razorback sucker in the upper basin, but summer temperatures are generally within the preferred range. However, there are two reaches of the Green and Colorado rivers where spring and summer temperatures are clearly below the preferred range of razorback sucker. The fish is virtually absent below Flaming Gorge Reservoir for 105 km (65 mi) where summer

18

temperatures average less than 15°C (59°F)(Ugland et al. 1987), and below Lake Powell for 384 km (238 mi) where summer water temperatures rarely exceed 15°C (59°F)(Carothers and Minckley 1981).

In some portions of the historic razorback sucker range, temperatures may now be too cold for survival of fertilized eggs (Marsh, pers. comm. 1996). Marsh (1985) reported an optimal temperature of 20°C for incubation of razorback sucker eggs in the laboratory; hatching success was lower at 15°C and hatching failed completely at 5° and 10°C. Bozek et al. (1990) reported similar results.

Chemical Changes

Changes in water quality also are associated with an increasing human presence. Environmental contaminants may be introduced from municipal or industrial point source discharges, or from non-point sources associated with agricultural activity or resource extraction. The threat posed by environmental contaminants has not been studied adequately. Preliminary results from one study show that exposing young razorback suckers to agricultural drainage from areas near the Green River can produce mortality in the range of 30 to 50% (Bruce Waddell, US Fish and Wildlife Service, pers. comm. 1993). The specific agent responsible for the mortality has not yet been identified, but trace elements or metals are possibilities. For example, at the Stewart Lake Waterfowl Management Area near Jensen, Utah, concentrations of boron, selenium, and zinc in water, bottom sediments and biological tissues (Stephens et al 1992) were sufficiently high to be harmful to fish and wildlife (e.g, Ostler 1985).

Selenium has probably received more attention than other environmental contaminants that may be harmful to razorback suckers. Hamilton and Waddell (1992) reported values of 3.7, 4.7, and 10.6 $\mu$g/g dry weight for selenium in eggs of razorback suckers collected from fish spawning in the Green River. Waddell and May (1995) reported selenium concentrations of 24–54 $\mu$g/g dry weight in muscle plugs collected from Green River razorbacks. Concentrations that high have caused poor growth and reproductive failure in other fishes (Gillespie and Badman 1986). High selenium levels also occur in backwater habitats along the Colorado and Gunnison rivers, and preliminary data suggest that the selenium concentrations in some areas are high enough to cause reproductive failure in razorback suckers (S.J. Hamilton, USGS Biological Service, pers. comm. 1996).

Because razorback sucker recovery will require the use of some of the large reservoirs in the Colorado River system, it is pertinent to understand threats of environmental contaminants that also may occur. As an example, one area that has been intensely studied is the effect of drainage from Las Vegas Valley on the limnology of Lake Mead, Arizona and Nevada. Contaminants there include organochlorines, polycyclic aromatic hydrocarbons (PAHs), and phenols (Bevans et al. 1996). Using common carp as a surrogate fish for razorback sucker, Bevans et al (1996) found necrotic changes in kidney and hepatopancreas tissues, evidence of long-term exposure to environmental

19

BLM_0070567

contaminants. In addition, there were significant differences in the endocrine systems of both female and male fish attributed to exposure to compounds that alter the function of the endocrine system associated with reproduction and recruitment. Due to a lack of mixing in Las Vegas Wash within Lake Mead (LaBounty and Horn 1997), there is concern that these contaminants are also being transported downstream into the mainstream Lower Colorado River. The discovery of perchlorates, likely originating from Lake Mead, as far downstream as Lake Havasu (R.D. Williams, personal communication, 1998), suggests that contaminant problems in Lake Mead may pose a threat to razorback sucker recovery downstream.

## Changes in the Biological Environment

In many areas, nonnative fishes are the most significant threat to survival of the razorback sucker. Nearly 70 nonnative fish species have been introduced actively or passively into the Colorado River system during the last 100 years (Minckley 1982, Tyus et al. 1982, Carlson and Muth 1989, Minckley and Deacon 1991, Maddux et al. 1993). As demonstrated by Moyle and Light (1996) biotic resistance to invasions by native fishes appears to play only a small part in limiting the success of invading species. More important appears to be the suitability of the hydrologic regime and perhaps other physicochemical factors. In natural systems, rapid extinctions of native fishes seldom occur. However, some invading species may be "preadapted" to changed conditions, and native fish populations can be extirpated from waters that have been greatly modified by humans. Such extirpations can be anticipated where native populations have been "depleted, disrupted or stressed" (Moyle and Light 1996).

Creation of the US Fish Commission in 1872 is thought to be the beginning of organized stocking initiatives for the Colorado River basin (Miller 1961). The original motivation for fish stocking included, among other justifications, an attempt to "benefit" the relatively "depauperate" Colorado River fauna (e.g., Jordan 1891). Several species including common carp, channel catfish, and largemouth bass were introduced prior to 1900 (e.g., Wiltzius 1985). In the two decades prior to 1950, at least 36 fish species, mostly game fishes from the eastern US, were introduced in the basin (Miller 1961). By 1980, more than 50 nonnative species had been actively introduced into rivers and reservoirs of the Colorado River basin (Minckley 1982, Tyus et al. 1982, Carlson and Muth 1989).

The primary reason for most intentional introductions was the desire to expand or enhance sport fishing opportunities. Other reasons for fish introductions include providing forage fish for game species, biological control of unwanted pests, and aesthetic or ornamental purposes (reviewed by Taylor et al. 1984). Even though most stocking in the river channels has been curtailed, nonnative fishes continue to enter the river channel through escapement from adjacent water bodies or by recruitment from the mainstream populations (Tyus and Saunders 1996).

20

BLM_0070568

For more than 50 years, researchers have expressed concerns about the role that nonnative fishes have played in causing the decline of native fishes in the Colorado River basin. Dill (1944) was one of the first to suggest that nonnatives were responsible for the observed declines in native fish populations in the lower basin. He traced the decline to about 1930 and observed that it was coincident with a large increase in the abundance of nonnative fishes, especially channel catfish and largemouth bass. By 1960, Miller (1961) noted that the "most impressive documentation for changing fish fauna" occurred in the lower Colorado River where it was associated with a replacement by introduced fishes. Schoenherr (1981) believes the evidence was "overwhelming" that native fishes were being replaced by aggressive, introduced fishes. A decline in the abundance of native fishes as nonnative species have increased in abundance has been documented by many workers (e.g., Joseph et al. 1977, Behnke 1980, Osmondson and Kaeding 1989, Quaterone 1993).

A substantial body of indirect evidence exists for predation by nonnatives on the razorback sucker. Marsh and Langhorst (1988) reported that larval razorback suckers in Lake Mojave survived longer and grew larger in the absence of predators. Loudermilk (1985) observed that young larvae exhibited little defensive behavior in the presence of potential predators. Johnson et al. (1993) compared predator avoidance of razorback sucker larvae with that of northern hog sucker (*Hypentelium nigricans*) and concluded that "larval razorbacks are not likely to survive in habitats that support high numbers of nonnative fishes." Smaller nonnative species such as red shiner and fathead minnow may attack or display agonistic behavior toward razorback sucker larvae (Karp and Tyus 1990), and young of some of the more aggressive game fish also are problematic because they are highly agonistic (Sabo et al. 1996).

Several nonnative fishes, including green sunfish, common carp, and flathead and channel catfish, have been observed feeding on eggs and/or larval razorback suckers (Medel-Ulmer 1983, Minckley 1983, Brooks 1986, Langhorst 1989, Marsh and Langhorst 1988, Marsh and Brooks 1989). Karp and Tyus (1990) reported results of predation experiments in which several nonnative species were offered razorback sucker larvae in 4-minute trials: green sunfish consumed 90% of the larvae offered; red shiner, 50%, and redside shiner, 10%. A field experiment in Lake Mojave provided indirect evidence of predation by monitoring larvae in habitats with and without predators. Razorback sucker larvae up to 30 mm long occurred in the predator-free environment, but larvae exposed to predation did not exceed 10-12 mm, implying that predators removed the larger larvae (Brooks 1986, Langhorst 1989, Marsh and Brooks 1989). In addition, laboratory studies have also shown that razorback sucker larvae may face predation by native invertebrate species, such as odonate nymphs, which are common in backwater areas of Lake Mojave (Horn et al. 1994).

Direct observations, including stomach content analyses, of predation by nonnatives on razorback suckers have been reported by many investigators (Table 1). The list is extensive and should leave no doubt that predation by nonnatives is significant. Part of the difficulty in documenting predation on larvae in early studies is that the rapid

21

BLM_0070569

digestion of some of the centrarchid fishes was not appreciated. Langhorst and Marsh (1986) found that razorback sucker larvae were only distinguishable in stomachs of green sunfish (*Lepomis cyanellus*) for about 30 minutes. After that time the larvae were dissolved.

It is now thought that introduced nonnative fishes are the most important biological threat to the razorback sucker. At one time, there was concern about hybridization between the razorback sucker and other riverine suckers (e.g. Wick et al. 1982). Although recent work has largely dismissed that concern that hybridization poses a threat to the existence of the razorback sucker in the present system (reviewed by Minckley et al. 1991), the potential remains. The exotic parasitic copepod *Lernaea cyprinacea* (anchor worm) has been implicated as a factor in lack of successful razorback sucker reintroduction efforts in the Verde River (Clarkson et al. 1993), but there is no evidence that diseases or parasites have played a major role in its endangerment (Flagg 1982). However, the possibility of further introduction of foreign parasites and diseases remain. Finally, competition for food also may be a mechanism by which nonnatives limit the success of razorback sucker populations (Papoulias and Minckley 1990).

Relative Importance of Physical, Chemical , and Biological Factors

Native big river fishes have disappeared from about three-fourths of their original range during a time when there have been major alterations to physicochemical and biological conditions in the Colorado River system. Thus, the relative importance of physical, chemical, and biological changes in producing a decline in the fish is uncertain. However, even in the present system there are locations where physical habitat has been altered relatively little, such as in the Yampa River, but the abundance of native fishes has declined while nonnative fishes have become abundant. This suggests that natural physical habitat conditions are a necessary, but not a sufficient condition for recovery of the razorback sucker in its present environment. Although it is obvious that suitable physical habitat is a requirement for the native fishes, the suitability of the physical habitat is not the only issue. Most suitable physical habitat now is occupied by introduced species, including many that are predaceous and highly competitive, and therefore harmful to the native fish fauna (Minckley 1982, Tyus et al. 1982, Carlson and Muth 1989, Tyus and Saunders 1996). An increasing number of chemicals have entered the Colorado River system, but the effect of chemicals on the decline of razorback suckers is not very n the system is not understood.

22

BLM_0070570

| Introduced Predator | Reference |
|---|---|
| channel catfish | Medel-Ulmer 1983, Minckley 1983, Bozek et al. 1984, Brooks 1985, Langhorst 1987, Marsh and Langhorst 1988, Marsh and Brooks 1989, Marsh and Minckley 1989 |
| common carp | Jonez and Sumner 1954, Medel-Ulmer 1983, Minckley 1983, Bozek et al. 1984, Brooks 1985, Langhorst 1987, Marsh and Langhorst 1988, Marsh and Brooks 1989, Marsh and Minckley 1989 |
| green sunfish | Langhorst and Marsh 1986, Medel-Ulmer 1983, Minckley 1983, Bozek et al. 1984, Brooks 1985, Langhorst 1987, Marsh and Langhorst 1988, Marsh and Brooks 1989, Marsh and Minckley 1989, Muth and Beyers, in press |
| sunfishes | Mueller 1995 |
| largemouth bass | Mueller 1995 |
| flathead catfish | Medel-Ulmer 1983, Minckley 1983, Bozek et al. 1984, Brooks 1985, Langhorst 1987, Marsh and Langhorst 1988, Marsh and Brooks 1989, Marsh and Minckley 1989 |

Table 1.    Summary of citations for direct evidence of predation by nonnatives on razorback suckers in the Colorado River basin.

23

BLM_0070571

In the proximate sense, populations of razorback suckers have declined because recruitment has been insufficient to maintain population numbers. Some reduction in recruitment is attributable to alterations to the physical habitat, or reduced access to suitable habitat. But even with major modifications to physical conditions, razorback suckers continue to spawn in riverine and lacustrine habitats. A number of investigators have collected viable embryos and/or larvae in areas where razorback suckers have been observed spawning (Bozek et al. 1984, Medel-Ulmer 1983, Marsh and Langhorst 1988, Tyus 1987, Mueller 1989), but few have collected larvae larger than 14 mm. Many small larvae are collected in certain areas (e.g. Lake Mojave), but the small number of larger larvae and juveniles suggests that recruitment is curtailed at this point. The failure of adequate recruitment is largely attributable to predation by nonnative fishes (Minckley et al. 1991, Johnson et al. 1993, Tyus and Saunders 1996).

Razorback suckers now exist in areas where the populations are geographically isolated. With the possible exception of the population in Lake Mojave, all razorback sucker populations are small. Small, isolated populations (isolates) are very susceptible to "faunal collapse," a phenomenon that has been observed when such isolates are invaded by nonnative species (Wilcox 1980, Frankel and Soulé 1981). Increasing fragmentation of the Colorado River system presents problems that are presumably very similar to those observed in isolates elsewhere, where declining habitat diversity and introduction of new predators are main reasons for declines of native species (e.g., see Frankel and Soulé 1981). Thus, the impact of nonnative fishes is considered a significant detriment to isolates of a once larger Colorado River native fish community (reviewed by Tyus and Saunders, 1996).

**Conservation and Recovery**

<u>Recovery Planning</u>

Recovery plans, written under the authority of Section 4 of the Endangered Species Act, guide recovery activities. A recovery plan promotes conservation and provides the steps required for delisting species. In addition, a recovery plan provides guidance for implementing recovery actions and establishes priorities for those actions.

The Act incorporates several measures to promote conservation of listed species, making the conservation of endangered species a high priority of Federal agencies (Section 2). The act also aids recovery by identifying the status of a species by listing and identification of critical habitat (Section 4), providing Federal grants to States (Section 6), requiring Federal agencies to engage in conservation activities (Section 7), prohibiting the unauthorized take of listed species (Section 9), requiring permits to enhance survival of listed species (Section 10), and other means (e.g., research, land acquisition, etc.). All of these measures are brought into action by recovery planning, and the completion of recovery plans.

BLM_0070572

Recovery actions outlined in this plan will be implemented by various agencies guided by the USFWS and its cooperators, including the Colorado River Fishes Recovery Team, and recovery implementation programs.  Recent policy (i.e.,  USFWS and National Marine Fisheries Service1994) dictates that recovery of  the four listed fishes in mainstream rivers of the Colorado River system should be accomplished using a multispecies, or aquatic ecosystem approach.  The rationale for this approach is that all four species are declining for similar reasons, and that a functioning native ecosystem would provide a desirable degree of stability for recovery of the fishes .  An ecosystem perspective is not typically used in recovery plans for individual species, but is crucial for integrating recovery efforts for all four species.  A multispecies recovery plan has been drafted by the USFWS, but has not yet been accepted by the Colorado River Fishes Recovery Team.  A multispecies plan would potentially have a different set of recovery priorities based on the need for recovery of the fish community rather than only one species. In addition, such a plan could integrate ongoing recovery implementation efforts for the four fishes within the Colorado River basin and facilitate a speedier recovery for the fish community than would have been possible with single species plans alone.

Review of Recovery Actions

The razorback sucker has long been considered a species at risk (Miller 1964, 1972; Minckley and Deacon 1968; Ono et al. 1983).  It was placed on a list of threatened fishes by the American Fisheries Society in 1972 (Miller 1972).  The razorback sucker was proposed for listing on April 24, 1978 (43 FR 17375), but this proposal was withdrawn on May 27, 1980 (45 FR 35410).  The Sierra Club, National Audubon Society, The Wilderness Society, Colorado Environmental Coalition, Southern Utah Wilderness Alliance, and the Northwest Rivers Alliance petitioned the USFWS to list the fish as an endangered species on March 14, 1989.  A proposed rule to list the fish as endangered was published in the Federal Register on May 22, 1990 (55 FR 21154), and a final rule listing the fish was published on October 23, 1991 (56 FR 54957). Critical habitat for the razorback sucker, and three other listed Colorado River fishes, was designated by publication of a final rule on March 21, 1994 (59 FR 13374); the most recent list of previous Federal actions and a listing chronology are provided in the final rule.  The states of Arizona, California, Colorado, Nevada, and Utah had provided legal protection for the razorback sucker by 1987 (Minckley et al. 1991).

In 1987, after several years of study, a Recovery Implementation Program was initiated by several cooperating agencies and interests with the goal of recovering the endangered fishes in the upper Colorado River basin while allowing water resources development to continue.  The razorback sucker, although not Federally listed at that time, was included in the program (USFWS 1987).  More recent recovery activities in the upper basin have been conducted by the San Juan River Basin Recovery Implementation Program (USFWS 1995) and by programs of various state and other agencies (reviewed by Minckley and Deacon 1991).

25

BLM_0070573

Efforts to reintroduce razorback suckers in the lower Colorado River basin began in 1981 with a memorandum of understanding between the Arizona Game and Fish Department and the US Fish and Wildlife Service (1981-1987 stockings reviewed by Minckley et al. 1991). Similar, but less extensive, reintroduction programs have been conducted by the states of California and New Mexico. In addition, some partnership programs have emerged such as the Lake Havasu Fisheries Improvement Program, which has agreed to release 30,000 sub-adult razorback sucker into Lake Havasu by the year 2003 (J. Provencio, U.S. Bureau of Land Management, pers. comm. 1998).

Reintroduction efforts began during the 1980s when over 12 million small razorback suckers were stocked in the rivers of the lower basin (Mueller 1998). Very few of these stocked fish were recaptured in subsequent years, despite considerable monitoring effort. Because survival of young fish was very low (Minckley et al. 1991), recent stocking efforts have used larger razorback suckers. The most extensive razorback sucker augmentation effort now in progress is in Lake Mojave (summarized by Mueller 1995, 1997). Biologists are rearing the larval fish captured from lakeside backwaters of Lake Mojave and returning the larger juveniles back into the lake. About 15,000 of these "repatriated" juvenile razorbacks have been stocked in Lake Mojave since 1992. Annual monitoring has indicated that recaptures of repatriates ranges from a "few" to nearly half of all the razorback suckers captured, and ripe fish of both sexes have been recaptured on spawning grounds in the lake (P. Marsh, personal communication 1998). Although razorback suckers also have been reintroduced in Lake Havasu, reintroduction efforts there have been hampered by poor survival of the fish (i.e., 0.005%) in grow out facilities (Doelker and Conner 1998). A total of 2,360 razorback suckers were released into Lake Havasu from 1994 to 1997 (Doelker and Connor 1998).

The behavior and habitat use of hatchery-reared razorback suckers reintroduced into various locations have been monitored by biotelemetry. This includes studies in lakes Mojave and Powell where many of the fish have survived for over one year (e.g., Mueller 1998). Hatchery-reared razorbacks also have been radiotracked in the Gila and Verde rivers, but none of those fish survived over a year (P.B. Marsh, pers. comm. 1996; Creef and Clarkson 1993). Survival of reintroduced fish in the San Juan River has been more successful and razorback suckers there have survived for at least two years (Ryden and Pfeifer 1995). Augmentation plans have been developed recently for various locations in the upper Colorado River Basin (e.g., Modde et al. 1995, Nesler 1997).

Critical Habitat

A central feature of the recovery program for the razorback sucker is the designation and protection of critical habitat. Critical habitat (defined in section 3[5][A] of the Act) includes locations within the geographical area occupied by the species that contain physical or biological features essential to the conservation of the species, and that may require special management considerations or protection. Critical habitat may also

BLM_0070574

include locations outside the area currently occupied by the species, when such locations contain physical or biological qualities essential for its conservation. These physical or biological qualities are "primary constituent elements".

There are five features of critical habitat that require special management or protection for recovery of the razorback sucker: space for growth and normal behavior; food, water, or other nutritional or physiological requirements; cover or shelter; breeding and rearing sites; habitats protected from disturbance or representative of geographical and ecological distributions. These features generally fall into three areas that are considered primary constituent elements: water, physical habitat, and the biological environment (Maddux et al. 1993).

The "water" element includes consideration of water quality and quantity. Water quality is defined by parameters such as temperature, dissolved oxygen, environmental contaminants, nutrients, turbidity, and others. Water quantity refers to the amount of water that must reach specific locations at a given time of year to maintain biological processes and to support the various life stages of the species.

The "physical habitat" element includes areas of the Colorado River system that are or could be suitable habitat for spawning, nursery, rearing, and feeding, as well as corridors between such areas. Habitat types include bottomland, main and side channels, secondary channels, oxbows, backwaters, and other areas in the 100-year floodplain, which when inundated may provide habitat or corridors to habitat necessary for the feeding and nursery needs of the razorback sucker.

The "biological environment" element includes living components of the food supply and interspecific interactions. Food supply is a function of nutrient supply, productivity, and availability to each life stage. Negative interactions include predation and competition with introduced nonnative fishes.

The Service determined critical habitat for the razorback sucker in a final rule published on March 21, 1994 (59 FR 13374). Fifteen river reaches covering about 49% of the historic habitat of the razorback sucker (1,724 mi.) were designated within the Colorado River basin (Figure 3). Included are portions of the Green, Yampa, Duchesne, Colorado, White, Gunnison, and San Juan rivers in the upper Colorado River Basin, and portions of the Colorado, Gila, Salt, and Verde rivers in the lower Colorado River Basin. The designated areas contain habitats within the 100 year flood plain that will meet the needs of the razorback sucker as defined by primary constituent elements. As an integral park of making the critical habitat determination, the USFWS also has produced a Biological Support Document (Maddux et al. 1993) and an economic analysis (Brookshire et al. 1994).

The 15 reaches of critical habitat for the razorback sucker are described below with a brief summary of features important to the various life history stages. Legal descriptions of those areas are given elsewhere (USFWS 1994). Nonnative fishes,

27

which pose a serious threat to the razorback sucker, are present in all 15 reaches of critical habitat. Also included are areas in which critical habitat for the razorback sucker overlaps with that of other listed species (after Maddux et al. 1993, USFWS 1994):

RZ1: Yampa River section from Cross Mountain Canyon to Green River.

> The lower reaches of the Yampa River provide adult and spawning habitat, and potential nursery areas occur downstream. The existing water quantity and quality conditions are relatively unaltered from historic conditions. Tyus and Karp (1989) found the existing flows in this reach adequate for life history needs of the native fishes, principally because spring flows and baseline conditions are little changed from historic conditions. The primary threat to razorback sucker survival and recruitment in this reach is the abundance of nonnative fish species that prey upon or may compete with the razorback sucker, and the State of Colorado has removed bag and possession limits for predaceous warmwater game fish within critical habitat. Protection of the Yampa River will maintain its contribution of flow and nutrients to important downriver reaches (RZ2 and RZ3) on the Green River (McAda and Wydoski 1980; Tyus and Karp 1989).

RZ2: Green River section from mouth of Yampa River to Sand Wash.

> This reach of the Green River contains the largest existing riverine population of the razorback sucker (Lanigan and Tyus 1989, Modde et al. 1996). The reach provides spawning (Tyus and Karp 1990) and nursery habitat (Wick et al. 1982). Flaming Gorge dam prevents upstream movement and, in combination with the Fontenelle dam, alters water flows, temperature regimes, and sediment, and contaminant concentrations. The dams are presently providing some flows needed by the endangered fishes, and the Service and the Bureau of Reclamation are studying this reach for determining water flow needs of the fish. However, Stephens et al. (1992) found sufficient levels of boron, selenium, and zinc in water, sediment, and fish tissue samples to be harmful to fish in some restricted locations. Selenium levels from one impounded area are elevated and

BLM_0070576



Figure 3.  Critical habitat of the razorback sucker.

BLM_0070577

may cause mortality of razorback sucker larvae (Bruce Waddell, USFWS, pers. comm. 1993).  Although predaceous game fish occur in this reach the States of Colorado and Utah have removed bag and possession limits to encourage their removal.

RZ3: Green River section from Sand Wash to the Colorado River.

The lower portion of the Green River, which now contains a small population of razorback suckers, may provide important nursery habitat when water levels are high enough to flood bottomland.  However, flow regulation by upstream reservoirs has prevented inundation of nursery habitat and may restrict movements of razorback sucker from main river channels to flooded areas.  This reach may facilitate genetic exchange between razorback sucker populations in the Colorado River and the Green River.  This reach is under close evaluation as a recovery area due to the presence of newly hatched razorback sucker larvae.

RZ4: Lower 18 miles of the White River.

This reach contains seasonally flooded habitat and may be used by razorback suckers from the adjoining Green River.  Historic flow patterns of White River below Rangely, Colorado, were altered by construction of the Taylor Draw Dam, which poses a complete barrier to fish migration.  Water quantity is acceptable for razorback suckers, but the potential for degradation of water quality by various industries along the river should be investigated.  Although predaceous game fish occur in this reach the State of  Utah has removed bag and possession limits to encourage their removal.

RZ5: Lower 2.5 miles of the Duchesne River.

This reach is presently used by razorback suckers and is presumably an important staging area for fish spawning in the mainstream Green River  (Tyus and Karp 1990).  Water diversions, which have eliminated habitat upstream, continue to threaten the remaining habitat in this reach.  Several proposed diversion projects would further threaten flows.

RZ6: Gunnison River from Redlands Diversion to Uncompahgre River.

Upstream reservoirs (Taylor Park Dam and the Aspinall Unit) have changed the timing of runoff flows, but water use is mainly nonconsumptive and most of the water still flows down the Gunnison River.  The Fish and Wildlife Service and the Bureau of Reclamation have been working to manage reservoir releases to mimic the shape of the natural hydrograph.  A formal agreement is expected in 1998 with completion of a Biological Opinion.  Adequate flows are maintained in most of the reach because the Redlands Diversion Dam has a senior water right.  However, the 2.3 miles of river below the dam have been completely dewatered

BLM_0070578

in the past.  A recent MOU between the Fish and Wildlife Service, Bureau of Reclamation, and Gunnison River water users will guarantee a minimum flow of at least 300 cfs below the Redland diversion at all times.  Completion of fish passage around the Redlands diversion dam in 1996 allows fish movement between this reach and the Colorado River..

RZ7: Colorado River from Rifle, Colorado to Westwater Canyon.

The Colorado River near Grand Junction contains adult razorback suckers and there is some evidence of spawning.  Physical habitat is suitable for razorback suckers, but the Government Highline Dam at the lower end of DeBeque Canyon and the Price-Stubb Dam downstream completely block upstream movements. Fish passage structures have been completed for the downstream Grand Valley Diversion, and are being discussed for these other sites.  Flows below these structures are greatly altered from the natural hydrograph and the river channel is constrained by dikes and riprap.  Management actions have been taken to provide water to the reach and to restore parts of the floodplain.  Selenium levels are high in some areas. Although predaceous game fish occur in this reach the State of Colorado has removed bag and possession limits.

RZ8: Colorado River from Westwater to the Dirty Devil River.

Razorback suckers are present in this reach and were historically abundant in this portion of the Colorado River.  Although the reach contains bottomland and other habitats, inadequate water quantity and nonnative fish species threaten to the small population of razorback sucker in this reach.

RZ9: San Juan River from Hogback Diversion to Neskahai Canyon.

Anecdotal information from long-time area residents indicated that razorback sucker once occurred as far upstream as the Animas River (L. Ahlm, NM Dept. of Game and Fish, pers. comm.).  Habitat has been fragmented by construction of diversion structures and degraded by associated water depletions.  The flow regime is now regulated by Navajo Dam, and channel geometry has been altered by establishment of nonnative tamarisk and Russian olive.  Water quality has been degraded by discharges from domestic, agricultural, and industrial sources.  Nonnative fish species have become established throughout  the reach, and they compete with and prey on the native fish fauna.  Despite the alterations, some suitable habitat remains for the razorback suckers (Bliesner and Lamarra 1995, 1996; Ryden and Pfeifer 1995).

RZ10: Colorado River from Paria River to Hoover Dam.

This segment of the Colorado River contains riverine and lacustrine habitat.  The riverine portion below Glen Canyon Dam consists of cold, high-velocity water,

BLM_0070579

with some pools and long runs through the Marble and Grand canyons. The
dam controls the quality and quantity of water in the reach, and habitat
conditions can change drastically due to reservoir operation. In contrast, Lake
Mead provides deep water, shallow bays, and cove habitats. These low velocity
areas have suitable temperatures for all life stages and physical habitat for
adults. However, the reach, and especially Lake Mead, also contains many
nonnative predators. The USFWS is presently consulting with the Bureau of
Reclamation to potentially change management of Glen Canyon to improve
downstream conditions for razorback sucker.

RZ11: Colorado River from Hoover Dam to Davis Dam.

The largest known population of razorback suckers (about 25,000) occurs in
Lake Mojave. Flows into Lake Mojave are controlled by the releases from
Hoover Dam. This population of razorback suckers provides almost all hatchery
stocks and has been the focus of extensive research on population genetics,
parasites, disease, and many other aspects of razorback life history. A
reintroduction program is presently underway.

RZ12: Colorado River from Parker Dam to Imperial Dam.

Extensive construction for water development projects and other physical habitat
alteration has occurred along this reach. Several diversion dams impose partial
and seasonal barriers to fish migration. Water quality has been altered by
increased salinity due to water re-usage and lower temperatures from
hypolimnetic release. However, water temperatures below Parker Dam are
higher than tailrace temperatures below Glen Canyon or Hoover Dam. Portions
of the channel have been stabilized or channelized, but suitable habitat (i.e.,
unmodified channel, backwaters, and gravel bars) is still available for all life
stages of the razorback sucker and the presence of 11- to 12-inch juveniles in
canals and drainage ditches provides evidence of successful spawning within
this reach. Recruitment to the population is probably suppressed due to
predation by nonnative fishes.

RZ13: Gila River from Arizona/New Mexico state line to Coolidge Dam.

Razorback suckers were extirpated from this reach by the 1950s. Water quantity
and quality appears acceptable for razorback suckers from Safford, Arizona, to
the confluence with the San Francisco River. However, hatchery-reared
juveniles have been stocked into the Gila River and tributaries since 1981, but
apparently with little success. Water depletion in this reach is extreme, and
reservoirs may nearly dry up during periods of drought but pools in the main
channel and tributaries can provide some habitat during low flow periods.

BLM_0070580

RZ14: Salt River from the US 60/SR 77 bridge to Roosevelt Lake.

Razorback suckers were extirpated from the Salt River by the 1960s. A cooperative effort was started in 1981 to reintroduce the species, apparently with little success. Hydrologic conditions, water quality, and physical habitat have remained similar to the historic, natural conditions of this reach. However, as in other areas, the threats to recovery are mainly the many introduced fishes (including the highly predaceous flathead and channel catfishes)..

RZ15: Verde River from Prescott National Forest Boundary to Horseshoe Lake.

Wild razorback suckers have not been reported from the Verde River since 1954. Hatchery-raised individuals have been stocked since 1981, but the reintroduction apparently was not successful until recently, when larger individuals were stocked (K. Young, personal communication, Arizona Game and Fish Department). Flows within this reach have been altered by several diversion projects, but water levels remain adequate. Water quality parameters such as salinity, nutrients, and temperature have been changed, but remain within tolerance of aquatic species. The presence of nonnative fishes and heavy infestation of parasitic copepods have hampered reintroductions of razorback suckers in the Verde River (Creef and Clarkson 1993, Clarkson et al. 1993).

Critical habitat areas RZ1, RZ2, RZ3, and RZ9 overlap with critical habitat designated for the other big river Colorado River endangered fishes. RZ4, RZ6, RZ7, and RZ8 overlap with designated Colorado pike minnow area. RZ10 and RZ11 overlap with humpback chub and the bonytail chub areas respectively. Critical habitat designations RZ14 and RZ15 are areas where experimental, non-essential populations for the Colorado pike minnow have been authorized. RZ15 also overlaps with proposed critical habitat for the threatened spikedace, *Meda fulgida*.

Target Population Numbers

Recovery plans strive to present recovery objectives in quantified terms. However, it is difficult to determine needed population sizes of an endangered species because the species is almost always a rare one, which makes data difficult to obtain. Thus, the means for determining what population sizes are needed to facilitate down listing or delisting are often lacking.

The development of quantitative recovery goals will require determining population sizes of the fish in various locations that can be expected to persist over time, i.e., wild populations that would be "viable" in nature. In order for down listing or delisting to occur, a species would have to maintain populations for some time period, during which it would be expected to survive natural and anthropogenic threats. Although minimum

BLM_0070581

population sizes needed to maintain populations of domestic animals or captive populations for a number of generations have been determined, minimum population sizes needed to maintain wild species are less well understood. Target population sizes for populations of the endangered big-river fishes used in this document were provided by the Colorado River Fishes Recovery Team and accepted by USFWS. These population numbers represent the best professional judgement and fall within the range of ". . . several thousand to 10,000 . . ." thought to provide minimum viable population sizes to sustain wild populations (reviewed by Thomas 1990). However, more specific population targets are being developed for portions of the upper Colorado River basin (e.g., Crowl and Bouwes 1997). At present these target sizes are preliminary and have not been accepted by USFWS. Recovery plans can be updated as necessary when final population targets are developed and accepted. It is anticipated that it will take several years before such numbers are finalized. Although population targets must be based on genetic requirements, they also must consider how the population viability of wild populations are affected by existing conditions and how they might be threatened by new changes.

Ecosystem Recovery

The USFWS and NMFS (1994) has identified ecosystem recovery as an integral part of endangered species recovery program and the USFWS funded preparation of a draft multi-species recovery plan for the Colorado River fishes in 1996. This multi-species plan is preliminary and has not been approved by the Colorado River Fishes Recovery Team. However, it is assumed that a multispecies or ecosystem recovery plan will eventually be forthcoming.

Critical habitat designation will play an important role in maintaining the natural ecosystem. However, as important as critical habitat determination and management has been as a recovery tool, there is still a need for management of the riverine ecosystem due to widespread, continuing anthropogenic changes. Single species recovery remains important, but continuing habitat change and the complexity of riverine ecosystems suggest that recovery of the endangered Colorado River fishes should also include a more holistic approach.

34

## Part II.  RECOVERY

### Organization and Priorities

The Colorado River Compact divided the Colorado River system into upper and lower basins at Lees Ferry, AZ in 1922.  This legacy is so strong and pervasive that it makes a logical point of departure for organizing recovery efforts.  In addition, institutional recovery frameworks are roughly aligned along an upper-lower basin axis, such as the Upper Colorado River Basin Recovery Implementation Program (operational), and the Lower Colorado River Multispecies Conservation Program (still in an early stage of planning).  The San Juan River basin is the exception because it has its own Recovery Implementation Program.

Recovery objectives and criteria for the razorback sucker can best be accomplished using a two-basin concept:  the upper and lower Colorado River basins.  This concept recognizes fundamentally different approaches to recovery that may be needed in these two locations, and also that different entities assume primary responsibilities for different parts of the basin.  Priorities for recovery within each basin will be established on the basis of important extant populations and recovery areas for which critical habitat evaluations suggest high potential.  The designation of priorities does not exclude other populations or critical habitat from the protection afforded by the Act, but does provide a mechanism for focusing attention and resources on recovery actions needed in the most promising locations.

### Recovery Goals

The short-term goal for recovery of the razorback sucker is to prevent extinction.  The goal shall be attained when the continuing decline of the three extant stocks of the razorback sucker in Lake Mojave (Arizona and Nevada), and in the lower Yampa River (Colorado) and middle Green River (Utah) has been reversed, as indicated by increasing population sizes produced by natural recruitment.

The long-term goal is to recover the fish to the point that it may be down listed and then delisted.  Fragmentation of the habitat of this species by construction of dams and diversion has resulted in isolated populations and recovery areas.  Because of continuing environmental change, prudence dictates that the safety of this species will require recovery of a number of these isolates.  After the short-term goal is attained, down listing will be possible when populations have been established and protected in the lower Green and San Juan rivers, and one additional population has been established and protected  in the upper or lower basin.  After the fish has been down listed to threatened, delisting will be possible when a total of two additional populations, one in the upper and one in the lower basin (i.e., a total of five new or recovered populations in addition to the three extant populations) have been established by natural recruitment and protected.

35

BLM_0070583

## Recovery Criteria

When the following criteria have been met, the short-term goal will have been met:

1. Decline of the extant stock of the razorback sucker in Lake Mojave, Arizona and Nevada, has been reversed by management action, and the population reaches a sufficient size that genetic diversity is protected. The target size is 50,000 or more adult fish, and this abundance must be maintained or exceeded by natural recruitment for at least 5 years.

2. Management actions result in a razorback sucker population size of 5,000 adult fish in the lower Yampa-middle Green river stocks, with adequate numbers of naturally-recruited immature fishes to sustain this target adult population size for 5 years.

3. Management practices must be developed and instituted to improve biological (adverse nonnative fish interactions) and physical habitat conditions (e.g., flow regime, temperature, turbidity) to prevent further degradation habitats used by the populations listed under criteria 1-3.

Because of ongoing studies of the razorback sucker, population objectives stated for the short-term goal will be reviewed periodically and modified as needed for recovery of this species.

After the short-term goal has been achieved, down listing of the species may be considered when the following conditions are met:

1. Management actions result in a razorback sucker population size of 2,000 wild-produced adult fish in the lower Green River, with adequate numbers of naturally-recruited immature fishes to sustain the target adult population size for 5 years.

2. One additional population is recovered or established in the upper basin and one additional population is recovered or established in either the upper or lower basin.

3. All three of these additional populations shall reach a sufficient size to maintain genetic diversity and to be relatively secure from potential threats (to be determined by USFWS with advice of the Colorado River Fishes Recovery Team) and they shall receive legal protection necessary to insure their long-term survival. These populations must equal or exceed and identified threshold size for at least 5 years by means of natural recruitment. On the basis of critical habitat information, promising areas in the lower basin may include the Salt River (RZ14) and the Verde River (RZ15). Promising areas in the upper basin may include the Colorado (RZ7), Gunnison (RZ6), and San Juan (RZ9) rivers.

After the species has been down listed to threatened, delisting of the species may be considered when the following conditions have been met:

36

BLM_0070584

1. A total of two additional populations of the fish have been recovered or established under the criteria for down listing. One of these additional populations shall be in the upper basin and one in the lower basin, and also shall have the necessary management programs established to protect and, if necessary, manage habitats to ensure the long-term survival of the razorback sucker populations.

2. By the time all conditions have been met for delisting, there will be eight razorback sucker populations in the Colorado River basin that are secure from known threats and legally protected from anticipated future threats to their persistence as viable populations.

In addition to the recovery criteria specified above, recovery efforts might benefit from the establishment of natural (i.e., wild) refugia for razorback suckers. At times, there is excess hatchery production of the fish with no place to keep these fish. It has been suggested that such fish be marked to record genetic identity and placed in isolated areas where there is little chance of mixing with other stocks (R.S. Wydoski, USFWS, pers. comm., 1996). This concept has merit from several standpoints: a supply of fish for future efforts of recovery programs, a reduction of expense for holding the fish, and an opportunity to learn about survival and behavior of hatchery fish. One such area that has already been stocked with excess hatchery fish is Lake Powell (USFWS unpublished permitting records, Denver, CO). This area appears to be well suited because of its semi-isolation from other upstream and downstream populations. Stocking of fish in Lake Powell presently is occurring under terms of a MOU signed by cooperating agencies (J. Hamill, pers. comm. 1996).

**Recovery Priorities**

The stepdown outline and narrative of this plan are based on five priorities as described below. These priorities are necessary for directing the allocation of recovery efforts, but should not be regarded as immutable indefinitely. Experience has shown that planning should be strategic (rather than tactical) and should have a relatively short time horizon, because of the very precarious status of endangered species (Clark et al. 1994). As actions are taken and new information is obtained, this plan must be sufficiently flexible to allow changes of direction in the inherently unpredictable business of managing an endangered species.

This razorback sucker recovery plan has been drafted in an attempt to avoid some of the problems caused by an inflexible, tactical approach. It has been written as a brief strategic plan to provide incentives and a vehicle for development of conservation activities involving many interested parties. Conservation of endangered species requires state-of-the-art efforts that may be urgent, risky, complex, and costly. Thus, it is intended that implementation of the priority items in the plan be guided, rather than constrained by the stepdown provided. Existing recovery implementation programs can provide flexibility in recovery of endangered species and work planning efforts of those

BLM_0070585

programs, where they exist, will constitute some of the geographic implementation of this plan.

The following priorities are ranked in order of importance. The most urgent task (Priority 1) lists the actions considered necessary for preventing extinction of the razorback sucker. The next most urgent task (Priority 2) lists the actions considered necessary for recovery, down listing, and delisting. The remaining, and less urgent, tasks detail the long term actions necessary to meet other recovery objectives relating chiefly to population maintenance: management plans (Priority 3), habitat protection (Priority 4), and improved communication (Priority 5).

Priority 1.   An action that must be taken to prevent extinction in the immediate future, and to prevent the species from declining irreversibly in the foreseeable future.

Priority 2.   An action that must be taken to prevent a significant decline in the number of extant populations and needed habitats of this species, and to allow recovery to a less endangered status.

Priority 3-5.   All other actions necessary to meet the recovery objectives.

38

BLM_0070586

**Stepdown Outline**

1. Prevent extinction of major extant razorback sucker populations and permanent loss of genetic diversity of existing populations.

    1.1.   Protect fish in refugia and maintain genetic diversity .
        1.1.1.  Maintain adequate refugia.
        1.1.2.  Collect razorback suckers for refugia.
        1.1.3.  Manage genetic composition of razorback sucker refugia populations.
            1.1.3.1.  Maintain diversity found in wild populations.
            1.1.3.2.  Identify and maintain separate stocks if necessary and determine significance to recovery.
            1.1.3.3.  Determine degree of hybrid introgression and potential for affecting recovery effort.

    1.2.   Restore physical habitats and provide fish access.
        1.2.1.  Restore water flows.
        1.2.2.  Restore fish passage.
        1.2.3.  Reduce contaminants.

    1.3.   Reduce adverse biological impacts.
        1.3.1.  Control nonnative fishes.
            1.3.1.1.  Control nonnative fish in razorback habitat.
            1.3.1.2.  Stop movement of nonnative fish into razorback habitat.
            1.3.1.3.  Prevent new introduction of nonnative aquatic species.

    1.4.   Augment wild populations.
        1.4.1.  Introduce and protect wild larvae life stages.
        1.4.2.  Introduce and protect juvenile or adults.

    1.5.   Monitor populations and habitat status.
        1.5.1.  Develop standardized population monitoring procedures.
        1.5.2.  Implement population monitoring programs.
        1.5.3.  Compile and analyze population data.
        1.5.4.  Monitor habitat.
        1.5.5.  Compile and analyze habitat data.

2. Establish and protect additional wild populations.

    2.1.   Develop criteria for selecting additional recovery areas.

    2.2.   Assess restoration and access needs.
        2.2.1.  Determine flow, water level requirements.
        2.2.2.  Determine effects of contaminants.

BLM_0070587

2.2.3. Determine nonnative impacts that may limit recovery.
2.2.4. Quantify food abundance.
2.2.5. Determine annual temperature regimes.
2.2.6. Identify required fish passage.

2.3.   Select additional recovery areas in critical habitat reaches.

2.4.   Determine habitat restoration needs.
2.4.1. Determine habitat to be restored.
2.4.2. Identify habitat parameters that may be limiting.

2.5.   Restore Needed Habitats and provide fish access.
2.5.1. Restore physical habitat components.
2.5.1.1. Restore water conditions.
2.5.1.2. Restore fish passage.
2.5.1.3. Reduce contaminants.
2.5.1.4. Reduce effects from diseases and parasites
2.5.2. Restore biological habitat components.
2.5.2.1. Restore food resources.
2.5.2.2. Control/manage nonnative fishes.

2.6.   Augment or reintroduce razorback suckers in recovery areas.
2.6.1. Propagate razorback suckers.
2.6.1.1. Refine propagation, holding, and rearing techniques.
2.6.1.2. Maintain a diversified broodstock.
2.6.2. Develop and implement introduction and monitoring activities.
2.6.2.1. Develop procedures for introduction and monitoring.
2.6.2.2. Reestablish or augment razorback suckers.
2.6.2.3. Monitor reestablishment and augmentation efforts.

3. Protect and maintain razorback sucker populations and their habitats.

3.1.   Determine threats to razorback sucker populations

3.2.   Monitor and assess the impact of development projects.

3.3.   Refine and enforce existing laws and regulations protecting the razorback sucker.
3.3.1. Review conservation and enforcement responsibilities of appropriate agencies
3.3.2. Ensure compliance with Section 7 of the Endangered Species Act by all Federal Agencies.
3.3.3. Foster better relationships with non-federal agencies and promote more effective state and local government protection.

BLM_0070588

3.3.4. Assess effectiveness of current regulations/management and draft additional regulations or increase protection and enforcement as needed.

3.3.5. Discontinue or prevent introductions of nonnative fish species that may have a negative impact on the razorback sucker.

3.3.6. Protect high priority recovery areas.

3.4. <u>Develop and implement cooperative interagency programs to protect and recover the razorback sucker.</u>

4. <u>Develop quantitative recovery goals and a long-term habitat protection strategy.</u>

4.1. <u>Develop quantitative recovery goals for each recovery area.</u>
4.1.1. Develop goals for population size for each recovery area.
4.1.2. Develop habitat restoration or development goals compatible with recovery area needs.

4.2. <u>Develop quantitative recovery goals for each recovery area.</u>
4.2.1. Develop goals for population sizes needed for various recovery objectives.
4.2.2. Develop ecosystem restoration or development goals.

5. <u>Promote and encourage improved communication and information dissemination.</u>

5.1. <u>Develop and conduct workshops to coordinate recovery efforts.</u>

5.2. <u>Conduct nationwide information and education programs.</u>

5.3. <u>Conduct local information and education programs.</u>

5.4. <u>Promote information and education programs within management agencies.</u>

5.5. <u>Encourage and support publication of research and other recovery results in the technical literature.</u>

41

BLM_0070589

**Narrative**

1. <u>Prevent extinction of major extant razorback sucker populations and permanent loss of genetic diversity of existing populations.</u>

The razorback sucker is one of the most endangered fish species in the Colorado River basin. Several stocks are known, but there is no evidence that any of these populations is self-sustaining. Immediate action is required to prevent extinction, and to maintain the present wild populations and their gene pool. Habitat changes have no doubt affected populations of the razorback sucker, but there is compelling evidence that competition and especially predation by nonnative fishes is the greatest present problem contributing to their decline. Highest priority actions for recovery of the razorback sucker include maintaining wild populations, protecting genetic diversity, restoring habitat, and reducing the impact of nonnative fishes. It does not appear possible that the present razorback sucker populations can maintain themselves in nature without effective implementation of all of these recovery needs.

Management plans are required to address and implement site-specific recovery needs within the following framework:

1.1. <u>Protect fish in refugia and maintain genetic diversity.</u>

Most of the razorback suckers in the wild are older fish. As these fish die, they are not being replaced in sufficient numbers to maintain the present stocks. Loss of stocks may reduce the survivability of this species and lessens chances for recovery by depleting the gene pool. To prevent complete and permanent loss of this genetic material, portions of the gene pool are being protected. Further genetic evaluations should be made to ensure that the proper brood stock is in protective captivity in case remnant populations are extirpated.

1.1.1. Maintain adequate refugia.

Refugia for razorback suckers currently exist (or are being developed), at Dexter National Fish Hatchery, New Mexico; Ouray National Fish Hatchery, Utah; Horsethief Ponds, Grand Junction, Colorado; Wahweep Warm Water Facility, Big Water, Utah; Lake Powell; and the four National Wildlife Refuges along the lower Colorado River. Potential sites include Arizona Game and Fish Department's Bubbling Pond Hatchery. In addition, Tribes may furnish additional ponds, such as land in northwest New Mexico (Navaho Nation).

1.1.2. Collect razorback suckers for refugia.

Razorback suckers held in refugia should be maintained by captive breeding programs to lessen the number of the fish that have to be

42

removed from the wild. However, it is necessary to obtain additional genetic material in order to lessen the chance of inbreeding due to inadvertent selection and limited parental stock. Workers should be prepared to properly capture, handle, and transport razorback suckers to refugia according to established protocol. In order to limit stress to older individuals, high priority shall be placed on obtaining younger life stages of the fish, as is being accomplished in Lake Mojave.

1.1.3.  Manage genetic composition of razorback sucker refugia populations.

1.1.3.1.  Maintain diversity found in wild populations.

Manage refugia populations so that their genetics are representative of all wild populations.

1.1.3.2.  Identify and maintain separate stocks if necessary and determine their significance to recovery.

Monitor razorback matings to ensure that the genetics of the original wild populations are maintained.

1.1.3.3.  Determine the degree of hybrid introgression and the potential for affecting recovery efforts.

Hybridization with other catostomid is not regarded as a serious problem at present. However, it is possible that the incidence of introgression may increase in the future. All fish brought into captivity should be evaluated for potential introgression. Fish with a higher degree of introgression than is now present may not be suitable as broodstock.

1.2.  Restore physical habitats and provide fish access.

Using the best available information, restore razorback sucker habitats and maintain required habitat parameters.

1.2.1.  Restore water flow regimes.

Maintain the historic variability of flows by water management and /or by acquiring and managing spring flows to more adequately mimic the natural hydrograph. These flows should:  create and maintain habitats (i.e., move sediments to form spawning, nursery, and adult habitats); inundate selected floodplain bottomland; maintain seasonally flooded backwaters; flood tributary mouths. Use of flows to reduce nonnative fish

43

BLM_0070591

abundance should be further evaluated where potentially feasible. Because of geomorphic changes, there are areas where flows alone cannot provide desired outcomes, and other management options need to be evaluated, such as stream channel reconstruction or other mitigating features.

Acquire and manage non-spring flows to: maintain appropriate seasonal water levels in backwaters; provide a diversity of habitats for adult razorbacks; and allow passage at diversion structures.

### 1.2.2. Restore fish passage.

The use of existing passage structures by razorback suckers needs to be evaluated, and the feasibility of restoring passage at other barriers and impediments that block access to habitat required for recovery also needs to be addressed. There is a need to investigate behavioral attributes of razorback sucker that may facilitate the design of passage structures. The design of new passage structures should include any measure to restrict passage of problematic nonnative fishes.

### 1.2.3. Determine the role of environmental contaminants in recovery.

Investigate point and non-point source discharges that may harm razorback suckers. Reduce levels of harmful contaminants in problem areas (e.g., those areas where razorback adults seem to congregate, such as flood plains, tributary mouths, irrigation drains, etc.). Review existing spill contingency plans for adequacy in protecting areas important to the razorback sucker. Work with involved agencies to identify specific measures to protect important areas and include this information in updated spill contingency plans.

## 1.3. Reduce adverse biological impacts.

Razorback suckers can live for a long time, but young stages are extremely vulnerable to mortality in the present environment. For recovery to be successful, measures must be found to increase recruitment.

### 1.3.1. Control nonnative fishes.

Predation and perhaps competition by nonnative fishes has been shown to limit recruitment in razorback sucker populations (reviewed by Minckley et al. 1991, Tyus and Saunders 1996). The spread of nonnative fishes throughout razorback sucker habitat must be controlled if the razorback sucker is to be recovered. Especially vulnerable to predation are the younger life stages, but even larger juveniles are exposed to predation in

BLM_0070592

some locations. An extensive review and plan for nonnative fish control has been developed for the upper Colorado River basin (Tyus and Saunders 1996). This plan provides guidance for evaluating and implementing fish control methodologies.

### 1.3.1.1. Control nonnative fishes in razorback sucker habitats.

Several nonnative fishes occupy razorback sucker habitats. Control actions are needed to reduce their numbers in specific areas. New technologies should be developed to assist with fish control.

### 1.3.1.2. Stop movement of nonnative fishes into razorback sucker habitats.

Predaceous game species continue to escape from reservoirs and other areas and move into occupied habitat. Areas must be identified and effective escapement controls should be put into place to reduce escapement or the stocks of these nonnative fishes must be eradicated where practical or warranted.

### 1.3.1.3. Prevent new introductions of nonnative aquatic species.

Nonnative fish that are not currently in the Colorado River basin should be kept out. In addition, the introduction of nonnative fishes that are already in one part of the basin should not be placed in another. There are interagency agreements for a stocking policy to effectively preclude introduction of all species that do not currently occur within the Colorado River Basin.

## 1.4. Augment wild populations.

### 1.4.1. Collect and rear wild larvae.

Wild razorback sucker larvae are presently being captured on location in Lake Mojave, reared to a larger size, and repatriated into the lake to augment the wild population. Because of the success of this program relative to the survival and genetic diversity of these larvae, such procedures may have merit in other locations where wild larvae require protection to escape predators, and also may need to be reared in the absence of predators to survive.

### 1.4.2. Introduce juvenile or adult fish.

45

BLM_0070593

Larger size razorback suckers are less vulnerable to predation and population augmentation with larger fish has a greater chance of success. However, razorback suckers may imprint to natal areas in the late egg or early larval stages. Using the best available technology, it may be necessary to imprint introduced fish with natural or synthetic chemicals to maximize use of high quality spawning areas and to ensure long-term reproductive success. This may be particularly important for riverine areas. Imprinting may be less important in lacustrine areas.

1.5. Monitor populations and habitat status.

Razorback sucker populations and their habitats should be monitored to track the status of the populations, determine habitat conditions, and to detect potential problems. Effective and safe monitoring techniques should be developed. Evaluations relative to problems should be done as needed on a case by case basis.

1.5.1. Develop standardized population monitoring procedures.

Standardized procedures are needed for implementing efficient and compatible monitoring procedures throughout the Colorado River basin. Monitoring shall be accomplished with minimal harm to individual fish and with minimal stresses to fish populations. Monitoring procedures, including netting, electrofishing, angling, handling, tagging, and larval fish sampling should be developed and evaluated to reduce impacts to razorback sucker populations. New techniques should be evaluated for potential use.

1.5.2. Implement population monitoring programs.

The status of all wild and reestablished populations of razorback suckers will be monitored. Because of the extreme longevity of the fish (up to 50 years), and the relative inability to detect differences in population levels to date, monitoring programs should be long-term efforts (i.e., a minimum of 20 years) designed to detect population changes. This information is critical for evaluating the success of management and recovery efforts. Results of monitoring programs will be needed to determine progress of recovery, and to determine when the objectives for down listing and delisting have been met.

1.5.3. Compile and analyze population data.

Compile and analyze information on population abundance, distribution, migration, and other general biological information to determine

46

population status and trends (i.e., identify age classes, hatching and rearing success, relative abundance, etc.).

1.5.4. Monitor habitat.

Monitor the quantity and quality of habitats that have been identified in site-specific management plans for recovery areas.

1.5.5. Compile and analyze habitat data.

At present, mechanisms for compiling, analyzing, and interpreting habitat data for the fish are not in place basin-wide. Using habitat monitoring procedures, compile and analyze information on the quality of habitat, as related to the habitat use and success of populations of razorback sucker in various locations, must be compiled, analyzed, interpreted, and shared throughout the range of the species.

2. Establish and protect additional wild populations.

Historically, razorback suckers were common or abundant in many areas of the Colorado River basin, but most populations have been extirpated. Some habitat areas that have recovery potential do not contain razorback sucker populations. These areas and others should be considered as candidates for recovery of razorback sucker populations. Specific recovery areas should be selected from these candidates based on likelihood of success. This selection process can benefit from the intensive efforts undertaken in various parts of the basin where biotelemetry and other habitat assessment methods have demonstrated persistence of introduced hatchery or repatriated individuals.

Candidate sites for reestablishment of razorback sucker populations are lotic and lentic habitats. Such areas in the upper Colorado River Basin include the Grand Valley area of the Colorado River; the Gunnison River near Delta, Colorado; and the San Juan River. In the lower basin, such sites in the Gila, Verde, Salt, and lower Colorado rivers are being considered. However, each site will require some restoration prior to introduction of razorback suckers. Habitats in the recovery sites should be identified and classified as "suitable" with regard to spawning sites, nursery areas, floodplain, nonnatives, contaminants, flows, temperatures, and access. Care must be taken to ensure that all of the primary constituent elements of critical habitat are present (or can be restored) and specifically defined for these recovery areas. Each selected recovery area must have a specific management plan developed using the following guidance:

2.1. Develop criteria for selecting additional recovery areas.

A recovery area will have defined geographic boundaries (i.e., upstream, downstream, and floodplain boundary limits) which encompass the home range

BLM_0070595

of the population, and will contain components believed necessary to sustain a population of razorback suckers. For example, studies of riverine areas suggest that a recovery area should include a spawning bar near the upstream end of the Unit, nursery habitats for larvae and young downstream from the spawning bar (e.g., floodplain bottomland and backwaters), and a variety of habitats managed seasonally for adults (e.g., pools, runs, riffles, backwaters, side channels, flooded tributary mouths, inundated bottomland). In locations were a self-sustaining population will be maintained it must accommodate all life history phases of the razorback population. Thus, the length of the recovery area should be at least 30-50 river miles in length, depending upon conditions. Unrestricted passage for upstream, downstream, and lateral movements also may be needed within the area. Riverine areas such as the upper Colorado, Gunnison, San Juan, Verde, Salt, and Gila rivers should be re-evaluated for recovery potential using these criteria.

Some impounded reaches also may provide suitable razorback sucker habitat, especially those that retain certain riverine attributes. Criteria for such recovery units should be determined by study of Lake Mojave, Lake Powell, Senator Wash Reservoir, or other impoundments. Studies should identify all habitat areas within the recovery units that presently, or with proper modification may meet the habitat requirements of specific life stages of razorback suckers (e.g., spawning bars, nursery areas, adult habitats, and etc).

2.2. <u>Assess restoration and access needs.</u>

Evaluate the habitat conditions of each candidate recovery area and identify suboptimal conditions and other problems that need to be resolved within the recovery area. All recovery areas will differ with respect to various flow and water level and other habitat conditions. The evaluation process can be supported by biotelemetry and other studies that indicate habitats are acceptable or identify preferred habitats.

2.2.1. Determine flow and water level requirements.

Using data and information obtained through activities outlined in Section 155, determine spring flows (magnitude and duration) that are necessary to create and maintain razorback habitats (i.e., flows which may scour, move, and deposit sediments to form spawning and nursery habitats). Determine spring flows necessary to inundate floodplain bottomland and tributary mouths. Determine non-spring flows needed to provide a diversity of habitats for adult razorbacks. Make recommendations regarding methods or actions needed to obtain required habitats, including land form alteration if needed due to flow limitations.

BLM_0070596

2.2.2.  Determine effects of contaminants.

Candidate recovery areas should be screened to determine if serious contaminant problems exist.  For contaminants that are likely to be a problem, potential effects on razorback life cycle events (e.g., growth, survival, reproduction, etc.) should be evaluated to determine if they might reduce the potential of an area for recovery.

2.2.3.  Determine nonnative impacts that may limit recovery.

Within each selected recovery area, characterize composition, distribution, and abundance of the fish community. Determine partitioning by life stage and habitat type.  Conduct field experiments on management of nonnative predators/competitors (e.g., net enclosures, controlled access to ponds and flooded bottomland habitats, etc.).  Monitor differences in predation on young razorbacks and relative depletion of food resources.  Make recommendations on methods to control negative interactions with nonnative fishes.

2.2.4.  Quantify food abundance.

An important component of the life history needs of the razorback sucker is adequate food.  Recovery sites need to have the ability to sustain populations of the fish, and this cannot occur if proper foods are not available. If foods are not available, additional management measures may be required to manipulate habitats and produce food at the proper time of year.

Within selected recovery areas, the availability and abundance of foods for larvae and adults should be evaluated for various habitats considered important for recovery.  Efforts should also be made to determine food preferences of juvenile razorback suckers, and to assess food abundance for them as well.

2.2.5.  Determine annual temperature regimes.

Within selected recovery areas, monitor water temperatures; compare measured, modeled, and historical temperatures to those considered necessary for razorback growth, reproduction, and gonadal maturation.

2.2.6.  Identify and evaluate required fish passage.

Evaluate the net ecological benefit of providing razorback sucker passage versus the appropriateness of maintaining barriers to nonnative fishes. Identify potential barriers and impediments to razorback sucker

49

BLM_0070597

movement, and determine if flow management can relieve obstructions. Determine physical changes to barriers that facilitate passage, using care to ensure that barriers which restrict problematic nonnative fishes are not removed.

2.3.  Select additional recovery areas in critical habitat reaches.

Once criteria have been determined for selecting new areas, all areas that may provide recovery for the fish must be reviewed for suitability.

2.4.  Determine habitat restoration needs.

Habitat restoration needs should be developed for each site, and according to site-specific planning efforts.  Feasibility studies will be conducted to determine if there are ecological, sociopolitical, economic, or other constraints that might limit habitat restoration.

2.4.1.  Identify habitat parameters that may be limiting.

Identify the habitat parameters (depths, flows, substrates) and any environmental contaminants that may be limiting razorback sucker populations, habitat establishment, or utilization.  Make recommendations for restoring, maintaining, and protecting these habitats.

2.4.2.  Determine habitat to be restored.

Identify those habitats which are absent or are limited within the recovery units and which need to be restored or protected in order to recover the species.  As suggested above, this will require a careful consideration of physical and biological components of razorback sucker habitat.

2.5.  Restore needed habitats and provide fish access.

Utilizing the recommendations developed under Task 2.4, and in accordance with a site-specific management plan, restore razorback sucker habitats and required habitat parameters.  The development of a management plan for each area will require some form of feasibility study to determine if there are constraints in developing and maintaining habitats.

2.5.1.  Restore physical habitat components.

According to the needs of various recovery areas, physical habitat components shall be restored where possible and required for recovery of the fish.

50

BLM_0070598

### 2.5.1.1. Restore water conditions.

Water flows or levels should be provided as needed for recovery, create/maintain habitats (i.e., move sediments to form spawning, nursery, and adult habitats). Inundate selected floodplain bottomland. Fill backwaters with water; flood tributary mouths. Evaluate the use of flows to reduce nonnative fishes if appropriate.

Acquire and manage non-spring flows to: Fill backwaters with water; provide a diversity of habitats for adult razorbacks; and allow movements into various habitats.

### 2.5.1.2. Restore fish passage.

Identify and remove barriers and impediments to fish passage within each recovery area where prudent. In locations where barriers cannot be removed for economic or other reasons, important sites should be evaluated for providing needed passage by the potential use of fish ladders or other structures.

### 2.5.1.3. Reduce contaminants.

Identify contaminants of concern to razorback suckers and determine potential problem areas (e.g., those areas where razorback adults seem to congregate, such as flood plains, tributary mouths, irrigation drains, etc.). Utilize all federal and state resources to develop and implement plans to prevent contamination from point and non-point sources.

### 2.5.1.4. Reduce effects from diseases and parasites

At present, diseases and parasites are not considered a major factor in the recovery effort. However, managers should be alert to guard against disease or parasite problems that may occur in the future

### 2.5.2. Restore biological habitat components.

Biological components of razorback sucker habitat are essential. Nonnative fishes have limited razorback sucker recruitment and they are an important impediment to recovery. Availability of adequate food and control of nonnative fishes are considered  major biological components to be addressed in the recovery effort.

51

2.5.2.1.  Restore food resources.

Adequate food resources must be provided in each recovery area. This will require obtaining additional information about foods utilized by the fish in different habitats.

2.5.2.2.  Control/manage nonnative fishes.

Reduce the adverse impacts caused by nonnative fishes within recovery area, especially in sensitive areas such as nursery/rearing habitats.  The use of fish barriers, chemical and physical eradication, mechanical removal, and other options must be evaluated and implemented as needed.

## 2.6.  Augment or reintroduce razorback suckers in recovery areas.

Propagation and reintroduction are essential to preventing the species extinction and will require consideration of proper techniques for propagation, genetics management, environmental conditioning, imprinting, and stocking of appropriate size fish.

2.6.1.  Propagate razorback suckers.

Propagation has included capture and rearing of wild larvae and hatchery production.  It is important to produce razorback suckers that are genetically diverse, but it also is imperative that stocked fish be compatible with needs of candidate reintroduction or augmentation sites. These needs have not been adequately characterized to date, and may include rearing fish under various conditions, and site-specific imprinting or imprinting the fish to chemicals.

2.6.1.1.  Refine propagation, holding, and rearing techniques.

Additional development of propagation, rearing, and holding techniques may be needed to improve production and survival. There is a need to determine optimum capacities of holding/rearing facilities for different sizes of fish.  Additional production and rearing capability should be developed to meet future needs, but emphasis should be placed on maximizing the use of existing facilities.

2.6.1.2.  Maintain a diversified broodstock.

Studies should continue to determine the brood fish and matings

52

BLM_0070600

needed to maintain genetic diversity of fish needed for specific reintroduction areas.

2.6.2.  Develop and implement introduction and monitoring activities.

When a reintroduction or augmentation program is defined, fish will be reintroduced according to an implementation plan that will detail how fish are to be conditioned, stocked, and evaluated for success of the effort.

2.6.2.1.  Develop procedures for introduction and monitoring.

The importance of imprinting to razorback sucker is under evaluation.  If imprinting is determined to be an important component in the life history strategy of this species, the use of imprinting technology should be included with recovery efforts. This could be accomplished within selected candidate recovery areas by introducing razorback sucker embryos on the selected spawning bar (for natural imprinting), or hatchery-reared razorback suckers (which have been exposed to natural waters or imprinting chemicals) could be stocked and, upon sexual maturity, enticed to migrate to the selected spawning bar by release of chemical attractants.

2.6.2.2.  Reestablish or augment razorback suckers.

Restocked areas will be sampled by standard fishery techniques to assess survival, growth, etc. Monitoring results will determine if stocking is contributing to the reestablishment of a self-sustaining population.

2.6.2.3.  Monitor reestablishment and augmentation efforts.

Monitor the reestablished or augmented populations to determine relative success of stocking efforts, and to determine if additional efforts are needed.

3.  Protect and maintain razorback sucker populations and their habitats.

Provision of adequate habitats needed for down listing or delisting will require appropriate legal guarantees for adequate streamflow and temperature regimes, water quality, and physical characteristics.  Populations and habitats must be monitored until the species is delisted, and for at least 20 years after delisting to ensure habitat and population stability.  Monitoring procedures shall be specified in a long-term management plan, not stipulated as part of a post-delisting recovery requirement.

53

BLM_0070601

All of the above recovery needs should be evaluated and presented in management planning efforts.  In addition, site-specific plans must be developed for each recovery unit.

3.1.  Determine threats to razorback sucker populations.

An assessment of threats facing razorback sucker and potential impacts on the species and its habitat should be made and periodically reevaluated. Management and protective regulations can be instituted or revised as needed.

3.2.  Monitor and assess the impact of development projects.

Ongoing or proposed water development or related projects should be monitored/evaluated to determine their effects on razorback sucker populations and habitat. Considerations should include, but are not limited to flow, temperature, channel morphology, nonnatives, and water quality changes (e.g., turbidity, salinity, environmental contaminants).  Care must be taken to ensure that primary constituent elements of critical habitat are not destroyed, or adversely modified.

3.3.  Refine and enforce existing laws and regulations protecting the razorback sucker.

The purpose of this task is to maintain razorback sucker populations by preventing any further degradation of essential habitat.

> 3.3.1.  Review the conservation and enforcement responsibilities appropriate federal agencies and provide input.
>
> All affected agencies should actively preform their responsibilities to conserve endangered species as required by Section 7(a)(1) of the Endangered Species Act and should be pro-active in protecting listed species and their habitats (e.g., Endangered Species Act, Fish and Wildlife Coordination Act, and Lacey Act).  Agencies should keep current on all laws and regulations or revisions that would change agency responsibility.
>
> 3.3.2.  Ensure compliance with Section 7 of the Endangered Species Act by all Federal Agencies.
>
> Section 7 consultation should help in ensuring that the ecological requirements of the razorback sucker are maintained and further impacts minimized, especially with regards to any actions that might limit the success of the recovery effort.

BLM_0070602

3.3.3. Foster better relationships with non-federal agencies and promote more effective state and local government protection.

Although "take" provisions of the Act apply to private individuals, and state and local agencies, these entities are not under constraints that prohibit modification of critical habitat. Enforcement capabilities and other needed recovery actions that local, state, and tribal agencies can provide to protect and recover the fish should be evaluated and encouraged. The development of new non-federal statutes, regulations, or policy may be needed, and, if so, should be encouraged.

3.3.4. Assess effectiveness of current regulations/management and draft additional regulations or increase protection and enforcement as needed.

All management practices and protection or enforcement activities should be evaluated to determine effectiveness in conserving the species.

3.3.5. Discontinue or prevent introductions of nonnative fish species that may have a negative impact on the razorback sucker.

Stocking of nonnative species should be discontinued until it is demonstrated that such introductions do not have a negative impact on the razorback sucker. Some interagency agreements have been made to limit stocking of problematic species, but a broader cooperative agreement should be initiated by the Service, Tribes, and the States of Arizona, California, Colorado, Nevada, New Mexico, Utah, and Wyoming to prohibit introduction or spread of nonnative fishes that might further endanger the razorback sucker or jeopardize its recovery.

3.3.6. Protect high priority recovery areas.

If studies determine that certain reaches of river provide habitat necessary for the continued existence or recovery of razorback sucker, such areas must be protected and maintained. Costs identified for this action cover only initial efforts of determining habitat protection needs. Significant funds for habitat protection and maintenance will, most likely, be needed and will be identified in the future.

3.4. Develop and implement cooperative interagency programs to protect and recover the razorback sucker.

A major cooperative effort to recover endangered fish species in the upper basin (excluding the San Juan River drainage) was initiated in August 1984. This Recovery Program (USFWS 1987) is intended to provide a coordinated

BLM_0070603

implementation of the Service's recovery plans for the endangered razorback sucker, Colorado pike minnow, bonytail, and humpback chub in the Upper Basin.

A recovery implementation program for the Colorado pike minnow and the razorback sucker also has been developed for the San Juan River by the Service in coordination with appropriate Federal and State agencies, Indian tribes, and water development interests.

An additional cooperative interagency plan for recovery actions for these endangered fish in the lower basin is being planned. The Service shall ensure that the upper basin Recovery Program, the San Juan Recovery Program, and the Lower Colorado River Basin Multispecies Conservation Program currently being developed are fully coordinated.

4. <u>Develop quantitative recovery goals and a long-term habitat protection strategy.</u>

The razorback sucker is nearly extirpated from most of its historic range. This recovery plan focuses on those immediate actions that are believed necessary to prevent extinction, to gather essential life history and habitat information, and to restore habitats and populations. Interim goals are being developed in some locations, but these have not been finalized.

    4 1. <u>Develop quantitative recovery goals for each recovery area.</u>

        4.1.1. Develop goals for population sizes needed for each recovery area compatible with carrying capacity.

        Interim goals for population sizes of razorback sucker have been developed in portions of the upper Colorado River basin. At present, these are very general goals and have not been finalized nor accepted by the USFWS.

        4.1.2. Develop habitat restoration or development goals compatible with recovery area needs.

        Habitat restoration or development goals have not been developed for specific recovery sites. Each identified recovery area should have goals developed for recovery of each of the listed fish and the community upon which they depend.

    4.2. <u>Develop quantitative recovery goals for the species.</u>

        4.2.1. The number of populations needed for various recovery objectives has been determined. However, the number of fish required for these populations and the amount of habitat to be protected has not. Each

56

recovery site must be of suitable size to support the defined population. Different recovery sites may have different goals in this regard. However, environmental variability and inadequate knowledge of potential future threats will make it necessary to produce and sustain larger populations of razorback suckers than may theoretically be required only to maintain gene frequencies.

4.2.2. Develop ecosystem restoration or development goals.

The Service has developed a draft multi-species recovery plan for the endangered Colorado River fishes in 1996. Completion of this multispecies plan and development of goals to support the multispecies concept need to be given higher priority.

5. Promote and encourage improved communication and information dissemination.

Information and education programs should be implemented at local, regional, and national levels to focus on the value of the razorback sucker as an endemic natural resource. An active effort will be made by the Service and State agencies to inform the public of recovery activities. Inter- and intra-agency communications, the sharing of information, and the education of the public about the goals, objectives, methods, and benefits of the recovery program are essential for success.

5.1. Develop and conduct workshops to coordinate recovery efforts.

Agencies should encourage communication among their professional and managerial staffs to accelerate recovery efforts. Such communication should include coordinating responsibilities for implementation of the razorback sucker recovery program and conducting workshops for the exchange of information on recovery progress to keep staffs aware of state-of-the-art methods, progress, and new initiatives.

5.2. Conduct nationwide information and education programs.

Conduct a national campaign to inform the public of the need to recover the razorback sucker. News of restoration efforts should be published in the Service's Endangered Species Technical Bulletin. Also, national environmental groups, newspapers, and the media should be contacted and encouraged to promote the value of recovering the razorback sucker.

5.3. Conduct local information and education programs.

All State wildlife agencies should continue to develop and provide leaflets for use by the local chapters of sportsmen and environmental groups, river runners, newspapers, and the media. Efforts should focus on recent investigations,

57

problems facing the razorback sucker, and recovery efforts.  The ecological value of the razorback sucker as an endemic species should be emphasized.

5.4.  Promote information and education programs within management agencies.

Increase awareness among agency personnel regarding razorback sucker identification, importance, role in the ecosystem, etc., and the agency responsibility to aid in the recovery effort.

5.5.  Encourage and support publication of research and other recovery results in the technical literature.

All participating agencies and their contractors should encourage publication of research findings in technical literature.  These agencies should provide support by funding printing or other necessary logistical support.

58

BLM_0070606

# PART III.  IMPLEMENTATION SCHEDULE

The following table is a summary of scheduled actions and costs for this recovery program.  It is a guide to meet the objectives of the recovery plan for the endangered razorback sucker.  The table indicates the priority in scheduling tasks to meet the objectives, which agencies are responsible to perform these tasks, a time-frame for accomplishing these tasks, and the estimated costs to perform them.  Implementation of the recovery actions, when accomplished, will satisfy the recovery objectives. Initiation of these actions is subject to the availability of funds.

## Abbreviations Used in Implementation Schedule

| | |
|---|---|
| AZ | Arizona Game and Fish Department |
| BIA | Bureau of Indian Affairs |
| BLM | Bureau of Land Management, U.S. Department  of  Interior |
| BR | Bureau of Reclamation, U.S. Department of Interior |
| CA | State of California, Fish and Game Department |
| CO | Colorado Division of Wildlife |
| FWS | Fish and Wildlife Service, U.S. Department of Interior |
| NM | New Mexico Department of Game and Fish |
| NPS | National Park Service, U.S. Department of Interior |
| NV | Nevada Department of Wildlife |
| UT | Utah Division of Wildlife Resources |
| WY | Wyoming Game and Fish Department |

## Other Definitions

| | |
|---|---|
| Continuous | Task which will be required over a very long or undetermined amount of time. |
| Ongoing | Task which is now being implemented, and should be continued on an annual basis. |
| Unknown | The cost and/or duration of this task is yet to be determined and may require completion of other tasks to determine amount of effort required. |

59

BLM_0070607

Razorback sucker (*Xyrauchen texanus*) Recovery Implementation Schedule

| Priority | Task | Task Description | Task Duration | Responsibility Party | | Cost Estimates | | | Comments |
|---|---|---|---|---|---|---|---|---|---|
| | | | | FWS Region | Other | FY-01 | FY-02 | FY-03 | |
| 1 | 111 | Maintain adequate refugia | Ongoing | 2,6 | AZ, CO, NM, NV, UT, WY | 300,000 | 300,000 | 300,000 | Include as part of program for all rare Colorado River fishes |
| 1 | 112 | Collect razorback suckers for refugia | Ongoing | 2,6 | AZ, CO, NM, NV, UT, WY | --- | --- | --- | Included in costs of maintaining refugia populations |
| 1 | 113 | Maintain genetic composition of razorback sucker refugia populations | Continuous | 2,6 | AZ, CO, NM, NV, UT, WY, CA | --- | --- | --- | Included In costs of maintaining refugia populations |
| 1 | 1131 | Maintain diversity found in wild population | Continuous | 2,6 | | --- | --- | --- | Costs included as part of genetics and stocking costs for all rare Colorado River fishes |
| 1 | 1132 | Identify and maintain separate stocks if necessary and determine significance to recovery | Ongoing | 2,6 | | --- | --- | --- | Costs included as part of genetics and stocking costs for all rare Colorado River fishes |
| 1 | 1133 | Determine degree of hybrid introgression and potential for affecting recovery effort | 3 years | 2,6 | | --- | --- | --- | Costs included as part of genetics management |
| 1 | 121 | Restore water flows | Ongoing | 2,6 | all agencies | --- | --- | --- | Include as part of program for all rare Colorado River fishes.  Costs are likely to exceed $10 million in the Upper Basin |
| 1 | 122 | Restore fish passage | Ongoing | 2,6 | BR, BLM, NPS | $1.5 million | unknown | unknown | Include as part of program for all rare Colorado River fishes |
| 1 | 123 | Reduce contaminants | Ongoing | 2,6 | BR, BLM, NPS | unknown | unknown | unknown | Include as part of program for all rare Colorado River fishes |
| | 1311 | Control nonnative fish in razorback habitat | Ongoing | 2,6 | all agencies | 172,000 | unknown | unknown | Include as part of program for all rare Colorado River fishes. Costs include selective removal of nonnatives in the Green and Gunnison Rivers. |
| | 1312 | Stop movement of nonnative fish into razorback habitat | Ongoing | 2,6 | all agencies | --- | --- | --- | Costs included as part of restoring fish passage |
| 1 | 1313 | Prevent new introduction of nonnative aquatic species | Ongoing | 2,6 | all agencies | --- | --- | --- | Done with existing personnel and funds |
| 1 | 141 | Introduce and protect wild larvae life stages | Ongoing | 2,6 | AZ, CO, NM, NV, UT, WY,CA | $3 million | 477,000 | 477,000 | Costs include propagation facility construction for all rare Colorado River fish and facility operation and maintenance |

BLM_0070608

| Priority | Task | Task Description | Task Duration | Responsibility Party | | Cost Estimates | | | Comments |
|---|---|---|---|---|---|---|---|---|---|
| | | | | FWS Region | Other | FY-01 | FY-02 | FY-03 | |
| 1 | 142 | Introduce and protect juveniles or adults | Ongoing | 2,6 | AZ, CO, NM, NV, UT, WY,CA | --- | --- | --- | Costs included in introduction and protection of wild larvae life stages. |
| 1 | 151 | Develop standardized population monitoring procedures | 1 year | 2,6 | AZ, CO, NM, NV, UT, WY,CA | 131,200 | --- | --- | |
| 1 | 152 | Implement population monitoring programs | Continuous | 2,6 | AZ, CO, NM, NV, UT, WY | --- | 193,200 | 200,000 | Included in costs identified for developing standardized population monitoring procedures |
| 1 | 153 | Compile and analyze population data | Continuous | 2,6 | | 28,000 | 28,000 | 28,000 | Include as part of program for all rare Colorado River fishes |
| 1 | 154 | Monitor habitat | Continuous | 2,6 | all agencies | unknown | unknown | unknown | |
| 1 | 155 | Compile and analyze habitat data | Continuous | 2,6 | | unknown | unknown | unknown | |
| 2 | 21 | Develop criteria for selecting additional recovery areas | 2 years | 2,6 | | unknown | unknown | unknown | |
| 2 | 22 | Select additional recovery areas in critical habitat reaches | 3 years | 2,6 | | unknown | unknown | unknown | |
| 2 | 231 | Determine flow, water level requirements | 3 years | 2,6 | | 22,000 | 22,000 | 22,000 | Includes basin wide channel monitoring |
| 2 | 232 | Determine effects of contaminants | Ongoing | 1,2,6 | BR, BLM, NPS | unknown | unknown | unknown | Include as part of program for all rare Colorado River fishes |
| 2 | 233 | Determine nonnative impacts that may limit recovery | Ongoing | 1,2,6 | BR, BLM, NPS | unknown | unknown | unknown | Include as part of program for all rare Colorado River fishes |
| 2 | 234 | Quantify food abundance | 3 years | 2,6 | all agencies | 97,000 | unknown | unknown | Include as part of program for all rare Colorado River fishes |
| 2 | 235 | Determine annual temperature regimes | 3 years | 2,6 | all agencies | --- | --- | --- | To be conducted as part of monitoring protocol |
| 2 | 236 | Identify required fish passage | 2 years | 1,2,6 | BR | --- | --- | --- | Include as part of program for all rare Colorado River fishes |
| 2 | 241 | Determine habitat to be restored | Ongoing | 1,2,6 | | unknown | unknown | unknown | |
| 2 | 242 | Identify habitat parameters that may be limiting | Ongoing | 1,2,6 | | --- | --- | --- | Costs are included in ongoing studies such as food web dynamics |
| 2 | 2511 | Restore water conditions | Unknown | 1,2,6 | all agencies | unknown | unknown | unknown | |

BLM_0070609

| Priority | Task | Task Description | Task Duration | Responsibility Party | | Cost Estimates | | | Comments |
|---|---|---|---|---|---|---|---|---|---|
| | | | | FWS Region | Other | FY-01 | FY-02 | FY-03 | |
| 2 | 2512 | Restore fish passage | Unknown | 1,2,6 | | $1.5 million | unknown | unknown | Include as part of program for all rare Colorado River fishes |
| 2 | 2513 | Reduce contaminants | Ongoing | 1,2,6 | all agencies | unknown | unknown | unknown | Include as part of program for all rare Colorado River fishes |
| 2 | 2521 | Restore food resources | Unknown | 1,2,6 | all agencies | unknown | unknown | unknown | |
| 2 | 2522 | Reduce nonnative fish interactions | Continuous | 1,2,6 | all agencies | unknown | unknown | unknown | |
| 2 | 2611 | Refine propagation, holding, and rearing techniques | Ongoing | 1,2,6 | AZ, CO, NM, NV, UT, WY | --- | --- | --- | Costs are included as part of propagation, facility operation and maintenance costs |
| 2 | 2612 | Maintain a diversified broodstock | Continuous | 2,6 | | --- | --- | --- | Costs are included as part of propagation costs |
| 2 | 2621 | Develop procedures for introductions and monitoring | Ongoing | 2,6 | AZ, CO, NM, NV, UT, WY,CA | 22,000 | 22,000 | 22,000 | Costs include evaluating experimental stocking plan |
| 2 | 2622 | Reestablish or augment razorback suckers | Ongoing | 1,2,6 | AZ, CO, NM, NV, UT, WY.CA | --- | --- | --- | Costs are included as part of propagation, facility operation and maintenance costs |
| 2 | 2623 | Monitor reestablishment and augmentation efforts | Ongoing | 2,6 | AZ, CO, NM, NV, UT, WY,CA | --- | --- | --- | Costs are included in standardized monitoring program |
| 3 | 31 | Determine threats to razorback sucker populations and protect them | 10 years | 1,2,6 | | unknown | unknown | unknown | Costs in part covered by section 7 funds |
| 3 | 32 | Monitor and assess the impact of development projects | Ongoing | q,2,6 | | --- | --- | --- | Costs in part covered by section 7 funds |
| 3 | 331 | Inform appropriate agencies of their conservation and enforcement responsibilities | Ongoing | 1,2,6 | | --- | --- | --- | Done with existing personnel and funds |
| 3 | 332 | Ensure compliance with Section 7 of the Endangered Species Act by all Federal agencies | Ongoing | 1,2,6 | | --- | --- | --- | Done with existing personnel and funds |
| 3 | 333 | Foster better relationships with non-federal agencies and promote more effective state and local protection | Ongoing | 1,2,6 | all agencies | --- | --- | --- | Done with existing personnel and funds |

BLM_0070610

| Priority | Task | Task Description | Task Duration | Responsibility Party | | Cost Estimates | | | Comments |
|---|---|---|---|---|---|---|---|---|---|
| | | | | FWS Region | Other | FY-01 | FY-02 | FY-03 | |
| 3 | 334 | Assess effectiveness of current regulations/management and draft additional regulations or increase protection and enforcement as needed | Ongoing | 1,2,6 | all agencies | unknown | unknown | unknown | |
| 3 | 335 | Discontinue or prevent introductions of nonnative fish species that may have a negative impact on the razorback sucker | Ongoing | 1,2,6 | AZ, CO, NM, NV, UT, WY | --- | --- | --- | Done with existing personnel and funds |
| 3 | 336 | Protect high priority recovery areas | Ongoing | 1,2,6 | all agencies | unknown | unknown | unknown | Costs in part covered by section 7 funds |
| 4 | 411 | Develop goals for population size for recovery areas | 1 year | 2,6 | | --- | --- | --- | Part of ongoing agency efforts |
| 4 | 412 | Develop habitat restoration or development goals compatible with recovery area needs | 1 year | 2,6 | | unknown | unknown | unknown | |
| 4 | 421 | Develop goals for population sizes needed for various recovery objectives | 1 year | 2,6 | | unknown | unknown | unknown | |
| 4 | 422 | Develop ecosystem restoration or development goals | 3 years | 1,2,6 | | unknown | unknown | unknown | |
| 5 | 51 | Develop and conduct workshops to coordinate recovery efforts | Ongoing | 1,2,6 | all agencies | --- | --- | --- | Include as part of program for all rare Colorado River fishes |
| 5 | 52 | Conduct nationwide information and education programs | Ongoing | 1,2,6 | all agencies | 27,000 | 27,000 | 27,000 | Include as part of program for all rare Colorado River fishes |
| 5 | 53 | Conduct local information and education programs | Ongoing | 1,2,6 | all agencies | --- | --- | --- | Include as part of program for all rare Colorado River fishes |
| 5 | 54 | Promote information and education programs within management agencies | Ongoing | 1,2,6 | all agencies | --- | --- | --- | Done with existing personnel and funds |
| 5 | 55 | Encourage and support publication of research and other recovery results in the technical literature | Ongoing | 1,2,6 | all agencies | 10,000 | 10,000 | 40,000 | Include as part of program for all rare Colorado River fishes |

BLM_0070611

BLM_0070612

## LITERATURE CITED

Abbott, C.C. 1861. Descriptions of four new species of North American Cyprinidae.
Proceedings of the Philadelphia Academy of Natural Sciences 12(1960): 473-
474.

Allan, R.C. and D.L. Roden. 1978. Fishes of Lake Mead and Lake Mojave. Biological
Bulletin Number 7, Nevada Department of Wildlife. Reno. 105 pp.

Banks, J.L. 1964. Fish species distribution in Dinosaur National Monument during 1961
and 1962. M.S. Thesis, Colorado State University, Fort Collins. 96 pp.

Baxter, G.T., and J.R. Simon. 1970. Wyoming Fishes. Bulletin 4, Wyoming Game and
Fish Department, Cheyenne.

Behnke, R.J. 1980. The impacts of habitat alterations on the endangered and
threatened fishes of the Upper Colorado River Basin. Bulletin 503A. Cooperative
Extension Service, Colorado State University, Fort Collins. 34 pp.

Beland, R.D. 1953. The effect of channelization on the fishery of the lower Colorado
River. California Fish and Game 39:137-139.

Bestgen, K.R. 1990. Status review of the razorback sucker, *Xyrauchen texanus*.
Submitted to U.S. Department of the Interior, Bureau of Reclamation.
Contribution 44, Larval Fish Laboratory, Colorado State University.

Bevans, H.E., S.L. Goobred, J.F. Miesner, S.A. Satkins, T.S. Gross, N.D. Denslow, and
T. Schoeb. 1996. Synthetic organic compounds and carp endocrinology and
histology in Las Vegas Wash and Las Vegas and Callville Bays of Lake Mead,
Nevada, 1992 and 1995. U. S. Department of the Interior, U.S. Geological
Survey, Water Resources Investigations Report 96-4266, Carson City, NV.

Bliesner, R., and V. Lamarra. 1995. San Juan River habitat studies. 1994 Annual
Report to San Juan River Recovery Implementation Program. Keller-Bliesner
Engineering and Ecosystems Research Institute, Logan, UT.

Bliesner, R., and V. Lamarra. 1996. San Juan River habitat studies. 1995 Annual
Report to San Juan River Recovery Implementation Program.  Keller-Bliesner
Engineering and Ecosystems Research Institute, Logan, UT.

Bozek, M.A., L.J. Paulson, and G.R. Wilde. 1990. Effects of ambient Lake Mojave
temperatures on development, oxygen consumption, and hatching success of
the razorback sucker. Environmental Biology of Fishes 27:255-263.

Bradford, R.H., S.D. Gurtin, and B.R. Vlach. 1998. Habitat use by razorback suckers
implanted with ultra-sonic transmitters and released into the lower Imperial
Division, Colorado River. Contract Report 03, Cooperative Agreement 3-FC-34-

64

BLM_0070613

08243. U.S. Bureau of Reclamation and Arizona Game and Fish Department, Yuma.

Breder, C.M. Jr., and D.E. Rosen. 1966. Modes of reproduction in fishes. T.F.H. Publications. Garden City, New Jersey. 961 pp.

Brooks, J.E. 1986. Annual reintroduction and monitoring report for razorback sucker (*Xyrauchen texanus*) in the Gila River basin, Arizona. Arizona Game and Fish Department, Phoenix. 22 pp.

Brookshire, D.S., M.McKee, and G. Watts. 1994. Economic analysis of proposed critical habitat designation in the Colorado River basin for the razorback sucker, humpback chub, Colorado squawfish and bonytail. Final Report to the U.S. Fish and Wildlife Service. Department of Economics, University of New Mexico, Albuquerque.

Bulkley, R. V. and R. Pimental. 1983. Temperature preference and avoidance by adult razorback suckers. Transactions American Fisheries Society 112:601-607.

Burdick, B.D., and L.R. Kaeding. 1990. Biological merits of fish passage as part of recovery of Colorado squawfish in the upper Colorado River basin. Final Report. U.S. Fish and Wildlife Service, Grand Junction, Colorado. 23 pp.

Buth, D.G., R.W. Murphy, and L. Ulmer. 1987. Population differentiation and introgressive hybridization of the flannelmouth sucker and of hatchery and native stocks of the razorback sucker. Transactions of the American Fisheries Society 116:103-110.

Carlson, C.A., and R.T. Muth. 1989. Lifeline of the American Southwest. Pages 220-239 *in:* D.P. Dodge (editor). Proceedings of the International Large Rivers Symposium. Canadian Special Publication of Fisheries and Aquatic Sciences 106.

Carothers, S.W., and C.O. Minckley. 1981. A survey of the fishes, aquatic invertebrates and aquatic plants of the Colorado River and selected tributaries from Lees Ferry to Separation Rapids. Final Report for the U.S. Bureau of Reclamation (Contract 7-07030-C0026). Museum of Northern Arizona, Flagstaff.

Cavender, T.M. 1986. Review of the fossil history of North American freshwater fishes. Pages 699-724 *in:* C.H. Hocutt and E.O. Wiley (editors). The zoogeography of North American freshwater fishes. John Wiley and Sons, New York. 866 pp.

Clark, T.W., R.P. Reading, and A.L. Clarke (editors). Endangered species recovery: finding the lessons, improving the process. Island Press, Washington, D.C. 450 pp.

Clarkson, R.W., E.D. Creef, and D.K. McGuinn-Robbins. 1993. Movements and habitat utilization of reintroduced razorback suckers (*Xyrauchen texanus*) and Colorado

BLM_0070614

squawfish *Ptychocheilus lucius)* in the Verde River, Arizona. Special Report, Nongame and Endangered Wildlife Program, Arizona Game and Fish Department, Phoenix . 17 pp + App.

Coleman, G.A. 1929. A biological survey of the Salton Sea. California Fish and Game 14:218-227.

Creef, E.D, and R.W. Clarkson. 1993. Razorback sucker *(Xyrauchen texanus)* and Colorado squawfish *Ptychocheilus lucius)* monitoring, Verde and Salt rivers, Arizona, 1991-1993. Special Report. Nongame and Endangered Wildlife Program. Arizona Game and Fish Department, Phoenix. 7 pp + app.

Crowl, T.A., and N.W. Bouwes. 1997. Modeling population dynamics of Colorado squawfish, razorback sucker, and humpback chub: for management objective development. Ecology Center, Department of Fisheries and Wildlife , Utah State University, Logan.

Dence, W.A. 1948. Life history, ecology and habits of the dwarf sucker, *Catostomous commersoni utawana* Mather, at the Huntingtdon Wildlife Station. Roosevelt Wildlife Bulletin 8(4). Bulletin of New York State College of Forestry at Syracuse University 21(3):79-150.

Dill, W.A. 1944. The fishery of the lower Colorado River. California Fish and Game 30:109-211.

Doelker, A. and S. Connor. 1998. Lake Havasu native fish management plan. 1996 and 1997 Project Report.  Bureau of Land Management, Lake Havasu City, Arizona. 17 pp.

Douglas, P.A. 1952. Notes on the spawning of the humpback sucker, *Xyrauchen texanus* (Abbott). California Fish and Game 38:149-155.

Dowling, T.E., and W.L. Minckley. 1993. Genetic diversity of razorback sucker as determined by restriction endonuclease analysis of mitochondrial DNA. Final Report to the U.S. Bureau of Reclamation (Contract 0-FC-40-0-9530-004). Department of Zoology, Arizona State University, Tempe. 56 pp.

Dowling, T.E., W.L. Minckley, D.C. Marsh and E.S. Goldstone.  1996. Mitochondrial DNA variability in the endangered razorback sucker *(Xyrauchen texanus)*: Analysis of hatchery stacks and implications for captive propagation. Conservation Biology 10(1):120-127.

Eastman, J.T. 1977. The pharyngeal bones and teeth of catostomid fishes. American Midland Naturalist 97:68-88.

Eastman, J.T. 1980. The caudal skeleton of catostomid fishes. American Midland Naturalist 103:133-148.

66

BLM_0070615

Ostler, R. 1985. Selenium hazards to fish, wildlife and invertebrates: A synoptic review. U.S. Fish and Wildlife Service Biological Report 85(1.5):1-57.

Ellis, M.M. 1914. Fishes of Colorado. The University of Colorado Studies XI(1):1-136 + 12 plates. Boulder.

Evermann, B.W. 1916. Fishes of the Salton Sea. Copeia (1916):61-13.

Evermann, B.W., and C. Rutter. 1895. Fishes of the Colorado River basin. Bulletin of the U.S. Fish Commissioner 14 (1894):473-486.

Flagg, R. 1982. Disease survey of Colorado River fishes. U.S. Fish and Wildlife Service Fish Disease Center, Fort Morgan, Colorado. *in*: Miller, W.H., et al. (editors). Colorado River Fisheries Project, Volume 3. U.S. Fish and Wildlife Service and Bureau of Reclamation, Salt Lake City, UT.

Fradkin, P.L. 1984. A river no more: The Colorado River and the West. The University of Arizona Press, Tucson. 360 pp.

Frankel, O.H., and M.E. Soulé. 1981. Conservation and evolution. Cambridge University Press, NY. 327 pp.

Gilbert, C.H., and N.B. Scofield. 1898. Notes on a collection of fishes from the Colorado Basin in Arizona. Proceedings of the U.S. National Museum 20:181-192.

Gillespie R.B., and P.C. Badman. 1986. Effects of high tissue concentrations of selenium on reproduction by bluegills. Transactions of the American Fisheries Society 115:208-213.

Graf, W.L. 1978. Fluvial adjustments to the spread of tamarisk in the Colorado Plateau region. Geological Society of America Bulletin 89:1491-1501.

Gutermuth, F.B., L.D. Lentsch, and K.R. Bestgen. 1994. Collection of age-0 razorback suckers (*Xyrauchen texanus*) in the lower Green River, Utah. The Southwestern Naturalist 39:389-390.

Hamilton, S.J., and B. Waddell. 1992. Selenium in eggs and milt of razorback sucker (*Xyrauchen texanus*) in the middle Green River. Archives of Environmental Contamination and Toxicology 27:195-201.

Hamman, R.L. 1985. Induced spawning of hatchery-reared razorback sucker. Progressive Fish Culturist 47:187-189.

Hamman, R.L. 1987. Survival of razorback sucker cultured in earthen ponds. Progressive Fish Culturist 49:134-140.

BLM_0070616

Holden, P. B., and C.B. Stalnaker. 1975. Distribution of fishes in the Dolores and Yampa River systems of the upper Colorado Basin. Southwestern Naturalist 19:403-412.

Horn, M.J., P.C. Marsh, G. Mueller, and T. Burke. 1994. Predation by Odonate nymphs on larval razorback suckers (*Xyrauchen texanus*) under laboratory conditions. The Southwestern Naturalist 39:371-374.

Hubbs, C.L., and R.R. Miller. 1953. Hybridization in nature between the fish genera *Catostomus and Xyrauchen*. Papers of the Michigan Academy of Sciences, Arts, and Letters 38:207-233.

Huntington, E.H. 1955. Fisheries survey of the Gila and Mimbres rivers drainages, 1952-1955. Project Completion Report, Federal Aid Project F-1-R. State of New Mexico Department of Game and Fish. Sante Fe. 56 pp.

Johnson, J.E., M.G. Pardew, and M.M. Lyttle. 1993. Predation recognition and avoidance by larval razorback sucker and northern hog sucker. Transactions of the American Fisheries Society 122:1139-1145.

Jonez, A., and R.C. Sumner. 1954. Lakes Mead and Mojave investigations: A comparative study of an established reservoir as related to a newly created impoundment. Federal Aid to Fisheries Restoration Project Completion Report, F-1-R, Nevada Fish and Game Commission, Reno. 186 pp.

Jordan, D.S. 1891. Report of explorations in Utah and Colorado during the summer of 1889, with an account of fishes found in each of the river basins examined. Bulletin of the U.S. Fish Commissioner 9:1-40.

Jordan, D.S., and B.W. Evermann. 1896. The fishes of North and Middle America. Bulletin of the United States National Museum 47(1):1-1240.

Joseph, T.W., J.A. Sinning, R.J. Behnke, and P.B. Holden. 1977. An evaluation of the status, life history and habitat requirements of endangered and threatened fishes of the Upper Colorado River Basin. Report FWS/OBS-77/2, U.S. Fish and Wildlife Service, Fort Collins, Colorado.

Karp, C.A., and H.M. Tyus. 1990. Behavior and interspecific interactions of Colorado squawfish *Ptychocheilus lucius*, and five other fish species. Copeia 1990:25-34.

Kirsch, P.H. 1889. Notes on a collection of fishes obtained in the Gila River at Fort Thomas, Arizona, by Lieut. W.L. Carpenter, U.S. Army. Proceedings of the U.S. National Museum 11:555-558.

Koster, W.J. 1960. *Ptychocheilus lucius* (Cyprinidae) in the San Juan River, New Mexico. Southwestern Naturalist 5(3):174-175.

BLM_0070617

Langhorst, D.R. 1989. A monitoring study of razorback sucker (*Xyrauchen texanus*) reintroduced into the lower Colorado River in 1988. Final Report. (Contract FC-9494). California Department of Fish and Game, Blythe.

Langhorst, D.R., and P.C. Marsh. 1986. Early life history of razorback sucker in Lake Mojave. Final Report to the U.S. Bureau of Reclamation. Arizona State University, Tempe. 24 pp. + app.

Lanigan, S.L., and H.M. Tyus. 1988. Abundance, status, and rearing of razorback sucker (*Xyrauchen texanus*) in the Green River basin of Utah, USA. Proceedings of the Desert Fishes Council 19:136-148.

Lanigan, S.L., and H.M. Tyus. 1989. Population size and status of razorback sucker in the Green River basin, Colorado and Utah. North American Journal of Fisheries Management 9:68-73.

LaBounty, J.F., and M.J. Horn. 1997. The influence of drainage from the Las Vegas Valley on the limnology of Boulder Basin, Lake Mead, Arizona-Nevada. Journal of Lake and Reservoir Management 13:95-108.

LaRivers, I. 1962. Fishes and fisheries of Nevada. Nevada Game and Fish Commission, Carson City.

Lockington, W.N. 1881. Description of a new species of Catostomus (*Catostomus cypho*) from the Colorado River. Proceedings of the Philadelphia Academy of Natural Sciences 32:237-240.

Loudermilk, W.E. 1985. Aspects of razorback sucker (*Xyrauchen texanus*, Abbott) life history which help explain their decline. Proceedings of the Desert Fishes Council 13(1981):67-72.

Lyons, J. 1989. Green River channel characteristics below Flaming Gorge Dam. Unpublished report prepared for the Bureau of Reclamation, Denver, Colorado.

Maddux, H.R., D.M. Kubly, J.C. deVos, Jr., W.R. Persons, R. Staedicke, and R.L. Wright. 1987. Effects of varied flow regimes on aquatic resources of Glen and Grand Canyons. Final Report, U.S. Department of the Interior, Bureau of Reclamation, Salt Lake City, UT. 291 pp.

Maddux, H.R., L.A. Fitzpatrick, and W.R. Noonan. 1993. Colorado River endangered fishes critical habitat: Biological Support Document. U.S. Fish and Wildlife Service, Salt Lake City, UT. 225 pp.

Marsh, P.C. 1985. Effect of incubation temperature on survival of embryos of native Colorado River fishes. Southwestern Naturalist 30:129-140.

Marsh, P.C. 1987. Food of adult razorback sucker in Lake Mojave, Arizona-Nevada. Transactions of the American Fisheries Society 116: 117-119.

BLM_0070618

Marsh, P.C. 1995. Abundance, movements, and status of adult razorback sucker, *Xyrauchen texanus* in Lake Mojave, Arizona and Nevada. Proceedings of the Desert Fishes Council (1994): 25-35.

Marsh, P.C., and D.R. Langhorst. 1988. Feeding and fate of wild larval razorback sucker. Environmental Biology of Fishes 21:59-67.

Marsh, P.C., and J.L. Brooks. 1989. Predation by ictalurid catfishes as a deterrent to re-establishment of introduced razorback suckers. The Southwestern Naturalist 34:188-195

Marsh, P.C., and W.L. Minckley. 1989. Observations on recruitment and ecology of razorback sucker: lower Colorado River, Arizona-California-Nevada. Great Basin Naturalist 49:71-78.

McAda, C.W., and R.S. Wydoski. 1980. The razorback sucker, *Xyrauchen texanus*, in the upper Colorado River Basin, 1974-76. U.S. Fish and Wildlife Service Technical Paper 99. 15 pp.

McAda, C.W., J.W. Bates, J.S. Cranney, et al. 1994. Interagency Standardized Monitoring Program: Summary of Results, 1986-1992. U.S. Fish and Wildlife Service, Denver.

McAda, C.W., T.E. Chart, M.A. Trammel, et al. 1996. Interagency Standardized Monitoring Program: Summary of Results, 1995. U.S. Fish and Wildlife Service, Denver.

McCarthy, M.S., and W.L. Minckley. 1987. Age estimation for razorback sucker from Lake Mojave, Arizona, and Nevada. Journal of Arizona-Nevada Academy Sciences. 21:87-97.

Medel-Ulmer, L. 1983. Movement and reproduction of the razorback sucker (*Xyrauchen texanus*) inhabiting Senator Wash Reservoir, Imperial County, California. Proceedings of the Desert Fishes Council 12(1980):106(Abstract).

Miller, R.R. 1946. The need for ichthyological surveys of the major rivers of western North America. Science 104:517-519.

Miller, R.R. 1958. Origins and affinities of the freshwater fish fauna of western North America. Pages 187-222 *in*: Hubbs, C.L. (editor). Zoogeography. Publication 51, American Association for the Advancement of Science, Washington, D.C. 509 pp.

Miller, R.R. 1961. Man and the changing fish fauna of the American Southwest. Papers of Michigan Academy of Sciences, Arts, and Letters 46:365-404.

Miller, R.R. 1964. Fishes of Dinosaur. Naturalist 15:24-29.

BLM_0070619

Miller, R.R. 1972. Threatened freshwater fishes of the United States. Transactions of the American Fisheries Society 101:239-252.

Minckley, W.L. 1973. Fishes of Arizona. Arizona Game and Fish Department. Phoenix, 293 pp.

Minckley, W.L. 1982. Trophic interrelations among introduced fishes in the lower Colorado River, Southwestern United States. California Fish and Game 68(2):78-89.

Minckley, W.L. 1983. Status of the razorback sucker, *Xyrauchen texanus* (Abbott), in the lower Colorado River Basin. Southwestern Naturalist 28:165-187.

Minckley, W.L., and E.S. Gustafson. 1982. Early development of the razorback sucker, *Xyrauchen texanus* (Abbott). Great Basin Naturalist 42:553-561.

Minckley, W.L., and J.E. Deacon. 1968. Southwestern fishes and the enigma of "endangered species." Science 159:1424-1433.

Minckley, W.L., and J.E. Deacon. 1991. Battle against extinction: native fish management in the American West. University of Arizona Press. Tucson. 517 pp.

Minckley, W.L., D.A. Hendrickson, and C.E. Bond. 1986. Geography of western North American freshwater fishes: Description and relationships to intracontinental tectonism. Pages 519-614 *in:* C.H. Hocutt and E.O. Wiley (editors). The zoogeography of North American freshwater fishes. John Wiley and Sons, New York. 866 pp.

Minckley, W.L., P.C. Marsh, J.E. Brooks, J.E. Johnson, and B.L. Jensen. 1991. Management toward recovery of the razorback sucker. Pages 303-357 *in:* W.L. Minckley and J.E. Deacon (editors). Battle against extinction: Native fish management in the American Southwest. University of Arizona Press. Tucson. 517 pp.

Modde, T. 1996. Juvenile razorback sucker (*Xyrauchen texanus*) in a managed wetland adjacent to the Green River. Great Basin Naturalist 56:375-376.

Modde, T., A.T. Scholz, J.H.. Williamson, G.B. Haines, B.D. Burdick, and F. K. Pfeifer. 1995. An augmentation plan for razorback sucker in the upper Colorado River basin. American Fisheries Society Symposium 15:102-111.

Modde, T., and D. G. Irving. 1998. Use of multiple spawning sites and seasonal movement by razorback sucker in the middle Green River, Utah. North American Journal of Fisheries Management 18:318-326

Modde, T., K.P. Burnham, and E.J. Wick. 1996. Population status of the razorback sucker in the middle Green River (U.S.A.). Conservation Biology 10(1):110-119.

BLM_0070620

Molles, M. 1980. The impact of habitat alterations and introduced species on the native fishes of the upper Colorado River basin. Pages 163-181 *in:* W.O. Spofford, Jr., A.L. Parker, and A.V. Kneese (editors). Energy development in the Southwest. Research paper 18, Resources for the Future, Washington, DC.

Moyle, P.B., and J.J. Cech, Jr. 1996. Fishes: An introduction to ichthyology. 3rd Edition. Prentice Hall, Englewood Cliffs, NJ. 590 pp.

Moyle, P.B., and T. Light. 1996. Fish invasions in California: Do abiotic factors determine success? Ecology 77:1666-1670.

Mueller, G. 1989. Observation of spawning razorback sucker (*Xyrauchen texanus*) utilizing riverine habitat in the lower Colorado River, Arizona-Nevada. Southwestern Naturalist 34-147-149.

Mueller, G. 1995. A program for maintaining the razorback sucker in Lake Mojave. American Fisheries Society Symposium 15:127-135.

Mueller, G. 1997. Restoration of the razorback sucker in the Colorado River, Southwestern United States. Pages II-23 - II-33, *in:* Proceedings of the World River Conference, Gifu, Japan.

Mueller, G., and P.B. Marsh. 1998. Post-stocking dispersal, habitat use, and behavioral acclimation of juvenile razorback suckers (*Xyrauchen texanus*) in two Colorado River reservoirs. U. S. Geological Survey Open File Report 98-301, Denver, CO.

Muth, R.T., G.B. Haines, S.M. Meismer, E.J. Wick, T.E. Chart, D.E. Snyhder, J.M. Bundy, and K.R. Bestgen. 1998. Larvae of endangered razorback sucker in the Green River, Utah and Colorado, 1992-1994: Documentation of annual reproduction and aspects of early life history. Projects 34 and 38, Recovery Implementation Program for the Endangered Fish Species in the Upper Colorado River Basin, U.S. Fish and Wildlife Service, Denver.

Nelson, J.S. 1994. Fishes of the World. John Wiley and Sons, Inc. New York. 600 pp.

Nesler, T.P. 1998. Five year stocking plan for endangered Colorado river fish species in Colorado. Draft Final Report. Colorado Division of Wildlife. 34 pp.

Ono, R.D., J.D. Williams, and A. Wagner. 1983. Vanishing fishes of North America. Stone Wall Press, Washington, D.C.

Osmundson, D.B., and L.R. Kaeding. 1989. Studies of Colorado squawfish and razorback sucker use of the 15-mile reach of the upper Colorado River as part of conservation measures for the Green Mountain and Ruedi Reservoir water sales. Final Report. U.S. Fish and Wildlife Service, Grand Junction, CO.

BLM_0070621

Osmundson, D.B., and L.R. Kaeding. 1990. Recommendations for flows in the 15 mile reach during October-June for maintenance and enhancement of endangered fish populations in the upper Colorado River. Final Report, U.S. Fish and Wildlife Service, Grand Junction, CO.

Papoulias, D., and W.L. Minckley. 1990. Food limited survival of larval razback suckers in the laboratory. Environmental Biology of Fishes 29:73-78.

Paulin, K.M., C.M. Williams, and H. M. Tyus. 1989. Response of young razorback sucker and Colorado squawfish to water flow and light intensity. Unpublished report on file with the U.S. Fish and Wildlife Service, Vernal, UT. 12 pp.

Platania, S.P., K.R. Bestgen, M.A. Moretti, D.L. Propst, and J.E. Brooks. 1991. Status of Colorado squawfish and razorback sucker in the San Juan River, Colorado, New Mexico, and Utah. Southwestern Naturalist, 147-149.

Quartarone, F. 1993. Historical accounts of upper Colorado River basin endangered fish. Colorado Division of Wildlife, Denver. 66pp.

Roberts, B. and M. Moretti. 1989. Fisheries survey of the San Juan River, Utah, 1988. Final Report. Utah Division of Wildlife Resources, Salt Lake City. 40 pp.

Robins, R.C., R.M. Bailey, C.E. Bond, J.R. Brooker, E.A. Lachner, R.N. Lea, and W.G. Scott. 1991. Common and scientific names of fishes. Committee on the names of fishes. American Fisheries Society, Special Publication 20, 5th Edition. Bethesda, Maryland. 183 pp.

Ryden, D.W., and F.K. Pfeifer. 1995. Monitoring of experimentally stocked razorback sucker in the San Juan River. 1994 Annual Report. U.S. Fish and Wildlife Service, Grand Junction, CO. 30 pp.

Sabo, M.J., E.J. Pert, and K.O. Winemiller. 1996. Agonistic behavior of juvenile largemouth bass and smallmouth bass. Journal of Freshwater Ecology 11(1):115-118.

Schoenherr, A.A. 1981. The role of competition and the replacement of native fishes by introduced species. Pages 173-203 in: R.J. Naimon and D.L. Soltz (editors). Fishes in North American Deserts. Wiley-Interscience, John Wiley and Sons, New York.

Scholz, A.T., R.J. White, S.A. Horton, and V.A. Koehler. 1992. Measurement of egg and larval thyroxine concentration as an indicator of the critical period for imprinting in razorback suckers (Xyrauchen texanus Abbott): implications for endangered stocks in the Colorado River Basin. Colorado River Fisheries Project Technical Report 1, U.S. Department of the Interior, Bureau of Reclamation, Salt Lake City, UT.

BLM_0070622

Severson, S.H., H.M. Tyus, and G.B. Haines. 1991. An evaluation of feeds for rearing young razorback sucker *Xyrauchen texanus*. Journal of Applied Aquaculture. 1(3):55-65.

Sigler, W.F., and R.R. Miller. 1963. Fishes of Utah. Utah State Department of Fish and Game, Salt Lake City. 203 pp.

Simon, J.R. 1946. Wyoming fishes. Wyoming Game and Fish Department Bulletin 4:1-129.

Smith, G.R. 1959. Annotated check list of fishes of Glen Canyon. Pages 195-199, in A.M. Woodbury (editor). Ecological studies of the flora and fauna in Glen Canyon. University of Utah Anthropological Papers:40.

Smith, G.R. 1981. Effects of Habitat size on species richness and adult body sizes of desert fishes. Pages 125-172 in: Naiman, R.G., and D. L. Soltz (editors). Fishes in North American Deserts. John Wiley and Sons, New York. 552 pp.

Stephens, D.W., B. Waddell, L.A. Peltz, and J.B. Miller. 1992. Detailed study of selenium and selected elements in water, bottom sediment, and biota associated with irrigation drainage in the middle Green River Basin, Utah. 1988-1990. U.S. Geological Survey, Water Resources Investigation Report 92-4084. 164 pp.

Sublette, J.E., M.D. Hatch, and M. Sublette. 1990. The fishes of New Mexico. University of New Mexico Press, Albuqueque. 393 pp.

Taba, S.S., J.R. Murphy, and H.H. Frost. 1965. Notes on the fishes of the Colorado River near Moab, Utah. Proceedings of the Utah Academy of Science, Arts, Letters 42:280-283.

Taylor, J.N., W.R. Courtenay, Jr., and J.A. McCann. 1984. Known impacts of exotic fishes in the continental United States. Pages 323-373 in: W.R. Courtenay, Jr, and J.R. Stauford, Jr. (editors). Distribution, biology, and management of exotic fishes. Johns Hopkins University Press, Baltimore, Maryland. 430 pp.

Thomas, C.D. 1990. What do real population dynamics tell us about minimum viable population sizes? Conservation Biology 4:324-327.

Tyus, H.M. 1986. Life strategies in the evolution of the Colorado squawfish (*Ptychocheilus lucius*). Great Basin Naturalist 46:656-661.

Tyus, H.M. 1987. Distribution, reproduction, and habitat use of the razorback sucker in the Green River, Utah, 1979-1986. Transactions of the American Fisheries Society 116:111-116.

Tyus, H.M. 1988. Long-term retention of surgically-implanted transmitters in Colorado squawfish and razorback sucker. North American Journal of Fisheries Management 8:268-271.

74

BLM_0070623

Tyus, H.M., and C.A. Karp. 1989. Habitat use and stream flow needs of rare and endangered fishes, Yampa River, Colorado. U.S. Fish and Wildlife Service Biological Report 89(14):1-27.

Tyus, H.M., and C.A. Karp. 1990. spawning and movements of the razorback sucker *Xyrauchen texanus* (Abbott) in the Green and Yampa rivers, Colorado and Utah. Southwestern Naturalist 35:427-433.

Tyus, H.M., and J.F. Saunders, III. 1996. Nonnative fishes in the upper Colorado River basin and a strategic plan for their control. Final Report to U.S. Fish and Wildlife Service (14-48-0006-95-923). Center for Limnology, University of Colorado, Boulder.

Tyus, H.M., and S.H. Severson. 1990. Growth and survival of larval razorback suckers *Xyrauchen texanus* in response to five artificial diets. Progressive Fish Culturist 52:197-200.

Tyus, H.M., B.D. Burdick, R.A. Valdez, C.M. Haynes, T.A. Lytle, and C.R. Berry. 1982. Fishes of the upper Colorado River Basin, distribution, abundance, and status. Pages 12-70 *in*: Miller, W.H., H.M. Tyus, and C.A. Carlson (editors). Fishes of the upper Colorado River System: present and future. American Fisheries Society, Bethesda, MD. 131 pp.

Tyus, H.M., R.L. Jones, and L.A. Trinca. 1987. Green River rare and endangered fish studies 1982-1985. Final Report (BR-FWS Contract 207-40L3083). U.S. Fish and Wildlife Service, Vernal, UT. 117 pp.

Ugland, R.C., R.G. Kretschmann, E.A. Wilson and J.D. Bennett. 1987. Water resources data, Colorado, Water Year 1987. U.S. Geological Survey Water Data Report CO-87.2.

U.S. Fish and Wildlife Service. 1987. Recovery implementation program for endangered fish species in the upper Colorado River Basin. U. S. Fish and Wildlife Service, Region 6, Denver, Colorado. 82 pp.

U.S. Fish and Wildlife Service. 1994. Endangered and threatened wildlife and plants: determination of critical habitat for four Colorado River endangered fishes: Final rule. Federal Register 59(54):13374-13400.

U.S. Fish and Wildlife Service and National Marine Fisheries Service. 1994. Notice of interagency cooperative policy for the ecosystem approach to the Endangered Species Act . Federal Register 58(126):34273-34274.

U.S. Fish and Wildlife Service. 1995. San Juan River basin recovery implementation program. U.S. Fish and Wildlife Service, Region 2, Albuquerque, NM.

U.S. Fish and Wildlife Service and National Marine Fisheries Service. 1994.

BLM_0070624

Endangered and threatened wildlife and plants: Notice of interagency policy for the ecosystem approach to the Endangered Species Act. Federal Register 59(126):34273-34274.

Valdez, R.A., P.G. Mangan, R. Smith and B. Nilson. 1982. Upper Colorado River Investigations (Rifle Colorado to Lake Powell, Utah). Pages 101-279 in: W.H. Miller, J.J. Valentine, D.L. Archer, H.M. Tyus, R.A.Valdez, and L.R. Kaeding. Colorado River Fisheries Project, Final Report, Volume 2: Field Investigations. Final Report for the U.S. Bureau of Reclamation (Contract 9-07-40-L-1016) U.S. Fish and Wildlife Service, Salt Lake City, UT.

Valdez, R. A., and W. Masslich. 1989. Winter habitat study of endangered fish-Green River. Final Report to the U.S. Fish and Wildlife Service (Contract Report 136-2). BIO/WEST, Inc., Logan, Utah. 184 pp.

Vanicek, C. D. 1967. Ecological studies of native Green River fishes below Flaming Gorge Dam, 1964-1966. Ph.D. thesis, Utah State University, Logan. 125 pp.

Vanicek, C. D., R. H. Kramer, and D. R. Franklin. 1970. Distribution of Green River fishes in Utah and Colorado following closure of Flaming Gorge Dam. Southwestern Naturalist 14:297-315.

Waddell, B., and T. May. 1995. Selenium concentrations in the razorback sucker (Xyrauchen texanus): Substitution of non-lethal muscle plugs for muscle tissue in contaminant assessment. Archives of Environmental Contamination and Toxicology 28:321-326.

Wallis, O.L. 1951. The status of the fish fauna of the Lake Mead National Recreation Area, Arizona-Nevada. Transactions of the American Fisheries Society 80:84-92.

Werner, R.G. 1979. Homing mechanism of spawning white sucker in Wolf Lake, New York. New York Fish and Game Journal 26(1):48-58.

Wick, E.J., C.W. McAda, and R.V. Bulkley. 1982. Life history and prospects for recovery of the razorback sucker. Pages 120-126 in: W.H. Miller, H.M. Tyus, and C.A. Carlson (editors). Fishes of the upper Colorado River system: present and future. American Fisheries Society, Bethesda, Maryland.

Wilcox, B.A. 1980. Insular ecology and conservation. Pages 95-117 (Chapter 6) in: M.E. Soulé and B.A. Wilcox (editors). Conservation Biology: An Evolutionary-Ecological Prospectus. Sinauer Associates, Sunderland, MA. 365 pp.

Wiltzius, W.J. 1978. Some factors historically affecting the distribution and abundance of fishes in the Gunnison River. Final Report to the U.S. Bureau of Reclamation. Colorado Division of Wildlife, Fort Collins.

Wiltzius, W.J. 1985. Fish culture and stocking in Colorado, 1872-1978. Colorado Division of Wildlife, Report No. 12, Denver, CO. 102 pp.

✩ U.S. GOVERNMENT PRINTING OFFICE: 1999—774-270 / M6525 Region No. 8

BLM_0070625

BLM_0070626



Loggerhead Shrike in Oil Pit. *Photo by Brent Esmoil/USFWS*

## U.S. Fish and Wildlife Service

# Wildlife Mortality Risk
# in Oil Field Waste Pits

**Pedro Ramirez, Jr., Environmental Contaminants Specialist**

U.S. Fish and Wildlife Service Region 6 Contaminants Information Bulletin, December 2000

***B**irds may have trouble distinguishing pristine wetlands from small pits, ponds and reservoirs containing oil. Waterfowl and other aquatic birds may be attracted to pits and open tanks used to store and separate oil from produced water. The pits also can attract hawks, owls, songbirds, bats, insects, small mammals, and big game. Songbirds and mammals may approach oil-covered pits and ponds to drink, and can fall into the pits, or they can become entrapped if the banks of the pits are oiled. Insects entrapped in the oil can also attract songbirds, bats, and small mammals. Hawks and owls in turn become victims when they are attracted by struggling birds or small mammals. In Wyoming, U.S. Fish and Wildlife Service (USFWS) personnel have found waterfowl, songbirds, bats, pronghorn, and deer in oil pits and tanks.*



Oil-covered teal in oil pit. *Photo by Pedro Ramirez, Jr./USFWS*

## The Problem

The risk that oil pits pose to wildlife has been documented by several studies (Esmoil 1995, Flickinger 1981, Flickinger and Bunck 1987, Grover 1983, and King 1956). Wildlife attracted to oil-covered pits or ponds suffer death in several ways:
• they can become entrapped in the oil and drown;
• birds can ingest toxic quantities of oil by preening their oil-covered feathers;
• mammals can ingest toxic quantities of oil when they try to lick their fur clean; and
• cold stress can kill the animal if oil damages the insulation provided by feathers or fur.

Even if animals are not killed in the pits, the oil and chemicals in the pits can harm them later. If they absorb or ingest oil in less than toxic amounts they may suffer a variety of systemic effects and may become more susceptible to disease and predation. During the breeding season, birds can transfer oil from their feet and feathers to their eggs. In some cases, a few drops of oil on an egg shell can kill the embryo (King and LeFever 1979). USFWS Environmental Contaminants (EC) Specialists and Special Agents have observed evidence of scavengers feeding on oiled wildlife carcasses near oil pits. Scavengers and predators can also suffer indirect effects by consuming oil-covered carcasses.

Mortality events in oil pits can be episodic; there may be long periods without incident, but then large numbers of birds may be killed during short periods, such as migration. Grover (1983) found that in southeastern New Mexico, wildlife losses in oil pits during the summer consisted of inexperienced, recently fledged or weaned wildlife.



Skim pits are used to separate oil from produced water and are death traps for wildlife. Flagging is an ineffective deterrent for preventing wildlife mortality in oil pits. *Photo by Pedro Ramirez, Jr./USFWS*

During the fall, waterfowl and shorebirds were the primary victims of oil pits. Esmoil (1995, personal communications) found a disproportionate number of loggerhead shrikes killed during a two-week period that coincided with fledging. He found 35 birds in one oil pit in Hot Springs County in May 1989.

Esmoil (1991, 1995) recovered 334 birds from 53 pits in Wyoming between mid-May and mid-August in 1990. He also found cottontail rabbits, bats, mice and prairie dogs entrapped in oil pits. Although waterfowl are usually the most visible victims, small songbirds appear to suffer higher mortality in oil pits. In 1989 and 1990, Esmoil (1995) surveyed 88 pits in five oil fields in the Bighorn Basin of Wyoming and found a total of 616 bird carcasses. Songbirds accounted for 41 percent of the carcasses and aquatic birds made up 19 percent. Lee (1994) found dead songbirds in 37 percent of the mortality cases he investigated in the Texas Panhandle from 1987 through 1992.

BLM_0070627

In Wyoming, EC Specialists and Special Agents have observed large kills of migratory waterfowl during the fall migration. Some large mortality events documented by EC Specialists and Special Agents in Wyoming include:

• 81 birds in one site at Fremont County in August 1998;
• 17 birds in an 8 ft. by 10 ft. pit in Crook County in May 1998;
• 46 birds in a 30 ft. by 30 ft. pit in Johnson County in July 1996;
• 62 birds in a 100 ft. by 100 ft. pit in Washakie County in September 1995; and
• 22 birds in a commercial oil field waste disposal facility in September 1994.

The absence of wildlife or carcasses in pits does not mean that the sites are not risks for migratory birds and other animals. Wildlife mortality in oil pits can go undetected because carcasses in oil pits can sink and remain undetected (Flickinger and Bunck 1987); because scavengers such as coyotes, raccoons, and raptors can remove the carcasses from the edges of pits; and because people can remove carcasses from them.



Oil-covered duck carcass partially eaten by scavengers. *Photo by P. Ramirez, Jr./USFWS*



Proper netting of oil pits can exclude wildlife and prevent mortality. *Photo by Pedro Ramirez, Jr./USFWS*

## Solving the Problem

Solutions to the oil pit problem are fairly simple and straight forward and are being implemented by many oil operators. We suggest the following measures:

• *Use Closed Containment Systems* - Closed containment systems require little or no maintenance and the system can be moved to a new site when the well is shut in. Closed containment systems eliminate soil contamination and remediation expense.
• *Eliminate Pits or Keep Oil Off Open Pits or Ponds* - A fail-safe solution is to remove the pits or keep oil from entering the pits. Immediate clean up of oil spills into open pits is critical to prevent wildlife mortalities.
• *Use Effective & Proven Wildlife Deterrents or Exclusionary Devices* - netting appears to be the most effective method of keeping birds from entering waste pits.



Properly installed net (left) is supported by a steel frame and cable to prevent sagging. Sides are also netted to prevent ground entry by birds and other wildlife. Nets sagging into the oil-covered pond (bottom) after a heavy snow-load will expose the oil and entrap waterfowl. Nets should be installed 4 to 5 feet above the pond surface to allow for sagging.

Photo by P. Ramirez, Jr./USFWS

Photo by Gary Mowad/USFWS

## References

Esmoil, B. 1995. Wildlife mortality associated with oil pits in Wyoming. Prairie Naturalist 27(2):81-88.

Esmoil, B. 1991. Wildlife mortality associated with oil pits in Wyoming. Masters Thesis. University of Wyoming. Laramie, WY. 61 pp.

Flickinger, E.L. 1981. Wildlife mortality at petroleum pits in Texas. Journal of Wildlife Management 45:560-564.

Flickinger, E.L. and C.M. Bunck. 1987. Number of oil-killed birds and fate of bird carcasses at crude oil pits in Texas. Southwestern Naturalist 32:337-381.

Grover, V.L. 1983. The reduction of wildlife mortality in the sump pits of southeast New Mexico. Bureau of Land Management Report, Albuquerque, NM.

King, C.A. 1956. Waterfowl mortality on oil sumps of the Bighorn River drainage. Wyoming Game & Fish Dept. Report, Cheyenne, WY.

King, K. and C.A. LeFever. 1979. Effects of oil transferred from incubating gulls to their eggs. Marine Pollution Bulletin. 10:319-321.

Lee, R. C. 1994. Migratory bird kills at petroleum pits in Texas. Report of Investigation (copy) *in* Environmental Investigations Course Book. August 12-16, 1996, Reno, NV. U.S. Fish and Wildlife Service, National Conservation Training Center, Shepherdstown, WV.

*For more information contact: U.S. Fish & Wildlife Service, 4000 Airport Blvd., Cheyenne, WY 82001; 307-772-2374. Also visit the USFWS web site at http://www.fws.gov and the USFWS web site on oil pits at http://www.r6.fws.gov/contaminants/oilpits.htm*

December 2000



# COLORADO PIKEMINNOW
## (*Ptychocheilus lucius*)
# RECOVERY GOALS



BLM_0070630

COLORADO PIKEMINNOW (*Ptychocheilus lucius*)

## RECOVERY GOALS
## Amendment and Supplement to the Colorado Squawfish Recovery Plan

U.S. Fish and Wildlife Service
Mountain-Prairie Region (6)
Denver, Colorado

Approved: _Ralph O. Morgenweck_ _____

Regional Director, Region 6, U.S. Fish and Wildlife Service

Date: _8|1|0__ _____

BLM_0070631

# DISCLAIMER PAGE

These recovery goals amend and supplement the 1991 Colorado Squawfish Recovery Plan. Recovery plans delineate reasonable actions that are believed to be required to recover and/or protect listed species.  The U.S. Fish and Wildlife Service publishes these plans, which may be prepared with the assistance of recovery teams, contractors, State agencies, and others. Attainment of the objectives and provision of any necessary funds are subject to priorities, budgetary, and other constraints affecting the parties involved.  Recovery plans do not necessarily represent the views nor the official positions or approval of any individuals or agencies involved in the plan formulation, other than the U.S. Fish and Wildlife Service. Recovery plans represent the official position of the U.S. Fish and Wildlife Service **only** after they have been signed by the Regional Director or Director as **approved**.  Approved recovery plans are subject to modification as dictated by new findings, changes in species status, and the completion of recovery tasks.

BLM_0070632

# CITATION FOR THESE RECOVERY GOALS

**These recovery goals should be cited as follows:**

U.S. Fish and Wildlife Service.  2002.  Colorado pikeminnow (*Ptychocheilus lucius*) Recovery Goals: amendment and supplement to the Colorado Squawfish Recovery Plan.  U.S. Fish and Wildlife Service, Mountain-Prairie Region (6), Denver, Colorado.

Cover illustration © Joseph R. Tomelleri

BLM_0070633

# ACKNOWLEDGMENTS

## Principal Authors of Original Draft Report

| | |
|---|---|
| Richard Valdez | R.A. Valdez and Associates |
| Ronald Ryel | Utah State University |
| Stephen Carothers | SWCA, Inc., Environmental Consultants |

## U.S. Fish and Wildlife Service Project Liaison, Coordination, and Legal Counsel

| | |
|---|---|
| Robert Muth | U.S. Fish and Wildlife Service, Region 6 |
| Thomas Czapla | U.S. Fish and Wildlife Service, Region 6 |
| Debbie Felker | U.S. Fish and Wildlife Service, Region 6 |
| Henry Maddux | U.S. Fish and Wildlife Service, Region 6 |
| Ralph Morgenweck | U.S. Fish and Wildlife Service, Region 6 |
| Susan Baker | U.S. Fish and Wildlife Service, Region 6 |
| Bob McCue | U.S. Fish and Wildlife Service, Region 6 |
| Sharon Rose | U.S. Fish and Wildlife Service, Region 6 |
| David Redhorse | U.S. Fish and Wildlife Service, Region 6 |
| John Antonio | U.S. Fish and Wildlife Service, Region 2 |
| Margot Zallen | Senior Attorney, Solicitor's Office |

## Technical Assistance

| | |
|---|---|
| Dorothy House | SWCA, Inc., Environmental Consultants |
| Matt Peterson | SWCA, Inc., Environmental Consultants |
| Bill McDavitt | SWCA, Inc., Environmental Consultants |
| Bryan Cowdell | SWCA, Inc., Environmental Consultants |

iv

BLM_0070634

## ACKNOWLEDGMENTS (continued)

**The following individuals provided data, information, and reports, as well as reviews and comments, all which contributed to improving this document.**

| Individual | Affiliation |
|---|---|
| Kevin Bestgen | Colorado State University |
| Yvette Converse | U.S. Fish and Wildlife Service, Region 6 |
| James Deacon | University of Nevada Las Vegas |
| Thomas Dowling | Arizona State University |
| Chester Figiel | U.S. Fish and Wildlife Service, Region 2 |
| Lesley Fitzpatrick | U.S. Fish and Wildlife Service, Region 2 |
| Jennifer Fowler-Propst | U.S. Fish and Wildlife Service, Region 2 |
| Steve Harris | Harris Water Engineering, Inc. |
| Phil Hedrick | Arizona State University |
| Stewart Jacks | U.S. Fish and Wildlife Service, Region 2 |
| Angela Kantola | U.S. Fish and Wildlife Service, Region 6 |
| Nancy Kaufman | U.S. Fish and Wildlife Service, Region 2 |
| Chris Keleher | Central Utah Water Conservancy District |
| Stuart Leon | U.S. Fish and Wildlife Service, Region 2 |
| Paul Marsh | Arizona State University |
| W.L. Minckley | Arizona State University |
| Gordon Mueller | U.S. Geological Survey |
| Doug Osmundson | U.S. Fish and Wildlife Service, Region 6 |
| Bill Persons | Arizona Game and Fish Department |
| Dave Soker | U.S. Fish and Wildlife Service, Region 6 |
| Lynn Starnes | U.S. Fish and Wildlife Service, Region 2 |
| Ray Tenney | Colorado River Water Conservation District |
| Manuel Ulibarri | U.S. Fish and Wildlife Service, Region 2 |
| Randy VanHaverbeke | U.S. Fish and Wildlife Service, Region 2 |
| Ed Wick | Independent contractor |

## Colorado River Fishes Recovery Team

| Member | Affiliation | Representing |
|---|---|---|
| Matthew Andersen | Utah Division of Wildlife Resources | Utah Division of Wildlife Resources |
| Rob Bettaso | Arizona Game and Fish Department | Arizona Game and Fish Department |
| Jim Brooks | U.S. Fish and Wildlife Service | USFWS, Region 2 |
| Tom Burke | U.S. Bureau of Reclamation | USBR, Lower Colorado River Region |
| Tom Chart | U.S. Bureau of Reclamation | USBR, Upper Colorado River Region |
| Kevin Christopherson | Utah Division of Wildlife Resources | Utah Division of Wildlife Resources |
| Rob Clarkson | U.S. Bureau of Reclamation | USBR, Lower Colorado River Region |
| Larry Crist | U.S. Bureau of Reclamation | USBR, Upper Colorado River Region |
| Terry Foreman | California Department of Fish and Game | California Department of Fish and Game |
| Chris Hayes | California Department of Fish and Game | California Department of Fish and Game |
| Kirk LaGory | Argonne National Laboratory | Western Area Power Administration |
| Chuck McAda | U.S. Fish and Wildlife Service | USFWS, Region 6 |
| Chuck Minckley | U.S. Fish and Wildlife Service | USFWS, Region 2 |
| Tom Nesler | Colorado Division of Wildlife | Colorado Division of Wildlife |
| Stephen Petersburg | National Park Service | NPS, Intermountain Region |
| David Propst | New Mexico Game and Fish Department | New Mexico Game and Fish Department |
| Jon Sjoberg | Nevada Division of Wildlife | Nevada Division of Wildlife |

v

# ACKNOWLEDGMENTS (continued)

## Biology Committee, Upper Colorado River Endangered Fish Recovery Program

| Member | Affiliation | Representing |
|---|---|---|
| Matthew Andersen | Utah Division of Wildlife Resources | State of Utah |
| Tom Chart | U.S. Bureau of Reclamation | USBR, Upper Colorado River Region |
| Kevin Christopherson | Utah Division of Wildlife Resources | State of Utah |
| Larry Crist | U.S. Bureau of Reclamation | USBR, Upper Colorado River Region |
| Bill Davis | Eco Plan Associates, Inc. | Colorado River Energy Distributors Assoc. |
| Paul Dey | Wyoming Game & Fish Department | State of Wyoming |
| John Hawkins | Colorado State University | Environmental Groups |
| Tim Modde | U.S. Fish and Wildlife Service | USFWS, Region 6 |
| Tom Nesler | Colorado Division of Wildlife | State of Colorado |
| Steve Petersburg | National Park Service | NPS, Intermountain Region |
| Tom Pitts | Water Consult Engineering & Planning | Upper Basin Water Users |
| Art Roybal | Western Area Power Administration | Western Area Power Administration |
| John Wulschleger | National Park Service | NPS, Intermountain Region |

## Management Committee, Upper Colorado River Endangered Fish Recovery Program

| Member | Affiliation | Representing |
|---|---|---|
| Susan Baker | U.S. Fish and Wildlife Service | USFWS, Region 6 |
| Thomas Blickensderfer | Colorado Department of Natural Resources | State of Colorado |
| Shane Collins | Western Area Power Administration | Western Area Power Administration |
| Christine Karas | U.S. Bureau of Reclamation | USBR, Upper Colorado River Region |
| Robert King | Utah Division of Water Resources | State of Utah |
| Dave Mazour | Tri-State Generation & Transmission | Colorado River Energy Distributors Assoc. |
| Bruce McCloskey | Colorado Division of Wildlife | State of Colorado |
| Clayton Palmer | Western Area Power Administration | Western Area Power Administration |
| Tom Pitts | Water Consult Engineering & Planning | Upper Basin Water Users |
| John Reber | National Park Service | NPS, Intermountain Region |
| John Shields | Wyoming State Engineer's Office | State of Wyoming |
| Hugh Thompson | Utah Department of Natural Resources | State of Utah |
| Brent Uilenberg | U.S. Bureau of Reclamation | USBR, Colorado Area |
| Robert Wigington | The Nature Conservancy | The Nature Conservancy |

## Implementation Committee, Upper Colorado River Endangered Fish Recovery Program

| Member | Affiliation | Representing |
|---|---|---|
| Kathleen Clark | Utah Department of Natural Resources | State of Utah |
| Rick Gold | U.S. Bureau of Reclamation | USBR, Upper Colorado River Region |
| Leslie James | Colorado River Energy Distributors Assoc. | Colorado River Energy Distributors Assoc. |
| Dan Luecke | Environmental Defense | Environmental Defense |
| Ralph Morgenweck | U.S. Fish and Wildlife Service | USFWS, Region 6 |
| Tom Pitts | Water Consult Engineering & Planning | Upper Basin Water Users |
| Dave Sabo | Western Area Power Administration | Western Area Power Administration |
| Patrick Tyrrell | Wyoming State Engineer's Office | State of Wyoming |
| Karen Wade | National Park Service | NPS, Intermountain Region |
| Greg Walcher | Colorado Department of Natural Resources | State of Colorado |

vi

BLM_0070636

# ACKNOWLEDGMENTS (continued)

**Biology Committee, San Juan River Basin Recovery Implementation Program**

| Member | Affiliation | Representing |
|---|---|---|
| Ron Bliesner | Keller-Bliesner Engineering | Bureau of Indian Affairs |
| Jim Brooks | U.S. Fish and Wildlife Service | USFWS, Region 2 |
| Larry Crist | U.S. Bureau of Reclamation | USBR, Upper Colorado River Region |
| Paul Holden | Bio/West, Inc. | Jicarilla-Apache Tribe |
| Vince Lamarra | Ecosystems Research Institute | Navajo Nation |
| William Miller | Miller Ecological Consultants | Southern Ute Tribe |
| Tom Nesler | Colorado Division of Wildlife | State of Colorado |
| Frank Pfeifer | U.S. Fish and Wildlife Service | USFWS, Region 6 |
| Dave Propst | New Mexico Game and Fish Department | State of New Mexico |
| Tom Wesche | HabiTech, Inc. | Water Users |

A total of 69 comment letters from 66 individuals representing State, Federal, and private interests was accepted and considered by the U.S. Fish and Wildlife Service (Service) pursuant to the public review of the September 7, 2001, draft recovery goals for the four endangered fishes of the Colorado River Basin through the *Federal Register* Notice of Availability (66 FR 47033) and Notice of Reopening (66 FR 58748). The Service thanks those individuals for submitting comment letters and appreciates the valuable input. The Service also appreciates the input received through meetings with basin States, recovery or conservation programs, water and power interests, environmental groups, American Indian tribes, and other stakeholders.

BLM_0070637

# EXECUTIVE SUMMARY

This document amends and supplements the Colorado Squawfish Recovery Plan of 1991. The common name for this species was changed to Colorado pikeminnow by the American Fisheries Society in 1998. The purpose of this document is to describe site-specific management actions/tasks; provide objective, measurable recovery criteria; and provide an estimate of the time to achieve recovery of the endangered Colorado pikeminnow (*Ptychocheilus lucius*), according to Section 4(f)(1) of the Endangered Species Act of 1973, as amended. Recovery programs that include the Colorado pikeminnow will direct research, management, and monitoring activities and determine costs associated with recovery.

**Current Species Status:** The Colorado pikeminnow is listed as endangered under the Endangered Species Act of 1973, as amended. The species is endemic to the Colorado River Basin of the southwestern United States. Adults attain a maximum size of about 1.8 m total length (TL) and 36 kg in weight. Wild, reproducing populations occur in the Green River and upper Colorado River subbasins of the Upper Colorado River Basin (i.e., upstream of Glen Canyon Dam, Arizona), and there are small numbers of wild individuals (with limited reproduction) in the San Juan River subbasin. The species was extirpated from the Lower Colorado River Basin in the 1970's but has been reintroduced into the Gila River subbasin, where it exists in small numbers in the Verde River.

**Habitat Requirements and Limiting Factors:** The Colorado pikeminnow is a long-distance migrator; moving hundreds of kilometers to and from spawning areas. Adults require pools, deep runs, and eddy habitats maintained by high spring flows. These high spring flows maintain channel and habitat diversity, flush sediments from spawning areas, rejuvenate food production, form gravel and cobble deposits used for spawning, and rejuvenate backwater nursery habitats. Spawning occurs after spring runoff at water temperatures typically between 18 and 23°C. After hatching and emerging from spawning substrate, larvae drift downstream to nursery backwaters that are restructured by high spring flows and maintained by relatively stable base flows. Threats to the species include streamflow regulation, habitat modification, competition with and predation by nonnative fish species, and pesticides and pollutants.

**Recovery Objective:** Downlisting and Delisting.

**Recovery Criteria:** Objective, measurable criteria for recovery of Colorado pikeminnow in the Colorado River Basin are presented for the Upper Colorado River Basin (including the Green River, upper Colorado River, and San Juan River subbasins). Recovery of the species is considered necessary only in the upper basin because of the present status of populations and because existing information on Colorado pikeminnow biology support application of the metapopulation concept to extant populations. The need for self-sustaining populations in the lower basin and associated site-specific management actions/tasks necessary to minimize or remove threats will be reevaluated at the status review of the species, which is conducted at least once every 5 years (provisional recovery criteria for the lower basin are appended). The Colorado pikeminnow was listed prior to the 1996 distinct population segment (DPS) policy. If

viii

BLM_0070638

lower basin populations are determined necessary for recovery, the Service may conduct an evaluation to designate DPSs in a future rule-making process. If DPSs are designated, these recovery criteria will need to be reevaluated. These recovery goals are based on the best available scientific information, and are structured to attain a balance between reasonably achievable criteria (which include an acceptable level of uncertainty) and ensuring the viability of the species beyond delisting. Additional data and improved understanding of Colorado pikeminnow biology may prompt future revision of these recovery goals.

Downlisting can occur if, over a 5-year period, the upper basin metapopulation is maintained such that: (1) a genetically and demographically viable, self-sustaining population is maintained in the Green River subbasin such that — (a) the trends in separate adult (age 7+; ≥450 mm TL) point estimates for the middle Green River and the lower Green River do not decline significantly, and (b) mean estimated recruitment of age-6 (400–449 mm TL) naturally produced fish equals or exceeds mean annual adult mortality for the Green River subbasin, and (c) each population point estimate for the Green River subbasin exceeds 2,600 adults (2,600 is the estimated minimum viable population [MVP] needed to ensure long-term genetic and demographic viability); and (2) a self-sustaining population of at least 700 adults (number based on inferences about carrying capacity) is maintained in the upper Colorado River subbasin such that — (a) the trend in adult point estimates does not decline significantly, and (b) mean estimated recruitment of age-6 naturally produced fish equals or exceeds mean annual adult mortality; and (3) a target number of 1,000 age-5+ fish (≥300 mm TL); number based on estimated survival of stocked fish and inferences about carrying capacity) is established through augmentation and/or natural reproduction in the San Juan River subbasin; and (4) when certain site-specific management tasks to minimize or remove threats have been identified, developed, and implemented.

Delisting can occur if, over a 7-year period beyond downlisting, the upper basin metapopulation is maintained such that: (1) a genetically and demographically viable, self-sustaining population is maintained in the Green River subbasin such that — (a) the trends in separate adult point estimates for the middle Green River and the lower Green River do not decline significantly, and (b) mean estimated recruitment of age-6 naturally produced fish equals or exceeds mean annual adult mortality for the Green River subbasin, and (c) each population point estimate for the Green River subbasin exceeds 2,600 adults; and (2) either the upper Colorado River subbasin self-sustaining population exceeds 1,000 adults **OR** the upper Colorado River subbasin self-sustaining population exceeds 700 adults and San Juan River subbasin population is self-sustaining and exceeds 800 adults (numbers based on inferences about carrying capacity) such that for each population — (a) the trend in adult point estimates does not decline significantly, and (b) mean estimated recruitment of age-6 naturally produced fish equals or exceeds mean annual adult mortality; and (3) when certain site-specific management tasks to minimize or remove threats have been finalized and implemented, and necessary levels of protection are attained.

Conservation plans will go into effect at delisting to provide for long-term management and protection of the species, and to provide reasonable assurances that recovered Colorado pikeminnow populations will be maintained without the need for relisting. Elements of those

ix

plans could include (but are not limited to) provision of flows for maintenance of habitat conditions required for all life stages, regulation and/or control of nonnative fishes, minimization of the risk of hazardous-materials spills, and monitoring of populations and habitats.  Signed agreements among State agencies, Federal agencies, American Indian tribes, and other interested parties must be in place to implement the conservation plans before delisting can occur.

**Management Actions Needed:**

1.  Provide and legally protect habitat (including flow regimes necessary to restore and maintain required environmental conditions) necessary to provide adequate habitat and sufficient range for all life stages to support recovered populations.
2.  Provide passage over barriers within occupied habitat to allow adequate movement and, potentially, range expansion.
3.  Investigate options for providing appropriate water temperatures in the Gunnison River.
4.  Minimize entrainment of subadults and adults in diversion canals.
5.  Ensure adequate protection from overutilization.
6.  Ensure adequate protection from diseases and parasites.
7.  Regulate nonnative fish releases and escapement into the main river, floodplain, and tributaries.
8.  Control problematic nonnative fishes as needed.
9.  Minimize the risk of hazardous-materials spills in critical habitat.
10. Remediate water-quality problems.
11. Provide for the long-term management and protection of populations and their habitats beyond delisting (i.e., conservation plans).

**Estimated Time to Achieve Recovery:**  Reliable population estimates, based on a multiple mark-recapture model, are needed for all populations over a 5-year monitoring period for downlisting and over a 7-year monitoring period beyond downlisting in order to achieve delisting.  The accuracy and precision of each point estimate will be assessed by the Service in cooperation with the respective recovery or conservation programs, and in consultation with investigators conducting the point estimates and with qualified statisticians and population ecologists.  First point estimates were completed for all populations in 2001.  The Service is reviewing those estimates for reliability, and, if they are accepted by the Service and all recovery criteria are met, downlisting could be proposed in 2006 and delisting could be proposed in 2013.  This estimated time frame is based on current understanding of the status and trends of populations and on the monitoring time required to meet the downlisting and delisting criteria.

x

BLM_0070640

# TABLE OF CONTENTS

Page

TITLE/APPROVAL PAGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

DISCLAIMER PAGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

CITATION FOR THESE RECOVERY GOALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

ACKNOWLEDGMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

LIST OF TABLES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

LIST OF FIGURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xv

1.0   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      1.1   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      1.2   Purpose and Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      1.3   Recovery or Conservation Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2.0   THE RECOVERY PROCESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      2.1   Definition of Recovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      2.2   Recovery Units . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      2.3   Development of Recovery Goals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

3.0   POPULATION VIABILITY AND SELF-SUSTAINABILITY . . . . . . . . . . . . . . . . . . . 8
      3.1   Demographic Viability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
            3.1.1   Demographic characteristics, environmental uncertainty, and
                    catastrophic events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
            3.1.2   Existing populations of Colorado pikeminnow . . . . . . . . . . . . . . . . . 10
            3.1.3   Populations of Colorado pikeminnow as redundant units . . . . . . . . . . 13
            3.1.4   Colorado pikeminnow as a metapopulation . . . . . . . . . . . . . . . . . . . . 14
      3.2   Carrying Capacity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
            3.2.1   Green River . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
            3.2.2   Upper Colorado River . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
            3.2.3   San Juan River . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      3.3   Genetic Viability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
            3.3.1   Genetic effective population size . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
            3.3.2   Minimum viable population . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

BLM_0070641

# TABLE OF CONTENTS (continued)

Page

4.0  THREATS TO COLORADO PIKEMINNOW BY LISTING FACTOR . . . . . . . . . . . . 22
    4.1  Listing Factor (A): The Present or Threatened Destruction, Modification, or
         Curtailment of Its Habitat or Range . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    4.2  Listing Factor (B): Overutilization for Commercial, Recreational, Scientific, or
         Educational Purposes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    4.3  Listing Factor (C): Disease or Predation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        4.3.1  Diseases and parasites . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        4.3.2  Nonnative fishes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    4.4  Listing Factor (D): The Inadequacy of Existing Regulatory Mechanisms . . . . . 30
    4.5  Listing Factor (E): Other Natural or Manmade Factors Affecting Its Continued
         Existence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
        4.5.1  Pesticides and pollutants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

5.0  RECOVERY GOALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    5.1  Requirements and Uncertainties Associated with Recovery Goals . . . . . . . . . . 35
        5.1.1  Demographic criteria and monitoring . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        5.1.2  Recovery factor criteria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
        5.1.3  Uncertainties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    5.2  Site-Specific Management Actions and Tasks by Recovery Factor . . . . . . . . . . 39
        5.2.1  Factor A.—Adequate habitat and range for recovered populations
               provided . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
        5.2.2  Factor B.—Protection from overutilization for commercial,
               recreational, scientific, or educational purposes . . . . . . . . . . . . . . . . . . . 41
        5.2.3  Factor C.—Adequate protection from diseases and predation . . . . . . . 41
        5.2.4  Factor D.—Adequate existing regulatory mechanisms . . . . . . . . . . . . . . 42
        5.2.5  Factor E.—Other natural or manmade factors for which protection
               has been provided . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    5.3  Objective, Measurable Recovery Criteria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
        5.3.1  Downlist criteria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
            5.3.1.1 Demographic criteria for downlisting . . . . . . . . . . . . . . . . . . . . . 44
                5.3.1.1.1  Green River Subbasin . . . . . . . . . . . . . . . . . . . . . . . . . 44
                5.3.1.1.2  Upper Colorado River Subbasin . . . . . . . . . . . . . . . . 45
                5.3.1.1.3  San Juan River Subbasin . . . . . . . . . . . . . . . . . . . . . . 45
            5.3.1.2 Recovery factor criteria for downlisting . . . . . . . . . . . . . . . . . . . 45
        5.3.2  Delist criteria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
            5.3.2.1 Demographic criteria for delisting . . . . . . . . . . . . . . . . . . . . . . . 48
                5.3.2.1.1  Green River Subbasin . . . . . . . . . . . . . . . . . . . . . . . . . 48
                5.3.2.1.2  Upper Colorado River and San Juan River
                           Subbasins . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
            5.3.2.2 Recovery factor criteria for delisting . . . . . . . . . . . . . . . . . . . . . 49
    5.4  Estimated Time to Achieve Recovery of the Colorado Pikeminnow . . . . . . . . . 51

xii

## TABLE OF CONTENTS (continued)

Page

LITERATURE CITED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

APPENDIX A:  LIFE HISTORY OF THE COLORADO PIKEMINNOW . . . . . . . . . . . . .  A-1
    A.1    Species Description  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-1
    A.2    Distribution and Abundance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-1
    A.3    Habitat  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-3
    A.4    Movement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-5
    A.5    Reproduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-6
    A.6    Survival  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-7
    A.7    Predation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-7
    A.8    Age and Growth  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-9
    A.9    Length-Weight and Condition Factor  . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-12
    A.10  Diet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-12
    A.11  Parasites  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-13

APPENDIX B:  PROVISIONAL RECOVERY GOALS FOR COLORADO PIKEMINNOW
    IN THE LOWER COLORADO RIVER BASIN  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-1
    B.1    Provisional Site-Specific Management Actions and Tasks by
          Recovery Factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  B-1
          B.1.1    Factor A.—Adequate habitat and range for recovered
                   populations provided  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-1
          B.1.2    Factor B.—Protection from overutilization for commercial,
                   recreational, scientific, or educational purposes  . . . . . . . . . . . . . . . . B-2
          B.1.3    Factor C.—Adequate protection from diseases and predation  . . . . . . . B-2
          B.1.4    Factor D.—Adequate existing regulatory mechanisms . . . . . . . . . . . . . B-3
          B.1.5    Factor E.—Other natural or manmade factors for which
                   protection has been provided  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-3
    B.2    Provisional Objective, Measurable Recovery Criteria . . . . . . . . . . . . . . . . . . . B-4
          B.2.1    Downlist criteria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-4
                 B.2.1.1 Demographic criteria for downlisting . . . . . . . . . . . . . . . . . . . B-4
                 B.2.1.2 Recovery factor criteria for downlisting . . . . . . . . . . . . . . . . . B-4
          B.2.2    Delist criteria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-6
                 B.2.2.1 Demographic criteria for delisting  . . . . . . . . . . . . . . . . . . . . . B-6
                 B.2.2.2 Recovery factor criteria for delisting . . . . . . . . . . . . . . . . . . . . B-6

BLM_0070643

# LIST OF TABLES

Table                                                                                              Page

1.    Occupied habitat of wild Colorado pikeminnow in the Upper Colorado River Basin and
      limits to distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

2.    Estimates of effective/actual population size ratios for various fish species. . . . . . . . . . 20

3.    Existing dams and diversion structures within occupied Colorado pikeminnow
      habitat. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

A-1   Seasonal frequency of use of macrohabitats in the Grand Valley of the upper Colorado
      River subbasin by radio-tagged adult Colorado pikeminnow, 1986–1989 . . . . . . . . .   A-5

A-2   Lengths of adult and subadult Colorado pikeminnow as determined from scale back-
      calculations, mark-recapture growth data, and hatchery-reared fish . . . . . . . . . . . . .   A-11

xiv

BLM_0070644

# LIST OF FIGURES

Figure                                                                           Page

1       Distribution of wild Colorado pikeminnow in the Colorado River Basin . . . . . . . . . . . . 12

2       Mean catch rate for Colorado pikeminnow in the Green River during spring ISMP
sampling in 1986–1997. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

3       Mean catch rate for Colorado pikeminnow in the Colorado River during spring ISMP
sampling in 1986–1997. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

4       Estimated time to achieve recovery of the Colorado pikeminnow . . . . . . . . . . . . . . . . . 52

A-1     Predicted length at age for Colorado pikeminnow; computed from von Bertalanffy
growth functions and from growth-rate data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-11

xv

BLM_0070645

BLM_0070646

# 1.0 INTRODUCTION

## 1.1 Background

The Colorado pikeminnow (*Ptychocheilus lucius*) is the largest cyprinid fish endemic to the Colorado River Basin (Tyus 1991). The common name for this species was changed from Colorado squawfish by the American Fisheries Society (Nelson et al. 1998). Adults attain a maximum size of about 1.8 m total length (TL) and 36 kg in weight (Miller 1961). The Colorado pikeminnow is currently listed as "endangered" under the Endangered Species Act of 1973, as amended (ESA; 16 U.S.C. 1531 *et. seq.*). It was first included in the List of Endangered Species issued by the Office of Endangered Species on March 11, 1967 (32 FR 4001) and was considered endangered under provisions of the Endangered Species Conservation Act of 1969 (16 U.S.C. 668aa). The Colorado squawfish (pikeminnow) was included in the United States List of Endangered Native Fish and Wildlife issued on June 4, 1973 (38 FR No. 106), and it received protection as endangered under Section 4(c)(3) of the original ESA of 1973. The latest revised Colorado squawfish (pikeminnow) recovery plan was approved on August 6, 1991 (U.S. Fish and Wildlife Service 1991). The final rule for determination of critical habitat was published on March 21, 1994 (59 FR 13374), and the final designation became effective on April 20, 1994.

The Colorado pikeminnow is a member of a unique assemblage of fishes native to the Colorado River Basin, consisting of 35 species with 74% level of endemism (Miller 1959). It is one of four mainstem, big-river fishes currently listed as endangered under the ESA; others are the humpback chub (*Gila cypha),* bonytail (*Gila elegans*), and razorback sucker (*Xyrauchen texanus*). The native fish assemblage of the Colorado River Basin is jeopardized by large mainstem dams, water diversions, habitat modification, nonnative fish species, and degraded water quality (Miller 1961; Minckley and Deacon 1991).

## 1.2 Purpose and Scope

This document amends and supplements the Colorado Squawfish Recovery Plan of 1991 (Recovery Plan; U.S. Fish and Wildlife Service 1991). The purpose and scope are to assimilate current information on the life history of the species and status of populations to develop recovery goals associated with the five listing factors that [as specified under Section 4(f)(1) of the ESA] identify site-specific management actions necessary to minimize or remove threats; establish objective, measurable recovery criteria; and provide estimates of the time and costs required to achieve recovery. In developing the recovery goals, the full body of available information pertinent to issues related to species life history and conservation was considered. However, it is not the intent of this document to provide a comprehensive treatise of information on Colorado pikeminnow; a synopsis of the life history that includes a description of habitat requirements is provided in Appendix A. Additional and more detailed information can be found in literature cited in this document and in reports and publications referenced in those citations.

These recovery goals were developed as an amendment and supplement to the Recovery Plan to focus on the requirements of Section 4(f)(1)(B) of the ESA, which requires that the Secretary of

BLM_0070647

the Interior incorporate into each plan site-specific management actions; objective, measurable criteria; and estimates of the time and costs to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal. The Recovery Plan did not contain those key requirements of the ESA; therefore, these recovery goals take precedence over the Recovery Plan. Recovery programs that include the Colorado pikeminnow (see section 1.3) will direct research, management, and monitoring activities and determine costs associated with recovery. The recovery goals are not intended to include specifics on design of management strategies nor are they intended to prescribe ways that management strategies should be implemented. Those details (and associated costs) need to be developed by the respective recovery programs in their implementation plans.

An important aspect in development of these recovery goals was to attain a balance between reasonably achievable criteria and ensuring the viability and security of the species beyond delisting. Reasonably achievable criteria considered demographic and genetic requirements of self-sustainability in balance with available estimates of carrying capacity. These recovery goals are intended to be used by the U.S. Fish and Wildlife Service (Service) in rule-making processes to downlist and/or delist the Colorado pikeminnow. The Service intends to review, and revise as needed, these recovery goals at least once every 5 years from the date they are made public through a Notice of Availability published in the *Federal Register*, or as necessary when sufficient new information warrants a change in the recovery criteria. Review of these recovery goals will be part of the review of listed species as required by Section 4(c)(2)(A) of the ESA, *"The Secretary shall ... conduct, at least once every five years, a review of all species...".*

## 1.3   Recovery or Conservation Programs

Two of the five major endangered-species recovery or conservation programs in the Colorado River Basin include the Colorado pikeminnow (highlighted in Box 1). These are the Upper Colorado River Endangered Fish Recovery Program (UCRRP) and the San Juan River Basin Recovery Implementation Program (SJRRIP). The UCRRP is a recovery program that was initiated under a Cooperative Agreement signed by the Secretary of the Interior on January 22, 1988, as a coordinated effort of State and Federal agencies, water users, energy distributors, and environmental groups to recover the four endangered fishes in the upper basin downstream to Glen Canyon Dam, excluding the San Juan River (U.S. Department of the Interior 1987; Wydoski and Hamill 1991;

> **Box 1. Recovery or Conservation Programs**
>
> 1. ***Upper Colorado River Endangered Fish Recovery Program (UCRRP)***
> 2. ***San Juan River Basin Recovery Implementation Program (SJRRIP)***
> 3. Glen Canyon Adaptive Management Program (GCDAMP)
> 4. Native Fish Work Group (NFWG)
> 5. Lower Colorado River Multi-Species Conservation Program (MSCP)

Evans 1993). It functions under the general principles of adaptive management (see section 5.1.2) and consists of seven program elements, including instream flow protection; habitat

2

restoration; reduction of nonnative fish and sportfish impacts; propagation and genetics management; research, monitoring, and data management; information and education; and program management.  The SJRRIP is a similar recovery program, established under a cooperative agreement signed in 1992, to conserve populations of Colorado pikeminnow and razorback sucker in the San Juan River Basin (U.S. Department of the Interior 1995a).  As stated in the governing documents of the UCRRP and SJRRIP, the goal is to recover the endangered fishes while water development proceeds in compliance with State and Federal laws, including the ESA, State water law, interstate compacts, and Federal trust responsibilities to American Indian tribes.  Funding for the UCRRP and SJRRIP will continue through 2011 under legislation passed in October 2000 (P.L. 106-392); Congress will review the UCRRP and SJRRIP to determine if funding should be authorized beyond 2011.

# 2.0  THE RECOVERY PROCESS

## 2.1    Definition of Recovery

Understanding the Service's strategy for recovery of the Colorado pikeminnow, as provided in the ESA and implementing regulations, first requires an understanding of the meaning of "recover" and "conserve".  The ESA does not specifically define recover, and the term "recovery" is used with respect to recovery plans *"...for the conservation and survival..."* of listed species.  An endangered species, as defined in Section 3(6) of the ESA, means *"any species which is in danger of extinction throughout all or a significant portion of its range."*  A threatened species is defined in Section 3(19) of the ESA as *"any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."* According to Service policy (U.S. Fish and Wildlife Service 1990), *"Recovery is the process by which the decline of an endangered or threatened species is arrested or reversed, and threats to its survival are neutralized, so that its long-term survival in nature can be ensured.  The goal of this process is the maintenance of secure, self-sustaining wild populations of species with the minimum necessary investment of resources."*  The ESA's implementing regulations (50 CFR § 402.02) further define recovery as *"...improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act."*  The policy and regulations use the word recovery a narrow ESA sense, giving it meaning that is different from returning a species to its normal position or condition.

The definition provided for recovery in the implementing regulations and the definition provided for conserve in the ESA have essentially the same meaning.  Section 3(3) of the ESA states: *"The terms "conserve," "conserving," and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary."*  Hence, recovery and conserve both mean to bring a species to the point at which it no longer needs the protection of the ESA, because the species is no longer in danger of extinction throughout all or a significant portion of its range.  This definition of recovery falls far short of requiring that a species must be restored to its historic range and abundance before it can be considered

BLM_0070649

recovered or delisted.  It also falls short of requiring the restoration of a species to all the remaining suitable habitat, unless this is necessary to sufficiently reduce the species' susceptibility to threats to a level at which the species is no longer threatened or endangered.

The phrase "throughout all or a significant portion of its range" is used in both definitions of endangered and threatened.  Neither "significant" nor "range" are defined in the ESA or implementing regulations.  Hence, the ESA provides the Service with latitude to use its discretion, based on the best scientific information available, to develop recovery goals and implement recovery plans designed to conserve and recover species.  The ESA clearly does not use the term significant in a statistical sense.  Significance cannot be reliably and safely applied in any strictly quantitative framework, because of the great variety of organisms, habitats, and threats that must be evaluated for protection under the ESA.

Given that the ESA is intended to avoid species extinction, the Service avoids the pitfalls of a purely quantitative approach by instead viewing significant in the context of a species' long-term survival needs.  The term becomes logical, meaningful, and useful if applied in this context.  A significant portion of the range is that area that is important or necessary for maintaining a viable, self-sustaining, and evolving population or populations, in order for a taxon to persist into the foreseeable future.  That "significant portion" may constitute a large portion of the historic range of a species or a relatively small portion of the historic range.  Other parts of a species' range (regardless of whether it is historical, current, or potential range) may not be significant to its long-term survival, regardless of its geographic extent.  Therefore, a species extirpated from such areas does not necessarily mean it is threatened or endangered, regardless of the geographic extent of those areas.

Implicit in the ESA definitions of threatened and endangered and in the principles of conservation biology is the need to consider genetics, demographics, population redundancy, and threats (as identified by the listing factors).  The ESA is mandated to recover species to the point that they are "not likely" to be in danger of extinction for the foreseeable future throughout all or a significant portion of their range.  The Service believes that the "not likely" standard is exceeded by the requirement of the recovery goals to maintain multiple widespread populations that are independently viable, because it is unlikely that future singular threats will endanger widely separated multiple populations.  Viable populations have sufficient numbers of individuals to counter the effects of deleterious gene mutations as a result of inbreeding, and to counter the effects of deaths exceeding births and recruitment failure for periods of time.  Thus, the conservation biology principle of redundancy is satisfied by the required multiple genetically and demographically viable, self-sustaining populations (section 3.1.3).  Furthermore, the principle of resiliency is satisfied with sufficiently large populations to persist through normal population variations, as well as through unexpected catastrophic events (section 3.1.4).

The principles of recovery and conservation as defined in the ESA, implementing regulations, and Service policy demonstrate the strong relationship between the delisting criteria used for recovery and the five listing factors in Section 4(a)(1) of the ESA.  These five listing factors must

4

be addressed in any reclassification of a species [ESA Section 4(c)(2)(B); section 4.0 of this document], and are:

> "*(A)   The present or threatened destruction, modification, or curtailment of its habitat or range;*
> *(B)   overutilization for commercial, recreational, scientific, or educational purposes;*
> *(C)   disease or predation;*
> *(D)   the inadequacy of existing regulatory mechanisms; and*
> *(E)   other natural or manmade factors affecting its continued existence.*"

Recovery is based on reduction or removal of threats and improvement of the status of a species during the period in which it is listed, and not just from the time a listed species is proposed for reclassification. Environmental conditions and the structure of populations change over time, and threats recognized at listing or in subsequent recovery plans may no longer be directly applicable when reclassification is considered. Management actions and tasks conducted by recovery or conservation programs for listed species are expected to minimize or remove threats and improve the species' status.

When delisting a species, the Service must determine that the five listing factors no longer apply, e.g., the habitat is no longer threatened with destruction or modification, the current abundance and range is adequate, and the habitat needed to sustain recovered populations is present. Therefore, the recovery goals (section 5.0) include management actions and tasks, as well as downlisting and delisting criteria, presented by "recovery factor". These recovery factors were derived from the five listing factors and state the conditions under which threats are minimized or removed.

Recovery is achieved when management actions and associated tasks have been implemented and/or completed to allow genetically and demographically viable, self-sustaining populations to thrive under minimal ongoing management and investment of resources. Achievement of recovery does not mandate returning a species to all or a significant portion of its historic range, nor does it mandate establishing populations in all possible habitats, or everywhere the species can be established or reestablished. Removing a species from protection of the ESA remands the primary management responsibility of that species to the States, who may choose to further expand its range and populations. The standard of establishing and protecting viable, self-sustaining populations is applied to the recovery of Colorado pikeminnow, and was used in developing recovery goals for the other three endangered fishes of the Colorado River Basin (U.S. Fish and Wildlife Service 2002a, 2002b, 2002c). This approach is consistent with recovery of other vertebrate species, such as the bald eagle (*Haliaeetus leucocephalus*; 64 FR 36453), peregrine falcon (*Falco peregrinus*; 64 FR 46541), desert tortoise (*Gopherus agassizii*; Berry 1999), Pacific salmon (*Oncorhynchus spp.*; Allendorf et al. 1997), and southern sea otter (*Enhydra lutris nereis*; Ralls et al. 1996).

5

## 2.2    Recovery Units

Recovery of Colorado pikeminnow in the Colorado River Basin is considered necessary only in the Upper Colorado River Basin because of the present status of populations and because existing information on Colorado pikeminnow biology support application of the metapopulation concept to extant populations (see section 3.1.4).  For the purpose of these recovery goals, the upper basin is upstream of Glen Canyon Dam, Arizona, including the San Juan River.  The need for self-sustaining populations in the lower basin (i.e., downstream of Glen Canyon Dam) and associated site-specific management actions/tasks necessary to minimize or remove threats will be reevaluated at the status review of the species.  The upper basin encompasses two management areas under different and separate recovery programs (i.e., UCRRP and SJRRIP; see section 1.3 for description of geographic coverage by each of the programs).  Designation of the recovery units is consistent with goals established by these programs.  For example, the governing document for the UCRRP (U.S. Department of the Interior 1987) states: *"Since the recovery plans* [for the Colorado pikeminnow, humpback chub, and bonytail; razorback sucker was not federally listed in 1987, but was included in the UCRRP] *refer to species recovery in both the upper and lower basins, these goals* [recovery/management goals in the original recovery plans] *also apply to both basins, until revised for the upper basin, through implementation of this recovery program.  However, the goal of this program for the three endangered species is recovery and delisting in the upper basin.  In general, this would be accomplished when the habitat necessary to maintain self-sustaining populations has been determined and provisions are in place to maintain and protect that habitat and these species. The Implementation Committee will be expected to revise these goals for the upper basin as the program develops.  Attainment of these goals will result in recovery and delisting of the listed species in the upper basin."*   Parties to the UCRRP agreed that the four endangered species could be downlisted and delisted separately in the upper basin.  However, the document also states: *"... this program can not, and does not in anyway, diminish or detract from or add to the Secretary's ultimate responsibility for administering the Endangered Species Act."*

The Colorado pikeminnow was listed prior to the 1996 distinct population segment (DPS) policy, and the Service may conduct an evaluation to designate DPSs in a future rule-making process if, in the future, lower basin populations are determined necessary for recovery.  In the Policy Regarding the Recognition of Distinct Vertebrate Population (61 FR 4721–4725), the U.S. Fish and Wildlife Service and the National Marine Fisheries Service clarified their interpretation of the phrase *"distinct population segment of any species of vertebrate fish or wildlife"* for the purposes of listing, delisting, and reclassifying species under the ESA.  Designation of DPSs is a separate listing process that is different from recovery plans/goals, and is accomplished by a rule-making process.  A DPS is a segment of the population and includes a part of the range of a species or subspecies.  Like all listings, the DPS is described geographically, but it is important to retain the purpose of the ESA *"...to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved..."*.  The elements considered for designation of DPSs are: *"1) Discreteness of the population segment in relation to the remainder of the species to which it belongs; 2) The significance of the population segment to the species to which it belongs; and 3) The population segment's conservation status in relation*

BLM_0070652

*to the Act's standards for listing (i.e., is the population segment, when treated as if it were a species, endangered or threatened?)."*

Species listed prior to the DPS policy may be reconsidered for DPS designation at the time of reclassification or at the 5-year status review. The DPS policy states: *"Any DPS of a vertebrate taxon that was listed prior to implementation of this policy will be reevaluated on a case-by-case basis as recommendations are made to change the listing status for that distinct population segment. The appropriate application of the policy will also be considered in the 5-year reviews of the status of listed species required by section 4(c)(2) of the Act."* Section 4(c)(2)(A) of the ESA requires a review of listed species *"at least once every five years"*. If DPSs are designated, these recovery criteria will need to be reevaluated.

## 2.3    Development of Recovery Goals

Development of recovery goals for the Colorado pikeminnow followed a specific process. First, current data on the life history of the species and on existing populations were assimilated (Appendix A; section 3.0). Second, the assimilated data were used to evaluate population viability and self-sustainability (section 3.0). Third, past and existing threats were identified according to the five listing factors (section 4.0). Finally, site-specific management actions were identified to minimize or remove threats, and objective, measurable recovery criteria were developed based on the five factors (section 5.0). The process of developing the recovery goals was interactive and iterative, and the recovery goals are the product of considerable input from stakeholders and scientists from throughout the Colorado River Basin and from rigorous peer review. Input from biologists and managers throughout the basin was received through meetings with the Colorado River Fishes Recovery Team; Biology, Management, and Implementation committees of the UCRRP; Biology and Coordinating committees of the SJRRIP; Colorado River Fish and Wildlife Council; American Indian tribes; State game and fish agencies; water and power interests; and appropriate Federal agencies. Input was also received through independent reviews of previous drafts (see acknowledgments). Development of these recovery goals considered the approach taken by Lentsch et al. (1998) to develop interim management objectives, and paralleled similar efforts by the Colorado Division of Wildlife and benefitted from exchange of information with the principal author (Nesler 2000).

The process of downlisting and delisting described in this document is consistent with provisions specified under Section 4(b), Basis For Determinations, and Section 4(f)(1), Recovery Plans, of the ESA. Under Section 4(b), the Secretary of the Interior shall determine if a species is endangered or threatened *"...solely on the basis of the best scientific and commercial data available..."*. Specifically, under Section 4(f)(1)(B), each recovery plan must incorporate (i) *"a description of such site-specific management actions as may be necessary to achieve the plan's goal for conservation and survival of the species"*; (ii) *"objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list"*; and (iii) *"estimates of the time required and cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal."* Objective, measurable recovery criteria identify downlisting and delisting

7

requirements for each management action, and define viable, self-sustaining populations consisting of target numbers of adults and subadults for wild populations. Under Section 4(c)(2)(B) of the ESA, each determination of reclassification of a species shall be made in accordance with provisions of Sections 4(a) and 4(b).

# 3.0  POPULATION VIABILITY AND SELF-SUSTAINABILITY

Population viability and self-sustainability are the cornerstones to defining a recovered species. Factors that determine population viability and self-sustainability are demographics (size and age structure of populations), population redundancy (number and distribution of populations), habitat carrying capacity (resource limitations), and genetic considerations (inbreeding and genetic viability). This section discusses the development of genetic and demographic viability standards for achieving the primary objective of the Recovery Plan, i.e., *"To recover the Colorado squawfish ...by establishing naturally self-sustaining populations..."* (U.S. Fish and Wildlife Service 1991). Guidelines for population viability and self-sustainability are stated in Box 2 (Franklin 1980; Soulé 1980; Shaffer 1987; Allen et al. 1992).

---

### Box 2.  Guidelines for Population Viability and Self-Sustainability

- A viable, self-sustaining population has negligible probability of extinction over a 100- to 200-year period.
- A population should be sufficiently large to survive historically observed environmental variation.
- A population should be sufficiently large to maintain long-term genetic diversity and viability.
- Multiple demographically viable (redundant) populations greatly reduce the probability of extinction if the populations are independent in their susceptibility to catastrophic events.
- A viable, self-sustaining population must have positive recruitment potential sufficient to replace adult mortality near carrying capacity, and on average, exceed adult mortality when the population is below carrying capacity.
- Carrying capacity is not expected to be the same for different populations, because physical habitat, water quality, and biological components are likely to vary.

---

## 3.1  Demographic Viability

### 3.1.1  *Demographic characteristics, environmental uncertainty, and catastrophic events*

Demographic or population viability refers to the persistence of a species over time, as affected by uncertainties in population dynamics. A viable, self-sustaining population has negligible probability of extinction over a 100- to 200-year time frame (Franklin 1980; Soulé 1980).

8

BLM_0070654

Population viability can be affected by demographic characteristics, environmental uncertainty, and catastrophic events (Shaffer 1987; Allen et al. 1992). Demographic characteristics relate to random changes in birth and death rates, primarily reflecting differences at the population level. Persistence time for a population faced only with demographic variability increases geometrically as the population increases, and only populations with individuals that number in the "10s to 100s" are vulnerable to extinction due simply to demographic variability (Shaffer 1987). Hence, demographic viability is generally considered to be an issue only with severely depleted populations (Goodman 1987; Allen et al. 1992). Wild populations of Colorado pikeminnow in the Green River and upper Colorado River subbasins are not considered to be severely depleted, and a population-viability analysis conducted by Gilpin (1993) indicated that the species is unlikely to go to extinction. However, the current status of the species is being evaluated through population estimates.

In contrast, population persistence decreases linearly with environmental uncertainty (Shaffer 1987), and thus is of more concern for population viability of Colorado pikeminnow. Environmental uncertainty results from changes in environmental factors such as variability in food supply; weather; population dynamics of predators, competitors, and parasites; and in the case of riverine fishes, variability in seasonal flow characteristics. Many of these environmental factors may be highly correlated to population demographics, such as reproductive success, survival, and recruitment. Population sizes necessary for persistence under environmental variability reflect the resulting variability in birth and death rates (Allen et al. 1992). Specifically linking environmental variability to birth and death rates is difficult (Ewens et al. 1987), and use of a demographic model for Colorado pikeminnow is limited because of the lack of reliable empirical data on these life-history parameters. Population viability analyses (PVA; Gilpin 1993; Soulé 1987; Shaffer 1987) were considered but not employed because of a lack of conclusive data on state and rate variables for the species.

As an alternative to demographic models, the concept of carrying capacity can be used to approximate population sizes and potential. Populations can be viewed as having some potential with respect to resource limitations or theoretical carrying capacity. The variance (V) in potential growth rate (r), without limitations of carrying capacity, has to be sizably greater than r (V > 2r) before the population is susceptible to extinction, otherwise the population tends toward the carrying capacity (Roughgarden 1979). For the Colorado pikeminnow, increasing population sizes of adults suggests that recruitment is greater than adult mortality for this species. It is doubtful that environmental uncertainty will affect Colorado pikeminnow populations that meet genetic considerations if the environment is protected and secured against changes that exceed environmental stochasticity for the species; e.g., anthropogenic changes such as dams and introductions of nonnative fish species can impose environmental conditions that exceed the range of conditions experienced by the species historically.

Catastrophic events, however, could dramatically impact Colorado pikeminnow populations. Catastrophic events are rare incidents that may cause sizable mortality in one or more age groups. A catastrophe is an event that would, with a single act, eliminate one or more ages of Colorado pikeminnow in a reach of river. This may include such factors as dramatic and extensive alteration of riverine habitat, invasion of nonnative fishes as highly successful

9

predators or competitors, or spills of toxic substances.  Abundance and distribution of Colorado pikeminnow were greatly reduced by the 1930's as a result of land-use practices, degraded water quality, and nonnative fishes (Dill 1944; Miller 1961).  Colorado pikeminnow were extirpated from the Lower Colorado River Basin shortly after construction of major mainstem dams because direct and indirect effects of these dams affected specific life-history events by impeding passage to spawning, feeding, and nursery areas; causing reproductive failure from cold-water releases; and reducing survival through the introduction of successful nonnative predators and competitors.  A rotenone treatment in Flaming Gorge Canyon in the early 1960's killed unknown numbers of Colorado pikeminnow  (Holden 1991) but did not extirpate the species from the Green River, nor did an oil spill on the Yampa River in 1987.  In order for the Colorado pikeminnow to be extirpated from a large portion of its existing range, a catastrophe would have to be of the magnitude where the entire ecosystem is fragmented and altered.

The Colorado pikeminnow is a long-lived fish (40+ years; Osmundson et al. 1997) that evolved in a variable system, with high adaptability to natural environmental variability and resilience to natural catastrophes.  This evolution has become manifest as pulsed recruitment from periodic strong year classes, great longevity of adults, and low vulnerability of adults to environmental influences.  Great longevity and stability of adults provides a "storage effect" for populations, into which periodic recruitment from strong year classes allows fish to become stored (Gilpin 1993).  This is seen as a way that Colorado pikeminnow maintain long-term population viability and stability under environmental variation.

A critical aspect of recovery is increased frequency of strong year classes.  Strong year classes of Colorado pikeminnow have been linked to years immediately following wet hydrologic conditions resulting in high spring-runoff flows (McAda and Ryel 1999; Valdez et al. 1999).  High to moderate spring flows rework sediment deposits, which seems to increase larval survival and results in a strong year class (Van Steeter and Pitlick 1998; Osmundson 1999).  Characteristically, two or three strong year classes occur in consecutive years, with a recurrence interval of 7–10 years.  Shortening this recurrence interval by increasing the frequency of high spring flows increases the likelihood of greater recruitment, population expansion, and long-term stability.  Mid-summer, rain-induced flow spikes have been linked to spawning cues (Nesler et al. 1988) and may stimulate reproduction and add to the success of strong year classes.

### 3.1.2   Existing populations of Colorado pikeminnow

Three wild populations of Colorado pikeminnow are found in about 1,753 km of riverine habitat in the Green River, upper Colorado River, and San Juan River subbasins (Table 1, Figure 1; Appendix A).  Occupied habitat occurs in the Green River from Lodore Canyon to the confluence of the Colorado River (Tyus 1991; Bestgen and Crist 2000); the Yampa River downstream of Craig, Colorado (Tyus and Haines 1991); the Little Snake River from its confluence with the Yampa River upstream into Wyoming (Marsh et al. 1991; Wick et al. 1991); the White River downstream of Taylor Draw Dam and Kenney Reservoir (Tyus and Haines 1991); the lower 143 km of the Price River (Cavalli 1999); the lower Duchesne River; the upper Colorado River from Palisade, Colorado, to Lake Powell (Valdez et al. 1982a; Osmundson et al. 1997, 1998); the lower 54 km of the Gunnison River (Valdez et al. 1982b; Burdick 1995); the

10

BLM_0070656

Table 1.  Occupied habitat of wild Colorado pikeminnow in the Upper Colorado River Basin and limits to distribution.

| River | Occupied Habitat | Limits to Distribution |
|---|---|---|
| Green River Subbasin | | |
| 1. Green River | Lodore Canyon to Colorado River confluence (580 km) | Cold releases from Flaming Gorge Dam have been warmed and species has naturally expanded upstream into Lodore Canyon; species distributed continuously downstream to Colorado River confluence |
| 1a. Yampa River | Craig, Colorado, to Green River confluence (227 km) | Present distribution similar to historic |
| 1b. Little Snake River | Wyoming to Yampa River confluence (80 km) | Habitat is marginal; flows are reduced; historic distribution unknown |
| 1c. White River | Taylor Draw Dam to Green River confluence (100 km) | Upstream distribution blocked by Taylor Draw Dam |
| 1d. Price River | Lower 143 km above Green River confluence | Streamflow reduced; barriers occur above current distribution |
| 1e. Duchesne River | Lower 10 km above Green River confluence | Streamflow reduced; barriers occur above current distribution |
| Upper Colorado River Subbasin | | |
| 2 Upper Colorado River | Palisade, Colorado, to Lake Powell inflow (298 km) | Passage by Grand Valley Diversion completed in 1998; Price-Stubb and Government Highline diversion dams restrict upstream distribution; Lake Powell inflow defines downstream distribution |
| 2a. Gunnison River | Lower 54 km above Colorado River confluence | Redlands Fishway allowed passage in 1996; upstream distribution is limited by Hartland Diversion Dam and possibly cold-water releases from the Aspinall Unit |
| 2b. Dolores River | Lower 2 km above Green River confluence | Streamflow altered; no barriers in potential historic habitat |
| San Juan River Subbasin | | |
| 3. San Juan River | Shiprock, New Mexico, to Lake Powell inflow (241 km) | Irrigation diversions block upstream movement; Lake Powell defines downstream distribution |

lower 2 km of the Dolores River (Valdez et al. 1992); and 241 km of the San Juan River downstream from Shiprock, New Mexico, to the Lake Powell inflow (Jordan 1891; Koster 1960; Olson 1962; Holden 1999; Propst 1999).  Natural reproduction of Colorado pikeminnow is currently known from the Green, Yampa, upper Colorado, Gunnison, and San Juan rivers.

Recent preliminary estimates of abundance summed for the three Colorado pikeminnow populations range from about 6,600 to 8,900 wild adults.  The precision and reliability of these estimates vary, and approximate numbers are provided as a general indication of the size of populations in the basin.  Estimates of subadults are not currently available for all populations, and precise estimates of adults and subadults will be developed in order to determine if demographic criteria are met for downlisting and delisting.  Estimates of adults for the three subbasins are: Green River, 6,000–8,000 (Nesler 2000; personal communication, K. Bestgen,

11

BLM_0070657



Figure 1.  Distribution of wild Colorado pikeminnow in the Colorado River Basin.

12

BLM_0070658

Colorado State University); upper Colorado River, 600–900 (Nesler 2000; Osmundson 2002 [includes some subadults]); and San Juan River, 19–50 (Holden 1999; personal communication, D. Ryden, U.S. Fish and Wildlife Service).

Two principal spawning sites have been identified in the Green River subbasin (Tyus 1990). Crowl and Bouwes (1998) estimated that 1,000 adults were associated with the spawning site near Three Fords Canyon in Gray Canyon of the lower Green River, and 1,400 adults were associated with the spawning site in the lower 32 km of the Yampa River. Fish associated with the two spawning sites may be demographically independent with individual stock-recruitment characteristics (personal communication, T. Modde, U.S. Fish and Wildlife Service), but overlap in adult and juvenile distributions and no significant differences in allele frequencies suggest essential panmixia or mixing of these two stocks (Ammerman and Morizot 1989; Williamson et al. 1999; Morizot et al. 2002). Fish in the upper Colorado River subbasin are believed to spawn near Grand Junction, Colorado, and in the lower Gunnison River (personal communication, C. McAda, U.S. Fish and Wildlife Service).

In addition to adults, age-0 fish and juveniles are found in the lower Yampa River; Green River downstream of the Yampa River confluence; upper Colorado River downstream of Palisade, Colorado, to the Lake Powell inflow, Utah; and lower 40 km of the Gunnison River. Small numbers of age-0 Colorado pikeminnow have been collected in the San Juan River (Holden 1999). Subadults and small adults have also been found in the lower Price, Duchesne, and White rivers (Tyus and Haines 1991; Cavalli 1999; Muth et al. 2000). The Interagency Standardized Monitoring Program (ISMP) of the UCRRP (McAda et al. 1994a, 1994b, 1995, 1996, 1997) has determined catch-rate indices of age-0 and subadult fish in the Green and upper Colorado rivers since 1988. Average of geometric mean catch-per-effort (CPE) during 1986–1997 for Reach 1 (lower Colorado River), Reach 2 (upper Colorado River), Reach 3 (lower Green River), and Reach 4 (upper Green River) are approximately 0.4, 0.03, 1.5, and 0.4 fish/10 m$^2$, respectively. Numbers of age-0 and subadult fish in the other rivers are low, but with no extensive surveys, except for the San Juan River. All data collected under ISMP for age-0 are catch-rate indices, with a few mark-recapture estimates in backwaters (Haines et al. 1998).

Efforts to reestablish populations of Colorado pikeminnow have taken place in the Lower Colorado River Basin and the San Juan River. Over 623,000 Colorado pikeminnow were reintroduced into the Salt and Verde rivers, tributaries of the Gila River subbasin in Arizona, during 1981–1990 (Hendrickson 1994). These reintroductions were part of conservation efforts and considered nonessential experimental populations [Section 10(j) of the ESA]. Long-term survival was not reported as a result of these releases (Maddux et al. 1993), but some of these stocked fish still persist in the Verde River. Also, over 300,000 hatchery-produced Colorado pikeminnow have been released in the mainstem as part of the SJRRIP (Ryden and Ahlm 1996; Holden 1999; personal communication, F. Pfeifer, U.S. Fish and Wildlife Service).

### 3.1.3   *Populations of Colorado pikeminnow as redundant units*

Maintaining several populations with relatively independent susceptibility to threats is an important consideration in the long-term viability of a species (Shaffer 1987; Goodman 1987).

13

BLM_0070659

These redundant populations provide security in case of a catastrophic event or repeated year-class failure. The positive effect of relatively independent populations can be demonstrated by the following examples. Consider that a single population has a probability of extinction from a catastrophic event of 10% in 200 years. If two populations are independent, the probability of both going extinct is 1% ($0.1^2$). For three populations, the probability reduces to 0.1% ($0.1^3$). Even with an extinction probability of 25% for one population, the probability of extinction for two and three populations is 6.3% and 1.6%, respectively. Maintenance of Colorado pikeminnow populations in discrete subbasins contributes to redundancy as protection against threats and catastrophic events simultaneously affecting all or most populations. The migratory nature of the species and connectedness of the riverine system allows individuals to repopulate patches in the event of local extirpation.

### 3.1.4   Colorado pikeminnow as a metapopulation

The metapopulation concept is a natural phenomenon that should be considered when evaluating species persistence. A metapopulation is defined as a network of populations or subpopulations that have some degree of intermittent or regular gene flow among geographically separate units occupying habitat patches (Meffe and Carroll 1994). Populations that make up a metapopulation exist along a continuum of connectedness, with no clear break points, from totally isolated units to those that experience regular and high gene flow (Ehrlich and Murphy 1987; Harrison et al. 1988). Connectedness among units of a metapopulation may vary seasonally or annually (U.S. Fish and Wildlife Service 1995), and the best way to identify population units is that they have some ecological and evolutionary significance (Hanski and Gilpin 1997). Under metapopulation dynamics, habitat patches that become unoccupied due to local extirpations may become repopulated by dispersing individuals from other subpopulations. Metapopulations depend on the ability of individuals to disperse and repopulate empty patches in a manner timely enough to ensure that sufficient numbers of patches always contain viable subpopulations.

Colorado pikeminnow in the Upper Colorado River Basin are distributed in three geographically separate subbasins, where the migratory nature of the species and documented mixing of stocks indicate that Colorado pikeminnow function as a metapopulation (see section 3.1.2 and Appendix A). The largest self-sustaining population occurs in the Green River subbasin with direct and unimpeded riverine connection to a smaller self-sustaining population in the upper Colorado River subbasin. Colorado pikeminnow in San Juan River subbasin are separated from the other two subbasins by about 320 km across Lake Powell, habitat not normally inhabited by Colorado pikeminnow, but through which passage is possible. Several adults have been captured in this reservoir (Valdez 1990); most recently near Bullfrog, Utah (personal communication, W. Gustaveson, Utah Division of Wildlife Resources), a midpoint between the San Juan River and upper Colorado River, but movement of Colorado pikeminnow between these subbasins has not been documented. Several tagged adults have been recaptured to substantiate exchange of Colorado pikeminnow between the Green and upper Colorado rivers (personal communication, C. McAda, U.S. Fish and Wildlife Service). Gilpin (1993) hypothesized that mixing of Colorado pikeminnow from the Green River and upper Colorado River subbasins also occurs when young fish in downstream areas begin to mature and return randomly to upstream feeding and spawning areas. High densities of age-0 Colorado pikeminnow have been found below the confluence of

14

the Green and Colorado rivers and in the Lake Powell inflow (Valdez 1990), suggesting that fish from both systems are transferred passively or move actively downstream and mix in these regions. Longitudinal distributions show decreasing sizes of fish with distance downstream, and tag-recapture data show fish moving back upstream as they mature (Valdez et al. 1982a; Osmundson et al. 1998). Gilpin (1993) hypothesized that this upstream return by subadults provides connectivity and gene flow between the Green and upper Colorado rivers, resulting in a panmictic population for the entire upper basin with evidence of source/sink dynamics. Although Colorado pikeminnow show fidelity to four primary spawning locales (Tyus 1985, 1991), fish in the Green River and upper Colorado River subbasins are linked genetically, based on movement throughout the system and lack of genetic separation (Ammerman and Morizot 1989; Gilpin 1993). Williamson et al. (1999) and Morizot et al. (2002) reported that Colorado pikeminnow from the San Juan River are genetically similar to fish from the Green River and upper Colorado River subbasins, and they suggested that exchange of genes occurred historically and may continue today.

Populations of Colorado pikeminnow within the Green River and upper Colorado River subbasins consist of separate spawning stocks, whose progeny and adults mix (see section 3.1.2 and Appendix A). Two spawning stocks are recognized in the Green River subbasin; fish spawn in the lower Yampa River (i.e., Cleopatra's Couch) and in lower Desolation/Gray Canyons (i.e., Three Fords). Radio telemetry studies show considerable fidelity of adults to respective spawning locations, but with some exchange of adults between these spawning locations on different years. Young produced in the lower Yampa River drift downstream and nurse primarily in alluvial backwaters upstream of Desolation/Gray Canyons, and young produced in lower Desolation/Gray Canyons nurse primarily in alluvial backwaters downstream of Desolation/Gray Canyons. There is considerable downstream transport and movement of these young fish and, eventually, there is mixing of these age-0 fish, as well as the juveniles, such that the progeny of the two stocks become mixed and indistinguishable. Hence, although there are two separate and distinct spawning stocks in the Green River subbasin, there is only one mixed population. A similar situation exists for the upper Colorado River subbasin, where spawning occurs in the mainstem Colorado River and the Gunnison River. Although stock recruitment dynamics are not well documented, exchange of adults between the upper Colorado and Gunnison rivers is documented through a selective fish passage structure in the lower Gunnison River.

## 3.2    Carrying Capacity

Carrying capacity is the theoretical size of a population that can be sustained by the existing environment, and is determined by population demographics and resource limitations (i.e., limiting factors), including habitat. Functional carrying capacity is the population at its equilibrium state in the presence of resource limitations, and is determined as the level where births equal deaths, or lambda ($\lambda$) is equal to 1.0 (Begon et al. 1990). Potential carrying capacity is the maximum possible population size with resource limitations minimized or removed.

Carrying capacity of Colorado pikeminnow is not expected to be the same for different populations because physical habitat (e.g., river channel, flow, and cover), chemical constituents

15

(water quality), and biological components (e.g., food and predators) are likely to vary among river reaches. Hence, the same or even similar numbers and densities of fish in each population should not be expected for recovery. Carrying capacity, as a function of recovery, must be considered on its own merits for each population.

### 3.2.1 Green River

For the period 1986–1997, the catch of adult Colorado pikeminnow per hour of electrofishing in the Green River steadily increased (McAda et al. 1998; Figure 2). Catch rates from the 1986–1988 period to the 1996–1997 period increased by three-fold from about 0.8 fish/hour to about 2.5 fish/hour. Relative condition of adult Colorado pikeminnow in the Green River declined between these two time periods, suggesting that the population was at or near carrying capacity under existing conditions. Recently, small adult Colorado pikeminnow have moved into the Price River, where they were not reported from surveys in the 1970's (Cavalli 1999), also suggesting dispersal as a result of carrying capacity.

### 3.2.2   Upper Colorado River

Preliminary estimates of Colorado pikeminnow carrying capacity in the upper Colorado River were provided by Osmundson (1999). These estimates are based on existing population abundance, prey abundance and distribution, and water temperature regime for 298 km of the upper Colorado River from the Green River confluence to the Grand Valley Diversion near Palisade, Colorado. Estimates of Colorado pikeminnow (includes some subadults) in the uppermost 98 km (upstream of Westwater Canyon) increased from 205 in 1991 to 332 in 1994 and 435 in 1998 (Osmundson and Burnham 1998; Osmundson 1999), an increase of 112% during the 8-year period. Relative condition of adult Colorado pikeminnow in this upper reach remained constant during 1991–1994 but declined significantly with higher numbers in 1998 (Osmundson 1999), suggesting that carrying capacity had been reached or exceeded at about 435 Colorado pikeminnow, or about 4 fish/km. One possible explanation for increased dispersal, as indicated by increased numbers of adults migrating into the Gunnison River through the Redlands Fishway (1 in 1996, 18 in 1997, and 23 in 1998), is density-dependent dispersal from populations at or near carrying capacity under existing conditions.

Estimates of adult Colorado pikeminnow (includes some subadults) in 180 km of the upper Colorado River downstream of Westwater Canyon increased from 224 in 1992 to 512 in 1993 but decreased to 297 in 1994, for an average of 344 fish, or about 2 fish/km. Condition of Colorado pikeminnow declined following the 1991–1994 period, suggesting that the population was also at or near carrying capacity at current conditions (Osmundson 1999). In 1998, the estimates of Colorado pikeminnow upstream and downstream of Westwater Canyon were 435 and 330, respectively for a total of 765. Total estimates in 1999 and 2000 were 768 and 801 fish, respectively. Concurrent with these increases in population estimates, catch of adult Colorado pikeminnow per hour of electrofishing increased steadily for the period 1986–1997 (McAda et al. 1998; Figure 3). Catch rates from the 1986–1990 period to the 1995–1997 period increased by over ten times from about 0.1fish/hour to about 1.2 fish/hour.

BLM_0070662



Figure 2.  Mean catch rate (fish per hour of electrofishing) for Colorado pikeminnow in the
Green River during spring ISMP sampling in 1986–1997.  Bars indicate ± 1 standard error.

Osmundson (1999) estimated a carrying capacity of 700 adult Colorado pikeminnow for the
Colorado River from the Grand Valley Diversion Dam to the Green River confluence and the
lower 3.5 km of the Gunnison River based on forage base, thermal units, and fish condition.  He
also hypothesized that carrying capacity could be increased to 1,000 adults through range
expansion by providing fish passage into a total of 22 km of the upper Colorado River (past the
Grand Valley, Price-Stubb, and Government-Highline diversions) and into a total of 54 km of the
lower Gunnison River from the recent Redlands Fishway.  This range expansion constitutes year-
around home-feeding range for adult Colorado pikeminnow, based on prey supply and a
threshold of 40 annual thermal units (ATU; Kaeding and Osmundson 1989).  Water-temperature
augmentation in the Gunnison River, by modifying penstocks at Aspinall Unit dams, could
expand the ATU threshold upstream about 40 km and hypothetically increase carrying capacity
to 1,200 adults.  This translates to densities of about 4 adults/km for the upper reach and about
3 adults/km (present density) for the lower reach.  Penstock modification at Aspinall Unit dams
has not been investigated to determine if water-temperature augmentation is feasible.

### 3.2.3   San Juan River

Under the current conditions, carrying capacity of Colorado pikeminnow in the San Juan River is
estimated at 800 adults, based on a majority opinion of members of the San Juan Biology
Committee.  This estimate of carrying capacity is preliminary and subject to revision.

BLM_0070663



Figure 3.  Mean catch rate (fish per hour of electrofishing) for Colorado pikeminnow in the Colorado River during spring ISMP sampling in 1986–1997.  Bars indicate ± 1 standard error.

## 3.3   Genetic Viability

Genetic viability describes the pool of genetic diversity adequate to allow a population of animals to survive environmental pressures that may exceed the limits of developmental plasticity (Frankel 1983).  Genetically viable populations maintain 90% of the genetic diversity present in the ancestral (pre-disturbance) population for 200 years (Soulé 1980; Soulé and Wilcox 1980; Soulé and Simberloff 1986).  Ammerman and Morizot (1989) reported that Colorado pikeminnow maintain a high level of heterozygosity throughout their natural range.  Genetic variability consists of within-population genetic diversity and genetic variation found among linked populations or stocks (Meffe 1986; Meffe and Carroll 1994), such as populations in the Green River and upper Colorado River subbasins.  Genetic concepts that were considered are summarized in Box 3.

### 3.3.1   Genetic effective population size

One way to judge genetic viability is through consideration of "genetic effective population size" ($N_e$), which is the number of individuals contributing genes to the next generation (Crow and Kimura 1970; Gilpin and Soulé 1986; Soulé 1987; Allendorf et al. 1997).  $N_e$ was derived in

18

BLM_0070664

---

**Box 3.  Genetics Concepts and Considerations**

- Genetic viability describes the pool of genetic diversity adequate to allow a population of animals to survive environmental pressures that may exceed the limits of developmental plasticity.
- Genetic variability consists of within-population genetic diversity and genetic variation found among linked populations.
- Genetic effective population size ($N_e$) is the number of individuals contributing genes to next generation.
- Rate of inbreeding is an index of the amount of genetic exchange among closely related individuals and is of particular importance because it may result in offspring that are sterile or inviable after one to several generations.
- $N_e$ of at least 50 adults avoids inbreeding depression and is necessary for conservation of genetic diversity in the short-term; $N_e$ of 500 is needed to avoid serious long-term genetic drift; $N_e$ of 1,000 provides a conservative estimate beyond which significant additional genetic variation is not expected.
- Minimum viable population (MVP) is defined as a population that is sufficiently abundant and well adapted to its environment for long-term persistence without significant artificial demographic or genetic manipulations.

---

order to gauge the number of adults needed in a population to maintain genetic viability.  The concept of $N_e$ was defined by Wright (1931) as the size of an ideal population whose genetic composition is influenced by random processes in the same way as the real population.  Low heterozygosity is the dynamic result of low $N_e$, and $N_e$ likely differs by species (Meffe 1986).  The concept of $N_e$ was used to determine if wild populations are at risk genetically, but lack of genetic structural characterization with functional relationships for Colorado pikeminnow precludes a specific determination of $N_e$ at this time.  In the absence of this information, $N_e$ for Colorado pikeminnow was derived from principles in conservation genetics by using the "50/500 rule" (Franklin 1980).  It has been suggested that a minimum genetic effective population size of 50 is required to avoid inbreeding depression (Soulé 1980), and a minimum genetic effective population size of 500 is required to reduce long-term genetic drift (Franklin 1980).  Lynch (1996) suggested an $N_e$ of 1,000 as the number of adults beyond which significant additional genetic variation is not expected.  An $N_e$ of 500 is commonly used for fishes (Waples 1990; Bartley et al. 1992; Allendorf et al. 1997) and other vertebrate species (Mace and Lande 1991; Ralls et al. 1996), therefore an $N_e$ of 500 was used to derive an estimate of the number of adults needed to maintain genetic viability of a population of Colorado pikeminnow.  Recent research by fish geneticists support use of the 50/500 rule (Reiman and Allendorf 2001).  An important consideration to genetic viability is maintaining natural connectedness and potential for gene flow among populations, regardless of size (Reiman and Dunham 2000).  For Colorado pikeminnow populations in the Green River and Colorado River subbasins, natural connection is maintained and gene exchange indicates panmixis (Morizot et al. 2002).

BLM_0070665

It is important to note that the number of individuals in a population required to achieve a genetic effective population size of 500 may be several times greater than 500 (Frankel and Soulé 1981). Sex ratio and proportion of breeding individuals in the population are two important considerations in deriving the number of individuals necessary to support $N_e$. A 3:1 male to female ratio is used as the effective sex ratio for Colorado pikeminnow based on a consensus decision of biologists (Lentsch et al. 1998). To maintain an $N_e$ of 500 with a 3:1 sex ratio the total number of breeding adults ($N_b$) must be increased according to the following relationship:

$$N_e = 4M_bF_b/M_b+F_b \tag{1}$$

where: $M_b$ = number of breeding males,
$F_b$ = number of breeding females, and
$N_b = M_b + F_b$.

The number of breeding males ($M_b$) needed is 499 and the number of breeding females ($F_b$) is 167 for a total of 666 adults needed to maintain an $N_e$ of 500. Hence, according to Equation [1]:

$$N_e = 4(499)(167)/666 = 500 \tag{2}$$

If all adults in a population breed every year and contribute genes to the following generation, some minimum number of adults ($N_g$) would equal $N_e$. However, as with most populations, it is believed that not all Colorado pikeminnow spawn every year or contribute genes to the following generation, and hence, $N_g$ is not equal to $N_e$. It is important to determine a ratio of genetic effective population size ($N_e$) to minimum population size ($N_g$), or $N_e/N_g$.

For various fish species (rainbow trout, *Oncorhynchus mykiss*; chinook salmon, *O. tshawytscha*; white seabass, *Atractoscion nobilis*), the ratio $N_e/N_g$ varies from 0.013 to 0.90 (Table 2; Bartley et al. 1992; Avise 1994; Hedrick et al. 1995; Allendorf et al. 1997) for an overall average of about 0.30, which is the ratio reported for chinook salmon (McElhany et al. 2000) and other Pacific salmon species (Waples et al. 1990a, 1990b). This overall average ratio for fishes of 0.30 was used to determine the number of adult Colorado pikeminnow needed to support an $N_e$ of 500. Mace and Lande (1991) reported that the genetic effective population size is typically 20–50% of the actual population size.

Table 2. Estimates of effective/actual population size ($N_e/N_g$) ratios for various fish species.

| Species | $N_e/N_g$ | Reference |
|---|---|---|
| Sea bass (*Atractoscion nobilis*) | 0.27–0.40 | Bartley et al. (1992) |
| Coho salmon (*Oncorhynchus kisutch*) | 0.24 | Simon et al. (1986) |
| Rainbow trout (*Oncorhynchus mykiss*) | 0.90 | Bartley et al. (1992) |
| Chinook salmon (*Oncorhynchus tshawytscha*) | 0.013–0.043 | Bartley et al. (1992) |
| Chinook salmon (*Oncorhynchus tshawytscha*) | 0.30 | McElhany et al. (2000) |

BLM_0070666

Using an $N_e$ of 500, a 3:1 sex ratio, and an $N_e/N_g$ ratio of 0.30, an estimated $N_g$ of 2,217 was derived as the estimated number of adult Colorado pikeminnow necessary to maintain a genetic effective population size. This approach does not imply that existing populations should be allowed to decrease to this level; the estimate of 2,217 is used as a gauge to evaluate genetic viability of isolated populations.

### 3.3.2   Minimum viable population

Genetic effective population size provides a gauge for genetic viability but does not necessarily account for demographic viability. The concept of a minimum viable population (MVP) is defined as a population that is sufficiently abundant and well adapted to its environment for long-term persistence without significant artificial demographic or genetic manipulations (Shaffer 1981; Soulé 1986, 1987; Soulé and Simberloff 1986). Meffe and Carroll (1994) define an MVP as *"the smallest isolated population size that has a specified percent chance of remaining extant for a specified period of time in the face of foreseeable demographic, genetic, and environmental stochasticities, plus natural catastrophes."* Use of MVP does not mean that populations should be allowed to drop to these levels, but is used to assess their genetic and demographic viability. It must be recognized that some populations of any wild animal species may be below an MVP, as dictated by carrying capacity. It cannot be expected that every population will exceed an MVP; linkages to other populations help to keep smaller populations viable. As stated by Thomas (1990), *"There is no single 'magic' population size that guarantees the persistence of animal populations."* Thomas (1990) also stated that MVPs are rarely lower than a few 100 individuals and often correspond to an actual population count of about 1,000.

A minimum viable population size of 2,600 adults was derived by adding 15% to the $N_g$ of 2,220 to account for an estimate of the average annual mortality of adult Colorado pikeminnow (2,220 x 1.15 = 2,553 or about 2,600; Box 4; Osmundson and Burnham 1998). An average annual adult mortality factor was added to buffer against an event that may result in recruitment failure for a year. The concept of adding a mortality factor to a genetically viable population as demographic security is taken from recovery criteria established for the southern sea otter, in which the estimated mortality from exposure to simulated oil spills was added to the estimate of $N_g$, based on an $N_e$ of 500 (Ralls et al. 1996).

> **Box 4.  Computation of Minimum Viable Population (MVP)**
>
> $$N_g = N_e/(N_e/N_g)$$
> where: $N_e$ = genetic effective population size, 666
> $N_e/N_g$ = proportion of adults contributing genes to next generation; ~0.30 for most fish
> therefore: $N_g = 666/0.30$
> $N_g = 2,220$
> hence:  MVP = 2,220 x 1.15 = 2,553 (rounded to 2,600)
> where: 1.15 compensates for annual adult mortality of 15%

The population of Colorado pikeminnow in the Green River subbasin is the largest and most important unit of the upper basin metapopulation. It contains sufficient numbers of adults to

21

ensure genetic and demographic viability, and subadult numbers show that reproduction and recruitment provide self-sustainability (see Appendix A). Maintenance of the Green River subbasin population is vital for the upper basin metapopulation that includes the upper Colorado River subbasin and potentially the San Juan River subbasin.

# 4.0 THREATS TO COLORADO PIKEMINNOW BY LISTING FACTOR

The Colorado pikeminnow was designated as an endangered species prior to enactment of the ESA, and a formal listing package identifying threats was not assembled. Construction and operation of mainstem dams, nonnative fish species, and local eradication of native minnows and suckers in advance of new human-made reservoirs in the early 1960's were recognized as early threats (Miller 1961; Holden 1991), and the species was included in the United States List of Endangered Native Fish and Wildlife on June 4, 1973 (38 FR No. 106). A description of Threatened Wildlife of the United States compiled by the Office of Endangered Species and International Activities (U.S. Bureau of Sports Fisheries and Wildlife 1973) identified the reasons for decline of the Colorado pikeminnow as:

> "Modification of habitat by man through construction of large reservoirs. The species will not reproduce in cold tailwaters below high dams nor in reservoirs behind these dams. The species is adapted to life in turbid, swift, warm rivers. Introduced fishes may have a decimating effect in waters not affected by dams."

Although habitat losses were documented, the threats were poorly understood and distribution and abundance of the species were not well known. Threats were further identified in the Recovery Plan (U.S. Fish and Wildlife Service 1991):

> "In summary, the absolute cause for the decline of Colorado squawfish is not fully understood but is probably related to a combination of factors, including direct loss of habitat, changes in flow and temperature, blockage of migration routes, and interaction with introduced fish species."

Hence, the primary threats to Colorado pikeminnow populations are streamflow regulation and habitat modification (including cold-water dam releases, habitat loss, and blockage of migration corridors); competition with and predation by nonnative fish species; and pesticides and pollutants (Box 5). These threats are associated with the five listing factors (see section 2.1), and a summary of each is presented in the following sections. Site-specific management actions and objective, measurable criteria associated with five recovery factors to minimize or remove threats are provided in section 5.0.

**Box 5. Primary Threats To Colorado Pikeminnow**

- Streamflow regulation.
- Habitat modification.
- Competition with and predation by nonnative fish species.
- Pesticides and pollutants.

BLM_0070668