**59994**   **Federal Register**/Vol. 79, No. 192/Friday, October 3, 2014/Rules and Regulations



**Figure 1. Historical Breeding Range of Eastern and Western Yellow-billed Cuckoos based on American Ornithological Union's 1957 Checklist.**

Under our DPS policy, three elements are considered in a decision regarding the status of a possible DPS as endangered or threatened under the Act. The elements are: (1) Discreteness of the population segment in relation to the remainder of the species to which it belongs; (2) the significance of the population segment to the species to which it belongs; and (3) the population segment's conservation status in relation to the Act's standards for listing. In other words, if we determine that a population segment of a vertebrate species being considered for listing is both discrete and significant, we would conclude that it represents a DPS, and thus a "species" under section 3(16) of the Act, whereupon we would evaluate the level of threat to the DPS based on the five listing factors established under section 4(a)(1) of the Act to determine whether listing the DPS as an "endangered species" or a "threatened species" is warranted.

Below, we evaluate under our DPS policy whether the population segment of yellow-billed cuckoos that occurs in the western United States, northwestern Mexico, and southwestern Canada qualifies as a DPS under the Act.

*Discreteness*

Under our DPS Policy, a population segment of a vertebrate species may be considered discrete if it satisfies either of the following two conditions: (1) It is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors (quantitative measures of genetic or morphological discontinuity may provide evidence of this separation); or (2) it is delimited by international governmental boundaries within which significant differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(1)(D) of the Act.

The analysis of the population segment of the yellow-billed cuckoo in western North America is based on the first of those two conditions, the marked separation from other populations. From southwest British Columbia along the Canadian border to the southern end of the Sangre de Cristo Mountains in northern New Mexico, nesting yellow-billed cuckoos in western North America are separated from nesting yellow-billed cuckoos in eastern North

America by the high-elevation zone of the Rocky Mountains. Yellow-billed cuckoos breed both east and west of the crest of the Rocky Mountains, where suitable habitat occurs (Johnsgard 1986, p. 201). We generally define the crest of the Rocky Mountains and Continental Divide as the high-elevation zone between the drainages flowing west and east in the United States, Canada, and Mexico, although some areas such as near the Sangre de Cristo Range in southern Colorado and northern New Mexico is east of the east-flowing Rio Grande River. The division between the western and eastern population segments spans a distance of about 2,200 miles (mi) (3,540 kilometers (km)) from southwest British Columbia near the Canadian border along the crest of the Rocky Mountains based on watershed boundaries, south along the Rio Grande-Pecos Rivers watershed divide to the United States-Mexico border in the Big Bend area of Texas, then into Mexico along the eastern and southern boundaries of the State of Chihuahua south to the southern border of the State of Durango and to the Pacific Ocean along the southern border of the State of Sinaloa. The distance of separation between breeding yellow-

billed cuckoos in the east and west varies along this division from 160 mi (257 km) to more than 400 mi (644 km), and consists entirely of areas of unoccupied, unsuitable habitat for breeding yellow-billed cuckoos. The one exception to this distance of separation is along the Rio Grande in Brewster County, in southwestern Texas, where eastern yellow-billed cuckoos breed as far west as Rio Grande Village and western yellow-billed cuckoos are found upstream along the river approximately 50 mi (80 km) to the west.

Yellow-billed cuckoos historically bred at the southern tip of Vancouver Island and in the Fraser River valley north to Kamloops in southwestern British Columbia, Canada (Bent 1940, p. 64; Campbell *et al.* 1990, p. 481). The species was apparently never common, with 23 records (18 specimen and 5 sight records) between 1881 and 1927. Two of these observations were of pairs believed to be nesting but not confirmed. Since the 1920s, the species has been recorded five times in British Columbia, with four of those records occurring since 1990 from the eastern half of the Province in areas not considered breeding habitat (Campbell *et al.* 1990, p. 481; Siddle 1992, p. 1169; Cornell Lab of Ornithology 2012). Today, the species is considered extirpated as a breeder from the Province, but adult, nonbreeding individuals still occur irregularly (British Columbia Conservation Data Centre 2013).

In the northern Rocky Mountains and northern Great Plains—from the Canada border south through Colorado—the yellow-billed cuckoo is "extremely rare and local" as a breeding bird both east and west of the Rocky Mountains (Hughes 1999, p. 3). While the species breeds locally in river valleys in southern Idaho, southwestern Wyoming, western Colorado, and in Utah (Hughes 1999, pp. 1–3), it is quite rare or absent within the higher Rocky Mountains (Johnsgard 1986, p. 201). An examination of the distributional records for the Rocky Mountain region indicates that the area has had few records of yellow-billed cuckoos and the species is even scarcer at elevations above approximately 6,000 feet (ft) (1,850 meters (m)), and almost never breeds above 7,000 ft (2,154 m) (Bailey 1928, pp. 307–309; Phillips *et al.* 1964, p. 45; Bailey and Niedrach 1965, pp. 404–406; Johnsgard 1986, p. 201; Corman and Magill 2000, pp. 10, 15; Howe and Hanberg 2000, p. 1–20). Exceptions to the elevational limit do occur and recent records of yellow-billed cuckoos have been confirmed above 6,000 ft (1,850 m) in the areas of

Lower Green River Basin from the Seedskadee National Wildlife Refuge (NWR) to the Flaming Gorge Reservoir and west to the Bear River Drainage in Wyoming; along the Yampa River near Craig in northwest Colorado, and the Rio Grande River near Del Norte, and San Luis Valley of south-central Colorado; and the Henry's Fork River in Utah and Wyoming. Nevertheless, most of the crest of the Rocky Mountains includes a wide region of higher elevation where habitat for the species does not occur. In Colorado and Wyoming, the region above 6,000 ft (1,850 m) is typically more than 150 mi (240 km) wide on an east-west axis (Oxford 1995, p. 82).

The separation of the western yellow-billed cuckoo population segment from yellow-billed cuckoos in the eastern population segment continues south along the crest of the Rockies into southern Colorado and northern New Mexico, then the Rocky Mountains end and the separation is along the watershed boundary between the Rio Grande and the Pecos Rivers in central New Mexico (Sangre de Cristo Mountains), and southwest Texas, terminating at the Rio Grande in the Big Bend National Park. In this region, the eastern and western yellow-billed cuckoo populations are separated by arid basins and isolated mountain ranges that emerge from a high desert plateau. These mountain ranges from north to south include the Sangre de Cristo Mountains and Sacramento Mountains in central and southern New Mexico, the Guadalupe Mountains and Delaware Mountains on the Texas-New Mexico border, and the Davis Mountains, Del Norte Mountains, and Santiago Mountains in western Texas south to the Chisos Mountains in the Big Bend National Park on the border with Mexico.

In southern New Mexico and western Texas where western yellow-billed cuckoos nest along the Rio Grande and eastern yellow-billed cuckoos nest along the Pecos River, the geographical separation is as little as 160 mi (257 km) and even closer along the Rio Grande (50 mi; 80 km). The closer proximity of western and eastern yellow-billed cuckoos in this region may be caused in part by the lower height of the mountain range being a less effective barrier (Hubbard 1978, p. 32; Howe 1986, p. 2). Historically, this gap was wider, because the banks of the Pecos River did not have riparian woodland and the area was not used by the species. Today, the riverine habitat along the Pecos River consists primarily of introduced tamarisk (*Tamarix* spp.), and it is thought that yellow-billed cuckoos from

eastern North America have colonized the Pecos River system. Much of the area between the Pecos River and the Rio Grande in New Mexico and Texas consists of internal ephemeral drainages that are not connected to any major river systems and have no riparian habitat. Considering these factors along with the information on physical factors, we have included Texas west of the Rio Grande-Pecos River watershed boundary within the range of the western population. This physical division coincides with behavioral differences between eastern and western yellow-billed cuckoos, as discussed below.

South of the United States-Mexico border, yellow-billed cuckoos are separated by extensive areas of desert that lack suitable nesting and foraging habitat. In Mexico, the Chihuahuan Desert widens to 350 mi (563 km), and includes nearly all of the States of Chihuahua and Coahuila. There are very few records of yellow-billed cuckoos for this region, and we are not aware of any nesting records for either State. Suitable breeding habitat or connective riparian corridors are also lacking. Published range maps for the species do not include the eastern three-quarters of Chihuahua or the western three-quarters of Coahuila as part of the species' breeding range (Howell and Webb 1995, p. 347; Hughes 1999, p. 1). There are only 12 records of yellow-billed cuckoos from Chihuahua: 11 specimens from the 1940s to 1960, and a sight observation in 2003. There are only nine records of the species from Coahuila: six specimen and three sight records (1958, 1988, and 2011). Three of the specimens from Coahuila were identified as eastern yellow-billed cuckoos on their museum records, and the others were not identified to subspecies. Seven specimens from Chihuahua were identified to subspecies and six of these were considered the western subspecies. It is likely that many, if not most, of the records from this region are of migrating yellow-billed cuckoos, as 16 are from May to mid-June or from late September, and only 5 are from late June or July, the primary breeding season.

From this information we concluded that the Chihuahua-Coahuila border was the most biologically supportable boundary for the population segment. The boundary then follows the southern border of Chihuahua west to the Continental Divide, then south along the divide through the State of Durango and west along the southern border of Durango and Sinaloa. There are no breeding season records for yellow-billed cuckoos from the State of Nayarit or Jalisco or farther south along the

Pacific coast of Mexico. The species has occurred sporadically in the State of Zacatecas, but the records are from east of the Continental Divide.

Eastern and western yellow-billed cuckoos are highly migratory, and the two populations may spend winters in overlapping regions in South America. However, we do not have information to indicate that there is anything more than an extremely low level of interchange (if any at all) between the two populations during the breeding season. This conclusion is supported by differences in habitat use and morphology, which are genetically controlled traits, as discussed in the following sections.

Although the Rocky Mountains and the Chihuahuan Desert may not wholly prevent movement of yellow-billed cuckoos between the east and west, especially in a migratory species that winters far to the south, and moves thousands of miles between its wintering and breeding grounds, the available information indicates that this mountain range and desert substantially separates yellow-billed cuckoo populations during the breeding season, thereby effectively separating them into discrete populations. The separation between yellow-billed cuckoo population segments in the east and west is a physical one that is maintained by their behavioral differences, which we discuss below.

*Behavioral Discreteness*

Data collected from publications and other sources demonstrate the existence of behavioral differences between yellow-billed cuckoos in the east and west.

Yellow-billed cuckoo populations in the east and west differ in the timing of arrival on the breeding grounds in the spring. Yellow-billed cuckoos in western North America arrive on the breeding grounds 4 to 8 weeks later than eastern yellow-billed cuckoos at similar latitude (Franzreb and Laymon 1993, pp. 24–25; Hughes 1999, pp. 5–6, 12–13; Laymon 2000, *in. litt.,* pp. 15–16). Timing of spring migration and arrival on the breeding grounds has been determined to be the result of an evolved response under genetic control, and is likely caused by east-west climatic, habitat, and food availability differences (Cresswell *et al.* 2011, pp. 13–15; Pulido *et al.* 2001). The watershed boundary between the Rio Grande and the Pecos Rivers also appears to separate yellow-billed cuckoos that arrive in spring migration earlier on the Pecos River and those that arrive later on the Rio Grande in addition to separating morphological differences.

Information, including timing of migration, indicates that yellow-billed cuckoos from Texas west of the Pecos River (from the Rio Grande upstream of Big Bend) and from northwestern Mexico (Chihuahua, Sonora, Sinaloa, Durango, Baja California Sur) exhibit greater similarity to yellow-billed cuckoos in western North America, and those on the Pecos River in Texas and eastern Mexico (Coahuila, Nuevo Leon, Tamaulipas, San Luis Potosi) are more similar to yellow-billed cuckoos in the east (Wauer 1971, p. 96; Oberholser and Kincaid 1974, pp. 434–435; Franzreb and Laymon 1993, pp. 17–28; Hughes 2000, *in litt.* pp. 1–2, 26; Sproul 2000, *in litt.,* pp. 1–5). Based on the best available science, the watershed boundary between the Rio Grande and Pecos Rivers is the optimum dividing line between eastern and western yellow-billed cuckoo in this area.

Based on migration timing, yellow-billed cuckoos split into two populations. This split occurs along the line that corresponds with the traditional subspecies boundary (see Figure 1, above).

*Discreteness Conclusion*

The available information indicates that the yellow-billed cuckoo population segment that occurs west of the Continental Divide (as defined above) in the United States, in southwestern Canada, and in northwestern Mexico is markedly separated from the eastern population segment of yellow-billed cuckoo, including those that nest in eastern North America, eastern Mexico, certain Caribbean Islands, and the Yucatan Peninsula. The distribution of the western populations is markedly separated physically (geographically) during the breeding season from the distribution of other yellow-billed cuckoo populations by high mountains, extensive desert, or nonhabitat areas with the shortest geographical separation occurring across 160 mi (257 km) of desert between the Pecos River and Rio Grande in southern New Mexico and western Texas with the exception of nesting of western yellow-billed cuckoos near Big Bend National Park in Texas. Evidence that this geographical separation between populations has been consistent through time may be found in the differences in the two populations' biology and morphology. Even in this area of closest proximity, information on genetically controlled behavior available in the scientific literature provides evidence of a biological separation between the western populations and eastern populations.

Under our DPS policy, the standard for discreteness does not require absolute separation because this can rarely be demonstrated for any population of organism. For the yellow-billed cuckoo populations in western North America, we have met this standard, and, therefore, we consider the western population segment of the yellow-billed cuckoo from southern British Columbia, Canada south along the Continental Divide (including the Rio Grande basin) in the United States into Mexico, and ending at the coast in the State of Sinaloa, Mexico, to be discrete per our DPS policy. We conclude that the western population segment of the yellow-billed cuckoo is discrete from the remainder of the species because the yellow-billed cuckoo population segment that nests west of the Continental Divide (as defined above) and in northwestern Mexico is markedly separated geographically and behaviorally from all other populations of yellow-billed cuckoo, including those that nest in eastern North America.

*Significance*

Under our DPS policy, once we have determined that a population segment is discrete, we consider its biological and ecological significance to the larger taxon to which it belongs. Our DPS policy provides several potential considerations that may demonstrate the significance of a population segment to the remainder of its taxon, including: (1) Evidence of the persistence of the discrete population segment in an ecological setting unusual or unique for the taxon, (2) evidence that loss of the discrete population segment would result in a significant gap in the range of the taxon, (3) evidence that the population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range, or (4) evidence that the discrete population segment differs markedly from the remainder of the species in its genetic characteristics.

We have found substantial evidence that two of these four significance criteria (numbers 2 and 4) are met by the discrete population segment of yellow-billed cuckoos that occurs west of the Continental Divide (as defined above). We address these significance factors below as they relate to the population segment of western yellow-billed cuckoo. We focus on whether the loss of this population segment would result in a significant gap in the range of the taxon and evidence that the discrete

population segment differs from other population segments in its genetic characteristics in demonstrating significance of the DPS.

*Evidence That Loss of the Discrete Population Segment Would Result in a Significant Gap in the Range of the Taxon*

Loss of the discrete population segment would result in a significant gap in the range of the taxon because an extensive area would be without yellow-billed cuckoos if the western population segment were lost. Seven entire States and substantial portions of five additional States in the United States, and six States in Mexico, that are currently occupied would have no breeding populations of the species. Bird migration experts divide the North American continent into four migratory flyways: The Atlantic, Mississippi, Central, and Pacific. The range of the yellow-billed cuckoo west of the Rocky Mountains covers the entire Pacific flyway and half of the Central flyway. Additionally, the range of the yellow-billed cuckoo west of the Rocky Mountains covers 1,350,000 square (sq) mi (3,496,500 sq km), or approximately 40 percent of the lower 48 States. Even though the actual area occupied by the species in western North America is less than the total area identified above, the potential loss of the western population of the yellow-billed cuckoo would constitute a significant gap in the range of the species in North America.

*Evidence That the Discrete Population Segment Differs Markedly From Other Populations of the Species in Its Genetic Characteristics*

Data collected from publications and other sources demonstrate the existence of morphological and physiological differences between yellow-billed cuckoos in the east and west. Morphologically, the yellow-billed cuckoos in western North America are generally larger, with significantly longer wings, longer tails, and longer and deeper bills (Franzreb and Laymon 1993, p. 25). Banks, in a review of the species taxonomic status (1988, pp. 473–477), grouped yellow-billed cuckoo specimens into 19 regional groups, 7 in the western United States and western Mexico, 10 in the eastern United States and eastern Mexico, 1 in New Mexico, and 1 in the Caribbean. He found yellow-billed cuckoos in the east to be uniform in measurement throughout their range and yellow-billed cuckoos in the west to be uniform in measurements throughout their range (Banks 1988, p. 475). Banks stated that the change from smaller to larger yellow-billed cuckoos

appeared to take place in extreme western New Mexico or extreme eastern Arizona (Banks 1988, p. 476). A subsequent analysis, based on available specimens from New Mexico and western Texas, showed the watershed boundary between the Pecos River and the Rio Grande as the apparent boundary between the smaller eastern and larger western birds, with a majority of yellow-billed cuckoos on the Rio Grande above Big Bend being larger western birds (63 percent, n=19) and the majority of yellow-billed cuckoos on the Pecos River being smaller eastern birds (82 percent, n=11) (Franzreb and Laymon 1993, p. 25). This is the only area where the ranges of the western and eastern population segments are in close proximity; elsewhere the two populations are separated by wide expanses of unsuitable, unoccupied habitat (see Figure 1, above).

One peer reviewer measured 35 cuckoos from the Rio Grande and 25 cuckoos from the Pecos River in the field. With the exception of wing and tail measurements, accurate measurements are hard, if not impossible, to obtain from live birds under field conditions. Male and female cuckoos averaged longer wings and tails on Rio Grande than on the Pecos River, with the difference being more pronounced on male than on female cuckoos. Sample sizes were insufficient to do t-tests to compare the means for the wing and tail data. The bill measurements that the reviewer took in the field were not reliable and therefore could not be compared, and as a result the comparison using the Discriminant Function equations developed by Franzreb and Laymon (1993, pp. 17–28) could not be used reliably on the data.

Other physical and morphological differences exist between yellow-billed cuckoos in the east and west, and provide additional evidence of ecological significance. These include:
• Yellow-billed cuckoos in western North America produce larger eggs (1.2 percent longer, 0.6 percent wider, and 3.2 percent heavier) with thicker eggshells (7.1 percent thicker) (Hughes 1999, p. 14), which is an evolved trait that would help yellow-billed cuckoos in the west to cope with potential higher egg water loss in the hotter, drier conditions of western North America (Hamilton and Hamilton 1965, pp. 426–430; Ar *et al.* 1974, pp. 153–158; Rahn and Ar 1974, pp. 147–152).
• Juvenile yellow-billed cuckoos in the east have yellow bills (Oberholser and Kincaid 1974, pp. 434–435), while juvenile yellow-billed cuckoos in the west have all-black bills (Franzreb and Laymon 1993, p. 26).

• Adult yellow-billed cuckoos in the west have a lower mandible that is orange-yellow, while yellow-billed cuckoos in the east have lower mandibles that are bright yellow (Franzreb and Laymon 1993, p. 26; Laymon 2000, *in litt.*, p. 14).
• As noted previously, adult yellow-billed cuckoos in the west are larger and heavier, on average, than adult yellow-billed cuckoos in the east. More than 80 percent of individuals can be assigned to east or west based on morphological measurements (see also Oberholser and Kincaid 1974, pp. 434–435; Banks 1988, pp. 473–477; 1990, p. 538; Franzreb and Laymon 1993, pp. 17–28). The size differences between eastern and western cuckoos are discussed in detail in the *Taxonomy* section of the proposed rule (78 FR 61624–61625; October 3, 2013).

Information, including morphology, indicates that yellow-billed cuckoos from Texas west of the Pecos River (from the Rio Grande upstream of Big Bend) and from northwestern Mexico (Chihuahua, Sonora, Sinaloa, Durango, Baja California Sur) exhibit greater similarity to yellow-billed cuckoos in western North America, and those on the Pecos River in Texas and eastern Mexico (Coahuila, Nuevo Leon, Tamaulipas, San Luis Potosi) are more similar to yellow-billed cuckoos in the east (Wauer 1971, p. 96; Oberholser and Kincaid 1974, pp. 434–435; Franzreb and Laymon 1993, pp. 17–28; Hughes 2000, *in litt.* pp. 1–2, 26; Sproul 2000, *in litt.*, pp. 1–5). Based on the best available science, the watershed boundary between the Rio Grande and Pecos Rivers is the optimum dividing line between eastern and western yellow-billed cuckoo in this area.

Based on morphological measurements, bill color of young and adults, egg size and weight, and migration timing, yellow-billed cuckoos split into two populations. This split occurs along the line that corresponds with the traditional subspecies boundary (see Figure 1, above). Phenotypically or outwardly expressed traits present substantial evidence that the western population segment of yellow-billed cuckoo differs markedly from other populations of the species.

However, the strongest evidence of differences between yellow-billed cuckoos in the western population segment and those of the east in genetic characteristics is the difference in timing of migrations. This difference can only have developed as an evolved trait in response to environmental factors over a long period of time, and thus is genetically linked (Cresswell *et al.* 2011, pp. 13–15; Pulido *et al.* 2001). As previously discussed, the difference

in size of yellow-billed cuckoos between east and west, as well as differences in size, weight, and shell thickness of eggs, are also evolved genetically linked traits. As discussed in the October 3, 2013, proposed rule, researchers have developed methods using these phenotypic (outwardly expressed) traits that correctly predicted separation for nearly 90 percent of yellow-billed cuckoos that were eastern, and up to approximately 86 percent that were western (Franzreb and Laymon 1993, pp. 17–28). Thus, based on the phenotypic traits, there is indirect evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics.

*Significance Conclusion*

The best available information indicates that the discrete yellow-billed cuckoo population segment that nests west of the Continental Divide (as defined above) and in northwestern Mexico is important to the taxon to which it belongs because: (1) Loss of the population segment would leave a significant gap in the species' range

(more than one third of the species' range would be vacant); and (2) it differs markedly from other yellow-billed cuckoo populations in morphology (e.g., western yellow-billed cuckoos are larger) Therefore, we conclude that the western population segment of the yellow-billed cuckoo is *significant* per our DPS Policy.

*DPS Conclusion*

Based on the best scientific and commercial data available on distribution as well as behavioral and morphological characteristics of the species, we have determined that the western population segment of the yellow-billed cuckoo is both discrete and significant per our DPS policy. Therefore, we conclude that the western distinct population segment of the yellow-billed cuckoo is a DPS, and thus a "species" under section 3(16) of the Act. Our determination of biological and ecological significance is appropriate because the population segment has a geographical distribution that is biologically meaningful.

The term "distinct population segment" is not commonly used in

scientific discourse. As such, and in contrast to taxonomically defined species and subspecies, there is no established name for the western distinct population segment of the yellow-billed cuckoo in the available literature; we will refer to this "species" (DPS) as the western yellow-billed cuckoo. The range of the western yellow-billed cuckoo in Canada includes the area of Vancouver Island and along the Fraser River system upstream to Kamloops to the Rocky Mountains west of the Continental Divide. In the United States the DPS includes the area west of the Continental Divide, south through Montana, Wyoming, Colorado, and along the watershed divide between the upper and middle Rio Grande and Pecos Rivers in New Mexico and Texas, south to Big Bend in southwestern Texas, and extending to the States of the west coast. In Mexico, the DPS is the area west of the eastern and southern border of the State of Chihuahua, west of the Continental Divide in the State of Durango, and the southern border of the State of Sinaloa (Figure 2).

BLM_0071931



Figure 2.  Western Yellow-billed Cuckoo distinct population segment boundary.

## Summary of Comments and Recommendations

In the proposed rule published on October 3, 2013 (78 FR 61621), we requested that all interested parties submit written comments on the proposal by December 2, 2013. The comment period was reopened on December 26, 2013, and remained open until February 24, 2014 (78 FR 78321). The comment period was reopened again on April 10, 2014, and remained open until April 25, 2014 (79 FR 19860). We also contacted appropriate Federal and State agencies, scientific experts and organizations, and other interested parties and invited them to comment on the proposal. Newspaper notices inviting general public comment were published in the Idaho State Journal (Pocatello, ID), Post Register (Idaho Falls, ID), Idaho Mountain Express (Sun Valley, ID), Idaho Statesman (Boise, ID), Coeur d'Alene Press (Coeur d'Alene, ID), Las Vegas Sun (Las Vegas, NV), Las Vegas Review-Journal (Las Vegas, NV), Reno Gazette-Journal (Reno, NV), The Oregonian (Portland, OR), Yakama Herald, (Yakima, WA), Wenatchee World (Wenatchee, WA), The Olympian (Olympia, WA), The Spokesman Review (Spokane, CA), Bellingham Herald (Bellingham, WA), Salt Lake Tribune (Salt Lake City, UT), Helena Independent Record (Helena, MT), The Missoulian (Missoula, MT), Valley Courier (Alamosa, CO), Craig Daily Press (Craig, CO), (The Daily Sentinel (Grand Junction, CO), El Paso Times (El Paso, TX), Albuquerque Journal (Albuquerque, NM), The Arizona Republic (Phoenix, AZ), The Californian (Bakersfield, CA), and Press-Enterprise (Riverside, CA). We did not receive any requests for a public hearing.

During the comment periods for the proposed rule, we received 34,459 comment letters directly addressing the proposed listing of the western DPS of the yellow-billed cuckoo as a threatened species. The vast majority of these comment letters voiced their support or opposition to the action, but did not provide significant supporting information on the proposed listing. A total of 34,380 letters were in support of the listing, while 54 letters were in opposition to listing, with 25 commenters providing additional information, but took no position on the listing of the species. Approximately 141 of these comment letters provide additional information or comments. All substantive information provided during comment periods has either been incorporated directly into this final determination or is addressed below.

*Peer Review*

In accordance with our peer review policy published on July 1, 1994 (59 FR 34270), we solicited expert opinion from five knowledgeable individuals with scientific expertise that included familiarity with the yellow-billed cuckoo and its habitat, biological needs, and threats. We received responses from all five of the peer reviewers.

We reviewed all comments we received from the peer reviewers for substantive issues and new information regarding the listing of the western DPS of the yellow-billed cuckoo. The peer reviewers generally concurred with our methods and conclusions, and provided additional information, clarifications, and suggestions to improve the final

rule. Peer reviewer comments are addressed in the following summary and incorporated into the final rule as appropriate.

*Peer Reviewer Comments*

(1) *Comment:* One reviewer discussed the heritability of migration timing, indicating that the difference in migration timing between eastern and western cuckoos is reflective of genetic differences and added a supportive reference (Pulido *et al.* 2001).

*Our Response:* In the proposed and this final rule, we outlined our reasoning for determining that the western populations of the yellow-billed cuckoo constitute a valid DPS (see **Distinct Vertebrate Population Segment Analysis**, above). In our determination, we relied on behavioral and morphological and other characteristics of the species to support separation and distinctness from yellow-billed cuckoos in the east. Although genetics most likely play a role in behavioral and morphological aspects of a species, in our determination we did not rely on specific genetic information or separation to come to our conclusion. The views of the peer reviewer and the information they provided (Pulido *et al.* 2001, pp. 149–158) further support our conclusions reached in determining a valid DPS for the western yellow-billed cuckoo. We revised this final rule to include the information provided.

(2) *Comment:* One reviewer stated that a close examination of the DNA studies conducted on cuckoos to date would infer a deeper genetic divergence between western and eastern cuckoos than presented in the proposed rule and that further analysis would likely support division of species into two subspecies. The reviewer also provided a critique of the techniques used in the studies to date, noting that markers used in all three genetics studies evolve too slowly to reveal genetic structure within the species, and that the choice of outgroup for study comparison was flawed in one study.

*Our Response:* See response to *Comment* 1 above for a discussion of how we used genetic information in our DPS determination. Although we agree that further studies and information on the genetics for the yellow-billed would assist in further validating our determination of separation between eastern and western yellow-billed cuckoo populations, we must rely on the best scientific or commercial data available to make our listing determinations. We appreciate the information provided and have made some revisions to the DPS analysis to

incorporate citations provided by the peer reviewer, as needed.

(3) *Comment:* Two reviewers indicated that recent research has shown that vocalizations cannot be reliably used to determine the sex of cuckoos in the field. Two public commenters also raised this concern.

*Our Response:* We concur and have revised the text to clarify information on vocalizations for the western yellow-billed cuckoo.

(4) *Comment:* One reviewer indicated that the habitat section could be strengthened by presenting habitat models that have been developed. This reviewer suggested that the presentation of tamarisk as a habitat component could be improved by using information from several references from research on the Colorado River (see Johnson *et al.* 2008a, Johnson *et al.* 2012, McNeil *et al.* 2012). Within-patch vegetation measurements show that sites occupied by western yellow-billed cuckoos do not include dense tamarisk patches.

*Our Response:* Based on observations of western yellow-billed cuckoos, we have identified riparian trees including willow (*Salix* sp.), Fremont cottonwoods (*Populus fremontii*), alder (*Alnus* sp.), walnut (*Juglans* sp.), sycamore (*Platanus* sp.), boxelder (*Acer* sp.), ash (*Fraxinus* sp.), mesquite (*Prosopis* sp.), and tamarisk (*Tamarix* sp.) as habitat that provides cover, shelter, foraging, and dispersing habitat for the western yellow-billed cuckoo. Tamarisk is considered a nonnative, invasive species across the West. Although the western yellow-billed cuckoo uses tamarisk as a component of its habitat, it is usually in areas where the habitat has been degraded. We appreciate the peer reviewer's information on habitat modeling and will review this information in development of any final critical habitat determination for the species. We have reviewed the information provided by the reviewer and have revised our discussion of habitat selection and tamarisk use and compatibility for the western yellow-billed cuckoo in this final rule (see "Use of Tamarisk by Western Yellow-billed Cuckoos and the Spread of the Introduced Tamarisk Leaf Beetle into the Southwest," below).

(5) *Comment:* One reviewer suggested that estimates of breeding populations of western yellow-billed cuckoos may be overestimates and the numbers may be even lower than indicated in the proposed rule.

*Our Response:* We are aware of the difficulties in obtaining accurate counts of western yellow-billed cuckoos. Survey methods for western yellow-billed cuckoos have evolved over time

since the first play-back surveys were conducted in California in the 1970s. Some changes in survey method include changes in the distance between calling stations (100 vs. 200 meters), changes in the number of calls played at calling stations (5 vs. 10 calls), number of surveys carried out during the breeding season (2 to 5 surveys), and the timing of the surveys (1 June to 15 August vs. 15 June to 1 August). Despite these changes, general response rates have remained constant. On average, an individual western yellow-billed cuckoo will respond to playback call 50 percent of the time, and one member of a pair will respond 75 percent of the time. With a second visit, the probability of an individual responding has risen to 75 percent, and the probability of one member of a pair responding has risen to 94 percent. With three visits, the probability of an individual responding is 94 percent, and the probability of one member of a pair responding is 99.6 percent.

Obtaining accurate survey results are made more difficult because: (1) Western yellow-billed cuckoos often have helper males at the nest; (2) they are only loosely territorial; (3) nests of adjacent pairs can be very close to each other; (4) female western yellow-billed cuckoos often lay a second and third clutch sometimes with different mates; and (5) it is likely that they move from one river system to another between clutches. These unusual behaviors can lead to either an over count or an under count of individuals, pairs, or territories.

Many of the earlier population estimates were made of pairs of western yellow-billed cuckoos. For the reasons listed above, some recent researchers have decided that it is more accurate to use the term territories rather than pairs. An assessment of the methodology used to determine pairs in the older studies and territories in the more recent studies concludes that very similar methodology is used and that the numbers are comparable.

In some cases, we were able to use the original survey data and simply compare the number of survey hours and number of western yellow-billed cuckoos surveyed and compare them from one year to the next and one time period to another. This is a very reliable and accurate method of comparison. In other cases, such as that at the South Fork Kern River Valley in California from 1985 to 2001, when all nesting pairs were either documented by finding a nest or seeing positive nesting behavior (e.g., western yellow-billed cuckoos carrying food to young) the

number of pairs were compared over time.

We have taken all of these difficulties and changes of survey methods and changes of data and behavior interpretation into account in our assessment of survey results and western yellow-billed cuckoo population trends. We have used the best available data and science in determining population estimates and trends. Because we have been aware of the changes in survey methods and have factored that information into our analysis, we are confident that our estimates of breeding populations are accurate.

(6) *Comment:* One reviewer indicated that habitat use separates eastern and western cuckoos; observations suggest that in eastern New Mexico and Texas yellow-billed cuckoos from eastern populations nest in monotypic stands of tamarisk, while western yellow-billed cuckoos do not.

*Our Response:* We have considered this information in our determination of the DPS for the yellow-billed cuckoo. Although credible observations of species behavior are valuable, peer-reviewed published materials would further support these observations, and additional research on this topic would be valuable. The information provided will be considered further in the development of the final critical habitat designation for the species and in recovery planning.

(7) *Comment:* Two reviewers suggested that the section on climate change could be condensed and that uncertainties in forecasting precipitation could bog down conservation actions that would clearly benefit western yellow-billed cuckoos in the near future.

*Our Response:* The Service used the climate change information that was available in the literature. Because the western DPS of the yellow-billed cuckoo covers such a large area, the effects of climate change will be different in the various regions. The Pacific Northwest may become cooler and wetter, the desert Southwest may become warmer and drier. The exact effect of these changes on western yellow-billed cuckoos is difficult to predict. However, based on our review of the literature, we have concluded that a warmer and dryer Southwest, an area that is already water-stressed, with a growing human population, is likely to have an adverse effect on riparian habitat. This will exacerbate the changes that have already occurred in the region and should not be ignored. We appreciate the expressed concerns; however, we have retained

the information presented in the section.

(8) *Comment:* One reviewer provided survey results indicating that western yellow-billed cuckoos have been detected along the San Juan and Green rivers in Utah, although it is not yet known whether breeding occurs in these areas. The reviewer notes that further surveys are needed.

*Our Response:* We appreciate this additional information and have considered this in our listing determination. This information will also be considered in our final critical habitat designation.

(9) *Comment:* One reviewer commented that a potential planned activity is the reallocation of water from the San Juan River on Navajo Tribal lands, which could negatively affect water delivery on the Colorado River and western yellow-billed cuckoo habitat on the Lower Colorado River.

*Our Response:* We appreciate this additional information and have considered this in our listing determination. This information will also be useful in recovery planning and implementation.

(10) *Comment:* One reviewer provided information that describes the ecological cascade process that leads to loss of western yellow-billed cuckoo habitat in riparian areas. The peer reviewer stated that the key to sustaining western yellow-billed cuckoo habitat is maintaining an ongoing process of new land creation and flow patterns conducive to colonization of willow and cottonwood. The peer reviewer also noted that it is problematic that a National Wildlife Refuge (NWR) on Sacramento River only occurs on one side of the river, and the opposite bank is not allowed to erode.

*Our Response:* We appreciate this additional information and have considered this in our listing determination. The information will be helpful when developing a recovery plan for the western yellow-billed cuckoo.

(11) *Comment:* One reviewer adds an additional pervasive threat is the design of open channel flood control channels with inappropriately smooth roughness coefficients. This over-scours the floodplains and requires removal of woody riparian vegetation that regenerates on floodplains. This leads to floodplains with no western yellow-billed cuckoo habitat.

*Our Response:* We have added this information to section "Encroachment of Levees and Flood Control and Bank Stabilization Structures into the River Channel and Floodplain" in the Factor A discussion in this final rule.

(12) *Comment:* One reviewer provides information on several additional projects that he indicates are impacting western yellow-billed cuckoo habitat. The reviewer notes that the U.S. Army Corps of Engineers (USACE) Sacramento River Bank Protection Project has been channelizing and rip-rapping river banks for many decades and that the project impedes the dynamic riverine processes that create western yellow-billed cuckoo habitat. The reviewer adds that the California Department of Water Resources has proposed a new reservoir project (the Sites Reservoir) for off-stream water storage, suggesting that the project would be a major water diversion project that would further degrade stream power on the Sacramento River, and contribute to an ecological cascade on the river (see *Comment* 10 above and the discussion under Factor A below). The reviewer also noted two proposed projects that he thinks would provide a potential conservation benefit to western yellow-billed cuckoo habitat. Both projects involve the creation of several miles-long oxbow lakes on the Sacramento River, at Woodson Bridge, and at a pumping facility across from Llano Seco unit of Sacramento River NWR.

*Our Response:* We appreciate this additional information and have considered this in our listing determination. This information will be helpful in developing and implementing the recovery plan for the species.

(13) *Comment:* One reviewer indicated that in Conservation Efforts section under the Factor E discussion, a distinction should be made between "active" restoration and "process-based" restoration.

*Our Response:* We have revised the text in the section to clarify the difference in types of restoration activities.

(14) *Comment:* One reviewer measured 35 cuckoos from the Rio Grande and 25 cuckoos from the Pecos River. He found that Rio Grande males and females were larger for all measurements than Pecos cuckoos, but Pecos cuckoos are larger than eastern or Trans Pecos cuckoos reported in Franzreb and Laymon's (1993, pp. 17–28) subspecies paper. He applied the Discriminant Function Analysis (DFA) equation (developed by Franzreb and Laymon, 1993, pp. 17–28) to 35 cuckoos from Rio Grande, of which 86 percent tested as western and 25 cuckoos from Pecos River of which 68 percent tested as western.

*Our Response:* We thank the reviewer for this information. However, we are concerned that the measurements may have been taken incorrectly for the

BLM_0071934

following reasons. We first note that, with the exception of wing measurements, accurate measurements are hard, if not impossible, to obtain from live birds under field conditions. We are concerned that in the given sample, bill-depth measurements may have been measured incorrectly because all individuals measured, regardless of area of origin, had deeper bills than any of the cuckoos measured by Banks (1988, pp. 473–477) or Franzreb and Laymon (1993, pp. 17–28). It is likely that these measurements were taken on an incorrect location on the bill. We note that several of the bill-length measurements reported were also record lengths for cuckoos, regardless of origin and suspect that they too were likely measured incorrectly. The use of these incorrect measurements in the DFA equations would be expected to yield incorrect "likely area of origin." Therefore, we have not used this information in our final listing determination.

*Federal Agency Comments*

During the development of the proposed and this final listing rule, we coordinated with Federal agencies and asked for their input on the information presented and any concerns they may have. We have not included specific comments and responses to Department of the Interior (DOI) agencies in this rule (Bureau of Land Management, Bureau of Reclamation, and National Park Service). We have worked with the DOI agencies during the development of this rule, and their comments and concerns are included in the record materials for this final determination. We have reviewed any DOI comments and information, and have made changes that we determined were appropriate to the final listing of the western yellow-billed cuckoo. A total of seven comment letters were received from five Federal agencies from outside the DOI, and they are outlined below.

(15) *Comment:* The U.S. Air Force stated that training flights from Luke Air Force Base (AFB) may pass over western yellow-billed cuckoo habitat, but they are unlikely to disturb the western yellow-billed cuckoos because the airplanes fly over 500 ft. above ground level, while western yellow-billed cuckoo fly, forage, and nest within the canopy of the trees. Also, the duration of the sound from the jet airplanes is only for a few seconds and the flights are infrequent.

*Our Response:* We appreciate receiving the information on Air Force training flights at Luke AFB. We will consider this information during any

consultation regarding the species in the future.

(16) *Comment:* The USACE provided references that deal with southwestern willow flycatcher (*Empidonax traillii extimus*) consultations and management at Lake Isabella, California. They stated that their conservation plan and associated conservation easements for southwestern willow flycatchers provide habitat protections for the western yellow-billed cuckoo as well as least Bell's vireos (*Vireo bellii pusillus*). They are concerned that if the western yellow-billed cuckoo is listed and formal consultation for long-term operations of Isabella Reservoir are triggered, the USACE may be required to "reoperate" the reservoir, which would increase risk of loss of human life and cause significant impacts to economics downstream. This concern was also voiced by one public commenter.

*Our Response:* Although specific project activities may require additional review and potentially result in formal consultation for various Federal actions, it is reasonable to assume that the conservation plan and associated conservation easements for the southwestern willow flycatcher may provide habitat protections for the western yellow-billed cuckoo. However, consultation with the Service will not likely result in operation decisions that would cause a risk of loss of human life or cause significant impacts to downstream economies. We have been coordinating with the USACE on their activities and dam operation at Lake Isabella as it relates to all listed species and will continue to do so into the future.

(17) *Comment:* The U.S. Forest Service (USFS) provided several reports on western yellow-billed cuckoo surveys conducted at Isabella Reservoir. The Southwest Region of the USFS does not think they have western yellow-billed cuckoos on the Carson or Cibola National Forests. They also had several questions about wording in the proposed rule regarding grazing and listed several references regarding the effects of well-managed grazing, which they say has less adverse impact on western yellow-billed cuckoos and their habitat than traditional, poorly managed grazing. Lastly, they stated that mesquite bosque habitat was very important to western yellow-billed cuckoos and that the habitat was more important than the proposed rule indicated.

*Our Response:* We appreciate the additional information provided by the USFS and have considered it or incorporated changes to language into our final listing determination. Well-

controlled grazing activity can be compatible within riparian zones and in western yellow-billed cuckoo habitat depending on the conservation measures implemented for the grazing activity. The amount of management depends on the sensitivity of the habitat at any given location and would most likely need to be managed on a site-by-site basis. For example, a grazing regime used on Audubon California's Kern River Preserve in the South Fork Kern River Valley limits grazing to outside the growing season (October to March). This time restriction allows for regeneration of willows and cottonwoods and precludes the tree browsing and high-lining that often accompanies heavy summer (growing season) grazing. We concur that mesquite bosque habitat is very important to western yellow-billed cuckoos, and this has been stated clearly in the proposed and this final rule.

(18) *Comment:* The U.S. Department of Agriculture (USDA), Natural Resources Conservation Service (NRCS) in Texas stated that they are interested in helping landowners conserve and manage critical habitat for the western yellow-billed cuckoo.

*Our Response:* We appreciate this additional information and have considered this in our listing determination. NRCS' cooperation and assistance will be very helpful during the recovery phase for the species.

(19) *Comment:* The International Boundary and Water Commission provided information on riparian habitat restoration along the Rio Grande as well as results of recent western yellow-billed cuckoo surveys.

*Our Response:* We appreciate this additional information and have considered this in our listing determination. Restoration of riparian habitat will be an important phase in the recovery of the western yellow-billed cuckoo. This information will also be helpful in the development and implementation of a recovery plan for the western yellow-billed cuckoo.

(20) *Comment:* The USDA NRCS in Texas expressed concern regarding economic impacts to local landowners and municipalities. This concern was echoed by several public commenters.

*Our Response:* According to section 4(b)(1)A) of the Act, we are to base our listing determinations solely on the basis of the best scientific and commercial data available as they relate to the five factors listed in section 4(a)(1) of the Act. The consideration of economics is only related to the designation of critical habitat under section 4(b)(2) of the Act.

BLM_0071935

*Comments From States*

Section 4(i) of the Act states, "the Secretary shall submit to the State agency a written justification for his failure to adopt regulations consistent with the agency's comments or petition." Comments received from the States regarding the proposal to list as a "threatened species" for the western DPS of the yellow-billed cuckoo are addressed below. We received 17 comment letters from 17 State agencies in 11 States. Of the 17 letters submitted, 9 were from State wildlife agencies. We did not receive comments from the State of Oregon.

*Washington State*

(21) *Comment:* The Washington State Department of Fish and Wildlife supports the DPS determination and listing of the western yellow-billed cuckoo as threatened. This is based on their observations that reports of individual occurrences for the State have been very rare for the past several decades and that the species is not confirmed to be breeding in the State. This is despite having some sizable areas of riparian habitat still remaining along the Lower Columbia River and additional habitat improvements, acquisition, and restoration efforts elsewhere in the State. The Washington State Department of Fish and Wildlife provided suggestions for clarification of habitat use by the western yellow-billed cuckoo in moist riparian habitat areas of western Oregon, western Washington, and southwestern British Columbia. They also provided information on several records of wider habitat use in the Northwest and suggested that there is historical evidence that the species may have used conifer woodlands and open brushy hillsides in Washington as secondary nesting habitat (Bent 1940, pp. 54–70; Jewett *et al.* 1953, pp. 342–343).

*Our Response:* We appreciate this additional information and have considered this in our final listing determination. This habitat information has been discussed in detail in our proposed critical habitat designation. See the proposed critical habitat rule for the western yellow-billed cuckoo published in the **Federal Register** on August 15, 2014 (79 FR 48547). Also see the **Summary of Changes from Proposed Rule** section of this final rule and the *Habitat Use and Needs* section from the proposed listing rule for additional discussion on habitat use in Washington and Oregon (78 FR 61633–61634; October 3, 2013).

(22) *Comment:* The Washington State Department of Natural Resources (DNR) stated that they have developed a conservation strategy on its trust lands for conservation of salmonid freshwater stream habitat and other riparian obligate species habitat (DNR Trust Lands Habitat Conservation Plan). DNR stated that they would expect that implementation of the plan would assist in benefiting the western yellow-billed cuckoo's habitat and any future recovery efforts for the species. DNR also stated that they would continue to participate in the development of any future critical habitat designation.

*Our Response:* We appreciate this additional information and have considered this in our listing determination. This information will also be considered in our final critical habitat designation.

*Idaho*

(23) *Comment:* The Idaho Office of Species Conservation and the Idaho Department of Fish and Game stated that the Service fails to define foreseeable future in the proposed rule. This comment was echoed by several other commenters.

*Our Response:* The Act does not specifically define the term "foreseeable future," and does not require the Service to quantify the time period of foreseeable future in making listing determinations. The Solicitor for the Department of the Interior conducted a review of the Congressional intent behind the term "foreseeable future" in the Act, and concluded that Congress intended the term "foreseeable future" to describe the extent to which the Secretary can reasonably rely on predictions about the future in making determinations about the future conservation status of the species. The Secretary's ability to make reliable predictions may vary according to the threat at issue; consequently, the Solicitor concludes that this timeframe of "the foreseeable future is not necessarily reducible to a particular number of years. Rather, it relates to the predictability of the impact or outcome for the specific species in question." In addition, the opinion notes that "definitive quantification is rarely possible . . . and not required for a 'foreseeable future' analysis" (Department of the Interior Memorandum M–37021, January 16, 2009; available at: *http://www.doi.gov/solicitor/opinions/M-37021.pdf*).

In considering the foreseeable future as it relates to the status of the western yellow-billed cuckoo, we considered the factors acting on the species and looked to see if reliable predictions about the status of the species in response to those factors could be drawn. We considered the historical data to identify any relevant existing trends that might allow for reliable prediction of the future conservation status of the species (in the form of extrapolating the trends). We also considered whether we could reliably predict any future events that might affect the status of the species, recognizing that our ability to make reliable predictions into the future is limited by the variable quantity and quality of available data. Available population information for western yellow-billed cuckoo is limited for determining trends because no long-term rangewide status survey has been completed and the threats facing the species are variable in intensity and scope across the species' range and do not reliably provide a sound basis for specific timeframe predictions. The available data do not allow us to determine a specific timeframe for the foreseeable future for the western yellow-billed cuckoo; therefore, we rely on a qualitative assessment of the foreseeable future, in terms of that period of time over which we can reasonably predict the future population trends and threats to the species, and the likely consequences of those threats and trends for the status of the species. We have discussed the timeframe for when we have determined the threats are acting on the species under each factor in the **Summary of Factors Affecting the Species** and in our **Determination** sections below.

*Montana*

(24) *Comment:* Montana Fish, Wildlife, and Parks indicated that the portion of the State that is shown as being within the DPS has historically not been considered within the range of the species. The agency indicated that there are only 8 records for western Montana, and only 3 of those were found in the past 30 years. They stated that the western quarter of the State, west of the Continental Divide, should be excluded from the DPS and the species not listed in Montana. This comment was also echoed by commenters in Utah, Colorado, and Wyoming who wanted their States removed from the DPS.

*Our Response:* We are aware of the limited number of sightings for the species in western Montana and other areas within the DPS. However, we consider yellow-billed cuckoos that are found in the portion of Montana west of the Continental Divide are western yellow-billed cuckoos based on dispersal and migratory patterns, the large gap between this region and southeastern Montana where eastern yellow-billed cuckoos sporadically

occur, and criteria used to map the DPS boundary. We based our boundary for the DPS on watershed boundaries along the upper elevation areas along the Rocky Mountains and on species occurrence records. It would be inconsistent and arbitrary to move the boundary or not include the western yellow-billed cuckoos in western Montana from the DPS regardless of how seldom they are found in the area.

*Wyoming*

(25) *Comment:* The Wyoming Game and Fish Department (WGFD) provided information on additional surveys for the Green River and on the State's classification of the species as a Tier III Species of Greatest Conservation Need with unknown population status and trends due to an extremely limited number of detections during targeted survey work (WGFD 2010, pp. IV-i-8). The WGFD stated it does not differentiate between eastern and western yellow-billed cuckoos but that habitat for the species continues to decline primarily as a result of nonnative plant (tamarisk) invasion. The WGFD believes that the estimate in the proposed rule of five or fewer pairs is an overestimate for the State, that it is highly unlikely that western yellow-billed cuckoos breed in the State on a consistent basis, and they doubt that the small numbers in Wyoming add to population viability of the subspecies. The WGFD recommended not designating any critical habitat or land use restrictions for the species in the State as most of the potential habitat for the species is above 7,000 ft (2,134 meters (m)). The State also recommended that ongoing and planned tamarisk removal should not be impeded as a result of the Service's final determination.

*Our Response:* As stated in the proposed rule and this final rule, we agree that the number of western yellow-billed cuckoos nesting in Wyoming is small. It is also possible that western yellow-billed cuckoos do not nest in the State every year. However, the species most likely uses the available habitat as movement corridors or stop-over areas during its migration to areas farther north or as foraging areas during prey outbreaks. We will consider any information on critical habitat during the development of the final critical habitat designation. As a result of listing the species, we would expect agencies and organizations conducting tamarisk removal projects to do so in a manner compatible with conservation of the western yellow-billed cuckoo (see response to *Comment* 28 below for

additional information on tamarisk removal and the conservation of the western yellow-billed cuckoo).

*California*

(26) *Comment:* The California Department of Fish and Wildlife supports the DPS determination and listing of the western yellow-billed cuckoo as the species is already listed as endangered under the California Endangered Species Act (CESA) and the populations of the species in the State continue to decline. The California Department of Fish and Wildlife will continue to provide support in habitat management that will encourage recovery for the species in California.

*Our Response:* We appreciate the review and support of the California Department of Fish and Wildlife. This information will help with the development and implementation of the recovery plan for the western yellow-billed cuckoo.

*Nevada*

(27) *Comment:* Nevada State Department of Wildlife concurred with the Service's concerns regarding declines of the western yellow-billed cuckoo and summarized the status of the species in the State. The Nevada State Department of Wildlife also provided clarifications and updated information on occurrence records and habitat for the State. The western yellow-billed cuckoo is a species of conservation priority in Nevada, and the Nevada State Department of Wildlife is dedicated to conserving the species and improving its habitat whether it is listed or not.

*Our Response:* We appreciate this additional information and have considered this in our listing determination. This information will also be used in the development of our final critical habitat designation and implementation of a recovery plan for the western yellow-billed cuckoo.

(28) *Comment:* Nevada State Department of Wildlife, Wyoming Game and Fish Department, Utah Office of Governor, and Colorado Department of Agriculture listed tamarisk invasion as a major threat for western yellow-billed cuckoos and their habitat. There is some concern that listing the western yellow-billed cuckoo will curtail tamarisk removal projects and riparian restoration. Several commenters would like us to develop a rule under section 4(d) of the Act for riparian habitat restoration.

*Our Response:* The Service agrees that tamarisk is a major threat to the western yellow-billed cuckoo's habitat. We expect that in areas where restoration of

native riparian vegetation is possible, removal of tamarisk would be considered a net benefit, as native riparian vegetation has a greater habitat value for the western yellow-billed cuckoo. If western yellow-billed cuckoos are documented to use an area slated for tamarisk removal, consultation with the Service may be necessary in order to jointly develop appropriate measures to avoid or minimize the potential for adverse effects to the western yellow-billed cuckoo. However, the process of listing a species as threatened under the Act is not designed to curtail projects that have the potential to benefit that species, and it is unlikely that beneficial tamarisk removal and riparian restoration projects would be negatively impacted from listing the western yellow-billed cuckoo. At this time, we are not developing a rule under section 4(d) of the Act for this species.

*Utah*

(29) *Comment:* The Director for the Utah Public Lands Policy Coordination Office stated that: (a) Utah has made great strides in conserving the yellow-billed cuckoo and its habitat and that the Service did not characterize the conservation benefits for the yellow-billed cuckoo as a State-sensitive species adequately in the proposed rule; (b) the DPS boundary is arbitrary and includes unoccupied areas or migratory habitat; and (c) the Service did not use or consider the best available scientific information provided by the Utah Division of Wildlife Resources (e.g., Beason 2009, additional Statewide surveys, GIS habitat models). The State requested that the Service not list the species as endangered or threatened under the Act, as it believes that the State is in the best position to manage and conserve the species and its habitat.

*Our Response:* We commend the State of Utah on the efforts they have made in conserving the western yellow-billed cuckoo and its habitat. However, we were not supplied with any information by the State on specific conservation efforts for the western yellow-billed cuckoo, so characterization of the conservation benefits for the species is not possible.

We disagree that the DPS line is arbitrary. The DPS line used to separate the western yellow-billed cuckoo from yellow-billed cuckoos in the east in the vicinity of Utah was the watershed boundaries along the Continental Divide. This boundary does not imply that all areas within the DPS contain suitable habitat. In fact, most areas within the DPS do not contain suitable habitat for the species because the

species is restricted to riparian habitat and most of western United States is upland habitat covered by forest, desert, shrubland, or agriculture. Riparian habitat, by definition, is limited to the banks of rivers and streams, and comprises a very small percentage of the arid West. The DPS simply shows the outer limits that one can expect to find western yellow-billed cuckoos during the breeding season and during migration to breeding areas.

We received GIS data from the State of Utah and excel spreadsheets with location data apparently derived from surveys and incidental observation within the State. We did not receive the information mentioned in the comment letter (e.g., Beason 2009, additional statewide surveys, and GIS habitat models) from the State. During the development of this proposed rule and in response to the State's comment, we independently obtained a copy of the information cited (Beason 2009, pp. 1–19). The results of that study, which surveyed areas in and around Dinosaur National Park in Utah and Colorado, did not confirm any western yellow-billed cuckoo observations. We contacted the researcher and they confirmed the information.

*Colorado*

(30) *Comment:* The Colorado Department of Agriculture asked to participate in the recovery of the species and is actively removing tamarisk and Russian olive and restoring native riparian vegetation.

*Our Response:* We appreciate this additional information and have considered this in our listing determination. This cooperation in recovering the species will be important in the development and implementation of a recovery plan for the species.

(31) *Comment:* The Water Resources Division of the Colorado Department of Natural Resources stated that riparian habitat is not threatened in Colorado and the western yellow-billed cuckoo should not be listed because adequate conservation efforts are underway.

*Our Response:* Riparian systems in Colorado have been highly impacted by the nonnative, invasive tamarisk and Russian olive. Many of the other threats detailed in the proposed and this final rule also apply to riparian habitats in that State. In addition, the State of Colorado contains only a small portion of both the range and population of the western DPS of the yellow-billed cuckoo. Our obligation is to review and assess the population status as a whole and not on a regional or Statewide basis.

*Arizona*

(32) *Comment:* The Arizona Game and Fish Department supported the Service's overall determination of the western yellow-billed cuckoo as a DPS, but stated that using morphological information in the DPS significance section weakened the argument.

*Our Response:* We appreciate this additional information and have considered this in our DPS analysis and listing determination. Morphological information is just one of the reasons we have determined that the western yellow-billed cuckoo is a valid DPS under our policy. In order to be more transparent in describing our rationale for our DPS determination, we included the morphological information as further evidence of the DPS. We conclude that including morphological information in the DPS *Significance* section helps to provide a complete picture of the differences between eastern and western yellow-billed cuckoos.

(33) *Comment:* The Arizona Game and Fish Department stated that they did not support listing the western yellow-billed cuckoo as it would be counterproductive to current conservation efforts.

*Our Response:* Some restoration projects, especially where existing poor-quality, tamarisk-dominated habitat that is occupied by western yellow-billed cuckoo is being removed and higher quality, willow-cottonwood or mesquite habitat is being planted, may require consultation with the Service in order to jointly develop appropriate measures to avoid or minimize the potential for adverse effects to the western yellow-billed cuckoo. However, the process of listing a species as threatened under the Act is not designed to curtail projects that have the potential to benefit that species, and it is unlikely that beneficial tamarisk removal and riparian restoration projects would be negatively impacted from listing the western yellow-billed cuckoo. It is more likely that listing the western yellow-billed cuckoo will complement the recovery efforts and potentially provide additional sources of funding through section 6 of the Act.

(34) *Comment:* The Arizona Game and Fish Department stated that they agreed that western yellow-billed cuckoos have declined in Arizona over the last 100 years due to habitat loss. The Arizona Game and Fish Department went on to state that the western yellow-billed cuckoo population and habitat loss have stabilized over the past 30 years and populations will increase as a result of riparian restoration on the Lower

Colorado River. The Arizona Game and Fish Department stated that 4,000 acres (ac) (1,619 hectares (ha)) of habitat is scheduled for restoration, and in locations where restoration has occurred, western yellow-billed cuckoos are using the created habitat within 2 years of planting. They asked us to add references that show that western yellow-billed cuckoos have declined as a result of riparian habitat loss and degradation (they cite Noss *et al.* 1995). They also stated that there was a need to quantify the benefits of riparian habitat restoration to western yellow-billed cuckoos.

*Our Response:* Most locations in Arizona that have western yellow-billed cuckoo populations have not been surveyed regularly enough to provide population trend information. The only two locations with semi-regular monitoring (the Bill Williams River and the San Pedro River) both show downward trends in western yellow-billed cuckoo populations. The western yellow-billed cuckoo population on the Colorado River on the Arizona-California border appears to be increasing with the riparian restoration activities at that location. More years of survey data are needed to determine whether or not that is a long-term trend.

While the results of the riparian restoration work on the Lower Colorado River are promising, based on the scientific information available we conclude that it is too soon to tell what effect this planned restoration will have on western yellow-billed cuckoo populations. As population goals for recovery of the western yellow-billed cuckoo have not yet been established, it is not known what the overall effect of an addition of the 40 or so pairs of western yellow-billed cuckoos on the Lower Colorado River will have on the overall status of the yellow-billed cuckoo in the West. In addition, so far it appears that western yellow-billed cuckoos nesting on restoration sites tend to have lower nesting success than western yellow-billed cuckoos nesting in areas still containing healthy native riparian forests (McNeil *et al.* 2012, p. 53).

We have added citations in this final rule that show that western yellow-billed cuckoos have declined as a result of riparian habitat loss and degradation (see section in Factor A discussion). We have concluded that this is a well-documented pattern in California and Arizona.

To date it is difficult to quantify the benefit of riparian habitat restoration to western yellow-billed cuckoo populations. Most restoration efforts are carried out on a small scale in

comparison to the home-range size of the western yellow-billed cuckoo. In the Kern River Valley where riparian restoration has been ongoing for the past 30 years, the western yellow-billed cuckoo population has stabilized but has not increased. Along the Sacramento River, where several thousands of acres of riparian restoration has occurred over the past 30 years, the western yellow-billed cuckoo population has continued to decline. The one location where restoration work is appearing to have a positive effect on western yellow-billed cuckoo populations is along the Lower Colorado River, but this work is very recent and the long-term effect on western yellow-billed cuckoo populations there is still unknown. The largest positive effects for western yellow-billed cuckoos have occurred in the reservoir draw-down zones (e.g., Isabella Reservoir and Elephant Butte Reservoir), when riparian habitat has regenerated during droughts. These benefits are ephemeral, as the habitat will be inundated and lost when wet periods return.

*New Mexico*

(35) *Comment:* New Mexico Game and Fish requested a delay in listing so that more research can be conducted in New Mexico to better define the DPS line. They state that data from e-bird [Cornell Lab of Ornithology] and New Mexico Ornithological Society (2007) do not support difference in migration timing between eastern and western New Mexico, and cite Sechrist and Best (2012) to say that cuckoos from Pecos and Rio Grande had the same migration timing and direction. Twenty additional commenters questioned the DPS' status, indicating that the DPS was neither discrete nor significant, without providing additional information to support their comments.

*Our Response:* In making listing determinations under the Act, we are to rely solely on the best scientific and commercial data currently available. Our DPS policy outlines the criteria for determination of whether a segment of a vertebrate species population qualifies as a DPS. In reviewing the most current information available, we have determined that the western DPS of the yellow-billed cuckoo is valid and meets the criteria outlined in our policy. As we stated above in the **Distinct Vertebrate Population Segment Analysis** section, we understand that the area in southern New Mexico and western Texas is an area where there may be overlap between both eastern and western populations of the yellow-billed cuckoo. Our DPS policy allows for some "mixing" of populations, and

absolute separation is not required for a population segment of a species to be considered a DPS (61 FR 4723–4725; February 7, 1996). The location and boundaries of a western DPS for the yellow-billed cuckoo has been under consideration since the Service first received a petition to list the species in 1986. As detailed in the proposed rule and this final rule, yellow-billed cuckoos on the Rio Grande above Big Bend are more similar to yellow-billed cuckoos in the West than they are to yellow-billed cuckoos in the East. Yellow-billed cuckoos on the Pecos River and in eastern New Mexico are more similar to yellow-billed cuckoos in the East than they are to yellow-billed cuckoos in the West. Peer reviewer Dr. Janice Hughes, the only avian taxonomist who has conducted research on yellow-billed cuckoos in this region, believes that the highlands between the Rio Grande and the Pecos River are the dividing line between eastern and western yellow-billed cuckoos.

As discussed above in *Comment* 14, one peer reviewer measured yellow-billed cuckoos on the Rio Grande and Pecos River and found the Rio Grande yellow-billed cuckoos to be larger than those on the Pecos River. The differences were not statistically significant, but the sample sizes were small, so a significant difference would not be expected. Also the measurements were not taken in a similar way as measurements taken by Banks (1988, pp. 473–477) and Franzreb and Laymon (1993, pp. 17–28) so they cannot be compared to measurements from those studies. At this time, a definitive study has not been completed on morphology, genetics, or behavior (including migration timing) comparing yellow-billed cuckoos on the Rio Grande and Pecos River. Until that is done, the best available science on the subject is in Franzreb and Laymon (1993, pp. 17–28) and in the opinion of Dr. Janice Hughes, which divides eastern and western yellow-billed cuckoos along the highlands separating the Rio Grande and the Pecos Rivers.

(36) *Comment:* New Mexico Game and Fish and several other commenters suggest that western yellow-billed cuckoos have been found at elevations higher than reported in the proposed rule.

*Our Response:* We appreciate this additional information and have considered this in our listing determination. Most of these higher elevation sightings in the Rocky Mountains are likely of migrant western yellow-billed cuckoos, though a few may refer to nesting pairs.

(37) *Comment:* New Mexico Game and Fish would like us to develop a rule under section 4(d) of the Act to allow for economic and agricultural growth in conjunction with conservation efforts, especially while developing the State's comprehensive conservation program.

*Our Response:* Section 4(d) of the Act allows the Secretary the discretion to issue such regulations as [s]he deems necessary and advisable to provide for the conservation of a species. The Service's standard policy (under 50 CFR 17.31(a)) for issuing prohibitions for threatened species is to apply all the prohibitions of an endangered species to a threatened species unless otherwise revoked by issuance of more specific prohibitions. In the case of the western yellow-billed cuckoo, we are in the process of reviewing whether the "standard" prohibitions apply or whether more specific prohibitions are appropriate. If we determine that more specific prohibitions apply and that they are necessary and advisable to provide for the conservation of the western yellow-billed cuckoo, we will issue a proposed rule under section 4(d) of the Act for public comment. However at this time, we do not have and the commenter did not provide enough information on whether a section 4(d) rule for agricultural activities is appropriate. We would be available for future discussion on potentially developing measures to maximize the conservation value of agricultural practices and develop some type of conservation mechanism with the commenter in the future; however, due to time constraints for developing a final rule we cannot currently develop and implement such measures.

(38) *Comment:* New Mexico Game and Fish stated that there was a large discrepancy between population estimates of 100–155 pairs for western New Mexico listed in the proposed rule and 7,000 individuals in the State as reported by the Partners in Flight program (PIF 2014).

*Our Response:* The Partners in Flight Web site for New Mexico (New Mexico Partners in Flight 2014, entire) reports that the western yellow-billed cuckoo population in New Mexico is much less than 1 percent of the total species population of 9.2 million, or less than 92,000 yellow-billed cuckoos. This was then converted to 0.1 percent of the global population, which should have been 9,200 yellow-billed cuckoos, but was transcribed or rounded to 7,000 yellow-billed cuckoos or 3,500 pairs of yellow-billed cuckoos. This is a questionable method to determine the yellow-billed cuckoo population for a State and should not be accepted as

BLM_0071939

valid. This is much higher than Howe's (1986, pp. 1–16) estimate of 1,000 pairs of yellow-billed cuckoos Statewide in New Mexico and 315 pairs for the western half of the State. Howe's estimates were made based on an estimate of available habitat and an understanding that western yellow-billed cuckoo territories were much smaller than they actually are, leading to an overestimate for New Mexico. It is likely that fewer than 1,000 pairs of western yellow-billed cuckoos existed in New Mexico in 1986. The population for western yellow-billed cuckoos estimated for the State by Hughes (1999, p. 19) was 100 to 200 pairs. The Service's estimate of 100 to 155 pairs is based on the best available science of surveys conducted over the past 10–15 years.

(39) *Comment:* The New Mexico Department of Agriculture asked that the Service address management of the western yellow-billed cuckoo as a watershed health issue and not list the species.

*Our Response:* Listing of the western yellow-billed cuckoo under the Act is based on the species' population status and trends, and the threats to the species. Recovery of a species will be based on criteria developed by the Recovery Team once it becomes established. Solving the threats to the western yellow-billed cuckoo is an important part of the recovery process, and watershed health will be very important when developing recovery criteria and implementing recovery actions.

(40) *Comment:* New Mexico Interstate Stream Commission commented that because western yellow-billed cuckoos are listed by New Mexico Fish and Game as a "Species of Greatest Conservation Need" the Service should not state that it has no protective status in New Mexico.

*Our Response:* Although the identification of the western yellow-billed cuckoo by the State of New Mexico as a "Species of Greatest Conservation Need" is encouraging, this designation is for planning purposes and provides no regulatory protective status for the species in New Mexico. Any actions or conservation measures implemented for the cuckoo as a result of its State status would be recommendations and voluntary, and would not ensure that actions or measures would be implemented.

(41) *Comment:* New Mexico Interstate Stream Commission states that if the western yellow-billed cuckoo is listed, we should develop a rule under section 4(d) of the Act for ongoing and future water management in the State. Other

commenters expressed concern about the impact of listing the western yellow-billed cuckoo on water delivery.

*Our Response:* The disruption and changes to "natural" river and stream processes, which help the development and regeneration of riparian vegetation, have been identified as a threat to the species. The majority of streams and water delivery facilities within the range of the western yellow-billed cuckoo are at least partly managed by Federal entities or proposed activities that would have a Federal nexus. As a result, these Federal agencies have an obligation under section 7 the Act to conserve endangered or threatened species and their habitat. Section 4(d) of the Act states that the Secretary shall issue such regulations as [s]he deems necessary and advisable to provide for the conservation of any threatened species. New projects on Federal land or funding by the Federal government will be subject to section 7 consultations, as will reauthorization of Federal projects. Because of the interrelatedness between water management, the health of riparian habitat, and the dependence of riparian habitat by the western yellow-billed cuckoo, we are not currently considering a rule under section 4(d) of the Act for this species to limit the prohibitions of the Act for ongoing and future water management activities.

(42) *Comment:* The New Mexico Interstate Stream Commission stated that because humans do not have control over caterpillar population, lack of caterpillars should not be listed as a threat.

*Our Response:* Caterpillar and other insect populations can be affected by health of the riparian habitat, tree and shrub species in the riparian zone, and pesticide use (e.g., pesticide drift into the riparian zone or applying pesticides directly on the riparian zone). All of these factors are influenced by human activities at some level. Lack of an adequate food supply is a major threat for the western yellow-billed cuckoo.

(43) *Comment:* The New Mexico Interstate Stream Commission stated that climate change effects have so far not been as great as they are predicted to be in the future.

*Our Response:* We appreciate the New Mexico Interstate Stream Commission's comments on climate change and have considered them in our listing determination. The New Mexico Department of Game and Fish in their Comprehensive Wildlife Conservation Strategy for New Mexico (2006) stated that "[t]he effects of climate change on ecosystems and species are likely to be exacerbated in areas that have already been substantially affected by human

activities such as habitat loss and fragmentation, air and water pollution, and the establishment of invasive species." They also state that riparian habitat is one of the key habitats that may have the highest risk of being altered by synergistic effects of factors that influence habitats (New Mexico Department of Game and Fish. 2006, pp. 74–79).

We agree that climate change projections and prediction can be difficult due to the availability of information and variability of climate and habitat conditions over time. However, in a study looking at the recent effects of climate change on temperature and precipitation over the past 36+ years (1970–2006), Enquist *et al.* (2008, pp. 1–32) found that in New Mexico, observed climate-linked effects include declines in snowpack, earlier peak stream flows, forest mortality, and population declines in some sensitive species. To avoid issues of uncertainty associated with future climate change predictions, the study used a retrospective approach that analyzed changes over time. Their study found that: (1) 93 Percent of New Mexico's watersheds have become relatively drier over the 36+ year period; and (2) snowpack has declined in 98 percent of New Mexico's major mountain ranges and the timing of peak streamflow from snowmelt in the State is an average of one week earlier than in the 1950s. In addition, the study found that the watersheds with the highest numbers of sensitive species tend be those showing the greatest increase in moisture stress or drying and that these watersheds have already experienced climate change-linked ecological effects. We have determined that the long-term effects of climate change are and will continue to be a factor in sensitive species or habitat conservation regardless of any short-term trends.

(44) *Comment:* The New Mexico Interstate Stream Commission commented that western yellow-billed cuckoos may rely on tamarisk, like southwestern willow flycatchers do, but even if true, tamarisk beetles should not be listed as a threat to western yellow-billed cuckoos.

*Our Response:* Western yellow-billed cuckoos do not rely on tamarisk in the same way that southwestern willow flycatchers do. Western yellow-billed cuckoos may on rare occasions nest in tamarisk, but they forage almost entirely in native riparian habitat. Western yellow-billed cuckoos are primarily dependent on large caterpillars, which depend on cottonwoods and willows and are not found on tamarisk. On the other hand, southwestern willow

flycatchers feed on small flying insects and both nest and forage in tamarisk as long as water or super-saturated soil is in the vicinity of the nest and flying insects are available. In areas where the hydrology is still intact and will support native riparian habitat, the tamarisk beetle could assist in the restoration of the riparian zone. In areas that can no longer support willows, cottonwoods, and mesquite, the beetle could suppress the tamarisk to the point that western yellow-billed cuckoos will no longer use the habitat. In this latter case, the tamarisk beetle could be considered a threat, as spontaneous regeneration of native vegetation is difficult due to the degraded nature of the habitat and disrupted hydrologic conditions.

*Texas*

(45) *Comment:* The Deputy Commissioner for the Texas General Land Office stated that listing the western yellow-billed cuckoo would lead to increased economic costs and delay in the development of oil, gas, wind, and solar projects for the State. Royalties collected by the State from such activities would be reduced, and this would indirectly affect funds available for Texas public schools. The Deputy Commissioner also stated that the Service's analysis of the information is not sufficient to support listing and that the Service is only moving forward at this time with listing due to its settlement with outside litigants and not because listing is warranted under the Act.

*Our Response:* Under section 4(a)(1) of the Act, we are to determine if a species is endangered or threatened based on one of five listing factors. Economics or loss of revenue is not one of the factors used in determining if a species should be listed. Although we understand that listing a species as either endangered or threatened causes some regulatory oversight and the potential need for consultation, we are obligated to make such determinations solely on the threats facing the species or its habitat. Listing a species does not mean projects cannot proceed, it only means they must be implemented in a manner that still conserves the species and its habitat. In addition, because the species occurs in riparian habitat along streams, it is most likely that projects involving the development of oil, gas, wind, and solar projects would not result in significant direct impacts on the species, as these projects typically do not occur in riparian corridors.

We believe we have used the best scientific and commercial information available in coming to our decision to list the western yellow-billed cuckoo as

a threatened species. The western yellow-billed cuckoo has been a candidate for listing since 2001. Although we were litigated to develop a timeframe for moving forward on the review of candidate species, the Act requires us to promptly make our evaluations for species considered candidates. Any settlements reached as a result of litigation took into consideration what was best for conservation and protection of candidate or sensitive species and were not dictated by litigants.

(46) *Comment:* The Texas Comptroller of Public Accounts stated that they were concerned that listing of the western yellow-billed cuckoo would have potential economic impacts on landowners, businesses, and communities within the boundary of the DPS in Texas. The Comptroller also stated that additional information is needed on the status of the species and that the benefits of ongoing conservation efforts for the southwestern willow flycatcher are adequate to conserve the western yellow-billed cuckoo.

*Our Response:* See our response to *Comment* 45 above for economic considerations in the listing process and our view on the information used to determine the status of the species. In regard to conservation measures for the southwestern willow flycatcher being adequate to conserve the western yellow-billed cuckoo, we disagree. Although the range of the southwestern willow flycatcher and the western yellow-billed cuckoo overlap to some degree and they are found in similar habitats, that is not always the case and the two species have very different habitat and ecological requirements.

**Public Comments**

*Comments on "Endangered" vs. "Threatened" Status*

(47) *Comment:* More than 12,000 commenters stated that the western yellow-billed cuckoo should be listed as "endangered" rather than the proposed "threatened" status.

*Our Response:* The Act defines an endangered species as any species that is currently "in danger of extinction throughout all or a significant portion of its range" and a threatened species as any species "that is likely to become endangered throughout all or a significant portion of its range within the foreseeable future." Based on the available information on the range and distribution of the species, the immediacy and severity of threats facing the species, the persistence of the species throughout most of its historical range, and the rate of decline of the

species, we have determined that the western yellow-billed cuckoo meets the definition of a threatened species rather than an endangered species under the Act. See the **Determination** section below for additional discussion of our rationale for a "threatened" determination.

(48) *Comment:* One commenter stated that the entire species (both in the eastern and western United States) should be listed as a threatened species under the Act.

*Our Response:* Our analysis in the rule is limited to the petitioned entity (western United States), and we have not evaluated the status of the eastern population of the yellow-billed cuckoo. Should new information become available about the status, trends, or threats facing the eastern population of the yellow-billed cuckoo, we would evaluate that information at that time, as budget and staffing allow.

*Comments on the Distinct Population Segment*

(49) *Comment:* One commenter stated that the western DPS of the yellow-billed cuckoo also meets significance because of persistence of population on unusual or unique ecological setting (i.e., streamside riparian areas in arid West).

*Our Response:* We appreciate this additional information and have considered this in our listing determination. Yellow-billed cuckoos in both the East and West nest in riparian habitat. The species in the eastern United States has a wider range of habitat use, including nesting in upland broadleaf woodlands that are not available to the species in the West. We do not consider riparian habitat as unusual or unique habitat under our DPS policy.

(50) *Comment:* Several commenters stated that there had been too many studies on the yellow-billed cuckoo and other commenters stated that there had been too few studies. Genetics and taxonomic uniqueness was a suggested area of study by one commenter.

*Our Response:* Although there has been much focus on research on the yellow-billed cuckoo, most of these efforts have been on survey and monitoring. Additional research activity is a common response once a species is identified for listing under the Act. However, other information, such as migratory routes, timing, and wintering ground use, has been scarce, and we agree that there are many areas of the life history, ecology, genetics, and taxonomy of the western yellow-billed cuckoo that need further research. However, in making our listing

BLM_0071941

determination, we must use the best scientific and commercial data available in coming to any conclusions on whether the species should be listed.

(51) *Comment:* One commenter stated that the eastern and western yellow-billed cuckoos may be interbreeding on the wintering grounds.

*Our Response:* Because yellow-billed cuckoos do not breed on their wintering grounds in South America, it is not plausible that they are interbreeding during this time.

(52) *Comment:* Several commenters do not believe that differences in migration timing between eastern and western yellow-billed cuckoos are evidence that there is a marked separation between the two groups.

*Our Response:* The proposed rule and this final rule identify a wide variety of factors that separates western yellow-billed cuckoos from the rest of the taxon. Migration timing is one of these factors. In general, migration timing is governed by forces of natural selection that operate over long periods of time. Given that populations of eastern and western yellow-billed cuckoos arrive on their breeding grounds, at the same latitude, a month or more apart is significant and is most likely governed by evolutionary forces. This pattern of consistently arriving on their respective breeding grounds a month or more apart is different from year to year, and variations in weather may lead to individual birds arriving on the breeding grounds a few days earlier or later than normal. Please see the **Distinct Vertebrate Population Segment Analysis** section, above, for further explanation of our rationale for determining that the western yellow-billed cuckoo is a valid DPS.

(53) *Comment:* Three commenters stated that they believed that the species was not distinct.

*Our Response:* The Service is listing a DPS rather than a species or subspecies. As detailed in the *Taxonomy* section under **Background** and *Discreteness* section of the **Distinct Vertebrate Population Segment Analysis** above, the western DPS of the yellow-billed cuckoo coincides with the range of the proposed subspecies boundary of the "western" yellow-billed cuckoo (*Coccyzus americanus occidentalis*). However, because there is some scientific uncertainty to the validity of the subspecies, the Service is not listing the subspecies, but rather is listing the western DPS.

*Population Numbers*

(54) *Comment:* Twelve commenters stated that there have been recent declines of breeding populations of

western yellow-billed cuckoos in various locations of California, Arizona, New Mexico, and Colorado. Several additional commenters provided their personal observations in Arizona, New Mexico, and Colorado, which indicated that local populations of western yellow-billed cuckoos have declined over the last 30 years.

*Our Response:* These additional observations support the information that we presented in the proposed and this final listing rule regarding population trends for the species in these States.

(55) *Comment:* Nine commenters stated that the western yellow-billed cuckoo was not threatened, that they were either not declining or not declining at a rate that would lead to extinction, and that yellow-billed cuckoos were doing well in the East.

*Our Response:* Yellow-billed cuckoos in the East are declining at 1.4 to 1.6 percent per year over the past 43 years (Sauer *et al.* 2012, entire). Based on the best available science and data, western yellow-billed cuckoos have declined dramatically throughout their range over the past 150 years. This decline has continued in recent years, and with very few exceptions (e.g., the South Fork Kern River Valley, where the small populations appears to be stable, and the Lower Colorado River, where the population is showing an increase), it is continuing to decline. The data and information we have used in this final rule lead us to conclude that the western DPS of the yellow-billed cuckoo is threatened with extinction. No data were presented by commenters that show increasing population trends or population numbers that contradict our conclusion that the western yellow-billed cuckoo is a threatened species.

(56) *Comment:* Eight comments were received on data analysis and proposed rule preparation. Issues raised included the lack of a population viability analysis, the lack of a global population analysis, inadequate citations support for statements made in the document, not providing the names of Service biologists who reviewed data, taking a California-centric approach in the proposed rule, and only providing range maps showing the breeding season's range.

*Our Response:* Current available scientific data on the western yellow-billed cuckoo are not sufficient to conduct a meaningful population viability analysis. Too many of the important parameters are not known well enough for the results to be reliable. The State-by-State and region-by-region analysis of the entire range of the western DPS of the yellow-billed

cuckoo is essentially a global population analysis. Every attempt has been made to be certain that citations support the statements made in the proposed and this final rule. Where we do not have specific reference support we explained our rationale based on the best available information on coming to any conclusions. It is not Service policy to list names of document authors or those who reviewed data. Much of the research that has been conducted on the western yellow-billed cuckoos has occurred in California, which may lead readers to the opinion that the proposed rule is California-centric. The winter range of the western yellow-billed cuckoo is not well-known and therefore could not be mapped.

(57) *Comment:* Several commenters stated that western yellow-billed cuckoo survey data were missing from the proposed rule or the data have been updated after the proposed rule was published (e.g., Utah, New Mexico, Arizona).

*Our Response:* We have considered this updated information in our final listing determination, and the information will be considered in the final critical habitat designation and future recovery plan.

(58) *Comment:* One commenter asked why western yellow-billed cuckoos are continuing to decline with all the habitat protection that has been happening over the past 25 years.

*Our Response:* It is true that significant habitat protection and restoration has been underway for the past 25 to 30 years. Much of this work has been done on a project-by-project basis or on a smaller scale than will likely be necessary for the stabilization and recovery of the species. Recovery goals for western yellow-billed cuckoos and their habitat will be set in the recovery plan for the species as it is developed. In some areas, such as the Sacramento River, western yellow-billed cuckoo populations have continued to decline even though significant habitat restoration activities have been carried out. Aging of the existing habitat and increased occupancy by invasive species, especially edible fig (*Ficus carica*) and black walnut (*Juglans* sp.), may be contributing factors. In addition, effects of pesticides on caterpillars may be a factor in many areas. It is indeed a concern that western yellow-billed cuckoos have declined even in areas where habitat has been protected and has either been stabilized or has increased. Further research is needed to determine the exact causes of this continued decline.

(59) *Comment:* One commenter questioned our science and asked that

all information on western yellow-billed cuckoo populations and declines should be removed from the discussion in the rule.

*Our Response:* The information on western yellow-billed cuckoo population and declines presented in the proposed and this final rule is based on the best available science. In making listing determinations under the Act, we must conduct a five-factor analysis on the threats facing a species based on the best available scientific and commercial information. In some cases the information on a species' status and trends is unclear or the information available is sparse. In these cases, we nonetheless must base our determinations on the best available information. In the case of the western yellow-billed cuckoo, the available information on population status and declines is appropriate to include in our discussion of the status of the species and in making our final determination on the species' listing status of threatened.

(60) *Comment:* Numerous commenters have concerns regarding survey methods, comparison of survey data, accuracy of survey counts, and changes in survey protocols over the years for the yellow-billed cuckoo.

*Our Response:* Please see response to *Comment* 5 above for our response to concerns over the survey protocols and other survey concerns.

*Comments on Habitat Use and Species Information*

(61) *Comment:* Several commenters indicated that habitat use separates eastern and western yellow-billed cuckoo populations. One commenter further stated that in eastern New Mexico and western Texas, yellow-billed cuckoos from eastern populations nest in monotypic stands of tamarisk, while western yellow-billed cuckoos do not. The commenter did not provide any specific study but based their statement on observations.

*Our Response:* We appreciate this additional information and have considered this in our listing determination. Additional research on this topic would be valuable. The information provided will also be considered further in recovery planning. See response to *Comment* 6, above, for additional information.

(62) *Comment:* One commenter stated that yellow-billed cuckoos select much different habitat in the East than they do in the West.

*Our Response:* We appreciate this additional information and have considered this in our listing determination. We recognize that

habitat use is different between eastern and western populations of yellow-billed cuckoos. See our response to *Comment* 6, above, for additional discussion on habitat use in the eastern and western United States.

(63) *Comment:* One commenter stated that understory vegetation was as important to western yellow-billed cuckoos as overstory vegetation.

*Our Response:* As stated in the proposed listing rule and cited by reference in this final rule, the amount, size, composition, and density of habitat are important habitat selection criteria for the western yellow-billed cuckoo. Although habitat characteristics vary across the range of the species, understory vegetation is an important characteristic for the species. For example, along the Sacramento River, the size of the site, the amount of riparian habitat in each 5-mi (8-km) river segment, and the presence of young woody vegetation (understory) were the most important factors in a model explaining the distribution of yellow-billed cuckoo pairs (Halterman 1991, p. 30). Along the lower Colorado River, in a comparison of occupied versus unoccupied habitat, yellow-billed cuckoos were found at sites with denser riparian vegetation and more variation in vegetation density, and less tamarisk and shrubby vegetation, compared to unoccupied sites (Johnson *et al.* 2012, pp. 15–17).

(64) *Comment:* Two commenters stated that western yellow-billed cuckoos do not need large blocks of riparian habitat, and one commenter stated that they do not need riparian habitat at all. Another commenter stated that habitat use and patch size needed were not well-defined.

*Our Response:* The use of large blocks of riparian habitat for yellow-billed cuckoos in western United States is well-documented. Recent studies of habitat use using radio telemetry have shown that a western yellow-billed cuckoo will use 100 ac (40 ha) of habitat or more during the breeding season. See our response to *Comment* 63, above, for additional discussion on habitat use by the western yellow-billed cuckoo.

(65) *Comment:* Eight commenters stated that yellow-billed cuckoos were providing ecosystem services by eating caterpillars.

*Our Response:* We appreciate this additional information and have considered this in our listing determination. Yellow-billed cuckoos in eastern United States, where they are more abundant, may be numerous enough to control caterpillar populations. It is unlikely that the small

populations in the West are able to have an impact on the caterpillar population.

*Comments on Specific Habitat Areas*

(66) *Comment:* Two commenters stated that water transfers from agriculture to urban areas and from the Kern River Valley to southern California were threats to the western yellow-billed cuckoo.

*Our Response:* We appreciate this additional information and have considered this in our listing determination. We have identified the disruption of "natural" stream hydrology and flows as a threat to the species. The occupied habitat for the western yellow-billed cuckoo in the South Fork of the Kern River is upstream of the control facilities at Lake Isabella. Large-scale water diversions from the Kern River do not take place until downstream of the dam. For the Kern River, the majority of water available for potential transfer to southern California is part of a ground water storage program (underground water bank). Any actions associated with this transfer of water would not affect occupied western yellow-billed cuckoo habitat upstream.

(67) *Comment:* One commenter stated that western yellow-billed cuckoo habitat was declining along the Verde River in Arizona.

*Our Response:* We appreciate this additional information and have considered this in our listing determination. This is consistent with the pattern of habitat loss and degradation described in the Factor A section of this document.

(68) *Comment:* Several commenters pointed out the importance of the San Pedro River (AZ) and the Gila River (AZ and NM) for western yellow-billed cuckoos.

*Our Response:* We appreciate this additional information and have considered this in our listing determination. The San Pedro River has the largest population of western yellow-billed cuckoos in Arizona and one of the largest in the western DPS, and the Gila River also contains an important population of western yellow-billed cuckoos in both New Mexico and Arizona.

(69) *Comment:* Commenters in Arizona, Wyoming, Montana, and Colorado all stated that their State was fringe habitat for the western yellow-billed cuckoo and did not contribute to the conservation of the species.

*Our Response:* Southwestern Wyoming and western Montana are at the northeastern edge of the range of the western DPS of the yellow-billed cuckoo. These areas at the margin of the

BLM_0071943

range can be very important in monitoring the health of a population, as they may become unoccupied when the population is declining and reoccupied when the population is increasing. Habitat in Colorado is important for the conservation of western yellow-billed cuckoos not only for the small breeding population, but more importantly for habitat for migrating western yellow-billed cuckoos that nest to the north in Idaho. Arizona is at the center of the range of the western DPS of the yellow-billed cuckoo, and habitat there is vital to the DPS' survival.

(70) *Comment:* One commenter mentioned that land in New Mexico is being retired from agriculture, not converted to agriculture.

*Our Response:* We appreciate the commenter's statement, but they did not provide specific information on the subject. Our research on agricultural land use changes for New Mexico also did not provide any specific information on the extent, location, or nature of agricultural lands being converted or retired; however, it has been estimated that over 90 percent of riparian habitat within New Mexico has been lost during the last century (Krzysik 1990, entire).

(71) *Comment:* One commenter stated that recent information shows that yellow-billed cuckoos that breed in the eastern United States then move to northwestern Mexico and breed as was speculated in another paper is wrong.

*Our Response:* Researchers (Rowher and Wood 2013 pp. 243–250) have recently retracted an earlier assertion that yellow-billed cuckoos bred in eastern North America and then flew to northwestern Mexico and bred a second time. We have revised our discussion on the subject in this final rule.

*Comments on Factors Affecting the Species*

(72) *Comment:* Three commenters addressed the threat of proposed mining operations in the Patagonia Mountains in south-central Arizona, the declining water table, and the decline in western yellow-billed cuckoo populations in that area.

*Our Response:* We concur that gravel mining and other mining activity can impact the western yellow-billed cuckoo and its habitat. This is a localized threat that is discussed under Factor A section of the final rule. See *Factor A. The Present or Threatened Destruction, Modification, or Curtailment of its Habitat or Range,* for additional discussion on the threat of mining.

*Grazing Impacts*

(73) *Comment:* One commenter indicated that impacts to livestock ranchers are unequal east and west of the DPS line, making for unfair economic competition.

*Our Response:* According to the Act, we are to make listing determinations solely on the basis of the best scientific and commercial data available. The economic impact of listing is only considered when designating critical habitat for a listed species. We will consider the incremental impacts on livestock grazing operations during our designation of critical habitat for the species.

(74) *Comment:* One commenter stated that livestock grazing improves the ecological condition of riparian systems, while another stated that in the past cattle grazing was destructive, but that it was no longer a problem in riparian habitats.

*Our Response:* We identified past and current grazing activity in riparian areas occupied by the species to be a threat to the western yellow-billed cuckoo. We are not aware of any science or data that support the statement that livestock grazing improves the ecological condition of riparian systems. The western yellow-billed cuckoo nesting habitat is structurally complex with tall trees, a multistoried vegetative understory, low woody vegetation (Halterman 1991, p. 35), and higher shrub area than sites without western yellow-billed cuckoos (Hammond 2011, p. 48). Livestock grazing alters understory vegetation, trampling existing vegetation, reducing density, or eliminating new growth in riparian areas and thereby hampering recruitment of woody species that, when mature, provide nest sites. Furthermore, the relatively cool, damp, and shady areas favored by western yellow-billed cuckoos are those favored by livestock over the surrounding drier uplands. This can concentrate the effects of habitat degradation from livestock in western yellow-billed cuckoo habitat (Ames 1977, p. 49; Valentine *et al.* 1988, p. 111; Johnson 1989, pp. 38–39; Clary and Kruse 2004, pp. 242–243).

Controlled and seasonal livestock grazing can occur in a manner that is compatible with the management of western yellow-billed cuckoo habitat, although effective monitoring and management would most likely be needed especially in the more arid regions of the Southwest. Current grazing management practices are less harmful to riparian systems than some past practices. However, especially

during droughts, riparian zones can still be grazed in a manner that may degrade riparian habitat attributes and prevent long-term health and persistence of these systems.

*Habitat Loss*

(75) *Comment:* One commenter stated that just because California destroyed its riparian habitat that other States should not bear the burden of listing.

*Our Response:* Listing determinations are based on habitat and population trends and threats. A severe threat in one portion of the range can lead to listing throughout the range. However, for the western yellow-billed cuckoo, there is abundant evidence that riparian habitat has been lost throughout the range of the species. This loss is greater in some areas than in others, but the threats to the western yellow-billed cuckoo through habitat loss, as detailed in this final rule, are widespread and not limited to California (see **Summary of Factors Affecting the Species** for additional discussion of threats affecting the species).

(76) *Comment:* Three commenters stated that the proposed rule does not show a causal link between habitat loss and population declines.

*Our Response:* We disagree. The data and information utilized for the proposed and final rules show a strong link between the declines in the western DPS of the yellow-billed cuckoo and riparian habitat. The **Historical and Current Status** section of the proposed rule, which is incorporated (by reference) into this final rule, lists numerous examples where riparian forests were removed and the western yellow-billed cuckoo population declined. In addition, literature is referenced in the rule that provides abundant additional supporting examples connecting loss of habitat to western yellow-billed cuckoo population declines. Factor A under the **Summary of Factors Affecting the Species** section in this final rule details the threats to riparian habitat both in the past and present.

(77) *Comment:* Three commenters said that riparian habitat may have declined by 90 percent in the past, but that it now is increasing. One commenter said that there is no evidence that habitat is being adversely affected by natural or manmade factors.

*Our Response:* Riparian habitat is increasing in some areas, but at the same time is decreasing or becoming less suitable in other areas. The overall trend throughout the range of the western yellow-billed cuckoo is not known. Simply measuring the extent of riparian habitat from one time period to

the next will not tell what the effect on western yellow-billed cuckoos will be. Tens of thousands of acres of riparian habitat still exist on the Lower Colorado River, but almost all of it, with the exception of the recently planted restoration sites, is comprised only of tamarisk that does not support western yellow-billed cuckoos. Tamarisk domination has occurred on many river systems through the range of the western yellow-billed cuckoo. Along other streams like the Sacramento River, other invasive species, such as edible fig and black walnut, have become dominant, and these areas now provide lower quality habitat for western yellow-billed cuckoos even though the overall acreage of riparian habitat has risen over the past 20 years. In many river systems in the Great Basin, Russian olive (*Elaeagnus angustifolia*) is now the dominant species, and it has reduced the habitat value for western yellow-billed cuckoos. In response to the second part of the comment, the discussion under the section *The Present or Threatened Destruction, Modification, or Curtailment of its Habitat or Range* details the effect that human activities have had and are continuing to have on riparian systems throughout the range of the western yellow-billed cuckoo.

(78) *Comment:* One commenter asked that all statements regarding threats from water projects and water management should be removed from the document.

*Our Response:* Threats from water projects and water management are significant threats as detailed in the proposed and this final rule. As such, discussion of these threats is appropriate. See discussion under the *Habitat Loss from Dams and Alteration of Hydrology* section for additional information.

*Drought*

(79) *Comment:* One commenter stated that western yellow-billed cuckoos had declined because of the drought and will recover now that the rains have returned.

*Our Response:* While drought may have a negative effect on western yellow-billed cuckoo populations, the declines in the western yellow-billed cuckoo's range and populations have occurred through both wet and dry periods over the past 150 years.

*Pesticides and Disease*

(80) *Comment:* One commenter stated that dichlorodiphenyltrichloroethane (DDT) does not thin eggshells and that western yellow-billed cuckoo eggshells

in the West are thicker because there is more calcium in the West.

*Our Response:* There is a large body of literature linking environmental DDT and its derivatives (e.g., dichlorodiphenyldichloroethylene (DDE)) to eggshell thinning in birds. Calcium deficiency can cause eggshell thinning in bird eggs, but this effect has not been demonstrated through region-by-region comparisons or a population-to-population comparison. Trees and shrubs rarely show the effects of calcium deficiency within either the eastern or western range of the yellow-billed cuckoo in North America. Yellow-billed cuckoos would obtain calcium from their prey, which would obtain calcium from the leaves they eat. It is not clear that environmental calcium is more available in riparian zones in the West than it is in the East. It is also unclear as to what effect an abundance of environmental calcium has on yellow-billed cuckoo bird eggshells. There are no scientific studies that the Service is aware of on this topic.

(81) *Comment:* One commenter stated that rotenone used by Game and Fish agencies to kill fish may have injured western yellow-billed cuckoos.

*Our Response:* Although rotenone is classified as a broad-spectrum pesticide and has been used to control insects, we are not aware of any information that the use of the chemical as a piscicide (control of fish) has harmed the western yellow-billed cuckoo. The exposure risk of rotenone to terrestrial birds is low, and studies have shown that it would take levels of consumption of fish, vegetation, and/or water that are not physically possible or probable to reach a lethal dose (Finlayson *et al.* 2000, p. 193). The commenter did not provide information on the possible mechanism behind this perceived threat.

(82) *Comment:* One commenter stated that West Nile virus was a reason that yellow-billed cuckoos have declined.

*Our Response:* As discussed below in the *Disease or Predation* section, the U.S. Geological Survey's National Wildlife Health Center has identified the yellow-billed cuckoo as a species that is subject to the effects of West Nile virus and the Center for Disease Control's (CDC) Vector-Borne Disease Web site reports that West Nile virus has been documented in a dead yellow-billed cuckoo (Center for Disease Control 2012). The information on the impact of West Nile virus to the western yellow-billed cuckoo does not suggest that it has undergone a precipitous decline coincident with the relatively recent arrival of West Nile virus in western North America, and no

scientific data indicate this disease as a major factor in the western yellow-billed cuckoo's decline.

(83) *Comment:* One commenter stated that most pesticides are used in highly populated areas by people who do not follow label instructions.

*Our Response:* While this statement may be true, western yellow-billed cuckoos rarely occur in or near highly populated areas and are much more likely to be affected by application of pesticides on adjacent agricultural fields. See "Pesticides" section, below, for further information on the impacts of pesticides on the western yellow-billed cuckoo.

(84) *Comment:* Two commenters mentioned, and included references on, the new threat of neonicotinoid pesticides, which are extremely toxic to caterpillars.

*Our Response:* Neonicotinoid pesticides are systemic chemicals that are taken up through various plant parts and can be distributed through a plant's tissues. These chemicals can be applied to a plant as a seed coating, through soil contact, through irrigation water, or as a foliar spray. Many of these chemicals are long-acting, with half-lives up to 2 years. Plant tissues that have been treated are toxic to both sap-sucking (e.g., aphids and true bugs) and foliage-eating insects (e.g., caterpillars, katydids, grasshoppers, and beetles). Many of these foliage-eating insects are potential prey of the western yellow-billed cuckoo. This information has been incorporated into this final rule.

*Additional Threats*

(85) *Comment:* Several commenters stated that there were threats to western yellow-billed cuckoos that were not discussed in the proposed rule. These included threats from recreational shooting, threats from solar generation sites, and threats from wind power.

*Our Response:* All the activities may impact the western yellow-billed cuckoo. In our evaluation of threats, we identified those threats that rise to the level of being a threat to the continued existence of the species. Although these activities affect the species, we do not find that these activities would have a significant effect on the species.

*Comment on Regulatory Mechanisms*

(86) *Comment:* Five commenters stated that Factor D, inadequacy of existing regulatory mechanisms, is also a significant threat. Other commenters stated that the proposed rule ignored the Federal regulatory mechanisms that protect western yellow-billed cuckoos and their habitat.

*Our Response:* The proposed and this final rule present a detailed discussion of Federal, State, and international laws and regulations that provide some protection and conservation benefit to the western DPS of the yellow-billed cuckoo. The western yellow-billed cuckoo has continued to decline, and its habitat has continued to be lost and degraded. In determining if a species is to be added to the List of Endangered or Threatened Wildlife, the species needs only to be threatened by one of the five factors listed in section 4(a)(1) of the Act. According to our analysis of the best scientific and commercial information available, the western yellow-billed cuckoo is threatened by both Factors A and E. Our evaluation of Factor D discusses the extent to which the inadequacy of each existing regulatory mechanism exacerbates the threats evaluated in Factors A and E. An individual regulatory mechanism may reduce a threat to a greater or lesser extent, but none separately or in combination reduces any of the threats to the point that they are no longer threats to the western yellow-billed cuckoo.

*Comment on Cumulative Effects*

(87) *Comment:* Several commenters stated that the proposed rule needs more emphasis on cumulative effects.

*Our Response:* We recognize that cumulative effects are important. Cumulative effects are discussed in several sections of the proposed and this final rule, including the section of water management, grazing, climate change, and pesticide use. Please see those sections for additional information on the impacts of cumulative effects on the western yellow-billed cuckoo.

*Comment on Conservation Measures*

(88) *Comment:* Eighteen commenters discussed conservation measures and indicated that benefits from conservation measures were not discussed and that conservation measures for other species should "take care" of the western yellow-billed cuckoo. Others stated that there was a need to quantify the benefits of riparian habitat restoration to western yellow-billed cuckoos.

*Our Response:* Conservation measures and their effect on western yellow-billed cuckoos are discussed in the proposed and this final rule. The majority of currently implemented conservation measures focus on species other than the western yellow-billed cuckoo. Conservation measures that are carried out for other species may have a positive effect on the western yellow-billed cuckoo, but western yellow-billed

cuckoos, while being a riparian obligate species, have different ecological requirements than other species that are already listed (e.g., southwestern willow flycatcher and least Bell's vireo). As a result, it has not been proven that the conservation measures outlined by commenters would "take care" of the western yellow-billed cuckoo and its habitat. In regards to quantification of the benefits habitat restoration, we readily acknowledge that any well-developed and maintained restoration efforts will most likely benefit the western yellow-billed cuckoo and its habitat. However, we have found that, in some cases, even when habitat restoration has been completed, the benefit to the species has not been clear, as some areas still remain unoccupied or their numbers continue to decline.

(89) *Comment:* Two commenters were concerned that the listing of the western yellow-billed cuckoo would disrupt recovery efforts for the southwestern willow flycatcher and the Rio Grande silvery minnow (*Hybognathus amarus*).

*Our Response:* We disagree. Although additional coordination would be required to ensure that the habitat and species needs for all three species was occurring for a potential recovery action, we do not believe that that process would favor or harm any one single species in particular. In fact, by implementing recovery efforts for two or more species it would present opportunities that may be larger in scale or allow greater flexibility than smaller disjointed efforts for single species conservation.

*Comments on Potential Exemptions (Section 4(d) Rule)*

(90) *Comment:* Several commenters requested that rules under section 4(d) of the Act be included in the listing to exempt the following activities: (a) Oil and gas development and other economic activities; (b) riparian restoration activities; (c) all existing conservation activities; and (d) land and water use activities.

*Our Response:* Section 4(d) of the Act allows the Secretary the discretion to issue such regulations as [s]he deems necessary and advisable to provide for the conservation of a species. The Service's standard policy (under 50 CFR 17.31(a)) for issuing prohibitions for threatened species is to apply all the prohibitions applicable to endangered species to a threatened species unless otherwise revoked by issuance of more specific prohibitions. In the case of the western yellow-billed cuckoo, we reviewed whether the "standard" prohibitions apply or whether more specific prohibitions might be

appropriate for the western yellow-billed cuckoo. Based on our review, we have determined that modifying our "standard" regulations for a threatened species would not be necessary and advisable in providing for the conservation of the western yellow-billed cuckoo. If new or additional information is received that may suggest that a rule issued under section 4(d) of the Act may be appropriate, we would review such information and, if appropriate, issue a proposed section 4(d) rule for public comment prior to developing any final section 4(d) prohibitions for the species.

*Listing Process Public Input*

(91) *Comment:* Eight comments were received on the listing process. This included statements regarding: Inadequate public feedback, that listing decisions should reflect customs and cultures of the local community, that court settlements should not be a factor in listing decisions, and that a finding of warranted but precluded should have been maintained as a possibility.

*Our Response:* In accordance with the Act and the Administrative Procedure Act (5 U.S.C. Subchapter II), and our regulations in Title 50 of the Code of Federal Regulations (CFR), we have solicited public comment on our proposed listing action. The comment period was reopened twice to insure that the public had ample opportunity to comment on the proposed rule. Listing endangered or threatened species is a process that examines threats to the species. Although customs and cultures of local communities are important considerations, they are not part of the listing process under the Act. Court settlements were not a factor in preparation of the proposed rule to list the western DPS of the yellow-billed cuckoo as a threatened species. The court settlement simply guaranteed that the Service would do an analysis of the western DPS of the yellow-billed cuckoo and determine if it should be listed as an endangered species or a threatened species or not listed. Regarding maintaining the warranted-but-precluded category as a listing possibility, the western yellow-billed cuckoo was previously found to be "warranted but precluded," in 2001; the next step in the listing process is to either propose it for listing (and finalize the proposal if appropriate) or make a finding that the species is no longer warranted for listing.

*Use of the Best Available Scientific and Commercial Information*

(92) *Comment:* Ten commenters said that the science used in the proposed

rule is flawed, inaccurate, and biased and is not the best available science. Several commenters indicated that the Service should only select the "best" data from the data that was available.

*Our Response:* All available sources of data on distribution and abundance of yellow-billed cuckoos in the western United States were consulted, reviewed, and used in the proposed rule. We also provided the proposed rule for peer review to five knowledgeable individuals with scientific expertise that included familiarity with the yellow-billed cuckoo and its habitat, biological needs, and threats. We reviewed all comments we received from the peer reviewers for substantive issues and new information regarding the listing of the western DPS of the yellow-billed cuckoo. The peer reviewers generally concurred with our methods and conclusions, and provided additional information, clarifications, and suggestions to improve this final rule. Additional data were provided by commenters, including Federal and State wildlife and resource agencies, but none of that additional data changed the pattern of western yellow-billed cuckoo distribution and abundance presented in the proposed rule. In response to the selection of data, we conclude that it is much better to present and discuss all available pertinent data in our determinations, rather than be subjective and select which data to present and review. We have made our determination in this final rule solely based on the best available scientific and commercial data available as required by section 4(b)(1)(A) of the Act.

(93) *Comment:* One commenter stated that the Service did not cite papers in the proposed rule that were cited in the 12-month finding.

*Our Response:* The proposed rule is an updated and more thorough review of the best available information on the western yellow-billed cuckoo and is an independent document from the 12-month finding (66 FR 38611; July 25, 2001). Additional research has been completed on the species, and additional peer-reviewed papers have been published and reports written over the past 13 years that supersede previously published paper and reports. The new information in some cases has confirmed, updated, or revised older research. These are all reasons that some papers that were cited in the 12-month finding are not directly cited in the proposed rule. However, information and research cited in the 12-month finding is still part of the decisional record for the western yellow-billed cuckoo and included (by reference) in this final rule.

(94) *Comment:* One commenter said that two recent peer reviewed papers (Villarreal *et al.* 2014 and Wallace *et al.* 2013) that were not cited in the proposed rule are not valid.

*Our Response:* The Service appreciates the commenter drawing our attention to these papers that had published after the proposed rule was published in the **Federal Register** (October 3, 2013). We will evaluate these peer-reviewed papers, which deal with modeling western yellow-billed cuckoo habitat using remote sensing, and with the commenter's concerns in mind, we will consider them in our final critical habitat designation as appropriate.

(95) *Comment:* One commenter stated that they did not like the use of data from the Arizona Breeding Bird Atlas (Corman and Wise-Gervais 2005, pp. 202–203) in the proposed rule.

*Our Response:* Arizona Breeding Bird Atlas data (Corman and Wise-Gervais 2005, pp. 202–203) were used in the proposed rule to demonstrate that western yellow-billed cuckoos are found on a small percentage of the landscape in Arizona. Breeding bird atlases are an important source of information on bird distribution and abundance in areas where they are available. To not present these data would be contrary to our requirement to use the best available science in listing decisions.

*Property Rights*

(96) *Comment:* Two commenters stated that listing the western yellow-billed cuckoo will restrict property rights and access to public lands.

*Our Response:* This comment was presented generally with no specific instances or information. It is very unlikely that listing the western yellow-billed cuckoo will have the effect of limiting access to public lands. Direct human disturbance is not seen as a major threat to the western yellow-billed cuckoo as discussed in the final rule. It is unclear what the commenter meant by restriction of property rights, but it is not likely that listing the western yellow-billed cuckoo will have an adverse effect on private property ownership or use.

**Summary of Changes From Proposed Rule**

Based upon our review of the public comments, comments from other Federal and State agencies, peer review comments, and any new relevant information that may have become available since the publication of the proposal, we reevaluated our proposed rule and made changes as appropriate. Other than minor clarifications and

incorporation of additional information on the species' biology, this final rule has not changed significantly from the proposed rule. Changes to the final rule include: (1) Updates to the life-history information of the species' vocalizations and how these changes may have affected survey results for the species; (2) updates to survey data (though no new populations have been located and no major increases have been noted in the past 2 years); (3) updates to the threats in Factor A; and (4) the addition of threats of neonicotinoid pesticides in Factor E.

We did receive information from the State of Washington regarding habitat use in the Pacific Northwest including western Oregon, western Washington, and southwestern British Columbia. This information updates our *Habitat Use and Needs* section of the proposed listing rule. In describing habitat use by the species, we stated that the species requires large blocks of habitat in riparian landscapes for breeding. In the description of breeding habitat, the document generally focuses on riparian areas in arid environments as this is where the majority of confirmed breeding now occurs. The result gives the impression that the species does not currently use or has not historically used more moist riparian areas such as northern California, western Oregon, western Washington, and southwestern British Columbia, Canada, as breeding habitat. Although breeding for the western yellow-billed cuckoo has not been recently confirmed in Oregon, Washington, and British Columbia, these more moist areas are within the historic breeding range of the species. Recent observations indicate that western yellow-billed cuckoos occasionally occur in these areas and the possibility of breeding in Oregon, Washington, and British Columbia cannot be ruled out at this time. We are not including the *Habitat Use and Needs* section in this final rule, but are updating the information here and incorporating the remainder of the discussion contained in the proposed rule by reference.

**Summary of Factors Affecting the Species**

Section 4 of the Act and its implementing regulations (50 CFR 424) set forth the procedures for adding species to the Federal Lists of Endangered and Threatened Wildlife and Plants. A species may be determined to be an endangered or threatened species due to one or more of the five factors described in section 4(a)(1) of the Act: (A) The present or threatened destruction, modification, or

curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. Listing actions may be warranted based on any of the above threat factors, singly or in combination. Each of these factors is discussed below.

*A. The Present or Threatened Destruction, Modification, or Curtailment of Its Habitat or Range*

The decline of the western yellow-billed cuckoo is primarily the result of riparian habitat loss and degradation. Within the three States with the highest historical number of western yellow-billed cuckoo pairs, past riparian habitat losses are estimated to be about 90 to 95 percent in Arizona, 90 percent in New Mexico, and 90 to 99 percent in California (Ohmart 1994, pp. 276–281; DOI 1994, p. 215; Noss *et al.* 1995, pp. 37, 46; Greco 2008, p. 5). Many of these habitat losses occurred historically, and although habitat destruction continues, many past impacts have subsequent ramifications that are ongoing and are affecting the size, extent, and quality of riparian vegetation within the range of the western yellow-billed cuckoo. The connection between habitat loss and the decline of western yellow-billed cuckoos is thoroughly documented in California (Gaines and Laymon 1984, pp. 49–80). These adverse impacts to the western yellow-billed cuckoo's habitat including habitat loss and degradation are occurring now and are anticipated to continue for decades to come.

Moreover, these impacts are often subtle. As described in the Habitat Use and Needs section in the proposed rule, during the breeding season the habitat of the western yellow-billed cuckoo consists of expansive blocks of riparian vegetation containing trees of various ages, including in particular larger, more mature trees used for nesting and foraging. In order for these areas to remain as viable western yellow-billed cuckoo habitat, the dynamic transitional process of vegetation recruitment and maturity must be maintained. Without such a process of ongoing recruitment, habitat becomes degraded and is eventually lost. In our discussion below, we identify human impacts to riparian vegetation as resulting in current and ongoing destruction and modification of existing and future potential habitat for the western yellow-billed cuckoo.

Past actions by humans have resulted in changes to the landscape, the hydrology, or both such that they

prevent the riparian plants that are the basis of the species' habitat from growing at all. The consequences of these past actions may have initially resulted in destruction or modification of then-existing riparian habitat; however, once that habitat is lost, the changed conditions (such as changed hydrologic regime) also prevents riparian habitat from regenerating, even in the absence of other impacts. For example, channelization—through manmade levees or other constructs, or through channel incising as a consequence of other actions—may leave the geographical area where riparian plants once grew (such as the watercourse's floodplain) physically untouched, but the altered hydrology prevents riparian plant species from germinating and growing.

Principal causes of riparian habitat destruction, modification, and degradation in the range of the western yellow-billed cuckoo have occurred from alteration of hydrology due to dams, water diversions, management of riverflow that differs from natural hydrological patterns, channelization, and levees and other forms of bank stabilization that encroach into the floodplain. These losses are further exacerbated by conversion of floodplains for agricultural uses, such as crops and livestock grazing. In combination with altered hydrology, these threats promote the conversion of existing primarily native habitats to monotypic stands of nonnative vegetation, which reduce the suitability of riparian habitat for the western yellow-billed cuckoo. Other threats to riparian habitat include long-term drought and climate change. These threats are summarized in a recent detailed review of the literature on the subject (Poff *et al.* 2011, pp. 1241–1254). Water management and delivery throughout the western United States is contentious, and resolving issues related to water allocation is difficult and often a lengthy, heavily contested process. The exact timeframe for resolving water management and delivery issues and their impact on the western yellow-billed cuckoo and its habitat would vary on the location, resource demands, sensitive habitat or species concerns, stakeholders, and amount of water available. As a result, we would expect that resolving water issues for the various uses (agriculture, urbanization, wildlife, and tribal interests) in the west will be a lengthy ongoing process and not be resolved in the near future (10–20 years) and may take substantially longer considering the increased demands and the effects of climate

change. The Factor A threats are described in more detail below. Moreover, past and ongoing impacts to the species' habitat are working in combination with other threats, which are discussed in greater detail in Factors C and E, below.

Habitat Loss From Dams and Alteration of Hydrology Dams

Several researchers and scientific organizations including the Service reviewed the following effects of human modification of natural hydrological processes on riparian habitat, including those from dams (Poff *et al.* 1997, pp. 769–784; Greco 1999, pp. 36–38; National Academy of Sciences (NAS) 2002, pp. 145–150; Service 2002, Appendix I, pp. 1–12). Dams result in an immediate effect of destroying riparian structure and functioning due to habitat displacement from dam construction and by permanent inundation, sometimes flooding miles of upstream riparian areas. This results in the physical loss of riparian vegetation. In the absence of vegetation, the western yellow-billed cuckoo cannot breed, feed, or find shelter. Current and future releases of water downstream from dams at unnatural rates of flow or timing that differ from preconstruction hydrologic circumstances, or at too frequent or too infrequent intervals, may lead to flooding or desiccation beyond the tolerance limits of the native riparian vegetation, thus resulting in loss of habitat of the western yellow-billed cuckoo.

Dam construction has been occurring since the settlement of western North America with its peak in the mid-20th century. These include most major western rivers, many of which have a series of dams, and include, but are not limited to, the Sacramento, Kern, San Joaquin, Mojave, Snake, Gila, Salt, Verde, and Rio Grande, including 25 major reservoirs built on the Colorado and Green Rivers alone between the 1930s and 1970s (Richter *et al.* 1998, p. 332). In northern Mexico, these rivers include the Río Conchos, Yaqui, and Mayo, Río Bambuto, Río Bravo, Tubutama, La Reforma, Cuchujaqui River in Alamos, Aconchi and Baviacora in Río Sonora, and Upper San Pedro River in Sonora (Instituto del Media Ambiente y el Desarrollo Sustentable del Estado de Sonora (IMADES) 2003, p. 4; Kelly and Arias Rojo 2007, pp. 2–3; Cornell *et al.* 2008, p. 96).

There are now dozens of large dams and scores of smaller dams on rivers throughout the range of the western yellow-billed cuckoo. Today, the rate of building new dams has slowed because most of the highest quality dam sites

already have dams constructed on them. There were proposals to build two dams on Cottonwood Creek, one of the major tributaries of the Sacramento River (USACE 1982), but it is not clear when or if these dams will be built. A larger current threat is the enlargement (raising of dams or control structures) of existing dams. The enlargement of Terminus Dam on the Tule River in California by 21 ft (6.5 m) in height was completed in 2004 (Barcouda *et al.* 2006, p. 12), and proposals to enlarge Shasta Dam on the Sacramento River by up to 18.5 ft (5.7 m) in height and increasing its storage capacity (Reclamation 1999, pp. 3–8; Reclamation 2013, pp. ES 15–22) and Friant Dam on the San Joaquin River by up to 140 ft (43 m) in height are being explored (Reclamation 2003, pp. 3.1–3.8), and the raising of Lake Isabella on the Kern River by the USACE is in the final stages of implementation (USACE 2012, pp. 1–4). Larger dams with additional storage would likely flood potential western yellow-billed cuckoo habitat upstream and cause additional hydrologic disruption downstream.

While the amount of habitat lost within the construction zone of a dam is relatively small, far greater amounts of habitat are destroyed in the areas of inundation and through the ongoing effects of the amount and timing of water releases through the dam operation, which affects both upstream and downstream habitats. Ongoing downstream effects to riparian habitat from dams include changes in sediment transport due to sediment retention behind the dams so that channels below a dam become increasingly "sediment starved." This situation causes vertical erosion (downcutting), which can lead to loss of river terraces that sustain riparian vegetation (NAS 2002, pp. 145–150; Poff *et al.* 2009, pp. 773–774; Poff and Zimmerman 2010, pp. 196–197).

Ongoing operations of large dams can also dampen the magnitude of normal high flows, thus preventing cottonwood germination (Howe and Knopf 1991, p. 218), and dewater downstream reaches, causing substantial declines of riparian forests (NAS 2002, pp. 145–150). For example, Groschupf (1987, p. 19) found that almost all cottonwoods and over half of all willow trees were eliminated from one waterway in Arizona that was exposed to repeated large releases of water from a dam. This situation reduced the density of western yellow-billed cuckoos from 13 per 100 ac (40 ha) before the flooding to 3 per 100 ac (40 ha) after the flooding (Groschupf 1987, p. 19). In another example, a study of the San Joaquin River from downstream of the Friant Dam to the

Merced River confluence found that, between 1937 and 1993, the area of riparian forest and scrub decreased 28 percent, from 6,787 to 4,914 ac (2,727 to 1,989 ha), and the herbaceous riparian vegetation decreased from 4,076 to 780 ac (1,650 to 316 ha) (Jones and Stokes Associates, Inc. 1998, Chap. 5, pp. 1–2). These losses are most likely attributed to reduced stream flow down the river as a result of water diversions.

In the case of the San Joaquin River, efforts are under way for restoring a more natural functioning hydrologic system and to restore riparian habitat (Reclamation 2012, pp. 7–8). Generally, in the absence of ongoing dam operations, where areas are allowed to flood and deposit sediment, the habitat is likely to regenerate naturally. However, because of the way the majority of dams are operated, the ability for the stream courses to promote natural regeneration and maintenance of riparian habitat has been greatly diminished. These impacts are happening now and are likely to continue without changes to water release strategies and management.

After the completion of the larger dams on the Colorado River system starting in the 1930s, limited pulse flows reached the lower Colorado River in Mexico for nearly 50 years, resulting in the loss of cottonwood–willow forests and the establishment of tamarisk (Glenn *et al.* 2001, pp. 1175–1186; Nagler *et al.* 2005, pp. 1843–1844). Local decline of the western yellow-billed cuckoo and other riparian birds has been attributed to that habitat loss and degradation (Hinojosa-Huerta *et al.* 2008, p. 81). Additionally, along the Río Altar in northern Mexico, completion of the Cuauhtémoc Dam and Reservoir (Presa Cuauhtémoc) in 1950 diverted surface water and contributed to increased vegetation clearing for agriculture, degradation of mature cottonwood forests, and subsequent declines in distribution and abundance of riparian bird species associated with these forests (Flesch 2008, p. 43), including the western yellow-billed cuckoo, which is known to occur there. In addition to past habitat losses, the altered hydrology caused by dams continues to have an ongoing impact on riparian habitat.

While alteration of hydrology due to dam construction and other water supply projects has been widely implicated in the loss and degradation of downstream riparian habitat for the western yellow-billed cuckoo (Gaines and Laymon 1984, p. 73; Greco 1999, pp. 36–38; Greco 2012, pp. 8–9), some dams have resulted in temporary habitat expansion for the western yellow-billed

cuckoo within the immediate upstream influence of the associated reservoirs. For example, one of the largest concentrations of western yellow-billed cuckoo in New Mexico occurs at the inflow to Elephant Butte Reservoir on the middle Río Grande (Sechrist *et al.* 2009, p. 1; Ahlers and Moore 2011, pp. 19–20). Western yellow-billed cuckoo numbers increased following several years when water levels receded and riparian vegetation expanded into the exposed area of the reservoir pool. The western yellow-billed cuckoo population there continues to increase, likely as a result of continued drawdown from long-term drought that allows maturation of the riparian forest into suitable breeding habitat (Ahlers and Moore 2011, pp. 19–20). Drought patterns are cyclical, and, when wetter conditions return to the region, Elephant Butte Reservoir likely will be refilled. When this happens, approximately 92 percent of 44 to 87 pairs of western yellow-billed cuckoos there (detected during the 2007 and 2008 surveys) would be displaced through inundation (Reclamation 2009, pp. 64–65).

The threat to the western yellow-billed cuckoo's habitat from fluctuating water levels behind dams is likely to occur elsewhere in the range of the western yellow-billed cuckoo. In California, the State's second largest population of western yellow-billed cuckoos occurs within the inflow delta footprint of Lake Isabella, a dammed reservoir on the Kern River. Breeding western yellow-billed cuckoos are also found at other reservoir inflow deltas, such as Horseshoe Reservoir on the Verde River (Dockens and Ashbeck 2011a, p. 1) and the Tonto Creek and Salt River inflows to Roosevelt Lake in Arizona (Salt River Project 2002, pp. 61–67).

The temporary gain in riparian habitat at the inflow of reservoirs can be beneficial to the western yellow-billed cuckoo by providing large expanses of additional nesting and foraging habitat during a sequence of low-water years. However, the value of such habitat is affected by fluctuating water levels between years. Drastically fluctuating water levels with alternating inundation and desiccation cycles have been associated with fluctuations in populations of western yellow-billed cuckoos that breed in reservoir inflow sites (Laymon and Williams 2002, pp. 12–13; Henneman 2008, pp. 12–13). For example, along the Kern River, western yellow-billed cuckoo numbers increased during low reservoir levels for multiple years when vegetation recolonized the drawdown area (Laymon *et al.* 1997, p.

10), but western yellow-billed cuckoos moved to other sites during a wet year when lake levels rose and flooded out habitat (Launer *et al.* 1990, p. 10; Halterman *et al.* 2001, p. 20). When the water receded, it took up to 2 years for western yellow-billed cuckoos to return to breed in the area; however, this return was at reduced numbers even though the habitat returned to previous levels (Laymon and Williams 2002, pp. 12–13; Henneman 2008, pp. 12–13). The reason for this delay in recolonization needs further study (Henneman 2010, pp. 12–14).

The water level continues to remain below capacity at Lake Isabella due to dam safety concerns (Stewart 2012, pers. comm.). Once Lake Isabella fills again to capacity, the riparian habitat that has since formed at the inflow and that supports western yellow-billed cuckoos will become inundated, at least periodically (Whitfield 2012, pers. comm.), thereby impacting the habitat of the western yellow-billed cuckoo. In addition, the USACE and the USFS are developing a proposal and have completed a final environmental impact statement on options to repair dam deficiencies and raise the height of the dam an additional 16 ft (4.9 m) (Isabella Lake Dam Safety Modification Project Environmental Impact Statement Final October 2012). Pursuant to section 7 of the Act, consultation was completed for the proposed action, but the western yellow-billed cuckoo was not a species addressed in the biological opinion.

Lake Isabella is currently managed to minimize incidental take of the southwestern willow flycatcher (flycatcher) (*Empidonax traillii extimus*) from reservoir operations and recreation using reasonable and prudent measures developed during consultation with the Service (Service 1996, 1999, and 2005, entire). Some of these measures to conserve the flycatcher may be beneficial to the western yellow-billed cuckoo; however, the eventual inundation of the drawdown area of the reservoir will result in some degree of temporary habitat loss and degradation under current operational guidelines and may result in permanent loss of habitat for the western yellow-billed cuckoo if the proposed dam raise is implemented. Similar periods of inundation and drawdown, resulting in corresponding development and destruction of suitable western yellow-billed cuckoo habitat, occur at Roosevelt Lake (Salt River Project (SRP) 2002, entire).

In Arizona, following the high water levels of 1983–1984 and 1986 on the Bill Williams River Delta, which is influenced by fluctuating water levels

from dams in the Colorado River system (Rosenberg *et al.* 1991, pp. 18–23), the western yellow-billed cuckoo numbers declined by 70–75 percent. Habitat has since improved on the Bill Williams River Delta, but western yellow-billed cuckoo numbers remained low for several years (Laymon and Halterman 1987a, pp. 10–18). The actual mechanism that influences the yellow-billed cuckoo's response to fluctuations in water levels is unknown, but loss of prey has been implicated; areas that were inundated normally support ground-nesting invertebrates, such as katydids and sphinx moths, that western yellow-billed cuckoos feed upon, and it may take several years for these prey populations to rebound (Laymon and Williams 2002, pp. 12–13; Henneman 2008, pp. 12–13).

In Sonora, Mexico, large dams exist on the Mayo, Yaqui, and Sonora Rivers (Villaseñor-Gomez 2006, p. 107). We do not have information on the magnitude or frequency of effects, positive or negative, from water management activities, to the western yellow-billed cuckoo in those locations. However, we have no reason to believe that the dams are managed in a substantially different manner in Mexico than dams in the southwestern United States, and the effects to riparian habitat are expected to be similar.

Despite some positive effects of dams on increasing western yellow-billed cuckoo habitat in a few areas, these gains in habitat are only temporary, and overall, the net effect of dams on the species has been negative. As such, dams and their ongoing operations are a threat to the western yellow-billed cuckoo over most of its range. This threat has resulted in substantial historical losses of western yellow-billed cuckoo habitat resulting in a curtailment of the species' range. The ongoing operation of these dams is likely to have minor impacts to the species at any given location, but because so many of the waterways within the range of the species have been dammed, we believe this threat has a substantial cumulative impact on the habitat of the western yellow-billed cuckoo, especially when considered with other threats. Moreover, we expect the operation of these dams will continue in a similar manner for decades to come, and thus we expect this threat to be an ongoing impact to the western yellow-billed cuckoo's habitat.

The areas where the floodplain is still hydrologically connected to the river and has relatively unconstrained riverflow, such as in some areas of California and Sonora, Mexico, support

the highest number of western yellow-billed cuckoos (Villaseñor-Gomez 2006, pp. 107–108; Greco 2008, p. 6; Greco 2012, pp. 8–9). For example, the Sacramento River from Red Bluff to Colusa has a highly dynamic mosaic of habitat patches of varying ages that form, disappear, and reform in response to active river channel processes that operate over decades (Greco 2008, p. 6; Greco 2012, pp. 8–9). Although this section of the Sacramento River is also affected by altered hydrology, it is far enough below Shasta Dam and below several major undammed tributaries, such as Cottonwood Creek and Battle Creek, that it still has flood events every few years that help support riparian habitat processes (Werner 2012, pers. comm.).

The river provides habitat characteristics that Laymon (1998, p. 4) indicated were important for the western yellow-billed cuckoo in California, such as a meandering system with young riparian habitat that, compared to mature woodlands, provides preferred nesting sites; high productivity of invertebrate prey; and reduced predator abundance (Laymon 1998, p. 4). Another example of relatively intact riparian habitat in the range of the western yellow-billed cuckoo is found in the highlands of central Sonora, Mexico, which supports occupied habitat of the western yellow-billed cuckoo. Villaseñor-Gomez (2006, p. 108) found that the maintenance of the natural flooding regimes due to the limited number of water development structures has allowed riparian vegetation along sections of the Sonora, Moctezuma, and Sahiaripa Rivers to persist in very good condition in some areas. Most of the known occurrences of western yellow-billed cuckoo in central Sonora are associated with these regions.

We conclude that dams continue to affect both the downstream and upstream habitat through alteration of flows. These effects can include widely fluctuating water levels at inflow sites that inundate nesting habitat, limit food resources, and flood or desiccate habitat (Poff *et al.* 1997, pp. 769–784; Greco 1999, pp. 36–38; NAS 2002, pp. 145–150; Service 2002, Appendix I, pp. 1–12). Downstream effects caused by sediment retention behind dams, or sediment scouring and removal caused by excessive water releases, do not mimic the natural flow regimes and often result in the inability for cottonwoods to become established or regenerate and provide habitat for the western yellow-billed cuckoo. Woody and herbaceous debris accumulates in the absence of these scouring flows,

BLM_0071950

increasing fire risk and intensity (Stromberg and Chew 2002, pp. 195–219) (see section on Wildfire below).

Dams and their flow modifications have ongoing effects to habitat and will likely do so for decades to come, further modifying the habitat of the western yellow-billed cuckoo. Therefore, direct and indirect destruction of riparian habitat resulting from altered hydrology from past dam-building activities continues to contribute to the curtailment of the range of the western yellow-billed cuckoo. Additionally, as a result of future predicted climate change (see Climate Change section below), the climate within the range of the western yellow-billed cuckoo will likely become drier, which will increase the demand for water storage and conveyance systems, which in turn will likely increase the frequency and severity of impacts on western yellow-billed cuckoo habitat (Stromberg et al. 2013, pp. 411–415).

Surface and Ground Water Diversion

Water extractions, both from surface water diversions and ground water pumping, can negatively affect riparian vegetation (Poff et al. 1997, pp. 769–784; Service 2002, Appendix I, pp. 1–8). Water diversions and withdrawals can lower ground water levels in the vicinity of riparian vegetation. Because ground water and surface water are generally connected in floodplains, lowering ground water levels by only about 3 ft (1 m) beneath riparian areas is sometimes sufficient to induce water stress in riparian trees, especially in the western United States (NAS 2002, p. 158). Physiological stress in native vegetation from prolonged lower flows or ground water results in reduced plant growth rate, morphological change, or mortality, and altered species composition dominated by more drought-tolerant vegetation, and conversion to habitat dominated by nonnative species (Poff et al. 1997, p. 776). These effects reduce and degrade habitat for the western yellow-billed cuckoo for foraging, nesting, and cover.

Adverse effects of excessive ground water extraction on riparian vegetation have been well-documented in the southwestern United States. Case histories on many river systems in Arizona including the Santa Cruz River and on the Owens River in California have documented the connection between overutilization of the ground water, lowering of the water table, and the decline and eventual elimination of riparian vegetation (Zektser et al. 2005, pp. 400–401; Webb and Leake 2006, pp. 317–320). Ground water extraction

is also affecting river flows and riparian vegetation along rivers that support the western yellow-billed cuckoo in Mexico, including the Río Conchos in Chihuahua (Kelly and Aria-Rojo 2007, p. 174; Cornell et al. 2008, p. 98) and the Río Altar in Sonora, where the quantity of surface water declined greatly between 2000 and 2007 (Flesch 2008, pp. 44–45). Therefore, ground water extraction and water diversions create an ongoing threat to western yellow-billed cuckoo habitat.

The hydrologic regime (stream flow pattern) and supply of (and interaction between) surface and subsurface water is a driving factor in the long-term maintenance, growth, recycling, and regeneration of western yellow-billed cuckoo habitat (Service 2002, p. 16). As streams reach the lowlands, their gradients typically flatten and surrounding terrain opens into broader floodplains (Service 2002, p. 32). In these geographic settings, the stream-flow patterns (frequency, magnitude, duration, and timing) will provide the necessary stream-channel conditions (wide configuration, high sediment deposition, periodic inundation, recharged aquifers, lateral channel movement, and elevated ground-water tables throughout the floodplain) that result in the development of riparian habitat suitable for use by western yellow-billed cuckoos (Poff et al. 1997, pp. 770–772; Service 2002, p. 16).

Allowing the river to flow over the width of the floodplain, when overbank flooding occurs, is integral to allow deposition of fine moist soils, water, nutrients, and seeds that provide the essential material for plant germination and growth. An abundance and distribution of fine sediments extending farther laterally across the floodplain and deeper underneath the surface retains much more subsurface water, which in turn supplies water for the development of the vegetation that provides western yellow-billed cuckoo habitat and microhabitat conditions (Service 2002, p. 16). The interconnected interaction between ground water and surface water contributes to the quality of the riparian vegetation community (structure and plant species) and will influence the ability of vegetation to germinate, regenerate, and maintain its foliage density, vigor, and species composition (Arizona Department of Water Resources 1994, pp. 31–32).

In many instances, western yellow-billed cuckoo breeding site occur along streams where human impacts are minimized enough to allow more natural processes to create and maintain the habitat. However, there are also

breeding sites that are supported by various types of supplemental water including agricultural and urban runoff, treated water outflow, irrigation or diversion ditches, reservoirs, and dam outflows (Service 2002, p. D–15). Although the waters provided to these habitats might be considered "artificial," they are often important for maintaining the habitat in appropriate condition for breeding western yellow-billed cuckoos within the existing environment.

Encroachment of Levees and Flood Control and Bank Stabilization Structures Into the River Channel and Floodplain

Other alterations in river hydrology with ongoing effects on western yellow-billed cuckoo habitat include river channelization, construction of levees, bank stabilization, and placement of any flood control structures that encroach into the river and its floodplain. These actions result in direct loss of habitat from construction and from maintenance activities that remove woody vegetation that has become established on the structures. Furthermore, these structures are effective, by design, at severing the hydrologic connection of the river's main channel and the river's immediate floodplain, thereby preventing overbank flooding. By preventing overbank flooding, levees and other similar structures reduce the amount of water available to riparian vegetation in the floodplain, which results in desiccation and eventual loss and degradation of riparian habitat (Vogl 1980, pp. 84–86; NAS 2002, p. 155; Greco 2012, pp. 8–9). Such effects are less destructive, however, for those levees located farther from the stream system, such as those outside the meander belt of a river (Greco 2012, p. 4).

As an illustrative example, we provide a brief summary of how river channelization, construction of levees close to the river, and rock riprap armoring along the levees have caused destruction and modification of western yellow-billed cuckoo habitat on the Sacramento River, one of the most substantial historical nesting and foraging habitat areas for the western yellow-billed cuckoo. The Sacramento River is now disconnected from ecological processes that both renew and restore riparian and aquatic habitats (Laymon and Halterman 1987a, pp. 11–14; Halterman 1991, pp. 1–2; Greco 2008, p. 6; Greco 2012, pp. 8–9). More than one-half of the Sacramento River's banks in the lowermost 194 mi (312 km) of river have now been rip-rapped by 40 years of bank protection (Service

2000, pp. 26–29). Rock riprap armoring a river reach often changes the river dynamics and leads to channel downcutting and erosion immediately downstream from the riprap. Therefore, riprapping banks leads to the need for more riprapping.

Channelizing the river and severing the connection to the floodplain has severely altered the natural disturbance regime that would have allowed riparian habitat to regenerate now and in the future (Poff *et al.* 1997, pp. 769–784; Greco 2008, p. 6; Greco 2012, pp. 8–9). The result is that much of the river's remaining riparian habitat is modified, and now occurs in narrow, disconnected, linear strips (Service 2000, pp. 26–29; Halterman *et al.* 2001, p. 4) that are not utilized by the western yellow-billed cuckoo for breeding (Gaines 1974, p. 204; Greco 2012, p. 9). With the example of the Sacramento River, nesting western yellow-billed cuckoos no longer occur south of Colusa as the river has been channelized and riprapped from that point into the Sacramento-San Joaquin River Delta. These flood control and bank stabilization structures also keep the riparian habitat from regenerating and maturing. The factors that reduce western yellow-billed cuckoo breeding in these areas are not well-understood, but reductions of breeding population have been attributed to lack of patches of adequate size for nesting (Greco 2012, pp. 8–9), increased predators, and the species' inability to use highly isolated patches (Halterman 1991, pp. 33–38), as discussed under Factor E. The Sacramento River is but one of many rivers within the range of the western yellow-billed cuckoo where these activities have destroyed and modified riparian habitat and where the ramifications of these past actions are continuing to impact the western yellow-billed cuckoo's habitat today. These ongoing impacts will likely continue for decades to come.

An additional pervasive threat is the design of open-channel flood control channels with inappropriately smooth roughness coefficients. This creation over-scours the floodplains and requires removal of woody riparian vegetation that regenerates on floodplains, which in turn leads to floodplains with no western yellow-billed cuckoo habitat (Greco 2013, pp. 707–717).

Transportation Systems

Similarly, transportation systems have directly and indirectly altered a large number of riparian areas in western North America (NAS 2002, p. 182). Road and rail systems are frequently sited along rivers, and often entail removing riparian vegetation for construction of the roadbed, and modifying local hydrology to reroute surface water and ground water. Bridges or culverts require abutments along the bank to provide roadway support. Because abutments and roadbeds physically constrain the stream, future lateral adjustments by the stream, which can affect floodplain dynamics, are effectively eliminated, which reduces and degrades riparian habitat (NAS 2002, p. 182). Such impacts result in additional destruction and modification of habitat for the western yellow-billed cuckoo. In comparison with construction of dams and altered hydrology, this threat, by itself, is less likely to result in severe impacts to riparian habitat. However, this threat is but one of many that, in combination, results in substantial changes to physical and hydrological properties of a watercourse, which in turn contributes to a substantial curtailment in the habitat of the western yellow-billed cuckoo.

Gravel Mining

Other past and ongoing effects to riparian habitat result from gravel mining (Kondolf *et al.* 2001, pp. 54, 59). Extraction of gravel, primarily for construction products, typically occurs along rivers and adjacent floodplains where gravel deposits are naturally found. Large amounts of gravel removal from the stream and active floodplain result in channel downcutting or incision, which affects groundwater levels, frequency of overbank flows, bank stability, and the extent and character of riparian vegetation of specific stream reaches (Collins and Dunne, 1989, pp. 213–224; Kondolf 1995 pp. 133–136; NAS 2002, p. 179). Some examples of downcutting on streams in California that historically had, but no longer have, populations of western yellow-billed cuckoos, include: Cache Creek, Yolo County (15.0 ft (4.6 m) average and 26.0 ft (8.2 m) maximum downcutting); Merced River, Merced County (5.9 ft (1.8 m) average and 7.8 ft (2.4 m) maximum downcutting); Putah Creek, Yolo County (7.8 ft (2.4 m) average and 15.0 ft (4.6 m) maximum downcutting); Russian River, Sonoma County (11.4 ft (3.5 m) average and 17.9 ft (5.5 m) maximum downcutting); and Santa Clara River, Ventura County (15.6 ft (4.8 m) average and 20.2 ft (6.2 m) maximum downcutting) (Kondolf *et al.* 2001, p. 50).

Furthermore, gravel extraction creates a knickpoint (a sharp change in channel slope) that typically erodes upstream in a process known as headcutting, which has the potential to propagate upstream for miles on the main river and its tributaries. As headcuts migrate upstream, the incision propagates upstream (Kondolf *et al.* 2001, p. 49). This process creates ongoing and future impacts to habitat from past as well as current gravel mining operations. Similar to the effects of manmade levees when they disconnect floodplain habitat from the active river channel, artificial channel incision as a result of gravel mining and similar activities reduces overbank flooding. This situation reduces the hydrological connection to the floodplain (Kondolf *et al.* 2001, p. 56), thereby resulting in subsequent loss and degradation of riparian habitat for the western yellow-billed cuckoo, throughout its range, including Mexico (Cornell *et al.* 2008, p. 98). The effects of incision and channel erosion are further exacerbated where gravel mining occurs in sediment-starved reaches below dams (Kondolf *et al.* 2001, p. 10). We expect past and ongoing gravel mining activities, either alone or in combination with other hydrological changes in riparian areas, to continue to modify habitat and further curtail the range of the western yellow-billed cuckoo for decades.

In conclusion, dams, channelization, and other manmade features that alter the watercourse hydrology and encroach into the active channel and floodplain are threats to the habitat of the western yellow-billed cuckoo because they, separately or in combination, significantly reduce and degrade nesting and foraging habitats. The natural processes that sustain riparian habitat in these and similar dammed and channelized river systems in the American West and in northwestern Mexico have been altered, resulting in only fragments or remnants of formerly large tracts of native riparian forests that no longer support breeding western yellow-billed cuckoos or support them in fewer numbers. The multiple effects from altered hydrology comprise the most widespread and greatest magnitude of current threats to habitat that supports the western yellow-billed cuckoo. Such processes continue to modify habitat and further curtail the range of the western yellow-billed cuckoo. Moreover, we expect these alterations in the hydrology to continue to affect habitat of the western yellow-billed cuckoo into the future.

Habitat Loss and Degradation From Agricultural Activities

Following the effects from alterations in hydrology in severity, conversion of riparian areas for agricultural crops and livestock grazing has been, and continues to be, a major contributor to

riparian habitat loss and degradation (NAS 2002, p. 161; Johnson et al. 2007, p. 61).

Large areas of cottonwood–willow floodplain vegetation have been converted to agricultural uses, further reducing the extent of habitat available to western yellow-billed cuckoos for breeding (Swift 1984, pp. 225–226; Rosenberg et al. 1991, pp. 18–23). For example, within areas that support the western yellow-billed cuckoo, clearing for agricultural uses occurred extensively in the past. On the floodplains of the Sacramento River (Greco 1999, pp. 2, 107), riparian habitat was reduced from 775,000 ac (314,000 ha) in the 1850s to less than 18,000 ac (7,287 ha) by 1977 (Swift 1984, p. 226). Clearing for agriculture is also extensive along the lower Colorado River (Rosenberg et al. 1991, pp. 18–23), San Pedro River, Gila River (Swift 1984, p. 226), Río Grande, and several river courses in northern Mexico including, but not limited to, the Río Yaqui, Río Mayo, Río Bambuto, Río Tubutama, and Río Sonora (Russell and Monson 1998, p. 11; IMADES 2003, p. 4; Villaseñor-Gomez 2006, p. 108). Clearing also occurred along the coasts of Sinaloa and southern Sonora, Mexico, resulting in massive losses of thorn forest to industrial agriculture (Rohwer et al. 2009, p. 19054).

Although most riparian and thorn scrub habitat losses largely stem from past agricultural clearing, effects from cultivated agricultural lands are ongoing. Agricultural lands continue to dominate much of the remaining riparian landscape, particularly along the Sacramento (Greco 1999, pp. 94, 104, 107), parts of the Gila, and lower Colorado Rivers (Johnson et al. 2007, p. 207); along the latter, 65 percent of western yellow-billed cuckoo survey sites are bordered on at least one side by agriculture fields (Johnson et al. 2007, p. 61). Riparian areas are sometimes viewed as a potential source of plant and animal pests, a source of shade that may reduce crop yields, and competition for scarce water resources (NAS 2002, pp. 170–171). For example, in the Salinas Valley in California, a vigorous program is under way to comply with food safety practices that involve the clearing of riparian habitat adjacent to certain types of crops in an effort to eliminate wildlife presence, which has been linked to contamination of crops with a virulent strain of the bacteria *Escherichia coli* (Beretti and Stuart 2008, pp. 68–69; Gennet et al. 2013, pp. 236–242). While western yellow-billed cuckoos do not currently breed along the Salinas River (Gaines and Laymon 1984, p. 52), if these same rules are applied to farmland along the Gila, Rio Grande, Sacramento, and Colorado Rivers, western yellow-billed cuckoo habitat could be eliminated to meet these food safety concerns.

Accidental fire from farm workers operating machinery or burning weeds sporadically escapes into adjacent riparian habitat. Recent fires on western yellow-billed cuckoo and southwestern willow flycatcher conservation properties occurred in 2011, burning 58 ac (24 ha) and 6 ac (2 ha), respectively, within the Fort Thomas Preserve, on parcels owned by the Salt River Project and U.S. Bureau of Reclamation. Both fires were determined to be human-caused, likely from farm workers burning weeds along irrigation drains (SRP 2011, p. 39).

Other ongoing effects from cultivated agriculture on the western yellow-billed cuckoo are addressed under Factor E. These include fragmentation of habitat into smaller, more widely disjunct patches; ongoing influence of agriculture on riparian bird community composition; and effects from pesticides, which can negatively impact insect prey populations of the western yellow-billed cuckoo.

Habitat Loss and Degradation From Livestock Grazing Activities

Domestic livestock grazing is a traditional agricultural land use practice in the southwestern United States since the first Spanish settlement along the Rio Grande in New Mexico in 1598 (Little 1992, p. 88; Clary and Kruse 2004, p. 239). Livestock grazing continues to be a widespread agricultural use of riparian areas in the western United States and is one of the most common sources of past and ongoing riparian habitat degradation (Carothers 1977, p. 3; Rickard and Cushing 1982, pp. 2–4; Cannon and Knopf 1984, p. 236; Klebenow and Oakleaf 1984, p. 202; Swift 1984, pp. 225–226; Clary and Webster 1989, pp. 1–2; Schultz and Leininger 1990, pp. 298–299; Bock et al. 1993, p. 300). Livestock grazing occurs in western yellow-billed cuckoo habitat along sections of the middle Rio Grande in New Mexico (Lehman and Walker 2001, p. 12), Río Conchos (Cornell et al. 2008, p. 96), Río Bambuto, Tubutama, La Reforma, and Cuchujaqui River in Alamos, Aconchi and Baviacora in Río Sonora, and upper San Pedro River (IMADES 2003, p. 4), and several other rivers in central Sonora, Mexico (Villaseñor-Gomez 2006, p. 108). Grazing also occurs extensively along watercourses in a protected reserve on the Río Aros and Río Yaqui in Sonora, Mexico, where the western yellow-billed cuckoo has been documented (O'Brien et al. 2008, p. 8). Grazing intensity in northern Sonora, Mexico, is generally much higher than in adjacent Arizona (Balling 1988, pp. 106–107; Flesch 2008, pp. 44–45), which leads to greater degradation of riparian habitat than in Arizona.

The Service (2002, Appendix G, pp. 5–7) and Krueper et al. (2003, p. 608) reviewed the effects of livestock grazing, primarily in southwestern riparian systems. The frequency and intensity of effects vary across the range of the species, due to variations in grazing practices, climate, hydrology, ecological setting, habitat quality, and other factors (Service 2002, Appendix G, p. 1). However, these effects generally include the removal and trampling of vegetation and compaction of underlying soils, which can inhibit germination and change hydrology (Rea 1983, p. 40; Belsky et al. 1999, pp. 419–431) and promote the dispersal of nonnative plant species. Such effects are most significant when riparian areas have been subject to overuse by livestock (NAS 2002, pp. 24, 168–173). Overuse occurs when grazed vegetation does not recover sufficiently to maintain itself and soils are left bare and vulnerable to erosion. Over time, livestock grazing in riparian habitats, combined with other alterations in streamflow, typically results in reduction of plant species diversity and density and may increase the distribution and density of nonnative tamarisk by eliminating competition from native cottonwood and willow saplings, which are preferred forage for livestock (Krueper et al. 2003, p. 608).

Long-term cumulative effects of livestock grazing involve changes in the structure and composition of riparian vegetation (Service 2002, Appendix G, pp. 5–7), which may affect suitability of habitat for western yellow-billed cuckoo breeding and prey population abundance. The western yellow-billed cuckoo nesting habitat is structurally complex with tall trees, a multistoried vegetative understory, low woody vegetation (Halterman 1991, p. 35) and higher shrub area than sites without western yellow-billed cuckoos (Hammond 2011, p. 48). Livestock grazing alters understory vegetation, reducing height and density or eliminating new growth in riparian areas, and thereby hampering recruitment of woody species that, when mature, provide nest sites. Furthermore, the relatively cool, damp, and shady areas favored by western yellow-billed cuckoos are those favored by livestock over the surrounding drier uplands. This preference can

concentrate the effects of habitat degradation from livestock in western yellow-billed cuckoo habitat (Ames 1977, p. 49; Valentine *et al.* 1988, p. 111; Johnson 1989, pp. 38–39; Clary and Kruse 2004, pp. 242–243).

Removal, reduction, or modification of cattle grazing has resulted in increases in abundance of some riparian bird species. For example, Krueper (1993, pp. 322–323) documented responses of 61 bird species, most of which increased significantly 4 years after removal of livestock grazing in Arizona's San Pedro River Riparian National Conservation Area. The bird species guilds that increased most dramatically were riparian species, open-cup nesters, Neotropical migrants, and insectivores, all species that share characteristics with the western yellow-billed cuckoo. The western yellow-billed cuckoo numbers in the study increased, although not significantly (p=0.13) (Krueper *et al.* 2003, p. 612), but their survey methodology was not designed to detect western yellow-billed cuckoos. Recovery of vegetation in response to grazing removal in that study was quickest and most pronounced in the lower vegetation layers, the most accessible to grazing cattle. Thus, this situation would allow a greater number of seedlings and saplings of cottonwoods and other nest trees to attain maturity as suitable nesting sites.

In another example, livestock grazing was terminated along portions of the South Fork Kern River at the Kern River Preserve in the 1980s, and western yellow-billed cuckoos increased in number in the years following livestock removal. Smith (1996, p. 4) contended that termination of grazing at the Kern River Preserve was responsible for the dramatic increase in riparian vegetation, which was concurrent with the increase in western yellow-billed cuckoo numbers. These examples suggest that even severely degraded riparian systems can recover quickly, in at least some cases, after livestock removal (Krueper *et al.* 2003, p. 615), and that damage to riparian vegetation from grazing is at least partly reversible. They also illustrate the extent to which livestock grazing destroys and modifies nesting and foraging habitat of the western yellow-billed cuckoo.

In conclusion, most of the direct loss of habitat from agricultural conversion has occurred in the past, but ongoing agricultural activities, in whole or in combination with other impacts, especially those that result in changes in a watercourse's hydrology, have resulted in the curtailment of nesting and foraging habitat for the western

yellow-billed cuckoo by restricting or preventing the growth of riparian plants, and such activities present an ongoing threat. Most of the current impacts from agricultural land uses arise from livestock overgrazing in riparian areas. Riparian vegetation can recover relatively quickly from these effects after livestock removal (Smith 1996, p. 4; Krueper *et al.* 2003, p. 615). However, without proper management to reduce overgrazing, ongoing overgrazing will continue to contribute to habitat modification in the range of the western yellow-billed cuckoo into the future.

Habitat Loss and Degradation Due to Conversion to Nonnative Vegetation

Throughout most of its range, habitat for the western yellow-billed cuckoo is threatened by the conversion of native riparian woodlands to riparian vegetation dominated by tamarisk and other nonnative vegetation. The major threat from this habitat conversion is the change from vegetation that supplies the western yellow-billed cuckoos with essential food and adequate thermal cover to vegetation that does not provide these necessary components of habitat for the western yellow-billed cuckoo. The establishment and persistence of tamarisk is often, but not always, aided by altered hydrology, as described above. Altered hydrology is not the cause for establishment and persistence of other types of nonnative vegetation; therefore, we present information on nonnative vegetation in this separate section.

Tamarisk is the most widespread nonnative woody plant species found in habitat for the western yellow-billed cuckoo. Glenn and Nagler (2005, pp. 420–423) provide most of the following overview of tamarisk. Tamarisk is present in nearly every southwestern riparian plant community, but varies in dominance from stream to stream. On streams where altered hydrology can no longer support native species, it has replaced native plant communities entirely, but occurs at a low frequency on other streams. Tamarisk was introduced into western North America in the 1800s to serve as ornamental windbreaks, and for erosion control and other purposes. Several species escaped cultivation and have since spread rapidly. The center of tamarisk distribution is currently Arizona, New Mexico, and Utah, and it has spread throughout most of the range of the western yellow-billed cuckoo at least as far north as the Yellowstone River in Montana in the Rockies, and at least as far south as the Yaqui River Valley in Sonora, Mexico. Recent studies in the northwest have located major

populations of tamarisk in southwestern Idaho, and eastern Washington and Oregon. Models based on projected climate change predict that this invasive species will become more dominant in this region over the next 100 years (Kerns *et al.* 2009, pp. 200–215). Tamarisk also occurs west to the Owens, San Joaquin, and Sacramento Rivers in California, although it is still nearly absent from the mainstem Sacramento River in California and suitable habitat west of the Cascades in Oregon and Washington.

Tamarisk also occurs as isolated individuals along sections of the Sonora, Moctezuma, and Sahiaripa Rivers in Sonora, Mexico, where the hydrology has been little altered by human modifications (Villaseñor-Gomez 2006, pp. 107–108). Its presence is highly variable within sections of the Río Conchos in Chihuahua, Mexico, and becomes dominant in some reaches of that river (Kelly and Arias Rojo 2007, pp. 177–178; Cornell *et al.* 2008, p. 4).

The threshold (in terms of percent tamarisk) for abandonment of a riparian system by western yellow-billed cuckoos is not known. They are not found in areas that are totally dominated by tamarisk with the complete lack of willows or cottonwoods. In California, two native-dominated areas occupied in 1977 by several pairs of western yellow-billed cuckoos had, by 1986, converted to monotypic stands of tamarisk and were found to be uninhabited by western yellow-billed cuckoos. Above Laguna Dam on the Colorado River in 1977, at least three pairs of western yellow-billed cuckoos occupied a 30-ac (12-ha) site that was approximately 20–40 percent willow (Laymon and Halterman 1987a, p. 12). By 1986 no western yellow-billed cuckoos were detected on the site where the dominant vegetation had become tamarisk, with less than 1 percent willow cover. In the vicinity of Picacho State Recreation Area, on the California side of the Colorado River, in 1977, 21 western yellow-billed cuckoos were found in 297 ac (120 ha) of a 230-ft-wide (70-m-wide) willow forest (Gaines and Laymon 1984, p. 72). By 1986, tamarisk and aquatic vegetation dominated this area, and no western yellow-billed cuckoos were found in the 12 ac (5 ha) of scattered willow–cottonwood habitat that remained (Laymon and Halterman 1987a, pp. 12–13).

Human disturbance, such as water diversion, flood control, vegetation clearing, and improper grazing management, often facilitates replacement of native vegetation with tamarisk (Kerpez and Smith 1987, pp.

BLM_0071954

**60022**   **Federal Register** / Vol. 79, No. 192 / Friday, October 3, 2014 / Rules and Regulations

1–5; Hunter *et al.* 1988, p. 113; Rosenberg *et al.* 1991, pp. 18–23). Altered hydrologic regimes (flooding or reduction in water flows from dams) has disrupted natural flooding events that are essential for maintaining native riparian ecosystems (Vogl 1980, pp. 84–86; Rosenberg *et al.* 1991, pp. 18–23), and the disruption (usually elimination) of flooding tends to favor tamarisk. In contrast to native cottonwoods, tamarisk does not need flooding to regenerate (Kerpez and Smith 1987, pp. 1–5).

Tamarisk is also tolerant of high salt levels, which can be present in river systems as a combined result of water diversions that lower the near-surface ground water and irrigation water runoff that contains high levels of dissolved salts (Kerpez and Smith 1987, pp. 1–5; Busch and Smith 1993, pp. 186–194). This higher tolerance to water stress and salt accumulation is a principle mechanism by which tamarisk has become dominant on some regulated western rivers (Glenn and Nagler 2005, p. 439). In addition, tamarisk takes salts from the ground water and exudes them from its leaves, rendering the soil even more unsuitable for germination of native riparian vegetation. This is a significant problem in streams with artificially reduced streamflows where salts accumulate and are not flushed from the system. These factors favor regeneration of tamarisk over native trees and shrubs and are an ongoing threat. Additional areas of native habitat are continuing to be lost to this process. In summary, the persistence and expansion of tamarisk-dominated habitat is the result of multiple forms of ongoing human-related disturbances, which result in degradation of native-dominated riparian habitat, thus reducing its suitability as breeding habitat for the western yellow-billed cuckoo.

Other nonnative tree and shrub species have become established within the range of the western yellow-billed cuckoo. In western Colorado and Utah, Russian olive (*Elaeagnus angustifolia*) has become established and is a dominant tree species in many riparian systems. Giant reed (*Arundo donax*), common edible fig (*Ficus carica*), and the Himalayan blackberry (*Rubus discolor*) are some of the more conspicuous nonnative plants widely established along the Sacramento River, with Himalayan blackberry dominating the understory at some restoration sites (Borders *et al.* 2006, p. 310). Along the Sacramento River, western yellow-billed cuckoos were far less likely to be detected at sites with an understory dominated by Himalayan blackberry than sites with a predominant native

understory. Himalayan blackberry may prevent establishment of native understory species due to its dense growth habit (Hammond 2011, pp. 48–49). Nesting of the western yellow-billed cuckoo has not been documented in riparian stands dominated by giant reed, common fig, or Himalayan blackberry that lack at least some native canopy trees.

In conclusion, because of the absence or near absence of nesting by western yellow-billed cuckoos in nearly monotypic stands of tamarisk and other nonnative vegetation, the available literature suggests that conversion of native or mixed (native and nonnative) riparian woodlands to nearly monotypic stands of tamarisk and other nonnative vegetation, coupled with the inability of native vegetation to regenerate under altered hydrological conditions, is a significant threat to the western yellow-billed cuckoo now and in the future. Nonnative vegetation, such as tamarisk, occurs across most of the range of the western yellow-billed cuckoo; its establishment can be caused by altered hydrology or other disturbances, which are widespread throughout the range. We expect nonnative vegetation to increasingly modify and curtail habitat for the western yellow-billed cuckoo within a majority of its range in the United States and northern Mexico into the future.

Use of Tamarisk by Western Yellow-Billed Cuckoos and the Spread of the Introduced Tamarisk Leaf Beetle Into the Southwest

Western yellow-billed cuckoos use habitat with some tamarisk component for nesting in southern California, Arizona, and western New Mexico, but are not found in monotypic stands of tamarisk. Western yellow-billed cuckoo presence in tamarisk-dominated habitats does not necessarily equate to habitat suitability (Sogge *et al.* 2008, p. 149; Hammond 2011, p. 50), and additional research is needed to determine productivity, survivorship, physiological condition, and food availability in these habitats.

Tamarisk can add to foliar cover that contributes toward reducing temperatures in riparian areas (Paxton *et al.* 2011, p. 259). Even relatively small decreases in foliar cover may render a site unsuitable for nesting western yellow-billed cuckoos (Paxton *et al.* 2011, p. 260). Removal of tamarisk in drainages occupied by western yellow-billed cuckoos can have unintended negative consequences if the removal leaves little or no woody vegetation and native riparian vegetation is unable to reestablish. The available literature that

pertains to riparian restoration in New Mexico and Arizona (Poff *et al.* 1997, pp. 769–784; Glenn and Nagler 2005, pp. 439–441; Sogge *et al.* 2008, pp. 151–152; Stromberg *et al.* 2009, pp. 181–182) suggests that restoration of natural hydrological processes, rather than direct removal programs, would be a more effective method for promoting regeneration of native riparian vegetation and diminishing the presence of tamarisk. However, tamarisk removal programs coupled with native riparian plantings can speed up the restoration process assuming that the hydrologic system will support the native vegetation.

Tamarisk leaf beetle insects (leaf beetles) (*Diorhabda* spp.) were released into many locations throughout the southwest to control tamarisk. Leaf beetles are now spreading within the more arid range of the western yellow-billed cuckoo on Nevada, Utah, Arizona, New Mexico, and Texas. Defoliation of tamarisk by the beetles occurs in the summer months when western yellow-billed cuckoos are in the process of nesting. Tamarisk leaf beetles could eventually occur throughout the western United States and northern Mexico (Tracy *et al.* 2008, pp. 1–3). The future effects of the beetle introductions to the western yellow-billed cuckoo are unknown. If beetles succeed in killing tamarisk, western yellow-billed cuckoo numbers may decline in areas where the hydrology is no longer capable of supporting a native riparian habitat and the numbers may increase in areas where native riparian vegetation is able to become reestablished.

Wildfire

Historically, wildfire was uncommon in native riparian woodlands (Busch and Smith 1993, pp. 186–194). However, the lack of scouring floods on regulated and unregulated rivers has resulted in the accumulation of fuel on the floodplain, which increases fire risk and intensity (Stromberg and Chew 2002, pp. 195–219). Water withdrawal, dams, climate change, drought, and human use also contribute toward an increased fuel load and probability of wildfire occurrence. Most fires today are human-caused (Service 2002, p. L–8). In degraded habitat with tamarisk the threat of fire may be greater. Tamarisk ignites quickly, further increasing the incidence of periodic fires. Exacerbating the immediate loss of native trees from fire, tamarisk recovers more quickly than native trees (Glenn and Nagler 2005, pp. 435–436). Along the Rio Grande River in New Mexico and Texas, wildfire has been documented as destroying, degrading, or setting back

BLM_0071955

successional stages of vegetation development of western yellow-billed cuckoo habitat (Sproul 2000, in litt., p. 3). In summary, the alteration of riparian systems through changes in hydrologic functioning and the introduction of nonnative tamarisk have increased the incidence of wildfire into western yellow-billed cuckoo habitat. These fires further degrade, isolate, or fragment western yellow-billed cuckoo habitat.

Environmental Impacts of Cross-Border Foot Traffic in the Southwest

The environmental impact caused by cross border foot traffic has been increasingly occurring in more fragile and remote areas. The number of U.S. Border Patrol apprehensions of border crossers varies annually. Between October 1, 1999, and September 30, 2012, a yearly average of 333,517 border crossers were apprehended by the United States Border Patrol in the Tucson Sector, which does not account for the many others who were not caught (U.S. Border Patrol 2013, p. 1). Impacts associated with border crossings include creation of erosion and watershed degradation, loss of vegetation and wildlife, and human-caused wildfire (Defenders of Wildlife 2006, pp. 1–42). Drainages used by border crossers include the San Pedro River, Santa Cruz River, Cienega Creek, and many remote drainages in the mountain ranges of southeastern Arizona.

Human-caused wildland fires have been particularly damaging to areas of riparian habitat in Arizona, especially within 100 mi (161 km) of the United States-Mexico border where border crossers are known to set fires to divert law enforcement agents. Border crossers are also responsible for campfires that can escape and spread as wildfires. At least 2,467 wildfires began along the Arizona border with Mexico from 2006 to 2010 (Government Accounting Office 2011, p. 1). Federal officials have officially investigated only 77 of those fires. Of the fires investigated, 30 were started by border crossers. The resulting environmental impacts include the expansion of nonnative plant species, degraded endangered species habitat, and soil erosion.

Climate Change

Climate change may be impacting the western yellow-billed cuckoo. Climate change is discussed here under Factor A because, although it may affect the western yellow-billed cuckoo directly by creating physiological stress, the primary impacts of climate change on the species are expected to be through

changes in the availability and distribution of western yellow-billed cuckoo habitat.

Our analyses under the Act include consideration of ongoing and projected changes in climate. The terms "climate" and "climate change" are defined by the Intergovernmental Panel on Climate Change (IPCC). The term "climate" refers to the mean and variability of different types of weather conditions over time, with 30 years being a typical period for such measurements (IPCC 2013a, p. 1450). The term "climate change" thus refers to a change in the mean or variability of one or more measures of climate (for example, temperature or precipitation) that persists for an extended period, whether the change is due to natural variability or human activity (IPCC 2013a, p. 1450).

Scientific measurements spanning several decades demonstrate that changes in climate are occurring, and that the rate of change has increased since the 1950s. Examples include warming of the global climate system, and substantial increases in precipitation in some regions of the world and decreases in other regions (for these and other examples, see Solomon et al. 2007, pp. 35–54, 82–85; IPCC 2013b, pp. 3–29; IPCC 2014, pp. 1–32). Results of scientific analyses presented by the IPCC show that most of the observed increase in global average temperature since the mid-20th century cannot be explained by natural variability in climate and is "very likely" (defined by the IPCC as 90 percent or higher probability) due to the observed increase in greenhouse gas (GHG) concentrations in the atmosphere as a result of human activities, particularly carbon dioxide emissions from use of fossil fuels (Solomon et al. 2007, pp. 21–35; IPCC 2013b, pp. 11–12 and figures SPM.4 and SPM.5). Further confirmation of the role of GHGs comes from analyses by Huber and Knutti (2011, p. 4), who concluded it is extremely likely that approximately 75 percent of global warming since 1950 has been caused by human activities.

Scientists use a variety of climate models, which include consideration of natural processes and variability, as well as various scenarios of potential levels and timing of GHG emissions, to evaluate the causes of changes already observed and to project future changes in temperature and other climate conditions (Meehl et al. 2007, entire; Ganguly et al. 2009, pp. 11555, 15558; Prinn et al. 2011, pp. 527, 529). All combinations of models and emissions scenarios yield very similar projections of increases in the most common measure of climate change, average

global surface temperature (commonly known as global warming), until about 2030. Although projections of the magnitude and rate of warming differ after about 2030, the overall trajectory of all the projections is one of increasing global warming through the end of this century, even for the projections based on scenarios that assume that GHG emissions will stabilize or decline. Thus, there is strong scientific support for projections that warming will continue through the 21st century, and that the magnitude and rate of change will be influenced substantially by the extent of GHG emissions (Meehl et al. 2007, pp. 760–764, 797–811; Ganguly et al. 2009, pp. 15555–15558; Prinn et al. 2011, pp. 527, 529; IPCC 2013b, pp. 19–23). See IPCC 2013b (entire), for a summary of other global projections of climate-related changes, such as frequency of heat waves and changes in precipitation.

Various changes in climate may have direct or indirect effects on species. These effects may be positive, neutral, or negative, and they may change over time, depending on the species and other relevant considerations, such as threats in combination and interactions of climate with other variables (for example, habitat fragmentation) (IPCC 2014, pp. 4–11). Identifying likely effects often involves aspects of climate change vulnerability analysis. Vulnerability refers to the degree to which a species (or system) is susceptible to, and unable to cope with, adverse effects of climate change, including climate variability and extremes. Vulnerability is a function of the type, magnitude, and rate of climate change and variation to which a species is exposed, its sensitivity, and its adaptive capacity (Glick et al. 2011, pp. 19–22; IPCC 2014, p. 5). There is no single method for conducting such analyses that applies to all situations (Glick et al. 2011, p. 3). We use our expert judgment and appropriate analytical approaches to weigh relevant information, including uncertainty, in our consideration of the best scientific information available regarding various aspects of climate change.

Global climate projections are informative, and, in some cases, the only or the best scientific information available for us to use. However, projected changes in climate and related impacts can vary across and within different regions of the world (IPCC 2013b, pp. 15–16). Therefore, we use "downscaled" projections when they are available and have been developed through appropriate scientific procedures, because such projections provide higher resolution information

BLM_0071956

**60024**   **Federal Register** / Vol. 79, No. 192 / Friday, October 3, 2014 / Rules and Regulations

that is more relevant to spatial scales used for analyses of a given species (see Glick *et al.* 2011, pp. 58–61, for a discussion of downscaling). With regard to our analysis for the western yellow-billed cuckoo, downscaled projections are available.

The Southwest is already experiencing the impacts of climate change. The region has heated up markedly in recent decades, and the period since 1950 has been hotter than any comparably long period in at least 600 years (Graumlich 1993, pp. 249–255; Salzer and Kipfmueller 2005, pp. 465–487; Millar *et al.* 2006, pp. 273–287; Ababneh 2008, pp. 59–78; Bonfils *et al.* 2008, pp. 6404–6424; Stevens *et al.* 2008, pp. 1–15; Salzer *et al.* 2009, pp. 20348–20353; Woodhouse *et al.* 2010, pp. 21283–21288; Hoerling *et al.* 2012, pp. 74–92). The decade 2001–2010 was the warmest in the 110-year instrumental record, with temperatures almost 2 °F higher than historic averages, with fewer cold snaps and more heat waves (Hoerling *et al.* 2012, pp. 74–92). Compared to temperature, precipitation trends vary considerably across the region, with portions experiencing both decreases and increases (Hoerling *et al.* 2012, pp. 74–92). There is mounting evidence that the combination of human-caused temperature increases and recent drought has influenced widespread tree mortality (Van Mantgem *et al.* 2009, pp. 521–524; Allen *et al.* 2010, pp. 660–684), increased fire occurrence and area burned (Westerling *et al.* 2006, pp. 940–943), and forest insect outbreaks (Bentz *et al.* 2010, pp. 602–613). Human-caused temperature increases and drought have also caused earlier spring snowmelt and shifted runoff to earlier in the year (Barnett *et al.* 2008, pp. 1080–1083).

There are three predictions for anticipated effects from climate change in the southwestern United States and parts of northwestern Mexico. First, climate change is expected to shorten periods of snowpack accumulation, as well as reduce snowpack levels. With gradually increasing temperatures and reduced snowpack (due to higher spring temperatures and reduced winter-spring precipitation), annual runoff will be reduced (Smith *et al.* 2003, p. 226; Ellis *et al.* 2010, p. 236), consequently reducing ground water recharge. Second, snowmelt is expected to occur earlier in the season because increased minimum winter and spring temperatures could melt snowpacks sooner, causing peak water flows to occur much sooner than the historical spring and summer peak flows (Smith *et al.* 2003, p. 226; Stewart *et al.* 2005, pp.

217–218, 224, 230) and reducing flows later in the season. Third, the hydrological cycle is expected to become more dynamic on average with climate models predicting increases in the variability and intensity of rainfall events. This change will modify disturbance regimes by changing the magnitude and frequency of floods.

Precipitation events under most climate change scenarios will decrease in frequency but increase in severity so that, paradoxically, a warmer atmosphere and an intensified water cycle are likely to mean not only a greater likelihood of drought for the Southwest, but also an increased risk of flooding (Karl *et al.* 2009, pp. 132–133; Dominguez *et al.* 2012, pp. 1–7). Precipitation patterns are already observed to be shifting in the Southwest, with more rain falling in heavy downpours that can lead to flooding (Karl *et al.* 2009, p. 133). Adding to flood risk is that the earlier streamflow from earlier snowmelt may impinge on the flood protection stages of reservoir operations so that less streamflow can be captured safely in key reservoirs, increasing spring flooding downstream (Smith *et al.* 2005, p. 1154; Karl *et al.* 2009, p. 133). In some sites, where natural floodplain dynamics allow for overbank flooding, this could result in a positive regenerating effect on habitat for the western yellow-billed cuckoo. However, where floodplains have been constrained, as in many areas of the range, such changes in hydrology could excessively scour remaining habitat, thus preventing their reestablishment and resulting in smaller patch size or loss of habitat for the western yellow-billed cuckoo. Long drought cycles could also hamper recruitment of riparian vegetation following scouring floods and lead to reduced cover and nest sites for the western yellow-billed cuckoo.

Exactly how climate change will affect precipitation from site to site within the range of the western yellow-billed cuckoo in the southwestern United States and northwestern Mexico is uncertain. However, consistent with recent observations of regional effects of climate change, the projections presented for the Southwest predict overall warmer, drier, and more drought-like conditions (Hoerling and Eischeid 2007, p. 19; Seager *et al.* 2007, p. 1181; Ellis *et al.* 2010, p. 243). For example, climate simulations of the Palmer Drought Severity Index (a calculation of the cumulative effects of precipitation and temperature on surface moisture balance) for the Southwest for the periods of 2006 to

2030 and 2035 to 2060 show an increase in drought severity with surface warming. Additionally, drought-like conditions will increase even during wetter simulations because of the effect of heat-related moisture loss through evaporation and evapotranspiration (Hoerling and Eischeid 2007, p. 19). Annual mean precipitation is likely to decrease in the Southwest, as is the length of snow season and snow depth (Sun *et al.* 2013, pp. 21–22; Garfin *et al.* 2014, pp. 462–486). Most models project a widespread decrease in snow depth and earlier snowmelt in the Rocky Mountains (Clow *et al.* 2012, 2583–2591; Pederson *et al.* 2013, 1811–1816).

Assessments for the Sonoran Desert are few, but the region is also expected to warm (Weiss and Overpeck 2005, pp. 2065–2077; National Park Service 2010, pp. 1–4; Munson *et al.* 2012, pp. 1083–1095). Since about the 1970s, the Sonoran Desert region appears to have experienced "widespread warming trends in winter and spring, decreased frequency of freezing temperatures, lengthening of the freeze-free season, and increased minimum temperatures per winter year" (Weiss and Overpeck 2005, p. 2065). The Sonoran Desert area is expected to warm faster and experience reduced annual precipitation, resulting in a reduction in soil moisture in an already dry environment. The area will also experience increases in the intensity of heat waves, decreases in the frequency of freezing temperatures, and lengthening of the freeze-free season. Munson *et al.* (2012) stated that "Climate models and long-term trends predict increased variability in precipitation seasonality, with fewer, larger, and more intense precipitation events" (Munson *et al.* 2012, pp. 1083–1095). Other researchers have also concluded similar climactic changes for the area (Easterling *et al.* 2000, pp. 2068–2074; Weiss and Overpeck 2005, pp. 2065–2077; Seager *et al.* 2007, pp. 1181–1184).

In California, regional downscaled climate change assessments (Point Reyes Bird Observatory (PRBO) Conservation Science 2011, pp. 1–68) indicate changes in precipitation and temperature of varying magnitude across ecoregions. Assessments for areas occupied by the western yellow-billed cuckoo, such as the Sacramento River, Sierra Nevada (southern), and Sonora Desert (lower Colorado River) (PRBO Conservation Science 2011, pp. 25, 28, 48), mostly indicate an overall reduction in precipitation and increase in average temperature, which can alter hydrology and negatively affect habitat for the western yellow-billed cuckoo, as

described previously. Furthermore, Gardali *et al.* (2012, pp. 8–10) ranked 358 avian taxa in California, and classified 128 as vulnerable to climate change. They ranked the western yellow-billed cuckoo as subject to a moderate level of climate vulnerability, owing in part to its specialization in habitat (riparian) that has already experienced significant loss or alteration. Of the 128 species that were rated vulnerable, only 48 were rated as having high or moderate climate vulnerability.

Regionally downscaled climate models for the Pacific Northwest project higher air temperatures in the next century (Littell *et al.* 2009, pp. 6–7) that will lead to lower soil moisture and increased evaporation from streams and lakes (Climate Leadership Initiative (CLI) and the National Center for Conservation Science and Policy 2009, p. 8). While high uncertainty exists in the total precipitation projections for the region (Littell *et al.* 2009, p. 1), effective precipitation (precipitation that contributes to runoff) may be reduced significantly even if there is no decline in total precipitation (CLI and the National Center for Conservation Science and Policy 2009, p. 8). Increases in extreme high precipitation falling as rain in the western Cascades and reductions in snowpack are key projections from high-resolution regional climate models (Littell *et al.* 2009, p. 1). These may result in more winter flooding and reduced summer streamflows in rivers that depend on snowmelt, which include many of the rivers in the Pacific Northwest.

In drier climates overall, there will be increases in riverine system temperatures that are predicted to result in periods of prolonged low flows and stream drying (Stromberg *et al.* 2013, pp. 411–415) and increased demand for water storage and conveyance systems (Stromberg *et al.* 2013, pp. 411–415). Warmer water temperatures across temperate regions are likely to increase the density and expand distribution of tamarisk because it has a higher tolerance for drought and salt than native cottonwoods and willows (Glenn and Nagler 2005, p. 439). This situation is expected to lead to the conversion of native and mixed (native and nonnative) riparian habitat to monotypic stands of tamarisk, which provides very little or no suitable breeding habitat for the western yellow-billed cuckoo (as described previously above).

Increased drought is expected to adversely affect food availability for western yellow-billed cuckoos (Newton 1980, pp. 11–12; Durst 2004, pp. 40–41; Scott *et al.* 2004, p. 70) through the

disruption of the timing between a species and its food resources (Visser and Both 2005, pp. 2561–2569). For example, changes in precipitation or temperature may influence the peak timing of insect emergence or timing of the western yellow-billed cuckoo's arrival from its wintering grounds so that the nesting season does not coincide as closely with peak insect abundance (Anders and Post 2006, p. 225). This change in timing could result in reduced food availability for the western yellow-billed cuckoo and breeding success, possibly causing further population decline and curtailment of its occupied range.

Virtually all future climate scenarios for the Pacific Northwest predict increases in wildfire in western North America, especially east of the Cascades, due to higher summer temperatures, earlier spring snowmelt, and lower summer flows, which can lead to drought stress in trees (Littell *et al.* 2009, p. 14). These effects could result in both short-term and long-term loss of riparian habitat from excessive winter scouring, summer drying, and wildfire. Regional downscaled climate change models for the Intermountain West also provide similar projections for warmer, drier climate with a reduced snowpack and episodic precipitation events. Prolonged drought in the southwestern United States and northern Mexico is expected to increase fire frequency, which results in a short-term loss of patches of riparian or thorn forest habitat for breeding. When fire frequency increases, riparian and thorn forests do not have sufficient time to recover, resulting in habitat conversion to fire-adapted nonforested vegetation types unsuitable for nesting. Furthermore, the effects of climate change and ongoing reduction in habitat and patch fragmentation, discussed previously, would increase.

Little is known about the wintering habitat of the western yellow-billed cuckoo in South America, and uncertainty exists about how climate change will affect it there. Regional downscaled models project an increase in wet-season precipitation and a decrease in dry-season precipitation over most of South America (Kitoh *et al.* 2011, p. 1). In the future, precipitation intensity will increase over most of South America. In particular, precipitation intensity will be greatest over southeast South America, implying an increasing risk of flooding in this region (Kitoh *et al.* 2011, p. 1). At the same time, a large increase of consecutive dry days is projected over the western part of the Amazon, where extremes in seasonal precipitation and

resulting runoff is projected to increase in the Amazon River, implying more floods in the wet season and droughts in the dry season (Kitoh *et al.* 2011, p. 1). Uncertainty exists regarding the specific effects of such changes on the wintering habitat of the western yellow-billed cuckoo.

In summary, the available climate change models are predicting altered future environmental conditions across the breeding range of the western yellow-billed cuckoo. In the southwestern United States, northern Mexico, California, Intermountain West, and Pacific Northwest, climate change is generally predicted to result in an overall warmer, drier climate, with periodic episodic precipitation events that, depending on site conditions, are expected to have adverse effects on habitat of the western yellow-billed cuckoo. In rivers that depend on snowmelt, these changes are expected to result in more winter flooding and reduced summer stream flows. The amount of surface ground water available to regenerate and sustain riparian forests is expected to decline overall with persistent drought, favor the spread of tamarisk and other nonnative vegetation, and increase fire frequency. Precipitation events under most climate change scenarios will decrease in frequency and increase in severity. This change may reduce available nesting sites, patch size, and affect prey abundance as a result of lower humidity in riparian areas from reduced moisture retention, and through periods of prolonged desiccation followed by scouring flood events. In addition, evidence shows that climate change may disrupt the synchrony of nesting western yellow-billed cuckoos and their food supply, causing further population decline and curtailment of its occupied range.

Impacts to habitat from climate change exacerbate impacts from impoundments, channelization, and alteration of river flows across the western United States and Mexico, and from conversion of habitat from native to mostly nonnative vegetation. Changing climate is expected to place an added stress on the species and its habitats. While we do not have evidence to suggest that the habitat of the western yellow-billed cuckoo is being substantially affected by climate change at this time, we expect long-term climate trends to have an overall negative effect on the available habitat throughout the breeding range of the western yellow-billed cuckoo. Moreover, a drying trend associated with global climate change may result in more dams, levees, or other activities to

ensure fresh water for human consumption, which may result in additional habitat loss from the activities described in the Habitat Loss from Dams and Alteration of Hydrology section, above.

Summary of Factor A

We have identified a number of threats to the habitat of the western yellow-billed cuckoo that have operated in the past, are impacting the species now, and will continue to impact the species in the future. The curtailment and decline in the habitat of the western yellow-billed cuckoo is primarily the result of the long-lasting effects of habitat loss from manmade features that alter watercourse hydrology so that the natural processes that sustained riparian habitat in western North America are greatly diminished. Loss and degradation of habitat has also occurred as a result of livestock overgrazing and encroachment from agriculture. All of these have the potential to promote, and are exacerbated by, the conversion of native habitat to predominantly nonnative vegetation. The curtailment, degradation, fragmentation, and loss of habitat for the western yellow-billed cuckoo is ongoing and, absent changes in the landscape, hydrology, or other factors, it will likely continue to be negatively impacted or lost into the future.

We recognize that climate change is a critical issue with potentially severe wide-ranging effects on the species and its habitat. The available scientific literature suggests that the effects of climate change will likely exacerbate multiple existing threats to the western yellow-billed cuckoo and its habitat. These threats include habitat loss and degradation from altered hydrology, with secondary effects from increases in nonnative vegetation and wildfire. These threats may result in smaller patch sizes of habitat such that many will be no longer occupied by the western yellow-billed cuckoo.

Conservation actions, such as habitat protection and restoration described above, have strong potential to be beneficial to the species by increasing the amount of available habitat and patch size. However, these efforts offset only a small portion of past losses and degradation of riparian habitat in the range of the western yellow-billed cuckoo. Habitat elsewhere in the range continues to be vulnerable to loss and degradation from ongoing alterations in hydrology, nonnative vegetation, and agricultural activities combined with additional or synergistic effects associated with climate change. Moreover, we expect these multiple

stressors to continue to affect habitat of the western yellow-billed cuckoo into the future. The amount of time required for willow and cottonwood vegetation to mature and provide habitat for the western yellow-billed cuckoo under optimal hydrologic, environmental, and ecological conditions varies by location but may be as little as between 3 to 5 years (Golet *et al.* 2008, pp. 20–22). However, other vegetation used by the western yellow-billed cuckoo such as alder, walnut, sycamore, boxelder, ash, or mesquite would take several decades for habitat to mature to the point where it would be available for use (Strahan 1984, pp. 58–67; Opperman and Merenlender 2004, pp. 822–834; Trowbridge *et al.* 2004, pp. 157–164; Morris *et al.* 2006, pp. 106–116; Griggs 2009, p. 12). In areas where conditions are less than optimal (as is the current situation in most areas) it may take longer if at all (Briggs 1995, pp. 63–67).

The exact timeframe for resolving water management and delivery issues and their impact on the western yellow-billed cuckoo and its habitat would vary on the location, resource demands, sensitive habitat or species concerns, stakeholders, and amount of water available. As a result, we would expect that resolving water issues for the various uses (agriculture, urbanization, wildlife, and tribal interests) in the west will be a lengthy ongoing process and not be resolved in the near future (next 20 years) and may take substantially longer considering the increased demands and the effects of climate change.

Our review of the best available scientific and commercial information identified numerous activities or processes that threaten to destroy, modify, or curtail the western yellow-billed cuckoo's habitat or range now or are likely to in the near future in any portion of the western yellow-billed cuckoo range. These include habitat loss from reservoirs and water management, surface and groundwater diversion, flood control activities, gravel mining, agriculture, livestock grazing, invasive nonnative plants and their control, and climate change. We, therefore, conclude that habitat loss under Factor A currently constitutes a threat to the western yellow-billed cuckoo, and we expect these activities to continue and habitat loss to be a threat in the near future.

B. Overutilization for Commercial, Recreational, Scientific, or Educational Purposes

There are no known threats to the western yellow-billed cuckoo resulting from overutilization for commercial,

scientific, or educational purposes. Our review of the best available scientific and commercial information yielded nothing to indicate that overutilization for commercial, recreational, scientific, or educational purposes is occurring at this time or is likely to in the near future in any portion of the western yellow-billed cuckoo range. We, therefore, conclude that such overutilization does not currently constitute a threat to the western yellow-billed cuckoo, nor do we expect it to be a threat in the future.

C. Disease or Predation

Little is known about diseases in the western yellow-billed cuckoo. West Nile virus has recently spread throughout portions of the western United States. It poses a potential threat to many bird species. The U.S. Geological Survey's (USGS) National Wildlife Health Center has identified the yellow-billed cuckoo as a species that is subject to the effects of West Nile virus (USGS–National Wildlife Health Center 2005, p. 2). The Centers for Disease Control's (CDC) Vector-Borne Disease Web site reports that West Nile virus has been documented in a dead yellow-billed cuckoo (CDC 2012); however, it is unknown if this yellow-billed cuckoo was from the western DPS. Although the population of the western yellow-billed cuckoo has been in decline over several decades (see Historical and Current Status section, above), no evidence suggests that it has undergone a precipitous decline coincident with the relatively recent arrival of West Nile virus in western North America. Therefore, we conclude, based on the best available scientific and commercial information, which is limited, that the adverse effects of West Nile virus to the western yellow-billed cuckoo are not significant and do not constitute a threat at this time, nor is there any information to suggest that this situation will change into the future.

All bird species, including the yellow-billed cuckoo, are exposed, to some extent, to parasites. Greiner *et al.* (1975, pp. 1762–1787) found 5 of 16 yellow-billed cuckoos infected with Leucocytozoon, Trypanosoma, and microfilaria blood parasites. No information indicates whether these and other parasites (see Hughes 1999, p. 18, for a brief review) pose any threat to the western yellow-billed cuckoo.

Predation is a potential threat to the western yellow-billed cuckoo. On the Kern River, red-shouldered hawks (*Buteo lineatus*) and northern harriers (*Circus cyaneus*) have been observed preying on nestlings, and western yellow-billed cuckoos have been observed chasing western scrub-jays

BLM_0071959

(*Aphelocoma californica*) and loggerhead shrikes (*Lanius ludovicianus*) away from their nests (Laymon 1998, pp. 12–14); however, we do not have any information on the frequency of predation. An inverse relationship appears to exist between the presence of western yellow-billed cuckoos and western scrub-jays on the Sacramento River, indicating a possible aversion by the western yellow-billed cuckoos to nesting at sites occupied by western scrub-jays, a known predator of eggs and young (Halterman 1991, p. 38). Avian predators such as the Cooper's hawks (*Accipiter cooperii*) or other similarly sized avian predators are thought to be the only avian predator capable of taking adult western yellow-billed cuckoos (Laymon 1998, pp. 12–13). During migration, adult western yellow-billed cuckoo are susceptible to predation by raptors, such as the Aplomado falcons (*Falco femoralis*) (Hector 1985, p. 338); however, we have no information to suggest that the rate of adult predation is significantly affecting the western yellow-billed cuckoo population. In the Sonoran town of Alamos, Mexico, Mackay (David Mackay 2012, *in litt.*) witnessed a brown vine snake (*Oxybelis aeneus*) leaving a western yellow-billed cuckoo nest after eating one of four nestlings.

On the lower Colorado River, McNeil *et al.* (2011, p. 41) found that high nest predation rates (63 percent of nests failed) contributed to the much lower average nest productivity at restoration sites (1.25 young fledged per nest) compared to nests at the Bill Williams River NWR (2.14 young fledged per nest). Most of that predation was attributed to avian predators; however, for 2 consecutive years a nest was preyed upon by a California king snake (*Lampropeltis getula californiae*) (McNeil *et al.* 2011, p. 41; McNeil *et al.* 2012, p. 50). Nest predation may have been high in restoration sites because most were located adjacent to agricultural areas, which may have increased the exposure of nests to human-adapted avian predators that thrive in agricultural areas. Additionally, these sites did not yet have the height, structure, and composition of more complex riparian habitats (McNeil *et al.* 2011, pp. 41, 49; McNeil *et al.* 2012, p. 56) that may serve to hide nests from predators. Nest predation can be partially compensated by the ability of western yellow-billed cuckoos to renest when a nest fails. In general, despite the instances of nest predation listed above, western yellow-billed cuckoos have higher than normal nest success and lower nest predation

rates than other open-cup nesting birds (Laymon *et al.* 1997, p. 11).

In summary, western yellow-billed cuckoos, particularly the eggs or young in nests, are vulnerable to predation. Predation may be a significant threat in some localities and in some years, and may be influenced by several factors, such as surrounding land use and size and complexity of riparian habitat. As a result, predation may act periodically in concert with other stressors that contribute to the decline of the species (which we discuss in greater detail under Factor E, below). However, we conclude that predation by itself does not pose a significant threat to the western yellow-billed cuckoo at this time, and we do not have any reason to believe that this situation will change substantially in the future.

We conclude that predation, parasites, and disease are not currently significant threats to the western yellow-billed cuckoo, and are not expected to become significant threats in the near future.

### D. The Inadequacy of Existing Regulatory Mechanisms

Under this factor, we examine whether existing regulatory mechanisms are inadequate to address the threats to the western yellow-billed cuckoo discussed under other factors. We give strongest weight to statutes and their implementing regulations, and management direction that stems from those laws and regulations. They are nondiscretionary and enforceable, and are considered a regulatory mechanism under this analysis. Examples include State governmental actions enforced under a State statute or constitution, or Federal action under statute.

Some other programs are more voluntary in nature or dependent on available funding; in those cases, we analyze the specific facts for that effort to ascertain its effectiveness at mitigating the threat and the extent to which it can be relied on in the future. Having evaluated the significance of the threat as mitigated by any such conservation efforts, we analyze under Factor D the extent to which existing regulatory mechanisms adequately address the specific threats to the species. Regulatory mechanisms, if they exist, may preclude the need for listing if we determine that such mechanisms adequately address the threats to the species such that listing is not warranted.

We have identified a number of significant threats to the western yellow-billed cuckoo that are impacting the species now and will continue to impact the species in the future. The decline of the western yellow-billed

cuckoo is primarily the result of the long-lasting effects of habitat loss and modification from altered hydrology resulting from decades of dam construction, channelization, water extraction, and other activities, as well as impacts associated with climate change. Other threats include loss of habitat to agricultural and other land uses, overgrazing, exposure to pesticides (which is addressed in Factor E, below), wildfire, and conversion of habitat to monotypic stands of nonnative vegetation. Under this factor, we discuss whether the existing regulatory mechanisms adequately address impacts to the western yellow-billed cuckoo described under Factors A and E, based on the best available information.

### Federal Regulatory Mechanisms

In the United States, the Migratory Bird Treaty Act (MBTA) (16 U.S.C. Sec. 703–712) is the only current Federal protection provided for the yellow-billed cuckoo. The yellow-billed cuckoo (the entire taxonomically defined species), which includes the western yellow-billed cuckoo, is considered a "migratory bird" under the MBTA. The MBTA prohibits "take" of any migratory bird. Take is defined as: "to pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to pursue, hunt, shoot, wound, kill, trap, capture, or collect." However, no provisions in the MBTA prevent habitat destruction unless direct mortality or destruction of active nests occurs.

The Federal Land Policy and Management Act of 1976 (FLPMA) (43 U.S.C. 1701 *et seq.*) requires that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that . . . will preserve and protect certain public lands in their natural condition; (and) that will provide food and habitat for fish and wildlife. . . ." Furthermore, it is the policy of the Bureau of Land Management (BLM) "to manage habitat with emphasis on ecosystems to ensure self-sustaining populations and a natural abundance and diversity of wildlife, fish, and plant resources on public lands" (BLM manual 6500.06). Similarly, the National Forest Management Act of 1976 (NFMA) directs that the National Forest System "where appropriate and to the extent practicable, will preserve and enhance the diversity of plant and animal communities." Additionally, section 219.12(g) calls for the maintenance of viable populations of native vertebrates in national forests. As such, FLPMA and

NFMA have the potential to benefit the western yellow-billed cuckoo and its habitat. However, given that the BLM and USFS have discretion in how these statutes are carried out and measures are implemented, we continue to see continued loss and degradation of habitat for the western yellow-billed cuckoo on lands that these agencies manage.

Congress passed the Federal Water Pollution Control Act Amendments of 1972 and the Clean Water Act (CWA) of 1977 (33 U.S.C. 1251 *et seq.*) to provide for the restoration and maintenance of the chemical, physical, and biological integrity of the Nation's lakes, streams, and coastal waters. Primary authority for the implementation and enforcement of the CWA now rests with the U.S. Environmental Protection Agency (EPA) and, to a lesser extent, the USACE. In addition to the measures authorized before 1972, the CWA implements a variety of programs, including Federal effluent limitations and State water quality standards, permits for the discharge of pollutants and dredged and fill materials into navigable waters, and enforcement mechanisms. Section 404 of the CWA is the principal Federal program that regulates activities affecting the physical integrity of wetlands and other waters of the United States.

Section 404 prohibits the discharge of dredged or fill material in jurisdictional waters of the United States, unless permitted by USACE under section 404(a) (individual permits) or 404(e) (general permits), or unless the discharge is otherwise exempt from regulation as designated in section 404(r). Some areas of riparian habitat may be considered "waters of the United States," but many areas of riparian habitat do not meet the term's strict definition. The Service can review permit applications and provide recommendations to the USACE to avoid and minimize impacts and to implement conservation measures for fish and wildlife resources, including the western yellow-billed cuckoo. However, incorporation of Service recommendations into section 404 permits is at the discretion of the USACE.

Furthermore, not all activities in wetlands or streams involve fill, and not all wetlands or streams fall under the jurisdiction of the USACE. For example, in areas where the historical floodplain has been cut off from the river by levees, determining the boundaries of wetlands subject to USACE jurisdiction becomes complex. The areas behind these levees have had their hydrological characteristics altered, soil conditions changed, and riparian vegetation removed. As a result, these former floodplains, which in some cases would be important to protect and restore as habitat for the western yellow-billed cuckoo, fall outside the jurisdiction of the USACE. Additionally, many actions that resulted in adverse hydrological modifications, such as channelization and levees, were implemented in compliance with the CWA.

The National Environmental Policy Act (NEPA) (42 U.S.C. 4321 *et seq.*) requires all Federal agencies to formally document, consider, and publicly disclose the environmental impacts of major Federal actions and management decisions that have significant effects on the human environment (including natural resources); however, NEPA does not require that mitigation alternatives be implemented. Additionally, NEPA applies only to actions by Federal agencies, so private landowners are not required to comply with NEPA unless a Federal agency is involved through provision of Federal funding or a Federal permit.

Through the Fish and Wildlife Coordination Act (FWCA) (16 U.S.C. 661 *et seq.*), the Service may recommend discretionary conservation measures to avoid, minimize, and offset impacts to fish and wildlife resources resulting from Federal projects and water development projects authorized by the USACE and other Federal agencies such as Reclamation. Therefore, the FWCA may provide some protection for the western yellow-billed cuckoo and its habitat through avoidance and minimization measures that may be incorporated into Federal projects. However, these measures are discretionary.

A majority of dams in the western United States supply hydropower, and their construction and ongoing operation is authorized by the Federal Energy Regulatory Commission (FERC), under the Federal Power Act of 1920, which incorporates by reference the FWCA and NEPA. The remainder of hydropower in the western United States is largely produced by the USACE and Reclamation. Reclamation also oversees water diversion and delivery projects. FERC reconsiders its hydropower licenses every 30 to 50 years. Through the various Federal regulations under which these agencies implement their water projects, the Service has an opportunity to periodically review their permits and relicensing applications and provide its recommendations to avoid and minimize impacts, and implement conservation measures for fish and wildlife resources, including species

such as the western yellow-billed cuckoo. Implementation of these recommendations by FERC, USACE, and Reclamation is discretionary for nonlisted species. We continue to see loss and degradation of habitat for the western yellow-billed cuckoo as a result of altered hydrology from operation of dams and other water supply projects, as described under Factor A.

The EPA is responsible for regulating pesticides under the Federal Insecticide, Fungicide, and Rodenticide Act and the Food Quality Protection Act. Before a pesticide can be distributed, sold, and used in the United States, it must first go through a registration process through the EPA. The EPA conducts short- and long-term toxicity tests to evaluate potential adverse effects on humans, wildlife, fish, and plants, including endangered species and nontarget organisms, and evaluates the potential for possible contamination of surface water or ground water from leaching, runoff, and spray drift. The sensitivity of any life stages of the western yellow-billed cuckoo or its prey items to exposure from common agricultural pesticides that could leach, runoff, or migrate from agricultural areas into the habitat of the western yellow-billed cuckoo has not been tested. However the EPA does evaluate the effects of these factors on surrogate species and has determined the use of certain approved pesticides are appropriate in areas used by the western yellow-billed cuckoo. Even if approved application procedures are followed, pesticides could reduce available insect prey for the western yellow-billed cuckoos.

State Regulatory Mechanisms

The majority of occupied areas for the western yellow-billed cuckoo north of Mexico occur within California, Arizona, and New Mexico (Hughes 1999, p. 1). Only California classifies the western yellow-billed cuckoo as endangered (CDFW 2011, p. 10). The California Endangered Species Act (CESA) prohibits unpermitted possession, purchase, sale, or take of listed species. However, the CESA definition of take does not include harm, which under the Federal Act can include destruction of habitat that actually kills or injures wildlife by significantly impairing essential behavioral patterns (50 CFR 17.3). CESA does require consultation between the CDFW and other State agencies to ensure that their activities will not jeopardize the continued existence of State-listed species; however, the western yellow-billed cuckoo continues to decline in California despite its status

as a State-listed species. In Arizona, the western yellow-billed cuckoo is listed as a species of concern (Arizona Game and Fish Department 2002, p. 3), with no protective status. The western yellow-billed cuckoo has no special protective status in New Mexico.

The State of California has an additional layer of pesticide regulation through the Department of Pesticide Regulation, whose mission is to protect human health and the environment by regulating pesticide sales and use. While concentrating on human health and exposure to pesticides, the agency has a program (Endangered Species Project) that maps sites occupied by federally listed species and candidate species and evaluates pesticide exposure risks to the species at those sites. This project does not include species like the western yellow-billed cuckoo that are listed as endangered by the State but not the Federal Government. In addition, the work was carried out in 1997 prior to the western yellow-billed cuckoo becoming a Federal candidate species. As a result the western yellow-billed cuckoo has not been included in the project.

Washington State's Department of Fish and Wildlife considers the western yellow-billed cuckoo a candidate for listing. The State wildlife agencies in Wyoming, Montana, Colorado, and Texas classify the western yellow-billed cuckoo as a species of concern or a sensitive species. In Utah, the Utah Division of Wildlife Resources (UDWR) has designated the yellow-billed cuckoo as a State-sensitive species and the yellow-billed cuckoo has been a priority for the State's Native Terrestrial Wildlife Program since the late 1990's. For example, in 2009, surveys for the species were conducted on National Park Service and adjacent lands at Cubs Creek and Jones Hole in northeastern Utah (Beason 2009, pp. 1–19). During these surveys no western yellow-billed cuckoos were detected on lands managed by the National Park Service in Dinosaur National Monument or private land in northwestern Colorado. However, suitable habitat is found within Dinosaur National Monument. UDWR has implemented additional survey and monitoring efforts over the past 2 years. This status allows for enhanced attention for the species and potential voluntary conservation, but the status provides no conservation assurances or regulatory oversite.

The western yellow-billed cuckoo is identified as a Species of Greatest Conservation Need in Idaho's Comprehensive Wildlife Conservation Strategy (Idaho Department of Fish and Game 2005, Appendix B, p. 7), and,

under Idaho State law, is considered a protected nongame species. It is illegal to intentionally take or possess a protected nongame species, except as provided in sections 36–106(e) and 36–1107, Idaho Code, by Commission rule, or the Idaho Administrative Procedures Act 13.01.10, "Rules Governing the Importation, Possession, Release, Sale, or Salvage of Wildlife," subsection 100.06.b (Idaho Department of Fish and Game 2005, Appendix B, p. 5). While protected status extends certain protections to the western yellow-billed cuckoo in Idaho, neither this status nor the Species of Greatest Conservation Need designation protects its habitat.

In Nevada, the western yellow-billed cuckoo is identified as critically imperiled due to extreme rarity, imminent threats, or biological factors, but this designation provides no protection for habitat. Western yellow-billed cuckoos have no State status in Oregon because it has not been considered an active breeding species since the 1940s (Oregon Department of Fish and Wildlife 2005, p. 3). State Wildlife Action Plans that include the western yellow-billed cuckoo as a species of conservation concern are: California, Washington, Arizona, Colorado, Montana, Idaho, New Mexico, Utah, Texas, Nevada, and Wyoming. These plans identify conservation needs and actions for a broad range of species and habitats, but their implementation is discretionary.

In summary, where the western yellow-billed cuckoo is State-listed (CA), a State candidate (WA), a species of concern or sensitive species (AZ, ID, WY, MT, CO, TX), or critically imperiled (NV), these designations contain no protection for the western yellow-billed cuckoo from habitat modification or destruction, as described under Factors A and E. Existing State regulatory mechanisms are not specifically designed to protect the western yellow-billed cuckoo from habitat loss and degradation from altered hydrology from upstream dams and surface water and ground water diversions, encroachment into the floodplain by agricultural and other development activities, bank stabilization and levee construction and maintenance activities, overgrazing, pesticide use on adjacent agricultural lands, conversion of habitat to monotypic stands of nonnative vegetation, gravel mining, wildfire, drought, and climate change across the range of the western yellow-billed cuckoo.

Canadian, Mexican, and Other International Laws

Canada

The Canadian Government through the Department of the Environment (Environment Canada, which was first established by the Department of the Environment Act of 1971) administers numerous acts to preserve and enhance the quality of Canada's natural environment. Acts identified for conservation of wildlife and plant species or their habitat are identified below.

*1916 Great Britain–United States Convention for the Protection of Migratory Birds.* Canada has committed to migratory bird protection through the 1916 Great Britain–United States Convention for the Protection of Migratory Birds in Canada, which encourages voluntary cooperative actions to protect identified migratory birds. The yellow-billed cuckoo is listed under the 1916 Great Britain–United States Convention for the Protection of Migratory Birds in Canada. In addition, Canada has enacted the Migratory Birds Convention Act of 1994 (MBCA). The MBCA is intended to ensure the conservation of migratory bird populations by regulating potentially harmful human activities. The implementing regulations of the MBCA ban all activities that are harmful to migratory birds, their eggs or their nests, but does not protect habitat. Also, some activities, such as hunting or scientific collection, may be allowed with an appropriate permit.

*The Species at Risk Act of 2002.* The purpose of the Species at Risk Act (SARA) is to prevent Canadian native wildlife and plant species, subspecies, and distinct populations from becoming extirpated or extinct, to provide for the recovery of endangered or threatened species, and encourage the management of other species to prevent them from becoming at risk. SARA establishes the Committee on the Status of Endangered Wildlife in Canada (COSEWIC) as an independent body of experts responsible for assessing and identifying species at risk. SARA also, among other objectives, establishes: Prohibitions to protect listed Canadian threatened and endangered species and their critical habitat; requirements for use of the best available knowledge on assessing threats to and conservation for wildlife and plant species; and long- and short-term objectives for development of recovery strategies and action plans.

The yellow-billed cuckoo is not identified as a species that is sensitive, threatened, or endangered under Canadian law. Within the range of the

western yellow-billed cuckoo, British Columbia considers the western yellow-billed cuckoo as an extirpated breeder, but that the species still does occur within the Province (British Columbia Conservation Data Centre, 2013).

*Canadian Environmental Protection Act of 1999.* The Canadian Environmental Protection Act sets out several guiding principles for conserving the environment including but not limited to supporting: Sustainable development; pollution prevention; elimination of releases of substances that are persistent or that bioaccumulate; an ecosystem approach and using the precautionary principle on issues related to the environment; science-based national standards; and seeking intergovernmental cooperation for consistency and avoidance of duplication of efforts. Because the yellow-billed cuckoo is not considered a species at risk, implementation of environmental protection regulations are optional for the species.

Mexico

The Mexican Government, through its Secretaría de Medio Ambiente y Recursos Naturales (SEMARNAT), has authority to designate species as threatened or endangered. The western yellow-billed cuckoo is not listed by the Mexican Government's Official Mexican Norm NOM–059–SEMARNAT–2010, Mexico's threatened species law. The yellow-billed cuckoo is listed under the 1936 Mexico–United States Convention for the Protection of Migratory Birds and Game Mammals (Service 2013b), which encourages voluntary cooperative actions to protect identified migratory birds and mammals.

In 1988, the Mexican Government passed the General Law of Ecological Equilibrium and Environmental Protection, which is similar to NEPA in the United States. This Mexican statute requires an environmental assessment of private or government actions that may affect wildlife or their habitat. Currently, no known regulatory mechanisms or conservation planning are in place that specifically targets the conservation of habitat within the range of the western yellow-billed cuckoo in Mexico. Therefore, we anticipate continued threats in Mexico, with little or no protection to the western yellow-billed cuckoo.

The National Natural Protected Areas (NPAs) system is a Mexican program to protect sensitive habitats and species. NPA designation is supposed to protect areas that have not been significantly altered by human activities and that provide diverse ecosystem services. However, prior to 1994, most NPAs lacked sound and comprehensive management plans. By 2000, approximately 30 percent of new and existing NPAs had developed management plans; however, under the NPA model these plans lacked detailed information, and in many cases could be considered obsolete. NPA goals to promote sustainable natural resources are often unattainable because of conflicting land ownership interests (Valdez *et al.* 2006, p. 272). The allocation of funds for management of natural reserve areas in Sonora is not assured, and some reserves have not received protection other than that given by government edicts or their natural isolation (Burquez and Martinez-Yrizar 1997, p. 378). Urban development has reduced some of Sonora's natural reserves. Three of the reserves have already disappeared, reflecting the tenuous state of many nature reserves in Mexico (Burquez and Martinez-Yrizar 2007, p. 546).

Wildlife management units, or UMAs, were part of a program developed and implemented by SEMARANT in 1997 to promote wildlife management on private property in Mexico (Weber *et al.* 2006, p. 1480). The UMA program has not been effective in promoting wildlife management or biodiversity conservation. It has increased the introduction of exotic wildlife species to meet hunting demands. There is a lack of technical capability on private lands to conduct proper wildlife monitoring and management (Weber *et al.* 2006, p. 1482). In Mexico, the exploitation of minerals and industrial development has not been matched by strong measures to protect the environment (Burquez and Martinez-Yrizar 2007, p. 547). Surface water and ground water management in Mexico is also lacking, and restoring water quality and quantity to water bodies is a primary concern (Organisation for Economic Co-operation and Development (OECD) 2013, p. 102). In the State of Sonora, 30 years of unregulated water extraction from both above and below ground has resulted in serious water resource overexploitation and degradation (OECD 2013, p. 115). Although regulatory measures are in place, they lack consistent implementation and oversight (OECD 2013, p. 133).

Current efforts for protecting the western yellow-billed cuckoo in Mexico primarily consist of identifying areas as Important Areas for Bird Conservation (Áreas de Importancia para la Conservación de las Aves), but no specific projects or conservation efforts are focused on the western yellow-billed cuckoo or its habitat (Sánchez-González and Berlanga 2012 in litt.).

Lack of habitat protection for the western yellow-billed cuckoo in northwestern Mexico also impacts the western yellow-billed cuckoo in the United States because individuals are known to make transitory movements up to several hundred miles between the southwestern United States and northern Mexico within a single breeding season (Sechrist *et al.* 2012, p. 5), so that individuals that breed in the United States also depend to some extent on habitat in northern Mexico. We are not aware of any information on the number of western yellow-billed cuckoos that utilize habitats in both countries during a given breeding season; however, these are also stopover areas between breeding and wintering grounds in South America, and are important as foraging habitat. Therefore, lack of regulatory protections for habitat of the western yellow-billed cuckoo in northwestern Mexico also affects western yellow-billed cuckoos in the southwestern United States.

In regard to potential for pesticide exposure south of the U.S. border, Mexico has the second largest pesticide sales in Latin America, behind Brazil, which together account for 78 percent of the volume of pesticides within 11 Latin American countries (Mora 1997, pp. 3–4). While Mexico has laws concerning pesticide use, and import regulations on certain pesticides, there is limited enforcement capacity (Behre 2003, pp. 337–338). The same is true in Paraguay, Bolivia, Brazil, and Argentina, where yellow-billed cuckoos winter. For example, in Paraguay, at the center of the yellow-billed cuckoo's wintering range, importation and use of many pesticides are banned, but it is estimated that the amount of pesticides that are imported illegally are double the amount that are imported legally (Scribano 2013, entire). For additional information on pesticides, see Factor E below.

Based on the best available information, the regulatory mechanisms in Mexico that would protect the western yellow-billed cuckoo from threats described under Factors A and E are either lacking or not being fully implemented. These include water supply projects, water diversions, expansion of agricultural activities and overgrazing, conversion of habitat to nonnative vegetation, climate change (Factor A), and pesticides, as well as the threat of small, isolated patches of western yellow-billed cuckoo habitat (Factor E).

Summary of Factor D

Various Federal, State, and international regulatory mechanisms in

place provide varying degrees of conservation oversight that may to some degree address the threat of ongoing habitat loss and degradation resulting from altered hydrology, conversion of habitat to nonnative vegetation, climate change, agricultural activities (Factor A), or exposure to pesticides and effects of small and isolated habitat patches (Factor E). In California, where the species is listed as endangered, regulations prohibit unpermitted possession, purchase, sale, or take of listed species. Such prohibition of take does not include the species' habitat, and the western yellow-billed cuckoo continues to decline in California despite its status as a State-listed species. In addition, even though the California Department of Pesticide Regulations has a program to protect endangered species, the western yellow-billed cuckoo has not been included as a covered species.

Because the yellow-billed cuckoo is not a protected or sensitive species in Canada, Mexico, or in a majority of the United States, and a variety of factors influence the species and its habitat, we have determined that the current regulatory regime does not adequately address the majority of impacts to the western yellow-billed cuckoo or its habitat. As described under Factor A, one of the primary threats with the greatest severity and magnitude of impact to western yellow-billed cuckoo is the loss of habitat as a result of altered hydrologic functioning of streams in the West. Although some protections currently exist for the species and its habitat as a result of existing regulatory mechanisms at the Federal, State, or local level, our evaluation suggests these protections are inadequate to address the threats associated with the species and its habitat.

*E. Other Natural or Manmade Factors Affecting Its Continued Existence*

Small and Widely Separated Habitat Patches

As described in the **Background** section and under Factor A, the habitat of the western yellow-billed cuckoo has undergone significant loss and modification within its occupied breeding range as a result of widespread multiple human-caused effects. These include altered hydrology in watercourses and past loss and degradation from agriculture. Past destruction and modification transformed formerly large expanses of riparian habitat into a number of smaller patches of smaller total area, isolated from each other by a matrix of mostly human-altered habitats (McGill, 1975,

pp. 1–4; Thompson, 1961, pp. 294–315; Wilcove *et al.* 1986, p. 237). The potential natural regeneration or restoration of the habitat to reconnect these areas is low due to various reasons (see Factor A discussion). Under the best of circumstances, for riparian habitat (willows, cottonwoods) to mature to the point at which it provides for appropriate food, shelter, and breeding conditions for the western yellow-billed cuckoo may take 3–5 years (Golet *et al.* 2008, pp. 20–22). However, in areas where conditions are less than optimal, habitat may take several decades to mature to the point where it would be available for use (Strahan 1984, pp. 58–67; Briggs 1995, pp. 63–67; Opperman and Merenlender 2004, pp. 822–834; Trowbridge *et al.* 2004, pp. 157–164; Morris *et al.* 2006, pp. 106–116; Griggs 2009, p. 12).

As a result, the western yellow-billed cuckoo now primarily occurs in smaller, more widely separated populations. Compared to large populations, smaller populations are disproportionately affected by natural and manmade factors. These stressors vary in frequency, timing, and magnitude across the species' range. They are related or correlated to each other or act in combination to result in significant impacts to the western yellow-billed cuckoo within all or portions of its range.

One of the ramifications of smaller, more isolated habitat patches is that the smaller the patch, the more edge it has in proportion to its area, which increases the percentage of the available habitat exposed to the surrounding land uses (Hunter 1996, pp. 186–187). This is a particularly prevalent characteristic of the western yellow-billed cuckoo's remaining disjunct habitat patches, as many patches are in proximity to agricultural and other human-altered landscapes. For example, such land use currently dominates much of the riparian landscape within many regions, particularly along some reaches of the lower Colorado River, Sacramento River, Snake River, Verde River, Gila River, Santa Cruz River, San Pedro River, and Río Grande; and also in parts of northern Mexico in the vicinity of floodplain farming along the Sonora, Magdalena, and Moctezuma Rivers (Villaseñor-Gomez 2006, p. 111).

Agricultural activities on adjacent lands affect riparian bird communities in ways that may result in lower reproductive success, and possible abandonment of the patch, as reviewed by Saab (1999, pp. 136, 147–148). Saab (1999, p. 147) found that bird species, including the western yellow-billed cuckoo, were more likely to occur in

riparian habitat along the Snake River, Idaho, in sites surrounded by upland natural vegetation than in habitat adjacent to agricultural lands. Saab found that, compared to habitat patches surrounded by natural habitat, patches near agricultural lands supported more avian nest predators that prosper in human-altered landscapes and have a greater effect on the smaller, fragmented habitats (Saab 1999, p. 147). Increases in these predators can result in more nest losses and discourage western yellow-billed cuckoos from nesting, thus suppressing local western yellow-billed cuckoo population size. Increases in nonnative vegetation can displace or degrade suitable nesting and foraging habitat, thereby leading to lower utilization of such areas by western yellow-billed cuckoos. Together, the effects can lead to western yellow-billed cuckoos abandoning these small habitat patches.

The western yellow-billed cuckoo is currently found in the largest contiguous and least-fragmented remaining habitat patches. For example, in California, sites larger than 198 ac (80 ha) in extent and wider than 950 ft (600 m) provided optimal patch size for western yellow-billed cuckoos (Laymon and Halterman 1989, p. 275). Nesting western yellow-billed cuckoos are sensitive to patch size and seldom use patches smaller than 325 × 975 ft (100 × 300 m) (Hughes 1999, p. 20). This observed preferential use of large patches strongly suggests that the western yellow-billed cuckoo is sensitive to fragmentation and reductions in habitat patch size. Moreover, patch-size reduction combined with the scarcity of larger patches keeps the western yellow-billed cuckoo breeding population size depressed. Such effects prevent the western yellow-billed cuckoo from reversing its long-term decline in population and range (Hunter 1996, pp. 179–187).

Moreover, isolated breeding sites separated by hundreds of miles of nonhabitat also reduce the ease with which dispersing juvenile and returning adult western yellow-billed cuckoos are able to find these sites. This isolation may result in low colonization and reoccupation rates, so that otherwise suitable habitat remains unoccupied or occupied at low densities (Laymon and Halterman 1989, p. 274; Hunter 1996, p. 185). For example, the Sacramento River still appears to have sufficient habitat to maintain a self-sustaining population of western yellow-billed cuckoos, as more than 25,000 ac (10,117 ha) of riparian and associated natural habitat has been protected and other sections are in the

process of being restored. However, not all suitable patches are occupied or may only be occupied in very low densities, and the western yellow-billed cuckoo population remains much lower than its potential (Dettling and Howell 2011, pp. 20–21).

On the Colorado River (between Lake Mead and the Mexico border), habitat restoration efforts are being implemented as a result of the Lower-Colorado River Multi-species Conservation Plan (LCR MSCP). The LCR MSCP permittees are in the process of creating and maintaining up to 4,050 ac (1,639 ha) of western yellow-billed cuckoo habitat, reducing the risk of loss of created habitat to wildfire, replacing created habitat affected by wildfire, and avoiding and minimizing operational and management impacts to western yellow-billed cuckoos over the 50-year life of the permit (2005 to 2055) (Lower Colorado River Multi-Species Conservation Program 2004, pp. 5–30–5–36, Table 5–10, 5–58–5–60). Not all of the habitat has been created, and as a result, the restoration sites are not contiguous along the entire river reach. Monitoring and survey efforts for the western yellow-billed cuckoo have shown an increase in detections, but the majority of detections were confined to only a few of the larger areas (McNeil et al. 2011, pp. 1–16).

In summary, despite efforts to protect and restore riparian habitat along the Sacramento River and Colorado River and elsewhere in the range of the western yellow-billed cuckoo, these efforts offset only a small fraction of historical habitat that has been lost. Therefore, the threats resulting from the species' behavioral response to the multiple, combined effects of small and widely separated habitat patches exacerbate the effect of other threats within a large portion of the range of the western yellow-billed cuckoo. Moreover, because the threats that create small and isolated patches are ongoing (see Factor A) and maturation of regenerated or restored habitat may take several decades to fully provide for the needs of the species, we expect the effects of the species' response to small patch size to continue to adversely impact the western yellow-billed cuckoo into the future.

Pesticides

Exposure to pesticides may also be a threat to western yellow-billed cuckoos because it negatively impacts populations of insect prey (Groschupf 1987, p. 29; Hughes 1999, p. 2). The effects of pesticides on western yellow-billed cuckoos can be from intentional aerial spraying of habitat for mosquito or forest pest control, or from overspray or drift when the species' foraging habitat is located next to agricultural fields. Pesticides can affect western yellow-billed cuckoos foraging for grasshoppers at the field-forest interface or foraging for caterpillars in riparian habitat adjacent to the sprayed fields. Accumulation of chlorinated hydrocarbon pesticides, particularly dichlorodiphenyltrichloroethane (DDT), has affected other bird species, particularly top predators (Robinson and Bolen 1989, pp. 269–275). Pesticides may affect behavior (for example, loss of balance) or cause death by direct contact. Pesticide use may indirectly affect western yellow-billed cuckoos by reducing prey numbers, or by poisoning nestlings if sprayed directly in areas where the birds are nesting (Layman and Halterman 1987b, p. 23; Lehman and Walker 2001, p. 12).

Western yellow-billed cuckoo prey populations were affected by aerial spraying of larvicides for control of mosquitoes at Caswell State Park in California (Laymon 1998, p. 12) and in Colorado to control an outbreak of caterpillars on box elders near Durango (Colyer 2001, pp. 1–6). The available evidence suggests that a reduction in prey availability results in reduced nesting success (Laymon 1980, p. 27; Hughes 1999, pp. 19–20), and pairs may even forgo breeding in years with inadequate food supplies (Veit and Petersen 1993, pp. 258–259). Therefore, the application of pesticides directly onto areas of riparian habitat may indirectly affect the reproductive success of the western yellow-billed cuckoo, leading to nest failure and lowered population size. Additionally, because breeding site fidelity is in part dependent on previous successful nesting (see the Breeding Site Fidelity section of the proposed rule), western yellow-billed cuckoos may abandon otherwise suitable nest sites where prey availability is limited by pesticide use, resulting in curtailment of its occupied range.

Effects from overspray of pesticides are more pronounced in smaller patches next to agricultural fields (because they have more edges, which allows for increased chances of exposure), but the effects of pesticides could also affect larger habitat patches as well. In many areas riparian habitat borders agricultural lands, such as California's Central Valley, the lower Colorado River, Snake River, Gila River, Río Grande Valley, and rivers in northern Mexico, including the Sonora, Yaqui, Mayo, and Moctezuma, where western yellow-billed cuckoos are vulnerable to pesticide exposure. Laymon (1980, pp.

11–12) reported sublethal poisoning of young western yellow-billed cuckoos caused by spraying active nests in walnut orchards in California.

Although DDT use has been banned in the United States since 1972, and in Mexico since 1999, yellow-billed cuckoos may be exposed to DDT in Mexico or on wintering grounds where DDT is still used despite any bans on its use. The soil half-life for DDT is from 2 to 15 years. However, in some cases, half of the DDT initially present will remain for 20, 30, or more years (U.S. Department of Human Health & Human Services, Agency for Toxic Substances and Disease Registry 1994, pp. 3–4).

For example, yellow-billed cuckoos (most likely of the eastern population) collected during the spring and fall migration in Florida had unusually high concentrations of DDT, suggesting exposure on the wintering grounds in South America (Grocki and Johnston 1974, pp. 186–188). Analysis of two eggs collected in California in 1979 showed very low levels of dichlorodiphenyldichloroethylene (DDE), a stable metabolite of DDT, but eggshell fragments collected in 1985 from three nests along the South Fork Kern River in California averaged 19 percent thinner than pre-DDT era eggshells (Laymon and Halterman 1987b, pp. 22–23). DDT has caused eggshell thinning in other bird species, and this percentage of thinning in other species has allowed eggs to be crushed during incubation, but there is no information showing that western yellow-billed cuckoo eggs have been crushed during incubation because of shell thinning.

A recent study in southern Sonora, Mexico, tested for the presence of a group of agricultural pesticides banned in the United States, known as organochlorine pesticides (beta-hexachlorocyclohexane (BHC), lindane, aldrin, endrin, b-endosulfan, methoxychlor, p, p0–DDE, p, p0-Dichlorodiphenyldichloroethane (DDD), p, p0–DDT). Collectively called OCPs, these pesticides are persistent in the environment. Soil samples collected from 24 localities in the Yaqui and Mayo Valleys of southern Sonora, Mexico, watersheds in which the western yellow-billed cuckoo is known to breed, were found to have higher OCP levels than other regions of the world. The OCPs were predominantly DDT (Cantu-Soto et al. 2011, p. 559), despite its having been discontinued in Mexico in 1999 after decades of heavy use in agriculture and for malaria control (Yañez et al. 2004, p. 18). This finding may indicate recent applications of DDT in agricultural soils (Cantu-Soto et al.

2011, p. 559). Because of the proximity of habitat for western yellow-billed cuckoos to these valleys and the prevalence of floodplain agriculture in northern Mexico, these pesticides, especially DDT, may be having widespread long-lasting effects on the western yellow-billed cuckoo. These include direct and indirect exposure through ingestion of contaminated prey items, and reduction in prey availability from direct exposure and pesticide runoff into habitat that supports western yellow-billed cuckoos.

Neonicotinoid pesticides are systemic chemicals that are taken up through various plant parts and can be distributed through a plant's tissues. These chemicals can be applied to a plant as a seed coating, soil contact, irrigation water, or as a foliar spray. Many of these chemicals are long acting with half-lives up to 2 years. Plant tissues that have been treated are toxic to both sap-sucking (e.g., aphids and true bugs) and foliage-eating insects (e.g., caterpillars, katydids, grasshoppers, and beetles). Many of these foliage-eating insects are potential prey of the western yellow-billed cuckoo. These chemicals have the potential to reduce prey abundance if intentionally or accidentally applied to foliage on which western yellow-billed cuckoos forage. To date no scientific studies have been done on western yellow-billed cuckoos and their prey, but additional reports and research on these chemicals discuss the potential adverse effects (Mineau and Whiteside 2013; Hopwood *et al.* 2013; Mineau and Palmer 2013).

In summary, pesticide use is widespread in agricultural areas in the western yellow-billed cuckoo breeding range in the United States and northern Mexico. Yellow-billed cuckoos have been exposed to the effects of pesticides on their wintering grounds, as evidenced by DDT found in their eggs and eggshell thinning in the United States. Because much of the species' habitat is in proximity to agriculture, the potential exists for direct and indirect effects to a large portion of the species in these areas through altered physiological functioning, prey availability, and, therefore, reproductive success, which ultimately results in lower population abundance and curtailment of the occupied range. While agricultural pesticides can kill prey of the yellow-billed cuckoo, and documentation exists of pesticide exposure in the wild, described above, no known data are available to determine specifically how often agricultural chemicals may be affecting yellow-billed cuckoo prey availability,

locations where it may be particularly significant, or the extent to which pesticides may be responsible for population-level effects in the western yellow-billed cuckoo. However, based on the close proximity of agricultural areas to where the western yellow-billed cuckoo breeds, the threat is potentially significant.

Collisions With Communication Towers, Wind Turbines, Solar Power Towers, and Other Tall Structures

Yellow-billed cuckoos are vulnerable to collision with communication towers and other tall structures, particularly during their migration. For example, several hundred yellow-billed cuckoo mortalities were documented at a single television tower in Florida over a 29-year period (Crawford and Stevenson 1984, p. 199; Crawford and Engstrom 2001, p. 383), and at an airport ceilometer in the east (Howell *et al.* 1954, p. 212). Lesser numbers of yellow-billed cuckoos have been reported as killed at other sites with both television towers and wind turbines in Wisconsin, West Virginia, and northern Texas (Kemper 1996, p. 223; Schechter 2009, p. 1; Bird Watching 2011, p. 1). Although these mortalities were in the eastern segment of the population, with the number of tall towers that have been constructed in recent years in the western United States, the potential exists for collisions with the western yellow-billed cuckoo. Remains of a yellow-billed cuckoo along with 70 other species of birds have been recovered at the Ivanpah solar power tower facility (California) during its first year of operation (Kagan *et al.* 2014, p. 10). Without further study, we anticipate this to be a minor, but ongoing, effect to individual yellow-billed cuckoos, but in combination with all the other effects to this species, as described under Factors A and E, mortality from collision would have an additive effect to the threats facing the western yellow-billed cuckoo.

Conservation Efforts To Reduce Other Natural or Manmade Factors Affecting Its Continued Existence

Active and hydrological process-based restoration of riparian habitat on the Colorado, Kern, and Sacramento Rivers and elsewhere will help reduce habitat fragmentation, small patch size, and overall lack of habitat. In some restoration plans, reduction of fragmentation is a stated goal, and restoration sites are planned for sites adjacent to existing habitat. The Colorado River riparian habitat restoration work is just beginning and is part of the Lower Colorado River Multi-

Species Conservation Plan. This habitat conservation plan calls for the creation of 5,940 ac (2405 ha) of riparian habitat through active restoration of which 4,050 ac (1,640 ha) will be suitable for western yellow-billed cuckoos (Reclamation 2004, Sec. 5, p. 58). Active restoration work began on the South Fork Kern River in California, in 1986. To date, 340 ac (138 ha) of riparian habitat have been restored (Audubon California 2012, pp. 1–10). Along the Sacramento River, the Sacramento River National Wildlife Refuge has implemented an active riparian restoration program. Riparian habitat restoration activities have been conducted on 4,513 ac (1,826 ha) with 2,400 ac (738 ha) slated for additional restoration (Hammond 2011, p. 14). In Utah, from 2008–2013, the State's Watershed Restoration Initiative (WRI) has invested funding with partners toward collaborative habitat enhancement efforts in lowland riparian habitats. The efforts were distributed across 35 different projects and totaled more than 8,000 ac (3,200 ha).

At present, restoration occurs on a relatively small scale in comparison to the need to reduce habitat fragmentation and increase the overall extent of suitable habitat. Future process-based restoration projects that restore natural river hydrology show great promise for large-scale restoration of riparian habitat for western yellow-billed cuckoos.

To date, conservation efforts, though helpful, have been inadequate to significantly reduce the effects of natural or manmade factors affecting the western yellow-billed cuckoo.

Summary of Factor E

As noted in Factor A, habitat for the western yellow-billed cuckoo has been modified and curtailed, resulting in only remnants of formerly large tracts of native riparian forests, many of which are no longer occupied by western yellow-billed cuckoos. Despite recent efforts to protect existing, and restore additional, riparian habitat in the Sacramento, Kern, and Colorado Rivers, and other rivers in the range of the western yellow-billed cuckoo, these efforts offset only a small fraction of historical habitat that has been lost. Therefore, we expect the final resulting from the combined effects associated with small and widely separated habitat patches to continue to affect a large portion of the range of the western yellow-billed cuckoo. This threat is particularly persistent where small habitat patches are in proximity to human-altered landscapes, such as near agricultural fields that dominate the landscape in many areas where the

western yellow-billed cuckoo occurs. As a result, the potential exists for pesticides to directly affect (poisoning individual cuckoos) and indirectly affect (reducing the prey base) a large portion of the species. These effects could ultimately result in lower population abundance and curtailment of its occupied range. Mortality from collisions with tall structures is also an ongoing but largely unquantified effect.

Cumulative Impacts

Habitat loss and degradation occurs throughout the range of the western yellow-billed cuckoo (see **Background** section and Factor A above), and many of the threats under Factor A have worked and are working in combination to reduce the amount, configuration, and quality of the riparian habitat that remains.

This array of Factor A threats, working in combination, creates the situation that then allows threats from the other listing factors to markedly affect the species. These other-factor threats may not be significant in and of themselves, but because they are not occurring in isolation they, in combination, are contributing to the population decline of the species. For example, as discussed in the Small and Widely Separated Habitat Patches section of Factor E, above, small habitat patches (resulting from the effects of Factor A threats) are more likely to have a larger number and a wider range of nest predators (see the Predation section of Factor C, above) because more nest predators occur in ecological edges. Additionally, habitat patches near areas of agricultural or urban development can foster higher densities of potential nest predators. Thus, any western yellow-billed cuckoo nesting in a small habitat patch near development may be subject to higher levels of nest predation and thus lower productivity. Moreover, the mere presence of certain nest predators in a habitat patch may elicit a behavioral response from western yellow-billed cuckoos such that they do not even attempt to nest in such habitat patches, even if other aspects of the habitat would suggest that it is suitable for nesting.

Similarly, riparian habitat patches that occur near urban and agricultural development may be subject to intentional or accidental pesticide spraying, as discussed in the Pesticide section under Factor E. This spraying would be unlikely to occur but for the habitat patch's proximity to development. This development likely occurs close to the riparian habitat through a process similar to the generalized scenario described above

(see also specific details under Factor A).

Much of the available habitat is now in small patches with only a relatively few patches regularly occupied by nesting western yellow-billed cuckoos. Thus, the species' intolerance of small patch size in combination with extensive habitat loss has resulted in much less suitable habitat and a greatly reduced western yellow-billed cuckoo population size. In areas at the edge of the western yellow-billed cuckoo's current range (e.g., the Sacramento River), restoration of riparian habitat has not been accompanied by an increase in the species' population indicating that other factors may be limiting the population in those areas. Moreover, large areas of suitable habitat are unlikely to naturally regenerate within the range of the species into the future because western yellow-billed cuckoos need riparian habitat in a range of ages, including older, more structurally diverse areas for nesting, and nearly all of the areas where riparian habitat could grow in western North America are modified by dams, channelization, water extraction, and other activities that disrupt natural processes to allow good-quality riparian habitat to grow in a mosaic of different ages (see Factor A). Climate change is likely to further add to these impacts.

Summary of Factors

The primary factors threatening the western DPS of the yellow-billed cuckoo are the loss and degradation of habitat for the species from altered watercourse hydrology and natural stream processes, livestock overgrazing, encroachment from agriculture, and conversion of native habitat to predominantly nonnative vegetation as identified in Factor A. Additional threats to the species under Factor E include the effects of climate change, pesticides, wildfire, and small and widely separated habitat patches. The cumulative impact from various threats is also a factor that will exacerbate multiple existing threats to the western yellow-billed cuckoo and its habitat.

Various Federal, State, and international regulatory mechanisms in place provide varying degrees of conservation oversight that may to some degree address the threat of ongoing habitat loss and degradation; however, because the yellow-billed cuckoo is not a protected or sensitive species in a majority of the United States or in Canada and Mexico, the application of these regulatory mechanisms to conserve the western yellow-billed cuckoo or its habitat is unknown and

the effectiveness of these regulatory mechanisms is uncertain.

These factors pose current and future threats to the species because they are ongoing and likely to continue in the near future.

Determination

We have carefully assessed the best scientific and commercial data available regarding the past, present, and reasonably anticipated future threats to the western yellow-billed cuckoo. In assessing the status of the western yellow-billed cuckoo, we applied the general understanding of "in danger of extinction" discussed in the December 22, 2010, Memorandum to the polar bear listing determination file, "Supplemental Explanation for the Legal Basis of the Department's May 15, 2008, Determination of Threatened Status for the Polar Bear," signed by then Acting Director Dan Ashe (Service 2010, pp. 1–18). Threats to the western yellow-billed cuckoo exist for two of five threat factors. Threats also occur in combination, resulting in synergistically greater effects.

Factor A threats result from habitat destruction, modification, and degradation from dam construction and operations, water diversions, riverflow management; stream channelization and stabilization; conversion to agricultural uses, such as crops and livestock grazing; urban and transportation infrastructure; and increased incidence of wildfire. Continuing ramifications of actions that caused habitat loss in the past have resulted in ongoing curtailment of the habitat of the western yellow-billed cuckoo throughout its range. These factors also contribute to fragmentation and promote conversion to nonnative plant species, particularly tamarisk. The threats affecting western yellow-billed cuckoo habitat are ongoing and significant and have resulted in curtailment of the range of the species. Loss of riparian habitat leads not only to a direct reduction in western yellow-billed cuckoo numbers but also leaves a highly fragmented landscape, which in combination with other threats (see below), can reduce breeding success through increased predation rates and barriers to dispersal by juvenile and adult western yellow-billed cuckoos.

Factor E threats, including habitat rarity and small and isolated population sizes, cause the remaining western yellow-billed cuckoo populations to be increasingly susceptible to further declines through lack of immigration, reduced populations of prey species (food items), pesticides, and collisions with tall vertical structures during

BLM_0071967

migration. The serious and ongoing threat of small overall population size, which is the result of other threats in combination, leads to an increased chance of local extirpations.

The threats that affect the western yellow-billed cuckoo are important on a threat-by-threat basis, but are even more significant in combination. Habitat loss has been extensive throughout the range of the western yellow-billed cuckoo. The remaining riparian habitat is fragmented into small patches, which the species does not normally select as breeding habitat. Additionally, western yellow-billed cuckoos need riparian habitat in a range of ages, including older structurally diverse areas for nesting. This diversity of tree ages within the riparian vegetation (western yellow-billed cuckoo's habitat) is largely dependent on disturbances that affect some but not all of the vegetation within that habitat patch at one time. A number of threats, working in combination or individually, prevent such disturbance from happening now and will continue to do so in the future.

For example, dams and other flood control modifications to a watercourse may prevent floods from being severe enough to affect that habitat patch; channelization may restrict floodwaters to a narrow channel, allowing floodwaters to cause too much damage to habitat within the channel and not enough (or no) damage to habitat outside the channel; altered flood regimes may allow dead wood to accumulate, allowing fires, when they occur, to be severe and affect most of the patch; development and other human activities next to habitat patches may allow more wildfires to be ignited; and the reduction in patch size, through neighboring development, alteration of hydrology, or encroachment by nonnative plants, makes it more likely that a larger proportion of that patch will be affected during any given disturbance event. Moreover, nearly all areas where riparian habitat could potentially grow are modified by dams or water withdrawal and disrupted by other activities, often in combination, that prevent the reestablishment of riparian habitat. Patch size, when coupled with habitat loss and Factor C and E threats, including proximity to incompatible land uses, which increases exposure to predators and pesticides, is a significant cumulative threat to the western yellow-billed cuckoo now and in the future.

Per section 4(b)(1)(A) of the Act, prior to making our determination, we must first "[take] into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a

State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas." Restoration of riparian habitat on the Colorado, Kern, and Sacramento Rivers and elsewhere will help reduce habitat fragmentation, small patch size, and overall lack of habitat. However, at present, restoration is being done on a relatively small scale in comparison to the need to reduce habitat fragmentation and increase the overall extent of suitable habitat. DDT has been banned in the United States for several decades, but use of DDT continues in Central and South America, thus potentially exposing western yellow-billed cuckoos during migration and winter.

Through our analysis of the best available scientific and commercial information on the species' abundance, life history, current population status and trends, and the response of the species and its habitat to natural and anthropogenic threats, we have determined that the western yellow-billed cuckoo meets the definition of a threatened species under the Act, rather than endangered. The Act defines an endangered species as any species that is "in danger of extinction throughout all or a significant portion of its range" and a threatened species as any species "that is likely to become endangered throughout all or a significant portion of its range within the foreseeable future."

The geographic extent of the western yellow-billed cuckoo remains rather widespread through much of its historic range, conferring some measure of ecological and geographic redundancy and resilience. Although there is a general decline in the overall population trend and its breeding range has been reduced, the rate of the population decline and contraction of its breeding range is not so severe to indicate extinction is imminent for the western yellow-billed cuckoo. This current downward trend is slow and not expected to increase in the near future. The majority of large-scale habitat losses and conversions through dam building and agricultural development have already occurred, and we are not aware of any large-scale projects that would affect the species to the extent that the current trend of decline would change. Therefore, threats to the species and population declines do not currently reach the level typical of an endangered species.

Because the western yellow-billed cuckoo does not face any known sudden and calamitous threats, it is not a narrowly endemic species vulnerable to

extinction from elevated or cumulative threats, is not yet restricted to a critically small range or critically low numbers, and currently does not show any substantial reduction in numbers, it would not meet the definition of "endangered" as determined by the Act. More appropriately, we find that the western yellow-billed cuckoo is likely to become endangered throughout all or a significant portion of its range within the foreseeable future, based on the timing, severity, and scope of the threats described above. Therefore, on the basis of the best available scientific and commercial information, we are listing the western distinct population segment of the yellow-billed cuckoo as a threatened species in accordance with sections 3(6), 3(20), and 4(a)(1) of the Act.

### Significant Portion of the Range

Under the Act and our implementing regulations, a species may warrant listing if it is an endangered or threatened species throughout all or a significant portion of its range. The Act defines "endangered species" as any species which is "in danger of extinction throughout all or a significant portion of its range," and "threatened species" as any species which is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." The definition of "species" is also relevant to this discussion. The Act defines "species" as follows: "The term 'species' includes any subspecies of fish or wildlife or plants, and any distinct population segment [DPS] of any species of vertebrate fish or wildlife which interbreeds when mature." The phrase "significant portion of its range" (SPR) is not defined by the statute, and we have never addressed in our regulations: (1) The consequences of a determination that a species is either endangered or likely to become so throughout a significant portion of its range, but not throughout all of its range; or (2) what qualifies a portion of a range as "significant."

In determining whether a species is threatened or endangered in a significant portion of its range, we first identify any portions of the range of the species that warrant further consideration. The range of a species can theoretically be divided into portions an infinite number of ways. However, there is no purpose to analyzing portions of the range that are not reasonably likely to be both (1) significant and (2) threatened or endangered. To identify only those portions that warrant further consideration, we determine whether

there is substantial information indicating that: (1) The portions may be significant, and (2) the species may be in danger of extinction or likely to become so within the foreseeable future. In practice, a key part of this analysis is whether the threats are geographically concentrated in some way. If the threats to the species are essentially uniform throughout its range, no portion is likely to warrant further consideration. Moreover, if any concentration of threats applies only to portions of the species' range that are not significant, such portions will not warrant further consideration.

If we identify portions that warrant further consideration, we then determine whether the species is threatened or endangered in these portions of its range. Depending on the biology of the species, its range, and the threats it faces, the Service may address either the significance question or the status question first. Thus, if the Service considers significance first and determines that a portion of the range is not significant, the Service need not determine whether the species is threatened or endangered there. Likewise, if the Service considers status first and determines that the species is not threatened or endangered in a portion of its range, the Service need not determine if that portion is significant. However, if the Service determines that both a portion of the range of a species is significant and the species is threatened or endangered there, the Service will specify that portion of the range as threatened or endangered under section 4(c)(1) of the Act.

We evaluated the current range of the western yellow-billed cuckoo to determine if there is any apparent geographic concentration of threats for the species. The western yellow-billed cuckoos are highly restricted to riparian habitat in their ranges, and the threats occur throughout the species' range. We considered the potential threats due to altered watercourse hydrology and natural stream processes, livestock overgrazing, encroachment from agriculture, conversion of native habitat to predominantly nonnative vegetation, pesticides, wildfire, small and widely separated habitat patches, and the effects of climate change. We found no concentration of threats because of the species' limited and curtailed range, and uniformity of the threats throughout its entire range. Having determined that the western yellow-billed cuckoo is threatened throughout its entire range, we must next consider whether there are any significant portions of the range where the western yellow-billed cuckoo is in danger of extinction or is likely to

become endangered in the foreseeable future.

The western yellow-billed cuckoo is highly restricted to riparian habitat, and the threats to the species and its habitat occur throughout its breeding range. Therefore, we assessed the status of the western yellow-billed cuckoo throughout its entire breeding range. The threats to the survival of the species occur throughout the western DPS' breeding range and are not restricted to any particular significant portion of that range. We conclude that what affects the entire breeding portion of the western DPS' range affects the status of the entire western yellow-billed cuckoo throughout its breeding range, including migration corridors and stopover areas. Accordingly, our assessment and proposed determination applies to the western yellow-billed cuckoo throughout its entire breeding range.

We found no portion of the western yellow-billed cuckoo's range where threats are significantly concentrated or substantially greater than in other portions of their range and that factors affecting the species are essentially uniform throughout its range, indicating no portion of the range of the species warrants further consideration of possible endangered or threatened status under the Act. Therefore, we find there is no significant portion of the range of the western yellow-billed cuckoo that may warrant a different status.

## Available Conservation Measures

Conservation measures provided to species listed as endangered or threatened under the Act include recognition, recovery actions, requirements for Federal protection, and prohibitions against certain practices. Recognition through listing results in public awareness and conservation by Federal, State, and local agencies; private organizations; and individuals. The Act encourages cooperation with the States and requires that recovery actions be carried out for all listed species. The protection measures required of Federal agencies and the prohibitions against certain activities are discussed, in part, below.

The primary purpose of the Act is the conservation of endangered and threatened species and the ecosystems upon which they depend. The ultimate goal of such conservation efforts is the recovery of these listed species, so that they no longer need the protective measures of the Act. Subsection 4(f) of the Act requires the Service to develop and implement recovery plans for the conservation of endangered and threatened species. The recovery

planning process involves the identification of actions that are necessary to halt or reverse the species' decline by addressing the threats to its survival and recovery. The goal of this process is to restore listed species to a point where they are secure, self-sustaining, and functioning components of their ecosystems.

Recovery planning includes the development of a recovery outline shortly after a species is listed and preparation of a draft and final recovery plan. The recovery outline guides the immediate implementation of urgent recovery actions and describes the process to be used to develop a recovery plan. Revisions of the plan may be done to address continuing or new threats to the species, as new substantive information becomes available. The recovery plan identifies site-specific management actions that set a trigger for review of the five factors that control whether a species remains endangered or may be downlisted or delisted, and methods for monitoring recovery progress. Recovery plans also establish a framework for agencies to coordinate their recovery efforts and provide estimates of the cost of implementing recovery tasks. Recovery teams (composed of species experts, Federal and State agencies, nongovernmental organizations, and stakeholders) are often established to develop recovery plans. When completed, the recovery outline, draft recovery plan, and the final recovery plan will be available on our Web site (*http://www.fws.gov/ endangered*), or from our Sacramento Fish and Wildlife Office (see **FOR FURTHER INFORMATION CONTACT**).

Implementation of recovery actions generally requires the participation of a broad range of partners, including other Federal agencies, States, Tribal, nongovernmental organizations, businesses, and private landowners. Examples of recovery actions include habitat restoration (e.g., restoration of native vegetation), research, captive propagation and reintroduction, and outreach and education. The recovery of many listed species cannot be accomplished solely on Federal lands because their range may occur primarily or solely on non-Federal lands. To achieve recovery of these species requires cooperative conservation efforts on private, State, and Tribal lands.

Following publication of this final listing rule, funding for recovery actions will be available from a variety of sources, including Federal budgets, State programs, and cost share grants for non-Federal landowners, the academic community, and nongovernmental organizations. In addition, pursuant to

section 6 of the Act, the States of Washington, Idaho, Montana, Oregon, California, Nevada, Wyoming, Utah, Colorado, Arizona, New Mexico, and Texas would be eligible for Federal funds to implement management actions that promote the protection or recovery of the yellow-billed cuckoo. Information on our grant programs that are available to aid species recovery can be found at: *http://www.fws.gov/grants*.

Please let us know if you are interested in participating in recovery efforts for the yellow-billed cuckoo. Additionally, we invite you to submit any new information on this species whenever it becomes available and any information you may have for recovery planning purposes (see **FOR FURTHER INFORMATION CONTACT**).

Section 7(a) of the Act requires Federal agencies to evaluate their actions with respect to any species that is proposed or listed as endangered or threatened and with respect to its critical habitat, if any is designated. Regulations implementing this interagency cooperation provision of the Act are codified at 50 CFR 402. Section 7(a)(4) of the Act requires Federal agencies to confer with the Service on any action that is likely to jeopardize the continued existence of a species proposed for listing or result in destruction or adverse modification of proposed critical habitat. If a species is listed subsequently, section 7(a)(2) of the Act requires Federal agencies to ensure that activities they authorize, fund, or carry out are not likely to jeopardize the continued existence of the species or destroy or adversely modify its critical habitat. If a Federal action may affect a listed species or its critical habitat, the responsible Federal agency must enter into formal consultation with the Service.

Federal agency actions within or affecting the species' habitat that may require conference or consultation or both as described in the preceding paragraph include, but are not limited to, projects that will result in removal or degradation of riparian vegetation, altered streamflow or fluvial dynamics, or other habitat-altering activities on Federal lands or as a result of issuance of section 404 CWA permits by the USACE; construction and management of energy and power line rights-of-way by the FERC; construction and maintenance of roads, highways, or bridges by the Federal Highway Administration; grazing leases by the USFS or the BLM; and projects funded through Federal loan programs. Such projects may include, but are not limited to, construction or modification of reservoirs, levees, bank stabilization

structures, water diversion and withdrawal projects, roads and bridges, utilities, recreation sites, and other forms of development, and livestock grazing.

Under section 4(d) of the Act, the Service has discretion to issue regulations that we find necessary and advisable to provide for the conservation of threatened species. The Act and its implementing regulations set forth a series of general prohibitions and exceptions that apply to threatened wildlife. The prohibitions of section 9(a)(1) of the Act, as applied to threatened wildlife and codified at 50 CFR 17.31 make it illegal for any person subject to the jurisdiction of the United States to take (which includes harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect; or to attempt any of these) threatened wildlife within the United States or on the high seas. In addition, it is unlawful to import; export; deliver, receive, carry, transport, or ship in interstate or foreign commerce in the course of commercial activity; or sell or offer for sale in interstate or foreign commerce any listed species. It is also illegal to possess, sell, deliver, carry, transport, or ship any such wildlife that has been taken illegally. Certain exceptions apply to employees of the Service, the National Marine Fisheries Service, other Federal land management agencies, and State conservation agencies.

We may issue permits to carry out otherwise prohibited activities involving threatened wildlife under certain circumstances. Regulations governing permits are codified at 50 CFR 17.32. With regard to threatened wildlife, a permit may be issued for the following purposes: For scientific purposes, to enhance the propagation or survival of the species, and for incidental take in connection with otherwise lawful activities. There are also certain statutory exemptions from the prohibitions, which are found in sections 9 and 10 of the Act.

It is our policy, as published in the **Federal Register** on July 1, 1994 (59 FR 34272), to identify to the maximum extent practicable at the time a species is listed, those activities that would or would not constitute a violation of section 9 of the Act. The intent of this policy is to increase public awareness of the effect of a final listing on proposed and ongoing activities within the range of a listed species. However, at this time, we are unable to identify specific activities that would not be considered to result in a violation of section 9 of the Act because the western yellow-billed cuckoo occurs in riparian habitat across numerous western States that exhibit a

variety of habitat conditions across its range, and it is likely that site- and project-specific conservation measures may be needed for activities that may directly or indirectly affect the species.

Based on the best available information, the following activities may potentially result in a violation of section 9 the Act; this list is not comprehensive: (1) Handling or collecting of the species; (2) destruction/ alteration of the species' habitat by discharge of fill material, draining, ditching, tiling, pond construction, stream channelization or diversion, or diversion or alteration of surface or ground water flow; (3) livestock grazing that results in direct or indirect destruction of riparian habitat; (4) activities such as continued presence of cattle and fragmentation of riparian habitat; (5) pesticide applications in violation of label restrictions; and (6) release of biological control agents that modifies or destroys habitat used by the species.

Questions regarding whether specific activities would constitute a violation of section 9 of the Act should be directed to the Sacramento Fish and Wildlife Office (see **FOR FURTHER INFORMATION CONTACT**).

**Required Determinations**

*National Environmental Policy Act (42 U.S.C. 4321 et seq.)*

We have determined that environmental assessments and environmental impact statements, as defined under the authority of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 *et seq.*), need not be prepared in connection with regulations pursuant to section 4(a) of the Act. We published a notice outlining our reasons for this determination in the **Federal Register** on October 25, 1983 (48 FR 49244).

*Government-to-Government Relationship With Tribes*

In accordance with the President's memorandum of April 29, 1994 (Government-to-Government Relations with Native American Tribal Governments; 59 FR 22951), Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments), and the Department of the Interior's manual at 512 DM 2, we readily acknowledge our responsibility to communicate meaningfully with recognized Federal Tribes on a government-to-government basis. In accordance with Secretarial Order 3206 of June 5, 1997 (American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the Endangered

Species Act), we readily acknowledge our responsibilities to work directly with tribes in developing programs for healthy ecosystems, to acknowledge that tribal lands are not subject to the same controls as Federal public lands, to remain sensitive to Indian culture, and to make information available to tribes. During the development of this final rule, we contacted, held meetings with, or otherwise coordinated with all known tribal entities within the range of the species within the United States. Information solicited or gathered as result of this coordination has been incorporated into this final determination as appropriate. We will conduct further coordination during our designation of critical habitat for the species.

**References Cited**

A complete list of all references cited in this rule is available on the Internet at *http://www.regulations.gov* or upon request from the Field Supervisor, Sacramento Fish and Wildlife Office (see **ADDRESSES**).

**Authors**

The primary authors of this final rule are the staff members from the Service's Sacramento Fish and Wildlife Office and the Pacific Southwest Regional Office (Region 8) with assistance from staff from the Pacific Northwest Region (Region 1), the Southwest Region (Region 2), and the Mountain-Prairie Region (Region 6).

**List of Subjects in 50 CFR Part 17**

Endangered and threatened species, Exports, Imports, Reporting and recordkeeping requirements, Transportation.

**Regulation Promulgation**

Accordingly, we amend part 17, subchapter B of chapter I, title 50 of the Code of Federal Regulations, as follows:

**PART 17—[AMENDED]**

■ 1. The authority citation for part 17 continues to read as follows:

**Authority:** 16 U.S.C. 1361–1407; 1531– 1544; 4201–4245, unless otherwise noted.

■ 2. Amend § 17.11(h) by adding an entry for ''Cuckoo, yellow-billed (Western DPS)'' to the List of Endangered and Threatened Wildlife in alphabetical order under Birds, to read as follows:

**§ 17.11   Endangered and threatened wildlife.**

\*     \*     \*     \*     \*

(h) \* \* \*

| Species | | Historic Range | Vertebrate population where endangered or threatened | Status | When listed | Critical habitat | Special rules |
|---|---|---|---|---|---|---|---|
| Common name | Scientific name | | | | | | |
| \* | \* | \* | \* | \* | \* | | \* |
| BIRDS | | | | | | | |
| \* | \* | \* | \* | \* | \* | | \* |
| Cuckoo, yellow-billed | *Coccyzus americanus.* | U.S.A., Canada, Mexico. | Western DPS: U.S.A. (AZ, CA, CO (western), ID, MT (western), NM (western), NV, OR, TX (western), UT, WA, WY (western)); Canada (British Columbia (southwestern); Mexico (Baja California, Baja California Sur, Chihuahua, Durango (western), Sinaloa, Sonora). | T | 850 | NA | NA |
| \* | \* | \* | \* | \* | \* | | \* |

\*     \*     \*     \*     \*

Dated: September 24, 2014.

**Daniel M. Ashe,**

*Director, U. S. Fish and Wildlife Service.*

[FR Doc. 2014–23640 Filed 10–2–14; 8:45 am]

**BILLING CODE 4310–55–P**

BLM_0071971

11/12/2014    Species Profile for Mexican Spotted owl (Strix occidentalis lucida)



**U.S. Fish & Wildlife Service**

Environmental Conservation Online System
Conserving the Nature of America
Enter Search Term(s):

[ ] [Search]

- ECOS>
- Species Profile for Mexican Spotted owl (Strix occidentalis lucida)

# Mexican Spotted owl (Strix occidentalis lucida)

Federal Register | Recovery | Critical Habitat | Conservation Plans | Petitions | Life History

**Taxonomy:**    View taxonomy in ITIS

**Listing Status:**   **Threatened**

**Where Listed: WHEREVER FOUND**

*Search for images on
digitalmedia.fws.gov*

**General Information**

Unlike most owls, Mexican spotted owls have dark eyes. They are an ashy-chestnut brown color
with white and brown spots on their abdomen, back and head. Their brown tails are marked with
thin white bands. They lack ear tufts. Young owls less than 5 months old have a downy appearance. Females are larger than males.

**This species is listed wherever it is found, but**

- **States/US Territories** in which the Mexican Spotted owl, Entire is known to or is believed to occur:  Arizona , Colorado , New
  Mexico , Texas , Utah
- **US Counties** in which the Mexican Spotted owl, Entire is known to or is believed to occur:  View All

BLM_0071972

- **Countries** in which the the Mexican Spotted owl, Entire is known to occur: Mexico
- [Additional species information](#)

**Current Listing Status Summary**

| Status | Date Listed | Lead Region | Where Listed |
|--------|-------------|-------------|--------------|
| Threatened | 03/16/1993 | Southwest Region (Region 2) | Entire |

# » Federal Register Documents

**Most Recent Federal Register Documents (Showing 5 of 19: view all)**

| Date | Citation Page | Title |
|------|---------------|-------|
| 02/06/2013 | 78 FR 8576 8577 | 5-Year Status Reviews of Ocelot and Mexican Spotted Owl in the Southwest Region; Notice of reviews; request for information |

BLM_0071973

| | | |
|---|---|---|
| 02/06/2013 | 78 FR 8576 8577 | request for information |
| 12/17/2012 | 77 FR 74688 74689 | Notice of document availability: Final Recovery Plan, First Revision; Mexican Spotted Owl |
| 06/24/2011 | 76 FR 37141 37142 | Notice of Availability for Comment: Draft Recovery Plan, First Revision; Mexican Spotted Owl |
| 08/31/2004 | 69 FR 53182 53298 | Endangered and Threatened Wildlife and Plants; Final Designation of Critical Habitat for the Mexican Spotted Owl |
| 11/18/2003 | 68 FR 65020 65023 | Endangered and Threatened wildlife and Plants; Designation of Critical Habitat for the Mexican Spotted Owl; Proposed Rule; Reopening of Public Comment Period |

## » Recovery

- Recovery Plan Information Search
- Information Search FAQs

**Current Recovery Plan(s)**

| Date | Title | Plan Action Status | Plan Status |
|---|---|---|---|
| 12/18/2012 | Final Recovery Plan for the Mexican Spotted Owl, First Revision (Strix occidentalis lucida) | View Implementation Progress | Final Revision 1 |

**Other Recovery Documents (Showing 3 of 3)**

| Date | Citation Page | Title | Document Type |
|---|---|---|---|
| 02/06/2013 | 78 FR 8576 8577 | 5-Year Status Reviews of Ocelot and Mexican Spotted Owl in the Southwest Region; Notice of reviews; request for information | - Notice 5-year Review, Initiation |
| 12/17/2012 | 77 FR 74688 74689 | Notice of document availability: Final Recovery Plan, First Revision; Mexican Spotted Owl | - Notice Final Recovery Plan Availability |
| 06/24/2011 | 76 FR 37141 37142 | Notice of Availability for Comment: Draft Recovery Plan, First Revision; Mexican Spotted Owl | - Notice Draft Recovery Plan Availability |

**Five Year Review**

| Date | Title |
|---|---|

BLM_0071974

08/16/2013  5-Year-Review for Mexican Spotted Owl - 2013

# » Critical Habitat

**Current Critical Habitat Documents (Showing 5 of 7: view all)**

| Date | Citation Page | Title | Document Type | Status |
|------|--------------|-------|---------------|--------|
| 08/31/2004 | 69 FR 53182 53298 | Endangered and Threatened Wildlife and Plants; Final Designation of Critical Habitat for the Mexican Spotted Owl | Final Rule | Final designated |
| 11/18/2003 | 68 FR 65020 65023 | Endangered and Threatened wildlife and Plants; Designation of Critical Habitat for the Mexican Spotted Owl; Proposed Rule; Reopening of Public Comment Period | Proposed Rule | Not Required |
| 02/01/2001 | 66 FR 8530 8553 | Endangered and Threatened Wildlife and Plants; Final Designation of Critical Habitat for the Mexican Spotted Owl | Final Rule | Not Required |
| 07/21/2000 | 65 FR 45336 45353 | Endangered and Threatened Wildlife and Plants; Proposed Designation of Critical Habitat for the Mexican Spotted Owl | Proposed Rule | Not Required |
| 06/06/1995 | 60 FR 29915 29951 | ETWP; Determination of Critical Habitat for the Mexican Spotted Owl | Final Rule | Not Required |

To learn more about critical habitat please see http://ecos.fws.gov/crithab

## » Conservation Plans

**Habitat Conservation Plans (HCP) (learn more) (Showing 1 of 1)**
 **HCP Plan Summaries**
 Malpai Borderlands

**Safe Harbor Agreements (SHA): (learn more) (Showing 1 of 1)**
          **SHA Plan Summaries**
 Paterson, Thomas W. and Caroline H. (Spur Ranch)

## » Petitions

**Most Recent Petition Findings (Showing 4 of 4)**

| Date | Citation Page | Title | Finding |
|------|--------------|-------|---------|
| | | | • Notice 90-day |

BLM_0071975

| | | |
|---|---|---|
| 04/01/1994 59 FR 15361 15367 | ETWP; 90-Day Finding on a Petition to Remove the Mexican Spotted Owl From the List of Endangered and Threatened Wildlife | • Notice 90-day Petition Finding, Not substantial |
| 09/23/1993 58 FR 49467 49468 | ETWP; Notice of 90-Day Finding on Petition to Remove the Mexican Spotted Owl From the List of Endangered and Threatened Wildlife and Plants | • Notice 90-day Petition Finding, Not substantial |
| 04/11/1991 56 FR 14678 14680 | ETWP; 12-month Finding on Petition to List the Mexican Spotted Owl as Threatened or Endangered; 56 FR 14678 14680 | • Notice 12 month petition finding, Warranted |
| 03/28/1990 55 FR 11413 11414 | ETWP; 90-day Finding on a Petition to List the Mexican Spotted Owl as Threatened or Endangered; 55 FR 11413 11414 | • Notice 90-day Petition Finding, Substantial |

## » Life History

### Habitat Requirements

Spotted owls are residents of old-growth or mature forests that possess complex structural components (uneven aged stands, high canopy closure, multi-storied levels, high tree density). Canyons with riparian or conifer communities are also important components. In southern Arizona and New Mexico, the mixed conifer, Madrean pine-oak, Arizona cypress, encinal oak woodlands, and associated riparian forests provide habitat in the small mountain ranges (Sky Islands) distributed across the landscape. Owls are also found in canyon habitat dominated by vertical-walled rocky cliffs within complex watersheds, including tributary side canyons. Rock walls with caves, ledges, and other areas provide protected nest and roost sites. Canyon habitat may include small isolated patches or stringers of forested vegetation including stands of mixed-conifer, ponderosa pine, pine-oak, pinyon-juniper, and/or riparian vegetation in which owls regularly roost and forage. Owls are usually found in areas with some type of water source (i.e., perennial stream, creeks, and springs, ephemeral water, small pools from runoff, reservoir emissions). Even small sources of water such as small pools or puddles create humid conditions. Roosting and nesting habitats exhibit certain identifiable features, including large trees (those with a trunk diameter of 12 inches (in) (30.5 centimeters (cm)) or more (i.e., high tree basal area)), uneven aged tree stands, multi-storied canopy, a tree canopy creating shade over 40 percent or more of the ground (i.e., moderate to high canopy closure), and decadence in the form of downed logs and snags (standing dead trees). Canopy closure is typically greater than 40 percent. Owl foraging habitat includes a wide variety of forest conditions, canyon bottoms, cliff faces, tops of canyon rims, and riparian areas. Juvenile owls disperse into a variety of habitats ranging from high-elevation forests to pinyon-

BLM_0071976

juniper woodlands and riparian areas surrounded by desert grasslands. Observations of long-distance dispersal by juveniles provide evidence that they use widely spaced islands of suitable habitat which are connected at lower elevations by pinyon-juniper and riparian forests. Critical habitat was finalized on August 31, 2004(69 FR 53182) in Arizona in Apache, Cochise, Coconino, Gila, Graham, Greenlee, Maricopa, Navajo, Pima, Pinal, Santa Cruz, and Yavapai counties.

## Food Habits

Owls feed on small mammals, particularly mice, voles, and woodrats. They will also take birds, bats, reptiles and arthropods. The Mexican spotted owl is a "perch and pounce" predator, using elevated perches to find prey items using sight and sound. They can take prey on the wing, particularly birds. Most hunting is at night, however, there are some reports of diurnal foraging.

## Movement / Home Range

Mated pairs are territorial. The breeding season activity centers tend to be smaller than the non-breeding season activity centers, with considerable overlap between the two. Adults may or may not leave the territory during the winter. Most adults remain on the same territory year after year. Juveniles leave their natal territory in September, and while they are capable of moving long distances, many successfully establish themselves nearby. Some juveniles will travel through a variety of vegetation communities until they settle down. Distribution: The owl occupies a broad geographical area, but does not occur uniformly throughout its range. Instead, the owl occurs in disjunct localities that correspond to isolated mountain systems and canyons. The owl is frequently associated with mature mixed-conifer (Douglas-fir (Psuedotsuga menziesii), white fir (Abies concolor), limber pine (Pinus flexilis) or blue spruce (Picea pungens)), pine-oak (ponderosa pine (Pinus ponderosa) and Gambel oak (Quercus gambellii)), and riparian forests (various species of broadleaved deciduous trees and shrubs). Typically found between 4,100 and 9,000 feet of elevation. Ninety-one percent of known owls existing in the United States between 1990 and 1993 occurred on land administered by the U.S. Forest Service, the primary administrator of lands supporting owls. Most owls have been found within the 11 National Forests of Arizona and New Mexico. It is unknown why Colorado and Utah support fewer owls.

## Reproductive Strategy

Mated pairs of owls defend a breeding territory at least during the nesting season (March through August). Clutch size is small (generally 1 to 3 eggs), and eggs hatch in early May. A second clutch may be laid if the first fails. The females brood the young owlets almost constantly the first couple of weeks, then may be gone hunting for several hours a day. Owlets fledge at 4 to 5 weeks old (early to mid June), and leave the nest before they can fly, moving to the tree branches or the ground while still under parental care. Dispersal from the nest area usually occurs from mid-September to early October. Mexican spotted owls breed sporadically, and not all birds nest every year. Local conditions, particularly for the prey base, may govern nesting success.

## Other

Actions that open up or remove mature or old-growth forests (logging, wildfire, road or site construction that results in fragmentation of the forest) are detrimental to the local owl population. Human activity (hiking, shooting, off-road vehicle activity) in or near nesting, roosting,

BLM_0071977

or foraging sites may result in abandonment of an area, and indirectly may affect habitat parameters from trampling, vegetation removal, or increased fire risk.

## » Other Resources

NatureServe Explorer Species Reports -- NatureServe Explorer is a source for authoritative conservation information on more than 50,000 plants, animals and ecological communtities of the U.S and Canada. NatureServe Explorer provides in-depth information on rare and endangered species, but includes common plants and animals too. NatureServe Explorer is a product of NatureServe in collaboration with the Natural Heritage Network.

ITIS Reports -- ITIS (the Integrated Taxonomic Information System) is a source for authoritative taxonomic information on plants, animals, fungi, and microbes of North America and the world.

FWS Digital Media Library -- The U.S. Fish and Wildlife Service's National Digital Library is a searchable collection of selected images, historical artifacts, audio clips, publications, and video.

BLM_0071978





# FEDERAL REGISTER

| Vol. 79 | Thursday, |
|---|---|
| No. 224 | November 20, 2014 |

Part II

## Department of the Interior

Fish and Wildlife Service

50 CFR Part 17

Endangered and Threatened Wildlife and Plants; Threatened Status for Gunnison Sage-Grouse; Final Rule

BLM_0071979

## DEPARTMENT OF THE INTERIOR

**Fish and Wildlife Service**

**50 CFR Part 17**

[Docket No. FWS–R6–ES–2012–0108; 4500030114]

**RIN 1018–AZ20**

**Endangered and Threatened Wildlife and Plants; Threatened Status for Gunnison Sage-Grouse**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), determine threatened species status under the Endangered Species Act of 1973, as amended (Act), for the Gunnison sage-grouse (*Centrocercus minimus*), a bird species from southwestern Colorado and southeastern Utah. The effect of this regulation will be to add the Gunnison sage-grouse to the List of Endangered and Threatened Wildlife.

**DATES:** This rule is effective December 22, 2014.

**ADDRESSES:** This final rule is available on the internet at *http:// www.regulations.gov* and *http:// www.fws.gov/mountain-prairie/species/ birds/gunnisonsagegrouse*. Comments and materials we received, as well as supporting documentation we used in preparing this rule, are available for public inspection at *http:// www.regulations.gov*. All of the comments, materials, and documentation that we considered in this rulemaking are available by appointment, during normal business hours at: U.S. Fish and Wildlife Service, Western Colorado Field Office, 445 West Gunnison Avenue, Suite 240, Grand Junction, CO 81501–5720; telephone 970–243–2778.

**FOR FURTHER INFORMATION CONTACT:** Susan Linner, Field Supervisor, U.S. Fish and Wildlife Service, Colorado Ecological Services Office, 134 Union Blvd., Suite 670, P.O. Box 25486 DFC, Denver, CO 80225; telephone 303–236–4774. Persons who use a telecommunications device for the deaf (TDD) may call the Federal Information Relay Service (FIRS) at 800–877–8339.

**SUPPLEMENTARY INFORMATION:**

## Executive Summary

*Why we need to publish a rule.* Under the Endangered Species Act a species may warrant protection through listing if it is endangered or threatened as those terms are defined in the Act. Listing a species as an endangered or threatened species can only be completed by issuing a rule. In this case, we are required by a judicially approved settlement agreement to make a final determination regarding the Gunnison sage-grouse by no later than November 12, 2014. Elsewhere in today's **Federal Register** we finalize the designation of critical habitat for the species.

*This rule will* finalize the listing of the Gunnison sage-grouse (*Centrocercus minimus*) as a threatened species.

*The basis for our action.* Under the Endangered Species Act, we can determine that a species is an endangered or threatened species based on any of five factors: (A) The present or threatened destruction, modification, or curtailment of its habitat or range; (B) Overutilization for commercial, recreational, scientific, or educational purposes; (C) Disease or predation; (D) The inadequacy of existing regulatory mechanisms; or (E) Other natural or manmade factors affecting its continued existence.

As described in detail below, we have determined that the most substantial threats to Gunnison sage-grouse currently and in the future include habitat decline due to human disturbance (Factor A), small population size and structure (Factor E), drought (Factor E), climate change (Factor A), and disease (Factor C). Other threats that are impacting Gunnison sage-grouse to a lesser degree or in localized areas include grazing practices inconsistent with local ecological conditions, fences, invasive plants, fire, mineral development, piñon-juniper encroachment, large-scale water development (Factor A); predation (Factor C), primarily in association with anthropogenic disturbance and habitat decline due to human disturbance (Factor A); and recreation (Factor E). As described in Factor D below, some existing regulatory mechanisms are in place to conserve Gunnison sage-grouse, but individually or collectively they do not fully address the substantial threats faced by the species, particularly habitat decline, small population size and structure, drought, climate change, and disease. The threats listed above are also acting cumulatively, contributing to the challenges faced by Gunnison sage-grouse now and into the future.

Multiple partners, including private citizens, nongovernmental organizations, and Tribal, State, and Federal agencies, are engaged in conservation efforts across the range of Gunnison sage-grouse. Numerous conservation actions have been implemented or are planned for Gunnison sage-grouse, and these efforts have provided and will continue to provide conservation benefit to the species. The Candidate Conservation Agreement with Assurances for Gunnison sage-grouse (CCAA), Gunnison Basin Candidate Conservation Agreement (CCA), conservation plans, multi-county commitments, habitat improvement projects, and similar non-regulatory conservation actions that address habitat-related impacts and issues are described and evaluated under Factor A in this rule. Federal, State, and local laws and regulations, conservation easements, and other regulatory mechanisms are evaluated under Factor D. Scientific research activities are described under Factor B and throughout this rule where applicable. Also, conservation efforts are described and evaluated as appropriate under relevant threat sections throughout this rule.

*Peer review and public comment.* We sought comments on the proposed rule from independent and qualified specialists to ensure that our determination is based on scientifically sound data, assumptions, and analyses. We invited these peer reviewers to comment on our listing proposal. We also considered all comments and information received during each public comment period.

## Previous Federal Actions

Please refer to the proposed listing rule for the Gunnison sage-grouse (78 FR 2486, January 11, 2013) for a detailed description of previous Federal actions concerning this species. Federal actions that have occurred since that publication are described below.

On January 11, 2013, we published a rule proposing to list the Gunnison sage-grouse as endangered throughout its range (78 FR 2486), and a proposed rule to designate 1.7 million acres of critical habitat for the species (78 FR 2540). We opened a public comment period until March 12, 2013, that was subsequently extended until April 2, 2013 (78 FR 15925, March 13, 2013).

On July 19, 2013, we announced that we were extending the final rule deadline by 6 months, from September 30, 2013, to March 31, 2014; and reopened the comment period until September 3, 2013 (78 FR 43123). This extension served to solicit additional scientific information due to scientific disagreement regarding the sufficiency and accuracy of the available data relevant to our listing determinations for Gunnison sage-grouse.

On September 19, 2013, we announced the availability of a draft economic analysis and draft environmental assessment for our proposal to designate critical habitat for

Gunnison sage-grouse, and reopened the public comment period on those subjects and the proposed listing and critical habitat rules until October 19, 2013. We also announced two planned public informational sessions and public hearings for the proposed rules (78 FR 57604).

On November 4, 2013, we reopened the public comment period on the proposed rules until December 2, 2013, and announced the rescheduling of three public information sessions and public hearings that were postponed due to the lapse in government appropriations in October 2013 (78 FR 65936).

Public information sessions and public hearings were held in Gunnison, Colorado, on November 19, 2013; Montrose, Colorado, on November 20, 2013; and Monticello, Utah, on November 21, 2013.

In a press release on February 12, 2014, available on our Web page at *http://www.fws.gov/mountain-prairie/ species/birds/gunnisonsagegrouse/*, we announced a 6-week extension, to May 12, 2014, for our final decision on our proposed listing and critical habitat rules. This extension was granted by the Court due to delays caused by the lapse in government appropriations in October 2013, and the resulting need to reopen a public comment period and reschedule public hearings.

In a press release on May 6, 2014, available on our Web page at *http:// www.fws.gov/mountain-prairie/species/ birds/gunnisonsagegrouse/*, we announced a 6-month extension, to November 12, 2014, for our final decision to list Gunnison sage-grouse under the Act. This extension was granted by the Court to provide the Service with additional time to complete a final listing determination for the Gunnison sage-grouse, and if listed, a final critical habitat designation. In the event the Service decided to list the species as threatened, the court order also allowed for the Service to publish a proposed rule under section 4(d) of the Act (which are only available for threatened species) and finalize it with the final listing determination on November 12, if appropriate. We decided not to propose and finalize a 4(d) rule for the Gunnison sage-grouse at this time, but continue to evaluate the potential for issuing a section 4(d) rule in the future to tailor the take prohibitions of the Act to those necessary and advisable to provide for the conservation of the Gunnison sage-grouse.

Elsewhere in today's **Federal Register**, we finalize the designation of critical habitat for the species.

## Background

Gunnison sage-grouse and greater sage-grouse (a similar, closely related species) have similar life histories and habitat requirements (Young 1994, p. 44). In this final rule, we use scientific information specific to the Gunnison sage-grouse where available but apply scientific management principles and scientific information for greater sage-grouse that are relevant to Gunnison sage-grouse threats, conservation needs, and strategies—a practice followed by the wildlife and land management agencies that have responsibility for management of both species and their habitat. Throughout this rule, we use *sage-grouse* in reference to both Gunnison and greater sage-grouse whenever the scientific data and information is relevant to both species.

*Species Information*

A detailed summary of Gunnison sage-grouse taxonomy, the species description, historical distribution, habitat, and life-history characteristics can be found in the 12-month finding published September 28, 2010 (75 FR 59804). More recent scientific information relevant to the species and our evaluation of the species is included throughout this final rule.

*Current Distribution and Population Estimates and Trends*

Gunnison sage-grouse currently occur in seven populations in Colorado and Utah, occupying 3,795 square kilometers (km²) (1,511 square miles [mi²]) (Gunnison Sage-grouse Rangewide Steering Committee) [GSRSC] 2005, pp. 36–37; CDOW 2009a, p. 1). The seven populations are Gunnison Basin, San Miguel Basin, Monticello-Dove Creek, Piñon Mesa, Crawford, Cerro Summit-Cimarron-Sims Mesa, and Poncha Pass (Figure 1). A summary of land ownership and recent population estimates among these seven populations is presented in Table 1, and Figures 2 and 3, respectively. The following information and Figures 2 and 3 are based on lek count data (systematic counts of male sage-grouse attendance at traditional breeding sites) and associated population estimates from Colorado Parks and Wildlife (CPW) and the Utah Division of Wildlife Resources (UDWR) for the period 1996–2014 (CDOW 2010a, p. 2; CPW 2012a, pp. 1–4; CPW 2013a, p. 1; CPW 2014d, p. 1).

**69194**    **Federal Register** / Vol. 79, No. 224 / Thursday, November 20, 2014 / Rules and Regulations



Figure 1. Locations of Current Gunnison Sage-grouse Populations.

BLM_0071982

TABLE 1—PERCENT SURFACE OWNERSHIP OF GUNNISON SAGE-GROUSE OCCUPIED [a] HABITAT

[GSRSC [b] 2005, pp. D–3–D–6; CDOW [c] 2009a, p. 1; CPW 2013e, spatial data]

| Population | Hectares | Acres | Gunnison sage-grouse occupied habitat management and ownership | | | | | | |
| | | | BLM [d] | NPS [e] | USFS [f] | CPW | CO SLB [g] | State of UT | Private |
| | | | % | % | % | % | % | % | % |
| Gunnison Basin ...................................... | 239,641 | 592,168 | 51 | 2 | 14 | 2 | <1 | 0 | [i] 30 |
| San Miguel Basin ................................... | 41,177 | 101,750 | [g] 35 | 0 | 1 | 11 | [g] 3 | 0 | [h] 49 |
| Monticello-Dove Creek (Combined) ....... | 45,544 | 112,543 | 7 | 0 | 0 | 3 | 0 | <1 | 90 |
| Dove Creek ...................................... | 16,949 | 41,881 | 13 | 0 | 0 | 6 | 0 | 0 | 82 |
| Monticello ....................................... | 28,595 | 70,661 | 5 | 0 | 0 | 0 | 0 | 1 | 94 |
| Piñon Mesa ........................................... | 18,080 | 44,678 | 28 | 0 | 2 | 0 | 0 | 0 | 70 |
| Cerro Summit-Cimarron-Sims Mesa ...... | 15,039 | 37,161 | 13 | <1 | 0 | 11 | 0 | 0 | 76 |
| Crawford ................................................ | 14,170 | 35,015 | 63 | 12 | 0 | 0 | 0 | 0 | 24 |
| Poncha Pass .......................................... | 11,229 | 27,747 | 48 | 0 | 20 | 0 | 4 | 0 | 28 |
| Rangewide ............................................. | 384,880 | 951,061 | 42 | 2 | 10 | 3 | <1 | <1 | 43 |

[a] Occupied Gunnison sage-grouse habitat is defined as areas of suitable habitat known to be used by Gunnison sage-grouse within the last 10 years from the date of mapping, and areas of suitable habitat contiguous with areas of known use, which have no barriers to grouse movement from known use areas (GSRSC 2005, p. 54; CPW 2013e, spatial data).

[b] Gunnison Sage-grouse Rangewide Steering Committee.

[c] Colorado Parks and Wildlife.

[d] Bureau of Land Management.

[e] National Park Service.

[f] United States Forest Service.

[g] State Land Board.

[h] Estimates reported in San Miguel Basin Gunnison Sage-grouse Conservation Plan (San Miguel Basin Gunnison Sage-grouse Working Group (SMBGSWG) 2009, p. 28) vary by 2 percent in these categories from those reported here. We consider these differences insignificant.

[i] Includes approximately 12,000 ao of land on Pineorest Ranch, west of Gunnison, Colorado. This is restricted fee status land held in private ownership by the Ute Mountain Ute Tribe.

BLM_0071983

Figure 2. Population estimates by year for the Gunnison Basin population and the rangewide total Gunnison sage-grouse population derived from the formula presented in the Gunnison sage-grouse Rangewide Conservation Plan (GSRSC[a] 2005, pp. 44–45) applied to high male counts on leks (CDOW[b] 2012a, pp. 1–3; CPW 2013a, entire; CPW 2014d, p. 1).



| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gunnison Basin | 2,880 | 3,164 | 3,360 | 3,547 | 3,130 | 3,493 | 3,027 | 2,453 | 2,443 | 4,763 | 5,205 | 4,616 | 3,669 | 3,817 | 3,655 | 3,743 | 4,082 | 4,160 | 3978 |
| Rangewide Totals | 4,038 | 4,258 | 4,782 | 5,207 | 4,873 | 4,581 | 4,101 | 3,194 | 3,208 | 5,720 | 6,220 | 5,480 | 4,371 | 4,386 | 4,023 | 4,150 | 4,621 | 4,773 | 4705 |

[a]Gunnison Sage-grouse Rangewide Steering Committee
[b]Colorado Parks and Wildlife

BLM_0071984

Federal Register / Vol. 79, No. 224 / Thursday, November 20, 2014 / Rules and Regulations

Figure 3. Population estimates by year for the six satellite Gunnison sage-grouse populations derived from the formula presented in the Gunnison sage-grouse Rangewide Conservation Plan (GSRSC[a] 2005, pp. 44–45) applied to high male counts on leks (CPW[b] 2012a, pp. 1–3; CPW 2013a, entire; CPW 2014e, p. 6) (Note: lek counts did not occur between 1996 and 1998 for the Cerro Summit–Cimarron–Sims Mesa and Poncha Pass populations).



| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| San Miguel Basin | 206 | 270 | 446 | 231 | 280 | 392 | 383 | 250 | 255 | 334 | 378 | 324 | 216 | 162 | 123 | 93 | 172 | 186 | 206 |
| Monticello–Dove Creek (Combined) | 304 | 255 | 289 | 486 | 511 | 363 | 270 | 186 | 162 | 196 | 191 | 245 | 245 | 191 | 132 | 162 | 147 | 123 | 98 |
| Pinon Mesa | 118 | 113 | 128 | 142 | 162 | 152 | 132 | 123 | 142 | 167 | 152 | 123 | 108 | 78 | 74 | 64 | 54 | 152 | 182 |
| Cerro Summit–Cimarron–Sims Mesa | | | | 25 | 29 | 29 | 39 | 29 | 39 | 25 | 49 | 34 | 10 | 39 | 5 | 29 | 54 | 44 | 74 |
| Crawford | 226 | 201 | 270 | 265 | 245 | 137 | 206 | 118 | 128 | 191 | 201 | 113 | 98 | 78 | 20 | 44 | 98 | 108 | 157 |
| Poncha Pass | | | | 25 | 5 | 15 | 44 | 34 | 39 | 44 | 44 | 25 | 25 | 20 | 15 | 15 | 15 | 0 | 10 |

[a]Gunnison Sage-grouse Rangewide Steering Committee
[b]Colorado Parks and Wildlife

BLM_0071985

Lek count data are the primary means of estimating and monitoring Gunnison sage-grouse populations. However, sage-grouse populations can fluctuate widely on an annual basis, and there are concerns about the statistical reliability of population estimates based on lek counts (CDOW 2009b, pp. 1–3). Stiver *et al.* (2008, p. 474) concluded that lek counts likely underestimate population size. Another study (Davis 2012, p. 136) indicated that, based on demographic data, lek count indices overestimate population size. Although lek count data are available from as early as the 1950s for some populations, lek count protocols were first standardized and implemented in 1996 (GSRSC 2005, p. 46). Prior to 1996, lek count data are highly variable and uncertain, and are not directly comparable to recent population data (Braun 1998, p. 3; Davis 2012, pp. 139, 143). Therefore, for the purposes of evaluating current population sizes and trends, the analysis in this rule is focused on lek count data from 1996 to 2014. We also consider other available scientific information such as demographic data and population viability analyses (see Factor E). Historical distribution and population information is discussed under Factor A below.

The Gunnison Basin is the largest population (approximately 3,978 birds) and, while showing variation over the period of record, including drought cycles and harsh winters, has been relatively stable, based on lek count estimates (but see further discussion below and in the Factor E analysis). The Gunnison Basin population is the primary influence on the rangewide population size of Gunnison sage-grouse (see Figure 2); thus, the significance of this population to the species' survival and persistence is evident. The Gunnison Basin population area includes approximately 239,600 ha (592,053 ac) of occupied habitat.

In contrast, the remaining six populations, or satellite populations, are much smaller than the Gunnison Basin. All satellite populations were generally in decline until 2010; however, increases in several populations have been observed recently (Figure 3) and could be a product of numerous factors including but not limited to population cycles, translocation efforts, and increased access to leks. San Miguel and Piñon Mesa are currently the largest of the satellite populations, with 206 and 182 birds, respectively, in 2014. The Monticello-Dove Creek populations currently have less than 100 birds combined (74 and 24, respectively). The current (2014) population estimates for the two smallest populations, Cerro

Summit-Cimarron-Sims Mesa and Poncha Pass, are 74 and 16, respectively (CPW 2014d, p. 1). A count of zero birds at Poncha Pass in 2013 suggests that extirpation of this population may have occurred, although 17 birds were translocated there later that fall, and ten more in spring of 2014, with 16 known to survive into summer 2014 (see Factor B, Scientific Research and Related Conservation Efforts). The satellite population areas are much smaller than the Gunnison Basin population area, all with less than 40,500 hectares (ha) (100,000 acres [ac]) of occupied habitat (Table 1) and, with the exception of the San Miguel population, fewer than 40 males counted on leks (CDOW 2009b, p. 5; CPW 2012a, p. 3; CPW 2013a, p. 1; CPW 2014d, p. 1).

Lek count-based population estimates suggest some satellite populations have increased slightly over the last several years. However, lek count data spanning the last 19 years (1996 to 2014) as a whole indicate that all the satellite populations were generally in decline until 2010 (Figure 3). Several of the satellite populations remain in decline and all remain at population size estimates that indicate concern for their viability, ranging from 206 to 10 birds (Figure 3). Furthermore, some of the recent increases in population sizes can be attributed to translocation and survey efforts, rather than an actual increase in the population. For example, the 2014 estimated population for Piñon Mesa was 182 birds (CPW 2014d, p. 1), much greater than the 2012 estimate of 54 birds. The population in Crawford increased from 20 birds in 2010 to 157 in 2014. These increases may be due in part to the translocation of 93 birds to the Piñon Mesa population between the spring of 2010 and spring of 2013 and 73 birds to Crawford over the same period. (CPW 2014c, entire), and two new leks found in 2012 on Piñon Mesa (CPW 2012a, pp. 2–3). The potential historical range of Gunnison sage-grouse is discussed briefly below by population, and loss of historical range is discussed under Factor A.

*Gunnison Basin Population*—The Gunnison Basin is an intermontane (located between mountain ranges) basin that includes parts of Gunnison and Saguache Counties, Colorado. The current Gunnison Basin population is distributed across approximately 239,640 ha (592,168 ac) (Table 1), surrounding the City of Gunnison. This population comprises approximately 84 percent of the rangewide population and 62 percent of occupied habitat for the species rangewide. Elevations in the area occupied by Gunnison sage-grouse range from 2,300 to 2,900 meters (m)

(7,500 to 9,500 feet [ft]). Approximately 69 percent of the land area occupied by Gunnison sage-grouse in this population is managed by Federal agencies (67 percent) and CPW (2 percent), and the remaining 30 percent is primarily private lands, including approximately 12,000 ac on Pinecrest Ranch owned by the Ute Mountain Ute Tribe under restricted fee status. Wyoming big sagebrush (*Artemisia tridentata* ssp. *wyomingensis*) and mountain big sagebrush (*A. t.* ssp. *vaseyana*) dominate the upland vegetation, with highly variable growth form depending on local site conditions.

In 1964, Gunnison County was one of five counties containing the majority of all sage-grouse in Colorado. This was likely the case before Euro-American settlement, around the turn of the century, as well (Rogers 1964, pp. 13, 20). The 2014 population estimate for the Gunnison Basin was 3,978 birds (CPW 2014d, p. 1). Population estimates from 1996 to 2014 meet or exceed the population target of 3,000 breeding birds (based on a 10-year average) for the Gunnison Basin, as set forth by the Gunnison Sage-grouse Rangewide Conservation Plan (RCP) (CPW 2013a, p. 10; GSRSC 2005, p. 270). Based on available habitat and other considerations, the RCP identified population targets as attainable population sizes sufficient to conserve Gunnison sage-grouse in each population (GSRSC 2005, p. 255). Approximately 45 percent of leks in the Gunnison Basin occur on private land; and 55 percent are on public land administered primarily by the BLM (GSRSC 2005, p. 75). Five physiographic zones or divisions are recognized in the Gunnison Basin population area for the purposes of monitoring and management actions (CSGWG 1997, pp. 6–7).

*San Miguel Basin Population*— The San Miguel Basin population estimate in 2014 was 206 individuals (CPW 2014d, p. 1). Population estimates from 1996 to 2014 are less than 50 percent of the population target of 450 Gunnison sage-grouse (based on a 10-year average) for the San Miguel Basin, as set forth by the RCP (CPW 2013a, p. 12; GSRSC 2005, p. 296). This population occurs in Montrose and San Miguel Counties in Colorado, and comprises six small subpopulations (Dry Creek Basin, Hamilton Mesa, Miramonte Reservoir, Gurley Reservoir, Beaver Mesa, and Iron Springs) occupying approximately 41,177 ha (101,750 ac). Gunnison sage-grouse use some of these areas year-round, while others are used seasonally. Gunnison sage-grouse in the San Miguel Basin move widely between the six

subpopulation areas (Apa 2004, p. 29; Stiver and Gibson 2005, p. 12). The area encompassed by this population is thought to have once served as critical migration corridors between populations to the north (Piñon Mesa) and northeast (Cerro Summit-Cimarron-Sims Mesa) and to the west (Monticello-Dove Creek) (Oyler-McCance et al. 2005, pp. 635–636; SMBGSWG 2009, p. 9), but gene flow among these populations is currently very low (Oyler-McCance et al. 2005, p. 635). Historically, Gunnison sage-grouse occupied the majority of available big sagebrush (*Artemisia tridentata*) plant communities in San Miguel and Montrose Counties (Rogers 1964, pp. 22, 115).

Habitat conditions vary among the six subpopulation areas of the San Miguel Basin population areas. The following discussion addresses conditions among the subpopulations beginning in the west and moving east. The majority of occupied acres in the San Miguel Basin population (approximately 25,130 ha (62,100 ac) or 62 percent of the total population area) occur in the Dry Creek Basin subpopulation (SMBGSWG 2009, p. 28). However, the Dry Creek Basin contains some of the poorest quality habitat and the fewest individual Gunnison sage grouse numbers in the San Miguel population (SMBGSWG 2009, pp. 28, 36). Sagebrush habitat in the Dry Creek Basin area is patchily distributed. Where irrigation is possible, private lands in the southeastern portion of Dry Creek Basin are cultivated. Sagebrush habitat on private land has been heavily thinned or removed entirely (GSRSC 2005, p. 96). Elevations in the Hamilton Mesa subpopulation are approximately 610 m (2,000 ft.) higher than in the Dry Creek Basin, resulting in more mesic (moist) conditions. Agriculture is very limited on Hamilton Mesa, and the majority of the vegetation consists of oakbrush (*Quercus gambelii*) and sagebrush. Gunnison sage-grouse use the Hamilton Mesa area (1,940 ha (4,800 ac)) in the summer, but use of Hamilton Mesa during other seasons is unknown.

Gunnison sage-grouse occupy approximately 4,700 ha (11,600 ac) around Miramonte Reservoir (GSRSC 2005, p. 96). Sagebrush stands there are generally contiguous with a mixed-grass and forb understory. Occupied habitat at the Gurley Reservoir area (3,305 ha (7,500 ac)) is negatively affected by human development. Farming attempts in the Gurley Reservoir area in the early 20th century led to the removal of much of the sagebrush, although agricultural activities are now restricted primarily to the seasonally irrigated crops (hay meadows), and sagebrush has

reestablished in most of the failed pastures. However, grazing pressure and competition from introduced grasses have limited overall sagebrush representation (GSRSC 2005, pp. 96–97). Sagebrush stands in the Iron Springs and Beaver Mesa areas (2,590 ha and 3,560 ha (6,400 ac and 8,800 ac respectively)) are contiguous with a mixed-grass understory. The Beaver Mesa area has numerous scattered patches of oakbrush.

*Monticello-Dove Creek Population*—This population includes two separate subpopulations of Gunnison sage-grouse, the Monticello and Dove Creek subpopulations. Genetic data suggest these two subpopulations could be considered one population (GSRSC 2005, p. 37), though we are unaware of any current connectivity between the two. The larger subpopulation is near the town of Monticello in San Juan County, Utah. Gunnison sage-grouse in this subpopulation inhabit a broad plateau on the northeastern side of the Abajo Mountains, with fragmented patches of sagebrush interspersed with large grass pastures and agricultural fields. In 1972, the estimated population size ranged from 583 to 1,050 individuals; by 2002, the population size had decreased, estimated at 178 to 308 individuals (UDWR 2011, p. 1). The 2013 and 2014 population estimates are 74 individuals (CPW 2013a, p. 1; CPW 2014d, p. 1)). Gunnison sage-grouse currently occupy an estimated 28,595 ha (70,661 ac) in the Monticello area (GSRSC 2005, p. 81).

The Dove Creek subpopulation is located primarily in western Dolores County, Colorado, north and west of Dove Creek, although a small portion of occupied habitat extends north into San Miguel County. The majority of sagebrush plant communities in Dolores and Montezuma Counties within Colorado were historically used by Gunnison sage-grouse (Rogers 1964, pp. 22, 112). Habitat north of Dove Creek is characterized as mountain shrub habitat, dominated by oakbrush interspersed with sagebrush. The area west of Dove Creek is dominated by sagebrush, but the habitat is highly fragmented by agricultural fields. Lek counts in the Dove Creek area were more than 50 males in 1999, suggesting a population of about 245 birds (C = High male count; C/0.53 + (C/0.53 × 1.6)), but declined to 2 males in 2009 (CDOW 2009b, p. 71), suggesting a population of 10 birds at that time. Low sagebrush canopy cover, as well as low grass height, exacerbated by drought, may have led to nest failure and subsequent population declines (Connelly et al. 2000a, p. 974; Apa 2004,

p. 30). The 2014 population estimate was 24 individuals (CPW 2014d, p. 1).

Combined, the Monticello-Dove Creek estimated population size in 2014 was 98 individuals (CPW 2014d, p. 1). Most population estimates from 1996 to 2014 are well below the population target of 500 breeding birds (based on a 10-year average) for the Monticello-Dove Creek population, as set forth by the RCP (CPW 2013a, p. 12; GSRSC 2005, p. 278). Likewise, most population estimates from 1996 to the present time are well below the population target of 250 birds for each subpopulation alone (CPW 2013a, p. 12).

*Piñon Mesa Population*—The Piñon Mesa population occurs on the northwestern end of the Uncompahgre Plateau in Mesa County, about 35 km (22 mi) southwest of Grand Junction, Colorado. Gunnison sage-grouse likely occurred historically in all suitable sagebrush habitat in the Piñon Mesa area, including the Dominguez Canyon area of the Uncompahgre Plateau, southeast of Piñon Mesa proper (Rogers 1964, pp. 22, 114). Their current distribution is approximately 18,080 ha (44,678 ac) (GSRSC 2005, p. 87) which, based on a comparison of potential presettlement distribution, is approximately 6 percent of presettlement habitat on the northern portion of the Uncompahgre Plateau in Mesa County, Colorado, and Grand County, Utah. The 2014 estimated population was 182 birds (CPW 2014d, p. 1), much greater than the 2012 estimate of 54 birds. Over the last 4 years, CPW has translocated 93 sage-grouse to this area, which may have contributed to the increase observed over the past 2 to 4 years (CPW 2014c, entire), in addition to the discovery of two formerly unknown leks in 2012 (CPW 2012a, pp. 2–3). Population estimates from 1996 to 2014 are below the population target of 200 breeding birds (based on a 10-year average) for the Piñon Mesa population, as set forth by the RCP (CPW 2013a, p. 11; GSRSC 2005, p. 285). Of 12 known leks, only 4 were active in 2012 (CPW 2012a, pp. 2–3). The Piñon Mesa area may have other leks as well, but the high percentage of private land, a lack of roads, and heavy snow cover during spring make locating new leks difficult (CDOW 2009b, p. 109).

*Crawford Population*—The Crawford population of Gunnison sage-grouse includes approximately 14,170 ha (35,015 ac) of occupied habitat in Montrose County, Colorado, about 13 km (8 mi) southwest of the town of Crawford and north of the Gunnison River. Basin big sagebrush (*A. t.* ssp. *tridentata*) and black sagebrush (*A.*

nova) dominate the mid-elevation uplands (GSRSC 2005, p. 62). The 2014 estimated population was 157 individuals (CPW 2014a, p. 1), much greater than the 2010 estimate of 20 birds, and 2011 estimate of 44 birds. This observed increase could be, in part, the product of the translocation of 72 birds to the Crawford population from 2011 to the spring of 2013 (CPW 2014c, entire), although natural increases or other reasons not understood could also be contributing. Furthermore, new lek count techniques for this population were implemented in 2012 (Gunnison County 2013a, p. 190), and increased survey efforts may be partly responsible for observed increases in high male counts and population estimates (Figure 3). Population estimates from 1996 to 2014 are well below the population target of 275 breeding birds (based on a 10-year average) for the Crawford population, as set forth by the RCP (CPW 2013a, p. 11; GSRSC 2005, p. 264). Three leks are currently active in the Crawford population (CPW 2012a, p. 1), all on BLM lands near an 11-km (7-mi) stretch of road. This area represents the largest contiguous sagebrush plant community within the occupied area of the Crawford population (GSRSC 2005, p. 64).

*Cerro Summit-Cimarron-Sims Mesa Population*—This population is divided into two geographically separate subpopulations, both in Montrose County, Colorado: The Cerro Summit–Cimarron and Sims Mesa subpopulations. It is unknown whether sage-grouse currently move between these subpopulations.

The Cerro Summit–Cimarron subpopulation is centered about 24 km (15 mi) east of the City of Montrose. Rogers (1964, p. 115) noted a small population of sage-grouse in the Cimarron River drainage, but did not report population numbers. The same publication also reported that four individual birds were observed during lek counts at Cerro Summit in 1959. Habitat in this subpopulation area includes 15,039 ha (37,161 ac) of patchy sagebrush habitat fragmented by oakbrush and irrigated pastures. Four leks are currently known in the Cerro Summit–Cimarron group, although only two have been active in recent years (GSRSC 2005, p. 257; CPW 2012a, entire).

The Sims Mesa area, about 11 km (7 mi) south of Montrose, consists of small patches of sagebrush fragmented by piñon-juniper, residential and recreational development, and agriculture (CDOW 2009b, p. 43). Rogers (1964, p. 95) recorded eight males from lek counts at Sims Mesa in 1960. In

2000, the CPW translocated six Gunnison sage-grouse from the Gunnison Basin to Sims Mesa (Nehring and Apa 2000, p. 12). There is only one currently known lek in the Sims Mesa and, since 2003, it has not been attended by Gunnison sage-grouse. However, lek counts on Sims Mesa did not occur in 2011. A lek is designated historic when it is inactive for at least 10 consecutive years, according to CPW standards. Therefore, the current status of the Sims Mesa lek is unknown (CDOW 2009b, p. 7; CPW 2012a, p. 1).

The Cerro Summit-Cimarron-Sims Mesa population estimate in 2014 was 74 individuals (CPW 2014a, p. 1), with all birds in the Cerro Summit–Cimarron areas. Population estimates from 1996 to 2014 are below the population target of 100 breeding birds (based on a 10-year average) for this population, as set forth by the RCP (CPW 2013a, p. 11; GSRSC 2005, p. 258).

Available information indicates that some birds translocated to the Crawford area between 2011 and 2013 went to the Cerro Summit-Cimarron area, then moved back to Crawford (Crawford Area Gunnison Sage-grouse Working Group 2014, p. 3). Translocated birds also returned to the Gunnison Basin permanently (Crawford Area Gunnison Sage-grouse Working Group 2014, p. 3). Genetic information (Oyler-McCance *et al.* 2005, pp. 635–636; SMBGSWG 2009, p. 9) indicates that there was past gene flow between the Cerro Summit– Cimarron population and the San Miguel population. Therefore, we consider the Cerro Summit–Cimarron population to be an important linkage area, providing connectivity between the two largest populations, the Gunnison Basin and the San Miguel populations, as well as the Crawford population.

*Poncha Pass Population*—The Poncha Pass Gunnison sage-grouse population is located in Saguache County, approximately 16 km (10 mi) northwest of Villa Grove, Colorado. The known population distribution includes 11,229 ha (27,747 ac) of sagebrush habitat from the summit of Poncha Pass extending south for about 13 km (8 mi) on either side of U.S. Highway 285. Sagebrush in this area is generally intact with little fragmentation, and habitat quality throughout the area appears adequate to support a population of the species (Nehring and Apa 2000, p. 25). Despite this, the area has struggled to sustain a viable population. San Luis Creek runs through the area, providing a perennial water source and wet meadow riparian habitat for brood-rearing. Decker and Rock Creeks also provide water most of the year. However, water flows in the

area have been much lower and less dependable in recent years due to drought conditions (Nehring 2013a, pers. comm.).

The Poncha Pass population was reintroduced in the 1970s in a portion of the San Luis Valley where Gunnison sage-grouse were thought to have been extirpated by the 1950s (Rogers 1964, pp. 22, 27, 116). Reestablishment of this population began with 30 birds translocated from the Gunnison Basin in 1971 and 1972 (GSRSC 2005, p. 94). In 1992, a CPW effort to simplify hunting restrictions inadvertently opened the Poncha Pass area to sage-grouse hunting, and at least 30 grouse were harvested from this population. Due to declining population numbers since the 1992 hunt, CPW translocated 24 additional birds from the Gunnison Basin in the spring of 2000 (Nehring and Apa 2000, p. 11). In 2001 and 2002, an additional 20 and 7 birds, respectively, were moved to Poncha Pass by the CPW (GSRSC 2005, p. 94).

Translocated females have bred successfully (Apa 2004, pers. comm.), and male display activity resumed on the historical lek in the spring of 2001. The only known lek is located on BLM-administered land (CDOW 2011a, p. 1; CPW 2012a, p. 3). A high male count of 3 males occurred in 2012, resulting in an estimated population size of 15 for the Poncha Pass population. In 2013, no birds were counted at leks or in surrounding habitat despite considerable survey efforts, suggesting a population estimate of zero birds. In the fall of 2013, CPW translocated 17 birds to the Poncha Pass population from the Gunnison Basin. As of January 2014, 10 of these birds were known to be surviving (Nehring 2014, pers. comm.). In 2014, CPW translocated 10 more birds to the area. Sixteen birds were known to survive into summer of 2014 (all translocated birds had telemetry transmitters). Poncha Pass current and past population estimates from 1996 to 2013 are well below the population target of 75 birds, as set forth by the RCP (CPW 2013a, p. 12; GSRSC 2005, p. 291). We note that given the history of this population, lack of unique genetics (all sage-grouse were introduced from the Gunnison Basin), and concerns about translocation success, we do not consider this population necessary to the recovery of the species.

*Additional Special Status Information*

The Gunnison sage-grouse has an International Union for Conservation of Nature (IUCN) Red List Category of ''endangered'' (Birdlife International 2009). NatureServe currently ranks the Gunnison sage-grouse as G1–Critically

Case No. 1:20-cv-02484-MSK   Document 50-6   filed 04/28/21   USDC Colorado   pg 62 of 291

Imperiled (Nature Serve 2010, entire). The Gunnison sage-grouse is on the National Audubon Society's Watch List 2007 Red Category, which is "for species that are declining rapidly or have very small populations or limited ranges, and face major conservation threats." This information is provided here for background only; these assessments were not factored into our analysis or listing determination in this rule.

## Summary of Changes From the Proposed Rule

Based upon our review of the public comments, comments from other Federal and State agencies, peer review comments, issues raised at the public hearing, and new relevant information that has become available since the publication of the proposal, we have reevaluated our proposed listing rule and made changes as appropriate. Other than minor clarifications and incorporation of additional information on the species' biology and populations, this determination differs from the proposal in the following ways:

(1) Based on our analyses of the potential threats to the species, we have determined that Gunnison sage-grouse does not meet the definition of an endangered species, contrary to our proposed rule published on January 11, 2013 (78 FR 2486).

(2) Based on our analyses, we have determined that the species meets the definition of a threatened species. Subsequently, pursuant to this final rule, the species will be added to the list of threatened species set forth in 50 CFR Part 17.

(3) We have expanded the discussion of Ongoing and Future Conservation Efforts, in Factor A below.

(4) We have found that the threat from current residential development in the Gunnison Basin is not as high as we previously concluded. See Factor A analysis and discussion.

## Summary of Peer Review and Public Comments

In our January 11, 2013, proposed rules for Gunnison sage-grouse (proposed listing, 78 FR 2486; proposed critical habitat designation, 78 FR 2540), we requested written public comments on the proposal from all interested parties. At various times, public comment periods were extended or reopened (see Previous Federal Actions), with a final comment period on both proposals ending on December 2, 2013. We contacted appropriate State and Federal agencies, county governments, elected officials, scientific organizations, and other interested parties and invited them to comment. We also published notices inviting general public comment in local newspapers throughout the species' range.

Between January 11, 2013, and December 2, 2013, we received a total of 36,171 comment letters on the listing and critical habitat proposals. Of those letters, we determined that approximately 445 were substantive comment letters; 35,535 were substantive form letters; and 191 were non-substantive comment letters. Substantive letters generally contained comments pertinent to both proposed rules, although the vast majority of comments were related to the proposed listing rule. Responses to comments related to critical habitat are provided in the final rule to designate critical habitat for Gunnison sage-grouse, published elsewhere in today's **Federal Register**. Also, we held three public hearings between November 19 and 21, 2013, in response to requests from local and State agencies and governments; we received oral comments during that time (see Previous Federal Actions). All substantive information provided during all comment periods and hearings that pertains to the listing of the species has been incorporated directly into this final rule or addressed below. For the readers' convenience, we combined similar comments and responses.

*Comments From Peer Reviewers*

In accordance with our peer review policy published in the **Federal Register** on July 1, 1994 (59 FR 34270), we solicited expert opinion from five independent and qualified individuals with scientific expertise on Gunnison sage-grouse biology and conservation. The purpose of the peer review was to ensure that our decisions are based on scientifically sound data, assumptions, and analyses, based on the input of appropriate experts and specialists. We received written responses from all five peer reviewers. We reviewed all comments received from the peer reviewers for substantive issues and new information regarding the listing of the Gunnison sage-grouse. One peer reviewer concluded that our proposals included a thorough and accurate review of the available scientific and commercial data on Gunnison sage-grouse, but did not provide substantive comments. The remaining four letters provided additional relevant information on biology, threats, and scientific research for the species. Two peer review letters were opposed to the proposed listing and questioned our rationale and determinations. All substantive comments from peer reviewers are incorporated directly into this final rule or addressed in the summary of comments below.

(1) *Comment:* One peer reviewer noted that population growth models of greater sage-grouse (*C. urophasianus*) indicate adult annual survival is the most sensitive vital rate. However, in the proposed rule, we said that limitations in the quality and quantity of nesting and early brood-rearing habitats, in particular, are especially important because Gunnison sage-grouse population dynamics are most sensitive during these life-history stages (GSRSC 2005, p. G–15).

*Our Response:* Juvenile recruitment has been identified as the most important demographic factor influencing or limiting greater and Gunnison sage-grouse population growth rates and viability (Connelly *et al.* 2004, p. 3–11, GSRSC 2005, p. 173). In a recent demographic and population viability study of Gunnison sage-grouse (Davis 2012), juvenile survival was found to be the most influential vital rate in the Gunnison Basin population, a relatively stable population. However, adult survival was more influential in the San Miguel population, a smaller and steeply declining population where no juvenile recruitment occurred (Davis 2012, pp. 89, 93). Therefore, both juvenile survival and adult survival rates appear to be important to the species' viability. This topic is discussed further under Factor E in this final rule.

(2) *Comment:* One peer reviewer stated that the methods and rationale regarding the proposed rule's evaluation of residential development and estimated housing development in the Gunnison Basin are not clear for the following reasons: It was unclear how the potential spatial configuration of new housing units was estimated; thus calculations for habitat lost directly or indirectly are not transparent. The reviewer stated that the conclusion that the species should be listed as endangered relies heavily on the analysis of potential threats of additional anthropogenic infrastructure given increasing human populations. The peer reviewer commented that there are potential flaws in the estimated impacts of residential impact in the Gunnison Basin, which relied primarily on Aldridge *et al.* (2012, entire). The peer reviewer noted that to establish the scientific credibility of these conclusions, additional information is required describing the methodology and data used in the analysis as well as reporting the results; for example, citing the spatial data sources, specifically

BLM_0071989

establishing the methods used to come to the level of potential impact (spatially and temporally), providing results specific to each analysis, and specifically establishing the assumptions made. The peer reviewer also stated that an analysis of residential development in the satellite populations is lacking.

*Our Response:* In Factor A of this final rule, we reevaluate the threat of residential development in the Gunnison Basin and in the six satellite populations, and explain the framework for our assessment. In that revised analysis, based on new information regarding the location and magnitude of past development patterns in Gunnison sage-grouse habitat in the Gunnison Basin, we avoid the use of spatial zones of influence to estimate or extrapolate potential impacts of current and future development, focusing instead on human population growth rates and available developable private lands in occupied habitat.

(3) *Comment:* A peer reviewer noted that the proposed rule analysis indicated that approximately 85 percent of occupied habitat in the Gunnison Basin has an increased likelihood of current or future road-related disturbance. This conclusion would suggest that the vast majority of sagebrush habitats in the Gunnison Basin are within 700 m of a road, an exceptionally dense road network—as a comparison, Knick *et al.* 2011 (chapter 12 in Studies in Avian Biology No. 38 page 215) estimated that 89 percent of sage-grouse habitats were within 2.5 km of a road in Western Association of Fish and Wildlife Agencies Management Zone 7 (Colorado Plateau), road densities less than those reported here. The reviewer suggested that we provide more specificity on how we analyzed roads. The reviewer noted that, given that this analysis is specific to the spatial scale of the potential spread of invasive weeds associated with roads in general, it may benefit the discussion to include the amount of habitat within 700 m of improved surface roads as well as all roads (assuming two-tracks are included as roads in this analysis).

*Our Response:* Our analysis included all road types (primary, secondary, etc.) in occupied habitat in the Gunnison Basin, hence the relatively high density of road networks. We did not differentiate by road type, as our primary intent was to estimate exposure of occupied habitat to road networks in general. We revised this final rule to clarify that the extent and severity of weed invasion would vary by road type. See further discussion under "Roads" in Factor A.

(4) *Comment:* One peer reviewer commented that the proposed rule discusses the short-lived benefits of fire in sage-grouse habitats, including a flush of understory vegetation and forbs. The peer reviewer noted that the proposed rule states that beneficial effects of fire were found by studies in mesic habitats and that, therefore, some benefits may be expected from fire in those habitat types (but this is contradictory to the previous statement). The reviewer stated that effects in Wyoming sagebrush, where most studies have taken place, may be different from those in mountain sagebrush types (such as in Gunnison sage-grouse range).

*Our Response:* As presented in this final rule, effects of fire in sagebrush habitat and to sage-grouse are highly variable. A clear positive response of Gunnison or greater sage-grouse to fire has not been demonstrated (Braun 1998, p. 9). The few studies that have suggested fire may be beneficial for greater sage-grouse were primarily conducted in mesic areas used for brood-rearing (Klebenow 1970, p. 399; Pyle and Crawford 1996, p. 323; Gates 1983, *in* Connelly *et al.* 2000c, p. 90; Sime 1991, *in* Connelly *et al.* 2000a, p. 972). In mesic habitat, small fires may maintain a suitable habitat mosaic by reducing shrub encroachment and encouraging understory, herbaceous growth. However, without available nearby sagebrush cover, the utility of these sites is questionable, especially within the six small Gunnison sage-grouse populations where fire could further degrade the remaining habitat. More recent research related to Gunnison sage-grouse indicated that due to the fragmented nature of remaining sagebrush habitat across the species' range, prescribed fire may be inappropriate if the goal is to improve sagebrush and overall habitat conditions for the species (Baker 2013, p. 8). This topic is discussed further under Factor A in this final rule.

(5) *Comment:* A peer reviewer recommended that our analysis include more discussion on the role of water developments in the proliferation of West Nile virus. The reviewer cited a study by Walker and Naugle (2011), arguing that West Nile outbreaks in small, isolated sage-grouse populations—similar to all except perhaps the Gunnison Basin population of Gunnison sage-grouse—may result in extirpation. Given the potential impact to populations from West Nile virus and the predicted spread of this disease associated with climate change, the reviewer stated that the effect of

anthropogenic water sources that harbor mosquitoes should be analyzed.

*Our Response:* In this rule, we reevaluated West Nile virus as a threat to Gunnison sage-grouse and included several new citations. We did not conduct a landscape analysis on the precise quantity or distribution of water developments, but instead focused our analysis on the known distribution of West Nile virus across Gunnison sage-grouse range. In this final rule we find that, due to the known and potential presence and distribution of West Nile virus across the majority of Gunnison sage-grouse range, the high risk of mortality and population-level impacts based on the biology of the species, and the immediacy of those potential impacts, West Nile virus is a potential future threat to Gunnison sage-grouse throughout its range. The threat of West Nile virus is currently lower in the high-elevation areas, such as the Gunnison Basin and most of the Piñon Mesa populations, but we expect it to increase in the near term due to increased drought and the predicted effects of climate change. This topic is discussed in detail under Factor C of this rule.

(6) *Comment:* A peer reviewer stated that limited evidence is provided to establish predation as a substantial threat to Gunnison sage-grouse.

*Our Response:* We agree that research and data linking predation and Gunnison sage-grouse abundance and viability are limited. However, available scientific information (primarily for greater sage-grouse) presented in this rule indicates that, particularly in areas of intensive habitat alteration and fragmentation, and in smaller less resilient populations, sage-grouse productivity and, potentially, population persistence could be negatively affected by predation. Because the Gunnison and greater sage-grouse have similar behavior and life-history traits, it is reasonable to assume that predator impacts on Gunnison sage-grouse are similar to those observed in greater sage-grouse. The best available information indicates that predation is having an impact on Gunnison sage-grouse, particularly in the satellite populations, where there is some evidence that predation is affecting chick and juvenile survival, especially in smaller populations. Based on the greater sage-grouse data and the limited data available for Gunnison sage-grouse, we conclude that predation is a threat. While predation likely acts as a threat in localized areas across the range of the species, the stability of the Gunnison Basin population over the last 19 years indicates that predation is not having a significant impact on that population.

We believe, however, that the effects of predation are more pronounced in the satellite populations. Given the stability of the Gunnison Basin population, we do not believe that the magnitude of this threat is significant at the rangewide level. This topic is discussed in detail in Factor C of the rule.

(7) *Comment:* A peer reviewer noted that the proposed rule's analysis on non-renewable energy development is lacking.

*Our Response:* This final rule includes a revised and expanded evaluation of mineral and energy development (Factor A).

(8) *Comment:* A peer reviewer stated that there are no data to support the conclusion that habitat conditions with respect to grazing are better on public lands than private lands, due in part to land health standards and more regulation.

*Our Response:* We agree and have revised our statement in the final rule to more accurately reflect that in our analysis of grazing under Factor A.

(9) *Comment:* A peer reviewer noted that the proposed rule states, with respect to fences, that ''we anticipate that the effect on sage-grouse populations through the creation of new raptor perches and predator corridors into sagebrush habitats is similar to that of powerlines.'' The reviewer did not think this assumption was correct. The commenter noted that differences in height between a fence post and a utility pole would theoretically result in different spatial scales of functional habitat loss due to differences in the distance from the perch a predator could see while perched.

*Our Response:* The final rule has been revised to state that fence posts create perching places for raptors and corvids, which may increase their ability to prey on sage-grouse (Braun 1998, p. 145; Oyler-McCance *et al.* 2001, p. 330; Connelly *et al.* 2004, p. 13–12). This topic is discussed in detail in Factor A of this rule.

(10) *Comment:* A peer reviewer suggested that we review a recent article by Blomberg *et al.* 2012, related to climate change and invasive plants. This article suggests that characteristics of climate and landscape disturbance influence the dynamics of greater sage-grouse populations.

*Our Response:* We reviewed this article and cited it in Factor A (Invasive Plants) and Factor E (Drought and Extreme Weather) of this rule.

(11) *Comment:* A peer reviewer noted that the Utah population of Gunnison sage-grouse was at its highest in the 1970s and 1980s (San Juan County Working Group (SJCWG) 2000, Lupis

2005, Prather 2010). During this period, the peer reviewer stated, the primary agricultural crops in the county were winter wheat (*Triticum* spp.) and dryland alfalfa (*Medicago* spp.). Many growers did not use herbicides or insecticides at this time because of the slim profit margin in growing these crops. The peer reviewer suggested that these practices may have resulted in a greater arthropod abundance as a result of increased green vegetation and forb availability, providing more food resources for Gunnison sage-grouse. The reviewer also reported that during this period landowners frequently reported observing flocks of sage-grouse in their fields during harvest and post-harvest periods.

*Our Response:* While sage-grouse may forage on agricultural croplands (Commons 1997, pp. 28–35), when possible, they tend to avoid landscapes dominated by agriculture (Aldridge *et al.* 2008, p. 991). Influences resulting from agricultural activities extend into adjoining sagebrush, and include increased predation and reduced nest success due to predators associated with agriculture (Connelly *et al.* 2004, p. 7–23). Agricultural lands provide some benefits for sage-grouse as some crops such as alfalfa (*Medicago sativa*), winter wheat (*Triticum aestivum*), and pinto bean sprouts (*Phaseolus* spp.) are eaten or used seasonally for cover by Gunnison sage-grouse (Braun 1998, pers. comm., Lupis *et al.* 2006, entire). Agricultural fields and their management may provide a surplus of arthropods and forbs for Gunnison sage-grouse, and for hens with broods, in particular. Despite these seasonal benefits, crop monocultures do not provide adequate year-round food or sagebrush cover (GSRSC 2005, pp. 22–30). This topic is discussed in Factor A of this rule (Conversion to Agriculture).

(12) *Comment:* One peer reviewer felt that the proposed rule neglected to discuss the importance of Conservation Reserve Program (CRP) lands in Utah to Gunnison sage-grouse.

*Our Response:* Lands within the occupied range of Gunnison sage-grouse enrolled into the CRP occur within Dolores and San Miguel counties in Colorado, and San Juan County in Utah (USDA FSA 2010, entire). A significant portion of the agricultural lands in the Monticello subpopulation are enrolled in the CRP program, and some CRP lands are sometimes used by Gunnison sage-grouse as early-brood-rearing and summer-late fall habitat when they are part of a landscape that otherwise encompasses the species' seasonal habitats (Lupis *et al.* 2006, pp. 959–960; Ward 2007, p. 15). We therefore

acknowledge the benefits of CRP lands to Gunnison sage-grouse, as habitat provided under this program is generally more beneficial to the species than lands under more intensive agricultural uses such as crop production. However, CRP lands are generally lacking in the sagebrush and shrub components typically critical to the survival and reproduction of Gunnison sage-grouse and vary greatly in plant diversity and forb abundance (Lupis *et al.* 2006, pp. 959–960; Prather 2010, p. 32). As such, these CRP lands are generally of lower value or quality than native sagebrush habitats. This topic is discussed further in Factor A (Conversion to Agriculture).

(13) *Comment:* A peer reviewer noted that adult survival and nesting success in San Juan County was higher (Lupis 2005, Ward 2007) than that reported for other populations (Young 1994, Commons 1997, Apa 2004). The reviewer hypothesized that this difference may be due to the effort in San Juan County to reduce mammalian and corvid depredation (Lupis 2005, Ward 2007).

*Our Response:* While we acknowledge that predator control may be effective under certain circumstances, the cited studies did not evaluate the effect of predator control, nor was that their objective. They only speculated regarding the potential positive effects of predator control on the Monticello (San Juan County) population of Gunnison sage-grouse. This topic is discussed further in Factor C (Predation) of this rule.

(14) *Comment:* A peer reviewer reported that the Gunnison sage-grouse population in San Juan County may be stable or increasing based on increases in brood sizes and hatch success between 1974 and 2005 (UDWR 1974; Lupis 2005). This reviewer noted that this hypothesis was not supported by lek count indices, which indicated that the population was declining.

*Our Response:* Lek count data from 1996 through 2014 indicate a decline in the Monticello-Dove Creek population (located in the adjacent counties of San Juan, UT, and Dolores, CO, respectively) collectively and in both of these populations individually. Further, current population estimates are well below the Rangewide Conservation Plan (RCP) population target of 250 birds for each population alone (CPW 2013, p. 12). Sample size for the aforementioned study was limited to three nests, and predator control at the time may have contributed to relatively high nesting success (Lupis 2005, entire); the inference to be drawn from the study is, therefore, limited. The best available

scientific information indicates that the Monticello-Dove Creek population is neither stable nor secure. This topic is discussed further in this rule in the Current Distribution and Population Estimates and Trends section below; and in Factor E (Small Population Size and Structure).

(15) *Comment:* A peer reviewer provided data and information from pertinent studies conducted in Utah and Colorado that the reviewer thought could improve our analysis.

*Our Response:* We reviewed the provided study information and literature and found that most had already been considered in our proposed rule. In this final rule, we included all new studies, data, and information relevant to our evaluation.

(16) *Comment:* A peer reviewer thought that the proposed rule was missing a description and summary of the two decades of conservation actions completed by local communities, landowners, public and private agencies, and organizations in Utah and Colorado to conserve the species. The reviewer indicated that stakeholders in both States dedicated significant resources to conservation of the species that have abated numerous threats. The peer reviewer recommended expanding discussion of the efforts of the local working groups, the State agencies, nongovernmental organizations, and counties, as well as Natural Resources Conservation Service (NRCS) programs, including the Sage-grouse Initiative Program.

*Our Response:* We recognize the contributions made by multiple partners including private citizens, nongovernmental organizations, and Tribal, State, and Federal agencies that are actively engaged in conservation efforts across the range of Gunnison sage-grouse. Numerous conservation actions have been implemented for Gunnison sage-grouse, and these efforts have provided and will continue to provide conservation benefit to the species. The CCAA, Gunnison Basin CCA, conservation plans, habitat improvement projects, and similar conservation efforts that address habitat-related issues are described and evaluated under Factor A (see Conservation Programs and Efforts Related to Habitat Conservation) in this rule. Laws and regulations, conservation easements, and other regulatory mechanisms are evaluated under Factor D. Scientific research activities are described under Factor B and throughout this rule where applicable. Also, throughout this rule, conservation efforts are described under the relevant factor section.

(17) *Comment:* A peer reviewer stated that the proposed rule provides information regarding the estimated historical occupied Gunnison sage-grouse habitats, based largely on estimates of potential habitats. As such, these figures may overestimate the historical range of the species. The commenter noted that it is logical to assume that, if a species' habitat declines, so will the population. However, the peer reviewer could not find any data to support the idea that populations have declined over time.

*Our Response:* Our listing decision is based on the current status of Gunnison sage-grouse and the current and future threats to the species and its habitat. However, the loss of historical range and decline in abundance, and the associated causes, are informative in that they can be used to help forecast how populations and the species may respond to current and future threats. The onset of Euro-American settlement in the 1800s resulted in significant alterations to sagebrush ecosystems throughout North America, primarily as a result of urbanization, agricultural conversion, and irrigation projects (West and Young 2000, pp. 263–265; Miller *et al.* 2011, p. 147). Areas in Colorado that supported basin big sagebrush were among the first sagebrush community types converted to agriculture because their typical soils and topography are well suited for agriculture (Rogers 1964, p. 13). Decreases in the abundance of sage-grouse paralleled the loss of range (Braun 1998, pp. 2–3), and a gradual but obvious decrease in sage-grouse distribution and numbers in Colorado had begun around 1910 (Rogers 1964, pp. 20–22).

The best available information indicates a reduction of Gunnison sage-grouse distribution since Euro-American settlement in the 1800s, with evidence of the loss of peripheral populations (Schroeder *et al.* 2004, p. 371, and references therein) and a northward and eastward trend of extirpation (Schroeder *et al.* 2004, p. 369, and references therein), meaning western and southern extents of the species' former range are now lost. Based on historical records, museum specimens, and potential sagebrush habitat distribution, the potential historical range of Gunnison sage-grouse was estimated to have been 21,376 square miles, or 13,680,590 ac (GSRSC 2005, pp. 32–35, as adapted from Schroeder *et al.* 2004, entire). This range included parts of central and southwestern Colorado, southeastern Utah, northwestern New Mexico, and northeastern Arizona (Schroeder *et al.* 2004, pp. 368, 370).

Braun *et al.* (2014, entire) provides more detail on historical distribution in Colorado that largely matches Schroeder *et al.* (2004). Not all of this historical range would have been occupied at any one time. The species' estimated current range is 1,822 square miles, or 1,166,075 ac, in central and southwestern Colorado, and southeastern Utah (Figure 1) (GSRSC 2005, pp. 32–35, as adapted from Schroeder *et al.* 2004, entire). Based on these figures, the species' current range represents about 8.5 percent of its historical range (GSRSC 2005, p. 32). Similarly, Schroeder *et al.* (2004, p. 371) estimated the species' current overall range to be 10 percent of potential presettlement habitat (prior to European settlement in the 1800s). As estimated in our final rule to designate critical habitat for Gunnison sage-grouse (published elsewhere in today's **Federal Register**), the species' ''overall range'' includes an estimated 1,621,008 ac in southwestern Colorado and southeastern Utah, comprising 923,314 ac (57 percent) of occupied habitat and 697,694 ac (43 percent) of unoccupied habitat. Based on these figures, the current overall range of 1,621,008 acres represents approximately 12 percent of the potential historical range of 13,680,640 ac. The estimates above indicate that approximately 88 to 93 percent of the historical range of Gunnison sage-grouse has been lost. This topic is discussed further under our introduction to Factor A.

(18) *Comment:* A peer reviewer noted that Davis (2012) suggested Gunnison sage-grouse populations in the Gunnison Basin declined slightly over the last 16 years, but that Davis concluded the Gunnison Basin population, which may comprise 85–90 percent of the entire population, is relatively stable. Population projection models based on Davis' 6-year study suggested that the Gunnison sage-grouse population in the Gunnison Basin is declining. However, the peer reviewer noted that lek count data extended farther back in time than the demographic estimates and showed that this population exhibited a considerable increase, so the peer reviewer indicated that inference from this study is limited.

*Our Response:* Based on an integrated analysis of 16 years of lek count and demographic data (1996–2011), Davis found that the Gunnison Basin population may have been declining slightly through the period of study (Davis 2012, p. 137). That study indicated that the Gunnison Basin population may not be as stable as previously thought, although the time span of the study may not have been long enough to reveal a broader pattern

in a larger cyclical time series (Davis 2012, p. 38). A more recent manuscript by Davis *et al.* (*in press*) states that the Gunnison Basin population (1996–2012) is "slightly declining" (line 24), and, while the growth rate of this population has been variable, it is "near stable" (line 341). Consider also that the Gunnison Basin population may not be as large as lek count-based estimates suggest, which are based solely on counting males (Davis 2012, p. 136). Davis (2012, pp. 134, 136) found that, in comparison to demographic data, lek count data showed population growth rates that varied wildly and should be interpreted with caution. This is particularly true for the lek data collected prior to 1996, before the lek survey methodology was standardized (Davis 2012, pp. 136–139). Demographic stochastic simulations resulted in a mean extinction time of 58 years for the Gunnison Basin population, without removing any birds for translocation efforts (removal of birds decreased the estimated mean extinction time) (Davis 2012, pp. 111, 137). Davis (2012, p. 92) noted, however, that if the study had been conducted just a few years earlier or later, a different trend across time could have resulted, because it was based on a 6-year period of time when the population was experiencing a slight decline. This study and other population viability analyses are evaluated in detail in Factor E (Small Population Size and Structure) of this rule.

(19) *Comment:* One peer reviewer thought that it is difficult to assess what future conditions hold, be it vegetation responses to climate change or the effects of population growth and development resulting in fragmentation and associated effects on the species of conservation concern. The reviewer thought it is also difficult to evaluate how a species such as Gunnison sage-grouse might respond to projected changes, even 5 or 10 years into the future, let alone 50–100 years. Despite these uncertainties, the peer reviewer considered the short- and long-term viability for six of the seven populations of Gunnison sage-grouse to be tenuous, at best.

*Our Response:* We agree with the reviewer that it is difficult to predict what will happen in the future. However, the Act requires us to determine if a species is endangered (in danger of extinction throughout all or a significant portion of its range) or threatened (likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range). Thus, we are required to make assumptions or predictions into the future based on the best available information.

We agree with the reviewer that the viability of the six smaller ("satellite") populations is at risk (see Small Population Size and Structure below under Factor E).

(20) *Comment:* A peer reviewer noted that, while the Gunnison basin population appears to have stabilized more recently within a population cycle, the number of current and future threats makes one question whether this population will remain viable into the future. The reviewer thought existing threats, or levels of threats, appear to already threaten the Gunnison basin population. This reviewer questioned whether the remaining Gunnison basin population will persist, if other smaller populations disappear, which seems likely in the near future without considerable management efforts, given projected future threats. The reviewer also questioned whether the localized nature of a single remaining population in the Gunnison Basin is enough to prevent extirpation of the species, considering potential stochastic events and the likely continued and increasing effects of habitat degradation and fragmentation.

*Our Response:* Based on the best available information, we found that survival of the Gunnison Basin population alone would be insufficient to ensure the species' long-term persistence in the face of ongoing and future threats (see Factor E (Small Population Size and Structure)).

(21) *Comment:* One peer reviewer questioned whether the Service had access to the considerable amount of telemetry data collected by Colorado Parks and Wildlife (CPW) in recent years, primarily for birds located in the Gunnison Basin. This reviewer fully supported the use of existing information and models, in lieu of restricted access to other important data. The reviewer thought that the Service had done a realistic job of proceeding with existing information, whether it be from model applications to assist with broader habitat identification across the Gunnison Basin (see Aldridge *et al.* 2012), or biological information and responses (i.e., effects of fences on sage-grouse mortality) based on studies conducted on the closely related greater sage-grouse.

*Our Response:* We do not have access to the telemetry data collected by CPW. This data has not been published. We do have some telemetry information provided in overview maps and the information was discussed in meetings.

As pointed out in the Species Information section, Gunnison sage-grouse and greater sage-grouse (a similar, closely related species) have similar life histories and habitat requirements (Young 1994, p. 44). In this final rule, we use scientific information specific to the Gunnison sage-grouse where available but also apply scientific management principles and scientific information for greater sage-grouse that are relevant to Gunnison sage-grouse conservation needs and strategies, a practice followed by the wildlife and land management agencies that have responsibility for management of both species and their habitat. We have considered the best available information in our assessment, including data and studies provided by CPW.

(22) *Comment:* A peer reviewer stated that the effects of powerlines are not all the same, depending on the type of the powerline. The peer reviewer requested that we clarify what types of powerlines we are referring to, and which were evaluated in each of the studies we address.

*Our Response:* As described in this rule, depending on the infrastructure design, size, location, and site-specific factors, powerlines can directly affect greater sage-grouse by posing a collision and electrocution hazard (Braun 1998, pp. 145–146; Connelly *et al.* 2000a, p. 974) and can have indirect effects by decreasing lek recruitment (Braun *et al.* 2002, p. 10, Walker *et al.* 2007a, p. 2,644), increasing predation (Connelly *et al.* 2004, p. 12–13, Howe *et al.* 2014), fragmenting habitat (Braun 1998, p. 146), and facilitating the invasion of exotic animal plants (Knick *et al.* 2003, p. 612; Connelly *et al.* 2004, p. 7–25). We also specify types of powerlines (transmission or distribution) and their effects on Gunnison sage-grouse as appropriate. This topic is discussed further in Factor A (Powerlines) of this rule.

(23) *Comment:* A peer reviewer commented that the proposed rule reads as though Wisdom *et al.* (2011) tested electromagnetic fields and found sage-grouse avoidance of them. The reviewer indicates that was not the case. Wisdom *et al.* (2011) found a correlation between sage-grouse extirpations and the presence of powerlines. The reviewer suggested this effect may be related to electromagnetic fields. The reviewer cautioned that we ensure here, and throughout, that this supposition is not presented as a finding.

*Our Response:* We revised our analysis to explicitly state that no studies have been conducted specifically on the effects of electromagnetic fields on sage-grouse.

This topic is discussed further in Factor A (Powerlines) of this rule.

(24) *Comment:* A peer reviewer noted that Gregg *et al.* (2004) did not actually test grazing impacts on vegetation causing reduction in nest success. Rather, they found that lower heights of grass cover (below 18 cm) resulted in increased nest predation. The peer reviewer suggested that careful choice of wording may be necessary to accurately reflect what was evaluated and found by a study, versus what was inferred and speculated from the results of the study. The reviewer stated that our proposed rule suggested that Gregg *et al.* (2004) evaluated livestock reduction in grass heights and showed a direct link to reduced nesting success for sage-grouse, which was not the case.

*Our Response:* In this final rule, we clarified that, Gregg *et al.* (1994, p. 165) speculated that the reduction of grass heights due to livestock grazing in sage-grouse nesting and brood-rearing areas may negatively affect nesting success when cover is reduced below the 18 cm (7 in.) needed for predator avoidance. This topic is discussed further under Factor A (Domestic Grazing and Wild Ungulate Herbivory).

(25) *Comment:* A peer reviewer commented that one could argue that livestock grazing on private lands might be better managed than public lands, because individual landowners may be more cognizant of grazing practices on those lands.

*Our Response:* In this final rule, we state that livestock grazing allotments containing both Federal and private lands can often be managed by Federal agencies to meet land health standards through coordination and cooperation with grazing permittees (BLM 2013c, p. 1–2). However, we have no information on the extent of grazing, management, or habitat conditions on private lands in Gunnison sage-grouse range, and therefore cannot make a definitive assessment of these areas. Furthermore, although Federal land and livestock grazing may be more regulated, we cannot make any generalizations about how habitat conditions in those areas might compare with private lands where livestock grazing occurs. This topic is discussed further under Factor A (Domestic Grazing and Wild Ungulate Herbivory).

(26) *Comment:* A peer reviewer commented that the table displaying Land Health Standard data on Federal lands in Gunnison sage-grouse range is confusing.

*Our Response:* In this final rule, we restructured the table and included additional columns and figures to better show how numbers were calculated (see Table 8 in Factor A (Domestic Grazing and Wild Ungulate Herbivory)). The information in the table was also updated based on comments received from Federal agencies during the public comment periods for the proposed rules.

(27) *Comment:* One peer reviewer commented that mortality of handled Gunnison sage-grouse (ranging between zero and seven percent) could be significant. The peer reviewer would prefer to see a summary of the percentages by study and age class of birds handled and a sample size to indicate the potential overall population effect. The reviewer suggested that we link the summary to match with the cited number of research related mortalities being typically below three percent. The rule stated that "Mortality from scientific research is low (two percent) and is not a threat." These all need appropriate citations, and the differences between these numbers should be reconciled.

*Our Response:* In this final rule, we describe why, overall, we expect that scientific research and related conservation efforts, such as translocation of Gunnison sage-grouse, have a net conservation benefit for the species. However, some unintended, but minor negative effects are known to occur in the process. This topic is addressed further in Factor B (Scientific Research and Related Conservation Efforts, see especially Table 11 summarizing various research efforts).

(28) *Comment:* A peer reviewer noted that in our table of conservation easements, we have cumulated the percentages based on the area in easements out of the total area (rangewide) considered, as opposed to taking the average of the percentages for each population.

*Our Response:* In this final rule we updated conservation easement information and acres, based on Lohr and Gray (2013, entire) (see Factor A (Other Regulatory Mechanisms: Conservation Easements)). Therein, we provide conservation easement acres by population and rangewide in occupied and unoccupied habitats. We feel this is a better representation of lands protected under conservation easement for Gunnison sage-grouse; averaging those values across populations would not accurately depict protected acres for the species.

(29) *Comment:* A peer reviewer expressed concern about what the reviewer perceived as the frequent use of speculation and commentaries as empirical evidence. The peer reviewer stated that we speculate about proposed threats (e.g., climate change) that we have no information on how they may,

or may not, affect Gunnison sage-grouse. The reviewer stated that we also frequently use vague language (i.e., "may have", or "is likely to") and then make definitive statements about Gunnison sage-grouse in support for the proposed listing decision.

*Our Response:* As noted above, throughout this rule, we have carefully identified and qualified instances of speculation or hypotheses from past scientific studies and publications. Our identification of current and future threats to Gunnison sage-grouse is based on the best available scientific information, and we acknowledge where there is uncertainty associated with data or predictions. For instance, in this final rule, we discuss that climate change predictions are based on models with assumptions, and there are uncertainties regarding the magnitude of associated climate change parameters such as the amount and timing of precipitation and seasonal temperature changes.

There is also uncertainty as to the magnitude of effects of predicted climate parameters on sagebrush plant community dynamics. These factors make it difficult to predict whether, or to what extent, climate change will affect Gunnison sage-grouse. We recognize that climate change has the potential to alter Gunnison sage-grouse habitat by facilitating an increase in the distribution of cheatgrass and concurrently increasing the potential for wildfires, and reducing herbaceous vegetation and insect production in drought years, all of which would have negative effects on Gunnison sage-grouse.

This topic is discussed further in Factor A (Climate Change) of this rule, and in Factor E (Drought and Extreme Weather).

(30) *Comment:* A peer reviewer stated that we frequently make generalizations about the decline of Gunnison sage-grouse abundance, such as, "Fragmentation of sagebrush habitats are a primary cause of the decline of Gunnison and greater sage-grouse populations." However, the reviewer notes, lek counts in the Gunnison Basin population are currently at historic high levels and have increased substantially since the mid-1990s. The reviewer further notes that lek counts from 2005–2007 were the highest counts recorded in the Gunnison Basin population. Since 2007, lek counts in Gunnison Basin have averaged 703 males.

*Our Response:* Loss, degradation, and fragmentation of Gunnison sage-grouse habitat is discussed in Factor A of this rule. Population trends based on 1996–2014 lek count data show stable to

slightly declining levels from 1996 through 2004, then the high levels mentioned from 2005–2007; followed by lower but stable levels since (see Figure 2). The 2008–2014 population level is higher than levels prior to 2005, but around 20 percent lower than the 2006 peak (CPW 2014e. e.p.2). Population trends are discussed further in the section, Current Distribution and Population Estimates and Trends; and Factor E (Small Population Size and Structure) of this rule. Also see our response to State Comment 5 below.

(31) *Comment:* One peer reviewer stated that we had not presented a case that Gunnison sage-grouse are in danger of extirpation in the Gunnison Basin. It is the largest of all Gunnison sage-grouse populations, and three different population viability analyses have all concluded it is relatively stable.

*Our Response:* In our proposed rule to list Gunnison sage-grouse as endangered (78 FR 2486; January 11, 2013), we found that the species is in danger of extinction throughout its range, primarily due to habitat loss, degradation, and fragmentation associated with residential and human development across its range and, in particular, in the Gunnison Basin. In this final rule we determined that the species is not currently in danger of extinction throughout its range, but is likely to become so in the foreseeable future. As a result, this final rule lists the species as threatened rather than endangered. The basis for this decision is set out in the Determination section below. We also assess the three population viability analyses (PVA) for the Gunnison Basin and other populations in Factor E (Effective Population Size and Population Viability Analyses).

(32) *Comment:* A peer reviewer noted that we present the PVA from the Rangewide Conservation Plan. However, the reviewer noted that there are two other PVAs we need to address: Garton (2005) and Davis (2012).

*Our Response:* All three available PVAs for Gunnison sage-grouse are included in our assessment in this final rule (Factor E, Effective Population Size and Population Viability Analyses). Also see our response to peer review comment 31 above.

(33) *Comment:* A peer reviewer noted that in referring to the PVA in the Rangewide Conservation Plan, we state that small populations (<50 birds) are "at a serious risk of extinction within the next 50 years (assuming some degree of consistency of environmental influences in sage-grouse demography)." (p. 2531). However, environmental and democratic

stochasticity were incorporated into the model (i.e., the model does not assume "consistency of environmental influences").

*Our Response:* The RCP and actual PVA (see GSRSC 2005, pp. 170 and G–27) state that the estimates assumed some degree of consistency of environmental factors over time. This topic is discussed further in Factor E (Small Population Size and Structure).

(34) *Comment:* A peer reviewer commented that we misapply the terms habitat loss, fragmentation, and loss.

*Our Response:* In the scientific literature and community there are widely varying interpretations of habitat loss, degradation, and fragmentation processes, and various methods are applied to measure these processes. Therefore, in this final rule, we collectively refer to these processes as habitat decline, as prefaced in the Factor A section below. However, we do not alter the terminology as applied by peer-reviewed or other studies. For instance, if a particular study evaluated and presented results on habitat *fragmentation*, we did not interpret the study or authors to mean habitat *loss*, instead. This topic is discussed further in our introduction to Factor A in this rule.

(35) *Comment:* A peer reviewer stated that we argue more than once that while individual human activities or features may not be a significant threat, it is the cumulative impact of all these features that threatens the Gunnison sage-grouse. However, the peer reviewer stated that this reasoning ignores the spatial (and temporal) variation in these potential threats. The reviewer is of the opinion that proposed threats are not uniformly distributed across space and therefore will not uniformly impact Gunnison sage-grouse populations. The reviewer stated that development will only impact a very small proportion of the habitat in Gunnison Basin and will be restricted to zoned areas. The reviewer stated that preliminary analyses indicate that Gunnison sage-grouse are flexible in their movement patterns and the habitats they use (CPW Demography and Movement project, in prep.). The reviewer stated that the cumulative negative impacts are not as likely as we seem to assume.

*Our Response:* The historic loss of habitat and current isolation of once connected populations, the declining status of several satellite populations, and presence of current and future threats to habitat all indicate that the cumulative loss or decline of habitat has negatively influenced populations and the species as a whole and is likely to continue to do so into the future. This

topic is discussed further in our introduction to Factor A in this rule. Threats to Gunnison sage-grouse habitat are also discussed under Factor A in this rule. We agree that future residential development in occupied habitat in the Gunnison Basin is likely to be more limited than we presented in the proposed rule (see Factor A (Residential Development), but nonetheless find, for the reasons stated in Factor A, that this development remains a threat to the species and supports our determination that the species is likely to become in danger of extinction throughout its range in the foreseeable future.

(36) *Comment:* A peer reviewer noted that, related to livestock grazing, Williams and Hild (2011) showed that vegetation conditions in the Gunnison Basin met, or exceeded, the habitat structural guidelines in the Rangewide Conservation Plan. The peer reviewer also stated that we misrepresented the objective of this study in our proposed rule, stating that it was not a grazing study and therefore our criticism is not valid. With 392 transects distributed across Gunnison Basin for this study, the reviewer did not understand our statement that "sampling is limited" (p. 2503).

*Our Response:* Because livestock grazing effects were not an objective of the Williams and Hild (2011) study, the extent of past or ongoing livestock grazing in these areas was not described, nor did the study compare un-grazed to grazed areas. The Williams and Hild study found that habitat conditions are likely favorable to Gunnison sage-grouse in a portion of the Gunnison Basin (Williams and Hild 2011, entire), although the relationship to livestock grazing effects in those areas is unknown. In this final rule, we clarify that there is limited ability to make inferences from this study for other areas in the Gunnison Basin, due to limitations of the study. Transect locations for the study were prioritized and selected in areas used by radio-collared Gunnison sage-grouse, potentially biasing study results. Therefore, the relationship between livestock grazing and habitat conditions is unclear in this study, and there is limited ability to infer from its conditions in other portions of the Gunnison Basin not prioritized for sampling. This topic is discussed further in Factor A (Domestic Grazing and Wildlife Herbivory) of this rule.

(37) *Comment:* A peer reviewer stated that our discussion of "presettlement" distribution of Gunnison sage-grouse was highly speculative. The peer reviewer also stated that we assume that

Gunnison sage-grouse distribution closely matches the distribution of sagebrush, and that this assumption is used by some authors (e.g., Schroeder, *et al.* 2004, Wisdom *et al.* 2011), but is not necessarily true. The peer reviewer stated that the map by Schroeder *et al.* (2004) is not meant to be a definitive description that accurately defines historical distribution, but a generalization based on available information (i.e., the model includes areas that are not habitat and omits other areas that are habitat). The peer reviewer noted that we also state Gunnison sage-grouse distribution depends on large areas of contiguous sagebrush. The peer reviewer also noted that this assumption does not seem to be well supported since Gunnison sage-grouse have existed in small, isolated populations for decades (Rogers 1964).

*Our Response:* Related to potential historical range of Gunnison sage-grouse, and the estimated loss of historical range, see our response to Peer Reviewer Comment 17 above. Related to our position that the species depends on sagebrush on a landscape scale for its survival, the best available science supports this, and it is an empirical principle widely accepted by sage-grouse biologists and the scientific community. As discussed in this rule, Gunnison sage-grouse depend on sagebrush for their survival and persistence, and the historical and current distribution of the Gunnison sage-grouse closely matches that of sagebrush (Patterson 1952, p. 9; Braun 1987, p. 1; Schroeder *et al.* 2004, p. 364, and references therein). Habitat fragmentation resulting from human development patterns is especially detrimental to Gunnison sage-grouse because of their dependence on large expanses of sagebrush (Patterson 1952, p. 48; Connelly *et al.* 2004, p. 4–1; Connelly *et al.* 2011a, p. 72) and more contiguous sagebrush habitats (Rogers 1964, p. 19; Wisdom *et al.* 2011, pp. 452–453). The overall declining status of several of the satellite populations (despite translocation/augmentation efforts) does not support the idea that the species is capable of persisting at low levels or in isolated conditions. Refer to Factor E in this rule for more discussion on this topic.

(38) *Comment:* A peer reviewer noted that we describe the genetic work by Oyler-McCance *et al.* (1999, 2005) that illustrates the lower genetic diversity of Gunnison sage-grouse compared to greater sage-grouse, and the lower genetic diversity of the small Gunnison sage-grouse populations compared to the Gunnison Basin population. The peer reviewer asserted that lower

genetic diversity may have important consequences, but it is unlikely to have an effect anytime in the near future and that it must be demonstrated that low genetic diversity has negative consequences on individuals and populations.

The peer reviewer stated that it is inappropriate to suggest that there is a specific population size that is necessary for long-term population survival from a genetic perspective (i.e., that there should be 500–5,000 Gunnison sage-grouse in a population for it to be viable). The peer reviewer commented that the genetic viability of a population depends on the effective population size, the type of genetic variation in the population, and type of selection acting on the population. The peer reviewer noted it is possible that animals can rapidly adapt to inbreeding by the selective elimination of the genes responsible for inbreeding depression and although highly speculative, this may be operating in the small, isolated Gunnison sage-grouse populations. So, the peer reviewer suggested that to argue that inbreeding depression due to low genetic diversity is a basis for listing the species as endangered is not warranted without empirical data focused on this specific question.

*Our Response:* In this final rule, we have determined that listing the species as threatened, not endangered, is the appropriate determination. We describe the potential negative consequences of genetic deterioration associated with small population size and geographic isolation under Factor E (Genetic Risks)). We also discuss this topic and other relevant information further under Factor E (Small Population Size and Structure) in this rule.

*Comments From States*

(1) *Comment:* The Arizona Game and Fish Department noted that there are no records of Gunnison sage-grouse ever existing in Arizona, and estimates of historical range in northeastern Arizona are based on pre-settlement occurrence of sagebrush (*Artemisia* spp.), which has largely been extirpated. Consequently, no viable habitat remains for the Gunnison sage-grouse in Arizona. Any future restoration efforts should focus on the remaining core distributions in Colorado and Utah.

*Our Response:* Identification of potential pre-settlement Gunnison sage-grouse habitat in Arizona was based on both historical sagebrush distribution and a 1937 observation of sage-grouse in the northeastern corner of that state (Schroeder *et al.* 2004, pp. 368–369, and references therein). Restoration or

reintroduction of Gunnison sage-grouse in Arizona is not being proposed.

(2) *Comment:* The Colorado Office of the Governor noted that letters had been sent from Colorado Parks and Wildlife (CPW) and Colorado Department of Agriculture (CDA), and recommended that the Gunnison sage-grouse should be determined not warranted for listing.

*Our Response:* The Colorado Office of the Governor referenced CPW and CDA letters in support of a not warranted determination for Gunnison sage-grouse, but provided no other information or data to support their position. We acknowledge receipt of letters from CPW and CDA. Their comments will be addressed in further detail in this section. Our listing determination for the Gunnison sage-grouse is explained in this final rule.

(3) *Comment:* CPW recommended the following hierarchy in the evaluation of biology and threats.

a. Use of only Gunnison sage-grouse data when it exists.

b. If Gunnison sage-grouse data does not exist, use greater sage-grouse data closest to Gunnison sage-grouse range in Colorado or Utah.

c. If greater sage-grouse data from adjacent populations does not exist, then proceed with the appropriate cautions and limited inference to available information within the range of greater sage-grouse.

Another State commenter suggested that references to greater sage-grouse be omitted altogether.

*Our Response:* We generally used the above approach recommended by CPW, although we did not distinguish between greater sage-grouse data from populations closest to Gunnison sage-grouse's range. We did not explicitly state that in the proposed rule—we stated that the "best available scientific and commercial data" were used. We also noted that we used information specific to the Gunnison sage-grouse where available but still applied scientific management principles for greater sage-grouse that we determined were relevant to Gunnison sage-grouse management needs and strategies. We followed the same approach in this final rule.

(4) *Comment:* CPW and CDA stated that lek counts in the San Miguel, Crawford, and Cerro Summit-Cimarron-Sims Mesa populations have increased in recent years, in contrast to the statement in the listing proposal that population trends over the last 12 years indicate that six of the populations are in decline.

*Our Response:* We used the same CPW lek survey data that these comments refer to in our assessment of

population trends from 2001 through 2012. Our conclusion was that the six smaller populations had stable to declining numbers from the first half of the survey period (2001–2006) to the second half of the survey period (2007–2012). We agree that the three previously mentioned populations have increased in the past 2–3 years, along with Piñon Mesa, as indicated in Figure 3 in the proposed listing rule (78 FR 2492, January 11, 2013). However, these populations are not at higher levels than in 2001–2006. It should also be noted that these declining trends in the smaller populations have occurred despite translocation efforts (see Scientific Research and Related Conservation Efforts). Without these translocations, bird numbers likely would be lower for these populations. Furthermore, in this final listing rule, we analyzed population estimates over a longer period, based on lek count data from 1996–2014 (lek count protocols were standardized in 1996 by CPW). Similar to our previous analysis, the long-term data indicate that, despite slight increases in the past several years, the satellite populations have declined overall, with the possible exception of the Cerro Summit-Cimarron-Sims Mesa population, which appears to be stable or increasing, and Piñon Mesa, with its highest count since standardized lek counts began in 1996. This topic is discussed further in the Current Distribution and Population Estimates and Trends section of this rule.

(5) *Comment:* CPW stated that the listing proposal does not acknowledge that male counts from recent lek surveys are at historic high levels in the Gunnison Basin, and notes that prior to 1996, surveys lacked a standard protocol and may have had an inconsistent counting effort.

*Our Response:* The proposed listing rule stated that the Gunnison Basin population, while variable, has been relatively stable over the past 13 years. As the commenter noted, survey data was not standardized until 1996, making comparisons between current populations and populations prior to 1996 difficult. If data from 1953–2014 are considered, the highest lek count occurred in 2006, as shown in Figure 2 in this final listing rule. However, apparent increases in population size based on lek count data may be the result of increased survey effort in recent years. Davis (2012, p. 139) noted a sharp increase in lek areas counted in 1996, when the protocol for lek counts was standardized in the Gunnison Basin. Therefore, the variation in the lek counts may reflect a change in survey effort and not a change in population

size. (Also see Davis 2012, p. 143, Figure 5.1, which displays the increase in lek areas counted beginning around 1996.) Additionally, Davis (2012, pp. 137–138) and Davis *et al.* (in press) indicate that the Gunnison Basin population, although relatively stable, has declined slightly in recent years, following earlier increases. These topics are discussed further in the following sections of this rule: Current Distribution and Population Estimates and Trends; and Small Population Size and Structure.

(6) *Comment:* CPW stated that both the PVA described in the RCP (GSRSC 2005) and the Garton (2005) PVA should be referenced and considered in the final rule. Another commenter stated that the Garton (2005) PVA overestimated the species' long-term viability.

*Our Response:* We describe and evaluate the RCP and Garton PVAs, as well as that of Davis (2012), in this final rule (see Factor E).

(7) *Comment:* CPW noted that the proposed rule to list the species cites the RCP PVA regarding the risk of extinction for small populations less than 50 birds, but does not explain why several small populations have persisted at low numbers for decades.

*Our Response:* The Cerro Summit-Cimarron-Sims Mesa population has had an estimated population of less than 50 birds for 14 of the past 16 years. The Poncha Pass population has remained at less than 50 birds from 1999–2014, and lek surveys found no birds in 2013. Poncha Pass is nearing extirpation, and the Cerro Summit-Cimarron-Sims Mesa population may also be at risk—with five small leks known in the Cerro Summit-Cimarron subpopulations and only one lek, which is inactive, in the Sims Mesa subpopulation. The four remaining satellite populations generally have population estimates of more than 50 birds, but less than 500 birds. These four populations would be expected to persist for a longer period of time than the two smallest populations, but are not secure from the threats described in this final rule below. Additionally, as noted in our response to State comment 4, several smaller populations have been augmented with birds from the Gunnison Basin population. Without these translocations, the numbers would have likely been lower for these populations.

As presented in this final rule, based on 1996–2014 lek count data, a number of the satellite populations are declining. Several population viability analyses indicate a high extinction risk for all of the satellite populations (see

response to Peer Review comment 31 above). Our assessment of the current and future threats to these populations indicates that these trends are likely to continue if the threats are not addressed. The best available information indicates a reduction of Gunnison sage-grouse distribution since Euro-American settlement in the 1800s, with evidence of the loss of peripheral populations and a northward and eastward trend of extirpation (Schroeder *et al.* 2004, pp. 369, 371, and references therein). These downward trends and historical losses further indicate the high vulnerability of the satellite populations to extirpation. These topics are discussed further in the following sections of this rule: Current Distribution and Population Estimates and Trends; and Small Population Size and Structure.

(8) *Comment:* CPW stated that an updated refinement of historical habitat estimated by Schroeder *et al.* (2004) is critical to an accurate assessment of changes in distribution, since they believe this study likely overestimates the historical range of Gunnison sage-grouse.

*Our Response:* Historical range estimates from Schroeder *et al.* (2004, pp. 370–371) were modified by the RCP (GSRSC 2005, pp. 34–35) based on more complete information on historical and current habitat and distribution of the species. We are not aware of any further refinements to estimates of historical range. Information from Braun *et al.* (2014) matches information presented by Schroeder *et al.* (2004) and does not add or detract from changes & additions to historical range presented in the RCP (GSRSC 2005, pp. 33–35). Consequently, the RCP (GSRSC 2005, entire) provides the best available information concerning the likely historical range of the species. That information indicates that the Gunnison sage-grouse currently occupies about 8.5 percent of its potential historical range. Further analysis in this final rule indicates that approximately 88 to 93 percent of the historical range of Gunnison sage-grouse has been lost since Euro-American settlement. While there is some uncertainty in all of these figures, the best available information indicates there has been a considerable loss of habitat and a reduction in the range and distribution of Gunnison sage-grouse. Our listing decision is based on the current status of Gunnison sage-grouse and the current and future threats to the species and its habitat. However, the loss of historical range and decline in Gunnison sage-grouse abundance, and their causes, have contributed to the species' current status. This topic is

BLM_0071997

discussed further in our introduction to Factor A of this rule.

(9) *Comment:* CPW noted a discrepancy between current occupied range estimates of 4,720 square kilometers (km²) in our 2006 decision and 3,795 km² in the 2013 proposed rule to list the species, which results in a loss of 925 km² of currently occupied range.

*Our Response:* Both estimates cite GSRSC (2005). However, the 2006 final listing determination used an initial estimate based on Schroeder *et al.* (2004). The 2013 estimate is a refined estimate based on the GSRSC and CPW data.

(10) *Comment:* CPW recommended that we rely primarily on Rogers (1964) to determine historic distribution of the Gunnison sage-grouse, and noted three citations of Rogers (1964) in the proposed rule to list the species that should more precisely quote the author. Another commenter stated that historic distribution estimates by Rogers (1964) are inferior to Schroeder *et al.* (2004).

*Our Response:* Rogers (1964) was written prior to the identification of Gunnison sage-grouse as a separate species, and summarized overall sage-grouse distribution in Colorado (including greater sage-grouse) based on both qualitative and quantitative data and reports from various sources. This study is informative in that it provides a broad picture of the species' status, distribution, and trends in Colorado over time, among other data and information. As such, Rogers (1964) is considered and cited in this final rule. However, the study did not conduct a spatial analysis of the species' potential historic range or the loss of habitat over time, as was done by Schroeder *et al.* (2004, entire). Consequently, we concluded it is appropriate to consider and evaluate this more recent, quantitative study specific to Gunnison sage-grouse (Schroeder *et al.* 2004, entire), as modified by GSRSC (2005, pp. 34–35). We verified information derived from Rogers (1964, entire) and provided more precise citations in this final rule.

(11) *Comment:* CPW noted that the Wisdom *et al.* (2011) standard for identifying a population stronghold could likely never have been met in the range of Gunnison sage-grouse, even historically, due to the high elevation basins and naturally fragmented nature of sagebrush communities in Colorado.

*Our Response:* We agree that the distribution of Gunnison sage-grouse habitat is naturally disconnected due to the presence of unsuitable habitats such as forests, deserts, and canyons across the landscape (Rogers 1964, p. 19). This

is evident in Figure 18.1 of Wisdom *et al.* (2011). The authors combined the occupied and extirpated ranges of both greater sage-grouse and Gunnison sage-grouse for their "stronghold" analysis. Given the much larger range of greater sage-grouse, with typically larger patches of contiguous sagebrush habitat, conclusions from the analysis are likely more applicable to greater sage-grouse. Therefore, in this final rule, we discuss Wisdom *et al.* (2011, entire) and its conclusions, but do not further use the term "stronghold" because the term, based on the scale of analysis, was more applicable to greater sage-grouse. This topic and study is discussed further in our introduction to Factor A in this rule, and throughout the rule where applicable.

(12) *Comment:* CPW and others stated that the proposed rule used the rate of residential development associated with the entirety of Gunnison County, including the Crested Butte area, and is not representative of development rates in Gunnison sage-grouse habitats. Other commenters also noted that human population growth rates have slowed in recent years leading to slower rates of development. Lastly, commenters recommended that a single source of human population growth (such as Colorado Department of Local Affairs) be used. Other commenters suggested that the human population is increasing.

*Our Response:* Our estimates regarding human population growth in the Gunnison Basin in the proposed rule to list the species were largely based on Colorado Water Conservation Board studies that included all of Gunnison County, including areas not occupied by Gunnison sage-grouse, and were derived before the economic downturn (78 FR 2495, January 11, 2013). We recognize that a large portion of projected human population growth for Gunnison County is expected to occur outside of Gunnison sage-grouse occupied habitat, such as in the Crested Butte area and within the City of Gunnison. For this final rule, we apply current data from the Colorado Department of Local Affairs to our analysis of human population growth and project residential development in Gunnison and other counties across the Gunnison sage-grouse range. For each sage-grouse population area, we consider total private lands available for development as a proportion of total occupied habitat, accounting for perpetual conservation easements that would preclude or limit such development. This analysis indicates that human populations are expected to continue increasing across the species' range, but that residential development is a threat of a low

magnitude in the Gunnison Basin now, but is expected to increase in the future. Residential development is a substantial current and future threat to the San Miguel, Cerro Summit-Cimarron-Sims Mesa, and Poncha Pass populations. This topic is discussed further in the Factor A, Residential Development section of this final rule.

(13) *Comment:* CPW disagreed with the conclusion in the proposed rule that roads are a "major threat" to the continued existence of Gunnison sage-grouse and stated that the proposed rule used speculation from Oyler-McCance *et al.* (2001) that overstated the threat from roads and powerlines.

*Our Response:* In its discussion of roads, the proposed rule stated that "Roads within Gunnison sage-grouse habitats have been shown to impede movement of local populations between the resultant patches, with road avoidance presumably being a behavioral means to limit exposure to predation (Oyler-McCance *et al.* 2001, p. 330)." The proposed rule then gave several examples, with additional citations, of impacts due to roads including: increased disturbance, corridors for predators, invasion of exotic plants, and resultant avoidance by sage-grouse. The proposed rule does not cite Oyler-McCance *et al.* (2001) in its discussion of powerlines. In this final rule, we describe impacts from roads and conclude that increased road use and construction will continue at least through 2050, and is a current and future threat to the species (see Factor A).

(14) *Comment:* CPW and one other commenter questioned the use of Aldridge *et al.* (2012) regarding nest site selection and urged caution in applying results across the entire Gunnison Basin, particularly the firm conclusion that habitat within 2.5 km (1.6 miles (mi)) of roads and residential developments is unsuitable for the species. CPW also presented data from a GIS analysis that it conducted.

*Our Response:* In the proposed rule to list the species, we did not use 2.5 km (1.6 mi) in any recommendations regarding thresholds for nest selection; although we did cite papers by Aldridge *et al.* (2008 and 2011). We agree that some recommendations from the modeling effort completed by Aldridge *et al.* (2012) are based on confusing probabilities regarding selection of nest sites, in particular, the relationship between relative probability of nest occurrence and distance to residential development. Figure 5f in Aldridge *et al.* (2012) indicates that the probability of nest occurrence is greatest when the nest is approximately 2.5 km (1.6 mi)

from development. This probability decreases at both shorter and greater distances from development; although one would expect the probability of nest occurrence to continue to increase with increasing distance from residential development. The variable of residential density was more intuitive, with the likelihood of nesting decreasing with increasing residential density. Other variables such as the proportion of sagebrush cover and road density had more influence on nest site selection and were also more intuitive. For example, the probability of nesting decreased abruptly with decreasing sagebrush cover and with increasing road density. In this final rule, we updated our older citation (Aldridge *et al.* 2011); we added a citation regarding CPW's preliminary GIS analysis of the frequency of successful and unsuccessful nests at increasing distances from roads (CPW 2013b); and we do not apply spatial zones of influence to evaluate impacts of residential development as is discussed in Factor A.

(15) *Comment:* CPW urged caution in citing Braun (1995), Bui *et al.* (2010), and Aldridge and Boyce (2007) regarding impacts from roads due to the speculative nature of authors' conclusions.

*Our Response:* We did not cite Braun (1995) or Bui *et al.* (2010) in discussions of Factor A, including roads, in the proposed rule or in this final rule. Aldridge and Boyce (2007) were cited in discussions of residential development, roads, and nonrenewable energy development. Related to this comment, when citing Aldridge and Boyce (2007), we indicate that this and other studies cited were on greater sage-grouse. However, as discussed in our response to State comment 3 above, due to similar life histories and habitat requirements between these two species, we consider information specific to greater sage-grouse as relevant to Gunnison sage-grouse, a practice followed by the wildlife and land management agencies that have responsibility for both species and their habitats.

(16) *Comment:* CPW and some other commenters questioned the conclusions regarding powerlines and impacts on Gunnison sage-grouse from raptor perches and habitat fragmentation.

*Our Response:* The discussion of powerlines in the proposed rule provided numerous citations regarding aspects such as raptor perches, habitat fragmentation, and the spread of invasive plants. Citations note when the studies were specific to greater sage-grouse. In some instances, the only

information is specific to greater sage-grouse, in which case, we regard it as the best available information (see our response to comment 3). We revise our language in this final rule to clarify usage of the terms habitat loss, degradation, and fragmentation (see our response to peer review comment 34).

(17) *Comment:* CPW disagreed with the conclusion in the proposed rule to list the species that grazing in combination with climate change and other factors is a threat to Gunnison sage-grouse and questioned citations from Gregg *et al.* (1994) and Connelly *et al.* (2000a) regarding optimal grass height. CPW also noted a conflict between critical habitat requirements of grass height of 10–15 cm and aforementioned citations that recommend grass height of 18 cm or more.

*Our Response:* In the proposed rule, we concluded that habitat degradation resulting from improper grazing (described in Factor A in the proposed rule), particularly with the interacting factors of invasive weed expansion and climate change, is a threat to Gunnison sage-grouse persistence. The proposed rule also noted that livestock grazing may have positive effects on sage-grouse (78 FR 2501, January 11, 2013). Properly managed livestock grazing is not likely to adversely impact Gunnison sage-grouse. Gregg *et al.* (1994) described a study conducted on greater sage-grouse in Oregon and speculated about potential impacts from livestock grazing. In this final rule, we clarify that "Gregg *et al.* (1994, p. 165) speculated that the reduction of grass heights due to livestock grazing in sage-grouse nesting and brood-rearing areas may negatively affect nesting success when cover is reduced below the 18 cm (7 in.) needed for predator avoidance." Connelly *et al.* (2000a) was not cited in the grazing discussion in the proposed rule to list, but was cited in the proposed rule to designate critical habitat. Seasonally specific primary constituent elements described in the proposed and final rules to designate critical habitat include a guideline of 10–15 cm (4–6 in) grass height based on recommendations in the RCP (GSRSC 2005, p. H–6). In this final rule, we clarify that recommendations vary for Gunnison sage-grouse habitat requirements and vegetation characteristics. We note that Connelly *et al.* (2000a, p. 977) recommended greater than 18 cm (7 in) grass height for breeding habitats, and that the GSRSC (2005, p. H–6) (the basis of the critical habitat proposal for breeding habitats) recommended a grass height of 10–15 cm (3.9–5.9 in).

(18) *Comment:* CPW noted that the proposed rule to list the species suggests that livestock trample seedlings, and that this constitutes competition. CPW stated that they were unaware of any research that has demonstrated competition between grazers and sage-grouse. One other commenter stated that Connelly *et al.* (2004) does not describe trampling of sagebrush seedlings.

*Our Response:* Connelly *et al.* (2004, p. 7–31) states that livestock trample sagebrush, and provides citations; we note in this final rule that Connelly *et al.* (2004) was citing other references. In the proposed rule, we surmised that livestock may compete directly with sage-grouse for rangeland resources by consuming forbs and shrubs. However, as the commenter mentions, this question has not been researched, and our conclusion is therefore inferred rather than proven. In this final rule, we deleted specific references to competition between livestock and sage-grouse. However, we present evidence that indicates consumption of important vegetation by livestock negatively affects sage-grouse that use those resources, such as the reduction of forbs and grasses that may affect chick survival (see Factor A).

(19) *Comment:* CPW disagreed with the conclusion and inference that browsing by big game on mountain shrubs resulted in a negative effect on Gunnison sage-grouse habitat.

*Our Response:* This final rule includes a discussion of available information regarding impacts of wild ungulate herbivory in Gunnison sage-grouse habitat, including one study (Japuntich *et al.* 2010, pp. 7–9) that documented reduced size and vigor of mountain shrubs (not sagebrush), which could reduce accumulations of drifting snow, which might in turn reduce the availability of soil moisture for forbs and grasses. If all of these impacts occurred, nesting and brood-rearing habitat could be affected. In this final rule, we conclude that the effects of livestock grazing are likely being exacerbated by intense browsing of woody species by wild ungulates in portions of the Gunnison Basin and the Crawford area (see Factor A, Domestic Grazing and Wild Ungulate Herbivory).

(20) *Comment:* CPW asserted that the proposed rule relied on speculation by Braun (1998), Oyler-McCance *et al.* (2001), and Stevens (2011) regarding the effects of fences on Gunnison sage-grouse. CPW also provided additional information regarding research it conducted that tracked more than 1,000 radio-marked greater sage-grouse and documented two mortalities from collisions with fences. A follow-up

letter from CPW also noted four mortalities resulting from collisions with utility lines. One other commenter stated that fences fragment habitat.

*Our Response:* We cite multiple references in Factor A of this final rule that implicate the potential impacts of fences on Gunnison sage-grouse. Based on the information provided by CPW specific to Gunnison sage-grouse, mortalities from collisions with fences and utility lines are likely minimal, and we have included the information that CPW provided on strike-related mortalities. We conclude that fences may be a contributing factor in the species' decline; however, we have no specific data on the scope of this threat (see Factor A, Fences).

(21) *Comment:* CPW stated that the Service does not know what the final measures in the Bureau of Land Management's (BLM) Resource Management Plans (RMPs) will be concerning travel management, and that the Service overstates the threat of roads. Consequently, CPW states that our conclusion that the revised RMPs are inadequate to address that threat of roads outlined by Aldridge *et al.* (2012) was premature.

*Our Response:* We use the best available information to reach our conclusion in this final rule that roads are a threat to Gunnison sage-grouse (see Factor A, Roads). The BLM is in the process of amending its RMPs and we do not know how road issues will be addressed in the amended plans. Under the Act, we are required to assess the adequacy of RMPs with respect to relevant threats based on the RMPs as they exist at the time of this listing decision. Thus, while we conclude that road impacts can be reduced by regulatory mechanisms, the existing mechanisms are currently not fully addressing the threat. We recognize the complexity of threats to Gunnison sage-grouse and the limited capacity of regulatory mechanisms to address some of those threats. For example, impacts caused by disease, small population size, or climate change are not easily addressed by regulatory mechanisms. However, other impacts such as current and future roads, hunting, grazing, or development can often be addressed with adequate regulatory mechanisms

(22) *Comment:* CPW stated that the discussion regarding vegetative structure guidelines incorporated into management plans and permit renewals is confusing.

*Our Response:* We clarify discussions regarding vegetative structure guidelines in this final rule (see Factor A, Domestic Grazing and Wild Ungulate Herbivory).

(23) *Comment:* CPW asserted that the Service did not acknowledge that Gunnison sage-grouse habitat is highly variable rather than continuous across the landscape.

*Our Response:* We acknowledge that Gunnison sage-grouse habitat is highly variable across the landscape, and we do not consider it to be continuous currently or historically. We included a discussion of the naturally disconnected nature of Gunnison sage-grouse habitat in this final rule (see Factor A).

(24) *Comment:* CPW and several other commenters suggested that the Service evaluate structural habitat guidelines recommended in the RCP with data reported by the BLM and Williams and Hild (2011).

*Our Response:* The final rule includes conclusions from vegetation monitoring efforts in the Gunnison Basin conducted by Williams and Hild in 2010 and 2011. This topic is discussed further in the Domestic Grazing and Wildlife Herbivory section in Factor A of this final rule.

(25) *Comment:* CPW presented new information regarding small populations and inbreeding depression.

*Our Response:* We include and consider this information in this final rule. We note that this new information indicates that the San Miguel Basin Gunnison sage-grouse effective population size is below the level at which inbreeding depression has been observed to occur (Stiver *et al.* 2008, p. 479), and that the authors postulated that the observed lowered hatching success rate of Gunnison sage-grouse in their study may be caused by inbreeding depression. Finally, we conclude that because the remaining Gunnison sage-grouse satellite populations are smaller than the San Miguel population, they are also likely small enough to induce inbreeding depression, and could be losing adaptive potential (see Factor E).

(26) *Comment:* CPW and two other commenters disagreed with conclusions in the proposed rule regarding minimum and effective population sizes, and the amount of habitat needed to support a viable population.

*Our Response:* We do not recommend or adopt a specific number for a minimum viable population size, other than concluding that, based on the best available information, several of the satellite populations are trending toward extirpation. With their low absolute and effective population sizes, the satellite populations are particularly at risk from stochastic environmental and genetic factors (see Factor E, Small Population Size). We address the amount of habitat needed to provide for the conservation of the species in our

final critical habitat determination for Gunnison sage-grouse published elsewhere in today's **Federal Register**. In this final rule we also reviewed the three available PVAs for Gunnison sage-grouse, which applied various techniques to estimate the viability of populations. Collectively, these studies and population trends from 1996–2014 indicate that one or more of the satellite populations may become extinct within the foreseeable future (see Factor E).

(27) *Comment:* CPW noted that drought can impact nest success, but not adult survival, suggesting that Gunnison sage-grouse can accommodate drought cycles.

*Our Response:* We agree that adults are less vulnerable to impacts from drought. Adult survival rates of Gunnison sage-grouse in the Gunnison Basin were not influenced by drought conditions in 2005 (CPW 2013c, p. 9; Davis 2012, p. 55). However, if a drought persists through multiple nesting seasons, recruitment will likely be impacted. This topic is discussed further under the following sections in this final rule: Drought and Extreme Weather, Small Population Size and Structure, and Climate Change.

(28) *Comment:* CPW and CDA noted that at least 79 percent of occupied habitat in the Gunnison Basin is protected from development, including government-owned lands, private lands with Conservation Easements, Candidate Conservation Agreements with Assurances, and/or similar legal agreements that preclude development to the detriment of grouse. Therefore, these agencies asserted, the Gunnison Basin is adequately protected for the conservation of the species.

*Our Response:* While the conservation and habitat protection efforts undertaken in the Gunnison Basin are commendable, and help reduce the impact of development on the species and its habitat, these measures vary in their capacity to avoid or minimize impacts such as the effects of habitat decline. Consequently, we were not able to conclude that Gunnison sage-grouse habitat is adequately protected, despite the benefits of the various conservation efforts. Conservation efforts and regulatory mechanisms are evaluated in this final rule.

(29) *Comment:* CPW, the Utah Office of the Governor, and several other commenters requested clarification regarding the interpretation and use of the Significant Portion of Range (SPR) policy.

*Our Response:* On July 1, 2014, we published a final policy interpreting the phrase "Significant Portion of its Range" (SPR) (79 FR 37578). In

accordance with that policy, the first step in our analysis of the status of a species is to determine its status throughout all of its range. If we determine that the species is in danger of extinction (endangered), or likely to become so in the foreseeable future (threatened), throughout all of its range, we list the species as an endangered or threatened species and no SPR analysis is required. In this case, we have determined in this rule that the Gunnison sage-grouse is threatened throughout all of its range, therefore we did not perform an SPR analysis.

(30) *Comment:* CPW, CDA, and the Utah Office of the Governor asserted that speculation in the literature was sometimes portrayed as science.

*Our Response:* Under the standards of the Endangered Species Act (Act), we are required to base our determinations of species status on the best available information. Our first choice is information from recent, peer-reviewed publications that is specific to Gunnison sage-grouse. However, sometimes the only available information may be based on studies of greater sage-grouse. Additionally scientific data are sometimes limited, studies are conflicting, or results are uncertain or seemingly inconclusive. Scientific information includes both empirical evidence, and expert knowledge or opinion. In this final rule, we carefully identified and qualified instances of speculation or hypotheses from past scientific studies and publications.

(31) *Comment:* CDA noted that agriculture in Colorado generates $40 billion annually, with cattle anticipated to contribute approximately $3.5 billion to agricultural production in 2013. CDA stated that cattle production would likely be seriously harmed, should the species be listed.

*Our Response:* The Act does not allow us to consider economic impacts in decisions on whether to list a species, which must be made solely on the basis of scientific and commercial information related to the 5 factors in Section 4(a)(1) of the Act. Economic impacts may be considered in the designation of critical habitat, and are discussed in our final critical habitat rule. Our final critical habitat determination for Gunnison sage-grouse is published elsewhere in today's **Federal Register**.

(32) *Comment:* The Utah Office of the Governor noted that the timing on the proposed rule is based solely on the need to meet a court approved settlement date, which did not include participation by the States of Utah or Colorado. Some commenters suggested

that more time is needed for public review.

*Our Response:* The publication deadline for the proposed rule was set by a court approved settlement agreement; however, the timeline for this final rule was initially set according to the statutory requirements of the Act and has been extended several times by court order. The Act requires that a final listing rule be published within one year of the publication of the proposed rule. As allowed by the Act, however, we extended this statutory deadline by 6 months due to substantial disagreement regarding the sufficiency or accuracy of available data relevant to our determination. Invoking this statutory extension postponed the final listing decision from September 30, 2013 to March 31, 2014. We also re-opened the public comment period several times. In addition, due to a government shutdown in October 2013 that caused us to postpone and reschedule public meetings, the court granted our request for an additional 6 weeks beyond the statutory timeline. Finally, the court granted our subsequent request for an additional 6 month extension to allow us to consider the possibility that the species should be listed as threatened rather than endangered, and to consider whether a 4(d) rule would be appropriate. This action extended the deadline for this final rule until November 12, 2014.

(33) *Comment:* The Utah Office of the Governor stated that the Service's 2010 warranted-but-precluded finding and 2013 proposed rule to list Gunnison sage-grouse under the Act differs from the 2006 finding that concluded the species was not warranted for listing, without presentation of any new information that would indicate a different conclusion is justified. Several commenters asserted that the decision to list was due to litigation.

*Our Response:* Litigation resulted in a settlement agreement that established a schedule for us to submit a proposed rule to list the species or a finding that listing was not warranted by a date certain. The litigation had nothing to do with the ultimate decision to list, or not. The 2006 not-warranted, the 2010 warranted-but-precluded finding, and the 2013 proposed rule to list the species were based upon the best scientific and commercial information available at that time. The 2006 finding concluded that the rangewide population was stable to slightly increasing (71 FR 19961–19962, April 18, 2006). The 2013 proposed listing rule included information from new studies, 8 additional years of recent survey information (2006–2013), as well

as population data from 1996–2000, and concluded that the Gunnison Basin population was relatively stable and the six smaller populations were in decline (78 FR 2488, January 11, 2013). This final rule incorporates additional information received since publication of the proposed rule. The basis for our determination in this final rule is provided in the Determination section of this rule.

(34) *Comment:* The Utah Office of the Governor and one other commenter stated that a Federal listing of the species at this time provides no additional protection or resources from those already in place and that voluntary cooperation of private landowners will be much more effective in improving habitat than protections than what may be afforded by listing and critical habitat designation. The Utah Office of the Governor also noted that a final regulation providing for a listing will cause the State to reassess its conservation efforts for this species, and may result in reallocation of these efforts to other species.

*Our Response:* By statute, the Service must list a species if it meets the definition of threatened or endangered. There is no provision in the Act that would allow us to decline to list a species that meets the definition of threatened or endangered if no additional protection or resource would occur. Moreover, the Act would confer additional protection to the Gunnison sage-grouse that could help arrest and reverse its decline. Once listing of the Gunnison sage-grouse becomes effective, actions authorized, funded or carried out by Federal agencies that may affect the species will require section 7 consultations under the Act in all areas occupied by the species. Section 9 prohibitions against "take" will further protect the species from human-caused mortality due to both direct effects and indirect effects such as continued habitat decline and harassment. We recognize that the voluntary cooperation of private landowners has improved conservation of the species in many areas. However, declining population trends indicate that these efforts have not been able to stabilize rangewide conditions (habitat and populations) for the species. We maintain that the best chance for conservation and ultimately recovery of the species will require both the protections afforded by listing and critical habitat designation as well as voluntary conservation measures undertaken by private landowners, with support from the States in accomplishing these measures.

(35) *Comment:* The Utah Office of the Governor described efforts of the San

Juan Local Working Group, by Federal and State agencies, private landowners, and universities to address concerns regarding declining numbers of Gunnison sage-grouse. Similarly, Colorado's Office of the Governor identified dozens of conservation efforts that have been carried out in Colorado that they believe address Gunnison sage-grouse.

*Our Response:* We acknowledge and commend conservation efforts undertaken in Utah and recognize their importance in a county where more than 90 percent of occupied habitat is on private lands. We also commend the conservation efforts undertaken in Colorado by CPW, local jurisdictions and other entities. This final rule describes many of the conservation measures, including local, State, and Federal laws and regulations, conservation easements, the Gunnison Basin CCA, and enrollment in the Colorado CCAA, that have been undertaken to improve or protect Gunnison sage-grouse habitat. We have carefully considered the projects and programs noted by Colorado and Utah in the development of this final rule.

(36) *Comment:* The Utah Office of the Governor described Gunnison sage-grouse population trends in Utah and stated that reliance on current population figures would be an arbitrary and capricious application of facts because adequate time has not been allowed to determine if numbers will return to stable levels following the severe winter in 2010. In contrast, CPW stated that severe winters are not a threat to the species.

*Our Response:* We recognize that there is annual variability in population numbers for the Gunnison sage-grouse. Consequently, we place more emphasis on longer-term population trends over a number of years than on population estimates from any given year. Our analysis considers Gunnison sage-grouse population trends from 1996 (when lek count protocols were standardized) through 2013. We do not conclude that severe winters are a threat to the species.

*Comments From Federal Agencies*

(37) *Comment:* We received multiple comments expressing concerns regarding the long-term viability of the Poncha Pass population, noting that bird movement between Poncha Pass and the Gunnison Basin is not likely. One commenter suggested that Poncha Pass and other small populations may be better managed as satellite populations, rather than individual self-sustaining populations.

*Our Response:* We are also concerned about the long-term viability of the Poncha Pass population, particularly in view of the 2013 lek count surveys, which did not detect any birds. CPW translocated 17 additional birds from the Gunnison Basin in the fall of 2013, and 10 more in spring of 2014 (CPW 2014e, p.7). Six males were counted in the Poncha Pass population during the spring 2014 lek count (CPW 2014d, p.2). This population will likely require repeated augmentations to avoid extirpation. This topic is discussed further under the following sections in this final rule: Current Distribution and Population Estimates and Trends; and Factor E.

(38) *Comment:* One agency noted that although the proposed rule to list the species repeatedly states that the effects from grazing are inconclusive, the final conclusion was that habitat degradation from improperly managed grazing, particularly with the interacting factors of invasive weed expansion and climate change, is a threat to the species. Several commenters recommended that historical grazing practices be differentiated from improved current grazing practices.

*Our Response:* The key word in our conclusion in the proposed rule is "improperly." Livestock grazing that is done in a manner consistent with local ecological conditions, including soil types, precipitation zones, vegetation composition and drought conditions, is not likely to negatively impact Gunnison sage-grouse, and is compatible with the needs and conservation of the species. See discussion under Factor A. The final rule also notes that properly managed livestock grazing may have positive effects on sage-grouse. We also recognize that maintenance of sustainable grazing practices on private rangelands can aid in recovery of the Gunnison sage-grouse by discouraging further conversion of the species' habitat into habitat unsuitable to the species (i.e., due to development).

(39) *Comment:* Several commenters noted that the proposed rule might have overstated the impacts from grazing on Gunnison sage-grouse habitat as indicated by BLM Land Health Assessments (LHA). A comment stated that available data may vary by office, and the LHA is only a snapshot in time; therefore, it cannot indicate trends. Additionally, grazing is only one of many causal factors on land health. The commenter also noted that failure to meet indicators for Land Health Standard 4 (which evaluates ecological indicators for Special Status Species)

may be due to population trends rather than existing habitat conditions.

*Our Response:* This final rule recognizes the limitations and uncertainties associated with LHA and supporting data. Our conclusion for livestock grazing effects on Gunnison sage-grouse and its habitat also acknowledges limitations associated with LHA data (see Factor A, Domestic Grazing and Wildlife Herbivory).

(40) *Comment:* One commenter recommended we clarify the impact from different fence types with regard to habitat fragmentation, increased predator activities, and collisions.

*Our Response:* This final rule discusses the various factors that influence fence strike risks. We acknowledge that those risks vary depending on fence design, landscape topography, and spatial configuration. In the Factor A discussion of fences, we note that in 10 years of tracking radio-collared sage-grouse in Colorado, CPW has documented only two fence strike mortalities in Gunnison sage-grouse. This information suggests that direct mortality of Gunnison sage-grouse due to fence strikes is low.

(41) *Comment:* We received a comment requesting that the Service recognize that fire and fuels treatment projects managed under very narrow parameters may be a beneficial tool in managing Gunnison sage-grouse habitat. The commenter also noted that impacts from cheatgrass on fire regimes in Colorado do not appear to be the same as in the Great Basin, and suggests that fire has a role to play in rejuvenating unoccupied or marginal habitats by creating "micro-mosaics" that benefit the species during different portions of its life cycle.

*Our Response:* The final rule acknowledges that small fires may have beneficial impacts to Gunnison sage-grouse habitat and concludes that fire is currently not a threat to the species. It also concludes that wildfires may become a threat in the future if cheatgrass continues to expand. Recent research indicates that prescribed fire may be inappropriate due to the direct loss and fragmentation of the remaining sagebrush habitat within the species' range, (Baker 2013, p. 8). We include this information and citation in this final rule (see Factor A, Fire).

(42) *Comment:* One commenter expressed concern regarding the potential effects of climate change to the long-term sustainability of Gunnison sage-grouse, particularly in the Dove Creek and Dry Creek areas.

*Our Response:* We too are concerned about the potential effects of climate change on Gunnison sage-grouse

BLM_0072002

rangewide. The final rule concludes that climate change is currently not a threat to the species, but is likely to become a threat in the foreseeable future. Our analysis includes consideration of climate change projections for the western U.S. A climate change vulnerability assessment for the Gunnison sage-grouse described the Gunnison sage-grouse as highly vulnerable to impacts from climate change (TNC *et al.* 2011, p. iii). This topic is discussed further under Factor A, Climate Change in this final rule.

(43) *Comment:* The United States Forest Service (USFS) suggested expanding the CCA from Gunnison Basin to other Gunnison sage-grouse populations on Federal lands. One other commenter expressed concern regarding a possible expansion of the CCA to areas outside of the Gunnison Basin.

*Our Response:* We agree that the CCA could have benefitted Gunnison sage-grouse in other populations outside of the Gunnison Basin, and provided a means for Federal land agencies to streamline ESA section 7 requirements associated with their programs and activities. Although CCAs cannot be implemented for listed species, adoption of a similar plan that builds on the principles of the CCA is a viable option for the satellite populations in the future. We also note the BLM is now in the process of amending all field office resource management plans within the range of the Gunnison sage-grouse to increase protections for this species. This effort will likely build on what was included in the CCA for BLM-managed lands in the Gunnison Basin.

*Comments From the Public*

(44) *Comment:* Several commenters asserted that listing the Gunnison sage-grouse will adversely impact the local economy.

*Our Response:* The Act does not allow us to consider economic impacts in decisions on whether to list a species, which must be made solely on the basis of scientific and commercial information regarding the 5 factors in Section 4(a)(1) of the Act. However, economic impacts may be considered in the designation of critical habitat. Our final critical habitat determination for Gunnison sage-grouse is published elsewhere in today's **Federal Register**. As part of the process of completing the final critical habitat rule, we completed an Economic Analysis that evaluates the potential economic impacts of designating critical habitat on transportation, livestock grazing, mineral and fossil fuel extraction, residential development, recreation, agriculture, and renewable energy

(Industrial Economics, Inc. 2014). We also completed an environmental assessment pursuant to the National Environmental Policy Act (NEPA) on the proposed critical habitat designation that evaluated the affected environment, including potential economic impacts to the human environment. These are discussed further in our final critical habitat rule, published elsewhere in today's **Federal Register**.

(45) *Comment:* Several commenters suggested that the Service should work cooperatively with other Federal agencies, State wildlife agencies, farm bureaus, and local governments to partner with landowners on conservation efforts. One commenter asserted that the Service has no on-the-ground experience with Gunnison sage-grouse conservation.

*Our Response:* We encourage partnerships between the Service, other agencies, and landowners and have worked cooperatively in such partnership to further Gunnison sage-grouse conservation. In 2005, for example, we participated in development of the RCP (GSRSC 2005). This Plan established management guidelines throughout the range of the species. In 2006, we entered into a CCAA for the Gunnison sage-grouse with Colorado Division of Wildlife (now CPW). We estimate, in of December, 2014 when this rule becomes effective, 40 Certificates of Inclusion (CI) will have been completed for private properties, enrolling 94,391 ac in four Gunnison sage-grouse populations, although only roughly 81,156 ac of these acres fall within suitable Gunnison sage-grouse habitat. We also cooperated with Federal agencies and other stakeholders in the Gunnison Basin to complete a CCA to promote conservation of the species in the Gunnison Basin population on Federal lands. As stated above, our listing decision is based on the best available scientific information. Accordingly, our focus is on well-supported, scientific data and information for the species, generally at a broader scope than is acquired at the local level.

(46) *Comment:* Several commenters expressed differing views on whether livestock grazing in Gunnison sage-grouse habitat should be restricted.

*Our Response:* We determined that grazing that is inconsistent with local ecological conditions is a threat to the species, and grazing in general may have inadvertent effects at a local level (Factor A, Domestic Grazing and Wild Ungulate Herbivory).

Although grazing on both public and private lands may affect Gunnison sage-grouse, privately owned lands typically

lack a Federal nexus for section 7 consultations under the Act, in which case grazing practices would not be affected by the Act unless they were to result in "take" of Gunnison sage-grouse, as prohibited by section 9 of the Act. However, more than 300 Federal grazing allotments on nearly 405,000 ha (1,000,000 ac) are located within the final critical habitat designation (Industrial Economics, Inc. 2014, p. 3–1). On Federal allotments, through the section 7 consultation process, the managing agency (BLM or USFS) may choose to implement AUM reductions, seasonal restrictions, rotational grazing, or other changes to minimize impacts or avoid jeopardy to the species and any adverse modification to critical habitat. We do not intend to preclude grazing within critical habitat, but may seek grazing modifications where warranted to promote the conservation and recovery of the species. We discuss livestock grazing under Factor A, Domestic Grazing and Wild Ungulate Herbivory in this final rule.

(47) *Comment:* Several commenters expressed differing views on whether energy and mineral development should be further restricted.

*Our Response:* The Monticello-Dove Creek and San Miguel Basin populations support numerous mineral and fossil fuel extraction activities. One wind project and one potash mine are under development in the Monticello-Dove Creek population. There are no active uranium mines in Gunnison sage-grouse habitat. Oil and gas extraction occurs on both Federal and private lands within the species' range. Mineral and fossil fuel extraction activities on private lands without Federal mineral rights are unlikely to have a Federal nexus for section 7 consultations under the Act. Existing Federal regulations, such as BLM RMPs, and State regulations from the Colorado Oil and Gas Conservation Commission (COGCC) provide some protection to the species and its habitat. With respect to mineral and energy development projects on Federal lands or that otherwise have a Federal nexus (e.g., the project is authorized, funded or carried out by a Federal agency), we may seek project modifications during ESA section 7 consultations to benefit Gunnison sage-grouse. We consider current energy and mineral development a low threat to the species, as discussed under Factor A, Mineral Development and Renewable Energy Development, in this final rule.

(48) *Comment:* Several commenters expressed differing views regarding the effectiveness of predator control.

*Our Response:* Predator removal efforts may sometimes provide short-

term gains in sage-grouse numbers, but predator numbers quickly rebound without continual control efforts (Hagen 2011, p. 99). The impacts of predation on greater sage-grouse can increase where habitat quality has been compromised by anthropogenic activities such as exurban development and road development (Coates 2007, pp. 154–155; Bui 2009, p. 16; Hagen 2011, p. 100). This is discussed further under Factor C, Predation.

(49) *Comment:* Several commenters stated that conservation efforts and recovery should focus on public lands.

*Our Response:* Conservation of the Gunnison sage-grouse will require collaboration between Federal, State, and local agencies wherever the species occurs. Federal agencies manage 54 percent of currently occupied habitat for Gunnison sage-grouse. Although there is an abundance of public lands within the current range of the Gunnison sage-grouse, Federal lands alone are insufficient to conserve the species. Therefore, conservation and recovery efforts limited to public lands are not sufficient to ensure conservation of the species.

(50) *Comment:* Some commenters support or oppose development of a captive breeding program or translocation of Gunnison sage-grouse. One commenter stated that the State of Colorado does not have the funds necessary to conduct a long-term captive breeding program.

*Our Response:* Establishing wild populations from captive-reared gallinaceous birds is very difficult, expensive, and only rarely successful; a captive breeding program in Idaho for greater sage-grouse had only minimal success (GSRSC 2005, p. 181). The CPW started a captive-rearing program in 2009 to study whether techniques can be developed to captively rear and release Gunnison sage-grouse. To date, survival of captive-reared chicks has been low, as we cited in our proposed rule (78 FR 2518, January 11, 2013). Translocation of wild Gunnison sage-grouse from Gunnison Basin to other populations has had some success, although our understanding of translocation contributions is limited. Without these translocations, current numbers would likely be lower for these populations. These topics are discussed further under Scientific Research and Related Conservation Efforts in this final rule.

(51) *Comment:* Some commenters suggested that a Gunnison sage-grouse working group or recovery team should be established.

*Our Response:* Local working groups including landowners, interested individuals and groups, local governments, land management agencies, and State wildlife agencies have developed conservation plans for the following Gunnison sage-grouse populations: Gunnison Basin, Crawford, Dove Creek, San Miguel Basin, Monticello, Piñon Mesa, and Poncha Pass. As a result, all populations with the exception of the Cerro Summit-Cimarron-Sims Mesa population have conservation plans. Following the development of these local conservation plans, the RCP (GSRSC 2005, entire) was developed, which included participation by the BLM, CPW, NPS, NRCS, USFS, the Service, and Utah Division of Wildlife Resources (UDWR). The RCP was intended to supplement local plans and provide guidance to aid in conservation of the Gunnison sage-grouse. Population targets were recommended for each population. These planning efforts are discussed in further detail in Factor A of this final rule. We also discuss future conservation measures for this species below in this final rule. The Act requires development of a recovery plan in most cases for endangered and threatened species, which often results in establishment of a recovery team.

(52) *Comment:* Some commenters suggested that sagebrush habitat should be preserved and, when necessary, recovered.

*Our Response:* Because greater sage-grouse are obligate users of sagebrush, preserving and recovering sagebrush habitat is key to sage-grouse conservation. Other habitat types such as riparian meadows and agricultural lands may also be important for Gunnison sage-grouse, but only if they are in close proximity to sagebrush-dominated habitat (75 FR 59808, September 28, 2010). Several Federal agencies as well as CPW and UDWR continue to work to improve the quality of sagebrush communities through grazing management, fencing, re-seeding, fuels management, and other habitat improvement strategies (GSRSC 2005, pp. 214–219). Listing the species and designating critical habitat will further conserve Gunnison sage-grouse habitat.

(53) *Comment:* Several commenters noted the importance of open water and wet meadows and some also suggested that these habitat types should be re-established in some areas by removal of sagebrush.

*Our Response:* High quality brood-rearing habitat for Gunnison sage-grouse includes mesic meadows, springs, seeps, and low vegetation riparian areas, all dependent on adequate moisture and consequently at risk in today's changing climate (TNC *et al.* 2011, p. H–9). Prescribed burning and mechanical treatments can be used on a small scale to create a mosaic of small open patches; however, care should be taken to avoid further fragmentation of sagebrush habitat (GSRSC 2005, pp. 206–207).

(54) *Comment:* Some commenters suggested that seasonal closures of roads and recreation areas should be implemented as appropriate.

*Our Response:* Closures have been authorized and used by Federal agencies and counties to protect Gunnison sage-grouse habitat in several populations (BLM 2013c, attachment 2; Gunnison County Board of County Commissioners 2013a, Appendix A; NPS 2013, p. 1; USFS 2013, pp. 11 and 14). We evaluate these efforts in this final rule (see Factor A, Roads, and Factor D).

(55) *Comment:* One commenter suggested that number of leks, number of birds on leks, survival rates, and other ecological parameter be monitored and used as triggers for requiring additional conservation efforts.

*Our Response:* The local and rangewide conservation plans include monitoring plans. The CPW has conducted annual monitoring of these parameters following a standard protocol since 1996. Monitoring of habitat conditions, treatment actions, and compliance are an integral part of the CCAA for Gunnison sage-grouse.

(56) *Comment:* Several commenters stated that the Gunnison sage-grouse population in the Gunnison Basin is stable and not at risk of extinction; consequently, since this is a significant portion of the species' range, the species is not endangered. One commenter noted that the six smaller populations did not constitute a significant portion of the species' range.

*Our Response:* Please see our response to comment 29 above. We include an explanation of how we considered and applied the concept of SPR in this final rule.

(57) *Comment:* Several commenters expressed various opinions regarding the stability of the six smaller populations outside of Gunnison Basin.

*Our Response:* The six satellite populations are small, all were generally in decline from 1996 until 2010, and several continue to show a declining trend. The San Miguel and Piñon Mesa populations are currently the largest of the satellite populations, with 206 and 182 birds, respectively, in 2014. The Monticello-Dove Creek population currently has less than 100 birds total. Population estimates in 2014 for what have been the two smallest populations, Cerro Summit-Cimarron-Sims Mesa and

Poncha Pass, were 74 and 16, respectively (CPW 2014a, p.1). Based on lek count-based population estimates, some satellite populations have increased slightly over the last several years, or intermittently over time. However, the last 19 years (1996 to 2014) of lek count data as a whole indicate all the satellite populations are were in decline in 2010. Several of the satellite populations have increased since 2010. Although population estimates for Piñon Mesa are currently higher than in any year since 1996, this population has been augmented with 93 birds from Gunnison Basin since 2010. The Crawford population has also been augmented, with 73 birds over the same period; and while the 2014 population estimate of 157 in this population is the highest since 2006, it is considerably less than the post-1996 high of 270 in 1998.

For all six satellite populations, population estimates from 1996 to 2014 are below population targets (based on a 10-year average), set forth by the RCP (CPW 2014d, p. 1; GSRSC 2005, pp. 255–302). The RCP population targets are the number of birds thought necessary to conserve Gunnison sage-grouse in those population areas (GSRSC 2005, p. 255). Combined, the satellite populations comprise about 16 percent of the rangewide population of Gunnison sage-grouse and include approximately 37 percent of rangewide occupied habitat. These topics are discussed further in Factors A and E of this rule.

(58) *Comment:* Several commenters stated that lek counts are not accurate.

*Our Response:* As described in this final rule (see Current Distribution and Population Estimates and Trends), lek count data are the primary means of estimating and monitoring Gunnison sage-grouse populations. However, sage-grouse populations can fluctuate widely on an annual basis, and there are concerns about the statistical reliability of population estimates based on lek counts (CDOW 2009b, pp. 1–3). Stiver *et al.* (2008, p. 474) concluded that lek counts likely underestimate population size. Another study (Davis 2012, p. 136) indicated that, based on demographic data, lek count indices overestimate population size. Although lek count data are available from as early as the 1950's for some populations, lek count protocols were first standardized and implemented in 1996 (GSRSC 2005, p. 46). Prior to 1996, lek count data are highly variable and uncertain, and are not directly comparable to recent population data (Braun 1998, p. 3; Davis 2012, pp. 139, 143). Therefore, for the purposes of evaluating current

population sizes and trends, the analysis in this final rule is focused on the standardized lek count data from 1996 to 2013. We also consider other available scientific information regarding Gunnison sage-grouse populations such as demographic data and population viability analyses (see Factor E).

(59) *Comment:* Several commenters recommended that population data prior to 2001 be evaluated.

*Our Response:* In the 2010 12-month finding we relied on population data over the past decade to quantitatively assess recent trends (75 FR 59808, September 28, 2010). The starting point of 2001 was also used for trend analysis in the 2013 proposed rule (78 FR 2491, January 11, 2013). In this final listing rule, we analyzed population estimates over a longer period, based on lek count data from 1996–2013. Similar to our previous analysis, the long-term data indicates that despite slight increases in the past several years, the satellite populations have declined overall, with the possible exception of the Cerro Summit-Cimarron-Sims Mesa population, which appears stable to increasing at this time.

(60) *Comment:* Some commenters stated that there are too many caveats in the rangewide conservation plan to rely on it for distribution and abundance information.

*Our Response:* The current distribution of the Gunnison sage-grouse is thought to be well understood, based on several decades of surveys and data. Although not conclusive, CPW aerial surveys during 2013 found no new leks or occupied areas. Nevertheless, current distribution and abundance data are estimates due to adverse weather, access, and survey error. Earlier data is further compromised by the use of incomplete museum records and historical accounts, as well as varying methodologies and survey intensities. Pre-settlement data is by necessity an extrapolation based on species accounts and the likely distribution of suitable habitat. This is the best available information, and forms the basis of historical and current distribution and abundance information, as presented in this final rule.

(61) *Comment:* Some commenters asserted that the Gunnison sage-grouse is not a separate species from greater sage-grouse.

*Our Response:* Gunnison sage-grouse and greater sage-grouse were recognized as separate species in 2000 based on morphological, genetic, and behavioral differences, and geographical isolation. Consequently, the American Ornithologist's Union accepted the

Gunnison sage-grouse as a distinct species. Due to the several lines of evidence separating the two species, we determined in our 2010 12-month finding that the best available information indicates that the Gunnison sage-grouse is a valid taxonomic species and a listable entity under the Act (75 FR 59804, September 28, 2010).

(62) *Comment:* Several commenters stated that habitat fragmentation and degradation are the main reasons for a steep decline in Gunnison sage-grouse abundance. One commenter asserted that we overestimated the impact from fragmentation, and another commenter asserted that habitat has not been lost or fragmented in the past 50 years.

*Our Response:* Habitat loss and fragmentation are recognized as primary causes of the decline in abundance and distribution of sage-grouse across western North America (Rogers 1964, pp. 13–24; Braun 1998, entire; Schroeder *et al.* 2004, p. 371), and in Gunnison sage-grouse across its former range (Oyler-McCance *et al.* 2001, p. 330; GSRSC 2005, p. 149; Wisdom *et al.* 2011, pp. 465–469). Gunnison sage-grouse depend on sagebrush for their survival and persistence, and the historical and current distribution of the Gunnison sage-grouse closely matches that of sagebrush (Patterson 1952, p. 9; Braun 1987, p. 1; Schroeder *et al.* 2004, p. 364, and references therein). Current and future threats described under Factor A of this final rule will further contribute to habitat loss and decline and, based on historical and current population trends, a continued decline in the abundance of Gunnison sage-grouse across its range.

(63) *Comment:* One commenter noted that there has been no chick survival in the Miramonte area of the San Miguel population.

*Our Response:* Although sample size in a study of the San Miguel Basin (Miramonte subpopulation) was small (eight chicks were studied), no chicks survived to 30 days of age, meaning no recruitment (survival of bird from hatching to breeding age) occurred over a 4-year period (Davis 2012, p. 37). We provide this information in this final rule (see Predation; and Davis Population Viability Analysis sections).

(64) *Comment:* Some commenters noted that the bio-geographical characteristics of the upper Gunnison Basin differ markedly from the lower Gunnison Basin.

*Our Response:* There is wide habitat variation within and between all of the Gunnison sage-grouse populations. We presume this comment is directed to the idea of population redundancy in the Gunnison Basin. This topic is discussed

in Factor E, Small Population Size and Structure, of this final rule.

(65) *Comment:* One commenter stated that there is no data indicating the Dove Creek population was within the historical range of the Gunnison sage-grouse prior to introducing the species to this area in 2010 and 2011.

*Our Response:* CPW began collecting lek count data from Dove Creek in 1993, which predates efforts to augment that population. Dove Creek is included in historical, recent, and current descriptions of the species' range (Schroeder *et al.* 2004, pp. 368–371). The 2006 not warranted finding described the Dove Creek subpopulation as ranging from 10–358 birds from 1995–2005 (71 FR 19957–19961, April 18, 2006).

(66) *Comment:* One commenter stated that the Dove Creek population declined following the 2002–2003 drought and has not yet rebounded.

*Our Response:* Drought conditions from 1999 through about 2003 (with residual effects lasting through about 2005) were closely associated with reductions in the sizes of all populations (CDOW 2009b, entire; CPW 2013c, p. 9) (see Figures 2 and 3 in this final rule) and lower nest success (CPW 2013c, p. 2). To date, several of the smaller satellite populations have not rebounded from declines around that time (see Figure 3 in this final rule).

(67) *Comment:* Some commenters stated that conversion to cropland has not fragmented sagebrush habitat in the past 20–30 years.

*Our Response:* As stated in this final rule (Factor A, Agricultural Conversion), except in Gunnison County, the total area of harvested cropland has declined over the past two decades in all counties within the occupied range of Gunnison sage-grouse (USDA NASS 2010, entire). Further, the majority of agricultural land use in Gunnison County is in hay production, and this has also declined over the past two decades (USDA NASS 2010, p. 1). We do not have any information to predict changes in the amount of land devoted to agricultural purposes. However, because of this long-term trend in reduced land area devoted to agriculture, we do not expect a significant amount of Gunnison sage-grouse habitat to be converted to agricultural purposes in the future.

(68) *Comment:* Some commenters stated that there are no new road projects; therefore, roads have not increased fragmentation.

*Our Response:* Roads of all kinds can impact Gunnison sage-grouse through direct loss of habitat, mortality from collisions, habitat fragmentation, and habitat degradation. Existing roads will continue to require maintenance, and usage may increase due to increases in recreational activities or in the human population. We discuss roads under Factor A in this final rule.

(69) *Comment:* Several commenters stated that grazing minimizes fragmentation by preventing development, conversion to cropland, and loss of water rights.

*Our Response:* We agree that livestock grazing operations generally result in less habitat fragmentation than alternatives such as residential development, conversion to cropland, mineral and fossil fuel extraction, or road construction.

(70) *Comment:* Two commenters noted that ranches are no longer being subdivided; therefore, fragmentation due to this factor is not occurring.

*Our Response:* Exurban development and subdivision of ranches likely slowed during the recent economic downturn. However, it still occurs, particularly in the Piñon Mesa and Gunnison Basin populations, and we expect it to continue into the future in some areas. We discuss this issue in this final rule (see Factor A, Residential Development).

(71) *Comment:* Some commenters asserted that the conclusion that large blocks of sagebrush habitat are needed by Gunnison sage-grouse is in error because it is based on greater sage-grouse research. Other commenters stated that not all sagebrush habitat will support Gunnison sage-grouse.

*Our Response:* With regard to the first comment, references cited in the proposed and final rules regarding the need for large expanses of sagebrush sometimes pertain to greater sage-grouse, but also include references specific to Gunnison sage-grouse. References specific to Gunnison sage-grouse that discuss the need for large blocks of sagebrush habitat include Oyler-McCance *et al.* (2001, pp. 327–330), Wisdom *et al.* (2011, p. 451), and Baker (2013, p. 8). Regarding the second comment, we agree that not all sagebrush habitat will support Gunnison sage-grouse. Much sagebrush habitat is outside the current range of the species or is in patches that are too small in size and are fragmented, and some sagebrush habitat does not contain the physical and biological features necessary to sustain the species.

(72) *Comment:* One commenter stated that Blue Mesa Reservoir resulted in the largest habitat fragmentation in Gunnison County.

*Our Response:* Our proposed rule noted the potential impacts of development of a large irrigation project, but it was not clear that we were referring to Blue Mesa Reservoir. As clarified in this final rule (see Factor A, Large Scale Water Development), development of Blue Mesa Reservoir in 1965 in the Gunnison Basin flooded an estimated 3,700 ha (9,200 ac), or 1.5 percent of potential habitat for Gunnison sage-grouse in the Gunnison Basin (McCall 2005, pers. comm.), and according to Gunnison County (2013a, p. 124), at least one known lek. Based on the size and location of Blue Mesa Reservoir, we presume that habitat connectivity and dispersal of birds between the Gunnison Basin population and satellite populations to the west were impacted.

(73) *Comment:* One commenter noted that mountain shrub habitat is used by the Gunnison sage-grouse and therefore, mountain shrub should not be lumped in with piñon-juniper (*Pinus edulis-Juniperus* spp.) habitat.

*Our Response:* We agree that some deciduous shrub communities (primarily Gambel oak and serviceberry) are used seasonally by Gunnison sage-grouse (Young *et al.* 2000, p. 451). See discussion under Factor A, Piñon-Juniper Encroachment.

(74) *Comment:* Several commenters asserted that Gunnison sage-grouse numbers were highest during a period of higher livestock grazing, and that there is no negative correlation between grazing intensity and Gunnison sage-grouse numbers. Other commenters noted either improvement or degradation of habitat associated with livestock grazing. One commenter asked what we consider to be a proper grazing regime.

*Our Response:* Excessive grazing by domestic livestock during the late 1800s and early 1900s, along with severe drought, significantly impacted sagebrush ecosystems (Knick *et al.* 2003, p. 616). Overgrazing by livestock was cited as one of several contributing factors in the early loss and deterioration of sagebrush range in the region (Rogers 1964, p. 13). Historical accounts indicate that overgrazing of sagebrush range in Colorado began around 1875. Overgrazing was apparently at its worst in the early 1900s and continued until the BLM was organized in 1934 (Rogers 1964, p. 13). Around 1910, a gradual but marked decline in sage-grouse numbers and distribution in Colorado had begun (Rogers 1964, pp. 20–22). This information indicates that historical livestock grazing practices and overgrazing were a contributing factor in the early loss and degradation of sagebrush habitats and initial declines in sage-grouse numbers and distribution. Although current livestock

stocking rates in the range of Gunnison sage-grouse are lower than historical levels (Laycock et al. 1996, p. 3), long-term effects from historical overgrazing, including changes in plant communities and soils, persist today (Knick et al. 2003, p. 116). In addition, widespread use of water developments across the West has since increased livestock access to sagebrush habitats, and so even reduced numbers of livestock still pose impacts (Connelly 2004, pp. 7–33, 7–35, 7–92). We know that grazing can have negative impacts to sagebrush and consequently to Gunnison sage-grouse at local scales. Grazing inconsistent with local ecological conditions is occurring over a large portion of the range of the species. Habitat degradation that can result from grazing practices inconsistent with local ecological conditions, particularly with the interacting factors of invasive weed expansion and climate change, is a threat to Gunnison sage-grouse persistence. See Factor A, Domestic Grazing and Wild Ungulate Herbivory.

(75) *Comment:* Several commenters stated that Gunnison sage-grouse chicks depend on insects in cattle manure.

*Our Response:* Anecdotal reports and opinion papers (Brunner 2006, p. 16; Gunnison County 2013a, p. 95) have suggested that cattle manure attracts and supports insect populations upon which sage-grouse depend for survival, and that sage-grouse "follow" cattle through pastures. However, there is no evidence to support this theory. Further, there are no data to substantiate the idea that in sagebrush areas not actively grazed by livestock, sage-grouse are limited in some way (Connelly et al. 2007, p. 37). This topic is discussed in Factor A of this final rule (see Factor A, Domestic Grazing and Wild Ungulate Herbivory.).

(76) *Comment:* Several commenters expressed differing opinions on whether livestock grazing reduces or increases the risk of catastrophic fire.

*Our Response:* We know that livestock grazing influences fire ecology in sage-grouse habitat. However, due to the spatial complexity of fire in sagebrush ecosystems (Crawford et al. 2004, p. 7), and the numerous factors that determine the effects of grazing on sagebrush habitats, the effects of grazing on sage-grouse by altering fire regimes likely vary widely across time and space. This topic is discussed in detail in Factor A, Domestic Grazing and Wild Ungulate Herbivory, of this final rule.

(77) *Comment:* Several commenters asked what has changed from 2006, when the Service concluded that grazing was not a threat, to 2013, when the Service concluded that grazing was a threat.

*Our Response:* Both the 2006 not warranted determination (71 FR 19954, April 18, 2006) and the 2013 proposed rule to list the species (78 FR 2486, January 11, 2013) presented similar observations:

• Excessive grazing by domestic livestock during the late 1800s and early 1900s, along with severe drought, significantly affected sagebrush ecosystems, causing long-term impacts that persist today.

• Although we know that historical livestock grazing practices and overgrazing were a contributing factor in the early loss and degradation of sagebrush habitats and initial declines in sage-grouse numbers and distribution, the correlation between historical grazing and reduced sage-grouse numbers is not exact.

• Habitat manipulations to improve livestock forage, such as sagebrush removal, can affect sage-grouse habitat.

In 2006, we concluded that there was insufficient data to demonstrate that current grazing was a rangewide threat to the species. In 2013, several new references related to grazing were available for consideration (Coates 2007, Hagen et al. 2007, Aldridge et al. 2008, France et al. 2008, BLM 2008, BLM 2009a, Gunnison County Stockgrowers 2009, Knick et al. 2011, Pyke 2011, Williams and Hild 2011, BLM 2012a). Our conclusion in 2013 was that habitat degradation can result from improperly managed grazing, and, particularly with the interacting factors of invasive weed expansion and climate change, is a threat to Gunnison sage-grouse persistence. Climate change was not included as a factor in 2006, but in 2013 we stated that climate change is likely to become an increasingly important threat to the persistence of Gunnison sage-grouse. We also noted in our 2013 proposed rule that livestock grazing can cause local impacts, but population-level impacts are unlikely. We make the same conclusions in this final rule (see Factor A, Domestic Grazing and Wild Ungulate Herbivory).

(78) *Comment:* Some commenters stated that wildlife herbivory needs to be addressed.

*Our Response:* In the proposed and final rules, we discuss wild ungulate herbivory. It occurs throughout the range of the Gunnison sage-grouse, and there are instances of overgrazing by wild ungulates on a local level. In this final rule, we note that the effects of livestock grazing are likely being exacerbated by browsing of woody species by wild ungulates in portions of the Gunnison Basin and the Crawford area (see Factor A, Domestic Grazing and Wild Ungulate Herbivory).

(79) *Comment:* One commenter noted that very little private or public land in Dolores County is grazed.

*Our Response:* More than 81 percent of lands in Dove Creek are privately owned. We do not have information regarding what percentage of private lands occupied by Gunnison sage-grouse in Dolores County is grazed.

(80) *Comment:* One commenter suggested that grazing should be reduced or eliminated on public lands.

*Our Response:* Properly managed livestock grazing is not likely to impact Gunnison sage-grouse such that it threatens populations or the species. The BLM and USFS manage grazing allotments on their lands, and currently consider conservation of Gunnison sage-grouse on many of their allotments. Allotments occur on approximately 292,000 ha (720,000 ac) or 77 percent of occupied habitat (Industrial Economics, Inc. 2013, p. 3–1). Stocking rates have declined significantly in recent years. Both agencies have designated the Gunnison sage-grouse as a "Sensitive Species." This designation requires the BLM and the USFS to address the species in their RMPs, and their Land and Resource Management Plans (LRMPs), respectively. Management actions in these plans include changes to seasons of use, AUM reductions, rotational grazing, and other changes to grazing management practices. When the Gunnison sage-grouse is listed, actions on allotments that might affect the species will require ESA section 7 consultations under the Act in all areas occupied by the species. Section 9 prohibitions against "take" will also apply.

(81) *Comment:* Several commenters asserted that invasive plants such as cheatgrass and piñon-juniper are not a proven threat to Gunnison sage-grouse; they have only been proven a threat with greater sage-grouse. One commenter noted that cheatgrass has increased within the Gunnison sage-grouse range and is a major threat in the Gunnison Basin.

*Our Response:* Cheatgrass can shorten fire intervals in sagebrush communities. Piñon-juniper encroachment is potential evidence of extended fire intervals. Either change in fire intervals can adversely impact habitat for the Gunnison sage-grouse by reducing sagebrush cover. Based on what is known about the effects of cheatgrass and piñon-juniper on greater sage-grouse, it is reasonable to infer their expansion has similar effects on Gunnison sage-grouse. In this final rule we conclude that neither invasive weeds nor piñon-juniper encroachment are substantial threats to Gunnison sage-

grouse at this time, due to their limited extent; however, they are potential future threats (see Factor A, Invasive Plants and Piñon-Juniper Encroachment).

(82) *Comment:* Several commenters stated that drought is causing a decline in Gunnison sage-grouse numbers; conversely, one commenter stated that drought is not a threat. Several commenters also stated that the Monticello-Dove Creek area has degraded Gunnison sage-grouse habitat due to climate change and drought.

*Our Response:* The proposed rule to list the species stated that it is too speculative to conclude that drought alone is a threat to the species at this time; however, based on rapid species decline in drought years, it is likely that drought exacerbates other known threats and thus can negatively affect the species. Drought and associated effects are discussed further in Factors A and E and Cumulative Effects From Factors A through E of this rule.

(83) *Comment:* Several commenters stated that prescribed fire creates a desirable habitat mosaic, but may also cause a short-term decline in sagebrush.

*Our Response:* In Factor A (Fire) of the proposed and final rules we state that in mesic areas used for brood-rearing, small fires may maintain a suitable habitat mosaic by reducing shrub encroachment and encouraging understory growth. However, without available sagebrush cover nearby, the utility of these sites is questionable.

(84) *Comment:* Some commenters asserted that climate change is not a threat because it will not occur within the foreseeable future.

*Our Response:* Climate change is ongoing and cumulative. The proposed and final rules conclude that climate change is not a threat to the Gunnison sage-grouse at this time, but is likely to become a threat to the persistence of the species over the next 40 years. The Gunnison sage-grouse was found to be "highly vulnerable" to climate change in the Gunnison Basin (TNC *et al.* 2011, p. 48).

(85) *Comment:* Some commenters noted that fire suppression and reduced fire frequency due to grazing have caused piñon-juniper encroachment into sagebrush habitat.

*Our Response:* Piñon-juniper encroachment has been attributed to the reduced role of fire, the introduction of livestock grazing, increases in global carbon dioxide concentrations, climate change, and natural recovery from past disturbance. Most Gunnison sage-grouse population areas are experiencing low to moderate levels of piñon-juniper encroachment, although considerable encroachment has occurred at Piñon Mesa (see Factor A, Piñon-Juniper Encroachment in All Population Areas). We discuss the relationship between fire and piñon-juniper encroachment in this final rule (see Factor A, Fire and Piñon-Juniper Encroachment).

(86) *Comment:* Some commenters noted that the historical fire rotation was 178–357 years in Wyoming big sagebrush (*A. t. wyomingensis*) and 90–143 years in mountain big sagebrush; these rotation intervals may or may not be changing.

*Our Response:* These time periods are from Bukowski and Baker (2013, p. 5). The authors concluded that fire size, rate of burning, and severity may be changing due to land-use changes, fire exclusion, and invasive species such as cheatgrass. Crawford *et al.* (2004, p. 2) stated that fire ecology changed dramatically with European settlement. In high elevation sagebrush habitat, fire return intervals increased from 12–24 years to more than 50 years, resulting in invasion of conifers and a resulting loss in shrubs and herbaceous understory; at lower elevations, fire return intervals decreased dramatically from 50–100 years to less than 10 years due to invasion by annual grasses. TNC *et al.* (2011, p. 12) predicted a trend of higher fire frequency and severity in the Gunnison Basin due to climate change.

(87) *Comment:* Two commenters noted that drought has encouraged invasive plants.

*Our Response:* Drought can increase the likelihood of some invasive plants such as cheatgrass out-competing native perennials. The potential effects of drought and invasive plants on Gunnison sage-grouse and its habitat are further described in Factors A (Invasive Plants) and E (Drought) of this final rule.

(88) *Comment:* One commenter stated that climate change is adversely affecting Gunnison sage-grouse, but it cannot be mitigated by the Service.

*Our Response:* The Service can do little to avert climate change; however, actions can be taken to minimize specific impacts and improve the resiliency of species in the face of climate change. For example, the preferred Gunnison sage-grouse habitat for early brood-rearing includes riparian areas and wet meadows near sagebrush that provide the insects and forbs essential for chick survival. These habitat types are highly vulnerable to impacts from climate change and have been seriously degraded, but management actions can be taken to maintain and restore these important habitats (TNC *et al.* 2011, p. H–9–10).

(89) *Comment:* One commenter stated that if there are similar trends in Gunnison sage-grouse populations separated by long distances, the driver could be climate change.

*Our Response:* This hypothesis is plausible, although there is no evidence to support this hypothesis. This final rule discusses the potential impacts of climate change and drought in Factors A (Climate change) and E (Drought), and the associated effects on Gunnison sage-grouse.

(90) *Comment:* Several commenters stated that predator numbers have increased and are likely a threat to the Gunnison sage-grouse.

*Our Response:* Predator populations can increase as a result of habitat fragmentation and degradation, causing otherwise suitable habitat to become a population sink for sage-grouse. The best available information indicates that, as we stated in our proposed rule, predation is a current and future threat to the species, particularly in the satellite populations Predation is discussed further under Factor C in this final rule.

(91) *Comment:* Several commenters suggested that predator levels could be managed to relieve the threat from predation.

*Our Response:* Predator removal efforts sometimes result in short-term population gains for sage-grouse, but predator numbers quickly rebound without continual control (Hagen 2011, p. 99). Predation may be limiting some of the smaller populations of Gunnison sage-grouse, and in those cases predator control efforts may be appropriate. The best available information indicates that, as we stated in our proposed rule, predation is a current and future threat to the species, particularly in the satellite populations. While predation likely acts as a threat in localized areas across the range of the species, the stability of the Gunnison Basin population over the last 19 years indicates that predation is not having a significant impact on that population. We believe, however, that the effects of predation are more pronounced in the satellite populations. Given the stability of the Gunnison Basin population, we do not believe that the magnitude of this threat is significant at the rangewide level. While predation is a threat rangewide, we believe that the effects of predation are localized and more pronounced in the satellite populations, and therefore we do not believe that the magnitude of this threat is significant (see Factor C, Predation).

(92) *Comment:* Some commenters recommended that we reevaluate our conclusions regarding nest depredation by elk (*Cervus canadensis*) and cattle.

*Our Response:* The proposed and final rules document that livestock can trample nests, either destroying eggs or causing abandonment by hens. We also cite references that list several species of nest predators, including elk and domestic cows (see Factor C). However, the best available information indicates that nest predation by livestock and elk has negligible impacts on Gunnison sage-grouse at the population level (See Factor C, Predation).

(93) *Comment:* Some commenters noted that many predators of Gunnison sage-grouse are protected and cannot be controlled.

*Our Response:* Migratory birds such as raptors are protected under the Migratory Bird Treaty Act (16 U.S.C. 703–712). Take of these species requires a Federal permit. However, most mammalian predators of Gunnison sage-grouse and some birds may be controlled. Nevertheless, predator control efforts will likely only be effective under special circumstances (see our response to comment 48).

(94) *Comment:* Some commenters believed that raptor concentrations associated with powerlines are not evidence of increased predation on Gunnison sage-grouse, and that perch deterrents are not successful over the long-term. One commenter provided a paper that summarized studies regarding sage-grouse and powerlines (EDM International, Inc. 2011).

*Our Response:* In the proposed and final rules, we present numerous peer-reviewed studies that have demonstrated an increase in corvids and raptors associated with powerlines and transmission lines, which we infer could logically lead to increased predation of sage-grouse. We discuss these topics further under Factors A (Powerlines) and E (Predation) in this final rule.

(95) *Comment:* Some commenters suggested that the risk from the parasite *Tryptmosoma cruzi* and the encephalitis virus should be investigated.

*Our Response:* In Factor C of this final rule we evaluate the best available information on diseases in Gunnison sage-grouse and greater sage-grouse, including West Nile virus, an encephalitis virus lethal to greater sage-grouse and other gallinaceous birds. We also discuss other pathogens potentially relevant to Gunnison sage-grouse, based on data provided by CPW. We are not aware of other scientific information related to disease in Gunnison sage-grouse. To our knowledge, *Tryptmosoma cruzi* is a disease endemic to Latin America and does not pose a threat to sage-grouse.

(96) *Comment:* Some commenters stated that there is no evidence that disease is currently a threat. One commenter noted that there is a low abundance of the mosquito species that are known vectors of West Nile virus, and all mosquitos and Gunnison sage-grouse sampled by CPW tested negative.

*Our Response:* In the proposed rule, we determined that West Nile virus is a potential future threat, but it, and other diseases and parasitic infections, were not considered a current threat. We received comments from the scientific community expressing concern with this conclusion, particularly in regard to West Nile virus, based on the following information: To date, West Nile virus has not been documented in Gunnison sage-grouse, but is present in all counties throughout the species' range (USGS 2013, entire). Walker and Naugle (2011, p. 140) predicted that West Nile virus outbreaks in small, isolated, and genetically depauperate populations could reduce sage-grouse numbers below a threshold from which recovery is unlikely because of limited or nonexistent demographic and genetic exchange from adjacent populations. Therefore, a West Nile virus outbreak in any Gunnison sage-grouse population, except perhaps the Gunnison Basin population, could limit the persistence of that population. This information is discussed further in Factor C of this final rule.

(97) *Comment:* One commenter stated that Sovada *et al.* (1995) does not support the assertion that red fox and corvid populations are increasing.

*Our Response:* We removed this citation from the final rule, because the study is not relevant to our analysis. Our proposed rule, in error, stated that Sovada *et al.* (1995, p. 5) found that "red fox and corvids, which historically were rare in the sagebrush landscape, have increased in association with human altered landscapes." However, the author only speculated that abundance of these species had increased in sagebrush habitats over time. In this final rule, we discuss how anthropogenic pressures can influence the diversity and density of predators based on other studies (see Factor C).

(98) *Comment:* One commenter stated that predation threats to Gunnison sage-grouse cannot be presumed to be similar to predation threats to greater sage-grouse.

*Our Response:* In the proposed and final rules, we use the best available scientific and commercial data. We also note that we use information specific to the Gunnison sage-grouse where available but still applied scientific management principles for greater sage-grouse that are relevant to Gunnison sage-grouse management needs and strategies.

(99) *Comment:* One commenter asserted that the threat of predation by raptors is exaggerated.

*Our Response:* The proposed and final rules state that predation is the most commonly identified cause of direct mortality for Gunnison sage-grouse during all life stages and discuss common predators of adults, juveniles, and eggs. We also present information from scientific studies that demonstrate the potential impact of raptor predation on sage-grouse (see Factor C, Predation).

(100) *Comment:* One commenter noted that in Dolores County at least one person has contracted West Nile virus, and a significant number of dead birds have been found.

*Our Response:* The proposed rule to list the species stated that there have been no confirmed avian mortalities from West Nile virus in San Miguel, Dolores, and Hinsdale Counties (78 FR 2519, January 11, 2013). For updates in the final rule, we revisited records from the Centers for Disease Control (USGS 2013, entire) for West Nile reports in Colorado and Utah. Those records indicate that a total of 84 dead wild birds (species other than Gunnison sage-grouse) infected by West Nile virus have been reported from nine counties within the current range of the Gunnison sage-grouse since 2002, when reporting began in Colorado and Utah. In this final rule we conclude that West Nile virus is a future threat to Gunnison sage-grouse (see Factor C).

(101) *Comment:* Several commenters stated that conservation easements, CCAs, and CCAAs protect Gunnison sage-grouse, either directly or through protection of sagebrush habitat. Varying estimates of lands under conservation easements were provided, with most commenters citing the properties and acreages identified in Lohr and Gray (2013). Other commenters provided estimates of lands enrolled in the CCAA. Another commenter noted that 17.4 percent of all private lands in both occupied and unoccupied proposed critical habitat are protected through either conservation easements or CCAAs. Since 1995, a commenter reported, private landowners, local, and State expenditures towards Gunnison sage-grouse conservation exceed $31 million.

*Our Response:* We applaud these efforts towards Gunnison sage-grouse conservation. Continuation of conservation efforts across the species' range will be necessary for conservation and recovery of the species. Conservation easements and CCAAs

BLM_0072009

provide some level of protection for the species from future development on enrolled lands. In this final rule, we add information provided in Lohr and Gray (2013), update estimates for lands enrolled in CCAAs and conservation easements, and consider these conservation efforts in our listing decision as appropriate (see Factors A and D).

(102) *Comment:* Several commenters asserted that the current regulations are either adequate or inadequate to address threats to the Gunnison sage-grouse.

*Our Response:* There have been major strides in improving regulations to protect Gunnison sage-grouse and its habitat. Examples include Gunnison and Montrose County regulations for land use permitting in occupied habitat. Nonetheless, for the reasons stated in Factor D of this rule, existing regulatory mechanisms currently do not fully address the threat of habitat decline caused by human development in the species range. In addition, under the Act, the adequacy or inadequacy of regulatory mechanisms is just one of several factors upon which our determination to list a species must be based. As described in the proposed and final rules, there are multiple other threats contributing to the species' decline rangewide. Therefore, even the most protective local regulations may be insufficient to address all threats to the species, or halt recent declines in many of the populations, such that protection of the species under the Act is not warranted. In Factor D of this final rule, we evaluate the best available information related to existing regulatory mechanisms that address threats to Gunnison sage-grouse and its habitat (Factors A through C, and E).

(103) *Comment:* Several commenters stated that the Service should discuss existing land use policies and regulatory mechanisms with local governments.

*Our Response:* The Service has been engaged with Federal agencies, the States of Colorado and Utah, the Ute Mountain Ute Tribe, affected counties, and other interested parties throughout the listing process via letters, emails, telephone calls, meetings, and other means. Verbal and written comments have been carefully considered and in many instances incorporated into this final rule.

(104) *Comment:* Some commenters noted that resources on private lands are not managed to a lesser standard than resources on Federal lands.

*Our Response:* These comments may have been referring to our assessment of private lands in the grazing section of the proposed rule. In this final rule (see Factor A, Domestic Grazing and Wild Ungulate Herbivory), we revise our language to state that we have more limited information on the extent of grazing, management, and habitat conditions on non-Federal lands. Although Federal land and livestock grazing may be more regulated, we cannot make any generalizations about how habitat conditions in those areas might compare with private lands where livestock grazing occurs. We note, however, that grazing allotments containing both Federal and private lands are, in some cases, managed to meet BLM land health standards through coordination and cooperation with grazing permittees (BLM 2013c, p. 1–2).

(105) *Comment:* Some commenters noted that as a designated "sensitive species" the BLM must address Gunnison sage-grouse conservation in their Resource Management Plans and associated activity plans.

*Our Response:* We acknowledge that the commenter is correct (see Factor D, Federal Laws and Regulations).

(106) *Comment:* Some commenters stated that the COGCC protects wildlife resources and their habitat.

*Our Response:* The COGCC implements several environmental regulations that provide protection to the Gunnison sage-grouse and its habitat. These regulations generally apply to both Federal and private lands, although they may conflict with Federal regulations in some cases. The COGCC classifies all Gunnison sage-grouse occupied habitat as "Sensitive Wildlife Habitat" that requires operators to: (1) Consult with CPW to evaluate options for minimizing adverse habitat impacts, (2) educate employees and contractors on conservation practices, (3) consolidate new facilities to minimize disturbance, (4) control road access and limit traffic, and (5) monitor wells remotely when possible. The COGCC also designates lek areas as "Restricted Surface Occupancy Areas" that require operators to: (1) Comply with all requirements for "Sensitive Wildlife Habitat" and (2) avoid all new ground-disturbing activities if feasible. The COGCC does not require these protections in unoccupied habitat (COGCC 2014). We discuss COGCC regulations in this final rule (see Factor D, State Laws and Regulations).

(107) *Comment:* Some commenters noted that parcels of 35 ac (14 ha) or more are not exempted from State or county oversight.

*Our Response:* We include this information in this final rule, and acknowledge that counties have regulatory controls applicable to plus-35 acre development and projects (see Factor D, Local Laws and Regulations).

(108) *Comment:* Some commenters suggested that a PECE analysis should be conducted.

*Our Response:* Our Policy for Evaluation of Conservation Efforts (PECE) is used by the Service when making listing decisions under the Act. It established criteria for determining when we can consider in our listing determination future formalized conservation efforts that have not yet been implemented, or have been implemented, but have not yet demonstrated whether they are effective at the time of the listing decision. Numerous conservation actions have already been implemented for Gunnison sage-grouse, and these efforts have provided and will continue to provide conservation benefit to the species. These implemented efforts are considered in the appropriate section of this rule. Additionally, there are recently formalized future conservation efforts that intend to provide conservation benefits to the Gunnison sage-grouse; some of which have not been fully implemented or shown to be effective. A PECE analysis was conducted by the Service for these conservation efforts that are too recent to have demonstrated effectiveness as of this listing determination. This is described further under Conservation Programs and Efforts Related to Habitat Conservation. Efforts that are considered regulatory are considered under Factor D of this rule.

(109) *Comment:* Two commenters stated that the BLM and USFS must modify all existing leases and permit allotments in Gunnison sage-grouse habitat to incorporate enforceable terms and conditions to protect the species.

*Our Response:* Current BLM RMPs and USFS LRMPs provide some regulatory protection for the species. Changes to grazing allotment management have occurred, consistent with existing RMPs, over the past 10 years as permits have been revised or renewed. The extent to which appropriate measures to reduce or eliminate other threats to the species have been incorporated into planning documents or are being implemented, varies across the species' range and will likely continue to evolve as a result of BLM's on-going revision of several RMPs in the species' range and its planned landscape-level, targeted RMP amendments for the conservation of Gunnison sage-grouse on BLM-administered public lands in Colorado and Utah (see Factor D, Federal Laws and Regulations).

(110) *Comment:* Some commenters noted that although conservation easements are voluntary, they are legally binding once they have been recorded; therefore, they may offer regulatory protection. One commenter stated that voluntary conservation measures do not constitute adequate regulatory mechanisms if they are not enforceable and are not rangewide.

*Our Response:* We consider conservation easements to be an effective regulatory tool for the conservation of Gunnison sage-grouse, to the extent that they permanently limit or restrict land uses for identified conservation values and purposes and prevent long-term or permanent habitat loss (see Factor D, Other Regulatory Mechanisms: Conservation Easements). Other conservation efforts such as the CCA and CCAA are not considered regulatory mechanisms; and are therefore evaluated in Factor A, Conservation Programs and Efforts Related to Habitat Protection.

(111) *Comment:* One commenter suggested that the Land and Water Conservation Fund could be used to acquire Gunnison sage-grouse habitat.

*Our Response:* We agree that this would be a reasonable expenditure for the Land and Water Conservation Fund. However, there is a backlog of Federal land acquisition needs, estimated at more than $30 billion, which could impede timely use of the Fund for this purpose.

(112) *Comment:* One commenter asserted that conservation agreements are a violation of Federal and State constitutions.

*Our Response:* Conservation agreements have been successfully used by Federal and State agencies for several years to improve the status of many wildlife species and their habitats; we are not aware of any instances where they have been found to be unconstitutional, nor do we have any reason to believe that they are unconstitutional.

(113) *Comment:* Several commenters stated that oil and gas companies may cease operations if the Gunnison sage-grouse is listed or critical habitat is designated for the species. Some commenters asserted that they have been unable to lease their mineral rights as a result of the anticipated listing of the species. Several commenters also noted that a large percentage of county revenues in Dolores and Montezuma Counties are from oil and gas activities.

*Our Response:* While restrictions may be placed on various types of development that are subject to consultation under section 7 of the Act (on Federal lands or with Federal permitting or funding), the Service does not intend to preclude mineral or fossil fuel extraction as a result of listing or designating critical habitat. As noted in our response to comment 106, the COGCC implements several environmental regulations on both Federal and private lands that provide some protection to the Gunnison sage-grouse and occupied habitat. The BLM generally requires conservation measures on leases it issues. We may also seek project modifications during section 7 consultations to benefit Gunnison sage-grouse.

(114) *Comment:* Some commenters suggested that wind energy development should be allowed to proceed.

*Our Response:* The Endangered Species Act contains provisions to allow development projects to go forward even if they are within critical habitat or could result in take of a listed species, if those projects are done in accordance with sections 7 and 10 of the Act. For a discussion of wind energy development as a threat to the species, see discussion of Renewable Energy Development in Factor A.

(115) *Comment:* Some commenters expressed concern that potash mining in Gunnison sage-grouse habitat may cease operations if the species is listed or critical habitat designated. RM Potash expressed concerns that listing may delay their project (Thorson 2013).

*Our Response:* Potash exploration is planned on BLM lands within Gunnison sage-grouse unoccupied habitat in San Miguel and Dolores Counties. The BLM requires operators to adopt conservation efforts specified in the RMP for this area. These conservation efforts are required with or without listing the species under the Act. When the species is listed and critical habitat is designated, section 7 consultation will also be required. The amount of time necessary to complete a section 7 consultation will vary depending on the complexity of the project and the anticipated level of impacts to the species. In this final rule we consider the development of leasable minerals such as potash a low threat to the species (see Factor A, Mineral Development).

(116) *Comment:* Two commenters stated that oil and gas development threatens some Gunnison sage-grouse populations in San Miguel County.

*Our Response:* Approximately 13 percent of occupied habitat within the San Miguel Basin population has authorized Federal leases for oil and gas development; production is currently occurring on approximately five percent of this lease area. Currently, 25 gas wells are active within occupied habitat and 18 additional active wells are immediately adjacent to occupied habitat. All of these wells are in or near the Dry Creek subpopulation. In this final rule we consider the development of leasable minerals such as oil and gas a low threat to the species (see Factor A, Mineral Development).

(117) *Comment:* Two commenters suggested that energy companies could contribute money for Gunnison sage-grouse conservation.

*Our Response:* Energy companies that pursue development in Gunnison sage-grouse habitat must follow stipulations provided in the applicable BLM RMP (if Federal minerals are involved) and comply with applicable COGCC regulations. The annual costs associated with required conservation efforts represent a contribution by energy companies.

(118) *Comment:* One commenter suggested that energy development is not a threat to the Gunnison sage-grouse because: (1) There is not adequate information to indicate that renewable energy development is a threat, and (2) impacts from non-renewable energy development are very localized.

*Our Response:* We do not consider renewable energy development to be a threat to the species at this time (see Factor A, Renewable Energy Development). As noted in our responses to comment 116, we consider the development of non-renewable energy (leasable minerals) a low threat to the species (see Factor A, Mineral Development).

(119) *Comment:* One commenter asked if power companies will be able to clear sagebrush under their power lines.

*Our Response:* The Endangered Species Act contains provisions to allow projects to go forward even if they are within habitat, critical habitat or could result in take of a listed species, if those projects are done in accordance with sections 7 and 10 of the Act. Listed species, both within and outside of critical habitat, are protected from take, which includes harming (e.g., shooting, killing, trapping, collecting) and harassing individual animals. Incidental take that may result from, but is not the purpose of, otherwise legal activities without a Federal nexus may be allowed with a permit available from the Service under section 10 of the Act. Pursuant to section 7 of the Act, Federal agencies are also required to consult with the Service regarding any action authorized, funded, or carried out by the agency that may affect a listed species, both within and outside of critical habitat, to ensure that the Federal action does not

jeopardize the existence of any listed species. Sagebrush clearing under power lines would likely need to be addressed, and effects minimized, through section 7 or 10 of the Act.

(120) *Comment:* One commenter suggested that leks in areas of energy development be relocated.

*Our Response:* Relocating leks is likely not in the best interest of the species. Sage-grouse often will continue to return to altered breeding habitats including leks, nesting areas, and early brood-rearing areas due to the species' strong site fidelity, despite past nesting or productivity failures (Rogers 1964, pp. 35–40; Wiens and Rotenberry 1985, p. 666; Young 1994, p. 42; Lyon 2000, p. 20; Connelly *et al.* 2004, pp. 3–4–3–6; Holloran and Anderson 2005, p. 747). Broad-scale characteristics within surrounding landscapes influence habitat selection, and adult Gunnison sage-grouse exhibit a high fidelity to all seasonal habitats, resulting in low adaptability to habitat changes. A study of greater sage-grouse concluded that strong site fidelity makes natural re-colonization slow and that anthropogenic translocations into areas with no resident populations are unlikely to succeed (Doherty 2008, pp. 80–81). We believe that this conclusion applies to the Gunnison sage-grouse as well because it exhibits similar site fidelity characteristics.

(121) *Comment:* One commenter stated that information regarding impacts from energy development is based on studies of greater sage-grouse rather than Gunnison sage-grouse.

*Our Response:* There is more information available specific to greater sage-grouse due to the fact that Gunnison sage-grouse was not recognized as a distinct species until 2000, which means only 14 years of species-specific research is potentially available. The greater sage-grouse also has a much broader range, with several states monitoring and managing the species. The life history and ecology of the two species are very similar, therefore, with minimal information available regarding impacts to Gunnison sage-grouse from energy development, it is reasonable to also consider impacts to greater sage-grouse from energy development when determining whether or not this development is a threat to the Gunnison sage-grouse. In this final rule we do not consider renewable energy development to be a current threat to the species rangewide; we consider non-renewable energy development to be a threat of low magnitude to Gunnison sage-grouse (see Factor A, Mineral Development and Renewable Energy Development).

(122) *Comment:* One commenter asserted that the Federal government has put an end to oil and gas drilling throughout the range of the Gunnison sage-grouse.

*Our Response:* Of approximately 22,000 ha (54,000 ac) leased by BLM within Gunnison sage-grouse habitat in Colorado, 38 percent are currently in production, with 67 active wells. In Utah, approximately 1,100 ha (2,700 ac) are leased within Gunnison sage-grouse habitat, with none currently in production. On non-Federal lands there are five active wells in Colorado and three active wells in Utah (Industrial Economics, Inc. 2013, p. 5–4). Since 2005, the BLM has temporarily withheld new oil and gas leases from sales throughout occupied Gunnison sage-grouse habitat in Colorado. However, leases can be sold on unoccupied habitat, and oil and gas development continues on private lands.

(123) *Comment:* Several commenters stated that voluntary conservation measures and local regulations should be fully considered.

*Our Response:* We agree. Local regulations and voluntary conservation measures such as conservation easements, CCAAs, and CCAs provide formal protection for the Gunnison sage-grouse. We recognize that such efforts contribute to the conservation of Gunnison sage-grouse. Under Factor D we evaluate whether threats to the Gunnison sage-grouse are adequately addressed by existing regulatory mechanisms, including local regulations, conservation easements, State regulations, and Federal regulations. CCAAs and CCAs are discussed under Factor A, Conservation Programs and Efforts Related to habitat Protection.

(124) *Comment:* Several commenters stated that the DPS analysis needs to be described in more detail for the seven Gunnison sage-grouse populations.

*Our Response:* The term "distinct population segment" (DPS) is included in the definition of species in Section 3(16) of the Act, which describes a DPS as any species of vertebrate fish or wildlife which interbreeds when mature. We have a policy that guides our consideration of DPS issues. In addition to full taxonomic species and subspecies, a DPS of any vertebrate species is eligible for consideration for purposes of listing, delisting, or reclassifying. The authority to list a DPS is to be used sparingly and only when the biological evidence indicates that such action is warranted. In order to be considered a DPS, a population must be both discrete and significant. If a population segment is discrete and

significant, it can be evaluated with regard to whether it is endangered or threatened. This analysis is different from an SPR (Significant Portion of the Range) analysis. We considered the entire range of the Gunnison sage-grouse in our listing evaluation and found that it warranted listing throughout its range; therefore, there was no need to evaluate individual population segments for consideration as a DPS. In addition, we do not believe any biological evidence warrants the listing of any DPS.

(125) *Comment:* Several commenters stated that the proposed rules rely too much on the use of linguistically uncertain or vague wording to support their conclusions.

*Our Response:* Natural sciences, including wildlife biology, typically do not deal in absolutes. Studies seldom evaluate all members of a species or address all possible variables. Consequently, conclusions often include wording to address this uncertainty. Tools such as adaptive management can strengthen the decision-making process by incorporating new information and adjusting decisions accordingly. This has occurred with the Gunnison sage-grouse—as more information has become available, we have adjusted and refined our recommendations from the proposed to the final rule.

(126) *Comment:* One commenter stated that if a stressor is not a threat; the regulatory mechanisms associated with that stressor cannot be considered a threat.

*Our Response:* We agree. For example, if hunting is not considered a threat, then the regulations associated with hunting would not be considered inadequate. In other instances, it may not be possible to adequately address a threat through regulatory mechanisms (e.g., small population size, disease, climate change). We also recognize that regulatory mechanisms may help reduce impacts of a particular threat (e.g., residential development in Gunnison County), and yet not fully address this or other threats to the species.

(127) *Comment:* Two commenters asserted that tribal concerns have not been addressed.

*Our Response:* We have considered tribal concerns in this final rule. The Service underwent a Government to Government consultation with the Ute Mountain Ute Tribe regarding the Species Management Plan developed for the tribal-owned Pinecrest Ranch. This topic is discussed in detail in Factor A (Conservation Programs and Efforts) of this final rule.

(128) *Comment:* Some commenters asserted that initial town hall meetings

BLM_0072012

were not conducted properly because no public meetings were held in Montezuma County, there was a faulty sound system, too short of a time-frame for the meeting, poor coordination, and some comments were not recorded.

*Our Response:* No public meetings were held in Montezuma County because no critical habitat was proposed in that county, nor is the species known to occur in that area. We apologize to anyone who experienced difficulties in hearing the discussions, did not feel that adequate time was provided, or felt there was poor coordination between the Service and local governments. In November, 2013, additional public hearings were held in Gunnison and Montrose, Colorado; and in Monticello, Utah to ensure that we provided adequate opportunity for public comment to occur through our hearing process. In addition, written comments were accepted during the reopened comment periods. These processes are discussed in Previous Federal Actions in this final rule.

(129) *Comment:* Two commenters asserted that the Service's decision-making process for listing is influenced by the International Union for Conservation of Nature (IUCN).

*Our Response:* The IUCN does not influence our decision-making process. We provided information on IUCN's ranking of the species for background only; these assessments are not factored into our analysis or listing determination in this rule. We make this clarification in this final rule (see Additional Special Status Information).

(130) *Comment:* One commenter suggested that the RCP not be considered in the listing decision because of its questionable legality and methodology.

*Our Response:* We believe that the RCP used sound methods which constituted the best available information at the time. The RCP specifically states that it is not a legal or regulatory document (GSRSC 2005, p. 1). Accordingly, we do not consider it a regulatory mechanism, but do consider it in Factor A as a Conservation Program and Effort. The plan was developed cooperatively by the BLM, CPW, NPS, NRCS, USFS, the Service, and UDWR. It was intended to supplement local conservation plans and provide additional guidance to aid in conservation of the Gunnison sage-grouse. New research and monitoring data has been collected since the plan was written; however, we still regard this as a valuable document. In many instances it provides the best available information regarding habitat requirements, distribution and

abundance, threats, and current conservation strategies for the species.

(131) *Comment:* Some commenters recommended that a range management school be created to address Gunnison sage-grouse and other issues.

*Our Response:* In 2006, the Gunnison County Stockgrowers' Association, supported by a Grazing Lands Conservation Initiative Grant, organized a training workshop, called Range Management School, for 37 participants including private ranchers, permittees of Federal grazing allotments, Federal land managers, and other interested parties. We support this type of educational program.

(132) *Comment:* Two commenters suggested that a classification of "threatened" is a better approach than a classification of "endangered."

*Our Response:* Based upon the analysis of additional data and new information received during the comment period, we have concluded that "threatened" is the appropriate determination. Our analysis and a detailed explanation for this determination are presented in this final rule (see Determination).

(133) *Comment:* One commenter stated that snowmobiling does not conflict with lek activities because snowmobiling season ends before lek activities begin and snowmobiling requires snow depths adequate to bury sagebrush.

*Our Response:* Snowmobiling was evaluated as a recreational activity under Factor E in the proposed rule to list the species. We cited several sources that identified snowmobiles as one form of recreation that may be of concern. In this final rule we conclude that recreational activities in general are not a threat at a rangewide or population level, but could impact individuals at the local level (see Factor B).

(134) *Comment:* Two commenters suggested that overutilization for scientific research may be a factor in Gunnison sage-grouse declines.

*Our Response:* We describe mortality risks from scientific research in the proposed and final rules to list the species and conclude that the associated mortality rate is low (two percent) and is not a threat at the population or species level (see Factor B).

(135) *Comment:* One commenter asserted that chemicals used in households and farming have affected Gunnison sage-grouse habitat more than other factors.

*Our Response:* We evaluate the effects of pesticides, contaminants associated with non-renewable energy development, and accidental spills associated with pipelines and

transportation corridors in this final rule. We conclude that none of these posed a threat to the species (see Factor E, Pesticides and Herbicides).

(136) *Comment:* One commenter stated that Gunnison sage-grouse are in an extinction vortex.

*Our Response:* "Extinction vortex" is a modeling term that describes the process in a declining population where greater rates of decline occur as the population falls below a minimum viable number and approaches extinction. This final rule evaluates population trends across the range of the Gunnison sage-grouse. We determined that this species is threatened (i.e., likely to become an endangered species within the foreseeable future throughout all of its range). However, we do not believe that the species is at this time in an "extinction vortex," which implies that extinction is inevitable.

(137) *Comment:* One commenter stated that the number of off-highway vehicle (OHV) permits issued is not a good indication of the level of OHV use.

*Our Response:* The proposed and final rules note that the number of annual OHV registrations in Colorado increased from approximately 12,000 in 1991 to approximately 131,000 in 2007 (see Factor E, Recreation). This information is provided simply to note that OHV activity has increased. Although other factors also should be considered in determining the level of use by OHVs, an increase of more than an order of magnitude in registrations from 1991 to 2007 indicates that the level of use increased during that time period. We conclude that recreation does not pose a rangewide threat to the species, although it has the potential to cause individual or local impacts.

(138) *Comment:* One commenter stated that aircraft-wildlife strikes pose a risk to aviation.

*Our Response:* We are not aware of any studies or information demonstrating that Gunnison sage-grouse collisions with aircraft have occurred or are a concern.

(139) *Comment:* One commenter stated that a recovery plan is needed.

*Our Response:* Recovery Plans are typically drafted after a species is listed and provide guidance for recovery of threatened and endangered species and the ecosystems upon which they depend. Section 4(f)(1) of the Act requires the Service to develop and implement these plans unless a plan will not promote the conservation of a species. Recovery plans should include: Management actions to conserve the species; objective, measurable criteria for determining when a species can be

removed from the list; and an estimate of the time and cost required to achieve recovery. We anticipate commencing a recovery planning process in the near future. Until that time, we are including a conservation strategy (see Conservation Measures for Gunnison Sage-Grouse Recovery) in this rule that will provide guidance for conservation efforts in the interim.

(140) *Comment:* Several commenters noted specific ongoing projects or programs that improve Gunnison sage-grouse habitat.

*Our Response:* We considered the projects and programs noted by the commenters in making our listing determination and finalizing this rule. Under Factors A and D in the proposed and final rules to list the species, we describe many of the conservation measures including local, State and Federal laws and regulations, conservation easements, the Gunnison Basin CCA, and enrollment in the Colorado CCAA that have been undertaken to improve or protect Gunnison sage-grouse habitat.

(141) *Comment:* Some commenters suggested that the Service collaborate with the Colorado Farm Bureau (CFB) in Gunnison sage-grouse management.

*Our Response:* We welcome input and participation from the CFB and other organizations. We received a comment letter from CFB that encouraged continued collaboration between the Service, private landowners, local and state governments, and others. We agree that working cooperatively with interested parties will aid in conservation and recovery of the Gunnison sage-grouse.

(142) *Comment:* One commenter stated that when landowners enroll lands in the Conservation Reserve Program (CRP) they often stop maintaining ponds and wet meadows to the detriment of Gunnison sage-grouse.

*Our Response:* We are not aware of any information regarding the extent of ponds and wet meadows lost following enrollment in the CRP. We consider enrolled lands, particularly those enrolled under the CRP State Acres for Wildlife Enhancement initiative, to improve Gunnison sage-grouse habitat in most cases. The CRP is implemented by the Farm Service Agency and promotes the conversion of environmentally sensitive land to long-term vegetative cover. The objectives of the program include reduction of soil erosion, protection of water resources, and enhancement of wildlife habitat. Approximately 23,000 ha (57,000 ac) of Gunnison sage-grouse occupied habitat are currently enrolled in the CRP

(Industrial Economics, Inc. 2013, p. 4–5).

(143) *Comment:* One commenter stated that wind farms are compatible with CRP, and wildlife protection.

*Our Response:* The compatibility of wind farms with CRP as they relate to Gunnison sage-grouse, and wildlife protection would vary for each site, depending on the protective measures in place for wildlife, the location and number of turbines, the type of vegetative cover, and other variables.

(144) *Comment:* One commenter stated that no explanation was provided for why Gunnison sage-grouse are no longer found in Arizona and New Mexico.

*Our Response:* We note in the proposed and final rules that a description of the species' historical distribution was provided in the 2010 12-month finding. In the 12-month finding, we state that much of what was once Gunnison sage-grouse habitat was lost prior to 1958 (75 FR 59808, September 28, 2010). This included habitat loss throughout Arizona and New Mexico, as well as portions of Utah and Colorado. We summarize this information in the Background and Factor A sections of this final rule.

(145) *Comment:* One commenter asserted that there is no evidence of Gunnison sage-grouse movement from Gunnison Basin to other populations.

*Our Response:* Both the Cerro Summit-Cimarron-Sims Mesa and Crawford populations are approximately 2 km (1.2 mi) from the Gunnison Basin population at their nearest points, which is well within movement distances documented for Gunnison sage-grouse. Sage-grouse require a diversity of seasonal habitats and are wide-ranging; therefore, they are capable of making large seasonal movements (Connelly *et al.* 2000a). Preliminary data in the Gunnison Basin documented bird movements as great as 56 km (35 mi) (Phillips 2013, p. 4). Most populations are currently geographically isolated, with low amounts of gene flow between populations. However, genetic analysis indicated that a recent migrant came to the Crawford population from the Gunnison Basin population; historically, populations were connected through more contiguous areas of sagebrush habitat (Oyler-McCance *et al.* 2005).

(146) *Comment:* One commenter recommended that we distinguish between smaller distribution power lines and larger transmission power lines when assessing impacts and planning mitigation.

*Our Response:* This final rule states that depending on the infrastructure

design, size, location, and other factors, powerlines can directly affect greater sage-grouse by posing a collision and electrocution hazard (Braun 1998, pp. 145–146; Connelly *et al.* 2000a, p. 974) and can have indirect effects by decreasing lek recruitment (Braun *et al.* 2002, p. 10; Walker *et al.* 2007a, p. 2,644), increasing predation (Connelly *et al.* 2004, p. 13–12), fragmenting habitat (Braun 1998, p. 146), and facilitating the invasion of exotic annual plants (Knick *et al.* 2003, p 612; Connelly *et al.* 2004, p. 7–25) (see Factor A, Powerlines). However, we have no information to precisely measure how powerlines and transmission lines vary in design or distribution across the range of Gunnison sage-grouse, and how those effects might vary across time and space.

(147) *Comment:* One commenter asserted that the proposed rules dismissed information provided by CPW.

*Our Response:* In the proposed and final rules, we consider all information provided by CPW, and reference that information as appropriate throughout the rules.

(148) *Comment:* One commenter recommended citing Davis (2012) regarding nest success.

*Our Response:* In this final rule (see Factor E, Effective Population Size and Population Viability Analyses), we include a thorough discussion and evaluation of Davis's (2012) findings, including observed differences in nest success between populations.

(149) *Comment:* Several commenters stated that we should not interfere in CPW's management of Gunnison sage-grouse.

*Our Response:* We recognize the proactive management of Gunnison sage-grouse by CPW and continue to work with this agency for the species' conservation. However, our analysis in this final rule indicates that Gunnison sage-grouse meets the definition of a threatened species; therefore, we must list it under the Act.

(150) *Comment:* One commenter noted that historical Gunnison sage-grouse habitat on BLM land in the Sims Mesa area has been severely damaged by sagebrush removal.

*Our Response:* Sagebrush removal on Sims Mesa may have contributed to the one known lek there being currently inactive. Sage-grouse have an obligate relationship with sagebrush. The original distribution of sage-grouse closely followed that of sagebrush. Loss, fragmentation, and degradation of this habitat is a major threat and a primary reason for listing the species and

BLM_0072014

designating critical habitat. If alteration of sagebrush habitat continues, remnant populations may become extirpated.

(151) *Comment:* One commenter noted that there is not adequate data available to determine whether recent declines of Gunnison sage-grouse observed by Davis (2012) in the Gunnison Basin are short-term population fluctuations or the beginning of a long-term decline.

*Our Response:* We agree. This concern supports the importance of continued monitoring and conservation of Gunnison sage-grouse populations. This study is discussed and evaluated in detail in Factor E of this final rule. We believe, however, that the threat from residential development in the Gunnison Basin will increase in the future. Habitat fragmentation and disturbance from new roads, powerlines, fences, and other infrastructure are also likely to increase (see Factor A). Additionally, climate change is likely to increase the threats from drought and West Nile Virus in the future (discussed further in Factors A, C, and E). Thus, these future threats must be considered along with the results of the Davis (2012) study.

(152) *Comment:* One commenter asked if grazing will be considered "take."

*Our Response:* Whether a particular activity will result in "take" is determined on a case-by-case basis. Grazing practices that could result in take can be addressed through ESA section 7 or section 10 processes as applicable, including appropriate review under the terms of the Gunnison Basin Candidate Conservation Agreement.

(153) *Comment:* Some commenters noted that all of the affected county governments have taken the following actions:
• Participation in a Memorandum of Understanding,
• Signatories to the Conservation Agreement,
• Formally committed to adopting a Habitat Prioritization Tool, which will better predict preferred habitat for the species, and
• Formally committed to updating and adopting an amended Rangewide Conservation Plan.

*Our Response:* We considered this information in this final rule (see Factor D, Local Laws and Regulations).

(154) *Comment:* Some commenters asserted that many of the peer review comments do not support listing.

*Our Response:* We requested comments from appropriate and independent individuals with scientific expertise based on their review of the proposed rules to list the Gunnison sage-grouse and to designate critical habitat for the species. We received numerous comments back from these individuals; some in agreement, some disagreements, and many suggestions for improving the proposed rules. Substantive comments are discussed above in the Peer Reviewer Comment section. We considered all of these comments and incorporated many of their suggestions into this final rule.

(155) *Comment:* One commenter expressed concern that hang gliding and paragliding could be impacted by listing.

*Our Response:* In this final rule, we conclude that recreational activities are not a threat at a rangewide or population level, but could impact the species at a local level (see Factor E, Recreation). Nevertheless, for those projects and activities with a Federal nexus, project and activity modifications may be requested by the Service through the section 7 consultation process to limit impacts on Gunnison sage-grouse, as necessary.

(156) *Comment:* One commenter noted that most of the mineral ownership is severed from surface ownership within the range of the Gunnison sage-grouse.

*Our Response:* In this final rule we note that the BLM has regulatory authority for oil and gas leasing on Federal lands and on private lands with split-estate, or Federal mineral estate (see Factor D, Federal Laws and Regulations).

## Summary of Factors Affecting the Species

Section 4 of the Endangered Species Act (16 U.S.C. 1533), and its implementing regulations at 50 CFR part 424, set forth the procedures for adding species to the Federal Lists of Endangered and Threatened Wildlife and Plants. Under section 4(a)(1) of the Act, we may list a species based on any of the following five factors: (A) The present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; and (E) other natural or manmade factors affecting the species' continued existence. Listing actions may be warranted based on any of the above threat factors, singly or in combination.

Below, we carefully assess the best scientific and commercial information available regarding the past, present, and future threats to Gunnison sage-grouse. We consider all such information in analyzing the five factors identified in section 4(a)(1) of the Endangered Species Act to determine whether Gunnison sage-grouse meets the definition of an endangered or threatened species.

A. The Present or Threatened Destruction, Modification, or Curtailment of Its Habitat or Range

In this section, we evaluate various factors influencing the decline of sagebrush and important sage-grouse habitats. The term *habitat decline* includes any quantitative or qualitative degradation of habitat by area, structure, function, or composition (Noss *et al.* 1995, pp. 2, 17). In this rule, we collectively refer to habitat loss, degradation, and fragmentation as 'habitat decline'. There are varying interpretations of the term habitat decline, and various methods for measuring or evaluating it. In this rule, we apply the following general concepts and definitions to our analysis. Habitat loss or destruction (such as sagebrush conversion) includes the permanent or long-term reduction of habitat and generally occurs at smaller scales. Habitat degradation includes the reduction of habitat quality or characteristics and generally occurs at smaller scales. Habitat fragmentation, or the breaking apart of contiguous habitat, occurs at larger or landscape scales, often as the result of cumulative loss and degradation of habitat over space and time. In this final rule, we provide information indicating each of these processes has occurred across Gunnison sage-grouse range, though those processes may vary over time and space. Consequently, effects at the individual, population, and species levels due to habitat decline are variable and not always certain.

Habitat loss and fragmentation are recognized as primary causes of the decline in abundance and distribution of sage-grouse across western North America (Rogers 1964, pp. 13–24; Braun 1998, entire; Schroeder *et al.* 2004, p. 371), and in Gunnison sage-grouse in Colorado, Utah, and across their former range (Oyler-McCance *et al.* 2001, p. 330; GSRSC 2005, p. 149; Wisdom *et al.* 2011, pp. 465–469). Gunnison sage-grouse depend on sagebrush for their survival and persistence, and the historic and current distribution of the Gunnison sage-grouse closely matches that of sagebrush (Patterson 1952, p. 9; Braun 1987, p. 1; Schroeder *et al.* 2004, p. 364, and references therein). Habitat fragmentation resulting from human development patterns is especially detrimental to Gunnison sage-grouse because of their dependence on large

BLM_0072015

expanses of sagebrush (Patterson 1952, p. 48; Connelly *et al.* 2004, p. 4–1; Connelly *et al.* 2011a, p. 72) and more contiguous sagebrush habitats (Rogers 1964, p. 19; Wisdom *et al.* 2011, pp. 452–453). In addition, female Gunnison and greater sage-grouse exhibit strong site fidelity to nesting locations (Connelly *et al.* 1988; Young 1994; Lyon 2000, Connelly *et al.* 2004, Holloran and Anderson 2005, Thompson 2012). Sage-grouse often will continue to return to altered breeding habitats (leks, nesting areas, and early brood-rearing areas), despite any past failures in nesting or productivity (Rogers 1964, pp. 35–40; Wiens and Rotenberry 1985, p. 666; Young 1994, p. 42; Lyon 2000, p. 20, Connelly *et al.* 2004, pp. 3–4 to 3–6; Holloran and Anderson 2005, p. 747). Consequently, there may be lags in the response of sage-grouse to development or habitat changes, similar to those observed in other sagebrush obligate birds (Harju *et al.* 2010, entire; Wiens and Rotenberry 1985, p. 666).

The distribution of sage-grouse habitat is naturally disconnected due to the presence of unsuitable habitats such as forests, deserts, and canyons across the landscape (Rogers 1964, p. 19). However, the onset of Euro-American settlement in the 1800s resulted in significant human alterations to sagebrush ecosystems throughout North America, primarily as a result of urbanization, agricultural conversion, and irrigation projects (West and Young 2000, pp. 263–265; Miller *et al.* 2011, p. 147). Areas in Colorado that supported basin big sagebrush were among the first sagebrush community types converted to agriculture because their soils and topography are well-suited for agriculture (Rogers 1964, p. 13). Decreases in the abundance of sage-grouse paralleled the loss of range (Braun 1998, pp. 2–3), and a gradual but marked decrease in sage-grouse distribution and numbers in Colorado had begun around 1910 (Rogers 1964, pp. 20–22). Our listing decision is based on the current status of Gunnison sage-grouse and the current and future threats to the species and its habitat. However, the loss of historical range and decline in abundance, and the associated causes of those declines, have contributed to the species' current precarious status. Further, historical information can be evaluated to help forecast how populations and the species may respond to current and future threats.

Based on historical records, museum specimens, and potential sagebrush habitat distribution, the potential historic range of Gunnison sage-grouse was estimated to be 21,376 square miles,

or 13,680,590 ac (GSRSC 2005, pp. 32–35, as adapted from Schroeder *et al.* 2004, entire). This range included parts of central and southwestern Colorado, southeastern Utah, northwestern New Mexico, and northeastern Arizona (Schroeder *et al.* 2004, pp. 368, 370). However, only a portion of this historical range would have been occupied at any one time. The species' estimated current range is 1,822 square miles, or 1,166,075 ac, in central and southwestern Colorado, and southeastern Utah (Figure 1) (GSRSC 2005, pp. 32–35, as adapted from Schroeder *et al.* 2004, entire). Based on these figures, the species' current range represents approximately 8.5 percent of its historical range (GSRSC 2005, p. 32). Similarly, Schroeder *et al.* (2004, p. 371) estimated the species' current overall range to be 10 percent of potential presettlement habitat (prior to Euro-American settlement in the 1800s). As estimated in our final rule to designate critical habitat for Gunnison sage-grouse published elsewhere in today's **Federal Register**, the species' current potential range includes an estimated 1,621,008 ac in southwestern Colorado and southeastern Utah, comprised of 923,314 ac (57 percent) of occupied habitat and 697,694 ac (43 percent) of unoccupied habitat. Based on these figures, the current potential range of 1,621,008 ac represents approximately 12 percent of the potential historic range of 13,680,640 ac. The estimates above indicate that approximately 88 to 93 percent of the historical range of Gunnison sage-grouse has been lost since Euro-American settlement. We acknowledge that these estimates are uncertain and imprecise. Nevertheless, the best available information indicates a reduction of Gunnison sage-grouse distribution since Euro-American settlement in the 1800s, with evidence of the loss of peripheral populations and a northward and eastward trend of extirpation (Schroeder *et al.* 2004, pp. 369, 371, and references therein). This contraction in the birds' range indicates the vulnerability of all the populations to extirpation.

In southwestern Colorado, between 1958 and 1993, an estimated 20 percent (155,673 ha (384,676 ac)) of sagebrush was lost, and 37 percent of sagebrush plots examined were fragmented (Oyler-McCance *et al.* 2001, p. 326). Another study estimated that approximately 342,000 ha (845,000 ac) of sagebrush, or 13 percent of the pre-Euro-American settlement sagebrush extent, were lost in Colorado, which included both greater sage-grouse and Gunnison sage-grouse habitat (Boyle and Reeder 2005, p. 3–3).

However, the authors noted that the estimate of historic sagebrush area used in their analyses was conservative, possibly resulting in an underestimate of historic sagebrush losses (Boyle and Reeder 2005, p. 3–4). Within the range of Gunnison sage-grouse, the principal areas of sagebrush loss were in the Gunnison Basin, San Miguel Basin, and areas near Dove Creek, Colorado. The authors point out, however, that the rate of loss in the Gunnison Basin was lower than other areas of sagebrush distribution in Colorado. At that time, the Gunnison Basin contained approximately 250,000 ha (617,000 ac) of sagebrush and areas of riparian aspen forest, mixed-conifer forest, and oakbrush (Boyle and Reeder 2005, p. 3–3). Within the portion of the Gunnison Basin currently occupied by Gunnison sage-grouse, 170,000 ha (420,000 ac) is composed exclusively of sagebrush vegetation types, as derived from Southwest Regional Gap Analysis Project (SWReGAP) landcover data (multi-season satellite imagery acquired 1999–2001) (USGS 2004, entire).

Sagebrush habitats within the range of Gunnison sage-grouse are becoming increasingly fragmented as a result of various changes in land uses and the expansion in the density and distribution of invasive plant species (Oyler-McCance *et al.* 2001, pp. 329–330; Schroeder *et al.* 2004, p. 372). Based on spatial modeling, a variety of human developments including roads, energy development, residential development, and other factors known to cause habitat decline were correlated with historical loss of range and extirpation of Gunnison and greater sage-grouse (Wisdom *et al.* 2011, pp. 465–468). This model indicated that no "strongholds" (secure areas where the risk of extirpation appears low) of occupied range are evident for Gunnison sage-grouse (Wisdom *et al.*, 2011, p. 469). Landscapes containing large and contiguous sagebrush patches and sagebrush patches in close proximity had an increased likelihood of sage-grouse persistence (Wisdom *et al.* 2011, p. 462).

In this final rule, we discuss Wisdom *et al.* (2011, entire) and its conclusions, but do not use the term "stronghold." Nevertheless, consistent with Wisdom *et al.* (2011, entire) and numerous other studies noted above, we maintain that the persistence of Gunnison sage-grouse is dependent on large and contiguous sagebrush habitats, that human development and disturbance contribute to the decline of this needed habitat, and that such impacts negatively affect the survival and persistence of Gunnison sage-grouse.

The degree to which habitat fragmentation prevents a species' movement across the landscape depends, in part, on that species' ability to move large distances and thereby adjust to changes on the landscape. Sage-grouse are wide-ranging and capable of making large seasonal movements, because they require a diversity of seasonal habitats (Connelly *et al.* 2000a, pp. 968–969, and references therein). Movements of Gunnison sage-grouse as great as 56 km (35 mi) have been documented in the Gunnison Basin (Phillips 2013, p. 4). In contrast, the maximum recorded movement distance of Gunnison sage-grouse in the Monticello population is 8.2 km (5.1 mi), associated with winter movement (Ward 2007, p. 15). Prather (2010, p. 70) noted that such behavior may be due to the presence of large areas of piñon-juniper (i.e., less suitable habitats) which bracket currently occupied habitat in the Monticello population area.

Population dynamics of greater sage-grouse in northwestern Colorado functioned at much smaller scales than expected for a species capable of moving large distances (Thompson 2012, p. 256). The majority of juvenile dispersal was intra-population movement (within one breeding population), with only one inter-population movement (between separate breeding populations) observed during one study (Thompson 2012, p. 169). As a result, juvenile recruitment into home breeding ranges ranged between 98 and 100 percent (Thompson 2012, p. 170). Based on observed bird dispersal in that study, gene flow and connectivity can likely be maintained for populations within 5 to 10 km (most dispersals were less than 10 km) and possibly as far as 20 km (the maximum dispersal distance of one of the subpopulations studied) in greater sage-grouse (Thompson 2012, pp. 285–286). The populations of greater sage-grouse studied were within areas where birds are known for moving between populations.

Because individual movement patterns likely vary by population and area, their susceptibility to habitat loss and degradation may also differ. We expect that where habitat is already more limited (quantity and quality) and isolated, such as in the six satellite populations, habitat loss and decline will have more serious consequences in terms of population fitness and survival. Where habitat is already severely limited or degraded, or where sage-grouse populations are small, any loss of habitat may impact those populations. In addition, habitat loss impacts are expected to be greater in important and/or limiting seasonal habitats, such as areas used during moderate to severe winters, or in lekking, nesting, or brood-rearing habitats (GSRSC 2005, p. 161).

The loss of leks or the decline of nesting or brood-rearing habitats can have serious consequences for sage-grouse population viability by reducing reproductive success and recruitment (survival of young to breeding age). Limitations in the quality and quantity of nesting and early brood-rearing habitats, in particular, are especially important because Gunnison sage-grouse population dynamics are most sensitive during these life-history stages (GSRSC 2005, p. G–15). Juvenile recruitment is one of the most important demographic factors influencing or limiting sage-grouse population growth rates and viability (Connelly *et al.* 2004, p. 3–11, GSRSC 2005, p. 173). In a recent demographic and population viability study of Gunnison sage-grouse, juvenile survival was found to be the most influential vital rate in the Gunnison Basin population, which is currently a relatively stable population (Davis 2012).

Brood-rearing habitat must provide adequate cover adjacent to areas rich in forbs and insects to assure chick survival during this period (Connelly *et al.* 2000a, p. 971; Connelly *et al.* 2004, p. 4–11). Late brood-rearing habitats (also referred to as summer-fall habitats) may include riparian areas, wet meadows, and irrigated fields that provide an abundance of forbs and insects for hens and chicks (Schroeder *et al.* 1999, p. 4; Connelly *et al.* 2000a, p. 980). In northwest Colorado, dispersal, migration, and settlement patterns of juvenile greater sage-grouse—factors important to population persistence—were more influenced by limitations associated with local traditional breeding (lek) and brood-rearing areas than by landscape-level vegetation structure and composition (i.e., the spatial distribution and configuration of vegetation types) (Thompson 2012, pp. 317, 341). The same study recommended restoration, creation, and protection of early and late brood-rearing habitats to increase chick survival rates (Thompson 2012, p. 135). The importance of brood-rearing habitat for juvenile survival, recruitment, and hence, population viability of sage-grouse is evident. These key habitats are particularly susceptible to drought (see Factor E, Drought) and predicted climate change effects (The Nature Conservancy 2011, p. 11) (see Climate Change in this Factor A analysis).

As presented above, habitat decline, including loss, fragmentation, and degradation of quality, has known adverse effects on Gunnison sage-grouse populations. Gunnison sage-grouse depend on sagebrush for their survival and persistence, and the historical and current distribution of the Gunnison sage-grouse closely matches that of sagebrush (Patterson 1952, p. 9; Braun 1987, p. 1; Schroeder *et al.* 2004, p. 364, and references therein). Approximately 88 to 93 percent of the species' former range has been lost since the 1800s (see discussion above), and much of the remaining habitat is degraded or fragmented (Oyler-McCance *et al.* 2001, p. 326; Oyler-McCance *et al.* 2001, pp. 329–330; Schroeder *et al.* 2004, p. 372; Wisdom *et al.*, 2011, p. 469). Future habitat loss will have greater impacts in seasonally important habitats and in smaller populations where available habitat is already limited (GSRSC 2005, p. 161). As described later in this section, many of the factors that result in habitat decline may be amplified by the effects of climate change, thereby influencing long-term population trends. The following sections examine factors that can result in or contribute to habitat decline to evaluate whether they, individually and cumulatively, threaten Gunnison sage-grouse.

*Residential Development*

In our proposed rule to list Gunnison sage-grouse as endangered (78 FR 2486, January 11, 2013), we determined habitat loss and fragmentation from residential development to be a principal threat to Gunnison sage-grouse conservation. We received numerous comments and new information from the scientific community, government agencies, and other entities related to residential development in the range of Gunnison sage-grouse. Many of the comments we received suggested that our initial analysis incorrectly applied scientific and other information related to residential development and its effects, likely overestimating its threat to the species, particularly in relation to the Gunnison Basin area.

In light of these comments, in this final rule, we reevaluate the threat of residential development to Gunnison sage-grouse. First, we evaluate scientific information related to effects of residential and infrastructural development on sage-grouse and sagebrush habitats in general, including studies specific to Gunnison sage-grouse where available. Second, we discuss human population growth and residential development trends and projections across the broader Rocky Mountain region. Finally, we assess the impact of current and future human population growth and residential development rangewide and within the

individual Gunnison sage-grouse populations. As in the proposed listing rule, much of our analysis here is focused on the current and potential future effects of residential development and habitat loss in the Gunnison Basin, since it contains the vast majority of occupied habitat and Gunnison sage-grouse.

The level of habitat loss due to residential development varies widely across the seven populations of Gunnison sage-grouse. Federal land ownership of occupied habitat in some populations reduces the potential impact of residential development, which largely occurs on private lands. Conversely, portions of occupied habitat in private ownership may predispose some sage-grouse populations to greater impacts due to higher levels of development (GSRSC 2005, p. 160). As described in the following sections, current and future human population growth rates and patterns also vary widely across the species' range. Concentration of residential growth in or near municipal and other areas outside of occupied or suitable habitat will likely avoid or minimize impacts, while rural and exurban development in occupied habitat will likely increase impacts on the species.

Other factors may also affect the impact of residential development on Gunnison sage-grouse populations or habitat. These factors include, but are not limited to, the extent and density of already developed land and existing infrastructure, changes in future patterns of residential growth, new or additional development of infrastructure (e.g., roads, powerlines, irrigation) associated with human population growth, the site-specific quality or quantity of suitable habitat on affected lands, resiliency or sensitivity of the affected sage-grouse population or group of birds, and indirect effects of development such as functional habitat loss due to weed invasion, noise disturbance, and other anthropogenic stressors. Functional habitat loss results from disturbance that changes a habitat's successional state or reduces or removes one or more habitat functions or values; presents physical barriers that preclude use of otherwise suitable areas; or introduces activities that prevent animals from using suitable habitat due to behavioral avoidance.

In evaluating the impact that residential development has on the species, we acknowledge that enrollment in the Candidate Conservation Agreement with Assurances (CCAA) for Gunnison sage-grouse, local regulatory mechanisms, Federal efforts such as the Gunnison Basin Candidate Conservation Agreement (CCA), and implementation of future conservation easements and similar conservation efforts will, upon effective implementation, likely reduce, but not necessarily preclude, impacts from residential development. However, as described in more detail in *Conservation Programs and Efforts Related to Habitat Conservation* in this Factor A analysis and in *Local Laws and Regulations* in the Factor D analysis, currently available data and information indicates that these conservation efforts do not fully address this and other threats, or are too uncertain with respect to their implementation and effectiveness for us to forecast or evaluate how all of these efforts will individually or collectively influence future residential development in the species' range, the resultant habitat decline, and related impacts on Gunnison sage-grouse.

We base our analysis of residential development primarily on the following available information: (1) Current and future human population growth rates in and around occupied habitat as an indicator of residential development; (2) total available private land area and conservation easement protection (prohibited or restricted residential development) in the context of total occupied habitat; and (3) the current and potential loss of occupied and unoccupied habitats as a result of residential development, and its direct and indirect effects on Gunnison sage-grouse individuals and populations. Broadly, we consider private lands in occupied habitat without conservation easement as being at higher risk of residential development, relative to those lands currently under conservation easement (see Other Regulatory Mechanisms: Conservation Easements in the Factor D analysis). Applying the best available information, these factors depict the intensity and immediacy of impacts due to residential development, and the exposure and anticipated response of Gunnison sage-grouse to that impact.

*Effects of Residential Development*

Residential development is likely contributing to habitat decline in parts of the range of Gunnison sage-grouse. It was estimated that 3 to 5 percent of all sage-grouse historical habitat in Colorado has been negatively affected by town and urban development (Braun 1998, p. 7). Habitat fragmentation resulting from human development patterns is especially detrimental to Gunnison sage-grouse because of their dependence on large areas of sagebrush (Patterson 1952, p. 48; Connelly *et al.* 2004, p. 4–1; Connelly *et al.* 2011a, p. 72) and more contiguous sagebrush habitats (Rogers 1964, p. 19; Wisdom *et al.* 2011, pp. 452–453). Greater sage-grouse range retraction was linked to patterns of remaining sagebrush habitat and loss due to factors including human population growth and the peripherality of populations (Aldridge *et al.* 2008). Infrastructure such as roads and power lines associated with residential development (urban and exurban) further contribute to habitat decline and other impacts such as increased risk of predation. Those specific effects are discussed elsewhere in this rule, but we recognize the cumulative effects of development and related infrastructure increase the level of impact on Gunnison sage-grouse.

Aldridge developed a landscape-scale spatial model predicting Gunnison sage-grouse nesting probability based on nesting data from the western portion of the Gunnison Basin (Aldridge *et al.* 2012, entire). The study extrapolated the model to the entire Gunnison Basin to predict the likelihood of Gunnison sage-grouse nesting throughout the area (Aldridge *et al.* 2012, p. 403). Results of the model indicated that Gunnison sage-grouse select nest sites in landscapes with a low density of residential development (<1 percent in a 1.5 km [0.9 mi] radii) (Aldridge *et al.* 2012, p. 400). Nest site selection by Gunnison sage-grouse decreased near residential developments, out to approximately 2.5 km (1.6 mi) from any given residential development (Aldridge *et al.* 2012, p. 400). Since early brood-rearing habitat is often in close proximity to nest sites (Connelly *et al.* 2000a, p. 971), impacts to nesting habitat likely also affect nearby brood-rearing habitat (however, individual females with broods may move large distances (Connelly 1982, as cited in Connelly *et al.* 2000a, p. 971)).

Similar to the above findings (and those referenced in Aldridge *et al.* 2008), based on spatial modeling of anthropogenic factors and nest and brood habitat selection, Aldridge (2005, entire) found that nesting greater-sage grouse and broods also tended to avoid urban development areas and other human developments such as roads or cropland, potentially due to predator avoidance behavior. As discussed elsewhere in this rule, there are numerous other studies indicating that the expansion of roads and other human development in occupied habitat can negatively affect sage-grouse (see, e.g., Roads below.)

The RCP (GSRSC 2005, pp. 160–161) hypothesized that residential density in excess of one housing unit per 1.3 km² (0.5 mi²) could cause declines in

Gunnison sage-grouse populations. However, because the analyses that formed the basis for this hypothesis were preliminary and did not take into account potential lags in the response of Gunnison sage-grouse to development (Wiens and Rotenberry 1985, p. 666), the threshold at which impacts are expected could be higher or lower (GSRSC 2005, p. F–3). The resulting impacts are expected to occur in nearly all seasonal habitats, including moderate to severe winter use areas, nesting and brood-rearing areas, and leks (GSRSC 2005, p. 161).

Based on preliminary analysis of radio telemetry, a CPW researcher reported that Gunnison sage-grouse do not totally avoid residences, and that some farmyards and areas with low housing density are used by individual birds (Phillips 2013, p. 8). Further information about this study was provided during the public comment period by CPW, including preliminary results of the distances for successful and unsuccessful nests to the nearest road in Gunnison and Saguache Counties (CPW 2013b, pp. 8–9). CPW has not provided us with these data, however, or a map of the reported locations. We are also uncertain as to what percentage of roads in the study may have been closed to protect nesting Gunnison sage-grouse, which may influence nest survival. Further, this preliminary analysis of CPW's telemetry data has not been peer reviewed. While this information may suggest that individual Gunnison sage-grouse within the Gunnison Basin vary in their response to development, the preliminary nature of the study doesn't allow us to draw any definite conclusions.

Residential development can cause habitat decline both by the direct loss of occupied habitat and by indirect effects (e.g., off-site or functional habitat loss, habitat degradation, loss of unoccupied habitat). We consider both in the analysis that follows, though we assess direct loss from a quantitative perspective and indirect effects more qualitatively.

*Indirect Effects of Residential Development*

As stated above, we know that indirect effects of development such as functional habitat loss due to weed invasion, noise disturbance, and other anthropogenic stressors occur, and that these indirect effects act cumulatively with the direct loss of occupied and unoccupied habitats to fragment native sagebrush habitats and increase threats, for example, through an increase in the number and types of predators (see Factor C, Predation). The impact of residential development is also increased by the additional disturbance footprint and the area of species' avoidance of other associated infrastructure such as roads, powerlines, and fences. Because we have no specific information about the level of these impacts, we have evaluated them qualitatively, but we focus the remainder of our analysis on the direct effects of residential development.

*Human Population Growth in the Rocky Mountains*

Human population growth in the rural Rocky Mountains is driven by the availability of natural amenities, recreational opportunities, aesthetically desirable settings and views, and perceived remoteness (Riebsame *et al.* 1996, p. 396, 402; Theobald *et al.* 1996, p. 408; Gosnell and Travis 2005, pp. 192–197; Mitchell *et al.* 2002, p. 6; Hansen *et al.* 2005, pp. 1899–1901). The increase in residential and commercial development associated with expanding human populations is different from historical land use patterns in the rural Rocky Mountains (Theobald 2001, p. 548). The allocation of land for resource-based activities such as agriculture and livestock production is decreasing as the relative economic importance of these activities diminishes (Theobald *et al.* 1996, p. 413; Sammons 1998, p. 32; Gosnell and Travis 2005, pp. 191–192). Currently, agribusiness occupations constitute approximately 3 percent of the total job base in Gunnison County (Colorado Department of Local Affairs (CDOLA) 2009b, p. 4). Recent conversion of farm and ranch lands to housing development has been significant in Colorado (Odell and Knight 2001, p. 1144). Many large private ranches in the Rocky Mountains, including the Gunnison Basin, are being subdivided into both high-density subdivisions and larger, scattered ranchettes with lots typically greater than 14 ha (35 ac), which encompass a large, isolated house (Riebsame *et al.* 1996, p. 399; Theobald *et al.* 1996, p. 408).

The resulting pattern of residential development in the rural Rocky Mountains is less associated with existing town sites or existing subdivisions, and is increasingly exurban in nature (Theobald *et al.* 1996, pp. 408, 415; Theobald 2001, p. 546). Exurban development is described as low-density growth outside of urban and suburban areas (Clark *et al.* 2009, p. 178; Theobald 2004, p. 140) with less than one housing unit per 1 ha (2.5 ac) (Theobald 2003, p. 1627; Theobald 2004, p. 139). Also, the pattern is one of increased residential lot size and the diffuse scattering of residential lots in previously rural areas with a premium placed on adjacency to federal lands and isolated open spaces (Riebsame *et al.* 1996, p. 396, 398; Theobald *et al.* 1996, pp. 413, 417; Theobald 2001, p. 546; Brown *et al.* 2005, p. 1858). Residential subdivision associated with exurban development causes landscape fragmentation (Gosnell and Travis 2005, p. 196) primarily through the accumulation of roads, buildings, (Theobald *et al.* 1996, p. 410; Mitchell *et al.* 2002, p. 3) and other infrastructure such as power lines (GSRSC 2005, p. 146).

*Human Population Growth Across the Range of Gunnison Sage-Grouse*

The GSRSC (2005, p. 146) identified current and potential issues affecting Gunnison sage-grouse populations, based on conservation status information, local working group plans, and similar documents. Residential development, and associated habitat loss or degradation, urban development, roads, utility corridors, and fences were all identified as current or potential issues in each of the seven populations.

Human population growth is occurring throughout much of the range of Gunnison sage-grouse. The human population in all Colorado counties within the range of Gunnison sage-grouse has increased by approximately 57.8 percent in the last several decades, since 1985 (Table 2). During the same period, human population growth in Utah counties in Gunnison sage-grouse range increased by about 24.5 percent (Table 3), less than that of Colorado counties. Residential development in the Gunnison sage-grouse range is expected to increase to meet the demand of growing human populations.

TABLE 2—HUMAN POPULATION GROWTH IN COLORADO COUNTIES IN GUNNISON SAGE-GROUSE RANGE, 1985 TO 2012

[Colorado Department of Local Affairs (CDOLA) 2012, entire]

| County | Overlap with Gunnison sage-grouse population [a] | 1985 Human population | 2012 Human population | Human population growth from 1985 to 2012 (%) |
|---|---|---|---|---|
| Gunnison | Gunnison Basin | 10,390 | 15,475 | 48.9 |
| | Cerro Summit-Cimarron-Sims Mesa | | | |
| Ouray | Cerro Summit-Cimarron-Sims Mesa | 2,130 | 4,530 | 112.7 |
| | San Miguel—Overlap with unoccupied habitat only | | | |
| San Miguel | Monticello-Dove Creek | 3,189 | 7,580 | 137.7 |
| | San Miguel | | | |
| Hinsdale | Gunnison Basin—Overlap with unoccupied habitat only | 472 | 810 | 71.6 |
| Saguache | Gunnison Basin | 4,400 | 6,304 | 43.3 |
| | Poncha Pass | | | |
| Mesa | Piñon Mesa | 88,0121 | 147,855 | 68.0 |
| Montrose | Cerro Summit-Cimarron-Sims Mesa | 24,389 | 40,732 | 67.0 |
| | San Miguel | | | |
| Montezuma | Monticello-Dove Creek—Overlap with unoccupied habitat only. | 19,283 | 25,437 | 31.9 |
| Delta | Crawford | 23,466 | 30,436 | 29.7 |
| Dolores | Monticello-Dove Creek | 1,548 | 1,994 | 28.8 |
| Chaffee | Poncha Pass | 12,349 | 18,151 | 47.0 |
| Total | | 189,637 | 299,304 | 57.8 |

[a] Based on county overlap with occupied habitat (GSRSC 2005, pp. 54–102) unless noted otherwise.

TABLE 3—HUMAN POPULATION GROWTH IN UTAH COUNTIES IN GUNNISON SAGE-GROUSE RANGE, 1985 TO 2011

[Demographic and Economic Analysis (DEA) 2011, entire]

| County | Overlap with Gunnison sage-grouse population [a] | 1985 Human population | 2011 Human population | Human population growth from 1985 to 2011 (%) |
|---|---|---|---|---|
| San Juan | Dove Creek-Monticello | 12,300 | 14,954 | 21.6 |
| Grand | Piñon Mesa—Overlap with unoccupied habitat only | 7,200 | 9,322 | 29.5 |
| Total | | 19,500 | 24,276 | 24.5 |

[a] Based on county overlap with occupied habitat (GSRSC 2005, pp. 54–102) unless noted otherwise.

These trends are expected to continue into the future (GSRSC 2005, p. 150–153). The year 2050 projected human population for the entire Gunnison River Basin (a watershed area spanning multiple counties), which encompasses the majority of Gunnison sage-grouse occupied habitat across all population areas, is expected to be 2.3 times (233 percent) greater than the 2005 population, with Mesa and Montrose Counties being the most populous in that area (Colorado Water Conservation Board (CWCB) 2009, pp. 15, 53). Across the six satellite populations, the human population in Colorado is forecasted to grow by about 60 percent, with most of this growth (and total number of persons) occurring in Mesa, Montrose, and Delta Counties (Table 4). Similar to the past, future human population growth in Utah counties in Gunnison sage-grouse range is expected to be low, approximately 14 percent by the year 2040, lower than Colorado counties. In some counties, the population growth is projected to occur mainly in urban areas. For example, in Grand County, Utah, and Mesa County, Colorado, significant growth is expected within the cities of Moab and Grand Junction, respectively. Also, we recognize that in some counties, what appears to be significant growth from the baseline may actually be minimal in terms of total persons added to the population (for example, see Hinsdale County in Table 4). In response to public comments regarding human population growth figures for Gunnison County provided in our proposed listing rule (78 FR 2486, January 11, 2013), we discuss future human population growth for Gunnison County in detail in the following section.

TABLE 4—HUMAN POPULATION FORECAST IN COLORADO COUNTIES IN GUNNISON SAGE-GROUSE RANGE, 2013 TO 2040

[CDOLA 2011, entire]

| County | Overlap with Gunnison sage-grouse population [a] | 2013 (current) human population | 2040 human population forecast | Human population growth from 2013 to 2040 (%) |
|---|---|---|---|---|
| Gunnison | Gunnison Basin | 15,982 | 22,107 | 38.3 |

TABLE 4—HUMAN POPULATION FORECAST IN COLORADO COUNTIES IN GUNNISON SAGE-GROUSE RANGE, 2013 TO 2040—Continued

[CDOLA 2011, entire]

| County | Overlap with Gunnison sage-grouse population[a] | 2013 (current) human population | 2040 human population forecast | Human population growth from 2013 to 2040 (%) |
|---|---|---|---|---|
| Ouray | Cerro Summit-Cimarron-Sims Mesa. Cerro Summit-Cimarron-Sims Mesa San Miguel—Overlap with unoccupied habitat only. | 4,662 | 6,108 | 31.0 |
| San Miguel | San Miguel Monticello-Dove Creek. | 8,148 | 16,426 | 101.6 |
| Hinsdale | Gunnison Basin—Overlap with unoccupied habitat only | 853 | 1,378 | 61.6 |
| Saguache | Gunnison Basin Poncha Pass. | 6,478 | 9,133 | 41.0 |
| Mesa | Piñon Mesa | 150,123 | 226,263 | 50.7 |
| Montrose | Cerro Summit-Cimarron-Sims Mesa San Miguel. | 41,751 | 75,048 | 79.8 |
| Montezuma | Monticello-Dove Creek-Overlap with unoccupied habitat only. | 26,481 | 42,947 | 62.2 |
| Delta | Crawford | 31,741 | 59,142 | 86.3 |
| Dolores | Monticello-Dove Creek | 2,097 | 3,313 | 57.9 |
| Chaffee | Poncha Pass | 18,726 | 30,282 | 61.7 |
| Rangewide Total | | 307,042 | 492,147 | 60.3 |

[a] Based on county overlap with occupied habitat (GSRSC 2005, pp. 54–102) unless noted otherwise.

TABLE 5—HUMAN POPULATION FORECAST IN UTAH COUNTIES IN GUNNISON SAGE-GROUSE RANGE, 2013 TO 2040

[DEA 2012, entire].

| County | Overlap with Gunnison sage-grouse population[a] | 2010 human population | 2040 human population forecast | Human population growth from 2013 to 2040 (%) |
|---|---|---|---|---|
| San Juan | Dove Creek-Monticello | 14,746 | 15,191 | 3.0 |
| Grand | Piñon Mesa—Overlap with unoccupied habitat only | 9,225 | 12,147 | 31.7 |
| Rangewide Total | | 23,971 | 27,338 | 14.0 |

[a] Based on county overlap with occupied habitat (GSRSC 2005, pp. 54–102) unless noted otherwise.

In addition to past and projected human population growth, the impact of residential development on Gunnison sage-grouse depends on total private land area in occupied habitat available for development. Substantial Federal land ownership of occupied habitat in the Crawford, Gunnison Basin, Poncha Pass, and portions of the San Miguel Basin populations helps reduce the threat of residential development in these areas. Conversely, large portions of occupied habitat in the Dove Creek-Monticello, Piñon Mesa, Cerro Summit-Cimarron-Sims Mesa, and some portions of the San Miguel populations are in private ownership, making those areas

more vulnerable to residential development and associated impacts (GSRSC 2005, p. 160). Within all Gunnison sage-grouse populations, the area of private land under conservation easement (which generally prohibits subdivision and restricts other residential or agricultural development to defined areas) will help ameliorate impacts from human population growth and residential development that might otherwise occur (see Factor D discussion, Other Regulatory Mechanisms: Conservation Easements).

Below, Table 6 synthesizes future human population growth rates in Gunnison sage-grouse population areas,

total private land area, and conservation easement protection in occupied habitats. As noted above, we focused our analysis on the potential for direct habitat loss in occupied habitats, where negative impacts are more likely to occur. We qualitatively ranked past and forecasted human population growth for area counties in Colorado (based on Tables 2 and 4) and Utah (based on Tables 3 and 5), considering both percent growth and total number of persons. Below, we apply information from Table 6 to determine the impact of residential development to individual Gunnison sage-grouse populations and to the species rangewide.

TABLE 6—HUMAN POPULATION GROWTH RATES AND CONSERVATION EASEMENTS IN GUNNISON SAGE-GROUSE OCCUPIED HABITAT

| Gunnison sage-grouse population | Human population growth rates [a] | | Total occupied habitat (acres) | Private land in occupied habitat | | Private land in occupied habitat under conservation easement [b] | | Private land in occupied habitat not under conservation easement | | Percentage of total occupied habitat at higher risk of residential development [c] (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| | Past: 1985 to 2012 | Forecast: 2013 to 2040 | | Acres | % | Acres | Percentage of private land in occupied habitat (%) | Acres | Percentage of private land in occupied habitat (%) | |
| San Miguel Basin ...... | M | M | 101,750 | 49,492 | 49 | 6,961 | 14.1 | 42,531 | 85.9 | 41.8 |
| Monticello-Dove Creek ..................... | L | L | 112,543 | 100,773 | 90 | 5,482 | 5.4 | 95,291 | 84.6 | 84.7 |
| Piñon Mesa ............... | H | H | 44,678 | 31,313 | 70 | 15,317 | 48.9 | 15,996 | 51.1 | 35.8 |
| Cerro Summit-Cimarron-Sims Mesa ... | H | H | 37,161 | 28,218 | 76 | 3,484 | 12.3 | 24,734 | 87.7 | 66.6 |
| Crawford ................... | L | M | 35,015 | 8,481 | 24 | 2,005 | 23.6 | 6,476 | 76.4 | 18.5 |
| Poncha Pass ............. | L | L | 27,747 | 7,893 | 28 | 0 | 0.0 | 7,893 | 100.0 | 28.4 |
| Gunnison Basin ......... | L | L | 592,168 | 178,855 | 30 | 40,769 | 22.8 | 138,086 | 77.2 | 23.3 |
| Rangewide Total | ............... | ............... | 951,062 | 405,025 | 43 | 74,018 | 18.3 | 331,007 | 81.7 | 34.8 |

[a] Based on a qualitative assessment of past and forecast human population growth for area counties in Colorado (Tables 2 and 4) and Utah (Tables 3 and 5), considering percent growth and total number of persons: H—High; M—Moderate; L—Low.
[b] Lohr and Gray (2013, entire).
[c] Calculated by dividing acres of "private land in occupied habitat not under conservation easement" by "total occupied habitat."

Based on the factors presented in Table 6 above, residential development is likely to have the greatest impact on the San Miguel and Cerro Summit-Cimarron-Sims Mesa populations of Gunnison sage-grouse. In the San Miguel Basin population, moderate human population growth has occurred and is projected through the year 2040; and private land comprises about 49 percent of total occupied habitat, of which 14 percent is under conservation easement. This means that approximately 42 percent of total occupied habitat in the San Miguel population area is at higher risk of residential development (Table 6). The rate of residential development in the San Miguel Basin population area increased between 2005 and 2008 but slowed in 2009 (CDOW 2009b, p. 135). However, a 429-ha (1,057-ac) parcel north of Miramonte Reservoir is currently being developed. The CPW reports that potential impacts to Gunnison sage-grouse resulting from this development may be reduced by placing a portion of the property into a conservation easement and the relocation of a proposed major road to avoid occupied habitat (CDOW 2009b, p. 136). A downward trend in the San Miguel population over the last decade or more (Figure 3) indicates it may not have the resilience (see Small Population Size and Structure) to sustain substantial habitat losses. Therefore, residential development is a current and future threat to Gunnison sage-grouse in the San Miguel Basin population.

Likewise, in the Cerro Summit-Cimarron-Sims Mesa area, considerable human population growth has occurred and is forecast through the year 2040; and private land comprises about 76 percent of total occupied habitat, of which 12 percent is under conservation easement. This means that approximately 67 percent of total occupied habitat in the Cerro Summit-Cimarron-Sims Mesa population area is at higher risk of residential development (Table 6). Scattered residential development has recently occurred along the periphery of occupied habitat in the Cerro Summit-Cimarron-Sims Mesa population (CDOW 2009b, p. 45). Already limited habitat (Table 6) and low population numbers (Figure 3) indicate the Cerro Summit-Cimarron-Sims Mesa population may not have the resilience (see Small Population Size and Structure) to sustain substantial habitat losses. Therefore, residential development is a current and future threat to Gunnison sage-grouse in the Cerro Summit-Cimarron-Sims Mesa population.

Although past and future human population growth in the Poncha Pass population is estimated to be low, and the proportion of land at higher risk of residential development is low (about 28 percent) (see Table 6), other information indicates that residential development is nevertheless a threat to the Poncha Pass population. Residential subdivision continues to be concentrated in the northern part of the Poncha Pass population area where Gunnison sage-grouse occur most, and CPW considers this to be the highest priority threat to this population (CDOW 2009b, p. 124). As noted earlier, where habitat is already severely limited, or where sage-grouse populations are small, any loss of habitat may impact those populations (GSRSC 2005, p. 161). Due to the pattern of residential development, already limited sagebrush habitat in the area (about 20,000 acres), and critically low population numbers (zero birds counted in 2013; Figure 3), residential development is a current and future threat to the Poncha Pass population of Gunnison sage-grouse.

For the remaining four Gunnison sage-grouse populations, we find that current residential development may impact individual birds or areas of habitat, but is a threat of low magnitude at the population level at the present time. In these areas, past or projected human population growth rates are very low, indicating that residential development will be limited (Monticello-Dove Creek); or private land available for residential development (considering Federal land ownership and conservation easement protection) is limited (Piñon Mesa and Crawford). For these two populations, we also believe that the threat of residential development will remain low in the future. With respect to the Gunnison Basin population, however, as described in more detail below, over half of the 23.3 percent of total occupied habitat that is at higher risk of residential development (see Table 6) is high priority habitat, because it includes seasonally important habitat for the species. The potential loss or degradation of even relatively smaller portions of habitat due to future residential development is a concern, especially if important seasonal habitats are affected, so we believe that threats related to residential development will be higher in the future in the Gunnison

Basin (see Reevaluation of Residential Development in the Gunnison Basin).

The analysis above is focused on the threat of residential development in occupied habitats for Gunnison sage-grouse. However, it is reasonable to assume that residential development will also occur in important but currently unoccupied habitats. These habitats may now or in the future provide dispersal corridors for birds between occupied habitat, subpopulations, or populations; or provide areas for range migration or expansion. The threat of habitat loss or degradation due to residential development in the San Miguel and Cerro Summit-Cimarron-Sims Mesa populations will likely reduce habitat connectivity between satellite populations and potential connectivity between the Gunnison Basin population and satellite populations to the west. The GSRSC (2005, p. 167) identified habitat areas in the San Miguel population that provide potential linkages with the Dove Creek-Monticello population to the west, Piñon Mesa population to the north, and Cerro Summit-Cimarron-Sims Mesa population to the east. Potential linkages in the Cerro Summit-Cimarron-Sims Mesa population were also identified that may provide connectivity with the San Miguel population to the west, Crawford population to the northeast, and Gunnison Basin population to the east. Genetic evidence indicates maintaining or enhancing habitat connectivity between populations is important for Gunnison sage-grouse survival into the future (See detailed discussion in Factor E analysis, Small Population Size and Structure).

*Reevaluation of Residential Development in the Gunnison Basin Population Area*

In our proposed rule to list Gunnison sage-grouse as endangered, we concluded that residential development was a principal threat to the species as a whole. That analysis was focused on the potential impacts of residential development in the Gunnison Basin population area, since the vast majority of occupied habitat and birds occur there. As noted above, based on numerous public comments and new information we received on the proposed rule, we have reevaluated the threat of residential development to the species, both in the individual populations and rangewide. In this section, we describe in greater detail the basis for our conclusions regarding the effects of residential development, both at the present time and in the foreseeable future, on individual birds

or areas of habitat in the Gunnison Basin population area.

*Current Impacts of Residential Development*

Approximately 239,640 ha (592,168 ac) of occupied habitat occur in the Gunnison Basin. Of this, approximately 161,336 ha (398,669 ac) (67 percent) are on Federal lands; 5,906 ha (14,595 ac) (2 percent) are State land; and 72,380 ha (178,855 ac) (30 percent) are private land (Table 1). In this rule, our evaluation of residential development in the Gunnison Basin is based largely on human demographic information for Gunnison County, where nearly three-quarters (approximately 71 percent) of the Gunnison Basin population of Gunnison sage-grouse occurs (the remainder occurs in Saguache County). Based on the available information, we expect that the rate of future residential development in the Saguache County portion of the Gunnison Basin will be similar to that of Gunnison County. Approximately 30 percent of Gunnison sage-grouse occupied habitat in the Gunnison Basin occurs on private lands.

When evaluating Gunnison County overall (including both Gunnison sage-grouse habitat and non-habitat areas), our analysis found that the cumulative number of human developments (including housing, infrastructure, and improvements to existing development) increased considerably since the early 1970s. The number of new developments averaged approximately 70 per year from the late 1800s to 1969, increasing to approximately 450 per year from 1970 to 2008 (USFWS 2010a, pp. 1–5). Furthermore, there has been an increasing trend toward development away from major roadways (primary and secondary paved roads) into areas of occupied Gunnison sage-grouse habitat that had previously undergone very limited development (USFWS 2010b, p. 7). Between 1889 and 1968, approximately 51 human developments were located more than 1.6 km (1 mi) from a major road in currently occupied Gunnison sage-grouse habitat. Between 1969 and 2008, this number increased to approximately 476 developments (USFWS 2010b, p. 7).

However, the majority of residential development in Gunnison County is outside of Gunnison-sage grouse occupied habitat. About 26 percent of housing units in Gunnison County occur within Gunnison sage-grouse occupied habitat (Gunnison County 2013a, Appendix G, p. 9). Although significant development has occurred in the past, residential growth in Gunnison County has been influenced heavily by development in the East River Valley

near Crested Butte, outside of occupied habitat for Gunnison sage-grouse (Gunnison County 2013a, pp. 69–70). Furthermore, the majority of existing development in the lower Gunnison Basin is concentrated near the City of Gunnison, outside of occupied habitat or in more marginalized habitat (Gunnison County 2013c, p. 5). Gunnison County building permit data indicate that since 1980, over 70 percent of all county building permits have been located within subdivisions that are already served by water and sewer services (urban service areas). If building permits for the City of Gunnison are included, over 80 percent of all new development since 1980 has occurred in urban service areas (Gunnison County 2013a, p. 68). Urban service areas (utilities, trash, etc.) in Gunnison County may include small areas of Gunnison sage-grouse habitat, but are generally less suitable than more rural areas; therefore, human development and activities in such areas are likely to have less impact to Gunnison sage-grouse.

Available data nonetheless indicates human developments in occupied Gunnison sage-grouse habitat in Gunnison County occur and have increased over time. We conducted a GIS analysis of parcel ownership data to evaluate the spatial and temporal pattern of past human development (including infrastructure) within occupied Gunnison sage-grouse habitat in the Gunnison Basin population area. Our analyses were limited to the portion of occupied habitat in Gunnison County because parcel data was available only for Gunnison County and not Saguache County. Approximately 18 percent of the land area within the range of Gunnison sage-grouse in Gunnison County has a residential density greater than one housing unit per 1.3 km² (0.5 mi²) (USFWS 2010b, p. 8). The GSRSC (2005, pp. 160–161) hypothesized that residential density in excess of one housing unit per 1.3 km² (0.5 mi²) could cause declines in Gunnison sage-grouse populations, though there are limitations with this assumption (see discussion above). Based on this estimate, current human residential densities in the Gunnison Basin population area are such that they may be having an impact on Gunnison sage-grouse in at least 18 percent of the occupied area.

In our proposed rule to list Gunnison sage-grouse as endangered, we also applied a 1.5 km (.93 mi) "zone of influence" to residential development in Gunnison County (based on Aldridge *et al.* 2012, p. 400), in an effort to evaluate how the current level of

residential development may be impacting habitat and limiting the Gunnison Basin population of sage-grouse (for more details, see 78 FR 2486, January 11, 2013). That analysis led us to conclude that within occupied Gunnison sage-grouse habitat in Gunnison County, 49 percent of the land area within the range of Gunnison sage-grouse had at least one housing unit within a radius of 1.5 km (0.9 mi). We found that this level of residential development strongly decreased the likelihood of Gunnison sage-grouse using these areas as nesting habitat. Based on this analysis, we determined that residential development, particularly in the Gunnison Basin, was currently a principal threat to the species. This conclusion was critical to our proposal to list the species as endangered.

Since the listing proposal, we have received significant comments and new information regarding this conclusion, and particularly our application of the Aldridge *et al.* 2012 study, to find that human development is currently negatively affecting the species' utilization of 49 percent of occupied habitat in Gunnison County. As noted by various commentators, this conclusion is at odds with the current status of the Gunnison Basin population, which, as described above, is and has been relatively stable for the last 19 years, based on lek count data. If residential development is currently negatively impacting such a significant percentage of occupied habitat in the Gunnison Basin population, we would

expect to see some evidence of this in these population trends. This is so even recognizing that, as a consequence of their site fidelity to seasonal habitats (Lyon and Anderson 2003, p. 489), measurable population effects may lag behind negative changes in habitat (Harju *et al.* 2010, entire; Wiens and Rotenberry 1985, p. 666). As a result, we believe that our use of Aldridge *et. al* 2012, as described above, significantly overestimated the impact that current levels of residential development in Gunnison County are having on the species.

Based on this reevaluation, we conclude that current development in the Gunnison Basin population area is a threat of low magnitude to the persistence of this Gunnison sage-grouse population. Despite past residential development in the Gunnison Basin, the Gunnison Basin population of Gunnison sage-grouse has remained relatively stable over the past 19 years, based on lek count data and population estimates (Figure 2). The Gunnison Basin population is currently large and relatively stable and appears to be resilient (see further discussion under Small Population Size and Structure section). Therefore, this population has been able to sustain the negative effects of development at current levels.

*Future Impacts of Residential Development*

Residential development in occupied habitat in the Gunnison Basin will increase in the future, which means the impacts from such development will

also increase. Based on new information received since the proposed rule, however, we believe that the rate of increase may be less than what we determined in the proposed rule. Projections for human population growth in Gunnison County range from about 0.75 percent to 2.15 percent annually, depending on the source (Table 7). The current (2013) estimated human population of Gunnison County is 15,982 (CDOLA 2011, entire). By 2050, the human population in Gunnison County is projected to be 20,877 to 37,828 people (Table 7). In our proposed rule to list Gunnison sage-grouse as endangered (78 FR 2486, January 11, 2013), we applied the Colorado Water Conservation Board's (CWCB) middle-growth scenario of 1.7 percent annual growth for Gunnison County (CWCB 2009, p. 53). We now recognize this figure may overestimate actual growth in the area due to that study's broader geographic focus (Colorado watersheds) and purpose (to forecast water use and demands). The Colorado State Demographer (CDOLA 2011, entire) estimated an average annual growth rate of 1.2 percent for Gunnison County, with approximately 22,107 people by the year 2040, or approximately 38 percent greater than the 2013 population. Coincidentally, these projections are near the average of the range of projected growth rates from the various sources (Table 7), and represent a reliable estimate of expected future growth in the Gunnison Basin area.

TABLE 7—HUMAN POPULATION PROJECTIONS FOR GUNNISON COUNTY

| Source | Average annual growth rate | Population projection | Source/citation |
|---|---|---|---|
| Colorado Water Conservation Board ... | 1.06%—low scenario ............................ <br> 1.70%—middle scenario ...................... <br> 2.15%—high scenario .......................... | By the year 2050: ............................... <br> 23,314—low scenario <br> 31,086—middle scenario <br> 37,828—high scenario | CWCB 2009, p. 53. |
| Colorado State Demographer ............... | 1.2% ..................................................... | By the year 2040: ............................... <br> 22,107 | CDOLA 2011, entire. |
| Gunnison County ................................... | 1% ........................................................ | By the year 2050: ............................... <br> 20,877 | Gunnison County 2013a, p. 69. |
| Gunnison City Council .......................... | 0.75% ................................................... | n/a ....................................................... | City of Gunnison 2013, p. 4. |

Future population growth in the Saguache County portion of the Gunnison Basin is projected to be 1.5 percent per year, with an estimated population of 9,133 by the year 2040, or approximately 41 percent greater than the 2013 population (Table 4 above).

All population projections from Table 4 and Table 7 above indicate the density and distribution of human residences in the Gunnison Basin will increase in the

future. The precise rate of human population growth in Gunnison or Saguache Counties, however, is not the determinative factor in assessing whether the Gunnison Basin population of Gunnison sage-grouse will persist into the future. As discussed below, future residential development in occupied habitat in the Gunnison Basin is constrained by the relatively limited area of developable private lands. In

addition, if future residential development follows past patterns, much of this future development in Gunnison County will occur outside of Gunnison sage-grouse habitat and within existing urban or otherwise developed areas. Nonetheless, even under this development pattern, approximately 26 percent of future residential development in Gunnison County would occur in occupied

Gunnison sage-grouse habitat (Gunnison County 2013a, Appendix G, p. 9).

Of the 239,640 ha (592,168 ac) of occupied habitat in the Gunnison Basin, approximately 72,380 ha (178,855 ac) (30 percent) are on private lands (Table 6). Approximately 16,499 ha (40,769 ac) (22.8 percent) of these private lands, or 6.9 percent of occupied habitat in the Gunnison Basin population area, are currently under conservation easement where development is prohibited or restricted to protect conservation values, including values for Gunnison sage-grouse on some properties (Gunnison County 2013b, p. 21; Lohr and Gray 2013, p. 54). (Refer to Factor D analysis, Other Regulatory Mechanisms: Conservation Easements for a detailed discussion.) Approximately 55,881 ha (138,086ac) (77.2 percent) of private lands are not currently under conservation easement and, thus, are at higher risk of residential development. This constitutes 23.3 percent of the entire occupied range in the Gunnison Basin. Therefore, about 23.3 percent of the 239,640 ha (592,168 ac) of total occupied habitat in the Gunnison Basin is at higher risk of residential development (relative to lands not protected under conservation easement).

Over half of this at risk occupied habitat currently consists of high priority habitat for the species. Based on the habitat recommendations in the RCP, the Gunnison Basin Sage-Grouse Strategic Committee developed a Habitat Prioritization Tool (Gunnison County 2013a, Appendix G; see detailed description under Local Laws and Regulations, Gunnison County), which identifies sage-grouse habitat and then discounts the value of the habitat based on distance to structures, roads, and power lines. The Habitat Prioritization Tool determined that, of private lands in occupied habitat in the Gunnison Basin not under conservation easement, over half a Tier 1 habitat, or high value habitat (e.g., lekking, nesting, brood-rearing, or wintering habitat); the remaining habitat is classified as Tier 2, or lower value habitat (Cochran 2013, pers. comm.) that is closer to structures, roads, and power lines. This tool does not quantify or map unoccupied habitats. Based on this figure, of the 55,881 ha (138,086 ac) or 23.3 percent of total occupied habitat in the Gunnison Basin at higher risk of residential development (as discussed below), 28,033 ha (69,270 ac) of those are Tier 1, or priority habitat.

The GSRSC (2005, p. 161) cautioned that, in the Gunnison Basin population, any habitat loss from residential development should be avoided or mitigated because of this population's high conservation importance. As noted earlier, the GSRSC (2005, p.161) suggested that the greatest impacts from permanent habitat loss are expected in seasonal habitats most important to Gunnison sage-grouse, such as areas used during moderate to severe winters or in lekking, nesting, or brood-rearing habitats. These areas are quantified within the Tier 1 habitats of the Habitat Prioritization Tool described above, and constitute approximately 69,000 acres. Forty-five percent of the leks in the Gunnison Basin population area occur on private lands (see discussion above in the *Current Distribution and Population Estimates and Trends* section), and any impacts within 4 miles of these leks could affect nesting and brood-rearing activities.

Additional residential development in those high value habitats could result in increased impacts to Gunnison sage-grouse in the Gunnison Basin. Lesser impacts would be expected in Tier 2 habitats, and from indirect effects of development in unoccupied habitats. These impacts, particularly to the seasonally important habitats, are a concern, and we expect impacts, and the level of threat posed by residential development, to increase in the future, although at a somewhat lower rate than what we described in the proposed listing rule.

Although exurban development will likely increase as in other parts of the rural west, if past residential growth patterns in Gunnison County continue, we can expect the majority of residential development to occur outside of occupied habitat and near municipalities and existing infrastructure. Nevertheless, under these past residential growth patterns, we would still expect approximately 26 percent of residential growth in the future to occur in occupied habitat.

While we recognize that current conservation efforts, including conservation easements, enforcement of current county land use regulations, and CCAA implementation are likely to help reduce (but not necessarily preclude) the effects of past and future residential development on Gunnison sage-grouse and its habitat in the Gunnison Basin, we find that such efforts will not fully address this and other threats (see Factor A, Conservation Programs and Efforts Related to Habitat Conservation, and Factor D, Regulatory Mechanisms). In addition, future residential development of private lands will likely demand new or additional infrastructure on adjacent properties such as Federally administered lands, which may cause additional impacts to Gunnison sage-grouse habitat (see Cumulative Effects From Factors A through E). Although we cannot forecast what those impacts might look like, we anticipate that such impacts on Federal lands will be addressed, to some degree, through Federal programs and policies such as the Gunnison Basin CCA (see Conservation Programs and Efforts Related to Habitat Conservation in this Factor A analysis).

In summary, the threat to Gunnison sage-grouse as a result of current residential development is less than we previously thought as discussed above. While individual birds may be affected, current residential development is a threat of low magnitude to Gunnison Basin birds at the population level. Approximately 23.3 percent of the 239,640 ha (592,168 ac) of total occupied habitat in the Gunnison Basin is at higher risk of development (i.e., are not protected by conservation easement) in the future, relative to lands where development is precluded, prohibited, or restricted (under State or Federal ownership or conservation easement). Approximately 50 percent of these developable lands are in priority habitats, and their potential loss or degradation in the future would be a concern for the Gunnison Basin population. In addition, indirect and cumulative effects of infrastructure associated with residential development will increase the impacts of future residential development. Based on these reasons, we find that residential development is currently a threat of low magnitude to the Gunnison Basin population of Gunnison sage-grouse, but that it is an increasing threat in the future.

*Summary of Residential Development*

Residential development is likely contributing to habitat loss and degradation throughout the range of Gunnison sage-grouse. Habitat fragmentation resulting from human development patterns is especially detrimental to Gunnison sage-grouse because of their dependence on large areas of sagebrush (Patterson 1952, p. 48; Connelly *et al.* 2004, p. 4–1; Connelly *et al.* 2011a, p. 72) and more contiguous sagebrush habitats (Rogers 1964, p. 19; Wisdom *et al.* 2011, pp. 452–453). Infrastructure such as roads and power lines associated with residential development (urban and exurban) likely further contribute to habitat loss and other impacts such as increased risk of predation, particularly in the satellite populations. Residential development, and associated habitat loss or degradation, urban development, roads, utility corridors, and fences have all been identified as current or

potential issues in each of the seven populations (GSRSC 2005, p. 146). Increasing rural and exurban development in sagebrush habitats will continue impacting Gunnison sage-grouse.

Human population growth is occurring throughout much of the range of Gunnison sage-grouse. The human population in all Colorado counties within the range of Gunnison sage-grouse has increased by approximately 57.8 percent in the last several decades, since 1985 (Table 2). During the same period, human population growth in Utah counties in Gunnison sage-grouse range increased by about 24.5 percent (Table 3), much less than that of Colorado counties. Population increases are expected to continue into the future (GSRSC 2005, p. 150–153). Across the six satellite populations, the human population in Colorado is forecasted to grow by about 60 percent, with most of this growth (and total number of persons) occurring in Mesa, Montrose, and Delta Counties (Table 4). Residential development is expected to increase to meet the demand of these growing human populations. Projected human population growth rates in the Gunnison Basin population are considered low relative to other populations. However, residential development in the Gunnison Basin, including development in occupied habitat, is expected to continue into the future and potentially impact the species and its habitat.

Our analysis was focused on the direct loss of occupied habitat due to residential development, in which negative impacts on the species are more quantifiable. Indirect effects (e.g., off-site or functional habitat loss, loss of unoccupied habitat) of habitat decline due to residential development are also expected, however, and are evaluated qualitatively in the above analysis. Residential growth rates and patterns vary widely across the range of Gunnison sage-grouse. Based on these considerations, our framework for assessing the threat of residential development was based primarily on human population growth rates (current and projected), the availability of developable private lands, the ameliorating effects of conservation efforts, and other information (see Table 6 and discussions above). Our evaluation found that residential development is a substantial threat to the San Miguel, Cerro Summit-Cimarron-Sims Mesa, and Poncha Pass populations of Gunnison sage-grouse, both now and in the future. Based on the best available information, current residential development in the

remaining Gunnison sage-grouse populations may impact individual birds or areas of habitat, but is currently a threat of low magnitude at the population level. Residential development will continue into the future in these areas and, as discussed above, such development in areas of important seasonal habitats would be a concern in these populations.

Rangewide, approximately 34.8 percent of occupied Gunnison sage-grouse habitat is at higher risk of residential development (Table 6), relative to lands not under conservation easement or Federal or State ownership. As described above, human population growth is occurring throughout much of the range of Gunnison sage-grouse, although the rate and pattern of residential development varies widely by sage-grouse population. These trends are expected to continue into the future, resulting in further residential development, associated infrastructure, and habitat loss in parts of the species' range.

The threat of habitat loss or degradation due to residential development in the San Miguel and Cerro Summit-Cimarron-Sims Mesa populations will likely reduce habitat connectivity between satellite populations and, potential connectivity between the Gunnison Basin population and satellite populations to the west. The GSRSC (2005, p. 167) identified habitat areas in the San Miguel population that provide potential linkages with the Dove Creek-Monticello population to the west, Piñon Mesa population to the north, and Cerro Summit-Cimarron-Sims Mesa population to the east. Potential linkages in the Cerro Summit-Cimarron-Sims Mesa population were also identified that may provide connectivity with the San Miguel population to the west, Crawford population to the northeast, and Gunnison Basin population to the east. Genetic evidence indicates maintaining or enhancing habitat connectivity between populations is important for Gunnison sage-grouse survival into the future (See discussion in Factor E analysis, Small Population Size and Structure). Based on the above information, we find residential development to be a threat to Gunnison sage-grouse rangewide, both now and into the future.

*Roads*

Impacts to Gunnison sage-grouse from roads may include direct habitat loss, direct mortality, barriers to migration corridors or seasonal habitats, facilitation of predation and spread of invasive vegetative species, and other

indirect influences such as noise (Forman and Alexander 1998, pp. 207–231). Greater sage-grouse mortality resulting from collisions with vehicles does occur, but mortalities are typically not monitored or recorded (Patterson 1952, p. 81). Therefore, it is difficult to determine the influence of road-related mortalities on sage-grouse populations. We have no information on the frequency or number of mortalities of Gunnison sage-grouse due to roads or vehicles, but because of similarities in their habitat and habitat use, we expect effects to be similar to those observed in greater sage-grouse (described below). Roads have been shown to fragment Gunnison sage-grouse habitat, with road avoidance by birds presumably to limit exposure to human activity and predation (Oyler-McCance *et al.* 2001, p. 330). The probability of Gunnison sage-grouse habitat occupancy (presence based on pellet surveys or sage-grouse observation) was positively correlated with distance from roads and habitat patch size (Oyler-McCance *et al.* 1999, p. 29).

The presence of roads increases human access and resulting disturbance effects in remote areas (Forman and Alexander 1998, p. 221; Forman 2000, p. 35; Connelly *et al.* 2004, pp. 7–6 to 7–25). In addition, roads can provide corridors for predators to move into previously unoccupied areas. Some mammalian species known to prey on sage-grouse, such as red fox *(Vulpes vulpes),* raccoons *(Procyon lotor),* and striped skunks *(Mephitis mephitis),* have greatly increased their distribution by dispersing along roads (Forman and Alexander 1998, p. 212; Forman 2000, p. 33; Frey and Conover 2006, pp. 1114–1115). Corvids (Family Corvidae: Crows, ravens, magpies, etc.) also use linear features such as primary and secondary roads as travel routes (Bui 2009, p. 31), expanding their movements into previously unused regions (Knight and Kawashima 1993, p. 268; Connelly *et al.* 2004, p. 12–3). Corvids are significant sage-grouse nest predators and were responsible for more than 50 percent of nest predations in Nevada (Coates 2007, pp. 26–30). See Factor C below for further discussion of predation.

The expansion of road networks also contributes to exotic plant invasions via introduced road fill, vehicle transport, and road maintenance activities (Forman and Alexander 1998, p. 210; Forman 2000, p. 32; Gelbard and Belnap 2003, p. 426; Knick *et al.* 2003, p. 619; Connelly *et al.* 2004, p. 7–25). Invasive species are not limited to roadsides, but also encroach into surrounding habitats (Forman and Alexander 1998, p. 210; Forman 2000, p. 33; Gelbard and Belnap

2003, p. 427). Upgrading unpaved four-wheel-drive roads to paved roads resulted in increased cover of invasive plant species within the interior of adjacent plant communities (Gelbard and Belnap 2003, p. 426). This effect was associated with road construction and maintenance activities and vehicle traffic, and not with differences in site characteristics. The incursion of invasive and exotic plants into native sagebrush systems can negatively affect Gunnison sage-grouse through habitat losses and conversions (see Invasive Plants).

Gunnison sage-grouse may avoid road areas because of noise, visual disturbance, pollutants, and predators moving along a road, which further reduces the amount of available habitat. An unpublished study by Western State Colorado University and CPW in the Gunnison Basin found that anthropogenic noise was significantly higher at leks closer to roads and human activity centers than leks farther from those sources (Piquette et al. 2013, pp. 7–8). Leks with higher noise levels were associated with lower Gunnison sage-grouse male counts and attendance (Piquette et al. 2013, pp. 10–11). The landscape-scale spatial model predicting Gunnison sage-grouse nest site selection showed strong avoidance of areas with high road densities of roads classed 1 through 4 (primary paved highways through primitive roads with 2-wheel drive sedan clearance) within 6.4 km (4 mi) of nest sites (Aldridge et al. 2012 p. 397). Nest sites also decreased with increased proximity to primary and secondary paved highways (roads classes 1 and 2) (Aldridge et al. 2012, p. 401). Male greater sage-grouse lek attendance was shown to decline within 3 km (1.9 mi) of a deep seam natural gas well haul road where traffic volume exceeded one vehicle per day (Holloran 2005, p. 40). Surface coal mining activity and associated vehicle traffic on haul roads in the North Park of Colorado was correlated with a 94 percent reduction in the number of displaying greater sage-grouse males over a 5-year period on leks situated within 2 km (1.24 mi) of roads (Remington and Braun 1991). Peak male greater sage-grouse attendance at leks experimentally treated with noise from natural gas drilling and roads decreased 29 percent and 73 percent, respectively, relative to paired control (no treatment) areas (Blickley et al. 2012, p. 467). Male sage-grouse depend on acoustical signals to attract females to leks (Gibson and Bradbury 1985, p. 82; Gratson 1993, p. 692). If noise from roads interferes with mating displays, and thereby female attendance, younger males will not be drawn to the lek and eventually leks will become inactive (Amstrup and Phillips 1977, p. 26; Braun 1986, pp. 229–230).

In a study on the Pinedale Anticline in Wyoming, greater sage-grouse hens that bred on leks within 3 km (1.9 mi) of roads associated with oil and gas development traveled twice as far to nest as did hens that bred on leks greater than 3 km (1.9 mi) from roads. Nest initiation rates for hens bred on leks close to roads also were lower (65 versus 89 percent), affecting population recruitment (33 versus 44 percent) (Lyon 2000, p. 33; Lyon and Anderson 2003, pp. 489–490). Roads may be the primary impact of oil and gas development to sage-grouse, due to their persistence and continued use even after drilling and production have ceased (Lyon and Anderson 2003, p. 490). Lek abandonment patterns suggested that daily vehicular traffic along road networks for oil wells can impact greater sage-grouse breeding activities (Braun et al. 2002, p. 5). Similar data are not available for Gunnison sage-grouse, so we do not know how the species responds to roads and traffic associated with energy development, though we expect effects would be similar to those observed in greater sage-grouse.

One study showed that road density was not an important factor affecting greater sage-grouse persistence or rangewide patterns in sage-grouse extirpation (Aldridge et al. 2008, p. 992). However, the authors did not consider the intensity of human use of roads in their modeling efforts. They also indicated that their analyses may have been influenced by inaccuracies in spatial road data sets, particularly for secondary roads (Aldridge et al. 2008, p. 992). Spatial modeling of historic range where greater and Gunnison sage-grouse have been extirpated had a 25 percent higher density of roads than occupied range (Wisdom et al. 2011, p. 467). Wisdom et al.'s (2011, entire) greater and Gunnison sage-grouse rangewide analysis supports the findings of numerous local studies showing that roads can have both direct and indirect impacts on sage-grouse distribution and individual fitness (reproduction and survival) (e.g., Lyon and Anderson 2003 p. 490, Aldridge and Boyce 2007, p. 520).

Recreational activities including off-highway vehicles (OHV), all-terrain vehicles, motorcycles, mountain bikes, and other mechanized methods of travel have also been recognized as a potential direct and indirect threat to Gunnison sage-grouse and their habitat (BLM 2009a, p. 36). In Colorado, the number of annual off-highway vehicle (OHV) registrations has increased dramatically from 12,000 in 1991 to 131,000 in 2007 (BLM 2009a, p. 37). Four wheel drive, OHV, motorcycle, specialty vehicle, and mountain bike use is expected to increase in the future based on increased human population in Colorado and within the range of Gunnison sage-grouse. Numerous off-road routes and access points to habitat used by Gunnison sage-grouse combined with increasing capabilities for mechanized travel and increased human population further contribute to habitat decline.

### Roads in the Gunnison Basin Population Area

Currently, 1,349 km (838 mi) of roads accessible to 2-wheel-drive passenger cars occur in occupied Gunnison sage-grouse habitat in the Gunnison Basin on all land ownerships. Four-wheel-drive vehicle roads, as well as motorcycle, mountain bike, horse, and hiking trails are heavily distributed throughout the range of Gunnison sage-grouse (BLM 2009a, pp. 27, 55, 86), which further increases the overall density of roads and their direct and indirect effects on Gunnison sage-grouse. User-created roads and trails have increased since 2004 (BLM 2009a, p. 33), although we do not know the scope of this increase.

On BLM lands in the Gunnison Basin, approximately 2,050 km (1,274 mi) of roads are currently within 6.4 km (4 mi) of Gunnison sage-grouse leks (BLM 2010a, p. 147). This distance is thought to be important, because eighty-seven percent of all Gunnison sage-grouse nests were located less than 6.4 km (4 mi) from the lek of capture (Apa 2004, p. 21). However, the BLM proposed to reduce the roads on its Gunnison Basin lands from 2,050 km (1,274 mi) to 1,157 km (719 mi) (BLM 2010a, p. 147), including implementation of other conservation measures from the Gunnison Basin Candidate Conservation Agreement (CCA) (BLM 2013b, entire) (see Conservation Programs and Efforts Related to Habitat Conservation below). The NPS completed a Motorized Vehicle Access Plan and Environmental Assessment for the Curecanti National Recreation Area (NPS 2010, 78 FR 72028). As of January 2014, roads open to the public within Gunnison sage-grouse habitat (occupied and unoccupied) were reduced from 91.1 km (56.6 mi) to 39.6 km (24.6 mi) (Stahlnecker 2014, pers. com) (also discussed below).

The U.S. Forest Service (USFS) is implementing their 2010 Travel Management Plan to benefit Gunnison sage-grouse. Approximately 66 km (41 mi) of road have recently been decommissioned on USFS lands in the Gunnison Basin. An additional 40–56 km (25–35 mi) of roads were proposed for decommissioning by the USFS in 2013. The BLM, USFS, CPW, and Gunnison County currently close 36 roads at 47 closure points to all motorized traffic from March 15 to May 15 to minimize impacts to Gunnison sage-grouse during the breeding season. Six USFS closures extend to June 15 to protect nesting Gunnison sage-grouse. These closures limit motorized access to all known leks and adjacent habitats on public lands in the Gunnison Basin (Gunnison County 2013a, pp. 78, 127). The USFS implements winter and spring travel closures for motorized and mechanized activities in the Flat Top Mountain and Almont Triangle areas, which includes a total of more than 11,000 ha (27,000 ac). While road closures may be violated in a small number of situations, we expect these seasonal closures are having a beneficial effect on Gunnison sage-grouse in the majority of the Gunnison Basin area through avoidance or minimization of impacts during sensitive periods.

Using GIS and a spatial dataset of roads in the Gunnison Basin, we evaluated the potential effects of roads to Gunnison sage-grouse and their habitat. To account for secondary effects from invasive weed spread from roads (see discussion below in Invasive Plants), we applied a 0.7-km (0.4-mi) "zone of influence" (Bradley and Mustard 2006, p. 1146) to all roads in the Gunnison Basin. These analyses indicate that approximately 85 percent of occupied habitat in the Gunnison Basin has an increased likelihood of current or future road-related invasive weed invasion, although the extent and severity of weed invasion would vary by road and area. It is likely that all occupied habitat in the Gunnison Basin may be negatively affected in some way by the direct or indirect impacts of roads (see the discussion below). In addition, available information indicates that noise from roads and other human activity centers such as the airport may be negatively impacting Gunnison sage-grouse reproduction in the Gunnison Basin by reducing male sage-grouse attendance at nearby leks (Piquette *et al.* 2013, entire).

The CPW (2013b, pp. 8–9) calculated the distance from roads (highways and county roads) for 185 separate successful and unsuccessful sage-grouse nests in the Gunnison Basin population,

based on telemetry and nesting data collected from 2005 to 2010. Roads included highways and county roads in Gunnison and Saguache counties. The study did not evaluate "primitive" roads as the Aldridge *et al.* 2012 study did, making this analysis more conservative. A GIS analysis of the distance frequencies of the 185 nests did not indicate an avoidance of roads by sage-grouse, in contrast to the findings of other authors cited above (see discussion above). Rather, CPW believes the data showed a correlation between a decline in the number of nests and increasing distance from roads. Approximately 45 percent of studied nests were within 300 m (984 ft) of a road, and 70 percent were within 500 m (1,640 ft). Nest frequency declined around distances greater than 500 m (1,640 ft) from roads. However, road density was not described and the distance to nests may be a reflection of road density rather than site selection. We are also uncertain as to what percentage of these roads may have been closed to protect nesting Gunnison sage-grouse, which may influence nest survival. The CPW acknowledged, moreover, that their analysis was not peer reviewed, and did not account for factors such as age (yearling vs. adult), re-nesting (however, only 3.2 percent of females studied re-nested), or time (i.e., the same female observed across years) (CPW 2013b, pp. 8–9). CPW also recognized that its report of nesting success in relation to roads only addressed one aspect of potential threats to Gunnison sage-grouse from roads, and did not address additional threats from roads such as impacts on suitability of brood-rearing and seasonal habitat components, changes in lekking behavior, noise impacts, depredation risks and chick and adult mortality (CPW 2013b, p.9). While the CPW study may indicate that Gunnison sage-grouse in the Gunnison Basin are not totally avoiding roads, the best available scientific information on the effects of roads on sage-grouse and their habitats nevertheless indicates that roads are likely having a negative impact on Gunnison sage-grouse in the Gunnison Basin population, though the extent and magnitude of those impacts are unknown.

*Roads in All Other Population Areas*

Approximately 140 km (87 mi), 243 km (151 mi), and 217 km (135 mi) of roads (all road classes) occur on BLM lands within the Cerro Summit-Cimarron-Sims Mesa, Crawford, and San Miguel Basin population areas, respectively, all of which are managed by the BLM (BLM 2009a, p. 71). We do

not have information on the total length of roads within the Monticello-Dove Creek, Piñon Mesa, or Poncha Pass Gunnison sage-grouse populations. However, several maps provided by the BLM show that roads are widespread and common throughout these population areas (BLM 2009a, pp. 27, 55, 86).

In the Crawford population area, Montrose County seasonally closes C77 Road from March 15 through May 15 to protect Gunnison sage-grouse during the breeding season (Gunnison County 2013, App. 1.G.40). Likewise, Saguache County seasonally closes three roads in the Poncha Pass population, and one road in the Gunnison Basin population area (Gunnison County 2013, App. 1.I.49). San Miguel County vacated, reclaimed, and relocated a county road in the San Miguel Basin to protect a lek in the Miramonte area (Gunnison County 2013, App. 1.K.67). San Miguel County also restricts road traffic speed year-round to 10 miles per hour or less on another road in the Miramonte area (Gunnison County 2013, App. 1.K.67.b). An Ouray County resolution (Resolution Number 2013–022, entire), adopted on May 28, 2013, provides that seasonal restrictions (March 15 until May 15) be implemented for roads (not belonging to adjacent property owners or their guests), and appropriate terms and conditions be applied during this same time period at construction sites within 0.6 miles of a lek to minimize and avoid impacts on breeding and brood-rearing habitat. This affects portions of the San Miguel and Cerro Summit-Cimarron-Sims Mesa populations. We expect these seasonal closures and restrictions are benefitting Gunnison sage-grouse in important portions of these populations through avoidance and minimization of impacts during sensitive periods. However, we believe that roads are having negative impacts at some level on all Gunnison sage-grouse populations.

*Summary of Roads*

As described above in the Residential Development section, the human population is increasing throughout the range of Gunnison sage-grouse (CDOLA 2009a, pp. 2–3; CWCB 2009, p. 15), and data indicates this trend will continue. Gunnison sage-grouse are dependent on large landscapes to meet their life history needs (GSRSC 2005, pp. 26–30) and contiguous sagebrush habitat (Rogers 1964, p. 19; Wisdom *et al.* 2011, pp. 452–453). The collective influences of fragmentation and disturbance from roads reduce the amount of effective habitat to the extent that they are avoided by sage-grouse (Aldridge *et al.*

BLM_0072028

2012, p. 402; Aldridge and Boyce 2007, p. 520; Knick *et al.* 2011, pp. 212–219 and references therein; CPW 2013, pp. 8–9). Given the current and future human demographic and economic trends discussed above under the Residential Development Section, we conclude that increased road use and increased road construction associated with residential development will continue to increase. Seasonal closures are likely providing benefits to Gunnison sage-grouse in portions of its range and during sensitive periods. Nevertheless, habitat decline associated with roads, as described above, is a current and future threat to Gunnison sage-grouse rangewide.

*Powerlines*

Depending on the infrastructure design, size, location, and site-specific factors, powerlines can directly affect greater sage-grouse by posing a collision and electrocution hazard (Braun 1998, pp. 145–146; Connelly *et al.* 2000a, p. 974) and can have indirect effects by decreasing lek recruitment (Braun *et al.* 2002, p. 10, Walker *et al.* 2007a, p. 2,644), increasing predation (Connelly *et al.* 2004, p. 13–12), fragmenting habitat (Braun 1998, p. 146), and facilitating the invasion of exotic annual plants (Knick *et al.* 2003, p. 612; Connelly *et al.* 2004, p. 7–25). In 10 years of tracking and studying over 1,000 radio-collared sage-grouse in Colorado, CPW has documented only three powerline strike-related mortalities (two confirmed cases, and one suspected case) of Gunnison sage-grouse; and one powerline strike-related mortality of greater sage-grouse (CPW 2013b, p. 11; Phillips and Griffin 2013, pers. comm.). In contrast, powerline collisions in southeastern Idaho accounted for 33 percent of juvenile mortality of greater sage-grouse in low-elevation areas (Beck *et al.* 2006, p. 1,075). Based on spatial modeling, proximity to powerlines is positively correlated with Gunnison and greater sage-grouse extirpation and loss of range (Wisdom *et al.* 2011, pp. 467–468). Due to the potential spread of invasive species and predators as a result of powerline construction and maintenance, the most substantial impact of powerlines on Gunnison sage-grouse likely comes from indirect effects, rather than from direct mortality. The effects of powerlines to Gunnison sage-grouse are expected to be similar to those observed in greater sage-grouse due to similar life histories and behavior.

In areas where vegetation is low and the terrain relatively flat, power poles provide an attractive hunting, roosting, and nesting perch for many species of raptors and corvids, known predators of Gunnison sage-grouse (Steenhof *et al.* 1993, p. 27; Connelly *et al.* 2000a, p. 974; Manville 2002, p. 7; Vander Haegen *et al.* 2002, p. 503) (see Factor C, Predation). Power poles increase a raptor's range of vision, allow for greater speed during attacks on prey, and serve as territorial markers (Steenhof *et al.* 1993, p. 275; Manville 2002, p. 7), thereby increasing the likelihood of predation where sage-grouse occur. Raptors may actively seek out power poles where natural perches are limited. For example, within 1 year of construction of a 596-km (370-mi) transmission line in southern Idaho and Oregon, raptors and common ravens began nesting on the supporting poles (Steenhof *et al.* 1993, p. 275). Within 10 years of construction, 133 pairs of raptors and ravens were nesting along this stretch (Steenhof *et al.* 1993, p. 275). Raven counts increased by approximately 200 percent along the Falcon-Condor transmission line corridor in Nevada within 5 years of construction (Atamian *et al.* 2007, p. 2). Howe *et al.* (2014) found (1) the average distance to a transmission line from selected raven nest sites was approximately 2.5 times closer than from random sites, and (2) areas comprised of nonnative vegetation next to sagebrush were more likely to be used by ravens (p.42), suggesting that ravens selected nest sites (1) closer to transmission lines, and (2) in close proximity to land cover edges and areas where land cover edges adjoined one another. A post hoc analysis revealed that ravens were most likely to nest near edges of adjoining big sagebrush and land cover types that were associated with direct human disturbance or fire (Howe *et al.*, p. 43). It is reasonable to assume an increase in the abundance of corvids within occupied Gunnison sage-grouse habitats can lead to increased predation (see Factor C, Predation, for further discussion).

As with corvids, eagles can also increase following power line installation. Golden eagle *(Aquila chryrsaetos)* predation on sage-grouse on leks increased from 26 to 73 percent of the total predation after completion of a transmission line within 200 meters (m) (220 yards (yd)) of an active sage-grouse lek in northeastern Utah (Ellis 1985, p. 10). The lek was eventually abandoned, and Ellis (1985, p. 10) concluded that the presence of the powerline resulted in changes in sage-grouse dispersal patterns and caused fragmentation of the habitat. Golden eagles are found throughout the range of Gunnison sage-grouse (USGS 2010, p. 1), and golden eagles were found to be the dominant species recorded perching on power poles in Utah in Gunnison sage-grouse habitat (Prather and Messmer 2009, p. 12). An increase in the abundance of golden eagles associated with power lines within occupied Gunnison sage-grouse habitats would be expected to increase predation rates (see Factor C, Predation, for further discussion).

Greater sage-grouse leks within 0.4 km (0.25 mi) of new powerlines constructed for coalbed methane development in the Powder River Basin of Wyoming had significantly lower recruitment compared to leks further from these lines, presumably resulting from increased raptor predation (Braun *et al.* 2002, p. 10). Connelly *et al.* (2004, p. 7–26) assumed a 5- to 6.9-km (3.1- to 4.3-mi) radius buffer around the perches, based on the average foraging distance of these corvids and raptors, and estimated that the area potentially influenced by additional perches provided by powerlines was 672,644 to 837,390 km² (259,641 to 323,317 mi²), or 32 to 40 percent of their assessment area. The impact on a given area would depend on local densities of corvids and raptors (see discussion in Factor C, Predation).

Powerlines may negatively impact sage-grouse habitats even if raptors are not present. The use of otherwise suitable habitat by sage-grouse near powerlines increased as distance from the powerline increased for up to 600 m (660 yd) (Braun 1998, p. 8), indicating sage-grouse avoidance of powerlines. Based on those unpublished data, Braun (1998, p. 8) reported that the presence of powerlines may limit Gunnison and greater sage-grouse use within 1 km (0.6 mi) in otherwise suitable habitat. Greater sage-grouse tended to avoid using brood-rearing habitats within 4.7 km (2.9 mi) of wind energy transmission lines in Wyoming (LeBeau 2012, p. 27).

Electromagnetic fields emitted by power and transmission lines can alter the behavior, physiology, endocrine systems and immune function in birds, with negative consequences on reproduction and development (Fernie and Reynolds 2005, p. 135). Birds are diverse in their sensitivities to electromagnetic field exposures, with domestic chickens being very sensitive. Many raptor species are less affected (Fernie and Reynolds 2005, p. 135). Based on spatial modeling, sage-grouse extirpation appears to be correlated to the presence of powerlines (Wisdom *et al.* 2011, p. 467). However, no studies have been conducted specifically on the effects of electromagnetic fields on sage-

grouse. Therefore, we do not know how electromagnetic fields may impact Gunnison sage-grouse.

In addition, linear corridors through sagebrush habitats can facilitate the spread of invasive species, such as cheatgrass *(Bromus tectorum)* (Gelbard and Belnap 2003, pp. 424–426; Knick *et al.* 2003, p. 620; Connelly *et al.* 2004, p. 1–2). However, we were unable to find any information regarding the amount of invasive species incursion associated with powerlines within Gunnison sage-grouse habitat.

*Powerlines in the Gunnison Basin Population Area*

On approximately 121,000 ha (300,000 ac) of BLM land in the Gunnison Basin, 36 rights-of-way for power facilities, power lines, and transmission lines have resulted in the direct loss of 350 ha (858 ac) of occupied habitat (Borthwick 2005a, pers. comm.; Borthwick 2005b, pers. comm.). In the Curecanti National Recreation Area, Gunnison County Electric Association has a right of way for 63 km (39 mi) of overhead power lines, and Western Area Power Administration (WAPA) has a 31-km (19 mi) right of way for transmission lines.

As discussed above, the impacts of these lines likely extend beyond their actual footprint. Based on the average foraging distance of corvids and raptors, Connelly *et al.* (2004, p. 7–26) assumed a 5- to 6.9-km (3.1- to 4.3-mi) radius buffer around the perches, and estimated that the area potentially influenced by additional perches provided by powerlines was 672,644 to 837,390 km $^2$ (259,641 to 323,317 mi $^2$), or 32 to 40 percent of their assessment area. We performed a similar GIS analysis of large transmission line location in relation to overall habitat area and Gunnison sage-grouse lek locations in the Gunnison Basin population area to obtain an estimate of the potential effects in the Basin. These analyses indicate that 68 percent of the Gunnison Basin population area is within 6.9 km (4.3 mi) of an electrical transmission line and is potentially influenced by avian predators using the additional perches provided by transmission lines. This area within 6.9 km (4.3 mi) of an electrical transmission line contains 65 of 109 active leks (60 percent) in the Gunnison Basin population. While we recognize that powerlines will not entirely preclude the use of adjacent habitats by Gunnison sage-grouse, these results suggest that increased predation risks associated with transmission lines could affect a substantial portion of the Gunnison Basin population. Four sage-grouse

collisions with taller utility lines were documented during a demographic study (Davis 2012, entire) in the Gunnison Basin, but none of those birds were killed as a result (Phillips 2013, p. 4). There have been no documented strike-related mortalities of Gunnison sage-grouse in the Gunnison Basin (Phillips and Griffin 2013, pers. comm.). Conservation measures from the Gunnison Basin CCA (BLM 2013b, entire) are expected to reduce impacts from some future power line projects and activities on Federal lands in the Gunnison Basin (see Conservation Programs and Efforts Related to Habitat Conservation).

*Powerlines in All Other Population Areas*

A transmission line runs through the Dry Creek Basin group in the San Miguel Basin population, and the Beaver Mesa group has two transmission lines. None of the transmission lines in the San Miguel Basin have raptor proofing, nor do most distribution lines (Ferguson 2005, pers. comm.), so their use by raptors and corvids as perch sites for hunting and use for nest sites is not discouraged. In the winter of 2012, one Gunnison sage-grouse individual in the San Miguel population died due to a powerline strike (Phillips and Griffin 2013, pers. comm.). One major electric transmission line runs east-west in the northern portion of the current range of the Monticello population (San Juan County Gunnison Sage-grouse Working Group 2005, p. 17). There have been no documented strike-related mortalities of Gunnison sage-grouse in the Dove Creek or Piñon Mesa population areas (Phillips and Griffin 2013, pers. comm.), and because of their limited extent in occupied habitat, powerlines do not appear to be a threat to the Piñon Mesa population. One transmission line parallels Highway 92 in the Crawford population and distribution lines run from there to homes on the periphery of the current range (Ferguson 2005, pers. comm.). Several transmission and utility lines intersect occupied habitat in the Poncha Pass area and may be negatively impacting an already small population and limited available habitat. A bird translocated from the Gunnison Basin to the Poncha Pass area in 2013 was found dead under the large transmission line on the west side of Highway 285; necropsy results indicated collision was a likely cause of death (Phillips and Griffin 2013, pers. comm.; Nehring 2013b, pers. comm.). During the same year, one radio collar was found under a powerline, but no bird was observed

(i.e., an unconfirmed mortality) (Phillips and Griffin 2013, pers. comm.)

*Summary of Powerlines*

Human populations are projected to increase to varying degrees in and near most Gunnison sage-grouse populations (see Residential Development discussion above). As a result, we expect an associated increase in distribution powerlines to meet this demand. Powerlines are likely negatively affecting Gunnison sage-grouse as they contribute to habitat decline and facilitation of predators of Gunnison sage-grouse. Given the current demographic and economic trends described in the Residential Development Section above, we conclude that existing powerlines and anticipated distribution of powerlines associated with residential and other development will continue to increase. Direct and indirect impacts resulting from powerlines are a current and future threat to Gunnison sage-grouse persistence rangewide.

*Domestic Grazing and Wild Ungulate Herbivory*

At least 87 percent of occupied Gunnison sage-grouse habitat on Federal lands is currently grazed by domestic livestock (USFWS 2010c, entire). We lack information on the proportion of Gunnison sage-grouse habitat on private lands that is currently grazed, but it is reasonable to expect that the proportion of grazed area is similar to that on Federal lands because livestock grazing is the most widespread type of land use across the sagebrush biome (Connelly *et al.* 2004), and almost all sagebrush areas are managed for livestock grazing (Knick *et al.* 2003). Livestock grazing can have negative or positive impacts on sage-grouse, depending on the timing and intensity of grazing and the habitat type or attribute of interest (Crawford *et al.* 2004, p. 2). Excessive grazing by domestic livestock during the late 1800s and early 1900s, along with severe drought, significantly impacted sagebrush ecosystems (Knick *et al.* 2003, p. 616). Overgrazing by livestock was cited as one of several contributing factors in the early loss and deterioration of sagebrush range in the region (Rogers 1964, p. 13). Historical accounts indicate that overgrazing of sagebrush range in Colorado began around 1875. Overgrazing was apparently at its worst in the early 1900's and continued until the BLM was organized in 1934 (Rogers 1964, p. 13). Around 1910, a gradual but marked decline in sage-grouse numbers and distribution in Colorado had begun (Rogers 1964, pp. 20–22). Though there

is no evidence of direct correlation, this information suggests that historical livestock grazing practices and overgrazing were a contributing factor in the early loss and degradation of sagebrush habitats and initial declines in sage-grouse numbers and distribution. Although current livestock stocking rates in the range of Gunnison sage-grouse are lower than historical levels (Laycock *et al.* 1996, p. 3), long-term effects from historical overgrazing, including changes in plant communities and soils, persist today (Knick *et al.* 2003, p. 116).

In addition, widespread use of water developments in connection with livestock grazing across the West has since increased livestock access to sagebrush habitats, and so even reduced numbers of livestock still pose impacts (Connelly *et al.* 2004, pp. 7–33, 7–35, 7–92). However, in some cases, small scale water development may benefit the species. For instance, in the recent past, landowners in San Juan County, Utah, in the range of the Monticello population of Gunnison sage-grouse did not have automatic control valves on water developments for livestock watering. This resulted in overflow creating seasonal wet meadow and mesic habitats often used by Gunnison sage-grouse and broods. The recent use of more advanced watering devices and shutoff valves has resulted in the loss of many of these created wet meadow sites, potentially contributing to sage-grouse declines in the area (Prather 2010, p. 27). Water developments are also a potential source of West Nile virus, a serious risk factor to sage-grouse populations. Unless they are designed and managed specifically to benefit Gunnison sage-grouse, we conclude that the negative effects of water development outweigh the positives (see Factor C discussion, Disease).

Although livestock grazing and associated land treatments have likely altered plant composition, increased topsoil loss, and increased spread of exotic plants, the impacts on Gunnison sage-grouse populations are not clear. Few studies have directly addressed the effect of livestock grazing on sage-grouse (Beck and Mitchell 2000, pp. 998–1000; Wamboldt *et al.* 2002, p. 7; Crawford *et al.* 2004, p. 11), and little direct experimental evidence links grazing practices to Gunnison sage-grouse population levels (Braun 1987, pp. 136–137, Connelly and Braun 1997, p. 7–9). Rowland (2004, pp. 17–18) conducted a literature review and found no experimental research that demonstrates grazing alone is responsible for reduction in sage-grouse numbers.

Despite the obvious impacts of grazing on plant communities within the range of the species, the GSRSC (2005, p. 114) could not find a direct correlation between historical grazing and reduced Gunnison sage-grouse numbers. Impacts from livestock grazing on individual birds and site-specific habitat conditions may have impacts at the population level as well, given the widespread nature of grazing. However, no studies have documented the impacts (positive or negative) of grazing at the population level.

Sage-grouse need significant grass and shrub cover for protection from predators, particularly during nesting season, and females will preferentially choose nesting sites based on these qualities (Hagen *et al.* 2007, p. 46). However, specific recommendations on vegetation characteristics and habitat requirements for sage-grouse vary. Nest success in Gunnison sage-grouse habitat was positively correlated with greater grass and forb heights; and shrub density and cover (Young 1994, p. 38). In contrast, nest site vegetation characteristics did not have a strong influence on nest success between the Gunnison Basin and San Miguel populations, where temporal factors had the greatest influence (Davis 2012, pp. 1, 10). It is thought that, in Colorado, sagebrush canopy cover conceals nests more than grass (GSRSC 2005, p. 73). In Oregon, grass height at greater sage-grouse nests was taller at successful nests than at unsuccessful nests (specific grass species that tend to be taller than others were also positively associated with successful nests) (Gregg 1991, p. 2). Gregg *et al.* (1994, p. 165) speculated that a reduction of grass heights due to livestock grazing in sage-grouse nesting and brood-rearing areas would negatively affect nesting success whenever cover is reduced below the 18 cm (7 in.) needed for predator avoidance. Maintaining average grass height greater than 18 cm (7 in.) was recommended by Connelly *et al.* 2000a, p. 977). However, guideline standards from Connelly *et al.* (2000a, entire) are derived primarily from research and publications from the Great Basin and northwest, where bunch grasses predominate (GSRSC 2005, p. 73).

The RCP (GSRSC 2005, p. H–6) provided structural habitat guidelines for Gunnison sage-grouse and recommends a grass height of 10 to 15 cm (3.9–5.9 in.) in breeding habitats. Lupis (2005, entire) found that despite reduced grass and forb cover, all (100 percent) Gunnison sage-grouse nests monitored in the Monticello population were successful. However, sample size for the study was limited to three nests,

and predator control at the time may have contributed to relatively high nesting success (Lupis 2005, entire); inference from this study is therefore limited. Based on measurements of cattle foraging rates on bunchgrasses both between and under sagebrush canopies, the probability of foraging on under-canopy bunchgrasses depends on sagebrush size and shape. Consequently, the effects of grazing on nesting habitats might be site-specific (France *et al.* 2008, pp. 392–393). Effects of grazing on nesting habitats are dependent on the timing as well as duration and intensity of grazing. Grazing on grasses and forbs during nesting and early brood rearing seasons could impact food sources for young broods, as well as alter the desired herbaceous plant community. Grazing on grasses and forbs in late-fall or winter could reduce residual vegetation important for hiding cover for nesting hens the following spring. In addition, grazing on shrubs, especially sagebrush, during winter months may cause impacts to both hiding/thermal cover as well as the primary food resource for Gunnison sage-grouse.

Livestock grazing can also impact fire return intervals, which in turn can affect Gunnison sage-grouse habitat quality. Fire ecology in the sagebrush steppe ecosystem has changed dramatically with European settlement. In high elevation sagebrush habitat, fire return intervals have increased from 12–24 years to more than 50 years, resulting in the dominance of woody vegetation (typically juniper and/or piñon pine) and the decline of important shrubs and herbaceous understories. At lower elevations, fire return intervals have decreased dramatically from 50–100 years to less than 10 years due to invasion by annual grasses resulting in the loss of native perennial shrubs, forbs, and grasses (Crawford *et al.* 2004, p. 8). By changing vegetative structure and composition, livestock grazing can contribute to either condition (an increase in woody vegetation or invasive annual grasses) (Beck and Mitchell 2000, pp. 995–996, and references therein), increasing the risk of larger, more severe, or more frequent wildfires (also see Piñon-Juniper Encroachment and Invasive Plants sections in this rule). On the other hand, livestock grazing may reduce herbaceous fuel accumulation and continuity and, consequently, the risk of wildfires in sagebrush habitats (Davies *et al.* 2010, p. 662).

We know that livestock grazing influences fire ecology in sage-grouse habitat. However, due to the spatial complexity of fire in sagebrush ecosystems (Crawford *et al.* 2004, p.7),

and the numerous factors determining the effects of grazing on sagebrush habitats (as described above), the effects of grazing on sage-grouse by altering fire ecology likely vary widely across time and space. Grazing by livestock, especially if done in a manner not consistent with local ecological conditions, including soil types, precipitation zones, vegetation composition and drought conditions, can reduce the suitability of breeding and brood-rearing habitat, negatively affecting sage-grouse populations (Braun 1987, p. 137; Dobkin 1995, p. 18; Connelly and Braun 1997, p. 231; Beck and Mitchell 2000, pp. 998–1000; USFWS 2013e, p. 45). Livestock and wild ungulate numbers must be managed at levels that allow native sagebrush vegetative communities to minimally achieve Proper Functioning Conditions for riparian areas or Rangeland Health Standards for uplands (USFWS 2013e, p. 45). Domestic livestock grazing reduces water infiltration rates and the cover of herbaceous plants and litter, compacts the soil, and increases soil erosion (Braun 1998, p. 147; Dobkin et al. 1998, p. 213). These impacts change the proportion of shrub, grass, and forb components in the affected area, and facilitate invasion of exotic plant species that do not provide suitable habitat for sage-grouse (Mack and Thompson 1982, p. 761; Miller and Eddleman 2000, p. 19; Knick et al. 2011, pp. 228–232).

Cattle feed mostly on grasses, but will make seasonal use of forbs and shrub species like sagebrush (Vallentine 1990, p. 226), the primary source of nutrition for sage-grouse. Within the range of Gunnison sage-grouse, sheep use of sagebrush habitats occurs primarily during the winter and spring months, depending on elevation. Sheep feed primarily on sagebrush and other shrubs. A sage-grouse hen's nutritional condition affects nest initiation rate, clutch size, and subsequent reproductive success (Barnett and Crawford 1994, p. 117; Coggins 1998, p. 30). Grazing management practices that are inconsistent with local ecological conditions in mesic sites result in a reduction of forbs and grasses available to sage-grouse chicks, thereby affecting chick survival (Aldridge and Brigham 2003, p. 30). Chick survival is one of the most important factors in maintaining Gunnison sage-grouse population viability (GSRSC 2005, p. 173). We conclude that livestock utilization of forage resources has the potential to negatively impact Gunnison sage-grouse, though the magnitude of those

effects depends on location, grazing practices, and site-specific factors.

Livestock can trample sage-grouse nests and nesting habitat. Although the effect of trampling at a population level is unknown, outright nest destruction has been documented, and the presence of livestock can cause sage-grouse to abandon their nests (Rasmussen and Griner 1938, p. 863; Patterson 1952, p. 111; Call and Maser 1985, p. 17; Holloran and Anderson 2003, p. 309; Beck and Mitchell 2000, p. 994; Coates 2007, p. 28). Sage-grouse have been documented to abandon nests following partial nest predation by cows (Coates 2007, p. 28). In general, all recorded encounters between livestock and grouse nests resulted in hens flushing from nests, which could expose the eggs to predation. Visual predators like ravens likely use hen movements to locate sage-grouse nests (Coates 2007, p. 33). Livestock also may trample sagebrush seedlings, thereby removing a source of future sage-grouse food and cover (Connelly et al. 2004, pp. 7–31, and references therein). Trampling of soil by livestock can reduce or eliminate biological soil crusts making these areas susceptible to cheatgrass invasion (Mack 1981, pp. 148–149; Young and Allen 1997, p. 531).

Livestock grazing may also have positive effects on sage-grouse under some habitat conditions. Sage-grouse use grazed meadows significantly more during late summer than ungrazed meadows because grazing had stimulated the regrowth of forbs (Evans 1986, p. 67). Greater sage-grouse sought out and used openings in meadows created by cattle grazing in northern Nevada (Klebenow 1981, p. 121). Also, both sheep and goats have been used to control invasive weeds (Mosley 1996 in Connelly et al. 2004, pp. 7–49; Merritt et al. 2001, p. 4; Olsen and Wallander 2001, p. 30) and woody plant encroachment (Riggs and Urness 1989, p. 358) in sage-grouse habitat. Anecdotal reports and opinion papers (Brunner 2006, p. 16; Gunnison County 2013a, p. 95) have suggested that cattle manure attracts and supports insect populations upon which sage-grouse depend for survival, and that sage-grouse "follow" cattle through pastures. However, there is no empirical evidence to support this theory. Further, there are no data to substantiate the idea that in areas not actively grazed by livestock, sage-grouse are limited in some way (Connelly et al. 2007, p. 37).

Sagebrush plant communities are not adapted to domestic grazing disturbance. Grazing changed the functioning of systems into less resilient, and in some cases, altered

communities (Knick et al. 2011, pp. 229–232). The ability to restore or rehabilitate areas depends on the condition of the area relative to the ability of a site to support a specific plant community (Knick et al. 2011, pp. 229–232). For example, if an area has a balanced mix of shrubs and native understory vegetation, a change in grazing management can restore the habitat to its potential historical species composition (Pyke 2011, pp. 536–538). Wambolt and Payne (1986, p. 318) found that resting areas from grazing had a better perennial grass response than other treatments. Active restoration is likely required where native understory vegetation is much reduced (Pyke 2011, pp. 536–540). But, if an area has soil loss or invasive species, returning the site to the native historical plant community may be impossible (Daubenmire 1970, p. 82; Knick et al. 2011, pp. 230–231; Pyke 2011, p. 539).

Aldridge et al. (2008, p. 990) did not find any relationship between sage-grouse persistence and livestock densities. However, the authors noted that livestock numbers do not necessarily correlate with range condition. They concluded that the intensity, duration, and distribution of livestock grazing are more influential on rangeland condition than the density of livestock (Aldridge et al. 2008, p. 990). Currently, little direct evidence links grazing practices to population levels of Gunnison or greater sage-grouse. Although grazing has not been examined at large spatial scales, as discussed above, we do know that grazing that is incompatible with local ecological conditions and that does not allow native sagebrush vegetative communities to minimally achieve Proper Functioning Conditions for riparian areas or Rangeland Health Standards for uplands can have negative impacts to individuals, nests, breeding productivity, and sagebrush and, consequently, to sage-grouse at local scales (USFWS 2013e, p. 44). However, how these impacts operate at large spatial scales and thus on population levels is currently unknown.

*Livestock Grazing Allotments and Habitat Monitoring*

Our analysis of grazing is focused on BLM lands because nearly all of the information available to us regarding current grazing management within the range of Gunnison sage-grouse was provided by the BLM. Similar information was provided by the USFS, but was more limited since the USFS has less occupied habitat in grazing allotments and has a different habitat monitoring approach than BLM (see

discussion below). A summary of domestic livestock grazing management on BLM and USFS lands in occupied Gunnison sage-grouse habitat is provided in Table 8.

TABLE 8—SUMMARY OF DOMESTIC LIVESTOCK GRAZING MANAGEMENT AND ALLOTMENT DATA ON BLM[a] AND USFS[b] LANDS IN OCCUPIED HABITAT FOR EACH OF THE GUNNISON SAGE-GROUSE (GUSG) POPULATIONS

[From BLM (2013b, p. 3–1) and USFWS (2010c), compilation of data provided by BLM and USFS]

| Population | USFS | BLM | | | | | | |
| | Number of active USFS allotments | Number of active BLM allotments | Active BLM allotments with GUSG[c] objectives | | BLM allotments assessed under LHA[d] | | Assessed BLM allotments meeting LHA objective (standard 4) | |
| Gunnison .............. | 34 ........................... | 62 | 62 | 100% | 62 | 100% | 20 | 32% |
| San Miguel Basin .. | no data ................. | 12 | 11 | 92% | 10 | 83% | [g]4 | 40% |
| Dove Creek .......... | n/a[e] ...................... | 3 | 0 | 0% | 3 | 100% | [h]Unknown | .................... |
| Monticello .............. | 6 ............................ | 6 | 6 | 100% | 5 | 83% | 4 | 80% |
| Piñon Mesa .......... | 15 ........................... | 15 | 8 | 53% | 4 | 27% | 4 | 100% |
| Cerro Summit-Cimarron-Sims Mesa. | n/a[e] ...................... | 6 | 1 | 17% | 6 | 100% | [i]1 | 17% |
| Crawford[f] .............. | n/a[e] ...................... | 8 | 8 | 100% | 8 | 100% | [j]7 | 88% |
| Poncha Pass ......... | no data ................. | 8 | 8 | 100% | 8 | 100% | 8 | 100% |
| Total .............. | 34 ........................... | 124 | 83 | 67% | 101 | 81% | 48 | 48% |

[a] Bureau of Land Management.
[b] United States Forest Service.
[c] Gunnison sage-grouse.
[d] Land Health Assessments.
[e] No United States Forest land in occupied habitat in this population area.
[f] Includes allotments on National Park Service lands but managed by the Bureau of Land Management.
[g] BLM did not evaluate land health specific to GUSG Habitat Objectives in 8 of the 12 active allotments in the San Miguel Basin population area.
[h] BLM did not evaluate land health specific to GUSG Habitat Objectives in any of the 3 active allotments in the Dove Creek population area.
[i] BLM did not evaluate land health specific to GUSG Habitat Objectives in 5 of the 6 active allotments in the Cerro Summit-Cimarron-Sims Mesa population area; however, general land health standards were met on BLM lands in this area.
[j] BLM found that 6 allotments (75 percent) were "meeting with problems" for GUSG Habitat Objectives. Generally these allotments were found to be low for some aspect of vegetation characteristics for breeding habitat recommended in GSRSC (2005 H–6).

Some of the available information on domestic livestock grazing and its relationship to habitat conditions on Federal lands is in the form of BLM's Land Health Assessment (LHA) data. The purpose of LHAs is to determine the status of resource conditions within a specified geographic area at a specific time. The LHA process incorporates land health standards that define minimum resource conditions that must be achieved and maintained. Further discussion on the LHA process is provided in the following section.

The USFS does not apply the LHA process, but monitors allotment trends through a combination of procedures including seasonal inspections, permanent photo points, and inventory and mapping of plant community conditions and changes over time (USFS 2010). The majority of Gunnison sage-grouse occupied habitat in USFS grazing allotments is located in the Gunnison Basin population area (Table 8 of Factor A (Livestock Grazing Allotments and Habitat Monitoring)), and grazing information from USFS as it relates to Gunnison sage-grouse is therefore limited to this area (USFWS 2010c, p2).

Although grazing also occurs on lands owned or managed by other entities, we have more limited information on the extent of grazing, management, and habitat conditions in those areas. However, substantial portions of sage-grouse habitat on private land in the Gunnison Basin, Crawford, San Miguel, and Piñon Mesa population areas are enrolled in the CCAA (see Conservation Programs and Efforts Related to Habitat Conservation below in this Factor A section). Based on the RCP conservation objective of securing and maintaining 90 percent of seasonally important habitat (severe winter, nesting, and late brood-rearing habitats) for the Gunnison sage-grouse in each population area (GSRSC 2005, pp. 223–224), the CCAA identifies targets for private land protection for each population area, including private lands not already considered as protected under a conservation easement (USFWS 2006, pp. 11–12). Roughly 91 percent of the Gunnison Basin population area target, 95 percent of the Crawford population area target, 46 percent of the San Miguel population area target, and 217 percent of the Piñon Mesa population area target on private lands are enrolled in the CCAA (Table 10). Except for properties recently enrolled in the program, all enrolled private lands have been monitored by CPW using standardized vegetation transects and rangeland health assessments and, despite recent drought conditions and ongoing land uses, no significant deviations from baseline habitat conditions were observed (CPW 2014a, p. 1). All enrolled properties continue to be in compliance with the terms of their Certificate of Inclusion (CI) (CPW 2014a, p. 1). This information suggests that the current level of livestock grazing and operations on those lands is compatible with Gunnison sage-grouse habitat needs.

Although Federal land and livestock grazing may be more regulated than private lands grazing, we cannot make any generalizations about how habitat conditions in those areas might compare with private lands where livestock grazing occurs. Grazing allotments containing both Federal and private lands are, in some cases, managed to meet land health standards through coordination and cooperation with grazing permittees (BLM 2013c, p. 1–2). Furthermore, many livestock operations within the range of Gunnison sage-grouse are employing innovative grazing strategies and conservation actions (BLM 2012a, pp. 1–2; Gunnison County Stockgrowers 2009, entire) in

collaboration with the BLM and Forest Service.

## BLM Land Health Assessment Standards

LHA standards are based on the recognized characteristics of healthy ecosystems and include considerations of upland soils, riparian systems, plant and animal communities, habitat conditions and populations of special status species, and water quality (BLM 1997, pp. 6–7). Each LHA standard, such as the condition and health of soils, riparian areas, or plant communities, has varying degrees of applicability to basic Gunnison sage-grouse habitat needs. The LHA standard most applicable to Gunnison sage-grouse is LHA Standard 4, which is specific to special status species (BLM 1997, p. 7). *Special status species* include Federally threatened, endangered, proposed, and candidate species; recently delisted (5 years or less) species; and BLM sensitive species. *BLM sensitive species* are those that require special management consideration to promote their conservation and reduce the likelihood and need for future listing under the Act; they are designated by the BLM State Director(s) (BLM 2008). Gunnison sage-grouse was designated as a BLM sensitive species in 2000, when it was recognized as a separate species from greater sage-grouse (BLM 2009a, p. 7). Therefore, Gunnison sage-grouse is managed by the BLM as a special status species.

In addition to requiring stable and increasing populations and suitable habitat for special status species, the specific indicators for LHA Standard 4 include the presence of: minimal noxious weeds, sustainably reproducing native plant and animal communities, mixed age classes sufficient to sustain recruitment and mortality fluctuations, habitat connectivity, photosynthetic activity throughout the growing season, diverse and resilient plant and animal communities in balance with habitat potential, plant litter accumulation, and several plant communities in a variety of successional stages and patterns (BLM 1997, p. 7). BLM deems an allotment that meets LHA Standard 4 to meet or exceed a minimum resource condition for those species considered for that area.

If livestock grazing is found to be a causal factor for not meeting LHA standards, including LHA Standard 4, BLM implements changes to grazing management to address those issues and to move toward achieving desired resource conditions. Examples of adjustments include reduction of stocking rates or utilization, changes in seasons of use, reductions in duration of use, implementation of resting or deferred rotation grazing systems, or change in livestock class. Under BLM Instruction Memoranda WO–IM–2010–071, CO–IM–2010–028 and CO–IM–2013–033 (see further discussion in Factor D on Instruction Memoranda), BLM must consider Gunnison sage-grouse habitat needs and objectives when analyzing grazing management and permit renewals (BLM 2013a, Attachment 1–10).

We recognize that LHAs are largely qualitative and other factors such as impacts from invasive species, drought, OHV use, or the lingering effects of historical overgrazing, may influence the outcome of LHA determinations. Furthermore, BLM's application of LHA standards, methodologies used, and data interpretation varies widely by Field Office and State (Veblen *et al.* 2011, p. 3; BLM 2013c, p. 1–3), and the potentially subjective nature of the methodology is evident in the information on each populations presented below. Therefore, the relationship between LHA determinations and the effects of domestic livestock grazing on Gunnison sage-grouse is very imprecise. We also recognize that if an allotment does not fully meet LHA Standard 4, it does not mean the habitat is degraded or unsuitable for Gunnison sage-grouse; and a "not meeting" ranking is not always attributable to livestock grazing (BLM 2013c, p. 1–2). For instance, some vacant allotments (not grazed by livestock) are not currently meeting LHA Standard 4 (BLM 2013c, p. 1–3), meaning current grazing practices are not a causal factor for that ranking. A "not meeting" determination could also be based primarily on the declining status of a special status species' population, including species other than Gunnison sage-grouse. Finally, LHAs are typically only conducted every 10 years, triggered by changes in management such as grazing permit renewal and similar actions and, therefore, do not directly indicate rangeland trend (BLM 2013c, p. 1–3). However, the fact that some grazing allotments or areas within grazing allotments are not meeting LHA objectives indicates that habitat conditions may be degraded for Gunnison sage-grouse in parts of its range, and that domestic livestock grazing may be contributing to these conditions in some instances. A more thorough examination of each allotment not meeting LHA Standard 4 would be required to determine to what extent livestock grazing is a causal factor.

## Livestock Grazing in the Gunnison Basin Population Area

The BLM manages approximately 51 percent of the area currently occupied by Gunnison sage-grouse in the Gunnison Basin. Nearly all (98 percent) of this area is actively grazed USFWS 2010c, p. 1). The USFS manages livestock grazing on approximately 14 percent of the occupied portion of the Gunnison Basin population area. Therefore, this information on livestock grazing is pertinent to approximately 65 percent of occupied habitat in the Gunnison Basin.

In 2013, of 62 active BLM grazing allotments in the Gunnison Basin population, all had incorporated Gunnison sage-grouse habitat objectives as described above and completed LHAs. LHA Standard 4 was met in 32 percent of these allotments in 2013 (Table 8 of Factor A (Livestock Grazing Allotments and Habitat Monitoring); BLM 2013c, p. 3–1). In 2012, on actively grazed BLM lands in the Gunnison Basin, approximately 8 percent was "meeting", 17 percent was "moving towards", and 63 percent was "not meeting" Standard 4; while 11 percent was of "unknown" status (BLM 2012a, pp. 2–3).

Although 2013 data shows that 68 percent of allotments may not be meeting LHA Standard 4, the data show that 32 percent of allotments were meeting this standard, which is an improvement over the 8 percent indicated by the 2012 data. Nonetheless, recognizing the limitations of LHA methodology and data as discussed above, the information above suggests that there may be reduced habitat conditions on BLM land in the Gunnison Basin. The cause of these conditions may or may not be directly related to grazing management practices that were inconsistent with local ecological conditions, either in the past or at present, but the overall trend is for improving conditions with respect to LHA Standard 4. The BLM has also implemented a CCA for Gunnison Basin (BLM 2013b, entire), which has specific measures for livestock grazing within all occupied habitat in the Gunnison Basin to help improve Gunnison sage-grouse habitat quality (BLM 2013b, Attachment 5–4) (see Conservation Programs and Efforts Related to Habitat Conservation later in this Factor A analysis).

In 2007 and 2008, the BLM Gunnison Field Office conducted Gunnison sage-grouse habitat assessments in two major occupied habitat locations in the Gunnison Basin population, quantifying

vegetation structural characteristics and plant species diversity. Data were collected and compared to Gunnison sage-grouse Structural Habitat Guidelines in the 2005 Rangewide Conservation Plan (RCP) (GSRSC, 2005, Appendix H) during optimal growing conditions in these two major occupied areas. Of 97 transects, guidelines were met in 45 percent for sagebrush cover; 30 percent for grass cover; 25 percent for forb cover; 75 percent for sagebrush height; 81 percent for grass height; and 39 percent for forb height (BLM 2009a, pp. 31–32). This information suggests that habitat conditions in those areas generally fall short of standards for Gunnison sage-grouse, particularly in relation to grass cover, forb cover, and forb height. However, it is not known whether those conditions were attributable to livestock grazing or other factors such as big game forage use or weather patterns.

Livestock grazing has also negatively impacted several Gunnison sage-grouse treatments (projects aimed at improving habitat condition) in the Gunnison Basin (BLM 2009a, p. 34). Although these areas are generally rested from domestic livestock grazing for 2 years after treatment, several have been heavily used by cattle shortly after the treatment and the effectiveness of the treatments decreased (BLM 2009a, p. 34), which reduced the potential benefits of the treatments.

As noted earlier, the USFS does not use the LHA process, but monitors allotment trends through a combination of procedures including seasonal inspections, permanent photo points, and inventory and mapping of plant community conditions and changes over time (USFS 2010, entire). Three (9 percent) of the 34 USFS allotments in Gunnison sage-grouse occupied habitat in the Gunnison Basin population area have incorporated habitat objectives in their grazing plans. However, we have no specific data that evaluate allotment conditions as they relate to these objectives. Overall, the USFS reports that its grazing allotments in the Gunnison Basin population area appear to be improving in forb and grass cover but are declining in sagebrush cover (USFS 2010, entire).

All of this information indicates that grazing management may be a factor in degraded habitat conditions for Gunnison sage-grouse in parts of the Gunnison Basin. Given that there are far more acres of occupied Gunnison sage-grouse habitat in the Gunnison Basin that are actively grazed than in other populations, and over 50 percent of land (295,000 ac) in the Gunnison Basin is under BLM management, most of which

is actively grazed, overall exposure to Federal grazing management is higher in the Gunnison Basin than elsewhere. This raises concerns about the long-term habitat impacts of grazing management on BLM land, and supports the need for BLM to continue to monitor and improve LHA trends and grazing allotment management.

BLM reviews and renews grazing permits at 10 year intervals. Since at least 2010 BLM has modified grazing permit terms and conditions in areas determined to be "not meeting" LHA standards through the permit renewal process. Examples of new permit terms or conditions required by the BLM include implementation of rotational grazing systems, deferment or elimination of grazing in certain pastures, reduced grazing duration, changes in season of use, reduced stocking rates, fencing livestock out of riparian areas, or incorporating specific habitat objectives for Gunnison sage-grouse or other special status species (BLM 2012a, pp. 1–2). It is anticipated that these changes will minimize further impacts to habitat and, if continued in the future through Instruction Memoranda or Resource Management Plan Amendments (see Factor D discussion), improve degraded habitats for Gunnison sage-grouse in the Gunnison Basin. Likewise, conservation measures from the CCA (BLM 2013b, entire) should continue to reduce impacts from livestock grazing and operations on Federal lands in the Gunnison Basin (see Conservation Programs and Efforts Related to Habitat Conservation later in this Factor A analysis for more details).

Some data indicate habitat conditions within a part of occupied habitat in the Gunnison Basin may be favorable to Gunnison sage-grouse (Williams and Hild 2011, entire). Detailed vegetation monitoring was conducted on six study sites, across the Gunnison Basin during 2010 and 2011 in order to determine baseline habitat conditions for a potential future study of the effects of manipulating livestock grazing on Gunnison sage-grouse habitat (Williams and Hild 2011, entire). Transects were conducted on private, BLM, USFS, and CPW land. Despite lower than average precipitation in 2010, and wide variability of habitat conditions across the study area, most vegetation measurements were within the structural habitat guidelines for Gunnison sage-grouse from the 2005 Rangewide Conservation Plan (GSRSC[b] 2005, pp. H–6–H–8). However, measuring livestock grazing effects was not an objective of the study (Phillips 2013, p. 4). The extent of past or current

livestock grazing in these areas was not described, nor did the study compare un-grazed to grazed areas. Further, transect locations were prioritized and selected in important breeding areas used by radio-collared Gunnison sage-grouse, potentially biasing study results. Therefore, the relationship between livestock grazing and habitat conditions is unknown under this study, and there is limited ability to infer conditions in other portions of the Gunnison Basin not prioritized for sampling.

*Livestock Grazing in All Other Population Areas*

The BLM manages approximately 36 percent of the area currently occupied by Gunnison sage-grouse in the San Miguel Basin, and approximately 79 percent of this area is actively grazed. Grazing also occurs on lands owned or managed by other entities within the San Miguel Basin, but we have no information on the extent of grazing in these areas. Within the occupied range in the San Miguel population, no active BLM grazing allotments have Gunnison sage-grouse habitat objectives incorporated into the allotment management plans or Records of Decision for permit renewals (USFWS 2010c, p. 9). In 2013, 10 (83 percent) of 12 active allotments in the San Miguel population area had LHAs completed in the last 15 years; however, BLM only evaluated land health specific to Gunnison sage-grouse habitat objectives in four (33 percent) of these 12 allotments. Of the four allotments evaluated, all were found to be meeting LHA Standard 4. LHA data are not available for conditions in the remaining 8 allotments where Gunnison sage-grouse habitat objectives were not considered (Table 8 of Factor A (Livestock Grazing Allotments and Habitat Monitoring); BLM 2013c, p. 3–1). Therefore, for the four allotments in the San Miguel population area for which we have information, it appears that grazing is managed in a manner consistent with land health standards and habitat requirements for Gunnison sage-grouse.

More than 81 percent of the area occupied by the Dove Creek group is privately owned. The BLM manages 11 percent of the occupied habitat, and 41 percent of this area is actively grazed. Within the occupied range in the Dove Creek group of the Monticello-Dove Creek population, there are three active BLM grazing allotments, and none of these have Gunnison sage-grouse habitat objectives incorporated into the allotment management plans or Records of Decision for permit renewals (Table 8 of Factor A (Livestock Grazing

Allotments and Habitat Monitoring); USFWS 2010c, p. 3; BLM 2013c, p. 3–1). In 2013, all three active allotments in occupied habitat had completed LHAs. However, because Gunnison sage-grouse habitat objectives were not considered in these assessments, habitat conditions for Gunnison sage-grouse are unknown (BLM 2013c, p. 3–1). Gunnison sage-grouse are not specifically considered in grazing management plans or permits in this area. Due to the lack of data specific to Gunnison sage-grouse, it is unknown how livestock grazing may be influencing the species or its habitat in the Dove Creek population area.

More than 95 percent of the area occupied by the Monticello population is privately owned. The BLM manages 4 percent of the occupied habitat, and 83 percent of this area is grazed. Within the occupied range in the Monticello population, all 6 active BLM grazing allotments have Gunnison sage-grouse habitat objectives incorporated into the allotment management plans or Records of Decision for permit renewals (USFWS 2010c, p. 6). In 2009 (the most recent information received from BLM on this topic), 88 percent of the area of occupied habitat in active allotments had a recently completed LHA. Approximately 60 percent of the area in occupied habitat in active allotments was found by the BLM to meet LHA Standard 4. Given the small amount of land managed by the BLM in this area, most of which is meeting Standard 4, this information suggests that grazing on the majority of the small percentage of lands managed by the BLM in the Monticello population area is likely managed in a manner consistent with land health standards and habitat requirements for Gunnison sage-grouse.

The majority of occupied habitat in the Monticello population is in private ownership and is actively grazed by cattle. Sheep historically grazed this area as well (Messmer 2013, p. 16). A significant portion of the agricultural lands in Monticello population are enrolled in the Conservation Reserve Program (CRP), and much of these lands are used by Gunnison sage-grouse (Lupis *et al.* 2006, pp. 959–960; Ward 2007, p. 15). CRP land has provided a considerable amount of brood-rearing habitat in the Monticello group because of its forb component. Grazing of CRP land in Utah occurred in 2002 under emergency Farm Bill provisions due to drought and removed at least some of the grass and forb habitat component, thus likely negatively affecting Gunnison sage-grouse chick survival (see NRCS and Private Land Conservation Efforts). Radio-collared males and non-brood-rearing females

exhibited temporary avoidance of grazed fields during and after grazing (Lupis *et al.* 2006, pp. 959–960), although one hen with a brood continued to use a grazed CRP field and successfully fledged her brood.

The BLM manages 28 percent of occupied habitat in the Piñon Mesa population area, and approximately 97 percent of this area is grazed. Over 50 percent of occupied habitat in this population area is privately owned, and while grazing certainly occurs on these lands, we have no information on its extent. Within the occupied range in the Piñon Mesa population, 8 of 15 (53 percent) active BLM grazing allotments have Gunnison sage-grouse habitat objectives incorporated into the allotment management plans or Records of Decision for permit renewals (USFWS 2010c, p. 5). In 2013, four of these allotments (27 percent) had completed LHAs. Of the four allotments in which LHAs were completed, all (100 percent) were found to be meeting LHA Standard 4 (Table 8 of Factor A (Livestock Grazing Allotments and Habitat Monitoring); BLM 2013c, p. 3–1). Therefore, for the small portion of the Piñon Mesa population area for which we have information, it appears that grazing is managed in a manner consistent with Gunnison sage-grouse habitat requirements.

Over 76 percent of the area occupied by the Cerro Summit-Cimarron-Sims Mesa population is privately owned. The BLM manages only 13 percent of the occupied habitat, of which 83 percent is grazed. Within the occupied range in the Cerro Summit-Cimarron-Sims Mesa population, 1 of 6 active BLM grazing allotments have Gunnison sage-grouse habitat objectives incorporated into the allotment management plans or Records of Decision for permit renewals (USFWS 2010c, p. 7). In 2013, of six active allotments, all had completed LHAs; however, BLM only evaluated land health specific to Gunnison sage-grouse habitat objectives in one (17 percent) of these six allotments. That single allotment was found to be meeting LHA Standard 4. However, general land health standards (not specific to Gunnison sage-grouse) were met on BLM lands in this area, although such conditions may or may not meet the needs of Gunnison sage-grouse. LHA data specific to Gunnison sage-grouse habitat objectives are not available for the remaining five allotments (Table 8 of Factor A (Livestock Grazing Allotments and Habitat Monitoring); BLM 2013c, p. 3–1). However, for the small portion of the Cerro Summit-Cimarron-Sims Mesa population area for which we have

information, it appears that grazing is being managed in a manner consistent with land health standards and habitat requirements for Gunnison sage-grouse.

Lands administered by the BLM and NPS comprise over 75 percent of occupied habitat in the Crawford population, and 96 percent of this area is actively grazed. Grazing allotments on NPS lands in this area are administered by the BLM. In 2013, of eight active allotments in the Crawford population, all had incorporated Gunnison sage-grouse habitat objectives and completed LHAs. Seven (88 percent) of these eight allotments were found to be meeting LHA Standard 4, however 6 of those allotments were defined as "meeting with problems" (generally these allotments were found to be low for some aspect of vegetation characteristics for breeding habitat recommended in GSRSC) (Table 8 of Factor A (Livestock Grazing Allotments and Habitat Monitoring); BLM 2013c, p. 3–1). Based on this information, it appears that grazing may be managed in a manner consistent with Gunnison sage-grouse conservation in the majority of the Crawford population area.

The BLM manages nearly half of occupied habitat in the Poncha Pass population area, and approximately 98 percent of this area is actively grazed. Within the occupied range in the Poncha Pass population, all eight active BLM grazing allotments have Gunnison sage-grouse habitat objectives incorporated into the allotment management plans or Records of Decision for permit renewals (USFWS 2010c, p. 4). In 2013, all active allotments in occupied habitat had completed LHAs, and all were meeting LHA objectives. Based on this information it appears that grazing is managed in a manner consistent with Gunnison sage-grouse conservation on BLM land in the Poncha Pass population area.

### Wild Ungulate Herbivory in All Population Areas

Overgrazing by deer and elk may cause local degradation of habitats by removal of forage and residual hiding and nesting cover. Hobbs *et al.* (1996, pp. 210–213) documented a decline in available perennial grasses as elk densities increased. Such grazing could negatively impact nesting cover for sage-grouse. The winter range of deer and elk overlaps the year-round range of the Gunnison sage-grouse. Excessive but localized deer and elk grazing has been documented in the Gunnison Basin (BLM 2005a, pp. 17–18; Jones 2005, pers. comm.).

BLM_0072036

Grazing by deer and elk occurs in all Gunnison sage-grouse population areas. Although we have no information indicating that competition for resources is limiting Gunnison sage-grouse in the Gunnison Basin, BLM observed that certain mountain shrubs were being browsed heavily by wild ungulates (BLM 2009a, p. 34). Subsequent results of monitoring in mountain shrub communities indicated that drought and big game were having large impacts on the survivability and size of mountain mahogany *(Cercocarpus utahensis)*, bitterbrush *(Purshia tridentata)*, and serviceberry *(Amelanchier alnifolia)* in the Gunnison Basin (Japuntich *et al.* 2010, pp. 7–9). The authors speculated that observed reductions in shrub size and vigor will reduce drifting snow accumulation resulting in decreased moisture availability to grasses and forbs during the spring melt. Reduced grass and forb growth could negatively impact Gunnison sage-grouse nesting and early brood-rearing habitat. It is also thought that elk numbers and their seasonal occurrence in the Crawford population may be contributing to habitat impacts and direct disturbance of Gunnison sage-grouse (BLM 2013c, p. 4–9).

*Summary of Domestic Grazing and Wild Ungulate Herbivory*

Livestock management and domestic grazing have the potential to degrade Gunnison sage-grouse habitat. Grazing incompatible with local ecological conditions, as described above, can adversely impact nesting and brood-rearing habitat by decreasing vegetation available for concealment from predators. Grazing incompatible with local ecological conditions also has been shown to compact soils, decrease herbaceous abundance, increase erosion, and increase the probability of invasion of exotic plant species (GSRSC 2005, p. 173).

The impacts of livestock operations on Gunnison sage-grouse depend upon stocking levels and season of use. We recognize that not all livestock grazing results in habitat degradation, and many livestock operations within the range of Gunnison sage-grouse are employing innovative grazing strategies and conservation actions (BLM 2012a, pp. 1–2; Gunnison County Stockgrowers 2009, entire) in collaboration with the BLM and Forest Service. As discussed above, habitat conditions are likely favorable to Gunnison sage-grouse in part of the Gunnison Basin (Williams and Hild 2011, entire), although the relationship of livestock grazing to habitat conditions in those areas is unknown.

As described above, the relationship between LHA determinations and the effects of domestic livestock grazing on Gunnison sage-grouse is imprecise, and the application of LHA methods varies widely across the species' range. The best available information suggests that LHA objectives important to Gunnison sage-grouse are not being met across parts of the species' range and that livestock grazing is likely contributing to those conditions in some instances. Reduced habitat quality in those areas, as reflected in LHA data, is likely negatively impacting Gunnison sage-grouse in some of the populations, including the Gunnison Basin. In summary, for BLM allotments, 67 percent have Gunnison sage-grouse habitat objectives, and 39 percent are meeting LHA Standard 4 (Table 8 of Factor A (Livestock Grazing Allotments and Habitat Monitoring)).

Numerous public comments on our proposed rule to list Gunnison sage-grouse as endangered (78 FR 2486, January 11, 2013) suggested that because the Gunnison Basin population is large and stable (but see additional discussion regarding this assumption in Factor E (Small Population Size and Structure)), current livestock grazing practices are not having adverse effects on this population. While we agree that, relative to the satellite populations, the Gunnison Basin population is large and lek count data indicate it is currently stable, there are no data to demonstrate whether livestock grazing is limiting the population. The best available data suggests that livestock grazing that is done in a manner inconsistent with local ecological conditions is likely negatively impacting localized areas of habitat and individual birds in the Gunnison Basin and in other populations.

We know that grazing incompatible with local ecological conditions can have negative impacts to sagebrush and consequently to Gunnison sage-grouse at local scales. Impacts to sagebrush plant communities as a result of grazing are occurring on a large portion of the range of the species. As described in more detail below, conservation measures from the Gunnison Basin CCA (BLM 2013b, entire) should continue to reduce impacts from livestock grazing and operations on Federal lands in the Gunnison Basin. Likewise, conservation measures from the CCAA Program have minimized impacts from livestock grazing and operations on private lands across the range of Gunnison sage-grouse (see Conservation Programs and Efforts Related to Habitat Conservation later in this Factor A discussion). We expect livestock grazing to continue

throughout the range of Gunnison sage-grouse for as long as it is economically viable. Since the winter range of deer and elk overlaps the year-round range of Gunnison sage-grouse and there is documentation of isolated localized excessive grazing by deer and elk as discussed above, effects of domestic livestock grazing are likely intensified by browsing of woody species by wild ungulates in portions of the Gunnison Basin and the Crawford area, and potentially other populations. Habitat degradation that can result from grazing in a manner incompatible with local ecological conditions, particularly with the interacting factors of invasive weed expansion and climate change, is a current and future threat to Gunnison sage-grouse persistence.

*Fences*

Effects of fencing on sage-grouse include direct mortality through collisions, creation of raptor and corvid perch sites, the potential creation of predator corridors along fences (particularly if a road is maintained next to the fence), incursion of exotic species along the fencing corridor, and habitat decline (Call and Maser 1985, p. 22; Braun 1998, p. 145; Connelly *et al.* 2000a, p. 974; Beck *et al.* 2003, p. 211; Knick *et al.* 2003, p. 612; Connelly *et al.* 2004, p. 1–2). However, fences can also benefit Gunnison sage-grouse by facilitating the management of livestock forage use and distribution to achieve desired habitat objectives (GSRSC 2005, pp. 211–213).

Sage-grouse frequently fly low and fast across sagebrush flats, and fences can create a collision hazard resulting in direct mortality (Call and Maser 1985, p. 22; Christiansen 2009, pp. 1–2). Not all fences present the same mortality risk to sage-grouse. Mortality risk appears to be dependent on a combination of factors including design of fencing, landscape topography, and spatial relationship with seasonal habitats (Christiansen 2009, pp. 1–2). This variability in fence mortality rate and the lack of systematic fence monitoring make it difficult to determine the magnitude of direct strike mortality impacts to sage-grouse populations; however, in some cases the level of mortality is likely significant to localized areas within populations. Greater sage-grouse fence collisions during the breeding season in Idaho were found to be relatively common and widespread, with collisions being influenced by the technical attributes of the fences, fence length and density, topography, and distance to nearest active sage-grouse lek (Stevens 2011, pp. 102–107; Stevens *et al.* 2012a; p. 300; Stevens *et al.* 2012b, p. 1377). Stevens

BLM_0072037

et al. (2012a; p. 299) found 41 of 60 recorded collisions (73 percent) in spring of 2010 were less than 500m from a lek and only 1 collision > 500m from a lek, indicating that fences near leks containing certain topographic properties may pose an increased risk to sage-grouse.

Although we expect the impacts of fences to Gunnison sage-grouse are similar to those observed in greater sage-grouse, studies on fence strike-related mortality in Gunnison sage-grouse are more limited. In 10 years of tracking and studying over 1,000 radio-collared sage-grouse in Colorado, CPW has documented only two strike-related mortalities in Gunnison sage-grouse due to fences (one confirmed case in Poncha Pass attributed to bird release methods; and one unconfirmed case in the Gunnison Basin); and only two strike-related mortalities in greater sage-grouse due to fences (CPW 2013b, p. 11; Phillips and Griffin 2013, pers. comm.). This information suggests that, in Colorado, direct mortality of sage-grouse due to fence strikes is minimal, although without a more thorough study, the anecdotal information may be misleading.

Although the effects of direct strike mortality on populations are not fully analyzed, fences are generally widespread across the landscape. At least 1,540 km (960 mi) of fence are on BLM lands within the Gunnison Basin (Borthwick 2005b, pers. comm.; BLM 2005a, 2005e) and an unquantified amount of fence is located on land owned or managed by other landowners. Many miles of historic fence occurs on NPS lands, some of which may be affecting Gunnison sage-grouse. As of 2013, the NPS has removed 1.6 km (1 mi) of unnecessary fencing, and will continue inventorying efforts for additional removal where fencing is not needed. The NPS is also constructing 8.8 km (5.5 mi) of fence to prevent cattle grazing on a retired portion of an allotment. The fence is built to CPW suggested wildlife-friendly specifications with raptor perch deterrents and marked fence wires. Fences are present within all other Gunnison sage-grouse population areas as well, but we have no quantitative information on the amount or types of fencing in these areas.

Fence posts create perching places for raptors and corvids, which may increase the ability of these birds to prey on sage-grouse (Braun 1998, p. 145; Oyler-McCance et al. 2001, p. 330; Connelly et al. 2004, p. 13–12). This impact is potentially significant for sage-grouse reproduction because corvids were responsible for more than 50 percent of

greater sage-grouse nest predations in Nevada (Coates 2007, pp. 26–30). Greater sage-grouse avoidance of habitat adjacent to fences, presumably to minimize the risk of predation, effectively results in habitat fragmentation even if the actual habitat is not removed (Braun 1998, p. 145). Because of similarities in behavior and habitat use, the response of Gunnison sage-grouse should be similar to that observed in greater sage-grouse.

*Summary of Fences*

Fences contribute to habitat decline and increase the potential for loss of individual grouse through collisions or enhanced predation. Fences can also benefit Gunnison sage-grouse by facilitating better management of livestock grazing forage use and distribution in sagebrush habitats. Despite some fence removal, we expect that the majority of existing fences will remain on the landscape indefinitely. In the smaller Gunnison sage-grouse populations, fencing cumulatively affects the ability of the species to persist. We also recognize that fences are located throughout all Gunnison sage-grouse populations and are, therefore, contributing to the decline of remaining habitat and are a potential source of mortality within all populations. For these reasons, fences are likely a contributing factor to the decline of Gunnison sage-grouse populations, both directly and indirectly, and are therefore a current and future threat to the species.

*Invasive Plants*

For the purposes of this rule, we define invasive plants as those that are not native to an ecosystem and that have a negative impact on Gunnison sage-grouse habitat. Invasive plants alter native plant community structure and composition, productivity, nutrient cycling, and hydrology (Vitousek 1990, p. 7) and may cause declines in native plant populations through competitive exclusion and niche displacement, among other mechanisms (Mooney and Cleland 2001, p. 5446). Invasive plants reduce and can eliminate vegetation that sage-grouse use for food and cover, and generally do not provide quality sage-grouse habitat. Sage-grouse depend on a variety of native forbs and the insects associated with them for chick survival, and on sagebrush, which is used exclusively throughout the winter for food and cover. In eastern Nevada, leks with post-fire invasive grasses showed reduced lek recruitment and reduced annual survival of male greater sage-grouse as compared to leks surrounded by native sagebrush habitats, despite

favorable rainfall and climatic conditions (Blomberg et al. 2012). Reduced adult survival, reproduction, and recruitment at the local levels may, in turn, negatively impact sage-grouse populations.

Along with replacing or removing vegetation essential to sage-grouse, invasive plants negatively impact existing sage-grouse habitat. They can create long-term changes in ecosystem processes, such as fire-cycles (see discussion below under Fire in this Factor A analysis) and other disturbance regimes that persist even after an invasive plant is removed (Zouhar et al. 2008, p. 33). A variety of nonnative annuals and perennials are invasive to sagebrush ecosystems (Connelly et al. 2004, pp. 7–107 and 7–108; Zouhar et al. 2008, p 144). Cheatgrass is considered most invasive in Wyoming big sagebrush communities (Connelly et al. 2004, pp. 5–9). Other invasive plants found within the range of Gunnison sage-grouse that are reported to take over large areas include: spotted knapweed *(Centaurea maculosa),* Russian knapweed *(Acroptilon repens),* oxeye daisy *(Leucanthemum vulgare),* yellow toadflax *(Linaria vulgaris),* and field bindweed *(Convolvulus arvensis)* (BLM 2009a, p. 28, 36; Gunnison Watershed Weed Commission (GWWC) 2009, pp. 4–6).

Although not yet reported to affect large expanses in the range of Gunnison sage-grouse, the following weeds are also known to occur in the species' range and have successfully invaded large expanses of native wildlife habitats in other parts of western North America: diffuse knapweed *(Centaurea diffusa),* whitetop *(Cardaria draba),* jointed goatgrass *(Aegilops cylindrica),* and yellow starthistle *(Centaurea solstitialis).* Other invasive plant species present within the range of Gunnison sage-grouse that are problematic yet less likely to overtake large areas include: Canada thistle *(Cirsium arvense),* musk thistle *(Carduus nutans),* bull thistle *(Cirsium vulgare),* houndstongue *(Cynoglossum officinale),* black henbane *(Hyoscyamus niger),* common tansy *(Tanacetum vulgare),* and absinth wormwood *(A. biennis)* (BLM 2009a, p. 28, 36; GWWC 2009, pp. 4–6).

Cheatgrass impacts sagebrush ecosystems by potentially shortening fire intervals from several decades, to as low as 3 to 5 years (depending on sagebrush plant community type and site productivity), perpetuating its own persistence and intensifying the role of fire (Whisenant 1990, p. 4). Another study found that cheatgrass presence can shorten fire intervals to less than 10 years resulting in the elimination of

shrub cover and reducing the availability and quality of forb cover (Connelly *et al.* 2004, p. 7–5). Elevated carbon dioxide levels associated with climate change may increase the competitive advantage (via increased growth and reproduction rates) of exotic annual grasses, such as cheatgrass, in higher elevation areas, such as in Gunnison sage-grouse range, where its current distribution is limited (Miller *et al.* 2011, pp. 181–183). Decreased summer precipitation reduces the competitive advantage of summer perennial grasses, reduces sagebrush cover, and subsequently increases the likelihood of cheatgrass invasion (Bradley 2009, pp. 202–204; Prevey *et al.* 2009, p. 11). Future decreased summer precipitation could increase the susceptibility of sagebrush areas in Utah and Colorado to cheatgrass invasion (Bradley 2009, p. 204).

A variety of restoration and rehabilitation techniques are used to treat invasive plants, but they can be costly and are mostly unproven and experimental at a large scale. No broad-scale cheatgrass eradication method has yet been developed. Habitat treatments that either disturb the soil surface or deposit a layer of litter increase cheatgrass establishment in the Gunnison Basin when a cheatgrass seed source is present (Sokolow 2005, p. 51). Rehabilitation and restoration techniques for sagebrush habitats are mostly unproven and experimental, raising further concerns about soil disturbance and removal of any remaining sage-brush habitats. (Pyke 2011, p. 543). Therefore, researchers recommend using habitat treatment tools, such as brush mowers, with caution and suggest that treated sites should be monitored for increases in cheatgrass emergence (Sokolow 2005, p. 49).

*Invasive Plants in the Gunnison Basin Population Area*

Quantifying the total amount of Gunnison sage-grouse habitat impacted by invasive plants is difficult due to differing sampling methodologies, incomplete sampling, inconsistencies in species sampled, and varying interpretations of what constitutes an infestation (Miller *et al.,* 2011, pp. 155–156). Cheatgrass has invaded areas in the Gunnison sage-grouse range, supplanting sagebrush habitat in some areas (BLM 2009a, p. 60). However, we do not have a reliable estimate of the amount of area occupied by cheatgrass in the range of Gunnison sage-grouse. While not ubiquitous, cheatgrass is found at numerous locations throughout the Gunnison Basin (BLM 2009a, p. 60)

and has been identified as an impact to sage-grouse habitat in that population (GSRSC 2005, p. 78).

Cheatgrass infestation within a particular area can range from a small number of individuals scattered sparsely throughout a site, to complete or near-complete understory domination of a site. Cheatgrass has increased throughout the Gunnison Basin in the last decade and is becoming increasingly detrimental to sagebrush community types (BLM 2009a, p. 7). Currently in the Gunnison Basin, cheatgrass attains site dominance most often along roadways; however, other highly disturbed areas have similar cheatgrass densities. In the Gunnison Basin, cheatgrass is currently present in almost every grazing allotment in Gunnison sage-grouse occupied habitat; and other invasive plant species, such as Canada thistle, black henbane, spotted knapweed, Russian knapweed, kochia (*Kochia scoparia*), bull thistle, musk thistle, oxeye daisy, yellow toadflax and field bindweed, are found in riparian areas and roadsides (BLM 2009a, p. 7).

Weed control efforts in the Gunnison Basin vary by area and agency or organization. NPS weed control efforts have been successful at reducing weeds (undesirable plant species, typically including exotic or introduced species) in targeted areas. Gunnison County, the Gunnison Basin Weed Commission, and other partners aggressively treat and control weeds on all lands in the Gunnison Basin. From 2006 to 2012, a total of 517 ha (1,280 ac) of land was treated for weeds in and near occupied habitat for Gunnison sage-grouse (Gunnison County 2013a, p. 105), however it is unclear what portion of habitat this represents. Gunnison County also recently adopted best management practices for weeds identified in the Gunnison Basin CCA (Gunnison County 2013a, p. 78). Other measures related to weed control by Gunnison County include reclamation standards and inspections (Gunnison County 2013a, p. 106), educational programs and consultations (Gunnison County 2013a, p. 107). While beneficial and necessary, such control efforts are likely inadequate to address the threat of invasive plants, particularly in the face of climate change and drought which are likely to intensify the proliferation of these species in the range of Gunnison sage-grouse.

Although disturbed areas most often contain the highest cheatgrass densities, cheatgrass can readily spread into less disturbed and even undisturbed habitat. A strong indicator for future cheatgrass invasion is the proximity to current

locations (Bradley and Mustard 2006, p. 1146) as well as summer, annual, and spring precipitation, and winter temperature (Bradley 2009, p. 196). Although we lack the information to make a detailed determination on the actual extent or rate of increase, given its invasive nature, it appears that cheatgrass and its negative influence on Gunnison sage-grouse will increase in the Gunnison Basin in the future due to future human disturbances, potential exacerbation from climate change interactions, and the lack of success to date with control efforts at broad scales. Based on experience from other areas in sagebrush ecosystems concerning the rapid spread of cheatgrass and the shortened fire return intervals that can result, the spread of cheatgrass within Gunnison sage-grouse habitat and the negative effects to Gunnison sage-grouse populations will likely increase over time.

*Invasive Plants in All Other Population Areas*

Cheatgrass is present throughout much of the San Miguel Basin population area (BLM 2005c, p. 6), but is most abundant in the Dry Creek Basin area (CDOW 2005, p. 101), which comprises 62 percent of the San Miguel Basin population. It is also present in the five Gunnison sage-grouse subpopulations east of Dry Creek Basin, although at much lower densities that do not currently pose a serious threat to Gunnison sage-grouse (CDOW 2005, p. 101).

Invasive species are present at low levels in the Monticello group (San Juan County GSGWG 2005, p. 20). However, there is no evidence that they are affecting the population.

Cheatgrass dominates 10–15 percent of the sagebrush understory in the current range of the Piñon Mesa population (Lambeth 2005, pers. comm.). It occurs in the lower elevation areas below Piñon Mesa that were formerly Gunnison sage-grouse range. Cheatgrass invaded two small prescribed burn areas in or near occupied habitat conducted in 1989 and 1998 (BLM 2005d, p. 6), and continues to be a concern with new ground-disturbing projects. Within the Piñon Mesa population, 520 ha (1,284 ac) of BLM lands are currently mapped with cheatgrass as the dominant species (BLM 2009a, p. 3). This is not a comprehensive inventory of cheatgrass occurrence, as it only includes areas where cheatgrass dominates the plant community and does not include areas where the species is present at lower densities.

Invasive plants, especially cheatgrass, occur primarily along roads, other disturbed areas, and isolated areas of untreated vegetation in the Crawford population area. According to BLM (2005c, p.6), in the Crawford population area, the threat of cheatgrass may be greater than all other nonnative species combined and could be a major limiting factor when and if disturbance is used to improve habitat conditions, unless mitigated.

Cheatgrass distribution has not been comprehensively mapped for the Monticello-Dove Creek population area; however, cheatgrass is beginning to be assessed on a site-specific and project-level basis. No significant invasive plant occurrences are currently known in the Poncha Pass population area.

*Summary of Invasive Plants*

Invasive plants negatively impact Gunnison sage-grouse primarily by reducing or eliminating native vegetation that sage-grouse require for food and cover, resulting in habitat decline. Although invasive plants, especially cheatgrass, have affected some Gunnison sage-grouse habitat, the impacts do not currently appear to be threatening individual populations or the species rangewide. However, invasive plants continue to expand their range, facilitated by ground disturbances such as fire, grazing, and human infrastructure. Climate change will likely alter the range of individual invasive species, accelerating the decline of sagebrush communities. Even with treatments, given the history of invasive plants on the landscape, and our continued inability to control such species, invasive plants will persist and will likely continue to spread throughout the range of the species indefinitely. Although currently not a major threat to the persistence of Gunnison sage-grouse at the species level, we anticipate invasive species to become an increasing threat to the species in the future, particularly when considered in conjunction with future climate projections and potential changes in sagebrush plant community composition and dynamics.

*Fire*

Mountain big sagebrush, the most important and widespread sagebrush species for Gunnison sage-grouse, is killed by fire and can require decades to recover. In nesting and wintering sites, fire causes direct loss of habitat due to reduced cover and forage (Call and Maser 1985, p. 17), with effects likely lasting 75 years or longer until sagebrush recovers (Baker 2011, p. 16). While there may be limited instances

where burned habitat is beneficial (via prescribed fire or wildfire), these gains are lost if alternative sagebrush habitat is not readily available (Woodward 2006, p. 65). Another study (Baker 2013, p. 8) suggested that prescribed burning in sagebrush habitat may be detrimental, given the already limited range of Gunnison sage-grouse (see above sections, Current Distribution and Population Estimates, and Factor A introduction). Findings from that study indicated that historical fire regimes in Gunnison sage-grouse range resulted in large areas of contiguous sagebrush across the landscape when Gunnison sage-grouse were more widespread and abundant. Fire treatments to thin or reduce sagebrush, with its potential negative effects, would not be as beneficial to the species as efforts made to expand areas of contiguous sagebrush (Baker 2013, pp. 1, 8). Likewise, using fire to remove all trees in sagebrush habitats is likely not appropriate, based on the historical presence of piñon-juniper in these communities. Piñon-juniper abundance likely fluctuated over time in response to fire, at times occupying approximately 20 percent of the sagebrush landscape (Baker 2013, p. 8). Thus, on the whole, we conclude that fire negatively affects Gunnison sage-grouse and its habitat.

The nature of historical fire patterns in sagebrush communities, particularly in Wyoming big sagebrush, is not well understood, and a high degree of variability likely occurred (Miller and Eddleman 2001, p. 16; Zouhar et al. 2008, p. 154; Baker 2011, p. 195). In general, mean fire return intervals in low-lying, xeric (dry) big sagebrush communities range from over 100 to 350 years, with return intervals from 50 to over 200 years in more mesic (wet) areas, at higher elevations, during wetter climatic periods, and in locations associated with grasslands (Baker 2006, p. 181; Mensing et al. 2006, p. 75; Baker 2011, pp. 194–195; Miller et al. 2011, p. 166).

Herbaceous understory vegetation plays a critical role throughout the breeding season as a source of forage and cover for Gunnison sage-grouse females and chicks. The response of herbaceous understory vegetation to fire varies with differences in species composition, pre-burn site condition, fire intensity, and pre- and post-fire patterns of precipitation. Any beneficial flush of perennial grasses and forbs following fire in sagebrush communities is often minimal and lost after only a few years, with little difference in herbaceous vegetation between burned and unburned sites, but reduced sagebrush in burned sites (Cook et al.

1994, p. 298; Fischer et al. 1996a, p. 196; Crawford 1999, p. 7; Wrobleski 1999, p. 31; Nelle et al. 2000, p. 588; Paysen et al. 2000, p. 154; Wambolt et al. 2001, p. 250).

In addition to altering plant community structure through shrub removal and potential weed invasion, fires can influence invertebrate food sources (Schroeder et al. 1999, p. 5). Studies in greater sage-grouse habitats indicate fire indeed influences the abundance of important insect species (Fischer et al. 1996a, p. 196; Nelle et al. 2000, p. 589; Pyle and Crawford 1996, p. 322). However, the response (positive or negative) and duration of those effects, and subsequent recovery of insect populations, varied widely between studies and areas. Therefore, although the best available information indicates that fire may influence sage-grouse survival by altering the availability of insect prey, the magnitude of those effects is uncertain.

The invasion of the exotic annual grass cheatgrass increases fire frequency within the sagebrush ecosystem (Zouhar et al. 2008, p. 41; Miller et al. 2011, p. 170). As described in the previous section (Invasive Species), cheatgrass readily invades sagebrush communities, especially disturbed sites, and changes historical fire patterns by providing an abundant and easily ignitable fuel source that facilitates fire spread. While sagebrush is killed by fire and is slow to reestablish, cheatgrass recovers within 1 to 2 years of a fire event (Young and Evans 1978, p. 285). This annual recovery leads to a readily burnable fuel source and ultimately a reoccurring fire cycle that prevents sagebrush reestablishment (Eiswerth et al. 2009, p. 1324). The extensive distribution and highly invasive nature of cheatgrass poses increased risk of fire and permanent loss of sagebrush habitat, as areas disturbed by fire are highly susceptible to further invasion and ultimately habitat conversion to an altered community state. For example, Link et al. (2006, p. 116) show that risk of fire increases from approximately 46 to 100 percent when ground cover of cheatgrass increases from 12 to 45 percent or more. However, BLM (2013b, p. 1–7) noted that changes in fire frequency due to cheatgrass invasion, such as those observed in the Great Basin region of the western United States, have not been observed on BLM lands in Gunnison sage-grouse range.

As discussed above, there are numerous potential negative effects of fire to sagebrush habitat and, presumably, Gunnison sage-grouse. A clear positive response of Gunnison or greater sage-grouse to fire has not been

demonstrated (Braun 1998, p. 9). The few studies that have suggested fire may be beneficial for greater sage-grouse were primarily conducted in mesic areas used for brood-rearing (Klebenow 1970, p. 399; Pyle and Crawford 1996, p. 323; Gates 1983, in Connelly et al. 2000c, p. 90; Sime 1991, in Connelly et al. 2000a, p. 972). In this type of habitat, small fires may maintain a suitable habitat mosaic by reducing shrub encroachment and encouraging understory, herbaceous growth. However, without available nearby sagebrush cover, the utility of these sites is questionable. This is especially true within the six small Gunnison sage-grouse populations, where fire could further degrade the remaining habitat. More recent research indicated that, due to the fragmented nature of remaining sagebrush habitat across the species' range, prescribed fire may be inappropriate if the goal is to improve sagebrush conditions and overall habitat quality for the species (Baker 2013, p. 8).

*Fire in the Gunnison Basin Population Area*

Six prescribed burns have occurred on BLM lands in the Gunnison Basin since 1984, totaling approximately 409 ha (1,010 ac) (BLM 2009a, p. 35). The fires created large sagebrush-free areas that were further degraded by poor post-burn livestock management (BLM 2005a, p. 13). As a result, these areas are less suitable as Gunnison sage-grouse habitat. Approximately 8,470 ha (20,930 ac) of prescribed burns occurred on Forest Service lands in the Gunnison Basin since 1983 (USFS 2009, p. 1). A small wildfire on BLM lands near Hartman Rocks burned 8 ha (20 ac) in 2007 (BLM 2009a, p. 35). The NPS completed a prescribed burn on the north rim of the Black Canyon of the National Park in mixed montane shrub and mountain big sagebrush communities to remove invading juniper trees. Very few mountain big sagebrush were killed as a result of the burn. The total area of occupied Gunnison sage-grouse habitat in the Gunnison Basin burned in recent decades is approximately 8,887 ha (21,960 ac), which constitutes 1.5 percent of the occupied Gunnison sage-grouse habitat area. Cumulatively, this 1.5 percent area equates to a relatively small amount of habitat burned over a period of nearly three decades. This information suggests that there has not been a demonstrated change in fire cycle in the Gunnison Basin population area to date. The Nature Conservancy et al. (2011, p. 12) predicts that, due to climate change, wildfire frequency and

severity will increase in the Gunnison Basin (see Climate Change section in this Factor A analysis). However, CPW recently completed a literature review regarding fire in high elevation Intermountain sage-brush basins, such as the Gunnison Basin, and concluded that the probability of catastrophic fire in these areas in the future is low, due to historic fire return intervals, the low number of lightning strikes in the Gunnison Basin, and a low relative risk of cheatgrass invasion after fires (CPW 2014g, Attachment 2).

*Fire in All Other Population Areas*

Two prescribed burns conducted in 1986 (105 ha (260 ac)) and 1992 (140 ha (350 ac)) on BLM land in the San Miguel Basin on the north side of Dry Creek Basin had localized negative impacts on Gunnison sage-grouse. The burns were conducted for big game forage improvement, but the sagebrush died and was largely replaced with weeds (BLM 2005b, pp. 7–8). The Burn Canyon wildfire in the Dry Creek Basin and Hamilton Mesa areas burned 890 ha (2,200 ac) in 2000. Three wildfires have occurred in Gunnison sage-grouse habitat since 2004 on lands managed by the BLM in the Crawford, Cerro Summit-Cimarron-Sims Mesa, and San Miguel Basin population areas. There have been no fires since 2004 on lands managed by the BLM within the Monticello-Dove Creek population. Because these fires were mostly small in size, we do not believe they resulted in substantial impacts to Gunnison sage-grouse at the species level.

Several wildfires near or within the Piñon Mesa population area have occurred in the past 20 years. One fire burned a small amount of occupied Gunnison sage-grouse habitat in 1995, and several fires burned in potential Gunnison sage-grouse habitat. Individual burned areas in this population ranged from 3.6 ha (9 ac) to 2,160 ha (5,338 ac). A wildfire in 2009 burned 1,053 ha (2,602 ac), predominantly within vacant or unknown Gunnison sage-grouse habitat (suitable habitat for sage-grouse that is separated from occupied habitats that has not been adequately inventoried, or without recent documentation of grouse presence) near the Piñon Mesa population.

Since 2004, a single 2.8-ha (7-ac) wildfire occurred in the Cerro Summit-Cimarron-Sims Mesa population area, and two prescribed fires, both less than 12 ha (30 ac), were implemented in the San Miguel population area. No fire activity is reported within occupied Gunnison sage-grouse habitat in the last two decades in the Poncha Pass

population area (CDOW 2009b, pp. 125–126) or the Monticello-Dove Creek population area (CDOW 2009b, p. 75; UDWR 2009, p. 5). Although fire can have devastating effects on Gunnison sage-grouse habitats, as discussed above, because fires have burned primarily outside of occupied Gunnison sage-grouse habitat in the Piñon Mesa population area and fire has been recently absent or minimal in most other population areas, fire has not resulted in substantial impacts to Gunnison sage-grouse in these population areas.

*Summary of Fire*

Fires can cause the proliferation of weeds and can degrade suitable sage-grouse habitat, which may not recover to suitable conditions for decades, if at all (Pyke 2011, p. 539). Recent fires in Gunnison sage-grouse habitat were mostly small in size and did not result in substantial impacts to Gunnison sage-grouse, and there has been no obvious change in fire cycle in any Gunnison sage-grouse population area to date. Therefore, we do not consider fire to be a current threat to Gunnison sage-grouse. While the best available scientific information does not currently allow us to predict the extent or location of future fire events, it does indicate that fire frequency may increase in the future as a result of cheatgrass encroachment on the sagebrush habitat and the projected effects of climate change (see Invasive Plants and Climate Change discussions, above and below in this Factor A analysis, respectively). Fire is, therefore, likely to become a threat to Gunnison sage-grouse in the future.

*Climate Change*

Our analyses under the Act include consideration of ongoing and projected changes in climate and its associated effects. The terms "climate" and "climate change" are defined by the Intergovernmental Panel on Climate Change (IPCC). "Climate" refers to the mean and variability of different types of weather conditions over time, with 30 years being a typical period for such measurements, although shorter or longer periods also may be used (IPCC 2007, p. 78; IPCC 2013, p. 1450). The term "climate change" thus refers to a change in the mean or variability of one or more measures of climate (e.g., temperature or precipitation) that persists for an extended period, typically decades or longer, whether the change is due to natural variability, human activity, or both (IPCC 2007, p. 78; IPCC 2013, p. 1450). Various types of changes in climate can have direct or indirect effects on species. These effects

BLM_0072041

may be positive, neutral, or negative and they may change over time, depending on the species and other relevant considerations, such as the effects of interactions of climate with other variables (e.g., habitat fragmentation) (IPCC 2007, pp. 8–14, 18–19). In our analyses, we use our expert judgment to weigh relevant information, including uncertainty, in our consideration of various aspects of climate change.

According to the IPCC, "Warming of the climate system in recent decades is unequivocal, as is now evident from observations of increases in global average air and ocean temperatures, widespread melting of snow and ice, and rising global sea level" (IPCC 2007, p. 1). Average Northern Hemisphere temperatures during the second half of the 20th century were very likely higher than during any other 50-year period in the last 500 years and likely the highest in at least the past 1,300 years (IPCC 2007, p. 30). Over the past 50 years, cold days, cold nights, and frosts have become less frequent over most land areas, and hot days and hot nights have become more frequent. Heat waves have become more frequent over most land areas, and the frequency of heavy precipitation events has increased over most areas (IPCC 2007, p. 30).

For the southwestern region of the United States, including western Colorado, warming is occurring more rapidly than elsewhere in the country (Karl et al. 2009, p. 129). Annual average temperature in west-central Colorado increased about 1.11 °C (2 °F) over the past 30 years, but high variability in annual precipitation precludes the detection of long-term precipitation trends (Ray et al. 2008, p. 5). Under high greenhouse gas emission scenarios, future projections for the southwestern United States show increased probability of drought (Karl et al. 2009, pp. 129–134), and the number of days over 32 °C (90 °F) could double by the end of the century (Karl et al. 2009, p. 34). Climate models predict annual temperature increase of approximately 2.2 °C (4 °F) in the Southwest by 2050, with summers warming more than winters (Ray et al. 2008, p. 29). Projections also show declines in snowpack across the West with the most dramatic declines at lower elevations (below 2,500 m (8,200 ft)) (Ray et al. 2008, p. 29).

Colorado's complex, mountainous topography results in a high degree of spatial variability across the State. As a result, predicting localized climate changes is challenging for mountainous areas because current global climate models are unable to capture this variability at local or regional scales

(Ray et al. 2008, pp. 7, 20). To obtain climate projections specific to the range of Gunnison sage-grouse, we requested a statistically downscaled model from the National Center for Atmospheric Research for a region covering western Colorado. The resulting projections indicate the highest probability scenario is that average summer (June through September) temperature could increase by 2.8 °C (5.1 °F), and average winter (October through March) temperature could increase by 2.2 °C (4.0 °F) by 2050 (University Corporation for Atmospheric Research (UCAR) 2009, pp. 1–15). Annual mean precipitation projections for Colorado are unclear; however, data indicate a shift towards increased winter precipitation and decreased spring and summer precipitation (Ray et al. 2008, p. 34; Karl et al. 2009, p. 30). Similarly, there is a high probability of a 5 percent increase in average winter precipitation and a 5 percent decrease in average spring-summer precipitation in 2050 (UCAR 2009, p. 15). These predicted changes in precipitation and temperature will likely alter sagebrush plant community composition and dynamics, but to what degree is uncertain.

For sagebrush, spring and summer precipitation comprises the majority of the moisture available to the species; thus, the interaction between reduced precipitation in the spring-summer growing season and increased summer temperatures will likely decrease growth of mountain big sagebrush. This effect could result in a significant long-term reduction in the distribution of sagebrush communities (Miller et al. 2011, pp. 171–174). In the Gunnison Basin, increased summer temperature was strongly correlated with reduced growth of mountain big sagebrush (Poore et al. 2009, p. 558). Based on these results and the likelihood of increased winter precipitation falling as rain rather than snow, and the corresponding increase in evaporation and decrease in deep soil water recharge, Poore et al. (2009, p. 559) predict decreased growth of mountain big sagebrush, particularly at the lower elevation limit of the species. Because Gunnison sage-grouse are sagebrush obligates, loss of sagebrush would result in a reduction of suitable habitat and negatively impact the species. The interaction of climate change with other stressors likely has impacted and will impact the sagebrush steppe ecosystem where Gunnison sage-grouse occur.

Climate change is likely to alter fire frequency, community assemblages, and the ability of nonnative species to proliferate. Increasing temperature as well as changes in the timing and

amount of precipitation will alter the competitive advantage among plant species (Miller et al. 2011, pp. 175–179), and may shift individual species and ecosystem distributions (Bachelet et al. 2001, p. 174). Temperature increases may increase the competitive advantage of cheatgrass in higher elevation areas where its current distribution is limited (Miller et al. 2011, p. 182). Decreased summer precipitation reduces the competitive advantage of summer perennial grasses, reduces sagebrush cover, and subsequently increases the likelihood of cheatgrass invasion (Prevey et al. 2009, p. 11). This impact could increase the susceptibility of areas within Gunnison sage-grouse range to cheatgrass invasion (Bradley 2009, p. 204), which would reduce the overall cover of native vegetation, reduce habitat quality, and potentially decrease fire return intervals, all of which would negatively affect the species. In addition, The Nature Conservancy et al. (2011, p. 12) predicted increased fire frequency and severity in the Gunnison Basin associated with climate change.

Under drought conditions, plants generally are less vigorous and less successful in reproduction, and may require several years to recover following drought (Weltzin et al. 2003, p. 946). Increased drought and shifts in the magnitude and timing of temperature and precipitation could reduce herbaceous and insect production within Gunnison sage-grouse habitats.

A recent climate change vulnerability index applied to Gunnison sage-grouse ranked the species as "highly vulnerable" to modeled climate change by the year 2050 (The Nature Conservancy 2011, p. 11). The mechanism of this vulnerability was the degradation of high-quality brood-rearing habitat due to the loss of adequate moisture for the maintenance of mesic meadows, springs, seeps, and riparian areas, as well as potential changes in the fire regime and subsequent loss of sagebrush cover. A reduction in the quality and amount of these resources, including brood-rearing habitats in particular, will likely affect key demographic processes such as the productivity of breeding hens and survival of chicks and juveniles, resulting in reduced population viability. A recent analysis indicated juvenile survival was the most influential vital rate affecting population growth rates in the Gunnison Basin (Davis 2012, pp. 89). Drought conditions from 1999 through 2003 were closely associated with reductions in the sizes of all Gunnison sage-grouse populations, including the

Gunnison Basin (CDOW 2009b, entire). While geographic and microclimatic variation in the Gunnison Basin may provide some degree of local variation and, perhaps, local population redundancy to resist environmental pressures, past drought has had widespread impacts on this population, as indicated by negative trends in nearly all lek complexes during that period (see Drought in this Factor A analysis; and Resiliency, Redundancy, and Representation in the Factor E analysis for further discussion on this topic).

### Summary of Climate Change

Climate change predictions are based on models with assumptions, and there are uncertainties regarding the magnitude of associated climate change parameters such as the amount and timing of precipitation and seasonal temperature changes. There is also uncertainty as to the magnitude of effects of predicted climate parameters on sagebrush plant community dynamics. These factors make it difficult to predict to what extent climate change will alter Gunnison sage-grouse. We recognize that climate change has the potential to alter Gunnison sage-grouse habitat by facilitating an increase in the distribution of cheatgrass and concurrently increasing the potential for wildfires, and reducing herbaceous vegetation and insect production in drought years, which would have negative effects on Gunnison sage-grouse. We do not consider climate change to be a current threat to Gunnison sage-grouse because of the uncertainties described above. However, based on the best available information on climate change projections over the next 35 years or so, climate change has the potential to alter important seasonal habitats and food resources of Gunnison sage-grouse, the distribution and extent of sagebrush, and the occurrence of invasive weeds and associated fire frequencies. Climate change effects, including increased drought, are also predicted in the Gunnison Basin population. Therefore, we find that climate change is a substantial future threat to Gunnison sage-grouse rangewide.

### Mineral Development

Mineral commodity development on Federal lands includes three primary types: Leasable, locatable, and salable minerals. Below, we define each type of mineral development and assess the scope of those activities and their potential impacts across Gunnison sage-grouse range.

### Leasable Mineral Development

Leasable minerals are defined and administered under the Mineral Leasing Act of 1920, as amended, and include oil and gas, oil shale, coal, geothermal, potash, sodium, and sulfur. In this section, we first discuss the effects of oil and gas development on sage-grouse and sage-grouse habitats in general. We then evaluate potential and ongoing development of oil and gas, coal and coal-bed methane, and other leasable minerals across the range of Gunnison sage-grouse. Available scientific information on the effects of mineral development to sage-grouse is related primarily to oil and gas development. However, in terms of effects on the species and its habitat, we expect other types of mineral development to have impacts similar to that of oil and gas development, though those impacts may vary in magnitude and scope.

### Effects of Oil and Gas Development

Oil and gas, or fluid mineral, development for energy resources on Federal (BLM and USFS) lands is regulated by the BLM (see Factor D analysis below for a more thorough discussion). The BLM (1999, p. 1) has classified the area encompassing all Gunnison sage-grouse habitat for its oil and gas potential. Two population areas, San Miguel Basin and Monticello-Dove Creek, have areas with high potential, and one, the Crawford population area, has medium potential. BLM classifies the oil and gas potential for the remaining populations as low or none. San Miguel County, where much oil and gas activity has occurred in the last few years, ranked 9 out of 39 in Colorado counties producing natural gas in 2009 (Colorado Oil and Gas Conservation Commission 2010a, p. 1) and 29 of 39 in oil production in 2009 (Colorado Oil and Gas Conservation commission 2010b, p. 2).

Energy development impacts sage-grouse and sagebrush habitats through direct habitat loss from well pad construction, seismic surveys, roads, powerlines and pipeline corridors, and indirectly from noise, gaseous emissions, changes in water availability and quality, and human presence. The interaction and intensity of effects could cumulatively or individually lead to habitat degradation and fragmentation (Suter 1978, pp. 6–13; Aldridge 1998, p. 12; Braun 1998, pp. 144–148; Aldridge and Brigham 2003, p. 31; Knick et al. 2003, pp. 612, 619; Lyon and Anderson 2003, pp. 489–490; Connelly et al. 2004, pp. 7–40 to 7–41; Holloran 2005, pp. 56–57; Holloran et al. 2007, pp. 18–19; Aldridge and Boyce 2007, pp. 521–522;

Walker et al. 2007a, pp. 2652–2653; Zou et al. 2006, pp. 1039–1040; Doherty et al. 2008, p. 193; Leu and Hanser 2011, pp. 270–271). Increased human presence resulting from oil and gas development can also impact sage-grouse either through avoidance of suitable habitat or disruption of breeding activities (Braun et al. 2002, pp. 4–5; Aldridge and Brigham 2003, pp. 30–31; Aldridge and Boyce 2007, p. 518; Doherty et al. 2008, p. 194). The development of oil and gas resources requires surveys for economically recoverable reserves, construction of well pads and access roads, subsequent drilling and extraction, and transport of oil and gas, typically through pipelines. Ancillary facilities can include compressor stations, pumping stations, electrical generators and powerlines (Connelly et al. 2004, p. 7–39; BLM 2007, p. 2–110). Surveys for recoverable resources occur primarily through loud seismic exploration activities. These surveys can result in the crushing of vegetation. Well pads vary in size from 0.10 ha (0.25 ac) for coal-bed natural gas wells in areas of level topography to greater than 7 ha (17.3 ac) for deep gas wells and multi-well pads (Connelly et al. 2004, p. 7–39; BLM 2007, p. 2–123). Pads for compressor stations require 5–7 ha (12.4–17.3 ac) (Connelly et al. 2004, p. 7–39). Individually, impacts from well pads, infrastructure, and ancillary features may be small; however, the cumulative impact of such development can be significant.

The amount of direct habitat loss within an area of oil and gas development is ultimately determined by well densities and the associated loss from ancillary facilities. Roads associated with oil and gas development were suggested as the primary impact to greater sage-grouse due to their persistence and continued use even after drilling and production ceased (Lyon and Anderson 2003, p. 489). Declines in male greater sage-grouse lek attendance were reported within 3 km (1.9 mi) of a well or haul road with a traffic volume exceeding one vehicle per day (Holloran 2005, p. 40). Because of reasons discussed previously, the effects of oil and gas development to Gunnison sage-grouse are expected to be similar to those observed in greater sage-grouse. Sage-grouse also may be at increased risk for collision with vehicles simply due to the increased traffic associated with oil and gas activities (Aldridge 1998, p. 14; BLM 2003, p. 4–222).

Habitat fragmentation resulting from oil and gas development infrastructure, including access roads, may have greater effects on sage-grouse than habitat loss associated with drill sites.

Energy development and associated infrastructure works cumulatively with other human activity or development to decrease available habitat and increase fragmentation. Greater sage-grouse leks had the lowest probability of persisting (40–50 percent) in a landscape with less than 30 percent sagebrush within 6.4 km (4 mi) of the lek. These probabilities were even less in landscapes where energy development also was a factor (Walker *et al.* 2007a, p. 2652).

Oil and Gas Development Across the Gunnison Sage-Grouse Range—

As noted above, high oil and gas development potential exists in the San Miguel Basin and Monticello-Dove Creek population areas, medium potential exists in the Crawford population area, and low or no potential exists in the remaining population areas. Approximately 33 percent of the Gunnison Basin population area was ranked as having low oil and gas potential with the remainder having no potential for oil and gas development (GSRSC 2005, p. 130). No Federal lands are currently leased for oil and gas development within the Gunnison Basin population area.

Energy development within the range of Gunnison sage-grouse is occurring primarily in the San Miguel Basin and Dove Creek population areas in Colorado. The San Miguel Basin and Monticello-Dove Creek population areas occur in the Paradox Basin, a known oil and gas producing region. The majority of oil and gas development and potential is outside of Gunnison sage-grouse habitat (Industrial Economics, Inc. (IEc) 2014, p. 5–2, and references therein). In addition, to date, low levels of development and production have occurred in this area relative to recent development in other regions within the western U.S. Oil and gas production in San Juan County, Utah, which includes the Monticello portion of occupied range for Gunnison sage-grouse, has declined since the late 1980's (IEc 2014, p. 5–1 to 5–2, and references therein). In the San Miguel Basin, approximately 8,000 acres are leased for oil and gas development in occupied habitat on BLM land and, of that area, about 5,000 acres (63 percent) are producing (IEc 2014, p. 5–4, and references therein). The entire San Miguel Basin population area has high potential for oil and gas development (GSRSC 2005, p. 130).

Fluid mineral development in the Paradox Basin is currently taking place on 44 active, producing, or permitted wells in occupied habitat in the San Miguel and Monticello-Dove Creek populations. Of these, 38 active or producing wells occur in the San Miguel population area on BLM land; 5 newly permitted wells occur on non-Federal land in the Dove Creek population in Colorado; and 1 active well occurs on private land in the Monticello population in Utah (IEc 2014, pp. 5–4 to 5–5, and references therein). In the San Miguel population, most wells are in or near the Dry Creek subpopulation area. The exact locations of potential future wells are not known, but because the area is small, they will likely lie within 3 km (2 mi) of one of only three leks in this area (CDOW 2005, p. 108).

In the remainder of the Gunnison sage-grouse range, a total of 10 oil and gas wells occur in occupied habitat. Eight oil and gas wells occur in the Gunnison Basin population area, and one in each of the Crawford and Cerro Summit-Cimarron-Sims Mesa population areas (derived from Colorado Oil and Gas Commission 2010, GIS dataset). We are not aware of any new fluid mineral development in these or other population areas since 2010. No oil and gas wells or Federal leases are within the Piñon Mesa population area (BLM 2009a, p. 1), and no potential for oil or gas exists in this area except for a small area on the eastern edge of the largest habitat block (BLM 1999, p. 1; GSRSC 2005, p. 130). The Crawford population is in an area with medium potential for oil and gas development. A single Federal lease occurs on less than 1 percent of the Crawford population area (GSRSC 2005, p. 130). We are not aware of any information which indicates that oil and gas development is a threat to the Poncha Pass population. Based on the best available information, we conclude that oil and gas development is not a current or future threat to the Piñon Mesa, Crawford, or Poncha Pass populations.

Since 2005, the BLM has deferred (temporarily withheld from lease sales) federal parcels nominated for oil and gas leasing in occupied Gunnison sage-grouse habitat in Colorado (see further discussion in Factor D Federal Laws and Regulations). Even with this temporary deferment, however, we expect energy development on public and private lands in the San Miguel Basin and the Monticello-Dove Creek areas to continue over the next 20 years based on the length of development and production projects described in existing project and management plans. Gas development may be negatively impacting a portion of the Dry Creek subpopulation because this area contains some of the poorest habitat and smallest grouse populations within the San Miguel population ((SMBGSWG)

2009, pp. 28 and 36). Overall, we believe that this stressor is localized and, although it is likely to increase in the future, it is not now, or likely to become a rangewide threat to the species in the future.

Coal and Coal-bed Methane Development in All Population Areas

While coal resources and several active coal fields (Somerset, Crested Butte, Grand Mesa, etc.) exist in the region, there are no active coal operations in Gunnison sage-grouse habitat (Colorado Division of Reclamation, Mining, and Safety (CDRMS) 2013), and recoverable coal resources are limited in Gunnison sage-grouse range. We have reviewed the best available scientific information regarding the potential for development of any coal resources in the Gunnison sage-grouse range, and found that it is unlikely in the near future due to technological, geologic, economic, and other constraints (USFWS 2014a, entire). Therefore, we find that coal and coal-bed methane development are not current or future threats to Gunnison sage-grouse.

Other Leasable Mineral Development

Potash exploration is currently underway in the Monticello-Dove Creek population area, but outside of occupied habitat for Gunnison sage-grouse. During 2009 and 2010, BLM received applications for 22 prospecting permits on approximately 40,000 acres of BLM land in this area (outside of occupied habitat). Recently, BLM prepared an Environmental Analysis for six proof-of-concept drill sites. The company that submitted the application estimates that between 250,000 and two million tons of potash may be recovered per year for at least 20 years. If preliminary explorations determine that extraction is feasible, potash development will likely follow (IEc 2014, p. 5–6). However, because it is unknown where and to what extent development would occur, the degree to which potash development would affect Gunnison sage-grouse and its habitat is unknown at this time.

Summary of Leasable Mineral Development

The San Miguel Basin and Dove Creek populations are the only areas within Gunnison sage-grouse range that currently have a moderate amount of oil and gas production. However, impacts to Gunnison sage-grouse and its habitat in this area are limited in scope relative to other regions of oil and gas development within the western U.S. We recognize that portions of the range, such as the Dry Creek subpopulation of

the San Miguel population, may currently be impacted by fluid mineral development. However, current and potential leasable energy development is limited to a small portion of the species' overall range. To date, the majority of oil and gas development has occurred outside of occupied habitat for Gunnison sage-grouse.

While the San Miguel, Monticello-Dove Creek, and Crawford populations have high or medium potential for future development, the potential for future development is low throughout the remaining population areas, which represent the majority of the species' range. While coal resources and several active coal fields exist in the region, there are no active coal operations in Gunnison sage-grouse habitat, and recoverable coal resources are limited in Gunnison sage-grouse range (USFWS 2014a, entire). In the near future, there is a potential for potash development in the Monticello-Dove Creek population; however, the magnitude of the impacts (if any) of this development on the species are unknown at this time (see above discussion). Because of the localized scale of these impacts, we consider leasable mineral development to be a threat of low magnitude to species as a whole. However, given the small and isolated nature of the populations where oil and gas development is most likely to occur, oil and gas development is a current and future threat to those populations.

*Locatable and Salable Mineral Development in All Population Areas*

*Locatable minerals* include both metallic minerals (gold, silver, uranium, vanadium, lead, zinc, copper, etc.) and certain unique, valuable non-metallic minerals (gemstones, fluorspar, mica, gypsum, asbestos, mica, etc.). The Mining Law of 1872 governs the exploration, purchase, and development of locatable minerals on mining claims. This law grants citizens of the United States the opportunity to explore for, discover, develop, and purchase certain valuable mineral deposits on public domain minerals. Unpatented mining claims established under the Mining Law of 1872 give the holder the right to mine locatable minerals on Federal lands. Locating a mining claim requires discovery of a valuable mineral through exploration. The BLM administers mining claims and related notices and approvals on BLM and USFS lands. The BLM reviews and approves a "Plan of Operations" for mining on Federal lands resulting in surface disturbance of more than 5 acres, and, in Colorado, financial warranty (e.g., cash bond) is required for reclamation through the Colorado

Division of Reclamation, Mining and Safety (CDRMS). A mine operator need only file a "Notice of Intent" with BLM before proceeding with locatable mineral exploration or prospecting resulting in surface disturbance of 5 acres or less. Operators are required to provide financial warranty for reclamation costs associated with disturbance from exploration, which is also filed and held by the CDRMS. "Casual use" activities related to locatable minerals on Federal lands that cause negligible disturbance (e.g., no use of earth moving equipment or explosives) have no legal requirements. The quantity and extent of casual use activities, and thus the effects on Gunnison sage-grouse and its habitat, are unknown.

*Salable minerals,* or mineral materials, include sand, gravel, stone, clay, pumice, cinders, and similar minerals. Salable minerals on Federal lands are subject to mineral material disposal under the Materials Act of 1947, as amended. Mining of these minerals entails a sales contract or a free-use permit from the responsible Federal agency.

The Service accessed CDRMS mine and mine claim data (CDRMS 2013, entire) to evaluate mineral potential and development in Gunnison sage-grouse occupied range in Colorado. The CDRMS's dataset includes both active and terminated or expired mining permits since about 1984 to present, including locatable and salable minerals. Our analysis found that in Gunnison sage-grouse occupied habitat in Colorado, there are 19 active mining permits ("active" means the permits are valid and current, not necessarily that actual mining is occurring), comprising 324.07 acres. Of this number, our analysis found that 247.96 acres (77 percent) are in the Gunnison Basin population, and are associated primarily with sand and gravel operations (USFWS 2014b, p. 1).

Fifty recently expired or terminated mining permits exist in Gunnison sage-grouse occupied range in Colorado, affecting approximately 256.5 acres. Again, the majority of area affected was in the Gunnison Basin, including 194.1 acres (75.6 percent) associated with sand and gravel, borrow material, and gold mining. Some of these mining permit applications were withdrawn, or mining did not occur (USFWS 2014b, p. 2).

Where mining has not yet been permitted or occurred, active (recorded) *mining claims* indicate potential development of those resources in the future, since identifying a claim requires discovery of a valuable mineral.

Currently, in Gunnison sage-grouse occupied habitat in Colorado, there are 694 active mining claims, totaling approximately 9,966 acres, or 1.15 percent of rangewide occupied habitat. Approximately 7.79 percent and 2.10 percent of occupied habitat in the San Miguel Basin and Dove Creek populations, respectively, are under mining claims. For each of the other five Gunnison sage-grouse populations, the area under mining claims is less than 1 percent of total occupied habitat in those populations (USFWS 2014b, p. 3). These data indicate that mining potential and future development is limited in scope in the range of Gunnison sage-grouse. It is uncertain what proportion of these mining claims will be developed in the future, and to what extent they will be developed. Future development depends on economic and market conditions, permitting requirements, and multiple other factors.

Future development of some mining claims, however, could affect individual Gunnison sage-grouse or populations. Future development of uranium mining claims in the San Miguel population area, in particular, could result in impacts on this population of Gunnison sage-grouse and its habitat. This area includes the Uravan Mineral Belt, which has historically been the most productive uranium region in Colorado, and provides an important national reserve of uranium (IEc 2014, pp. 5–1, 5–5 to 5–6). The Department of Energy, which is responsible for managing uranium leasing and development, is currently in the process of evaluating the continuation of existing uranium leases under a Draft Programmatic Environmental Impact statement. In recent years, uranium mining activity in this area has nearly ceased due to a decrease in global uranium prices. One active uranium mine occurs in occupied habitat in the San Miguel population. However, this mine is currently not in production (IEc 2014, p. 5–5 to 5–6). Construction of the first conventional uranium mill in 25 years, the Piñon Ridge Uranium Mill, is proposed near, but outside of, occupied habitat in the San Miguel Basin. However, this mill may not be built until uranium prices increase (IEc 2014, p. 5–5 to 5–6). Such a project may result in indirect impacts on Gunnison sage-grouse, though we cannot predict the scope or magnitude of those impacts.

We were unable to acquire similar data for mining activity in the State of Utah, and as a result we do not know the degree to which mineral claims or mines overlap occupied habitat in the Monticello population area. Published

maps indicate there are four small mines (less than 5 ac of disturbance at any one time) on the periphery of occupied habitat in the Monticello population area. These include two uranium mines and one flagstone mine that are inactive; and one uranium/vanadium mine that was active as of 2008 (UGS 2008a, pp. 4–5, 7). The majority of uranium and vanadium potential and past production in San Juan County is south-southeast of the city of Monticello, Utah, outside of occupied habitat (UGS 2005, entire). Several large mines (more than 5 ac of disturbance at any one time), including uranium and copper (inactive and active) occur northeast of Monticello, Utah (UGS 2008b, pp. 2, 5), outside the species' range. This information indicates that the overall current and potential development of locatable and salable minerals is very limited in Gunnison sage-grouse occupied range in Utah.

Future mineral development, especially in seasonally important habitats or in smaller or declining populations, will likely impact Gunnison sage-grouse populations. Indirect effects such as functional habitat loss associated with mineral operations, as well as impacts from associated infrastructure, are also likely.

*Summary of Locatable and Salable Mineral Development*

Mining, especially in seasonally important habitats or in smaller or declining populations, will likely impact Gunnison sage-grouse populations. Indirect effects such as functional habitat loss associated with mining operations, as well as impacts from associated infrastructure, are also likely. However, currently active mines and mining claims are limited in geographic scope, and thus are considered a threat of low magnitude to Gunnison sage-grouse rangewide. If uranium prices increase in the future, development in the San Miguel Basin could potentially pose a threat to this already small and vulnerable population of Gunnison sage-grouse.

*Renewable Energy Development— Geothermal and Wind*

Geothermal energy production is similar to oil and gas development in that it requires surface exploration, exploratory drilling, field development, and plant construction and operation, and likely results in similar degrees of direct and functional habitat loss (see Effects of Oil and Gas Development). Wells are drilled to access the thermal source, and drilling can require 3 weeks to 2 months of continuous activity

(Suter 1978, p. 3), which may cause disturbance to sage-grouse. The ultimate number of wells, and, therefore, potential loss of habitat, depends on the thermal output of the source and expected production of the plant (Suter 1978, p. 3). Pipelines are needed to carry steam or superheated liquids to the generating plant, which is similar in size to a coal- or gas-fired plant, resulting in further habitat destruction and indirect disturbance. Direct habitat loss occurs from well pads, structures, roads, pipelines and transmission lines, and impacts would be similar to those described above for oil and gas development. The development of geothermal energy requires intensive human activity during field development and operation, which could lead to habitat loss. Furthermore, geothermal development could cause toxic gas release. The type and effect of these gases depends on the geological formation in which drilling occurs (Suter 1978, pp. 7–9). The amount of water necessary for drilling and condenser cooling can be high. Local water depletions may be a concern if such use results in the loss or degradation of brood-rearing habitat.

Geothermal Energy in the Gunnison Basin Population Area—

The entire Gunnison Basin, or 87 percent of rangewide occupied habitat, is within a region of known geothermal potential (BLM and USFS 2010, p. 1). Currently, geothermal leases in the Gunnison Basin occur in the same general vicinity on private, BLM, USFS, and Colorado State Land Board lands, near Tomichi Dome and Waunita Hot Springs in southeastern Gunnison County. The cumulative area of geothermal leases in occupied habitat is approximately 3,399 ha (8,400) ac, including 1,861 ha (4,600 ac) on BLM land, and 1,538 ha (3,800 ac) on USFS land. This comprises 1.4 percent of occupied habitat in the Gunnison Basin.

In 2012, all of the leased area described above was acquired by a conservation group that does not intend to develop the resource. Geothermal leases are issued for 10 years and may be extended for two five-year periods (IEc 2014, p. 7–2, and references therein). Therefore, we do not anticipate geothermal development of these leases prior to 2032. If geothermal development occurs on the leases in the future, it would likely negatively impact Gunnison sage-grouse through habitat loss and disturbance of birds. One active lek and two inactive leks are located within the leased parcels. In addition, six active leks and four inactive leks are within 6.4 km (4 mi) of the lease

application parcels indicating that a high degree of seasonal use may occur within the area surrounding these leks (GSRSC 2005, p. J–4). A significant amount of high-quality Gunnison sage-grouse nesting habitat also exists on and near the leased parcels (Aldridge *et al.* 2012, p. 402). Thus, geothermal development is a potential future threat to the Gunnison Basin population.

Geothermal Energy in All Other Population Areas—

Geothermal development potential exists in the San Luis Valley including portions of the Poncha Pass population area. No geothermal leases currently exist in the San Luis Valley or Poncha Pass areas (BLM 2012b, entire; IEc 2014, p. 7–2). Further, the 2013 BLM San Luis Valley Geothermal Amendment to their Resource Management Plan prohibits all geothermal development within Gunnison sage-grouse occupied habitat through a no surface occupancy stipulation (BLM 2012b, entire; BLM 2013e, p. 2–11; BLM 2013f, entire). Therefore, geothermal development does not appear to be a current or future threat to Gunnison sage-grouse in the Poncha Pass population. We found no other information on the presence of existing, pending, or authorized geothermal energy sites, nor any other areas with high potential for geothermal energy development, within any other Gunnison sage-grouse population area. Thus, at this time, geothermal development outside the Gunnison Basin does not appear to be a threat to Gunnison sage-grouse.

*Wind Energy Development*

Most published reports of the effects of wind development on birds focus on the risks of collision with towers or turbine blades. However, a recent study conducted in south-central Wyoming examined the short-term behavioral response of greater sage-grouse to wind energy development (LeBeau 2012, entire). In the two years following construction, greater sage-grouse were not avoiding habitats near wind turbines, and even selected for habitats closer to turbines during the summer months. Male lek attendance was apparently unaffected by wind energy development in the area. However, the author cautioned that these responses may have been due to typically high site fidelity of sage-grouse despite anthropogenic disturbances, and that impacts may not be realized until two to 10 years following development, similar to oil and gas development in sage-grouse habitats. The study reported that other fitness and vital rates such as nesting and brood survival rates

declined near constructed wind turbines, potentially as a result of increased predation and edge effects created by wind energy infrastructure (LeBeau 2012, entire).

Avoidance of human-made structures such as powerlines and roads by sage-grouse and other prairie grouse is well-documented (Holloran 2005, p. 1; Pruett *et al.* 2009, pp. 1255–1256) (also see Roads and Powerlines sections above). Wind power requires many of the same features for construction and operation as do nonrenewable energy resources. Therefore, we anticipate that potential impacts from habitat decline due to roads and powerlines, noise, and increased human presence (Connelly *et al.* 2004, pp. 7–40 to 7–41) will generally be similar to those discussed above for mineral energy development.

Wind farm development begins with site monitoring and collection of meteorological data to accurately characterize the wind regime. Turbines are installed after the meteorological data indicate the appropriate siting and spacing. Roads are necessary to access the turbine sites for installation and maintenance. Each turbine unit has an estimated footprint of 0.4 to 1.2 ha (1 to 3 ac) (BLM 2005e, pp. 3.1–3.4). One or more substations may be constructed depending on the size of the farm. Substation footprints are 2 ha (5 ac) or less in size (BLM 2005e, p. 3.7).

The average footprint of a turbine unit is relatively small from a landscape perspective. Turbines require careful placement within a field to avoid loss of output from interference with neighboring turbines. Spacing improves efficiency but expands the overall footprint of the field. Sage-grouse populations are impacted by the direct loss of habitat associated with the construction of access roads, as well as indirect loss of habitat and behavioral avoidance of the wind turbines. Sage-grouse could be killed by flying into turbine rotors or towers (Erickson *et al.* 2001, entire), although reported collision mortalities have been few. One sage-grouse was found dead within 45 m (148 ft) of a turbine on the Foote Creek Rim wind facility in south-central Wyoming, presumably from flying into a turbine (Young *et al.* 2003, Appendix C, p. 61). This is the only known sage-grouse mortality at this facility during three years of monitoring. We have no recent reports of sage-grouse mortality due to collisions with wind turbines; however, many facilities may not be monitored. No deaths of gallinaceous birds were reported in a comprehensive review of avian collisions and wind farms in the United States; the authors hypothesized that the average tower height and flight height of grouse, and diurnal migration habitats of some birds minimized the risk of collision (Johnson *et al.* 2000, pp. ii–iii; Erickson *et al.* 2001, pp. 8, 11, 14, 15).

Noise is produced by wind turbine mechanical operation (gear boxes, cooling fans) and airfoil interaction with the atmosphere. No published studies have focused specifically on the noise effects of wind power to Gunnison or greater sage-grouse. In studies conducted in oil and gas fields, noise may have played a factor in habitat selection and decrease in greater sage-grouse lek attendance (Holloran 2005, pp. 49, 56). However, comparison between wind turbine and oil and gas operations is difficult based on the character of sound. Adjusting for manufacturer type and atmospheric conditions, the audible operating sound of a single wind turbine has been calculated as the same level as conversational speech at 1 m (3 ft) at a distance of 600 m (2,000 ft) from the turbine. This level is typical of background levels of a rural environment (BLM 2005e, p. 5–24). However, commercial wind farms do not have a single turbine, and multiple turbines over a large area would likely have a much larger noise print. Low-frequency vibrations created by rotating blades also produce annoyance responses in humans (Van den Berg 2004, p. 1), but the specific effect on birds is not documented.

Moving blades of turbines cast moving shadows that cause a flickering effect producing a phenomenon called "shadow flicker" (American Wind Energy Association (AWEA) 2008, p. 5–33). Shadow flicker could mimic predator shadows and elicit an avoidance response in birds during daylight hours, but this potential effect has not been investigated. However, greater sage-grouse hens with broods have been observed under turbines at Foote Creek Rim in south-central Wyoming (Young 2004, pers. comm.), suggesting those birds were not disturbed by the motion of turbine blades.

### Wind Energy in the Monticello Population Area—

There is increasing interest in wind energy development in the vicinity of the Monticello population in San Juan County, Utah (UDWR 2011, p. 3). Three wind energy projects are proposed in the vicinity of Gunnison sage-grouse habitat (IEc 2014, p. 7–2). The San Juan County Commission recently issued a permit for wind energy development on private land in occupied habitat in the Monticello population area, and development is currently underway there by Eco-Power Wind Farms, LLC (IEc 2014, p. 7–2). Other landowners have recently been approached to lease their properties for wind development as well (Messmer 2013, p. 14). The two other wind energy projects are proposed for areas outside of occupied Gunnison sage-grouse habitat (IEc 2014, p. 7–2 to 7–3, and references therein).

In addition, the State of Utah recently completed a statewide screening study to identify geographic areas with a high potential for renewable energy development (UDNR 2009, entire). An area approximately 80,200-ha (198,300-ac) in size northwest of the city of Monticello, UT, was identified, with a high level of confidence, as a wind power production zone with a high potential for utility-scale wind development (production of greater than 500 megawatts) (UDNR 2009, p. 19). The mapped wind power production zone overlaps with nearly all Gunnison sage-grouse occupied habitat in the Monticello population, as well as the large area surrounding the perimeter of occupied habitat. The Monticello population is currently small (approximately 70 individuals), with apparent low resilience (see discussion and analysis in Factor E below), making it particularly sensitive to habitat loss and other impacts. Therefore, we conclude that future wind energy development poses a threat to the Monticello population of Gunnison sage-grouse.

### Wind Energy in All Other Population Areas—

We found no additional information on the presence of existing, pending, or authorized wind energy sites, or any other areas with high potential for wind energy development within any other Gunnison sage-grouse population area.

### Summary of Renewable Energy Development

Based on the above information, we do not consider renewable energy development to be a current threat to Gunnison sage-grouse range-wide. However, in the Gunnison Basin, geothermal development potential is high; if geothermal energy development were to increase here in the future, it may influence the overall long-term viability of the Gunnison Basin population; thus, it is a potential future threat to that population. Similarly, information suggests wind energy development may increase in the future in the Monticello population, potentially contributing to further population declines in this small and vulnerable population. Therefore, wind

energy development is a future threat to the Monticello population of Gunnison sage-grouse.

*Piñon-Juniper Encroachment*

Piñon-juniper woodlands are a native habitat type dominated by piñon pine *(Pinus edulis)* and various juniper species *(Juniperus* species) that can encroach upon, infill, and eventually replace sagebrush habitat and other rangelands. Piñon-juniper extent has increased ten-fold in the Intermountain West since Euro-American settlement, causing the loss of many bunchgrass and sagebrush-bunchgrass communities (Miller and Tausch 2001, pp. 15–16). Piñon-juniper woodlands have also been expanding throughout portions of the range of Gunnison sage-grouse (BLM 2009a, pp. 14, 17, 25), although we do not have information that quantifies this expansion. Piñon-juniper expansion has been attributed to the reduced influence of fire, the introduction of livestock grazing, increases in global carbon dioxide concentrations, climate change, and natural recovery from past disturbance (Miller and Rose 1999, pp. 555–556; Miller and Tausch 2001, p. 15; Baker 2011, p. 199). In addition, Gambel oak *(Quercus gambelii)* invasion as a result of fire suppression is a potential threat to Gunnison sage-grouse (CDOW 2002, p.139) if stands become thick and begin to choke out sagebrush understory. However, some deciduous shrub communities (primarily Gambel oak and serviceberry) are used seasonally by Gunnison sage-grouse (Young *et al.* 2000, p. 451).

Removal of piñon-juniper is a common treatment to improve sage-grouse habitat. Similar to powerlines, trees provide perches for raptors, and as a consequence, Gunnison sage-grouse avoid areas with piñon-juniper (Commons *et al.* 1999, p. 239). In Oregon, greater sage-grouse lek activity ceased when conifer canopy exceeded 4 percent of the land area, suggesting that low levels of piñon-juniper encroachment can lead to population-level impacts (Baruch-Mordo *et al.* 2013, p. 238). The number of male Gunnison sage-grouse observed on leks in the Crawford population doubled after piñon-juniper removal and mechanical treatment of mountain sagebrush and deciduous brush (Commons *et al.* 1999, p. 238). However, removal of all trees in a given area is likely not appropriate, based on the historical presence of piñon-juniper communities when Gunnison sage-grouse were more abundant and widespread. Piñon-juniper abundance likely fluctuated over time in response to fire, at times occupying

approximately 20 percent of the sagebrush landscape (Baker 2013, p. 8).

*Piñon-Juniper Encroachment in All Population Areas*

The Gunnison Basin population area is not currently undergoing significant piñon-juniper encroachment (Boyle and Reeder 2005, Figure 4–1); however, all other populations have some degree of documented encroachment. A considerable portion of the Piñon Mesa population is experiencing piñon-juniper encroachment. Approximately 9 percent (1,140 ha [3,484 ac]) of occupied habitat in the Piñon Mesa population area has piñon-juniper coverage, while 7 percent (4,414 ha [10,907 ac]) of vacant or unknown (suitable habitat for sage-grouse that is separated from occupied habitats that either (1) has not been adequately inventoried, or (2) has not had documentation of grouse presence in the past 10 years (GSRSC 2005, p. 258) and 13 percent (7,239 ha [17,888 ac]) of potential habitat (unoccupied habitats suitable for occupation of sage-grouse if practical restoration were applied) have encroachment (BLM 2009a, p. 17).

Some areas on lands managed by the BLM within other population areas are undergoing piñon-juniper invasion. However, the extent of the area affected has not been quantified (BLM 2009a, p. 74; BLM 2009a, p. 9). Approximately 9 percent of the 1,300 ha (3,200 ac) of the current range in the Crawford population is dominated by piñon-juniper (GSRSC 2005, p. 264). However, BLM (2005d, p. 8) estimated that as much as 20 percent of the Crawford population area is occupied by piñon-juniper, although much of that has been removed by habitat treatments in recent years. Piñon and juniper trees have also been encroaching in peripheral habitat on Sims Mesa, and to a lesser extent on Cerro Summit, but not to the point where it is a threat to the Cerro Summit-Cimarron-Sims Mesa population area (CDOW 2009b, p. 47). Piñon and juniper trees are reported to be encroaching throughout the current range in the Monticello group, based on a comparison of historical versus current aerial photos, but no quantification or mapping of the encroachment has occurred (San Juan County GSWG 2005, p. 20). A relatively recent invasion of piñon and juniper trees between the Dove Creek and Monticello groups appears to be contributing to their isolation from each other (GSRSC 2005, p. 276).

Within the range of Gunnison sage-grouse, approximately 5,341 ha (13,197 ac) of piñon-juniper have been treated with various methods designed to

remove piñon and juniper trees since 2005, and nearly half of which occurred in the Piñon Mesa population area (CDOW 2009b, pp. 111–113). Mechanical treatment of areas experiencing piñon-juniper encroachment continues to be one of the most successful and economical treatments for the benefit of Gunnison sage-grouse habitat. However, such treatments may have minimal benefit at the population level, since the majority of affected populations have continued to decline since 1996 (Figure 3) despite considerable efforts to remove piñon-juniper in those areas.

*Summary of Piñon-Juniper Encroachment*

Most Gunnison sage-grouse population areas are experiencing low to moderate levels of piñon-juniper encroachment; however, considerable piñon-juniper encroachment in the Piñon Mesa population has occurred. The encroachment of piñon-juniper into sagebrush habitats can contribute to the decline of Gunnison sage-grouse habitat. However, piñon-juniper treatments, particularly when completed in the early stages of encroachment when the sagebrush and forb understory is still intact, have the potential to benefit sage-grouse (Commons *et al.* 1999, p. 238). Approximately 5,341 ha (13,197 ac) within the range of Gunnison sage-grouse has been treated to address piñon-juniper encroachment. Based on the rate of past treatment efforts (CDOW 2009c, entire), we expect piñon-juniper encroachment and corresponding treatment efforts to continue. Piñon-juniper encroachment is contributing to habitat decline in a limited area, but the level of encroachment is not sufficient to pose a threat to Gunnison sage-grouse at a population or rangewide level at this time. However, in combination with other factors such as those contributing to habitat decline (roads, powerlines, invasive plants, etc.), piñon-juniper encroachment poses a threat to the species. In addition, future conditions due to drought or climate change may intensify the problem such that piñon-juniper encroachment becomes a more serious threat, particularly in the smaller, declining populations.

*Conversion to Agriculture*

While sage-grouse may forage on agricultural croplands (Commons 1997, pp. 28–35), they tend to avoid landscapes dominated by agriculture (Aldridge *et al.* 2008, p. 991) and do not nest or winter in agricultural lands where shrub cover is lacking. Effects resulting from agricultural activities extend into adjoining sagebrush, and

include increased predation and reduced nest success due to predators associated with agriculture (Connelly *et al.* 2004, p. 7–23). Agricultural lands provide limited benefits for sage-grouse as some crops such as alfalfa *(Medicago sativa),* winter wheat *(Triticum aestivum),* and pinto bean sprouts *(Phaseolus* spp.) are eaten or used seasonally for cover by Gunnison sage-grouse (Braun 1998, pers. comm., Lupis *et al.* 2006, entire). Since lek monitoring began, the Monticello population of Gunnison sage-grouse appears to have been at its highest numbers during the 1970's and 1980's (SJCWG 2003, p. 5). During this time, winter wheat and dryland alfalfa were the primary agricultural crops in the area, and many growers did not use herbicides or insecticides because of the slim profit margin in growing these crops. Also during this period, landowners frequently reported observing flocks of sage-grouse in their fields during harvest and post-harvest periods (Messmer 2013, p. 19). These agricultural fields and their management may have provided a surplus of arthropods and forbs for Gunnison sage-grouse, and for hens with broods, in particular. Despite these seasonal benefits, crop monocultures do not provide adequate year-round food or cover (GSRSC 2005, pp. 22–30).

### Current Agriculture in All Gunnison Sage-grouse Population Areas

The following estimates of land area dedicated to agriculture (including grass/forb pasture) were derived primarily from Southwest Regional Gap Analysis Project (SWReGAP) landcover data (USGS 2004, entire). Agricultural parcels are distributed patchily amongst what was recently a sagebrush landscape. These agricultural parcels are likely used briefly by grouse to move between higher quality habitat patches. Habitat conversion to agriculture is most prevalent in the Monticello-Dove Creek population area, where approximately half of Gunnison sage-grouse occupied range is currently in agricultural production (primarily cropland and pastureland). The conversion of sagebrush to agricultural use eliminated suitable vegetation cover at three leks in the Monticello population, and those leks are no longer used by Gunnison sage-grouse (SJCWG 2000, p. 15; GBSC 2005, p. 81). However, habitat loss due to agricultural conversion has been mitigated somewhat by the Conservation Reserve Program (CRP) (see section below, NRCS and Private Land Conservation Efforts, in this Factor A analysis).

In the Gunnison Basin, approximately 9 percent of the occupied range is currently in agricultural production. In Gunnison County, approximately 38,419 ha (94,936 ac) is currently in agricultural production (primarily irrigated hay and pastureland) (Gunnison County 2013a, p. 97, 123; GSRSC 2005, p. 73), though we do not know what proportion of these lands occur in occupied range. Approximately 15 percent of the occupied range in the San Miguel Basin is currently in agricultural production. In the Cerro Summit-Cimarron-Sims Mesa population, approximately 14 percent of the occupied range is currently in agricultural production. Habitat conversion due to agricultural activities is limited in the Crawford, Piñon Mesa, and Poncha Pass populations, with 3 percent or less of the occupied range currently in agricultural production in each of the population areas.

Substantial portions of sage-grouse habitat on private land in the Gunnison Basin, Crawford, San Miguel, and Piñon Mesa population areas are currently enrolled in the CCAA (see Conservation Programs and Efforts Related to Habitat Conservation in this Factor A analysis). Except for properties recently enrolled in the program, all enrolled private lands have been monitored using standardized vegetation transects and rangeland health assessments and, despite recent drought conditions and ongoing land uses, no significant deviations from baseline habitat conditions were observed. CPW reports that all enrolled properties continue to be in compliance with the terms of their Certificates of Inclusion (CIs) (CPW 2014a, p. 1). This information suggests that the current level of livestock grazing and operations on those lands is compatible with Gunnison sage-grouse habitat needs.

Except in Gunnison County, where cropland is relatively limited, total cropland has declined over the past two decades in all counties within the occupied range of Gunnison sage-grouse (USDA NASS 2010, entire). The majority of agricultural land use in Gunnison County is hay production, and this has also declined over the past two decades (USDA NASS 2010, p. 1). We do not have any information to predict changes in the amount of land devoted to agricultural purposes. However, because of this long-term downward trend in land area devoted to agriculture, we do not expect a significant amount of Gunnison sage-grouse habitat to be converted to agricultural purposes in the future.

### Summary of Conversion to Agriculture

Throughout the range of Gunnison sage-grouse, the amount of land area devoted to agriculture is declining. Therefore, although we expect most land currently in agricultural production to remain so indefinitely, we do not expect significant additional, future habitat conversion to agriculture within the range of Gunnison sage-grouse. The loss of sagebrush habitat from 1958 to 1993 was estimated to be approximately 20 percent throughout the range of Gunnison sage-grouse (Oyler-McCance *et al.* 2001, p. 326). One exception is the Monticello-Dove Creek population, where more than half of the occupied range is currently in agriculture or other land uses that are generally incompatible with Gunnison sage-grouse conservation. This habitat loss is being mitigated somewhat by the enrollment of lands in CRP. Because of its limited extent, we do not consider future conversion of sagebrush habitats to agriculture to be a current or future threat to the persistence of Gunnison sage-grouse.

However, the extent of historical conversion of sagebrush to agriculture has fragmented the remaining Gunnison sage-grouse habitat to a degree that currently occupied lands are inadequate for the species' conservation, especially in light of other threats discussed throughout this rule. As described above in the introduction to this Factor A analysis, the onset of Euro-American settlement in the 1800s resulted in significant human alterations to sagebrush ecosystems throughout North America, primarily as a result of urbanization, agricultural conversion, and irrigation projects (West and Young 2000, pp. 263–265; Miller *et al.* 2011, p. 147). Areas in Colorado that supported basin big sagebrush were among the first sagebrush community types converted to agriculture because their soils and topography are well-suited for agriculture (Rogers 1964, p. 13). Decreases in the abundance of sage-grouse paralleled the loss of range (Braun 1998, pp. 2–3), and a gradual but marked decrease in sage-grouse distribution and numbers in Colorado had begun around 1910 (Rogers 1964, pp. 20–22). However, due to the long-term downward trend in land area devoted to agriculture, we do not expect agricultural conversion to be a significant cause of further range contraction into the future.

### Large-Scale Water Development and Irrigation

Irrigation projects have generally resulted in loss of sage-grouse habitat

(Braun 1998, p. 6). Development of Blue Mesa Reservoir in 1965 in the Gunnison Basin flooded an estimated 3,700 ha (9,200 ac), or 1.5 percent of potential habitat for Gunnison sage-grouse (McCall 2005, pers. comm.), and according to Gunnison County (2013a, p. 124), at least one known lek. Based on the size and location of Blue Mesa Reservoir, we presume that habitat connectivity and dispersal of birds between the Gunnison Basin population and satellite populations to the west were impacted. Three other reservoirs inundated approximately 2 percent of habitat in the San Miguel Basin population area (Garner 2005, pers. comm.).

The demand for water in Gunnison sage-grouse range is expected to increase into the future due to increased temperatures resulting from climate change (see Climate Change in this Factor A analysis), severe drought (see Drought and Extreme Weather in the Factor E analysis), and human population growth (see Residential Development in this Factor A analysis). Water demand from the Upper Colorado River Basin, which encompasses Gunnison sage-grouse occupied range, is expected to increase over the next several decades, and there are likely to be significant shortfalls between projected water supply and demand through 2060 (BOR 2013, entire). However, it is unknown if, when, or where future water projects in the Upper Colorado River Basin would occur.

A small amount of Gunnison sage-grouse habitat has been lost to large-scale water development projects, but in potentially important areas (see discussion above). We expect these existing reservoirs to be maintained indefinitely, thus acting as another source of habitat fragmentation. With increased water demand in the future, we expect that water developments and irrigation practices may further contribute to impacts on Gunnison sage-grouse, though the scope and magnitude of those effects are unknown. Based on this information, we conclude that large-scale water developments and irrigation are a threat of low magnitude to Gunnison sage-grouse rangewide, both now and in the future. Small-scale water developments, such as stock ponds and tanks, are described and evaluated in the Domestic Grazing and Wildlife Herbivory (Factor A analysis), and Disease (Factor C analysis) sections of this rule.

### Conservation Programs and Efforts Related to Habitat Conservation

#### Consideration of Conservation Efforts in This Rulemaking

Multiple partners including private citizens, nongovernmental organizations, Tribal, State, and Federal agencies are engaged in conservation efforts across the range of Gunnison sage-grouse. Numerous conservation actions have already been implemented for Gunnison sage-grouse, and these efforts have provided and will continue to provide conservation benefit to the species. These implemented efforts are considered below.

Additionally, there are recent and planned conservation efforts that are intended to provide conservation benefits to the Gunnison sage-grouse; some of which have not been fully implemented or shown to be effective. The Service's Policy for Evaluation of Conservation Efforts When Making Listing Decisions (PECE; 68 FR 15100, March 28, 2003) describes our procedure for evaluating the certainty of implementation and effectiveness of these recent and future actions. The purpose of PECE is to ensure consistent and adequate evaluation of recently formalized conservation efforts when making listing decisions. The policy provides guidance on how to evaluate formalized conservation efforts that have not yet been implemented or have not yet demonstrated effectiveness. The evaluation focuses on the certainty that the conservation efforts will be implemented and effectiveness of the conservation efforts. The policy defines "formalized conservation efforts" as "specific actions, activities, or programs designed to eliminate or reduce threats or otherwise improve the status of species" that are identified in a conservation agreement, conservation plan or similar document, and presents nine criteria for evaluating the certainty of implementation and six criteria for evaluating the certainty of effectiveness of such conservation efforts. These criteria are not considered comprehensive evaluation criteria. The certainty of implementation and the effectiveness of a formalized conservation effort may also depend on species-specific, habitat-specific, location-specific, and effort-specific factors.

Conservation efforts that are not sufficiently certain to be implemented and effective cannot contribute to a determination that listing is unnecessary or a determination that to list as threatened rather than endangered (PECE, 68 FR 15115). Accordingly, before considering

whether a future formalized conservation effort contributes to forming a basis for not listing a species, or listing a species as threatened rather than endangered, we must find that the conservation effort is sufficiently certain to be implemented, and effective, so as to have contributed to the elimination or adequate reduction of one or more threats to the species identified through the section 4(a)(1) (five-factor) analysis. If a conservation effort meets the criteria described in PECE, we are able to include and rely upon these recent and future efforts in our current threats analysis and status determination.

We completed an evaluation of the recently developed multi-county Conservation Agreement and Memorandum of Understanding (MOU), the 2013 Gunnison Basin CCA and the Ute Mountain Ute Tribe's 2014 Species Management Plan pursuant to PECE; however, only the CCA met the criteria established under PECE and thus may be considered in determining whether the species is warranted for listing or is threatened rather than endangered. Neither the MOU nor the multi-county conservation agreement can contribute to these determinations because they do not include specific conservation efforts as defined in the PECE polic, and the Tribal plan only met 7 of the 15 PECE criteria. Therefore, we did not rely upon these conservation efforts in our current threats analysis and status determination.

The 2006 Colorado Gunnison sage-grouse CCAA, 2013 Gunnison Basin CCA, habitat improvement projects, and other non-regulatory conservation efforts that address habitat-related issues are described and evaluated below in this section. Habitat-related and other conservation efforts provided through Federal, state, tribal, and local laws and regulations, conservation easements, and similar regulatory mechanisms are evaluated under Factor D below. Also, throughout this rule, conservation efforts are described under relevant threat sections.

#### 2006 Colorado Candidate Conservation Agreement with Assurances (CCAA)

In April 2005, the Colorado Division of Wildlife (CDOW, now called Colorado Parks and Wildlife (CPW)) applied to the Service for an Enhancement of Survival Permit for the Gunnison sage-grouse pursuant to section 10(a)(1)(A) of the Act. The permit application included a proposed Candidate Conservation Agreement with Assurances (CCAA) between CPW and the Service. The standard that a CCAA must meet is that the "benefits of the conservation measures implemented by

a property owner under a CCAA, when combined with those benefits that would be achieved if it is assumed that conservation measures were also to be implemented on other necessary properties, would preclude or remove any need to list the species'' (64 FR 32726, June 17, 1999). The draft CCAA, the permit application, and the draft environmental assessment were made available for public comment on July 6, 2005 (70 FR 38977). The CCAA and environmental assessment were finalized in October 2006, and the associated permit was issued on October 23, 2006, with a term of 20 years.

The goal of the CCAA is to reduce threats to Gunnison sage-grouse and help provide for secure, self-sustaining local populations by enrolling, protecting, maintaining, and enhancing or restoring non-federally owned Colorado habitats of Gunnison sage-grouse (as described further below). Landowners with eligible property in southwestern Colorado could voluntarily sign up under the CCAA and associated permit through a Certificate of Inclusion (CI) that specifies the land enrolled in the CCAA and the habitat protection or enhancement measures the landowner will implement on these lands. Eligible lands include non-Federal lands in Colorado within the current range of Gunnison sage-grouse where occupied, vacant/unknown, or potentially suitable habitats occur, as mapped and identified in the RCP. After Gunnison sage-grouse is listed under the Act, the CCAA remains in place and the permit becomes effective. The permit exempts take of Gunnison sage-grouse incidental to otherwise lawful activities specified in the CCAA (e.g., crop cultivation or harvesting, livestock grazing, farm equipment operation, commercial/residential development), when performed in accordance with the terms of the CCAA, provided the participating landowner is implementing conservation measures voluntarily agreed to in the landowner's CI (USFWS 2006, entire). Landowners may only enroll properties in the CCAA and receive these benefits before a species is listed under the Act.

CPW may terminate landowner participation in the CCAA or otherwise revoke the CI if the landowner fails to comply with or implement the terms of the agreement. Further, the Service may suspend or revoke the permit for just cause or if continuation of permitted activities would likely result in jeopardy to Gunnison sage-grouse (USFWS 2006, p. 20). However, except for recently enrolled properties, all properties have been monitored using standardized vegetation transects and rangeland health assessments and, despite recent drought conditions and ongoing land uses, no significant deviations from baseline habitat conditions have been observed. According to CPW, which is responsible for administering the CCAA with Service oversight, all enrolled properties continue to be in compliance with the terms of their CIs (CPW 2014a, p. 1).

Colorado Parks and Wildlife has made great strides to enroll landowners, protect habitat, and alleviate threats to Gunnison sage-grouse under this voluntary program. We estimate that by December 2014, when this rule becomes effective, 40 CIs will have been completed for private properties, enrolling 94,391 ac, roughly 81,156 ac that are in suitable habitat, in four Gunnison sage-grouse populations. This includes 32 CIs (54,580 ac (roughly 50,410 ac in suitable habitat)) in the Gunnison Basin; 2 CIs (4,231 ac (roughly 3,921 ac in suitable habitat)) in Crawford; 3 CIs (16,820 ac (roughly 13,694 ac in suitable habitat)) in San Miguel; and 3 CIs (18,761 ac (roughly 13,131 ac in suitable habitat)) in Piñon Mesa (Table 9).

TABLE 9—COMPLETED AND IN-PROGRESS CIS UNDER THE GUNNISON SAGE-GROUSE CCAA

[CPW 2014a, entire; CPW 2014g, appendix 3]

| Population | Total | | |
| --- | --- | --- | --- |
| | # | Enrolled acres | Acres * in suitable habitat |
| Gunnison Basin | 32 | 54,580 | 50,410 |
| Crawford | 2 | 4,231 | 3,921 |
| San Miguel | 3 | 16,820 | 13,694 |
| Piñon Mesa | 3 | 18,761 | 13,131 |
| Rangewide Totals | 40 | 94,391 | 81,156 |

* These are estimates based on Geospatial analyses.

Based on the RCP conservation objective of securing and maintaining 90 percent of seasonally important habitat for the Gunnison sage-grouse in each population area (GSRSC 2005, pp. 223–224), the CCAA identifies targets for private land protection for each population area, including private lands not already considered as protected under a conservation easement (USFWS 2006, pp. 11–12). However, we note that there are lands that are part of the CCAA, and are also protected under a conservation easement. Targeted CCAA acreages on private lands are intended to complement lands already receiving some protection because they are under Federal ownership.

A habitat protection objective of 75 percent of seasonally important habitat was identified for the Cerro Summit-Cimarron-Sims Mesa population, because this area is thought to function more as a habitat linkage between the San Miguel Basin, Gunnison, and Crawford populations (GSRSC 2005, pp. 223–224; USFWS 2006, p. 10). The CCAA habitat protection target for the Gunnison Basin population was based on important seasonal habitats since these are mapped in this area. In the remaining populations where important seasonal habitats are not mapped, CCAA targets were based on available occupied habitat (USFWS 2006, pp. 11–12). Roughly 99 percent of the Gunnison Basin population area target, 95 percent of the Crawford population area target, 45 percent of the San Miguel population area target, and 217 percent of the Piñon Mesa population area target on private lands are enrolled in the CCAA (Table 10).

TABLE 10—CCAA HABITAT PROTECTION TARGETS ON PRIVATE LAND AND ENROLLMENT

[CPW 2014a, entire; CPW 2014b, entire]

| Population | CCAA Target (ac) on private land | Enrolled CIs (ac)[a] on private land | % of CCAA target on private land |
|---|---|---|---|
| Gunnison basin | 55,302 | 54,580 | 99 |
| Crawford | 4,143 | 4,231 | 95 |
| San Miguel | 37,690 | 16,820 | 45 |
| Piñon Mesa | 8,635 | 18,761 | 217 |

[a] CI acreage in suitable habitat based on geospatial analyses. Includes some properties also protected by conservation easements.

The CCAA promotes the conservation of Gunnison sage-grouse on portions of private lands in the Gunnison Basin, Crawford, San Miguel, and Piñon Mesa populations. In these areas, threats to Gunnison sage-grouse are reduced and habitats covered by the CCAA are protected, maintained, enhanced, or restored. In particular, private land uses including livestock grazing and agricultural production are managed to be consistent with the needs of Gunnison sage-grouse and the species' conservation. Although enrollment of property in the CCAA is voluntary and not permanent or binding, the program's regulatory assurances and take authority provide an incentive for participating landowners to continue enrollment and compliance with terms of their CI. However, there are instances in which those assurances and incentives would no longer be desirable to the landowner. For instance, a landowner may choose to opt out of the CCAA to sell subject lands, whether for development or other purposes, meaning the benefits to Gunnison sage-grouse provided under the program would cease as well unless the new owner decided to continue the property's enrollment in the CCAA. Thus, although residential development is expected to be very limited on enrolled properties under the terms of the CIs (USFWS 2006, p. 13), the CCAA does not preclude the sale of those properties nor their subsequent development. Such development would likely result in further habitat loss and decline for Gunnison sage-grouse, though we cannot predict the scope or magnitude of those impacts. Therefore, the Service views the CCAA differently from conservation easements in terms of its regulatory certainty (see Other Regulatory Mechanisms: Conservation Easements, Factor D analysis; and Residential Development, in this Factor A analysis). Nevertheless, we consider lands enrolled under the CCAA to be a net gain for Gunnison sage-grouse conservation, particularly in regard to the reduction of habitat-related impacts due to ongoing land uses on private lands.

*2013 Gunnison Basin Candidate Conservation Agreement*

Candidate Conservation Agreements are formal, voluntary agreements between the Service and one or more parties to address the conservation needs of one or more candidate species or species likely to become candidates in the near future. Participants commit to implement specific actions designed to remove or reduce threats to the covered species, so that listing may not be necessary. Unlike CCAAs, CCAs do not provide assurances that additional conservation measures will not be required if a species is listed or critical habitat is designated.

In January 2010, the BLM, USFS, NPS, and other members of the Gunnison Basin Sage-Grouse Strategic Committee (Strategic Committee) began preparing a Candidate Conservation Agreement (CCA) with the Service to promote the conservation of the Gunnison Basin population of Gunnison sage-grouse (BLM 2013b, entire). The CCA was completed and signed by the Federal land management agencies on August 23, 2012. On April 12, 2013, the Federal land management agencies submitted a joint biological assessment (BA) and letter to the Service requesting an ESA Section 7 formal conference on the CCA. The Service issued its conference opinion on July 29, 2013 (USFWS 2013b, entire) and subsequently signed the CCA. The conference opinion evaluated anticipated effects of the CCA on Gunnison sage-grouse and estimated incidental take over a 20-year period, or through July 29, 2033.

The CCA serves as a project screen and requires implementation of conservation measures associated with specified actions under three Federal land use programs: Development (roads, transmission lines, etc.), recreation (such as trails and special recreation permits, etc.), and livestock grazing (permit renewals and operations). Larger or impact intensive projects (e.g., construction of a new transmission line, energy development) are not covered under the CCA, and any conservation

measures required for these projects on Federal lands in the Gunnison Basin will be addressed separately through ESA section 7 consultation. However, the actions addressed by the CCA, as listed above, comprise the most common land use authorizations where Gunnison sage-grouse occur on Federal lands in the Gunnison Basin. The CCA and conference opinion cover an estimated 160,769 ha (397,267 ac) of occupied habitat on Federal lands in the Gunnison Basin. This constitutes about 67 percent of the estimated 239,953 ha (592,936 ac) of total occupied habitat in the Gunnison Basin; approximately 78 percent of rangewide occupied habitat on Federal lands; and approximately 42 percent of rangewide total occupied habitat for the species.

Conservation measures in the CCA and conference opinion are actions that the signatory agencies agreed to implement to further the recovery of Gunnison sage-grouse. A key component of the CCA's site-specific conservation measures is a requirement for offsetting habitat loss or disturbance to ensure a net increase in priority habitats, and no net loss (maintenance) of secondary habitats for Gunnison sage-grouse. A number of other conservation measures and practices will be implemented pursuant to the CCA by the Federal agencies during the ESA section 7 consultation process to avoid and minimize project impacts on Gunnison sage-grouse.

The Service commends the Federal agencies, and the Gunnison Basin Sage-grouse Strategic Committee for their efforts in the design of the CCA and implementation of conservation measures to benefit Gunnison sage-grouse. In our conference opinion, we found that, despite incidental negative effects on individual birds and potential short-term, localized, and unavoidable effects, implementation of the CCA will provide a long-term, net benefit for Gunnison sage-grouse on a landscape scale. The conservation measures and mitigation scheme are required for the signatory Federal agencies engaging in covered activities, and are based on

current applicable land management plans of the respective agencies. As noted earlier, approximately 87 percent of the rangewide population of Gunnison sage-grouse occurs in the Gunnison Basin population. Implementation of the proposed action and its conservation measures will help reduce several substantial threats known to affect the species on Federal lands in the Gunnison Basin, including habitat decline. Although we analyzed the CCA under our PECE policy and found it satisfies all the criteria for consideration in our listing determination, approximately 22 percent of rangewide occupied habitat on Federal lands—all within the satellite population areas—are not covered under the CCA or a similar agreement. Additional protections on those Federal lands will be necessary to conserve these smaller, declining populations. Therefore, while the CCA is effective in reducing some threats in the Gunnison Basin population, it is not effective at reducing the threats to the species rangewide such that listing is not warranted.

*NRCS and Private Lands Conservation Efforts*

The NRCS's Sage-Grouse Initiative (SGI) is a rangewide, collaborative, targeted effort to implement conservation practices which alleviate threats that some agricultural activities can pose to greater and Gunnison sage-grouse while improving the sustainability of working ranches. Through SGI, the NRCS and its partners help ranchers proactively conserve and improve sage-grouse habitat. The SGI includes a monitoring and evaluation component for projects to measure the response of sage-grouse populations and vital rates (USFWS 2010d, p. 5).

In 2010, the Service issued the SGI Conference Report (USFWS 2010d, entire) to facilitate the SGI and conservation of Gunnison and greater sage-grouse rangewide. In the Conference Report, the Service provided guidance and conservation recommendations for avoiding and minimizing adverse effects to sage-grouse associated with the SGI, and found that the implementation of the SGI and identified conservation measures would have a net benefit on the species. The report identified primary conservation practices (management, vegetative, and structural) implemented by the NRCS to benefit sage-grouse and its habitat, and specific conservation measures (e.g., avoiding fence construction near leks) for those practices. The report did not provide for exemption of incidental take of sage-

grouse if either species is listed under the Act (USFWS 2010d, entire).

Also under the SGI and related private land programs (e.g., Farm Bill), the NRCS, Farm Service Agency (FSA), U.S. Fish and Wildlife Service Partners for Fish and Wildlife (PFW), CPW, and other partners have implemented numerous habitat improvement projects on private lands to benefit Gunnison sage-grouse. Since 1998, the Service's Colorado PFW has completed 20 habitat improvement or restoration projects in Gunnison sage-grouse habitat including projects on 638.5 ac of wetland habitat; 3,957 ac of upland habitat; and 4.3 mi of riparian habitat in Gunnison, Saguache, and Montrose Counties, with most treated acres in Gunnison County. Project types included restoration, improvement, and management actions such as enhancement of wetland and brood-rearing habitat, treating sagebrush, reseeding of native vegetation, fencing installation, grazing management, and removal of piñon-juniper (USFWS 2014c, entire). Contributing partners for these projects have included CPW, NRCS, and Rocky Mountain Bird Observatory. In addition, in 2006 the NRCS Gunnison Basin Conservation District sponsored a Range Management School to assist ranchers in managing and monitoring their lands to benefit Gunnison sage-grouse and meet the requirements of the CCAA (Gunnison County 2013a, pp. 204–206).

Projects undertaken through SGI and related private land programs, as described above, have benefitted Gunnison sage-grouse and its habitat, but are limited in extent. Therefore, it is unlikely that such actions are able to offset habitat loss and decline across the species' range.

The CRP is another Federally sponsored program that has helped offset the loss of Gunnison sage-grouse habitat. Administered by the FSA, this program provides incentives to landowners to plant more natural vegetation in lands formerly devoted to agricultural production. The NRCS provides technical assistance and planning in the implementation of CRP. The CRP helps address the threat of habitat decline due to agricultural conversion.

Lands within the occupied range of Gunnison sage-grouse currently enrolled in the CRP are limited to Dolores and San Miguel counties in Colorado, and San Juan County in Utah (USDA FSA 2010, entire). From 2000 to 2008, CRP enrollment averaged 10,622 ha (26,247 ac) in Dolores County, 1,350 ha (3,337 ac) in San Miguel County, and 14,698 ha (36,320 ac) in San Juan County (USDA FSA 2010, entire). In 2011,

approximately 9,793 ha (24,200 ac) were enrolled in the CRP program within occupied habitat in the Monticello population (UDWR 2011, p. 7). This area represents approximately 34 percent of the occupied habitat in the Monticello population, and approximately 22 percent of the entire Monticello-Dove Creek population area. By 2011, lands that had dropped out of the CRP program were replaced by newly enrolled properties, and the total acreage of lands enrolled in the CRP program remained at the maximum allowed by the FSA for San Juan County, UT (UDWR 2011, p. 7).

Gunnison sage-grouse are known to regularly use CRP lands in the Monticello population (Lupis *et al.* 2006, pp. 959–960; Ward 2007, p. 15). In San Juan County, Gunnison sage-grouse use CRP lands in proportion to their availability (Lupis *et al.* 2006, p. 959). The CRP areas are used by grouse primarily as foraging and brood-rearing habitat, but these areas vary greatly in plant diversity and forb abundance, generally lack any shrub cover (Lupis *et al.* 2006, pp. 959–960; Prather 2010, p. 32), and thus are less suitable for nesting and wintering habitat.

Except in emergency situations such as drought, CRP-enrolled lands are not hayed or grazed. In response to a severe drought, four CRP parcels totaling 1,487 ha (3,674 ac) in San Juan County, UT, were emergency grazed for a duration of one to two months in the summer of 2002 (Lupis *et al.* 2006, p. 959). Males and broodless females avoided the grazed areas while cattle were present but returned after cattle were removed (Lupis *et al.* 2006, pp. 960–961). Thus, the effects from grazing were likely negative but apparently short in duration.

Largely as a result of agricultural conversion, sagebrush patches in the Monticello-Dove Creek subpopulation area have progressively become smaller and more fragmented, thereby limiting the amount of high quality nesting and winter habitat (GSRSC 2005, pp. 82, 276). Overall, the CRP has provided important foraging habitat and has protected a portion of the Monticello-Dove Creek population from more intensive agricultural use and development. Continued enrollment of lands in CRP and management of those lands are conservation priorities of the local sage-grouse working group (SJCWG 2003, entire). However, the overall value of CRP lands to Gunnison sage-grouse to reduce or remove the threat of habitat loss and fragmentation is currently limited because these lands largely lack sagebrush cover required by the species throughout most of the year.

The value of CRP lands to the species will likely increase over time with the establishment of sagebrush in those areas. The extent to which existing CRP lands will be reenrolled in the future is unknown. However, given the recent enrollment, we expect lands to continue to be enrolled into the future.

*Tribal Species Management Plan*

Approximately 12,000 ac of occupied habitat on Pinecrest Ranch are owned by the Ute Mountain Ute Tribe (Tribe) under restricted fee status. The Pinecrest Ranch includes a total of 18,749 ac in the Gunnison Basin population area west of Gunnison, Colorado. The Tribe uses the ranch primarily for livestock grazing and for important traditional and cultural purposes. In February 2014, the Tribe completed a Species Management Plan (SMP) to promote the conservation of Gunnison sage-grouse and its habitat on the Pinecrest Ranch while maintaining a sustainable agricultural operation and other traditional uses of the property (Ute Mountain Ute Tribe 2014a, entire). On April 9, 2014, the Tribe approved and adopted the SMP for the Pinecrest Ranch per Resolution No. 2014–059 (Ute Mountain Ute Tribe 2014b, pp. 1–2).

The SMP includes management actions and/or considerations that will benefit Gunnison sage-grouse including, but not limited to, continued predator control, seasonal restrictions for construction and development activities, road restrictions and closures, wildlife-friendly fencing, outreach and education, and sustainable grazing practices which are compatible with maintaining habitat that meets the species' needs (UMUT 2014, pp. 7–15). While we think the SMP provides a benefit to species, we evaluated the species management plan under our PECE policy, but found the plan met only 7 of the 15 criteria.

*Other Conservation Efforts*

To varying degrees, most counties in Colorado either support or are involved in other conservation efforts for Gunnison sage-grouse, such as local working groups, habitat improvement projects, and research projects (Gunnison County 2013b, Appendix 1 A–K, CPW 2014g, Attachment 3 and Appendix A; Office of the Governor of Colorado 2014, entire). Through CPW, the State of Colorado has also been a leader in sage-grouse research and conservation efforts throughout the species' range (CPW 2014g, entire; Office of the Governor of Colorado 2014, entire). We have considered all such conservation efforts in this listing determination, and highlight some of the more significant of these efforts below.

Except for the Cerro Summit-Cimarron-Sims Mesa population, each of the Gunnison sage-grouse population areas has a Conservation Plan authored by Local Working Groups with publication dates of 1997 to 2011 (CSGWG 1997; Dove Creek/Monticello Local Working Group 1998; GSRSC 2005; Piñon Mesa Gunnison Sage-grouse Working Group 2000; Poncha Pass Local Working Group 2000; Gunnison Sage-grouse Working Group 2000; SJCWG 2000 and 2003; SMBGSWG 2009; Crawford Area Sage-grouse Working Group 2011). These plans provide guidance and recommendations for management of Gunnison sage-grouse and have been the basis for identifying and prioritizing local conservation efforts. We have reviewed all of the Local Working Group plans and the implementation reporting we received with respect to these plans. While these plans are providing a conservation benefit to the species, the actions in these plans are all voluntary and many of the satellite populations are in a downward trajectory, therefore the actions do not reduce the threats, such as residential development (Factor A), which may require compensatory mitigation to ameliorate, and, to the species to a point where listing is not warranted.

The Gunnison Sage-Grouse Rangewide Conservation Plan (RCP) was developed by the states of Colorado and Utah and 5 Federal agencies, including the Service, in 2005 to supplement the local working group plans and to offer a rangewide perspective for conservation of the species. The RCP includes specific, recommended avoidance and minimization measures, as well as species and habitat conservation targets. However, similar to the local plans, the RCP is a guidance document only, is voluntary, and does not provide regulatory mechanisms for Gunnison sage-grouse conservation (GSRSC 2005, p. 1). Where RCP recommended conservation measures have been implemented, we have evaluated and included them in our analysis. For example, the RCP recommends road closures and the enactment of county regulations to minimize impacts to the species; where appropriate, the existing efforts that implement these recommendations are included in our analysis. Overall, however, there is no requirement to implement the recommendations in the RCP and past implementation of these recommendations has generally been ad hoc and opportunistic. Given this history, we find that the RCP is not effective at reducing the threats acting on the species to the point where listing the species is not warranted.

Other conservation efforts in the species' range include the North Rim Landscape Strategy developed by Federal and state agencies, partners, and stakeholders to supplement the Crawford Area Conservation Plan. The strategy identifies broad recommendations for resource management and conservation of Gunnison sage-grouse in the Crawford population area, but is not a legal decision document (BLM 2013c, p. 4–5).

Gunnison County has been particularly active in Gunnison sage-grouse conservation activities. In 2005, it hired a Gunnison Sage-grouse Coordinator and organized a Strategic Committee to facilitate implementation of conservation measures in the Gunnison Basin under both the local Conservation Plan (CSGWG 1997, entire) and RCP (GSRSC 2005, entire). An estimated $30 million has been invested in conservation actions by these groups and partners in the Gunnison Basin (Gunnison County 2013a, p. 147). Gunnison County reports that it alone has contributed more than $1 million to Gunnison sage-grouse conservation (Gunnison County 2013a, p. 218). In 2009, Gunnison County adopted the Gunnison Basin Sage-grouse Strategic Plan (Gunnison County 2013a, Appendix E) to foster coordination and guide local citizens in the conservation of Gunnison sage-grouse. Also in 2009, the Gunnison County Sage-Grouse Conservation Action Plan (Gunnison County 2013a, Appendix F) was developed to guide and prioritize the implementation of specific conservation actions identified in the Strategic Plan. Gunnison County and the Gunnison Basin Sage-Grouse Strategic Committee (local working group for the Gunnison Basin population area) have also made significant public outreach efforts including holding the Gunnison Sage-Grouse Festival, providing Web site information for the public, and education and communication with area landowners (Gunnison County 2013a, p. 59).

The Crawford Working Group (Delta and Montrose County areas) also hired a Gunnison sage-grouse coordinator in December 2009. Likewise, Saguache County hired a part-time coordinator for the Poncha Pass population in 2013. These efforts facilitate coordination relative to sage-grouse management and reflect positively on these counties' commitment to Gunnison sage-grouse conservation.

Gunnison County and several other counties in the species' range have also enacted regulatory and related measures to benefit Gunnison sage-grouse and its habitat, as discussed under Factor D (Local Laws and Regulation).

The Gunnison Climate Adaptation Pilot Project, led by the Gunnison Climate Change Working Group, implemented several habitat projects in 2012 and 2013 to restore and improve the resiliency of Gunnison sage brood-rearing habitats (riparian areas and wet meadows) to address climate change in the Gunnison Basin (The Nature Conservancy (TNC) 2012, entire). The projected vulnerability of the Gunnison Basin to climate change was the primary impetus for the pilot project (see Climate Change). Long-term monitoring will determine effectiveness of the projects. Additional projects under this initiative are planned for the future (The Nature Conservancy (TNC) 2011, p. 1).

A review of a database compiled by the CPW that included local, State, and Federal ongoing and pending Gunnison sage-grouse conservation actions in Colorado from 2005 to 2009 (CDOW 2009c, entire) revealed a total of 224 individual conservation efforts, most of which were habitat improvement or protection projects. As of 2012, 165 of those efforts were completed, resulting in the treatment (enhancement or restoration) of 9,324 ha (23,041 ac), or approximately 2.5 percent of occupied Gunnison sage-grouse habitat. A monitoring component was included in 45 percent of the completed efforts, although we do not have information on their overall effectiveness. Five habitat improvement or protection projects occurred between January 2011 and September 2012, treating an additional 300 acres (CPW 2012b, p. 7). Further discussions of habitat improvement projects occurred before 2005 and subsequent to the 2012 summary document (CPW 2012b, entire; CPW 2014e, entire; CPW 2014g entire). These are not discussed here but were considered. Individually, these projects are generally all relatively small in scale, in relation to the individual populations where they have occurred. Cumulatively, these conservation efforts are providing a conservation benefit to the species, however, given the general downward trend of many of the satellite populations and the inability of these efforts to reduce threats such as residential development, we find these conservation efforts are not effective at reducing the threats acting on the species to the point where listing the species is not warranted.

## Multi-County Rangewide Efforts

In 2013, the "Conservation Agreement for Gunnison Sage-grouse," and a Memorandum of Understanding, was drafted by 11 Colorado and Utah Counties across the range of Gunnison sage-grouse (Gunnison, Saguache, Dolores, Montezuma, Delta, Montrose, Hinsdale, Mesa, San Miguel, and Ouray Counties in Colorado; and San Juan County in Utah) (hereafter, County Coalition). To date, the Governors of the States of Colorado and Utah; and County Commissioners from all nine counties in occupied range from both States have signed the agreement. Hinsdale and Montezuma Counties do not contain occupied range for Gunnison sage-grouse and, therefore, did not sign the agreement. While the agreement itself is not regulatory, signatories of the agreement committed to implementing appropriate resolutions, regulations, and guidelines to enhance the species and its habitat in an effort to increase populations of Gunnison sage-grouse (County Coalition 2013, entire). Specifically, they have formally committed to adopting a Habitat Prioritization Tool, which will better predict preferred habitat for the species, and they have formally committed to updating and adopting an amended Rangewide Conservation Plan. We did evaluate these multi-county efforts under our PECE policy, but found they did not include specific conservation efforts as defined by the PECE policy, and hence cannot contribute to a determination that listing is unnecessary or a determination to list the species as threatened rather than endangered.

## Summary of Conservation Programs and Efforts Related to Habitat Protection

Numerous conservation actions have been implemented for Gunnison sage-grouse, and these efforts have provided and will continue to provide conservation benefit to the species. The CCAA and CCA provide significant conservation benefit to the species and its habitat on private lands rangewide and Federal lands in the Gunnison Basin, respectively, reducing the impacts of primarily habitat-related threats in those areas. However, the identified conservation efforts, taken individually and in combination, do not fully address the substantial threats of rangewide habitat decline (Factor A), small population size and structure (Factor E), drought (Factor E), climate change (Factor A), and disease (Factor C). The Gunnison Basin CCA provides some protection for Gunnison sage-grouse on Federal lands in the Gunnison Basin, but does not cover the remaining, more vulnerable populations. Similarly, the existing CCAA benefits Gunnison sage-grouse, but does not provide sufficient coverage of the species' range to ensure the species' long-term conservation. Based on their voluntary nature and track records, the RCP, local working group plans, and other conservation efforts are not effective at reducing the threats acting on the species to the point where listing the species is not warranted. Thus, although the ongoing conservation efforts are a positive step toward the conservation of the Gunnison sage-grouse and have undoubtedly reduced the severity of certain threats to populations, on the whole we find that current conservation efforts are not sufficient to offset the full scope of threats to Gunnison sage-grouse.

## Summary of Factor A

Gunnison sage-grouse require large areas of sagebrush for long-term persistence, and thus are affected by factors that occur at the landscape scale. Broad-scale characteristics within surrounding landscapes influence habitat selection, and adult Gunnison sage-grouse exhibit a high fidelity to all seasonal habitats, resulting in low adaptability to habitat changes. Habitat loss, degradation, and fragmentation of sagebrush habitats are a primary cause of the decline of Gunnison and greater sage-grouse populations (Patterson 1952, pp. 192–193; Connelly and Braun 1997, p. 4; Braun 1998, p. 140; Johnson and Braun 1999, p. 78; Connelly et al. 2000a, p. 975; Miller and Eddleman 2000, p. 1; Schroeder and Baydack 2001, p. 29; Johnsgard 2002, p. 108; Aldridge and Brigham 2003, p. 25; Beck et al. 2003, p. 203; Pedersen et al. 2003, pp. 23–24; Connelly et al. 2004, p. 4–15; Schroeder et al. 2004, p. 368; Leu et al. 2011, p. 267). Documented negative effects of fragmentation include reduced lek persistence, lek attendance, population recruitment, yearling and adult annual survival, female nest site selection, and nest initiation rates, as well as the loss of leks and winter habitat (Holloran 2005, p. 49; Aldridge and Boyce 2007, pp. 517–523; Walker et al. 2007a, pp. 2651–2652; Doherty et al. 2008, p. 194).

We examined a number of factors that contribute to habitat decline. Habitat loss due to residential and infrastructural development (including roads and powerlines) is a current and future threat to Gunnison sage-grouse range-wide. Due to habitat decline, the seven individual populations are now mostly isolated, with limited migration and gene flow among populations,

increasing the likelihood of population extirpations. Functional habitat loss also contributes to habitat decline as sage-grouse avoid areas due to human activities and noise, even when sagebrush remains intact. The collective disturbance from human activities around residences and infrastructure results in habitat decline that negatively impacts Gunnison sage-grouse survival. Human populations are increasing across the species' range, a trend expected to continue into the future. Resulting habitat decline is diminishing the probability of Gunnison sage-grouse survival and persistence, particularly in the satellite populations.

Other habitat-related threats that are impacting Gunnison sage-grouse include grazing practices inconsistent with local ecological conditions, fences, invasive plants, fire, mineral development, piñon-juniper encroachment, and large-scale water development and irrigation. The cumulative presence of all these features and activities constitutes a threat to Gunnison sage-grouse as they collectively contribute to habitat decline. In particular, the satellite populations are less resilient and more vulnerable to extirpation and environmental pressures including habitat loss and fragmentation (see discussion in Factor A analysis above and in the Factor E analysis below).

Several issues discussed above, such as fire, invasive species, and piñon-juniper encroachment, may not currently have a substantial impact on Gunnison sage-grouse. For example, while it may be impacting individual birds or populations, piñon-juniper encroachment does not currently pose a threat to the species because of its limited distribution throughout the range of Gunnison sage-grouse. However, the documented synergy among these three issues (piñon-juniper encroachment, fire and invasive species), results in a high likelihood that they will pose a threat to the species in the future. Nonnative invasive plants, including cheatgrass and other noxious weeds, continue to expand their range, facilitated by ground disturbances such as fire, grazing incompatible with local ecological conditions, and human infrastructure. Invasive plants negatively impact Gunnison sage-grouse primarily by reducing or eliminating native vegetation that sage-grouse require for food and cover, resulting in habitat decline (both direct and functional). Cheatgrass is present at varying levels in nearly all Gunnison sage-grouse population areas, but there has not yet been a demonstrated change in fire cycle in the range of Gunnison

sage-grouse. However, climate change will likely alter the range of invasive plants, intensifying the proliferation of invasive plants to the point that they become a threat to the species. Even with aggressive treatments, invasive plants will likely persist and continue to spread throughout the range of Gunnison sage-grouse.

Livestock management inconsistent with local ecological conditions has the potential to degrade sage-grouse habitat at local scales by causing the loss of nesting cover and decreases in native vegetation, and by increasing the probability of incursion of invasive plants. Given the widespread nature of grazing within the range of Gunnison sage-grouse, the potential for population-level impacts is probable. Effects of domestic livestock grazing inconsistent with local ecological conditions are likely being exacerbated by intense browsing of woody species by wild ungulates in parts of the Gunnison Basin. We conclude that habitat degradation that can result from grazing practices inconsistent with local ecological conditions is a threat to Gunnison sage-grouse.

We do not consider nonrenewable energy development to be impacting Gunnison sage-grouse habitat to the extent that it is a threat to the long-term persistence of the species at this time, because its current and anticipated extent is limited throughout the range of Gunnison sage-grouse. We do not consider renewable energy development to be a threat to the persistence of Gunnison sage-grouse rangewide at this time. However, geothermal and wind energy development could increase in the Gunnison Basin and Monticello areas, respectively, in the future.

We recognize ongoing and proposed conservation efforts by all entities across the range of the Gunnison sage-grouse, and commend all parties for their vision and participation. Local communities, landowners, agencies, and organizations in Colorado and Utah have dedicated resources to Gunnison sage-grouse conservation and have implemented numerous conservation efforts. We encourage continued implementation of these efforts into the future to promote the conservation of Gunnison sage-grouse. Our review of conservation efforts indicates that the measures identified are not fully addressing the most substantial threats to Gunnison sage-grouse including habitat decline (Factor A), small population size and structure (Factor E), drought (Factor E), climate change (Factor A), and disease (Factor C). All of the conservation efforts are limited in size and the measures provided to us were not

implemented at the scale (even when considered cumulatively) that would be required to effectively reduce the threats to the species and its habitat across its range. The Gunnison Basin CCA, for example, provides some protection for Gunnison sage-grouse on Federal lands in the Gunnison Basin, but does not cover the remaining, more vulnerable satellite populations. Similarly, the existing CCAA benefits Gunnison sage-grouse on participating lands, but does not provide sufficient coverage of the species' range to ensure the species' long-term conservation. Thus, although the ongoing conservation efforts are a positive step toward the conservation of the Gunnison sage-grouse, and some have likely reduced the severity of some threats to the species, on the whole we find that current conservation efforts are not sufficient to offset the full scope of threats to Gunnison sage-grouse.

We have evaluated the best scientific information available on the present or threatened destruction, modification, or curtailment of the Gunnison sage-grouse's habitat or range. Based on the current and anticipated future threats identified above and their cumulative effects as they contribute to the overall decline of Gunnison sage-grouse habitat, we have determined that the present or threatened destruction, modification, or curtailment of Gunnison sage-grouse habitat poses a threat to the species throughout its range. This threat is substantial and current, and is projected to continue and increase into the future with additional anthropogenic pressures.

## B. Overutilization for Commercial, Recreational, Scientific, or Educational Purposes

*Hunting*

Hunting for Gunnison sage-grouse is not currently permitted under Colorado and Utah law. Hunting was eliminated in the Gunnison Basin in 2000 due to concerns with meeting Gunnison sage-grouse population objectives (Colorado Sage Grouse Working Group (CSGWG) 1997, p. 66). Hunting has not occurred in the other Colorado populations of Gunnison sage-grouse since 1995 when the Piñon Mesa area was closed (GSRSC 2005, p. 122). Utah has not allowed hunting of Gunnison sage-grouse since 1989 according to GSRSC (2005, p. 82), or as early as the mid-1970's according to SJCWG (2000, p. 11).

Both Colorado and Utah report they will consider hunting of Gunnison sage-grouse only if populations can be sustained (GSRSC 2005, pp. 5, 8, 229). The local Gunnison Basin working group plan calls for a minimum

BLM_0072056

population of 500 males (based on lek counts) before hunting would occur again (CSGWG 1997, p. 66). The minimum population level in the Gunnison Basin population has been exceeded in all years since 1996, except 2003 and 2004 (CDOW 2009d, pp. 18–19). However, the sensitive State regulatory status and potential political ramifications of hunting the species has precluded the States from opening a hunting season. If hunting does ever occur again, harvest will likely be restricted to only 5 to 10 percent of the fall population, and will be structured to limit harvest of females to the extent possible (GSRSC 2005, p. 229). However, the ability of these measures to be implemented is in question, as adequate means to estimate fall population size have not been developed (Reese and Connelly 2011, pp. 110–111) and limiting female harvest may not be possible (WGFD 2004, p. 4; WGFD 2006, pp. 5, 7).

In 1992, a CPW effort to simplify hunting restrictions inadvertently opened the Poncha Pass area to sage-grouse hunting, and at least 30 grouse were harvested from this population. The area was closed to sage-grouse hunting the following year and has remained closed to hunting since (Nehring and Apa 2000, p. 3). One sage-grouse was known to be illegally harvested in 2001 in the Poncha Pass population (Nehring 2010, pers. comm.), but based on the best available information illegal harvest has not contributed to Gunnison sage-grouse population declines in either Colorado or Utah. We do not anticipate hunting to be opened in the Gunnison Basin or smaller populations for many years, if ever. Consequently, we do not consider hunting to be a threat to the species now or in the future.

*Lek Viewing and Counts*

The Gunnison sage-grouse was designated as a new species in 2000 (American Ornithologists' Union 2000, pp. 847–858), which has prompted a much increased interest by bird watchers to view the species on their leks (Pfister 2010, pers. comm.). Daily human disturbances on sage-grouse leks could cause a reduction in mating, and some reduction in total production (Call and Maser 1985, p. 19). Human disturbance, particularly if additive to disturbance by predators, could reduce the time a lek is active, as well as reduce its size by lowering male attendance (Boyko *et al.* 2004, *in* GSRSC 2005, p. 125). Smaller lek sizes have been hypothesized to be less attractive to females, thereby conceivably reducing the numbers of females mating.

Disturbance during the peak of mating also could result in some females not breeding (GSRSC 2005, p. 125). Furthermore, disturbance from lek viewing might affect nesting habitat selection by females (GSRSC 2005, p. 126), as leks are typically close to areas in which females nest. If females move to poorer quality habitat farther away from disturbed leks, nest success could decline. If chronic disturbance causes sage-grouse to move to a new lek site away from preferred and presumably higher quality areas, both survival and nest success could decline. Whether any or all of these have significant population effects would depend on timing and degree of disturbance (GSRSC 2005, p. 126).

Throughout the range of Gunnison sage-grouse, public viewing of leks is limited by a general lack of knowledge of lek locations, seasonal road closures in some areas, and difficulty in accessing many leks. Furthermore, 52 of 109 active Gunnison sage-grouse leks occur on private lands, further limiting public access. The BLM closed a lek in the Gunnison Basin to viewing in the late 1990s due to declining population counts perceived as resulting from recreational viewing, although no scientific studies were conducted (BLM 2005a, p. 13; GSRSC 2005, pp. 124, 126).

The Waunita lek east of Gunnison is the only lek in Colorado designated by the CPW for public viewing (Waunita Watchable Wildlife Area) (CDOW 2009b, p. 86). Since 1998, a comparison of male counts on the Waunita lek versus male counts on other leks in the Doyleville zone show that the Waunita lek's male counts generally follow the same trend as the others (CDOW 2009d, pp. 31–32). In fact, in 2008 and 2009, the Waunita lek increased in the number of males counted along with three other leks, while seven leks decreased in the Doyleville zone (CDOW 2009d, pp. 31–32). These data suggest that lek viewing on the Waunita lek has not impacted Gunnison sage-grouse attendance at leks. Two lek viewing tours per year are organized and led by UDWR on a privately owned lek in the Monticello population. The lek declined in males counted in 2009, but 2007 and 2008 had the highest counts for several years, suggesting that lek viewing is not impacting that lek either. Data collected by CPW on greater sage-grouse viewing leks also indicates that controlled lek visitation has not impacted greater sage-grouse at the viewed leks (GSRSC 2005, p. 124).

A lek viewing protocol has been developed and has largely been followed on the Waunita lek, likely

reducing impacts to sage-grouse (GSRSC 2005, p. 125). During 2004–2009, the percentage of individuals or groups of people in vehicles following the Waunita lek viewing protocol in the Gunnison Basin ranged from 71 to 92 percent (CDOW 2009b, pp. 86, 87; Magee *et al.* 2009, pp. 7, 10). Violations of the protocol, such as showing up after the sage-grouse started to display and creating noise, caused one or more sage-grouse to flush from the lek (CDOW 2009b, pp. 86, 87). Despite the protocol violations, the percentage of days from 2004 to 2009 that grouse were flushed by humans was relatively low, ranging from 2.5 percent to 5.4 percent (Magee *et al.* 2009, p. 10). The current lek viewing protocol includes regulations to avoid and minimize disturbance from photography, research, and education-related viewing; regulations and related information are provided to the public online (CDOW 2009b, p. 86; Gunnison County 2013a, p. 127; CPW 2013, entire). Implementation of this protocol should preclude lek viewing from becoming a threat to this lek.

The CPW and UDWR will continue to coordinate and implement lek counts to determine population levels. We expect annual lek viewing and lek counts to continue into the future. Lek counts may disturb individual birds. However, since the Waunita lek is open to viewers on a daily basis throughout the lekking season, and lek counters only approach an individual lek 2–3 times per season, all leks counted will receive lower disturbance from counters than the Waunita lek receives from public viewing, so we do not consider lek counts a threat to Gunnison sage-grouse populations or the species.

*Scientific Research and Related Conservation Efforts*

Overall, it is expected that scientific research and related conservation efforts by the States, such as translocation of Gunnison sage-grouse, have a net conservation benefit for the species, because they contribute to improved understanding of the species' conservation needs and may have helped to augment some of the satellite populations, likely contributing to their continued persistence. However, some unintended negative effects are known to occur in the process. Gunnison sage-grouse have been the subject of multiple scientific studies, some of which included capture and handling. Most field research has been conducted in the Gunnison Basin population, San Miguel Basin population, and Monticello portion of the Monticello-Dove Creek population. Between zero and seven percent mortality of handled adults or

juveniles and chicks has occurred during recent Gunnison sage-grouse studies where trapping and radio-tagging was done (Apa 2004, p. 19; Childers 2009, p. 14; Lupis 2005, p. 26; San Miguel Basin Gunnison Sage-grouse Working Group (SMBGSWG) 2009, p.

A–10). For these studies combined, of 688 birds captured, 11 (1.6 percent) died (Table 11). Additionally, one radio-tagged hen was flushed off a nest during subsequent monitoring and did not return after the second day, resulting in the loss of 10 eggs (Ward 2007, p. 52).

The CPW does not feel that these losses or disturbance are having significant impacts on the sage-grouse (CDOW 2009b, p. 29), and we agree with this assessment.

TABLE 11—MORTALITY OF GUNNISON SAGE-GROUSE FROM RECENT STUDIES

| Study focus | Total birds handled/ captured/ studied | Mortality | | Source |
| | | Number of individuals | % of total birds | |
| --- | --- | --- | --- | --- |
| Habitat use, movement, survival of Gunnison sage-grouse in south-west Colorado. | 138 | 3 | 2.2 | Apa 2004, p. 19. |
| Gunnison sage-grouse habitat use ...................................................... | a 336 | 7 | 2.1 | Childers 2009, p. 14. |
| Summer ecology of Gunnison sage-grouse ........................................ | 14 | 1 | 7.1 | Lupis 2005, p. 26. |
| Summary of CPW research projects in the Gunnison Basin and San Miguel populations from 2004 to 2009. | 200 | 0 | 0.0 | SMBGSWG 2009, p. A–10. |
| Total ................................................................ | 688 | 11 | 1.6 | n/a. |

a This figure includes 218 adults and 118 chicks captured; of these, 5 adults (2.3%) and 2 chicks (1.7%) died.

Translocation of birds from the Gunnison Basin population has been used to augment some of the satellite populations and may contribute to their persistence. However, related to translocated birds, there are potential genetic and population viability concerns for the satellite (receiving) populations and the Gunnison Basin (source) population (see Small Population Size and Structure in Factor E). Trapping and translocation of Gunnison sage-grouse may also increase mortality rates, either due directly to capturing and handling, or indirectly (later in time) as a result of translocation to areas outside the individuals' natal (home) range.

From the spring of 2000 to the spring 2013, CPW translocated a total of 300 radio-collared Gunnison sage-grouse from the Gunnison Basin population to the following satellite populations: Poncha Pass (41 birds), San Miguel Basin (Dry Creek Basin) (51 birds), Piñon Mesa (93 birds), Dove Creek (42 birds), and Crawford (73 birds). During this time, CPW reported only four bird deaths associated with capture myopathy (muscle damage due to extreme exertion or stress associated with capture and transport), including two deaths in 2007 and two in 2009 (CPW 2014c, entire). Excluding capture myopathy cases, data for birds with unknown fates (i.e., due to dropped or expired radio collars), and some of the more recent (2013) translocated birds, CPW has tracked the survival of 176 Gunnison sage-grouse translocated to date. Survival of all translocated birds to 12 months following translocation was higher in the spring (53.8 percent) than fall (39.6 percent); higher for yearlings

(55.4 percent) and juveniles (61.3 percent) than adults (40.0 percent); and comparable for males (50.0 percent) and females (48.8 percent). By population, survival to 12 months was highest in Dove Creek (60 percent) and Crawford (59.6 percent), followed by Piñon Mesa (40 percent), Dry Creek Basin (35.3 percent), and Poncha Pass (20.0 percent). Overall survival of translocated birds to 12 months was approximately 48 percent (CPW 2013d, entire; Wait 2013, pers. comm.; CPW 2014c, entire). Therefore, about 50 percent of these translocated birds died within the first 12 months following translocation, greater than the average annual mortality rate of non-translocated sage-grouse (approximately 20 percent) (CDOW 2009b, p. 9). However, some birds with an unknown fate (e.g., a dropped radio collar with no sign of death) were assumed dead and, therefore, the data may overestimate actual mortality rates (Wait 2013, pers. comm.).

In the fall of 2013, an additional 17 Gunnison sage-grouse were translocated to the Poncha Pass population from the Gunnison Basin. As of January 2014, 10 of these birds were known to be surviving (Nehring 2014, pers. comm.). In spring of 2014, 10 more birds were translocated to the Poncha Pass population from the Gunnison Basin (CPW 2014e, p. 7). In the fall of 2013 and spring of 2014, CPW translocated 23 birds from the Gunnison Basin to the Miramonte subpopulation of the San Miguel population (CPW 2014e, p. 7). Survival data for these birds were not available upon the drafting of this final rule.

Greater sage-grouse translocations have not fared any better than those of Gunnison sage-grouse. Over 7,200 greater sage-grouse were translocated between 1933 and 1990, but only five percent of the translocation efforts were considered to be successful in producing sustained, resident populations at the translocation sites (Reese and Connelly 1997, pp. 235–238, 240). More recent translocations from 2003 to 2005 into Strawberry Valley, Utah, resulted in a 40 percent annual mortality rate (Baxter *et al.* 2008, p. 182). We believe the lack of success of translocations found in greater sage-grouse is applicable to Gunnison sage-grouse because the two species exhibit similar behavior and life-history traits, and translocations are also managed similarly.

Because the survival rate for translocated sage-grouse has not been as high as desired, the CPW started a captive-rearing program in 2009 to investigate techniques for captive breeding and rearing of chicks, and methods to release chicks into wild, surrogate broods, to potentially increase brood survival and recruitment (CDOW 2009b, pp. 9–12). The GSRSC conducted a review of captive-rearing attempts for both greater sage-grouse and other gallinaceous birds and concluded that survival will be very low, unless innovative strategies are developed and tested (GSRSC 2005, pp. 181–183). However, greater sage-grouse have been reared in captivity, and survival of released chicks was similar to that of wild chicks (CDOW 2009b, p. 10). Consequently, the CPW started a captive-breeding project for Gunnison sage-grouse. After establishing a captive,

breeding flock, 78 domestically-reared chicks were introduced to wild Gunnison sage-grouse broods in 2010 and 2011 at two treatment ages. While survival of successfully-adopted, domestically-reared chicks was slightly lower than that of wild-reared chicks through 14 weeks, across both years none of the domestically-reared chicks were recruited into the breeding population (Wiechman 2014c, pers. comm.). Although introduced chick survival was relatively low, chick survival during captivity increased with improved protocols, and valuable knowledge on Gunnison sage-grouse rearing techniques has been gained (CPW 2011b). In another study, approximately 42 percent of captive-reared chicks introduced to wild females and their broods survived to 30 days of age. Of chicks that did not survive, 26.3 percent of chicks were lost due to predation, and 25.6 percent were lost due to exposure to the elements (Thompson 2012, pp. 29, 93).

As techniques improve, the CPW intends to develop a captive-breeding manual for Gunnison sage-grouse (CDOW 2009b, p. 11). Although adults or juveniles have been captured and moved out of the Gunnison Basin, as well as eggs, the removal of the grouse only accounts for a very small percentage of the total population of the Gunnison Basin sage-grouse population (less than 1 percent per year).

The CPW has a policy regarding trapping, handling, and marking techniques approved by its Animal Use and Care Committee (SMBGSWG 2009, p. A–10, Childers 2009, p. 13). Evaluation of research projects by the Animal Use and Care Committee and improvement of trapping, handling, and marking techniques over the last several years has resulted in fewer mortalities and injuries. In fact, in the San Miguel Basin, researchers have handled more than 200 sage-grouse with no trapping mortalities (SMBGSWG 2009, p. A–10). The CPW has also drafted a sage-grouse trapping and handling protocol, which is required training for people handling Gunnison sage-grouse, to minimize mortality and injury of the birds (CDOW 2002, pp. 1–4 in SMBWG 2009, pp. A–22–A–25). Injury and mortality does occasionally occur from trapping, handling, marking, and flushing off nests. However, research-related mortality is typically below two percent of handled birds (Table 11), indicating there is minimal effect on Gunnison sage-grouse at the population level.

Overall, we find that ongoing and future scientific research and related conservation efforts provide a net conservation benefit for the species.

Primarily due to handling, capture, and translocations, short-term negative effects to individuals occur as does injury and mortality, but these effects do not pose a threat to Gunnison sage-grouse populations or the species. Translocation of birds from the Gunnison Basin population has been used to augment some of the satellite populations and may have contributed to their persistence, albeit with potential genetic and population viability concerns for the receiving populations (see Genetic Risks), and for the Gunnison Basin (source) population (see Small Population Size and Structure in Factor E). Based on the best available information, scientific research and associated activities as described above have a relatively minor impact and are not a threat to the Gunnison sage-grouse.

*Summary of Factor B*

We have no evidence to suggest that legal hunting resulted in the overutilization of Gunnison sage-grouse. However, Gunnison sage-grouse harvest from an inadvertently opened hunting season resulted in a significant population decrease in the small Poncha Pass population. Nevertheless, we do not expect hunting to be permitted in the near future. Illegal hunting has only been documented once in Colorado and is not a known threat in Colorado or Utah. Lek viewing has not affected the Gunnison sage-grouse, and lek viewing protocols designed to reduce disturbance have generally been followed. CPW is currently revising its lek viewing protocol to make it more stringent and to include considerations for photography, research, and education-related viewing. Mortality from scientific research and capture or handling of wild birds is low, generally less than 2 percent and is not a threat. We know of no overutilization for commercial or educational purposes. Thus, based on the best scientific and commercial data available, we conclude that overutilization for commercial, recreational, scientific, or educational purposes is not a threat to Gunnison sage-grouse.

C. Disease or Predation

*Disease*

No research focusing on the types or pathology of diseases in Gunnison sage-grouse has been published. However, multiple bacterial and parasitic diseases have been documented in greater sage-grouse (Patterson 1952, pp. 71–72; Schroeder *et al.* 1999, pp. 14, 27). Some early studies have suggested that greater sage-grouse populations are adversely

affected by parasitic infections (Batterson and Morse 1948, p. 22). However, the role of parasites or infectious diseases in population declines of greater sage-grouse is unknown based on the few systematic surveys conducted (Connelly *et al.* 2004, p. 10–3). No parasites have been documented to cause mortality in Gunnison sage-grouse, but the protozoan, *Eimeria* spp., which causes coccidiosis, has been reported to cause death in greater sage-grouse (Connelly *et al.* 2004, p. 10–4). Infections tend to be localized to specific geographic areas, and no cases of greater sage-grouse mortality resulting from coccidiosis have been documented since the early 1960s (Connelly *et al.* 2004, p. 10–4).

Parasites have been implicated in greater sage-grouse mate selection, with potentially subsequent effects on the genetic diversity of this species (Boyce 1990, p. 263; Deibert 1995, p. 38). These relationships may be important to the long-term ecology of greater sage-grouse, but they have not been shown to be significant to the immediate status of populations (Connelly *et al.* 2004, p. 10–6). Although diseases and parasites have been suggested to affect isolated sage-grouse populations (Connelly *et al.* 2004, p. 10–3), we have no evidence indicating that parasitic diseases are a threat to Gunnison sage-grouse populations.

Greater sage-grouse are subject to a variety of bacterial, fungal, and viral pathogens. The bacterium *Salmonella* sp. has caused a single documented mortality in the greater sage-grouse and studies have shown that infection rates in wild birds are low (Connelly *et al.* 2004, p. 10–7). The bacteria are apparently contracted through exposure to contaminated water supplies around livestock stock tanks (Connelly *et al.* 2004, p. 10–7). Other bacteria found in greater sage-grouse include *Escherichia coli,* botulism *(Clostridium* spp.), avian tuberculosis *(Mycobacterium avium),* and avian cholera *(Pasteurella multocida).* These bacteria have never been identified as a cause of mortality in greater sage-grouse and the risk of exposure and hence, population effects, is low (Connelly *et al.* 2004, p. 10–7 to 10–8). In Gunnison sage-grouse, domestically-reared chicks have died due to bacterial infections by *Klebsiella spp., E. coli,* and *Salmonella spp.* In one case (CDOW 2009b, p. 11), bacterial growth was encouraged by a wood-based brooder substrate used to raise chicks. However, in a subsequent study (CPW 2011b, pp. 14–15) where the wood-based substrate was not used, similar bacterial infections and chick mortality still occurred. This was likely

BLM_0072059

a product of warm and potential moist substrates which promoted bacterial growth and spread. After switching to a gravel-based substrate and administering antibiotics, bacteria-related mortalities decreased. While this appears to suggest that Gunnison sage-grouse may be less resistant to bacterial infections than greater sage-grouse, most of the bacteria found can be present at non-lethal levels in wild Gunnison sage-grouse (Wiechman 2014a, pers. comm.). However, we have no information that shows the risk of exposure in the wild is different for Gunnison sage-grouse; therefore, these bacteria do not appear to be a threat to the species.

To limit the risk of disease transmission from introduced avian species, Gunnison County's Land Use Resolution (LUR) Number 07–17 regulates the importation of non-indigenous, gallinaceous game birds. This regulation requires that species only be imported from a source certified by the State of Colorado to be disease free (Gunnison County 2013a, p. 130).

West Nile virus was introduced into the northeastern United States in 1999 and has subsequently spread across North America (Marra et al. 2004, p. 394). Greater sage-grouse are highly susceptible to West Nile virus (Clark et al. 2006, p. 19; McLean 2006, p. 54) and do not develop a resistance to the disease. Death is almost certain once an individual is infected with the disease (Clark et al. 2006, p. 18). Transmission occurs when mosquitoes acquire the virus by biting an infected bird, and then transfer it by feeding on a new host (avian or mammalian). Culex species are recognized as the most efficient mosquito vectors for West Nile virus (Turell et al. 2005, p. 60), and Culex tarsalis is the dominant vector of the virus in sagebrush habitats (Naugle et al. 2004, p. 711). West Nile virus transmission is regulated by multiple factors, including temperature, precipitation, biology of the mosquito vector (Turrell et al. 2005, pp. 59–60), and the presence of anthropogenic water sources, such as stock ponds and tanks, coal bed methane ponds, and irrigated agricultural fields that support mosquito life cycles (Reisen et al. 2006, p. 309; Walker and Naugle 2011, pp. 131–132). The peak of West Nile virus activity typically occurs in the summer from July through August, though this varies by region (Walker et al. 2004).

In Gunnison sage-grouse range and other parts of the west, water sources are commonly developed to support livestock operations and improve animal distribution and forage use. Some water developments are designed specifically to benefit Gunnison sage-grouse, although this practice was recommended prior to our knowledge of West Nile virus as a serious risk factor for sage-grouse (Walker and Naugle 2011, p. 29) (see discussion below; also see discussion of the potential benefits of water development to Gunnison sage-grouse in Domestic Grazing and Wildlife Herbivory in Factor A above). The precise quantity and distribution of water developments in Gunnison sage-grouse range is unknown. However, we know that at least 87 percent of occupied Gunnison sage-grouse habitat on Federal lands is currently grazed by domestic livestock (USFWS 2010c, entire), suggesting that water developments are common and widespread across the species range. A similar proportion of area on private lands is likely grazed by domestic livestock as well. It is expected that some of these water sources are contributing to the persistence of mosquito populations and, therefore, to the potential spread of West Nile virus across the range of Gunnison sage-grouse. Management or modification of water developments in sage-grouse habitats is one way to control mosquito vector populations and, therefore, sources of West Nile virus (Walker and Naugle 2011, p. 29, and references therein).

The virus persists largely within a mosquito-bird-mosquito infection cycle (McLean 2006, p. 45). However, direct bird-to-bird transmission of the virus has been documented in several species (McLean 2006, pp. 54, 59), including the greater sage-grouse (Walker and Naugle 2011, p. 132; Cornish 2009, pers. comm.). The frequency of direct transmission has not been determined (McLean 2006, p. 54). Cold ambient temperatures preclude mosquito activity and virus amplification, so transmission to and in sage-grouse is limited to the summer (mid-May to mid-September) (Naugle et al. 2005, p. 620; Zou et al. 2007, p. 4), with a peak in July and August (Walker and Naugle 2011, p. 131). Reduced and delayed West Nile virus transmission in sage-grouse has occurred in years with lower summer temperatures (Naugle et al. 2005, p. 621; Walker et al. 2007b, p. 694). In non-sagebrush ecosystems, high temperatures associated with drought conditions increase West Nile virus transmission by allowing for more rapid larval mosquito development and shorter virus incubation periods (Shaman et al. 2005, p. 134; Walker and Naugle 2011, p. 131).

Greater sage-grouse congregate in mesic (moist) habitats in the mid-late summer (Connelly et al. 2000, p. 971), thereby increasing their risk of exposure to mosquitoes. Likewise, Gunnison sage-grouse use more mesic habitats in the summer and early fall (GSRSC 2005, p. 30, and references therein), increasing their exposure to mosquitoes. If West Nile virus outbreaks coincide with drought conditions that aggregate birds in habitat near water sources, the risk of exposure to West Nile virus will be elevated (Walker and Naugle 2011, p. 131). Greater sage-grouse inhabiting higher elevation sites in summer (similar to areas of the Gunnison Basin) are likely less vulnerable to contracting West Nile virus than birds at lower elevation (similar to Dry Creek Basin of the San Miguel population) as ambient temperatures are typically cooler at higher elevations (Walker and Naugle 2011, p. 131).

West Nile virus has caused population declines in wild bird populations on the local and regional scale (Walker and Naugle 2011, pp. 128–129) and has reduced the survival rates of greater sage-grouse (Naugle et al. 2004, p. 710; Naugle et al. 2005, p. 616). Experimental results, combined with field data, suggest that a widespread West Nile virus infection has negatively affected greater sage-grouse (Naugle et al. 2004, p. 711; Naugle et al. 2005, p. 616). As noted above, the selective use of mesic habitats by sage-grouse during the summer and fall increases their exposure to West Nile virus. Greater sage-grouse are highly susceptible to West Nile virus (Clark et al. 2006, p. 19; McLean 2006, p. 54) and do not develop a resistance to the disease. Death is certain once an individual is infected with the disease (Clark et al. 2006, p. 18). Furthermore, other gallinaceous bird species such as ruffed grouse (Bonasa umbellus), wild turkey (Meleagris gallopavo), and chukar partridge (Alectoris chukar), have died as a result of West Nile virus infection (CDC 2013, entire).

It is reasonable to assume the Gunnison sage-grouse is susceptible to West Nile virus based on the confirmed cases of infection and mortality in greater sage-grouse and other taxonomically related birds. We are also aware of at least 3 Gunnison sage-grouse dying of West Nile disease, although these birds were growing in captivity in Fort Collins, CO where the virus is more likely to be present (Wiechman 2014b, pers. comm). To date, however, West Nile virus has not been documented in Gunnison sage-grouse despite the presence of West Nile virus across most of the species' range (see discussion below). This may be the result of the small number of birds marked and studied; limited local abundance of the principle mosquito vector species,

*Culex;* unsuitable conditions in Gunnison sage-grouse habitat for the virus to become virulent or widespread; or any number of other factors. West Nile virus activity within the range of Gunnison sage-grouse is apparently low compared to other parts of Colorado, Utah, and the western United States. However, West Nile virus surveillance may not occur every year or in every county (USGS 2013, entire), meaning that incidents likely go undetected. Furthermore, rural areas with smaller human populations, such as the majority of lands within Gunnison sage-grouse range, may have decreased detection and reporting rates of avian mortalities, thus potentially biasing the modeled distribution of West Nile virus (Ward *et al.* 2006, p. 102).

To date, across Gunnison sage-grouse occupied range, only San Miguel and Dolores, Counties in Colorado have no confirmed avian mortalities associated with West Nile virus, nor has the virus been reported in human or mosquito infection data in those counties. However, adjacent counties have confirmed West Nile virus presence, so the virus is potentially present in San Miguel and Dolores Counties as well. A total of 84 dead wild birds (species other than Gunnison sage-grouse) infected by West Nile virus have been reported from nine counties within the current range of Gunnison sage-grouse since 2002, when reporting began in Colorado and Utah. These include Chaffee, Delta, Gunnison, Mesa, Montrose, Ouray, and Saguache Counties in Colorado; and Grand and San Juan Counties in Utah. Seventy and 14 of these bird deaths were reported in Colorado and Utah, respectively. Fifty-two (62 percent) of reported cases were in Mesa County where the Piñon Mesa population is found. Also, the majority of reported cases were in Colorado counties (USGS 2013, entire; USFWS 2013a, entire). However, as noted above, areas with higher human population densities, such as Mesa County, Colorado, can result in increased detection and reporting rates, thus potentially biasing the modeled distribution of West Nile virus (Ward *et al.* 2006, p. 102). In Utah, 13 (93 percent) avian mortality reports were in Grand County, and 1 (7 percent) was in San Juan County. Sixty-four (76 percent) of the 84 total reported bird mortalities in Colorado and Utah occurred in 2003 and 2004, when summer temperatures were above average and, likely contributing to the spread of West Nile virus (Reisen *et al.* 2006, p. 1). Since that time, reported avian mortalities associated with West Nile virus across

the range of Gunnison sage-grouse have declined, and no avian infections or mortalities were reported from 2008 through 2012 (USGS 2013, entire; USFWS 2013a, entire).

A CPW study with the Colorado Mosquito Control Company in 2004 used mosquito trap monitoring to evaluate the relative risk of West Nile virus on Gunnison sage-grouse in the Gunnison Basin. Trapping resulted in a total of 6,729 mosquitoes throughout the Gunnison Basin from June 1 through August 30. Testing of mosquito samples conducted by the Colorado Department of Public Health observed nine species of mosquito, including *Culex tarsalis,* the primary vector of West Nile virus. However, the relative abundance of *C. tarsalis* was low, comprising about 15.8 percent of all samples collected. No other *Culex* species were observed. The other species observed are not known to be effective transmitters of West Nile virus to avian species. All mosquito samples tested negative for West Nile virus. Sixteen Gunnison sage-grouse were radiomarked by CPW during the same summer, and no mortalities of marked or unmarked birds were observed (Phillips 2013, p. 6). One avian mortality (a species other than Gunnison sage-grouse) due to West Nile infection was reported in Gunnison County in 2003 (USGS 2013, entire; USFWS 2013a, p. 1).

Walker and Naugle (2011, p. 140) predict that West Nile virus outbreaks in small, isolated, and genetically depauperate populations could reduce sage-grouse numbers below a threshold from which recovery is unlikely because of limited or nonexistent demographic and genetic exchange from adjacent populations. If so, a West Nile virus outbreak in any Gunnison sage-grouse population, except perhaps the Gunnison Basin population, assuming it remains large and resilient, would challenge their survival.

As described above, West Nile virus is present throughout most of the range of Gunnison sage-grouse. Although the disease has not yet been documented in any Gunnison sage-grouse, it has caused large mortality events and has also caused the deaths of other gallinaceous birds including greater sage-grouse. Similar to observations in greater sage-grouse (Walker and Naugle 2011, p. 131), higher elevation populations of Gunnison sage-grouse, such as the Gunnison Basin may be at lower risk of West Nile virus infection and outbreaks. Also, the frequency of avian mortalities (species other than sage-grouse) associated with the virus have apparently declined since 2004 across the range of Gunnison sage-grouse.

However, increased temperature and drought conditions are expected to increase in the future due to climate change across the range (see Climate Change in Factor A). Such conditions will contribute to the prevalence and spread of West Nile virus and, therefore, the exposure of Gunnison sage-grouse to this disease. Therefore, due to the known presence of West Nile virus across the majority of Gunnison sage-grouse range, the high risk of mortality and population-level impacts based on the biology of the species, and the immediacy of those potential impacts, we conclude that West Nile virus is a future threat to Gunnison sage-grouse rangewide. The threat of West Nile virus is currently lower in the high elevation areas, such as the Gunnison Basin population, but is expected to increase in the foreseeable future due to increased drought and the predicted effects of climate change. No other diseases or parasitic infections are known to be a threat to Gunnison sage-grouse now or in the future.

*Predation*

Predation is the most commonly identified cause of direct mortality for sage-grouse during all life stages (Schroeder *et al.* 1999, p. 9; Connelly *et al.* 2000b, p. 228; Connelly *et al.* 2011b, p. 66). However, sage-grouse have co-evolved with a variety of predators, and their cryptic plumage and behavioral adaptations have allowed them to persist despite this mortality factor (Schroeder *et al.* 1999, p. 10; Coates 2008, p. 69; Coates and Delehanty 2008, p. 635; Hagen 2011, p. 96). Until recently, little published information has been available that indicates predation is a limiting factor for the greater sage-grouse (Connelly *et al.* 2004, p. 10–1), particularly where habitat quality has not been compromised (Hagen 2011, p. 96). Although many predators will consume sage-grouse, none specialize on the species (Hagen 2011, p. 97). Generalist predators have the greatest effect on ground-nesting birds because predator numbers are independent of the density of a single prey source since they can switch to other prey sources when a given prey source is not abundant (Coates 2007, p. 4). We presume that the effects of predation observed in greater sage-grouse are similar to those anticipated in Gunnison sage-grouse since overall behavior and life-history traits are similar for the two species. However, as discussed below, those effects may be more substantial and of greater concern for smaller, declining populations, such as the six satellite populations of Gunnison sage-grouse.

Major predators of adult sage-grouse include many species including golden eagles *(Aquila chrysaetos),* red foxes *(Vulpes fulva),* and bobcats *(Felis rufus)* (Hartzler 1974, pp. 532–536; Schroeder *et al.* 1999, pp. 10–11; Schroeder and Baydack 2001, p. 25; Rowland and Wisdom 2002, p. 14; Hagen 2011, p. 97). Juvenile sage-grouse also are killed by many raptors as well as common ravens *(Corvus corax),* badgers *(Taxidea taxus),* red foxes, coyotes *(Canis latrans),* and weasels *(Mustela* spp.) (Braun 1995, entire; Schroeder *et al.* 1999, p. 10). Nest predators include badgers, weasels, coyotes, common ravens, American crows *(Corvus brachyrhyncos),* magpies *(Pica* spp.), elk *(Cervus canadensis)* (Holloran and Anderson 2003, p. 309), and domestic cows *(Bovus* spp.) (Coates *et al.* 2008, pp. 425–426). Ground squirrels *(Spermophilus* spp.) also have been identified as nest predators (Patterson 1952, p. 107; Schroeder *et al.* 1999, p. 10; Schroder and Baydack 2001, p. 25), but recent data show that they are physically incapable of puncturing eggs (Holloran and Anderson 2003, p. 309; Coates *et al.* 2008, p. 426; Hagen 2011, p. 97). Several other small mammals visited sage-grouse nests in Nevada, but none resulted in predation events (Coates *et al.* 2008, p. 425).

The most common predators of Gunnison sage-grouse eggs are weasels, coyotes, and corvids (Young 1994, p. 37). Most raptor predation of sage-grouse is on juveniles and older age classes (GSRSC 2005, p. 135). Golden eagles were found to be the dominant raptor species recorded perching on power poles in Utah in Gunnison sage-grouse habitat (Prather and Messmer 2009, p. 12), indicating a possible source of predation. In a study conducted from 2000 to 2009 in the western portion of the Gunnison Basin, 22 and 40 percent of 111 adult Gunnison sage-grouse mortalities were the result of avian and mammalian predation, respectively (Childers 2009, p. 7). Twenty-five and 35 percent of 40 chick mortalities were caused by avian and mammalian predation, respectively (Childers 2009, p. 7). A causative agent of mortality was not determined in the remaining mortalities (approximately one-third of all known mortalities) in the western portion of the Gunnison Basin from 2000 to 2009 (Childers 2009, p. 7).

Adult male Gunnison and greater sage-grouse are very susceptible to predation while on the lek (Schroeder *et al.* 1999, p. 10; Schroeder and Baydack 2001, p. 25; Hagen 2011, p. 5), presumably because they are conspicuous while performing their mating displays. Because leks are attended daily by numerous grouse, predators also may be attracted to these areas during the breeding season (Braun 1995, p. 2). In a study of greater sage-grouse mortality causes in Idaho, it was found that, among males, 83 percent of the mortality was due to predation and 42 percent of those mortalities occurred during the lekking season (March through June) (Connelly *et al.* 2000b, p. 228). In the same study, 52 percent of the mortality of adult females was due to predation and 52 percent of those mortalities occurred between March and August, which includes the nesting and brood-rearing periods (Connelly *et al.* 2000b, p. 228).

Predation of adult sage-grouse is low outside the lekking, nesting, and brood-rearing season (Connelly *et al.* 2000b, p. 230; Naugle *et al.* 2004, p. 711; Moynahan *et al.* 2006, p. 1536; Hagen 2011, p. 97). Adult female greater sage-grouse are susceptible to predators while on the nest but mortality rates are low (Hagen 2011, p. 97). Greater sage-grouse selected nest and brood-rearing sites with lower avian predator densities than nearby random locations (Dinkins *et al.* 2012, p. 605). Hens will abandon their nest when disturbed by predators (Patterson 1952, p. 110), likely reducing this mortality (Hagen 2011, p. 97). Sage-grouse populations are likely more sensitive to predation upon females given the highly negative response of Gunnison sage-grouse population dynamics to adult female reproductive success and chick mortality (GSRSC 2005, p. 173).

Estimates of predation rates on juvenile sage-grouse are limited and variable due to the difficulties in studying this age class (Aldridge and Boyce 2007, p. 509; Hagen 2011, p. 97). For greater sage-grouse, chick mortality from predation ranged from 10 to 51 percent in 2002 and 2003 on three study sites in Oregon (Gregg *et al.* 2003, p. 15; 2003b, p. 17). Mortality due to predation during the first few weeks after hatching was estimated to be 82 percent (Gregg *et al.* 2007, p. 648). Survival of juveniles to their first breeding season was estimated to be low (10 percent). In northwest Colorado, mortality due to predation was estimated at 26.3 percent in captive reared greater sage-grouse chicks introduced to the wild (Thompson 2012, pp. 29, 93). Given the known sources and rates of adult mortality due to predation, it is reasonable to assume that predation is a contributor to the high juvenile mortality rates as well (Crawford *et al.* 2004, p. 4).

Sage-grouse nests are subject to varying levels of predation. Predation can be total (all eggs destroyed) or partial (one or more eggs destroyed). However, hens abandon nests in either case (Coates, 2007, p. 26). Over a 3-year period in Oregon, 106 of 124 nests (84 percent) were preyed upon (Gregg *et al.* 1994, p. 164). Nest predation rates of 41 percent were reported in one study in Wyoming (Patterson 1952, p. 104), while another study reported a predation rate of 12 percent in Wyoming (Holloran and Anderson 2003, p. 309). Moynahan *et al.* (2007, p. 1777) attributed 131 of 258 (54 percent) of nest failures to predation in Montana. Re-nesting efforts may partially compensate for the loss of nests due to predation (Schroeder 1997, p. 938), but re-nesting rates for greater sage-grouse are highly variable (Connelly *et al.* 2011b, p. 63). Further, re-nesting rates are low in Gunnison sage-grouse (Young, 1994, p. 44; Childers, 2009, p. 7), indicating that re-nesting may not offset losses caused by predation. Loss of breeding hens and young chicks to predation can influence overall greater and Gunnison sage-grouse population numbers, as these two groups contribute most significantly to population productivity (GSRSC, 2005, p. 29, Baxter *et al.* 2008, p. 185; Connelly *et al.,* 2011, pp. 64–65).

Nesting success of greater sage-grouse is positively correlated with the presence of big sagebrush and grass and forb cover (Connelly *et al.* 2000, p. 971). Females actively select nest sites with these qualities (Schroeder and Baydack 2001, p. 25; Hagen *et al.* 2007, p. 46). Nest predation appears to be related to the amount of herbaceous cover surrounding the nest (Gregg *et al.* 1994, p. 164; Braun 1995, pp. 1–2; DeLong *et al.* 1995, p. 90; Braun 1998; Coggins 1998, p. 30; Connelly *et al.* 2000b, p. 975; Schroeder and Baydack 2001, p. 25; Coates and Delehanty 2008, p. 636). Therefore, loss of nesting cover from any source (e.g., grazing, fire) has the potential to reduce nest success and adult hen survival. Also, habitat alteration that reduces cover for young chicks can increase their rate of predation (Schroeder and Baydack 2001, p. 27). Conversely, Coates (2007, p. 149) found that badger predation was facilitated by nest cover as it attracts small mammals, a badger's primary prey.

In a review of published nesting studies, Connelly *et al.* (2011, pp. 63–64) reported that nesting success was greater in unaltered habitats versus habitats affected by anthropogenic activities. Where habitat has been altered, it has been shown that the associated influx of predators can decrease annual recruitment of greater sage-grouse (Gregg *et al.* 1994, p. 164;

DeLong *et al.* 1995, p. 91; Coates 2007, p. 2;), and the same cause-effect relationship has been speculated in other cases as well (Schroeder and Baydack 2001, p. 28; Braun 1995, pp. 1–2; Braun 1998; Hagen 2011, pp. 97–98). Agricultural development, landscape fragmentation, and human populations can increase predation pressure on all life stages of greater sage-grouse by forcing birds to nest in less suitable or marginal habitats, increasing travel time through altered habitats where they are vulnerable to predation, and increasing the diversity and density of predators (see further discussion below) (Ritchie *et al.* 1994, p. 125; Schroeder and Baydack 2001, p. 25; Connelly *et al.* 2004, p. 7–23; and Summers *et al.* 2004, p. 523; GSRSC 2005, p.135). We believe the above information for greater sage-grouse is also applicable to Gunnison sage-grouse since overall behavior and life-history traits are similar between the two species (Young 1994, p. 4).

In the Strawberry Valley of Utah, a high density of red fox contributed to historically low survival rates of female (30 percent) and male (29.7 percent) greater sage-grouse. The authors speculated that the high density of red foxes were attracted to the area by Strawberry Reservoir and associated anthropogenic activities (Bambrough *et al.* 2006, p. 1). The red fox population has apparently increased within the Gunnison Basin (BLM, 2009, p. 37), and the species was only recently observed in habitat within the Monticello, Utah, population area (UDWR 2011, p. 4). In addition to wild predators, domestic species including dogs *(Canis domesticus)* and cats *(Felis domesticus)* have been introduced by ranches, farms, and housing developments into greater sage-grouse habitats (Connelly *et al.* 2004, p. 12–2).

Raven abundance has increased as much as 1,500 percent in some areas of western North America since the 1960s (Coates 2007, p. 5). Breeding bird survey trends from 1966 to 2007 indicate increases throughout Colorado and Utah (USGS, 2009, pp. 1–2). The presence of ravens was negatively associated with greater sage-grouse nest and brood success in western Wyoming (Bui 2009, p. 27). It was suggested that raven numbers have increased in the Piñon Mesa population, though data have not been collected to verify this (CDOW 2009b, p. 110). Raven numbers in the Monticello population area remain high (UDWR 2011, p. 4).

Local attraction of ravens to nesting hens may be facilitated by loss and fragmentation of native shrublands, which increases the exposure of nests to predators (Aldridge and Boyce 2007, p.

522; Bui 2009, p. 32; Howe *et al.* 2014, p. 41–44). Human-made structures in the environment increase the effect of raven predation, particularly in low canopy cover areas, by providing ravens with perches (Braun 1998, pp. 145–146; Coates 2007, p. 155; Bui 2009, p. 2; Howe *et al.* 2014, p. 41–44) (also see discussion under Factor A above). Reduction in patch size and diversity of sagebrush habitat, as well as the construction of fences, powerlines, and other infrastructure, also are likely to encourage the presence of the common raven (Coates *et al.* 2008, p. 426; Bui 2009, p. 4; Howe *et al.* 2014, p. 44). For example, raven counts have increased by approximately 200 percent along the Falcon-Gondor transmission line corridor in Nevada (Atamian *et al.* 2007, p. 2). Ravens contributed to lek disturbance events in the areas surrounding the transmission line (Atamian *et al.* 2007, p. 2), but as a cause of decline in surrounding sage-grouse population numbers, this could not be separated from other potential impacts, such as West Nile virus. Holloran (2005, p. 58) attributed increased sage-grouse nest predation to high corvid abundance, which resulted from anthropogenic food and perching subsidies in areas of natural gas development in western Wyoming. Bui (2009, p. 31) also found that ravens used road networks associated with oil fields in the same Wyoming location for foraging activities. Holmes (2009, pp. 2–4) also found that common raven abundance increased in association with oil and gas development in southwestern Wyoming.

Raven abundance was strongly associated with sage-grouse nest failure in northeastern Nevada, with resultant negative effects on sage-grouse reproduction (Coates 2007, p. 130). The presence of high numbers of predators within a sage-grouse nesting area may negatively affect sage-grouse productivity without causing direct mortality. Increased raven abundance was associated with a reduction in the time spent off the nest by female sage-grouse, thereby potentially compromising their ability to secure sufficient nutrition to complete the incubation period (Coates 2007, pp. 85–98). Another model utilized known raven nest locations and found a 31 percent decrease in the odds of nesting by ravens for every 1-km increase in distance from a transmission line (Howe *et al.* 2014), indicating that the presence of transmission lines may increase the presence of and risk of predation by ravens in sage-grouse habitat.

As more suitable grouse habitat is converted to exurban development,

agriculture, or other non-sagebrush habitat types, grouse nesting and brood-rearing become increasingly spatially restricted (Bui 2009, p. 32). Future human population growth and associated development and infrastructure will likely further restrict nesting habitat within the species' range. Additionally, Gunnison sage-grouse have been shown to avoid residential development and infrastructure in some areas, resulting in functional habitat loss (Aldridge *et al.* 2012, p. 402). Of 99 nest sites studied in the western portion of the Gunnison Basin population, 69 (approximately 70 percent) occurred within 13 percent of the available habitat (Aldridge *et al.* 2012, p. 400). Unnaturally high nest densities, which result from habitat fragmentation or disturbance associated with the presence of edges, fencerows, or trails, may increase predation rates by making foraging easier for predators (Holloran 2005, p. C37). Increased nest density could negatively influence the probability of a successful hatch (Holloran and Anderson, 2005, p. 748).

The influence of the human footprint in sagebrush ecosystems may be underestimated (Leu and Hanser 2011, pp. 270–271) since it is uncertain how much more habitat sage-grouse (a large landscape-scale species) need for persistence in increasingly fragmented landscapes (Connelly *et al.* 2011a, pp. 80–82). Therefore, the influence of ravens and other predators associated with human activities may be underestimated. In addition, nest predation may be higher, more variable, and have a greater impact on the small, fragmented Gunnison sage-grouse populations, particularly the six smallest populations (GSRSC 2005, p. 134).

Except for the few studies presented here, data that link Gunnison sage-grouse population numbers and predator abundance are limited. Still, in at least the six smaller populations, the best available information suggests that predation may be limiting Gunnison sage-grouse survival and persistence. The lack of recruitment in the San Miguel population may be associated with predation (CDOW 2009b, p. 31; Davis 2012, p. 162). In this area, six of 12 observed nests were destroyed by predation. None of the chicks from the remaining successful nests survived beyond two weeks. Those observations are in contrast to the Gunnison Basin where approximately 20 percent of radio-marked chicks survived their first year during that period. Further, trends in lek count and other data indicate there has been no recruitment of young into the San Miguel population since

around 2005. The CPW suspects these trends are most likely due to predation (CDOW 2009b, p. 30–31; Davis 2012, pp. 37, 79). The other five satellite populations are smaller than the San Miguel population; therefore, it is reasonable to expect that predation may be limiting those populations as well.

*Actions To Address Predation*

Due to low population numbers and the potential impact of predation, a predator control program initiated by CPW occurred between March 2011 and June 2012 in the Miramonte subpopulation area of the San Miguel population to evaluate the effects of predator removal on Gunnison sage-grouse juvenile recruitment in the subpopulation (CPW 2012b, pp. 8–10). Over the two-year period, the United States Department of Agriculture Animal and Plant Health Inspection Service removed 155 coyotes, 101 corvids, two bobcats, eight badgers, two raccoons, and three red foxes. Radio-marked hens, nest success, and chick survival were monitored during this time, and results were compared to baseline data collected for the same area from 2007 to 2010. Prior to predator control, of eight marked chicks, no individuals survived to 3 months. From 2011 through August of 2012, during which predator control occurred, of 10 marked chicks, four (40 percent) chicks survived to three months, and two (20 percent) survived at least one year. The study did not compare chick survival rates to non-predator removal areas, so it is unknown whether the apparent increase in chick survival was due to predator control or other environmental factors (e.g., weather, habitat conditions, etc.).

Predator removal efforts have sometimes shown short-term gains that may benefit fall populations, but not breeding population sizes (Cote and Sutherland 1997, p. 402; Hagen 2011, pp. 98–99; Leu and Hanser 2011, p. 270). Predator removal may have greater benefits in areas with low habitat quality, but predator numbers quickly rebound without continual control (Hagen 2011, p. 99). Red fox removal in Utah appeared to increase adult greater sage-grouse survival and productivity, but the study did not compare these rates against other nonremoval areas, so inferences are limited (Hagen 2011, p. 98).

Coyote control efforts failed to have an effect on greater sage-grouse nesting success in southwestern Wyoming (Slater 2003, p. 133). However, coyotes may not be an important predator of sage-grouse. In a coyote prey base analysis, sage-grouse and bird egg shells

made up a very small percentage (0.4–2.4 percent) of analyzed scat samples (Johnson and Hansen 1979, p. 954). Additionally, coyote removal can have unintended consequences resulting in the release of smaller predators, like the red fox, many of which may have more negative impacts on sage-grouse (Mezquida *et al.* 2006, p. 752).

Removal of ravens from an area in northeastern Nevada caused only short-term reductions in raven populations (less than 1 year), as apparently transient birds from neighboring sites repopulated the removal area (Coates 2007, p. 151). Additionally, badger predation appeared to partially compensate for decreases due to raven removal (Coates 2007, p. 152). In their review of literature regarding predation, Connelly *et al.* (2004, p. 10–1) noted that only two of nine studies examining survival and nest success indicated that predation had limited a sage-grouse population by decreasing nest success, and both studies indicated low nest success due to predation was ultimately related to poor nesting habitat. It has been suggested that removal of anthropogenic "subsidies" (e.g., landfills, tall structures) may be an important step to reducing the presence of sage-grouse predators (Bui 2009, pp. 36–37). Leu and Hanser (2011, p. 270) also argue that reducing the effects of predation on sage-grouse can only be effectively addressed by precluding these features.

In 1999, property was transferred from the BLM to Gunnison County for the purposes of the Gunnison County Landfill. This conveyance required implementation of a mitigation plan for potential impacts to Gunnison sage-grouse, including establishment of a mitigation fund known as the Gunnison Sage-grouse Conservation Trust. To date, over $250,000 has been allocated from the trust fund for Gunnison sage-grouse projects in occupied habitat in Gunnison County. Projects include, but are not limited to, habitat improvements, conservation easements, road closures, and outreach and education (Gunnison County 2013a, pp. 147–150). Gunnison County has actively controlled ravens at the Gunnison County Landfill since 2003. Between 200 and 250 ravens are removed annually within the landfill boundaries. Further efforts to control ravens in the Gunnison Basin are under consideration by the county and the Gunnison Basin Sage-grouse Strategic Committee (Gunnison County 2013a, p. 132). The effects of these control efforts on Gunnison sage-grouse survival have not been studied.

Gunnison County and CPW have jointly funded an ongoing study (Magee 2013, pers. comm.) of the distribution and abundance of ravens and crows (corvids), which may help inform managers of the potential influence of these species in the Gunnison Basin. Of twelve survey sites in the Gunnison Basin, the site most used by ravens was the Gunnison County Landfill. Preliminary distribution and abundance data indicate that a large number of ravens are utilizing the landfill as their primary food source (Magee 2013, pers. comm.). Additional information from surveys during spring and early summer of 2014 may provide information on raven use of sagebrush habitats during the sage-grouse breeding and nesting season when Gunnison sage-grouse are more vulnerable to predation. Evaluating raven predation on Gunnison sage-grouse was not an objective of this study. However, preliminary data on raven abundance, spatial and temporal distribution, and movements suggest that ravens are not preying on Gunnison sage-grouse as primary food source in the Gunnison Basin. Planned spring and early summer surveys may indicate otherwise, but the results of these surveys were not available at the time of drafting of this final rule.

*Summary of Predation*

Due to the extent of human influence and alteration of habitat across its range, Gunnison sage-grouse may be increasingly subject to levels and impacts of predation that would not normally occur in the historically contiguous, intact sagebrush habitats, or in larger, more resilient populations. Gunnison sage-grouse are adapted to minimize predation through cryptic plumage and behavior, however predation is strongly influenced by anthropogenic factors on the landscape, and human presence on the landscape will continue to increase. The impacts of predation on greater sage-grouse can increase where habitat quality has been compromised by anthropogenic activities (exurban development, road development, powerlines, etc.) (e.g., Coates 2007, p. 154, 155; Bui 2009, p. 16; Hagen 2011, p. 100; Howe *et al.* 2014, p. 41–44). Landscape fragmentation and habitat decline associated with human populations have the potential to increase predator populations through increasing the ease of securing prey and subsidizing food sources and nest or den substrate for predators. Consequently, otherwise suitable habitat may change into a habitat sink (habitat in which reproduction is insufficient to balance

mortality) for grouse populations (Aldridge and Boyce 2007, p. 517).

Anthropogenic influences on sagebrush habitats that increase suitability for ravens may also limit sage-grouse populations (Bui 2009, p. 32). Current land-use practices in the Intermountain West favor high predator (in particular, raven) abundance relative to historical numbers (Coates *et al.* 2008, p. 426). The interaction between changes in habitat and predation may have substantial effects to sage-grouse at the landscape level (Coates 2007, pp. 3–5; Howe *et al.* 2014, p. 41–44).

Research and data linking predation to Gunnison sage-grouse abundance and viability are limited. However, the studies presented above suggest that, particularly in areas of intensive habitat alteration and fragmentation and in smaller less resilient populations, sage-grouse productivity and, potentially, population viability could be negatively affected by predation. Since the Gunnison and greater sage-grouse have similar behavior and life-history traits, it is reasonable to assume that predator impacts on Gunnison sage-grouse are similar to those documented in greater sage-grouse. As more habitats are altered or lost due to human development, including dispersed development, we expect predators to spread and increase in numbers into the future, thereby increasing the risk of predation. Ongoing effects from predation are likely greater in the smaller satellite populations, and will likely increase if these populations continue declining in abundance. Therefore, the best available information indicates that, as we stated in our proposed rule, predation is a current and future threat to the species, particularly in the satellite populations. While predation likely acts as a threat in localized areas across the range of the species, the stability of the Gunnison Basin population over the last 19 years indicates that predation is not having a significant impact on that population. We believe, however, that the effects of predation are more pronounced in the satellite populations. Given the stability of the Gunnison Basin population, we do not believe that the magnitude of this threat is significant at the rangewide level.

*Summary of Factor C*

We have reviewed the available information on the effects of disease and predation on the long-term persistence of the Gunnison sage-grouse. The only disease that is known to be a threat to the survival of the Gunnison sage-grouse is West Nile virus. This virus is distributed throughout most of the species' range. However, despite its near 100 percent lethality, disease occurrence is sporadic in other taxa across the species' range and has not yet been detected in Gunnison sage-grouse. While we have no evidence of West Nile virus acting on Gunnison sage-grouse individuals or populations, because of its presence within the species' range, its lethality to sage-grouse, and the continued development of anthropogenic water sources in the area that support mosquito vector populations, the virus is a future threat to the species. We anticipate that West Nile virus will persist within the range of Gunnison sage-grouse indefinitely and that the threat it presents will be exacerbated by any factor (e.g., drought, climate change) that increases ambient temperatures and the presence of the vector on the landscape.

The best available information shows that existing and future habitat decline, and fragmentation in particular, will increase the effects of predation on this species, particularly in the six smaller populations, resulting in a reduction in sage-grouse productivity and abundance in the future.

We evaluated the best available scientific information regarding disease and predation and their effects on the Gunnison sage-grouse. Based on the information available, we have determined that predation and disease are threats to the species throughout its range at the present time and are likely to increase in the future. In particular, West Nile virus poses a substantial threat to Gunnison sage-grouse rangewide in the foreseeable future.

D. The Inadequacy of Existing Regulatory Mechanisms

Under this factor, we examine whether threats to the Gunnison sage-grouse are adequately addressed by existing regulatory mechanisms. Existing regulatory mechanisms that can provide some protection for Gunnison sage-grouse include: (1) Local land use laws, regulations and ordinances; (2) State laws and regulations; and (3) Federal laws and regulations. Regulatory mechanisms, if they exist, may preclude the need for listing if such mechanisms adequately address the threat to the species such that listing is not warranted. Conversely, threats to a species may be exacerbated when not addressed at all by existing regulatory mechanisms, or if the existing mechanisms are not adequately implemented or enforced.

Multiple partners, including private citizens, nongovernmental organizations, Tribes, Counties, States, and Federal agencies, are engaged in conservation efforts across the range of Gunnison sage-grouse. Conservation efforts by these parties that are voluntary or are not enforceable, however, including conservation strategies and guidance, are typically not regulatory mechanisms. Non-regulatory conservation efforts that address habitat related issues, such as the Rangewide Conservation Plan, the Colorado CCAA and the Gunnison Basin CCA, are described and evaluated under Factor A, and other non-regulatory conservation efforts are described and assessed under relevant threat sections. In this section, pursuant to Factor D, we review and evaluate only regulatory mechanisms undertaken by local, State, and Federal entities designed to reduce or remove threats to Gunnison sage-grouse and its habitat.

*Local Laws and Regulations*

Approximately 43 percent of Gunnison sage-grouse rangewide occupied habitat is privately owned (Table 1), and local laws and regulations are most applicable in those areas. Local laws and regulations vary widely by county across Gunnison sage-grouse range. Below we first broadly address general county regulations that have the potential to affect Gunnison sage-grouse and its habitat and then move on to local laws and regulations that specifically address Gunnison sage-grouse.

Under state law, all county governments have general authority to regulate land use development in their jurisdictions through the implementation of comprehensive or master plans, zoning, and subdivision planning (Colo. Rev. Stat. § 30–28–101 *et seq.*; Utah 2011, entire), and to protect wildlife habitat through enforcement of wildlife-related regulations or requirements (Colo. Rev. Stat. § 24–65.1–104; Utah Code § 17–27a–403). Local laws and regulations enacted pursuant to this authority may benefit Gunnison sage-grouse depending on the regulations adopted in a particular county and the degree to which threats to Gunnison sage-grouse and its habitat are considered and addressed in these local regulations.

By statute, the State of Colorado grants Colorado counties broad authority for planning and regulation of land use and development in their respective jurisdictions (Colo. Rev. Stat. § 30–28–101 *et. seq.*). This law provides that whenever local land use regulations impose higher standards than other statutes, the provisions of the regulations made under local authority (i.e., county planning) shall apply (Colo. Rev. Stat. § 30–28–123). Furthermore, Colorado law authorizes local

governments to plan for and regulate land uses in order to protect significant wildlife habitat and species (Colo. Rev. Stat. § 30–29–104).

In our proposed rule, we reported that Colorado law exempts parcels of land that are 35 acres or larger from county land use regulations (78 FR 2523). This is only partially correct. Under Colorado law, a county does not have authority to regulate the subdivision of land that creates parcels that are each 35 acres or larger ("plus-35 acre parcels") (Colo. Rev. Stat. § 30–28–101(10)(b)). However, Colorado counties retain authority to regulate the actual use and development of plus-35 acre parcels (for example, home, road, or infrastructure development). All Colorado counties in the occupied range of Gunnison sage-grouse have land use regulations that apply to development of plus-35 acre parcels (Delta County 2013–R–025; Dolores County policy on subdivisions exemptions; Gunnison County 95–34; Mesa County 31; Montrose County 45–2012, 02–2013, 24–2013, 14–2006; Ouray County 2013–022; Saguache County 2013–LU–11; San Juan County Utah Statute Summary; San Miguel Article 1). Similarly, the State of Utah grants County governments, including San Juan County, which encompasses the Monticello population of Gunnison sage-grouse, authority to regulate and control property (i.e., zoning) and development (Utah 2011, entire).

County or city ordinances in San Juan County, Utah, that address agricultural lands, transportation, and zoning for various types of land uses have the potential to affect sage-grouse habitat, behavior, and abundance. Similarly, general, non-sage-grouse specific local land use codes and permitting requirements in the Colorado portion of the species' range can affect development in occupied habitat and thus have implications for the species and its habitat. We do not, however, have sufficient information about implementation of general local land use laws and regulations to determine what uses, if any, have been modified pursuant to these general authorities to avoid or lessen impacts to Gunnison sage-grouse. Therefore, we are unable to conclude that such general county land use codes and regulations within Gunnison sage-grouse occupied habitat constitute adequate regulatory mechanisms to reduce the threats to the species. (Local land use regulations specific to Gunnison sage-grouse are discussed individually and separately below.)

Many Colorado counties within Gunnison sage-grouse range have requirements for County review of

development proposals, which may include generic "1041" wildlife habitat regulations, requiring review and/or coordination with CPW/UDWR for new subdivision and development requests in sensitive wildlife habitat (Delta County 2011–R–054. 2012–R–044, 2013–R–025; Delta County 2011–R–054; Dolores County land use regulations; Mesa County 7.6.4; Ouray County 6, 25, and site development permit; Saguache County Article XX). However, we do not have sufficient information to determine whether and how these general wildlife habitat regulations have been applied to Gunnison sage-grouse habitat, what recommendations may have been made by CPW/UDWR regarding the avoidance of impacts to Gunnison sage-grouse under these non-sage-grouse specific regulations, and how or if the counties incorporated any such recommendations in their land use authorization. Therefore, we cannot conclude that the generic county requirements to consult with state wildlife agencies for actions that occur within sensitive wildlife habitat constitute adequate regulatory mechanisms to reduce the threats to the species. (Again, wildlife habitat regulations specific to Gunnison sage-grouse are discussed separately below.)

Several counties without specific land use regulations directed at Gunnison sage-grouse habitat conservation do have regulations that contain restrictions that may benefit the species. These measures may include control of dogs, seasonal road closures, or requirements for clustering housing units within subdivisions. Specifically, San Juan County, Utah, and Gunnison, San Miguel, Mesa, and Montrose Counties, Colorado include regulations to control dogs from roaming freely and Dolores, Gunnison, Mesa, San Juan, and San Miguel Counties have regulations that apply to road closures (CPW 2014g; Appendix A).

Counties within Gunnison sage-grouse range with regulations or policies that include conservation measures or considerations specifically targeted at Gunnison sage-grouse and its habitat include Dolores, Cunnison, Montrose, Ouray, and San Miguel Counties, Colorado (Dolores County 05–13–04; Gunnison County 2013a, pp. 33–57; Gunnison County 2013b, p. 11; Gunnison County 11–106, 07–17 and 2013–23; Gunnison County 2014–24; Montrose County 2013, entire; Montrose County 39–2013; Ouray County 2013–022; San Miguel County land use code, 2–16, 5–407, 5–26; San Miguel County Wright's Mesa Zone Districts), as described below. We anticipate that land use regulations designed

specifically for Gunnison sage-grouse will typically be more effective in conserving the species and its habitat than the standard regulations described above that do not address the species specifically.

Gunnison County Sage-Grouse Regulations (Gunnison Basin Population)

The Gunnison Basin population is located in Gunnison and Saguache County, Colorado. Gunnison County has adopted specific regulations to further the conservation of the Gunnison sage-grouse and its habitat (Gunnison County Land Use Resolution (LUR) § 11.106 including amendments 07–17 and 2013–23). Approximately 79 percent of private lands in occupied habitat in the Gunnison Basin population is in Gunnison County, and is thereby subject to those regulations. The remaining 21 percent of private lands in the Gunnison Basin population is in Saguache County, which does not currently have similar species-specific regulations in place, although Saguache County is working to develop species-specific criteria (CPW 2014g, Attachment 3, Appendix A).

Gunnison County's Land Use Resolution (LUR) 11.106 was adopted in 1977 and broadly provides for the regulation of land uses in sensitive wildlife habitat areas. In 2007, Gunnison County Board of County Commissioners approved Resolution Number 07–17, which amended LUR 11.106, to create a review process and protective standards specific to Gunnison sage-grouse. In 2013, Gunnison County further amended LUR § 11.106 to incorporate use of the Gunnison Basin Sage Grouse Habitat Prioritization Tool, a GIS model developed by the Gunnison Basin Sage-grouse Strategic Committee in 2012 that first stratifies or values Gunnison sage-grouse habitat (largely based on distances to leks) and then discounts the value of the habitat based on soils, and on distance to developed areas including structures, roads, and power lines. This process stratifies occupied habitat in the Gunnison Basin into three types (Gunnison County 2013a, Appendix G; see detailed description under Local Laws and Regulations, Gunnison County). *Tier 1* habitat includes important seasonal habitats and is considered the highest value for the species; *Tier 2* habitat includes the remainder of occupied habitat in the Gunnison Basin that is closer to structures, roads, and power lines, and is generally of lower value to the species. Occupied habitat that does not stratify into Tier 1 or Tier 2 is not considered Gunnison sage-grouse

habitat under Gunnison County's sage-grouse regulations. CPW telemetry data from 2004 to 2010 for approximately 500 collared Gunnison sage-grouse in the Gunnison Basin showed that, of 10,140 radio locations in Saguache and Gunnison County, approximately 79.63 percent (8,074) and 15.65 percent (1,587) points occurred in Tier 1 habitat and Tier 2 habitats, respectively (including all occupied habitat in the Gunnison Basin regardless of ownership) (Gunnison County 2013b, p. 25; Gunnison County 2013d, p. 1). This indicates a preference for modeled Tier 1 habitats by the Gunnison Basin birds and supports the model's reliability.

As amended, Gunnison County LUR § 11.106 requires the County to review applications for land use change permits, building permits, individual sewage disposal system permits, Gunnison County access permits, and Gunnison County Reclamation permits (Gunnison County Public Works Department 2014a, 2014b; subject to some exceptions) specifically for potential impacts to Gunnison sage-grouse and occupied habitat. If the activity to be permitted is located wholly or partially in Gunnison sage-grouse habitat identified pursuant to the Habitat Prioritization Tool, then the County performs a site-specific analysis and works with the applicant to ensure that the project meets the County's sage-grouse specific and other wildlife protective standards for such development (LUR § 11.106.G–11.106.J). In general, these standards direct that covered land use activities and projects be designed to avoid, minimize, and/or mitigate impacts on the species and its habitat. According to Gunnison County, standard avoidance and minimization measures included in permits subject to LUR § 11.106 include restrictions on pets and animals and on the siting and timing of construction, adjustment of building envelopes, and other recommendations (Gunnison County 2013a, pp. 24–31). Mitigation techniques as defined and used by Gunnison County include visual and sound buffers, limitation of human activities during sensitive time periods, and controls on the location of development. Gunnison County's use of the term "mitigation" thus differs from the Service's definition of this term, which is the full suite of activities to avoid, minimize, and compensate for adverse impacts to sage-grouse and sage-grouse habitat.

From July 2006 through September 2014, Gunnison County reviewed 461 projects under § 11.106 for impacts to Gunnison sage-grouse. Gunnison County reports that, to date, the majority of development projects have been located within existing areas of development, including outbuildings or additions to buildings. According to the County seventy-one (15.4 percent) of the projects reviewed involved development within 1 km (0.6 mi) of a lek (CPW 2014g, Attachment 3, p. 27). Implementation of the County regulations likely reduced impacts from these projects, but did not fully compensate for disturbance or lost habitat.

Pursuant to Gunnison County Resolution No. 95–34, adopted on June 6, 1995, "individual parcels of land greater than 35 acres in size are subject to the same county review and regulatory processes as individual parcels less than 35 acres in size except, as is generally provided in current state statute, for the act of subdividing such parcels into resultant parcels all of which are 35 acres or greater in size" (Gunnison County 2013a, pp. 34–35). As a result, development on parcels that are 35 acres or larger requires one or more of the County permits identified above and are subject to review and regulation under LUR § 11.106.

Gunnison County reports that five separate developments involving 35-acre or greater parcels ("plus-35 acre") have occurred in the County since 2003. This included a total of about 2,700 acres divided into 75 parcels, with portions occurring in occupied habitat for Gunnison sage-grouse. Two of the five projects were reviewed by Gunnison County under LUR § 11.106 for Gunnison sage-grouse concerns and included permit conditions to avoid and minimize potential impacts from their development. The County reports that the other three projects did not occur in Gunnison sage-grouse habitats. The Ohio Creek area, which has experienced the greatest concentration of plus-35 acre development in the county since lek counts were standardized in 1996, has had increasing numbers of Gunnison sage-grouse since that time (based on increased high male counts at the Ohio Creek lek) (Gunnison County 2013a, pp. 35–37).

Recently, Gunnison County has started requiring monetary compensation for reclamation of habitats disturbed in Tier 1 and Tier 2 Gunnison sage-grouse habitat (Gunnison County Public Works Department 2014a, 2014b; subject to some exceptions). This is a recently enacted regulation for which we have little more information than what is presented here. Additional regulatory measures implemented by Gunnison County in coordination with State and Federal agencies include: closing of shed antler collection in the Gunnison Basin by the Colorado Wildlife Commission due to its disturbance of Gunnison sage-grouse during the early breeding season, and a BLM/USFS/Gunnison County/CPW collective effort to implement and enforce road closures during the early breeding season (March 15 to May 15) (see Roads for more details). These regulatory efforts have provided a benefit to Gunnison sage-grouse during the breeding period.

We commend Gunnison County for the regulatory measures (and other actions it has taken, as described in the Factor A discussion above and elsewhere in this final rule), to conserve Gunnison sage-grouse and its habitat. The County regulations have helped to reduce some of the negative effects of human development and infrastructure on the species and its habitat. However, Gunnison County's current Gunnison sage-grouse related regulations do not prevent human development in Gunnison sage-grouse habitat nor do they prevent additional habitat loss and fragmentation that occurs as a result. Further, they do not address or require offsetting or mitigation for the habitat loss and fragmentation that cannot be avoided and that occurs as a result of permitted development in the species' habitat. Gunnison County's sage-grouse regulations have not, therefore, sufficiently or adequately reduced this threat, which is the primary concern related to human development (see Factor A, Residential Development).

San Miguel County Gunnison Sage-Grouse Regulations (San Miguel Population)

In 2005, San Miguel County amended its Land Use Codes to require consideration and implementation, to the extent possible, of conservation measures recommended in the 2005 RCP (GSRSC 2005, entire) for the Gunnison sage-grouse when considering land use activities and development located within its habitat (San Miguel County 2005). More specifically, under its Land Use Code, the County has specific requirements that apply when there is a request for a special use permit (such as for oil and gas facilities or wind turbines) in occupied habitat. Special use permits are not, however, typically required for residential development projects, which limits the County's involvement in review of projects adversely affecting Gunnison sage-grouse and their habitat. In addition, when the County receives an application for a special use permit for activities in sage-grouse habitat, it only solicits recommended conservation measures from the CPW and a local

Gunnison sage-grouse working group, and does not require implementation of the recommended conservation measures. As a result, implementation of recommended conservation measures is dependent on negotiations between the County and the applicant.

Some positive measures (e.g., locating a special use activity outside grouse habitat, establishing a 324-ha (800-ac) conservation easement; implementing speed limits to reduce likelihood of bird/vehicle collisions) have been implemented as a result of this process. Most measures that result from discussions with applicants, however, result in measures that may minimize, but do not prevent, or mitigate for impacts (Henderson 2010, pers. comm.). In addition, as noted above, residential development proposals typically do not require a special use permit so are not subject to this review and negotiation process. San Miguel County also has regulations relating to the Wrights Mesa Zone Districts that restrict fence building, sagebrush removal, powerlines, housing, and roads within 0.6 miles of a lek (San Miguel County 2010, entire). In addition, San Miguel County hired a Gunnison Sage-grouse Coordinator for the San Miguel Basin population in March 2006 to implement the regulatory process.

The San Miguel County Land Use Codes provide some conservation benefit to the species by encouraging landowners to voluntarily minimize impacts of residential development in grouse habitat where the County has authority to do so (with special use permits). The County's regulations do not prevent human disturbance in occupied habitat or address or require offsetting or mitigation for habitat loss and fragmentation resulting from such disturbance. As a result, we find that San Miguel County's regulations do not adequately address the threat of habitat loss, degradation and fragmentation which is the primary concern related to human development (see Factor A, Residential Development).

Dolores, Ouray, and Montrose County Sage-Grouse Regulations (San Miguel and Cerro Summit-Cimarron-Sims Mesa Populations)

Ouray County adopted a resolution (Resolution Number 2013–022) on May 28, 2013, directed at protecting Gunnison sage-grouse breeding and brood-rearing habitat from land use activities including construction and motor vehicle use. The resolution provides that seasonal restrictions (March 15 until May 15) be implemented for roads (not belonging to adjacent property owners or their guests) and appropriate terms and conditions be applied during this same time period at construction sites within 0.6 miles of a lek to minimize and avoid impacts on breeding and brood-rearing habitat (Ouray County 2013, entire). The restrictions do not specify what avoidance or minimization will occur with development permits in these areas.

On November 4, 2013, Montrose County adopted special regulations ("1041 regulations" 39–2013) that are intended to avoid and minimize impacts from land use activities on Gunnison sage-grouse and occupied habitat, similar to the approach adopted by Gunnison County. Building permits are required for construction within 0.6 miles of an active lek, and land use projects or permitting in occupied habitat will require conservation actions to avoid or minimize impacts on Gunnison sage-grouse (Montrose County 2013, entire).

On May 20, 2013 Dolores County clarified what planning and regulatory means are available for local efforts in preservation of Gunnison sage-grouse (Dolores County Resolution 05–13–04). The resolution highlights coordination with CPW (and other agencies) to review the impacts to wildlife from any change of use application submitted to the County. It also highlights regular coordination with both the BLM and the U.S. Forest Service.

While these three recently enacted county regulations likely provide some conservation benefits to the species, none of them provide the requisite certainty that they will be effective in ameliorating the threat human development poses to the species and its habitat. For example, the Ouray County regulations do not specify what terms or conditions will be required for construction in occupied habitat, and neither the Montrose nor Dolores County regulations specify how mitigation will occur where effects cannot be avoided. None of these county regulations prevent human development in occupied habitat and the additional habitat loss and fragmentation that occurs as a result, or address or require offsetting or mitigation of habitat loss for the species, which is the primary concern related to human development (see Factor A, Residential Development). As a result, none of these local land regulations eliminate or adequately reduce the impact of human development on Gunnison sage-grouse and their habitat.

Summary of Local Laws and Regulations

We commend the efforts that local governments have made to date (those regulations not yet completed are not included) to enact and strengthen local regulatory protections for Gunnison sage-grouse. Existing local laws and regulations are helping and will continue to help to reduce the negative effects of human development and infrastructure on the species. Continuation, enhancement, and expansion of these efforts across the species' range will likely be necessary for conservation of the species. Nevertheless, current local laws and regulations do not fully address the full scope of threats to the species (Factors A through C and E), including habitat loss due to residential and human development (see Residential Development). The permanent loss, and associated fragmentation and degradation, of sagebrush habitat are considered the greatest threat to Gunnison sage-grouse (GSRSC 2005, p. 2). Residential development is likely contributing to habitat loss and degradation throughout the range of Gunnison sage-grouse. Future development, especially in areas of important seasonal habitats, is a concern throughout the range, including in the Gunnison Basin, where we believe that the level of impact from residential development will increase in the future (Factor A). For the reasons described above, existing local regulations and laws do not fully address this threat. Likewise, existing local regulations and laws do not address other substantial threats to the species, including small population size and structure (Factor E), drought (Factor E); or disease (Factor C).

*State Laws and Regulations*

Colorado and Utah State laws and regulations may influence Gunnison sage-grouse conservation by providing specific authority for sage-grouse conservation over lands that are directly owned by the States. As described in more detail below, the States also have broad authority to regulate and protect wildlife on all lands within their borders, and State laws provide mechanisms for indirect conservation through regulation of threats to the species (e.g., noxious weeds). In the previous section, we described the authorities granted by Colorado and Utah to local and county governments in regulating land use development within their respective jurisdictions to conserve wildlife, including the Gunnison sage-grouse.

BLM_0072068

Colorado Revised Statutes (C.R.S.) section 33–1–104 gives the CPW Board responsibility for the management and conservation of wildlife resources within State borders. The CPW, which operates under the direction of the CPW Board, is required by statute to provide counties with information on "significant wildlife habitat," and provide technical assistance in establishing guidelines for designating and administering such areas, if asked (C.R.S. § 24–65.1–302). The CPW Board also has authority to regulate possession of the Gunnison sage-grouse, set hunting seasons, and issue citations for poaching (C.R.S § 33–1–106). These authorities, as implemented by the CPW Board, provide individual Gunnison sage-grouse with protection from direct mortality from hunting, as described below.

The Wildlife Resources Code of Utah (Utah Code Annotated Title 23) provides UDWR with the powers, duties, rights, and responsibilities to protect, propagate, manage, conserve, and distribute wildlife throughout the State (Utah Code Ann. § 23–14–1). Section 23–13–3 of the Code declares that wildlife existing within the State, not held by private ownership and legally acquired, is property of the State. Section 23–14–18 authorizes the Utah Wildlife Board to prescribe rules and regulations for the taking and/or possession of protected wildlife, including Gunnison sage-grouse. These authorities provide adequate protection to individual Gunnison sage-grouse from direct mortality from hunting, as described below.

Gunnison sage-grouse are managed by CPW and UDWR on all lands within each State as resident native game birds. In both States this classification allows the direct human taking of the bird during hunting seasons authorized and conducted under State laws and regulations. In 2000, CPW closed the hunting season for Gunnison sage-grouse in the Gunnison Basin, the only area then open to hunting for the species. The hunting season for Gunnison sage-grouse in Utah has been closed since 1989 according to GSRSC (2005, p. 82), or as early as the mid-1970's according to SJCWG (2000, p. 11). The Gunnison sage-grouse is listed as a species of special concern in Colorado, as a sensitive species in Utah, and as a Tier I species under the Utah Wildlife Action Plan, providing heightened priority for management (CDOW 2009b, p. 40; UDWR 2009, p. 9). Hunting and other State regulations that deal with issues such as harassment provide adequate protection for individual birds (see discussion under Factor B), but do not protect the habitat or address other substantial threats such as drought, climate change, or disease.

In 2009, the Colorado Oil and Gas Conservation Commission (COGCC), which is the entity responsible for permitting oil and gas well development in Colorado, adopted new rules addressing the impact of oil and gas development on wildlife resources (COGCC as amended 2014, entire). These COGCC rules require that permittees and operators on all lands within the state of Colorado determine whether their proposed development location overlaps with "sensitive wildlife habitat," or is within a restricted surface occupancy (RSO) area. If it does, the COGCC rules require that the Commission consult with CPW, the operator and the surface owner to allow it to determine whether conditions of approval are necessary to "minimize adverse impacts" from the proposed oil and gas operations in the identified sensitive wildlife habitat or RSO area (COGCC 2014). For purposes of this rule, "minimize adverse impacts" means, "wherever reasonably practicable, to (i) avoid adverse impacts from oil and gas operations on wildlife resources, (ii) minimize the extent and severity of those impacts that cannot be avoided, (iii) mitigate the effects of unavoidable remaining impacts, and (iv) take into consideration cost-effectiveness and technical feasibility with regard to actions taken and decisions made to minimize adverse impacts to wildlife resources, consistent with the other provisions of the Act." (*Id.*) Consultation with CPW is not required under certain circumstances, however, such as when the Director of the COGCC issues a variance, a previously CPW-approved wildlife mitigation plan exists, and others (COGCC 2014).

All oil and gas operations in sensitive wildlife habitat or RSO areas authorized since implementation of the regulations in 2009 are also required to comply with specified general operating requirements, including (1) educating employees and contractors on conservation practices, (2) consolidating new facilities to minimize disturbance, (3) controlling road access and limiting traffic, where approved by the surface owner and appropriate authorities, and (4) monitoring wells remotely when possible (COGCC 2014). The COGCC Director may waive these requirements, however (COGCC 2014). With respect to RSO areas, operators are also required to avoid these areas in planning and conducting new oil and gas operations "to the maximum extent technically and economically feasible," again subject to various exceptions (COGCC 2014).

The 2009 COGCC rules identified certain areas as "sensitive wildlife habitat" and RSO areas for Gunnison sage-grouse (COGCC 2009). In September 2013, COGCC amended its rules to, among other things, update and expand the definitions and maps of sensitive wildlife habitat and RSO areas for Gunnison sage-grouse (COGCC 2013). The COGCC rules as amended define sensitive wildlife habitat for the Gunnison sage-grouse lek based on 4 mile buffers around lek sites and RSO areas for the species as areas within 0.6 miles of a lek (COGCC 2014; COGCC 2013).

We find that while COGCC's rules provide for greater consideration of Gunnison sage-grouse needs, the rules only apply to oil and gas development, and they do not adequately address the threats to Gunnison sage-grouse. Oil and gas operations that were approved before the COGCC's 2009 adoption of the wildlife protection rules are not subject to Rule 1202's wildlife consultation and conditions of approval requirements, for example, even if operations have not yet begun (COGCC 2014). The limitations on new oil and gas development operations in RSO areas also do not apply to applications that were approved before May 1, 2009 on federal land or April 1, 2009 on all other land (COGCC 2014). Unless operations change in a manner that requires additional COGCC authorization, drilling operations that are already on the landscape may continue to operate without further restriction into the future. In addition, the COGCC regulations qualify implementation of many of its conservation measures to "wherever reasonably practicable" and like terms, which can limit the effectiveness of these measures in avoiding or minimizing impacts to the species. We also are not aware of any situations where RSOs have been effectively applied or where conservation measures have been implemented for potential oil and gas development impacts to Gunnison sage-grouse on private lands underlain with privately owned minerals.

Colorado and Utah have laws that directly address the priorities for use of State school section lands, which require that management of these properties be based on maximizing financial returns. We have no information on any conservation measures that will be implemented under statutes or regulations for Gunnison sage-grouse on State school section lands.

BLM_0072069

In 2007, the Colorado State Land Board (SLB) purchased the Miramonte Meadows property (approximately 809 ha (2,300 ac) next to the Dan Noble State Wildlife Area (SWA)). Roughly 526 ha (1,300 ac) of this property is considered prime Gunnison sage-grouse habitat (Garner 2010, pers. comm.). Discussions with the SLB have indicated a willingness to implement habitat improvements (juniper removal) on the property. They have also accepted an application to designate the tract as a "Stewardship Trust" parcel. The Stewardship Trust program is capped at 119,383 to 121,406 ha (295,000 to 300,000 ac), and no more property can be added until another tract is removed from the program. Because of this cap, it is unknown if or when the designation of the tract as a Stewardship Trust parcel may occur. The scattered nature of State school sections (generally single sections of land) across the landscape and the requirement to conduct activities to maximize financial returns minimize the likelihood of implementation of measures that will benefit Gunnison sage-grouse. Thus, no regulatory mechanisms are present on State trust lands to minimize habitat decline and thus help ensure conservation of the species. However, State school section lands account for only 1 percent of occupied habitat in Colorado and 1 percent in Utah, so impacts from development and relevant laws or regulation pertaining to State lands may be negligible in terms of effects on Gunnison sage-grouse.

Some States require landowners to control noxious weeds, which are a potential habitat threat to sage-grouse (as discussed in Factor A, Invasive Plants). The types of plants considered to be noxious weeds vary by State. Cheatgrass, which is a particular threat to sage-grouse, is listed as a Class C species in Colorado (Colorado Department of Agriculture 2010, p. 3). The Class C designation delegates to local governments the choice of whether or not to implement activities for the control of cheatgrass. Gunnison, Saguache, and Hinsdale Counties target cheatgrass with herbicide applications (GWWC 2009, pp. 2–3). The CPW annually sprays for weeds on SWAs (CDOW 2009b, p. 106). The State of Utah, however, does not consider cheatgrass as noxious within the State (Utah Department of Agriculture 2010a, p. 1) nor in San Juan County, Utah (Utah Department of Agriculture 2010b, p. 1). The laws dealing with other noxious and invasive weeds may provide some protection for sage-grouse in local areas by requiring some control of the invasive plants, although large-scale control of the most problematic invasive plants is not occurring. Rehabilitation and restoration techniques for sagebrush habitats are mostly unproven and experimental (Pyke 2011, p. 543). Neither Colorado nor Utah's regulatory mechanisms have been demonstrated to be effective in addressing the overall impacts of invasive plants on the decline of sagebrush habitat within the species' range.

*Federal Laws and Regulations*

Gunnison sage-grouse are not covered or managed under the provisions of the Migratory Bird Treaty Act (16 U.S.C. 703–712) because they are considered resident game species. Federal agencies are responsible for managing 54 percent of the total Gunnison sage-grouse habitat. The Federal agencies with the most sagebrush habitat are BLM, an agency of the Department of the Interior, and USFS, an agency of the Department of Agriculture. The NPS in the Department of the Interior also has responsibility for lands that contain Gunnison sage-grouse habitat.

BLM

About 42 percent of Gunnison sage-grouse occupied habitat is on BLM-administered land (see Table 1). The Federal Land Policy and Management Act of 1976 (FLPMA) (43 U.S.C. 1701 et seq.) is the primary Federal law governing most land uses on BLM-administered lands. Section 102(a)(8) of FLPMA specifically recognizes wildlife and fish resources as being among the uses for which these lands are to be managed. Regulations pursuant to FLPMA (30 U.S.C. 181 et seq.) and other statutory authorities that address wildlife habitat protection on BLM-administered land include 43 CFR 3162.3–1 and 43 CFR 3162.5–1 (oil and gas); 43 CFR 4120 et seq. (grazing); and 43 CFR 4180 et seq. (grazing).

Gunnison sage-grouse has been designated as a BLM Sensitive Species since they were first identified and described as a species in 2000 (BLM 2009a, p. 7). The management guidance afforded sensitive species under BLM Manual 6840—Special Status Species Management (BLM 2008, entire) states that "Bureau sensitive species will be managed consistent with species and habitat management objectives in land use and implementation plans to promote their conservation and to minimize the likelihood and need for listing" under the Act (BLM 2008, p. 05V). BLM Manual 6840 further requires that Resource Management Plans (RMPs) should address sensitive species, and that implementation "should consider all site-specific methods and procedures needed to bring species and their habitats to the condition under which management under the Bureau sensitive species policies would no longer be necessary" (BLM 2008, p. 2A1). As a designated sensitive species under BLM Manual 6840, sage-grouse conservation must be addressed in the development and implementation of RMPs on BLM lands.

RMPs are the basis for all actions and authorizations involving BLM-administered lands and resources. They establish allowable resource uses, resource condition goals and objectives to be attained, program constraints and general management practices needed to attain the goals and objectives, general implementation sequences, and intervals and standards for monitoring and evaluating the plan to determine its effectiveness and the need for amendment or revision (43 CFR 1601 et seq.).

The RMPs also provide a framework and programmatic guidance for activity plans, which are site-specific plans written to implement decisions made in an RMP. Examples include Allotment Management Plans that address livestock grazing, oil and gas field development, travel management (motorized and mechanized road and trail use), and wildlife habitat management. Activity plan decisions normally require additional planning and National Environmental Policy Act (NEPA) analysis. If an RMP contains specific direction regarding Gunnison sage-grouse habitat, conservation, or management, the specific direction for the species is an enforceable regulatory mechanism to ensure that the species and its habitats are considered during permitting and other decision making for activities that occur on BLM lands.

The BLM in Colorado manages Gunnison sage-grouse habitat under six existing RMPs. These include the Gunnison Field Office (1993), Uncompahgre Field Office (1989), Gunnison Gorge National Conservation Area (NCA) (2004), Tres Rios Field Office (1985), Grand Junction Field Office (1987), and San Luis Valley Field Office (1991) RMPs. A new RMP for the BLM Dominguez-Escalante NCA, designated in 2009 and encompassing Gunnison sage-grouse habitat in the vicinity of the Piñon Mesa population, is also under development.

In Utah, Gunnison sage-grouse habitat falls under the Monticello Field Office (2008) and Moab Field Office (2008) RMPs. All six of the existing Colorado RMPs contain broad objectives for Gunnison sage-grouse conservation, but lack specific land use allocation

BLM_0072070

decisions, stipulations, and enforceable measures to achieve those objectives. Three of these RMPs were under revision as of the drafting of this rule, including the Tres Rios, Grand Junction, and Uncompahgre Field Offices, covering all or portions of the San Miguel, Piñon Mesa, Crawford, Cerro Summit-Cimarron-Sims Mesa, and Dove Creek populations.

All ongoing RMP revisions include in their range of alternatives or preferred alternative various stipulations and measures, such as spatial buffers, seasonal limitations, and other site-specific restrictions and best management practices, for land use activities in important Gunnison sage-grouse habitat (leks, nesting habitat, brood-rearing habitat, winter habitat). Many of these recommendations are derived or adapted from the RCP (GSRSC 2005, entire) or local Gunnison sage-grouse working group plans (see Multi-County and Rangewide Efforts in Factor A above) and should provide conservation benefits to the species and its habitat, if adopted into Final RMP Plan Revisions and Records of Decision (BLM 2009a, p.6).

In May of 2014, BLM Headquarters issued guidance and direction to BLM Colorado and Utah to undertake a landscape-level, targeted RMP Amendment for the conservation of Gunnison sage-grouse on BLM-administered public lands in Colorado and Utah (BLM 2014a). This process is expected to be completed within 18–24 months, and will evaluate the adequacy of all current RMPs, including those which may be revised during the current plan amendment review process. It is unknown what conservation measures will be included in the planned RMP Amendments or in the three BLM Colorado RMPs that are currently under revision rangewide.

All existing Colorado BLM RMPs date from 1985 to 1993 and, as described above, contain broad objectives for Gunnison sage-grouse conservation, but generally lack specific land use allocation decisions, stipulations, and enforceable measures to ensure that those objectives are achieved. This may be attributed, in part, to the broader view and approach in land use planning and resource decisions typical of older RMPs.

More recent (i.e., 2000 and later) RMPs or revisions typically contain more detailed and resource-specific decisions and protections than their predecessors. The Gunnison Gorge NCA RMP (BLM 2004) contains management decisions adequate to conserve Gunnison sage-grouse and its habitat in the Crawford population. This RMP designates an ACEC in habitat occupied by Gunnison sage-grouse where management and protection of the Gunnison sage-grouse and its habitat will be emphasized. Within this area, the plan contains specific protections to maintain or increase Gunnison sage-grouse numbers and its distribution, improve the quality of sage-grouse habitat, and to prevent, minimize and mitigate fragmentation and loss of habitat. The RMP adopts and incorporates the Gunnison sage-grouse conservation plan, Crawford Area, Colorado (Crawford Area Gunnison Sage-Grouse Working Group 2011), as part of the direction and management objectives of the ACEC.

Current BLM RMPs in Utah and Colorado do provide limited regulatory protection for Gunnison sage-grouse as they are implemented through project-level planning. These protections include conservation measures to be implemented during travel management (the management of the motorized and non-motorized use of public lands), energy development, and grazing permit renewals.

The 2008 Final RMP for the BLM Monticello Field Office in Utah incorporates the recommendations of the 2005 RCP, which provides a level of benefit for Gunnison sage-grouse. For example, this RMP precludes oil and gas development, roads, power lines, fences, and other aboveground structures within 0.6 mile of a Gunnison sage-grouse lek. It also prohibits grazing in allotments containing Gunnison sage-grouse during the breeding season. It does not, however, specifically limit oil and gas development and the construction of other infrastructure in Gunnison sage-grouse habitat beyond 0.6 mile, which includes nesting, brood rearing, and wintering habitat.

In general, other than the Gunnison Gorge NCA RMP, the remaining RMPs provide only partial protection for Gunnison sage-grouse in terms of land use allocation decisions specific to the species and its habitat and, therefore, are considered inadequate to protect the species.

In addition to land use planning through its RMPs, BLM uses Instruction Memoranda (IM) to provide instruction to district and field offices regarding specific resource issues. Instruction Memoranda provide policy guidance or directives, but do not contain binding legal decisions such as those promulgated under an RMP. IMs are temporary directives, generally of short duration (1 to 2 years), intended to address urgent resource concerns by providing interim direction to staff until a threat passes or until the resource issue can be addressed through revisions or updates to manuals or RMPs.

BLM has issued a number of IMs addressing Gunnison sage-grouse. On July 12, 2005 BLM Colorado issued IM Number CO–2005–038, stating BLM's intent and commitment to assist with and participate in the implementation of the 2005 RCP. This guidance has been used for BLM-administered lands in the State of Colorado to provide conservation benefit for Gunnison sage-grouse (BLM 2009a, p. 6). On August 17, 2010, BLM Colorado issued IM number CO–2010–028 on Gunnison sage-grouse and greater sage-grouse habitat management policy, which provides direction regarding implementation of National BLM sage-grouse guidance, ensures continued coordination with CPW and other agency partners regarding sage-grouse conservation planning, and calls for fluid mineral leasing deferrals in core Greater sage-grouse habitats until Field Office plan revisions have been completed (BLM 2010b, entire).

On July 15, 2013, BLM Colorado issued IM Number CO–2013–033 to provide policy guidance to Colorado Field Offices on Gunnison sage-grouse habitat management, land uses, and resource management planning (BLM 2013d, p. 1). This IM updated and superseded the 2010 IM, Number CO–2010–028. The 2013 IM was developed in coordination with the Service and provided direction regarding management and ongoing land use planning in Gunnison sage-grouse occupied habitat, including the application of specific conservation measures for the species (BLM 2013d, p. 2).

On May 30, 2014, BLM HQ issued a new IM, 2014–100, which applies to all Gunnison sage-grouse proposed occupied critical habitat in both Colorado and Utah (BLM 2014b entire). In order to protect important habitat across the range of the species, BLM will continue to apply conservation measures and focus any type of development in non-habitat areas. All disturbances will be focused outside of a 4-mile buffer around leks, except where there are valid existing rights or where benefits to Gunnison sage-grouse may be greater than under other alternatives (BLM 2014b, p.1). The Policy identifies conservation measures for activities including Land Use Planning, Proper Livestock Grazing, Wildland Fire and Fuels Management, Processing Fluid Mineral Leases and Solid Mineral Leases (BOM 2014b pp. 2–5). This IM is expected to remain in effect until the RMP Amendment

process is complete in 2016. While this IM is of short duration, we anticipate that its implementation will reduce threats to the Gunnison sage-grouse on BLM lands from the covered activities.

### Fluid Minerals

The BLM has regulatory authority for oil and gas leasing on Federal lands and on private lands with a severed Federal mineral estate, as provided at 43 CFR 3100 et seq., and they are authorized to require stipulations as a condition of issuing a lease. The BLM's Land Use Planning Handbook describes program-specific guidance for fluid minerals (which include oil and gas) and the handbook specifies that RMP decisions will identify restrictions on areas subject to leasing, including closures, as well as lease stipulations (BLM 2005e, Appendix C, pp. 23–24). The handbook also specifies that all stipulations must have waiver, exception, or modification criteria documented in the plan, and notes that the least restrictive constraint to meet the resource protection objective should be used (BLM 2005e, Appendix C, pp. 23–24).

To our knowledge, BLM Field Offices are deferring the sale of new drilling leases, which was first implemented in the 2010 IM, in habitats they have identified as "priority" or "core" habitats for Gunnison sage-grouse until RMP revisions are complete and/or adequate protective lease stipulations are in place. However, there is currently no regulatory mechanism in effect which assures that future lease sales in occupied habitat on BLM administered lands will not occur or that operations on federal leases are conducted in a manner consistent with protection of the Gunnison sage-grouse.

In addition, oil and gas leases already exist in 17 percent of the Piñon Mesa population area, and 49 percent of the San Miguel Basin population. For existing oil and gas leases on BLM land in occupied Gunnison sage-grouse habitat, oil and gas companies may conduct drilling operations subject to BLM-imposed permit conditions. Specifically, the BLM has regulatory authority to condition "Application for Permit to Drill" authorizations that are conducted under a lease that does not contain specific Gunnison sage-grouse conservation stipulations, consistent with lease rights, but utilization of these conditions is discretionary and we are uncertain at this time how widely such authority has or will be applied to avoid or minimize impacts to Gunnison sage-grouse.

We also note that onshore federal oil and gas leases include a provision (also known as a standard lease term) that allows movement of the drilling area or facilities by 200m (650ft) to avoid sensitive resources (43 CFR 3101.1(c)). However, in most cases this small amount of movement would have little to no conservation benefit to Gunnison sage-grouse because sage-grouse respond to nonrenewable energy development at much further distances (Holloran *et al.* 2007, p. 12; Walker *et al.* 2007, p. 10). Pursuant to its permitting authority as described above, our experience is that many of the BLM field offices work with the operators to move a proposed drilling site farther from sensitive resources and justify such a move through a site-specific NEPA process.

Given the already small and fragmented nature of the populations where future oil and gas leases are likely to occur, additional development within occupied habitat would negatively impact those populations by contributing to further habitat decline. Since we have no information on what minimization and mitigation measures might be applied to future leases at this time, we cannot assess the conservation benefit of potential BLM regulations to those populations.

### Salable and Locatable Minerals

As discussed under Factor A (Locatable and Salable Mineral Development), currently active mines and mining claims are limited in geographic scope and mining is expected to have limited impacts on Gunnison sage-grouse populations. As a result, we found current locatable and salable mineral development to be a threat of low magnitude to Gunnison sage-grouse. We have no information indicating that any regulatory mechanisms currently exist to reduce impacts of mines.

### Grazing

As stated previously, Gunnison sage-grouse are a BLM Sensitive Species and therefore receive Special Status Species management considerations. The BLM regulatory authority for grazing management is provided at 43 CFR part 4100 (Regulations on Grazing Administration Exclusive of Alaska). Livestock grazing permits and leases contain terms and conditions determined by BLM to be appropriate to achieve management and resource condition objectives on the public lands and other lands administered by BLM, and to ensure that habitats are, or are making significant progress toward being, restored or maintained for BLM special status species (43 CFR 4180.1(d)). BLM's State or regional standards for grazing administration must address habitat for endangered, threatened, proposed, candidate, or special status species, and habitat quality for native plant and animal populations and communities (43 CFR 4180.2(d)(4) and (5)). BLM's guidelines for ensuring that grazing standards are met similarly must address restoring, maintaining, or enhancing habitats of BLM special status species to promote their conservation, as well as maintaining or promoting the physical and biological conditions to sustain native populations and communities (43 CFR 4180.2(e)(9) and (10)); BLM 2009b, p. 8). The BLM is required to take appropriate action no later than the start of the next grazing year upon determining that existing grazing practices or levels of grazing use are significant factors in failing to achieve the standards and conform with the guidelines (43 CFR 4180.2(c)).

The BLM is required to consult with their Resource Advisory Councils (RACs) to expand the rangeland health standards required under 43 CFR part 4180 so that there are public land health standards relevant to all ecosystems, not just rangelands, and that these standards apply to all BLM programs and actions across public lands, not just livestock grazing (BLM Land Health Manual 4180 (BLM 2009b, p. 8)). Both southwest Colorado and southeast Utah have RACs established by the BLM.

A detailed analysis of grazing on BLM-administered lands and its impacts on the Gunnison sage-grouse is included above in Factor A. As of 2012, all active BLM grazing permits in occupied Gunnison sage-grouse habitat managed by the BLM Gunnison Field Office have vegetation structure guidelines specific to Gunnison sage-grouse incorporated into Allotment Management Plans or Records of Decision for permit renewals as habitat objectives (BLM 2012a, pp. 3–4). These Gunnison sage-grouse habitat objectives are designed to provide good habitat for the species. Similar objectives are also incorporated into Allotment Management Plans in portions of some of the smaller population areas (see section, Public Lands Grazing in other Population Areas under Factor A). However, as noted earlier (see Domestic Grazing and Wild Ungulate Herbivory under Factor A), available information suggests that LHA objectives important to Gunnison sage-grouse are not being met across parts of the species' range. Reduced habitat quality in those areas, as reflected in unmet LHA objectives, may be negatively impacting Gunnison sage-grouse. However, the relationship between LHA determinations and the effects of domestic livestock grazing on

Gunnison sage-grouse is difficult to quantify.

Specific Gunnison sage-grouse habitat objectives from the 2005 RCP are incorporated into some Federal grazing permits and are an effective means of ensuring that the needs of Gunnison sage-grouse are met on grazed lands. Certain grazing permits also contain standard terms and conditions, such as forage utilization standards, that may indirectly help achieve habitat objectives for Gunnison sage-grouse. However, terms and conditions applied within BLM's existing livestock grazing permits and leases are currently inadequate in parts of the range of Gunnison sage-grouse. As discussed under Factor A (Summary of Domestic Grazing and Wild Ungulate Herbivory), the best available information suggests that Land Health Assessment objectives important to Gunnison sage-grouse are not being met across localized parts of the species' range and that livestock grazing is likely contributing to those conditions in some instances. Reduced habitat quality in those areas, as reflected in LHA data, is likely negatively impacting Gunnison sage-grouse in some of the populations. While it is anticipated that future terms and conditions in BLM grazing permits will minimize further grazing impacts to habitat on BLM-administered lands, it is currently unknown what terms and conditions might be incorporated into grazing permits and how such terms and conditions may improve degraded habitats for Gunnison sage-grouse.

USFS

The USFS manages 10 percent of the occupied Gunnison sage-grouse habitat (Table 1). Management of National Forest System lands is guided principally by the National Forest Management Act (NFMA) (16 U.S.C. 1600–1614, August 17, 1974, as amended). The NFMA specifies that all National Forests must have a Land and Resource Management Plan (LRMP) (16 U.S.C. 1600) to guide and set standards for all natural resource management activities on each National Forest or National Grassland. The NFMA requires USFS to incorporate standards and guidelines into LRMPs (16 U.S.C. 1600), which include provisions to manage plant and animal communities for diversity, based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives.

The Gunnison sage-grouse is a USFS sensitive species in both Region 2 (Colorado) and Region 4 (Utah). USFS policy provides direction to USFS Forests to analyze potential impacts of programs and activities to endangered, threatened, proposed, or sensitive species in a biological evaluation. The National Forests within the range of sage-grouse provide important seasonal habitats for the species, particularly the Grand Mesa, Uncompahgre, and Gunnison (collectively known as GMUG) National Forests. The 1991 Amended Land and Resource Management Plan for the GMUG National Forests has not incorporated Gunnison sage-grouse conservation measures or habitat objectives. Similarly, the 1996 the Forest Plan for the Rio Grande National Forest does not contain Gunnison sage-grouse specific conservation measures. The newer 2013 Forest Plan for the San Juan National Forest does contain measures to protect Gunnison sage-grouse, although there is very little Gunnison sage-grouse habitat on this national forest. The Regional Forester signed the 2005 RCP, agreeing to follow and implement the recommendations in the plan. Nonetheless, only three of the 34 grazing allotments in occupied grouse habitat on National Forest lands have incorporated Gunnison sage-grouse habitat objectives from the RCP, indicating that USFS regulations and the USFS agreement to implement the RCP are currently inadequate to protect the species.

The only Gunnison sage-grouse population within USFS lands that is in an area of high or even medium potential for oil and gas reserves is the San Miguel Basin, and USFS lands only make up 1.4 percent of that population (GSRSC 2005, D–8). Although the 2014 BLM IM does not specifically apply to USFS lands, USFS considers the IM in evaluating leasing decisions. The BLM, which regulates oil and gas leases on USFS lands, has the authority to defer leases and would make a leasing decision consistent with their 2014 IM in coordination with USFS (McDonald 2014, pers. com).

While USFS consideration of Gunnison sage-grouse as a sensitive species and commitment to follow the recommendations contained in the 2005 RCP (GSRSC 2005, entire) can provide some conservation benefits to the species, both of these actions are primarily voluntary in nature and thus are not treated as regulatory mechanisms in our evaluation process. Considering the above information, the USFS has implemented some regulatory mechanisms and policies to provide for the long-term conservation of Gunnison sage-grouse and is a signatory to the CCA for the Gunnison Basin (see Factors A and E). However, we find that USFS regulations are not fully addressing the conservation of Gunnison sage-grouse because the GMUG and Rio Grande National Forests, which cover the vast majority of Gunnison sage-grouse habitats on national forest lands, are governed by older Forest Plans that do not contain detailed conservation standards for this species.

NPS

The NPS manages 2 percent of occupied Gunnison sage-grouse habitat (Table 1), which means that there is little opportunity for the agency to affect range-wide conservation of the species. The NPS Organic Act (16 U.S. C. § 1) states that NPS will administer areas under their jurisdiction "by such means and measures as conform to the fundamental purpose of said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historical objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." Lands in the Black Canyon of the Gunnison National Park and the Curecanti National Recreation Area include portions of occupied habitat in the Crawford and Gunnison Basin populations and are managed under NPS's General Management Plan for these Park units (NPS 1997, entire). Under this plan, resource objectives related to Gunnison sage-grouse include protection of the species and its habitat, protection of threatened and endangered species, and minimization of the causes and impacts of habitat fragmentation (NPS 1997, pp. 18–19). In addition, the NPS has nearly completed an area Resource Stewardship Strategy, a plan that identifies more specific conservation measures and actions, including an emphasis on Gunnison sage-grouse conservation, for implementation of the General Management Plan (Stahlnecker 2014, pers. comm.). In the meantime, NPS's ability to actively manage for Gunnison sage-grouse is not limited by the scope of their management plans, as discussed below.

The NPS completed a Fire Management Plan in 2006 that covers both of the areas mentioned above (NPS 2006, entire). Both prescribed fire and fire use (allowing wildfires to burn) are identified as a suitable use in Gunnison sage-grouse habitat. However, Gunnison sage-grouse habitat is identified as a Category C area, meaning that, while fire is a desirable component of the ecosystem, ecological constraints must be observed. For Gunnison sage-grouse, constraints in the plan include limitation of acreage burned per year

BLM_0072073

and limitation of percent of project polygons burned. Moreover, the NPS is currently following the fire-related conservation measures in the local conservation plans as described in Multi-County and Rangewide Conservation Efforts above under Factor A, and the 2005 RCP fire recommendations (Stahlnecker 2010, pers. comm.). In most cases, implementation of NPS fire management policies should result in minimal adverse effects since emphasis is placed on activities that will minimize impacts to Gunnison sage-grouse habitat. Overall, implementation of NPS plans should reduce impacts to Gunnison sage-grouse because they include conservation measures to protect Gunnison sage-grouse habitat.

Recreational activities are generally managed more intensively on NPS land than on other Federal lands. Nevertheless, recreational activities within occupied habitat on NPS land may have adverse effects on Gunnison sage-grouse individuals (see Factor E discussion). However, given the limited amount of occupied habitat on NPS land (2 percent of the Gunnison Basin population area), recreation on those lands is likely having negligible impacts on Gunnison sage-grouse at the population or species level.

Grazing management activities on NPS lands are governed by BLM regulations, and their implementation and the results of these regulations are likely similar to those discussed for the BLM, because they occur under the same management criteria and guidance. In 2013, all of the active allotments in the Crawford population, including NPS allotments, had incorporated Gunnison sage-grouse habitat objectives and completed LHAs (see Grazing section in Factor A). Grazing management plans on NPS lands appear to be provide conservation measures for the species. Overall, NPS regulations reduce threats to Gunnison sage-grouse on the 2 percent of occupied habitat in the Gunnison Basin population under NPS jurisdiction. However, they do not significantly reduce threats on a rangewide basis.

*Environmental Protection Agency*

On December 15, 2009, the EPA published in the **Federal Register** (74 FR 66496) a rule titled, "Endangerment and Cause or Contribute Findings for Greenhouse Gases under Section 202(a) of the Clean Air Act." In this rule, the EPA Administrator found that the current and projected concentrations of the six long-lived and directly emitted greenhouse gases—carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride—in the atmosphere threaten the public health and welfare of current and future generations; and that the combined emissions of these greenhouse gases from new motor vehicles and new motor vehicle engines contribute to the greenhouse gas pollution that threatens public health and welfare. In effect, the EPA has concluded that the greenhouse gases linked to climate change are pollutants, whose emissions can now be subject to the Clean Air Act (42 U.S.C. 7401 et se.; see 74 FR 66496, December 15, 2009). On October 15, 2012, EPA and the National Highway Transportation Safety Administration (NHTSA) issued a joint Final Rulemaking to extend the National Program of harmonized greenhouse gas and fuel economy standards to model year 2017 through 2025 passenger vehicles (77 FR 62624). On June 17, 2013, EPA and NHTSA implemented standards for medium- and heavy-duty vehicles (model years 2014 through 2018) (78 FR 36370). These regulations are relatively new, and at present, we have no basis to conclude that implementation of the Clean Air Act in the near future (40 years, based on global climate projections) will substantially reduce the current rate of global climate change through regulation of greenhouse gas emissions. Thus, we conclude that while the Clean Air Act may reduce greenhouse gas emissions, it does not address the primary threats to the Gunnison sage-grouse, such as drought, nonnatives, fire frequency, and decrease of sagebrush.

*Other Regulatory Mechanisms: Conservation Easements*

Conservation easements are voluntary legal agreements between a landowner and a land trust, nongovernmental organization, or government agency that permanently limit or restrict land uses for identified conservation values and purposes and are binding regulatory mechanisms once established. With very few exceptions, conservation easements require that individual parcels be owned and conveyed as single units in perpetuity, thereby ensuring they are not subdivided for development in the future. Conservation easements also restrict land uses by defining specific areas for residential or agricultural development, including roads and driveways, and may include other parameters for land management practices to achieve conservation values (Lohr and Gray 2013, p. 2). Therefore, we generally consider conservation easements to be an effective regulatory tool to prevent long-term or permanent habitat loss. Conservation easements across Gunnison sage-grouse range are held by nongovernmental organizations and land trusts (The Nature Conservancy, Colorado Cattlemen's Agricultural Land Trust, and others), state agencies (CPW, UDWR), and Federal agencies (Natural Resources Conservation Service (NRCS, NPS, and BLM). Some conservation easements include conservation measures specific to Gunnison sage-grouse, while many are directed at other species, such as big game (GSRSC 2005, pp. 59–103).

Following is a summary of the estimated amount of lands under conservation easement for occupied and unoccupied Gunnison sage-grouse habitat in Colorado and Utah, based on Lohr and Gray (2013, entire) (Table 12). This report also included lands not under conservation easement, but which are owned by entities that manage the property for Gunnison sage-grouse and other conservation values (e.g., The Nature Conservancy properties), or which carry covenants that restrict subdivision and development in perpetuity (e.g., Eagle Ridge Ranch in the Gunnison Basin). Rangewide, approximately 35,195 ha (86,968 ac), or 22.6 percent, of private lands in occupied Gunnison sage-grouse habitat were under conservation easement as of 2013 (Lohr and Gray 2013, entire). Another 51,040 ac, or 11 percent, of private lands in mapped unoccupied habitat are also under conservation easement (Lohr and Gray 2013, entire). Combined, conservation easements include approximately 138,008 ac, or 16 percent, of all occupied and unoccupied habitat on private land (840,346 ac) across the species' range.

Of all the Gunnison sage-grouse populations, the Gunnison Basin contains the most acres under conservation easement (102,986 ac total in occupied and unoccupied habitat). In proportion to total occupied habitat, conservation easements in the Piñon Mesa and Crawford population areas are significant (74 and 41 percent, respectively). Approximately 30 percent of private land in unoccupied habitat is also protected under conservation easement in the Gunnison Basin and Crawford population areas (Table 12).

TABLE 12—CONSERVATION EASEMENTS IN GUNNISON SAGE-GROUSE OCCUPIED[a] AND UNOCCUPIED[a] HABITATS

[Lohr and Gray 2013, entire; Gunnison County 2013b, p. 21]

| Population | Private land in occupied habitat (ac) | Private land in occupied habitat under CE | | Private land in unoccupied habitat (ac) | Private land in unoccupied habitat under CE | |
|---|---|---|---|---|---|---|
| | | Acres | % of total | | Acres | % of total |
| Monticello-Dove Creek | 100,702 | 6,117 | 5 | 200,318 | 0 | 0 |
| Piñon Mesa | 27,283 | 20,076 | 74 | 64,275 | 20,246 | 31 |
| San Miguel Basin | 49,492 | 6,938 | 14 | 45,843 | 1,486 | 3 |
| Cerro Summit-Cimarron-Sims Mesa | 28,218 | 3,995 | 14 | 20,117 | 3,774 | 19 |
| Crawford | 8,481 | 3,470 | 41 | 44,552 | 8,665 | 20 |
| Gunnison Basin | 178,531 | 46,372 | 26 | 56,614 | 16,348 | 29 |
| Poncha Pass | 4,792 | 0 | 0 | 11,128 | 521 | 5 |
| Rangewide Totals | 397,499 | 86,968 | 22 | 442,847 | 51,040 | 12 |

[a] Occupied and unoccupied habitat acres and conservation easements provided in Lohr and Gray (2013) were based on the Service's proposed critical habitat designation for Gunnison sage-grouse (78 FR 2540, January 11, 2013).

In the context of potential threats to Gunnison sage-grouse, conservation easements and the protections they afford are most relevant to the threat of residential and human development. Therefore, in the Residential Development section of this rule (Factor A), we further analyzed existing conservation easements by Gunnison sage-grouse population and across the species' range. Therein, Table 6 summarizes conservation easement acres in occupied habitat for each Gunnison sage-grouse population, and also provides estimates for those portions of occupied habitat not under conservation easement, for the purposes of evaluating the threat of residential development.

Total conservation easements recorded to date cover about 18.3 percent of private lands in rangewide occupied habitat for Gunnison sage-grouse. The Service has analyzed the conservation and regulatory benefit of existing conservation easements throughout the range of the species. However, conservation easements are offered and held by numerous entities and happen opportunistically with willing sellers across the range of the species.

Summary of Factor D

Gunnison sage-grouse conservation has been addressed in some local, State, and Federal, laws, regulations, and land management plans. We commend Gunnison, San Miguel, Ouray, and Montrose Counties for enacting special regulations for Gunnison sage-grouse for land uses within their jurisdictions. Existing local laws and regulations will help to reduce some of the negative effects of human development and infrastructure on Gunnison sage-grouse. Continuation and enhancement of these efforts across the species' range will be necessary for conservation of the species. Past residential and exurban development throughout the species range is a primary cause of habitat decline. Future human development will further contribute to habitat loss (see Factor A, Residential Development, Roads, and Powerlines). As described above, existing local laws and regulations do not fully address this threat to the species. Local regulatory mechanisms also do not fully address other substantial threats to the species, including small population size (Factor E), invasive plants (Factor A), disease (Factor B), and climate change (Factor A).

Implementation of Federal agency regulations specifically for Gunnison sage-grouse conservation provides obvious benefits to the species, considering that approximately 54 percent of rangewide occupied habitat occurs on Federal lands (Table 1). Protections afforded to Gunnison sage-grouse vary by agency and field office or unit, but many of these protections are discretionary or undertaken on a voluntary basis rather than required by a regulatory mechanism. BLM's land use management plans are regulatory mechanisms, but for the most part do not currently include requirements directed at sage-grouse conservation. This will likely change in the future, as a result of the ongoing revision process for some RMPs in the species' range and the planned rangewide RMP Amendment to address sage-grouse threats. Nonetheless, we do not know at this time what conservation measures will be included in these future RMPs or the degree to which they may address threats to the species. As a result, we do not consider or rely on these future planning efforts in this rule. BLM's 2013 IM for Gunnison sage-grouse in Colorado provides a more consistent foundation for the management and conservation of the species on BLM land in Colorado, but it is a temporary measure and is not a binding regulatory mechanism. Based on this analysis, and our more detailed evaluation of BLM and other possible Federal regulatory mechanisms, we find that existing Federal laws and regulations are not fully addressing the full scope of threats to the species (Factors A through C, and E).

The CPW, UDWR, and other entities have acquired and continue to pursue conservation easements in Colorado and Utah, respectively, to conserve Gunnison sage-grouse habitat and meet the species' needs. We determined that perpetual conservation easements offer protection from habitat loss, but that conservation values and objectives for those properties vary according to the terms of the easement. Existing conservation easements provide a level of protection from future development on these lands, but are limited in geographic scope such that they do not adequately address the threat of habitat loss across the species' range. State wildlife regulations provide protection for individual Gunnison sage-grouse from direct mortality due to hunting but do not address habitat loss and other threats such as drought, climate change, or disease. While the COGCC regulations discussed above provide some protection and mitigation (as defined by COGCC, not the Service) for loss of Gunnison sage-grouse habitat, they do not prevent ongoing habitat loss and fragmentation (Factor A).

We evaluated the best available information related to existing regulatory mechanisms that address threats (Factors A through C, and E) to Gunnison sage-grouse and its habitats. Based on our analysis, we find that some existing regulatory mechanisms are in place to conserve Gunnison sage-grouse, but individually or collectively they do not fully address the substantial

threats faced by Gunnison sage-grouse across their range. Further, while these existing regulatory mechanisms may help reduce current threats to the species, they are insufficient to fully reduce or eliminate the increase in threats that may act on the species in the future.

E. Other Natural or Manmade Factors Affecting Its Continued Existence

Other factors potentially affecting the Gunnison sage-grouse's continued existence include small population size and structure; drought, recreational activities, pesticides and herbicides, and contaminants.

*Small Population Size and Structure*

Negative effects on population viability, such as reduced reproductive success or loss of genetic variation and diversity, become more evident as populations decline or become more isolated. In this section, we evaluate the issue of small and declining population size and structure in Gunnison sage-grouse, and associated genetic risks and other effects. We also evaluate existing population viability analyses for the species. Finally, we synthesize this information to assess resiliency, redundancy, and representation of the individual Gunnison sage-grouse populations and the species as a whole.

*Relevant Species Information*

In general, while various natural factors would not limit sage-grouse populations across large geographic scales under historical conditions or in larger populations, they may contribute to local population declines or extirpations when populations are small, isolated, or when weather patterns, habitats, or mortality rates are altered. When coupled with mortality stressors related to human activity and significant fluctuations in annual population size, long-term persistence of small populations (in general) is unlikely (Traill *et al.* 2010, entire). Sage-grouse have low reproductive rates and high annual survival rates (Schroeder *et al.* 1999, pp. 11, 14; Connelly *et al.* 2000a, pp. 969–970), resulting in a long recovery period from disturbances due to slower potential or intrinsic population growth rates than is typical of other game birds. Also, as a consequence of their site fidelity to seasonal habitats (Lyon and Anderson 2003, p. 489), measurable population effects may lag behind negative changes in habitat (Harju *et al.* 2010, entire; Wiens and Rotenberry 1985, p. 666).

As described in the Current Distribution and Population Estimates and Trends subsection in the Background section above, the Gunnison Basin is the largest population of Gunnison sage-grouse (3978 individuals in 2014) and, while showing variation over the period of record, has been relatively stable since 1996, based on lek count data (Figure 2). However, as discussed later in this section, demographic data indicate this population may not be quite as stable as suggested by lek count data (Davis 2012, p. 38). The Gunnison Basin population declined during the period 2005–2010, as shown by rates of growth estimated from demographic parameter estimates measured during that time period (Davis 2012, entire), and from lek count indices (CPW 2014e, entire). In addition to this, an integrated population model that used this short term demographic data in conjunction with the longer time series of lek count data estimated a rate of growth slightly less than 1.0 (lambda = 0.984) with confidence intervals that overlapped 1.0 (0.879–1.179) for the period 1996–2012 (Davis *et al. in press*). This 1996–2012 estimate was not statistically significantly different from a lambda of 1.0, suggesting the population is currently largely stable. The Gunnison Basin population comprises about 84 percent of the rangewide population of Gunnison sage-grouse and includes 63 percent of rangewide occupied habitat.

In contrast, the remaining six populations, also referred to in this final rule as satellite populations, were generally in decline from 1996 until 2010; however, increases in several populations have been observed recently (Figure 3) and could be a product of numerous factors including but not limited to population cycles, translocation efforts, and increased access to leks. The San Miguel and Piñon Mesa populations are currently the largest of the satellite populations, with 206 and 182 birds, respectively, in 2014. The Monticello-Dove Creek and Crawford populations currently have less than 160 birds. Population estimates in 2014 for the two smallest populations, Cerro Summit-Cimarron-Sims Mesa and Poncha Pass, were 74 and 16, respectively (CPW 2014, p.6). The 16 radio-telemetered birds known at Poncha Pass in summer 2014 are the remainder of 27 birds translocated from Gunnison Basin in fall of 2013 and spring of 2014.

Based on lek count-based population estimates, some satellite populations have increased slightly over the last several years, or intermittently over time. However, the last 19 years (1996 to 2014) of lek count data as a whole indicate that the satellite populations are in decline, with the possible exception of the Cerro Summit-Cimarron-Sims Mesa population which appears to be relatively stable to increasing, and Piñon Mesa, which is at its highest over the 19 year period (Figure 3). However, some of the recent increases in population sizes may be attributable to translocation and survey efforts, rather than an actual increase in the population, which may be the case with Piñon Mesa. For example, the 2014 estimated population for Piñon Mesa was 182 birds (CPW 2014, p. 6), much greater than the 2012 estimate of 54 birds. This increase could be, in part, a product of the 93 birds translocated to Piñon Mesa population between the spring of 2010 and spring of 2013 (CPW 2014c, entire) and the discovery of two new leks in 2012 (CPW 2012a, pp. 2–3). For all six satellite populations, population estimates from 1996 to 2014 are below population targets (based on a 10-year average), as set forth by the RCP (CPW 2013, p. 11; GSRSC 2005, pp. 255–302) (see Current Distribution and Population Estimates and Trends in the Background section for more details). The RCP identified population targets as attainable population sizes sufficient to conserve Gunnison sage-grouse in those population areas (GSRSC 2005, p. 255). This constitutes the current and best available information on population targets for Gunnison sage-grouse.

Combined, the satellite populations comprise about 16 percent of the rangewide population of Gunnison sage-grouse and include approximately 37 percent of rangewide occupied habitat. Small population size and population structure occur in all of the six satellite populations, or across approximately 37 percent of occupied range for the species. The small sizes of the satellite populations of Gunnison sage-grouse make them particularly sensitive to stochastic and demographic fluctuations, and this vulnerability is exacerbated by other threats such as drought (GSRSC 2005, p. G–22). Small population size, declining population trends, and apparent isolation indicate long-term population persistence and evolutionary potential are compromised in the satellite populations (see Genetic Risks).

*Genetic Risks*

Small populations face three primary genetic risks: Inbreeding depression; loss of genetic variation; and accumulation of new mutations. In general, these negative genetic consequences influence a species' fitness, or ability to reproduce and survive in the face of environmental pressures. Inbreeding can have individual and population level

BLM_0072076

consequences by either increasing the phenotypic expression of recessive, deleterious alleles (the expression of harmful genes through the physical appearance) or by reducing the overall fitness of individuals in the population (GSRSC 2005, p. 109 and references therein).

Gunnison sage-grouse have low levels of genetic diversity, particularly in comparison to greater sage-grouse (Oyler-McCance et al. 2005, p. 635). There is no consensus regarding how large a population must be in order to prevent inbreeding depression. However, the San Miguel Basin satellite population has an effective population size (the number of individuals in a population that contribute their genes to the next generation) that is below the level at which inbreeding depression has been observed to occur (Stiver et al. 2008, p. 479). Since the remaining Gunnison sage-grouse satellite populations are smaller than the San Miguel population, they are likely small enough to induce inbreeding depression, and thus could be losing adaptive potential (Stiver et al. 2008, p. 479).

Population structure of Gunnison sage-grouse was investigated using mitochondrial DNA sequence (mtDNA, maternally-inherited DNA located in cellular organelles called mitochondria) and nuclear microsatellite data from six geographic areas (Crawford, Gunnison Basin, Curecanti area of the Gunnison Basin, Monticello-Dove Creek, Piñon Mesa, and San Miguel Basin) (Oyler-McCance et al. 2005, entire). The Cerro Summit-Cimarron-Sims Mesa population was not included in the analysis due to inadequate sample sizes. The Poncha Pass population also was not included as it is composed of individuals translocated from Gunnison Basin. Levels of genetic diversity were highest in the Gunnison Basin, which had more alleles and many but not all of the alleles present in other populations. All other populations had much lower levels of diversity. The lower diversity levels were thought to be the result of small population sizes and a high degree of geographic isolation (Oyler-McCance et al. 2005, entire).

Collectively, the smaller populations contained 24 percent of the genetic diversity of the species. Individually, each of the satellite populations may not be crucially important genetically to the survival of the species, but collectively it is reasonable to assume that 24 percent of the genetic diversity is important to the future rangewide survival and adaptability of the species. Some of the genetic makeup contained

within the satellite populations (with the potential exception of the Poncha Pass population since it consists of birds from the Gunnison Basin) may be critical to maintaining adaptability in the face of issues such as climate change or other environmental change. All populations sampled were found to be genetically discrete units (Oyler-McCance et al. 2005, p. 635), so the loss of any of them would result in a decrease in genetic diversity of the species. In addition, having multiple populations across a broad geographic area (population redundancy) provides insurance against catastrophic events, such as prolonged drought, and the aggregate number of individuals across all populations increases the probability of demographic persistence and preservation of overall genetic diversity by providing an important genetic reservoir (GSRSC 2005, p. 179). The satellite populations are important to the long-term viability of Gunnison sage-grouse because they: (1) Increase species abundance rangewide; (2) minimize the threat of catastrophic events to the species since the populations are widely distributed across the landscape; and (3) provide additional genetic diversity not found in the Gunnison Basin (GSRSC 2005, p. 199).

Habitat loss and decline can lead to range contraction and population extinction (see Factor A). As a species' range contracts and distances between populations increase, opportunities for gene flow are reduced. Historically, the Monticello-Dove Creek, San Miguel, Crawford, and Piñon Mesa populations were larger and were connected through more contiguous areas of sagebrush habitat. The loss and fragmentation of sagebrush habitat between the late 1950s and the early 1990s led to the current isolation of these populations, which is reflected in low amounts of gene flow and isolation by distance (Oyler-McCance et al. 2005, p. 635). However, Oyler-McCance et al. (2005, p. 636) noted that a few individuals in their analysis appeared to have the genetic characteristics of a population other than their own, suggesting they were dispersers from a different population. Two probable dispersers were individuals moving from the San Miguel Basin population into Monticello-Dove Creek and Crawford. The San Miguel population itself appeared to have a mixture of individuals with differing probabilities of belonging to different clusters. This information suggests that the San Miguel population may act as a conduit of gene flow among the satellite

populations surrounding the larger Gunnison Basin population. Additionally, another potential disperser into Crawford was found from the Gunnison Basin (Oyler-McCance et al. 2005, p. 636). This result is not surprising given their close geographic proximity. The genetic makeup of the outlying Monticello-Dove Creek and Piñon Mesa populations were consistently distant from all other populations and from each other. This and other tests indicated that geographic distances (or separation) are correlated with the genetic distance between populations of Gunnison sage-grouse (Oyler-McCance et al. 2005, p. 635).

Movement of local (not translocated) birds between the Monticello and Dove Creek populations has not been documented. In 2011, five translocated and radio-collared hens released in Dove Creek during the spring were recorded in Utah during the breeding season (Messmer 2013, p. 4). These movements may not be representative of typical behavior of local birds, however, since translocated birds have been known to make erratic or irregular movements following translocation.

While we acknowledge there are likely benefits from translocating Gunnison sage-grouse from the Gunnison Basin to satellite populations (see Scientific Research and Related Conservation Efforts in Factor B), such efforts may have diluted the genetic makeup and potentially unique characteristics of some of the receiving populations (e.g., Piñon Mesa, which is thought to be more unique genetically). However, more research is needed to determine the success of translocations, what the effect is on genetic make-up within populations, and whether translocations should continue in all satellite populations.

In northwestern Colorado, dispersal of juvenile male greater sage-grouse had more influence on genetic diversity in populations than dispersal of females (Thompson 2012, p. 256). Based on observed bird dispersal, gene flow and connectivity in greater sage-grouse can likely be maintained for populations 5 to 10 km apart (most dispersals were less than 10 km) and possibly as far as 20 km (the maximum dispersal distance of birds studied) (Thompson 2012, p. 285–286). If genetic diversity and dispersal mechanisms operate similarly in Gunnison sage-grouse populations (typical dispersals less than 10 km), it is unlikely that gene flow and genetic diversity is currently being maintained due to the distance between these populations. The seven Gunnison sage-grouse populations are generally more than 10 km apart from each other (based

on mapped occupied habitat), and most are 20 km apart or more (Figure 1).

Lowered hatching success is a well-documented indicator of inbreeding in wild bird populations. In one study, it was suggested that the low hatching success rates observed in Gunnison sage-grouse may have been due to inbreeding depression (Stiver *et al.* 2008, p. 479, and references therein). Other bird species that had undergone genetic bottlenecks have had similar hatchability rates. Independent of genetic pressures or differences in a given population, some eggs fail to hatch because they are infertile or simply do not develop fully. Based on a review of sage-grouse research in Colorado, an estimated 10 percent of eggs produced will likely fail to hatch, even in healthy populations (CPW 2013b, p. 12). However, we expect that hatch failure rates would likely increase above that level in smaller populations where inbreeding is more likely to occur.

*Effective Population Size and Population Viability Analyses*

Effective population size (Ne) is an important parameter in conservation biology. It is defined as the number of individuals contributing their genes to the next generation. In technical terms, effective population size is an idealized population size of breeding adults that would experience the same rate of (1) loss of heterozygosity (the amount and number of different genes within individuals in a population), (2) change in the average inbreeding coefficient (a calculation of the amount of breeding by closely related individuals), or (3) change in variance in allele (one member of a pair or series of genes occupying a specific position in a specific chromosome) frequency through genetic drift (the fluctuation in gene frequency occurring in an isolated population) as the actual population (Wright 1930, entire).

The effective size of a population is often much less than its actual size or number of individuals. As effective population size decreases, the rate of loss of allelic diversity via genetic drift increases. Two consequences of this loss of genetic diversity, reduced fitness through inbreeding depression and reduced response to sustained directional selection ("adaptive potential"), are thought to elevate extinction risk (Stiver *et al.,* 2008, p. 472 and references therein). While no consensus exists on the population size needed to retain a level of genetic diversity that maximizes evolutionary potential (i.e., the ability to adapt to local changes) for a given species, up to

5,000 greater sage-grouse may be necessary to maintain an effective population size of 500 birds (Aldridge and Brigham, 2003, p. 30). Other recent recommendations also suggest populations of at least 5,000 individuals to deal with evolutionary and demographic constraints (Traill *et al.* 2009, p. 3, and references therein). While the persistence of wild populations is usually influenced more by ecological rather than by genetic effects, once populations are reduced in size, genetic factors become increasingly important (Lande 1995, p. 318).

Population viability analysis (PVA) is a risk assessment tool used to predict the relative probability of extinction for a species, population, or various population sizes under different management scenarios to aid in decision-making for conservation and management. Fundamentally, population viability and persistence depends on a population's growth rate (births and deaths) and the recruitment of individuals through immigration and emigration. PVA does not predict the real or absolute risk of extinction for a species or population, only their relative extinction risk under various scenarios, and thus should be interpreted and applied with caution. To date, three population viability analyses or studies have been conducted for Gunnison sage-grouse: (1) A PVA developed as part of the RCP in 2005 by Dr. Phil Miller through CPW (GSRSC 2005, Appendix G); (2) a PVA developed for the Service in 2005 by Dr. Edward Garton (Garton 2005, entire); and (3) a demographic study and PVA developed by Dr. Amy Davis at Colorado State University (Davis 2012, entire). Each of these studies and their results are described in detail below.

RCP Population Viability Analysis

Dr. Phillip Miller prepared a population viability analysis (PVA) for the Gunnison sage-grouse for CPW as part of the RCP (GSRSC 2005, Appendix G). The purpose of this PVA was to assist the CPW in evaluating the relative risk of extinction for each population under the conditions at that time (i.e., the risk of extinction if nothing changed), to estimate relative extinction probabilities and loss of genetic diversity over time for various population sizes, and to determine the sensitivity of Gunnison sage-grouse population growth rates to various demographic parameters (GSRSC 2005, p. 169). The PVA was used by the RCP as a tool to predict the relative, not absolute or precise, probability of extinction for the different populations under various management scenarios

based on information available at that time. The model did not incorporate certain factors including habitat loss and fragmentation, density-dependent reproduction, effects of disease, or inbreeding depression, all of which may affect the demographic rates and, therefore, status of a given population (GSRSC 2005, p. 170). Furthermore, while Gunnison sage-grouse demographic data were used where available, the PVA also applied greater sage-grouse demographic data, as needed (GSRSC 2005, p. 169). We believe it is appropriate to apply greater sage-grouse data where Gunnison sage-grouse data are not available or limited. However, this may weaken inferences in assessing the viability of Gunnison sage-grouse due to the species' unique behavioral and genetic characteristics (Young *et al.* 2000b, entire) and potentially different vital rates, such as annual survival (Davis 2012, p. 63) and nesting success rates (Davis 2012, p. 11). In contrast, another more recent PVA applied only Gunnison sage-grouse demographic data (Davis 2012, entire) (see Davis Population Viability Analysis), and thus it is likely more reliable in terms of assessing the viability of the species.

This 2005 PVA indicated that, in the absence of additional habitat loss and fragmentation and the factors noted above, stable populations in excess of 500 birds had an extinction risk of less than 5 percent within the next 50 years following the study (that is, through 2055) and may be considered "secure" (GSRSC 2005, p. 170; GSRSC 2005, p. G–21). The PVA found that the probability of the Gunnison Basin population going extinct within the next 50 years was less than approximately 1 percent (GSRSC 2005, p. G–21). The Gunnison Basin population was approximately 3,000 individuals around the time the PVA was developed (2005). If the model were re-run, with approximately 3,978 birds as of 2014, the predicted risk of extinction would be even lower due to this population increase (Phillips 2013, p. 2). This view does not take into account, however, other new information that could be incorporated into an updated model re-run, such as the Gunnison sage-grouse demographic data collected by Davis (2012, entire). The model concluded that the Gunnison Basin population, and therefore the species, is likely to survive over the long term (GSRSC 2005, p. 179), barring catastrophic events such as disease or prolonged drought (assuming a degree of consistency of environmental influences on sage-grouse demography) or a

significant reduction in carrying capacity through habitat loss.

In contrast, the analysis found that small populations (<25 to 50 birds) are at high risk of extinction within the next 50 years (through the year 2055) (assuming some degree of consistency of environmental influences on sage-grouse demography, even if these populations are expected to increase over the long-term (GSRSC 2005, pp. 170 and G–27). A stable population of 50 birds had an extinction probability of 59 percent within the next 50 years; a stable population of 25 birds had an extinction probability of 86 percent within the next 50 years. The analysis also found that the probability of extinction was higher yet for declining populations of this size (GSRSC 2005, p. G–27). However, the model found that augmentation of birds (approximately 10 birds every five years) would considerably reduce the probability of extinction (to near zero) for these smaller populations (GSRSC 2005, pp. 176–179).

Based on the RCP PVA (GSRSC 2005, Appendix G), in the absence of intervention such as translocating of birds, the Cerro Summit-Cimarron-Sims Mesa (74 birds) and Dove Creek (24 birds) populations are currently at high risk of extirpation (GSRSC 2005, pp. 168–179). Likewise, the Poncha Pass population has remained below 50 birds since 1999, and has generally declined over this period (Figure 3), indicating this population is also at high risk of extirpation, based on this PVA. Zero birds were counted at leks in the spring of 2013 for the Poncha Pass population. However, 17 birds were translocated into the population in the fall of 2013, with 16 surviving in the spring of 2014 and 10 more birds were translocated in the spring of 2014 (see Scientific Research and Related Conservation Efforts in Factor B). Considerable translocation efforts from 2010 to 2013 have likely contributed to increased population estimates in the Crawford and Piñon Mesa populations (see Current Distribution and Population Estimates and Trends; and Scientific Research and Related Conservation Efforts). Without the recent increases in bird numbers, Crawford and Piñon Mesa population would likely be at serious risk of population extinction (i.e., around 50 birds and a 59 percent or greater probability of extinction), based on this PVA.

Garton Population Viability Analysis

To estimate population viability, Garton (2005, entire) analyzed trends in abundance for Gunnison sage-grouse populations and the species rangewide

using male lek count data from the preceding 50 years from CPW and the UDWR. Due to inconsistencies in data collection over time, the analysis was conducted for two time periods—long-term lek data collected since 1957 for CPW, and since 1976 for UDWR, through 2005; and short-term lek data from 1995–2005 when sampling methodologies were standardized and became more consistent. Relative population size from past years was calculated by setting the most recent population estimate at the time (in 2005) to 100 and calculating the previous years' population size relative to that, so that it could be viewed as a percentage of the 2005 population level.

Garton's (2005, pp. 3–4) analysis indicated that the rangewide population varied between a low of 40 percent of the 2005 lek count in 1991 and 1993; to a high of 140 percent of the 2005 lek count in 1969. He suggested that unusual counts, which represented at least a 50 percent change in abundance, were preceded or followed by more typical count indices, and that these outlier data probably reflect measurement errors rather than actual changes population size. For instance, lek count data collected for 2005 show a considerable increase in the number of males attending leks, with an approximate 50 percent increase from 2004 estimates of rangewide abundance. This aberration is thought to be the result of unusual weather conditions during that period and, consequently, possible double- or triple-counting of males across multiple lek sites at various elevations (Garton 2005, pp. 2–3, and references therein). Because of this, the analyses were conducted both with and without 2005 data. Including the 2005 data in the long-term analysis (since 1957) resulted in a slightly increasing population trend; without the 2005 count data, the analysis showed a slightly decreasing population trend, which Garton (2005, p. 4) suggested was a better descriptor of observed trends in population estimates. Statistical analyses of the Cerro Summit-Cimarron-Sims Mesa and Dove Creek populations could not be completed due to low lek counts and inconsistencies in sampling over time. Likewise, the small Poncha Pass population was not analyzed because it had been surveyed for only 6 years and the population was augmented with birds from Gunnison Basin during that time.

The long-term analysis (1957–2005) by Garton (2005, entire) found that the rangewide population of Gunnison sage-grouse was stable, neither increasing nor decreasing, during that time period. Annual rates of change were highly

variable, with some of that variability likely attributed to different sampling methods rather than actual population change. The shorter analysis period (1995–2005) yielded the same results, although the variability was reduced, likely due to more consistent data collection methods. Individual populations reflected the trends in the rangewide analysis, in that some populations were slightly increasing and some were slightly decreasing.

As observed in similar analyses conducted for the greater sage-grouse (Connelly *et al.* 2004, entire), density-dependent models appeared to more accurately describe observed population trends in Gunnison sage-grouse. Garton's study suggested an apparent inverse density-dependent pattern of population change in Gunnison sage-grouse, resulting in a low probability (less than 1 percent) that the population will decline to low abundances (below 25 percent of the 2005 population index), provided environmental factors (e.g., catastrophic drought, disease, continuing habitat loss) do not reduce equilibrium population size or increase the variability in population change (Garton 2005, pp. 4–5).

Of the populations studied, Gunnison Basin and Piñon Mesa showed slightly increasing trends in abundance of Gunnison sage-grouse; San Miguel Basin, Crawford, and Monticello showed slightly decreasing trends in abundance from 1995 to 2005 (Table 13 below). The short-term analysis (1995–2005) indicated that the San Miguel Basin population was declining rapidly, as much as a 10 percent decline per year, though there was uncertainty in this prediction due to possible sampling errors. Declines were also evident in the Monticello population.

TABLE 13—SUMMARY OF POPULATION TRENDS FOR THE GUNNISON SAGE-GROUSE FROM 1995 TO 2005 (GARTON 2005, ENTIRE)

[Values are the finite rate of change in the population, where 1 is no change, numbers less than 1 indicate a decline, and numbers greater than 1 indicate an increase]

| Population | Finite rate of change 1995–2005 |
|---|---|
| Gunnison Basin | 1.05 |
| Piñon Mesa | 1.09 |
| San Miguel Basin | 0.902 |
| Crawford | 0.999 |
| Monticello | 0.99 |
| Rangewide | 1.049 |

Six peer reviewers evaluated the report by Garton (2005, entire). We received comments from five of the

reviewers, three generally favorable towards the report and its conclusions and two expressing concerns regarding limitations in the data sets, assumptions, and/or analyses. For example, one would have to assume that habitat availability over time would remain stable in order to conclude that Gunnison sage-grouse numbers are unlikely to experience a decline in the future. Also, while the conclusions showed that the number of males per lek remained relatively stable over time, the proportion of leks on which males were counted appeared to have declined, which could be indicative of population declines. Peer reviewers also recommended that more appropriate statistical tests would need to be applied to come to any conclusion about potential population trends and that emphasis should be on an independent analysis of each geographically isolated population because each population exhibits independent population dynamics. Population trend analyses were conducted on a population basis as well as rangewide. There was concern expressed that habitat loss over time was not accounted for, that population declines would go unnoticed, and that population trends would appear far too optimistic.

Davis Demographic Study and Population Viability Analysis

The Davis PVA (2012, entire) utilized demographic data specific to Gunnison sage-grouse populations and incorporated other variables such as extreme weather, fire, disease, and predation known to affect survival and reproduction rates in Gunnison sage-grouse. This is in contrast to the RCP PVA (GSRSC 2005, Appendix G) which combined greater and Gunnison sage-grouse demographic data and did not account for environmental variation (fire, disease, predation) other than simulating a 3-year drought resulting in increased mortality; and the Garton PVA (Garton 2005, entire) which only examined lek count-based population estimates and trends to estimate viability. To estimate and project Gunnison sage-grouse population trends, Davis (2012, pp. 1, 18) conducted a demographic study of the Gunnison Basin and San Miguel populations, the two largest populations. CPW acknowledged that this study represents the most current and longest set of demographic data collected for Gunnison sage-grouse (Phillips 2013, p. 2). Demographic parameters (survival and reproduction rates) from both populations collected from 2005 to 2010 were used to estimate population size and viability over the

next 30 years (Davis 2012, p. 79). These demographic data were combined with longer-term lek count data from 1996 to 2011 (lek count protocols were standardized in 1996 (GSRSC 2005, p. 46)) in the Gunnison Basin to model that population. The purpose of the model (i.e., an integrated model that combined the two datasets) was to reduce potential weaknesses and biases in both datasets—high variability and uncertainty with the lek count data, and the small sample size of the shorter-term demographic data—thereby statistically improving estimates and predictions (Davis 2012, pp. 125–126). Key methods and findings of this study are summarized below.

The demographic component of the study found no apparent difference in nest success rates or adult survival between the San Miguel and Gunnison Basin populations (Davis 2012, p. 37). However, the results may be due in part to the limited duration and small sample size of the study, especially in the San Miguel population (Davis 2012, p. 92). Nest success from 2005 to 2011 varied widely between 21 and 60 percent, with an average of 39 percent (Davis 2012, p. 9). Contrary to expectations, nest site vegetation characteristics did not have a strong influence on nest success in the Gunnison Basin and San Miguel populations (Davis 2012, p. 10). Temporal factors appeared to have the greatest influence on nesting success, as earlier season nesting tended to be more successful than later season nesting, and the longer that incubation occurred, the greater the risk of nest failure (Davis 2012, p. 1). No yearlings were observed in the San Miguel population during the study (Davis 2012, p. 12).

Juvenile recruitment was also evaluated within and between the two populations (Davis 2012, p. 27). Chick survival (hatching to 30 days of age) was higher in the Gunnison Basin than the San Miguel population (Davis 2012, p. 44). Although sample size in the San Miguel Basin was small (eight chicks were studied), none survived to 30 days of age, meaning no recruitment (survival of bird from hatching to breeding age) occurred over a 4-year period (Davis 2012, p. 37). Of 282 chicks studied in the Gunnison Basin, 124 (44 percent) survived to 30 days of age (Davis 2012, pp. 37–38). A slight negative trend in chick survival and stronger negative trend in juvenile survival in the Gunnison Basin population occurred from 2005 to 2010 (Davis 2012, p. 27). Juvenile recruitment declined from 26 percent in 2005 to 5 percent in 2010. These results indicate that lower juvenile recruitment may be

contributing to the study's observed population declines in the Gunnison Basin (birds from the San Miguel population were not included in the juvenile survival analysis, as none survived to 31 days), and that the population may not be as stable as has been suggested. However, study results may be due to the limited sample size (duration) of the study, and a longer study may indicate that declines observed are fluctuations within a larger cyclical time series (Davis 2012, p. 38).

Adult and yearling survival rates were also analyzed within and between the two populations. The effect of harsh winter conditions on these demographic rates was also studied. Male survival rates were lower during the lekking season (March—April), and female survival rates were lower during the nesting and chick rearing season (May–August) (Davis 2012, p. 55). Harsh winters (as indicated by above normal snow depth), which occurred during 2007 and 2008 in the Gunnison Basin, and during 2009 and 2010 in the San Miguel Basin, had minimal effect on Gunnison sage-grouse survival (Davis 2012, pp. 55, 65). The study found no differences in adult and yearling survival between the San Miguel and Gunnison Basin populations. This was surprising, given the apparent decline in bird numbers in the San Miguel population based on lek count estimates, suggesting declines are likely due to reduced recruitment and juvenile survival rates rather than reduced adult survival (Davis 2012, p. 66).

The Davis PVA applied the derived baseline demographic data for survival and reproduction rates to estimate population growth of Gunnison sage-grouse, including an analysis of viability and extinction risk. The study also evaluated the effects of bird translocation efforts on the survival of the San Miguel (destination) population and the Gunnison Basin (source) population (Davis 2012, p. 79, 87). Based on the six years of demographic data collected from 2005 to 2010 in the Gunnison Basin, and four years of demographic data collected from 2007 to 2010 in the San Miguel population, deterministic population models indicated that both the Gunnison Basin and San Miguel populations were declining during those time periods, with more pronounced declines in the latter (Davis 2012, p. 87). For the four years when data was collected in both populations (2007–2010), population growth rates ($\lambda$) ranged from 0.65 to 0.91 in the Gunnison Basin, and 0.52 to 0.68 in the San Miguel population (Davis 2012, pp. 87–88). A $\lambda$ value of 1.0 indicates a stable population; values

less than 1.0 indicate a declining population; and values greater than 1.0 indicate an increasing population. Of the six years of study (2005–2010) in the two populations combined, population growth rates ranged from 0.65 in 2010, to 1.14 in 2006 (Davis 2012, p. 134). Of the six years of study in the Gunnison Basin alone (from 2005 to 2010), four of these years indicated population declines and two years indicated population growth (Davis 2012, p. 87).

Incorporating environmental stochasticity (variability in population growth rates due to external factors such as weather, fire, disease, and predation) and demographic stochasticity (variability in population growth rates due to survival and reproduction rates), model simulations also predicted population declines in the future (Davis 2012, pp. 105–106). Combining the six years of demographic data (2005 to 2010) from both populations, environmental stochastic simulations resulted in a minimum extinction time of 31 years for both populations. *Minimum extinction time* is the earliest time at which population extinction occurred among the various modeled simulations in this study. This is in contrast to the *mean extinction time,* the average time of all modeled simulations at which population extinction occurred. Mean or expected extinction time in this PVA for the Gunnison Basin population is 58 years (Davis 2012, p. 137). Davis also (2012, p. 92) noted, however that if the study had been conducted just a few years earlier or later, a different trend across time could have resulted, because it was based on a 6-year period of time when the population was experiencing a slight decline.

Assuming and incorporating an additional year of increasing, constant, or declining population growth into these simulations to model demographic stochasticity resulted in minimum extinction times of 41, 29, and 20 years, respectively for both populations combined (Davis 2012, p. 88). Additionally, the extinction risk (i.e., proportion of simulations that went extinct within 30 years) was substantially larger for San Miguel than for Gunnison Basin (0.53 for San Miguel, 0 for Gunnison Basin) (Davis 2012, p. 88). Demographic stochastic simulations for the Gunnison Basin population approached extinction, but none went extinct over the 30-year period. Therefore, the estimated extinction risk was 0.00 for the Gunnison Basin population over this period, indicating a low probability of extinction over the next 30 years due to demographic stochasticity alone (Davis

2012, pp. 88, 106). However, looking further out, demographic stochastic simulations resulted in mean extinction time of 58 years for the Gunnison Basin population, without removing any birds for translocation efforts (removal of birds decreased the mean extinction time) (Davis 2012, pp. 111, 137). These demographic projections indicate the Gunnison Basin population is relatively stable, but may be in decline (Davis 2012, p. 137–138). However, see discussion involving the integrated model below. Additionally, Davis also (2012, p. 92) noted that if the study had been conducted just a few years earlier or later, a different trend across time could have resulted, because it was based on a 6-year period of time when the population was experiencing a slight decline.

Davis (2012, p. 96) also examined the periodic removal of birds from the Gunnison Basin and whether a long-term translocation effort would be sustainable since it could negatively affect the viability of that population depending upon the number of birds translocated each time and the frequency of translocations. Results indicated that, in general, more frequent removal of birds from the source population had a greater effect than removing a larger number less frequently.

If trends observed during the study continue into the future, declines in both the San Miguel and Gunnison Basin populations are expected to occur over the next 30 years (i.e., by 2042). However, the results may be due in part to the limited duration and small sample size of the study (Davis 2012, p. 92) (see also discussion involving the integrated model below.) Davis (2012, pp. 89, 93) indicated that adult survival may be the most important vital rate for steeply declining populations, such as the San Miguel population, while juvenile survival is most important for increasing or slightly declining populations, such as the Gunnison Basin population.

An evaluation of translocation efforts indicated that more frequent translocations would increase population persistence in the San Miguel population, but with negative effects on the Gunnison Basin, or source, population (decreased mean and minimum extinction times) (Davis 2012, p. 91). Frequent translocations would avoid extinction of the San Miguel population, based on the population models, although this would mean maintaining a population of translocated birds (Davis 2012, p. 96). Furthermore, juvenile recruitment in that population would need to be

improved for the population to persist on its own (Davis 2012, p. 97).

To further evaluate population viability, Davis (2012, pp. 125–126) combined baseline demographic data and lek count data from the Gunnison Basin in a separate, integrated population model. Short-term demographic data were combined with long-term lek count data from 1996 to 2011 (16 years) to reduce potential weaknesses in both datasets—high variability and uncertainty with the lek count data and small sample size of the demographic data—with the goal of statistically improving estimates and predictions (Davis 2012, pp. 125–126). Lek count protocols were standardized in 1996 (GSRSC 2005, p. 46); prior to that time, data showed high variability and uncertainty and, therefore, were not included in the analysis (Davis 2012, pp. 139, 143). The analysis indicated that the Gunnison Basin population has declined slightly over the past 16 years, with a mean annual population growth rate of 0.94, with a 95 percent confidence interval of 0.83 to 1.04. This growth range was found to be narrower (more accurate) than growth estimates based on lek count data alone (0.79–1.92, with a mean of 1.04) or demographic data alone (0.65–1.14, with a mean of 0.89) (Davis 2012, p. 134). On average, the population appeared to be relatively stable over the 16-year period, but the end of the time series showed a slight decline (Davis 2012, p. 138). However, it was noted that results of the study are preliminary, and further testing is needed to validate the model (Davis 2012, p. 140).

More recently, incorporating an additional year of lek count data into their integrated model (1996–2012), Davis *et al.* (*in press*) states that the Gunnison Basin population is "slightly declining" and the growth rate of this population has been variable, but is "near stable." The updated growth rate was calculated to be 0.988, with the 95 percent confidence interval also including stable and slightly increasing growth rates (0.893 to 1.079).

Davis (2012, p. 139) cautioned against making conclusions and population estimates based on lek count data collected prior to 1996, due to the data's high variability and uncertainty. The number of lek areas surveyed in Colorado increased beginning in 1996, when lek count protocols were standardized (GSRSC 2005, p. 46), indicating increases in abundance that may not be accurate (Davis 2012, p. 143). Even standardized lek counts show high variability and uncertainty and, therefore, should not be used alone to estimate or project Gunnison sage-

grouse populations (Davis 2012, p. 165). Demographic data showed consistently lower population growth rates than indicated by standardized lek count data, suggesting an imperfect relationship between the two data types. Lek count data sometimes resulted in extremely high values of population growth that were not realistic based on demographic analyses (Davis 2012, pp. 134, 136).

Discussion of All Population Viability Analyses

The most current and comprehensive demographic study and population viability analysis for Gunnison sage-grouse (Davis PVA) indicated that the San Miguel population is showing a decline, and the Gunnison Basin population has been relatively stable over the past 16 years (up to 2011), with a slight decline towards the end of the study period (Davis 2012, entire). Incorporating environmental and demographic stochasticity into the models also predicted declines in both of these populations in the future (Davis 2012, pp. 105–106). Combining demographic data from both populations, environmental stochastic simulations resulted in a minimum extinction time of 31 years (i.e., 2043) for the two populations combined (Davis 2012, p. 88). For the San Miguel population, demographic stochastic simulations indicated a high probability (0.53) of extinction over the next 30 years (2042) (Davis 2012, p. 88). Demographic stochastic simulations for the Gunnison Basin population approached extinction over this period, but none went extinct over the 30-year period (extinction risk of 0.00) (Davis 2012, pp. 88, 106). However, looking further out, demographic simulations resulted in a mean extinction time of 58 years for the Gunnison Basin population (without removing any birds for translocation efforts) (Davis 2012, pp. 111, 137), or by about 2070. Davis (2012, p. 92) noted, however, that if the study had been conducted just a few years earlier or later, a different trend across time could have resulted, because it was based on a 6-year period of time when the population was experiencing a slight decline.

The Davis PVA also suggested that the Gunnison Basin population may not be as stable as previously thought (Davis 2012, p. 38). Based on an integrated analysis of 16 years of lek count and demographic data, the Gunnison Basin population may be declining slightly (Davis 2012, p. 137). Further, based on Davis's findings, we infer that the Gunnison Basin population may not be as large as lek count-based estimates

suggest. Davis (2012, pp. 134, 136) found that lek count data resulted in extremely high values of population growth that were not realistic based on demographic data for the Gunnison Basin population. Davis 2012 (p. 138) and Davis *et al. in press* state, however, that the Gunnison Basin population has shown only a slight decline since 1996, which they also describe as currently being "relatively stable" and "near-stable."

In contrast, the earliest population viability analysis for Gunnison sage-grouse from the RCP (GSRSC 2005, Appendix G) indicated a low probability of extinction (less than 1 percent) for the Gunnison Basin population (with approximately 3,000 birds at the time); and a low extinction risk (less than 5 percent) for smaller populations (more than 500 birds) over the next 50 years (i.e., to 2055) (GSRSC 2005, p. G–21). This model concluded that the Gunnison Basin population, and therefore the species, is likely to survive over the long term (GSRSC 2005, p. 179). We are concerned, however, with the reliability of the estimated extinction probabilities and conclusions from this study, for reasons noted above and as follows. Applying the extinction probabilities from this study, some satellite populations would have been considered relatively secure in recent years based on estimated abundance. For example, the San Miguel and Monticello populations, with approximately 200 to 400 birds or more in recent years (see Figure 3), would have had a relatively low risk of extinction over the 50 years ending in 2055 according to the RCP PVA. However, these populations have declined since 2005 (Figure 3; also see Relevant Species Information in this section) to a point that their survival and long-term viability is currently at risk. This suggests that the extinction risk for individual Gunnison sage-grouse populations, including the Gunnison Basin, and the entire species is higher than was estimated in this study (i.e., the study may have overestimated the viability of Gunnison sage-grouse). This PVA combined greater and Gunnison sage-grouse demographic data and did not account for environmental variation (such as fire, disease, and predation), in contrast to the Davis PVA.

Long-term (1957–2005) and short-term analyses (1996–2005) from Garton (2005, entire) found that the rangewide population of Gunnison sage-grouse was generally stable, neither increasing nor decreasing during that time period. Accordingly, some populations were declining and some were increasing.

The study did not estimate extinction probabilities. We are concerned with the current relevance of the Garton (2005, entire) study, however, as nine additional years of lek count data have become available since the study was conducted. These new lek count data, combined with other data from 1996 to 2010 (per Davis 2012, entire), provide a more precise estimate of population levels and trends than from information that was available in 2005. As discussed earlier, lek count protocols were first standardized in 1996 (GSRSC 2005, p. 46), and lek count data collected prior to that year were prone to high variability and uncertainty (Davis 2012, p. 139). Based on lek count population estimates, relatively stable trends in the Gunnison Basin population 1996 to 2014 match that of the findings in Garton (2005, entire). However, a relatively stable rangewide population, as indicated by Garton (2005, entire), is not supported by recent declines in several of the satellite populations from 1996 to 2014 (Figure 3; also see Relevant Species Information above). The apparent rangewide stability of Gunnison sage-grouse under the 2005 Garton PVA is influenced primarily by the largest population (the Gunnison Basin—about 63 percent of the species' range) (Figure 2). However, based on overall declining trends in several of the satellite populations (encompassing about 37 percent of the species' occupied range; and 16 percent of the known birds), as well as the questions raised by the Davis PVA regarding the long-term stability of the Gunnison Basin population, we do not agree that the species is stable rangewide. Finally, in contrast to the Davis PVA, the Garton PVA only examined lek count-based population estimates and trends to estimate viability, and did not consider demographic or environmental factors or stochasticity.

Each of these population viability models has its own limitations and weaknesses, as described above. Again, a PVA does not predict the real or absolute risk of extinction for a species or population, only their relative extinction risk under various scenarios, and thus should be interpreted and applied with caution. Further, the available PVAs for Gunnison sage-grouse have resulted in somewhat disparate findings. The two earlier PVAs (GSRSC 2005, entire; Garton 2005, entire) collectively suggest most Gunnison sage-grouse populations are relatively stable and that the species is likely to persist into the future, attributable primarily to the large size and apparently stable trend of the

Gunnison Basin population. On the other hand, the Davis model (2012, entire) showed that the second largest population, the San Miguel population, is at risk of extinction, with 53 percent of model simulations reaching extinction in the next 30 years (by 2042) (Davis 2012, p. 88), and that even the largest Gunnison Basin population is declining with a mean extinction time of 58 years from now, or by about 2070, due to demographic stochasticity alone (Davis 2012, pp. 111, 137). Davis (2012, p. 92) noted, however, that if the study had been conducted just a few years earlier or later, a different trend across time could have resulted, because it was based on a 6-year period of time when the population was experiencing a slight decline. Based on recent population trend data and related information, we identified concerns with the two earliest PVAs and their current relevance and reliability for assessing the status of Gunnison sage-grouse now and in the future.

For the reasons stated above and here, we find that Davis (2012, entire) and Davis *et al.* (*in press*) represent the most current and best available scientific information regarding the viability of Gunnison sage-grouse. We recognize that absolute extinction probabilities provided in the Davis PVA are uncertain. However, based on that study (Davis 2012, entire), the survival and persistence of the San Miguel population appears to be at risk, with a 53 percent chance of extinction by about 2042. Based on this finding, it is reasonable to assume that the viability of the remaining satellite populations is also at similar risk due to their small size, though we recognize that environmental, demographic, genetic, and other factors likely vary between populations, and that these differences will influence survival and viability rates. Due to demographic fluctuations alone, the Davis PVA also indicated that the Gunnison Basin population's viability is at risk in the future, with a mean extinction time of 58 years, or by about 2070.

### Resiliency, Redundancy, and Representation

In this section, we synthesize the information above to evaluate resiliency, redundancy, and representation as they relate to the viability of Gunnison sage-grouse. *Resiliency* refers to the capacity of an ecosystem, population, or organism to recover quickly from disturbance by tolerating or adapting to changes or effects caused by a disturbance or a combination of disturbances. *Redundancy,* in this context, refers to

the ability of a species to compensate for fluctuations in or loss of populations across the species' range such that the loss of a single population has little or no lasting effect on the structure and functioning of the species as a whole. *Representation* refers to the conservation of the diversity of a species, including genetic makeup.

Small population sizes, declining population trends, low genetic diversity, geographic isolation, and overall low viability (see preceding discussions in this section) indicate that long-term persistence and evolutionary or adaptive potential are compromised in the six satellite populations. This, in turn, suggests that resiliency is very low in the satellite populations, meaning they are less likely to tolerate or adapt to the changes and effects from current and future threats (see discussions in Factors A through C, and E). For example, drought conditions from 1999 through about 2003 (with residual effects lasting through about 2005) were closely associated with reductions in the sizes of all Gunnison sage-grouse populations (CDOW 2009b, entire; CPW 2013c, p. 9) (Figures 2 and 3) and lower nest success (CPW 2013c, p. 2). To date, most of the smaller satellite populations have not rebounded from declines around that time (Figure 3) (see Drought and Extreme Weather in this Factor E discussion below).

In contrast, resilience currently appears to be relatively high in the Gunnison Basin population, likely due to a large effective population. For instance, drought has coincided with declines in the Gunnison Basin population (CDOW 2009b, entire; Figure 2), including declines at many of the lek complex areas (USFWS 2013c, pp. 1–2), but the population has since rebounded to pre-drought levels (see Drought and Extreme Weather in this section below for a detailed discussion). However, as the effects from drought, climate change, disease, and other substantial threats increase in the future, it is uncertain whether resilience in this population will be sufficient to offset declines (see Drought and Extreme Weather (Factor E) discussion below), Climate Change (Factor A), and Disease (Factor C)). As discussed earlier, model simulations of environmental and demographic stochasticity (natural fluctuations) resulted in extinction of the Gunnison Basin population in 31 years (minimum extinction time) and 58 years (mean extinction time), respectively. This analysis suggested the Gunnison Basin population may not be as stable (i.e., resilient) as previously thought (Davis 2012, entire) (see Davis Population Viability Analysis in this

Factor E analysis). Davis also (2012, p. 92) noted, however, that if the study had been conducted just a few years earlier or later, a different trend across time could have resulted, because it was based on a 6-year period of time when the population was experiencing a slight decline.

While population redundancy currently exists across the species' range, the best available information indicates the six satellite populations are at risk of extirpation in approximately 30 years (see preceding discussions in this section). Maintaining multiple satellite populations is important to the long-term viability of Gunnison sage-grouse because they: (1) Increase species abundance rangewide; (2) minimize the threat of catastrophic events to the species since the populations are widely distributed across the landscape; and (3) provide additional genetic diversity not found in the Gunnison Basin (GSRSC 2005, p. 199). With the loss of any population, population redundancy will be lowered, thereby decreasing the species' chances of survival in the face of environmental, demographic, and genetic stochastic factors and catastrophic events (extreme drought, fire, disease, etc.). Therefore, multiple populations across a broad geographic area are required to provide insurance against catastrophic events, and the aggregate number of individuals across multiple populations increases the probability of demographic persistence and preservation of overall genetic diversity by providing an important genetic reservoir (representation) (GSRSC 2005, p. 179).

Five physiographic zones or divisions are recognized in the Gunnison Basin population area for the purposes of monitoring and management actions (CSGWG 1997, pp. 6–7). It has been suggested that these zones represent subpopulations, or relatively discrete breeding populations, and that they provide adequate population redundancy and insurance against environmental disturbances such as drought (CPW 2013c, pp. 2, 9–10; Gunnison County 2013a, pp. 137–138; 169–170; Gunnison County 2013b, p. 43). In this rule (see Drought and Extreme Weather in this Factor E analysis), we present information which indicates that, while some local redundancy may exist in the Gunnison Basin population, it is not at a large enough scale to withstand environmental pressures. While geographic and microclimatic variation in the Gunnison Basin likely provide some degree of local variation and, perhaps, local population redundancy to resist environmental pressures, past

BLM_0072083

drought has had apparently extensive impacts on this population, as indicated by concurrent negative trends in the majority of lek complexes (see Drought and Extreme Weather in this Factor E analysis). This information suggests that population redundancy in the Gunnison Basin is limited, and is inadequate at the landscape scale necessary to withstand more environmental pressures than those experienced to date, such as prolonged drought, climate change effects, disease, or any combination of those threats.

As discussed above, representation across the species' range is currently low due to apparently isolated populations and limited gene flow. Genetic diversity is highest in the Gunnison Basin population, but low in the studied satellite populations (Oyler-McCance et al. 2005, entire). If population sizes continue declining, genetic diversity will likely decrease as well (see Genetic Risks above in this Factor E analysis).

Based on the information above, we find that resiliency, redundancy, and representation in Gunnison sage-grouse are inadequate overall to ensure the species' long-term viability. In particular, the best available information indicates population redundancy will be more limited in the near future, due to the extirpation of one or more satellite populations, thereby decreasing the species' chances of survival in the face of limiting factors. Current and future threats to the Gunnison Basin population (in particular, see Drought and Extreme Weather (Factor E discussion below), Climate Change (Factor A), and Disease (Factor C)) combined with the probable loss of one or more satellite populations and overall reduction of range indicate the long-term persistence of Gunnison sage-grouse is at risk.

Summary of Small Population Size and Structure

Negative effects on population viability, such as reduced reproductive success or loss of genetic variation and diversity are a concern as populations decline and become smaller or more isolated. Small population size and population structure occur in all of the six satellite populations, or across approximately 37 percent of occupied range for the species (see Relevant Species Information in this section). Lek count data for the last 19 years (1996 to 2014) as a whole indicate that several satellite populations are in decline (despite increases in numbers in some populations in the last several years Figure 3). Integrating lek count data and demographic data, the Gunnison Basin

population, the largest population, may be declining slightly and may not be quite as stable as previously thought (Davis et al. in press; Davis 2012, pp. 134, 38). Furthermore, because lek count data tend to overestimate populations (Davis 2012, pp. 134, 136) the Gunnison Basin population may not be large as has been estimated.

Based on small effective population sizes, the satellite populations are at risk of inbreeding depression and could be losing evolutionary or adaptive potential (Stiver et al. 2008, p. 479). Lower levels of genetic diversity were apparent in studied satellite populations of Gunnison sage-grouse, thought to be the result of small population sizes and a high degree of geographic isolation (Oyler-McCance et al. 2005, entire). All satellite populations sampled were found to be genetically discrete units (Oyler-McCance et al. 2005, p. 635), so their loss would result in a decrease in genetic diversity of the species. The only population currently providing individuals for translocation is the Gunnison Basin population; however, we believe care should be taken to ensure that this population can sustain the loss of individuals required by a long-term translocation program to other populations.

Historically, the satellite populations were larger and better connected through more contiguous areas of sagebrush habitat. The loss and fragmentation of sagebrush habitat between the late 1950's and the early 1990's led to the current isolation of these populations, as indicated by the low amounts of gene flow and isolation by distance (Oyler-McCance et al. 2005, p. 635). Genetic information suggests gene flow is limited between all populations (Oyler-McCance et al. 2005, entire) (see Genetics discussion above in this section).

Available PVAs for Gunnison sage-grouse have resulted in somewhat disparate findings, each with their own limitations or weaknesses. We found that Davis (2012, entire) represents the best available scientific information regarding the viability of Gunnison sage-grouse. This represents the longest and most current demographic study and population viability analysis for Gunnison sage-grouse. Based on that study, the Gunnison Basin and San Miguel populations, the two largest populations, are declining, with more pronounced declines in the latter (Davis 2012, p. 87). The survival and persistence of the San Miguel population, and likely the smaller satellite populations as well, appear to be at risk in the near future. Though we expect the Gunnison Basin population

will persist longer than the satellite populations, Davis (2012, entire) indicated that its future viability is also at risk due to natural environmental and demographic fluctuations.

Small population size, declining population trends, and apparent isolation indicate long-term population persistence and evolutionary potential (i.e., resiliency) are compromised in the satellite populations. In general, while various natural factors would not limit sage-grouse populations across large geographic scales under historical conditions or in larger populations, they may contribute to local population declines or extirpations when populations are small or when weather patterns, habitats, or mortality rates are altered. Multiple populations across a broad geographic area provide insurance against catastrophic events (population redundancy), such as prolonged drought, and the aggregate number of individuals across all populations increases the probability of demographic persistence and preservation of overall genetic diversity by providing an important genetic reservoir (representation) (GSRSC 2005, p. 179). As discussed above, the best available information indicates the viability of the six satellite populations is currently at risk due to small population size and structure, and those cover 37 percent of the species occupied range. Loss of as much as 37 percent of the species' occupied range would impact the species' overall viability. The cumulative effects of ongoing and future threats, such as habitat loss (Factor A) and drought (discussed below), will further contribute to declining and increasingly isolated populations and, ultimately, smaller population size and structure.

Based on the best available information, we determined that resiliency, redundancy, and representation in Gunnison sage-grouse are inadequate, or will be inadequate in the near term, to ensure the species' long-term viability. The best available information indicates population redundancy, in particular, will be limited or compromised in the near term, due to the probable extirpation of one or more satellite populations, thereby decreasing the species' chances of survival in the face of limiting factors. The rangewide cumulative effects of ongoing and future threats (Factors A through C, and E) will further compromise resiliency, redundancy, and representation of the species. Current and future threats to the Gunnison Basin population (in particular, see Drought (Factor E) discussion below), Climate Change

BLM_0072084

(Factor A), and Disease (Factor C)) combined with the probable loss of satellite populations and overall reduction of range indicate the long-term persistence of Gunnison sage-grouse is at risk.

Drought and Extreme Weather

Drought and extreme weather such as severe winters have the potential to impact the survival and, therefore, persistence of Gunnison sage-grouse. Drought is a common occurrence throughout the range of the Gunnison and greater sage-grouse (Braun 1998, p. 148) and is considered a universal ecological driver across the Great Plains region (Knopf 1996, p. 147). Infrequent, severe drought may cause local extinctions of annual forbs and grasses that have invaded stands of perennial species, and recolonization of these areas by native species may be slow (Tilman and El Haddi 1992, p. 263). Drought reduces vegetation cover (Milton *et al.* 1994, p. 75; Connelly *et al.* 2004, p. 7–18), potentially resulting in increased soil erosion and subsequent reduced soil depths, decreased water infiltration, and reduced water storage capacity. Drought also can exacerbate other natural events such as defoliation of sagebrush by insects. For example, approximately 2,544 km² (982 mi²) of sagebrush shrublands died in Utah in 2003 as a result of drought and infestations with the *Aroga* (webworm) moth (Connelly *et al.* 2004, p. 5–11). Sage-grouse are affected by drought through the loss of vegetative habitat components, reduced insect production (Connelly and Braun 1997, p. 9), and increased risk of West Nile virus infections as described in the Factor C discussion above. These habitat component losses can result in declining sage-grouse populations due to increased nest predation and early brood mortality associated with decreased nest cover and food availability (Braun 1998, p. 149; Moynahan *et al.* 2007, p. 1781).

Greater sage-grouse populations declined during the 1930s period of drought (Patterson 1952, p. 68; Braun 1998, p. 148). Drought conditions in the late 1980s and early 1990s also coincided with a period when sage-grouse populations were at historically low levels (Connelly and Braun 1997, p. 8). Although drought has been a consistent and natural part of the sagebrush-steppe ecosystem, drought impacts on sage-grouse can be exacerbated when combined with other habitat impacts, such as human developments, that reduce cover and food (Braun 1998).

Aldridge *et al.* (2008, p. 992) found that the number of severe droughts from 1950 to 2003 had a weak negative effect on patterns of greater sage-grouse persistence. However, they cautioned that drought may have a greater influence on future sage-grouse populations as temperatures rise over the next 50 years, and synergistic effects of other threats affect habitat quality (Aldridge *et al.* 2008, p. 992). Drought has also been shown to have a negative effect on chick survival rates in greater sage-grouse (Aldridge 2005, entire), a key factor in sage-grouse population reproduction, survival, and persistence (GSRSC 2005, p. 173). Populations on the periphery of the range may suffer extirpation during a severe and prolonged drought (Wisdom *et al.* 2011, pp. 468–469). In eastern Nevada, annual recruitment of greater sage-grouse was higher in years with higher precipitation, based on annual precipitation, annual rainfall, and average winter snow depth. Likewise, greater sage-grouse population growth was positively correlated with annual rainfall and mean monthly winter snowpack in the study area. Annual survival of adult male greater sage-grouse was negatively affected by high summertime temperatures (i.e., winter survival rates occurred in years with relatively low maximum temperatures) (Blomberg *et al.* 2012, pp. 7, 9). In contrast, adult survival rates of Gunnison sage-grouse in the Gunnison Basin were not apparently influenced by drought conditions in 2005 (CPW 2013c, p. 9; Davis 2012, p. 55).

Drought conditions from 1999 through about 2003 (with residual effects lasting through about 2005) were closely associated with reductions in the sizes of all populations of Gunnison sage-grouse (CDOW 2009b, entire; CPW 2013c, p. 9) (Figures 2 and 3) and lower nest success (CPW 2013c, p. 2). The driest summer on record in the Gunnison Basin occurred in 2002 (Gunnison County 2013a, pp. 112, 141). Based on population trends from lek count data, the Gunnison Basin population declined by about 30 percent from 2001 to 2003, but has since rebounded to pre-drought numbers (USFWS 2013c, p. 1; Figure 2). Therefore, larger populations of Gunnison sage-grouse may be capable of enduring moderate or severe, but relatively short-term, drought. However, to date, most of the smaller satellite populations have not rebounded from declines around that time (Figure 3). This information highlights the potential significance of drought and its influence on Gunnison sage-grouse

populations. It also indicates that resiliency is currently limited in the satellite populations (see Resiliency, Redundancy, and Representation). The small sizes of the satellite populations of Gunnison sage-grouse make them particularly sensitive to stochastic and demographic fluctuations, and this vulnerability is intensified by drought (GSRSC 2005, p. G–22).

Overall, habitat appeared to be negatively affected by drought conditions across a broad area of the Gunnison sage-grouse's range from 1999 through about 2003, though those effects varied by population area (see our April 18, 2006, finding (71 FR 19954) for a detailed discussion). Defoliation and mortality of sagebrush plants, and the loss of grass and forb understories, was reported in 2003 across the range of Gunnison sage-grouse (GSRSC 2005, p. 143, and references therein), and in 2013 in the Gunnison Basin and Dry Creek Basin area of the San Miguel population (CPW 2013c, p. 10, and references therein). However, the reduction of sagebrush density, allowing for greater herbaceous growth and stimulating the onset of sagebrush seed crops, may have been beneficial to sagebrush habitats in certain areas over the long term (GSRSC 2005, p.143; CPW 2013c, p. 10). Nonetheless, as indicated by declining Gunnison sage-grouse populations during and following drought periods, the negative impacts of drought appear to outweigh any positive effects.

The above information indicates that regional drought that operated at large enough scales to impact all populations of Gunnison sage-grouse past. Furthermore, it appears that past drought has had broad-scale, measurable impacts on even the Gunnison Basin population, despite its larger geographic area and population size. Figure 4 below shows changes in high male sage-grouse counts at lek complexes in the Gunnison Basin from 2001 to 2003. Based on lek count data, the largest declines in the Gunnison Basin occurred during this time (Figure 2). Of 25 total lek complexes in the Gunnison Basin (not including leks where no birds were observed or where counts did not occur), approximately 68 percent declined from 2001 to 2003, including many of the larger complex areas with typically more birds. The largest lek complex in the Gunnison Basin, Ohio Creek, declined by about 34 percent, from 530 birds in 2001 to 348 birds in 2003 (USFWS 2013c, pp. 1–2). The eight lek complexes that remained stable or increased during this period (32 percent of total lek complexes) were typically smaller lek complexes with fewer birds

BLM_0072085

(Lost Canyon, Gold Basin, Iola, North Parlin, and Sugar Creek); or, if larger, only minor increases in bird numbers were observed (Antelope, Hartman Gulch, Eagle Ridge) (USFWS 2013c, p. 3).



[a] Lek complex, or lek areas, are comprised of several geographically grouped or proximate leks.

[b] Graph does not include lek complexes where no counts occurred or where zero birds were observed from 2001 to 2003. These include Cochetopa Dome, McCabe Lane, Needle Creek, Ninemile, and Willow Creek lek areas.

Figure 4. Change in High Male Counts at Lek Complexes[a] in the Gunnison Basin From 2001 to 2003 (USFWS 2013c, pp. 1–2)[b]

BLM_0072086

While geographic and microclimatic variation in the Gunnison Basin likely provides a degree of local variation and, perhaps, local population redundancy to resist environmental pressures, past drought had apparent widespread impacts on this population, as indicated by negative trends in the majority of lek complexes during that time. This suggests that population redundancy in the Gunnison Basin is limited, and is inadequate at the landscape scale necessary to withstand more substantial environmental pressures such as prolonged drought, climate change effects, disease, or a combination of those threats. The drought from 2001 to 2003 was severe but relatively short in duration. More severe, prolonged, or frequent drought would likely have more serious impacts. The species' apparent sensitivity to drought effects in all populations, including the Gunnison Basin and across most lek complexes in that population, suggests the species would have limited capacity to withstand or adapt to more significant drought and the interacting effects of climate change, disease, and other threats. Drought is also discussed under the Climate Change (Factor A); and Resiliency, Redundancy, and Representation (Factor E) sections.

Harsh or severe winters appear to have minimal influence on Gunnison sage-grouse survival. Davis (2012, p. 55) evaluated the effect of harsh winter conditions (as indicated by above normal snow depth) on adult and yearling survival rates in the Gunnison Basin and San Miguel populations. The winter of 2007 to 2008 was one of the most severe winters on record in the Gunnison Basin, with snow depths that exceeded records for all but 2 winters in the last 50 years (CPW 2013c, p. 2; Gunnison County 2013a, p. 112). Severe winter conditions during 2007 and 2008 in the Gunnison Basin, and during 2009 and 2010 in the San Miguel Basin, had minimal effect on Gunnison sage-grouse survival in both populations; and, in the Gunnison Basin, the highest nesting success during the study was observed the following spring (Davis 2012, p. 55; CPW 2013c, p. 2).

Data are not available to evaluate whether the observed population declines are due to drought alone. Drought likely intensifies other stressors such as predation (Factor C), invasive plants (Factor A), and fire (Factor A). However, based on the best available information, drought has contributed to substantial declines in all Gunnison sage-grouse populations. Therefore, we conclude that drought is a substantial threat to Gunnison sage-grouse

rangewide, both now and into the future.

*Recreation*

Nonconsumptive recreational activities can degrade wildlife resources, water, and the land by distributing refuse, disturbing and displacing wildlife, increasing animal mortality, and simplifying plant communities (Boyle and Samson 1985, pp. 110–112). Sage-grouse response to disturbance may be influenced by the type of activity, recreationist behavior, predictability of activity, frequency and magnitude, timing, and activity location (Knight and Cole 1995, p. 71). We do not have any published literature concerning measured direct effects of recreational activities on Gunnison or greater sage-grouse, but can infer potential impacts on Gunnison sage-grouse from studies on related species and from research on nonrecreational activities. Displacement of male sharp-tailed grouse has been reported at leks due to human presence, resulting in loss of reproductive opportunity during the time of disturbance (Baydack and Hein 1987, p. 537). Female sharp-tailed grouse were observed at undisturbed leks while absent from disturbed leks during the same time period (Baydack and Hein 1987, p. 537). Disturbance of incubating female sage-grouse could cause displacement from nests, increased predator risk, or loss of nests. Disruption of sage-grouse during vulnerable periods at leks, or during nesting or early brood-rearing could affect reproduction or survival (Baydack and Hein 1987, pp. 537–538).

Recreational use of off-highway vehicles (OHVs) is one of the fastest-growing outdoor activities. In the western United States, greater than 27 percent of the human population used OHVs for recreational activities between 1999 and 2004 (Knick *et al.* 2011, p. 217). Knick *et al.* (2011, p. 219) reported that widespread motorized access for recreation facilitated the spread of predators adapted to humans and the spread of invasive plants. Any high-frequency human activity along established corridors can affect wildlife through habitat loss and fragmentation (Knick *et al.* 2011, p. 219). The effects of OHV use on sagebrush and sage-grouse have not been directly studied (Knick *et al.* 2011, p. 216). However, Gunnison sage-grouse local working groups and conservation plans considered recreational uses, such as off-road vehicle use and biking, to be a risk factor in many areas (see Factor D discussion, Multi-County and Rangewide Efforts).

Recreation from OHVs, hikers, mountain bikes, campers, snowmobiles, bird watchers, and other sources has affected many parts of the range, especially portions of the Gunnison Basin and Piñon Mesa population areas (BLM 2005a, p. 14; BLM 2005d, p. 4; BLM 2009a, p. 36). These activities can result in abandonment of lekking activities and nest sites by Gunnison sage-grouse, energy expenditure reducing survival, and greater exposure to predators (GSRSC 2005).

Recreation is a significant use on lands managed by BLM (Connelly *et al.* 2004, p. 7–26). For example, recreational activities within the Gunnison Basin are widespread, occur during all seasons of the year, and have expanded as more people move to the area or travel there to recreate (BLM 2009a, pp. 36–37). Four wheel drive, OHV, motorcycle, and other mechanized travel has been increasing rapidly. The number of annual OHV registrations in Colorado increased from 12,000 in 1991 to 131,000 in 2007 (BLM 2009a, p. 37). Recreational activities can have direct and indirect impacts to the Gunnison sage-grouse and their habitat (BLM 2009a, p. 36). The Grand Mesa, Uncompahgre, and Gunnison (GMUG) National Forest is the fourth most visited National Forest in the Rocky Mountain Region of the USFS (Region 2), and is the second most heavily visited National Forest on the western slope of Colorado (DEIS Gunnison Basin Federal Lands Travel Management 2009, p. 137). However, it is unknown what percentage of the visits occurs within Gunnison sage-grouse habitat on the Gunnison Ranger District (DEIS Gunnison Basin Federal Lands Travel Management 2009, p. 137). With human populations expected to increase in towns and cities within and adjacent to the Gunnison Basin and nearby populations (see Factor A analysis), the impacts to Gunnison sage-grouse from recreational use will continue to increase.

The BLM, USFS, CPW, and Gunnison County currently close 36 roads at 47 closure points in the Gunnison Basin to all motorized traffic from March 15 to May 15 to minimize impacts during the breeding season. Six road closures by the USFS extend to June 15 to protect nesting Gunnison sage-grouse. These closures limit motorized access to all known leks and adjacent habitats on public lands in the Gunnison Basin (Gunnison County 2013a, pp. 78, 127). While road closures may be violated in a small number of situations, road closures are having a beneficial effect on Gunnison sage-grouse through avoidance or minimization of impacts

BLM_0072087

during the breeding season. Conservation measures from the CCA (BLM 2013b, entire), including road closure and reclamation, seasonal road closures, and over-snow travel area closures during severe winters, are expected to ameliorate impacts from some recreational activities on Federal lands in the Gunnison Basin (see Conservation Programs and Efforts Related to Habitat Conservation section in Factor A for more details).

Dispersed camping occurs at a low level on public lands in all of the population areas, particularly during the hunting seasons for other species. However, we have no information indicating that these camping activities are impacting Gunnison sage-grouse.

Domestic dogs accompanying recreationists or associated with residences can disturb, harass, displace, or kill Gunnison sage-grouse. Dogs, whether under control, on leash, or loose, have been shown to result in significant disturbance responses by various wildlife species (Sime 1999, entire, and references therein). The primary consequence of dogs being off leash is harassment, which can lead to physiological stress as well as the separation of adult and young birds, or flushing incubating birds from their nest. However, we have no data indicating that this activity is impacting Gunnison sage-grouse populations.

Recreational activities as discussed above do not singularly pose a threat to Gunnison sage-grouse. However, there may be certain situations where recreational activities are impacting local concentrations of Gunnison sage-grouse, especially in areas where habitat is already fragmented such as in the six satellite populations and in certain areas within the Gunnison Basin.

*Pesticides and Herbicides*

Insects are an important component of sage-grouse chick and juvenile diets (GSRSC 2005, p. 132 and references therein). Insects, especially ants (Hymenoptera) and beetles (Coleoptera), can comprise a major proportion of the diet of juvenile sage-grouse and are important components of early brood-rearing habitats (GSRSC 2005, p. 132 and references therein). Most pesticide applications are not directed at control of ants and beetles. Insecticides are used primarily to control insects causing damage to cultivated crops on private lands and to control grasshoppers (Orthoptera) and Mormon crickets (*Mormonius sp.*) on public lands.

Few studies have examined the effects of pesticides to sage-grouse, but at least two pesticides have caused direct mortality of greater sage-grouse as a result of ingestion of alfalfa sprayed with organophosphorus insecticides (Blus *et al.* 1989, p. 1142; Blus and Connelly 1998, p. 23). In one case, a field of alfalfa was sprayed with methamidophos and dimethoate when approximately 200 greater sage-grouse were present; 63 of these sage-grouse were later found dead, presumably as a result of insecticide exposure (Blus *et al.* 1989; p. 1142, Blus and Connelly 1998, p. 23). Both methamidophos and dimethoate remain registered for use in the United States (Christiansen and Tate 2011, p. 125), but we found no further records of sage-grouse mortalities from their use. In another case in 1950, rangelands treated with toxaphene and chlordane bait to control grasshoppers in Wyoming resulted in game bird mortality of 23.4 percent (Christiansen and Tate 2011, p. 125). Forty-five greater sage-grouse deaths were recorded, 11 of which were most likely related to the insecticide (Christiansen and Tate 2011, p. 125, and references therein). Greater sage-grouse who succumbed to vehicle collisions and mowing machines in the same area also were likely compromised from insecticide ingestion (Christiansen and Tate 2011, p. 125). Neither toxaphene nor chlordane has been registered for grasshopper control since the early 1980's (Christiansen and Tate 2011, p. 125, and references therein) and thus they are not a threat to Gunnison sage-grouse.

Infestations of Russian wheat aphids (*Diuraphis noxia*) have occurred in Gunnison sage-grouse occupied range in Colorado and Utah (GSRSC 2005, p. 132). Disulfoton, a systemic organophosphate that is extremely toxic to wildlife, was routinely applied to over a million acres of winter wheat crops to control the aphids during the late 1980s. We have no data indicating there were any adverse effects to Gunnison sage-grouse (GSRSC 2005, p. 132). More recently, an infestation of army cutworms (*Euxoa auxiliaries*) occurred in Gunnison sage-grouse habitat along the Utah-Colorado State line. Thousands of acres of winter wheat and alfalfa fields were sprayed with insecticides such as permethrin, a chemical that is toxic to wildlife, by private landowners to control them (GSRSC 2005, p. 132), but again, we have no data indicating any adverse effects to Gunnison sage-grouse.

Game birds that ingested sublethal levels of insecticides have been observed exhibiting abnormal behavior that may lead to a greater risk of predation (Dahlen and Haugen 1954, p. 477; McEwen and Brown 1966, p. 689; Blus *et al.* 1989, p. 1141). Wild sharp-tailed grouse poisoned by malathion and dieldrin exhibited depression, dullness, slowed reactions, irregular flight, and uncoordinated walking (McEwen and Brown 1966, p. 689). Although no research has explicitly studied the indirect levels of mortality from sublethal doses of insecticides (e.g., predation of impaired birds), it was inferred to be the cause of mortality among some study birds (McEwen and Brown 1966 p. 609; Blus *et al.* 1989, p. 1142; Connelly and Blus 1991, p. 4). Both Blus (1951, p. 383) and Blus *et al.* (1989, p. 1142) located depredated sage-grouse carcasses in areas that had been treated with insecticides. Exposure to these insecticides may have predisposed sage-grouse to predation. Sage-grouse mortalities also were documented in a study where they were exposed to strychnine bait used to control small mammals (Ward *et al.* 1942 as cited in Schroeder *et al.* 1999, p. 16). While we do not have specific information on these effects occurring in Gunnison sage-grouse, the effects observed in greater sage-grouse can be expected if similar situations arise within Gunnison sage-grouse habitat.

Cropland spraying may affect populations that are not adjacent to agricultural areas, given the distances traveled by females with broods from nesting areas to late brood-rearing areas (Knick *et al.* 2011, p. 211). The actual footprint of this effect cannot be estimated, because the distances sage-grouse travel to get to irrigated and sprayed fields is unknown (Knick *et al.* 2011, p. 211). Similarly, actual mortalities from insecticides may be underestimated if sage-grouse disperse from agricultural areas after exposure.

Much of the research related to pesticides that had either lethal or sublethal effects on greater sage-grouse was conducted on pesticides that have been banned or have had their use restricted for more than 20 years due to their toxic effects on the environment (e.g., dieldrin). We currently do not have any information to show that the banned pesticides are having negative impacts to sage-grouse populations through either illegal use or residues in the environment. For example, sage-grouse mortalities were documented in a study where they were exposed to strychnine bait used to control small mammals (Ward *et al.* 1942 as cited in Schroeder *et al.* 1999, p. 16). According to the U.S. Environmental Protection Agency (EPA), above-ground uses of the rodenticide strychnine were prohibited in 1988 and those uses remain temporarily cancelled today. We do not know when, or if, above-ground uses will be permitted to resume. Currently, strychnine is registered for use only

below-ground as a bait application to control pocket gophers (*Thomomys* sp.; EPA 1996, p. 4). Therefore, the current legal use of strychnine baits is unlikely to present much of an exposure risk to sage-grouse. No information on illegal use, if it occurs, is available. We have no other information regarding mortalities or sublethal effects of strychnine or other banned pesticides on sage-grouse.

Although a reduction in insect population levels resulting from insecticide application can potentially affect nesting sage-grouse females and chicks (Willis *et al.* 1993, p. 40; Schroeder *et al.* 1999, p. 16), there is no information as to whether insecticides are impacting survivorship or productivity of the Gunnison sage-grouse.

Use of insecticides to control mosquitoes is infrequent and probably does not have detrimental effects on sage-grouse. Available insecticides that kill adult mosquitoes include synthetic pyrethroids such as permethrin, which are applied at very low concentrations and have very low vertebrate toxicity (Rose 2004). Organophosphates such as malathion have been used at very low rates to kill adult mosquitoes for decades, and are judged relatively safe for vertebrates (Rose 2004).

Herbicide applications can kill sagebrush and forbs important as food sources for sage-grouse (Carr 1968 *in* Call and Maser 1985, p. 14). The greatest impact resulting from a reduction of either forbs or insect populations is to nesting females and chicks due to the loss of potential protein sources that are critical for successful egg production and chick nutrition (Johnson and Boyce 1991, p. 90; Schroeder *et al.* 1999, p. 16). A comparison of applied levels of herbicides with toxicity studies of grouse, chickens, and other gamebirds (Carr 1968, *in* Call and Maser 1985, p. 15) concluded that herbicides applied at recommended rates should not result in sage-grouse poisonings.

In summary, historically insecticides have been shown to result in direct mortality of individuals, and also can reduce the availability of food sources, which in turn could contribute to mortality of sage-grouse. Despite the potential effects of pesticides, we could find no information to indicate that the use of these chemicals, at current levels, negatively affects Gunnison sage-grouse population numbers. Schroeder *et al.*'s (1999, p. 16) literature review found that the loss of insects can have significant impacts on nesting females and chicks, but those impacts were not detailed. Many of the pesticides that have been shown to have an effect on sage-grouse have been banned in the United States for more than 20 years. We currently do not have any information to show that either the illegal use of banned pesticides or residues in the environment are presently having negative impacts to Gunnison sage-grouse populations. While the reduction in insect availability via insecticide application has not been documented to affect overall population numbers in sage-grouse, it appears that insect reduction, because of its importance to chick production and survival, could be having as yet undetected negative impacts in populations with low population numbers. At present, however, there is no information available to indicate that either herbicide or insecticide applications pose a threat to the species.

*Contaminants*

Gunnison sage-grouse exposure to various types of environmental contaminants may potentially occur as a result of agricultural and rangeland management practices, mining, energy development and pipeline operations, and transportation of materials along highways and railroads.

We expect that the number of sage-grouse occurring in the immediate vicinity of wastewater pits associated with energy development would be small due to the small amount of energy development within the species' range, the typically intense human activity in these areas, the lack of cover around the pits, and the fact that sage-grouse do not require free standing water. Most bird mortalities recorded in association with wastewater pits are water-dependent species (e.g., waterfowl), whereas dead ground-dwelling birds (such as the sage-grouse) are rarely found at such sites (Domenici 2008, pers. comm.). However, if the wastewater pits are not appropriately screened, sage-grouse may have access to them and could ingest water and/or become oiled while pursuing insects. If these birds then return to sagebrush cover and die, their carcasses are unlikely to be found as only the pits are surveyed.

A few gas and oil pipelines occur within the San Miguel population. Exposure to oil or gas from pipeline spills or leaks could cause mortalities or morbidity to Gunnison sage-grouse. Similarly, given the network of highways and railroad lines that occur throughout the range of the Gunnison sage-grouse, there is some potential for exposure to contaminants resulting from spills or leaks of hazardous materials being conveyed along these transportation corridors. We found no documented occurrences of impacts to Gunnison sage-grouse from such spills, and we do not expect they are a significant source of mortality or threat to the species because these types of spills occur infrequently and may involve only a small area within the occupied range of the species.

*Summary of Factor E: Other Natural or Manmade Factors*

Based on the information above, we find that small population size and structure is a threat to the six satellite populations of Gunnison sage-grouse, both now and into the future. Although genetic consequences of low Gunnison sage-grouse population numbers have not been definitively detected to date, the results from Stiver *et al.* (2008, p. 479) suggest that six of the seven populations may have effective sizes low enough to induce genetic deterioration, and that all seven could be losing adaptive potential. While some of these consequences may be ameliorated by translocations, information indicates the long-term viability of Gunnison sage-grouse is compromised by this situation, particularly when combined with threats discussed in other Factors. Therefore, we have determined that genetics risks related to the small population size of Gunnison sage-grouse are a threat to the species.

Available PVAs for Gunnison sage-grouse have resulted in somewhat disparate findings, each with their own limitations or weaknesses. We found that Davis (2012, entire) represents the best available scientific information regarding the viability of Gunnison sage-grouse. This represents the longest and most current demographic study and population viability analysis for Gunnison sage-grouse. Based on that study, the Gunnison Basin and San Miguel populations, the two largest populations, are declining, with more pronounced declines in the latter (Davis 2012, p. 87). The survival and persistence of the San Miguel population, and likely the smaller satellite populations as well, appear to be at risk in the near future. Though we expect the Gunnison Basin population will persist longer than the satellite populations, Davis (2012, entire) indicated that its future viability is also at risk due to natural environmental and demographic fluctuations.

Small population size, declining population trends, and apparent isolation indicate long-term population persistence and evolutionary potential (i.e., resiliency) are compromised in the satellite populations. In general, while various natural factors would not limit sage-grouse populations across large

geographic scales under historical conditions or in larger populations, they may contribute to local population declines or extirpations when populations are small or when weather patterns, habitats, or mortality rates are altered. Multiple populations across a broad geographic area (population redundancy) provide insurance against catastrophic events, such as prolonged drought, and the aggregate number of individuals across all populations increases the probability of demographic persistence and preservation of overall genetic diversity by providing an important genetic reservoir (representation) (GSRSC 2005, p. 179). As discussed, viability of the six satellite populations is currently at risk, and those cover 37 percent of the species occupied range. Loss of as much as 37 percent of the species' occupied range would impact the species' overall viability. The cumulative effects of ongoing and future threats, such as habitat loss (Factor A) and drought (discussed above), will further contribute to declining and increasingly isolated populations and, ultimately, smaller population size and structure.

Based on the best available information, we determined that resiliency, redundancy, and representation in Gunnison sage-grouse are inadequate, or will be inadequate in the future, to ensure the species' long-term viability. The best available information indicates population redundancy, in particular, will be limited or compromised in the future, due to the probable extirpation of one or more satellite populations, thereby decreasing the species' chances of survival in the face of limiting factors. The rangewide cumulative effects of ongoing and future threats (see discussions in Factors A through C, and E) will further compromise resiliency, redundancy, and representation of the species. Current and future threats to the Gunnison Basin population (in particular, see Drought, Climate Change, and Disease sections) combined with the probable loss of one or more satellite populations and overall reduction of range indicate the long-term persistence of Gunnison sage-grouse is at risk.

While sage-grouse have evolved with drought, population trends suggest that drought is at least correlated with, and likely an underlying cause of, observed declines. We found that drought is a current and future threat to Gunnison sage-grouse. Based on the best available information, pesticides are being used infrequently enough and in accordance with manufacturer labeling such that they are not adversely affecting populations of the Gunnison sage-

grouse. The most likely impact of insecticides on Gunnison sage-grouse is the reduction of insect prey items. However, we could find no information to indicate that use of insecticides, in accordance with their label instructions, is a threat to Gunnison sage-grouse. We similarly do not have information indicating that contaminants, as described above, are a threat to the species.

**Cumulative Effects From Factors A through E**

Many of the threats described in this finding may cumulatively or synergistically impact Gunnison sage-grouse beyond the scope of each individual threat. For example, grazing practices inconsistent with local ecological conditions alone may only affect portions of Gunnison sage-grouse habitat. However, grazing practices inconsistent with local ecological conditions, combined with invasive plants, drought, and recreational activities may collectively result in substantial habitat decline across large portions of the species' range. In turn, climate change may exacerbate those effects, further diminishing habitat and increasing the isolation of already declining populations, making them more susceptible to genetic deterioration, disease, or catastrophic events such as drought and fire. Drought, a substantial threat to Gunnison sage-grouse rangewide, likely intensifies other threats such as predation, invasive plants, habitat loss, and fire. The impact of residential development is increased by the additional disturbance footprint and area of species' avoidance of other infrastructure such as roads, powerlines, and fences. Further, predation on Gunnison sage-grouse may increase as a result of the increase in human disturbance and development. The impact of residential development can be increased by other anthropogenic stressors resulting in habitat loss and decline, such as powerlines, roads, and other infrastructure. Numerous threats are likely acting cumulatively to further increase the likelihood that the species will become extinct in the future. The cumulative effects of ongoing and future threats (Factors A through E), and small and declining population size and structure, in particular, are likely to further reduce resiliency, redundancy, and representation of the species.

**Determination**

We have carefully assessed the best scientific and commercial information available regarding the past, present, and future threats to the Gunnison sage-

grouse. We consider the five factors identified in section 4(a)(1) of the Act in determining whether the Gunnison sage-grouse meets the Act's definition of an endangered species (section 3(6)) or a threatened species (section 3(20)).

Section 3 of the Act defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range," and defines a "threatened species" as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." Although these statutory definitions are similar, there is a crucial temporal distinction between them. The statutory definition of an "endangered species," a species that "is in danger of extinction," connotes an established, present condition. The statutory definition of a "threatened species," a species that is "likely to become an endangered species within the foreseeable future," connotes a predicted or expected future condition. Thus, a key statutory difference between a threatened and endangered species is the time of when a species may be in danger of extinction, either now (endangered) or in the foreseeable future (threatened).

As a result of new information and comments received on the proposed rule, we have reconsidered our prior determination that the Gunnison sage-grouse is currently in danger of extinction and therefore meets the definition of an "endangered species" under the Act. This reconsideration focuses on the principal threat relied upon in the proposed rule, the threat to the species posed by current residential development and associated infrastructure, especially in the critical Gunnison Basin population area.

In the proposed rule, we reported that the results of a GIS analysis of parcel ownership and development in occupied habitat in Gunnison County indicated that the current level of residential development in this habitat was strongly decreasing the likelihood of Gunnison sage-grouse using 49 percent of this land area as nesting habitat. This analysis was based on a model indicating Gunnison sage-grouse tend to select nest sites in larger landscapes (1.5 km [0.9 mi] radii) with a low density of residential development (Aldridge 2012, p. 10). We considered the results of applying this modeling to the current level of residential development to be particularly concerning given the close link of nesting habitat to early brood rearing habitat and the sensitivity of the species population dynamics during these life history stages. In assessing the

risk posed by current levels of residential development, we also noted that the GSRSC (2005, pp. 160–61) hypothesized that residential density in excess of one housing unit per 1.3 km² (0.5 mi²) could cause declines in Gunnison sage-grouse populations, and that under this hypothesis residential development is limiting the species in approximately 18 percent of its habitat in Gunnison County.

Since our proposed listing rule, we reevaluated residential development and found it to be a current threat to the species as a whole, but that it is a lower magnitude threat to the Gunnison Basin population than we previously thought. Our reevaluation of residential development in the Gunnison Basin (Factor A above) found that human developments in occupied Gunnison sage-grouse habitat in Gunnison County occur and have increased over time. Our overall conclusion, however, was that current development in the Gunnison Basin population area is a threat of low magnitude to the persistence of this Gunnison Basin sage-grouse population. The Gunnison Basin population is currently relatively stable, based on population trends since 1996. It is also the most important population for the species' survival with approximately 63 percent of occupied habitat, approximately 60 percent of the leks, and 84 percent of the rangewide population occurring in Gunnison Basin. Thus the current level of threat of residential development in the Gunnison Basin is not causing the rangewide population to trend towards extinction.

Based on the factors presented in the Residential Development Section above (Factor A), outside of the Gunnison Basin, residential development is likely to have the greatest impact on the San Miguel, Cerro Summit-Cimarron-Sims Mesa, and Poncha Pass populations of Gunnison sage-grouse. For the remaining three Gunnison sage-grouse populations, we found that current residential development may impact individual birds or areas of habitat, but is a threat of low magnitude at the population level at the present time. Although residential development is a current and future threat to the San Miguel, Cerro Summit-Cimarron-Sims Mesa, and Poncha Pass populations, we do not believe that it is a significant threat to the species rangewide such that it meets the definition of an endangered species.

We find that the other factors that we identified as threats in the proposed rule (inadequate regulatory mechanisms, genetic issues and small population sizes, predation, improper grazing management, and the interaction among climate change, invasive plants and drought/weather) are still current threats to the species, but when considered individually and cumulatively with other current threats (including the lower level of the threat of development to the Gunnison Basin population), they do not support a finding that the species is currently in danger of extinction. Based on the preceding analysis, we have determined that Gunnison sage-grouse is not an endangered species as defined in the Act.

However, considering both our analysis of the species' status here and in the proposed listing rule, and new information and comments received following publication of the proposed rule, we find that Gunnison sage-grouse qualifies as a threatened species under the Act because it is likely to become in danger of extinction throughout all of its range in the foreseeable future.

The Act does not define the term "foreseeable future." In a general sense, the foreseeable future is the period of time over which events can reasonably be anticipated. In the context of the definition of "threatened species," the Service interprets the foreseeable future as the extent of time over which the Secretary can reasonably rely on predictions about the future in making determinations about the future conservation status of the species. It is important to note that references to "reliable predictions" are not meant to refer to reliability in a statistical sense of confidence or significance; rather the words "rely" and "reliable" are intended to be used according to their common, non-technical meanings in ordinary usage. In other words, we consider a prediction to be reliable if it is reasonable to depend upon it in making decisions, and if that prediction does not extend past the support of scientific data or reason so as to venture into the realm of speculation.

In considering threats to the species and whether they rise to the level such that listing the species as a threatened or endangered species is warranted, we assess factors such as the imminence of the threat (is it currently affecting the species or, if not, when do we expect the effect from the threat to commence, and whether it is reasonable to expect the threat to continue into the future), the scope or extent of the threat, the severity of the threat, and the synergistic effects of all threats combined. If we determine that the species is not currently in danger of extinction, then we must determine whether, based upon the nature of the threats, it is reasonable to anticipate that the species may become in danger of extinction within the foreseeable future. As noted in the 2009 Department of the Interior Solicitor's opinion on foreseeable future, "in some cases, quantifying the foreseeable future in terms of years may add rigor and transparency to the Secretary's analysis if such information is available. Such definitive quantification, however, is rarely possible and not required for a foreseeable future analysis" (M–37021, January 16, 2009; p. 9). In some specific cases where extensive data are available to allow for the modeling of extinction probability over various time periods (e.g., the PVAs performed on the Gunnison sage-grouse), the Service has provided quantitative estimates of what may be considered to constitute the foreseeable future.

We consider foreseeable future in this final rule to be 40–60 years based on the following:

(1) The most current and comprehensive demographic study and population viability analysis (Davis 2012). In contrast to the RCP PVA described below, this study exclusively used demographic information from Gunnison sage-grouse and included environmental stochastic factors such as fire, disease, and drought. This analysis was done for the Gunnison Basin (2005–2010) and the San Miguel populations (2007–2010), the two largest populations (Davis 2012, entire). The study concluded that the small San Miguel Basin population had a high probability (53 percent chance) of going extinct in the next 30 years. For the Gunnison Basin population, the model found a minimum extinction time of 31 years and a mean extinction time of 58 years, based on a six-year data set during a period with a slightly declining population. However, because the study occurred during a drought period and the overall population declined during this period, which is inconsistent with the long-term record of stability for this population, we are also utilizing the RCP PVA in our consideration of the foreseeable future.

(2) A second population viability analysis done in conjunction with the RCP. This PVA found that small populations of birds (< 25 and 25 to 50 birds) are at a high risk of extinction within the next 50 years (2055) with an 86 percent and 59 percent chance of extinction respectively (GSRSC 2005, pp. 170 and G–27). For the Gunnison Basin population, this PVA found the probability of extinction in the next 50 years was less than 1 percent (GSRSC 2005, p. G–21).

(3) The Gunnison Basin Climate Change Vulnerability Assessment (The Nature Conservancy (TNC) *et al.* 2011,

p. 4), which uses a timeframe of 50 years to project the likely effects of climate change in the Gunnison Basin.

As noted in the proposed listing rule, we anticipate that current threats to the species will increase over time throughout the species' range. Based on the analysis of the listing Factors A–E described above, we now find that the Gunnison sage-grouse is "likely to become endangered throughout all or a significant portion of its range within the foreseeable future" based on the following continuing, new, and increasing threats, which are acting on the species individually and cumulatively, contributing to the challenges faced by Gunnison sage-grouse in the foreseeable future:

(1) Small population size and population structure (Factor E) occur in all of the six satellite populations, or across approximately 37 percent of occupied range for the species. Without concerted management effort, one or more of the satellite populations are likely to go extinct in the next 50 years. Satellite populations are isolated and small, with generally declining trends, low resilience, and low genetic diversity. The small sizes of the satellite populations of Gunnison sage-grouse make them particularly sensitive to stochastic and demographic fluctuations, and this vulnerability is exacerbated by other threats such as drought. Having multiple populations across a broad geographic area (population redundancy) is needed to provide insurance against such catastrophic events.

(2) Gunnison sage-grouse require large areas of sagebrush for long-term persistence, and thus are affected by factors that occur at the landscape scale. Habitat decline, including habitat loss, degradation, and fragmentation of sagebrush habitats (Factor A), is a primary cause of the decline of Gunnison sage-grouse populations. Habitat loss due to residential and infrastructural development (including roads, powerlines, and fences) is a significant threat to Gunnison sage-grouse across its range. Due to habitat decline, the seven individual populations are now mostly isolated, with limited migration and gene flow among populations, increasing the likelihood of population extirpations.

a. Thirty-two percent of occupied Gunnison sage-grouse habitat rangewide is at risk of residential development (Factor A). Residential development is a substantial risk to San Miguel, Poncha Pass, and Cerro-Cimarron-Sims populations, and the effects of residential development will likely reduce connectivity among satellite

populations and potential connectivity between the Gunnison Basin and satellite populations to the west. Although our reevaluation found the threat of current residential development in the Gunnison Basin to be of a lower magnitude than previously thought, we believe that the level of impact and threat from residential development will increase in the Gunnison Basin population in the future.

The collective influences of fragmentation and disturbance from roads (Factor A) reduce the amount of effective habitat, as roads are largely avoided by sage-grouse. Powerlines and fences (Factor A) also fragment habitat and are avoided by sage-grouse. They are also sources of direct mortality through strikes, electrocution, and by attracting and increasing the predator population.

(3) Drought (Factor E) has contributed to substantial declines in all Gunnison sage-grouse populations. Drought likely intensifies other stressors such as predation, invasive plants, and fire. Based on the best available information, we concluded that drought is a substantial threat to Gunnison sage-grouse rangewide, both now and into the future.

(4) Warming is occurring more rapidly in the southwestern region of the United States, including western Colorado, than elsewhere in the country. Based on the best available information on climate change projections over the next 35 years or so, climate change (Factor A) has the potential to alter important seasonal habitats and food resources of Gunnison sage-grouse, the distribution and extent of sagebrush, and the occurrence of invasive weeds and associated fire frequencies. Climate change effects, including increased drought, are predicted in all populations.

(5) West Nile virus (Factor C) is present throughout most of the range of Gunnison sage-grouse. Although the disease has not yet been documented in any Gunnison sage-grouse, it has caused large mortality events and has also caused the deaths of other gallinaceous birds including greater sage-grouse. The effects of drought and increased temperatures will contribute to the prevalence and spread of West Nile virus and, therefore, the exposure of Gunnison sage-grouse to this disease. We concluded that West Nile virus is a future threat to Gunnison sage-grouse rangewide.

(6) The Davis PVA (2012) is the most current and comprehensive demographic study and population viability analysis. This study

exclusively used demographic information from Gunnison sage-grouse and incorporated environmental stochasticity (variability in population growth rates due to external factors such as weather, fire, disease, and predation) and demographic stochasticity (variability in population growth rates due to survival and reproduction rates). Model simulations predicted population declines in the future (Davis 2012, pp. 105–106). Combining the six years of demographic data (2005 to 2010) from both populations, environmental stochastic simulations resulted in a minimum extinction time of 31 years and a mean or expected extinction time in this PVA of 58 years. Although this model shows that the extinction probability for the Gunnison Basin population is farther into the future, it still supports a determination that the species is likely to become endangered in the foreseeable future.

(7) We have found the above-listed factors to be significant threats that are acting on Gunnison sage-grouse populations rangewide and collectively are likely to increase over time. We further examined whether these threats to the Gunnison sage-grouse are adequately addressed by existing regulatory mechanisms (Factor D). We evaluated the adequacy of existing local, State, and Federal plans, laws, and regulations currently in place across the range of the species and determined that while they will help to reduce the negative effects of human development and infrastructure on Gunnison sage-grouse in some respects, and that continuation of these efforts across the species' range will be necessary for conservation of the species, cumulatively the existing regulatory mechanisms are not being appropriately implemented such that land-use practices result in habitat conditions that adequately support the life-history needs of the species. Existing plans, laws, and regulations are not effective at ameliorating the threats resulting from small population size and structure, habitat decline, drought, climate change, and disease as discussed above. Further, while these regulatory mechanisms may help reduce current threats to the species, they are insufficient to fully reduce or eliminate the increase in threats that may act on the species in the future.

(8) Other current and future threats to the species identified in this final rule, including grazing management inconsistent with local ecological conditions, fences, invasive plants, fire, mineral development, piñon-juniper encroachment, large scale water development (all in Factor A); predation

(primarily associated with anthropogenic disturbance and habitat decline)(Factor C); and recreation (Factor E) are acting at a more localized level, and while individually may affect some populations more than others, they do not individually or cumulatively rise to the level of a significant rangewide threat. However, the current impacts of these threats do contribute to the overall status of the species as "likely to become endangered in the foreseeable future". As discussed under the Threat Factors sections above, we also expect that many of these threats will increase in the future.

*Summary of the Threatened Determination*

In summary, multiple threats affecting Gunnison sage-grouse and its habitat are occurring and interacting synergistically, resulting in increasingly fragmented habitat and other threats. We expect all of these threats to increase in the future. The components of human infrastructure, once present on the landscape, become virtually permanent features, fragmenting sagebrush habitats, and resulting in the reduction or elimination of proactive and effective management alternatives. We anticipate other threats such as drought, climate change, invasive species, and fire frequency to increase in the future and to act synergistically to become greater threats to Gunnison sage-grouse. We anticipate renewable energy development, particularly geothermal and wind energy development, to increase in some population areas. Taken cumulatively, the ongoing and future habitat-based impacts in all populations will likely act to fragment and further isolate populations of the Gunnison sage-grouse. As these threats increase, one or more of the satellite populations are likely to go extinct due to small population size, genetic factors, and stochastic environmental events and the remaining populations will become in danger of extinction.

Therefore, we find that Gunnison sage-grouse is likely to become endangered throughout all of its range in the foreseeable future, and thus is a threatened species as defined by the Act.

As noted above, in determining that Gunnison sage-grouse is a threatened species, we also considered ongoing conservation efforts and existing regulatory mechanisms. Based on the best available information (Factor A and Factor D), such conservation efforts are not currently adequate to address the full scope of threats to Gunnison sage-grouse, particularly habitat loss and decline, small population size and

structure, drought, climate change, and disease. While some efforts have provided conservation benefits at the rangewide scale, such as the CCAA and CEs, these and other conservation efforts are limited in scope and therefore limited in their ability to effectively reduce or remove the threats to the species and its habitat across its range. Thus, although ongoing conservation efforts are a positive step toward conserving Gunnison sage-grouse, and some have undoubtedly reduced the severity of certain threats to the species, on the whole we find that current conservation efforts are not sufficient to offset the full scope of threats to Gunnison sage-grouse or prevent the increase in threats that result in the species likely becoming in danger of extinction in the foreseeable future. Therefore, we cannot conclude that the species is not warranted for listing.

Therefore, on the basis of the best available scientific and commercial information, we are listing Gunnison sage-grouse as threatened in accordance with sections 3(20) and 4(a)(1) of the Act.

The Gunnison sage grouse is restricted in its range and the threats occur throughout its range. Therefore, we assessed the status of the species throughout its entire range. Under the Act and our implementing regulations, a species may warrant listing if it is endangered or threatened throughout all or a significant portion of its range. Because we have determined that Gunnison sage-grouse is threatened throughout all of its range, no portion of its range can be "significant" for purposes of the definitions of "endangered species" and "threatened species." See the Final Policy on Interpretation of the Phrase "Significant Portion of Its Range" in the Endangered Species Act's Definitions of "Endangered Species" and "Threatened Species" (79 FR 37577).

**Available Conservation Measures**

Conservation measures provided to species listed as endangered or threatened under the Act include recognition, recovery actions, requirements for Federal protection, and prohibitions against certain practices. Recognition through listing results in public awareness and conservation by Federal, State, Tribal, and local agencies, private organizations, and individuals. The Act encourages cooperation with the States and requires that recovery actions be carried out for all listed species. The protection required by Federal agencies and the prohibitions against certain activities are discussed, in part, below.

The primary purpose of the Act is the conservation of endangered and threatened species and the ecosystems upon which they depend. The ultimate goal of such conservation efforts is the recovery of these listed species, so that they no longer need the protective measures of the Act. Subsection 4(f) of the Act requires the Service to develop and implement recovery plans for the conservation of endangered and threatened species. The recovery planning process involves the identification of actions that are necessary to halt or reverse the species' decline by addressing the threats to its survival and recovery. The goal of this process is to restore listed species to a point where they are secure, self-sustaining, and functioning components of their ecosystems.

Recovery planning includes the development of a recovery outline shortly after a species is listed, and preparation of a draft and final recovery plan. The recovery outline guides the immediate implementation of urgent recovery actions and describes the process to be used to develop a recovery plan. The recovery plan identifies site-specific management actions that set a trigger for a review of the five factors that control whether a species remains endangered or threatened or may be downlisted or delisted, and methods for monitoring recovery progress. Revisions of the plan may be made to address continuing or new threats to the species, as new substantive information becomes available. Incorporating or adapting components of the Gunnison sage-grouse RCP for a recovery outline will be considered. Recovery plans also establish a framework for agencies to coordinate their recovery efforts and provide estimates of the cost of implementing recovery tasks. Recovery teams (composed of species experts, Federal and State agencies, nongovernmental organizations, and stakeholders) are often established to develop recovery plans. When completed, the recovery outline, draft recovery plan, and the final recovery plan will be available on our Web site (*http://www.fws.gov/endangered*), or from our Western Colorado Field Office (see **FOR FURTHER INFORMATION CONTACT**).

Implementation of recovery actions generally requires the participation of a broad range of partners, including other Federal agencies, States, Tribes, nongovernmental organizations, businesses, and private landowners. Examples of recovery actions include habitat restoration (e.g., restoration of native vegetation), research, captive propagation and reintroduction, and outreach and education. The recovery of

many listed species cannot be accomplished solely on Federal lands because their range may occur primarily or solely on non-Federal lands. To achieve recovery of these species requires cooperative conservation efforts on private, State, and Tribal lands.

Funding for recovery actions may be available from a variety of sources, including Federal budgets, State programs, and cost share grants for non-Federal landowners, the academic community, and nongovernmental organizations. In addition, pursuant to section 6 of the Act, the States of Colorado and Utah will be eligible for Federal funds to implement management actions that promote the protection and recovery of the Gunnison sage-grouse. Information on our grant programs that are available to aid species recovery can be found at: *http:// www.fws.gov/grants*.

Please let us know if you are interested in participating in recovery efforts for this species. Additionally, we invite you to submit any new information on this species whenever it becomes available and any information you may have for recovery planning purposes (see **FOR FURTHER INFORMATION CONTACT**).

Section 7(a) of the Act requires Federal agencies to evaluate their actions with respect to any species that is proposed or listed as endangered or threatened and with respect to its critical habitat, if any is designated. Regulations implementing this interagency cooperation provision of the Act are codified at 50 CFR part 402. When a species is listed, section 7(a)(2) of the Act requires Federal agencies to ensure that activities they authorize, fund, or carry out are not likely to jeopardize the continued existence of the species or destroy or adversely modify its critical habitat. If a Federal action may affect a listed species or its critical habitat, the responsible Federal agency must enter into consultation with the Service.

Federal agency actions within the species' habitat that may require consultation as described in the preceding paragraph include management and any other landscape-altering activities on Federal lands administered by the Bureau of Land Management, U.S. Forest Service, and National Park Service; issuance of section 404 Clean Water Act permits by the Army Corps of Engineers; construction and management of gas pipeline and power line rights-of-way by the Federal Energy Regulatory Commission; and construction and

maintenance of roads or highways by the Federal Highway Administration.

The Act and its implementing regulations set forth a series of general prohibitions and exceptions that apply to all endangered and threatened wildlife. The prohibitions of section 9(a)(2) of the Act, codified at 50 CFR 17.21 for endangered wildlife, in part, make it illegal for any person subject to the jurisdiction of the United States to take (includes harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect; or to attempt any of these), import, export, ship in interstate commerce in the course of commercial activity, or sell or offer for sale in interstate or foreign commerce any listed species. Under the Lacey Act (18 U.S.C. 42–43; 16 U.S.C. 3371–3378), it is also illegal to possess, sell, deliver, carry, transport, or ship any such wildlife that has been taken illegally. Certain exceptions apply to agents of the Service and State conservation agencies.

We may issue permits to carry out otherwise prohibited activities involving endangered and threatened wildlife species under certain circumstances. Regulations governing permits are codified at 50 CFR 17.22 for endangered species, and at 17.32 for threatened species. With regard to endangered wildlife, a permit must be issued for the following purposes: for scientific purposes, to enhance the propagation or survival of the species, and for incidental take in connection with otherwise lawful activities.

It is our policy, as published in the **Federal Register** on July 1, 1994 (59 FR 34272), to identify to the maximum extent practicable at the time a species is listed, those activities that would or would not constitute a violation of section 9 of the Act. The intent of this policy is to increase public awareness of the effect of a listing on proposed and ongoing activities within the range of listed species. The following activities could potentially result in a violation of section 9 of the Act; this list is not comprehensive:

(1) Unauthorized collecting, handling, possessing, selling, delivering, carrying, or transporting of the species, including import or export across State lines and international boundaries, except for properly documented antique specimens of these taxa at least 100 years old, as defined by section 10(h)(1) of the Act.

(2) Actions that would result in the loss of sagebrush overstory plant cover or height. Such activities could include, but are not limited to, the removal of native shrub vegetation by any means for any infrastructure construction project; direct conversion of sagebrush

habitat to agricultural land use; habitat improvement or restoration projects involving mowing, brush-beating, Dixie harrowing, disking, plowing, Tebuthiuron (Spike) and other herbicide applications, or prescribed burning; and fire suppression activities.

(3) Actions that would result in the loss or reduction in native herbaceous understory plant cover or height, and a reduction or loss of associated arthropod communities. Such activities could include, but are not limited to, livestock grazing, the application of herbicides or insecticides, prescribed burning and fire suppression activities; and seeding of nonnative plant species that would compete with native species for water, nutrients, and space.

(4) Actions that would result in Gunnison sage-grouse avoidance of an area during one or more seasonal periods. Such activities could include, but are not limited to, the construction of vertical structures such as power lines, fences, communication towers, buildings; motorized and non-motorized recreational use; and activities such as well drilling, operation, and maintenance, which would entail significant human presence, noise, and infrastructure.

Questions regarding whether specific activities would constitute a violation of section 9 of the Act should be directed to the Western Colorado Field Office (see **FOR FURTHER INFORMATION CONTACT**). Requests for copies of the regulations concerning listed animals and general inquiries regarding prohibitions and permits may be addressed to the U.S. Fish and Wildlife Service, Endangered Species Permits, Denver Federal Center, P.O. Box 25486, Denver, Colorado, 80225–0489 (telephone (303) 236–4256; facsimile (303) 236–0027).

Under section 4(d) of the ESA, the Secretary has discretion to issue such regulations as he deems necessary and advisable to provide for the conservation of threatened species. Our implementing regulations (50 CFR 17.31) for threatened wildlife generally incorporate the prohibitions of section 9 of the Act for endangered wildlife, except when a "special rule" promulgated pursuant to section 4(d) of the Act has been issued with respect to a particular threatened species. In such a case, the general prohibitions in 50 CFR 17.31 would not apply to that species, and instead, the special rule would define the specific take prohibitions and exceptions that would apply for that particular threatened species, which we consider necessary and advisable to conserve the species. The Secretary also has the discretion to prohibit by regulation with respect to a

BLM_0072094

threatened species any act prohibited by section 9(a)(1) of the ESA. Exercising this discretion, which has been delegated to the Service by the Secretary, the Service has developed general prohibitions that are appropriate for most threatened species in 50 CFR 17.31 and exceptions to those prohibitions in 50 CFR 17.32. We continue to evaluate the appropriateness of issuing a special rule for the Gunnison sage-grouse in the future.

*Conservation Measures for Gunnison Sage-Grouse Recovery*

We want to work cooperatively with and to support the ongoing conservation efforts of the many public and private partners across the range. Our desire is to build on the important existing conservation efforts of many partners to bring the species to a point where listing will no longer be necessary.

In 2005, the Gunnison sage-grouse Range-wide Conservation Plan (RCP) (Gunnison Sage-grouse Rangewide Steering Committee 2005) identified conservation actions for the Gunnison sage-grouse. In 2013, the counties belonging to the County Coalition for Gunnison sage-grouse indicated that they would work with Colorado Parks & Wildlife (CPW) to update and revise the RCP in the near future to better reflect best available science and conservation progress made to date. Our partners, the counties, and the public asked the Service for our perspective on what conservation actions would be necessary to conserve the Gunnison sage-grouse. In advance of the revision of the RCP, and in advance of recovery planning for the species, the Service gathered the best available information and conferred with our partners to outline conservation recommendations that, if achieved, would improve the Service's confidence in the conservation of Gunnison sage-grouse. The conservation recommendations identified here are intended to update, modify, and build on the conservation strategies in the 2005 RCP and to be discussed in the context of an upcoming revision to the RCP. The approach and actions identified in this section, if completed, would help increase the satellite populations' redundancy to the Gunnison Basin population, thereby increasing the resiliency of the species. The Service further recommends that a recovery strategy include population and habitat targets for the Gunnison Basin and the satellite populations using a scientifically defensible, peer-reviewed approach.

*Targeting Satellite Populations for Conservation Efforts*

The Gunnison Basin is the largest population (approximately 3,978 birds in 2014) and, while showing variation from 1996 to 2014, has been relatively stable. However, redundancy to the Gunnison Basin population is a necessary element to have confidence in the conservation of the Gunnison sage-grouse. Confidence in redundancy provided by a satellite population is based on whether the satellite population is able to withstand perturbations and recover and persist. We recommend developing a recovery strategy that will be built around the resilience of multiple satellite populations to provide redundancy to the Gunnison Basin population.

The total abundance of Gunnison sage-grouse is an important indicator of species-level resiliency. Of the six satellite populations, Poncha Pass and Cerro Summit-Cimarron-Sims Mesa have very low population numbers to the extent that their potential to provide redundancy would be very limited without extraordinary conservation actions taking place over a long period of time. Therefore, to maximize the potential to achieve resilience in the satellite populations that would provide redundancy to the Gunnison Basin population, our initial recommendations for conservation measures focus on the Piñon Mesa, Crawford, San Miguel, and Dove Creek-Monticello satellite populations. In addition, the Service agrees with the RCP assertion that the Cerro Summit-Cimarron-Sims Mesa area is needed for the conservation of Gunnison sage-grouse, as it has and should continue to provide an important habitat linkage to the other satellite populations. However, the Service recommends focusing limited conservation resources on the four larger satellite populations while still protecting the Cerro Summit-Cimarron-Sims Mesa area. This approach should yield the quickest conservation results and improve the resilience of the species as a whole.

*Summary of Service Recommendations*

As soon as possible, we want to work with CPW and UDWR to convene science experts to identify targets for population numbers, habitat acreage, sagebrush cover, and limiting factors for the above-identified satellite populations. Development of the targets will guide recovery efforts and improve confidence in the conservation of the species as they are achieved.

**Overarching Conservation Objectives**

We recommend protections that should apply rangewide and could be achieved on Federal and non-Federal lands.

Protection of Gunnison Sage-Grouse Habitat That Is Currently Occupied, or That Becomes Occupied Through Future Expansion

Any further loss of habitat quality or quantity of habitat will decrease the long-term viability of Gunnison sage-grouse. In addition, current occupied habitat is not of sufficient quality or quantity to provide confidence in conservation of the Gunnison sage-grouse. Therefore the goal should be to protect all habitat that is occupied or that becomes occupied through future expansion from future loss and/or degradation, including temporary degradation related to indirect impacts of surface occupancy and/or disruptive activities.

A 4-mile restriction on surface disturbance (e.g. No Surface Occupancy) for all surface-disturbing activities around a lek should be enforced. If there are circumstances that preclude No Surface Occupancy within 4 miles around a lek, such as existing disturbances, disruptive activities, or valid existing fluid or locatable mineral rights in occupied habitat, permitted activities should follow the mitigation hierarchy of avoiding impact to the degree possible, minimizing impact, and providing compensatory mitigation to offset any unavoidable impacts. In addition, for those areas where No Surface Occupancy is precluded, the following recommendations apply:

• Limit permitted surface disturbances to 1 per section with no more than 3 percent surface disturbance, factoring in existing and new impacts, in that section.

Protect breeding habitat and leks from future loss and/or degradation, including temporary degradation related to indirect impacts of surface occupancy and/or disruptive activities.

• Leks and the area within 0.6 miles must be avoided and protected from surface occupancy and disruptive activities.

○ If avoidance and/or disturbance is not possible due to pre-existing valid rights, adjacent development, or split estate issues, development and/or disruptive activities should only be allowed in non-habitat areas with an adequate buffer to preclude impacts to sage-grouse habitat from noise and other human activities.

Protect nesting habitat from any future loss and/or degradation,

including temporary degradation related to indirect impacts of surface occupancy and/or disruptive activities.

• The area from 1 to 6.5 km (0.6 to 4.0 mi) around a lek must be protected between March 1st and July 15th. Outside of this period, some disturbance may occur, but only if the disturbance does not exceed the disturbance cap, all feasible measures are taken to minimize impacts, and it is determined that the cumulative impact does not negatively affect reproductive success or reduce an individual's physiological ability to cope with environmental stress, and will not in the future.

Protect winter habitat from any future loss and/or degradation, including temporary degradation related to indirect impacts of surface occupancy and/or disruptive activities.

• Winter habitats need to be identified by CPW or UDWR and protected from October 1st to March 1st. If winter habitat and winter refuge areas are not identified, all potential winter habitat must be protected from October 1st to March 1st. Outside of this period, some disturbance may occur, but only if the disturbance does not exceed the disturbance cap, all feasible measures are taken to minimize impacts, and if it is determined that the cumulative impact does not remove or negatively impact the stands of sage-brush necessary for Gunnison sage-grouse winter survival.

Maintain summer brood-rearing habitat. In grazed areas, require grazing management appropriate to local ecological conditions to promote and achieve habitat characteristics representative of healthy sagebrush ecosystems and sage-grouse habitat.

• Areas within 0.4 km (0.25 mi) of known late summer/brood-rearing habitat must be maintained or enhanced to represent habitat characteristics representative of brood-rearing habitats described in the RCP.

Prevent noise disturbance during the breeding season.

• Do not allow any disruptive activities or surface occupancy that will increase noise levels 10 dBa above ambient noise level measured at sunrise at the perimeter of leks during the breeding season (March 1st to May 31st).

Increase Occupied Habitat

Reclaim and restore degraded habitat to meet characteristics of functional, seasonal sage-grouse habitats.

• Existing disturbances should meet reclamation standards that are aimed at restoring disturbances to functional sage-grouse habitat as described in the

RCP and are representative of the pre-disturbance habitat type.

**Range-Wide Mitigation Strategy**

In the Gunnison Basin and the satellite populations, any development and/or disruptive activities in occupied habitat will impact Gunnison sage-grouse. We recommend the development of land-use regulations that prescribe the following mitigation hierarchy of avoid, minimize, and compensate for unavoidable impacts, at the State or local level.

If avoidance of surface disturbance and disruptive activities around leks cannot be achieved, efforts to minimize and compensate for impacts will not offset impacts. Avoidance of direct and/or indirect disturbance of the area within 0.6 miles of existing leks is critical, due to sage-grouse site fidelity (Connelly 2000).

If land use regulations quantify the negative impacts of surface disturbance and disruptive activities on Gunnison sage-grouse and then require an offset that provides a net conservation benefit, that would help ensure that negative impacts do not overshadow conservation efforts. To be effective, mitigation policy must require avoidance of impacts as the highest priority, then minimization of impacts and finally offset of unavoidable impacts through conservation actions.

The San Miguel and Dove Creek-Monticello satellite populations may be impacted by oil and gas development. To manage the potential impact of oil and gas development, mitigation policy should specify best management practices and conservation measures to minimize impacts of oil and gas development to Gunnison sage-grouse and their habitat.

**Conservation Actions Recommended for San Miguel, Dove Creek-Monticello, Crawford, and Piñon Mesa Satellite Populations**

The following are near-term high-priority recommendations for four of the satellite populations.

*Assess Existing Habitat Availability and Quality*

Habitat loss and degradation are recognized as causes of the decline in abundance and distribution of Gunnison sage-grouse. The Service agrees with the 2005 RCP recommendation that Gunnison sage-grouse seasonal habitat should be identified, habitat quality assessed, and changes in habitat monitored over time. If CPW and UDWR identify seasonal habitat types and assess habitat quality, it will improve their ability to identify potential

limiting habitat types and prioritize habitat restoration efforts. The Gunnison Basin Sage-Grouse Habitat Prioritization Tool (HPT) identifies sage-grouse habitat and then discounts the value of the habitat based on distance to structures, roads, and power lines. However, the HPT covers only the Gunnison Basin and does not possess the functionality to determine habitat quality. A tool should be developed for all of the populations to monitor and detect changes to habitat quality and seasonal habitat availability. A habitat mapping tool could help identify where and how to improve habitat quality, prioritize habitat improvement projects, evaluate development threats and protection needs, and adaptively manage Gunnison sage-grouse for the satellite populations.

*Reduce Pinyon-Juniper Encroachment*

Pinyon-juniper encroachment degrades and, if untreated, eliminates sage-grouse habitat. Treatment of phase I and phase II encroachment levels of pinyon-juniper adjacent to occupied habitat is often the quickest and least expensive method to restore sagebrush habitat for sage-grouse. Under the Natural Resource Conservation Service (NRCS) Sage-Grouse Initiative (SGI), a geo-spatial analysis of potential pinyon-juniper removal is being completed for each of the Western Association of Fish & Wildlife Association (WAFWA) sage-grouse Management Zones (MZ). The range of the Gunnison sage-grouse is in MZ VII. Once the analysis is completed for MZ VII, phase I and II encroaching pinyon-juniper should be removed, starting within 6.5 km (4 mi) of occupied habitat and expanding out by 6.5 km (4 mi) as restored habitat is occupied until habitat targets are achieved for each satellite population.

*Road Closures*

Disturbance from roads and vehicular traffic near leks during the breeding season must be reduced and/or minimized. Road closures, seasonal timing restrictions, and proper siting of new roads should be used to eliminate or minimize disturbance. In the Piñon Mesa population, a seasonal closure and time of day restrictions for the section of MS County Road that is directly adjacent to one of the leks will remove a significant source of potential disturbance to that population.

*Grazing Management Appropriate to Ecological Conditions*

Overgrazing that is not appropriate for ecological conditions on the range can lead to habitat degradation. Continued enrollment of ranchers into the NRCS

SGI will improve grazing management. Landowners and land managers who manage cattle on both private and public lands should be encouraged to manage across ownerships for sage-grouse conservation. The Service will consider lands already enrolled in the Candidate Conservation Agreement with Assurances, implementation of NRCS practices on private rangelands that follow Conference Opinion guidance, and lands subject to other programs that require signed commitments to manage grazing appropriate to ecological conditions when assessing the acreage being grazed in a manner appropriate to ecological conditions in a satellite population.

*Prioritize Translocations*

The small population size and structure of the six satellite populations of Gunnison sage-grouse raises concerns about the probability of extirpation of the satellite populations and extinction of the species due to demographic and/or environmental stochasticity. Colorado Parks & Wildlife has indicated that recent translocations have had a positive influence on the population counts seen in 2012–2013. In order to maximize the population augmentation benefits of translocation, the Colorado Parks & Wildlife Trap and Transplant Committee should revise the translocation strategy to allow for prioritization of the Piñon Mesa, Crawford, San Miguel, and Dove Creek–Monticello satellite populations. The revision should address how timing (spring and/or fall), age class (adult or yearling), gender, and quantity of transplants can increase the resilience of the Piñon Mesa, Crawford, San Miguel, and Dove Creek–Monticello satellite populations. CPW should also continue to evaluate the effectiveness of translocation strategies to maximize their effectiveness.

*Protection of Targeted Occupied Habitat*

The Service agrees with the RCP recommendation that 90 percent of habitats currently occupied, or that become occupied through future expansion should be protected through a combination of voluntary agreements, land use planning, conservation easements, fee-title acquisition, or land trades. We would consider a variety of conservation efforts as providing protection of occupied habitat. For example:

BLM Lands With an RMP That Protects Gunnison Sage-Grouse

BLM lands that will be managed under the new range-wide Resource Management Plan (RMP) amendment for Gunnison sage-grouse with sufficient protections can be considered as providing habitat protection.

Candidate Conservation Agreement With Assurances (CCAA)

Private lands already enrolled under the Candidate Conservation Agreement for Gunnison sage-grouse that is administered by Colorado Parks & Wildlife will be considered as providing habitat protection.

Enrollment in the Sage-Grouse Initiative (SGI)

Private lands managed under Conservation Plans that follow the guidance of the Natural Resource Conservation Service's Sage-Grouse Initiative (SGI) will be considered as providing habitat protection.

Enrollment in the Conservation Reserve Program (CRP)

The Service will consider private lands enrolled in the Farm Service Agency's Conservation Reserve Program (CRP) within the Dove Creek–Monticello satellite population as providing habitat protection based on its assessment of the quality of habitat provided by CRP practices.

The CRP State Acres for Wildlife Enhancement (SAFE) program allows continuous sign-up and is designed to address State and regional high-priority wildlife objectives. Producers within a SAFE area can submit offers to voluntarily enroll acres in CRP contracts for 10–15 years. In exchange, producers receive annual CRP rental payments, incentives, and cost-share assistance to establish, improve, connect, or create higher quality habitat. In Colorado, the goal of the Colorado Western Slope Grouse CRP SAFE project is to restore and enhance habitat for the Columbian sharp-tailed grouse, greater sage-grouse, and Gunnison sage-grouse. The project seeks to enroll 12,600 acres in CRP.

Enrollment in CRP is limited by FSA to 25 percent of cropland in a county, unless a waiver is granted. The enrollment caps for the Dove Creek–Monticello satellite population counties are: San Juan County, Utah 33,550 acres; Dolores County, Colorado, 22,152 acres; and San Miguel County, Colorado, 5,404 acres.

Current enrollment in San Juan County is 33,654 acres. Three additions could be made in San Juan County, Utah, to increase the Gunnison sage-grouse conservation value of the CRP program: (1) The addition of a CRP SAFE program targeting Gunnison sage-grouse would make continuous signup available and could also provide additional incentives for landowners;

(2) A waiver to exceed the 25 percent cropland limit to allow increased CRP enrollment and incentive to create Gunnison sage-grouse habitat; and (3) The addition of sagebrush and more forbs to the CRP seed mix would improve Gunnison sage-grouse habitat more quickly than relying on natural reestablishment.

In Dolores County, Colorado, 6,431 acres of occupied habitat and 10,869 acres of potentially suitable habitat are currently enrolled in CRP. In San Miguel County, Colorado, 303 acres of occupied habitat and 4,742 acres of potentially suitable habitat are currently enrolled in CRP. The 2005 RCP identified the lack of sagebrush as an issue and recommends that CRP target establishment of 5,000 acres of sagebrush within 3 miles of leks in Utah and 3,000 acres of sagebrush within 6.5 km (4 mi) of leks in Colorado.

*Protection Under Conservation Easements*

Conservation easements with provisions that protect Gunnison sage-grouse habitat will be considered as providing habitat protection on private lands. The Service recommends that efforts to increase acreage under conservation easements first prioritize areas closest to active leks.

In San Miguel County and Montrose County, new conservation easements should focus on the Miramonte Basin, Iron Mesa, and Gurley Basin.

In the Dove Creek–Monticello population, the majority of occupied habitat is privately owned (87 percent in Dove Creek; 95 percent in Monticello). Conservation easements in the Dove Creek–Monticello population should prioritize landowners participating in the Conservation Reserve Program (CRP), if the habitat is recognized as already providing a high conservation value for the population.

Targeted opportunities under the NRCS Agricultural Conservation Easement Program (ACEP) could play a major role in restoring sagebrush and understory grasses and forbs to provide the protection levels needed for the population persistence.

*Summary*

An updated conservation strategy for the Gunnison sage-grouse should reflect the complexity of the species' biology, the distribution of the species across the landscape, and the diverse stakeholders who are critical to success. The Service will assess not only population and habitat status and trends, but also the degree to which current and projected threats are addressed when determining the confidence in the long-term

conservation of Gunnison sage-grouse. The status and trend of the total population size of Gunnison sage-grouse as well as the status and trend of the Gunnison Basin and satellite populations influence confidence in the resilience and redundancy evaluation. The Service also needs to know that sage-grouse habitat for the satellite populations are of sufficient quality and quantity to support populations with a high likelihood of persistence. Sufficient habitat quality and quantity combined with resilient population levels could provide confidence that the relative extinction risk in the future for the satellite populations is sufficiently low. Finally, an assessment of habitat quality and quantity for all the populations will highlight potential limiting habitat factors and target conservation to efforts that should yield the highest and most expedient impact on Gunnison sage-grouse populations.

### Required Determinations

*National Environmental Policy Act (42 U.S.C. 4321 et seq.)*

We have determined that environmental assessments and environmental impact statements, as defined under the authority of the National Environmental Policy Act (NEPA; 42 U.S.C. 4321 *et seq.*), need not be prepared in connection with listing a species as an endangered or threatened species under the Endangered Species Act. We published a notice outlining our reasons for this determination in the **Federal Register** on October 25, 1983 (48 FR 49244).

*Government-to-Government Relationship With Tribes*

In accordance with the President's memorandum of April 29, 1994 (Government-to-Government Relations with Native American Tribal Governments; 59 FR 22951), Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments), and the Department of the Interior's manual at 512 DM 2, we readily acknowledge our responsibility to communicate meaningfully with recognized Federal Tribes on a government-to-government basis. In accordance with Secretarial Order 3206 of June 5, 1997 (American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the Endangered Species Act), we readily acknowledge our responsibilities to work directly with tribes in developing programs for healthy ecosystems, to acknowledge that tribal lands are not subject to the same controls as Federal public lands, to remain sensitive to Indian culture, and to make information available to tribes.

The Service consulted with the Ute Mountain Ute Tribe (Tribe) on March 26, 2014, regarding the proposed listing of Gunnison sage-grouse and proposed critical habitat designation, and potential impacts to Tribal activities on Pinecrest Ranch (USFWS 2014d, entire). Owned by the Tribe under restricted fee status, Pinecrest Ranch includes 18,749 ac of land in the Gunnison Basin population area west of Gunnison, Colorado, including approximately 12,000 ac of occupied habitat for Gunnison sage-grouse. The consultation was focused primarily on potential exemptions from take of Gunnison sage-grouse on the ranch and exclusion of the ranch from critical habitat designation. In consideration of the information provided by the Tribe and Tribal conservation efforts for Gunnison sage-grouse (see discussion in Factor D), the Service is excluding the ranch from the critical habitat designation (published elsewhere in today's **Federal Register**).

### References Cited

A complete list of references cited in this rulemaking is available on the Internet at *http://www.regulations.gov* and upon request from the Western Colorado Field Office (see **FOR FURTHER INFORMATION CONTACT**).

### Authors

The primary authors of this package are the staff members of the Western Colorado Field Office.

### List of Subjects in 50 CFR Part 17

Endangered and threatened species, Exports, Imports, Reporting and recordkeeping requirements, Transportation.

### Final Regulation Promulgation

Accordingly, we amend part 17, subchapter B of chapter I, title 50 of the Code of Federal Regulations, as follows:

### PART 17—[AMENDED]

■ 1. The authority citation for part 17 continues to read as follows:

**Authority:** 16 U.S.C. 1361–1407; 1531–1544; 4201–4245; unless otherwise noted.

■ 2. Amend § 17.11(h) by adding an entry for "Sage-grouse, Gunnison" to the List of Endangered and Threatened Wildlife in alphabetical order under "Birds" to read as follows:

### § 17.11 Endangered and threatened wildlife.

\* \* \* \* \*

(h) \* \* \*

| Species | | Historic range | Vertebrate population where endangered or threatened | Status | When listed | Critical habitat | Special rules |
|---|---|---|---|---|---|---|---|
| Common name | Scientific name | | | | | | |
| \* | \* | \* | \* | \* | \* | | \* |
| Birds | | | | | | | |
| \* | \* | \* | \* | \* | \* | | \* |
| Sage-grouse, Gunnison. | *Centrocercus minimus.* | U.S.A. (AZ, CO, NM, UT). | Entire ...................... | T | 854 | 17.95(b) | NA |
| \* | \* | \* | \* | \* | \* | | \* |

\* \* \* \* \*

Dated: November 7, 2014.
**Daniel M. Ashe,**
*Director, U.S. Fish and Wildlife Service.*
[FR Doc. 2014–27109 Filed 11–19–14; 8:45 am]
**BILLING CODE 4310–55–P**

BLM_0072098



[Federal Register Volume 79, Number 224 (Thursday, November 20, 2014)]
[Rules and Regulations]
[Pages 69311-69363]
From the Federal Register Online via the Government Printing Office [www.gpo.gov]
[FR Doc No: 2014-27113]


[[Page 69311]]

Vol. 79

Thursday,

No. 224

November 20, 2014

Part III



Department of the Interior


-----------------------------------------------------------------------



Fish and Wildlife Service


-----------------------------------------------------------------------



50 CFR Part 17



 Endangered and Threatened Wildlife and Plants; Designation of Critical
Habitat for Gunnison Sage-Grouse; Final Rule

Federal Register / Vol. 79 , No. 224 / Thursday, November 20, 2014 /
Rules and Regulations

[[Page 69312]]

-----------------------------------------------------------------------

DEPARTMENT OF THE INTERIOR

Fish and Wildlife Service

50 CFR Part 17

[Docket No. FWS-R6-ES-2011-0111; 4500030114]
RIN 1018-AX71


Endangered and Threatened Wildlife and Plants; Designation of
Critical Habitat for Gunnison Sage-Grouse

AGENCY: Fish and Wildlife Service, Interior.

ACTION: Final rule.

-----------------------------------------------------------------------

SUMMARY: We, the U.S. Fish and Wildlife Service (Service), designate
critical habitat for the Gunnison sage-grouse (Centrocercus minimus)
under the Endangered Species Act (Act). In total, approximately
1,429,551 acres (ac) (578,515 hectares (ha)) are designated as critical
habitat in Delta, Dolores, Gunnison, Hinsdale, Mesa, Montrose, Ouray,
Saguache, and San Miguel Counties in Colorado; and in Grand and San
Juan Counties in Utah. The effect of this regulation is to conserve
Gunnison sage-grouse habitat under the Act.

DATES: This rule becomes effective on December 22, 2014.

ADDRESSES: This final rule is available on the internet at http://www.regulations.gov and at the Service's species Web site for Gunnison
sage-grouse, at http://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/. Comments and materials we received, as well as

BLM_0072099

supporting documentation used in preparing this final rule, are available for public inspection at http://www.regulations.gov. All of the comments, materials, and documentation that we considered in this rulemaking will be made available by appointment, during normal business hours at the U.S. Fish and Wildlife Service, Western Colorado Field Office, 445 West Gunnison Ave., Suite 240, Grand Junction, CO 81501; telephone 970-243-2778.

The coordinates from which the critical habitat maps are generated are included in the administrative record for this rulemaking and are available at http://www.regulations.gov at Docket No. FWS-R6-ES-2011-0111, at http://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/, and at the Western Colorado Field Office (see FOR FURTHER INFORMATION CONTACT). Any additional tools or supporting information that we developed for this critical habitat designation will also be available at the Fish and Wildlife Service Web site and Field Office set out above, and may also be included in the preamble and at http://www.regulations.gov.

FOR FURTHER INFORMATION CONTACT: Susan Linner, Western Colorado Supervisor, U.S. Fish and Wildlife Service, Western Colorado Field Office, 445 West Gunnison Ave., Suite 240, Grand Junction, CO 81501; telephone 970-243-2778; facsimile 970-245-6933. If you use a telecommunications device for the deaf (TDD), call the Federal Information Relay Service (FIRS) at 800-877-8339.

SUPPLEMENTARY INFORMATION:

Executive Summary

Why we need to publish a rule. This is a final rule to designate critical habitat for the Gunnison sage-grouse. Under the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 et seq.) (Act), any species that is determined to be an endangered or threatened species requires critical habitat to be designated, to the maximum extent prudent and determinable. Designations and revisions of critical habitat can only be completed by issuing a rule.

Elsewhere in today's Federal Register, we, the U.S. Fish and Wildlife Service (Service), publish a final rule to list the Gunnison sage-grouse as a threatened species under the Act. On January 11, 2013, we published in the Federal Register a proposed rule to designate critical habitat for the species (78 FR 2540). Section 4(b)(2) of the Act states that the Secretary shall designate critical habitat on the basis of the best available scientific data after taking into consideration the economic impact, national security impact, and any other relevant impact of specifying any particular area as critical habitat.

The critical habitat areas we are designating in this rule constitute our current best assessment of the areas that meet the definition of critical habitat for Gunnison sage-grouse. Here we are designating approximately 1,429,551 acres (ac) (578,515 hectares (ha)) in six units in Delta, Dolores, Gunnison, Hinsdale, Mesa, Montrose, Ouray, Saguache, and San Miguel Counties in Colorado, and in Grand and San Juan Counties in Utah.

This rule consists of: A final rule designating critical habitat for the Gunnison sage-grouse. The Gunnison sage-grouse is concurrently being listed as threatened under the Act, in a separate rule elsewhere in today's Federal Register. This rule designates critical habitat necessary for the conservation of the species.

We have prepared an economic analysis of the designation of critical habitat. In order to consider economic impacts, we prepared an analysis of the economic impacts of the critical habitat designations and related factors. We announced the availability of the draft economic analysis (DEA) in the Federal Register on September 19, 2013 (78 FR 57604), allowing the public to provide comments on our analysis. We have incorporated the comments into our analysis and have completed the final economic analysis (FEA) concurrently with this final determination.

Peer review and public comment. We sought comments on our proposed critical habitat rule (as well as our proposal to list the species) from independent and appropriate specialists to ensure that our designation is based on scientifically sound data and analyses. We obtained opinions from five knowledgeable individuals with relevant scientific expertise to review our technical assumptions, analysis, and whether or not we had used the best available information. One peer reviewer concluded that our proposals included a thorough and accurate review of the available scientific and commercial data on Gunnison sage-grouse, but did not provide substantive comments. The remaining four letters provided additional relevant information on biology, threats, and scientific research for the species. Two peer review letters were generally in opposition to the proposals and questioned our rationale and determinations. Information we received from peer review is considered and incorporated as appropriate in this final revised designation. We also considered all comments and information received from the public during each comment period.

Previous Federal Actions

Please see the proposed (78 FR 2486, January 11, 2013) and final listing rules (published elsewhere in today's Federal Register) for a history of previous Federal actions related to Gunnison sage-grouse prior to January 11, 2013.

On January 11, 2013, we published in the Federal Register a proposed rule to list Gunnison sage-grouse as endangered (78 FR 2486), and a proposed rule to designate critical habitat for the species (78 FR 2540). We proposed to designate as critical habitat approximately 1,704,227 acres (689,675 hectares) in seven units located in Chaffee, Delta, Dolores, Gunnison, Hinsdale, Mesa, Montrose, Ouray, Saguache, and San Miguel Counties in Colorado, and in Grand and San Juan Counties in Utah. Those proposals initially had a 60-day

BLM_0072100

[[Page 69313]]

comment period, ending March 12, 2013, but we extended the comment period by an additional 21 days, through April 2, 2013 (78 FR 15925, March 13, 2013).

On July 19, 2013, we extended the timeline for making final determinations on both proposed rules by 6 months due to scientific disagreement regarding the sufficiency and accuracy of the available data relevant to the proposals, and we reopened the public comment period to seek additional information to clarify the issues in question (78 FR 43123). In accordance with that July 19, 2013, publication, we indicated our intent to submit a final listing determination and a final critical habitat designation for Gunnison sage-grouse to the Federal Register on or before March 31, 2014.

On September 19, 2013, we announced in the Federal Register the availability of the draft economic analysis and a draft environmental assessment prepared pursuant to the National Environmental Policy Act (NEPA) for the proposed critical habitat designation, and reopened the public comment period until October 19, 2013 (78 FR 57604). The draft economic analysis (IEc 2013, entire) was prepared to identify and evaluate the economic impacts of the proposed critical habitat designation. We also reopened the public comment period from November 4, 2013, through December 2, 2013, and announced the rescheduling of three public hearings on the proposed listing and critical habitat rules due to delays caused by the lapse in government appropriations in October 2013 (78 FR 65936, November 4, 2013). All substantive information received during all public comment periods related to the critical habitat designation, economic analysis, and environmental assessment have been incorporated directly into the final versions of those documents, or addressed below (see Peer Review and Public Comments).

On February 11, 2014, we announced a 6-week extension to May 12, 2014, for our final decision on our proposed listing and critical habitat rules (USFWS 2014e). This extension was granted by the Court due to delays caused by the lapse in government appropriations in October 2013, and the resulting need to reopen a public comment period and reschedule public hearings. On May 6, 2014, we announced a 6-month extension to November 12, 2014, as approved by the Court, to make our final listing and critical habitat decisions (USFWS 2014f).

Summary of Changes From Proposed Rule

We refined some critical habitat boundaries based the most recent occupied habitat spatial layers by Colorado Parks and Wildlife (CPW). We also modified the unoccupied habitat in the Sanborn Park/Iron Springs area to better match CPW's mapping. We also deleted one unoccupied polygon (Bostwick Park) in the Cerro Summit area based on the low likelihood of this area supporting birds.

Although we previously proposed designating a habitat unit in Poncha Pass, information received since the publication of the proposed rule has caused us to reevaluate the appropriateness of including the unit. Poncha Pass is thought to have been part of the historical distribution of Gunnison sage-grouse. There were no grouse there, however, when a population was established via transplant from 30 Gunnison Basin birds in 1971 and 1972. In 1992, hunters harvested at least 30 grouse from the population when CPW inadvertently opened the area to hunting. We have no information on the population's trends until 1999 when the population was estimated at roughly 25 birds. In one year, the population declined to less than 5 grouse, when more grouse were brought in, again from the Gunnison Basin, in 2000 and 2001. In 2002, the population rose to just over 40 grouse, but starting in 2006, the population again started declining until no grouse were detected in lek surveys in the spring of 2013 (after publication of the proposed critical habitat rule). Grouse were again brought in in the fall of 2013 and 2014 and six grouse were counted in the Poncha Pass population during the spring 2014 lek count (CPW 2014d, p. 2); however, no subsequent evidence of reproduction was found. We now conclude that the Poncha Pass area, for reasons unknown, is not a landscape capable of supporting a population of Gunnison sage-grouse and therefore does not meet primary constituent element (PCE) 1. As a result, we have determined that the Poncha Pass area should not be designated as critical habitat, and have therefore removed this proposed critical habitat unit from the final critical habitat designation.

Based on peer review and public comments and our analysis, this final rule excludes specific properties from the critical habitat designation under section 4(b)(2) of the Act, namely private lands enrolled in the Gunnison Sage-grouse Candidate Conservation Agreement with Assurances (CCAA) as of the effective date of this rule, private lands under permanent conservation easement (CE) as of August 28, 2013 as identified by Lohr and Gray (2013), and private land owned by the Ute Mountain Ute Tribe under restricted fee status that is subject to a species conservation plan as of the effective date of this final rule (see Exclusions). These private land exclusions reduced the total critical habitat designation from 1,621,008 ac (655,957 ha) to 1,429,551 ac (578,515 ha) (see Table 1).

We modified the boundaries of this critical habitat designation around the City of Gunnison. We refined the boundary to leave out areas of medium- to high-intensity development, airport runways, and golf courses. In all other areas, lands covered by buildings, pavement, and other manmade structures, as of the effective date of this rule, are not included in this designation, even if they occur inside the boundaries of a critical habitat unit, because such lands lack physical and biological features essential to the conservation of Gunnison sage-grouse, and hence do not constitute critical habitat as defined in section 3(5)(A)(i) of the Act.

Based on comments and recommendations received by peer reviewers and the public, in this final rule, we refined our

BLM_0072101

description of the PCEs (see Primary Constituent Elements for Gunnison
Sage-grouse) and have provided more detailed background and rationale
for the criteria and methods used to identify and map critical habitat
(see Criteria and Methods Used to Identify and Map Critical Habitat).

[[Page 69314]]

Table 1--Size and Current Occupancy Status of Gunnison Sage-Grouse in Proposed and Final Designated C

| Critical habitat unit | Proposed critical habitat | | | | | Final critical habitat without exclusions | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Ac | Ha | Occupied? | Ac | Ha | Ac | Ha | Occupied? | Ac |
| Monticello-Dove Creek.......... | 348,353 | 14,097 | Yes.............. | 111,945 | 45,303 | 348,949 | 141,214 | Yes.............. | 112,543 |
| | | | No.............. | 236,408 | 95,671 | | | No.............. | 236,405 |
| Pi[ntilde]on Mesa.............. | 245,179 | 99,220 | Yes.............. | 38,905 | 15,744 | 245,925 | 99,522 | Yes.............. | 44,678 |
| | | | No.............. | 206,274 | 83,476 | | | No.............. | 201,247 |
| San Miguel Basin.............. | 165,769 | 67,084 | Yes.............. | 101,371 | 41,023 | 143,277 | 57,982 | Yes.............. | 101,750 |
| | | | No.............. | 64,398 | 26,061 | | | No.............. | 41,526 |
| Cerro Summit-Cimarron-Sims Mesa | 62,708 | 25,334 | Yes.............. | 37,161 | 15,038 | 56,541 | 22,881 | Yes.............. | 37,161 |
| | | | No.............. | 25,547 | 10,339 | | | No.............. | 19,380 |
| Crawford..................... | 97,123 | 3,930 | Yes.............. | 35,015 | 14,170 | 97,124 | 39,305 | Yes.............. | 35,015 |
| | | | No.............. | 62,109 | 25,134 | | | No.............. | 62,109 |
| Gunnison Basin................ | 76,802 | 298,173 | Yes.............. | 592,952 | 239,959 | 729,194 | 295,053 | Yes.............. | 592,168 |
| | | | No.............. | 143,850 | 58,214 | | | No.............. | 137,027 |
| Poncha Pass.................. | 48,292 | 19,543 | Yes.............. | 20,416 | 8,262 | | | Not included in |
| | | | No.............. | 27,877 | 11,281 | | | |
| All Units.................... | 1,704,227 | 689,675 | Yes.............. | 937,765 | 379,499 | 1,621,008 | 655,957 | Yes.............. | 923,314 |
| | | | No.............. | 766,463 | 310,176 | | | No.............. | 697,694 |

a Numbers may not sum due to rounding.

[[Page 69315]]

Peer Review and Public Comments

    In our January 11, 2013, proposed rules for Gunnison sage-grouse
(proposed listing, 78 FR 2486; and proposed critical habitat
designation, 78 FR 2540), we requested written public comments on the
proposals. We requested written comments from the public on the
proposed designation of critical habitat for the Gunnison sage-grouse
during four comment periods, spanning from January 11, 2013, to
December 2, 2013 (see Previous Federal Actions). We also requested
comments on the associated draft economic analysis and environmental
assessment during two of those comment periods (see Previous Federal
Actions). We contacted appropriate State and Federal agencies, county
governments, elected officials, scientific organizations, and other
interested parties and invited them to comment. We also published
notices inviting general public comment in local newspapers throughout
the species' range. From January 11, 2013, to December 2, 2013, we
received a total of 36,171 comment letters on both proposals. Of those
letters, approximately 445 were substantive comment letters; 35,535
were substantive form letters; and 191 were non-substantive comment
letters.
    Substantive letters generally contained comments pertinent to both
proposed rules, although the vast majority of comments were related to
the proposed listing rule. Responses to comments related to the listing
rule are provided in the final rule to list Gunnison sage-grouse as
threatened, published elsewhere in today's Federal Register. Also,
three public hearings were held November 19-21, 2013, in response to
requests from local and State agencies and governments; oral comments
were received during that time (see Previous Federal Actions). All
substantive information related to critical habitat provided during the
comment periods has been incorporated directly into this final rule or
addressed below. For the readers' convenience, we combined similar
comments and responses.

Peer Review

    In accordance with our peer review policy published in the Federal
Register on July 1, 1994 (59 FR 34270), we solicited and received
expert opinion from five appropriate and independent individuals with
scientific expertise on Gunnison sage-grouse biology and conservation.
The purpose of the peer review is to ensure that our decisions are
based on scientifically sound data, assumptions, and analyses, based on
the input of appropriate experts and specialists. We received written
responses from all five peer reviewers. We reviewed all comments
received from the peer reviewers for substantive issues and new
information regarding critical habitat for the Gunnison sage-grouse.
One peer reviewer concluded that our proposals included a thorough and
accurate review of the available scientific and commercial data on
Gunnison sage-grouse, but did not provide substantive comments. The
remaining four letters provided additional relevant information on
biology, threats, and scientific research for the species. Two peer
review letters were generally in opposition to the proposed listing and
critical habitat designation and questioned our rationale and
determinations. All substantive comments from peer reviewers related to
critical habitat are incorporated directly into this final rule or
addressed in the summary of comments below. For the readers'
convenience, similar comments and responses are combined.

Comments From Peer Reviewers

(1) Comment: One peer reviewer commented that we should consider including measures of residual grass cover and height in the assessment of breeding habitat within the PCEs for Gunnison sage-grouse critical habitat.

Our response: As described in this final rule, habitat structural values for breeding habitat (PCE 2) are based on the Gunnison Sage-grouse Rangewide Conservation Plan (RCP) and are considered average values over a given project or area (Gunnison Sage-grouse Rangewide Steering Committee (GSRSC) 2005, p. H-6). This comprises the best available information for breeding habitat requirements of Gunnison sage-grouse. The RCP does not specifically define minimum residual grass cover or height (remaining seasonal residual livestock grazing) or grazing management for breeding habitats. However, the PCE 2 includes habitat structural guidelines that require appropriate and cognizant management (i.e., related to livestock grazing and forage utilization levels) to ensure that adequate residual grass cover and height are achieved and maintained. Thus, we conclude that the PCEs indirectly address residual grass cover and height requirements for Gunnison sage-grouse. This topic is discussed further in the Primary Constituent Elements for Gunnison Sage-grouse section of this final rule.

(2) Comment: A peer reviewer stated that the sagebrush canopy cover and height requirements establishing winter habitat seem high, as compared to greater sage-grouse needs, and given that sagebrush exposed above the snow is the overriding consideration for wintering habitat, and this exposure often occurs in wind-blown areas where sagebrush cover and height are much less than the numbers presented here.

Our response: Winter habitat for Gunnison sage-grouse either has sufficient shrub height to be above average snow depths, or is exposed due to topographic features (e.g., windswept ridges, south-facing slopes) (GSRSC 2005, p. H-3). As described in this final rule, habitat structural values for winter habitat (PCE 4) are specific to Gunnison sage-grouse and its habitat and are based on the RCP and studies that quantified vegetation attributes of winter habitat used by Gunnison sage-grouse (Hupp 1987, entire; GSRSC 2005, pp. H-2 to H-3). These are considered average values over a given project or area (GSRSC 2005, p. H-8). This comprises the best available information for the winter habitat requirements specific to Gunnison sage-grouse. This topic is discussed further in the Primary Constituent Elements for Gunnison Sage-grouse section of this final rule.

(3) Comment: A peer reviewer stated that it is not clear in the proposed rule what methods and criteria were used to identify and map critical habitat, or why.

Our response: In this final rule, we expand our description of the criteria and methods used to identify and map critical habitat and provide detailed rationale for our analysis and approach (see Criteria and Methods Used to Identify and Map Critical Habitat).

(4) Comment: A peer reviewer noted that habitat in Utah at brood location sites did not meet the rangewide structural habitat guidelines (and by extension, do not contain the proposed PCEs), yet brood production, based on small samples sizes, exceeded what was previously reported for Colorado (Young 1994, Apa 2004). The peer reviewer suggested that these habitat differences were an artifact of the hens with broods selecting for Conservation Reserve Program (CRP) fields where sagebrush cover was limited to small patches.

Our response: As indicated in the peer reviewer's information, brood production in the subject study area (areas with lower vegetation structural values than identified by the RCP and our PCEs) was based on a very small sample size--the broods of just three hens were monitored during this study (Lupis 2005, p. 28). Therefore, we cannot conclude from this study that brood production of Gunnison sage-grouse in Utah is higher than observed

[[Page 69316]]

in Colorado, despite lower habitat structural values in the study area.

As described in this final rule, habitat structural values for breeding habitat (PCE 2) are based on the RCP and are considered average values over a given project or area (GSRSC 2005, p. H-6). This comprises the best available information for breeding habitat requirements of Gunnison sage-grouse. Agricultural fields, which include CRP lands, are also included in both PCE 2 and PCE 3, because the best available science indicates that these lands are sometimes used by the species as early brood-rearing and summer-late fall habitat when they are part of a landscape that otherwise encompasses the species' seasonal habitats. We therefore acknowledge the benefits of CRP lands to Gunnison sage-grouse, as habitat provided under this program is generally more beneficial to the species than lands under more intensive agricultural uses such as crop production. Gunnison sage-grouse are known, for example, to regularly use CRP lands in the Monticello population (Lupis et al. 2006, pp. 959-960; Ward 2007, p. 15). In San Juan County, Gunnison sage-grouse use CRP lands in proportion to their availability (Lupis et al. 2006, p. 959). However, CRP lands are generally lacking in the sagebrush and shrub components typically critical to the survival and reproduction of Gunnison sage-grouse and vary greatly in plant diversity and forb abundance (Lupis et al. 2006, pp. 959-960; Prather 2010, p. 32). As such, while these CRP lands are considered critical habitat, they are generally of lower value or quality than native sagebrush habitats. Future section 7(a)(2) consultations regarding the potential effect of a Federal project on critical habitat would take into consideration the value or quality of the affected habitat.

The CRP program is evaluated in our final rule to list Gunnison sage-grouse as threatened, published elsewhere in today's Federal Register.

(5) Comment: A peer reviewer noted that the total area summarized as unoccupied habitat in Table 4 of the proposed critical habitat rule approximates estimates provided by the Utah Division of Wildlife for

BLM_0072103

Utah based on sagebrush cover. The peer reviewer further noted that unoccupied areas north of Highway 491 in Utah approximate rangewide habitat guidelines. However within this area, approximately 30,000 acres would be considered non-habitat (Table 3, San Juan County Working Group 2000) because they are largely dominated by pi[ntilde]on-juniper (Pinus edulis-Juniperus spp.). Therefore, the peer reviewer suggested that many of the areas included in the critical habitat designation may not contain suitable habitat.

    Our response: Unoccupied habitat does not need to contain the PCEs, the standard is instead ``essential for the conservation of the species.'' For occupied habitat at the landscape scale, we consider all areas designated as occupied critical habitat here to meet the landscape specific PCE (1) and one or more of the seasonally specific PCEs (2-5). Although in our final listing rule, published elsewhere in today's Federal Register, we found that using a 1.5-km radius (window) analysis was not appropriate for evaluating the effects of residential development, for our habitat suitability analysis, we found that, at the 1.5-km scale (or window) (based on Aldridge et al. 2012, p. 400), areas where at least 25 percent of the land is dominated by sagebrush cover (based on Wisdom et al. 2011, pp. 465-467; and Aldridge et al. 2008b, pp. 989-990) provided the best estimation of our current knowledge of Gunnison sage-grouse occupied range and suitable habitat. It is important to note that 25 percent of a 1.5-km radius area being dominated by sagebrush cover (as classified by Southwest Regional Gap Analysis Project (SWReGAP) 30 x 30 meter pixels) is very different from an area having 25 percent canopy cover of sagebrush. At the landscape scale, there will still be areas (up to 75 percent) that are not dominated by sagebrush within the larger matrix of Gunnison sage-grouse occupied habitat. For example, there will be areas within this landscape that are dominated by pi[ntilde]on-juniper or mixed shrub communities that will still be occupied critical habitat, because at the landscape scale considered here, these areas are still part of the larger Gunnison sage-grouse habitat. In a critical habitat determination, the Service determines what scale is most meaningful to identifying specific areas that meet the definition of ``critical habitat'' under the Act. For example, for a wide-ranging, landscape species covering a large area of occupied and potential habitat across several States (such as the Gunnison sage-grouse), a relatively coarse-scale analysis is appropriate and sufficient to designate critical habitat as defined by the Act, while for a narrow endemic species, with specialized habitat requirements and relatively few discrete occurrences, it might be appropriate to engage in a relatively fine-scale analysis for the designation of critical habitat.

    (6) Comment: A peer reviewer noted that the answer to ``how much is enough'' in terms of minimum size landscape needed to support a sage-grouse population remains uncertain. This peer reviewer felt that the Monticello population area proposed critical habitat should include only the Conservation Study Area (CSA), and that additional areas include some sites dominated by pi[ntilde]on-juniper and deep draws and canyons that may never provide suitable Gunnison sage-grouse habitat. Thus, the peer reviewer recommended refining the proposed critical habitat boundaries to include only the CSA and appropriate buffer areas as defined by Prather (2010).

    Our response: The Act directs us to designate critical habitat in areas outside the geographic area occupied by the species at the time it is listed (such as the CSA), upon a determination that such areas are essential for the conservation of the species. For the Gunnison sage-grouse, we evaluated the ability of unoccupied habitat to potentially provide for the landscape scale habitat needs of the species by identifying areas of large size with large areas dominated by sagebrush. A minimum of 500 birds may be necessary to support a viable population (Shaffer 1981, p. 133; GSRSC 2005, pp. 2 and 170). Approximately 100,000 ac (40,500 ha) likely would be needed to support 500 birds (GSRSC 2005, p. 197). Currently occupied habitat is less than this amount for three of the six Gunnison sage-grouse populations included in this final designation--Pi[ntilde]on Mesa, Cerro Summit-Cimarron-Sims Mesa, and Crawford. Two other populations--Monticello-Dove Creek and San Miguel Basin--slightly exceeds this amount. This suggests that currently occupied habitat alone may not be sufficient to maintain long-term viability for at least three and possibly five of the six populations included in this final designation. Declining trends in the abundance of Gunnison sage-grouse outside of the Gunnison Basin further indicate that currently occupied habitat for the five satellite populations included in this final designation may be less than the minimum amount of habitat necessary for their long-term viability. Therefore, we consider the designation of unoccupied critical habitat, including areas outside the CSA in the Monticello population area, essential for conservation of the species.

    As we discuss in detail below, our delineation of unoccupied critical habitat areas was based on specific criteria, scientific data, and mapping methods on a landscape scale. These parameters were consistently applied across the range of Gunnison sage-grouse to ensure the integrity and reliability of the maps on a broad scale,

[[Page 69317]]

as opposed to applying varying sources and scales of data or information on habitat conditions. This topic is discussed further under Criteria and Methods Used to Identify and Map Critical Habitat in this final rule.

    In a critical habitat determination, the Service determines what scale is most meaningful to identifying specific areas that meet the definition of ``critical habitat'' under the Act. For example, for a wide-ranging, landscape species covering a large area of occupied and potential habitat across several States (such as the Gunnison sage-grouse), a relatively coarse-scale analysis is appropriate and sufficient to designate critical habitat as defined by the Act. While for a narrow endemic species, with specialized habitat requirements and

BLM_0072104

relatively few discrete occurrences, it might be appropriate to engage
in a relatively fine-scale analysis for the designation of critical
habitat.

Comments From States

    Comments received from the States regarding the proposal to
designate critical habitat for the Gunnison sage-grouse are
incorporated directly into this final rule or are addressed below.
    (1) Comment: Arizona Game and Fish Department stated that any
designation of Gunnison sage-grouse critical habitat should occur
within the current distribution for the species, in Colorado and Utah.
    Our Response: Critical habitat has been designated only in Colorado
and Utah, within the current range of the species.
    (2) Comment: Colorado Parks and Wildlife (CPW) requested
justification for our use of the Dolores County line as the southern
boundary for critical habitat designation, and not including areas of
habitat within Montezuma County.
    Our Response: Our identification of lands that contain the features
essential to conservation of the Gunnison sage-grouse was based on a
habitat mapping project by the Gunnison Sage-grouse Rangewide Steering
Committee in 2005 (78 FR 2547, January 11, 2013). The Gunnison Sage-
grouse Rangewide Conservation Plan notes that the local conservation
plan for Dove Creek was limited to Dolores County (GSRSC 2005, p. 70).
The RCP potential habitat polygon that extended into Montezuma County
was very large. The portion of the potential polygon that fell within
Montezuma County had little suitable habitat (less than 20 percent of
the almost 95,000 ac) and the suitable habitat was almost all more than
18.5 km away from occupied habitat. The Dove Creek Conservation Plan
(1998, p. 7) states that the species is not known to currently occur in
Montezuma County. Further, vegetation data indicate that areas in
Montezuma County are generally unsuitable for the species. For these
reasons, we modified this very large potential polygon so it no longer
included Montezuma County. Criteria for identifying and mapping
critical habitat are described in further detail in this final rule
(see Criteria and Methods Used to Identify and Map Critical Habitat).
    (3) Comment: CPW and one other commenter questioned the use of 18
kilometers (km) (11 miles (mi)) as a distance for seasonal movement and
for critical habitat designation. CPW stated that this distance is for
extreme movements and results in large areas of non-habitat being
included in the critical habitat designation.
    Our Response: Gunnison sage-grouse make relatively large movements
on an annual basis (GSRSC 2005, p. J-3). The movement distances of
Gunnison sage-grouse as a criterion for identifying unoccupied critical
habitat areas are discussed in this final rule (see Proximity and
Potential Connectivity (Criterion 3)). To account for proximity to and
potential connectivity with occupied Gunnison sage-grouse habitat, we
only considered unoccupied areas meeting our other criteria to be
critical habitat if they occur within approximately 18.5 km (11.5 mi)
of occupied habitat (using ``shortest distance''). This distance
represents the rangewide maximum measured seasonal movement of Gunnison
sage-grouse across all seasons, as presented in the RCP (GSRSC 2005, p.
J-3). Therefore, outside of occupied habitat, we conclude that
unoccupied areas within 18.5 km (11.5 mi) of occupied areas have the
highest likelihood of Gunnison sage-grouse use and occupation.
    Other scientific information further supports our use of 18.5 km to
account for habitat connectivity. Connelly et al. (2000a, p. 978)
recommended protection of breeding habitats within 18 km of active leks
in migratory sage-grouse populations. The maximum dispersal distance of
greater sage-grouse in northwestern Colorado was greater than 20.0 km
(12.4 mi) and, therefore, it was suggested that populations within this
distance could maintain gene flow and connectivity (Thompson 2012, pp.
285-286). It was hypothesized that isolated patches of suitable
habitats within 18 km (11.2 mi) provide for connectivity between sage-
grouse populations; however, information on how sage-grouse actually
move through landscapes is lacking (Knick and Hanser 2011, pp. 402,
404).
    We recognize that Gunnison sage-grouse movement behavior and
distances likely vary widely by population and area, potentially as a
function of population dynamics, limited or degraded habitats, and
similar factors. Movements have been documented as being much greater
(up to 56 km (35 mi)) or less than 18.5 km in some cases (see our final
rule to list Gunnison sage-grouse elsewhere in today's Federal Register
for more discussion). However, the best available information indicates
18.5 km is a reasonable estimate of the distance required between
habitats and populations to ensure connectivity for Gunnison sage-
grouse, or facilitate future expansion of the species range--hence, we
used this measure in our evaluation of areas as potential critical
habitat. This topic is discussed further under Criteria and Methods
Used to Identify and Map Critical Habitat in this final rule.
    (4) Comment: CPW recommended that the following areas of proposed
critical habitat be reevaluated: Pine forests along the eastern
boundary of Gunnison Basin, Sanborn Park north of Iron Springs,
Bostwick Park and Poverty Mesa in the Cerro Summit-Cimarron-Sims Mesa
Unit, Black Mesa between Crawford and Gunnison Basin (they requested
that we exclude the north side and include the south side), southern
Dove Creek, Hinsdale County, and the southeastern portion of Sims Mesa.
CPW recommended that these areas be reevaluated for a variety of
reasons, including updated mapping, severely degraded or converted
habitats, and inappropriate habitats (such as forested areas).
    Our Response: We have modified our critical habitat designation to
address several of CPWs concerns as follows: (1) We modified several
occupied polygons to reflect the latest mapping from CPW (CPW 2013e,
spatial data); (2) we used CPW's mapping for unoccupied habitat in the
Sanborn Park/Iron Springs area; and (3) we removed the unoccupied
habitat in the Bostwick Park area (part of the Cerro Summit-Cimarron-
Sims Mesa population) from our critical habitat designation because the
habitat has been converted to a point where restoration to Gunnison

age-grouse habitat would be highly unlikely and because it did not meet our suitability criterion (see Criteria and Methods Used to Identify and Map Critical Habitat below). Other areas have remained the same based on our sagebrush habitat suitability analysis as further described here.

For occupied habitat, we based our identification of lands that contain the

[[Page 69318]]

PCEs for Gunnison sage-grouse on polygons delineated, defined, and updated by Colorado Parks and Wildlife (CPW) and the Utah Division of Wildlife Resources (UDWR) as part of the 2005 RCP Habitat Mapping project (GSRSC 2005, p. 54; CPW 2013e, spatial data). We consider all areas designated as occupied critical habitat here to meet the landscape specific PCE 1 and one or more of the seasonally specific PCEs (2-5). In general, for PCE 1, this includes areas with vegetation composed of sagebrush plant communities (at least 25 percent of the land is dominated by sagebrush within a 0.9-mi (1.5-km) radius of any given location) (see Habitat Suitability), of sufficient size and configuration to encompass all seasonal habitats for a given population of Gunnison sage-grouse, and facilitate movements within and among populations.

We based our identification of unoccupied critical habitat for Gunnison sage-grouse on four criteria: (1) The overall distribution or range of the species; (2) potential occupancy of the species; (3) proximity and potential connectivity to occupied habitats; and (4) suitability of the habitat for the species. Our delineation of unoccupied critical habitat areas was based on these criteria, scientific data, and mapping methods on a landscape scale. These parameters were consistently applied across the range of Gunnison sage-grouse to ensure the integrity and reliability of the maps on a broad scale, as opposed to applying varying sources and scales of data or information on habitat conditions.

In this designation, as described in Criteria and Methods Used to identify and map Critical Habitat, we utilized the best available information to identify areas for critical habitat at a landscape level scale. At a smaller scale, there are local areas that do not meet these landscape criteria, and for occupied habitat, the PCEs. All occupied areas have the PCEs on a landscape scale, and unoccupied areas meet the landscape criteria at a landscape scale as well, therefore these areas are designated as critical habitat.

Gunnison and greater sage-grouse occupancy, survival, and persistence are dependent on the availability of sufficient sagebrush habitat on a landscape scale (Patterson 1952, p. 9; Braun 1987, p. 1; Schroeder et al. 2004, p. 364; Knick and Connelly 2011, entire; Aldridge et al. 2012, entire; Wisdom et al. 2011, entire). Aldridge et al. (2008b, pp. 989-990) reported that at least 25 percent of the land needed to be dominated by sagebrush cover within a 30 km (18.6 mi) radius scale for long-term persistence of sage-grouse populations. Wisdom et al. (2011, pp. 465-467) indicated that at least 27 percent of the land needed to be dominated by sagebrush cover within an 18-km (11.2-mi) radius scale for a higher probability of sage-grouse population persistence. Although in our final listing rule, published elsewhere in today's Federal Register, we found that using a 1.5-km radius (window) analysis was not appropriate for evaluating the effects of residential development, for our habitat suitability analysis, we found that, at the 1.5-km radius scale (or window) (based on Aldridge et al. 2012, p. 400), areas where at least 25 percent of the land is dominated by sagebrush cover (based on Wisdom et al. 2011, pp. 465-467; and Aldridge et al. 2008, pp. 989-990) provided the best estimation of our current knowledge of Gunnison sage-grouse occupied range and suitable habitat. It is important to note that 25 percent of a 1.5-km radius area being dominated by sagebrush cover (as classified by SWReGAP 30 x 30 meter pixels) is very different from an area having 25 percent canopy cover of sagebrush. At the landscape scale, there will still be areas (up to 75 percent) that are not dominated by sagebrush within the larger matrix of Gunnison sage-grouse occupied habitat. For example, there are areas within this landscape that are dominated by pi[ntilde]on-juniper or mixed shrub communities that are still occupied critical habitat, because at the landscape scale considered here, these areas are still part of the larger Gunnison sage-grouse habitat. In a critical habitat determination, the Service determines what scale is most meaningful to identifying specific areas that meet the definition of ``critical habitat'' under the Act. For example, for a wide-ranging, landscape species covering a large area of occupied and potential habitat across several States (such as the Gunnison sage-grouse), a relatively coarse-scale analysis is appropriate and sufficient to designate critical habitat as defined by the Act. While for a narrow endemic species, with specialized habitat requirements and relatively few discrete occurrences, it might be appropriate to engage in a relatively fine-scale analysis for the designation of critical habitat.

Although in our final listing rule, published elsewhere in today's Federal Register, we found that using a 1.5-km radius (window) analysis was not appropriate for evaluating the effects of residential development, we found that, at the 1.5-km radius scale (or window) (based on Aldridge et al. 2012, p. 400), mapping areas where at least 25 percent of the land is dominated by sagebrush cover (based on Wisdom et al. 2011, pp. 465-467; and Aldridge et al. 2008, pp. 989-990) provided the best estimation of our current knowledge of Gunnison sage-grouse occupied range and suitable habitat. Specifically, we found that modeling at the finer 1.5-km scale was necessary to identify or ``capture'' all areas of known occupied range, particularly in the smaller satellite populations where sagebrush habitat is generally limited in extent. Larger scales failed to capture areas that we know to contain occupied and suitable habitats (e.g., at the 54-km scale, only the Gunnison Basin area contained areas where 25 percent or more of the land is dominated by sagebrush cover) (USFWS 2013d, p. 3).

BLM_0072106

The scale of the maps provided in the final rule to designate critical habitat does not allow for delineation of some developed areas such as buildings, paved areas, and other manmade structures within critical habitat that do not contain the required PCEs; nonetheless, lands covered by buildings, pavement and other manmade structures on the effective date of this rule are not included in critical habitat, and text has been included in the final regulation to make this point clear. This topic is discussed further under Criteria and Methods Used to Identify and Map Critical Habitat in this final rule.

(5) Comment: The Colorado Department of Agriculture, the State of Utah Office of the Governor, and several other commenters expressed concern that critical habitat designation would impact the local economy, with income losses due to restrictions to agriculture, energy development, mineral extraction, or hunting.

Our Response: We expect some economic impacts as a result of designating critical habitat for the Gunnison sage-grouse. The Final Economic Analysis (FEA) forecasted incremental impacts from the critical habitat designation alone (not including baseline impacts due to listing of the species) of $6.9 million (present value over 20 years), assuming a seven percent discount rate. Assuming a social rate of time preference of three percent, incremental impacts were $8.8 million (present value over 20 years). Annualized incremental impacts of the critical habitat designation were forecast to be $610,000 at a seven percent discount rate, or $580,000 at a three percent discount rate (Industrial Economics, Inc. 2014, p. ES-2). Estimated economic impacts for a 20-year period regarding livestock grazing, agriculture and water management, mineral and fossil fuel extraction,

[[Page 69319]]

residential development, renewable energy development, recreation, and transportation are described in the FEA (Industrial Economics, Inc. 2014). Actions carried out, authorized by or funded by a Federal agency that might affect the species or its critical habitat would require section 7 consultations under the Act.

(6) Comment: The State of Utah Office of the Governor asserted that voluntary cooperation of private landowners will be much more effective in improving habitat for Gunnison sage-grouse than protections afforded by listing and designation of critical habitat.

Our Response: We agree that voluntary cooperation of private landowners will be key in improving habitat for Gunnison sage-grouse. However, under the Act, we must list a species that meets the definition of a threatened or endangered species, and we have determined that the Gunnison sage-grouse meets this definition. We believe that the best opportunity to conserve and ultimately recover the species will require both the protections afforded by listing and the critical habitat designation as well as voluntary conservation measures undertaken by private landowners, with support from the State in accomplishing these measures.

(7) Comment: The State of Utah Office of the Governor asserted that the critical habitat designation for Utah is too broad and erroneously includes sagebrush (Artemisia spp.) areas that likely never supported Gunnison sage-grouse, but are based on habitat definitions from the Gunnison Sage-grouse Rangewide Conservation Plan. Similarly, a Federal agency asserted that approximately one-third of unoccupied habitat proposed for designation as critical habitat does not contain at least 25 percent sagebrush cover and suggested that we clearly identify the criteria (such as soil type) that indicate sagebrush communities once occurred.

Our Response: See our responses to comments 3 and 4 above, which explain the methodology we used to delineate critical habitat areas.

(8) Comment: CPW commented that, within proposed unoccupied critical habitat, mapped ``vacant/unknown habitat'' should be considered more important than ``potentially suitable habitat'' because restoration would not be required in vacant/unknown habitat. Additionally, CPW recommended that old-growth pi[ntilde]on-juniper, exurban lands, and agricultural lands be removed from the category of potentially suitable habitat.

Our Response: We consider both categories of unoccupied critical habitat (vacant/unknown and potentially suitable habitat, as defined by the RCP) to be essential to conservation of the Gunnison sage-grouse. However, habitat conditions and suitability across these areas vary, and we recognize that certain areas may require restoration to meet the needs of Gunnison sage-grouse. With respect to exurban lands, lands covered by buildings, pavement and other manmade structures on the effective date of this rule are not included in this critical habitat designation, either by mapping or by text in this final rule. With respect to unoccupied agricultural lands, these areas can be important for various seasonal uses by grouse and can, because of scale, meet the landscape level habitat suitability criteria. These topics are discussed further under the Criteria and Methods Used to Identify and Map Critical Habitat section in this final rule.

Comments From Federal Agencies

Comments received from Federal agencies regarding the proposal to designate critical habitat for the Gunnison sage-grouse are incorporated directly into this final rule or are addressed below.

(9) Comment: Two Federal agencies noted that the proposed rule to designate critical habitat included areas outside of currently occupied habitat that are deemed essential for the conservation of the Gunnison sage-grouse and questioned how a section 7 adverse modification analysis will be conducted in unoccupied critical habitat that does not contain the PCEs.

Our Response: Our memorandum of December 9, 2004, provides our most current guidance on critical habitat and adverse modification (USFWS 2004). This memorandum describes an analytical framework for adverse modification determinations addressing how critical habitat will be

addressed in different sections of the Section 7(a)(2) consultation or
Section 7(a)(4) conference. Unoccupied habitat does not need to have
the PCEs, the standard is instead ``essential to the conservation of
the species.'' Instead of considering the PCEs, in the section 7
consultation addressing unoccupied habitat, we would expect a
discussion of whether critical habitat, through the implementation of
the proposed Federal action, would remain functional (or retain the
current ability for the PCEs to be functionally established) to serve
the intended conservation role for the species (USFWS 2004, p. 3).
    We also note that the Service has proposed to amend the definition
of ``destruction or adverse modification of critical habitat'' to (1)
more explicitly tie the definition to the stated purpose of the Act;
and (2) more clearly contrast the definitions of ``destruction or
adverse modification'' of critical habitat and ``jeopardize the
continued existence of'' any listed species (79FR 27060).
    (10) Comment: A Federal agency recommended that critical habitat
boundaries and edges should be made contiguous at the Utah and Colorado
state line for the Pi[ntilde]on Mesa population and for the Monticello-
Dove Creek population.
    Our Response: We based our identification of occupied and
unoccupied habitats for Gunnison sage-grouse on maps and polygons
delineated and defined by the CPW and UDWR. Habitat maps were completed
by the CPW and UDWR in support of the 2005 RCP (GSRSC 2005, pp. 54-102)
and are updated periodically (CPW 2013e, spatial data). The habitat
maps were derived from a combination of telemetry locations, sightings
of sage-grouse or sage-grouse sign, local biological expertise, GIS
analysis, and other data sources (GSRSC 2005, p. 54; CDOW 2009e, p. 1).
These sources, as compiled in the RCP and updated, combined with recent
lek count data, collectively constitute the best available information
on the species' current distribution and occupancy in Colorado and
Utah. In general, we considered areas classified as ``occupied
habitat'' (GSRSC 2005, pp. 38, 54) to be currently occupied by Gunnison
sage-grouse. All RCP mapped occupied habitat for Gunnison sage-grouse,
except Poncha Pass (which does not meet PCE 1), is included in this
critical habitat designation. Unoccupied habitat is included in this
designation only when designated by the RCP (including both potential
and vacant/unknown habitats), where potential connectivity to occupied
habitat exists, and where vegetation cover provides suitable habitat,
as described below. This topic is discussed further under the Criteria
and Methods Used to Identify and Map Critical Habitat section in this
final rule.
    According to the RCP information, in the Pi[ntilde]on Mesa
population area in Utah, the center polygon is of vacant or unknown
status; and the northern and southern polygons are potential habitat.
As pointed out, the polygons do not match between Colorado and Utah.
For instance, mapped occupied habitat in Colorado terminates at the
State line, although adjacent habitat in Utah is shown as unoccupied.
In that case, while Gunnison sage-grouse from the Pi[ntilde]on Mesa
population are known to seasonally use adjacent habitat in Utah, the
area was not classified as occupied

[[Page 69320]]

by the RCP (GSRSC 2005, p. 86). In the Monticello-Dove Creek
population, part of the state line transition is due to a change to
cropland on the Utah side of the border (GSRSC 2005, p. 38). The RCP
has identified resolving these mapping issues as an objective, but this
resolution has not been completed to date (GSRSC 2005, p. 221). A
Federal agency recently suggested that all critical habitat near
Monticello, Utah should be considered occupied. This change in
designation has not been vetted through the RCP process, which we have
determined provides the best available science regarding habitat
occupied by the species. Critical habitat designations can also be
revised by a future rulemaking, if appropriate. In the meantime,
section 7 consultations can incorporate updated information in the
analysis of designated critical habitats.
    (11) Comment: A Federal agency stated that the following
information from statements in the proposed rule to designate critical
habitat conflict and need clarification. The first statement was that
critical habitat designated at a particular point in time may not
include all of the habitat areas that we may later determine are
necessary for the recovery of the species. The second statement was
that critical habitat units were depicted for Grand and San Juan
Counties, Utah, and Chaffee, Delta, Dolores, Gunnison, Hinsdale, Mesa,
Montrose, Ouray, Saguache, and San Miguel Counties, Colorado (78 FR
2542 and 2562, January 11, 2013).
    Our Response: The first statement acknowledges that with new
information we may in the future identify other areas outside of
designated critical habitat that are needed for recovery of the
species. Consequently, conservation actions for the species can occur
outside of critical habitat, section 7 consultations can occur outside
of critical habitat if the species is present, and section 9
prohibitions regarding take apply anywhere. The second statement
proposes critical habitat, based on the best available information, in
portions of the aforementioned counties (note, however, that lands in
Chaffee County are no longer included in this final designation). This
results in requirements for section 7 consultations within critical
habitat, even if the habitat is not currently occupied by the species.
    (12) Comment: Several agencies requested that research be cited
regarding the justification for the landscape specific PCE 1, and more
specifically the generally corresponding habitat suitability analysis
(areas with vegetation composed primarily of sagebrush plant
communities [at least 25 percent of the area is dominated by sagebrush
cover within a 1.5-km (0.9-mi) radius of any given location], of
sufficient size and configuration to encompass all seasonal habitats
for a given population of Gunnison sage-grouse, and facilitate
movements within and among populations). The commenters noted that no
on-the-ground assessment was completed to verify the choice of 1.5 km

(0.9 mi) as a tool to delineate critical habitat.

Our Response: See our response to comment 4 above. The Act does not require us to collect additional information or do assessments on the ground; instead it requires us to base our decisions on the best available information.

(13) Comment: A Federal agency requested clarification regarding whether each PCE must be met for designation as critical habitat.

Our Response: We consider all areas designated as occupied critical habitat here to meet the landscape specific PCE 1 and one or more of the seasonally specific PCEs (2-5). This topic is discussed under the Primary Constituent Elements for Gunnison Sage-grouse section of this final rule. However, our response to comment 9 above has a discussion of unoccupied critical habitat and section 7 consultation. Unoccupied critical habitat does not need to contain the PCEs, but rather is designated because it is considered essential to the conservation of the species.

(14) Comment: A Federal agency requested clarification regarding the ``non-sagebrush canopy cover component'' of PCEs 2-3, and asked whether this component includes trees or just non-sagebrush shrubs.

Our Response: Habitat structural values for the seasonally specific PCEs 2 and 3 (breeding habitat and summer-fall habitat, respectively) are based on the RCP (GSRSC 2005, pp. H-6 and H-7). The non-sagebrush canopy cover component (5 to 15 percent) does not include tree canopy cover, but may include other shrub species such as horsebrush (Tetradymia spp.), rabbitbrush (Chrysothamnus spp.), bitterbrush (Purshia spp.), snakeweed (Gutierrezia sarothrae), greasewood (Sarcobatus spp.), winterfat (Eurotia lanata), Gambel's oak (Quercus gambelii), snowberry (Symphoricarpos oreophilus), serviceberry (Amelanchier spp.), and chokecherry (Prunus virginiana). We clarify this in the Seasonally Specific Primary Constituent Elements section of this final rule.

(15) Comment: A Federal agency suggested that wording in the proposed rule to designate critical habitat (78 FR 2547, January 11, 2013) be changed from implying that wildfire suppression would be a new management consideration to noting that it is an ongoing management action. The agency also requested that the North Rim Landscape Strategy be explicitly recognized as an ongoing conservation effort.

Our Response: In this final rule, we provide a list of management considerations or protections (including wildfire suppression) that may be applied in the future within critical habitat, each of which has been implemented to some extent in the past. We clarify this in the Special Management Considerations section of this final rule. The North Rim Landscape Strategy is discussed in the final rule to list Gunnison sage-grouse as threatened, published elsewhere in today's Federal Register. To the extent the commenter is inquiring about whether certain activities might be ``actions'' under section 7 of the ESA, this determination is made on a case-by-case basis as an agency investigates whether a particular action is subject to consultation.

(16) Comment: A Federal agency recommended that results from the ESRI ``Neighborhood Analysis'' tool be provided within the final rule to designate critical habitat.

Our Response: The full results of our modeling and analysis, including the ESRI ``Neighborhood Analysis'', are not in a format that can be provided in the Federal Register. However, the data and methods used to perform our analyses are described in greater detail in this final rule (see Criteria and Methods Used to Identify and Map Critical Habitat); and background and supporting data are available by appointment, during normal business hours at the U.S. Fish and Wildlife Service, Western Colorado Field Office (see ADDRESSES).

(17) Comment: A Federal agency stated that the proposed rule to designate critical habitat and the proposed rule to list present conflicting viewpoints regarding whether or not fire regimes are altered and whether or not altered fire regimes are a threat.

Our Response: In the proposed and final critical habitat rules for Gunnison sage-grouse, we identified ``threats to the physical and biological features'' of critical habitat units, including altered fire regimes. These are stressors potentially affecting the conservation and management of critical habitat. This is in contrast to identified threats to the species' continued persistence, as evaluated in the final rule to list

[[Page 69321]]

Gunnison sage-grouse (published elsewhere in today's Federal Register). In this final rule, we clarify this point by identifying these stressors as ``factors potentially affecting the physical and biological features'' of given critical habitat units (see Unit Descriptions).

(18) Comment: A Federal agency recommended adding areas to the critical habitat unit proposed for Pi[ntilde]on Mesa, provided GIS data, and noted that more information is available.

Our Response: We have added and expanded occupied areas in the Pi[ntilde]on Mesa critical habitat unit based on updated mapping provided by CPW. CPW does recognize that the boundaries of Pi[ntilde]on Mesa need to be changed, but those changes were not completed prior to the publication of this rule. CPW modifies their unit boundaries in a group setting with input from numerous individuals and sources. Since a group (that would include the Federal agency) has not been convened by CPW to officially change the Pi[ntilde]on Mesa boundaries, we choose here to rely on the older information provided by CPW as the best currently available information.

(19) Comment: A Federal agency noted that in the proposed rule to designate critical habitat, the text describes ``potential'' and ``vacant or unknown'' habitat categories, whereas the maps refer to ``occupied'' and ``unoccupied'' habitat.

Our Response: We used RCP ``occupied habitat'' to define areas currently occupied by Gunnison sage-grouse (GSRSC 2005, pp. 38, 54) (see Criteria and Methods Used to Identify and Map Critical Habitat).

We also use the RCP mapped ``potential'' and ``vacant or unknown'' habitat polygons (GSRSC 2005, pp. 54-102) to evaluate unoccupied areas as potential critical habitat for Gunnison sage-grouse. We combined and classified these two types as unoccupied habitat for consideration in our analysis and identification of critical habitat (see Potential Occupancy of the Species).

(20) Comment: A Federal agency recommended deleting a portion of unoccupied habitat in the southern part of Gunnison Basin that is forested, and provided shapefiles.

Our Response: We did look at the shapefiles provided. In general, we have relied on the most recent habitat mapping done by CPW (GSRSC 2005, spatial data; CPW 2013e, spatial data) as the best available data. Some critical habitat unit boundaries have been refined based on the mapping by CPW. Our habitat suitability analysis looked at areas that generally correlated with PCE 1 where the dominant species is sagebrush 25 percent of the time within a 1.5 km radius. Given this, there could be up to 75 percent of the time where a different species, such as treed areas, is dominant. See our responses to comments 3 and 4 above.

(21) A Federal agency stated it does not support inclusion of isolated Federal lands polygons of unoccupied habitat within a matrix of private lands that are also unoccupied, unless the Service can demonstrate that those Federal land polygons--if restoration were applied and successful--are valuable in and of themselves for sage-grouse habitat.

Our Response: Unoccupied lands are designated here because they are ``essential for the conservation of the species'' and these areas do not stop at land ownership boundaries. We recognize that in areas with a high proportion of private ownership and with more intensive land uses (such as agriculture), the conservation of these populations will be more difficult than in less developed areas. In these developed areas, the importance of Federal lands can be greater than less developed areas because there may be fewer conservation options available on private lands (especially those that are already developed). The conservation of the grouse in these more developed areas will be more likely with the cooperation of private landowners and there are numerous tools available to private landowners to work on conservation of the grouse. The comment to exclude Federal lands assumes that restoration is not possible on these private lands.

Our landscape level approach used in this critical habitat designation generally does not consider land ownership. With the exception of exemptions for economic reasons or for Department of Defense lands and exclusions under section 4(b)(2) of the Act (where the benefits of such exclusions outweigh the benefits of inclusion), all lands that contain the PCEs (for occupied areas) or are essential to the conservation of the species (for unoccupied areas) are included in a critical habitat designation. On Federal lands where agencies are required to conserve endangered species (section 7(a)(1) of the Act) and consult on projects that may adversely affect species (section 7(a)(2) of the Act), it is difficult to show how an exclusion outweighs inclusion. In contrast, on private lands where conservation is largely voluntary, rewarding landowners for their conservation efforts by excluding their lands in a critical habitat designation can outweigh the benefits of including those lands.

(22) Comment: The U.S. Forest Service (USFS) recommended several additions and deletions to critical habitat on USFS lands at Crawford, Gunnison Basin, Pi[ntilde]on Mesa, and San Miguel Basin, with a net reduction of 12,781 ha (31,557 ac), and noted the following information:

Most of the areas proposed for removal at Crawford are forested areas directly north of Blue Mesa Reservoir.

Waunita Park in Gunnison Basin was considered unoccupied critical habitat in the proposed rule, but Gunnison sage-grouse have been observed in that area by USFS personnel for at least the past 20 years.

Forested areas in Gunnison Basin should be deleted.

At Pi[ntilde]on Mesa, sagebrush areas in portions of the Dominguez Creek watershed and in portions of Calamity Basin should be added.

Forested areas at San Miguel Basin should be removed from critical habitat designation.

Our Response: Waunita Park was changed to occupied critical habitat, consistent with CPWs updates (CPW 2013e, spatial data). Although in our final listing rule, published elsewhere in today's Federal Register, we found that using a 1.5-km radius (window) analysis was not appropriate for evaluating the effects of residential development, for our habitat suitability analysis, we found that, at the 1.5-km radius scale (or window) (based on Aldridge et al. 2012, p. 400), areas where at least 25 percent of the land is dominated by sagebrush cover (based on Wisdom et al. 2011, pp. 465-467; and Aldridge et al. 2008, pp. 989-990) provided the best estimation of our current knowledge of Gunnison sage-grouse occupied range and suitable habitat. Given this, there could be up to 75 percent of the time where a different vegetation type is dominant, such as treed areas. CPW does recognize that changes are needed to the boundaries of Pi[ntilde]on Mesa, but those changes were not completed by CPW prior to the publication of this rule. CPW modifies their unit boundaries in a group setting with input from numerous individuals and sources. Since a group (that would include the USFS) has not been convened by CPW to change the Pi[ntilde]on Mesa boundaries, we choose here to rely on the older information provided by CPW as the best currently available information. See our responses to comments 3, 4, 18, and 20 above.

(23) Comment: The USFS provided a list of grazing allotments containing critical habitat, dates of permit renewal for those allotments, and information on

[[Page 69322]]

BLM_0072110

whether or not they are covered by the Gunnison Basin Candidate Conservation Agreement (CCA).

Our Response: We considered this information for the final critical habitat (and listing) rules.

(24) Comment: The USFS asked if the proposed designation of critical habitat at the Dolores and Montezuma County line was intended to include any portion of Montezuma County; a close inspection of the map in the proposed rule indicates that a small portion of Montezuma County is included.

Our Response: Montezuma County is not included in this critical habitat designation. Please see our response to comment 2 above; and the map for Critical Habitat Unit 1: Monticello-Dove Creek, at the end of this rule. Any observed overlap of this critical habitat unit with Montezuma County may be due to GIS application and/or projection errors.

(25) Comment: We received several comments about our proposed critical habitat designation at Poncha Pass. One Federal agency recommended revising the delineation of critical habitat at Poncha Pass based on the Natural Resources Conservation Service (NRCS) Level III Soil classification survey and vegetation potential and provided GIS files. A Federal agency also asserted that most of the unoccupied habitat and a small section of occupied habitat do not have the potential to support sagebrush due to alkaline soils and low precipitation, or do not have the potential to support brood-rearing habitat because of minimal water availability. The USFS recommended that any land in the Rio Grande National Forest on the east side of the Valley at Poncha Pass that is designated as critical habitat be considered unoccupied due to a lack of documented presence. The agency noted that small parcels of USFS land on the west side of the Valley within critical habitat contain sagebrush that might eventually be used by Gunnison sage-grouse. The USFS stated that proposed critical habitat extends too far up the slopes of the Sangre de Cristo Range into mixed-conifer forests and offered to work with the Service in defining critical habitat on the east side of the Valley.

Our Response: Although we previously proposed designating a critical habitat unit in Poncha Pass, information received since the publication of the proposed rule (CPW 2013e, p. 1; CPW 2014d, p. 2; CPW 2014e, p. 2; CPW 2014f, p. 2) has caused us to reevaluate this proposal and to determine that it should not be included in this designation. See Reasons for Removing Poncha Pass as a Critical Habitat Unit below.

Comments From the Public

Comments received from the general public including local governments, organizations, associations, and individuals regarding the proposal to designate critical habitat for the Gunnison sage-grouse are incorporated directly into this final rule or are addressed below.

(26) Comment: Several commenters indicated that National Environmental Policy Act (NEPA) and economic analyses should be completed and made available for review prior to designating critical habitat.

Our Response: Both a Draft Environmental Assessment, as required by NEPA, and a Draft Economic Analysis were completed and made available for public review on September 19, 2013 (78 FR 57604), prior to this final designation of critical habitat. Comments have been addressed for both the Environmental Assessment and Economic Analysis, and final versions of these documents have been completed and posted to the Service's Web site at http://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/ and at http://www.regulations.gov.

(27) Comment: Several commenters expressed differing opinions on whether private lands should be excluded from critical habitat designation.

Our Response: Private lands are essential to the conservation of the species and, therefore, qualify as critical habitat. Federal agencies manage 55 percent of critical habitat designated in this rule. Approximately 43 percent of critical habitat is on private lands. Although there are public lands within the current range of the Gunnison sage-grouse, they are not sufficient to ensure conservation of the species for the reasons discussed in Rationale and Other Considerations below. The language of the Act does not restrict the designation of critical habitat to specific land ownerships such as Federal lands. Consequently, lands of all ownerships are considered if they meet the definition of critical habitat. Designation of private or other non-Federal lands as critical habitat has no regulatory impact on the use of that land unless there is Federal action that is subject to consultation. Identifying non-Federal lands that are essential to the conservation of a species alerts State and local government agencies and private landowners to the value of habitat on their lands, and may promote conservation partnerships. We have, however, excluded from our critical habitat designation 191,460 ac (77,481 ha) of private land where the CCAA, CEs, and a Tribal land management plan provide protection for Gunnison sage-grouse (see Exclusions below).

(28) Comment: Several commenters stated that agricultural lands and other habitat without sagebrush should be excluded from critical habitat designation.

Our Response: The best available information supports the consideration and inclusion of certain agricultural lands and other lands without sagebrush in this critical habitat designation. The PCEs for this species include those habitat components essential for meeting the biological needs of reproducing, rearing of young, foraging, sheltering, dispersing, and exchanging genetic material. Gunnison sage-grouse are sagebrush obligates, requiring large, interconnected expanses of sagebrush plant communities that contain a healthy understory of native, herbaceous vegetation. The species may also use riparian habitat, agricultural lands, and grasslands that are in close proximity to sagebrush habitat. Primary constituent elements 2, 3, and 5 include agricultural lands, and PCE 5 (alternative, mesic habitats) also includes wet meadows, and other habitats that may not contain sagebrush but which occur near sagebrush communities. This topic is

BLM_0072111

discussed further under the Seasonally Specific Primary Constituent Elements section of this final rule.

(29) Comment: Several commenters stated that critical habitat should not include unoccupied habitat.

Our Response: The Service has found that areas outside the geographical area currently occupied by the species are essential for the conservation of the species. Data indicate that the currently occupied habitat area for four populations in this designation is insufficient for the conservation of the species, and may be minimally adequate for one other population (see our response to peer review comment 6). Declining trends in the abundance of Gunnison sage-grouse outside of the Gunnison Basin further indicate that currently occupied habitat for the five satellite populations included in this final designation may be less than the minimum amount of habitat necessary for the conservation of the species. Unoccupied habitat in the Gunnison Basin population is also needed for movement and migration of birds to outlying areas and satellite populations and for potential range expansion. Consequently, we do not believe that occupied habitat alone is sufficient to ensure conservation of the species. We

[[Page 69323]]

designated occupied and unoccupied habitat that is essential for conservation of Gunnison sage-grouse. This topic is discussed further under the Rationale and Other Considerations section in this final rule.

(30) Comment: Several commenters stated that critical habitat should include all PCEs throughout the designated area.

Our Response: We consider all areas designated as occupied critical habitat here to meet the landscape specific PCE 1 and one or more of the seasonally specific PCEs (2-5). See our responses to comments 9 and 13. Each of the seasonally specific PCEs represents a unique seasonal habitat important for Gunnison sage-grouse survival and reproduction. Therefore, few areas would contain all seasonally specific PCEs. For instance, alternative, mesic habitats (PCE 5) may contain little to none of the sagebrush component generally required for the breeding, summer-fall, and winter habitats (PCEs 2-4).

(31) Comment: Several commenters asserted that a specific county (i.e., Dolores, Hinsdale, Ouray, or Saguache Counties in Colorado, or San Juan County in Utah) should be excluded from critical habitat designation.

Our Response: See our responses to comments 27 and 28. The five smaller populations included in this final designation outside of Gunnison Basin provide redundancy in the event of perturbations such as an outbreak of West Nile virus or the occurrence of drought, either of which could result in severe impacts to the Gunnison sage-grouse. The loss of one or more of the populations outside of Gunnison Basin could reduce the geographical distribution and total range of the Gunnison sage-grouse and increase the species' vulnerability to stochastic events and natural catastrophes, although the Poncha Pass population less so because it provides no unique genetic characteristics (since it is composed entirely of Gunnison Basin birds). These topics are discussed in detail in our final rule to list Gunnison sage-grouse as threatened, published elsewhere in today's Federal Register. The specific counties mentioned include portions of critical habitat designated for the Monticello-Dove Creek, San Miguel Basin, Cerro Summit-Cimarron-Sims Mesa, and Gunnison Basin populations and are essential for conservation of the species.

(32) Comment: Several commenters recommended that lands with an existing conservation plan, CEs, Certificates of Inclusion (CIs), or other protections for Gunnison sage-grouse either should or should not be excluded from critical habitat designation.

Our Response: Multiple partners including private citizens, nongovernmental organizations, a Tribe, and Tribal, State, and Federal agencies are engaged in conservation efforts across the range of Gunnison sage-grouse. Numerous conservation actions have been implemented for Gunnison sage-grouse, and these efforts have provided and will continue to provide conservation benefit to the species. In this final rule, as provided by section 4(b)(2) of the Act, we evaluate the benefits of including versus excluding lands covered under an existing conservation plan. Based on that evaluation, lands covered under the CCAA or CEs have been excluded from this final critical habitat designation. That evaluation also supported our decision to exclude the Ute Mountain Ute Tribe's Pinecrest Ranch in the Gunnison Basin area from the critical habitat designation, based on the Tribe's conservation plan for the ranch (see Exclusions). We are excluding 191,460 ac (77,481 ha) of proposed critical habitat on these conserved areas from the final designation.

(33) Comment: Several commenters presented differing opinions on whether or not energy and mineral exploration and production should be prohibited on critical habitat.

Our Response: Critical habitat does not in and of itself prohibit or permit certain activities or development. Critical habitat designation will only affect projects that are subject to a Federal action. The Monticello-Dove Creek and San Miguel Basin populations support numerous mineral and fossil fuel extraction activities. Additionally, one wind project and one potash mine are under development in the Monticello-Dove Creek unit. There are no active uranium mines in proposed critical habitat. Oil and gas extraction occurs on both Federal and private lands within proposed critical habitat. Mineral and fossil fuel extraction activities on private lands without Federal mineral rights are less likely to have a Federal action that would require section 7 consultations under the Act.

(34) Comment: Several commenters noted that critical habitat sometimes follows political boundaries rather than ecological boundaries.

Our Response: In some cases, political boundaries may also be ecological boundaries due to differences in land management practices

between counties or States. Also, in some cases non-ecological boundaries such as roads or county lines provide recognizable boundaries to help provide clarity to the public on where critical habitat begins and ends. In other cases, land cover types actually differ across political boundaries due to different land uses (e.g., the Monticello-Dove Creek population area along the Colorado-Utah State line).

(35) Comment: One commenter stated that routes within critical habitat to recreational areas outside of critical habitat should not have access restricted.

Our Response: Critical habitat does not in and of itself prohibit or restrict certain activities or development. Critical habitat designation will only affect actions that have a Federal action that are subject to consultation under section 7 of the ESA. Through section 7 consultation with Federal land management agencies, conservation measures may be implemented to avoid or minimize impacts on critical habitat or the species.

(36) Comment: Some commenters recommended that the proposed Poncha Pass critical habitat unit be excluded from critical habitat designation due to impacts to private property.

Our Response: We are no longer including the Poncha Pass population area in our critical habitat designation as described above in our response to comment 25 and below in Reasons for Removing Poncha Pass as a Critical Habitat Unit. Private properties, while important to the conservation of the species, did not factor into the decision not to include this population in critical habitat.

(37) Comment: One commenter noted that some critical habitat units are less than the 100,000-ac (40,500-ha) criteria needed to support 500 birds.

Our Response: Two units of the critical habitat designation are less than 100,000 ac (40,500 ha): Cerro Summit-Cimarron-Sims Mesa at 52,544 ac (21,264 ha) and Crawford at 83,671 ac (33,860 ha). These two populations likely do not have enough contiguous habitat remaining to independently support 500 birds--the theoretical minimum number needed to maintain long-term viability, as previously described in our response to peer review comment 6. However, as populations grow and recover, we expect occupied habitat to expand and the distance between populations to decrease, thereby facilitating migration and interchange between populations. Furthermore, the Cerro Summit-Cimarron-Sims Mesa population likely serves, and should continue to serve in the future, as an important linkage area between the Crawford, Gunnison Basin, and San Miguel populations.

[[Page 69324]]

(38) Comment: Several commenters stated that the listing and proposed critical habitat designation for the Gunnison sage-grouse will have economic impacts on energy and mineral development. Several commenters stated that oil and gas companies may cease operations if critical habitat is designated for the Gunnison sage-grouse. Some commenters asserted that they have been unable to lease their mineral rights as a result of the anticipated listing and designation of proposed critical habitat. Several commenters also noted that a large percentage of county revenues in Dolores and Montezuma Counties are from oil and gas.

Our Response: Four of the critical habitat units included in this final designation currently have little or no energy or mineral development. Habitat in the San Miguel Basin and Monticello-Dove Creek populations has a high oil and gas development potential; habitat for the Crawford population has a medium oil and gas development potential. Approximately 54,000 ac (22,000 ha) of Bureau of Land Management (BLM) lands within proposed critical habitat are leased in Colorado, with 38 percent currently in production; approximately 2,700 ac (1,100 ha) are leased in Utah, with none currently in production (Industrial Economics, Inc. 2014, p. 5-4). Most costs of critical habitat designation would be borne by Federal and State agencies, and would include species monitoring and section 7 consultation. Energy and mineral development and extraction on privately owned lands without Federal mineral rights are unlikely to have a Federal action that would require section 7 consultations. We estimate annual baseline costs (costs due to listing) associated with mineral and energy development on Federal lands of approximately $15,000 for Monticello-Dove Creek and $23,000 for San Miguel Basin Units (Industrial Economics, Inc. 2014 p. 5-12). We estimate additional annual incremental costs on Federal lands due to proposed critical habitat designation of approximately $93,000 for Monticello-Dove Creek and $7,600 for San Miguel Basin (Industrial Economics, Inc. 2014 p. 5-17). More detailed information is available in the Final Economic Analysis of Critical Habitat Designation for the Gunnison Sage-grouse (Industrial Economics, Inc. 2014).

Montezuma County is not part of Gunnison sage-grouse occupied habitat or unoccupied critical habitat; therefore, oil and gas activities should not be impacted in that county. Oil and gas activities on privately owned lands without Federal mineral rights are unlikely to require section 7 consultation. The Colorado Oil and Gas Conservation Commission implements several environmental regulations on both Federal and private lands that provide protection to the Gunnison sage-grouse and occupied habitat. The BLM also requires conservation measures on leases it issues.

(39) Comment: Several commenters stated that the listing and proposed critical habitat designation for the Gunnison sage-grouse will have economic impacts on farming and ranching.

Our Response: Ranching activities occur throughout most of the species' range on Federal and private lands. Farming occurs on private lands. Activities on private lands that do not have a Federal action associated with the particular activity will not be subject to section 7 consultations or be required to implement recommended conservation practices. However, more than 300 Federal grazing allotments cover nearly 1,000,000 ac (405,000 ha) within the proposed designation for

BLM_0072113

critical habitat (Industrial Economics, Inc. 2013, p. 3-1), as well as numerous farms that have a Federal action associated with the activity due to participation in Federal programs (typically through NRCS or the Farm Service Agency). Impacts to ranching could include potential reductions in stocking rates, which would impact ranchers, and administrative costs due to section 7 consultations, which would impact BLM or USFS. Rangewide economic impacts to grazing activities due to listing the species are estimated at $110,000 annually, with an additional annual cost of $100,000 due to designation of proposed critical habitat (Industrial Economics, Inc. 2014, pp. 3-11-3-12). Economic impacts to other agricultural activities due to listing the species are estimated at $6,100 annually, with an additional annual cost of $2,000 due to designation of proposed critical habitat (Industrial Economics, Inc. 2014, p. 4-8). More detailed information is available in the Final Economic Analysis of Critical Habitat Designation for the Gunnison Sage-grouse (Industrial Economics, Inc. 2014).

(40) Comment: Several commenters stated that the listing and critical habitat designation for the Gunnison sage-grouse will impact the regional economy, reduce the tax base, or affect property values.

Our Response: Activities on private lands that do not require Federal approval or action will not be subject to section 7 consultations or restrictions related to this critical habitat designation. Impacts may occur on Federal lands or on other lands where landowners are participating in Federal programs. The Economic Analysis forecasts an annual economic impact from listing of $4.3 million and an additional annual impact of $610,000 from designation of proposed critical habitat (Industrial Economics, Inc. 2014, p. ES-2). These cost estimates are rangewide totals and address potential economic impacts to livestock grazing, agriculture and water management, mineral and fossil fuel extraction, renewable energy, residential and related development, recreation, and transportation activities. Most costs would be borne by Federal and State agencies, which include species monitoring and section 7 consultation. However, the majority of costs associated with residential development would be to developers or landowners for potential land set-asides to offset impacts to the species, and costs associated with livestock grazing would consist primarily of potential restrictions on grazing activities that would be borne largely by private ranchers. There may also be perceived negative impacts on jobs and the general economy due to concerns about additional regulatory requirements. More detailed information is available in the Final Economic Analysis of Critical Habitat Designation for the Gunnison Sage-grouse (Industrial Economics, Inc. 2014).

(41) Comment: Some commenters expressed concern that listing and proposed critical habitat designation for the Gunnison sage-grouse will have economic impacts on recreation, including activities such as hunting, wildlife watching, and tourism.

Our Response: We anticipate that, due to listing the species and the proposed designation of critical habitat, there may be additional monitoring and management requirements and additional costs associated with section 7 consultations on public lands. These costs will largely be borne by the BLM, USFS, and the National Park Service (NPS). The Economic Analysis forecasts annual rangewide economic impacts to recreation from listing of $140,000 and an additional annual impact of $2,400 from designation of proposed critical habitat (Industrial Economics, Inc. 2014, pp. 8-10-8-11). More detailed information is available in the Economic Analysis of Critical Habitat Designation for the Gunnison Sage-grouse (Industrial Economics, Inc. 2014).

(42) Comment: Some commenters suggested that critical habitat boundaries be moved to avoid

[[Page 69325]]

encompassing their personal property, thereby reducing economic impacts to those individuals.

Our Response: See our response to comment 27. We did exclude certain private lands covered under the CCAA or with a CE. Our economic analysis did not identify any costs that are concentrated in any geographic area or sector likely to result from the designation, since activities on private lands that do not require Federal approval or action will not be subject to section 7 consultations or restrictions related to critical habitat designation (Industrial Economics, Inc. 2014, Appendix A). Therefore, we did not exclude any area from designation as critical habitat based on economic reasons.

(43) Comment: Some commenters stated that listing and proposed critical habitat designation for the Gunnison sage-grouse will impact the economics of water development.

Our Response: Water projects may be affected by the designation of critical habitat if they involve a Federal action under section 7 of the Act (e.g., if a permit is required from the U.S. Army Corps of Engineers to dam or divert streams). The estimated costs associated with water development projects are included in the costs for agricultural activities other than ranching, as described in our response to comment 39.

(44) Comment: Some commenters stated that listing and proposed critical habitat designation for the Gunnison sage-grouse will impact the economics of airport properties.

Our Response: The scale of the maps used for publication in the Federal Register cannot delineate small areas within critical habitat that are developed. To address this, the final rule includes text specifying that lands covered by buildings, pavement or other manmade structures on the effective date of this rule, such as existing airports, are not included in critical habitat. As a result, Federal actions affecting such lands would not require section 7 consultation. We do not anticipate the critical habitat designation will result in an economic impact to airports.

(45) Comment: Two commenters suggested that travel corridors

BLM_0072114

linking critical habitat units should be protected or created. Other commenters recommended that travel corridors not be included as critical habitat because: (1) Connectivity is already addressed through translocation efforts, (2) travel corridors could facilitate disease transmission, and (3) travel corridors have not been proven to work.

Our Response: We have not designated specific corridors linking critical habitat units in this final rule. As noted in our response to comment 3, Gunnison sage-grouse make relatively large movements on an annual basis. Movement distances up to 27.9 km (17.3 mi) within a given year have been reported, and winter migration distances as great as 56.3 km (35 mi) have been documented. Gunnison sage-grouse commonly travel from lek sites to summer-use areas, from summer-use areas to fall/winter-use areas, and back to lek sites (Commons 1997, entire). This critical habitat designation will facilitate intrapopulation (within a single population) bird movement and the protection and availability of seasonal habitats necessary for the survival of Gunnison sage-grouse. With the designation of unoccupied habitat and the Cerro Summit-Cimarron-Sims Mesa Unit, we hope to facilitate some natural migration and interpopulation (between two or more populations) exchange of birds. However, further understanding and research of bird movements across the landscape is needed to better identify travel corridors and assess their utility. We recognize that natural migration and inter-population movement is the desired condition to restore self-sustaining populations. The translocation of birds is a less sustainable (since it requires constant human intervention) and less desirable method for interpopulation movement.

(46) Comment: Some commenters noted specific sites within proposed critical habitat that are forested and should, therefore, not be included in critical habitat designation.

Our Response: Our habitat suitability analysis, which generally correlates with PCE 1, looked at sagebrush on a landscape, not a small scale. Although in our final listing rule, published elsewhere in today's Federal Register, we found that using a 1.5-km radius (window) analysis was not appropriate for evaluating the effects of residential development, for our habitat suitability analysis, we found that, at the 1.5-km radius scale (or window) (based on Aldridge et al. 2012, p. 400), areas where at least 25 percent of the land is dominated by sagebrush cover (based on Wisdom et al. 2011, pp. 465-467; and Aldridge et al. 2008, pp. 989-990) provided the best estimation of our current knowledge of Gunnison sage-grouse occupied range and suitable habitat. Given this, there could be up to 75 percent of the area where a different species, such as a tree, is dominant. We evaluated the information provided by these commenters and other entities, but have retained the original critical habitat boundaries in these areas (with exclusions) based on our methodology, as described above in our responses to comments 3 and 4. We have refined the boundaries of a few units where better mapping data from CPW became available.

(47) Comment: Some commenters expressed concern that potash mining in Gunnison sage-grouse habitat may cease operations if the species is listed or critical habitat designated. RM Potash expressed concerns that listing may delay their project (Thorson 2013).

Our Response: Potash exploration is planned on BLM lands within Gunnison sage-grouse unoccupied critical habitat in San Miguel and Dolores Counties. As a result of the listing and designation of critical habitat, section 7 consultation will be required for such projects if they may affect Gunnison sage-grouse or designated critical habitat for the species. The amount of time necessary to complete a section 7 consultation will vary depending on the complexity of the project and the anticipated level of impacts. More detailed information on the economic impacts of the critical habitat designation on potash mining is available in the Final Economic Analysis of Critical Habitat Designation for the Gunnison Sage-grouse (Industrial Economics, Inc. 2014).

(48) Comment: Several commenters stated that the proposed rule to designate critical habitat relies too much on the use of linguistically uncertain or vague wording to support its conclusions.

Our Response: Natural sciences, including wildlife biology, typically does not allow for absolute conclusions. Studies can seldom evaluate all members of a species or address all possible variables. Under the Act, we base our decision on the best and most current available scientific information, even if that information includes some uncertainty, but we have attempted to explicitly characterize that uncertainty where applicable.

(49) Comment: Several commenters stated that voluntary conservation efforts by landowners such as CEs and CCAAs either should or should not be encouraged in lieu of critical habitat designation.

Our Response: The Service strongly supports voluntary conservation efforts by landowners, and we have excluded some lands covered by specific conservation measures from the final critical habitat designation, as described in our response to comment 32 and Exclusions below.

(50) Comment: Several commenters noted that without critical habitat

[[Page 69326]]

designation, a proposed 81-ha (200-ac) gravel pit on Sims Mesa in Montrose County will likely be developed.

Our Response: We appreciate this new information and considered it in finalizing our critical habitat designation and our final rule to list Gunnison sage-grouse, published elsewhere in today's Federal Register. However, as stated above, critical habitat designation does not automatically preclude or otherwise restrict land uses or development. Consultation under section 7 is only required if there is a Federal action associated with a project that may affect a listed species or its critical habitat.

(51) Comment: One commenter asked if road exclusions in critical habitat include power lines in road rights-of-way.

Our Response: Lands covered by paved roads, buildings or other manmade structures on the effective date of this rule are not included in critical habitat designated under this rule. A right-of-way that is not paved would be considered critical habitat. Within designated critical habitat, the value or quality of the critical habitat will vary in terms of conserving Gunnison sage-grouse. This habitat value or quality will be considered and evaluated through our section 7(a)(2) consultation process.

(52) Comment: Some commenters suggested that critical habitat designation should be deferred for one year to enable areas outside of Gunnison Basin to achieve positive results from conservation efforts that are currently underway.

Our Response: We acknowledge past and ongoing conservation efforts by the affected State, local, and Federal agencies, and private landowners, which have improved the status of the Gunnison sage-grouse. We are required by the Act, however, to designate critical habitat at the time of listing to the extent prudent and determinable, and are required by court order to make this determination no later than November 12, 2014. We have determined that designation is prudent and critical habitat is determinable (see Background section).

(53) Comment: One commenter requested explanation of the terms ``protected habitat,'' ``approximate quantity,'' and ``spatial arrangement'' as used in describing the PCEs.

Our Response: The term ``protected habitat'' is noted as a feature essential to conservation of the species and refers to the species' natural environment not subject to disturbance that could interfere with the species' life-history processes. The term ``approximate quantity'' is not used in the context of PCEs. However, the term ``appropriate quantity'' was used in the proposed rule regarding the need for a sufficient number of physical or biological features to provide for a species' life-history processes essential to the conservation of the species. Similarly, the term ``spatial arrangement'' was used in the proposed rule regarding the need for an adequate geographical placement of physical or biological features within typical dispersal distances throughout a species' range to provide for life-history processes essential to the conservation of the species. We have simplified this language in this final rule.

(54) Comment: One commenter noted that, within proposed critical habitat, soils differ between occupied and unoccupied habitat.

Our Response: We recognize that there is variation in soil types, and other physical, biological, and chemical characteristics, across the species' range and throughout designated critical habitat. In the context of our analysis, soil type is most directly related to its capacity to support sagebrush communities upon which Gunnison sage-grouse depend. To identify and map critical habitat for the species, we relied on land cover data from SWReGAP (USGS 2004, entire), including three prominent sagebrush land cover types in Gunnison sage-grouse range: Intermountain Basin big sagebrush shrubland, Intermountain Basin montane sagebrush steppe, and Colorado Plateau mixed low sagebrush. For the purposes and scope of our analysis, we determined broader land cover data (vegetation type) to be more appropriate than fine-scale or site-specific information such as soils data. This topic is discussed further under the Criteria and Methods Used to Identify and Map Critical Habitat section of this final rule.

(55) Comment: One commenter recommended that all areas excluded from critical habitat be identified on maps, rather than just by text.

Our Response: When determining critical habitat boundaries, we make every effort to avoid including developed areas, e.g., lands covered by buildings, pavement, and other manmade structures on the effective date of this rule, because such lands lack the physical and biological features essential for Gunnison sage-grouse conservation. However, the broad scale of critical habitat maps prepared for publication in the Federal Register typically cannot depict all such developed areas or small exclusions under section 4(b)(2) of the Act. As a result, the text of the rule specifies that lands covered by buildings, pavement and other manmade structures on the effective date of this rule are not included in critical habitat.

(56) Comment: One commenter noted that the proposed rule to designate critical habitat stated that the City of Gunnison and Gunnison County only own 52 ac (21 ha) within the Gunnison Basin critical habitat unit. However, the City owns 744 ac (301 ha), and the County owns 1,849 ac (749 ha) within this unit.

Our Response: This discrepancy may be attributed to differences in how acreages are calculated using GIS. Our GIS analysis, using version 9 of COMaP (the most comprehensive and up-to-date ownership layer for the State of Colorado), showed that, in the Gunnison Basin critical habitat unit, the City of Gunnison owns 5 ac (2 ha) of occupied habitat. Combined, land owned by the City of Gunnison and Gunnison County constitutes less than one percent of the entire Gunnison Basin unit. When we use the Gunnison County ownership layer, we show that approximately 1,200 ac (486 ha) of City and County lands fall within the final critical habitat designation. The figures provided in the comment above, with a combined total of 2,593 ac, are not all included in the final critical habitat boundaries (in other words, many of the acres fall within the City of Gunnison boundary that is not part of this critical habitat designation), and this area still constitutes less than 0.1 percent of the entire Gunnison Basin unit. Therefore, we consider this a minor discrepancy. Also note that we expect land ownership in critical habitat to change over time, due to land conveyance and exchange; consequently, estimated acres by land owner or entity as provided in this final rule are not static.

(57) Comment: We received a comment from the City of Gunnison that an area left out of the critical habitat designation in the Gunnison Basin did not follow the City of Gunnison's boundary.

Our Response: We looked at the most up-to-date boundary for the City of Gunnison, which has changed significantly through the last several years, and found it contained areas of suitable habitat for Gunnison sage-grouse. Based on these comments, we modified the critical

BLM_0072116

habitat area according to the City of Gunnison's boundaries where, based on satellite imagery and land cover data, these boundaries reflected the edge of moderate to high density development. We also adjusted the critical habitat boundary to leave out all of the runway

[[Page 69327]]

areas at the airport and the golf course south and west of town since these areas do not contain the PCEs for Gunnison sage-grouse. We retained lands within the city boundary that contain the PCEs for Gunnison sage-grouse.

(58) Comment: One commenter stated that critical habitat designation is difficult, uncertain, inefficient, costly, and a low priority; therefore, it shouldn't be done. Another commenter asserted that critical habitat designation is not prudent or determinable.

Our Response: Under the Act, the Service is required to designate critical habitat, to the maximum extent prudent and determinable, for any species determined to be an endangered or threatened species under the Act. We have determined that designation is prudent and critical habitat is determinable (see Background section); therefore, we must designate critical habitat for this species.

(59) Comment: One commenter recommended that a Small Government Agency plan be required.

Our Response: Our economic analysis forecasted incremental impacts on five county governments associated with transportation and administrative costs. However, incremental costs were estimated to be less than 0.7 percent of annual revenues for those entities (Industrial Economics, Inc. 2014, p. A-9). Therefore, we do not expect that this rule will significantly or uniquely affect small governments because it will not produce a Federal mandate of $100 million or greater in any year, that is, it is not a ``significant regulatory action'' under the Unfunded Mandates Reform Act. Consequently, we do not believe that the critical habitat designation would significantly or uniquely affect small government entities. As such, a Small Government Agency Plan is not required.

(60) Comment: Some commenters noted that critical habitat designation may affect other wildlife species.

Our Response: We believe the overall effects on other wildlife species will be positive, as described in sections 5.2.2 and 5.2.3 of our Environmental Assessment.

(61) Comment: One commenter asserted that critical habitat mapping was a closed process that should have involved other land managers.

Our Response: We have carefully considered input from Federal, State, and county land managers and have incorporated this information, as appropriate, in our identification and mapping of critical habitat, both in the proposed as well as the final rule.

(62) Comment: One commenter noted that critical habitat polygons are delineated with straight lines; habitat boundaries are seldom straight lines; therefore, the critical habitat maps are not accurate.

Our Response: See our responses to comments 10 and 24 above.

(63) Comment: One commenter asked if landowners will be able to withdraw lands enrolled in the Conservation Reserve Program that are designated as critical habitat and resume farming.

Our Response: Any landowner will have the option of managing their lands as they choose unless ``take'' (defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct) of Gunnison sage-grouse will occur. The ESA provides various mechanisms for authorizing take, depending on the circumstances.

(64) Comment: One commenter requested that the city of Gunnison, including wastewater treatment facilities and the Gunnison River channel from Highway 135 to Tomichi Riverway Park, be excluded from critical habitat designation.

Our Response: When determining critical habitat boundaries within this final rule, we made every effort to avoid including developed areas, e.g. lands covered by buildings, pavement, and other manmade structures on the effective date of this rule, because such lands lack physical and biological features essential for Gunnison sage-grouse conservation. For example, we did not include moderately to highly developed lands around the City of Gunnison and Dove Creek within the mapped critical habitat boundaries. We have also not included lands around the Gunnison wastewater treatment facility and the Gunnison River channel extending through the Dos Rios Golf Club to Highway 135, because these areas fell within the moderately to highly developed lands.

(65) Comment: Some commenters requested that hang gliding be allowed within critical habitat.

Our Response: Critical habitat designation does not automatically preclude or otherwise restrict land uses, including recreation.

(66) Comment: Two commenters suggested that a Flexibility Analysis Report should be completed due to the large number of small businesses that will be impacted.

Our Response: The Regulatory Flexibility Act as amended by the Small Business Regulatory Enforcement Fairness Act requires a determination of whether the critical habitat designation will have a significant economic impact on a substantial number of small entities (i.e., small businesses, small organizations, and small governmental jurisdictions). In this final rule, we are certifying that the critical habitat designation for Gunnison sage-grouse will not have a significant economic impact on a substantial number of small entities. As described in more detail in Required Determinations below, we believe that, based on our interpretation of directly regulated entities under the RFA and relevant case law, this designation of critical habitat will only directly regulate Federal agencies which are not by definition small business entities. And as such, we certify in this final rule that this designation of critical habitat will not have a significant economic impact on a substantial number of small business entities. Therefore, an initial regulatory flexibility analysis is not

required. However, though not necessarily required by the RFA, in our final economic analysis for this rule we considered and evaluated the potential effects to third parties that may be involved with consultations with Federal action agencies related to this action (Industrial Economics, Inc. 2014, Appendix A).

(67) Comment: One commenter requested a definition of ``crucial seasonal habitat.''

Our Response: This term is used in our description of the six critical habitat units, in reference to the need for special management actions to address threats from development to these habitats. Crucial seasonal habitat refers to areas important to the life history and survival of Gunnison sage-grouse including breeding, nesting, brood rearing, and wintering habitats, as defined by seasonally specific PCEs 2 through 5 in this rule (see Seasonally Specific Primary Constituent Elements).

(68) Comment: Several commenters requested that an environmental impact statement (EIS) be prepared for the critical habitat designation for Gunnison sage-grouse.

Our Response: As described in the National Environmental Policy Act section of this rule, we found, based on our final environmental assessment, that no significant environmental impact would occur as a result of critical habitat designation for Gunnison sage-grouse. Therefore, an environmental impact statement is not necessary for the designation of critical habitat for Gunnison sage-grouse.

Critical Habitat

Background

    It is our intent to discuss below only those topics directly relevant to the designation of critical habitat for

[[Page 69328]]

Gunnison sage-grouse in this section of the final rule. For more information on Gunnison sage-grouse taxonomy, life history, habitat, population descriptions, and threats to the species, refer to the 12-month finding published September 28, 2010 (75 FR 59804) and the final listing rule published elsewhere in today's Federal Register.

    Critical habitat is defined in section 3 of the Act as:

    (1) The specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the Act, on which are found those physical or biological features:

        (a) Essential to the conservation of the species, and

        (b) Which may require special management considerations or protection; and

    (2) Specific areas outside the geographical area occupied by the species at the time it is listed, upon a determination that such areas are essential for the conservation of the species.

    Conservation, as defined under section 3 of the Act, means to use and the use of all methods and procedures that are necessary to bring an endangered or threatened species to the point at which the measures provided pursuant to the Act are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

    Critical habitat receives protection under section 7 of the Act through the requirement that Federal agencies ensure, in consultation with the Service, that any action they authorize, fund, or carry out is not likely to result in the destruction or adverse modification of critical habitat. The designation of critical habitat does not affect land ownership or establish a refuge, wilderness, reserve, preserve, or other conservation area. Such designation does not allow the government or public to access private lands. Such designation does not require implementation of restoration, recovery, or enhancement measures by non-Federal landowners. Where a landowner seeks or requests Federal agency funding or authorization for an action that may affect a listed species or critical habitat, the consultation requirements of section 7(a)(2) apply, but even in the event of a destruction or adverse modification finding, the obligation of the Federal action agency and the landowner is not to restore or recover the species, but to implement reasonable and prudent alternatives to avoid destruction or adverse modification of critical habitat.

    Under the first prong of the Act's definition of critical habitat, areas within the geographic area occupied by the species at the time it was listed are included in a critical habitat designation if they contain physical or biological features (1) which are essential to the conservation of the species and (2) which may require special management considerations or protection. For these areas, critical habitat designations identify, to the extent known using the best scientific and commercial data available, those physical or biological features that are essential to the conservation of the species (such as space, food, cover, and protected habitat). In identifying those physical and biological features within an area, we focus on the principal biological or physical constituent elements (primary constituent elements such as roost sites, nesting grounds, seasonal wetlands, water quality, tide, soil type) that are essential to the conservation of the species. Primary constituent elements are the elements of physical or biological features that provide for a species' life-history processes and are essential to the conservation of the species.

    Under the second prong of the Act's definition of critical habitat, we can designate critical habitat in areas outside the geographic area occupied by the species at the time it is listed, upon a determination that such areas are essential for the conservation of the species. For

BLM_0072118

example, an area formerly occupied by the species but that was not occupied at the time of listing may be essential to the conservation of the species and may be included in the critical habitat designation. We designate critical habitat in areas outside the geographic area occupied by a species only when a designation limited to its current range would be inadequate to ensure the conservation of the species.

Section 4 of the Act requires that we designate critical habitat on the basis of the best scientific and commercial data available. Further, our Policy on Information Standards Under the Endangered Species Act (published in the Federal Register on July 1, 1994 (59 FR 34271)), the Information Quality Act (section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001 (Pub. L. 106-554; H.R. 5658)), and our associated Information Quality Guidelines, provide criteria, establish procedures, and provide guidance to ensure that our decisions are based on the best scientific data available. They require our biologists, to the extent consistent with the Act and with the use of the best scientific data available, to use primary and original sources of information as the basis for recommendations to designate critical habitat.

When we determine which areas should be designated as critical habitat, our primary source of information is generally the information developed during the listing process for the species. Additional information sources may include articles in peer-reviewed journals, conservation plans developed by States and counties, scientific status surveys and studies, biological assessments, or other unpublished materials and expert opinion or personal knowledge.

Habitat is dynamic, and species may move from one area to another over time. We recognize that critical habitat designated at a particular point in time may not include all of the habitat areas that we may later determine are necessary for the recovery of the species. For these reasons, a critical habitat designation does not signal that habitat outside the designated area is unimportant or may not be needed for recovery of the species. Areas that are important to the conservation of the species, both inside and outside the critical habitat designation, will continue to be subject to: (1) Conservation actions implemented under section 7(a)(1) of the Act; (2) regulatory protections afforded by the requirement in section 7(a)(2) of the Act for Federal agencies to insure their actions are not likely to jeopardize the continued existence of any endangered or threatened species; and (3) the prohibitions of section 9 of the Act if actions occurring in these areas may result in take of the species. Federally funded or permitted projects affecting listed species outside their designated critical habitat areas may still result in jeopardy findings in some cases. These protections and conservation tools will continue to contribute to recovery of this species. Similarly, critical habitat designations made on the basis of the best available information at the time of designation will not control the direction and substance of future recovery plans, habitat conservation plans (HCPs), or other species conservation planning efforts if new information available at the time of

[[Page 69329]]

these planning efforts calls for a different outcome.
Prudency Determination

Section 4(a)(3) of the Act, as amended, and implementing regulations (50 CFR 424.12), require that, to the maximum extent prudent and determinable, the Secretary designate critical habitat at the time the species is determined to be endangered or threatened. Our regulations (50 CFR 424.12(a)(1)) state that the designation of critical habitat is not prudent when one or both of the following situations exist: (1) The species is threatened by taking or other human activity, and identification of critical habitat can be expected to increase the degree of threat to the species, or (2) such designation of critical habitat would not be beneficial to the species.

There is currently no imminent threat of take attributed to collection or vandalism for this species (see Factor B discussion in the final listing rule elsewhere in today's Federal Register), and identification and mapping of critical habitat is not expected to initiate any such threat. In the absence of finding that the designation of critical habitat would increase threats to a species, if there are any benefits to a critical habitat designation, then a prudent finding is warranted. Here, the potential benefits of designation include: (1) Triggering consultation under section 7 of the Act, in new areas for actions in which there may be a Federal nexus where consultation would not otherwise occur because, for example, the area is or has become unoccupied or the occupancy is in question; (2) focusing conservation activities on the most essential features and areas; (3) providing educational benefits to State or county governments or private entities; and (4) preventing people from causing inadvertent harm to the species. Therefore, because we have determined that the designation of critical habitat will not likely increase the degree of threat to the species and may provide some measure of benefit, we find that designation of critical habitat is prudent for the Gunnison sage-grouse.
Critical Habitat Determinability

Having determined that designation is prudent, under section 4(a)(3) of the Act we must find whether critical habitat for the species is determinable. Our regulations at 50 CFR 424.12(a)(2) state that critical habitat is not determinable when one or both of the following situations exist:

(i) Information sufficient to perform required analyses of the impacts of the designation is lacking, or

(ii) The biological needs of the species are not sufficiently well known to permit identification of an area as critical habitat. When critical habitat is not determinable, the Act allows the Service an additional year to publish a critical habitat designation (16 U.S.C. 1533(b)(6)(C)(ii)).

BLM_0072119

We reviewed the available information pertaining to the biological needs of the species and habitat characteristics where the species is located. This and other information represent the best scientific data available and led us to conclude that the designation of critical habitat is determinable for the Gunnison sage-grouse.

Physical and Biological Features

In accordance with section 3(5)(A)(i) and 4(b)(1)(A) of the Act and regulations at 50 CFR 424.12, in determining which areas within the geographical area occupied by the species at the time of listing to designate as critical habitat, we consider the physical and biological features essential to the conservation of the species and which may require special management considerations or protection. These include, but are not limited to:
(1) Space for individual and population growth and for normal behavior;
(2) Food, water, air, light, minerals, or other nutritional or physiological requirements;
(3) Cover or shelter;
(4) Sites for breeding, reproduction, or rearing (or development) of offspring; and
(5) Habitats that are protected from disturbance or are representative of the historical, geographical, and ecological distributions of a species.
We derive the specific physical and biological features required for Gunnison sage-grouse from studies of this species' habitat, ecology, and life history as described in the proposed and final listing rules and in greater detail in the 12-month finding published September 28, 2010 (75 FR 59804), and in the information presented below. As in the cited rules and 12-month finding, the information below uses scientific information specific to the Gunnison sage-grouse where available but also applies scientific management principles and scientific information for greater sage-grouse, a closely related species with similar life histories and habitat requirements (Young 1994, p. 44), that are relevant to our determinations--a practice followed by the wildlife and land management agencies that have responsibility for management of both species and their habitat. We use sage-grouse below in reference to both Gunnison and greater sage-grouse whenever the scientific data and information is relevant to both species.
We have determined that the Gunnison sage-grouse requires the following physical and biological features:
Space for Individual and Population Growth and for Normal Behavior
Gunnison sage-grouse require large, interconnected expanses of sagebrush plant communities that contain healthy understory composed primarily of native, herbaceous vegetation (Patterson 1952, p. 9; Rogers 1964, p. 19; Knick et al. 2003, p. 623; Connelly et al. 2004, 4-15; Knick and Connelly 2011, entire; Pyke 2011, p. 532; Wisdom et al. 2011, entire). Gunnison sage-grouse may use a variety of habitats throughout their life cycle, such as riparian meadows, riparian areas with a shrub component, agricultural lands, and steppe dominated by native grasses and forbs. However, Gunnison sage-grouse are considered sagebrush obligates (Patterson 1952, pp. 9, 42; Braun et al. 1976, p. 168; Schroeder et al. 1999, pp. 4-5; Connelly et al. 2000a, pp. 970-972; Connelly et al. 2004, p. 4-1), and the use of non-sagebrush habitats by sage-grouse is dependent on the presence of sagebrush habitats in close proximity (Connelly et al. 2004, p. 4-18 and references therein). In fact, the historical and current distribution of the Gunnison sage-grouse closely matches that of sagebrush (Patterson 1952, p. 9; Braun 1987, p. 1; Schroeder et al. 2004, p. 364, and references therein) (see the final listing rule published elsewhere in today's Federal Register).
Gunnison sage-grouse move seasonally among various habitat types driven by breeding activities, nest and brood-rearing site requirements, seasonal changes in the availability of food resources, and response to weather conditions. In the 2005 Gunnison Sage-grouse Rangewide Conservation Plan (RCP) (GSRSC 2005, entire), annual Gunnison sage-grouse habitat use was categorized into three seasons: (1) Breeding (2) summer-late fall and (3) winter (GSRSC 2005, pp. 27-31). Sage-grouse exhibit strong site fidelity (loyalty to a particular area) to seasonal habitats, including breeding, nesting, brood-rearing, and wintering areas, even when a particular area may no longer be of value (Connelly et al. 2004, p. 3-1). Adult sage-grouse rarely switch inter-annual use among these seasonal

[[Page 69330]]

habitats once they have been selected (Berry and Eng 1985, pp. 238-240; Fischer et al. 1993, p. 1039; Young 1994, pp. 42-43; Root 2002, p. 12; Holloran and Anderson 2005, p. 749), limiting the species' adaptability to habitat changes. Consequently, there may be lags in the response of Gunnison sage-grouse to development or habitat changes, similar to those observed in other sagebrush obligate birds (Wiens and Rotenberry 1985, p. 666).
The pattern and scale of Gunnison sage-grouse annual movements, and the degree to which a given habitat patch can fulfill the species' annual habitat needs, are dependent on the arrangement and quality of habitats across the landscape. Habitat structure and quality vary spatially over the landscape; therefore, some areas may provide habitat for a single season, while other areas may provide habitat for one or more seasons (GSRSC 2005, pp. 25-26). In addition, plant community dynamics and disturbance also influence habitat changes and variability over time. Rangewide, fine-scale habitat structure data on which to delineate seasonal habitats currently does not exist. A spatially explicit nest site selection model developed for the Gunnison Basin by Aldridge et al. (2012, entire) predicted the location of the best Gunnison sage-grouse nesting habitat. The total area of the predicted

BLM_0072120

best nesting habitat (containing greater than 90 percent of an independent sample of nest locations) amounted to approximately 50 percent of the study area. However, this model does not predict other life-history requirements of Gunnison sage-grouse such as seasonal habitat needs outside of the nesting season (Aldridge et al. 2012, p. 403).

Gunnison sage-grouse make relatively large movements on an annual basis due to the need for a diverse range of seasonal habitat types (Connelly et al. 2000a, pp. 968-969). Maximum Gunnison sage-grouse annual movements in relation to lek capture have been reported as 18.5 km (11.5 mi) (GSRSC 2005, p. J-3), and 17.3 km (10.7 mi) (Saher 2011, pers. comm.), and individual Gunnison sage-grouse location points can be up to 27.9 km (17.3 mi) apart within a given year (Root 2002, pp. 14-15). Individual Gunnison sage-grouse have been documented to move more than 56.3 km (35 mi) to wintering areas in the Gunnison Basin (Phillips 2011, pers. comm.; Phillips 2013, p. 4). In contrast, the maximum recorded movement distance of Gunnison sage-grouse in the Monticello population is 8.2 km (5.1 mi) (Ward 2007), demonstrating that movement distances of sage-grouse likely vary by population and area. While it is likely that some areas encompassed within these movement boundaries are used only briefly as movement areas, the extent of these movements demonstrate the large scale annual habitat requirements of the species.

Therefore, based on the species' year-round reliance on sagebrush and the various seasonal habitat requirements discussed above, we identify sagebrush plant communities of sufficient size and configuration to encompass all seasonal habitats, including areas used to move between seasonal habitats, for a given population of Gunnison sage-grouse to be a physical or biological feature essential to the conservation of this species.

Food, Water, Air, Light, Minerals, or Other Nutritional or Physiological Requirements

Food resources used by Gunnison sage-grouse vary throughout the year because of seasonal changes in food availability and specific dietary requirements of breeding hens and chicks. The diet of Gunnison sage-grouse is composed of nearly 100 percent sagebrush in the winter, while forbs, insects, and sagebrush are important dietary components during the remainder of the year (Wallestad et al. 1975, p. 21; Barnett and Crawford 1994, p. 117; Schroeder et al. 1999, p. 5; Young et al. 2000, p. 452).

Pre-laying hens are particularly dependent on forbs and the insects supported by native herbaceous understories (Drut et al. 1994, pp. 173-175). The Gunnison sage-grouse hen pre-laying period is from approximately late-March to early April. Pre-laying habitats for sage-grouse hens need to provide a diversity of vegetation including forbs that are rich in calcium, phosphorous, and protein to meet the nutritional needs of females during the egg development period (Barnett and Crawford 1994, p. 117; Connelly et al. 2000a, p. 970). During the pre-laying period, female sage-grouse select forbs that generally have higher amounts of calcium and crude protein than sagebrush (Barnett and Crawford 1994, p. 117).

Forbs and insects are essential nutritional components for sage-grouse chicks (Klebenow and Gray 1968, pp. 81-83; Peterson 1970, pp. 149-151; Johnson and Boyce 1991, p. 90; Connelly et al. 2004, p. 3-3). During the first 3 weeks after hatching, insects are the primary food of chicks (Patterson 1952, p. 201; Klebenow and Gray 1968, p. 81; Peterson 1970, pp. 150-151; Johnson and Boyce 1990, pp. 90-91; Johnson and Boyce 1991, p. 92; Drut et al. 1994, p. 93; Pyle and Crawford 1996, p. 320; Fischer et al. 1996a, p. 194). Diets of 4- to 8-week-old greater sage-grouse chicks were found to have more plant material as the chicks matured (Peterson 1970, p. 151). Succulent forbs are predominant in the diet until chicks exceed 3 months of age, at which time sagebrush becomes a major dietary component (Klebenow 1969, pp. 665-656; Connelly and Markham 1983, pp. 171-173; Fischer et al. 1996b, p. 871; Schroeder et al. 1999, p. 5).

Decreased availability of forbs corresponded to a decrease in the number of chicks per hen and brood size (Barnett and Crawford 1994, p. 117). Gunnison sage-grouse population dynamics appear to be linked closely to female reproductive success and chick survival (GSRSC 2005, p. G-13). In a recent demographic and population viability study of Gunnison sage-grouse, juvenile survival was found to be the most influential vital rate in the Gunnison Basin population. In northwest Colorado, dispersal, migration, and settlement patterns of juvenile greater sage-grouse--factors important to population persistence--were more influenced by limitations associated with local traditional breeding (lek) and brood-rearing areas than by landscape-level vegetation structure and composition (i.e., the spatial distribution and configuration of vegetation types) (Thompson 2012, pp. 317, 341). The same study recommended restoration, creation, and protection of early and late brood-rearing habitats to increase chick survival rates (Thompson 2012, p. 135). The importance of brood-rearing habitat for juvenile survival, recruitment, and hence, population viability of sage-grouse is clear. Habitats that support healthy sagebrush communities including herbaceous understories of native grasses and forbs provide such brood-rearing habitat essential to the persistence of Gunnison sage-grouse populations.

Brood-rearing habitat for females with chicks must provide adequate cover adjacent to areas rich in forbs and insects to assure chick survival during this period (Connelly et al. 2000a, p. 971; Connelly et al. 2004, p. 4-11). In most areas within the range of Gunnison sage-grouse, the herbaceous understory component of sagebrush plant communities typically dries out as summer progresses into fall. Habitats used by Gunnison sage-grouse in summer through late-fall are typically more mesic than surrounding habitats during this time of year (GSRSC 2005, p. 30). These areas are used primarily

[[Page 69331]]

for foraging because they provide reliable sources of vigorous, herbaceous vegetation and an abundance of forbs and insects when these resources are otherwise limited on the landscape. Such areas include riparian communities, springs, seeps, mesic meadows, or irrigated hay meadows and alfalfa fields (GSRSC 2005, p. 30; Schroeder et al. 1999, p. 4; Connelly et al. 2000a, p. 980). However, seasonal foraging habitats typically receive use by Gunnison sage-grouse only if they are within 50 m (165 ft.) of surrounding sagebrush plant communities (Colorado Sage Grouse Working Group (CSGWG) 1997, p. 13).

In winter, greater and Gunnison sage-grouse diet is almost exclusively sagebrush (Rasmussen and Griner 1938, p. 855; Batterson and Morse 1948, p. 20; Patterson 1952, pp. 197-198; Wallestad et al. 1975, pp. 628-629; Young et al. 2000, p. 452). Various species of sagebrush can be consumed by sage-grouse (Remington and Braun 1985, pp. 1056-1057; Welch et al. 1988, p. 276, 1991; Myers 1992, p. 55). Habitats used by Gunnison sage-grouse during winter typically consist of 15 to 30 percent sagebrush canopy cover, similar to those used by greater sage-grouse (Connelly et al. 2000a, p. 972; Young et al. 2000, p. 451). However, Gunnison sage-grouse also seasonally use some deciduous shrub communities (e.g., Gambel oak and serviceberry) (Young et al. 2000, p. 451). Sagebrush exposure and height must be sufficient to provide birds access to food during snowy conditions and severe winters (GSRSC 2005, pp. 30-31) (see Cover or Shelter).

Based on the information above, we identify sagebrush plant communities that contain herbaceous vegetation consisting of a diversity and abundance of forbs, insects, and grasses, that fulfill all Gunnison sage-grouse seasonal dietary requirements, to be a physical or biological feature essential to the conservation of this species. We also identify as such features non-sagebrush habitats located adjacent to sagebrush plant communities that are used by Gunnison sage-grouse for foraging during seasonally dry periods, such as summer-late fall. These habitats are generally more mesic than surrounding habitat, and include wet meadows, riparian areas, and irrigated pastures.

Cover or Shelter

Predation is the most commonly identified cause of direct mortality for sage-grouse during all life stages, and Gunnison sage-grouse require sagebrush and herbaceous vegetation year-round for escape and hiding cover (Schroeder et al. 1999, p. 9; Connelly et al. 2000b, p. 228; GSGRC 2005, p. 138; Connelly et al. 2011b, p. 66). Major predators of adult sage-grouse include many species including golden eagles (Aquila chrysaetos), red foxes (Vulpes fulva), and bobcats (Felis rufus) (Hartzler 1974, pp. 532-536; Schroeder et al. 1999, pp. 10-11; Schroeder and Baydack 2001, p. 25; Rowland and Wisdom 2002, p. 14; Hagen 2011, p. 97). Most raptor predation of sage-grouse is on juveniles and older age classes (GSRSC 2005, p. 135). Juvenile sage-grouse also are killed by common ravens (Corvus corax), badgers (Taxidea taxus), red foxes, coyotes (Canis latrans) and weasels (Mustela spp.) (Braun 1995, entire; Schroeder et al. 1999, p. 10). Nest predators include badgers, weasels, coyotes, common ravens, American crows (Corvus brachyrhyncos) and magpies (Pica spp.), elk (Cervus canadensis) (Holloran and Anderson 2003, p. 309), and domestic cows (Bovus spp.) (Coates et al. 2008, pp. 425-426). Ground squirrels (Spermophilus spp.) also have been identified as nest predators (Patterson 1952, p. 107; Schroeder et al. 1999, p. 10; Schroder and Baydack 2001, p. 25), but recent data show that they are physically incapable of puncturing eggs (Holloran and Anderson 2003, p. 309; Coates et al. 2008, p. 426; Hagen 2011, p. 97). Young (1994, p. 37) found the most common predators of Gunnison sage-grouse eggs were weasels, coyotes, and corvids.

Nest predation appears to be related to the amount of herbaceous cover surrounding the nest (Gregg et al. 1994, p. 164; Braun 1995, pp. 1-2; DeLong et al. 1995, p. 90; Braun 1998; Coggins 1998, p. 30; Connelly et al. 2000b, p. 975; Schroeder and Baydack 2001, p. 25; Coates and Delehanty 2008, p. 636). Females actively select nest sites with the presence of big sagebrush and grass and forb cover (Connelly et al. 2000a, p. 971), and nesting success of greater sage-grouse is positively correlated with these qualities (Schroeder and Baydack 2001, p. 25; Hagen et al. 2007, p. 46). Likewise, reduced herbaceous cover for young chicks can increase their rate of predation (Schroeder and Baydack 2001, p. 27), and high shrub canopy cover at nest sites was related to lower levels of predation by visual predators, such as the common raven (Coates 2007, p. 148). However, herbaceous cover may not be effective in deterring olfactory predators such as badgers (Coates 2007, p. 149).

Gunnison sage-grouse nearly exclusively use sagebrush plant communities during the winter season for thermal cover and to meet nutritional needs. Sagebrush stand selection in winter is influenced by snow depth (Patterson 1952, pp. 188-189; Connelly 1982 as cited in Connelly et al. 2000a, p. 980) and in some areas, topography (Beck 1977, p. 22; Crawford et al. 2004, p. 5). Winter sagebrush use areas are associated with drainages, ridges, or southwest aspects with slopes less than 15 percent (Beck 1977, p. 22). Lower flat areas and shorter sagebrush along ridge tops provide roosting areas. In extreme winter conditions, greater sage-grouse will spend nights and portions of the day burrowed into ``snow burrows'' (Back et al. 1987, p. 488), and we expect Gunnison sage-grouse to exhibit the same behavior. Hupp and Braun (1989, p. 825) found that most Gunnison sage-grouse feeding activity in the winter occurred in drainages and on slopes with south or west aspects in the Gunnison Basin. During a severe winter in the Gunnison Basin in 1984, less than 10 percent of the sagebrush was exposed above the snow and available to sage-grouse (Hupp, 1987, pp. 45-46). In these conditions, the tall and vigorous sagebrush typical in drainages was an especially important food source (GSRSC 2005, p. 91).

Therefore, based on the information above, we identify sagebrush plant communities consisting of adequate shrub and herbaceous structure to provide year-round escape and hiding cover, as well as areas that provide concealment of nests and broods during the breeding season, and

BLM_0072122

winter season thermal cover, to be a physical or biological feature essential to the conservation of this species. Quantitative information on cover can be found in the Primary Constituent Elements for Gunnison Sage-grouse section below.
Sites for Breeding, Reproduction, or Rearing (or Development) of Offspring

    Lek Sites--Lek sites can be located on areas of bare soil, wind-swept ridges, exposed knolls, low sagebrush, meadows, and other relatively open sites with good visibility and low vegetation structure (Connelly et al. 1981, pp. 153-154; Gates 1985, pp. 219-221; Klott and Lindzey 1989, pp. 276-277; Connelly et al. 2004, pp. 3-7 and references therein). In addition, leks are usually located on flat to gently sloping ground of less than 15 percent grade (Patterson 1952, p. 83; Giezentanner and Clark 1974, p. 218; Wallestad 1975, p. 17; Autenrieth 1981, p. 13). Leks are often surrounded by denser shrub-steppe cover, which is used for escape, and thermal and feeding cover. Leks can be formed opportunistically at any appropriate site within or adjacent to nesting habitat (Connelly et al. 2000a, p. 970). Lek habitat availability is not

[[Page 69332]]

considered to be a limiting factor for sage-grouse (Schroeder 1997, p. 939). However, adult male sage-grouse demonstrate strong yearly fidelity to lek sites (Patterson 1952, p. 91; Dalke 1963 et al., pp. 817-818; Lyon and Anderson 2003, p. 489), and some Gunnison sage-grouse leks have been used since the 1950s (Rogers 1964, pp. 35-40).
    Nesting Habitat--Gunnison sage-grouse typically select nest sites under sagebrush cover with some forb and grass cover (Young 1994, p. 38), and successful nests were found in higher shrub density and greater forb and grass cover than unsuccessful nests (Young 1994, p. 39). The understory of productive sage-grouse nesting areas contains native grasses and forbs, with horizontal and vertical structural diversity that provides an insect prey base, herbaceous forage for pre-laying and nesting hens, and cover for the hen while she is incubating (Schroeder et al. 1999, p. 11; Connelly et al. 2000a, p. 971; Connelly et al. 2004, pp. 4-5--4-8). Shrub canopy and grass cover provide concealment for sage-grouse nests and young and are critical for reproductive success (Barnett and Crawford 1994, pp. 116-117; Gregg et al. 1994, pp. 164-165; DeLong et al. 1995, pp. 90-91; Connelly et al. 2004, p. 4-4). Few herbaceous plants are growing in April when nesting begins, so residual herbaceous cover from the previous growing season is critical for nest concealment in most areas (Connelly et al. 2000a, p. 977).
    Nesting success for Gunnison sage-grouse is highest in areas where forb and grass covers are found beneath a sagebrush canopy cover of 15 to 30 percent (Young et al. 2000, p. 451). These numbers are comparable to those reported for greater sage-grouse (Connelly et al. 2000a, p. 971). Nest success for greater sage-grouse was greatest where grass cover is present (Connelly et al. 2000a, p. 971). Because of the similarities between these two species, we infer that increased nest success in Gunnison sage-grouse also depends on sufficient herbaceous understories beneath sagebrush cover. However, in a recent demographic study of Gunnison sage-grouse, nest site vegetation characteristics did not have a strong influence on nest success in the Gunnison Basin and San Miguel populations (Davis 2012, p. 10). Temporal factors appeared to have the greatest influence on nesting success, as earlier season nesting tended to be more successful than later season nesting; the longer incubation occurred, the greater the risk of nest failure (Davis 2012, p. 1). Nevertheless, the best available scientific information overall indicates a link between habitat and vegetation characteristics and nest site selection and success in sage-grouse. Therefore, we maintain that vegetation characteristics are important physical and biological features of breeding and reproduction habitats for Gunnison sage-grouse.
    Female Gunnison sage-grouse exhibit strong fidelity to nesting locations (Young 1994, p. 42; Lyon 2000, p. 20, Connelly et al. 2004, pp. 4-5; Holloran and Anderson 2005, p. 747). The degree of fidelity to a specific nesting area appears to diminish if the female's first nest attempt in that area was unsuccessful (Young 1994, p. 42). However, movement to new nesting areas does not necessarily result in increased nesting success (Connelly et al. 2004, pp. 3-6; Holloran and Anderson 2005, p. 748). As a consequence of their site fidelity to seasonal habitats, measurable population effects may lag behind negative changes in habitat, similar to other sagebrush obligate birds (Wiens and Rotenberry 1985, p. 666).
    Brood-Rearing Habitat--Early brood-rearing habitat is found close to nest sites (Connelly et al. 2000a, p. 971), although individual females with broods may move large distances (Connelly 1982, as cited in Connelly et al. 2000a, p. 971). Gunnison sage-grouse with broods used areas with lower slopes than nesting areas, high grass and forb cover, and relatively low sagebrush cover and density (Young 1994, pp. 41-42). Broods frequently used the edges of hay meadows, but were often flushed from areas found in interfaces of wet meadows and habitats providing more cover, such as sagebrush or willow-alder (Salix-Alnus). By late summer and into the early fall, the birds move from riparian areas to mesic sagebrush plant communities that continue to provide green forbs. During this period, Gunnison sage-grouse can be observed in atypical habitat such as agricultural fields (Commons 1997, pp. 79-81). However, broods in the Gunnison Basin typically do not use hay meadows further away than 50 m (165 ft) from the edge of adjacent sagebrush stands (CSGWG 1997, p. 13). In the Monticello area, broods have been documented using CRP lands (Lupis 2005, p. 28).
    Therefore, based on the information above, we identify sagebrush plant communities with the appropriate shrub and herbaceous vegetation structure to meet all the needs for all Gunnison sage-grouse reproductive activities (including lekking, nesting, and brood-rearing) to be a physical or biological feature essential to the conservation of

BLM_0072123

this species.
Habitats Protected From Disturbance or Representative of the
Historical, Geographical, and Ecological Distributions of the Species
    Based on historical records, museum specimens, and potential
historical sagebrush habitat distribution, Gunnison sage-grouse
potential historical range included parts of central and southwestern
Colorado, northwestern New Mexico, northeastern Arizona, and
southeastern Utah (Schroeder et al. 2004, pp. 370-371). The potential
historical range of Gunnison sage-grouse was estimated to have been
21,376 square miles, or 13,680,590 ac (GSRSC 2005, pp. 32-35, as
adapted from Schroeder et al. 2004, entire). However, only a portion of
this historical range would have been occupied at any one time.
    According to the RCP, the species' estimated current range is 1,822
square miles, or 1,166,075 ac, in central and southwestern Colorado,
and southeastern Utah (GSRSC 2005, pp. 32-35, as adapted from Schroeder
et al. 2004, entire). Based on these figures, the species' current
range would represent about 8.5 percent of its historical range (GSRSC
2005, p. 32). Similarly, Schroeder et al. (2004, p. 371) estimated the
species' current overall range to be 10 percent of potential
presettlement habitat (prior to Euro-American settlement in the 1800s).
As estimated here, the species' current potential range includes an
estimated 1,621,008 acres (ac) (655,957 hectares (ha)) in southwestern
Colorado and southeastern Utah (Index Map), comprising 923,314 ac
(349,238 ha) (57 percent) of occupied habitat and 697,694 ac (306,719
ha) (43 percent) of unoccupied habitat (Table 1). Based on these
figures, the current potential range of 1,621,008 ac represents
approximately 12 percent and occupied habitat represents approximately
7 percent of the potential historical range of 13,680,590 ac.
    The estimates above indicate that approximately 88 to 93 percent of
the historical range of Gunnison sage-grouse has been lost. We
acknowledge that these estimates are uncertain and imprecise. We also
recognize that only a portion of historical range would have been
occupied at any one time, and that the distribution of sage-grouse
habitat across the landscape is naturally disconnected due to the
presence of unsuitable habitat such as forests, deserts, and canyons
across the landscape (Rogers 1964, p. 19). Nevertheless, the best
available information indicates a substantial reduction of Gunnison
sage-grouse

[[Page 69333]]

distribution since Euro-American settlement in the 1800s, with evidence
of the loss of peripheral populations (Schroeder et al. 2004, p. 371,
and references therein) and a northward trend of extirpation (Schroeder
et al. 2004, p. 369). This significant loss in habitat supports our
determination that occupied habitat alone, or a subset of those lands
(e.g., Federal land), are insufficient to ensure the species'
persistence.
    The occupied sagebrush plant communities included in this
designation contain the physical and biological features representative
of the historical and geographical distribution of the Gunnison sage-
grouse. The unoccupied sagebrush plant communities included in this
designation were all likely historically occupied (GSRSC 2005, pp. 32-
33; Schroeder et al. 2004, entire) and allow for the expansion of the
current geographic distribution of the species and potentially
facilitate movements among populations. As discussed further under
Rationale and Other Considerations, the extremely limited extent of
sagebrush habitat throughout the current range of the species,
particularly in the satellite populations, is a factor in our decision
to include areas beyond currently occupied habitat in this critical
habitat designation.

Primary Constituent Elements for Gunnison Sage-Grouse

    Under the Act and its implementing regulations, we are required to
identify the physical and biological features essential to the
conservation of Gunnison sage-grouse in areas occupied at the time of
listing, focusing on the features' primary constituent elements (PCEs).
Primary constituent elements are those specific elements of physical
and biological features that provide for a species' life-history
processes and are essential to the conservation of the species.
    We consider all areas designated as occupied critical habitat here
to meet the landscape specific PCE 1 and one or more of the seasonally
specific PCEs (2-5).
    For the ``seasonally specific PCEs (2-5), we generally adopt the
values from the 2005 RCP (GSRSC 2005, Appendix H, and references
therein). The 2005 RCP provides structural habitat values developed
using only Gunnison sage-grouse habitat use data from various Gunnison
sage-grouse populations in all seasonal habitats (GSRSC 2005, p. H-2).
Source data includes structural vegetation data collected in the
breeding season (Young 1994, entire; Apa 2004, entire), summer-fall
(Young 1994, entire; Woods and Braun 1995, entire; Commons 1997,
entire; Apa 2004, entire), and winter (Hupp 1987, entire). In addition,
these structural habitat values are specific to the Colorado Plateau
floristic province and reflect the understory structure and composition
specific to the range of Gunnison sage-grouse (GSRSC 2005, p. H-2). As
such, these values are based on the most current and comprehensive,
rangewide assessment of Gunnison sage-grouse habitat structure.
    We also note, however, that some lands, especially agricultural
fields and CRP lands, meet one or more of the seasonally specific PCEs
even without meeting the RCP's structural habitat guidelines. This is
so because in some of these areas there is little sagebrush habitat
available for the birds, oftentimes critical seasonal habitats have
been converted to agricultural fields, and when sagebrush communities
are drying out and forbs are waning on the landscape, resources can
still be available in these agricultural areas. Still, these
agricultural fields are less desirable for the species than intact
sagebrush communities.

As presented in the RCP (GSRSC 2005, pp. H6-H8), habitat structural values are known to vary between arid and mesic areas in sage-grouse habitat. Therefore, in the following descriptions and Tables 2 and 3, we provide the full range of these structural values to account for this variation. We have also included agricultural fields in the seasonally specific PCEs.

Based on our current knowledge of the physical or biological features and habitat characteristics required to support the species' life-history requirements, we identify the following primary constituent elements specific to Gunnison sage-grouse. The basis for selected metrics of landscape specific and seasonally specific PCEs is discussed in detail below (see Criteria and Methodology Used to Identify Critical Habitat).

Landscape Specific Primary Constituent Element

Primary Constituent Element 1-- Extensive sagebrush landscapes capable of supporting a population of Gunnison sage-grouse. In general, this includes areas with vegetation composed primarily of sagebrush plant communities (at least 25 percent of the land is dominated by sagebrush cover within a 0.9-mi (1.5-km) radius of any given location), of sufficient size and configuration to encompass all seasonal habitats for a given population of Gunnison sage-grouse, and facilitate movements within and among populations. These areas also occur wholly within the potential historical range of Gunnison sage-grouse (GSRSC 2005, pp. 32-35, as adapted from Schroeder et al. 2004, entire).

Seasonally Specific Primary Constituent Elements

Primary Constituent Element 2--Breeding habitat composed of sagebrush plant communities that, in general, have the structural characteristics within the ranges described in the following table. Habitat structure values are average values over a project area. Breeding habitat includes lek, nesting, and early brood-rearing habitats used typically March 15 through July 15 (GSRSC 2005, p. H-3). Early brood-rearing habitat may include agricultural fields.

Table 2--Breeding Habitat Structural Guidelines for Gunnison Sage-Grouse \a\

| Vegetation variable | Amount in habitat |
|---|---|
| Sagebrush Canopy Cover.................. | 10-25 percent. |
| Non-sagebrush Canopy Cover \b\.......... | 5-15 percent. |
| Total Shrub Canopy Cover............... | 15-40 percent. |
| Sagebrush Height....................... | 9.8-19.7 in (25-50 cm). |
| Grass Cover............................ | 10-40 percent. |
| Forb Cover............................. | 5-40 percent. |
| Grass Height........................... | 3.9-5.9 in (10-15 cm). |
| Forb Height............................ | 2.0-5.9 in (5-15 cm). |

\a\ Derived from GSRSC 2005, p. H-6, which depicts structural values for both arid and mesic areas in Gunnison sage-grouse habitat. Here we provide the full range of these structural values to account for this variation.

\b\ Includes shrubs such as horsebrush (Tetradymia spp.), rabbitbrush (Chrysothamnus spp.), bitterbrush (Purshia spp.), snakeweed (Gutierrezia sarothrae), greasewood (Sarcobatus spp.), winterfat (Eurotia lanata), Gambel's oak (Quercus gambelii), snowberry (Symphoricarpos oreophilus), serviceberry (Amelanchier spp.), and chokecherry (Prunus virginiana).

Primary Constituent Element 3--Summer-late fall habitat composed of sagebrush plant communities that, in general, have the structural characteristics within the ranges described in the following table. Habitat structure values are average values over a project area. Summer-fall habitat includes sagebrush communities having the referenced habitat structure values, as well as agricultural fields and wet meadow or riparian habitat types. Wet meadows and riparian habitats are also included qualitatively under PCE 5 below.

[[Page 69334]]

Table 3--Summer-Late Fall Habitat Structural Guidelines for Gunnison Sage-Grouse \a\ \b\

| Vegetation variable | Amount in habitat |
|---|---|
| Sagebrush Canopy Cover.................. | 5-20 percent. |
| Non-sagebrush Canopy Cover\c\.......... | 5-15 percent. |
| Total Shrub Canopy Cover............... | 10-35 percent. |
| Sagebrush Height....................... | 9.8-19.7 in (25-50 cm). |
| Grass Cover............................ | 10-35 percent. |
| Forb Cover............................. | 5-35 percent. |
| Grass Height........................... | 3.9-5.9 in (10-15 cm). |
| Forb Height............................ | 1.2-3.9 in (3-10 cm). |

\a\ Structural habitat values provided in this table do not include wet meadow or riparian habitats. Therefore, we address these habitat types under Primary Constituent Element 5 below.

\b\ Derived from GSRSC 2005, p. H-7, which depicts structural values for both arid and mesic areas in Gunnison sage-grouse habitat. Here we provide the full range of these structural values to account for this variation.

\c\ Includes shrubs such as horsebrush (Tetradymia spp.), rabbitbrush (Chrysothamnus spp.), bitterbrush (Purshia spp.), snakeweed (Gutierrezia sarothrae), greasewood (Sarcobatus spp.), winterfat (Eurotia lanata), Gambel's oak (Quercus gambelii), snowberry (Symphoricarpos oreophilus), serviceberry (Amelanchier spp.), and chokecherry (Prunus virginiana).

BLM_0072125

Primary Constituent Element 4--Winter habitat composed of sagebrush plant communities that, in general, have sagebrush canopy cover between 30 to 40 percent and sagebrush height of 15.8 to 21.7 in (40 to 55 cm). These habitat structure values are average values over a project area. Winter habitat includes sagebrush areas within currently occupied habitat that are available (i.e., not covered by snow) to Gunnison sage-grouse during average winters (GSRSC 2005, p. H-3).

Primary Constituent Element 5--Alternative, mesic habitats used primarily in the summer-late fall season, such as riparian communities, springs, seeps, and mesic meadows (GSRSC 2005, pp. 30, H-7; Schroeder et al. 1999, p. 4; Connelly et al. 2000a, p. 980).

Special Management Considerations or Protection

When designating critical habitat, we assess whether the specific areas within the geographical area occupied by the species at the time of listing contain features that are essential to the conservation of the species and which may require special management considerations or protection. All areas being designated as critical habitat as described below may require some level of management to address the current and future threats to the physical and biological features essential to the conservation of Gunnison sage-grouse. In all of the described units, special management may be required to ensure that the habitat is able to provide for the biological needs of the species.

A detailed discussion of the current and foreseeable threats to Gunnison sage-grouse can be found in the final listing rule, published elsewhere in today's Federal Register, in the section titled Summary of Factors Affecting the Species. In general, the features essential to the conservation of Gunnison sage-grouse may require special management considerations or protection to address or ameliorate the following significant threats and their interactions: The small population size and structure of most Gunnison sage-grouse populations; habitat decline, including habitat loss, degradation, and fragmentation of sagebrush habitats; drought and climate change; and disease. The special management considerations needed for each critical habitat unit that is being designated are described below.

Special management considerations or protection may be required to address these threats in designated critical habitat. Based on our analysis of threats to Gunnison sage-grouse, continued or future management activities that could ameliorate these threats include, but are not limited to: Comprehensive land-use planning and implementation that prevents a net decrease in the extent and quality of Gunnison sage-grouse habitat through the prioritization and protection of habitats and monitoring; protection of lands by fee title acquisition or the establishment of permanent CEs; management of recreational use to minimize direct disturbance and habitat loss; activities to control invasive weed and invasive native plant species; management of domestic and wild ungulate use so that overall habitat meets or exceeds Gunnison sage-grouse structural habitat guidelines; monitoring of predator communities and management as appropriate; coordinated and monitored habitat restoration or improvement projects; and wildfire suppression, particularly in Wyoming big sagebrush communities. In some cases, continuing current land management practices may be appropriate and beneficial for Gunnison sage-grouse. For instance, continued irrigation and maintenance of hay and alfalfa fields on private lands near sagebrush habitats may help provide or enhance mesic, brood-rearing habitats for Gunnison sage-grouse. While this is a list of special management considerations or protections that are needed, the Service acknowledges the ongoing and pending conservation efforts of all entities across the range of the Gunnison sage-grouse, such as the Sage Grouse Initiative led by the Natural Resources Conservation Service and its many partners. Conservation efforts by those entities on private lands are described in detail under Factor A in our final listing rule for Gunnison sage-grouse elsewhere in today's Federal Register.

Additionally, management of critical habitat lands can increase the amount of suitable habitat and enhance connectivity among Gunnison sage-grouse populations through the restoration of areas that were once dominated by sagebrush plant communities. The limited extent of sagebrush habitats throughout the species' current range emphasizes the need for additional habitat for the species to be able to expand into, allowing for species' conservation. Furthermore, additional sagebrush habitat will also allow the grouse to adjust to changes in habitat availability that may result from climate change.

Criteria and Methods Used To Identify and Map Critical Habitat

As required by section 4(b)(2) of the Act, we use the best scientific data available to designate critical habitat. In accordance with the Act and our implementing regulations at 50 CFR 424.12(b), we review available information pertaining to the habitat requirements of the species and identify occupied areas at the time of listing that contain the features essential to the conservation of the species. If, after identifying currently occupied areas, we determine that those areas are inadequate to ensure conservation of the species, in accordance with the Act and our implementing regulations at 50 CFR 424.12(e), we then consider whether designating additional areas-- outside those currently occupied--are essential to the conservation of the species. Based on this analysis, we are designating critical habitat in areas within the geographical area occupied by the species at the time of listing (currently occupied). We also are designating specific areas outside the geographical area currently occupied by the species, including areas that were historically occupied but are presently unoccupied, because we find that such areas are essential for the conservation of the species (see Rationale and Other Considerations). In an attempt to better explain our criteria in response to public comments, we are providing a new format for our criteria. Therefore, this section looks different from our proposed critical habitat rule. Although

[[Page 69335]]

the explanation presented here is different in format, our criteria and the designation resulting from these criteria is the same. We have also expanded our description of the criteria to add additional clarity.

For occupied habitat, we based our identification of lands that contain the PCEs for Gunnison sage-grouse on polygons delineated and defined by Colorado Parks and Wildlife (CPW) and the Utah Division of Wildlife Resources (UDWR) as part of the 2005 RCP Habitat Mapping project (GSRSC 2005, p. 54), and as updated by subsequent CPW mapping (CPW 2013e, spatial data). Gunnison sage-grouse polygons mapped in the 2005 RCP were derived from a combination of telemetry locations, sightings of sage-grouse or sage-grouse sign, local biological expertise, GIS analysis, or other data sources (GSRSC 2005, p. 54; CDOW 2009e, p. 1). We consider polygons designated as ``occupied habitat'' (GSRSC 2005, p. 54; CPW 2013e, spatial data) to be the area occupied by Gunnison sage-grouse at the time of the listing. These occupied polygons, lek locations, and the habitat guidelines laid out in the RCP, allowed us to determine where the PCEs for Gunnison sage-grouse existed (see Primary Constituent Elements for Gunnison Sage-grouse). Unfortunately, maps of where seasonally specific PCEs exist on the landscape are not available. Therefore, we additionally looked at the Gunnison Basin habitat prioritization tool (BLM 2013b, Appendix F), and 0.6 and 4 mile buffers around lek locations (as described in the RCPs disturbance guidelines (GSRSC 2005, Appendix I) in our evaluation to better consider the seasonally specific PCEs. Further, we utilized this occupied habitat to develop our habitat suitability analysis (used for unoccupied habitat below in criterion 4) and generally, this habitat suitability criterion analysis correlates with PCE 1.

We based our model and identification of unoccupied critical habitat for Gunnison sage-grouse on four criteria: (1) The distribution and range of the species; (2) potential occupancy of the species; (3) proximity and potential connectivity between occupied habitats; and (4) suitability of the habitat for the species.

Distribution and Range of the Species (Criterion 1)

We first limited our consideration and analysis of unoccupied critical habitat to the species' potential historical range (GSRSC 2005, pp. 32-35, as adapted from Schroeder et al. 2004, entire) (potential historical range is described in detail in our final rule to list Gunnison sage-grouse elsewhere in today's Federal Register). In other words, the entirety of designated unoccupied critical habitat (and occupied critical habitat) in this final rule occurs within the boundaries of the species' historical range. However, we further narrowed our consideration of unoccupied critical habitat within the historical range by evaluating potential occupancy of the species, habitat connectivity, and habitat suitability.

Potential Occupancy of the Species (Criterion 2)

We based our identification of unoccupied habitats for Gunnison sage-grouse on maps and polygons of ``potential'' and ``vacant/ unknown'' habitat delineated and defined by the CPW and UDWR. Habitat maps were completed in support of the 2005 RCP (GSRSC 2005, pp. 54-102). The 2005 RCP defined two unoccupied habitat categories, ``potential habitat,'' and ``vacant or unknown habitat'' (GSRSC 2005, p. 54). The RCP defined potential habitat as ``unoccupied habitats that could be suitable for occupation of sage-grouse if practical restoration were applied,'' and is most commonly former sagebrush areas overtaken by pi[ntilde]on-juniper woodlands. The RCP defines vacant or unknown habitat category as ``suitable habitat for sage-grouse that is separated (not contiguous) from occupied habitats that either has not been adequately inventoried, or has not had documentation of sage-grouse presence in the past 10 years.''

We used the ``potential'' and ``vacant or unknown'' habitat polygons (GSRSC 2005, pp. 54-102) to evaluate unoccupied areas as potential critical habitat for Gunnison sage-grouse. Due to limited information available for these areas, we assumed that both types are equal in value and importance to the species (i.e., one was not ranked or weighted as being more important than the other). We then combined and classified these two types as unoccupied habitat for consideration in our analysis and in this critical habitat designation. As described in more detail below, we further evaluated these areas as potential critical habitat based on their adjacency or proximity to currently occupied habitat (potential connectivity between and within populations, criterion 3); and suitability, defined by large areas with dominated by sufficient sagebrush cover at the landscape scale (criterion 4).

Unoccupied habitat in this critical habitat designation differs from the RCP mapped unoccupied habitats (GSRSC 2005, pp. 54-102), in some instances adding or omitting certain areas of unoccupied habitat, based on our adopted criteria and methodology. Some RCP-identified areas were not included in the designation due to distance of the locations from occupied range (i.e., failed criterion 3), where movement of sage-grouse is either not known or anticipated (e.g., peripheral unoccupied habitat north and northeast of the Crawford population of Gunnison sage-grouse). There were areas where only a part of the potential or vacant/unknown habitat met our suitability criterion (4). In these cases, the entire polygon was still included in the designation, with one exception. One RCP potential polygon was very large and extended into Montezuma County. The portion of the polygon that fell within Montezuma County had little suitability (less than 20 percent of the almost 95,000 ac) and the suitable habitat was almost all more than 18.5 km away from occupied habitat. For these reasons, we modified this very large polygon so it no longer included Montezuma County.

Proximity and Potential Connectivity (Criterion 3)

    To account for proximity to and potential connectivity with
occupied Gunnison sage-grouse habitat, we only considered unoccupied
areas as critical habitat if they occur within approximately 18.5 km
(11.5 mi) of occupied habitat (using ``shortest distance'') as
presented in the RCP (GSRSC 2005, pp. J-3). Therefore, outside of
occupied habitat, we conclude these areas have the highest likelihood
of Gunnison sage-grouse use and occupation. Other studies have
suggested similar maximum seasonal (not dispersal) movement distances,
supporting our use of 18.5 km for connectivity. For example, Connelly
et al. (2000a, p. 978) recommended protection of breeding habitats
within 18 km of active leks in migratory sage-grouse populations.
    The maximum dispersal distance of greater sage-grouse in northwest
Colorado is about 20.0 km (12.4 mi) and, therefore, it was suggested
that populations within this distance could maintain gene flow and
connectivity (Thompson 2012, pp. 285-286). It was hypothesized that
isolated patches of suitable habitats within 18 km (11.2 mi) provide
for connectivity between sage-grouse populations; however, information
on how sage-grouse actually disperse and move through landscapes is
lacking (Knick and Hanser 2011, pp. 402, 404). Gunnison sage-grouse
birds have been measured moving up to 35 mi (56 km), but these
dispersal events appear to be less frequent.
    We recognize that Gunnison sage-grouse movement behavior and

[[Page 69336]]

distances likely vary widely by population and area, potentially as a
function of population dynamics, limited or degraded habitats, and
similar factors; and that movements have been documented as being much
greater or less than 18.5 km in some cases (see our final rule to list
Gunnison sage-grouse elsewhere in today's Federal Register for more
discussion). However, the best available information indicates 18.5 km
is a reasonable estimate of the maximum distance required between
habitats and populations to ensure connectivity for Gunnison sage-
grouse, or facilitate future expansion of the species range--hence, our
selection of this metric in our evaluation of areas as potential
critical habitat.

Habitat Suitability (Criterion 4)

    Gunnison and greater sage-grouse occupancy, survival, and
persistence are dependent on the availability of sufficient sagebrush
habitat on a landscape scale (Patterson 1952, p. 9; Braun 1987, p. 1;
Schroeder et al. 2004, p. 364; Knick and Connelly 2011, entire;
Aldridge et al. 2012, entire; Wisdom et al. 2011, entire). Aldridge et
al. (2008b, pp. 989-990) reported that at least 25 percent of the
landscape needed to be dominated by sagebrush cover within a 30-km
(18.6-mi) radius for long-term persistence of sage-grouse populations.
Wisdom et al. (2011, pp. 465-467) indicated that areas where at least
27 percent of the landscape was dominated by sagebrush cover within an
18-km (11.2-mi) radius had a higher probability of persistence. These
combined studies indicate that approximately 25 percent of the
landscape needs to be dominated by sagebrush cover to ensure sage-
grouse persistence. On a finer scale, spatial modeling by Aldridge et
al. (2012, p. 400) indicated that Gunnison sage-grouse in the Gunnison
Basin selected for nesting areas with adequate sagebrush cover (5
percent or more was dominated by sagebrush cover) at landscape scales
(defined as 1.5-km radius areas).
    As discussed above, we have a basic understanding of the species'
needs for connectivity of habitat and populations (18.5 km or less
separation between occupied habitats or populations) (see Proximity and
Potential Connectivity (Criterion 3)). The scientific literature also
indicates that habitat suitability is dependent on large landscapes
(18- to 30-km radius area) where 25 percent or greater of the area is
dominated by sagebrush cover (Wisdom et al. 2011, pp. 465-467; Aldridge
et al. 2008b, pp. 989-990). At finer scales (1.5-km radius area) and
during the breeding season, at least 5 percent of the landscape needs
to be dominated by sagebrush to be preferred by nesting sage-grouse
(Aldridge et al. 2012, p. 400). These studies and figures demonstrate
the uncertainty in how large landscapes must be to support Gunnison
sage-grouse populations, at what scale habitat selection occurs and,
therefore, at what scale habitat should be evaluated and mapped.
    To address this uncertainty, we used GIS to evaluate Gunnison sage-
grouse habitats at multiple spatial scales and compared the results to
our current knowledge of the species' range and habitat. We applied a
moving windows analysis (ESRI ``Neighborhood Analysis'' Tool) to three
prominent sagebrush landcover types in Gunnison sage-grouse range
(Intermountain Basin big sagebrush shrubland, Intermountain Basin
montane sagebrush steppe, and Colorado Plateau mixed low sagebrush
shrubland) isolated (reclassified) from the SWReGAP land cover raster
dataset (30-meter resolution) (USGS 2004, entire). Several other
regional sagebrush land cover types were not included in our analysis
either because they occur outside of Gunnison sage-grouse range or are
limited in extent or land cover types and are generally considered less
important to the species. We then quantified the land cover of these
sagebrush habitat types at 54 km, 18 km, 5 km, and 1.5 km radii scales
(33.6 mi, 11.2 mi, 3.1 mi, and 0.9 mi radii, respectively) to identify
and map areas where at least 25 percent of the landscape is dominated
by sagebrush cover (based on Wisdom et al. 2011, pp. 465-467; and
Aldridge et al. 2008b, pp. 989-990).
    To determine which scale was most applicable for unoccupied
habitats, we overlaid the various scale (54 km, 18 km, 5 km, and 1.5 km
radii) analyses with occupied habitat. We found that modeling at the
finer 1.5-km scale was necessary to identify or ``capture'' all areas
of known occupied range, particularly in the smaller satellite
populations where sagebrush habitat is generally limited in extent.
Larger scales failed to capture areas we know to contain occupied and

suitable habitats (e.g., at the 54-km scale, only the Gunnison Basin area contained areas where at least 25 percent of the landscape is dominated by sagebrush cover) (USFWS 2013d, p. 3). Although in our final listing rule, published elsewhere in today's Federal Register, we found that using a 1.5-km radius (window) analysis was not appropriate for evaluating the effects of residential development, for our habitat suitability analysis, we found that, at the 1.5-km radius scale (or window) (based on Aldridge et al. 2012, p. 400), mapping areas where at least 25 percent of the landscape is dominated by sagebrush cover (based on Wisdom et al. 2011, pp. 465-467; and Aldridge et al. 2008b, pp. 989-990) provided the best estimation of our current knowledge of Gunnison sage-grouse occupied range and suitable habitat.

Based on the information and results above, to evaluate habitat suitability for unoccupied Gunnison sage-grouse habitat, we applied the 1.5-km scale and 25 percent dominant sagebrush land cover attributes. This means that areas found to be suitable as unoccupied critical habitat contain large portions where at least 25 percent of the landscape is dominated by sagebrush cover within a 1.5-km (0.9-mi) radius.

Rationale and Other Considerations

The best available information suggests that currently occupied habitat is inadequate for the conservation of the species. The RCP evaluated the linear relationship between the mean high count of males on leks and the amount of available habitat of ``average quality'' in each Gunnison sage-grouse population, and predicted a habitat area in excess of 100,000 acres is needed to support a population of 500 birds (GSRSC 2005, p. 197). In the absence of habitat loss, inbreeding depression, and disease, population viability modeling for Gunnison sage-grouse predicted that individual populations greater than 500 birds may be viable (have a low probability of extinction) over a 50-year time period (GSRSC 2005, p. 170). These data suggest that an individual habitat patch, or the cumulative area of two or more smaller habitat patches in close proximity, may need to be in excess of 100,000 ac (40,500 ha) to support a viable population of Gunnison sage-grouse. This model did not take into account the inherent variance in habitat structure and quality over the landscape, however, and detailed habitat structure and quality data are lacking. Therefore, we consider the modeled minimum habitat area to be an approximation.

The currently occupied habitat areas, for the Pi[ntilde]on Mesa, Cerro Summit-Cimarron-Sims Mesa and Crawford populations, which range in size from 35,015 ac (14,170 ha) to 44,678 ac (18,080 ha) are smaller than the RCP model's predicted minimum required area (Table 1). The currently occupied habitat areas in the Monticello-Dove Creek and the San Miguel Basin populations population are 112,543 ac (45,544 ha) and 101,750 ac (16,805 ha),

[[Page 69337]]

respectively (Table 1). These areas only slightly exceed the model's predicted minimum required area. While correlative in nature, together these data suggest that the currently occupied habitat area for at least three populations included in this final designation is insufficient for long-term population viability, and may be minimally adequate for two populations. Declining trends in the abundance of Gunnison sage-grouse outside of the Gunnison Basin further indicate that currently occupied habitat for the five satellite populations areas included in this final designation may be less than the minimum amount of habitat necessary for these populations' long-term viability.

Occupied habitat within the Gunnison Basin population is much larger (592,168 ac (239,600 ha)) than the RCP model's predicted minimum required area. However, extensive sagebrush landscapes capable of supporting a wide array of seasonal habitats and annual migratory patterns for Gunnison sage-grouse are rare across the species' range. The Gunnison Basin population is extremely important for the species' survival, because it contains approximately 63 percent of the occupied habitat and 84 percent of the birds rangewide (see our final rule to list Gunnison sage-grouse as threatened, published elsewhere in today's Federal Register). Therefore, based on the best available data, we determined that currently unoccupied areas in this population are essential for the persistence and conservation of the Gunnison sage-grouse. With the satellite populations declining, providing more stability for the Gunnison Basin population through additional expanses of sagebrush landscapes is essential for the conservation of the species. Further, these unoccupied areas of sagebrush expanses also provide potential connectivity to the Crawford and Cerro Summit-Cimarron-Sims Mesa populations to the west. The small piece of unoccupied habitat to the east of the Gunnison Basin provides a link between those birds in occupied habitat to the north and west.

With the exception of the Gunnison Basin critical habitat unit (CHU), CHUs for Gunnison sage-grouse collectively contain relatively small, and in some cases, isolated, populations of the species. Thus, we determined that all currently occupied areas, (except the Poncha Pass population area, which does not meet PCE 1), as well as some currently unoccupied areas, are essential for the persistence and conservation of the Gunnison sage-grouse and help to meet the landscape specific habitat criteria set forth above. The best available information indicates that, with implementation of special management considerations, the CHUs, including the designated unoccupied areas, are sufficient to provide for the conservation of the species. Designated unoccupied critical habitat in the Gunnison Basin provides for dispersal of birds from this larger population to outlying areas and satellite populations. We believe that the Cerro Summit-Cimarron-Sims Mesa unit is particularly important as a linkage area between the Gunnison Basin and the Crawford and San Miguel population, and contains both occupied and unoccupied critical habitat. Furthermore, unoccupied critical habitat across the range of the species offers the potential

BLM_0072129

for range expansion and migration, whether associated with environmental (e.g., climate change), demographic (e.g., population growth), or catastrophic (e.g., large fires) factors.

When determining critical habitat boundaries within this final rule, we made every effort to avoid including lands covered by buildings, pavement, and other manmade structures because such lands lack physical and biological features essential to the conservation of Gunnison sage-grouse. Therefore, we have determined that lands covered by existing manmade structures on the effective date of this rule do not meet the definition of critical habitat in Section 3(5)(a) of the Act, and should not be included in the final designation. For this reason, we did not include moderately to highly developed lands around the City of Gunnison and Dove Creek in the final designation.

The scale of the maps we prepared under the parameters for publication within the Code of Federal Regulations may not reflect that developed lands are not included in the final critical habitat designation. Any lands covered by buildings, pavement, and other manmade structures on the effective date of this rule left inside critical habitat boundaries shown on the maps of this final rule have been removed by text in the final rule, and are not designated as critical habitat. Therefore, a Federal action involving the lands that are removed by text will not trigger section 7 consultation with respect to critical habitat and the requirement of no adverse modification, unless the specific action would affect the essential physical and biological features in the adjacent critical habitat.

We are designating as critical habitat lands that we have determined are occupied at the time of listing (with the exception of the Poncha Pass area), and contain the physical or biological features to support life-history processes essential to the conservation of the species. Because we conclude that the designation of lands occupied at the time of listing, standing alone, is not adequate to conserve the species, we are also designating lands outside of the geographical area occupied at the time of listing that we have determined are essential for the conservation of Gunnison sage-grouse.

Units were designated based on the physical and biological features being present to support Gunnison sage-grouse life-history processes. All units individually contain all of the identified elements of physical and biological features, and each unit as a whole supports multiple life-history processes. In a critical habitat determination, the Service determines what scale is most meaningful to identifying specific areas that meet the definition of ``critical habitat'' under the Act. For example, for a wide-ranging, landscape species covering a large area of occupied and potential habitat across several States (such as the Gunnison sage-grouse), a relatively coarse-scale analysis is appropriate and sufficient to designate critical habitat as defined by the Act, while for a narrow endemic species, with specialized habitat requirements and relatively few discrete occurrences, it might be appropriate to engage in a relatively fine-scale analysis for the designation of critical habitat.

The critical habitat designation is defined by the maps, as modified by any accompanying regulatory text, presented at the end of this final rule. We include more detailed information on the boundaries of the critical habitat designation in this preamble to the rule. We will make the coordinates on which each map is based available to the public on http://www.regulations.gov at Docket No. FWS-R6-ES-2011-0111, on our Internet site at http://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/, and at the field office responsible for the designation (see FOR FURTHER INFORMATION CONTACT above).
Reasons for Removing Poncha Pass as a Critical Habitat Unit

Although we previously proposed designating a critical habitat unit in Poncha Pass, information received since the publication of the proposed rule (CPW 2013e, p. 1; CPW 2014d, p. 2; CPW 2014e, p. 2; CPW 2014 f, p. 2) has caused us to reevaluate the appropriateness of including the unit. Poncha Pass is thought to have been part of the historical distribution of Gunnison sage-grouse. There were no grouse there, however, when a

[[Page 69338]]

population was established via transplant from 30 Gunnison Basin birds in 1971 and 1972. In 1992, hunters harvested at least 30 grouse from the population when CPW inadvertently opened the area to hunting. We have no information on the population's trends until 1999, when the population was estimated at roughly 25 birds. In one year the population declined to less than 5 grouse, after which more grouse were brought in, again from the Gunnison Basin, in 2000 and 2001. In 2002, the population rose to just over 40 grouse, but starting in 2006, the population again started declining until no grouse were detected in lek surveys in the spring of 2013 (after publication of the proposed critical habitat rule). Grouse were again brought in the fall of 2013 and 2014 (CPW 2014e, p. 1), and six grouse were counted in the Poncha Pass population during the spring 2014 lek count (CPW 2014d, p.2); however, no subsequent evidence of reproduction was found (CPW 2014f, p. 2).

We now conclude that the Poncha Pass area, for reasons unknown, is not a landscape capable of supporting a population of Gunnison sage-grouse and therefore does not meet PCE 1. Because the population has repeatedly declined to the point of extirpation and is not self-sustaining, something in the unit is not providing the wide array of habitats that support seasonal movement patterns and provide for all the life history needs of the Gunnison sage-grouse. While we do not consider currently stable populations as being a litmus test for designation, we carefully considered the unique history of the grouse's repeated extirpation from this particular area, as well as the lack of evidence of the landscape functions described by PCE 1, in reaching our conclusion that this area does not meet PCE 1 and should not be designated as critical habitat.

We have reached this conclusion for the following reasons: (1) The population was extirpated before 1971, declined to fewer than 5 birds

by 2000, and was again extirpated in 2013 (had more grouse not been
reintroduced in 2013 and 2014, there would be no grouse currently in
the Poncha Pass area), (2) to the extent that any of the reintroduced
birds or their offspring currently survive, the population has
demonstrated (through the need for repeated transplant efforts) that it
is not self-sustaining or viable (always with fewer than 50 birds since
counts began), and (3) we expect that this population will require
repeated augmentations to avoid yet another extirpation.

     Because this unit is not meeting PCE 1, and therefore does not have
the necessary physical and biological features essential to the
conservation of the grouse, we conclude that the Poncha Pass unit does
not meet the ESA's definition of ``critical habitat.'' Therefore, we
are removing the entire unit from the final critical habitat
designation.

Final Critical Habitat Designation

     The critical habitat areas described below constitute our current
best assessment of areas that meet the definition of critical habitat
for Gunnison sage-grouse. We are designating approximately 1,429,551 ac
(578,515 ha) of critical habitat across six units for Gunnison sage-
grouse (Table 1). These six units correspond to six of the seven
Gunnison sage-grouse populations, including: (1) Monticello-Dove Creek,
(2) Pi[ntilde]on Mesa, (3) San Miguel Basin, (4) Cerro Summit-Cimarron-
Sims Mesa, (5) Crawford, and (6) Gunnison Basin. We consider
approximately 55 percent of all critical habitat to be currently
occupied and 45 percent to be currently unoccupied by Gunnison sage-
grouse (Table 4). Of this critical habitat designation, approximately
55 percent occurs on Federal land; 43 percent occurs on private land; 2
percent occurs on State land; and less than 0.1 percent occurs on city
and county land (Table 5). Table 4 provides the size and occupancy
status of Gunnison sage-grouse for each critical habitat unit; Table 5
provides land ownership and occupancy status of Gunnison sage-grouse
for each critical habitat unit. Calculated acres reflect exclusions
from this final critical habitat designation, including private lands
under CE, properties with a CI under the CCAA as of the effective date
of this rule, and the Ute Mountain Ute Tribe's Pinecrest Ranch (see
Exclusions below).

Table 4--Size and Current Occupancy Status of Gunnison Sage-Grouse in Designated Critical Habitat Units \a\ \b\
[Area estimates reflect all land within critical habitat unit boundaries.]

| Critical habitat unit | Acres | Hectares | Unit percent of total acres | Occupied? | Acres | Hectares | Percent of individual unit | Percent of all units |
|---|---|---|---|---|---|---|---|---|
| Monticello-Dove Creek...................... | 343,000 | 138,807 | 24.0 | Yes........................... | 107,061 | 43,326 | 31.2 | 7.5 |
|  |  |  |  | No............................ | 235,940 | 95,481 | 68.8 | 16.5 |
| Pi[ntilde]on Mesa........................... | 207,792 | 84,087 | 14.5 | Yes........................... | 28,820 | 11,663 | 13.9 | 2.0 |
|  |  |  |  | No............................ | 178,972 | 72,424 | 86.1 | 12.5 |
| San Miguel Basin........................... | 121,929 | 49,343 | 8.5 | Yes........................... | 81,514 | 32,988 | 66.9 | 5.7 |
|  |  |  |  | No............................ | 40,414 | 16,355 | 33.1 | 2.8 |
| Cerro Summit-Cimarron-Sims Mesa............ | 52,544 | 21,264 | 3.7 | Yes........................... | 33,675 | 13,628 | 64.1 | 2.4 |
|  |  |  |  | No............................ | 18,869 | 7,636 | 35.9 | 1.3 |
| Crawford................................... | 83,671 | 33,860 | 5.9 | Yes........................... | 32,632 | 13,206 | 39.0 | 2.3 |
|  |  |  |  | No............................ | 51,039 | 20,655 | 61.0 | 3.6 |
| Gunnison Basin............................. | 620,616 | 251,154 | 43.4 | Yes........................... | 500,909 | 202,711 | 80.7 | 35.0 |
|  |  |  |  | No............................ | 119,707 | 48,444 | 19.3 | 8.4 |
| All Units.................................. | 1,429,551 | 578,515 | 100 | Yes........................... | 784,611 | 317,521 | 54.9 | 54.9 |
|  |  |  |  | No............................ | 644,940 | 260,994 | 45.1 | 45.1 |

\a\ Area sizes may not sum precisely due to rounding.
\b\ Area sizes reflect lands excluded in this final critical habitat designation including private lands under CE, CCAA properties, and the Ute Mountain
  Ute Tribe's Pinecrest Ranch.

[[Page 69339]]

Table 5--Land Ownership and Occupancy Status of Gunnison Sage-Grouse in Designated Critical Habitat Units \a\ \b\

| Critical habitat unit | Occupied? | Federal | | State | | City and county | | Private | |
|---|---|---|---|---|---|---|---|---|---|
|  |  | Percent of subunit | Percent of unit | Percent of subunit | Percent of unit | Percent of subunit | Percent of unit | Percent of subunit | Percent of unit |
| Monticello-Dove Creek................. | Yes................... | 7.9 | 13.0 | 3.1 | 1.0 | ......... | ......... | 89.0 | 86.0 |
|  | No.................... | 15.3 | ........ | 0.0 | ........ | ......... | ......... | 84.7 | ........ |
| Pi[ntilde]on Mesa..................... | Yes................... | 44.9 | 73.3 | 0.0 | 0.0 | ......... | ......... | 55.1 | 26.6 |
|  | No.................... | 77.9 | ........ | 0.0 | ........ | ......... | ......... | 22.0 | ........ |
| San Miguel Basin...................... | Yes................... | 45.5 | 40.6 | 18.4 | 12.3 | ......... | ......... | 36.1 | 47.1 |
|  | No.................... | 30.7 | ........ | 0.0 | ........ | ......... | ......... | 69.3 | ........ |
| Cerro Summit-Cimarron-Sims Mesa....... | Yes................... | 14.5 | 18.8 | 12.1 | 7.7 | ......... | ......... | 73.5 | 73.5 |
|  | No.................... | 26.5 | ........ | 0.0 | ........ | ......... | ......... | 73.5 | ........ |
| Crawford.............................. | Yes................... | 81.3 | 52.6 | 0.0 | 0.0 | ......... | ......... | 18.7 | 47.4 |
|  | No.................... | 34.3 | ........ | 0.0 | ........ | ......... | ......... | 65.7 | ........ |
| Gunnison Basin........................ | Yes................... | 79.2 | 77.5 | 2.8 | 2.3 | 0.0 | 0.0 | 18.0 | 20.2 |
|  | No.................... | 70.3 | ........ | 0.3 | ........ | ......... | ......... | 29.3 | ........ |
| All Units............................. | Yes................... | 62.0 | 54.6 | 4.6 | 2.6 | 0.0 | 0.0 | 33.4 | 42.8 |
|  | No.................... | 45.7 | ........ | 0.1 | ........ | ......... | ......... | 54.2 | ........ |
|  |  |  |  |  |  |  |  |  |  |
| Total.............. | ..................... | 54.6 | 54.6 | 2.6 | 2.6 | 0.0 | 0.0 | 42.8 | 42.8 |

\a\ Percentages may not sum precisely due to rounding.
\b\ Percentages reflect lands excluded in this final critical habitat designation including private lands under CE, CCAA properties, and the Ute
  Mountain Ute Tribe's Pinecrest Ranch (see Exclusions).

We present below a general description for all critical habitat units, followed by brief descriptions of each individual unit, and reasons why they meet the definition of critical habitat for Gunnison sage-grouse. Various protection efforts on lands within these units are described in our final rule to list Gunnison sage-grouse as threatened, published elsewhere in today's Federal Register; in that publication, see the following sections: Other Regulatory Mechanisms: Conservation Easements; and Related Conservation Programs and Efforts.

Unit Descriptions

All units were likely historically occupied by Gunnison sage-grouse (GSRSC 2005, pp. 32-35, as adapted from Schroeder et al. 2004, entire), but we recognize that only portions of these units would have been occupied at any one time. As discussed above, we found that all lands identified as critical habitat are essential to the conservation of the Gunnison sage-grouse for the following reasons:

(1) The loss of sagebrush habitats within the potential presettlement range of Gunnison sage-grouse is associated with a substantial reduction in the species range (88 to 93 percent). The best available information indicates a substantial reduction of Gunnison sage-grouse distribution since Euro-American settlement in the 1800s, with evidence of the loss of peripheral populations (Schroeder et al. 2004, p. 371, and references therein) and a northward trend of extirpation (Schroeder et al. 2004, p. 369).

(2) The Gunnison Basin population is the most important population for the species' survival with approximately 63 percent of occupied habitat, approximately 60 percent of the leks, and 84 percent of the rangewide population. It has been relatively stable based on the last 19 years of lek counts (but see Effective Population Size and Population Viability Analyses in the Factor E discussion in the final listing rule published elsewhere in today's Federal Register).

(3) In contrast to the Gunnison Basin population, the remaining five populations included in this final designation are much smaller and all but two have declined substantially from 1996 to 2014, despite transplant efforts in most of these areas since 2000 (CPW 2014c, entire); also see Current Distribution and Population Estimates and Trends in our final rule to list Gunnison sage-grouse, published elsewhere in today's Federal Register. These five populations are currently geographically isolated and are genetically at risk. The San Miguel Basin Gunnison sage-grouse effective population size is below the level at which inbreeding depression has been observed to occur. Because the remaining Gunnison sage-grouse satellite populations are smaller than the San Miguel population, they are likely small enough to induce inbreeding depression, and could be losing adaptive potential (Stiver et al. 2008, p. 479). The majority of the satellite populations are still rebounding from declines that coincided with a drought cycle from 1999 to 2003 (CPW 2014c, entire). Our analysis in our final rule to list the Gunnison sage-grouse suggests that resiliency is limited in the satellite populations (for more discussion, see Small Population Size and Structure section in the final listing rule published elsewhere in today's Federal Register).

(4) Existing small populations are at higher risk of extirpation due to stochastic events. The smaller populations are important to the long-term viability of Gunnison sage-grouse because they: (1) Increase species abundance rangewide; (2) minimize the threat of catastrophic events to the species since the populations are widely distributed across the landscape; and (3) likely provide additional genetic diversity not found in the Gunnison Basin (with the exception of the Poncha Pass population) (GSRSC 2005, p. 199). Thus, multiple populations are needed to provide population redundancy, and to increase the species' chances of survival in the face of environmental, demographic, and genetic stochastic factors and random catastrophic events (extreme drought, fire, disease, etc.). Multiple populations across a broad geographic area provide insurance against catastrophic events, and the aggregate number of individuals across all populations increases the probability of demographic persistence and preservation of overall genetic diversity (with the exception of the Poncha Pass population) by providing an important

[[Page 69340]]

genetic reservoir (representation) (GSRSC 2005, p. 179) (see the Small Population Size and Structure section in the final listing rule, published elsewhere in today's Federal Register).

(5) Currently occupied habitat area for five of the six populations included in this final designation (with the exception of the Gunnison Basin population) may be less than the minimum amount of habitat necessary for the long-term viability of each population.

Designation of critical habitat limited to the Gunnison sage-grouse's present occupied range would be inadequate to ensure the conservation of the species. Therefore, we are designating areas of potential historical habitat that are not known to be currently occupied, for the following reasons:

(1) Current population sizes of the five smaller Gunnison sage-grouse populations included in this final designation are at such low levels that they must increase in order to ensure long-term survival (GSRSC 2005, p. G-22). While the occupied portions of the critical habitat units provide habitat for current populations, currently unoccupied areas will provide habitat for population expansion either through natural means, or by reintroduction, thus reducing threats due to naturally occurring events.

(2) Occupied habitat within the Gunnison Basin population is much larger (592,168 ac (239,600 ha)) than the RCP model's predicted minimum required area. However, extensive sagebrush landscapes capable of supporting a wide array of seasonal habitats and annual migratory patterns for Gunnison sage-grouse are rare across the species' range.

BLM_0072132

The Gunnison Basin population is the largest population, and the population is extremely important for the species' survival. With the satellite populations declining, providing more stability for the Gunnison Basin population through additional expanses of sagebrush landscapes is essential for the conservation of the species. Further, these unoccupied areas of sagebrush expanses also provide potential connectivity to the Crawford and Cerro Summit-Cimarron-Sims Mesa populations to the west. The small piece of unoccupied habitat to the east of the Gunnison Basin provides a link between those birds in occupied habitat to the north and west.

(3) Population expansion either through natural means or by reintroduction into the five small CHUs is necessary to increase the long-term viability and decrease the risk of extirpation of the populations in these units through stochastic events, such as fires or drought, as the current, isolated populations are each at high risk of extirpation from such stochastic events (GSRSC 2005, p. G-22), particularly because of their small sizes and restricted ranges.

(4) Unoccupied portions of all six CHUs decrease the geographic isolation of the current geographic distribution of the Gunnison sage-grouse by increasing the connectivity between occupied habitats and populations.

(5) Unoccupied portions of units are in areas that were occupied in the past and are located within the historical range of the species such that they will serve as corridors, or movement areas, between currently occupied areas. All unoccupied subunits lie within 18.5 km of an occupied area. We considered unoccupied areas as critical habitat if they, among other things, are located within approximately 18.5 km (11.5 mi) of occupied habitat based on typical sage-grouse movement distances (Connelly 2000a, p. 978; GSRSC 2005, p. J-5) because these areas have the highest likelihood of receiving Gunnison sage-grouse use and potential for occupied habitat expansion.

Unit 1: Monticello-Dove Creek

Unit 1 consists of 343,000 ac (138,807 ha) of Federal, State, and private lands in San Juan County, Utah; and Montrose, San Miguel, and Dolores Counties, Colorado. Approximately 13 percent of the land area within the unit is managed by Federal agencies, 1 percent is owned by the State of Colorado and the State of Utah, and the remaining 86 percent comprises private lands. We consider 33 percent of this unit to be currently occupied by Gunnison sage-grouse, based on mapping developed for the 2005 RCP, as updated (GSRSC 2005, p. 54; CPW 2013e, spatial data). Tables 4 and 5 provide detailed acreage estimates for all critical habitat units.

The occupied portion of the Monticello-Dove Creek Unit contains the physical and biological features essential to the conservation of the Gunnison sage-grouse, but these areas are interspersed within lands in agricultural production. Within the occupied portion of this Unit, approximately 23,220 ha (57,377 ac) or 51 percent of the area is currently in agricultural production (USGS 2004, entire). However, a significant portion of the agricultural lands within the Unit are enrolled in the USDA Farm Service Agency's Conservation Reserve Program (CRP), which is a land conservation program where farmers agree to remove environmentally sensitive lands from agricultural production in exchange for a yearly rental payment. Many CRP lands are used by Gunnison sage-grouse (Lupis et al. 2006, pp. 959-960; Ward 2007, p. 15).

Factors potentially affecting the physical and biological features of the Monticello-Dove Creek Unit include, but are not limited to: Habitat loss, degradation, and fragmentation resulting from conversion to agriculture; climate change, drought-related effects; oil and gas production and associated infrastructure; the proliferation of predators of Gunnison sage-grouse; the spread of invasive plant species and associated changes in sagebrush plant community structure and dynamics; and past and present grazing management that degrades or eliminates vegetation structure; all of which can result in the loss, degradation, or fragmentation of sagebrush plant communities. Special management actions that may be needed to address these threats include, but are not limited to: The rangewide prioritization and protection of crucial seasonal habitats from development and agricultural conversion; the control of invasive plant species and restoration of historic plant community structure and dynamics, including altered fire regimes and other natural disturbance factors; and the implementation of grazing regimes that result in proper vegetation structure for Gunnison sage-grouse life-history needs in areas used for domestic and wild ungulate grazing and browsing.

Limiting the designation of critical habitat in this unit only to currently occupied areas would be inadequate to ensure the conservation of the species. Accordingly, we are designating currently unoccupied areas that we conclude are essential for the conservation of the species. Designated unoccupied habitat comprises approximately 69 percent of the unit, including lands defined in the 2005 RCP as potential habitat or vacant or unknown habitat (GSRSC 2005, p. 54) and other unoccupied areas that met our criteria for critical habitat (see Criteria and Methods Used to Identify and Map Critical Habitat). We acknowledge, however, that portions of these unoccupied lands are locally unsuitable as habitat for Gunnison sage-grouse. For instance, some areas within the critical habitat unit are dominated by pi[ntilde]on-juniper communities (Messmer 2013, p. 17). As described earlier, critical habitat was identified on a landscape scale, and includes areas with varying amounts of overall sagebrush cover, plus habitat types that may facilitate bird movements and dispersal. These areas are also located adjacent to occupied

[[Page 69341]]

habitat or are located immediately between surrounding populations. In addition to contributing to the fulfillment of the landscape scale habitat needs of Gunnison sage-grouse, these areas provide habitat for future population growth and reestablishment of portions of

BLM_0072133

presettlement range, and facilitate movement between other units and within the unit.

Some unoccupied habitat areas within this unit consist of lands that recently supported sagebrush-dominant plant communities but are currently in agricultural production or are currently subject to encroachment by coniferous trees or shrubs, most commonly pi[ntilde]on-juniper or mountain shrub plant communities. These areas require management to reestablish or enhance sagebrush communities to support the primary constituent elements of Gunnison sage-grouse nesting or brood-rearing habitats. However, in their current state, these areas provide essential habitat for inter-population movements and thus may reduce population isolation and increase genetic exchange among populations.

Unit 2: Pi[ntilde]on Mesa

Unit 2, the Pi[ntilde]on Mesa Unit, consists of 207,792 ac (84,087 ha) of Federal, State, and private lands in Grand County, Utah, and Mesa County, Colorado. Approximately 73 percent of the land area within the unit is managed by Federal agencies, less than 1 percent is owned by the State of Utah, and 27 percent comprises private lands. We consider 14 percent of this unit to be currently occupied by Gunnison sage-grouse, based on mapping developed for the 2005 RCP and subsequently (GSRSC 2005, p. 54; CPW 2013e, spatial data). Tables 4 and 5 provide detailed estimates for all critical habitat units. The occupied portion of the Pi[ntilde]on Mesa Unit contains the physical and biological features essential to the conservation of Gunnison sage-grouse.

Factors potentially affecting the physical and biological features of the Pi[ntilde]on Mesa Unit include, but are not limited to: Residential and commercial development including associated land-clearing activities for the construction of access roads, utilities, and fences; increased recreational use of roads and trails; the proliferation of predators of Gunnison sage-grouse; climate change, drought-related effects; the spread of invasive plant species and associated changes in sagebrush plant community structure and dynamics; and past and present grazing management that degrades or eliminates vegetation structure; all of which can result in the loss, degradation, or fragmentation of sagebrush plant communities. Special management actions that may be needed to address these threats include, but are not limited to: The rangewide prioritization and protection of crucial seasonal habitats subject to future residential and commercial development and increasing recreational use of roads and trails; the control of invasive plant species and restoration of historical plant community structure and dynamics, including altered fire regimes and other natural disturbance factors; and the implementation of grazing regimes that result in proper vegetation structure for Gunnison sage-grouse life-history needs in areas used for domestic and wild ungulate grazing and browsing.

Limiting the designation of critical habitat in this unit only to currently occupied areas would be inadequate to ensure the conservation of the species. Accordingly, we are designating currently unoccupied areas that we conclude are essential for the conservation of the species. Designated unoccupied habitat comprises approximately 86 percent of the unit, including lands defined in the 2005 RCP as potential habitat or vacant or unknown habitat (GSRSC 2005, p. 54) and other unoccupied areas that met our criteria for critical habitat (see Criteria and Methods Used to Identify and Map Critical Habitat). These areas consist of lands with varying amounts of overall sagebrush cover, or have habitat types suitable for movements and dispersal. These areas are also located adjacent to occupied habitat or are located immediately between surrounding populations. In addition to contributing to the fulfillment of the landscape specific habitat needs of Gunnison sage-grouse, these areas provide habitat for future population growth and reestablishment of portions of presettlement range, and facilitate or allow movement between other units and within the unit. Some unoccupied habitat areas within this unit consist of lands that recently supported sagebrush-dominant plant communities but are currently in agricultural production or are currently subject to encroachment by coniferous trees or shrubs, most commonly pi[ntilde]on-juniper or mountain shrub plant communities. These areas require management to reestablish or enhance sagebrush communities to support the primary constituent elements of Gunnison sage-grouse nesting or brood-rearing habitat. However, in their current state, these areas provide essential habitat for inter-population movements and thus may reduce population isolation and increase genetic exchange among populations.

Unit 3: San Miguel Basin

Unit 3, the San Miguel Basin Unit, consists of 121,929 ac (49,343 ha) of Federal, State, and private lands in Montrose, San Miguel, and Ouray counties, Colorado. Approximately 41 percent of the land area within the unit is managed by Federal agencies, 12 percent is owned by the State of Colorado, and 47 percent comprises private lands. We consider 67 percent of this unit to be currently occupied by Gunnison sage-grouse, based on mapping developed for the 2005 RCP and subsequently (GSRSC 2005, p. 54; CPW 2013e, spatial data). Tables 4 and 5 provide detailed estimates for all critical habitat units. The occupied portion of the San Miguel Basin Unit contains the physical and biological features essential to the conservation of the Gunnison sage-grouse.

Factors potentially affecting the physical and biological features within the San Miguel Basin Unit include, but are not limited to: Residential and commercial development including associated land-clearing activities for the construction of access roads, utilities, and fences; increased recreational use of roads and trails; the proliferation of predators of Gunnison sage-grouse; climate change, drought-related effects; the spread of invasive plant species and associated changes in sagebrush plant community structure and dynamics; past and present grazing management that degrades or eliminates vegetation structure; and oil and gas development and associated

infrastructure, all of which can result in the loss, degradation, or fragmentation of sagebrush plant communities. Special management actions that may be needed to address these threats include, but are not limited to: The rangewide prioritization and protection of crucial seasonal habitats subject to future residential and commercial development (including oil and gas development) and increasing recreational use of roads and trails; the control of invasive plant species and restoration of historical plant community structure and dynamics, including altered fire regimes and other natural disturbance factors; and the implementation of grazing regimes that result in proper vegetation structure for Gunnison sage-grouse life-history needs in areas used for domestic and wild ungulate grazing and browsing.

Limiting the designation of critical habitat in this unit only to currently occupied areas would be inadequate to ensure the conservation of the species.

[[Page 69342]]

Accordingly, we are designating currently unoccupied areas that we conclude are essential for the conservation of the species. Designated unoccupied habitat comprises approximately 33 percent of the unit including lands defined in the 2005 RCP as potential habitat or vacant or unknown habitat (GSRSC 2005, p. 54) and other unoccupied areas that met our criteria for critical habitat (see Criteria and Methods Used to Identify and Map Critical Habitat). These areas consist of lands with varying amounts of overall sagebrush cover, or have habitat types suitable for movements and dispersal. These areas are also located adjacent to occupied habitat or are located immediately between surrounding populations. In addition to contributing to the fulfillment of the landscape scale habitat needs of Gunnison sage-grouse, these areas provide habitat for future population growth and reestablishment of portions of presettlement range, and facilitate or allow movement between other units and within the unit.

Some unoccupied habitat areas within this unit consist of lands that recently supported sagebrush-dominant plant communities but are currently in agricultural production or are currently subject to encroachment by coniferous trees or shrubs, most commonly pi[ntilde]on-juniper or mountain shrub plant communities. These areas require management to reestablish or enhance sagebrush communities to support the primary constituent elements of Gunnison sage-grouse nesting or brood-rearing habitat. However, in their current state, these areas provide essential habitat for inter-population movements and thus may reduce population isolation and increase genetic exchange among populations.

Unit 4: Cerro Summit-Cimarron-Sims Mesa

Unit 4, Cerro Summit-Cimarron-Sims Mesa Unit, consists of 52,544 ac (21,264 ha) of Federal, State, and private lands in Montrose, Ouray, and Gunnison Counties, Colorado. Approximately 19 percent of the land area within the unit is managed by Federal agencies, 8 percent is owned by the State of Colorado, and 74 percent comprises private lands. We consider 64 percent of this unit to be currently occupied by Gunnison sage-grouse, based on mapping developed for the 2005 RCP and subsequently (GSRSC 2005, p. 54; CPW 2013e, spatial data). Tables 4 and 5 provide detailed estimates for all critical habitat units. The occupied portion of the Cerro Summit-Cimarron-Sims Mesa Unit contains the physical and biological features essential to the conservation of the Gunnison sage-grouse.

Due to the amount of private land within this population, and the small size and scattered nature of the individual populations, we do not consider that having a viable population in this area to be necessary for the conservation of the species. However, we conclude that this population area currently provides a key linkage area between the Gunnison Basin and the Crawford and San Miguel populations. Data indicates that current gene flow between populations is very low (Oyler-McCance et al. 2005, p. 635), but if potentially suitable habitat is restored in these population areas, then the Cerro Summit-Cimarron-Sims Mesa population area could provide connectivity for gene flow between these populations. Therefore, we are finalizing critical habitat in this unit primarily for the purpose of facilitating connectivity between Gunnison Basin and the two smaller populations.

Factors potentially affecting the physical and biological features of the Cerro Summit-Cimarron-Sims Mesa Unit include, but are not limited to: Residential and commercial development including associated land-clearing activities for the construction of access roads, utilities, and fences; increased recreational use of roads and trails; the proliferation of predators of Gunnison sage-grouse; the spread of invasive plant species and associated changes in sagebrush plant community structure and dynamics; climate change, drought-related effects; and past and present grazing management that degrades or eliminates vegetation structure; all of which can result in the loss, degradation, or fragmentation of sagebrush plant communities. Special management actions that may be needed to address these threats include, but are not limited to: The rangewide prioritization and protection of crucial seasonal habitats subject to future residential and commercial development and increasing recreational use of roads and trails; the control of invasive plant species and restoration of historical plant community structure and dynamics, including altered fire regimes and other natural disturbance factors; and the implementation of grazing regimes that result in proper vegetation structure for Gunnison sage-grouse life-history needs in areas used for domestic and wild ungulate grazing and browsing.

Limiting the designation of critical habitat in this unit only to currently occupied areas would be inadequate to ensure the conservation of the species. Accordingly, we are designating currently unoccupied areas that we conclude are essential for the conservation of the species. Designated unoccupied habitat comprises approximately 36 percent of the unit including lands defined in the 2005 RCP as potential habitat or vacant or unknown habitat (GSRSC 2005, p. 54) and

other unoccupied areas that met our criteria as critical habitat (see
Criteria and Methods Used to Identify and Map Critical Habitat). These
areas consist of lands with varying amounts of overall sagebrush cover,
or have habitat types suitable for movements and dispersal. These areas
are also located adjacent to occupied habitat or are located
immediately between surrounding populations. In addition to
contributing to the fulfillment of the landscape scale habitat needs of
Gunnison sage-grouse, these areas provide an important linkage area
between populations.
    Some unoccupied habitat areas within this unit consist of lands
that recently supported sagebrush-dominant plant communities but are
currently in agricultural production or are currently subject to
encroachment by coniferous trees or shrubs, most commonly pi[ntilde]on-
juniper or mountain shrub plant communities. These areas require
management to reestablish or enhance sagebrush communities to support
the primary constituent elements of Gunnison sage-grouse nesting or
brood-rearing habitat. However, in their current state, these areas
provide essential habitat for inter-population movements and thus may
reduce population isolation and increase genetic exchange among
populations.
Unit 5: Crawford
    Unit 5, the Crawford Unit, consists of 83,671 ac (33,860 ha) of
Federal and private lands in Delta, Montrose, and Gunnison Counties,
Colorado. Approximately 53 percent of the land area within the unit is
managed by Federal agencies, and 47 percent comprises private lands. We
consider 39 percent of this unit to be currently occupied by Gunnison
sage-grouse, based on mapping developed for the 2005 RCP and
subsequently (GSRSC 2005, p. 54; CPW 2013e, spatial data). Tables 4 and
5 provide detailed estimates for all critical habitat units. The
occupied portion of the Crawford Unit contains the physical and
biological features essential to the conservation of the Gunnison sage-
grouse.
    Factors potentially affecting the physical and biological features
of the Crawford Unit include, but are not limited to: Residential and
commercial development including associated land-

[[Page 69343]]

clearing activities for the construction of access roads, utilities,
and fences; increased recreational use of roads and trails; the
proliferation of predators of Gunnison sage-grouse; climate change,
drought-related effects; the spread of invasive plant species and
associated changes in sagebrush plant community structure and dynamics;
and past and present grazing management that degrades or eliminates
vegetation structure; all of which can result in the loss, degradation,
or fragmentation of sagebrush plant communities. Special management
actions that may be needed to address these threats include, but are
not limited to: The rangewide prioritization and protection of crucial
seasonal habitats subject to future residential and commercial
development and increasing recreational use of roads and trails; the
control of invasive plant species and restoration of historical plant
community structure and dynamics, including altered fire regimes and
other natural disturbance factors; and the implementation of grazing
regimes that result in proper vegetation structure for Gunnison sage-
grouse life-history needs in areas used for domestic and wild ungulate
grazing and browsing.
    Limiting the designation of critical habitat in this unit only to
currently occupied areas would be inadequate to ensure the conservation
of the species. Accordingly, we are designating currently unoccupied
areas that we conclude are essential for the conservation of the
species. Designated unoccupied habitat comprises approximately 61
percent of the unit including lands defined in the 2005 RCP as
potential habitat or vacant or unknown habitat (GSRSC 2005, p. 54) and
other unoccupied areas that met our criteria for critical habitat (see
Criteria and Methods Used to Identify and Map Critical Habitat). These
areas consist of lands with varying amounts of overall sagebrush cover,
or have habitat types suitable for movements and dispersal. These areas
are also located adjacent to occupied habitat or are located
immediately between surrounding populations. In addition to
contributing to the fulfillment of the landscape scale habitat needs of
Gunnison sage-grouse, these areas provide habitat for future population
growth and reestablishment of portions of presettlement range, and
facilitate or allow movement between other units and within the unit.
    Some unoccupied habitat areas within this unit consist of lands
that recently supported sagebrush-dominant plant communities but are
currently in agricultural production or are currently subject to
encroachment by coniferous trees or shrubs, most commonly pi[ntilde]on-
juniper or mountain shrub plant communities. These areas require
management to reestablish or enhance sagebrush communities to support
the primary constituent elements of Gunnison sage-grouse nesting or
brood-rearing habitat. However, in their current state, these areas
provide essential habitat for inter-population movements and thus may
reduce population isolation and increase genetic exchange among
populations.
Unit 6: Gunnison Basin
    Unit 6, the Gunnison Basin Unit, consists of 620,616 ac (251,154
ha) of Federal, State, local government, and private lands in Gunnison,
Hinsdale, Montrose, and Saguache Counties, Colorado. Approximately 78
percent of the land area within the unit is managed by Federal
agencies, 2 percent is owned by the State of Colorado, less than 0.1
percent is owned by Gunnison County and the City of Gunnison, and 20
percent comprises private lands. We consider 81 percent of this unit to
be currently occupied, based on mapping developed for the 2005 RCP and
subsequently (GSRSC 2005, p. 54; CPW 2013e, spatial data). Tables 4 and
5 provide detailed estimates for all critical habitat units. The
Gunnison Basin contains the largest remaining expanse of sagebrush
plant communities within the occupied range of Gunnison sage-grouse.
The occupied portion of the Gunnison Basin Unit contains the physical

and biological features essential to the conservation of the Gunnison sage-grouse.

Factors potentially affecting the physical and biological features of the Gunnison Basin Unit include, but are not limited to: Residential and commercial development including associated land-clearing activities for the construction of access roads, utilities, and fences; increased recreational use of roads and trails; climate change, drought-related effects; the proliferation of predators of Gunnison sage-grouse; the spread of invasive plant species and associated changes in sagebrush plant community structure and dynamics; and past and present grazing management that degrades or eliminates vegetation structure; all of which can result in the loss, degradation, or fragmentation of sagebrush plant communities. Special management actions that may be needed to address these threats include, but are not limited to: The rangewide prioritization and protection of crucial seasonal habitats subject to future residential and commercial development and increasing recreational use of roads and trails; the control of invasive plant species and restoration of historical plant community structure and dynamics, including altered fire regimes and other natural disturbance factors; and the implementation of grazing regimes that result in proper vegetation structure for Gunnison sage-grouse life-history needs in areas used for domestic and wild ungulate grazing and browsing.

Limiting the designation of critical habitat in this unit only to currently occupied areas would be inadequate to ensure the conservation of the species. Accordingly, we are designating currently unoccupied areas that we conclude are essential for the conservation of the species. Designated unoccupied habitat comprises approximately 19 percent of the unit including lands defined in the 2005 RCP as potential habitat or vacant or unknown habitat (GSRSC 2005, p. 54; CPW 2013e, spatial data) and other unoccupied areas that met our criteria for critical habitat (see Criteria and Methods Used to Identify and Map Critical Habitat). These areas consist of lands with varying amounts of overall sagebrush cover, or have habitat types suitable for movements and dispersal. These areas are also located adjacent to occupied habitat or are located immediately between surrounding populations.

Occupied habitat within the Gunnison Basin population is much larger (592,168 ac (239,600 ha)) than the RCP model's specified minimum required area. However, extensive sagebrush landscapes capable of supporting a wide array of seasonal habitats and annual migratory patterns for Gunnison sage-grouse are rare across the species' range. The Gunnison Basin population is the largest population, and the population is extremely important for the species' survival. With the satellite populations declining, providing more stability for the Gunnison Basin population through additional expanses of sagebrush landscapes is essential for the conservation of the species. Further, these unoccupied areas of sagebrush expanses also provide potential connectivity to the Crawford and Cerro Summit-Cimarron-Sims Mesa populations to the west. The small piece of unoccupied habitat to the east of the Gunnison Basin provides a link between those birds in occupied habitat to the north and west.

Some unoccupied habitat areas within this unit consist of lands that recently supported sagebrush-dominant plant communities but are currently in agricultural production or are currently

[[Page 69344]]

subject to encroachment by coniferous trees or shrubs, most commonly pi[ntilde]on-juniper or mountain shrub plant communities. These areas require management to reestablish or enhance sagebrush communities to support the primary constituent elements of Gunnison sage-grouse nesting or brood-rearing habitat. However, in their current state, these areas provide essential habitat for inter-population movements and thus may reduce population isolation and increase genetic exchange among populations. The maintenance and enhancement of inter-population connectivity is particularly important for the Gunnison Basin because it is the largest population in the species' range and is, therefore, the most likely source of dispersal of Gunnison sage-grouse to other populations.

Effects of Critical Habitat Designation

Section 7 Consultation

Section 7(a)(2) of the Act requires Federal agencies, including the Service, to ensure that any action they fund, authorize, or carry out is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of designated critical habitat of such species. In addition, section 7(a)(4) of the Act requires Federal agencies to confer with the Service on any agency action that is likely to jeopardize the continued existence of any species proposed to be listed under the Act or result in the destruction or adverse modification of proposed critical habitat.

Decisions by the 5th and 9th Circuit Courts of Appeals have invalidated our previous regulatory definition of ``destruction or adverse modification'' (50 CFR 402.02) (see Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service, 378 F. 3d 1059 (9th Cir. 2004) and Sierra Club v. U.S. Fish and Wildlife Service, 245 F.3d 434, 442 (5th Cir. 2001)), and we do not rely on this regulatory definition when analyzing whether an action is likely to destroy or adversely modify critical habitat. Under the statutory provisions of the Act, we determine destruction or adverse modification on the basis of whether, with implementation of the proposed Federal action, the affected critical habitat would continue to serve its intended conservation role for the species. We note that the Service has proposed to amend the definition of ``destruction or adverse modification of critical habitat'' to (1) more explicitly tie the definition to the stated

BLM_0072137

purpose of the Act; and, (2) more clearly contrast the definitions of ``destruction or adverse modification'' and ``jeopardize the continued existence of' (79 FR 27060).

If a Federal action may affect a listed species or its critical habitat, the responsible Federal agency (action agency) must enter into consultation with us. Examples of actions that are subject to the section 7 consultation process are actions on State, tribal, local, or private lands that require a Federal permit (such as a permit from the U.S. Army Corps of Engineers under section 404 of the Clean Water Act (33 U.S.C. 1251 et seq.) or a permit from the Service under section 10 of the Act) or that involve some other Federal action (such as funding from the Federal Highway Administration, Federal Aviation Administration, or the Federal Emergency Management Agency). Federal actions not affecting listed species or critical habitat, and actions on State, tribal, local, or private lands that are not federally funded or authorized, do not require section 7 consultation.

As noted earlier, when determining the critical habitat boundaries for this rule, we made every effort to avoid including lands covered by buildings, pavement, and other manmade structures (as of the effective date of this rule), based on our determination that such lands lack physical and biological features essential to the conservation of Gunnison sage-grouse and therefore do not meet the definition of critical habitat in Section 3(5)(a) of the Act. The scale of the maps we prepared under the parameters for publication within the Code of Federal Regulations, however, may not reflect our determination that such lands are not included in the final designation. As a result, we have included text in the final rule to make this point clear. A Federal action involving these lands would not trigger section 7 consultation with respect to critical habitat and the requirement of no adverse modification unless the specific action would affect the physical and biological features in the adjacent critical habitat, or otherwise affect the species.

As a result of section 7 consultation, we document compliance with the requirements of section 7(a)(2) through our issuance of:

(1) A concurrence letter for Federal actions that may affect, but are not likely to adversely affect, listed species or critical habitat; or

(2) A biological opinion for Federal actions that may affect, or are likely to adversely affect, listed species or critical habitat.

When we issue a biological opinion concluding that a project is likely to jeopardize the continued existence of a listed species and/or destroy or adversely modify critical habitat, we provide reasonable and prudent alternatives to the project, if any are identifiable, that would avoid the likelihood of jeopardy and/or destruction or adverse modification of critical habitat. We define ``reasonable and prudent alternatives'' (at 50 CFR 402.02) as alternative actions identified during consultation that:

(1) Can be implemented in a manner consistent with the intended purpose of the action,

(2) Can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction,

(3) Are economically and technologically feasible, and

(4) Would, in the Director's opinion, avoid the likelihood of jeopardizing the continued existence of the listed species and/or avoid the likelihood of destroying or adversely modifying critical habitat.

Reasonable and prudent alternatives can vary from slight project modifications to extensive redesign or relocation of the project. Costs associated with implementing a reasonable and prudent alternative are similarly variable.

Regulations at 50 CFR 402.16 require Federal agencies to reinitiate consultation on previously reviewed actions in certain circumstances, including where we have listed a new species or designated critical habitat that may be affected, if the Federal agency has retained discretionary involvement or control over the action (or the agency's discretionary involvement or control is authorized by law). Consequently, Federal agencies sometimes may need to request reinitiation of consultation with us on actions for which formal consultation has been completed, if those actions with discretionary involvement or control may affect subsequently listed species or designated critical habitat.

On April 21, 2014, the Service received a request from NRCS for conferencing under authority of Section 7 of the Act on the NRCS's Farm Bill program activities, including the Sage-Grouse Initiative and associated procedures, conservation practices, and conservation measures. The focus of the resulting conference opinion (which will be converted to a biological opinion once the Gunnison sage-grouse is listed) will be on the effects of NRCS programs on the Gunnison sage-grouse and the areas to be designated as critical habitat for this species. The Service continues

[[Page 69345]]

to work closely with NRCS on developing the conference opinion and anticipates that it will be issued as a final opinion prior to the effective date of the final listing determination for Gunnison sage-grouse. The resulting opinion will provide Endangered Species Act compliance for both NRCS and current and future participating landowners enrolled in conservation programs and implementing conservation practices affecting Gunnison sage-grouse or its designated critical habitat, as analyzed within the conference opinion.

Application of the ``Adverse Modification'' Standard

The key factor related to the adverse modification determination is whether, with implementation of the proposed Federal action, the affected critical habitat would continue to serve its intended conservation role for the species. Activities that may destroy or adversely modify occupied critical habitat are those that alter the

BLM_0072138

physical and biological features to an extent that appreciably reduces
the conservation value of critical habitat for Gunnison sage-grouse. As
discussed above, the role of critical habitat is to support life-
history needs of the species and provide for the conservation of the
species.

Section 4(b)(8) of the Act requires us to briefly evaluate and
describe, in any proposed or final regulation that designates critical
habitat, activities involving a Federal action that may destroy or
adversely modify such habitat, or that may be affected by such
designation.

Activities that may affect critical habitat, when carried out,
funded, or authorized by a Federal agency, should result in
consultation for the Gunnison sage-grouse. These activities include,
but are not limited to:

(1) Actions carried out, funded or authorized by a Federal agency
that would result in the loss of sagebrush overstory plant cover or
height. Such activities could include, but are not limited to, the
removal of native shrub vegetation by any means for any infrastructure
construction project; direct conversion to agricultural land use;
habitat improvement or restoration projects involving mowing, brush-
beating, Dixie harrowing, disking, plowing, herbicide applications such
as Tebuthiuron (Spike), or prescribed burning; and fire suppression
activities. These activities could eliminate or reduce the habitat
necessary for the production and survival of Gunnison sage-grouse.

(2) Actions carried out, funded or authorized by a Federal agency
that would result in the loss or reduction in native herbaceous
understory plant cover or height, and a reduction or loss of associated
arthropod communities. Such activities could include, but are not
limited to, livestock grazing, the application of herbicides or
insecticides, prescribed burning and fire suppression activities, and
seeding of nonnative plant species that would compete with native
species for water, nutrients, and space. These activities could
eliminate or reduce the quantity and quality of habitat necessary for
Gunnison sage-grouse nesting and production through a reduction in food
quality and quantity, and increased exposure to predation.

(3) Actions carried out, funded or authorized by a Federal agency
that would result in Gunnison sage-grouse avoidance of an area during
one or more seasonal periods. Such activities could include, but are
not limited to, the construction of vertical structures such as power
lines, fences, communication towers, and buildings; management of
motorized and nonmotorized recreational use; and activities such as
well drilling, operation, and maintenance, which would entail
significant human presence, noise, and infrastructure. These activities
could result in the direct or functional loss of habitat if they result
in Gunnison sage-grouse avoidance or more limited use of otherwise
suitable habitat in the vicinity.

Exemptions

Application of Section 4(a)(3) of the Act

Section 4(a)(3)(B)(i) of the Act (16 U.S.C. 1533(a)(3)(B)(i))
provides that: ``The Secretary shall not designate as critical habitat
any lands or other geographic areas owned or controlled by the
Department of Defense, or designated for its use, that are subject to
an integrated natural resources management plan [INRMP] prepared under
section 101 of the Sikes Act (16 U.S.C. 670a), if the Secretary
determines in writing that such plan provides a benefit to the species
for which critical habitat is proposed for designation.'' There are no
Department of Defense lands with a completed INRMP within this critical
habitat designation.

Exclusions

Application of Section 4(b)(2) of the Act

On August 24, 2012 (77 FR 51503) the Services published a proposed
rule to revise 50 CFR 424.19. In that rule the Services proposed to
elaborate on the process and standards for implementing section 4(b)(2)
of the Act. The final rule was published on August 28, 2013 (78 FR
53058). The revisions to 50 CFR 424.19 provide the framework for how
the Services intend to implement section 4(b)(2) of the Act. A proposed
policy meant to complement those revisions and provide further
clarification as to how we will implement section 4(b)(2) when
designating critical habitat was published on May 12, 2014 (79 FR
27052). This draft policy further details the discretion available to
the Services (acting for the Secretaries) and provides detailed
examples of how we consider partnerships and conservation plans,
conservation plans permitted under section 10 of the Act, tribal lands,
national security and homeland security impacts and military lands,
Federal lands, and economic impacts in the exclusion process when we
undertake a discretionary exclusion analysis. The draft policy tracks
prior and current Service practices regarding the consideration of
exclusions under section 4(b)(2) of the Act. While the Service is not
formally following the draft policy, the Service continues to follow
past practices when considering exclusions and excluding areas under
section 4(b)(2) of the Act.

Section 4(b)(2) of the Act states that the Secretary shall
designate and make revisions to critical habitat on the basis of the
best available scientific data after taking into consideration the
economic impact, national security impact, and any other relevant
impact of specifying any particular area as critical habitat. The
Secretary may exclude an area from critical habitat if she determines
that the benefits of such exclusion outweigh the benefits of specifying
such area as part of the critical habitat, unless she determines, based
on the best scientific data available, that the failure to designate
such area as critical habitat will result in the extinction of the
species. The statute on its face, as well as the legislative history,

BLM_0072139

are clear that the Secretary has broad discretion regarding which factor(s) to use in making an exclusion determination and how much weight to give to any factor.

In considering whether to exclude a particular area from the designation, we identify the benefits of including the area in the designation, identify the benefits of excluding the area from the designation, and evaluate whether the benefits of exclusion outweigh the benefits of inclusion. If the analysis indicates that the benefits of exclusion outweigh the benefits of inclusion, the Secretary may exercise her discretion to exclude the area only if such exclusion would not result in the extinction of the species.

When identifying the benefits of inclusion for an area, we consider,

[[Page 69346]]

among other things, the additional regulatory benefits that area would receive from the protection from adverse modification or destruction as a result of actions with a Federal nexus; the educational benefits of mapping essential habitat for recovery of the listed species; and any benefits that may result from a designation due to State or Federal laws that may apply to critical habitat.

When identifying the benefits of exclusion, we consider, among other things, whether exclusion of a specific area is likely to result in conservation; the continuation, strengthening, or encouragement of partnerships; or implementation of a management plan that provides equal to or more conservation than a critical habitat designation would provide.

In the case of Gunnison sage-grouse, the benefits of critical habitat include public awareness of Gunnison sage-grouse presence and the importance of habitat protection, and in cases where a Federal nexus exists, increased habitat protection for Gunnison sage-grouse due to the protection from adverse modification or destruction of critical habitat. Approximately 55 percent of the critical habitat designation for Gunnison sage-grouse occurs on Federal land; 43 percent occurs on private land; 3 percent occurs on State land; and less than 0.1 percent occurs on city and county land. We anticipate that consultations under section 7 of the Act for activities on these Federal lands and for activities with a Federal nexus on other lands will help avoid and minimize impacts on critical habitat and Gunnison sage-grouse, thereby promoting the species' recovery. Because this designation provides specific areas on maps that are available to the public, the critical habitat designation on non-Federal lands (45 percent) will also increase public awareness and promote conservation of the species and its habitat.

After identifying the benefits of inclusion and the benefits of exclusion, we carefully weigh the two sides to evaluate whether the benefits of exclusion outweigh those of inclusion. If our analysis indicates that the benefits of exclusion outweigh the benefits of inclusion, we then determine whether exclusion would result in extinction. If exclusion of an area from critical habitat will result in extinction, we will not exclude it from the designation.

Based on the information provided by entities seeking exclusion, as well as any additional public comments received, we evaluated whether certain lands in each unit of the critical habitat designation (1,621,008 ac (655,957 ha)) were appropriate for exclusion from this final designation pursuant to section 4(b)(2) of the Act. For the reasons discussed below, we are excluding a total of 191,460 ac (77,481 ha) of private land from the critical habitat designation for Gunnison sage-grouse, including 122,037 ac (49,387 ha) of land under permanent CE as of August 28, 2013 according to Lohr and Gray (2013); 81,156 ac (32,843 ha) of lands with completed Certificates of Inclusion (CIs) under the Gunnison sage-grouse CCAA (of which 24,464 ac (9,900 ha) overlaps with CEs) as of the effective date of this rule; and 12,727 ac (5,150 ha) of land owned by the Ute Mountain Ute Tribe that is subject to a species' conservation plan. Tables 6 and 7 below provide approximate areas of lands that meet the definition of critical habitat but are being excluded under section 4(b)(2) of the Act from the final critical habitat rule. Exclusions are depicted in the critical habitat maps. Private land boundaries may not be exact due to mapping inconsistencies between land survey data, Geographic Information System (GIS) coordinates, and differing mapping layers provided. The private lands subject to the identified conservation agreements or easements are intended for exclusions and adjacent lands are not.

Table 6--Areas Excluded From Critical Habitat Designation by Critical Habitat Unit *

| Critical habitat unit | Occupied? | Certificates of inclusion (CI) under CCAA\a\ | | Conservation easement (CE)\b\ | | CCAA and CE overlap | | Tribal \c\ | | Total exclusions | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Acres | Hectares | Acres | Hectares | Acres | Hectares | Acres | Hectares | Acres | Hectares |
| Monticello-Dove Creek............. | Yes............. | ........ | ........ | 5,482 | 2,218 | ........ | ........ | ........ | ........ | 5,482 | 2,218 |
| | No............. | ........ | ........ | 469 | 190 | ........ | ........ | ........ | ........ | 469 | 190 |
| Pi[ntilde]on Mesa................. | Yes............. | 8,512 | 3,445 | 15,317 | 6,199 | 7,971 | 3,226 | ........ | ........ | 15,858 | 6,417 |
| | No............. | 4,619 | 1,869 | 21,876 | 8,853 | 4,218 | 1,707 | ........ | ........ | 22,277 | 9,015 |
| San Miguel Basin................. | Yes............. | 13,694 | 5,542 | 6,961 | 2,817 | 420 | 170 | ........ | ........ | 20,235 | 8,189 |
| | No............. | ........ | ........ | 1,110 | 449 | ........ | ........ | ........ | ........ | 1,111 | 450 |
| Cerro Summit-Cimaron-Sims Mesa... | Yes............. | ........ | ........ | 3,484 | 1,410 | ........ | ........ | ........ | ........ | 3,485 | 1,410 |
| | No............. | ........ | ........ | 511 | 207 | ........ | ........ | ........ | ........ | 511 | 207 |
| Crawford......................... | Yes............. | 1,316 | 533 | 2,005 | 811 | 938 | 380 | ........ | ........ | 2,383 | 964 |
| | No............. | 2,605 | 1,054 | 8,514 | 3,445 | 50 | 20 | ........ | ........ | 11,070 | 4,480 |
| Gunnison Basin................... | Yes............. | 49,087 | 19,865 | 40,769 | 16,499 | 18,564 | 4,275 | 11,966 | 4,842 | 91,258 | 36,931 |
| | No............. | 1,323 | 535 | 15,539 | 6,288 | 303 | 123 | 761 | 308 | 17,320 | 7,009 |
| All Units........................ | Yes............. | 72,609 | 29,384 | 74,018 | 29,954 | 19,884 | 8,051 | 11,966 | 4,842 | 138,702 | 56,131 |
| | No............. | 8,547 | 3,459 | 48,019 | 19,433 | 4,570 | 1,850 | 761 | 308 | 52,758 | 21,350 |

```
Total.......................  ...............  81,156  32,843  122,037  49,387  24,464  9,900  12,727  5,150  191,460  77,481
```
------------------------------------------------------------------------------------------
\* Numbers may not sum due to rounding and mapping artifacts
\a\ CCAA: Completed Certificates of Inclusion (CIs) under the Candidate Conservation Agreement with Assurances; excluded acres are reflected in the
    final critical habitat designation acreage (see Final Critical Habitat Designation)
\b\ CE: perpetual conservation easements; excluded acres are reflected in the final critical habitat designation acreage (see Final Critical Habitat
    Designation)
\c\ Tribal SMP: Ute Mountain Ute Tribe's Species Management Plan for Pinecrest Ranch; excluded acres are reflected in the final critical habitat
    designation acreage (see Final Critical Habitat Designation)

Table 7--Critical Habitat Before and After Exclusions \*

| Critical habitat unit | Occupied? | Critical habitat before exclusions | | Exclusions | | Critical habitat after exclusions | |
|---|---|---|---|---|---|---|---|
| | | Acres | Hectares | Acres | Hectares | Acres | Hectares |
| Monticello-Dove Creek......... | Yes........... | 112,543 | 45,544 | 5,482 | 2,218 | 107,061 | 43,326 |

[[Page 69347]]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | No........... | 236,409 | 95,671 | 469 | 190 | 235,940 | 95,481 |
| Pi[ntilde]on Mesa............. | Yes........... | 44,678 | 18,081 | 15,858 | 6,417 | 28,820 | 11,663 |
| | No........... | 201,249 | 81,443 | 22,277 | 9,015 | 178,972 | 72,424 |
| San Miguel Basin.............. | Yes........... | 101,750 | 16,805 | 20,235 | 8,189 | 81,514 | 32,988 |
| | No........... | 41,526 | 41,177 | 1,111 | 450 | 40,414 | 16,355 |
| Cerro Summit-Cimarron-Sims Mesa. | Yes........... | 37,161 | 15,039 | 3,485 | 1,410 | 33,675 | 13,628 |
| | No........... | 19,380 | 7,843 | 511 | 207 | 18,869 | 7,636 |
| Crawford..................... | Yes........... | 35,015 | 14,170 | 2,383 | 964 | 32,632 | 13,206 |
| | No........... | 62,109 | 25,134 | 11,070 | 4,480 | 51,039 | 20,655 |
| Gunnison Basin............... | Yes........... | 592,168 | 239,600 | 91,258 | 36,931 | 500,909 | 202,711 |
| | No........... | 137,027 | 55,453 | 17,320 | 7,009 | 119,707 | 48,444 |
| All Units.................... | Yes........... | 923,314 | 373,610 | 138,702 | 56,131 | 784,611 | 317,521 |
| | No........... | 697,700 | 282,349 | 52,758 | 21,350 | 644,940 | 260,994 |
| Totals................... | ............... | 1,621,014 | 655,959 | 191,460 | 77,481 | 1,429,551 | 578,515 |

------------------------------------------------------------------------------------------
\*\ Numbers may not sum due to rounding and mapping artifacts.

Exclusions Based on Economic Impacts

     Under section 4(b)(2) of the Act, we consider the economic impacts
of specifying any particular area as critical habitat. In order to
consider economic impacts, we prepared a draft economic analysis (DEA)
of the proposed critical habitat designation and related factors
(Industrial Economics, Inc. (IEc) 2013, entire). The draft analysis,
dated August 27, 2013, was made available for public review from
September 19, 2013, through October 19, 2013 (78 FR 57604), and from
November 4, 2013, through December 2, 2013 (78 FR 65936). Following the
close of the comment periods, a final analysis (dated November 7, 2014)
of the potential economic effects of the designation was developed
taking into consideration the public comments and any new information
received (Industrial Economics, Inc. (IEc) 2014, entire).
     The intent of the final economic analysis (FEA) is to quantify the
economic impacts of all potential conservation efforts for Gunnison
sage-grouse; some of these costs will likely be incurred regardless of
whether we designate critical habitat (baseline). The economic impact
of the final critical habitat designation is analyzed by comparing
scenarios both ``with critical habitat'' and ``without critical
habitat.'' The ``without critical habitat'' scenario represents the
baseline for the analysis, considering protections already in place for
the species (e.g., under the Federal listing and other Federal, State,
and local regulations). The baseline, therefore, represents the costs
incurred regardless of whether critical habitat is designated. The
``with critical habitat'' scenario describes the incremental impacts
associated specifically with the designation of critical habitat for
the species. The incremental conservation efforts and associated
impacts are those not expected to occur absent the designation of
critical habitat for the species. In other words, the incremental costs
are those attributable solely to the designation of critical habitat
above and beyond the baseline costs; these are the costs we consider in
the final designation of critical habitat. The analysis looks at
baseline impacts incurred due to the listing of the species, and
forecasts both baseline and incremental impacts likely to occur with
the designation of critical habitat. We note that on August 28, 2013
the Service finalized revisions to its regulations for impact analyses
of critical habitat (78 FR 53058) to clarify that it is appropriate to
consider the impacts of designation on an incremental basis
notwithstanding the Tenth Circuit's decision in New Mexico Cattle
Growers Ass'n v. FWS, 248 F.3d 1277 (10th Cir. 2001) (See 78 FR 57604,
57607 (September 19, 2013) for additional discussion regarding this
subject). As the economic analysis process for this critical habitat
rule was underway prior to the revision of the regulation, our FEA
analyzes both incremental and baseline costs, however, we are only
required to consider incremental costs based on the revised regulation.
     The FEA also addresses how potential economic impacts are likely to
be distributed, including an assessment of any local or regional
impacts of habitat conservation and the potential effects of
conservation activities on government agencies, private businesses, and
individuals. The FEA measures lost economic efficiency associated with
livestock grazing, agriculture and water management, mineral and fossil
fuel extraction, residential and related development, including power
infrastructure; renewable energy development; recreation; and
transportation. Decisionmakers can use this information to assess
whether the effects of the designation might unduly burden a particular

BLM_0072141

group or economic sector. Finally, the FEA considers those costs that may occur in the 20 years following the designation of critical habitat, which was determined to be the appropriate period for analysis because limited planning information was available for most activities to forecast activity levels for projects beyond a 20-year timeframe. The FEA quantifies economic impacts of Gunnison sage-grouse conservation efforts associated with the above economic activities.

The FEA forecasted baseline impacts of $48 million (present value over 20 years), discounted at seven percent, or $65 million (present value over 20 years), discounted at three percent. Annualized baseline impacts were forecast to be $4.3 million at a seven percent rate, or $4.2 million at a three percent discount rate. Quantified incremental impacts from the critical habitat designation alone were $6.9 million (present value over 20 years), assuming a seven percent discount rate. Assuming a social rate of time preference of three percent, incremental impacts were $8.8 million (present value over 20 years). Annualized incremental impacts of the critical habitat designation were forecast to be $610,000 at a seven percent discount rate, or $580,000 at a three percent discount rate (Industrial Economics, Inc. 2014, p. ES-2). Forecast baseline impacts were greatest in the Gunnison

[[Page 69348]]

Basin unit. Forecast incremental impacts were greatest in the Monticello-Dove Creek unit, followed by the Gunnison Basin unit. Forecast baseline and incremental impacts on specific economic activities were greatest in the electric power infrastructure category, followed by transportation (Industrial Economics, Inc. 2014, pp. ES-5 to ES-7). The economic analysis was completed before our removal of the Poncha Pass unit from our final designation and before our removal of the CCAA, CE, and Tribal exclusions included here. Since the designation is now 274,676 ac (111,160 ha) smaller, the overall economic impact would likely be an even smaller amount than listed above.

Our economic analysis did not identify any costs that are concentrated in any geographic area or sector likely to result from the designation. Consequently, the Secretary is not exercising her discretion to exclude any areas from this designation of critical habitat for the Gunnison sage-grouse based on economic impacts.

A copy of the FEA with supporting documents may be obtained by contacting the Western Colorado Field Office (see ADDRESSES) or by downloading from the Internet at http://www.regulations.gov or at http://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/.

Exclusions Based on National Security Impacts

Under section 4(b)(2) of the Act, we consider whether there are lands owned or managed by the Department of Defense where a national security impact might exist. In preparing this final rule, we have determined that no lands within the critical habitat designation for Gunnison sage-grouse are owned or managed by the Department of Defense or Department of Homeland Security, and, therefore, we anticipate no impact on national security. Consequently, the Secretary is not exercising her discretion to exclude any areas from this final designation based on impacts on national security.

Exclusions Based on Other Relevant Impacts

Under section 4(b)(2) of the Act, we consider any other relevant impacts, in addition to economic impacts and impacts on national security. We consider a number of factors, including whether the landowners have developed any HCPs or other management plans for the area, or whether there are conservation partnerships that would be encouraged by designation of, or exclusion from, critical habitat. In addition, we look at tribal interests and issues, and consider the government-to-government relationship of the United States with tribal entities. We also consider any social impacts that might occur because of the designation.

Land and Resource Management Plans, Conservation Plans, or Agreements Based on Conservation Partnerships

We acknowledge and commend landowners who have made significant commitments to manage their lands in a manner that is compatible with the conservation of Gunnison sage-grouse. Multiple partners including private citizens, nongovernmental organizations, Tribes, and Tribal, State, and Federal agencies are engaged in conservation efforts across the range of Gunnison sage-grouse. Numerous conservation actions have been implemented for Gunnison sage-grouse, and these efforts have provided and will continue to provide conservation benefit to the species (see a full description of conservation efforts in the final listing rule published elsewhere in today's Federal Register). In the proposed rule to designate critical habitat for Gunnison sage-grouse (78 FR 2540), we requested input from the public, especially private landowners, as to whether or not the Secretary should exclude from the designation under section 4(b)(2) of the Act lands protected, at varying levels, under the Gunnison sage-grouse CCAA, CEs, or other management with conservation measures applicable to Gunnison sage-grouse.

We generally consider a current land management or conservation plan (HCPs as well as other types) to provide adequate management or protection if it meets the following criteria:

(1) The plan is complete and provides a conservation benefit for the species and its habitat;

(2) There is a reasonable expectation that the conservation management strategies and actions will be implemented for the foreseeable future, based on past practices, written guidance, or regulations; and

BLM_0072142

(3) The plan provides conservation strategies and measures consistent with currently accepted principles of conservation biology.

Based on the following evaluation of conservation plans and agreements, we are excluding a total of 191,460 ac (77,481 ha) of private land from the critical habitat designation for Gunnison sage-grouse, including 122,037 ac (49,387 ha) of land under permanent CE; 81,156 ac (32,843 ha) of lands with completed CIs under the CCAA (of which 24,464 ac (9,900 ha) overlaps with CEs); and 12,727 ac (5,150 ha) of private lands owned by the Ute Mountain Ute Tribe under restricted fee status that are subject to a species' conservation plan (refer to our final rule to list Gunnison sage-grouse, published elsewhere in today's Federal Register, for a detailed account of these programs). We hereby exclude such properties from the critical habitat designation. The take prohibitions of section 9(a)(2) of the Act (i.e., related to the take of listed species) still apply to projects and activities on lands excluded from critical habitat designation, unless they are specifically excepted under section 4(d) of the Act.

Gunnison Sage-Grouse CCAA

In April 2005, the Colorado Division of Wildlife (CDOW, now called Colorado Parks and Wildlife (CPW)) applied to the Service for an Enhancement of Survival Permit for the Gunnison sage-grouse pursuant to section 10(a)(1)(A) of the Act. The permit application included a proposed Candidate Conservation Agreement with Assurances (CCAA) between CPW and the Service. The standard that a CCAA must meet is that the ``benefits of the conservation measures implemented by a property owner under a CCAA, when combined with those benefits that would be achieved if it is assumed that conservation measures were also to be implemented on other necessary properties, would preclude or remove any need to list the species'' (64 FR 32726, June 17, 1999). A detailed account of the CCAA is provided in our final rule to list Gunnison sage-grouse, published elsewhere in today's Federal Register (see Related Conservation Programs and Efforts in that document).

The goal of the CCAA is to reduce threats to the Gunnison sage-grouse and help provide for secure, self-sustaining local populations by enrolling, protecting, maintaining, and enhancing or restoring necessary non-federally owned Colorado habitats of Gunnison sage-grouse. Landowners with eligible property in southwestern Colorado who wish to participate can voluntarily sign up under the CCAA and associated permit through a CI in which they agree to implement habitat protection or enhancement measures on their lands. Eligible lands include non-Federal lands in Colorado within the current range of Gunnison sage-grouse where occupied, vacant/unknown, or potentially suitable habitats occur, as mapped and identified in the RCP. Except for properties recently enrolled, all properties have been monitored since enrollment using standardized vegetation transects and rangeland

[[Page 69349]]

health assessments and, despite recent drought conditions and existing land uses, no significant deviations from baseline habitat conditions have been observed. All CI properties were found to have Gunnison sage-grouse habitat, and in all cases, baseline habitat conditions on CI properties met the tier 1 standard, indicating no habitat manipulations were needed to support Gunnison sage-grouse. All enrolled properties continue to be in compliance with the terms of their CI's (CPW 2014a, p. 1).

The CCAA promotes the conservation of Gunnison sage-grouse on significant portions of private lands in the Gunnison Basin, Crawford, San Miguel, and Pi[ntilde]on Mesa populations (Table 5). In these areas, threats to Gunnison sage-grouse are reduced and habitats are protected, maintained, enhanced or restored as a result of participation in the CCAA. In particular, private land uses including livestock grazing and agricultural production are managed to be consistent with the needs of Gunnison sage-grouse and the species' conservation, using conservation strategies and measures consistent with currently accepted principles of conservation biology. As described in our final listing rule for Gunnison sage-grouse (published elsewhere in today's Federal Register), the agreement is complete and provides a conservation benefit for the species and its habitat, particularly in regard to its reduction of habitat-related impacts due to existing land uses on private lands.

Although property enrollment in the CCAA can be withdrawn by the current or a future owner at any time, we expect that properties will remain enrolled in the CCAA for the term of the agreement for the following reasons: (1) Since CPW began issuing CI's to landowners in 2009, no property has been withdrawn from the CCAA; (2) now that the species has been listed, there is more incentive for landowners to continue to participate in the CCAA, in order to receive the assurances provided in the CCAA; (3) the majority of the participating landowners have owned their ranches for generations, and we have no reason to believe they intend to do anything other than maintain the land in ranching or agriculture in the future.

Lands enrolled in the CCAA meet the definition of critical habitat and, thus, their designation would benefit Gunnison sage-grouse. The benefits of critical habitat include public awareness of Gunnison sage-grouse presence and the importance of habitat protection, and in cases where a Federal nexus exists, increased habitat protection for Gunnison sage-grouse due to the protection from adverse modification or destruction of critical habitat. Since the lands enrolled in the CCAA are private lands, the regulatory benefit from the protection from adverse modification or destruction would likely be minimal due to the lack of a Federal nexus for many land uses. Landowners voluntarily enrolled and are working with CPW to manage their lands in a manner consistent with sage-grouse conservation. Because of this, they are already aware of sage-grouse presence and the importance of habitat protection, so any additional educational benefits provided by

BLM_0072143

designation of critical habitat, if any, are also very minimal.

The benefits of excluding lands with CCAAs that have been permitted under section 10 of the Act from critical habitat designation include relieving landowners, communities, and counties of any potential additional regulatory burden that might be imposed as a result of the critical habitat designation. A related benefit of exclusion is the unhindered, continued ability to maintain existing partnerships and seek new partnerships with potential plan participants, including States, counties, local jurisdictions, conservation organizations, and private landowners. Together, these entities can implement conservation actions that the Services would be unable to accomplish without private landowners. These partnerships can lead to additional CCAAs in the future.

We find that the benefits of excluding these lands from the critical habitat designation outweigh the benefits of their inclusion. Exclusion of these properties continues and strengthens existing partnerships, particularly the important relationship between the Service and CPW. The CCAA incentivizes the conservation of Gunnison sage-grouse and important seasonal habitats on private lands that might otherwise not be managed consistent with the needs of the species. We recognize the value of working lands in rural areas and the open spaces they provide Gunnison sage-grouse and other species. Exclusion of these properties from critical habitat designation will encourage continued participation in the CCAA and its partnership and contribute to the sustainability of working lands managed for the benefit of Gunnison sage-grouse. Exclusion of these properties will not result in the extinction of Gunnison sage-grouse because they are managed in a manner compatible with Gunnison sage-grouse conservation. Therefore, we are excluding 81,156 ac (32,843 ha) of lands with completed CIs under the CCAA on or before the effective date of this rule (Table 6).

Conservation Easement Lands

Since the time of our proposed rule, we have received new information on conservation easements across the range of Gunnison sage-grouse (Lohr and Gray 2013, entire). In particular, all the conservation easements across the range of Gunnison sage-grouse have been identified and we better understand that these permanent conservation easements cannot be subdivided (Lohr and Gray 2013, p. 1 and spatial data). This information has led us to believe that these permanent conservation easements should be considered complete and they provide a conservation benefit to the species and its habitat.

Conservation easements (CEs) are voluntary legal agreements between a landowner and a land trust or government agency that permanently limit or restrict land uses on identified parcels for conservation values and purposes. CEs require that individual parcels be owned and conveyed as single units in perpetuity, thereby ensuring that there is a reasonable expectation that the conservation management strategies and actions will be implemented for the foreseeable future and they will not be subdivided for development in the future. Conservation easements also restrict land uses by defining specific areas for residential or agricultural development, including roads and driveways, and may include other parameters for land management practices to achieve conservation values (Lohr and Gray 2013, p. 2). The parameters for these restrictions allow for limited development while still conserving open space and managing private development in a way that provides benefits for the conservation of Gunnison sage-grouse habitat. Therefore, we consider CEs as an effective regulatory tool to prevent long-term or permanent habitat loss. In the context of potential threats to Gunnison sage-grouse, CEs and the protections they afford are most relevant to the threat of residential and human development. Protecting lands under permanent conservation easements provides conservation strategies and measures consistent with the needs of Gunnison sage-grouse. Lands that are able to be subdivided indefinitely fragment the open landscapes needed by the species. Lands under easement managed to achieve conservation values will provide more suitable habitat for the life history processes of Gunnison

[[Page 69350]]

sage-grouse, including connectivity and seasonal habitat matrices.

Since our publication of the proposed critical habitat rule, we have received a summary of the estimated amount of lands under conservation easement for occupied and unoccupied Gunnison sage-grouse habitat in Colorado and Utah (Lohr and Gray 2013, entire). Permanent conservation easements across Gunnison sage-grouse range are held by nongovernmental organizations and land trusts (The Nature Conservancy, Colorado Cattlemen's Agricultural Land Trust, and others), State agencies (CPW, UDWR), and Federal agencies (NRCS, NPS, and BLM). Some CEs include conservation measures specific to Gunnison sage-grouse, while many are directed at other species, such as big game (GSRSC 2005, pp. 59-103), but still indirectly provide benefits to Gunnison sage-grouse by preventing habitat loss and fragmentation. Some of these properties are also enrolled in other programs to benefit sage-grouse conservation, including the CCAA and NRCS's Sage Grouse Initiative. For additional information on CEs across the range of Gunnison sage-grouse, please see our final rule to list the species, published elsewhere in today's Federal Register (see Other Regulatory Mechanisms: Conservation Easements in that document).

We are aware of approximately 122,037 ac (49,387 ha) under permanent CE in Gunnison sage-grouse habitat (Table 6) as of August 28, 2013, according to Lohr and Gray (2013). Conservation easements occur in all six critical habitat units. These lands meet the definition of critical habitat and, thus, their designation would benefit Gunnison sage-grouse. The benefits of critical habitat include public awareness of Gunnison sage-grouse presence and the importance of habitat protection, and in cases where a Federal nexus exists, increased habitat protection for Gunnison sage-grouse due to the protection from

adverse modification or destruction of critical habitat. Since the lands enrolled in the CEs are private lands, the regulatory benefit from the protection from adverse modification or destruction would likely be minimal due to the lack of a Federal nexus for many land uses. Educational and public awareness benefits would also be very minimal, as it is expected that a landowner who has put their property under permanent easement is already aware of the importance of habitat protection for Gunnison sage-grouse.

Permanent conservation easements provide substantial benefit to Gunnison sage-grouse and its habitat by preventing long-term or permanent habitat loss and fragmentation due to subdivision and development. Exclusion of these properties from critical habitat designation will strengthen our partnership with the organizations currently holding conservation easements and those advocating for additional conservation easements in the species' range. Exclusion of these properties will also contribute to the protection of Gunnison sage-grouse habitat by reducing habitat fragmentation and development that is not consistent with the species' conservation. Exclusion of these properties from critical habitat designation acknowledges the value of these lands and fosters conservation efforts and partnerships. We find that the benefits of excluding these lands from the critical habitat designation outweigh the benefits of their inclusion. Exclusion of these properties will not result in the extinction of Gunnison sage-grouse because they are managed in a manner compatible with Gunnison sage-grouse conservation. Lands that are able to be subdivided indefinitely fragment the open landscapes needed by the species. Lands not subdivided will provide more suitable habitat for the life history processes of Gunnison sage-grouse, including connectivity and seasonal habitat matrices. Therefore, we are excluding 122,037 ac (49,387 ha) of lands under CE as of August 28, 2013 across the range of Gunnison sage-grouse (Table 6).

Ute Mountain Ute Tribe Pinecrest Ranch Species Management Plan

Approximately 12,727 ac (5,150 ha) of Gunnison sage-grouse habitat on Pinecrest Ranch are owned by the Ute Mountain Ute Tribe (Tribe or UMUT) under restricted fee status (classified in this rule as private land). The Pinecrest Ranch includes a total of 18,749 ac in the Gunnison Basin population area west of Gunnison, Colorado. The Tribe uses the ranch primarily for livestock grazing and for important traditional and cultural purposes. In March 2014, the Tribe finalized a Species Management Plan (SMP) to promote the conservation of Gunnison sage-grouse and its habitat on the Pinecrest Ranch while maintaining a sustainable agricultural operation and other traditional uses of the property (UMUT 2014, entire). See our September 19, 2013 Federal Register notice discussing the SMP (78 FR 57611). The plan is complete and provides a conservation benefit for the species and its habitat. The SMP includes management actions and considerations that will benefit Gunnison sage-grouse including, but not limited to, continued predator control, seasonal restrictions for construction and development activities, road restrictions and closures, wildlife-friendly fencing, outreach and education, and sustainable grazing practices (UMUT 2014, pp. 4-11). The NRCS assisted with the SMP by evaluating Pinecrest Ranch and developing a conservation plan (NRCS 2014, entire) to ensure that the plan provides conservation strategies and measures consistent with currently accepted principles of conservation biology. The NRCS's evaluation indicated that past and ongoing management of Pinecrest Ranch by the Tribe has provided good habitat for Gunnison sage-grouse (based on vegetation measurements) and a variety of other wildlife species (NRCS 2014, pp. 4-5). This suggests a reasonable expectation that the conservation management strategies and actions will be implemented for the foreseeable future, based on past practices, and the formalized plan. The NRCS also noted that overall limited human activity at the ranch has likely been beneficial to wildlife in general (NRCS 2014, p. 5). The above information indicates that current and future Tribal management of the Pinecrest Ranch is consistent with the needs and conservation of Gunnison sage-grouse (UMUT 2014, entire). The Service also met with the Tribe regarding the development of the plan (UMUT 2014, p. 2). This plan is also evaluated in our final rule to list Gunnison sage-grouse, published elsewhere in today's Federal Register (see Tribal Laws and Management).

The lands subject to the SMP meet the definition of critical habitat and, thus, their designation would provide some benefit to Gunnison sage-grouse. The benefits of critical habitat include public awareness of Gunnison sage-grouse presence and the importance of habitat protection, and in cases where a Federal nexus exists, increased habitat protection for Gunnison sage-grouse due to the protection from adverse modification or destruction of critical habitat. Since the lands owned by the tribe are classified as private lands, the regulatory benefit from the protection from adverse modification or destruction would likely be minimal due to the lack of a Federal nexus for many land uses. The Tribe finalized a SMP to promote the conservation of Gunnison sage-grouse and its habitat on the Pinecrest Ranch. Because of this, they are already aware of sage-grouse presence and the importance of habitat protection, so any additional educational benefits provided by

[[Page 69351]]

designation of critical habitat, if any, are also very minimal.
We find that the benefits of excluding these lands from the critical habitat designation outweigh the benefits of their inclusion. The SMP will promote the conservation of Gunnison sage-grouse and its habitat. We recognize the value of working lands in rural areas and the open spaces they provide Gunnison sage-grouse and other species. Exclusion of these properties from critical habitat designation contributes to the sustainability of working lands managed for the

BLM_0072145

benefit of Gunnison sage-grouse. Exclusion of these properties from
critical habitat designation acknowledges the government-to-government
relationship between the United States and Tribes, acknowledges the
value of Pinecrest Ranch to Gunnison sage-grouse, and fosters
conservation efforts and partnerships. Exclusion of these lands will
not result in the extinction of Gunnison sage-grouse. Therefore, we are
excluding 12,727 ac (5,150 ha) of the Ute Mountain Ute Pinecrest Ranch
from the critical habitat designation.

Required Determinations

Regulatory Planning and Review (Executive Orders 12866 and 13563)

    Executive Order 12866 provides that the Office of Information and
Regulatory Affairs (OIRA) in the Office of Management and Budget will
review all significant rules. OIRA has determined that this rule is
significant.
    Executive Order 13563 reaffirms the principles of E.O. 12866 while
calling for improvements in the nation's regulatory system to promote
predictability, to reduce uncertainty, and to use the best, most
innovative, and least burdensome tools for achieving regulatory ends.
The executive order directs agencies to consider regulatory approaches
that reduce burdens and maintain flexibility and freedom of choice for
the public where these approaches are relevant, feasible, and
consistent with regulatory objectives. E.O. 13563 emphasizes further
that regulations must be based on the best available science and that
the rulemaking process must allow for public participation and an open
exchange of ideas. We have developed this rule in a manner consistent
with these requirements.

Regulatory Flexibility Act (5 U.S.C. 601 et seq.)

    Under the Regulatory Flexibility Act (RFA; 5 U.S.C. 601 et seq.) as
amended by the Small Business Regulatory Enforcement Fairness Act
(SBREFA) of 1996 (5 U.S.C. 801 et seq.), whenever an agency must
publish a notice of rulemaking for any proposed or final rule, it must
prepare and make available for public comment a regulatory flexibility
analysis that describes the effects of the rule on small entities
(small businesses, small organizations, and small government
jurisdictions). However, no regulatory flexibility analysis is required
if the head of the agency certifies the rule will not have a
significant economic impact on a substantial number of small entities.
The SBREFA amended the RFA to require Federal agencies to provide a
certification statement of the factual basis for certifying that the
rule will not have a significant economic impact on a substantial
number of small entities. In this final rule, we are certifying that
the critical habitat designation for Gunnison sage-grouse will not have
a significant economic impact on a substantial number of small
entities. The following discussion explains our rationale.
    According to the Small Business Administration, small entities
include small organizations such as independent nonprofit
organizations; small governmental jurisdictions, including school
boards and city and town governments that serve fewer than 50,000
residents; as well as small businesses (13 CFR 121.201). Small
businesses include such businesses as manufacturing and mining concerns
with fewer than 500 employees, wholesale trade entities with fewer than
100 employees, retail and service businesses with less than $5 million
in annual sales, general and heavy construction businesses with less
than $27.5 million in annual business, special trade contractors doing
less than $11.5 million in annual business, and agricultural businesses
with annual sales less than $750,000. To determine if potential
economic impacts on these small entities are significant, we consider
the types of activities that might trigger regulatory impacts under
this designation as well as types of project modifications that may
result. In general, the term ``significant economic impact'' is meant
to apply to a typical small business firm's business operations.
    Importantly, the incremental impacts of a rule must be both
significant and substantial to prevent certification of the rule under
the RFA and to require the preparation of an initial regulatory
flexibility analysis. If a substantial number of small entities are
affected by the proposed critical habitat designation, but the per-
entity economic impact is not significant, the Service may certify.
Likewise, if the per-entity economic impact is likely to be
significant, but the number of affected entities is not substantial,
the Service may also certify.
    The Service's current understanding of recent case law is that
Federal agencies are only required to evaluate the potential impacts of
rulemaking on those entities directly regulated by the rulemaking;
therefore, they are not required to evaluate the potential impacts to
those entities not directly regulated. The designation of critical
habitat for an endangered or threatened species only has a regulatory
effect where a Federal action agency is involved in a particular action
that may affect the designated critical habitat. Under these
circumstances, only the Federal action agency is directly regulated by
the designation, and, therefore, consistent with the Service's current
interpretation of RFA and recent case law, the Service may limit its
evaluation of the potential impacts to those identified for Federal
action agencies. Under this interpretation, there is no requirement
under the RFA to evaluate the potential impacts to entities not
directly regulated, such as small businesses. However, Executive Orders
12866 and 13563 direct Federal agencies to assess costs and benefits of
available regulatory alternatives in quantitative (to the extent
feasible) and qualitative terms. Consequently, it is the current
practice of the Service to assess to the extent practicable these
potential impacts if sufficient data are available, whether or not this
analysis is considered by the Service to be strictly required by the
RFA. In other words, while the effects analysis required under the RFA
is limited to entities directly regulated by the rulemaking, the

BLM_0072146

effects analysis under the Act, consistent with the EO regulatory
analysis requirements, can take into consideration impacts to both
directly and indirectly impacted entities, where practicable and
reasonable.
    In conclusion, we believe that, based on our interpretation of
directly regulated entities under the RFA and relevant case law, this
designation of critical habitat will only directly regulate Federal
agencies, which are not by definition small business entities. And as
such, we certify that this designation of critical habitat will not
have a significant economic impact on a substantial number of small
business entities. Therefore, an initial regulatory flexibility
analysis is not required. However, though not necessarily required by
the RFA, in our final economic analysis for this rule we considered and
evaluated the potential

[[Page 69352]]

effects to third parties that may be involved with consultations with
Federal action agencies related to this action.
    Designation of critical habitat only affects activities authorized,
funded, or carried out by Federal agencies. Some kinds of activities
are unlikely to have any Federal involvement and so will not be
affected by critical habitat designation. In areas where the species is
present, Federal agencies already are required to consult with us under
section 7 of the Act on activities they authorize, fund, or carry out
that may affect the Gunnison sage-grouse. Federal agencies also must
consult with us if their activities may affect critical habitat.
Designation of critical habitat could result in an additional economic
impact on small entities due to the potential requirement for Federal
agencies to consult on certain Federal actions (see Application of the
``Adverse Modification Standard'' section).
    In our final economic analysis of the critical habitat designation,
we evaluated the potential economic effects on small business entities
resulting from conservation actions related to the listing of the
Gunnison sage-grouse and the designation of critical habitat. The
analysis is based on the estimated impacts associated with the
rulemaking as described in Chapters 3 through 8 and Appendix A of the
analysis, and evaluates the potential for economic impacts related to:
(1) Livestock grazing; (2) agriculture and water management; (3)
mineral and fossil fuel extraction; (4) residential and related
development; (5) electric power infrastructure; (6) renewable energy
development; (7) recreation; (8) and transportation projects. The
analysis considered each activity for which third parties may incur
incremental costs associated with section 7 consultation. Incremental
costs due to project modification and administrative impacts are
forecast for small business entities in livestock grazing (63
entities), water management (1 entity), mineral and fossil fuel
extraction (10 entities), residential and related development (3
entities), electric power infrastructure (unknown number of entities),
transportation (5 entities), and renewable energy (1 entity).
Incremental costs forecast in each of these categories were under 2
percent of annual revenues for respective business entities; in most
categories, incremental costs were less than 1 percent of annual
revenues for respective business entities (Industrial Economics, Inc.
2014, p. A-12).
    In summary, we considered whether this designation would result in
a significant economic effect on a substantial number of small
entities. Based on the above reasoning and currently available
information, we concluded that this rule would not result in a
significant economic impact on a substantial number of small entities.
Therefore, we are certifying that the designation of critical habitat
for Gunnison sage-grouse will not have a significant economic impact on
a substantial number of small entities, and a regulatory flexibility
analysis is not required.

Energy Supply, Distribution, or Use--Executive Order 13211

    Executive Order 13211 (Actions Concerning Regulations That
Significantly Affect Energy Supply, Distribution, or Use) requires
agencies to prepare Statements of Energy Effects when undertaking
certain actions. OMB has provided guidance for implementing this
Executive Order that outlines nine outcomes that may constitute ``a
significant adverse effect'' when compared to not taking the regulatory
action under consideration.
    In our final economic analysis, incremental effects of the critical
habitat designation were assumed to occur for energy projects in
unoccupied sage-grouse habitat. Approximately 31 producing or newly
permitted oil and gas wells are located within unoccupied portions of
the critical habitat designation. Approximately 28,000 wells in the
State of Colorado produced 1.3 billion Mcf-equivalents in 2005 (an Mcf-
equivalent is the total heat value of natural gas and oil expressed as
a volume of natural gas). The number of wells within the critical
habitat designation, therefore, represents less than one percent of
wells in the State. We do not anticipate that the designation of
critical habitat will result in significant incremental impacts to the
energy industry on a national scale (Industrial Economics, Inc. 2014,
p. A-15). As such, the designation of critical habitat is not expected
to significantly affect energy supplies, distribution, or use.
Therefore, this action is not a significant energy action, and no
Statement of Energy Effects is required.

Unfunded Mandates Reform Act (2 U.S.C. 1501 et seq.)

    In accordance with the Unfunded Mandates Reform Act (2 U.S.C. 1501
et seq.), we make the following findings:
    (1) This rule will not produce a Federal mandate. In general, a
Federal mandate is a provision in legislation, statute, or regulation
that would impose an enforceable duty upon State, local, or tribal

governments, or the private sector, and includes both ``Federal
intergovernmental mandates'' and ``Federal private sector mandates.''
These terms are defined in 2 U.S.C. 658(5)-(7). ``Federal
intergovernmental mandate'' includes a regulation that ``would impose
an enforceable duty upon State, local, or tribal governments'' with two
exceptions. It excludes ``a condition of Federal assistance.'' It also
excludes ``a duty arising from participation in a voluntary Federal
program,'' unless the regulation ``relates to a then-existing Federal
program under which $500,000,000 or more is provided annually to State,
local, and tribal governments under entitlement authority,'' if the
provision would ``increase the stringency of conditions of assistance''
or ``place caps upon, or otherwise decrease, the Federal Government's
responsibility to provide funding,'' and the State, local, or tribal
governments ``lack authority'' to adjust accordingly. At the time of
enactment, these entitlement programs were: Medicaid; Aid to Families
with Dependent Children work programs; Child Nutrition; Food Stamps;
Social Services Block Grants; Vocational Rehabilitation State Grants;
Foster Care, Adoption Assistance, and Independent Living; Family
Support Welfare Services; and Child Support Enforcement. ``Federal
private sector mandate'' includes a regulation that ``would impose an
enforceable duty upon the private sector, except (i) a condition of
Federal assistance or (ii) a duty arising from participation in a
voluntary Federal program.''
    The designation of critical habitat does not impose a legally
binding duty on non-Federal Government entities or private parties.
Under the Act, the only regulatory effect is that Federal agencies must
ensure that their actions do not destroy or adversely modify critical
habitat under section 7. While non-Federal entities that receive
Federal funding, assistance, or permits, or that otherwise require
approval or authorization from a Federal agency for an action, may be
indirectly impacted by the designation of critical habitat, the legally
binding duty to avoid destruction or adverse modification of critical
habitat rests squarely on the Federal agency. Furthermore, to the
extent that non-Federal entities are indirectly impacted because they
receive Federal assistance or participate in a voluntary Federal aid
program, the Unfunded Mandates Reform Act would not apply, nor would
critical habitat shift the costs of the large entitlement programs
listed above onto State governments.

[[Page 69353]]

    (2) We do not believe that this rule would significantly or
uniquely affect small governments because only a small percentage of
the total land ownership falls on small government lands such as those
owned by the City of Gunnison and Gunnison County. Our economic
analysis forecasted incremental impacts on five county governments
associated with transportation and administrative costs. However,
incremental costs were estimated to be less than 0.7 percent of annual
revenues for those entities (Industrial Economics, Inc. 2014, p. A-9).
Therefore, we do not expect that this rule would significantly or
uniquely affect small governments because it would not produce a
Federal mandate of $100 million or greater in any year, that is, it is
not a ``significant regulatory action'' under the Unfunded Mandates
Reform Act. Consequently, we do not believe that the critical habitat
designation would significantly or uniquely affect small government
entities. As such, a Small Government Agency Plan is not required.

Takings--Executive Order 12630

    In accordance with Executive Order 12630 (Government Actions and
Interference with Constitutionally Protected Private Property Rights),
we have analyzed the potential takings implications of designating
critical habitat for Gunnison sage-grouse in a takings implications
assessment. Critical habitat designation does not affect landowner
actions that do not require Federal funding or permits, and the
designation of critical habitat does not preclude the issuance of
section 10(a)(1)(B) permits to private landowners should incidental
take be anticipated from a particular action by a landowner. Based on
the best available information, the takings implications assessment
concludes that this designation of critical habitat for Gunnison sage-
grouse does not pose significant takings implications.

Federalism--Executive Order 13132

    In accordance with Executive Order 13132 (Federalism), this rule
does not have significant Federalism effects. A Federalism assessment
is not required. In keeping with Department of the Interior and
Department of Commerce policy, we requested information from, and
coordinated development of this critical habitat designation with
appropriate State resource agencies in Colorado and Utah. We received
comments from Colorado Parks and Wildlife and the Utah Division of
Wildlife Resources and have addressed them in the Peer Review and
Public Comments section of this rule, and throughout the rule as
appropriate. From a federalism perspective, the designation of critical
habitat directly affects only the responsibilities of Federal agencies.
The Act imposes no other duties with respect to critical habitat,
either for States and local governments, or for anyone else. As a
result, the rule does not have substantial direct effects either on the
States, or on the relationship between the national government and the
States, or on the distribution of powers and responsibilities among the
various levels of government. The designation may have some benefit to
these governments because the areas that contain the features essential
to the conservation of the species are more clearly defined, and the
physical and biological features of the habitat necessary to the
conservation of the species are specifically identified. This
information does not alter where and what federally sponsored
activities may occur. However, critical habitat may assist local
governments in long-range planning because the designation highlights

BLM_0072148

important habitat areas for a species.

Where State and local governments require approval or authorization from a Federal agency for actions that may affect critical habitat, the Federal agency will be required to consult under section 7(a)(2). As a result, while non-Federal entities that receive Federal funding, assistance, or permits, or that otherwise require approval or authorization from a Federal agency for an action, may be indirectly impacted by the designation of critical habitat, the legally binding duty to avoid destruction or adverse modification of critical habitat rests squarely on the Federal agency.

Civil Justice Reform--Executive Order 12988

In accordance with Executive Order 12988 (Civil Justice Reform), the Office of the Solicitor has determined that the rule does not unduly burden the judicial system and that it meets the requirements of sections 3(a) and 3(b)(2) of the Order. We are designating critical habitat in accordance with the provisions of the Act. To assist the public in understanding the habitat needs of the species, the rule identifies the elements of physical or biological features essential to the conservation of the Gunnison sage-grouse. The designated areas of critical habitat are presented on maps, and the rule provides several options for the interested public to obtain more detailed location information, if desired.

Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.)

This rule does not contain any new collections of information that require approval by OMB under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.). This rule will not impose recordkeeping or reporting requirements on State or local governments, individuals, businesses, or organizations. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

National Environmental Policy Act (42 U.S.C. 4321 et seq.)

It is our position that, outside the jurisdiction of the U.S. Court of Appeals for the Tenth Circuit, we do not need to prepare environmental analyses pursuant to the National Environmental Policy Act (NEPA; 42 U.S.C. 4321 et seq.) in connection with designating critical habitat under the Act. We published a notice outlining our reasons for this determination in the Federal Register on October 25, 1983 (48 FR 49244). This position was upheld by the U.S. Court of Appeals for the Ninth Circuit (Douglas County v. Babbitt, 48 F.3d 1495 (9th Cir. 1995), cert. denied 516 U.S. 1042 (1996)). However, when the range of the species includes States within the Tenth Circuit, such as that of Gunnison sage-grouse, under the Tenth Circuit ruling in Catron County Board of Commissioners v. U.S. Fish and Wildlife Service, 75 F.3d 1429 (10th Cir. 1996), we undertake a NEPA analysis for critical habitat designation and notify the public of the availability of the draft environmental assessment for a proposal when it is finished.

We conducted the NEPA analysis, and a draft of the environmental assessment was made available for public comment from September 19, 2013, through October 19, 2013 (78 FR 57604), and from November 4, 2013, through December 2, 2013 (78 FR 65936). The final environmental assessment has been completed and is available for review with the publication of this final rule. The environmental assessment evaluated the effects of the No Action Alternative (no designation of critical habitat) and Proposed Action Alternative (designation of critical habitat) on the physical, biological, and human environment. Based on the environmental assessment, the Service found that no significant environmental impact would occur as a result of critical habitat designation for Gunnison sage-grouse. Therefore, an environmental impact statement is not

[[Page 69354]]

necessary for the designation of critical habitat for Gunnison sage-grouse. You may obtain a copy of the final environmental assessment and the Service's Finding of No Significant Impact (FONSI) online at http://www.regulations.gov, by mail from the Western Colorado Field Office (see ADDRESSES), or by visiting our Web site at http://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/.

Government-to-Government Relationship With Tribes

In accordance with the President's memorandum of April 29, 1994 (Government-to-Government Relations with Native American Tribal Governments; 59 FR 22951), Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments), and the Department of the Interior's manual at 512 DM 2, we readily acknowledge our responsibility to communicate meaningfully with recognized Federal Tribes on a government-to-government basis. In accordance with Secretarial Order 3206 of June 5, 1997 (American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the Endangered Species Act), we readily acknowledge our responsibilities to work directly with tribes in developing programs for healthy ecosystems, to acknowledge that tribal lands are not subject to the same controls as Federal public lands, to remain sensitive to Indian culture, and to make information available to tribes.

Our proposed critical habitat rule for Gunnison sage-grouse included approximately 5,150 ha (12,725 ac) of Gunnison sage-grouse habitat on Pinecrest Ranch owned by the Ute Mountain Ute Tribe (Tribe) under restricted fee status (classified in this rule as private land). As described above (see Exclusions based on Other Relevant Impacts), we have excluded this area from the final critical habitat designation because the benefits of exclusion outweigh the benefits of exclusion, and the exclusion will not result in extinction of the species.

BLM_0072149

References Cited

A complete list of references cited in this rulemaking is available on the Internet at http://www.regulations.gov and upon request from the Western Colorado Field Office (see FOR FURTHER INFORMATION CONTACT).

Authors

The primary authors of this package are the staff members of the Western Colorado Field Office.

List of Subjects in 50 CFR Part 17

Endangered and threatened species, Exports, Imports, Reporting and recordkeeping requirements, Transportation.

Regulation Promulgation

Accordingly, we amend part 17, subchapter B of chapter I, title 50 of the Code of Federal Regulations, as set forth below:

PART 17--[AMENDED]

0
1. The authority citation for part 17 continues to read as follows:

Authority: 16 U.S.C. 1361-1407; 1531-1544; 4201-4245; unless otherwise noted.

0
2. In Sec.  17.95, amend paragraph (b) by adding an entry for ``Gunnison Sage-Grouse (Centrocercus minimus)'' after the entry for ``Western Snowy Plover (Charadrius nivosus nivosus)--Pacific Coast Population'', to read as follows:

Sec.  17.95  Critical habitat--fish and wildlife.

* * * * *
    (b) Birds.
* * * * *
    Gunnison Sage-grouse (Centrocercus minimus)
    (1) Critical habitat units are depicted for Grand and San Juan Counties, Utah, and Delta, Dolores, Gunnison, Hinsdale, Mesa, Montrose, Ouray, Saguache, and San Miguel Counties, Colorado, on the maps below.
    (2) Within these areas, the primary constituent elements (PCEs) of the physical and biological features essential to the conservation of Gunnison sage-grouse consist of five components:
    (i) Landscape Specific Primary Constituent Element. Primary Constituent Element 1--Extensive sagebrush landscapes capable of supporting a population of Gunnison sage-grouse. In general, this includes areas with vegetation composed primarily of sagebrush plant communities (at least 25 percent of the land is dominated by sagebrush cover within a 0.9-mi (1.5-km) radius of any given location), of sufficient size and configuration to encompass all seasonal habitats for a given population of Gunnison sage-grouse, and facilitate movements within and among populations. These areas also occur wholly within the potential historical range of Gunnison sage-grouse.
    (ii) Seasonally Specific Primary Constituent Elements. (A) Primary Constituent Element 2--Breeding habitat composed of sagebrush plant communities that, in general, have the structural characteristics within the ranges described in the following table. Habitat structure values are average values over a project area. Breeding habitat includes lek, nesting, and early brood-rearing habitats used typically March 15 through July 15. Early brood-rearing habitat may include agricultural fields.

--------------------------------------------------------------------
         Vegetation variable                  Amount in  habitat
--------------------------------------------------------------------
Sagebrush Canopy.....................  10-25 percent.
Non-sagebrush Canopy *...............  5-15 percent.
Total Shrub Canopy...................  15-40 percent.
Sagebrush Height.....................  9.8-19.7 in (25-50 cm).
Grass Cover..........................  10-40 percent.
Forb Cover...........................  5-40 percent.
Grass Height.........................  3.9-5.9 in (10-15 cm).
Forb Height..........................  2.0-5.9 in (5-15 cm).
--------------------------------------------------------------------
* Includes shrubs such as horsebrush (Tetradymia spp.), rabbitbrush
  (Chrysothamnus spp.), bitterbrush (Purshia spp.), snakeweed
  (Gutierrezia sarothrae), greasewood (Sarcobatus spp.), winterfat
  (Eurotia lanata), Gambel's oak (Quercus gambelii), snowberry
  (Symphoricarpos oreophilus), serviceberry (Amelanchier spp.), and
  chokecherry (Prunus virginiana).

    (B) Primary Constituent Element 3--Summer-late fall habitat composed of sagebrush plant communities that, in general, have the structural characteristics within the ranges described in the following table. Habitat structure values are average values over a project area. Summer-fall habitat includes sagebrush communities having the referenced habitat structure values, as well as agricultural fields and wet meadow or riparian habitat types. Wet meadows and riparian habitats are also included qualitatively under PCE 5 at paragraph (2)(ii)(D) of this entry.

--------------------------------------------------------------------

```
         Vegetation variable              Amount in habitat
------------------------------------------------------------------------
Sagebrush Canopy.......................  5-20 percent.
Non-sagebrush Canopy *.................  5-15 percent.
Total Shrub Canopy.....................  10-35 percent.
Sagebrush Height.......................  9.8-19.7 in (25-50 cm).
Grass Cover............................  10-35 percent.
Forb Cover.............................  5-35 percent.
Grass Height...........................  3.9-5.9 in (10-15 cm).
Forb Height............................  1.2-3.9 in (3-10 cm).
------------------------------------------------------------------------
* Includes shrubs such as horsebrush (Tetradymia spp.), rabbitbrush
  (Chrysothamnus spp.), bitterbrush (Purshia spp.), snakeweed
  (Gutierrezia sarothrae), greasewood (Sarcobatus spp.), winterfat
  (Eurotia lanata), Gambel's oak (Quercus gambelii), snowberry
  (Symphoricarpos oreophilus), serviceberry (Amelanchier spp.), and
  chokecherry (Prunus virginiana).
```

   (C) Primary Constituent Element 4-- Winter habitat composed of
sagebrush

[[Page 69355]]

plant communities that, in general, have sagebrush canopy cover between
30 to 40 percent and sagebrush height of 15.8 to 21.7 in (40 to 55 cm).
These habitat structure values are average values over a project area.
Winter habitat includes sagebrush areas within currently occupied
habitat that are available (i.e., not covered by snow) to Gunnison
sage-grouse during average winters.
   (D) Primary Constituent Element 5-- Alternative, mesic habitats
used primarily in the summer-late fall season, such as riparian
communities, springs, seeps, and mesic meadows.
   (3) Critical habitat for the Gunnison sage-grouse does not include
manmade structures (such as buildings, airport runways, roads, and
other paved areas) and the land on which they are located existing
within the boundaries of designated critical habitat on December 22,
2014.
   (4) Critical habitat map units. Data layers defining map units were
created from a number of geospatial data, including: Polygons generated
as part of the Gunnison sage-grouse Rangewide Conservation Plan,
Southwest Regional Gap Analysis Project (SWReGAP) land cover data,
National Agriculture Imagery Program (NAIP) aerial images, and USGS 7.5
minute quadrangle maps. Critical habitat units were then mapped as
shapefiles using Universal Transverse Mercator (UTM) Zone 13N
coordinates.
   (i) The maps in this entry, as modified by any accompanying
regulatory text, establish the boundaries of the critical habitat
designation. Private land boundaries may not be exact due to mapping
inconsistencies between land survey data, Geographic Information System
(GIS) coordinates, and differing mapping layers provided.
   (ii) Private lands enrolled in the Gunnison Sage-Grouse
Conservation Agreement with Assurances as of December 22, 2014, and
those subject to a permanent conservation easement as of August 28,
2013, or subject to the Ute Mountain Ute Tribe's Species Management
Plan for Pinecrest Ranch on December 22, 2014, are excluded from
designation pursuant to section 4(b)(2) of the Act, but adjacent lands
are not.
   (iii) The coordinates or plot points or both on which each map is
based are available to the public at the Service's internet site,
(http://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/
), http://www.regulations.gov at Docket No. FWS-R6-ES-2011-0111, and at
the field office responsible for this designation. You may obtain field
office location information by contacting one of the Service regional
offices, the addresses of which are listed at 50 CFR 2.2.
   (5)  Note: Index map follows:

BILLING CODE 4310-55-P

[[Page 69356]]

[GRAPHIC] [TIFF OMITTED] TR20NO14.004


[[Page 69357]]


   (6) Unit 1: Monticello-Dove Creek: San Juan County, Utah, and
Montrose, San Miguel, and Dolores Counties, Colorado.
   (i) General Description: 343,000 ac (138,807 ha); 24.0 percent of
all critical habitat.
   (ii) Map of Unit 1, Monticello-Dove Creek: San Juan County, Utah,
and Montrose, San Miguel, and Dolores Counties, Colorado, follows:
[GRAPHIC] [TIFF OMITTED] TR20NO14.005


[[Page 69358]]


   (7) Unit 2: Pi[ntilde]on Mesa: Grand County, Utah, and Mesa County,
Colorado.
   (i) General Description: 207,792 ac (84,087 ha); 14.5 percent of
all critical habitat.
   (ii) Map of Unit 2, Pi[ntilde]on Mesa: Grand County, Utah, and Mesa
County, Colorado, follows:
[GRAPHIC] [TIFF OMITTED] TR20NO14.006


[[Page 69359]]

BLM_0072151

(8) Unit 3: San Miguel Basin: Montrose, San Miguel, and Ouray Counties, Colorado.
(i) General Description: 121,929 ac (49,343 ha); 8.5 percent of all critical habitat.
(ii) Map of Unit 3, San Miguel Basin: Montrose, San Miguel, and Ouray Counties, Colorado, follows:
[GRAPHIC] [TIFF OMITTED] TR20NO14.007


[[Page 69360]]


(9) Unit 4: Cerro Summit-Cimarron-Sims Mesa: Montrose, Ouray, and Gunnison Counties, Colorado.
(i) General Description: 52,544 ac (21,264 ha); 3.7 percent of all critical habitat.
(ii) Map of Unit 4, Cerro Summit-Cimarron-Sims Mesa: Montrose, Ouray, and Gunnison Counties, Colorado, follows:
[GRAPHIC] [TIFF OMITTED] TR20NO14.008


[[Page 69361]]


(10) Unit 5: Crawford: Delta, Montrose, and Gunnison Counties, Colorado.
(i) General Description: 83,671 ac (33,860 ha); 5.9 percent of all critical habitat.
(ii) Map of Unit 5, Crawford: Delta, Montrose, and Gunnison Counties, Colorado, follows:
[GRAPHIC] [TIFF OMITTED] TR20NO14.009


[[Page 69362]]


(11) Unit 6: Gunnison Basin: Gunnison, Saguache, Montrose, and Hinsdale Counties, Colorado.
(i) General Description: 620,616 ac (251,154 ha); 43.4 percent of all critical habitat.
(ii) Map of Unit 6, Gunnison Basin: Gunnison, Saguache, Montrose, and Hinsdale Counties, Colorado, follows:
[GRAPHIC] [TIFF OMITTED] TR20NO14.010


[[Page 69363]]


* * * * *

    Dated: October 21, 2014.
Michael J. Bean,
Principal Deputy Assistant Secretary for Fish and Wildlife and Parks.
[FR Doc. 2014-27113 Filed 11-19-14; 8:45 am]
BILLING CODE 4310-55-C

BLM_0072152



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Colorado Ecological Services



IN REPLY REFER TO:
FWS/R6/ES CO

Front Range:
Post Office Box 25486
Mail Stop 65412
Denver, Colorado 80225-0486

Western Slope:
445 W. Gunnison Avenue
Suite 240
Grand Junction, Colorado 81501-5711

ES/GJ-6-CO-08-F-0006
TAILS 65413-2008-F-0073-R001

December 26, 2017

Memorandum

To:         Deputy State Director, Bureau of Land Management, Colorado State Office,
            Resources and Fire, Lakewood, Colorado

From:       Western Slope Supervisor, Fish and Wildlife Service, Ecological Services, Grand
            Junction, Colorado

Subject:    Programmatic Biological Opinion for Water Depletions Associated with Bureau of
            Land Management's Fluid Mineral Program within the Upper Colorado River Basin
            in Colorado.

In accordance with section 7 of the Endangered Species Act (ESA) of 1973, as amended (16
U.S.C. 1531 et seq.), and the Interagency Cooperation Regulations (50 CFR 402), this transmits
the U.S. Fish and Wildlife Service's (Service) final programmatic biological opinion (PBO) for
impacts to four endangered Colorado River fish species (Colorado pikeminnow (*Ptychocheilus
lucius*), razorback sucker (*Xyrauchen texanus*), bonytail chub (*Gila elegans*), and humpback
chub (*Gila cypha*)) and their critical habitats from water depletions associated with Bureau of
Land Management's (BLM) Fluid Mineral Program (project) authorized by BLM within the
Upper Colorado River Basin in Colorado. This PBO is a reinitiation of consultation on this
project completed on December 19, 2008 (ES/GJ-6-CO-08-F-0006, TAILS65413-2008-F-0073),
and is in response to your May 31, 2017, request for reinitiation of consultation, which included
the May 26, 2017, programmatic biological assessment (2017 PBA) for the project. This PBO
also supersedes and replaces our 2008 opinion for this project.

Oil and gas activities typically require the use of various amounts of water. This consultation
only addresses the effects of water depletions and withdrawals on the endangered Colorado
River fishes and their critical habitats and does not include other direct or indirect impacts that
may be associated with oil and gas activities. For example, effects resulting from a project that
involve the release of contaminants, or non-depletion-related impacts to fish habitat, are not
covered under this PBO. The location and timing of such activities would be important to an
analysis of their effects and is unknown at this time; future, separate section 7 consultation would
be required for such projects.

BLM_0072153

# Table of Contents

Consultation History ........................................................................................................... 3

BIOLOGICAL OPINION ....................................................................................................... 6

Description of the Proposed Action ....................................................................................... 6

Conservation Measures ......................................................................................................... 9

Status of the Species and Critical Habitat ........................................................................... 11

    Colorado Pikeminnow ...................................................................................................... 11

    Razorback Sucker ............................................................................................................. 22

    Humpback Chub ................................................................................................................ 29

    Bonytail ............................................................................................................................ 34

    Critical Habitat ................................................................................................................. 36

    Climate Change ................................................................................................................ 38

Environmental Baseline ...................................................................................................... 39

    Colorado pikeminnow ...................................................................................................... 40

    Razorback sucker ............................................................................................................. 43

    Humpback chub ................................................................................................................ 45

    Bonytail ............................................................................................................................ 45

    Climate Change in the Action Area .................................................................................. 46

Flow Recommendations ...................................................................................................... 47

    Yampa River .................................................................................................................... 47

    Colorado River ................................................................................................................. 48

    Gunnison River ................................................................................................................ 51

    White River ...................................................................................................................... 51

Effects of the Action ........................................................................................................... 52

    Effects to Critical Habitat ................................................................................................ 53

    Species and Critical Habitat Response to the Proposed Action.......................................... 55

Cumulative Effects .............................................................................................................. 65

Conclusion .......................................................................................................................... 66

INCIDENTAL TAKE STATEMENT .................................................................................... 68

MONITORING AND REPORTING ...................................................................................... 69

CONSERVATION RECOMMENDATIONS .......................................................................... 69

REINITIATION NOTICE ..................................................................................................... 70

LITERATURE CITED .......................................................................................................... 73

BLM_0072154

**Consultation History**

Implementation of the Endangered Species Act in the Upper Colorado River Basin started with section 7 consultation on Bureau of Reclamation (Reclamation) projects in the late 1970's. At that time, the Service determined that the Colorado pikeminnow and humpback chub were in danger of extinction (the bonytail was listed in 1980 and the razorback sucker was listed in 1991). Subsequently, section 2 (c) of the Act was amended as follows: It is further declared to be the policy of Congress that Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species.

In 1984, the Department of the Interior (DOI), Colorado, Wyoming, Utah, water users, and environmental groups formed a coordinating committee to discuss a process to recover the endangered fishes while new and existing water development proceeds in the Upper Colorado River Basin in compliance with Federal and State law and interstate compacts. After four years of negotiations, the Recovery Implementation Program for the Endangered Fish Species in the Upper Colorado River Basin was developed.

On January 21-22, 1988, the Secretary of the Interior; Governors of Wyoming, Colorado, and Utah; and the Administrator of the Western Area Power Administration (WAPA) cosigned a Cooperative Agreement to implement the Recovery Implementation Program (Recovery Program) for Endangered Fish Species in the Upper Colorado River Basin (Service 1987). Current participants in the Recovery Program include: the Service, Reclamation, Western Area Power Administration, Colorado, Utah, Wyoming, Environmental Defense Fund, The Nature Conservancy, Colorado Water Congress, Utah Water Users Association, Wyoming Water Development Association, and the Colorado River Energy Distributors Association. In 2009, the Cooperative Agreement was extended through September 30, 2023 (Recovery Program 2009).

The Recovery Program was intended to be the reasonable and prudent alternative to avoid jeopardy to the endangered fishes by depletions from the Upper Colorado River Basin. The goal of the Recovery Program is to recover the listed species while providing for new and existing water development in the Upper Colorado River Basin. All participants agreed to cooperatively work toward the successful implementation of a recovery program that will provide for recovery of the endangered fish species consistent with Federal law and all applicable State laws and systems for water resource development and use. Each signatory assumed certain responsibilities in implementing the Recovery Program.

In order to further define and clarify the process in the Recovery Program, a section 7 agreement was implemented on October 15, 1993, by the Recovery Program participants (Service 1993). Incorporated into this agreement is a Recovery Implementation Program Recovery Action Plan (RIPRAP) which identifies actions currently believed to be required to recover the endangered fishes in the most expeditious manner. Included in the Recovery Program was the requirement that a depletion fee would be paid to offset the effects of the depletions by helping to support the Recovery Program. The funds are received by the Service's designated agent, the National Fish and Wildlife Foundation, and used for acquisition of water rights (or directly-related activities) to meet the instream flow needs of the endangered fishes or to support other recovery activities for the endangered fishes described in the RIPRAP.

3

BLM_0072155

Federal action agencies have come to anticipate Recovery Program activities and a requirement of a financial contribution for new depletions greater than 100 acre-feet/year (af/yr) to support these activities serving as the reasonable and prudent alternative that must be included in their project planning to avoid jeopardy to listed species. Thus, the Recovery Program, serving as a reasonable and prudent alternative, has essentially become part of the proposed action. The Recovery Program activities will now serve as conservation measures within the proposed action and minimize adverse effects to the endangered fish species and their critical habitats. The following excerpts summarize portions of the Recovery Program that address depletion impacts, section 7 consultation, and Project proponent responsibilities:

"All future section 7 consultations completed after approval and implementation of this program (establishment of the Implementation Committee, provision of congressional funding, and initiation of the elements) will result in a one-time contribution to be paid to the Service by water project proponents in the amount of $10.00 per acre-foot based on the average annual depletion of the project . . .  This figure will be adjusted annually for inflation [the FY 2018 figure is $21.17 per acre-foot] …"

It is important to note that these provisions of the Recovery Program were based on appropriate legal protection of the instream flow needs of the endangered Colorado River fishes. The Recovery Program further states:

". . . it is necessary to protect and manage sufficient habitat to support self-sustaining populations of these species. One way to accomplish this is to provide long term protection of the habitat by acquiring or appropriating water rights to ensure instream flows. Since this program sets in place a mechanism and a commitment to assure that the instream flows are protected under State law, the Service will consider these elements under section 7 consultation as offsetting project depletion impacts."

In May 1994, BLM Colorado prepared a programmatic biological assessment (1994 PBA) that addressed water-depleting activities in the Colorado River Basin. In response to the 1994 PBA, the Service issued a biological opinion (1994 BO) on June 13, 1994 (Service 1994), which determined that water depletions from the Colorado River Basin would jeopardize the continued existence of the Colorado pikeminnow, humpback chub, bonytail, and razorback sucker and result in the destruction or adverse modification of their critical habitats. The 1994 BO included reasonable and prudent alternatives developed by the Service to allow BLM to authorize projects with resultant water depletions of less than 125 af/yr.

The 1994 PBA and 1994 BO were written to remain in effect until a total depletion threshold of 1,417 af/yr of new depletions was reached. The threshold for historic depletions was 1,588 af/yr. As of January 2008, BLM had depleted or authorized the depletion of approximately 1,354 af/yr of new depletions under the 1994 PBA and 1,019 af/yr of historic depletions. The 1994 consultation did not fully account for fluid mineral activities and their associated water depletions; however these activities were not excluded from the consultation. The 1994 BO was amended March 2, 2000 and September 27, 2005. The BLM paid depletion fees on an annual basis for projects covered by the 1994 consultation. The 1994 consultation was replaced in 2008 and 2009 by two new water depletion consultations, one for fluid mineral development (Service

4

BLM_0072156

2008) and one for all other activities (Service 2009a). The 2008 fluid mineral consultation is further discussed below.

On December 20, 1999, the Service issued the "Final programmatic biological opinion for Bureau of Reclamation's Operations and Depletions, Other Depletions, and Funding and Implementation of Recovery Program Actions in the Upper Colorado River above the Confluence with the Gunnison River" (Colorado River PBO). The Service has determined that projects that fit under the umbrella of the Colorado River PBO would avoid the likelihood of jeopardy and/or adverse modification of critical habitat for depletion impacts. Projects fit under the umbrella of the Colorado River PBO if they deplete water from the Colorado River above the confluence with the Gunnison River; the water user signs a Recovery Agreement; the project sponsors make a one-time monetary contribution for water depletions greater than 100 af/yr to help fund their share of the costs of recovery actions. The Colorado River PBO contemplated existing water depletions of 1,000,000 af/yr and 120,000 af/yr of new water depletions.

On January 10, 2005, the Service issued the "Final programmatic biological opinion on the *Management Plan for Endangered Fishes in the Yampa River Basin*" (Yampa River PBO) (Service 2005). The Service has determined that projects that fit under the umbrella of the Yampa River PBO avoid the likelihood of jeopardy and/or adverse modification of critical habitat for depletion impacts to the Yampa River Basin. Projects fit under the umbrella of the Yampa River PBO if they deplete water from the Yampa River above the confluence with the Green River; the water user signs a Recovery Agreement for projects greater than 100 af/yr; and the project sponsors make a one-time monetary contribution for water depletions greater than 100 af/yr to help fund their share of the costs of recovery actions. The Yampa River PBO contemplated existing water depletions of 168,000 af/yr and 53,000 af/yr of new water depletions.

In January 2007, the Glenwood Springs Field Office of the BLM prepared a biological assessment for the Resource Management Plan Amendment, Roan Plateau Planning Area (Roan BA) that among other things, addressed water-depleting activities within the planning area including those associated with fluid mineral development. In response to the Roan BA, the Service issued a memo dated February 7, 2007, which concurred with BLM's determination that, water depletions from the Colorado River Basin would adversely affect the Colorado pikeminnow, humpback chub, bonytail, and razorback sucker and their critical habitats. Because the average annual depletion was less than 125 af/yr (83.6 af/yr), these depletions were addressed by the 1994 small water depletions BO.

In November 2008, the BLM prepared and submitted a PBA addressing the effects of water depletions on the four endangered big river fish associated with the management of the Federal fluid minerals program in the Upper Colorado River Basin in western Colorado excluding the San Juan River Basin. As stated above, the Service responded in December 2008 with a PBO addressing the effects of water depletions on the four endangered fish from BLM's authorization of Federal fluid mineral development. *The new PBO we are issuing today is a product of reinitiation of consultation of this 2008 PBO.*

On December 4, 2009, the Service issued the "Final Gunnison River Basin programmatic biological opinion" on the operation of the Aspinall Unit and the reconsultation for the Dallas

5

BLM_0072157

Creek and Dolores Projects and their effects on the four endangered fish and their critical habitats (Gunnison River PBO) (Service 2009b). This consultation for the Gunnison River Basin includes operation and depletions associated with existing Reclamation projects, other Federal projects, and existing nonfederal water depletions. The Service determined that projects that fit under the umbrella of the Gunnison River PBO avoid the likelihood of jeopardy and/or adverse modification of critical habitat for depletion impacts to the Gunnison River Basin. Water depletions in the Gunnison River Basin fit under the Gunnison River PBO if: private project sponsors sign a Recovery Agreement for projects greater than 100 af/yr; the project sponsors make a one-time monetary contribution for water depletions greater than 100 af/yr to help fund their share of the costs of recovery actions; reinitiation stipulations are included in all consultations; and, the authorizing Federal Agency agrees to retain discretionary Federal authority. The Gunnison River PBO contemplated existing water depletions of 602,700 af/yr and 37,900 af/yr of new water depletions.

## BIOLOGICAL OPINION

**Description of the Proposed Action**

Details of the proposed action are contained in the 2017 PBA for the project and are summarized here. The project area includes all areas within western Colorado draining into the Colorado River except the San Juan River Basin. The action area includes the project area plus occupied and critical habitats for the four endangered fish downstream from the project area to Lake Powell (e.g., Green, Colorado, and White Rivers in Utah) to account for downstream effects from the project. Within the project area, the BLM manages 5,178,984 acres of Federal fluid mineral estate. This includes surface management by the BLM and other government agencies including the Service, Reclamation, U.S. Forest Service, U.S. National Park Service, Colorado Parks and Wildlife, and Colorado State Land Board. The remaining lands overlying Federal fluid minerals are held in private ownership.

The proposed action consists of water use associated with fluid mineral development as administered by the BLM in western Colorado. Water depletions analyzed for this consultation are composed of fresh water (excludes recycled and produced water) used for:

- Dust abatement for access roads and well pads

- Well drilling and completion (drilling and fracking fluids)

- Water associated with connected Federal actions allowing for the development of private fluid minerals (e.g., BLM authorization of a pipeline or access road across public lands that is connected to the action of developing privately owned fluid mineral estate)

- Hydrostatic testing of newly constructed pipelines

- Geophysical/seismic exploration

Due to unknown and likely insignificant amounts, water use for connected Federal actions, hydrostatic pipeline testing, and seismic exploration was not quantified by BLM in the 2017

6

PBA to estimate future water use.  However, future water depletions for these activities are contemplated, are included in our analysis on the water quantities given below, will be reported by BLM annually, and covered under this PBO as long as the overall water use projections listed below are not exceeded.

In order to estimate water use for the project, BLM estimated the number of wells that would be drilled and completed in the project area (3,871 wells over the next 10 years) and the associated volumes of water that would be used.  Because horizontal wells typically use much more water than vertical or directional wells, the PBA provided water use estimates specific to the type of wells that are expected to be drilled and completed.  Water use projections were also tailored to each subbasin within the project area given that differing amounts of recycled water is available in different areas.

Within the Upper Colorado River Basin in Colorado, the 2017 PBA provides the following water depletion estimates in af/yr associated with Federal fluid mineral development:

| | |
|---|---:|
| Colorado River Basin | 2,463 |
| Gunnison River Basin | 607 |
| White River Basin | 538 |
| Yampa River Basin | 315 |
| Dolores River Basin | 35 |
| Green River Basin (in Colorado) | 4 |
| Total = | 3,962 |

Actual water use by the project will vary from year to year.  Water use may even exceed these estimates in a given subbasin in a given year.  However, as long as the average annual water use does not exceed the total, and the subbasin amounts are not more than minimally exceeded when averaged over the years of water used, the effects of the water depletions will be consistent with our analysis in this PBO (the average beginning with the first reporting year pursuant to the original 2008 biological opinion (Service 2008) and including all years since).  For example, if water depletions from the White River over the course of the first three years had been 500, 570, and 540, the average annual water depletion would be 536.7, which is less than the estimate above and consistent with the analysis in this PBO.

The BLM State Office will track all water depletions that result from Federal fluid mineral projects in the Upper Colorado River Basin on an annual basis.  The BLM will complete and submit a log of all water depleting projects by river subbasin to the Service by April 30 of each year for the recently completed calendar year.  These logs will be used to track consistency with the depletion amounts analyzed in this PBO.

Most of the water depletions involved with the current proposal by BLM would occur within the Yampa, Upper Colorado, and Gunnison River Basins.  The Service has determined that projects that fit under the umbrella of the Yampa River, Colorado River, and Gunnison River PBOs would avoid the likelihood of jeopardy and would avoid adverse modification of critical habitat. The Service has determined that if a project meets the following criteria, then it would fit under the umbrella of one of these PBOs:

BLM_0072159

1. The project depletes water from the Yampa River, Colorado River above the confluence with the Gunnison River, or Gunnison River.

2. The applicant signs a Recovery Agreement and returns it to the Service.

3. In order to rely on the Recovery Program to offset the subject depletions, the project sponsors are to make a one-time monetary contribution for water depletions greater than 100 af/yr to help fund their share of the costs of recovery actions.

4. The Service requests that the agency retain discretionary Federal authority for the subject project in case reinitiation of section 7 consultation is required.

Since 2008 the BLM has been obtaining, and will continue to obtain, signed Recovery Agreements from each company (water user) before approving oil and gas permits. BLM also facilitated the payment of a one-time contribution based on the appropriate share of the costs of the Recovery Implementation Program to fund recovery actions specified in these PBOs. See further details in the Conservation Measures section below. BLM also agreed to condition its approval documents to retain jurisdiction should section 7 consultation need to be reinitiated. Therefore, the Service concludes that water depletions from this project within the three river basins covered by the Yampa, Colorado, and Gunnison Rivers PBOs meet the criteria to rely on the Recovery Implementation Program Recovery Action Plan to offset depletion impacts. Our conclusions for such water depletions tier to those PBOs.

The Service and the Recovery Program track all water depletions that are covered under these three PBOs on a quarterly basis. A summary of those depletions are available at: http://www.coloradoriverrecovery.org/documents-publications/section-7-consultation/consultation-list.html . Also, in accordance with the Section 7, Sufficient Progress, and Historic Projects Agreement, the Service reviews cumulative accomplishments and shortcomings of the Recovery Program in the Upper Colorado River Basin. Per that Agreement, the Service uses the following criteria to evaluate whether the Recovery Program is making "sufficient progress" toward recovery of the four listed fish species:
- actions which result in a measurable population response, a measurable improvement in habitat for the fishes, legal protection of flows needed for recovery, or a reduction in the threat of immediate extinction;
- status of the fish populations;
- adequacy of flows;
- and magnitude of the impact of projects.

Through these bi-annual Sufficient Progress reviews the Service evaluates the best available and current information to determine if the Recovery Program continues to offset depletion effects identified in existing Section 7 consultations including the depletions covered by these PBOs. In the most recent assessment (dated December 10, 2017), the Service determined that sufficient progress has been made towards recovery (Service 2017). Sufficient Progress reports can be found at: http://www.coloradoriverrecovery.org/documents-publications/section-7-consultation/sufficient-progress-letters.html.

BLM_0072160

This biological opinion provides updated information and analysis relevant to the entire Upper Colorado River Basin within Colorado, including, but not limited to, the areas covered by the Yampa River, Colorado River, and Gunnison River PBOs.

In the 2008 PBA, water depletions estimates for the project were generally based on reasonable foreseeable development scenarios looking out 15 years (until 2023). At that time, the biological opinion would be examined to ensure its assumptions and conclusions were still valid. However, the BLM requested reinitiation of consultation and produced a new PBA prior to that time (i.e., this year) to address new technologies (horizontal drilling, broader use of hydraulic fracturing, greater use of recycled water, etc.) that were not contemplated in 2008. In the 2017 PBA, the BLM used past water depletion amounts and a 10-year outlook to re-estimate the average annual pace of well drilling and resulting water depletions. Our analysis of effects included below will focus primarily on this 10-year timeframe (until 2027).

**Conservation Measures**

Conservation measures are actions that the action agency and applicant agree to implement to minimize negative effects of the action and to further the recovery of the species under review. The beneficial effects of conservation measures are taken into consideration for determining both jeopardy and incidental take analyses. The BLM agrees to incorporate the following conservation measures as a condition of any water-use authorized for fluid mineral development:

- Water may be extracted directly out of the Colorado, Gunnison, White, Yampa, or Green Rivers, which all have occupied and critical habitat for the four endangered Colorado River fish. The eight western slope BLM Field Offices/Administrative Units have committed to implement the following measures to minimize direct impacts to federally listed species from pumping water directly out of these rivers:

  1. The best method to avoid entrainment is to pump from off-channel locations (e.g., ponds, lakes, and diversion ditches), not directly connected to the mainstem rivers even during high spring flows. Early life stages (eggs, larvae, fry) are most vulnerable to pump entrainment. Given this, and given that the highest concentration of endangered fish reproduction in Colorado is in the Colorado River below Palisade (15-Mile Reach and below), water withdrawal is prohibited directly from the Colorado River (including side channels and backwaters where fish might be) below the Price-Stubb diversion down to the Utah state line and below. The Price-Stubb diversion is just upstream from the I-70 bridge over the Colorado River near Palisade, Colorado).

  2. Outside the 15-Mile Reach, if the pump head must be located in the river channel where larval fish are known to occur (generally within Designated Critical Habitat, although none are known above De Beque on the Colorado River or above Kinney Reservoir on the White River), the following measures apply:

     a. Do not situate the pump in a low-flow or no-flow area as these habitats tend to concentrate larval fishes. Instead place the pump into fast moving/riffle habitat.

9

    b.  Restrict the amount of pumping, to the greatest extent possible, during that period of the year when larval fish may be present (June 1 to August 15).

    c.  Avoid pumping, to the greatest extent possible during the pre-dawn hours (two hours prior to sunrise) as larval fish drift studies indicate that this is a period of greatest daily activity.

3.  Screen all pump intakes with ¼ inch or finer mesh material.

4.  Report any endangered fish impinged on any intake screens to the Service at (970) 628-7180 or the Colorado Parks and Wildlife, Northwest Region, 711 Independent Avenue, Grand Junction, Colorado, 81505, (970) 255-6100, or Colorado Parks and Wildlife, Southwest Region, 415 Turner Drive, Durango, Colorado, 81303, (970) 375-6700.

The BLM, working with the individual companies, their sub-contractors and industry representative groups will inform and educate on-the-ground personnel of the need to implement these conservation measures. In addition, these conservation measures will be added to all Applications for Permit to Drill (APD's) as a condition of approval (COA) prior to commencement of development activity.

- Water depletions in the Colorado, Yampa, and Gunnison River subbasins have been addressed in previous PBOs (Service 1999, 2005, 2009). These opinions require water users to sign Recovery Agreements that state that the water users will not interfere with the implementation of recovery actions and the Service will provide ESA compliance. The BLM will ensure Recovery Agreements are initiated with the Service by individual operators, or on the behalf of individual operators via industry representative groups.

- As a means of offsetting the impacts associated with the depletion of freshwater from the BLM's management of the Federal fluid minerals program within the project area, the BLM obtained a one-time monetary contribution from the industry representative group Independent Petroleum Association of Mountain States (now known as Western Energy Alliance) when the 2008 PBO was issued. The 2008 PBA/PBO analyzed water use over a 15-year timeframe; a payment of $71,978.34 was made to the National Fish and Wildlife Foundation on behalf of the Recovery Program based on the 4,046 acre-foot af/yr threshold identified in the 2008 consultation effort (see 2008 PBO for further details). Since the 2008 threshold was never exceeded, and the revised threshold in this reinitiated consultation is below that amount, no new payment is required at his time. These funds are used by the Recovery Program to contribute to the recovery of endangered fish through habitat restoration, propagation and genetics management, instream flow identification and protection, program management, nonnative fish management, research and monitoring, and public education (Recovery Program 2006).

BLM_0072162

**Status of the Species and Critical Habitat**

The purpose of this section is to summarize the best available information regarding the current range-wide status of the four listed fish species. Additional information regarding listed species may be obtained from the sources of information cited for these species. The latest recovery goals for all four endangered fish, which provide information on species background, life history, and threats, can be found on the internet at:  http://www.coloradoriverrecovery.org/documents-publications/foundational-documents/recovery-goals.html. Critical habitat for all four endangered fish species is addressed in the Critical Habitat section below.

*Colorado Pikeminnow*

Species description and status

The Colorado pikeminnow is the largest cyprinid fish (minnow family) native to North America and evolved as the main predator in the Colorado River system. Individuals begin consuming other fish for food at an early age and rarely eat anything else. It is a long, slender, cylindrical fish with silvery sides, greenish back, and creamy white belly (Sigler and Sigler 1996). Historically, individuals may have grown as large as 6 feet (ft) long and weighed up to 100 pounds (estimates based on skeletal remains) (Sigler and Miller 1963), but today individuals rarely exceed 3 ft or weigh more than 18 pounds (lbs) (Osmundson et al. 1997).

The species is endemic to the Colorado River Basin, where it was once widespread and abundant in warm-water rivers and tributaries from Wyoming, Utah, New Mexico, and Colorado downstream to Arizona, Nevada, and California. Currently, wild populations of pikeminnow occur only in the Upper Colorado River Basin (above Lake Powell) and the species occupies only 25 percent of its historic range-wide habitat (Service 2002b). Colorado pikeminnow are long distance migrators, moving hundreds of miles to and from spawning areas, and requiring long sections of river with unimpeded passage. They are adapted to desert river hydrology characterized by large spring peaks of snow-melt runoff and low, relatively stable base flows.

The Office of Endangered Species first included the Colorado pikeminnow (as the Colorado squawfish) in the List of Endangered Species on March 11, 1967 (32 FR 4001). It is currently protected under the ESA as an endangered species throughout its range, except the Salt and Verde River drainages in Arizona where it was reintroduced as an experimental, non-essential population (50 FR 30188). The Service finalized the latest Recovery Goals for the species in 2002 (Service 2002b), and is currently conducting a Status Review of the species (81 FR 33698). Recovery of Colorado pikeminnow is considered necessary only in the Upper Colorado River Basin (above Glen Canyon Dam, including the San Juan, and Green River subbasins) at this time because of the present status of populations and because existing information on Colorado pikeminnow biology support application of the metapopulation concept to extant populations (Service 2002b). As a result, this BO will focus on the status of the Colorado pikeminnow in that unit.

Life history

The Colorado pikeminnow requires relatively warm waters for spawning, egg incubation, and survival of young. Males become sexually mature at approximately 6-7 years of age, which

11

BLM_0072163

corresponds to a length of about 450-500 millimeters (mm) (18-20 inches (in.)) (Service 2002b, Osmundson and White 2017), and females mature 1 year later (Sigler and Sigler 1996).

Mature adults migrate to established spawning areas in late spring as water temperatures begin to warm, with migration events up to 745 river kilometers round-trip on record (463 mi) (Bestgen et al. 2005). Rates of movement for individuals are not precisely known, but 2 individuals made the approximately 400 km (250 mi) migration from the White River below Taylor Draw Dam to the Yampa River spawning area in less than 2 weeks. Spawning typically begins after peak flows have subsided and water temperatures are above 16° Celsius (°C) (60.8° Fahrenheit (°F)). Mature adults deposit eggs over gravel substrate through broadcast spawning and eggs generally hatch within 4 to 6 days (multiple references in Bestgen et al. 2005). River flows then carry emerging larval fish (6.0 to 7.5 mm long (0.2 to 0.3 in.)) downstream 40 to 200 km to nursery backwaters (25 to 125 mi), where they remain for the first year of life (Service 2002b).

Colorado pikeminnow reach lengths of approximately 70 mm by age 1 (juveniles) (2.8 in.), 230 mm by age 3 (subadults) (9 in.), and 420 mm by age 6 (adults) (16.5 in.), with mean annual growth rates of adult and subadult fish slowing as fish become older (Osmundson et al. 1997). The largest fish reach lengths between 900 and 1000 mm (35 to 39 in.); these fish are quite old, likely being 47 to 55 years old with a minimum of 34 years (Osmundson et al. 1997).

Reproductive success and recruitment of Colorado pikeminnow is pulsed, with certain years having highly successful productivity and other years marked by failed or low success (Service 2002b). The most successful years produce a large cohort of individuals that is apparent in the population over time. Once individuals reach adulthood, approximately 80 to 90 percent of adults greater than 500 mm (20 in.) survive each year (Osmundson et al. 1997; Osmundson and White 2009). Strong cohorts, high adult survivorship, and extreme longevity are likely life history strategies that allow the species to survive in highly variable ecological conditions of desert rivers.

Very little information is available on the influence of turbidity on the endangered Colorado River fishes. Osmundson and Kaeding (1989) found that turbidity allows use of relatively shallow habitats ostensibly by providing adults with cover; this allows foraging and resting in areas otherwise exposed to avian or terrestrial predators. Tyus and Haines (1991) found that young pikeminnow in the Green River preferred backwaters that were turbid. Clear conditions in these shallow waters might expose young fish to predation from wading birds or exotic, sight-feeding, piscivorous fish. It is unknown whether the river was as turbid historically as it is today. For now, it is assumed that these endemic fishes evolved under conditions of high turbidity. Therefore, the retention of these highly turbid conditions is probably an important factor in maintaining the ability of these fish to compete with nonnatives that may not have evolved under similar conditions.

<u>Population Dynamics</u>

The Colorado pikeminnow is endemic to the Colorado River Basin, where it was once widespread and abundant in warm-water rivers and tributaries. Wild populations of Colorado pikeminnow are found only in the Upper Basin of the Colorado River (above Lake Powell). Three wild populations of Colorado pikeminnow are found in about 1,090 miles of riverine

BLM_0072164

habitat in the Green River, Upper Colorado River, and San Juan River subbasins (Service 2011a).

We measure population dynamics of Colorado pikeminnow separately in the Green, Upper Colorado, and San Juan River Basins because distinct recovery criteria are delineated for each of these three basins.  In the 2002 recovery goals, preliminary abundance estimates for wild adults in the basins were:  Upper Colorado River, 600 to 900; Green River, 6,000 to 8,000; and San Juan River, 19 to 50 (Service 2002b).

## UPPER COLORADO RIVER

To monitor recovery of the Colorado pikeminnow, the Recovery Program conducts multiple-pass, capture-recapture sampling on two stretches of the Upper Colorado River which are roughly above and below Westwater Canyon (Osmundson and White 2009).  In their most recent summary of those data (Osmundson and White 2017), the principal investigators conclude that though the population remained self-sustaining during the 23-year study period [1991-2013], low abundance and a recent rapid decline suggest long-term population persistence is tenuous.

The current downlisting demographic criteria for Colorado pikeminnow (USFWS 2002b) in the Upper Colorado River subbasin is a self-sustaining population of at least 700 adults maintained over a 5-year period, with a trend in adult point estimates that does not decline significantly. Secondarily, recruitment of age-6 (400–449 mm TL), naturally produced fish must equal or exceed mean adult annual mortality (estimated to be about 20 percent).  The average of all adult estimates (1992 – 2010) is 644.  The average of the five most recent annual adult population estimates is 658.  Osmundson and White (2014) determined that recruitment rates were less than annual adult mortality in six years and exceeded adult mortality in the other six years when sampling occurred.  The estimated net gain for the 12 years studied was 32 fish $\geq$ 450 mm TL. Whereas the Colorado River population may meet the trend or 'self-sustainability' criterion, it has not met the abundance criteria of 'at least 700 adults' during the most recent five year period. Updated graphs of Colorado pikeminnow abundance in the Colorado River are shown in Figure 1 (adults) and Figure 2 (subadults) (Service 2016a).

BLM_0072165



Figure 1.  Adult Colorado pikeminnow population abundance estimates for the Colorado River (Osmundson and Burnham 1998; Osmundson and White 2009; 2014).  Error bars represent the 95 percent confidence intervals.  The 2013-2015 data are preliminary and represented by hollow data points (Service 2016a).

BLM_0072166



Figure 2. Colorado pikeminnow recruitment abundance estimates (calculated using the same mark recapture methodology as for the adults) for the Colorado River (Osmundson and White 2009, 2014; Service 2016a). Recruits are age-6 (400-449mm TL). Error bars represent the 95 percent confidence intervals. The 2013-2015 data are preliminary and represented by hollow data points (Service 2016a).

To summarize, in the Upper Colorado River subbasin, the Colorado pikeminnow subpopulation may be self-sustaining, but the number of adults is below the level needed for recovery. Recruitment is quite variable over time, but has exceeded adult mortality in approximately half of the years when measured over the past two decades. The number of age-0 (young of year) Colorado pikeminnow is also quite variable over time, but appears to be less, on average, since the year 2000 than prior to 2000 (Figure 5). Colorado pikeminnow are also generally distributed throughout the Colorado River now to the same extent that they were when they became listed.

GREEN RIVER

Population estimates for adult Colorado pikeminnow in the Green River subbasin began in 2000. Sampling occurs on the mainstem Green River from the Yampa confluence to the confluence with the Colorado River and in the Yampa and White rivers. The initial year of sampling did not include the lower Green River (from near the confluence of the White River to the confluence with the Colorado River). Beginning in 2001, the sampling regime has consisted of three years of estimates followed by two years of no estimates. In support of an ongoing Population Viability Analysis, Dr. Kevin Bestgen (Colorado State University) correlated the much more robust Mark/Recapture (M/R) population estimates of recent years with Catch per Unit Effort (CPUE: number of adults collected per hour of electrofishing) metrics. This correlation analysis allowed researchers to extend trend analyses back to 1991 (Figure 3) (Service 2016a). This

15

BLM_0072167

retrospective and more expansive view of population trend indicates that the Recovery Program initiated M/R population estimates at a high point in historical abundance.



Figure 3.  Adult Colorado pikeminnow population abundance estimates for the Green River Basin (1991–2013).  Estimates from 2000–2013 are based on Mark/Recapture data analysis as reported in Bestgen et al. 2016 (in review).  Pre-2000 data (open markers) were derived (via correlation analysis (Service 2016a).

The downlisting demographic criteria for Colorado pikeminnow in the Green River subbasin require that separate adult point estimates for the middle Green River and lower Green River do not show a statistically significant decline over a 5-year period, and each estimate for the Green River subbasin exceeds 2,600 adults (estimated minimum viable population [MVP] number) (Service 2002b).  The average of the first two sets of adult estimates was 3,020 (between 2000 – 2008).  The estimates for 2011-2013 are below 2,600 adults in each year.

Another demographic requirement in the 2002 Recovery Goals is that recruitment of age-6; naturally-produced fish must equal or exceed mean annual adult mortality.  Estimates of recruitment age fish (subadults; 400–449mm TL) have averaged 1,455 since 2001, but have varied widely (Figure 4).  Recruitment exceeded annual adult mortality only during the 2006–2008 periods.  The numbers of recruits throughout the Green River subbasin were high in 2011, but declined in subsequent years.

BLM_0072168



Figure 4.  Estimated numbers of Colorado pikeminnow recruits (400–449 mm TL) in the Green River subbasin (Yampa, White, Middle Green, Desolation-Gray Canyons, and Lower Green) for 2001–2013 (Service 2016a).

Bestgen et al. (2010) recognized that the mechanism driving frequency and strength of recruitment events was likely the strength of age-0 Colorado pikeminnow production in backwater nursery habitats.  Osmundson and White (2014) saw a similar relationship between a strong age-0 cohort in 1986 and subsequent recruitment of late juveniles five years later, but that relationship was more tenuous in later years.  Researchers are particularly concerned with what appears to be very weak age-0 representation in the Middle Green reach (1999 thru 2008) and in the lower Colorado River (2001 thru 2008) (Figure 5).  Bestgen and Hill (2016) reviewed fall densities of age-0 Colorado pikeminnow collected in the middle and lower Green River that date back to 1979.  They compared those densities to August and September base flows and discovered that declines in summer base flow magnitude were correlated with declining densities of age-0 Colorado pikeminnow in both reaches. As a result, they recommended new base flow magnitudes to support increased age-0 production. Specifically, base flows between 1,700 and 3,000 cubic feet per second (cfs) in the middle Green River, and 1,700–3,800 cfs in the lower Green River, increase the frequency and magnitude of age-0 Colorado pikeminnow production (Service 2016a).

The Recovery Program and Reclamation have coordinated experimental higher summer base flow releases from Flaming Gorge in recent years based on the recommendations from Bestgen and Hill (2016).  Base flow levels fell within these ranges for both reaches in 2015 and a significant increase in fall recruitment was observed, underscoring the value of manipulating Flaming Gorge Dam releases as a main recovery action to benefit Colorado pikeminnow recruitment in the Green River.

A preliminary analysis of age-0 densities and summer base flows on the lower Colorado River has revealed a similar relationship. Record high densities of age-0 pikeminnow were recorded

BLM_0072169

from the lower Colorado River in 2015 (see Figure 5) when August–September base flows fell within a preferable range.



Figure 5.  Numbers of age-0 Colorado pikeminnow collected each year from three different habitat reaches of river.  A total of 2,892 Age-0 were collected in the lower Green River in 1988 (Service 2016a).

To summarize, in the Green River subbasin, the Colorado pikeminnow subpopulation appears to have declined somewhat and the number of adults is below the level needed for recovery. Recruitment is quite variable over time, and has not exceeded adult mortality in all years when measured over the past two decades.  The number of age-0 Colorado pikeminnow is also quite variable over time, but fewer have been captured in the Green River, on average, since the year 2000 than prior to 2000 (Figure 5); in the Colorado River, age-0 year classes have been variable but showing a declining trend until 2015 when a strong age-0 year class was collected.  Colorado pikeminnow are generally distributed throughout the Green River subbasin now nearly to the same extent that they were when they became listed, although their numbers have dwindled in the Yampa River and the reach in the White River above the Taylor Draw Dam is no longer occupied.

SAN JUAN RIVER

Unlike the Green and Upper Colorado River Basins, wild Colorado pikeminnow are extremely rare in the San Juan River.  Between 1991 and 1995, 19 (17 adult and 2 juvenile) wild Colorado pikeminnow were collected in the San Juan River by electrofishing between RM 142 (the former Cudei Diversion) and Four Corners at RM 119 (Ryden 2000; Ryden and Ahlm 1996).  The multi-threaded channel, habitat complexity, and mixture of substrate types in this area of the river appear to provide a diversity of habitats favorable to Colorado pikeminnow on a year-round

BLM_0072170

basis (Holden and Masslich 1997). Estimates made during the seven-year research period between 1991 and 1997 suggested that there were fewer than 50 adult Colorado pikeminnow in a given year (Ryden 2000).

Monitoring for adult Colorado pikeminnow currently occurs every year on the San Juan River. In 2013, 149 Colorado pikeminnow were collected during monitoring from RM 180-77, the eighth consecutive year that more than 100 Colorado pikeminnow were caught in this reach (Schleicher 2014). However, only 7 of these fish were greater than 450 mm (18 in). In addition, 19 Colorado pikeminnow greater than 450 mm (18 in) were collected during the non-native fish removal trips in 2013 (Duran et al. 2014). In order to down-list the species, the San Juan River population of Colorado pikeminnow must reach at least 1,000 Age-5 fish (Service 2002).

The majority of individuals come from hatchery reared stocks supported by the San Juan River Recovery Implementation Program. This program has stocked more than 2 million age 0 and age 1+ fish in the San Juan River since 2002 (Furr and Davis 2009). River wide population estimates for age-2+ pikeminnow that have been in the San Juan River at least one year was approximately 4,600 and 5,400 individuals in 2009 and 2010, respectively (Duran et al. 2010; 2013). However, because few adult Colorado pikeminnow were detected in the San Juan River, this population estimate largely consists of juveniles. Other Colorado pikeminnow abundance estimates exhibit substantial annual variation, likely due to the effects of short-term retention from recent stocking events, but no clear population trends were evident in the San Juan River Basin (Durst 2014).

Successful Colorado pikeminnow reproduction was documented in the San Juan River in 1993, 1995, 1996, 2001, 2004, 2007, 2009-2011, and 2013. A total of 58 larval Colorado pikeminnow were collected since 1993 (Farrington and Brandenburg 2014); however, there has been little to no recruitment documented in the San Juan River. A total of 48 Age-1+ Colorado pikeminnow were collected in 2013; all presumably the result of augmentation efforts (Farrington and Brandenburg 2014). Since 1998, Colorado pikeminnow were collected during small-bodied monitoring every year except 2001-2003; however, young of year (YOY) Colorado pikeminnow were stocked in each of these years prior to monitoring efforts so these fish were likely hatchery-reared (Service 2015c). Larval Colorado pikeminnow detections occurred throughout the San Juan River from Reach 4 (RM 106-130) downstream to Reach 1 (RM 0-16) (Farrington and Brandenburg 2014, Service 2015c). Franssen et al. (2007) found that maintenance of a natural flow regime favored native fish reproduction and provided prey at the appropriate time for Age-1 Colorado pikeminnow.

Tissue samples from Colorado pikeminnow caught during research conducted under the Recovery Program have been analyzed as part of a basin-wide analysis of endangered fish genetics. The results of that analysis indicate that the San Juan River fish exhibit less genetic variability than the Green River and Colorado River populations, likely due to the small population size, but they were very similar genetically to pikeminnow from the Green, Colorado, and Yampa rivers (Morizot in litt. 1996). These data suggest that the San Juan population is probably not a separate genetic stock (Holden and Masslich 1997; Houston et al. 2010).

To summarize, the Colorado pikeminnow was quite rare in the San Juan River in the 1990s, with an estimate of less than 50 adults. Since 2002, millions of young Colorado pikeminnow have

19

BLM_0072171

been stocked into the river. Adult fish are still rather uncommon, however, and not nearly at the level yet needed for recovery. Despite low numbers of adults, reproduction is occurring to some extent, but recruitment is low. Most of the Colorado pikeminnow in the San Juan River are stocked juveniles. Through augmentation, Colorado pikeminnow are generally distributed throughout the San Juan River within critical habitat.

Threats

The Colorado pikeminnow was designated as an endangered species prior to enactment of the ESA, and therefore a formal listing package identifying threats was not assembled. Construction and operation of mainstem dams, nonnative fish species, and local eradication of native minnows and suckers in advance of new human-made reservoirs in the early 1960's were recognized as early threats (Service 2002a). According to the 2002 Recovery Goals for the species, the primary threats to Colorado pikeminnow populations are streamflow regulation and habitat modification (including cold-water dam releases, habitat loss, and blockage of migration corridors); competition with and predation by nonnative fish species; and pesticides and pollutants (Service 2002a).

Stream flow regulation, which includes mainstem dams; cause the following adverse effects to the Colorado pikeminnow and its habitat:

- block migration corridors,
- changes in flow patterns, reduced peak flows and increased base flows,
- release cold water, making temperature regimes less than optimal,
- change river habitat into lake habitat, and
- retain sediment that is important for forming and maintaining backwater habitats

In the Upper Basin, 435 miles of Colorado pikeminnow habitat have been lost by reservoir inundation from Flaming Gorge Reservoir on the Green River, Lake Powell on the Colorado River, and Navajo Reservoir on the San Juan River. Cold water releases from these dams have eliminated suitable habitat for native fishes, including Colorado pikeminnow, from river reaches downstream for approximately 45-65 miles below Flaming Gorge Dam, Navajo Dam, and the Aspinall Unit Dams on the Gunnison River (Osmundson 2011). In addition to main stem dams, many dams and water diversion structures occur in and upstream from critical habitat that reduce flows and alter flow patterns, which adversely affect critical habitat. Diversion structures in critical habitat can divert fish into canals and pipes where the fish become permanently lost to the river system. It is unknown how many endangered fish are lost in irrigation systems, but in some years, in some river reaches, the majority of the river flow is diverted into unscreened canals. Peak spring flows in the Green River at Jensen, Utah, have decreased 13–35 percent and base flows have increased 10–140 percent due to regulation by Flaming Gorge Dam (Muth et al. 2000).

Although a good portion of the recovery factor criteria (Service 2002a) are being addressed, nonnative fish species continue to be very problematic. Recovery Goals (Service 2002a, 2002b, 2002c, 2002d) identified predation or competition by nonnative fish species as a primary threat to the continued existence or the reestablishment of self-sustaining populations of Colorado pikeminnow and the other three endangered fishes (Martinez et al. 2014). Predation and

BLM_0072172

competition from nonnative fishes have been clearly implicated in the population reductions or elimination of native fishes in the Colorado River Basin (Dill 1944, Osmundson and Kaeding 1989, Behnke 1980, Joseph et al. 1977, Lanigan and Berry 1979, Minckley and Deacon 1968, Meffe 1985, Propst and Bestgen 1991, Rinne 1991). Data collected by Osmundson and Kaeding (1991) indicated that during low water years nonnative minnows capable of preying on or competing with larval endangered fishes greatly increased in numbers.

The Colorado River Basin is an altered riverscape and the interaction of native and nonnative species with non-adapted and competing life histories has contributed to what may be the largest expansion of nonnative fishes and displacement of native fishes in a North America river basin (Martinez et al. 2014). At least 67 species of nonnative fishes have been introduced into the Colorado River Basin during the last 100 years (Tyus et al. 1982, Carlson and Muth 1989, Minckley and Deacon 1991, Tyus and Saunders 1996). Tyus et al. (1982) reported that 42 nonnative fish species have become established in the Upper Basin, and Minckley (1985) reported that 37 nonnative fish species have become established in the Lower Basin. Many of these species were intentionally introduced as game or forage fishes, whereas others were unintentionally introduced with game species or passively as bait fish. The numerous nonnative species have begun to overshadow the 14 native fish species in the basin.

Nonnative fishes compete with native fishes in several ways and include predation, habitat degradation, competition for resources, hybridization, and disease transmission (Martinez et al. 2014). The capacity of a particular area to support aquatic life is limited by physical habitat conditions and increasing the number of species in an area usually results in smaller populations of most species. The size of each species population is controlled by the ability of each life stage to compete for space and food resources and to avoid predation. Some life stages of nonnative fishes appear to have a greater ability to compete for space and food and to avoid predation in the existing altered habitat than do some life stages of native fishes. Tyus and Saunders (1996) cite numerous examples of both indirect and direct evidence of predation on eggs and larvae by nonnative species. The Recovery Program (Service 2016a) provides an expanded discussion about the worst-of-the-worst nonnative predators (smallmouth bass, northern pike, and walleye) in the Upper Colorado River Basin.

The Service has begun discussions about the potential downlisting of Colorado pikeminnow, but the biggest obstacle may become the existing and future threat of invasive ecological impacts by nonnative aquatic species, particularly predatory sport fishes. The most problematic nonnative fish species in the basin have been identified as northern pike, smallmouth bass, and channel catfish, although other nonnative percid, ictalurid, cyprinid, centrarchid and catastomid species continue to be problematic as well (Martinez et al. 2014). Although the main threat from nonnative predators is being eaten by one, the reverse can also be a problem—Colorado pikeminnow that have preyed on nonnative channel catfish have died from choking on the pectoral spines (McAda 1983, Pimental et al. 1985, Ryden and Smith 2002, Lapahie 2003). Arguably the biggest efforts of the Recovery Program today center on the control of nonnative species. Fish crews from state and Federal agencies now remove nonnative predators from over 600 miles of river annually at a cost of approximately $1.7 million (Service 2017).

Threats from pesticides and pollutants include accidental spills of petroleum products and hazardous materials; discharge of pollutants from uranium mill tailings; and high selenium

21

concentration in the water and food chain (Service 2002a).  Accidental spills of hazardous material into occupied habitat can cause immediate mortality when lethal toxicity levels are exceeded.  Researchers now speculate that mercury may pose a more significant threat to Colorado pikeminnow populations of the Upper Colorado River Basin than previously recognized (Service 2015b).  Osmundson and Lusk (2012) have recently reported elevated mercury concentrations in Colorado pikeminnow muscle tissue; the highest concentrations were from the largest adults collected from the Green and Colorado River subbasins.

To summarize, Colorado pikeminnow habitat loss and degradation from dams and diversions constructed decades ago generated some of the early, primary impacts to the species.  Most of the long-term impacts from these structures continue and are unlikely to change significantly in the near term.  In the remaining suitable habitats, nonnative fish species pose a significant ongoing threat and challenge to recovery.  Contaminants, including mercury and selenium, pose a threat as well, but the magnitude of this threat is in need of further investigation.

***Razorback Sucker***

Species description and status

Like all suckers, the razorback sucker has a ventral mouth (Family: Catostomidae, meaning "down mouth").  It is a robust, river catostomid endemic to the Colorado River Basin (Sigler and Sigler 1996; Service 2002b) and is the largest native sucker to the western United States.  The species feeds primarily on algae, aquatic insects, and other available aquatic macroinvertebrates using their ventral mouths and fleshy lips (Sigler and Sigler 1996).  Adults can be identified by olive to dark brown coloration above, with pink to reddish brown sides and a bony, sharp-edged dorsal keel immediately posterior to the head, which is not present in the young.  The species can reach lengths of 3 ft and weights of 16 pounds (7.3 kg), but the maximum weight of recently captured fish is 11 to 13 pounds (5 to 6 kg) (Sigler and Sigler 1996; Service 2002b).  Taxonomically, the species is unique, belonging to the monotypic genus Xyrauchen, meaning that razorback sucker is the only species in the genus (Service 2002b).  Like Colorado pikeminnow, razorback suckers may live to be greater than 40 years.

Historically, the razorback sucker occupied the mainstem Colorado River and many of its tributaries from northern Mexico through Arizona and Utah into Wyoming, Colorado, and New Mexico (Service 2002b).  In the late 19th and early 20th centuries, it was abundant in the Lower Colorado River Basin and common in parts of the Upper Colorado River Basin, with numbers apparently declining with distance upstream (Service 2002b).  Bestgen (1990) reported that this species was once so numerous that it was commonly used as food by early settlers and that a commercially marketable quantity was caught in Arizona as recently as 1949.  Distribution and abundance of the razorback sucker declined throughout the 20th century across its historic range, and the species now exists naturally only in a few small, unconnected populations or as dispersed individuals.  Specifically, razorback sucker are currently found in small numbers in the Green River, Upper Colorado River, and San Juan River Basins; the lower Colorado River between Lake Havasu and Davis Dam; Lakes Mead and Mohave; in small tributaries of the Gila River Basin (Verde River, Salt River, and Fossil Creek); and in local areas under intensive management such as Cibola High Levee Pond, Achii Hanyo Native Fish Facility, and Parker Strip (Service 2002b).

22

BLM_0072174

The razorback sucker is listed as endangered under the ESA under a final rule published on October 23, 1991 (56 FR 54957). The Service finalized the latest recovery plan for the species in 2002 (2002b), but is currently drafting an updated revision.

Separate, objective recovery criteria were developed for each of two recovery units (the Upper Colorado and Lower Colorado River Basins as delineated at Glen Canyon Dam) to address unique threats and site specific management actions necessary to minimize or remove those threats.

Life history

Except during periods before and after spawning, adult razorback sucker are thought to be relatively sedentary and have high fidelity to overwintering sites (Service 2002b). Adults become sexually mature at approximately 4 years and lengths of 400 mm (16 in.) (Zelasko et al. 2010), at which time they travel long distances to reach spawning sites (Service 2002b). Mature adults breed in spring (mostly April–June) on the ascending limb of the hydrograph, congregating over cobble/gravel bars, backwaters, and impounded tributary mouths near spawning sites (Service 2002b; Snyder and Muth 2004). Flow and water temperature cues may play an important role prompting razorback adults to aggregate prior to spawning (Muth et al. 2000). Tyus and Karp (1990) and Osmundson and Kaeding (1991) reported off-channel habitats to be much warmer than the mainstem river and that razorback suckers presumably moved to these areas for feeding, resting, sexual maturation, spawning, and other activities associated with their reproductive cycle.

Razorback sucker have high reproductive potential, with reported average female fecundity of approximately 50,000 to 100,000 eggs per fish (Service 2002b). They are broadcast spawners that scatter adhesive eggs over gravel-cobble substrate (Snyder and Muth 2004). High spring flows are important to egg survival because they remove fine sediment that can otherwise suffocate eggs. Hatching is limited at temperatures less than 10°C (50° F) and best around 20°C (68° F) (Snyder and Muth 2004). Eggs hatch 6 to 11 days after being deposited and larval fish occupy the sediment for another 4 to 10 days before emerging into the water column. Larval fish occupy shallow, warm, low-velocity habitats in littoral zones, backwaters, and inundated floodplains and tributary mouths downstream of spawning bars for several weeks before dispersing to deeper water (Service 2002b; Snyder and Muth 2004). It is believed that low survival in early life stages, attributed to loss of nursery habitat and predation by non-native fishes, causes extremely low recruitment in wild populations (Muth et al. 2000). Wydoski and Wick (1998) identified starvation of larval razorback suckers due to low zooplankton densities in the main channel and loss of floodplain habitats which provide adequate zooplankton densities for larval food as one of the most important factors limiting recruitment.

Razorback sucker in the Upper Basin tend to be smaller and grow slower than those in the Lower Basin, reaching 100 millimeters (4 in.) on average in the first year (Service 2002b). Based on collections in the middle Green River, typical adult size centers around 510 mm (20 in.) (Modde et al. 1996). Razorback suckers are long-lived fishes, reaching 40+ years via high annual survival (Service 2002b). Adult survivorship was estimated to be 71 to 73 percent in the Middle Green River from 1980-1992 (Modde et al. 1996; Bestgen et al. 2002) and 76 percent from 1990 to 1999 (Bestgen et al. 2002).

BLM_0072175

Outside of the spawning season, adult razorback suckers occupy a variety of shoreline and main channel habitats including slow runs, shallow to deep pools, backwaters, eddies, and other relatively slow velocity areas associated with sand substrates (Tyus and Karp 1989, Osmundson and Kaeding 1989, Osmundson and Kaeding 1991, Tyus and Karp 1990). Their diet consists primarily of algae, plant debris, and aquatic insect larvae (Sublette et al. 1990).

Population dynamics

Population estimates in the Upper Colorado River Basin during the 1980 to 1992 period were on average between 300 and 600 wild fish (Modde et al. 1996). By the early 2000s, the wild population consisted of primarily aging adults, with steep decline in numbers caused by extremely low natural recruitment (Service 2002b). Although reproduction was occurring, very few juveniles were found (Service 2002b).

In the early part of the 2000s, population numbers were extremely low. Population estimates from sampling efforts in the middle Green River had declined to approximately 100 by 2002, with researchers hypothesizing that wild fish in the Green River Basin could become extirpated because of lack of recruitment (Bestgen et al. 2002). Similarly, in the Upper Colorado River, razorback sucker were exceedingly rare. In the 2002 recovery plan, razorback sucker were considered extirpated in the Gunnison River, where fish were last captured in 1976 (Service 2002b). Similarly, in the Grand Valley, only 12 fish were collected from 1984 to 1990, despite intensive sampling (Service 2002b). No young razorback suckers were captured in the Upper Colorado River since the mid-1960s (Service 2002b).

Razorback sucker likely occurred in the San Juan River as far upstream as Rosa, New Mexico (now inundated by Navajo Reservoir) (Ryden 1997). In the San Juan River we know of only two wild razorback suckers that were captured in 1976 in a riverside pond near Bluff, Utah, and one fish captured in the river in 1988, also near Bluff (Ryden 2006). No wild razorback suckers were found during the 7-year research period (1991–1997) of the San Juan River Basin Recovery Implementation Program (Ryden 2006).

Because of the low numbers of wild fish, the Recovery Program has been rebuilding razorback sucker populations in the Upper Colorado River Basin with hatchery stocks. Since 1995, over 386,000 subadult razorback suckers have been stocked in the Green and Upper Colorado River Basins. Since 2013, fewer but larger razorback suckers have been stocked to increase survival. Preliminary population estimates have been generated for razorback sucker in the Colorado River Basin as a whole, and now generally exceed 3,000 (Figure 6). In the Green River Basin, estimates of large juvenile to adult razorback sucker in three reaches of the Green River ranged from 474 to over 5,000 within a reach. Although these estimates are highly imprecise, they provide further confirmation that stocked fish are surviving in the wild (Bestgen et al. 2012, Service 2016a).

BLM_0072176



Figure 6. Captures and preliminary population estimates of the razorback sucker (juveniles and adults) in the Colorado River (Palisade, CO to the confluence of the Green River) (Service 2016a).

Razorback suckers stocked in the Green and Colorado Rivers have been recaptured in reproductive condition and often in spawning groups. Larval captures in the Green, Gunnison, and Colorado rivers document reproduction. Collections of larvae by light trap in the middle Green River have been generally increasing since 2003; in 2013, the largest collection of light trapped larvae occurred (7,376; Figure 7, Service 2016a). In 2011, researchers documented spawning by razorback sucker in the White River for the first time (Service 2016a).

BLM_0072177



Figure 7.  Numbers of razorback sucker larvae collected in light traps in the middle Green River since 1993.

Survival of larvae through their first year remains rare, largely due to a decrease in the availability of warm, food-rich floodplain areas and predation by a suite of nonnatives when the flood plain nursery habitats are available (Bestgen et al. 2011).  Currently, perhaps the most productive site for young razorbacks is Stewart Lake at the Ouray National Wildlife Refuge along the Green River.  In 2016, after a three-month inundation period at Stewart Lake, over 2,000 age-0 wild-produced razorbacks were captured and released to the Green River (Schelly et al. 2016).  Nevertheless, the bottleneck to a self-sustaining wild population of razorback suckers is larval recruitment to juvenile life stages.  However, occasional captures of juveniles (ages 0, 1, and 2) in the Green and Colorado rivers are starting to occur and indicate that survival of early life stages is occurring (Service 2017).  Unfortunately, no wild-produced recruits have yet been detected anywhere in the Upper Colorado River Basin (Service 2016a, 2017).

In the San Juan River, 130,473 razorback suckers were stocked from 1994 through 2012.  The number of endangered fishes stocked in the San Juan River is reported annually (see http://www.fws.gov/southwest/sjrip/).  After stocking in the San Juan River began, river wide razorback sucker population estimates of 268 in October 2000 (Ryden 2001) have since grown to 1,200 in October 2004 (Ryden 2005), and to about 2,000 and 3,000 in 2009 and 2010, respectively (Duran et al. 2013).  Additional mark-recapture data indicates increasing razorback sucker abundance estimates since 2009 (Durst 2014).  However, because there is little to no documented recruitment in the San Juan River, this population increase should be attributed almost entirely to augmentation with hatchery-reared razorback suckers.

Three razorback suckers stocked in the San Juan River near Farmington, NM, for the San Juan Recovery Program were captured between Moab, UT and the state line with Colorado in 2008.

BLM_0072178

This demonstrates that exchange of stocked razorback sucker between the San Juan River and the Upper Colorado River is certain, and may have ramifications for recovery criteria. Researchers have confirmed that hundreds of razorback suckers are using both transitional inflow areas and fully lacustrine (lake-like) habitats in Lake Powell. Razorback suckers are spawning in the lake and there is now evidence that recruitment may be occurring (Service 2015b). While the role of Lake Powell in the recovery of razorback sucker is unclear, 75 individuals were detected in the San Juan arm of Lake Powell in 2011 (Francis et al. 2013).

In the Lower Colorado River Basin, Lake Mead has supported a relatively small (a few hundred adults) but stable, self-sustaining population of wild razorback sucker for over 20 years, with recruitment occurring every year in that time frame. The Lake Mead population is primarily found in the reservoir but may extend upstream into the lower Grand Canyon; however, cold-water releases from Glen Canyon Dam limit expansion into the upper Grand Canyon (Service 2002b). In 2012 and 2013, razorback suckers have been detected in the lower Grand Canyon; these were the first recorded sightings in Grand Canyon National Park since the 1990s. A population of over 3,000 razorback suckers in Lake Mohave has been created by an augmentation program using fry that were produced naturally in the lake. Razorback suckers are also stocked into Lake Havasu. In 2008, the population there was estimated to be around 1,600 fish (Service 2012a). However, they have not yet become a self-sustaining population with successful recruitment.

To summarize, the razorback sucker was facing extirpation in the Upper Colorado River Basin approximately 20 years ago. To build population numbers in the Green, Colorado, and San Juan River Basins, over a quarter of a million razorbacks have been stocked in these rivers. Stocking continues today and reproduction is occurring and increasing. Recruitment remains the most limiting factor for re-establishing a self-sustaining population in the wild.

Threats

According to the 2002 Recovery Goals for the species, the primary threats to razorback sucker populations are streamflow regulation and habitat modification (including cold-water dam releases, habitat loss, and blockage of migration corridors); competition with and predation by nonnative fish species; and pesticides and pollutants (Service 2002b). No new threats have emerged since the completion of this document. The Service's status review of razorback sucker completed in 2012 (Service 2012b) reported that 85 percent of the downlisting recovery factor criteria (Service 2002b) have been addressed to varying degrees; however, nonnative fish species continue to be problematic. A new species status assessment is currently being conducted for the species.

Recruitment failure is thought to be the primary reason for decline of the species throughout its range (Zelasko et al. 2010). Many researchers believe that nonnative species are a major cause for the lack of recruitment and that nonnative fish are the most important biological threat to the razorback sucker (e.g., McAda and Wydoski 1980, Minckley 1983, 59 FR 54957, Service 2002b, Muth et al. 2000). There are reports of predation of razorback sucker eggs and larvae by common carp, channel catfish, smallmouth bass, largemouth bass, bluegill, green sunfish, and red-ear sunfish (Marsh and Langhorst 1988, Langhorst 1989).

BLM_0072179

Marsh and Langhorst (1988) found higher growth rates in larval razorback sucker in the absence of predators in Lake Mohave, and Marsh and Brooks (1989) reported that channel catfish and flathead catfish were major predators of stocked razorback sucker in the Gila River. Juvenile razorback sucker (average total length 171 mm) stocked in isolated coves along the Colorado River in California, suffered extensive predation by channel catfish and largemouth bass (Langhorst 1989).

Carpenter and Mueller (2008) tested nine non-native species of fish that co-occur with razorback sucker and found that seven species consumed significant numbers of larval razorback suckers. The seven species consumed an average of 54 – 99 percent of the razorback sucker larvae even though alternative food was available (Carpenter and Mueller 2008). Lentsch et al. (1996) identified six species of nonnative fishes in the Upper Colorado River Basin as threats to razorback sucker: red shiner, common carp, sand shiner, fathead minnow, channel catfish, and green sunfish. Smaller fish, such as adult red shiner, are known predators of larval native fish (Ruppert et al. 1993). Large predators, such as walleye, northern pike (Esox lucius), and striped bass, also pose a threat to subadult and adult razorback sucker (Tyus and Beard 1990). Until recently, efforts to introduce young razorback sucker into Lake Mohave have failed because of predation by nonnative species (Minckley et al. 1991, Clarkson et al. 1993, Burke 1994, Marsh et al. 2003).

Overall, the threats to the razorback sucker from nonnative fish are similar to those facing the Colorado pikeminnow, as described above. See the discussion on threats to the Colorado pikeminnow above for further information, particularly regarding the threat to all endangered fish due to predation from nonnative species. One threat from nonnative species peculiar to the razorback sucker is from hybridization. While hybridization between native and endangered razorback sucker may occur in the wild at a low level (Buth et al. 1987), the mass release of any native suckers hybridized with nonnative suckers would threaten gene pools of wild native or endangered suckers. McDonald et al. (2008) revealed that hybridization of native bluehead (Catostomus discobolus) and flannelmouth (Catostomus latipinnis) suckers with the nonnative white sucker (Catostomus commersonii) increased introgression between the native suckers. This mechanism could ultimately pose an increased threat of hybridization for razorback sucker (USFWS 2002b).

Selenium, a trace element, is a natural component of coal and soils in many areas of the western United States and can be released to the environment by the irrigation of selenium-rich soils and the burning of coal in power plants with subsequent emissions to air and deposition to land and surface water. Contributions from anthropogenic sources have increased with the increases of world population, energy demand, and expansion of irrigated agriculture (Mayer et al. 2010). Selenium can enter surface waters through erosion, leaching, and runoff. Excess selenium in fish have been shown to have a wide range of adverse effects including mortality, reproductive impairment, effects on growth, and developmental and teratogenic effects including edema and finfold, craniofacial, and skeletal deformities (Lemly 2002, Hamilton et al. 2004; Holm et al 2005). Excess dietary selenium causes elevated selenium concentrations to be deposited into developing eggs, particularly the yolk (Buhl and Hamilton 2000, Lemly 2002, Janz 2010). If concentrations in the egg are sufficiently high, developing proteins and enzymes become dysfunctional, leading to embryo deformation and a higher risk of mortality. Embryos that do survive, hatch, and grow may experience an elevated risk of predation as small fish; thus

BLM_0072180

selenium may be a contributing factor to the serious lack of recruitment seen throughout the range of the razorback sucker.  Of all the endangered fish in the Colorado River system, concern regarding elevated selenium levels is greatest for the razorback sucker (Hamilton et al. 2002; Osmundson et al. 2010).

Hamilton (1999) hypothesized that historic selenium contamination of the Upper and Lower Colorado River Basins contributed to the decline of these endangered fish by affecting their overall reproductive success, including loss of eggs and larvae.  Selenium concentrations in whole-body fish in the Colorado River Basin have been among the highest in the nation (Hamilton 1999).  Several DOI National Irrigation Water Quality Program (NIWQP) studies in the Colorado River Basin have reported elevated levels of selenium in water, sediment, and biota, including fish (Hamilton 1999).  In the NIWQP studies of 25 areas in the 15 western states, the middle Green River ranked 3rd for the highest median water concentration of selenium, 1st for sediment, and 1st for fish, and 14th for birds.  The Gunnison River Basin/Grand Valley ranked 4th for the highest median water concentration of selenium, 2nd for sediment, 7th for fish, and 1st for birds (Engberg, 1998, as seen in Hamilton 1999).  While selenium has been more the focus of contaminants research involving the razorback sucker, mercury, which can pose a threat to any animal species, could also pose a threat at elevated concentrations.  Because the razorback sucker is not a top predator, as is the Colorado pikeminnow, we expect mercury bioaccumulation (through prey) to pose less of a problem for this species.

To summarize, razorback sucker habitat loss and degradation from dams and diversions constructed decades ago posed some of the early, primary impacts to the species.  Most of the long-term impacts from these structures continue and are unlikely to change significantly in the near term.  In the remaining suitable habitats, nonnative fish species pose a significant ongoing threat and challenge to recovery.  Contaminants, including mercury and selenium, pose a threat as well, but the magnitude of this threat is in need of further investigation.

### *Humpback Chub*

<u>Species description and status</u>

The humpback chub is a medium-sized freshwater fish of the minnow family endemic to warm-water portions of the Colorado River basin.  The species evolved around 3 to 5 million years ago (Sigler and Sigler 1996).  The pronounced hump behind its head gives the humpback chub a striking, unusual appearance.  It has an olive-colored back, silver sides, a white belly, small eyes, and a long snout that overhangs its jaw (Sigler and Sigler 1996).  This fish can grow to nearly 500 mm (20 in.) and may survive more than 30 years in the wild (Service 2002c).  The humpback chub does not have the swimming speed or strength of species such as the Colorado pikeminnow.  Instead, it uses its large fins to "glide" through slow-moving areas, feeding on insects.

Historic distribution is surmised from various reports and collections that indicate the species inhabited canyons of the Colorado River and four of its tributaries: the Green, Yampa, White, and Little Colorado Rivers.  Presently the species occupies about 68 percent of its historic habitat.  Historic to current abundance trends are unclear because historic abundance is unknown (Service 2002c).

BLM_0072181

The Office of Endangered Species first included the humpback chub in the List of Endangered Species on March 11, 1967 (32 FR 4001). Subsequently, it was considered endangered under provisions of the Endangered Species Conservation Act of 1969 (16 U.S.C. 668aa) and was included in the United States List of Endangered Native Fish and Wildlife issued on June 4, 1973 (38 FR No. 106). It is currently protected under the Endangered Species Act of 1973 as an endangered species throughout its range (ESA; 16 U.S.C. 1531 *et. seq.*). The Service finalized the latest recovery plan for the species in 2002 (Service 2002c), but is currently drafting an updated revision. A new Species Status Assessment has also been drafted and is scheduled for completion in 2018 (Service 2017).

Separate, objective recovery criteria were developed for each of two recovery units (the Upper Colorado and Lower Colorado River Basins as delineated at Glen Canyon Dam) to address unique threats and site-specific management actions necessary to minimize or remove those threats.

Life History

The Humpback Chub has a variable diet, such that individuals consume a large array of food items under different river conditions. The species' life cycle is described as seven life stages including spawning, eggs, larvae, age-0, juveniles, sub-adults, and adults. During each life stage, the species requires certain resource conditions to successfully move to the next stage. The following eight resource categories are considered the most important for species success: 1. Diverse rocky canyon river habitat for spawning, nursery, feeding, and shelter, 2. Suitable river flow and temperature regimes for spawning, egg incubation, larval development, and growth, 3. Adequate and reliable food supply, including aquatic and terrestrial insects, crustaceans, and plant material, 4. Habitat with few nonnative predators and competitors that allow the young to survive and recruit to maintain self-sustaining populations, 5. Suitable water quality with few contaminants and little risk of spills of petroleum products and other toxic materials, 6. Unimpeded range and connectivity that allow free movement and access to habitats necessary for all life stages, 7. Persistent populations, each with reproductive potential, recruitment, and adult survival, to ensure redundancy, and 8. High genetic diversity within and across populations to maintain and ensure adaptive traits.

Unlike Colorado pikeminnow and razorback sucker, which are known to make extended migrations of up to several hundred miles to spawning areas, humpback chubs do not appear to make extensive migrations. Instead, humpback chub live and complete their entire life cycle in canyon-bound reaches of the Colorado River mainstem and larger tributaries characterized by deep water, swift currents, and rocky substrates (Service 2002c). Individuals show high fidelity for canyon reaches and move very little.

Like other large desert river fishes, the humpback chub is an obligate warm-water species that requires relatively warm temperatures for spawning, egg incubation, and survival of larvae. Mature humpback chub typically spawn on the descending hydrograph between March and July in the Upper Basin (Karp and Tyus 1990). Humpback chub are broadcast spawners who may mature as young as 2 to 3 years old. Eggs incubate for three days before swimming up as larval fish (Service 2002c). Egg and larvae survival are highest at temperatures close to 19 to 22°C (Service 2002c). Unlike larvae of other Colorado River fishes (e.g., Colorado pikeminnow and

30

BLM_0072182

razorback sucker), larval humpback chub show no evidence of long-distance drift (Robinson et al.1998).

Recruitment appears to be successful in all known Upper Basin populations (Service 2002c). Survival of humpback chub during the first year of life is low, but increases through the first 2 to 3 years of life with decreased susceptibility to predation, starvation, and environmental changes. Survival from larvae to adult life stages was estimated at 0.1 percent (0.001) (Service 2002c). Survival of adults is high, with estimates approximating 75 percent based on Grand Canyon adults (Service 2002c).

Growth rates of humpback chub vary by populations, with fish in the Upper Basin growing slower than those in the Grand Canyon (Service 2002c). Individuals in Cataract Canyon were 50, 100, 144, 200, 251, and 355 mm total length from 1 to 6 years, respectively (Service 2002c). Based on sexual maturity and age-to-length ratios, adults are classified as those fish 200 mm or longer. Maximum life span is estimated to be 30 years in the wild.

Humpback chub move substantially less than other native Colorado River fishes, with studies consistently showing high fidelity by humpback chub for specific riverine locales occupied by respective populations. Despite remarkable fidelity for given river regions, individual humpback chub adults are known to move between populations. Movement by juveniles is not as well documented as for adults, but is also believed to be limited in distance. For example, no out-migration by young fish is seen from population centers such as Black Rocks and Westwater Canyon.

Population Dynamics

The species is currently found as five extant populations, including four upstream of Lake Powell (Black Rocks, Westwater Canyon, Desolation/Gray canyons, and Cataract Canyon) and one downstream of Lake Powell (Grand Canyon). A sixth population in Dinosaur National Monument is considered functionally extirpated because individuals have not been collected since the early 2000s (Service 2017). The Little Colorado River population, found in the Grand Canyon, is the largest known population, harboring up to 10,000 fish (Service 2002c).

Recovery goal downlisting demographic criteria (USFWS 2002c) for humpback chub require each of five populations in the upper Colorado River basin to be self-sustaining over a 5-year period, with a trend in adult point estimates that does not decline significantly. Secondarily, recruitment of age-3 (150–199 mm TL) naturally produced fish must equal or exceed mean adult annual mortality. In addition, one of the five populations (e.g., Black Rocks/Westwater Canyon or Desolation/Gray Canyons) must be maintained as a core population such that each estimate exceeds 2,100 adults (estimated minimum viable population number).

Population estimates for the Upper Basin are shown in Figure 8. In a report on 2006–2007 estimates, researchers (Badame 2012) indicated that this population was trending downward. Badame (2012) linked declining catch of humpback chub in the upper portions of Desolation Canyon in the 2006–2007 estimates with increasing densities of nonnative smallmouth bass.

31

BLM_0072183



Figure 8. Adult humpback chub population estimates with confidence intervals for four populations in the upper Colorado River Basin (note that the scale differs among the graphs for the different populations). Clockwise from upper left: Desolation-Gray Canyons (from Badame 2011, 2012; Service 2015b); Black Rocks (from Francis and McAda 2011); Westwater Canyon (from Elverud 2011); and Cataract Canyon (from Badame 2008).

On the Colorado River in the Upper Colorado River Basin, three humpback chub populations are recognized. Black Rocks and Westwater Canyon have enough exchange of individuals that they are considered a single core population. Researchers caution that 78 largemouth bass and the same number of gizzard shad were collected in Black Rocks in 2012. This represents a ten-fold increase over the 2011 catch. However, the large declines in humpback chub densities in both Black Rocks and Westwater Canyons occurred in the late 1990's and are not attributed to more recent increases of nonnative predators in the Colorado River.

In 2008, the core population (Black Rocks/Westwater combined) dropped below the population size downlist criterion (MVP = 2,100 adults) for the first time (Figure 9). Population estimates in both Black Rocks and Westwater canyons declined dramatically during the first population estimation rotation in the late 1990s, but have remained relatively stable since that time. Colorado State University's recent robust population estimate analysis more clearly indicated that declines in the Westwater and Black Rock humpback chub populations are due to lapses in recruitment (i.e. adult survival rates have remained stable). Principle investigators agree that reinitiating an age-0 monitoring component is advisable. It should be noted that whatever is affecting humpback chub recruitment has not affected sympatric populations of native roundtail chub; roundtail chub populations in both canyons have remained stable or have increased since

32

population estimation started. In addition to the potential and recent negative interactions between humpback chub and nonnative predators discussed above, both the Westwater and Black Rocks populations are at risk of potential chemical contamination due to the proximity of a railroad located on the right bank of the Colorado River which at times transports toxic substances.



Figure 9. Combined population estimates for humpback chub in Black Rocks and Westwater Canyon based on a robust open model created by Drs.' Bestgen and White, Colorado State University. The 2002 Recovery Goal downlist criteria for these combined ("core population") estimates is 2,100 adults.

The Cataract Canyon humpback chub population is small, with estimates ranging in the hundreds of adults rather than thousands (Figure 8). The population trajectory is unclear and estimates are difficult to obtain in Cataract; therefore, catch-per-unit-effort (CPUE) has been determined to be an effective replacement (began in 2008 on a 2-years-on, 2-years-off sampling regime). In 2011, UDWR reported that the Cataract population appears to be stable with CPUE ranging between 0.010 and 0.035 fish/net-hour. The population is deemed likely to persist simply based on the consistent catch of adult and young life stages. Despite additional effort to sample below Big Drop Rapid in more recent years, no additional humpback chub were encountered in the new riverine habitat created by low Lake Powell levels.

Threats

The humpback chub was designated as an endangered species prior to enactment of the ESA, and therefore a formal listing package identifying threats was not assembled. Construction and operation of mainstem dams, nonnative fish species, and local eradication of native minnows and suckers in advance of new human-made reservoirs in the early 1960's were recognized as early threats (Service 2002c). According to the 2002 Recovery Goals for the species, the primary threats to humpback chub are streamflow regulation, habitat modification, predation by non-native fish species, parasitism, hybridization with other native *Gila* species, and pesticides and pollutants (Service 2002c). Two of eight originally documented populations of humpback chub

BLM_0072185

were extirpated because of the construction of Flaming Gorge (Hideout Canyon) and Hoover dams (Black Canyon).

No new threats have emerged since the completion of the Recovery Goals. The Service's status review of humpback chub completed in 2011 (Service 2011b) reported that 60 percent of the recovery factor criteria (Service 2002c) have been addressed to varying degrees; however, nonnative fish species and issues dealing with the potential chemical contamination of the river from spills and pipelines continue to be problematic. Overall, the threats to the humpback chub from nonnative fish are similar to those facing the Colorado pikeminnow, as described above. See the discussion on threats to the Colorado pikeminnow above for further information, particularly regarding the threat to all endangered fish due to predation from nonnative species.

To summarize, humpback chub habitat loss and degradation from dams and diversions constructed decades ago posed some of the early, primary impacts to the species. Most of the long-term impacts from these structures continue and are unlikely to change significantly in the near term. In the remaining suitable habitats, nonnative fish species pose a significant ongoing threat and challenge to recovery. Contaminants, including mercury and selenium, may pose a lesser threat as well, but the magnitude of this threat is in need of further investigation.

### *Bonytail*

Species description and status

The bonytail is a medium-sized freshwater fish in the minnow family, endemic to the Colorado River Basin. The species evolved around 3 to 5 million years ago (Sigler and Sigler 1996). Individuals have large fins and a streamlined body that typically is very thin in front of the tail. They have a gray or olive colored back, silver sides, and a white belly (Sigler and Sigler 1996). The mouth is slightly overhung by the snout and there is a smooth low hump behind the head that is not as pronounced as the hump on a humpback chub. A very close relative to the roundtail chub (*Gila robusta*), bonytail can be distinguished by counting the number of rays in the fins, with bonytail having 10 dorsal and anal fin rays (Sigler and Sigler 1996). The fish can grow to be 600 mm (24 in.) and are thought to live as long as 20 to 50 years (Sigler and Sigler 1996). Little is known about the specific food and habitat of the bonytail because the species was extirpated from most of its historic range prior to extensive fishery surveys, but it is considered adapted to mainstem rivers, residing in pools and eddies, while eating terrestrial and aquatic insects (Service 2002d).

The bonytail is currently listed as endangered under the ESA, under a final rule published on April 23, 1980 (45 FR 27710). The Service finalized the latest recovery plan for the species in 2002 (U.S. Fish and Wildlife Service 2002d), but is currently drafting an updated revision. Separate, objective recovery criteria were developed for each of two recovery units (the Upper Colorado and Lower Colorado River Basins as delineated at Glen Canyon Dam) to address unique threats and site specific management actions necessary to minimize or remove those threats.

34

BLM_0072186

Life History

Natural reproduction of bonytail was last documented in the Green River in 1959, 1960, and 1961 at water temperatures of 18°C (Service 2002d).  Similar to other closely related *Gila* species, bonytail in rivers probably spawn in spring over rocky substrates; spawning in reservoirs has been observed over rocky shoals and shorelines.  While age at sexually maturity is unknown, they are capable of spawning at 5 to 7 years old.  Recruitment and survival estimates are currently unknown because populations are not large enough for research to occur.  Individuals in Lake Mohave have reached 40 to 50 years of age (Service 2002d), but estimates for river inhabiting fish are not available.

Fish researchers have speculated that the large fins and streamlined body of the Bonytail is an adaptation to torrential flows (Miller 1946; Beckman 1963).  Of five wild specimens captured in the Upper Basin, four were captured in deep, swift, rocky canyon regions (i.e., Yampa Canyon, Black Rocks, Cataract Canyon, and Coal Creek Rapid), but the fifth was taken in a reservoir (Lake Powell).  Vanicek (1967) who handled numerous Bonytail detected no difference in habitat selection from roundtail chub.  These fish were generally found in pools and eddies at varying depths, sometimes adjacent to strong current.  Adult Bonytail captured in Cataract Canyon and Desolation/Gray Canyons were sympatric with humpback chub in shoreline eddies among emergent boulders and cobble, and adjacent to swift current (Valdez 1990).

Population dynamics

Bonytail were once widespread in the large rivers of the Colorado River Basin (Service 2002a).  The species experienced a dramatic, but poorly documented, decline starting in about 1950, following construction of mainstem dams, introduction of nonnative fishes, poor land-use practices, and degraded water quality (Service 2002d).  Population trajectory over the past century and reasons for decline are unclear because lack of basin-wide fishery investigations precluded accurate distribution and abundance records.

Wild bonytail are now rarely found in the Green and Upper Colorado River Basins and are the rarest of all the endangered fish species in the Colorado River Basin.  In fact, no wild, self-sustaining populations are known to exist upstream of Lake Powell.  From 1977 to 1994 only 11 wild adults were reported from the Upper Basin (Valdez et al. 1994).  Prior to the more recent stocking program, these rare bonytail had been captured on the Yampa River in Dinosaur National Monument, on the Green River at Desolation and Gray canyons, and on the Colorado River at the Colorado/Utah border and in Cataract Canyon.  In the lower Basin, remnant populations presently occur in the wild in low numbers in Lake Mohave and several fish have been captured in Lake Havasu (and in Lake Powell) (Service 2002d)..

In response to the low abundance of individuals, the Recovery Program has implemented a stocking program to reestablish populations in the Upper Basin.  Since 1996, over 380,000 tagged bonytail subadults have been stocked in the Green and Upper Colorado River Basins.  To date, most stocked bonytail do not appear to survive very long after release into a given river, with relatively few surviving until the following year.  A few recaptured bonytail have lived in-river for several years by now, however.  So far, the bonytail stocking program has not been as

BLM_0072187

successful as the razorback sucker stocking program.  Researchers continue to experiment with pre-release conditioning and exploring alternative release sites to improve their survival.

Although bonytail have been stocked in the Upper Basin for a number of years now, there has been no evidence of natural reproduction until just recently.  For the second consecutive year, hatchery-raised adult bonytail entered Stewart Lake from the Green River (south of Vernal, Utah) and evidently spawned during the inundation period.  In 2016, nine specimens of age-0 *Gila* sp., tentatively identified as bonytail, were sampled during draining of the Lake that fall. These were released to the Green River (Schelly et al. 2016).  Recruitment of wild bonytail from stocked fish has not yet been documented.

Threats

Reasons for decline of the species were identified as the physical and chemical alteration of their habitat and introduction of exotic fishes.  The 1990 Bonytail Chub Recovery Plan further stated that the decline of the bonytail chub is attributed to stream alteration caused by construction of dams, flow depletion from irrigation and other uses, hybridization with other *Gila*, and the introduction of nonnative fish species (Service 1990b).  Hence, the primary threats to bonytail populations are streamflow regulation and habitat modification (including cold-water dam releases, habitat loss, and blockage of migration corridors); competition with and predation by nonnative fish species; hybridization; and pesticides and pollutants (Service 2002d).  No new threats have emerged since the 2002 recovery goals were published.  The Service's status review of bonytail completed in 2012 (USFWS 2012c) reported that 72 percent of the recovery factor criteria (USFWS 2002d) have been addressed to varying degrees.

Overall, the threats to the bonytail from nonnative fish are similar to those facing the Colorado pikeminnow, as described above.  See the discussion on threats to the Colorado pikeminnow above for further information, particularly regarding the threat to all endangered fish due to predation from nonnative species.

To summarize, bonytail habitat loss and degradation from dams and diversions constructed decades ago posed some of the early, primary impacts to the species.  Most of the long-term impacts from these structures continue and are unlikely to change significantly in the near term. In the remaining suitable habitats, nonnative fish species pose a significant ongoing threat and challenge to recovery.  Contaminants may pose a lesser threat as well, but the magnitude of this threat is in need of further investigation.

*Critical Habitat*

Critical habitat was designated for all four endangered fish simultaneously in 1994 in one Federal Register notice (59 FR 13374).  It consists of river segments and associated areas within the 100-year floodplain within each species' historical range.  Different reaches have been designated for each species, and are discussed for each species within the action area in the Baseline section below.  Figure 10 shows critical habitat for the Colorado pikeminnow, which is confined to the Upper Colorado River Basin (above Lake Powell).  Critical habitats for the other three endangered fish are found in the lower Colorado River Basin as well (59 FR 13374). Within the Upper Colorado River Basin, critical habitats for the other three endangered fish are largely subsets of that designated for the Colorado pikeminnow (i.e., shorter reaches) (Fig. 10).

BLM_0072188

Within the Upper Colorado River Basin, critical habitat for the humpback chub and bonytail are identical.



Figure 10. Designated critical habitat for the Colorado pikeminnow (blue), razorback sucker (white), and humpback chub/bonytail (together, brown).

Critical habitat is defined as specific geographic areas, whether occupied by a listed species or not, that are essential for its conservation and that are formally designated by rule. Many of these critical habitat reaches overlap throughout the Colorado River Basin. Critical habitat for the humpback chub and bonytail are primarily canyon-bound reaches, while critical habitat for the Colorado pikeminnow and razorback sucker include long stretches of river required for migration corridors and larval fish drift.

Concurrently with designating critical habitat, the Service identified physical and biological features of critical habitat, which are identical for all four endangered fish species. The physical or biological features essential to the conservation of a species for which its designated include: space for individual and population growth, and for normal behavior; food, water, air, light, minerals, or other nutritional or physiological requirements; cover or shelter; sites for breeding, reproduction, rearing of offspring, germination, or seed dispersal; and habitats that are protected from disturbance or are representative of the species historic geographic and ecological distribution. The physical and biological features of critical habitat are the same for each of the four endangered fish within the Colorado River system and include:

37

BLM_0072189

Water:  a quantity of water of sufficient quality (i.e., temperature, dissolved oxygen, lack of contaminants, turbidity, etc.) that is delivered to a specific location in accordance with a hydrologic regime that is required for the particular life stage for the species;

Physical habitat:  areas of the Colorado River system that are inhabited or potentially habitable for spawning, feeding, rearing, as a nursery, or corridors between these areas, including oxbows, backwaters, and other areas in the 100-year floodplain which when inundated provide access to spawning, nursery, feeding, and rearing habitats; and,

Biological environment:  adequate food supply and ecologically appropriate levels of predation and competition.

### Climate Change

In this section, we address climate change observations and modeled projections within the range of the species in the Upper Colorado River Basin.  Climate change in the action area, a subset of the entire Colorado River Basin, is addressed under the Environmental Baseline section.  The most current observations and projections for the southwestern United States, as well as more targeted areas, provide an indication of climate change in the Colorado River Basin.  These include a rise in temperature, earlier peak spring streamflow, changes in precipitation, and potentially more frequent and severe droughts.  Reasonably likely to occur changes to the timing and volume of stream flow are expected to present an increasing challenge to the quality of Colorado River endangered fish habitat.

Average annual temperatures in the Southwest have increased 1.6°F  (+/- 0.5°F) during 1901-2010, and the most recent decade of 2001 to 2010 was recorded as the fourth driest decade over this time period (Hoerling et al. 2013).  Five climate projections for temperature increases specific to western Colorado show the average annual temperature increasing over historical values (Colorado Water Conservation Board 2012).  More specifically, they indicate a basin-wide average temperature increase of 3.6 °F by 2040.

Snowmelt makes up the majority of the annual flow in Colorado's major rivers.  The peak spring streamflow in the Colorado River Basin, which is a function of snowmelt, has shifted earlier by about two weeks (Clow 2010).  Climate projections indicate that snowmelt timing will continue to advance in response to additional warming (Rauscher et al. 2008, Reclamation 2016).  Future changes to the total water content or volume of snowmelt are difficult to predict.  Snowmelt volume is dependent in large part on precipitation and temperature.  There is much uncertainty as to how precipitation may change in the future.  Colorado's statewide precipitation trends have remained relatively stable since measurements began in 1900 but there is a range of projections for future precipitation amounts, from -5 percent to +6 percent statewide by 2050 (Lukas et al 2014).  However, most projections of future hydrology in Colorado's river basins show reductions in streamflow, which would likely be attributed to increasing temperatures, evapotranspiration, and demand for anthropogenic uses.

The potential for earlier snowmelt and reduced streamflow could result in less water in endangered fish habitat, heightened interactions with nonnative species, higher concentrations of contaminants, life cycle changes, as well as the potential for aquatic disease spread to higher

BLM_0072190

elevations and expansion of nonnative plant species in riparian areas (Ray et al. 2008). Although it is also possible that the warming of water temperatures at higher elevations could expand the range of the endangered fishes upstream and to tributaries which are currently too cold, any benefits of upstream range expansion from climate-induced water temperature increases could be offset by more widespread negative effects on other habitat attributes from reduced flows (Osmundson 2011).

Greenhouse gas emissions are going to continue, state-wide and nationally. If the current levels of emissions are maintained, or even somewhat decreased, the effects of climate change are still expected to gradually increase over time and contribute to reduced river flows and increased temperatures. Over the next 10 years, however, the initial and primary term of focus for this PBO, any potential changes are likely to be gradual and the magnitude of change is likely to be relatively small. Additionally, given that these endangered fish live in main-stem rivers, generally downstream from most of the dams on tributaries within the Upper Colorado River Basin, we expect that some of the effects of climate change in the area will be moderated by dam releases, particularly those that are done to benefit endangered fish. Dam releases and river flows through endangered fish habitat are further discussed in the Effects of the Action section below.

**Environmental Baseline**

The environmental baseline includes the past and present impacts of all Federal, State, and private actions and other human activities in the action area; the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal section 7 consultation; and the impact of State or private actions contemporaneous with the consultation process.

The action area is defined at 50 CFR 402 to mean "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." For the purposes of this consultation, the action area has been defined to include BLM lands, and non-BLM lands underlain by Federal minerals, in western Colorado that ultimately drain into the Colorado River, excluding the San Juan River Basin, and those river reaches in Utah that are downstream of these lands (to Lake Powell) that are occupied by any of the four endangered fish species or their critical habitats. The environmental baseline will emphasize conditions within Colorado where the impacts of water depletions would be greatest.

The Green River segment in the state of Colorado above its confluence with the Yampa River does not contain any critical habitat for any of the endangered fish, and has not historically supported significant numbers of any endangered fish species due to the cold water coming out of Flaming Gorge Dam. Similarly, the Dolores River in its current state is not known to be used to any significant degree by any of the endangered fish, except for the Colorado pikeminnow, as discussed below. Critical habitat for all four endangered fish species is discussed in the Status of the Species section.

BLM_0072191

*Colorado pikeminnow*

Yampa River

Low numbers of Colorado pikeminnow were captured in the Yampa River during population estimation sampling in 2011-2013.  Bestgen et al. (2013, p.4) states, "Captures were particularly low in the Yampa River, where only six Colorado pikeminnow were captured, in spite of high effort associated with northern pike and smallmouth bass removal sampling, as well as regular Colorado pikeminnow sampling passes (up to eight sampling passes)."  And for 2013, only 8 Colorado pikeminnow were captured in the Yampa River, in spite of high effort, once again.  Preliminary population estimates based on these captures are shown in Figure 11.

As part of the process of revising the 2002 Colorado Pikeminnow Recovery Goals into recovery plans, a recovery team for Colorado pikeminnow was assembled in late 2012 consisting of species and threat experts.  During initial discussions in November 2012, the Recovery Team linked persistent low densities of adult Colorado pikeminnow in the Yampa River to persistent high densities of nonnative predators (e.g., smallmouth bass and northern pike; northern pike abundance shown in Figure 11).  These estimates, which indicate that northern pike are outnumbering Colorado pikeminnow at least 3:1, point up the ongoing challenge of managing nonnative predators (Service 2015b).  A published fish density model (McGarvey et al. 2010) supported the importance of competition among top predators in lotic systems and suggested that partitioning available energetic resources among multiple predator species would inevitably reduce carrying capacity for Colorado pikeminnow.  Examination of historic and recent trends in densities of large-bodied Colorado pikeminnow, northern pike, and smallmouth bass in the middle Yampa River suggests that large-bodied invasive predators have functionally replaced Colorado pikeminnow as the river's top predator (Martinez et al. 2014).

The number of adult Colorado pikeminnow residing in the Yampa River has been greatly reduced, largely because of persistent high densities of nonnative predators, and perhaps also because of extended drought (Recovery Program 2015).  The Recovery Program initiated a campaign to remove nonnative predators from the critical habitat reaches of the Yampa River in the early 2000s when it became apparent that smallmouth bass were decimating the native fish populations (Anderson 2005).  Since that time removal efforts have increased both geographically (now encompassing ~ 170 miles of Yampa River + Catamount Reservoir) and in intensity (with some reaches receiving more than 10 removal passes/yr).

BLM_0072192



Figure 11.  Comparison of Colorado pikeminnow population estimates (2000 – 2008 data from Bestgen et al. 2010) and northern pike (Battige 2012) in the middle Yampa River.  The 2011-2013 data points for Colorado pikeminnow are preliminary.  Northern pike population estimates were not conducted in 2013.

As stated in Martinez et al. (2014), the dramatic decline of native fishes in the Yampa River provides a stark example of the cumulative detrimental impacts of an increase in the number and abundance of nonnative aquatic species, particularly increases in the range and abundance of invasive species including northern pike and smallmouth bass, and virile crayfish *Orconectes virilis*.  The Yampa River has been previously described as the "crown jewel" of the Upper Colorado River Basin due to its formerly robust native fish populations (Johnson et al. 2008) and its comparatively unregulated hydrograph.  It contains designated critical habitat for all four of the endangered fish in the basin.  In recent decades, the Yampa River has been progressively invaded by nonnative species, altering the native aquatic community and food web and increasing the threat of invasive impacts to native and endangered fishes (Johnson et al. 2008; Martinez 2014).  Examples of these threats include the detection of Asian tapeworm *Bothriocephalus acheilognathi*, hybridization between native sucker species and nonnative white sucker *Catostomus commersoni*, and predation or apparent competition with and hyperpredation on native and endangered fishes (Martinez 2014).  Endangered Colorado pikeminnow have steadily declined in the Yampa River, despite pikeminnow increases in four other major population areas in the Green River Basin (Bestgen et al. 2010; Martinez et al. 2014).  It has become imperative that preventive eradication and control measures be diligently, vigorously, and more rapidly applied to restore the native aquatic community in the Yampa River (Martinez et al. 2014).

BLM_0072193

White River

A somewhat higher number of Colorado pikeminnow currently occupy the White River.
Captures in the White River during population estimation sampling between 2011-2013 ranged
from 50-96 fish (Bestgen et al. 2013).  Final population estimates based on these captures are not
yet available.  However, numbers of Colorado pikeminnow have been larger in the past.  Adult
Colorado pikeminnow abundance estimates in the White River declined from 1,115 animals in
2000 to 465 animals in 2003.  Adult Colorado pikeminnow resident to the White River are
known to spawn in the Green and Yampa rivers.  However, in 2011, researchers documented for
the first time Colorado pikeminnow spawning in the White River.  Juvenile and subadult
Colorado pikeminnow also utilize the White River on a year-round basis (Recovery Program
2015).

Colorado, Gunnison, and Dolores Rivers

The Colorado River in the Grand Valley area near Grand Junction is occupied year round by
Colorado pikeminnow.  A 15-mile reach in this section of river upstream from the confluence
with the Gunnison River up to Palisade (the 15-Mile Reach) has been identified as important
habitat for Colorado pikeminnow.  Pikeminnow are known to spawn within this reach and larval
pikeminnow have been found within and just downstream of this reach.  The 10 miles below this
reach are also important and have been classified as a "Young of the Year Nursery Area" by the
Basin Biology Subcommittee (Service 1984).  Population estimates for the main-stem of the
Colorado River are provided in the Status of the Species section above.

There are no specific population estimates for Colorado pikeminnow above the Price-Stubb
water diversion above Palisade on the main-stem Colorado River or above the Redlands
Diversion Dam on the Gunnison River; relatively few wild pikeminnow are likely to be found in
these reaches.  However, fish passage structures have been constructed at both diversions and
Colorado pikeminnow have been stocked in both of these reaches in the past.

The Colorado pikeminnow population was augmented by stocking both in the Colorado and
Gunnison Rivers.  The integrated stocking plan (Nesler et al. 2003) calls for 1,125 age 3+ fish to
be stocked into each of two river reaches for 8 successive years:  1) Colorado River (Rifle to
De Beque Canyon), and 2) Gunnison River (Hartland to Redland dams).  During the period from
2000 through 2004, over 2,800 Colorado pikeminnow were stocked into the Upper Colorado
River.  During 2003-2004, approximately 2,250 Colorado pikeminnow were stocked into the
Gunnison River.  During 2005 surveys, recaptures of these stocked pikeminnow in both reaches
led to an estimate of 185 remaining individuals, or 3.6 percent of those that were stocked.  Most,
if not all, pikeminnow ultimately moved downstream and out of the Upper Colorado and
Gunnison River reaches where they were stocked (D. Osmundson, Fisheries Biologist, Service,
pers. comm. 2008).  No further Colorado pikeminnow stocking has taken place in these reaches
since 2004.

In the 21 years since fish passage was constructed at the Redlands Diversion Dam on the
Gunnison River (1996-2016), 180 Colorado pikeminnow have used the passage.  A record
number of fish, 33 pikeminnow, were passed by this structure in 2016. However, Gunnison River
fish community monitoring efforts have, as yet, been unable to recapture any of these

BLM_0072194

translocated fish—except for 2 pikeminnow, which were relocated in 2016. One of these pikeminnow had originally used the Redland fish passage in 2014 and was still in the Gunnison River Basin two years later (in Roubideau Creek, near Delta). The other pikeminnow used the Redlands fish passage in August of 2016, but within 2 weeks had exited the Gunnison River and was located in the Colorado River near Palisade (Francis and Ryden 2016a). Reproduction has also been documented upstream of the fish passage (Recovery Program 2007).

Since construction in 2004, the fish passage structure at the Government Highline Diversion Dam has been operated 10 of the past 12 years (2004-2016). It is upstream from the Price-Stubb diversion, which has had fish passage since 2008, prior to which Price-Stubb was only a seasonal barrier. Of the 15,889 fish that entered the Government Highline fish passage structure in 2016, 1 was a Colorado pikeminnow. This is the third consecutive year that a Colorado pikeminnow has been documented using this fish passage, for a total of three passes by two Colorado pikeminnow since construction (one individual passed it twice, in 2015 and 2016) (Francis and Ryden 2016b).

The Dolores River was historically occupied by the Colorado pikeminnow. Today, however, we do not know of any significant usage by Colorado pikeminnow, except possibly in the lower reach near the confluence with the Colorado River where they have been detected. Any Colorado pikeminnow entering and exiting the lower Dolores River are considered part of the pikeminnow population occupying the main-stem of the Colorado River.

### *Razorback sucker*

#### Yampa and White Rivers

No current population estimates of razorback sucker in the Yampa River is available due to low numbers captured in recent years. The Yampa River at the mouth of Yampa Canyon was an historical site for razorback sucker reproduction, and in fact, was the first such spawning site described in the Upper Colorado River Basin (McAda and Wydoski 1980, Bestgen 1990). Tyus and Karp (1990) located concentrations of ripe razorback suckers at the mouth of the Yampa River during the spring in 1987-1989. Ripe fish were captured in runs associated with bars of cobble, gravel, and sand substrates in water averaging 0.63 m deep and mean velocity of 0.74 m/s. Razorback suckers are rarely found upstream as far as the confluence with the Little Snake River (McAda and Wydoski 1980). More recently, only a few razorback larvae have been captured in the lower Yampa River in 2000, 2008, and 2011 (Bestgen et al. 2012). Although substantial numbers of razorback sucker do not occur in the Yampa River, scattered individuals can occasionally be found (Bestgen et al. 2012).

Razorback suckers are not stocked into the Yampa River or White Rivers. They are, however, stocked into the Green River and can swim up and into the Yampa or White River. A few substantial captures of adult razorback suckers occurred in the lower White River in 2011. A passive integrated antenna array near the Bonanza Bridge (installed September 2012) demonstrated that razorback sucker and Colorado pikeminnow use the Utah portion of the White River in higher numbers than previously thought. However, a recent expansion of smallmouth bass in the White River is a cause for concern for this native fish stronghold (Recovery Program

43

2015).  In 2011, researchers documented spawning by razorback sucker in the White River for the first time (Bestgen et al. 2012).

Colorado, Gunnison, and Dolores Rivers

Osmundson and Kaeding (1991) reported that the number of razorback sucker captures in the Grand Junction area had declined dramatically since 1974.  Between 1984 and 1990, intensive collecting effort captured only 12 individuals in the Grand Valley (Osmundson and Kaeding 1991).  In 1991 and 1992, 28 adult razorback suckers were collected from isolated ponds adjacent to the Colorado River near De Beque, Colorado for captive breeding purposes (Burdick 1992).

More recently, the razorback sucker population is being augmented by stocking both in the Colorado and Gunnison Rivers.  Nearly 50,000 juvenile, sub-adult, and adult razorback sucker were stocked in both the Upper Colorado (approximately 31,500) and Gunnison (approximately 18,500) Rivers in Colorado between 1994 and 2001.  However, despite regular sampling, only 84 of these fish were recaptured 6 months or more following stocking (Burdick 2003).  Many of the stocked fish were less than 200 mm; Burdick (2003) determined that it may be futile to stock individuals of this size or smaller due to their very low survival rate.  A total of 5,617 razorback sucker were stocked into the Colorado (up to Rifle) and Gunnison (up to Delta) Rivers in 2016 from the Horsethief Canyon Native Fish Facility, the 24 Road Hatchery building in Grand Junction, and several other groups of grow-out ponds (Bingham et al. 2016).  These fish were larger, with a mean total length of 382 mm, giving them a higher chance of survival than the 200 mm length fish that had been stocked in earlier years.

Since fish passage was constructed in 1996 at the Redlands Diversion Dam on the Gunnison River (after 80 years of blocked fish passage), 35 razorback suckers have used the passage (1996-2016) and reproduction has recently been documented upstream of the diversion dam (McAda 2003, Recovery Program 2007, Francis and Ryden 2016a).  Sampling for larval fish was done in the Gunnison River for the first time in 2002; eight larval razorback suckers were collected that year (Osmundson 2002a), seven were collected in 2003, and two were collected in 2005.

Since construction in 2004, the fish passage structure at the Government Highline Diversion Dam has been operated 10 of the past 12 years (2004-2016).  It is upstream from the Price-Stubb diversion, which has had fish passage since 2008, prior to which Price-Stubb was only a seasonal barrier.  Of the 15,889 fish that entered the Government Highline fish passage structure in 2016, 36 were razorback suckers.  This is the third consecutive year that dozens of razorback suckers have used this fish passage (Francis and Ryden 2016b).

The current and increasingly most significant threat to the razorback sucker in the action area is from nonnative species, which is discussed in the Status of the Species section.  See also the discussion regarding nonnative species in the Colorado pikeminnow Status of the Species and Baseline sections above, as this threat is similar for all endangered fish in the Upper Colorado River Basin, particularly regarding predation from nonnative predators.

BLM_0072196

We do not know of any significant usage of the Dolores River by razorback suckers, except possibly in the lower reach near the confluence with the Colorado River where they have been detected. Any razorback suckers entering and exiting the lower Dolores River are considered part of the razorback sucker population occupying the main-stem of the Colorado River.

*Humpback chub*

There are five humpback chub populations within the action area, as described in the Status of the Species section. However, one of these—the population in Dinosaur National Monument, comprised of Yampa and Whirlpool canyons--is below detection limits and is now considered functionally extirpated. The only other population in Colorado is the Black Rocks population; it is in a one-mile, canyon-bound reach along the Colorado River within Ruby-Horsethief Canyon, close to the Utah state line. This area supports approximately 400 humpback chub, as shown in Figure 8 in the Status of the Species section.

A small number of humpback chub have also been detected or captured over time in or near Beavertail Bend, a short reach along the Colorado River within De Beque Canyon, not far above Grand Junction. Six humpback chub have been captured in the Grand Valley Water User's fish passageway (fish ladder for Government Highline diversion) since it began operation in 2005 (Francis and Ryden 2016b). These fish were likely from the relict population at Beavertail Bend a few miles upstream. Only one humpback chub has ever been captured in the Redlands fish passageway since it began operation in 1996—this fish came from the Westwater Canyon population where it was originally PIT tagged two years earlier (Francis and Ryden 2016a). As opposed to the other endangered fish, no hatchery-reared humpback chub have ever been stocked within Colorado; all humpback chub that have been captured within Colorado have been wild-produced.

*Bonytail*

All bonytail in Colorado's Rivers have originated from hatchery stock; there are no wild populations that have re-established yet. Approximately 2,800 bonytail were stocked from the Mumma Native Aquatic Species Restoration Facility into the Yampa River in 2016 (mean total length 325 mm) (Smith and Garcia 2016). In the Colorado River, a total of 10,324 bonytail were stocked into the Grand Valley in 2016 from the Horsethief Canyon Native Fish Facility (Bingham et al. 2016). An additional 3,321 bonytail were stocked into the Colorado River from the Mumma Facility, with a mean total length of 327 mm. Most of these Mumma Facility fish were stocked at De Beque, but 520 of them were stocked into Salt Creek, a tributary to the Colorado River near Mack (Smith and Garcia 2016). Bonytail were not stocked in 2016 into the White, Gunnison, or Dolores Rivers in Colorado.

Since 2009, an increasing number of bonytail have been detected at several locations throughout the Upper Colorado River Basin where stationary pit-tag reading antennas are used. During high spring flows in 2011, more than 1,100 bonytail (16.6 percent of the 6,804 stocked in early April of that year) were detected by antenna arrays in the breach of the Stirrup floodplain on the Green River. The Price-Stubb antenna array on the Colorado River detected 138 bonytail between October 2011 and September 2013. The fish detected in fall 2011 had been stocked above Price-Stubb in Debeque Canyon, but in spring 2012, some of those fish were moving upstream through the fish passage.

45

BLM_0072197

A number of bonytail have been captured at the fish ladders on the Colorado River. Since 1996 when the Redlands fish ladder began operation, only 13 bonytail were captured from 2003 to 2014. More bonytail have been captured in this fish ladder recently due to an increased level of stocking; 77 fish were captured in 2015-2016 (Francis and Ryden 2016a). At the Government Highline fish passage structure, bonytail began to be captured in 2011. From 2011 to 2016, 90 bonytail have been captured in the fish trap there (Francis and Ryden 2016b).

### Climate Change in the Action Area

Climate change is discussed on the species' range-wide scale in the Status of the Species section above and includes the action area. In this section we provide further insights into the potential effects of climate change within the action area--the Upper Colorado River Basin including the Yampa, White, Green, Colorado, and Gunnison Rivers in Colorado.

Native fish in the Colorado River Basin could potentially move upstream in response to periods of warming and drying associated with climate change, especially on the Yampa River because there are no barriers until relatively far upstream, beyond Steamboat Springs, Colorado. However, there are ten identified barriers within Colorado pikeminnow critical habitat upstream of Glen Canyon Dam/Lake Powell (Osmundson 2011), some with fish passage structures as previously described. In the White River, the Taylor Draw Dam precludes migration to potentially more favorable upstream areas. Flaming Gorge Dam limits upstream expansion on the Green River and Crystal Dam (part of the Aspinall Unit) prohibits upstream movement of fish on the Gunnison River.

In addition to the physical barrier dams create, the release of cold water has eliminated native fishes from the reaches immediately downstream from dams (Osmundson 2011). Presently, the summer water temperatures coming out of the Aspinall Unit are about 5°F (3°C) cooler than other reaches in the Colorado River Basin (Service 2009), which in a warming environment could provide refuge for the listed fish.

If the modeled predictions of more frequent, more severe, and possibly longer-lasting droughts, along with generally warmer temperatures and less snowfall occur, it will likely become increasingly challenging to meet the established flow recommendations for the protection of listed and native fish in the Yampa, White, Green, Colorado, and Gunnison Rivers (Service 2005). Additionally, reduced flow levels may also exacerbate contaminant issues, as less dilution of contaminants in the river would occur.

Climate change could also affect numbers of nonnative fish, which we believe to be the greatest threat to the endangered fish in the action area. As stated in Martinez et al. (2014), the challenges in restoring and conserving native aquatic species will likely become more difficult due to the interaction of invasive species and climate change. The abundance of nonnative species can increase rapidly under favorable conditions such as low flow prolonged by drought. Reductions in water stores and stream flows due to climate change may intensify demand for remaining water supplies and may hasten proposed water development. Long-term climate and water development forecasts suggest flow scenarios for the Yampa River that will functionally mimic drought conditions, including reduced stream discharge, smaller stream size, and an increase in summertime water temperatures (Roehm 2004; Johnson et al. 2008). Several

BLM_0072198

invasive species, including green sunfish *Lepomis cyanellus* and largemouth bass *Micropterus salmoides*, have higher thermal tolerances than many of the fish species native to the Colorado River Basin. The projected increase in channel catfish growth rate (McCauley and Beitinger 1992) could increase piscivory by larger catfish in the Colorado River Basin. See the discussion on nonnative fish in the Effects of the Action section below for further analysis.

Climate change and its effects on water temperature may also alter the dynamics of parasite and disease transmission and host susceptibility, exposing immunologically naïve native fish to outbreaks of pathogens. For example, thermophilic Asian tapeworm *Bothriocephalus acheilognathi* may become more widespread and increase its infection intensity due to higher water temperatures associated with lower summertime flows. Incidence of infection may be higher in small fish and infected fish may grow more slowly, prolonging their exposure to increased infection and predation, and potentially reducing the survival of native cyprinids (Martinez et al. 2014).

Given the uncertainties involved with climate change, including the possibility for both positive and negative effects on endangered fish particularly at a local level and within the action area, it is currently not possible to predict precisely how endangered fish and their habitats will be affected. We believe that the primary net effects are likely to be in a gradual increase in the competitive edge for some nonnative fish at the expense of native fish, including the four endangered fish in the Upper Colorado River Basin, gradual reductions in streamflow, and gradual changes to the timing of peak flows.

**Flow Recommendations**

Within Colorado, flow recommendations have been developed for reaches within endangered fish critical habitat along the Yampa River (Service 2005), three reaches of the Colorado River (Osmundson and Kaeding 1991, Osmundson et al. 1995, Osmundson 2001, McAda 2003), and the Gunnison River (McAda 2003). Flow recommendations have not been finalized for the White River yet. Recommended flows vary by season and by water availability for a given year (e.g., flow recommendations are reduced for drought years). In general, spring flows recommended for dry years provide small peaks used as spawning cues by endangered fish, but contribute little to habitat maintenance; spring flows recommended for average years promote scouring of cobble and gravel bars and provide localized flooding of short duration; and spring flows for wet years promote wide-spread scouring of cobble and gravel bars, flushing of side channels, removal of encroaching vegetation, and inundation of floodplain habitats (McAda 2003).

*Yampa River*

For the Yampa River, the Service recommends that summer flows not drop below 93 cfs (at Maybell, Gage 09251000) with any greater frequency, magnitude, or duration than has occurred historically (1916-1995). Historically, flows have dropped below 93 cfs approximately 38 percent of the years of record with an average duration of about 9 days. Winter flows are typically somewhat higher; these should not drop below 124 cfs beyond what has occurred historically. The Service has established a water augmentation protocol and entered into agreements with other governmental agencies to provide the recommended flows in 90 percent of the years, and partially satisfy the flow recommendation during the driest 10 percent of years.

47

BLM_0072199

Water from the recently expanded Elkhead Reservoir will be used to meet these goals. Water would be delivered at a rate of 50 cfs until augmented water flow at Maybell surpasses flow recommendations. During drought years, water would be delivered at a rate of 33 cfs (Service 2005). Flows at Maybell declined to very low levels during the drought of 2002—down to 13 cfs in August of that year. The only other year since 2000 when summer flows dropped below 93 cfs was during the dry year of 2012 when they dipped to 77 cfs in September. Mean monthly winter flows have not dropped below 124 cfs since 2000 (USGS Surface-Water Monthly Statistics at http://nwis.waterdata.usgs.gov/co/nwis).

### *Colorado River*

#### Palisade to Rifle

For the Palisade-to-Rifle reach along the Colorado River, Osmundson (2001) recommended that base-flow levels be between 1,600 and 2,500 cfs as measured at the USGS gage at Cameo (09095500). However, due to the need to provide the recommended base flows in the 15-Mile Reach, provide minimum flows through the De Beque Canyon, and allow local diversion canals to continue operating, additional water must pass by the Cameo gage. Given this, the mean monthly recommended base flow levels range as high as 3,280 cfs (above average and wet years during August-October) and as low as 1,555 cfs (dry years during November-March). Mean monthly flows in excess of 3,280 cfs at Cameo during August-March is considered detrimental to endangered fish habitat and Osmundson (2001) recommended that it be stored in upstream reservoirs if possible. Since 2001 when the flow recommendations were established, baseline flows (monthly means) exceeded 3,280 cfs (data through 2017-09) on a few occasions, but only significantly exceeded 3,280 cfs once, during August of the very wet year of 2011 when the mean monthly flow was 4,697 cfs. However, from 2001-2017, baseline flows fell below 1,555 cfs for at least 1 month in every year except 2006 and 2017 (so far). During the drought of 2002, mean monthly base line flows were below 1,555 every month from August-March, with February, 2003, averaging the lowest flows at 1,073 cfs (USGS Surface-Water Monthly Statistics at http://nwis.waterdata.usgs.gov/co/nwis).

Osmundson (2001) recommended that peak flows at the Cameo gage reach 25,000 cfs during wet years (wettest 25 percent, or 5 in 20 years) and reach 14,400 cfs during dry years (driest 20%, or 4 in 20 years). Intermediate peak flows were recommended for years of intermediate precipitation; mean monthly flows for each month were provided as well. Peak flows during wet years should be maintained for at least 3 weeks to give razorback sucker larvae adequate time to feed and grow in flooded bottomlands before being compelled to migrate to the main channel. Since 2001 when the flow recommendations were established, daily mean peak flows at the Cameo gage have ranged from 4,260 cfs, during the drought of 2002, to 29,700 cfs in 2011. Of the 17 years since 2001 until the present, peak flows at Cameo have fallen short of the minimum recommended peak of 14,400 cfs in 5 separate years (USGS Surface-Water for Colorado: Peak Streamflow and Daily Data at http://nwis.waterdata.usgs.gov/co/nwis).

#### 15-Mile Reach

As stated previously, one of the most important reaches within the Colorado River for Colorado pikeminnow and razorback sucker is the 15-Mile Reach within the Grand Valley. It has experienced major agricultural water depletions for many years and during late summer and

BLM_0072200

early fall this reach can be severely dewatered. Water depletions in the 15-Mile Reach have been identified as a limiting factor for Colorado pikeminnow. Osmundson et al. (1995) provided recommendations for summer flows through the 15-Mile Reach. They state that in years with above average winter precipitation levels, a flow of 1,630 cfs is recommended for summer months. In years of somewhat below average precipitation, when the ideal flow of 1,630 cfs would be difficult to meet, the recommendation could be relaxed to 1,240 cfs. In years of drought (20 percent lowest precipitation years), when even 1,240 cfs would be difficult to meet, flows should not fall below 810 cfs. The assumption is that at this low level the fish that remain in the reach can wait out the dry period until more favorable conditions return with the end of the irrigation season. Mean monthly flows have, nevertheless, dropped below 810 cfs for at least one of the summer-time months during 6 of the last 23 years (1995-2017). The lowest monthly mean occurred during the drought of 2002 when only 115 cfs flowed through the 15-Mile Reach in August of that year (USGS Surface-Water Monthly Statistics at http://nwis.waterdata.usgs.gov/co/nwis).

As stated in the 2017 RIPRAP, numerous approaches are being taken to restore flows in the 15-Mile Reach to levels recommended by the Service. Reclamation has made available 5,000 acre-feet of water annually plus an additional 5,000 acre-feet in four of every five years from Ruedi Reservoir to augment flows in the 15-Mile Reach during July, August, and September. In addition, water is available for the 15-Mile Reach from the permanent commitment of 10,825 af/yr from East and West slope water users through the "Lake Granby-Ruedi" option (Recovery Program 2017a).

Although the summer base flow augmentation program often increases instantaneous flows in the 15-Mile Reach by 200 cfs or more, the Service's average monthly summer base flow recommendation of 810 cfs continues to be difficult to achieve/maintain during dry years. In April 2013, below average snowpack, low runoff conditions, and early onset of the irrigation season resulted in predictions of flows less than 200 cfs in the 15 Mile Reach. In light of potential extreme low flows in the summer of 2013, consensus was reached to conserve upstream storage for late summer flow augmentation. Subsequently, cold temperatures further curtailed runoff, resulting in instantaneous flows in the range of 50 cfs or less in the 15 Mile Reach (mean monthly flows were above 300 cfs, however). In the future, water users and the Service will address the potential for this situation to reoccur and determine what measures if any should be taken based on current conditions. This should avoid a repeat of such extreme low flows (Recovery Program 2017a). Mean monthly base flows have always been above 810 cfs since 2013 (USGS Surface-Water Monthly Statistics at http://nwis.waterdata.usgs.gov/co/nwis).

Osmundson and Kaeding (1991) stated that the availability of good winter habitat has probably not been a limiting factor for adult Colorado pikeminnow or razorback sucker in the Upper Colorado River. Unlike spring flows, recent (1954-1989) mean monthly winter flows have increased to approximately 112 percent to 134 percent of historic flows (1902-1942). It is not apparent that these increased winter flows have had any negative effects on the endangered fishes. Given this, Osmundson and Kaeding (1991) recommended that mean monthly winter flows through the 15-Mile Reach simply not drop below historic levels, averaging approximately 1,470 cfs. From 1995 through 2017 mean monthly winter flows have averaged higher than historic levels, with flows dropping somewhat below historic mean flows on occasion, but never

BLM_0072201

below 1,000 cfs (USGS Surface-Water Monthly Statistics at http://nwis.waterdata.usgs.gov/co/nwis).

Flow recommendations during spring run-off call for high spring flows that are critical for shaping the river channel, determining substrate composition, and influencing the abundance of various species for the remainder of the year. Recommended peak flows (1-day average) in the 15-Mile Reach are: 1) 20,500 to 23,500 cfs in at least 1 of 4 years, 2) greater than 23,500 cfs in at least 1 of 4 years, and 3) 14,800 cfs to 20,500 cfs to occur no more often than 2 of 4 years. See Osmundson and Kaeding (1991) for more details, including state-line peak flow and 15-Mile Reach mean monthly flow recommendations. Osmundson et al. (1995) updated the minimum recommended peak flows to be greater than 12,900 cfs rather than 14,800 in 2 of 4 years. Since the initial publication of the spring flow recommendations in 1991, peak 1-day average flows through the 15-Mile Reach have been below 12,900 cfs nearly one third of the years through 2017; thus, these targets have not always been met (USGS Surface-Water for Colorado: Peak Streamflow at http://nwis.waterdata.usgs.gov/co/nwis).

The Colorado River District, Reclamation, Denver Water, and Northern Colorado Water Conservancy District as owners and operators of Upper Colorado River reservoirs have mutually agreed to modify their operations to benefit the endangered fish of the Upper Colorado River Basin. The Coordinated Reservoir Operations (CROS) program was established in 1995 as part of the Upper Colorado River Endangered Fish Recovery Program. The purpose of the Coordinated Operations is to enhance spring peak flows for 10 days to 2 weeks in the 15-Mile Reach and downstream. In years with sufficient snowpack, surplus inflows to the reservoirs can be passed downstream to benefit these fish without impacting reservoir yields or future beneficial water uses (Recovery Program 2016). Coordinated Reservoir Operations were most recently conducted in 2017, 2016, 2015 and 2010. In 2011 and 2014, wet conditions caused streamflows in certain areas of the basin to approach or exceed levels associated with minor flooding, so CROS was not performed. In 2012 and 2013, reservoirs did not have surplus inflow to contribute due to extremely dry conditions. For further details see https://www.usbr.gov/newsroom/newsrelease/detail.cfm?RecordID=59775.

State Line

Peak flow recommendations for the Colorado River at the USGS gage near the Colorado-Utah state line (09163500) were provided by McAda (2003). Flow recommendations vary by hydrologic category; summarized excerpts are presented here. During wet years, instantaneous peak flow should fall between 39,300 and 69,800 cfs, should exceed 35,000 cfs for 30-35 days, and should exceed 18,500 cfs for 80-100 days. During dry years (10 percent lowest precipitation years), instantaneous peak flows should range between 5000-12,100 cfs. Intermediate peak flows are recommended for the four hydrologic categories between wet and dry. From 2000-2017, peak flows have ranged between 5,520-47,700 cfs. Of the 17 years since 2001 until the present, peak flows at the state line have fallen within the range recommended for wet years two times, which is approximately at the recommended rate (USGS Surface-Water for Colorado: Peak Streamflow at http://nwis.waterdata.usgs.gov/co/nwis).

Baseflow recommendations for the Colorado River at the USGS gage near the Colorado-Utah state line (09163500) were also provided by McAda (2003). The base-flow period begins after

50

BLM_0072202

spring runoff is completed and continues through initiation of spring runoff the following year. A minimum flow of 3,000-6,000 cfs should be maintained at the state-line USGS gage (09152500) in wet years. During dry years (10 percent lowest precipitation years), flows should remain above 1,800 cfs, which will make backwaters available for young-of-the-year Colorado pikeminnow, although not at a maximum number or surface area. Intermediate base flow levels are recommended for the four hydrologic categories between wet and dry. From 2000 to 2017, flows at this gage only dropped below 1,800 cfs during the drought of 2002 in July and August; August had the lowest mean flows at 1,597 cfs) (USGS Surface-Water for Colorado: Daily Data at http://nwis.waterdata.usgs.gov/co/nwis).

*Gunnison River*

Flow recommendations for the Gunnison River apply to the USGS gage at Whitewater (09152500), which is within critical habitat for the Colorado pikeminnow and razorback sucker. Detailed flow recommendations can be found in McAda (2003); summarized excerpts are presented here. During wet years, peak flow should fall between 15,000 and 23,000 cfs for 1 day, should exceed 14,350 cfs for 15–25 days, and should exceed 8,070 cfs for 60-100 days. During dry years (10 percent lowest precipitation years), flows should peak between 900-4,000 cfs for a day. Intermediate peak flows are recommended for the four hydrologic categories between wet and dry. From 2000-2017, peak flows have ranged between 2,700-15,900 cfs (USGS Surface-Water for Colorado: Peak Streamflow at http://nwis.waterdata.usgs.gov/co/nwis). Three of the years since 2000 have peaked below 4,000 cfs, with the 2012 peak (2,700 cfs) slightly lower than during the drought of 2002 (2,890 cfs).

Similarly, baseflow recommendations for the Gunnison River are provided by McAda (2003). A minimum flow of at least 1,050 cfs should be maintained at the USGS gage (09152500) in all but dry and moderately dry years. This flow maximizes the amount of pool habitat in the Gunnison River, which is preferred by adult Colorado pikeminnow and razorback sucker. Also, flows exceeding 950 cfs prevent fine sediments from settling in riffles, which might smother eggs and larvae of endangered fishes. Additionally, flows of 1,050 cfs roughly corresponds to providing a minimum of 300 cfs downstream from Redlands Diversion Dam (based on senior water rights of 750 cfs) and provides access for migrating fish to the fishway there. During dry and moderately dry years, flows may decrease below 1,050 cfs after the Colorado pikeminnow spawning migrations and larval drift are completed (approximately June through August), but only after consultation with Service biologists. The 2.5-mile reach downstream from Redlands Diversion Dam could experience severe dewatering at this level and endangered fish may be forced to leave this reach of critical habitat. From 2000 to 2017, flows at this gage have dropped below 1050 cfs for one or more months in 5 of the 17 years (USGS Surface-Water for Colorado: Daily Data at http://nwis.waterdata.usgs.gov/co/nwis). In the more sensitive spawning migration and larval drift months of June, July, and August, from 2000-2017, 7 of 51 months averaged below 1,050 cfs. June of 2002 had the lowest monthly mean at 852 cfs ((USGS Surface-Water for Colorado: monthly statistics for gage 09152500 at http://nwis.waterdata.usgs.gov/co/nwis).

*White River*

Official flow recommendations have not been finalized for critical habitat along the White River, which was designated for the Colorado pikeminnow. However, Haines et al. (2004) made a preliminary recommendation that base flow patterns remain at current levels in order to maintain

BLM_0072203

habitat for the Colorado pikeminnow.  They stated that between 1923-1997, baseflow (August through October) discharge in the White River has only dropped below 200 cfs 5 percent of the time at the USGS Watson Gage (09306500, near Watson, Utah), and below 150 cfs 1 percent of the time.  They found that to provide for fish passage over riffles, flows greater than 300 cfs are apparently needed.  To maintain riffle productivity during base flow periods, flows of 400-500 cfs are needed, and if flows fall below 161 cfs, riffle habitat declines rapidly.  From 2000 to 2017, mean monthly baseflow at the Watson gage has fallen below 200 cfs approximately 13 percent of the time, with a low of 100 cfs occurring during August of 2002 (USGS Surface-Water: Monthly Statistics at http://nwis.waterdata.usgs.gov/nwis).

**Effects of the Action**

The project would adversely affect Colorado pikeminnow, razorback sucker, humpback chub, and bonytail by reducing the amount of water in the river systems upon which they depend by the following approximate, estimated amounts (af/yr):

| Colorado River Basin | 2,463 | Yampa River Basin | 315 |
|---|---|---|---|
| Gunnison River Basin | 607 | White River Basin | 538 |
| Dolores River Basin | 35 | Green River in Colorado | 4 |

**Total water depletions from the Upper Colorado River Basin:  3,962 acre-feet/year**

The effects to these fish species essentially results from the effects of the action upon their habitats; the fish are not immediately or directly affected by removal of water upstream (see discussion of effects to critical habitat below).

In general, the proposed action would adversely affect the listed fishes by reducing the amount of water available to them, decreasing the amount and quality of spawning and nursery habitat, increasing the likelihood of water quality issues, and increasing their vulnerability to competition and predation by nonnative fish.  Because drilling, fracking, pipeline construction, dust abatement, and associated activities occur year-round, water use for these activities would occur in all seasons.  The primary challenge, however, in meeting recommended flows for endangered fish largely comes during spring run-off and late summer/fall periods of low flow.

The reduction of peak spring flows and available breeding habitats can directly affect individuals by decreasing reproductive potential and foraging and sheltering opportunities.  Many of the habitats required for breeding become diminished when flows are reduced.  If spring flows are reduced enough, individual fish within the action area may not be able to find a suitable place to breed or will deposit eggs in less than optimal habitats more prone to failure or predation.  In addition, reduction in flow rates lessens the ability of the river to inundate bottomland, a source of nutrient supply for fish productivity.  Food supply is a function of nutrient supply and site productivity, which could be limited by reduction of flows brought about by water depletions.

Adequate late summer, fall, and winter flows (i.e., base flows) are important for providing a sufficient quantity of preferred habitats for a duration and at a frequency necessary to support all life stages of these endangered fishes.  They are important to maintain backwater habitats and depths of these habitats sufficient to provide for winter refugia for small fish to successfully

BLM_0072204

overwinter, as well as provide for periodic connectivity to microhabitats created during spring peak flow events (isolated pools, oxbows, and flooded bottomlands). To the extent that the project will reduce flows, particularly peak flows and base flows in dry years, the ability of the river to provide these functions will be reduced. This reduction of water affects habitat availability and habitat quality.

The modification of flow regimes, water temperatures, sediment levels, and other habitat conditions caused by water depletions has contributed to the establishment of nonnative fishes. Water depletions exacerbate competition and predation by nonnative fishes by altering river conditions that often favor nonnatives and by concentrating a fish assemblage in a smaller volume of water. Endangered fishes within the action area are likely to experience increased competition and predation as a result.

***Effects to Critical Habitat***

The Service identified water, physical habitat, and the biological environment as the physical or biological features of critical habitat. This includes a quantity of water of sufficient quality that is delivered to specific habitats in accordance with a hydrologic regime that is required for the particular life stage for the species.

<u>Water Quantity and Quality</u>

The proposed action would result in new depletions of water from critical habitats for the Colorado pikeminnow, razorback sucker, humpback chub, and bonytail along the Colorado, Gunnison, White, Green, and Yampa Rivers. These depletions reduce the quantity of water delivered to specific habitats important for particular life stages of these species. An appropriate volume of water is needed within critical habitat to avoid concentrating and crowding of fish and potentially reducing the carrying capacity of a river segment. The base flow period (August – February) is a particularly sensitive time period to water depletions because that is the time when flows are the lowest and the removal of a given quantity of water constitutes a relatively larger proportion of a rivers' flow. Sufficient base flows are important for endangered fish in order to maintain backwater habitats and depths of these habitats sufficient to provide for winter refugia for small fish to successfully overwinter, as well as provide for periodic connectivity to microhabitats created during spring peak flow events (isolated pools, oxbows, and flooded bottomlands).

This biological opinion is limited to addressing depletions of water quantity; however, changes in water quantity can affect water quality. Most projects covered by this opinion would remove water before it enters downstream river segments where the fish currently reside, therefore, depletions could reduce the dilution effect provided by this relatively clean water for any contaminant concentrations within critical habitat. This may result in an increase in heavy metals, selenium, salts, polycyclic aromatic hydrocarbons, pesticides, and other contaminant concentrations in the Colorado River and its main-stem tributaries (Service 1999). An increase in contaminant concentrations in the river would likely result in an increase in the bioaccumulation of these contaminants in the food chain which could adversely affect the endangered fishes, particularly the predatory Colorado pikeminnow. Selenium may be of particular concern due to its effects on fish reproduction and its tendency to concentrate in low velocity areas that are important habitats for Colorado pikeminnow and razorback suckers.

BLM_0072205

Selenium concentrations are most worrisome in the Gunnison River and the Colorado River below its confluence with the Gunnison River due to return irrigation flows (Osmundson et al. 2000). The Recovery Program is intended to offset some water quality impacts associated with flow reductions (Service 1987). These impacts include changes in temperature, salinity and turbidity, as well as the reduced dilution factor associated with depletions. However, the Recovery Program is not intended to offset any point or nonpoint discharges of pollutants; such discharges will have to be offset or avoided by other means and addressed in separate section 7 consultations. This would include discharges of irrigation water with elevated levels of selenium and the input of any contaminants into critical habitat from oil and gas development; these actions are not a part of this consultation, however.

Physical Environment

The physical habitat includes areas of the Colorado River system that are inhabited or potentially habitable for use in spawning and feeding, as a nursery, or serve as corridors between these areas. In addition, oxbows, backwaters, and other areas in the 100-year floodplain, which when inundated provide access to spawning, nursery, feeding, and rearing habitats, are included.

Consumptive water use during the spring months contributes to the cumulative reduction in high spring flows, which are essential for creating and maintaining complex channel geomorphology and suitable spawning substrates, creating and providing access to off-channel habitats, and stimulating spawning migrations. Peak spring flows are needed to inundate preferred and identified spawning sites and river substrates (primarily cobbles), periodically flush sediments from spawning substrates, and maintain and create important microhabitats including backwaters, flooded bottomlands, side channels, oxbows, eddies, and in some cases isolated off channel pools and impoundments. In addition, periodic flows that inundate floodplains and stimulate riparian vegetation recruitment and regeneration are important to provide river bank stability, cover, shading, organic inputs, and increased habitat diversity and complexity.

Spring peak flows are important for channel maintenance and efficient conveyance of sediments. Coupled with a reduced flow regime, sediment input rates are likely to exceed transport rates and sediment depositional problems (aggradation) are likely to occur with time (Reiser et al. 1989). Reductions in springtime flows allow fine sediments to build up which reduces habitat complexity and diversity as river channels narrow, and backwater habitats are cut off from the main channel, and side channels are reduced in abundance and quality. Excessive sediment can impact recruitment of young fish as important low and zero velocity micro-habitats, primarily backwaters, oxbows, and flooded bottomlands are reduced in quantity or quality. Accumulation of fine sediments can also reduce spawning substrate quality and usability which can impact successful reproduction and recruitment.

Biological Environment

Food supply, predation, and competition are important elements of the biological environment. The modification of flow regimes, water temperatures, sediment levels, and other habitat alterations caused by water depletions has likely contributed to the establishment of nonnative fishes. To the extent that it would reduce flows and contribute to further habitat alteration, the project may contribute to an increase in nonnative fish populations. Endangered fishes could experience increased competition and predation as a result.

54

BLM_0072206

*Species and Critical Habitat Response to the Proposed Action*

<u>Withdrawing Water Directly from Occupied Habitats</u>

The potential exists for water intake structures placed on any of the occupied river reaches including the Colorado, Green, Gunnison, White, and Yampa Rivers to result in direct mortality to eggs, larvae, young-of-the-year, and juvenile life stages.  Larger fish (subadults and adults) are generally able to avoid or swim away from intake pumps.  Endangered larval fish are very small (<0.5 inches total length) and incapable of directed swimming from the time of hatching through the first 2-4 weeks of their life.  Depending on the water year, larval fish may be present in occupied habitats from as early as April 1 to as late as August 31 (earlier in dry years; later in wet years).  Young of the year endangered fish are most susceptible to entrainment from pumping water directly out of occupied river reaches.

However, given the conservation measures associated with the proposed project committed to by BLM, we believe entrainment of larval or young fish of any of the four endangered species would be rare.  Most or all current spawning sites in the Yampa River are protected within Dinosaur National Monument.  Along the Colorado River, known spawning sites within the 15-Mile Reach and rearing locations downstream are away from the areas of concentrated drilling for oil and gas and direct withdrawal from this reach and below will be prohibited.  There are no known spawning sites for any of the endangered fish upstream from the 15-Mile Reach.  The occupied portion of the Gunnison River is also away from current active drilling sites and proven oil and gas fields.  Although a substantial amount of oil and gas activity occurs near the White River, presumably along with associated water extraction and pumping, spawning has not been documented for any of the endangered fishes within the White River in Colorado.  In sum, although water for drilling and completion activities could potentially be pumped from spawning sites in Colorado, and trucked to drilling sites or used for dust abatement on gas field access roads, it is far more likely to be extracted within areas of high oil and gas potential that are upstream and away from occupied habitats (see Oil & Gas Fields at https://cogccmap.state.co.us/cogcc_gis_online/).  In addition, even if water is occasionally pumped directly from an occupied river reach, the conservation measures described in the project description (e.g., pump screening) outline methods to minimize adverse pumping effects to eggs, larvae, or very young endangered fish.

<u>Water Quantities & Affected Flows</u>

Based on the number of Federal wells anticipated, BLM estimates that administration of their fluid mineral program will result in an average annual depletion of 3,962 af/yr within the action area.  While this estimate is slightly lower than the estimate derived in the 2008 PBA, based on BLM's tracking and reporting, the 2008 estimate was apparently an overestimate.  Between 2009 and 2016, water use never exceeded 971 af/yr.

To put the water quantity used for the project into perspective, according to the 2017 PBA and the Colorado Water Plan (2015), 5.3 million acre-feet of water is used each year in Colorado for all human activities and can be categorized as such:  Agricultural (89%), Municipal (7%), and Industrial (4%).  Water used for the development of fluid minerals falls into the Industrial category, specifically Large Industry.  Other activities in the Large Industry category include beer brewing, snowmaking, power generation, food processing, and many others.  Collectively,

55

BLM_0072207

the Large Industry category currently requires approximately 200,000 AF of water annually in the state. BLM's water use projections for its fluid minerals program in western Colorado (3,962 AF annually), represents 2% of the current Large Industry portion of water use. Thus, according to the PBA, when considered at the state-level, the 3,962 af/yr of water depletions from the Upper Colorado River Basin for this project amount to approximately 0.07 percent of the total consumptive use in the state.

When focusing just on the Colorado River Basin in Colorado, the water depletions associated with the proposed project are also rather small when compared to larger consumptive uses in the action area. A number of water exports (trans-basin diversions) have impacted the Colorado River for over 100 years, diverting about 475,000 af/yr of water from the Colorado River Basin to the East Slope (Denver Water 2017). And considering basin exports and in-basin consumptive uses together from that portion of the Colorado River Basin above the 15-Mile Reach between 1975 to 2015, exports, agricultural uses, municipal uses, evaporative losses, livestock, and mineral uses have collectively depleted an average of 1,500,000 af/yr (2017 PBA). Given this, *project-related water depletions* from the Colorado River above the 15-Mile Reach equate to less than one fifth of one percent of all consumptive uses in that subbasin (2,463/1,500,00 x 100 = 0.16%). For another simple comparison, the two main ditches that are used to deliver water for agriculture that divert water from the Colorado River at the top of the 15-Mile Reach (Grand Valley Canal) and 8 miles upstream (Government Highline Canal) together divert nearly 1 million af/yr (http://cdss.state.co.us/onlineTools/Pages/MapViewer.aspx); roughly one quarter of this water does not return to the river downstream after use and constitutes a water depletion. This is approximately 100 times more than the projected 2,463 af/yr for use in Federal fluid mineral development in this project in this basin.

GREEN RIVER

According to the 2017 PBA for this project, very little fluid mineral activity is expected to occur in the Colorado portion of the Green River Basin, which drains the extreme northwest corner of Colorado. Depletions of only 4 af/yr are projected. Flows in this portion of the Green River are directly controlled by releases from Flaming Gorge Dam operated by Reclamation; it is not considered occupied by any of the endangered fish due to cold water releases from the dam. Occupied and critical habitat for all four endangered fish begins in the Green River after its confluence with the Yampa River. Even in dry years, dam releases tailored to benefit the endangered fish would be at least 800-1000 cfs during the summer-to-winter base flow period, and higher in wetter years (Reclamation 2005) (8,600 cfs during peak flow in wet years). A water depletion of 4 af/yr equates to approximately one one-hundredth of one cfs. Thus, water depletions from the project would not affect Green River flows in any appreciable way. Water depletion effects from the project would be greater in all other river segments discussed below.

YAMPA RIVER

In most cases, the project would not substantially impact the ability for the flow recommendations through critical habitat to be met. In the Yampa River, the Service has developed an augmentation protocol to meet base-flow (summer-fall-winter) recommendations with water releases from upstream reservoirs (Service 2005). As outlined in the Yampa PBO, the Recovery Program proposed to implement a base-flow augmentation plan on the Yampa

56

BLM_0072208

River and adopted the Service's Yampa River flow recommendations (Modde et al. 1999) for the August–October base-flow period, when river flows typically are at their lowest levels. Modeling suggests that the undepleted hydrograph of the Yampa River followed a similar pattern, wherein flows during this period were generally lower than the remainder of the base-flow period (November–February), with the lowest flows in September. The augmentation protocol calls for water to be released from storage or otherwise delivered to augment stream flows when unaugmented flows at Maybell fall below 78 cfs July–October and 109 cfs November–February. Water would be delivered at a rate of 50 cfs until augmented flow at Maybell exceeds 138 cfs July–October and 169 cfs November–February. No water would be delivered during peak flows (March 1–June 30).

The anticipated 315 af/yr of water depleted from the Yampa River for this project would equate to somewhat less than 1 acre-foot/day. As stated above, most water use for oil and gas extraction activities would likely be withdrawn on a year-round basis. An average of 315 af/yr equates to an approximate reduction in river flows of 0.5 cfs (base-flows typically remain above 100 cfs). The augmentation protocol, which would provide 50 cfs of water (33 cfs during drought conditions), should generally be able to meet base flow recommendations in the Yampa River despite the 0.5 cfs of water consumed for anticipated oil and gas activities during base-flow months. Even without augmentation, or prior to augmentation, a reduction in flow of 0.5 cfs is relatively small (< 1 percent) compared with river flows (e.g., 0.5 cfs/78 cfs x 100 = 0.64% during base flow).

During spring peak flows, the augmentation protocol does not call for reservoir releases to meet specified target flows. Therefore, water depletions from this project during peak flows (May-June) would likely lessen peak flows through critical habitat by 0.5 cfs. Nevertheless, given that peak flows through critical habitat (near Maybell) are typically 5,000 to 20,000 cfs (USGS Surface-Water for Colorado: Peak Streamflow at http://nwis.waterdata.usgs.gov/co/nwis), this relatively small flow reduction would likely not change any of the important effects of flood flows (e.g., cobble bar construction; scouring of fine sediment from the interstitial spaces within the cobble so it is suitable for spawning; flushing sediments from backwaters; maintaining channel complexity; overbank flows to provide nursery habitat; spawning initiation).

Therefore, the depletions caused by the proposed project, with implementation of the augmentation protocol to meet flow recommendations, are not expected to measurably reduce population numbers, limit reproduction, or constrain endangered fish distribution within the Yampa River. Similarly, we do not expect water depletions from this project to compromise critical habitat along the Yampa River to a point that it no longer provides sufficient water to maintain the primary biological features essential for the conservation of the four endangered fish species.

## WHITE RIVER

The anticipated 538 af/yr of water that would be depleted from the White River equates to an average reduction in flows of approximately 0.7 cfs throughout the year. Although the White River in Colorado is not known to be used regularly by the other endangered fish, it is important to the Colorado pikeminnow. Razorback suckers use the White River downstream in Utah closer to its confluence with the Green River. As stated above, official flow recommendations have not been established for endangered fish habitat along the White River. However, traditional base

BLM_0072209

flows have remained above 150 cfs in 99 percent of the years since 1923 (Haines et al. 2004). A flow of 0.7 cfs is approximately 0.5 percent of 150 cfs. A flow reduction due to fluid mineral extraction activities of 0.7 cfs during low flow periods, particularly in dry years, would likely reduce available riffle productivity somewhat and may lessen the ability of Colorado pikeminnow to pass through shallow riffle sections (Haines et al. 2004). This modest flow reduction could also lead to a slight increase in water temperatures in the White River, although probably not in the section close to Taylor Draw Dam due to the cooling effect of deep water in Kenney Reservoir (to the extent that water is released from the base of the dam). A flow reduction of 0.7 cfs would have less of an effect on spring flood flows as it would be a much smaller portion of the overall flow at that time (less than 0.05 percent), which typically peaks between 1,500 cfs and 6,000 cfs near Watson, Utah (USGS Surface water for Utah: Peak Streamflow at http://nwis.waterdata.usgs.gov/ut/nwis/peak).

We do not expect that the depletions caused by the proposed project, along with the conservation measures for the project, would measurably reduce population numbers, limit reproduction, or constrain Colorado pikeminnow or razorback sucker distribution within the White River. Similarly, we do not expect water depletions from this project to compromise critical habitat for the Colorado pikeminnow or razorback sucker along the White River to a point that it no longer provides sufficient water to maintain the primary biological features essential for the conservation of the these endangered fish species.

## COLORADO RIVER

The anticipated 2,463 af/yr of water that would be depleted from the Colorado River equates to an approximate reduction in river flows of 3.4 cfs. As with the Yampa River, agreements have been made to provide water for endangered fish in the Colorado River. A multi-party agreement involving the Grand Valley Irrigation Company, Grand Valley Power Plant, Orchard Mesa Irrigation District, Grand Valley Water Users Association and Reclamation was reached that has made up to 30,000 acre-feet of water available to endangered fish each year. The water will be used to boost flows in the Colorado River in the 15-Mile Reach between Palisade and the Gunnison River confluence. In addition, Reclamation has made 31,650 acre-feet of water available for release from Ruedi Reservoir to increase flows in this same part of the Colorado River. Although recommended flows through endangered fish critical habitat along the Colorado River have not always been achieved in the past, agreements are in place to provide the recommended water.

Even if the water consumed by the projects' activities was not replaced by upstream dam releases, the reduction in flows of 3.4 cfs likely would not result in a large reduction in the suitability of endangered fish habitat in the Colorado River. A flow of 3.4 cfs represents 0.4 percent of the smallest recommended base flow in the Colorado River—flows through the 15-Mile Reach during a dry year should be at least 810 cfs (Colorado River PBO). Recommended flows in other seasons and through other segments of the Colorado River (state-line and Palisade-to-Rifle) are all larger; thus, 3.4 cfs would be a smaller percentage of the recommended flows in those reaches. Therefore, particularly with implementation of the Colorado River PBO (including conservation measures) and augmentation agreements to meet flow recommendations, the depletions caused by the proposed project are not expected to measurably reduce population numbers, limit reproduction, or constrain endangered fish distribution within the Colorado River. Similarly, we do not expect water depletions from this

BLM_0072210

project to compromise critical habitat along the Colorado River to a point that it no longer provides sufficient water to maintain the primary biological features essential for the conservation of the four endangered fish species.

## GUNNISON RIVER

In the Gunnison River, water depletions for project activities are expected to amount to 607 af/yr. This equates to a reduction of approximately 0.8 cfs in river flows, a relatively small proportion of actual flows, including base flows. The Gunnison River PBO (Service 2009) outlines base flow targets within critical habitat at Whitewater regulated by releases from the Aspinall Unit (comprised of Blue Mesa, Morrow Point, and Crystal reservoirs on the Gunnison River). Flow targets vary based on natural precipitation (e.g., "year type" of wet vs. average vs. dry year). Peak flow targets range from 14,350 cfs (wet year) to 900 cfs (dry year). Base flows vary accordingly from 1,050 cfs (wet year) to 750 cfs (dry year). Even in a dry year, should base flows be limited by drought conditions, a reduction of 0.8 cfs equates to only 0.1 percent of 750 cfs. Reclamation operates the Aspinall Unit and makes releases each year pursuant to the Gunnison River PBO to maintain endangered fish habitat downstream. Therefore, with implementation of the Gunnison River PBO and releases from the Aspinall Unit to meet flow recommendations, the depletions caused by the proposed project are not expected to measurably reduce population numbers, limit reproduction, or constrain endangered fish distribution within the Gunnison River. Similarly, we do not expect water depletions from this project to compromise critical habitat along the Gunnison River, which was designated for the Colorado pikeminnow and razorback sucker, to a point that it no longer provides sufficient water to maintain the primary biological features essential for the conservation of these endangered fish species.

## DOLORES RIVER

In the Dolores River Basin, 35 af/yr is projected to be depleted for future Federal fluid mineral activities. This equates to a reduction in flows of approximately 0.05 cfs. To attempt to put this in perspective, the lowest mean monthly flows for the Dolores River near its confluence with the Colorado River (USGS Gage 09180000 near Cisco) occur November through February and range from 140 cfs to 165 cfs, on average (averaged from 2000 through 2007; USGS Surface-Water: Monthly Statistics at http://waterdata.usgs.gov/nwis). A flow reduction of 0.05 cfs would reduce a flow of 140 cfs by less than one tenth of one percent. Although Colorado pikeminnow may use the lower 2 km of the Dolores River (Service 2002a), no other endangered fish are documented to use the Dolores River (Service 2002b, 2002c, 2002d) and the Dolores River was not included in the designation of critical habitat for any of the four endangered fish in the Upper Colorado River Basin. The depletions caused by the proposed project are not expected to measurably reduce population numbers, limit reproduction, or constrain endangered fish distribution within the Dolores River.

Water Quality

As stated above, through the removal of fresh water from a river, particularly water higher up in a watershed which tends to have relatively clean water, any remaining contaminants in the river can become more concentrated. In this way, water depletions from the project can affect water quality. (The proposed project, and thus this consultation, does not include or address, however, the addition of contaminants into the environment or the watershed, as stated above.) Selenium and Mercury are two contaminants known to be found within endangered fish critical habitat in

BLM_0072211

the action area and are of some concern for endangered fish health, depending on the occupied river reach (Hamilton 1999, Hamilton et al. 2000, Osmundson et al. 2000, Osmundson and Lusk 2016, Service 2016b).  Accidental spills, including hydrocarbons from oil and gas operations, can also enter endangered fish critical habitats on occasion and have localized effects.

## SELENIUM

Sources of selenium in the action area are primarily associated with natural geology as it is concentrated in marine shales - primarily Mancos, Green River, and Lewis shales (USGS 2017). Selenium is an essential element and there is a fine line between amounts needed for survival and amounts that can cause harm.  Lemly (1996) found that amounts above 8 ug/g (= mg/kg) dry weight for muscle tissue and 4 ug/g for whole body are of concern.  The new EPA criterion for selenium is 8.5 mg/kg dry weight for whole body fish, 11.3 mg/kg dry weight for fish muscle, and 15.1 mg/kg dry weight for fish eggs/ovaries (EPA 2016).  It has the potential to become problematic to fish due to extensive conversion of arid land to irrigated land which has exacerbated transport of selenium to waterways.  Within the action area, the Gunnison subbasin contains the highest amounts of selenium based shale soils and irrigated agriculture, and is the focus of work being conducted by the Gunnison Basin and Grand Valley Selenium Task Forces. A study analyzing selenium concentrations from Colorado pikeminnow and razorback sucker fish tissue collected from critical habitat along the Gunnison River noted elevated levels of selenium (Osmundson 2017).  Selenium is mainly bioaccumulated by fish through the food chain (Lemly 1996).  Excess selenium is known to cause effects to fish including malaise, reduced feeding, lethargy, organ damage, developmental abnormalities, and reduced fecundity and reproductive success (Hamilton 2004, Janz et al. 2010).

Selenium is readily reduced in concentration by improved dilution; higher upstream fresh water inputs (or reduced depletions) may ultimately reduce selenium concentrations in downstream fish (Osmundson et al. 2000).  However, given the relatively small amount of project-related water depletions compared to overall river flow, the increase in selenium concentrations due to upstream project-related depletions are expected to be insignificant.  Even in the Gunnison River where selenium is of greatest concern, a reduction in the lowest base flows during a dry year— when water depletions could affect the dilution factor the most--would be expected to increase selenium concentration by no more than 0.1 percent (0.8 cfs depletion from 750 cfs base flow, and assuming depleted water contains no selenium itself, a conservative assumption).

The most recent (Water Year 2016) annual 85th percentile selenium concentration in the Gunnison River within endangered fish critical habitat (Whitewater stream gauge) is 3.6 micrograms per liter (µg/L) (USGS 2016), which is below the State of Colorado water-quality standard for dissolved selenium of 4.6 µg/L (also based on the 85th percentile).  An increase of 0.1 percent in the selenium concentration would not significantly change this value—it would still be 3.6 µg/L after rounding to the nearest tenth.  It is also worth noting that selenium concentrations in the Gunnison River have been declining since 1986 when the 85th percentile value was calculated at 7.1 µg/L (USGS 2016), largely due to efforts by the Selenium Management Program (see https://www.usbr.gov/uc/wcao/progact/smp/).  As the Selenium Management Program continues its efforts, selenium concentrations in the Gunnison and Colorado Rivers are expected to continue to slowly decrease.

60

BLM_0072212

An increase in water selenium concentrations due to project-related water depletions in the other rivers in Colorado containing endangered fish and their critical habitats is likely to be similar or less of a concern due to overall lower selenium concentrations found in those rivers.  Even though selenium is a contaminant of concern for endangered fish, particularly the razorback sucker, we do not expect the very minor increase in selenium water concentrations *due to project-related water depletions* to be of significant concern for any of the endangered fish or their critical habitats.

## MERCURY

Mercury (Hg) is a naturally occurring but non-essential toxic metallic element. It can be found in soils and the atmosphere, as well as water bodies.  Mercury is emitted by both natural and anthropogenic sources.  Natural sources include volcanoes, geothermal sources, and exposed naturally mercury-enriched geological formations.  These sources may also include re-emission of historically deposited mercury as a result of escape from the surface back into the atmosphere, fires, meteorological conditions, as well as changes in land use and biomass burning. Anthropogenic sources of mercury include burning of fossil fuels, incinerators, mining activities, metal refining, and chemical production facilities.  Anthropogenic mercury emissions now far surpass those derived from natural processes (Fitzgerald et al., 2005; Pacnya et al. 2010; UNEP 2013; Driscoll et al. 2013).  The global emissions inventory for 2010 estimated that 1,960 metric tons 4,319,840 lbs) of mercury was emitted into the atmosphere as a direct result of human activity (UNEP 2013), with approximately 61 metric tons supplied by North America.  East and Southeast Asia were by far the highest contributors, with 777 metric tons of mercury released (UNEP 2013).

Atmospheric transport and deposition is an important mechanism for the global deposition of mercury (EPRI 2014), as it can be transported large distances across continents from its source regions.  It is considered a global pollutant. Atmospheric mercury is primarily inorganic and although inorganic mercury is widespread across the landscape, it is not biologically available to fish until it is converted into methyl mercury (MeHg).  It is converted into MeHg through a process known as methylation when microbial organisms in sediment, algal mats, or periphyton biofilms methylate inorganic mercury species into organic species (Marvin-DiPasquale et al. 2009; Tsui et al. 2009, 2010).  Several variables can affect MeHg production including land use/cover, local geology, soil properties, discharge, and redox conditions (Shanley et al. 2005). Water bodies such as reservoirs and wetlands that experience year to year variation in water levels and intermittent plant growth and decay are especially susceptible to the conversion of inorganic mercury to biologically available MeHg (Shanley et al. 2005; Willacker et al. 2016). MeHg accumulates in fish to concentrations that exceed those in surface waters as much as $10^6$ to $10^7$ fold (Sandheinrich and Wiener 2011).

Reducing the ability of ambient amounts of inorganic mercury to convert to biologically available MeHg may be the best method by which to reduce harmful effects to aquatic species. Fish accumulate MeHg mostly from their diet ($\geq$ 90 percent of total uptake), though some waterborne MeHg can be passed over the gills and accumulated (Sandheinrich and Wiener 2011).  Mercury ingested in food bioaccumulates over time into fish tissues and concentrations generally increase with increasing age of fish or body size.  Biomagnification (increased tissue concentrations as the chemical is passed up through two or more trophic levels) is exacerbated by a very slow release time of mercury from the body.  Because mercury biomagnifies up food

BLM_0072213

webs, fish at higher trophic levels usually contain greater concentrations than coexisting species at lower trophic levels (Beckvar et al. 2005; Peterson et al. 2007; Sandheinrich and Wiener 2011).

Sandheinrich and Wiener (2011) conclude that changes in biochemical processes, behavior, damage to cells and tissues, and reduced reproduction in fish occur at MeHg concentrations of about 0.5-1.2 µg Hg/g wet weight in muscle tissue.  Lusk (2010) describes the potential effects of MeHg to fish as:

1. Potent neurotoxin:
    a. Affects the central nervous systems (reacts with brain enzymes, then lesions);
    b. Affects the hypothalamus and pituitary, affects gonadotropin-secreting cells;
    c. Altered behaviors: Reduced predator avoidance, reproduction timing failure;
    d. Reduced ability to feed (emaciation and growth effects).
2. Endocrine disruptor
    a. Suppressed reproduction hormones in male and female fish;
    b. Reduce gonad size and function, reduced gamete production;
    c. Altered ovarian morphology, delayed oocyte development;
    d. Reduced reproductive success;
    e. Transfer of dietary Hg of the maternal adult during oogenesis and into the developing embryo.
3. Inability to grow new brain cells or significantly reduce brain mercury.

Because Colorado pikeminnow are long-lived top predators, they are especially susceptible to bioaccumulation via biomagnification of MeHg (Service 1994).  The other three endangered Colorado River fish are less piscivorous and less long-lived; therefore, we expect them to have relatively lower mercury levels when occupying the same river segment.  Osmundson and Lusk (2016) recently reported elevated mean mercury concentrations in Colorado pikeminnow muscle tissue from most sampled specimens and locations within the Upper Colorado River Basin; the highest mean concentration was from the White River subbasin (0.95 µg Hg/g wet weight in muscle tissue).

Although mercury contamination is a concern for the endangered fish and their habitats in the Upper Colorado River Basin, project-related water depletions are not likely to have much of an effect on water mercury concentrations in endangered fish critical habitat, nor on fish tissue mercury concentrations in endangered fish.  Because mercury is a wide-spread global pollutant and is broadly delivered to the environment primarily through atmospheric deposition, we have no reason to believe that mercury concentrations differ significantly between water that is extracted for project-related activities (often upstream from critical habitats) and water reaching endangered fish critical habitats (generally downstream).  Given this, we do not anticipate any overall increase in mercury water concentrations due to a dilution effect from project related water depletions.  Nor do we have any reason to believe that slightly reduced river flows from project-related water depletions would affect mercury methylation in the system.  Additionally, as stated above, project-related activities do not add any contaminants, including mercury, into the environment.  Given this, we do not expect the project to exacerbate mercury contamination within any endangered fish critical habitats nor contribute to fish tissue mercury concentrations in any of the endangered fish in the Colorado River.

BLM_0072214

## ACCIDENTAL SPILLS OF CONTAMINANTS

Another threat to the Colorado River endangered fish and their critical habitats is the potential for accidental spills or leaks of contaminants either directly or indirectly (via tributary streams) into occupied habitats. Such spills and leaks are not part of the project description or this consultation, except as water depletions may exacerbate their effect through reduced contaminant dilution (i.e., increased contaminant concentration). Reduced flows would lessen dilution effectiveness and could result in contaminant concentrations at levels capable of causing greater intensity of impacts or impacts for a greater duration and distance downstream than if dilution amounts were greater. Impacts from spills are impossible to predict and depend on several factors including the chemical released, distance to live water, time of travel once in water, chemical amounts, time of year, flows, and stream and air temperatures, among others. Effects can range from sub-lethal (malaise, reduced feeding, lethargy, habitat avoidance, displacement, etc.) to lethal (direct mortality). Generally, the effects of spills are localized and temporary.

Given the relatively small reductions in water volume in rivers within the action area associated with project-related water depletions, the changes in contaminant concentration through reduced dilution would be small as well. As explained above, none of the large rivers containing critical habitat for the endangered fishes would experience reduced flow by more than one percent, even during the base flow period when project-related water depletions would constitute a larger proportion of the river volume than during higher flows. The largest potential flow reduction in terms of percent flow would be a reduction of 0.64 percent to the Yampa River during fall base flows. Augmentation plans, as explained above, would prevent flows from being further reduced and recommended flow levels for the endangered fish should be able to be met. This small flow reduction, and potential contaminant concentration increase by a similar amount (possibly less), could lead to a small, temporary increase in the strength of negative effect to endangered fish in any of these occupied rivers from spilled contaminants until the contaminants are cleaned up or dissipated. We do not expect these effects to be substantial; we are not aware of any past spill or leak in Colorado that has led to a significant fish-kill of any endangered fish within any of their critical habitat units.

<u>Nonnative Fishes</u>

Competitive and predaceous nonnative fish are widely recognized as the biggest obstacle to endangered fish recovery (Chart 2014, Recovery Program 2017b). Top predators such as the northern pike, smallmouth bass, and walleye are of particular concern due to their potential to prey upon the endangered fish. Northern pike and Colorado pikeminnow have very similar habitat and niche preferences and thus compete directly for food and habitat. The main cause for the recent declines in Colorado pikeminnow populations throughout the Green River Basin, which includes the White and Yampa River Basins, is persistent competition and predation from nonnative predatory species (Northern Pike, Smallmouth Bass, and Walleye), and similarly, nonnative predation and competition is currently considered the greatest threat to the Colorado Pikeminnow population in the Colorado River Basin (Service 2016a). The Recovery Program (2017) states that predation and competition by nonnative fish species is the primary threat to endangered fish recovery and the most challenging threat to manage. Hybridization is another threat posed by nonnative fish; the nonnative white sucker has the potential to hybridize with the razorback sucker, which can compromise its genetic purity.

63

BLM_0072215

Reduced water flows can create habitat conditions preferred by introduced nonnative fishes. Many introduced fishes prefer warmer, shallower water conditions that result from decreased flows.  This could negatively affect the four endangered fishes via increased competition, predation, and in the case of the razorback sucker, hybridization (with nonnative white suckers). For example, low stream flows in the Upper Colorado River Basin appear to favor nonnative species such as smallmouth bass and virile crayfish, which benefit from earlier reproduction and longer growing seasons due to warmer water temperatures (Martinez et al. 2014).  Osmundson and Kaeding (1991) indicated that during low flow water years (1986-1989), nonnative minnows (red shiners, fathead minnows, and sand shiners) capable of preying on or competing with larval endangered fishes greatly increased in numbers.  Propst and Gido (2004) found that most nonnative fishes responded positively (population increases) to extended low summer flows in the San Juan River.  Additional research by Propst et al. (2008) in a different western river system (Gila River) suggested that the chronic presence of nonnative fish, coupled with naturally low flows reduced the abundance of individual native species and compromised persistence of native fish assemblages.

The relationship between the abundance of nonnative fish and river flows in the Colorado River system is complex.  A decrease in river flows can affect different nonnative (and native) species in different ways and produce contrasting results.  Although Gido and Propst (2012) found that most nonnative fishes were more abundant after extended low summer flows in the San Juan River, the abundance of channel catfish, the most problematic and numerically dominant nonnative predator in the system, did not correlate with low summer flows.  In contrast with smallmouth bass, northern pike and largemouth bass abundance in Upper Colorado River Basin rivers appears to increase following high water events; this may be due to the earlier and extended connection of floodplain habitats, possibly facilitating reproduction or access to the river from habitats that were formerly disconnected from the mainstem (Whitledge et al. 2007). Bestgen (et al. 2007b) found that increases in flows and a reduction in water temperatures (from Flaming Gorge Dam releases) likely disadvantage smallmouth bass but may prove advantageous for nonnative white suckers.  Gaining a better understanding of the influence of flows/discharge on water temperature and habitat inundation or connection in relation to reproduction, recruitment, growth, dispersal, and abundance of nonnative fishes is recommended as a "high priority" under the Upper Colorado River Basin Nonnative and Invasive Aquatic Species Prevention and Control Strategy (Martinez et al. 2014).

Given the relatively small reductions in water volume in rivers within the action area associated with *project-related* water depletions, the changes in flows through occupied and critical habitats would be small.  As explained above, none of the large rivers containing critical habitat for the endangered fishes would experience reduced flow by more than one percent, even during the base flow period when project-related water depletions would constitute a larger proportion of the river volume than during higher flows.  The largest potential flow reduction in terms of percent flow would be a reduction of 0.64 percent to the Yampa River during fall base flows. Augmentation plans, as explained above, would prevent flows from being further reduced and recommended flow levels for the endangered fish should be able to be met.  These small flow reductions could lead to a small benefit to certain nonnative fish, such as smallmouth bass, red shiners, and fathead minnows.  This small benefit to nonnative fish equates to a small disadvantage to all of the endangered fish.  We do not expect the negative effects of the project to endangered fish to be substantial, however, given: 1) the relatively small magnitude of

64

BLM_0072216

project-related water depletions, 2) the ability of flows to be regulated by dam releases upstream from most occupied and critical habitats, along with flow targets and agreements to benefit the endangered fish within the action area (Green, Yampa, Colorado, and Gunnison rivers, but not the White River), and 3) the contrasting effects to different nonnative species of altered river flows, along with some level of uncertainty as to the net effect of changed flows on the nonnative fish assemblage.

**Cumulative Effects**

Cumulative effects include the effects of future State, Tribal, local, or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act.

Reasonably foreseeable future activities that may affect river-related resources in the area include oil and gas exploration and development, irrigation, urban development, recreational activities, and industrial development. Implementation of these projects may affect both water quantity and quality. It is reasonable to expect that these activities and the associated impacts are likely to intensify in the foreseeable future on private, state, and other non-federal lands within the state. Colorado's human population is predicted to nearly double by 2050 which will require increased municipal water use. Data in the Colorado Water Plan (2015), suggest the Green, Yampa, and White River Basins' municipal and industrial water demands will increase by between 34,000 and 95,000 af/yr (approximately 2% of annual flow) by 2050, depending on the rate of population growth. By 2050, municipal and industrial water demand in the Gunnison River basin is projected to increase between 16,000 and 23,000 af/yr (less than 1 percent of annual flow) with passive conservation included. The Colorado River Basins' municipal and industrial water demands are anticipated to increase by 65,000 – 110,000 AF by 2050 depending on population growth. The Southwest basins, which include the Dolores River basin, are expected to have municipal and industrial water needs of an additional 20,000 – 31,000 AF by 2050.

BLM_0072217