OCS Oil and Natural Gas:  Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon



**Figure 4.  Estimated GHG emissions for the 2017–2022 Proposed Program (*left*) and No Action Alternative (*right*) where oil and gas is recovered from other sources, including substitution of other sources of energy such as coal. Emissions are distributed over time in thousands of metric tons of $CO_2e$.**

BLM_0075607

The United States has pledged to reduce emissions by filing an INDC with the United Nations as part of the Paris Agreement (See Section 3 and Table 3-1).  Tables 8-2 and 8-3 provide a comparison of the U.S. GHG reduction commitments to the estimated OCS oil and gas lifecycle emissions for the high- and low-price scenarios in those specific years.  Since the 2017-2022 Program did not exist in 2005 and 2014, these lines are blank, but are included to show both the base year (2005) for measuring U.S. GHG emission commitments and the most recent U.S. GHG inventory available (2014), respectively.  The percentages illustrate the proportion of the total U.S. GHG commitments that would be represented by OCS-related emissions if the BOEM production scenarios are ultimately realized.

**Table 8-2.  Estimated Emissions from the 2017–2022 Proposed Program and the No Action Alternative in Thousands of Metric Tons of $CO_2e$**

| Year | U.S. GHG Commitment[a] | Low-Price Scenario | | | | High-Price Scenario | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Proposed Program[d] | | No Action Alternative | | Proposed Program[d] | | No Action Alternative | |
| | | $CO_2e$ | % | $CO_2e$ | % | $CO_2e$ | % | $CO_2e$ | % |
| 2005[b] | 6,680,300 | – | – | – | – | – | – | – | – |
| 2014[b] | 6,108,000 | – | – | – | – | – | – | – | – |
| 2020 | 5,544,649 | 2,030 | 0.05 | 1,660 | 0.03 | 5,880 | 0.11 | 5,040 | 0.09 |
| 2025 | 4,943,422 | 23,930 | 0.48 | 24,180 | 0.49 | 60,240 | 1.22 | 59,890 | 1.21 |
| | 4,809,816 | | 0.50 | | 0.50 | | 1.25 | | 1.25 |
| 2050[c] | 1,336,060 | 13,820 | 1.03 | 13,808 | 1.03 | 167,210 | 12.52 | 170,700 | 12.78 |

Notes:  Estimates are rounded to the nearest 10,000 metric tons.  Percentage refers to the percent of U.S. Commitment.
[a] U.S. commitments in later years assume many changes in policy, many of which have not yet fully formulated; in contrast, the 2017-2022 Program does not take into account any future policy, or other changes that could assist the U.S. achieve those commitments that has not yet been implemented.
[b] The U.S. commitments column shows historical data for 2005, which shows the base year for U.S. GHG reduction commitments, and 2014, which shows the most recent U.S. GHG emissions inventory.
[c] Meeting these commitments is expected to require substantial changes in the U.S. energy market.  These changes could reduce the amount of oil and gas being produced or GHG emissions from OCS production, and consequently reduce the amount of $CO_2e$ emissions released from the consumption of OCS resources.  This table does not account for such changes, as BOEM lacks the necessary information about specific policies not yet fully formulated.
[d] This includes all program areas, including the Arctic leases.  Under the low-price scenario, there is no Artic production, but under the high-price scenario, Arctic emissions represent approximately 50 percent of the Program's emissions.

However, it is critical to acknowledge that meeting the U.S. commitment for 2050 is expected to require substantial future changes in Government policies to reduce domestic oil and gas demand, most of which have yet to be fully formulated.  In contrast, the emissions estimates for the 2017–2022 Program do not take into account such future policies or other changes[2] that could assist the U.S. in meeting its commitments.  Since new Government policies could take a variety of forms, it is difficult to assess how they would affect OCS production.  As specific policies are adopted, it would become possible to adapt the model to account for these changes.  See Section 7 for information on assumptions made about future demand.

---

[2] Transformative technological changes (e.g., rapid U.S. consumer adoption of electric vehicles) also have the potential to contribute to meeting U.S. emissions targets.  Such changes, if realized, are likely to be driven by some combination of market forces and Government actions.

BLM_0075608

OCS Oil and Natural Gas:  Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon

Table 8-3.  Estimated Emissions from the 2017–2022 Proposed Final Program in Thousands of Metric Tons of $CO_2e$

| Year | U.S. GHG Commitment[a] | Low-Price Scenario: Proposed Final Program[d] | | High-Price Scenario: Proposed Final Program[d] | |
|---|---|---|---|---|---|
| | | $CO_2e$ | % | $CO_2e$ | % |
| 2005[b] | 6,680,300 | – | – | – | – |
| 2014[b] | 6,108,000 | – | – | – | – |
| 2020 | 5,544,649 | 2,030 | 0.05 | 5,880 | 0.11 |
| 2025 | 4,943,422 | 23,910 | 0.48 | 56,870 | 1.15 |
| | 4,809,816 | | 0.50 | | 1.18 |
| 2050[c] | 1,336,060 | 13,820 | 1.03 | 45,160 | 3.38 |

Notes:  Estimates are rounded to the nearest 10,000 metric tons.  Percentage refers to the percent of U.S. Commitment.
[a] U.S. commitments in later years assume many changes in policy, many of which have not yet fully formulated; in contrast, the 2017-2022 Program does not take into account any future policy, or other changes that could assist the U.S. achieve those commitments that has not yet been implemented.
[b] The U.S. commitments column shows historical data for 2005, which shows the base year for U.S. GHG reduction commitments, and 2014, which shows the most recent U.S. GHG emissions inventory.
[c] Meeting these commitments are expected to require substantial changes in the U.S. energy market.  These changes could reduce the amount of oil and gas being produced or GHG emissions from OCS production, and consequently reduce the amount of $CO_2e$ emissions released from the consumption of OCS resources.  This table does not account for such changes, as BOEM lacks the necessary information about specific policies not yet fully formulated.
[d] The Proposed Final Program only includes lease sales in the Gulf of Mexico and Cook Inlet Program Areas, excluding lease sales in the Artic Program Areas.

The proportion of emissions from oil and gas is also not constant across the different price cases (see Figure 5).  Under the high-price scenario, the GHGs emitted from onshore processing and consumption of oil is proportionally higher relative to gas compared to the low-price scenario.

### 8.1.2    Social Cost of Carbon from the 2017–2022 Program

To calculate a present value of the stream of monetary values, BOEM discounted the values for the 2017–2022 Program in each of the four cases using the specific discount rate that had been used to obtain the SC-$CO_2$ in each case.  Tables 8-4, 8-5, and 8-6 provide these net present value results for the Program and No Action Alternative cases for each of the three price scenarios[3].

---

[3] In the Proposed Program and Proposed Final Program, BOEM analyzes three different price scenarios:  low-, mid-, and high-prices.  The low-price scenario is $40/barrel of oil and $2.13/thousand scf of natural gas.  The mid-price scenario is $100/barrel of oil and $5.35/thousand scf of natural gas.  The high-price scenario is $160/barrel of oil and $8.54/thousand scf of natural gas.  All price scenarios represent a constant, inflation-adjusted price throughout the life of the 2017-2022 Program.

BLM_0075609

OCS Oil and Natural Gas:  Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon



Figure 5.  Estimated $CO_2e$ Emissions by Source for the 2017–2022 Proposed Program (*left*) and the No Action Alternative (*right*), as a Percent of Total.  The Offshore Production category includes operations occuring on the OCS, which produce oil and gas.  The Oil, Gas, and Coal Consumption categories only include emissions from the final consumption of the resource.  These ratios represent the Proposed Program, which includes the Arctic lease sales.  The Proposed Final Program does not include Arctic lease sales.

BLM_0075610

OCS Oil and Natural Gas:  Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon

**Table 8-4.  SC-CO$_2$ Results for the Low-Price Scenario in Dollars**

| Social Cost of Carbon for Program and No Action Alternative (Low-Price Case) | | | |
|---|---|---|---|
| **Discount Rate** | **$ billions** | | |
| | **Program Area** | **Program** | **NAA** | **Net Difference** |
| **5.0%** | Beaufort Sea | 0.00 | 0.00 | 0.00 |
| | Chukchi Sea | 0.00 | 0.00 | 0.00 |
| | Cook Inlet | 0.34 | 0.34 | -0.01 |
| | Gulf of Mexico | 10.10 | 10.20 | -0.10 |
| | *Total Proposed Program* | *10.44* | *10.55* | *-0.11* |
| | *Total Proposed Final Program* | *10.44* | * | * |
| **3.0%** | Beaufort Sea | 0.00 | 0.00 | 0.00 |
| | Chukchi Sea | 0.00 | 0.00 | 0.00 |
| | Cook Inlet | 1.46 | 1.49 | -0.02 |
| | Gulf of Mexico | 44.54 | 45.00 | -0.46 |
| | *Total Proposed Program* | *46.01* | *46.49* | *-0.48* |
| | *Total Proposed Final Program* | *46.01* | * | * |
| **2.5%** | Beaufort Sea | 0.01 | 0.00 | 0.01 |
| | Chukchi Sea | 0.00 | 0.00 | 0.00 |
| | Cook Inlet | 2.29 | 2.32 | -0.04 |
| | Gulf of Mexico | 70.00 | 70.73 | -0.72 |
| | *Total Proposed Program* | *72.30* | *73.05* | *-0.75* |
| | *Total Proposed Final Program* | *72.29* | * | * |
| **3.0% 95th Percentile** | Beaufort Sea | 0.01 | 0.00 | 0.01 |
| | Chukchi Sea | 0.00 | 0.00 | 0.00 |
| | Cook Inlet | 4.45 | 4.53 | -0.07 |
| | Gulf of Mexico | 135.69 | 137.10 | -1.41 |
| | *Total Proposed Program* | *140.16* | *141.63* | *-1.47* |
| | *Total Proposed Final Program* | *140.15* | * | * |

Key:  * = The estimated distribution (%) of substitutions for the Proposed Final Program would be slightly different than those under the Proposed Program.  The gross emissions estimates should be similar to the No Action Alternative under the Proposed Program.

BLM_0075611

OCS Oil and Natural Gas:  Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon

**Table 8-5.  SC-CO$_2$ Results for the Mid-Price Scenario in Dollars**

| Social Cost of Carbon for Program and No Action Alternative (Mid-Price Case) | | | | |
|---|---|---|---|---|
| Discount Rate | $ billions | | | |
| | Program Area | Program | NAA | Net Difference |
| 5.0% | Beaufort Sea | 7.76 | 7.99 | -0.23 |
| | Chukchi Sea | 8.52 | 8.86 | -0.34 |
| | Cook Inlet | 0.80 | 0.83 | -0.02 |
| | Gulf of Mexico | 18.32 | 18.65 | -0.33 |
| | *Total Proposed Program* | *35.76* | *36.33* | *-0.93* |
| | *Total Proposed Final Program* | *19.12* | * | * |
| 3.0% | Beaufort Sea | 38.08 | 39.20 | -1.13 |
| | Chukchi Sea | 39.97 | 41.51 | -1.55 |
| | Cook Inlet | 3.54 | 3.64 | -0.10 |
| | Gulf of Mexico | 81.15 | 82.61 | -1.46 |
| | *Total Proposed Program* | *162.73* | *166.97* | *-4.24* |
| | *Total Proposed Final Program* | *84.69* | * | * |
| 2.5% | Beaufort Sea | 61.44 | 63.25 | -1.81 |
| | Chukchi Sea | 63.68 | 66.13 | -2.45 |
| | Cook Inlet | 5.54 | 5.70 | -0.16 |
| | Gulf of Mexico | 127.64 | 129.93 | -2.29 |
| | *Total Proposed Program* | *258.30* | *265.01* | *-6.70* |
| | *Total Proposed Final Program* | *133.18* | * | * |
| 3.0% 95th Percentile | Beaufort Sea | 117.01 | 120.47 | -3.46 |
| | Chukchi Sea | 122.56 | 127.30 | -4.74 |
| | Cook Inlet | 10.79 | 11.10 | -0.31 |
| | Gulf of Mexico | 247.35 | 251.81 | -4.46 |
| | *Total Proposed Program* | *497.70* | *510.67* | *-12.97* |
| | *Total Proposed Final Program* | *258.14* | * | * |

Key:  * = The estimated distribution (%) of substitutions for the Proposed Final Program would be slightly different than those under the Proposed Program.  The gross emissions estimates should be similar to the No Action Alternative under the Proposed Program.

BLM_0075612

OCS Oil and Natural Gas:  Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon

**Table 8-6.  SC-CO$_2$ Results for the High-Price Scenario in Dollars**

| Social Cost of Carbon for Program and No Action Alternative (High-Price Case) | | | | |
|---|---|---|---|---|
| Discount Rate | $ billions | | | |
| | Program Area | Program | NAA | Net Difference |
| 5.0% | Beaufort Sea | 12.49 | 12.80 | -0.31 |
| | Chukchi Sea | 12.04 | 12.49 | -0.45 |
| | Cook Inlet | 1.26 | 1.29 | -0.03 |
| | Gulf of Mexico | 30.49 | 30.53 | -0.05 |
| | *Total Proposed Program* | *56.27* | *57.11* | *-0.84* |
| | *Total Proposed Final Program* | *31.75* | * | * |
| 3.0% | Beaufort Sea | 60.78 | 62.17 | -1.39 |
| | Chukchi Sea | 59.18 | 61.36 | -2.18 |
| | Cook Inlet | 5.58 | 5.72 | -0.14 |
| | Gulf of Mexico | 135.08 | 135.32 | -0.24 |
| | *Total Proposed Program* | *260.63* | *264.57* | *-3.94* |
| | *Total Proposed Final Program* | *140.66* | * | * |
| 2.5% | Beaufort Sea | 98.07 | 100.25 | -2.18 |
| | Chukchi Sea | 95.59 | 99.09 | -3.49 |
| | Cook Inlet | 8.78 | 8.99 | -0.22 |
| | Gulf of Mexico | 212.48 | 212.86 | -0.37 |
| | *Total Proposed Program* | *414.93* | *421.19* | *-6.26* |
| | *Total Proposed Final Program* | *221.36* | * | * |
| 3.0% 95th Percentile | Beaufort Sea | 186.58 | 190.81 | -4.23 |
| | Chukchi Sea | 181.86 | 188.55 | -6.69 |
| | Cook Inlet | 17.05 | 17.47 | -0.42 |
| | Gulf of Mexico | 411.75 | 412.50 | -0.75 |
| | *Total Proposed Program* | *797.25* | *809.33* | *-12.09* |
| | *Total Proposed Final Program* | *428.80* | * | * |

Key:  * = The estimated distribution (%) of substitutions for the Proposed Final Program would be slightly different than those under the Proposed Program.  The gross emissions estimates should be similar to the No Action Alternative under the Proposed Program.

BLM_0075613

OCS Oil and Natural Gas:  Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon

## 8.2    EMISSIONS FROM THE 2012–2017 PROGRAM

This case evaluates the oil and gas emissions of leases awarded, or to be awarded, during the current (2012–2017) program.  Additionally, the original projections for the current program have been adjusted based on the lower levels of leasing activity witnessed through actual lease sale results and in light of recent market conditions (see Section 6.2).  The original projections and the adjusted projections were both analyzed and are provided in Table 8-7.  Note that this analysis is a subset of the oil and gas leases discussed in Sections 6.3 and data output provided in Section 8.3.

Table 8-7.  Estimated Emissions from the Current 2012–2017 Program in Thousands of Metric Tons of $CO_2$e

| Area | Low-Price Scenario | | High-Price Scenario | |
|---|---|---|---|---|
| | Original Current Program | Adjusted Current Program | Original Current Program | Adjusted Current Program |
| Cook Inlet | 43,960 | 43,960 | 127,370 | 127,370 |
| Gulf of Mexico | 1,969,160 | 984,580 | 3,777,740 | 1,888,870 |
| Total | 2,013, 120 | 1,028,540 | 3,905,110 | 2,016,240 |

Notes:  Estimates are rounded to the nearest 10,000 metric tons.  Numbers may not add up due to rounding.

## 8.3    EMISSIONS FROM LEASES ISSUED BEFORE THE END OF 2017

This case includes emissions from the beginning of 2017, considering the oil and gas emissions of all leases awarded before the end of 2017 (see Section 6.3), but only the oil and gas not yet produced as of the start of 2017.  Although OCS leases are already issued, or will be by the end of 2017, the emissions analyzed here have yet to occur.  This analysis includes existing leases from all OCS planning areas with active leases, including the GOM, Alaska, and Southern California (see Table 8 8).

Table 8-8.  Estimated Emissions from OCS Leases Potentially Issued before December 2017 for the Oil and Gas Not Yet Produced in Thousands of Metric Tons of $CO_2$e

| | EIA's Low Oil Price Case | EIA's Reference Case | EIA's High Oil Price Case |
|---|---|---|---|
| Total | 9,387,360 | 10,238,460 | 10,718,460 |

Note:  Estimates are rounded to the nearest 10,000 metric tons.

Figure 6 shows how the proportion of emissions from oil and gas activities fluctuates for each different EIA oil price case.  The proportion of GHG emissions for this scenario is relatively consistent even as prices change.  Table 8-9 provides a comparison of the U.S. GHG reduction commitments to the estimated OCS oil and gas lifecycle emissions for EIA's Low and High Oil Price cases in the years identified for U.S. GHG emissions goals.

BLM_0075614

OCS Oil and Natural Gas:  Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon



Figure 6.  Estimated $CO_2e$ Emissions by Source for Leases Issued Before the End of 2017 as a Percent of the Total. The Offshore Production category includes operations occuring on the OCS, which produce oil and gas.  The Oil and Gas Consumption categories only include emissions from the final consumption of the resource.

BLM_0075615

**Table 8-9.  Estimated Emissions from all Leases Issued before the End of 2017 in Thousands of Metric Tons of $CO_2e$**

| Year | U.S. GHG Commitment[a] | EIA's Low Oil Price Case | | EIA's Reference Case | | EIA's High Oil Price Case | |
|---|---|---|---|---|---|---|---|
| | | $CO_2e$ | % | $CO_2e$ | % | $CO_2e$ | % |
| 2005[b] | 6,680,300 | – | – | – | – | – | – |
| 2014[b] | 6,108,000 | – | – | – | – | – | – |
| 2020 | 5,544,649 | 382,320 | 6.90 | 387,960 | 7.00 | 397,540 | 7.17 |
| 2025 | 4,943,422 | 305,900 | 6.19 | | 6.64 | | 7.14 |
| | 4,809,816 | | 6.36 | 328,090 | 6.82 | 353,020 | 7.34 |
| 2050[c] | 1,336,060 | 106,850 | 8.00 | 129,100 | 9.66 | 133,220 | 9.97 |

Notes:  Estimates are rounded to the nearest 10,000 metric tons.  Percent refers to the percent of U.S. commitment.

[a] U.S. commitments in later years assume many changes in policy, many of which have not yet fully formulated; in contrast, the 2017-2022 program does not take into account any future policy, or other changes that could assist the U.S. achieve those commitments which has not yet been implemented.

[b] U.S. commitments column shows historical data for 2005, which shows the base year for U.S. GHG reduction commitments, and 2014 which shows the most recent U.S. GHG inventory.

[c] Meeting these commitments are expected to require substantial changes in the U.S. energy market. These changes may reduce the amount of oil and gas being produced or GHG emissions from OCS production, and consequently reduce the amount of $CO_2e$ emissions released from the consumption of OCS resources. This table does not account for such changes, as BOEM lacks the necessary information about specific policies not yet fully formulated.

## 8.4    OCS EMISSIONS COMPARED TO THE GLOBAL AND DOMESTIC CARBON BUDGETS

By combining expected GHG emissions from past OCS program leasing and those being considered under the 2017–2022 Proposed Final Program, it is possible to describe the potential, incremental use of the remaining global and domestic $CO_2e$ emissions budget.  It is important to note that the 2017-2022 Proposed Final Program excludes Arctic OCS leasing.

Table 8-10 uses estimates in  McGlade and Ekins (2015), Peters et al. (2015), Gignac and Mathews (2015), IPCC's (2014) Climate Change Synthesis Report, and the International Energy Agency (2015) to estimate the contribution of OCS leasing to the remaining GHG emissions that could be released without exceeding 2°C increase in global temperatures.  Since the Program and its substitution emissions are comparable at the scale of consideration, a single table is presented representing both cases.  The results show the potential for a meaningful incremental contribution of OCS oil and gas to the remaining global and domestic GHG emissions possible without exceeding 2°C of worldwide warming.  The GHG emissions expected to be released after that date are shown in a separate column.

The estimates for global $CO_2e$ emissions not leading to an exceedance of 2°C global temperature increase are in the neighborhood of 1 trillion metric tons, ranging from 768 to 1,180 billion metric tons. BOEM expects emissions from OCS leases already issued, combined with 2017–2022 Proposed Final Program to consume between 0.5 and 1 percent of the remaining global emissions budget.  If all Arctic

BLM_0075616

OCS Oil and Natural Gas:  Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon

program areas were considered, between 0.5–2 percent of the budget would be consumed.  Two analyses allocate a U.S. share of future global $CO_2e$ emissions not leading to an exceedance of 2°C, placing the budgeted U.S. amount between 34 and 123 billion metric tons.  BOEM estimates that OCS leases already issued, combined with emissions from 2017–2022 program leases, would consume between 1 and 9 percent of the total U.S. budget.  However, there is a considerable amount of uncertainty in estimating these kinds of national emissions budgets given the wide range presented in McGlade and Ekins (2015) and Peters et al. (2015) studies.  The estimates from the two studies have an end date of 2050, beyond which only a small amount of additional emissions could be emitted.  BOEM's contribution to these additional emissions is listed separately in Table 8-10.

Table 8-10.  Emissions from the 2017–2022 Proposed Final Program and Active Leases Issued Before the End of 2017 Compared to Various Carbon Budget Analyses

| Carbon Budget Analysis | Timescale | Global Emissions Budget | | U.S. Emissions Budget | | Post-2050 Emissions |
|---|---|---|---|---|---|---|
| | Years | Billion Metric Tons | Percent Consumed[c] | Billion Metric Tons | Percent Consumed[c] | Billion Metric Tons |
| Using $CO_2e$ | | | | | | |
| McGlade and Ekins (2015)[a] | 2011-2050 | 1,100 | 0.1 - 0.3% | – | – | 0.072– 1 |
| Gignac and Mathews (2015)[a] | 2014-onward | 1,000 | 0.1 - 0.4% | 78 – 97 | 1- 5% | – |
| IPCC (2014)[a,b] | 2011-onward | 1,000 | 0.1 - 0.4% | – | – | – |
| IEA (2015)[a] | 2014-onward | 880 – 1180 | 0.1 - 0.5% | – | – | – |
| Using $CO_2$ only | | | | | | |
| Peters et al. (2015)[a] | 2015 – 2050 | 765 | 0.2 - 0.4% | 34 – 123 | 1 – 9% | 0.071 – 1 |

Notes:  The carbon budget analyses reflect the amount of carbon that can be released without causing warming of more than 2°C.  The percent range covers EIA's Low and High Oil Price cases.

[a] Meeting these commitments is expected to require substantial changes in the U.S. energy market.  These changes could reduce the amount of oil and gas being produced or GHG emissions from OCS production, and consequently reduce the amount of $CO_2e$ emissions released from the consumption of OCS resources.  This table does not account for such changes, as BOEM lacks the necessary information about specific policies not yet fully formulated.

[b] Uses the Complex Model with 66 percent certainty.

[c] To provide the full range of possible outcomes, when a range is provided in the Global and U.S. Emissions Budget columns, the Low Case Budget is compared to the High Case OCS lifecycle emissions, and the High Case Budget is compared to the Low Case OCS lifecycle emissions scenario.

[d] The Peters et al. (2015) paper only evaluated the $CO_2$ emissions, and so it is compared to only OCS $CO_2$ emissions.

BLM_0075617

# 9. Conclusion

In each price case, and in each scenario for the 2017–2022 Program, U.S. GHG emissions would be slightly higher if BOEM were to have no lease sales, assuming no major market or policy changes. However, the margin is small, and uncertainties in the assumptions could account for the difference, even though assumptions used in analyzing the Proposed Program and the No Action Alternative were the same. Emissions from substitutions are higher due to the exploration, development, production, and transportation of oil from international sources being more carbon-intensive. Even so, the majority of GHG emissions are a result of oil and gas product consumption. As reflected in the analysis, the emissions and associated social costs from the Proposed Program and the No Action Alternative are relatively similar, in large part due to the assumed substitution of more GHG-intensive oil and gas sources in the absence of a new OCS leasing program.

In addition, the estimates for the 2017–2022 Program do not take into account any future policy or technological adaptations; therefore, the U.S. GHG emissions originating from OCS production become proportionately larger if U.S. commitments to reduce GHG emissions are achieved. Similarly, the cumulative effect of OCS emissions consumes a meaningful increment of the remaining worldwide and domestic GHG emissions budget. Assuming policies, regulations, and other factors to reduce GHG emissions continue to be implemented, these changes would affect the production and consumption of oil and gas, produced on the OCS in similar ways to energy produced elsewhere.

Future changes in climate or other policies, supply and demand, shifting economic circumstances, or technological advances could substantially affect the assumptions and results of this analysis. Such changes could affect the GHG emissions from each scenario, price case, and the No Action Alternative for the 2017–2022 Program.

BLM_0075618

# 10.  References

Bureau of Economic Analysis (BEA).  2016.  National Income and Product Accounts.  Available online at http://www.bea.gov/newsreleases/national/gdp/gdpnewsrelease.htm.  Accessed August 30, 2016.

Bureau of Ocean Energy Management (BOEM).  2016a.  Final Programmatic EIS for 2017-2022 OCS Oil and Gas Program.  Available online at http://www.boemoceaninfo.com.

BOEM.  2016b.  Assessment of Undiscovered Technically Recoverable Oil and Gas Resources of the Nation's Outer Continental Shelf, 2016.  Available online at http://www.boem.gov/National-Assessment-of-Oil-and-Gas-Resources-2016/.

BOEM.  2016c.  Final Economic Analysis Methodology Report.  Available online at http://www.boem.gov.

BOEM.  2015a.  Forecasting Environmental and Social Externalities Associated with Outer Continental Shelf Oil and Gas Development – Volume 1:  The 2015 Revised Offshore Environmental Cost Model.  Prepared by: Industrial Economics, Inc.; Applied Sciences Associates, Inc.; Northern Economics; Dr. Nicholas Z. Muller; and SC&A, Inc. OCS Study BOEM 2015-052.

BOEM.  2015b.  Forecasting Environmental and Social Externalities Associated with Outer Continental Shelf Oil and Gas Development – Volume 2:  Supplemental Information to the 2015 Revised OCEM. Prepared by: Industrial Economics, Inc.; and SC&A, Inc. OCS Study BOEM 2015-053.

BOEM.  2014.  Gulfwide Offshore Activity Data System.  Available online at http://www.boem.gov/Gulfwide-Offshore-Activity-Data-System-GOADS/.  Accessed May 10, 2016.

BOEM.  2012.  Final Programmatic EIS for 2012-2017 OCS Oil and Gas Program.  Available online at http://www.boem.gov/5-year/2012-2017/PEIS/.

BOEM.  2011.  Assessment of Undiscovered Technically Recoverable Oil and Gas Resources of the Nation's Outer Continental Shelf, 2011.  Available online at http://www.boem.gov/National-Assessment-of-Oil-and-Gas-Resources-2011/.  Accessed October 31, 2016.

Energy Information Administration (EIA).  2016a.  Natural Gas Consumption by End Use.  Available online at https://www.eia.gov/dnav/ng/ng_cons_sum_dcu_nus_a.htm.  Accessed May 16, 2016.

EIA.  2016b.  Petroleum Products Supplied by Type.  Available online at http://www.eia.gov/totalenergy/data/monthly/pdf/sec3_15.pdf.  Accessed May 16, 2016.

EIA.  2016c.  2016 Annual Energy Outlook.  Available online at http://www.eia.gov/forecasts/aeo/.  Accessed August 31, 2016.

EIA.  2016d.  U.S. Refinery Net Input.  Available online at http://www.eia.gov/opendata/qb.cfm?sdid=PET.WCRRIUS2.W.  Accessed September 8, 2016.

BLM_0075619

OCS Oil and Natural Gas:  Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon

EIA.  2016e.  How much petroleum does the United States import and export?  Available online at http://www.eia.gov/tools/faqs/faq.cfm?id=727&t=6.  Accessed September 15, 2016.

EIA.  2015.  Refining Crude Oil.  Available online at http://www.eia.gov/energyexplained/ index.cfm?page=oil_refining#tab3.  Accessed May 17, 2016.

EIA.  2014.  NEMS Model Documentation.  Available online at https://www.eia.gov/forecasts/ aeo/nems/documentation/.

EIA.  2012.  Non-Combustion Use of Fossil Fuels 1980-2011.  Available online at https://www.eia.gov/ totalenergy/data/annual/showtext.cfm?t=ptb0115.  Accessed May 13, 2016.

EIA.  2009.  The National Energy Modeling System: An Overview 2009.  Available online at http://www.eia.gov/forecasts/archive/0581(2009).pdf.  Accessed August 30, 2016.

Environmental Protection Agency (EPA).  2016a.  Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990 – 2014.  Available online at https://www3.epa.gov/climatechange/Downloads/ ghgemissions/US-GHG-Inventory-2016-Main-Text.pdf.  Accessed August 31, 2016.

EPA.  2016b.  Understanding Global Warming Potentials.  Available online at https://www.epa.gov/ ghgemissions/understanding-global-warming-potentials.  Accessed August 31, 2016.

EPA.  2015.  Emission Factors for Greenhouse Gas Inventories.  Available online at https://www.epa.gov/ sites/production/files/2015-12/documents/emission-factors_nov_2015.pdf.  Accessed May 13, 2016.

EPA.  2008.  Compilation of Air Pollutant Emission Factors, Publication AP-42, Section 5.2 Transportation and Marketing of Petroleum Liquids.  Available online at www.epa.gov/ttnchie1/ap42.  Office of Air Quality Planning and Standards, Research Triangle Park, NC.

Gignac, R. and H. D. Mathews.  2015.  Allocating a 2°C Cumulative Carbon Budget to Countries, Environmental Research Letters, vol. 10, issue 7, 075004.

Goldfuss, C.  2016.  Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews, Council for Environmental Quality.  Available online at https://www.whitehouse.gov/sites/whitehouse.gov/files/documents/nepa_final_ghg_guidance. pdf.  Accessed August 1, 2016.

Gordon, D. et al.  2015.  Know your Oil.  Carnegie Endowment for International Peace.  Available online at http://carnegieendowment.org/files/know_your_oil.pdf.  Accessed October 31, 2016.

Hansen, J. et al.  2016.  Ice melt, sea level rise and superstorms: evidence from paleoclimate data, climate modeling, and modern observations that 2oC global warming could be dangerous. Atmospheric Chemistry and Physics.  Available online at http://www.atmos-chem- phys.net/16/3761/2016/acp-16-3761-2016.pdf.  Accessed May 12, 2016.

BLM_0075620

Industrial Economics, Inc., 2015.  Consumer Surplus and Energy Substitutes for OCS Oil and Gas Production: The 2015 Revised Market Simulation Model (MarketSim).  OCS Study BOEM 2015-054.

Interagency Working Group on Social Cost of Greenhouse Gases (IWG).  2016.  Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866.  Available online at https://www.whitehouse.gov/sites/ default/files/omb/inforeg/scc_tsd_final_clean_8_26_16.pdf.  Accessed August 30, 2016.

Intergovernmental Panel on Climate Change (IPCC).  2014.  Climate Change 2014: Synthesis Report. Contribution of Working Groups I, II and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change [Core Writing Team, R.K. Pachauri and L.A. Meyer (eds.)].  IPCC, Geneva, Switzerland, 151 pp.

International Energy Agency (IEA).  2015.  Energy and Climate Change, Paris, France.  pp. 200.

McGlade, C. and P. Ekins.  2015.  The geographical distribution of fossil fuels unused when limiting global warming to 2°C.  Nature, vol. 517, issue 7533, pp. 187-193.

Nykvist B. and M. Nilsson.  2015.  Rapidly falling costs of battery packs for electric vehicles.  Nature Climate Change, vol. 5, issue 4, pp. 329-332.

Peters, G., R. Andrew, S. Solomon and P. Friedlingstien.  2015.  Measuring a fair and ambitious climate agreement using cumulative emissions.  Environmental Research Letters, vol. 10, issue 10, 105004.

United Nations Framework Convention on Climate Change (UNFCC).  2016.  Paris Agreement.  Available online at http://unfccc.int/files/essential_background/convention/application/pdf/ english_paris_agreement.pdf.

United States Global Change Research Program (USGCRP).  2014.  Climate Change Impacts in the United States.  Available online at http://nca2014.globalchange.gov.  Accessed October 31, 2016.

White House.  2013.  The President's Climate Action Plan.  Available online at https://www.whitehouse.gov/sites/default/files/image/president27sclimateactionplan.pdf. Accessed October 21, 2016.

White House.  2015.  FACT SHEET: U.S. Reports its 2025 Emissions Target to the UNFCCC.  Available online at https://www.whitehouse.gov/the-press-office/2015/03/31/fact-sheet-us-reports-its-2025-emissions-target-unfccc.  Accessed March 21, 2015.

BLM_0075621

OCS Oil and Natural Gas:  Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon

*This page intentionally left blank*

BLM_0075622

OCS Oil and Natural Gas:  Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon

# Appendix A – Additional Greenhouse Gas Emissions Tables

**Table A-1.  Estimated Emissions from Leases Issued before December 2017 for the Oil and Gas Not Yet Produced, in Thousands of Metric Tons Rounded to the Nearest 10,000**

|  | Low-Price Scenario | | | Mid-Price Scenario | | | High-Price Scenario | | |
|---|---|---|---|---|---|---|---|---|---|
|  | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2$ | $CH_4$ | $N_2O$ |
| Total | 9,183,490 | 7,350 | 70 | 10,010,160 | 8,270 | 70 | 10,476,900 | 8,760 | 80 |

Note:  Numbers may not add up due to rounding.

**Table A-2.  Estimated Emissions from the Current 2012–2017 Program in Thousands of Metric Tons Based on the Original Projections Rounded to the Nearest 10,000**

| Area | Low-Price Scenario | | | High-Price Scenario | | |
|---|---|---|---|---|---|---|
|  | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2$ | $CH_4$ | $N_2O$ |
| Cook Inlet | 43,260 | 20 | 0.4 | 124,070 | 120 | 0.8 |
| Gulf of Mexico | 1,905,540 | 2,400 | 10 | 3,656,330 | 4,570 | 20 |
| Total | 1,948,800 | 2,420 | 10 | 3,780,400 | 4,680 | 20 |

Note:  Numbers may not add up due to rounding.

**Table A-3.  Estimated Emissions from the Current 2012–2017 Program in Thousands of Metric Tons based on Revised Projections Rounded to the Nearest 10,000**

| Area | Low-Price Scenario | | | High-Price Scenario | | |
|---|---|---|---|---|---|---|
|  | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2$ | $CH_4$ | $N_2O$ |
| Cook Inlet | 43,260 | 20 | 0.4 | 124,070 | 120 | 0.8 |
| Gulf of Mexico | 996,030 | 1,200 | 6 | 1,828,170 | 2,290 | 10 |
| Total | 974,400 | 1,220 | 6 | 1,952,240 | 2,410 | 10 |

Note:  Numbers may not add up due to rounding.

BLM_0075623

OCS Oil and Natural Gas:  Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon

**Table A-4.  Estimated Emissions from the 2017–2022 Proposed Program in Thousands of Metric Tons Rounded to the Nearest 10,000**

| Area | Low-Price Scenario | | | Mid-Price Scenario | | | High-Price Scenario | | |
|---|---|---|---|---|---|---|---|---|---|
| | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2$ | $CH_4$ | $N_2O$ |
| **Beaufort Sea** | 120 | 0 | 0 | 1,055,980 | 600 | 10 | 1,944,570 | 1,450 | 10 |
| **Chukchi Sea** | 20 | 0 | 0 | 1,354,290 | 930 | 10 | 1,913,350 | 1,020 | 20 |
| **Cook Inlet** | 38,800 | 20 | 0.3 | 96,010 | 55 | 0.8 | 156,200 | 90 | 1 |
| **Gulf of Mexico** | 1,218,630 | 990 | 10 | 2,228,140 | 2,000 | 20 | 3,708,070 | 3,450 | 24 |
| **Total** | **1,257,570** | **1,010** | **10** | **4,734,420** | **3,600** | **30** | **7,720,190** | **6,010** | **54** |

Note:  Numbers may not add up due to rounding.

**Table A-5.  Estimated Emissions from the 2017–2022 Proposed Final Program, or Preferred Alternative in the Final Programmatic EIS, in Thousands of Metric Tons Rounded to the Nearest 10,000**

| Area | Low-Price Scenario | | | Mid-Price Scenario | | | High-Price Scenario | | |
|---|---|---|---|---|---|---|---|---|---|
| | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2$ | $CH_4$ | $N_2O$ |
| **Cook Inlet** | 38,800 | 20 | 0.3 | 96,010 | 55 | 0.8 | 156,200 | 90 | 1 |
| **Gulf of Mexico** | 1,218,630 | 990 | 10 | 2,228,140 | 2,000 | 20 | 3,708,070 | 3,450 | 24 |
| **Total** | **1,257,430** | **1,010** | **10** | **2,324,150** | **2,055** | **21** | **3,864,270** | **3,540** | **25** |

Note:  Numbers may not add up due to rounding.

**Table A-6.  Estimated Emissions from the 2017–2022 No Action Alternative in Thousands of Metric Tons Rounded to the Nearest 10,000**

| Area | Low-Price Scenario | | | Mid-Price Scenario | | | High-Price Scenario | | |
|---|---|---|---|---|---|---|---|---|---|
| | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2$ | $CH_4$ | $N_2O$ |
| **Beaufort Sea** | 0 | 0 | 0 | 1,073,360 | 1,840 | 10 | 1,913,510 | 3,380 | 10 |
| **Chukchi Sea** | 0 | 0 | 0 | 1,356,220 | 1,840 | 10 | 1,969,070 | 2,770 | 20 |
| **Cook Inlet** | 38,830 | 70 | 0.3 | 146,590 | 150 | 0.9 | 234,250 | 250 | 1 |
| **Gulf of Mexico** | 1,195,640 | 2,390 | 10 | 2,131,810 | 4,290 | 15 | 3,523,170 | 7,570 | 30 |
| **Total** | **1,234,480** | **2,460** | **10** | **4,751,510** | **8,130** | **40** | **7,636,860** | **13,980** | **60** |

Note:  Numbers may not add up due to rounding.

BLM_0075624

OCS Oil and Natural Gas:  Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon

# Appendix B – Unit Conversions

| Unit Conversions | |
|---|---|
| 1 kilogram (kg) | 1,000 metric tons |
| 1 metric ton | 0.907185 short tons |
| 1 barrel (bbl) | 42 gallons |
| 1 million barrels (MMbbl) | 1,000,000 barrels (bbl) |
| 1 thousand cubic feet (mcf) | 1,000 standard cubic feet (scf) |
| 1 million cubic feet (mmcf) | 1,000,000 standard cubic feet (scf) |
| 1 billion cubic feet (bcf) | 1,000,000,000 standard cubic feet (scf) |
| 1 barrel of oil equivalent (boe) | 5,620 standard cubic feet (scf) gas |

BLM_0075625

OCS Oil and Natural Gas:  Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon

*This page intentionally left blank*

BLM_0075626



# RANGE ECONOMICS

## John P. Workman

Scanned with CamScanner

BLM_0075627

# RANGE ECONOMICS

## JOHN P. WORKMAN

Department of Range Science
Utah State University

MACMILLAN PUBLISHING COMPANY
NEW YORK

Collier Macmillan Publishers
LONDON

Scanned with CamScanner

BLM_0075628

Copyright © 1986 by Macmillan Publishing Company
A division of Macmillan, Inc.

All rights reserved. No part of this book may be reproduced
or transmitted in any form or by any means, electronic or
mechanical, including photocopying, recording, or by any
information storage and retrieval system, without permission
in writing from the Publisher.

Macmillan Publishing Company
866 Third Avenue, New York, NY 10022

Collier Macmillan Canada, Inc.

Printed in the United States of America

printing number
1 2 3 4 5 6 7 8 9 10

Library of Congress Cataloging in Publication Data

Workman, John P.
    Range Economics

    (Biological resource management)
    Includes bibliographies and index.
    1. Rangelands—Economic Aspects.    2. Range
management.   I. Title.   II. Series.
HD1635.W67  1986      333.74      85-18882
ISBN 0-02-948810-9

Scanned with CamScanner



# BIOLOGICAL RESOURCE MANAGEMENT

A Series of Primers on the Conservation and Exploitation of Natural and Cultivated Ecosystems

Wayne M. Getz, Series Editor
University of California, Berkeley

*Available*
*Range Economics*, by John P. Workman

*Forthcoming in 1986*
*Adaptive Management of Renewable Resources*, by Carl Walters
*Building Models for Wildlife Management*, by Anthony Starfield and A. L. Bleloch
*Mathematical Programming for Economic Analysis in Agriculture*, by Peter B. R. Hazell and Roger D. Norton

**Scanned with CamScanner**



BLM_0075630



**Figure 9.3** Yield and Vegetation Composition.

preceding discussion, we determine that the expected usable annual air-dry forage production after improvement is 539 pounds per acre, an increase of 195 pounds.

Before this forage production increase can be valued in terms of either its direct market value or its potential contribution to livestock production, it must be converted to animal unit month (AUM) feed equivalents. An AUM may be defined as the amount of feed required per month by one animal unit (usually considered to be a 1000-pound cow or her equivalent) for maintenance and normal growth. According to the National Research Council (1970), a lactating 1000-pound cow requires an average of about 22 pounds of dry matter daily (or about 660-pounds air-dry usable forage per month).[8] Dividing the 195 pounds of additional forage per acre due to the prescribed burn by the 660 pounds required per AUM yields an estimated 0.30 additional AUM per acre or a total of 125 AUM for the 417-acre tract of Upland Loam.

## Value of Expected Benefits

Before being compared with project costs, the benefits expected from a range improvement must be converted to increased dollar returns. Numerous analytical techniques have been employed by researchers to value additional AUM of forage. These techniques fall into two general categories: (1) a simple

**Scanned with CamScanner**

approach seeking to value added AUM in terms of their direct market value and (2) a more complicated technique that attempts to estimate the value of increased livestock production made possible by additional AUM.

**Forage Value Based on Private Lease Rate**    Straightforward and much easier to use, the first technique is sufficiently accurate in some situations. Nielsen and Hinckley (1975), for example, valued increased AUM from sagebrush control at the current average private range lease rate. If a rancher is currently leasing private range and can avoid paying future lease fees through improvement of his own rangeland, this simple evaluation procedure is quite valid. Even the rancher who does not normally lease range from other owners usually has the opportunity to lease forage produced by range improvements to neighboring stockmen. Thus in our prescribed burning example the 0.30 additional AUM per acre annually might have been valued in 1980 at the average private lease rate of $8.00 per AUM (USDA, 1980) resulting in an added return of $2.40 per acre per year.[9]

A more complicated approach to calculating the average value of an added AUM has been used by Kearl (1975). All nonforage costs were subtracted from annual gross ranch income and the result divided by the total number of AUM of forage used by the operation annually. Kearl preferred this method to that of applying the average private lease rate, since the ranches he studied normally did not graze leased private rangeland.

An alternative to the two average value methods is based on the premise that due to crucial shortages of forage during certain seasons of the year, both the average lease value of an AUM and the amount of net income attributable to the average AUM have little meaning to some ranching operations (McCormick and Workman, 1975). Instead additional AUM that become available during a particular season, such as early spring, are valued in terms of avoided costs of purchased alternative feeds, such as hay. Again, if purchased hay is required in the current ranch operation and if hay purchases avoided are the only benefits resulting from a range improvement, this approach offers an accurate measure of forage value. However, in many ranching situations seasonal forage imbalance is sufficiently serious that there are forage surpluses in some seasons and forage shortages in others. Thus range improvements may make possible the use of a previously wasted surplus forage resource as well as provide cost savings through decreased requirements for purchased feeds. Use of previously surplus forage may allow expansion of the base herd and increased production of salable livestock. Similarly, alleviation of seasonal forage shortages may sufficiently improve the nutritional status of livestock to allow increased conception and birth rates and improved weaning weights. For these two reasons, the more complicated technique of valuing the contribution of additional forage to livestock production is often the only means of accurately accounting for total range improvement benefits. Cook et al. (1980) have used linear programming analysis to more precisely estimate the value of public land forage.

Scanned with CamScanner

148

## Forage Value Based on Livestock Production

*Seasonal Forage Balance*  Estimation of forage value due to increases in livestock production from range improvements requires an assessment of changes in livestock forage balance. The assessment begins with the construction of two charts. The first, called a forage or feed balance chart, is a tabular representation of monthly or seasonal availability of all sources and amounts of feed on the ranch; the second, the stock count chart, portrays the monthly feed requirements by class of livestock. Prior to construction of the necessary charts, all quantities of available and required feed must be converted to AUM. Suppose the available feeds for the 300 head cattle ranch of Chapter 4 are as shown in Table 9.1.[10] Barley commonly contains about 75 percent total digestible nutrients (TDN) and mixed meadow hay contains about 50 percent TDN. Combining this information with the rule of thumb that 400 pounds of TDN are required per AUM (American Institute of Real Estate Appraisers, 1972) and remembering that the average weight of barley is 48 pounds per bushel, the contribution of the barley is calculated to be

$$\frac{2000 \text{ bushels} \times 48 \text{ pounds} \times 0.75 \text{ TDN}}{400 \text{ pounds TDN/AUM}} = 180 \text{ AUM}.$$

Similarly, the meadow hay represents

$$\frac{784 \text{ tons} \times 2000 \text{ pounds} \times 0.5 \text{ TDN}}{400 \text{ pounds TDN/AUM}} = 1960 \text{ AUM}.$$

Now that all available feeds are expressed in terms of AUM we can begin to allocate the feed supply among months in our trial feed balance chart (Table 9.2). This will be a preliminary allocation, since monthly feed requirements in the form of a stock count chart have not yet been made. We begin with the inflexible feed sources from Table 9.1. Forage from native range, seeded pasture, and barley and meadow aftermath (the forage remaining in fields and meadows after grain and hay has been harvested) are relatively inflexible feeds as compared with barley and hay. Due to timing of range readiness and susceptibility to injury during the initial portion of the grazing season, the 1700

**Table 9.1   Feeds Available on a Hypothetical 300-cow Utah Cattle Ranch**

| Feed source | Quantity | Unit |
|---|---|---|
| Native range | 1700 | AUM |
| Seeded pasture | 280 | AUM |
| Barley | 2000 | bushels |
| Meadow hay | 784 | tons |
| Aftermath | 554 | AUM |

Scanned with CamScanner

Table 9.2  Trial Feed Balance Chart for a Hypothetical 300-Head Utah Cattle Ranch (AUM)

| Month | Range | Seeded pasture | Barley | Meadow hay | Aftermath | Total available |
|---|---|---|---|---|---|---|
| Jan. | | | | | | |
| Feb. | | | | | | |
| Mar. | | 140 | | | | |
| Apr. | 212 | 140 | | | | |
| May | 213 | | | | | |
| June | 425 | | | | | |
| July | 425 | | | | | |
| Aug. | 425 | | | | 278 | |
| Sept. | | | | | 277 | |
| Oct. | | | | | | |
| Nov. | | | | | | |
| Dec. | | | | | | |
| Total | 1700 | 280 | 180 | 1960 | 555 | 4675 |

Source: Workman and MacPherson (1973).

AUM of native forage cannot be evenly distributed over the five month grazing season. Instead only about half as much native forage can be harvested monthly during May and June as during the other three months. Based on this utilization constraint, range forage is allocated in Table 9.2 subject to any changes made necessary by the monthly distribution of feed requirement to be calculated in Table 9.3. Seeded pasture represents a purposely inflexible feed supply, since a cool season wheatgrass pasture has been established on the subject ranch specifically to help alleviate the shortage of native spring range. Availability of seeded pasture is evenly divided between the months of May and June. Inflexibility of crop and meadow aftermath is simply due to the fact that this forage must be used after crop harvest and before being covered with snow. Prior to development of the stock count chart, aftermath is initially evenly divided between the months of October and November. Except for the early spring season (to be discussed), barley and hay can be freely allocated among months and the trial feed balance chart is as complete as we can make it prior to construction of the stock count chart.

The first step in formulating the stock count chart is to convert all the various kinds and ages of livestock to a common measure, the animal unit (AU). As mentioned, an AU is usually defined as a 1000-pound cow or her equivalent.[12] Cattle "equivalents" have often been calculated as 0.1 AU for each 100 pounds of live cattle weight (American Institute of Real Estate Appraisers, 1972). In the case of sheep equivalents, the U.S. Forest Service has long used a conversion ratio of five sheep equal one cow or 1 AU. Less efficient than ruminant live stock had 150

Scanned with CamScanner

150

**Table 9.3  Stock Count Chart for a Hypothetical 300-Head Utah Cattle Ranch**

| Month | Cows (1.0 AU) | | Yearling Helfers (0.74 AU) | | Calves (0.42 AU) | | Bulls (1.29 AU) | | Total required AUM |
|---|---|---|---|---|---|---|---|---|---|
| | Head | AUM | Head | AUM | Head | AUM | Head | AUM | |
| Jan. | 300 | 300 | | | 45 | 18.9 | 15 | 19.4 | 338 |
| Feb. | 300 | 300 | | | 45 | 18.9 | 15 | 19.4 | 338 |
| Mar. | 300 | 300 | | | 45 | 18.9 | 15 | 19.4 | 338 |
| Apr. | 300 | 300 | 45 | 33.3 | born | | 15 | 19.4 | 353 |
| May | 300 | 300 | 45 | 33.3 | | | 15 | 19.4 | 353 |
| June | 300 | 300 | 45 | 33.3 | | | 15 | 19.4 | 353 |
| July | 300 | 300 | 45 | 33.3 | | | 15 | 19.4 | 353 |
| Aug. | 300 | 300 | 45 | 33.3 | 240 | 100.8 | 15 | 19.4 | 454 |
| Sept. | 300 | 300 | 45 | 33.3 | 240 | 100.8 | 15 | 19.4 | 454 |
| Oct. | 300 | 300 | 45 | 33.3 | 240 | 100.8 | 15 | 19.4 | 454 |
| Nov. | 300 | 300 | | | 45 | 18.9 | 15 | 19.4 | 338 |
| Dec. | 300 | 300 | | | 45 | 18.9 | 15 | 19.4 | 338 |
| Total | | | | | | | | | 4464 |

*Source:* Workman and MacPherson (1973).

form a metabolic requirement ratio $(W)^{0.75}/(1000 \text{ pounds})^{0.75}$, where $W$ is the weight (in pounds) of the animal in question and a 1000-pound cow is defined as the basic AU. Thus a 150-pound ewe represents $(150)^{0.75}/(1000)^{0.75} = 0.25$ AU, and four rather than five sheep are equivalent to one cow.

From Chapter 2, we have the information necessary for the construction of our stock count chart (Table 9.3). We begin with the cow column, knowing that 300 breeding cows are run and that 15 percent (45 head) are culled annually in November just after pregnancy evaluation. Also in November, 45 bred long yearling replacement heifers enter the herd, maintaining the breeding herd at 300 head during each month of the year. Turning now to the calf column, 240 calves are born during March, April, and May. On August 1, four months after their average birth date, the calves are assumed to begin using forage, independent from that taken by their mothers. At this time the calves weigh about 250 pounds and represent $(250)^{0.75}/(1000)^{0.75} = 0.35$ AU each. At weaning time on November 1, the calves average 390 pounds or 0.49 AU. For the three months August 1–November 1, each calf requires an average of 0.42 AUM of forage per month and the total monthly AUM requirement for calves is based on this figure. After weaning, 195 calves are sold and 45 heifer calves remain in the calf column until they become yearlings on April 1 of the following year. At this time they weigh about 550 pounds each. By November 1 they have grown to about 800 pounds and they are entered into the cow column to replace cows culled from the herd. Thus, on the average during this seven month period, they require 0.74 AUM per head per month. Finally the bulls are entered into the chart. From Chapter 2, 15 bulls are run or 1 bull for each 23 cows or yearling replacement heifers present in the herd during the

**Scanned with CamScanner**

*breeding season.* Since the 5 bulls culled from the herd in November are immediately replaced with young purchased stock, 15 bulls, weighing an average of 1400 pounds and requiring 1.29 AUM of feed monthly, are present during each month. Total monthly AUM requirements are now determined by multiplying the number of head in each animal class by the appropriate AU requirement and summing across each row. For January, 300 cows × 1.0 AU + 45 calves × 0.42 AU + 15 bulls × 1.29 AU = 338.3 AU present for one month or 338.3 AUM.

We are now ready to combine the information in the stock count chart (Table 9.3) with that in the trial forage balance chart (Table 9.2) in order to formulate a final forage balance chart. This final chart (Table 9.4) will reveal the degree of balance between feed available and feed required and will let us determine whether the yearlong carrying capacity of the ranch in question really is 300 cows. We begin the construction of Table 9.4 by filling in the Total Required AUM column of Table 9.3 along with the bottom row from Table 9.2, which shows the number of AUM supplied by each feed source. Feeds from all sources, subject to Table 9.2 constraints on availability of the inflexible feeds (range, pasture, and aftermath), are now allocated to fit the monthly feed needs shown in the Total Required column. During May and June, the allowable use of native range plus the seeded pasture is just sufficient to meet feed needs. Forage requirements and supplies can also be made to balance during July, August, and September by reducing the July native range allocation from 425 to 355 and dividing the 70 AUM released evenly between August and September to bring the available AUM for each of these months to 460.

**Table 9.4   Final Feed Balance Chart for a Hypothetical 300-Head Utah Cattle Ranch (AUM)**

| Month | Range | Seeded pasture | Barley | Meadow hay | Aftermath | Total required | Total available |
|-------|-------|----------------|--------|------------|-----------|----------------|-----------------|
| Jan. | | | 25 | 341 | | 338 | 366 |
| Feb. | | | 25 | 341 | | 338 | 366 |
| Mar. | | | 25 | 341 | | 338 | 366 |
| Apr. | | | 25 | 356 | | 353 | 381 |
| May | 212 | 140 | | | | 353 | 352 |
| June | 213 | 140 | | | | 353 | 353 |
| July | 355 | | | | | 353 | 355 |
| Aug. | 460 | | | | | 454 | 460 |
| Sept. | 460 | | | | | 454 | 460 |
| Oct. | | | 30 | | 454 | 454 | 484 |
| Nov. | | | 25 | 240 | 101 | 338 | 366 |
| Dec. | | | 25 | 341 | | 338 | 366 |
| Total | 1700 | 280 | 180 | 1960 | 555 | 4464 | 4675 |

**Scanned with CamScanner**

152

The next adjustment to the trial allocation of Table 9.2 is for October. For the purpose of "creep feeding" calves to be marketed November 1, 30 AUM of barley are allocated for the month of October leaving 25 AUM per month for November–April for "growing out" replacement heifers. The remainder of the October feed requirement is met by reallocating 176 AUM of November aftermath from Table 9.2 to October, bringing the total available AUM to 464 and leaving 101 AUM of aftermath for use during November. The remainder of the November feed requirement is met through the allocation of 240 AUM of hay, bringing the total monthly AUM available for November–March to 366.[13] Based on our completed forage balance chart, we can conclude that feed availability does match feed requirement and that the ranch in question is capable of supporting a 300 head breeding herd yearlong.

Examination of Table 9.4 also reveals that total yearlong carrying capacity is constrained by the limited forage resources available from May through September. During the other seven months of the year feed supplies are more than adequate. Also, even if shortages did exist during the period October–April, the deficit could be alleviated with purchased hay or grain. Purchased feeds do not offer a workable solution to shortages during the growing season, especially the early portion. Not only do cattle not relish hay and concentrates when green forage is available, but confinement feeding during May often leads to wet, muddy conditions giving rise to calf scours and other animal diseases. If these confinement problems are avoided by feeding hay and concentrates on the range, the natural preference of cattle for green forage from growing plants may lead to ingestion of poisonous plants since these species are usually the first plants to initiate spring growth. Thus, for the ranch in question, the forage supply available during the "limiting months" of May and June sets the maximum yearlong breeding herd carrying capacity.

Once the limiting months have been identified and the feed supply available during each month is known, yearlong breeding herd carrying capacity can be accurately calculated. Equally important when, as in this example, a figure for breeding herd size is already available, monthly feed supply information and knowledge of the limiting months allows maximum herd size carrying capacity to be easily verified. Although several rules of thumb approaches[14] have long been used by range managers and ranch appraisers to calculate or verify breeding herd carrying capacity, the algebraic method (Workman and MacPherson, 1973) appears to be much more accurate. This method first identifies the months that impose the most severe limits on yearlong breeding herd carrying capacity (the months during which available feed supplies are the smallest and that are composed of inflexible feeds). Next the feed required by livestock during the most limiting month is calculated in terms of $X$, the unknown maximum breeding herd that can be supported for that month. From Chapter 2 and Table 9.3, we know that during the limiting months of May and June the cattle herd consists of cows requiring 1 AUM per head, yearling replacement heifers (0.15 heifers per cow) requiring 0.74 AUM

Scanned with CamScanner

per head, and bulls (0.05 bulls per cow) requiring 1.29 AUM per head. The May feed requirement is

$$1.00 \text{ cow } (1.00 \text{ AUM}) X + 0.15 \text{ heifer } (0.74 \text{ AUM}) X$$
$$+ 0.05 \text{ bull } (1.29 \text{ AUM}) X = 1.1755X \text{ (AUM)}.$$

During May, then, each breeding cow and her necessary herd complement require 1.1755 AUM of feed. Feed requirement is now set equal to the feed available during May,

$$1.1755X \text{ (AUM)} = 353 \text{ AUM},$$

and solving for $X$ we obtain 300, the maximum number of cows that the ranch will support during May. Since May and June are the limiting months constraining yearlong cow herd carrying capacity, we know that feed supplies are adequate for 300 head of cows and their herd complement during the entire year.

We are now ready to address the first of two important questions concerning the economic evaluation of our prescribed burn: How many additional brood cows, along with the necessary herd complement of bulls, calves, and replacement heifers, can be supported yearlong due to the addition of 125 AUM of range forage produced through the proposed range improvement? This question is easily answered by revising the above forage balance and stock count charts. Since the only portions of the forage balance chart that will be changed by the increased range forage are the AUM available monthly for the period May–September, this information is easily combined with a

**Table 9.5   Stock Count Chart for a Hypothetical Utah Cattle Ranch**[a]

| | Animal class | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Cows (1.0 AU) | | Yearling heifers (0.74 AU) | | Calves (0.42 AU) | | Bulls (1.29 AU) | | Total required AUM | Total available AUM |
| Month | Head | AUM | Head | AUM | Head | AUM | Head | AUM | | |
| Jan. | 320 | 320 | | | 48 | 20.2 | 16 | 20.6 | 361 | 366 |
| Feb. | 320 | 320 | | | 48 | 20.2 | 16 | 20.6 | 361 | 366 |
| Mar. | 320 | 320 | | | 48 | 20.2 | 16 | 20.6 | 361 | 366 |
| Apr. | 320 | 320 | 48 | 35.5 | born | | 16 | 20.6 | 376 | 381 |
| May | 320 | 320 | 48 | 35.5 | | | 16 | 20.6 | 376 | 377 |
| June | 320 | 320 | 48 | 35.5 | | | 16 | 20.6 | 376 | 378 |
| July | 320 | 320 | 48 | 35.5 | | | 16 | 20.6 | 376 | 380 |
| Aug. | 320 | 320 | 48 | 35.5 | 256 | 107.5 | 16 | 20.6 | 484 | 485 |
| Sept. | 320 | 320 | 48 | 35.5 | 256 | 107.5 | 16 | 20.6 | 484 | 485 |
| Oct. | 320 | 320 | 48 | 35.5 | 256 | 107.5 | 16 | 20.6 | 484 | 484 |
| Nov. | 320 | 320 | | | 48 | 20.2 | 16 | 20.6 | 361 | 366 |
| Dec. | 320 | 320 | | | 48 | 20.2 | 16 | 20.6 | 361 | 366 |
| Total | | | | | | | | | 4761 | 4800 |

**Scanned with CamScanner**

154

revised stock count chart (Table 9.5). We first fill in the Total Available AUM column. The 125 additional AUM are spread evenly through the five-month grazing season, increasing available AUM for each month by 25. All other figures for monthly feed available remain as in Table 9.4. Employing the algebraic method, we set the forage requirement per breeding cow during May (1.755X) equal to the feed available in May (377 AUM). Solving for X, our revised maximum breeding herd carrying capacity is 320.71, conservatively rounded to 320 cows or an increase of 20 head. Based on a revised breeding herd of 320 head, Table 9.5 can now be completed and Total Required AUM can be compared with Total Available AUM. This comparison reveals that the feed requirements of the expanded breeding herd are met by feed resources available after improvement. Due to surplus fall and winter feed supplies prior to improvement, the 125 AUM forage increase during the grazing season has increased total yearlong breeding herd carrying capacity by 20 cows.

The second important question to be answered now is: What will be the resulting increase in net ranch income brought about by the increased herd size made possible by the prescribed burning project?[15]

***Partial Budgeting***  To convert the expected increase in breeding herd size to an increase in annual ranch income we must now refer back to Chapter 2 to obtain the necessary production and income information for our subject ranch. Referring to Table 2.2 we obtain the appropriate sale weights and prices for the additional cull cows, cull bulls, and weaner calves produced by the 20 additional breeding cows. The resulting additional gross ranch income is shown in Table 9.6. The $4132 addition to gross ranch income is only one of several revisions to the ranch income statements of Chapter 2 (Tables 2.3 and 2.4) that must be made in order to calculate the increase in net ranch income that will ultimately determine the economic feasibility of the prescribed burn.

**Table 9.6   Hypothetical Added Annual Production and Gross Ranch Income from 20 Additional Cows[a]**

| Number and category | Sale weight (lb) | Sale price ($ / lb) | Total sales ($) |
|---|---|---|---|
| 3 cull cows | 1000 | 0.35 | 1050.00 |
| $\frac{1}{3}$ cull bull[b] | 1500 | 0.40 | 200.00 |
| 5 heifer calves[c] | 380 | 0.54 | 1026.00 |
| 8 steer calves | 400 | 0.58 | 1856.00 |
| Total added cash returns | | | $4132.00 |

**Scanned with CamScanner**

**Cookie use on the World Nuclear Association website**

To provide the best possible experience for you, our site uses cookies. Continuing to use the World Nuclear Association site means you agree to our use of cookies. If you'd like to learn more about the cookies we use please click here.

**Close and continue using site**



Home / Information Library / Facts and Figures / World Nuclear Power Reactors and Uranium Requirements

# World Nuclear Power Reactors & Uranium Requirements

*March 2018*

In the 'planned' category, this table includes only those future reactors envisaged in specific plans and expected to be operating by the late 2020s.

The World Nuclear Association country profiles linked to this table cover both areas: near-term developments and the prospective long-term role for nuclear power in national energy policies. They also provide more detail of what is tabulated here.

| COUNTRY (Click name for Country Profile) | NUCLEAR ELECTRICITY GENERATION 2016 | | REACTORS OPERABLE Mar 2018 | | REACTORS UNDER CONSTRUCTION Mar 2018 | | REACTORS PLANNED Mar 2018 | | REACTORS PROPOSED Mar 2018 | | URANIUM REQUIRED 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | TWh | % e | No. | MWe net | No. | MWe gross | No. | MWe gross | No. | MWe gross | tonnes U |
| Argentina | 7.7 | 5.6 | 3 | 1627 | 1 | 27 | 2 | 1950 | 2 | 1300 | 195 |
| Armenia | 2.2 | 31.4 | 1 | 376 | 0 | 0 | 1 | 1060 | 0 | 0 | 77 |
| Bangladesh | 0 | 0 | 0 | 0 | 1 | 1200 | 1 | 1200 | 0 | 0 | 0 |
| Belarus | 0 | 0 | 0 | 0 | 2 | 2388 | 0 | 0 | 2 | 2400 | 0 |
| Belgium | 41.3 | 51.7 | 7 | 5943 | 0 | 0 | 0 | 0 | 0 | 0 | 987 |
| Brazil | 15.9 | 2.9 | 2 | 1896 | 1 | 1405 | 0 | 0 | 4 | 4000 | 321 |
| Bulgaria | 15.8 | 35.0 | 2 | 1926 | 0 | 0 | 0 | 0 | 1 | 1200 | 327 |
| Canada | 97.4 | 15.6 | 19 | 13,553 | 0 | 0 | 2 | 1500 | 0 | 0 | 1592 |
| Chile | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 4400 | 0 |
| China | 210.5 | 3.6 | 38 | 34,647 | 20 | 21,546 | 39 | 46,100 | 143 | 164,000 | 8289 |
| Czech Republic | 22.7 | 29.4 | 6 | 3904 | 0 | 0 | 2 | 2400 | 1 | 1200 | 649 |
| Egypt | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2400 | 2 | 2400 | 0 |
| Finland | 22.3 | 33.7 | 4 | 2764 | 1 | 1720 | 1 | 1250 | 0 | 0 | 494 |
| France | 384.0 | 72.3 | 58 | 63,130 | 1 | 1750 | 0 | 0 | 0 | 0 | 9502 |
| Germany | 80.1 | 13.1 | 7 | 9444 | 0 | 0 | 0 | 0 | 0 | 0 | 1480 |
| **WORLD**** | **2,490** TWh | c **10.6** % e | **449** No. | **394,137** MWe | **56** No. | **60,440** MWe | **158** No. | **163,287** MWe | **351** No. | **401,895** MWe | **65,014** tonnes U |
| | NUCLEAR ELECTRICITY GENERATION | | REACTORS OPERABLE | | REACTORS UNDER CONSTRUCTION | | ON ORDER or PLANNED | | PROPOSED | | URANIUM REQUIRED |

| COUNTRY (Click name for Country Profile) | NUCLEAR ELECTRICITY GENERATION 2016 | | REACTORS OPERABLE Mar 2018 | | REACTORS UNDER CONSTRUCTION Mar 2018 | | REACTORS PLANNED Mar 2018 | | REACTORS PROPOSED Mar 2018 | | URANIUM REQUIRED 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | TWh | % e | No. | MWe net | No. | MWe gross | No. | MWe gross | No. | MWe gross | tonnes U |
| Hungary | 15.2 | 51.3 | 4 | 1889 | 0 | 0 | 2 | 2400 | 0 | 0 | 349 |
| India | 35.0 | 3.4 | 22 | 6219 | 6 | 4350 | 19 | 17,250 | 46 | 52,000 | 843 |
| Indonesia | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 30 | 4 | 4000 | 0 |
| Iran | 5.9 | 2.1 | 1 | 915 | 0 | 0 | 4 | 2200 | 7 | 6300 | 157 |
| Israel | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1200 | 0 |
| Italy | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Japan | 17.5 | 2.2 | 42 | 39,952 | 2 | 2756 | 9 | 12947 | 3 | 4145 | 662 |
| Jordan | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2000 | 0 | 0 | 0 |
| Kazakhstan | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1800 | 0 |
| Korea DPR (North) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 950 | 0 |
| Korea RO (South) | 154.2 | 30.3 | 24 | 22,505 | 4 | 5600 | 1 | 1400 | 6 | 8800 | 4730 |
| Lithuania | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2700 | 0 |
| Malaysia | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2000 | 0 |
| Mexico | 10.3 | 6.2 | 2 | 1600 | 0 | 0 | 0 | 0 | 3 | 3000 | 248 |
| Netherlands | 3.8 | 3.4 | 1 | 485 | 0 | 0 | 0 | 0 | 0 | 0 | 82 |
| Pakistan | 5.1 | 4.4 | 5 | 1355 | 2 | 2322 | 1 | 1170 | 0 | 0 | 217 |
| Poland | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 6000 | 0 | 0 | 0 |
| Romania | 10.4 | 17.1 | 2 | 1310 | 0 | 0 | 2 | 1440 | 0 | 0 | 183 |
| Russia | 179.7 | 17.1 | 37 | 28,961 | 5 | 3634 | 26 | 28,390 | 22 | 21,000 | 5380 |
| Saudi Arabia | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 17,000 | 0 |
| Slovakia | 13.7 | 54.1 | 4 | 1816 | 2 | 942 | 0 | 0 | 1 | 1200 | 651 |
| Slovenia | 5.4 | 35.2 | 1 | 696 | 0 | 0 | 0 | 0 | 1 | 1000 | 141 |
| South Africa | 15.2 | 6.6 | 2 | 1830 | 0 | 0 | 0 | 0 | 8 | 9600 | 279 |
| Spain | 56.1 | 21.4 | 7 | 7121 | 0 | 0 | 0 | 0 | 0 | 0 | 1275 |
| Sweden | 60.6 | 40.0 | 8 | 8376 | 0 | 0 | 0 | 0 | 0 | 0 | 1188 |
| Switzerland | 20.3 | 34.3 | 5 | 3333 | 0 | 0 | 0 | 0 | 3 | 4000 | 497 |
| Thailand | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 5000 | 0 |
| Turkey | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 4800 | 8 | 9500 | 0 |
| Ukraine | 81.0 | 52.3 | 15 | 13,107 | 0 | 0 | 2 | 1900 | 11 | 12,000 | 1944 |
| UAE | 0 | 0 | 0 | 0 | 4 | 5600 | 0 | 0 | 10 | 14,400 | 627 |
| United Kingdom | 65.1 | 20.4 | 15 | 8883 | 0 | 0 | 11 | 15,600 | 2 | 2300 | 1772 |
| WORLD** | 2,490 TWh | c 10.6 % e | 449 No. | 394,137 MWe | 56 No. | 60,440 MWe | 158 No. | 163,287 MWe | 351 No. | 401,895 MWe | 65,014 tonnes U |
| | NUCLEAR ELECTRICITY GENERATION | | REACTORS OPERABLE | | REACTORS UNDER CONSTRUCTION | | ON ORDER or PLANNED | | PROPOSED | | URANIUM REQUIRED |

BLM_0075641

| COUNTRY (Click name for Country Profile) | NUCLEAR ELECTRICITY GENERATION 2016 | | REACTORS OPERABLE Mar 2018 | | REACTORS UNDER CONSTRUCTION Mar 2018 | | REACTORS PLANNED Mar 2018 | | REACTORS PROPOSED Mar 2018 | | URANIUM REQUIRED 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | TWh | % e | No. | MWe net | No. | MWe gross | No. | MWe gross | No. | MWe gross | tonnes U |
| USA | 805.3 | 19.7 | 99 | 99,647 | 2 | 2500 | 14 | 3100 | 21 | 30,000 | 18,996 |
| Vietnam | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 4800 | 6 | 7100 | 0 |
| WORLD** | 2,490 | c 10.6 | 449 | 394,137 | 56 | 60,440 | 158 | 163,287 | 351 | 401,895 | 65,014 |
| | TWh | % e | No. | MWe | No. | MWe | No. | MWe | No. | MWe | tonnes U |
| | NUCLEAR ELECTRICITY GENERATION | | REACTORS OPERABLE | | REACTORS UNDER CONSTRUCTION | | ON ORDER or PLANNED | | PROPOSED | | URANIUM REQUIRED |

Sources:
Reactor data: International Atomic Energy Agency Power Reactor Information System (PRIS); company data; World Nuclear Association estimates
PRIS – for nuclear electricity production & percentage of electricity (% e)
World Nuclear Association, *The Nuclear Fuel Report* (September 2017, reference scenario) – for U
65,014 tU = 76,671 t $U_3O_8$

Operable = Connected to the grid
Under Construction = First concrete for reactor poured, or major refurbishment underway
Planned = Approvals, funding or commitment in place, mostly expected in operation within 8-10 years
Proposed = Specific programme or site proposals, timing of start of operation very uncertain

New plants coming online are largely balanced by old plants being retired. Over 1996-2016, 80 reactors were retired as 96 started operation. The reference scenario in the 2017 edition of *The Nuclear Fuel Report* (Table 2.4) has 140 reactors closing by 2035, and 224 new ones coming online (figures include 22 Japanese reactors online by 2035).

TWh = terawatt hour (billion kilowatt hours); kWh = kilowatt hour; MWe = megawatt (electrical as distinct from thermal)

** The world total includes six reactors operating on Taiwan with a combined capacity of 4927 MWe, which generated a total of 30.5 TWh in 2016 (accounting for 13.7% of Taiwan's total electricity generation).

Note: This table is routinely updated approximately every two months, and more frequently as required.
*Earlier tables:* February 2018 December 2017 September 2017 July 2017 May 2017 March 2017 January 2017 November 2016
September 2016 August 2016 July 2016 June 2016 May 2016 March 2016 January 2016 December 2015 November 2015
August 2015 June 2015 April 2015 February 2015 January 2015 December 2014 October 2014 August 2014 June 2014 April 2014
February 2014 January 2014 December 2013 October 2013 September 2013 July 2013 June 2013 May 2013 April 2013
January 2013 December 2012 November 2012 October 2012 September 2012 August 2012 July 2012 June 2012 May 2012
April 2012 March 2012 February 2012 January 2012 December 2011 November 2011 September 2011 August 2011 July 2011
June 2011 April 2011 March 2011 February 2011 January 2011 December 2010 November 2010 October 2010 August 2010
July 2010 June 2010 May 2010 April 2010 February 2010 January 2010 December 2009 October 2009 September 2009
August 2009 June 2009 May 2009 April 2009 February 2009 January 2009 October 2008 September 2008 July 2008 March 2008
January 2008 December 2007 October 2007 September 2007 August 2007 July 2007 May 2007 March 2007 January 2007

© 2016, 2017, 2018 World Nuclear Association, registered in England and Wales, number 01215741.
Registered office: Tower House, 10 Southampton Street, London, WC2E 7HA, United Kingdom

Reuse of World Nuclear Association Content

BLM_0075643



Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

2018
June

NATIONAL SYSTEM OF PUBLIC LANDS
U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

U.S. DEPARTMENT OF THE INTERIOR
MARCH 3, 1849

FINAL WILD AND SCENIC RIVER
SUITABILITY REPORT
*for the BLM* Uncompahgre Planning Area

BLM_0075644

BLM_0075645

# TABLE OF CONTENTS

ACRONYMS AND ABBREVIATIONS .................................................................6

A. INTRODUCTION .....................................................................................7
    The Study Area ..................................................................................7

B. WILD AND SCENIC RIVER STUDY PROCESS...........................................7
    *Figure 1 - WSR Study Process Flowchart*..............................................9
    Eligibility Analysis..............................................................................10
        *Table 1 - Eligible Segments by Hydrologic Unit*................................10
        *Table 2 - National Register of Historic Places Evaluation Criteria*......13
        *Table 3 - Colorado Natural Heritage Program Element Imperilment Ranks*.......14
    Suitability Analysis ...........................................................................15
    Actions in Response to Recommendations .........................................19
        *Table 4 - Interim Protection for Suitable Segments*..........................20
        *Figure 2 - Map of Classifications for Suitable Segments*....................21
        *Table 5 - Summary of Segment Suitability*.......................................22
        *Table 6 - Segment Changes from Eligibility to Suitability*...................24

C. SUITABLE SEGMENTS:............................................................................27

ASSESSMENT & SUITABILITY DETERMINATION.............................................27
        *Figure 3 - (7) Monitor Creek*........................................................28
    7 ~ Monitor Creek...........................................................................30
        *Figure 4 - (8) Potter Creek*...........................................................32
    8 ~ Potter Creek.............................................................................33
        *Figure 5 - (10) Roubideau Creek, Segment 1*..................................36
    10 ~ Roubideau Creek, Segment 1...................................................37
        *Figure 6 - (14) Beaver Creek*........................................................41
    14 ~ Beaver Creek..........................................................................43
        *Figure 7 - (17) Saltado Creek*.......................................................47
    17 ~ Saltado Creek.........................................................................48
        *Figure 8 - (18) San Miguel River, Segment 1*..................................52
    18 ~ San Miguel River, Segment 1...................................................54
        *Figure 9 - (19) San Miguel River, Segment 2*..................................60
    19 ~ San Miguel River, Segment 2...................................................62
        *Figure 10 - (20) San Miguel River, Segment 3*................................67
    20 ~ San Miguel River, Segment 3...................................................69
        *Figure 11 - (21) San Miguel River, Segment 5*................................74
    21 ~ San Miguel River, Segment 5...................................................76
        *Figure 12 - (22) San Miguel River, Segment 6*................................81

BLM_0075646

Final Wild and Scenic River Suitability

22 ~ San Miguel River, Segment 6 ................................................................................83
    *Figure 13 - (23) Tabeguache Creek, Segment 1* ...............................................88
23 ~ Tabeguache Creek, Segment 1 ..........................................................................90
    *Figure 14 - (25) Lower Dolores River* ..............................................................93
25 ~ Lower Dolores River..........................................................................................95
    *Figure 15 - (27) Dolores River, Segment 2*........................................................100
27 ~ Dolores River, Segment 2................................................................................102
    *Figure 16 - (30) La Sal Creek, Segment 2*.........................................................107
30 ~ La Sal Creek, Segment 2.................................................................................109
    *Figure 17 - (31) La Sal Creek, Segment 3*.........................................................112
31 ~ La Sal Creek, Segment 3.................................................................................114
    *Figure 18 - (34) Dolores River, Segment 1* .......................................................118
34 ~ Dolores River, Segment 1................................................................................120

D. NOT SUITABLE SEGMENTS:  ASSESSMENT & SUITABILITY
DETERMINATION .........................................................................................................124
    *Figure 19 - Gunnison River, Segment 2*...........................................................125
5 ~ Gunnison River, Segment 2.............................................................................126
    *Figure 20 - (11) Roubideau Creek, Segment 2* ................................................129
11 ~ Roubideau Creek, Segment 2.........................................................................130
    *Figure 21 - (12) Deep Creek*...........................................................................132
12 ~ Deep Creek.....................................................................................................133
    *Figure 22 - (13) West Fork Terror Creek* .........................................................135
13 ~ West Fork Terror Creek.................................................................................136
    *Figure 23 - (15) Dry Creek*..............................................................................139
15 ~ Dry Creek ......................................................................................................140
    *Figure 24 - (16) Naturita Creek*.......................................................................142
16 ~ Naturita Creek...............................................................................................143
    *Figure 25 - (24) Tabeguache Creek, Segment 2* ..............................................147
24 ~ Tabeguache Creek, Segment 2 ......................................................................148
    *Figure 26 - (26) North Fork Mesa Creek*.........................................................151
26 ~ North Fork Mesa Creek.................................................................................152
    *Figure 27 - (28) Ice Lake Creek, Segment 2* ....................................................155
28 ~ Ice Lake Creek, Segment 2............................................................................156
    *Figure 28 - (29) La Sal Creek, Segment 1*.........................................................159
29 ~ La Sal Creek, Segment 1................................................................................160
    *Figure 29 - (32) Lion Creek, Segment 2*...........................................................163
32 ~ Lion Creek, Segment 2...................................................................................164
    *Figure 30 - (33) Spring Creek*..........................................................................167
33 ~ Spring Creek..................................................................................................168

BLM_0075647

**E. DOLORES-SAN MIGUEL STAKEHOLDER ANALYSIS & RECOMMENDATIONS**..........................................................................**171**

**Southwest Resource Advisory Council** .............................................**171**

Table 7 - Summary of Southwest Resource Advisory Council Suitability Recommendations .........172

**F. GUNNISON BASIN STAKEHOLDER ANALYSIS & RECOMMENDATIONS** ...........**180**

**Stakeholder Group One Recommendations** .....................................**181**

Table 8 - Gunnison River, Segment 2 Stakeholder Assessment............................................186

Table 9 - Monitor Creek Stakeholder Assessment ...........................................................188

Table 10 - Potter Creek Stakeholder Assessment ...........................................................189

Table 11 - Roubideau Creek, Segment One Stakeholder Assessment..................................190

Table 12 - Roubideau Creek, Segment Two Stakeholder Assessment.................................192

Table 13 - Deep Creek Stakeholder Assessment .............................................................193

Table 14 - West Fork Terror Creek Stakeholder Assessment...........................................196

**Stakeholder Group Two Recommendations** ....................................**199**

**G. SUITABILITY STUDY PARTICIPANTS**.........................................................**205**

**H. BIBLIOGRAPHY** ............................................................................................**206**

Table 15 - Suitable Segments in the UFO Planning Area.....................................................209

BLM_0075648

## ACRONYMS AND ABBREVIATIONS

| ACRONYM OR ABBREVIATION | COMPLETE PHRASE |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| ATV | all-terrain vehicle |
| BLM | United States Department of the Interior, Bureau of Land Management |
| BOR | United States Department of the Interior, Bureau of Reclamation |
| cfs | cubic feet per second (water flow measurement) |
| CNHP | Colorado Natural Heritage Program |
| CWCB | Colorado Water Conservation Board |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| NCA | National Conservation Area |
| NWSRS | National Wild and Scenic Rivers System |
| ORV | Outstandingly Remarkable Value |
| RMP | Resource Management Plan |
| ROW | Right-of-Way |
| T/R/Sec | Township/Range/Section (Public Land Survey System) |
| UFO | United States Department of the Interior, Bureau of Land Management, Uncompahgre Field Office |
| USFS | United States Department of Agriculture, Forest Service |
| WSA | Wilderness Study Area |
| WSR | Wild and Scenic Rivers |
| WSR Act | Wild and Scenic Rivers Act |

BLM_0075649

## A. INTRODUCTION

This report presents an analysis of and recommendations regarding the suitability of 29 eligible river segments within the Bureau of Land Management (BLM) Uncompahgre Planning Area (planning area) for inclusion in the National Wild and Scenic Rivers System (NWSRS). An 11.88-mile segment of the Dolores River within the planning area was identified as eligible in the San Juan Public Lands Draft Land Management Plan and is among the 29 segments evaluated for this report.

After considering information, comments, and recommendations from BLM resource staff, the BLM Southwest Resource Advisory Council, cooperating agencies, stakeholder groups, landowners, and other interested parties, the BLM identified 16 of the 29 segments as suitable for NWSRS consideration. The findings are used to develop the preferred alternative for the Uncompahgre Resource Management Plan (RMP) and to make NWSRS recommendations to Congress.

### THE STUDY AREA

The United States Department of the Interior, BLM, Uncompahgre Field Office (UFO) manages public land in Delta, Mesa, Montrose, Gunnison, Ouray, and San Miguel counties in southwestern Colorado. The planning area for the RMP consists of over 675,000 acres of BLM-administered public land within the UFO, excluding the Gunnison Gorge National Conservation Area (NCA) and the Dominguez-Escalante NCA, which operate under separate RMPs.

The BLM completed an evaluation of 174 river segments in the planning area and released the *Final Wild and Scenic River Eligibility Report for the BLM Uncompahgre Planning Area* on July 15, 2010. The report identifies 34 segments as eligible for inclusion in the NWSRS, including six segments within the UFO portion of the Dominguez-Escalante NCA. These segments will be evaluated for suitability during development of the Dominguez-Escalante NCA RMP and are not included in this report:

- Cottonwood Creek
- Dry Fork Escalante Creek, Segment 2
- Escalante Creek, Segment 1
- Escalante Creek, Segment 2
- Gunnison River, Segment 3
- Rose Creek

## B. WILD AND SCENIC RIVER STUDY PROCESS

Section 5(d) (1) of the 1968 Wild and Scenic Rivers Act (WSR Act) requires federal agencies to evaluate potential wild and scenic rivers when preparing resource management plans: "In all planning for the use and development of water and related land resources, consideration shall be given by all federal agencies involved to potential national wild, scenic, and recreational river areas."

As shown in the flowchart below, the Wild and Scenic River (WSR) study process consists of evaluating segments for *eligibility* and *suitability*. Both studies are conducted in accordance with

BLM_0075650

the WSR Act, BLM Manual 8351 and the revised BLM Manual 6400: *Wild and Scenic Rivers–Policy and Program Direction for Identification, Evaluation, and Management* (1992 and 2012), and *The Wild and Scenic River Study Process Technical Report* (1999) issued by the Interagency Wild and Scenic Rivers Coordinating Council.

BLM_0075651

**Identify river segments for initial Wild and Scenic River consideration**

**Evaluate ELIGIBILITY of each segment, using established standards and the knowledge of resource specialists to determine:**
- Is the segment free-flowing?
- Does the segment have one or more *Outstandingly Remarkable Values (ORVs)*?

 **NO** **Drop segment from further Wild and Scenic River consideration**

 **YES**

**For each ELIGIBLE segment:**
- Document ORV(s) and basis of determination
- Assign a preliminary classification of *Wild, Scenic*, or *Recreational*

**Submit DRAFT ELIGIBILITY results for public review and comment**

**Incorporate public comments into FINAL ELIGIBILITY REPORT**

**Evaluate segment SUITABILITY, using public input and land status records to determine:**
- Should the segment's free-flowing character, water quality, and ORVs be protected, or do certain uses warrant other forms of protection?
- Will the segment's free-flowing character, water quality, and ORVs be best protected through designation?
- Is there a demonstrated commitment to protect the segment by nonfederal entities partially responsible for implementing protective management?

 **NO** **Drop segment from further Wild and Scenic River consideration**

 **YES**

**Document segment SUITABILITY results in Draft Resource Management Plan**

**Recommend SUITABLE segments to Congress for further consideration**

FIGURE 1 - WSR STUDY PROCESS FLOWCHART

**Final Wild and Scenic River Suitability**

## ELIGIBILITY ANALYSIS

### FIELD SURVEYS

Extensive field inventories were conducted throughout the planning area between 2006 and 2009. An interdisciplinary team of BLM employees identified 174 river and stream segments from within seven hydrologic units.

#### TABLE 1 - ELIGIBLE SEGMENTS BY HYDROLOGIC UNIT

| HYDROLOGIC UNIT | ELIGIBLE SEGMENTS |
|---|---|
| Upper Gunnison | 0 |
| Lower Gunnison | 5 |
| Uncompahgre | 0 |
| North Fork of the Gunnison | 2 |
| San Miguel | 11 |
| Lower Dolores | 2 |
| Upper Dolores[1] | 9 |
| **TOTAL SEGMENTS** | **29** |

[1]**Includes one reach of the Dolores River determined to be eligible in the San Juan Public Lands Draft Land Management Plan.**

### ANALYSIS

The team evaluated each segment to determine whether it meets the two criteria required for NWSRS eligibility: the stream (1) is free-flowing and (2) possesses any of several outstandingly remarkable values (ORVs) adopted and specifically tailored for application within the planning area prior to the assessment. As shown in Table 1 above, 29 planning area segments within five of the seven hydrologic units analyzed were found to possess the eligibility criteria. In addition, one Upper Dolores segment within the planning area was identified as eligible in the San Juan Public Lands Draft Land Management Plan. No eligible segments were identified within either the Upper Gunnison or Uncompahgre hydrologic units.

### OUTSTANDINGLY REMARKABLE VALUES

Presented below are the nine ORVs used in the analysis. While values must be river-related, eligible ORVs may be scenic, recreational, geologic, fish, wildlife, cultural, historic, vegetation, or other similar value (such as paleontological). In addition, in order to be considered outstandingly

BLM_0075653

remarkable, a value must be unique, rare, or exemplary, as well as significant within a defined region of comparison.

*Regions of Comparison*

A region of comparison is used to compare the special values for which a river is being considered against comparable elements within a defined geographic area. The area, region, or scale used for comparison is not fixed, and should be that which best serves as a basis for meaningful analysis—it might vary, depending on the value being considered. The scale of a region could consist of a portion of a state or other appropriately scaled geographic area or hydrologic unit (Interagency WSR Coordinating Council 1999).

The following standards and regions of comparison for each ORV category were developed by UFO resource specialists, and used to evaluate the WSR eligibility of UFO rivers:

## 1. SCENIC

*Standard* - The landscape elements of landform, vegetation, water, color, and related factors must result in notable or exemplary visual features and/or attractions within the geographic region. The BLM Visual Resource Inventory Handbook (H8410-1) may be used to assess visual quality and evaluate the extent to which development impacts an area's scenic values. The area must have a Scenic Quality Classification of A, as defined in H8410-1. When analyzing scenic values, additional factors such as seasonal variations in vegetation, scale of cultural modifications, and length of time negative intrusions are viewed may be considered. Scenery and visual attractions may be highly diverse over the majority of the river segment length and not common to other rivers in the geographic region.

*Region of Comparison* - The landscape has a Scenic Quality Classification of "A" within either the Southern Rockies or Colorado Plateau ecologic region.

## 2. RECREATIONAL

*Standard* - Recreational opportunities are or have the potential to be unusual enough to attract visitors to the geographic region. Visitors are willing to travel long distances to use the river resources for recreational purposes. Recreation-related opportunities could include, but are not be limited to, sightseeing, wildlife observation, camping, photography, hiking, fishing, hunting, and boating. Interpretive opportunities may be exceptional and attract or have the potential to attract visitors from outside the geographic area. The river may provide or have the potential to provide settings for national or regional commercial usage or competitive events. In addition, the river may be eligible if it is determined to provide a critically important regional recreation opportunity, or be a significant component of a regional recreation opportunity spectrum setting.

*Region of Comparison* - The area possesses recreational opportunities popular enough to attract visitors from throughout or beyond the state of Colorado, and/or that are unique or rare within either the Southern Rockies or Colorado Plateau ecologic region. Opportunities could include Gold Medal fisheries, rafting, and others.

BLM_0075654

### 3. GEOLOGIC

*Standard* - The river or the area within the river corridor contains one or more examples of a geologic feature, process, or phenomenon that is rare, unusual, or unique to the geographic region. The feature or features may be in an unusually active stage of development, represent a textbook example and/or represent a unique or rare combination of geologic features (erosional, volcanic, glacial, and other geologic structures).

*Region of Comparison* - The feature is unique or rare within either the Southern Rockies or Colorado Plateau ecologic region.

### 4. FISH

*Standard* - Fish values may be judged on the relative merits of either fish populations or habitat, or a combination of these river-related conditions.

a) Populations:  The river is nationally or regionally one of the top producers of resident, indigenous, and/or anadromous fish species. Of particular significance may be the presence of wild or unique stocks, or populations of Colorado State and/or federally listed or candidate threatened and endangered species.

b) Habitat:  The river provides exceptionally high quality habitat for fish species indigenous to the region. Of particular significance is habitat for Colorado State and/or federally listed or candidate threatened and endangered species.

*Region of Comparison* - Distribution of native species across their entire range, within either the Southern Rockies or Colorado Plateau ecologic region.

### 5. WILDLIFE

*Standard* - Wildlife values may be judged on the relative merits of either wildlife populations or habitat, or a combination of these conditions.

a) Populations:  The river or area within the river corridor contains nationally or regionally important populations of resident or indigenous wildlife species dependent on the river environment. Of particular significance may be species considered to be unique or populations of Colorado State and/or federally listed or candidate threatened and endangered species.

b) Habitat:  The river or area within the river corridor provides exceptionally high quality, occupied habitat for wildlife of national or regional significance, or may provide a unique or critical habitat link for special status species known to occur in the area. Contiguous habitat conditions are such that the biological needs of the species are met.

*Region of Comparison* - Distribution of native species across their entire range, within either the Southern Rockies or Colorado Plateau ecologic region.

BLM_0075655

## 6. CULTURAL

*Standard* - The river or area within the river corridor contains one or more sites where there is evidence of occupation or use by Native Americans. Sites must be rare, have unusual characteristics, or exceptional human interest values. Sites may have national or regional importance for interpreting prehistory, may be rare, may represent an area where culture or cultural period was first identified and described, may have been used concurrently by two or more cultural groups, or may have been used by cultural groups for rare, sacred, tribal, or spiritual purposes.

*Region of Comparison* - A site that is on, or could be eligible for, the National Register of Historic Places (NRHP).

## 7. HISTORIC

*Standard* - The river or area within the corridor contains one or more sites or features associated with a significant event, person, or cultural activity of the past that was rare or unusual in the region. Historic and/or Native American sites or features in most cases are 50 years old or older. Sites or features listed in, or eligible for inclusion in, the NRHP may be of particular significance.

*Region of Comparison* - A site that is unique or rare within the state of Colorado, and is on or could be eligible for the NRHP (as shown in Table 2).

### TABLE 2 - NATIONAL REGISTER OF HISTORIC PLACES EVALUATION CRITERIA

| The quality of significance in American history, architecture, archeology, engineering, and culture is present in districts, sites, buildings, structures, and objects that possess integrity of location, design, setting, materials, workmanship, feeling, and association, and: | |
| --- | --- |
| **CRITERION** | **DESCRIPTION** |
| A | Are associated with events that have made a significant contribution to the broad patterns of our history |
| B | Are associated with the lives of persons significant in our past |
| C | Embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction |
| D | Have yielded, or may be likely to yield, information important in history or prehistory |

BLM_0075656

## 8. VEGETATION

*Standard* - The river or stream segment supports a riparian vegetation community that is a superior occurrence or is rare on a global basis:

a) Superior occurrence:  For this standard, a superior community is defined as having received an Element Occurrence Ranking of A by the Colorado Natural Heritage Program (CNHP). An A ranking denotes that a community has excellent estimated ecological integrity based on size, condition, and landscape context.

b) Rare on a global basis:  For this standard, rareness is defined as a ranking of G1 or G2 (as determined by CNHP and described in Table 3).

Riparian vegetation that is located in a Potential Conservation Area (as determined by CNHP) has enhanced value because it has been identified as highly important for conserving regional and global biodiversity.

*Region of Comparison* - The river or area within the river corridor provides exceptional vegetative species or communities of significance within either the Southern Rockies or Colorado Plateau ecologic region. Consideration should be given to habitats and rare plants identified by CNHP as being of global importance (such as exceptional riparian areas and hanging gardens).

The element imperilment ranks shown in the table below are assigned in terms of an element's imperilment over its entire range (its Global-rank or G-rank):

#### TABLE 3 - COLORADO NATURAL HERITAGE PROGRAM ELEMENT IMPERILMENT RANKS

| RANK | DESCRIPTION |
|------|-------------|
| G1 | Critically imperiled globally because of rarity (5 or fewer occurrences in the world or 1,000 or fewer individuals), or because some factor of its biology makes it especially vulnerable to extinction. |
| G2 | Imperiled globally because of rarity (6 to 20 occurrences or 1,000 to 3,000 individuals), or because other factors demonstrably make it very vulnerable to extinction throughout its range. |
| G3 | Vulnerable through its range or found locally in a restricted range (21 to 100 occurrences or 3,000 to 10,000 individuals). |
| G4 | Apparently secure globally, though it may be quite rare in parts of its range, especially at the periphery. Usually more than 100 occurrences and 10,000 individuals. |
| G5 | Demonstrably secure globally, though it may be quite rare in parts of its range, especially at the periphery. |

## 9. OTHER SIMILAR VALUES

*Standard* - While no specific evaluation guidelines have been established for the "other similar values" category, additional values deemed relevant to the eligibility of the river segment should be

BLM_0075657

considered in a manner consistent with the foregoing guidance including, but not limited to, paleontologic, and scientific study opportunities.

**Region of Comparison** - Unique or rare within the Southern Rockies or Colorado Plateau ecologic region. For paleontological resources, these regions would be defined based on geological associations.

### PRELIMINARY CLASSIFICATION

As defined in the WSR Act, the eligible segments were then assigned a preliminary classification of *wild*, *scenic,* or *recreational* based upon the amount of access to, and level of shoreline and water resource development within the corridor.

For a complete description of the segments analyzed and methods used, the eligibility report is available for review at the Montrose Public Lands Center in Montrose, Colorado.

## SUITABILITY ANALYSIS

During the suitability process, the BLM weighed protective measures for eligible river segments and the corresponding corridor in relation to current and potential identified uses. Possible environmental and economic consequences of, management issues resulting from, and reasonable alternatives to WSR designation were considered. Preliminary segment boundaries and classifications were reevaluated in response to public input. Geographic information systems data was recalculated, at times resulting in modified segment lengths and land ownership measures.

The portions of the eligible stream segment that are not included within the suitable stream segment boundaries, both in terms of stream miles and acreage within the eligible stream corridor, are found to be not suitable.

According to the Interagency WSR Coordinating Council (1999), a suitability evaluation should address three primary considerations:

- Should the river's free-flowing character, water quality, and ORVs be protected, or are one or more other uses important enough to warrant doing otherwise?

- Will the river's free-flowing character, water quality, and ORVs be protected through designation? Is designation the best method for protecting the river corridor? In answering these questions, the benefits and impacts of WSR designation must be evaluated and alternative protection methods considered.

- Is there a demonstrated commitment to protect the river by any nonfederal entities partially responsible for implementing protective management?

### UFO SUITABILITY CRITERIA

Criteria used to evaluate eligible planning area segments for suitability were derived from BLM Manual 8351, *Wild and Scenic Rivers - Policy and Program Direction for Identification, Evaluation, and Management* (1992), as well as from guidelines issued by the Interagency Wild and Scenic Rivers

BLM_0075658

Coordinating Council (1999). Suitability criteria in the recently revised 8351 manual (now BLM Manual 6400 [2012]) were also considered. The following suitability criteria were formulated to elicit focused responses from BLM staff and the public useful in analyzing individual segments:

1. Characteristics that do, or do not, make the area a worthy addition to the NWSRS. These characteristics (free flow and ORVs) are described in the WSR Act and may include additional factors.

2. The current status of land ownership and use in the area.

3. The reasonably foreseeable potential uses of the land and water that would be enhanced, foreclosed, or curtailed if the area were included in the NWSRS.

4. The federal agency that will administer the area should it be added to the NWSRS.

5. The extent to which the agency proposes that administration of the river, including the costs thereof, is shared by state and local agencies.

6. The estimated cost to the United States of acquiring necessary lands or interests in land within the corridor, as well as the cost of administering the area should it be added to the NWSRS.

7. A determination of the extent that other federal agencies, the state, or its political subdivisions might participate in the preservation and administration of the river should it be proposed for inclusion in the NWSRS.

8. An evaluation of local zoning and other land use controls in protecting the river's ORVs and preventing incompatible development.

9. The state/local government's capacity to manage and protect the ORVs on nonfederal lands. This factor requires an evaluation of the river protection mechanisms available through the authority of state and local governments. Such mechanisms may include, for example, statewide programs related to population growth management, vegetation management, water quantity or quality, or protection of river-related values such as open space and historic areas.

10. The existing support or opposition of designation. Assessment of this factor will define the political context. The interest in designation or nondesignation by federal agencies; state, local, and tribal governments; national and local publics; and the state's congressional delegation should be considered.

11. The consistency of designation with other agency plans, programs, and policies in meeting regional objectives. Designation may help or impede the goals of tribal governments or other federal, state, or local agencies. For example, designation of a river may contribute to state or regional protection objectives for fish and wildlife resources. Similarly, adding a river that includes a scarce recreation activity or setting to the NWSRS may help meet statewide recreation goals. Designation might, however, limit irrigation and/or flood control measures in a manner inconsistent with regional socioeconomic goals.

BLM_0075659

12. The contribution to river system or basin integrity. This factor reflects the benefits of a "systems" approach (e.g., expanding the designated portion of a river in the NWSRS or developing a legislative proposal for an entire river system—headwaters to mouth—or watershed). Numerous benefits may result from managing an entire river or watershed, including the ability to design a holistic protection strategy in partnership with other agencies and the public.

13. The potential for water resources development. Identify any proposed water resource projects that may be foregone, as designation may limit development of water resources projects as diverse as irrigation and flood control measures, hydropower facilities, dredging, diversion, bridge construction, and channelization.

## BLM Interdisciplinary Team

For each eligible segment, an interdisciplinary team of BLM resource specialists (listed on page 205) compiled information from within their particular area(s) of expertise. The specialists met as a group to evaluate the segments in relation to the suitability criteria. Following their preliminary review, the team collected additional data to fill information gaps.

## Information Sources

BLM staff utilized a variety of resources to analyze and make recommendations for each segment, including:

Geographic Information Systems data
U.S. Geological Survey stream gauge data and minerals maps
Land status maps
State and federal agency agreements and management plans
Local and county government land use plans and zoning documents
Colorado Water Conservation Board (CWCB) project data
Colorado Water Plan and Basin Implementation Plans
Water district planning documents
Published books and reports
River guides
Water rights tabulations

## Public Participation

The suitability comment period was announced through a press release issued July 15, 2010. Letters inviting participation and requesting input regarding eligible segments were mailed to potential interested parties. Response forms were disseminated at public meetings and via mail and email, and available through the UFO Wild and Scenic River Studies webpage.

BLM_0075660

### Public Comments

The UFO received hundreds of forms and letters containing unique comments, as well as numerous form letters. Substantive comments received during the formal suitability comment period (ending August 20, 2010) were summarized by segment and suitability criteria and considered in the suitability analysis. Comments received during the stakeholder process ending January 24, 2011 were also considered when they provided new information. In addition, comments received during the eligibility period that pertained more closely to suitability were included. Eligibility-related comments were not considered during the suitability analysis. Original comments are on file at the UFO administrative headquarters in Montrose, Colorado.

### Stakeholder Groups

Input from public stakeholder groups was critical in evaluating the suitability of each segment. Separate stakeholder processes were initiated for segments in the Gunnison River Basin and those in the Dolores and San Miguel river basins. Stakeholder groups held public meetings during late 2010 and early 2011. BLM staff participated in the meetings to provide information and data and answer questions pertaining to the WSR process and specific segments, but did not offer recommendations. Results of both stakeholder processes were forwarded to the BLM for consideration.

### Gunnison Basin Stakeholder Process

The Gunnison Basin stakeholder process was initiated by the Colorado River Water Conservation District. The stakeholder group contracted with a team of co-facilitators and held nine public meetings pertaining to Gunnison Basin segments outside of the Dominguez-Escalante NCA. The stakeholder group was unable to reach a consensus and two sets of recommendations were forwarded to the BLM for consideration.

### Dolores and San Miguel Basin Stakeholder Process

The Dolores-San Miguel process was coordinated by the RMP Subgroup for the Southwest Resource Advisory Council (SWRAC). The subgroup contracted with a facilitator early in the process and held ten public meetings. In addition, the subgroup opened a second public comment period to gather additional suitability input.

The subgroup considered BLM analysis and public input and developed recommendations for each of the Dolores-San Miguel segments. The full BLM Colorado Southwest Resource Advisory Council reviewed and adopted the subgroup recommendations at the Colorado Statewide Resource Advisory Council meeting held on February 25, 2011.

### Cooperating and Other Public Agency Input

State and federal agencies were invited to participate as cooperating agencies in the RMP process, providing information and reviewing preliminary findings during and between monthly meetings. Agencies opting not to serve as cooperating agencies provided input through correspondence and during public meetings.

BLM_0075661

## ACTIONS IN RESPONSE TO RECOMMENDATIONS

Results of the suitability analysis were used to formulate a range of alternatives for the Draft RMP/Environmental Impact Statement (EIS). The range of alternatives consists of a no action alternative that would maintain all rivers at the eligible stage, an alternative that would find all eligible rivers suitable, an alternative that would find all segments not suitable, and an alternative that would find some or portions of some eligible rivers suitable. Following publication of the Notice of Availability in the *Federal Register* for the Draft RMP/EIS, the public had 90 days to comment on the draft suitability determinations. The public comment period was extended by an additional 60 days due to public request and ended on November 1, 2016. The final suitability determinations will be documented in the Approved RMP/Record of Decision. Segments found not suitable will be dropped from further consideration and revert to management according to objectives and prescriptions in the Approved RMP.

### NWSRS CONGRESSIONAL CONSIDERATION

Neither the suitability evaluation nor the RMP planning process result in designation of a river segment as part of the NWSRS. Following completion of the Uncompahgre RMP, the findings are forwarded to Congress for consideration. Congress (or the Secretary of the Interior upon application by a state governor) has the final authority to designate waterways. Members of Congress craft the legislative language for designated segments and develop water protection strategies and measures in support of the WSR Act.

### INTERIM MANAGEMENT OF SUITABLE SEGMENTS

The WSR Act and BLM guidelines require the BLM to develop and implement interim management to protect the free-flowing nature, water quality, ORVs, and recommended classification of suitable segments until Congress takes formal action regarding NWSRS designation. Table 4 on page 20 provides interim guidelines for managing suitable rivers, as adapted by the Interagency Wild and Scenic Rivers Coordinating Council from the WSR Act. Once final determinations have been made, the BLM will draft protective management measures for each suitable segment.

While congressionally authorized study rivers are protected under the WSR Act, agency-identified rivers receive protection through other authorities, including the National Environmental Policy Act, the Federal Lands Policy and Management Act, the Clean Water Act, and the Endangered Species Act. For example, potential effects on the free-flowing condition, water quality, and ORVs of eligible river segments would be considered when proposing federal or federally permitted actions subject to the National Environmental Policy Act.

Following release of the Approved RMP/Record of Decision, suitable segments will be managed to maintain their free-flowing character and ORVs in support of the selected alternative until designated or released from consideration by Congress.

BLM_0075662

### TABLE 4 - INTERIM PROTECTION FOR SUITABLE SEGMENTS

| ISSUE | PROTECTION UNDER SUITABLE DESIGNATION |
|---|---|
| Study Boundary | • Corridor width is generally one-quarter mile from ordinary high water mark on both sides of active channel<br>• Boundary may include adjacent areas needed to protect identified values |
| Preliminary Classification WSR Act Section (2b) | • Wild, Scenic, and Recreational classes as defined by statute (classification criteria described in Interagency Guidelines)<br>• Manage segment at recommended classification |
| Study Report Review Procedures | • Notice of study report/Draft EIS published in *Federal Register*<br>• Comments/responses from federal, state, and local agencies, and public included in study report/Final EIS transmitted to President and Congress |
| Private Land:<br>• Administration<br>• Acquisition | • Affects private land uses only through voluntary partnerships with state/local governments and landowners<br>• No regulatory authority over private land<br>• Evaluation of local zoning and land use control adequacy is typically a component of suitability determination[1]<br>• BLM has no authority to acquire interest in land under WSR Act prior to designation |
| Water Resources Project | • River's free-flowing condition protected to the extent of other BLM authorities and not under the WSR Act |
| Land Disposition | • Agency discretion to retain lands within river corridor in federal ownership |
| Mining and Mineral Leasing | • Protect free flow, water quality, and ORVs through other BLM authorities |
| Actions of Other Agencies | • Affect actions of other agencies through voluntary partnerships |
| Protect Outstandingly Remarkable Values (ORVs) | • No regulatory authority conferred by WSR Act; agency protects through other authorities<br>• Section 11(b)(1): Limited financial or other assistance to encourage participation in acquisition, protection, and management of river resources[2] |

[1]Agency-identified study rivers that include private land typically require an evaluation of existing state and local land use controls and the willingness of state and local governments to protect river values.

[2]Section 11(b)1 authorizes the Secretary of the Interior and Secretary of Agriculture, or the head of any other federal agency to provide for "limited financial or other assistance to encourage participation in the acquisition, protection, and management of river resources." This authority "applies within or outside a federally administered area and applies to rivers which are components of the NWSRS and to other rivers." Recipients of federal assistance include states or their political subdivisions, landowners, private organizations, or individuals. Examples of assistance under this section include riparian restorations, riparian fencing to protect water quality and riparian vegetation, and vegetative screening to enhance scenery and/or the recreation experience.

Source: Interagency Wild and Scenic Rivers Coordinating Council (1999)

BLM_0075663



**FIGURE 2 - MAP OF CLASSIFICATIONS FOR SUITABLE SEGMENTS**

BLM_0075664

## TABLE 5 - SUMMARY OF SEGMENT SUITABILITY

| # | RIVER SEGMENT | SUITABLE MILES | BLM MILES | OUTSTANDINGLY REMARKABLE VALUES | RECOMMENDED CLASSIFICATION |
|---|---|---|---|---|---|
| **SUITABLE SEGMENTS** | | | | | |
| **Lower Gunnison River** | | | | | |
| 7 | Monitor Creek | 9.4 | 9.4 | Fish, Vegetation | Wild |
| 8 | Potter Creek | 9.8 | 9.8 | Fish, Vegetation | Wild |
| 10 | Roubideau Creek, Segment 1 | 10.0 | 10.0 | Recreational, Wildlife, Cultural, Vegetation | Wild |
| **San Miguel River** | | | | | |
| 14 | Beaver Creek | 14.3 | 14.2 | Vegetation | Recreational |
| 17 | Saltado Creek | 5.6 | 4.1 | Vegetation | Wild |
| 18 | San Miguel River, Segment 1 | 27.2 | 17.3 | Scenic, Recreational, Wildlife, Historic, Vegetation, Paleontology | Recreational |
| 19 | San Miguel River, Segment 2 | 4.0 | 3.6 | Scenic, Recreational, Wildlife, Vegetation | Wild |
| 20 | San Miguel River, Segment 3 | 4.5 | 4.5 | Recreational, Fish, Wildlife, Vegetation | Recreational |
| 21 | San Miguel River, Segment 5 | 7.5 | 1.3 | Recreational, Fish, Historic, Vegetation | Recreational |
| 22 | San Miguel River, Segment 6 | 2.1 | 2.1 | Recreational, Fish, Historic, Vegetation | Recreational |
| 23 | Tabeguache Creek, Segment 1 | 3.4 | 3.4 | Vegetation | Wild |
| **Lower Dolores River** | | | | | |
| 25 | Lower Dolores River | 4.2 | 4.2 | Scenic, Recreational, Geologic, Fish, Wildlife | Scenic |
| **Upper Dolores River** | | | | | |
| 27 | Dolores River, Segment 2 | 5.3 | 5.3 | Scenic, Recreational, Geologic, Fish, Wildlife, Vegetation | Recreational |
| 30 | La Sal Creek, Segment 2 | 3.3 | 3.3 | Fish, Vegetation | Recreational |
| 31 | La Sal Creek, Segment 3 | 3.4 | 3.4 | Scenic, Recreational, Fish, Cultural, Vegetation | Wild |
| 34 | Dolores River, Segment 1 | 8.7 | 8.7 | Recreation, Scenery, Fish, Wildlife, Geology, Ecology, Archaeology[**] | Wild |

BLM_0075665

| # | RIVER SEGMENT | SUITABLE MILES | BLM MILES | OUTSTANDINGLY REMARKABLE VALUES | RECOMMENDED CLASSIFICATION |
|---|---|---|---|---|---|
| | | NOT SUITABLE SEGMENTS | | | |
| | | Lower Gunnison River | | | |
| 5 | Gunnison River, Segment 2 | 0.4 | 0.4 | Fish | Recreational |
| 11 | Roubideau Creek, Segment 2 | 7.6 | 3.5 | Wildlife, Vegetation | Scenic |
| | | North Fork of the Gunnison River | | | |
| 12 | Deep Creek | 2.6 | 0.6 | Fish | Scenic |
| 13 | West Fork Terror Creek | 1.2 | 0.5 | Fish | Scenic |
| | | San Miguel River | | | |
| 15 | Dry Creek | 10.5 | 10.4 | Scenic, Geologic | Wild |
| 16 | Naturita Creek | 25.0 | 10.0 | Fish | Scenic |
| 24 | Tabeguache Creek, Segment 2 | 11.6 | 7.9 | Cultural, Vegetation | Recreational |
| | | Lower Dolores River | | | |
| 26 | North Fork Mesa Creek | 8.5 | 5.8 | Vegetation (not supported following review) | Scenic |
| | | Upper Dolores River | | | |
| 28 | Ice Lake Creek, Segment 2 | 0.6 | 0.3 | Scenic | Scenic |
| 29 | La Sal Creek, Segment 1 | 4.8 | 0.6 | Fish, Vegetation | Recreational |
| 32 | Lion Creek, Segment 2 | 1.6 | 1.3 | Vegetation | Scenic |
| 33 | Spring Creek | 2.7 | 1.5 | Vegetation | Recreational |

**ORVs for (34) Dolores River, Segment 1 were identified by the BLM Dolores Field Office and documented on page D-16 of the San Juan Public Lands Draft Land Management Plan, Appendix D.

BLM_0075666

**Final Wild and Scenic River Suitability**

TABLE 6 - SEGMENT CHANGES FROM ELIGIBILITY TO SUITABILITY

| HYDROLOGIC UNIT | RIVER SEGMENT | CHANGES FROM ELIGIBILITY TO SUITABILITY |
|---|---|---|
| **LOWER GUNNISON** | **7 - Monitor Creek** | • A fish survey conducted by the BLM indicates viable populations of Bluehead Sucker (*Catostomus discobolus*) and Flannelmouth Sucker (*Catostomus latipinnis*), warranting the addition of a Fish ORV.<br>• A Colorado Natural Heritage Program review lowered the rarity rankings of the narrowleaf cottonwood/strapleaf willow/silver buffaloberry and Fremont cottonwood/ skunkbush sumac plant communities to G3 (although the Vegetation ORV is still supported). |
| | **8 - Potter Creek** | • A fish survey conducted by the BLM indicates viable populations of Bluehead Sucker (*Catostomus discobolus*) and Flannelmouth Sucker (*Catostomus latipinnis*), warranting the addition of a Fish ORV.<br>• A Colorado Natural Heritage Program review lowered the rarity ranking of the narrowleaf cottonwood/strapleaf willow/silver buffaloberry plant community to G3 (although the Vegetation ORV is still supported). |
| | **10 - Roubideau Creek, Segment 1** | • A Colorado Natural Heritage Program review lowered the rarity ranking of the Fremont cottonwood/skunkbush sumac plant communities to G3 (although the Vegetation ORV is still supported).<br>• Reduced segment length to begin at UFO boundary and exclude private land upstream. |
| | **11 - Roubideau Creek, Segment 2** | • Following a review by the Colorado Natural Heritage Program that lowered the rarity ranking of the Fremont cottonwood/skunkbush sumac plant community to G3, the segment no longer possesses a Vegetation ORV and the remaining Wildlife ORV could not be adequately substantiated to support WSR eligibility. |

BLM_0075667

| HYDROLOGIC UNIT | RIVER SEGMENT | CHANGES FROM ELIGIBILITY TO SUITABILITY |
|---|---|---|
| SAN MIGUEL | 14 - Beaver Creek | • Changed classification from *Scenic* to *Recreational* to allow for protection of the ORV, while providing reasonable certainty that future water development projects could move forward with minimal difficulty. |
| | 19 - San Miguel River, Segment 2 | • Reduced segment length to end at the Bennett property in order to protect landowner interests at Horsefly Creek.<br>• Modified corridor boundaries to follow the natural topography of the canyon rims. |
| | 20 - San Miguel River, Segment 3 | • Changed classification from *Scenic* to *Recreational* due to the presence of the CC Ditch, two BLM campgrounds, and many number of mining claims along the stretch, as well as a dirt road running parallel to the river.<br>• Reduced segment length to exclude the Bennett property, as well as private land, at the lower end of the segment. |
| | 21 - San Miguel River, Segment 5 | • Reduced segment length to begin downstream from the Richards property, run the length of The Nature Conservancy property, and terminate at the confluence with Tabeguache Creek.<br>• Modified corridor boundaries to extend rim to rim and follow existing developments and barriers (such as the state highway). |
| | 22 - San Miguel River, Segment 6 | • Reduced segment length to begin downstream of Umetco Minerals Corporation property and terminate at the confluence with the Dolores River. |
| | 23 - Tabeguache Creek, Segment 1 | • Reduced segment length to begin at the USFS boundary and end above water diversion. |
| LOWER DOLORES | 25 - Lower Dolores River | • Reduced segment length to end at and exclude the Weimer property.<br>• Modified corridor to circumvent mining claims, using Highway 141 to delineate the east boundary and natural topographic features such as the canyon rim to delineate the west boundary. |
| | 26 - North Fork Mesa Creek | • Following a review by the Colorado Natural Heritage Program that lowered the rarity ranking of the narrowleaf cottonwood/ strapleaf willow/silver buffaloberry plant community to G3, the segment no longer possesses a Vegetation ORV to support WSR eligibility. |

BLM_0075668

**Final Wild and Scenic River Suitability**

| HYDROLOGIC UNIT | RIVER SEGMENT | CHANGES FROM ELIGIBILITY TO SUITABILITY |
|---|---|---|
| **UPPER DOLORES** | **27 - Dolores River, Segment 2** | • Modified segment corridor to exclude Buck Shot Mine and associated ROWs and to follow the cliff line if less than one-quarter mile from the river center. |
| | **30 - La Sal Creek, Segment 2** | • Changed classification from *Scenic* to *Recreational* in order to accommodate potential future mining activities and road improvements.<br>• Reduced segment length to end at and exclude the Cashin Mine. |
| | **34 - Dolores River, Segment 1** | • Reduced segment length to begin at the UFO boundary, terminate at the private land boundary south of Bedrock, and exclude the entire portion classified as *Recreational*.<br>• Delineated corridor boundary from rim to rim or one-quarter mile from high water mark (whichever measure is less). |

BLM_0075669

Case No. 1:20-cv-02484-MSK   Document 52-10   filed 04/28/21   USDC Colorado   pg 64 of 98

# C. SUITABLE SEGMENTS: ASSESSMENT & SUITABILITY DETERMINATION

BLM_0075670

**Final Wild and Scenic River Suitability**



**FIGURE 3 - (7) MONITOR CREEK**

BLM_0075671

**SUMMARY OF RATIONALE FOR DETERMINATION**

Monitor Creek was found to be *suitable* for WSR designation, with a classification of *Wild*. The BLM made this determination because:

- This segment is part of several interconnected stream segments in the Roubideau Creek watershed that support exceptionally high-quality riparian communities, some of which are vulnerable at a global scale. Interconnected riparian systems of this quality and extent are very unusual in the southern Rocky Mountain ecoregion. The land management standards associated with a suitability determination and with designation would help ensure the long-term sustainability of this ORV.

- Many of the stakeholders in the Gunnison River watershed stakeholder group are opposed to a determination of suitable because they believed it would impact water rights and grazing rights. However, the BLM concludes that a suitable determination and potential designation would not be likely to conflict with current or future uses of the segment. The BLM administers all lands within the segment. Upstream water rights are limited to small reservoirs and have priority dates that would be senior to any instream flow water rights for the segments. Current grazing practices have allowed the ORVs to persist, and a suitability determination would not require changes to grazing permits. Finally, the segment is largely in a natural, undeveloped state, and there are no existing mineral claims or leases.

- The Gunnison watershed stakeholder group expressed concern that other BLM administrative designations that could be used to protect the ORV, such as ACEC and SRMA designations, could impact human uses of the area, because such designations would extend far beyond the stream corridor. A suitable determination would protect the ORVs and would be restricted to 0.25-mile on each side of the stream, minimizing impacts on other uses.

- There is currently no instream flow protection for this segment, and the vegetation ORV is highly dependent on natural flow regimes. A suitability determination and designation would substantially increase the likelihood of obtaining permanent instream flow protection for riparian and fish values. The BLM is in the process of formulating an instream flow recommendation to the CWCB that is designed to protect both riparian and fish values. If this recommendation is ultimately adopted by the CWCB, it could serve as a template for flow protection on other streams that support a riparian ORV. To acknowledge this collaborative effort, the BLM's suitability determination includes the following finding:

  > *If scientific studies conclude that alternative forms of flow protection are in place and are sufficient to fully protect the flow-related ORVs on Monitor Creek, the BLM will determine it is unnecessary to quantify, assert, or adjudicate a federal reserved water right for this segment if it is ultimately designated into the NWSRS.*

BLM_0075672

*Final Wild and Scenic River Suitability*

# 7 ~ MONITOR CREEK



## ~SUITABLE SEGMENT~

*Classification:* **Wild**
*ORVs:* **Fish, Vegetation**
*Suitable Length:* **9.4 miles**
*BLM-administered:* **9.4 miles**
*Key Considerations:*

- Protecting a stream flow regime that mimics natural seasonal changes needed to sustain a healthy riparian vegetation community within the segment might only be achieved through federal WSR designation, but an opportunity exists to collaborate with the CWCB on flow protection.

- The small percentage of private land is primarily consolidated near the upper terminus and predominantly outside of areas containing the Vegetation ORV.



**LOWER GUNNISON HYDROLOGIC UNIT**

*Public Input*

Public support for suitability focused on providing a reliable and enduring form of protection for the continued health of rare plant communities and the riparian ecosystem, as well as citing values not considered for suitability (such as wilderness character and recreation opportunities). The State of Colorado communicated that it would not oppose a suitability determination, provided that its concerns about water rights, permitting, and classification were addressed.

Public comments opposing suitability cited existing protections, including a proposed conservation easement for adjacent land and a citizen-proposed wilderness area designation.

## SEGMENT ASSESSMENT

### OUTSTANDINGLY REMARKABLE VALUES

*Fish*

A recent fish survey conducted by the BLM indicates that Monitor Creek is likely to support viable populations of both Bluehead Sucker *(Catostomus discobolus)* and Flannelmouth Sucker *(Catostomus latipinnis)*, warranting the addition of a Fish ORV.

*Vegetation*

This segment supports a superior (A-ranked) occurrence of the common coyote willow riparian shrubland *(Salix exigua/mesic graminoids)*. Monitor Creek is within the Roubideau Creek Potential Conservation Area designated by the CNHP.

### WATER RIGHTS AND USES

Monitor Creek is a small headwater drainage managed primarily by the BLM and USFS. Flows can cease during extended dry periods, making the potential for future water development low. The segment has no existing instream flow water right protection.

BLM_0075673

Flow from Monitor Creek contributes heavily to Potter and Roubideau creeks downstream, providing spring spawning habitat for native warm water fishes.

There are no absolute or conditional water rights or impoundments in this segment, and absolute water rights upstream would not be affected by designation. A couple of small reservoirs (totaling 184 acre-feet of storage) occur above the upper terminus and have a slight potential to influence the flow regime through the segment.

## LAND OWNERSHIP AND USES

The BLM manages all of the land within the corridor, with private land primarily consolidated adjacent to the upper terminus. Because of the limited amount of adjacent private land and remote location, non-restrictive zoning in the area is not expected to have much of an impact on the segment. Travel along Monitor Creek is restricted to non-motorized vehicles on designated roads and trails.

### Special Designations
The segment is within a proposed Special Recreation Management Area, as well as two potential Areas of Critical Environmental Concern (ACEC) being considered within separate alternatives for the Uncompahgre RMP.

### Energy and Mineral Leasing
No existing oil and gas leases or mining claims occur within the segment.

## ADMINISTRATION

WSR designation would be consistent with actions pertaining to the Range-wide Conservation Agreement and Strategy for Roundtail Chub (Gila robusta), Bluehead Sucker (Catostomus discobolus), and Flannelmouth Sucker (Catostomus latipinnis) and would complement the BLM Colorado Public Land Health Standard for riparian vegetation.

Because of the predominance of public land, few additional resources and facilities would be needed to effectively manage and support the ORV.

State and local governments have not indicated an interest in sharing administration or funding of a designated river segment.

### Potential Costs Associated with WSR Designation
As a result of the suitability finding, the stream and corridor will be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

### Alternative Protective Measures Considered
ACEC designation would provide some protection for the segment, but would not confer the flow protection needed to support the Vegetation ORV. BLM staff determined that a state-based instream flow water right would very likely be sufficient to protect the Fish ORV, but that a state-based instream flow right sufficient to protect riparian values was an uncertain outcome because such rights are uncommon in Colorado.

BLM_0075674



**FIGURE 4 - (8) POTTER CREEK**

BLM_0075675

## SUMMARY OF RATIONALE FOR DETERMINATION

Potter Creek was found to be **suitable** for WSR designation, with a classification of **Wild**. The BLM made this determination because:

- This segment is part of several interconnected stream segments in the Roubideau Creek watershed that support riparian communities that are globally vulnerable and are of very high quality. Interconnected stream systems of this quality and extent are very unusual in the southern Rocky Mountain ecoregion. The land management standards associated with a suitability determination and with designation would help ensure the long-term sustainability of this ORV.

- Many of the stakeholders in the Gunnison River watershed stakeholder group are opposed to a determination of suitable because they believe it would impact water rights and grazing rights. However, the BLM concludes that a suitable determination and potential designation would not be likely to conflict with current or future uses of the segment. The BLM administers all lands within the segment. There are no water rights within or upstream from this segment. Current grazing practices have allowed the ORVs to persist, and a suitability determination would not require changes to grazing permits. Finally, the segment is largely in a natural, undeveloped state, and there are no existing mineral claims or leases.

- The Gunnison watershed stakeholder group expressed concern that other BLM administrative designations that could be used to protect the ORV, such as ACEC and SRMA designations, could impact human uses of the area, because such designations would extend far beyond the stream corridor. A suitable determination would protect the ORVs and would be restricted to 0.25-mile on each side of the stream, minimizing impacts on other uses.

## 8 ~ POTTER CREEK



### ~SUITABLE SEGMENT~

**Classification:** **Wild**

**ORV:** **Fish, Vegetation**

**Eligible Length:** **9.8 miles**

**BLM-Administered:** **9.8 miles**

**Key Considerations:**

- Most private land is relatively consolidated in one parcel near the lower terminus and predominantly outside of areas containing the Vegetation ORV. The segment would require few additional resources and facilities to manage effectively and support the ORV.

- Protecting a stream flow regime that mimics natural seasonal changes needed to sustain a healthy riparian vegetation community might only be secured through federal WSR designation, but an opportunity exists to collaborate with the CWCB on instream flow protection.



**LOWER GUNNISON HYDROLOGIC UNIT**

**Final Wild and Scenic River Suitability**

- This segment currently has instream flow protection, but the instream flow water right is not structured to protect the peak flow necessary to sustain the riparian community. A suitability determination and designation would substantially increase the likelihood of obtaining permanent flow protection for riparian values. The BLM is in the process of formulating an instream flow recommendation to the CWCB that is designed to protect both riparian and fish values. If this recommendation is ultimately adopted by the CWCB, it could serve as a template for flow protection on other streams that support a riparian ORV. To acknowledge this collaborative effort, the BLM's suitability determination includes the following finding:

    *If scientific studies conclude that alternative forms of flow protection are in place and are sufficient to fully protect the flow-related ORVs on Potter Creek, the BLM will determine it is unnecessary to quantify, assert, or adjudicate a federal reserved water right for this segment if it is ultimately designated into the NWSRS.*

### Public Input

Public support for suitability focused on providing a reliable and enduring form of protection for the continued health of the riparian ecosystem extending from USFS lands upstream, as well as outstanding opportunities for solitude and a primitive and unconfined form of recreation. The State of Colorado communicated that it would not oppose a suitability determination, provided that its concerns about water rights, permitting, and classification were addressed.

Public comments opposing suitability cited existing protections, including a proposed conservation easement for adjacent lands and a citizen-proposed wilderness area designation.

## SEGMENT ASSESSMENT

### OUTSTANDINGLY REMARKABLE VALUES

#### Fish

Fish surveys conducted by the BLM indicate that Potter Creek supports viable populations of both bluehead sucker *(Catostomus discobolus)* and Flannelmouth Sucker *(Catostomus latipinnis)*, warranting the addition of a Fish ORV.

#### Vegetation

This segment supports areas of narrowleaf cottonwood/ strapleaf willow/silver buffaloberry riparian forest *(Populus angustifolia/Salix ligulifolia/Shepherdia argentea)*. While the CNHP lowered the rarity ranking to G3, the BLM determined that the quality and extensiveness of the plant community warrants retaining the Vegetation ORV until a review determines whether or not the occurrence is superior (A-ranked). This segment is included in the Roubideau Creek Potential Conservation Area designated by the Colorado Natural Heritage Program.

BLM_0075677

## WATER RIGHTS AND USES

There are no absolute or conditional water rights or impoundments on or upstream of this segment. The CWCB holds an instream flow water right with 2004 priority date. The water right is decreed for 1.8 cfs (from March 1 to March 31), 4 cfs (from April 1 to June 15), 1.8 cfs (from June 16 to July 31), and 1.4 cfs (from August 1 to February 28), helping to sustain the Vegetation ORV.

Flow from Potter Creek contributes to the proper hydrologic function of Roubideau Creek and the Gunnison River downstream.

## LAND OWNERSHIP AND USES

All land within the corridor is managed by the federal government. One parcel of private land is adjacent to the lower terminus.

### Energy and Mineral Leasing
There are no existing oil and gas leases or mining claims within the segment.

## ADMINISTRATION

WSR designation would be consistent with actions pertaining to the Range-wide Conservation Agreement and Strategy for Roundtail Chub (*Gila robusta*), Bluehead Sucker (*Catostomus discobolus*), and Flannelmouth Sucker (*Catostomus latipinnis*) and would complement the BLM Colorado Public Land Health Standard for riparian vegetation.

State and local governments have not indicated an interest in sharing administration or funding of a designated river segment.

### Potential Costs Associated with WSR Designation
As a result of the suitable finding, the stream and corridor will be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

### Alternative Protective Measures Considered
The segment is within a proposed Special Recreation Management Area and two versions of a potential Area of Critical Environmental Concern are being considered during development of the Uncompahgre RMP.

BLM_0075678

**Final Wild and Scenic River Suitability**



FIGURE 5 - (10) ROUBIDEAU CREEK, SEGMENT 1

BLM_0075679

## SUMMARY OF RATIONALE FOR DETERMINATION

Roubideau Creek was found to be *suitable* for WSR designation, with a classification of *Wild*. The BLM made this determination because:

- This segment is part of several interconnected stream segments in the Roubideau Creek watershed that support riparian communities that are globally vulnerable and are of very high quality. Interconnected stream systems of this quality and extent are very unusual in the southern Rocky Mountain ecoregion. The land management standards associated with a suitability determination and with designation would help ensure the long-term sustainability of this ORV.

- Many of the stakeholders in the Gunnison River watershed stakeholder group are opposed to a determination of suitable because they believe it would impact water rights and grazing rights. However, the BLM concludes that a suitable determination and potential designation would not be likely to conflict with current or future uses of the segment. The BLM administers all lands within the segment. There are no water rights within the segment, and there is only one diversion above the segment that has water rights that are senior to the existing instream flow water right. Current grazing practices have allowed the ORVs to persist, and a suitability determination would not require changes to grazing permits. Finally, the segment is largely in a natural, undeveloped state, and there are no existing mineral claims or leases.

- The Gunnison watershed stakeholder group expressed concern that other BLM administrative designations that could be used to protect the ORV, such as ACEC and SRMA designations, could impact human uses of the area, because such designations would extend far beyond the stream corridor. A suitable determination would protect the ORVs and would be restricted to 0.25-mile on each side of the stream, minimizing impacts on other uses.

## 10 ~ ROUBIDEAU CREEK, SEGMENT 1



### ~SUITABLE SEGMENT~

*Classification:* **Wild**

*ORVs:* **Recreational, Wildlife, Cultural, Vegetation**

*Suitable Length:* **10.0 miles**

*BLM-Administered:* **10.0 miles**

*Key Considerations:*

- The segment contains a wide array of ORVs.
- The segment is within the Camel Back WSA.
- Private land is consolidated into one parcel near the upper terminus.
- Protection of a streamflow regime that mimics the natural seasonal changes needed to sustain a healthy riparian vegetation community for this segment might only be protected through WSR designation, but an opportunity exists to collaborate with the CWCB on instream flow protection.



**LOWER GUNNISON HYDROLOGIC UNIT**

BLM_0075680

**Final Wild and Scenic River Suitability**

- This segment currently has instream flow protection, but the instream flow water right is not structured to protect the peak flow necessary to sustain the riparian community. A suitability determination and designation would substantially increase the likelihood of obtaining permanent flow protection for riparian values. The BLM is in the process of formulating an instream flow recommendation to the CWCB that is designed to protect both riparian and fish values. If this recommendation is ultimately adopted by the CWCB, it could serve as a template for flow protection on other streams that support a riparian ORV. To acknowledge this collaborative effort, the BLM's suitability determination includes the following finding:

   *If scientific studies conclude that alternative forms of flow protection are in place and are sufficient to fully protect the flow-related ORVs on Roubideau Creek, the BLM will determine it is unnecessary to quantify, assert, or adjudicate a federal reserved water right for this segment if it is ultimately designated into the NWSRS.*

- Even though this segment is within the Camelback Wilderness Study Area (WSA), that designation does not provide permanent protection of the ORVs. Even if the area were ultimately designated by Congress as wilderness, there is no guarantee that the wilderness designation would contain water rights to protect flow-dependent values.

*Public Input*

Public support for suitability focused on providing a reliable and enduring form of protection for the continued health of the riparian ecosystem extending from USFS lands upstream, as well as outstanding opportunities for solitude and a primitive and unconfined form of recreation. The State of Colorado communicated that it would not oppose a suitability determination, provided that its concerns about water rights, permitting, and classification were addressed.

Public comments opposing suitability cited existing protections, including a proposed conservation easement for adjacent lands and a citizen-proposed wilderness area designation.

## SEGMENT ASSESSMENT

### OUTSTANDINGLY REMARKABLE VALUES

*Recreational*

The perennial creek flows within a highly scenic, wilderness-quality canyon, offering superior opportunities for non-mechanized recreation in a primitive setting. Activities include hiking, backpacking, horseback riding, photography, nature study, and other non-mechanized uses, with vehicle access at the lower terminus.

*Wildlife*

The area has been designated as a potential conservation area for the northern leopard frog *(Rana pipiens)*, a species currently under review by the Fish and Wildlife Service. This segment also provides regionally important habitat for desert bighorn sheep *(Ovis Canadensis)*, which use the lower end of the creek extensively as a water source and the cliffs above for lambing.

BLM_0075681

*Cultural*
The stream flows past an inscription panel of extreme historic significance. The site has been nominated to the National Register of Historic Places under *Criteria A, B,* and *D.* In 1769, Juan Maria Rivera visited the site at the behest of the king of Spain and carved his name and a date into a rock face. The panel also contains a prehistoric mountain sheep figure.

*Vegetation*
The segment lies within the CNHP-designated Roubideau Creek Potential Conservation Area, supporting areas of globally imperiled (G2) skunkbush sumac/sandbar willow riparian shrubland *(Rhus trilobata/Salix exigua).*

## WATER RIGHTS AND USES

The entire stream channel is federally managed. There are no absolute or conditional water rights or impoundments within the segment. In the headwaters, a water diversion known as Spruce Spring Ditch (decreed for up to 9.3 cfs) transfers water from Roubideau Creek to the Dry Creek drainage (typically limited to the snowmelt period). The diversion diminishes spring and early summer flow through the segment.

The CWCB holds an instream flow water right with a 2004 priority date. The water right is decreed for 5 cfs (from March 1 to March 31), 21 cfs (from April 1 to June 15), 5 cfs (from June 16 to July 31), and 1.9 cfs (from August 1 to February 28) and structured to preserve the natural environment to a reasonable degree. The instream flow provides partial protection of flows necessary to support the recreation, wildlife, and vegetation ORVs. .

This section of Roubideau Creek in turn contributes flow to the proper hydrologic function of Lower Roubideau Creek and the Gunnison River downstream, providing habitat for native warm water fishes consistent with actions in the Range-wide Conservation Agreement and Strategy for Roundtail Chub *(Gila robusta)*, Bluehead Sucker *(Catostomus discobolus)*, and Flannelmouth Sucker *(Catostomus latipinnis)*.

## LAND OWNERSHIP AND USES

The entire corridor is managed by the BLM. One parcel of private agricultural land is adjacent to the corridor's upper terminus.

*Special Designations*
The segment lies almost entirely within the Camel Back WSA.

*Energy and Mineral Leasing*
There are no existing oil and gas leases or mining claims within the segment.

## ADMINISTRATION

WSR designation would complement the BLM Colorado Public Land Health standard for riparian vegetation. The segment would require few additional resources and facilities to effectively manage in support of the ORV.

BLM_0075682

**Final Wild and Scenic River Suitability**

State and local governments have not indicated an interest in sharing administration or funding of a designated river segment.

### Potential Costs Associated with WSR Designation

As a result of the suitability finding, the stream and corridor will be managed to protect the ORVs, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

### Alternative Protective Measures Considered

Although the segment is within a WSA, the designation is provisional and may not offer the long-term flow protection necessary for sustaining the Vegetation ORV. In addition, the segment is within two versions of a potential Area of Critical Environmental Concern being considered within separate alternatives for the Uncompahgre RMP.

BLM_0075683



**FIGURE 6 - (14) BEAVER CREEK**

BLM_0075684

**Final Wild and Scenic River Suitability**

## SUMMARY OF RATIONALE FOR DETERMINATION

Beaver Creek was found to be *suitable* for WSR designation, with a classification of *Recreational*. The BLM made this determination because:

- This segment is part of several interconnected stream segments in the San Miguel River watershed that support riparian communities that are "A" ranked by the CNHP, indicating unusually high-quality riparian habitat. Interconnected stream systems of this quality are very unusual in the southern Rocky Mountain ecoregion. The land management standards associated with a suitability determination and with designation would help ensure the long-term sustainability of this ORV.

- BLM's Southwest Resource Advisory Council Subgroup, which included a broad array of stakeholders within the basin, recommended that this segment be determined suitable. In addition, there was strong public support for suitable determination.

- A suitable determination and potential designation would be consistent with potential development of mineral resources and protection of WSR values. Current mineral leases and mining claims may be developed, but will be subject to conditions to minimize impacts on WSR values. The suitable river corridor would remain open to mineral leasing, but leases would be subject to stipulations that prohibit surface disturbance within the suitable river corridor.

- While the current CWCB instream flow water right from Goat Creek to the San Miguel River provides some base flow protection for the vegetation ORV, it does not provide full protection because it does not protect peak flows that are necessary to support riparian communities, and it does not cover the entire length of the segment. The federal reserved water right that comes with designation would allow the BLM to file for a water right that provides full protection. However, it is also possible that BLM could work collaboratively with the CWCB to increase the instream flow water right to fully support the vegetation ORV. To acknowledge current instream flow protection and the potential to protect riparian flows by increasing the existing instream flow water right or by using other methods, the BLM's suitability determination includes the following finding:

    *If scientific studies conclude that alternative forms of flow protection are in place and are sufficient to fully protect the flow-related ORVs on Beaver Creek, the BLM will determine it is unnecessary to quantify, assert, or adjudicate a federal reserved water right for this segment if it is ultimately designated into the NWSRS.*

- The suitability determination has been structured to minimize conflict with long-term water supply initiatives. The stream segment has been classified as recreational, a classification that provides the greatest level of flexibility to allow for construction of infrastructure in the segment. Such infrastructure may be necessary for construction and operation of future water supply projects in upstream locations.

BLM_0075685

- Designation would be consistent with the programs and policies of other agencies. The Southwest Basin Roundtable Basin Implementation Plan identifies a suitable determination as a process that can be used to manage the nonconsumptive, water-dependent values associated with this segment.

*Public Input*

There was strong public support for suitability, including from the primary private landowner and San Miguel County, with protection of riparian vegetation and predominance of federal ownership most commonly cited as the rationale for support. The State of Colorado communicated that it would not oppose a suitability determination, provided that its concerns about water rights, permitting, and classification were addressed.

## SEGMENT ASSESSMENT

### OUTSTANDINGLY REMARKABLE VALUE

*Vegetation*

This segment supports an occurrence of narrowleaf cottonwood/blue spruce/thinleaf alder riparian forest *(Populus angustifolia/ Picea pungens/Alnus tenuifolia)* along several miles of the corridor ranked as superior (A) by the CNHP. The BLM has designated an area that includes this segment as part of the San Miguel ACEC, primarily in order to protect this outstanding riparian community.

### WATER RIGHTS AND USES

Beaver Creek provides flow for the proper hydrologic function of the San Miguel River system and river-dependent resource values (including aquatic and riparian plant and animal species).

The CWCB holds an instream flow water right along a portion of the segment from the confluence with Goat Creek to the confluence with San Miguel River. This water right holds a 1993 priority date and is decreed for 5 cfs (from May 1 to June 30) and 2.5 cfs (from July 1 to April 30). The instream flow provides some base flow protection to sustain the Vegetation ORV. A 2.7-mile portion of the segment from the upper terminus to the

## 14 ~ BEAVER CREEK



## ~SUITABLE SEGMENT~

*Classification:* **Recreational**
*ORV:* **Vegetation**
*Suitable Length:* **14.3 miles**
*BLM-Administered:* **14.2 miles**
*Key Considerations:*

- Water supply projects have been proposed for locations upstream from the segment. If the segment is designated and federal permits are required for the proposed water supply projects, project proponents would be required to avoid and minimize impacts on WSR values.

- A stream flow regime that mimics natural seasonal changes necessary for sustaining a healthy riparian vegetation community for this segment might only be achieved through WSR designation, but an opportunity exists to collaborate with the CWCB on flow protection.

- The principal private landowner within the corridor has expressed support for WSR designation.

**SAN MIGUEL HYDROLOGIC UNIT**

BLM_0075686

**Final Wild and Scenic River Suitability**

confluence with Goat Creek has no direct protection from instream flow water rights. However, this portion of the segment receives indirect protection the CWCB instream flow water right downstream. While there are no absolute or conditional water rights or impoundments within the segment, ditch diversions totaling 28 cfs and decreed storage rights totaling 203 acre-feet located upstream of the segment diminish flow through the segment, primarily during irrigation season.

The Naturita Canal presently diverts water from Beaver Creek upstream of the segment. The diversion is presently limited to a portion (approximately 60%) of the full decree due to water conveyance limitations of the canal system. As the infrastructure is improved to increase the water carrying capacity of the canal, more of the decree will be diverted, further depleting flows through the segment (based upon personal communication with Colorado Division of Water Resources Water Commissioner Aaron Todd). This water right is senior to both the existing state instream flow and any federal water right associated with WSR designation

Conditional water rights for direct flow totaling 10 cfs and 6,043 acre-feet of storage rights occur upstream of the segment and on tributaries. Some of these water rights are senior to the existing CWCB instream flow water rights.

According to the 2010 Statewide Water Supply Initiative, demand for municipal and industrial water supplies in San Miguel and Montrose Counties will increase from 5,900 acre-feet (low estimate) to 11,000 acre-feet (high estimate). Most future water demand will be met through conservation practices and development of existing water rights. However, the 2015 Southwest Basin Roundtable Basin Implementation Plan lists multiple projects that could be developed to meet future demand, including increased irrigation water demand. If these projects require federal agency permits for construction, they could be impacted by WSR designation of this segment, because the permitting agency would be required to consider downstream impacts on this segment. Three proposed projects have the potential to divert water upstream from this segment:

- Straw Reservoir – The Farmers Water Development Company holds a 6,000 acre-foot conditional storage right for a proposed dam immediately downstream from the existing Gurley Reservoir. The reservoir would be filled with diversions from Beaver Creek.

- Enlargement of Gurley Reservoir – The Farmers Water Development Company has proposed an enlargement of the existing Gurley Reservoir, which diverts water from Beaver Creek. Water rights have not yet been secured for this project.

- Enlargement of Lone Cone Reservoir – The Lone Cone Ditch and Reservoir Company and the Norwood Water Commission have obtained a 4,000 acre-foot conditional water right enlargement of the reservoir. The conditional water right is junior to the 1993 CWCB instream flow water right, but the conditional water right would be senior to any federal reserved water that comes with WSR designation. The water supply for the enlargement would be diverted from Naturita Creek and Goat Creek, which is a tributary to Beaver Creek.

BLM_0075687

## LAND OWNERSHIP AND USES

Land ownership is primarily federal within an approximately one quarter-mile buffer of the creek. Approximately 13% of land in the San Miguel County portion of the corridor is private. Private lands on the east side of Beaver Creek are in the Forestry, Agriculture, and Open Zone District, which is intended to preserve large, relatively remote areas of the county for resource, agricultural, open space, and recreational proposes. These areas currently have minimal public facilities and services and are considered inappropriate for substantial development. Development and/or special uses are encouraged to be located away from environmentally sensitive land.

Private lands on the west side of the corridor are within the Wright's Mesa Zone District. The district is intended to preserve the rural and agricultural character of Wright's Mesa while encouraging compatible, diverse economic opportunities that complement the rural landscape. Wright's Mesa has a history of coexisting agricultural, ranching, residential, and small business uses that comprise its rural character. The district discourages sprawl patterns typically created by 35-acre lots by offering reasonable alternatives and incentives to cluster buildings, retain open lands, and keep large parcels intact.

The Beaver Creek corridor is closed to OHV use.

### ROWs
Numerous BLM ROW authorizations cross or run adjacent to the creek, including distribution and transmission powerlines operated by Western Area Power Administration (WAPA)/Tri-State, a gas pipeline, a Colorado Department of Transportation (CDOT) highway, and a county road. These ROWs are primarily concentrated near the confluence of Beaver Creek with the San Miguel River.

### Energy and Mineral Resources
There are existing oil and gas leases within the segment, and these leases could be developed pursuant to lease stipulations included at the time of leasing. All future oil and gas leases would be subject to stipulation NSO-11, which would allow the minerals to be developed, but would prohibit surface occupancy within 325 feet of the stream. Active mining claims for locatable minerals occur within the segment corridor and have a prior existing right to mineral deposits. Any existing or future mining claims could be developed pursuant to regulations found under 43 CFR 3809 and the BLM Wild and Scenic Rivers Manual 6400, Section 3.6, which require the BLM to allow mineral development but to minimize impacts on WSR values.

## ADMINISTRATION

Although compatible with WSR designation, neither the existing ACEC and Special Recreation Management Area designations secure sufficient instream flow protection to sustain the Vegetation ORV.

Segment access is somewhat restricted by limited existing roads and trails.

WSR designation would complement the BLM Colorado Public Land Health standard for riparian vegetation.

BLM_0075688

**Final Wild and Scenic River Suitability**

State and local governments have not indicated an interest in sharing administration or funding of a designated river segment.

### Potential Costs Associated with WSR Designation

As a result of the suitability finding, the stream and corridor will be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Costs for administering and managing this segment for the Vegetation ORV are not likely to increase much above current funding levels. Factors that assist in protecting the ORV include: remoteness of the segment, limited trail access, and the predominance of federal land managed as an ACEC for riparian protection. It is unlikely that additional facilities would be needed to enhance management.

### Alternative Protective Measures Considered

WSR designation would provide the highest level of protection for the Vegetation ORV because designation would include a federal reserved water right that protects flow rates that mimic natural, seasonal variation in flows. However, even if a federal reserved water right is created, it would be junior to all existing water rights on the creek, and could not ensure adequate flows to support riparian values under all hydrologic conditions.

Several existing authorities and segment features provide a lesser level of ORV protection, including an ACEC designation that protects riparian values, an existing state-based instream flow water right, environmentally supportive San Miguel County land use codes, and a high percentage of federally managed land within the corridor.

BLM_0075689



**FIGURE 7 - (17) SALTADO CREEK**

BLM_0075690

**Final Wild and Scenic River Suitability**



# 17 ~ SALTADO CREEK

## ~SUITABLE SEGMENT~

*Classification:* **Wild**
*ORV:* **Vegetation**
*Suitable Length:* **5.6 miles**
*BLM-Administered:* **4.1 miles**
*Key Considerations:*

- A stream flow regime that mimics natural seasonal changes necessary for sustaining a healthy riparian community might only be achieved through designation, but an opportunity exists to collaborate with the CWCB on instream flow protection.
- San Miguel County and a local homeowners association have expressed support for WSR designation.
- The majority of the segment is comprised of contiguous BLM-administered land, allowing for efficient management if designated.
- There are no roads or water right diversions within the segment.



**SAN MIGUEL
HYDROLOGIC UNIT**

## SUMMARY OF RATIONALE FOR DETERMINATION

Saltado Creek was found to be *suitable* for WSR designation, with a classification of *Wild*. The BLM made this determination because:

- This segment is part of several interconnected stream segments in the San Miguel River watershed that support riparian communities that are ranked as superior (A) by the CNHP, indicating unusually high-quality riparian habitat. Interconnected stream systems of this quality are very unusual in the southern Rocky Mountain ecoregion. The land management standards associated with a suitability determination and with designation would help ensure the long-term sustainability of this ORV.

- The BLM's Southwest Resource Advisory Council Subgroup, which included a broad array of stakeholders within the basin, recommended that this segment be determined suitable. In addition, there was strong public support for suitable determination.

- A suitable determination and potential designation would be consistent with potential development of mineral resources and protection of WSR values. Current mineral leases and mining claims could be developed, but would be subject to conditions to minimize impacts on WSR values. The suitable river corridor would remain open to mineral leasing, but leases would be subject to stipulations that prohibit surface disturbance within the suitable river corridor.

- While the current CWCB instream flow water right provides some base flow protection for the riparian ORV, it does not provide full protection because it does not protect peak flows that are necessary to support riparian communities. The federal reserved water right that comes with designation would allow the BLM to file for a water right that provides full protection. However, it is also possible that the BLM could work collaboratively with the CWCB to increase the instream flow water right to fully support the riparian ORV. To acknowledge current instream flow protection and the potential to protect

BLM_0075691

riparian flows by increasing the existing instream flow water right or by using other methods, the BLM's suitability determination includes the following finding:

*If scientific studies conclude that alternative forms of flow protection are in place and are sufficient to fully protect the flow-related ORVs on Beaver Creek, the BLM will determine it is unnecessary to quantify, assert, or adjudicate a federal reserved water right for this segment if it is ultimately designated into the NWSRS.*

- The BLM is not aware of any major water supply projects that are proposed within the Saltado Creek watershed, so a suitability determination and designation would not be in conflict with long-term water supply initiatives.

- Designation would be consistent with the programs and policies of other agencies. The Southwest Basin Roundtable Basin Implementation Plan identifies a suitable determination as a process that can be used to manage the nonconsumptive, water-dependent values associated with this segment.

### Public Input
There was strong public support for suitability, including from a local homeowners association and San Miguel County, with the protection of riparian vegetation and stream-related values most commonly cited as the rationale for designation. The State of Colorado communicated that it would not oppose a suitability determination, provided that its concerns about water rights, permitting, and classification were addressed.

## SEGMENT ASSESSMENT

### OUTSTANDINGLY REMARKABLE VALUE

#### Vegetation
This segment supports an occurrence of narrowleaf cottonwood/blue spruce/thinleaf alder riparian forest *(Populus angustifolia/ Picea pungens/Alnus incana ssp. tenuifolia)* along several miles of its length ranked as superior (A) by the CNHP. The BLM has designated an area that includes this segment as part of the San Miguel ACEC, primarily in order to protect this outstanding riparian community.

### WATER RIGHTS AND USES

The CWCB holds an instream flow water right along the entire segment with a 1993 priority date. The water right is decreed for 2 cfs (from May 1 to June 30) and 1 cfs (from July 1 to April 30).

Water yield through the segment contributes to the proper hydrologic function of the San Miguel River.

There are no water diversions or impoundments within the segment. Absolute water rights upstream of the segment include ditch diversions totaling 39 cfs and storage rights totaling 11.4 acre-feet. These water rights cause some depletion of streamflow through the segment, especially during the irrigation season.

**Final Wild and Scenic River Suitability**

Conditional water rights above the upper terminus include flow diversions totaling 5 cfs and storage rights totaling 15 acre-feet. If developed, these water rights would have seniority over the existing instream flow and any water right established as part of WSR designation, and could further diminish flow through the segment.

## LAND OWNERSHIP AND USES

Approximately 18% of the corridor consists of private land within the Forestry, Agriculture, and Open Zone District of San Miguel County. The district is intended to preserve large, relatively remote areas of the county for resource, agricultural, open space, and recreational proposes. These areas currently have minimal public facilities and services and are considered inappropriate for substantial development. Development and special uses are encouraged to be located outside of environmentally sensitive areas.

### Special Designations
The segment is within the San Miguel Special Recreation Management Area and ACEC. The area is closed to OHV use.

### ROWs and Withdrawals
Numerous BLM ROW authorizations cross or briefly run adjacent to the creek, including distribution and telephone lines, a CDOT highway, two WAPA transmission lines, and the Tri-State Nucla-Sunshine 115 kV transmission project.

While portions of the segment are within an area identified as a Powersite Classification, the classification does not preclude WSR designation. The federal government acquired public access easement across private lands adjacent to the creek in the southern upper reach of the segment.

### Energy and Mineral Leasing
There are existing oil and gas leases within the segment, and these leases could be developed pursuant to lease stipulations included at the time of leasing. All future oil and gas leases would be subject to stipulation NSO-11, which would allow the minerals to be developed, but would prohibit surface occupancy within 325 feet of the stream. Active mining claims for locatable minerals occur within the segment corridor and have a prior existing right to mineral deposits. Any existing or future mining claims could be developed pursuant to regulations found under 43 CFR 3809 and the BLM Wild and Scenic Rivers Manual 6400, Section 3.6, which require the BLM to allow mineral development but to minimize impacts on WSR values.

## ADMINISTRATION

The northern lower reach of the segment has contiguous public land and lack of development, while along the southern upper reach, land ownership is split. WSR designation would be consistent with the BLM Colorado Public Land Health standard for riparian vegetation.

State and local governments have not indicated an interest in sharing administration or funding of a designated river segment.

BLM_0075693

### Potential Costs Associated with WSR Designation

As a result of the suitability finding, the stream and corridor will be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Administering and managing this segment for the Vegetation ORV would require a moderate increase in funding over current levels. The segment is remote, has no developed access, and 82% of the corridor is federal land managed as an ACEC for riparian protection, factors that assist in protecting the ORV.

It is unlikely that additional facilities would be necessary as a result of WSR designation. If available for purchase from willing sellers, private land parcels within the corridor would have added value for ORV protection.

### Alternative Protective Measures Considered

Several existing authorities and segment features provide a lesser level of ORV protection, including: an ACEC designation intended to protect riparian values, an existing state-based instream flow water right, environmentally supportive San Miguel County land use codes, and a high percentage of federally managed land within the corridor.

BLM_0075694



**FIGURE 8 - (18) SAN MIGUEL RIVER, SEGMENT 1**

BLM_0075695

## SUMMARY OF RATIONALE FOR DETERMINATION

San Miguel River Segment 1 was found to be *suitable* for WSR designation, with a classification of *Recreational*. The BLM made this determination because:

- The segment supports a very high number of ORVs. The land management standards associated with a suitability determination and with designation would help ensure the long-term sustainability of the ORVs.

- Even though this segment is presently managed under ACEC and SRMA designations, those designations are focused on protecting riparian and recreational resources. They are not designed to comprehensively protect all of the ORVs. Designation would provide permanent protection and additional resources for management of all of the identified ORVs.

- The BLM's Southwest Resource Advisory Council Subgroup, which included a broad array of stakeholders within the basin, recommended that this segment be determined suitable. While concerns were raised regarding uranium and recreational placer mining within the segment, the Resource Advisory Council Subgroup believed that a *Recreational* classification would allow for the continuation of these activities.

- A suitable determination and potential designation would be consistent with potential development of mineral resources and protection of WSR values. Current mineral leases and mining claims could be developed, but would be subject to conditions to minimize impacts on WSR values. The suitable river corridor would remain open to mineral leasing, but leases would be subject to stipulations that prohibit surface disturbance within the suitable river corridor.

- The BLM can rely upon the instream flow water right appropriated by the CWCB that covers this segment to protect water-dependent environmental values, avoiding a potential conflict between State of Colorado water interests and a federal reserved water right that comes with designation. The CWCB does not have the authority to appropriate flows to protect recreational values, but there are other potential processes, including applications by local governments for recreational water rights, that could protect recreational values. To acknowledge current instream flow protection and the potential to protect recreation flows by using other methods, the BLM's suitability determination includes the following finding:

  *If scientific studies conclude that alternative forms of flow protection are in place and are sufficient to fully protect the flow-related ORVs on the San Miguel River, the BLM will determine it is unnecessary to quantify, assert, or adjudicate a federal reserved water right for this segment is it is ultimately designated into the NWSRS.*

- Designation would be consistent with long-term water supply initiatives. The BLM has determined that management under suitable status or designated status would not be likely to interfere with future upstream water supplies for municipal, industrial, and agricultural use.

BLM_0075696

**Final Wild and Scenic River Suitability**

## 18 ~ SAN MIGUEL RIVER, SEGMENT 1



### ~SUITABLE SEGMENT~

**Classification:** Recreational

**ORV:** Scenic, Recreational, Wildlife, Historic, Vegetation, Paleontology

**Suitable Length:** 27.2 miles

**BLM-Administered:** 17.3 miles

**Key Considerations:**

- The current CWCB instream flow water right for this segment provides base flow protection for the vegetation ORV. However, the CWCB is not authorized to appropriate flows to support recreation uses. Recreation flows could potentially be protected by water rights held by local governments or by a federal water right associated with designation.

- Over 80% of land within the segment is public. Most of the segment is within San Miguel County, which has expressed support for WSR designation. A small portion of the segment is within Montrose County, which opposes designation.

**SAN MIGUEL HYDROLOGIC UNIT**

- Designation would be consistent with the programs and policies of other agencies. The Southwest Basin Roundtable Basin Implementation Plan identifies a suitable determination as a process that can be used to manage the nonconsumptive, water-dependent values associated with this segment.

### Public Input

The segment received much support for and opposed to suitability, with supporters (including San Miguel County) citing the unparalleled scenery and natural and cultural features within the corridor and opponents (including the Montrose County Board of Commissioners) expressing concern over potential restrictions on historic uses. The State of Colorado communicated that it would not oppose a suitability determination, provided that its concerns about water rights, permitting, and classification were addressed.

## SEGMENT ASSESSMENT

### OUTSTANDINGLY REMARKABLE VALUES

#### Scenic

An interdisciplinary BLM field inventory team evaluated and assigned this section of the San Miguel a *Scenic Quality Classification* of A. The river here is boulder-strewn, with a strong and constant gradient. The energetic, splashy flow is the keystone to the scenic quality of the reach. The color and contrast provided by steep canyon walls and interesting erosional patterns add to the visual appeal. Thick, diverse riparian vegetation provides additional scenic interest, changing in color and density throughout the growing season. From Deep Creek to Leopard Creek, stunning views of the San Juan mountain range enhance the landscape. A few modifications, including power lines and roads, are a minor detraction from the scenery.

#### Recreational

This entire segment of the San Miguel is within the San Miguel River Special Recreation Management Area and provides superior opportunities for river-related recreation. The river is easily accessed via paved highway and contains a number of high-quality BLM recreation

BLM_0075697

sites, including six developed boat launches, six picnic areas, a campground, and an interpretive center. During snowmelt, whitewater rafters and kayakers are challenged by the swift currents and complex hydraulics of this boulder-strewn river. Outside of the snowmelt season, the river provides excellent opportunities for trout fishing on complex pocket water. Fishing enthusiasts may access the river via foot or raft.

The river's reputation for outstanding recreation, combined with the availability of commercial guide services, consistently draws visitors from around the world. This section also offers exceptional opportunities for sightseeing and photography along the Unaweep-Tabeguache Byway. The byway is marketed to visitors both within and outside of Colorado by the Unaweep-Tabeguache Byway Committee and the Colorado Office of Tourism.

### Wildlife

Portions of the river corridor in this segment represent one of the finest protected Southwest Canyon Riparian Habitat sites in the United States. The Southwest Canyon Riparian Habitat is recognized as the richest terrestrial bird habitat type in North America, providing breeding sites for a wide variety of species, and primary migratory routes for nearly all songbirds throughout the western United States. According to the National Audubon Society, more than 300 bird species have been observed in the San Miguel River corridor.

### Historic

Remnants of an old railroad grade follow along much of this section. The Rio Grande Southern Railroad operated a fleet of seven unusual railcars along a narrow gauge track from the 1930s until service ended in 1952, at which point the line was decommissioned. The rail line was known as the Galloping Goose. Built from car, truck, and bus parts, the lightweight "motors" proved to be an economical method for transporting mail and passengers between Durango and Ridgway.

The remains of historic uranium ore processing loadout areas are also present along this stretch. The site qualifies for nomination to the National Register of Historic Places under *Criterion A*.

### Vegetation

This reach supports occurrences of four riparian communities, river birch/mesic graminoid riparian shrubland *(Betula occidentalis/mesic graminoids)*, narrowleaf cottonwood/blue spruce/thinleaf alder riparian forest *(Populus angustifolia/Picea pungens/Alnus incana ssp. tenuifolia)*, narrowleaf cottonwood/thinleaf alder riparian woodland *(Populus angustifolia/Alnus incana ssp. tenuifolia)*, and thinleaf alder/mesic graminoid riparian shrubland *(Alnus incana ssp. tenuifolia/mesic graminoids)*, ranked as Superior (A) by the CNHP. The reach falls within the Middle San Miguel Potential Conservation Area and the BLM has designated an area which includes this segment as part of the San Miguel ACEC, primarily to protect these outstanding riparian communities.

### Paleontology

For many miles, the canyon formed by the San Miguel River exposes chunks of the Morrison Formation, remnants of a one hundred million-year old river bed. This Jurassic-age river meandered eastward from the ancestral Rocky Mountains into immense inland seas. Many fossils, including rare fish, plants, and fragmentary dinosaur bones, can be found along this stretch.

BLM_0075698

**Final Wild and Scenic River Suitability**

## WATER RIGHTS AND USES

Water yield through the segment contributes to the proper hydrologic function of the lower San Miguel River and Dolores River downstream.

The CWCB holds two instream flow water rights structured to preserve the natural environment to a reasonable degree. The instream flow water right from Deep Creek to Fall Creek holds a 1984 priority date and provides for a year-round flow of 20 cfs. The instream flow water right from Fall Creek to Horsefly Creek holds a 2002 priority and protects 93 cfs from May 1 to October 14 and 61 cfs for the remainder of the year. These flow rates were established to support cold water fisheries, and may not be fully protective of riparian values. The CWCB does not have legal authority to appropriate instream flow water rights for recreational purposes.

According to the 2010 Statewide Water Supply Initiative, demand for municipal and industrial water supplies in San Miguel County will increase from 2,900 acre-feet (low estimate) to 6,000 acre-feet (high estimate) annually. Most future water demand will be met through conservation practices and development of existing water rights. However, the 2015 Southwest Basin Roundtable Basin Implementation Plan lists multiple projects that could be developed to meet future demand, including increased irrigation water demand. If these projects require federal agency permits for construction, they could be impacted by WSR designation of this segment, because the permitting agency would be required to consider downstream impacts on this segment. These upstream projects include:

- Straw Reservoir – The Farmers Water Development Company holds a 6,000 acre-foot conditional storage right for a proposed dam immediately downstream from the existing Gurley Reservoir. The reservoir would be filled with diversions from Beaver Creek.

- Enlargement of Gurley Reservoir – The Farmers Water Development Company has proposed an enlargement of the existing Gurley Reservoir, which diverts water from Beaver Creek. Water rights have not yet been secured for this project.

- Enlargement of Lone Cone Reservoir – The Lone Cone Ditch and Reservoir Company and the Norwood Water Commission have obtained a 4,000 acre-foot conditional water right enlargement of the reservoir. The water supply for the enlargement would be diverted from Naturita Creek and Goat Creek.

Approximately six water diversions scattered along the segment are not prominent features in the corridor and do not detract from the natural character of the river. Impoundments upstream of the segment include Trout Lake and Hope Lake on the Lake Fork tributary. There are a few off-channel impoundments within the segment associated with Cascabel Ranch near the lower terminus.

According to a draft BLM San Miguel instream flow assessment, senior water rights on the mainstem of the San Miguel River between Horsefly Creek and Naturita Creek divert water downstream of the segment. Much of this water demand is conveyed through the segment, but the demand is limited primarily to the irrigation season.

BLM_0075699

Estimates from the Colorado HydroBase Decision Support System indicate that there are more than 160,000 acre-feet of conditional storage water rights within and upstream of the segment. If developed, these rights could influence flow through the segment.

## LAND OWNERSHIP AND USES

### Zoning

A portion of the segment within Montrose County is zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. Many of these uses are not related to agriculture and have the potential to conflict with the intent of the WSR Act.

Portions of the corridor downstream of Beaver Creek and on the southwest side of the San Miguel River are within the Wright's Mesa Zone District in San Miguel County. The district is intended to preserve the rural and agricultural character of Wright's Mesa while encouraging diverse economic opportunities compatible with the rural landscape. Wright's Mesa has a history of coexisting agriculture, ranching, residential, and small business uses that comprise its rural character. The district discourages large-lot patterns of sprawl (typically created through 35-acre developments) by offering alternatives and incentives to cluster buildings, retain open lands, and keep large parcels intact.

The remaining portions of the corridor within San Miguel County are primarily in the Forestry, Agriculture, and Open Zone District. The district is intended to preserve large, relatively remote areas of the county for resource, agricultural, open space, and recreational purposes. These areas currently have minimal public facilities and services and are considered inappropriate for substantial development. Development and/or special uses are encouraged to be located away from environmentally sensitive land.

The incorporated town of Placerville is zoned into two districts: The Placerville Residential Zone District provides areas and design standards for single-family residences surrounding the Placerville Commercial Zone District. The Placerville Commercial Zone District provides standards for commercial establishments located on Front Street in Placerville and at the southwest corner of the intersection of State Highways 62 and 145 west of Placerville. The size of the district cannot be increased.

There are a few planned unit developments along the San Miguel River in the vicinity of the incorporated town of Sawpit. The allowed uses within the planned unit developments are primarily single family housing on large lots (with a minimum of 35 acres). Other uses, such as multi-family housing and neighborhood commercial development, are allowed upon approval from the Board of County Commissioners.

### ROWs and Withdrawals

ROWs within the segment include four power and nine telephone lines, gas pipelines, private access roads, county roads, a highway, an historic ditch, two WAPA 345-kilovolt power lines, the McKeever drift fence to the USFS boundary, and C-64335 river diversion weirs.

BLM_0075700

While portions of the segment are within an area identified by the Federal Energy Regulatory Commission as having potential for hydropower development, classification as a Power Site does not preclude WSR designation.

### Energy and Mineral Leasing

There are existing oil and gas leases within the segment, and these leases could be developed pursuant to lease stipulations included at the time of leasing. All future oil and gas leases would be subject to stipulation NSO-9, which would allow the minerals to be developed, but would prohibit surface occupancy within 400 meters from of stream. Active mining claims for locatable minerals occur within the segment corridor and have a prior existing right to mineral deposits. Any existing or future mining claims could be developed pursuant to regulations found under 43 CFR 3809 and the BLM Wild and Scenic Rivers Manual 6400, Section 3.6, which require the BLM to allow mineral development but to minimize impacts on WSR values.

### ADMINISTRATION

Several private land parcels are scattered throughout the corridor. A small portion of the segment is within Montrose County, which has adopted a resolution opposing WSR designation.

WSR designation would complement BLM Colorado Public Land Health standards for riparian vegetation and wildlife.

State and local governments have not indicated an interest in sharing administration or funding of a designated river segment.

### Special Designations

Most of the segment is within a Special Recreation Management Area and an ACEC.

### Potential Costs Associated with WSR Designation

As a result of the suitability finding, the stream and corridor will be managed to protect the ORVs, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

The costs for managing this segment for the Scenic, Recreational, Wildlife, Historic, Vegetation, and Paleontologic ORVs would be moderately higher than current funding levels. The segment is within an existing Special Recreation Management Area and an ACEC from Placerville downstream, both of which have resulted in additional funding and resource protection actions along the river corridor.

A state highway parallels most of this reach, providing for easy access and use of the river and riparian area.

The segment includes several scattered parcels of private land. The BLM would pursue land acquisition from willing sellers as funding and opportunities arose, which would add value toward management and protection of the ORVs.

BLM_0075701

*Alternative Protective Measures Considered*

While WSR designation would provide the most comprehensive protection for the ORVs, several existing authorities and segment features provide some lesser level of ORV protection:

- ACEC and Special Recreation Management Area designations emphasize management for riparian and recreation values.

- An existing state-based instream flow water right in the San Miguel River helps to sustain the water-dependent ORVs.

- Development objectives on private lands in most of the segment are within the San Miguel County Land Use Code, which promotes preserving large remote areas for resource, agricultural, open space, and recreational purposes.

- A large portion of private land within the corridor is managed by The Nature Conservancy, which supports a finding of suitability.

In addition, conservation easements could be pursued on select private portions of the corridor, which would be value added in providing protection for the ORVs.

BLM_0075702



**FIGURE 9 - (19) SAN MIGUEL RIVER, SEGMENT 2**

BLM_0075703

## SUMMARY OF RATIONALE FOR DETERMINATION

San Miguel River Segment 2 was found to be *suitable* for WSR designation, with a classification of *Wild*. The BLM made this determination because:

- The segment supports a very high number of ORVs. The land management standards associated with a suitability determination and with designation would help ensure the long-term sustainability of the ORVs. In addition, this segment is the only segment along the San Miguel River classified as *Wild*, so the segment provides a unique recreational opportunity for solitude and primitive and unconfined recreation.

- Even though this segment is presently managed under ACEC and SRMA designations, those designations are focused on protecting riparian and recreational resources. They are not designed to comprehensively protect all of the ORVs. Designation would provide permanent protection and additional resources for management of all of the identified ORVs.

- The BLM's Southwest Resource Advisory Council Subgroup, which included a broad array of stakeholders within the basin, recommended that this segment be determined suitable. The Resource Advisory Council Subgroup considered overall land health within the segment to be of primary concern. While the impact of grazing on the Vegetation ORV is addressed to some extent through the current ACEC and SRMA designations, it was determined that WSR designation would provide longer-lasting protections. The BLM shortened the segment to end at the Bennett property in order to protect landowner interests at Horsefly Creek, and the natural topography of the canyon rims would be used to delineate the corridor.

- A suitable determination and potential designation would be consistent with potential development of mineral resources and protection of WSR values. Current mineral leases and mining claims could be developed, but would be subject to conditions to minimize impacts on WSR values. The suitable river corridor would remain open to mineral leasing, but leases would be subject to stipulations that prohibit surface disturbance within the suitable river corridor.

- The BLM can rely upon the instream flow water right appropriated by the CWCB that covers this segment to protect water-dependent environmental values, avoiding a potential conflict between State of Colorado water interests and a federal reserved water right that comes with designation. The CWCB does not have the authority to appropriate flows to protect recreational values, but there are other potential processes, including applications by local governments for recreational water rights, that could protect recreational values. To acknowledge current instream flow protection and the potential to protect recreation flows by using other methods, the BLM's suitability determination includes the following finding:

  *If scientific studies conclude that alternative forms of flow protection are in place and are sufficient to fully protect the flow-related ORVs on the San Miguel River, the BLM will determine it is unnecessary to quantify, assert, or adjudicate a federal reserved water right for this segment is it is ultimately designated into the NWSRS.*

BLM_0075704