This water right covers only the snowmelt runoff period because the Templeton Ditch, located close to the upper terminus of the segment, can dewater the creek downstream of the diversion during the summer months. The ditch is decreed for 5.5 cfs and is senior to the instream flow water right.

Several small stock reservoirs and ditch diversions on tributaries draining into the segment are decreed for a total of 62.3 cfs in direct flow rights and 46 acre-feet of storage rights. Changing points of diversion on existing water rights within the segment could be restricted by any instream flow right associated with WSR designation.

If developed, a conditional water right ditch diversion of 3.5 cfs upstream of the segment could result in additional diminution of flow through the segment. Conditional water rights are senior to the CWCB instream flow water right and any future instream flow water right associated with WSR designation.

The majority of the watershed upstream of this segment is managed by the BLM or USFS, and much of the federal acreage is within the Tabeguache Area, which is managed for wilderness values. Given this land ownership pattern, it is unlikely that significant new uses of water will diminish flows in this segment.

## LAND OWNERSHIP AND USES

Private property within the corridor consists of three distinct parcels separated by public land. The scattered land configuration provides opportunities for land uses that could negatively impact the ORVs. Approximately 17.2% of the corridor consists of private land zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. Many of the allowable and special uses are not related to agriculture and have the potential to conflict with the intent of the WSR Act.

### Special Designations
Cultural resources within the segment are on the National Register of Historic Places. In addition, cultural resources are protected by the Archaeological Resources Protection Act and the National Historic Preservation Act.

### Rights-of-Way and Withdrawals
ROWs within the corridor include county roads V19 & U19, telephone and power lines adjacent to and crossing the creek, and an historic ditch adjacent to the creek in the upper part of the segment. In the Uncompahgre Proposed RMP, SSR-13 would apply to the creek. This stipulation would implements a ROW avoidance area for 325 feet on each side of the creek.

While portions of the segment are within an area classified as having Waterpower and Reservoir Resources the Powersite Classification does not preclude WSR designations.

### Energy and Mineral Leasing
There are existing oil and gas leases within the segment. Per the Uncompahgre Proposed RMP, future oil and gas leases would be subject to NSO-11, which would prohibit surface occupancy

**Final Wild and Scenic River Suitability**

within 325 feet of all perennial streams. In addition, CSU-12 would allow the BLM to require special operation constraints, including relocation of operations beyond 656 feet of the creek.

Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

### ADMINISTRATION

WSR designation would complement the BLM Colorado Public Land Health standard for riparian vegetation.

Management actions in support of the Range-wide Conservation Agreement and Strategy for Roundtail Chub *(Gila robusta)*, Bluehead Sucker *(Catostomus discobolus)*, and Flannelmouth Sucker *(Catostomus latipinnis)*, which are focused upon maintaining and improving stream habitat, would also be likely to benefit the Vegetation ORV.

State and local governments have not indicated an interest in sharing administration or funding of a designated WSR.

#### Potential Costs Associated with WSR Designation
Costs for administering and managing this segment for the Cultural and Vegetation ORVs would be moderately higher than current funding levels. Portions of the segment can be accessed by county roads which would facilitate increased visitor use if designated.

The corridor does include parcels of private land containing riparian vegetation. As funding and opportunities arise, the BLM would pursue land acquisition from willing sellers, which would assist with protecting the Vegetation ORV.

#### Alternative Protective Measures Considered
Congressional designation of the Tabeguache Area upstream of the segment (which includes Tabeguache Creek, Segment 1 and a contiguous USFS segment) to protect wilderness assets with delivering reliable flow to this segment. The CWCB instream flow water right provides partial protection of flows needed to support the Vegetation ORV.

The segment does not qualify for ACEC or SRMA designation. However, proposed BLM land use prescriptions and stipulations would provide substantial protection to the creek corridor.

BLM_0075793



**FIGURE 26 - (26) NORTH FORK MESA CREEK**

## 26 ~ NORTH FORK MESA CREEK



### ~NOT SUITABLE~

*Classification:* **Scenic**

*ORV:* **Vegetation** (not supported following review)

*Eligible Length:* **8.5 miles**

*BLM-Administered:* **5.8 miles**

*Key Considerations:*

- There is little water development in the headwaters of the North Fork Mesa Creek, which produces a flow regime mimicking natural conditions.

- The majority of the source water area upstream of the segment is managed by the BLM or USFS and existing authorities provide for ample management actions to protect stream flow needed to sustain the Vegetation ORV.

- Several ROWs occur within the corridor.

- There is a significant amount of private land in the lower reach of the segment.

**LOWER DOLORES HYDROLOGIC UNIT**

### SUMMARY OF RATIONALE FOR BLM DETERMINATION

Tabeguache Creek, Segment 2 was found to be ***not suitable*** for WSR designation. The BLM made this determination because:

- A review by the CNHP lowered the rarity ranking of the Narrowleaf cottonwood/strapleaf willow/silver buffaloberry plant community to G3. The segment no longer possesses a Vegetation ORV and is no longer eligible for WSR designation. If a segment is not eligible for designation, it cannot be determined to be suitable for designation.

### SEGMENT ASSESSMENT

#### WATER RIGHTS AND USES

The North Fork of Mesa Creek contributes flow to Mesa Creek and the Lower Dolores River, which provide habitat for native warm water fish.

WSR designation would be consistent with actions in the Range-wide Conservation Agreement and Strategy for the Roundtail Chub *(Gila robusta)*, Bluehead Sucker *(Catostomus discobolus)*, and Flannelmouth Sucker *(Catostomus latipinnis)*.

The CWCB holds instream flow water rights along the entire segment. The instream flow water rights provides partial protection of the Vegetation ORV. From the lower terminus to 3.90 miles upstream to the Cedar Tree Ditch Diversion, the instream flow water right is 2.1 cfs for the period from April 1 to May 31. This water right holds a 2006 priority. From Cedar Tree Ditch to the upper terminus, the CWCB holds an instream flow water right with a 2002 priority date. The water right is decreed for 2.75 cfs (April 1 to May 31), 0.5 cfs between (June 1 to February 29), and 1.9 cfs (March 1 to March 31).

There are three water diversions in the lower reach, but only the Patterson Ditch has a decreed water right for 14.12 cfs. The Patterson ditch diversion is located on public land. This water right is senior to the existing instream flow water right and any federal water right

BLM_0075795

associated with WSR designation. An instream flow right associated with WSR designation could restrict the ability to change points of diversion for existing water rights within the segment.

A number of stock watering facilities in headwater tributaries constitute the only water use above the upper terminus.

There are no conditional water rights within or upstream of the segment.

Any additional water right filings or changes to existing diversions would be junior to the instream flow water right.

### LAND OWNERSHIP AND USES

Approximately 17.2% of the corridor consists of private lands zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. Many of the allowable and special uses are not related to agriculture and have the potential to conflict with the intent of the WSR Act.

#### ROWs and Withdrawals

ROWs include telephone and power lines. A county road runs along the creek, dominating the setting for much of the segment. Unsurfaced roads cross the stream in a couple of locations. In the Uncompahgre Proposed RMP, any future ROW would be subject to stipulation SSR-13, which is 325 foot ROW avoidance area on both sides of the creek.

There is a bat maternity roost withdrawal along the creek.

While portions of the segment are within an area classified as having Waterpower and Reservoir Resources, the Powersite Classification does not preclude WSR designation.

#### Energy and Mineral Leasing

There are existing oil and gas leases within the segment. Per the Uncompahgre Proposed RMP, any future leases would be subject to stipulation NSO-11, which would prohibit surface occupancy within 325 feet on either side of the creek. In addition, CSU-12 would allow the BLM to require special operation constraints, including relocation of operations beyond 656 feet of the creek.

Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

### ADMINISTRATION

WSR designation would complement the BLM Colorado Public Land Health standard for riparian vegetation, while private land at the lower portion of the corridor could create challenges for managing the area.

#### Potential Costs Associated with WSR Designation

Upon finding a segment suitable, the stream and corridor would be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary

BLM_0075796

depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

### Alternative Protective Measures Considered

Because the BLM and USFS manage the headwaters of the North Fork of Mesa Creek, it is unlikely that any new diversions would be proposed or approved that would substantially decrease flows in the creek.

The creek does not qualify for ACEC designation, but substantial protection would be provided by proposed BLM land use prescriptions and stipulations.

BLM_0075797



FIGURE 27 - (28) ICE LAKE CREEK, SEGMENT 2

BLM_0075798

**Final Wild and Scenic River Suitability**

## SUMMARY OF RATIONALE FOR BLM DETERMINATION

Ice Lake Creek, Segment 2 was found to be *not suitable* for WSR designation. The BLM made this determination because:

- A subgroup of the Southwest RAC, which was comprised of a broad range of stakeholders, recommended that this segment be found not suitable for designation. In addition, private landowners along the segment are not supportive of designation.

- The BLM ownership pattern would make it very challenging to manage the segment as a designated river. Land uses inconsistent with protecting and enhancing the ORVs may occur on private lands, and private land ownership would make access to the segment difficult.

- The Scenic ORV would be adequately protected through the BLM's proposed Visual Resource Management Classifications and through stipulations on surface occupancy.

## SEGMENT ASSESSMENT

### WATER RIGHTS AND USES

Water yield through the segment contributes to the proper hydrologic function of La Sal Creek downstream.

One absolute water right near the lower terminus would be senior to any water right associated with WSR designation. There are no conditional water rights or impoundments within or upstream of the segment. Flow through the segment could be further reduced if diversion amounts are enlarged or diversion points are changed.

There is no instream flow water right protection on the segment. However, there is an existing CWCB instream flow water right on La Sal Creek, to which Ice Lake Creek is a tributary. The instream flow water right on La Sal Creek provides indirect protection of Ice Lake Creek,

## 28 ~ ICE LAKE CREEK, SEGMENT 2



### ~NOT SUITABLE~

*Classification:* **Scenic**

*ORV:* **Scenic**

*Eligible Length:* **0.58 miles**

*BLM-Administered:* **0.31 miles**

*Key Considerations:*

- Landowners in the lower reach of the segment oppose WSR designation.

- The segment length is short and there are access issues involving private land within the segment.

- The BLM manages the source water areas that produce baseflow for the creek, providing protection for flow-dependent values.



**UPPER DOLORES HYDROLOGIC UNIT**

BLM_0075799

because during low flow conditions the La Sal Creek instream flow water right could call for water from tributaries to La Sal Creek.

A federal water right associated with WSR designation could restrict changing the points of diversion for existing water rights within the segment.

## LAND OWNERSHIP AND USES

Approximately 42% of the corridor consists of private lands zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. Many of the uses are not related to agriculture and have the potential to conflict with the intent of the WSR Act. The private property is a contiguous parcel located just upstream of the lower terminus.

### ROWs
A BLM road traverses the canyon just east of the creek. In the Uncompahgre Proposed RMP, SSR-13 would apply to Naturita Creek. This stipulation would implement a ROW avoidance area for 325 feet on each side of the creek.

### Energy and Mineral Resources
There are existing oil and gas leases within the segment. Per the Uncompahgre Proposed RMP, future oil and gas leases would be subject to stipulation NSO-11, which would prohibit surface occupancy with 325 feet of perennial stream segments. In addition, CSU-12 would allow the BLM to require special operation constraints, including relocation of operations beyond 656 feet of the creek.

There are no active mining claims in or adjacent to the creek corridor.

### Visual Resource Management

In the Uncompahgre Proposed RMP, the creek would be managed under VRM Class IV.

## ADMINISTRATION

Ice lake Creek contributes flow to La Sal Creek, providing spring spawning habitat for native warm water fish consistent with the Range-wide Conservation Agreement and Strategy for Roundtail Chub (Gila robusta), Bluehead Sucker (Catostomus discobolus), and Flannelmouth Sucker (Catostomus latipinnis).

A large amount of private land hinders access to public land within the segment and a number of private landowners have expressed opposition to WSR designation.

State and local governments have not indicated an interest in sharing administration or funding of a designated WSR.

### Potential Costs Associated with WSR Designation
Upon finding a segment suitable, the stream and corridor would be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for

BLM_0075800

signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Administering and managing this segment for the Scenic ORV would increase costs moderately above current levels. The public land portion of this segment is remote and has no developed access, both factors that would assist in the protection of the ORV. The lower reach of this segment is private land within which the Ice Lake Creek Corridor is bisected by Colorado State Highway 90.

Private land currently limits access to the public land portion of the corridor from the highway. Acquiring portions of private land from willing sellers would enhance management of ORVs and provide public access, if this segment is designated. If designated, additional facilities would not likely be needed.

### *Alternative Protective Measures Considered*
The BLM determined that the creek corridor would not qualify for any special designations. For example, the very low amount of recreation use would not qualify for SRMA designation, and the resources along the creek do not meet the relevance and importance criteria for ACEC designation. In addition, the BLM determined that the creek is not a good candidate for an instream flow water right, because the creek lacks a fish population, and the riparian community is not of unusually high quality. Based on these factors, the BLM concluded that proposed BLM land use prescriptions would provide the best protection of the ORVs.

BLM_0075801



**FIGURE 28 - (29) LA SAL CREEK, SEGMENT 1**

BLM_0075802

**Final Wild and Scenic River Suitability**

## 29 ~ LA SAL CREEK, SEGMENT I



### ~NOT SUITABLE~

*Classification:* **Recreational**

*ORV:* **Fish, Vegetation**

*Eligible Length:* **4.82 miles**

*BLM-Administered:* **0.62 miles**

*Key Considerations:*

- There is a significant amount of private land within the segment, along with significant opposition to WSR designation from private landowners.

- Land use zoning for private land within the segment is relatively non-restrictive.

- This segment has no instream flow protection.



### UPPER DOLORES HYDROLOGIC UNIT

### SUMMARY OF RATIONALE FOR BLM DETERMINATION

La Sal Creek, Segment I was found to be *not suitable* for WSR designation. The BLM made this determination because:

- A subgroup of the Southwest RAC, which was comprised of a broad range of stakeholders, recommended that this segment be found not suitable for designation. In addition, private landowners along the segment are not supportive of designation.

- The BLM ownership pattern would make it very challenging to manage the segment as a designated river. Land uses inconsistent with protecting and enhancing the ORVs may occur on private lands, and private land ownership would make access to some portions of the segment difficult.

- Given the large percentage of private land ownership, the optimal approach for managing the ORVs is to rely on BLM land use prescriptions and the downstream instream flow water right that acts to pull water through this segment.

### SEGMENT ASSESSMENT

#### WATER RIGHTS AND USES

The upstream terminus of this segment is along the Colorado-Utah state line. The headwaters of La Sal Creek are in Utah.

Water yield through the segment contributes substantially to the proper hydrologic function of the lower reaches of La Sal Creek. There is no instream flow water right protection on the segment. However, there is an existing CWCB instream flow water right on La Sal Creek downstream, starting at the confluence of La Sal Creek and Sharp Canyon. The instream flow water right on downstream portions of La Sal Creek provides indirect

BLM_0075803

protection of this segment, because during low flow conditions, the La Sal Creek instream flow water right could call for water from upstream locations.

Four absolute water right diversions totaling 8.9 cfs within private portions of the segment are senior to any instream flow water right. A water right associated with WSR designation could restrict changing the points of diversion on existing water rights within the segment.

No conditional water rights or impoundments occur within the segment.

## LAND OWNERSHIP AND USES

Approximately 47% of the corridor consists of private lands zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. Many of the allowable and special uses are not related to agriculture and have the potential to conflict with the intent of the WSR Act.

### ROWs and Withdrawals
ROWs within the segment include a CDOT highway and county roads. Telephone and power lines cross and run adjacent to La Sal Creek.

In the Uncompahgre Proposed RMP, SSR-13 would apply to the creek. This stipulation would implement a ROW avoidance area for 325 feet on each side of the creek to protect values associated with perennial streams.

### Energy and Mineral Leasing
There are existing oil and gas leases within the segment. Per the Uncompahgre Proposed RMP, future oil and gas leases would be subject to stipulation NSO-11, which would prohibit surface disturbance with 325 feet on each side of the creek. In addition, CSU-12 would allow the BLM to require special operation constraints, including relocation of operations beyond 656 feet of the creek.

Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

## ADMINISTRATION

WSR designation would complement BLM Colorado Public Land Health standards for riparian vegetation and special status species.

A large amount and configuration of private land with non-restrictive zoning occurs within the segment. Large portions of private land have been converted to agricultural crops, making it difficult to manage for native riparian vegetation.

State and local governments have not indicated an interest in sharing administration or funding of a designated WSR.

### Potential Costs Associated with WSR Designation
Upon finding a segment suitable, the stream and corridor would be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for

BLM_0075804

signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Costs for administering and managing this segment for the Fish and Vegetation ORVs would be substantially higher than current funding levels. Some management actions to sustain the target fish species would continue with or without designation, per the Range-Wide Conservation Agreement and strategy for Flannelmouth Sucker (*Catostomus latipinnis*), Bluehead Sucker (*Catostomus discobolus*), and Roundtail Chub (*Gila robusta*).

Private land acquisition would not be pursued, as more than 87% of the stream segment is privately owned, making it difficult for the BLM to acquire enough land to benefit management of the ORV. Some stream channel modification projects may be needed to facilitate fish propagation.

### *Alternative Protective Measures Considered*

The BLM determined that the creek corridor would not qualify for any special designations. For example, the low amount of recreation use would not qualify for SRMA designation, and the resources along the creek do not meet the relevance and importance criteria for ACEC designation. In addition, the BLM determined that the creek is not a good candidate for instream flow protection, because most of the segment is in private ownership and those owners have expressed concern that an instream flow water right could restrict future irrigation activities on private lands. With these factors in mind, the BLM concluded that proposed BLM land use prescriptions, combined with relying upon the downstream instream flow water right to pull water through this segment, would provide the best protection of the ORVs.

BLM_0075805



**FIGURE 29 - (32) LION CREEK, SEGMENT 2**

BLM_0075806

*Final Wild and Scenic River Suitability*

## 32 ~ LION CREEK, SEGMENT 2



### ~NOT SUITABLE~

*Classification:* **Scenic**

*ORV:* **Vegetation**

*Eligible Length:* **1.57 miles**

*BLM-Administered:* **1.26 miles**

*Key Considerations:*

- There are many private land parcels and landowner opposition to WSR designation in the lower reaches of the segment.

- BLM manages the source water areas that produce baseflow for the creek. The BLM is unlikely to approve permits for projects that would reduce flows.

- Proposed BLM land use prescriptions would provide adequate protection of the Vegetation ORV.



**UPPER DOLORES HYDROLOGIC UNIT**

### SUMMARY OF RATIONALE FOR BLM DETERMINATION

Lion Creek, Segment 2 was found to be *not suitable* for WSR designation. The BLM made this determination because:

- A subgroup of the Southwest RAC, which was comprised of a broad range of stakeholders, recommended that this segment be found not suitable for designation. In addition, private landowners along the segment are not supportive of designation.

- The BLM ownership pattern would make it very challenging to manage the segment as a designated river. Land uses inconsistent with protecting and enhancing the ORVs may occur on private lands, and private land ownership would make access to the entire segment difficult.

- The Vegetation ORV would be adequately protected through proposed stipulations on surface occupancy.

### SEGMENT ASSESSMENT

#### WATER RIGHTS AND USES

Water yield through the segment contributes to the proper hydrologic function of La Sal Creek downstream.

The Manning Ditch is an absolute water right (of 0.6 cfs) near the lower terminus of the segment, which may be senior to any instream flow associated with WSR designation. There are no conditional water rights or impoundments within or upstream of the segment.

Changing points of diversion on existing water rights within the segment could be limited in the future by water rights associated with WSR designation.

There is no instream flow water right on the segment. However, there is an existing CWCB instream flow water right on La Sal Creek, to which Lion Creek is a tributary. The instream flow water right on La Sal Creek provides indirect protection of Lion Creek, because during low flow conditions, the La Sal Creek instream flow water right could call for water from tributaries to La Sal Creek.

BLM_0075807

The BLM does have option of recommending an instream flow water right to the CWCB, based upon protecting riparian values.

## LAND OWNERSHIP AND USES

Approximately 17.4% of the corridor consists of private lands zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. The property is a contiguous parcel located just upstream of the lower terminus, limiting the potential for impacts on the ORV.

### ROWs
In the Uncompahgre Proposed RMP, SSR-13 would apply to the creek. This stipulation would implement a ROW avoidance area for 325 feet on each side of the creek.

### Energy and Mineral Resources
There are existing oil and gas leases within the segment. Per the Uncompahgre Proposed RMP, future oil and gas leases would be subject to NSO-11, which would prohibit surface occupancy within 325 feet on each side of the creek to protect values associated with perennial streams. In addition, CSU-12 would allow the BLM to require special operation constraints, including relocation of operations beyond 656 feet of the creek.

Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

## ADMINISTRATION

WSR designation would complement the BLM Colorado Public Land Health Standard for riparian vegetation.

There are many private land parcels and landowner opposition to WSR designation in the lower reaches.

### Potential Costs Associated with WSR Designation
Upon finding a segment suitable, the stream and corridor would be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Costs for administering and managing this segment for the Vegetation ORV would increase moderately above current funding levels. The public land portion of this segment is remote and has no developed access, both factors that would assist in the protection of the ORV. The lower reach of this segment is private land within which the Lion Creek Corridor is bisected by Colorado State Highway 90.

The private land presently limits access to the public land portion of the corridor from the highway. Thus, acquiring portions of the private land from willing sellers would assist with managing and providing public access to this segment if designated. A small amount of additional funding would be

BLM_0075808

**Final Wild and Scenic River Suitability**

needed for signage, public education, ranger patrolling, and maintenance. Additional facilities would not be needed if designated. No detailed cost analysis or estimate was prepared as part of this study.

### *Alternative Protective Measures Considered*

The BLM determined that the Lion Creek corridor would not qualify for any special designations. For example, the very low amount of recreation use would not qualify for SRMA designation, and the resources along the creek do not meet the relevance and importance criteria for ACEC designation. The creek may qualify for instream flow protection based upon riparian values, but given limited BLM resources, the BLM will likely focus on making instream flow recommendations on other creeks that have more BLM ownership along the creek. With these factors in mind, the BLM concluded that proposed BLM land use prescriptions would provide the best protection of the ORV.

BLM_0075809



**FIGURE 30 - (33) SPRING CREEK**

*Final Wild and Scenic River Suitability*

## 33 ~ SPRING CREEK



### ~NOT SUITABLE~

*Classification:* **Recreational**

*ORV:* **Vegetation**

*Eligible Length:* **2.65 miles**

*BLM-Administered:* **1.49 miles**

*Key Considerations:*

- The segment is short and non-contiguous, with private land parcels near the lower terminus and along much of the middle portion.

- The BLM manages the source water areas that produce baseflow for Spring Creek, allowing for protection of flow-dependent values through existing ROW authorities.

- There is currently no instream flow protection on the creek.



**UPPER DOLORES HYDROLOGIC UNIT**

## SUMMARY OF RATIONALE FOR BLM DETERMINATION

Spring Creek was found to be *not suitable* for WSR designation. The BLM made this determination because:

- A subgroup of the Southwest RAC, which was comprised of a broad range of stakeholders, recommended that this segment be found not suitable for designation. In addition, private landowners along the segment are not supportive of designation.

- The BLM ownership pattern would make it very challenging to manage the segment as a designated river. Land uses inconsistent with protecting and enhancing the ORVs may occur on private lands, and private land ownership would make access to the entire segment difficult.

- The Vegetation ORV would be adequately protected through proposed stipulations on surface occupancy.

## SEGMENT ASSESSMENT

### WATER RIGHTS AND USES

Water yield from Spring Creek contributes to the proper hydrologic functioning of La Sal Creek, located downstream.

The BLM manages the springs that provide base flow for Spring Creek. The BLM has authority to deny ROW applications to protect this flow, or the BLM can place terms and conditions on ROW grants to protect flows.

An absolute ditch diversion water right within the segment is senior to any water right associated with WSR designation. There are no conditional water rights or impoundments within or upstream of the segment.

There is no instream flow water right on the segment. However, there is an existing CWCB instream flow water right on La Sal Creek, to which Spring Creek is a tributary. The instream flow water right on La Sal Creek provides indirect protection of Spring Creek, because

BLM_0075811

during low flow conditions, the La Sal Creek instream flow water right could call for water from tributaries to La Sal Creek.

The BLM has the option of recommending an instream flow water right to the CWCB, based upon protecting riparian values.

## LAND OWNERSHIP AND USES

Approximately 24.1% of the corridor consists of private lands zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. Many of the uses are not related to agriculture. Private parcels cover much of the middle portion and lower terminus of the segment.

### ROWs
ROWs within the segment include Highway 90, a county road, a powerline, and a telephone line that parallels a portion of the creek. In the Uncompahgre Proposed RMP, SSR-13 would apply to the creek. This stipulation would implement a ROW avoidance area for 325 feet on each side of the creek.

### Energy and Mineral Resources
There are existing oil and gas leases within the segment. Per the Uncompahgre Proposed RMP, future oil and gas leases would be subject to NSO-11, which would prohibit surface occupancy with 325 feet from the creek. In addition, CSU-12 would allow the BLM to require special operation constraints, including relocation of operations beyond 656 feet of the creek.

Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

## ADMINISTRATION

WSR designation would complement the BLM Colorado Public Land Health standard for riparian vegetation.

State and local governments have not indicated an interest in sharing administration or funding of a designated WSR.

### Potential Costs Associated with WSR Designation
Upon finding a segment suitable, the stream and corridor would be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Costs for administering and managing this segment for the Vegetation ORV would increase slightly above current funding levels. The headwater, public land portion of this segment is remote and has no developed access, both factors that would assist in the protection of the ORV.

The middle and lower portions of this segment contain private land within which the Spring Creek corridor is bisected by Colorado State Highway 90. The private land currently limits highway access

BLM_0075812

**Final Wild and Scenic River Suitability**

to public land portions of the segment. Thus, acquiring portions of private land from willing sellers would assist in managing and providing public access to this segment if designated. A small amount of additional funding would be necessary for signage, public education, ranger patrolling, and maintenance. Additional facilities would not be needed if designated.

### Alternative Protective Measures Considered

The BLM determined that the creek corridor would not qualify for any special designations. For example, the very low amount of recreation use would not qualify for SRMA designation, and the resources along the creek do not meet the relevance and importance criteria for ACEC designation. The creek may qualify for instream flow protection based upon riparian values, but given limited BLM resources, the BLM will likely focus on making instream flow recommendations on other creeks that have more BLM ownership along the creek. With these factors in mind, the BLM concluded that proposed BLM land use prescriptions and use of existing BLM ROW authority would provide the best protection of the ORV.

BLM_0075813

# E. DOLORES-SAN MIGUEL STAKEHOLDER ANALYSIS & RECOMMENDATIONS

## SOUTHWEST RESOURCE ADVISORY COUNCIL

The Southwest Resource Advisory Council is appointed by the Secretary of the Interior to represent a variety of interests across the Southwest District. The Southwest Resource Advisory Council meets two to four times annually to develop recommendations for the BLM regarding the preparation, amendment, and implementation of land use plans for public lands and resources and to provide representative citizen counsel and advice to the Secretary of the Interior concerning the planning and management of public land resources within the BLM Southwest District.

Between November 2010 and January 2011, a subgroup of the Southwest Resource Advisory Council conducted a series of public meetings in various towns throughout the western portion of the planning area to inform and solicit comment regarding segments within the Dolores and San Miguel river basins. The Southwest Resource Advisory Council Subgroup presented their suitability recommendations to the full Southwest Resource Advisory Council at the Statewide Resource Advisory Council Meeting on February 25. The Southwest Resource Advisory Council adopted the recommendations and forwarded them to the UFO for consideration.

BLM_0075814

TABLE 7 - SUMMARY OF SOUTHWEST RESOURCE ADVISORY COUNCIL SUITABILITY RECOMMENDATIONS

| SEGMENT/ Eligibility Report Page Number | BLM ELIGIBILITY CLASSIFICATION | SOUTHWEST RESOURCE ADVISORY COUNCIL RECOMMENDATION | COMMENTS/BASIS FOR RECOMMENDATION |
|---|---|---|---|
| 14 - Beaver Creek Page 57 | Scenic | Suitable for Recreational classification | While mining is not a significant factor within the segment, the Southwest Resource Advisory Council determined that the following issues render the segment better suited to classification as *Recreational*:<br>• Recreational classification would allow for a healthy balance of competing interests:  protection of the ORV, while providing reasonable certainty that future water development projects would receive consideration and could move forward with minimal difficulty<br>• The Norwood Water Commission has requested future rights to develop a pump station at Goat Creek (a significant project) and development of the Naturita Canal is moving forward<br>• Overall, there was a great deal of public support for suitability. The Recreational Classification would allow for development of water rights if the Vegetation ORV continues to be protected. |

BLM_0075815

| SEGMENT/ Eligibility Report Page Number | BLM ELIGIBILITY CLASSIFICATION | SOUTHWEST RESOURCE ADVISORY COUNCIL RECOMMENDATION | COMMENTS/BASIS FOR RECOMMENDATION |
|---|---|---|---|
| **15 - Dry Creek** Page 59 | Wild | Not Suitable | The Southwest Resource Advisory Council recommended that the segment be found *not suitable* based upon the following discussion: <br>• The area does not receive significant visitation and the terrain protects the canyon to some extent <br>• The biggest threats to the segment are oil and gas development (but there has not been much exploration to date) <br>• Because the creek flows intermittently, the contribution of the segment to the NWSRS is questionable <br>• Five miles of private land at the upper end of the segment and three miles of private land between the segment and the San Miguel River, as well as accompanying senior private water rights, could make managing the segment difficult <br>• A rough 4WD road runs through the segment, making it unsuitable for classification as *Wild*. |
| **16 - Naturita Creek** Page 62 | Scenic | Not Suitable | • Fish species for which the Fish ORV was assigned are found primarily within private property at the lower end of the segment and landowners in that portion do not support WSR suitability. <br>• While a private landowner (Foley) with property at the upper end of the segment expressed strong support for suitability, an onsite review conducted by BLM staff could not substantiate a Vegetation ORV within the stretch. Another landowner (Lockhart) within the segment has a conservation easement on their property. <br>**NOTE:** *BLM staff conducted an on-site review of the stretch and could not recommend a Vegetation ORV.* |

BLM_0075816

**Final Wild and Scenic River Suitability**

| SEGMENT/ Eligibility Report Page Number | BLM ELIGIBILITY CLASSIFICATION | SOUTHWEST RESOURCE ADVISORY COUNCIL RECOMMENDATION | COMMENTS/BASIS FOR RECOMMENDATION |
|---|---|---|---|
| **17 - Saltado Creek** Page 64 | Wild | Suitable | • The Southwest Resource Advisory Council acknowledged and concurred with the strong support for a finding of *suitable* that the segment has received from private land owners. |
| **18 - San Miguel River, Segment 1** Page 66 | Recreational | Suitable | • The Southwest Resource Advisory Council found significant overall support for a finding of *Suitable* for the segment.<br>• While there are concerns regarding uranium and recreational placer mining within the segment, the Southwest Resource Advisory Council believes that the Recreational Classification would allow for the continuation of these activities. |
| **19 - San Miguel River, Segment 2** Page 70 | Wild | Suitable with modifications | • The Southwest Resource Advisory Council found significant support for a finding of *Suitable*.<br>• The natural geography of the segment led the Southwest Resource Advisory Council to recommend that the segment be shortened to end at the Bennett property in order to protect the landowner's interests at Horsefly Creek, and the corridor extend only to the canyon rims and end at the confluence with Horsefly Creek.<br>• The Southwest Resource Advisory Council considered the overall land health to be of great concern for the segment. While the impact of grazing on the Vegetation ORV is addressed to some extent through the current ACEC and Special Recreation Management Area designations, WSR designation would provide longer lasting protections. |

BLM_0075817

| SEGMENT/ Eligibility Report Page Number | BLM ELIGIBILITY CLASSIFICATION | SOUTHWEST RESOURCE ADVISORY COUNCIL RECOMMENDATION | COMMENTS/BASIS FOR RECOMMENDATION |
|---|---|---|---|
| **20 - San Miguel River, Segment 3** Page 73 | Scenic | Suitable for Recreational classification | The Southwest Resource Advisory Council recommended that the segment be reclassified as Recreational due to: <br>• The CC Ditch and a dirt road that runs parallel to the river <br>• Two BLM campgrounds along the stretch <br>• A significant number of mining claims in the area <br>• The popularity of the segment for recreational gold mining. <br>The Southwest Resource Advisory Council also recommended that the Bennett property, as well as private land at the lower end of the segment, be excluded from the suitability recommendation. |
| **21 - San Miguel River, Segment 5** Page 76 | Recreational | Suitable with modifications | The Southwest Resource Advisory Council recommended that: <br>• The segment length be significantly reduced, beginning downstream from the Richards' property, running the length of The Nature Conservancy property, and terminating at the confluence with Tabeguache Creek. <br>• The boundaries of the protective corridor extend rim to rim and should be delineated by existing developments and natural barriers (such as the state highway). |
| **22 - San Miguel River, Segment 6** Page 79 | Recreational | Suitable with modifications | • The Southwest Resource Advisory Council recommended that the segment begin downstream of Umetco Minerals Corporation property and terminate at the confluence with the Dolores River. |

BLM_0075818

| SEGMENT/ Eligibility Report Page Number | BLM ELIGIBILITY CLASSIFICATION | SOUTHWEST RESOURCE ADVISORY COUNCIL RECOMMENDATION | COMMENTS/BASIS FOR RECOMMENDATION |
|---|---|---|---|
| **23 - Tabeguache Creek, Segment 1** Page 82 | Wild | Suitable | The Southwest Resource Advisory Council: <br>• Recommended that the segment begin at the USFS boundary and end one-quarter mile from private property. <br>• Noted that a *Wild* Classification would complement existing protections in the area (including designation as a specially managed "Area") and provides a good management tool for the BLM. |
| **24 - Tabeguache Creek, Segment 2** Page 84 | Recreational | Not Suitable | The Southwest Resource Advisory Council recommended a finding of *Not Suitable* due to: <br>• The ability to manage the segment being compromised by significant portions of private land. <br>• Lack of support from private landowners for finding the segment *Suitable*. |
| **25 - Lower Dolores River** Page 88 | Scenic | Suitable with modifications | The Southwest Resource Advisory Council recommended that: <br>• The segment be shortened to exclude private property (ending at the Weimer property). <br>• The corridor boundary be modified to protect mining claims and delineated on the east side by the highway and on the west side by a geographic marker such as the canyon rim or other natural feature. |
| **26 - North Fork Mesa Creek** Page 91 | Scenic | Not Suitable | Following a review by the Colorado Natural Heritage Program that lowered the rarity ranking of the Narrowleaf cottonwood/strapleaf willow/silver buffaloberry plant community to G3, the segment no longer possesses an ORV to support eligibility. |

BLM_0075819

| SEGMENT/ Eligibility Report Page Number | BLM ELIGIBILITY CLASSIFICATION | SOUTHWEST RESOURCE ADVISORY COUNCIL RECOMMENDATION | COMMENTS/BASIS FOR RECOMMENDATION |
|---|---|---|---|
| **27 - Dolores River, Segment 2** Page 94 | Recreational | Suitable with modifications | The Southwest Resource Advisory Council recommended: <br>• Suitability for the public land portion of the segment (5.3 miles), but not for private land portions (6.2 miles). <br>• Aligning the protective corridor to exclude the Buck Shot Mine and associated ROW. The segment boundary would follow the cliff line if less than one-quarter mile from the river center. |
| **28 - Ice Lake Creek, Segment 2** Page 98 | Scenic | Not Suitable | The Southwest Resource Advisory Council recommended that the segment be found Not Suitable based upon the following issues: <br>• Mining occurs on the mesa along the northern end of the segment <br>• The segment length is extremely short <br>• The segment terminates on private land, which could make the area more difficult to manage. |
| **29 - La Sal Creek, Segment 1** Page 100 | Recreational | Not Suitable | The Southwest Resource Advisory Council recommended finding the segment Not Suitable because: <br>• Extensive private land would make the segment difficult to manage. <br>• A significant number of private landowners do not support finding the segment Suitable. |
| **30 - La Sal Creek, Segment 2** Page 102 | Scenic | Suitable for Recreational classification with modifications | The Southwest Resource Advisory Council recommended that the segment be found Suitable with the following modifications: <br>• Change the Classification from Scenic to Recreational in order to accommodate potential future mining activities and road improvements <br>• Shorten the segment to end at and exclude the Cashin Mine. |

BLM_0075820

**Final Wild and Scenic River Suitability**

| SEGMENT/ Eligibility Report Page Number | BLM ELIGIBILITY CLASSIFICATION | SOUTHWEST RESOURCE ADVISORY COUNCIL RECOMMENDATION | COMMENTS/BASIS FOR RECOMMENDATION |
|---|---|---|---|
| 31 - La Sal Creek, Segment 3 Page 104 | Wild | Suitable | The Southwest Resource Advisory Council recommended that the segment be classified as Wild due to:<br>• The pristine, wild, and remote character of the area.<br>• The critical habitat for native warm water fish provided by the segment. |
| 32 - Lion Creek, Segment 2 Page 107 | Scenic | Not Suitable | The Southwest Resource Advisory Council recommended that the segment be found Not Suitable due to:<br>• The short length<br>• A measure of self-protection afforded by the steep slopes of the corridor<br>• Restricted access from private land<br>• Lack of landowner support for finding the segment Suitable. |
| 33 - Spring Creek Page 109 | Recreational | Not Suitable | The Southwest Resource Advisory Council recommended that the segment be found Not Suitable due to:<br>• The short length<br>• An extensive amount of interspersed private land that could make the segment difficult to manage<br>• A measure of self-protection already afforded by the steep slopes of the corridor. |

BLM_0075821

| SEGMENT/ Eligibility Report Page Number | BLM ELIGIBILITY CLASSIFICATION | SOUTHWEST RESOURCE ADVISORY COUNCIL RECOMMENDATION | COMMENTS/BASIS FOR RECOMMENDATION |
|---|---|---|---|
| **34 - Dolores River, Segment 1** SJPLC Draft Land Management Plan, Page D-14 | Wild/ Recreational | Wild portion Suitable with modifications | The Southwest Resource Advisory Council believes that a recommendation of Suitable: <br>• Complements the WSA designation <br>• Is consistent with other WSR designations for portions of the Dolores River outside of the planning area. <br>In order to avoid interference with mining operations, the Southwest Resource Advisory Council recommended that the segment begin at the UFO boundary and terminate at the private land boundary (T47N/R18W/Section 31) south of Bedrock, and that the corridor extend from rim to rim or one-quarter mile from the high water mark (whichever measure is less). |

BLM_0075822

## F. GUNNISON BASIN STAKEHOLDER ANALYSIS & RECOMMENDATIONS

The Gunnison Basin stakeholder process was initiated by the Colorado River Water Conservation District. The stakeholder group contracted with a team of co-facilitators and held a series of public meetings to formulate recommendations regarding WSR suitability for eligible river segments in the Gunnison River Basin, including within the Dominguez-Escalante NCA. Nine meetings pertained to segments within the planning area outside of the NCA.

The stakeholder group was unable to reach a consensus and two sets of recommendations were forwarded to the BLM for consideration. Following are the meeting notes submitted by each group.

BLM_0075823

## STAKEHOLDER GROUP ONE RECOMMENDATIONS

February 16, 2011

Barbara Sharrow
Field Manager, Uncompahgre Field Office
Bureau of Land Management
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Wild & Scenic River Suitability Evaluation – Gunnison Basin Segments outside of Dominguez-Escalante National Conservation Area

Dear Ms. Sharrow:

The Gunnison Basin Wild and Scenic Rivers Stakeholder Group is a group of diverse stakeholders that has held ten meetings with 25 – 60 people in attendance at each since October 2010 to develop management plans to guide the Bureau of Land Management's suitability determinations for segments in the Gunnison Basin that BLM has found eligible to become part of the National Wild & Scenic Rivers System.

After careful deliberation, the stakeholder group has come to consensus that Deep Creek, the West Fork of Terror Creek, Gunnison River Segment 2 and Roubideau Creek Segment 2 should be found "Not Suitable" for inclusion in the National Wild & Scenic Rivers System. There was no dissent from this final recommendation by participants in the stakeholder group.

Key factors leading to this conclusion for each of these stream segments are listed below; additional information generated by the group's discussion can be found in the attached charts.

Deep Creek:
- The small portion of the creek that is managed by the BLM raised concerns about the BLM's ability to manage it as a Wild & Scenic River.
- Existing management actions by area landowners are protective of the Outstandingly Remarkable Value (ORV).
- The stream segment is frequently dry.
- Sole-source power lines and access roads currently exist that must be used for year-round operations and maintenance. Future development will likely require future upgrades and/or replacement of this infrastructure.

West Fork of Terror Creek:
- The small portion of the creek that is managed by the BLM raised concerns about the BLM's ability to manage it as a Wild & Scenic River.
- The stream segment is frequently dry. Water is diverted from upstream reservoirs to water right holders of the Leroux Creek Water Users Association. Water is only in the stream segment in the

*Gunnison Basin Wild & Scenic Stakeholder Group Report, Page 1 of 5*

BLM_0075824

**Final Wild and Scenic River Suitability**

summer when Terror Ditch and Reservoir Company diverts water through it.
- The stream corridor contains extensive infrastructure related to power lines. A 230 KV transmission line crosses BLM land within the eligible corridor and requires year-round motorized access for operation, maintenance, and repair.
- Potential coal reserves exist in the area, and leases for their development have been issued.

Gunnison River Segment 2:
- The ORV for Gunnison River Segment #2 was endangered fish in the eligibility report; however, this is in error. Therefore there are no ORVs for this segment. Gunnison River Segment #2 is upstream of the Recovery Implementation Program's (for the four endangered fish species of the Upper Colorado River) designated "Critical Habitat" for all of the listed species. Analysis on planned re-operation of the Aspinall Unit is nearing completion with a primary goal of providing adequate flows for recovery of the listed species. The Draft Environmental Impact Statement for the Operation of the Aspinall Unit requires that the Unit be operated to avoid jeopardizing the continued existence of, and assist in the recovery of, the endangered fishes. To avoid jeopardizing means adequate water must continue to flow from the Aspinall Unit through Gunnison River Segment #2 and beyond. Even delisting of all four species would require continued flows deemed adequate for continued self-sustaining populations.
- The small portion of the river corridor that is managed by the BLM raised concerns about the impact on private lands from suitability finding.
- Potential for the river channel to change course exacerbated concerns about impacts to private property and reduced the viability of narrowing the corridor to mitigate concerns (one option discussed).

Roubideau Creek Segment 2:
- The large amount of private land in the corridor raised concerns about the BLM's ability to manage it as a Wild & Scenic River.
- Concerns about the potential impact of a Wild & Scenic suitability finding on grazing permittees' ability to use the area for grazing and transit (critical transit corridor for cattle grazing).
- Utility corridor crossing BLM with power lines and gas pipelines as well as electric distribution service to 10 meters within the corridor.

The stakeholder group held more in-depth discussions on Monitor Creek, Potter Creek and Roubideau Creek Segment 1, including two subcommittee meetings. The group came to unanimous agreement on what conditions need to be maintained in these stream corridors, but did not come to full consensus on what management tools should be applied to maintain these conditions. Additional information collected on each segment by the group can be found in the attached charts.

Conditions to be maintained on Monitor Creek, Potter Creek and Roubideau Creek Segment 1:
- Existing grazing rights, including continued access to important livestock transit corridors to both BLM and Forest Service lands.
- Existing water rights.
- Equipment access for pond maintenance.
- Healthy range and well-managed grazing.
- Healthy vegetation: both vegetation types identified by the BLM as ORV's and other vegetation types, which have improved because of current grazing management practices.
- Diverse and healthy wildlife: both wildlife identified by the BLM as ORV's and other species.

*Gunnison Basin Wild & Scenic Stakeholder Group Report, Page 2 of 5*

BLM_0075825

- A sense of wildness, remoteness and naturalness.
- Existing quiet recreation opportunities:
  - Hiking.
  - Horseback riding.
  - Hunting.
- Protection from over-use for recreation and damaging forms of recreation, including effective means to limit access by motorized vehicles.
- Existing healthy stream flows, which include return flows from irrigation and water facilities.

Management tools:
The group agreed that current management has maintained the values listed above and should be continued. However, there was no consensus on what classifications or management tools should be applied to the areas to ensure that this continues. Management tools discussed included Wild & Scenic Suitability, incorporating the corridors into an area classified as "Lands with Wilderness Characteristics (LWC)," a "Special Recreation Management Area (SRMA)," or "Area of Critical Environmental Concern (ACEC)." Group members expressed a preference for management tools that the local BLM office can reconsider with resource management plan revisions over tools that require the maintenance of particular protections until Congress acts (such as Wilderness Study Areas and Wild and Scenic suitability determinations).

*Wild & Scenic Suitability*
On Wild & Scenic Suitability, the majority of the group (24) indicated that the segments should be found Not Suitable, with two in opposition. Those opposed, which represent environmental advocacy organizations, will submit a separate report detailing why they believe the segments should instead be found Suitable. Key factors in the majority's opinion that the segments should be found Not Suitable include:
- The ORV's are already protected by a combination of current management strategies and the topography of the area. The current management is adequate as evidenced by the ORV's BLM identified in finding the segments eligible
- Concern about potential impacts on water rights.
- Concern about potential impacts on grazing rights.
- On Potter Creek, updated information showed that the vegetation identified by BLM as the segment's sole ORV in the original eligibility report was too common for the vegetation to qualify as an ORV, making the segment ineligible for Wild and Scenic status.
- Roubideau Creek Segment 1 is already contained within the Camelback Wilderness Study Area and therefore already managed to protect its wilderness qualities.

*Alternative Management Tools*
The group did not find consensus on whether classifying the stream segments as part of a LWC, SRMA, or ACEC would be an acceptable alternative to Wild & Scenic Suitability. Concerns raised with all of these management options included:
- The area is already sufficiently protected through current BLM management.
- These tools could affect a broader area than the stream corridors the group has been discussing.
- The full implications of these classifications are not yet sufficiently understood by the group.
- The group has not had time to flesh out what use stipulations they would want to recommend along with any of these classifications.

*Gunnison Basin Wild & Scenic Stakeholder Group Report, Page 3 of 5*

BLM_0075826

**Final Wild and Scenic River Suitability**

Please review the attached individual segment sheets for detailed information collected from the stakeholders.

The stakeholder group participants appreciate the support provided by BLM staff to help the participants understand the Wild & Scenic Rivers evaluation process.

Sincerely,
Gunnison Basin Wild & Scenic Rivers Stakeholder Group

| | |
|---|---|
| **Billy L. Pease**\* <br> Western Slope Gold Prospectors Association of America chapter from Olathe | **Constantine Hirschfeld**\* <br> President, Thunder Mountain Wheelers <br> North Fork Snowmobile Club |
| **Larry R. and Wanda K. Boyd**\* <br> Landowners in Roubideau Segment 1 and grazing permitees in Roubideau Segment 1 and 2, and Potter Creek, and Monitor Creek | Kenyon E. McGuire <br> Terror Ditch and Reservoir Company |
| **Mike Wilson**\* <br> Thunder Mountain Wheelers | Eugene M. McGuire <br> Terror Ditch & Reservoir Company |
| **Olen Lund**\* <br> Delta County Commissioner District #3 <br> *Delta County endorses this letter.* | **Steven R. Lewis**\* <br> Concerned citizen, Western Colorado Chapter <br> Gold Prospectors Association of America |
| **Betty Oglesby**\* | **Shelby Bear**\* <br> SCRAC Subgroup |
| **Thomas M Alvey**\* <br> North Fork Water Conservancy District <br> Delta County Director CRWCD | **Charles McMurdy**\* <br> President, Montrose Ouray and San Miguel Farm Bureau <br> Olathe property owner and farmer. |
| **Chris Treese** <br> Colorado River Water Conservation District | **Dick Steele, DVM**\* <br> Western Colorado Chapter of the Gold Prospectors Association of America <br> Colorado Mule Deer Association <br> Colorado Sportsmens Wildlife Fund <br> Western Colorado Sportsmens Council |
| **Eric Trommer**\* <br> Landowner/farmer on the lower Gunnison and owner of New Leaf Fruit | **Art Etter, Engineer**\* <br> Bowie Resources, LLC |

\*Permission to list as signatory provided via email or phone.

Signatures continued on following page.

*Gunnison Basin Wild & Scenic Stakeholder Group Report, Page 4 of 5*

BLM_0075827

| James Graziano*<br>Monitor Mesa Ranch | Max, Julie & Gina Ungerer*<br>Landowners and water rights owners |
|---|---|
| Mike Berry<br>Tri-County Water Conservancy District | Dick Miller<br>My signature represents that of myself, Scott<br>Miller, John and Beth Wool, Kent Davis, Alan<br>Malcolm and Dave Abbott who are all in<br>association with the Escalante Ranch. |
| Mike Clarke*<br>Grazing permittee | |
| Robert Gill*<br>Ranch Manager for Bear Ranch, LLC | C. Douglas Atchley*<br>Landowner |
| Richard Connell*<br>Colorado Farm Bureau | Roger Bentley*<br>Landowner |
| Chann Fogg*<br>Vice President, Delta County Farm & Livestock<br>Bureau  Delta County Farm & Livestock Bureau<br>endorses this letter. | Anna M. Hutchins*<br>Landowner |

*Permission to list as signatory provided via email or phone.

BLM_0075828

**Final Wild and Scenic River Suitability**

## STAKEHOLDER GROUP ONE MEETING NOTES

### 5 - GUNNISON RIVER SEGMENT 2

***Eligibility Report Information:***
- Classification: Recreational
- ORV: Endangered warm water fish
- Segment Length: .41

***Stakeholder comments & questions on BLM information:***
- Is this a critical habitat reach for the fish, and are they in that segment?
  - DOW response: this segment does not fall in the critical habitat designated by the USFWS.
- Is there spawning habitat or some other special feature for the endangered fish in this segment?
  - None noted
- Is this a natural channel (river splits around an island at this point)?
  - BLM response: Yes
- Arial photos show water in this segment, with the south channel drier.
- Why no recreation ORV – valuable for canoeing & boating.
  - BLM response: not "best of best," usual take-out is above segment because of downstream dam.
- How wide is the island?
  - BLM response: Approx. ¼ mile

### TABLE 8 - GUNNISON RIVER, SEGMENT 2 STAKEHOLDER ASSESSMENT

| | ORV NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 1 | Fish – flows | Heartland diversion dam downstream. | | Being rebuilt to allow fish passage. | Endangered Species Act already provides protections for the endangered fish. |
| 2 | Fish – other threats | Fishing | | Northern Pike coming will cause problems through predation. | |
| 3 | General | * Electrical services & access roads on south side within ¼ mile. Utility service requires year-round access for operation, maintenance & repair. Vegetation trimming and/or road repair may be required to maintain t-line and access ROW's. * Hunting waterfowl | Replacement, upgrade or expansion of utilities within corridor. | | |

BLM_0075829

## 7 - MONITOR CREEK

### Eligibility Report Information

- Classification:  Wild
- ORV: Vegetation: ~~riparian narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest forests, Fremont cottonwood/skunkbush sumac riparian woodland and~~ coyote willow riparian shrublands
- Segment Length – 9.42; 100% BLM-managed

### Stakeholder comments & questions on BLM information

- Some stakeholders would like to see Recreation and Wildlife added as ORV's. BLM requested scientific data to support these ORVs.
- Question how the segment can be "Wild" if an upstream diversion is key to creating its character.
- No current Coal or Oil & Gas leases
- Vegetation ORVs narrowleaf cottonwood/strapleaf willow/silver buffaloberry and Fremont cottonwood/skunkbush sumac were removed through BLM updated information.
- A-ranking occurrence of Sandbar willow (aka Coyote Willow) remains.
- Subgroup agreed on the conditions needed to be maintained in the stream corridor, but did not come to agreement on what management tools should be applied to maintain these conditions.

BLM_0075830

*Final Wild and Scenic River Suitability*

### TABLE 9 - MONITOR CREEK STAKEHOLDER ASSESSMENT

| | ORV NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 1 | Wildness | • Hunting<br>• Hiking | Potential for trail | • Deep canyon separates creek from private land. | • Adjacent landowner is in the process of establishing a conservation easement.<br>• Both sides of creek in Citizen-proposed Wilderness area.<br>• Trail compatible with "Wild"<br>• Colorado Natural Heritage Program – Potential Conservation Area |
| 2 | Flows | Upstream flows diverted to reservoir (100 yrs old). | Same as now | Reservoir/ irrigation impact:<br>• May benefit ORV by regulating flows, preventing scouring.<br>• Not clear what impact would be if diversion was stopped. | |
| 3 | | Grazing – there is a permit | Same as now | | • Suitability would only affect grazing if it was shown to degrade ORV.<br>• Would affect range improvements – increasing evidence of human activity could have an impact on the "Wild" classification.<br>• Related trails would be unaffected by suitability with "Wild" classification. |
| 4 | Habitat quality | | | Russian knapweed problem (least severe of Monitor, Potter, Roubideau). | BLM sprays to control. |
| 5 | General | Water rights? | | | If ORV depends on management of adjacent ranch, that puts BLM in a box. |

BLM_0075831

## 8 - POTTER CREEK

### Eligibility Report Information
- Classification:  Wild
- ORV:  ~~Vegetation: narrowleaf cottonwood/strapleaf willow-silver buffaloberry riparian forest~~
- Segment Length – 9.82; 100% BLM-managed

### Stakeholder comments & questions on BLM information
- Some stakeholders would like to see Recreation and Wildlife added as ORV's. BLM requested scientific data to support these ORVs.
- Does the creek cross private land near the confluence?
    - *No – BLM verified after the meeting.*
- Grazing permittees utilize the watering ponds in this area and they must have access to maintain the ponds with equipment
- Details on mineral leases – No current leases
- How close is the jeep/ all-terrain vehicle (ATV) trail?
    - *From Edd Franz (BLM) after the meeting:  The jeep trail between 7N Mesa and Potter Creek gets within 0.24 mile of Potter Creek. This should not be an issue because the "buffer" lands do not have to be exactly 0.25 mile on each side of the stream. The land just must average to 320 acres per mile.*
- Vegetation ORV removed from eligibility by BLM update.
- Subgroup agreed on the conditions needed to be maintained in the stream corridor, but did not come to agreement on what management tools should be applied to maintain these conditions.

### TABLE 10 - POTTER CREEK STAKEHOLDER ASSESSMENT

| | ORV NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 1 | Wildness/ habitat | | | Used to be a jeep/log road; closed 25 years ago at DOW recommendation. | Citizen-proposed wilderness on both sides. Colorado Natural Heritage Program - Roubideau Creek Potential Conservation Area |
| 2 | Flows | Water rights? | | No diversions or impoundments | One individual suggested dividing Potter Creek into two segments because there doesn't appear to be water rights above Monitor Creek. |
| 3 | Habitat quality | | | Russian knapweed problem | BLM sprays to control. |
| 4 | | Grazing | | | |
| 5 | | Hunting | | | |
| 6 | | Hiking/ Recreation | | Jeep/ATV trail | ATV Club has adoption the trail for maintenance |

BLM_0075832

**Final Wild and Scenic River Suitability**

### 10 - ROUBIDEAU CREEK, SEGMENT 1

*Eligibility Report Information*

- Classification: Wild
- ORV: Recreational (non-mechanized), Wildlife (leopard frog, bighorn sheep), Cultural (inscription panel, rock art), Vegetation (~~Fremont cottonwood/skunkbush sumac~~ riparian woodland; skunkbush sumac/sandbar willow riparian shrubland)
- Segment length: 10.74 miles; 93% BLM

*Stakeholder comments & questions on BLM information*

- How do those landowners feel about the potential for their part of the stream to be determined "suitable" for Wild & Scenic status?
- *Wanda Boyd requests her land be removed from any Wild and Scenic consideration.*
- Is there a chunk of private land in the middle of the segment as well?
- *No – BLM verifies*
- Would BLM seek to swap or acquire private land on a segment if it was determined suitable? Yes per BLM
- Vegetation ORV Fremont Cottonwood/skunkbush removed per BLM update
- Subgroup agreed on the conditions needed to be maintained in the stream corridor, but did not come to agreement on what management tools should be applied to maintain these conditions.

### TABLE 11 - ROUBIDEAU CREEK, SEGMENT ONE STAKEHOLDER ASSESSMENT

| | ORV NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 1 | Wildness | • Hunting<br>• Fishing<br>• Hiking | | | Within Camelback WSA:<br>• Provides surface disturbance protection.<br>• Does not provide protection specifically for ORV's.<br>• BLM found "not suitable" for designation as Wilderness; no process for revising. |
| 2 | Flows | Large diversion upstream. | | Sometimes stream goes dry in places. | |
| | Habitat quality | | | Russian knapweed problem (most severe among Monitor, Potter & Roubideau). | BLM spraying done on horseback because of WSA restrictions. |
| 3 | Cultural preservation | | | | Nominated for National Register of Historic Places (*would require that any federal or federally funded project take into account potential impacts on places deemed eligible to be on the National Register of Historic Places & give opportunity to comment by the Advisory Council on Historic Preservation*). |

BLM_0075833

| | ORV NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 4 | | Access Roads | | Main road up Roubideau terminates for public use just up from the confluence; good condition. | |
| 5 | | Grazing | | | |

## 11 - ROUBIDEAU CREEK SEGMENT 2

*Eligibility Report Information:*
- Classification: Scenic
- ORV: Wildlife (leopard frog, bighorn sheep). ~~Vegetation (Fremont cottonwood/ skunkbush sumac riparian woodland)~~
- Segment Length:  7.59 miles, 45.5% BLM managed

*Stakeholder comments & questions on BLM information:*
- Less than 50% BLM – potential management problems.
- Why does segment go so much on private land?
  - BLM response: ORV there.
- Frogs may not be so rare – noisy + lots of tadpoles seen locally.
- Bighorn sheep re-introduced; desert bighorn – not mountain; presumed native b/c rock art, but Fremont rock art sometimes depicts game species that weren't local to the area where they were drawn.
- Riparian vegetation not unusual
  - Vegetation ORV dropped by BLM after information update

BLM_0075834

**Final Wild and Scenic River Suitability**

TABLE 12 - ROUBIDEAU CREEK, SEGMENT TWO STAKEHOLDER ASSESSMENT

| | ORV NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 1 | Scenic classification | Utility corridor crossing BLM (345kV & 115kV power lines, and Trans-Colorado Natural Gas pipeline). Also, electric distribution service to 10 meters within corridor. All utilities require year-round access for operation, maintenance & repair. Vegetation trimming and/or road repair may be required to maintain t-line and access ROW's. | Replacement, upgrade or expansion of utilities within corridor. | | |
| | | Gas line | Replacement, upgrade or expansion of utilities within corridor. | | |
| 2 | Wildlife/ Vegetation Habitat | | | WSA upstream from segment. | |
| | | Irrigation diversion upstream | | Often no flow in late summer, fall. | |
| | | | | Buttermilk Cr near Roubideau – water for bighorns to drink. | |
| | | | | Springs and runoff provide moisture that supports frogs, vegetation. | |
| | | | | predation – if controlled herons & raccoons, would help. | |

BLM_0075835

| | ORV NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 3 | General | Cattle grazing in canyon: 1 day spring, 1 day fall; 900 transit canyon to access other grazing areas – vital for access; started 1882. | | Not pleasant for recreation while cattle are going through. Cattle don't stay on road; drift through whole canyon. | BLM: Scenic classification was made with road considered; suitability with this classification wouldn't close the road. |
| | | Sheep on top, South + East, in winter. | | | |

## 12 - DEEP CREEK

*Information:*

- Classification - Scenic
- ORV - Green-back cutthroat trout
- Segment Length – 2.55 mi.;  BLM Admin Length - .58 mi.
- DOW recommended any stream with pure cutthroat be an ORV. Technique to differentiate greenback cutthroat from Colorado cutthroat… are genetic differences, only recently figured out… Original paper may have miss-labeled as greenback.
- Viable population upstream on USFS land

### TABLE 13 - DEEP CREEK STAKEHOLDER ASSESSMENT

| | KEY CONDITIONS TO MAINTAIN ORV | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 1 | Fish are there | Limited fishing | | • Only places fish survive is in isolated pools on BLM stretch. • Only occasional hitchhikers make it down to BLM • More viable population upstream. | • If it's not broke, why fix it? |
| 2 | Limit other species detrimental to Cutthroat | | | • Competition from brook trout | • Consider going downstream to prevent brook trout from going upstream. |

BLM_0075836

**Final Wild and Scenic River Suitability**

| | KEY CONDITIONS TO MAINTAIN ORV | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 3 | Water Quantity – running water for longer period of time | • Irrigation Diversion up-stream<br>• Ranch has 1933 decree | Irrigation Diversion changes | • Creek is dried up 3 months of the year.<br>• Water is the limiting factor | • Cost-share a project to build a new, fish-friendly diversion.<br>• A public / private partnership for storage upstream could provide water for irrigation + fish.<br>• Bear Ranch cost-share program with USFS; can BLM participate<br>• BLM & water user agreements<br>• In Stream Flow (ISF) appropriation<br>• WSR Suitability - Permanency is important – uncertainty about future management decisions.<br>• With Suitability, BLM would manage to protect the fish & keep it from slipping from "Scenic" classification but can't do much without water.<br>• With Suitability, BLM management may not be very different but would force agencies to look at any actions that may harm the ORV |
| 4 | | Any pure cutthroat regardless of what kind, DOW considers important to conserve | | Question about if it is greenback cutthroat, and if so, if planted | • FWS "threatened"<br>• Protected under ESA<br>• Broad USFS guidance<br>• Angling regulations<br>• Ranch and water use of local water users are key factors in protection<br>• DOW to summarize regulations and for group |

BLM_0075837

| | KEY CONDITIONS TO MAINTAIN ORV | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 5 | | • Currently leased for Oil & Gas – per BLM<br>• No current coal leases – per BLM | | | • "No surface occupancy" would be easy to directionally drill.<br>• Suitability - would require a buffer around the stream in the case of oil & gas leasing – Potential for litigation? |
| 6 | | Sole-source power line crosses creek within 200-250' of BLM river segment, and uses an existing access road on BLM for year-round operation, maintenance & repair. Vegetation trimming and/or road repair (approx. 1 mile) may be needed to maintain the t-line and access ROW's. | Additional houses possible that would require more service.<br><br>Future replacement or upgrade of utilities within corridor may be necessary to accommodate load growth. | | |
| 7 | | Road crossing Deep Creek/ approx. 1 mile of access on BLM | Road maintenance if required to maintain access | | |
| 8 | | Livestock Grazing | | | |

BLM_0075838

**Final Wild and Scenic River Suitability**

### 13 - WEST FORK OF TERROR CREEK

*Eligibility Report Information:*
- Classification: Scenic
- ORV: Native Colorado Trout (may be threatened Greenback Cutthroats)
- Segment Length: 1.21 miles, 39.2% managed by BLM

*Stakeholder comments & questions on BLM information:*
- Request for details on when and where trout were found in the creek
  - DOW Response: Sampling records confirm the presence of cutthroat trout as early as 1978 & as recent as 2010
- Fish may be a non-threatened species of Colorado Cutthroat Trout. Most sampling has occurred on USFS land.
- If BLM only manages a broken 39.2% of the segment, could it manage that? Suggest not considering it b/c of this issue.
- Grand Mesa Canal Headgate #4, mentioned in eligibility report, has never been built – it is a conditional decree.
- Two small impoundments Rex and Holy Terror Reservoirs, are upstream from the reach; their stored water is not released through the West Fork of Terror Creek, but instead the water is diverted into the Leroux Creek drainage for irrigation use by the Leroux Creek Water Users Association.

#### TABLE 14 - WEST FORK TERROR CREEK STAKEHOLDER ASSESSMENT

| | ORV + CLASSIFICATION CONDITION & NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 1 | Fish ORV: Flows | Senior water rights: <br>• Above segment: Overland Ditch, Leroux Creek Water Users Association <br>• Below segment: Terror Ditch, Holy Bee, Fawcett | | Several years the creek is dry at the confluence with the East Fork of Terror Creek. Bowie Resources has data back to 1983 showing flows ranging from spring flood (220 cfs) to 0 in the fall. | Endangered Species Act already provides protections for the endangered fish. **Noted at 1/10 mtg:** ESA is not valid for these fish that are not threatened or endangered. |

BLM_0075839

| | ORV + CLASSIFICATION CONDITION & NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 2 | Scenic Classification | Roads: 1.15 miles unsurfaced, 0.90 single-lane county rd | | Segment can be easily accessed by road. There is currently no public access to adjacent road system. | 1/10/11 Mtg: Water is diverted to West Fork Terror Creek that is not a natural drainage. |
| | | 230 KV transmission line crosses creek on BLM and requires year-round motorized access for operation, maintenance & repair. Vegetation trimming and/or road repair may be required to maintain t-line and access ROW's. | Replacement, upgrade or expansion of utilities within corridor. | More industrial infrastructure in corridor than indicated in eligibility report. | |
| | | Dilapidated cabin and several small outbuildings located within corridor. | Future permanent and/or seasonal residence within corridor | Existing structures not noted in eligibility report. | |
| | | Roads cross the stream at two locations within the corridor. The county road crosses the stream over a culvert and the unsurfaced road crosses the steam with an unimproved 'at-grade' ford. | | Stream crossing not noted in eligibility report. | |
| | | Coal exploration drill hole and water quality monitoring wells currently permitted and scheduled to be installed in 2011 | Use of water quality monitoring wells will be required for 10-15 years | Additional industrial use in the corridor not noted in eligibility report. | |

BLM_0075840

**Final Wild and Scenic River Suitability**

| | ORV + CLASSIFICATION CONDITION & NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 3 | General | Cattle grazing | | | All species whether listed as endangered, threatened, or sensitive species are protected under mine permitting processes. |
| | | Fishing | | Stream is narrow and brushy limiting fishing opportunity. | |
| | | Mining – coal exploration drill holes. | Potential coal reserves in corridor; leased. | Significant economic impact on local economy if coal reserves are unable to be mined. | |
| | | Oil & gas leases. | Oil & gas devel. | | |

BLM_0075841

## STAKEHOLDER GROUP TWO RECOMMENDATIONS

**Audubon Colorado • Center for Native Ecosystems**
**Colorado Environmental Coalition • Colorado Mountain Club • Colorado Wild**
**San Juan Citizens Alliance • Sheep Mountain Alliance • The Wilderness Society**
**Western Colorado Congress • NWWSERC/NFRIA/WSERC Conservation Center**

c/o The Wilderness Society
1660 Wynkoop #850
Denver, Colorado  80202                                    February 22, 2011

Barbara Sharrow, Manager
Uncompahgre Field Office
Bureau of Land Management
Montrose, Colorado

Dear Ms. Sharrow,

The ten undersigned organizations participated in the recently concluded ad hoc stakeholders process reviewing management recommendations and potential suitability of seven stream segments for possible inclusion in the National Wild and Scenic Rivers System (stream segments previously listed by the BLM as eligible for consideration for such protection—*Final Wild and Scenic River Eligibility Report for the BLM Uncompahgre Planning Area, June 2010*). These organizations either participated directly in the stakeholders process or were represented by participants, consulting with and advising those representatives throughout the process.

Our organizations joined this effort in good faith that open and fair consideration would be given, by all participants, to the option of a wild & scenic suitability finding for at least some of the stream segments. While that openness was not broadly forthcoming among the participating stakeholders, our representatives did present detailed information on the values of, and need for protection for, select streams. We hope that information and our perspectives contributed positively to the discussion. We also appreciate very much the efforts of a few stakeholders, outside our delegation, in their pursuit of a greater level of agreement on at least some streams.

In large part because of the refusal of other stakeholders to even consider the possibility of a suitability finding for any stream, the group reached no consensus agreement on recommendations to the Bureau of Land Management (BLM). While a letter signed by some of the stakeholders, opposing any suitability findings, has been sent to the BLM as the so-called majority recommendations, that letter does not represent the full group of stakeholders. **There was no consensus.**

Correspondingly, we respectfully offer our collective recommendations regarding potential suitability findings, and protective management, for the seven stream segments. These recommendations build on suitability comments our organizations submitted to the BLM in August 2010. They are supplemented with additional, updated, information and with new perspectives arising from the recent stakeholders discussions.

We thank you for carefully considering the details of these recommendations as you develop the range of alternatives for the pending resource management plan and, ultimately, as you settle on a final management plan.

BLM_0075842

The BLM's eligibility report was a very helpful starting point in the preparation of our original suitability comments and for our continued discussions of these streams with the BLM and with others. The level of detail provided, the careful research, and the professional presentation of that eligibility report have contributed to thoughtful review and discussion of these important streams.

Meanwhile, it is significant to note that Colorado has only one stream included in the National Wild and Scenic Rivers System. We trust that it is obvious that this is not because of a lack of outstanding streams in this state. Indeed, the BLM's eligibility report confirms that a long list of remarkable streams and stream corridors warrant special consideration and strong protection, whether under provisions of the Wild and Scenic Rivers Act or otherwise.

### Stream segments

<u>Gunnison River Segment 2</u>
*.41 mile; Recreational; Fish*
This regionally significant river warrants strong and enduring protection as an important recreational opportunity, as the hydrologic heart of unique adjacent public lands, and as essential habitat for at least two endangered species of native fish, along with three other species of ancient native fish that are imperiled, primarily because of loss of habitat or changes in river flows. (All these values are documented in the BLM's eligibility report.)

Federal ownership of the river segment is 100%. While only 66.5% of lands in the river corridor are federally owned, all those lands are on one side of the river, simplifying the implementation of protective management for those lands.

The primary need for the identified outstandingly remarkable values—particularly for the native fish—are reliable and seasonally natural flows of water in the Gunnison River. Other federal programs—primarily the Endangered Species Act—and evolving federal management efforts—including re-operation of the Aspinall Unit dams upstream—contribute, or will contribute, to the reliability of those critical-habitat flows.

It therefore is not necessary to apply a finding of wild & scenic suitability to this portion of the Gunnison River, *so long as* those other federal measures are implemented and properly maintained. If those measures are either removed or fail to protect the native fish and their habitat, the BLM should reconsider a finding of suitability in future planning processes.

<u>Monitor Creek</u>
*9.42 miles; Wild; Vegetation (cottonwood/riparian)*
This stream is an important feature flowing through the heart of federal lands with wilderness character and wilderness characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's eligibility report's preliminary classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

BLM_0075843

In addition to the outstandingly remarkable values identified in the BLM's eligibility report (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Monitor Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and Outstandingly Remarkable Value (ORV)) identified by the BLM for nearby Roubideau Creek (*desert bighorn sheep*). The features, condition, and importance of this wildlife habitat along Monitor Creek are of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Monitor Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), the version found along Monitor Creek is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Monitor Creek are also present in Roubideau Creek, which is included, stream and corridor, in the Roubideau (Camel Back) WSA, thus necessarily defined by those same backcountry recreation opportunities.

Meanwhile, a finding of wild & scenic suitability for Monitor Creek—a finding most directly applicable to the lands in the stream corridor—will provide highly reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*).

Federal ownership of 100% of this stream segment, and of 96.2% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 104.9 acres of private land within the stream corridor are actually separate from the stream, further simplifying protective management, especially if that management were applied specifically to the federal lands.

We recommend that the full length of the Monitor Creek segment be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should be expanded to include recreational opportunities and wildlife habitat.

Potter Creek
*9.82 miles; Wild; Vegetation (cottonwood/riparian)*
This stream is an important feature associated with adjacent lands with wilderness character and characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's eligibility report's preliminary classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

BLM_0075844

In addition to the outstandingly remarkable values originally identified in the BLM's eligibility report (*vegetation*), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Potter Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and ORV identified by the BLM for adjacent Roubideau Creek (*desert bighorn sheep*). The features, condition, and importance of that wildlife habitat along Potter Creek is of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Potter Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), it is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Potter Creek are also present in Roubideau Creek. Roubideau Creek and its corridor are included in the Roubideau (Camel Back) WSA, which is necessarily defined by those same backcountry recreation opportunities.

Meanwhile, the BLM's decision to remove the one outstandingly remarkable value originally identified in the agency's eligibility report is in error. The BLM's rather arbitrary distinction between a classification as critically imperiled globally (G1) and vulnerable throughout its range (G2) is not well founded. Glibly stated, rare is rare, and vulnerable is vulnerable.

Stated a bit more thoughtfully, a plant community that is currently vulnerable throughout its range warrants the highest possible level of protection in each of its occurrences, lest damage from human activity, climate change, or other harmful factors translate vulnerable to imperiled. The best way to avoid plant community failures in the future is an active protection in the present. A finding of eligibility, and accompanying protective management, is an appropriate and timely tool for this plant community.

In any case, a finding of wild & scenic suitability for Potter Creek—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*).

Federal ownership of 100% of this stream segment, and of 98.5% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 44.3 acres of private land are located at the far lower end of the stream segment, further simplifying protective management, especially if that management were applied specifically to the federal lands.

We recommend that the full length of the Potter Creek be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should continue to include the highlighted vegetation communities, and they should be expanded to include recreational opportunities and wildlife habitat.

Roubideau Creek Segment 1
*10.71 miles; Wild; Recreational, Wildlife, Cultural, Vegetation*
This stream is an important feature flowing through and enhancing lands with wilderness character and characteristics, both within the long-standing Roubideau (Camel Back) WSA and in the larger citizens' wilderness proposal of the same name. The stream is also associated with national forest

BLM_0075845

lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's eligibility report's preliminary classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

A finding of wild & scenic suitability for Roubideau Creek Segment 1—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring protection for the continued health of the ORVs identified in the BLM's eligibility report, including: rare plant communities (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*); wildlife (*northern leopard frog, desert bighorn sheep*); cultural; and recreational (*primitive and non-mechanical exploration and exercise*).

Federal ownership of 93% of this stream segment, and of 94.8% of the land in the stream corridor simplifies the effective implementation of protective management.

We recommend that the full length of the Roubideau Creek Segment 1 be found suitable, applicable at least to the federal lands in the corridor.

Roubideau Creek Segment 2
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (45.5%, 60.2%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Roubideau Creek Segment 2.

Deep Creek
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

In particular, the critical rarity of greenback cutthroat trout warrants the highest level of protective management, especially management and cooperative measures to ensure reliable and seasonally natural stream flows.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (22.7%, 15.8%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Deep Creek, *so long as* those other methods continue to successfully protect the trout and its habitat.

West Fork Terror Creek
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

BLM_0075846

The relatively low percentage of federal land ownership along the stream and in the stream corridor (39.2%, 47.5%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for West Fork Terror Creek, *so long as* those other methods continue to successfully protect the trout and its habitat.

**Summary**

The undersigned organizations recommend that the BLM reach a finding of suitability, and implement corresponding strong protective management measures for:

- Monitor Creek
- Potter Creek
- Roubideau Creek Segment 1

The undersigned organizations recommend that the BLM implement the strongest possible protective management measures, other than a finding of wild & scenic suitability for:

- Gunnison River Segment 2
- Roubideu Creek Segment 2
- Deep Creek
- West Fork Terror Creek

Thank you again for your careful consideration of these comments and recommendations, as complement to the thorough research and review the BLM has already applied to these important streams and corridors.

Please let us know any way in which we can clarify these recommendations, expand on them, or assist with securing their implementation in the BLM's protective management of these streams.

Sincerely,

Steve Smith, Assistant Regional Director
The Wilderness Society
for

Ken Strom, Director
Audubon Colorado

Megan Mueller, Senior Staff Biologist
Center for Native Ecosystems

Becky Long, Water Caucus Coordinator
Colorado Environmental Coalition

Jay Heeter, Campaigns Coordinator
Colorado Mountain Club

Paul Joyce, Conservation Associate
Colorado Wild

Meghan Maloney, River Program Director
San Juan Citizens Alliance

Hilary White, Director
Sheep Mountain Alliance

Gretchen Nicholoff, President
Western Colorado Congress

Rob Peters, Executive Director
Andrea Robinson, Conservation Chair
NFRIA/WSERC Conservation Center

BLM_0075847

## G. SUITABILITY STUDY PARTICIPANTS

| NAME | DISCIPLINE | RESPONSIBILITY |
|------|------------|----------------|
| Bruce Krickbaum | Planning & Environmental Coordinator | Report Oversight |
| Pauline Adams | Hydrologist | Hydrology & Public Outreach |
| Joe Cain | Geographical Information Systems Specialist | Mapping & Spatial Analysis |
| Amanda Clements | Ecologist | Vegetation & Land Health |
| Desty Dyer | Mining Engineer | Coal Resources |
| Robert Ernst | Geologist | Mineral Resources |
| Edd Franz | GGNCA Outdoor Recreation Planner | Recreation, Wilderness & Public Outreach |
| Tom Fresques | Colorado River Valley Fisheries Biologist | Fish |
| Glade Hadden | Archaeologist | Cultural & Historic Resources |
| Julie Jackson | Outdoor Recreation Planner | Recreation & Travel Management |
| Dave Kauffman | Associate Field Manager | Interdisciplinary Team |
| Jeff Litteral | Hydrologist | Hydrology & Public Outreach |
| D. Maggie Magee | Technical Writer/Editor | Report Writing & Editing |
| Jana Moe | Administrative Support Assistant | Administrative Support |
| Amanda Moore | Geographical Information Systems Specialist | Mapping & Spatial Analysis |
| Dennis Murphy | UFO/Contract Hydrologist | Report Writing & Hydrology |
| Teresa Pfifer | Lands & Minerals Staff Supervisor | Interdisciplinary Team |
| Linda Reed | Realty Specialist | Lands & Realty |
| Charles Sharp | Wildlife Biologist | Wildlife & TES Species |
| Barbara Sharrow | Field Manager | Interdisciplinary Team |
| Melissa Siders | Biology Staff Supervisor | Interdisciplinary Team |
| David Sinton | Geographical Information Systems Lead | Mapping & Spatial Analysis |
| Roy Smith | BLM Colorado Water Rights Specialist | Water Rights & Report Oversight |
| Jedd Sondergard | Hydrologist | Hydrology & Public Outreach |
| Thane Stranathan | Natural Resource Specialist | Oil & Gas Resources |
| Karen Tucker | GGNCA Manager | Interdisciplinary Team |

**\*All participants are BLM UFO Staff unless otherwise noted**

BLM_0075848

*Final Wild and Scenic River Suitability*

## H. BIBLIOGRAPHY

**American Whitewater**
2017   *Assessing Instream Flows that Support Whitewater Recreation in the San Miguel River Basin.* Accessed online at: https://www.americanwhitewater.org/resources/repository/SanMiguelReport2016_FINALweb.pdf

**Bureau of Land Management**
1982   *Archaeological Resources of Southwestern Colorado: Uncompahgre and Gunnison Resource Areas, San Miguel Resource Area.* Colorado State Office. Denver.

1992   *Wild and Scenic Rivers-Policy and Program Direction for Identification, Evaluation, and Management.* BLM Manual 8351. Rel. 8-61. Washington D.C.

2000   *Colorado BLM State Director's Sensitive Species List (Animals and Plants).* Webpage: http://www.blm.gov/co/st/en/BLM_Programs/botany/Sensitive_Species_List_.html

2007   *San Juan Public Lands Center Draft Land Management Plan and Draft Environmental Impact Statement, Volume 3 - Appendices.* BLM/USFS San Juan Public Lands Center. Durango, CO.

2008   *Moab Field Office Record of Decision and Approved Resource Management Plan.* BLM Moab Field Office. Moab, UT.

2008b   *Preparation Plan for the Uncompahgre Resource Management Plan.* BLM Uncompahgre Field Office. Montrose, CO.

2009   *Wild and Scenic River Eligibility Report for Bureau of Land Management Grand Junction Field Office.* BLM Grand Junction Field Office. Grand Junction, CO.

2010   *Final Wild and Scenic River Eligibility Report for the Uncompahgre Planning Area.* BLM Uncompahgre Field Office. Montrose, CO. Available online at: http://www.blm.gov/co/st/en/fo/ufo/wild_and_scenic_river.html

2012   *Wild and Scenic Rivers-Policy and Program Direction for Identification, Evaluation, and Management.* BLM Manual 6400. Rel. 6-136. Washington, D.C.

**BOR (US Department of the Interior, Bureau of Reclamation)**
2009   Colorado River Basin Salinity Control Project. *Paradox Valley Unit, Title II.* Webpage: http://www.usbr.gov/projects/Project.jsp?proj_Name=CRBSCP+-+Paradox+Valley+Unit+-+Title+II

**Colorado Department of Public Health and Environment**
2010   Water Quality Control Commission. *Section 303(d) List of Water Quality-limited Segments Requiring Total Maximum Daily Loads. 5CCR 1002-93, Regulation #93.* Denver.

2010b   Water Quality Control Commission Regulations. *Regulation Number 35: Classifications and Numeric Standards for Gunnison and Lower Dolores River Basins, as amended 8 February 2010.* Accessed online at:  http://www.cdphe.state.co.us/regulations/wqccregs/

**Colorado River Water Conservation District**
2009   Water Glossary. *Colorado River Terms.* Webpage:  http://www.crwcd.org/page_100

BLM_0075849

## Colorado Water Conservation Board

2015    *Colorado Water Plan.* Accessed online at: https://www.colorado.gov/pacific/cowaterplan/plan

2015    *Gunnison Basin Implementation Plan.* Accessed online at: https://www.colorado.gov/pacific/cowaterplan/gunnison-river-basin

2015    *Southwest Basin Implementation Plan* Accessed online at: https://www.colorado.gov/pacific/cowaterplan/southwest-basin

2011    Instream Flow Program. *2011 Contested Appropriations.* Webpage: http://cwcb.state.co.us/environment/instream-flow-program/Pages/2011ContestedAppropriations.aspx

2010    *Statewide Water Supply Initiative.* Accessed online at: http://cwcb.state.co.us/water-management/water-supply-planning/pages/swsi2010.aspx

2004    *Statewide Water Supply Initiative.* Accessed online at: http://cwcb.state.co.us/public-information/publications/Pages/StudiesReports.aspx

## U.S. Geological Survey

2018    U.S. Geological Survey, 2018, National Water Information System data available on the World Wide Web (USGS Water Data for the Nation), accessed [March 22, 2018], at URL [http://waterdata.usgs.gov/nwis/].

2009    Capesius, J.P., and Stephens, V.C., 2009, Regional regression equations for estimation of natural streamflow statistics in Colorado: U.S. Geological Survey Scientific Investigations Report 2009–5136, 46 p.

2009    Ries, K.G., III, Steeves, P.A., Guthrie, J.D., Rea, A.H., and Stewart, D.W., 2009, Stream_network Navigation in the U.S. Geological Survey StreamStats Web Application, pp. 80-84.

## Colorado Wilderness Network

2006    *Colorado's Canyon Country Wilderness Proposal.* Website:  http://www.canyoncountrywilderness.org/home.htm

## Dolores Water Conservancy District

2018    *Draft Dolores Project Drought Contingency Plan.* Accessed online at: http://doloreswater.com/wp-content/uploads/2018/01/CLEAN-Final-Draft-DPDCP-with-Reclamation-Comments-Addressed.pdf

2014    *Water Management and Conservation Plan.* Accessed online at: http://doloreswater.com

## Environmental Protection Agency

2008    *Final Closeout Report: Uravan Mill and Adjacent Areas, Montrose County, Colorado.* Accessed online at:  www.epa.gov/region8/superfund/co/uravan/

2005    *Five Year Review:  Umetco Minerals Corporation Uravan Superfund Site.* Accessed online at: http://cumulis.epa.gov/fiveyear/index.cfm?fuseaction=fyrsearch.showSitePage&id=0800076

## Interagency Wild and Scenic Rivers Coordinating Council

1999    *National Wild and Scenic Rivers.* Website:  http://www.rivers.gov

BLM_0075850

**National Audubon Society**

2010    *Important Bird Areas Program.* Webpage:  http://www.audubon.org/bird/iba

**Orr, John, Editor**

2011    Coyote Gulch. Weblog:  http://coyotegulch.wordpress.com/category/colorado-water/wild-and-scenic/

**U.S. Forest Service**

2007    *Proposed Land Management Plan Grand Mesa, Uncompahgre, and Gunnison National Forests.* Delta, CO.

2007b   *Wild and Scenic Rivers Suitability Study for National Forest System Lands in Utah.* PowerPoint. Accessed online at:  http://www.fs.fed.us/r4/rivers/documents/suitability_presentation_052407.pdf

**U.S. Geological Service**

2010    National Water Information System. *Real-time data for Colorado:  Streamflow.* Webpage:  http://waterdata.usgs.gov/co/nwis/current/?type=flow&group_key=huc_cd

**Watershed Management Council**

1994    *Recommended Watershed Terminology.* Webpage: http://watershed.org/news/fall_94/terminology.html

**Wild and Scenic Rivers Act**

1968    Public Law 90-542, 16 U.S.C. 1271 et seq., as amended. Accessed online at: http://www.rivers.gov/publications.html#wsract

**Willits, Patrick**

2001    The Trust for Land Restoration. *San Miguel River Restoration Assessment Summary.* Accessed online at:  www.restorationtrust.org/Rest-Assess_summ.pdf

BLM_0075851

## TABLE 15 - SUITABLE SEGMENTS IN THE UFO PLANNING AREA

| SUITABLE SEGMENT | TOTAL SEGMENT MILES | TOTAL BLM MILES | TOTAL CORRIDOR ACRES | BLM LAND ACRES | RECOMMENDED CLASSIFICATION | OUTSTANDINGLY REMARKABLE VALUES |
|---|---|---|---|---|---|---|
| Monitor Creek | 9.4 | 9.4 | 2,540 | 2,540 | Wild | Vegetation |
| Potter Creek | 9.8 | 9.8 | 2,810 | 2,810 | Wild | Fish, Vegetation |
| Roubideau Creek, Segment 1 | 10.0 | 10.0 | 2,680 | 2,680 | Wild | Recreational, Wildlife, Cultural, Vegetation |
| Beaver Creek | 14.3 | 14.2 | 4,170 | 3,640 | Recreational | Vegetation |
| Saltado Creek | 5.6 | 4.1 | 1,640 | 1,340 | Wild | Vegetation |
| San Miguel River, Segment 1 | 27.2 | 17.3 | 8,360 | 6,680 | Recreational | Scenic, Recreational, Wildlife, Historic, Vegetation, Paleontology |
| San Miguel River, Segment 2 | 4.0 | 4.0 | 1,100 | 1,100 | Wild | Scenic, Recreational, Wildlife, Vegetation |
| San Miguel River, Segment 3 | 4.5 | 4.5 | 1,350 | 1,350 | Recreational | Recreational, Fish, Wildlife, Vegetation |
| San Miguel River, Segment 5 | 7.5 | 1.3 | 2,340 | 1,740 | Recreational | Recreational, Fish, Historic, Vegetation |
| San Miguel River, Segment 6 | 2.1 | 2.1 | 390 | 390 | Recreational | Recreational, Fish, Historic, Vegetation |
| Tabeguache Creek, Segment 1 | 3.4 | 3.4 | 1,010 | 1,010 | Wild | Vegetation |
| Lower Dolores River | 4.2 | 4.2 | 630 | 630 | Scenic | Scenic, Recreational, Geologic, Fish, Wildlife |
| Dolores River, Segment 1 | 8.7 | 8.7 | 1,950 | 1,950 | Wild | Recreational, Scenery, Fish, Wildlife, Geology, Ecology, Archaeology |
| Dolores River, Segment 2 | 5.3 | 5.3 | 1,230 | 1,230 | Recreational | Scenic, Recreational, Geologic, Fish, Wildlife, Vegetation |
| La Sal Creek, Segment 2 | 3.3 | 3.3 | 790 | 790 | Recreational | Fish, Vegetation |
| La Sal Creek, Segment 3 | 3.4 | 3.4 | 800 | 800 | Wild | Scenic, Recreational, Fish, Cultural, Vegetation |

BLM_0075852

This page intentionally left blank.

BLM_0075853

BLM_0075854

**Draft Wild and Scenic River Suitability**

*It is hereby declared to be the policy of the United States that certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural or other similar values, shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations. The Congress declares that the established national policy of dams and other construction at appropriate sections of the rivers of the United States needs to be complemented by a policy that would preserve other selected rivers or sections thereof in their free-flowing condition to protect the water quality of such rivers and to fulfill other vital national conservation purposes.*

Wild & Scenic Rivers Act, October 2, 1968



BLM_0075855

Received: 16 November 2016 | Accepted: 16 May 2017

DOI: 10.1111/soc4.12497

**WILEY**

<u>**ARTICLE**</u>

# The sociology of U.S. gun culture

## David Yamane

Department of Sociology, Wake Forest University

**Correspondence**
David Yamane, Department of Sociology, Wake Forest University, Winston-Salem, NC 27109, USA.
Email: yamaned@wfu.edu

**Abstract**

Despite the fact that a robust culture centered on the legal owner-ship and use of guns by law-abiding gun owners exists in the United States, there is no sociology of U.S. gun culture. Rather, the social sci-entific study of guns is dominated by criminological and epidemiolog-ical studies of gun violence. As a corrective to this oversight, I outline what a sociology of U.S. gun culture should look like. In the first sec-tion, I give a brief history of U.S. gun culture from the founding era through the 1960s. Guns began as tools of necessity in the colonies and on the frontier, but evolved into equipment for sport hunting and shooting, as well as desired commodities for collecting. The second section examines these recreational pursuits which formed the core of U.S. gun culture for most of the 20th century. Although recreation remains an important segment, the central emphasis of U.S. gun culture has gradually shifted to armed self-defense over the course of the past half-century. The third section examines the rise of this culture of armed citizenship, what I call "Gun Culture 2.0," the current iteration of the country's historic gun culture. I conclude by suggesting important avenues for future research.

## 1 | INTRODUCTION

The world today is awash in a sea of small arms in the hands of civilians, with the United States leading the way by a considerable margin. Although there is no official registry of firearms, the Small Arms Survey estimated that there are 270 million civilian owned firearms (and counting) in the United States, including handguns, rifles, and shotguns (Graduate Institute of International Studies, 2007). Two decades ago, Wright (1995, p. 64) observed that there is "nearly one gun for every man, woman, and child in the country." This remains true today, as the size of the population and the civilian gun stock have grown together.

Despite the fact that "gun ownership is normative, not deviant, behavior across vast swaths of the social landscape" (Wright, 1995, p. 64), there is no sociology of guns, per se. Most research examines guns in connection with crime and violence, either from a criminological (Harcourt, 2006) or public health perspective (Hemenway,

This is an open access article under the terms of the Creative Commons Attribution-NonCommercial-NoDerivs License, which permits use and distribution in any medium, provided the original work is properly cited, the use is non-commercial and no modifications or adaptations are made.
© 2017 The Authors. Sociology Compass Published by John Wiley & Sons Ltd.

BLM_0075856

2004). As a corrective to this oversight, I take my cue from Wright (1995) and use the scant sociological literature on the legal use of firearms by lawful gun owners to outline what a sociology of U.S. gun culture should look like. I focus here exclusively on the U.S. because it has more guns than any other country and appears unique in the world in having a strong cultural association of guns with personal identity and national values—i.e., in having a gun culture (Cook & Goss, 2014, p. 155; Wright, Rossi, & Daly, 1983).

In the first section, I give a brief history of U.S. gun culture from the founding era through the 1960s. Guns began as tools of necessity in the colonies and on the frontier but evolved into equipment for sport hunting and shooting, as well as desired commodities for collecting. The second section examines these recreational pursuits which formed the core of U.S. gun culture for most of the 20th century. Although recreation remains an important segment, the central emphasis of U.S. gun culture has gradually shifted to armed self-defense over the course of the past half-century. The third section examines the rise of this culture of armed citizenship, what I call "Gun Culture 2.0," the current iteration of the country's historic gun culture. I conclude by suggesting important avenues for future research.

## 2 | U.S. GUN CULTURE: A BRIEF HISTORY

In "America as a Gun Culture," historian Richard Hofstadter (1970) remarked on—more accurately, he lamented—the uniqueness of the United States "as the only modern industrial urban nation that persists in maintaining a gun culture." In Hofstadter's account, U.S. gun culture is rooted in the reality of widespread, lawful possession of firearms by a large segment of the population. He recognizes that guns as material objects are central to the construction of any gun culture. Without guns, there is no gun culture. But in itself, this is a trivial statement. What is crucial to explain is how people understand and use guns, as well as how guns themselves change over time, both responding to and facilitating different understandings and uses (Haag, 2016; Kohn, 2004).

Guns were a significant aspect of the social reality of the U.S. from the outset (Winkler, 2011). As Cramer (2006, p. 236) argues, "Gun ownership appears to have been the norm for freemen, and not terribly unusual for free women and at least male children, through the Colonial, Revolutionary, and early Republic periods." Of course, guns then were not as plentiful or as loaded with symbolism as they would come to be. The 19th century shift from craft to industrial production, from hand-made unique parts to machine-made interchangeable parts, dramatically increased manufacturing capacities, and gun manufacturing played a central role in this development. And like other mass produced commodities, the guns had to be sold to the public; where markets for them did not already exist, they had to be created (Haag, 2016). As the nation developed, so too did gun culture.

"What began as a necessity of agriculture and the frontier," Hofstadter (1970) observed, "took hold as a sport and as an ingredient in the American imagination." Hunting became not only a source of food but a dominant form of recreation for many, and casual target shooting competitions were commonplace on the frontier in the 19th century. At midcentury, *Schützenbünde*—fraternal shooting clubs—flourished in many cities with sizable German populations including New York, Cincinnati, Milwaukee, and San Francisco (Gilmore, 1999). These realities in the United States, and the organization of rifle/target shooting organizations in England and Canada in the 1850s and 1860s, make the founding of the National Rifle Association (NRA) in 1871 more understandable (Gilmore, 1999; Hummel, 1985). The NRA has played a significant role in promoting America's gun culture since its founding in 1871, beginning with its efforts to promote rifle marksmanship through long-range shooting competitions. Although better known today for its political activities, for over 100 years, the NRA has overseen rifle and pistol target shooting competitions at Camp Perry, Ohio, known as "The National Matches" (Hummel, 1985). These marksmanship events represent on the national and expert level a type of recreational shooting enjoyed by thousands of gun owners across the country.

Into the 20th century, hunting continued to be an important part of U.S. gun culture, particularly in the South, but in rural areas of other regions of the country as well, and among urban-dwellers looking for some escape from city life (Marks, 1991). Especially as part of socialization into hunting, receiving a "real" rifle became seen as a rite of passage from boyhood into manhood (Littlefield & Ozanne, 2011). The gun industry also promoted guns as objects of (typically

masculine) desire through the mass advertising that was increasingly embraced by corporate America to fuel consumer capitalism. Gun collecting as an avocation and business arose in the early 20th century in conjunction with this evolution away from a purely utilitarian view of guns (Haag, 2016).

As the citations in this brief section suggest, sociologists have been noticeably absent in historical studies of U.S. gun culture. This is unfortunate because, as Tonso (1982) suggested decades ago, understanding Americans' contemporary attachment to guns would benefit from understanding the roots of its attachment historically. As the following section on contemporary studies of hunting, target shooting, and collecting as recreational activities demonstrates, sociologists continue to ignore significant aspects of U.S. gun culture today.

## 3 | RECREATIONAL GUN CULTURE

Writing in the mid-1990s, Wright (1995, p. 64–65) observed that most guns in America are "owned for socially innocuous sport and recreation purposes," and therefore, that "gun ownership is apparently a topic more appropriate to the sociology of leisure than to the criminology or epidemiology of violence." A 1978 survey of gun owners found that 71 percent owned them for leisure purposes (hunting, target shooting, and collecting) (Wright et al., 1983, p. 60). Twenty years later, an ABC News/Washington Post poll similarly found that nearly two-thirds of the respondents cited recreation as the main reason they owned a firearm, including 49 percent hunting, 8 percent target/sport shooting, and 4 percent collecting (Pew Research Center, 2013). The 2015 National Firearms Survey allowed respondents to name multiple primary reasons for firearms ownership and found that 40% named hunting, 34% collecting, and 28% sporting use (Azrael, Hepburn, Hemenway, & Miller, 2016). Unfortunately, only a handful of scholars have considered gun culture as a form of recreation akin to other "collective passionate avocations" (Gillespie, Leffler, & Lerner, 2002, p. 286) like swing dancing, adult league tennis, and birding. There is, however, good reason to see a large part of gun culture as "serious leisure" (Stebbins, 2001).

The concept of "serious leisure" was pioneered by Stebbins (2001), who initially distinguished between casual leisure and serious leisure. Casual leisure involves mundane activities that require little specialized training, while serious leisure is complex and specialized and requires a greater level of commitment and training (Anderson & Taylor, 2010, p. 36). Unlike casual pursuits such as watching TV, activities involving guns tend toward serious leisure because of the cost and the dangers of firearms, as well as the amount of time and effort necessary to master their use.

As with other serious leisure pursuits, gun culture grew over the course of the 20th century. The previously noted transformation of hunting from a necessity of survival to a sporting pastime was amplified with the broader rise in leisure activities in the 20th century, as work days and hours shrank and income (and consumer credit) grew. Although many still hunt in order to harvest game meat, not many people in the U.S. hunt for subsistence (Grandy, Stallman, & Macdonald, 2003). Kellert (1988) argues that over the course of the 20th century a "utilitarian" attitude toward hunting has declined. An increasing proportion of hunters can be characterized as "sport hunters"—those who enjoy being outdoors with others and displaying their skills—and "nature hunters"—those who hunt to participate in nature for "inner-directed, virtually mystical, reasons" (Wright et al., 1983, p. 59).

Although the proportion of the U.S. population that hunts has declined, millions of Americans still hunt and in some locations hunting is sufficiently normative that public schools close on the opening day of hunting season. Unfortunately, sociologists have not seriously studied recreational motivations for hunting, perhaps because, like much of the non-hunting population, they do not approve of hunting for non-utilitarian, sporting reasons (Grandy et al., 2003). It would be an enormous benefit to our understanding of gun culture for someone to ethnographically study animal hunters in the way Fine (1998) studied the culture of mushroom hunters.

Slightly more research has been conducted on sport shooting and collecting as part of recreational gun culture. Kohn (2004) uses the phrase "gun enthusiasm" to characterize the orientation of the sport shooters she studied ethnographically in the San Francisco Bay Area. Kohn (2004, p. 9) argues, "At its most basic, gun enthusiasm is an enjoyment of and enthusiasm for firearms. Gun enthusiasts, like enthusiasts of any kind, take pleasure in the handling and use of the object of their pleasure." In other words, they approach shooting as a form of serious leisure. One

BLM_0075858

shooter interviewed by Stenross (1990, p. 59) explained his enjoyment of shooting by comparing it to another popular but less stigmatized recreational pursuit, golfing. "It's my day off, people might ask if I play golf. Well, I don't play golf, I shoot. 'Shoot what?' That upsets their world. Shoot what! Most people don't understand that it can be a sport." In fact, the shotgun sport known as "sporting clays" is often called "golf with a shotgun." In sporting clays, the participant moves from station to station and shoots at clay targets that are thrown from different locations and in different directions, much like a golfer moves from hole to hole, each of which is different.

Treating target shooting like any other legitimate leisure pursuit, a recent online survey utilized a 35-item Leisure Motivation Scale (LMS) and a 34-item Leisure Satisfaction Scale (LSS) to understand what gets and keeps target shooters involved in the activity. In terms of motivations, the highest rated reasons were "because it is fun" (mean of 4.83 out of 5), "to improve my marksmanship" (4.78), and "to challenge my abilities" (4.50). Factor analysis of the responses to the LMS identified six underlying components: escapism (34% of explained variance), social interaction (9.6%), self-actualization (7.9%), physical activity (6.2%), efficacy/skill (5.2%), and family history (3.9%) (Martin, Murray, O'Neill, MacCarthy, & Gogue, 2014, pp. 212-13).[1] Escapism included such items as "to relax" and "to relieve stress and tension," characterizations of shooting guns that could be very foreign to those outside gun culture. In terms of the satisfaction target shooters derive from their activity, "it is fun" (mean of 4.83 out of 5) and "I like it" (4.66) are the two most widely embraced responses. Factor analysis of the LSS survey responses identified eight components: self-actualization (37.3% of explained variance), social interaction (7.2%), respite (5.7%), physical benefit (5.2%), connection (4.5%), technical (4.1%), and hedonic pleasure (3.8%) (Murray, Martin, O'Neill, & Jason Gouge, 2015, pp. 9–10). These quantitative data reinforce Kohn's (2004) and others' qualitative data on the pleasure and enjoyment people get from their participation in this aspect of gun culture.

In addition to shooting, gun collecting is also understood as a form of serious leisure. Of the 14 gun collectors, Stenross (1990, p. 60) interviewed, most owned at least 30 guns, and four owned 100 or more. While target shooters and hunters see guns as useful for particular purposes, and anti-gun people sees them as implements of death, gun collectors see guns as "aesthetic objects" to be understood and appreciated like other collectables (Stenross, 1994, p. 30). The pleasure of collecting firearms comes from an appreciation of their beauty, the craftsmanship that goes into making them, and their connection to history (Stenross, 1990, p. 61; Anderson & Taylor, 2010, p. 44). Indeed, like those who collect stamps or other material objects, gun collectors often see themselves as "curators" of history, helping to preserve valuable objects for the future (Stenross, 1994, p. 31).

Unlike some others who engage in serious leisure, however, the objects of shooters' and collectors' enthusiasms are frequently associated with emotional and physical pain. They therefore have to negotiate the stigma associated with guns—a stigma which is not applied to coins or stamps (Stenross, 1990, p. 62). This reminds us that categorizing something as a form of leisure does not mean it is normative. Recreational drug use, shooting pool, and sexual "swinging" have historically been seen as "disreputable pleasures" or "morally controversial leisure" (Olmsted, 1988, p. 277). Gun collecting, target shooting, and hunting have all been viewed through this lens.

Gun avocationists find themselves having to give "dignifying accounts" of their use of guns to justify owning and using them (Stenross, 1990; Taylor, 2009). Hunters, for example, highlight the ethics of killing an animal appropriately ("quickly and cleanly") and of harvesting the meat, horns, and hide rather than allowing them to go to waste. Here, they draw a strong contrast to their cosmopolitan critics who are morally compromised because they are more distant from the sources of their food (Tonso, 1982). Target shooters emphasize the calmness, discipline, and self-control required and cultivated by shooting (Stenross, 1990, p. 59). Taylor (2009) highlights how gun collectors must use impression management techniques to negotiate the stigma of engaging in a leisure pursuit involving "morally controversial products" (Olmsted, 1988, p. 278). Those who own cars and drink alcohol are rarely blamed for drunk driving generally, but gun owners are sometimes made to feel partially responsible for the very existence of gun violence. So gun enthusiasts have to rationalize their avocations so as to distance themselves: "I know that guns are used as weapons to kill people every day. Those aren't my guns. The world is safe from my collection. I own over 100 guns" (Anderson & Taylor, 2010, p. 49). Those attracted to these avocations are often called "gun nuts." Some gun collectors coopt the "nutty" characterization of those so obsessed with firearms and characterize themselves as such, but in the sense of being quirky—like a professor or stamp collector can be nutty (Stenross, 1990, p. 61).

Hunting, target shooting, and collecting continue to be important aspects of U.S. gun culture today and merit further investigation by sociologists. At the same time, the center of gravity of U.S. gun culture has shifted over the course of the past half-century from recreational shooting to armed self-defense, from "Gun Culture 1.0," America's historic gun culture that Hofstadter described, to "Gun Culture 2.0."[2]

## 4 | THE RISE OF GUN CULTURE 2.0

Gun Culture 2.0 is centered on armed self-defense, or what I call the culture of armed citizenship. The concept of armed citizenship recognizes the large and growing number of people in the United States who are exercising their rights as citizens to carry firearms in public for self-defense. Although, as we have seen, the motivations for gun ownership are complex, the majority of gun owners today—especially new gun owners—point to self-defense as the primary reason for owning a gun. In a 1999 ABC News/Washington Post poll, 26 percent of respondents cited protection as being the primary reason for owning a gun; by 2013, that proportion had grown to 48 percent (Pew Research Center, 2013). Hunting, target/sport shooting, and gun collecting together declined by a roughly equal amount. More recently, the 2015 National Firearms Survey found 63% of respondents indicated "protection against people" to be a primary reason for owning a firearm (Azrael et al., 2016). Significantly, a 2013 Washington Post/ABC News poll found more Americans saying that having a gun in the house makes it a safer place to be (51%) than a more dangerous place to be (29%) (Clement & Craighill, 2013). This view extends outside the home, as well. A 2015 Gallup Poll found a majority of Americans (56%)—including 50% of women and 48% of non-gun owners—believe that if more Americans carried concealed weapons, the country would be safer (Newport, 2015). These statistics are reflective of the changing legal structure governing the carrying and use of firearms for self-defense. The dramatic liberalization of gun laws over the past four decades reflects and facilitates the development of Gun Culture 2.0.

In the early republic, no special licensing was required to bear arms, either openly or concealed. But beginning with Kentucky in 1813, there was a movement in several southern states to ban the carrying of concealed weapons in public (Cramer, 1999). In time, these prohibitions spread from the south to the rest of the United States. This "restricted era" of gun carry continued through the 1970s, but over the last four decades, there has been dramatic shift toward the liberalization of concealed carry laws (Patrick, 2009). The dominant movement in concealed carry legislation has been toward state passage of what have come to be known as "shall issue" laws (Grossman & Lee, 2008). From 1980 to 2013, 38 states passed these laws that require state or local authorities to issue a permit to any applicant that meets the objective statutory criteria if no statutory reasons for denial exist. The issuing authority's discretion over subjective criteria like the "good moral character" or "good cause" of the applicant is removed from the process. Two hundred years after Kentucky banned the carrying of concealed weapons in public, state or local governments in all 50 states must have (according to court decisions) some provision in place for issuing permits to citizens allowing them to carry concealed firearms in public, though nine states maintain more restrictive "may issue" laws under which the issuing authority is not required to issue a concealed carry license but *may* issue one at its discretion.

As concealed carry laws have been liberalized, the number of concealed carry permit holders have grown considerably. The Government Accountability Office estimated that there were at least 8 million active permits to carry concealed handguns in the United States at the end of 2011 (GAO, 2012). This amounts to at least 3.5 percent of the eligible U.S. population (adults who are legally allowed to possess guns). The portion of individual state populations with a concealed carry permit varies but shall issue states like Georgia (600,000 permits, 11.5%), Iowa (243,000 permits, 10.9%), and South Dakota (62,000 permits, 10.6%) have the highest rates in the country. It would surely surprise many to know that one out of every 10 adult citizens in these states is potentially legally armed in public, not to mention 3 to 4 out of every 100 Americans overall.

This lawful carrying of firearms for legal purposes has received very little attention from sociologists, who have largely ceded the topic to criminologists. Criminologists have examined aggregate levels of legal gun carrying using

data on the number of concealed carry permits issued in different jurisdictions. These studies tend to find that the political orientation of a locality matters (more Republican, more permits), as do shifts in racial composition (more racial minorities move in, more permits), and population density (more suburban, more permits) (Costanza & Kilburn, 2004; Thompson & Stidham, 2010). Although these studies are suggestive, the names of individual permit holders are not generally matters of public record, leaving scholars to analyze aggregated administrative data on permits. Establishing causality is difficult and the ecological fallacy looms large.

A more common approach has been to use statistical analysis of survey data to understand the individual decision to carry a firearm. As in studies of gun ownership more generally, these studies often identify demographic correlates of gun carrying such as age, gender, and region of residence (Bankston, Thompson, Jenkins, & Forsyth, 1990). More sophisticated studies try to capture additional subjective or situational factors, emphasizing fear of crime and history of criminal victimization, as well individual beliefs in self-protection, as principle motivators (Kleck & Gertz, 1998). While helpful, the strong emphasis on individual decision-making without understanding the broader cultural context within which that decision makes sense is a limitation of these studies.

Fortunately, two recent studies by sociologists have taken a more qualitative approach to studying concealed carry permit holders. In *Citizen Protectors: The Everyday Politics of Guns in an Age of Decline*, Carlson (2015) examines the decision to carry a gun in public in a wider context. Carlson's study of gun carrying (both legally open and concealed) in the Detroit, Michigan metro area is based on 60 interviews with male gun carriers and observations of firearms training, shooting ranges, activist events, and Internet gun forums. She understands the decision to carry a gun as a response to a very broad pattern of socio-economic decline, the feelings of economic and physical insecurity it produces, and related concerns about crime and police ineffectiveness. Carlson sees gun carrying for men as being strongly connected to their cultural conceptions of masculinity. The socio-economic "age of decline" Carlson identifies has affected men in particular and their role as breadwinners, so male gun carriers reassert their relevance as men by identifying themselves as "citizen-protectors" (her term, not theirs). Emphasizing the connection between the cultural ideal of personal responsibility and a broader conception of citizenship—what Kohn (2004) calls the "citizen soldier"—gun carriers as citizen-protectors are morally upstanding citizens exercising their historically masculine duty to protect their families and others.

Stroud's (2016) *Good Guys with Guns: The Appeal and Consequences of Concealed Carry* follows closely on the heels of Carlson's study. It is based on open-ended interviews with 36 concealed handgun license holders in Texas as well as observation of Texas concealed handgun license (CHL) courses and gun ranges. Rather than focusing on situational factors like fear of crime in one's immediate environment or a past history of criminal victimization, Stroud looks at the broader cultural meanings of concealed carry for Texas CHL holders. Her male respondents drew on ideal images of masculinity in emphasizing the need to protect their families and to compensate for lost strength due to age as motivations for concealed carry. Stroud's female respondents, by contrast, emphasized a need to protect themselves (rather than their families) and felt empowered to do so because guns are "equalizers" that compensate for strength differences between women and their male victimizers. What both male and female CHL holders have in common, Stroud concludes, is their embrace of a cultural ideal of personal responsibility.

Carlson and Stroud can be profitably read together for their similarities and differences. Both seek to understand why average citizens in the United States today feel the need to carry a firearm in public. Both find answers not primarily in the practical utility of guns as tools of self-defense but in the symbolic value of guns to individuals in particular social circumstances. For Carlson, gun carrying says "I deserve to be treated with dignity as a law-abiding citizen." For Stroud, it says "I am a good guy." Carlson situates gun carrying in the context of social insecurities created by postindustrial economic decline and neoliberal policy ascendance. Stroud sees it primarily through the lens of gender, racial, and class inequality, though implicates neoliberalism in her conclusion. Significantly, both argue that white male gun carriers in the suburbs are motivated by emasculation (due to economic marginalization for Carlson and physical decline for Stroud), as well as race-based fears of crime.

Carlson and Stroud provide an excellent starting point for sociologists studying Gun Culture 2.0, the non-criminal culture of armed citizenship at the core of U.S. gun culture today. But as with recreational gun culture, much more can

Case No. 1:20-cv-02484-MSK   Document 52-12   filed 04/28/21   USDC Colorado   pg 71 of 96

be done to understand this important and emergent social phenomenon. In the final section, I consider some future directions for the sociology of U.S. gun culture.

## 5 | FUTURE DIRECTIONS

Compared to the criminology and epidemiology of gun violence, the sociology of U.S. gun culture has lagged considerably behind. Decades ago, Stenross (1990, p. 56) observed that those who only associate guns with violence and crime cannot understand why people use guns "for fun," sociologists included. There is no doubt that ignorance of and bias against guns is common in the discipline. Kohn (2004, p. ix) discusses the considerable hostility she encountered from academic colleagues when she was researching guns in the 1990s. Although less hostile, when I tell colleagues today that I am studying "gun culture," they routinely hear me saying "gun violence" or "gun control." As gun culture remains a significant social reality, sociologists would do well to pay more attention to it. I conclude, therefore, with three suggested directions for future research.

### 5.1 | Focus on Social Practices

Gun culture is part of the broader American culture, so obviously reflects some of its dominant themes (Kohn, 2004). This is as true of Gun Culture 2.0 as it was of Gun Culture 1.0. Carlson (2015), Stroud (2016), and Melzer (2009) have shown this, particularly the way that gender ideology shapes gun ownership and use. But understanding gun culture only as reflecting broader ideas and ideals—about gender, race, freedom, rugged individualism—is too limited. We also need to understand gun culture on its own terms, especially the practices that constitute it. Being a part of gun culture is not simply about holding a particular set of beliefs but involves participation in a particular social world (Shapira, 2013). Kohn (2004) approaches gun culture this way, but more solidly ethnographic work like hers is necessary.

The social world of gun culture is shaped by broader social institutions including the legal system, economy, and technology, and these requires greater attention as well. For example, the widespread practice of legally carrying a gun in public was facilitated by the movement for shall issue concealed carry laws. The growing practice of concealed carry that is facilitated by these laws also creates a number of new challenges for the individuals who do so, as well as for the broader social worlds (other people, spaces, and places) in which they do so. These challenges are individually and collectively addressed through the developing culture of armed citizenship—both the "hardware" of material culture like guns, accessories, and other products, as well as the "software" of ways of thinking, legal frameworks, and the development of relevant abilities.

### 5.2 | Focus on Wider Social Worlds

Related to the focus on social practices is greater attention to the wider social worlds in which gun owners participate. According to Stebbins (2001, p. 54), "Serious leisure participants typically become members of a vast social world, a complex mosaic of groups, events, networks, organizations, and social relationships." The same is true for participants in both recreational and self-defense gun culture. America is not just a "Gun Show Nation" (Burbick, 2007), it is a nation of gun clubs, training classes, shooting events, network meet-ups, and gun collectors and shooters associations. Although Taylor (2009) and Kohn (2004) have captured small slices of this reality on the recreational side, and Carlson (2015) on the self-defense side, this aspect of gun culture has not been adequately studied to date.

### 5.3 | Focus on Marginalized Populations

Although the predominance of socially privileged (white, heterosexual, and middle class) men among gun owners suggests the importance of masculinity in studying gun culture, sometimes this focus has come at the exclusion of gun owners who come from marginalized populations. Two decades ago, McCaughey (1997) studied women's armed

BLM_0075862

self-defense classes as part of her pioneering study of "physical feminism." Despite the expansion of such classes and of women's gun ownership more generally—part of the rise of Gun Culture 2.0—no one has yet followed McCaughey's lead. Similarly, the Pink Pistols, an LGBTQ organization founded in response to hate crimes, remains unstudied. And we know very little about legal concealed carry by those who are most likely to be victims of criminal gun violence, African Americans living in urban areas.

In promoting the sociological study of U.S. gun culture, I do not mean to suggest that criminological, epidemiological, or public health approaches to the study of guns are unimportant. Rather, because the vast majority of guns will never be used to commit crimes and the vast majority of gun owners will never commit or be victims of gun violence, they simply offer a partial perspective. To the extent that efforts to mitigate the harmful effects of guns require a collective response—including (perhaps especially) law-abiding gun owners—understanding U.S. gun culture in its various dimensions is an important step forward.

## ENDNOTES

[1] It is important to recognize that those characteristics that are most universally embraced also explain the least amount of variance in scale scores because they do not themselves vary. This is true of both the "skill" component in the LMS scale and the "hedonic pleasure" component in the LSS scale.

[2] Terms I borrow from gun journalist Michael Bane.

## REFERENCES

Anderson, L., & Taylor, J. D. (2010). Standing out while fitting in: Serious leisure identities and aligning actions among skydivers and gun collectors. *Journal of Contemporary Ethnography, 39*(1), 34–59.

Azrael, D., Hepburn, L., Hemenway, D., & Miller, M. (2016). The stock and flow of US firearms: Results from the 2015 National Firearms Survey. Unpublished paper presented at Russell Sage Foundation conference on "The Underground Gun Market," New York, 29 April. http://www.russellsage.org/sites/all/files/RSF_Journal/Cook_Pollack//Azrael_et_al.pdf. Retrieved 7 November 2016.

Bankston, W. B., Thompson, C. Y., Jenkins, Q. A. L., & Forsyth, C. J. (1990). The influence of fear of crime, gender, and southern culture on carrying firearms for protection. *The Sociological Quarterly, 31*(2), 287–305.

Burbick, J. (2007). *Gun show nation: Gun culture and American democracy*. New York: New Press.

Carlson, J. (2015). *Citizen-protectors: The everyday politics of guns in an age of decline*. New York: Oxford University Press.

Clement, S, & Craighill, P. (2013). Majority of Americans say guns make homes safer. *The Washington Post*, 18 April. https://www.washingtonpost.com/news/the-fix/wp/2013/04/18/majority-of-americans-say-guns-make-homes-safer/. Retrieved 19 October 2016.

Cook, P. J., & Goss, K. A. (2014). *The gun debate: What everyone needs to know*. New York: Oxford University Press.

Costanza, S. E., & Kilburn, J. C. (2004). Circling the welcome wagons: Area, income, race, and legal handgun concealment. *Criminal Justice Review, 29*(2), 289–303.

Cramer, C. E. (1999). *Concealed weapon laws of the early republic: Dueling, southern violence, and moral reform*. Westport, CT: Praeger.

Cramer, C. E. (2006). *Armed America: The remarkable story of how and why guns became as American as apple pie*. Nashville, TN: Nelson Current.

Fine, G. A. (1998). *Morel tales: The culture of mushrooming*. Cambridge, MA: Harvard University Press.

GAO 2012. Gun control: States' laws and requirements for concealed carry permits vary across the nation. GAO-12-717. United States Government Accountability Office. http://www.gao.gov/products/GAO-12-717. Retrieved 19 October 2016.

Gillespie, D., Leffler, A., & Lerner, E. (2002). If it weren't for my hobby, I'd have a life: Dog sports, serious leisure, and boundary negotiation. *Leisure Studies, 21*(3–4), 285–304.

Gilmore, R. S. (1999). 'Another branch of manly sport': American rifle games, 1840–1900. In J. E. Dizard, R. M. Muth, & S. P. Andrews, Jr. (Eds.), *Guns in America: A reader* (pp. 105–121). New York: NYU Press.

Graduate Institute of International Studies (2007). *Small Arms Survey 2007*. Cambridge: Cambridge University Press.

Grandy, J. W., Stallman, E., & Macdonald, D. W. (2003). The science and sociology of hunting: Shifting practices and perceptions in the United States and Great Britain. In D. J. Salem, & A. N. Rowan (Eds.), *The state of the animals II: 2003* (pp. 107–130). Washington, DC: Humane Society Press.

Case No. 1:20-cv-02484-MSK   Document 52-12   filed 04/28/21   USDC Colorado   pg 73 of 96

Grossman, R. S., & Lee, S. A. (2008). May issue versus shall issue: Explaining the pattern of concealed-carry handgun laws, 1960–2001. *Contemporary Economic Policy, 26*(2), 198–206.

Haag, P. (2016). *The gunning of America: Business and the making of American gun culture.* New York: Basic Books.

Harcourt, B. (2006). *Language of the gun: Youth, crime, and public policy.* Chicago: University of Chicago Press.

Hemenway, D. (2004). *Private guns, public health.* Ann Arbor: University of Michigan Press.

Hofstadter, R. (1970). America as a gun culture. *American Heritage, 21,* 6 (October 1970). http://www.americanheritage.com/content/america-gun-culture. Retrieved 23 March 2015.

Hummel, R. (1985). Anatomy of a wargame: Target shooting in three cultures. *Journal of Sport Behavior, 8*(3), 131–143.

Kellert, S. R. (1988). human-animal interactions: A review of American attitudes to wild and domestic animals in the twentieth century. In A. N. Rowen (Ed.), *Animals and people sharing the world* (pp. 137–175). Hanover. NH: University Press of New England.

Kleck, G., & Gertz, M. (1998). Carrying guns for protection: Results from the National Self-Defense Survey. *Journal of Research in Crime and Delinquency, 35*(2), 193–224.

Kohn, A. A. (2004). *Shooters: Myths and realities of America's gun cultures.* New York: Oxford University Press.

Littlefield, J., & Ozanne, J. L. (2011). Socialization into consumer culture: Hunters learning to be men. *Consumption Markets & Culture, 14*(4), 333–360.

Marks, S. A. (1991). *Southern hunting in black and white: Nature, history, and ritual in a Carolina community.* Princeton, NJ: Princeton University Press.

Martin, D. S., Murray, D., O'Neill, M. A., MacCarthy, M., & Gogue, J. (2014). Target shooting as a serious leisure pursuit—An exploratory study of the motivations driving participant engagement. *World Leisure Journal, 56*(3), 204–219.

McCaughey, M. (1997). *Real knockouts: The physical feminism of women's self-defense.* New York: NYU Press.

Melzer, S. (2009). *Gun crusaders: The NRA's culture war.* New York: NYU Press.

Murray, D. W., Martin, D., O'Neill, M., & Jason Gouge, T. (2015). Serious leisure: The sport of target shooting and leisure satisfaction. *Sport in Society, 19*(7), 891–905.

Newport, F. (2015). Majority say more concealed weapons would make U.S. safer. http://www.gallup.com/poll/186263/majority-say-concealed-weapons-safer.aspx. Retrieved 19 October 2016.

Olmsted, A. D. (1988). Morally controversial leisure: The social world of gun collectors. *Symbolic Interaction, 11*(2), 277–287.

Patrick, B. A. (2009). *Rise of the anti-media: In-forming America's concealed weapon carry movement.* Lanham, MD: Lexington Books.

Pew Research Center (2013). Why own a gun? Protection is now top reason. http://www.people-press.org/2013/03/12/why-own-a-gun-protection-is-now-top-reason/. Retrieved 19 October 2016.

Shapira, H. (2013). *Waiting for José: The minutemen's pursuit of America.* Princeton, NJ: Princeton University Press.

Stebbins, R. A. (2001). Serious leisure. *Society, 38*(4), 53–57.

Stenross, B. (1990). Turning vices into virtues: The dignifying accounts of gun avocationists. In C. R. Sanders (Ed.), *Marginal conventions: Popular culture, mass media and social deviance* (pp. 56–64). Bowling Green, OH: Bowling Green State University Popular Press.

Stenross, B. (1994). Aesthetes in the marketplace: Collectors in the gun business. *Qualitative Sociology, 17*(1), 29–42.

Stroud, A. (2016). *Good guys with guns: The appeal and consequences of concealed carry.* Chapel Hill, NC: University of North Carolina Press.

Taylor, J. D. (2009). *American gun culture: Collectors, shows, and the story of the gun.* El Paso, TX: LFB Scholarly Publishing.

Thompson, J. A., & Stidham, R. (2010). Packing heat in the tar heel state: A county-level assessment of concealed carry permits. *Criminal Justice Review, 35*(1), 52–66.

Tonso, W. R. (1982). *Gun and society: The social and existential roots of American attachment to firearms.* Washington, DC: University Press of America.

Winkler, A. (2011). *Gunfight: The battle over the right to bear arms in America.* New York: Norton.

Wright, J. D. (1995). Ten essential observations on guns in America. *Society, 32*(3), 63–68.

Wright, J. D., Rossi, P. H., & Daly, K. (1983). *Under the gun: Weapons, crime, and violence in America.* New Brunswick, NJ: Aldine Transaction.

BLM_0075864

**David Yamane** is Professor of Sociology at Wake Forest University. He is author or editor of seven books, mostly in the sociology of religion. In a recent departure from his previous work, Yamane has begun studying guns, particularly the rise of Gun Culture 2.0—the emerging culture of armed citizenship in the United States. He blogs at GunCulture2point0.com.

**How to cite this article:** Yamane D. The sociology of U.S. gun culture. *Sociology Compass*. 2017;11:e12497. https://doi.org/10.1111/soc4.12497

## Yellowstone to Yukon Conservation Initiative

**Our Mission:**
*Connecting and protecting habitat from*
*Yellowstone to Yukon so people and nature can thrive.*

learn more about us

**LATEST NEWS**

### Provincial Protection of Bighorn Region a Must for Both Wildlife and Humans

In an op-ed in the Edmonton Journal, Y2Y's Sarah Cox says the North Saskatchewan Regional Plan offers residents a great opportunity to ensure clean drinking water, prevent and mitigate flooding, and protect wildlife throughout the region. **read more**

### Returning wild plains bison to Banff National Park

Alberta MP Blake Richards is presented with post cards showing the growing support for restoring bison to Banff National Park. **read more**

### Peel Supporters Vow to Take Case to Supreme Court

About 100 supporters of the Peel Coalition met in Whitehorse last night to talk about the Yukon government's recent appeal. **read more**

more news

**THIS MONTH'S FEATURE**

### New Proposal to Protect Alaskan Wilderness Most Sweeping in Decades

President Obama's proposal would protect up to 12.3 million acres of wilderness in the Arctic National Wildlife Refuge. **read more**

more features

BLM_0075866



**U.S. Department of the Interior
Bureau of Land Management**

# Uncompahgre Field Office Resource Management Plan

Review Team Briefing, BLM UFO Record of Decision and Approved RMP



## Planning Area
**Total Surface Acres:** 3,096,780

### SURFACE ADMINISTRATION
- ➢ **USFS (40%) - 1,248,390 acres**
- ➢ **Private (36%) - 1,125,350 acres**
- ➢ **BLM (22%) - 675,800 acres**
- ➢ **NPS (1%) - 27,130 acres**
- ➢ **State (1%) - 20,110 acres**

Two NCAs within the Uncompahgre Field Office are managed under separate RMPs.

### BLM DECISION AREA
- ➢ **971,220 acres of BLM Subsurface**
- ➢ **675,800 acres of BLM Surface**

### COUNTY OVERLAP
- ➢ **Montrose County (66%)**
- ➢ **Delta County (18%)**
- ➢ **San Miguel County (8%)**
- ➢ **Ouray County (4%)**
- ➢ **Gunnison County (2%)**
- ➢ **Mesa County (2%)**

Refer to Map 1

BLM_0075867

U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE**
**ROD & Approved RMP**

# Need for Plan Revision

- Uncompahgre Field Office (UFO) Record of Decision (ROD) and Approved Resource Management Plan (ARMP) will replace 1985 San Juan/San Miguel RMP and 1989 Uncompahgre Basin RMP.

- Approved RMP continues multiple-use management and addresses new issues and resources:
  - Five newly listed species under Endangered Species Act (ESA)
  - Emerging fluid mineral extraction methods, including hydraulic fracturing and directional drilling
  - Increased prominence of hunting, fishing, and recreation in local economy
  - 62% increase in population of planning area since 1990
  - Shift from mining sector to recreation and tourism sectors, notably in Ouray, Gunnison, and San Miguel counties
  - Decreased coal mining and increased small-scale agriculture in North Fork Valley of Delta County
  - Rapid increase in ATV and mountain bike use
  - Frequent protests, appeals, and litigation related to fluid mineral development and leasing.

   

2

BLM_0075868



**Fluid Leasable Minerals (Oil & Gas and Geothermal) - Approved RMP**

| | | |
|---|---|---|
| ☐ Uncompahgre RMP Planning Area | ☐ Controlled Surface Use - 641,740 ac. | |
| ☐ No Leasing - 44,220 ac. | ☐ Only Timing Limitations - 12,050 ac. | |
| ☐ No Surface Occupancy - 136,080 ac. | ☐ Standard Leasing Terms & Conditions - 81,930 ac. | |

Map 2

# Approved RMP

- Promotes access and reduces regulatory burden

- Promotes economic development by resource and location

- Responds to community input and needs across a diverse field office:

  o North Fork (of the Gunnison River) Valley; *Paonia and Hotchkiss*

  o Uncompahgre River Valley; *Delta, Montrose, and Ridgway*

  o San Miguel Headwaters; *Telluride and Norwood*

  o "West End" and west slope of Uncompahgre Plateau; *Nucla and Naturita*

3

U.S. Department of the Interior
Bureau of Land Management

UNCOMPAHGRE FIELD OFFICE
ROD & Approved RMP

# Changes to Resource Uses

| Resource | Current | Approved RMP |
|---|---|---|
| Locatable Minerals | Open for location: 840,440 acres | Increases area open for location by 13,020 acres; Retains 28,060 acres currently withdrawn; No new areas recommended for withdrawal. |
| Fluid Minerals | Open to leasing: 871,810 acres | No change. |
| Coal | Area acceptable for leasing: 144,790 acres | Increases area acceptable for leasing by 226,460 acres. |
| ROWs | 590,720 acres open 85,080 acres excluded | Increases acres open and decreases acres excluded by 32,040 acres. |
| Lands for Disposal | 9,850 acres available for disposal. | 1,980 acres available for disposal. |
| Livestock Grazing | AUMs: 35,520 Acres open: 619,500 | No change to AUMs; Closes 2,000 acres of open OHV play area and 610 acres of T&E plant habitat. |
| Recreation | 2 SRMAs: 49,320 acres 0 ERMAs | Adds 6 SRMAs and 72,810 acres. Adds 3 ERMAs and 64,790 acres. |
| Target Shooting | Closed in developed recreation sites. | Closed within 150 yards of developed recreation sites. |
| Special Designations | 5 ACECs: 30,000 acres WSRs: 154 miles Eligible | 6 ACECs: 30,190 acres WSRs: 105 miles Suitable |
| Lands with Wilderness Characteristics | No acreage managed for wilderness characteristics 42,150 acres inventoried | No acreage managed for wilderness characteristics; 18,320 acres managed for other uses (with impacts minimized as feasible). |

4

BLM_0075870

**U.S. Department of the Interior
Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE
ROD & Approved RMP**

# Job Creation

Over the twenty-year life of the plan, RMP is expected to **contribute $2.5 billion in total economic output to the region and support approximately 950 jobs** on an average annual basis.




---

### AREA INCOME GENERATORS ON UFO PUBLIC LANDS

- **Exploration, development, and production of minerals and mineral materials, including oil and gas, solid leasable minerals (such as coal), and locatable minerals (including uranium)**
- **Rights-of-way and designated communication sites**
- **Livestock production**
- **Recreational and motorized/nonmotorized uses**

5

BLM_0075871

# Protest Resolution

- BLM received 13 protests from parties with standing; issues were related to:

  - ACECs
  - Consistency with other plans
  - Unnecessary or undue degradation
  - Purpose and need
  - Range of alternatives
  - Best available information

  - Impact analyses for air quality, climate change, bighorn sheep, Gunnison sage-grouse, fluid minerals, water quality, wilderness characteristics, and human health

- BLM Director concluded that BLM Colorado State Director:
  - Followed applicable laws, regulations, and policies
  - Considered all relevant resource information and public input in developing Proposed RMP.

- BLM Director denied all protests.

- Protest Resolution Report was posted February 7, 2020

6

U.S. Department of the Interior
Bureau of Land Management

UNCOMPAHGRE FIELD OFFICE
ROD & Approved RMP

# Protest Resolution

- Governor's review identified concerns regarding consistency between RMP and recently enacted State legislation and wildlife plans.

- BLM determined that Proposed RMP was generally in conformance with existing State plans.

**To address Governor's concerns, BLM:**

o **Brought forward into Approved RMP two No Surface Occupancy (NSO) stipulations for fluid mineral leasing from Alternative D of Proposed RMP; both NSOs would reduce impacts to hydrology and groundwater resources.**

o **Adopted new Controlled Surface Use (CSU) restriction that would reduce impacts to big game winter habitat, production areas, and migration corridors.**

o **Modified stipulation language for increased protection of Gunnison sage-grouse habitat to require:**
  1) **Design feature for noise reduction during breeding season**
  2) **Consultation with CPW on proposed exceptions, waivers, or modifications to lease stipulations.**

7

BLM_0075873

**U.S. Department of the Interior**
**Bureau of Land Management**

# Schedule

| MILESTONE | TARGET DATE |
|---|---|
| ✓ BLM State Director issues Response to Governor's Consistency Review | January 2020 |
| ✓ BLM Director issues Protest Resolution Report | Late January 2020 |
| BLM submits ROD and NOA package to DOI Review Team | Early March 2020 |
| DOI Review Team approves publication of ROD | Mid-March 2020 |
| BLM State Director Signs ROD and issues Approved RMP | Mid-March 2020 |

8

BLM_0075874

# Questions/Comments?

**Greg Larson**

**Field Manager, Uncompahgre Field Office**

**970.240.5338**

**glarson@blm.gov**

9

BLM_0075875

# Fluid Mineral Leasing – Fluid Mineral Estate

- All fluid minerals open to leasing, unless closed by law.

- Stipulations provide access to all federal minerals with less than 4,000-foot directional reach.

- In high fluid mineral potential areas, 97% of federal minerals are accessible with less than 2,000-foot reach.

- Requires least restrictive stipulations necessary for resource protection:
  o Only 15% of high fluid mineral potential areas will be under NSO.
  o Of the 15%:  ~46% is for source water protection areas; ~24% is for raptors or ESA-listed species; and ~12% is for state wildlife areas.

- General increase in stipulations reflecting new resource issues: (1) allows for orderly development, and (2) streamlines planning, authorizations, and leasing.

- Substantially reduces stipulations from Draft RMP; industry submitted no major comments on Draft.

- CSU stipulations narrowly and specifically written:
  o No blanket ability to relocate.
  o Clear notice of resource constraints to avoid or mitigate.

Refer to Maps 2 & 2a

BLM_0075876

**U.S. Department of the Interior**
**Bureau of Land Management**

# Fluid Mineral Leasing – Fluid Mineral Estate









11

BLM_0075877

**U.S. Department of the Interior**
**Bureau of Land Management**

# Fluid Mineral Leasing – Fluid Mineral Estate

| LAND STATUS | No Action Alternative A Acres (percent) | DEIS Alternative B1 (North Fork Citizen) Acres (percent) | DEIS Alternative C (Development) Acres (percent) | DEIS Preferred Alternative D Acres (percent) | Approved RMP Acres (percent) |
|---|---|---|---|---|---|
| **Decision Area for Fluid Minerals – 916,030 acres** | | | | | |
| **Closed to Leasing\*** | 44,220 (5%) | 306,670 (33%) | 44,220 (5%) | 50,060 (6%) | **44,220 (5%)** |
| **Open for Leasing** | 871,810 (95%) | 609,360 (67%) | 871,810 (95%) | 865,970 (94%) | **871,810 (95%)** |
| **Open:  NSO\*\*** | 25,610 (3%) | 404,690 (44%) | 22,300 (2%) | 238,140 (26%) | **136,080 (15%)** |
| **Open:  CSU\*\*** | 119,860 (13%) | 199,170 (22%) | 457,120 (50%) | 333,330 (36%) | **641,740 (70%)** |
| **TL Only** | 400,040 (44%) | 5,500 (<1%) | 266,890 (29%) | 294,500 (32%) | **12,050 (1%)** |
| **Open:  Standard Stipulations** | 326,300 (36%) | 0 | 125,500 (14%) | 0 | **81,930 (9%)** |
| **\* Includes Wilderness Study Areas and Tabeguache (Wilderness) Area (44,220); \*\*Most stringent stipulation** | | | | | |

**NSO:**
Dolores/San Miguel SRMAs; ACECs; Gunnison sage-grouse leks and critical habitat; WSRs; State Parks; National Recreation Areas; raptor nests; ESA-listed plant habitat; source water protection areas (ground and surface); streams and riparian areas; bald eagle roosts; green lineage cutthroat trout streams; ESA-listed fish rivers; BOR withdrawals; uranium mill tailings.

**CSU:**
Big game winter, migration, and production areas; Slopes>30%; saline/selenium soils; SRMAs; Scenic Byways; bighorn habitat; domestic wells; Gunnison sage-grouse leks and critical habitat; raptors; national trails; WSRs; coal leases; source water protection areas (ground and surface); sensitive plants; yellow-billed cuckoo; rivers; lynx habitat; state wildlife areas; streams; bat hibernacula.

12

BLM_0075878

**U.S. Department of the Interior
Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE
ROD & Approved RMP**

# Coal Mineral Leasing

Approved RMP will:

- Increase area available for coal leasing by 275,640 acres (189%) compared to existing plans.
- Continue successful and collaborative coal program; leases at West Elk Mine recently modified to continue production for several more years.
- Place no limitations on areas with developments or meaningful development potential; Proposed RMP received no industry opposition.




13

Refer to Map 3

BLM_0075879

U.S. Department of the Interior
Bureau of Land Management

UNCOMPAHGRE FIELD OFFICE
ROD & Approved RMP

# Coal Mineral Leasing

| RESOURCE STATUS | No Action Alternative A | DEIS Alternative B | DEIS Alternative C | DEIS Preferred Alternative D | Approved RMP |
|---|---|---|---|---|---|
| | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) |
| Coal Resource Development Potential Area | 145,860 | 421,500 | 421,500 | 421,500 | 421,500 |
| Congressionally Closed | 1,910 (<1%) * | 1,910 (<1%) | 1,910 (<1%) | 1,910 (<1%) | 1,910 (<1%) |
| Unsuitable | 490 (<1%) | 2,500 (<1%) | 2,500 (<1%) | 2,500 (<1%) | 2,500 (<1%) |
| Unacceptable | 0 (0%) | 96,650 (23%) | 11,860 (3%) | 45,690 (11%) | 44,570 (10%) |
| Acceptable | 144,790 (99%) | 320,440 (76%) | 405,230 (96%) | 371,400 (88%) | 371,250 (88%) |

\* Includes new coal development potential area in Tabeguache Area

Moderate to high coal mineral potential in UFO is limited. Approved RMP will keep limited areas open to leasing in support of American energy independence and jobs in local communities.

14

Refer to Map 3

BLM_0075880

**U.S. Department of the Interior**
**Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE**
**ROD & Approved RMP**

# Uranium and Other Locatable Minerals

|  | No Action Alternative A | DEIS Alternative B | DEIS Alternative C | DEIS Preferred Alternative D | Approved RMP |
|---|---|---|---|---|---|
| **RESOURCE STATUS** | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) |
| **Currently withdrawn** | 28,060 (3%) | 28,060 (3%) | 28,060 (3%) | 28,060 (3%) | **28,060 (3%)** |
| **Recommended for Withdrawal** | 27,690 (3%) | 387,270 (43%) | 11,250 (1%) | 55,880 (6%) | **15,790 (2%)** |
| **Open for Location** | 840,440 (94%) | 496,410 (55%) | 856,880 (96%) | 812,250 (91%) | **853,460 (95%)** |

Approved RMP will:
- Increase lands open for locatable minerals such as uranium and precious metals by reducing lands recommended to the Secretary for withdrawal by 60 percent compared to Alternative D.
- Support Administration's priorities for energy independence and job creation.

Refer to Map 4

BLM_0075881

U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE**
**ROD & Approved RMP**

# Recreation

Approved RMP will:

- Carry forward North Delta OHV Open Play Area, avoiding concentrations of ESA-threatened Colorado hookless cactus

- Identify eight Special Recreation Management Areas (SRMAs) and three Extensive Recreation Management Areas (ERMAs)

- Greatly increase access for OHVs, fishing, rafting, hunting, hiking, horseback riding, rock crawling, and mountain biking, etc.

- Promote development of:
  - Up to 280 miles of new trails
  - Campgrounds/campsites
  - Event staging areas
  - Parking lots
  - Horse and ATV ramps
  - Boat ramps
  - Informational kiosks
  - Commercial operations and/or events.





16

Refer to Map 5

BLM_0075882

U.S. Department of the Interior
Bureau of Land Management

UNCOMPAHGRE FIELD OFFICE
ROD & Approved RMP

# Recreation

| | No Action Alternative A | DEIS Alternative B | DEIS Alternative C | DEIS Preferred Alternative D | Approved RMP |
|---|---|---|---|---|---|
| **LAND STATUS** | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) |
| **SRMA** | 49,320 (7%) | 246,760 (37%) | 0 | 124,400 (18%) | **122,130 (18%)** |
| **ERMA** | 0 | 0 | 215,880 (32%) | 73,310 (11%) | **64,790 (10%)** |
| **Total** | 49,320 | 246,760 | 215,880 | 197,710 | **186,920** |
| **OHV Open Play Area** | 8,560 | 0 | 16,070 | 0 | **3,950** |

Approved RMP will:

- Retain North Delta OHV Open Play Area in response to public comments and Delta and Montrose county support for keeping area open to OHV use; benefits local economies.
- Retain large portion of OHV Open Play Area focused on areas of highest use, despite presence of ESA-listed Colorado hookless cactus populations.
- Manage North Delta OHV Open Play Area as SRMA to highlight OHV use and provide enhanced access and infrastructure.
- Not otherwise change travel management in planning area.

Refer to Map 5

BLM_0075883

U.S. Department of the Interior
Bureau of Land Management

UNCOMPAHGRE FIELD OFFICE
ROD & Approved RMP

# Livestock Grazing

| LAND STATUS | No Action Alternative A<br>Acres (percent) | DEIS Alternative B<br>Acres (percent) | DEIS Alternative C<br>Acres (percent) | DEIS Preferred Alternative D<br>Acres (percent) | Approved RMP<br>Acres (percent) |
|---|---|---|---|---|---|
| **Available for Grazing** | 619,500 (92%) | 517,670 (77%) | 653,270 (97%) | 617,050 (91%) | **616,640 (91%)** |
| **Unavailable for Grazing** | 56,300 (8%) | 158,130 (23%) | 22,530 (3%) | 58,750 (9%) | **59,160 (9%)** |
| **Closed to Livestock Trailing** | 2,680 (0.4%) | 2,680 (0.4%) | 0 | 0 | **0** |
| **AUMS** | 35,520 | 28,958 | 36,950 | 35,558 | **35,520** |

Approved RMP will:
- Increase access by opening 2,680 acres of currently closed lands in Camel Back WSA to livestock trailing.
- Carry forward **99.5%** of currently grazed lands for continued use with no change in AUMs.
- Close to grazing 610 acres in Fairview ACEC—home to one of the largest populations of federally endangered clay-loving buckwheat—and 2,250 acres in North Delta OHV Open Play Area, with no AUMs available.

18

BLM_0075884

U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE
ROD & Approved RMP**

# Rights of Way (ROW) and Utility Corridors

Approved RMP:

- Will reduce ROW exclusion areas by 32,040 acres (38%) relative to the No Action Alternative, greatly reducing regulatory burden.
- Identifies limited ROW avoidance areas to facilitate development of proposals and minimize unexpected issues during NEPA/coordination/authorization, and streamline overall "planning to production" process.

Exceptions to ROW exclusion areas include:

- West-Wide Energy Corridor
- 100 feet from county roads and highways
- Reasonable access for private inholdings
- Valid existing rights.





19

Refer to Map 6

BLM_0075885

# Rights of Way (ROW) and Utility Corridors

| | No Action Alternative A | DEIS Alternative B | DEIS Alternative C | DEIS Preferred Alternative D | Approved RMP |
|---|---|---|---|---|---|
| **STATUS** | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) |
| **Utility Corridors** | 26,880 (4%) | 64,180 (9%) | 26,880 (4%) | 64,180 (9%) | **64,180 (9%)** |
| **ROW Exclusion** | 85,080 (13%) | 431,040 (64%) | 44,550 (7%) | 53,700 (8%) | **53,040 (8%)** |
| **ROW Avoidance** | 22,780 (3%) | 195,460 (29%) | 210,390 (31%) | 276,500 (41%) | **66,030 (10%)** |

**Avoidance:**
SRMAs; some ACECs; ESA-listed plants; rivers; surface water source areas; streams; national trails; Gunnison sage-grouse critical habitat; Scenic and Recreational WSRs.

**Exclusion:**
Wild WSRs; WSAs; Wilderness Areas; Gunnison sage-grouse leks; some ACECs

Refer to Map 6

BLM_0075886

# Special Designations

**Areas of Critical Environmental Concern**

- Net change of 190 acres (0.6%) relative to No Action Alternative; major change relative to published Draft RMP.
- Sized to only cover Relevant and Important Values.
- Two new ACECs managed for rock art and biological soil crust assemblage; one existing ACEC expanded for ESA-listed plant species; and two existing ACECs reduced.

**Wild and Scenic Rivers**

- Suitability recommendations are outcome of robust stakeholder process.
- Met with Montrose County and Colorado Water Conservation Board—parties with most questions about WSRs; both were comfortable with Proposed RMP recommendations.





21

Refer to Map 7

BLM_0075887