**U.S. Department of the Interior**
**Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE**
**ROD & Approved RMP**

# Special Designations

| SPECIAL DESIGNATION | No Action Alternative A Acres (percent) | DEIS Alternative B Acres (percent) | DEIS Alternative C Acres (percent) | DEIS Preferred Alternative D Acres (percent) | Approved RMP Acres (percent) |
|---|---|---|---|---|---|
| ACEC | 30,000 (4%) | 215,940 (32%) | 29,440 (4%) | 51,320 (8%) | **30,190 (4%)** |
| **Wild & Scenic Rivers** | **29 Eligible Segments (154 miles)** | | | | |
| | 0 | **16 Suitable Segments (105 miles)** | | | |

**ACECs**

289,960 acres found to have Relevant and Important Values

30,190 acres brought forward for designation:

- **Adobe Badlands** [6,370 acres: Reduced Existing] - Important refuge for federally listed Colorado hookless cactus within WSA; manage to promote delisting and allow for North Delta OHV Open Play Area.
- **Biological Soil Crust** [390 acres: New] - Manage for extremely unique assemblage with limited resource development conflicts.
- **Fairview South** [610 acres: Expanded Existing] - Manage to protect endangered plant habitat.
- **Needle Rock** [80 acres: Existing] - Manage to protect unique volcanic formation with high-value scientific, scenic, and interpretive characteristics.
- **Paradox Rock Art** [1,080 acres: New] - Manage for regionally important area to consulting Tribes.
- **San Miguel River** [21,660 acres: Reduced Existing] - Manage for high quality riparian vegetation, important bird habitat, and scenic values; supported by San Miguel County and important to tourism economy.

22

Refer to Map 7

BLM_0075888

**U.S. Department of the Interior
Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE
ROD & Approved RMP**

# Lands with Wilderness Characteristics

| | No Action Alternative A | DEIS Alternative B | DEIS Alternative C | DEIS Preferred Alternative D | Approved RMP |
|---|---|---|---|---|---|
| **LAND STATUS** | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) |
| **Managed to preserve wilderness characteristics** | 0 (0%) | 42,150 (6%) | 0 | 18,320 (3%) | **0 (0%)** |
| **Managed for multiple uses; reduce impacts to wilderness characteristics** | 0 | 0 | 0 | 0 | **18,320 (3%)** |
| **Managed to prioritize other multiple uses** | 42,150 (6%) | 0 | 42,150 (6%) | 23,830 (4%) | **23,830 (3%)** |

- None of the inventoried units would be managed to preserve their wilderness characteristics.
- 18,320 acres would be managed for other multiple uses, with impacts to wilderness characteristics minimized as feasible (CSU, ROW avoidance, and design features).
- 23,830 acres would prioritize other multiple uses over wilderness characteristics.
- Minimizing impacts to wilderness characteristics, where it can be accomplished in a multiple-use framework, may benefit other associated values, like wildlife, hunting, and recreation.

23

Refer to Map 8

BLM_0075889

# Stakeholders

| Cooperating Agencies | Primary Comments/Concerns | Addressed in PRMP |
|---|---|---|
| US Fish & Wildlife Service | Highlighted protections from surface-disturbing activities for T&E species. | PRMP applies a fluid mineral stipulation in some T&E species habitat. |
| Colorado Parks and Wildlife (CPW) | Acknowledged land protection, resource allocation, and stipulations to protect and enhance Gunnison sage-grouse. | Brought forward limited management for Gunnison sage-grouse habitat; Includes NSO stipulation for occupied critical habitat. |
| Delta County | Requested the North Delta OHV Open Play Area remain Open for economic reasons. | PRMP includes the North Delta OHV Open Play Area as open to cross-country motorized uses. |
| Montrose County | Expressed opposition to managing Camelback, Dry Creek, and Roc Creek areas to preserve wilderness characteristics. | No lands would be managed to preserve wilderness characteristics. |
| | Expressed opposition to managing Roubideau SRMA to preserve wilderness characteristics. | Roubideau SRMA provides motorized and mechanized opportunities in specific zones; not managed to preserve wilderness characteristics. |
| Ouray County | Supports CPW specified buffers, timing limitations, and BMPs. | Revised stipulations to better match CPW policy and BLM CO Statewide stipulations. |
| San Miguel County | Supports maintaining San Miguel River Corridor SRMA to support large local demand for these types of services. | PRMP includes the 29,530-acre San Miguel SRMA to preserve recreation opportunities. |
| | Supports expansion of existing San Miguel River ACEC and its withdrawal from mineral entry. | San Miguel River ACEC carried forward in slightly reduced size; not recommended for withdrawal from mineral entry. |

24

U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE**
**ROD & Approved RMP**

# Approved RMP Increases Access
# And Reduces Regulatory Burden

- Increased Access:
  - Increases coal available for leasing by 189%.
  - Increases locatable mineral availability by 13,020 acres.
  - Decreases ROW exclusion areas by 30,040 acres.
  - Makes all fluid minerals leasable for potential development.
  - Recreation designations promote up to 280 miles of trails, campgrounds, event staging areas, parking lots, ATV ramps, boat ramps, etc.
  - Opens 2,680 acres to livestock trailing in Camel Back WSA.

- Decreased Regulatory Burden:
  - Industry-familiar stipulations reduce "planning to production" regulatory burden  by streamlining leasing, master development planning, staking, on-siting, NEPA,  and APD approval; stipulations in key locations reduce need for site-specific  analysis.
  - ROW avoidance areas provide notice of potential resource conflicts to streamline proposal development, NEPA, and approval process.
  - Provides predictability to proponents and partner agencies.

25



## Planning Area Land Ownership - 3,096,780 Total Acres

Map 1



- ☐ Uncompahgre RMP Planning Area
- ▨ National Conservation Area
- ⬚ WSAs (36,160 acres, 1%)
- ▨ Tabeguache Area (8,060 acres, <1%)
- ☐ BLM (675,800 acres, 22%)
- ▨ NPS (27,130 acres, 1%)
- ☐ Private (1,125,350 acres, 36%)
- ☐ State (20,110 acres, 1%)
- ☐ US Forest Service (1,248,390 acres, 40%)
- ☐ Federal Mineral Estate (971,220 acres, 31%)

BLM_0075892



## Uncompahgre Field Office

# Fluid Leasable Minerals (Oil & Gas and Geothermal) - Approved RMP



- ☐ Uncompahgre RMP Planning Area
- No Leasing - 44,220 ac.
- No Surface Occupancy - 136,080 ac.
- Controlled Surface Use - 641,740 ac.
- Only Timing Limitations - 12,050 ac.
- Standard Leasing Terms & Conditions - 81,930 ac.

Map 2

BLM_0075893



**Uncompahgre Field Office**
*North Fork Area*

0 1 2 3 4 5 Miles
N

Very Low

Very High

Moderate

Uncompahgre Field Office

**Fluid Mineral Potential**

Uncompahgre RMP Planning

Fluid Mineral Estate

Wilderness and WSAs - Potential Not Reported

Conventional Oil & Gas Potential

No Surface Occupancy - ARMP

Map 2a

BLM_0075894



## Coal - Approved RMP

- ☐ Uncompahgre RMP Planning Area
- 🟥 Congressionally Closed to Coal Leasing - 1,910 ac.
- 🟪 Unsuitable for surface mining and surface mining operations 2,500 ac.
- ▨ Unacceptable for Coal Leasing - 44,570 ac.
- ⬛ Acceptable for Coal Leasing - 371,250 ac.

Map 3

BLM_0075895



## Uranium and Other Locatable Minerals - Approved RMP

- ☐ Uncompahgre RMP Planning Area
- 🟥 Withdrawn from Locatable Mineral Entry - 28,060 ac.
- 🟦 Recommend for Withdrawal from Locatable Mineral Entry - 15,790 ac.
- ⬛ Open to Uranium and Other Locatable Minerals - 853,460 ac.

Map 4

BLM_0075896



**Uncompahgre Field Office**

## Recreation Designations - Approved RMP



Uncompahgre RMP Planning Area

Special Recreation Management Area (SRMA) - 122,130 ac.

Extensive Recreation Managment Area (ERMA) - 64,790 ac.

Open OHV Area - 3,950 ac.

Map 5

BLM_0075897



# Rights of Way and Designated Utility Corridors - Approved RMP

Uncompahgre RMP Planning Area

Utility Corridors - 64,180 ac.

Right of Way Exclusion Areas - 53,040 ac.

Right of Way Avoidance Areas - 66,030 ac.

Map 6

BLM_0075898





## Special Designations - Approved RMP

☐ Uncompahgre RMP Planning Area   Suitable Wild and Scenic Rivers (WSR) - 35,090 ac.

■ ACEC - 30,190 ac.

■ Recreational (19,930 ac.)

■ Scenic (630 ac.)

■ Wild (14,530 ac.)

Map 7

BLM_0075899



## Lands with Wilderness Characteristics - Approved RMP



Uncompahgre RMP Planning Area

Managed to Preserve Wilderness Characteristics - 0 ac.

Managed to Reduce Impacts to Wilderness Characteristics - 18,320 ac.

Managed to Prioritize Other Multiple Uses - 22,690 ac.

Map 8

BLM_0075900

United States Department of the Interior
Bureau of Land Management

# RECORD OF DECISION

**DOI-BLM-CO-S050-2016-0042-EIS**

**December 2017**

## United States Forest Service Supplemental Final Environmental Impact Statement (SFEIS) for Federal Coal Lease Modifications COC-1362 & COC-67232 (including on-lease exploration plan)

*Location:* Grand Mesa, Uncompahgre and Gunnison National Forests,
Paonia Ranger District,
Gunnison County, Colorado

**U.S. Department of the Interior
Bureau of Land Management
Colorado State Office
2850 Youngfield Street
Lakewood, CO 80215
Phone: (303) 239-3700**



# Table of Contents

1.0   Introduction ................................................................................................................ 1

2.0   Background .................................................................................................................. 1

3.0   Purpose of and Need for Action ................................................................................. 4

4.0   Decision ...................................................................................................................... 5

5.0   Overview of the Alternatives ...................................................................................... 6

    5.1   Alternative 1 (No Action) ..................................................................................... 6

    5.2   Alternative 2 – 2001 Roadless Conservation Rule ............................................... 6

    5.3   Alternative 3 – Consent to and modification of the leases (Agencies' Preferred Alternative and Proposed Action) ............................................................................... 7

    5.4   Alternative 4 – COC-1362 only (Environmentally Preferable Alternative) .............. 8

    5.5   Alternatives Considered But Eliminated From Detailed Analysis ............................ 8

6.0   Management Considerations and Rationale for the Decision .......................................... 8

7.0   Consultation and Consistency Review .......................................................................... 9

    7.1   Endangered Species Act Section 7 Consultation ..................................................... 9

    7.2   National Historic Preservation Act Section 106 Consultation ................................ 10

    7.3   Tribal Consultation ................................................................................................ 10

8.0   Public Involvement and NEPA Process ....................................................................... 11

    8.1   2012 NEPA Process ............................................................................................... 11

    8.2   Supplemental Environmental Impact Statement ..................................................... 12

9.0   Mitigation Measures ................................................................................................... 12

10.0   Adaptive Management ............................................................................................... 14

11.0   Approval ................................................................................................................... 15

Appendix A ....................................................................................................................... 16

i

BLM_0075902

# Bureau of Land Management
# Record of Decision
## for the
# Supplemental Final Environmental Impact Statement,
# Federal Coal Lease Modifications COC-1362 & COC-67232

## 1.0   Introduction

This Bureau of Land Management (BLM) Record of Decision (ROD) formally adopts the Supplemental Final Environmental Impact Statement (SFEIS) for Federal Coal Lease Modifications COC-1362 & COC-67232 that the U.S. Forest Service (USFS) Grand Mesa, Uncompahgre and Gunnison National Forests (GMUG), Paonia Ranger District completed on August 31, 2017. I concur with the selection of Alternative 3 as described in the USFS ROD (December 11, 2017).

Under Title 40 of the Code of Federal Regulations (CFR), section 1506.3(a), "An agency may adopt a Federal draft or final environmental impact statement or portion thereof provided that the statement or portion thereof meets the standards for an adequate statement under these [the CEQ] regulations." The BLM affirms that the SFEIS meets all requirements of the Council on Environmental Quality (CEQ), Department of the Interior (DOI), and BLM for preparation of an EIS. With the consent of the USFS, this decision will add the federal mineral estate underlying the National Forest System (NFS) lands included in the modifications to federal coal lease numbers COC-1362 and COC-67232.  And this decision will authorize on-lease exploration consistent with lease terms..

The BLM served as a Cooperating Agency in the preparation of the SFEIS. Per 40 CFR 1506.3(c), the BLM has conducted an independent review of the SFEIS and concluded that its comments and suggestions were incorporated during the National Environmental Policy Act (NEPA) process.  Therefore, the BLM adopts the SFEIS without recirculating.

## 2.0   Background

Grand Mesa, Uncompahgre and Gunnison National Forests (GMUG) prepared an SFEIS titled "Federal Coal Lease Modifications COC-1362 & COC-67232 (including on-lease exploration plan)" in cooperation with:
- BLM, Uncompahgre Field Office,
- BLM, Southwest District Office,
- BLM, Colorado State Office,
- Western Region of the Office of Surface Mining, Reclamation and Enforcement (OSM), and
- Colorado Division of Reclamation, Mining and Safety (DRMS).

The SFEIS supplements the final environmental impact statement (EIS) for the same coal lease modifications.  The SFEIS also incorporates and updates analysis from the BLM

1

BLM_0075903

Environmental Assessment (EA) for the consideration of on-lease exploration. GMUG and the BLM prepared the original EA in 2011and the original EIS in 2013. After an appeal, the Regional Forrester, Resources, for Region 2 of the USFS vacated the EA in February 2012. And the EIS was vacated in Federal Court in September, 2014.

Public interest groups filed suit against the EIS and EA, as well as an EIS for the 2012 the Colorado Roadless Rule (CRR), which the USFS and State of Colorado developed. *See High Country Conservation Advocates et al. v U.S. Forest Service et al.*, 52 F. Supp. 3d 1174 (D. Colo. 2014) (*High Country I*) and *High Country Conservation Advocates v. United States Forest Service*, 67 F. Supp. 3d 1262 (D. Colo. 2014) (*High Country II*). The Court vacated the agency decisions because it determined that the 2012 EIS inadequately: (1) disclosed the economic effects of methane emissions that result from the lease modifications and (2) took a hard look at effects the lease modification would have on recreational interests. The Court also vacated an exception for temporary road building in the North Fork Coal Mining Area under the CRR because the EIS for the CRR failed to disclose and adequately discuss the impacts the West Elk Mine would have on greenhouse gas (GHG) emissions.

GMUG prepared this SFEIS to address Court-identified deficiencies and to incorporate new information and policies since 2012. The SFEIS incorporates analysis and disclosure of proposed on-lease exploration. The SFEIS also analyzes and discloses the impacts of modifying federal coal leases COC-1362 and COC-67232 in response to applications received by the BLM Colorado State Office.

In February 2015, the BLM requested that the USFS resume analysis of the proposed modifications and stipulations to COC-1362 containing about 800 acres, and COC-67232, containing about 920[1] acres. Ark Land LLC holds lease COC-67232 and Mountain Coal Company (MCC) holds lease COC-1362.

The lessees mine coal under the existing leases at the West Elk Mine near Somerset, Colorado. Under Section 3 of the Mineral Leasing Act, a lessee may apply for a modification of a lease to include coal lands or coal deposits contiguous to those embraced in a lease. However, the total area added by the modifications cannot exceed 960 acres or an acreage larger than the lease. The lessees applied for the lease modifications to continue mining in areas contiguous to the leases, which will ensure that compliant and super-compliant coal reserves (high-quality coal or coal characterized by a high BTU, low- ash, and low-moisture content) are recovered and not bypassed. The BLM processed these applications according to procedures set forth in 43 CFR 3432.

The lands subject to the coal lease modification areas lie in portions of sections 10, 11, 14, 15, 22 and 23 of T. 14S., R. 90W., 6th PM in Gunnison County, Colorado. The modification areas are within NFS lands managed by the GMUG. The BLM administers the coal estate.

---

[1] 1 Certificates from Cadastral Land Description Reviews on 3/29/2012 and 5/10/2016 have revised this to 920 acres down from 921-922 acres.

2

BLM_0075904

The BLM is required by law to consider leasing federally-owned minerals for economic recovery. The BLM must get USFS consent prior to leasing or modifying existing coal leases underlying NFS lands. The USFS consent usually includes stipulations to protect non-mineral surface resources.

The lessees will use underground longwall mining methods to access and recover coal within the lease modification areas within the existing West Elk Mine. The lessees will transport the coal using the existing coal transportation system and surface facilities.

The SFEIS evaluates the effects of mining on non-mineral (surface) resources. This evaluation includes direct impacts resulting from expected subsidence (in which the elevation of the land surface over mined areas would be slightly reduced), and other foreseeable impacts to surface resources from mining-related activities. Under a foreseeable mine plan scenario, surface impacts within these modification areas would include those from constructing methane drainage wells (MDWs) and associated access routes required to safely mine the coal resources.

Methane gas is a byproduct of the process of mining coal using longwall systems. Because methane concentrations in excess of 5% can be explosive, it must be removed—most commonly through MDWs or methane vent bores—to keep concentrations below that dangerous level. At this stage, the specific locations of the MDWs and roads are not known. These locations will be known once DRMS, BLM, OSM and the Mine Safety and Health Administration approve the specific mine plans during the mine permitting process, which occurs after the BLM approves the lease modifications to include the additional lands. Based on similar impacts from recent mining, GMUG estimated the surface impacts associated with mining the additional lands in order to consider direct, indirect, and cumulative effects of leasing.

On July 3, 2012, the USFS promulgated the CRR and codified the rule in 36 CFR Part 294, which removed the 2001 Roadless Area Conservation Rule (RACR). The State of Colorado and the USFS developed the CRR in partnership to create a balance between conserving roadless area characteristics for future generations and allowing limited management activities within roadless areas. The CRR includes an exception for temporary road construction within an area on the GMUG defined as the North Fork Coal Mining Area (NFCMA). The NFCMA totals approximately 19,700 acres and allows for the continued operation of coal mines. The USFS crafted this exemption to allow temporary roads needed for coal mining activities. The RACR did not allow these temporary roads and the project proponent has said that absent these roads, coal mining would not occur.

Although portions of the lease modification areas are within the Sunset Colorado Roadless Area, a 5800 acre area managed by the GMUG and located in Gunnison County, they are also located within the NFCMA and subject to the exception for temporary road construction. However, the Court vacated the NFCMA exception in 2014, as part of the *High Country* cases described above. In response, the USFS prepared and published the SFEIS to address the deficiencies identified by the Court. The USFS also engaged in a rulemaking that

3

BLM_0075905

reinstated the NFCMA exception to the CRR which became effective April 17, 2017.[2]

About 915 of the approximately 920 acres of the proposed modification to federal coal lease COC-67232, and about 786 of the approximately 800 acres of the proposed modification to federal coal lease COC-1362 are within the Sunset Colorado Roadless Area. Once BLM approves the lease modifications and DRMS permits coal mining, the lessees will likely use temporary roads and cut trees, as allowed by the CRR, to construct, operate and maintain MDWs necessary for safety and incidental to underground mining.

All coal leases that underlie NFS lands, including any respective subsequent lease modifications, must contain language stating that "the permittee/lessee must comply with all the rules and regulations of the Secretary of Agriculture set forth at Title 36, Chapter II, of the Code of Federal Regulations governing the use and management of the [NFS] when not inconsistent with the rights granted by the Secretary of the Interior in the permit."[3]  To comply with these requirements, these modifications include lease stipulations that specifically reflect requirements of the CRR. (SFEIS, Table 2-1).

On December 11, 2017, the Forest Supervisor signed the USFS ROD that gave consent to the BLM to modify coal leases underlying NFS land and prescribed stipulations to protect non-mineral surface resources. The USFS implemented its consent decision on December 11, 2017 following resolution of an administrative appeal of the USFS SFEIS and ROD.

The regulations that pertain to leasing federal lands administered by a surface management agency outside of the DOI require that the leases be subject to conditions the surface management agency may prescribe to ensure the use and protection of the lands for the primary purpose for which they are being administered.[4] The purpose of this ROD is for the BLM, as a Cooperating Agency, to formally adopt the GMUG SFEIS to comply with NEPA requirements for the BLM to accept, reject, or modify the coal lease modifications and approve the on-lease exploration plan.  This BLM ROD also documents the suitability of the SFEIS for this purpose.

## 3.0 Purpose of and Need for Action

The purpose of the USFS and BLM's actions is to respond to the lessees' applications to lease and develop federal coal through modifying existing leases including an on-lease exploration plan. *See* 43 C.F.R. Subparts 3432 and 3480.  The BLM must also respond to the lessees' request for on-lease exploration.

The proposed action complies with the overall guidance given in the GMUG Land and Resource Management Plan as amended (USFS, 1991), which encourages environmentally sound energy and mineral development.  The proposed action also complies with the BLM

---

[2] 36 CFR 294.43, "Roadless Area Conservation; National Forest System Lands in Colorado," 81 FR 91811 (December 19, 2016).
[3] Forest Service Manual (FSM) 2820, SFEIS, Table 2-1.
[4] 43 CFR 3400.3-1

4

Uncompahgre Basin Resource Management Plan (BLM, 1989), which states that the BLM will identify federal coal resources that are acceptable for further leasing consideration.

In response to the applications, the GMUG identified the need to consider consenting to two coal lease modifications for federal coal lands immediately adjacent to existing federal coal leases COC-1362 and COC-67232. The BLM must decide whether to accept the coal lease modification proposals, reject the applications, or modify the proposed lease modifications in accordance with NEPA, the Mineral Leasing Act of 1920, as amended, and the Federal Land Policy and Management Act of 1976. Also, the BLM is responsible for analyzing any on-lease exploration plans. The BLM must decide whether to (1) approve the exploration plan and allow the activities to occur on the coal leases, consistent with any rights and obligations under the leases, (2) approve the exploration plan with additional conditions as provided under 43 CFR 3482.2(a)(1), if needed, to minimize impacts, or (3) not approve the exploration plan. Also, under 43 CFR 3432.3(d)the Authorized Officer must have the surface management agency's (USFS's) concurrence to approve the exploration plan which BLM has received. The BLM has also received the USFS's consent to modify the leases. Note concurrence is not a "decision" subject to the USFS objection process.

The purpose of the federal agencies' actions is to respond to applications to modify two existing coal leases, whether to approve an on-lease exploration plan and to facilitate the recovery of federal coal resources in an environmentally sound manner. Further, the purpose includes ensuring that compliant and super-compliant (high quality or characterized by a high BTU, low- ash, and low-moisture content) coal reserves are recovered and not bypassed. The proposed action responds to the federal government's overall policy to foster and encourage private enterprise in the development of economically sound and stable industries, to help assure satisfaction of industrial, security and environmental needs (Mining and Minerals Policy Act of 1970).

## 4.0  Decision

It is my decision to adopt the USFS GMUG "Federal Coal Lease Modifications COC-1362 & COC-67232 (including on-lease exploration plan)" SFEIS (2017), as allowed under 40 CFR 1506.3. Based on USFS recommendation, I have determined that there are no significant recreation, timber, economic, or other values that may be incompatible with leasing the lands in question.[5] Consistent with the USFS decision, I am selecting Alternative 3, as described in the SFEIS. Stipulations described in Appendix A of this ROD will apply. Additionally, pursuant to lease addenda attached to the coal leases COC-1362 and COC-67232 executed on January 14, 2009 it is my decision to apply methane gas mitigation measures, as this decision describes in Section 9.0 below.

The BLM is required by law to consider the leasing of federally owned minerals for economic recovery. In accordance with 43 CFR 3432.2 as described in Alternative 3 of the SFEIS, I have determined that: (1) Modifying the leases serve the interests of the United

---

[5] *See* 30 U.S.C. § 1272(e)(2); 43 CFR 3461.5(a)(2)(i).

BLM_0075907

States; (2) There is no competitive interest in the lands or deposits; and (3)The additional lands or deposits cannot be developed as part of another potential or existing independent operation.

The SFEIS meets the standards for an adequate EIS under the CEQ regulations. The BLM has independently evaluated the SFEIS and has determined that the USFS satisfactorily considered the BLM's concerns, comments, and suggestions as a Cooperating Agency during the NEPA process. The SFEIS forms a sound basis for NEPA compliance related to BLM's responsibilities for coal leasing on NFS lands.

The BLM concurs with the USFS' findings of consistency with laws, regulations, and policy in the GMUG National Forest's SFEIS and ROD.

## 5.0   Overview of the Alternatives

### 5.1   Alternative 1 (No Action)

*Leasing:*

The USFS would not grant consent to modify the leases and mining would not occur in the areas proposed for modification. Impacts from mining coal under the proposed modification areas would not occur and the effects from on-going land uses could continue, including coal mining activities such as exploration and monitoring related to mine activities on existing leases, and continued recreation and grazing. The USFS would continue to manage the land according to Forest Plan standards, goals and guidelines.

*Exploration:*

Under the No Action Alternative, the BLM would not approve on-lease exploration. Based on MCC's assessment, without an exploration plan, MCC would be unable to acquire the information necessary to develop a sufficient mine plan for the additional leased area. Without exploration plan and a mine plan, it would be highly unlikely that mining would occur in the lease modification areas. For the purposes of the analysis, no action would result in no mining on the lease modification areas.

### 5.2   Alternative 2 – 2001 Roadless Conservation Rule

Alternative 2 was moved to Section 2.3 of the SFEIS, **Alternatives Considered, but Eliminated from Detailed Study**, due to the high likelihood of decreased operating periods, increased erosion potential, and safety concerns of cross country travel with no roads. Moreover, the 2001 Roadless Area Conservation Rule, which prevented road construction in Inventoried Roadless Areas has been replaced with the CRR.

6

## 5.3   Alternative 3 – Consent to and modification of the leases (Agencies' Preferred Alternative and Proposed Action)

*Leasing:*

Under alternative 3, the BLM would modify existing federal coal leases COC-1362 and COC-67232 by adding 800 and 920 additional acres (respectively). The USFS would consent to the lease modifications with all stipulations/notices/addenda in Tables 2.1a and 2.1b of the SFEIS.  Under the CRR, post-lease temporary road building could be permitted in the lease modifications because it is in the area known as the "North Fork Coal Mining Area" in the Rule. This would allow for MDW drilling and temporary road access, which would enable MCC to mine the coal under the Reasonable Foreseeable Mining Plan (RFMP) (described in Section 3.2 of the SFEIS). Because a leasing decision itself does not involve any mineral development or surface disturbance, it is necessary to project the amount of surface use or activity that will likely result during lease development in order to disclose potential effects and inform decision making.  The RFMP describes the likely post-lease activity for this alternative, which is outlined in Section 3.2 of the SFEIS.  A full description of this alternative can be found in Section 2.2.3 of the SFEIS.

Alternative 3 is similar to Alternative 2 except that it is analyzed under the framework of the CRR. This rule went into effect on July 3, 2012. The CRR contains an exception to the prohibitions for road construction and reconstruction in a geographic area known as the NFCMA. The exception facilitates access to federal coal resources in the NFCMA by allowing for the construction or reconstruction of temporary roads for coal exploration and development activities such as installation of MDWs, monitoring locations or other purposes.  The USFS reinstated the NFCMA exemption to the CRR on December 19, 2016, and the exception became effective on April 18, 2017. Just over 1,700 acres of the NFS lands in the lease modifications are within the NFCMA.

*Exploration:*

If the BLM issues the lease modifications under the proposed action (Alternative 3), BLM would likely approve the exploration plan to conduct on-lease coal exploration activities. Ark submitted the exploration plan on behalf of MCC. Exploration consists of drilling, obtaining e-logs down-hole, and collecting core samples for testing. Full description of Alternative 3 – Exploration can be found in Section 2.2.3.2 of the SFEIS.

7

BLM_0075909

### 5.4 Alternative 4 – COC-1362 only (Environmentally Preferable Alternative)

*Leasing:*

Many commenters expressed concerns regarding roadless area effects due to post-lease development. Similarly, in the original DEIS, some commenters suggested an Alternative requesting the USFS consent, and the BLM modify, only the COC-1362 lease and not consent to or modify lease COC-67232. In response to those comments, Alternative 4 was brought forward for further analysis from Alternatives Considered but Eliminated from Detailed Study in the DEIS. Like it did for Alternative 3, GMUG developed an RFMP to analyze the effects of post-lease surface activities of Alternative 4 under the CRR and resultant NFCMA (Section 3.3.3). The RFMP allowed GMUG to address indirect and cumulative effects specific to only the COC-1362 modification.

*Exploration:*

The on-lease exploration activities would remain similar to Alternative 3, except the estimated surface impact would be reduced. When compared to the exploration component of Alternative 3, this alternative may result in at least two fewer exploration drill holes and a reduction of approximately one mile of temporary road compared. Because an exploration plan specific to this alternative has not been submitted, the maps in this section reflect the USFS's projection of roads and pads based on topography and other local knowledge. It is estimated that approximately 18 acres (where 0.15 acres would be on private land and 0.32 acres on parent leases) of disturbance may occur with exploration under this alternative.

### 5.5 Alternatives Considered But Eliminated From Detailed Analysis

Section 2.3 of the SFEIS thoroughly describes twelve alternatives and the reasons for not carrying each forward for detailed analysis. All of these alternatives related to surface disturbance and/or the release of ventilation air methane from MDWs. They were eliminated for one or more of the following reasons: (1) Not considered reasonable; (2) Would hinder safe and efficient recovery of the coal resource; (3) Presented unviable mitigations; (4) Advocated stipulations and/or mitigations already in use or provided under the preferred alternative 3; (5) Were equivalent to the "No Action" alternative 1; and, (6) Would not meet the purpose and need.

## 6.0 Management Considerations and Rationale for the Decision

The BLM concurs with the rationale ("Reasons for the Decision") presented in the USFS ROD that selecting Alternative 3 best meets the Purpose and Need, while also responding to public concerns and providing protection to important forest resources. Alternative 3 is also consistent with the applicable laws, regulations, and policy described in the SFEIS.

The SFEIS addresses and analyzes a wide range of surface resources managed by the USFS

8

BLM_0075910

and applies necessary mitigation measures, expressed as stipulations, to protect those resources (Tables 2-1, and 2-2). The SFEIS includes information and analysis relative to the subsurface resources that BLM is responsible for managing.

The decision to modify the leases consistent with Alternative 3 in the SFEIS meets the BLM purpose and need by responding to the application for modification and ensuring that compliant and super-compliant coal reserves are recovered. Consistent with 43 CFR 3432.2 and through the NEPA analysis of the potential impacts of the lease modification, the BLM has determined that the modifications serve the interest of the United States. The BLM considered both the economic and environmental impacts resulting from the modification of the leases. Before examining the lease through the NEPA process, the BLM determined that the proposed modification areas did not have competitive interest and could not be developed as part of another potential or existing independent operation.[6]

Approving the exploration plan within the coal lease modification area meets the purpose and need for this action; to respond to an application to explore the coal deposits in accordance with the federal lease agreements, NEPA; the Mineral Leasing Act, as amended by the Federal Coal Leasing Amendments Act of 1976; and the Federal Land Policy and Management Act of 1976. The BLM also fulfills management obligations regarding the federal coal resource by obtaining information which allows the BLM to verify the recoverable reserves. As the surface management agency, the GMUG has to review the adequacy of the bond and has to concur with the approval terms of the exploration plan.

## 7.0   Consultation and Consistency Review

### 7.1   Endangered Species Act Section 7 Consultation

The USFS prepared a Biological Assessment (BA) for the SFEIS (Sections 3.9-3.10, Project File and Internet). All known endangered or threatened species in the area were considered. Due to "may affect, likely to adversely affect" determinations for Canada Lynx and water depletions related to the four endangered Colorado River fish, formal consultation with the USFWS was completed on June 16, 2010[7] and the USFWS concurred with the BA's findings.

The vegetation removal in the area of the 2010 consultation was also included in 2016 in the GMUG forest-wide Programmatic Biological Opinion.[8] This consultation set acreage limits for surface disturbance within the Lynx Analysis Units before consultation would again be required. There are over 6,000 additional acres beyond this project and previous disturbances of habitat in the Mount Gunnison Lynx Analysis Unit that may be removed

---

[6] *See* Combined Geologic & Engineering Report and Maximum Economic Recovery Report for Coal Lease Modifications (COC1362 & COC67232), March 2016.
[7] ES/CO: FS/GMUG/Paonia RD; Tails 65413-2010-F-0109.
[8] BO ES/LK-6-CO-08-F-024-GJ0t 6 and TAILS 06824t00-201 6-F -0132.

BLM_0075911

before approaching a conservation limit in compliance with the Southern Rockies Lynx Amendment. Depletions are covered under the GMUG's Programmatic Biological Opinion.[9] These are further included in the Gunnison Basin Programmatic Biological opinion[10] and the USFWS's Sufficient Progress Memo dated December 20, 2016.  If additional findings regarding threatened or endangered, proposed, or sensitive species are discovered, a new biological assessment or evaluation will be written, and formal consultation reinitiated.

Appropriate stipulations specific to Lynx and related to Threatened and Endangered species are in Alternatives 3. Lynx stipulations included are consistent with the GMUG Forest Plan 2008 amendment, Southern Rockies Lynx Amendment, and the Endangered Species Act. Further, the Forest Service has consulted with the USFWS regarding Canada lynx.

Compliance with terms and conditions of the Biological Opinion are addressed in lease stipulations for threatened and endangered species, which can be found in Tables 2-1 and 2-2 of Appendix B of the SFEIS. Therefore, my decision is consistent with the Endangered Species Act.

## 7.2   National Historic Preservation Act Section 106 Consultation

Three cultural resource inventories have occurred within the project area and no heritage resources were located. GMUG found the lease modifications have no potential to affect cultural resources, as defined in regulations 36 CFR 800.

The addition of the standard cultural resources lease clause will protect currently undiscovered sites (SFEIS Section 3.31 and Project File). Site specific resource surveys have been completed for exploration disturbance, and must be conducted prior to any post-lease ground disturbing activities (Appendix B, SFEIS Table 2-1). Therefore, at this time, no additional inventories need to be completed, and consultation with the State Historic Preservation Office (SHPO) is not required.  My decision is consistent with this and other acts protecting heritage resources.

## 7.3   Tribal Consultation

Tribal consultation is required by Executive Order 13175, which states that "Each agency shall have an accountable process to ensure meaningful and timely input by Tribal officials in the development of regulatory policies that have Tribal implications." The following affected tribes were contacted during the scoping period that occurred prior to the initiation of the preparation of the DEIS and again when the USFS engaged in a rulemaking that reinstated the NFCMA exception to the CRR: Ute Mountain Utes, Southern Utes, and (Northern) Utes. The Tribes provided no formal comments and did

---

[9] ES/GJ-6-CO-F-033-CP062.
[10] ES/GJ-6-CO-09-F-0001; TAILS 65413-2009-F-0044.

BLM_0075912

not request any meetings.

## 8.0 Public Involvement and NEPA Process

### 7.1    2012 NEPA Process

There have been extensive public outreach efforts associated with this project. Initially, the GMUG and BLM prepared a preliminary EA for this project. The BLM published the Notice of Opportunity to Comment on the preliminary EA in *the Grand Junction Daily Sentinel* (newspaper of record) and in the *Delta County Independent* on April 21, 2010. The Notice of Opportunity to Comment asked for public comment on the proposed lease modifications from April 21-May 21, 2010. In addition, as part of the public involvement process, the agencies sent out approximately 120 letters to state, federal, local agencies, tribes, environmental groups, and interested individuals; posted scoping materials to the GMUG's website; and posted to the Forest Service's Schedule of Proposed Actions.

During that initial comment period, approximately 684 versions of email form letters were received from WildEarth Guardians supporters; 1900 versions of email form letters were received from Defenders of Wildlife supporters; 23,771 versions of email form letters were received from supporters of Natural Resources Defense Council; 5647 versions of email form letters were received from supporters of Earth Justice; 576 hardcopy/faxed various form letters were received from local community members in four counties in support of mining in this area; 74 original or somewhat original comments were received; and 4 original comments with attachments were received in response to this scoping effort. Using the comments from the public, environmental groups, other agencies, and those developed internally, the interdisciplinary team developed a list of issues to address (see *Issues* section of SFEIS). Other comments were responded to in the EA. GMUG issued its decision on that EA in November 2011. That decision was appealed to the USFS Regional Forrester, Resources, for Region 2 December 2011. The Regional Forrester reversed the decision in February 2012.

Subsequently, a Notice of Intent (NOI) to prepare an Environmental Impact Statement was published in the *Federal Register* on April 25, 2012. Approximately 830 copies of letters/emails informing interested parties (including state, federal, local agencies, tribes, environmental groups, and individuals expressing desire to remain on mailing lists) of this intent were also sent out on April 25, 2012, inviting additional comments throughout the process but reminding them that to be eligible for appeal they must comment on the DEIS when it became available. Additional notification was not sent out to those who submitted form letters through other groups' clearinghouse websites on the previously prepared EA except for those who submitted original or somewhat original comments. USFS's Schedule of Proposed Actions was also updated. Additional notification was sent out with the DEIS to approximately 768 individuals, additional legal notices were published in the *Grand Junction Daily Sentinel* and *Delta County Independent.*

Approximately 24,680 comment letters were received on the DEIS. Of those, 67 were original or somewhat original comments. Responses to comments received during the 30 day period

11

BLM_0075913

following the printing of the NOI and the 45 day comment period on the DEIS and other comments specifically included by reference can be found in Appendix I. Comments received during this time can be viewed in entirety in Appendix I (Volume II) of the FEIS or at: https://cara.ecosystem-management.org/Public//ReadingRoom?Project=32459

## 8.2   Supplemental Environmental Impact Statement

To correct Court-identified deficiencies and to update analysis as needed, a Notice of Intent to Prepare a Supplemental EIS was published February 2016, and a Supplemental EIS was prepared. The leasing and exploration analyses were combined into a single document for agency and public convenience.

Over 9,800 additional submissions (primarily form letters, groups of form letters and petitions) were received on the Notice of Intent to Prepare a Supplemental Environmental Impact Statement in 2016-2017 which was not an official comment period. Comments and responses can be found in Appendix J.

During the official comment period (June 2, 2017-July 24, 2017) on the Supplemental Draft Environmental Impact Statement the agencies received approximately 127, 250 expressions of interest or comment letters. Issue topics are consistent with those raised in previous comment periods. Summarized substantive comments and responses are included in Appendix K of the SFEIS.

## 9.0   Mitigation Measures

Mitigation for potential impacts to surface resources will take the form of USFS stipulations applied to lease modifications issued pursuant to this decision. The stipulations are described in detail in Appendix A of this ROD.

In addition to the USFS stipulations that apply to the potential surface impacts associated with these lease modifications, on January 14, 2009, the BLM and MCC executed lease addenda on COC-1362 and COC- 67232 that included  mitigation measures associated with the release of methane gas from the mine identified in the lease's addendum, discussed below. The lease addenda grant the following authority:

> Sec. 3. Notwithstanding the language in Section 2 of this lease and subject to the terms and conditions below, lessee is authorized to drill for, extract, remove, develop, produce and capture for use or sale any or all of the coal mine methane from the above described lands that it would otherwise be required to vent or discharge for safety purposes by applicable laws and regulations. For purposes of this lease,
> "coalmine methane" means any combustible gas located in, over, under, or adjacent to the coal resources subject to this

12

lease, that will or may infiltrate underground mining operations.

Sec. 4. Notwithstanding any other provision of this lease, nothing herein shall, nor shall it be interpreted to, waive, alter or amend lessee's right to vent, discharge or otherwise dispose of coal mine methane as necessary for mine safety or to mine the coal deposits consistent with permitted underground mining operations and federal and state law and regulation. Lessee shall not be obligated or required to capture for use or sale coal mine methane that would otherwise be vented or discharged if the capture of coal mine methane, independent of activities related to mining coal, is not economically feasible or if the coal mine methane must be vented in order to abate the potential hazard to the health or safety of the coal mines or coal mining activities. In the event of a dispute between lessor and lessee as to the economic or other feasibility of capturing for use or sale the coal mine methane, lessor's remedy as a prevailing party shall be limited to recovery of compensatory royalties on coal mine methane not captured for use or sale by lessee. Lessee shall have the right to continue all mining activities under this lease, including venting coal mine methane, pending resolution of any dispute regarding the application of the terms of Sections 3 and 4.

Under the lease addenda and subsequent BLM request, West Elk contracted with third-parties to evaluate various methane uses and their technological and economic feasibility at the mine. The result is the 2009 West Elk Mine E-Seam Gas Economic Evaluation Report (2009 Report).

The 2009 Report analyzes methane capture for pipeline sale, capture for onsite electric generation, and flaring. The 2009 Report showed that, at the time, there were no economically feasible uses of the methane emitted from the mine. The BLM evaluated this report and found it to be credible based on relevant economics and technology.

As a part of the 2009 Report, MCC proposed that annual evaluations of new technology, coupled with economic trigger values, will determine when MCC will analyze the viability of methane capture in the future. The economic trigger values are: (1) natural gas price of $18.66MM/Btu; (2) price per Megawatt/Hour (MWh) for electricity paid by the mine of $114/MWh; and (3) carbon offset price of $19.25/ton.

The BLM also evaluated a report related to the lease addenda that Power Consulting prepared and provided the BLM in January 2010. This report indicated that methane capture was economically viable at the West Elk Mine. The BLM determined that Power Consulting's

13

report was unpersuasive because it relied on a carbon credit market that did not support economic methane use at the West Elk Mine in 2009 and 2010. Since then, the carbon credit market has been significantly devalued.

MCC provided the BLM with updated information pursuant to Section VII of the Resource, Recovery, and Protection Plan (R2P2) report in April, 2012. The information showed that none of MCC's stated economic trigger values have occurred. MCC concluded that any additional analysis is not necessary. The BLM reviewed MCC's R2P2 report and agrees with MCC's conclusions based on the updated information. The BLM approved MCC's proposed economic trigger values and MCC's commitment to continually evaluate new methane use technology.

## 10.0   Adaptive Management

The unique geologic, terrain, and economic conditions at each coal mine determine whether, when, and how methane use mitigation options are feasible. Additionally, if coal leases are overlaid with oil and gas leases, the coal and oil and gas operators must reach an agreement with regard to any potential methane use and/or liberation.

The West Elk Mine's lease addenda (described above in Section 7.0) allow for methane use when economically feasible. Based on the BLM's approval of MCC's economic trigger values, the BLM requires MCC to perform additional analysis when those trigger values are reached. Pursuant to these lease addenda on leases COC-1362 and COC-67232 if determined to be economically feasible, the BLM will require the lessee to capture the methane for use or sale.

Currently, based on the analysis in the 2009 Report, the conditions at the West Elk Mine are not conducive to any of the methane use options. The geology of the current mining area is not resulting in high methane liberation. The terrain is very rugged, and as such, placing pipelines through the area to the MDWs is geographically, technically, and economically infeasible. The MDWs used at the West Elk Mine are temporary and those used to liberate methane from the E-Seam mine workings are in service for an average of 12 weeks per MDW as underground mining progresses. There can be a range of 1 to 5 E-Seam MDWs draining at any given time while methane content of the exhausted gases can range from 20% - 95%. This temporary and fluctuating nature of the MDWs drainage decreases the reliability of a consistent methane flow. This is a major contributor to the infeasibility of economic methane use.

Additionally, to make a methane flaring option economically feasible, a robust carbon credit market is necessary. Such a market does not currently exist, but as described above in Section 7.0, a future increase in carbon credit price is one of the economic trigger values that will prompt further review of methane use at the West Elk Mine.

While the 2009 Report concluded that methane use options are not currently economically feasible, the West Elk Mine is able to use liberated methane to heat the mine when outside

14

temperatures so require. Such use is economically feasible and the BLM supports this methane use. Therefore, when methane liberation concentrations in the mine and outside temperatures allow West Elk to use methane to heat the mine, the BLM will require the West Elk Mine to do so, which is within the purview of the lease addenda.

The lease addenda on COC-1362 and COC-67232, coupled with the accepted economic trigger values described above in Section 7.0, require additional potential future analysis by MCC. If such analysis shows that methane capture and use or sale is economically feasible, under the lease addenda, the lessee must capture the methane for use or sale.

## 11.0   Approval

In consideration of the information presented above, I approve this BLM ROD adopting the USFS GMUG SFEIS and concur with the USFS's selection of Alternative 3 (Consent to and Modification of the Leases) as described in the SFEIS (Section 2.2.3). Accordingly, I approve the lease modifications and approve the on-lease exploration plan detailed in the SFEIS (Section 2.2.3.2).

My approval of these decisions constitutes the final decision of the Department of the Interior and, in accordance with the regulations at 43 C.F.R. § 4.410(a)(3), is not subject to appeal to the Office of Hearings and Appeals under Departmental regulations at 43 CFR Part 4.

Approved by:

_Katharine S. MacGregor_                               12.15.2017

Katharine S. MacGregor
Deputy Assistant Secretary – Land and Minerals Management, Exercising the Authority of the Assistant Secretary – Land and Minerals Management
U.S. Department of the Interior

Attachment:
   1 - Appendix A - USFS Stipulations

15

BLM_0075917

# Appendix A

BLM_0075918

BLM ROD DOI-BLM-CO-S050-2016-0042-EIS

BLM_0075919

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| **Cultural and Paleontological Resources** | The FS is responsible for assuring that the leased lands are examined to determine if cultural resources are present and to specify mitigation measures. Prior to undertaking any surface-disturbing activities on the lands covered by this lease, the lessee or operator, unless notified to the contrary by the FS, shall: <br><br>• Contact the FS to determine if a site specific cultural resource inventory is required. If a survey is required then:<br>• Engage the services of a cultural resource specialist acceptable to the FS to conduct a cultural resource inventory of the area of proposed surface disturbance. The operator may elect to inventory an area larger than the area of proposed disturbance to cover possible site relocation which may result from environmental or other considerations. An acceptable inventory report is to be submitted to the FS for review and approval at the time a surface disturbing plan of operation is submitted.<br>• Implement mitigation measures required by the FS and BLM to preserve or avoid destruction of cultural resource values. Mitigation may include relocation of proposed facilities, testing, salvage, and recordation or other protective measures. All costs of the inventory and mitigation will be borne by the lessee or operator, and all data and materials salvaged will remain under the jurisdiction of the U.S. Government as appropriate.<br>• The lessee or operator shall immediately bring to the attention of the FS and BLM any cultural or paleontological resources or any other objects of scientific interest | The FS is responsible for assuring that the leased lands are examined to determine if cultural resources are present and to specify mitigation measures. Prior to undertaking any surface-disturbing activities on the lands covered by this lease, the lessee or operator, unless notified to the contrary by the FS, shall: <br><br>• Contact the FS to determine if a site specific cultural resource inventory is required. If a survey is required then:<br>• Engage the services of a cultural resource specialist acceptable to the FS to conduct a cultural resource inventory of the area of proposed surface disturbance. The operator may elect to inventory an area larger than the area of proposed disturbance to cover possible site relocation which may result from environmental or other considerations. An acceptable inventory report is to be submitted to the FS for review and approval at the time a surface disturbing plan of operation is submitted.<br>• Implement mitigation measures required by the FS and BLM to preserve or avoid destruction of cultural resource values. Mitigation may include relocation of proposed facilities, testing, salvage, and recordation or other protective measures. All costs of the inventory and mitigation will be borne by the lessee or operator, and all data and materials salvaged will remain under the jurisdiction of the U.S. Government as appropriate.<br>• The lessee or operator shall immediately bring to the attention of the FS and BLM any cultural or paleontological resources or any other objects of scientific interest | Use language from parent leases (required Standard Notice for Lands under the Jurisdiction of the Department of Agriculture.) |

BLM ROD DOI-BLM-CO-S050-2016-0042-EIS

BLM_0075920

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | discovered as a result of surface operations under this license, and shall leave such discoveries intact until directed to proceed by FS and BLM. | discovered as a result of surface operations under this license, and shall leave such discoveries intact until directed to proceed by FS and BLM. | |
| **Endangered or Threatened Species** | The FS is responsible for assuring that the leased land is examined prior to undertaking any surface-disturbing activities to determine effects upon any plant or animal species listed or proposed for listing as endangered or threatened, or their habitats. The findings of this examination may result in some restrictions to the operator's plans or even disallow use and occupancy that would be in violation of the Endangered Species Act of 1973 by detrimentally affecting endangered or threatened species or their habitats.<br><br>The lessee/operator may, unless notified by the FS that the examination is not necessary, conduct the examination on the leased lands at his discretion and cost. This examination must be done by or under the supervision of a qualified resource specialist approved by the FS. An acceptable report must be provided to the FS identifying the anticipated effects of a proposed action on endangered or threatened species or their habitats. | The FS is responsible for assuring that the leased land is examined prior to undertaking any surface-disturbing activities to determine effects upon any plant or animal species listed or proposed for listing as endangered or threatened, or their habitats. The findings of this examination may result in some restrictions to the operator's plans or even disallow use and occupancy that would be in violation of the Endangered Species Act of 1973 by detrimentally affecting endangered or threatened species or their habitats.<br><br>The lessee/operator may, unless notified by the FS that the examination is not necessary, conduct the examination on the leased lands at his discretion and cost. This examination must be done by or under the supervision of a qualified resource specialist approved by the FS. An acceptable report must be provided to the FS identifying the anticipated effects of a proposed action on endangered or threatened species or their habitats. | Use language from parent leases, required Standard Notice for Lands under the Jurisdiction of the Department of Agriculture. |
| | If there is reason to believe that Forest Service Sensitive species, Threatened or Endangered species of plants or animals, or migratory bird species of high Federal interest are present, or become present in the lease area, the Lessee/Operator shall be required to conduct an intensive field inventory of the area to be disturbed and/or impacted. The inventory shall include species or groups of species identified by the FS, and will be conducted to by a qualified specialist. A report of findings will be prepared and provided to the FS. A plan will be made that recommends protection for these species or action necessary to mitigate the disturbance consistent with the Forest Plan. The cost of conducting such inventory, preparing reports and carrying out mitigation measures shall be borne by the | If there is reason to believe that Sensitive, Threatened or Endangered species of plants or animals, or migratory bird species of high Federal interest are present, or become present in the lease area, the Lessee/Operator shall be required to conduct an intensive field inventory of the area to be disturbed and/or impacted. The inventory shall be conducted by a qualified specialist, and a report of findings prepared. A plan will be made that recommends protection for these species or action necessary to mitigate the disturbance. The cost of conducting such inventory, preparing reports and carrying out mitigation measures shall be borne by the Lessee/Operator. | Use language from parent leases, required Standard Notice for Lands under the Jurisdiction of the Department of Agriculture. |

BLM_0075921

BLM ROD DOI-BLM-CO-S050-2016-0042-EIS

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands<br>Lessee/Operator. | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| Canada Lynx | To comply with the USDA Forest Service Conservation Agreement with Fish and Wildlife Service, to follow the conservation measures in the Canada Lynx Conservation Assessment and Strategy (Ruediger et al. 2000), the following special constraints will apply if surface use on the lease is proposed in lynx habitat:<br><br>• Winter access will be limited to designated routes.<br>• Further, should surface disturbing operations be proposed on the lease in lynx habitat, the following special constraints may apply, depending on site-specific circumstances:<br>• Remote monitoring of the development sites and facilities may be required to reduce snow compaction.<br>• A reclamation plan (e.g. road reclamation and vegetation rehabilitation) for sites and facilities that promotes the restoration of lynx habitat may be required.<br>• Public motorized use on new roads constructed for project-specific purposes will be restricted.<br>• Access roads will be designed to provide for effective closures and will be reclaimed or decommissioned at project completion if they are no longer needed for other management objectives.<br>• New permanent roads will not be built on ridge tops or in saddles, or in areas identified as important for lynx habitat connectivity. New roads will be situated away from forested stringers. | To comply with the Canada Lynx Assessment and Strategy (Ruediger et al. 2000), the following special constraints will apply if post-lease surface use is proposed in lynx habitat:<br><br>• Winter access will be limited to designated routes.<br>Further, should post-lease surface operations be proposed on the lease in lynx habitat, the following special constraints may apply, depending on site-specific circumstances:<br>• Remote monitoring of the development sites and facilities may be required to reduce snow compaction.<br>• A reclamation plan (e.g. road reclamation and vegetation rehabilitation) for sites and facilities that promotes the restoration of lynx habitat may be required.<br>• Public motorized use on new roads constructed for project-specific purposes will be restricted.<br>• Access roads will be designed to provide for effective closures and will be reclaimed or decommissioned at project completion if they are no longer needed for other management objectives.<br>• New permanent roads will not be built on ridge tops or in saddles, or in areas identified as important for lynx habitat connectivity. New roads will be situated away from forested stringers.<br>• If post lease surface use occurs in lynx habitat, the Lessee will be required to submit an annual report to the USDA-FS and USFWS of all activities having occurred in lynx habitat. | To comply with the GMUG Forest Plan 2008 amendment, the following special constraints will apply if surface use on the lease is proposed in lynx habitat:<br><br>• Winter access will be limited to designated routes.<br>Further, should surface disturbing operations be proposed on the lease in lynx habitat, the following special constraints will apply:<br>• Remote monitoring of the development sites and facilities will be required to reduce snow compaction.<br>• A reclamation plan (e.g. road reclamation and vegetation rehabilitation) for sites and facilities that promotes the restoration of lynx habitat will be required.<br>• Public motorized use on new roads constructed for project-specific purposes will be restricted.<br>• Access roads will be designed to provide for effective closures and will be reclaimed or decommissioned at project completion if they are no longer needed for other management objectives.<br>• New permanent roads will not be built on ridge tops or in saddles, if possible, or in areas identified as important for lynx habitat connectivity. New roads will be situated away from forested stringers, if possible. |

BLM ROD DOI-BLM-CO-S050-2016-0042-EIS

BLM_0075922

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| **Raptors** | For raptors (except American kestrel) the Lessee will be required to:<br>• Conduct surveys for nesting raptors on the lease prior to development of any surface facilities, and<br>• No surface activities will be allowed within ¼ mile radius of active nest sites between the dates of February 1 and August 15, unless authorized by the Forest Service on a site-specific basis.<br>• No surface activities will be allowed within 1-mile radius of active bald eagle or peregrine falcon nest sites between the dates of February 1 and August 15, unless authorized by the Forest Service on a site-specific basis. | For raptors (except American kestrel) the Lessee will be required to:<br>• Conduct surveys for nesting raptors on the lease prior to development of any surface facilities, and<br>• No surface activities will be allowed within ½-mile radius of active nest sites between the dates of February 1 and August 15, unless authorized by the Forest Service on a site-specific basis. | Use combined language from COC-67232 and COC-1362 which reflects Forest Plan standards as well as guidelines from the Biological Evaluation for this project:<br>• Conduct surveys for nesting raptors on the lease prior to development of any surface facilities, and<br>• No surface activities will be allowed within ½-mile radius of active nest sites between the dates of February 1 and August 15, unless authorized by the Forest Service on a site-specific basis.<br>• No surface activities will be allowed within 1-mile radius of active bald eagle or peregrine falcon nest sites * between the dates of February 1 and August 15, unless authorized by the Forest Service on a site-specific basis.<br>(* No bald eagle or peregrine falcon nest site habitat has been identified within the lease modifications as indicated in the Biological Evaluation prepared for this analysis.) |
| **Big game winter range** | In order to protect big game wintering areas, elk calving areas, and other key wildlife habitat and/or activities, specific surface use may be curtailed during specific times of year. Specific time restrictions for specific species will be evaluated by the Forest Service at the individual project stage, and any additional site specific conditions of use developed at that time. | In order to protect big game wintering areas, elk calving areas, and other key wildlife habitat and/or activities, specific surface use may be curtailed during specific times of year. Specific time restrictions for specific species will be evaluated by the Forest Service at the individual project stage, and any additional site specific conditions of use developed at that time. | Use language from parent leases. |
| **Water depletions** | In the future, if water to be used for mine related activities is taken from a source that is not considered to be non-tributary waters by the U.S. Fish and Wildlife Service, or which exceeds a depletion amount previously consulted upon, the permitting agency must enter into consultation with the U.S. Fish and Wildlife Service to determine appropriate conservation measures to offset effects to listed fish and critical habitat in the upper Colorado River Basin. | In the future, if water to be used for mine related activities is taken from a source that is not considered to be non-tributary waters by the U.S. Fish and Wildlife Service, or which exceeds a depletion amount previously consulted upon, the permitting agency must enter into consultation with the U.S. Fish and Wildlife Service to determine appropriate conservation measures to offset effects to listed fish and critical habitat in the upper Colorado River Basin. | Based on the CRR Section 7 consultation effort for the CRR's NFCMA in 2016, the Forest Service took on the responsibility for reinitiating consultation if minor water depletion caps were exceeded. The Forest Service wants to ensure the lessee provides the necessary information from monitoring and reporting to determine if minor water depletion caps are exceeded, and, in the highly unlikely event that the depletion caps were exceeded, the lessee would |

BLM ROD DOI-BLM-CO-S050-2016-0042-EIS

BLM_0075923

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | | | meet any additional conservation measures the USFWS might require. This updated stipulation provides clarification to the process that has been occurring on the parent leases regarding water depletion. Changes to stipulation are in italics.<br><br>In the future, if water to be used for mine related activities is taken from a source that is not considered to be non-tributary waters by the U.S. Fish and Wildlife Service, or which exceeds a depletion amount previously consulted upon, *the surface management agency* must enter into consultation with the U.S. Fish and Wildlife Service to determine appropriate conservation measures to offset effects to listed fish and critical habitat in the upper Colorado River Basin. *The lessee shall monitor and report all depletions to the Forest Service. Notwithstanding the fact that the surface management agency has the obligation to consult, the Lessee has the obligation to comply with all appropriate conservation measures to offset effects to listed fish and critical habitat in the upper Colorado River Basin in the event the depletion threshold is exceeded and additional reasonable and prudent actions are required.* |
| Breeding birds | If surface disturbance is proposed on the lease, the lessee/operators will be required to conduct breeding bird surveys prior to surface disturbance as prescribed by the Forest Service. | If surface disturbance is proposed on the lease, the lessee/operators will be required to conduct breeding bird surveys prior to surface disturbance. | Use language from COC-1362 parent lease on both modifications. |
| Geologic hazards | No surface occupancy would be allowed in areas of high geologic hazard or high erosion potential, or on slopes which exceed 60%. | No surface occupancy would be allowed in areas of high geologic hazard or high erosion potential. | Use language from parent lease COC-1362 on both modifications. |
| | Special interdisciplinary team analysis and mitigation plans detailing construction and mitigation techniques would be required on areas where slopes range from 40-60 percent. The interdisciplinary team could | Special interdisciplinary team analysis and mitigation plans detailing construction and mitigation techniques would be required on areas where slopes range from 40-60 percent. The interdisciplinary team could | Use language from parent leases. |

BLM ROD DOI-BLM-CO-S050-2016-0042-EIS

BLM_0075924

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
|  | include engineers, soil scientist, hydrologist, landscape architect, reclamation specialist and mining engineer. | include engineers, soil scientist, hydrologist, landscape architect, reclamation specialist and mining engineer. |  |
| **Baseline Information** | The operator/lessee would be required to perform adequate baseline studies to quantify existing surface and subsurface resources. Existing data can be used for baseline analyses provided that the data is adequate to locate, quantify, and demonstrate interrelationships between geology, topography, hydrogeology, and hydrology. Baseline studies are critical to the success of future observation and assessment of mining related effects on resources. | The operator/lessee would be required to perform adequate baseline studies to quantify existing surface and subsurface resources. Existing data can be used for baseline analyses provided that the data is adequate to locate, quantify, and demonstrate interrelationships between geology, topography, hydrogeology, and hydrology. Baseline studies are critical to the success of future observation and assessment of mining related effects on resources in the Dry Fork lease tract. | Use language from parent leases. |
| **Monitoring Program** | The operator/lessee would be required to establish or amend a monitoring program to be used as a continuing record of change over time of area resources in order to assess mining induced impacts. The monitoring program shall provide the procedures and methodologies to adequately assess interrelationships between geology, topography, hydrogeology, and hydrology identified in the baseline assessment to mining activities on the lease area. The monitoring program shall incorporate baseline data so as to provide a continuing record over time. | The operator/lessee of the lease tract would be required to establish or amend a monitoring program to be used as a continuing record of change over time of area resources in order to assess mining induced impacts. The monitoring program shall provide the procedures and methodologies to adequately assess interrelationships between geology, topography, hydrogeology, and hydrology identified in the baseline assessment to mining activities in the lease tract area. The monitoring program shall incorporate baseline data so as to provide a continuing record over time. | Use language from parent leases. |
| **Riparian, wetland or floodplain** | Surface use or disturbances (except for surface subsidence and resource monitoring purposes defined in the approved mining permit) will avoid riparian, wetland or floodplain areas, and a buffer zone surrounding these areas (the definition of riparian areas and appropriate buffer zone will be consistent with that defined in the Forest Service Manual and Water Conservation Practices Handbook. Wetland definition will follow Army Corps of Engineers guidelines) unless no practical alternatives exist. | Surface use or disturbances (except for surface subsidence and resource monitoring purposes defined in the approved mining permit) will not be permitted in riparian, wetland or floodplain areas, or within a buffer zone surrounding these areas (the definition of riparian areas and appropriate buffer zone will be consistent with that defined in the Forest Service Manual and Water Conservation Practices Handbook. Wetland definition will follow Army Corps of Engineers guidelines) unless no practical alternatives exist. | Use language from parent leases. |
| **Subsidence** | If subsidence adversely affects surface resources in any way (including, but not limited to a documented water loss), the Lessee, at their expense will be responsible | If subsidence adversely affects surface resources in any way (including, but not limited to a documented water loss), the Lessee, at their expense will be responsible | Use language from parent leases. |

BLM ROD DOI-BLM-CO-S050-2016-0042-EIS

BLM_0075925

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | to: restore stream channels, stock ponds, protect stream flow with earthwork or temporary culverts, restore affected roads, or provide other measures to repair damage or replace any surface water and/or developed ground water source, stock pond, water conveyance facilities, with water from an alternate source in sufficient quantity and quality to maintain existing riparian habitat, livestock and wildlife use, or other land uses as authorized by 36 CFR 251. | to: restore stream channels, stock ponds, protect stream flow with earthwork or temporary culverts, restore affected roads, or provide other measures to repair damage or replace any surface water and/or developed ground water source, stock pond, water conveyance facilities, with water from an alternate source in sufficient quantity and quality to maintain existing riparian habitat, livestock and wildlife use, or other land uses as authorized by 36 CFR 251. | |
| | The Lessee/Operator shall be responsible for monitoring, repairing and/or mitigating subsidence effects on existing facilities under Special Use Permit with the Forest Service. Monitoring, repair and/or mitigation, if needed, would be performed at the Lessee's expense. These requirements will be coordinated with the District Ranger and the Special Use Permittee. | The Lessee/Operator shall be required to perform the following with respect to monitoring, repairing and/or mitigating subsidence effects on existing facilities under Special Use Permit with the Forest Service. Monitoring, repair and/or mitigation will be performed at the Lessee's expense. The Lessee may request variations on timing for surveys, monitoring and reporting. Approving such requests would be at the discretion of the District Ranger. a. Baseline condition surveys of existing facilities will be completed the Fall following award of lease. Reports of this survey will be deliverable to the Forest Service by December 1 of that same year. b. In consultation with the Special Use Permittee and the Forest Service, install equipment to monitor flow on water conveyance facilities during the Fall following award of lease. Flow monitoring shall commence the following spring and continue until one year post mining. Flow data shall be provided to the Forest Service annually by December 1. c. A Surface Facility Monitoring and Mitigation Plan (Plan) will be submitted to the Forest Service for review and approval not later than 12 months prior to scheduled undermining. The Plan will detail measures to be taken to monitor, repair and mitigate subsidence effects of the facilities during actual mining and for one year. | As parent lease for COC-67232 deals specifically with an irrigation ditch on that lease, use language from COC-1362 on both lease modifications. |
| Roadless | The permittee/lessee must comply with all the rules and regulations of the Secretary of Agriculture set forth at Title 36, Chapter II, of the Code of Federal Regulations | All or parts of the following lands encompassed in this lease are in the West Elk Inventoried Roadless Area and may be subject to restrictions on road-building | On the following lands within the Sunset Colorado Roadless Area, surface operations incident to underground coal mining are subject to regulations in 36 |

BLM ROD DOI-BLM-CO-S050-2016-0042-EIS

BLM_0075926

| Resource Area | Stipulations Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Stipulations Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Stipulations Specific to Lease Modifications |
|---|---|---|---|
| | governing the use and management of the National Forest System (NFS) when not inconsistent with the rights granted by the Secretary of Interior in the permit. The Secretary of Agriculture's rules and regulations must be complied with for (1) all use and occupancy of the NFS prior to approval of an exploration plan by the Secretary of the Interior, (2) uses of all existing improvements, such as forest development roads, within and outside the area permitted by the Secretary of the Interior, and (3) use and occupancy of the NFS not authorized by the permit/operation approved by the Secretary of the Interior.<br><br>Federal Coal Lease C-1362, as modified October 2001.<br><br>All or parts of the following lands encompassed in this lease are in the West Elk Inventoried Roadless Area and may be subject to restrictions on road-building pursuant to rules and regulations of the Secretary of Agriculture applicable at the time any roads may be proposed on the lease.<br><br>Legal descriptions are approximate. Locations of any proposed surface use would be verified for relationship to IRA boundaries using site-specific maps if/when surface operations are proposed. | pursuant to rules and regulations of the Secretary of Agriculture applicable at the time any roads may be proposed on the lease.<br><br>All or parts of the following lands encompassed in this lease are in the West Elk Inventoried Roadless Area and may be subject to restrictions on road-building pursuant to rules and regulations of the Secretary of Agriculture applicable at the time any roads may be proposed on the lease. | CFR 294, subpart D:<br>• All roads that may be constructed must be temporary.<br>• All temporary road construction must be consistent with applicable land management plan direction<br>• Road construction may only occur if motorized access has been deemed infeasible by the responsible official; unless a temporary road is needed to protect public health and safety in cases of an imminent threat of flood, fire or other catastrophic event that, without intervention, would cause the loss of life or property<br>• Temporary road construction must be completed in a manner that reduces effects on surface resources, and prevents unnecessary or unreasonable surface disturbance<br>• All temporary roads must be decommissioned and affected landscapes restored when it is determined that the road is no longer needed for the established purpose<br>• All temporary roads must prohibit public motorized vehicles (including off-highway vehicles) except:<br>  I. Where specifically used for the purpose for which the road was established; or<br>  II. Motor vehicle use that is specifically authorized under a Federal law or regulation.<br>For any linear construction zone (LCZ) over 50 inches wide used to install pipelines, the Regional Forester must determine that they are needed, and the responsible official must determine that motorized access without a linear |

8

BLM_0075927

| | | | |
|---|---|---|---|
| | | | over the long-term. Upon completion of the installation of a linear facility via the use of a linear construction zone, all areas of surface disturbance shall be reclaimed as prescribed in the authorization and the approved reclamation plan and may not be waived. |
| **Visuals** | n/a | n/a | Within the lease modification areas, the lessee will work with the District Ranger and his/her representative to see that all mine operations are situated on the ground in such a manner that reasonably minimizes impacts to the scenic integrity of that landscape as prescribed in the Forest Plan. |
| **Methane use** | n/a | n/a | If flaring or other combustion is prescribed as part of any future mitigation measure, lessee will be required to submit a fire prevention and protection plan subject to responsible Forest Service official for approval. |

9

BLM ROD DOI-BLM-CO-S050-2016-0042-EIS

BLM_0075928

**BLM-specific Lease Stipulations for Protection of Non-Mineral (Surface) Resources**

| Resource Area | Addendum Carried Forward from Parent Lease COC-1362 Specific to Forest Service Lands | Addendum Carried Forward from Parent Lease COC-67232 Specific to Forest Service Lands | Revised Addendum per BLM IM 2017-037 (January 20, 2017) |
|---|---|---|---|
| Methane Flaring, Capture/Use or other alternatives to venting | Sec. 3. Notwithstanding the language in Sec.2 of this lease and subject to the terms and conditions below, lessee is authorized to drill for, extract, remove, develop, produce and capture for use or sale any or all of the coal mine methane from the above described lands that it would otherwise be required to vent or discharge for safety purposes by applicable laws and regulations. For purposes of this lease, "coal mine methane" means any combustible gas located in, over, under, or adjacent to the coal resources subject to this lease, that will or may infiltrate underground mining operations.<br><br>Sec. 4. Notwithstanding any other provision of this lease, nothing herein shall, nor shall it be interpreted to, waive, alter or amend lessee's right to vent, discharge or otherwise dispose of coal mine methane as necessary for mine safety or to mine the coal deposits consistent with permitted underground mining operations and federal and state law and regulation. Lessee shall not be obligated or required to capture for use or sale coal mine methane that would otherwise be vented or discharged if the capture of coal mine methane, independent of activities related to mining coal, is not economically feasible or if the coal mine methane must be vented in order to abate the potential hazard to the health or safety of the coal miners or coal mining activities. In the event of a dispute between lessor and lessee as to the economic or other feasibility of capturing for use or sale the coal mine methane, lessor's remedy as a prevailing party shall be limited to recovery of the compensatory royalties on coal mine methane not captured for use or sale by lessee. Lessee shall have the right to continue all mining activities under the lease, including venting coal mine methane, pending resolution of any dispute regarding the application of the terms of Sections 3 and 4.<br><br>Sec. 2 (c) COAL MINE METHANE OPERATIONS AND ROYALTIES- Notwithstanding the language in Part II, Section 2 (a) of this lease, the royalty shall be 12.5 percent of the value of any coal mine methane that is captured for use or sale from this lease. For purposes of this lease, the term "capture for use or sale" shall not include and | Sec. 3. Notwithstanding the language in Sec.2 of this lease and subject to the terms and conditions below, lessee is authorized to drill for, extract, remove, develop, produce and capture for use or sale any or all of the coal mine methane from the above described lands that it would otherwise be required to vent or discharge for safety purposes by applicable laws and regulations. For purposes of this lease, "coal mine methane" means any combustible gas located in, over, under, or adjacent to the coal resources subject to this lease, that will or may infiltrate underground mining operations.<br><br>Sec. 4. Notwithstanding any other provision of this lease, nothing herein shall, nor shall it be interpreted to, waive, alter or amend lessee's right to vent, discharge or otherwise dispose of coal mine methane as necessary for mine safety or to mine the coal deposits consistent with permitted underground mining operations and federal and state law and regulation. Lessee shall not be obligated or required to capture for use or sale coal mine methane that would otherwise be vented or discharged if the capture of coal mine methane, independent of activities related to mining coal, is not economically feasible or if the coal mine methane must be vented in order to abate the potential hazard to the health or safety of the coal miners or coal mining activities. In the event of a dispute between lessor and lessee as to the economic or other feasibility of capturing for use or sale the coal mine methane, lessor's remedy as a prevailing party shall be limited to recovery of the compensatory royalties on coal mine methane not captured for use or sale by lessee. Lessee shall have the right to continue all mining activities under the lease, including venting coal mine methane, pending resolution of any dispute regarding the application of the terms of Sections 3 and 4.<br><br>Sec. 2 (c) COAL MINE METHANE OPERATIONS AND ROYALTIES- Notwithstanding the language in Part II, Section 2 (a) of this lease, the royalty shall be 12.5 percent of the value of any coal mine methane that is captured for use or sale from this lease. For purposes of this lease, the term "capture for use or sale" shall not include and | Section 3. Notwithstanding the language in Section 2 of the lease and subject to the terms and conditions below, lessee is authorized to drill for, extract, remove, develop, produce and capture for use or sale any or all of the waste mine methane for the above described lands that it would otherwise be required to vent or discharge for safety purposes by applicable laws and regulations. For purposes of this lease, "waste mine methane" means any combustible methane gas located in, over, under, or adjacent to the coal resources subject to this lease, that will or may infiltrate underground mining operations and that must be vented to protect the health and safety of the mine workers.<br><br>Section 4. Notwithstanding any other provision of this lease, nothing herein waives, alters, or amends lessee's right to vent, discharge or otherwise dispose of waste mine methane as necessary for mine safety or lessee's obligation to mine the coal deposits consistent with Federal and state law and regulation and with safety requirements contained in permits applicable to underground mining operations subject to this lease. Lessee is not obligated or required to capture for use or sale waste mine methane that would otherwise be vented or discharged if the capture of waste mine methane, independent of the activities related to mining coal, is not economically feasible, or if the waste mine methane must be vented in order to abate the potential hazard to the health or safety of the miners or mining activities. In the event of a dispute between the lessor and the lessee as to the economic or technical feasibility of capturing the waste mine methane for use or sale, lessor's remedy as a prevailing party is limited to recovery of compensatory royalties on the waste mine methane not captured for use or sale by the lessee. Lessee retains the right to continue all mining activities under the lease, including venting waste mine methane, pending resolution of any dispute regarding the application of the terms of Sections 3 and 4.<br><br>PART II. TERMS AND CONDITIONS (c) WASTE MINE METHANE OPERATIONS AND ROYALTY – Notwithstanding the language in Part II, Sec.2(a) of this lease, the |

BLM ROD DOI-BLM-CO-S050-2016-0042-EIS

BLM_0075929

| | | |
|---|---|---|
| the royalty shall not apply to coal mine methane that is vented or discharged and not captured for the economic or safety reasons described in Part I, Section 4 of this lease. Lessee shall have no obligation to pay royalties on any coal mine methane that is used on or for the benefit of mineral extraction at the West Elk coal mine. When not inconsistent with any express provision of this lease, the lease is subject to all rules and regulations related to Federal gas royalty collection in Title 30 of the Code of Federal Regulations now or hereinafter in effect and lessor's rules and regulations related to applicable reporting and gas measurement now or hereinafter in effect.

SEVERABILITY- In the event any provision of this addendum is subject to a legal challenge or is held to be invalid, unenforceable or illegal in any respect, the validity, legality and enforceability of this lease will not in any way be affected or impaired thereby and lessee will retain, in accordance with the terms of this lease, the exclusive right and privilege to drill for, mine, extract, remove or otherwise process and dispose of the coal deposits ,upon, or under the lands described in this lease, including the right to vent or discharge coal mine methane for safety purposed as required by applicable laws and regulation. | the royalty shall not apply to coal mine methane that is vented or discharged and not captured for the economic or safety reasons described in Part I, Section 4 of this lease. Lessee shall have no obligation to pay royalties on any coal mine methane that is used on or for the benefit of mineral extraction at the West Elk coal mine. When not inconsistent with any express provision of this lease, the lease is subject to all rules and regulations related to Federal gas royalty collection in Title 30 of the Code of Federal Regulations now or hereinafter in effect and lessor's rules and regulations related to applicable reporting and gas measurement now or hereinafter in effect.

SEVERABILITY- In the event any provision of this addendum is subject to a legal challenge or is held to be invalid, unenforceable or illegal in any respect, the validity, legality and enforceability of this lease will not in any way be affected or impaired thereby and lessee will retain, in accordance with the terms of this lease, the exclusive right and privilege to drill for, mine, extract, remove or otherwise process and dispose of the coal deposits ,upon, or under the lands described in this lease, including the right to vent or discharge coal mine methane for safety purposed as required by applicable laws and regulation. | royalty will be 12.5 percent of the value of any waste mine methane that is captured for use or sale from this lease. For purposes of this lease, the term "capture for use or sale" does not include, and the royalty will not apply to, waste mine methane that is vented, or otherwise discharged and not captured, for the economic feasibility or safety reasons described in Part I, Section 4 of this lease. Lessee will have no obligation to pay royalties on any waste mine methane that is used on or for the benefit of mineral extraction at the (insert mine name here) coal mine. When not inconsistent with any express provision of this lease, this lease is subject to all the rules and regulations related to Federal gas royalty collection in Title 30 of the Code of Federal Regulations now or hereinafter in effect and the lessor's rules, regulations, notices, and orders related to applicable reporting and gas measurement now or hereinafter in effect.

SEVERABILITY – In the event any provision of this addendum is subject to a legal challenge or is held to be invalid, unenforceable, or illegal in any respect, the validity, legality, and enforceability of this lease will not in any way be affected or impaired thereby and lessee will retain, in accordance with the terms of this lease, the exclusive right and privilege to drill for, mine, extract, remove, or otherwise process and dispose of the coal deposits in, upon, or under the lands described in this lease, including the right to vent or otherwise discharge waste mine methane for safety purposes as required by applicable laws and regulations. |

11

Desert Weyr, LLC
16870 Garvin Mesa Rd
Paonia, CO 81428
28 October 2016

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

Please fully consider the issues raised in these comments on the Uncompahgre Field Office draft Resource Management Plan. As presented, none of the alternatives offer the level of protection these lands warrant, that communities and the public in your planning area have specifically asked for and favored, and which federal law requires.

Desert Weyr, LLC is a small farm located in Paonia Colorado. We own the second largest flock of Black Welsh Mountain Sheep in North America and are a cooperating researcher with the US Department of Agriculture, National Animal Germplasm Program conducting basic research into sheep reproduction.

The RMP does not provide a full look into all the issues related to extensive oil and gas development in the area.

We have a number of specific concerns.

The first issue is that the North Fork Alternative should be included as an option in every proposed version. The North Fork Alternative, B1 was hammered out by the communities after a long and arduous process. It provides the minimum level of protection we need for our critical farming lands in the North Fork valley and must be included in every proposed alternative. Only with it included can we make a fair comparison of all the various alternatives.

The RMP does not include a no leasing option. That option would provide the highest protection for our irreplaceable views, clean air and water and new economy and must be included for the BLM to comply with it's hard look requirements at alternatives. No leasing is a reasonable alternative given the geologic, environmental and economic problems with any oil and gas development.

Within the preferred alternative D the BLM is proposing to open to oil and gas drilling over 90% of the public lands. However in the Reasonable Foreseeable Development Final Report the BLM failed to take into account the changes in hydraulic fracturing and multi-drilling technology. The report is based on analysis done in 2004, over 12 years ago. The technology has changed so dramatically and there are so many more reports of earthquakes and other harms that the BLM must look more closely as the current state of the science regarding potential harms. As shown in Oklahoma there can be no mitigation from the geologic risks and that alone is a reason to prefer a no leasing alternative.

Another issue is that all the rural gas gathering pipelines are not required to have any inspection and they are at risk of leaks and ruptures that could destroy critical wildlife habitat as well as contaminate the air and

water that is the lifeblood of our agriculture economy. The developments will crisscross critical wildlife habitat, irrigation systems and geologically active slide and steep slope areas. None of these issues were properly addressed in the RMP. Even with Colorado's strict guidelines on reporting surface spills and contamination the network of irrigation systems means that any spill could destroy a ditch company and send polluted water down onto organic and conventional croplands long before anyone has a chance to turn off the headgates or perform required clean-up operations. In our case our Terror Ditch Company water system consists of many miles of ditches and gathering areas in steep terrain that would be severely compromised by even the simplest of surface spills.

We have significant concerns about potential contamination of our water resources.

Even if drilling and fracking can be performed without any risk of contamination the potential for surface contamination and spills from even the best managed drilling will cause irreparable harm to the waters of the valley. Within the last 3 years Garvin Mesa has experienced 3 separate "50 Year" storms that sent water down stream overflowing all the ditches and culverts. This water spread out over the Garvin Mesa irrigated lands. These events would have completely overwhelmed any settling ponds and sent the pollution from those ponds directly into our fields. Once contaminated the effect is permanent. There can be no mitigation from the effects of the air and water pollution from these events. The only reasonable course is to totally prevent any drilling at all anywhere within the North Fork valley.

As documented as far back as 1992 surface contamination of drinking water can cause death in livestock. The article "Toxicosis in Sheep Following Ingestion of Natural Gas Condensate" R. Adler, H. J. Boermans, J. E. Moulton and D. A. Moore published in Veterinary Pathology 1992 29: 11 DOI: 10.1177/030098589202900102 describes the loss of 30 ewes who had a single day exposure to contaminates from gas drilling. These sheep died even though they had access to fresh drinking water.

Many of the areas proposed for development in the preferred alternative are adjacent to Garvin Mesa or are within the watershed for the Terror Ditch and Reservoir Company irrigation system. Desert Weyr, LLC depends on this water to provide irrigation water for the pastures and orchard and to provide drinking water for our livestock. The risk of a catastrophic contamination of our ditch system puts our rare breed sheep at risk. There is no compensation or mitigation that can cover the loss of the critical genetic diversity that our flock represents.

The RMP also fails to protect the water supplies of the local towns and small water companies.

We have significant concerns about the removal of water from our local environment. Contaminated drilling fluids are proposed to be pumped back into the ground and all drilling removes some water from the hydrological cycle. There was no discussion of the potential impacts to irrigation and weather system by the removal of that water and the destruction of clean water. Even closed loop systems use good water. In our desert environment with drought a constant threat it is irresponsible for he BLM to ignore the impacts of water removal on the local environment.

We have major concerns about air pollution.

The RMP does not take into account the increased haze and dust from the miles of surface roads that would be required to develop in the area. With the Black Canyon nearby as well as other Wilderness areas any loss of visibility and clear air impacts the recreational and view shed areas.

BLM_0075931

Cornell University published their findings from a study of the impacts of gas drilling on food animals. "Impacts of gas drilling on human and animal health." Bamberger M, Oswald RE Department of Molecular Medicine, Cornell University, Ithaca, NY 14853, USA. Because animals often are exposed continually to air, soil, and groundwater and have more frequent reproductive cycles, animals can be used as sentinels to monitor impacts to human health. The findings illustrate which aspects of the drilling process may lead to health problems. Complete evidence regarding health impacts of gas drilling cannot be obtained due to incomplete testing and disclosure of chemicals, and nondisclosure agreements. Without disclosure of everything used in the drilling process it is impossible to effectively test the environment for contaminants.

Yet another scientific paper, "An Exploratory Study of Air Quality near Natural Gas Operations" by Theo Colborn, Kim Schultz, Lucille Herrick, and Carol Kwiatkowski has been peer reviewed and accepted for publication by Human and Ecological Risk Assessment. This research looked at the air pollution from even a totally closed loop drilling and fracking procedure. Closed loop is being touted by the industry as a way to eliminate the risks from air pollution but this research indicates that it is ineffective at reducing exposures to the endocrine disrupting chemicals that affect reproduction.

Our flock is over 10% of the entire North American population of Black Welsh Mountain sheep but is responsible for over 30% of the breeding population. The loss of any animals from this flock in the event of a single exposure to toxic chemicals from gas drilling would represent a significant threat to the continued genetic diversity of the entire North American population.

The National Oceanic and Atmospheric Administration has been conducting studies in oil and gas fields across the nation. They are finding huge increases in ozone near oil and gas wells. http://www.esrl.noaa.gov/news/2009/winter_ozone.html A recent study of the Denver-Julesburg Basin in northeastern Colorado by the National Oceanic and Atmospheric Administration found elevated levels of methane coming from well sites. NOAA scientists say initial results from another study show high concentrations of butane, ethane and propane in Erie, east of Boulder, where hundreds of natural-gas wells are operating. These airborne contaminants would cause permanent harm to the reproductive capacity of our sheep flock. These risk have not be discussed in the RMP. There is no way to mitigate the problems posed by this activity.

We are in year twelve of a major research project in cooperation with the USDA. Our research focuses on reproduction in sheep. The known problems from air and water pollution and their effect on the reproductive systems of our sheep would render them useless for the research if there is any drilling activity within the valley. At Desert Weyr, LLC we have had a weather station in operation for over 15 years. Our data show a constant wind flow that moves up and down the valley. Any contaminants anywhere in the valley will find their way to our farm and impact our sheep flock.

Within the RMP the BLM did not even consider that their own models show that ozone levels have exceeded EPA guidelines. Thus any increase due to development is foolhardy.

As part of the Garvin Mesa Wine Loop we give farm tours all summer in cooperation with local wineries. This food and drink based tourism is a major portion of our business. The visual impacts from the drilling rigs, lights, dust and increased traffic would make our area undesirable for these tourists. Our customers come to the valley to enjoy the scenery, clean air and ready access to local public lands for hunting, fishing,

BLM_0075932

mountain biking, hiking to name a few uses. These uses are incompatible with oil and gas development.

The BLM also ignored the impact that additional oil and gas development would have on our ability to counteract climate change. The BLM should only propose alternative that fully comply with federal rules regarding reducing carbon emissions.  We need to move beyond fossil fuels and cannot support this type of development in our critical food shed.  It is inconceivable that the BLM did not provide a no leasing option to provide the highest protection for our irreplaceable views, clean air and water and new economy.

We have concerns about the visual and scenic values.

While within the RMP many areas were considered important scenic vistas there was insufficient analysis of how the scenic views from private lands on the mesas in the North Fork valley affect the economics of the wineries, agri-tourism and recreational users who are becoming the primary economic drivers in the valley. The increase in broadband internet capability in Paonia has fostered a number of new businesses moving in. These businesses are comprised of people who can live anywhere in the world they choose to as long as there is internet. They have come to the North Fork for our good food, clean air, and water and recreational opportunities. The RMP did not take into account the impact that development of oil and gas would have on the perception os the people who are coming in to replace the lost coal mining jobs.

Desert Weyr, LLC also provides meat to local restaurants and consumers through our on-farm retail store. Our customers depend on additive free meat from our pasture finished flock. Any perceived contamination will negatively impact our business.

According to the BLM: "It is the mission of the Bureau of Land Management (BLM), an agency of the Department of the Interior, to manage BLM-administered lands and resources in a manner that best serves the needs of the American people. Management is based upon the principles of multiple use and sustained yield, taking into account the long-term needs of future generations for renewable and nonrenewable resources."

The proposed alternative violates the mission statement of the BLM because it does not administer the lands to serve the needs of the American people and it does not take into account the long term needs of future generations. By definition all oil and gas development cannot be sustained. Once the resource is removed from the ground it is gone. The surface impacts from such development will adversely impact the other uses of the land. This violates the BLM mandate for sustained yield.

Specifically the preferred alternative D ignores a number of recent scientific studies and does not take into account the rapidly changing economics of our valley. Nowhere in the RMP is there any discussion of the number of organic farms and the risks that any development pose to this growing source of local income. The North Fork is home to Colorado's largest concentration of organic farms and any perceived or real contamination of those farms through even the best managed oil and gas extraction will devastate an economy already hit hard by the loss of coal mining jobs.

Our farm depends on tourism to sell our products. Visitors have already expressed dismay that there might be any oil and gas drilling. We have been unable to sell our breeding rams to people who are concerned about the existing gas development up the Muddy and the risks of reproductive harm due to the VOCs that drift in the winds that bathe our mesa daily. To expand this to include oil and gas development as far as the eye can see will effectively destroy our entire business.

The RMP did provide for the Jumbo Mountain special area for mountain biking. We agree that this special designation is critical to our Paonia economic health. There are a number of new businesses focused on supporting biking and the draw of the Jumbo Mountain trails has helped. In addition many of the newer high-tech businesses are drawing in employees who like to take advantage of the hiking and biking trails and we need to continue to provide the great experiences they crave.

We also support increased restrictions on general target shooting as described in alternative B while still providing many opportunities to enjoy shooting sports.

Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan would be carried out if included in the preferred alternative, the draft RMP fails to fulfill it's duty to consider the full range of reasonable management possibilities.

We are disappointed that in spite of overwhelming community opposition to oil and gas development the BLM charged ahead with a plan that destroys all that we have worked for in this community. The preferred alternative should have been the middle road that the community hashed out over many months, i.e. the North Fork Alternative and not kowtowing to the industry and going full bore into an extraction economy that will kill our existing businesses.

We expect that the final RMP will address these concerns and provide strict protection for our farms and businesses.

Sincerely,

Eugenie M. McGuire

Kenyon E. McGuire

Tracy E. McCurdy
324 Orchard Ave.
P.O. Box 1670
Paonia, CO 81428

11/01/2016

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

I am writing this letter to comment on the Draft Resource Management Plan for the Uncompahgre Field Office. I have lived in Colorado's North Fork Valley for 16 years, and am currently a resident of Paonia, Colorado. I own my home at 324 Orchard Avenue, a 5-minute bike ride from the BLM lands that include Jumbo Mountain. I am a member of the North Fork Trail Advocacy Group (NFTAG), which is part of the Delta Area Mountain Biking (DAMB) chapter of Colorado Plateau Mountain Bike Trails Association (COPMOBA). I am also a board member of the Western Slope Conservation Center (WSCC). DAMB and WSCC have submitted their own highly substantive comments, which I support fully.

I support the protections outlined in the North Fork Alternative, included in the draft RMP as Alternative B1, because it is the only alternative in the draft plan that provides the level and type of protections needed for North Fork public lands. In addition, I specifically support designating Jumbo Mountain as a Special Recreation Management Area (SRMA), which is needed to properly manage and capitalize on our unique recreational opportunities here in the North Fork Valley.

For several years, I have enjoyed riding my bike on the trails of Jumbo Mountain. Through this ability to find outdoor recreation so close to me, I gain unquantifiable mental and physical health benefits. My work is sedentary (I work remotely from home as part of a software development company), so physical activity is particularly important for my health as a 52-year-old woman. Being so close to Jumbo Mountain's BLM lands, I have daily access to biking single track trails, a physically demanding sport that helps keep me fit and mentally alert and brings me personal fulfillment. While on the Jumbo trails, I see people of all ages walking their dogs; riding horses; exploring with their children or students; running and hiking; photographing, drawing and painting; and soaking up beautiful views of the mesas and the valley surrounding the town of Paonia. Uninterrupted views of distant mountain vistas and nearby family farms, productive orchards, and world-class vineyards. Views that would be severely compromised by the intrusion of oil and gas development in these areas.

Based on the unique characteristics of Jumbo Mountain, these lands should be preserved for locals and tourists, yet outside of Alternative B1, the draft RMP leaves nearly the entire Jumbo Mountain area and surrounding lands open for oil and gas development. This is not acceptable, responsible management of these lands. Please recognize the current use and future potential use for Jumbo Mountain and surrounding lands as recreational by adopting Alternative B1 and designating Jumbo Mountain as a SRMA.

Our trails have important potential to bring significant economic benefits for the North Fork Valley that cannot be ignored. This past October 22, Paonia had our 7th annual "Gears and Beers" festival, which has its basis in mountain biking and road riding throughout our clean, scenic area, followed by enjoying local foods and refreshments. This year, the event was very successful and had high attendance from both locals and visitors, and I met several groups of riders who had travelled from neighboring areas, such as Grand Junction and Aspen.

BLM_0075935

Mountain biking and other forms of outdoor recreation provide a growing economic opportunity in the North Fork, with these industries bringing millions of dollars to communities in Colorado. We are just beginning to realize the economic benefits that mountain biking can bring to our valley, and DAMB/NFTAG as part of the greater organization of COPMOBA seek the support of the BLM to realize this potential, as the BLM has done successfully for other areas on the Western Slope of Colorado.

With the involvement and support of the BLM, cycling-related revenue has grown to contribute approximately $1.5 million annually to the once-depressed economy of Fruita, Colorado, with significant increases in sales tax revenue, particularly coming from restaurants. For more on this success story, please see http://www.steamboattoday.com/news/2013/may/19/biking-series-part-2-how-fruita-did-it. More supporting evidence of the benefits of cycling on boosting economic growth can be found at: http://www.americantrails.org/resources/economics/economic-benefits-trails-macdonald.html http://www.pinkbike.com/news/economic-impacts-of-mountain-biking-tourism-2014.html, http://www.pinkbike.com/news/economic-impacts-of-mountain-bike-tourism-2016-update.html http://headwaterseconomics.org/trail/13-coldwater-mountain-bike-trail

While oil and gas development may benefit a small number of people in our community on a short-term basis, recreationally based tourism is sustainable and will benefit nearly everyone in the North Fork Valley either directly or indirectly: farmers, restaurants, shops, and those they employ. In the past several years, I've seen our tourism growing rapidly, as people from across the Western Slope and the Front Range of Colorado and from neighboring states learn of the beauty and healthy lifestyle our valley has to offer.

For example, an annual Cider Fest event at Delicious Orchards in Paonia has been more than doubling in popularity for the past 4 years, attracting hundreds of people, with many coming from other areas of Colorado and out of state. I've seen Delicious Orchards' overall success as an organic farm and store grow immensely over the past few years. Since opening 8 years ago, Revolution Brewing, Paonia's microbrewery, has regularly had to increase its brewing and tasting room capacity to meet the growing demand from locals and visitors. The brewery's tasting room is literally overflowing during high tourism months.

There are many interrelated reasons people visit and live in the North Fork Valley, all adversely affected by oil and gas development. We have a different type of development that is working for us and must be developed further for our economy to grow and thrive: we have developed a solid reputation for our high-quality organic foods, clean air and water, and pristine, scenic lands. The North Fork Valley is a place where people go to relax on vacation and a place where people relocate based on the high quality of life that our natural resources allow us.

Those views from Jumbo Mountain of family farms, orchards, and vineyards are not only pretty. These agricultural lands sustain and contribute to local wineries, produce sheds, farm-to-table restaurants, local organic groceries, and many other businesses. Our businesses and resulting jobs are benefitting from a growing demand for organic and local foods and agricultural tourism. This trickles down to the rest of our community that relies on that healthy food, and expands to consumers outside of the Western Slope, such as Glenwood Springs, Aspen, Denver, and beyond. Businesses and jobs will suffer from any development of the North Fork Valley lands that threatens even the *perception* of the quality of our water and air, because this perception is directly tied to the perception of quality of our agricultural products.

The final RMP must protect the idyllic character and scenic beauty of the North Fork Valley, which is home to the West Elk Wine region and has been called Colorado's Farm-to-Table Capital. That character would be jeopardized by oil and gas activity. Alternative B1 requires development setbacks from agricultural lands, prevents damage to visual qualities, and best preserves the current rural character of the valley.

As a home owner, I've been seeing a gradual recovery of home sales as our recreational and agricultural tourism economy continues to grow and our area recovers from nation-wide recession and a local reduction in coal mining. Just in the past few months, homes on my street have sold to both local and out-of-state buyers for prices

that have increased dramatically from when I bought my home 6 years ago—a time during which home owners were more likely to be forced to foreclose on their homes than sell them. I bought my own home on a short sale, as the previous owner was defaulting on his mortgage and facing foreclosure. Now, local home buyers are staying and buyers from other areas are relocating to the North Fork Valley for our rural, non-industrial, agricultural lifestyle, strong community, and viable economy.

Speculative oil and gas leasing will drive prices and number of prospective buyers down, *harming my investment in my property*. The final RMP must protect our real estate investments here in the North Fork Valley, which are closely tied to the quality of life our valley has to offer.

I'm particularly concerned that Alternative D is the BLM's "Preferred Alternative," because this does not represent how North Fork Valley citizens want our lands to be managed. Alternative D would open over 90 percent of the Uncompahgre area to oil and gas leasing, endangering watersheds, wilderness-quality lands, wildlife, recreation and cultural sites. Much of the area doesn't even have oil and gas reserves that are feasible for development, meaning the BLM is putting our public lands at risk for speculative leasing, which in itself can harm the attractiveness of our area's organic farming and peaceful, rural way of life that currently infuses our economy with tourism and new residents.

To summarize, I implore the BLM to listen to the local communities of Crawford, Hotchkiss and Paonia and adopt the North Fork Citizens' Alternative B1 in the final UFO RMP. This locally driven proposal protects the Gunnison Watershed, which in turn supports the sustainable rural economy of the North Fork Valley and all of Colorado's Western Slope. The North Fork Alternative B1 provides protection from oil and gas development for streams and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo Mountain area. These protections must be included in the final plan.


Sincerely,
Tracy E. McCurdy

BLM_0075937

PRMP-1-515601, Letter #4

The proposed Alternative E has been presented as a hybrid of other alternatives, but it varies greatly from previously reviewed alternatives and is in fact a new plan. As such, it has not been subject to previous review. I want to express my disappointment that the BLM would use a deceitful and questionably legal process to aggressively pursue a change in direction for the management of these lands.

Although residents like myself, benefit from living and owning a home near the BLM lands, it is also true that this requires us to interface with the federal government on issues that in other communities are handled by local governments. Would a typical US community allow exploration and extraction in close proximity to the community water supply &ndash; no, only in areas where there are few people and few voices to speak out about concerns and undue risks.

I object to the late introduction of a highly exploitive Alternative E for the BLM RMP. I, like many others here, am hopeful that this community will have a cherished place in the recreation industry in Colorado in the future. Using the lands for recreation versus extraction can also provide economic benefits in a sustainable manor. Please stop this plan that has not been legitimately subjected to public review. We need to continue to use good processes that assure all public interests can be evaluated openly and publicly by all the stakeholders.

Thank you for favorable consideration of this protest to stop Alternative E, which undermines the normal review processes.

Charles L Zick, P.E.

42102 Foothills Road

Paonia, CO 81428

Letter #3

Submission ID PRMP-1-515604

Adopting a wholly new alternative at this stage is unacceptable, and a violation of the National Enviromental Policy Act (NEPA). The public has not had a meaningful opportunity to comment on this brand new proposal.   The BLM cannot adopt an alternative the public has not been able to provide comments on.


   I have just moved into Delta County two years ago, and trying to read this 3000 page proposed RMP from scratch - considering none of the previous Alternatives were selected - is not acceptable.


   The Proposed RMP downplays public health risks, and ignores significant evidence that has been provided that shows increased oil and gas development can hae serious adverse impacts on public health.


I respectfully protest teh Proposed RMP.


Michael Burkley

42232 Lamborn Mesa Rd

Paonia, CO  81428

614-634-3656

BLM_0075939

To: Jamie Connell, BLM State Director
From:
RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office
Date: July 19, 2019

Dear Director Connell,

As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP
(comments dated: Oct 2018), I respectfully submit the following protest. My contact information is:
Cedar Keshet, 40423 Cedar Lane, Paonia, CO 81428 notjuniper@gmail.com 9702610834


My protest addresses the following issues that I have raised in my previous comments:
This proposed Final RMP does not reflect our community's input, and that presenting an entirely
new alternative without public comment is a violation of federal law. Shame on you, the BLM for
releasing a 3000-page document which clearly does not reflect the majority of public comments
provided by the public, and state and local governments over the last ten years.
Alternative E
o Adopting a wholly new alternative at this stage is unacceptable,
and a violation of the National Environmental Policy Act (NEPA). The public has not had a
meaningful opportunity to comment on this proposal.
o The BLM cannot adopt an alternative the public has not been able to provide comments on.
• Issues from CHC Form Comment in 2016:
o Impact on unique NFV characteristics – organic ag, gold medal
fishing, viticulture, orchards, big game hunting, outdoor recreation o "no-leasing" alternative is
reasonable and must be considered
o Cumulative impacts of unregulated gas gathering lines
o Impacts of extreme weather, flooding, landslides, and geological instability
o Impact of permanently withdrawing water from hydrological cycle o Impact on public health and
safety
o Ozone levels already exceeding EPA thresholds in specific areas
o Impact on community source-water protections
o Impact of oil and gas development causing air and water pollution, and the impact of that on
wildlife resources.
o The proposed alternative is an inappropriate use of public lands, and prioritizes oil and gas
development over all other uses
o The potential for human, animal, and environmental damage is too high
o The proposed alternative with contribute to increased greenhouse gas emissions, and could
exacerbate climate change
• General Issues
o Infrastructure impacts
o Air and water quality
o Health risks
o Wildlife resources
o Recreation Management Areas

Those issues are addressed in the following sections of the RMP:
Alternative E in its entirety
  • Section 3.4.2 Public Health & Safety

- Section 4.3.1 Air Quality & Climate
- Section 4.3.2 Soils & Geology
- Section 4.3.5 Water Resources
- Section 4.4.3 Fish & Wildlife

I believe the BLM has erred in adopting the Proposed RMP for the following reasons:
Alternative E was improperly adopted and was not subject to public comments.

The Proposed RMP downplays public health risks, and ignores significant evidence we have provided that shows increased oil and gas development can have serious adverse impacts on public health.

The Proposed RMP drastically decreases the stipulations in Alternative B1 and even the Preferred Alternative D that were designed to protect resources of value from oil and gas development. It increases lands available for oil & gas lease with 'standard stipulations' - from 0% to 12%. It drastically decreases the amount of land with No Surface Occupancy (NSO) from 26% to 11% compared to Preferred Alternative D.
The Proposed RMP reduces setbacks from water supplies, waterways, areas with highly erodible and saline soils. It allows oil & gas surface use on lands with steep slopes greater than 40 percent. It weakens CSU stipulations & reduces Timing Limitations near critical wildlife habitat
The Proposed RMP eliminates Ecological Emphasis Areas entirely, reduces Areas of Critical Environmental Concern, and significantly weakens the proposed protections for the Jumbo Mountain Special Recreation Management Area, and does not include any "No Surface Occupancy" stipulations in that area, effectively opening Jumbo Mountain to oil and gas development.
The Proposed RMP opened more of the federal mineral estate to oil and gas development without giving adequate consideration to the impact this will have on infrastructure maintained by the State and other local governments.
The Proposed RMP anticipates over 1,000 new hydraulically fractured wells in the UFO, yet does not address the Programmatic Biological Opinion from the US Fish and Wildlife Service that caps surface water withdrawals on the North Fork of the Gunnison River at ~600 acre-feet per year for energy development purposes. Current oil and gas development in the area is already pushing that threshold. The BLM has failed to acknowledge that there is simply not enough water in the North Fork to sustain the level of oil and gas development anticipated in the Proposed RMP.

For those reasons, I respectfully protest the Proposed RMP, and the sections I have outlined above.

Sincerely,

_____Date:

PRMP-1-500000203

A protest process disallowing interested parties that have not previously protested is preposterous.  I along with many interested (and directly affected) parties insist you proceed with a public comment period.   Your brazen attempt to silence affected parties by circumventing your own rules is incredibly disheartening.

David Livingston

| PRMP-1-500000203 | | Mr. David Livingston | | 12347 3600 Rd | | Hotchkiss |
| | Colorado | 81419 | United States | 970-765-0475 | davidrlivingston@gmail.com | |

BLM_0075942

RECEIVED

JUL 1 9 2019

UNCOMPAHGRE FIELD OFFICE

Dear Greg Larsen

**Re: BLM Uncompahgre Field Office Final Resource Management Plan/ FEIS Inconsistent with North Fork Valley and Colorado Vision for the Future**

I am writing to you today to thank you for standing up for the North Fork Valley over the years and to once again ask for your help regarding the Bureau of Land Management's Final Proposed Uncompahgre Resource Management Plan (RMP). As you know, the North Fork Valley is a leader in renewable energy, small scale, resilient, organic and sustainable agriculture, and outdoor recreation. It continues its transition away from an economy dependent on coal extraction and is a thriving rural economy that has become a model for other communities. We have also witnessed how vulnerable it is to climate change, and how we are ground zero for drought contingency planning in an aridifying west.

As such, the North Fork Valley is also leading the way in consistency with and achieving state policies and goals:
- HB 1261, which sets 5, 10, and 20 year targets to aggressively reduce greenhouse gas emissions from all sources;
- SB 181 which prioritizes the protection of public health, safety, welfare, the environment and wildlife, over oil and gas development;
- Colorado's Water Plan which ensures continued viability of irrigated agriculture; and
- Colorado's interest in maintaining a diverse, sustainable, and resilient economy.

Unfortunately, the Bureau of Land Management has a different view of the North Fork Valley. It sees the North Fork Valley as resources to extract; not as resources and values worth protecting. The BLM's Final Proposed RMP opens 95% of the federal mineral estate to oil and gas leasing, while eliminating stipulations intended to mitigate impacts and protect other valuable resources. The RMP is antithetical to State policies, including new state laws that you worked so hard get passed this year, that are intended to ensure Colorado remains the beautiful, great state that it is, and a magnet for attracting extraordinary talent.

Federal Land Policy and Management Act (FLPMA) regulations require that "resource management plans and amendments to management framework plans shall be consistent with officially approved or adopted resource related plans, and the policies and programs contained therein, of other Federal agencies, State and local governments and Indian tribes..." and affords governors "60 days in which to identify inconsistencies and provide recommendations in writing to the State Director." 43 CFR § 1610.3-2. The Governor has 60 days from June 28th to conduct his consistency review.

The RMP is the first RMP post enactment of the landmark bills HB 1261 and SB 181. It is critically important that this RMP does not serve to circumvent the will of the legislature, nor the will of the people to put people, the environment and climate first!

By signing this comment letter you authorize the public distribution of your name and contact information for the

BLM_0075943

A thorough review of the RMP demonstrates that this RMP proposes unsafe and environmentally unsound oil and gas activity in the 2nd most geologically unstable corridor in the state. You will also find that this RMP is not only inconsistent with Colorado laws and regulations, but that it will serve to derail Colorado policies at a time when we simply do not have time to waste or gamble with our future. The BLM has ignored over 42,000 public comments, failed to address deficiencies in BLM environmental review identified in the 2016 draft or recommendations made by you, state and local governments, and the environmental community to protect the irreplaceable ecosystem present in the North Fork Valley.

I respectfully request that you send a letter to the BLM expressing your concern for an RMP that appears to circumvent Colorado's right to protect its citizens and climate, and that you ask the Governor to conduct a consistency review of the RMP, and upon determination of inconsistencies with Colorado laws, regulations or policies, that the BLM revise the RMP to be consistent with our laws and policies and vision for the future.

In addition, I would like to add that the BLM submitted an entirely new Alternative E, that was not the subject of public comment as its preferred alternative and final proposed RMP. This is in violation of federal environmental law.

I am: [Please check all that apply]

- ☐ An organic farmer
- ☐ A conventional farmer
- ☐ A rancher
- ☑ A resident of the NFV
- ☐ A consumer of NFV/Delta County produce and meat and poultry

- ☐ A Republican
- ☑ A Democrat
- ☐ An Independent
- ☑ A homeowner
- ☐ A food business owner
- ☐ A scientist/geologist
- ☐ A realtor

- ☐ A hotel/recreation business owner
- ☐ A tourist/Visitor to Delta County/NFV
- ☑ Interested/impacted citizen
- ☐ Other

Additional Comments: As a resident of Paonia, Co in the North Fork Valley, I would like to voice my concerns and am urging a withdrawal and reconsideration of the BLM Uncompahgre Field Office Final Resource Management Plan. The North Fork Valley communities and much of Colorado's western slope. Concerns include potential health impacts (water quality). The North Fork Valley would be impacted as well on revenue sources such as hunting, fishing, recreation, agritourism, traffic increases, air quality, and potential natural disasters arising from allowing the proposed BLM RMP to be placed into law. Thank you for your consideration and for being aware of the harm that may be done to the North Fork Valley here in Delta County, Colorado.

Signed,

Print Name: James Matusoff

Date: 7-17-19

Signature: James Matusoff

Email Address: jmatusoff@gmail.com

Street Address, City, State, Zip code: 13452 Dry Gulch Rd, Paonia, Co 81428

By signing this comment letter you authorize the public distribution of your name and contact information for the

Beast & Bottle • Coperta • Bosq • Caribou Club
Crested Butte's Personal Chefs • Ela Family Farms • Mountain Oven Potager •
Sunflower • Soupcon • The Slogar • The Butcher's Block
The Populist • The Stowaway • The Surf Hotel
Valley Organic Growers Association • Thistle Whistle Farm
Victoria & Co. • Wildflower Sweets

July 15, 2018

RECEIVED

JUL 1 9 2019

UNCOMPAHGRE FIELD OFFICE

Senator Michael Bennet
261 Russell Senate Office Building
Washington, DC 20510

Senator Cory Gardner
354 Russell Senate Office Building
Washington, DC 20510

Re: Protecting Sustainable Businesses on the West Slope

Dear Senators Bennet and Gardner,

We are writing to express our strong opposition to the Bureau of Land Management's plan to open public lands in Colorado's North Fork Valley for gas and oil extraction as part the agency's revised Uncompahgre Resource Management Plan that covers Colorado's Western Slope. We are asking for your help to block this plan.

As chefs, restaurant owners and growers in Colorado, our businesses depend on clean water, air and soil. We rely on the award-winning wines, fruits and vegetables grown in the North Fork Valley and it's been thrilling to see the region grow into a world-class hub for organic produce and wineries.

Our businesses are growing, too. Our customers depend on us to provide fresh, high-quality food and we wouldn't offer them anything less.

Regrettably, the BLM has rejected alternatives to eliminate or limit new gas and oil leasing, choosing instead to open more than 870,000 acres of public lands and minerals to leasing across the Western Slope. Nearby oil and gas leasing followed by subsequent drilling and fracking, as the BLM has proposed for the North Fork Valley, is a direct assault on our businesses, our patrons and our close-knit communities. The farmers and vintners we rely on to supply our restaurants and markets are downstream from the public land that the BLM has proposed for gas and oil extraction. This threatens to contaminate the region's water, air and soil. That's a risk we simply cannot afford.

The North Fork Valley is truly a success story, riding out the waves of boom-and-bust economies reliant on mining and drilling industries to transform into a clean, sustainable economy. The area is attracting new businesses and tourism and creating a new generation of community leaders. In Delta County alone, **1,250 farms** generate more than **$55 million** a year in direct sales, while wineries bring in another

1

**$10 million**. The economic impact from recreation and outdoor industries is a conservative **$36 million** a year.

The Valley's future depends on smart land management and innovative policymakers willing to take the long view rather than rely on promises of short-term benefits. Just one drilling spill could wipe out much of what the North Fork Valley businesses have worked so hard to build. This region has the highest concentration of organic farms in Colorado. Our communities want to pursue a sustainable path for our future, not a path that is rooted in the past.

We strongly support a recommendation for **no new leasing**. We urge you to oppose new leasing in these important agricultural communities and to tell the Interior Department and Bureau of Land Management that more gas and oil development jeopardizes the strong, growing and sustainable economy of the North Fork Valley.

We look forward to hearing from you and thank you for your help to support this beautiful Colorado region.

Sincerely,

Paul Reilly, Executive Chef/Proprietor, Beast & Bottle, Coperta

Signature

Charles Barclay Dodge, Chef/Owner, Bosq

Michael Ziemer, Chef de Cuisine, Caribou Club

Dana Zobs, Chef/Owner, Crested Butte's Personal Chefs

2

BLM_0075946

Emily Harwell, Chef/Owner, Crested Butte's Personal Chefs

Stacee VanAernem, Chef/Owner, Crested Butte's Personal Chefs

Ben Homuth, Chef, Crested Butte's Personal Chefs

Steve Ela, Owner, Ela Family Farms

Chris Sullivan, Owner, Mountain Oven

Teresa Rippeto, Owner/Chef, Potager

Christopher J. Philips, Owner, Sunflower

3

BLM_0075947

Natalie Moselle, Owner, Sunflower

John Lenoardi, Chef and Owner, Soupcon

David Wooding, Chef and Owner, Soupcon

Ian Scott, Chef and Owner, The Slogar

Grant Hall, Chef, Sunflower

Rachel Saitzyk, Manager, Sunflower

Alix A. Hoch, Manager, The Butcher's Block

4

BLM_0075948

Russell Stippich, Chef de Cuisine, The Populist

Joan Nuffah, Chef, The Stowaway

Kalon Wall, Executive Chef, The Surf Hotel

Mark Waltermire, Owner, Valley Organic Growers Association, Thistle Whistle Farm

John Really, CEO, Victoria & Co.

Danielle Renee Riesz, Owner, Wildflower Sweets

Cc:
Governor Jared Polis
Jamie Connell, State Director, Colorado BLM
Stephanie Connolly, Southwest District Manager, BLM
Greg Larson, Uncompahgre Field Manager, BLM

BLM_0075949



**Wyoming Office**
**PO Box 171**
**Bondurant, WY 82922**
**Email: Wyoming@WesternWatersheds.org**
**Web site: www.WesternWatersheds.org**

*Working to protect and restore Western Watersheds*

**Western**
**Watersheds**
**Project**

Director (210)
Attention: Protest Coordinator, WO-210  - Uncompahgre RMP Protest
P.O. Box 71383
Washington, D.C. 20024-1383

BLM_0075950



**Wyoming Office**
**PO Box 171**
**Bondurant, WY 82922**
**Tel: (877) 746-3628**
**Fax: (208) 475-4702**
**Email: Wyoming@WesternWatersheds.org**
**Web site: www.WesternWatersheds.org**          *Working to protect and restore Western Watersheds*

**Western Watersheds Project**

July 29, 2019

Director (210)
Attention: Protest Coordinator, WO-210  - Uncompahgre RMP Protest
P.O. Box 71383
Washington, D.C. 20024-1383


Re:  Uncompahgre RMP Protest

*"A thing is right when it tends to preserve the integrity, stability, and beauty of the biotic community. It is wrong when it tends otherwise."*

*"We abuse land because we regard it as a commodity belonging to us. When we see land as a community to which we belong, we may begin to use it with love and respect. There is no other way for land to survive the impact of mechanized man, nor for us to reap from it the esthetic harvest it is capable, under science, of contributing to culture."*

-   Aldo Leopold

*"What we do with the public lands of the United States tells a great deal about what we are, what we care for and what is to become of us as a nation."*

-   Senator Henry M. Jackson

*"And [multiple use is] harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output."*

-   Federal Land Policy and Management Act 43 U.S.C. § 1702(c)

*"In managing the public lands the Secretary [of the Department of the Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands."*

-   Federal Land Policy and Management Act 43 U.S.C. § 1732(b)

BLM_0075951

Dear BLM Director,

The following is our protest of the Uncompahgre FEIS and RMP. We incorporate our scoping comments and attachments, submitted on February 7th, 2010 and our DEIS comments and attachments, submitted October 23rd, 2016 in this protest by reference.

WWP, myself and our members have a long history of use of the Uncompahgre Field Office as well as a long history of participation in decision making processes on this Field Office. Our interests in healthy and functioning ecosystems, wildlands and wildlife will be injured by the implementation of this RMP, which fails to comply with a wide range of DOI and BLM regulation, policy and direction, as detailed previously in our comments. FLPMA and the direction flowing from it are very low bars, but the BLM has failed to even clear these low bars in its proposed RMP.

The issues being protested are wide ranging and encompass most aspects of the RMP and its associated NEPA document. These include:

1) BLM's failure to comply with regulation, manual, handbook and other policy directly related to writing of RMP's
2) BLM's failure to implement management direction in the RMP's based on the best available science
3) BLM's failure to comply with NEPA by not taking the required "hard look" at the issues and their impacts

These failures are not limited to only a few sections but are nearly universal throughout the entire RMP.

The first and foremost consideration must be the legal and regulatory framework within which the BLM operates. The overarching law is FLPMA. FLPMA requires that the BLM:

*Section 102 (2) the national interest will be best realized if the public lands and their resources are periodically and systematically inventoried and their present and future use is projected through a land use planning process coordinated with other Federal and State planning efforts*

*Section 102 (8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will pro-vide for outdoor recreation and human occupancy and use*

*Section 201 (a) The Secretary <u>shall</u> prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern. This inventory shall be kept current so as to reflect changes in conditions and to*

*identify new and emerging resource and other values. The preparation and maintenance of such inventory or the identification of such areas shall not, of itself, change or prevent change of the management or use of public lands.*(emphasis added)

Compliance with this subsection is the prerequisite of all planning and must be completed prior to initiation of the RMP revision process. Note also that the next Section B mentions funding. This indicates Section B is discretionary, whereas Section A is mandatory.

A wide range of key resources and values exist within the UFO for which the BLM has failed maintain an inventory of attributes, conditions and trends. This information is critical to informed decision making and analysis. This failure violates both the FLPMA requirement as well as NEPA's "hard look" requirement.

*Section 202 (c) In the development and revision of land use plans, the Secretary <u>shall</u>–*
*(1) use and observe the principles of multiple use and <u>sustained yield</u> set forth in this and other applicable law;*
*(2) use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences;*
*(3) <u>give priority to the designation and protection of areas of critical environmental concern;</u>*
*(4) rely, to the extent it is available, on the inventory of the public lands, their resources, and other values;*
*(5) consider present and potential uses of the public lands;*
*(6) <u>consider the relative scarcity of the values involved and the availability of alternative means (including recycling) and sites for realization of those values;</u>*
*(7) <u>weigh long-term benefits to the public against short-term benefits;</u>*
*(8) <u>provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans;</u>* (emphasis added)

*Section 302 B In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands.*

The EIS and proposed RMP failed implement actions needed to provide for "sustained yield", failed to give priority to the designation and protection of ACEC's, failed to consider the values involved and the availability of alternative means and sites, failed to weigh the long term benefits to the country as a whole versus the short term benefits to a few industries, and failed to ensure compliance with pollution control laws.

The regulations implementing the FLPMA planning requirements are at 43 CFR 1600.

43 CFR 1601.0-2 Objective.

The objective of resource management planning by the Bureau of Land Management is to maximize resource values for the public through a rational, consistently applied set of regulations and procedures which promote the concept of multiple use management and ensure participation by the public, state and local governments, Indian tribes and appropriate Federal agencies. <u>Resource management plans are designed to guide and</u>

BLM_0075953

control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses. (emphasis added)

It is clear from the above that RMP's are required to provide specific requirements, standards and limitations that are overarching for the Field Office and that guide the site-specific decisions later. The FEIS and RMP direction are little more than aspirational with no requirements. This violates FLPMA.

This is made even clearer under Definition N, which states:

(n) Resource management plan means a land use plan as described by the Federal Land Policy and Management Act. The resource management plan generally establishes in a written document:
(1) Land areas for limited, restricted or exclusive use; designation, including ACEC designation; and transfer from Bureau of Land Management Administration;
(2) Allowable resource uses (either singly or in combination) and related levels of production or use to be maintained;
(3) Resource condition goals and objectives to be attained;
(4) Program constraints and general management practices needed to achieve the above items;
(5) Need for an area to be covered by more detailed and specific plans;
(6) Support action, including such measures as resource protection, access development, realty action, cadastral survey, etc., as necessary to achieve the above;
(7) General implementation sequences, where carrying out a planned action is dependent upon prior accomplishment of another planned action; and
(8) Intervals and standards for monitoring and evaluating the plan to determine the effectiveness of the plan and the need for amendment or revision.

The FEIS and proposed RMP failed to examine or implement N(1) for a wide range of resources and actions such as livestock grazing. The BLM also failed implement N(3) as defined in manual and handbook direction, as discussed below. The BLM again failed to implement N(4) and (6) needed to achieve goals and objectives. Further, BLM failed to implement N(8), with the possible exception of drought.

 43 CFR 1610.4-4 requires that the BLM:

The Field Manager, in collaboration with any cooperating agencies, will analyze the inventory data and other information available to determine the ability of the resource area to respond to identified issues and opportunities. The analysis of the management situation shall provide, consistent with multiple use principles, the basis for formulating reasonable alternatives, including the types of resources for development or protection. Factors to be considered may include, but are not limited to:
(a) The types of resource use and protection authorized by the Federal Land Policy and Management Act and other relevant legislation;
(b) Opportunities to meet goals and objectives defined in national and State Director guidance;
(c) Resource demand forecasts and analyses relevant to the resource area;
(d) The estimated sustained levels of the various goods, services and uses that may be attained under existing biological and physical conditions and under differing management

BLM_0075954

practices and degrees of management intensity which are economically viable under benefit cost or cost effectiveness standards prescribed in national or State Director guidance;
(e) Specific requirements and constraints to achieve consistency with policies, plans and programs of other Federal agencies, State and local government agencies and Indian tribes;
(f) Opportunities to resolve public issues and management concerns;
(g) Degree of local dependence on resources from public lands;
(h) The extent of coal lands which may be further considered under provisions of §3420.23(a) of this title;
and
(i) Critical threshold levels which should be considered in the formulation of planned alternatives.

Many of these factors, such as (d), (e), (f) and (i) were ignored in the development of the AMS, EIS and RMP.

43 CFR 1610.7-2 requires:

Areas having potential for Areas of Critical Environmental Concern (ACEC) designation and protection management shall be identified and considered throughout the resource management planning process (see §§1610.4–1 through 1610.4–9).
 (a) The inventory data shall be analyzed to determine whether there are areas containing resources, values, systems or processes or hazards eligible for further consideration for designation as an ACEC. In order to be a potential ACEC, both of the following criteria shall be met:
(1) Relevance. There shall be present a significant historic, cultural, or scenic value; a fish or wildlife resource or other natural system or process; or natural hazard.
(2) Importance. The above described value, resource, system, process, or hazard shall have substantial significance and values. This generally requires qualities of more than local significance and special worth, consequence, meaning, distinctiveness, or cause for concern. A natural hazard can be important if it is a significant threat to human life or property.

The EIS and RMP failed to prioritize the establishment and protection of ACEC.

BLM Manual 1601 Land Use Planning further describes the requirements the BLM must comply with in the development of an RMP:

Section .1 B. The land use planning process is the key tool used by the BLM, in coordination with interested publics, to protect resources and designate uses on Federal lands managed by the BLM. Planning is critical to ensuring a coordinated, consistent approach to managing these lands. This Manual and Handbook provide guidance for preparing new Resource Management Plans (RMPs), plan revisions, plan amendments, other equivalent plans (e.g., plans adopted from other agencies), and subsequent implementation-level plans. Procedures and requirements are set forth to ensure that the BLM's plans meet regulatory and statutory requirements. (emphasis added)

Section .2 .02 Objectives. These plans help ensure that the public lands are managed in accordance with FLPMA (43 USC 1701 et seq.) and other applicable laws and regulations, under the principles of multiple use and sustained yield; in a manner that recognizes the

Nation's need for domestic sources of minerals, food, timber, and fiber; <u>and in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water, and archaeological values. Where appropriate, lands will be managed to preserve and protect certain public lands in their natural condition to provide food and habitat for fish and wildlife and domestic animals, and to provide for outdoor recreation and human occupancy and use. The BLM will encourage collaboration and public participation throughout the planning process.</u> To accomplish the above, the BLM will:

A. Provide on a continuing basis an inventory of all public lands and their resource and other values. <u>This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values</u> (FLPMA, Sec. 201 (a)).

B. Use an interdisciplinary process for evaluating resource information that considers physical, cultural, and biological resources in conjunction with social and economic factors to decide appropriate public land uses.

C. Ensure opportunities for participation by Indian tribes, State and local governments, other Federal agencies, <u>and the public in a way that coordinates land use inventory, planning, and management activities with these other jurisdictional entities</u>. Such participation will help ensure that land use plans for public lands are consistent with the plans and policies of these entities to the maximum extent consistent with Federal law (FLPMA, Sec. 202 (c) (9)), and that policies of approved Indian tribal land resource management programs are considered (FLPMA, Sec. 202 (b)).

D. Use collaborative and multijurisdictional approaches, to the extent possible, to encourage consistency in planning across different land ownerships and jurisdictions.

E. <u>Provide to the public a documented record of land allocations and permissible resource uses and constraints</u>.

F. Provide <u>a framework to guide subsequent implementation decisions.</u> (emphasis added)

The proposed RPM fails to implement the requirements of this Section, including subsections A, E and F.

Section .3 2. reiterates the requirements of FLPMA:

"<u>Sec. 201 requires</u> the Secretary of the Interior <u>to prepare and maintain an inventory of the public lands and their resource and other values,</u> **giving priority** to areas of critical environmental concern (ACECs), and, as funding and workforce are available, to determine the boundaries of the public lands, provide signs and maps to the public, and provide inventory data to State and local governments.

As stated previously, the RMP does not comply with these requirements.

F. The Colorado River Basin Salinity Control Act, 43 U.S.C. 1593, requires a comprehensive program for minimizing salt contributions to the Colorado River from BLM lands.

The EIS fails to examine and the RMP fails to implement "a comprehensive program for minimizing salt contributions".

Section .06 requires:

BLM_0075956

2. The BLM's mission is to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations. <u>Land use plan decisions will further this mission by identifying desired outcomes and actions that restore and maintain the health of the land; preserve natural and cultural heritage; reduce threats to public health, safety, and property; and provide opportunities for environmentally responsible recreational and commercial activities.</u>

3. When making land use plan decisions, the BLM will consider information from all available sources, including scientific data gained from resource assessments, information regarding ecosystem protection and restoration needs, the reasonably foreseeable development of consumptive and nonconsumptive uses, and social and economic information.

The proposed RMP to implement these requirements.

The Manual provides specific definitions for the requirements that a RMP must contain:

Goal: a broad statement of a desired outcome. Goals are usually not quantifiable and may not have established time frames for achievement.

Guidelines: actions or management practices that may be used to achieve desired outcomes, sometimes expressed as best management practices. Guidelines may be identified during the land use planning process, but they are not considered a land use plan decision unless the plan specifies that they are mandatory. Guidelines for grazing administration must conform to 43 CFR 4180.2.

Land Use Allocation: the identification in a land use plan of the activities and foreseeable development that are allowed, restricted, or excluded for all or part of the planning area, based on desired future conditions.

Land Use Plan Decision: <u>establishes desired outcomes and actions needed to achieve them</u>. Decisions are reached using the planning process in 43 CFR 1600. When they are presented to the public as proposed decisions, they can be protested to the BLM Director. They are not appealable to IBLA.

Objective: <u>a description of a desired condition for a resource. Objectives can be quantified and measured and, where possible, have established time frames for achievement</u>.

Planning Criteria: <u>the standards, rules, and other factors developed</u> by managers and interdisciplinary teams for their use in forming judgments about decision making, analysis, and data collection during planning. Planning criteria streamline and simplify the resource management planning actions.

Resource Use Level: <u>the level of use allowed within an area. It is based on the desired outcomes and land use allocations in the land use plan. Targets or goals for resource use levels are established on an area-wide or broad watershed level in the land use plan.</u> Site-specific resource use levels are normally determined at the implementation level, based on site-specific resource conditions and needs as determined through resource monitoring and assessments.

Standard: <u>a description of the physical and biological conditions or degree of function required for healthy, sustainable lands</u> (e.g., land health standards).

With the exception of some specific oil and gas related requirements, most of the other resource extraction sections fail to implement Objectives, Actions and Resource Use Levels as defined above. Livestock grazing is a perfect example of this problem. It fails to implement limitations or specific requirements. This violates FLPMA.

BLM H-1601-1 Land Use Planning Handbook, likewise provides further specificity and reiteration of the requirements the BLM must follow in the development of RMP's:

Land use plans and planning decisions are the basis for every on-the-ground action the BLM undertakes.

Land use plans ensure that the public lands are managed in accordance with the intent of Congress as stated in FLPMA (43 U.S.C. 1701 et seq.), under the principles of multiple use and sustained yield. As required by FLPMA and BLM policy, the public lands must be managed in a manner that protects the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; that will provide for outdoor recreation and human occupancy and use;

Land use plans are one of the primary mechanisms for guiding BLM activities to achieve the mission and goals outlined in the Department of the Interior (DOI) Strategic Plan.

Handbook at 1A

Decisions in land use plans guide future land management actions and subsequent site-specific implementation decisions. These land use plan decisions establish goals and objectives for resource management (desired outcomes) and the measures needed to achieve these goals and objectives (management actions and allowable uses). Section 202(c) of FLPMA (43 U.S.C. 1712) requires that in developing land use plans, the BLM:

1. Use and observe the principles of multiple use and sustained yield;
2. use a systematic interdisciplinary approach to integrate physical, biological, economic, and other sciences;
3. <u>give priority to designating and protecting areas of critical environmental concern (ACECs)</u>;
4. rely, to the extent available, on an inventory of public lands, their resources, and other values;
5. <u>consider present and potential uses of public lands</u>;
6. <u>consider the relative scarcity of the values involved and the availability of alternative means and sites for realizing those values</u>;
7. <u>weigh long-term benefits to the public against short-term benefits</u>;
8. <u>provide for compliance with applicable Tribal, Federal, and state pollution control laws, standards, and implementation plans</u>; and
9. to the extent consistent with the laws governing the administration of public lands, coordinate the land use inventory, planning, and management activities of public lands

BLM_0075958

with land use planning and management programs of other Federal departments/agencies and state/local governments, as well as the policies of approved Tribal and state land resource management programs. The BLM must, to the extent practical, assure that consideration is given to those Tribal, state, and local plans that are germane in the development of land use plans for public lands. Land use plans must be consistent with state and local plans to the maximum extent consistent with Federal law. Refer to FLPMA for the full text of Federal responsibilities detailed under Section 202(c)(9).

Handbook at IIA

The proposed RMP does not comply with these requirements.

Further defining the required components of an RMP, the Handbook states in Section II B:

**B. Types of Land Use Plan Decisions**
Land use plan decisions for public lands fall into two categories: desired outcomes (goals and objectives) and allowable (including restricted or prohibited) uses and actions anticipated to achieve desired outcomes.

1. Desired outcomes
Land use plans must identify desired outcomes expressed in terms of specific goals and objectives. Goals and objectives direct the BLM's actions in most effectively meeting legal mandates; numerous regulatory responsibilities; national policy, including the DOI Strategic Plan goals; State Director guidance (see 43 CFR 1610.0-4(b)); and other resource or social needs. Desired outcomes should be identified for and pertain to resources (such as natural, biological, and cultural), resource uses, (such as energy and livestock grazing), and other factors (such as social and economic conditions). Definitions and examples of goals and objectives are listed below:

*Goals* are broad statements of desired outcomes (e.g., maintain ecosystem health and productivity, promote community stability, ensure sustainable development) that usually are not quantifiable. Since the release of the original Handbook, the BLM has worked with RACs to develop Land Health Standards applicable to all ecosystems and management actions. These Land Health Standards must be expressed as goals in the land use plan. Goals can also be drawn from the Departmental and/or the DOI Strategic Plan or other sources. A sample goal for a Land Health Standard is: "Maintain healthy, productive plant and animal communities of native and other desirable species at viable population levels commensurate with the species and habitat's potential." A sample goal from the Strategic Plan is: "Sustain desired biological communities on Department of the Interior-managed and -influenced lands and waters in a manner consistent with obligations regarding the allocation and use of water." These goals, or modifications thereof, could be used in a land use plan.

*Objectives* identify specific desired outcomes for resources. Objectives are usually quantifiable and measurable and may have established timeframes for achievement (as appropriate). A sample objective is: "Manage vegetative communities on the upland portion of the Clear Creek Watershed to achieve, by 2020, an average 30 to 40 percent canopy cover of sagebrush to sustain sagebrush-obligate species." When quantified, the indicators associated with Land Health Standards are one possible source of objectives.

BLM_0075959

While the proposed RMP has goals, the objectives as defined above are noticeably missing.

2. Allowable uses and management actions anticipated to achieve desired outcomes (goals and objectives)

After establishing desired outcomes, the BLM identifies allowable uses (land use allocations) and management actions for different alternatives that are anticipated to achieve the goals and objectives.

a. Allowable uses. Land use plans must identify uses, or allocations, that are allowable, restricted, or prohibited on the public lands and mineral estate. These allocations identify surface lands and/or subsurface mineral interests where uses are allowed, including any restrictions that may be needed to meet goals and objectives. Land use plans also identify lands where specific uses are excluded to protect resource values. Certain lands may be open or closed to specific uses based on legislative, regulatory, or policy requirements or criteria to protect sensitive resource values. If land use plan decisions close areas of 100,000 acres or greater in size to a principal or major use for 2 years or more, Congress must be notified of the closure upon its implementation as prescribed in 43 CFR 1610.6.

The land use plan must set the stage for identifying site-specific resource use levels. Site-specific use levels are normally identified during subsequent implementation planning or the permit authorization process. At the land use plan level, it is important to identify reasonable development scenarios for allowable uses such as mineral leasing, locatable mineral development, recreation, timber harvest, utility corridors, and livestock grazing to enable the orderly implementation of future actions. These scenarios provide a context for the land use plan's decisions and an analytical base for the NEPA analysis. The BLM may also establish criteria in the land use plan to guide the identification of site-specific use levels for activities during plan implementation.

b. Management actions. Land use plans must identify the actions anticipated to achieve desired outcomes, including actions to maintain, restore, or improve land health. These actions include proactive measures (e.g., measures that will be taken to enhance watershed function and condition), as well as measures or criteria that will be applied to guide day-to-day activities occurring on public land. Land use plans also establish administrative designations such as ACECs, recommend proposed withdrawals, land tenure zones, and recommend or make findings of suitability for congressional designations (such as components of the National Wild and Scenic River System). While protection and restoration opportunities and priorities are often related to managing specific land uses (such as commodity extraction, recreation, or rights-of-way corridors), they can be independent of these types of uses as well. In certain instances, it is insufficient to simply remove or limit a certain use, because unsatisfactory resource conditions may have developed over long periods of time that will not correct themselves without management intervention. For example, where exotic invasive species are extensive, active restoration may be necessary to allow native plants to reestablish and prosper. In these cases, identifying restoration opportunities and setting restoration priorities are critical parts of the land use planning process.

Again, the 'direction' contained in the proposed RMP utterly fails to meet the above requirements.

Appendix C of the Handbook states:

The application of program-specific guidance for land use plan decisions will vary, depending on the decision category, and must be applied as follows:

I. *Natural, Biological, and Cultural Resources:* <u>Decisions identified must be made during the land use planning process if the resource exists in the planning area.</u>

II. *Resource Uses:* <u>Decisions identified must be made during the land use planning process if the BLM anticipates it may authorize or allow a resource use. If uses are allowed, decisions must also be made regarding intensity and limits or restrictions.</u>

Again, take livestock grazing as an example, the proposed RMP 'direction' fails to implement requirements and limitations needed to meet goals. Bighorn sheep management would be another example where the RMP fails to provide the specificity required by these requirements.

III. *Special Designations:* <u>Special designation decisions identified must be made during the land use planning process when the BLM anticipates it may authorize or allow uses which could disqualify inventoried resource values from designation. Special designation decisions may be made during the land use planning process when there is no threat to the inventoried resource.</u>

IV. *Support:* Support needs and decisions may be determined through the land use planning process, based on individual planning situations.

Appendix C of the Handbook provides the heart of the planning process. Given its importance to complying with FLPMA, we are providing it, with highlights, in its entirety as Exhibit A.

The Department of the Interior Departmental Manual 516 DM1 provides important guidance for the development of DEIS:

1.2    **Policy**.  It is the policy of the Department:

A.        To provide leadership in protecting and enhancing those aspects of the quality of the Nation's environment which relate to or may be affected by the Department's policies, goals, programs, plans, or functions in furtherance of national environmental policy;

Section D states, in part:

(4)      Shall monitor, evaluate, and control on a continuing basis their activities as needed to protect and enhance the quality of the environment.  Such activities will include both

those directed to controlling pollution and enhancing the environment and those designed to accomplish other program objectives which may affect the quality of the environment. They will develop programs and measures to protect and enhance environmental quality. They will assess progress in meeting the specific objectives of such activities as they affect the quality of the environment.

The proposed RMP fails to properly monitor, evaluate and control permitted actions. Again livestock grazing is a perfect example of these failures.

Section E states, in part:

(2)     Shall use information obtained in the NEPA process, including pertinent information provided by those persons or organizations that may be interested or affected, to identify reasonable alternatives to proposed actions that will avoid or minimize adverse impacts to the human environment while improving overall environmental results.

(3)     Shall monitor, evaluate, and control their activities on a continuing basis to further protect and enhance the quality of the environment.

The proposed RMP fails to properly monitor, evaluate and control permitted actions. Again livestock grazing is a perfect example of these failures.

Subsection 1.19     **Methodology and Scientific Accuracy** (40 CFR 1502.24). Conclusions about environmental effects will be preceded by an analysis that supports that conclusion unless explicit reference by footnote is made to other supporting documentation that is readily available to the public.  Bureaus will also follow Departmental procedures for information quality as required under Section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001 (Pub. L.106-554, 114 Stat. 2763).

The DEIS failed to comply with this requirement. Most 'analyses' are merely bald unsupported assertions.

The Department of the Interior Departmental Manual 520 DM1 provides important guidance for the development of RMP. We provide a highlighted version of this in full as Exhibit B.

We particularly draw your attention to the Policy statement, Section 1.7 C 4, 5 and 10 as well as 1.8.

These requirements were not implemented in the EIS.

We also provide as highlighted version of BLM Manual 1737 Riparian-Wetland Area Management as Exhibit C. Of critical importance are:

.06 Department of the Interior and BLM Policy (p9)
.11C 1 through 6 (p12)  which define RMP minimum requirements
.41A (p19) grazing related RMP requirements for the protection of riparian areas
.41B (20) Wetland management requirements for RMP's

.42A 1, 2 and 3  RMP requirements for soil and water
.45A and D - RMP requirements for fish and wildlife habitat
Page 30 Salinity Control Act requirements

These requirements were not implemented in the EIS.

We also provide as highlighted version of BLM Manual 6720 Aquatic Resource Management as Exhibit D. Of critical importance are:

.04J Manager responsibilities
.06 BLM Policy
.11 and .12 Inventory requirements
.13B (p9) RMP requirements
.16 (p11) RMP requirements

These requirements were not implemented in the FEIS.

We also provide as highlighted version of BLM Manual 7200 Water Resource Management as Exhibit E. Of critical importance are:

Objectives (p3)
.06C RMP requirements
.21 Planning and RMP requirements

These requirements were not implemented in the EIS.

We also provide as highlighted version of BLM Manual 6840 Sensitive Species Management as Exhibit F. Of critical importance are:

.04E5 (p5) State director responsibilities
.06 (p7) ESA and Sensitive Species requirements
 Section D on p9
.12 (p14) Sensitive Species RMP requirements
.2 (p15)
.22 (p36 and on) Section A
.22D4C (p41) RMP requirements

These requirements were not implemented in the EIS.

Without question, private livestock grazing is the most important RMP topic. Livestock grazing is permitted on 99% of the total Field Office acres. Livestock grazing has caused and is causing the most impacts over the entire Field Office. BLM permitted livestock grazing has caused a permanent ~50% loss in the productivity over most parts of the Field Office. BLM permitted livestock grazing has destroyed most of the riparian and hydrologic function throughout the Field Office. BLM permitted livestock grazing has degraded the water storage capacity of riparian areas throughout the Field Office which has lead to reduced flows, elimination of once productive fisheries and loss of riparian habitat. BLM permitted livestock grazing has help to nearly eliminate bighorn sheep and other species from the UFO. BLM permitted livestock grazing has not been properly managed.

Trespassing livestock and excessive utilization are the rule not the exception. The BLM has known about these violations of permit terms and conditions for decade after decade, it has also known the ecosystem degradation caused by this lack of action for decade after decade, but has failed to take any effective actions to fulfill its public trust and legal responsibilities.

The RMP is not be morally or legally defensible since this most important of issues is not addressed properly. The RMP EIS failed to thoroughly and defensibly review the failures of the past RMP and what actions must be taken to correct these failures. The current FEIS fails to do this.

The BLM must include in each RMP alternative and in the final selected alternative a voluntary waiver and retirement provision for all grazing permits.

The RMP must include measurable (i.e. quantifiable) standards for livestock grazing including maximum upland and riparian utilization of 30% on any herbaceous graminoids; maximum bank or wetland trampling annually not to exceed 10% of hydric and mesic soils areas; maximum use of woody browse by all sources not to exceed 15% of new leader growth annually.

In addressing range management in the revision the BLM failed to use and reference the quantitative data (including the methodologies used to collect them and the time they were collected) pertaining to the current and expected acreages which meet, or fail to meet, desired vegetative condition, and trends in vegetative condition. Using out-dated data or using methodologies which are no longer accepted, would be inappropriate. As we previously cited, the BLM's own planning handbook requires the use of the best available information. For example, the critical values of riparian areas were not well known even twenty years ago, so that most analyses at the time did not apply to riparian areas.

In many areas, winter use by wildlife follows the end of the livestock grazing period. It would be worthwhile to establish a standard and a monitoring plan for total use (by both wildlife and livestock) on an annual basis to determine if the standards for livestock use are achieving the desired objectives. In some areas, it is likely that combined use would be greater than expected for both riparian and upland total utilization and stricter standards may be necessary for livestock utilization.

It is widely recognized in the range management literature that monitoring is the key to successful range management program. The RMP revision failed to include standards/requirements for a range management monitoring protocol for both upland and riparian areas. Details of the stream stability monitoring protocol, including the frequency and intensity with which it will be utilized, and so forth, should be provided in the RMP revision.

The EIS failed to disclose the type, location, and number of the various "range improvements" (fencing, water developments, water pipelines, access roads, and so forth) that currently exist on the public lands that will be managed under the direction of the RMP revision. What cumulative impacts have these "improvements" had on vegetation, wildlife habitat, water quality, riparian areas, soils, and habitat fragmentation? What changes/impacts to upland vegetation, water quality, habitat values, and other resources

near these developments have occurred as a result of these "improvements?" Have these management activities been successful at accomplishing the goals for which they were implemented? These questions were not answered in the EIS.

Claims based on the absence of streams from 303d lists or absence of monitoring data are not sufficient to document that water quality is not impaired. Research has shown that when livestock are present, fecal coliform bacteria increase, temperature increases due to removal of shading vegetation and streams become silt-laden, destroying their native aquatic life. Other factors such as eroding stream banks, cattle defecating in streams, etc. are violations of Narrative or Anti-degradation Standards. The altering of stream flows by degraded watershed conditions that allow greater runoff and siltation as well as late season dewatering of streams must all be considered.

The RMP must address how it will handle the buy-out of grazing permits by conservation and other organizations, and should identify how it will retire such permits through the planning process. BLM should work with permittees to identify those who are interested in retiring their permits or being relocated to prevent resource damage.

Grazing permits should require public access easements across private land. If permittees refuse to grant access to public lands, then all permits should be cancelled.

It is imperative that BLM, in its RMPs, recognize the value of ungrazed watersheds both from an economic and environmental point of view. Not all areas should be grazed by livestock. This should be based on a determination of suitability for livestock grazing considering alternative uses and their benefits as well as the current condition of the land. In addition, sensitive soils must be protected. This includes soils which occur on steep slopes, are susceptible to severe wind and water erosion or have been degraded from their potential by removal of ground covering vegetation and cryptogrammic crusts. It also means that in areas of weed infestations, generally caused as a result of livestock grazing, livestock should be eliminated to allow recovery. Unsuitable areas should be mapped and allotments in those areas phased out to provide necessary protections. Those areas that are to continue being grazed by livestock must be stocked and managed in accordance with the condition of the land and its vegetation.

In areas to be grazed by livestock, the amount of forage produced must be determined and allocations of forage to watershed protection (50%), wildlife (25%) and livestock (25%) be made as recommended by Holechek et al (1998)[1]. Field data collection will be necessary to accomplish this.

To summarize key components that the RMP must address:

> PFC – The BLM initiated in 1991, a program called Riparian-Wetland Initiative for the 1990's, Among other things, this initiative called for management improvements to insure that at least 75% of the BLM stream miles reached the minimum of PFC by 1997. The BLM has failed miserably in meeting this goal. The RMP must commit to and provide the direction necessary to maintain all streams in the FO at a minimum of PFC

---

[1] Holechek, Jerry L., Rex D. Piper and Carlton H. Herbel. 1998. Range Management Principles and Practices. 542 pp. Prentice-Hall, New Jersey.

➢ Fundamentals of Rangeland Health – Implementing the 4180 regulations within the FO has been spotty at best and in those areas that compliance with Standards and Guidelines have been reviewed, the actions proposed have either never been implemented or been proven to be ineffective. The RMP must correct this deficiency and implement a schedule and regular feedback loops to complete the processes required under 4180. It also must prioritize reviews based on the need for change, such as I Category allotments first

➢ The EIS and RMP must address the fact that livestock sizes, and thus forage consumption, have increased dramatically since the AUM was defined. Failure to address this critical issue will lead to legal vulnerability under NEPA, APA and the False Claims Act.

➢ To comply with FLMPA, TGA, PRIA, NEPA and the APA, the EIS and RMP must only approve livestock grazing within the limits of current productivity and suitability, not capacities determined many decades ago. Current data shows that productivity on BLM lands has declined significantly over the last 20-40 years.

➢ The EIS and RMP must analyze the successes and failures of the current RMP and analyze the validity of the assumptions and accuracy of the analysis of the EIS conducted to develop the current RMP. Such analyses are critical to learning from the mistakes of the past as well as to comply with NEPA

➢ The RMP must provide clear management direction for the protection of ESA listed and BLM Sensitive Species

PFC

In 1991 the BLM initiated a program called "Riparian-Wetland Initiative for the 1990's" (See BLM/WO/GI-91/001+4340). This initiative called for achievement of four overarching goals:

➢ Restore and maintain riparian-wetland areas so that 75% or more are in proper functioning condition by 1997
➢ Protect riparian-wetland areas and associated uplands through proper management and to avoid or mitigate negative impacts
➢ Ensure an aggressive riparian-wetland information and outreach program
➢ Improve partnerships and cooperative restoration

Strategies to implement these goals include:

➢ Inventory and Classification to determine current status and potential
➢ Land Use and Activity Planning revisions describing actions needed to meet these objectives
➢ Monitoring to determine if management actions are meeting goals and objectives
➢ Avoiding or mitigating impacts on riparian-wetland areas

Little progress has been made in the 20 years since.

The RMP failed to address this poor performance and lay out an action plan to achieve the goals laid out in the BLM's "Riparian-Wetland Initiative for the 1990's".

We would like the reader to note that attaining PFC is only the lowest acceptable level. PFC is not a goal but the basis on which other resource goals are met. We request the BLM review its own manual, TR 1737-15, for a more complete description of what PFC is and is not. We especially direct the BLM's attention to page 16 of this manual for a very clear description of the fact that PFC is only the lowest basis on which all other values are built upon. As such, the RMP must delineate management objects that go far beyond PCF to include watershed health values, fisheries values, water quality values and wildlife values.

FUNDAMENTALS OF RANGELAND HEALTH

The RMP must include timelines and priorities for the completion and review of progress of the Fundamentals of Rangeland Health Standards and Guidelines assessments and determinations as required under the 4180 regulations.

For further details on the implementation of the 4180 regulations, we request that the BLM review its 1/19/01 Manual Transmittal Sheet for H-4180-1 Rangeland Health Standards. We specifically bring the BLM's attention to its duties to make "significant progress" towards meeting Standards and Guidelines. The RMP must provide direction to achieve the Fundamentals of Rangeland Health and the Standards and Guidelines, and in those situations, of which there are many, where these are not being met, the RMP must provide sufficient direction that results in the required "significant progress".

The RMP must also provide feedback loops so that once Standards and Guidelines (S&G) evaluations are completed, that the BLM requires regular reviews to insure "significant progress" is being made.

Further undercutting the Fundamentals of Rangeland Health is the fact that nearly all permits are renewed with no NEPA, no FLPMA compliance and no public participation. The EIS failed to examine this key issue and the RMP failed to implement requirements to deal with this.

LIVESTOCK SIZES, FORAGE CONSUMPTION AND THE AUM

The BLM can not just assume that an AUM is 800 lbs of forage consumption per month. The RMP/EIS must analyze the current and potentially available forage to satisfy the forage consumption by the number of livestock it currently permits or proposes to permit. It can not assume that the forage capacity determined 20-40 years ago is applicable today.

The Society for Range Management (SRM) in 1974 defined an Animal Unit *"to be one mature (1000 lb.) cow or the equivalent based upon average daily forage consumption of 26 lbs. dry matter per day."*[2]. SRM also defined an Animal Unit Month as *"The amount of feed or forage required by an animal-unit for one month."* NRCS defined the forage demand for a 1,000 pound cow as 26 pounds of oven-dry weight or 30 pounds air-dry weight of forage per day[3]. It is important to ensure that forage consumption rates by livestock are based on the size of animals present on the allotment and a reasoned estimate of their daily consumption rates. The following analysis provides some background and justifies a more current forage consumption rate for cow/calf pairs. It is BLM's obligation

---

[2] Society for Range Management. 1974. Glossary of terms used in range management.
[3] USDA. 1997. National Range and Pasture Handbook.

to ensure this forage is accurately accounted for as this is its fiduciary duty to the American People.  Undercounting forage consumption by livestock results in undercharging for that forage.  This is potentially defrauding the American public under the False Claims Act[4]

The University of Nevada Agricultural Experiment Station published a report on cattle production in 1943[5] (Brennan and Harris, 1943).  That report analyzed 14 years of ranch operation for eleven ranches in northeastern Nevada.  At that time, a mature cow was considered one unit and a branded calf or weaner as ½ cow unit, for a combined total of 1.5 cow units per cow/calf pair.  Bulls were considered 1.5 cow units.  For the period 1938 – 1940, the average turnoff weight (when they left the range) of mature cows was 959 pounds, calves were 381 pounds and bulls were 1222 pounds. This means that in the 1930's, a cow/calf pair was 1340 pounds.  With breeding, supplements and hormones, weights have increased over time, for example, Anderson et al (ca 2000) calculated a 35% increase in dressed weights per animal between 1975 and 1995[6].

USDA market statistics[7] give the average weights of slaughter cattle for the week ending August 14, 2004 as 1251 pounds.  The estimate for the same week in 2005 for slaughter cattle average weight was 1260 pounds.  The USDA National Agricultural Statistics Service data for average live weight of cattle slaughtered in 2004 was 1242 pounds compared to 1187 pounds in 1995, or an increase of nearly 8.5% in those 10 years[8].  The Livestock Monitor is a newsletter produced by the North Dakota State University Extension Service Livestock Marketing Information Center in cooperation with USDA State Extension Services[9].  The Livestock Monitor shows for the week ending August 6, 2005, live weights of slaughter cattle averaged 1258 pounds.

The potential weights of mature cows can be even larger than these numbers.  For example, NRCS in its National Range and Pasture Handbook, referenced above, defines body condition scores.  A body condition score of 6 which is described as *"Good, smooth appearance throughout.  Some fat deposits in brisket and over the tailhead.  Ribs covered and back appears rounded."*  This body condition score relates to a pregnancy percentage of 88%, which is important as a goal for cow/calf operations as dry cows are usually culled and replaced and the weight gain of calves is important for income.   According to Dr. Larry W. Olson, Extension Animal Scientist at Clemson University, a medium frame cow in body condition score 6 could easily weigh 1300 – 1400 pounds[10].

Holechek et al (2001) summarized the weaning weights of calves grazed on various types of rangelands at different stocking rates[11].  The data for the period since 1990 produced an average weaning weight of 430 pounds and a range of 382 – 475 pounds.  Ray et al (2004) gave a weaning weight of 480 pounds for calves.  Using the current market statistics for

---

[4] Title 18 USC Section 1001.
[5] Brennan, C.A. and Fred B. Harris.  1943.  Fourteen Years Cattle Production and Ranch Earning Power in Northeastern Nevada 1928 to 1941.  University of Nevada Agricultural Experiment Station, Reno, Nevada.
[6] http://agecon.uwyo.edu/RiskMgt/marketrisk/TheCattleCycle.pdf
[7] http://www.ams.usda.gov/mnreports/SJ_LS712.txt
[8] http://www.usda.gov/nass/pubs/agr05/acro05.htm
[9] http://www.ag.ndsu.nodak.edu/aginfo/lsmkt/monitor.htm
[10] Email correspondence with Dr. Olson dated 8/18/05.
[11] Holechek, Jerry L., Rex D. Pieper and Carlton H. Herbel.  2001.Range Management: Principles and Practices, Fourth Edition.  Prentice-Hall, New Jersey.  587p

BLM_0075968

slaughter cattle at about 1250 pounds and assuming a calf weight of 300 pounds to allow for weight gain during the grazing season, an estimate for the average weight of a cow/calf pair during the grazing season of 1,500 pounds seems reasonable.

As pointed out above, the NRCS used 26 lbs/day of oven dry weight for a 1,000 pound cow and stated this was equivalent to 30 pounds per day air-dry weight. The NRCS Range and Pasture Handbook value of 30 pounds air-dry weight would be 3% of body weight for a 1,000 pound cow. Applying this to the estimate of a current weight of 1,500 pounds for a cow/calf pair, the daily forage consumption would be 45 lbs of air-dry forage per day, or for a month (30.4 days), 1368 pounds of forage per AUM.

The forage needs for domestic sheep must also be determined. Based on current USDA published weights for ewes and lambs, adult domestic sheep weigh from 165 to 440 pounds,[12] and lambs about 129 pounds.[13] A low-end estimate of the weights of a sheep and two lambs grazing on these allotments would be 400 pounds (200 pounds for the ewe and 100 pounds each for two lambs). The forage consumption rate for sheep given in the 1964 R4 Range Analysis Handbook cited above was 3.3% of body weight per day consumed as air dry forage weight. Using these estimated weights of mature sheep (ewes) and lambs with two lambs per ewe and a total weight of 400 pounds would result in forage consumption of 13.2 pounds per day for each mature sheep with two lambs, or 6.6 pounds per day for a mature ewe weighing 200 pounds.

Forage consumption rates must be calculated based on the current weights and consumption rates of livestock in order to provide the forage needed for wildlife, plant community sustainability and watershed protection and to ensure the public trust is not violated by undercharging for the actual weights of cattle and calves grazed.

The current RMP authorizes a certain number of AUM's. However, that is based on an AUM equivalent to 800 lbs of forage per month. The most current information, reviewed above shows that number to be 1368 lbs/month per AUM. Therefore, if sufficient forage were available to satisfy all needs, the numbers of livestock grazed should be reduced to account for the increases in weight and correct the erroneous assumption that 800 lbs/month is an accurate consumption figure. Using the ratio between the current RMP's forage amount per AUM divided by the correct figure above, gives a needed reduction in permitted numbers and/or seasons of use of 42% to account for the RMP's understated forage consumption, without accounting for wildlife, plant and watershed needs.

CAPABILITY AND SUITABILITY ANALYSIS

The EIS can not just move forward allotment condition and use information from the current RMP to satisfy its NEPA, FLPMA, PRIA and APA requirements.

BLM RMP Planning Handbook Appendix C requires that lands available or not available for livestock grazing be determined by considering: other uses for the land; terrain characteristics; soil, vegetation and watershed characteristics; the presence of undesirable vegetation, including significant invasive weed infestations; and the presence of other

---

[12] http://www.wildlifeprairiestatepark.org/animalpages/domestic_sheep.htm
[13] http://www.usda.gov/nass/pubs/agr04/04_ch7.pdf

resources that may require special management or protection, such as special status species, special recreation management areas (SRMAs), or ACECs.

The proposed RPM failed to comply with this requirement.

One of the thorniest issues that the BLM has to consider is water quality of streams flowing through the lands it manages. The revision should provide a comprehensive plan for watershed analysis, restoration, monitoring, and adaptive management; particularly where livestock impact water quality; and to inventory, monitor and develop site-specific plans for riparian management, tailored to watershed needs as identified through these processes.

The EIS does not accomplish this.

No BLM action or plan would be complete without considering TMDL listing, status, and planning. Therefore state data and information are incorporated by reference with the specific request that the BLM insure that TMDL goals are met and water quality is not further degraded. Furthermore, the revision should include details of the actions the BLM intends to take relative to state listed Water Quality Limited Stream Segments. The EIS needs to include a thorough discussion of how the BLM intends to meet its legal obligations under the federal Clean Water Act, State Water Quality Standards and FLPMA requirements in managing water quality limited segments (WQLSs). The RMP must also require water quality monitoring to determine the impacts of its authorized activities.

The BLM failed to develop a monitoring plan. Many activities on BLM lands degrade water quality but the BLM may not have a clear grasp on its waters' quality.

Overall, the BLM must comply with the Clean Water Act. To this end, the BLM should look to required CWA reporting, such as 305(b) reports, the 303(d) list, and triennial reviews, and consider how high quality waters can be protected and how degraded waters can be improved. Additionally, the BLM should specially insure that anti-degradation provisions are met, and that principles of anti-degradation are applied to all facets of the RMP.

The RMP/EIS can not present livestock grazing as a given with little difference in AUM's between alternatives. This would not be a reasonable range of alternatives.

With current GIS technology, availability of soil surveys, and vegetation type information, developing a capability analysis is a relatively simple task.

Without balancing the currently available livestock AUM's with the physical and biological limitation of the land, the BLM avoids the most basic scientific principles which are aimed at providing for sustainable use without impairment. As a result of having no capability determination, combined with a realistic forage capacity determination, BLM cannot assure that sufficient forage exists to support the proposed livestock numbers and ignores the forage and habitat needs of wildlife and the need for nutrient cycling and soil protection provided by retaining plant matter to hold the soil and add nutrients.

A review of range science studies which we include as Appendix A, shows that forage for livestock should be allocated at conservative levels of about 25 - 30% utilization. This is

necessary so that overgrazing does not place palatable, or preferred native species at risk of decline, prevents over grazing in dry years and provides forage and habitat for wildlife and watershed protection. As can be seen throughout the FO, failure to adjust for topographic, soil and other limitation and apply conservative use principles has lead to severely degraded conditions including soil erosion, loss of native forage species and infestations of noxious weeds and invasives.

Grazing and rest requirements for key species of grass can be critical. Native cool-season perennial bunchgrasses can be very sensitive to defoliation and growing season use. For example, Anderson (1991)[14] stated in regards to bluebunch wheatgrass, *"Effects of growing season defoliation injury are well documented: basal area, stem numbers and both root and forage yields are reduced and mortality can be high. ... Defoliation to very short stubble heights during the boot stage has been reported to essentially eliminate plants within as few as three years. ... Vigor recovery has been found to require most of a decade, even with complete protection from grazing."* The author went on to describe experiments in which a single clipping of the grass during the growing season produced 43% less herbage and 95% fewer flower stalks the following year than unclipped plants. Under a deferred system in eastern Oregon, it was reported that bluebunch wheatgrass could not be maintained at 30 – 40% use in the boot stage (early June). A one time removal of 50% of the shoot system during active growth may require six years' rest even in an area with 17" precipitation.[15] Anderson (1991) also makes the point regarding bluebunch wheatgrass that, *"The belief that range improvement will occur after one or two years of rest following a single season of more than 'light' use during the growing season is erroneous."* Mueggler (1975) also determined that Idaho fescue of moderately low vigor required 3 years of rest for recovery and that plants of bluebunch wheatgrass and Idaho fescue in very low vigor may require 8 years and 6 years of rest, respectively for recovery. BLM failed to consider the recovery, growth and maintenance requirements for these sensitive native grasses.

A failure by the BLM in its RMP to analyze utilization, stocking rates and precipitation is a failure to meet NEPA requirements for analysis. The failure to provide sustainable utilization rates for upland and riparian area herbaceous vegetation, aspen suckers and riparian shrubs and incorporate those into grazing permits as terms and conditions leaves management uncontrolled and subject to bias, violating FLPMA.

We provide in C_Grazing Capacity Info Proposed Outline, a scientifically and legally defensible methodology for determining capability and suitability of BLM lands for livestock grazing. We request the BLM incorporate this process into the RMP as well as the EIS alternatives.

SPECIAL STATUS SPECIES

The RMP failed to provide scientifically defensible and clear direction for the recovery and management ESA listed and BLM Sensitive Species. The EIS fails to accomplish this.

---

[14] Anderson, Loren D. 1991. Bluebunch wheatgrass defoliation, effects and recovery – A Review. BLM Technical Bulletin 91-2, Bureau of Land Management, Idaho State Office.
[15] Mueggler, W.F. 1975. Rate and pattern of vigor recovery in Idaho fescue and Bluebunch wheatgrass. Journal of Range Management 28(3):198-204.

BLM_0075971

BLM failed to ensure full compliance with BLM Manual MS-6840.06.E (Special Status Species Management). BLM Manual MS-6840.06.E requires that "protection provided by the policy for candidate species shall be used as the minimum level of protection for BLM sensitive species"—that is:

Consistent with existing laws, the BLM shall implement management plans that conserve candidate species and their habitats and shall ensure that actions authorized, funded, or carried out by the BLM do not contribute to the need for the species to become listed. BLM Manual MS-6840.06.C & .06.E. See BLM Manual MS-6840.06.C (1&3) (discussing BLM's responsibility to confer with U.S. Fish & Wildlife Service regarding individual species' needs).

BLM Manual MS-6840.06.C.2 imposes a series of additional substantive obligations on the BLM regarding candidate [and therefore sensitive] species management:

2.      For candidate species [and sensitive species] where lands administered by the BLM or BLM authorized actions have a significant effect on their status, [the BLM shall] manage the habitat to conserve the species by:

> Ensuring candidate [and BLM sensitive species] are appropriately considered in land use plans (BLM 1610 Planning Manual and Handbook, Appendix C).
> Developing, cooperating with, and implementing range-wide or site-specific management plans, conservation strategies and assessments for candidate [and sensitive] species that include specific habitat and population management objectives designed for conservation, as well as management strategies necessary to meet those objectives.
> Ensuring that BLM activities affecting the habitat of candidate [and sensitive] species are carried out in a manner that is consistent with the objectives for managing those species.
> Monitoring populations and habitats of candidate [and sensitive] species to determine whether management objectives are being met.

Additionally, BLM must ensure compliance with BLM Manual MS¬6840.22. Provisions here require BLM to take a broad and proactive approach to special status species management, and in the context of planning require that, "Land use plans shall be sufficiently detailed to identify and resolve significant land use conflicts with special status species without deferring conflict resolution to implementation-level planning." (emphasis added).

Take for instance, bighorn sheep, the EIS and proposed RMP fails to even mention let alone implement the BLM's bighorn sheep manual.

The proposed RMP does not provide meaningful security for bighorn sheep populations in and near the BLM Uncompahgre Field Office, and does not comply with BLM Sensitive Species policy, BLM Manual 1730, or Colorado Grazing Standard 3. As such, it fails to comply with the requirement that RMP's must provide requirements and limitations needed to resolve use conflicts at the RMP level.

BLM fails to disclose the Field Office's record of NEPA completion for domestic sheep allotments, and therefore fails to disclose the likely effects to bighorn sheep populations should the proposed action be implemented. BLM's record of NEPA completion for existing domestic sheep permits in the Field Office, including those permits for allotments that pose a high risk to bighorn sheep, is exactly 0%. BLM's record of NEPA completion for all permits in the Field Office is 36%. Given that BLM's proposed alternative direction for the management of bighorn sheep is that existing BLM policies will be implemented when NEPA assessments are conducted, that BLM has not completed NEPA assessments for domestic sheep permits despite the designation of bighorn sheep as a Sensitive Species, and that BLM is unlikely to initiate NEPA assessments in the near future, BLM here proposes to remain in noncompliance with existing policies regarding bighorn sheep indefinitely. BLM in effect proposes the continuation of current management as described under Alternative A. Unless BLM develops and adheres to a schedule for NEPA analysis of all domestic sheep allotments not exceeding the date of expiration of existing permits, direction contained in the RMP will have no beneficial effects, and likely will have undisclosed harmful effects, to bighorn populations. This failure to disclose this information violates NEPA's "hard look" requirement and FLMPA's RMP development and Sensitive Species requirements.

BLM describes positive outcomes for bighorn sheep under Alternative E resulting from the potential for reestablishment of bighorn populations to areas where Risk of Contact modeling indicates low risk. However, the current configuration of sheep allotments in the Field Office will prevent bighorn reestablishment to historic habitat in the absence of a commitment to the completion of NEPA analyses on existing domestic sheep allotments and resultant actions closing sheep allotments with significant risk. In addition, under Alternative E, BLM will allow for the conversion of cattle allotments to sheep allotments in areas deemed low risk to bighorn sheep, which will preclude the expansion of bighorn sheep into those habitats. The actual potential for bighorn habitat expansion over the long term is therefore at best equivalent to management under Alternative A.

BLM fails to include qualitative or quantitative management objectives or desired outcomes for bighorn sheep populations potentially affected by domestic sheep grazing, and fails to include standards for bighorn sheep monitoring which would provide any substantive opportunity to determine whether objectives are being met. Adherence to Colorado Parks and Wildlife population objectives alone will fail to address known critical limitations to bighorn sheep populations and habitat resulting from domestic livestock grazing and surface disturbing activities, as those objectives are set below landscape carrying capacity in an effort to minimize contact with domestic sheep allotments. The circular logic in adopting CPW objectives which were initially based, in part, on BLM's own bighorn-limiting activities is untenable. Further, the proposed RMP fails to comply with BLM Sensitive Species policy and direction as discussed later.

BLM fails to disclose the likely outcomes of bighorn sheep exposure to domestic sheep on BLM allotments under each of the plan alternatives. BLM does not quantify the probable population impacts due to die-offs, declines in lamb recruitment, and habitat limitations resulting from each alternative, so that the alternatives can be reliably compared. BLM also does not disclose the economic losses and losses of recreational opportunities relating to bighorn sheep associated with each alternative. This violates NEPA's "hard look" requirement.

BLM_0075973

BLM fails to consider the cumulative effects of domestic sheep pathogens on bighorn sheep populations within the cumulative impact analysis area. In the last century, bighorn sheep populations have been reduced by more than 90% rangewide as a result of human activities, including the grazing of domestic livestock. Many herds remain small, isolated, and at risk of extirpation. The species has suffered significant and irreversible genetic losses, affecting individual and population fitness, mating success, resilience to disease and disturbance, and the ability to adapt to the effects of climate change. No bighorn sheep herd within the cumulative impact analysis area is secure from the threat of disease posed by domestic sheep on the landscape. The cumulative short and long term effects of authorized domestic sheep grazing on bighorn sheep throughout the impact area must be disclosed. This violates NEPA's "hard look" requirement.

**Migratory Birds:** Woodyard et al (2003) conducted bird censuses along an elevational gradient in east-central Nevada. These censuses were conducted in study plots monitored in 1981 and 1982 by Dean E. Medin and found fewer species and total numbers of birds (62% less)[16]. Parrish et al (2002)[17] also describe the declines in these birds due to a variety of factors relating to habitat. They provide descriptions of the birds in Utah most in need of conservation and describe their habitat requirements, threats and management considerations. They discuss habitats most in need of conservation. Habitats such as shrub-steppe occurring in the Pocatello Resource Area are described as in need of protection. Medin et al (2000) provide a discussion of bird-habitat relationships for the Great Basin that provide insight into the habitats that occur in the Pocatello Resource Area and their relationships to these birds. Many of these birds are dependent on riparian areas[18].

Paige and Ritter (1999) cite population declines of 63% and 70% in shrub dependent and grassland bird species during the last 30 years across the U.S. In the Intermountain West, more than 50% of shrub- and grassland species show downward trends with sagebrush steppe as the highest priority for conservation based on trends for habitat and bird populations[35]. They provide detailed descriptions of the history, characteristics and management of these systems with management recommendations. They note that cattle grazing in sagebrush steppe first select grasses and forbs and avoid browsing on sagebrush. In addition, even light grazing can put pressure on the herbaceous plants favored by livestock and intensive spring grazing prevents bunchgrasses from reproducing, eventually eliminating the palatable native bunchgrasses. They also discuss the response time for recovery of these systems and parasitism by cowbirds, a significant factor in decline of songbirds in some areas.

[16] Woodyard, John, Melissa Renfro, Bruce L. Welch and Kristina Heister. 2003. A 20-year recount of bird populations along a Great Basin elevational gradient. USDA Forest Service Rocky Mountain Research Station Research Paper RMRS-RP-43.

[17] Parrish, Jimmie R., Frank Howe and Russell Norvell. 2002. Utah Partners in Flight Avian Conservation Strategy Version 2.0. Utah Division of Wildlife Publication No. 02-27. 305p.

[18] Medin, Dean E., Bruce L. Welch and Warren P. Clary. 2000. Bird habitat relationships along a Great Basin elevational gradient. USDA Forest Service Rocky Mountain Research Station Research Paper RMRS-RP-23. 22p.

BLM_0075974

Taylor (1986) evaluated the effects of cattle grazing on birds nesting in riparian habitats[19]. He found that increased grazing resulted in decreases shrub volume and density and decreased bird abundance. *"The longer the time since a transect was last grazed correlated significantly with increases in bird abundance, shrub volume and shrub height"*. Bird species decreased with increased grazing, bird counts were 5 to 7 times higher on an area ungrazed since 1940 than on 2 areas grazed annually until 1980 and 11 to 13 times higher on a transect that was severely disturbed.

Krueper et al (2003) studied the changes in vegetation and breeding birds in the San Pedro River, Arizona following removal of cattle in 1987[20]. Birds were monitored for five years. Mean numbers detected along riparian transects increased by 23% per year or from 103/km in 1986 to 221/km in 1992. Earnst et al (2004) compared songbird abundance in 2000-2001 to that in 1991-1993, following cattle removal from the Sheldon National Wildlife Refuge in 1990[21]. Of 51 species for which abundances were sufficient to calculate changes, 71% exhibited a positive trend. Detections of ground/low cup and high cup nesting species, ground/understory foraging species, aerial and overstory foraging species increased significantly.

Rich (2002) evaluated the ability of riparian PFC assessments as employed by BLM and noted that they lacked the ability to incorporate assessment of land breeding bird communities[22]. He constructed a list of riparian-obligate birds that should occur on the site during the breeding season and used that to score the site based on the percent of those occurring there.

The RMP/EIS must review the habitat requirements for migrant birds, the effects of livestock grazing at the permitted numbers in combination with all other habitat altering management proposed and provide prescriptions that will assure migrant birds and their habitat improve.

CURRENT RMP PERFORMANCE AND ACCOMPLISHMENTS

In order to comply with NEPA and the APA, the BLM must conduct a thorough review of the performance and accomplishments of the current RMP as well as the validity and accuracy of the current RMP's NEPA documents. Further, the BLM must analyze how effectively the RMP and ROD have been implemented, what goals and objective have been met and why aspects of the RMP and ROD were not implemented or not implemented effectively.

Such analyses must form the foundation for any RMP revision. Such analyses are fundamental not only compliance with the law by basic management principles.

---

[19] Taylor, Daniel M. 1986. Effects of cattle grazing on passerine birds nesting in riparian habitat. Journal of Range Management 39(3):254-258.

[20] Krueper, David, Jonathan Bart and Terrell D. Rich. 2003. Response of vegetation and breeding birds to the removal of cattle on the San Pedro River, Arizona (U.S.A.). Conservation Biology 17(2):607-615.

[21] Earnst, Susan L., Jennifer A. Ballard, and David S. Dobkin. 2004. Riparian songbird abundance a decade after cattle removal on Hart Mountain and Sheldon National Wildlife Refuges. USDA Forest Service PSW-GTR-191.

[22] Rich, Terrell D. 2002. Using breeding land birds in the assessment of western riparian systems. Wildlife Society Bulletin 30(4):1128-1139.

BLM_0075975

The EIS failed to comply with this.

<u>ECONOMIC ANALYSIS</u>

The RMP/EIS must adequately and honestly analyze the economic impacts of livestock grazing on BLM lands. The BLM has pandered to "lifestyles" for ranchers while ignoring the actual contribution of the livestock grazed to the local and regional economy or the economic impacts of the land degradation that takes place from livestock grazing. The Fish and Wildlife Service publishes reports on the value of wildlife-associated recreation that shows values of hundreds of millions of dollars to billions of dollars of revenue related to hunting, fishing and wildlife watching in each western state[23]. In addition, the cost of polluted water, loss of watershed storage due to soil compaction and loss of herbaceous cover are not counted in the costs of livestock grazing. As the reference below shows, in actuality, rural communities as well as livestock permittees depend on other sources of income. Laws require that public lands be administered in the long-term interests of the American people and not a handful of stockmen, who are permittees, on the public lands.

Livestock permittees are a small minority of livestock producers in the eleven western states and are insignificant in their numbers or their economic contribution to the States, their local and regional economies. Their numbers and contribution pale in comparison to the natural values of our public lands. Dr. Thomas Power, Chairman of the University of Montana's Economics Department, in Wuerthner and Matteson (2002)[24] points out the minimal economic contribution of federal public lands livestock grazing to local, state and regional economies in the West. That reference can be found on-line at:

**http://www.publiclandsranching.org/htmlres/PDF/wr_TAKING_STOCK.pdf**

Dr. Power also points out that the majority of public lands livestock producers depend on non-agricultural sectors of these local, state and regional economies for employment, not livestock production. It is not in the public's interest to blindly continue livestock grazing at unsustainable stocking levels in order to provide a short-term benefit to this small minority, while ignoring the values displaced by livestock grazing.

Dr. Power shows that *"Livestock grazing on federal lands is generally unimportant to local economies and even less so to state and regional economies. In terms of income and numbers of jobs provided, the contribution of federal lands grazing is less than 0.1% across the West. Farm and ranch operations are increasingly reliant on non-farm income sources to be financially feasible, while livestock grazing competes with other uses of public lands – such as clean water, recreation, wildlife habitat – that contribute to the ongoing vitality of western economies."*

---

[23] U.S. Department of Interior, U.S. Fish and Wildlife Service, U.S. Department of Commerce and U. S. Census Bureau. 2002. 2001 National Survey of Fishing, Hunting and Wildlife-Watching Associated Recreation. 170 p.
[24] Wuerthner, George and Mollie Matteson. 2002. Welfare ranching: the subsidized destruction of the west. Island Press.

In his analysis of the economies of individual rural counties, Dr. Power showed that federal lands grazing does not contribute significantly to those economies across the west. In fact, given the high percentage of ranching families that have jobs, either full or part time outside the ranch (60 – 70%), it is ranchers that depend on the other economic sectors for their ability to persist, not federal grazing. Dr. Power states, *"It is not that towns depend on agriculture, but that agriculture increasingly depends on the vitality of urban and nonagricultural rural economies to provide the nonfarm income that keeps farm operations alive."*

Dr. Power states that claims about the relative importance of federal grazing to the economies of western states can be analyzed by answering these questions:

1. "What portion of the value produced by cattle and sheep operations is associated with feed used?

2. What portion of the feed for those cattle and sheep operations comes from grazing on federal lands?

3. What portion of the total agricultural activity involves raising cattle and sheep?

4. What part of the total economy is represented by agriculture?"

The RMP Economic analyses should include consideration of this information and the following:

➢ costs of administration
➢ costs of installation and maintenance of range improvements borne by the BLM and/or funded by county range improvement funds
➢ grazing fees collected and their distribution to various entities
➢ grazing fees collected and net return to the Forest Service and the American people, and separate out the dollars returned to grazing permittees and local counties.
➢ value of livestock grazing gross revenue to the permittee at current market rates
➢ value of wildlife-associated recreation (DOI 2002)
➢ loss in value of wildlife associated recreation to livestock grazing by using equivalent AUMS consumed by livestock as applied to wildlife needs (AUMs) and economic benefits
➢ cost of soil erosion and loss of groundwater recharge and streamflow
➢ cost of water pollution
➢ the net contribution of the individual livestock operations under consideration to the county and regional economy
➢ compare the individual livestock operation in dollars and jobs to the local, state and regional economy and report what percentage this allotment comprises of this total
➢ compare these various economic values with other economic and employment sectors at those local, state and regional levels.

BEDROCK ISSUES

The RMP and EIS failed to consider the bedrock management principles that direct all activities on BLM lands. FLPMA is one of these key bedrock laws. FLMPA requires the BLM to manage public lands under the principle of multiple use and sustained yield.

The definition of multiple use in FLPMA is long, but key provisions include the following:

- Public lands and their resource values must be managed so that they "best meet the present and future needs of the American people;"
- It is appropriate that some land be used "for less than all of the resources;"
- There must be harmonious and coordinated resource management that is done "without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or greatest unit output."

43 U.S.C. § 1702(c)

Sustained yield as defined in FLPMA can be achieved either by "high-level annual" or "regular periodic" output of resources, so long as this is accomplished in a way that can be maintained in perpetuity and is consistent with the definition of multiple use. 43 U.S.C. §1702(h).

These definitions give substance to the requirement that land use plans and resulting management actions are to use and observe multiple use and sustained yield principles. The purpose of this planning process must be to produce a plan that "best" meets the present and future needs of the American people. The RMP cannot adequately meet these needs, or generally meet these needs, or largely meet these needs, it must "best" meet them. FLPMA explicitly requires that what is "best" must be viewed from the perspective of the present and the future and all alternatives, including the proposed action, must be designed to satisfy this requirement. What is best now may not meet future needs, and since future needs may be unknown in some respects, the only way to "best" insure that future needs are met is to develop and select alternatives that have a large built in margin of safety. To achieve a large built in margin of safety the plan should emphasize resource and ecosystem protection, which will best ensure that future options are retained.

Furthermore, what is "best" must be determined with reference to the needs of the American people as a whole, not a small subset of the American people. FLPMA explicitly provides that the plan that is developed need not accommodate all resource uses on all lands. This provision has special significance relative to grazing, oil and gas leasing, exploration, and development because too often essentially all lands are made available by the BLM for oil and gas extraction. By this legally required measure, rare, unique, and sensitive native species have a relative value far in excess of more common or easily replaced public land resources, or resources that can be provided from other lands. The same is true of many other resources, such as cultural and wilderness resources. Accordingly, the alternative plans that are developed, and particularly the preferred alternative, must give special emphasis to protecting and providing for relatively rare resources.

The FLPMA Section 1702(c) permanent impairment and Section 1732(b) prevention of unnecessary or undue degradation provisions are extremely important. They must inform and be the basis of all RMP direction.

The BLM must base its management decisions upon inventories of the resources that occur on the public lands. The BLM must structure a comprehensive inventory program to inform the RMP process. This is a crucial and frequently overlooked aspect of the planning process.

The EIS and RMP must also address CWA compliance, including monitoring, anti-degradation and Class I waters issues.

ECONOMICS OF THE LIVESTOCK PROGRAM

The Revised RMP should also contain a complete and unbiased economic analysis of livestock grazing, including the income to the federal government and counties of permitting grazing on allotments within the planning area and an accurate and thorough breakdown of costs of administering livestock grazing in the planning area. Costs should include restoration of habitats, monitoring, fence maintenance, and administrative and planning expenses. The costs of livestock grazing in terms of loss in ecological services should be analyzed. Ecological services compromised by livestock grazing include watershed function as a result of reduced ground cover, soil compaction and loss of infiltration capacity and water storage, soil erosion, loss of forage and habitat for native species. The forage consumed by livestock must be valued in terms of the value of deer and other wildlife species displaced, the loss of hunting and wildlife watching opportunities Further, in terms of the value of livestock grazing itself, Dr. Thomas Power (Power 2002) has developed questions that allow a determination of the significance of forage used on public lands to the economy as a whole. These are:

5. "What portion of the value produced by cattle and sheep operations is associated with feed used?

6. What portion of the feed for those cattle and sheep operations comes from grazing on federal lands?

7. What portion of the total agricultural activity involves raising cattle and sheep?

8. What part of the total economy is represented by agriculture."

The following references provide insight into non-market or ecosystem service valuations of natural resources: (1) Daily, Gretchen C and Katherine Ellison. 2002. The New Economy of Nature; (2) Committee on Assessing and Valuing the Services of Aquatic and Related Terrestrial Ecosystems, National Research Council. 2004.*Valuing Ecosystem Services: Toward Better Environmental Decisionmaking.* Washington DC: National Academies Press; (3) Loomis, John., Paula Kent, Liz Strange, Kurt Fausch, and Alan Covich. Measuring the Total Economic Value of Restoring Ecosystem Services in an Impaired River Basin: Results from a Contingent Valuation Survey. *Ecological Economics.* 33, pp. 103-117. 2000. (4) Loomis, John. Environmental Valuation Techniques in Water Resource Decision Making. *Journal of Water Resources Planning and Management,* Vol. 126, No. 6, pp. 339-344. November/December 2000.

RESOURCES

Attached we provide a range of information we request the BLM to review and provide analysis of in the EIS and move into management direction in the RMP. If the BLM feels that any of the information supplied is not applicable to the RMP planning process, we request the BLM to supply rationale in the EIS to justify that decision. Without such justification the BLM will not be complying with NEPA and the APA.

We also request the BLM to review its own analyses, management and monitoring direction contained in:

BLM Application of Environmental Laws, September 1995

BLM TR 1734-6 Interpreting Indicators of Rangeland Health

BLM TR 1737-20 Grazing Management Processes and Strategies for Riparian-Wetland Areas

BLM TR 1737-17 A Guide to Managing, Restoring and Conserving Springs in the Western United States

USDA FS RMRS-GTR-160 Survey Responses From the Intermountain West: Are we Achieving the Public's Objectives for Forests and Rangelands

US EPA Managing Change – Livestock Grazing on Western Riparian Areas, 1993

USDA FS Research Paper INT-RP-492 Response of a Depleted Sagebrush Steppe Riparian System to Grazing Control and Woody Plantings, 1996

USDA FS Research Paper INT-425 Bird and Small Mammal Populations in a Grazed and Ungrazed Riparian Habitat in Idaho, 1990

Montana BLM Riparian Technical Bulletin #3 Effective Cattle Management in Riparian Zones – A Field Survey and Literature Review

Montana BLM Riparian Technical Bulletin #4 Successful Strategies for Grazing Cattle in Riparian Zones, 1998

BLM TR 1737-14 Grazing Management for Riparian Wetland Areas, 1997

BLM TR 1730-2 Biological Soil Crusts: Ecology and Management, 2001

BLM TR 1737-3 Inventory and Monitoring of Riparian Areas, 1989

USDA FS PNW-GTR-361 Role of Nonmarket Economic Values in Benefit-Cost Analysis of Public Forest Management, 1996

USDA FS RMRS-GTR-47 Monitoring the Vegetation Resources in Riparian Areas

USDA FS RMRS-GTR-121 Guide to Effective Monitoring of Aquatic and Riparian Resources

BLM_0075980

USDA FS RMRS-RP-40 Counter Misinformation Concerning Big Sagebrush, 2003

USDA FS RMRS-GTR-141 Big Sagebrush: A Sea Fragmented into Lakes, Ponds and Puddles, 2005

We incorporate by reference all of the above and request that the BLM analyze each of them and add these to the administrative record.

The EIS stated that it was in compliance with WO IM 2012-169 but this is not the case. Clearly, just looking at the bighorn sheep issue, the IM was not implemented.

Let's look at Action #19 as an example of the failure to provide appropriate limitations and requirements. This "action" states:

> **Action:**
> Address climate change effects on soil and water resources, vegetation, and habitats and apply appropriate management to protect these resource values.

But this is a broad goal that lacks any specificity that would allow it to be implemented. As discussed in the earlier section on RMP requirements, this type of general„ 'apple pie' type statement does not drive or direct action. Appropriate actions would be such things as limitations on forage utilization, requirements for biological soil crust coverage by soil type with timeframes and repercussions if BSC recovery is not attained. This type of specificity, which the BLM's planning requirements mandate is totally absent from the DEIS.

In Action #25 we see that the BLM proposes to manage most of its lands to allow <50% of the areas to fail Rangeland Health Standards as long as the failing areas are "stable". This clearly does not comply with the 43 CFR 4180 mandate.

> Manage the remaining lands, streams, and wetlands to *fully meet* the BLM Colorado Public Land Health Standards or to *meet with problems* where needed to support resource uses, provided that lands meeting with problems are stable or trend toward achieving the BLM Colorado Public Land Health Standards.

Action #37 applies only to oil and gas, no other soil disturbing activity and that too only where BSC is in excellent condition. The vast majority of the FO has very low levels of BSC because of the impacts of livestock grazing but no recovery or protection actions are provided.

Goal #71 stunningly elevates resource extraction above other FLPMA requirements across nearly all the FO. Clearly, this does not comply with the wide range of requirements discussed above.

Frequently, we see such as in #74:

> **Objective:**

> Manage naturally occurring riparian and wetland areas <u>to maintain or improve</u> hydrologic and riparian vegetation conditions

But this is another typical way for the BLM to eliminate requirements. These kinds of statements must be changed to maintain areas exceeding objectives/standards and improve area not exceeding.

Another frequently abused weasely words rendering direction meaningless is the use of words such as "pursue" and "analyze" and "prioritize". All these modifiers render the subsequent direction utterly meaningless, and violate BLM's requirements for RMP development, as discussed earlier.

The primary impact to vegetation and the spread of weeds is livestock grazing yet the EIS fails to address this primary issue and the RMP fails to implement actions to deal with the problem.

#103 designates ecological emphasis areas but authorizes the same ecologically degrading activities, such as livestock grazing, in them. This renders the whole ecological emphasis area concept meaningless.

The elimination of #109 prioritized resource extraction of wildlife needs.

#116 fails to implement the recent WO IM regarding bighorn sheep management.

#126 is another example of meaningless direction that looks good on paper but does nothing:

> **Action:**
> Use adaptive management to conserve and avoid impacts on populations of Birds of Conservation Concern, Partners-in-Flight priority species, and other species of concern.

The action needs to properly define adaptive management triggers and response actions. As currently written it provides no management direction.

#128 is similar in its worthlessness:

> **Action:**
> Apply appropriate restrictions and mitigation to minimize impacts on migratory birds.

It is the RMP that is required to define what those "appropriate restrictions and mitigation" measures are and when they are to be applied. Again this violates the requirements for the development of RMP's

#136 is the same rubbish:

> **Action:**

> Promote BLM-sensitive species conservation to reduce the likelihood and
> need for species to be listed

This is a general goal not an action.

#543 is just pure corruption. The BLM is so spineless that it allows the only significant
impact to BSC to continue in the postage stamp sized ACEC to protect BSC.

It is quite similar to the bighorn sheep section that prohibits goat grazing that impacts
bighorn sheep, because goat grazing does not exist, very much like prohibiting Martian
landing sites, but leaves domestic sheep, which is very much a treat to bighorn sheep
essentially unaddressed.

On p. 317 we see the statement: "The "meeting the standard with problems" category implies
that less than half of the assessment sites within a soil polygon had a soil indicator rating of less
than satisfactory, but overall, the soil condition in the polygon was meeting the standard."

We could find no support, either in the 4180 regulations or elsewhere to support the policy that
49% of a land area failing Rangeland Health Standards meets Rangeland Health Standards.

Please provide the regulatory basis for this approach in the revised EIS.

We see on 3-21 the statements:

> The most recent salinity management efforts in the UFO have concentrated on non-
> structural controls, such as managing soil surface-disturbing activities such as livestock
> grazing and off-highway vehicle (OHV) use to minimize salinity yields.
>
> Because high concentrations of selenium occur in Mancos Shale and soils derived from this
> formation, land management practices and actions that reduce soil surface disturbance and
> deep water percolation minimize the yield of selenium offsite, much like salinity
> management.

Yet the primary surface disturbing activity across the FO, livestock grazing, has no
requirements or limitations put in place to reduce salinity or selenium.

3-29 states:

> Water quality of UFO surface waters is assessed and monitored by several means. The land
> health assessments conducted over the most recent ten-year period assessed water quality
> against BLM Colorado Public Land Health Standard 5. Data assessed for land health
> assessments include water chemistry, bacteriological analyses, density, and composition of
> aquatic macroinvertebrates, and the potential for accelerated levels of sediment, salinity,
> and selenium.

This statement implies that the BLM actually monitors the water quality impacts of its
authorized actions. I deal with dozens of FO's in Wyoming Utah and Colorado and none of
them do this. There is no evidence that the UFO is actually monitoring water quality
impacts of its actions, such as e. coli, sediment from livestock grazing on each allotment it
administers.

BLM_0075983

The FEIS failed to provide what data is being collected, where and how often and what percent of the FO the data collection efforts cover.

The EIS lists a large number of water bodies on the 303d list, but the proposed RMP does not implement actions to bring these water bodies into compliance with the CWA.

3-32 states that the BLM is mandated to reduce salinity but the proposed RMP is entirely silent on requirements and limitations to reduce salinity from most of its action, including the most significant source of increased salinity, livestock grazing.

3-33 states:

> As part of the land health assessment process, several UFO streams with primary-contact recreation activities were monitored for fecal and *Escherichia coliform* bacteria concentrations. There is a strong correlation between these bacteria and the occurrence of other pathogens. Based on a limited number of samples per site (usually one or two samples collected in spring or summer months), none of the sampled streams exceeded state criteria for bacteria

Please provide information as to the dates when this sampling occurred and when livestock were present on the applicable allotment. WWP and the Forest Service have collected thousands of e. coli samples and exceedances of standards only occur when livestock are present. Natural background levels of e. coli are rarely above 25 CFU. So if your data was not collected when livestock were present on the allotment, the results are meaningless to conclude there are no exceedances.

3-37 states:

> However, because many livestock tanks were constructed prior to state permit filings or being cataloged in BLM databases, the actual number is considered to be much higher. Many of the tanks are poorly maintained or non-functional and cause accelerated levels of erosion and sedimentation. Invasive weed species commonly become established on areas disturbed by livestock tanks, which can degrade watershed conditions.

Certainly, if the BLM were serious about salinity, erosion and selenium control it would have inventoried these for the AMS and then put in specific actions in the RMP to deal with this problem.

3-46 states:

> Across all ten land health assessment units, cool season grasses were underrepresented in the plant communities. This is probably the result of livestock grazing in the spring and fall periods when these grasses are most vulnerable. Often perennial forbs are also underrepresented in the same areas. The reduced cool season grass and forb cover may make it easier for exotic species such as cheatgrass to move in. On many crucial big game winter ranges throughout the planning area, moderate to severe hedging of palatable shrubs is common. Usually reduced vigor of these shrubs is also evident.

Yet the RMP puts in place no requirements or limitations to recover cool season bunch grasses, eliminate growing season grazing or deal with the over-allocation of forage and

winter range problems it fully knows about. The proposed RMP utterly fails to address these major FO-wide problems.

3-72 states:

> Within the last 10 years, two newly designated wilderness areas have effectively protected a substantial portion of the species' range from development-related impacts, and the Dominguez-Escalante and Gunnison Gorge NCAs have added or are likely to add new protections specific to the conservation of the Colorado hookless cactus.

But this inaccurately portrays the situation. None of these designations protect, and the RMP fails to implement protections, from the primary disturbance factor for this species, livestock grazing. The RMP fails to provide adequate protections in the BLM's rush to continue the status quo grazing.

Appendix C contains various BMP's but the RMP does not implement these. For instance in the livestock section we see rest and not doing repeated spring grazing yet the RMP fails to implement these BMP's despite the fact that repeated spring grazing is one of the major grazing problems on the FO.

So Appendix C looks good on paper but is worthless on the ground.

8. Colorado Best Management Practices and other scientifically developed practices that enhance land and water quality should be used in the development of activity plans prepared for land use.

But again these are not only undefined but not implemented.

Appendix G suffers from the same failure.

## GEOLOGY, SOILS, AND WATER

• Implement guidelines from BLM Technical Reference 1737-17 (Sada et al. 2001), to protect or restore the functions of springs.

• Measures designed to minimize erosion and water quality deterioration will be required in the site-specific plans for surface-disturbing land use activities.

• Implement BMPs from the BLM/USGS Mancos shale research findings (Murphy 2011) applicable to livestock management, recreation management (e.g. location and limitations of OHV use areas), rights-of-way, and other surface disturbing activities.

• Implement guidelines from BLM Technical Reference 1730-2 (BLM 2001), to protect or restore the functions of biological soil crusts.

Yet the RMP fails to implement any of these nor does the RMP require the implementation of these. So again it looks good on paper but is designed to be worthless from a resource protection perspective.

> Maintaining healthy soil surface conditions on Mancos shale landscapes is more effective for the long term in limiting the yield of sediment, salinity and selenium than physical retention/detention structures

Again the RMP fails to put in place any requirements or limitations to achieve this. This is particularly obvious from the perspective of livestock which is the primary impact to soil surface conditions.

> ☐ Minimize livestock grazing and trailing impacts in riparian areas to protect vegetation, habitat values, streambank stability, and water quality.

Yet the RMP puts in place NO requirements or limitations to achieve this.

The livestock grazing section of Appendix G is another example of where the RMP fails to implement basic protections.

Appendix K fails to comply with the WO IM on bighorn sheep management. It also fails to utilize current science. We provide as an attachment a review of the use of this model in the North Delta process.

The analysis also fails to address disease transmission from cattle.

From a recent RMP revision:

> https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=renderDefaultPlanOrProjectSite&projectId=36859&dctmId=0b0003e88040d6d4

### 2.4.6 Alternative L – Allow Domestic Sheep and Goat Grazing on All Allotments with Leasing Terms and Conditions to Reduce Potential Interspecies Contact

The BLM considered an alternative that would make all four allotments available for domestic sheep and goat grazing with application of the leasing terms and conditions identified in Appendix C to reduce the potential for contact with bighorn sheep. These terms and conditions have previously been identified, recommended, or implemented by the USFS and the BLM as best management practices (BMPs). However, when bighorn sheep CHHR occur in or adjacent to a domestic sheep allotment, and especially when the allotment is within bighorn herd home range, development and implementation of effective separation measures is difficult; and contact between the species will most likely still occur. **In other words, special terms and conditions to avoid contact between bighorn and domestic sheep that are known to be in close proximity are generally ineffective to ensure separation of the species.** Furthermore, even with these extra measures, control of domestic sheep, or monitoring and locating bighorn sheep in forested/ dense vegetation or steep/rocky/rugged terrain is very difficult. Accordingly, without a

large buffer between domestic and wild bighorn sheep, extra measures are not likely to result in a significant reduction in the risk of contact (Schommer 2009). No known studies, research, or peer reviewed literature has documented the effectiveness of BMPs preventing contact and disease transmission when domestic sheep or goats grazed within or adjacent to occupied bighorn sheep habitats. Appendix C contains a more detailed review of the effectiveness of BMPs.

The Partridge Creek allotment overlaps with bighorn sheep CHHR and the Marshall Mountain Allotment is in close proximity to CHHR. The Hard Creek allotment overlaps with the Little Salmon area of concern. The terrain on all three of these allotments is interspersed with dense vegetation and forested areas, with additional areas that are steep, rocky, and rugged. Therefore, application of the specified terms and conditions on these allotments would likely be ineffective at significantly reducing the potential for contact between bighorn sheep and domestic sheep. Hence, for the Partridge Creek, Hard Creek, and Marshall Mountain Allotments, this alternative would be effectively the same as Alternative A under which all four allotments would be available for domestic sheep grazing but without specified terms and conditions. Differing from the other three allotments, the Big Creek Allotment is not in or near bighorn sheep CHHR or the Little Salmon area of concern and has more open and moderately sloped rangeland. However, for this allotment, this alternative would be essentially the same as Alternatives B, which also makes Big Creek available for domestic sheep or goat grazing with application of the terms and conditions. Therefore this alternative was not analyzed in detail.

Appendix K relies on BMP's which have been shown to be ineffective and it ignores completely the WO IM for bighorn sheep which requires effective separation.

CONCLUSION:

The current RMP revision is BLM's traditional faith-based, politics-based management where no requirements or limitations are imposed.  The BLM should review the Standards of Ethical Conduct for Federal Employees [25] that are based on Executive Order 12674, as amended by Executive Order 12731.  In particular, three of the broad principles I believe apply here are:

*"(1) Public service is a public trust, requiring employees to place loyalty to the Constitution, the laws and ethical principles above private gain.*

*(5) Employees shall put forth honest effort in the performance of their duties.*

*(8) Employees shall act impartially and not give preferential treatment to any private organization or individual."*

---

[25] http://www.usdoj.gov/jmd/ethics/generalf.htm

Just because the BLM has outsourced much of this process does not mean it has any less legal or ethical responsibilities to the American people. I bring this up because, after years of working on livestock grazing and other issues on public lands and, with other WWP staff, having reviewed EAs and EISs on hundreds of grazing allotments and other projects, it is my belief that these documents are used to justify decisions that are already made and basically constitute a "shell game" in which evident degradation by livestock is explained away in every case due to some other cause even though livestock grazing is widely recognized in the scientific literature as a cause of degradation to riparian areas, water quality, plant communities, soils and wildlife. I cannot recall a single instance in all these cases, no matter how serious the environmental degradation, when the agency (Forest Service or BLM) performed an objective, science-based monitoring and analysis process directed at making an objective and logical decision concerning livestock grazing. Invariably, the decisions arrived at through these NEPA documents have amounted to a continuation of the status quo with at best, cosmetic changes that make little or no difference on the ground. It is time for BLM to demonstrate to the public that it will engage in an honest, objective process in order to restore the public trust.

Sincerely yours,

Jonathan B Ratner
Director, WWP –Wyoming Office



**Wyoming Office**
**PO Box 1160**
**Pinedale, WY 82941**
**Email: Wyoming@WesternWatersheds.org**
**Web site: www.WesternWatersheds.org**

*Working to protect and restore Western Watersheds*

**Western**
**Watersheds**
**Project**

Uncompahgre Field Office
Bureau of Land Management
2465 South Townsend Ave.
Montrose, CO 81401

BLM_0075989



**Wyoming Office**
PO Box 1160
Pinedale, WY 82941
Tel: (877) 746-3628
Fax: (707) 597-4058
Email: Wyoming@WesternWatersheds.org
Web site: www.WesternWatersheds.org          *Working to protect and restore Western Watersheds*

**Western
Watersheds
Project**

Uncompahgre Field Office
Bureau of Land Management
2465 South Townsend Ave.
Montrose, CO 81401

February 7, 2010

Re:      RMP Scoping Comments

Western Watersheds Project is concerned with the lack of any meaningful requirements or direction in RMP's developed over the last decade. We hope the Uncompahgre Field Office does not take that approach.

We are currently litigating 18 RMP's for a wide range of defects including such basic issues is failure to consider a no-grazing alternative.  The attachment Utilization Review looks at the common 50% utilization rate allowed and shows it is excessive.   We also attach a review of livestock weights and forage utilization that must be taken into account in the analyses.

There must be an analysis of the impacts of the thousands of water developments for livestock, the thousands of miles of fences and their impacts on wildlife, the loss of riparian and wetland areas due to water developments nor the thousands of acres of watershed and plant community degradation that occur around livestock water developments.  There must be an analysis of the watershed impacts from livestock grazing including the degree of loss of ground cover, the accelerated rate of erosion compared to natural conditions with intact plant and biological crust communities, the loss of ground water and watershed storage or the impacts on the Colorado River System and its endangered species.   The Colorado River Salinity Control Act must be directly addressed in regards to livestock, erosion, sedimentation and salinity.

Western Watersheds Project supports conservation and protection of our public lands and asks that, restrictions and analyses as specifically outlined below (bullet points) and based on the science provided in the attachments to these comments.

•        Protect all wilderness quality lands by closing them to off road vehicles and livestock
•        Address livestock grazing and the science of management including that in the Appendices.  Livestock have the most significant impacts on soil, water, wildlife and plant communities and ecosystems due to its near universal presence across the RA.
•        No reallocation of forage should occur for livestock in allotments that have not been grazed except to reallocate that forage to watershed protection and wildlife.

BLM_0075990

- All the ACECs should be closed to livestock grazing. No new leasing for oil, gas and minerals should occur in these areas and in all other areas until the current leases expire and/or are being developed. The low percentage of active leases relative to those leased dictates no further leasing during this planning period and former leases are closed and restored.

- The riparian goal of PFC is totally inadequate because PFC is only a minimal hydrologic evaluation, is highly subjective and biased. PFC does not address habitat or water quality. Regarding stubble height standards, they are ineffective because they are typically not enforced, do not represent use in riparian areas and little strips of sedges do not filter sediment. For filtering sediment, intact riparian areas with vegetated stream banks and fully vegetated riparian areas are needed to reduce erosion and filter sediment. These deficiencies should be addressed by closing all riparian areas to livestock.

- Rangeland Health is used as a goal, yet RH, like PFC is subjective, has not been documented to result in improved conditions and is a subjective measure with great bias. Reference areas should be the standard and these should be ungrazed, and their characteristics used to judge conditions in areas grazed or used for mining, oil and gas, oil shale, tar sands, and other extractive or land disturbing uses.

- Drought management should close all allotments during years of below normal precipitation due to the long recovery times for native plants when grazed and during dry years. This is especially the case for plant communities and soils that are already damaged. Forage should be allocated 100% to wildlife and watershed protection during below normal years, which occur more than half the time.

- Off-road vehicles including dirt bikes, ATVs, aerial vehicles should be banned from the RA. Four wheel drive vehicles (Trucks, SUVs) should be limited to main roads and dispersed camping areas adjacent to roads. Self-powered recreation should be emphasized. No new dispersed camping locations should be allowed.

- No mineral, oil and gas leasing or development should occur in roadless and/or wilderness quality lands or habitats for sensitive species. No new leasing should be allowed until existing leases expire or are developed.

- Spring sources and their watershed must be protected from surface disturbance, including livestock grazing and trampling and dewatering for development must be limited to minimally impact the associated wetland, riparian and wildlife values.

- Maintenance of water tables in riparian and wetland areas should be a mandate because water is precious in arid environments and BLM should not sacrifice soil and ground water storage to activities such as grazing and trampling of livestock or OHVs. Buffers for all uses must be established to restore these degraded systems. They should be closed to livestock to control coliform pollution, provide a buffer to protect water quality, limit erosion and sedimentation and due to the importance for wildlife.

- Predator Control should be eliminated and let natural processes occur. Owners of livestock grazed on public lands must accept this risk. It is time to allow coyotes, foxes, badgers, ravens, mountain lions and others to function in their role of keeping deer out of riparian zones, controlling rodent populations, consuming carrion and providing the ecosystem benefits that come with predators. Livestock owners should not be allowed to kill predators as there are many methods they can use to protect their livestock that don't result in killing of predators.

- Fire and Fuels Management should include recognition of the role of livestock in fostering cheatgrass, juniper expansion, sagebrush expansion, weeds and invasives, and loss of biological crust. Livestock should not be grazed in areas where cheatgrass exists or areas that are susceptible to cheatgrass invasion.

- Lands not available for livestock grazing should include areas with soils subject to moderately high to high erosion by wind and water and slopes over 30% in addition to the areas listed. Riparian areas should be placed off limits to livestock due to the severe degradation and the need to "accelerate restoration" as required by FLPMA. Tinkering

around with Rangeland Health and PFC assessments with their inherent subjectivity and bias or riparian stubble height measures which are universally abused and have not proved effective is a flawed approach. These should be abandoned in favor of definitive actions and quantitative based monitoring with comparisons to reference areas instead of kicking the can down the road while the land, water supply and wildlife suffer for more decades.
• 10% of the Field Office should be excluded from permitted livestock grazing in order to serve as controls.

The following sections provide additional comments and scientific information which the RMP must consider in its planning and analysis.
Livestock Grazing

In 2004, WWP submitted a review of livestock grazing management science to all Field Offices and the State Office in an effort to have BLM incorporate the best available science into its range management. A copy of that document is included with these comments. In addition, an update of the AUM forage consumption value to reflect current livestock weights was completed in 2009. This analysis is also attached. It shows that the forage values BLM uses underestimate forage consumption by livestock such that taking into account the most current information on livestock weights would automatically reduce current permitted numbers in each allotment and pasture by 1/3. WWP has also reviewed the impacts of livestock on water quality, watersheds and riparian areas showing that the impacts are well understood.

Additional concerns with livestock grazing are the destruction of soil crusts and removal of soil stabilizing vegetation, thus impairing soil and microbiotic function. Such functions as nutrient cycling, water infiltration and storage are drastically altered. By grazing livestock on the sensitive and erodible soils found in the RA, BLM is impairing watershed function, creating salinity problems in the Colorado River, which is in opposition to the Colorado River Salinity Control Act. This also results in the impairment of habitat for sensitive, threatened and endangered fish. It is BLM's obligation to research and provide citations and a summary of this research that clearly documents the role of livestock grazing within upland and riparian ecosystems in altering watershed function as well as water quality, and delineate what particular practices will be followed to protect water quality, including effectiveness monitoring.

For example, sediment load and turbidity increase from watershed inputs, instream trampling, disturbance and erosion from denuded streambanks, reduced sediment trapping by riparian and instream vegetation, loss of bank stability and increased peak flows from compaction. Fine sediments increase in depositional environments (pools, quiet water areas) from the increased erosion and spawning gravels are made unusable due to high sediment content (Belsky and Uselman, 1999 ). White et al (1983) found sediment yield 20-fold higher in a grazed watershed when compared to an ungrazed watershed. USDA (1981) reported that topsoil erosion rates from grazed forest and rangeland were 4.2 tons/acre-year and 3.1 tons/acre-year compared to less than 1 ton for healthy forest and range. Packer (1998) documented that loss of soil in Utah and Idaho watersheds through erosion and runoff increased as ground cover decreased. A decrease in ground cover from 40% to 16% resulted in 6 times more runoff and 5.4 times more sediment yield. Trimble and Mendel (1995) estimated that peak storm runoff from a 120 ha basin in Arizona would be 2 to 3 times greater when heavily grazed than when lightly grazed.

BLM_0075992

Even under moderate stocking rates, grazing contributes to the deterioration of soil stability in deserts (Warren et al. 1985) , thus leading to increased soil erosion.  Soil erosion is further exacerbated by increased surface runoff triggered by loss of vegetative cover and litter (Ellison 1960) , both of which have been shown by numerous studies to be reduced by livestock grazing.  Numerous studies have observed severe erosion in the western United States when comparing heavily grazed areas to ungrazed sites (e.g. Cottam and Evans 1945 , Gardner 1950 , Lusby 1979 , and Kauffman et al. 1983 ).  Furthermore, there are a number of extensive literature reviews on this topic that describe the indisputable impact of livestock grazing on soil stability and erosion (see Gifford and Hawkins 1978 , Fleischner 1994 , and Jones 2000 ).   The Lusby study cited here was conducted on tributaries of the Colorado River and demonstrated the significant change in sediment delivery and runoff in a watershed that was closed to livestock grazing when compared to its paired watershed that continued to be grazed.

The effects of surface disturbance by livestock on soils, biological crusts and plant communities as they interact with wind must be analyzed in an appropriate model that takes into account ground cover, shrub and forest cover, erosion factor, wind patterns and speed to determine the impacts on ambient air quality and human health in nearby communities, National Parks and the region from particulate pollution.  This analysis must include consideration of all other surface disturbing activities such as recreational vehicles, normal traffic, oil, gas and mineral exploration, development and production activities.  In addition, the release of greenhouse gases ($CO_2$ and $CH_4$) and other organic or inorganic pollutants must be calculated and modeled to determine the impacts on air quality, climate change and global warming, wildlife and human health in a like manner.  For example the report recently released by the United Nations, Livestock's Long Shadow, shows that the greenhouse gas emissions from livestock are greater than that from transportation.

The BLM should conduct a capability analysis to determine the areas that might be available for livestock grazing, excluding steep slopes >30%, low forage production <200 lbs/areas, ecosystems converted by wildfire or invasive weeds, and the ability of sensitive soils to respond following impacts (arid elevations, reclamation, soil chemistry, drought).  Then, in consideration of wildlife competition and recreation impacts, determine those lands that will be made available (suitable) for livestock grazing.  Areas that should not be considered suitable include riparian areas, wilderness areas, wilderness study areas, ACECs, sensitive soils, crucial wildlife areas, and public campgrounds and other administrative sites.  Once this is done, BLM should then apply the current forage capacity and livestock consumption rates to determine the appropriate stocking rates and incorporate management as described in Appendix 1.  This analysis, which will result in significantly reduced grazing, should determine the levels and management of livestock for analysis for comparison with a NO Grazing Alternative and the Status Quo, or No Action Alternative.

The DEIS must analyze the role and values of predators in controlling rodent populations and fulfilling their role in a healthy ecosystem.  This is addressed here under Livestock issues because the reason predators are persecuted is the failure of the livestock industry to manage their livestock and the blame is placed on predators for losses.  Studies have documented the importance of predators to restoration of plant communities, particularly riparian and aspen areas. These have correlated loss of cottonwood recruitment with extirpation of wolves and increased elk browsing in Yellowstone NP ; demonstrated the loss of cottonwood recruitment and riparian degradation in Zion NP where cougar populations have been eliminated, resulting in deer consumption of cottonwood seedlings, while in areas with cougars, healthy riparian areas and cottonwood recruitment

BLM_0075993

occur ; postulated the elk/wolf relationship in YNP will rebalance plant community structure, including aspen ; in Banff NP, wolf exclusion decreased aspen recruitment, willow production and increased browsing intensity ; and documented aspen decline associated with removal of wolves in YNP.

In addition to the role of predators in restoring ecosystem function, predator control efforts cost lives in helicopter crashes and other means; disturb non-target wildlife with helicopters, airplanes, off-road vehicles and human disturbance; and place humans and their pets at risk from M44s, snares, leg-hold traps and other obnoxious means. BLM must take a pro-active stance in eliminating this practice as it represents a basic conflict between livestock, wildlife and recreational users.

The role of livestock grazing in establishing infestations of cheatgrass or other flammable conditions such as increasing juniper expansion, sagebrush expansion and increasing fuel loads must be addressed and the costs and benefits evaluated. The recent book, Wildfire, by George Wuerthner explores this topic in great detail and its content should be included in the analysis.

As described above, stocking rates and grazing systems must take into account the precipitation and forage production elements with proper stocking rates based on utilization rates that are sustainable. The DEIS must present an allotment by allotment summary of current monitoring information that describes the trend or condition as compared to the existing RMP. Claims of streams and riparian areas in PFC ignore that PFC is a minimal classification that does not address the wildlife habitat attributes of these most important areas, water quality or instream habitat for fish. In addition, springs, seeps and wetlands condition and trend are not described. Where is the analysis of utilization and annual stocking rates?

The DEIS must propose science based utilization standards for upland and riparian areas, stream bank stability standards or other critical livestock management mechanisms. The DEIS must provide specific monitoring requirements to satisfy the FLPMA mandate for effectiveness monitoring.

Livestock grazing within arid regions of the west have damaged 80% of streams and riparian ecosystems (USDI 1994a) . Impacts from livestock grazing include affects to soils, vegetation, stream hydrology, channel morphology, fisheries, riparian-dependent wildlife, water quality, water temperature, and sedimentation (Belsky 1999) . However, between 60-80% of birds and other wildlife species are dependent on support from riparian habitats for food, nesting, cover, shade, shelter, breeding and water sources (Ohmart 1996 , Chaney et al. 1990 , Thomas et al. 1979 ). With similar attractions, studies have found cattle spend between 5-30 times as much time in these highly productive riparian zones which can supply up to 81% of the forage consumed from only 1.9% of the allotment by area (Roath and Krueger 1982 , Skovlin 1984 ). Saab et al (1995) concluded that 46% of the 68 neotropical migrant birds which utilize riparian habitat declined in abundance in response to livestock grazing. Nutrient concentrations from livestock urine and manure can accumulate within grazed streams, reducing dissolved oxygen and aquatic species composition (Schepers et al. 1982 , , Taylor et al. 1989 ). Livestock trampling and vegetative removal along streambanks results in increased erosion, wider channel widths, and sedimentation of streams also reducing habitat quality and biodiversity of fisheries, amphibians, and invertebrates which serve as prey bases for other wildlife (Belsky 1999).   Studies have found that use of proper grazing systems such as rest-rotation, seasonal, or deferred grazing, reduced stocking rates and fencing away from stream corridors can reduce grazing impacts from cattle

BLM_0075994

within riparian areas unless topographic limitations force them to remain in riparian zones (e.g., Clary and Webster 1989 , Elmore and Kauffman 1994 , Burton and Kozel 1996 , Weller 1996 ), but no grazing system was compatible with a healthy aquatic ecosystem (Meehan and Platts (1978) .

The DEIS must analyze the role and values of predators in controlling rodent populations and fulfilling their role in a healthy ecosystem.  This is addressed here under Livestock issues because the reason predators are persecuted is the failure of the livestock industry to manage their livestock and the blame is placed on predators for losses.  Studies have documented the importance of predators to restoration of plant communities, particularly riparian and aspen areas. These have correlated loss of cottonwood recruitment with extirpation of wolves and increased elk browsing in Yellowstone NP ; demonstrated the loss of cottonwood recruitment and riparian degradation in Zion NP where cougar populations have been eliminated, resulting in deer consumption of cottonwood seedlings, while in areas with cougars, healthy riparian areas and cottonwood recruitment occur ; postulated the elk/wolf relationship in YNP will rebalance plant community structure, including aspen ; in Banff NP, wolf exclusion decreased aspen recruitment, willow production and increased browsing intensity ; and documented aspen decline associated with removal of wolves in YNP.

In addition to the role of predators in restoring ecosystem function, predator control efforts raise  public health and safety issues by costing lives in helicopter crashes and other means; increasing disturbance to non-target wildlife with helicopters, airplanes, off-road vehicles and human disturbance; and place humans and their pets at risk from M44s, snares, leg-hold traps and other obnoxious means.  BLM must take a pro-active stance in eliminating this practice as it represents a basic conflict between livestock, wildlife and recreational users.

The role of livestock grazing, motorized recreation, and mineral and oil/gas extraction in establishing and spreading infestations of invasive cheatgrass, knapweed and increases in other flammable conditions such as increasing juniper expansion, sagebrush expansion and increasing fuel loads must be addressed in the DEIS and the economic costs and benefits evaluated.   The recent book, Wildfire, by George Wuerthner explores this topic in great detail and its content should be included in the analysis.

Motorized Recreation

Motorized recreation has been and remains largely unpatrolled, unenforced and is bordering on an outlaw activity because riders of ATVs, dirt bikes, etc understand there is none to minimal enforcement.  In view of the President's declaration that our dependence on foreign oil is a National Security issue and we must engage in conservation, BLM should take this mandate seriously to minimize greenhouse gases, soil erosion and noise pollution.   The science on this issue as presented in the new book, Thrillcraft by George Wuerthner is a comprehensive source that BLM must consult in evaluating any alternatives regarding Motorized Recreation.

The BLM should at a minimum, analyze alternatives including No Action (status quo), No ATVs, Dirt Bikes or Snowmobiles, or the new experimental playtoys, Personal Aerial Vehicles, and the level of use allowed in the current set of alternatives.  Some of the science regarding this issue is presented in the following paragraphs.

Enforcement:  The USU Institute for Outdoor Recreation and Tourism has conducted studies showing that nearly 40% of riders admit going off legal trails on their last ride .

The Forest Service published a Technical Report in 2005 (RWU – 2905) that recognized there is a lack of evidence that educational programs lead to behavioral changes in motorized users.  The DEIS must provide evidence that any proposed mitigation and enforcement efforts will be effective for those alternatives that allow any level of use by these machines.

Noise and Safety:  The DEIS must address safety and noise effects to non-motorized users and wildlife.  Quiet environments are becoming extremely rare.  In a recent study by a professional sound recorder who visited 15 western and Midwestern states, it was found that quiet periods longer than a minute and a half without the sound of motors were difficult to find .  Another study pointed out that in 1999, the decibel levels of conversation among Americans had risen to 65 decibels, up 10 decibels from a decade earlier, or a doubling of volume due to elevation of background noise levels .  While it is recognized by OSHA and other health officials that exposure to noise of 85 decibels and higher leads to hearing loss, noise at even lower levels can lead to physiological changes in blood pressure, sleep, digestion, and other stress-related disorders.  Former U.S. Surgeon General William H. Stewart stated that, "Calling noise a nuisance is like calling smog an inconvenience." , , , ,    Loud noise, even within established health guidelines, can lead us to feel, angry, frustrated, annoyed and prone to violence in addition to contributing to hearing loss.  In the period between 1982 and 2000, the incidence of measurable hearing loss increased by 15 to 60%, depending on the age group.  In 1999, the U.S. Census Bureau rated noise as the single biggest neighborhood problem among those surveyed. More than one in ten people cited traffic noise as of concern and nearly half of those said they had considered moving as a way of escaping such noise .  The EPA has found that 20% of those surveyed are "highly annoyed" when sound levels reach 55 decibels .  Federal regulations for highways dictate that if a new or expanded road will yield noise levels of 67 decibels or higher, efforts must be made to bring about a substantial reduction in noise levels.  Generally this involves construction of sound barriers .

After Zion National Park banned private vehicles and instituted a low pollution shuttle bus system, visitors commented that the absence of RVs with generators running, buses with clouds of diesel fumes and noise were noticeable and that  they could now hear birds calling, streams running, and other low-volume sounds of nature that were previously obliterated by "vehicle noise".   Noise is a particularly objectionable aspect of snowmobile use.  A Park Service report showed that even "quiet" snowmobiles could be heard more than two miles away, thus affecting a four mile wide area adjacent to travel corridors or use areas .  This means that a snowmobile traveling 50 miles in one day, which they can easily do, can affect an area of 200 square miles.  A visitor survey at Grand Teton National Park found that 96% thought snowmobiles had a negative impact on the park because of noise, air pollution and negative effects on wildlife .

Air and Water Pollution:  Public Lands and National Forests should function primarily as the watershed for local communities and for preserving natural stream flows and water quality.  The combined effects of sediments from watershed uses such as roads, OHVs, grazing and logging, have not been addressed in a comprehensive analysis.   No evaluation has been done for the contribution of hazardous pollutants to the air and watersheds where motorized vehicles are used.  Atmospheric inversions and canyon environments can trap and hold these hazardous air pollutants and raise exposures to people and wildlife.

Fuel and lubricants used in these machines spill on the ground and are carried out in exhaust streams and then deposited into the snow and soils wherever they go.  They

contain benzene, xylene, toluene, polycyclic aromatic hydrocarbons and other hazardous organic chemicals . As the Montana DEQ states, "A portion of the air/fuel/lubricant charge escapes directly to the atmosphere with the combustion products, producing poor fuel economy and releasing high levels of hydrocarbons as air pollutants. This phenomenon is known as "short circuiting." EPA models and emission factors should be used to determine the impacts on the environment and exposures to cross country skiers and snowmobile users from these machines. Other information is available showing that noise levels of both two-cycle and four-cycle engines reach levels up to 110 dB even in four stroke engines. EPA and the Montana Department of Environmental Quality have provided research on this issue. The EPA and Montana DEQ websites provide links to much of this information and EPA has modeling protocols to allow prediction of emissions from these vehicles .

Accumulations of motorized hydrocarbon pollutants from rubber tires, fuel and motor oils collect on rocks and within pothole waters within streams and canyon (USDI, 2005 Jeep Safari EA) which can support and adversely affect wildlife, growth of amphibians and invertebrates used for prey bases (Lefcort et al, 1997). Vehicle disturbance within streams can also negatively affect reproduction of amphibians where eggs and growth occur in warm pools which can be fatally crushed or covered with silt as vehicles pass (Schelz, Salt Creek Report 2001). Limitations on the number of motorized uses and areas of use need to be included in the BLM Preferred alternative of the DRMP/EIS to reduce these motorized impacts.

The pollutants emitted by these machines are carcinogenic to humans and highly persistent in the environment, adversely affecting terrestrial and aquatic organisms, including reduced plant productivity, tree mortality and making plants susceptible to disease and pests.

Road densities must be analyzed nor have their effects on wildlife been analyzed. Researchers, including those with the Forest Service have documented the effects of roads and OHVs on wildlife and the benefits of roadless areas. For example, Gilbert , Noss and Wisdom et al describe the detrimental effects of road density and human activity on large mammals causing large displacements away from roads and mechanized activity.

Thank you,

Jonathan B Ratner
Director – Wyoming Office



**Wyoming Office**
**PO Box 1160**
**Pinedale, WY 82941**
**Email: Wyoming@WesternWatersheds.org**
**Web site: www.WesternWatersheds.org**

*Working to protect and restore Western Watersheds*

**Western**
**Watersheds**
**Project**

Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave
Montrose, CO 81401

BLM_0075998



**Wyoming Office**
**PO Box 1160**
**Pinedale, WY 82941**
**Tel: (877) 746-3628**
**Fax: (208) 475-4702**
**Email: Wyoming@WesternWatersheds.org**
**Web site: www.WesternWatersheds.org**          *Working to protect and restore Western Watersheds*

**Western**
**Watersheds**
**Project**

October 23, 2016

Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave
Montrose, CO 81401

Re:  RMP Comments

*"A thing is right when it tends to preserve the integrity, stability, and beauty of the biotic community. It is wrong when it tends otherwise."*

*"We abuse land because we regard it as a commodity belonging to us. When we see land as a community to which we belong, we may begin to use it with love and respect. There is no other way for land to survive the impact of mechanized man, nor for us to reap from it the esthetic harvest it is capable, under science, of contributing to culture."*

-   Aldo Leopold

*"What we do with the public lands of the United States tells a great deal about what we are, what we care for and what is to become of us as a nation."*

-   Senator Henry M. Jackson

*"And [multiple use is] harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output."*

-   Federal Land Policy and Management Act 43 U.S.C. § 1702(c)

*"In managing the public lands the Secretary [of the Department of the Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands."*

- Federal Land Policy and Management Act 43 U.S.C. § 1732(b)

Dear Field Office Manager,

The first and foremost consideration must be the legal and regulatory framework within which the BLM operates. The overarching law is FLPMA. FLPMA requires that the BLM:

*Section 102 (2) the national interest will be best realized if the public lands and their resources are periodically and systematically inventoried and their present and future use is projected through a land use planning process coordinated with other Federal and State planning efforts*

*Section 102 (8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will pro-vide for outdoor recreation and human occupancy and use*

*Section 201 (a) The Secretary <u>shall</u> prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern. This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values. The preparation and maintenance of such inventory or the identification of such areas shall not, of itself, change or prevent change of the management or use of public lands.*(emphasis added)

Compliance with this subsection is the prerequisite of all planning and must be completed prior to initiation of the RMP revision process. Note also that the next Section B mentions funding. This indicates Section B is discretionary, whereas Section A is mandatory.

*Section 202 (c) In the development and revision of land use plans, the Secretary <u>shall</u>–*
*(1) use and observe the principles of multiple use and <u>sustained yield</u> set forth in this and other applicable law;*
*(2) use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences;*
*(3) <u>give priority to the designation and protection of areas of critical environmental concern;</u>*
*(4) rely, to the extent it is available, on the inventory of the public lands, their resources, and other values;*
*(5) consider present and potential uses of the public lands;*
*(6) <u>consider the relative scarcity of the values involved and the availability of alternative means (including recycling) and sites for realization of those values;</u>*
*(7) <u>weigh long-term benefits to the public against short-term benefits;</u>*
*(8) <u>provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans;</u>* (emphasis added)

BLM_0076000

*Section 302 B In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands.*

The regulations implementing the FLPMA planning requirements are at 43 CFR 1600.

43 CFR 1601.0-2 Objective.

The objective of resource management planning by the Bureau of Land Management is to maximize resource values for the public through a rational, consistently applied set of regulations and procedures which promote the concept of multiple use management and ensure participation by the public, state and local governments, Indian tribes and appropriate Federal agencies. Resource management plans are designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses. (emphasis added)

It is clear from the above that RMP's are required to provide specific requirements, standards and limitations that are overarching for the Field Office and that guide the site-specific decisions later. The DEIS RMP direction are little more than aspirational with no requirements. This violates FLPMA.

This is made even more clear under Definition N, which states:

(n) Resource management plan means a land use plan as described by the Federal Land Policy and Management Act. The resource management plan generally establishes in a written document:
    (1) Land areas for limited, restricted or exclusive use; designation, including ACEC designation; and transfer from Bureau of Land Management Administration;
    (2) Allowable resource uses (either singly or in combination) and related levels of production or use to be maintained;
    (3) Resource condition goals and objectives to be attained;
    (4) Program constraints and general management practices needed to achieve the above items;
    (5) Need for an area to be covered by more detailed and specific plans;
    (6) Support action, including such measures as resource protection, access development, realty action, cadastral survey, etc., as necessary to achieve the above;
    (7) General implementation sequences, where carrying out a planned action is dependent upon prior accomplishment of another planned action; and
    (8) Intervals and standards for monitoring and evaluating the plan to determine the effectiveness of the plan and the need for amendment or revision.

 43 CFR 1610.4-4 requires that the BLM:

The Field Manager, in collaboration with any cooperating agencies, will analyze the inventory data and other information available to determine the ability of the resource area to respond to identified issues and opportunities. The analysis of the management situation shall provide, consistent with multiple use principles, the basis for formulating reasonable alternatives, including the types of resources for development or protection. Factors to be considered may include, but are not limited to:

BLM_0076001

(a) The types of resource use and protection authorized by the Federal Land Policy and Management Act and other relevant legislation;
(b) Opportunities to meet goals and objectives defined in national and State Director guidance;
(c) Resource demand forecasts and analyses relevant to the resource area;
(d) The estimated sustained levels of the various goods, services and uses that may be attained under existing biological and physical conditions and under differing management practices and degrees of management intensity which are economically viable under benefit cost or cost effectiveness standards prescribed in national or State Director guidance;
(e) Specific requirements and constraints to achieve consistency with policies, plans and programs of other Federal agencies, State and local government agencies and Indian tribes;
(f) Opportunities to resolve public issues and management concerns;
(g) Degree of local dependence on resources from public lands;
(h) The extent of coal lands which may be further considered under provisions of §3420.23(a) of this title;
and
(i) Critical threshold levels which should be considered in the formulation of planned alternatives.

43 CFR 1610.7-2 requires:

Areas having potential for Areas of Critical Environmental Concern (ACEC) designation and protection management shall be identified and considered throughout the resource management planning process (see §§1610.4–1 through 1610.4–9).
 (a) The inventory data shall be analyzed to determine whether there are areas containing resources, values, systems or processes or hazards eligible for further consideration for designation as an ACEC. In order to be a potential ACEC, both of the following criteria shall be met:
(1) Relevance. There shall be present a significant historic, cultural, or scenic value; a fish or wildlife resource or other natural system or process; or natural hazard.
(2) Importance. The above described value, resource, system, process, or hazard shall have substantial significance and values. This generally requires qualities of more than local significance and special worth, consequence, meaning, distinctiveness, or cause for concern. A natural hazard can be important if it is a significant threat to human life or property.

BLM Manual 1601 Land Use Planning further describes the requirements the BLM must comply with in the development of an RMP:

Section .1 B. The land use planning process is the key tool used by the BLM, in coordination with interested publics, to protect resources and designate uses on Federal lands managed by the BLM. Planning is critical to ensuring a coordinated, consistent approach to managing these lands. This Manual and Handbook provide guidance for preparing new Resource Management Plans (RMPs), plan revisions, plan amendments, other equivalent plans (e.g., plans adopted from other agencies), and subsequent implementation-level plans. Procedures and requirements are set forth to ensure that the BLM's plans meet regulatory and statutory requirements. (emphasis added)

Section .2 .02 Objectives. These plans help ensure that the public lands are managed in accordance with FLPMA (43 USC 1701 et seq.) and other applicable laws and regulations, under the principles of multiple use and sustained yield; in a manner that recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber; and in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water, and archaeological values. Where appropriate, lands will be managed to preserve and protect certain public lands in their natural condition to provide food and habitat for fish and wildlife and domestic animals, and to provide for outdoor recreation and human occupancy and use. The BLM will encourage collaboration and public participation throughout the planning process. To accomplish the above, the BLM will:

A. Provide on a continuing basis an inventory of all public lands and their resource and other values. This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values (FLPMA, Sec. 201 (a)).

B. Use an interdisciplinary process for evaluating resource information that considers physical, cultural, and biological resources in conjunction with social and economic factors to decide appropriate public land uses.

C. Ensure opportunities for participation by Indian tribes, State and local governments, other Federal agencies, and the public in a way that coordinates land use inventory, planning, and management activities with these other jurisdictional entities. Such participation will help ensure that land use plans for public lands are consistent with the plans and policies of these entities to the maximum extent consistent with Federal law (FLPMA, Sec. 202 (c) (9)), and that policies of approved Indian tribal land resource management programs are considered (FLPMA, Sec. 202 (b)).

D. Use collaborative and multijurisdictional approaches, to the extent possible, to encourage consistency in planning across different land ownerships and jurisdictions.

E. Provide to the public a documented record of land allocations and permissible resource uses and constraints.

F. Provide a framework to guide subsequent implementation decisions. (emphasis added)

Section .3 2. reiterates the requirements of FLPMA:

"Sec. 201 requires the Secretary of the Interior to prepare and maintain an inventory of the public lands and their resource and other values, **giving priority** to areas of critical environmental concern (ACECs), and, as funding and workforce are available, to determine the boundaries of the public lands, provide signs and maps to the public, and provide inventory data to State and local governments.

F. The Colorado River Basin Salinity Control Act, 43 U.S.C. 1593, requires a comprehensive program for minimizing salt contributions to the Colorado River from BLM lands.

Section .06 requires:

2. The BLM's mission is to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations. Land use plan decisions will further this mission by identifying desired outcomes and actions that restore and maintain the health of the land; preserve natural and cultural heritage; reduce threats to

BLM_0076003

public health, safety, and property; and provide opportunities for environmentally responsible recreational and commercial activities.

3. When making land use plan decisions, the BLM will consider information from all available sources, including scientific data gained from resource assessments, information regarding ecosystem protection and restoration needs, the reasonably foreseeable development of consumptive and nonconsumptive uses, and social and economic information.

The Manual provides specific definitions for the requirements that a RMP must contain:

Goal: a broad statement of a desired outcome. Goals are usually not quantifiable and may not have established time frames for achievement.

Guidelines: actions or management practices that may be used to achieve desired outcomes, sometimes expressed as best management practices. Guidelines may be identified during the land use planning process, but they are not considered a land use plan decision unless the plan specifies that they are mandatory. Guidelines for grazing administration must conform to 43 CFR 4180.2.

Land Use Allocation: the identification in a land use plan of the activities and foreseeable development that are allowed, restricted, or excluded for all or part of the planning area, based on desired future conditions.

Land Use Plan Decision: establishes desired outcomes and actions needed to achieve them. Decisions are reached using the planning process in 43 CFR 1600. When they are presented to the public as proposed decisions, they can be protested to the BLM Director. They are not appealable to IBLA.

Objective: a description of a desired condition for a resource. Objectives can be quantified and measured and, where possible, have established time frames for achievement.

Planning Criteria: the standards, rules, and other factors developed by managers and interdisciplinary teams for their use in forming judgments about decision making, analysis, and data collection during planning. Planning criteria streamline and simplify the resource management planning actions.

Resource Use Level: the level of use allowed within an area. It is based on the desired outcomes and land use allocations in the land use plan. Targets or goals for resource use levels are established on an area-wide or broad watershed level in the land use plan. Site-specific resource use levels are normally determined at the implementation level, based on site-specific resource conditions and needs as determined through resource monitoring and assessments.

Standard: a description of the physical and biological conditions or degree of function required for healthy, sustainable lands (e.g., land health standards).

With the exception of some specific oil and gas related requirements, most of the other resource extraction sections fail to implement Objectives and Resource Use Levels as

BLM_0076004

defined above. Livestock grazing is a perfect example of this problem. It fails to implement limitations or specific requirements.

BLM H-1601-1 Land Use Planning Handbook, likewise provides further specificity and reiteration of the requirements the BLM must follow in the development of RMP's:

Land use plans and planning decisions are the basis for every on-the-ground action the BLM undertakes.

Land use plans ensure that the public lands are managed in accordance with the intent of Congress as stated in FLPMA (43 U.S.C. 1701 et seq.), under the principles of multiple use and sustained yield. As required by FLPMA and BLM policy, the public lands must be managed in a manner that protects the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; that will provide for outdoor recreation and human occupancy and use;

Land use plans are one of the primary mechanisms for guiding BLM activities to achieve the mission and goals outlined in the Department of the Interior (DOI) Strategic Plan.

Handbook at 1A

Decisions in land use plans guide future land management actions and subsequent site-specific implementation decisions. These land use plan decisions establish goals and objectives for resource management (desired outcomes) and the measures needed to achieve these goals and objectives (management actions and allowable uses). Section 202(c) of FLPMA (43 U.S.C. 1712) requires that in developing land use plans, the BLM:

1. Use and observe the principles of multiple use and sustained yield;
2. use a systematic interdisciplinary approach to integrate physical, biological, economic, and other sciences;
3. give priority to designating and protecting areas of critical environmental concern (ACECs);
4. rely, to the extent available, on an inventory of public lands, their resources, and other values;
5. consider present and potential uses of public lands;
6. consider the relative scarcity of the values involved and the availability of alternative means and sites for realizing those values;
7. weigh long-term benefits to the public against short-term benefits;
8. provide for compliance with applicable Tribal, Federal, and state pollution control laws, standards, and implementation plans; and
9. to the extent consistent with the laws governing the administration of public lands, coordinate the land use inventory, planning, and management activities of public lands with land use planning and management programs of other Federal departments/agencies and state/local governments, as well as the policies of approved Tribal and state land resource management programs. The BLM must, to the extent practical, assure that consideration is given to those Tribal, state, and local plans that are germane in the development of land use plans for public lands. Land use plans must be consistent with

state and local plans to the maximum extent consistent with Federal law. Refer to FLPMA for the full text of Federal responsibilities detailed under Section 202(c)(9).

Handbook at IIA

Further defining the required components of an RMP, the Handbook states in Section II B:
**B. Types of Land Use Plan Decisions**
Land use plan decisions for public lands fall into two categories: desired outcomes (goals and objectives) and allowable (including restricted or prohibited) uses and actions anticipated to achieve desired outcomes.

1. Desired outcomes
Land use plans must identify desired outcomes expressed in terms of specific goals and objectives. Goals and objectives direct the BLM's actions in most effectively meeting legal mandates; numerous regulatory responsibilities; national policy, including the DOI Strategic Plan goals; State Director guidance (see 43 CFR 1610.0-4(b)); and other resource or social needs. Desired outcomes should be identified for and pertain to resources (such as natural, biological, and cultural), resource uses, (such as energy and livestock grazing), and other factors (such as social and economic conditions). Definitions and examples of goals and objectives are listed below:

*Goals* are broad statements of desired outcomes (e.g., maintain ecosystem health and productivity, promote community stability, ensure sustainable development) that usually are not quantifiable. Since the release of the original Handbook, the BLM has worked with RACs to develop Land Health Standards applicable to all ecosystems and management actions. These Land Health Standards must be expressed as goals in the land use plan. Goals can also be drawn from the Departmental and/or the DOI Strategic Plan or other sources. A sample goal for a Land Health Standard is: "Maintain healthy, productive plant and animal communities of native and other desirable species at viable population levels commensurate with the species and habitat's potential." A sample goal from the Strategic Plan is: "Sustain desired biological communities on Department of the Interior-managed and -influenced lands and waters in a manner consistent with obligations regarding the allocation and use of water." These goals, or modifications thereof, could be used in a land use plan.

*Objectives* identify specific desired outcomes for resources. Objectives are usually quantifiable and measurable and may have established timeframes for achievement (as appropriate). A sample objective is: "Manage vegetative communities on the upland portion of the Clear Creek Watershed to achieve, by 2020, an average 30 to 40 percent canopy cover of sagebrush to sustain sagebrush-obligate species." When quantified, the indicators associated with Land Health Standards are one possible source of objectives.

While the DEIS has goals, the objectives as defined above are noticeably missing.

2. Allowable uses and management actions anticipated to achieve desired outcomes (goals and objectives)

BLM_0076006

After establishing desired outcomes, the BLM identifies allowable uses (land use allocations) and management actions for different alternatives that are anticipated to achieve the goals and objectives.

a. Allowable uses. <u>Land use plans must identify uses, or allocations, that are allowable, restricted, or prohibited on the public lands and mineral estate</u>. These allocations identify surface lands and/or subsurface mineral interests where uses are allowed, <u>including any restrictions that may be needed to meet goals and objectives</u>. <u>Land use plans also identify lands where specific uses are excluded to protect resource values</u>. <u>Certain lands may be open or closed to specific uses based on legislative, regulatory, or policy requirements or criteria to protect sensitive resource values</u>. If land use plan decisions close areas of 100,000 acres or greater in size to a principal or major use for 2 years or more, Congress must be notified of the closure upon its implementation as prescribed in 43 CFR 1610.6.

<u>The land use plan must set the stage for identifying site-specific resource use levels</u>. Site-specific use levels are normally identified during subsequent implementation planning or the permit authorization process. <u>At the land use plan level, it is important to identify reasonable development scenarios for allowable uses such as mineral leasing, locatable mineral development, recreation, timber harvest, utility corridors, and livestock grazing to enable the orderly implementation of future actions</u>. These scenarios provide a context for the land use plan's decisions and an analytical base for the NEPA analysis. <u>The BLM may also establish criteria in the land use plan to guide the identification of site-specific use levels for activities during plan implementation</u>.

b. Management actions. <u>Land use plans must identify the actions anticipated to achieve desired outcomes, including actions to maintain, restore, or improve land health. These actions include proactive measures (e.g., measures that will be taken to enhance watershed function and condition), as well as measures or criteria that will be applied to guide day-to-day activities occurring on public land. Land use plans also establish administrative designations such as ACECs, recommend proposed withdrawals, land tenure zones, and recommend or make findings of suitability for congressional designations (such as components of the National Wild and Scenic River System)</u>. While protection and restoration opportunities and priorities are often related to managing specific land uses (such as commodity extraction, recreation, or rights-of-way corridors), they can be independent of these types of uses as well. In certain instances, it is insufficient to simply remove or limit a certain use, because unsatisfactory resource conditions may have developed over long periods of time that will not correct themselves without management intervention. For example, where exotic invasive species are extensive, active restoration may be necessary to allow native plants to reestablish and prosper. In these cases, identifying restoration opportunities and setting restoration priorities are critical parts of the land use planning process.

Again, the 'direction' contained in the DEIS utterly fails to meet the above requirements.

Appendix C of the Handbook states:

The application of program-specific guidance for land use plan decisions will vary, depending on the decision category, and must be applied as follows:

I. *Natural, Biological, and Cultural Resources:* <u>Decisions identified must be made during the land use planning process if the resource exists in the planning area.</u>

II. *Resource Uses:* <u>Decisions identified must be made during the land use planning process if the BLM anticipates it may authorize or allow a resource use. If uses are allowed, decisions must also be made regarding intensity and limits or restrictions.</u>

Again, take livestock grazing as an example, the DEIS 'direction' fails to implement requirements and limitations needed to meet goals.

III. *Special Designations:* <u>Special designation decisions identified must be made during the land use planning process when the BLM anticipates it may authorize or allow uses which could disqualify inventoried resource values from designation. Special designation decisions may be made during the land use planning process when there is no threat to the inventoried resource.</u>

IV. *Support:* Support needs and decisions may be determined through the land use planning process, based on individual planning situations.

Appendix C of the Handbook provides the heart of the planning process. Given its importance to complying with FLPMA, we are providing it, with highlights, in its entirety as Exhibit A.

Please review the

The Department of the Interior Departmental Manual 516 DM1 provides important guidance for the development of DEIS:

1.2    **Policy**. It is the policy of the Department:

A.    To provide leadership in protecting and enhancing those aspects of the quality of the Nation's environment which relate to or may be affected by the Department's policies, goals, programs, plans, or functions in furtherance of national environmental policy;

Section D states, in part:

(4)    Shall monitor, evaluate, and control on a continuing basis their activities as needed to protect and enhance the quality of the environment. Such activities will include both those directed to controlling pollution and enhancing the environment and those designed to accomplish other program objectives which may affect the quality of the environment. They will develop programs and measures to protect and enhance environmental quality. They will assess progress in meeting the specific objectives of such activities as they affect the quality of the environment.

Section E states, in part:

BLM_0076008

(2)    Shall use information obtained in the NEPA process, including pertinent information provided by those persons or organizations that may be interested or affected, to identify reasonable alternatives to proposed actions that will avoid or minimize adverse impacts to the human environment while improving overall environmental results.

(3)    Shall monitor, evaluate, and control their activities on a continuing basis to further protect and enhance the quality of the environment.

Subsection 1.19    **Methodology and Scientific Accuracy** (40 CFR 1502.24). Conclusions about environmental effects will be preceded by an analysis that supports that conclusion unless explicit reference by footnote is made to other supporting documentation that is readily available to the public. Bureaus will also follow Departmental procedures for information quality as required under Section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001 (Pub. L.106-554, 114 Stat. 2763).

The DEIS failed to comply with this requirement.

The Department of the Interior Departmental Manual 520 DM1 provides important guidance for the development of RMP. We provide a highlighted version of this in full as Exhibit B.

We particularly draw your attention to the Policy statement, Section 1.7 C 4, 5 and 10 as well as 1.8.

These requirements were not implemented in the DEIS.

We also provide as highlighted version of BLM Manual 1737 Riparian-Wetland Area Management as Exhibit C. Of critical importance are:

.06 Department of the Interior and BLM Policy (p9)
.11C 1 through 6 (p12)  which define RMP minimum requirements
.41A (p19) grazing related RMP requirements for the protection of riparian areas
.41B (20) Wetland management requirements for RMP's
.42A 1, 2 and 3  RMP requirements for soil and water
.45A and D - RMP requirements for fish and wildlife habitat
Page 30 Salinity Control Act requirements

These requirements were not implemented in the DEIS.

We also provide as highlighted version of BLM Manual 6720 Aquatic Resource Management as Exhibit D. Of critical importance are:

.04J Manager responsibilities
.06 BLM Policy
.11 and .12 Inventory requirements
.13B (p9) RMP requirements
.16 (p11) RMP requirements

These requirements were not implemented in the DEIS.

We also provide as highlighted version of BLM Manual 7200 Water Resource Management as Exhibit E. Of critical importance are:

Objectives (p3)
.06C RMP requirements
.21 Planning and RMP requirements

These requirements were not implemented in the DEIS.

We also provide as highlighted version of BLM Manual 6840 Sensitive Species Management as Exhibit F. Of critical importance are:

.04E5 (p5) State director responsibilities
.06 (p7) ESA and Sensitive Species requirements
 Section D on p9
.12 (p14) Sensitive Species RMP requirements
.2 (p15)
.22 (p36 and on) Section A
.22D4C (p41) RMP requirements

These requirements were not implemented in the DEIS.

Without question, private livestock grazing is the most important RMP topic. Livestock grazing is permitted on 99% of the total Field Office acres. Livestock grazing has caused and is causing the most impacts over the entire Field Office. BLM permitted livestock grazing has caused a permanent ~50% loss in the productivity over most parts of the Field Office. BLM permitted livestock grazing has destroyed most of the riparian and hydrologic function throughout the Field Office. BLM permitted livestock grazing has degraded the water storage capacity of riparian areas throughout the Field Office which has lead to reduced flows, elimination of once productive fisheries and loss of riparian habitat. BLM permitted livestock grazing has not been properly managed. Trespassing livestock and excessive utilization are the rule not the exception. The BLM has known about these violations of permit terms and conditions for decade after decade, it has also known the ecosystem degradation caused by this lack of action for decade after decade, but has failed to take any effective actions to fulfill its public trust and legal responsibilities.

The RMP will not be morally or legally defensible if this most important of issues is not addressed properly. The RMP EIS must thoroughly and defensibly review the failures of the past RMP and what actions must be taken to correct these failures. The current DEIS fails to do this.

The BLM must include in each RMP alternative and in the final selected alternative a voluntary waiver and retirement provision for all grazing permits.

The RMP must include measurable (i.e. quantifiable) standards for livestock grazing including maximum upland and riparian utilization of 30% on any herbaceous graminoids; maximum bank or wetland trampling annually not to exceed 10% of hydric and mesic soils

BLM_0076010

areas; maximum use of woody browse by all sources not to exceed 15% of new leader growth annually.

In addressing range management in the revision the BLM should use and reference the quantitative data (including the methodologies used to collect them and the time they were collected) pertaining to the current and expected acreages which meet, or fail to meet, desired vegetative condition, and trends in vegetative condition. Using out-dated data or using methodologies which are no longer accepted, would be inappropriate. As we previously cited, the BLM's own planning handbook requires the use of the best available information. For example, the critical values of riparian areas were not well known even twenty years ago, so that most analyses at the time did not apply to riparian areas.

In many areas, winter use by wildlife follows the end of the livestock grazing period. It would be worthwhile to establish a standard and a monitoring plan for total use (by both wildlife and livestock) on an annual basis to determine if the standards for livestock use are achieving the desired objectives. In some areas, it is likely that combined use would be greater than expected for both riparian and upland total utilization and stricter standards may be necessary for livestock utilization.

It is widely recognized in the range management literature that monitoring is the key to successful range management program. The RMP revision should include standards/requirements for a range management monitoring protocol for both upland and riparian areas. Details of the stream stability monitoring protocol, including the frequency and intensity with which it will be utilized, and so forth, should be provided in the RMP revision.

The EIS must disclose the type, location, and number of the various "range improvements" (fencing, water developments, water pipelines, access roads, and so forth) that currently exist on the public lands that will be managed under the direction of the RMP revision. What cumulative impacts have these "improvements" had on vegetation, wildlife habitat, water quality, riparian areas, soils, and habitat fragmentation? What changes/impacts to upland vegetation, water quality, habitat values, and other resources near these developments have occurred as a result of these "improvements?" Have these management activities been successful at accomplishing the goals for which they were implemented? These questions must be answered.

Additionally, the EIS should document how domestic grazing activities on allotments has affected habitat for threatened, endangered, and sensitive species in the project area. How has vegetation changed as a result of a century of livestock grazing?

Claims based on the absence of streams from 303d lists or absence of monitoring data are not sufficient to document that water quality is not impaired. Research has shown that when livestock are present, fecal coliform bacteria increase, temperature increases due to removal of shading vegetation and streams become silt-laden, destroying their native aquatic life. Other factors such as eroding stream banks, cattle defecating in streams, etc. are violations of Narrative or Anti-degradation Standards. The altering of stream flows by degraded watershed conditions that allow greater runoff and siltation as well as late season dewatering of streams must all be considered.

BLM_0076011

The RMP must address how it will handle the buy-out of grazing permits by conservation and other organizations, and should identify how it will retire such permits through the planning process. BLM should work with permittees to identify those who are interested in retiring their permits or being relocated to prevent resource damage.

Grazing permits should require public access easements across private land. If permittees refuse to grant access to public lands, then all permits should be cancelled.

It is imperative that BLM, in its RMPs, recognize the value of ungrazed watersheds both from an economic and environmental point of view. Not all areas should be grazed by livestock. This should be based on a determination of suitability for livestock grazing considering alternative uses and their benefits as well as the current condition of the land. In addition, sensitive soils must be protected. This includes soils which occur on steep slopes, are susceptible to severe wind and water erosion or have been degraded from their potential by removal of ground covering vegetation and cryptogrammic crusts. It also means that in areas of weed infestations, generally caused as a result of livestock grazing, livestock should be eliminated to allow recovery. Unsuitable areas should be mapped and allotments in those areas phased out to provide necessary protections. Those areas that are to continue being grazed by livestock must be stocked and managed in accordance with the condition of the land and its vegetation.

In areas to be grazed by livestock, the amount of forage produced must be determined and allocations of forage to watershed protection (50%), wildlife (25%) and livestock (25%) be made as recommended by Holechek et al (1998)[1]. Field data collection will be necessary to accomplish this.

To summarize key components that the RMP must address:

- ➢ Drought – The RMP must lay out a clear and effective drought policy
- ➢ PFC – The BLM initiated in 1991, a program called Riparian-Wetland Initiative for the 1990's, Among other things, this initiative called for management improvements to insure that at least 75% of the BLM stream miles reached the minimum of PFC by 1997. The BLM has failed miserably in meeting this goal. The RMP must commit to and provide the direction necessary to maintain all streams in the FO at a minimum of PFC
- ➢ Fundamentals of Rangeland Health – Implementing the 4180 regulations within the FO has been spotty at best and in those areas that compliance with Standards and Guidelines have been reviewed, the actions proposed have either never been implemented or been proven to be ineffective. The RMP must correct this deficiency and implement a schedule and regular feedback loops to complete the processes required under 4180. It also must prioritize reviews based on the need for change, such as I Category allotments first
- ➢ The EIS and RMP must address the fact that livestock sizes, and thus forage consumption, have increased dramatically since the AUM was defined. Failure to address this critical issue will lead to legal vulnerability under NEPA, APA and the False Claims Act.

---

[1] Holechek, Jerry L., Rex D. Piper and Carlton H. Herbel. 1998. Range Management Principles and Practices. 542 pp. Prentice-Hall, New Jersey.

BLM_0076012

- To comply with FLMPA, TGA, PRIA, NEPA and the APA, the EIS and RMP must only approve livestock grazing within the limits of current productivity and suitability, not capacities determined many decades ago. Current data shows that productivity on BLM lands has declined significantly over the last 20-40 years.
- The EIS and RMP must analyze the successes and failures of the current RMP and analyze the validity of the assumptions and accuracy of the analysis of the EIS conducted to develop the current RMP. Such analyses are critical to learning from the mistakes of the past as well as to comply with NEPA
- The RMP must provide clear management direction for the protection of ESA listed and BLM Sensitive Species

PFC

In 1991 the BLM initiated a program called "Riparian-Wetland Initiative for the 1990's" (See BLM/WO/GI-91/001+4340). This initiative called for achievement of four overarching goals:

- Restore and maintain riparian-wetland areas so that 75% or more are in proper functioning condition by 1997
- Protect riparian-wetland areas and associated uplands through proper management and to avoid or mitigate negative impacts
- Ensure an aggressive riparian-wetland information and outreach program
- Improve partnerships and cooperative restoration

Strategies to implement these goals include:

- Inventory and Classification to determine current status and potential
- Land Use and Activity Planning revisions describing actions needed to meet these objectives
- Monitoring to determine if management actions are meeting goals and objectives
- Avoiding or mitigating impacts on riparian-wetland areas

Little progress has been made in the 20 years since.

The RMP must address this poor performance and lay out an action plan to achieve the goals laid out in the BLM's "Riparian-Wetland Initiative for the 1990's".

We would like the reader to note that attaining PFC is only the lowest acceptable level. PFC is not a goal but the basis on which other resource goals are met. We request the BLM review its own manual, TR 1737-15, for a more complete description of what PFC is and is not. We especially direct the BLM's attention to page 16 of this manual for a very clear description of the fact that PFC is only the lowest basis on which all other values are built upon. As such, the RMP must delineate management objects that go far beyond PCF to include watershed health values, fisheries values, water quality values and wildlife values.

FUNDAMENTALS OF RANGELAND HEALTH

The RMP must include timelines and priorities for the completion and review of progress of the Fundamentals of Rangeland Health Standards and Guidelines assessments and determinations as required under the 4180 regulations.

For further details on the implementation of the 4180 regulations, we request that the BLM review its 1/19/01 Manual Transmittal Sheet for H-4180-1 Rangeland Health Standards. We specifically bring the BLM's attention to its duties to make "significant progress" towards meeting Standards and Guidelines. The RMP must provide direction to achieve the Fundamentals of Rangeland Health and the Standards and Guidelines, and in those situations, of which there are many, where these are not being met, the RMP must provide sufficient direction that results in the required "significant progress".

The RMP must also provide feedback loops so that once Standards and Guidelines (S&G) evaluations are completed, that the BLM requires regular reviews to insure "significant progress" is being made.

LIVESTOCK SIZES, FORAGE CONSUMPTION AND THE AUM

The BLM can not just assume that an AUM is 800 lbs of forage consumption per month. The RMP/EIS must analyze the current and potentially available forage to satisfy the forage consumption by the number of livestock it currently permits or proposes to permit. It can not assume that the forage capacity determined 20-40 years ago is applicable today.

The Society for Range Management (SRM) in 1974 defined an Animal Unit *"to be one mature (1000 lb.) cow or the equivalent based upon average daily forage consumption of 26 lbs. dry matter per day."* [2].   SRM also defined an Animal Unit Month as *"The amount of feed or forage required by an animal-unit for one month."*   NRCS defined the forage demand for a 1,000 pound cow as 26 pounds of oven-dry weight or 30 pounds air-dry weight of forage per day [3].  It is important to ensure that forage consumption rates by livestock are based on the size of animals present on the allotment and a reasoned estimate of their daily consumption rates.   The following analysis provides some background and justifies a more current forage consumption rate for cow/calf pairs.  It is BLM's obligation to ensure this forage is accurately accounted for as this is its fiduciary duty to the American People.  Undercounting forage consumption by livestock results in undercharging for that forage.  This is potentially defrauding the American public under the False Claims Act [4]

The University of Nevada Agricultural Experiment Station published a report on cattle production in 1943 [5] (Brennan and Harris, 1943).   That report analyzed 14 years of ranch operation for eleven ranches in northeastern Nevada.  At that time, a mature cow was considered one unit and a branded calf or weaner as ½ cow unit, for a combined total of 1.5 cow units per cow/calf pair.  Bulls were considered 1.5 cow units.  For the period 1938 – 1940, the average turnoff weight (when they left the range) of mature cows was 959 pounds, calves were 381 pounds and bulls were 1222 pounds. This means that in the

---

[2] Society for Range Management. 1974.  Glossary of terms used in range management.
[3] USDA.  1997.  National Range and Pasture Handbook.
[4] Title 18 USC Section 1001.
[5] Brennan, C.A. and Fred B. Harris.  1943.  Fourteen Years Cattle Production and Ranch Earning Power in Northeastern Nevada 1928 to 1941.  University of Nevada Agricultural Experiment Station, Reno, Nevada.

BLM_0076014

1930's, a cow/calf pair was 1340 pounds. With breeding, supplements and hormones, weights have increased over time, for example, Anderson et al (ca 2000) calculated a 35% increase in dressed weights per animal between 1975 and 1995[6].

USDA market statistics[7] give the average weights of slaughter cattle for the week ending August 14, 2004 as 1251 pounds. The estimate for the same week in 2005 for slaughter cattle average weight was 1260 pounds. The USDA National Agricultural Statistics Service data for average live weight of cattle slaughtered in 2004 was 1242 pounds compared to 1187 pounds in 1995, or an increase of nearly 8.5% in those 10 years[8]. The Livestock Monitor is a newsletter produced by the North Dakota State University Extension Service Livestock Marketing Information Center in cooperation with USDA State Extension Services[9]. The Livestock Monitor shows for the week ending August 6, 2005, live weights of slaughter cattle averaged 1258 pounds.

The potential weights of mature cows can be even larger than these numbers. For example, NRCS in its National Range and Pasture Handbook, referenced above, defines body condition scores. A body condition score of 6 which is described as *"Good, smooth appearance throughout. Some fat deposits in brisket and over the tailhead. Ribs covered and back appears rounded."* This body condition score relates to a pregnancy percentage of 88%, which is important as a goal for cow/calf operations as dry cows are usually culled and replaced and the weight gain of calves is important for income. According to Dr. Larry W. Olson, Extension Animal Scientist at Clemson University, a medium frame cow in body condition score 6 could easily weigh 1300 – 1400 pounds[10].

Holechek et al (2001) summarized the weaning weights of calves grazed on various types of rangelands at different stocking rates[11]. The data for the period since 1990 produced an average weaning weight of 430 pounds and a range of 382 – 475 pounds. Ray et al (2004) gave a weaning weight of 480 pounds for calves. Using the current market statistics for slaughter cattle at about 1250 pounds and assuming a calf weight of 300 pounds to allow for weight gain during the grazing season, an estimate for the average weight of a cow/calf pair during the grazing season of 1,500 pounds seems reasonable.

As pointed out above, the NRCS used 26 lbs/day of oven dry weight for a 1,000 pound cow and stated this was equivalent to 30 pounds per day air-dry weight. The NRCS Range and Pasture Handbook value of 30 pounds air-dry weight would be 3% of body weight for a 1,000 pound cow. Applying this to the estimate of a current weight of 1,500 pounds for a cow/calf pair, the daily forage consumption would be 45 lbs of air-dry forage per day, or for a month (30.4 days), 1368 pounds of forage per AUM.

The forage needs for domestic sheep must also be determined. Based on current USDA published weights for ewes and lambs, adult domestic sheep weigh from 165 to 440

---

[6] http://agecon.uwyo.edu/RiskMgt/marketrisk/TheCattleCycle.pdf
[7] http://www.ams.usda.gov/mnreports/SJ_LS712.txt
[8] http://www.usda.gov/nass/pubs/agr05/acro05.htm
[9] http://www.ag.ndsu.nodak.edu/aginfo/lsmkt/monitor.htm
[10] Email correspondence with Dr. Olson dated 8/18/05.
[11] Holechek, Jerry L., Rex D. Pieper and Carlton H. Herbel. 2001.Range Management: Principles and Practices, Fourth Edition. Prentice-Hall, New Jersey. 587p

pounds,[12] and lambs about 129 pounds.[13] A low-end estimate of the weights of a sheep and two lambs grazing on these allotments would be 400 pounds (200 pounds for the ewe and 100 pounds each for two lambs). The forage consumption rate for sheep given in the 1964 R4 Range Analysis Handbook cited above was 3.3% of body weight per day consumed as air dry forage weight. Using these estimated weights of mature sheep (ewes) and lambs with two lambs per ewe and a total weight of 400 pounds would result in forage consumption of 13.2 pounds per day for each mature sheep with two lambs, or 6.6 pounds per day for a mature ewe weighing 200 pounds.

Forage consumption rates must be calculated based on the current weights and consumption rates of livestock in order to provide the forage needed for wildlife, plant community sustainability and watershed protection and to ensure the public trust is not violated by undercharging for the actual weights of cattle and calves grazed.

The current RMP authorizes a certain number of AUM's. However, that is based on an AUM equivalent to 800 lbs of forage per month. The most current information, reviewed above shows that number to be 1368 lbs/month per AUM. Therefore, if sufficient forage were available to satisfy all needs, the numbers of livestock grazed should be reduced to account for the increases in weight and correct the erroneous assumption that 800 lbs/month is an accurate consumption figure. Using the ratio between the current RMP's forage amount per AUM divided by the correct figure above, gives a needed reduction in permitted numbers and/or seasons of use of 42% to account for the RMP's understated forage consumption, without accounting for wildlife, plant and watershed needs.

CAPABILITY AND SUITABILITY ANALYSIS

The EIS can not just move forward allotment condition and use information from the current RMP to satisfy its NEPA, FLPMA, PRIA and APA requirements.

BLM RMP Planning Handbook Appendix C requires that lands available or not available for livestock grazing be determined by considering: other uses for the land; terrain characteristics; soil, vegetation and watershed characteristics; the presence of undesirable vegetation, including significant invasive weed infestations; and the presence of other resources that may require special management or protection, such as special status species, special recreation management areas (SRMAs), or ACECs.

Sec. 201. [43 U.S.C. 1711] states:

   (c) In the development and revision of land use plans, the Secretary shall–

      (1) use and observe the principles of multiple use and sustained yield set forth in this and other applicable law;

      (2) use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences;

      (3) give priority to the designation and protection of areas of critical environmental concern;

---

[12] http://www.wildlifeprairiestatepark.org/animalpages/domestic_sheep.htm
[13] http://www.usda.gov/nass/pubs/agr04/04_ch7.pdf

BLM_0076016

(4) rely, to the extent it is available, on the inventory of the public lands, their resources, and other values;

(5) consider present and potential uses of the public lands;

(6) consider the relative scarcity of the values involved and the availability of alternative means (including recycling) and sites for realization of those values;

(7) weigh long-term benefits to the public against short-term benefits;

(8) provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans; …

Therefore, BLM must give priority to ACECs and the inventory must be current and reflect changes in conditions and identify new and emerging resources and other values.  The revised RMP and the DEIS must show that the BLM identified the emerging issues of the public's increasing desire for wilderness values, unspoiled wildlife habitat, protected resources, and the value of public lands.

BLM should define specifically what, if any, animal damage control or predator control activities will be allowed and in what manner. The WWP opposes all animal damage control, predator control and wildlife services proposals made to date. The majority, if not all, of these types of activities are not appropriate and should not be allowed on public lands.

The BLM should establish goals, objectives, standards and limitations to ensure the protection of and recovery of threatened, endangered, sensitive and special status species. BLM should designate critical habitat for every endangered, sensitive, threatened and special status species. These habitat areas should be managed with the species survival and recovery as the highest and most valuable use. The BLM should look at all options for protecting activity centers through special status land designations, including, but not limited to, Areas of Critical Environmental Concern, Research Natural Areas, Outstanding Natural Areas, Wilderness Study Areas, Suitable Wild, Scenic and Recreational River miles, or other administrative designations.

One of the thorniest issues that the BLM has to consider is water quality of streams flowing through the lands it manages.  The revision should provide a comprehensive plan for watershed analysis, restoration, monitoring, and adaptive management; particularly where livestock impact water quality; and to inventory, monitor and develop site-specific plans for riparian management, tailored to watershed needs as identified through these processes.

The DEIS does not accomplish this.

No BLM action or plan would be complete without considering TMDL listing, status, and planning.  Therefore state data and information are incorporated by reference with the specific request that the BLM insure that TMDL goals are met and water quality is not further degraded.  Furthermore, the revision should include details of the actions the BLM intends to take relative to state listed Water Quality Limited Stream Segments.  The EIS needs to include a thorough discussion of how the BLM intends to meet its legal obligations under the federal Clean Water Act, State Water Quality Standards and FLPMA requirements in managing water quality limited segments (WQLSs).   The RMP must also require water quality monitoring to determine the impacts of its authorized activities.

BLM_0076017

The BLM should also develop an expanded monitoring plan. Many activities on BLM lands degrade water quality but the BLM may not have a clear grasp on its waters' quality. This RMP revision and EIS must expand on other agencies' and individuals' monitoring efforts, to insure that no data-gaps exist on BLM lands.

Overall, the BLM must comply with the Clean Water Act. To this end, the BLM should look to required CWA reporting, such as 305(b) reports, the 303(d) list, and triennial reviews, and consider how high quality waters can be protected and how degraded waters can be improved. Additionally, the BLM should specially insure that anti-degradation provisions are met, and that principles of anti-degradation are applied to all facets of the RMP.

The RMP/EIS can not present livestock grazing as a given with little difference in AUM's between alternatives. This would not be a reasonable range of alternatives.

With current GIS technology, availability of soil surveys, and vegetation type information, developing a capability analysis is a relatively simple task.

Without balancing the currently available livestock AUM's with the physical and biological limitation of the land, the BLM avoids the most basic scientific principles which are aimed at providing for sustainable use without impairment. As a result of having no capability determination, combined with a realistic forage capacity determination, BLM cannot assure that sufficient forage exists to support the proposed livestock numbers and ignores the forage and habitat needs of wildlife and the need for nutrient cycling and soil protection provided by retaining plant matter to hold the soil and add nutrients.

A review of range science studies which we include as Appendix A, shows that forage for livestock should be allocated at conservative levels of about 25 - 30% utilization. This is necessary so that overgrazing does not place palatable, or preferred native species at risk of decline, prevents over grazing in dry years and provides forage and habitat for wildlife and watershed protection. As can be seen throughout the FO, failure to adjust for topographic, soil and other limitation and apply conservative use principles has lead to severely degraded conditions including soil erosion, loss of native forage species and infestations of noxious weeds and invasives.

Grazing and rest requirements for key species of grass can be critical. Native cool-season perennial bunchgrasses can be very sensitive to defoliation and growing season use. For example, Anderson (1991)[14] stated in regards to bluebunch wheatgrass, *"Effects of growing season defoliation injury are well documented: basal area, stem numbers and both root and forage yields are reduced and mortality can be high. ... Defoliation to very short stubble heights during the boot stage has been reported to essentially eliminate plants within as few as three years. ... Vigor recovery has been found to require most of a decade, even with complete protection from grazing."* The author went on to describe experiments in which a single clipping of the grass during the growing season produced 43% less herbage and 95% fewer flower stalks the following year than unclipped plants. Under a deferred system in eastern Oregon, it was reported that bluebunch wheatgrass could not be

---

[14] Anderson, Loren D. 1991. Bluebunch wheatgrass defoliation, effects and recovery – A Review. BLM Technical Bulletin 91-2, Bureau of Land Management, Idaho State Office.

BLM_0076018

maintained at 30 – 40% use in the boot stage (early June). A one time removal of 50% of the shoot system during active growth may require six years' rest even in an area with 17" precipitation.[15]  Anderson (1991) also makes the point  regarding bluebunch wheatgrass that, *"The belief that range improvement will occur after one or two years of rest following a single season of more than 'light' use during the growing season is erroneous."* Mueggler (1975) also determined that Idaho fescue of moderately low vigor required 3 years of rest for recovery and that plants of bluebunch wheatgrass and Idaho fescue in very low vigor may require 8 years and 6 years of rest, respectively for recovery.  BLM failed to consider the recovery, growth and maintenance requirements for these sensitive native grasses.

A failure by the BLM in its RMP to analyze utilization, stocking rates and precipitation is a failure to meet NEPA requirements for analysis.  The failure to provide sustainable utilization rates for upland and riparian area herbaceous vegetation, aspen suckers and riparian shrubs and incorporate those into grazing permits as terms and conditions leaves management uncontrolled and subject to bias, violating FLPMA.

We provide in C_Grazing Capacity Info Proposed Outline, a scientifically and legally defensible methodology for determining capability and suitability of BLM lands for livestock grazing. We request the BLM incorporate this process into the RMP as well as the EIS alternatives.

SPECIAL STATUS SPECIES

The RMP must provide scientifically defensible and clear direction for the recovery and management ESA listed and BLM Sensitive Species. The DEIS fails to accomplish this.

BLM must ensure full compliance with BLM Manual MS-6840.06.E  (Special Status Species Management).  BLM Manual MS-6840.06.E requires that "protection provided by the policy for candidate species shall be used as the minimum level of protection for BLM sensitive species"—that is:

Consistent with existing laws, the BLM shall implement management plans that conserve candidate species and their habitats and shall ensure that actions authorized, funded, or carried out by the BLM do not contribute to the need for the species to become listed. BLM Manual MS-6840.06.C & .06.E.  See BLM Manual MS-6840.06.C (1&3) (discussing BLM's responsibility to confer with U.S. Fish & Wildlife Service regarding individual species' needs).

BLM Manual MS-6840.06.C.2 imposes a series of additional substantive obligations on the BLM regarding candidate [and therefore sensitive] species management:

2.      For candidate species [and sensitive species] where lands administered by the BLM or BLM authorized actions have a significant effect on their status, [the BLM shall] manage the habitat to conserve the species by:

---

[15] Mueggler, W.F. 1975.  Rate and pattern of vigor recovery in Idaho fescue and Bluebunch wheatgrass.  Journal of Range Management 28(3):198-204.

> ➤ Ensuring candidate [and BLM sensitive species] are appropriately considered in land use plans (BLM 1610 Planning Manual and Handbook, Appendix C).
> ➤ Developing, cooperating with, and implementing range-wide or site-specific management plans, conservation strategies and assessments for candidate [and sensitive] species that include specific habitat and population management objectives designed for conservation, as well as management strategies necessary to meet those objectives.
> ➤ Ensuring that BLM activities affecting the habitat of candidate [and sensitive] species are carried out in a manner that is consistent with the objectives for managing those species.
> ➤ Monitoring populations and habitats of candidate [and sensitive] species to determine whether management objectives are being met.

Additionally, BLM must ensure compliance with BLM Manual MS¬6840.22. Provisions here require BLM to take a broad and proactive approach to special status species management, and in the context of planning require that, "Land use plans shall be sufficiently detailed to identify and resolve significant land use conflicts with special status species without deferring conflict resolution to implementation-level planning." (emphasis added).

Take for instance, bighorn sheep, the DEIS fails to even mention let alone implement the BLM's bighorn sheep manual.

**Migratory Birds:** Woodyard et al (2003) conducted bird censuses along an elevational gradient in east-central Nevada. These censuses were conducted in study plots monitored in 1981 and 1982 by Dean E. Medin and found fewer species and total numbers of birds (62% less)[16]. Parrish et al (2002)[17] also describe the declines in these birds due to a variety of factors relating to habitat. They provide descriptions of the birds in Utah most in need of conservation and describe their habitat requirements, threats and management considerations. They discuss habitats most in need of conservation. Habitats such as shrub-steppe occurring in the Pocatello Resource Area are described as in need of protection. Medin et al (2000) provide a discussion of bird-habitat relationships for the Great Basin that provide insight into the habitats that occur in the Pocatello Resource Area and their relationships to these birds. Many of these birds are dependent on riparian areas[18].

Paige and Ritter (1999) cite population declines of 63% and 70% in shrub dependent and grassland bird species during the last 30 years across the U.S. In the Intermountain West, more than 50% of shrub- and grassland species show downward trends with sagebrush steppe as the highest priority for conservation based on trends for habitat and bird populations[35]. They provide detailed descriptions of the history, characteristics and

---

[16] Woodyard, John, Melissa Renfro, Bruce L. Welch and Kristina Heister. 2003. A 20-year recount of bird populations along a Great Basin elevational gradient. USDA Forest Service Rocky Mountain Research Station Research Paper RMRS-RP-43.
[17] Parrish, Jimmie R., Frank Howe and Russell Norvell. 2002. Utah Partners in Flight Avian Conservation Strategy Version 2.0. Utah Division of Wildlife Publication No. 02-27. 305p.
[18] Medin, Dean E., Bruce L. Welch and Warren P. Clary. 2000. Bird habitat relationships along a Great Basin elevational gradient. USDA Forest Service Rocky Mountain Research Station Research Paper RMRS-RP-23. 22p.

BLM_0076020

management of these systems with management recommendations. They note that cattle grazing in sagebrush steppe first select grasses and forbs and avoid browsing on sagebrush. In addition, even light grazing can put pressure on the herbaceous plants favored by livestock and intensive spring grazing prevents bunchgrasses from reproducing, eventually eliminating the palatable native bunchgrasses. They also discuss the response time for recovery of these systems and parasitism by cowbirds, a significant factor in decline of songbirds in some areas.

Taylor (1986) evaluated the effects of cattle grazing on birds nesting in riparian habitats[19]. He found that increased grazing resulted in decreases shrub volume and density and decreased bird abundance. *"The longer the time since a transect was last grazed correlated significantly with increases in bird abundance, shrub volume and shrub height".* Bird species decreased with increased grazing, bird counts were 5 to 7 times higher on an area ungrazed since 1940 than on 2 areas grazed annually until 1980 and 11 to 13 times higher on a transect that was severely disturbed.

Krueper et al (2003) studied the changes in vegetation and breeding birds in the San Pedro River, Arizona following removal of cattle in 1987[20]. Birds were monitored for five years. Mean numbers detected along riparian transects increased by 23% per year or from 103/km in 1986 to 221/km in 1992. Earnst et al (2004) compared songbird abundance in 2000-2001 to that in 1991-1993, following cattle removal from the Sheldon National Wildlife Refuge in 1990[21]. Of 51 species for which abundances were sufficient to calculate changes, 71% exhibited a positive trend. Detections of ground/low cup and high cup nesting species, ground/understory foraging species, aerial and overstory foraging species increased significantly.

Rich (2002) evaluated the ability of riparian PFC assessments as employed by BLM and noted that they lacked the ability to incorporate assessment of land breeding bird communities[22]. He constructed a list of riparian-obligate birds that should occur on the site during the breeding season and used that to score the site based on the percent of those occurring there.

The RMP/EIS must review the habitat requirements for migrant birds, the effects of livestock grazing at the permitted numbers in combination with all other habitat altering management proposed and provide prescriptions that will assure migrant birds and their habitat improve.

CURRENT RMP PERFORMANCE AND ACCOMPLISHMENTS

---

[19] Taylor, Daniel M. 1986. Effects of cattle grazing on passerine birds nesting in riparian habitat. Journal of Range Management 39(3):254-258.

[20] Krueper, David, Jonathan Bart and Terrell D. Rich. 2003. Response of vegetation and breeding birds to the removal of cattle on the San Pedro River, Arizona (U.S.A.). Conservation Biology 17(2):607-615.

[21] Earnst, Susan L., Jennifer A. Ballard, and David S. Dobkin. 2004. Riparian songbird abundance a decade after cattle removal on Hart Mountain and Sheldon National Wildlife Refuges. USDA Forest Service PSW-GTR-191.

[22] Rich, Terrell D. 2002. Using breeding land birds in the assessment of western riparian systems. Wildlife Society Bulletin 30(4):1128-1139.

BLM_0076021

In order to comply with NEPA and the APA, the BLM must conduct a thorough review of the performance and accomplishments of the current RMP as well as the validity and accuracy of the current RMP's NEPA documents. Further, the BLM must analyze how effectively the RMP and ROD have been implemented, what goals and objective have been met and why aspects of the RMP and ROD were not implemented or not implemented effectively.

Such analyses must form the foundation for any RMP revision. Such analyses are fundamental not only compliance with the law by basic management principles.

ECONOMIC ANALYSIS

The RMP/EIS must adequately and honestly analyze the economic impacts of livestock grazing on BLM lands. The BLM has pandered to "lifestyles" for ranchers while ignoring the actual contribution of the livestock grazed to the local and regional economy or the economic impacts of the land degradation that takes place from livestock grazing. The Fish and Wildlife Service publishes reports on the value of wildlife-associated recreation that shows values of hundreds of millions of dollars to billions of dollars of revenue related to hunting, fishing and wildlife watching in each western state[23]. In addition, the cost of polluted water, loss of watershed storage due to soil compaction and loss of herbaceous cover are not counted in the costs of livestock grazing. As the reference below shows, in actuality, rural communities as well as livestock permittees depend on other sources of income. Laws require that public lands be administered in the long-term interests of the American people and not a handful of stockmen, who are permittees, on the public lands.

Livestock permittees are a small minority of livestock producers in the eleven western states and are insignificant in their numbers or their economic contribution to the States, their local and regional economies. Their numbers and contribution pale in comparison to the natural values of our public lands. Dr. Thomas Power, Chairman of the University of Montana's Economics Department, in Wuerthner and Matteson (2002)[24] points out the minimal economic contribution of federal public lands livestock grazing to local, state and regional economies in the West. That reference can be found on-line at:

**http://www.publiclandsranching.org/htmlres/PDF/wr_TAKING_STOCK.pdf**

Dr. Power also points out that the majority of public lands livestock producers depend on non-agricultural sectors of these local, state and regional economies for employment, not livestock production. It is not in the public's interest to blindly continue livestock grazing at unsustainable stocking levels in order to provide a short-term benefit to this small minority, while ignoring the values displaced by livestock grazing.

Dr. Power shows that *"Livestock grazing on federal lands is generally unimportant to local economies and even less so to state and regional economies. In terms of income and*

---

[23] U.S. Department of Interior, U.S. Fish and Wildlife Service, U.S. Department of Commerce and U. S. Census Bureau. 2002. 2001 National Survey of Fishing, Hunting and Wildlife-Watching Associated Recreation. 170 p.

[24] Wuerthner, George and Mollie Matteson. 2002. Welfare ranching: the subsidized destruction of the west. Island Press.

BLM_0076022

*numbers of jobs provided, the contribution of federal lands grazing is less than 0.1% across the West. Farm and ranch operations are increasingly reliant on non-farm income sources to be financially feasible, while livestock grazing competes with other uses of public lands – such as clean water, recreation, wildlife habitat – that contribute to the ongoing vitality of western economies."*

In his analysis of the economies of individual rural counties, Dr. Power showed that federal lands grazing does not contribute significantly to those economies across the west. In fact, given the high percentage of ranching families that have jobs, either full or part time outside the ranch (60 – 70%), it is ranchers that depend on the other economic sectors for their ability to persist, not federal grazing. Dr. Power states, *"It is not that towns depend on agriculture, but that agriculture increasingly depends on the vitality of urban and nonagricultural rural economies to provide the nonfarm income that keeps farm operations alive."*

Dr. Power states that claims about the relative importance of federal grazing to the economies of western states can be analyzed by answering these questions:

1. "What portion of the value produced by cattle and sheep operations is associated with feed used?

2. What portion of the feed for those cattle and sheep operations comes from grazing on federal lands?

3. What portion of the total agricultural activity involves raising cattle and sheep?

4. What part of the total economy is represented by agriculture?"

The RMP Economic analyses should include consideration of this information and the following:

➢ costs of administration
➢ costs of installation and maintenance of range improvements borne by the BLM and/or funded by county range improvement funds
➢ grazing fees collected and their distribution to various entities
➢ grazing fees collected and net return to the Forest Service and the American people, and separate out the dollars returned to grazing permittees and local counties.
➢ value of livestock grazing gross revenue to the permittee at current market rates
➢ value of wildlife-associated recreation (DOI 2002)
➢ loss in value of wildlife associated recreation to livestock grazing by using equivalent AUMS consumed by livestock as applied to wildlife needs (AUMs) and economic benefits
➢ cost of soil erosion and loss of groundwater recharge and streamflow
➢ cost of water pollution
➢ the net contribution of the individual livestock operations under consideration to the county and regional economy
➢ compare the individual livestock operation in dollars and jobs to the local, state and regional economy and report what percentage this allotment comprises of this total
➢ compare these various economic values with other economic and employment sectors at those local, state and regional levels.

BEDROCK ISSUES

The RMP and EIS must consider the bedrock management principles that direct all activities on BLM lands. FLPMA is one of these key bedrock laws. FLMPA requires the BLM to manage public lands under the principle of multiple use and sustained yield.

The definition of multiple use in FLPMA is long, but key provisions include the following:

> ➢ Public lands and their resource values must be managed so that they "best meet the present and future needs of the American people;"
> ➢ It is appropriate that some land be used "for less than all of the resources;"
> ➢ There must be harmonious and coordinated resource management that is done "without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or greatest unit output."

43 U.S.C. § 1702(c)

Sustained yield as defined in FLPMA can be achieved either by "high-level annual" or "regular periodic" output of resources, so long as this is accomplished in a way that can be maintained in perpetuity and is consistent with the definition of multiple use. 43 U.S.C. §1702(h).

These definitions give substance to the requirement that land use plans and resulting management actions are to use and observe multiple use and sustained yield principles. The purpose of this planning process must be to produce a plan that "best" meets the present and future needs of the American people. The RMP cannot adequately meet these needs, or generally meet these needs, or largely meet these needs, it must "best" meet them. FLPMA explicitly requires that what is "best" must be viewed from the perspective of the present and the future and all alternatives, including the proposed action, must be designed to satisfy this requirement. What is best now may not meet future needs, and since future needs may be unknown in some respects, the only way to "best" insure that future needs are met is to develop and select alternatives that have a large built in margin of safety. To achieve a large built in margin of safety the plan should emphasize resource and ecosystem protection, which will best ensure that future options are retained.

Furthermore, what is "best" must be determined with reference to the needs of the American people as a whole, not a small subset of the American people. FLPMA explicitly provides that the plan that is developed need not accommodate all resource uses on all lands. This provision has special significance relative to grazing, oil and gas leasing, exploration, and development because too often essentially all lands are made available by the BLM for oil and gas extraction. By this legally required measure, rare, unique, and sensitive native species have a relative value far in excess of more common or easily replaced public land resources, or resources that can be provided from other lands. The same is true of many other resources, such as cultural and wilderness resources. Accordingly, the alternative plans that are developed, and particularly the preferred

BLM_0076024

alternative, must give special emphasis to protecting and providing for relatively rare resources.

The FLPMA Section 1702(c) permanent impairment and Section 1732(b) prevention of unnecessary or undue degradation provisions are extremely important. They must inform and be the basis of all RMP direction.

The BLM must base its management decisions upon inventories of the resources that occur on the public lands. The BLM must structure a comprehensive inventory program to inform the RMP process. This is a crucial and frequently overlooked aspect of the planning process.

The EIS and RMP must also address CWA compliance, including monitoring, anti-degradation and Class I waters issues. We are attaching a letter by Raymond Corning discussing some of these issues.

ECONOMICS

The Revised RMP should also contain a complete and unbiased economic analysis of livestock grazing, including the income to the federal government and counties of permitting grazing on allotments within the planning area and an accurate and thorough breakdown of costs of administering livestock grazing in the planning area. Costs should include restoration of habitats, monitoring, fence maintenance, and administrative and planning expenses. The costs of livestock grazing in terms of loss in ecological services should be analyzed. Ecological services compromised by livestock grazing include watershed function as a result of reduced ground cover, soil compaction and loss of infiltration capacity and water storage, soil erosion, loss of forage and habitat for native species. The forage consumed by livestock must be valued in terms of the value of deer and other wildlife species displaced, the loss of hunting and wildlife watching opportunities Further, in terms of the value of livestock grazing itself, Dr. Thomas Power (Power 2002) has developed questions that allow a determination of the significance of forage used on public lands to the economy as a whole. These are:

5. "What portion of the value produced by cattle and sheep operations is associated with feed used?

6. What portion of the feed for those cattle and sheep operations comes from grazing on federal lands?

7. What portion of the total agricultural activity involves raising cattle and sheep?

8. What part of the total economy is represented by agriculture."

The following references provide insight into non-market or ecosystem service valuations of natural resources: (1) Daily, Gretchen C and Katherine Ellison. 2002. The New Economy of Nature; (2) Committee on Assessing and Valuing the Services of Aquatic and Related Terrestrial Ecosystems, National Research Council. 2004.*Valuing Ecosystem Services: Toward Better Environmental Decisionmaking.* Washington DC: National Academies Press; (3) Loomis, John., Paula Kent, Liz Strange, Kurt Fausch, and Alan Covich. Measuring the Total Economic Value of Restoring Ecosystem Services in an Impaired River Basin: Results from a Contingent Valuation Survey. *Ecological*

*Economics.* 33, pp. 103-117. 2000.  (4) Loomis, John. Environmental Valuation Techniques in Water Resource Decision Making. *Journal of Water Resources Planning and Management,* Vol. 126, No. 6, pp. 339-344. November/December 2000.

RESOURCES

Attached we provide a range of information we request the BLM to review and provide analysis of in the EIS and move into management direction in the RMP. If the BLM feels that any of the information supplied is not applicable to the RMP planning process, we request the BLM to supply rationale in the EIS to justify that decision. Without such justification the BLM will not be complying with NEPA and the APA.

We also request the BLM to review its own analyses, management and monitoring direction contained in:

BLM Application of Environmental Laws, September 1995

BLM TR 1734-6 Interpreting Indicators of Rangeland Health

BLM TR 1737-20 Grazing Management Processes and Strategies for Riparian-Wetland Areas

BLM TR 1737-17 A Guide to Managing, Restoring and Conserving Springs in the Western United States

USDA FS RMRS-GTR-160 Survey Responses From the Intermountain West: Are we Achieving the Public's Objectives for Forests and Rangelands

US EPA Managing Change – Livestock Grazing on Western Riparian Areas, 1993

USDA FS Research Paper INT-RP-492 Response of a Depleted Sagebrush Steppe Riparian System to Grazing Control and Woody Plantings, 1996

USDA FS Research Paper INT-425 Bird and Small Mammal Populations in a Grazed and Ungrazed Riparian Habitat in Idaho, 1990

Montana BLM Riparian Technical Bulletin #3 Effective Cattle Management in Riparian Zones – A Field Survey and Literature Review

Montana BLM Riparian Technical Bulletin #4 Successful Strategies for Grazing Cattle in Riparian Zones, 1998

BLM TR 1737-14 Grazing Management for Riparian Wetland Areas, 1997

BLM TR 1730-2 Biological Soil Crusts: Ecology and Management, 2001

BLM TR 1737-3 Inventory and Monitoring of Riparian Areas, 1989

USDA FS PNW-GTR-361 Role of Nonmarket Economic Values in Benefit-Cost Analysis of Public Forest Management, 1996

USDA FS RMRS-GTR-47 Monitoring the Vegetation Resources in Riparian Areas

USDA FS RMRS-GTR-121 Guide to Effective Monitoring of Aquatic and Riparian Resources

USDA FS RMRS-RP-40 Counter Misinformation Concerning Big Sagebrush, 2003

USDA FS RMRS-GTR-141 Big Sagebrush: A Sea Fragmented into Lakes, Ponds and Puddles, 2005

We incorporate by reference all of the above and request that the BLM analyze each of them and add these to the administrative record.

The DEIS stated that it was in compliance with WO IM 2012-169 but this is not the case. Clearly, just looking at the bighorn sheep issue, the IM was not implemented.

Let's look at Action #19 as an example of the failure to provide appropriate limitations and requirements. This "action" states:

> **Action:**
> Address climate change effects on soil and water resources, vegetation, and habitats and apply appropriate management to protect these resource values.

But this is a broad goal that lacks any specificity that would allow it to be implemented. As discussed in the earlier section on RMP requirements, this type of general,, 'apple pie' type statement does not drive or direct action. Appropriate actions would be such things as limitations on forage utilization, requirements for biological soil crust coverage by soil type with timeframes and repercussions if BSC recovery is not attained. This type of specificity, which the BLM's planning requirements mandate is totally absent from the DEIS.

In Action #25 we see that the BLM proposes to manage most of its lands to allow <50% of the areas to fail Rangeland Health Standards as long as the failing areas are "stable". This clearly does not comply with the 43 CFR 4180 mandate.

> Manage the remaining lands, streams, and wetlands to *fully meet* the BLM Colorado Public Land Health Standards or to *meet with problems* where needed to support resource uses, provided that lands meeting with problems are stable or trend toward achieving the BLM Colorado Public Land Health Standards.

Action #37 applies only to oil and gas, no other soil disturbing activity and that too only where BSC is in excellent condition. The vast majority of the FO has very low levels of BSC because of the impacts of livestock grazing but no recovery or protection actions are provided.

Goal #71 stunningly elevates resource extraction above other FLPMA requirements across nearly all the FO. Clearly, this does not comply with the wide range of requirements discussed above.

BLM_0076027

Frequently, we see such as in #74:

> **Objective:**
> Manage naturally occurring riparian and wetland areas <u>to maintain or improve</u> hydrologic and riparian vegetation conditions

But this is another typical way for the BLM to eliminate requirements. These kinds of statements must be changes to maintain areas exceeding objectives/standards and improve area not exceeding.

Another frequently abused weasely words rendering direction meaningless is the use of words such as "pursue" and "analyze" and "prioritize". All these modifiers render the subsequent direction utterly meaningless.

The primary impact to vegetation and the spread of weeds is livestock grazing yet the DEIS fails to address this primary issue.

#103 designates ecological emphasis areas but authorizes the same ecologically degrading activities, such as livestock grazing, in them. This renders the whole ecological emphasis area concept meaningless.

The elimination of #109 prioritized resource extraction of wildlife needs.

#116 fails to implement the recent WO IM regarding bighorn sheep management.

#126 is another example of meaningless direction that looks good on paper but does nothing:

> **Action:**
> Use adaptive management to conserve and avoid impacts on populations of Birds of Conservation Concern, Partners-in-Flight priority species, and other species of concern.

The action needs to properly define adaptive management triggers and response actions. As currently written it provides no management direction.

#128 is similar in its worthlessness:

> **Action:**
> Apply appropriate restrictions and mitigation to minimize impacts on migratory birds.

It is the RMP that is required to define what those "appropriate restrictions and mitigation" measures are and when they are to be applied.

#136 is the same rubbish:

> **Action:**
> Promote BLM-sensitive species conservation to reduce the likelihood and need for species to be listed

BLM_0076028

This is a general goal not an action.

#543 is just pure corruption. The BLM is so spineless that it allows the only significant impact to BSC to continue in the postage stamp sized ACEC to protect BSC.

It is quite similar to the bighorn sheep section that prohibits goat grazing that impacts bighorn sheep, because goat grazing does not exist, very much like prohibiting Martian landing sites, but leaves domestic sheep, which is very much a treat to bighorn sheep essentially unaddressed.

On p. 317 we see the statement: "The "meeting the standard with problems" category implies that less than half of the assessment sites within a soil polygon had a soil indicator rating of less than satisfactory, but overall, the soil condition in the polygon was meeting the standard."

We could find no support, either in the 4180 regulations or elsewhere to support the policy that 49% of a land area failing Rangeland Health Standards meets Rangeland Health Standards.

Please provide the regulatory basis for this approach in the revised EIS.

We see on 3-21 the statements:

> The most recent salinity management efforts in the UFO have concentrated on non-structural controls, such as managing soil surface-disturbing activities such as livestock grazing and off-highway vehicle (OHV) use to minimize salinity yields.

> Because high concentrations of selenium occur in Mancos Shale and soils derived from this formation, land management practices and actions that reduce soil surface disturbance and deep water percolation minimize the yield of selenium offsite, much like salinity management.

Yet the primary surface disturbing activity across the FO, livestock grazing, has no requirements or limitations put in place to reduce salinity or selenium.

3-29 states:

> Water quality of UFO surface waters is assessed and monitored by several means. The land health assessments conducted over the most recent ten-year period assessed water quality against BLM Colorado Public Land Health Standard 5. Data assessed for land health assessments include water chemistry, bacteriological analyses, density, and composition of aquatic macroinvertebrates, and the potential for accelerated levels of sediment, salinity, and selenium.

This statement implies that the BLM actually monitors the water quality impacts of its authorized actions. I deal with dozens of FO's in Wyoming Utah and Colorado and none of them do this. Is the UFO actually monitoring water quality impacts of its actions, such as e. coli, sediment from livestock grazing on each allotment it administers or is the above statement stretching the truth?

In the FEIS please clarify what data is being collected, where and how often and what percent of the FO the data collection efforts cover.

The DEIS lists a large number of water bodies on the 303d list, but the proposed RMP does not implement actions to bring these water bodies into compliance with the CWA.

3-32 states that the BLM is mandated to reduce salinity but the proposed RMP is entirely silent on requirements and limitations to reduce salinity from most of its action, including the most significant source of increased salinity, livestock grazing.

3-33 states:

> As part of the land health assessment process, several UFO streams with primary-contact recreation activities were monitored for fecal and *Escherichia coliform* bacteria concentrations. There is a strong correlation between these bacteria and the occurrence of other pathogens. Based on a limited number of samples per site (usually one or two samples collected in spring or summer months), none of the sampled streams exceeded state criteria for bacteria

Please provide information as to the dates when this sampling occurred and when livestock were present on the applicable allotment. WWP and the Forest Service have collected thousands of e. coli samples and exceedances of standards only occur when livestock are present. Natural background levels of e. coli are rarely above 25 CFU. So if your data was not collected when livestock were present on the allotment, the results are meaningless to conclude there are no exceedances.

3-37 states:

> However, because many livestock tanks were constructed prior to state permit filings or being cataloged in BLM databases, the actual number is considered to be much higher. Many of the tanks are poorly maintained or non-functional and cause accelerated levels of erosion and sedimentation. Invasive weed species commonly become established on areas disturbed by livestock tanks, which can degrade watershed conditions.

Certainly, if the BLM were serious about salinity, erosion and selenium control it would have inventoried these for the AMS and then put in specific actions in the RMP to deal with this problem.

3-46 states:

> Across all ten land health assessment units, cool season grasses were underrepresented in the plant communities. This is probably the result of livestock grazing in the spring and fall periods when these grasses are most vulnerable. Often perennial forbs are also underrepresented in the same areas. The reduced cool season grass and forb cover may make it easier for exotic species such as cheatgrass to move in. On many crucial big game winter ranges throughout the planning area, moderate to severe hedging of palatable shrubs is common. Usually reduced vigor of these shrubs is also evident.

Yet the RMP puts in place no requirements or limitations to recover cool season bunch grasses, eliminate growing season grazing or deal with the over-allocation of forage and winter range problems it fully knows about. The proposed RMP utterly fails to address these major FO-wide problems.

3-72 states:

> Within the last 10 years, two newly designated wilderness areas have effectively protected a substantial portion of the species' range from development-related impacts, and the Dominguez-Escalante and Gunnison Gorge NCAs have added or are likely to add new protections specific to the conservation of the Colorado hookless cactus.

But this inaccurately portrays the situation. None of these designations protect, and the RMP fails to implement protections, from the primary disturbance factor for this species, livestock grazing. The RMP fails to provide adequate protections in the BLM's rush to continue the status quo grazing.

Appendix C contains various BMP's but the RMP does not implement these. For instance in the livestock section we see rest and not doing repeated spring grazing yet the RMP fails to implement these BMP's despite the fact that repeated spring grazing is one of the major grazing problems on the FO.

So Appendix C looks good on paper but is worthless on the ground.

> 8. Colorado Best Management Practices and other scientifically developed practices that enhance land and water quality should be used in the development of activity plans prepared for land use.

But again these are not only undefined but not implemented.

Appendix G suffers from the same failure.

## GEOLOGY, SOILS, AND WATER

- Implement guidelines from BLM Technical Reference 1737-17 (Sada et al. 2001), to protect or restore the functions of springs.
- Measures designed to minimize erosion and water quality deterioration will be required in the site-specific plans for surface-disturbing land use activities.
- Implement BMPs from the BLM/USGS Mancos shale research findings (Murphy 2011) applicable to livestock management, recreation management (e.g. location and limitations of OHV use areas), rights-of-way, and other surface disturbing activities.
- Implement guidelines from BLM Technical Reference 1730-2 (BLM 2001), to protect or restore the functions of biological soil crusts.

Yet the RMP fails to implement any of these nor does the RMP require the implementation of these. So again it looks good on paper but is designed to to be worthless from a resource protection perspective.

> Maintaining healthy soil surface conditions on Mancos shale landscapes is more effective for the long term in limiting the yield of sediment, salinity and selenium than physical retention/detention structures

Again the RMP fails to put in place any requirements or limitations to achieve this. This is particularly obvious from the perspective of livestock which is the primary impact to soil surface conditions.

  ☐ Minimize livestock grazing and trailing impacts in riparian areas to protect vegetation, habitat values, streambank stability, and water quality.

Yet the RMP puts in place NO requirements or limitations to achieve this.

The livestock grazing section of Appendix G is another example of where the RMP fails to implement basic protections.

Appendix K fails to comply with the WO IM on bighorn sheep management. It also fails to utilize current science. We provide as an attachment a review of the use of this model in the North Delta process.

The analysis also fails to address disease transmission from cattle.

From a recent RMP revision:

https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=renderDefaultPlanOrProjectSite&projectId=36859&dctmId=0b0003e88040d6d4

### 2.4.6 Alternative L – Allow Domestic Sheep and Goat Grazing on All Allotments with Leasing Terms and Conditions to Reduce Potential Interspecies Contact

The BLM considered an alternative that would make all four allotments available for domestic sheep and goat grazing with application of the leasing terms and conditions identified in Appendix C to reduce the potential for contact with bighorn sheep. These terms and conditions have previously been identified, recommended, or implemented by the USFS and the BLM as best management practices (BMPs). However, when bighorn sheep CHHR occur in or adjacent to a domestic sheep allotment, and especially when the allotment is within bighorn herd home range, development and implementation of effective separation measures is difficult; and contact between the species will most likely still occur. **In other words, special terms and conditions to avoid contact between bighorn and domestic sheep that are known to be in close proximity are generally ineffective to ensure separation of the species.** Furthermore, even with these extra measures, control of domestic sheep, or monitoring and locating bighorn sheep in forested/ dense vegetation or steep/rocky/rugged terrain is very difficult. Accordingly, without a large buffer between domestic and wild bighorn sheep, extra measures are not likely to result in a significant reduction in the risk of contact (Schommer 2009). No known studies, research, or peer reviewed literature has documented the effectiveness of BMPs preventing contact and disease transmission when domestic sheep or goats grazed within or adjacent to occupied bighorn sheep habitats. Appendix C contains a more detailed review of the effectiveness of BMPs.

BLM_0076032

The Partridge Creek allotment overlaps with bighorn sheep CHHR and the Marshall Mountain Allotment is in close proximity to CHHR. The Hard Creek allotment overlaps with the Little Salmon area of concern. The terrain on all three of these allotments is interspersed with dense vegetation and forested areas, with additional areas that are steep, rocky, and rugged. Therefore, application of the specified terms and conditions on these allotments would likely be ineffective at significantly reducing the potential for contact between bighorn sheep and domestic sheep. Hence, for the Partridge Creek, Hard Creek, and Marshall Mountain Allotments, this alternative would be effectively the same as Alternative A under which all four allotments would be available for domestic sheep grazing but without specified terms and conditions. Differing from the other three allotments, the Big Creek Allotment is not in or near bighorn sheep CHHR or the Little Salmon area of concern and has more open and moderately sloped rangeland. However, for this allotment, this alternative would be essentially the same as Alternatives B, which also makes Big Creek available for domestic sheep or goat grazing with application of the terms and conditions. Therefore this alternative was not analyzed in detail.

Appendix K relies on BMP's which have been shown to be ineffective and it ignores completely the WO IM for bighorn sheep which requires effective separation.

CONCLUSION:

The current RMP revision is BLM's traditional faith-based, politics-based management where no requirements or limitations are imposed. The BLM should review the Standards of Ethical Conduct for Federal Employees[25] that are based on Executive Order 12674, as amended by Executive Order 12731. In particular, three of the broad principles I believe apply here are:

*"(1) Public service is a public trust, requiring employees to place loyalty to the Constitution, the laws and ethical principles above private gain.*

*(5) Employees shall put forth honest effort in the performance of their duties.*

*(8) Employees shall act impartially and not give preferential treatment to any private organization or individual."*

Just because the BLM will be outsourcing much of this process does not mean it has any less legal or ethical responsibilities to the American people. I bring this up because, after years of working on livestock grazing and other issues on public lands and, with other WWP staff, having reviewed EAs and EISs on hundreds of grazing allotments and other projects, it is my belief that these documents are used to justify decisions that are already made and basically constitute a "shell game" in which evident degradation by livestock is explained away in every case due to some other cause even though livestock grazing is

---

[25] http://www.usdoj.gov/jmd/ethics/generalf.htm

widely recognized in the scientific literature as a cause of degradation to riparian areas, water quality, plant communities, soils and wildlife.  I cannot recall a single instance in all these cases, no matter how serious the environmental degradation, when the agency (Forest Service or BLM) performed an objective, science-based monitoring and analysis process directed at making an objective and logical decision concerning livestock grazing.  Invariably, the decisions arrived at through these NEPA documents have amounted to a continuation of the status quo with at best, cosmetic changes that make little or no difference on the ground.  It is time for BLM to demonstrate to the public that it will engage in an honest, objective process in order to restore the public trust.

Sincerely yours,

Jonathan B Ratner
Director, WWP –Wyoming Office

BLM_0076034



**Western Watersheds Project, Inc.**
P.O. Box 280
Mendon, Utah 84325
435-881-5404 • wwshed@comcast.net

**Western Watersheds Project**

### UPDATING THE ANIMAL UNIT MONTH
Revised March 17, 2008
John G. Carter, PhD

The animal unit month (AUM) has historically been used as a unit of forage consumption and the basis of permits, stocking rates and fees for grazing public lands.   This report provides a review and update of current livestock weights and forage consumption rates, clarifies the definition of an AUM and proposes means whereby agencies can validate and adjust stocking and billing rates.

It is important to ensure that forage consumption rates by livestock are based on the size of animals present on the allotment so that stocking rates are more closely balanced with available forage.  It is also to ensure that grazing fees accurately represent the forage consumed by livestock so the public trust is not violated by undercharging for the actual weights and forage consumption of livestock being grazed.

The formula used for calculating the grazing fee, established by Congress in the 1978 Public Rangelands Improvement Act, has continued under a presidential executive order issued in 1986. Under that order, the grazing fee cannot fall below $1.35 per AUM, and any increase or decrease cannot exceed 25 percent of the previous year's level. In a recent press release, the Forest Service and BLM defined an AUM as the amount of forage needed to sustain one cow and her calf, one horse, or five sheep or goats for a month[1].

In the 1994 Rangeland Reform Draft Environmental Impact Statement, BLM and the Forest Service defined an animal unit month as:  *"The amount of forage needed to sustain one cow, five sheep, or five goats for a month.  A full AUM's fee is charged for each month by adult animals if the grazing animal (1) is weaned, (2) is 6 months old or older when entering public land, or (3) will become 12 months old during the period of use.  For fee purposes, an AUM is the amount of forage used by five weaned or adult sheep or goats or one cow, bull, steer, heifer, horse, or mule.  The term AUM is commonly used in three ways:  (1) stocking rate as in X acres per AUM, (b) forage allocation as in X AUMs in allotment A, and (3) utilization as in X AUMs consumed from Unit B"[2].*

These definitions avoid dealing with the actual weight and forage consumption of the various animals listed and ignore forage consumption by calves and lambs. Clarification and updating of these values is needed so that livestock producers are charged for the actual forage consumed by all animals grazed and the carrying capacity of the land is not exceeded.  Other requirements in FLPMA stress grazing

---

[1] http://www.blm.gov/ca/st/en/info/newsroom/2006/02/wonews_grazingfees_2006.html for press release announcing 2006 grazing fees.  US Dept of Interior, BLM.
[2] U.S Department of Interior, Bureau of Land Management in Cooperation with the Department of Agriculture Forest Service.  2004.  Rangeland Reform '94 Draft Environmental Impact Statement.

*Carter, John G.  March, 2008.   Updating the Animal Unit Month        Western Watersheds Project*

BLM_0076035

within the carrying capacity of forage within the allotment, the variability of forage
production and the need for sustainable use [Sec. 4130.3-1(a); 4100.0-5]. In order to
achieve the requirements for sustainable use without impairment, it is critical to align
available forage with livestock stocking rates. BLM, for example, has typically used
800 lbs/month of forage as the consumption rate for a cow/calf pair[3]. BLM also does
not clarify if this is air dry or oven dry weight. The Forest Service defines an AUM as
*"The quantity of forage required by one mature cow and her calf (or the equivalent, in
sheep or horses) for one month"*[4, 5]. They use a value of 26 pounds of forage per day for
a cow calf pair[6] but have been used other values such as 34 pounds per day for a
"head month" or cow/calf pair[7]. These inconsistencies need resolution.

NRCS, in its National Range and Pasture Handbook, defines an Animal Unit (AU) as
one mature cow of approximately 1,000 pounds and a calf as old as 6 months, or their
equivalent, then states, *"An animal unit month (AUM) is the amount of forage required
by an animal unit for one month"*.[8] NRCS further defines the actual forage
consumption as 26 pounds of oven-dry weight or 30 pounds of air-dry weight per day
as *"the standard forage demand for a 1,000 pound cow (one animal unit)"*. This is 2.6%
of body weight for oven-dry weight and 3% of body weight for air-dry weight of forage.
Note that there is no forage allowance for the calf in this consumption rate yet the
definition of an animal unit includes a calf. The same would be true for lambs, when
considering sheep grazing.

The Society for Range Management (SRM) in 1974 defined an Animal Unit *"to be one
mature (1000 lb.) cow or the equivalent based upon average daily forage consumption of
26 lbs. dry matter per day."*[9]. SRM also defined an Animal Unit Month as *"The
amount of feed or forage required by an animal-unit for one month."* In the second
edition, SRM revised this definition to include an *Animal-unit (AU) as the* forage
consumption on the basis of one standard mature 1,000-pound cow, either dry or with
calf up to 6 months old as consuming 26 pounds of air-dry forage per day or 800
pounds per month.[10]

It appears from these definitions that there is confusion over the amount of forage
consumed by livestock and whether that is expressed as air-dry or oven-dry forage
amounts. The later SRM definition also clouds the distinction between cow and calf

---

[3] U.S. Dept. of Interior. 2006. Draft Pocatello Resource Management Plan and Environmental Impact
Statement.
[4] U.S. Forest Service Wasatch Cache National Forest. 1995. Final Environmental Impact
Statement Rangeland Health.
[5] U.S. Forest Service Caribou-Targhee National Forest. 2003. Final Environmental Impact
Statement for the Caribou National Forest Revised Forest Plan.
[6] U.S. Forest Service Bighorn National Forest. 2004. Battle Park Cattle & Horse, Mistymoon
Sheep & Goat Allotment Management Plan Revision EIS
[7] U.S. Department of Agriculture Caribou-Targhee National Forest. 2002. Final Environmental
Impact Statement for the Curlew National Grassland.
[8] USDA Natural Resources Conservation Service. 2003. National Range and Pasture Handbook
Revision 1, Chapter 6. Grazing Lands Technology Institute.
[9] Society for Range Management. 1974. Glossary of terms used in range management.
[10] Ortmann, John, L. Roy Roath, and E.T. Bartlett. 2000. Glossary of Range Management Terms No. 6.
105. Colorado State University Natural Resource Series.

*Carter, John G. March, 2008. Updating the Animal Unit Month*        *Western Watersheds Project*

BLM_0076036

forage consumption, making it appear as if the forage consumed by the calf is included in the daily or monthly amount for the 1,000 pound cow.  A careful reading shows that no forage is included for the calf. A review of some history provides some further insight into animal units and forage consumption.

The University of Nevada Agricultural Experiment Station published a report on cattle production in 1943[11].   That report analyzed 14 years of ranch operation for eleven ranches in northeastern Nevada.  At that time, a mature cow was defined as one unit and a branded calf or weaner as ½ cow unit, for a combined total of 1.5 cow units per cow/calf pair.  Bulls were considered 1.5 cow units.  For the period 1938 – 1940, the average turnoff weight (when they left the range) of mature cows was 959 pounds, calves were 381 pounds and bulls were 1222 pounds. This means that in the 1930's, a cow/calf pair was 1340 pounds.  With breeding, supplements and hormones, weights have increased over time.  For example, Anderson et al (ca 2000) calculated a 35% increase in dressed weights per animal between 1975 and 1995[12].

The 1964 Forest Service R-4 Range Analysis Handbook[13] provided a detailed summary of forage consumption for cattle and sheep as air-dry amounts.   This is reproduced in Table 1.

**Table 1.  Air Dry Forage Consumption 1964 R4 Range Analysis Handbook**

| Cattle | Animal Unit Factor | Daily Air Dry Weight Consumption |
|---|---|---|
| 1,000 lb animal | 1.00 | 24 |
| Dry cow | 1.00 | 24 |
| Cow plus 300 lb calf | 1.36 | 33 |
| Cow plus 400 lb calf | 1.46 | 35 |
| Cow plus 500 lb calf | 1.55 | 37 |
| Yearling | 0.74 | 18 |
|  |  |  |
| **Sheep** | **Animal Unit Factor** | **Daily Air Dry Weight Consumption** |
| 125 lb ewe | 1.0 | 4.1 |
| Ewe plus 30 to 40 lb lamb | 1.3 | 5.3 |
| Ewe plus 40 to 50 lb lamb | 1.4 | 5.7 |
| Ewe plus 50 to 60 lb lamb | 1.5 | 6.2 |
| Ewe plus 60 to 70 lb lamb | 1.6 | 6.6 |
| Ewe plus 70 to 80 lb lamb | 1.65 | 6.8 |
| Ewe plus 80 to 90 lb lamb | 1.7 | 7.0 |
| Ewe plus 90 to 100 lb lamb | 1.8 | 7.4 |
| Ewe plus 100 to 110 lb lamb | 1.9 | 7.8 |

[11] Brennan, C.A. and Fred B. Harris.  1943.  Fourteen Years Cattle Production and Ranch Earning Power in Northeastern Nevada 1928 to 1941.  University of Nevada Agricultural Experiment Station, Reno, Nevada.
[12] http://agecon.uwyo.edu/RiskMgt/marketrisk/TheCattleCycle.pdf
[13] USDA Forest Service.  1964.  Forest Service Handbook – R4 Range Analysis Handbook.

*Carter, John G.  March, 2008.   Updating the Animal Unit Month        Western Watersheds Project*

3

Table 2 is taken from the NRCS National Range and Pasture Handbook. It provides animal unit equivalents for different animals. Again, there appears to be inconsistency over the animal unit for cows and calves. Table 2 and their definition define an animal unit as a cow and calf, but their forage allocation does not include the calf.

**Table 2.  NRCS Animal Unit Equivalents**

| Kind of Animal | Animal Unit Equivalent |
|---|---|
| Cow with calf | 1.00 |
| Mature bull | 1.35 |
| Mature Horse | 1.25 |
| Mature sheep | 0.2 |
| Lamb, 1 year old | 0.15 |
| Mature mule deer | 0.2 |
| Mature elk | 0.6 |
| Mature antelope | 0.2 |
| Mature bighorn sheep | 0.2 |

To clarify this situation, USDA market statistics were researched.[14]  These give the average weights of slaughter cattle for the week ending August 14, 2004 as 1251 pounds. The estimate for the same week in 2005 for slaughter cattle average weight was 1260 pounds. The USDA National Agricultural Statistics Service data for average live weight of cattle slaughtered in 2004 was 1242 pounds compared to 1072 pounds in 1984, or an increase of 15.8% in those 20 years[15]. The chart of that data is provided in Figure 1. The <u>Livestock Monitor</u> is a newsletter produced by the North Dakota State University Extension Service Livestock Marketing Information Center in cooperation with USDA State Extension Services[16]. The Livestock Monitor shows for the week ending August 6, 2005, live weights of slaughter cattle averaged 1258 pounds.

The potential weights of mature cows can be even larger than these numbers. For example, NRCS in its National Range and Pasture Handbook, referenced above, defines body condition scores in a range of 1 to 9. A body condition score of 6 which is described as *"Good, smooth appearance throughout. Some fat deposits in brisket and over the tailhead. Ribs covered and back appears rounded."* This body condition score relates to a pregnancy percentage of 88%, which is important as a goal for cow/calf operations. This is because dry cows are usually culled and replaced in order to maximize production of calves by the herd and the weight gain of calves is important for income. Therefore, maximizing Body Condition Score is necessary to maximize calf production.

Mature cow weight varies approximately 7 to 8 percent for each unit change in Body Condition Score (range 1 to 9), and extremes in muscling can cause weight to vary as

---

[14] http://www.ams.usda.gov/mnreports/SJ_LS712.txt
[15] http://www.usda.gov/nass/pubs/agr05/acro05.htm
[16] http://www.ag.ndsu.nodak.edu/aginfo/lsmkt/monitor.htm

*Carter, John G. March, 2008. Updating the Animal Unit Month*          *Western Watersheds Project*

4

BLM_0076038

much as 10 percent.[17]  Frame size (height) scores show that cows at maturity can weigh much more than 1,000 pounds[18].  Table 3 is reproduced from the North Dakota State University publication cited. These figures were for average condition cattle (body condition score of 5).  Actual weights will vary due to differences in muscling, body length, condition and other factors.  These figures were adapted from a 1991 publication, so represent weights from nearly two decades ago.



Figure 1.  USDA Cattle - Avg Live Weight Increase 1984 - 2004

Table 3.  Cattle Weight as Function of Frame Size for Average Condition Cattle

| Frame Score | Frame Size | Mature Cow Weight lbs | Steer Slaughter Weight lbs | Heifer Slaughter Weight lbs |
|---|---|---|---|---|
| 2 | Small | 955 | 850 | 700 |
| 3 | | 1030 | 950 | 800 |
| 4 | Medium | 1100 | 1050 | 900 |
| 5 | | 1175 | 1150 | 1000 |
| 6 | Large | 1250 | 1250 | 1100 |
| 7 | | 1320 | 1350 | 1200 |
| 8 | | 1395 | 1450 | 1300 |
| 9 | | 1470 | 1550 | 1400 |

---

[17] Hammack, Stephen P. and Ronald J. Gill.  1997.  Frame Score and Weight of Cattle.  Texas Agriculture Experiment Station, Texas A & M University System.
[18] John Dhuyvetter.  1995.  Beef Cattle Frame Scores.  North Dakota State University Agriculture and University Extension Publication AS-1091 ( http://showsteers.com/Frame%20Score%20Chart.htm ).

*Carter, John G.  March, 2008.   Updating the Animal Unit Month*          *Western Watersheds Project*

BLM_0076039

Holechek et al (2001) summarized the weaning weights of calves grazed on various types of rangelands at different stocking rates[19]. The data for the period since 1990 produced an average weaning weight of 430 pounds and a range of 382 – 475 pounds. Ray et al (2004) gave a weaning weight of 480 pounds for calves[20]. Using the current market statistics for slaughter cattle of 1250 pounds and the average weaning weight of 430 pounds provided by Holechek et al (2001) gives an estimate for the average weight of a cow/calf pair during the grazing season of 1,680 pounds.

As pointed out above, the NRCS used 26 lbs/day of oven dry weight for a 1,000 pound cow and stated this was equivalent to 30 pounds per day air-dry weight. The NRCS Range and Pasture Handbook value of 30 pounds air-dry weight would be 3% of body weight for a 1,000 pound cow. Applying this to the current weight of 1,680 pounds for a cow/calf pair, the daily forage consumption would be 50.4 lbs of air-dry forage per day, or for a month (30.4 days), 1532 pounds of forage per AUM.

BLM and the Forest Service should update their 800 lb/month forage consumption rates (26 lb/day) to current forage consumption rates based on this best available information. Based on these figures, BLM and the Forest Service are generally underestimating forage consumption for a cow/calf pair by 732 lb/month, or nearly 50%. To account for this in grazing permits and annual billings, stocking rates must be reduced by a corresponding amount.

The forage needs for domestic sheep must also be determined. Based on current USDA published weights for ewes and lambs at sale, adult domestic sheep weigh from 165 to 440 pounds,[21] and lambs are about 129 pounds.[22] Data downloaded from USDA NASS[23] for Idaho, Utah, Nevada and Wyoming for the period 2000 – 2006, show that the average lamb crop is 1.1 lambs per ewe, ranging up to 1.3. According to the American Sheep Industry Association, selective breeding is able to increase lamb birth rates by about 1 – 2% per year, leading to a possible 20% increase in the number of lambs per ewe over 10 years by increasing the number of ewes having twins. Twin survival rates are 1.63 lambs per set of twins[24].

If the low end weight of a sheep at 165 pounds and a lamb at 100 pounds were used and considering that the average lamb crop is 1.1 lambs per ewe, the weight of sheep for a forage consumption calculation would be 275 pounds for the ewe and lambs. The forage consumption rate for sheep given in the 1964 R4 Range Analysis Handbook was 3.3% of body weight per day consumed as air dry forage weight[25]. Thus, the 275 pounds of sheep would consume 276 pounds of air-dry forage per month. As defined

---

[19] Holechek, Jerry L., Rex D. Pieper and Carlton H. Herbel. 2001.Range Management: Principles and Practices, Fourth Edition. Prentice-Hall, New Jersey. 587p

[20] Ray, D.E., A.M. Lane, C.B. Roubicek, and R.W. Rice. 2004. Range beef herd growth statistics. In: Arizona Rancher's Management Guide. Arizona Cooperative Extension, College of Agriculture, University of Arizona.

[21] http://www.wildlifeprairiestatepark.org/animalpages/domestic_sheep.htm

[22] http://www.usda.gov/nass/pubs/agr04/04_ch7.pdf

[23] http://www.nass.usda.gov/index.asp

[24] Bradford, G. E. 2007. Selection for Reproductive Efficiency. American Sheep Industry Association, Sheep and Goat Research Journal.

[25] USDA Forest Service Intermountain Region. 1964. R-4 Range Analysis Handbook

*Carter, John G. March, 2008. Updating the Animal Unit Month*     *Western Watersheds Project*

BLM_0076040

an AUM consists of 5 sheep, leading to calculated forage consumption by one AUM of sheep to be 1380 pounds of air dry forage per month.  As for cattle, stocking rates must be adjusted to take this into account.

Federal and State Lands Agencies should begin recalculating their stocking rates, permitted numbers and grazing seasons based on this updated research.  Permits, Billing Statements and Annual Operating Plans should be modified to take this update into account.    If permittee sale records are available, those might be used to validate weights and therefore, forage consumption rates.  Frame size and body condition scoring also provide a means of making field determinations of the sizes of cattle and could be used to calculate an allotment specific average animal weight and forage consumption rate.

# Updating the Animal Unit Month

**By Dr. John Carter**

**October 2016**

**Yellowstone to Uintas Connection**
**PO Box 62**
**Paris, Idaho 83261**
**Y2uconn@hughes.net**

BLM_0076042

The animal unit month (AUM) has historically been used as a unit of forage consumption and the basis of permits, stocking rates and fees for grazing public lands.   This report provides a review and update of current livestock weights and forage consumption rates, clarifies the definition of an AUM and proposes means whereby agencies can validate and adjust stocking and billing rates.

It is important to ensure that forage consumption rates by livestock are based on the size of animals present on the allotment so that stocking rates are more closely balanced with available forage.  It is also to ensure that grazing fees accurately represent the forage consumed by livestock so the public trust is not violated by undercharging for the actual weights and forage consumption of livestock being grazed.

The formula used for calculating the grazing fee, established by Congress in the 1978 Public Rangelands Improvement Act, has continued under a presidential executive order issued in 1986. Under that order, the grazing fee cannot fall below $1.35 per AUM, and any increase or decrease cannot exceed 25 percent of the previous year's level. In a recent press release, the Forest Service and BLM defined an AUM as the amount of forage needed to sustain one cow and her calf, one horse, or five sheep or goats for a month[1].

In the 1994 Rangeland Reform Draft Environmental Impact Statement, BLM and the Forest Service defined an animal unit month as:  *"The amount of forage needed to sustain one cow, five sheep, or five goats for a month.  A full AUM's fee is charged for each month by adult animals if the grazing animal (1) is weaned, (2) is 6 months old or older when entering public land, or (3) will become 12 months old during the period of use.  For fee purposes, an AUM is the amount of forage used by five weaned or adult sheep or goats or one cow, bull, steer, heifer, horse, or mule.  The term AUM is commonly used in three ways:  (1) stocking rate as in X acres per AUM, (b) forage allocation as in X AUMs in allotment A, and (3) utilization as in X AUMs consumed from Unit B"[2].*

These definitions avoid dealing with the actual weight and forage consumption of the various animals listed and ignore forage consumption by calves and lambs. Clarification and updating of these values is needed so that livestock producers are charged for the actual forage consumed by all animals grazed and the carrying capacity of the land is not exceeded.  Other requirements in FLPMA stress grazing within the carrying capacity of forage within the allotment, the variability of forage production and the need for sustainable use [Sec. 4130.3-1(a); 4100.0-5].  In order to achieve the requirements for sustainable use without impairment, it is critical to align available forage with livestock stocking rates.  BLM, for example, has typically used 800 lbs/month of forage as the consumption rate for a cow/calf pair[3].  BLM also does not clarify if this is air dry or oven dry weight.   The Forest Service defines an AUM as

---

[1] http://www.blm.gov/ca/st/en/info/newsroom/2006/02/wonews_grazingfees_2006.html for press release announcing 2006 grazing fees.  US Dept of Interior, BLM.

[2] U.S Department of Interior, Bureau of Land Management in Cooperation with the Department of Agriculture Forest Service.  2004.  Rangeland Reform '94 Draft Environmental Impact Statement.

[3] U.S. Dept. of Interior.  2006.  Draft Pocatello Resource Management Plan and Environmental Impact Statement.

*"The quantity of forage required by one mature cow and her calf (or the equivalent, in sheep or horses) for one month"*[4, 5].  They use a value of 26 pounds of forage per day for a cow calf pair[6] and have used other values such as 34 pounds per day for a "head month" or cow/calf pair[7].  These inconsistencies need resolution.

NRCS, in its National Range and Pasture Handbook, defines an Animal Unit (AU) as one mature cow of approximately 1,000 pounds and a calf as old as 6 months, or their equivalent, then states, *"An animal unit month (AUM) is the amount of forage required by an animal unit for one month"*.[8]  NRCS further defines the actual forage consumption as 26 pounds of oven-dry weight or 30 pounds of air-dry weight per day as *"the standard forage demand for a 1,000 pound cow (one animal unit)"*.  This is 2.6% of body weight for oven-dry weight and 3% of body weight for air-dry weight of forage.  Note that there is no forage allowance for the calf in this consumption rate yet the definition of an animal unit includes a calf. The same would be true for lambs, when considering sheep grazing.

The Society for Range Management (SRM) in 1974 defined an Animal Unit *"to be one mature (1000 lb.) cow or the equivalent based upon average daily forage consumption of 26 lbs. dry matter per day."*[9].  SRM also defined an Animal Unit Month as *"The amount of feed or forage required by an animal-unit for one month."*  In the second edition, SRM revised this definition to include an *Animal-unit (AU) as the* forage consumption on the basis of one standard mature 1,000-pound cow, either dry or with calf up to 6 months old as consuming 26 pounds of air-dry forage per day or 790 pounds per month.[10]

It appears from these definitions that there is confusion over the amount of forage consumed by livestock and whether that is expressed as air-dry or oven-dry forage amounts.  The later SRM definition also clouds the distinction between cow and calf forage consumption, making it appear as if the forage consumed by the calf is included in the daily or monthly amount for the 1,000 pound cow.  A careful reading shows that no forage is included for the calf. A review of some history provides some further insight into animal units and forage consumption.

[4] U.S. Forest Service Wasatch Cache National Forest.  1995.  Final Environmental Impact Statement Rangeland Health.

[5] U.S. Forest Service Caribou-Targhee National Forest.  2003.  Final Environmental Impact Statement for the Caribou National Forest Revised Forest Plan.

[6] U.S. Forest Service Bighorn National Forest.  2004.  Battle Park Cattle & Horse, Mistymoon Sheep & Goat Allotment Management Plan Revision EIS

[7] U.S. Department of Agriculture Caribou-Targhee National Forest.  2002.  Final Environmental Impact Statement for the Curlew National Grassland.

[8] USDA Natural Resources Conservation Service.   2003.  National Range and Pasture Handbook Revision 1, Chapter 6.  Grazing Lands Technology Institute.

[9] Society for Range Management. 1974.  Glossary of terms used in range management.

[10] Ortmann, John, L. Roy Roath, and E.T. Bartlett.   2000.  Glossary of Range Management Terms No. 6. 105.  Colorado State University Natural Resource Series.

The University of Nevada Agricultural Experiment Station published a report on cattle production in 1943[11].   That report analyzed 14 years of ranch operation for eleven ranches in northeastern Nevada.  At that time, a mature cow was defined as one unit and a branded calf or weaner as ½ cow unit, for a combined total of 1.5 cow units per cow/calf pair.  Bulls were considered 1.5 cow units.  For the period 1938 – 1940, the average turnoff weight (when they left the range) of mature cows was 959 pounds, calves were 381 pounds and bulls were 1222 pounds. This means that in the 1930's, a cow/calf pair was 1340 pounds.  With breeding, supplements and hormones, weights have increased over time.  For example, Anderson et al (ca 2000) calculated a 35% increase in dressed weights per animal between 1975 and 1995[12].

The 1964 Forest Service R-4 Range Analysis Handbook[13] provided a detailed summary of forage consumption for cattle and sheep as air-dry amounts.   This is reproduced in Table 1.

**Table 1.  Air Dry Forage Consumption 1964 R4 Range Analysis Handbook**

| Cattle | Animal Unit Factor | Daily Air Dry Weight Consumption |
|---|---|---|
| 1,000 lb animal | 1.00 | 24 |
| Dry cow | 1.00 | 24 |
| Cow plus 300 lb calf | 1.36 | 33 |
| Cow plus 400 lb calf | 1.46 | 35 |
| Cow plus 500 lb calf | 1.55 | 37 |
| Yearling | 0.74 | 18 |
| | | |
| Sheep | Animal Unit Factor | Daily Air Dry Weight Consumption |
| 125 lb ewe | 1.0 | 4.1 |
| Ewe plus 30 to 40 lb lamb | 1.3 | 5.3 |
| Ewe plus 40 to 50 lb lamb | 1.4 | 5.7 |
| Ewe plus 50 to 60 lb lamb | 1.5 | 6.2 |
| Ewe plus 60 to 70 lb lamb | 1.6 | 6.6 |
| Ewe plus 70 to 80 lb lamb | 1.65 | 6.8 |
| Ewe plus 80 to 90 lb lamb | 1.7 | 7.0 |
| Ewe plus 90 to 100 lb lamb | 1.8 | 7.4 |
| Ewe plus 100 to 110 lb lamb | 1.9 | 7.8 |

Table 2 is taken from the NRCS National Range and Pasture Handbook.  It provides animal unit equivalents for different animals.  Again, there appears to be inconsistency over the animal unit for cows and calves.  Table 2 and their definition define an animal unit as a cow and calf, but their forage allocation does not include the calf.

---

[11] Brennan, C.A. and Fred B. Harris.  1943.  Fourteen Years Cattle Production and Ranch Earning Power in Northeastern Nevada 1928 to 1941.  University of Nevada Agricultural Experiment Station, Reno, Nevada.
[12] http://agecon.uwyo.edu/RiskMgt/marketrisk/TheCattleCycle.pdf
[13] USDA Forest Service.  1964.  Forest Service Handbook – R4 Range Analysis Handbook.

BLM_0076045

**Table 2.  NRCS Animal Unit Equivalents**

| Kind of Animal | Animal Unit Equivalent |
|---|---|
| Cow with calf | 1.00 |
| Mature bull | 1.35 |
| Mature Horse | 1.25 |
| Mature sheep | 0.2 |
| Lamb, 1 year old | 0.15 |
| Mature mule deer | 0.2 |
| Mature elk | 0.6 |
| Mature antelope | 0.2 |
| Mature bighorn sheep | 0.2 |

To clarify this situation, USDA market statistics were researched.[14]   These give the average weights of slaughter cattle for the week ending August 14, 2004 as 1251 pounds.  The estimate for the same week in 2005 for slaughter cattle average weight was 1260 pounds.  The USDA National Agricultural Statistics Service data for average live weight of cattle slaughtered in 2004 was 1242 pounds compared to 1072 pounds in 1984, or an increase of 15.8% in those 20 years[15].  The chart of that data is provided in Figure 1.  The Livestock Monitor is a newsletter produced by the North Dakota State University Extension Service Livestock Marketing Information Center in cooperation with USDA State Extension Services[16].  The Livestock Monitor shows for the week ending August 6, 2005, live weights of slaughter cattle averaged 1258 pounds.

The potential weights of mature cows can be even larger than these numbers.  For example, NRCS in its National Range and Pasture Handbook, referenced above, defines body condition scores in a range of 1 to 9.  A body condition score of 6 which is described as *"Good, smooth appearance throughout.  Some fat deposits in brisket and over the tailhead.  Ribs covered and back appears rounded."*  This body condition score relates to a pregnancy percentage of 88%, which is important as a goal for cow/calf operations.  This is because dry cows are usually culled and replaced in order to maximize production of calves by the herd and the weight gain of calves is important for income.  Therefore, maximizing Body Condition Score is necessary to maximize calf production.

Mature cow weight varies approximately 7 to 8 percent for each unit change in Body Condition Score (range 1 to 9), and extremes in muscling can cause weight to vary as much as 10 percent.[17]  Frame size (height) scores show that cows at maturity can weigh much more than 1,000 pounds[18].  Table 3 is reproduced from the North Dakota State University publication cited. These figures were for average condition cattle (body condition score of 5).  Actual weights will vary due to differences in muscling, body

---

[14] http://www.ams.usda.gov/mnreports/SJ_LS712.txt
[15] http://www.usda.gov/nass/pubs/agr05/acro05.htm
[16] http://www.ag.ndsu.nodak.edu/aginfo/lsmkt/monitor.htm
[17] Hammack, Stephen P. and Ronald J. Gill.  1997.  Frame Score and Weight of Cattle.  Texas Agriculture Experiment Station, Texas A & M University System.
[18] John Dhuyvetter.  1995.  Beef Cattle Frame Scores.  North Dakota State University Agriculture and University Extension Publication AS-1091 ( http://showsteers.com/Frame%20Score%20Chart.htm ).

BLM_0076046

length, condition and other factors.  These figures were adapted from a 1991 publication, so represent weights from nearly two decades ago.



Table 3.  Cattle Weight as Function of Frame Size for Average Condition Cattle

| Frame Score | Frame Size | Mature Cow Weight lbs | Steer Slaughter Weight lbs | Heifer Slaughter Weight lbs |
|---|---|---|---|---|
| 2 | Small | 955 | 850 | 700 |
| 3 | | 1030 | 950 | 800 |
| 4 | Medium | 1100 | 1050 | 900 |
| 5 | | 1175 | 1150 | 1000 |
| 6 | Large | 1250 | 1250 | 1100 |
| 7 | | 1320 | 1350 | 1200 |
| 8 | | 1395 | 1450 | 1300 |
| 9 | | 1470 | 1550 | 1400 |

Holechek et al (2001) summarized the weaning weights of calves grazed on various types of rangelands at different stocking rates[19].  The data for the period since 1990 produced an average weaning weight of 430 pounds and a range of 382 – 475 pounds. Ray et al (2004) gave a weaning weight of 480 pounds for calves[20].  Using the current

---

[19] Holechek, Jerry L., Rex D. Pieper and Carlton H. Herbel.  2001.Range Management: Principles and Practices, Fourth Edition.  Prentice-Hall, New Jersey.  587p
[20] Ray, D.E., A.M. Lane, C.B. Roubicek, and R.W. Rice.  2004.  Range beef herd growth statistics.  In: Arizona Rancher's Management Guide.  Arizona Cooperative Extension, College of Agriculture, University of Arizona.

market statistics for slaughter cattle of 1250 pounds and the average weaning weight of 430 pounds provided by Holechek et al (2001) gives an estimate for the average weight of a cow/calf pair during the grazing season of 1,680 pounds.

As pointed out above, the NRCS used 26 lbs/day of oven dry weight for a 1,000 pound cow and stated this was equivalent to 30 pounds per day air-dry weight.  The NRCS Range and Pasture Handbook value of 30 pounds air-dry weight would be 3% of body weight for a 1,000 pound cow.  **Applying this to the current weight of 1,680 pounds for a cow/calf pair, the daily forage consumption would be 50.4 lbs of air-dry forage per day, or for a month (30.4 days), 1532 pounds of forage per AUM.**

BLM and the Forest Service should update their 790 lb/month forage consumption rates (26 lb/day) to current forage consumption rates based on this best available information.  Based on these figures, BLM and the Forest Service are generally underestimating forage consumption for a cow/calf pair by 742 lb/month or 24.4 lb/day, an amount nearly equal to the current forage consumption rate used by the agencies.   To account for this in grazing permits and annual billings, stocking rates must be reduced by a corresponding amount.

The forage needs for domestic sheep must also be determined.  According to government statistics, in 2015, the average live weight of sheep and lambs for slaughter was 144 pounds.[21]  The average forage consumption rate is 3% of body weight on an air-dry basis.[22]   Since three sheep (ewe/lamb pair) can be grazed under these permits, the forage consumption by each permitted pair is 144 lb x 3 sheep x 3%, or 13 lb/day of air dry weight. **As defined, an AUM consists of 5 sheep (plus their lambs), leading to calculated forage consumption by one AUM of sheep to be  65 pounds of air dry forage per day or 1,976 pounds per month.**  As for cattle, stocking rates must be adjusted to take this into account.

Federal and State Lands Agencies should begin recalculating their stocking rates, permitted numbers and grazing seasons based on this updated research.  Permits, Billing Statements and Annual Operating Plans should be modified to take this update into account.    If permittee sale records are available, those might be used to validate weights and therefore, forage consumption rates.  Frame size and body condition scoring also provide a means of making field determinations of the sizes of cattle and could be used to calculate an allotment specific average animal weight and forage consumption rate.  In our experience, cattle today are typically large frame size which leads to much higher rates of forage consumption than the averages used in this report.

---

[21] http://www.usda.gov/nass/PUBS/TODAYRPT/lstk0315.pdf
[22] http://www.nrcs.usda.gov/Internet/FSE_PLANTMATERIALS/publications/idpmstn9390.pdf

BLM_0076048

**Western Watersheds Project, Inc.**
P.O. Box 280
Mendon, Utah 84325
435-881-1232 • utah@westernwatersheds.org



**Western Watersheds Project**

June 4, 2004

Mr. Bob Bennett, Director
BLM Wyoming State Office
5353 Yellowstone
P.O. Box 1828
Cheyenne, Wyoming 82003

Western Watersheds Project (WWP) is a 501c3 non-profit membership conservation organization. WWP, on behalf of all its members, has been working for over a decade to beneficially influence the management of BLM administered lands in the western United States. WWP has a long history of close involvement as an interested public on numerous grazing allotments administered by the BLM in Idaho, Nevada, Utah, Wyoming, eastern Oregon and southwest Montana.

WWP is submitting these comments and analysis for incorporation into the BLM's analysis of Range (Livestock Grazing) issues in its current and future planning and for inclusion in grazing permit renewal, vegetation treatments and range improvement project analyses. Copies of these comments and analyses are being submitted simultaneously by email to the State Office and all Wyoming Field Offices for incorporation into these efforts. We support sustainable multiple use without loss of the potential productivity and diversity of these lands and also support the restoration of these lands to their full biological potential. In accordance with BLM's multiple use mandate, you must include consideration of the intrinsic values of the native biodiversity of these lands and protect those values for the long-term benefit of the American people as described in 43 CFR 1601.0-5(f).

WWP is knowledgeable of literally hundreds of grazing allotments which are failing the most minimal of environmental health criteria because of livestock grazing on BLM administered lands. The evidence we provide in these comments makes the case that these lands continue to be <u>severely overstocked with livestock</u>. BLM's own data and current management shows this to be the case. The best quantitative and peer-reviewed range science shows that continued emphasis on structural facilities erroneously called "range improvements" is a flawed strategy. BLM typically proposes these projects rather than making the difficult decision to adjust livestock numbers and seasons to be within the current capacity of the land. Without addressing this issue, the productivity and diversity of the land will continue to fall with the result that the land, the public interest and livestock producers will suffer over the long term. Many irreplaceable resources, for example, springs, their associated wetlands and wildlife have been lost and many more will be lost or irreversibly damaged if management continues to ignore the limitations of the land and the scientific knowledge regarding livestock grazing.

As part of these comments, we refer to voluminous scientific literature and reports that BLM must consider in its analyses. Your review and analysis of these documents and inclusion of them in planning and grazing-related projects is necessary to provide

1

BLM_0076049

a "balanced" approach to the issues.  Their inclusion is also essential for BLM to comply with NEPA's mandate to take a "hard look" at science and do a thorough and integrated analysis of all disciplines.  WWP can provide copies of most of these publications to you for our costs of reproduction and postage, should you request them.

Our comments are organized by sections including:

1. Introduction
2. What Does Range Science Tell Us?
3. Management Recommendations for Uplands
4. Management Recommendations for Riparian Areas
5. References

## 1.0 Introduction

WWP is concerned that, in the past, BLM has not included consideration of the best available science in its environmental analyses.  BLM does not follow the well known and science-based principles of range management in managing livestock grazing.  The three pertinent federal statutes (FLPMA, PRIA and the Taylor Grazing Act) require that BLM administer these lands in the long-term interests of the American people and not a handful of stockmen, who are permittees, on the public lands.

Livestock permittees are a small minority of livestock producers in the eleven western states and are insignificant in their numbers or their economic contribution to the States, their local and regional economies.  Their numbers and contribution pale in comparison to the natural values of our public lands.  Dr. Thomas Power, Chairman of the University of Montana's Economics Department, in Wuerthner and Matteson (2002) points out the minimal economic contribution of federal public lands livestock grazing to local, state and regional economies in the West, including Utah.  That reference can be found on-line at:

http://www.publiclandsranching.org/htmlres/PDF/wr_TAKING_STOCK.pdf

Dr. Power also points out that the majority of public lands livestock producers depend on non-agricultural sectors of these local, state and regional economies for employment, not livestock production.  It is not in the public's interest to blindly continue livestock grazing at unsustainable stocking levels in order to provide a short-term benefit to this small minority, while ignoring the values displaced by livestock grazing.

In its environmental analysis and subsequent land use plan, BLM must include detailed consideration of the information and data provided in several recent publications and the references cited herein before making its decision.  The following three books provide volumes of meaningful assessments of the unfortunate current condition of public lands and the failing economic and social realities of public lands ranching. These are:

2

BLM_0076050

- *Welfare Ranching, The Subsidized Destruction of the American West* (Wuerthner and Matteson 2002)
- *The Western Range Revisited: Removing Livestock from Public Lands to Conserve Native Biodiversity* (Donahue 1999)
- *Waste of the West* (Jacobs 1991)

In addition, BLM must consider in detail the publications referenced in these comments and also National Research Council (2002), *Riparian Areas: Functions and Strategies for Management.* All of these publications are clear in describing the flaws in current methods of livestock management on public lands and should form a core of its analysis.

In addition, the BLM's *Rangeland Reform '94 DEIS* and *Executive Summary* (RRDEIS, BLM 1995) reported that riparian areas *"have continued to decline and are considered to be in their worst condition in history"*; livestock grazing is identified as the chief cause. Indeed, some riparian areas have literally been destroyed; that is, they no longer exist or have any potential for restoration.

In its recent DEIS to revise its grazing regulations, BLM bypassed consideration of best available science. It pretended that current grazing management is fine if interested publics and environmental organizations would just quit holding up BLM and Permittee proposals by creating an administrative paperwork burden (BLM 2003). BLM asserted that greater cooperation with stockmen would somehow result in improvement by merely "tweaking" stocking rates, but then went on to state that this seldom happens, that changes in grazing really only amount to changes in season or location of use and that *"Changes in active grazing use in excess of 10% are infrequent."*

In its RRDEIS, BLM provided definitions describing the status of upland plant communities. These were:

- Potential Natural Community (PNC) = existing vegetation is between 75 – 100% of the sites potential natural plant community.
- Late Seral Community = existing vegetation is between 50 – 74% of the sites' potential natural plant community
- Mid Seral Community = existing vegetation is between 25 – 49% of the sites' potential natural community
- Early Seral Community = existing vegetation is between 0 – 24% of the sites' potential natural community.

Table 1 indicates that management of uplands since the passage of the last Rangeland Reform regulation in 1995 has not resulted in improvement of upland condition. In fact, by BLM's own definitions, condition has declined. It also shows that productivity of those lands is greatly below potential with 63% of its lands below 49% of potential. The data also show that BLM's management has failed in the intervening 10 years to take meaningful actions to improve conditions.

In spite of the evidence of widespread loss of plant productivity and ground cover, accelerated erosion and BLM's own documentation of rapid declines in species such as

3

BLM_0076051

sage grouse, BLM routinely chooses not to address livestock impacts in any scientific or sustainable fashion. Instead, BLM proposes more water developments and grazing systems. This ignores that in the 1960's, BLM began a massive program of developing water, putting streams and springs into pipelines, seeding with crested wheatgrass, building fences, engaging in rotation grazing, and spending millions of dollars to "even out livestock distribution".

**Table 1. Comparison in BLM Upland Condition Between RRDEIS (1995) and Current Condition (BLM 2003)**

| Community Status | RRDEIS | Current DEIS | Change '94 to date |
|---|---|---|---|
| PNC | 4% | 6% | +2% |
| Late Seral | 34% | 31% | -3% |
| Mid Seral | 40% | 34% | -6% |
| Early Seral | 15% | 12% | -3% |
| Unclassified | 7% | 17% | +10% |

An early example of this, among others, was in BLM's Vale District, where millions of dollars were spent on crested wheatgrass seedings and structural range improvements. Today, across BLM lands in the west, many of these systems have fallen into disrepair, the land has failed to recover and we are faced with more and more proposals to install grazing systems, water developments, treat and seed – not reduce livestock numbers. This is in spite of the fact that long-term studies, including those from the Vale District have shown that <u>stocking rate</u> is the critical variable, not grazing systems. These are cited in a later section.

This is all in the context of BLM's failure to scientifically and accurately determine those lands which are capable and suitable for livestock grazing. We must add to this the further failure of BLM to accurately and quantitatively determine how much forage (i.e. forage capacity) is currently available. On top of this, there is the failure of BLM to properly allocate that forage to watershed and stream protection, wildlife habitat and food, then to livestock if available. Then there is the failure to provide for long-term rest to facilitate recovery. Finally, we must add the unwillingness of permittees to use peer-reviewed range science principles for management, instead they rely on "snake-oil" solutions such as time-controlled grazing <u>and</u> maintain strong opposition to the most minimal standards of performance. These failures by BLM and livestock permittees have prevented the recovery of damaged ecosystems in order that they might sustain use as envisioned in the Taylor Grazing Act and FLPMA.

Instead, BLM continues to use the take "half/leave half" principle for livestock use. In its planning, permits and analyses, BLM typically includes livestock use levels of 50% of forage as proper. They do this without providing any scientific foundation for this claim, nor do they adequately monitor this use and use it to manage livestock. The following paragraphs provide a summary of the relevant range science regarding utilization levels, plant growth and productivity, effects of precipitation regime, capability and suitability, capacity determinations, range improvements, stocking rates and range economics. These principles are well founded in the range science literature.

BLM_0076052

## 2.0  What Does Range Science Tell Us?

**2.1 <u>Plant Growth and Precipitation.</u>**   In order to understand the implications of grazing livestock at these heavy forage utilization levels in arid regions, it is important to understand the precipitation regime and its relationship to forage production. Holechek et al (2001) point out what we all understand at the most basic level.  That is, precipitation is the single most important factor determining the type and amount of vegetation in a particular area.  In the 11 Western States, 80% of the area receives less than 500 mm (19.6 inches) of annual average precipitation.  Further, this precipitation is subject to great year-to-year variation.

Four locations representative of precipitation patterns for Wyoming BLM lands are used for illustration.  Long-term precipitation records were analyzed for stations at Kemmerer, Rock Springs, LaBarge and Worland.  The effects of annual variations in precipitation on plant community production are important to understand in establishing livestock stocking rates and management.  Table 2 provides a summary of annual precipitation statistics for these locations.  Data was obtained from the Western Regional Climate Center database which can be found on line at http://www.wrcc.dri.edu/index.html .   Figure 1 provides plots of annual precipitation and occurrence of below average and drought years for these locations.

The analysis uses the Standard Precipitation Index (SPI) developed by McKee et al (1993) which considers drought, or extremely dry conditions, as years with 2" less than average precipitation.

**Table 2.  Summary of Precipitation Statistics for Four Wyoming Locations**

| Description | Kemmerer | LaBarge | Rock Springs | Worland |
|---|---|---|---|---|
| Period of Record | 1949 – 2003 | 1958 – 2003 | 1949 – 2003 | 1960 - 2003 |
| Years of Record | 43 | 28 | 50 | 43 |
| Average, inches | 10.26 | 7.94 | 8.7 | 7.63 |
| Range, inches | 5.06 – 23.72 | 3.44 – 17.82 | 4.53 – 14.54 | 3.75 – 11.27 |
| Year below average | 25 | 16 | 27 | 21 |
| Percent years below average | 58.1 | 57.1 | 54 | 48.8 |
| No drought years based on SPI | 14 | 5 | 13 | 6 |
| Percent drought years based on SPI | 30.2 | 17.8 | 26 | 13.9 |

Figure 2 shows the monthly distribution of precipitation at these locations. The differences in overall precipitation amounts are reflected in the relative magnitudes of monthly precipitation at each of the locations, with Worland being the driest.  All locations have increased precipitation during spring and late summer.  Winters are generally characterized by consistent, but lower precipitation from month to month.

BLM_0076053

These periods of precipitation vary in their effects on the plant communities. Increased precipitation during the spring-summer-fall months may not be effective due to the higher temperatures occurring then.  Typically, the fall-winter period is the period of greatest increase in soil moisture due to lower temperatures and lower evapo-transpiration.  Precipitation effectiveness during the warmer spring – fall periods varies with the storm intensity and soil condition.  Storms must be of high enough intensity to promote recharge of the soil profile into the root zone to be effective for plant growth.  Generally, this is greater than 0.6 inches in desert shrub types, although very high intensity storms may not be effective due to rainfall rates in excess of infiltration that result in overland runoff and flash events.

Spring plant growth in these arid areas depends on the amount of moisture received and retained during the fall-winter period.  Relatively dry summers may allow little regrowth and by the time fall comes, temperatures may be low and growth limited.  Trampled and compacted soils exacerbate this effect (Blaisdale and Holmgren 1984).  Some desert shrubs such as Artemisia sp. with both shallow and deep root systems can take advantage of both shallow and deep soil moisture (West 1983).

Annual production of available forage at the Desert Experimental Range in western Utah was highly correlated with total annual precipitation, showing an 800% variation in forage production between the driest and wettest years (Hutchings and Stewart, 1953).  Scientists developing quantitative ecosystem relationships for the Prototype Oil Shale Program managed by BLM in Utah's Uinta Basin found that annual sagebrush stem leader growth used as an index of production had a high correlation with winter precipitation (October – March) and that spring annual plant biomass was correlated with spring precipitation (ERI 1984; WRSOC 1984).  These studies were carried out under the supervision of BLM's Vernal Field Office.

Analysis of twenty years of data for perennial grass production and annual precipitation for a study area at the Chihuahuan Desert Rangeland Research Center in New Mexico showed a high correlation (Holechek et al, 2001).  A graph of this data is shown in Figure 3.  Annual perennial grass production varied between 6 and 750 lbs per acre, corresponding to the second-lowest and highest precipitation years.  The linear regression plot of the same data is provided in Figure 4.  Results of long term studies of crested wheatgrass production from experimental plots on BLM land at Malta, Idaho showed that crested wheatgrass production was most closely related to May-June precipitation (Sharp et al, 1992).  They found that annual production of crested wheatgrass during 35 years averaged about 500 pounds/acre and ranged between 130 and 1090 pounds/acre depending on precipitation (Figure 5).  These relationships demonstrate that this is a predictable phenomenon that should be taken into account in setting livestock grazing seasons, stocking rates and management on an annual basis as well as over the longer term.  A typical NRCS soil survey (USDA 1980) for these arid areas shows that total production of potential plant communities varies by about 300% between favorable and unfavorable years.  This wide range in production between dry and wet years is typical in the arid regions of the West and should be reflected in related levels of livestock use.

6

BLM_0076054









**Figure 1.  Annual precipitation patterns in Kemmerer, LaBarge, Rock Springs and Worland, Wyoming**

7









**Figure 2. Monthly precipitation patterns in Kemmerer, LaBarge, Rock Springs and Worland, Wyoming.**

8

BLM_0076056







9

BLM_0076057

**2.2  Grazing Intensity and Effects on Productivity.**  Much of the current research and analysis of livestock grazing management, plant productivity and economics has come out of the Department of Animal and Range Sciences at New Mexico State University.  This work has been presented in a series of textbooks and papers in the range science literature.  These references provide analyses of the interactions of livestock stocking rates, plant productivity and economics based on a set of long term grazing management studies from native rangeland types.  They provide recommendations for determining livestock grazing intensity to maintain vegetative productivity and economic stability, while taking into account the effects of inherent variation in precipitation in desert ecosystems.

The effects of different livestock grazing intensities on forage plant production was studied in a ponderosa pine type in Colorado as early as the 1940's (Schwan et al, 1949).  This study showed that forage consumption at a rate of 57% produced an average of twice as much forage as a rate of 71%.  An area left ungrazed by livestock for 7 years produced three times as much forage as the 71% use area.  The authors concluded that, as grazing use increased, forage production decreased.  During that same period, Dyksterhuis (1949), in a classic paper on the use of quantitative ecology in range management, presented examples of how stocking rates must be adjusted based on precipitation and range condition, which included a rating based on departure from the potential plant community.  NRCS (USDA, 1982) considers proper grazing management as that management that sustains the potential plant community.

The effects of conservative (30 – 35%) use vs. heavy (60 – 65%) grazing use on grasses and forbs by cattle was determined in a New Mexico study (Galt et al, 1999).  Both of these pastures had experienced conservative use for over 10 years.  In 1997, one pasture was changed to heavy use.  Quantitative measurements at key locations in both pastures in the following year, while being rested, provided the results shown in Table 3.

**Table 3. Standing Crop of Grasses and Forbs from Galt et al (1999)**

| Location/Forage Component | Spur Pasture Heavy Stocking Rate Pounds/acre | Deep Lake Pasture Conservative Stocking Rate Pounds/acre |
|---|---|---|
| Perennial Grasses | 352 | 824 |
| Forbs | 256 | 436 |
| Total Forage | 608 | 1260 |

This study showed that heavy stocking rates, even for a single year, resulted in serious declines in productivity in the succeeding year.  Perennial grass production was reduced by 57% and forbs by 41% in the heavily grazed pasture compared to the conservatively grazed pasture.  The authors cited a number of other studies in arid environments that showed heavy stocking rates were accompanied by decreases in forage production when compared to conservative use.  After drought, the ability of forage plants to recover was directly related to the standing crop levels maintained during the dry period.  The studies cited showed that grazing during different seasons was less important than grazing intensity.

10

BLM_0076058

Five long-term stocking rate studies from three different locations in Arizona, New Mexico and Utah documented similar patterns (Holechek et al 1999a). In the Desert Experimental Range in Utah, a 13-year study with moderate (35%) and heavy (60%) use by sheep resulted in annual forage production of 198 lbs/acre and 72 lbs/acre. The authors recommended 25 – 30% use of all forage species. A 10-year study at the Santa Rita Range in Arizona demonstrated that perennial grass cover and yield showed an inverse relationship to grazing intensity, while burroweed, an undesirable species, increased with increasing forage use. The authors recommended a 40% use level. A 37-year study in New Mexico involving conservative (33%) and moderate (45%) use showed that the lower grazing intensity resulted in greater black grama (perennial grass) cover. Lowland areas with high clay content and periodic flooding grazed at moderate intensity had higher cover of Tobosa, a perennial grass, than heavily grazed areas. They recommended 30% be used as a stocking intensity with no more than 40% removed in any year. A 10-year study at the Chihuihuan Desert Rangeland Research Center looked at four grazing intensities of 25%, 35%, 50% and 60%. Light (25%) and moderate (35%) use produced 70% more forage than 50% use and more than double that achieved at 60% use. Here, the author recommended conservative stocking at 30 – 35%.

Hutchings and Stewart (1953), suggested that 25 – 30 % use of all forage species by livestock was proper. They recommended this level because routinely stocking at capacity will result in overgrazing in half the years and necessitate heavy use of supplemental feed. Even with this system, they recognized that complete destocking would be needed in 2 or 3 out of ten years. Holechek et al (1999a) concluded that the research is remarkably consistent in showing that conservative grazing at 30 – 35% use of forage will give higher livestock productivity and financial returns than stocking at grazing capacity. They also recognized that consumption by rodents and other wildlife must be taken into account as part of this utilization. Otherwise, rangeland productivity would suffer even at these levels of use. Galt et al (2000) recommended levels of 25% utilization for livestock and 25% for wildlife with 50% remaining for watershed protection. In none of these cases have the scientists recommended 50% utilization by livestock and they are clear that even at the lower use levels recommended, wildlife use is included.

BLM has never even looked into the issue of the relationship between its typical riparian greenline stubble height standard of 3 – 4", usually applied to Nebraska sedge and other sedge species, and the effects of applying this standard on adjacent riparian plant community productivity. Carter (1998) showed that before greenline N. sedge had been reduced in height to the standard of 6", riparian grasses had been reduced to 2" stubble height and 89% of stream banks had been trampled, compacted or were actively eroding into the stream. Monitoring data from the Wasatch-Cache National Forest (USDA 1993) included the observation that a Nebraska sedge stubble height of 7.6" corresponded to an estimated 70% use of riparian grasses. Lile et al (2003), compared clipping of N. sedge to stubble heights of 2" and 4" during early season, late season and multiple clippings to both heights. Late season use or 2" stubble height did not allow recovery. Only the 4" early season use achieved the 4" criteria, but did not regrow to meet the 6" criteria by the end of the growing season. This shows that season-long or late season use does not allow sufficient time for re-growth and that 3-4" stubble heights are not effective in protecting riparian vegetation.

11

BLM_0076059

Schulz and Leininger (1990) studied long-term riparian exclosures compared to areas that continued to be grazed. They found that, after 30 years, willow canopy cover was 8.5 times greater in livestock exclosures than in adjacent grazed riparian areas. Grasses were 4 to 6 times greater in cover within the exclosure than outside. Mean peak standing crop of grasses within the exclosure was 2,410 Kg/Ha, while outside in caged plots, mean peak standing crop was 1,217 Kg/Ha.

Often cited, Franklin Crider's study on root growth stoppage from plant top removal provided quantitative measurements of plant re-growth under different amounts of removal (Crider 1955). Three mid-west perennial grasses were grown from seed in pots under ideal conditions of watering and fertilization. After sixty days of growth, these potted grasses were clipped once at intervals from 10% to 90% of the above ground biomass. Repeat clippings of the potted grasses were made every two days to return the plants to the same height as the original clipped percent. The experiment lasted thirty three days at which time root growth of controls became inhibited by the size of the pot. Crider concluded that under these ideal growing conditions, if these species of grasses had 40% or less of their aboveground biomass clipped either once or many times, then the net root mass was the same or more at the end of the experiment. This was used to make the assumption that grazing during the entire growing season at 40% or less would sustain plants from one season to the next. This same study has been used to justify the 50% or "take half/leave half" proposition that range managers have used for decades. Clearly, the long-term range studies cited here show that under actual field conditions, these use levels are excessive and light grazing (25%) is most equitable to BLM's mandate for sustainable use.

**2.3  Forage Needs Other Than Livestock.** Let's assume for the moment that Crider's finding (40% removal in a growing season) applies to the very arid lands found on Wyoming BLM lands. If Crider's results apply, then the 40% removed needs to be shared with all the animals that require forage. Some is needed for wild grazers (insects, nematodes, mammals), some for the generation of litter and nutrient cycling. A certain amount of the plant needs to remain to ensure regeneration of the plant and to ensure plant community structure is sufficient for wildlife habitat needs and soil erosion protection. A certain proportion of plants must remain ungrazed to allow for seed and flower production to ensure propagation of the species and provide food for pollinators and granivores, an often overlooked requirement.

Existing research helps answer the question of how much of the annual plant growth is required for wild grazers. For a detailed review of this research we recommend that you download Catlin et al (2003) from:

http://rangenet.org/directory/jonesa/sulrprec/index.html

Based on a number of studies of mammal consumption of forage, some annual forage consumption needs for mammals where mammal populations are at or near their potential are provided in Table 4.

12

BLM_0076060

**Table 4.  Forage Needs of Mammals**

| Mammal | Forage Needs kg/hectare |
|--------|-------------------------|
| Deer | 12.7 |
| Rabbits | 72.7 |
| Rodents | 142.3 |
| Total | 227.6 |

Less is understood regarding the typical vegetation needs for insects.  What is known is that insects play a significant role.  For example, harvester ants are granivores with individual colony populations of tens of thousands of individuals.  Even in the driest and hottest parts of North America, the total biomass of one species of harvester ant, *Messor (Veromessor) pergandei* has approximately the same total biomass as the total rodent population in the same area.  One of many ecological roles harvester ants fulfill is dispersing plants as a result of accidental abandoning of seeds near the nest.  The analysis here focuses on the typical forage needs of insects.

A number of studies have reported the percent of plant growth consumed by insects.  In grassland and savannah, insect consumption of a single species varied from less than 1% to 19% with a mean of 3.5% (Wiegert and Peterson, 1983).  Rangeland grasshoppers consume between 1- 3% in typical years (Mispagel 1978) and up to 99% in periods of super abundance (Nerny and Hamilton 1969).  Hewitt and Onsager (1983) suggest that between 21-23% of available range forage is consumed by all grasshopper species in the western U.S. each year.  This production is transferred to birds and mammals such as sage grouse and rodents as a food source, to the soil for nutrient cycling and to higher trophic levels such as raptors and other carnivores.  It is important for ecosystem function and cannot be dismissed.

Nematodes provide critical soil nutrient cycling and structure functions.  This complex array of species normally has a higher diversity and biomass than other rangeland flora and fauna combined. Some nematodes consume plants and should be considered as a component in the consumption of rangeland plants.  Ingham and Detling (1984) estimated that nematodes consumed between 6 and 13 % of below ground net productivity in the mixed grass prairie.  Other studies by Scott et al (1979) and Anderson (1987) found that root feeding arthropods and nematodes consume between 7-26% of the net productivity in normal years.  For the full citations to these studies please visit the paper at the web site shown above.

Holechek et al (2001) provide equivalents in forage consumption between livestock and wildlife.  They are summarized in Table 5.  Studies in the Vernal resource area during the 1970's and 1980's generated many years of quantitative data describing the abundance of many species of animal, bird and insect in the different vegetation types occurring there.  This information is available in the Vernal Field Office for review and analysis.  Some of it is provided in the (ERI 1984; WRSOC 1984) reports referenced.  Final determinations of livestock stocking rates and utilization criteria for livestock must take this information into account, using the current vegetation production for the area under consideration.

13

BLM_0076061

**Table 4.  Animal Equivalents from Holechek et al (2001)**

| Animal | Animal Unit Equivalents |
|---|---|
| Mature cow | 1.0 |
| Yearling cow | 0.75 |
| Domestic sheep | 0.15 |
| Horse | 1.8 |
| Bison | 1.8 |
| Elk | 0.7 |
| Moose | 1.2 |
| Bighorn sheep | 0.18 |
| Mule deer | 0.15 |
| Pronghorn | 0.12 |

**2.4  What is an AUM?**  Various estimates have been used in the past to define the amount of forage consumed by livestock (AUM).  BLM often uses the value of 800 lbs/AUM.  This section discusses some of that variability and proposes a standard forage amount for livestock consumption.  A check of USDA market statistics at:

http://www.ams.usda.gov/mnreports/lm_ct166.txt

shows that during 2003, auction weights of mature steers averaged 1268 lbs and mature heifers averaged 1157 pounds.  Recent auction weights for mature cows have seen ranges up to 1400 pounds.  Ray et al (2004) give a weaning weight of 480 pounds for calves. Holechek et al (2001) state that daily dry matter consumption averages  2% of body weight per day.  They then calculate that a 1000 pound cow will consume 20.0 lbs dry forage/day and a 750 pound yearling will consume 15 lbs dry forage/day, for a total of 35 lbs/day.  The 1969 AMP for the North Rich Allotment in Rich County and Cache Counties (Wasatch-Cache NF) used 30 lbs/day for a cow calf pair.  In its FEIS for the Land and Resource Management Plan for the Curlew National Grassland (USDA 2002), the Caribou-Targhee National Forest used 34 pounds per day for a cow/calf pair. There is little doubt that cattle weights have increased over time and a value that is accurate under current conditions must be applied.  In fact, Anderson et al (ca 2000) calculated a 35% increase in dressed weights per animal between 1975 and 1995.  Their analysis can be found at:

http://agecon.uwyo.edu/RiskMgt/marketrisk/TheCattleCycle.pdf

Using the average auction weight for heifers (1157 lbs), the weaning weight for calves (480 lbs) and the 2% consumption rate from Holechek et al (2001) results in forage dry weight consumption of:

(1157 + 480) x 0.02 x 30 days     =     982 lbs/month, or 32.7 lb/day

Even this will likely be an underestimate since calves graze all summer and are probably closer to the yearling weight given in Holechek et al (2001) and mature cows can be a good deal larger than the heifer weight used here.  BLM must also count

14

BLM_0076062

calves in its AUM for permitting purposes.  FLPMA requires that an AUM be the forage consumed by a mature cow or its equivalent each month.  Therefore, calves must be counted in the AUM allocation for permitting purposes.  We propose that BLM establish a forage consumption allocation for a cow/calf pair of 1,000 lbs/month = 1 AUM.

**2.5 <u>Grazing Systems</u>.**  In a review paper that considered grazing systems, grazing intensity and season of use, Holechek et al (1998) determined that, *"financial returns from livestock production, trend in ecological condition, forage production, watershed status and soil stability are all closely associated with grazing intensity."*  They found that <u>grazing systems such as rest-rotation had limited or no benefit in arid systems.</u>  Citing long-term studies in Arizona, they documented that after 12 years of rest-rotation management compared to continuous grazing, neither forage plant densities nor forage plant production differed between the treatments.  Grazing intensity employed was 30 – 35% use with occasional high use of 50% or more.  *"Rest and deferment were not sufficient to overcome the effects of periodic heavy use on primary forage plants when rest-rotation grazing was applied on big sagebrush range in northern Nevada."*  In an Arizona study comparing winter-spring grazing with summer-fall rest to continuous grazing, the rotation scheme was inferior to the year-long system from the standpoint of perennial grass density and production.  Perennial grass production was closely associated with the degree of use and was highest where grazing use was lowest.  In a Vale, Oregon study, lasting over 20 years at moderate grazing intensity, rotational grazing showed no advantage over season-long grazing in improving range condition or forage production.  *"The key factor in range improvement appeared to be the reductions in grazing intensities that were applied when the project was initiated..".*

A review of the "classic" range studies, which are the long-term stocking rate and grazing system studies that provide the scientific foundation for modern range management again showed that light use is closer to sustainable use, while heavy use is not (Holechek et al 1999a).  Definitions of "heavy", "moderate" and "light" grazing developed in 1961 were cited.  Heavy grazing was defined as the degree of forage utilization that does not allow desirable forage species to maintain themselves.  Moderate grazing was defined as the level at which palatable species can maintain themselves. Light grazing was defined as the degree of utilization at which palatable species are able to maximize their herbage producing ability.  <u>However, it is clear that using even "moderate" grazing in depleted areas will not allow them to recover.</u>

When averaged across all the long-term studies for all regions, heavy grazing was 57% use of primary forage species, moderate use was 43% and light use was 32%.  <u>In arid regions, the research showed that moderate grazing use was 35 – 45%.</u>  When the average forage production change over time was compared with use, heavy stocking resulted in a 20% decline in production, moderate use experienced no change and light use resulted in an 8% increase.  During drought, moderately stocked pastures produced 20% more forage than heavily stocked pastures, light grazing produced 49% more forage than heavy and 24% more than moderate stocking levels.  Heavy stocking resulted in a downward trend and light stocking an upward trend in ecological condition.  Moderate stocking showed a slight, but not significant increase in condition, resulting in depleted ranges being maintained in depleted condition.

BLM_0076063

Table 6 provides summary statistics from that paper. It must be remembered that these comparisons are to prior heavy use, not to ungrazed lands. It is apparent from these studies that "moderate" use levels will not allow significant recovery of severely depleted range. In fact, in studies of long-term rest at Idaho National Engineering Laboratory, the recovery rate of grasses in sagebrush communities was slow, progressing from 0.28% to 5.8% over 25 years (Anderson and Holte, 1981 and Anderson and Inouye, 2001). <u>It is clear from these examples that native plant communities in heavily depleted sites will require decades to recover in the absence of livestock, while their ability to recover in the presence of livestock at any level of use has not been demonstrated.</u>

Relying on additional water developments, fences and grazing systems will not alleviate the problem. The use of range improvements and rotation systems is not sufficient to correct over-stocking. Results from 18 western grazing system studies by Van Poollen et al (1979) found that adjustment of livestock numbers, or stocking intensity was more important than implementing grazing systems to improve herbage production. Holechek et al (1999a) recognized that *"various rotation grazing systems cannot overcome the rangeland deterioration associated with chronic overstocking."* Holechek et al (2000) also showed that the various claims made by advocates of short-duration or time-controlled grazing were false.

A comprehensive discussion of rest-rotation is found in Clary and Webster's General Technical Report titled *"Managing Grazing of Riparian Areas in the Intermountain Region."* (Clary and Webster 1989). They summarized a dozen studies showing significant increases in forage production occurred with decreased intensities of grazing. The article described the improvements found in reducing grazing from heavy, to moderate and then to light grazing. Grazing with utilization above 50% was described as heavy, moderate was 30 - 50% and <25-30% was called light grazing in most of these studies.

**Table 5.  Summary of Data from 25 Classic Grazing Studies (Holechek et al 1999a)**

| Description | Heavy | Moderate | Light |
|---|---|---|---|
| Average Forage Use % | 57 | 43 | 32 |
| Average Forage Production lb/acre | 1,175 | 1,473 | 1,597 |
| Drought Years Production lb/acre | 820 | 986 | 1,219 |
| Average Calf Crop % | 72 | 79 | 82 |
| Average Lamb Crop % | 78 | 82 | 87 |
| Calf Weaning Weight lbs | 381 | 415 | 431 |
| Lamb Weaning Weight lbs | 57 | 63 | -- |
| Gain per Steer lbs | 158 | 203 | 227 |
| Steer/calf Gain per Day lbs | 1.83 | 2.15 | 2.3 |
| Steer/calf Gain per Acre lbs | 40.0 | 33.8 | 22.4 |
| Lamb Gain per Acre lbs | 26.0 | 20.4 | 13.8 |
| Net Returns per Animal $ | 38.06 | 51.57 | 58.89 |
| Net Returns per Acre $ | 1.29 | 2.61 | 2.37 |

16