Clary and Webster's study concluded that *"managers should place more emphasis on proper stocking intensity and less on grazing system implementation. The concentrated use of grazing pastures is not compensated for during rest years if grazing use is heavy. In summary, although grazing systems have great intuitive appeal, they are apparently of less consequence than once thought. In fact as long as good management is practiced so that there is control of livestock distribution and grazing intensity, the specific grazing system employed may not be significant."*

Holechek et al (2001) have indicated that, depending on topography, areas of severe degradation, or *"sacrifice areas"* occur around water sources including water developments. These can extend from 1 mile to several miles from these sources and out further if stocking rates are too high. Based on this, a single water development can result in an area of soil compaction, erosion and severe loss of ground cover and vegetation for thousands of acres. They also indicate that installing water developments in locations that have had limited access to livestock in the past may increase ecological damage to areas that are important refuges for relict plant communities and wildlife that have not been displaced by livestock.

Catlin et al (2003) provides a review of grazing systems. It summarizes more than 40 studies concerning rest rotation and related issues. Short term rest (one year) as typically applied does not lead to significant improvements of deteriorated ranges. Clearly, the long-term range studies we have cited show that it is stocking rate, not water developments, or grazing systems that are most important in maintaining or improving rangeland productivity. It is critical that BLM take this information into account in determining livestock stocking intensities and evaluating the efficacy of added water developments or grazing systems.

**2.6 <u>Economic Considerations.</u>** The studies we have cited show that light stocking results in greater forage production and improvement in range condition when compared to both heavy and moderate use. Moderate and light use also provided greater financial returns than those obtained with heavy use. Because these financial figures included data from humid areas, a separate analysis taking into account the necessity for destocking during drought in arid regions showed that conservative stocking (35% use) would provide the highest long-term financial returns on semi-desert rangelands in Arizona.

Economic analyses in (Holechek et al, 1999b) show that conservative stocking rates yield better returns. For example, in the sheep experiment at the Desert Experimental Range in Utah, the lower stocking rate (35% use) yielded a financial return of $0.39/acre compared to $0.14/acre for the higher stocking rate (60% use). A modeling study that evaluated 29 years of financial returns for a cow-calf operation revealed that a relatively constant stocking rate of 35% use was considered the best approach.

Winder et al (2000) reported on comparisons of stocking rates and financial returns using 30 or 40% of current years perennial grass growth. The 30% use level provided greater vegetation productivity and financial returns. After drought in 1994 through 1996, forage production on the pastures with the lower stocking rate (30% use) increased 71% compared to 35% increase on those with the moderate stocking rate (40%). Economic returns were $0.52/acre for the conservative use level and

17

BLM_0076065

$0.31/acre for the moderate use level.  <u>A combination of stubble heights, clippings and ocular measures were used to set annual stocking rates, termination of the grazing season, sale of cattle to balance numbers with capacity and destocking during drought.</u>  Under these criteria, all pastures were destocked in the summer of 1994 and the moderately stocked pasture was destocked in May, 1999.  After livestock were removed due to drought, pastures were rested for two years, then afterwards stocked in late fall according to current year's forage production.

Results of seven years' research in New Mexico's Chihuahuan Desert to evaluate the relationship between range condition and financial returns showed similar relationships (Holechek et al 1996a).  Condition was evaluated using the Dyksterhuis (1949) definitions based on departure from climax.  This study showed a relationship between forage production and range condition.  Higher condition range, or that nearer climax community plant composition, had higher production of forage and more preferred forage species than lower condition range.  <u>Excellent range condition provided over four times the financial return of fair condition range and 65% greater return than good condition range.</u>

The reasons for this were the high costs of management and the energy lost by livestock in seeking forage in lower condition range. In a companion paper, livestock returns were compared to conventional investments such as bonds or stocks (Holechek et al, 1996b).  This analysis showed that over-capitalization in infrastructure, coupled with over-stocking lead ranchers into a boom and bust cycle as climatic conditions change.  In wet years, they added livestock, generally when prices were high then sold off their herds during dry, or bust periods when prices and productivity are low.  <u>The final analysis concluded that conservative stocking, minimal investment in range improvements and greater spacing of watering points reduced fixed costs and insulated the operation from the vagaries of precipitation and market forces.</u>

In addition to the economics of livestock production, BLM is required to analyze other economic values and determine the values foregone by its proposed action.  NEPA (40CFR1508.8) recognizes that the analysis of effects must include ecological, aesthetic, historic, cultural, economic, social, or health issues.  BLM typically has clouded the distinction between "cultural" as applied to historical features such as buildings, artifacts, or paleo-resources with societal lifestyle issues.  In particular, in its recent DEIS to revise the grazing regulations, BLM used the abstraction called "lifeways" .  <u>This distinction needs to be clearly drawn.</u>  It appears BLM is trying to draw in "lifestyle" or "lifeways" as some sort of cultural feature that is given protection by the cultural preservation laws and SHPOs.  This is not the intent of these laws or NEPA.  If it were, would not "lifestyles" or "lifeways" other than livestock production also deserve protection, consideration and analysis?

NEPA, at 40 CFR 1501.2 (b) states that federal agencies must *"Identify environmental effects and values in adequate detail so they can be compared to economic and technical analysis."* 43 CFR 1601.0-5(f) defines Multiple Use as:  *"Multiple use means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the lands for some or all of these*

18

*resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some lands for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the lands and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output."*

FLPMA requires BLM to manage the public lands for multiple use. This means that the agency must make *"the most judicious use of the land for some or all of [the various] resource values . . . [and to] use . . . some land for less than all of the resources . . . ."* 43 U.S.C. § 1702(c). This requires BLM to undertake a decision process *"to balance competing resource values to ensure that the public lands are managed in a manner 'that will best meet the present and future needs of the American people.'"* 43 U.S.C. § 1702(c); Comb Wash at 101. BLM's balancing of values must be reasoned and well-informed. Therefore, the agency must accumulate sufficient data and consider relevant rigorous science to determine what uses are appropriate in any given area.

Applied to the management of livestock grazing, the analysis must, on a site-specific level, weigh the benefits and harms of grazing to determine if BLM should allow this use in any given area. Moreover, should the agency conclude that livestock grazing is an appropriate use, BLM must consider multiple-use values in determining how that area should be grazed. National Wildlife Fed'n v. BLM, No. UT-06-91-1 (DOI, Office of Hearings and Appeals, Hearings Div.) (Dec. 20, 1993) at 25, *aff'd* Comb Wash (*citing* 43 U.S.C. §§ 1701(a)(8), 1702(c)). Therefore, in establishing grazing thresholds such as stocking rates and utilization levels, BLM is required to abide by *"FLPMA's mandate [that it] protect the full spectrum of environmental, ecological, cultural, and recreational values."* Id.

Other than asserting in various ways that continued livestock grazing at current levels provides for preservation of rural values and lifestyles, BLM generally does not provide any economic analysis of the costs and benefits of public lands livestock grazing and its contribution to local and regional economies. It does not analyze the values of uses foregone in favor of livestock grazing and its infrastructure. See the detailed and quantitative analysis by Dr. Power in (Wuerthner and Matteson 2002) that is referenced above.

Dr. Power shows that *"Livestock grazing on federal lands is generally unimportant to local economies and even less so to state and regional economies. In terms of income and numbers of jobs provided, the contribution of federal lands grazing is less than 0.1% across the West. Farm and ranch operations are increasingly reliant on nonfarm income sources to be financially feasible, while livestock grazing competes with other uses of public lands – such as clean water, recreation, wildlife habitat – that contribute to the ongoing vitality of western economies."*

In his analysis of the economies of individual rural counties, Dr. Power showed that federal lands grazing does not contribute significantly to those economies across the

19

west.  In fact, given the high percentage of ranching families that have jobs, either full or part time outside the ranch (60 – 70%), it is ranchers that depend on the other economic sectors for their ability to persist, not federal grazing.  Dr. Power states, *"It is not that towns depend on agriculture, but that agriculture increasingly depends on the vitality of urban and nonagricultural rural economies to provide the nonfarm income that keeps farm operations alive."*

Dr. Power states that claims about the relative importance of federal grazing to the economies of western states can be analyzed by answering these questions:

1. "What portion of the value produced by cattle and sheep operations is associated with feed used?

2. What portion of the feed for those cattle and sheep operations comes from grazing on federal lands?

3. What portion of the total agricultural activity involves raising cattle and sheep?

4. What part of the total economy is represented by agriculture."

Souder (1997) analyzed the economics of livestock grazing in the Central Winter Ecosystem Management Area on the Kaibab Plateau using readily available economic data.  His analysis showed the values of various activities in the study area generated values that are tabulated in Table 7.

**Table 7.  Summary of Values Received Annually in the Central Winter EMA**

| Resource | Local Benefits |
|---|---|
| Dispersed Recreation | $6,400,000 (Locally and Regionally) |
| Hunting Mule Deer and Turkey | $719,392 (Mule Deer = $470,528) |
| Livestock Grazing | $43,283 |
| Fuelwood Gathering | $45,492 |

BLM should include consideration and analysis of these sources in its planning and grazing-related project proposals and also provide more analysis of the economic benefits of wildlife through hunting, fishing and wildlife-watching associated recreation.  These benefits are summarized in the Fish and Wildlife Service *2001 National Survey of Fishing, Hunting and Wildlife-Watching Associated Recreation* (DOI 2002).  That survey showed that in Wyoming alone, expenditures for hunting, fishing and wildlife-associated recreation were $634,049,000.00 in 2001

**2.6 Grazing Capability and Suitability Determinations**.  Current range science recommendations include adjusting the stocking rate for livestock in order to account for distance from water and steepness of slope (Holechek et al, 2001).  The Natural Resources Conservation Service has adopted these guidelines for slope adjustments (Galt et al, 2000).  Their suggested reductions in grazing capacity for cattle with distance to water and increasing slope are provided in Table 8.

They note that on cold desert ranges of the U.S., snow reduces water availability problems in winter.  Also, sheep do not require water every day and can use areas further than 2 miles from water.  Sheep on New Mexico winter ranges used slopes of less than 45% with no adjustment necessary for slope, whereas slopes greater than 45% were hardly used.  Regional criteria for the Intermountain Region of the Forest

20

BLM_0076068

Service designate lands with greater than 30% slope as not capable for cattle and greater than 45% slope as not capable for sheep. Other factors used by the Intermountain Region of the Forest Service for determining lands that are not capable include: current vegetation production less than 200 lb/acre, forested areas and areas with highly erodible soils (Blackwell 2001; USDA 2001).

**Table 7.  Adjustments for Distance to Water and Slope for Cattle (Galt et al, 2000)**

| Distance from Water miles | Percent Reduction in Grazing Capacity |
|---|---|
| 0 – 1 | 0 |
| 1 – 2 | 50 |
| >2 | 100 |
| *Slope %* | |
| 0 – 10 | 0 |
| 11 – 30 | 30 |
| 31 – 60 | 60 |
| >60 | 100 |

Suitability determinations should be performed on those lands that are found capable for livestock to determine whether or not livestock grazing should be allowed. For example, important or critical fish and wildlife habitat, recreation areas, locations of sensitive populations, natural research areas, watershed protection areas among others should not be considered suitable and should be closed to livestock. These capability and suitability determinations are critical components in meeting the definitions and mandates of FLPMA, PRIA and NEPA regarding sustainability and multiple use. See also the discussion in the previous section regarding balancing of resource uses and values.

## 3.0  Management Recommendations for Uplands

It is critical for BLM to incorporate the science we have cited in its analysis for planning and grazing-related project documents to ensure that best available science is applied on the ground. In this way, it may be possible to sustain livestock grazing on those lands that are capable and suitable. The following steps should be implemented in each of these efforts.

**3.1  Literature Review.**  Review the literature on the effects of grazing livestock in arid environments. This review should address the effects of different levels of grazing intensity (stocking rate), grazing systems, range improvements and livestock exclusion on upland habitats. It should include an evaluation of their effects on maintenance, productivity and recovery rates of native plants and soil communities. It should also review the use of various standards, indicators and monitoring methods used to manage grazing and their ability to accurately and timely assess and be representative of plant and soil community characteristics.

BLM_0076069

**3.2  Determine Soil and Plant Community Status.**  Using GIS, map all vegetation, range site types and soil types on BLM lands in the affected areas.  Design and carry out a science-based review of existing information and a field survey to accurately assess current conditions in the plant and soil community.  This survey should determine the distribution of plant species, their ground cover and production.  It should do this by allotment, pasture and range site (soil) type.  Survey locations should be selected to incorporate distance to the nearest source of water so effects due to proximity to water can be determined.  The survey should also include considerations of slope in order to assess the interaction of susceptibility to erosion based on slope and proximity to water sources.  Results should be analyzed in the context of past grazing management including type of livestock, seasons of use and grazing intensity.  Summarize historical actual use records and grazing systems for each allotment to provide a basis for evaluating proposed actions.

**3.3  Determine Capable and Suitable Acres for Livestock Grazing.**  Based on the science we have provided and criteria we have discussed (slope, distance to water, forage production, hazard of erosion, etc), establish a protocol for determining capable and suitable lands for livestock grazing.  This protocol should include a recovery prescription for lands that are severely depleted of their native herbaceous plant communities or have bare ground exceeding thresholds that lead to accelerated erosion.

**3.3  Determine a Sustainable Livestock Stocking Rate.**  Establish the percent of diets of domestic sheep, cattle, deer, elk, pronghorn and sage grouse that are grasses, forbs and shrubs and their seasonal variation in selection of these foods.  We suggest information from Holechek et al (2001) as a starting point.  Using this information and the population management goals for wildlife, calculate wildlife needs.  This should include the stubble height and other criteria established in Braun et al (1977) and Connelly et al (2000).  Based on the information we provided in section **2.0** above, and the limitations on use of perennial grasses established by the scientific review, calculate the available AUMs of palatable native forage grasses, forbs and shrubs that can be utilized by livestock without impairment of plant productivity.  Use this analysis to determine livestock stocking rates for each allotment and pasture for normal and dry precipitation years.  Livestock numbers should not be increased during above normal precipitation years to allow for improvement of plant and soil conditions.

**3.4  Develop a Systematic Monitoring Protocol.**  Based on the science we have referenced here, develop a systematic monitoring protocol for assessing livestock use (forage amount) in a timely manner to avoid over use of any pasture.  The timing of measurement must be established relative to the permitted grazing season of use.  It is critical that during the early years of application, these must be assessed frequently in order to ascertain the length of time livestock may remain in each pasture before excessive use occurs.  This information will lead to establishment of realistic grazing schedules that lower the risk of excessive livestock grazing and damage. If indicators such as stubble height are proposed, they must also have a demonstrated relationship to actual percent use on grasses, forbs and shrubs by field testing.

22

BLM_0076070

**3.5  Determine Recovery Prescriptions for Lands Below Potential.**  Analyze peer-reviewed science and government publications we have referenced as well as others that have specifically evaluated different grazing scenarios and their ability to recover native components of damaged arid lands to their potential.  Use this information to develop recovery prescriptions for allotments and pastures that are not at potential (based on their departure from potential species distribution, ground cover and productivity).  Prescriptions that should be evaluated should include options such as (a) long-term rest, (b) reduced stocking rates, (c) grazing systems, (d) reseeding with native species, (e) vegetation treatments and others.  The time required for recovery of potential should be evaluated for each method.

**3.6  Determine Impacts of Water Developments.**  Water developments have been used for decades on the promise that they would result in better livestock distribution and improvement in conditions on the ground.  BLM has never quantitatively assessed these claims.  It is critical that BLM provide this analysis based on evidence from the literature and its own survey of conditions in Wyoming.  The analysis described in sections **3.1** and **3.2** above should include an element that locates and maps all water developments in the area of interest.  Based on field surveys combined with historical range data and satellite imagery, determine the impacts and/or benefits of these past water developments on upland plant communities and soils.  The effects of these water developments on their source waters (spring, stream or seep) and associated wetland habitats should be assessed, documented and reported in each project analysis.

## 4.0  Management Recommendations for Riparian Areas

BLM must provide assured protection of springs, streams, riparian areas and wetlands as these areas are highest in wildlife values, yet occupy only a small land area.  While continuing to propose additional water developments and grazing systems as means of protecting riparian areas, BLM does not provide scientific evidence that the values of these areas are actually protected by these methods.  The evidence in the government and scientific literature is that excluding livestock from riparian areas is the only effective method of protection and recovery.  According to FLPMA, BLM is to "accelerate" recovery through its management options.

Don Duff (1977) published results of studies that showed greater fish and vegetation production and stream bank recovery occurred within exclosures on Big Creek, Utah than outside in grazed areas.  In fact, he stated that conditions outside the exclosures continued to decline.  He concluded that 6 to >8 years of rest were necessary to restore aquatic and riparian habitat.  Even after 30 years of excluding livestock, sediment from uplands and riparian areas outside the exclosures continues to impair salmonid spawning, rearing and feeding substrates.  The literature is consistent in showing that exclusion of livestock from riparian areas is the most effective method of restoring their ecological integrity.  There is little evidence that continued livestock grazing of degraded streams under various management schemes or at any level leads to recovery of habitat attributes required for native fish and wildlife.  BLM must objectively evaluate its alternatives to livestock exclosures in the literature review proposed in paragraphs (4.1) and (4.7) below and include those evaluations and the science upon which they are based in its project analysis.

BLM_0076071

We are concerned over the lack of quantitative monitoring of streams, springs and riparian areas. Some of the limitations of the current BLM PFC assessment technique are discussed in Stevens et al (2002). BLM has not provided any systematic protocol for this monitoring and in general does not assess spring or wetland conditions. We are concerned that reliance will be placed on stubble heights without providing any evidence that, in arid ecosystems, use of this standard promotes recovery of critical habitat elements in damaged stream or wetland systems, or for that matter, prevents degradation of those attributes.

If stubble height is used, it must be correlated with percent riparian vegetation use and a stubble height standard set so that livestock use is kept within constraints that do not lead to lowered production of riparian vegetation in future years. In addition, it must be shown to be protective of stream bank integrity through comparison to percent bank trampling, bank erosion and bank stability. The literature review we propose in section **4.1** should address these issues, establish and justify riparian utilization standards and bank trampling standards that are protective of stream banks and riparian vegetation. This analysis of this and other issues presented below must be incorporated into each project analysis.

**4.1  Literature Review.**  Review the literature on the effects of livestock grazing, grazing systems, range improvements and livestock exclusion on stream, spring and riparian habitats, their maintenance and recovery as well as water quality. Carter (2001) reviews the effects of livestock grazing on riparian areas and water quality. This report is available on line at:

http://www.westernwatersheds.org/reports/grazeWQ_JCarter/WQWWP.doc

Review the use of various indicators such as riparian stubble height and bank trampling measures, their application and relation to stream bank stability, riparian vegetation productivity, in-stream aquatic habitat and restoration rates. This review will incorporate analysis of the literature we have referenced in addition to any sources BLM and its consultant may provide.

**4.2  Assessment of Current Condition of Springs, Seeps and Wetlands.**  Locate and map all springs and wetlands not associated with perennial streams on BLM lands in the project area. Photograph and describe each, document whether and how they have been modified for water developments and if so, whether the development is still functioning. Assess their current condition, wetland extent (area) and flow using photographs and DOI (1994). These habitats should be surveyed to establish a current baseline. The surveys should also be repeated during each permit mid-term and one year prior to permit renewal. Conduct the baseline mapping, analysis and photographs for each project.

**4.3  Develop a Monitoring Protocol for Springs, Seeps and Wetlands.**  Based on the science reviewed in section **4.1**, develop a systematic monitoring protocol for livestock use of riparian/wetland herbaceous vegetation at springs, streams and wetlands. This assessment protocol will:

a  Establish stubble height and livestock trampling standards and assess these effects at each spring and wetland area and at multiple locations on each

24

flowing stream within each pasture.  A defined protocol should specify the number of measurements to be taken at each location, the length of stream reach to assess and a method to evaluate trampling damage to springs and wetlands.

b   Measure percent use of riparian grasses, not sedges.  These measurements will be taken in the riparian zone outside the stream channel, not along the greenline.

c   Monitor water quality for conformance to standards

d   Establish a schedule for each allotment/pasture that measures these parameters no later than 3 weeks after livestock enter a particular pasture or allotment subdivision.  It is important to measure these use levels early in the grazing period so stocking rates and management can be adjusted in a timely manner to prevent exceeding the standards.  Accelerated measurements during the first year, in particular, are necessary to refine the grazing schedule and stocking rate for future years.

e   Record the data, also including allotment, pasture, location designation, turn-in date, monitoring date, riparian species measured, percent bank trampling, eroding banks, percent area trampled (springs and wetlands) and stubble heights.  Record raw data on prepared forms so that means and standard deviations can be calculated.  Enter this information into an electronic database that can be regularly updated following each monitoring event and is accessible to interested parties either on-line or by request.

**4.4  Assessment of Current Condition of Streams.**  Based on best available science, describe a methodology and schedule for performing stream habitat and water quality surveys.  This should include analysis of existing data and collection of baseline habitat and water quality data, maps and photographs that will be included in each project analysis.

**4.5  Develop Stream and Water Quality Monitoring Protocol.**  In addition to the baseline survey, the project analysis should develop a monitoring protocol that provides for assessment of stream habitat and water quality during succeeding permit terms near the permit or lease mid-term and the year prior to renewal. This monitoring protocol should continue to include PFC assessments using DOI (1993) as modified by Stevens et al (2002).  Winward (2000) also provides insight into stream and riparian monitoring technology.  Any of these protocols must be supplemented by collecting additional data that quantitatively documents certain critical stream habitat conditions.  We suggest the Rosgen method, USDA (1992, 1997) or other acceptable fish habitat survey protocols.  Regardless of method, certain critical pieces of information must be collected to supplement PFC assessments.  The literature should be reviewed and analyzed and details of methodologies, data management, reporting and public access explained.  This critical supplemental data includes:

a.  Establishing permanent, marked stream cross-section survey points for determining channel profile, width and depth similar to those used by Duff (1977).  Priority locations are in Rosgen Type "C" channels, if available and should encompass a complete meander with multiple cross-sections (minimum 3 at each reach).  These channel surveys and the following data must be collected for a minimum of two reaches of each perennial stream in each pasture.

25

    b.  Bank condition surveys including measurement of the following parameters over a minimum 100' stream reach or full meander on both sides of the stream (Winward, 2000, recommends 363 feet).  Bank condition parameters (i – iv_ will be assessed from the water line to the top of the bank, not at the greenline:

        i.  the linear feet of stream banks that are vegetated/stable
        ii.  the linear feet of stream banks that are vegetated/unstable
        iii.  the linear feet of stream banks that are unvegetated/stable
        iv.  the linear feet of stream banks that are unvegetated/unstable
        v.  the linear feet of stream banks that are undercut
        vi.  the linear feet of stream bank with overhanging vegetation.

    c.  During the baseline survey, and during succeeding permit terms, at permit mid-term and last permit year, collect triplicate MacNeil Core Sediment samples of salmonid spawning gravels (<2") near the downstream extent of each stream in each pasture.  Based on the literature, establish criteria for sediment fines (<6.35 mm) as a percent of substrate that allows successful salmonid reproduction.  Generally, levels of sediment fines above 30% result in significant mortality of eggs and larvae.

    d.  Data collected will be systematic and quantitative in order that statistical analysis can be employed. All data will be entered into an electronic database for access by interested parties.

Describe the monitoring protocols.  This description will include: the actual methodologies, data entry forms, schedules and locations; provide maps of all locations for monitoring; and incorporate an electronic database with links to maps that is accessible to the interested public. Include the baseline data in each project analysis.  BLM must show it has the capability, either with its own staff or outside contractors, to do the necessary monitoring to ensure recovery and prevention of future degradation.

**4.6  <u>Develop Stream, Spring and Wetland Recovery Prescriptions</u>.**  For streams, springs and wetlands that are not functioning properly and/or have impaired water quality, analyze available methods for their recovery.  Include an anticipated time frame for recovery to take place based on the scientific literature.  Discuss and evaluate these options for recovery, including their costs and benefits and review the scientific literature provided.  Methods for recovery should include consideration of: (a) closing pastures; (b) exclosure fencing; (c) removal of water developments; (d) restoration/replanting of riparian areas; (e) active herding to minimize livestock use; (f) removal of livestock when utilization standards are reached, and any other methods discovered in the literature.  Propose and adopt methods that will best recover these degraded streams during the first permit term.  In the on-going permitting, management and monitoring of livestock grazing, the land use plan and permit documents should require documentation of condition and recovery rates by implementation of the described monitoring program.  These will be analyzed to demonstrate the changes resulting from application of the particular prescription or combinations of methods adopted.

BLM_0076074

Yours truly,

*John G. Carter*

John Carter
Utah Director

## 5.0  References

All references listed are incorporated into our comments and should be used by BLM in its planning and livestock-related project analyses.

Anderson, David C., Kimball T. Harper and Ralph C. Holmgren.  1982.  Factors influencing development of cryptogammic soil crusts in Utah deserts.  Journal of Range Management 35(2):180-185.

Anderson, Jay  E. and Karl L. Holte.  1981.  Vegetation development over 25 years without grazing on sagebrush-dominated rangelands in southeastern Idaho.  Journal of Range Management 34(1):25-29

Anderson, Jay E. and Richard S. Inouye.  2001.  Landscape-scale changes in plant species abundance and biodiversity of a sagebrush steppe over 45 years.  Ecological Monographs 71(4):531-556.

Armour,  C.L., D.A. Duff and W. Elmore.  1991.  The effects of livestock grazing on riparian and stream ecosystems.  Fisheries 16(1): 7 – 11.

Austin, Miriam.  2003a.  Water developments and wildlife.  Violating the public trust. Red Willow Research.

Austin, Miriam.  2003b. BLM Pleasantview allotment wildlife deaths, 2003.  Red Willow Research.

Bartos, Dale L. and Robert B. Campbell, Jr. 1998a.  Water depletion and other ecosystem values forfeited when conifer forests displace aspen communities. Rangeland Management and Water Resources of American Water Works Association. May 1998: 427-433.

Bartos, Dale L. and Robert B. Campbell, Jr.  1998b.  Decline of Quaking Aspen in the Interior West – Examples from Utah.  Rangelands 20(1):17-24.

Beck, Jeffrey, L. and Dean L. Mitchell.  2000.  Influences of livestock grazing on sage grouse habitat.  Wildlife Society Bulletin 28(4):993-1002.

Belnap, Jayne.  1995.  Surface disturbances:  their role in accelerating desertification. Environmental Monitoring and Assessment 37:39-57.

27

Belnap, Jayne.  1996.  Soil surface disturbances in cold deserts:  effects on nitrogenase activity in cyanobacterial-lichen soil crusts.  Biology and Fertility of Soils 23:362-367.

Belnap, Jayne and D. A. Gillette.  1997.  Disturbance of biological soil crusts:  impacts on potential wind erodibility of sandy desert soils in southeastern Utah.  Land Degradation and Development 8:355-362.

Belnap, Jayne, Roger Rosentreter, Steve Leonard, Julie H. Kaltnecker, John Williams and David Eldridge.  2001.  Biological soil crusts:  ecology and management.  U.S. D.O.I.  Bureau of Land Management Technical Reference 1730-2.

Belsky, A.J., A. Matzke, and S. Uselman. 1999. Survey of livestock influences on stream and riparian ecosystems in the western United States.  Journal of Soil and Water Conservation 54(1): 419-431.

Belsky, A. Joy and Dana M. Blumenthal.  1997.  Effects of livestock grazing on stand dynamics and soils in upland forests of the Interior West.  Conservation Biology 11(2):315-327.

Belsky, A. Joy, and Jonathan L. Gelbard.  2000.  Livestock Grazing and Weed Invasions in the Arid West.  A Scientific Report Published by the Oregon Natural Desert Association.  Portland, Oregon.

Beymer, Renee J. and Jeffrey M. Klopatek.  1992. Effects of grazing on cryptogamic crusts in pinyon-juniper woodlands in Grand Canyon National Park.  American Midland Naturalist 127:139-148.

Blaisdell, James P. and Ralph C. Holmgren.  1984.  Managing Intermountain Rangelands – Salt-Desert Shrub Ranges.  USDA Forest Service, Intermountain Forest and Range Experiment Station, Ogden, Utah.  General Technical Report INT-163. 52p.

Blackwell, Jack.  2001.  Letter on capability and suitability.  Regional Forester, Intermountain Region.

BLM.  1994.  Rangeland Reform '94 Draft Environmental Impact Statement.

BLM.  2003.  Proposed Revisions to Grazing Regulations for the Public Lands, Draft Environmental Impact Statement DES 03-62.

Bock, Carl E., Jane H. Bock, William R. Kenney and Vernon M. Hawthorne.  1984.  Responses of birds, rodents and vegetation to livestock exclosure in a semidesert grassland site.  Journal of Range Management 37(3):239-242.

Brotherson, Jack D., Samuel R. Rushforth, and Jeffrey R. Johansen.  1983.  Effects of long term grazing on cryptogam crust cover in Navajo National Monument, Ariz. Journal of Range Management 36(5):579-581.

BLM_0076076

Braun, Clait E.  1977.  Guidelines for maintenance of sage grouse habitat.  Wildlife Society Bulletin 5(3):99-105.

Brotherson, Jack D., Samuel R. Rushforth and Jeffrey R. Johansen.  1983.  Effects of long-term grazing on cryptogam crust cover in Navajo National Monument, Ariz. Journal of Range Management 36(5):579-581.

Bryant, H.T., R.E. Blaser, and J.R. Peterson.  1972.  Effect of trampling by cattle on bluegrass yield and soil compaction of a Meadowville loam.  Agronomy Journal. 64:331-334.

Carlson, Cathy and John Horning.  1992.  Big profits at a big price – Public Land ranchers profit at the expense of the range.  Publication No. 79950, National Wildlife Federation, 1400 Sixteenth St. N.W. Washington, D.C. 64p.

Carter, John. 1998.  Investigation of Spawn Creek, Utah Coliform Contamination and Stream Bank Stability in Relation to Cattle Grazing.  Willow Creek Ecology report.

Carter, John G.  2001.  Livestock and water quality.  Western Watersheds Project Report.

Catlin, James, Joro Walker, Allison Jone, John Carter and Joe Feller.  2003.  Multiple use grazing management in the Grand Staircase National Monument.  A tool provided to the Monument range staff by the Southern Utah Land Restoration Project.

Clary Warren and Bert Webster. 1989. Managing grazing of riparian areas in the Intermountain Region. Intermountain Research Station, Forest Service. General Technical Report INT-263

Cummins, K.W. and George L. Spengler.  1977. Stream ecosystems.  Water Spectrum. 10:1-9.

Cummins, K. W. 1974.  Stream ecosystem structure and function.  Bioscience 24:631-641.

Connelly, John W., Michael A. Schroeder, Alan R. Sands and Clait E. Braun.  2000. Guidelines to manage sage grouse populations and their habitats.  Wildlife Society Bulletin 28(4):967-985.

Cottam, Walter P.  1947.  Is Utah Sahara bound?  Bulletin of the University of Utah 37(11):1-41.

Crider, Franklin J.  1955.  Root-growth stoppage resulting from defoliation of grass. Technical Bulleting No. 1102.  USDA Soil Conservation Service.  23p

D'Antonio, C. M. and P. M. Vitousek.  1992.  Biological invasions by exotic grasses, the grass/fire cycle, and global change.  Annual Review of Ecology and Systematics 23:63-87.

BLM_0076077

Danvir, Rick.  Ca2003 (undated).  Sage grouse ecology and management in northern Utah sagebrush-steppe.  Deseret Land and Livestock, Woodruff, Utah.

Dodge, Marvin.  1972.  Forest fuel accumulation – a growing problem.  Science 177:139-142.

DOI.  1993.  Riparian Area Management:  Process for Assessing Proper Functioning Condition.  Department of Interior, BLM TR 1737-9.

DOI.  1994.  Riparian Area Management:  Process for Assessing Proper Functioning Condition for Lentic Riparian-Wetland Areas.  Department of Interior,  BLM TR 1737-11.

Donahue, Debra L.  1999.  The western range revisited – removing livestock from public lands to conserve native biodiversity.  University of Oklahoma Press, Norman.

Duff, D. A.  1977.  Livestock grazing impacts on aquatic habitat in Big Creek, Utah.  In:  Proceedings of the Workshop on Livestock and Wildlife-Fisheries Relationships in the Great Basin.  University of California Agric. Station, Sci. Spec. Publication 3301.  Berkeley, California.

Duff, Donald A. 1979.  Riparian habitat recovery on Big Creek, Rich County, Utah.  In Proceedings: Forum – Grazing and Riparian/Stream Ecosystems.  Trout Unlimited, Inc. 91 p.

Dyksterhuis, E. J.  1949.  Condition and management of range land based on quantitative ecology.  Journal of Range Management 2:104-115.

Ecosystem Research Institute.  1984.  1983 Annual Report Ecosystem Analysis.  Report to White River Shale Oil Corporation, Salt Lake City, Utah.  106p. Report available thru Western Watersheds Project Utah Office at P.O. Box 280, Mendon, Utah 84325.

EPA. 1998b. The quality of our Nation's water: 1996 – Executive Summary of the National Water Quality Inventory: 1996 Report to Congress.  EPA841-S-97-001 Office of Water, U.S. Environmental Protection Agency, Washington, D.C.

EPA. 1976.  Quality criteria for water, July 1976.  Fecal coliform bacteria.  U.S. Environmental Protection Agency, Washigton, D.C.: 42-50

Evanko, Anthony B. and Roald A. Peterson. 1955.  Comparisons of protected and grazed mountain rangelands in southwestern Arizona.  Ecology 36(1):71-82.

Fleischner, Thomas L.  1994.  Ecological costs of livestock grazing in western North America.  Conservation Biology 8(3):629-644.

GAO.  1988. Rangeland management:  more emphasis needed on declining and overstocked grazing allotments.  U.S. General Accounting Office, GAO/RCED-88-80, Washington, D.C.

BLM_0076078

GAO.  1991.  Public land management:  attention to wildlife is limited.  GAO/RCED-91-64

GAO. 1995. Animal waste managment and water quality issues.  Publication no. GAO/RCED-95-200BR. 97pp.  General Accounting Office, Washington, D.C.

Galt, Dee, Greg Mendez, Jerry Holechek and Jamus Joseph.  1999.  Heavy winter grazing reduces forage production:  an observation.  Rangelands 21(4):18-21

Galt, Dee, Francisco Molinar, Joe Navarro, Jamus Joseph and Jerry Holechek.  2000.  Grazing capacity and stocking rate.  Rangelands 22(6):7-11.

Green, D. M. and J. B. Kauffman.  1995.  Succession and livestock grazing in a northeastern Oregon riparian ecosystem.  Journal of Range Management 48:307-313.

Gregory, Stanley V., Frederick J. Swanson, W. Arthur McKee and Kenneth W. Cummins.  1991.  An ecosystem perspective of riparian zones.  Bioscience 41(8): 540-550.

Hanley, T. H. and J. L. Page.  1981.  Differential effects of livestock use on habitat structure and rodent populations.  California Fish and Game 68:160-173.

Harper, K. T., R. Van Buren, and S. Kitchen.  1996.  Invasion of alien annuals and ecological consequences in salt desert shrublands of western Utah.  Pages 58 -65 in J. R. Barrow, E. Durant, R.E. Sosebee and R. J. Tausch, editors.  Proceedings: Shrubland ecosystem dynamics in a changing environment.  General Technical Report-338.  U.S. Forest Service Intermountain Research Station, Ogden, Utah.

Hild, A.L., M.G. Karl, M.R. Heferkamp and R.K. Heitschmidt.  2001.  Drought and grazing III:  root dynamics and germinable seed bank.  Journal of Range Management 54(3):292-298.

Hobbs, R. J. and L. F. Huenneke.  1992.  Disturbance, diversity, and invasion: implications for conservation.  Conservation Biology 6:324-337.

Hockett, Glenn A.  2002.  Livestock impacts on the herbaceous components of sage grouse habitat:  a review.  Intermountain Journal of Sciences Vol 8(2):105-114.

Hoffman, L., and R.E. Ries.  1991.  Relationship of soil and plant characteristics to erosion and runoff on pasture and range.  Journal of Soil and Water Conservation, p. 143-147.

Holechek, Jerry L.  1996a.  Financial returns and range condition on southern New Mexico ranches.  Rangelands 18(2):52-56

Holechek, Jerry L.  1996b.  Drought and low cattle prices:  hardship for New Mexico ranchers.  Rangelands 18(1):11-13.

Holechek, Jerry L. and Karl Hess, Jr.  1996c.  Grazing lands: prices, value, and the future.  Rangelands 18(3):102-105

BLM_0076079

Holechek, Jerry L., Hilton de Souza Gomes, Francisco Molinar and Dee Galt.  1998.  Grazing intensity:  critique and approach.  Rangelands 20(5):15-18

Holechek, Jerry L., Hilton Gomez, Francisco Molinar and Dee Galt.  1999a.  Grazing studies:  what we've learned.  Rangelands 21(2):12-16

Holechek, Jerry L., Milton Thomas, Francisco Molinar and Dee Galt.  1999b.  Stocking desert rangelands:  what we've learned.  Rangelands 21(6):8-12

Holechek, Jerry L., Hilton Gomez, Francisco Molinar, Dee Galt and Raul Valdez.  2000.  Short-duration grazing:  The facts in 1999.  Rangelands 22(1):18-22.

Holechek, Jerry L., Rex D. Pieper and Carlton H. Herbel.  2001.Range Management:  Principles and Practices, Fourth Edition.  Prentice-Hall, New Jersey.  587p

Howard, Gary L., Steven R. Johnson and Stanley L. Ponce.  1983.  Cattle grazing impact on surface water quality in a Colorado front range stream.  J. Soil and Water Conservation. March-April 1983:124-128.

Hubbard, R.K., D.L. Thomas, R.A. Leonard and J.L. Butler. 1987. Surface runoff and shallow ground water quality as affected by center pivot applied dairy cattle wastes.  Trans. ASAE 30(2):430-437.

Hutchings, S.S. and G. Stewart.  1953.  Increasing forage yields and sheep production on Intermountain winter ranges.  U.S. Department of Agriculture Circular 925.  63p.

Jacobs, Lynn.  1991.  Waste of the West.

Johansen, Jeffrey R.  1993.  Cryptogamic crusts of semiarid and arid lands of North America.  Journal of Phycology 29:140-147.

Jones, Allison.  2000.  Effects of cattle grazing on North American arid ecosystems:  a quantitative review.  Western North American Naturalist 60(2):155-163.

Jones, Allison L and William S. Longland.  1999.  Effects of cattle grazing on salt desert rodent communities.  The American Midland Naturalist.  141(1):1-11.

Julander, Odell.  1962.  Range management in relation to mule deer habitat and herd productivity in Utah.  Journal of Range Management 15(5):278-281.

Kauffman, J. Boone and W.C. Kreuger.  1984.  Livestock impacts on riparian ecosystems and streamside management implications – a review.  Journal of Range Managment 37(5): 430 – 437.

Kay, Charles E. and Dale L. Bartos.  2000.  Ungulate herbivory on Utah aspen:  assessment of long-term exclosures.  Journal of Range Management 53(2):145-153.

BLM_0076080

Kay, Charles E.  2001.  The condition and trend of aspen communities on BLM administered lands in central Nevada – with recommendations for management.  Final Report to Battle Mountain Field Office, Bureau of Land Management.

Kie, John G.  1996.  The effects of cattle grazing on optimal foraging in mule deer (Odocoileus hemionus).  Forest Ecology and Management 88:131-138.

Kleiner, Edgar F. and K. T. Harper.  1972.  Environment and community organization in grasslands of Canyonlands National Park.  Ecology 53(2):299-309.

Knick, Steven T., David S. Dobkin, John T. Rotenberry, Michael A. Shroeder, W. Matthew Vander Haegen and Charles Van Riper III.  2003.  Teetering on the edge or too late?  Conservation and research issues for avifauna of sagebrush habitats.  The Condor 105:611-634.

Knopf, Fritz L., James A. Sedgwick and Richard W. Cannon.  1988.  Guild structure of a riparian avifauna relative to seasonal cattle grazing.  Journal of Wildlife Management 52(2):280-290.

Kreuger, William C. and A. H. Winward.  1974.  Influence of cattle and big-game grazing on understory structure of a Douglas-fir Ponderosa Pine- Kentucky bluegrass community.  Journal of Range Management 27(6):450-453.

Kreuper, David, Jonathan Bart and Terrell D. Rich.  2003.  Response of vegetation and breeding birds to the removal of cattle on the San Pedro River, Arizona (USA).  Conservation Biology 17(2):607-615.

Lacey, J. R. 1987.  The influence of livestock grazing on weed establishment and spread.  Proceedings: Montana Academy of Science 47:131-146.

Lile, David F., Kenneth W. Tate, Donald L. Lancaster and Betsy M. Karle.  2003.  Stubble height standards for Sierra Nevada meadows can be difficult to meet.  California Agriculture, 57(2):60-64.

Loft, Eric R., John W. Menke and John G. Kie.  1991.  Habitat shifts by mule deer: the influence of cattle grazing.  Journal of Wildlife Management.  55(1):16-26.

Loope, Walter L., and Neil E. West.  1979.  Vegetation in relation to environments of Canyonlands National Park.  In:  R. M. Linn (ed.) Proceedings of he First Conference on Scientific Research in the National Parks.  Vol. 1. U.S. Dept. of Interior, NPS Trans. And Proc. Series No. 5.

Lusby, Gregg C.  1979.  Effects of grazing on runoff and sediment yield from desert rangeland at Badger Wash in western Colorado, 1953-73.  U.S. Geological Survey Water Supply Paper 1532-1.

Lusby, Gregg C.  1970.  Hydrologic and biologic effects of grazing vs. non-grazing near Grand Junction, Colorado.  Journal of Range Management 23(4):256-260.

BLM_0076081

Mack, R. N. 1981.  Invasion of Bromus tectorum L.  into western North America:  An ecological chronicle.  Agro-ecosystems 7:145-165.

Mack, R. N. and J. N. Thompson.  1982.  Evolution in steppe with few large, hooved mammals.  American Naturalist 119:757-773.

Madany, Michael H. and Neil E. West.  1983.  Livestock grazing – fire regime interactions within montane forests of Zion National Park, Utah.  Ecology 64(4):661-667.

Marble, James R. and Kimball T. Harper.  1989.  Effect of timing of grazing on soil surface cryptogamic communities in a great basin low shrub desert:  a preliminary report.  Great Basin Naturalist 49(1):104-107.

Marcuson, Patrick E. 1977. Overgrazed streambanks depress fishery production in Rock Creek, Montana.  Fish and Game Federation Aid Program. F-20-R-21-11a.

Martin, John H. Jr. 1997. The Clean Water Act and animal agriculture.  J. Environmental Quality 26:1198-1203.

McKee, T.B., N.J. Doesken, and J. Kleist, 1993.  The relationship of drought frequency and duration ot time scales.  Eighth Conference on Applied Climatology, American Meteorological Society, Jan 17-23, 1993, Anaheim CA, pp. 179-186.

McLean, A. and E.W. Tisdale.  1972.  Recovery rate of depleted range sites under protection from grazing.  Journal of Range Management 25:178-184.

Medin, D. E., and W. P. Clary.  1990.  Small mammal populations in a grazed and ungrazed riparian habitat in Nevada.  Research Paper INT-413.  U.S. Forest Service, Intermountain Research Station, Ogden, Utah.

Moore, Elbert, Eric Janes, Floyd Kinsinger, Kenneth Pitney and John Sainsbury. 1979.  Livestock grazing management and water quality protection.  U.S. Environmental Protection Agency and the Bureau of Land Management.

National Research Council.  2002.  Riparian Areas: Functions and Strategies for Management,  National Research Council, Committee on Riparian Zone Functioning and Strategies for Management, Water Science and Technology Board, Board on Environmental Studies and Toxicology (National Academy Press, 2002).

NWF.  1997.  Comb Wash decision, National Wildlife Federation v. Bureau of Land Management, 140 IBLA 85 (Aug. 21, 1997)

Orr, Howard K.  1975.  Recovery from soil compaction on bluegrass range in the Black Hills.  Transactions of the ASAE 1076-1081.

Owens, L.B., W.M. Edwards and R.W. Van Keuren.  1996.  Sediment losses from a pastured watershed before and after stream fencing.  Journal of Soil and Water Conservation 51(1):90-94.

BLM_0076082

Packer, Paul. 1998. Requirements for watershed protection on western mountain rangelands. Unpublished manuscript. Dr. Packer is retired from the USDA Intermountain Forest and Range Experiment Station, Logan, Utah.

Paige, Christine and Sharon A. Ritter. 1999. Managing sagebrush habitats for bird communities. Partners in Flight, Western Working Group, Boise, Idaho.

Pearce, Richard. 1988. Where deer and cattle roam. USDA Forest Service Pacific Southwest Research Station.

Pell, Alice N. 1997. Manure and microbes: public and animal health problem? J. Dairy Sci. 80:2673-2681.

Peterjohn, W.T. and D. L. Correll. 1984. Nutrient dynamics in an agricultural watershed: observations of a riparian forest. Ecology 65: 1466-1475

Platts, W. S. 1991. Livestock Grazing. *In: Influence of Forest and Rangeland Management on Salmonid Fishes and Their Habitats.* American Fisheries Society Special Publication 19:389-423.

Ratliff, Joe and Charles Keeports. 2000. Surface water analysis and management recommendations for the Carico Lake Allotment. U.S. Dept. of Interior Bureau of Land Management, Battle Mountain Field Office, Nevada.

Ray, D.E., A.M. Lane, C.B. Roubicek, and R.W. Rice. 2004. Range beef herd growth statistics. In: Arizona Rancher's Management Guide. Arizona Cooperative Extension, College of Agriculture, University of Arizona.

Rosenzweig, M. L. and J. Winakur. 1969. Population ecology of desert rodent communities: habitats and environmental complexity. Ecology 50:558-572.

Rummell, Robert S. 1951. Some effects of livestock grazing on Ponderosa pine forest and range in central Washington. Ecology 32(4):594-607.

Saxon, Keith E., Lloyd F. Elliott, Robert I. Papendick, Michael D. Jawson and David H. Fortier. 1983. Effect of animal grazing on water qualiyt of non-point runoff in the Pacific Northwest. Project Summary, Robert S. Kerr Environmental Research Laboratory, Ada, Oklahoma. EPA-600/S2-83-071. 7p.

Schepers, J.S., B.L. Hackes and D.D. Francis. 1982. Chemical water quality of runoff from grazing land in Nebraska: II. contributing factors. J.Environ. Qual., Vol 11(3):355-359.

Schulz, Terri T and Wayne C. Leininger. 1990. Differences in riparian vegetation structure between grazed areas and exclosures. Journal of Range Management 43(4):295-299.

Sharp, Lee A., Ken Sanders and Neil Rimbey. 1992. Variability of crested wheatgrass production over 35 years. Rangelands 14(3):153-168

35

BLM_0076083

Schwan, H.E., Donald J. Hodges and Clayton N. Weaver.  1949.  Influence of grazing and mulch on forage growth. Journal of Range Management 2(3):142-148.

Stevens, Lawrence E., Peter Stacey, Don Duff, Chad Gourley and James C. Catlin. 2002.  Riparian ecosystem evaluation:  a review and test of BLM's proper functioning condition assessment guidelines.

Stewart, Kelley M., R. Terry Bowyer, John G. Kie, Norman J. Cimon, and Bruce K. Johnson.  2002.  Temprospatial distributions of elk, mule deer, and cattle:  resource partitioning and competitive displacement.  Journal of Mammalogy.  83(1):229-244.

Souder, Jon A.  ca1997.  How Does Livestock Grazing Fit Into the Larger Societal Uses of Wildlands?  Methods for Determining Benefits and Their Application to the Kaibab Plateau.  College of Ecosystem Science and Management, Northern Arizona University.

Taylor, Daniel M.  1986.  Effects of cattle grazing on passerine birds nesting in riparian habitat.  Journal of Range Management 39(3):254-258.

Thelin, Richard and Gerald F. Gifford.  1983.  Fecal coliform release patterns from fecal material of cattle.  Journal of Environmenatl Quality 12(1):57-63.

Tiedemeann, A.R., D.A. Higgins, T.M. Quigley, H.R. Sanderson and D.B. Marx. Responses of fecal coliform in streamwater to four grazing strategies.  Journal of Range Management 40(4):322-329.

Trimble, Stanley W. and Alexandra C. Mendel.  1995.  The cow as a geomorphic agent – a critical review.  Geomorphology 13:233-253.

USDA. 1981. America's soil and water:  condition and trends.  U.S. Department of Agriculture Soil Conservation Service, Washington, D.C. 33p.

USDA.  1982.  Soil Survey of Rich County Utah.  USDA Soil Conservation Service, Forest Service and Bureau of Land Management.

USDA. 1992.  Integrated riparian evaluation guide.  U.S. Department of Agriculture, Region IV Forest Service, Ogden, Utah.

USDA.  1993.  Monitoring data from the North Rich allotment, Logan Ranger District, Wasatch-Cache National Forest.

USDA.  1996.  Intermountain Regional Assessment: Properly Functioning Condition. USDA Forest Service, Region IV, Ogden, Utah.

USDA.  1997.  R1/R4 (Northern/Intermountain Regions) Fish and Fish Habitat Standard Inventory Procedures Handbook.  USDA Forest Service General Technical Report INT-GTR-346.

UDWR.  1997.  Conservation Agreement and Strategy for Bonneville Cutthroat Trout in Utah.  Utah Division of Wildlife Resources Publication 97-19.

BLM_0076084

USDA.  1998.  Draft Sub-regional Assessment of Properly Functioning Condition for Areas Encompassing the National Forests of Northern Utah.  USDA Forest Service, Region IV, Ogden, Utah.

USDA.  2001. Process Paper I: rangeland capability and suitability for sheep and cattle ranges.  Caribou National Forest.

USDA.  2002.  Final Environmental Impact Statement for the Curlew National Grassland.  Caribou National Forest.

U.S. Department of Interior, U.S. Fish and Wildlife Service, U.S. Department of Commerce and U. S. Census Bureau. 2002.  2001 National Survey of Fishing, Hunting and Wildlife-Watching Associated Recreation.  170 p.

VanHaveren, Bruce P., Eric B. Janes and William L. Jackson.  1985.  Nonpoint pollution control on public lands.  Journal of Soil and Water Conservation p.92-94.

Van Poollen, H.W. and  J. R. Lacey.  1979.  Herbage response to grazing systems and stocking intensities.  Journal of Range Management 32:250-253.

Walker, Larry.  2002.  Impact of grazing on 153 species of southwestern birds.  http://rangenet.org/directory/walker/swbirds.html .

Wambolt, C.L., K.S. Walhof and M.R. Frisina.  2001.  Recovery of big sagebrush communities after burning in south-western Montana.  Journal of Environmental Management 61:243-252.

Welch, Bruce L.   2002 (in editing).  Big sagebrush:  A sea fragmented into lakes, puddles, and ponds.  Gen. Tech. Rep. RMRS-GTR-___.  Fort Collins, CO:  U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station:  ___p.  Data on file at the Shrub Sciences Laboratory, 735 N  500 E, Provo, Utah 84606.

Welch, Bruce L.  and Craig Criddle.  2003.  Countering misinformation concerning big sagebrush. Forest Service Rocky Mountain Research Station Research Paper RMRS-RP-40.

West, Neil E.  1981.  Nutrient cycling in desert ecosystems.  In:  Arid Land Ecosystems:  Structure, Functioning and Management, Volume 2.  Cambridge University Press.

West, Neil E.  1983.  Western Intermountain Sagebrush Steppe.  In Temperate Deserts and Semi-deserts, edited by N. E. West.  Elsevier Scientific Publishing, Amsterdam. p351-373.

White, Clifford A., Charles E. Olmstead and Charles E. Kay.  1998.  Aspen, elk and fire in the Rocky Mountain national parks of North America.  Wildlife Society Bulletin 26(3):449-462.

White, Richard K., Robert W. VanKeuren, Lloyd B. Owens, William M. Edwards and Roberty H. Miller. 1983. Effects of livestock pasturing on non-point surface runoff.

BLM_0076085

Project Summary, Robert S. Kerr Environmental Research Laboratory, Ada, Oklahoma.  EPA-600/S2-83-011. 6p.

White River Shale Oil Corporation.  1984.  Progress Report Environmental Programs 1983.  White River Shale Oil Corporation, Salt Lake City, Utah.  785p.  Report available thru Western Watersheds Project Utah Office at P.O. Box 280, Mendon, Utah 84325

Winward, Alma.  2000.  Monitoring the Vegetation Resources in Riparian Areas. USDA Forest Service General Technical Report RMRS-GTR-47

Winder, J.A., C.C. Bailey, M.G. Thomas and J.L. Holechek.  2000.  Breed and stocking rate effects on Chihuahuan Desert cattle production.   Journal of Range Management 53(1):32-38.

Wuerthner, George and Mollie Matteson. 2002. Welfare ranching: the subsidized destruction of the west.  Island Press.

Zimmerman, G. Thomas and L.F. Neuenschwander.  1984.  Livestock grazing influences on community structure, fire intensity, and fire frequency within the Douglas-fir/ninebark habitat type.  Journal of Range Management 37)2):104-110.

BLM_0076086

H-1601-1 – LAND USE PLANNING HANDBOOK – (Public)



**United States
Department of the Interior
Bureau of Land Management**



# Land Use Planning Handbook



**BLM Handbook H-1601-1**

BLM_0076087

BLM_0076088

TC - 1

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

**Table of Contents**

I.  Introduction ..............................................................................................................1
   A.  The Purpose of This Handbook and the Need for Planning Guidance ..........................1
   B.  The Basic Planning Process ................................................................................2
   C.  Forms of Public and Intergovernmental Involvement...........................................2
   D.  Collaborative Planning.......................................................................................4
   E.  Coordination and Cooperation with Other Federal Agencies
   and State and Local Governments ...........................................................................5
   F.  Government-to-Government Coordination with Indian Tribes.......................................9
II.  Land Use Plan Decisions....................................................................................11
   A.  Introduction...................................................................................................11
   B.  Types of Land Use Plan Decisions ...................................................................12
   C.  Geographic Areas...........................................................................................14
   D.  Scale of Planning ..........................................................................................14
   E.  Multijurisdictional Planning...........................................................................15
   F.  Establishing Management Direction for Lands that May
   Come Under the BLM Jurisdiction in the Future. .................................................15
III.  Land Use Planning Process and Products .....................................................16
   A.  Planning for Environmental Impact Statement-level Efforts...........................16
   B.  Planning for Environmental Assessment-level Efforts ....................................25
IV.  Implementation ...............................................................................................29
   A.  Implementing Land Use Plans ........................................................................29
   B.  Defining Implementation Decisions.................................................................29
   C.  Making Implementation Decisions ..................................................................30
   D.  Making Land Use Plan and Implementation Decisions
   in the Same Planning Effort...................................................................................30
   E.  Developing Strategies to Facilitate Implementation of Land Use Plans.........................31
V.  Monitoring, Evaluation, and Adaptive Management.....................................32
   A.  Monitoring ....................................................................................................32
   B.  Evaluation......................................................................................................33
   C.  Adaptive Management ....................................................................................36
VI.  Determining if New Decisions are Required .................................................37
   A.  Specific Regulatory Requirements for Considering New
   Information or Circumstances.................................................................................37
   B.  Considering New Proposals, Circumstances, or Information .........................37
   C.  Deciding Whether Changes in Decisions or the Supporting
   NEPA Analyses are Warranted..............................................................................38
   D.  Documenting the Determination to Modify, or
   Not to Modify, Decisions or NEPA Analysis......................................................41
   E.  Evaluating New Proposals...............................................................................41
   F.  Plan Conformance ..........................................................................................42
   G.  Plan Conformance and Ongoing NEPA Activities.........................................42
   H.  Determining When to Update Land Use Plan Decisions
   Through Maintenance Actions................................................................................44

BLM MANUAL                                                        Rel. 1-1693
Supersedes Rel. 1-1667                                           03/11/05

BLM_0076089

TC - 2

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

VII. Amending and Revising Decisions ................................................................44
  A.  Changing Land Use Plan Decisions ...........................................................44
  B.  Determining When it is Necessary to Amend Plans and
  How it is Accomplished ..............................................................................45
  C.  Determining When it is Necessary to Revise an RMP or Replace an MFP ....46
  D.  Changing Implementation Decisions ........................................................46
  E.  Status of Existing Decisions During the Amendment or Revision Process ....47
  F.  Coordinating Simultaneous Planning/NEPA Processes ...............................47

Glossary of Terms and Acronyms ......................................................Glossary - 1
  Terms ..............................................................................................Glossary - 1
  Acronyms .........................................................................................Glossary - 9

Appendix A:  Guide to Collaborative Planning ..............................Appendix A, page 1
  I.  Principles .................................................................................Appendix A, page 1
  II.  Practices ................................................................................Appendix A, page 2
  III.  Benefits ................................................................................Appendix A, page 3
  IV.  Tools ....................................................................................Appendix A, page 3

Appendix B:  Federal Advisory Committee Act Considerations.........Appendix B, page 1
  I.  Purpose ...................................................................................Appendix B, page 1
  II.  Implementing FACA .................................................................Appendix B, page 1
    A.  Avoiding Violations ...............................................................Appendix B, page 1
    B.  Determining if FACA Applies .................................................Appendix B, page 2
    C.  FACA Requirements .............................................................Appendix B, page 2

Appendix C:  Program-Specific and Resource-Specific Decision Guidance ......Appendix C, page 1
  I.  Natural, Biological, and Cultural Resources ..............................Appendix C, page 2
    A.  Air ......................................................................................Appendix C, page 2
    B.  Soil and Water ....................................................................Appendix C, page 2
    C.  Vegetation ..........................................................................Appendix C, page 3
    D.  Special Status Species .........................................................Appendix C, page 4
    E.  Fish and Wildlife .................................................................Appendix C, page 6
    F.  Wild Horses and Burros........................................................Appendix C, page 7
    G.  Cultural Resources ..............................................................Appendix C, page 8
    H.  Paleontology........................................................................Appendix C, page 10
    I.  Visual Resources ..................................................................Appendix C, page 11
    J.  Wildland Fire Management.....................................................Appendix C, page 11
    K.  Wilderness Characteristics ....................................................Appendix C, page 12
    L.  Cave and Karst Resources ....................................................Appendix C, page 13
  II.  Resource Uses ........................................................................Appendix C, page 13
    A.  Forestry ..............................................................................Appendix C, page 13
    B.  Livestock Grazing ................................................................Appendix C, page 14
    C.  Recreation and Visitor Services..............................................Appendix C, page 15
    D.  Comprehensive Trails and Travel Management .........................Appendix C, page 17
    E.  Lands and Realty .................................................................Appendix C, page 20

BLM_0076090

F.  Coal ...............................................................................................Appendix C, page 21
G.  Oil Shale ........................................................................Appendix C, page 23
H.  Fluid Minerals: Oil and Gas, Tar Sands, and
Geothermal Resources ....................................................Appendix C, page 23
I.  Locatable Minerals ........................................................  Appendix C, page 24
J.  Mineral Materials ..........................................................Appendix C, page 25
K. Non-energy Leasable Minerals ...................................Appendix C, page 26
III. Special Designations ...........................................................Appendix C, page 27
A.  Congressional Designations ............................................Appendix C, page 27
B.  Administrative Designations ...........................................Appendix C, page 27
IV. Support ................................................................................Appendix C, page 28
A.  Cadastral .........................................................................Appendix C, page 29
B.  Interpretation and Environmental Education ..................Appendix C, page 29
C.  Transportation Facilities ...............................................Appendix C, page 30

Appendix D:  Social Science Considerations in Land Use
Planning Decisions ..................................................................Appendix D, page 1
I.  Using Social Science in Land Use Planning ...........................Appendix D, page 1
II.  Incorporating Socio-economic Information ............................Appendix D, page 2
A.  The Planning Process .....................................................Appendix D, page 2
B.  Objectives of the Analysis ..............................................Appendix D, page 2
C.  The Scope of Analysis ....................................................Appendix D, page 4
D.  Deliverables in Contracting ...........................................Appendix D, page 8
E.  Analytic Guidelines .......................................................Appendix D, page 8
III.  Public Involvement ................................................................Appendix D, page 10
A.  Integrating Social Science into Public Involvement ........Appendix D, page 10
B.  Economic Strategies Workshop ......................................Appendix D, page 10
IV.  Environmental Justice Requirements ....................................Appendix D, page 11
A.  BLM's Environmental Justice Principles ........................Appendix D, page 11
B.  Incorporating Environmental Justice Efforts in the
RMP/EIS Process ...............................................................Appendix D, page 12
C.  Documentation and Analysis ..........................................Appendix D, page 13
V.  Data Management ...................................................................Appendix D, page 13
A.  Types of Data ..................................................................Appendix D, page 13
B.  Data Quality and Analytic Soundness .............................Appendix D, page 13
C.  Paperwork Reduction Act Requirements for
New Data Collection ...........................................................Appendix D, page 14
VI.  Data Sources ........................................................................Appendix D, page 14
A.  Use of the Economic Profile System ...............................Appendix D, page 14
B.  References ........................................................................Appendix D, page 15
C.  Environmental Justice References ...................................Appendix D, page 17
VII.  Further Guidance ................................................................Appendix D, page 17

Appendix E:  Summary of Protest and Appeal Provisions ....................Appendix E, page 1
I.  Land Use Plan Protests ..........................................................Appendix E, page 1
A.  Washington Office Initial Evaluation of Protests ............Appendix E, page 1

BLM_0076091

TC - 4

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

B.  State Office Evaluation and Determination .......................................Appendix E, page 4
C.  Washington Office Final Review......................................................Appendix E, page 6
D.  Receiving, Managing, and Responding to Electronic Mail
and Faxed Protests ....................................................................................Appendix E, page 12
E.  State Director's Protest Analysis.......................................................Appendix E, page 13
II. Governor's Consistency Review Appeal Process .....................................Appendix E, page 14
III.  Administrative Remedies of Implementation Decisions .......................Appendix E, page 14

Appendix F:  Standard Formats for Land Use Plan Documents.........................Appendix F, page 1
Appendix F-1:  Recommended Format for Preparation Plans......................Appendix F, page 1
Appendix F-2:  Recommended Format for Scoping Reports .......................Appendix F, page 4
Appendix F-3:  Annotated Outline of the Analysis of the
Management Situation ................................................................................Appendix F, page 6
Appendix F-4:  Annotated Outline for a Draft and
Final RMP (Amendment)/EIS .....................................................................Appendix F, page 14
Appendix F-5:  Annotated Outline for Record of Decision
(ROD)/Approved RMP (Amendment) ...........................................................Appendix F, page 20
Appendix F-6:  Recommended Administrative Record File
Plan for Land Use Planning Projects ...............................................................Appendix F, page 24

Appendix G:  Managing and Applying Data and Information ............................Appendix G, page 1
I.  Metadata Standards and Requirements...................................................Appendix G, page 1
II.  Identifying Data Needs for a Land Use Plan.........................................Appendix G, page 1
III.  Data Sources ........................................................................................Appendix G, page 2
IV.  Managing Data During Land Use Plan Development ...........................Appendix G, page 2
V.  Integrating Data Application and Display ..............................................Appendix G, page 3

BLM_0076092

## I. Introduction

## A. <u>The Purpose of This Handbook and the Need for Planning Guidance</u>

This Handbook provides supplemental guidance to the Bureau of Land Management (BLM) employees for implementing the BLM land use planning requirements established by Sections 201 and 202 of the Federal Land Policy and Management Act of 1976 (FLPMA, 43 U.S.C. 1711-1712) and the regulations in 43 Code of Federal Regulations (CFR) 1600. Land use plans and planning decisions are the basis for every on-the-ground action the BLM undertakes. Land use plans include both resource management plans (RMPs) and management framework plans (MFPs).

Land use plans ensure that the public lands are managed in accordance with the intent of Congress as stated in FLPMA (43 U.S.C. 1701 et seq.), under the principles of multiple use and sustained yield. As required by FLPMA and BLM policy, the public lands must be managed in a manner that protects the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; that will provide for outdoor recreation and human occupancy and use; and that recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands by encouraging collaboration and public participation throughout the planning process. Land use plans are one of the primary mechanisms for guiding BLM activities to achieve the mission and goals outlined in the Department of the Interior (DOI) Strategic Plan.

This Handbook provides guidance for preparing, revising, amending, and maintaining land use plans. This Handbook also provides guidance for developing subsequent implementation (activity-level and project-specific) plans and decisions. It builds on field experience gained in implementing the 1983 planning regulations (43 CFR 1600), subsequent BLM Manual guidance, and the 2000 Handbook. This guidance does not, however, change or revise the planning regulations in 43 CFR 1600, which take precedence over this Handbook. Definitions for terms used in this Handbook are found in the glossary and in the BLM planning regulations in 43 CFR 1601.0-5.

Any interpretation of the guidance contained in this Handbook is subservient to the legal and regulatory mandates contained in FLPMA, 43 CFR 1600, the National Environmental Policy Act of 1969 (NEPA, 42 U.S.C. 4321 et seq.), the Council on Environmental Quality (CEQ) regulations at 40 CFR 1500-1508, and other applicable Federal laws and regulations. This planning guidance:

   1. Encourages planning on a variety of scales, including both local and regional, in partnership with other landowners and agencies;

   2. encourages active public participation throughout the planning process and facilitates multijurisdictional planning;

BLM_0076093

2

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

3.  clarifies the relationship between land use plans and implementation plans (implementation plans include both activity-level and project-specific plans);

4.  provides procedural requirements for completing land use plans and implementation plans;

5.  clarifies the relationships between land use and implementation planning and NEPA requirements;

6.  addresses new requirements and approaches for managing public lands or resources; and

7.  addresses the consideration of new information and circumstances, e.g., new listings of threatened and endangered species, and new requirements and standards for the protection of air and water quality, etc.

## B.  **The Basic Planning Process**

The BLM will use an ongoing planning process to ensure that land use plans and implementation decisions remain consistent with applicable laws, regulations, orders, and policies.  This process will involve public participation, assessment, decision-making, implementation, plan monitoring, and evaluation, as well as adjustment through maintenance, amendment, and revision.  This process allows for continuous adjustments to respond to new issues and changed circumstances. The BLM will make decisions using the best information available.  These decisions may be modified as the BLM acquires new information and knowledge of new circumstances relevant to land and resource values, uses, and environmental concerns.  Modifying land use plans through maintenance and amendment on a regular basis should reduce the need for major revisions of land use plans.

## C.  **Forms of Public and Intergovernmental Involvement**

Planning is inherently a public process.  The BLM uses a number of involvement methods to work with members of the public, interest groups, and governmental entities.

- *Public involvement* entails "The opportunity for participation by affected citizens in rule making, decision making, and planning with respect to the public lands, including public meetings or hearings . . . or advisory mechanisms, or other such procedures as may be necessary to provide public comment in a particular instance" (FLPMA, Section 103(d)). Several laws and Executive orders set forth public involvement requirements, including maintaining public participation records.  The BLM planning regulations (43 CFR 1601-1610) and the CEQ regulations (40 CFR 1500-1508) both provide for specific points of public involvement in the environmental analysis, land use planning, and implementation decision-making processes to address local, regional, and national interests.  The NEPA requirements associated with planning have been incorporated into the planning regulations.

BLM_0076094

3

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

- *Coordination*, as required by FLPMA (Section 202(c)(9)), involves on-going communication between BLM managers and state, local, and Tribal governments to ensure that the BLM considers pertinent provisions of non-BLM plans in managing public lands; seeks to resolve inconsistencies between such plans; and provides ample opportunities for state, local, and Tribal government representatives to comment in the development of BLM's RMPs (43 CFR 1610.3-1). The CEQ regulations implementing NEPA further require timely coordination by Federal agencies in dealing with interagency issues (see 40 CFR 1501.6), and in avoiding duplication with Tribal, state, county, and local procedures (see 40 CFR 1506.2). See Sections I(E)(1), Coordination under FLPMA; and I(F), Government-to-Government Coordination with Indian Tribes.

- *Cooperation* goes beyond the coordination requirement of FLPMA. It is the process by which another governmental entity (Federal, state, local, or Tribal) works with the BLM to develop a land use plan and NEPA analysis, as defined by the lead and cooperating agency provisions of the CEQ's NEPA regulations (40 CFR 1501.5 and 1501.6). Normally the BLM serves as the lead agency, though in some cases other governmental entities serve with the BLM as joint leads. Cooperating agency and related roles should be formalized through an agreement. See Section I(E)(2), Cooperating agency status under NEPA.

- *Consultation* involves a formal effort to obtain the advice or opinion of another agency regarding an aspect of land use management for which that agency has particular expertise or responsibility, as required by statute or regulation. For example, the Endangered Species Act requires the BLM to consult with the U.S. Fish and Wildlife Service (USFWS) or National Oceanic and Atmospheric Administration (NOAA)-Fisheries regarding land use actions that may affect listed species and designated critical habitat (see 50 CFR 402.14).

- *Collaboration* is a process in which interested parties, often with widely varied interests, work together to seek solutions with broad support for managing public and other lands. Collaboration mandates methods, not outcomes; and does not imply that parties will achieve consensus. Depending on local circumstances and the judgment of the Field Manager, varying levels of collaboration may be used in specific involvement processes. See Section I(D), Collaborative Planning.

Section 309 of FLPMA (43 U.S.C. 1739) requires that resource advisory councils (RACs) or their functional equivalent be involved in the land use planning process. RACs, which are advisory groups chartered under the Federal Advisory Committee Act (FACA) (86 Stat. 770, 5 U.S.C.A., Appendix 2), may advise the BLM regarding the preparation, amendment, and implementation of land use plans for public lands and resources within a jurisdictional area. In addition, Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations (Environmental Justice), February 11, 1994, requires the BLM to find ways to communicate with the public that are germane to community-specific needs in areas with low income or minority populations or Tribes.

Comments or protests submitted to the BLM for use in its planning efforts, including names and home addresses of individual(s) submitting the comments, are subject to disclosure under the

BLM_0076095

4

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

Freedom of Information Act (FOIA, 5 U.S.C. 552); however, names and home addresses of individuals may be protected from disclosure under exemption 6 of FOIA. In order to protect names and home addresses from public review or disclosure, the individual(s) submitting comments must request that their names and addresses be held in confidence. Offices must place the following or a similar statement in all notices requesting public input or announcing protest opportunities, including public meeting "sign-in" sheets, notices in newspapers, on the Internet, in *Federal Register* Notices of Intent and Notices of Availability, and in "Dear Interested Party" letters in the planning/NEPA documents:

> FREEDOM OF INFORMATION ACT CONSIDERATIONS: Public comments submitted for this planning review, including names and street addresses of respondents, will be available for public review at the XYZ Field Office during regular business hours (x:xx a.m. to x:xx p.m.), Monday through Friday, except holidays. Individual respondents may request confidentiality. If you wish to withhold your name or address from public review or from disclosure under the Freedom of Information Act, you must state this prominently at the beginning of your comments. Such requests will be honored to the extent allowed by law. All submissions from organizations or businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, will be made available for public inspection in their entirety.

## D.  Collaborative Planning

Collaboration as a general term describes a wide range of external and internal working relationships. Early identification of the most appropriate, efficient, and productive type of working relationships is desirable to achieve meaningful results in land use planning initiatives.

While the ultimate responsibility regarding land use plan decisions on BLM-administered lands rests with BLM officials, it is recognized that individuals, communities, and governments working together toward commonly understood objectives yields a significant improvement in the stewardship of public lands. Benefits of building collaborative partnerships include improving communication, developing a greater understanding of different perspectives, and finding solutions to issues and problems.

A collaborative approach to planning entails BLM working with Tribal, state, and local governments; Federal agencies; and other interested parties; from the earliest stages and continuing throughout the planning process, to address common needs and goals within the planning area. At the same time, BLM should consider existing plans of Tribal, state, and local governments and other Federal agencies. The BLM official must identify the decision space (i.e., regulations, policies, and local, regional and national interests) within which the BLM must operate, but the community or group working with the BLM may help focus the planning effort.

Although the initial stages of developing an open and inclusive process are time consuming, the potential returns from relationship building, cost savings, and durability of decisions more than compensate for this effort. To provide for effective public participation in any collaborative planning process, it is important to communicate effectively with the public and invite participation in all aspects of the planning effort. Outreach to distant interests is also important. An effective outreach strategy will inform distant publics as well as local residents. Appendix A of this Handbook provides additional guidelines on collaborative processes. Also see Executive Order 13352 (Facilitation of Cooperative Conservation).

BLM_0076096

The strategies associated with BLM's national Alternative Dispute Resolution (ADR)/Collaborative Action Program are valuable resources for providing support to collaborative planning processes.  The principal objective of the Program is to foster or strengthen ADR-based collaborative engagement with communities and other stakeholders, focusing primarily on helping to ensure successful outcomes on the ground through ADR-based collaboration.

Although the primary emphasis is on prevention of conflicts or disputes in the planning process through early engagement and convening to ensure up-front communication and consultation, the ADR/Collaborative Action Program's initiatives also address more formal conflicts or disputes that may arise during the planning process, as well as those associated with protests and litigation.  The Program's goal is to prevent, resolve, or mitigate adverse impacts to the Bureau before a protest or judicial action is filed wherever possible and to address all the parties' interests.

In using the collaboration and ADR processes, it is important to be aware of the situations where FACA does or does not apply so that an informed decision can be made to either avoid conflict with FACA, to utilize the resources of a RAC, or pursue a FACA charter for any advisory groups (see Appendix B).  Failure to review collaborative planning efforts and the requirements of FACA could result in land use plans being overturned if challenged in court.  The Congress passed FACA in 1972 to reduce narrow, special-interest group influence on decision makers, to foster equal access for the public to the decision-making process, and to control costs by preventing the establishment of unnecessary advisory committees.

## E.  **Coordination and Cooperation with Other Federal Agencies and State and Local Governments**

FLPMA and NEPA provide BLM managers with complementary directives regarding coordination and cooperation with other agencies and governments.  FLPMA emphasizes the need to insure coordination and consistency with the plans and policies of other relevant jurisdictions.  NEPA provides for what is essentially a cooperative relationship between a lead agency (here, normally BLM) and cooperating agencies in the NEPA process.

(Consultation requirements for specific resources and programs are outlined in Appendix C, under the Notices, Consultations, and Hearings subsections.)

1. Coordination under FLPMA

Section 202(c)(9) of FLPMA, as paraphrased, requires the BLM to provide for involvement of other Federal agencies and state and local government officials in developing land use decisions for public lands, including early public notice of proposed decisions that may have a significant effect on lands other than BLM-administered Federal lands (for coordination with Indian Tribes, see Section F following this section).  Note that FACA does not apply to meetings with other governmental entities.  Coordination must start as early in the land use planning process as is practical and must continue throughout the planning effort.  This process of early coordination and involvement by other Federal agencies and state and local governments is often, but not

BLM_0076097

6

always, formalized through various memoranda of understanding (MOUs) between the State Director and the state or regional heads of other Federal agencies, between the State Director and the Governor, or between BLM Field Managers and local municipalities, communities, counties, or burroughs.  The intent of a MOU is to establish points of contact and protocols for coordination between BLM and its partners.  Regardless of whether an MOU is used as a tool for consistency, the principles of collaborative planning must be used in coordinating with these entities.  The BLM can also seek involvement and coordination from associations of elected officials.

Section 202(c)(9) of FLPMA also requires, to the extent practical, that BLM keep itself informed of other Federal agency and state and local land use plans, assure that consideration is given to those plans that are germane to the development of BLM land use plan decisions, and assist in resolving inconsistencies between Federal and non-Federal plans.  The key is ongoing, long-term relationships where information is continually shared and updated.

Many municipalities, communities, and counties have established community advisory boards, county commissions, planning boards, public land use advisory committees, or other similar planning and advisory groups.  In some cases a state may have a Federal lands or policy liaison.  These organizations and officials should be actively engaged from the beginning of the planning effort.  The BLM may invite other Federal agencies and state and local governments to be involved as formal cooperating agencies.  In planning efforts led by another agency or government entity, the BLM can be a cooperating agency.

Involving state and local government in developing land use decisions may require the BLM to be "at the table" with the various land use boards of the state or local government.  In principle, coordination with and involvement of other Federal agencies and state and local government goes far beyond merely providing briefings on the status of any planning effort.  In practice, however, staffing and resource constraints by other agencies and local governments may limit their involvement.  BLM's plans shall be consistent with other Federal agency, state, and local plans to the maximum extent consistent with Federal law and FLPMA provisions.  All BLM land use plans or plan amendments and revisions must undergo a 60-day Governor's consistency review prior to final approval.  BLM's procedures for the Governor's consistency review are found in the planning regulations in 43 CFR 1610.3-2(e).

When other Federal agencies and state and local governments initiate planning efforts that may affect or be affected by BLM's management decisions, the BLM should collaborate in such planning efforts to the extent possible.

    2.  Cooperating agency status under NEPA

Cooperating agency status provides a formal framework for governmental units—local, state, Tribal, or Federal—to engage in active collaboration with a lead Federal agency to implement the requirements of NEPA.  This guidance supplements CEQ regulations on cooperating agency status.

BLM_0076098

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

In principle, a cooperating agency shares the responsibility with the lead agency for organizing the planning process. Within the constraints of time and resources, cooperating agency staff should be encouraged to participate fully with BLM staff as members of the plan/EIS team. Responsibilities of a cooperating agency may include:

- Formal involvement in scoping and sharing the responsibility for defining and framing the issues to be examined in the NEPA process;

- developing information and analysis for which the agency has particular expertise;

- contributing staff to enhance the interdisciplinary team's capabilities; and

- bearing the costs of its own participation.

When properly conducted, the lead agency/cooperating agency relationship provides mutual benefits. From the BLM's perspective the goals of the cooperating agency relationship include:

- Gaining early and consistent involvement of key governmental partners;

- incorporating local knowledge of economic, social, and political conditions;

- addressing intergovernmental issues;

- avoiding duplication of effort;

- enhancing the local credibility of the review process; and

- building relationships of trust and collaboration for long-term mutual gain.

a. <u>Criteria for cooperating agency status</u>. The CEQ defines cooperating agency in regulations implementing NEPA, particularly at 40 CFR 1501.6 and 1508.5. CEQ regulations specify that a Federal agency, state agency, local government, or Tribal government may qualify as a cooperating agency because of ". . . jurisdiction by law or special expertise."

   1) Jurisdiction by law means ". . . agency authority to approve, veto, or finance all or part of the proposal." (40 CFR 1508.15)

   2) Special expertise means ". . . statutory responsibility, agency mission, or related program experience." (40 CFR 1508.26)

BLM has interpreted the definition of special expertise broadly. For example, county or Tribal governments potentially affected by a BLM planning effort would qualify on this basis through their knowledge of local social, economic, and political conditions.

Cooperating agency status is at the request of the lead Federal agency. Another Federal agency having "jurisdiction by law" in the matters subject to the NEPA process must serve as a

BLM_0076099

8

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

cooperating agency when so requested.  A Federal agency qualifying through "special expertise," or a state, local, or Tribal government qualifying under either criterion may accept or decline a request to serve as a cooperating agency (40 CFR 1501.6, 1508.5).

Whether or not a federally-recognized Tribe enters into a cooperating agency relationship, its fundamental connection to the BLM is based on Tribal sovereignty, manifested through the government-to-government relationship.

b.  <u>Responsibilities of BLM managers</u>.  Before BLM begins the scoping process to develop, revise, or amend (EIS-level amendments only) an RMP, the State Director or Field Manager will invite qualifying Federal agencies and state, local, and Tribal governments to participate as cooperating agencies.  State Directors and Field Managers will consider any requests from other Federal agencies and state, local, and Tribal governments for cooperating agency status.  Field Managers who deny such requests will inform the State Director of the denial.  The State Director will determine if the denial is appropriate.

c.  <u>Role of cooperating agencies in the RMP/EIS process</u>.  It is BLM policy to encourage the involvement of cooperating agencies throughout the planning/EIS process, although practical limitations in cooperating agencies' time, resources, and expertise may make full involvement impractical.  Field Managers should encourage the collaboration of cooperating agencies in identifying issues, developing planning criteria, collecting inventory data, analyzing data for the analysis of the management situation, formulating alternatives, and estimating the effects of alternatives.  Field Managers should also collaborate with cooperating agencies in evaluating the alternatives and developing a preferred alternative.  Notwithstanding such collaborative efforts, the designation of a preferred alternative and the final decision remains the exclusive responsibility of the BLM.

Roles and responsibilities of each party should be formalized and clearly described in a MOU.  The key elements of a cooperating agency MOU are outlined below.

*Introduction:*

- Describes the planning/EIS effort, and the major statutory and regulatory requirements it fulfills
- Identifies the government entities assuming cooperating agency status through the MOU, and their qualifications as defined at 40 CFR 1508.15 and 1508.26: jurisdiction, special expertise, or jurisdiction and special expertise

*Purpose (describes what will be accomplished by the MOU):*

*Authorities:*

- Identifies the principal statutory authorities for the BLM to enter into the MOU
- Identifies the principal statutory authorities for the cooperating agencies to enter into the MOU

BLM_0076100

9

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

*Roles and responsibilities:*

- The roles of each party in the planning process, including contractors if applicable
- Particular interests and areas of expertise of the cooperating agencies relative to the plan
- Procedures for information sharing and confidentiality
- How the cooperating agencies' comments, recommendations, and data will be used in the planning process
- Resource commitments
- Anticipated schedule
- How final decisions will be adopted by the cooperating agencies (as applicable)
- Any other expectations of the parties

*Agency representatives (usually enumerated in an attachment):*

*Administration of the MOU:*

- How disagreements will be resolved
- How the MOU may be modified or terminated
- Acknowledgement that the authority and responsibilities of the parties under their respective jurisdictions are not altered by the MOU

**F. Government-to-Government Coordination with Indian Tribes**

The BLM will provide government officials of federally-recognized Tribes with opportunities to comment on and to participate in the development of land use plans. The BLM will consider comments, notify consulted Tribes of final decisions, and inform them of how their comments were addressed in those decisions. At a minimum, officials of federally-recognized Tribal governments must be offered the same level of involvement as state and county officials. It is recommended that coordination take place as early as possible and before official notifications are made. Land use plans and coordination activities must address the following:

1. Consistency with Tribal plans

Section 202(c)(9) of FLPMA requires the BLM to coordinate plan preparation for public lands with plans for lands controlled by Indian Tribes, so that the BLM's plans are consistent with Tribes' plans for managing Tribal resources to the extent possible, consistent with Federal law. This coordination allows the BLM and Tribes to develop management prescriptions for a larger land base than either agency can address by itself.

BLM_0076101

10

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

2. Protection of treaty rights

Land use plans must address the protection of treaty rights assured to Indian Tribes concerning Tribal uses of public lands and resources (such treaty rights in the West are generally limited to Northwestern Tribes who were subject to the Stevens Treaties of the 1850s).

3. Observance of specific planning coordination authorities

In addition to the FLPMA consistency provisions discussed above, the land use planning process, where applicable, must comply with the following statutes and Executive orders:

a. Section 101(d)(6) of the National Historic Preservation Act. This act requires the BLM to consult with Indian Tribes when historic properties of traditional religious or cultural importance to a Tribe would be affected by BLM decision-making.

b. The American Indian Religious Freedom Act. This act requires the BLM to protect and preserve the freedom of American Indians and Alaska Natives in exercising their traditional religions, including access to sites and the freedom to worship through ceremonials and traditional rites.

c. Executive Order 13007 (Indian Sacred Sites). This requires the BLM to accommodate access to and use of sacred sites and to avoid adversely affecting the physical integrity of sacred sites to the extent practicable, permitted by law, and not inconsistent with essential agency functions. The BLM must ensure reasonable notice is provided to Tribes, through government-to-government relations, of proposed actions or land management policies that may restrict future access to or ceremonial uses of, or adversely affect the physical integrity of, sacred sites, including proposed land disposals.

d. Executive Order 12898 (Environmental Justice). This requires the BLM to take into account the relevant CEQ guidelines and Department of the Interior policies and goals (see Appendix D, Table D-4).

In some cases, Native American or Tribal interests are represented by certain advocacy groups that have a "quasi-governmental" authority or interest, but that are not federally recognized. There is no statutory, fiduciary trust, or government-to-government relationship with these groups that requires consultation. These groups are consulted by BLM on the same level as any other nongovernmental organization or advocacy group using the principles of collaboration.

See BLM Manual 8120 and BLM Handbook H-8120-1 for specific guidance on Native American consultation. See Departmental Manual 512 DM 2 (Departmental Responsibilities for Indian Trust Resources).

Land use plans and their accompanying EISs must identify potential effects on Indian trust resources, trust assets, or Tribal health and safety. Any effect must be explicitly identified and documented in the land use plan, including appropriate mitigation where possible.

BLM_0076102

## II. Land Use Plan Decisions

## A. <u>Introduction</u>

Decisions in land use plans guide future land management actions and subsequent site-specific implementation decisions. These land use plan decisions establish goals and objectives for resource management (desired outcomes) and the measures needed to achieve these goals and objectives (management actions and allowable uses). Section 202(c) of FLPMA (43 U.S.C. 1712) requires that in developing land use plans, the BLM:

1. Use and observe the principles of multiple use and sustained yield;

2. use a systematic interdisciplinary approach to integrate physical, biological, economic, and other sciences;

3. give priority to designating and protecting areas of critical environmental concern (ACECs);

4. rely, to the extent available, on an inventory of public lands, their resources, and other values;

5. consider present and potential uses of public lands;

6. consider the relative scarcity of the values involved and the availability of alternative means and sites for realizing those values;

7. weigh long-term benefits to the public against short-term benefits;

8. provide for compliance with applicable Tribal, Federal, and state pollution control laws, standards, and implementation plans; and

9. to the extent consistent with the laws governing the administration of public lands, coordinate the land use inventory, planning, and management activities of public lands with land use planning and management programs of other Federal departments/agencies and state/local governments, as well as the policies of approved Tribal and state land resource management programs. The BLM must, to the extent practical, assure that consideration is given to those Tribal, state, and local plans that are germane in the development of land use plans for public lands. Land use plans must be consistent with state and local plans to the maximum extent consistent with Federal law. Refer to FLPMA for the full text of Federal responsibilities detailed under Section 202(c)(9).

Where there are competing resource uses and values in the same area, Section 103(c) of FLPMA (43 U.S.C. 1702(c)) requires that the BLM manage the public lands and their various resource values so that they are utilized in the combination that will best meet multiple use and sustained yield mandates.

BLM_0076103

12

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

Land use plan decisions are made according to the procedures in the BLM's planning regulations in 43 CFR 1600 and the implementing regulations for NEPA in 40 CFR 1500-1508.  Before land use plan decisions are finalized and selected, they must be presented to the public as proposed decisions and can be protested to the BLM Director under 43 CFR 1610.5-2 (see Appendix E).

**B.  Types of Land Use Plan Decisions**

Land use plan decisions for public lands fall into two categories:  desired outcomes (goals and objectives) and allowable (including restricted or prohibited) uses and actions anticipated to achieve desired outcomes.

  1.  Desired outcomes

Land use plans must identify desired outcomes expressed in terms of specific goals and objectives.  Goals and objectives direct the BLM's actions in most effectively meeting legal mandates; numerous regulatory responsibilities; national policy, including the DOI Strategic Plan goals; State Director guidance (see 43 CFR 1610.0-4(b)); and other resource or social needs.  Desired outcomes should be identified for and pertain to resources (such as natural, biological, and cultural), resource uses, (such as energy and livestock grazing), and other factors (such as social and economic conditions).  Definitions and examples of goals and objectives are listed below:

*Goals* are broad statements of desired outcomes (e.g., maintain ecosystem health and productivity, promote community stability, ensure sustainable development) that usually are not quantifiable.  Since the release of the original Handbook, the BLM has worked with RACs to develop Land Health Standards applicable to all ecosystems and management actions.  These Land Health Standards must be expressed as goals in the land use plan.  Goals can also be drawn from the Departmental and/or the DOI Strategic Plan or other sources.  A sample goal for a Land Health Standard is:  "Maintain healthy, productive plant and animal communities of native and other desirable species at viable population levels commensurate with the species and habitat's potential."  A sample goal from the Strategic Plan is:  "Sustain desired biological communities on Department of the Interior-managed and -influenced lands and waters in a manner consistent with obligations regarding the allocation and use of water."  These goals, or modifications thereof, could be used in a land use plan.

*Objectives* identify specific desired outcomes for resources.  Objectives are usually quantifiable and measurable and may have established timeframes for achievement (as appropriate).  A sample objective is:  "Manage vegetative communities on the upland portion of the Clear Creek Watershed to achieve, by 2020, an average 30 to 40 percent canopy cover of sagebrush to sustain sagebrush-obligate species."  When quantified, the indicators associated with Land Health Standards are one possible source of objectives.

BLM_0076104

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

   2.  Allowable uses and management actions anticipated to achieve desired outcomes (goals and objectives)

After establishing desired outcomes, the BLM identifies allowable uses (land use allocations) and management actions for different alternatives that are anticipated to achieve the goals and objectives.

   a.  Allowable uses.  Land use plans must identify uses, or allocations, that are allowable, restricted, or prohibited on the public lands and mineral estate.  These allocations identify surface lands and/or subsurface mineral interests where uses are allowed, including any restrictions that may be needed to meet goals and objectives.  Land use plans also identify lands where specific uses are excluded to protect resource values.  Certain lands may be open or closed to specific uses based on legislative, regulatory, or policy requirements or criteria to protect sensitive resource values.  If land use plan decisions close areas of 100,000 acres or greater in size to a principal or major use for 2 years or more, Congress must be notified of the closure upon its implementation as prescribed in 43 CFR 1610.6.

The land use plan must set the stage for identifying site-specific resource use levels.  Site-specific use levels are normally identified during subsequent implementation planning or the permit authorization process.  At the land use plan level, it is important to identify reasonable development scenarios for allowable uses such as mineral leasing, locatable mineral development, recreation, timber harvest, utility corridors, and livestock grazing to enable the orderly implementation of future actions.  These scenarios provide a context for the land use plan's decisions and an analytical base for the NEPA analysis.  The BLM may also establish criteria in the land use plan to guide the identification of site-specific use levels for activities during plan implementation.

   b.  Management actions.  Land use plans must identify the actions anticipated to achieve desired outcomes, including actions to maintain, restore, or improve land health.  These actions include proactive measures (e.g., measures that will be taken to enhance watershed function and condition), as well as measures or criteria that will be applied to guide day-to-day activities occurring on public land.  Land use plans also establish administrative designations such as ACECs, recommend proposed withdrawals, land tenure zones, and recommend or make findings of suitability for congressional designations (such as components of the National Wild and Scenic River System).

While protection and restoration opportunities and priorities are often related to managing specific land uses (such as commodity extraction, recreation, or rights-of-way corridors), they can be independent of these types of uses as well.  In certain instances, it is insufficient to simply remove or limit a certain use, because unsatisfactory resource conditions may have developed over long periods of time that will not correct themselves without management intervention.  For example, where exotic invasive species are extensive, active restoration may be necessary to allow native plants to reestablish and prosper.  In these cases, identifying restoration opportunities and setting restoration priorities are critical parts of the land use planning process.

BLM_0076105

14

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

Appendix C provides additional program-specific guidance for developing land use plan decisions.

## C.  Geographic Areas-

A variety of different geographic areas are associated with planning:

*Planning Area.*  The geographic area within which the BLM will make decisions during a planning effort.  A planning area boundary includes all lands regardless of jurisdiction; however the BLM will only make decisions on lands that fall under the BLM's jurisdiction (including subsurface minerals).  Unless the State Director determines otherwise, the planning area for a RMP is the geographic area associated with a particular field office (43 CFR 1610.1(b)).  State Directors may also establish regional planning areas that encompass several field offices and/or states, as necessary.

*Decision Area.*  The lands within a planning area for which the BLM has authority to make land use and management decisions.  In general, the BLM has jurisdiction over all BLM-administered lands (surface and subsurface) and over the subsurface minerals only in areas of split estate (areas where the BLM administers Federal subsurface minerals, but the surface is owned by a non-Federal entity, such as State Trust Land or private land).

*Analysis Area.*  Any lands, regardless of jurisdiction, for which the BLM synthesizes, analyzes, and interprets data and information that relates to planning for BLM-administered lands.  Analyses that extend beyond the planning area boundary allow management decisions to be made within the context of overall resource conditions and trends within the surrounding area, considering local, state, other Federal, and Tribal plans.  Examples of such information include the relative significance of BLM lands for a certain resource (such as a threatened or endangered species), or the anticipated impacts to resources (such as air quality, socio-economics) based on activities on BLM-administered lands.  The analysis areas can be any size, can vary according to resource, and can be located anywhere within, around, partially outside, or completely outside the planning or decision areas.

## D.  Scales of Planning

Planning and decision making may vary geographically (regional versus site-specific) or temporally (short-term versus long-term), providing a comprehensive basis for implementing resource management actions.

Planning at multiple scales may be necessary to resolve issues for a geographic area that is different from the planning area for the RMP.  For example, if broad-scale (regional) analysis identifies issues such as invasive weeds that cross BLM field office boundaries or other jurisdictional boundaries, desired outcomes and management actions in a planning area may be described and addressed in the context of the broader landscape.

Information presented at multiple scales also helps the BLM to understand priority resource issues, tailor decisions to specific needs and circumstances, and analyze cumulative impacts.

BLM_0076106

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

When establishing goals and objectives and making management decisions, it is also important to consider temporal scales. Some natural processes affected by decisions may occur over very long timeframes. For example, complete restoration of a degraded habitat may take much longer than the typical time span of a land use plan.

## E. **Multijurisdictional Planning**

Within a planning area, the BLM surface lands and subsurface mineral estate interests are often intermingled with non-Federal mineral estate, or with lands that are managed by or under the jurisdiction of Tribal, state, or local governments or other Federal agencies. As an outgrowth of these landownership patterns and responsibilities, other governmental entities and BLM have increasingly sought to coordinate their decisions and plans.

Multijurisdictional planning assists land use planning efforts where there is a mix of landownership and government authorities and there are opportunities to develop complementary decisions across jurisdictional boundaries. Planning can be accomplished for subbasins, entire watersheds, or other landscape units. A multijurisdictional plan may include both land use and implementation decisions that are germane to each jurisdiction involved in the planning effort. However, the BLM still retains authority for decisions affecting the public lands it administers. The BLM office leading or participating in a multijurisdictional plan must assure conformance with the BLM's planning regulations, as well as all other applicable laws and regulations for the BLM-administered lands. This can be accomplished by completing the notification, public review, and procedural requirements of 43 CFR 1600 and 40 CFR 1500-1508 as part of the multijurisdictional planning effort. Where BLM becomes a cooperating agency for implementation actions in conformance with the existing land use plan, the lead agency's planning process may be followed provided that NEPA requirements are met.

In cases where the BLM-administered lands make up a small part of the planning area for a multijurisdictional planning effort, it may be desirable for other jurisdictional interests to lead the planning effort. The BLM may act as a cooperating agency's facilitator, convener, leader, or participant, as appropriate, to encourage positive relationships and to develop a mutual understanding of resource conditions and multiple-use management options. In some cases, law may define the lead role. In most cases, planning procedures of Tribal, state, or local governments and other Federal agencies will differ from those of the BLM. Therefore, successful multijurisdictional planning efforts are normally guided by MOUs, which clearly delineate lines of authority and roles and responsibilities for all participants, including the BLM.

## F. **Establishing Management Direction for Lands That May Come Under the BLM Jurisdiction in the Future**

If it is foreseeable that the BLM will acquire management responsibility for certain parcels of land through purchase, exchange, withdrawal revocation, administrative transfers, or some other means, then the BLM can establish management direction for these lands, contingent on their acquisition, in conjunction with planning efforts on adjacent or similar BLM-administered lands.

BLM_0076107

16
H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

If acquired lands are surrounded by or adjacent to BLM lands, the BLM can extend applicable land use plan decisions, through plan maintenance (see 43 CFR 1610.5-4), to these lands after they are acquired without completing a plan amendment, as long as there are no unresolved management issues associated with the newly acquired lands.  In some cases, regulatory requirements may dictate a plan amendment be completed, such as when establishing or modifying boundaries of ACECs.

## III. Land Use Planning Process and Products

Planning requirements vary depending on the type of planning efforts and the level of environmental analysis needed.  There are three types of planning efforts:

1. *New plans.*  A set of decisions for an area previously managed by an entity other than the BLM, or for an area previously managed by the BLM under a MFP (the land use plan predecessor to the present-day RMP).

2. *Plan revisions.*  A complete or near-complete rewrite of an existing RMP.

3. *Plan amendments.*  A modification of one or more parts (e.g., decisions about livestock grazing) of an existing RMP.

The level of environmental analysis differs by the type of planning effort, as shown in Table III-1.

**Table III-1.—*Planning efforts and required NEPA analysis***

| Type of planning effort | Type of associated NEPA document required |
|---|---|
| New plans | • EIS |
| Plan revisions | • EIS |
| Plan amendments | • EIS or EA/FONSI:  Depends on the scope of the planning effort and on the anticipated impacts. |

## A.  Planning for Environmental Impact Statement-level Efforts

Figure 1 shows required planning steps for EIS-level planning efforts, followed by a description of each step.

BLM_0076108

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)



**Prepare to Plan**
• Write a preparation plan

Issue NOI[1] to prepare the RMP(amendment)/EIS and start scoping

**Analyze the Management Situation**
• Document results in an analysis of the management situation (AMS)

**Conduct Scoping**
• Provide a minimum 30-day comment period on issues and planning criteria
• Document results in a scoping report

Formulate Alternatives

Analyze Effects of Alternatives

Select a Preferred Alternative

**Prepare a Draft RMP (Amendment)/Draft EIS**

Publish NOA[1] & provide a 90+-day public comment period

**Prepare a Proposed RMP (Amendment)/Final EIS**

Publish NOA[1], provide a 30-day protest period, and resolve protests

Provide a 60-day Governor's Consistency Review period[2]

**Prepare Record of Decision/Approved RMP (Amendment)**

Implement, Monitor, and Evaluate Plan Decisions

**NOTES**

1)  The chart shows minimum planning requirements according to law, regulation, or BLM policy.  BLM managers can go beyond these requirements as needed or desired.

2)  Boxes around steps indicate required documents.

3)  Inventory of resource extent and condition should occur as needed, but is most useful prior to the analysis of the management situation.

*Abbreviations:*

**EIS** ~ Environmental Impact Statement
**NOI** ~ Notice of Intent
**NOA** ~ Notice of Availability
**RMP** ~ Resource Management Plan

[1] BLM must publish a notice in the *Federal Register.*
[2] States can negotiate a shorter review period with the Governor.
[3] If changes are significant, issue a notice of significant change and provide a 30-day comment period.

**Figure 1.—***EIS-level planning efforts:  Required steps for new plans, revisions, and amendments*

18

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

1. <u>Prepare to plan</u>

The preparation plan is more than merely a vehicle to secure planning funds.  A properly prepared preparation plan provides the foundation for the entire planning process by identifying the preliminary issues to be addressed, the skills needed to address them, a preliminary budget that can be used for the cost estimate, preliminary planning criteria, and data and metadata available and needed.  If the plan is to be contracted, the preparation plan also forms the basis for the statement of work.  Offices should use a full interdisciplinary team to develop a realistic preparation plan.  If the plan is to be contracted, include the procurement staff on the interdisciplinary team.

It is important that the preparation plans use the principles of project management and address the findings in the existing plan evaluation. A comprehensive preparation plan provides management direction, oversight, structure, cost estimate, and focus for the planning process.

Preparation plans should be as brief and concise as possible.

**PRODUCT:  PREPARATION PLAN**—Appendix F-1 (Recommended Format for Preparation Plans) contains a more detailed outline and discussion of specific components for a preparation plan.

2. <u>Issue a notice of intent to prepare the RMP (amendment)/EIS and start scoping</u>

At the earliest opportunity, the BLM should notify the public, Indian Tribes, other Federal agencies, and state and local governments about its intent to engage in land use planning for a given area.  BLM managers should take whatever measures they feel necessary to ensure all interested parties are notified of upcoming planning actions.  At a minimum, however, the BLM must distribute two types of notices.

a. *Publish a notice of intent (NOI) in the* Federal Register.  The BLM must publish a NOI in the *Federal Register* prior to scoping to announce its decision to prepare an EIS (and associated planning document) (40 CFR 1501.7).  The NOI should identify preliminary issues and planning criteria (see the following Conduct Scoping section).

b. *Distribute scoping notices.*  Simultaneously with the *Federal Register* NOI, the BLM should submit a scoping notice to Federal agencies, state agencies, the heads of county boards, other local government units, and Tribal chairmen or Alaska Native leaders and any other entities/individuals who have requested such notice or the Field Manager has reason to believe would be concerned with the planning effort (43 CFR 1610.3-1(d)).  BLM should request the current status of government entities' officially approved or adopted resource-related plans, and the policies and programs contained therein.

Publication of the NOI in the *Federal Register* formally initiates the plan development, revision, or amendment process and begins the scoping process.  Information discussions with cooperators (or potential cooperators), RACs, Tribes and other groups may occur before formal scoping begins.

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

3.  Conduct scoping

Scoping is a requirement of both the NEPA regulations (40 CFR 1501.7) and the BLM planning regulations (43 CFR 1610.2 and 43 CFR 1610.4-1).  The land use planning process is issue-driven.  Scoping is a collaborative public involvement process to identify planning issues to be addressed in the planning process.  Planning issues are disputes or controversies about existing and potential land and resource allocations, levels of resource use, production, and related management practices.  Issues include resource use, development, and protection opportunities for consideration in the preparation of the RMP.  These issues may stem from new information or changed circumstances, and the need to reassess the appropriate mix of allowable uses.  Planning issues are addressed in and provide major focus for the development of alternatives (see Section III(A)(5), Formulate alternatives).

Scoping also involves the introduction of preliminary planning criteria to the public for comment.  Planning criteria guide development of the plan by helping define the decision space (or the "sideboards" that define the scope of the planning effort); they are generally based upon applicable laws, Director and State Director guidance, and the results of public and governmental participation (43 CFR 1610.4-2).  Examples of planning criteria include but are not limited to the following:

a.  The plan will be completed in compliance with FLPMA, NEPA, and all other relevant Federal law, Executive orders, and management policies of the BLM;

b.  where existing planning decisions are still valid, those decisions may remain unchanged and be incorporated into the new RMP (or amendment);

c.  the plans will recognize valid existing rights; and

d.  Native American Tribal consultations will be conducted in accordance with policy and Tribal concerns will be given due consideration.  The planning process will include the consideration of any impacts on Indian trust assets.

**PRODUCT:  SCOPING REPORT**—The BLM must document the results of scoping (43 CFR 1610.2(d)).  Field offices must either write a scoping report to capture public input in one document (recommended), or include the results of scoping in the Analysis of the Management Situation (AMS) (see following Section III(A)(4)).  The documentation must summarize the individual comments received during the formal scoping period of the planning process.  It must also describe the issues and management concerns from public scoping meetings, internal scoping meetings, and those included in the preparation plan.  See Appendix F-2 (Recommended Format for Scoping Reports).

4.  Analyze the management situation

The BLM must analyze available inventory data and other information to characterize the resource area profile, portray the existing management situation, and identify management opportunities to respond to identified issues.  This analysis provides, consistent with multiple use

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

principles, the basis for formulating reasonable alternatives, including the types of resources for development or protection (43 CFR 1610.4-4).

The analysis should (as briefly and concisely as possible) describe the current conditions and trends of the resources and the uses/activities in the planning area to provide information for the affected environment, provide the basis for the no action/present management alternative, and to create a framework from which to resolve the planning issues through the development of alternatives. The analysis should describe the status, or present characteristics and condition of the public land; the status of physical and biological processes that affect ecosystem function; the condition of individual components such as soil, water, vegetation, and wildlife habitat; and the relative value and scarcity of the resources. The analysis should also address social and economic conditions that influence how people, communities, and economies interact with the ecosystem. Appendix D provides additional detail on addressing social science and economic considerations in the land use planning process in the context of the larger landscape.

**PRODUCT:  ANALYSIS OF THE MANAGEMENT SITUATION**—Field offices should produce a report called the *analysis of the management situation* (AMS). Field offices are encouraged to make a summary of the AMS findings (or the entire report) available to the public. Parts of the AMS should easily translate into the introduction chapter, the no action and action alternatives, and the affected environment chapter of the EIS.

Formulation of the AMS can begin as soon as the planning project is approved. Documentation supporting the AMS should be maintained in the field office for public review. The AMS document can be made available to the public during or after scoping. The scoping report can also be included in a published summary of the AMS if desired. See Appendix F-3 (Annotated Outline of the Analysis of the Management Situation) for additional guidance.

    5.  Formulate alternatives

Considering a reasonable range of alternatives helps the BLM and its partners understand the various ways of addressing the planning issues and different scenarios for management of the resources and uses in the planning area. Development of alternatives should draw on the management opportunities identified in the AMS. Each alternative includes desired outcomes (goals and objectives), and the allowable uses and actions anticipated to achieve those outcomes. It is important to keep in mind the following about alternative formulation:

    a.  The BLM must consider all reasonable alternatives, including the no action alternative (the continuation of present levels or systems of resource use). Some alternatives, including the no action alternative, may be developed for detailed study, while others are considered but not analyzed in detail. Both types of alternatives are described in the RMP/EIS. Rationale should be briefly described to document why certain alternatives were not studied in detail (43 CFR 1610.4-5). An example may be that one alternative is a reasonable variation of an existing alternative analyzed in detail.

    b.  Reasonable alternatives analyzed in detail meet the purpose and need of the project and can be feasibly carried out based on estimated cost, logistics, technology, and social,

BLM_0076112

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

and environmental factors.  An alternative may be considered reasonable even if it is outside the legal jurisdiction of the BLM because it may serve as the basis for modifying congressional approval in light of the analysis (40 CFR 1502.14(c); Forty Questions No. 2(b)).

c.  Each fully-developed alternative represents a different land use plan that addresses and/or resolves the identified planning issues in different ways.

d.  Each alternative will include a different suite of potential planning decisions to address the issues.  Some potential planning decisions may be common to multiple, or all alternatives.

e.  Goals typically pertain to all alternatives (will not vary by alternative).  Objectives, allowable uses, and management actions may (1) be consistent across alternatives, and/or (2) vary by alternative.  A plan could include some objectives that vary by alternative, and other objectives that are consistent across alternatives.

f.  Goals typically apply to the entire planning area.  Objectives, allowable uses, and management actions may (1) apply to the planning area as a whole, and/or (2) be specific to certain geographic areas, such as those listed below:

    1.  Landscape-level systems (such as ecosystems and watersheds);

    2.  specific resources (such as threatened and endangered species and cultural sites);

    3.  areas (such as allotments and special management units); and

    4.  areas needing restoration or maintenance in order to meet land health standards.

g.  All components of an individual alternative must be complementary.  Desired outcomes, allowable uses, and management actions can (and probably will) conflict from one alternative to the next.  However, they must not conflict within any one alternative.  For example, an alternative should not allow all lands open to oil and gas leasing while having all lands designated as Visual Resource Management Class I or II.

h.  When identifying allowable uses in alternatives, consider resource development potential, levels of use, and restrictions to best achieve the identified goals and objectives (see Analysis of the Management Situation above).  These uses and restrictions are based on resource protection needs and social and economic factors, and represent the most appropriate mix of uses and protections for the resources in the planning area.  Different protection and restoration measures and the availability of areas for certain uses, levels of uses, and restrictions are presented in alternatives.

BLM_0076113

22

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

i. In developing alternatives, the BLM must consider the relative scarcity of the values involved and the availability of alternative means and sites for realizing those values (43 U.S.C. 1712(c)(6)).

j. Alternatives should be developed in an open, collaborative manner, to the extent possible.

6. <u>Analyze the effects of alternatives</u>

The BLM must estimate and describe the physical, biological, economic, and social effects of implementing each alternative considered in detail, including the no action alternative (43 CFR 1610.4-6). This analysis should provide adequate information to evaluate the direct, indirect, and cumulative impacts of each alternative in order to determine the best mix of potential planning decisions to achieve the identified goals and objectives (the analysis should also specifically address the attainment, or non-attainment, of Land Health Standards expressed as goals). The assumptions and timeframes used for analysis purposes (such as reasonably foreseeable development scenarios) should be documented. The effects are described in the draft RMP (amendment)/draft EIS (see Section 8).

7. <u>Select a preferred alternative</u>

By evaluating the alternatives in the EIS, the BLM must determine which combination of potential planning decisions contained in the alternatives best meets multiple use and sustained yield mandates of Section 103(c) of FLPMA (43 U.S.C. 1702(c)). If any one alternative contains the desired combination of potential planning decisions, then that alternative should be identified as the preferred alternative. If the combination of potential planning decisions is drawn from different alternatives, then those potential planning decisions should be compiled into a new alternative (identified as the preferred alternative) and the impacts analyzed accordingly.

The preferred alternative should:

a. Meet statutory requirements;

b. represent the best combination of decisions to achieve the goals and policies of the BLM as reflected through the DOI's Strategic Plan and State Director guidance; and

c. best respond to the purpose and need and best resolve the issues pertinent to the planning effort.

These and other agreed-to selection criteria should be used in selecting the preferred alternative. Development of criteria and evaluation of alternatives should include the involvement of RACs, cooperators, and interested members of the public to the extent practical. The final decision to select a preferred alternative, however, remains the exclusive responsibility of the BLM.

BLM_0076114

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

The Field Manager recommends the preferred alternative to the State Director.  The State Director approves the selection of the preferred alternative along with the other alternatives under consideration.

    8.  Prepare a draft RMP (amendment) and draft EIS

**PRODUCT:  DRAFT RMP (AMENDMENT)/DRAFT EIS**—This document describes the purpose and need for the plan, the affected environment, the alternatives for managing public lands within the planning area (including the preferred alternative), the environmental impacts of those alternatives, and the consultation and coordination in which the BLM engaged in developing the plan.  See Appendix F-4 (Annotated Outline for a Draft and Final RMP [Amendment]/EIS).

    9.  Publish a notice of availability and provide a public comment period

The BLM must provide at least 90 days for the public to comment on the draft RMP (amendment) and draft EIS.  This public comment period officially starts with the Environmental Protection Agency's (EPA's) publication of a NOA for the document in the *Federal Register* (43 CFR 1610.2(e)).  The BLM also publishes a NOA in the *Federal Register* to provide information not contained in the EPA's NOA about the project, comment period, contact information, and other supplemental information.  The BLM may also announce the start of the comment period (and the dates, times, and locations of public meetings) through other mechanisms, such as press releases, planning bulletins or newsletters, direct mailings and e-mailings, and Internet postings.

Public comments may be submitted in a variety of forms, including written, electronic, and oral.  The BLM must assess and consider all comments received (similar or "like" comments may be grouped for analysis).  The BLM responds to public comments by one of the following ways (40 CFR 1503.4):

    a.  Modifying alternatives, including the proposed plan;

    b.  developing and evaluating alternatives not previously given serious consideration;

    c.  supplementing, improving, or modifying analysis;

    d.  making factual corrections; and

    e.  explaining why comments do not warrant further response, citing the sources, authorities, or reasons that support the agency's position, and, if appropriate, indicate those circumstances that would trigger reappraisal or further response.

Although the BLM is not required to write to individual commenters to explain how their comments were addressed, it is required to respond to substantive comments and include the response in the proposed RMP (amendment) and final EIS.  Nonsubstantive comments are those that include opinions, assertions, and unsubstantiated claims.  Substantive comments are those

BLM_0076115

that reveal new information, missing information, or flawed analysis that would substantially change conclusions.

10. Prepare a proposed RMP (amendment) and final EIS

**PRODUCT:  PROPOSED RMP (AMENDMENT)/FINAL EIS**—The proposed RMP (amendment) and final EIS builds on the draft RMP (amendment) and draft EIS to include appropriate responses to public comments received on the draft RMP (amendment) and draft EIS as well as a description (either verbatim or summary) of the comments received.  It also corrects errors in the draft RMP/EIS identified through the public comment process and internal BLM review.  The proposed RMP and final EIS may also contain modification to the alternatives and the accompanying impact analysis contained in the draft RMP/EIS.  However, substantial changes to the proposed action, or significant new information/circumstances collected during the comment period would require supplements to either the draft or final EIS (40 CFR 1502.9(c)).  The proposed RMP (amendment)/final EIS should clearly show the changes from the draft RMP (amendment)/draft EIS.  The proposed RMP/final EIS should also display land use plan and implementation decisions (and clearly distinguish between the two types of decisions).  One way of doing this is in the Dear Reader Letter.  See Appendix F-4 (Annotated Outline for a Draft and Final RMP [Amendment]/EIS).

11. Publish a notice of availability, provide a protest period, and resolve protests

Issuance of the proposed RMP (amendment)/EIS officially occurs with the EPA's publication of a NOA for the document in the *Federal Register*.  The BLM publishes a NOA as well, which contains information about the project, protest period and filing instructions, contact information, and other supplemental information not contained in the EPA's NOA.

Individuals and entities have 30 days from the publication of EPA's NOA of the document to file a protest with the BLM Director.  The protest period cannot be extended.  The BLM must resolve any protests on a proposed RMP (amendment)/final EIS before issuing a record of decision (ROD).  A ROD may be issued on any portion of the proposed RMP not protested, in coordination with the Washington Office.  See Appendix E (Summary of Protest and Appeal Provisions).

12. Provide a Governor's consistency review period

In addition to a 30-day protest period, the BLM must also provide a 60-day review period to the Governor of the state in which the RMP (amendment) is being proposed to ensure consistency with state and local plans, policies, and programs.  The protest period and the Governor's review period should occur simultaneously in order to save time.  Sending a print-ready copy to the Governor at the same time the document goes to the printer will allow both periods to end at about the same time.  BLM state offices can potentially negotiate a shorter review period with the Governor.

Any responses from a Governor on consistency must be resolved before the BLM issues a ROD. If the Governor does not respond within the review period, the BLM can assume that the

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

proposed land use plan (amendment) decisions are consistent (43 CFR 1610.3-2(e)). If the Governor recommends changes in the proposed plan (amendment) that were not raised during the public participation process, the State Director shall provide the public with an opportunity to comment on the recommendations (43 CFR 1610.3-2(e)). This public comment opportunity will be offered for 30 days and may coincide with the 30-day comment period for the notice of significant change (see Section III(A)(13) below). If the State Director does not accept the Governor's recommendations, the Governor has 30 days to appeal in writing to the BLM Director (43 CFR 1610.3-2(e)).

13.  Determine need for a notice of significant change and provide a comment period if necessary

The protest letters and comments from the Governor could result in the need to significantly modify the proposed RMP (amendment)/final EIS. For planning purposes, "significant" is the equivalent of "substantial" as used in 40 CFR 1502.9(c). If the change is significant, the BLM must announce the intended changes to the public and provide a 30-day comment period. Without this step, the public would not have an opportunity to understand and respond to the potential change (43 CFR 1610.5-1(b) and 40 CFR 1505.2). The BLM must then respond to the comments as described in previous Section III(A)(9).

Should the BLM issue a notice of significant change, it may also be necessary to issue a supplemental proposed RMP (amendment)/ final EIS (see 40 CFR 1502.9(c)(1-4)).

14.  Prepare a record of decision and approved RMP (amendment)

**PRODUCT:  RECORD OF DECISION /APPROVED RMP (AMENDMENT)**—The ROD /approved RMP (amendment) serves as a more concise and useful tool to land managers and stakeholders than a cumbersome EIS. It is typically the proposed RMP (amendment) as modified in response to protests, the Governor's consistency review, or other considerations. It describes the goals, objectives, and management actions for fulfilling the management direction developed within the land use planning process.

An RMP (amendment) is officially approved when the State Director signs a ROD adopting the RMP (amendment). The ROD should precede or coincide with the adoption of the RMP (40 CFR 1506.1(a)). The ROD, which provides the rationale for the decision (this should parallel the rational for the preferred alternative, using the same criteria), should be published and released in the same document with and reference the approved RMP (amendment). See Appendix F-5 (Annotated Outline for a Record of Decision/Approved RMP (Amendment)).

15.  Implement, monitor, and evaluate plan decisions

See Sections IV and V of this Handbook.

**B.  Planning for Environmental Assessment-level Efforts**

BLM_0076117

26

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

The BLM completes environmental assessment (EA)-level planning efforts mainly for certain types of plan amendments.  In general, there are fewer planning steps involved in EA-level planning.  The number of steps and extent of work involved with each step varies with the complexity of identified planning issues.  Figure 2 shows the required and optional steps associated with EA-level planning.  Steps are required unless noted as optional (designated by *italics*).

    1.  Prepare to plan (optional)

It is highly recommended that field offices engage in preplanning activities, though they are not required.  Field offices should complete preplanning steps necessary to help ensure efficient and effective planning efforts.  For example, field offices could write preparation plans similar to those required for EIS-level planning efforts (see Section III(A)(1), Prepare to Plan and Appendix F-1).

    2.  Issue a notice of intent (NOI) to prepare the RMP amendment and review planning criteria

The BLM must publish an NOI in the *Federal Register* to initiate the start of the planning effort (43 CFR 1610.2 (c)).  The BLM can include the draft planning criteria in the NOI to solicit public review of the criteria.  Alternatively, the BLM can make the planning criteria available to the public at a later date if desired (see following Section III(A)(3), Conduct Scoping).  Note, however, that public review of planning criteria is required at some point, whether at the time of the NOI or at a later date.

    3.  Conduct scoping

Field offices must engage in an appropriate level of scoping activities.  At a minimum, the BLM must offer a 30-day public comment period on issues and planning criteria.  Depending on the local situation and planning issues, the BLM can also conduct a more involved scoping effort and include a series of public meetings, for example.

The BLM must document the results of scoping either in a scoping report, the draft plan amendment and EA or the proposed amendment/EA (if a draft plan amendment and EA is not prepared).

    4.  Analyze the management situation (optional)

The BLM is not required to analyze the management situation or produce a report that describes it.  However, prior to formulating alternatives, the BLM should understand current conditions and trends of the resources and the uses/activities that will relate to potential decisions in the plan amendment.  It is highly recommended that the BLM begin the process of gathering existing data, and supplementing data as needed, early in the plan amendment process.  This information will create a solid base for analysis to support amending planning decisions.  This could be accomplished by reference to and/or augmenting the existing AMS.

BLM_0076118

27

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)



Figure 2.—*EA-level planning efforts:  Required and optional planning steps*

BLM_0076119

28

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

5. Formulate alternatives

The BLM must formulate appropriate alternatives for EA-level planning efforts.  The process is similar to that for EIS-level amendments.

6. Analyze the effects of alternatives

The BLM must also analyze the effects of alternatives.

7. Prepare a draft RMP amendment and EA/FONSI (optional)

The BLM must prepare a draft RMP amendment and EA/finding of no significant impact (FONSI) when it is determined that a public review and comment period are appropriate (for example, when proposed ACEC designations are being considered per 43 CFR 1610.7-2(b) or to meet NEPA requirements under certain limited circumstances per 40 CFR 1501.4(e)(2). Otherwise, a draft plan amendment is not required, and the BLM can simply go from analyzing the effects of alternatives (step 6) to preparing a proposed RMP amendment/EA/FONSI (step 9). The FONSI should be unsigned.

8. Provide a public comment period (optional)

If the BLM prepares a draft RMP amendment and EA/FONSI, it must offer a minimum 30-day public comment period.  The BLM must offer a 60-day comment period for potential decisions regarding ACEC designation.

9. Prepare a proposed RMP amendment/EA/FONSI

The BLM must prepare a proposed RMP amendment/EA/FONSI for all EA-level planning efforts.  The proposed RMP amendment/EA/FONSI is typically arranged in an EIS format (with chapters).  The FONSI should be signed (if a FONSI cannot be signed, an EIS should be initiated).

10. Provide a protest period and resolve protests

Like EIS-level planning efforts, EA-level efforts require a 30-day protest period.  The protest period cannot be extended.  Since a NOA is not published in the *Federal Register* for EA-level amendment, field offices are encouraged to widely notify the public (including publication of legal notices in local newspapers) to announce the protest period.  The BLM must resolve these protests before issuing a decision record/RMP amendment.  A decision record may be issued on any portion of the proposed RMP amendment not protested, in coordination with the Washington Office.

11. Provide a Governor's consistency review period

Like EIS-level planning efforts, EA-level efforts require a 60-day Governor's consistency review period.

12. <u>Issue a notice of significant change and provide a 30-day public comment period (if necessary)</u>

This step is identical to that for EIS-level efforts.

13. <u>Prepare a decision record/RMP amendment</u>

The BLM issues the decision record/RMP amendment after it resolves all protests and any potential consistency issues received from the Governor's office. The decision record should precede (or coincide with) the RMP amendment (40 CFR 1506.1).

14. <u>Implement, monitor and evaluate plan decisions</u>

See Sections IV and V of this Handbook.

## IV. Implementation

### A. <u>Implementing Land Use Plans</u>

When an approved land use plan or land use plan amendment decision document (i.e., ROD or decision record) is signed, most of the land use plan decisions in the plan are effective immediately and require no additional planning or NEPA analysis. See Appendix C for a listing of program-specific land use plan decisions.

Some programs have specific requirements that must be taken in order to make certain decisions effective. An example of a land use plan decision that requires an additional action for implementation would be a recommendation to withdraw lands from entry under the mining laws. Formal action requiring Secretarial-level review and decision making would follow if the BLM planning process results in a withdrawal recommendation and the applicable regulations in 43 CFR 2300 are followed.

Upon approval of the land use plan, subsequent implementation decisions are put into effect by developing implementation (activity-level or project-specific) plans. An activity-level plan typically describes multiple projects in detail that will lead to on-the-ground action. These plans traditionally focused on single resource programs (habitat management plans, allotment management plans, recreation management plans, etc.). However, activity-level plans are increasingly interdisciplinary and are focused on multiple resource program areas to reflect the shift to a more watershed-based or landscape-based approach to management. These types of plans are sometimes referred to as "integrated or interdisciplinary plans," "coordinated resource management plans," "landscape management plans," or "ecosystem management plans." A project-specific plan is typically prepared for an individual project or several related projects.

### B. <u>Defining Implementation Decisions</u>

Implementation decisions generally constitute BLM's final approval allowing on-the-ground actions to proceed. These types of decisions require appropriate site-specific planning and

BLM_0076121

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

NEPA analysis.  Unlike land use plan decisions, implementation decisions are not subject to protest under the planning regulations.  Instead, implementation decisions are subject to various administrative remedies, particularly appeals to the Office of Hearing and Appeals (Interior Board of Land Appeals).  Where implementation decisions are made as part of the land use planning process, they are still subject to the appeals process or other administrative review as prescribed by the specific resource program regulations after the BLM resolves the protests to land use plan decisions and makes a decision to adopt or amend the RMP.  The proposed plan /final EIS should display land use plan and implementation decisions (and clearly distinguish between the two types of decisions).  One way of doing this is in the Dear Reader Letter.  See Appendix C for a listing of program-specific implementation decisions.

### C. <u>Making Implementation Decisions</u>

Implementation decisions are made with the appropriate level of NEPA analysis along with any procedural and regulatory requirements for individual programs.  See 40 CFR 1500-1508, the BLM NEPA Handbook (H-1790-1), and 516 DM 1-7 for detailed descriptions of NEPA procedures.  An EA, EIS, or EIS supplement must be prepared for subsequent implementation planning unless the decisions and actions contained in the implementation plan are:

> 1.  Identified as exceptions to the BLM NEPA requirements (e.g., actions specifically exempted from NEPA by Congress);
>
> 2.  categorically excluded (refer to Departmental Manual 516 DM 2, Appendix 1; and 516 DM 6, Appendix 5.4, for a current listing (May 19, 1992) of categorical exclusions); and
>
> 3.  fully covered by a previously prepared EA or EIS that does not need to be updated as documented by a documentation of land use plan conformance and NEPA adequacy (DNA).

### D. <u>Making Land Use Plan and Implementation Decisions in the Same Planning Effort</u>

The BLM may use a single land use planning/NEPA process to make both land use plan and implementation decisions, provided both types of decisions are adequately addressed with the appropriate level of NEPA analysis.  This may be appropriate in RMPs or plan amendments covering relatively small geographic areas or where there are a number of activity-level projects such as timber sales being addressed simultaneously with land use planning efforts.  When describing the protest procedures for proposed RMPs, the BLM must make clear which decisions are land use plan decisions and thus protestable under the planning regulations and which decisions are implementation decisions that are not protestable.  At the decision-making stage, the BLM can separate the two categories of decisions into two decision documents, one adopting the RMP (or amendment) and the other approving the implementation decisions; or the BLM may use a single decision document that adopts the RMP (or amendment) and approves the implementation actions.  If a single decision document is used, the BLM must clearly distinguish the land use plan decisions from the implementation decisions and describe the administrative remedies for both.

BLM_0076122

When considering land use plan and implementation decisions in the same land use planning/NEPA process, the implementation decisions are usually approved at the same time or after the decision to approve the RMP (or amendment).  An exception may occur when some/all of the implementation decisions are in conformance with decisions in the current RMP.  In this case, the BLM may issue a ROD/decision record on the implementation decisions that are consistent with the current plan prior to approving the ROD/decision record on the new RMP (or amendment).  This situation may occur when there is a need to approve high priority implementation decisions before the protests to the proposed RMP (or amendment) are resolved.

Making implementation decisions as part of the land use planning process and analyzing them concurrently with land use plan decisions does not change their administrative remedies or the timing of those remedies.  See Appendix E (Summary of Protest and Appeal Provisions).

## E.  Developing Strategies to Facilitate Implementation of Land Use Plans

A documented, well-organized thought process is essential to the successful implementation of land use plans.  An implementation strategy lists prioritized decisions that (1) will help achieve the desired outcomes of one or more land use plans and (2) can be implemented given existing or anticipated resources.  Developing implementation strategies enables the BLM to prioritize the preparation of implementation decisions.

There are no procedural or approval requirements for an implementation strategy.  Implementation strategies may be developed in conjunction with developing land use plan decisions, but strategies are not land use plan decisions and are not subject to protest or appeal.  As a rule, they should not be included in the RMP.   A well thought-out implementation strategy should prioritize each decision for funding and implementation.  The strategy should also be interdisciplinary (not program by program).  Developing an implementation strategy creates an important opportunity for continued collaboration with the public, Tribes, state and local governments, and other Federal agencies.

Described below is a suggested collaborative four-step method for developing an implementation strategy with partners involved in developing the land use plan:

    1.  *Develop framework to portray the work.*  Identify specific projects to (a) achieve desired natural resource conditions, (b) achieve desired heritage and cultural resource conditions, (c) address anticipated demands for recreation, (d) address anticipated demands for forage and forest products, (e) address anticipated demand for direct community services, and (f) address demand for energy and minerals.

    2.  *Identify priorities for the next 3 to 5 years.*  Using the framework in step 1, and considering current budget capabilities, identify priorities within each workload (a. through f. in step 1) and priorities across workloads.  Factors that influence decision priorities are:

BLM_0076123

32

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

    a.  Statutory mandates, including, but not limited to, compliance with the Clean Air and Clean Water Acts, the Endangered Species Act, the National Historic Preservation Act, the Taylor Grazing Act, and FLPMA;

    b.  goals listed in the DOI's Strategic Plan and Annual Performance Plan;

    c.  present risks to resources, with resources at high risk ranking above resources without known or substantial risks;

    d.  likelihood of success, with management actions using proven techniques possibly ranking higher than management actions using experimental techniques;

    e.  cost-effectiveness of management actions; there is no requirement to develop a cost/benefit analysis, but management actions that have a high likelihood of improving resource conditions for relatively small expenditures of time and money should receive relatively higher priority;

    f.  willingness and availability of cooperators to meet similar resource objectives for adjacent non-Federal lands and resources; this would include opportunities to cooperate on a watershed basis and to leverage limited resources;

    g.  willingness and availability of partners interested in helping accomplish priority management actions needed to meet desired outcomes;

    h.  budgetary and staff resources required to implement the decisions; and

    i.  socioeconomic analysis of the local community.

    *3.  Develop a 3 to 5 year budget.*  Identify specific tasks to accomplish each project and associated funding needs, including labor and operations costs.  Identify potential funding sources including base, flexible, and contributions.

    *4.  Develop an outreach strategy.*  Identify a strategy for both internal and external communications needed to support implementation.  This could be in the form of annual plan updates and website development, etc.

## V.  Monitoring, Evaluation, and Adaptive Management

The regulations in 43 CFR 1610.4-9 require that land use plans establish intervals and standards for monitoring and evaluations, based on the sensitivity of the resource decisions involved.

## A.  Monitoring

Land use plan monitoring is the process of (1) tracking the implementation of land use planning decisions (implementation monitoring) and (2) collecting data/information necessary to evaluate the effectiveness of land use planning decisions (effectiveness monitoring).  In Appendix C, each

resource program identifies desired land use plan decisions.  BLM field offices must determine
what management actions are needed to implement those decisions.  Sometimes actions occur
just once, e.g., the development of an implementation plan; or actions occur on a fairly regular
basis, e.g., steps taken to repair a damaged watershed.  Monitoring is the process of following up
on these management actions and documenting BLM's progress toward full implementation of
the land use plan and the achievement of desired outcomes.  Field offices are encouraged to
involve Tribes, state and local governments, and the public if they express an interest in
participating in this process.

Implementation monitoring is the process of tracking and documenting the implementation (or
the progress toward implementation) of land use plan decisions. This should be done at least
annually and should be documented in the form of a tracking log or report.  The report must be
available for public review (one way to accomplish this is an annual planning update which can
be sent to those who participated in the planning process or have expressed an interest in
receiving the report).  The report should describe management actions proposed or undertaken to
implement land use plan decisions and can form the basis for annual budget documents.  In
subsequent years, reports should document which management actions were completed and what
further actions are needed to continue implementing land use plan decisions.

Effectiveness monitoring is the process of collecting data and information in order to determine
whether or not desired outcomes (expressed as goals and objectives in the land use plan) are
being met (or progress is being made toward meeting them) as the allowable uses and
management actions are being implemented.  A monitoring strategy must be developed as part of
the land use plan that identifies indicators of change, acceptable thresholds, methodologies,
protocols, and timeframes that will be used to evaluate and determine whether or not desired
outcomes are being achieved.

The monitoring process should collect information in the most cost-effective manner and may
involve sampling or remote sensing.  Monitoring could be so costly as to be prohibitive if it is
not carefully and reasonably designed.  Therefore, it is not necessary or desirable to monitor
every management action or direction.  Unnecessary detail and unacceptable costs can be
avoided by focusing on key monitoring questions and proper sampling methods.  The level and
intensity of monitoring will vary, depending on the sensitivity of the resource or area and the
scope of the proposed management activity.

## B. Evaluation

Evaluation is the process of reviewing the land use plan and the periodic plan monitoring reports
to determine whether the land use plan decisions and NEPA analysis are still valid and whether
the plan is being implemented.   Land use plans are evaluated to determine if: (1) decisions
remain relevant to current issues, (2) decisions are effective in achieving (or making progress
toward achieving) desired outcomes, (3) any decisions need to be revised, (4) any decisions need
to be dropped from further consideration, and (5) any areas require new decisions.

BLM_0076125

34

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

In making these determinations, the evaluation should consider whether mitigation measures are satisfactory, whether there are significant changes in the related plans of other entities, and whether there is new data of significance to the plan.

The plan should be periodically evaluated (at a minimum every 5 years) as documented in an evaluation schedule.  Plan evaluations should also be completed prior to any plan revisions and for major plan amendments.  Special or unscheduled evaluations may also be required to review unexpected management actions or significant changes in the related plans of Indian Tribes, other Federal agencies, and state and local governments, or to evaluate legislation or litigation that has the potential to trigger an RMP amendment or revision.

Evaluations may identify resource needs and means for correcting deficiencies and addressing issues through plan maintenance, amendments, or new starts.  They should also identify where new and emerging resource issues and other values have surfaced.  Evaluations may also identify new and innovative practices that improve effectiveness and efficiency so that other offices may benefit.

    1.  <u>Process for completing land use plan evaluations</u>

The following section outlines the recommended process for completing land use plan evaluations.

    a.  State offices, with input from the field, identify reasons for evaluating the RMP.

    b.  Where appropriate, state and field offices identify land use plans that can be grouped/batched in a geographic region or planning area to look at issues that cut across boundaries (state and field offices).  Each plan should have its own evaluation documentation as well as a combined (grouped/batched) evaluation for all RMPs identified in the geographical region or planning area.

    c.  State and field offices identify what the evaluation is to measure.  In some cases, the RMP/ROD may have identified both monitoring and evaluation measures, units, and programs, and may even have specified the monitoring/evaluation questions to be answered.

The state office may develop and send questionnaires to field offices (specific to the state and field offices) to focus the evaluation, along with instructions for completing it. Evaluations must be tailored to individual land use plans; however, a comprehensive evaluation must address the following questions:

    1.  Are management actions outlined in the plan being implemented?

    2.  Does the plan establish desired outcomes (i.e., goals and objectives)?
    3.  Are the allocations, constraints, or mitigation measures effective in achieving (or making progress towards achieving) the desired outcomes?   This

BLM_0076126

determination is often made based on information obtained from resource assessments.

4.  Have there been significant changes in the related plans of Indian Tribes, state or local governments, or other Federal agencies?

5.  Are there new data or analyses that significantly affect the planning decisions or the validity of the NEPA analysis?

6.  Are there unmet needs or new opportunities that can best be met through a plan amendment or revision, or will current management practices be sufficient? For example, are there outstanding requests for ACEC designations to protect resource values?  *Note:  ACECs must be designated through the land use planning process.*

7.  Are new inventories warranted pursuant to the BLM's duty to maintain inventories on a continuous basis (FLPMA, Section 201)?

8.  Are there new legal or policy mandates as a result of new statutes, proclamations, Executive orders, or court orders not addressed in the plan?

d.  The state and field office establish/identify an interdisciplinary team that will complete the evaluation(s).  If available, the team should include specialists from state and field offices as well as adjoining state(s), and representatives from Washington Office, and Tribes, other Federal agencies, state and local governments, and the public. The interdisciplinary team should represent the major resources/programs present in the land use plan evaluation area and should be encouraged to incorporate other (technical procedures) evaluations or analyses that address and provide useful information on the same resources.

e.  The evaluation team should review both published and unpublished documents that implement or support the RMP decisions and NEPA analysis (e.g., AMS, area-wide mineral reports, socio-economic studies/analyses, reasonably foreseeable development scenarios, ACEC reports, documents incorporated by reference/adoption, and other studies [wild and scenic river, threatened and endangered species, water, etc.]).  The evaluation reports should also cite examples of implementation plans (at the activity level) that incorporate new information, address new issues, and provide either more detailed decisions or additional protective management direction.  These may include formal decision-making documents as well as watershed-level analyses and other landscape units or plans.

f.  The evaluation team should review NEPA compliance and procedural conformance records within the land use plan evaluation (e.g., documentation of land use plan conformance and NEPA adequacy, which typically relies on the RMP and associated NEPA documents [categorical exclusions]).

BLM_0076127

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

    g.  The State Director should approve or concur with all evaluations.

    2.  Evaluation report

An evaluation report documenting the findings of the evaluation must be prepared.  Following State Director approval or concurrence, the report will be made available to the public.  The following report format is recommended.  If appropriate, use charts, diagrams, and matrixes to display or summarize information.

    a. Introduction

    b. Purpose

    c. Method and Scope

    d. Results and Findings

        1.  Document conclusions regarding achievement of desired outcomes as well as any individual program or resource management issues associated with plan implementation

        2.  Identify decisions to be carried forward (i.e., no change needed), decisions needing to be modified, decisions needing to be dropped, and new decisions needed

    e.  Recommendations, including any resource- or program-specific management actions needed and other follow-up opportunities for the BLM field and state offices or interagency consideration

    f. Approval/Concurrence

Also see Section VI for more information on determining when new decisions are required.

## C.  Adaptive Management

The Office of Environmental Policy and Compliance (OEPC) issued ESM03-6 providing initial guidance to all Department of the Interior agencies on implementing adaptive management practices in NEPA compliance.  While this guidance does not provide specifics on the process and procedures for integrating adaptive management into the NEPA and land use planning process, it does formally define adaptive management as:

    . . . a system of management practices based on clearly identified outcomes, monitoring to determine if management actions are meeting outcomes, and, if not, facilitating management changes that will best ensure that outcomes are met or to re-evaluate the outcomes.

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

The BLM has initiated an effort to develop policies and procedures to integrate adaptive management into the NEPA and land use planning processes.  When those policies and procedures are developed, they will be incorporated into this section of the Handbook.

## VI.  Determining if New Decisions are Required

### A.  Specific Regulatory Requirements for Considering New Information or Circumstances

New information, updated analyses, or new resource use or protection proposals may require amending or revising land use plans and updating implementation decisions.  The primary requirements for considering new information are as follows:

> 1.  The BLM planning regulations require evaluating whether there is new data of significance to the land use plan (see 43 CFR 1610.4-9) and whether plan amendments (see 43 CFR 1610.5-5) or revisions (see 43 CFR 1610.5-6) are required;

> 2.  the CEQ regulations (40 CFR 1502.9(c)) require the BLM to prepare supplements to draft or final EISs if the agency makes substantial changes in the proposed action that are relevant to environmental concerns, or if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts; and

> 3.  joint agency Endangered Species Act regulations (see 50 CFR 402.16 (b)) require consultation to be reinitiated if new information reveals that decisions may affect listed species or critical habitat in a way or to an extent not previously considered, including exceeding the incidental take for a particular action.

### B.  Considering New Proposals, Circumstances, or Information

New data or information can include, but is not limited to:

> 1.  Changes in status, new listings or new critical habitat designations for endangered, threatened, and other special status or sensitive species (see Appendix C, Section (I)(G));

> 2.  changes in intensity of use or impact levels for a particular resource (e.g., increased recreation use as a result of urban expansion);

> 3.  changes in social and economic conditions resulting from urban expansion or broad conservation efforts (e.g., open space management);

> 4.  public comment or staff assessments indicating that new information or changed circumstances warrant a reconsideration of the appropriate mix of uses on particular tracts of public lands;

> 5.  a biological opinion issued by the USFWS or NOAA-Fisheries on actions in the planning area;

BLM_0076129

38

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

6.  information from Tribes, elected county officials, state agencies, or other Federal agencies on significant changes in their related plans or resource conditions that are critical to the BLM land use plans and/or subordinate implementation plans;

7.  new state listings of water-quality-limited streams (Clean Water Act, Section 303(d)), total maximum daily load (TMDL) developments, or non-attainment area designations (Clean Air Act) that may lead to the identification of new management practices that would require additional NEPA compliance and could require new land use plan decisions;

8.  new geochemical, geologic, or geophysical data;

9.  new cultural resource data;

10  environmental disturbances that significantly change natural conditions (e.g., wildfires, floods, or noxious weed infestations);

11.  monitoring data and resource assessments associated with implementing resource management actions designed to achieve resource objectives and Land Health Standards;

12.  Land use plan evaluations that weigh and interpret information gathered through resource monitoring;

13.  determinations as to whether mitigation measures outlined in the plan are effective;

14.  new national policy or a change in legal duties resulting from laws, regulations, Executive orders, or the BLM directives.  An example would be congressional designation of a river segment under the Wild and Scenic Rivers Act that mandates a protection and enhancement standard that, in turn, may affect resource management objectives, conditions, or uses (e.g., livestock grazing, timber sales, or other proposed projects) outlined in the land use plan; and

15.  information from the public or others regarding conditions or uses of resources on public lands.

## C.  Deciding Whether Changes in Decisions or the Supporting NEPA Analyses are Warranted

The determination whether to amend or revise an RMP based on new proposals, circumstances, or information depends on (1) the nature of new proposals, (2) the significance of the new information or circumstances, (3) specific wording of the existing land use plan decisions, including any provisions for flexibility, and (4) the level and detail of the NEPA analysis.  A "yes" answer to any of the following questions suggests the need to revisit existing decisions and/or the NEPA analysis:

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

1.  Does the new information or circumstance provide for interpretations not known or considered at the time existing decisions were made that could significantly affect ongoing actions?  For example:  Current land use plan decisions may require that all wildland fires be suppressed to limit the fire to the smallest acreage possible and make no provision for wildland fire use.  This conflicts with new Secretarial policy guidance that wildland fire, as a critical natural process, must be reintroduced into fire-dependent ecosystems;

2.  Are the decisions in the current land use plan no longer valid, based on significant new information or changed circumstances?  If decisions are not valid, the decisions need to be vacated, replaced, or changed through plan amendment or revision.  Examples of situations that may require new or changed land use plan decisions include, but are not limited to, the following:

> a.  Monitoring information may show the need to discontinue managing a herd in an existing herd management area because it is not practical to preserve or maintain a thriving ecological balance with the multiple use relationships in that area; conversely, new herd management areas could be established if an analysis of monitoring data shows that a viable herd could be established and meet the requirements for maintaining a thriving ecological balance;

> b.  the inability to achieve Land Health Standards under any level or management of livestock use may affect the decision identifying that allotment as being available for livestock use;

> c.  consultations resulting in new requirements or actions that are not in conformance with the existing land use plan to protect threatened or endangered species or critical habitats may require new land use plan decisions, including new or supplemental NEPA analysis;

> d.  new requirements or actions that affect land use allocations or areawide constraints or restrictions established at the land use plan level would require amendment of land use plan decisions;

> e.  current scientific knowledge, as reflected in scientific literature, could highlight a need to change plan decisions; and

> f.  public comment or a staff assessment supporting a different mix of uses on the lands that will better promote the long-term health and sustainability of the lands and their resources could require an amendment.

3.  Are implementation decisions no longer valid, based on new information or changed circumstances?  Site-specific resource-use levels or management actions normally do not require a land use plan amendment if the land use plan decisions provide broad direction for these uses and actions; however, they may require appropriate NEPA analysis.  For example:

BLM_0076131

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

a.  The level of livestock use permitted in an allotment may normally be modified based on allotment-specific resource assessment, condition, and trend-monitoring data.

b.  Resource use levels or management practices, such as permitted livestock use or pre-commercial forest thinning, may normally be modified or eliminated on a site-specific or project-level basis to satisfy the needs of threatened or endangered species or their critical habitat, as detailed in biological opinions or approved recovery plans.  Elimination of livestock grazing on an entire allotment is a management decision that should be thoroughly analyzed through the plan amendment process and not through a maintenance action.

4.  Are the effects of proposed or ongoing actions substantially different from those projected in the existing NEPA analyses associated with the existing RMP?  If "yes," conduct a new or supplemental NEPA analysis to the extent necessary to address the differences and document the findings.  Determine whether the new NEPA analysis should be conducted as part of a RMP plan amendment.

a.  Consider direct and indirect effects and their significance.

b.  Consider cumulative effects and whether the new information or circumstances identify or produce incremental impacts added to those resulting from other past, present, and reasonably foreseeable future management actions.  Does the additional effect, in the context of the ongoing action, require further mitigation or new RMP decisions?

For example, upon receipt of a proposal to develop an oil and gas field, the BLM would evaluate the proposal for conformance with the RMP.  If the proposal is consistent with the reasonably foreseeable development analyzed in the RMP/EIS and the proposal is consistent with the RMP decisions, changes to the RMP/EIS are probably not necessary.  In this instance, the BLM would work with the lease holders to obtain appropriate site-specific information, then prepare an activity-level EA or EIS to approve some or all of the wells in the field and set the stage for subsequent application for permit to drill approvals.

If the proposal exceeds the reasonably foreseeable development analyzed in the current RMP/EIS, a new reasonably foreseeable development scenario and NEPA analysis supplementing the RMP/EIS would be warranted.  If the proposal exceeds *and* is substantially different from the reasonably foreseeable development analyzed in the RMP/EIS, *and* the new NEPA analysis could reasonably be expected to result in changes to RMP decisions, a plan amendment may also be warranted.  When it is not certain whether the project proposal and resulting NEPA analysis will result in the need to amend the RMP, considerable time and cost savings will be achieved by beginning the process as a plan amendment (issuing a NOI).  If it is later determined that a plan amendment is not warranted, the amendment may be cancelled and the supplemental NEPA analysis continued.

BLM_0076132

41

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

The supplemental EIS/RMP amendment could also address site-specific review for some or all of the proposed wells and related facilities so that decisions on the field development could be made sequentially with the decisions regarding the proposed RMP amendment. Where site-specific development proposals are known, such a planning/NEPA effort would promote efficient NEPA analysis and result in both plan-level and implementation-level decisions in the same document, thus reducing the need for additional NEPA analysis.

5. In light of new information or circumstances, are there now inconsistencies between the ongoing action and the resource-related plans of Indian Tribes, state and local governments, or other Federal agencies that render earlier consistency findings invalid? Changes in land use plan decisions through amendment or revision must be accompanied by new consistency determinations.

Further NEPA analysis may be conducted to help determine whether decisions are still valid. It is possible to conduct additional NEPA analysis and reach a conclusion that no change is needed in decisions, but the decisions cannot be changed without additional NEPA analysis.

## D.  Documenting the Determination to Modify, or Not to Modify, Decisions or NEPA Analysis

It is important to document decisions to modify or not modify the land use plan or NEPA analysis when these decisions are reached as part of the formal land use plan evaluation process (Section V). In reviewing new information or circumstances that are controversial or of interest to the public, it is also important to provide all interested parties with written documentation of the BLM's determination.

In response to an outside application or internal proposal, a decision not to change land use decisions will be documented in the case file and/or in the response to the applicant. Case file documentation of decisions to not amend must be signed and dated by the Field Manager and State Director. If the decision not to amend the plan was made through a NEPA analysis, then that decision can be documented in the Plan Conformance section of the NEPA document. If the decision is to change decisions or revisit the NEPA analysis, the rationale to modify, revise, or further evaluate decisions or NEPA analysis may be documented in a NOI prepared during scoping activities or in the planning or NEPA document. Also see Section VII(B).

## E.  Evaluating New Proposals

New proposals can stem from specific BLM implementation actions, such as a proposal to prepare a livestock grazing allotment management plan, or from non-BLM-initiated proposals, such as a rights-of-way request for a new powerline.
A new proposal should provide enough detail to allow the BLM to determine whether it conforms to existing land use plan decisions and to facilitate screening for adequate NEPA compliance (See Figure 3). The NEPA Handbook (H-1790-1) describes the screening process in more detail.

BLM_0076133

42

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## F.  Plan Conformance

The term "plan conformance," as defined in the BLM planning regulations, means either that the plan specifically identifies a resource management action or (if not) the action is consistent with the terms, conditions, and decisions of the approved plan (43 CFR 1601.0-5(b)).  Key considerations in making and documenting conformance determinations include the following:

    1.  Do land use plan decisions allow, conditionally allow, or preclude the action?

    2.  Do land use plan decisions call for a new decision to accommodate the action?

    3.  If the plan does not specifically mention the action, how clearly consistent is the action with plan objectives, terms, conditions, and decisions?

## G.  Plan Conformance and Ongoing NEPA Activities

After the RMP is approved, any authorizations and management actions approved based on an activity-level or project-specific EIS (or EA) must be specifically provided for in the RMP or be consistent with the terms, conditions, and decisions in the approved RMP.  A land use plan amendment may be necessary to consider monitoring and evaluation findings, substantive new data, new or revised policy, changes in circumstances or a proposed action that may result in a change in the scope of resource uses or a change in the terms, conditions, and decisions of the approved RMP.  If the BLM determines that a plan amendment may be necessary, preparation of the EIS (or EA) and the analysis necessary for the amendment may occur simultaneously (43 CFR 1610.5).

In those instances when activity-level or project-specific EISs (or EAs) are being used to analyze an action that may not conform to the current land use plan, the BLM has several options:  adjust the actions or condition the authorization to conform to the plan or achieve consistency with the terms, conditions, and decisions in the approved RMP; or prepare the EIS (or EA) as a RMP amendment, as described in Section VII.

BLM_0076134

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## Key for Evaluating New Proposals

*This key poses the six critical screening questions (1 through 6 below) for any proposal or action (see BLM NEPA Handbook [H-1790-1] for additional detail).*

1. If the proposal or action conforms to existing land use plans, **go to 2.**
1. If the proposal or action does not, **go to 1a.**

   1a. If proposal or action warrants further consideration, **then amend plan[1] or modify proposal to conform.**
   1a. If proposal or action does not, **then deny action.**

2. If proposal or action is an exception from BLM/NEPA requirements, **then no additional NEPA analysis is necessary.**
2. If not, **then go to 3.**

3. If proposal or action normally requires an EIS, **go to 3a.**
3. If not, **go to 4.**

   3a. If impacts are expected to be significant, **go to 8.**
   3a. If not, **go to 7.**

4. If proposal or category of action is listed as a Categorical Exclusion, **go to 4a.**
4. If not, **go to 5.**

   4a. If any of the 10 exceptions apply, **go to 7.**
   4a. If none apply, **then the proposal or action is Categorically Excluded.**

5. If existing analysis and documentation is sufficient, **then Document NEPA Adequacy.**
5. If insufficient, **then go to 6.**

6. If environmental impacts are expected to be significant, **go to 8.**
6. If insignificant, **go to 7.**

7. Complete EA; if no significant impacts are identified, **then issue FONSI.**
7. Complete EA; if significant impacts are identified, **go to 8.**

8. **Proposal or action requires an EIS.**

---

[1] This may also be accomplished through a new plan, plan revision, or planning analysis.

**Figure 3—***Key for evaluating new proposals (an overview)*

BLM_0076135

44

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## H.  Determining When to Update Land Use Plan Decisions Through Maintenance Actions

The BLM regulation in 43 CFR 1610.5-4 provides that land use plan decisions and supporting components can be maintained to reflect minor changes in data.  Maintenance is limited to further refining, documenting, or clarifying  a previously approved decision incorporated in the plan.  Maintenance must not expand the scope of resource uses or restrictions or change the terms, conditions, and decisions of the approved plan.

Plan maintenance is not considered a plan amendment and does not require formal public involvement, interagency coordination, or the NEPA analysis required for making new land use plan decisions.  Maintenance actions must be documented in the plan or supporting components (i.e., recorded so that the change and Field Manager concurrence are evident).   Examples of maintenance actions include:

> 1.  Correcting minor data, typographical, mapping, or tabular data errors in the planning records after a plan or plan amendment has been completed;
>
> 2.  refining the boundary of an archaeological district based on new inventory data;
>
> 3.  applying an existing oil and gas lease stipulation to a new area prior to the lease sale based on new inventory data (e.g., apply an existing protective stipulation for sage-grouse to a newly discovered sage-grouse lek);
>
> 4.  refining the known habitat of a special status species addressed in the plan based on new information;
>
> 5.  modifying or waiving the lease stipulation language in the RMP consistent with the criteria outlined in the land use plan; and
>
> 6.  refining or adjusting the boundary of a fire management unit (FMU) or other equivalent fire-related polygon through interagency coordination based on updated fire regime condition class inventory, fire occurrence, monitoring data, and/or demographic changes.

Plan maintenance must occur continuously so that the RMP and its supporting records reflect the current status of decision implementation and knowledge of resource conditions.

## VII. Amending and Revising Decisions

## A.  Changing Land Use Plan Decisions

Land use plan decisions are changed through either a plan amendment or a plan revision.  The process for conducting plan amendments is basically the same as the land use planning process used in creating RMPs.  The primary difference is that circumstances may allow for completing a plan amendment through the EA process, rather than through the EIS or supplemental EIS process.  The process for preparing plan revisions is the same as for preparing new RMPs, and an

BLM_0076136

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

EIS is always required.  Refer to Section III for an overview of the EIS-level and EA-level planning processes.

## B.  Determining When it is Necessary to Amend Plans and How it is Accomplished

Plan amendments (see 43 CFR 1610.5-5) change one or more of the terms, conditions, or decisions of an approved land use plan.  These decisions may include those relating to desired outcomes; measures to achieve desired outcomes, including resource restrictions; or land tenure decisions.  Plan amendments are most often prompted by the need to:

1.  Consider a proposal or action that does not conform to the plan;

2.  implement new or revised policy that changes land use plan decisions, such as an approved conservation agreement between the BLM and the USFWS;

3.  respond to new, intensified, or changed uses on public land; and

4.  consider significant new information from resource assessments, monitoring, or scientific studies that change land use plan decisions.

The BLM regulations in 43 CFR 1600 and the NEPA process detailed in the CEQ regulations in 40 CFR 1500 guide preparation of plan amendments.  The process is tailored to the anticipated level of public interest and potential for significant impacts.  In simple, routine cases, it is possible to complete the amendment process in less than 6 months.  See Section III for procedures for preparing land use plan decisions.

Plans needing amendment may be grouped geographically or by type of decision in the same amendment process.  Similarly, one amendment process may amend the same or related decisions in more than one land use plan.  The amendment process may also be used to update plans adopted from another agency.

In reaching a decision to amend a land use plan, the BLM must not only consider the resource, but also other workload priorities, budgetary constraints, and staff capabilities.  In situations where available budgets allow and staff capabilities are restricted, consider contracting for all or portions of the plan amendment's NEPA analysis, including baseline data acquisition.  If the manager decides not to amend, then nonconforming actions cannot be taken.  Any proposal requiring an activity-level or project-specific and programmatic EIS that could result in new or modified RMP decisions, or the need to amend the current RMP prior to implementation, should be prepared as a RMP amendment whenever feasible.

Activity-level or project-specific EISs that address significant new information or circumstances not considered in the EIS for the current land use plan should be prepared as supplements to the EIS for the RMP whenever feasible.  In most cases, if a supplement to the RMP/EIS is necessary, the BLM should also consider whether or not a simultaneous plan amendment is necessary.

46

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

Where a proposal is not in conformance with the land use plan, the Field Manager may deny the proposal without further review.  The decision to deny is subject to appeal to IBLA.

An applicant may request that BLM amend the land use plan to allow an otherwise non-conforming proposal.  If the Field Manager determines that the request is warranted, a plan amendment is initiated.  If not warranted, the Field Manager submits to the State Director a recommendation to deny, along with appropriate supporting documentation.  Denial of a request to amend the plan is a plan level decision made by the State Director and is protestable to the BLM director under 43 CFR 1610.5-2(a) (*Carrasco, 90 IBLA 39 (1985)*).

The State Director may terminate an ongoing plan amendment at any point if the Field Manager provides documentation that the amendment is no longer necessary or appropriate.  This is also a protestable decision under 43 CFR 1610.5-2(a).

In either case, whether an appealable or protestable action is taken, the Field Manager should provide public notice of the action and the applicable protest or appeal procedures through news release, letter to mailing list, or other appropriate means.  No *Federal Register* notice is required.

## C.  Determining When it is Necessary to Revise an RMP or Replace an MFP

RMP revisions (see 43 CFR 1610.5-6) involve preparation of a new RMP to replace an existing one.  RMP revisions are necessary if monitoring and evaluation findings, new data, new or revised policy, or changes in circumstances indicate that decisions for an entire plan or a major portion of the plan no longer serve as a useful guide for resource management.  Plan revisions are prepared using the same procedures and documentation as for new plans.

As funding and capability permit, all MFPs will be replaced by RMPs.  The priority for replacing MFPs will be guided by the extent to which those plans fail to meet the statutory requirements for land use planning in FLPMA (see Section II(A)), and the need to modify decisions to meet resource management needs.

## D.  Changing Implementation Decisions

Implementation decisions are changed through an interdisciplinary NEPA process in conjunction with the BLM resource program-specific guidance.

Any NEPA analysis that will be used to approve on-the-ground actions in conformance with the current RMP should include the appropriate level of site-specific information to facilitate approval of as many of the implementation actions as possible and reduce the need for additional NEPA analysis.

During an on-going RMP revision, it is possible to amend the current RMP to implement an action analyzed in an activity-level or project-specific EA or EIS.  The BLM must carefully consider the implications of the information and analysis being prepared for either document.  At a minimum, the documents must be carefully coordinated to ensure consistent utilization of available information and analysis.

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## E.  Status of Existing Decisions During the Amendment or Revision Process

Existing land use plans decisions remain in effect during an amendment or revision until the amendment or revision is completed and approved.  The decisions of existing land use plans do not change.  For example, if current land use plans have designated lands open for a particular use, they remain open for that use.  Land use plan decisions may be changed only through the amendment or revision process.

During the amendment or revision process, the BLM should review all proposed implementation actions through the NEPA process to determine whether approval of a proposed action would harm resource values so as to limit the choice of reasonable alternative actions relative to the land use plan decisions being reexamined.  Even though the current land use plan may allow an action, the BLM manager has the discretion to defer or modify proposed implementation-level actions and require appropriate conditions of approval, stipulations, relocations, or redesigns to reduce the effect of the action on the values being considered through the amendment or revision process.  The appropriate modification to the proposed action is subject to valid existing rights and program-specific regulations.  A decision to temporarily defer an action could be made where a different land use or allocation is currently being considered in the preferred alternative of a draft or proposed RMP revision or amendment.  These decisions would be specific to individual projects or activities and must not lead to an area-wide moratorium on certain activities during the planning process.

## F.  Coordinating Simultaneous Planning/NEPA Processes

When preparing an activity-level or project-specific EIS (or EA) during an on-going RMP revision (with its accompanying EIS), there may be opportunities to consolidate some components of the NEPA process, such as the cumulative effects analysis, and public involvement activities, such as public meetings and mailings, to reduce overall costs and simplify the overlapping processes for the public.  Depending on the timing of the two decisions (one for the activity-level or project-specific EIS or EA and one for the on-going RMP revision), and the conformance of the management actions to be approved in the EIS or EA, the BLM may chose to amend the RMP in order to implement the proposed actions being analyzed in the EIS or EA prior to completing the on-going RMP revision.  In such cases, the BLM must consider the effect of amending the RMP on the on-going RMP revision process.  Depending on the nature of the new land use plan decisions, the alternatives to be considered in the on-going RMP revisions process, such as the no action alternative, may need to be modified.  Any land use plan decision changed during the on-going RMP revision process could also have a "ripple" effect on many elements of the analysis being prepared for the on-going RMP, such as the purpose and need, affected environment, and environmental effects section.

BLM_0076139

BLM_0076140

Case No. 1:20-cv-02484-MSK   Document 52-14   filed 04/28/21   USDC Colorado   pg 77 of 228

**Glossary of Terms and Acronyms**

Following are the acronyms and definitions for terms used in this Handbook.  Also see definitions for terms used in Section 103 of FLPMA and the planning regulations at 43 CFR 1601.0-5.  This glossary does not supersede these definitions or those in other laws or regulations.

<u>Terms</u>

**Activity plan** ~ a type of implementation plan (see *Implementation plan*); an activity plan usually describes multiple projects and applies best management practices to meet land use plan objectives.  Examples of activity plans include interdisciplinary management plans, habitat management plans, recreation area management plans, and allotment management plans.

**Alternative dispute resolution** ~ any process used to prevent, manage, or resolve conflicts using procedures other than traditional courtroom litigation or formal agency adjudication.

**Amendment** ~ the process for considering or making changes in the terms, conditions, and decisions of approved RMPs or MFPs.  Usually only one or two issues are considered that involve only a portion of the planning area.

**Assessment** ~ the act of evaluating and interpreting data and information for a defined purpose.

**Beneficial outcomes** ~ also referenced as "Recreation Benefits"; improved conditions, maintenance of desired conditions, prevention of worse conditions, and the realization of desired experiences.

**Best management practices (BMPs)** ~ a suite of techniques that guide, or may be applied to, management actions to aid in achieving desired outcomes.  BMPs are often developed in conjunction with land use plans, but they are not considered a land use plan decision unless the land use plan specifies that they are mandatory.  They may be updated or modified without a plan amendment if they are not mandatory.

**Broadscale data** ~ broadscale data sets are intended to support state, multi-state, or regional information needs.  Such data could be used for bioregional assessments and conservation strategies, and typically employ a map scale of 1:250,000.

**Categorical exclusion (CX)** ~ a category of actions (identified in agency guidance) that do not individually or cumulatively have a significant effect on the human environment, and for which neither an environmental assessment nor an EIS is required (40 CFR 1508.4).

**Closed** ~ generally denotes that an area is not available for a particular use or uses; refer to specific definitions found in law, regulations, or policy guidance for application to individual programs.  For example, 43 CFR 8340.0-5 sets forth the specific meaning of "closed" as it relates to off-highway vehicle use, and 43 CFR 8364 defines "closed" as it relates to closure and restriction orders.

BLM_0076141

Glossary - 2

H-1601-1 — LAND USE PLANNING HANDBOOK

**Collaboration** ~ a cooperative process in which interested parties, often with widely varied interests, work together to seek solutions with broad support for managing public and other lands.

**Collaborative partnerships** ~ refers to people working together, sharing knowledge and resources, to achieve desired outcomes for public lands and communities within statutory and regulatory frameworks.

**Community recreation-tourism market** ~ a community or communities dependent on public lands recreation and/or related tourism use, growth, and/or development. Major investments in facilities and visitor assistance are authorized within SRMAs where BLM's strategy is to target demonstrated community recreation-tourism market demand. Here, recreation management actions are geared toward meeting primary recreation-tourism market demand for specific activity, experience, and benefit opportunities. These opportunities are produced through maintenance of prescribed natural resource and/or community setting character and by structuring and implementing management, marketing, monitoring, and administrative actions accordingly.

**Conformance** ~ means that a proposed action shall be specifically provided for in the land use plan or, if not specifically mentioned, shall be clearly consistent with the goals, objectives, or standards of the approved land use plan.

**Conservation agreement** ~ a formal signed agreement between the USFWS or NOAA-Fisheries and other parties that implements specific actions, activities, or programs designed to eliminate or reduce threats to, or otherwise improve the status of a species. Conservation agreements can be developed at a state, regional, or national level and generally include multiple agencies at both the state and Federal level, as well as Tribes. Depending on the types of commitments the BLM makes in a conservation agreement and the level of signatory authority, plan revisions or amendments may be required prior to signing the conservation agreement, or subsequently in order to implement the conservation agreement.

**Conservation strategy** ~ a strategy outlining current activities or threats that are contributing to the decline of a species, along with the actions or strategies needed to reverse or eliminate such a decline or threats. Conservation strategies are generally developed for species of plants and animals that are designated as BLM sensitive species or that have been determined by the USFWS or NOAA-Fisheries to be Federal candidates under the Endangered Species Act.

**Consistency** ~ means that the proposed land use plan does not conflict with officially approved plans, programs, and policies of Tribes, other Federal agencies, and state and local governments (to the extent practical with Federal law, regulation, and policy).

**Cooperating agency** ~ assists the lead Federal agency in developing an EA or EIS. The CEQ regulations implementing NEPA define a cooperating agency as any agency that has jurisdiction by law or special expertise for proposals covered by NEPA (40 CFR 1501.6). Any Federal, state, local government jurisdiction with such qualifications may become a cooperating agency by agreement with the lead agency.

H-1601-1 — LAND USE PLANNING HANDBOOK

**Designated roads and trails** ~ specific roads and trails identified by the BLM (or other agencies) where some type of motorized vehicle use is appropriate and allowed either seasonally or year-long.

**Desired outcomes** ~ a type of land use plan decision expressed as a goal or objective.

**Destination recreation-tourism market** ~ national or regional recreation-tourism visitors and other constituents who value public lands as recreation-tourism destinations. Major investments in facilities and visitor assistance are authorized within SRMAs where BLM's strategy is to target demonstrated destination recreation-tourism market demand. Here, recreation management actions are geared toward meeting primary recreation-tourism market demand for specific activity, experience, and benefit opportunities. These opportunities are produced through maintenance of prescribed natural resource setting character and by structuring and implementing management, marketing, monitoring, and administrative actions accordingly.

**Director (BLM Director)** ~ the national Director of the BLM.

**Documentation of Land Use Plan conformance and NEPA adequacy (DNA)** ~ a worksheet for determining and documenting that a new, site-specific proposed action both conforms to the existing land use plan(s) and is adequately analyzed in existing NEPA documents. The signed conclusion in the worksheet is an interim step in BLM's internal analysis process and is not an appealable decision.

**Environmental Justice** ~ the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies. Fair treatment means that no group of people, including racial, ethnic, or socio-economic group should bear a disproportionate share of the negative environmental consequences resulting from industrial, municipal, and commercial operations or the execution of Federal, state, local, and Tribal programs and policies (see Executive Order 12898).

**Evaluation (plan evaluation)** ~ the process of reviewing the land use plan and the periodic plan monitoring reports to determine whether the land use plan decisions and NEPA analysis are still valid and whether the plan is being implemented.

**Explicit recreation management objective** ~ specifically targeted recreation activity, experience, and benefit opportunities (i.e., recreation opportunity outputs) and their attainment (i.e., recreation outcomes).

**Extensive recreation management area (ERMA)** ~ a public lands unit identified in land use plans containing all acreage not identified as a SRMA. Recreation management actions within an ERMA are limited to only those of a custodial nature.

**Fine-scale data** ~ fine-scale data sets support local information needs and represent the highest thematic detail and spatial accuracy. Data at this scale are intended for project-specific planning, monitoring, and evaluation, and would be typically represented at the 1:24,000 map scale.

BLM_0076143

H-1601-1 — LAND USE PLANNING HANDBOOK

**Geographic information system** ~ a system of computer hardware, software, data, people and applications that capture, store, edit, analyze, and graphically display a potentially wide array of geospatial information.

**Goal** ~ a broad statement of a desired outcome; usually not quantifiable and may not have established timeframes for achievement.

**Guidelines** ~ actions or management practices that may be used to achieve desired outcomes, sometimes expressed as best management practices. Guidelines may be identified during the land use planning process, but they are not considered a land use plan decision unless the plan specifies that they are mandatory. Guidelines for grazing administration must conform to 43 CFR 4180.2.

**Implementation decisions** ~ decisions that take action to implement land use plan decisions; generally appealable to IBLA under 43 CFR 4.410.

**Implementation plan** – an area or site-specific plan written to implement decisions made in a land use plan. Implementation plans include both activity plans and project plans (they are types of implementation plans).

**Indian Tribe (or Tribe)** ~ any Indian group in the conterminous United States that the Secretary of the Interior recognizes as possessing Tribal status (listed periodically in the *Federal Register*).

**Land use allocation** ~ the identification in a land use plan of the activities and foreseeable development that are allowed, restricted, or excluded for all or part of the planning area, based on desired future conditions.

**Land Use Plan** ~ a set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of FLPMA; an assimilation of land-use-plan-level decisions developed through the planning process outlined in 43 CFR 1600, regardless of the scale at which the decisions were developed. The term includes both RMPs and MFPs.

**Land Use Plan boundary** ~ a BLM land use plan boundary is defined as the geographic extent of a RMP or MFP.

**Land Use Plan decision** ~ establishes desired outcomes and actions needed to achieve them. Decisions are reached using the planning process in 43 CFR 1600. When they are presented to the public as proposed decisions, they can be protested to the BLM Director. They are not appealable to IBLA.

**Limited** ~ generally denotes that an area or roads and trails are available for a particular use or uses. Refer to specific program definitions found in law, regulations, or policy guidance for application to individual programs. For example, 43 CFR 8340.0-5 defines the specific meaning of "limited" as it relates to off-highway vehicle use.

BLM_0076144

**Management decision** ~ a decision made by the BLM to manage public lands.  Management decisions include both land use plan decisions and implementation decisions.

**Midscale data** ~ midscale data sets support information needs at scales between the local and state/regional.  Such a level is usually represented at the 1:100,000 scale.  Typical usage includes land use planning, rangeland monitoring, and assessment.

**Monitoring (plan monitoring)** ~ the process of tracking the implementation of land use plan decisions and collecting and assessing data/information necessary to evaluate the effectiveness of land use planning decisions.

**Multijurisdictional planning** ~ collaborative planning in which the purpose is to address land use planning issues for an area, such as an entire watershed or other landscape unit, in which there is a mix of public and/or private land ownerships and adjoining or overlapping Tribal, state, local government, or other Federal agency authorities.

**Objective** ~ a description of a desired outcome for a resource.  Objectives can be quantified and measured and, where possible, have established timeframes for achievement.

**Off-highway vehicle (off-road vehicle)** ~ any motorized vehicle capable of, or designed for, travel on or immediately over land, water, or other natural terrain, excluding:  (1) any nonamphibious registered motorboat; (2) any military, fire, emergency, or law enforcement vehicle while being used for emergency purposes; (3) any vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved; (4) vehicles in official use; and (5) any combat or combat support vehicle when used for national defense.

**Open** ~ generally denotes that an area is available for a particular use or uses.  Refer to specific program definitions found in law, regulations, or policy guidance for application to individual programs.  For example, 43 CFR 8340.0-5 defines the specific meaning of "open" as it relates to off-highway vehicle use.

**Planning analysis** ~ a process using appropriate resource data and NEPA analysis to provide a basis for decisions in areas not yet covered by an RMP.

**Planning criteria** ~ the standards, rules, and other factors developed by managers and interdisciplinary teams for their use in forming judgments about decision making, analysis, and data collection during planning.  Planning criteria streamline and simplify the resource management planning actions.

**Project plan** ~ a type of implementation plan (see *Implementation plan*).  A project plan typically addresses individual projects or several related projects.  Examples of project plans include prescribed burn plans, trail plans, and recreation site plans.

**Public land** ~ land or interest in land owned by the United States and administered by the Secretary of the Interior through the BLM without regard to how the United States acquired

BLM_0076145

H-1601-1 — LAND USE PLANNING HANDBOOK

ownership, except lands located on the Outer Continental Shelf, and land held for the benefit of Indians, Aleuts, and Eskimos.

**Recreation experiences** ~ psychological outcomes realized either by recreation-tourism participants as a direct result of their onsite leisure engagements and recreation-tourism activity participation or by non-participating community residents as a result of their interaction with visitors and guests within their community and/or interaction with the BLM and other public and private recreation-tourism providers and their actions.

**Recreation management zones (RMZ)** ~ subunits within a SRMA managed for distinctly different recreation products.  Recreation products are comprised of recreation opportunities, the natural resource and community settings within which they occur, and the administrative and service environment created by all affecting recreation-tourism providers, within which recreation participation occurs.

**Recreation niche** ~ the place or position within the strategically targeted recreation-tourism market for each SRMA that is most suitable (i.e., capable of producing certain specific kinds of recreation opportunities) and appropriate (i.e., most responsive to identified visitor or resident customers), given available supply and current demand, for the production of specific recreation opportunities and the sustainable maintenance of accompanying natural resource and/or community setting character.

**Recreation opportunities** ~ favorable circumstances enabling visitors' engagement in a leisure activity to realize immediate psychological experiences and attain more lasting, value-added beneficial outcomes.

**Recreation opportunity spectrum (ROS)** ~ one of the existing tools for classifying recreation environments (existing and desired) along a continuum ranging from primitive, low-use, and inconspicuous administration to urban, high-use, and a highly visible administrative presence. This continuum recognizes variation among various components of any landscape's physical, social and administrative attributes; and resulting descriptions (of existing conditions) and prescriptions (of desired future conditions) define recreation setting character.

**Recreation setting character conditions** ~ the distinguishing recreational qualities of any landscape, objectively defined along a continuum ranging from primitive to urban landscapes, expressed in terms of the nature of the component parts of its physical, social and administrative attributes.  These recreational qualities can be both classified and mapped.  This classification and mapping process should be based on variation that either exists (i.e., setting descriptions) or is desired (i.e., setting prescriptions) among component parts of the various physical, social, and administrative attributes of any landscape.  The recreation opportunity spectrum is one of the existing tools for doing this.

**Recreation settings** ~ the collective, distinguishing attributes of landscapes that influence, and sometimes actually determine, what kinds of recreation opportunities are produced.

BLM_0076146

**Recreation-tourism market** ~ recreation-tourism visitors, affected community residents, affecting local governments and private sector businesses, or other constituents and the communities or other places where these customers originate (local, regional, national, or international).  Based on analysis of supply and demand, land use plans strategically identify primary recreation-tourism markets for each SRMA—destination, community, or undeveloped.

**Resource advisory council (RAC)** ~ a council established by the Secretary of the Interior to provide advice or recommendations to BLM management.  In some states, provincial advisory councils (PACs) are functional equivalents of RACs.

**Resource use level** ~ the level of use allowed within an area, based on the desired outcomes and land use allocations in the land use plan.  Targets or goals for resource use levels are established on an area-wide or broad watershed level in the land use plan.  Site-specific resource use levels are normally determined at the implementation level, based on site-specific resource conditions and needs as determined through resource monitoring and assessments.

**Revision** ~ the process of completely rewriting the land use plan due to changes in the planning area affecting major portions of the plan or the entire plan.

**Scale** ~ refers to the geographic area and data resolution under examination in an assessment or planning effort.

**Setting character** ~ the condition of any recreation system, objectively defined along a continuum ranging from primitive to urban in terms of variation of its component physical, social, and administrative attributes.

**Social science** ~ the study of society and of individual relationships in and to society, generally including one or more of the academic disciplines of sociology, economics, political science, geography, history, anthropology, and psychology.

**Special recreation management area (SRMA)** ~ a public lands unit identified in land use plans to direct recreation funding and personnel to fulfill commitments made to provide specific, structured recreation opportunities (i.e., activity, experience, and benefit opportunities).  Both land use plan decisions and subsequent implementing actions for recreation in each SRMA are geared to a strategically identified primary market—destination, community, or undeveloped.

**Special status species** ~ includes proposed species, listed species, and candidate species under the Endangered Species Act; state-listed species; and BLM State Director-designated sensitive species (see BLM Manual 6840, Special Status Species Policy).

**Standard** ~ a description of the physical and biological conditions or degree of function required for healthy, sustainable lands (e.g., Land Health Standards).  To be expressed as a desired outcome (goal).

**State implementation plan (SIP)** ~ a strategic document, prepared by a state (or other authorized air quality regulatory agency) and approved by the EPA, that thoroughly describes

BLM_0076147

how requirements of the Clean Air Act will be implemented (including standards to be achieved, control measures to be applied, enforcement actions in case of violation, etc.).

**Strategic plan (DOI strategic plan)** ~ a plan that establishes the overall direction for all DOI Bureaus, including the BLM.  This plan is guided by the requirements of the Government Performance and Results Act of 1993, covers a 5-year period, and is updated every 3 years.  It is consistent with FLPMA and other laws affecting the public lands.

**Total maximum daily load (TMDL)** ~ an estimate of the total quantity of pollutants (from all sources:  point, nonpoint, and natural) that may be allowed into waters without exceeding applicable water quality criteria.

**Travel management areas** ~ polygons or delineated areas where a rational approach has been taken to classify areas open, closed, or limited, and have identified and/or designated network of roads, trails, ways, and other routes that provide for public access and travel across the planning area.  All designated travel routes within travel management areas should have a clearly identified need and purpose as well as clearly defined activity types, modes of travel, and seasons or timeframes for allowable access or other limitations.

**Tribe** ~ see Indian Tribe.

**Undeveloped recreation-tourism market** ~ national, regional, and/or local recreation-tourism visitors, communities, or other constituents who value public lands for the distinctive kinds of dispersed recreation produced by the vast size and largely open, undeveloped character of their recreation settings.  Major investments in facilities are excluded within SRMAs where BLM's strategy is to target demonstrated undeveloped recreation-tourism market demand.  Here, recreation management actions are geared toward meeting primary recreation-tourism market demand to sustain distinctive recreation setting characteristics; however, major investments in visitor services are authorized both to sustain those distinctive setting characteristics and to maintain visitor freedom to choose where to go and what to do—all in response to demonstrated demand for undeveloped recreation.

**Visual resource management classes** ~ categories assigned to public lands based on scenic quality, sensitivity level, and distance zones.  There are four classes.  Each class has an objective which prescribes the amount of change allowed in the characteristic landscape.

**Watershed approach** – a framework to guide watershed management that: (1) uses watershed assessments to determine existing and reference conditions; (2) incorporates assessment results into resource management planning; and (3) fosters collaboration with all landowners in the watershed.  The framework considers both ground and surface water flow within a hydrologically defined geographical area.

BLM_0076148

H-1601-1 — LAND USE PLANNING HANDBOOK

## Acronyms

| | |
|---|---|
| **ACEC** | area of critical environmental concern |
| **ADR** | alternative dispute resolution |
| **AML** | appropriate management level |
| **AMS** | analysis of the management situation |
| **APD** | application for permit to drill |
| **AUM** | animal unit month |
| | |
| **BLM** | Bureau of Land Management |
| **BMP** | best management practice |
| | |
| **CEQ** | Council on Environmental Quality |
| **CFR** | Code of Federal Regulations |
| **CX** | categorical exclusion |
| | |
| **DM** | Departmental Manual |
| **DNA** | documentation of land use plan conformance and NEPA adequacy |
| **DOI** | Department of the Interior |
| **DR** | decision record (for an EA) |
| | |
| **EA** | environmental assessment |
| **EFH** | essential fish habitat |
| **EIS** | environmental impact statement |
| **EPA** | Environmental Protection Agency |
| **EPS** | Economic Profile System |
| **EPSC** | Economic Profile System for Communities |
| **ERMA** | extensive recreation management area |
| **ESA** | Endangered Species Act |
| | |
| **FACA** | Federal Advisory Committee Act |
| **FLPMA** | Federal Land Policy and Management Act |
| **FLTFA** | Federal Land Transaction Facilitation Act |
| **FOIA** | Freedom of Information Act |
| **FONSI** | finding of no significant impact |
| | |
| **GIS** | geographic information system |
| **GSA** | Government Services Agency |
| | |
| **HA** | herd area |
| **HMA** | herd management area |
| | |
| **IBLA** | Interior Board of Land Appeals |
| **IDT** | interdisciplinary team |
| | |
| **LAC** | limits of acceptable change |

BLM_0076149

Glossary - 10

H-1601-1 — LAND USE PLANNING HANDBOOK

**MFP**    management framework plan
**MOA**    memorandum of agreement
**MOU**    memorandum of understanding

**NEPA**    National Environmental Policy Act
**NHPA**    National Historic Preservation Act
**NLCS**    National Landscape Conservation System
**NMFS**    National Marine Fisheries Service
**NOA**    notice of availability
**NOAA**    National Oceanic and Atmospheric Administration
**NOI**    notice of intent

**OEPC**    Office of Environmental Policy and Compliance
**OEPR**    Office of Environmental Policy Review
**OHV**    off-highway vehicle (also refers to off-road vehicles)
**OMB**    Office of Management and Budget

**PAC**    provincial advisory council
**PILT**    payments-in-lieu-of-taxes
**PSQ**    probable sale quantity

**RAC**    resource advisory council
**RMP**    resource management plan
**RMZ**    recreation management zone
**ROD**    record of decision (for an EIS)
**ROS**    recreation opportunity spectrum
**ROW**    right-of-way

**SHPO**    State Historic Preservation Office
**SRMA**    special recreation management area

**T&E**    threatened and endangered
**TMDL**    total maximum daily load

**U.S.C.**    United States Code
**USDA**    U.S. Department of Agriculture
**USFWS**    U.S. Fish and Wildlife Service

**VRM**    visual resource management

**WO**    Washington Office

H-1601-1 — LAND USE PLANNING HANDBOOK

**Appendix A:  Guide to Collaborative Planning**

## I.  Principles

Collaboration implies that Tribal, state, and local governments, other Federal agencies, and the public will be involved well before the planning process is officially initiated, rather than only at specific points stipulated by regulation and policy.  The first-hand experience of BLM Field Managers and staff has resulted in the following suggested guidelines for collaboration.

    A.  *Recognize Tribal, state, and local governments' role in the planning process.*  FLPMA, Section 202(c)(9), as paraphrased, requires meaningful participation by local officials and consistency, to the extent practicable, with officially approved plans of Tribal, state, and local governments so long as the plans are consistent with Federal laws and regulations.  Early involvement will help ensure that the BLM develops land use decisions that are supported by and conform to other jurisdictions in the area to the maximum extent possible.

    B.  *Be inclusive and explicitly acknowledge the interests of distant groups, individuals, industry, corporations, and other agencies.*  An effective collaborative process for public land planning assures that local, regional, and national interests are integrated.  Distant interests are sought out and encouraged.  Effective outreach is the best way to get beyond the barriers to successful participation.  Ensure multiple options for participation.

    C.  *Clearly cite the authority of collaborative groups, including that of the BLM, and ensure accountability.*  Participants must understand the roles of all parties in the planning effort.  If the planning effort includes other participants with jurisdictional responsibilities or decision-making authority, the responsibilities of each must be clearly identified.  Decisions made by each jurisdiction must be within their own authorities.  The BLM retains decision-making authority for all decisions on BLM lands.  The BLM does not need to be the lead agency for agency personnel to participate in collaborative efforts.

    D.  *Use collaboration to enhance and complement standard public involvement requirements.*  Individuals or groups that were unable or chose not to participate in a collaborative process are still entitled to full input through legally required public review and comment processes.

    E.  *Recognize that collaborative processes may not be effective everywhere.*  The BLM manager retains the authority to manage the planning process and may choose to move forward with traditional planning processes if collaborative efforts are ineffective or become unacceptably lengthy.

BLM_0076151

Appendix A, page 2

H-1601-1 — LAND USE PLANNING HANDBOOK

## II. Practices

A. *Face-to-face or one-on-one communication provides the best means of building trust and good working relationships.* Be sure to ask yourself and others questions such as the following:

1. Who else should I talk to? Who else should be involved? Whom do I need to approach to ensure the best contacts are made? How can the BLM assure sufficiently diverse participation to adequately reflect local, regional, and national interests?

2. What formal and informal opportunities for communication could be used to relay the BLM's message?

B. *On a local level, postings on local bulletin boards and face-to-face communication may best serve community needs when presented in both English and local languages, depending on the unique characteristics of each community.* Consider the following questions:

1. How does this community receive and send information? Would the use of Internet technology, such as websites and e-mail, be effective?

2. Are there community meetings where information and ideas are exchanged?

Although this approach may seem time consuming at first, it is eventually very effective in communicating efficiently with a large number of people, motivating people to implement the agreed upon strategy, building trust, and encouraging broad-based participation. It may seem daunting in urban settings, but the same approach can be effective once the above questions are answered. This approach provides the BLM with a technique to more effectively engage the public in the decision-making process, which normally leads to increased support for the decisions ultimately reached. This approach also provides an early alert to emerging issues, giving a BLM manager more time and flexibility to resolve issues up front. As issues are resolved dynamically, conflict diminishes. These methods can be used in advance of, and are complementary to, a standard communications plan that defines what communications products are needed, who is responsible for producing them, and when specific products must be delivered.

BLM offices should maintain mailing lists of individuals and organizations that request involvement in specific activities or areas, such as rangeland developments or ACECs. NOIs and NOAs for planning/NEPA processes, along with other materials should be provided as requested. Offices should also maintain a listing of planned or ongoing planning/NEPA processes, make these lists available to the public, and encourage public participation throughout the decision-making process.

BLM_0076152

H-1601-1 — LAND USE PLANNING HANDBOOK

## III. Benefits

Benefits of collaboration include the following:

    A. *Better decisions are made.*  Concerns are heard and addressed, information and technical knowledge are shared, mutual goals and actions to achieve these goals are agreed upon, and plans are easier to implement as a result.  Solutions tend to be more long-term and hold up to legal scrutiny.  Through collaboration with different landowners and jurisdictions, BLM can more effectively plan for the protection and use of the resources it administers.

    B. *Resources are leveraged more effectively.*  There are a variety of cost-share arrangements and grants available for collaborative and partnership initiatives that can help implement on-the-ground projects.

    C. *Relationships are improved.*  Collaboration encourages people to continue to talk despite differences and changing circumstances, thus improving the ability to resolve conflict and build trust among participants.

## IV. Tools

It is highly recommended that training on collaborative skills be completed before undertaking initiatives to work with private citizens and groups.  The BLM National Training Center offers a series of courses, "The Partnership Series," which can be taught in BLM locations to mixed public-private audiences rather than at the National Training Center.  Visit their website at www.ntc.blm.gov/partner for more information.

Innovative partnerships and assistance agreements are very helpful to launching collaborative efforts.  The BLM Washington Office's Planning, Assessment, and Community Support Group (WO-210) can provide more information.

The BLM and the Sonoran Institute have prepared "A Desktop Reference Guide to Collaborative, Community-Based Planning" which is available at BLM state and field offices.  This guide provides suggestions and examples for collaborative planning.

Also see Executive Order 13352 (Facilitation of Cooperative Conservation).

BLM_0076154

## Appendix B:  Federal Advisory Committee Act Considerations

### I.  Purpose

The Federal Advisory Committee Act (FACA), 5 U.S.C.A. App. 2 (86 Stat. 770, as amended), was enacted on October 6, 1972, to reduce narrow special-interest group influence on decision-makers, to foster equal access to the decision-making process for the general public, and to control costs by preventing the establishment of unnecessary advisory committees.  The FACA applies whenever a statute or an agency official establishes or utilizes a committee, board, commission or similar group for the purpose of obtaining advice or recommendations on issues or policies within the agency official's responsibility.

The BLM's managers and staff must understand the provisions of FACA both when they are gathering public input for decision-making processes and when they are working in collaborative efforts, including Alternative Dispute Resolution, to ensure BLM's collaborative efforts comply with FACA.  In essence, any time a group will be consulted or will be providing recommendations to a BLM official, the BLM should verify whether FACA applies and, if so, ensure that the FACA requirements are followed.  If the BLM fails to comply with FACA, it will leave its decisions and products open to challenge in court.

### II.  Implementing FACA

### A.  <u>Avoiding Violations</u>

To avoid violating the FACA, BLM managers should:

   1.  Consider whether FACA applies to any current or proposed collaborative or group activity.  FACA will apply if a group is established or utilized by the BLM for the purpose of obtaining advice.  In reaching decisions whether FACA will apply, managers should refer to the General Services Administration's (GSA) regulations at 41 CFR 102-3 and consult with the Office of the Solicitor.  Further information about when FACA applies, including the FACA regulations, can be found at www.policyworks.gov/org/main/mc/linkit.htm or in the Committee Management Secretariat section of the GSA website.

        a.  If FACA applies, establishing a committee requires consultation with GSA, filing a charter, publishing a notice in the *Federal Register*, and opening meetings of the group to the public.  Also see 43 CFR 1784 (Advisory Committees).

        b.  Existing groups are covered by FACA if they are "utilized" by a Federal agency.  A group is "utilized" whenever a Federal agency exercises actual management or control over its operation.

   2.  For those groups covered by FACA, verify that its requirements are followed, including the filing of an appropriate charter, balancing the membership, informing the public of its meetings (time, place, purpose, etc.) through *Federal Register* publication,

BLM_0076155

Appendix B, page 2

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

and opening the meetings to the public.  Consult with FACA experts to ensure compliance with its procedures.  Also see 43 CFR 1784 (Advisory Committees).

Collaborative groups that are not initiated by the BLM can avoid application of FACA and can continue to have active BLM participation by maintaining their independence from BLM actual management or control.

## B.  Determining if FACA Applies

Figure 4 outlines the basic requirements to determine if the provisions of FACA apply.  If there is any doubt, the BLM field office should consult its Solicitor.  The field office must determine whether FACA applies to a particular collaborative effort, and if it does, whether it would be beneficial to pursue the effort by chartering the group under FACA or making it a subgroup of a RAC (see 43 CFR 1784.6-2).  Answers to the following questions can be helpful in determining whether FACA does or does not apply:

> 1.  Does the group include individuals who are not employees of Tribal, state, or local governments or other Federal agencies?
>
> 2.  Does the group have a formal organizational structure?
>
> 3.  How was the group or meeting initiated?  Specifically, was the group established by the BLM?
>
> 4.  Is the group subject to agency actual management or control?
>
> 5.  What is the function of the group?  Is it providing consensus advice or recommendations as a group to the agency?

FACA will not apply to any meeting of more than one individual initiated by the President or Federal official(s) to obtain the advice of individual attendees, provided that the Federal official does not exercise actual management or control over the group.  FACA does not apply to meetings held exclusively between Federal officials and Tribal, state, and local elected officials, or their designated employees, where such meetings are solely for the purpose of exchanging views, information, or advice relating to the management or implementation of Federal intergovernmental programs (see Unfunded Mandates Reform Act, 2 U.S.C. 1534).

## C.  FACA Requirements

If a group is subject to FACA, there are a number of requirements that must be in place in order to proceed.  Subcommittees of established FACA committees may, under some circumstances, be subject to these requirements as well.  Specific requirements include:

> 1.  A charter describing the committee's function, duration, members, duties, frequency of meetings, and costs.

BLM_0076156

H-1601-1 — LAND USE PLANNING HANDBOOK

2.  A designated Federal employee to attend all meetings and to approve meeting agendas.

3.  Notices of meetings that are published in the *Federal Register* and other appropriate venues.

4.  Meetings that are open to the public, with detailed minutes prepared for public review.

Further explanation is provided in the BLM's Natural Resource Alternative Dispute Resolution Initiative Strategic Plan and Tool Kit, September 11, 1997, available at BLM state offices.

BLM_0076157

Appendix B, page 4

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)



Figure 4.—*Federal Advisory Committee Act (FACA) flow chart:  Does FACA apply?*

BLM_0076158

**Appendix C:  Program/Resource-Specific Decision Guidance**

This appendix provides three categories of planning information for BLM program areas:  (1) *Land Use Plan Decisions*, (2) *Implementation Decisions*, and (3) *Notices, Consultations, and Hearings*.  Each program/resource heading contains resource-specific guidance for each category.  The guidance presented for each resource should be addressed in conjunction with the guidance presented for other resources to maintain an integrated, interdisciplinary approach to planning.

   1.  ***Land Use Plan Decisions.***  These broad-scale decisions guide future land management actions and subsequent site-specific implementation decisions.  Land use plan decisions fall into two categories:  desired outcomes (goals and objectives), and allowable uses and actions to achieve outcomes.  Proposed land use plan decisions are protestable to the BLM Director but are not reviewable by the Office of Hearings and Appeals.

   The application of program-specific guidance for land use plan decisions will vary, depending on the decision category, and must be applied as follows:

      I. *Natural, Biological, and Cultural Resources:*  Decisions identified must be made during the land use planning process if the resource exists in the planning area.

      II. *Resource Uses:*  Decisions identified must be made during the land use planning process if the BLM anticipates it may authorize or allow a resource use.  If uses are allowed, decisions must also be made regarding intensity and limits or restrictions.

      III. *Special Designations:*  Special designation decisions identified must be made during the land use planning process when the BLM anticipates it may authorize or allow uses which could disqualify inventoried resource values from designation.  Special designation decisions may be made during the land use planning process when there is no threat to the inventoried resource.

      IV. *Support:*  Support needs and decisions may be determined through the land use planning process, based on individual planning situations.

   2.  ***Implementation Decisions.***  Implementation decisions generally constitute the BLM's final approval allowing on-the-ground actions to proceed.  These types of decisions require site-specific planning and NEPA analysis.  They may be incorporated into implementation plans (activity  or project plans) or may exist as stand-alone decisions.  Where implementation decisions are made as part of the land use planning process, they are still subject to the appeals process or other administrative review as prescribed by specific resource program regulations after the BLM resolves the protests to land use plan decisions and makes a decision to adopt or amend the RMP *(High Desert Multiple Use Coalition, Inc. et al. Keith Collins, 142 IBLA 285 (1998)).*

BLM_0076159

Appendix C, page 2

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

   **3.  *Notices, Consultations, and Hearings.***  This section identifies resource-specific requirements and suggestions for notices, consultations, and hearings when developing Land use plan decisions that are in addition to those identified in Section III of this Handbook.  *Note:*  Some laws or regulations, such as the Endangered Species Act, National Historic Preservation Act, and Clean Air Act, have notice, consultation, or hearing requirements that apply to most resource programs, resource uses, or activities. These requirements are identified in the primary program narrative but are not repeated for each resource program, resource use, or activity that may be affected.

## I.  Natural, Biological, and Cultural Resources

## A.  Air

***Land Use Plan Decisions.***  Identify desired outcomes and areawide criteria or restrictions, in cooperation with the appropriate air quality regulatory agency, that apply to direct or authorized emission-generating activities, including the Clean Air Act's requirements for compliance with:

   1.  Applicable National Ambient Air Quality Standards (Section 109);
   2.  State Implementation Plans (Section 110);
   3.  Control of Pollution from Federal Facilities (Section 118);
   4.  Prevention of Significant Deterioration, including visibility impacts to mandatory Federal Class I Areas (Section 160 et seq.); and
   5.  Conformity Analyses and Determinations (Section 176(c)).

***Implementation Decisions.***  Identify site-specific emission control strategies, processes, and actions to achieve desired air quality conditions from direct or authorized emission-generating activities.

***Notices, Consultations, and Hearings.***  Consult, coordinate, and comply with applicable Tribal, Federal, state, and local air quality regulations, as required by the Clean Air Act, Executive Order 12088, and Tribal, Federal or state implementation plans.  Each field office should work closely with counties or states on the development or amendment of state implementation plans.

## B.  Soil and Water

***Land Use Plan Decisions.***  Identify desired outcomes (including standards or goals under the Clean Water Act).  Identify watersheds or specific soils that may need special protection from the standpoint of human health concerns, ecosystem health, or other public uses.  For riparian areas, identify desired width/depth ratios, streambank conditions, channel substrate conditions, and large woody material characteristics.  Identify areawide use restrictions or other protective measures to meet Tribal, state, and local water quality requirements.  Identify measures, including filing for water rights under applicable state or Federal permit procedures, to ensure water availability for multiple use management and functioning, healthy riparian and upland systems.

BLM_0076160

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

***Implementation Decisions.*** Identify site-specific management opportunities and priorities by using a watershed approach and watershed assessment information. Identify the site-specific or basin-specific soil, riparian, or nonpoint-source best management practices and rehabilitation techniques needed to meet Tribal, state, and local water quality requirements.

***Notices, Consultations, and Hearings.*** Consult and coordinate with other Federal, state, and local agencies, as directed by the Watershed Protection and Flood Prevention Act (16 U.S.C. 1001-1009), and the Clean Water Act (33 U.S.C. 1251) (see BLM Manual 7000). Collaborate with local watershed groups when developing activity plans.

## C. Vegetation

***Land Use Plan Decisions.*** Identify desired outcomes for vegetative resources, including the desired mix of vegetative types, structural stages, and landscape and riparian functions; and provide for native plant, fish, and wildlife habitats and livestock forage. Desired outcomes (goals and objectives) may be established at multiple scales. Identify areas of ecological importance and designate priority plant species and habitats, including special status species and populations of plant species recognized as significant for at least one factor such as density, diversity, size, public interest, remnant character, or age. Identify the actions and areawide use restrictions needed to achieve desired vegetative conditions.

Reference materials for establishing desired outcomes for vegetative resources include:

1. National Range and Pasture Handbook (1997): Natural Resource Conservation Service (USDA- NRCS) Methodology of Vegetation Inventory, Monitoring, Analysis and Management of Grazing Lands.

2. Interpreting Indicators of Rangeland Health: BLM Technical Reference 1734-6.

3. Ecological Site Inventory: BLM Technical Reference 1734-7.

4. Rangeland Health Standards: H-4180-1.

5. Website examples of ecological site descriptions (use Internet Explorer):

   - http://esis.sc.egov.usda.gov
   - http://www.nm.nrcs.usda.gov/technical/fotg/section-2/ESD.html
   - http://www.mt.nrcs.usda.gov/technical/ecs/range/ecolsites/

In areas where Healthy Forests Restoration Act authorities are to be used, identify old growth forest stands or describe a process for identifying old growth forest stands in the land use plan based on the structure and composition characteristic of the forest type. Provide management direction to maintain, or contribute toward the restoration of, the structure and composition of old growth forest stands in areas where these authorities will be used. This management direction should consider the pre-fire exclusion old growth conditions characteristic of the forest

BLM_0076161

Appendix C, page 4

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

type, taking into account the contribution of the stand to landscape fire adaptation and watershed health, and retaining the large trees contributing to old growth structure.

***Implementation Decisions.***  Identify site-specific vegetation management practices such as allotment grazing systems, vegetation treatments, or manipulation methods (including fuels treatments) to achieve desired plant communities, as well as integrated vegetation management techniques to rehabilitate weed infestations or otherwise control noxious and invasive weeds.

Identify old-growth stands and management practices to achieve old-growth management direction where applicable.  Identify old-growth stands and management practices to achieve old-growth management direction where applicable.

***Notices, Consultations, and Hearings.***  Consult under Section 7 of the Endangered Species Act with the USFWS and/or NOAA-Fisheries for all actions that may affect listed species or designated critical habitat or confer if actions are likely to jeopardize the continued existence of a proposed species or result in the destruction of adverse modification of proposed critical habitat (see 50 CFR 402.14 and 402.10; and BLM Handbook H-6840).  Depending on state-specific laws, agreements, or policies, there may be additional requirements to confer with state wildlife agencies if Federal actions may affect state-listed species or their habitats.

**D.  Special Status Species**

***Land Use Plan Decisions.***  Identify desired outcomes, strategies, restoration opportunities, use restrictions, and management actions to conserve and recover special status species.  Desired outcomes may incorporate goals and objectives from recovery plans and conservation strategies or identify ecologically important areas or scarce, limited habitats.  Goals and objectives may be species or habitat specific and can be established at multiple scales (i.e., fine, mid, and broad) to fully understand the context of the larger landscape.

Given the legal mandate to conserve threatened or endangered species and BLM's policy to conserve all special status species, land use planning strategies, desired outcomes, and decisions should result in a reasonable conservation strategy for these species.  Land use plan decisions should be clear and sufficiently detailed to enhance habitat or prevent avoidable loss of habitat pending the development and implementation of implementation-level plans.  This may include identifying stipulations or criteria that would be applied to implementation actions.  Land use plan decisions should be consistent with BLM's mandate to recover listed species and should be consistent with objectives and recommended actions in approved recovery plans, conservation agreements and strategies, MOUs, and applicable biological opinions for threatened and endangered species.

***Implementation Decisions.***  Identify the programmatic and site-specific actions needed to implement planning decisions for conserving and recovering special status species.  These decisions may be identified in implementation plans for habitat management areas, ACECs, and grazing allotments, etc.

BLM_0076162

Appendix C, page 5

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

**Notices, Consultations, and Hearings.** Consultation with the USFWS or NOAA-Fisheries is required by the Endangered Species Act for actions that may affect listed species and designated critical habitat, and conferencing is needed if actions are likely to jeopardize the continued existence of a proposed species, or result in the destruction or adverse modification of proposed critical habitat (see 50 CFR 402.14 and 402.10; and BLM Manual Section 6840). Depending on state-specific agreements or policies, there may be additional requirements to confer with state wildlife agencies if Federal actions may affect state-listed species or their habitats.

1. *Interagency Agreements on Consultation.* The BLM has entered into a variety of Memoranda of Agreement and Memoranda of Understanding regarding consultation on agency actions to help streamline and bring greater efficiency to the consultation process. A key element of these includes utilizing early involvement of regulatory agency personnel in the planning process. Including representatives from these agencies on the planning team during development of alternatives could improve the BLM's ability to address and discuss the effects of management direction on listed and proposed species and their critical habitats. For additional direction and guidance, consult the most current versions of these Memoranda.

2. *Initial Effects Determination.* During preparation of draft land use plan decisions and associated NEPA analysis, the BLM makes an initial determination of effects to listed or proposed species. If the BLM makes a determination of "no effect" on the preferred alternative, informal consultation is not required.

3. *Informal Consultation.* Informal consultation should be initiated on the preferred alternative with the USFWS or the NOAA-Fisheries if the initial BLM determination is "not likely to adversely affect" listed species or designated critical habitat. ."Not likely to adversely affect" determinations are reached when effects of the action are insignificant, discountable, or completely beneficial. **Beneficial effects** are contemporaneous positive effects without any long-term adverse effects to the species. **Insignificant effects** relate to the size of the impact and cannot be meaningfully measured. **Discountable effects** are those that have an extremely low probability of occurring.

Informal consultation is concluded if the Services concur with the BLM determination. This concurrence must be documented in the planning record by a written letter of concurrence from the USFWS or NOAA-Fisheries. If the Services do not concur with the BLM determination, formal consultation must be initiated.

3. *Formal Consultation.* Formal consultation is required when proposed management direction and resource allocations in the preferred alternative are determined to be "likely to adversely affect" to listed species or designated critical habitat. The Endangered Species Act and 50 CFR 402.16 outline criteria for re-initiating consultation when there has been significant change since the original consultation was completed. Based on these criteria, consultation on land use plan and implementation decisions must be re-initiated for any of the following reasons:

Appendix C, page 6

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

a) New information shows that the plan decisions may affect listed or proposed species or critical habitat in a way or to an extent not previously considered;

b) land use plan and/or implementation decisions are modified in a way that may cause adverse effects to the listed or proposed species or critical habitat that were not considered in the biological opinion;

c) implementation of existing land use plan decisions could affect a newly listed species or newly designated critical habitat; or

d) the amount or extent of incidental take is exceeded.

4. *Conferencing.* The BLM will conference with the Services on any action which is likely to jeopardize the continued existence of any proposed species or result in the destruction or adverse modification of proposed critical habitat. The conference is designed to assist the Federal agency and any applicant in identifying and resolving potential conflicts at an early stage in the planning process. Conferencing includes informal discussions concerning an action that is likely to jeopardize the continued existence of the proposed species or results in the destruction or adverse modification of the proposed critical habitat at issue.

5. *Consultation under Endangered Species Act with Indian Tribes.* Department of the Interior's Secretarial Order 3206, American Indian Tribal Rights; Federal-Tribal Trust Responsibilities; and the Endangered Species Act; requires Interior agencies to consult with Indian Tribes when agency actions to protect a listed species, as a result of compliance with Endangered Species Act, affect or may affect Indian lands, Tribal trust resources, or the exercise of American Indian Tribal rights. Consultation under this Order should be closely coordinated with regional or field offices of the USFWS and/or NOAA-Fisheries for game and non-game species.

**E. Fish and Wildlife**

***Land Use Plan Decisions.*** Designate priority species and habitats, in addition to special status species, for fish or wildlife species recognized as significant for at least one factor such as density, diversity, size, public interest, remnant character, or age. Identify desired outcomes using BLM strategic plans, state agency strategic plans, and other similar sources.

Describe desired habitat conditions and/or population for major habitat types that support a wide variety of game, non-game, and migratory bird species; acknowledging the states' roles in managing fish and wildlife, working in close coordination with state wildlife agencies, and drawing on state comprehensive wildlife conservation strategies. Identify actions and areawide use restrictions needed to achieve desired population and habitat conditions while maintaining a thriving natural ecological balance and multiple-use relationships. (Also see previous Section D, Special Status Species.) Identify essential fish habitat (EFH) for federally managed fish species (Oregon, Washington, California and Idaho only).

BLM_0076164

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

***Implementation Decisions.***  In coordination with state wildlife agencies, identify site-specific actions, such as riparian fencing, guzzler placement, fuels management, etc., needed to manage ecosystems for all species and habitat for special status species.  Identify specific measures to conserve and enhance EFH.

***Notices, Consultations, and Hearings.***  Consult under Section 7 of the Endangered Species Act with the USFWS and/or NOAA-Fisheries, for all actions that may affect listed species or designated critical habitat or confer if actions are likely to jeopardize the continued existence of a proposed species or result in the destruction or adverse modification of proposed critical habitat (see 50 CFR 402.14 and 402.10; and BLM Handbook H-6840).  Depending on state-specific laws, agreements, or policies, there may be additional requirements to confer with state wildlife agencies if Federal actions may affect state-listed species or their habitats.  Consult with the NOAA-Fisheries on any action authorized, funded, or undertaken that may impact EFH (through existing environmental review processes in accordance with NEPA)  Comply with Executive Order 13186 for the conservation of migratory birds.

## F.  Wild Horses and Burros

***Land Use Plan Decisions.***  Identify the following (see 43 CFR 4700):

1.  *Herd Areas.*  Herd areas (HAs) are limited to areas of the public lands identified as being habitat used by wild horses and burros at the time of the passage of the Wild Horse and Burro Act, as amended (16 U.S.C. 1331-1340).  HA boundaries may only be changed when it is determined that (1) areas once listed as HAs are later found to be used only by privately-owned horses or burros, or (2) the HA boundary does not correctly portray where wild horses and burros were found in 1971.

2.  *Herd Management Area Designation.*  Herd management areas (HMAs) are established only in HAs, within which wild horses and/or burros can be managed for the long term.  For HMAs, identify the following:

   a)  Initial and estimated herd size that could be managed while still preserving and maintaining a thriving natural ecological balance and multiple-use relationships for that area.
   b)  Guidelines and criteria for adjusting herd size.

3.  *Herd Areas Not Designated as Herd Management Areas.*  Where appropriate, the land use plan may include decisions removing horses from all or part of a HA.  Examples include intermingled and unfenced lands within HAs where private landowners do not want to make them available for wild horse or burro use; or essential habitat components are not available for wild horse or burro use within a HA.

4.  *Wild Horse and Burro Ranges.*  An HMA may be considered for designation as a wild horse or burro range when there is a significant public value present, such as unique characteristics in a herd or an outstanding opportunity for public viewing.

BLM_0076165

Appendix C, page 8

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

5. *Areawide Restrictions Needed to Achieve Objectives.* For example, if domestic horses in HMAs are not compatible with wild horse management policies, then, domestic horse grazing must not be permitted in HMAs or adjacent to HMAs if domestic and wild horses are likely to intermingle.

***Implementation Decisions.*** Identify and set objectives for herd composition, animal characteristics, and habitat development needs. Establish appropriate management levels (AMLs) based on monitoring and evaluations, including the population range within which the herd size will be allowed to fluctuate. *(Commission for the Preservation of Wild Horses, et al., 139 IBLA 24 (1997).)*

***Notices, Consultations, and Hearings.*** The Wild and Free-Roaming Horses and Burros Act, as amended (16 U.S.C. 1331-1340) requires BLM to consult with Federal and state wildlife agencies and all other affected interests during land use and implementation planning for the management of wild horses and burros.

Public hearings are required when anticipated management activities involve the use of helicopters to capture, or the use of motor vehicles to transport, wild horses and burros. Hearings are held in the state where the activities are proposed and are normally conducted on an annual basis (see 43 CFR 4740).

## G. Cultural Resources

***Land Use Plan Decisions.*** Identify special cultural resource restrictions that may affect the location, timing, or method of development or use of other resources in the planning area. Identify site-specific use restrictions from cultural resources currently being actively managed. Identify area wide criteria for recognizing potential cultural resource conflicts, such as geographic characteristics of sacred sites, historic properties, or cultural landscapes (springs, ridges, peaks, caves, and rock shelters, for example). Consider these restrictions and criteria in all proposed land and resource use decisions. Identify measures to pro-actively manage, protect, and use cultural resources, including traditional cultural properties.

The scope and scale of cultural resource identification are much more general and less intensive for land use planning than for processing site-specific use proposals. Instead of new, on-the-ground inventory, the appropriate identification level for land use planning is a regional overview: (1) a compilation and analysis of reasonably available cultural resource data and literature, (2) a management-oriented synthesis of the resulting information that includes priorities and a strategy for accomplishing needed inventory (see Manual Section 8110.) If land use decisions, however, are more specific in terms of impacts, they may require a more detailed level of identification of the scope and nature of cultural resources during land use planning.

RMPs will include at least the following two goals:

1. Identify, preserve, and protect significant cultural resources and ensure that they are available for appropriate uses by present and future generations (FLPMA, Section 103

BLM_0076166

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

(c), 201(a) and (c); National Historic Preservation Act, Section 110(a); Archaeological Resources Protection Act, Section 14(a)).

2.   Seek to reduce imminent threats and resolve potential conflicts from natural or human-caused deterioration, or potential conflict with other resource uses (FLPMA Sec. 103(c), NHPA 106, 110 (a) (2)) by ensuring that all authorizations for land use and resource use will comply with the NHPA Section 106.

All cultural properties in the RMP area, whether already recorded or projected to occur on the basis of existing-data synthesis, including cultural landscapes, will be allocated to the uses listed in Table C-1 according to their nature and relative preservation value.  These use allocations pertain to cultural resources, not to areas of land.

**Table C-1.—***Cultural use allocations and desired outcomes*

| Use allocation [1] | Desired outcomes |
|---|---|
| a. Scientific use | Preserved until research potential is realized |
| b. Conservation for future use | Preserved until conditions for use are met |
| c. Traditional use | Long-term preservation |
| d. Public use | Long-term preservation, on-site interpretation |
| e. Experimental use | Protected until used |
| f. Discharged from management | No use after recordation; not preserved |
| [1] The majority of the cultural properties in a given geographic area will fall into categories (a) and (f).  The less-common properties in categories (b)–(e) are likely to be associated with particular settings that can be delineated geographically in the planning process.  As the plan is developed, properties in categories b–d will require the most attention to balance their proactive uses with other land and resource uses. | |

*Implementation Decisions.*  Identify site-specific information needs, impacted resources, protection measures and opportunities to use cultural properties for scientific, educational, recreational, and traditional purposes.  Evaluate whether intended uses would result in changes to cultural properties' significance or preservation value, and if so, how resource condition should be monitored, measured, and maintained at an acceptable level.

1.   Cultural properties allocated to uses are subject to the management actions listed in Table C-2 to realize their use potential.

**Table C-2.—***Cultural use allocations and management actions*

| Use allocation | Management |
|---|---|
| a. Scientific use | Permit appropriate research, including date recovery |
| b. Conservation for future use | Propose protective measures/designations [1] |
| c. Traditional use | Consult with Tribes; determine limitations [1] |
| d. Public use | Determine permitted use [1] |
| e. Experimental use | Determine nature of experiment |
| f. Discharged from management | Remove protective measures |
| [1] Safeguards against incompatible land and resource uses may be imposed through withdrawals, stipulations on leases and permits, design requirements, and similar measures which are developed and recommended by an appropriately staffed interdisciplinary team. | |

BLM_0076167

Appendix C, page 10

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

2.  Categorize geographic area as high/medium/low priority for future inventory of cultural properties.

3.  All authorizations for land and resource use will comply with Section 106 of the National Historic Preservation Act, consistent with and subject to the objective established in the RMP for the proactive use of cultural properties in the public interest (NHPA Sec. 106, 101(d)(6), 110(a)(2)(E); national BLM-ACHP-NCSHPO Programmatic Agreement of March 1997).

***Notices, Consultations, and Hearings.***

1.  Consistent with the national Programmatic Agreement and individual state BLM-SHPO protocols, invite the State Historic Preservation Officer (SHPO) to participate from the outset of planning in order to reduce the potential for cultural resource conflicts with other resource uses as plans are implemented.

2.  For states not operating under a BLM-SHPO protocol, such as Eastern states, consult with the SHPO before plan approval concerning any actions that may be directly implemented upon plan approval and could affect a cultural property listed in or eligible for the National Register of Historic Places (see 36 CFR 800).

3.  Formal consultations under Section 106 of the National Historic Preservation Act usually take place during implementation planning; however, consult with the SHPO during land use planning regarding cultural resource evaluation recommendations (36 CFR 800.4(c)).

4.  Consult Tribal leaders and traditional religious practitioners under the American Indian Religious Freedom Act about any management objectives and actions that might affect Native American religious practices, including access to sacred sites.  Consult Tribal leaders under the National Historic Preservation Act about any management objectives or actions that might affect properties of traditional cultural importance.

## H.  Paleontology

***Land Use Plan Decisions.***  Identify criteria or use restrictions to ensure that (a) areas containing, or that are likely to contain, vertebrate or noteworthy occurrences of invertebrate or plant fossils are identified and evaluated prior to authorizing surface-disturbing activities; (b) management recommendations are developed to promote the scientific, educational, and recreational uses of fossils; and (c) threats to paleontological resources are identified and mitigated as appropriate.

***Implementation Decisions.***  Identify appropriate protection measures and scientific, educational, and recreational use opportunities for paleontological localities.

***Notices, Consultations, and Hearings.***  No additional specific requirements exist.

BLM_0076168

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## I.  Visual Resources

*Land Use Plan Decisions.*  Manage visual resource values in accordance with visual resource management (VRM) objectives (management classes).  Designate VRM management classes for all areas of BLM land, based on an inventory of visual resources and management considerations for other land uses.  VRM management classes may differ from VRM inventory classes, based on management priorities for land uses (see BLM Handbook H-8410-1 for a description of VRM classes).

*Implementation Decisions.*  Manage resource uses and management activities consistent with the VRM objectives established in the land use plan.  Design all BLM resource uses, management activities, and other implementation decisions to meet VRM objectives established in the land use plan.  Utilize visual resource design techniques and best management practices to mitigate the potential for short- and long-term impacts.  Contrast ratings are required for all major projects proposed on public lands that fall within VRM Class I, II, and III areas which have high sensitivity levels (see Handbook H-8341-1 for contrast-rating procedures).

*Notices, Consultations, and Hearings.*  No additional specific requirements exist.

## J.  Wildland Fire Management

*Land Use Plan Decisions.*  Fire management strategies must recognize the role of wildland fire as an essential ecological process and natural change agent.  Fire management strategies must result in minimum suppression costs, considering firefighter and public safety, benefits, and values to be protected; consistent with resource objectives.  Fire management decisions (goals and objectives, and allowable uses and management actions) must reflect that the protection of human life is the single, overriding priority.  Other priorities (protecting human communities and community infrastructure, other property and improvements, and natural and cultural resources) are based on the values to be protected, human health and safety, and the costs of protection.

Consistent with these principles, identify landscape-level fire management goals and objectives, which would be achieved through allowable uses and management actions.  Use fire regime/condition class methodology to identify desired wildland fire conditions.  Wildland fire management goals and objectives must be closely coordinated with vegetation management goals and objectives.

Identify allowable uses and management actions to achieve the fire management goals and objectives, and support the goals and objectives for vegetation, wildlife, and other resources.

As part of identifying allowable uses, identify the geographic areas that are suitable for wildland fire use, provided conditions are appropriate.  Also, identify the geographic areas where wildland fire use is not appropriate due to social, economic, political, or resource constraints (e.g., wildland urban interface areas); and where suppression action would be taken.

BLM_0076169

Appendix C, page 12

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

As part of identifying management actions to achieve goals and objectives, identify the types of fuels management or vegetation management treatments (e.g., mechanical, biological, and chemical treatments and prescribed fire) that would be implemented.

Allowable uses and management actions include the identification of restrictions on fire management practices (including both wildfire suppression and fuels management) needed to protect natural or cultural resource values. Restrictions may be structured to allow flexibility to apply restrictions on a seasonal or annual basis, based on resource conditions, weather factors, and operational capability.

Establish landscape-scale fire management priorities or provide criteria that will guide more site-specific priorities at the fire management plan level.

***Implementation Decisions.*** Identify site-specific fire management practices and fuels treatment actions needed to meet the broad-scale land use plan goals and objectives (such as wildland fire use, prescribed fire, mechanical thinning, biological, and chemical treatments) including their location, size, and specific layout and project design features, as well as any measures needed to protect sensitive resources.

For additional guidance, see the DOI and BLM Fire Management Manuals and Handbooks.

***Notices, Consultations, and Hearings.***

    1. Consult, coordinate, and comply with Tribes, Federal agencies, and state and local governments regarding smoke management where required by the Clean Air Act, Executive Order 12088 (Federal Compliance with Pollution Control Standards), and State Implementation Plans.

    2. Consult and coordinate with adjacent Tribes, Federal agencies, and state and local governments to establish protection and fuels management priorities.

## K. Wilderness Characteristics

***Land Use Plan Decisions.*** Identify decisions to protect or preserve wilderness characteristics (naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation). Include goals and objectives to protect the resource and management actions necessary to achieve these goals and objectives. For authorized activities, include conditions of use that would avoid or minimize impacts to wilderness characteristics.

***Implementation Decisions.*** Identify site-specific protection measures to insure protection of wilderness characteristics.

***Notices, Consultations, and Hearings.*** No additional specific requirements exist.

BLM_0076170

## L.  Cave and Karst Resources

***Land Use Plan Decisions.***  Identify significant caves as mandated by the Federal Cave Resources Protection Act of 1988.  Criteria for identification of significant caves is set forth in 43 CFR 37.11(c).  If it is determined that a cave meets these criteria, it must be designated as significant as set forth in 43 CFR 37.11(f).

For each designated significant cave, consider whether or not an administrative designation (e.g., ACEC) is needed to provide adequate protection for significant cave resources (see III. Special Designations).  Regardless, it is vital that both management objectives and setting prescriptions be set for each designated significant cave.  Management objectives should be outcome-based (i.e., not facility- or project-based).  Setting prescriptions should specify conditions needed to facilitate achievement of the management objectives.

***Implementation Decisions.***  Address four basic but broad types of cave and karst resource management actions for all significant caves:

1.  Management (resources, visitors and facilities);

2.  marketing (outreach, information and education, promotion, interpretation, and environmental education);

3.  monitoring (social, environmental and administrative indicators and standards); and

4.  administration (regulatory, permit/fee/fiscal, data management, and customer liaison).

All BLM implementing actions must be conditioned by the specific management objectives and accompanying setting prescriptions incorporated within land use plan decisions for each significant cave.

***Notices, Consultations, and Hearings.***  Certain actions involving impacts to cave and karst resources may require consultation and coordination with other Federal, state and local government agencies, and nongovernmental organizations or individuals as mandated by Section 4 of the Federal Cave Resources Protection Act; Section 106 of the National Historic Preservation Act; Section 7 of the Endangered Species Act; and Section 8 of the Public Rangeland Improvement Act.

## II.  Resource Uses

## A.  Forestry

***Land Use Plan Decisions.***  Identify characteristics (indicators) to describe healthy forest conditions (i.e., desired outcomes) for forest/woodland types found within the planning area (also see I(C), Vegetation).  Identify the suite of possible management actions (including appropriate harvest, reforestation, and forest development methods), and associated best management practices, that can be applied to meet desired outcomes.

BLM_0076171

Appendix C, page 14

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

Identify areas that are available and have the capacity for planned, sustained-yield timber harvest or special forest product harvest. A probable sale quantity (PSQ) should be determined, if possible, for those areas determined to be available for harvest. The PSQ is the allowable harvest level that can be maintained without decline over the long term if the schedule of harvests and regeneration are followed. PSQ recognizes a level of uncertainty in meeting the determined level; this uncertainty is typically based on other environmental factors that preclude harvesting at a particular time (for example, because of watershed or habitat concerns). A PSQ is not a commitment to offer for sale a specific level of timber volume every year.

***Implementation Decisions.*** Identify individual timber or special forest product sale locations and schedules; site-specific intensive management practices, locations, and schedules; and restrictions associated with forestry activities. Identify individual forest health treatment activities by location and schedule *(Headwaters, Inc., 116 IBLA 129 (1990))*.

***Notices, Consultations, and Hearings.*** There are no additional specific requirements.

## B. Livestock Grazing

***Land Use Plan Decisions.*** Identify lands available or not available for livestock grazing (see 43 CFR 4130.2(a)), considering the following factors:

1. Other uses for the land;
2. terrain characteristics;
3. soil, vegetation, and watershed characteristics;
4. the presence of undesirable vegetation, including significant invasive weed infestations; and
5. the presence of other resources that may require special management or protection, such as special status species, special recreation management areas (SRMAs), or ACECs.

Decisions identifying lands available, or not available, for livestock grazing may be revisited through the amendment or revision process if the grazing preference or permit on those lands has been voluntarily relinquished, or if there are outstanding requests to voluntarily relinquish the grazing preference or permit. If an evaluation of Land Health Standards identifies an allotment or group of allotments where Land Health Standards cannot be achieved under any level or management of livestock use, then decisions identifying those areas as available for livestock grazing need to be revisited.

For lands available for livestock grazing, identify on an areawide basis both the amount of existing forage available for livestock (expressed in animal unit months) and the future anticipated amount of forage available for livestock with full implementation of the land use plan while maintaining a thriving natural ecological balance and multiple-use relationships. The land use plan needs to describe how these public lands will be managed to become as productive as feasible for livestock grazing, including a description of possible grazing management practices such as grazing systems, range improvements (including land treatments), changes in seasons of use and/or stocking rates. In addition, identify guidelines and criteria for future allotment-

BLM_0076172

Appendix C, page 15

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

specific adjustments in the amount of forage available for livestock, season of use, or other grazing management practices *(Joel Stamatakis, Steve Stamatakis; 98 IBLA 4 (1987)).*

***Implementation Decisions.*** For areas available for grazing, identify allotment-specific (for one or several allotments) grazing management practices and livestock forage amounts based on monitoring and assessment information, as well as constraints and needs related to other resources. Grazing management practices and levels of livestock grazing use must achieve the desired outcomes outlined in the land use plan, including rangeland health standards (or comprehensive Land Health Standards), or must result in significant progress toward fulfilling rangeland health standards; they must also conform to the guidelines required under 43 CFR 4180.2(b).

***Notices, Consultations, and Hearings.*** Conduct appropriate consultation, cooperation, and coordination actions as required under 43 CFR 4130.2(b). Copies of proposed decisions on grazing use are sent to interested members of the public in accordance with 43 CFR 4160.1.

## C.  Recreation and Visitor Services

***Land Use Plan Decisions.*** Identify special recreation management areas (SRMAs).

Each SRMA has a distinct, primary recreation-tourism market as well as a corresponding and distinguishing recreation management strategy. For each SRMA selected, determine whether that primary market-based strategy will be to manage for a *destination* recreation-tourism market, a *community* recreation-tourism market, or an *undeveloped* recreation-tourism market, and state that determination in the land use plan. Then describe the market that corresponds to that specific recreation management strategy (who they are and where they are located). Divide recreation areas that have more than one distinct, primary recreation market into separate SRMAs.

For each SRMA identified, delineate discrete recreation management zone (RMZ) boundaries. Each RMZ has four defining characteristics - it: (1) serves a different recreation niche within the primary recreation market, (2) produces a different set of recreation opportunities and facilitates the attainment of different experience and benefit outcomes (to individuals, households and communities, economies, and the environment); (3) has distinctive recreation setting character; and (4) requires a different set of recreation provider actions to meet the strategically-targeted primary recreation market demand. To address these four variables within each RMZ, make the following land-use allocation decisions:

1.  Identify the corresponding recreation niche to be served;

2.  write explicit recreation management objectives for the specific recreation opportunities to be produced and the outcomes to be attained (activities, experiences, and benefits);

3.  prescribe recreation setting character conditions required to produce recreation opportunities and facilitate the attainment of both recreation experiences and beneficial

BLM_0076173

Appendix C, page 16

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

outcomes, as targeted above (the recreation opportunity spectrum is one of the existing tools for both describing existing setting character and prescribing desired setting character); and

4.  briefly describe an activity planning framework that addresses recreation management, marketing, monitoring, and administrative support actions (e.g., visitor services, permits and fees, recreation concessions, and appropriate use restrictions) necessary to achieve explicitly-stated recreation management objectives and setting prescriptions (see Implementation Decisions subsection below).

Visual resource management classes need to be correlated with the recreation management objectives and setting prescriptions that have been set for each RMZ delineated.

Anything not delineated as an SRMA is an extensive recreation management area (ERMA). Management within all ERMAs is restricted to custodial actions only.  Therefore, actions within ERMAs are generally implemented directly from land use plan decisions and do not require activity-level planning.  Land use plan decisions must, therefore, include recreation management objectives for all ERMAs.  Consider addressing visitor health and safety, user conflict and resource protection issues in particular through these recreation management objectives. However, land use plan decisions for ERMAs need to also identify implementing recreation management, marketing, monitoring, and administrative support actions of the kinds listed for SRMAs under Implementation Decisions below (because no follow-up implementation decisions at the activity plan level are required for ERMAs)  *Note: If recreation demand (i.e., from an undeveloped recreation-tourism market) requires maintenance of setting character and/or production of associated activity, experience, and benefit opportunities/outcomes, the area should be identified and managed as an SRMA, rather than being custodially managed as an ERMA.*

Recognition of singularly dominant activity-based recreation demand of and by itself (e.g., heavy off-highway vehicle use, river rafting, etc.), however great, generally constitutes insufficient rationale for the identification of an SRMA and the subsequent expenditure of major recreation program investments in facilities and/or visitor assistance.  This does not mean that the expenditure of substantial custodial funding is unwarranted when circumstances require it, but such expenditures should be geared to take care of the land and its associated recreation-tourism use and not to provide structured recreation opportunities which characterize SRMAs.

Identification, but not formal designation, of both SRMAs and ERMAs is required (see Manual Section 8300).

***Implementation Decisions.***  For all SRMAs, address four basic but broad types of recreation actions:

1.  Recreation management (of resources, visitors, and facilities [i.e., developed recreation sites, roads and trails, recreation concessions, etc.]);

BLM_0076174

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

2.  recreation marketing (including outreach, information and education, promotion, interpretation, environmental education; and other visitor services);

3.  recreation monitoring (including social, environmental, and administrative indicators and standards); and

4.  recreation administration (regulatory; permits and fees, including use restrictions where necessary and appropriate; recreation concessions; fiscal; data management; and customer liaison).

All BLM implementing actions for SRMAs must be conditioned by both the identified primary recreation market strategy and the specific RMZ land use allocation objectives and accompanying setting prescriptions incorporated within land use plan decisions.  Since the BLM is not the sole-source provider of public lands recreation, be sure to address any actions of other key recreation-tourism providers within local service communities (i.e., local governments and private recreation-tourism businesses).  The BLM cannot dictate to its local government and private business providers.  Yet, without their collaborative engagement as managing partners in plan design and implementation, recreation opportunities targeted by land use plan management objectives cannot be produced over the long run, nor can prescribed recreation settings be sustained.

To the greatest extent possible, and appropriate to the setting prescriptions for the area involved, all new construction and modifications to recreation facilities, outdoor developed areas, and any related programs and activities will be accessible to people with disabilities in accordance with the Architectural Barriers Act of 1968 and Section 504 of the Rehabilitation Act of 1973, as amended, and in conformance with relevant building standards, accessible outdoor program guidance, and program regulations.

***Notices, Consultations, and Hearings.***  No additional specific requirements exist.

## D.  Comprehensive Trails and Travel Management

***Land Use Plan Decisions.***  Delineate travel management areas and designate off-highway vehicle management areas.

1. *Delineating Travel Management Areas.*  Comprehensive travel management planning should address all resource use aspects (such as recreational, traditional, casual, agricultural, commercial, and educational) and accompanying modes and conditions of travel on the public lands, not just motorized or off-highway vehicle activities.  In the RMP, travel management areas (polygons) should be delineated.  Identify acceptable modes of access and travel for each travel management area (including over-land, over-water, over-snow and fly-in access [remote airstrips and float planes]).   In developing these areas, consider the following:

a.  Consistency with all resource program goals and objectives;
b.  primary travelers;

BLM_0076175

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

    c.  objectives for allowing travel in the area;
    d.  setting characteristics that are to be maintained (including recreation opportunity system and VRM settings); and
    e.  primary means of travel allowed to accomplish the objectives and to maintain the setting characteristics.

    2.  *Designation of Off-Highway Vehicle Management Areas.*  All public lands are required to have off-highway vehicle area designations (see 43 CFR 8342.1).  Areas must be classified as *open*, *limited*, or *closed* to motorized travel activities.  Criteria for open, limited, and closed area designations are established in 43 CFR 8340.0-5(f), (g) and (h), respectively.

For areas classified as limited consider a full range of possibilities, including travel that will be limited to types or modes of travel, such as foot, equestrian, bicycle, motorized, etc.; limited to existing roads and trails; limited to time or season of use; limited to certain types of vehicles (OHVs, motorcycles, all-terrain vehicles, high clearance, etc.); limited to licensed or permitted vehicles or users; limited to BLM administrative use only; or other types of limitations.  In addition, provide specific guidance about the process for managing motorized vehicle access for authorized, permitted, or otherwise approved vehicles for those specific categories of motorized vehicle uses that are exempt from a limited designation (see 43 CFR 8340.0-5(a)(1-5).

At a minimum, the travel management area designation for wilderness study areas (WSAs) must be limited to ways and trails existing at the time the area became a WSA.  *Open* areas within WSAs are appropriate only for sand dune or snow areas designated as such prior to October 21, 1976.  Existing roads, ways and trails must be fully documented and mapped. This applies to both motorized and mechanized transport (see Interim Management Policy and Guidelines for Lands Under Wilderness Review H-8550-1(I.)(B.)(11) for mechanized transport).  In addition, future designations may be made for a WSA if it is released from study.

Except as otherwise provided by law (e.g., the Alaska National Interest Lands Conservation Act), congressionally designated wilderness areas are statutorily closed to motorized and mechanized use.  These areas should be shown in the land use plans along with the acreage affected.

Existing laws, proclamations, regulations or Executive orders may limit the use of the open area designation or impose additional requirements relating to travel management in specific circumstances.

For RMP provisions related to national scenic, historic and national recreation trails, national back country byways, or other byway designations (see Appendix C, III. Special Designations).

***Implementation Decisions.***  Complete a defined travel management network (system of areas, roads and/or trails) during the development of the land use plan, to the extent practical.  If it is

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

not practical to define or delineate the travel management network during the land use planning process, a preliminary network must be identified and a process established to select a final travel management network.  Possible reasons for not completing the final network might be size or complexity of the area, controversy, incomplete data, or other constraints.

If the final travel management network is to be deferred in the RMP, then the RMP should document the decision-making process used to develop the initial network, provide the basis for future management decisions, and help set guidelines for making road and trail network adjustments throughout the life of the plan. The identification of the uncompleted travel management networks should be delineated in the land use plan and the following tasks completed for each area:

    1)  Produce a map of a preliminary road and trail network;

    2)  define short-term management guidance for road and trail access and activities in areas or sub-areas not completed;

    3)  outline additional data needs, and a strategy to collect needed information;

    4)  provide a clear planning sequence, including public collaboration, criteria and constraints for subsequent road and trail selection and identification;

    5)  provide a schedule to complete the area or sub-area road and trail selection process; and

    6)  identify any easements and rights-of-ways (to be issued to the BLM or others) needed to maintain the preliminary or existing road and trail network.

If the decision on delineating travel management networks is deferred in the land use plan to the implementation phase, the work normally should be completed within 5 years of the signing of the ROD for the RMP.

At the implementation phase of the plan, establish a process to identify specific areas, roads and/or trails that will be available for public use, and specify limitations placed on use.  Products from this process will include:

    1)  A map of roads and trails for all travel modes.

    2)  Definitions and additional limitations for specific roads and trails (defined in 43 CFR 8340.0-5(g)).

    3)  Criteria to select or reject specific roads and trails in the final travel management network, add new roads or trails and to specify limitations.

    4)  Guidelines for management, monitoring, and maintenance of the system.

BLM_0076177

Appendix C, page 20

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

5)  Indicators to guide future plan maintenance, amendments, or revisions related to travel management network.

6)  Needed easements and rights-of-ways (to be issued to the BLM or others) to maintain the existing road and trail network providing public land access.

In addition, travel management networks should be reviewed periodically to ensure that current resource and travel management objectives are being met (see 43 CFR 8342.3).

***Notices, Consultations, and Hearings.***  No additional specific requirements exist.

## E.  Lands and Realty

***Land Use Plan Decisions.***  Identify the following consistent with the goals and objectives for natural resources within the planning area:

1.  Lands for retention (43 CFR 2400), proposed disposal, or acquisition (based on acquisition criteria identified in the land use plan; FLPMA Section 205(b)) *(Oregon Natural Resources Council, 78 IBLA 124 (1983))*.  Lands are to be retained in Federal ownership, unless it is determined that disposal of a particular parcel will serve the national interest (FLPMA Section 102(a)(1)).  Land use plans should avoid prescribing the method of disposal, acquisition, or property interest to be acquired.

2.  Lands or interest in lands that are available for disposal under a variety of disposal authorities, provided they meet the criteria outlined in FLPMA (Sales, Section 203, 43 U.S.C. 1713(a); Exchanges, Section 206, 43 U.S.C. 1716(a); and Reservation and Conveyance of Minerals, Section 209, 43 U.S.C. 1719(a)) or other statutes and regulations.  Lands available for disposal must be identified by parcel or by specific areas (on a map or by legal description).

3.  Lands available for disposal under the Federal Land Transaction Facilitation Act of 2000 (FLTFA).  The FLTFA amended FLPMA to allow retention by the BLM of receipts received from sale of land or interests in land under Section 203 of FLPMA or conveyance of mineral interest under Section 209(b) of FLPMA provided a land use plan was completed prior to July 25, 2000.  The FLTFA currently does not apply to lands identified for disposal after July 25, 2000.  In Nevada, the FLTFA does not apply to lands eligible for sale under the Southern Nevada Public Land Management Act, Santini-Burton Act, Mesquite Lands Act, or Lincoln County Land Act.

4.  Proposed withdrawal areas including existing withdrawals to be continued, modified, or revoked (including how the lands would be managed if the withdrawal were relinquished and an opening order issued) (see 43 CFR 2300).

5.  Land Classifications under Section 7 of the Taylor Grazing Act of 1934, as amended (43 U.S.C. 315f).  The procedures applicable to Section 7 outlined in 43 CFR 2400 must be followed.  The following actions require classification:  Recreation and Public

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

Purposes Act sales (see 43 CFR 2740) and leases (see 43 CFR 2912); agricultural entries (see 43 CFR 2520, 2530, 2610); and state grants (see 43 CFR 2620).  To the extent that the land use planning procedures pursuant to 43 CFR 1600 differ from applicable classification procedures under 43 CFR 2400, the latter procedures shall be followed and applied.  The analysis that supports classification decisions is normally the same analysis utilized in the land use planning/NEPA process to make decisions concerning the disposal or retention of public lands.  For any classification decision made through the land use plan, initiate the classification decision requirements (i.e., proposed and initial decisions required under 43 CFR 2400) at the time the decision document is issued for the land use plan.

6.  Where and under what circumstances authorizations for use, occupancy, and development (such as major leases and land use permits) may be granted (see 43 CFR 2740, 2912, 2911, and 2920, respectively).

7.  Existing and potential right-of-way corridors (potential corridors include existing right-of-way routes with the potential for at least one additional facility and thus can be considered a corridor if not already designated) to minimize adverse environmental impacts and the proliferation of separate right-of-ways (see 43 CFR 2806).

8.  Existing and potential development areas for renewable energy projects (e.g., wind and solar), communication sites, and other uses.

9.  Right-of-way avoidance or exclusion areas (areas to be avoided but may be available for location of right-of-ways with special stipulations and areas which are not available for location of right-of-ways under any conditions).

10.  Terms and conditions that may apply to right-of-way corridors or development areas, including best management practices to minimize environmental impacts and limitations on other uses which would be necessary to maintain the corridor and right-of-way values.

***Implementation Decisions.***  Identify exchange agreements, land sale plans, approvals of leases and permits, and all subsequent phases of case processing.  Identify issuance of site-specific right-of-way grants and authorizations.  Identify authorization notices for those actions that require classification or other notices, including sales, exchanges, state selections, Recreation and Public Purposes Act sales and leases, agricultural entries, and other land disposal actions.

***Notices, Consultations, and Hearings.***  Consult with parties to Interagency Agreements or MOUs relating to corridor identification or use.  The Western Utility Group must be consulted when developing decisions affecting utility use.  Consult with Indian Tribes and state and local governments having an interest in or jurisdiction over lands proposed for disposal or acquisition.

## F. Coal

***Land Use Plan Decisions.***  The land use plan is the chief process by which public land is reviewed to assess whether there are areas suitable for leasing or unsuitable for all or certain

BLM_0076179

Appendix C, page 22

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

types of coal mining operations under Section 522(b) of the Surface Mining Control and Reclamation Act.  Identify the following consistent with the goals and objectives for natural resources within the planning area:

1.  Unleased coal lands that are acceptable for further consideration for coal leasing and development and those that are not (see 43 CFR 3461).

2.  Areas unsuitable for surface mining of coal (43 CFR 1610.7-1) under the criteria set forth in 43 CFR 3461.5.

3.  For acceptable lands, areas suitable for development by all mining methods or by only certain stipulated mining methods, such as surface or underground mining (see 43 CFR 3461).

4.  Any special conditions that must be met during more detailed planning, lease sale, or post-lease activities, including measures required to protect other resource values (see 43 CFR 3461).

5.  An estimate of the amount of coal recoverable by either surface or underground mining operations or both (43 CFR 3420.1-4(d)).  Only those areas that have development potential may be identified as acceptable for further consideration for leasing.

6.  Areas that have development potential for coal leasing according to the screening process outlined in 43 CFR 3420.1-4(e)(1–4).

7.  Areas to be withdrawn from further consideration for leasing to protect other resource values and land uses that are locally, regionally or nationally important or unique and that are not included in the unsuitability criteria discussed in 43 CFR 3461.5.

**Implementation Decisions.**  Offer leases with appropriate conditions and stipulations, process lease exchanges, process preference right lease applications, and delineate coal tracts for disposal.

**Notices, Consultations, and Hearings.**

1.  Prior to or as part of the initiation or update of a land use plan or land use analysis, a *call for coal and other resource information* shall be made to formally solicit indications of interest and information on coal resource development potential and on other resources which may be affected by coal development for land in the planning unit.  Industry, state, and local governments and the general public may submit information on lands that should be considered for coal leasing, including statements describing why the lands should be considered for leasing (43 CFR 3420.1-2).

BLM_0076180

The Call for Coal and other Resource Information may be combined with the notice of intent to conduct land use planning published in accordance with 43 CFR 1601.3(g) or with the issue identification process in accordance with 43 CFR 1600.

2.  Publish in the *Federal Register* a notice under 43 CFR 3461.2-1(a)(2), providing for a minimum 30-day comment period on the results of the application of unsuitability criteria, exemptions, and exceptions.

3.  Consult as required under 43 CFR 3461.5 for unsuitability criteria 7 through 11, criteria 13 through 15, and criterion 17.

4.  Consult qualified surface owners as required under 43 CFR 3420.1-4(e)(4) and 1610.2(j) to determine their preference for or against surface mining.  If a significant number of qualified surface owners in an area do not support surface mining, BLM can consider only underground mining unless one of the exceptions in 43 CFR 3420.1-4(e)(4)(ii) or (iii) applies.

5.  Consult Indian Tribes, other Federal agencies, and states as required under 43 CFR 3420.1-6 and 3420.1-7.

6.  Hold a public hearing as required under 43 CFR 1610.2(k) and 43 CFR 3420.1-5 if requested.

## G.  Oil Shale

Refer to the Fluid Minerals section (Appendix C, Section II.H below) for applicable decision guidance, making decisions that consider the unique development aspects of oil shale, from underground mining to in-situ production techniques.

## H.  Fluid Minerals:  Oil and Gas, Tar Sands, and Geothermal Resources

***Land Use Plan Decisions.***  Identify the following consistent with the goals and objectives for natural resources within the planning area (refer to H-1624-1):

1.  Areas open to leasing, subject to existing laws, regulations, and formal orders; and the terms and conditions of the standard lease form.

2.  Areas open to leasing, subject to moderate constraints such as seasonal and controlled surface use restrictions. (These are areas where it has been determined that moderately restrictive lease stipulations may be required to mitigate impacts to other land uses or resource values.)

3.  Areas open to leasing, subject to major constraints such as no-surface-occupancy stipulations on an area more than 40 acres in size or more than 0.25 mile in width. (These are areas where it has been determined that highly restrictive lease stipulations are required to mitigate impacts to other lands or resource values.  This category also

BLM_0076181

Appendix C, page 24

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

includes areas where overlapping moderate constraints would severely limit development of fluid mineral resources.)

4.  Areas closed to leasing.  (These are areas where it has been determined that other land uses or resource values cannot be adequately protected with even the most restrictive lease stipulations; appropriate protection can be ensured only by closing the lands to leasing.)  Identify whether such closures are discretionary or nondiscretionary; and if discretionary, the rationale.

5.  Resource condition objectives that have been established and specific lease stipulations and general/typical conditions of approval and best management practices that will be employed to accomplish these objectives in areas open to leasing.

6.  For each lease stipulation, the circumstances for granting an exception, waiver, or modification.  Identify the general documentation requirements and any public notification associated with granting exceptions, waivers, or modifications.

7.  Whether the leasing and development decisions also apply to geophysical exploration.

8.  Whether constraints identified in the land use plan for new leases also apply to areas currently under lease.

9.  Long-term resource condition objectives for areas currently under development to guide reclamation activities prior to abandonment.

A plan-level decision to open the lands to leasing represents BLM's determination, based on the information available at the time, that it is appropriate to allow development of the parcel consistent with the terms of the lease, laws, regulations, and orders, and subject to reasonable conditions of approval.  When applying leasing restrictions, the least restrictive constraint to meet the resource protection objective should be used.

***Implementation Decisions.***  Offer leases with appropriate stipulations.  Address site-specific actions such as geophysical exploration, approval or disapproval of applications for permit to drill (APDs) with attached restrictions or conditions of approval, well siting, tank battery placement, and pipeline routing.

***Notices, Consultations, and Hearings.***  Public notice shall be given 45 days before offering lands for lease and 30 days before approving APDs or substantially modifying the terms of any lease (43 CFR 3101.1-4).

# I.  <u>Locatable Minerals</u>

***Land Use Plan Decisions.***  For lands that are open to the location of lode, placer, and mill claims, the claimant has statutory authority under the mining laws to ingress, egress and development of those claims.  This authority means that those areas open to mineral entry for the purposes of exploration or development of locatable minerals cannot be unreasonably restricted.

BLM_0076182

Identify the following consistent with the goals and objectives of locatable mineral exploration and development in concert with the protection of natural resources within the planning area.

1. Areas recommended for closure to the mining laws for locatable exploration or development (that must be petitioned for withdrawal).

2. Any terms, conditions, or other special considerations needed to protect other resource values while conducting activities under the operation of the mining laws.

***Implementation Decisions.***

1. Process notices and plans of operations according to the 43 CFR 3809 regulations.

2. Manage the use and occupancy on public lands for the development of locatable mineral deposits to that which is reasonably incident to prospecting, mining or processing operations under the mining laws (43 CFR 3715).

3. After a resource management plan or plan amendment in which lands are designated unsuitable is approved, the authorized officer shall take all necessary steps to implement the results of the unsuitability review as it applies to locatable minerals.

***Notices, Consultations, and Hearings.*** Recommend proposed withdrawals to the Secretary of the Interior for appropriate action pursuant to Section 204(a) of FLPMA. Comply with the congressional notice provisions of Section 204(c) of FLPMA (43 U.S.C. 1714(c)) for withdrawals of 5,000 acres or more.

Areas that are petitioned for designation as unsuitable for mineral development shall receive public review and hearings as appropriate.

## J. **Mineral Materials**

***Land Use Plan Decisions.*** Identify the following consistent with the goals and objectives for the exploration, development, and disposal of mineral materials in concert with the protection of natural resources within the planning area.

1. Areas open or closed to mineral material disposal.

2. Any terms, conditions, or other special considerations needed to protect resource values while operating under the mineral materials regulations.

***Implementation Decisions.***

1. Establish common use areas and community pits and process and approve disposal of mineral materials through prospecting permits, free use permits, and competitive and noncompetitive permits and sales.

Appendix C, page 26

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

2.  After a resource management plan or plan amendment in which lands are designated unsuitable is approved, the authorized officer shall take all necessary steps to implement the results of the unsuitability review as it applies to mineral materials.

***Notices, Consultations, and Hearings.***  Recommend proposed withdrawals to the Secretary of the Interior for appropriate action pursuant to Section 204(a) of FLPMA.  Comply with the congressional notice provisions of Section 204(c) of FLPMA (43 U.S.C. 1714(c)) for withdrawals of 5,000 acres or more.

Areas that are petitioned for designation as unsuitable for mineral development shall receive public review and hearings as appropriate.

## K.  <u>Non-energy Leasables</u>

***Land Use Plan Decisions.***  Applies to minerals leased under the mineral leasing acts and to hardrock minerals leasable under Reorganization Plan No. 3 of 1946.  Identify the following consistent with the goals and objectives for exploration, development, and disposal of non-energy leasables in concert with the protection of natural resources within the planning area.

1.  Areas open or closed to non-energy leasing and development.

2.  Any area wide terms, conditions, or other special considerations needed to protect other resource values while exploring or developing minerals under the non-energy leasable regulations.

***Implementation Decisions.***

1.  Issue mineral use authorizations for prospecting permits, exploration licenses, preference right lease, competitive leases, lease modifications, and use permits.

2.  After a resource management plan or plan amendment in which lands are designated unsuitable is approved, the authorized officer shall take all necessary steps to implement the results of the unsuitability review as it applies to non-energy leasables.

***Notices, Consultations, and Hearings.***  Recommend proposed withdrawals to the Secretary of the Interior for appropriate action pursuant to Section 204(a) of FLPMA.  Comply with the congressional notice provisions of Section 204(c) of FLPMA (43 U.S.C. 1714(c)) for withdrawals of 5,000 acres or more.

Areas that are petitioned for designation as unsuitable for mineral development shall receive public review and hearings as appropriate.

BLM_0076184

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## III. Special Designations

### A. Congressional Designations

***Land Use Plan Decisions.*** Develop stand-alone RMP/EIS-level plans for all national monuments and congressionally designated national conservation areas, national recreation areas, cooperative management and protection areas, outstanding natural areas, and forest reserves (in accordance with the establishing statute or Presidential proclamation).

For designated national scenic and historic trails:

1. Identify goals, objectives and measures to achieve them, as well as allowable uses and surface restrictions to avoid potential adverse affects. Land use plans must also reference, incorporate, or be amended with provisions from applicable comprehensive management plans required by the National Trails System Act.

2. Establish VRM designations; identify SRMAs, recreation management zones, and off-highway vehicle designations; identify trail-related lands for retention, acquisition, withdrawals, avoidance, and exclusion areas; identify appropriate special leasing conditions, terms, constraints, or stipulations; designate trail segments as ACECs; and identify interpretive measures.

3. Concentrate on high potential sites and segments along national historic trails, national register eligible segments, and the primitive character and connection of national scenic trail segments. Consider the historic context and/or current and future landscape condition along the trails.

***Implementation Decisions.*** Develop site-specific implementation actions and plans for congressionally designated areas.

***Notices, Consultations, and Hearings.*** No additional specific requirements.

### B. Administrative Designations

***Land Use Plan Decisions.*** Consistent with the goals and objectives for the planning area, make the following determinations:

1. Manage WSAs under the interim management policy (H-8550-1) until they are designated wilderness or released by Congress. Identify management direction for WSAs should they be released from wilderness consideration by Congress.

2. Assess all eligible river segments and determine which are suitable or non-suitable per Section 5(d)(1) of the Wild and Scenic Rivers Act of 1968, as amended (see BLM Manual 8351).

BLM_0076185

Appendix C, page 28

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

3.  Designate ACECs and identify goals, standards, and objectives for each area, as well as general management practices and uses, including necessary constraints and mitigation measures (also see BLM Manual 1613).  This direction should be specific enough to minimize the need for subsequent ACEC management plans.  ACECs must meet the relevance and importance criteria in 43 CFR 1610.7-2(a) and must require special management (43 CFR 1601.0-5(a)) to:

> a)  Protect the area and prevent irreparable damage to resources or natural systems.

> b)  Protect life and promote safety in areas where natural hazards exist.

4.  Designate research natural areas and outstanding natural areas as types of ACECs using the ACEC designation process.

5.  Designate BLM Scenic or Back Country Byways.  Detailed procedural guidance for nomination and designation of BLM byways, as well as other byway designations occurring on BLM lands (such as All American Roads, National Scenic Byways, State Scenic Byways, Forest Scenic Byways, and similar) can be found in Handbook 8357-1: Byways, 12/17/93.

6.  Designate national recreation trails, watchable wildlife viewing sites, wild horse and burro ranges, or other BLM administrative designations.

Subject to valid existing rights, avoid approval of proposed actions that could degrade the values of potential special designations.  Proposed actions will be reviewed on a case-by-case basis and impacts to an area's values will be assessed.  The standard for this review is the protection of the area's resources and values so that the area will not be disqualified from designation.  Subject to valid existing rights, proposed actions that can not meet this standard should be postponed, relocated, mitigated, or denied until the planning for the area is completed.

***Implementation Decisions.***  Develop site-specific management actions and constraints.  Evaluate and issue permits for scientific, educational, or recreational activities, and develop project plans for trails, interpretive exhibits, resource rehabilitation, and other site-specific activities.  Protective management provisions must be followed to enhance or protect identified resource values and/or characteristics.

***Notices, Consultations, and Hearings.***  Publish a *Federal Register* notice providing a 60-day comment period on proposed ACEC recommendations and resource use limitations (see 43 CFR 1610.7-2(b)).

## IV.  Support

The planning regulations at 43 CFR 1601.0-5(k)(6) provide that land use plans may identify support needs.  These are based on individual planning situations.

BLM_0076186

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## A. Cadastral

*Land Use Plan Decisions.*  Identify planning boundaries so the geographic extent of land use decisions is clearly understood.  The plan may identify areas where additional cadastral survey work is needed to locate and mark boundaries on the ground, including those areas identified for disposal.  The plan may also identify the need to complete more detailed boundary management plans.

*Implementation Decisions.*  If necessary, develop a boundary management plan for locating and marking priority areas.  Identify areas needing immediate trespass resolution.

*Notices, Consultations, and Hearings.*  No additional specific requirements.

## B. Interpretation and Environmental Education

*Land Use Plan Decisions.*  Identify management goals and/or objectives for interpretation and environmental education, and describe the significant resources or areas that will be made available for interpretation/environmental education.  For units of the NLCS, significant resource or area descriptions should be based on the designation or proclamation language establishing each area.

*Implementation Decisions.*  Determine what management actions are necessary to achieve identified interpretive and environmental education goals and/or objectives.  Address the techniques to be used, and the partners and volunteers needed, to implement these management actions.  The following factors should be considered for relevant activity-level interpretive and environmental education plans:

1. Key stories unique to the area;

2. primary messages or themes;

3. educational goals which support management objectives;

4. primary recreation opportunities;

5. distinctive recreation setting character;

6. key resource as well as recreation-tourism attractions; and

7. administrative services and controls.

The key interpretive stories and educational themes are best identified by collaborating with: 1) community groups; 2) service providers and other interested partners; and 3) other federal, state, and local government agencies.  These key stories and themes are often about unique historical, biological, geological, or other resource and human values found within the planning area.  The interpretive and educational themes relate to the primary values of the areas and/or their

BLM_0076187

Appendix C, page 30

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

associated resources. LUP management goals should be incorporated into primary interpretive messages where appropriate.

***Notices, Consultations, and Hearings.*** No additional specific requirements.

## C. <u>Transportation Facilities</u>

***Land Use Plan Decisions.*** Identify land areas available or suitable for transportation facilities. Identify types of transportation facilities that are appropriate for the planning area. Identify limitations, if any, on the types or locations of facilities for specified areas.

Identify the area(s) having in-place transportation facilities that should be removed. Identify road repair, road rehabilitation, road construction, and maintenance standards appropriate to specific areas. Identify limitations, if any, on road repair, road rehabilitation, road construction, and maintenance actions. Identify limitations, if any, on road density (i.e., miles/section) for specific areas.

Also refer to Appendix C(II)(D), Comprehensive Trails and Travel Management.

***Implementation Decisions.*** Develop a map or other type of specification document that displays and describes the intended use of the individual geographic units within the planning area. In conjunction with the process of identifying a road network (see Appendix C, Section II.D, (Comprehensive Trails and Travel Management)), develop a transportation plan outlining specific road types and designations such as Federal, state, county, and Tribal roads, BLM administered/maintained roads, and BLM public roads. Identify roads in congressionally designated conservation units, Presidential conservation designations, and administrative conservation designations such as back country byways.

***Notices, Consultations, and Hearings.*** No additional specific requirements.

BLM_0076188

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## Appendix D:  Social Science Considerations in Land Use Planning Decisions

## I.  Using Social Science in Land Use Planning

Appendix D provides guidance on integrating social science information into the planning process.  Any information gathered in support of a planning effort must be considered in the context of BLM's legal mandates.

The BLM is required to manage the public lands on the basis of multiple use and sustained yield and to meet the needs of present and future generations.  As the human population continues to increase and social values evolve, resource conflicts are likely to increase.  More importantly, the American public is increasingly aware of the importance of the public lands to its well-being and is demanding a larger voice in resource management decisions.  Given these realities, the planning process can represent a constant balancing of competing needs, interests, and values.  The effective use of social science can be critical to understanding and reconciling these differing perspectives.

Social science information in land use planning can include the economic, political, cultural, and social structure of communities, regions, and the Nation as a whole; social values, beliefs, and attitudes; how people interact with the landscape; and sense-of-place issues.  The social sciences integrate a wide variety of disciplines, generally including economics, sociology, demography, anthropology, archaeology, political science, geography, history, and landscape architecture.  Though the information appropriate to a given analysis depends upon the specific issues being assessed, the social science information usually important for resource planning decisions can be grouped in the following categories:

- Demography and Social Indicators
- Social Organization and Institutions
- Attitudes and Values
- Human Geography
- Economic Value
- Employment, Income, and Subsistence
- Public Finance and Government Services
- Environmental Justice

By statute, regulation, and Executive order the BLM must utilize social science in the preparation of informed, sustainable land use planning decisions. Section 202(c)(2) of FLPMA requires BLM to integrate physical, biological, economic, and other sciences in developing land-use plans (43 USC 1712(c)(2)). FLPMA regulations 43 CFR 1610.4-3 and 1610.4-6 also require BLM to analyze social, economic, and institutional information. Section 102(2)(A) of NEPA requires Federal agencies to "insure the integrated use of the natural and social sciences . . . in planning and decision making" (42 USC 4332(2)(A)).  Federal agencies are also required to "identify and address . . . disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States" in accordance with Executive Order 12898 on Environmental Justice.

BLM_0076189

Appendix D, page 2

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## II.  Incorporating Socio-economic Information

### A.  The Planning Process

To be effective, social scientific data and methods should be integrated into the entire planning process, from preparing the pre-plan to implementation and monitoring.  The main social science activities for the various planning steps are outlined in Table D-1.

**Table D-1.—*Social science activities in land use planning***

| Planning steps | Social science activities |
|---|---|
| Steps 1 & 2—Identify Issues and Develop Planning Criteria | • Identify publics and strategies to reach them<br>• Identify social and economic issues<br>• Identify social and economic planning criteria |
| Step 3—Inventory Data | • Identify inventory methods<br>• Collect necessary social and economic data |
| Steps 4—Analyze Management Situation | • Conduct social and economic assessment, including existing conditions and trends and the impacts of continuing current management<br>• Document assessment methods in an appendix or technical supplement |
| Step 5—Formulate Alternatives | • Identify social and economic opportunities and constraints to help formulate alternatives |
| Step 6—Estimate Effects of Alternatives | • Identify analysis methods<br>• Analyze the social and economic effects of the alternatives<br>• Document impact analysis methods in an appendix or technical supplement<br>• Assess mitigation opportunities to enhance alternatives' positive effects and minimize their negative effects |
| Steps 7 & 8—Identify Preferred Alternative and Finalize Plan | • Identify potential social and economic factors to help select the preferred alternative |
| Step 9—Monitor and Evaluate | • Track social and economic indicators |

### B.  Objectives of the Analysis

Beyond contributing to the public involvement strategy (see Appendix D, Section III), socio-economic input to BLM's resource management planning has three main elements: baseline assessment, impact analysis, and mitigation.

1.  Baseline assessment

Characterize existing conditions and trends in local communities and the wider region that may affect and be affected by land use planning decisions. This baseline assessment should be

BLM_0076190

included or summarized and referenced in the Affected Environment section of the EIS.  In particular, the baseline assessment should:

    a)  Review and summarize the relevant published and unpublished literature on the history, economy, and social system(s) of the study area;

    b)  characterize the economic structure and activity of communities and groups within the study area that are affected by the management of BLM lands; and

    c)  characterize the social structure, activities, and values of such communities and groups.

When preparing RMP amendments for activity- or implementation-level projects, the social science and economic portions of the Affected Environment chapter may be referenced to the original RMP or reduced in complexity, based on the actual issues associated with the proposed actions.

    2.  <u>Impact analysis</u>

In the Environmental Consequences section of the EIS, characterize impacts to existing conditions and trends from each of the alternatives under consideration, including the no action alternative, relative to the baseline assessment. Impacts include direct, indirect, and cumulative effects for all resources that make up the human environment.  In particular, impact analyses should:

    a)  Analyze the positive and negative economic effects of each alternative developed within the RMP on those communities and groups;

    b)  analyze the positive and negative social effects of each alternative developed within the RMP on those communities and groups; and

    c)  in fulfillment of Environmental Justice requirements, identify any disproportionate negative effect on low-income or minority populations associated with one or more proposed alternatives (see Appendix D, Section IV).

    3.  <u>Mitigation measures</u>

As appropriate, identify measures that may reduce or avoid potential adverse economic or social effects of the alternatives, and maximize their positive effects.  Determination of the preferred alternative as expressed in the RMP ROD should reflect this analysis.  Note that the preferred alternative is not required to be the alternative with the least cumulative adverse impacts or that provides full mitigation to all social and economic impacts.

Appendix D, page 4

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## C.  The Scope of Analysis

There is no standard scope of work for socio-economic analysis because the key topics and methods are shaped in part by the social context and potential resource allocation decisions of a given resource management plan.  The social and economic assessment (affected environment) and impact analysis (environmental consequences) should assist the reader to understand the human context of the planning effort, and in particular to identify the potential effects, constraints, and opportunities associated with planning alternatives.  Table D-2 presents 27 topics of socio-economic information.  We suggest ranking topics as follows:

---

**1 ~ Basic**:  topic should be addressed (example:  population trends)

**2 ~ Optional**:  address if warranted by context and issues

**3 ~ Not currently indicated**:  address if indicated by new information

---

In Table D-2 some topics considered basic to all socio-economic analyses are assigned a priority of **1**.  Field office staff responsible for directing the socio-economic aspect of a resource management plan can use the list of topics to define an appropriate scope of work, identifying which topics should be included in the analysis by ranking as **1** (basic), **2** (optional), or **3** (not currently indicated).

These topics are available as a stand alone Checklist for Socio-Economic Analysis, available on the BLM social science website (see Appendix D, Section VII).  For each topic the checklist also includes a field for "plan-specific guidance" to provide BLM staff or contractors with more precise direction as to which groups, issues, and activities should receive particular attention.  Note also that the required Economic Strategies Workshop (see Appendix D, Section III[B]) provides an excellent opportunity to discuss with interested government leaders and the public what topics should be emphasized in the socio-economic analysis.

Appendix D, page 5

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

**Table D–2.**—*Topics for socio-economic analysis*

| | Topic | Planning relevance | Examples | Priority |
|---|---|---|---|---|
| **Demography and Social Indicators** | *Population* | Potential demand on BLM lands and resources | Population trends; migration, distribution by age and gender | 1 |
| | *Inequality* | Differences in visibility and influence; identify vulnerable populations (Environmental Justice) | Income distribution; percent of households in poverty | 1 |
| | *Social difference* | Barriers to public involvement; different user needs and values; identify distinctive populations (Environmental Justice) | Ethnicity; languages spoken in household; Tribal affiliation | |
| | *Social indicators* | Can indicate community strengths and weaknesses that may have implications for planning issues | Crime rates, divorce rates, unemployment, education, length of residence | |
| **Social Organization and Institutions** | *Government* | Potential cooperating agencies; contacts for plan coordination (identified in pre-plan) | Municipal and county governments in/near planning area; special districts; Tribal governments | 1 |
| | *Non-govern-mental institutions* | Potential partners for plan implementation; sources of economic and social resilience | Chamber of Commerce; church groups; ethnic advocacy organizations | |
| | *Communities of place* | Local and regional population centers relative to planning area effects may differ by community | Gateway communities; natural resource-dependent communities | 1 |
| | *Social groups and networks* | Opportunities for informal contacts in seeking public comment and communicating plans and proposals | Networks linking ranchers or retirees | |
| | *Occupational and interest groups* | Provide range of perspectives on potential land use decisions, effects may differ by distinct group | Wilderness advocates; oil and gas producers, Cattleman's Association | 1 |
| **Attitudes and Meanings** | *Attitudes and beliefs regarding local environment and its use* | Local understandings may shape acceptability of proposed land use decisions **[formal techniques: surveys, interviews, focus groups]** [1] | Survey to clarify local understanding of effects of coal bed methane technology on ground-water conditions | |

BLM_0076193

Appendix D, page 6

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

|  | Topic | Planning relevance | Examples | Priority |
|---|---|---|---|---|
|  | *Significance of proposed land management actions for various publics* | While public attitudes are elicited in scoping, formal data collection can identify important differences between groups, providing further information to help identify impacts and mitigation strategies **[formal techniques: surveys, interviews, focus groups]** [1] | Interviews to assess social impacts of prescribed burning |  |
|  | *Quality of life* | Can indicate community perceptions that may have implications for planning issues | Perceived access to community resources; satisfaction with community conditions, such as opportunities for employment |  |
| **Human Geography** | *Distribution of communities, roads, and resources* | Clarify geo-spatial context; can predict potential conflicts and impacts over proposed land use allocations | Wildland-urban interface, recreational demand from nearby cities | 1 |
|  | *Land ownership and access* | Can predict potential conflicts and impacts over proposed land use allocations | Split estate ownership of sub-surface minerals |  |
|  | *Culturally and socially significant places and areas* | Identify constraints on site-specific activities, help to identify mitigation (may be developed in cultural resource analysis) **[formal techniques: surveys, interviews, focus groups]** [1] | Locally valued buildings, sites, and landscapes; sense of place; traditional religious/cultural use areas |  |
| **Economic Value** | *Interrelation-ships among producing sectors* | Regional economic sectors and their interrelation as a context for BLM management decisions (when allocation decisions are of sufficient scale to have macroeconomic effects, consider national–level economic interrelationships) | Annual purchase and sales by economic sector (transaction matrix) | 1 |
|  | *Non-market values of resources and activities* | Consider the significance of the non-market values associated with resources managed or impacts by BLM when formulating the management alternatives | Estimate the value of open space, improved riparian areas, improved wildlife habitat |  |

BLM_0076194

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

|  | Topic | Planning relevance | Examples | Priority |
|---|---|---|---|---|
|  | *Dependence on BLM lands and resources* | Understand and quantify the potential local and regional impacts of land use decisions | Value of BLM timber sales, visitor-day expenditures, grazing and mining to the local economy |  |
| **Employment, Income, and Subsistence** | *Employment* | Quantify the anticipated employment impacts by sector to determine the population changes and the associated demand on the infrastructure in the study area | Temporary jobs from oil and gas development versus service jobs created by increased recreational opportunities | **1** |
|  | *Personal income* | Forecasting the anticipated change in income, occurring as a result of the BLM alternatives | Non-labor income (dividends, transfer payments) | **1** |
|  | *Economic diversity and resilience* | Ability of stakeholder communities to respond to external change | Level of dependence on single economic sector |  |
|  | *Regional economic organization* | Identify amount and geographic distribution of new indirect and induced employment resulting from additional local investment | New local jobs resulting from proposed increase in oil and gas production on public lands |  |
|  | *Subsistence activities* | Non-market production from BLM lands for local use | Amount and value of subsistence hunting by local residents |  |
| **Public Finance and Government Services** | *Government revenues and expenditures* | Fiscal capacity and resilience under change | Change in tax revenues and county PILT receipts |  |
|  | *Public infrastructure and services* | Community services may be impacted by resource or recreational development of public lands | Expenditures on schools, roads, social services |  |
| **Environmental Justice** | *Characterize Environmental Justice populations in planning area* | See Demography and Social Indicators:  inequality, social difference | Much of the commercial harvesting of non-timber forest products in Pacific Northwest is organized through ethnic networks | **1** |
|  | *Assess potential for disproportionate impacts to Environmental Justice populations* | Identify whether Environmental Justice issues require further modification of alternatives, or further mitigation of impacts | Oil and gas development in areas where American Indian populations collect medicinal plants | **1** |

[1] Primary (new) data collection methods may be subject to requirements of the Paperwork Reduction Act.  See Planning Handbook, Appendix D, Section V(C).  Secondary data may also be available.

BLM_0076195

## D.  Deliverables in Contracting

It is recommended the field offices contracting for socio-economic analyses in resource management plans require the following deliverables.

1.  Baseline social and economic assessments, for inclusion in the AMS document.

2.  Abbreviated baseline social and economic assessments, for inclusion in the Affected Environment chapter of the plan/EIS.

3.  Proposed impact analysis strategy, describing the social and economic variables, the key data sources, and the analytic methods proposed.  These should be based on requirements provided by the contracting officer's representative, issues identified in the pre-plan, information obtained through scoping and other public involvement, guidance from cooperating agencies, and the social and economic baseline assessments.

4.  Social and economic impact analyses, for inclusion in the Environmental Consequences chapter of the plan/EIS.

5.  Analysis of Environmental Justice compliance.

6.  A brief methodological statement, presented as an appendix to the plan/EIS, summarizing the significant analytic assumptions and methods utilized in preparing the statement of social and economic impacts.

## E.  Analytic Guidelines

Social science information provided for resource management plans should be consistent with the following guidelines.

1.  *Scale and level of effort.*  The scope of analysis and level of effort should be commensurate with the importance of the particular resource issues.  In other words, focus data collection and analysis on those issues and sectors that are important for the agency's decision-making or important for the publics, as identified through scoping and other formal and informal forms of public involvement.

For example, a regional programmatic plan would likely provide a broad characterization of communities within and near the planning region as well as an examination of national-scale public land priorities.  A single RMP would likely focus on a much smaller area and include a more detailed analysis for each community.  At the implementation plan level, the analysis would focus on more site-specific information, such as the groups, networks, or individuals affected by the decision under consideration.

2.  *Assessment area.*  The assessment (study) area for economic and social analysis may be larger than the designated planning area (for example, because of a major retail center outside but near the planning area).  Depending on the issues, the boundaries of the social

BLM_0076196

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

and economic study areas may not be identical. The analysis may also require describing populations that do not reside primarily in the assessment area, such as recreational users coming from metropolitan areas.

3. *Schedule.* Information should be gathered early enough to be included throughout the discussion and decision-making phases of the planning effort.

Note that the economic analysis (and indirectly, the social analysis) is dependent on sound output projections for each significant resource, over each alternative to be evaluated. For example, the economic analysis of recreation-related impacts (changes in assessment area payroll and employment) cannot be done until the recreation specialists have determined the changes in visitor days, by alternative. The economic analysis of mineral development cannot be done until the geologists have developed an analysis of the changes in mineral availability and production, by alternative.

4. *Dimensions of impact analysis.* Impact analyses must make clear how the social and economic effects of each management alternative—both positive and negative—are distributed among the communities and groups in the assessment area, and among other relevant populations (for example, recreational users who live outside the study area). Potential impacts have multiple aspects relevant to decision-making; a well-crafted impact analysis should describe the aspects listed in Table D-3.

**Table D-3.—***Dimensions of impact analysis relevant to decision-making*

| Aspect | Describe |
|---|---|
| Space | ▪ Impacts across multiple geographic scales: individual, household, community, region, and where appropriate, national society. |
| Time | ▪ Impacts across multiples time scales: short-term versus long-term. |
| Social identity | ▪ Who would be affected, and in what ways. If different groups or publics (for example, distinguished by income, ethnicity, gender, or occupation) will be unequally affected, describe and explain why. Where low income, minority, or Tribal populations would be disproportionately affected, ensure that this is documented in the Environmental Justice assessment (see Section IV). |
| Magnitude | ▪ The magnitude and significance of projected impacts. |
| Probability | ▪ The likelihood of a projected impact occurring. |
| Causation | ▪ The direct, indirect, and cumulative projected impacts. |
| Acceptability | ▪ The anticipated desirability or acceptability of projected impacts. |

5. *Analysis of no-action alternative.* For the Environmental Consequences section of the EIS, characterize impacts to existing economic conditions and trends from each of the alternatives under consideration, relative to the no action alternative. While the no action alternative assumes no new actions within the RMP's scope of decisions, it should

BLM_0076197

Appendix D, page 10

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

include other changes reasonably anticipated to affect the study area within the planning timeframe.

6. *Non-market value*. The analysis of economic impacts for each plan alternative should consider not merely anticipated expenditures (market transactions), but where feasible, the anticipated consumer surplus generated by the proposed activity, as determined by estimates of willingness-to-pay (non-market values). To estimate non-market values for activities proposed under a plan alternative, it is often more practical to utilize *benefit transfer* methods than to undertake new research within the study area, by applying soundly derived non-market values established for comparable sites and activities.

## III. Public Involvement

### A. Integrating Social Science Into Public Involvement

Development of the social and economic analysis should take place as part of a larger collaborative dialogue between BLM and the public. Staff or contractors responsible for social science contributions to the RMP should integrate information from public involvement processes with technical data collection and analysis. Moreover, social and economic analysis can provide information about affected groups that can improve plans for public involvement.

To the extent feasible, BLM's public involvement process should seek not only attitudes and values relevant to planning issues and alternatives, but also suggestions regarding sources of data and methods of analysis. Involving local publics in discussions of appropriate data and methods early in a planning process increases the likelihood that the resulting analysis of effects will be considered credible and useful. State and field offices are encouraged to engage potential and existing partners in the collection, preparation, and analysis of social and economic data leading to the formulation of alternatives, their anticipated impacts, and potential mitigation.

Partners include other Federal agencies and state, Tribal, county, and municipal governments. Information-sharing with partners is crucial to the formulation of cumulative social and economic impacts from alternatives that span jurisdictional/regional boundaries. Consider cooperating agency status where appropriate and look for opportunities to combine analysis with partners' planning processes. Other participants, such as universities, communities, religious institutions, industry representatives, and non-governmental organizations may also share vital information not obtainable through standard data sources.

### B. Economic Strategies Workshop

The public involvement effort on all new RMPs, RMP revisions, and RMP amendments accompanied by EISs must include at least one economic strategies workshop. Such workshops provide an opportunity for local government officials, community leaders, and other citizens to discuss regional economic conditions, trends, and strategies with BLM managers and staff. Such workshops must meet three objectives:

BLM_0076198

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

1.  Imparting skills on analyzing local and regional economic and social conditions and trends;

2.  assisting community members to identify desired economic and social conditions; and

3.  collaborating with BLM staff to identify opportunities to advance local economic and social goals through planning and policy decisions within the authority of BLM, its cooperating agencies, or other partners.

Field Managers are welcome to select appropriate workshops from qualified vendors, or to work with State Office or Washington Office social science staff to design a workshop appropriate to their situations.  The cost of such workshops should be included in the RMP planning budget and indicated in the pre-plan.  For sources of further information on such workshops, see Section VI, Further Guidance.

## IV.  Environmental Justice Requirements

Environmental Justice involves the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies.  Fair treatment means that no group of people, including racial, ethnic, or socio-economic group should bear a disproportionate share of the negative environmental consequences resulting from industrial, municipal, and commercial operations or the execution of Federal, state, local, and Tribal programs and policies.

Executive Order 12898, issued in 1994, requires that ". . . each Federal agency shall make achieving Environmental Justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."

## A.  BLM's Environmental Justice Principles

1.  The BLM will determine if its proposed actions will adversely and disproportionally impact minority populations, low-income communities, and Tribes (reference Executive Order No. 12898, Environmental Justice) and consider aggregate, cumulative, and synergistic effects, including results of actions taken by other parties. While Environmental Justice analysis is specifically concerned with disproportionate effects on the three populations, the social and economic analysis produced in accord with NEPA considers all potential social and economic effects, positive and negative, on any distinct group.

2.  The BLM will promote and provide opportunities for full involvement of minority populations, low-income communities, and Tribes in BLM decisions that affect their lives, livelihoods, and health.

BLM_0076199

Appendix D, page 12

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

3. The BLM will incorporate Environmental Justice considerations in land use planning alternatives to adequately respond to Environmental Justice issues and problems facing minority populations, low-income communities, and Tribes living near public lands, working with, and/or using public land resources.

4. Where disproportionately high adverse impacts are anticipated, the BLM will work with local community groups/associations, governments, and Tribal leaders to determine if land disposition and/or acquisition policies affect real estate values and real income of minority and low income communities, and Tribes.

5. The BLM State and Field Offices will continue to make Environmental Justice a mandatory critical element for consideration in all land use planning and NEPA documents.

**B.  Incorporating Environmental Justice Efforts in the RMP/EIS Process**

1. Consult with other Federal agencies, Tribal leaders, states and local governments, community groups/associations, churches, etc., to identify minority and low-income communities, and reservations, including migrant and/or seasonal workers. Work with the above groups to determine any potential disproportionately high and adverse impacts posed by the proposed action. With the cooperation of the partners, affected minority populations, low-income communities, and Tribes, adopt and implement creative measures to eliminate, minimize, and/or correct identified Environmental Justice impacts.

2. Through collaboration, identify potential planning areas where proposed action(s) could have disproportionately high and adverse impacts on the health of minority populations, low-income communities and Tribes or their surrounding environment, and document findings and recommended solutions.

3. Share appropriate information about potential high and adverse impacts with minority populations, and/or low-income communities, and/or Tribes through workshops, informal meetings, or other forums and solicit feedback and recommendations.

4. Publish NOIs and NOAs announcing scoping/issue identification meetings in the local media (newspaper, radio, or television) of identified minority and low-income communities and Tribes informing them of such meetings.

5. Develop mailing lists of identified minority populations, low-income communities, and Tribes. Become knowledgeable of the geographic areas of proposed actions and the people that live there (minority and low-income including those in transitory status).

6. When appropriate, schedule scoping/issue identification meetings in minority and low-income communities or on Tribal reservations; and

7. Consider the need to translate to other languages planning and NEPA documents mailed/circulated to identified minority populations, low-income communities, and

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

Tribes.  Consider also the need to have an interpreter present at all scheduled meetings if there are potential language problems.

## C. Documentation and Analysis

1.  Pre-plans should identify known low-income, minority, and Tribal populations within the assessment area, and should indicate what measures will be taken to encourage their participation in the planning process.

2.  Data and analyses needed to ensure Environmental Justice compliance should be incorporated in work plans for social and economic impact analyses.

3.  Environmental Justice considerations should be documented by the RMP/EIS social and economic analyses in (a) the Analysis of the Management Situation, (b) the Affected Environment chapter, and (c) the Impact Analysis (Environmental Consequences) chapter.  An explanation of how any Environmental Justice issues have been considered and, where possible, mitigated should be included in the description and rationale for the preferred alternative.

## V. Data Management

## A. Types of Data

The type of data to be collected and analyzed should be appropriate to the planning scale and the issues identified through the scoping process.

There are numerous sources of data available at the national, state, and local levels from government, university, and private sources.  Utilize BLM sources as well as other governmental agencies that routinely collect and report economic and social data.  Much of the government data is easily available online.  Locally and regionally produced reports on social and economic conditions that are produced on a one-time basis (such as county or community planning documents and university extension studies) may also be useful.

Use existing data to the extent possible:  planning documents and environmental impact statements do not routinely require primary data collection.  Nonetheless, collecting primary data may be necessary, particularly for social impact assessment, using techniques such as surveys, focus groups, or key informant interviews.  Any plan to include primary data collection should be justified in terms of gaps in available data or special circumstances.

## B. Data Quality and Analytic Soundness

Social and economic analyses should be performed in a manner consistent with professionally recognized approaches, methods, and techniques.  In addition, the Information Quality Act (Public Law 106-554, §515) requires Federal agencies to ensure that influential information, such as that used in the preparation of resource management plans, be characterized by reproducibility and transparency.

BLM_0076201

Appendix D, page 14

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

BLM recognizes that influential information should be subject to a high degree of transparency about data and methods to facilitate the reproducibility of such information by qualified third parties, to an acceptable degree of precision. It is important that analytic results have a high degree of transparency regarding (1) the source of the data used, (2) the various assumptions employed, (3) the analytic methods applied, and (4) the statistical procedures employed. It is also important that the degree of rigor with which each of these factors is presented and discussed be scaled as appropriate, and that all factors are presented and discussed. (See BLM's "Information Quality Guidelines," available at: http://www.blm.gov/nhp/efoia/data_quality/.)

Data sources and methods of analysis must be clearly and briefly described in the text of the RMP/EIS and described in more detail in a technical supplement or RMP appendix.

## C. Paperwork Reduction Act Requirements for New Data Collection

RMP/EIS teams must ensure that any new (primary) data collection complies with the requirements of the Paperwork Reduction Act of 1995 (Public Law 104-13).

If answers to identical questions are to be collected from 10 or more members of the public—for example, through a survey questionnaire—the Paperwork Reduction Act requires Office of Management and Budget (OMB) approval for the study. Note that for purposes of the Act, "public" also applies to state, local, and Tribal government employees, though not to employees of the Federal government. OMB review is normally a lengthy process, which must be initiated through the BLM Washington Office. Unless the proposed data collection can be processed by expedited review under the terms of an existing generic OMB authorization (such as that for Customer Satisfaction Surveys), approval is likely to be time consuming.

## VI. Data Sources

## A. Use of the Economic Profile System

Developed by the Sonoran Institute under an agreement with the BLM, the Economic Profile System (EPS) and its companion, EPSC (for Community), produce standardized economic and demographic profiles for a selected region, county, or community in any of the 50 states. EPS and EPSC simplify the socio-economic research required for land use planning by gathering and presenting, in a variety of useful formats, data from multiple Federal databases. These information tools were created to improve planning and more efficiently accomplish the time-consuming task of gathering important social and economic data. EPSC uses the Decennial Census to provide in-depth community-level profiles. EPS draws upon a variety of governmental databases to produce thorough and multi-faceted profiles of economic and demographic changes over the past 30 years.

Field offices are encouraged to use EPS and EPSC as tools for characterizing economic and social baseline conditions. EPS and EPSC profiles can be provided in an appendix to the AMS or RMP/EIS, while selected figures and tables can easily be incorporated in the main RMP/EIS text. Where a plan or NEPA analysis will be prepared by contractors, planning leads are encouraged to have contractors utilize EPS in plan preparation, and to seek commensurate cost

BLM_0076202

savings in contracted work. Note that EPS and EPSC are not impact models: they cannot be used to quantify the economic impacts of a proposed activity or planning alternative.

For further information on EPS and EPSC, see Section VI, Further Guidance.

## B. References

The following references are provided as potential sources for social and economic information. Data and information from these and other sources must be used within the context of the laws governing BLM's management of the public lands.

*The Federal Interagency Council on Statistical Policy.* Fedstats Website: http://www.fedstats.gov/. This website provides access to a wide variety of data produced by over 70 Federal agencies for public use. It provides access to statistics for demographics, economics, natural resources, the environment, energy, health, education, and many other areas. Much of this data is available at the county, state, and/or regional level.

*U.S. Department of Agriculture, Forest Service.* The USDA Forest Service's course 1900-03, *Social Impact Analysis: Principles and Procedures,* includes a helpful student manual. This source is available through Ecosystem Management Coordination (EMC), USDA Forest Service, but is not available online. [Yates Bldg. 3CEN, 201 14th Street, SW, Washington DC 20250; 202-205-0895]

The Human Dimensions website contains much useful information about human dimensions analysis and includes sites from which economic and demographic data can be downloaded. Source: http://www.fs.fed.us/emc/nris/hd/ or http://fsweb.nris.fs.fed.us/hd/software/hdmodule/index.shtml

*U.S. Department of Commerce, Bureau of the Census.* Census data includes the economic characteristics of cities, towns, counties, and states, as well as a wide variety of social and demographic information such as population, age, and migration rates. The Census Bureau also presents information on county governments including financial characteristics [Website: http://www.census.gov].

*U.S. Department of Commerce, Bureau of Economic Analysis.* Includes data for states, counties, and economic regions for such factors as personal income and employment by industry, gross state product, and more [Website: http://www.bea.doc.gov/].

*U.S. Department of Labor, Bureau of Labor Statistics.* This Federal agency collects and reports data on the labor market, including labor trends, detailed information on employment by industry, and unemployment rates. It also reports price indices such as the consumer price index and the producer price index [Website: http://www.stats.bls.gov].

*U.S. Department of the Interior, BLM.* The BLM collects data on a wide variety of commercial uses of public lands. This data is useful for putting public land uses in the context of overall use in a planning area. Examples of the data collected include grazing use, mining, timber product sales, coal, oil and gas leases, recreation, rights of way, and payments-in-lieu-of-

BLM_0076203

Appendix D, page 16

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

taxes (PILT).  To obtain this data, contact resource specialists for those uses or refer to BLM's annual Public Land Statistics publication [Website: http://www.blm.gov/publications/].

*The Interorganizational Committee on Principles and Guidelines for Social Impact Assessment*:  Principles and guidelines for social impact assessment in the USA. *Impact Assessment and Project Appraisal* 21(3), September 2003.  This document provides a clear model, as well as principles and steps for social impact assessment. [http://www.iaia.org/Members/Publications/Guidelines_Principles/US%20principles%20fin al%20IAPA%20version.pdf]

*Local sources of data*.  There are many local government agencies and organizations that collect data that can be useful in land use planning.  Such sources of data include state and local employment departments, city and county governments (e.g., building departments, departments of motor vehicles, or county tax assessors), local and state Chambers of Commerce, local and state economic development commissions, etc.

*Resource-specific sources of data*.  There are many state and Federal agencies that collect and report data on specific industries, such as agriculture (farming and ranching), mining, forestry, and recreation.  For agricultural data, the *USDA Economic Research Service* (Website:  http://www.ers.usda.gov/ http://www.econ.ag.gov) and the *National Agricultural Statistics Service* (Website:  http://www.usda.gov/nass/) are two good sources of information.  The *Economic Research Service* also conducts studies on rural conditions and trends.

The following text citations are provided as examples of possible sources for field offices:

Branch, K., et al.  1984.  *Guide to Social Assessment: A Framework for Assessing Social Change*.  Westview Press, Boulder, CO.

Rabel J. Burge, R.J., et al.  2004.  *The Concepts, Process and Methods of Social Impact Assessment*.  Social Ecology Press, Middleton, 2004.

Goldman, L.R., *ed*.  2000.  *Social Impact Analysis:  An Applied Anthropology Manual*.  Berg Publishing, New York, NY.

Rosenberger, R.S., Loomis, J.B.  2000.  Benefit Transfer of Outdoor Recreation Use Values:  A Technical Document Supporting the Forest Service Strategic Plan.  USDA-Forest Service, Rocky Mountain Research Station General Technical Report RMRS-GTR-72, Fort Collins, CO.

BLM_0076204

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## C. Environmental Justice References

Table D-4.—*Web-based Environmental Justice sources*

| | |
|---|---|
| The CEQ has prepared detailed guidance on complying with Environmental Justice objectives in the NEPA process: | "Environmental Justice:  Guidance Under the National Environmental Policy Act, 1997," available at: **http://ceq.eh.doe.gov/nepa/regs/ej/justice.pdf** |
| The Interagency Working Group on Environmental Justice, organized by EPA, has useful guidance and other resources: | **http://www.epa.gov/compliance/environmentaljustice/interagency/index.html.** |
| For assistance in identifying Tribal, minority, and low-income populations within a planning area: | "Environmental Justice Geographic Assessment Tool," available at: **http://www.epa.gov/enviro/ej/** |
| The Department of the Interior's Office of Environmental Policy and Compliance has information on Environmental Justice policy and projects: | **http://www.doi.gov/oepc/justice.html** |

## VII.  Further Guidance

For further information on the topics in Appendix D, contact your state office social science staff, or social science staff at the Planning, Assessment, and Community Support Group, Washington Office (WO-210).  Effective use of other agencies' plans and reports, including, but not limited to local government, state agencies, and community development organizations is strongly encouraged.

A website to provide social science guidance, tools, and information resources is under development.

BLM_0076205

BLM_0076206

**Appendix E: Summary of Protest and Appeal Provisions**

The BLM must distinguish between land use plan and implementation decisions in all proposed RMP documents (new RMPs, revisions, or amendments) and related decisions (records of decision [ROD] and decision records [DR]), and clearly describe for the public the administrative remedies for each type of decision.  The Dear Reader Letter or the Executive Summary could be used to communicate this information to the public.

## I.  Land Use Plan Protests

The protest procedures in 43 CFR 1610.5-2 provide the public an administrative review of the State Director's proposed land use plan decisions.  The BLM Director determines through this process whether the State Director followed established procedure, considered relevant information in reaching proposed decisions, and whether the proposed decisions are consistent with BLM policy, regulation, and statute.

The Director has delegated signing of response letters to protests to the Assistant Director, Renewable Resources and Planning (AD-200).  Acting in support of the Director, the Group Manager for Planning, Assessment, and Community Support (WO-210) is responsible for the oversight of the entire process once a protest is filed through final resolution.  Each protest is considered in close coordination with the involved State Director and affected Washington Office groups, other Washington Office policy officials, and as appropriate, the Office of the Solicitor.  The WO-210 Group Manager makes recommendations to the Assistant Director for final resolution of the protest.

It will be the BLM's goal to resolve all protests within 90 days.  If it is not possible to resolve and respond to the protest(s) within 90 days, the WO-210 Group Manager should send a letter acknowledging receipt of the protest to the originating party, indicating that a more detailed response will follow.  Refer to Figure 5 for a summary of the protest process.

## A.  Washington Office Initial Evaluation of Protests

When possible, all actions in this section will be completed within 5 business days of receipt of the protest letters:

1. ***The Protest Coordinator will establish a case file for each protest received.***  Each protest will be consecutively serialized using the following coding: **PP-SO-PN-FY-#**

> a) "PP" means Plan Protest,
> b) "SO" means the responsible State Office,
> c) "PN" means a plan name identifier of up to several letters,
> d) "FY" means the last two digits of the fiscal year,
> e) "#" is a sequential number assigned as the filings are received.

BLM_0076207

Appendix E, page 2

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)



Figure 5.—*Protest process flow chart*

BLM_0076208

2.  ***The Protest Coordinator will check to ensure that each protest was filed within the protest period (see 43 CFR 1610.5-2(a)(1)).***  Plan protests are deemed timely if the postmark is not later than the last day of the protest period (see Receiving, Managing, and Responding to Electronic Mail and Faxed Protests at the end of this section).  Normally, BLM does not need to actually receive a protest by the end of the protest period—the protest letter must only be postmarked by that date.  In certain instances, the BLM may require that protests be received by the end of the protest period.  This requirement may only occur if the public is widely and officially notified (at a minimum, in the *Federal Register* notice and Dear Reader Letter).  In all cases, the protest period shall be 30 days and always end on a business day.  If the 30th day falls on a Saturday or Sunday, the protest period shall end the following Monday.  The protest period may not be extended for any reason.  Due to security screening delays, some protests may arrive in Washington, D.C., 3 weeks after the protest period ends, or later.

The following strict standards will determine timeliness:

   a)  If the originator filed a protest after the protest period, the Washington Office will dismiss it and respond to the originator in writing.

   b)  If the originator filed a protest timely, proceed to the next steps.

   c)  The publication of the EPA's *Federal Register* NOA starts the protest period for EIS-level plans and amendments. The initiation of the protest period for EA-level plan amendments is the publication of the notice of the amendment's effective date (generally, this notice would be included in the Dear Reader Letter for the amendment).

3.  ***The Protest Coordinator will examine each protest to see if it is complete (see 43 CFR 1610.5-2(a)(2)(i)-(v)).***  The term "complete" means that the following five protest components are submitted in the protest filing:

   a)  The name, mailing address, telephone number, and interest of the person filing the protest;

   b)  a statement of the issue or issues being protested;

   c)  a statement of the part or parts of the plan or amendment being protested;

   d)  a copy of all documents addressing the issue or issues that were submitted during the planning process by the protesting party or an indication of the date the issue or issues were discussed for the record; and

   e)  a concise statement explaining why the State Director's decision is believed to be wrong.

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

The BLM will not dismiss a protest solely because the protest omits some of the documentation required by item (3) above.  If BLM is uncertain about standing (see B.1.a below) and the missing materials are necessary for BLM to make this determination, BLM shall request, in writing, the protesting party to provide the missing materials to the protest coordinator.  Requested materials must be postmarked no later than 10 days after BLM's request for these materials is received by the protesting party (return receipt verified).  If following BLM's request for missing materials, the protest does not meet the five protest components and if standing cannot be determined by this additional step, the protesting party will be denied standing.  Case-by-case consideration will be given to appropriate actions for incomplete submissions.  Minor omissions will not be used as a reason to dismiss a protest.

The requirements for filing a protest in accordance with the regulations apply to each protesting party.  Merely attaching or referencing another protesting party's protest is not sufficient to qualify as a valid protest.

4.  ***The Protest Coordinator will forward a copy of protest letters meeting the above five components to the responsible state and field office(s) for further evaluation and a detailed analysis.***  Protests that meet the requirements noted above will be forwarded to the affected state as soon as practicable rather than waiting until the end of the protest period.  Washington Office liaisons should also ensure that copies of the protests are distributed to all affected Washington Office program staffs.

## B.  State Office Evaluation and Determination

1.  The State Director and field office(s) will use the following criteria to determine the validity of the protest as documented on the "State Director's Protest Analysis" form at the end of this section:

a.  Does the protesting party have standing?  The protesting party must have an interest which is or may be adversely affected and must have participated in the planning process by:

1.  Sending written comments;
2.  making oral comments (at a hearing or meeting);
3.  attending a public meeting;
4.  calling the BLM field office; and/or
5.  discussing the project with BLM employees in the field.

The administrative record should be checked for appropriate documentation of the protesting party's participation in order for BLM to substantiate the protesting party's standing.  The responsible field office manager will review the planning records to make this determination.  If the record does not support the protester's allegations of participation, the field office shall attempt to verify the alleged participation with the protesting party, giving the protester the benefit of doubt if there is a dispute.  If the determination is made that no participation has occurred,

no further review of the protest is required.  The AD-200 will issue a written decision that dismisses the protest for lack of standing.  Even though the protest is dismissed, the AD may address any comments that were raised.

Individual members of an organization do not obtain standing solely because their organization has participated in the planning process.  To file a protest as an individual, the individual has to meet the requirements for standing (they must have participated in the planning process).  Conversely, an organization does not obtain standing solely because one of its members has standing (an officer or official representative of the organization must have participated in the planning process on behalf of the organization in order for the organization to have standing).

b.  Have the issues been raised before in the planning process?  Issues raised on protest must have been previously raised for the record in the planning process.  The issue does not need to have been raised specifically by the protesting party.  If some of the issues were previously raised, the State Director's analysis will indicate which issues were raised previously and which are newly introduced.  If the responsible state/field office determines that one or more issues have not been raised before, those issues will be treated as comments.

c.  Are the issues raised germane to the planning process?  An issue is not germane to the planning process if it is beyond the scope of a particular planning effort, or if it involves a matter normally addressed in plan implementation.  Issues that are not germane to the planning process will not be considered as protest issues but treated as comments.

If the answers to the questions in a., b., and c. above are all *yes*, the State Director should continue the analysis starting with Step 2 below.  If the answers to one or more of the questions is *no*, the State Director should complete a draft response and forward the document to the appropriate WO-210 state liaison who will complete a response that dismisses the protest wholly or in part.

2.  A detailed analysis will be prepared for each issue or comment raised (see Section E, State Director's Protest Analysis) in a protest letter.  The following factors must be addressed in the State Director's analysis:

a)  Facts considered;
b)  procedures followed;
c)  authorities cited;
d)  references from applicable documents; and
e)  applicable BLM policies.

When citing published data from the planning record, the document, date of publication, and page number(s) must be part of the analysis used in the response to the protest issue.

Appendix E, page 6

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

When citing material from unpublished BLM records, sufficient information must be included to show that the material existed and was relevant during the planning process.

3.  The State Director will document the detailed analysis of each protest using the format in the State Director's Protest Analysis.  The preparation of preliminary draft responses will expedite the protest resolution process.  Other pertinent information that would help resolve the protest should also be included.  Completed packages will be sent to the Group Manager, WO-210, no later than 60 days after the protest is received in the state office.

4.  The State Director, in consultation with the Washington Office, may determine that discussion and negotiation with protesting parties are appropriate if these discussions may lead to resolution of one or more issues.  When these discussions result in resolution of protest issues, advise the protesting party to give the Director a written notice withdrawing the protest.  The protesting party may decline to withdraw the protest, but may be willing to accept a clarification or minor change to the proposed plan that effectively resolves the contested issues.  This type of change must not trigger a "notice of significant change" required by 43 CFR 1610.5-1(b).  For large numbers of protests or complex protests, the Washington Office may send a team to work with the state office and field office in analyzing issues and preparing draft responses.

## C.  **Washington Office Final Review**

1.  WO-210 state liaisons, in coordination with the respective state/field office, will evaluate each protest for content.  43 CFR 1610.5-2(a)(2)(v) requires that protests include a "concise statement explaining why the State Director's decision is believed to be wrong."  Statements that merely reflect disagreement, express opinions, or make demands or allegations without the support of this concise statement will be addressed as comments and will not cause a change in the plan being protested.

2.  The Group Manager, WO-210, will prepare a draft response and decision on each protest.  Decisions should have standard organization and phraseology.  The decision will:

a)  Incorporate the results of the Washington Office and State Office evaluations;

b)  incorporate the State Office and WO-210 analyses of the protest points; and

c)  provide a clear statement of the action taken on the protest (dismissed, denied, returned to the State Director for further consideration, or upheld in total or in part).

The bases for upholding protests include:

a)  Approval of the proposed plan or amendment would be contrary to the Director's policy guidance;

b)  significant aspects of the proposed plan or amendment are based upon invalid or incomplete information; or

c)  the proposed plan or amendment does not comply with applicable laws, regulations, policies, and planning procedures.

Protests upheld on any of the three bases above will be returned, in whole or in part, to the State Director for:

a)  Clarification;
b)  further planning or consideration; or,
c)  change, in whole or in part, of the proposed management decisions.

3.  As the protest responses are drafted, WO-210 will coordinate with other Washington Office program staffs.  Program offices are consulted when a protest involves one or more of the following:

a)  Precedent-setting departures from the existing resource management practices;
b)  failure to comply with national policy guidance and legal requirements;
c)  a major change in the use of resources in the area covered by the plan; and/or
d)  subject areas or matters where special expertise is required.

4.  The WO-210 state liaison will forward the draft proposed response(s) for surnaming to the appropriate Assistant Directors.  The following strategy will be used for expediting the surnaming process:

a)  Use of staff from appropriate groups and directorates to prepare draft protest responses.

b)  WO-210 will provide "heads up" to AD-200 when draft protest responses are ready for surnaming.

c)  AD-200 will provide "heads up" at staff meetings to alert Group Managers of the availability of draft protest responses.

d)  WO-210 will provide briefings for Group Managers as needed (including Group Managers from other Directorates as needed) 2 to 3 days prior to obtaining necessary surnames.  Requested changes should be substantive rather than editorial.

e)  WO-210 will conduct "working briefings" with the AD-200, Deputy Director, Chief of Staff, etc. (including Departmental staff as necessary), early in the process as possible and prior to approval of protest responses.

5.  A formal surnaming package should be prepared for each protest response.  The format and content of the folder should include the following:

Appendix E, page 8

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

a)  Cover sheet prepared for surnaming by the following individuals:

   1)  Protest Coordinator
   2)  Author (generally the WO-210 state liaison)
   3)  Deputy Group Manager (DGM)
   4)  Group Manager (at the discretion of the DGM or author)
   5)  Washington Office Group Managers who have an interest in the EIS, plan, or issues raised in a protest
   6)  Deputy Assistant Director (DAD)
   7)  Assistant Director (AD) at the discretion of the DAD
   8)  Director (at the discretion of the AD)
   9)  Others at the discretion of the author

b)  The letter of protest.

c)  A Summary Brief (one or two pages) in the following format:

   1)  Background concerning the plan (or plan amendment) and the NEPA document (EA, EIS)—including what kinds of documents were prepared, when were they completed, etc.;

   2)  date the protest period closed;

   3)  requirements statement as to whether all of the NEPA, FLPMA, regulatory, and policy requirements were followed by the BLM State/Field Office;

   4)  position of constituents or other sensitivities—factual, political, litigation, etc;

   5)  summary of the major issues in the protest and responses to issues;

   6)  recommended decision or if you are recommending remand (return) in whole or part, why and what are the circumstances;

   7)  state/field office collaboration, who you worked with in the state/field office and whether they reviewed the draft letter; and

   8)  Washington Office coordination, who you worked with in the Washington Office (make sure they are on the surnaming sheet).

*Note:  for large numbers of protests, the above information may be arranged in a tabular format rather than preparing individual summary briefs for each protest.*

d)  Response letter.

BLM_0076214

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

These are typical responses to protests where the State Director's proposed decision is being upheld. Protests where the State Director's proposed decision is being returned in whole or in part, or the boilerplate paragraphs below do not fit the protest, will require a different response.

1) Standard Paragraphs

Each letter of response should contain the following paragraphs:

*Paragraph 1*: "The Bureau of Land Management (BLM) has carefully reviewed and considered your letter dated [insert date], regarding the [insert name of plan]. As the Assistant Director for Renewable Resources and Planning, I am responsible to the BLM Director for reviewing and resolving all protests of BLM land use plans. The purpose of this letter is to inform you of the results of my review."

*Paragraph 2*: *For protests that are determined to be invalid because the protesting party does not have standing:*

"As outlined in the Dear Reader Letter for the proposed plan, the planning regulations at 43 CFR 1610.5-2 outline the requirements for filing a valid protest. I find that you do not meet these requirements because you have not participated in the planning process or you do not have an interest that is or may be adversely affected. Therefore, I am dismissing the protest." (*Optional:* Even though your protest is being dismissed, you provided a comment(s), which is (are) addressed below.)

*For protests that are determined to be invalid because they were filed after the protest period:*

"As outlined in the Dear Reader Letter for the proposed plan, the planning regulations at 43 CFR 1610.5-2 outline the requirements for filing a valid protest. I find that you do not meet these requirements because your letter was not filed by the required date. The regulations at 43 CFR 1610.5-2 do not allow for an extension of the protest period for any reason. Therefore, I am dismissing the protest." (*Optional:* Even though your protest is being dismissed, you provided a comment(s), which is (are) addressed below.)

*For protests that are determined to be invalid because they were filed electronically or by fax and not followed with an original letter:*

"As outlined in the Dear Reader letter for the proposed plan, the planning regulations at 43 CFR 1610.5-2 outline the requirements for filing a valid protest. I find that you do not meet these requirements because your letter was filed electronically (or by fax) and you did not provide the original

BLM_0076215

Appendix E, page 10

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

letter by the close of the protest period.  Therefore, I am dismissing the protest."  (*Optional:*  Even though your protest is being dismissed, you provided a comment(s), which is (are) addressed below.)

*For all protests that contain only issues:*

"As outlined in the Dear Reader Letter for the proposed plan, the planning regulations at 43 CFR 1610.5-2 outline the requirements for filing a valid protest.  I find that you meet these requirements.  Your protest issue(s) is (are) addressed below."

*For protests that contain both issues and comments*:

"As outlined in the Dear Reader Letter for the proposed plan, the planning regulations at 43 CFR 1610.5-2 outline the requirements for filing a valid protest.  I find that you meet these requirements, in part, and therefore portions of your protest letter are considered a valid protest.  I have determined that your letter also contained a comment(s) which is (are) not considered a valid protest issue(s) because . . . " (*Explain why:*  "the comment(s) represent opinions or observations not substantiated with a concise statement of why the State Director's proposed decision is believed to be wrong, contains issues not previously raised in the planning process, or the issues you raised are not germane to the planning process", etc.).  "The issue(s) and comment(s) are addressed below."

*For protests that contain only comments:*

"As outlined in the Dear Reader Letter for the proposed plan, the planning regulations at 43 CFR 1610.5-2 outline the requirements for filing a valid protest.  I find that you do not meet these requirements because . . ." (*see above*).  "Therefore, your protest is not valid and is hereby dismissed." (*Optional:*  Even though your protest is being dismissed, your letter contained a comment(s).  That (those) comment(s) is (are) addressed below.)

2)  Issues Identified by the Protesting Party

In the response letters, issues should be addressed within separate paragraphs for the issue and response, in the same order as in the submitted protest letter.  Issues should be quoted wherever possible.  Where issues cannot reasonably be quoted (e.g., they are long, rambling or contain material not pertinent to the issues), they should be clearly summarized.  It is sufficient to have some issues summarized and others quoted.  The statement of the issue must capture all pertinent points addressed in the response.  If comments are addressed (optional), they

BLM_0076216

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

should be addressed at the end of the response letter.  Use the following format for addressing issues and comments:

*Issue/Comment #:*

*Response:*

Protest response letters should clearly document whether BLM followed the correct procedures in arriving at the proposed decision(s).  Authors should identify any regulatory basis for responding to a protesting party's assertion.  Do not argue or be defensive in the response.  BLM's response to each issue should cite page numbers, where possible, in the NEPA document that specifically relate to the issue or comment and not rely solely on what was said in meetings or derived from notes, files, or phone calls.  Focus on what was in writing or in the formal planning process.

3)  Comments

If comments are addressed (optional) they are addressed in the same manner as protest issues.  The response letter must clearly identify why comments are not treated as protest issues, either in the opening paragraphs of the letter or the response to the comment.  If comments that are part of a valid protest are not addressed, they should be responded to separately by the state or field office.

Letters addressed to the protest coordinator stating "this is not a letter of protest" should be forwarded to the respective state office.  A letter should be sent to the sender from WO-210, informing the sender that BLM has forwarded the letter to the respective state office for consideration as a comment.

4)  Standard Paragraphs after the Issues

*Decision*:  *For protests in which the State Director's proposed decision is being upheld (protests in which the decision is being returned, in whole or in part, will require a different response):*

"After careful review of your protest letter, I conclude that the BLM [insert state] State Director and the [insert field office] field office manager followed the applicable planning procedures, laws, regulations, and policies and considered all relevant resource information and public input in developing the [insert name of plan] proposed RMP/amendment/final EIS.  There is no basis for changing the Proposed RMP/amendment as a result of your protest."

Appendix E, page 12

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

"This decision is the final decision of the Department of the Interior on your protest letter (43 CFR 1610.5-2(b)).  The Interior Board of Land Appeals (IBLA) does not hear appeals from a decision by the Director of the BLM on protests concerning RMPs.  Any party to a case who is adversely affected by a decision of a BLM official to implement some portion of an RMP may appeal such action to the IBLA at the time the action is implemented."

"Thank you for your participation (if the protest is being dismissed for lack of standing, substitute "interest" for "participation") in the development of the [insert name of plan] proposed RMP/amendment/final EIS, and for your interest in the public lands.  Land use plans are designed to balance the public demands for various land uses while ensuring appropriate levels of resource protection.  While there may be times when BLM cannot meet the needs of all those interested in the public lands, BLM strives to address all public input in a conscientious manner.  I encourage you to remain actively (for protests being dismissed for lack of standing, substitute "become" for "remain actively") involved in BLM's resource management activities and to provide information and input during the implementation of the plan.  If you have any questions, or wish to further discuss any issues regarding the plan, please call [insert name], field office manager, [insert phone number]."

When the revised draft response is surnamed, the WO-210 state liaison and the Protest Coordinator will finalize each protest response and prepare a letter for signature by the Assistant Director (AD), WO-200.

Once the AD has signed the protest response, the Protest Coordinator will send it to the protesting party by certified mail, return receipt requested.  A copy will also be sent to the appropriate State Director and Field Manager(s).  The State Director may sign the land use plan decision document only after all protest response letters have been signed and mailed, and any other requirements for approval have been met.

Portions of the proposed plan not under protest or remanded for reconsideration may be approved and implemented.  In such cases, the state office should consult with the Washington Office for further direction.

If the proposed decision and its supporting analysis are returned in whole or in part to the State Director, WO-210 will negotiate the necessary follow-up with the affected state and field office.

## D.  Receiving, Managing, and Responding to Electronic Mail and Faxed Protests

All protest letters sent to BLM via facsimile (fax) or electronic mail (e-mail) will be considered invalid protests unless a properly filed protest is also submitted.  BLM will refer to such correspondence as "comments" and respond accordingly.  If the protesting party also provides

BLM_0076218

the original signed copy of the protest postmarked by the close of the protest period, then the fax and/or e-mail correspondence will be considered an advance copy of the protest.  Advance copies of protests provide BLM an indication of the number of protests that will come in after the close of the protest period.

The planning regulations (43 CFR 1610.5-2) require that all protests must be in writing.  "Electronic signatures" for certain types of correspondence are now recognized where systems have been established and mechanisms are in place to enable the affected parties to verify the authenticity of the electronic signature.  Such systems and mechanisms are not in place for BLM protest procedures.  Consequently, BLM requires protests be sent to the protest coordinator via regular mail or other delivery service.

New standard language regarding e-mail and fax protests to include in the Agency's *Federal Register* NOA and in the Dear Reader Letter is provided below:

"E-mail and faxed protests will not be accepted as valid protests unless the protesting party also provides the original letter by either regular mail or other delivery service postmarked by the close of the protest period.   Under these conditions, BLM will consider the e-mail or faxed protest as an advance copy and it will receive full consideration.  If you wish to provide BLM with such advance notification, please direct faxed protests to the attention of the BLM protest coordinator at [insert phone number], and e-mails to [insert e-mail address]."

**E.  State Director's Protest Analysis**

When citing published data from the planning record, the state/field office must provide the document, date of publication, and page number(s).

*State Office Analysis For Protest Number*:

1) Plan Name:

2) Closing Date for Protest:

3) Name of Individual or Organization:

4) State Office Evaluation Results:

      a.  After review of all planning records, the protesting party has standing through participation in some phase of the planning process (check one)?
Yes [  ] No [  ] (The protesting party must also show an interest that is or may be adversely affected.)

      b.  Have the issues raised in the protest been raised before by the protesting party or another party in some phase of the planning process (check one)?
Yes [  ] No [  ] (Indicate from the identified list of issues those not raised during the planning process with an X.)

BLM_0076219

Appendix E, page 14

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

    c.  Are the issues raised in the protest germane to the planning effort (check one)?
Yes [  ] No [  ] (Indicate with an X from the list of identified issues those that are
not germane and why.)

5.  List of Issues Raised:

6.  State Office Detailed Analysis of Identified Issues:

7.  State Office Detailed Analysis of Identified Comments:

8.  State Office Recommendations or Opportunities for Resolution:

## II.  Governor's Consistency Review Appeal Process

The planning regulations in 43 CFR 1610.3-2(e) allow a state Governor an opportunity to appeal
to the BLM Director if the BLM State Director does not accept the Governor's recommendations
on plan consistency.

Prior to approval of a proposed plan, revision, or amendment, the BLM State Director will
submit the proposed plan, revision, or amendment to the Governor(s) of the state(s) involved and
identify any known inconsistencies with approved state or local plans, policies, or programs.
The Governor has 60 days to identify inconsistencies and to provide written recommendations to
the BLM State Director.  If the BLM State Director does not accept a Governor's
recommendations, the BLM State Director must notify the Governor in writing; the Governor
then has 30 days from receipt of the State Director's letter in which to submit a written appeal to
the BLM Director.

The BLM Director will accept the Governor's recommendations if the Director determines that
the recommendations provide for a reasonable balance between the national interest and the
state's interest.  The Director must communicate to the Governor in writing and publish in the
*Federal Register* the reasons for accepting or rejecting the Governor's recommendations.

## III.  Administrative Remedies of Implementation Decisions

Implementation decisions are subject to the administrative remedies set forth in the regulations
that apply to each resource management program of the BLM.  These administrative remedies
for final implementation decisions usually take the form of appeals to the Office of Hearings and
Appeals, though for certain proposed or non-final implementation decisions, including those
affecting timber sales, oil and gas lease sales, land exchanges, and proposed grazing decisions,
the regulations provide for an internal agency review (usually a protest to the authorized officer)
which must be completed before the final implementation decision can be appealed to the Office
of Hearings and Appeals (OHA).  This type of protest to the authorized officer should not be
confused with the protest of land use plan decisions to the BLM Director (there is no OHA
review of land use planning decisions).

**Appendix F:  Standard Formats for Land Use Plan Documents**

*Appendix F-1:  Recommended Format for Preparation Plans*

Preparation plans should contain the following information and discrete sections.

## A.  Introduction and Background

## B.  Anticipated Planning Issues and Management Concerns

Issues are identified by BLM staff and managers based on their knowledge of the planning area and its users.  Planning issues may be based on:

1)  Contacts or correspondence with users, adjoining districts or field offices, and interested public (including other agencies).

2)  Ongoing consultation, advisory council meetings, interagency and intergovernmental coordination, and informal sessions with users and interested public.  Preplanning does not involve public notices or public participation activities since they are specifically provided for in the RMP and NEPA processes and key preplanning results are publicly reviewed during scoping.

3)  Staff and management knowledge of resource uses, users, conditions, needs, and trends.

Management concerns are generally of a program-specific nature, and while they may not be externally generated or controversial, deserve the appropriate level of consideration in the planning process.

## C.  Preliminary Planning Criteria

Planning criteria are the constraints or ground rules that guide and direct the development of the plan.  They ensure that plans are tailored to the identified issues and ensure that unnecessary data collection and analyses are avoided.  They focus on the decisions to be made in the plan and achieve the following:

1)  Provide an early, tentative basis for inventory and data collection needs.

2)  Enable the manager and staff to develop a preliminary planning base map delineating geographic analysis units.

3)  Stimulate the development of planning criteria during public participation.

BLM_0076221

Appendix F, page 2

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## D.  **Data and GIS Needs, Including Data Inventory**

Managers of planning efforts are encouraged to use existing data compiled by other Federal agencies; state, local, and Tribal governments; and private organizations, if applicable, to address assessment questions.  Data compiled by other agencies which are used in BLM land use plans should be consistent across administrative boundaries and landscapes, where available.  Regardless of its source, sufficient metadata (data about data) should be provided to clearly determine the quality of the data, along with any limitations associated with its use.  To define the information required to support each individual planning effort, each preparation plan should:

> 1)  Create a list of currently available data (list by theme, data elements, and explain how that data will support the plan in dealing with anticipated issues and planning requirements).
>
> 2)  Identify the anticipated data gaps in available data required to deal with the anticipated issues, as well as the planning and analysis requirements.
>
> 3)  Create a realistic data inventory and collection strategy (including work months, personnel involved, costs and timeframes involved) for acquiring critically needed data and information.

See Appendix G for more information on managing data and information throughout the planning process.

## E.  **Participants in the Process**

> 1)  Describe and list roles, responsibilities, and authorities.
>
> 2)  Provide team lists (including management team, core team, interdisciplinary, and support teams).

## F.  **Process for the Plan**

> 1)  General steps and format.
>
> 2)  Alternative formulation:  Identify preliminary plan alternative themes that focus on resolving anticipated issues and reflect the preliminary planning criteria.
>
> 3)  Internal review of the plan.
>
> 4)  Form of input from the interdisciplinary team and reviewers.

## G.  **Plan Preparation Schedule**

The schedule provides estimated timeframes for the completion of the required plan components.  It identifies:

BLM_0076222

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

   1)  All planning actions (43 CFR 1610.4) and support actions expected to be done either consecutively or concurrently.

   2)  Target completion dates for each action.

   3)  Time periods needed for preparation and award of contracts, if any, and preparation costs required for use in the budget process.

## H.  Public Participation Plan

The public participation plan is to be prepared as a part of the preparation plan.  Every effort should be made to assure meaningful public involvement throughout the planning process.  This includes:

   1)  Goals and objectives of public participation.

   2)  A description of the public known to be interested or affected and any contributions they may make or information they may need during the planning process and the involvement techniques most appropriate (including involvement of cooperating agencies).

   3)  Target dates and other pertinent details for public participation activities, notices, and availability of printed information.

   4)  Provisions for updating the plan, as necessary, during plan preparation.

   5)  A description of how the results of public participation activities will be summarized, analyzed, documented, and used by the line manager in making decisions in the plan.

   6)  Internet technology that will be used to provide information to the public and/or solicit comments.

## I.  Budget

The budget includes all costs associated with development of the plan including, data needs collection, contracting costs, BLM staff work months, *Federal Register* notices, vehicle, travel, and support costs.  It should address the level of program sources funding provided by the field or state office, as well as increased funding needs.

BLM_0076223

Appendix F, page 4

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

*Appendix F-2:  Recommended Format for Scoping Reports*

The following is a suggested format for field offices to prepare scoping reports to achieve a common and consistent approach that meets minimum requirements.  It is recognized that some situations (for example scoping reports dealing with an unusually large number of comments) may require additional content and detail.  Documents should be as brief, concise, and user-friendly as possible.   Authority for the scoping report can be found at 43 CFR 1610.2(d).

**A.  Cover Letter**

Optional; signed by field office manager.

**B.  Introduction**

> a)  Overview/purpose and need for the plan (tie to planning evaluation)
> b)  Brief description of the planning area (including a map)
> c)  Brief description of the scoping process (NOI history, meetings, contacts, etc.)
> d)  Cooperating agencies/invitees
> e)  Collaboration and consultation with Tribes

**C.  Issue Summary**

> a)  Summary of public comments
> b)  Issues identified during scoping
> c)  Anticipated decisions to be made
> d)  Issues raised that will not be addressed (including rationale)
> e)  Valid existing management to be carried forward
> f)  Special designations, including nominations

**D.  Draft Planning Criteria**

Include if not previously published in initial notice; otherwise incorporate by reference.

**E.  Data Summary/Data Gaps**

Include if not previously published in initial notice; otherwise incorporate by reference.

> a)  Refer to more detailed lists in preparation plan or elsewhere (state that these are available upon request)
>
> b)  Identify any relevant data provided or identified as available during scoping
>
> c)  List data gaps identified during scoping

BLM_0076224

Case No. 1:20-cv-02484-MSK   Document 52-14   filed 04/28/21   USDC Colorado   pg 161 of 228

**F.  <u>Summary of Future Steps in the Planning Process</u>**

Identify planning process timelines and opportunities for public participation (including webpage address and key contact address and information, etc.)

BLM_0076225

Appendix F, page 6

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

***Appendix F-3:  Annotated Outline of the Analysis of the Management Situation***

The analysis of the management situation (AMS) should describe the current conditions and trends of the resources and the uses/activities in the planning area in sufficient detail to create a framework from which to resolve the planning issues through the development of alternatives. This analysis should be short, concise, and focused on the issues relevant to resource management in the area.  It should not be an exhaustive review of everything known about the area.

## CHAPTER 1.  INTRODUCTION

### A.  <u>Purpose of Analysis of the Management Situation</u>

Describe the role of the AMS in the planning process.

### B.  <u>General Description of Planning Area, Geographic Scope, and Resources/Programs</u>

### C.  <u>Key Findings</u>

Summary of the most important conclusions drawn from the AMS.

## CHAPTER 2.  AREA PROFILE

This chapter describes the existing condition of the resources, resource uses, and other features of the planning area (i.e., area profile).  It should provide a context for resources and uses by incorporating information compiled at multiple levels to describe the large-scale ecoregions associated with the planning area.  The information will become the basis for the Affected Environment chapter of the RMP/EIS.  Table F-1 shows the components of the area profile (not necessarily all-inclusive).

BLM_0076226

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

**Table F-1.—***Area profile*

| Resources | Resource uses | Special designations | Social and economic |
|---|---|---|---|
| ▪ Air quality<br>▪ Geology<br>▪ Soil resources<br>▪ Water resources (surface and groundwater)<br>▪ Vegetative communities [1]<br>▪ Fish and wildlife<br>▪ Special status species<br>▪ Wild horse and burros<br>▪ Wildland fire ecology and management<br>▪ Cultural resources<br>▪ Paleontological resources<br>▪ Visual resources<br>▪ Wilderness characteristics<br>▪ Cave and karst resources | ▪ Facilities<br>▪ Forestry and woodland products<br>▪ Livestock grazing<br>▪ Minerals (leasable, locatable, salable)<br>▪ Recreation<br>▪ Renewable energy<br>▪ Transportation and access<br>▪ Utility corridors and communication sites<br>▪ Land tenure<br>▪ Land use authorizations<br>▪ Withdrawals | ▪ Areas of critical environmental concern<br>▪ Back country byways<br>▪ National recreation areas<br>▪ National trails<br>▪ Wild and scenic rivers<br>▪ Wilderness<br>▪ Wilderness study areas | ▪ Tribal interests<br>▪ Public safety (abandoned mines, debris flows, and hazardous materials)<br>▪ Social and economic conditions |
| [1] Vegetative communities can be identified at a variety of scales and include forests, woodlands, rangelands, riparian areas, and wetlands. | | | |

## A. Resources

The Resources section should have both an introduction common to all resources and a section specific to each resource.  The information presented in the introduction should help the planning team relate the resources in the planning area to the regional setting, and define the current condition and key features of those resources.  It should also help the team highlight potential management opportunities in Chapter 4 of the AMS by addressing the regional importance and function of resources within the planning area.

### 1. Regional Context:

Different agencies and organizations have compiled geospatial datasets for large-scale ecoregions such as the Wyoming Basin and the Colorado Plateau.  Ecoregions of this scale range in size from 3.5 million acres to 88 million acres (averaging 23 million acres).  Most planning areas will fall into one or two ecoregions, depending on the scale at which they were developed.  Planning boundaries may overlap ecoregional boundaries, so it is important for planning areas to coordinate in collecting and sharing information.

These large-scale geospatial datasets provide broad-level biological information that complements local planning efforts by identifying dominant patterns on the landscape and threats to resources.  Other existing fine and midscale data (e.g., state and Heritage programs, BLM-led assessments such as Land Health Assessments, Recovery Plans, and Conservation Strategies) used in combination with broad scale information can provide a complete picture of current conditions and key features of the resources (definitions for broad, mid, and fine scale data are provided in the Glossary).  For example, BLM-led Land Health Assessments contain information on upland, riparian, and stream channel condition that can be used to refine ecoregion conditions from larger datasets.  Use multiscale information to complete Table F-2.

BLM_0076227

Appendix F, page 8

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

**Table F-2.—*Ecoregion/Planning Area Information***

| Information about the ecoregion | Information about the planning area as it relates to the ecoregion |
|---|---|
| Size and general geographic location. | ▪ Orientation of the planning area within the ecoregion.<br>▪ Percent of the ecoregion that (1) all lands in the planning area cover and (2) BLM lands in the planning area cover. |
| Overall ecoregion condition (past versus present) and major issues affecting function and resource trends (i.e., fire suppression, habitat fragmentation, and invasive species). | ▪ The overall condition of the BLM lands relative to the condition of the ecoregion.<br>▪ Information relative to how current land use allocations and management BLM lands might be contributing to or helping to alleviate the major ecological issues of the ecoregion. |
| Features of the ecoregion that are unique or are particularly important to ecological condition (e.g., large blocks of grasslands or sagebrush). | ▪ The extent to which the planning area or portions within it may be ecologically important to maintaining ecosystem function. [1] |
| [1] This information may not be available depending on the source of ecoregion information used. | |

    2.  <u>Resource-specific information</u>

The AMS should include resource-specific information organized by the following five factors:

    *a.  Indicators*.  Identify factors that describe resource condition such as ambient pollutant level, visibility, and fire regime condition class.  Indicators should be quantitative whenever possible.  There are many potential sources for indicators, including Standards for Rangeland Health.

    *b.  Current Condition*.  Describe the location, extent, and current condition of the resource in the planning area.  Condition can be determined by comparing the value of indicator(s) to an established standard (current plan goal or objective) and/or benchmark.  Relate the condition assessment to Land Health Standards as appropriate.  The scale of the analysis may extend beyond the immediate planning area boundary and encompass a logical landscape (the analysis area).  For instance, the analysis can occur at different levels such as by watershed, geographic area, or region.

    *c.  Trends*.  Describe the degree and direction of change between the present and some point in the past.  Explain whether the trend is moving toward or away from the current desired condition based on the indicators.  Also describe the drivers or agents of change.  Note that for some resources, a desired condition has not been established or there will not be enough information to describe trends.  When describing trends, note whether the trend is based on quantitative or qualitative information.  For example, the trend for ambient pollutant levels most likely can be described from a quantitative standpoint; that is, based on changes in levels of criteria pollutants over time as recorded in published data.  For other resources where data are not available, a qualitative approach would be used.

    *d.  Forecast*.  Predict changes in the condition of resources given current management.  Describe the drivers or agents of the anticipated change.

BLM_0076228

   *e. Key features.* Describe the geographic location, distribution, areas or types of resource features that should guide land use allocation or management decisions. For example, certain areas may be particularly important to special status species habitat, or some soil types may be better able to support certain land uses than others.

## B.  Resource Uses

For each resource use, describe the following:

   1)  Current level (including potential) and locations of use (map each use).

   2)  Forecast, or the anticipated demand for use (levels and locations)—the reasonable foreseeable development.

   3)  Key features, or the areas of high potential for the use (these areas do not necessarily have to be currently managed for the use).

## C.  Special Designations

Identify the location of existing special designations such as ACECs, wilderness areas, wilderness study areas, wild and scenic rivers, and other applicable designations. Also identify areas meeting the relevance and importance criteria to be considered as potential ACECs or potentially eligible river segments, etc.

## D.  Social and Economic Features

Listed below are the topics to describe for each of the social and economic features.

   • Tribal interests—Identify the Tribes with interests in the planning area. Describe features not otherwise described in the cultural resources section, such as treaty-based subsistence uses, traditional use areas, and rights of access.

   • Public safety (abandoned mines, debris flows, and hazardous materials)—Identify areas where public safety is an issue.

   • Social and economic conditions—See Appendix D.

## CHAPTER 3.  CURRENT MANAGEMENT DIRECTION

This chapter describes current management direction based on existing land use plans and amendments by program (and later becomes the basis for the no action alternative). Provide a list of management decisions and their sources for each resource or resource use. Identify management decisions from all applicable BLM plans (RMPs, MFPs, and amendments for planning-level decisions). Note that some resources will not have any management decisions established.

BLM_0076229

Appendix F, page 10

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## A.  Relevant Plans and Amendments

The list of management decisions should be drawn from all applicable BLM plans (RMPs and amendments).  List all plans and amendments that influence current management.  This list can be displayed in a table such as the one below:

**Table F-3.—*Sample format for list of relevant plans and amendments***

| Document title | Year | Other relevant information | Admininstrative record document number |
|---|---|---|---|
|  |  |  |  |

## B.  Management Decisions

Describe all management decisions that will become the no action alternative in the draft RMP. Table F-4 is a recommended format.

**Table F-4.—*Current management for resources, resource uses, and social and economic features***

| Current management decision | Planning decision number | Decision source | Status |
|---|---|---|---|
| Insert decision title and/or description. | Insert decision number or other identifier if known. | Insert source document for the decision, such as: Lower Gila South RMP | Insert the status of the decision:  whether it was completed and when, progress if not completed, etc. |

To the extent possible, document decisions by logical management units or zones.  Special management areas (special designations) would be included in this manner.  Types of special management areas include ACECs, back country byways, national recreation areas, national trails, wild and scenic rivers, wilderness, and wilderness study areas.

## CHAPTER 4.  MANAGEMENT OPPORTUNITIES

Identifying management opportunities is a process of considering changes in management to respond to (a) information gathered in the area profile (Chapter 2) and (b) issues and concerns elevated through scoping.  It serves as a starting point for alternative formulation by providing a list of possible management opportunities for later sorting and refining into a framework of compatible alternatives.  Consult Appendix C as a guide to the program-specific land use plan decisions that should be made as part of the planning process when identifying management opportunities.

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## A.  Analyze the Ability of Current Management Direction to Achieve Desired Conditions and Address Resource Demands

Based on the current condition and trends of the resources and the current and trends of demands on those resources, analyze the ability of current management direction to achieve desired conditions and address resources and demands for use of the resources.  Discuss field office(s) capability in terms of staff, annual budget, summary of workload ranked by subactivity and/or program elements.

While discussing the management adequacy of each decision, also discuss options for changing the management if the decision does not adequately respond to current issues, changes in circumstances, new information, etc.

Fill out Table F-5 for each resource, resource use, special management area and social and economic feature.  Notice that the table is similar to Table G-4 in Chapter 3(B), which describes the management decisions.

**Table F-5.—*Adequacy of current management direction and options for change***

| Planning decision | Is decision responsive to current issues? | Remarks (rationale) | Options for change |
|---|---|---|---|
| Insert decision title and/or description. | (Y/N) | Describe why the decision is/is not adequate. | Insert options for changing management. As appropriate, include decisions from other jurisdictions that warrant consideration. |

## B.  Identify Areas of Relative Ecological Importance to Guide Land Uses and Management

Identifying areas of relative ecological importance enables planners to understand tradeoffs when establishing land use allocations and management requirements.  Regional knowledge, gained through broad scale assessments, can highlight the importance of an area in the context of the larger ecoregion. This information is fundamental to developing a range of alternatives and analyzing the effects of the alternatives in the RMP/EIS, and to managing for "the health, diversity, and productivity of the public lands."

Understanding relative ecological importance should guide land use allocations and management approaches, rather than preclude uses. For example, this information should feed into alternative development by helping to identify opportunities for maintenance and/or restoration of habitats. Note that relative ecological importance may change over time with new information and changes in land uses and condition.

When assembling information on relative ecological importance, focus on dominant patterns across the ecoregion, and on habitat extent, habitat condition, species connectivity requirements

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

and overall plant and animal species diversity within the planning area.  There are many ways to assemble this information.  One way is to create maps using information and datasets collected for both the ecoregion or for the preparation of the area profile and AMS.  This approach is described in Figure G-1, and can be applied using a geographic information system (GIS) or transparencies.

## CHAPTER 5.  CONSISTENCY/COORDINATION WITH OTHER PLANS

Identify plans in areas surrounding the planning area and discuss the implications for the planning area from these plans.  Identify resources that are in common, dependent, or interdependent.

1)  County/city plans
2)  State Comprehensive Wildlife Conservation Strategies and State lands plans
3)  Other Federal agency plans (including fire planning units)

Identify significant opportunities for enhancing coordination or gaining expertise through cooperating agency relationships.

## CHAPTER 6.  SPECIFIC MANDATES AND AUTHORITY

All resource specialists should provide a description of laws, regulations, and policy applicable to their resources.  Information on Federal, state, local, as well as BLM policy should be included.

## CHAPTER 7.  SCOPING REPORT OR SUMMARY OF SCOPING REPORT

## CHAPTER 8.  LIST OF PREPARERS

Provide the following information for each person working on the project:  name, responsibility, qualifications, and participation.

## CHAPTER 9.  GLOSSARY

## CHAPTER 10.  REFERENCES

Provide references for each resource section according to the format noted in the project work plan.  All references should be included and complete reference information should be submitted with each resource section.

BLM_0076232

Appendix F, page 13

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

**Figure F-1.—***One potential method for identifying areas of relative ecological importance*



BLM_0076233

Appendix F, page 14

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

*Appendix F-4: Annotated Outline for a Draft and Final RMP (Amendment)/EIS*

The following outline applies to draft and full text final EISs.  If minor changes consisting of technical, editorial, or nonsubstantive factual corrections are made in the draft EIS in response to comments, then an abbreviated final EIS may be prepared.  An abbreviated final EIS only contains substantive comments received on the draft, responses to those comments, and an errata section with specific modifications and corrections to the draft EIS in response to comments (see 40 CFR 1503.4).

Contractor logos should not be placed anywhere in the documents (although it is recommended that the role of the contractor be acknowledged in the list of preparers in Chapter 5).

1. <u>**Abstract**</u> *(Inside front cover)*

2. <u>**Cover sheet**</u> *or title page*

3. <u>**Dear Reader Letter**</u> *(include privacy statement)*

4. <u>**Protest procedures**</u> *(final EIS)*

5. <u>**Table of contents**</u>

6. <u>**Summary**</u> *(approximately 15 pages)*

*(Optional Reader's Guide to help explain chapter format and contents)*

7. <u>**Chapter 1.  Introduction**</u> *(approximately 5–10 pages)*

   A. <u>Purpose and Need for the Plan</u>

   B. <u>Planning Area and Map</u>

   C. <u>Scoping/Issues</u>

      1. <u>Issues Addressed</u>
         a. *Issues used to develop alternatives* [1]
         b. *Issues addressed in other parts of the EIS*

      2. <u>Issues Considered but Not Further Analyzed</u>
         a. *Issues beyond the scope of the plan*
         b. *Issues addressed through administrative or policy action*

   D. <u>Planning Criteria/Legislative Constraints</u>

   E. <u>Planning Process</u>

   ---
   [1] Italics here show optional categories for issues.

BLM_0076234

   1.  <u>Relationship to BLM Policies, Plans, and Programs</u>

   2.  <u>Collaboration</u>
        a.  Intergovernmental, inter-agency, and Tribal relationships
        b.  Other stakeholder relationships

F.  <u>Related Plans</u>:  *Discuss consideration of state, local, and Tribal land use plans that "are germane in the development of land use plans for public lands."* [2]

G.  <u>Policy</u>:  *Discuss policies and decisions that existed prior to the plan being written that are outside the scope of the plan but may influence the decisions, constrain the alternatives, or are needed to understand management of the area. Examples include: proclamations, legislative designations, and court settlements.*

H.  <u>Overall Vision</u>: [3]  *Identify the overall vision for management of the planning area. This vision should reflect the goals that are common to all alternatives. This can serve to help integrate programs.*

## 8.  Chapter 2.  Alternatives [4]

A.  <u>General Description of each Alternative</u>:  *Highlight the characteristics that distinguish each alternative. Rather than naming alternatives, number or letter each alternative and briefly describe the theme of each alternative.*

B.  <u>Management Common to All Alternatives</u>:  *Primarily goals for resource conditions and resource uses.*

C.  <u>No-Action Alternative</u>:  *Description of existing management direction including current decisions from relevant plans and reasonable, foreseeable, management scenarios.*

D.  <u>Action Alternatives</u>: [5]  *Detailed description of each of the alternatives, by alternative, needed to display a reasonable range of options to meet the stated Purpose and Need and address issues. Each alternative description should address the issues or programmatic areas. The decisions in the alternatives should follow the format for land use plan "Management Decisions" provided in Appendix F-5.*

---

[2] Federal Land Policy and Management Act, Section 202(c)(9).

[3] Optional.

[4] There has been some discussion of reversing the order of the Alternatives and Affected Environment chapters of the EIS. However, the Office of Environmental Policy and Compliance in the Department of the Interior has issued guidance stating that we must follow the recommended format in the CEQ regulations (40 CFR 1502.10) or obtain approval from OEPC to deviate from it.

[5] At the draft stage in the preparation of an EIS, the preferred alternative is identified in Chapter 2 of the draft EIS. At the final EIS stage, the proposed plan is presented with the alternatives. The proposed plan should be in a clearly delineated section to make it easily identifiable and may also be pulled out as a separate document.

BLM_0076235

Appendix F, page 16

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

   E.  <u>Alternatives Considered but Not Analyzed in Detail</u>

   F.  <u>Comparison of Alternatives</u> *(table)*

   G.  <u>Comparison of Impacts</u> *(table)*

**9.  Chapter 3.  Affected Environment** *(keep as short and concise as possible):  Limit discussion to what is needed to understand issues and environmental consequences and provide context for the Goals and Objectives.  This chapter may also be formatted in the same way as the Area Profile section of the Analysis of the Management Situation (See Appendix F-3).*

   A.  <u>Resources</u>:  *Physical, biological, and cultural resources (current conditions and trends).  This is not necessarily a comprehensive list.*

       1.  <u>Air Quality</u>
       2.  <u>Geology</u>
       3.  <u>Soil Resources</u>
       4.  <u>Water Resources</u>
       5.  <u>Vegetative Communities</u>
          a.  <u>Forests and Woodlands</u>
          b.  <u>Rangelands</u>
          c.  <u>Riparian and Wetlands</u>
       6.  <u>Fish and Wildlife</u>
       7.  <u>Special Status Species</u>
       8.  <u>Wild Horses and Burros</u>
       9.  <u>Wildland Fire Ecology and Management</u>
       10.  <u>Cultural Resources</u>
       11.  <u>Paleontological Resources</u>
       12.  <u>Visual Resources</u>
       13.  <u>Wilderness Characteristics</u>
       14  <u>Cave and Karst Resources</u>

   B.  <u>Resource Uses</u>:  *Resource uses (current conditions and trends).  This is not necessarily a comprehensive list.*

       1.  <u>Facilities</u>
       2.  <u>Forestry and Woodland Products</u>
       3.  <u>Livestock Grazing</u>
       4.  <u>Minerals</u>
          a.  Leasable Minerals (e.g. oil, gas, and geothermal)
          b.  Locatable Minerals (e.g. gold and silver)
          c.  Salable Minerals (e.g. sand and gravel)
       5.  <u>Recreation</u>
       6.  <u>Renewable Energy</u>
       7.  <u>Transportation and Access</u>
       8.  <u>Utility Corridors and Communication Sites</u>

BLM_0076236

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

    9. Land Tenure
    10. Land Use Authorizations
    11. Withdrawals

  C. Special Designations

    1. Areas of Critical Environmental Concern
    2. Back Country Byways
    3. National Recreation Areas
    4. National Trails
    5. Wild and Scenic Rivers
    6. Wilderness
    7. Wilderness Study Areas

  D. Social and Economic

    1. Tribal Interests
    2. Public Safety
      a. Abandoned Mines
      b. Debris Flows
      c. Hazardous Materials
    3. Social and Economic Conditions (including Environmental Justice and other considerations)

**10. Chapter 4. Environmental Consequences.** *Document sufficient analysis to support all conclusions. This chapter may also be formatted in the same way as the Area Profile section of the Analysis of the Management Situation (See Appendix F-3.)*

  A. Introduction

    1. Analytical assumptions (reasonably foreseeable development scenarios for oil and gas, anticipated levels of vegetation treatment, etc.)
    2. Types of effects to be addressed (direct, indirect, and cumulative)
    3. Summarize critical elements that are addressed, not affected, or not present
    4. Incomplete or unavailable information

For program areas, include discussions as outlined in 40 CFR 1502.16 for the alternatives by program area listed below.

  B. Resources: *Physical and biological resources addressed in alphabetical order. This is not necessarily a comprehensive list.*

    1. Air Quality
    2. Cave and Karst Resources
    3. Cultural Resources
    4. Fish and Wildlife

BLM_0076237

Appendix F, page 18

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

    5. <u>Geology</u>
    6. <u>Paleontological Resources</u>
    7. <u>Soil Resources</u>
    8. <u>Special Status Species</u>
    9. <u>Vegetative Communities</u>
        a. <u>Forests and Woodlands</u>
        b. <u>Rangelands</u>
        c. <u>Riparian and Wetlands</u>
    10. <u>Visual Resources</u>
    11. <u>Water Resources</u>
    12. <u>Wild Horses and Burros</u>
    13. <u>Wilderness Characteristics</u>
    14. <u>Wildland Fire Ecology and Management</u>

C. <u>Resource Uses</u>: *Resource uses addressed in alphabetical order.  This is not necessarily a comprehensive list.*

    1. <u>Facilities</u>
    2. <u>Forestry and Woodland Products</u>
    3. <u>Land Tenure</u>
    4. <u>Land Use Authorizations</u>
    5. <u>Livestock Grazing</u>
    6. <u>Minerals</u>
        a. Leasable Minerals (e.g. oil, gas, and geothermal)
        b. Locatable Minerals (e.g. gold and silver)
        c. Salable Minerals (e.g. sand and gravel)
    7. <u>Recreation</u>
    8. <u>Renewable Energy</u>
    9. <u>Transportation and Access</u>
    10. <u>Utility Corridors and Communication Sites</u>
    11. <u>Withdrawals</u>

D. <u>Special Designations</u>

    1. <u>Areas of Critical Environmental Concern</u>
    2. <u>Back Country Byways</u>
    3. <u>National Recreation Areas</u>
    4. <u>National Trails</u>
    5. <u>Wild and Scenic Rivers</u>
    6. <u>Wilderness</u>
    7. <u>Wilderness Study Areas</u>

E. <u>Social and Economic</u>

    1. <u>Tribal Interests</u>
    2. <u>Public Safety</u>

BLM_0076238

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

    a.  Abandoned Mines
    b.  Debris Flows
    c.  Hazardous Materials

    3.  Social and Economic Conditions (including Environmental Justice and other considerations)

**11.  Chapter 5.  Consultation and Coordination**

    A.  Description of specific actions taken to consult and coordinate with:

        1.  Tribes
        2.  Intergovernmental (State, Local, County, and City)
        3.  Federal Agency
        4.  Interest Groups
        5.  National Mailing List

    B.  Describe additional collaboration

    C.  Responses to comments by issue area (FEIS only)

    D.  List of Preparers

**12.  Appendices**

**13.  Glossary**

**14.  References**

**15.  Index**

**16.  Abbreviations/Acronyms** (inside back cover):  *Placement can also occur with the Reader's Guide, Summary, or in the Glossary.*

BLM_0076239

Appendix F, page 20

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

***Appendix F-5: Annotated Outline for Record of Decision (ROD)/Approved RMP (Amendment)***

At the end of the protest period on the final EIS and proposed plan and after protests are resolved, the ROD[6] is issued.  The ROD must be published in the same document with and reference the land use plan (proposed plan from the final EIS as modified in response to protests or other considerations between the final EIS and issuance of the ROD). The ROD/RMP serves as a more concise and useful tool to land managers and stakeholders than a cumbersome EIS. Separation of the approved RMP from the final EIS and attaching it to the ROD clarifies the different roles served by a plan and the supporting NEPA analysis.  Additionally a stand-alone ROD/RMP will improve internal agency and partner understanding of the plan and improve our long-term ability to implement the plan.

## I.  Record of Decision (ROD)

**A.  <u>Introductory Material:</u>**  *(on a cover sheet or at the top of the first page)*

    1)  <u>Title</u>
    2)  <u>Preparing office and office location</u>
    3)  <u>Cooperating agencies</u> (if any)
    4)  <u>Signature and title of responsible official and concurring officials</u> (if any) [7]
    5)  <u>Date of signature</u>(s)

**B.  <u>Summary:</u>**  *(if ROD exceeds 10 pages)*

**C.  <u>Decision:</u>**  *The primary decision is to approve the attached land use plan.* [8]

**D.  <u>Alternatives:</u>**  *Briefly discuss the alternative or alternatives that were considered to be "environmentally preferable."*[9]

**E.  <u>Management Considerations:</u>**  *Provide the rationale for the decision.*

**F.  <u>Mitigation Measures:</u>**  *In addition to identifying approved mitigation measures, state whether all practicable means to avoid or minimize environmental harm from the alternative*

---

[6] The format for the ROD can be found in the NEPA handbook (H-1790-1), Chapter V, pages V-22 to V-23.
[7] Signatures and date of signatures can occur at end of ROD.
[8] Example:  "The decision is hereby made to approve the attached plan as the resource management plan (Plan) for [insert title].  This Plan was prepared under the regulations implementing the Federal Land Policy and Management Act of 1976 (43 CFR 1600).  An environmental impact statement was prepared for this Plan in compliance with the National Environmental Policy Act (NEPA) of 1969.  The Plan is nearly identical to the one set forth in the [insert title] Proposed Resource Management Plan and Final Environmental Impact Statement published [insert here].  Specific management decisions for public lands under the jurisdiction of the [insert here] Field Office are presented in Chapter [insert] of the plan.  Major decisions include:  [insert here].
[9] See 40 CFR 1505.2(b).

BLM_0076240

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

*selected have been adopted, and if not, why.  Summarize any monitoring and enforcement program being adopted for mitigation measures.*[10]

**G.  Plan Monitoring:**

**H.  Public Involvement:**  *Briefly describe public participation in planning process.*

**II.  Approved Resource Management Plan**

**A.  Introduction.** [11]

   1.  Purpose and Need for the Plan

   2.  Planning Area and Map

   3.  Scoping/Issues

       a.  Issues Addressed
          i)  Issues used to develop alternatives [12]
          ii)  Issues addressed in other parts of the EIS

       b.  Issues Considered but Not Further Analyzed
          i)  Issues beyond the scope of the plan
          ii)  Issues addressed through administrative or policy action

   4.  Planning Criteria/Legislative Constraints

   5.  Planning Process

       a.  Relationship to BLM Policies, Plans, and Programs
       b.  Collaboration
          i)  Intergovernmental, inter-agency, and Tribal relationships
          ii)  Other stakeholder relationships

   6.  Related Plans: *Discuss consideration of state, local, and Tribal land use plans that "are germane in the development of land use plans for public lands."* [13]

   7.  Policy: *Discuss policies and decisions that existed prior to the plan being written that are outside the scope of the plan but may influence the decisions, constrain the alternatives, or are needed to understand management of the area.  Examples include: proclamations, legislative designations, and court settlements.*

---

[10] See 40 CFR 1505.2(c).
[11] This introduction section is optional material for the land use plan document.
[12] Italics here show optional categories for issues.
[13] Federal Land Policy and Management Act, Section 202(c)(9).

BLM_0076241

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

8. Overall Vision: [14] *Identify the overall vision for management of the planning area. This vision should reflect the goals that are common to all alternatives. This can serve to help integrate programs.*

**B. Management Decisions.** [15] *List management decisions by issue or programmatic area, making clear how decisions in one issue or programmatic area may affect others.*

1. Goals: [16] *Identify goals for resource conditions, resource uses, and other goals as appropriate.*

2. Objectives: [17] *Identify objectives with their rationale (include associated goal[s]). Reference which goals are advanced by the objective.*

3. Management Actions: *Make these adaptive as appropriate and practical. Relate each decision to all goals and objectives impacted. This section should address special designations and land tenure decisions.*

a. *Allowable uses*: This should include allowable uses, restricted uses, and prohibited uses. Incorporate maps where appropriate.

b. *Actions*: Management measures that will guide future and day-to-day activities. Project design features, stipulations, best management practices, standard operating procedures, and guidelines should be included in this section as well.

c. *Implementation decisions*: Include any implementation decisions (see appropriate guidance for distinction) related to particular land use planning decisions.

4. Monitoring (and adaptive management if applicable): *Describe plans for monitoring to assess progress toward meeting goals and objectives. If appropriate, discuss plans of action if monitoring indicates actions are not meeting goals and objectives or if actions are no longer needed.*

**C. Public Involvement.** *Describe how the public and partners can be involved in implementation.*

**D. Management Plan Implementation.** *To the extent practical and appropriate, identify priorities and costs of the management program. Costs should be estimated at a scale that is*

---

[14] Optional.

[15] The format of this section is designed to (a) clarify the distinction between goals, objectives, and management actions; (b) move toward (or demonstrate) objectives and management decisions that will work toward meeting multiple goals; (c) demonstrate the connectivity between programs; and (d) reduce conflicts internal to the document.

[16] Goals are broad statements of desired outcomes; and usually not quantifiable.

[17] Objectives are specific desired conditions; usually quantifiable and measurable and may have timeframes for achievement.

BLM_0076242

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

*useful for budgeting (thousands of dollars and whole work months).  It may be useful to identify priorities into two groups: one time projects and ongoing tasks.*

**E.  Plan Evaluation/Adaptive Management.**  *Identify a tentative schedule for land use plan evaluations and the management actions that could be taken after an evaluation.*

**F.  Appendices**

BLM_0076243

Appendix F, page 24

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

*Appendix F-6:  Recommended Administrative Record File Plan*
*for Land Use Planning Projects*

*For draft EISs, final EISs, and records of decision (ROD)*

A.  <u>General Information</u>

    1)  *Federal Register* Notices
    2)  Issues, Concerns, Opportunities
    3)  Planning Criteria
    4)  Interdisciplinary Team (IDT) Membership
    5)  Project Schedules
    6)  Preparation Plan

B.  <u>Public Information and Involvement</u>

    1)  Public Involvement Plans
    2)  Public Information Documents, Letters, Notices
    3)  Mailing Lists
    4)  News Reports and Clippings
    5)  General Correspondence
    6)  Meetings/Workshops
    7)  Public Comments:  *Scoping*
    8)  Public Comments:  *prior to draft EIS*
    9)  Public Comments:  *draft EIS*
    10)  Protests and Final EIS Comment Letters Received
    11)  Protest Responses
    12)  Governor's Consistency Review Comments/Response (if any)

C.  <u>External Communications</u>

    1)  Other Federal Agencies
    2)  Cooperating Agencies
    3)  Tribes
    4)  State Agencies
    5)  Local Agencies
    6)  Elected Officials
    7)  Organizations
    8)  Individuals
    9)  Freedom of Information Act (FOIA) Requests and Responses (FOIA officer is responsible for maintaining these files)

D.  <u>Internal Communications</u>

    1)  Project Management Correspondence
    2)  IDT Correspondence

BLM_0076244

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

    3)  IDT Meeting Agendas and Notes
    4)  FOIA Exempt Documents
    5)  Quality Assurance Determination

**E.  Materials (Background/Supporting) Used to Develop Planning Documents (Draft EIS, Final EIS, ROD)**

    1)  Introduction
    2)  Alternatives
    3)  Affected Environment
    4)  Environmental Consequences
    5)  Appendices

**F.  Data Used in Support of Planning Decisions**

    1)  Planning Data
    2)  Data Standards
    3)  Metadata

**G.  References**

**H.  Planning Documents**

    1)  Scoping Report
    2)  Analysis of the Management Situation
    3)  Draft EIS
    4)  Final EIS
    5)  ROD/Approved RMP

BLM_0076246

## Appendix G:  Managing and Applying Data and Information

A successful land use planning effort always employs rigorous standards for maintaining, managing, and applying data and derived information.  Standardized, accurate, and reliable data and information are critical to the development of plan assessments, alternatives, impact analyses, and planning decisions. All data used in supporting planning decisions are considered corporate data.  Corporate data are those data and applications that are exchanged across administrative units, shared with the public, used repetitively through time, and applied in decision-making.

The data and resultant information for a land use plan must be carefully managed, documented, and applied to withstand public, scientific, and legal scrutiny, and at the same time, facilitate the efficient development and operation of the Bureau's mapping and data management systems such as GIS.  For these reasons, the corporate data used in plans require a high level of consistency, standardization, and established quality control procedures.

### I.  Metadata Standards and Requirements

Metadata is the term used to describe the content, quality, condition, and other characteristics of data.  By Executive order, geospatial data used by the Bureau must be:  (1) accompanied by metadata in the format set forth by the Federal Geographic Data Committee and (2) be accessible to all interested parties.  The BLM also requires that non-spatial planning data must be accompanied by Federal Geographic Data Committee-compliant metadata.

In developing a plan, a distinction must be made between new data and existing data.  New data includes both raw data and derived information or products such as new GIS themes, or applying new analyses or modeling methods.  New data may be collected by BLM or contractors, or it may be acquired from external sources.  For additional information on metadata requirements, metadata fields, and standards, refer to the BLM Data Administration Handbook (H-1283) and the BLM Intranet through the IRM Data Management website. The site contains information on project contacts and assistance, frequently asked questions, guidelines and directives, a data standards reference library, data quality, and a data management toolkit.

### II.  Identifying Data Needs for a Land Use Plan

Data collection and management are significant costs when developing a land use plan.  Data needs are collectively determined by planning criteria, management concerns, and issues.  It is important to start identifying data needs at the inception of a planning project through the development of the preparation plan.  The BLM planning project manager must identify existing data and information sources, and determine what additional data must be collected.  A table of information should be prepared by the planning project manager and planning team which describes the specific data required to answer planning questions associated with the plan, along with the availability and status of the data.  The table will reveal data deficiencies and identify strategies to obtain missing or incomplete data or information.

BLM_0076247

Appendix G, page 2

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## III.  Data Sources

Managers of planning efforts are encouraged to use existing data compiled by Tribes, Federal, state, and local government agencies, and other entities where appropriate to fulfill planning data needs.  Data partnerships are also encouraged to reduce costs and to achieve data standardization across jurisdictional boundaries.

Regardless of the sources used, all metadata should be documented to identify the quality of the data, along with its limitations for application.  When data or information is extracted from an outside source, the development and maintenance of the material is the responsibility of the outside entity.  However, the data or information that is actually used by BLM in a plan must be treated as BLM corporate data.  Project planners and planning teams also should always judiciously validate all data sources for accuracy, reliability, and limitations.  At the very least, outside data and information sources will usually require reformatting, which should be taken into account in terms of project costs and time.

## IV.  Managing Data During Land Use Plan Development

Planning data should be stored and maintained for easy access to planning team members and to ensure that the team is using the same data and information.  At a minimum, data should be updated and archived at the stages of the management situation analysis, issuance of the draft plan or amendment, issuance of the proposed plan, and the final product approved through the ROD.  Throughout the duration of a planning project, it is also important for the project planner, planning team, and GIS-data management staff to routinely check on the quality, consistency, and accuracy of the data that is being managed, analyzed, and displayed.

With the increased emphasis on collaborative planning, there is an additional need to make data available to interested publics, both during and upon completion of a plan or plan amendment.  Under the Bureau-wide e-Planning Initiative, continued efforts will help bring the BLM land use planning process into an electronic business climate, reduce planning costs, and allow better public access to decision making.  In the interim, access to planning data may be made available through BLM's state websites or through distribution by CDs or hard copies of a planning document.

Although individual land use plans will have their own specific data requirements, some base mapping themes are common to all planning efforts.  For example, the Public Land Survey System landnet, land status, and administrative/jurisdictional boundaries are base themes needed to define the geographic extent of a given planning area.  Other themes such as topography, transportation, vegetation, soils, hydrography, and cultural features are also common to most analyses.

Maintaining high-quality geospatial data supports the planning process as well as a variety of other needs.  With regular updating and maintenance, the same geospatial data that supports the development of plans can be instrumental for plan implementation, monitoring, and periodic assessments.

BLM_0076248

H-1601-1 — LAND USE PLANNING HANDBOOK – (Public)

## V.  Integrating Data Application and Display

The availability of appropriate analytical models and tools to apply and display data is important. Quality data that is inappropriately applied has the same disastrous effect as using poor or erroneous data.  A geographic information system (GIS) provides the essential tools to bring data together at various scales and formats for spatial analysis and display, usually through maps and accompanying charts and tables. Spatial models, such as those used to predict erosion loss or to determine areas suitable or unsuitable for various uses, also allow data to be applied in addressing planning and management issues.

At the beginning of a land use planning project, it is important for the project planner to work with the GIS support staff, and identify and agree on how data and information will be integrated into the development of different displays.  This includes, for example, determining the desired sets of map products that will be used in a hard copy version of a plan, public exhibits, website postings, press releases, and public notices. This avoids unnecessary production costs by planning ahead, identifies potential data-display technical problems at the inception of a project, and streamlines and ensures the development of standardized data sets and the display of data.

Rel. 1-1693
03/11/05

BLM_0076249

Download 🔲 📄

# Department of the Interior

# Departmental Manual

**Effective Date**: 6/28/00

**Series**: Environmental Quality Programs

**Part 520**: Protection of the Natural Environment

**Chapter 1**: Floodplain Management and Wetlands Protection Procedures

**Originating Office**: Office of Environmental Policy and Compliance

**520 DM 1**

1.1 **Purpose**. This Chapter sets forth the procedures to be followed in implementing Executive Order 11988, Floodplain Management (May 24, 1977) and Executive Order 11990, Protection of Wetlands (May 24, 1977), which are hereinafter referred to as the Orders. Whenever only one Order is referred to it will be identified by its Executive Order number (e.g., EO 11988).

1.2 **Policy**. The Department has a general mandate and broad responsibility for the management of the Nation's natural resources, including its streams, wetlands and floodplains. The Department's policy is to:

A. Exercise leadership and take action to avoid, to the extent possible, the long- and short-term adverse impacts associated with the occupancy and modification of wetlands and floodplains;

B. Avoid the direct or indirect support of wetland or floodplain development whenever there is a practicable alternative;

C. Reduce the risk of flood loss and minimize the impact of floods on human health, safety and welfare;

D. Restore and preserve the natural and beneficial values served by floodplains and wetlands;

E. Develop an integrated process to involve the public in the floodplain management decision making process;

F. Incorporate the Unified National Program for Floodplain Management into relevant Departmental programs.

1.3 **Authority**.

A. EO 11988, which revoked and replaced EO 11296 (August 10, 1966), was issued in furtherance of the National Flood Insurance Act of 1968, as amended, the Flood Disaster Protection Act of 1973, and the National Environmental Policy Act of 1969 (NEPA). Section 2(d) of EO 11988 requires issuance of new or amended agency procedures.

B. EO 11990 was issued in furtherance of the NEPA, and Section 6 of EO 11990 requires issuance of new or amended procedures.

1.4 **References**. The following references are made an integral part of this Chapter.

BLM_0076250

A. EO 11988, Floodplain Management;

B. EO 11990, Protection of Wetlands;

C. Unified National Program for Floodplain Management, Water Resources Council (WRC);

D. Floodplain Management Guidelines, WRC, February 10, 1978 (43 FR 6030);

E. EO 11514, as amended, Protection and Enhancement of Environmental Quality;

F. EO 12372, as amended, Intergovernmental Review of Federal Programs.

1.5 **Interrelationships**.

A. General. The Department recognizes that the requirements of the Executive Orders have basic interrelationships with and condition the implementation of existing Federal activities and guidance documents. Therefore, to the extent possible, the Department will integrate floodplain management and wetland protection requirements into its programs and will utilize existing consultation, planning and decision processes.

B. Water Resources Council (WRC) Guidelines. The WRC Guidelines for implementing EO 11988 are the basic guidance for interpreting that Executive Order and conducting the floodplain management planning and decision process. Where it is deemed appropriate for the Department to diverge from the WRC Guidelines, this Chapter will supersede that document. In general, the substantive requirements of EO 11988 as interpreted and explained in the Executive Summary of the WRC Guidelines are adopted by this Department. This Department will adhere to the methods, standards and definitions of terms as set forth in the WRC Guidelines for determining risks and hazards of flood loss; minimization of impact on health, safety and welfare; and evaluation of alternatives.

C. Protection of Wetlands. EO 11990 requires Federal agencies to avoid destruction or modification of wetlands whenever there is a practicable alternative. Since almost all wetlands are found in floodplains, the Department will, in general, conduct its activities regarding wetlands in accordance with this Chapter.

D. NEPA Compliance. For actions located in floodplains and wetlands, the requirements of the Executive Orders supplement those of NEPA. Since most Federal actions in floodplains and wetlands will impact these resources, an environmental document (environmental statement or assessment) will probably be required to comply with NEPA. For ease and economy of documentation, the Executive Orders' requirements will be included in the NEPA compliance documents for each such action.

E. Interagency Review. Because of its broad responsibility for the protection, maintenance and enhancement of the Nation's natural resources, the Department maintains an effective review function which monitors other agency activities in floodplains and wetlands. Under the auspices of various laws, regulations and interagency agreements, the Department suggests methods of study and solutions for many problems which impact floodplain and wetland resources.

1.6 **Responsibilities**.

A. Assistant Secretary-Policy, Management and Budget (PMB). The Assistant Secretary--PMB will:

(1) Have overall responsibility for ensuring that the Secretary's responsibilities under the Executive Orders are carried out. In performing this duty, the Assistant Secretary--PMB will prepare program directives and other necessary guidance as required.

1/2/2011 3:48 PM

BLM_0076251

(2) Approve bureau and office procedures for complying with the Executive Orders.

(3) In consultation with Program Assistant Secretaries, prepare any required reports to the Water Resources Council and/or the Council on Environmental Quality.

(4) Mediate conflicting interests between two or more Assistant Secretaries, and either resolve differences between the parties, or refer the conflicting views to the Secretary with a recommended course of action.

B. <u>Program Assistant Secretaries</u>. The Program Assistant Secretaries will:

(1) Maintain general supervision of bureaus and offices under their jurisdiction in order to ensure compliance with the Executive Orders and this Chapter.

(2) Review and concur with the floodplain and wetland procedures of their bureaus and offices prior to forwarding them to the Assistant Secretary--PMB for approval.

(3) Be responsible for resolving any conflicts among the bureaus and offices under their individual jurisdiction.

C. <u>Heads of Bureaus and Offices</u>. The heads of bureaus and offices will:

(1) Review their programs for compliance with the Executive Orders and, at a minimum, apply the Executive Orders to the following types of activities:

(a) Planning and designing new Federal facilities;

(b) Modifying existing Federal facilities or constructing new ones;

(c) Acquiring, managing and disposing of Federal lands and facilities;

(d) Carrying out and influencing programs involving land use and water planning and development, including regulating and licensing activities;

(e) Administering construction, improvement and land acquisition programs supported or assisted by Federal grants, loans or other forms of financial assistance.

(2) Develop procedures for determining, for the activities listed above and any other covered activities, the degree of risk present, and whether or not an alternative location or other course of action is practicable. If not practicable, the procedures will indicate what steps to take to minimize harm to facilities, to the floodplain and to wetland resources.

(3) Furnish with all requests for new authorizations or appropriations (for proposals to be located in floodplains and wetlands) a statement that the proposal complies with the Executive Orders.

(4) Be responsible for assuring compliance with the public information and other procedural requirements of the Executive Orders.

(5) Inform private parties and State and local governments participating in regulatory, financial and land transactions of the hazards and impacts of locating structures in floodplains and wetlands. Appropriate information should include the levels of expected flooding, location in a riverine or coastal high hazard area, existence of multiple flooding sources or combinations of hazards, and other important information for the safety of potential floodplain occupants and development.

(6) Be the responsible official for all statements of findings (WRC Guidelines, Part II, Step 7).

1/2/2011 3:48 PM

BLM_0076252

1.7 **Procedures for Bureau and Office Guidance.**

A. <u>General</u>.

(1) Bureaus and offices are required to prepare or update written procedures for complying with the Executive Orders. Initially, bureau and office procedures will be prepared or updated in consultation with the Assistant Secretary--PMB and the appropriate Program Assistant Secretary. Once approved by the Assistant Secretary--PMB, periodic minor revisions can be made without extensive reconsultation. Any major amendments, however, will require concurrence of the appropriate program Assistant Secretary and approval by the Assistant Secretary--PMB.

(2) Secretarial Offices do not have to prepare separate procedures, but will comply with the Executive Orders and these procedures. The Office of Environmental Policy and Compliance is available to provide guidance for any specific compliance activities.

B. <u>Specific</u>.

(l) Procedures will be prepared in accordance with this Chapter, its references and existing policies and will be published in the <u>Federal Register</u>.

(2) Procedures initially prepared in accordance with this Chapter will be circulated for review to the Council on Environmental Quality (CEQ), Water Resources Council (WRC), Federal Emergency Management Agency (FEMA), Environmental Protection Agency (EPA), U.S. Fish and Wildlife Service (FWS) and Corps of Engineers (CE).

(3) Minor procedural amendments to procedures do not require extensive reconsultation; however, substantive amendments will be circulated as required in 520 DM 1.7B(2).

(4) Procedures will be prepared in the most logical format. The following two formats are recommended:

(a) <u>Single Procedure Document</u>. This format would present bureau and office procedures in one document and explain its application to all affected programs.

(b) <u>Dispersed Procedures</u>. This format would present a summary of and reference the various separate procedures of the bureau and office programs. With this approach detailed procedures would be issued separately as additions or revisions to existing program guidance.

(5) Procedures, when published in the <u>Federal Register</u>, will also provide a listing of any handbooks, manuals or other guidelines which will be modified, the schedule for completion of the modification, and how and where copies can be obtained for review.

C. <u>Criteria for Evaluation</u>. The following criteria will be used by the Assistant Secretary--PMB and the Program Assistant Secretaries to evaluate all procedures prepared for compliance with this Chapter. The procedures must provide for:

(1) Leadership with respect to natural and beneficial values of floodplains and wetlands;

(2) Utilization of the principles of the "Unified National Program for Floodplain Management";

(3) A systematic review of existing procedures to involve protection and restoration of values and a sound policy to apply floodplain and wetlands principles in all stages of planning, implementation, monitoring and evaluation of bureau and office activities;

BLM_0076253

(4) Avoidance of long- and short-term adverse impacts associated with the occupancy and modification of floodplains and wetlands;

(5) Avoidance of direct or indirect support of floodplain development whenever there is a practical alternative;

(6) Reduction of flood losses;

(7) Minimization of flood impacts on human health, safety and welfare;

(8) Development of an integrated process to involve the public in the floodplain and wetlands decision making process.

(9) Technical consultation with WRC, CEQ, FEMA, FWS, and CE and other institutions with expertise in the natural and beneficial values of floodplains and wetlands;

(10) Assurance that planning programs and budget requests reflect consideration of natural and beneficial values of floodplains and wetlands;

(11) Documentation of specific analysis of actions and examples of responses to EO 11988 for reporting purposes under that Executive Order.

1.8 **Procedures for Bureau and Office Activities**.

A. General. Procedures to be followed in applying EO 11988 to all activities are set forth in Part II of the WRC Guidelines. The Department has adopted this process and will deviate from it only when Departmental missions and programs will be more adequately served by modified procedures. When the affected floodplain includes wetlands, the application of these procedures will also reflect the wetlands considerations and will demonstrate how the wetlands will be protected.

B. Procedures. When an action is proposed in wetlands or a floodplain, the following procedural steps (summarized from the WRC Guidelines) will be addressed and integrated into the planning process.

(l) Identification of whether a proposed action is located in the 100-year floodplain (500-year floodplain for "critical actions") and assessment of the type of hazard involved. This requirement is discussed in Step 1 of the WRC Guidelines.

(2) Identification of the overall audience to be reached for public notice and involvement, the vehicles for public participation and the purpose and timing of public notice actions. This requirement is discussed in Step 2 of the WRC Guidelines.

(3) Identification of practicable, alternative sites or actions and how such alternatives will be reviewed and evaluated. This requirement is discussed in Step 3 of the WRC Guidelines.

(4) Identification of direct or indirect impacts associated with the occupancy and modification of the floodplain; direct and indirect support of floodplain development; and how they will be reviewed and evaluated. This requirement is discussed in Step 4 of the WRC Guidelines.

(5) Identification of minimization of harm to lives and property, and to natural and beneficial floodplain values; how this will be achieved; and what restoration and preservation of the natural and beneficial values will be made. These requirements are discussed in Step 5 of the WRC Guidelines.

(6) Re-evaluation of proposed actions to determine if they are still practicable at a floodplain site in light of

BLM_0076254

the exposure to flood risk and ensuing disruption of floodplain values. This requirement is discussed in Step 6 of the WRC Guidelines.

(7) Identification of the contents of the written statement of findings and public explanation, and appropriate integration of this process into existing procedures and documents. This requirement is discussed in Step 7 of the WRC Guidelines.

(8) Assurance that the actions are implemented according to the requirements of EO 11988. This requirement is discussed in Step 8 of the WRC Guidelines.

C. Documentation and Circulation.

(1) Case-by-case documentation is required for all actions covered by the Executive Orders. Project files will be kept current and reflect compliance with the decision making process outlined in the WRC Guidelines.

(2) Circulation of information and data on casework is necessary to satisfy Sections 2(a)(2), (3) and (4) of EO 11988. Section 2(a)(2) is a general notice of actions to be taken. Section 2(a)(3) assures compliance with EO 12372 reporting procedures. Section 2(a)(4) calls for early public review whether or not the action will require preparation of an environmental impact statement.

(3) Steps 2 and 7, Part II of the WRC Guidelines give thorough information for compliance with the public notice requirements of EO 11988. A notice will be published in the Federal Register when the proposed action has national significance or impact. On actions of lesser geographic coverage, the Federal Register may be used, but bureaus and offices will also use other public information methods, such as news releases, newsletters, and public meetings to inform the interested public.

(4) To assure interagency coordination notices, NEPA documents and decision statements on proposals in floodplains and wetlands will be circulated to the following agencies:

(a) Environmental Protection Agency (EPA)

(b) Federal Emergency Management Agency (FEMA)

(c) U.S. Fish and Wildlife Service (FWS)

(d) Geological Survey (WGS)

(e) Bureau of Reclamation (WBR)

(f) Corps of Engineers (CE)

(g) Natural Resources Conservation Service (NRCS)

(h) Applicable State Water Resources Agencies (if not covered by the EO 12372 process)

1.9 **Statement of Findings**. The WRC Guidelines in Part II, Step 7, describe the post-decisional process for the statement of findings and explanation to the public in the event that re-evaluation results in locating the project in the floodplain. All procedures will include the process in its pre-decisional activities including the re-evaluation of alternatives (Step 6). Bureaus and offices should work the key parts of the WRC Guidelines into their NEPA process so that floodplain and wetlands considerations remain pre-decisional. A proposed statement of findings would then be attached to a finding of no significant impact. If the final decision differs significantly from the proposed action, then bureaus and offices are required to issue a separate statement of findings in accordance with Step 7.

BLM_0076255

1.10 **Intra-Departmental Conflict Resolutions**. When two or more bureaus and offices of the Department hold conflicting views on a particular project, the following steps will be taken to achieve a satisfactory solution:

A. A meeting will be held between field-level officials of the bureaus and offices involved to resolve the matter or to clarify their differences.

B. If there is no resolution, a meeting will be held with the Regional Environmental Officer (REO) of the Office of Environmental Policy and Compliance and regional officials of the involved bureaus and offices to find a solution or refer to higher authority.

C. If referred to a higher authority, each involved bureau and office and the REO will prepare and forward to headquarters a complete case report which provides background, analysis, acceptable alternative positions, conclusions and recommendations. Supporting material (maps, associated reports, position papers, etc.) will accompany the case report. If the supporting materials are too voluminous, they should be summarized in the case report and made available to higher authority upon request.

D. If the opposing views are upheld within a program area under one Assistant Secretary, that Assistant Secretary will review the issue, document the findings, and decide the issue.

E. If the opposing views are held between two or more Assistant Secretaries, each Assistant Secretary will review the case report(s) and forward them with their separate findings and recommendations to the Assistant Secretary--PMB.

F. The Assistant Secretary--PMB will decide any disputed issue forwarded, or refer it to the Secretary in those few instances where the Secretary's personal decision may be necessary.

6/28/00 #3308

Replaces 6/11/79 #2180

Click here to download in WordPerfect format

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

Table of Contents

.01  Purpose
.02  Objectives
.03  Authority
.04  Responsibility
.05  References
.06  Policy
.07  File and Records Maintenance
.08  Background
.09  Natural and Beneficial Floodplain Functions

.1  Coordination
    .11  Internal Coordination
        A.  Program Coordination
        B.  Riparian-Wetland Coordinator
        C.  BLM Resource Management Planning
    .12  External Coordination
        A.  Public Participation
        B.  Workshops and Tours
        C.  Demonstration Areas
        D.  Public Consultation
        E.  Working Committee(s)
        F.  National Wetlands Priority Conservation Plans
              (NWPCP's)
        G.  North American Waterfowl Management Plan
    .13  Section 404 Dredge or Fill Permits
        A.  Applications
        B.  Review
    .14  Funding
        A.  Sources
        B.  Range Betterment Funds (8100)
        C.  Private and Other Public Contributions
        D.  Investment Analysis Guidelines
    .15  Progress Reporting and Accountability
        A.  Statewide Riparian-Wetland Management Strategies
        B.  Rangeland Improvement Project System (RIPS)

.2  Inventory, Monitoring, and Evaluation
    .21  General Guidance
    .22  Inventory and Monitoring Relationships
        A.  Purpose
        B.  Scope
        C.  Priorities
    .23  Coordination
        A.  Priorities
        B.  External
    .24  Classifying and Describing Riparian-Wetland Ecosystems
    .25  Standards
        A.  Data Collection
        B.  Data Storage
        C.  Evaluation
.3  Key Riparian-Wetland Management Considerations
    .31  Objectives
    .32  Integrated Watershed Management

BLM_0076257

TC-2

1737 – RIPARIAN-WETLAND AREA MANAGEMENT

.33  Natural Stream Functions
.34  Management vs. Structural Alternatives
.35  Priorities

.4  Program Specific Guidance Relative to Riparian-Wetland
    Management
.41  Grazing Management
    A.  Riparian Areas
    B.  Wetland Areas
    C.  Terms and Conditions
.42  Soil and Water Management
    A.  Objectives
    B.  Management Determinations
    C.  Watershed Management Plans (WMP's)
    D.  Chemical Pest Control
.43  Minerals Management
    A.  Mining Claims
    B.  Reclamation Standards
    C.  Placer Mining
    D.  Coal Development
    E.  Solid Minerals
    F.  Fluid Minerals
.44  Recreation Management
    A.  Off-Road Vehicle Use
    B.  Visitor Sites
    C.  Visitor Use
    D.  Wilderness Management
.45  Fish and Wildlife Habitat Management
    A.  Priority Species
    B.  Seasonal Use Conflicts
    C.  Waterfowl
    D.  Habitat Management-Plans
.46  Construction Management
.47  Lands and Realty
    A.  Public Interest
    B.  Restrictions
    C.  Authorizations
    D.  Acquisitions
.48  Forest Management
    A.  Management Direction
    B.  Free-Use Disposal
    C.  Contracts
    D.  Buffer Zone
.49  Fire Management
    A.  Retardant Application
    B.  Fireline Construction
    C.  Prescriptions
    D.  Emergency Fire Rehabilitation

Glossary of Terms

Bibliography

Appendix
    1.  Annotated Authorities

BLM_0076258

.01

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

.01  Purpose.  This Manual Section describes the policies, responsibilities, and guidance for the identification, protection, restoration, and maintenance, of fresh, brackish, and saline water wetland areas.  It applies to all Bureau of Land Management (BLM) programs and actions.  Wetlands include both natural and intentionally created areas adjacent to, and influenced by, streams (whether waters are surface, subsurface, or intermittent), springs, lake shores, marshes, potholes, swamps, muskegs, lake bogs, wet meadows, and estuarine areas.  Riparian areas  are a form of wetland transitional between permanently saturated wetlands and upland areas.  The Riparian-Wetland Initiative for the 1990's provides a strategic plan for management and restoration of BLM riparian wetland areas.

.02  Objectives.  The goal of riparian-wetland area management is to maintain, restore, improve, protect, and expand these areas so they are in proper functioning condition for their productivity, biological diversity,and sustainability.  The overall objective is to achieve an advanced ecological status, except where resource management objectives, including proper functioning condition would require an earlier successional stage. The goal is also to ensure agressive riparian-wetland information, training and research programs as well as improve partnerships and cooperative management processes.

.03  Authority.

   A.  Major Legislation (see Appendix 1 for other laws, Executive Orders, and regulations related to riparian-wetland area management).

      1.  Taylor Grazing Act of 1934, as amended, 49 U.S.C. 315; 48 Stat. 1269 (1970).

         a.  Directs the Secretary to stop injury to the public lands by preventing overgrazing and soil deterioration, and to provide for their orderly use, improvement, and development.

         b.  Requires that the Secretary provide for the protection, administration, regulation, and improvement of grazing districts created in accordance with the act.

         c.  Requires the Secretary to ensure the objectives of such grazing districts, namely, to regulate their occupancy and use, to protect the land and its resources from destruction or unnecessary injury, and to provide for the orderly use, improvement, and development of the range.

         d.  Authorizes the Secretary to continue the study of erosion and flood control and to perform such work as may be necessary to amply protect and rehabilitate such areas.

      2.  Oregon and California Act, P.L.  75-405, August 28, 1937.

         a.  States that "portions of the revested Oregon and California Railroad and reconveyed Coos Bay Wagon road grant lands as are or may hereafter come under the jurisdiction of the Department of the Interior . . . shall be managed. . . for permanent forest production . . . in conformity with the principles of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating streamflow, . . . and providing recreational facilities . . . ."

BLM_0076259

.03A3

### 1737 – RIPARIAN-WETLAND AREA MANAGEMENT

3.  National Environmental Policy Act of 1969 (42 U.S.C. 4321-47; 83 Stat. 852; P.L. 91-190).

a.  Encourages productive and harmonious relationships between man and his environment and an enriched understanding of ecological systems and natural processes important to the Nation.

b.  Requires preparation of detailed statements on environmental impacts of proposed major Federal actions that significantly impact the quality of the human environment.

c.  Directs Federal agencies to initiate and use ecological information in the planning and development of resources-oriented projects.

4.  Federal Land Policy and Management Act (FLPMA) of 1976 (43 U.S.C. 1701 et seq.; 90 Stat. 2743; P.L. 94-579).

a.  Requires the development and maintenance of land use plans based on an inventory of all public lands and their resources.

b.  Identifies fish and wildlife development and utilization, domestic livestock grazing, mineral exploration and production, rights-of-way, outdoor recreation, and timber production as principal or major land uses.

c.  Requires that part of grazing fees be spent for "range betterment," including aquatic and terrestrial wildlife habitat enhancement, protection, and maintenance; watershed protection; and livestock production where livestock use occurs.

d.  Requires that "the public lands be managed in a manner that will protect the quality of . . . ecological, environmental . . . water resource, and . . . that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals . . . ."

e.  Authorizes the designation of areas of critical environmental concern to protect and prevent irreparable damage to fish and wildlife, and other resources.

f.  Authorizes investigations, studies, and experiments involving the improvement, management, use, and protection of the public lands and their resources.

g.  Requires the compliance with State and Federal water pollution standards.

5.  Public Rangelands Improvement Act of 1978 (49 U.S.C. 1901 et seq.)

a.  Directs improvement of rangeland conditions in accordance with land use planning under FLPMA.

b.  Directs development and maintenance of an inventory of range conditions and trends as part of FLPMA's inventory process.

c.  Provides funding for rangeland improvements which includes stabilizing soil and water conditions and providing habitat for livestock and wildlife.

BLM_0076260

.03A6

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

6.  Water Quality Act of 1987, as amended from the Federal Water Pollution Control Act (Clean Water Act) of 1977 (33 U.S.C. 1251 et seq.; 91 Stat. 1566-1611; P. L. 95-217).

a.  The objective of this act is to restore and maintain ". . . the chemical, physical, and biological integrity of the Nation's water . . ." at a level of quality which provides protection for fish, shellfish, wildlife, and recreational use.

b.  Requires permits for certain activities in navigable waters.

c.  Requires States to assess their rivers, streams, and lakes  and to develop nonpoint source management programs to control and reduce specific nonpoint sources of pollution.  Requires Federal agency consistency with state management programs.

d.  Authorizes funds to help States and local entities to manage into sources of pollution.

7.  Emergency Wetlands Resource Act of 1986 (16 U.S.C.  3901).

a.  This act promotes the conservation of wetlands in the United States by intensifying cooperative efforts between public and private sectors to protect the wetlands resources of the Nation through land acquisition, easements, and other methods.

8.  Agricultural Credit Act of 1987 (7 U.S.C.  1989).

a.  This act authorizes the Farmers Home Administration (FmHA) to take several actions to aid farmers and ranchers who are in danger of defaulting on FmHA loans.

b.  One option is that FmHA may transfer a conservation/ recreation easement (at no cost) to another agency, including BLM.  FmHA can also grant access and conservation easements across properties which have been foreclosed.

9.  Land and Water Conservation Fund Act of 1964 (16 U.S.C. 460).

a.  Enacted for the purpose of "preserving, developing and assuring accessibility to all citizens . . . of outdoor recreation resources."

b.  Generates money from a wide variety of sources and applies it  to a broad spectrum of Federal and State recreation programs, including land acquisitions.

BLM_0076261

.03B

## 1737 – RIPARIAN-WETLAND AREA MANAGEMENT

B.  Executive Orders (EO).

1.  EO 11988 of 1977 (Floodplain Management as amended by Executive Order 12148).  Each Federal agency is to take action to avoid, to the extent possible, the long- and short-term adverse impacts associated with the occupancy and modification of floodplains.  Agencies are further required to avoid direct or indirect support of floodplain development whenever there is a practicable alternative.  Each agency shall provide leadership and shall take action to restore and preserve the natural and beneficial values served by floodplains in carrying out its responsibilities for acquiring, managing, and disposing of Federal lands and facilities.

2.  Executive Order 11990, May 24, 1977 (Protection of Wetlands).  This EO directs Federal agencies to take action to minimize the destruction, loss, or degradation of wetlands and to preserve and enhance the natural and beneficial value of wetlands in carrying out programs affecting land use.  All federally initiated, financed, or permitted construction projects in wetlands must include all practical measures to minimize adverse impacts.  This requires that all leases, rights-of-ways, easements, and disposals involving Federal wetlands must contain restrictions to uses by the grantee which are consistent with Federal, State, and local wetland regulations.

.04  Responsibility.  Responsibilities described below are commensurate with those identified in approved functional statements (see BLM Manual Sections 1211, 1212, and 1216).

A.  The Director and the Deputy Directors are responsible for all aspects of riparian-wetland area protection, management, and improvement on public lands administered by the BLM.

B.  Assistant Director, Land and Renewable Resources is responsible for the development, implementation, coordination, and integration of riparian-wetland area policies, procedures, and technical guidance.  This Assistant Director provides policy and program interpretations, direction, leadership, and line management to assure consistency of field implementation of policies and procedures to enhance, protect, maintain, or develop riparian-wetland resources on public lands administered by the BLM and ensures that these procedures are incorporated into all BLM programs.  The Assistant Director is also responsible for:

1.  Evaluating the effectiveness of riparian-wetland habitat protection and management procedures and programs.

2.  Developing guidance for the preparation of activity plans with riparian-wetland management objectives to protect, maintain, and restore these areas to the desired condition.

3.  Systematically reviewing rules, regulations, procedures, and proposed legislation to establish and update the BLM's efforts to protect and manage riparian-wetland resources on public lands administered by the BLM.

BLM_0076262

.04C

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

   C.   Chief, Division of Rangeland Resources and Branch Chief, Soil, and Air are responsible for interprogram coordination on policy, quality control, and riparian-wetland evaluations and reviews.

   D.   Assistant Director, Energy and Mineral Resources; Assistant Director, Support Services; Chief, Division of Wildlife and Fisheries; Chief, Division of Forestry; Chief, Division of Lands and Realty, Chief, Division of Recreation, Cultural, and Wilderness Resources; Chief, Division of Rangeland Resources; and Chief, Division of Planning and Environmental Coordination are all responsible for ensuring the incorporation of riparian-wetland protection and improvement policies and procedures into their program areas.

   E.   The Service Center Director is responsible for providing technical support for development and coordination of riparian-wetland inventory, classification, management techniques, and monitoring as well as other appropriate technical expertise, assistance, and/or support within the purview of Service Center operations and responsibilities.

   F.   State Directors are responsible for formulating policy (within limits delegated by the Director) and for developing, directing, coordinating, and implementing a Statewide riparian area management strategy.   They must ensure compliance with official procedures and provide technical assistance and guidance needed to implement inventory, classification, management, and monitoring procedures.

   G.   District Managers are responsible for formulating policy (within limits delegated by State Directors) and for developing, directing, and coordinating Districtwide riparian-wetland area management by implementing BLM and State policies, programs, and procedures.

   H.   Resource Area Managers are responsible for implementing District, State, and BLM riparian-wetland area management policies within their designated areas of jurisdiction.

.05 References.

   A.   Departmental Manual 520 - Floodplain and Wetlands Protection Procedure.

   B.   BLM Manuals and Handbooks.

      1.   Manual Section 1613 (Areas of Critical Environmental Concern).

      2.   Manual Sections 1620-1625 (Supplemental Program Guidance).

      3.   Manual Section 1702 (Research Management and Liaison).

      4.   Manual Section 1734 (Inventory and Monitoring Coordination).

      5.   Manual Section 1740 (Renewable Resource Improvements and Treatments).

      6.   Manual Section 4100 (Grazing Administration - Exclusive of Alaska).

BLM_0076263

.05B7

1737 – RIPARIAN-WETLAND AREA MANAGEMENT

    7.  Manual Section 6720 (Aquatic Resource Management).

    8.  Manual Section 6840 (Special Status Species Management).

    9.  Manual Section 7200 (Water Resources).

    10.  Manual Section 7221 (Floodplain Management).

    11.  Handbook H-4120-1 (Grazing Management).

    12.  Handbook H-4410-1 (National Range Handbook).

    13.  Manual Section 8550 (Interim Management Policy and Guidelines for Lands Under Wilderness Review).

    14.  Manual Section 8560 (Management of Designated Wilderness Areas).

    15.  Manual Section 8561 (Wilderness Management Plans).

    16.  Handbook H-8550-1 (Interim Management Policy and Guidelines for Lands Under Wilderness Review).

    17.  Handbook H-8560-1 Management of Designated Wilderness Areas).

  C.  Master Memorandum of Understanding with the U.S. Fish and Wildlife Service, dated December 1986.

  D.  Technical References on Riparian Area Management.

    1.  <u>Trend Studies</u>.  Technical Reference 4400-4, 1984.

    2.  <u>A Selected, Annotated Bibliography of Riparian Area Management</u>. Technical Reference 1737-1, 1987.

    3.  <u>The Use of Aerial Photography to Inventory and Monitor Riparian Areas.</u>  Technical Reference 1737-2, Aug. 1987.

    4.  <u>Inventory and Monitoring Riparian Areas</u>.  Technical Reference 1737-3, 1989.

    5.  <u>Grazing Management in Riparian Areas</u>.  Technical Reference 1737-4, 1989.

    6.  <u>Riparian and Wetland Classification Review</u>.  Technical Reference 1737-5, 1990.

    7.  <u>Management Techniques in Riparian Areas.</u>  Technical Reference 1737-6, 1992.

    8.  <u>Procedures for Ecological Site Inventory With Special Reference to Riparian-Wetland Sites</u>.  Technical Reference 1737-7, 1992.  Interior, Fish and Wildlife Service.

BLM_0076264

.05E

1737 – RIPARIAN-WETLAND AREA MANAGEMENT

E.  Concepts in Stream Riparian Rehabilitation, 1986.  BLM, by Van Haveren
and Jackson.

F.  North American Waterfowl Management Plan, 1986.  U.S. Department of
.

G.  Riparian Areas: Perspectives in Management.  Rangelands 9(6),
December 1987.  By Elmore, and Beschta.

H.  Federal Manual for Identifying and Delineating Jurisdictional Wetlands,
an Interagency Cooperative Publication, 1989.  Fish and Wildlife     Service,
Environmental Protection Agency, Department of the Army, and Soil
Conservation Service.

.06  Policy.

A.  Departmental Policy.  The Department of the Interior has a mandate for
the management of the Nation's natural resources, including riparian-
wetland areas.  The Department's policy is to:

1.  Exercise leadership and take action to avoid, to the extent
possible, the long- and short-term adverse impacts associated with the
occupancy and modification of wetlands and floodplains.

2.  Avoid the direct or indirect support of wetland or floodplain
projects whenever there is a practical alternative.

B.  BLM's Policy.  In accordance with laws, EO's, and Departmental policy
to maintain, restore, or improve riparian-wetland ecosystems to achieve a
healthy and proper functioning condition that assures biological diversity,
productivity, and sustainability, it is the BLM's policy to:

1.  Use an interdisciplinary team to conduct and maintain an inventory
of all riparian-wetland areas, quantifying physical, biological, chemical
condition and potential.

2.  Focus management on entire watersheds using an ecosystem approach
and involving all interested landowners and affected parties whenever
possible.

3.  Achieve riparian-wetland area improvement and maintenance
objectives through the management of existing and future uses wherever
feasible.

4.  Ensure that new resource management plans (RMP's) and activity
plans, and existing plans when revised, recognize the importance of
riparian-wetland values, and initiate management to maintain, restore,
improve or expand them.

5.  Prescribe management for riparian-wetland values that is based
upon site-specific characteristics and settings.

6.  Use an interdisciplinary team approach to monitor and evaluate
management activities in riparian-wetland areas and revise management
practices where objectives are not being met.

BLM_0076265

.06B7

1737 – RIPARIAN-WETLAND AREA MANAGEMENT

7.  Ensure public involvement in the planning and management of riparian-wetland ecosystems.  This includes Federal, State, local governments, and industry organizations sharing information, implementing management actions, coordinating activities, and providing education on the value, productivity, and management of riparian-wetland areas.

8.  Retain riparian-wetland areas in public ownership unless disposal would be in the public interest, and acquire riparian-wetlands as determined in the land use planning system.

9.  Identify, encourage, and support research and studies needed to ensure that riparian-wetland area management objectives can be properly defined and met.  Incorporate research findings into the planning and management of riparian-wetland ecosystems.

.07  File and Records Maintenance.  Record files for Riparian-Wetland Area Management should be established and maintained in accordance with BLM Manual Section 1272 and disposed of according to the BLM Records Schedule. Guidance on the organization and contents of riparian-wetland project files is contained in BLM Handbook H-1740-1.  See Sections .14 and .25 for documentation requirements.  Copies of records retention schedules and information pertaining to specific riparian-wetland area management may be obtained from the local records managers.  All records are for permanent retention, usually on paper or machine readable, and not of propriety or sensitive in character.

.08  Background.  Riparian-wetland areas are unique and among the most productive and important ecosystems, comprising approximately 1 percent of the Public lands in the contiguous United States and 24 percent in Alaska. Characteristically, these areas display a greater diversity of plant, fish, wildlife, and other animal life and vegetation structure than adjoining ecosystems.  Healthy riparian-wetland systems filter and purify water as it moves through the riparian zone, reduce sediment loads, enhance soil stability, provide micro-climate moderation when contrasted to extremes in adjacent areas, and contribute to ground water recharge and base flow.

.09  Natural and Beneficial Floodplain Functions.  Many of the natural and beneficial functions of a floodplain are directly related to riparian-wet-land vegetation.  Such functions include:

A.  Dissipating stream energies associated with high flows; thereby reducing erosion and improving water quality.

B.  Filtering sediment and other pollutants carried with overland flow and aiding alluvial valley floor and floodplain development.

C.  Improvement of floodplain storage potential, which can result in making water available for gradual release throughout the year.

D.  Development of root masses that stabilize stream banks against cutting action.

E.  Regulation of sunlight incident on the stream surface.  Adequate vegetative cover to shade the water is required to keep water temperatures low enough for survival and production of fish and aquatic life.

F.  Reduction of heat loss and icing during the colder winter months.

BLM_0076266

.09G

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

G.  Production of a food source for aquatic organisms and wildlife.

H.  Production of cover for fish and aquatic wildlife shelter or protection.

I.  Production of a food supply and habitat for terrestrial animals.

J.  Development of diverse stream morphology to provide habitat for aquatic organisms.

K.  Provision of critical wintering habitat for wildlife.

BLM_0076267

.1

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

.1  Coordination.

  .11  Internal Coordination.

    A.  Program Coordination.  Riparian-wetland area values and
functions influence virtually every BLM program with either compatible or
conflicting interests.  An interdisciplinary approach is, therefore, a
necessity to achieve riparian-wetland management objectives.  Coordination
between programs is required not only to analyze land use actions and
allocations, but for other activities including inventory, monitoring,
budget preparation, etc.

    B.  Riparian-Wetland Coordinator.  Each BLM State, District, and
Resource Area Office should designate a person responsible for riparian-
wetland coordination.  This person shall coordinate riparian-wetland related
actions and activities with all BLM programs that may be affected.

    C.  BLM Resource Management Planning.  Impacts of various land uses
and management proposals on riparian-wetland areas are initially considered
in the resource management plan.  Management actions stemming from decisions
developed in RMP's are translated, where necessary, into specific actions
through more detailed, site specific planning and environmental analysis
process.

    1.  Managers are to ensure that riparian-wetland determinations,
including management objectives, are made in accordance with the
Supplemental Program Guidance (SPG) for resource management planning, Manual
Sections 1622.1 and 1624.  Programs with SPG relating to riparian-wetland
management include livestock grazing management; recreation management;
wildlife habitat management; soil, water, and air management; forest
management; and energy/mineral resources.

    2.  Establish riparian-wetland management objectives using an
interdisciplinary approach and incorporate these as appropriate in
site-specific activity plans:  wildlife and fish habitat management plans
(HMP's), allotment management plans, timber management plans, watershed
management plans, coordinated activity plans, wild horse management plans,
oil and gas development plans, mine operation plans, etc.

    3.  Important riparian-wetland areas should be considered for
designation as areas of critical environmental concern (ACEC) through the
RPS when they meet the criteria of revelance and importance, as defined in
43 CFR 1610.7-2.

    4.  The authorized officer shall incorporate the necessary
stipulations in land use authorizations and contracts to ensure that
riparian-wetland objectives in land use and activity plans are met.

    5.  All actions and mitigating measures shall be monitored using
an iterative process and records of results shall be maintained.

    6.  Monitoring results should be evaluated by interdisciplinary
teams to ensure that management prescriptions are achieving their intended
purpose.  If they are not, management prescriptions, associated enforcement
and treatments must be changed to ensure that riparian-wetland objectives
are being met.

BLM_0076268

.12

1737 – RIPARIAN-WETLAND AREA MANAGEMENT

.12  Underline: External Coordination.

A.  Public Participation.  The public participation required in 43 CFR 1610.2 must be followed in developing RMP alternatives and decisions related to riparian-wetlands area management.

B.  Workshops and Tours.  BLM sponsored workshops and tours should  be conducted to increase and maintain riparian and wetland consciousness among BLM resource specialists and managers and the public;

C.  Demonstration Areas.  To assist in this education process, each District Office should develop and maintain at least one riparian showcase area to demonstrate that through proper management, conservation practices, and/or restoration project work, riparian-wetland areas are producing a variety of benefits.

D.  Public Consultation.  BLM should consult with the public, private organizations, other State and Federal agencies, and scientists from colleges and universities to exchange knowledge, experience, and technology in the maintenance, restoration, and improvement of riparian-wetland areas. Included is an awareness and compliance with State and local regulations and permits for work undertaken in streams.

E.  Working Committee(s).  The understanding and involvement of all interested parties generates commitment and accountability and are essential to successful riparian-wetland management.  To foster public involvement in implementing management goals and objectives, State Directors are encouraged to establish and/or participate in a working committee(s) to address riparian-wetland issues, consider options, and make recommendations for management on a general and site specific basis.

F.  National Wetlands Priority Conservation Plans (NWPCP's). Coordination with U.S. Fish and Wildlife Service is encouraged for the development of NWPCP's for identifying riparian-wetlands warranting priority attention for acquisition using Land and Water Conservation Funds appropriations.  In addition, the NWPCP should be used to identify priority riparian-wetlands warranting protection through measures not requiring land acquisition (see .47D).

G.  North American Waterfowl Management Plan.  This plan, developed jointly by Canada and the U.S., identifies strategies for the maintenance and recovery of populations of North American waterfowl.  The BLM, as a cooperator in implementation, has a key role to play in managing and restoring riparian-wetland habitats to support continental populations of waterfowl. Coordination of BLM riparian-wetland actions and programs with plan cooperators is essential particularly in Joint Venture areas and within Areas of Major Concern identified in the plan.  The BLM's role in implementation is outlined in "Waterfowl Habitat Management on Public Lands a Strategy for the Future", and State Fish and Wildlife 2000 Plans.

BLM_0076269

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

.13  Section 404 Dredge and Fill Permits.

A.  Applications.  All activities affecting riparian-wetland area  which
result in the discharge of dredge or fill material requires a permit from the
Army Corps of Engineers (see Section 404 (f)(2), Water Quality Act of 1987).
Certain types of activities may be conducted under a general permit, and
therefore do not require an individual permit application.  Title 33 CFR 320
through 330 provides the regulations for applying for a 404 permit.  The
office shall apply to the Corps of Engineers on all proposed Bureau dredge or
fill activities.  For all land use applications, the applicant shall acquire a
404 permit prior to the initiation of dredge and fill activities in
riparian-wetland areas.  BLM shall work with other Federal agencies for the
identification of jurisdictional wetlands subject to Section 404 of the Clean
Water Act permitting process.  Refer to the "Federal Manual for Identifying
and Delineating Jurisdictional Wetlands, an Interagency Cooperative
Publication", Fish and Wildlife Service, Environmental Protection Agency,
Department of the Army, and Soil Conservation Service, 1989 for additional
guidance.

B.  Review.  Departmental Manual Section 503 requires that all  agencies
review 404 Permit applications for activities affecting lands under their
management authority.  The agency must assure that such activities are
consistent with agency policy, management practices, and plans.  Review
comments and proposed stipulations shall be provided to the Army Corps of
Engineers through the U.S. Fish and Wildlife Service.

.14  Funding.

A.  Sources.  Riparian-wetland management and protection benefits a
variety of BLM resources and programs.  Riparian-wetland related activities,
including planning, inventory, monitoring, project development and
maintenance are to be funded according to the Financial Management System
and based on the benefitting activity concept (see Handbook H-1684-1).  The
special interest project code "RPRN" must be used on all financial documents
to establish a baseline for tracking accomplishments and expenditures by the
benefitting subactivity code.

B.  Range Betterment Funds (8100).  Use of 8100 funds for riparian-
wetland related projects is allowable and appropriate.  General guidelines
for expending these funds are described in Handbook H-1740-1.

C.  Private and Other Public Contributions.  Joint ventures with private
and governmental organizations should be considered as an approach to
financing high-priority management projects.  The use of Challenge Cost
Share funding for riparian-wetland workloads provides an excellent
opportunity to extend existing funding capability, encourage cooperative
partnerships and increase public awareness.

D.  Investment Analysis Guidelines.  (See Manual Section 1740 and
Handbook H-1740-1.)

BLM_0076270

.15

1737 – RIPARIAN-WETLAND AREA MANAGEMENT

.15 Progress Reporting and Accountability.

A. Statewide Riparian-Wetland Management Strategies.

1.  BLM riparian-wetland management activities receive  considerable attention from Congress and the public.  To be responsive, the BLM will track and report funds allocated and expended as well as units of  accomplishment for work done in these areas.  The BLM intends to direct riparian- wetland management through development and implementation of statewide and district riparian-wetland area management strategies.  At a minimum, these strategies are to outline the effort needed, target dates, and projected costs by subactivity to describe:

a.  The number of miles and acreages of riparian areas in the State.

b.  Riparian goals, objectives and values.

c.  Present and future management efforts.

d.  Benefits of sound riparian practices.

e.  RMP and activity plan updates needed to incorporate riparian objectives.

f.  Coordination of monitoring and evaluation schedules in  all activities.

g.  Training needs and curriculum.

h.  Ways to improve management understanding and commitment.

i.  Relationship between allotment categorization and important riparian values.

j.  Implementation of a Riparian Outreach Plan which brings partners into the effort.

2.  Statewide strategies will allow quick and thorough response to public and congressional inquiries on riparian-wetland related activities and accomplishments.  Strategies will provide a means to ensure consistency between Districts and States.  The goals, timeframes, management actions, and priorities established in these strategies are to be used in allocating available funds and staffing at the State and national level.

B. Rangeland Improvement Project System (RIPS). All improvement and treatment projects which primarily benefit riparian-wetland areas must be identified in the RIPS.  The RIPS provides a useful means of tracking work performed in riparian-wetland areas and accounting for funds spent on projects that benefit riparian areas.  It allows for identification of all contributors to such a project.  End-of-year funding summaries can be obtained quickly by requesting data relative to riparian codes.

BLM_0076271

.2

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

.2  Inventory, Monitoring, and Evaluation.

.21  General Guidance.  Manual Section 1734 provides general guidance for a
coordinated approach among programs for inventory, monitoring, and
evaluation of BLM activities.  Also refer to "Inventory and Monitoring of
Wildlife Habitat", Cooperrider, Boyd, and Stuart, 1986.  Policy and guidance
in 1734 are especially relevant to the BLM's interdisciplinary approach to
riparian-wetland management.  In particular, it is BLM's policy to
"coordinate all phases of resource inventory, monitoring, and evaluation
among Bureau programs to avoid duplication of effort and provide a process
for jointly coordinating the collection, interpretation, and evaluation of
data necessary to fulfill management requirements, and document progress in
resolving resource conflicts and meeting resource objectives" (see Manual
Section 1734.06C).

.22  Inventory and Monitoring Relationships.

A.  Purpose.  The primary purpose of inventory is to gather  information
on the distribution, characteristics, condition, trend, potential, and
utilization of riparian-wetland resources.  Inventories are usually conducted
prior to preparation of an environmental impact statement, environmental
assessments, RMP's, activity plans, and certain land use authorizations.

B.  Scope.  The scope of an inventory will depend on the level of
planning and the issues.  An RMP will generally require broad inventory
while activity plans require site specific inventories.  At all levels,
existing data must be reviewed and the inventory designed to fill data gaps
and update existing information using an interdisciplinary approach.  Once
baseline data have been collected and used in decisionmaking,  inter-
disciplinary monitoring is conducted to determine the effects of these
decisions and to assist in determining the extent to which riparian-wetland
management objectives are being met and effective and appropriate practices
are being used.  Monitoring results may be used to identify needed changes
in management.

C.  Priorities.  Inventory and monitoring priorities are based on  legal
mandates, BLM priorities, annual work plan directives, and priorities in land
use and activity plans.

.23  Coordination.

A.  Priorities.  Priorities shall be set to organize and implement
effective monitoring programs, and to establish priorities among affected
programs for riparian-wetland resource monitoring.  This should be done at
the Resource Area level through development of interdisciplinary monitoring
plans which include standards and procedures, responsibilities, and
schedules.

B.  External.  Riparian-wetland resource inventories and monitoring
programs within BLM shall be coordinated, with State agencies, other Federal
agencies, Indian tribes, and private individuals and groups to increase
effectiveness, reduce costs, and avoid duplication of effort.

BLM_0076272

.24

1737 – RIPARIAN-WETLAND AREA MANAGEMENT

.24  Classifying and Describing Riparian-Wetland Ecosystem.  To be most
useful to resource managers, classification of riparian sites must include
identification and description of existing resource condition as well as
potential for improvement through various types of management.  Classifica-
tion provides a systemmatic basis for extrapolating management applications
over similar sites.  Technical guidance on various reparian-wetland
classification and description procedures is provided in Technical Reference
1737-5.  The BLM has developed an approach to describing riparian area stream
sites using the ecological site criteria.  This approach has been incorporated
into the Standard Site Description Format and inventory procedures outlined in
Handbook H-4410-1.

.25  Standards.

A.  Data Collection.  Flexibility to use various methods is allowed to
meet inventory and monitoring needs in a wide variety of habitats and
management situations.  However, within regions possessing similar habitats
and species, managers should strive to use as many standard methods as
possible to ensure long-term data consistency.  See .05 for guidance on
acceptable methods for the inventory and monitoring of riparian-wetland
resources.

B.  Data Storage.

1.  Data generated from inventory and monitoring must be documented
and stored in permanent files that can be easily accessed. Computer files may
be developed at the local level, but inventory data should be entered using
the Data Elements from the Data Element Dictionary into Riparian Aquatic
Information Data System (Handbook H-6601-1) or SITEFORM Microcomputer program,
the BLM systems for storing riparian and ecological site data.  Major
inventories must be automated using automated techniques best suited for
individual situations.

2.  Written files are usually stored at the District or Resource
Area.  Ensure that riparian-wetland files are cross-referenced to other
pertinent program files.  All inventory and monitoring data shall be
summarized and interpreted in a report that is part of the activity plan
file.

C.  Evaluation.  Conduct periodic evaluations of inventory and
monitoring activities to ensure conformance with policy, standards, and
procedures.  Establish interdisciplinary teams to review monitoring data and
identify the need for changes in management direction.  This will ensure
that appropriate skills are represented to adequately analyze and review
monitoring data.

BLM_0076273

.3

1737 – RIPARIAN–WETLAND AREA MANAGEMENT

.3  Key Riparian–Wetland Management Considerations.

.31  Objectives.  Achievable management objectives are one of the
fundamental keys to successful riparian–wetland management.
Riparian–wetland management objectives developed through the planning
process using an interdisciplinary approach must be achievable, specific,
and measurable whenever possible.  Riparian sites vary in physical,
chemical, and biological characteristics, resource conditions, and local use
impacts.  Therefore, the objectives and management designed for an area
shall be tailored to the conditions, conflicts, capability and improvement
potential, and land use considerations on a site-specific basis.

.32  Integrated Watershed Management.  Management of riparian–wetland areas
should be integrated whenever possible with that of the uplands through a
holistic watershed approach.  Restoration and enhancement of riparian areas
should be approached through management of the entire watershed rather than
just focusing on a narrow riparian zone.

.33  Natural Stream Functions.  Management actions should permit the
natural functions of streams, including flood energy dissipation, bank
building, stream channel maintenance, filtration of sediment and other
contaminants, water-storage, and aquifer recharge to operate without
significant alteration.  To accomplish these actions or functions, it is
necessary to evaluate the interrelationships between riparian systems and the
hydrologic and geomorphic processes.  Refer to "Riparian Areas:  Perspectives
in Management," Elmore and Beschta, 1987 and "Concepts in Stream Riparian
Rehabilitation," Van Haveren and Jackson, 1986 for additional guidance.

.34  Management vs. Structural Alternatives.  Prior to initiating
restoration measures, a determination must be made of riparian–wetland site
potential and the primary causes of a degraded ecological condition.  The
natural recovery processes operating in an area should be evaluated prior to
considering structural measures.  While stream systems and wetland basins
are undergoing major geomorphic or hydrological adjustments, structural
measures should not be initiated.  Consider implementing structural measures
only if (1) proper management prescriptions will not achieve management
objectives within the desired timeframe, (2) costs incurred to achieve
accelerated rehabilitation are justified by the benefits to be achieved, and
(3) natural recovery has not progressed to a point that will stabilize
stream banks and/or wetlands basins.

.35  Priorities.  In setting priorities on riparian–wetland areas,
consider the extent to which the wetland may deteriorate if restoration or
improvement action is not immediately implemented.  Riparian–wetland areas
that may suffer further degradation and have potential for improvement
should be given top priority.  Those that have been degraded but appear
stable may be given lower priority for restoration and improvement.  Other
factors, such as special status species, water quality, competing water
uses, fisheries, and recreation values should also be considered when
establishing priorities.

Rel. 1-1611
                                                                        12/10/92

BLM_0076274

.4

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

.4  Program Specific Guidance Relative to Riparian-Wetland Management.

　.41  Grazing Management.

　　A.  Riparian Areas.

1.  The RMP's shall include general management objectives for use of
vegetative resources by livestock and wild horses and burros and other
grazing animals considering vegetation requirements for stream functions,
watershed protection, riparian dependent wildlife, and other uses.
Management objectives shall be expressed in terms of the landscape
description or the desired plant community (DPC) where site-specific data are
available and the amount of vegetation required on the banks and overflow
zones at the close of the grazing period to permit the natural stream
functions to operate.  When acceptable data are not available to allow
description of the DPC in the RMP, data shall be acquired to provide for its
development at the activity planning stage.

2.  The livestock operator is critical to the success of any grazing
management program.  Many who experience the results of good riparian
management become the best salespersons for proper management of these areas.
BLM resource specialists shall consult with livestock operators and other
affected interests to identify site-specific objectives and to design
grazing prescriptions that will help achieve these objectives.  The entire
watershed, including the uplands, shall be considered when designing grazing
management for riparian areas.  Successes have been documented in several
States where compliance with grazing prescriptions and practices have
achieved riparian habitat recovery.  Riparian areas shall be considered as
key for monitoring studies in allotments.  Technical guidance on grazing
management in riparian areas is provided in Technical Reference 1737-4.

3.  Livestock grazing prescriptions and practices needed to
accomplish riparian area management objectives must be identified in allotment
management plans.  These should include alternatives to passive continuous
(free choice) grazing, as well as changes in season of use and duration of
grazing, adjustments in numbers, minimum rest or deferment requirements,
utilization guides, salting, and riding or herding practices.  Analysis of
grazing management proposals must include the effects of the various practices
and intensities of livestock grazing on the other resource values and uses.

4.  Fencing is one of several tools useful in accomplishing riparian
management objectives but is expensive to construct and maintain.  Exclusion
fencing should be used only when other options will not meet management
objectives in the desired timeframe.  If fencing is chosen as a tool for
management, careful consideration shall be given to its design and location.
Handbook H-1741-1 provides further guidance on fencing applications and
standards.

5.  Compliance with the management prescription is essential.  Use
supervision must be frequent enough to ensure that range improvements are
functional, that livestock are in the proper area at the proper time, and
where utilization guides are used, that vegetation use does not exceed the
level prescribed.  Timely use supervision will help ensure that the
management prescription is given an opportunity to show its effectiveness and
also facilitate accurate evaluation of progress toward meeting the riparian
management objectives.

BLM_0076275

.41A6

# 1737 - RIPARIAN-WETLAND AREA MANAGEMENT

6. Grazing has been proven to be a compatible use in riparian areas when it is managed in harmony with multiple use objectives and when the functions of the riparian system, potential of the site, and needs of the vegetation guide the development of the grazing prescription. However, when grazing cannot be managed in harmony with other uses to accomplish the site specific land use plan objectives, restrictions on grazing use may be necessary. These areas shall be identified in the land use plan.

B. Wetland Areas. Grazing prescriptions and management practices shall be designed to give wetland sites the protection necessary to maintain and restore habitat cover and diversity, stabilize shoreline, reduce sedimentation, and provide water temperature ranges suitable for desired aquatic life. Refer to Technical Note 327, "Construction and Management of Stockponds for Waterfowl." As determined by the RMP, important waterfowl production habitat and water bodies inhabited by threatened, endangered, or sensitive species shall receive special management consideration, which may include special grazing prescriptions and livestock use adjustments to provide for the accomplishment of the management objectives for the area. Technical guidance on grazing management in wetland areas is provided in Technical Reference 1734-4.

C. Terms and Conditions. Grazing Administration Handbook H-4120-1 (Grazing Management) and 43 CFR 4130.6 and 4130.6-2 contain provisions appropriate for the management of grazing in riparian-wetland areas. These documents provide that:

1. Grazing permits and leases shall contain terms and conditions that are necessary to achieve the management objectives identified in land use and activity plans. Livestock grazing use may be temporarily delayed, discontinued, or modified to allow for the reproduction, establishment, or restoration of vigor of vegetation or to prevent soil compaction. Other terms and conditions which will provide for proper range management may be specified in permits and leases. Title 43 CFR 4110.3-2(b) provides for adjustments in management practices where unacceptable levels or patterns of utilization are determined by monitoring.

2. The authorized officer may specify that livestock be managed to provide the vegetation cover or structure at the end of the grazing period required to ensure that management objectives are met. Key plant species shall include the vegetation required for protection and sustenance of riparian-wetland values.

.42 Soil and Water Management.

A. Objectives. SPG requires that RMP's include management objectives to restore or rehabilitate watersheds (including riparian areas) found to be in unsatisfactory condition and protect unique soil and water values. Management direction is provided to meet soil and water management objectives in the form of:

1. Establishing land use restrictions or other protective measures based on soil and water related criteria (e.g., restrictions on off-road vehicle use, limitations in floodplains, and mitigation measures in areas vulnerable to contamination from various sources of pollution).

BLM_0076276

.42A2

1737 – RIPARIAN-WETLAND AREA MANAGEMENT

2.  Prescribing appropriate Best Management Practices and describing the circumstances under which they are to be applied.

3.  Designating soil and water related ACEC's.

B.  Management Determinations.  Site-specific soil and water management/determinations (e.g., watershed or riparian rehabilitation techniques, monitoring techniques and schedule, and the design and placement of improvements) are deferred to the activity planning phase for lead resource programs.

C.  Watershed Management Plans (WMP's).  The development and implementation of WMP's in areas with riparian-wetland values should include management actions and/or treatments to restore, maintain, and preserve the natural and beneficial floodplain functions.  (See .08.)

D.  Chemical Pest Control.  Establish definite boundaries for the treatment area and leave buffer strips in the riparian-wetland area and/or adjacent upland areas to prevent water pollution and damage to sensitive species or resource values as discussed in Manual Section 9011 and Handbook H-9011-1.

.43  Minerals Management.

A.  Mining Claims.  Title 43 CFR 3710 requires that no claimant of any mining claim shall, prior to issuance of patent thereof, sever, remove, or use any vegetative or other surface resources thereof which are subject to management or disposition.  Any severance or removal of timber shall be in accordance with sound principles of forest management.

B.  Reclamation Standards.  Title 43 CFR 3809 requires prevention of unnecessary or undue degradation.  These regulations specifically require reclamation of fisheries and wildlife habitat including revegetation of disturbed areas.  They require an approved plan of operations for any operation in designated ACEC's.  They also require compliance with water quality standards and prevent an operator from adversely impacting threatened or endangered species and their habitat.  In addition, an area may be withdrawn from mineral entry to protect unique characteristics.

C.  Placer Mining.  To the extent possible, mineral removal must be away from the water's edge or outside the riparian-wetland vegetation zone and instream or shoreline lease developments should be discouraged.  Placer mining activity should be monitored to prevent destruction of these habitats and enforce applicable regulations.  Placer mine settling ponds should be designed to allow for high waterflows to prevent washouts from seasonal flooding.

D.  Coal Development.  Title 43 CFR 3460 requires land use planning assessments that require a determination of the unsuitability of Federal lands for all or certain stipulated methods of coal mining.  The criteria to be applied in the planning or environmental assessment process and prior to lease issuance in riparian-wetland areas are defined in 43 CFR 3461.5.

BLM_0076277

.43E

1737 – RIPARIAN-WETLAND AREA MANAGEMENT

E.  Solid Minerals.  Title 43 CFR 3590 requires prospecting, exploration, testing, development, mining, and processing operations and production practices which will avoid, minimize, or correct damage to the environment, land, water, and air, for solid minerals (other than coal).

F.  Fluid Minerals.

1.  Oil and Gas Order No. 1 and Geothermal Resource Operational Order No. 4 require protection for environmentally sensitive areas. Ordinarily, fluid mineral development should not be authorized that would adversely affect riparian-wetland areas.  However, if measures can be taken to either prevent or offset adverse affects, and the operator agrees to undertake such measures, then activities may be approved.  Measures to be considered should include those that would either improve the particular riparian-wetland area involved or another area in the vicinity.  Coordination with the appropriate State agency, the U.S. Fish and Wildlife Service, and local chapters of national conservation organizations is recommended.  For operations which result in dredge or fill activities in wetlands, a 404 permit is required prior to authorization.

2.  Measures to be taken to protect riparian-wetland areas in the event of fluid mineral development are to be presented in RMP's with at least a summary appearing within the fluid minerals narrative of the plan.  The plan should make a clear commitment to ensure that there will be no net loss of riparian-wetland areas as a consequence of the fluids program.  Negative impacts are to be avoided to the maximum extent practicable.  If potential impacts have been avoided to the maximum extent practicable, then the remaining unavoidable impacts will be mitigated to the extent appropriate and practicable.  When feasible, compensatory mitigation, such as creating wetlands, may be applied.

.44  Recreation Management.

A.  Off-Road Vehicle Use.  Title 43 CFR 8300 specifies that no person shall operate an off-road vehicle on public lands in a manner causing, or likely to cause, significant, undue, damage to or disturbance of the soil, wildlife, wildlife habitat, or vegetative resources.

B.  Visitor Sites.  Locate recreation visitor-use facilities, including campgrounds, picnic areas, interpretative sites, parking areas, roads, and trails, and sewage disposal facilities to cause minimal or no adverse impact upon the quality and quantity of riparian-wetland areas.

C.  Visitor Use.  Plan and control visitor use to avoid adverse impacts of concentrated visitor use upon the quality of riparian-wetland areas.

D.  Wilderness Management.  Title 43 CFR 8560 specifies that wilderness areas shall be managed to promote, perpetuate, and where necessary, restore wilderness character of the land and its specific values of solitude, watersheds and water yield, wildlife habitat, natural plant communities, and similar natural and recreational values.  Wilderness study areas must be managed so as not to impair their suitability for preservation as wilderness.  Wilderness area activities must be conducted in such a manner as to leave them unimpaired for future use and enjoyment as wilderness and to preserve their wilderness character or wilderness resources.  (See Manual Sections 8550 and 8560.)

BLM_0076278

.45

1737 – RIPARIAN-WETLAND AREA MANAGEMENT

.45  Fish and Wildlife Habitat Management.

A.  Priority Species.  Supplemental Program Guidance (Manual Section 1622.1) requires every RMP to identify priority species an habitats having special significance for management.  These include aquatic, wetland, and riparian habitats.  Priority habitat areas may be designated as ACEC's, and special management measures applicable to each area are to be specified. RMP's are to identify required management objectives and threshold levels for the restoration and maintenance of riparian-wetland habitats to achieve desired resource conditions.

B.  Seasonal Use Conflicts.  Fish and wildlife habitat data that may be required during resource management planning include maps of seasonal use areas with special emphasis on riparian-wetland areas.  Known or potential conflicts between fish and wildlife habitat management objectives and other resource use objectives may also be required along with recommended solutions to resolve those conflicts.

C.  Waterfowl.  Strategies for the management of waterfowl and other associated wetland migratory species and their habitats are identified in the Waterfowl Habitat Management Strategic Plan and State Fish and Wildlife 2000 Plans.  These strategic planning documents also identify the BLM's role in participating in implementation of the North American Waterfowl Management Plan (NAWFP).  Management actions shall be focused in Joint Venture areas and within Major Areas of Concern identified in the NAWMP.  Outside these areas, priority shall be given to waterfowl habitat management areas identified in strategic planning documents consistent with land use and activity plans. Management actions shall be at intensities necessary to achieve desired wetlands habitat and population objectives and to restore wetland communities to productive condition and to encourage optimum use of available habitat.

D.  Habitat Management Plans.  The management of riparian-wetland habitats must be based on site-specific and measurable objectives related to RMP planning document decisions.  HMP objectives and planned actions shall establish required management direction and monitoring to restore and maintain wetland and riparian habitats.  (See Manual Section 6780.)

.46  Construction Management.  New construction in riparian-wetland areas shall be avoided unless enhancement of riparian-wetland values will occur. Any new construction shall meet the requirements of Manual Section 7221 and the intent of Executive Orders 11988 and 11990.  It shall result in the least amount of disturbance possible.  Any adverse action shall incorporate reasonable and practical mitigative measures to maintain, minimize damage to, or restore natural beneficial functions of the riparian-wetland area.

.47  Lands and Realty.

A.  Public Interest.  Riparian-wetland areas shall be retained in public ownership unless disposal would be in the public interest, as determined in appropriate planning processes and environmental analyses.

BLM_0076279

.478

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

    B.  Restrictions.  When property in riparian-wetland areas is proposed
for lease, easement, right-of-way, or disposal to non-Federal public or
private parties, the BLM shall (1) reference in the grant or conveyance those
uses that are restricted under identified Federal, State, or local
regulations; and (2) attach other appropriate restrictions to the uses of
properties by the grantee or purchaser and any successors, except where
prohibited by law; or (3) withhold such properties from conveyance.

    C.  Land Disposals.  To meet conveyance authorization requirements,
the BLM must engage in careful and extensive land use planning.  If any of
the four following requirements cannot be satisfied with respect to a
particular wetlands tract, the tract shall be retained in Federal ownership.
A Field Solicitor's Opinion dated April 7, 1983, expands on the Requirements
for wetlands (including those associated with floodplains) with the following
statement:  The BLM can "authorize the sale of wetlands when the following
conditions have been met:

        1.  The tract of public wetlands is either so small or remote that it
is uneconomical to manage.

        2.  The tract of public wetlands is not suitable for management by
another Federal agency.

        3.  The patent contains restrictions of uses as prohibited by
identified Federal, State, or local wetlands regulations.

        4.  The patent contains restrictions and conditions that ensure the
payee can maintain, restore, and protect the wetlands on a continuous basis .
. . ."

    D.  Acquisitions.  Improved management or protection of
riparian-wetland areas may require the acquisition of private inholdings
within wetland-riparian areas or of wetlands adjacent to public lands.  Such
acquisitions must be consistent with land use plans for the area and provided
by law (Land and Water Conservation Act of 1964; endangered Species Act of
1979; Food, Agriculture, Conservation, and Trade Act of 1990; Emergency
Wetlands Resource Act of 1986; Agricultural Credit Act of 1987; and Federal
Land Policy and Management Act of 1976). Lands may be acquired in fee or
conservation easements obtained by exchange, donation, or purchase under
these authorities.  Where major purchases are anticipated for a wetland or
riparian project, funding may be requested under the Land and Water
Conservation Fund (Subactivity 3110).  Opportunities may also be available to
obtain needed wetlands located on farm or ranch properties repossessed by the
Farmers Home Administration at reduced or no cost.

    .48  Forest Management.

    A.  Management Direction.  SPG requires management direction for
forest lands (commercial, noncommercial, woodlands, and the Alaska forest
land classifications).  Management direction for each timber management area
may include preferred or permitted silvicultural practices, restricted or
excluded silvicultural practices, and identification of other resource values
(riparian-wetland) requiring protection.

BLM_0076280

.48B

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

B. Free-Use Disposal. Title 43 CFR 5511.9 specifies that all free-use timber disposal under the Act of 1947 shall be removed in accordance with sound forestry and conservation practices so as to preserve all scenic, recreational, watershed, and other values of the land and resources.

C. Contracts. Removal of slash and stream blockages resulting from harvest operations is required as part of timber sale contracts. Skidding of logs across or down streams or drainage-ways is discouraged, and heavy equipment is allowed to cross streams only at designated crossing sites. Directional felling of trees and yarding of logs away from riparian-wetland areas or full suspension logging operations may be necessary to protect riparian-wetland ecosystems.

D. Buffer Zone. An adequate buffer zone of vegetation along riparian-wetland areas is required to ensure that resource values and natural stream functions are maintained, restored, or improved.

.49  Fire Management.

A. Retardant Application. Exercise care in the application of fire retardant chemicals in riparian-wetland areas. As a general rule, do not apply retardants closer than 100 yards to any wetland or riparian area. Make applications parallel to streams.

B. Fireline Construction. Construct firelines in a manner to minimize erosion and sedimentation of riparian-wetland Areas. Fire manages should avoid creating chutes into natural drainages. Firelines that are angular or perpendicular to a drainage should be stopped within 300 feet of drainages where terrace slope could create erosion entering the drainage system. Firelines along streambanks should be rehabilitated before leaving an area by structure development and seeding if natural revegetation would be insufficient to prevent erosion.

C. Prescriptions. The benefits of properly planned prescribed fire shall be considered. Precautions concerning siting and timing of the burn, resource needs, and fire effects on the riparian-wetland ecosystem shall be considered.

D. Emergency Fire Rehabilitation. Implement emergency rehabilitation treatments in a timely and effective manner to ensure protection of resource values and prevent further damage to the soil and water resources following wildfire as discussed in Handbook H-1742-1.

BLM_0076281

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

Glossary of Terms

-B-

best management practices (BMP's): methods, measures, or practices to prevent
or reduce water pollution, including, but not limited to, structural and
nonstructural controls and operation and maintenance procedures.
Usually, BMP's are applied as a system of practices rather than a single
practice. BMP's are selected on the basis of site-specific conditions
that reflect natural background conditions and political, social,
economic, and technical feasibility and are defined by the authorized
agency of the State government.

-E-

ecological status: the present state of vegetation and soil protection of an
ecological site in relation to the potential plant community for the
site. Ecological status is the expression of the relative degree to
which the kinds, proportions, and amounts of plants in a community
resemble that of the potential plant community. The four ecological
status classes correspond to 0-25, 26-50, 51-75, or 76-100 percent
similarity to the potential plant community and are generally called
early seral, mid-seral, late seral, and potential plant community,
respectively.

ephemeral stream: a stream that flows in direct response to surface runoff
and is not influenced by ground water sources.

-H-

habitat: the place where an animal or plant normally lives during its life
cycle often characterized by dominant food, cover, water, and space
(e.g., the stream habitat, the forest habitat).

-I-

intermittent stream: a stream that does not flow year round but has some
association with ground water for surface or subsurface flows.

-M-

monitoring: the collection of qualitative and quantitative data relating to
the physical, chemical, and biological status either at one point in time
or on a continuous basis, of a total environmental system or portion
thereof (e.g., water, air, aquatic life cycles), designed to detect
change or record events. Monitoring is used to record movement away from
or toward a specific quantifiable objective.

BLM_0076282

## 1737 - RIPARIAN-WETLAND AREA MANAGEMENT

-N-

nonpoint source (NPS): a term used for pollutants discharged by natural processes (precipitation, seepage, percolation, and runoff) that are not traceable to any discrete, discernable, or confined conveyance facility and are usually related to runoff from rainfall or snowmelt.

-P-

perennial stream: surface water normally flows throughout the year except during infrequent years of drought.

proper functioning condition: the functioning condition of riparian-wetland areas is a result of interaction among geology, soil, water, and vegetation. Riparian-wetland areas are functioning properly when adequate vegetation, land form or large woody debris is present to dissipate stream energy associated with high water flows, thereby reducing erosion and improving water quality; filter sediment, capture bedload, and aid floodplain development; improve floodwater retention and groundwater recharge; develop root masses that stabilize streambanks against cutting action; develop diverse pending and channel characteristics to provide the habitat and the water depth, duration, and temperature necessary for fish and production, waterfowl, and other such uses; and support greater biodiversity.

-R-

riparian areas: riparian areas are a form of wetland transition between permanently saturated wetlands and upland areas. These areas exhibit vegetation or physical characteristics reflective of permanent surface or subsurface water influence. Lands along, adjacent to, or contiguous with perennially and intermittently flowing rivers and streams, glacial potholes, and the shores of lakes and reservoirs with stable water levels are typical riparian areas. Excluded are such sites as ephemeral streams or washes that do not exhibit the presence of vegetation dependent upon free water in the soil.

riparian area-dependent resources: resources such as water, vegetation, fish, and wildlife that owe their existence to the riparian area.

-W-

wetlands: areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support and which, under normal circumstances, do support a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands include marshes, shallows, swamps, lakeshores, bogs, muskegs, wet meadows, estuaries, and riparian areas.

BLM_0076283

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

## Bibliography

Cooperrider, Boyd, Stuart.  Inventory and Monitoring of Wildlife Habitat.
   DOI-BLM. 1986. 858 pages.

U.S. Army Corps of Engineers, EPA, SCS, and U.S. Fish and Wildlife Service.
   Federal Manual For Identifying and Delineating Jurisdictional Wetlands -
   An Interagency Cooperative Publication.  1989.  Federal Interagency
   Committee for Wetland Delineation.  76 pages plus appendices.

Cowardin, Carter, Gobet and La Roe.  Classification of Wetlands and Deepwater
   Habitats of the United States.  DOI - U.S. Fish and Wildlife Service.
   1979.  FWS/OBS - 79/31.  107 pages.

Oakley et al. Management of Wildlife and Fish Habitats in Forests of Western
   Oregon and Washington - Riparian Zones and Freshwater Wetlands.  1985.
   Pacific Northwest Region, USDA, Forest Service.

Thomas, Maser, Rodiek.  Wildlife Habitats in Managed Rangelands - The Great
   Basin of Southeastern Oregon - Riparian Zones.  1979.  U.S. Department of
   Agriculture; Forest Service Gen. Tech. Rep. RNW - 80.  18 pages.

U.S. Fish and Wildlife Service.  National Wetlands Priority Conservation
   Plan.  1989.  58 pages plus appendices.

BLM_0076284

1737 – RIPARIAN-WETLAND AREA MANAGEMENT


Annotated Authorities


Legislation

1. <u>Soil Conservation and Domestic Allotment Act of 1935, as amended</u>. (P.L. 74-46, 49 Stat. 163, 16. U.S.C. 590).

a. Authorizes the BLM to conduct demonstration projects in areas subject to wind and water erosion.

2. <u>PL 167, 1955. An Act to amend the Act of July 91, 1947</u> (61 Stat. 681).

a. Provides for multiple use of the surface of mining tracts on the public lands.

b. States that the United States, prior to issuance of a patent, may "manage and dispose of the vegetative surface resources thereof" on mining claims, which provided a legal basis for managing riparian areas.

3. <u>Outer Continental Shelf Lands Act in 1953</u> (as amended, 43 U.S.C. 1331-43 (1970)).

a. Requires the Secretary of the Interior to use rules and regulations necessary to conserve natural resources. (BLM must identify wildlife resources, assess the impacts of mineral leasing on them in environmental impact statements, and imposes stipulations to protect them during mineral leasing and development.)

4. <u>Watershed Protection and Flood Prevention Act of 1954, PL 566</u> (Act of August 4, 1954, as amended; 16 U.S.C. 1001-1009 (1964 and Suppl. IV 1965-1968)).

a. Directs the Federal Government to prevent erosion or floodwater and sediment damage.

5. <u>Fish and Wildlife Coordination Act of 1958</u> (16 U.S.C. 661 et seq.; 72 Stat. 563).

a. Directs that wildlife conservation be given equal consideration and be coordinated with other features of water resource development programs.

b. Requires that possible damage to fish and wildlife resources from work planned in navigable waters and drainages be assessed and that measures be adopted for preventing such losses or damages. Provides for development and improvement of wildlife and fisheries resources.

6. <u>Water Resources Research Act</u> (Act of July 17, 1964, as amended; 42 U.S.C. 1961-1961c-7 (1964 and Supp. IV 1965-1968)).

a. Permits the Secretary of the Interior to give grants to, and cooperate with, Federal, State, and local agencies to undertake research into any water problems related to the mission on the Department.

BLM_0076285

Appendix 1, Page 2

1737 – RIPARIAN-WETLAND AREA MANAGEMENT

7. <u>Water Resources Planning Act of 1965</u>, as amended, 42 U.S.C. 1962 (Supp. IV 1965-1968).

a. Directs the Water Resources Council to maintain studies of water supplies and water programs.

8. <u>Coastal Zone Management Act of 1972</u> (16 U.S.C. 1451-64) as amended, P.L. 94-970, 90 Stat 1013 (1976).

a. Encourages States, with cooperation of the Federal Government, to develop and implement management plans to preserve, develop, and where possible, enhance resources of the Nation's coastal zone.

b. Prescribes that management plans include:

(1) An inventory and designation of areas of particular concern (e.g., areas of "essential habitat for living resources", including fish and wildlife); and

(2) Adequate consideration of national interests (e.g., wildlife refuges, areas of species and habitat preservation) during siting of facilities.

9. <u>Endangered Species Act (ESA) of 1973</u> (87 Stat. 884; 16 U.S.C. 1531 et seq.) P.L. 93-205, as amended.

a. Requires BLM to ensure that proposed actions neither jeopardize the continued existence of a threatened or endangered species nor cause its critical habitat to be adversely modified or destroyed.

b. Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species.

10. <u>Water Resources Development Act of 1974</u> (P.L. 93-251).

a. Directs agencies to consider the full range of potentially useful measures in all projects involving reduction of flood losses.

11. <u>Colorado River Basin Salinity Control Act of 1974</u>, PL 99-320, as amended by PL 98-569.

a. Directs the Department of the Interior to undertake projects to improve the water quality of the Colorado River.

b. Requires specific BLM action to develop and implement a program to minimize salt contributions from public lands.

BLM_0076286

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

12.  Surface Mining Control and Reclamation Act of 1977 (91 Stat. 445).

a.  Authorizes the surface mining of coal in environmentally compatible areas.

b.  Provides a mechanism for State management of the Act.  (Protection/or reestablishment of fish and wildlife habitat is one of the factors that would be considered during the design, assessment, and implementation of reclamation plans, and during designation of areas unsuitable for mining.)

c.  Directs improvement of rangeland conditions in accordance with land use planning under the Federal Land Policy and Management Act.

d.  Provides funding for rangeland improvements which include providing habitat for wildlife.

13.  Emergency Wetlands Resource Act of 1986 (100 Stat. 3582).

a.  Extends the Wetland Loan Act and delays its repayment.  Authorizes the charging of admission fees to certain units within the National Wildlife Refuge System and provides for distribution of the subject fee.

b.  Provides for the development of a national wetland priority conservation plan to prioritize, on a regional basis, wetland acquisitions to be pursued.

c.  Modifies the Land and Water Conservation Act of 1965 to require the Statewide Comprehensive Outdoor Recreation Plans to specifically address wetlands.

d.  Directs the Fish and Wildlife Service to continue the National Wetlands Inventory.

e.  Directs the Fish and Wildlife Service to evaluate the effects of Federal programs on wetlands.

14.  Sikes Act of 1960 (16 U.S.C.  670a-f; 74 Stat. 1052, as amended, P.L. 93-452 and 88 Stat. 1369 (1974), P.L. 95-420, and 92 Stat. 921 (1978)).  The basic intent of Title II was to extend the Sikes Act authority for wildlife program development from strictly military reservations to public lands administered by the Forest Service and BLM.  In essence, it was a congressional mandate for BLM to" . . . plan, develop, maintain and coordinate programs for the conservation and rehabilitation of wildlife, fish and game."

15.  Food, Agriculture, Conservation, and Trade Act of 1990 (104 Stat. 3585).

a.  Encourages the restoration of wetland values and functions of converted wetland to its prior (1985) wetland state.

BLM_0076287

Appendix 1, Page 4

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

b. Provides for Federal Farm Home Loan debt relief in exchange for easements to protect and restore wetlands on wetlands held by the borrower. BLM can be authorized to administer such easements.

16. Mineral Leasing Act of 1920 as amended and supplemented (30 U.S.C. 181-287).

a. Directs the Secretary of the Interior, prior to granting a right-of-way or permit for pipelines through Federal lands, to require the applicant to submit a plan of construction, operation, and rehabilitation.

b. Requires the BLM to impose stipulations to a new project that include:

(1) requirements for restoration, revegetation, and curtailment of erosion of the surface of the land.

(2) requirements to ensure that activities in connection with the new project will not violate applicable water quality standards.

(3) requirements designed to control or prevent damage to the environment including damage to fish and wildlife habitat.

17. Mineral Leasing Act for Acquired Lands of 1947, as amended (30 U.S.C 351-359). Authorizes the Secretary of the Interior to prescribe that such rules and regulations shall be the same as those prescribed under the mineral leasing laws.

18. Wilderness Act (Act of September 3, 1964; 78 Stat. 890; 16 U.S.C. 1131). Directs the jurisdictional agency to manage the wilderness area to retain its primeval character and influence, without permanent improvements or human habitation, and to preserve its natural conditions.

Executive Orders.

1. Executive Order 11989, May 24, 1977, Off-Road Vehicle (ORV). Recognizes wildlife and their habitat as one of the values to be protected through closure of certain areas to ORV use or through the limitation of ORV use in those areas.

BLM_0076288

1737 - RIPARIAN-WETLAND AREA MANAGEMENT

2.  <u>Executive Order 12088, October 24, 1978, Federal Compliance with Pollution Control Standards</u>.  Requires all Federal agencies to comply with local standards and limitations relating to water quality.

<u>Regulations</u>.

1.  <u>40 CFR 190, Water Quality Planning and Management</u>.  Provides for a consistent national approach for maintaining, improving, and protecting water quality while allowing States to implement the most effective individual programs.

2.  <u>43 CFR 3480, Coal Exploration and Mining Operations</u>.  Ensures orderly and efficient development, mining, preparation, and handling operations for Federal coal; ensures production practices that prevent wasting and loss of coal or other resources; and ensures efficient, environmentally sound exploration and mining operations.

3.  <u>43 CFR 3590, Solid Minerals (Other than Coal) Exploration and Mining Operations</u>.  Promotes orderly and efficient prospecting, exploration, testing, development, mining, and processing operations and production practices without waste or avoidable loss of minerals or damage to deposits; and promotes operating practices which will avoid, minimize, or correct damage to the environment--land, water, and air.

4.  <u>43 CFR 3809, Mining Claims under the General Mining Laws, Surface Management</u>.  Assures that operations include adequate and responsible measures to prevent unnecessary or undue degradation of the Federal lands and to provide for reasonable reclamation.  Reclamation shall include revegetation of disturbed areas and rehabilitation of fisheries and wildlife habitat.

5.  <u>43 CFR 4100, Grazing Administration</u>.  Includes improvement of fish and wildlife habitat as a basic part of range betterment, provides BLM grazing and trespass regulations, requires the reservation of sufficient habitat for wildlife, and recognizes wildlife habitat as one of the values that can be protected by closing certain areas to livestock use.

6.  <u>43 CFR 4700, Protection, Management, and Control of Wild Free-Roaming Horses and Burros</u>.  Provides for the management of wild horses and burros as an integral part of the natural system of the public lands under the principles of multiple use, including management of a self-sustaining population of healthy animals in balance with other uses and the productive capacity of their habitat.

7.  <u>43 CFR 8340, Recreation Management</u>.  Provides for limitation of ORV use to protect certain resource values, including wildlife and their habitat.

BLM_0076289

6720 - AQUATIC RESOURCE MANAGEMENT

Table of Contents

.01  Purpose
.02  Objectives
.03  Authority
.04  Responsibility
.05  References
.06  Policy
.07  File and Records Maintenance

.1  Aquatic Resource Management Guidelines
    .11  Program Priorities
        A.  Threatened-or-Endangered Species
        B.  Other Special Status Species
        C.  Anadromous Species
        D.  Resident Species
        E.  Exotic Species
    .12  Inventories
    .13  Aquatic Resources and the BLM Planning System
        A.  Policy Tier
        B.  RMP Tier
        C.  Activity Plan Tier
    .14  Protection for Special Status Species
        A.  Species Identification
        B.  Habitat Identification
        C.  Habitat Management Plans
        D.  Use of FWS and State Plans
    .15  Instream Flow Needs
        A.  Special Status Species
        B.  Anadromous Species
        C.  Resident Species
        D.  Riparian Areas
    .16  Water Quality Requirements
    .17  Aquatic Habitat Monitoring and Evaluation
    .18  Studies and Research Involving Habitat and Multiple-Use
         Relationships

.2  Support and Coordination with Other BLM Resource Programs
    .21  Energy and Minerals
    .22  Lands and Realty
    .23  Rangeland Resources
        A.  Rangeland EA's and EIS's
        B.  Grazing Systems
        C.  Rangeland Monitoring
        D.  Rangeland Practices Assessment
        E.  Rangeland Improvement Project Assessment
    .24  Forestry
        A.  Forest Management Plans
        B.  Forest Transportation Systems
        C.  Forest Management Activities

BLM_0076290

TC-2

6720 - AQUATIC RESOURCE MANAGEMENT

.25  Wildlife and Fisheries
.26  Soil, Water, and Air
     A.  Best Management Practices
     B.  Instream Flow Assessments
.27  Recreation, Cultural, and Wilderness Resources

.3   Support and Coordination with Other Federal Agencies,
     States and Interested Parties
.31  Other Federal Agencies
.32  State Fish and Wildlife Agencies
.33  Interested Parties
     A.  Trout Unlimited
     B.  The Nature Conservancy
     C.  Amerifish Corporation, Fishing Has No Boundaries
     D.  Other Parties

Glossary of Terms

BLM_0076291

.01

# 6720 - AQUATIC RESOURCE MANAGEMENT

.01 Purpose. This Manual Section defines the Bureau of Land Management's (BLM's) objectives and policy for those species of invertebrates, fish, and wildlife dependent upon aquatic habitats.

.02 Objectives. The BLM's overall objectives for aquatic resource management of public lands are to:

A. Ensure that the natural integrity of aquatic ecosystems is restored and managed in an ecologically sound manner.

B. Ensure that the natural diversity of aquatic biota is maintained or restored as appropriate.

C. Manage habitat for anadromous and resident species that are of high economic, social, or scientific value.

D. Expand recreational fisheries by developing and strengthening partnerships, considering needs and opportunities in the development and amendment of RMP's, and responding to changing attitudes and desires of the public.

E. Ensure full compliance with applicable Federal laws, Executive Orders, and regulations.

.03 Authority. See also Manual Sections 1737 and 6500.

A. Legislation.

1. Fish and Wildlife Coordination Act of 1958 (16 U.S.C. 661 et seq.). Requires wildlife conservation be given equal consideration with other features of water resource developments.

2. Sikes Act of 1960 (16 U.S.C. 670a-f). Provides for conservation and habitat rehabilitation programs for certain public lands, and collection of fees for such purposes.

3. National Environmental Policy Act of 1969 (42 U.S.C. 1701 et seq.). Encourages harmonious relationships between man and his environment by requiring preparation of detailed statements of environmental impacts from Federal projects and directs Federal agencies to use ecological information in the development of resource programs.

4. Endangered Species Act of 1973 (16 U.S.C. 153 et seq.). Provides for conservation of ecosystems upon which endangered or threatened species depend and consultation between Federal agencies on actions that affect threatened, endangered, and proposed species.

BLM_0076292