.03A5

## 6720 – AQUATIC RESOURCE MANAGEMENT

5.  Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.).  Requires that public lands be managed in a manner that will provide food and habitat for fish and wildlife, and protect the quality of water resources.  Section 201(a) provides for the preparation and maintenance of an inventory of public land resources on a continuing basis.

6.  Oregon and California Act of 1937 (43 U.S.C. 1181).  Provides for management of revested Oregon and California Railroad and reconveyed Coos Bay Wagon Road Grant Lands by BLM.

7.  Water Quality Act of 1987, as amended from the Federal Water Pollution Control Act (Clean Water Act) of 1977 (33 U.S.C. 1251 et seq.).  Provides for restoration and maintenance of the chemical, physical, and biological integrity of the Nation's water at a level of quality which provides protection for fish, shellfish, wildlife, and recreational use.

8.  Public Rangelands Improvement Act of 1978 (43 U.S.C. 1901 et seq.).  Directs and provides funds for rangeland improvements in accordance with land use planning.

9.  Wild and Scenic Rivers Act of 1968 (16 U.S.C. 1271 et seq.).  Provides for recognition and protection of certain rivers through designation as wild, scenic, or recreational.

B.  Executive Orders.

1.  Executive Order 11987, Exotic Organisms (dated May 24, 1977).  Restricts the introduction of exotic species into natural ecosystems of the United States.

2.  Executive Order 11988, Floodplain Management (dated May 24, 1977).  Directs Federal agencies to avoid, to the extent possible, the long-term and short-term adverse impacts associated with the occupancy and modification of floodplains.

3.  Executive Order 11990, Protection of Wetlands (dated May 24, 1977).  Directs Federal agencies to minimize the destruction, loss, or degradation of wetlands and to preserve and enhance the natural and beneficial values of wetlands in carrying out programs affecting land use.

.04  Responsibility.

A.  The Director and Deputy Director are responsible for overall aquatic resource management on public lands, and for the interactions between programs managing aquatic resources and all other BLM programs.

BLM_0076293

.04B

# 6720 – AQUATIC RESOURCE MANAGEMENT

B.  <u>Assistant Director, Land and Renewable Resources</u> is responsible for the overall coordination and integration of aquatic resource management, policies, and procedures.  The Assistant Director provides policy and program interpretations, direction, and leadership to ensure consistent field implementation of policies and procedures to manage aquatic resources.  The Assistant Director also reconciles aquatic resource-related issues and conflicts among Land and Renewable Resource programs.'

C.  <u>Assistant Director, Energy and Mineral Resources</u> is responsible for providing program interpretations, direction, and leadership to ensure consistent field implementation of necessary procedures to manage energy and mineral resources.  This includes consideration of aquatic resources in development programs.

D.  <u>Chief, Division of Wildlife and Fisheries</u> is responsible for the following:

1.  Developing aquatic resource management policy, strategic plans, and technical guidance.

2.  Developing guidance for the preparation of habitat management plans to maintain aquatic habitats at desired levels and in compliance with applicable Federal laws, executive orders, and regulations.

3.  Ensuring that aquatic resource management procedures are incorporated into the BLM programs.

4.  Evaluating the effectiveness of aquatic resource management programs and procedures.

5.  Systematically reviewing rules, regulations, procedures, and proposed legislation to establish and update the BLM's efforts to maintain aquatic resources and habitats on public lands.

E.  <u>Chief, Division of Rangeland Resources</u> is responsible for developing and issuing guidelines for water quality, riparian and floodplain management on public lands.  These responsibilities also include ensuring compliance with Federal, State, and local water quality standards and developing policy and guidance for preparing allotment and watershed management plans, and to manage beneficial and natural floodplain functions in accordance with applicable executive orders.

BLM_0076294

.04F

## 6720 - AQUATIC RESOURCE MANAGEMENT

F.  Other Division and Office Chiefs are responsible for
ensuring that policies and guidelines for their respective
resources are coordinated with the aquatic resource management
policies and guidance, to the extent applicable.

G.  Service Center Director is responsible for providing
technical support to Field Offices in new and emerging natural
resource technologies, assistance to Washington Office, and
development and information transfer of aquatic resource-
related inventories, data storage, and other appropriate
technical expertise.

H.  State Directors are responsible for the following:

1.  Ensuring compliance with the BLM policies and
procedures for aquatic resource management and protection.

2.  Ensuring coordination and cooperation with the States
and other cooperators in aquatic resource management programs
and issues.

3.  Monitoring aquatic resource management effectiveness
on public lands within the State to ensure that every effort is
made to meet management objectives in State Fish and Wildlife
2000 plans, resource management plans, and activity plans.

4.  Ensuring that when aquatic habitats on public lands,
or portions thereof, are proposed for exchange, lease,
easement, or right-of-way that the BLM retains ownership of
aquatic habitats containing special status species, anadromous
species, or other significant aquatic resources, and attaches
appropriate stipulations to the uses of properties by the
grantee or purchaser and any successor that are necessary to
protect aquatic resources.

I.  District Managers are responsible for the following
(those in Alaska, also are responsible for items listed under
.04(J) below):

1.  Monitoring aquatic habitat, population and water
quality characteristics to assure maintenance of aquatic
communities in compliance with Federal laws, regulations, and
resource management plans.

2.  Storing aquatic habitat, population and water quality
information in approved data bases such as Riparian Aquatic
Information Data Summary (RAIDS), Threatened and Endangered
Species Data System (TEDS), Environmental Protection Agency
water quality data management system, Storage Retrieval
(STORET) (water quality), etc.

BLM_0076295

.04J

6720 - AQUATIC RESOURCE MANAGEMENT

J.  Area Managers are responsible for the following:

1.  Maintaining up-to-date inventories of aquatic habitats and populations, analyzing and identifying protection and enhancement opportunities, and formulating management recommendations concerning aquatic resource management.

2.  Developing, implementing, and maintaining aquatic habitat management plans and projects that are consistent with legal and policy requirements.

.05  References.

A.  Fish Habitat Inventory and Monitoring.  BLM Manual Handbook 6720-1.

B.  Rapid Bioassessment Protocols for Use in Streams and Rivers: Benthic Macroinvertebrates and Fish.  U.S. Environmental Protection Agency Report No. EPA/444/4-89-001, dated May 1989.

C.  Fish and Wildlife 2000: a plan for the future.

D.  National Recreational Fisheries Policy, dated June 6, 1988.

E.  Forest Service and Bureau of Land Management Recreational Fisheries Policy, dated March 19, 1990.

F.  Riparian-Wetland Initiative for the 1990's.

.06  Policy.  See also Manual Sections 1737, 6500, and 6820. BLM policy with respect to aquatic resources is to:

A.  Inventory, evaluate, and monitor aquatic habitats on public lands to determine existing conditions and those habitats supporting aquatic vertebrate and macroinvertebrate species.

B.  Restore, enhance, and protect aquatic habitats by preventing their loss, and implementing and monitoring habitat management or restoration projects as identified during resource management planning process.

C.  Recover threatened or endangered aquatic species, and protect, restore, and monitor other special status aquatic species so that listing as threatened or endangered is not necessary.

.05D

## 6720 – AQUATIC RESOURCE MANAGEMENT

D.  Maintain or restore natural ecosystem functions, such as water flow regimes and energy cycles, that are necessary for maintenance of aquatic biodiversity at population, species, and ecosystem levels.

E.  Enhance anadromous fisheries by increasing habitat integrity and productivity in coastal drainages of the states of Alaska, California, Idaho, Oregon, and Washington.

F.  Enhance the quality and quantity of recreational fishing opportunities by increasing habitat integrity and productivity.

G.  Promote the use of native fishes for recreational use, where possible.  Introductions of nonnative and exotic species should be prevented in habitats where they would be harmful to the native biota or where it is against the established policy of the State fish and wildlife agency.

H.  Manage aquatic habitats in a manner that facilitates restoration of riparian areas to proper functional condition.

I.  Determine fisheries-related allocations, objectives, and management directions through resource management planning.

J.  Coordinate and cooperate among field managers/offices, State agencies, Federal agencies, fisheries organizations, conservation organizations and universities to identify and implement cooperative projects and activities for aquatic habitats as consistent with other policy statements.

.07  <u>File and Records Maintenance</u>.  See BLM Manual Section 1272 for records maintenance and the BLM Records Schedule for the disposition of records.

BLM_0076297

## 6720 - AQUATIC RESOURCE MANAGEMENT

.1  <u>Aquatic Resource Management Guidelines</u>.

  .11  <u>Program Priorities</u>.  Within the framework of BLM's overall program priorities, give attention to aquatic habitats in the following order:

  A.  <u>Threatened or Endangered Species</u>.  Aquatic habitats supporting federally listed threatened or endangered species, or those species proposed for such designation by the Secretary of the Interior.

  B.  <u>Other Special Status Species</u>.  Aquatic habitats supporting Federal candidate species, BLM sensitive species, or species listed by State governments as endangered or threatened.

  C.  <u>Anadromous Species</u>.  Aquatic habitats supporting anadromous species.

  D.  <u>Resident Species</u>.  Aquatic habitats supporting resident game and nongame species.

  E.  <u>Exotic Species</u>.  Aquatic habitats supporting exotic species.

  .12  <u>Inventories</u>.  To provide the necessary information for management decisions, including the resolution of planning issues, maintain and update aquatic resource inventories.

  .13  <u>Aquatic Resources and the Bureau Planning System</u>.

  A.  <u>Policy Tier</u>.  Policy guidance for managing aquatic resources is set forth in this Manual Section, Manual Sections concerning riparian-wetland management (M.S. 1737), introductions and transplants (1745), and special status species (6840), and further relevant directives that may be issued periodically by the Director.  These policies may be supplemented by pertinent State Director guidance issued pursuant to 43 CFR 1610.1(a)(3).

  B.  <u>RMP Tier</u>.  How specific aquatic habitats and resources are to be managed is determined through resource management planning.  Aquatic resource condition objectives, allowable uses on aquatic habitats, and management prescriptions for aquatic habitats are established in resource management plans.  Resource management planning is the principal means for accomplishing interdisciplinary coordination and establishing integrated resource management.  Guidance is found in Manual Section 1622.1.

BLM_0076298

.13C

6720 – AQUATIC RESOURCE MANAGEMENT

C. <u>Activity Plan Tier</u>. Activity plans are prepared <mark>only when necessary</mark> to show how particular uses provided for at the RMP tier are to be carried out (see Manual Section 1601.12). Activity plans involving aquatic habitats and resources should describe more fully capital improvements, investment schedules and/or priorities, and goals and objectives.  Activity plans may be for single or multiple activities.  Wherever appropriate, activity-level provisions for aquatic resources may be included in any Bureau activity plan.

.14  <u>Protection for Special Status Species</u>.  See also Manual Section 6840.  The aquatic resource management program must include the following components to protect threatened and endangered species, species proposed for such designation, Federal candidate species, BLM sensitive species, or species listed by States as endangered, threatened, or of special concern:

A.  <u>Species Identification</u>. Identification of special status aquatic species on public lands in cooperation with the States and the U.S. Fish and Wildlife Service (FWS).

B.  <u>Habitat Identification</u>.  Identification and protection of critical or essential habitat necessary for the survival or recovery of such designated aquatic species.

C.  <u>Habitat Management Plans</u>.  Develop, implement, and maintain habitat management plans to aid the recovery and possible delisting of threatened or endangered species, and to prevent the need to list candidate species as threatened or endangered.

D.  <u>Use of FWS and State Plans</u>.  Where approved recovery plans have been developed by the Fish and Wildlife Service for aquatic species, such plans provide the specific directions and habitat requirements to be included in the Habitat Management Plan (HMP).  For those species that are listed by the State but not by the Federal Government, HMP's conform, as appropriate, to the direction and habitat requirements identified by the official State publication or status report.  Should no recovery plan or status report exist, an HMP should be developed at the earliest practical opportunity based on best available data.

BLM MANUAL
Supersedes Rel. 6-92

Rel. 6-118
3/22/91

BLM_0076299

## 6720 - AQUATIC RESOURCE MANAGEMENT

.15  Instream Flow Needs.  Water flow is a critical
component of stream and spring habitats as well as for
maintenance of many lakes and reservoirs.  In all activities
affecting these habitats, include estimates of flow
requirements for maintenance of fisheries and aquatic habitats.
Assessing streamflow requirements for maintaining aquatic
habitats must be an integral part of all aquatic inventory and
monitoring procedures.  Instream flows necessary to protect
aquatic resources should be secured in cooperation with State
water management policies and regulations through guidance
contained in Manual Section 7250 (Water Rights).  Within this
framework, the following habitats should receive priority for
determination and appropriation of flow requirements.

   A.   Special Status Species.  Habitats supporting special
        status aquatic species.

   B.   Anadromous Species.  Habitats supporting species of
        salmon, steelhead, sea-run cutthroat, or other
        anadromous fish.

   C.   Resident Species.  Habitats supporting resident game
        and nongame species.

   D.   Riparian Areas.  Streams, rivers, or springs
        supporting significant riparian habitats.

   .16  Water Quality Requirements.  Resource management plans
and activity plans should establish watershed management
objectives where necessary to improve or protect downstream
habitat quality for aquatic resources.  Wherever possible,
point and nonpoint water pollution sources detrimental to
aquatic life should be identified.  Measures to reduce sources
of water pollution should be incorporated into landuse
authorizations.  BLM should work with States, the U.S.
Environmental Protection Agency, and other appropriate agencies
to ensure maintenance of water quality.

   .17  Aquatic Habitat Monitoring and Evaluation.  To maintain
an effective aquatic habitat management program, regularly
monitor aquatic habitats and/or populations, and evaluate
impacts of management decisions and management practices on
them to determine if management objectives are being met.

   .18  Studies and Research Involving Habitat and Multiple-Use
Relationships.  Studies should be designed, when needed, to
develop criteria for aquatic habitat management and overall
management objectives.  Cooperative studies should be
encouraged when appropriate.

BLM_0076300

6720 - AQUATIC RESOURCE MANAGEMENT

.2  Support and Coordination with Other BLM Resource Programs.

It is essential that management of aquatic resources be
coordinated with other resource uses and management activities.
Many of BLM's aquatic resource responsibilities can best be met
through incorporation of aquatic resource objectives and
protective provisions in other BLM activities and programs.  It
is incumbent upon each program to ensure that its actions and
plans are responsive to aquatic resource management on the
public lands involved.

.21  Energy and Minerals.  Energy and mineral development
programs affect aquatic organisms and their habitat, primarily
in terms of water quality and quantity, and physical habitat
disturbance or alteration.  Such development also may cause
human population increases and may create additional demands or
pressures on the local aquatic resources and habitats on public
lands.  For these reasons, activities associated with the
energy and minerals program must be coordinated with management
of aquatic resources.  Aquatic resource program
responsibilities include developing criteria to assess the
impacts of energy and mineral development on aquatic resources.

.22  Lands and Realty.  The aquatic resource management
program shall be coordinated with the withdrawal review and
land disposal programs to ensure adequate consideration of
valuable aquatic resources.  It also shall be coordinated with
the processing of energy related applications that involve
water use, such as small hydropower or geothermal projects.
Resource specialists in both programs are responsible for
ensuring adequate coordination.  Disposal of public land or
acquisition of private lands or easements for fishery values
shall be considered as they affect habitat significant to the
survival or recovery of endangered or threatened aquatic
species, areas designated as areas of critical environmental
concern, important anadromous fish habitats, and public access
to the land for fishing.  The existence and protection of
aquatic resources shall be considered in any proposed land
exchanges.  Exchanges to benefit the aquatic resource
management program shall demonstrate a particular need for land
acquisition and adhere to public interest criteria such as
public access to fishing sites or acquisition of important
aquatic habitat within a given watershed.

.23  Rangeland Resources.  Use of the public lands by
cattle, sheep, horses, or other livestock may seriously affect
aquatic resources on rangelands.  The aquatic resource
management program assists in actions to improve range
(including aquatic) conditions, by taking the following
actions.

BLM_0076301

.23A

# 6720 - AQUATIC RESOURCE MANAGEMENT

A.  Rangeland EA's and EIS's.  Providing aquatic information and analyses for environmental assessments and environmental impact statements, as necessary.

B.  Grazing Systems.  Providing aquatic data, analyses and interpretations for grazing systems to ensure protection and enhancement of aquatic habitat and fishery values.

C.  Rangeland Monitoring.  Providing aquatic resource baseline data for monitoring and evaluating rangeland management decisions.

D.  Rangeland Practices Assessment.  Coordinating with Rangeland Resources personnel in developing and implementing monitoring programs, to assess impacts of alternative grazing practices on aquatic resources.

E.  Rangeland Improvement Project Assessment.  Providing analyses of rangeland improvement projects affecting aquatic habitats and recommending practices to provide optimum habitat protection or improvement.

.24  Forestry.  The aquatic resource management program assists this program by taking the following actions.

A.  Forest Management Plans.  Providing aquatic data and environmental analysis for the development and implementation of forest management plans where aquatic resources are affected.  Makes recommendations on protection and enhancement of aquatic resources.

B.  Forest Transportation Systems.  Providing design and layout information for forest transportation systems to ensure consideration and protection of aquatic resources.

C.  Forest Management Activities.  Providing information for monitoring forest management activities to protect aquatic resources.

.25  Wildlife and Fisheries.  Coordination of the fish and wildlife programs is needed if conflicting use demands occur. Closing reservoirs to public use as part of waterfowl management, thus precluding angling opportunities, is an example.  Coordination of these programs also is needed to quantify instream flow needs.  Flows identified as adequate for fishery needs in certain streams may not suffice for terrestrial wildlife needs.

BLM_0076302

6720 - AQUATIC RESOURCE MANAGEMENT

.26  Soil, Water, and Air.  Point and nonpoint sources of
water pollution degrade aquatic habitats.  The soil and water
management program provides support to improve aquatic
conditions through the following:

A.  Best Management Practices.  Section 319 of the Clean
Water Act of 1987 (P.L. 100-4) authorizes a program to restore
waters impaired by nonpoint pollution sources.  A major
emphasis is to restore fisheries impacted by sources such as
silviculture, grazing, and mining.  Another goal is to prevent
damage from future activities by implementation of best
management practices.  Funds are available through this program
to State agencies for public and private lands.  The aquatic
resource management program should initiate projects to
establish baseline water quality characteristics and to restore
fisheries damaged by pollution sources.  Adequate program
coordination also is necessary to ensure that soil erosion and
sedimentation problems affecting aquatic resources are
considered in developing Best Management Practices, and that
aquatic resource needs are considered in constructing erosion
control structures.

B.  Instream Flow Assessments.  The program also must
coordinate instream flow assessments necessary to preserve,
restore, or enhance aquatic resource habitats.  Methodologies
may vary with the characteristics of the habitat in question,
but should be compatible with methods utilized by other
agencies, such as the Fish and Wildlife Service and·State fish
and wildlife agencies.  Acceptable methodologies are discussed
in Manual Handbook 6720-1.

.27  Recreation, Cultural, and Wilderness Resources.
Aquatic resources and habitats often are a significant part of
a wilderness or recreation experience, and should be considered
in the review of Wilderness Study Areas.  Aquatic resource
data, analyses, and interpretation may be needed to complete
some wilderness studies.  The Recreation program is responsible
for completing river management plans and providing river
recreation permit programs on major recreation rivers, some of
which are included in the National Wild and Scenic Rivers
System.  Aquatic resource data may be needed to develop
management plans for recreation users and to monitor impacts
from increased visitation on aquatic resources.

BLM_0076303

6720 – AQUATIC RESOURCE MANAGEMENT

.3  Support and Coordination with Other Federal Agencies, States and Interested Parties.

.31  Other Federal Agencies.  Close coordination with other Federal agencies is necessary for optimum management of public lands.  Special status species programs should be coordinated with U.S. Fish and Wildlife Service (for freshwater species) or National Marine Fisheries Service (for anadromous species). Close coordination with Federal agencies that manage lands upstream of public lands is critical.  The joint Forest Service/BLM Recreational Fisheries Policy should facilitate and guide cooperation between those two agencies on matters relating to recreational fisheries.

.32  State Fish and Wildlife Agencies.  The aquatic resource specialist must coordinate aquatic resource programs with State agencies.  State fish and wildlife agencies or commissions typically are responsible for fishing regulations and introductions of game and forage species into aquatic habitats. Introductions of sportfishes should be coordinated so that the most suitable habitats are stocked and that stocking does not conflict with special status species management.

.33  Interested Parties.  The BLM maintains national-level and State Memorandum of Understandings (MOU's) with various organizations for the purposes of promoting cooperation with interested parties, facilitating volunteer participation in projects, and cooperative management programs.  Involvement of these parties, plus other interested organizations and landowners will facilitate better management.

A.  Trout Unlimited.  The BLM maintains a master MOU and cooperative agreement with Trout Unlimited for maintaining and enhancing coldwater fish habitats on public lands.

B.  The Nature Conservancy.  The BLM maintains a master MOU and cooperative agreement with The Nature Conservancy for maintaining and enhancing important aquatic habitats, including those containing special status species, on public lands.

C.  Amerifish Corporation, Fishing Has No Boundaries. The BLM maintains a MOU with Amerifish Corporation for the purposes of promoting angling opportunities and increasing environmental awareness for disabled persons.

D.  Other Parties.  The aquatic resource specialist should coordinate activities with affected landowners and other interested parties as appropriate.

BLM_0076304

6720 - AQUATIC RESOURCE MANAGEMENT

## Glossary of Terms

### -A-

aquatic habitat:  habitat confined to streams, rivers, springs, lakes, ponds, or reservoirs; habitat confined to water.

aquatic resources:  fauna and flora that live within or are entirely dependent upon water to live; living resources of aquatic habitats (i.e., fishes, invertebrates, amphibians, etc.); aquatic species.

aquatic resource management program:  all BLM activities undertaken expressly to maintain, improve, and protect aquatic habitat for fisheries or other aquatic resources.

anadromous species:  species of fish that migrate upriver from the ocean to reproduce in freshwater.

### -C-

candidate species:  those category 1 or 2 species considered by the Secretary of the Interior for listing as published in Notices of Review in the Federal Register.

critical habitat:  an area designated as such by the Secretary of the Interior on which are found those physical and biological features essential to the conservation of threatened or endangered species and which may require special management considerations or protection.  Critical habitat may include any portion of the range of a listed species.  Some listed species may not have any critical habitat designated.

### -E-

essential habitat:  an area on which are found those physical and biological features essential to the conservation of threatened or endangered species and which may require special management considerations or protection.  Criteria for identifying essential habitat are the same as for critical habitat, although essential habitat has not been officially designated by the Secretary of the Interior.

exotic species:  any species not naturally occurring, either presently or historically, in any ecosystem of the United States.

BLM_0076305

Glossary, Page 2

## 6720 - AQUATIC RESOURCE MANAGEMENT

-F-

floodplain:  the lowland and relatively flat areas adjoining inland and coastal waters, including flood-prone areas of offshore islands, that at a minimum is subjected to a 1 percent or greater chance of flooding in any given year.

-N-

native:  any species that naturally occurred within a given body of water.

-P-

proper functioning condition:  when riparian-wetland areas (1) dissipate energy associated with high water flows, thereby reducing erosion and improving water quality; (2) filter sediments and nutrients and aid in floodplain development; (3) contribute to root mass development that stabilize banks against cutting action; (4) develop diverse channel and ponding characteristics to provide the habitat necessary for fish production, waterfowl breeding and other uses; and (5) support greater biodiversity.

-R-

resident species:  any species naturally occurring, either presently or historically, in any ecosystem of the United States.  This definition excludes special status and anadromous species.

riparian habitat:  a specialized form of wetland restricted to areas with characteristic vegetation along, adjacent to, or contiguous with perennially and intermittently flowing stream, lake, spring, and reservoir shore areas. Characteristic vegetation may range from hydrophilic plants such as pondweed through more terrestrial forms such as sycamores, cottonwoods, conifers, and willows.  This habitat is transitional between true bottomland wetlands and upland terrestrial habitats, and while associated with water courses, may extend inland for considerable distances.

-S-

special status species:  any species listed as threatened or endangered by the Federal government, officially proposed for such designation, Federal candidate species, BLM sensitive species, or species listed by State government as threatened or endangered.

species:  any species, subspecies, or variety of flora or fauna.

BLM MANUAL

Supersedes Rel. 6-92

Rel. 6-118

3/22/91

BLM_0076306

6720 - AQUATIC RESOURCE MANAGEMENT

-W-

<u>water quality degradation</u>:  any reduction in the biological, chemical, or physical values that describe the quality of water.

<u>wetland or wetland habitat</u>:  Areas that have a predominance of hydric soils and that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and under normal circumstances do support, a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions.  Marshes, shallows, swamps, muskegs, bogs, and wet meadows are examples of wetlands.

BLM_0076307

TC-1

# 7200 – WATER RESOURCES

## Table of Contents

.01  Purpose
.02  Objectives
.03  Authority
.04  Responsibility
.05  References
.06  Policy

.1  Program Operation
   .11  Programming
   .12  Program Functions
   .13  Cooperative Relations
      A.  Federal Agencies
      B.  Federal Interagency Advisory Committee on
          Water Data Acquisition (IACWD)
      C.  State
      D.  Local
   .14  Training

.2  Planning
   .21  Resource Management Plans
   .22  Activity Plans
   .23  Project Plans

.3  Inventory
   .31  Water Use
   .32  Watershed Condition

.4  Watershed Monitoring

.5  Watershed Improvements

.6  Project Maintenance
   .61  Dam Safety
   .62  Abandonment

.7  Water Rights

.8  Ground Water

Rel. 7-107
10/5/89

BLM_0076308

7200 – WATER RESOURCES

.9  Support Activities
   .91  Water Use/Rights
      A.  Legal Availability
      B.  Physical Availability
   .92  Floodplain Delineation and Mapping
   .93  Hydrologic Design
   .94  Water Power and Water Storage Assessments
   .95  Impact Assessment
   .96  Mitigative Measures
   .97  Compliance Monitoring

Illustration
1. Activities of the Soil and Water Resources Programs

.01

## 7200 – WATER RESOURCES

.01  <u>Purpose</u>.  This Manual Section presents overall objectives, responsibilities, and policies for conducting the Water Resources Program.

.02  <u>Objectives</u>.

   A.  ==Maintain or improve surface and ground water quality consistent with existing and anticipated uses and applicable State and Federal water quality standards.==

   B.  ==Minimize the harmful consequences of overland flow and surface runoff on, or arising from, Bureau-administered lands.==

   C.  ==Provide for the physical and legal availability of water to facilitate authorized== uses of the public lands.

.03  <u>Authority</u>.  The Water Resources Program is conducted under the following authorities:

   A.  <u>Statues</u>.

     1.  <u>Taylor Grazing Act of 1934</u>, as amended, P.L. 73-482, 48 Stat. 1269, 43 U.S.C. 315, June 28, 1934.

     2.  <u>Revested Oregon and California Railroad and Reconveyed Coos Bay Wagon Road Grant Lands Act of 1937</u>, as amended, P.L. 75-405, 50 Stat. 874, 43 U.S.C. 1181, August 28, 1937.

     3.  <u>Appropriations Act of 1952</u>, McCarran Amendment, 66 Stat. 560, 43 U.S.C. 666, July 10, 1952.

     4.  <u>Watershed Protection and Flood Control Act of 1954</u>, as amended, P.L. 83-566, 68 Stat. 666, 16 U.S.C. 1001 et seq., August 4, 1954.

     5.  <u>Water Resources Research Act of 1954</u>, as amended, P.L. 88-379, 78 Stat. 329, 42 U.S.C. 1961, July 17, 1964.

     6.  <u>National Environmental Policy Act (NEPA) of 1969</u>, as amended, P.L. 91-190, 83 Stat. 852, 42 U.S.C. 4321 et seq., January 1, 1970.

     7.  <u>Water Resources Development Act of 1974</u>, P.L. 93-251, March 7, 1974.

     8.  <u>Federal Land Policy and Management Act of 1976</u>, as amended, P.L. 94-579, 90 Stat. 2743, 43 U.S.C. 1701 et seq., October 21, 1976.

     9.  <u>Safe Drinking Water Amendments of 1977</u>, amended Section 2 of the <u>Safe Drinking Water Act</u>, P.L. 95-190, 42 U.S.C. 201, November 16, 1977.

BLM_0076310

.0310

7200 – WATER RESOURCES

10. Public Rangelands Improvement Act of 1978, P.L. 95-514, 92 Stat. 1803, 43 U.S.C. 1901 et seq., October 25, 1978.

11. Classification and Multiple-Use Act (78 Stat. 986, 43 U.S.C. 1411-18), 43 CFR 1725.3-3(h) October 1, 1981.

12. Water Resources Planning Act of 1983, as amended, P.L. 97-449, 96 Stat. 2413, 49 U.S.C. 1962 et. seq., Jan. 12, 1983.

13. Colorado River Basin Salinity Control Act, as amended P.L. 98-569, 98 Stat. 2933, 43 U.S.C. 1593, Oct. 30, 1984.

14. Water Quality Act of 1987, P.L. 100-4, 101 Stat. 7, 33 U.S.C. 1251, Feb. 4, 1987.

15. Annual Appropriation Act of the Department of the Interior and Related Agencies.

B. Executive Orders.

1. Executive Order (Public Water Reserve No. 107) of April 17, 1926 (36 Stat. 847).

2. Executive Order 11514, March 5, 1970, as amended by Executive Order 11991, May 24, 1977. Executive order for the protection and enhancement of environmental quality.

3. Executive Order 11738, September 10, 1973. This Order directs each Federal agency to enforce the Clean Air Act and the Clean Water Act in the procurement of goods, materials, and services.

4. Executive Order 11752, December 17, 1973. This Order mandates that Federal agencies shall provide national leadership to protect and enhance the quality of air, water, and land resources through compliance with applicable Federal, State, interstate, and local pollution standards.

5. Executive Order 11988, May 24, 1977, Floodplain Management, as amended by Executive Order 12148.

6. Executive Order 11990, May 24, 1977, Protection of Wetlands.

7. Executive Order 12322, September 17, 1981. Under this Order, any report, proposal, or plan relating to a Federal or federally assisted water and related land resources project or program must be submitted to the Director, Office of Management and Budget, before submission to Congress.

BLM_0076311

.03C

7200 – WATER RESOURCES

C.  Circulars.

1.  OMB (Office of Management and Budget) Circular A-67 (August 28, 1964).  This Circular provides guidelines for coordination of water data activities and states that the U.S. Geological Survey shall acquire basic water data on the water resources of the Nation.  It further states that other agencies shall acquire special water data in support of their respective missions and that these activities be closely coordinated to assure effective and economical management of resources.

2.  Circular A-81, Reporting Requirements in Connection with Prevention, Control, and Abatement of Water Pollution at Existing Federal Facilities.

   a.  Requires Federal agencies to:

      (1)  Meet water quality standards and related plans which States have developed under the Federal Water Pollution Control Act.

      (2)  Consult with the Secretary of the Interior at the earliest feasible time to determine standards applicable to particular facilities and, otherwise, cooperate with him/her.

      (3)  Cooperate with State and local pollution control agencies and with other Federal agencies in the evaluation of their pollution control needs.

3.  Circular A-97, Specialized and Technical Services to State and Local Governments.  Sets forth rules and regulations to effect Title III of the Intergovernmental Cooperation Act authorizing Federal agencies to provide reimbursable technical services to State and local governments.

.04  Responsibility.

A.  The Director and Deputy Director are responsible for:

1.  Establishing Bureauwide objectives, developing and analyzing national level policies, and setting national priorities for the conduct of the Water Resources Program.

2.  Preparing, evaluating, and revising Bureau Manual Sections, Handbooks, and Technical References to maintain a current system of program policy and guidance.

3.  Providing liaison at the national level with other Federal agencies and organizations.

4.  Ensuring internal coordination between the Water Resources Program and other Bureau programs.

5.  Providing direction and leadership to Bureauwide water resources training courses.

.04B

7200 - WATER RESOURCES

    B.  <u>The Service Center Director</u> is responsible for providing technical support to the Headquarters Office and Field Offices by:

        1.  Responding to Field Office requests for technical assistance and/or training.

        2.  Developing, testing, evaluating, and making recommendations to the Headquarters Office on the applicability of new technologies for the collection, storage and retrieval, analysis and interpretation, and application of water resources data.

        3.  Preparing water resource Handbooks, technical notes, and references, and other Field-oriented guidance at the direction of the Headquarters Office or request of Field Offices.

        4.  Providing liaison with research agencies, educational institutions, and professional organizations to maintain a "state-of-the-art" knowledge in water resources.

    C.  <u>State Directors</u> are responsible for achieving the Bureau's Water Resources Program objectives (.02) within their respective States by:

        1.  Implementing Bureauwide water resources policies, setting State water resources priorities, and preparing supplemental program directives for Statewide application.

        2.  Providing liaison with other Federal agencies, State agencies, user groups, and adjoining BLM State Offices to ensure a coordinated Water Resources Program.

        3.  Evaluating Statewide Water Resources Program effectiveness through periodic analyses of related decisions and products (e.g., Resource Management Plans (RMP), activity plans, data management).

        4.  Providing, or otherwise making available, training, workshops, and technical support to ensure that Water Resources Program personnel are professionally equipped to comply with established technical standards.

    D.  <u>District Managers</u> are responsible for achieving Bureau and State Water Resources Program objectives within their respective District boundaries by:

        1.  Implementing Bureau and State water resources policies, setting District water resources priorities, and preparing supplemental program directives and guidelines for Districtwide application.

        2.  Cooperating with other Federal, State, and local agencies, user groups; and adjoining BLM District Offices to ensure a coordinated Water Resources Program.

BLM_0076313

.04D3

7200 - WATER RESOURCES

3. Evaluating Districtwide Water Resources Program effectiveness by periodically reviewing Resource Area work accomplishments for technical adequacy and compliance with Bureau, State, and District policies.

4. Maintaining sufficient professional expertise, within applicable budgets, in the District and Resource Area organizations to ensure that water resources management is carried out in accordance with established policies and technical standards.

E. Resource Area Managers are responsible for achieving Bureau, State, and District Water Resources Program objectives within their respective Resource Area boundaries by:

1. Conducting water resources inventories of water sources/uses and watershed condition.

2. Implementing water resources monitoring to document changes over time in water quality, water quantity, and sediment yield.

3. Analyzing and interpreting water resources and related data to determine and maintain a record of resource conditions.

4. Protecting, acquiring, and/or perfecting water rights to meet multiple-use management needs according to Bureau Policy and Manual Section 7250 procedures.

5. Preparing and implementing plans to develop, protect, and/or rehabilitate water resources and watersheds.

6. Identifying and resolving shortages or deficiencies in professional expertise needed to carry out the Water Resources Program.

.05  References.

A. Manual Section 1601 - Bureau Planning System.

B. Manual Section 1619 - Activity Plan Coordination.

C. Manual Section 1621 - Supplemental Program Guidance for Environmental Resources.

D. Handbook H-1684-1 - Fund Coding Handbook.

E. Manual Section 1734 - Inventory and Monitoring Coordination.

F. Handbook H-1734-2 - Rangeland Monitoring.

G. Manual Section 1740 - Renewable Resource Improvements and Treatments.

BLM_0076314

.05H

7200 – WATER RESOURCES

H.  Handbook H-1740-1 – Renewable Resource Improvement and Treatment Guide-
lines and Procedures.

I.  Manual Section 1741 – Renewable Resource Improvement, Practices, and
Standards.

J.  Manual Section 1743 – Renewable Resource Investment Analysis.

K.  Handbook H-1743-3 – 1 Resource Investment Analysis.

L.  Manual Section 1780 – Cooperative Relations.

M.  Manual Section 7000 – Soil, Water, and Air Management.

N.  Manual Section 7240 – Water Quality.

O.  Manual Section 7250 – Water Rights.

P.  Manual Section 910  – Facility Planning

Q.  Manual Section 9104 – Facility Maintenance.

R.  Manual Section 9171 – Water Development.

S.  Manual Section 9172 – Water Control Structures.

T.  Manual Section 9177 – Maintenance and Safety of Dams.

U.  Manual Section 9184 – Drinking Water Supply.

V.  Manual Section 9188 – Nonpoint Source Pollution Control.

.06  Policy.

A.  Water resources information will be collected and maintained consistent
with land management needs and professionally accepted methodologies and
standards.

B.  Water resources information will be used through analysis and
interpretation to set and monitor resource management objectives, determine
compliance with State and Federal authorities, and assess environmental
impacts from land use activities.

C.  Water resources improvements and practices will be implemented through
the resource management planning process, State water quality management
programs, and budget directives.

BLM_0076315

.1

7200 - WATER RESOURCES

.1 <u>Program Operation</u>.  The Water Resources Program is administered as part of the Soil, Water, and Air subactivity.

.11 <u>Programming</u>.  All water resources programming and cost accounting shall use the available program elements in the financial management system (see H-1684-1).  The mix of program elements should be assessed periodically to ensure that they adequately reflect program emphasis and workload.

.12 <u>Program Function</u>.  The Water Resources Program includes three distinguishable, though closely related, areas of activity:  Watershed management, water use/rights, and ground water.  In each of the three areas, there are direct and support functions (see Illustration 1).  The Water Resources Program and Soil Resources Program together provide the policy and technical direction for accomplishing watershed management.  The Water Resources Program provides the policy and technical direction for water use/rights and ground water activities.

.13 <u>Cooperative Relations</u>.  Water resources management activities require cooperation with other agencies and organizations to provide for efficient data collection, information exchange, and the coordinated development or improvement of procedures, practices, and standards.  Due to the States' primary roles in water rights and water quality, the Bureau must establish and/or maintain effective communications and negotiative processes with State water resources administrators.  Principal agencies and organizations are listed below (also see Manual Section 1780).

A.  <u>Federal Agencies</u>.

1.  USDI Geological Survey, Water Resources Division.

2.  USDI Bureau of Reclamation.

3.  USDI Fish and Wildlife Service.

4.  USDA Forest Service.

5.  USDA Soil Conservation Service.

6.  Environmental Protection Agency.

7.  Army Corps of Engineers.

8.  NOAA, National Weather Service.

BLM_0076316

.13B

7200 – WATER RESOURCES

B.  Federal Interagency Advisory Committee on Water Data Acquisition
(IACWD).  The BLM is represented on the IACWD and on several of the permanent
subcommittees listed below:

1.  Hydrology.

2.  Sedimentation.

3.  Ground Water.

4.  Water Data and Information Exchange.

5.  Water Use.

6.  Water Quality

C.  State.

1.  Department of Water Resources.

2.  Department of Forestry.

3.  State Water Quality Boards and Agencies.

4.  Universities.

5.  Water Resources Research Center.

6.  Water Right Administrators.

D.  Local.

1.  Irrigation/Drainage Districts.

2.  City/County Planning Agencies.

3.  Conservation Districts.

.14  Training.  The Water Resources Program will provide training for BLM
employees on principles and techniques of hydrology as applied to water
resources management on public lands.  These activities will be based on
management needs identified through a periodic training needs analysis,
performed by program leaders and training coordinators.  Training and
technical guidance will be provided through professional meetings, workshops,
formal classroom sessions, packaged training modules, and technical reference
publications.

BLM_0076317

.2

7200 - WATER RESOURCES

.2  Planning.  Water Resources Program functions are carried out as part of
the Bureau Planning System described in Manual Section 1601.12.

.21  Resource Management Plans.  Resource management plans (RMP's) are
multiple use plans that establish allowable uses, levels of production and
protection, and provide management direction for all public land resources.
Water resources are addressed and analyzed in the RMP and related EIS to
identify objectives and associated actions.  Examples of program specific
factors of analysis, objectives, and actions, along with other guidance, are
provided in Manual Section 1621.  Exceptions to RMP-required determinations
are outlined in Manual Section 1620.06.

.22  Activity Plans.  Activity plans are more detailed, site-specific plans
prepared as necessary to supplement and implement an RMP.  Water resources
activity planning is carried out whenever such need is established in an
approved RMP (or Management Framework Plan not yet replaced by an RMP).  Water
resource activity planning is accomplished through specific Watershed
Management Plans or by incorporating watershed management objectives and
actions into other resource activity plans (e.g, Allotment Management Plans,
Habitat Management Plans).  In either case, cooperation among activities is
essential to minimize duplication of effort and to ensure the coordinated
design to specific features or actions that benefit several activities.
Activity plan coordination requirements are described in Manual Section 1619.

23.  Project Plans.  Watershed management objectives and/or actions
identified through the planning process may provide the basis for development
of site-specific plans such as project or detailed facility plans (see Manual
Section 9101).

BLM MANUAL

Rel. 7-107
10/5/89

BLM_0076318

7200 - WATER RESOURCES

.3  <u>Inventory</u>.  There are two water resources related inventories, one for collecting water use information and the other for characterizing watershed condition.

.31  <u>Water Use</u>.  ==All water uses on BLM-administered public land shall be inventoried.==  Water uses on public lands will be located, quantified, and otherwise described to facilitate water rights processes and public inquiries.  Each State Office is responsible for automating and managing water-use inventory data and providing supplemental guidance addressing data collection standards and informational requirements necessitated by individual State water laws.

.32  <u>Watershed Condition</u>.  The watershed condition inventory provides a rating of satisfactory or unsatisfactory for public land watersheds based on soil, water, and related resource components.  The data used are primarily derived from other inventories (e.g., soil surveys, ecological site inventories, water-use inventories), ongoing monitoring efforts (e.g., water quality, streamflow, erosion, climate), and other available descriptive information (e.g., slope, landform).  The watershed condition inventory and associated analyses are used to identify areas in need of rehabilitation or protection and to aid in establishing priorities for improvements and management action.

.4

## 7200 - WATER RESOURCES

.4  <u>Watershed Monitoring</u>.  Watershed monitoring is the systematic collection and analysis of soil, water, and related resource data to evaluate progress toward meeting specific watershed management objectives and to develop or refine watershed protection practices routinely applied as mitigations or standard operating procedures.  General requirements for renewable resource monitoring are described in Manual Section 1734.  Additional direction for watershed monitoring is provided in Manual Section 7240.

BLM_0076320

.5

7200 – WATER RESOURCES

.5  <u>Watershed Improvements</u>.  Watershed improvements consist of land treatments and structures whose primary function is to reduce soil loss, reduce sedimentation, stabilize streambanks and channels, improve water quality, augment water yields, and/or attenuate flood peaks.  General requirements for planning, coordination, and documentation of renewable resource improvements with specific exceptions and constraints are described in Manual Section 1740.

BLM_0076321

7200 – WATER RESOURCES

.6  Project Maintenance.  Maintenance of existing watershed improvements is
essential to assure the health and safety of public land users and to provide
for continued benefits from previous Federal investments.  Facility
maintenance policies in Manual Section 9104 require that all Bureau physical
facilities be inventoried, have maintenance plans, and have condition surveys
performed at regularly scheduled intervals and following unusually severe
climatic events.

.61  Dam Safety.  In addition to the above requirements, BLM-administered
dams must be assigned a hazard classification based on the potential for loss
of life and property downstream from the structure.  Classification procedures
and special requirements for dams with high or significant hazard ratings are
described in Manual Section 9177.

.62  Abandonment.  Where it is determined that the benefits of an existing
watershed improvement no longer justify the costs of continued maintenance,
the project shall be abandoned or removed and the site stabilized or
rehabilitated as necessary.  Such determinations must be documented in
accordance with established environmental and investment analysis standards
(see Manual Section 1740.1).

BLM_0076322

.7

## 7200 - WATER RESOURCES

.7  <u>Water Rights</u>.  The BLM shall ensure water availability for, and legally
protect, existing and proposed water uses needed by its resource management
programs.  Manual Section 7250 (Water Rights) provides direction on acquiring
and perfecting water rights.  The Water Resources Program coordinates and
directs responses to State-ordered adjudications, expert testimonies for
water-use litigation, and applications for State appropriations or assertions
of Federal water rights.  Where instream flow needs are addressed through
planning, the Bureau will perform necessary instream flow assessments,
determinations, and reports prior to any water-right assertions or
acquisitions.

BLM_0076323

.8

7200 - WATER RESOURCES

.8  <u>Ground Water</u>.  Regional or Areawide ground water studies provide resource information associated with supply and water quality determinations.  These studies are considered reconnaissance level or extensive in scope, and are conducted to satisfy multiresource data needs.  Examples of these studies would include Resource Areawide ground water data collection to supplement RMP's, or characterization of extensive subsurface water supplies potentially available to water users in general (not based on individual water project proposals).

BLM_0076324

7200 - WATER RESOURCES

.9 **Support Activities.** The Water Resources Program provides input to other BLM programs by incorporating hydrologic considerations, both on and offsite, into proposed actions to protect water resources values. Examples of appropriate input to the various Bureau programs are outlined below.

.91 **Water Use/Rights.**

A. **Legal Availability.** Provide direction and assistance to other programs for quantification, acquisition, transfer, and protection of water rights for specific uses such as recreation, wildlife, livestock, and mineral development and exploration. The types and amounts of assistance are specifically based on individual water project proposals. Activities in support of land sales, purchases, and exchanges would require legal status determinations of existing water uses(s) and proper transfer or acquisition of water rights.

B. **Physical Availability.** Provide hydrologic determinations of water supply during applicable project planning. Determinations include predicting surface water yields available to proposed reservoirs and performing well-site investigations. Due to the natural variability of ground water (e.g., depth occurrence) and cost of developing ground water resources, a well-site investigation is necessary and cost effective on all proposed well developments.

.92 **Floodplain Delineation and Mapping.** Provide floodplain data for proposed activities affecting these areas. Proposed activities such as locating recreational sites, using rivers and streams for water sports, managing wetlands, developing mineral resources, and lands exchanges must have information regarding floodplain locations, elevations, and risks.

.93 **Hydrologic Design.** Provide hydrologic design assistance for proposed water projects. Hydrologic design is the determination of flood volumes, peaks, frequencies, and analyses of associated risks to allow for proper operation and maintenance of facilities. Facilities that often need hydrologic design input are roads, bridges, reservoirs, recreation sites, channel stabilization projects, and wildlife habitat improvements. Provide review of water development project proposals affecting public lands for impacts to Bureau-managed resources, programs or activity plans.

.94 **Water Power and Water Storage Assessments.** Provide assistance in assessing Federal lands for waterpower and water storage potential. Such assessments shall be conducted to identify sites suitable for development for hydro-power, irrigation, flood control, water supply, recreation, and other uses. Such sites are subject to withdrawal to assure availability, free of encumbrance, for future water project development.

BLM_0076325

.95

7200 - WATER RESOURCES

.95  Impact Assessments.  Provide analyses of water resources and watershed system impacts from planned land uses and resource development.  The analysis must be documented typically in an RMP environmental impact statement (EIS), specific activity EIS, or programmatic environmental assessments.  The following are specific examples of analyses for determining positive and negative effects on hydrologic systems:

    A.  Providing hydrologic input to prescribed burn plans.

    B.  Identifying impacts to water resource values from recreational uses such as off-road vehicles, camping, and boating.

    C.  Evaluating vegetation and surface treatments and the changes to water resource values caused by the treatments.

    D.  Analyzing impacts to water resources due to mineral exploration and development activities.

    E.  Determining potential hydrologic changes resulting from silvicultural practices.

    F.  Identifying hydrologic considerations where changes in land ownership are proposed.

    G.  Identifying water resource problems associated with developing habitat improvements.

.96  Mitigative Measures.  Provide assistance in determining, recommending, and implementing mitigative measures for minimizing or avoiding water resource impacts from resource development.  Mitigative measures may include, but are not limited to, protective stipulations, reclamation standards and techniques, best management practices, land-use restrictions, and substitute resource provisions.  Grazing, timber harvesting, mineral exploration and development, and recreational activities are resource uses often encountered and typically requiring mitigative measures.

.97  Compliance Monitoring.  Provide technical and procedural input to activities such as testing drinking water at recreational facilities, evaluating permit compliance (e.g., mining operation plans, National Pollutant Discharge Elimination System-(NPDES), and verifying best management practices implementation.

BLM MANUAL

Illustration 1
(.1)

7200 – WATER RESOURCES



## ACTIVITIES OF THE
## SOIL AND WATER RESOURCES PROGRAMS

|— WATER RESOURCES PROGRAM —|

| | SOILS | WATERSHED MANAGEMENT | WATER USE/RIGHTS | GROUND WATER |
|---|---|---|---|---|
| D I R E C T | Soil Survey<br><br>Soil Interpretations<br>• Development<br>• Application<br><br>Research and Development | Watershed Condition Determination<br>• Erosion/Sedimentation<br>• Water Quality<br>• Runoff<br><br>Watershed Rehabilitation<br>• Planning/Implementation<br>• Monitoring<br>• Maintenance<br><br>RESEARCH AND DEVELOPMENT | Water Source Inventory<br><br>Water Rights<br>• Respond to State Adjudications<br>• Assert Federal Reservations<br>• Expert Witness<br><br>Instream Flow Quantification | Regional or Determination<br>• Water Quality<br>• Supply<br><br>Data Compilation<br><br>Research and Development |
| S U P P O R T | Soil/Vegetation Correlation<br><br>Site-Specific Evaluations<br><br>Impact Assessment and Mitigation | Floodplain Delineation<br><br>Hydrologic Design<br><br>Impact Assessment and Mitigation<br><br>Compliance Monitoring | Availability Determination<br><br>Individual Project Filings | Well Site Investigation<br><br>Impact Assessment and Mitigation<br><br>Compliance Monitoring |

|— SOIL RESOURCES PROGRAM —|

Rel. 7-107
10/5/89

BLM_0076327

Form 1221-2
(June 1969)



|  | UNITED STATES DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT | Release |
|--|--|--|
|  |  | 6-125 |
|  | MANUAL TRANSMITTAL SHEET | Date |
|  |  | 12/12/2008 |

**Subject**

### 6840 – Special Status Species Management

1. **Explanation of Materials Transmitted:  This release transmits a complete revision of Manual 6840, the Special Status Species Management Manual for the Bureau of Land Management.  This manual establishes policy for management of species listed or proposed for listing pursuant to the Endangered Species Act and Bureau sensitive species which are found on BLM-administered lands.**

2. **Reports Required:  None**

3. **Materials Superseded:  Manual pages superseded by this release are listed under "REMOVE" below.  No other directives are superseded.**

4. **Filing Instructions:  File as directed below**

| REMOVE | INSERT |
|--|--|
| **All of 6840 (Rels. 6-121)** | **6840** |
| **(Total: 26 Sheets)** | **(Total: 24 Sheets)** |

/s/ James Caswell
Director

BLM_0076328

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)          TC-1

## Table of Contents

.01    Purpose
.02    Objectives
.03    Authority
.04    Responsibility
.05    References
.06    Policy

.1 Administration of the ESA
    A.  Section 2 (Findings, purposes, and policy)
    B.  Section 4 (Determination of endangered species and threatened species, designation of critical habitat, and development of recovery plans)
    C.  Section 5 (Land Acquisition)
    D.  Section 6 (Cooperation with States)
    E.  Section 7 (a)(1) (Conservation Programs)
    F.  Section 7 (a)(2) (Consultation)
    G.  Section 9 (Prohibited Acts)
    H.  Section 10 (Exceptions to the ESA)
    I.  Section 11 (Penalties and Enforcement)
    J.  Section 18 (Annual Cost Analysis by the U.S. Fish and Wildlife Service)

.2 Administration of Bureau Sensitive Species
    A.  Designation of Bureau Sensitive Species
    B.  Planning
    C.  Implementation
    D.  Agreements, Assessments, and Cooperative Strategies for Conservation
    E.  Management of Bureau Sensitive Species with the Oregon and California Lands Act

.3 General Cooperation for BLM Special Status Species
    A. Coordination and Cooperation with Tribes
    B. Other Cooperation and Coordination

Glossary of Terms

BLM_0076329

.01           6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)

.01     <u>Purpose</u>.  The purpose of this manual is to provide policy and guidance for the conservation of BLM special status species and the ecosystems upon which they depend on BLM-administered lands.  BLM special status species are: (1) species listed or proposed for listing under the Endangered Species Act (ESA), and (2) species requiring special management consideration to promote their conservation and reduce the likelihood and need for future listing under the ESA, which are designated as Bureau sensitive by the State Director(s).  All Federal candidate species, proposed species, and delisted species in the 5 years following delisting will be conserved as Bureau sensitive species.

.02     <u>Objectives</u>.  The objectives of the BLM special status species policy are:

     A.  To conserve and/or recover ESA-listed species and the ecosystems on which they depend so that ESA protections are no longer needed for these species.

     B.  To initiate proactive conservation measures that reduce or eliminate threats to Bureau sensitive species to minimize the likelihood of and need for listing of these species under the ESA.

.03     <u>Authority</u>.

     A.  Endangered Species Act of 1973 (16 U.S.C. 1531 <u>et</u> <u>seq</u>.), as amended.

     B.  Sikes Act, Title II (16 U.S.C. 670g <u>et</u> <u>seq</u>.), as amended.

     C.  Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 <u>et</u> <u>seq</u>.), as amended (FLPMA).

     D.  Departmental Manual 235.1.1.A, General Program Delegation, Director, Bureau of Land Management.

     E.  Departmental Manual 632.1.1-1.6, Endangered Species Management.

     F.  Secretarial Order 3206 (American Indian Tribal Rights, Federal–Tribal Trust   Responsibilities, and the Endangered Species Act).

     G.  Information Quality Act (44 U.S.C 3504(d)(1) and 3516).

     H.  Oregon and California Lands Act (43 U.S.C. 1181a, <u>et</u> <u>seq</u>.).

.04     <u>Responsibility.</u>

     A.  The <u>Director</u> is responsible for overseeing implementation of Special Status species policies on BLM-administered lands, coordinating as needed with State Directors on select, multi-State species conservation issues, and making any

BLM_0076330

applications for project exemptions under Section 7(g) of the ESA to the Secretary of the Interior.

B. The Assistant Director for Renewable Resources and Planning is responsible for the timely development, approval, and implementation of procedures for carrying out the BLM special status species policies.

C. The Chief, Division of Fish Wildlife and Plant Conservation, is responsible for initiating and recommending policies, objectives, general procedures, and priorities relating to Bureau sensitive species, federally proposed and listed species, federally proposed and designated critical habitat, and overall coordination of the special status species policies. The Division Chief is also responsible for designating a National Program Lead whose responsibilities are:

    1.  Developing and maintaining up-to-date policies pertaining to management of special status species on BLM lands.

    2.  Developing agency budget documents pertaining to special status species management, and determining funding allocations to States.

    3.  Coordinating with State program leads in all phases of implementation of the Bureau special status species program.

    4.  Providing technical assistance and guidance to other BLM Washington Office programs to ensure proper consideration of BLM special status species matters in those programs.

    5.  Maintaining appropriate interactions with the headquarters of other Federal agencies and bureaus, national conservation organizations, international conservation groups, and individual authorities to advance the objectives of the BLM special status species program.

    6.  Maintaining a thorough knowledge of the legislation, regulations, court rulings, and litigation actions relative to Bureau sensitive species, federally proposed and listed species, and proposed and designated critical habitat, and communicating the implications of these actions to BLM decision makers and staff.

    7.  Working with the National Training Center and other agencies to develop training and orientation materials relevant to this policy.

D.  The State Directors are responsible for:

    1.  Developing and implementing procedures for the conservation of special status species on BLM-administered lands within their States.

BLM_0076331

2.   Coordinating the BLM special status species conservation efforts with adjoining BLM State Offices, State and other Federal agencies, various private organizations, and BLM stakeholders.

3.   Inventorying BLM lands to determine which BLM special status species occur on public lands, the condition of the populations and their habitats, and how discretionary BLM actions affect those species and their habitats.

4.   Designating Bureau sensitive species within their respective jurisdictions and, at least once every 5 years, reviewing and updating the Bureau sensitive species list in coordination with State agencies that are responsible for fisheries, wildlife, and botanical resources.

5.   Ensuring that when BLM engages in the planning process, land use plans and subsequent implementation-level plans identify appropriate outcomes, strategies, restoration opportunities, use restrictions, and management actions necessary to conserve and/or recover listed species, as well as provisions for the conservation of Bureau sensitive species.  In particular, such plans should address any approved recovery plans and conservation agreements.

6.   Ensuring that all actions comply with the ESA, its implementing regulations, and other directives associated with ESA-listed and proposed species, including compliance with Section 7 consultations and conferences with the U.S. Fish and Wildlife Service (FWS) and National Marine Fisheries Service (NMFS).

7.   Providing an annual summary of ESA-related expenditures, and other program performance and related information to the Washington Office on an as-needed basis.

8.   Designating State Program Leads, whose responsibilities are to:

   a.   Initiate and provide technical support to other BLM personnel in the development of conservation strategies for special status species on BLM lands.

   b.   Monitor implementation of Bureau sensitive species activities and policies within the state, and develop state level policies as needed to ensure program objectives are met.

   c.   Collaborate with other program leads at the state level to ensure objectives of the BLM special status species program are integrated in those programs as appropriate.

   d.   Maintain a cooperative working relationship with State and Federal agencies and local conservation groups, especially their respective state agencies with authority for listed species, wildlife, fish, and plants, and the

BLM_0076332

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)          .04D8e

regional and local offices of the FWS and NMFS.

e.   Recommend funding allocations that will best achieve the objectives of this policy and track expenditures to determine if the allocated funds have been appropriately expended.

f.   Recommend and develop training material to keep field and district offices current on policies and direction changes.

E.  District Managers and Field Managers are responsible for implementing the BLM special status species policies and program within their area of jurisdiction by:

1.   Implementing conservation strategies for BLM special status species as contained in approved recovery plans, cooperative agreements, and other instruments the BLM has cooperatively participated in the development of.

2.   Conducting and maintaining current inventories of BLM special status species on BLM-administered lands.

3.   Ensuring that all actions undertaken comply with the ESA, its implementing regulations, and other directives associated with ESA-listed and proposed species.

4.   Ensuring that the results of formal Section 7 consultations, including mandatory terms and conditions in incidental take statements that are consistent with 50 CFR 402 regulations, are implemented and documented in the administrative record.

5.   Coordinating field office activities with Federal, State, and local groups to ensure the most effective program for BLM special status species.

6.   Ensuring that land use and implementation plans fully address appropriate conservation of BLM special status species.

7.   Monitoring populations of Bureau special status species to determine whether management objectives are being met.  Records of monitoring activities are to be maintained and used to evaluate progress relative to such objectives.  Monitoring shall be conducted consistent with the principles of adaptive management as defined in Department of the Interior policy, as appropriate.

.05  References.

A.  50 CFR Part 17—Endangered and Threatened Wildlife and Plants.

B.  50 CFR Part 17—Subpart H—Experimental Population.

.05C        6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)

C.  50 CFR Part 226—Designated Critical Habitat.

D.  50 CFR Part 402—Interagency Coordination—Endangered Species Act of 1973, as amended.

E.  50 CFR Part 424—Listing Endangered and Threatened Species and Designating Critical Habitat.

F.  50 CFR Part 451—Application Procedure.

G.  43 CFR 4180—Fundamentals of Rangeland Health and Standards and Guidelines for Grazing Administration.

H.  68 FR 68255 (December 8, 2003)—Joint Counterpart Endangered Species Act Section7 Consultation Regulations.

I.  BLM Manual Section1601—Land Use Planning.

J.  BLM Handbook H-1601—Land Use Planning Handbook.

K.  BLM Manual 1745—Introduction, Transplant, Augmentation, and Reestablishment of Fish, Wildlife, and Plants.

L.  BLM Manual 1740—Renewable Resource Improvements and Treatments.

M.  BLM Handbook H-1740-2—Integrated Vegetation Management Handbook.

N.  BLM Handbook H-4180-1—Rangeland Health Standards Handbook.

O.  FWS and NMFS Endangered Species Consultation Handbook (March 1998).

P.  FWS Director, June 25, 2002, Memorandum on Arizona Cattle Growers Decision and Solicitor's opinion.

Q.  Norton v SUWA, 542 US 55 (2004).

R.  National Association of Homebuilders v Defenders of Wildlife, 127 S. Ct. 2518 (2007).

S.  Forest Guardians v Forsgren, 478 F.3d 1149 (10th Cir 2007).

T.  Western Watersheds Project v Bureau of Land Management, 552 F. Supp. 2d 1113 (D. N.V. 2008).

U.  Western Watersheds Project v Matejko, 468 F.3d 1099 (9th Cir 2006).

BLM_0076334

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)     .05V

V.  Arizona Cattle Growers Association v Fish and Wildlife Service, 273 F.3d 1229 (9th Cir 2004).

W.  Gifford Pinchot Task Force v Fish and Wildlife Service, 378 F.3d 1059 (9th Cir 2004).

X.  Application of the Endangered Species Act to proposals for access to non-Federal lands across lands administered by the Bureau of Land Management and the U.S. Forest Service, signed January 2003.

.06  Policy.  Actions authorized by the BLM shall further the conservation and/or recovery of federally listed species and conservation of Bureau sensitive species.  Note that "conservation" has a different meaning depending on whether it is referring to ESA listed species or Bureau sensitive species.  See glossary.  Bureau sensitive species will be managed consistent with species and habitat management objectives in land use and implementation plans to promote their conservation and to minimize the likelihood and need for listing under the ESA.

The BLM shall retain in Federal ownership those habitats essential for the conservation of any listed species, particularly those that are part of a broader, logical public land ownership management unit.  The BLM may dispose of lands providing habitat for listed species, including critical habitat, only following consultation with the FWS or NMFS and upon a determination that such action is consistent with relevant law.  This policy does not apply to any lands conveyed pursuant to the Alaska Native Claim Settlement Act.

.1  Administration of the ESA.  The administration portion of this manual is divided into three separate parts: (1) species and habitats listed under the ESA, (2) species identified by BLM as Bureau sensitive and (3) general cooperation on BLM special status species management.  The BLM shall conserve federally listed species by fulfilling the requirements of the ESA as described in this section.  The Bureau sensitive species shall be conserved through the use of management practices as described in Section .2.

Various provisions of the ESA, as amended, apply to plants and animals that have been listed as endangered or threatened, those proposed for being listed, and designated and proposed critical habitat.  The BLM shall conserve listed species through administration of the various sections of the ESA that apply to Federal agencies.  When administering the ESA, the BLM shall use the best scientific and commercial data available.  The BLM shall comply with all applicable sections of the ESA as follows:

A.  Section 2 (Findings, purposes, and policy).  The BLM shall, consistent with Section 2 of the ESA, seek to conserve endangered and threatened species and shall utilize its authorities in furtherance of the purposes of the ESA.  In addition:

1. Federal Agency Cooperation.  The BLM will cooperate with other Federal agencies as follows:

BLM_0076335

a.  Seek to improve efficiency by combining efforts with other Federal agencies  to foster better working relationships and promote the conservation of listed species.

b.  Establish or participate in existing regional interagency working groups that identify geographic areas within which the groups will coordinate agency actions, create opportunities, and overcome barriers to conserve listed species and the ecosystems upon which they depend.

c.  Participate in national ESA working groups to coordinate the implementation of the ESA.

2.  State and Local Agency Cooperation.  As specifically addressed in Section 2 of the ESA, the BLM shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species.  The BLM should:

a.  Participate on watershed councils.

b.  Provide technical assistance to State and local agencies on species, critical habitats, and resources.

c.  Actively engage in the Federal Energy Regulatory Commission licensing and relicensing process for hydropower projects affecting ESA-listed and proposed species on BLM-administered lands.

B.  <u>Section 4 (Determination of endangered species and threatened species, designation of critical habitat and development of recovery plans)</u>.  While it is the responsibility of the FWS and/or NMFS to list threatened or endangered species and designate critical habitat, the BLM should provide relevant information to the FWS and/or NMFS on species or habitats proposed for listing and may petition to add a species to, or to remove a species from, the threatened or endangered species list.  In addition, the BLM should provide information to the FWS and/or NMFS on proposed critical habitat for BLM-administered lands as per the policy at .1.B.3 of this Manual, and cooperate, as appropriate, with the FWS and/or NMFS in developing recovery plans for listed species that occur on BLM-administered lands. In the development of BLM comments on recovery plans, listing proposals, or critical habitat proposals involving species distributed across more than one state, the BLM will consider designation of a lead State Office or the Washington Office to prepare consolidated agency comments.  The decision on preparation of such comments will be jointly agreed to among the affected State Offices and the Washington Office.

1.  <u>Determination of endangered or threatened status</u>.  Determination of endangered or threatened status of species by the FWS and/or NMFS is provided

BLM_0076336

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)          .1B1a

for in Section 4 of the Endangered Species Act and the procedures in 50 CFR Part 424.  BLM should provide assistance to the FWS and/or NMFS for actions that affect BLM-administered land, including as follows:

a.  Responsibilities.  The BLM is responsible for preparing and maintaining, on a continuing basis, a current inventory of the public land and its resources (FLPMA, 43 U.S.C. 1701 Sec.201 (a)).  This inventory information, along with monitoring data collected under a variety of programs, shall be used to evaluate the current status and trends of plants and animals and their habitats on BLM-administered lands, and to respond to FWS and/or NMFS *Federal Register* Notices of species status review (e.g., 90-day, 12-month, 5-year, and annual candidate reviews).

b.  Petitions.  When conditions warrant, the BLM Director may petition the FWS and/or NMFS to change the status of any species or revise critical habitat.  These petitions shall contain appropriate biological evidence to substantiate any proposed change.

(1)  A petition to delist a species or downlist a species from endangered to threatened must demonstrate clearly that the recovery plan objectives have been met or that there is new evidence to show that the conditions on which the initial listing was based no longer exist.  Petitions to delist should also include a statement on how the BLM intends to manage the species to ensure that the provisions of the ESA will not be required in the future.

(2)  Petitions to list or delist a species must be based solely on substantial scientific information for the species and its habitat, and must address the five factors for listing included in Section 4 of the ESA.

(3)  All petitions shall be coordinated with the appropriate State agency having responsibility for the species involved.

2.  Recovery plans.  Recovery plans are prepared by the FWS and/or NMFS and establish recovery objectives for a species, provide a listing of tasks necessary to achieve those objectives, and recommend assignments to involved agencies to carry out these tasks.  A primary function of recovery plans is to combine programs of all agencies involved in managing a species into a coordinated management effort.  The BLM will incorporate objectives and actions identified in recovery plans into BLM documents, as appropriate.  Examples of such documents include land use plans, implementation level plans, and species conservation plans or agreements.

a. Recovery Teams.  The FWS and/or NMFS often request that the BLM provide representatives to serve as members on recovery teams to assist in preparation of recovery plans for species where public land has a significant

BLM_0076337

role in recovery.  These requests usually include a suggestion for a particular employee with special qualifications.

(1)  State Directors should make employees with special expertise available and provide support as appropriate to help ensure timely completion of recovery plans.

(2)  BLM employees should accept these nominations.  The role of the team member is to be a technical expert and advisor, to provide biological input for the species and its habitat, and to inform the recovery team of BLM policies, programs, and procedures.

(3)  For species that range across multiple states, the BLM employee on the recovery team shall coordinate with the other affected BLM State Offices.

(4)  BLM employee participation in recovery plan preparation does not indicate BLM Director or State Director endorsement of the plan.

b.  Technical Review Drafts.  The appropriate State Office or selected BLM representative should review technical review drafts of recovery plans to ensure that the information is biologically correct and complete.  This review and input represents State Director formal response to the review draft.

c.  Agency Review Drafts.  All BLM offices that will be involved in implementation of a particular recovery plan should review draft plans.  The State Director(s) in the affected State(s) shall designate a BLM lead office to complete the following analysis using field office input:

(1)  Determine whether measurable objectives are stated clearly.

(2)  Identify any conflicts with other laws, regulations, and policies governing BLM programs and activities.

(3)  Identify constraints on other BLM programs, activities, or practices mentioned or implied in the plan.

(4)  Evaluate the effects of planned actions carried out by other cooperators on BLM programs.

(5)  Identify any inconsistencies with other BLM plans, ongoing programs, or ongoing practices.  Initiate efforts to make appropriate adjustments to meet recovery needs.

(6)  Check accuracy of cost estimates for BLM tasks, and evaluate economic feasibility of accomplishing the assigned tasks within existing

BLM_0076338

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)            .1B3

and prospective staffing and budgetary constraints.

3.  Critical Habitat Proposals on BLM-administered Lands.  Whenever the FWS and/or NMFS propose to designate critical habitat on BLM-administered lands, the State Director(s) should provide a written response to the *Federal Register* notice that identifies any special management considerations that are in place on BLM lands.  Where the State Director determines that adequate conservation measures are in place, and that the benefits, including economic benefits, of excluding BLM lands from critical habitat designation exceed the benefits of inclusion of BLM lands, the State Director shall request exclusion of BLM lands from the critical habitat designation pursuant to Section 4(b)(2) and/or Section 3(5)(A) of the ESA.  For proposals across multiple States, the Director will coordinate with the States and submit such information.

4.  Delisted Species.  The objectives of recovery plans and actions should ultimately be species recovery and removal from the Federal threatened or endangered species list (delisting).  Pursuant to the ESA, FWS and/or NMFS are required to monitor delisted species for a minimum of 5 years.  The BLM shall work with partners such as the FWS, NMFS, State agencies, and others, as appropriate, to monitor delisted species.

C.  Section 5 (Land Acquisition).  This section authorizes the Secretary of the Interior to use Land and Water Conservation funds to acquire lands to conserve fish, wildlife, and plants, including those that are listed as endangered species or threatened species.  When the BLM engages in the land use planning process, it will identify appropriate opportunities for acquisition by purchase, donation, land exchange, conservation easement, or other means, of land, water, or interests therein for the purpose of conserving fish, wildlife and plants, including listed species.

D.  Section 6 (Cooperation with States).  This section authorizes the Secretary to cooperate to the maximum extent practicable with States, including entering into management agreements and cooperative agreements for the conservation of threatened and endangered species.  The BLM should implement this section through a State level memorandum of understanding by providing technical assistance to, and coordinating with, State agencies responsible for the conservation of endangered and threatened species.

E.  Section 7(a)(1) (Conservation Programs).  Section 7(a)(1) requires the BLM to use its authorities to further the purposes of the ESA by implementing programs for the conservation of threatened and endangered species and the ecosystems upon which they depend.  Ways in which the BLM can carry out these responsibilities include, but are not limited to:

1.  Developing and implementing activities that provide for the conservation and recovery of species listed pursuant to the ESA.

BLM_0076339

.1E2         6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)

2.  Undertaking actions designed to maintain the integrity of the primary constituent elements of federally designated critical habitat on BLM-administered lands.

3.  Ensuring that BLM actions are not likely to jeopardize the continued existence of any endangered species or threatened species or destroy or adversely modify designated critical habitat.

4.  Determining, to the extent practicable, the occurrence, distribution, population, and habitat condition of all ESA-listed species on BLM-administered lands, and evaluating the significance of BLM-administered lands in the conservation of those species.

5.  Developing and implementing agency land use plans, implementation plans, and actions in a manner consistent with conservation and/or recovery of listed species.

6.  Monitoring and evaluating ongoing management activities to ensure conservation objectives for listed species are being met.

7.  Cooperating with the FWS and/or NMFS and other interested parties in species recovery and conservation as provided in species recovery plans.  Such actions may include species reintroductions, which shall be carried out in conformance with BLM Manual 1745.

8.  Implementing conservation recommendations included in biological opinions if they are consistent with relevant law and policy and are technologically and economically feasible.

F.  Section 7(a)(2) (Consultation).  The procedures for carrying out Section 7(a)(2) are included in 50 CFR Part 402, Interagency Cooperation and the counterpart regulations developed for National Fire Plan projects (50 CFR Part 402.30-34).  Whenever the BLM is considering a discretionary action that may affect a listed or proposed species or designated or proposed critical habitat, the BLM should consider engaging the FWS and/or NMFS early in the project development process and seek recommendations designed to minimize or avoid potential adverse affects to resources protected under the ESA.

1.  Discretionary and Nondiscretionary Agency Actions.  Section 7(a)(2) applies to affirmative "agency actions" that are authorized, funded, or carried out by the BLM.  The BLM must also have discretion to undertake the action.  See Part b, below.  Illegal and prohibited actions (e.g., trespass grazing) are not Federal actions and therefore do not require consultation.

a.  Consultation requirements apply to all discretionary actions that are

BLM_0076340

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)    .1F1a(1)

authorized, funded, or carried out by the BLM, whether or not:

(1)  The species or critical habitat occurs on BLM-managed lands.

(2)  The proposed action occurs, either wholly or in part, on BLM-managed lands.

(3)  The BLM itself carries out the proposed action.

(4)  The species occurs on non-Federal surface lands and the BLM manages the subsurface mineral estate (split-estate lands).

b.  Determining if an Action is Discretionary or Nondiscretionary.

(1)  Generally, actions that the BLM is statutorily required to perform, with no discretion to take an action to inure to the benefit of, including limiting the impacts of action on, a listed species or designated critical habitat, are not discretionary, and therefore initiation of consultation is not required.  Reinitiation of consultation is slightly different and is discussed in section .1.F.5.h.  However, if the BLM's discretion is constrained by its own regulation or otherwise, initiation of consultation is generally still required.  Examples of statutory nondiscretionary activities include patenting of mining claims and land conveyances pursuant to the Alaska Native Claims Settlement Act.  When field managers are uncertain whether particular actions are nondiscretionary for purposes of ESA consultation, they should seek guidance from their respective State Office.

(2)  Pre-ESA authorizations to Private Parties.  When the BLM has authorized actions by private parties on public lands before the enactment of the ESA, it only has to consult on post-ESA activities conducted by those private parties if it retains discretionary involvement or control over those private actions sufficient to take some action to inure to the benefit of, including limiting the impacts of action on, a listed species or designated critical habitat.  If the BLM did not retain such discretionary involvement or control, consultation on further BLM action is not required.  For example, the BLM need not consult on activities conducted by private parties on BLM rights-of-way granted before the ESA if the right-of-way does not grant it sufficient discretionary control to take actions that inure to the benefit of, or limit the impacts of action on, a listed species or designated critical habitat.

c.  Even if an action is determined to be nondiscretionary on behalf of the BLM, provisions of the ESA may be applicable to the outside entity involved with the activity.  In such situations, the BLM's responsibilities are as follows:

(1)  If the BLM has reason to believe a nondiscretionary action involving

BLM_0076341

1F1c(2)    6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)

BLM-administered lands may affect listed species or designated critical habitat, the BLM shall provide written notification to any person or persons involved that ESA-listed species or designated critical habitat are present.

(2)  If the outside entity involved with the nondiscretionary action wishes to develop measures that would eliminate effects on listed species or designated critical habitat, the BLM shall arrange for the participation of BLM specialists and, if needed, specialists from the FWS and/or NMFS during the process of developing such measures.

2.  <u>Characterizing the Proposed Action, Action Area, Interrelated and Interdependent Actions, Effects of an Action, and the Environmental Baseline.</u> When the BLM is carrying out its consultation and conference responsibilities under Section 7(a)(2) (see Sections 3, 4, and 5), it is critical to properly characterize the proposed action, the action area, the environmental baseline, and effects.  Cumulative effects are considered in relation to the requirements of the ESA only during the formal consultation process and are discussed in Section .1.F.2.e.(3).

a.  Proposed Action.  The proposed action includes any species conservation measures.  These actions can include both on-site actions to minimize or avoid effects to listed species or critical habitat and off-site conservation actions for the benefit of listed species.  Although off-site compensatory mitigation may not be used as a means of reducing the effects on the listed species at the site, such actions can be used by the BLM as a means of furthering its conservation objectives under Section 7(a)(1) of the ESA and as a means of meeting resource objectives under land use plans.

b.  Action Area.  The action area includes those areas affected directly or indirectly by the action, not merely the footprint of the action.  For example, noise disturbance resulting from the action that may be transmitted beyond the immediate project area must be assessed as part of the proposed action.

c.  Interrelated and Interdependent Actions.  Interrelated actions are those actions that are part of a larger action and depend on the larger action for their justification.  Interdependent actions are those that have no independent utility apart from the action under consideration.  The "but for" test should be used to assess whether an action is interrelated or interdependent to the proposed Federal action.  If the activity would not occur "but for" the proposed Federal action, then the activity is interrelated or interdependent and must be considered during consultation on the proposed Federal action.  If the Federal action merely facilitates the implementation of a subsequent action that may cause an effect on a listed species, those subsequent effects are not effects of the Federal action and are not subject to consultation.  If however, the Federal action is essential for implementing a subsequent action, the effects of both

BLM_0076342

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)                .1F2c(1)

the Federal action and subsequent action need to be analyzed in the consultation.

(1)  Rights-of-Way.  If the Federal action is an authorization for a right-of-way to private land, yet there is alternative access for the project proponent, only effects from the Federal right-of-way need to be analyzed.  If there is no alternative access, effects from both the Federal action and private action need to be analyzed in the consultation.  Unless otherwise requested by an applicant (see section .1F.8.), the consultation process associated with the Federal action can only be used to condition activities on Federal lands.

(2)  Split-Estate Federal Minerals.  When necessary to comply with the ESA, the BLM or project proponent shall collect information to support an analysis of the effects to listed and proposed species as part of an effect determination for the proposed action in a biological assessment.  This may include the need for conducting inventory of either ESA listed or proposed species on private surface lands.  The BLM or the Federal mineral lessee has the right to enter the property for this purpose, since it is a necessary prerequisite to development of the dominant mineral estate.  When sufficient information already exists, the BLM may proceed through the Section 7 consultation process using the existing information and determine appropriate measures to avoid and minimize effects on listed species and their habitats.

The BLM will take the lead in completing consultation on the proposed action unless the surface estate is administered by another Federal agency that elects to serve as the lead for consultation, or the project proponent is designated as the non-Federal representative by the Federal agency managing the surface or by the BLM (see section .1.F.8).

d.  Environmental Baseline.   The environmental baseline is the condition of a species or critical habitat at a specified time within the action area.  The baseline does not include effects of the action under review for consultation.  It does include the Federal, tribal, State, local, and private actions already affecting a species or critical habitat, or those that will occur while the consultation is in progress.  Federal actions unrelated to the action under consultation that have affected or are affecting the species or critical habitat and have a completed formal, informal, or early consultation are part of the baseline.

e.  Types of Effects.  There are three types of effects that are considered under Section 7(a)(2) of the ESA: direct effects, indirect effects, and cumulative effects.  Each type of effect is described below.  In addition, when considering the effects of a proposed action under Section 7(a)(2), the BLM is required to consider the effects of interrelated or interdependent actions.

BLM_0076343

(1) Direct Effects.  Those effects caused by the action and that occur in the same time and place.  Direct effects are immediate, natural causes of taking the proposed action.  Effects of future federal actions cannot be direct effects.

(2)  Indirect Effects.  Those effects caused by the action that are later in time, but reasonably certain to occur.

(a) "Caused by."  For a particular effect on a species or critical habitat to be caused by a particular action, there must be a close causal connection between the action and the effect.  This means that the particular effect must not be able to occur "but for" the action under consultation.  Thus, if the effect may occur without the action under consultation taking place, the "but for" portion of the test is not met and the effect need not be considered.

(b) "Reasonably Certain to Occur."  For a particular effect to be an effect subject to consultation, it must be reasonably certain to occur.  This determination cannot be based on speculation or the mere possibility of an effect on a listed species or critical habitat.  In the context of indirect effects, "reasonably certain to occur" may be evidenced by appropriations, work plans, permits issued, or budgeting; they follow a pattern of activity undertaken in the action area; or they are the logical extensions of the proposed action.

(3) Cumulative Effects.  In accordance with Section 7 regulations, the FWS and/or NMFS is required to consider cumulative effects in formal consultation when determining whether or not an action is likely to jeopardize the continued existence of a species.  The regulations require the BLM to provide an analysis of cumulative effects for projects entering formal consultation.  Cumulative effects, as defined for the purposes of the ESA, involve those effects from future non-Federal actions (tribal, State, local, private and other entities) that are reasonably certain to occur within the action area.  See the discussion under indirect effects for an explanation of "reasonably certain to occur."  Future Federal actions are not considered as they will be subject to consultation when they are proposed.  When making the "reasonably certain to occur" determination in the context of cumulative effects, the BLM must examine the effects of these actions that are likely to occur, bearing in mind the economic, administrative, or legal hurdles that remain to be cleared.  Indications of this likelihood include approval of the action by the appropriate government unit(s), evidence of funding having been obtained by project sponsors, or the initiation of contracts.  These future non-Federal actions are reasonably certain to occur if approval by all non-Federal agencies or governments granting authority for the action is reasonably certain and

BLM_0076344

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)          .1F2e(4)

economically viable.  Past and ongoing effects are considered part of the environmental baseline and are not considered cumulative effects.

(4)  Distinguishing between National Environmental Policy Act (NEPA) effects and ESA effects.  NEPA and the ESA have different purposes and impose different analytical standards.  While the NEPA and ESA standards for direct effects are very similar, there is an important difference between the acts regarding the standards for indirect and cumulative effects.  Under NEPA, indirect or cumulative effects must be reasonably foreseeable.  In contrast, the ESA and its regulations require that such effects be reasonably certain to occur.  Thus, effects that may be required to be considered under the NEPA analysis standard may not necessarily require consideration under the ESA.  In addition, under NEPA, cumulative effects include the effects of both Federal and non-Federal actions, whereas under ESA, cumulative effects do not include Federal actions.

3.  "May Affect" Determination.  If the BLM is taking a discretionary agency action, it must determine if the action "may affect" a listed species or designated critical habitat.  If the BLM determines that ESA-listed species or designated critical habitat may be affected by an action, either positively or negatively, then the BLM must engage in either informal or formal consultation.  In addition, the FWS and/or NMFS may request that the BLM enter into consultation if they identify an action for which there has been no consultation that may affect a listed species or designated critical habitat.  If the BLM determines, after a review of the project and any interrelated or interdependent actions, that there is no reasonable likelihood that listed species are in the action area, or that there will be no direct or indirect effects to the species in the action area, the action is determined to have "no effect" on listed species or critical habitat.  No consultation is required under these circumstances.  The administrative record should document these conclusions.

4.  Informal Consultation.  Informal consultation is a process that includes all discussions and correspondence between the FWS and/or NMFS and the BLM or its designated non-Federal representative.  Its purpose is to assist the BLM in determining if formal consultation is required.

If the BLM determines that its particular discretionary agency action "may affect" a listed species or designated critical habitat, it must then determine whether the action is likely to adversely affect (LAA) any listed species or designated critical habitat or not likely to adversely affect (NLAA) such resources.

The consultation regulations at 50 CFR 402.12 only require preparation of a biological assessment (BA) when an action agency proposes a "major construction activity," which is defined as an action requiring preparation of an

BLM_0076345

.1F5          6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)

environmental impact statement pursuant to the National Environmental Policy Act. However, the BLM will prepare a BA for submittal to FWS and/or NMFS when seeking concurrence on an NLAA determination. The scope and content of a BA prepared by the BLM shall be directly related to the level of potential effect on listed species or designated critical habitat. See Section .1F.5.a.(2) for guidance on the preparation of a BA.

Not likely to adversely affect (NLAA) is the appropriate conclusion when a causal mechanism for creating an effect exists, and the effect is 1) discountable, 2) insignificant, or 3) completely beneficial. These effects have an extremely low probability of occurrence (discountable); cannot be translated into any significant measurable effect on the species even when effects on habitat can be measured (insignificant); or are completely beneficial. For discountable and insignificant, the risk of harm or harassment is so low that a reasonable person would not consider it a factor in making a decision on the proposed action.

Likely to adversely affect (LAA) is the appropriate conclusion if a causal mechanism exists within the action area that creates a direct or indirect effect, or an effect from an interrelated or interdependent activity, that is not discountable, insignificant, or completely beneficial. Adverse effects are those where the likelihood of "take" resulting from the action is not insignificant, and evidence is present in a logical analysis to support this determination to the extent that a reasonable person would agree with the determination.

If the BLM determines that the action is LAA, formal consultation is required. If the BLM determines a proposed action is NLAA a listed species or designated critical habitat, the agency must request that the FWS and/or NMFS concur in that determination. If the FWS and/or NMFS indicate they are unlikely to support an NLAA determination, the BLM should consider further discussion with the Services directed at resolution of outstanding questions and possible development of additional measures to reduce potential effects on listed species or designated critical habitat. If the FWS and/or NMFS refuse to concur in a BLM determination that an action is NLAA, formal consultation is required. Similarly, if the BLM determines that an action is LAA, formal consultation is required.

Informal consultation does not conclude until the BLM has written concurrence of its determination from the FWS and/or NMFS, until the procedures specified under counterpart regulations at 50 CFR 402.34 have been fulfilled, the BLM makes a determination of no effect, or until the BLM enters formal consultation with the FWS and/or NMFS.

5. <u>Formal Consultation</u>. Formal consultation is required on all actions that may affect a listed species, or any designated critical habitat, unless written concurrence that an action is not likely to adversely affect the species is received from FWS and/or NMFS, or the action qualifies for an alternative consultation

BLM_0076346

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)          .1F5a

under an alternative consultation agreement pursuant to the counterpart regulations for national fire plan projects. When it is determined by the BLM that a proposed action may affect and is likely to adversely affect a listed species or designated critical habitat, the BLM shall initiate formal consultation. Formal consultation is conducted to determine if the proposed action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of designated critical habitat. Formal consultation is initiated with submission of a completed biological assessment and a written request to initiate formal consultation.

a. Providing Information. During formal consultation, the BLM shall provide the FWS and/or NMFS with the best scientific and commercial information available for an adequate review of the effects that a proposed action may have on a listed species or designated critical habitat. If information is lacking, the FWS and/or NMFS can request that the BLM conduct additional surveys or studies to better address listed species issues. Although additional surveys or studies are not required by the ESA, and in many situations may not be practicable, they can be in the BLM's best interest, as the FWS and/or NMFS generally err on the side of conserving listed species when rendering a biological opinion based on limited information. In some situations, it may be necessary to enter consultation with the presently available best scientific and commercial data.

(1) The BLM shall request in writing a list from the FWS and/or NMFS of listed species and designated critical habitat in the action area of a major construction activity. The BLM may request in writing from FWS and/or NMFS a list of species or designated critical habitat for any other agency action. In lieu of requesting such a list, the BLM may determine the presence of listed species or designated critical habitat within the action area and request concurrence from the FWS and/or NMFS.

(2) The BLM shall prepare a biological assessment (BA), as described in 50 CFR 402.12 and 402.14, as the means of providing the best scientific and commercial information available to the FWS and/or NMFS.

(a) When to prepare a BA. A biological assessment shall be prepared for all actions on which formal consultation is necessary. In some instances, the BLM may satisfy the requirement to prepare a BA by incorporating by reference material from a previous biological assessment pertaining to a similar action or through preparation of an environmental assessment or environmental impact statement.

(b) BA contents. By regulation, the contents of a BA are at the discretion of the Federal action agency; however, they shall be based on the best available scientific and commercial data, and shall clearly document the logic used by BLM in reaching its determination of

BLM_0076347

.1F5b       6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)

effects. The consultation regulations (50 CFR 402.12.j) contain recommended contents of a BA. The content of a BA prepared by the BLM for either informal or formal consultation will contain the same information, except that a BA prepared for informal consultation will not include a discussion of cumulative effects. BAs prepared by the BLM will contain the following information:

(i)  A clear, thorough description of the action, including any actions to minimize or avoid adverse effects on listed species or designated critical habitat.

(ii)  A description of the area that may be directly or indirectly affected by the action.

(iii)  Identification of any interrelated or interdependent actions.

(iv)  A description of any listed species or designated critical habitat that may be affected, including the results of any on-site inspection(s) of the action area to determine if listed or proposed species are present or occur seasonally.

(v)  A review of the literature, and any other pertinent information, including available views of recognized experts on the species at issue.

(vi)  An analysis of the direct and indirect effects of the action and any interrelated or interdependent actions on the listed species and critical habitat.

(vii)  A determination of effects that is clearly supported by the analysis of effects.

(viii)  Identification of any alternate actions considered by the Federal agency for the proposed action.

(ix)  For formal consultation only, an analysis of cumulative effects.

While it is important to analyze and document the effects of actions on Bureau sensitive species and "no effect" determinations for listed species in NEPA documents, these analyses will not be included in BAs provided to the FWS and/or NMFS.

b.  Irreversible and Irretrievable Commitment of Resources. Under Section 7(d) of the Act, once a request for formal consultation is made or consultation is reinitiated and until the requirements of Section 7(a)(2) are satisfied, the

BLM_0076348

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)          .1F5c

BLM shall ensure that the agency and any of its applicants do not make any irreversible or irretrievable commitments of resources on agency land with respect to the agency action that have the effect of foreclosing the formulation or implementation of any reasonable and prudent alternatives that could avoid jeopardy to listed species or destruction or adverse modification of designated critical habitat. For ongoing actions subject to formal consultation, the BLM shall conduct and document an analysis pursuant to Section 7(d) of the ESA pertaining to agency actions to determine if there will be any such irreversible or irretrievable commitments of resources. Any BLM discretionary actions with such irreversible or irretrievable commitments of resources shall be immediately suspended until consultation has concluded.

c. Reasonable and Prudent Alternatives. If the FWS and/or NMFS conclude that an action is likely to jeopardize the continued existence of a listed species or is likely to result in the destruction or adverse modification of designated critical habitat, it will prepare a biological opinion that identifies any reasonable and prudent alternatives needed to avoid jeopardy or destruction or adverse modification of critical habitat. Reasonable and prudent alternatives are those that can be implemented in a manner consistent with the intended purpose of the action, can be implemented consistent with the scope of the action agency's legal authority and jurisdiction, are economically and technologically feasible, and would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of designated critical habitat. As the development of reasonable and prudent alternatives is necessitated when the FWS and/or NMFS concludes that an agency action is likely to cause jeopardy or adverse critical habitat modification, the scope of recommended alternatives will be based on the full range of discretion available to the agency.

d. Draft biological opinion. During formal consultation, the BLM should request a draft copy of the biological opinion and incidental take statement (ITS) (if applicable) for review. In any instance involving a potential jeopardy opinion, this review should include an analysis to determine whether any reasonable and prudent alternative is within the scope of the BLM's authority, can be implemented in a manner consistent with the intended purpose of the proposed action, and is economically and technically feasible. The BLM review should also evaluate whether any reasonable and prudent measures, and their implementing terms and conditions, contained in any ITS do not cause more than a minor change to the proposed Federal action. Minor changes cannot alter the basic design, location, scope, duration, or timing of the action. The ITS provided with a draft biological opinion does not constitute a statement of anticipated take under Section 10 of the ESA unless it is confirmed by the FWS and/or NMFS as the final biological opinion.

(1) The BLM should provide expertise to the FWS and/or NMFS in determining the availability and development of reasonable and prudent

BLM_0076349

.1F5d(2)        6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)

alternatives, although the FWS and/or NMFS retains the final decision on which alternatives are included in the biological opinion. The BLM should encourage applicant participation in the development of reasonable and prudent alternatives.

(2)  The BLM should forward a copy of the draft biological opinion to applicants upon their request, and inform them that any comments they may have for the FWS and/or NMFS must go through the BLM, although they may provide copies to the FWS and/or NMFS directly.

(3)  The BLM should forward applicant comments to the FWS and/or NMFS.

(4)  The BLM should ensure that any ITS with reasonable and prudent measures and mandatory terms and conditions provides the agency protection from any and all prohibited takings under Section 9 of the Act that are reasonably certain to occur. Reasonable and prudent measures imposed by the FWS and/or NMFS can include only actions that occur within the action area, and are consistent with a project's basic design, location, scope, duration, and timing. Since the FWS and/or NMFS have determined that any take associated with the agency action will not result in jeopardy, any changes to the project as a result of reasonable and prudent measures imposed by FWS and/or NMFS must be minor and directly related to reduction in the level of take. For example, it would be inappropriate for the FWS and/or NMFS to recommend relocation of a project as a reasonable and prudent measure. Incidental take statements should comport with the Department of the Interior policy, specifically:

(a)  If there is no reasonable certainty of take, there should be no ITS and no reasonable and prudent measures with terms and conditions. Terms and conditions must have an articulated, rational connection to the taking of a species.

(b)  Terms and conditions must give clear guidance to the holder of the ITS of what is expected of him or her and how the condition can be met, and must provide a clear standard for determining when the authorized level of take has been exceeded.

(5)  By regulation, incidental take statements and associated reasonable and prudent measures with accompanying terms and conditions do not apply to, nor are they issued for, ESA-listed plant species.

e.  Termination of the Consultation Procedures.  Formal consultation may terminate as follows:

(1)  The FWS and/or NMFS issues a biological opinion.

BLM_0076350

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)    .1F5e(2)

(2)  During any stage of consultation, the BLM notifies the FWS and/or NMFS in writing that the proposed action is not likely to occur.

(3)  During any stage of consultation, the BLM determines, with the written concurrence of the FWS and/or NMFS, that the proposed action is not likely to adversely affect any listed species or critical habitat.

f.  Consultation Timelines.  Consultation regulations require that formal consultation be concluded 90 days after it is initiated, unless otherwise agreed to between the FWS and/or NMFS and the BLM.  However, the FWS and/or NMFS does not consider the consultation process initiated until it determines that information provided by the BLM represents the best scientific and commercial data available.  The regulations provide that the biological opinion is to be transmitted to the Federal agency no later than 45 days after the conclusion of consultation.  As consultation deadlines approach, the BLM should contact the FWS and/or NMFS to determine whether consultation deadlines will be met.

g.  BLM responsibility after issuance of the biological opinion.  After the FWS and/or NMFS issues the biological opinion, the BLM determines how it will proceed.

(1)  The BLM shall notify the FWS and/or NMFS in writing of its final decision on any proposed actions that receive a jeopardy or adverse modification of critical habitat determination in the biological opinion.  If the BLM determines that it cannot comply with the requirements of Section 7(a)(2) (no jeopardy) of the ESA, it may apply for an exemption, as outlined in .1.F.10.

(2)  After acceptance of the biological opinion, the BLM shall implement the proposed action or reasonable and prudent alternative as described, and shall implement all mandatory terms and conditions identified in the ITS.  The exemption from listed species take prohibitions, as specified in Section 9 of the ESA, are only valid on the basis of full implementation of these requirements.  The BLM shall review conservation recommendations in biological opinions and implement them if they are consistent with BLM land use planning and policy and if they are technologically and economically feasible.

(3)  The ITS will specify the effect (i.e., the amount or extent of such incidental take); specify those reasonable and prudent measures that the FWS and/or NMFS considers necessary or appropriate to minimize such effect; set forth implementing terms and conditions (including reporting requirements) that must be complied with by the BLM or any applicant; specify procedures to be used to handle or dispose of any individuals of

BLM_0076351

a species actually taken; and outline the required monitoring and reporting requirements to be implemented over the life of the action. The responsible BLM line officer will ensure these reporting requirements are documented in the administrative record.

(4)  Biological opinions for plants will not have an accompanying ITS, but may contain conservation recommendations.  The BLM shall review such conservation recommendations and implement them if they are consistent with BLM land use plans and policy and if they are technologically and economically feasible.

(5)  An ITS provided with a conference opinion does not become effective unless the FWS and/or NMFS adopts the conference opinion as the final biological opinion once the species listing is final.  The BLM must request in writing that a conference opinion be adopted as a biological opinion once a proposed species has been listed.

h.  Reinitiation.  Reinitiation of formal consultation is required and shall be requested by the BLM or the FWS and/or NMFS where discretionary control over the action has been retained and (1) the amount or extent of incidental taking specified in the ITS is exceeded, (2) new information reveals that effects of the action may affect listed species or designated critical habitat in a manner or extent not previously considered, (3) the action is modified in a way that may affect listed species or critical habitat in a way not considered in the biological opinion, and/or (4) a new species is listed or critical habitat is designated that may be affected by the action. The appropriate line officer shall monitor the amount or extent of authorized incidental take and should reinitiate consultation in a timely way if it appears that the level of take will be exceeded over the life of the action.  If the amount or extent of incidental take is met or exceeded, the activity must be terminated until additional consultation is concluded.  The State Director or Field Manager of the administrative unit that received the biological opinion shall also determine if any other reinitiation condition has occurred and, if so, shall reinitiate the consultation with the appropriate FWS and/or NMFS office.

There is no duty to reinitiate consultation unless there is an ongoing agency action.  In the context of a land use plan, the agency action of approving a plan is complete upon approval and a plan is therefore not an ongoing action over the life of the plan.  For this reason, reinitiation of consultation is not required if, for example, a new species is listed or critical habitat is designated after a plan is approved.

i.  Incremental Step Consultation.  The BLM may request that the FWS and/or NMFS conduct consultation in incremental steps when by statute the BLM is allowed to take incremental steps toward completion of the action (e.g.,

BLM_0076352

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)          .1F5i(1)

issuance of oil and gas or geothermal leases that involve subsequent permitting processes).  The biological opinion will include the FWS and/or NMFS views on the entire action (50 CFR Part 402.14(k)).

(1)  The initial consultation using the incremental step approach must be formal (see .1.F.5).

(2)  The BLM may proceed with the incremental step provided that the FWS and/or NMFS finding for the incremental step is not a jeopardy opinion; the BLM continues consultation with respect to the entire action and obtains biological opinions, as required, for each incremental step; the BLM fulfills its obligation to obtain sufficient data upon which to base the final biological opinion on the entire action; the incremental step does not result in the irreversible or irretrievable commitment of resources; and there is reasonable likelihood that the entire action will not result in jeopardizing the continued existence of a listed species or destruction or adverse modification of designated critical habitat.

6.  Conference on Proposed Species and Proposed Critical Habitat.  Section 402.10 of 50 CFR provides the procedures necessary for compliance with Section 7(a)(4) of the ESA, which establishes requirements for conferencing on proposed species and proposed critical habitat.

a.  The ESA requires BLM to conference with the FWS and/or NMFS on actions that are likely to jeopardize a proposed species or cause destruction or adverse modification to proposed critical habitat.  Since the BLM is generally not in a position to determine jeopardy, BLM policy is to confer on all discretionary actions that are determined to be May Affect, Likely to Adversely Affect.  Conversely, BLM policy is to not confer on actions determined Not Likely to Adversely Affect.

b.  For proposed species, the BLM should request conference in anticipation of future listing.  The BLM should request that the conference follow the procedures for formal consultation when deemed advantageous to the agency.  The conference opinion issued at the conclusion of a conference may be adopted as the biological opinion if the species or critical habitat is listed or designated, provided the project proposal has not changed and no new pertinent information exists.  The FWS and NMFS usually provide advisory recommendations on ways to avoid or minimize adverse effects.

c.  The BLM should consider the advisory recommendations for minimizing or avoiding adverse effects to proposed species or proposed critical habitat that are provided by the FWS and/or NMFS in the conference report or conference opinion.  Implementation of recommendations is at the discretion of the BLM.

BLM_0076353

.1F7        6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)

7.  Programmatic and Plan Level Consultations.   The BLM should  invite the FWS and/or NMFS to participate early in the planning process to ensure that effective, agreed on conservation measures are included in the design of any plan to improve the efficiency of the Section 7 consultation process and to assist BLM in meeting its objectives under section 7(a)(1) of the ESA.

The adoption, revision, or amendment of a land use plan is an agency action subject to Section 7(a)(2) of the ESA.  Thus, for new land use plans, plan revisions, or plan amendments, the BLM must determine whether the plan "may affect" listed species or designated critical habitat.  If the BLM determines that the plan may affect listed species or critical habitat, then the BLM must engage in either informal or formal consultation with the FWS and/or NMFS.  When determining whether a plan may affect listed species or critical habitat, the BLM must carefully evaluate whether any effects of the actions, as defined by the ESA, are caused by the adoption, revision, or amendment of the land use plan and are reasonably certain to occur.  This analysis should be rigorously documented in the administrative record.

There is no duty to reinitiate consultation unless there is an ongoing agency action.  In the context of a land use plan, the agency action of approving a plan is complete upon approval and a plan is therefore not an ongoing action over the life of the plan.  For this reason, reinitiation of consultation is not required if, for example, a new species is listed or critical habitat is designated after a plan is approved.

8.  Applicants, Designation of non-Federal Representatives, and Early Consultation.

a.  Applicant.  An applicant is defined as any person who requires formal approval or authorization (such as for permits, licenses, leases, or letters of authorization or approval) from the BLM as a prerequisite to conducting an action.  An applicant can be an individual, corporation, partnership, trust, association, or any other private entity; or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State, or of any foreign government; any State, municipality, or political subdivision of a State; or any other entity subject to the jurisdiction of the United States.  The applicant is involved in the ESA conference or consultation process if the applicant's specific action that requires approval or authorization by the BLM may affect a federally threatened, endangered, or proposed species.

(1)  The BLM shall identify and determine who is an applicant for the purposes of ESA consultation.  The BLM does not typically identify applicants in association with programmatic consultations, (e.g., land use plan-level consultation) because no specific action that may require authorization or approval is involved.  Under programmatic consultations,

BLM_0076354

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)          .1F8a(2)

the BLM usually retains the discretion to provide formal authorization or approval for more specific actions.  If consultation for a more specific action is required, applicants for that specific action will be identified at that time.

(2)  The BLM shall promptly inform FWS and/or NMFS if there is an applicant identified for a project that has been or will be submitted for consultation.

(3)  The BLM shall notify known applicants promptly of their opportunities for participation in the consultation and/or conference process.

(a)  The BLM shall provide any applicant the opportunity to submit information for consideration during the consultation process and should provide the same opportunity during the conference process.

(b)  If, after receipt of or concurrence with the species list received from the FWS and/or NMFS, a required BA will not be completed within the 180-day period, the BLM shall provide the applicant with a written statement setting forth the estimated length of the proposed extension and the reasons why such an extension is necessary.  An extension is not allowed unless the BLM notifies the applicant before the 180-day deadline.

Once initiated, consultation involving an applicant must be concluded within 90 days, unless the FWS and/or NMFS and the BLM mutually agree to extend the consultation, provided that the FWS and/or NMFS submits to the applicant, before the close of the 90 days, a written statement setting forth:  (1) the reasons why a longer period is required, (2) the information that is required to complete the consultation, and (3) the estimated date on which the consultation will be completed.  A consultation involving an applicant cannot be extended for more than 60 days without the consent of the applicant.

(c)  If requested by the applicant, the BLM should request a copy of the draft biological opinion from the FWS and/or NMFS, provide a copy to the applicant, and forward any applicant comments to the FWS and/or NMFS.

(d)  The BLM should encourage the FWS and/or NMFS to discuss the basis for the biological determination in the biological opinion to enhance the applicant's understanding of the outcome.  The BLM may also involve the applicant in discussions with the FWS and/or NMFS to develop reasonable and prudent alternatives to the proposed action

BLM_0076355

in instances where a proposed action is determined to be likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of designated critical habitat.

b.  Designation of non-Federal Representative.  For each consultation involving an applicant, the appropriate BLM line manager will consider designating the applicant as the non-Federal Representative for purposes of conducting informal consultation and/or preparing a biological assessment under 50 CFR Part 402.08.  In making this determination, the line manager should evaluate (1) whether the applicant has sufficient expertise to prepare a biological assessment, or can reasonably secure such expertise, and (2) whether such designation is advantageous to the government.

The BLM can assign the non-Federal representative to prepare the biological assessment, conduct informal consultation, or both.  The non-Federal representative may be an applicant, contractor or other party as appropriate. The non-Federal Representative is not permitted to conduct formal consultation beyond preparation of a biological assessment, and shall not subject the BLM to any obligation without specific consent of the agency. The BLM shall furnish available information pertaining to the consultation, guidance, and supervision to the extent required, and must independently review and evaluate the scope and contents of the biological assessment prepared by the non-Federal Representative.

Even with designation of a non-Federal Representative, the ultimate responsibility for compliance with Section 7 of the ESA remains with the BLM.  Although there are similarities, a non-Federal representative is not the same as an applicant.  Whereas an applicant has the opportunity to participate in consultation alongside the BLM, a non-Federal representative acts in the BLM's place to prepare the BA and/or conduct informal consultation.

(1) The BLM shall provide written notice to the FWS and/or NMFS if it designates a non-Federal representative.

(2)  An applicant may be designated as the non-Federal representative.  If an applicant is involved and is not the designated non-Federal representative, then the applicant and the BLM must agree on the choice of the designated non-Federal representative.

(3)  The BLM shall furnish guidance and supervision and shall independently review and evaluate the scope and contents of the BA prepared by the designated non-Federal representative.  If the BLM review finds the BA prepared by a non-Federal representative is inadequate, it should either be returned to the preparer for corrections, or revised by the

BLM_0076356

BLM before submission to the FWS and/or NMFS.

(4)  Written correspondence requesting concurrence or formal consultation shall be prepared by the appropriate BLM official.

c.  Early Consultation.  Section 7(a)(3) of the ESA and implementing regulations provide the means (referred to as "early consultation") for a prospective applicant for public land use to request an early consultation if the prospective applicant has reason to believe that the prospective action may affect listed species or designated critical habitat (50 CFR Part 402.11).  For early consultation, the BLM shall:

(1)  Receive in writing the prospective applicant's certification that it has a definitive proposal outlining the action and its effects, and that it intends to implement its proposal, if authorized.

(2)  Upon receipt of the prospective applicant's certification, initiate early consultation in writing with the FWS and/or NMFS and provide all of the information required under initiation of formal consultation (50 CFR Part 402.14(c)).

(3)  For a major construction activity, include a BA at the time early consultation is initiated.

(4)  Provide any prospective applicant with the opportunity to submit information for consideration during early consultation.

(5)  If the prospective applicant requests through the BLM a copy of the draft preliminary biological opinion, forward the request and the prospective applicant's comments on the draft preliminary biological opinion to the FWS and/or NMFS.

(6)  Not consider the ITS of the preliminary biological opinion as authority to take listed species.

(7)  Request in writing to the FWS and/or NMFS confirmation of the preliminary biological opinion as the final biological opinion if the BLM believes that there have been no significant changes in the action as planned or in the information used during the early consultation.  If the FWS and/or NMFS do not confirm the preliminary biological opinion, they must request that the BLM initiate formal consultation.

9.  Counterpart Regulations.  Counterpart regulations provide the BLM an alternative approach for completing informal Section 7 consultation on actions that qualify for use under an ACA and are determined to be NLAA.  Presently, such regulations have only been adopted for use on National Fire Plan projects.

BLM_0076357

Qualifying projects include prescribed fire (including naturally occurring wildland fires managed to benefit resources), mechanical fuels treatments (thinning and removal of fuels to prescribed objectives), emergency stabilization, burned area rehabilitation, road maintenance and operation activities, ecosystem restoration, and culvert replacement actions.  State Offices will periodically review the administrative records of proposed actions to ensure conformance with the ACA.

10.  Exemption.  The ESA allows opportunity to apply for an exemption from the requirements of Section 7(a)(2) if, after consultation, the FWS and/or NMFS determines an agency action would jeopardize the continued existence of a listed species or result in the adverse modification of critical habitat.  Procedures for applications for exemption are found in 50 CFR Part 451.  Use of the exemption process is rare.

a.  The Director has sole authority to make an application for exemption under Section 7(g) of the ESA on behalf of BLM.  If any State Director has reason to believe a project deserves consideration for an exemption, a complete briefing package shall be presented to the Director for a final decision.

b.  The application for an exemption shall be submitted to the Secretary of the Interior or Secretary of Commerce, as appropriate, within 90 days following the termination of the consultation process.

11.  Emergency Consultation.  In certain emergency circumstances, special consultation procedures apply.  These emergency circumstances are typified by natural disasters, the most common of which on BLM lands is wildfire.  When a wildfire occurs on BLM-administered lands, the BLM is responsible for conducting any necessary emergency consultation.  In these situations, agency actions must be immediately undertaken to protect life and property, thereby precluding the typical consultation approach in which consultation is concluded in advance of an agency undertaking, which may affect listed species or critical habitats.  The first step in emergency consultation is to contact the FWS and/or NMFS by telephone or facsimile to explain the nature of the emergency.  The BLM will make every attempt to contact the FWS and/or NMFS within 3 days of onset of an emergency.  During this initial contact, the FWS and/or NMFS may suggest conservation recommendations to avoid or reduce potential effects on listed species or critical habitat.  The BLM will implement any conservation recommendations that do not substantially interfere with the execution of emergency operations.

As soon as practicable after the emergency is under control, the BLM will initiate consultation with the FWS and/or NMFS if there is reason to believe that a listed species or critical habitat has been adversely affected.  In addition to the information normally contained in a biological assessment, the BLM will provide the following information: (1) a description of the emergency, (2) a justification

BLM_0076358

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)                     .1F12

for the expedited consultation, and (3) an evaluation of the response to and the effects of the emergency on the listed species and critical habitat, including documentation of how the FWS and/or NMFS recommendations were implemented.  The ITS prepared by the FWS and/or NMFS will not include reasonable and prudent measures or terms and conditions unless the BLM has an ongoing action related to the emergency.

12.  Consultation and Conference Approaches.  A number of approaches for improving the efficiency and effectiveness of Section 7 consultation and conference have been taken by various BLM offices.  The overall goal is to enhance compliance with Section 7(a)(1) and 7(a)(2).  The Director, State Directors, District Managers, and Field Managers, in cooperation with other Federal agencies, should develop and use techniques to further the consultation and conference process.  Examples of these approaches are:

a.  Contacting and engaging, where possible, the FWS and/or NMFS reviewing office(s) early in the project development process.  Experience has shown that, in general, the earlier in the processes the FWS and/or NMFS are engaged, the easier it is to accommodate listed species needs into project design.  Similarly, early dialog and exchange of information on project design and components has made it easier to communicate to the FWS and/or NMFS the specific purposes and needs for individual projects, and those areas where flexibility does or does not exist.  That is, the earlier project designers become aware of listed species associated needs and issues, the easier it is to address those needs and issues, thereby shortening the consultation process and even potentially avoiding the need for formal consultation.

b.  Completing and using national, ecosystem, or regional level programmatic consultations and conferences that address broad-scale programs or wide-ranging species or critical habitats.  The BLM should tier to and use the information, analysis, and determinations of the effects of these consultations and conferences to the greatest extent practicable when consulting or conferring at more local or project-specific levels.

c.  Consulting and conferring jointly with other Federal agencies on programs or actions affecting the same species or critical habitats in the same project or geographic area.

d.  Designating the applicant as the non-Federal representative for preparation of biological assessments, rather than relying on cost recovery to prepare the document in-house, allows limited biological staff time to be directed toward species recovery and other higher priority work.

e.  Completing combined consultations and conferences with the FWS and NMFS together when programs or actions include effects on species or critical habitats under both agencies' jurisdictions (e.g., an action affects both listed

BLM_0076359

plants and anadromous fish).

f.  When programmatic consultation results in biological opinions that provide conservation recommendations or design criteria for future agency proposals, considering these recommendations or design criteria in the development of future proposals.  If these future proposals are designed to be consistent with these recommendations or criteria, consultation will be facilitated and compliance with Sections 7(a)(1) and 7(a)(2) furthered.

g.  Completing batched consultations or conferences on logical groupings of activities or programs of a similar nature.  Typically, these batched actions would be in the same geographic area (watershed or administrative unit).  Batched consultations can be conducted on a quarterly or annual basis, or longer.

h.  Using streamlined processes.  Streamlining agreements provide the BLM with alternative ways of meeting their Section 7 consultation obligations.  Streamlining may provide expedited consultation times for completing consultation.  While streamlining is not intended for use at the project level, other multi-State Memoranda of Understanding (MOUs) have been developed to address streamlining processes at this scale.  The use of streamlining processes is designed to make the consultation process more efficient.  In instances where the intended benefits of streamlining are not being (or are unlikely to be) realized, the streamlining process should not be used, and the BLM should follow the standard consultation process.

i.  For large or complex actions (e.g., energy corridor, promulgation of regulations) use consultation agreements to define agency roles, responsibilities, timeframes, and information requirements needed to complete consultation on the proposed action.

j.  It is not necessary to consult or confer on candidate or Bureau sensitive species.  However, States or offices may wish to seek technical assistance from the FWS and/or NMFS when it is determined to be advantageous to a species' conservation or BLM management options.

k.  When new or novel effective approaches to consultation and conference are developed at the field and State levels, those approaches should be shared with State and national program leads.  Similarly, when State and national program leads become aware of new or novel approaches being employed at the Field Office level, they should share those effective approaches with other State and Field Offices.

G.  Section 9 (Prohibited Acts).  The BLM shall not allow actions that result in take of endangered  animals or threatened animals that have take prohibitions established under Section 4(d) of the Act, or the removal or possession of endangered plants,

BLM_0076360

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)          .1H

except as provided for under Section 7(o) or Section 10(a) of the ESA.

Section 9 of the ESA prohibits take of all individuals of listed fish or wildlife.  For plants, there is no "take" prohibition, but Section 9 makes it unlawful for anyone to remove and reduce to possession any endangered plant species; maliciously damage or destroy any endangered plant species on Federal lands; remove, cut, dig up, or damage or destroy any such species from any other area in knowing violation of any law or regulation of any State or in the course of any violation of a State criminal trespass law; or violate any regulations pertaining to threatened plants.

H.  Section 10 (Exceptions to the ESA).  Section 10 of the ESA provides for exceptions to the requirements and prohibited acts of other sections of the ESA.

1.  Take of listed species.  Section 10 (a)(1)(A) of the ESA provides exceptions for activities otherwise prohibited.  The BLM shall obtain Section 10 permits from the FWS and/or NMFS if take of listed fish or wildlife species or the removal or reduction to possession of listed plants is anticipated for scientific purposes or to enhance the propagation or survival of the affected species.  Authorization for take can occur in several ways.  The exceptions to the requirement of permission for take are as follows and shall be reported to the FWS and/or NMFS as described in 50 CFR Part 17.21(4):

a. Any BLM employee may take endangered wildlife in defense of his or her own life or the lives of others.

b. Any BLM employee may, when acting in the course of his or her official duties, take endangered wildlife without a permit if such action is necessary to: (1) aid a sick, injured, or orphaned specimen; or (2) dispose of a dead specimen; or (3) salvage a dead specimen that may be useful for scientific study; or (4) remove specimens that constitute a demonstrable but non-immediate threat to human safety, provided that the taking is done in a humane manner; the taking may involve killing or injuring only if it has not been reasonably possible to eliminate such threat by live-capturing and releasing the specimen unharmed, in a remote area.

c. Any BLM employee may, when acting in the course of his or her official duties, remove and reduce to possession a federally endangered plant without a permit if such action is necessary to (1) care for a damaged or diseased specimen; (2) dispose of a dead specimen; or (3) salvage a dead specimen that may be useful for scientific study.

2.  Experimental Populations.

a.  General.  The FWS and/or NMFS can designate experimental populations of listed plants and animals.  With rare exceptions, these populations can only be released outside the species' current range, but within its probable

BLM_0076361

historical range if the Secretary determines that such release will further the
conservation of the species.  The intent is to ensure separation between
experimental and natural populations.  The Secretary of the Interior or
Commerce must determine whether the experimental population is:

    (1) "Essential"—Necessary for the continued existence of a listed species
       in the wild.

    (2) "Nonessential"—Not necessary for the continued existence of a listed
      species.

b.  Management.  The BLM shall cooperate and assist in establishing
experimental populations of listed species on BLM-managed lands when such
establishment is consistent with BLM land use plans and policy and is
technologically and economically feasible.  The BLM shall treat essential
experimental populations as threatened species and nonessential experimental
populations as proposed species for purposes of Section 7 (other than
subsection 7(a)(1)).  For nonessential experimental populations, this means:

    (1) Incidental take can occur without specific authorization by the FWS
      and/or NMFS.

    (2) Conferencing is required if the action is determined to be Likely to
      Adversely Affect (LAA).

    (3) As required by Section 7(a)(1), the BLM shall use its authorities to
      conserve these populations.

c.  Planning.  Planning efforts must reflect those actions necessary for the
recovery of species to the extent that BLM management can influence
recovery, including the establishment of experimental populations of listed
species when appropriate.  State Directors and Field Managers shall:

    (1) Keep informed on recovery plan development so needs can be
      addressed during planning.

    (2) Ensure participation with the FWS and/or NMFS in developing
      recovery needs for species that may have experimental population
      designation.

d.  Reintroduction of Listed Species into Congressionally Designated Areas.
In some instances, it is appropriate to transplant and reintroduce listed species
into their historical ranges within designated wilderness, wilderness study
areas, or other congressionally designated areas.  The BLM shall use only the
minimum actions necessary and the methods most appropriate to protect and
enhance the values for which the areas are identified or designated.  Further

BLM_0076362

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)       .1I

information on guidelines for fish and wildlife transplantation are contained in BLM Manual 1745 and in the 2006 Association of Fish and Wildlife Agencies, BLM and Forest Service Fish and Wildlife Management Policy in Designated Wilderness MOA, and in the 2005 BLM Interim Management Guidelines for Fish and Wildlife Management in Wilderness Study Areas.

I.  Section 11 (Penalties and Enforcement).   The BLM shall exercise all of its authorities to ensure compliance with the ESA.  Within its authority, BLM shall modify, suspend or revoke the lease, license, permit or other agreement authorizing the use of BLM-managed lands, of any person who is convicted of a criminal violation of the ESA or any regulation, permit, or certificate issued pursuant to the ESA.

J.  Section 18 (Annual Cost Analysis by the U.S. Fish and Wildlife Service).  Upon request of the FWS, the BLM shall provide to the FWS a species-by-species summary of its expenditures on the conservation of listed species for the FWS annual expenditure report to Congress.

.2  Administration of Bureau Sensitive Species.  This section establishes procedures for the management of species designated as BLM sensitive, and their habitat.  It is in the interest of the BLM to undertake conservation actions for such species before listing is warranted.  It is also in the interest of the public for the BLM to undertake conservation actions that improve the status of such species so that their Bureau sensitive recognition is no longer warranted.  By doing so, the BLM will have greater flexibility in managing the public lands to accomplish native species conservation objectives and other legal mandates.  When administering the Bureau sensitive species program, all information shall conform to the standards and guidelines established under the Information Quality Act.

In compliance with existing laws, including the BLM multiple use mission as specified in the FLPMA, the BLM shall designate Bureau sensitive species and implement measures to conserve these species and their habitats, including ESA proposed critical habitat, to promote their conservation and reduce the likelihood and need for such species to be listed pursuant to the ESA.  Any obligation to conserve proposed critical habitat under this section is terminated at the time the proposal becomes final or the habitat is no longer proposed for listing.  All federally designated candidate species, proposed species, and delisted species in the 5 years following their delisting shall be conserved as Bureau sensitive species.

A.  Designation of Bureau Sensitive Species.  State Directors shall designate species within their respective States as Bureau sensitive by using the following criteria.  For species inhabiting multiple States, State Directors shall coordinate with one another in the designation of Bureau sensitive species so that species status is consistent across the species' range on BLM-administered lands, where appropriate.  Species designated as Bureau sensitive must be native species found on BLM-administered lands for which the BLM has the capability to significantly affect the conservation status of the species through management, and either:

BLM_0076363

.2A1      6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)

1.  There is information that a species has recently undergone, is undergoing, or is predicted to undergo a downward trend such that the viability of the species or a distinct population segment of the species is at risk across all or a significant portion of the species range, or

2.  The species depends on ecological refugia or specialized or unique habitats on BLM-administered lands, and there is evidence that such areas are threatened with alteration such that the continued viability of the species in that area would be at risk.

B.  Planning.  When BLM engages in the planning process, it shall address Bureau sensitive species and their habitats in land use plans and associated NEPA documents (as per BLM 1610 Planning Manual and Handbook, Appendix C).   When appropriate, land use plans shall be sufficiently detailed to identify and resolve significant land use conflicts with Bureau sensitive species without deferring conflict resolution to implementation-level planning.  Implementation-level planning should consider all site-specific methods and procedures needed to bring species and their habitats to the condition under which management under the Bureau sensitive species policies would no longer be necessary.

C.  Implementation.  On BLM-administered lands, the BLM shall manage Bureau sensitive species and their habitats to minimize or eliminate threats affecting the status of the species or to improve the condition of the species habitat, by:

1.  Determining, to the extent practicable, the distribution, abundance, population condition, current threats, and habitat needs for sensitive species, and evaluating the significance of BLM-administered lands and actions undertaken by the BLM in conserving those species.

2.  Ensuring that BLM activities affecting Bureau sensitive species are carried out in a way that is consistent with its objectives for managing those species and their habitats at the appropriate spatial scale.

3.  Monitoring populations and habitats of Bureau sensitive species to determine whether species management objectives are being met.

4.  Working with partners and stakeholders to develop species-specific or ecosystem-based conservation strategies (see .2D Agreements, Assessments and Cooperative Strategies for Conservation).

5. Prioritizing Bureau sensitive species and their habitats for conservation action based on considerations such as human and financial resource availability, immediacy of threats, and relationship to other BLM priority programs and activities.

6. Using Land and Water Conservation Funds, as well as other land tenure

BLM_0076364

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)          .2C7

adjustment tools, to acquire habitats for Bureau sensitive species, as appropriate.

7. Considering ecosystem management and the conservation of native biodiversity to reduce the likelihood that any native species will require Bureau sensitive species status.

8. In the absence of conservation strategies, incorporate best management practices, standard operating procedures, conservation measures, and design criteria to mitigate specific threats to Bureau sensitive species during the planning of activities and projects. Land Health Standards should be used for managing Bureau sensitive species habitats until range-wide or site-specific management plans or conservation strategies are developed. Off-site mitigation may be used to reduce potential effects on Bureau sensitive species.

D. Agreements, Assessments, and Cooperative Strategies for Conservation. The BLM should work cooperatively with other agencies, organizations, governments, and interested parties for the conservation of sensitive species and their habitats to meet agreed on species and habitat management goals. Cooperative efforts are important for conservation based on an ecosystem management approach and will improve efficiency by combining efforts and fostering better working relationships. Addressing species' habitat management needs before a species is listed under the ESA will allow more management flexibility, reduce conflicts, and reduce the cost of conservation.

1. The FWS, NMFS, State agencies, universities, or others may have additional information on Bureau sensitive species. To help ensure that the best information is available in the BLM decision-making process, the BLM should request species information from these agencies as needed.

2. State Directors and line managers should make available employees with appropriate skills and expertise to support cooperative efforts for the development and implementation of habitat conservation assessments, strategies, and agreements.

3. State Directors and line managers should initiate the development of these conservation assessments, strategies, and agreements for the purpose of furthering the conservation of the subject species on BLM-administered lands where significant conservation benefits can be achieved through such an effort. Strategies and agreements should identify the role of the BLM and be proportionate to the resource values on BLM-administered lands.

4. The BLM should use habitat conservation assessments based on regional ecosystem assessments, where available, to develop conservation strategies and agreements that outline the program of work necessary to reduce, eliminate, or mitigate specific threats to sensitive species; to develop an ecosystem management approach to conservation on BLM-administered lands; and to

BLM_0076365

facilitate coordination and cooperation with others, such as States and private entities, to achieve species and habitat conservation across the range of the species.

5.  The BLM should be signatory to conservation strategies and agreements if public land or BLM authorization is involved.

6.  Habitat and species conservation assessments, strategies, and agreements should be consistent with existing BLM land use plans and describe in sufficient detail management objectives, treatments, and means for assessing accomplishment.  Where existing land use plans are not adequate, use plan maintenance, plan conformance reviews, or plan amendments as a means of integrating conservation strategies into existing land use plans.

7.  The BLM should consider successful implementation of the program in evaluating line officer performance.  Key leaders who contribute to notable successes should be recognized on a continuing basis.

8.  The BLM should participate in and coordinate with State natural heritage programs and State comprehensive wildlife management plans as per the Sikes Act (16 U.S.C. 670g et seq.), Fish and Wildlife Coordination Act (16 U.S.C. 661 et seq.), and 43 CFR parts 24.1-4.  Detailed guidance for management of species identified in State comprehensive wildlife management plans, which are not designated by the Bureau as special status species, is contained in BLM Manual 6500.

E.  Management of Bureau Sensitive Species with the Oregon and California Lands Act.

In Headwaters v. BLM (1990), the Ninth Circuit held that, under the Oregon and California Sustained Yield Act (O&C Act), former Oregon and California Railroad Company Lands in western Oregon are assigned timber production as a dominant use. The application of the special status species policy to provide specific protection to species that are listed by the BLM as sensitive on lands governed by the O&C Act must be consistent with timber production as the dominant use of those lands. Subsequent litigation on O&C lands regarding timber production and endangered species establishes that timber production actions are still subject to the provisions of the Endangered Species Act, including consultation under Section 7.

.3 General Cooperation for BLM Special Status Species.  The BLM shall cooperate with other government and nongovernment agencies to further the conservation of federally proposed and listed species, and will coordinate with the appropriate agencies on conservation of Bureau sensitive species.  Specifically:

A.  Coordination and Cooperation with Tribes.  The relationship between the United States and Indian Tribes is defined by treaties, statutes, executive orders, judicial

BLM_0076366

decisions, and agreements and differentiates Tribes from other entities that deal with, or are affected by, the Federal government.  Tribes are self-governing with fundamental rights to set their own priorities and make decisions affecting their resources and distinctive ways of life.  However, as with other entities, coordination on the conservation and management of resources would benefit the tribal resources and public resources as they relate to Bureau sensitive species and federally proposed and listed species.

1.  <u>Secretarial Order 3206 on American Indian Tribal Rights, Federal–Tribal Trust Responsibilities, and the ESA</u>.  The Secretarial Order, signed on June 5, 1997, by the Secretary of the Interior and Secretary of Commerce clarifies the responsibilities of agencies of the Department of the Interior and Department of Commerce when actions taken under the authority of the ESA and associated implementing regulations affect, or may affect, Indian land, tribal trust resources, or the exercise of American Indian tribal rights.  The Secretarial Order does not apply to Alaska.  In addition to BLM Policy 8160, the BLM shall administer the conservation provisions of the Secretarial Order as follows:

a.  Whenever the BLM is aware that its actions planned under the ESA may affect tribal trust resources, the exercise of tribal rights, or Indian lands, the BLM shall consult (as defined in BLM Handbook H8160-1 and distinct from ESA consultation procedure) with the Tribes that are affected and seek their participation to the maximum extent practicable.  This shall include providing affected Tribes adequate opportunities to participate in data collection, consensus seeking, and associated processes.

b.  The BLM shall assist Indian Tribes in developing and expanding tribal programs that promote the health of ecosystems upon which Bureau sensitive species and federally proposed and listed species depend.  This includes:

(1)  Offering and providing such scientific and technical assistance and information as may be available for the development of tribal conservation and management plans to promote the maintenance, restoration, enhancement, and health of the ecosystems upon which Bureau sensitive species and federally proposed and listed species depend.

(2)  Cooperatively identifying appropriate management measures to address concerns for such species and their habitats.

c.  The BLM shall give deference to tribal conservation and management plans for tribal trust resources that govern activities on Indian lands and that address the conservation needs of listed species.

d.  At the earliest indication that it is considering management actions that may be restrictive to Tribes, for the conservation of any species, the BLM shall promptly notify all potentially affected Tribes, and assist Tribes in

BLM_0076367

identifying and implementing tribal conservation and other measures
necessary to protect such species.

e. The BLM should assist the FWS and/or NMFS and other Federal agencies
with their required actions under the Secretarial Order regarding the
conservation of species.

f. The BLM shall coordinate with the affected Tribes and the Bureau of Indian
Affairs on BLM Section 7 consultations of which it is aware that tribal rights
or tribal trust resources may be affected.

g. To the extent consistent with the provisions of the Privacy Act, the
Freedom of Information Act (FOIA), and the Department's ability to continue
to assert FOIA exemptions, the BLM shall make available to a Tribe all
information held by the BLM that is related to a Tribe's Indian lands and
tribal trust resources.

h. The BLM shall, when appropriate and at the request of a Tribe, pursue
intergovernmental agreements to formalize arrangements involving Bureau
sensitive species and federally proposed and listed species.

2. <u>BLM 8160 Policy</u>. The BLM should use any opportunity available under its
8160 Policy to seek coordinated conservation activities with Tribes.

B. <u>Other Cooperation and Coordination</u>. Conservation activities in general would
benefit from cooperation and coordination with other agencies, organizations,
governments, and interested parties.

1. The BLM, in coordination with the FWS and/or NMFS and other interested
entities, should develop habitat conservation assessments and conservation
agreements for any BLM special status species that the BLM believes would
benefit from such an agreement.

2. The BLM should provide technical assistance to, and coordinate with,
appropriate state agencies and other agencies, organizations, or private
landowners developing and implementing conservation plans.

3. The BLM should seek partnerships and cooperative relationships with other
agencies, organizations, governments, and interested parties for the purposes of
conservation of sensitive species and compliance with the ESA. The BLM
already has MOUs with several agencies and organizations. Partnerships beyond
existing MOUs are encouraged. Partnerships and cooperative relationships
should be sought with agencies that include the following:

a. Other resource management and regulatory agencies, such as the Natural
Resource Conservation Service, State fish and wildlife agencies, State forestry

BLM_0076368

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)                    .3B3b

agencies, State water quality agencies, and municipal parks and recreation agencies.

b. State and local governments, such as governor's offices, County commissioners, and City councils; County extension units, watershed councils, and resource conservation districts; and interested landowners.

c. Federal advisory groups, such as the Sporting Conservation Council, resource advisory councils, and provincial advisory boards.

d. Research entities, such as the Biological Resource Division of the U.S. Geological Survey, U.S. Forest Service, Agricultural Research Service, Cooperative Ecosystem Studies Units, and university researchers.

e. Professional societies, such as The Wildlife Society, the American Fisheries Society, Society for Range Management and the Botanical Society of America.

f. Groups representing private sector interest in resources and resource uses, such as Trout Unlimited, Center for Plant Conservation, National Audubon Society, The Nature Conservancy, National Cattlemen's Beef Association, and American Sports Tackle Manufacturers.

4. The BLM's role in partnerships and cooperative relationships should include developing conservation programs based on ecosystem management, providing expertise for programs affecting lands outside of the public land when benefits to BLM-managed resources are expected to result, and developing grant and cost-shared (e.g., challenge cost-share) projects to support conservation activities.

BLM_0076369

Glossary of Terms

This glossary is provided for the convenience of the reader and the terms are defined for the purpose of this manual only.

**-A-**

action:  all discretionary activities or programs of any kind authorized, funded, or carried out by the BLM in whole or in part.  Examples include (1) projects intended to conserve Bureau sensitive species and federally proposed and listed species or their habitat; (2) the promulgation of regulations; (3) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (4) projects directly or indirectly causing modifications to the land, water, or air.

animals:  any member of the animal kingdom, including without limitation any mammal, fish, bird, amphibian, reptile, mollusk, crustacean, arthropod, or other invertebrate, and any part, product, egg, or offspring thereof, or the dead body or parts thereof.  As used here, the words "animals," "fish or wildlife," and "wildlife" are interchangeable.

**-B-**

biological assessment (BA):  information prepared by, or under the direction of, a Federal agency concerning listed and proposed species and designated and proposed critical habitat that may be present in the action area and may be affected by the proposed action.  A biological assessment presents the BLM's determination of whether any such species or habitat is likely to be adversely affected by the action.

biological opinion (BO):  document that includes (1) the opinion of the FWS and/or NMFS as to whether or not a Federal action is likely to jeopardize the continued existence of listed species, or result in the destruction or adverse modification of designated critical habitat; (2) a summary of the information on which the opinion is based; and (3) a detailed discussion of the effects of the action on listed species or designated critical habitat.  A BO may be accompanied by an incidental take statement.

BLM-administered lands:  collectively, BLM-managed lands and split-estate lands.

**-C-**

candidate species:  plant and animal taxa considered for possible addition to the list of endangered and threatened species under the Endangered Species Act.  These are taxa for which the FWS or NMFS has on file sufficient information on biological vulnerability and threat(s) to support issuance of a proposal to list, but issuance of a proposed rule is presently precluded by higher priority listing actions.  Separate lists for plants, vertebrate animals, and invertebrate animals are published periodically in the *Federal Register*.  Candidate species and their habitats are managed as Bureau sensitive species.

BLM_0076370

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)          Glossary 2

conservation (also conserve and conserving): 1) definition from ESA Section 3(3) and as applied to threatened, endangered, and proposed species in this policy: to use, and the use of, all methods and procedures that are necessary to bring a listed species to the point at which the measures provided pursuant to the ESA are no longer necessary. Methods and procedures of conservation include all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transportation; 2) as applied to Bureau sensitive species, the use of programs, plans, and management practices to reduce or eliminate threats affecting the status of the species, or improve the condition of the species' habitat on BLM-administered lands.

conservation agreement or strategy: formal, written document agreed to by the FWS and/or NMFS or another Federal agency, State agency, local government, or the private sector to achieve the conservation of Bureau sensitive species and federally proposed, listed, and candidate species through voluntary cooperation. It documents the specific actions and responsibilities for which each party agrees to be accountable. The objective of a conservation agreement or strategy is to reduce threats to a Bureau sensitive species and federally proposed and listed species or its habitat. An effective conservation agreement or strategy may lower species' listing priority or eliminate the need for listing.

conservation recommendations: suggestions of the FWS and/or NMFS regarding discretionary measures to minimize or avoid adverse effects of a proposed action on listed species or critical habitat or regarding the development of information.

critical habitat (CH): (1) the specific areas within the geographical area currently occupied by a species, at the time it is listed in accordance with the ESA, on which are found those physical or biological features (i) essential to the conservation of the species and (ii) that may require special management considerations or protection, and (2) specific areas outside the geographical area occupied by a species at the time it is listed upon determination by the FWS and/or NMFS that such areas are essential for the conservation of the species. Critical habitats are designated in 50 CFR Parts 17 and 226. The constituent elements of critical habitat are those physical and biological features of designated or proposed critical habitat essential to the conservation of the species, including, but not limited to: (1) space for individual and population growth, and for normal behavior; (2) food, water, air, light, minerals, or other nutritional or physiological requirements; (3) cover or shelter; (4) sites for breeding, reproduction, rearing of offspring, germination, or seed dispersal; and (5) habitats that are protected from disturbance or are representative of the historical geographic and ecological distributions of a species.

-D-

distinct population segment (DPS): subdivision of a vertebrate species (excluding Pacific salmon stock, see definition of evolutionarily significant unit) that is treated as a species for purposes of listing under the Endangered Species Act. To be so recognized, a potential distinct population segment must satisfy standards specified in a FWS or NMFS policy statement (see the February 7, 1996, *Federal Register*, pages 4722–4725). The standards require it to be separable from the remainder of and significant to the species to which it belongs.

BLM_0076371

**-E-**

endangered species:  any species that is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta, determined by the Secretary to constitute a pest whose protection under the provisions of this Act would present an overwhelming and overriding risk to man.

evolutionarily significant unit (ESU):  a Pacific salmonid stock that is substantially reproductively isolated from other stocks of the same species and that represents an important part of the evolutionary legacy of the species.  Life history, ecological, genetic, and other information can be used to determine whether a stock meets these two criteria.  The NMFS uses this designation.

**-F-**

fish or wildlife:  see animals.

formal consultation:  a component of the consultation process under Section 7 of the ESA that commences with the BLM's written request for consultation after it has determined that its action may affect and is likely to adversely affect listed species or designated critical habitats and concludes with the issuance of biological opinion.

**-H-**

habitat conservation assessment:  a comprehensive, state-of-knowledge technical document that describes life history, habitat requirements, and management considerations for a species or group of species throughout its occupied range on the lands managed by the cooperating agencies.  Habitat conservation assessments are often made as a forerunner to preparation of a conservation strategy or agreement.

**-I-**

implementation plan:  a site-specific plan written to implement decisions made in a land use plan.  An implementation plan usually selects and applies best management practices to meet land use plan objectives and is synonymous with an activity plan.  Examples of implementation plans include habitat management plans and allotment management plans.

incidental take:  see take.

incidental take statement (ITS):  under the ESA, a document that accompanies a biological opinion in which some incidental take of listed species is reasonably certain to occur.  Such take would not rise to a level that would jeopardize the listed species.  An ITS exempts a specific level of take associated with the action from the prohibitions on take under Section 9 of the ESA.  An ITS often includes reasonable and prudent measures and their implementing terms and conditions, which are intended to reduce or minimize the take associated with the action or monitor the progress of the action and associated take.  A biological opinion will not have an ITS

BLM_0076372

if no take is reasonably certain to occur.

informal consultation:  a component of the consultation process that includes all discussions, correspondence, or other contact between the FWS and/or NMFS and the BLM or the designated non-Federal representative, prior to formal consultation, to determine if a proposed action may affect listed species or critical habitat and to use FWS and/or NMFS expertise, if necessary, to modify the proposed action to avoid potential adverse effects.

**-J-**

jeopardize the continued existence of (also jeopardize, cause jeopardy to):  engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of listed species in the wild by reducing the recruitment, numbers, or distribution of a listed species.

**-L-**

listed species:  species that are designated under the ESA as either threatened or endangered, which may include members of the Plant, Animal or Fungi–Lichen Kingdoms.

**-M-**

multiple use:  a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific, and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment, with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output (FLPMA).

**-N-**

native species:  as per February 3, 1999, Executive Order 13112 (Invasive Species), native species means, with respect to a particular ecosystem, a species that, other than as a result of an introduction, historically occurred or presently occurs in that ecosystem.

**-P-**

plant:  any member of the plant kingdom, including seeds, roots, flowers, and other parts thereof.

**-R-**

recovery:  improvement in the status of listed species to the point at which listing is no longer appropriate under the ESA.

BLM_0076373

request for technical assistance:  communication with the FWS and/or NMFS concerning actions that will potentially have an adverse effect on a BLM special status species or its habitat.  The objectives of these requests are to obtain as much biological information as possible about the species involved and its habitat and the FWS and/or NMFS recommendations on how the proposed management action might be carried out without contributing to the further deterioration of the species or its habitat.

-S-

species:  any species or subspecies (and regarding plants, any varieties), and any distinct population segment or evolutionarily significant unit of any species of vertebrate, fish, or wildlife that interbreeds when mature.

(A)  Federally listed endangered—an animal or plant species in danger of extinction throughout all or a significant portion of its range.

(B)  Federally listed threatened—an animal or plant species likely to become endangered within the foreseeable future throughout all or a significant portion of its range.

(C)  Federally proposed—a species of animal or plant that is proposed in the *Federal Register* to be listed under Section 4 of the Endangered Species Act.

(D)  Federal candidate species—a plant or animal species for which FWS or NMFS has on file sufficient information on biological vulnerability and threats to support a proposal to list as endangered or threatened.  All Federal candidates shall be included in the Bureau sensitive species category.

(E)  Bureau sensitive species—species that require special management consideration to avoid potential future listing under the ESA and that have been identified in accordance with procedures set forth in this manual

special status species:  collectively, federally listed or proposed and Bureau sensitive species, which include both Federal candidate species and delisted species within 5 years of delisting.

split-estate:  subsurface mineral resources managed by the BLM where the surface resource is managed by a different public or private entity, as opposed to BLM-managed lands.

status review:  process of examination by FWS and/or NMFS to determine if a species situation warrants protection under the ESA.  Results of a status review are published in the *Federal Register*.

survival:  for determination of jeopardy or adverse modification, the species' persistence as listed or as a subset identified by the FWS and/or NMFS for recovery management purposes, beyond the conditions leading to its endangerment, with sufficient resilience to allow for the potential recovery from endangerment.  It is the condition in which a species continues to exist into the future while retaining the potential for recovery.  This condition is characterized by a

BLM_0076374

species with a sufficient population, represented by all necessary age classes, genetic heterogeneity, and number of sexually mature individuals producing viable offspring, which exists in an environment providing all requirements for completion of the species' entire life cycle, including reproduction, sustenance, and shelter.

## -T-

take:  harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.  The term applies only to fish and wildlife.

>  (A)  incidental take:  take of listed fish or wildlife species that results from, but is not the purpose of, carrying out an otherwise lawful activity conducted by a Federal agency or applicant. [50 CFR §402.02]  Incidental take of listed plant species is neither defined nor prohibited by the Act.

>  (B)  harm:  as defined by the FWS, harm includes significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns such as breeding, feeding, or sheltering.  As defined by the NMFS, harm means an act that actually kills or injures fish or wildlife.  Such an act may include significant habitat modification or degradation that actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding, or sheltering.

>  (C)  harass:  defined as actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns that include breeding, feeding, or sheltering Tribes (Indian Tribes):  any federally recognized Indian Tribe, band, nation, pueblo, community, or other organized group within the United States that the Secretary of the Interior has identified on the most recent list of federally recognized Tribes maintained by the Bureau of Indian Affairs.

## -W-

wildlife:  see animals.

BLM_0076375

# Department of the Interior
# Departmental Manual

**Effective Date**: 9/1/09
**Series**:   Environmental Quality Programs
**Part 516**:  National Environmental Policy Act of 1969
**Chapter 1**:  Protection and Enhancement of Environmental Quality

**Originating Office**:  Office of Environmental Policy and Compliance

## 516 DM 1

1.1    **Purpose**.  This chapter provides instructions for implementing the National Environmental Policy Act of 1969, as amended (42 U.S.C. 4321-4347) (NEPA); Section 2 of Executive Order 11514, Protection and Enhancement of Environmental Quality, as amended by Executive Order 11991; Executive Order 12114, Environmental Effects Abroad of Major Federal Actions; and the regulations of the Council on Environmental Quality (CEQ) implementing the procedural pro-visions of NEPA (40 CFR 1500-1508; identified in this Part 516 as the CEQ Regulations), and the Department of the Interior (DOI) regulations (43 CFR Part 46).  It supplements the CEQ and DOI regulations and must be read in conjunction with both.

1.2    **Policy**.  It is the policy of the Department:

A.    To provide leadership in protecting and enhancing those aspects of the quality of the Nation's environment which relate to or may be affected by the Department's policies, goals, programs, plans, or functions in furtherance of national environmental policy;

B.    To cooperate with and assist the CEQ; and

C.    To implement Cooperative Conservation (see E.O. 13352).

1.3    **Statutory Requirements**.  NEPA requires that in certain circumstances an Environmental Impact Statement (EIS) or other environmental document be prepared by the responsible Federal official.  This official is normally the lowest-level official who has overall responsibility for formulating, reviewing, or proposing an action or, alternatively, has been delegated the authority or responsibility to develop, approve, or adopt a proposal or action.  Preparation at this level will ensure that the NEPA process will be incorporated into the planning process and that the EIS or other environmental document will accompany the proposal through existing review processes.

1.4    **General Responsibilities**.  The following responsibilities reflect the Secretary's decision that the officials responsible for making program decisions are also responsible for taking the requirements of NEPA into account in those decisions and will be held accountable for that responsibility:

9/1/09 #3846
Replaces 5/27/04 #3611; 6/21/05 #3675; 5/27/04 #3613; and 5/27/04 #3614

BLM_0076376

A.   Assistant Secretary - Policy, Management and Budget (AS/PMB).

(l)   Is the Department's focal point on NEPA matters and is responsible for overseeing the Department's implementation of NEPA and Departmental regulations at 43 CFR Part 46.

(2)   Serves as the Department's principal contact with the CEQ.

(3)   Assigns to the Director, Office of Environmental Policy and Compliance (OEPC), the responsibilities outlined for that Office in this Part.

B.   Solicitor.  Is responsible for providing legal advice pertaining to the Department's compliance with NEPA, CEQ regulations, 43 CFR Part 46, and this Part.

C.   Program Assistant Secretaries.

(1)   Are responsible for compliance with NEPA, Executive Order 11514, as amended, Executive Order 12114, the CEQ Regulations, 43 CFR Part 46, and this Part for bureaus and offices under their jurisdiction.

(2)   Shall ensure that, to the fullest extent possible, the policies, regulations, and public laws of the United States administered under their jurisdiction are interpreted and administered in accordance with the requirements of NEPA.

D.   Heads of Bureaus and Offices.

(1)   Must comply with the provisions of NEPA, Executive Order 11514, as amended, Executive Order 12114, the CEQ Regulations, 43 CFR Part 46 and this Part.

(2)   Shall interpret and administer, to the fullest extent possible, the policies, regulations, and public laws of the United States administered under their jurisdiction in accordance with the requirements of NEPA.

(3)   Shall continue to review their statutory authorities, administrative regulations, policies, programs, and procedures, including those related to loans, grants, contracts, leases, licenses, or permits, in order to identify any deficiencies or inconsistencies therein which prohibit or limit full compliance with the intent, purpose, and provisions of NEPA and, in consultation with the Office of the Solicitor and the Office of Congressional and Legislative Affairs, shall take or recommend, as appropriate, corrective actions as may be necessary to bring these authorities and policies into conformance with the intent, purpose, and procedures of NEPA.

(4)   Shall monitor, evaluate, and control on a continuing basis their activities as needed to protect and enhance the quality of the environment.  Such activities will include both those directed to controlling pollution and enhancing the environment and those designed to accomplish other program objectives which may affect the quality of the environment.  They will

9/1/09 #3846
Replaces 5/27/04 #3611; 6/21/05 #3675; 5/27/04 #3613; and 5/27/04 #3614

BLM_0076377

develop programs and measures to protect and enhance environmental quality.  They will assess progress in meeting the specific objectives of such activities as they affect the quality of the environment.

      E.    <u>Heads of Regional, Field, or Area Offices, or Responsible Officials</u>.

      (1)    Must comply with the provisions of NEPA, Executive Order 11514, as amended, Executive Order 12114, the CEQ Regulations, 43 CFR Part 46 and this Part.

      (2)    Shall use information obtained in the NEPA process, including pertinent information provided by those persons or organizations that may be interested or affected, to identify reasonable alternatives to proposed actions that will avoid or minimize adverse impacts to the human environment while improving overall environmental results.

      (3)    Shall monitor, evaluate, and control their activities on a continuing basis to further protect and enhance the quality of the environment.

1.5    **Consideration of Environmental Values**.

      A.    <u>In Departmental Management</u>.

      (1)    In the management of natural, cultural, historic, and human resources under its jurisdiction, the Department must consider and balance a wide range of economic, environmental, and societal needs at the local, regional, national, and international levels, not all of which are quantifiable in comparable terms.  In considering and balancing these objectives, Departmental plans, proposals, and decisions often require recognition of complements and resolution of conflicts among interrelated uses of these natural, cultural, historic, and human resources within technological, budgetary, and legal constraints.  Various Departmental conflict resolution mechanisms are available to assist this balancing effort.

      (2)    Environmental analyses shall strive to provide baseline data where possible and shall provide monitoring and evaluation tools as necessary to ensure that an activity is implemented as contemplated by the NEPA analysis.  Baseline data gathered for these analyses may include pertinent social, economic, and environmental data.

> As in 12 new wells

      (3)    If proposed actions are planned for the same geographic area or are otherwise closely related, environmental analysis should be integrated to ensure adequate consideration of resource use interactions, to reduce resource conflicts, to establish baseline data, to monitor and evaluate changes in such data, to adapt actions or groups of actions accordingly, and to comply with NEPA and the CEQ Regulations.  Proposals shall not be segmented in order to reduce the levels of environmental impacts reported in NEPA documents.

      (4)    When proposed actions involve approval processes of other agencies, the Department shall use its lead role to identify opportunities to consolidate those processes.

9/1/09 #3846
Replaces 5/27/04 #3611; 6/21/05 #3675; 5/27/04 #3613; and 5/27/04 #3614

BLM_0076378

B.    In Internally Initiated Proposals.  Officials responsible for development or conduct of planning and decision making systems within the Department shall incorporate environmental planning as an integral part of these systems in order to ensure that environmental values and impacts are fully considered, facilitate any necessary documentation of those considerations, and identify reasonable alternatives in the design and implementation of activities that minimize adverse environmental impacts.  An interdisciplinary approach shall be initiated at the earliest possible time to provide for consultation among all participants for each planning or decision making endeavor.  This interdisciplinary approach should, to the extent possible, have the capacity to consider innovative and creative solutions from all participants.

C.    In Externally Initiated Proposals.  Officials responsible for the development or conduct of loan, grant, contract, lease, license, permit, or other externally initiated activities shall require applicants, to the extent necessary and practicable, to provide environmental information, analyses, and reports as an integral part of their applications.  As with internally initiated proposals, officials shall encourage applicants and other persons, organizations or communities who may be interested or affected to consult with the Department and provide their comments, recommendations, and suggestions for improvement.

1.6    **Consultation, Coordination, and Cooperation with Other Agencies and Organizations.**

A.    Departmental Plans and Programs.

(1)    Officials responsible for planning or implementing Departmental plans and programs will develop and utilize procedures to consult, coordinate, and cooperate with relevant State, local, and tribal governments; other bureaus and Federal agencies; and public and private organizations and individuals concerning the environmental effects of these plans and programs on their jurisdictions or interests.  Such efforts should, to the extent allowed by law and in accordance with the Federal Advisory Committee Act (FACA), include consensus-based management whenever possible.  This is a planning process that incorporates direct community involvement into bureau activities from initial scoping through implementation of the bureau or office decision and, in practicable cases, monitoring and future adaptive management measures.  All bureau NEPA and planning procedures will be made available to the public.

(2)    Bureaus and offices will use, to the maximum extent possible, existing notification, coordination, and review mechanisms established by the Office of Management and Budget and CEQ.  However, use of these mechanisms must not be a substitute for early consultation, coordination, and cooperation with others, especially State, local, and tribal governments.

(3)    Bureaus and offices are encouraged to expand, develop, and use new forms of notification, coordination, and review, particularly by electronic means and the Internet.  Bureaus are also encouraged to stay abreast of and use new technologies in environmental data gathering and problem solving.

9/1/09 #3846
Replaces 5/27/04 #3611; 6/21/05 #3675; 5/27/04 #3613; and 5/27/04 #3614

BLM_0076379

B.   Other Departmental Activities.

(1)   Technical assistance, advice, data, and information useful in restoring, maintaining, and enhancing the quality of the environment will be made available to other Federal agencies; State, local, and tribal governments; institutions; and other entities as appropriate.

(2)   Information regarding existing or potential environmental problems and control methods developed as a part of research, development, demonstration, test, or evaluation activities will be made available to other Federal agencies; State, local, and tribal governments; institutions; and other entities as appropriate.

C.   Plans and Programs of Other Agencies and Organizations.

(1)   Officials responsible for protecting, conserving, developing, or managing resources under the Department's jurisdiction shall coordinate and cooperate with State, local, tribal governments; other bureaus and Federal agencies; and those persons or organizations that may be interested or affected, and provide them with timely information concerning the environmental effects of these entities' plans and programs.

(2)   Bureaus and offices are encouraged to participate early in the planning processes of other agencies and organizations in order to ensure full cooperation with, and understanding of, the Department's programs and interests in natural, cultural, historic and human resources.

(3)   Bureaus and offices will use, to the fullest extent possible, existing Departmental review mechanisms to avoid unnecessary duplication of effort and to avoid confusion by other organizations.

(4)   Bureaus and offices will work closely with other Federal agencies to ensure that similar or related proposed actions in the same geographic area are fully evaluated to determine if agency analyses can be integrated so that one NEPA compliance document can be used by all for their individual permitting and licensing needs.

1.7   **Public Involvement.**

A.   Bureaus and offices, in accordance with 301 DM 2, 43 CFR Part 46, and this Part, will develop and implement procedures to ensure the fullest practicable provision of timely public information and understanding of their plans and programs with environmental impacts including information on the environmental impacts of alternative courses of action.  This is to include appropriate public involvement in the development of NEPA analyses and documents.

B.   These procedures will include, wherever appropriate, provision for public meetings in order to obtain the views of persons, organizations, or communities who may be interested or affected.  Public information shall include all necessary policies and procedures concerning plans and programs in a readily accessible, consistent format.

9/1/09 #3846
Replaces 5/27/04 #3611; 6/21/05 #3675; 5/27/04 #3613; and 5/27/04 #3614

C.    Bureaus and offices will also coordinate and collaborate with State and local agencies and tribal governments in developing and using similar procedures for informing the public concerning their activities affecting the quality of the environment.

1.8    **Mandate**.

A.    The provisions of Part 516 are intended to establish guidelines to be followed by the Department and its bureaus, and offices.  Part 516 is not intended to, nor does it, create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or equity by any person or party against the United States, its agencies, its officers, or any other person.  The provisions of Part 516 are not intended to direct or bind any person outside the Department.

B.    Instructions supplementing the CEQ Regulations are provided in Departmental regulations at 43 CFR Part 46.

C.    Instructions specific to each bureau are found in Chapters 8 through 15.  This portion of the manual may expand or contract depending on the number of bureaus existing at any particular time.  In addition, bureaus may prepare handbooks or other technical guidance for their personnel on how to apply this Part to principal programs.  In the case of any apparent discrepancies between these procedures and bureau handbooks or technical guidance, Departmental regulations at 43 CFR 46 and 516 DM 1 - 4 shall govern.

1.9    **Lead Agencies** (40 CFR 1501.5; 43 CFR 46.220).

A.    The AS/PMB shall designate lead bureaus within the Department when bureaus under more than one Assistant Secretary are involved and cannot reach agreement on lead bureau status.  The AS/PMB shall represent the Department in consultations with CEQ or other Federal agencies in the resolution of lead agency determinations.

B.    Bureaus will inform the OEPC of any agreements to assume lead agency status.  OEPC will assist in the coordination and documentation of any AS/PMB designations made in 1.9A.

C.    To eliminate duplication with State and local procedures, a non-Federal agency (including tribal governments) may be designated as a joint lead agency when it has a duty to comply with non-Federal requirements that are comparable to the NEPA requirements.

D.    40 CFR 1501.5 describes the selection of lead agencies, the settlement of lead agency disputes, and the use of joint lead agencies.  While the joint lead relationship is not precluded among several Federal agencies, the Department recommends that it be applied sparingly and that one Federal agency be selected as the lead with the remaining Federal, State, tribal governments, and local agencies assuming the role of cooperating agency.  In this manner, the other Federal agencies, as well as State, tribal, and local agencies can work to ensure that the ensuing NEPA document will meet their needs for adoption and application to their related decision.  If joint lead is dictated by other law, regulation, policy, or practice, then one Federal agency shall be identified as the agency responsible for filing the EIS.

9/1/09 #3846
Replaces 5/27/04 #3611; 6/21/05 #3675; 5/27/04 #3613; and 5/27/04 #3614

    E.    Lead agency designations may be required by law in certain circumstances.

1.10  **Cooperating Agencies** (40 CFR 1501.6 and 1508.5; 43 CFR 46.225).

    A.    Upon the request of a bureau, the OEPC will assist bureaus in determining cooperating agencies and coordinating requests from non-Interior agencies.

    B.    Bureaus will inform the OEPC of any requests to become a cooperating agency or any declinations to become a cooperating agency pursuant to 40 CFR 1501.6(c).

    C.    Bureaus will consult with the Solicitor's Office in cases where such non-Federal agencies are also applicants before the Department to determine relative lead/cooperating agency responsibilities.

    D.    An agency meeting the requirements of 43 CFR 46.225(a) is defined as an eligible governmental entity for the purposes of designation as a cooperating agency.

1.11  **Scoping** (40 CFR 1501.7; 43 CFR 46.235). Scoping should encourage the responsible official to integrate analyses required by other environmental laws. Scoping should also be used to integrate other planning activities for separate projects that may have similar or cumulative impacts. Integrated analysis facilitates the resolution of resource conflicts and minimizes redundancy.

1.12  **Environmental Assessments** (40 CFR 1501.3; 43 CFR 46.120, 46.140, 46.320).

    A.    Previous NEPA analyses should be used in a tiered analysis or transferred and used in a subsequent analysis to enhance the content of an EA whenever possible.

    B.    If such an EA is adopted or augmented, responsible officials must prepare their own notice of intent (NOI) or Finding of No Significant Impact (FONSI) that acknowledges the origin of the EA and takes full responsibility for its scope and content.

1.13  **Environmental Impact Statements** (40 CFR 1501.4, 1502.3; 43 CFR 46.100(b), and Subpart E).

    A.    If an agency's assessment of the environmental effects of a proposed action reveals that such action may significantly affect the quality of the human environment, and the agency elects to go forward with the proposed action, an EIS should be commenced.

    B.    The feasibility analysis (go/no-go) stage, at which time an EIS is to be prepared for proposed projects undertaken by DOI, is to be interpreted as the stage prior to the first point of major commitment to the proposal. For example, this would normally be at the authorization stage for proposals requiring Congressional authorization; the location or corridor stage for transportation, transmission, and communication projects; and the leasing stage for offshore mineral resources proposals (40 CFR 1502.5(a)).

9/1/09 #3846
Replaces 5/27/04 #3611; 6/21/05 #3675; 5/27/04 #3613; and 5/27/04 #3614

BLM_0076382

C.     For situations involving applications to DOI or the bureaus, an EIS need not be commenced until an application is essentially complete; i.e., any required environmental information is submitted and any required advance funding is paid by the applicant (40 CFR 1502.5(b)).  Officials shall also inform applicants of any responsibility they will bear for funding environmental analyses associated with their proposals (43 CFR 46.200(e)).

1.14   **Supplemental Statements** (40 CFR 1502.9).

A.     Supplements are required if an agency makes substantial changes in the proposed action relevant to environmental concerns or there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

B.     A bureau and/or the appropriate program Assistant Secretary will consult with the OEPC and the Office of the Solicitor prior to proposing to CEQ to prepare a supplemental statement using alternative arrangements such as issuing a final supplement without preparing an intervening draft.

C.     If, after a decision has been made based on a final EIS, a described proposal is further defined or modified and if its changed effects are not significant and still within the scope of the earlier EIS, an EA, and a FONSI may be prepared for subsequent decisions rather than a supplement.

1.15   **Format** (40 CFR 1502.10).

A.     Proposed departures from the standard format described in the CEQ regulations and this chapter must be approved by the OEPC.

B.     The section listing the preparers of the EIS will also include other sources of information, including a bibliography or list of cited references, when appropriate.

C.     Cover Sheet (40 CFR 1502.11).  The cover sheet will also indicate whether the EIS is intended to serve any other environmental review or consultation requirements pursuant to Section 1502.25.  The cover sheet will also identify cooperating agencies, the location of the action, and whether the analysis is programmatic in nature.

D.     Summary (40 CFR 1502.12).  The emphasis in the summary should be on those considerations, controversies, and issues that significantly affect the quality of the human environment.

1.16   **Alternatives Including the Proposed Action** (40 CFR 1502.14; 43 CFR 46.425).  For externally initiated proposals, i.e., for those cases where the Department is reacting to an application or similar request, the draft and final EIS shall identify the applicant's proposed action.  Proposed departures from 43 CFR 46.425(a) or this guidance must be approved by the OEPC and the Office of the Solicitor.

9/1/09 #3846
Replaces 5/27/04 #3611; 6/21/05 #3675; 5/27/04 #3613; and 5/27/04 #3614

BLM_0076383

1.17  **Appendix** (40 CFR 1502.18).  If an EIS is intended to serve other environmental review or consultation requirements pursuant to Section 1502.25, any more detailed information needed to comply with these requirements may be included as an appendix.

1.18  **Tiering** (40 CFR 1502.20; 43 CFR 46.120, 46.140).  Bureaus must maintain access to such things as:  sources of similar information, examples of tiered and transferred analyses, a set of procedural steps to make the most of tiered and transferred analyses, knowledge of when to use previous material, and how to used tiered and transferred analyses without sacrificing references to original sources.

1.19  **Methodology and Scientific Accuracy** (40 CFR 1502.24).  Conclusions about environmental effects will be preceded by an analysis that supports that conclusion unless explicit reference by footnote is made to other supporting documentation that is readily available to the public.  Bureaus will also follow Departmental procedures for information quality as required under Section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001 (Pub. L.106-554, 114 Stat. 2763).

1.20  **Environmental Review and Consultation Requirements** (40 CFR 1502.25; 43 CFR 46.155, 46.430).

    A.  A list of related environmental review and consultation requirements is available from the OEPC (ESM 09-8).

    B.  Bureaus shall ensure that they have a process in place to make integrated analyses a standard part of their NEPA compliance efforts.

    C.  The comments of bureaus and offices must also be requested.  In order to do this, the preparing bureau must furnish copies of the environmental document to the other bureaus in quantities sufficient to allow simultaneous review.  Bureaus may be removed from this circulation following consultation with, and concurrence of, a bureau.

    D.  Informal attempts will be made to determine the status of any late comments and a reasonable attempt should be made to include the comments and a response in the final EIS.  Late introduction of new issues and alternatives is to be avoided and they will be considered only to the extent practicable.

    E.  For those EISs requiring the approval of the AS/PMB pursuant to 516 DM 3.3B, bureaus will consult with the OEPC when they propose to prepare an abbreviated final EIS [40 CFR 1503.4(c)].

1.21  **Further Guidance** (40 CFR 1506.7).  The OEPC may provide further guidance concerning NEPA pursuant to its organizational responsibilities (112 DM 4) and through supplemental directives (381 DM 4.5B).  Current guidance is located in the Environmental Memoranda Series periodically updated by OEPC and available on the OEPC website at: http://www.doi.gov/oepc/.

9/1/09 #3846
Replaces 5/27/04 #3611; 6/21/05 #3675; 5/27/04 #3613; and 5/27/04 #3614

BLM_0076384

Case No. 1:20-cv-02484-MSK   Document 52-15   filed 04/28/21   USDC Colorado   pg 93 of 260

1.22  **Time Periods** (40 CFR 1506.10).

     A.    The minimum review period for a draft EIS will be forty-five (45) days from the date of publication by the Environmental Protection Agency (EPA) of the notice of availability, unless a longer period is required by individual agency regulation or process.

     B.    For those EISs requiring the approval of the AS/PMB pursuant to 516 DM 3.3B, the OEPC will be responsible for consulting with the EPA and/or CEQ about any proposed reductions in time periods or any extensions of time periods proposed by the bureaus.

9/1/09 #3846
Replaces 5/27/04 #3611; 6/21/05 #3675; 5/27/04 #3613; and 5/27/04 #3614

BLM_0076385

To: Jamie Connell, BLM State Director

From: Elena Goldstein

Re: Protest FEIS and Proposed RMP for Uncompahgre Field Office

Date: July 20, 2019


Dear Director Connell,

As a resident of the North Fork Valley who as previously submitted comments of the Draft RMP (comments dated; March 11, 2017, March 16, 2017. I respectfully submit the following protest. My contact information is:


Elena Goldstein

38324 Saddle Mountain Lane

Crawford, CO 81415

97-921-5072

My protest addresses the following issues raised in previous comments:

1. Oil and gas extraction produces greenhouse gases which contribute to climate change, which is threatening all of life on this planet
2. Oil and gas extraction close to the Paonia Reservoir threatens water supply to the region, which includes drinking water and water for our organic farms and vineyards.
3. Avalanches and mudslides caused by vibrations from the extraction process and well as by heavy truck traffic on Hwy 133 are geologically proven threats to the safety and economy of the North Fork Valley.

Those issues are addressed in the following section of the RMP:

See Sections

4.3.1

1.3.2

1.3.5

I believe the BLM has erred in adopting the Proposed RMP for the following reasons:

*Alternative E was improperly adopted and was not subject to public comments.

*It does not address the steep slopes in the areas proposed for drilling

*It reduces setbacks from the Paonia Reservoir

BLM_0076386

*It denies there is any information to correlate fuel extraction with climate change... a blatantly untrue statement.


Sincerely,

Elena Goldstein, July 20, 2019

BLM_0076387

(No subject)                    Protest Letter              7·21·19

ellee coyle

Mon 7/22 ~ 11:01:58 PM

To: ellee coyle ~ ellzcoyle@hotmail.com

Attention: Protest Coordinator

In regards to:
Uncompahgre BLM Field Office Resources Management Plan/FEIS

Elizabeth C. O'Reilly, p.o. box 173 (230 Oak Ave) Paonia CO 81428
801.867.2586

As a home owner & resident in Paonia CO I previously submitted, comment Number 000224
O'ReillyE_20161019-2 Organization1: and comment Number 000224_O'ReillyE _20161019-
3 Organization1: I am writing this protest letter to the Draft RMP recently released by the
BLM in June 2019 with a protest period for 30 days starting on June 28th.

As I understand it, Draft E is being proposed. I do not recall, of the several proposals of
alternatives suggested beginning back in 2016, of there being a Draft E ? I do recall, drafts
A thru D with a draft alternative of B1 being highly discussed & preferred not only by myself
yet by many of the residents in the area.

This Draft E has not had the time for review nor been offered for public comment, as the
other drafts have. This seems to not be consistent of the BLM's system of giving the public
the information to comment upon. When did Draft E become a possibility? and provided to
the public for comment ?

In my two comments previously submitted I was in favor of Alternative B1. I am not in favor
of Alternative E.

In my earlier comments I addressed the organic industry: agricultural, viticulture and
ranching practices predominately found in this area to be taken into account. We are known
to have the highest density of organic land practices in the state of CO, here on the western
slope. I do not see where Alternative E takes this into consideration. In fact it seems that
with Alternative E, if adopted, which would allow 95% of BLM & Mineral Estates to be open
for oil & gas leasing it could drastically affect for the worse, these in place industries.

I think the water necessary for increase extractive industry, such as fracking, will greatly
impact this industry. Such that if contamination of the water resources for the already in place
irrigation happens, it will have a detrimental impact on these orchards and farms. The
location of possible allowable future leases & drilling being so close to the Paonia Reservoir,
which the Alternative E is reducing setbacks from water supplies is of great concern. This will
have a negative impact upon us citizens who choose to live here when a mishap, which does
occur periodically even with the best safety procedures & intentions of the industry.

I comprehend the amount of water a fracking well needs, which causes me to question
allocation for such as it seems it'll take away from the high demand already in place for the

**RMP**

ellza coyle

Wed 7/17/2019 2:46 AM

**To:** ellza coyle <ellzacoyle@hotmail.com>

Comment Number: 000224_O'ReillyE_20161019-2 Organization1:

Commenter1:Elizabeth O'Reilly

Commenter Type: Individual

Comment Excerpt Text:

Please, initiate Alternative B1 to help decrease the above issues I personally think will detract if any other initiative is chosen. If the water is contaminated, if the air is more polluted, if the wildlife are restricted in their habitual patterns and harmed, if the organic industry that resides within Delta County & is making a strong demonstration of an industry worth backing & providing a living is thwarted it will cause me personally to move and many others, if they have the resources to do so. It will stop the growth of our changing Delta County at a critical transitional time and the burgeoning creative district will succumb to wasteland. Not a long term vision I imagine anyone wishes to observe.

Comment Number: 000224_O'ReillyE_20161019-3 Organization1:

Commenter1:Elizabeth O'Reilly

Commenter Type: Individual

Comment Excerpt Text:

I moved to this area in 2011, specifically for the organic food being produced throughout the area. Which since 1980's has seen a huge growth nationwide. The wildlife sightings during migration times or hiking about, the accessibility to clean air, and the lifestyle characteristics that go along with these practices of "healthy" living. My concern for the area is that if Alternative B1 is not chosen, the risk goes higher in affecting the long time ranchers, organic farms/orchards and vineyards along with myself as a resident, drinking the city water in negative ways that challenge the reasons many choose to live here.

agricultural needs. Along with the chemicals used in the fracking procedures that would create unreparable damage upon the soil and those affected in our water resource even before a known leak is detected.

I recently heard on the news, **Republican Representative Matt Soper, say that the number one issue for the state of CO is in protecting the water**. Alternative E does not seem to be consistent with that high priority.

I also made reference to the recreation found in this region of CO with mentioning the wildlife sightings on hikes, migration of animals and clean air.  To see in Alternative E the scaling down of the protections for the Jumbo Mountain Recreation BLM lands from leasing and not including "No Surface Occupancy" stipulations for this area does not seem consistent with BLM's mission of maintaining multiple use of the lands that the BLM oversees. I don't understand how opening up 95% of these lands to oil & gas leasing align with a multiuser approach I thought the BLM attempted to follow.  This Jumbo recreation area is highly used, being that it is so easily accessible to residents & their visitors, of the North Fork Valley. With bike & hiking trails, of all activity levels, plus wildlife and wildflowers and plants satisfies an enormous need that I thought the BLM found of importance. Alternative E fails to address this.

My concern also is that the air quality from the exposure of chemicals gassing off from fracking, in addition to truck traffic the fracking industry creates will impact the region for humans and wildlife.  I do not see how such a high use area, will be enhanced, if drilling rigs etc. are in place, with the noise, pollution, additional wear & tear on the already challenged infrastructure fits into the recreation on public lands that BLM is overseeing.  Alternative E fails to keep these aspects in mind.

Recently, the **democratic Attorney General for Colorado, Phil Weiser** who claims to be a bridge between the western slope and the state capitol, was in Delta County to become more acquainted with us here on the western slope from Denver.  He commented on **how this region is a critical part of the state of CO.**

Please hear our cry to keep the extractive industry from expanding any more in this region and help preserve what has been going into place over the last decade  as the region shifts from a coal/mining extractive industry to an agricultural and arts industry which demonstrates our ability to change directions and create jobs without the need for any further extractive practices.

I believe the BLM has erred in adopting the proposed RMP with Alternative E for these reasons specifically relating to my previous comments. (which I've included a copy)
Thank You for your time & addressing my concerns as a resident in the impacted area.
Sincerely
elizabeth c. O'Reilly

BLM_0076390

To: Jamie Connell, BLM State Director

From:

RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office Date:

Date:

Dear Director Connell,

As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP (comments dated: 10/30/16), I respectfully submit the following protest. My contact information is:

Cynthia Ziegler

17462 Farmers Mine Rd

Paonia, CO 81428

970-424-2320

My protest addresses the following issues that I have raised in my previous comments:

*        Section 4.4.3 - Fish & Wildlife. Alternative E does not consider the needs of wildlife for a contiguous undisturbed habitat.

*        Section 4.3.1: Alt. E does not address our need to reduce greenhouse gas emissions. As we experience continued aridification, there is not enough water in the North Fork to sustain increased oil and gas development.

These issues are addressed in the following sections of the RMP:

Section 4.4.3

Section 4.3.1

I believe the BLM has erred in adopting the Proposed RMP for the following reasons:

*        Alternative E was improperly adopted and was not subject to public comments.

*        Increased fragmentation of Wildlife habitat and corridors

*        Climate change and aridification not considered.

BLM_0076391

For these reasons, I respectfully protest the proposed RMP, and the Sections I have outlined above.


Sincerely,

Cynthia Ziegler


July 22, 2019

BLM_0076392

July 22, 2019

To: Jamie Connell, BLM State Director
From: Elaine Brett, Citizen of the North Fork Valley

RE: Protest FEIS and Proposed RPM for Uncompahgre Field Office

Director Connell:

I am submitting the following protest as a resident of the North Fork Valley, my contact information is:

> Elaine M. Brett
> PO Box 1682
> 1899 Hawks Haven Rd.
> Paonia, CO 81428
> Mobile: 9702109717
> email: cmbrett@icloud.com

I have previously submitted comments to the Draft Resource Management Plan - comments dated 1 Oct 2016, 18 Oct 2016 and 20 Oct 2016 with the following Submission Numbers

| |
|---|
| 000158_BrettE_20161018 |
| 000159_BrettE_20161018 |
| 000160_BrettE_20161018 |
| 500186_BrettE_20161001 |
| 000157_BrettE_20161018 |
| 500163_BrettE_20161020_FOPT |

My protest addresses the following issues

1. Alternative E.

    1.1. Adopting a wholly new alternative at this stage is unacceptable and a violation of the National Environmental Policy Act (NEPA). The public has not had a meaningful opportunity to comment on this proposal.

    1.2. The BLM cannot adopt an alternative the public has not been able to provide comments on.

2.  Issues from Citizens for a Healthy Community Form Comment in 2016:

   2.1. Impact on unique NFV characteristics – organic ag, gold medal fishing, viticulture, orchards, big game hunting, outdoor recreation o "no-leasing" alternative is reasonable and must be considered

   2.2. Cumulative impacts of unregulated gas gathering lines

   2.3. Impacts of extreme weather, flooding, landslides, and geological instability

   2.4. Impact of permanently withdrawing water from hydrological cycle

   2.5. Impact on public health and safety

   2.6. Ozone levels already exceeding EPA thresholds in specific areas

   2.7. Impact on community source-water protections

   2.8. Impact of oil and gas development causing air and water pollution, and the impact of that on wildlife resources.

   2.9. The proposed alternative is an inappropriate use of public lands, and prioritizes oil and gas development over all other uses

   2.10. The potential for human, animal, and environmental damage is too high

   2.11. The proposed alternative with contribute to increased greenhouse gas emissions, and could exacerbate climate change.

3.  Issues from my Comments as referenced in Volume 4:

## Section 21 – Leasable Minerals – Fluid

The draft RMP does not address how fluid mineral development would strain local emergency services such as volunteer fire, ems and rescue groups. In the fall of 2015, there was a report of flames in the forest alongside Hwy 133. Paonia Volunteer Fire Dept was dispatched to the scene, over an hour's drive from their station. It turned out that one of the wells was flaring gasses and hadn't notified the local authorities as they were required to. This had the effect of wasting volunteers' time and could have been detrimental if there had been a real emergency during the time the fire department and it's equipment was tied up investigating this false alarm. If there were a true emergency, where is the nearest HAZMAT team that is qualified to deal with oil and gas spills? What is the response time? The specifics should be determined in project EIS's but the issue needs to be mentioned in the RMP that guides them.

The draft RMP does not consider the cumulative effect that the level of fluid mineral extraction (drilling) outlined in the Reasonably Foreseeable Development Scenario will

have on existing domestic and commercial water supplies, including springs, wells or surface irrigation water.

As I previously stated  "Allowing oil and gas leases adjacent to communities like the North Fork Valley is the equivalent to genocide. You would be killing those people, lifestyles and lands that make America great. I urge you to incorporate into the UFO RMP plans that prohibit or severely limit oil and gas development. The BLM should include a "no leasing" alternative. However, reality dictates that the market continues to demand fossil fuels, therefore, I urge you to accept Alternatives B and B1 which limit development and maintain special places for all of us to enjoy for years to come. "

## Section 27 - Recreation

Citizens requested that all of the Jumbo Mountain area be a Special Recreation Management  Area but the RPM reduces the acreage for recreation.  This is an area that is adjacent to the Town of Paonia and the Hawks Haven Subdivision.  It is a prime area for biking, hiking and hunting and is of low value for oil & gas development.  By designating this entire area for recreation, the BLM will meet its goal of multiple uses in its management area and will prevent future protests and litigation by the citizens of any leasing or related activities.   Stop wasting the taxpayers money by creating egregious situations!

Even the threat of oil and gas development in the NFV will destroy interest in the beauty of the landscape, which is critical to the tourist, sportsmen and recreationalist's experience. No one wants to drive, hike or mountain bike past wastewater ponds, condensate tanks, storage tanks, gas wells, sand trucks and more on their way to a healthy, natural experience.

## Section 30 – Socioeconomics and Environmental Justice

**The BLM's data is and remains flawed.**
- The draft RMP repeatedly states that, at the projected rate of fluid mineral development outlined in the Reasonably Forseeable Development Scenario, oil and gas development would not have a significant impact on regional employment or the economy. It makes some mention of severance taxes but does not give estimates of what the income amount could be. It states that current employment in the planning **area by** oil and gas is less than .01%, and is not expected to increase to greater than 1%. "Across all alternatives, for natural gas development, the economic contributions to the planning area represent a small fraction of jobs and income." (Page 4-462)
-  "Agriculture represents 3.6% of jobs in the planning area…The North Fork Valley represents a region where traditional agricultural uses have maintained importance due to the presence of organic and conventional small-scale farms, orchards, and wineries. Delta County is home to the highest concentration of organic farms of any Colorado county." **According to the Colorado Demography Office, in 2017, Agriculture represented 10% of jobs in Delta County.  Use of even a**



modest multiplier effect for supporting businesses would indicate the importance of agriculture to this area.

- (4-459).  The Outdoor recreation economy is $674 Billion in consumer spending, which is almost double the pharmaceutical industry and only 25% less than the financial services and insurance industries. Outdoor recreation also employs 3x the number of people in the oil and gas industry.
- Oil and gas development in the NFV will destroy the beauty of the landscape, which is critical to the tourist, sportsmen and recreationalist's experience. No one wants to drive, hike or mountain bike past wastewater ponds, condensate tanks, storage tanks, gas wells, sand trucks and more on their way to a healthy, natural experience.

## Section  37  - Water

BLM did not consider the permanent removal of water from the hydrologic cycle and that there are insufficient water supplies necessary to support fracking and other drilling operations, particularly in this period of persistent drought.

In 2019, the Town of Paonia and its affiliated water companies experience a serious water crisis because of depleted resources from the springs that feed the water collection system. http://www.townofpaonia.com/regular-board-meeting-tuesday-may-28-2019-630pm/
 It is a serious reminder of how fragile the West is in terms of water access.   Succumbing to an industry that removes water and contaminates water, taking water away from people and  livestock is a crime against humanity.

The basic question  of reduction and contamination of  irrigation water and infrastructure threatens the area by
- Risk of  contamination to irrigation water and crops from:
- Fracking chemical contamination of  ground and surface waters
- Damage to irrigation canal access and bridges
- Airborne volatile organic compounds
- Airborne silicates
- Silting in of  rivers and irrigation ditches
- Increases in diesel exhaust from transportation, well and compressor sites
- Risk of loss to irrigation shares for multiple irrigation ditches in the North Fork.

The Proposed RMP downplays public health risks, and ignores significant evidence we have provided that shows increased oil and gas development can have serious adverse impacts on public health.

The Proposed RMP drastically decreases the stipulations in Alternative B1 and even the Preferred Alternative D that were designed to protect resources of value from oil and gas development. It increases lands available for oil & gas lease with 'standard stipulations' - from 0% to 12%. It drastically decreases the amount of land with No Surface Occupancy (NSO) from 26% to 11% compared to Preferred Alternative D.

The Proposed RMP reduces setbacks from water supplies, waterways, areas with highly erodible and saline soils. It allows oil & gas surface use on lands with steep slopes greater than 40 percent. It weakens CSU stipulations & reduces Timing Limitations near critical wildlife habitat

The Proposed RMP eliminates Ecological Emphasis Areas entirely, reduces Areas of Critical Environmental Concern, and significantly weakens the proposed protections for the Jumbo Mountain Special Recreation Management Area, and does not include any "No Surface Occupancy" stipulations in that area, effectively opening Jumbo Mountain to oil and gas development.

The Proposed RMP opened more of the federal mineral estate to oil and gas development without giving adequate consideration to the impact this will have on infrastructure maintained by the State and other local governments.

The Proposed RMP anticipates over 1,000 new hydraulically fractured wells in the UFO, yet does not address the Programmatic Biological Opinion from the US Fish and Wildlife Service that caps surface water withdrawals on the North Fork of the Gunnison River at ~600 acre-feet per year for energy development purposes. Current oil and gas development in the area is already pushing that threshold. The BLM has failed to acknowledge that there is simply not enough water in the North Fork to sustain the level of oil and gas development anticipated in the Proposed RMP.

**Conclusion**

I live on the edge of the Jumbo Mountain BLM area on a split estate. The proposed RMP directly affects my quality of life and the future of my community. The plan is in direct opposition to life style and cultural heritage of the North Fork valley and it is an insult to the tens of thousands of comments submitted to the BLM.

Removing the areas around the North Fork Valley from the threat of oil and gas development will not significantly impact the revenue potential for the BLM or private

industry particularly considering that the North Fork Valley is in an area of "Very Low Oil and Gas Potential" (Figure 3-29)  Removing the area from leasing threats  WILL provide peace of mind for citizens, ensure the future of agriculture and outdoor recreation and preserve one special area that stands for a dying American dream.

I respectfully protest the Proposed RMP  for its disregard of the local citizens' lives and livelihood and for the sections I have outlined above.

Sincerely yours,

Elaine M. Brett

Elaine M. Brett

cc:

David Bernhardt, BLM

Casey Hammond, BLM

Greg Larson, BLM

Town of Paonia

Delta County Commissioners

State Senator Kerry Donovan

State Representative Julie McCluskie

Senator Michael Bennet

Senator Cory Gardner

Representative Scott Tipton

Governor Jared Polis

BLM_0076398

October 22, 2016

Kay Hannah

11589 Crawford Rd.

Paonia, CO 81428

UFO Draft RMP /Uncompahgre Field Office

Dear Uncompahgre Field Office Director:

I am a resident landowner, small-scale organic farmer, member of domestic and irrigation water districts and an enthusiastic cyclist and hiker in the North Fork Valley of the Gunnison River. Additionally, I am a professional massage therapist reliant on tourism and a healthy local economy for my living. As such I have grave concerns about and objections to the proposed Draft RMP that would open 95% of available land to gas and oil leasing. These concerns include but are not limited to air, water, noise and light pollution and increased heavy truck traffic on our already marginal roads as well as degradation of wildlife habitat and recreational areas.

While the detrimental effects on human health of oil and gas development and associated fracking are being documented nationwide as well as locally the BLM neglected to conduct a human health impact assessment as part of this Draft RMP. Why this oversight? Or was it deliberate? Though Delta County does not monitor air quality the surrounding counties of Mesa, Gunnison and Garfield all received low marks from the American Lung Association due directly to oil and gas development. This seems to me an unacceptable risk.

In order to protect our clean water and air, health, scenic viewsheds and emerging economy based on sustainable activities such as farming, ranching, viticulture, hunting, fishing and other outdoor recreation as well as the tourism these things bring it is essential to ensure the strongest levels of protection. These must safeguard water supplies and riparian areas as well as wildlife habitat including winter range and migration corridors. A no-leasing alternative, not even considered in this Draft RMP, would be my first choice. If this is not possible I urge you in the strongest possible terms to adopt the North Fork Alternative, Plan B1, and to include all the other conservation protections in Alternative B. We have a duty and an obligation to ensure the highest quality of environment for current and future generations in the North Fork Valley. "Avoidance" (not allowing a harmful activity in sensitive places) is an essential step in proper mitigation and I encourage you to adopt it in appropriate places such as water sheds, viewsheds and wildlife habitat by closing these areas to gas and oil development and imposing strict No Surface Occupancy requirements. Thank you.

Sincerely,

Kay Hannah

BLM_0076399

Kay Hannah

11589 Crawford Rd.

Paonia, CO 81428

970-527-3381

To: Jamie Connell, BLM State Director

RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office

July 22, 2019

Dear Director Connell,

As a resident and landowner in the North Fork Valley and having previously commented on the Draft RMP on 10-22-2016 (enclosed) I must respectfully protest the current version of this RMP. In my previous comments I voiced several concerns. The proposal now before us fails to adequately address them.

1. Water Resources   Section 4.3.5

The proposed RMP reduces the setbacks from water supplies and waterways, increasing the risk of pollution to the water we rely on for farming, ranching, viticulture, recreation and quality of life. This is unacceptable. The anticipated creation of 1,000 plus new hydraulically fractured wells in the area ignores the Programmatic Biological Opinion from the US Fish and Wildlife Service that caps water withdrawals from the North Fork of the Gunnison River at 600 acre-feet per year for energy development. Current gas and oil development in the area is already pushing that threshold. In the Proposed RMP under discussion the BLM fails to acknowledge that there simply is not enough water in the North Fork to sustain the level of gas and oil development that would be allowed.

2. Fish and Wildlife      Section 4.4.3

The detrimental impacts of allowing this level of development on wildlife habitat and riparian areas due to the reduction of setbacks, the weakening of CSU stipulations and the reduction of Timing Limitations near critical wildlife habitat are completely unacceptable. The drastic decrease in the amount of land with No Surface Occupancy from the 26% in Alternative D to a mere 11% will certainly add to the degradation of our wild areas.

3. Public Health and Safety       Section 3.4.2

The current proposed RMP seriously downplays the very real risks to public health inherent in oil and gas development. The BLM has ignored and/or disregarded the significant evidence provided to them regarding the detrimental effects on human (and animal) health that occurs with increased gas and oil development. Under this heading I must include also the reduction in outdoor recreation opportunities so essential to mental health. In the Safety portion of this Section falls the increased heavy truck traffic on our already marginal roads. The proposal of this RMP to open most of the federal mineral estate (95%!) to oil and gas development does not adequately consider the impact the increase

BLM_0076400

in traffic will have on infrastructure maintained by state, county and other local governments. As a regular driver on some of these roads I am especially concerned about the damage more traffic will cause including increased rock and landslide activity.

In addition to the aforementioned problems with the proposed RMP is the creation of Alternative E. This action is totally unacceptable at this point in the process as the public was not given a meaningful opportunity to comment on Alternative E. In my opinion it is even worse that the BLM's Preferred Alternative D from the 2016 Draft EIS which does not reflect the concerns and wishes of the community. Alternative E does not in any way represent responsible resource management planning and it ignores and disregards the tens of thousands of comments from concerned citizens. It is, in fact, an inappropriate use of public lands that prioritizes gas and oil development over all other uses and is out of line with the BLM's mandate to manage public lands and resources for the good of all, not the profit of a few. Moreover this action is in violation of NEPA rules. The BLM cannot adopt a proposal without giving the public a meaningful opportunity to comment on it.

In conclusion, I respectfully demand that the BLM scrap Alternative E and propose a plan that takes into account the unique characteristics of the North Fork Valley including but not limited to our clean air and water, sustainable agriculture, hunting, fishing, other outdoor recreation and ecotourism. My first choice would be the "No Leasing" option or the North Fork Alternative, worked on by so many people. Whatever is finally agreed upon must be geared toward conservation of our precious resources and landscapes.   Thank you for your time and consideration.

Sincerely,

Kay Hannah

| Letter # | Author Name | Organization Name | Date Submitted | Letter Type | Coding Status | Early Attention | Size (bytes) | |
|---|---|---|---|---|---|---|---|---|
| 124 | Walsh-Osinck, Patricia | | 07/25/2019 | Unique | New | Not Required | 155248 | |
| 125 | Danuff, Steve | | 07/23/2019 | Unique | New | Not Required | 145619 | |
| 130 | Grother, Craig | Backcountry Hunters & Anglers | 07/25/2019 | Unique | New | Needs Attention | 701129 | |
| 131 | McGavin, Rick | | 07/25/2019 | Unique | New | Needs Attention | 41157 | |
| 132 | Brett, Elaine | | 07/26/2019 | Unique | New | Needs Attention | 175514 | |
| 133 | Brett, Jim | Slow Food Western Slope | 07/26/2019 | Unique | New | Needs Attention | 130602 | |
| 134 | Baumgarten, David | Board of County Commissioners of Gunnison County, Colorado | 07/26/2019 | Unique | New | Needs Attention | 805386 | |

## Application Error

An error occurred while processing your request - Object reference not set to an instance of an object.

For more information about CARA, please visit the support page.

CARA Support team

Go Back To Previous Page

**Inner Exception:**
**Controller:** Letter
**Action:** Coding

**Stack Trace:** at Aquilent.Cara.WebApp.Controllers.LetterController.Coding(Int32 projectId, Int32 phaseId, Int32 id, String nextLetterIds, Nullable`1 lettersRemaining, Boolean useDefaultFilte
System.Web.Mvc.ReflectedActionDescriptor.Execute(ControllerContext controllerContext, IDictionary`2 parameters) at System.Web.Mvc.ControllerActionInvoker.InvokeActionMethod(Controller
parameters) at System.Web.Mvc.ControllerActionInvoker.<>c__DisplayClass8.b__a() at System.Web.Mvc.ControllerActionInvoker.InvokeActionMethodFilter(IActionFilter filter, ActionExecuting
System.Web.Mvc.ControllerActionInvoker.InvokeAction(ControllerContext controllerContext, String actionName)

UFORMP-004_SmithR_20190724

July 15, 2019

BLM Director (210)
Attention: Protest Coordinator, WO-210
P.O. Box 71383
Washington, D.C. 20024-1383

Dear BLM Director,

I am writing to protest the Uncompahgre Field Office Proposed Resource Management Plan and
Final Environmental Impact Statement.

NAME OF RESOURCE MANAGEMENT PLAN BEING PROTESTED
Uncompahgre Field Office Proposed Resource Management Plan and Final Environmental
Impact Statement

PROTESTERS NAME
Robin Smith

ADDRESS
40849 M Road
Paonia, Colorado  81428

PHONE NUMBER
(970) 527-5060

MY INTEREST IN FILING THIS PROTEST
As stated in my enclosed comment letter on the draft RMP:

> When it came time to retire, my wife and I choose to move from Ohio to a 45-acre
> property three miles south of Paonia. We put much of our savings into building
> our dream home where we intended to live the remainder of our days. Now,
> thanks to BLM, our future is at risk.

> The Agency's Preferred Alternative makes available for a leasing a parcel of land
> that is directly adjacent to our property at 40849 M Road, Paonia. Consequently,
> we have the potential of having oil and gas drilling occurring right next door to
> our property. We also have water well and a pond that is located 488 yards from
> the parcel BLM is proposing to make available for oil and gas leasing. If my well
> and pond become contaminated with chemicals from the oil and gas industry, will
> BLM provide my family with drinking water in perpetuity? We grow much of our

own food on our property—herbs and vegetables in the garden, as well as apples, peaches, plums, pears, nectarines, cherries, grapes, blackberries, and raspberries in our orchard. Will BLM provide us with food when we can no longer grow our own organic produce due to contaminated irrigation water?

It is a bold-faced lie for BLM to state that oil and gas development occurring on the federal mineral estate property adjacent to ours will not have any direct or indirect impacts on our non-decision lands—our private property. The negative impacts of oil and gas drilling next to our property will result in us being forced to:

- Breathe contaminated air;

- Risk drinking contaminated water;

- Risk irrigating our organically cultivated garden and orchard with contaminated water;

- Listen to constant fracking noise;

- Feel the ground vibrate from fracking;

- Endure endless truck traffic breaking the peace and tranquility of our rural property;

- Lose our dark skies due to light pollution;

- Have our beautiful mountain views obscured by oil and gas wells; and

- No longer see dozens of migrating deer, elk, and other wildlife on our property.

Because we do not want to live next to an oil and gas patch, the direct and indirect negative impact of oil and gas drilling next to our property will result in us having to sell our property and move out of the area. That assumes, of course, that we will be able to find someone to buy our property—after-all, who would buy his dream home next to an oil and gas well? Additionally, our reduced property values will cause financial hardship on our family. And, by the way, will BLM pay our moving costs? Or will this be another indirect financial impact that we must bear because of BLM's poor decision making?

Lastly, if BLM is so sure there will not be any direct or indirect impacts to our property, then they should be willing to pay us the difference between an appraisal of our property value done before leasing and another one done while fracking is taking place on the adjacent property.

ISSUE OR ISSUES BEING PROTESTED

1. Insufficient length of public comment period.

2. Failure of the public involvement process.

3. Failure to consider all reasonable alternatives.

4. Failure to consider direct and indirect impacts to non-decision area lands.

5. Creating a more extreme Preferred Alternative than proposed in the draft RMP.

STATEMENT OF THE PART OR PARTS OF THE PLAN BEING PROTESTED

1. **Paragraph 5, of un-numbered page 7, titled Proposed Resource Management Plan and Final Environmental Impact Statement for the Uncompahgre Field Office, Colorado BLM/CO/PL-19/001.**

   The paragraph above indicates that protests are due 30 days after publishing in the Federal Register, or July 29.

   It is absolutely ludicrous and unreasonable for BLM to spend 9 years to prepare a nearly 3,000-page RMP and Final Environmental Impact Statement but only allow 30 days for the public to read and comment on this document. Further, releasing this during the height of summer vacation ensures that many people will not be able to participate in the comment period because they are out of town. My family leaves for summer vacation tomorrow and will not return until July 28—the final day letters of protest will be accepted. Consequently, I have had just two weeks to read the 3,000 pages that took BLM 9 years to write. This is a violation of the spirit and intent of the National Environmental Policy Act (NEPA), which has as one of its goals the encouragement of public participation. BLM's 30-day comment period during summer vacation on a 3,000-page document tears at the heart of one of the primary purposes of NEPA.

2. **Section 1.4 Public Involvement and Planning Issues**
   Approximately 42,000 out of the 53,000 comments received during the draft RMP public comment period urged BLM to curtail oil and gas development and increase environmental protections when oil and gas development takes place. Rather than incorporating these comments into the final RMP, BLM's final preferred alternative increases the acreage available for oil and gas leasing by 6,000 acres and reduces environmental protections.

   Allowing the public to comment during the scoping period and on the draft RMP and then ignoring that comment is not public involvement. In plain English, this is a charade. Public involvement means BLM not only solicits public input, but also takes seriously these comments and incorporates them into the final RMP. Anything short of this is a violation of the spirit and intent of NEPA.

BLM_0076405

3.  **Section 2.2.2 Develop a Reasonable Range of Alternatives.**

BLM has failed to develop and consider a reasonable range of alternatives. Paragraph (a) of §1502.14 of the Council on Environmental Quality regulations direct federal agencies undergoing the NEPA process to:

> Rigorously explore and objectively evaluate *all reasonable alternatives*, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated. (Emphasis added.)

Section 2.4.1 of the Final RMP provides the following additional information on how BLM formulates its alternatives:

> …the purpose of this RMP is to ensure that public lands are managed in accordance with the intent of Congress, as stated in the FLPMA, under the principles of multiple use and sustained yield. Alternatives that promote *exclusive use or maximum development, production, or protection of one resource at the expense of other resources or resource uses were eliminated from further consideration.* (Emphasis added.)

Consistent with these guidelines, Section 2.4.3 of the draft RMP dismisses a no oil and gas leasing alternative by stating:

> An alternative that prohibits fluid mineral leasing throughout the decision area would not meet the purpose of and need for the RMP.

Further, Section 2.4.4 states:

> An alternative that prohibits coal leasing throughout the decision area would not meet the purpose of and need for the RMP.

However, an analysis of Alternative E, the Agency's Preferred Alternative, reveals BLM is proposing to make 871,010 acres, or 95%, of the 916,000 acres in the planning area available for oil and gas leasing. *Apparently, BLM considers making 95% of the acreage available for oil and gas leasing a reasonable alternative and not an exclusive use or maximum development alternative.*

*If designating 95% of the UFO as available for oil and gas leasing is reasonable, then designating 95% of the UFO as unavailable for oil and gas leasing is also reasonable.* Consequently, I proposed in my comment letter on the Draft RMP inserting language in Alternative B, the Conservation Alternative, prohibiting fossil fuel (coal, oil and gas) leasing on 95% of the lands within the planning area throughout the life of the RMP. *This reasonable alternative was not considered as required by law*

4.  **Failure to consider direct and indirect impacts to non-decision area lands.**

The fifth bullet point in Section 4.1.1 of the Final RMP states that "Direct and indirect impacts of implementing the RMP primarily occur on the decision area lands."

Nothing could be further from the truth. BLM's decision to allow 95% of the area to be available for oil and gas leasing will destroy many people's lives—including that of my family. Please read *My Interest In Filing This Protest* above.

The purpose of NEPA is evaluate environmental impacts of the proposed action as a basis for decision making. By dismissing the direct and indirect impacts to non-decision area lands, the Final RMP illegally fails to evaluate the many negative impacts of oil and gas development on the private land in the North Fork Valley.

5. **Creating a more extreme Preferred Alternative than proposed in the draft RMP.**
   After receiving approximately 42,000 comments supporting a reduction in the acreage available for oil and gas leasing and calling for increased E protections on those lands where drilling takes placed, BLM's final preferred alternative E increases the acreage available for leasing by 6,000 acres and reduces the environmental protections for this drilling over the draft preferred alternative, now alternative D. By creating a more extreme preferred alternative with regards to oil and gas development that is not a combination of any of the alternatives analyzed in the draft RMP and was not supported by public comment effectively provides the State Director a preferred alternative that the public has not had an opportunity to comment on. NEPA does not allow for the creation of new preferred alternatives out of thin air in the final RMP while denying the public an opportunity to comment on this alternative.


ATTACH COPIES OF ALL DOCUMENTS ADDRESSING THE ISSUE(S) THAT WERE SUBMITTED DURING THE PLANNING PROCESS BY THE PROTESTING PARTY, OR AN INDICATION OF THE DATE THE ISSUE(S) WERE DISCUSSED FOR THE RECORD
See enclosed draft comment period letter dated October 28, 2016. I also commented during the scoping period in the winter of 2010, but I no longer have a copy of my comments as the computer I owned/used to write these comments 9 years ago no longer exists.


A CONCISE STATEMENT WHY YOU THINK THE STATE DIRECTOR'S DECISION IS BELIEVED TO BE WRONG
The Director's decision to approve the final UFO RMP and EIS is wrong because it:
   1. Violates NEPA by failing to provide an adequate public comment period.
   2. Violates NEPA by conducting an inadequate public involvement process.
   3. Violates NEPA by failing to consider all reasonable alternatives with regards to oil and gas leasing.
   4. Violates NEPA by failing to consider direct and indirect impacts to non-decision area lands.
   5. Violates NEPA by creating a new Preferred Alternative E that is more extreme than either Alternative C in the draft (the extractive leaning alternative) or Alternative D in the

draft (the preferred extractive leaning alternative) in which the public did not have an opportunity to comment on.

Respectfully submitted,

Robin Smith

Robin Smith
40849 M Road
Paonia, Colorado. 81428

BLM_0076408

October 28, 2016

BLM
Uncompahgre Field Office
2465 S. Townsend Ave
Montrose CO 81401
uformp@blm.gov

RE: Comments on Draft Resource Management Plan

Dear UFO BLM,

I am writing to urge you to select Alternative B as the agency's preferred alternative, **with the stipulation that it be revised to incorporate language prohibiting fossil fuel leasing on 95% of the lands within the decision area throughout the life of the Resource Management Plan**.

Outlined below are my comments on the Draft RMP.

FAILURE TO CONSIDER ALL REASONABLE ALTERNATIVES
BLM has failed to consider all reasonable alternatives in the Draft RMP. Paragraph (a) of §1502.14 of the Council on Environmental Quality regulations direct federal agencies undergoing the NEPA process to:

> Rigorously explore and objectively evaluate **all reasonable alternatives**, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated. (Emphasis added.)

Section 2.4.1 of the Draft RMP provides the following additional information on how BLM formulates its alternatives:

> …the purpose of this RMP is to ensure that public lands are managed in accordance with the intent of Congress, as stated in the FLPMA, under the principles of multiple use and sustained yield. Alternatives that promote **exclusive use or maximum development, production, or protection of one resource at the expense of other resources or resource uses were eliminated from further consideration.** (Emphasis added.)

Consistent with these guidelines, Section 2.4.3 of the draft RMP dismisses a no oil and gas leasing alternative by stating:

> An alternative that prohibits fluid mineral leasing throughout the decision area would not meet the purpose of and need for the RMP.

Further, Section 2.4.4 states:

An alternative that prohibits coal leasing throughout the decision area would not meet the purpose of and need for the RMP.

However, an analysis of Alternative D, the Agency's Preferred Alternative, reveals BLM is proposing to make approximately 870,000 acres, or 95%, of the 916,000 acres in the planning area available for oil and gas leasing. Apparently, BLM considers making 95% of the acreage available for oil and gas leasing a reasonable alternative and not an exclusive use or maximum development alternative.

To remain consistent with BLM's proposed Preferred Alternative, I propose inserting language in Alternative B, the Conservation Alternative, prohibiting fossil fuel (coal, oil and gas) leasing on 95% of the lands within the planning area throughout the life of the RMP.

When deciding where to locate the 5% of lands, or approximately 46,000 acres, that <u>will</u> be open to fossil fuel leasing in Alternative B, BLM must take into account where there is opposition to oil and gas development and where there is support. Due to the overwhelming opposition to leasing anywhere near the North Fork Valley, this area should be included in the 870,000 acres that will remain closed to leasing. Similarly, the 46,000 acres available for fossil fuel leasing should be located in those communities within the UFO that support oil and gas development.

<u>FAILURE TO CONSIDER IMPACTS OF CLIMATE CHANGE</u>

Scientists say that 2016 is turning out to be the warmest year on record, breaking the second warmest year that occurred in 2015. As a result of warmer temperatures, severe climate events are becoming more commonplace. For example, southern Louisiana recently received 30 inches of rain in three days! Let's put that in perspective—since we don't receive much rain within the UFO, let's translate this into snow. Thirty inches of rain is equivalent to approximately 300 inches (25 feet) of snow. In three days! This extreme weather would result in the loss of many lives.

According to a recent article in CommonDreams.org, three of the world's biggest insurance companies are warning that climate change amounts to the "mother of all risks" and are demanding the industrialized countries of the world stop bankrolling the fossil fuels industry. This article states:

> Multi-national insurance giants Aviva, Aegon, and Amlin, which together manage $1.2 trillion in assets, released a statement in August of this year calling on the leaders of the world's biggest economies to commit to ending coal, oil, and gas subsidies within four years.

> "Climate change in particular represents the mother of all risks—to business and to society as a whole. And that risk is magnified by the way in which fossil fuel subsidies distort the energy market," said Aviva CEO Mark Wilson.

> One of the subsidies our local oil and gas companies receive is the leasing of publicly-owned lands for a pittance—often for as little as $2 per acre. Meanwhile,

the "real costs" associated with damage to the environment and human health are foisted on others and are not paid by polluters.

Indeed, insurance companies are increasingly shouldering many of the costs associated with a warming planet, whether it be from extreme weather damage or reimbursing farmers for lost crops.

In the first half of 2016 alone, natural catastrophes worldwide have caused $70 billion in losses, of which $27 billion was insured, according to an assessment by insurance and reinsurance company Munich RE—with events of particular note being climate-related "storms in the U.S. and Europe, massive forest fires in Canada, and the complete absence of typhoons in the northwestern Pacific."

And housing data firm Zillow recently published an analysis which found that as many as 1.9 million homes across the country could be underwater by 2100 if the seas rise as much as climate scientists predict, amounting to property losses in the hundreds of billions of dollars.

"These subsidies fuel dangerous climate change," said Whitley. **"If we are to have any chance of meeting the 2°C target set at the Paris climate summit then governments need to start a program of rapid decarbonization**. The finance sector recognizes the importance of moving away from fossil fuels, **governments need to realize they may be the only ones left not moving**." (Emphasis added.)

It is absolutely unconscionable for BLM to propose fossil fuel leasing on approximately 870,000 of available acreage in the Preferred Alternative. BLM must instead adopt Alternative B with the inclusion of a provision prohibiting fossil fuel leasing on 95% of the acreage in the planning area because the climate crisis we are currently facing demands action. Approximately 73% of fossil fuel extraction in the U.S. takes place on private lands while the remaining 27% occurs on publicly-owned land. Preventing fossil fuel extraction on private lands is difficult, if not impossible, for citizens and government agencies to stop. **Therefore, to protect our families and all life forms on Earth from this impending crisis, it is imperative that we keep those fossil fuels we have direct control over—the federal mineral estate—in the ground.**

FAILURE TO CONSIDER DIRECT AND INDIRECT IMPACTS TO NON-DECISION AREA LANDS
The fifth bullet point found in Section 4.1.1 of the Draft RMP states that "Direct and indirect impacts of implementing the RMP primarily occur on the decision area lands:"

Nothing could be further from the truth. BLM's decisions are about to destroy many people's lives—including that of my family.

When it came time to retire, my wife and I choose to move from Ohio to a 45-acre property three miles south of Paonia. We put much of our savings into building our dream home where we intended to live the remainder of our days. Now, thanks to BLM, our future is at risk.

The Agency's Preferred Alternative makes available for a leasing a parcel of land that is directly adjacent to our property at 40849 M Road, Paonia. Consequently, we have the potential of having oil and gas drilling occurring right next door to our property. We also have water well and a pond that is located 488 yards from the parcel BLM is proposing to make available for oil and gas leasing. If my well and pond become contaminated with chemicals from the oil and gas industry, will BLM provide my family with drinking water in perpetuity? We grow much of our own food on our property—herbs and vegetables in the garden, as well as apples, peaches, plums, pears, nectarines, cherries, grapes, blackberries, and raspberries in our orchard. Will BLM provide us with food when we can no longer grow our own organic produce due to contaminated irrigation water?

It is a bold-faced lie for BLM to state that oil and gas development occurring on the federal mineral estate property adjacent to ours will not have any direct or indirect impacts on our non-decision lands—our private property. The negative impacts of oil and gas drilling next to our property will result in us being forced to:

- Breathe contaminated air;

- Risk drinking contaminated water;

- Risk irrigating our organically cultivated garden and orchard with contaminated water;

- Listen to constant fracking noise;

- Feel the ground vibrate from fracking;

- Endure endless truck traffic breaking the peace and tranquility of our rural property;

- Lose our dark skies due to light pollution;

- Have our beautiful mountain views obscured by oil and gas wells; and

- No longer see dozens of migrating deer, elk, and other wildlife on our property.

Because we do not want to live next to an oil and gas patch, the direct and indirect negative impact of oil and gas drilling next to our property will result in us having to sell our property and move out of the area. That assumes, of course, that we will be able to find someone to buy our property—after-all, who would buy his dream home next to an oil and gas well? Additionally, our reduced property values will cause financial hardship on our family. And, by the way, will BLM pay our moving costs? Or will this be another indirect financial impact that we must bear because of BLM's poor decision making?

Lastly, if BLM is so sure there will not be any direct or indirect impacts to our property, then they should be willing to pay us the difference between an appraisal of our property value done before leasing and another one done while fracking is taking place on the adjacent property.

BLM_0076412

DOI-BLM-CO-S050-2010-0001-RMP-EIS

UFO RMP Protest

Dear Director,

I have been involved in the RMP planning process for about ten years. I was on the RAC planning subgroup that met ten times from 2010 through 2012. I believe I am the only surviving member (of three) of that group representing conservation interests. Despite being outnumbered by industry interests, we believed that the preferred alternative from the 2016 draft plan was reasonable in most ways. (The extremely large area made available for oil and gas development and the small area of ACECs were the parts that were disappointing.) The industry driven majority of the RAC subgroup was obviously satisfied that they had gotten what they wanted from the preferred alternative d.

We (the SubRAC group and the general public on the west slope) were given the impression that the final plan would be very close to the draft preferred alternative, with small changes here and there.

I am shocked that all of our work, and the majority of local citizens&rsquo; comments have been ignored at the end of the process, and we are getting a one sided, anti conservation, plan from Washington.

The Proposed Final EIS ignores the FLPMA 103(c) citation on page r-33, &ldquo;BLM multiple use mandate does not require all uses be allowed on all lands&rdquo; by allowing oil and gas development on nearly the entire UFO, but dedicating almost no BLM land to wildlife or non motorized human use.

I protest the following issues and parts of the proposed plan:

1)The change in what was previously Lands With Wilderness Characteristics (LWC). The new LWC management is not within the draft range of alternatives. The proposed alt E should be the same as the draft alts b-d.

I discussed the importance of the LWC designation in my comments on the draft in October, 2016. Those comments are in the proposed plan at page r-355 and r-265 (comment 000409).

BLM_0076413

2) The proposed EIS eliminates all of the draft plan&rsquo;s Ecological Emphasis Areas (EEAs). The BLMs own rationale for keeping them at #2 on page r-1012-1013 is sound. The proposal at r-1013 also correctly states that the EEAs were discussed at the subRAC meetings, (with no hint that they would later be removed by others). In any event, the alt e with no acres of EEA is also outside the range of alternatives presented in the draft.

In my comments on the draft, which are at pages r-265, r-994,r- 998,(comment 000409), r-1009 and r-1010 (comment 000549), and, I said that the EEAs are probably the most important part of the RMP for wildlife, especially for connectivity for deer and elk, and for allowing habitat to persist with changes in climate. I also mentioned that many of these areas should have been ACECs, and thus were also being downgraded to EEAs. (Ironically BLMs reply at page r-1015 to my request for the Salt Desert EEA to be kept, was that since it is an ACEC, it doesn&rsquo;t need a lesser layer of protection. It isn&rsquo;t and it does.)

3) ACECs were cut to a shocking degree in the draft alt d, from 215k in alt b to 51k acres. This is after many proposed areas had already been cut out for legit reasons. At least we knew some areas that should have been ACECs but weren&rsquo;t, would get lesser protection as EEAs. Now only 30k acres of potential ACECs get any protection. This very low total of combined ACEC and EEA does not comply with the BLMs mission, it&rsquo;s multiple use mandate, nor the plan&rsquo;s purpose and need of resolving multiple use conflicts.

My comments on the draft regarding ACECs can be found at page r-77 (comment 000409), r-90 (comment 000549), and r-265 (comment 000409) of the proposed RMP.

So in summation, I believe the decision is wrong for the following reasons:

&bull;   That the area of Ecological Emphasis Areas is outside the reasonable range of alternatives offered in the draft.

&bull;   The management of Lands with Wilderness Characteristics is outside the draft&rsquo;s range of alternatives.

&bull;   That the small combined areas EEAs and ACECs fail to comply with the BLM mission by not &ldquo;sustaining health and diversity&hellip;of the public lands for the use and enjoyment of present and future generations.&rdquo;

&bull;   The extreme emphasis on energy development and grazing at the expense of conservation of wildlife and the public&rsquo;s enjoyment, fails to meet the purpose and need of the plan from ES.2, &ldquo;resolves multiple use conflicts&rdquo;.

&bull;   The proposed RMP disregards the FLPMA 103(c) quote from BLMs own plan that the &ldquo;multiple use mandate does not require all uses on all lands.&rdquo; This RMP is very close to allowing industrial uses everywhere while leaving a very few scraps for the use and enjoyment of present and future generations.

I ask you to use the draft preferred alternative d as the final RMP EIS, and discard alternative e. Alternative d was deemed to be a very good deal by extractive industry while some conservation features in 2016. At the very least, many parts of alt d, including the parts regarding LWCs, ACECs and EEAs I have mentioned here should be retained. I&rsquo;m sure others will have similar requests about other parts of the proposed RMP.

All of my above mentioned comments were transmitted during the October, 2016 comment period for the Draft RMP. I will be impacted if the current Proposed RMP is adopted by lower property values, a lower quality of life due to lessened non-motorized recreation opportunities and less wildlife on and near UFO land, a worse long term local economy (less tourism and agriculture), and a myriad of negative effects of industrial energy development (effects on water, air, property values, roads and wildlife).

Sincerely,

Bill Day

28478 Hwy 92

Hotchkiss, CO 81419

<a href="tel:970-623-4727">970-623-4727</a>

Billday@paonia.com

PRMP-1-500000060<ol style="list-style-type:lower-alpha">

<li>Regarding water contamination from surface disturbances, there is a huge difference between &ldquo;eliminate&rdquo; and &ldquo;limit.&rdquo; This gives BLM a hefty leeway. From our residential perspective, limiting surface disturbances can still result in surface contamination that harms our health.

Does this buffer of 50 feet measure from the banks of a perennial stream or from the center of a perennial stream? A buffer of 50 feet along perennial streams is negligible when compared with a 1,000-foot buffer near public water supplies. Differentiating between public water supplies and irrigation sources (perennial streams) places a lower priority on irrigation sources, which is not acceptable. Contaminated perennial streams may eventually feed into public water supplies. How far away from perennial stream contamination to a public water supply is considered &ldquo;safe&rdquo;? Why not provide the same buffers to all water sources? (Please include cited evidence that a 50-foot buffer will prohibit contamination.)

What are BLM&rsquo;s &ldquo;specific actions&rdquo; that will protect and monitor water quality? In light of the concerns raised in (b) above, how will Alternative E protect riparian and perennial streams with 50-foot buffers?

This section mentions that only municipal water supplies and public water supply systems will have &ldquo;measures to protect.&rdquo; This does not address water sources that supply irrigation. See discussion (b) above.

The buffers mentioned above the underlined statement are generic (one size fits all). For proposed pad sites near our watershed, geologic and hydrologic features will be unique (steep gradients, differing substrates) such that these setbacks are not enough to guarantee risk reduction.

Stating that &ldquo;[t]hese measures would reduce the potential for contamination of public water supplies ...&rdquo; does not address our concerns. As taxpayers and residents who will be impacted, we should not have to accept BLM&rsquo;s reduction in potential contamination ... or reduction in associated risks to human health. As taxpayers and residents who will be impacted, we expect the elimination of any potential for contamination. </li>

</ol>

Lisa Joss

PRMP-1-500000060        Lisa Joss     40872 O Road        Paonia  Colorado  81428   United States   303-547-0132   lisajoss7@gmail.com

BLM_0076416





☐ Exclude Forms and Duplicates

Filter | Show All Letters

| Letter # | Author Name | Organization Name | Date Submitted | Letter Type | Coding Status | Early Attention | Size (bytes) | |
|---|---|---|---|---|---|---|---|---|
| 124 | Walsh-Oeinck, Patricia | | 07/25/2019 | Unique | New | Not Required | 156248 | |
| 125 | Danuff, Steve | | 07/23/2019 | Unique | New | Not Required | 146619 | |
| 130 | Grother, Craig | Backcountry Hunters & Anglers | 07/25/2019 | Unique | New | Needs Attention | 701129 | |
| 131 | McGavin, Rick | | 07/25/2019 | Unique | New | Needs Attention | 41157 | |

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
CARA | Comment Analysis and Response Application

Home | Projects | Reports | My Profile | Admin | Support

## Application Error

An error occurred while processing your request - Object reference not set to an instance of an object.

For more information about CARA, please visit the support page.

CARA Support team

Go Back To Previous Page

**Inner Exception:**
**Controller:** Letter
**Action:** Coding

**Stack Trace:** at Aquilent.Cara.WebApp.Controllers.LetterController.Coding(Int32 projectId, Int32 phaseId, Int32 id, String nextLetterIds, Nullable`1 lettersRemaining, Boolean useDefaultFilter) at lambda_method(Closure , ControllerBase , Object[] ) at System.Web.Mvc.ReflectedActionDescriptor.Execute(ControllerContext controllerContext, IDictionary`2 parameters) at System.Web.Mvc.ControllerActionInvoker.InvokeActionMethod(ControllerContext controllerContext, ActionDescriptor actionDescriptor, IDictionary`2 parameters) at System.Web.Mvc.ControllerActionInvoker.<>c__DisplayClassd.b__a() at System.Web.Mvc.ControllerActionInvoker.InvokeActionMethodFilter(IActionFilter filter, ActionExecutingContext preContext, Func`1 continuation) at System.Web.Mvc.ControllerActionInvoker.InvokeAction(ControllerContext controllerContext, String actionName)

# Ref: Bureau of Land Management Uncompahgre RMP

 We would like to thank the BLM for the ongoing efforts of the Uncompahgre Field Office in developing a reasonable Resource Management Plan that safeguards all resources in the North Fork Valley. Specifically, we appreciate the inclusion of the North Fork Alternative, or B1, as part of the draft RMP. This locally driven proposal ensures protection of the entire Gunnison Watershed, supports farmers, protects public health, sustains ecological well-being and allows for continued building of a sustainable rural economy. **We request that the BLM adopt the North Fork Alternative in the final RMP.**

We think that at a minimum the issues that need to be addressed and considered are:
> a) analysis of the impacts of hydraulic fracturing and multi-drilling technologies.
> b) the cumulative impacts of unregulated gas gathering pipelines.
> c) the impact of extreme weather causing flooding, mudslides and geological instability, which can compromise the integrity of pipelines and result in leaks and potential explosions.
> d) the impact of permanently removing water from the hydrologic cycle.
> e) injection wells and the potential for earthquakes and contamination of aquifers.
> f) the impacts on human health
> g) that ozone levels already exceed the EPA threshold of 70ppb in certain areas.
> h) community source water protection plans.
> i) impacts on hunting due to changes in wildlife migration and reproduction habits.
> j) impacts on currently used recreation areas

Our valley is growing and people are moving here for a clean and healthy lifestyle. Our valley is moving away from singular dependence on mining, oil and gas development to an economy focused on organic food, outdoor recreation and the opportunity to raise young families in a healthy environment.

**We own four business in this valley; a retail liquor store, a jewelry store, a karate dojo and we own rentals.** Most of our karate students are either involved in the organic food business or moved here to provide their young growing families with a clean, healthy life style. This would be negatively effected by large scale oil and gas development.  Our retail wine business and jewelry business is also supported by persons who again moved here for the North Fork lifestyle.

The BLM must adopt a management plan that protects these resources which make Paonia and the North Fork Valley such a special place. Inappropriate development over the next twenty years has great potential to cause air and water pollution, which would significantly degrade Paonia residents' quality of life.

The BLM should consider the uniqueness of the North Fork Valley in adopting the final RMP. We have Gold Medal fishing, prized big game hunting, and award-winning fruits,

vegetables, and wines which can all be harmed by air pollution or surface or ground water contamination that are inevitably associated with oil and gas extraction.

Clean water is one of the greatest assets to the North Fork Valley, and as we move into the 21st century it will become increasingly important. **The North Fork Alternative stipulates that a buffer area of a half of a mile from all source water supplies oil and gas surface activities be maintained. We strongly support this part of the Alternative plan.**

In addition to drinking water, irrigation water is a major concern in and around the town of Paonia. Irrigation waters are used not only for animals but the farms and orchards that are highly regarded throughout the state for providing high quality products. Many of these farms and orchards are certified organic and any contamination would jeopardize this certification.

In the last few years we have seen a major growth in hops, cider and organic food production in this valley. It's very exciting. These products are sold to many places around the nation, making the valley's future America's future. Unforeseen contamination in this valley could significantly impact the land and subsequently the agricultural industry that is vital to the economic stability of this area. **Mineral leasing and severance tax funds will not compensate** for the loss of agricultural endeavors and its attributed labor force.

**Any proposed areas open for leasing in the final RMP that are on or near critical wildlife habitat, such as the Roeber State Wildlife Area, which is designated as a critical habitat area by the Division of Wildlife, should be protected from any potential negative impacts from oil and gas development.** This particular area is a calving area for elk and is closed in the winter; any human disturbance could affect the wildlife calving or migration.

**The final plan should also include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat.**

Furthermore, **areas which are in close proximity to town limits and are used for recreation must be protected from potential damage due to oil and gas development.** In addition to the concerns about the impacts on local recreation areas, **any development in these potential parcels would severely impact our already degrading roads.** Heavy truck traffic is cause for concern at the municipal level. Not only would the increase in traffic cause real damage to the surfaces of our roads, there would be an increase in exhaust fumes and dust which would settle into the valley and deteriorate air quality. **The North Fork Alternative, B1, considers all of these protections** and ensures that these valuable assets remain intact.

We strongly encourage the BLM to designate **Elephant Hill and Jumbo Mountain as a Special Recreation Management Area (SRMA)** and manage it as such. This designation would allow an area that is already being predominantly used for recreation, such as hiking, biking, hunting, equestrian and ATV use to be managed and maintained for the quality of these uses. We use the area for daily recreation and exercise, one of the great things about being residents of this valley. Management of this area should benefit from BLM resources that will ensure that the trails remain safe and that residents and visitors will enjoy a high-quality experience.

On a personal note, we have a vested interest in the hunting and recreational activities that take place in proximity to these wildlife areas as these types of activities create an economic interest for us.

**The RMP as written is an inappropriate use of public lands.** It would open almost every acre of public lands in the region to leasing (865,970 acres or 94.5% of total oil, gas, and mineral acreage), and specifically in sensitive air, water and food sheds. The Preferred Alternative is a roadmap to industrializing this economically and ecologically unique area with gas wells, pipelines, storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks, and more.

**The potential for human, animal and environmental damage is too high.**

**We ask that the BLM adopt the North Fork Alternative to the RMP instead of the Preferred Alternative.**

Thank you for your consideration in this matter,
Rick and Jennifer McGavin
North Fork Karate, Tridea, West Wine and Spirits, McG 3 LLC
PO Box 1805
Paonia CO 81428

BLM_0076420



Date: July 25, 2019

To: Jamie Connell, BLM State Director

From:  Paonia Board of Trustees

Dear Director Connell:

The Town of Paonia has appreciated being an active participant in with the Bureau of Land Management Uncompahgre Field Office for the Resource Management Plan. As an active past and continuing participant, the Town of Paonia hereby submits this formal protest of the Final Environmental Impact Statement and Proposed Resource Management Plan for the Uncompahgre Field Office on behalf of the Town of Paonia and the Board of Trustees, 970-527-4101, paonia@townofpaonia.com.

The Town of Paonia previously commented on the Draft EIS, in a letter submitted on October 27, 2016. This comment is referenced in the Appendix R Comment Summary of the FEIS and Proposed RMP as 500176_StewartC_20161027_TownofPaonia. In our comment, we requested the BLM adopt the North Fork Alternative Plan to provide a community driven management framework for oil and gas leasing and development to protect the North Fork Valley's thriving agricultural economy, scenic vistas, and healthy populations of wildlife and game. We expressed serious concerns with the draft EIS and the Preferred Alternative included therein, focusing on the issues of protections for the Town's source water and other domestic water supplies, impacts to Town infrastructure, health risks from natural gas development, adverse impacts to wildlife resources, and management of Jumbo Mountain. These are the issues that form the core of the Town of Paonia's protest. We also protest BLM's introduction of an entirely new Alternative E, without the proper public comment at the protest stage, which is radically different from the 4 alternatives that were the subject of the Draft EIS.

ISSUES
**Source Water Protections**
The Town of Paonia's original 2016 comment letter requested the BLM include all buffers and oil and gas restriction recommendations in the North Fork Alternative Plan, including a ½ mile setback and ¼ mile no leasing restriction between oil and gas operations and the Town's source water supplies, which is consistent with the Town's Source Water Protection Plan. This ½ mile setback is necessary to ensure that the Town is able to continue providing high-quality drinking water to its residents. The Proposed RMP imposes significantly less-protective setbacks and is inconsistent with the Town's Source Water Protection Plan.

Additionally, the town requested the BLM adopt the protections for irrigation water included in the North Fork Alternative to ensure the viability and sustainability of our Valley's agricultural industry. The BLM failed to properly analyze potential impacts to irrigation water from oil and gas development and do not adequately address the concerns we raised in our 2016 comment letter.

---

BLM_0076421

**Town Infrastructure**

The Town of Paonia is a municipal water company, Public Water System ID #CO 0115601. The Town of Paonia has severe concerns about the impact of oil and gas development on infrastructure the Town maintains. Paonia's water is acquired via 38 surface water influenced ground-water springs and the Town passed Watershed Ordinance 2003-02 on February 25, 2003. Paonia has also created a Source Water Protection Plan which the BLM needs to consider in the determination of the final RMP. The planning team for the source water protection plan recommended "Source Water Protection Best Management Practices" be considered for implementation by several agencies, including the BLM. As our water crisis highlighted, infrastructure is fragile, and the Town needs an RMP crafted with that in mind. The Town of Paonia asks that, in order to protect the quality and quantity of our domestic water, the final UFO RMP include all buffers and oil and gas restriction recommendations in the Source Water Protection Plan and Alternative B1. The level of increased oil and gas development anticipated in this Proposed RMP would significantly exacerbate this already serious issue.

**Health Risks**

The Town of Paonia has long been committed to providing a high quality of life for all of the people that call this area home. This quality of life is directly impacted by the quality of air and water in the North Fork Valley. The Town urges the BLM to make decisions using the best available data, as this is a requirement of the National Environmental Protection Act (NEPA). As the Sixth Edition of Physicians for Social Responsibility's "Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking" and numerous other studies demonstrate, there are clear risks of living downstream of oil and gas development. Our 2016 comment letter made clear the concerns the Town has about protecting our air and water supplies, and the health of our community.

Additionally, the Town of Paonia raised concerns regarding industries that would further degrade or risk the coal mining business in the North Fork Valley. Due to the unknown risks associated with nearby oil and gas development, the town supported limiting the areas where oil and gas development are allowed. This concern was not properly addressed by the BLM in the proposed RMP.

**Wildlife Resources**

Wildlife and its habitat have both their own intrinsic value, and significant value to the Town of Paonia. In our 2016 comment letter, we were very clear that wildlife resources need protection from oil and gas development. The town requested the BLM protect areas that are on or near critical wildlife habitat, such as the Roeber State Wildlife Area, be protected from any potential negative impacts from oil and gas development. Rather than protecting wildlife resources, the RMP radically reduces the stipulations designed to protect wildlife and habitat in the North Fork Valley area from that which was originally considered in the original 4 alternatives proposed in the Draft EIS.

**Jumbo Mountain**

The Town of Paonia requested that areas in close proximity to town limits which are used for recreation must be protected from potential damage due to oil and gas development. As outlined in the North Fork Alternative Plan, we requested Special Recreation Management Area (SRMA)

BLM_0076422

designation for Jumbo Mountain. This designation must include no leasing and no surface occupancy stipulations. The SRMA should manage this land for the quality of hiking, biking, equestrian and ATV experiences, as well as historical uses such as hunting and grazing. Additionally, we requested this area should include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat. Maintaining the viability of the area for all forms of recreation within the Jumbo Mountain area is a key priority, and was ignored.

PLAN SECTIONS UNDER PROTEST
- **Alternative E in its entirety**
- **Section 3.4.2 Public Health & Safety**
- **Section 4.3.1 Air Quality & Climate**
- **Section 4.3.2 Soils & Geology**
- **Section 4.3.5 Water Resources**
- **Section 4.4.3 Fish & Wildlife**

CONCISE STATEMENT WHY STATE DIRECTOR'S DECISION IS WRONG
First, it is improper, and a violation of the National Environmental Policy Act for the BLM to publish an entirely new alternative here in this final proposed RMP. Alternative E, the proposed RMP, is wholly new. It has not been subject to any public comments or review. When the Town of Paonia commented on the Draft EIS for this RMP, we were unable to comment on Alternative E, because it did not exist. To offer a proposed RMP that has been subject to no public comment is unacceptable, doubly so when the new alternative is directly contrary to the comments submitted by over 40,000 members of the public, and the Town of Paonia.

The Final EIS ignores the input of the Town of Paonia across the board. The Final EIS downplays the significant health and environmental risks associated with oil and gas development, not to mention the impact on the local economy and offers 95% of the federal mineral estate to development, with no concern for Town of Paonia. The Town of Paonia requested no leasing within ¼ mile of public water supplies and a ½ mile no surface occupancy stipulation around the same to protect its water supply, and Alternative E minimizes the potential protections for springs, and reduces the setback distances for the entire North Fork of the Gunnison Corridor (among other rivers).

In our 2016 letter, the Town of Paonia supported the North Fork Alternative, Alternative B.1, that would have extensive No Surface Occupancy (NSO), Controlled Surface Use (CSU), and Timing Limitations (TL) areas to protect wildlife resources. Alternative E significantly reduces the amount of land area under those protective designations, in some cases eliminating them entirely, with no consideration for the wildlife resources. The Proposed RMP shrinks existing Areas of Critical Environmental Concern and eliminates Ecological Emphasis Areas entirely. Finally, the Town requested a 5020-acre Jumbo Mountain Special Recreation Management Area (SMRA) with a fluid mineral withdrawal. The Proposed RMP cuts the acreage of the SMRA to less than 1,600 acres and eliminates any NSO, and dramatically reduces the CSU and TL stipulations within the area. Oil and gas will therefore continue to threaten the future of Jumbo Mountain recreation.

BLM_0076423

Offering Alternative E at the protest stage, without public input is deeply flawed, and improper. Ignoring the input of the Town of Paonia and members of the public to create that alternative is also deeply flawed.

For these reasons, the Town of Paonia respectfully protests the Final EIS and Proposed RMP.

Sincerely

Mayor Pro-Tem, Chelsea Bookout

Trustee, Mary Bachran

Trustee, Karen Budinger

Trustee, Dave Knutson

Town Administrator, Ken Knight

Cc:     Town Clerk File
        Town Attorney
        Western Slope Conservation Center
        Citizen's for a Healthy Community

BLM_0076424

Submission ID PRMP-1-500000059

Per previous protest, the effects of water quality deterioration and community health decline due to fracking are well documented. The North Fork Valley is my home and I resent that people, such as yourselves, who know what has already happened in communities such as Rifle, CO are willing to subject me and my family to this abuse. Shame on you. Research the 6th Extinction.

William Crompton

| William Crompton | 40839 Stewart Mesa Rd. | 40839 Stewart Mesa Rd. | | PAONIA | Colorado | 81428 | United States | 503-504-0667 | billcrompton@hotmail.com |
|---|---|---|---|---|---|---|---|---|---|



Colorado Backcountry Hunters & Anglers
*"The sportsmen's voice for our wild public lands, waters and wildlife"*
www.backcountryhunters.org

Jamie E. Connell
BLM State Director
2850 Youngfield Street
Lakewood. Colorado 802 15-72 10                                July 26, 2019

Subject: Protest of planning decisions included in the Proposed Resource Management Plan & Final Environmental Impact Statement for the Uncompahgre Field Office, BLM Reference 1610 (COS050).

Submitted by:

Craig Grother
P.O. Box 156
Norwood, CO. 81423
(970) 327-4850

Representing: Backcountry Hunters & Anglers

Pursuant to BLM planning regulations at 43 C.F.R. 1610.5-2 I am protesting several planning decisions included in the Proposed Resource Management Plan and Final Environmental Impact Statement for the Uncompahgre Field Office [BLM Reference 1610 (S050)] on behalf of Backcountry Hunters and Anglers.

During the planning process I represented the Colorado chapter of Backcountry Hunters & Anglers (CO BHA) as the Habitat Watchman for the Uncompahgre, and currently serve as one of the Chapter Co-Chairs and Regional Director for the Central Western Slope.

During the planning process I attended public scoping meetings and focus group meetings held in Montrose in 2010 and provided oral comments to the Uncompahgre Field Office (UFO) Planning Team. I also submitted written comments on behalf of the CO BHA to the BLM during the comment period for the Draft RMP/EIS (10/27/16) which are provided as an attachment to this formal Protest.

Upon review of the Proposed Resource Management Plan (RMP) and Final Environmental Impact Statement (FEIS) I believe the Proposed RMP has not fully responded to our comments and concerns related to the conservation and management of our remaining wild lands, wildlife, their habitat needs, and the hunting and fishing opportunities that are of vital interest to us and future generations.

1

Issues being protested:

**1) Protection and conservation of remaining lands with wilderness character and their associated values for wildlife habitat and backcountry hunting and fishing.**

Lands that qualify for this designation are of primary interest to the members of Backcountry Hunters & Anglers. In combination with designated wilderness, wilderness study areas, and congressionally designated Special Management Areas they provide essential habitat and security for wildlife and fish as well as high quality backcountry hunting and fishing opportunities. We are adamant that the remaining areas that retain their wilderness character be protected from further energy and recreation development and emphasized for the improvement of land health objectives and habitat for terrestrial wildlife.

The FEIS summarized the findings of the wilderness characteristics inventory in Appendix F. A total of eight areas that meet the qualifications for lands with wilderness characteristics were originally identified and evaluated in the Draft RMP/EIS. In reviewing the analysis and management alternatives for these areas, it is apparent that the BLM recognized that portions of these areas have been severely impacted by roads and trails used for past mining and energy development, utilities, livestock grazing, and OHV use. Of the eight areas identified, seven were found to possess wilderness character according to agency criteria.

Alternative D of the FEIS (the agency preferred alternative in the DEIS) further reduced the number of areas identified to be designated as Lands Managed to Protect Wilderness Characteristics to a total of three areas. Alternative E, the Proposed RMP, includes the same three areas but further reduces protection of these areas to Lands Managed to Minimize Impacts on Wilderness Characteristics while managing for Other Uses.

Our previous comments on the DEIS were directed to four of the original areas inventoried for their wilderness character (BHA Comments at Appendix F - Lands with wilderness characteristics), including Camel Back WSA Adjacent, Lower Tabeguache/Campbell Creek, Shavano Creek, and the San Miguel River/Norwood Canyon. The Proposed RMP includes the Camel Back WSA Adjacent area, but not the other three areas we feel are essential for protection of key wildlife habitats and high quality backcountry hunting and fishing opportunities within the UFO.

The *Camel Back WSA Adjacent* area includes a total of 8,700 acres of BLM lands that include Monitor and Potter Canyons as well as most of the Monitor Mesa area in between. According to the BLM's analysis, at least 6,950 acres still retain their wilderness character. In combination with the Camel Back WSA and adjacent National Forest lands, this area represents some of the best remaining roadless and backcountry habitat on this portion of the Uncompahgre Plateau. It provides high quality habitat for a population of desert bighorn sheep as well as winter range for elk and mule deer.

BLM_0076427

The *Lower Tabeguache/Campbell Creek* area includes 11,060 acres of BLM lands that include Long Mesa, Burro Creek Mesa, Wild Cow Mesa, and Spring Creek Mesa. This area represents another large block of unroaded backcountry habitat that has escaped the development associated with past uranium mining on this portion of the Uncompahgre Plateau. This portion of the Uncompahgre Plateau also contains high quality big game winter range and important security from the disturbance of roads and OHV trails.

*Shavano Creek* includes 6,090 acres of BLM lands in the upper Campbell Creek and West Campbell Creek adjacent to the north side of the Tabeguache SMA. In combination with Colorado Roadless Area lands on the adjacent Uncompahgre National Forest, this area provides a significant roadless area on this portion of the Uncompahgre Plateau. The Upper Campbell Creek drainage of the BLM would increase the size of this area if it were not for a county road (U472) going to a stock pond development, presumably for maintenance of this pond. Other user-developed OHV trails have been created off county road 226 in to Shavano Creek. Much of this area burned in the Campbell Creek wildfire of 2004 which significantly enhanced habitat conditions on big game winter range, creating a large winter concentration area.

The *San Miguel River* is the most significant fishery in the west end of the UFO and provides other river based recreation opportunities such as rafting and kayaking. The UFO has done an excellent job in providing river access and overnight camping facilities on this portion of the San Miguel. The main San Miguel River above the Cascabel Ranch is adjacent to State highway 145 and other county roads which provide unlimited public access to the river for fishing. The San Miguel River between the lower end of the Cascabel Ranch and the Bennett property boundary below Horsefly Creek (RMZ 3) provides a section of the river that is not accessible by road. So are the tributaries of Saltado Creek and Beaver Creek on the south side of the San Miguel River (RMZ 2). These two major tributary canyons also provide excellent opportunities for solitude and backcountry hunting or fishing experiences adjacent to the main river corridor.

We are opposed to any trail development into the Norwood Canyon below the Cascabel Ranch. This area is already accessible on foot, and provides an excellent opportunity for more solitude and quiet use. We also oppose any plans to develop trails into the Beaver Creek and Saltado Creek Canyons.

The Proposed RMP does not adequately recognize the resource values of these remaining roadless areas for wildlife and backcountry hunting and fishing opportunities, or "minimize impacts" to those resource values from further recreation and trail development as evidenced by other elements of the RMP.

We protest the removal of the Lower Tabeguache/Campbell Creek and Shavano Creek areas from designation as lands with wilderness character in the Proposed RMP, and the lack of management direction to adequately minimize impacts to these areas as well as the San Miguel River and Camel Back WSA Addition while managing for other uses.

BLM_0076428

The lack of consideration and management direction is apparent within the Proposed RMP at:

- The Proposed RMP does not include the Areas with Wilderness Characteristics we have recommended which contain exceptional habitat for big game and fish and provide outstanding opportunities for backcountry hunting and fishing.
- Appendix D – Ecological Emphasis Areas. The development of the concepts of designating areas as Ecological Emphasis Areas is completely dropped in the Proposed RMP (Alternative E).
- Appendix J – Description of San Miguel River SRMA, RMZ 2 for Alternative E. Within the description table, Travel Management: Manage Saltado Canyon as closed to motorized and mechanized travel, except administrative and permitted vehicular access which would be limited to authorized routes. In the remainder of the RMZ, motorized and mechanized travel limited to designated routes.
  - This statement implies allowing motorized and mechanized travel on designated routes within Beaver Canyon.
- Appendix G – Best Management Practices and Standard Operating Procedures. In spite of our requests for more restriction on trail construction within and prohibiting recreational use during the winter months on big game winter range, there are no BMP's or SOP's included in the sections on Wildlife, Recreation, or Comprehensive Trails and Travel Management.
- Figure 2-98, Alternative E Comprehensive Travel and Transportation Management significantly reduces the areas identified for seasonal closures under the Proposed RMP, exacerbating the impacts of recreation on big game winter range throughout the UFO.

## 2) Recreation impacts to big game and other wildlife species

One of the primary concerns we have with increased trail development for OHV's and bicycles on BLM lands is where this development is occurring, and the level to which it is being developed. New trail development is occurring within all habitat types and seasonal use areas without full consideration of the retention of large intact blocks of functional habitat to provide adequate forage and security from disturbance on seasonal concentration and production areas. The result has been a dramatic increase in the displacement of wildlife off their preferred habitat areas and a subsequent decline in the health and productivity of our big game herds.

This RMP provides an opportunity for the BLM to define which areas are critical for wildlife and should not be developed for recreational use, and which areas can be developed for recreation while still protecting other resource values. We strongly feel that the BLM should provide this direction in the RMP instead of continuing to react to proposals from user-groups that are only focused on their own goals and activities.

In general, we support the efforts to manage use of the most popular destinations by providing good maps, access to the trailheads, and education for the users of those areas. However, we are very concerned that there are no Management Actions and Allowable

BLM_0076429

Use Decisions for fish or wildlife related to recreation or comprehensive travel and transportation management in any descriptions of the proposed Recreation Management Areas (RMA's), and insist that the BLM include this direction in the Final RMP. The following are some specific comments on a few of the proposed RMA's.

*Burn Canyon SRMA.* A travel management plan was recently developed for this SRMA and projects are currently being implemented within the planning area. The Burn Canyon SRMA is located within one of the most heavily used big game winter ranges of the San Miguel watershed. The current NEPA decision includes seasonal use restrictions on the BLM roads and trails to mitigate impacts to wintering big game.

The description for this SRMA in Appendix J and Figure 2-98, Alternative E Comprehensive Travel and Transportation Management does not show the seasonal closures associated with BLM roads and trails within Recreation Management Zone (RMZ) 2 in the Burn Canyon SRMA. We protest any changes to this decision under the Proposed RMP. The NEPA document for this project did not define adaptive management as giving up on efforts to comply with these mitigation measures.

The McKee Draw and Flatiron area in the Burn Canyon SRMA (RMZ 3) provides solitude and security for big game and people seeking opportunities for quiet recreation. The description table for Alternative 2 of the FEIS and Proposed RMP does not accurately reflect the existing NEPA decision for RMZ 3. This area is to be managed specifically for foot and horse travel only, mechanized travel is prohibited, and motorized travel is limited to administrative use only. We protest any changes to this decision under the Proposed RMP.

*Dolores River Canyon SRMA.* We agree entirely with the management goals and objectives for this SRMA. We are also aware of several user-developed OHV trails in the area that access the south rim of the Dolores River canyon, as well as go all the way into the bottom of the Dolores River canyon from Sylvia's Pocket. The description of this SRMA in Appendix J is lacking any Management Actions to obliterate these trails to restore the primitive nature of this canyon.

*Dry Creek SRMA.* Management emphasis within this area is primarily for a variety of motorized and mechanized recreation, both trail based and off-trail rock crawling. The description for this SRMA in Appendix J does not have any Management Actions or Allowable Use Decisions for wildlife included in any of the five RMZ's. There are substantial areas of big game winter range within this SRMA and there are currently proposals to further develop mountain bike trails. The description of this SRMA in Appendix J is lacking any seasonal use restrictions to avoid impacts to big game winter range.

Management Actions and Allowable Use Decisions for the Dry Creek SRMA must accurately reflect the NEPA decision for this travel management plan and include seasonal closures on BLM roads and trails. We protest any changes to this decision under the Proposed RMP.

BLM_0076430

The Proposed RMP does not adequately mitigate impacts to wildlife security under the Proposed SRMA. The BLM needs to prevent any trail construction within RMZ 5 which is the core area identified as Lands Managed to Minimize Impacts on Wilderness Characteristics in Alternative E, and develop and include a standard for open route density to alleviate these impacts outside this core area. We protest any changes to this decision under the Proposed RMP that will diminish project design and mitigation measures for wildlife included in the Dry Creek Travel Management Plan.

*Paradox Valley SRMA.* RMZ 3 of this SRMA includes a substantial amount of area that should be included in the RMZ 4 management strategy. Any plans to provide OHV and mountain bike trail riding in this area should be limited to existing roads that are managed by the county, or that are roads that remain from previous mining activity that are somewhat used and maintained and would create a logical and safe trail system. Much of the area near the rim of the Paradox Valley and Dolores River canyon is very primitive in nature, and should be left available for dispersed hiking, hunting, and exploring. Appendix J only includes one alternative, and the BLM has not provided retention and enhancement measures addressing the primitive nature of the areas we have identified for wildlife habitat and undeveloped, dispersed uses.

We protest the Paradox Valley SRMA proposal as described in Alternative B without the modifications to RMZ 3 as we have identified during the DEIS. We assert that additional development of trails within the areas we have identified in RMZ 3 will substantially alter the primitive character and existing uses of this area.

*San Miguel River SRMA.* The San Miguel River is the most significant fishery in the west end of the UFO and provides other river based recreation opportunities such as rafting and kayaking. The UFO has done an excellent job in providing river access and overnight camping facilities on this portion of the San Miguel. The San Miguel River above the Cascabel Ranch is also adjacent to public highways and county roads which provide unlimited public access to the river for fishing. We continue to oppose and protest any trail development into the Norwood Canyon below the Cascabel Ranch. This area is already accessible on foot, and provides an excellent opportunity for more solitude and quiet use.

The Proposed RMP (Alternative E) would allow use of trails on designated routes within Beaver Canyon. We continue to oppose and protest any plans to develop trails into the Beaver Creek and Saltado Creek Canyons. These two major tributary canyons provide excellent opportunities for solitude and backcountry hunting or fishing experiences adjacent to the main river corridor.

We protest the lack of Management Actions and Allowable Use Decisions for wildlife related to Comprehensive Travel and Transportation Management and the other Recreation SRMA's and ERMA's included in the Proposed RMP. We have continually requested avoidance and timing restrictions on recreational development and travel in big

BLM_0076431

game winter ranges, production areas, migration routes, and other seasonal concentration areas within the UFO.

However, BMP's and SOP's specific to avoidance and seasonal timing restrictions on recreational development and activities are not included in the sections on Wildlife, Recreation, or Comprehensive Trails and Travel Management of Appendix G the proposed RMP. Table 2-2 of the FEIS provides a summary of management guidance for all of the alternatives evaluated. There is guidance for seasonal restrictions to protect elk calving areas in the section on Fish and Wildlife, but there is no mention of winter range seasonal restrictions. There is no guidance for seasonal wildlife restrictions in either section on Recreation or Comprehensive Travel and Transportation Management.

We insist that the Final RMP utilize the best scientific information and local knowledge of Colorado Parks and Wildlife to identify areas of critical wildlife habitat and movement areas to completely avoid recreational development, and to include meaningful Management Actions and Allowable Use Decisions in all the appropriate sections of the RMP to effectively prevent or mitigate impacts to wildlife where development is authorized.

### 3)  Response to assessment of risk of contact between wild and domestic sheep

Rocky Mountain and desert bighorn sheep represent one of the premier backcountry hunts available in Colorado, and are of very high interest to us in BHA. We are extremely concerned about the health and productivity of our limited bighorn sheep herds. Current scientific consensus is that the major threat and limiting factor to expanding bighorn populations is a respiratory disease complex caused by a combination of pathogens carried by domestic sheep. Respiratory disease transmitted from domestic sheep has caused catastrophic all-age die offs and markedly reduced lamb recruitment in herds throughout the West and in Colorado. Negative effects of a single disease event can last for decades in a herd, resulting in chronic decline or stagnation. Reduced lamb recruitment can occur in herds with low grade infection without suffering die-offs.

There is no effective vaccine or treatment available at this time. Separation of bighorns from domestic sheep, especially on historic core bighorn home range is the cornerstone of science-based management efforts and the clear path forward for recovery of the species. Current best available science has also confirmed that domestic goats can carry the full load of respiratory pathogens capable of causing catastrophic disease in bighorns. Although disease events in bighorns caused by exposure to domestic goats are less common than domestic sheep, significant risk of disease transmission exists.

We appreciate the efforts the BLM and CPW has taken to utilize the Risk of Contact (RoC) assessment model to evaluate and compare the results for potential risk of contact between wild and domestic sheep within the UFO (Appendix K). When the results are examined, it is very apparent that there are allotments where domestic sheep grazing is authorized directly within and adjacent to existing populations of bighorn sheep, and the BLM needs to take action to eliminate this threat to bighorn sheep.

7

BLM_0076432

The FEIS and Proposed RMP used the results of the RoC analysis to determine the suitability of existing grazing allotments for livestock and domestic goats. Figures 2-11, 2-12, 2-13, and 2-89 represent the various alternatives. The only alternative to identify and close allotments to domestic sheep grazing and trailing is Alternative B, which was dismissed from both the DEIS and the FEIS and Proposed RMP. The Proposed RMP identifies all suitable rangelands as open to all grazing (figure 2-89).

The Proposed RMP relies on one BMP for livestock grazing to resolve the existing conflicts between domestic sheep and bighorn: Utilize "Recommendations on management practices for domestic sheep grazing on public land ranges shared with bighorn sheep" (Appendix G). Table 2-2 of the FEIS provides a summary of Management Guidance for all of the alternatives evaluated. The Proposed RMP excludes domestic goat grazing from occupied bighorn habitat while relying on BLM policy and management practices to prevent contact between wild and domestic sheep.

Based upon the current science and professional experience and judgement of range and wildlife managers, we believe the only effective way to achieve full separation is to prevent physical contact between wild and domestic sheep. Domestic sheep herd management practices and mitigation measures included in Table 2-2 were never intended to be the sole method of preventing contact, and have not been verified to effectively prevent contact.

Page 4-149 of the FEIS says that "For bighorn sheep, current levels of interaction and disease transmission would continue until the BLM renews grazing permits; at that time, the BLM would conduct NEPA analyses using more site-specific information and any new data to determine the bighorn herd's current condition and possible subsequent changes in management".

However, according to BLM Instruction Memorandum IM 2015-122, current BLM policy directs Administrative Officers to transfer or renew livestock grazing permits under section 402(c)(2) authority. This authority would allow the BLM to transfer or renew grazing permits under existing terms and conditions with minimal review or site-specific NEPA for an additional 10 years, essentially perpetuating the current levels of interaction and potential for disease transmission for another decade or more. We strongly believe that the UFO must comply with the intent of direction on page 4-149 of the FEIS, and the RMP needs to stipulate that allotments identified in Appendix K as high or moderate risk will not be renewed under section 402(c)(2) authority.

The RoC modelling and figure 2-12 representing Alternative B clearly demonstrate that there are numerous allotments where domestic sheep grazing is authorized directly within and adjacent to existing populations of bighorn sheep. The Proposed RMP continues to put our desert and Rocky Mountain bighorn sheep populations at significant risk of severe population decline and or stagnation. We protest the dismissal of closing the areas identified to domestic sheep grazing in the FEIS and the exclusive reliance of the BLM upon unverified management practices intended to mitigate the risk of contact.

8

BLM_0076433

Attachment 1 – BHA Comments on Draft RMP/EIS

Project Manager, Uncompahgre RMP                              October 29, 2016
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave
Montrose, CO 81401

**Comments on the Draft RMP/EIS for the Uncompahgre Field Office**

Submitted by:

Craig Grother
P.O. Box 156
Norwood, CO. 81423
(970) 327-4850

Representing:  Backcountry Hunters and Anglers

Thank you for the opportunity to comment on the Draft Resource Management Plan and Environmental Impact Statement (Draft RMP/EIS) for the Uncompahgre Field Office (UFO).  I am a resident of Norwood Colorado and have lived and worked in the area since 1989.  I have worked as a wildlife biologist for the US Forest Service for 33 years on various Ranger Districts in Idaho, Nevada, and Colorado.  For the last 20 years of my career I was the wildlife biologist for the Norwood and Ouray Ranger Districts of the GMUG National Forest.  During that time I was able to work with various staff members of the UFO on cooperative wildlife habitat improvement projects through programs and initiatives such as the Habitat Partnership Program and the Uncompahgre Plateau Project.

I am submitting my comments on behalf of the Colorado Chapter of the Backcountry Hunters and Anglers.  I represent our State Chapter as the Habitat Watchman for the Uncompahgre and as the Regional Director for the Central Western Slope.  Backcountry Hunters and Anglers is a grass roots organization of sportsmen and women who strongly believe in the principals of the North American Wildlife Conservation Model and the value of our public lands for fish and wildlife habitat and the traditional fishing and hunting opportunities that are available to all sportsmen.  As a group of sportsmen, we are highly dependent upon our public lands to support the fish and wildlife species we all enjoy.  We believe in the conservation and management of fish and wildlife habitats on our public lands, and in providing undisturbed backcountry areas for fish and wildlife and the opportunity for traditional methods of hunting and fishing that challenge us physically and mentally and emphasize the principals of fair chase.

Our membership can also be characterized as families who enjoy undisturbed backcountry for reasons other than hunting and fishing.  We cherish the opportunity to venture into areas free of the noise and activity of OHV's and bicycles to enjoy the peace and solitude of the outdoors with our friends and family on river trips, day hikes, backpacking trips, and horse pack trips.  We also strongly feel that these opportunities should not only be available to us now but to our future generations as well.

BLM_0076434

Although I have reviewed much of the Draft EIS and Supporting Documents for this RMP, my comments are focused on those Appendices which are of primary concern to Backcountry Hunters and Anglers.  I would appreciate any opportunity to discuss these comments with you and BLM staff working on this revision.

**Appendix G – Best Management Practices and Standard Operating Procedures**

There have been several wildlife habitat improvement projects implemented on the UFO to enhance winter range for big game.  Several of those projects were developed and implemented in cooperation with the US Forest Service and Colorado Parks and Wildlife.  The primary objective of these projects was to enhance existing winter range conditions and encourage elk and mule deer to utilize traditional winter ranges on public lands by improving winter forage and browse condition and production.  These projects in combination with wildfire rehab efforts were largely successful in meeting these objectives.
During that time the Uncompahgre National Forest also developed and implemented a forest-wide travel management plan which includes specific direction and actions to further encourage big game use of these winter ranges through an active program of reducing open road and trail densities through route decommissioning and seasonally closing big game winter range areas to all forms of motorized and mechanized travel from December 1 through April 15.  In combination, these efforts have had a significant effect on seasonal use patterns and distribution of big game.

While the BLM did implement the vegetation projects, there has not been an equal effort to reclaim or manage the existing roads, trails, or fire lines within these areas, or to control use by the public.  This was largely due to the lack of direction in the current RMP, or a comprehensive travel management plan for the UFO.  The effectiveness of the vegetation treatments for big game on BLM lands has been reduced by this lack of travel management.  Over the years of implementing these projects and suppressing and rehabbing wildfires, there has been a steady progression and increase in open road and OHV trail densities which are having a significant impact upon big game habitat effectiveness.

The UFO has made the decision to approach travel management on a watershed or implementation-level scale.  There is a lot of merit to this approach, but there needs to be stronger direction and guidance in the RMP to prevent cumulative effects to wildlife habitat and our remaining unroaded landscapes.  As one recent example, a travel management plan was developed for the Burn Canyon area south of Norwood.  The final decision intends to provide a mix of recreation opportunities for hiking/horseback, bicycle, and OHV recreation.  The Burn Canyon area is located within one of the most heavily used big game winter ranges of the San Miguel watershed.  The decision includes seasonal use restrictions on the BLM roads and trails to mitigate impacts to wintering big game.  Unfortunately, use within the project areas has not gone according to plan.  Bicycles continue to use the horse & foot use only trails in McKee Draw.  Access to BLM lands is provided by a system of county roads which the BLM has no jurisdiction over.  People are using any and all of the trails whenever they physically can, regardless of their seasonal restriction or use designation.  The area attracts more use now that trail systems have been formally developed, and the impacts to big game have increased as a result of the project.

The following comments are specific to some of the resources area BMP's and SOP's included in Appendix G that I believe are necessary to provide direction in the RMP.

10

Vegetation – General and Upland

Retain the following direction to meet landscape objectives and enhance success of treatments:

- Limit authorized use levels and activities where needed to allow vegetation to recover from fire, drought, disease and insect outbreaks

- Incorporate strategies in grazing plans which manage fuel build up to enhance natural fire use.

- Defer vegetation disturbing activities during severe or extreme drought to allow for vegetation recovery.

- On a landscape scale, maintain a diversity of age classes. Any 100 square mile patch of pinyon-juniper should encompass the full range of seral stages. Preferentially achieve diversity by actions in younger age classes rather than reductions of older stands.

- To benefit species sensitive to habitat fragmentation, maintain unroaded stands or patches no less than 1.2 square miles in size.

- Maintain connectivity between stands of pinyon-juniper, sagebrush, and ponderosa pine by preserving corridors of similar vegetation.

- Reclaim unused or undesired roadbeds in pinyon-juniper woodland, salt desert shrub, and ponderosa pine.

- Place high requirements for justifying creation or retention of roads (or other linear features that fragment the habitat) in sagebrush. Reclaim unused or undesired roadbeds in sagebrush land cover types.

Wildlife – Terrestrial

Retain the following direction to improve habitat effectiveness:

- In all habitat improvements and manipulations, and maintenance of those areas, including projects designed to improve livestock grazing, reduce fuel loading, or otherwise, consider the habitat requirements of native wildlife communities, game and non-game alike, and acknowledge the ecological tradeoffs.

- During severe or extreme drought years, to the extent possible, assure that some pastures retain the maximum herb cover (even standing dead material) possible for ground-nesting birds.

11

BLM_0076436

Modify or add the following direction to improve habitat effectiveness:

- "Where winter range areas are not protected by lease stipulations, operations such as construction, drilling, completion, work-overs and other intensive activities will be avoided from January 1 to March 1 to minimize impacts to wintering big game."   Modify this direction to include seasonal closures on public recreation use to avoid impacts to wintering big game, and change the dates to December 1 through May 1.  These dates encompass the winter season for big game animals, and would be more consistent with seasonal closures on adjacent National Forest lands.

- Manage big game winter ranges to provide habitat conditions and seclusion that will encourage use of public lands by elk and mule deer.

Livestock Grazing

Retain the following direction to meet landscape objectives and enhance success of treatments:

- Grazing will be deferred on new vegetation treatments and rehabilitated burned areas to the extent necessary to comply with BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997).

- Seasonal utilization levels on palatable forage species should not exceed 50 percent unless required to meet specific range management objectives as identified in an allotment management plan or other activity plan.

- During any time of the year, livestock use shall not exceed an average of 30 percent on native woody vegetation in riparian areas unless required to meet specific range or riparian management objectives as identified in an allotment management plan or other activity plan.

- Develop rotational grazing strategies, incorporating rest, deferment, and/or other grazing methods to improve rangeland health. All developed strategies that are not during dormant periods should ensure livestock grazing does not occur in the same location during the same time period in any two consecutive years.

Comprehensive Trails and Travel Management

Appendix G currently lacks any direction specific to wildlife.  The following direction should be added to improve habitat effectiveness:

12

- Recreational trail systems will not be developed in areas identified as big game winter concentration areas, severe winter range, or critical winter range.

- All proposals for the establishment, modification, and funding of recreational trails will be reviewed by local District Wildlife Managers and Biologists with Colorado Parks and Wildlife prior to BLM proceeding with implementation.

- Where effective, the use of seasonal route and/or area restrictions will be in effect from December 1 through May 1 regardless of current weather and snow conditions.

- The analysis of OHV and bicycle trail system proposals will include identification of open road and trail densities and the potential impacts of the alternatives on habitat effectiveness.

- The implementation of travel management plans will include corresponding measures and funding to decommission roads and user-developed routes concurrently with trail development.

**Appendix F - Lands with wilderness characteristics**

The Draft RMP/EIS identifies a total of eight areas that meet the qualifications for lands with wilderness characteristics. Lands that qualify for this designation are of primary interest to Backcountry Hunters and Anglers. They can provide essential habitat and security for wildlife and fish as well as high quality backcountry hunting and fishing opportunities. In reviewing the analysis and management alternatives for these areas in the Draft RMP/EIS, it is apparent that the BLM recognizes that several of these areas have been severely impacted by roads and trails used for past mining and energy development, utilities, livestock grazing, and OHV use. We are adamant that the remaining areas that retain their wilderness character be protected from further energy and recreation development and emphasized for the improvement of land health objectives and habitat for terrestrial wildlife.

The Camel Back WSA Adjacent area includes a total of 8,700 acres of BLM lands that include Monitor and Potter Canyons as well as most of the Monitor Mesa area in between. According to the BLM's analysis, at least 6,950 acres still retain their wilderness character. In combination with the Camel Back WSA and adjacent National Forest lands, this area represents some of the best remaining roadless and backcountry habitat on this portion of the Uncompahgre Plateau. It provides high quality habitat for a population of desert bighorn sheep as well as winter range for elk and mule deer. Management of the Camel Back area should emphasize the retention and enhancement of its roadless character and wildlife habitat. The RMP should acknowledge the resource values of this landscape for wildlife and its primitive backcountry character, and develop a management prescription that is specific to these values. As a minimum, the RMP should specify that there will not be any motorized or mechanized trail development within this area. It should also specify that vegetation treatments will be utilized and livestock grazing will be managed to maintain or improve land health objectives while providing residual forage for big game. The RMP should also specify that domestic sheep grazing will only be authorized and

13

managed to achieve no contact between domestic sheep and desert bighorn to prevent disease transmission.

The Lower Tabeguache/Campbell Creek area includes 11,060 acres of BLM lands that include Long Mesa, Burro Creek Mesa, Wild Cow Mesa, and Spring Creek Mesa. This area represents another large block of unroaded backcountry habitat that has escaped the development associated with past uranium mining on this portion of the Uncompahgre Plateau. This portion of the Uncompahgre Plateau also contains high quality big game winter range and important security from the disturbance of roads and OHV trails. In order to retain and improve habitat for elk and mule deer, and encourage them to remain on public lands during the winter months, the RMP should include specific direction for this area that will prohibit any development of motorized and mechanized trails. Some attempts by the BLM and Forest Service have been made to allow OHV and bicycle trail development within big game winter range while mitigating impacts to wildlife through the use of seasonal closures. Unfortunately this has not prevented use of these trail systems by the public. If the conditions on the ground are favorable, people use the roads and trails regardless of the seasonal closure. The agencies do not have the law enforcement presence capable of ensuring compliance. It is far better to not create a trail system in these areas in the first place.

Shavano Creek includes 6,090 acres of BLM lands in the upper Campbell Creek and West Campbell Creek adjacent to the north side of the Tabeguache SMA. In combination with the adjacent National Forest lands, this area provides a significant roadless area on this portion of the Uncompahgre Plateau. The Upper Campbell Creek drainage of the BLM would increase the size of this area if it were not for a county road (U472) going to a stock pond development, presumably for maintenance of this pond. Other user-developed OHV trails have been created off county road 226 in to Shavano Creek. Much of this area burned in the Campbell Creek wildfire of 2004 which significantly enhanced habitat conditions on big game winter range, creating a large winter concentration area. The RMP should acknowledge the resource values of this area for wildlife and its primitive backcountry character, and develop a management prescription that is specific to these values. As a minimum, the RMP should specify that there will not be any motorized or mechanized trail development within this area, and implement an aggressive decommissioning program to eliminate the user-developed OHV trails. It should also specify that vegetation treatments will be utilized and livestock grazing will be managed to maintain or improve land health objectives while providing residual forage for big game. Implementing these management standards would encourage elk and mule deer to remain on preferred habitats on public lands and reduce game damage occurring to adjacent private lands in and around Nucla.

Norwood Canyon contains 5,600 acres of BLM lands along the San Miguel River between Norwood Bridge and Pinyon Bridge. This part of the San Miguel River canyon provides river rafting, kayaking, and fishing opportunities that are not adjacent to the noise and activities of highway 145 or 141. River recreation and fishing activities are far less than the section above Norwood Bridge so the area provides opportunities for more solitude and quiet use. There are currently at least two ways to legally hike into the Norwood Canyon to gain fishing access. Both access routes are not official "government" trails which further limits activity in this area and provides a high quality backcountry fishing experience. This situation needs to be maintained by the BLM and the RMP should specify that there will not be any trail development or OHV/bicycle use into or within the Norwood Canyon. Access on the BLM would continue to be provided by

14

BLM_0076439

boat and/or hiking the old road on the north side of the river which goes around the Cascabel Ranch private land.

**Appendix J – Recreation Management Areas**

Appendix J provides a series of tables that outlines goals and objectives for various Recreation Management Areas on BLM lands under various alternatives. Some of the RMA's include the entire range of alternatives in the Draft EIS, while others do not. Presumably the areas that do not include a range of alternatives already have a recently approved travel management plan in place (such as Burn Canyon, Ridgway, Dry Creek).

One of the primary concerns we have with increased trail development for OHV's and bicycles on BLM lands is where this development is occurring, and the level to which it is being developed. Most big game winter range occurs in the lower elevation valleys and foothills, and extends upward in elevation on the drier south and west facing slopes. Much of the habitat for big game and other species that occurs in the valleys is now developed for our towns and housing in the rural areas surrounding these towns, or for agricultural production. As a result, extensive areas of winter habitat have been lost to this development and its associated roads, traffic, and other human activities. This has generally displaced big game to higher elevation winter ranges on the foothills and mesas of the adjacent public lands. With our increase in human population there is also a tremendous increase in recreation on the adjacent public lands and pressure on the BLM to build and/or authorize more and more OHV and bicycle trails to accommodate this use. Once a few trails are established, other user-developed trails appear and additional proposals from user-groups come to the BLM for even more trails that reach farther and farther into areas that have provided big game winter range. The result has been a dramatic increase in the displacement of wildlife off their limited winter range areas and a subsequent decline in the health and productivity of our big game herds.

This RMP provides an opportunity for the BLM to define which areas are critical for wildlife and should not be developed for recreational use, and which areas can be developed for recreation while still protecting other resource values. We strongly feel that the BLM should provide this direction in the RMP instead of continuing to react to proposals from user-groups that are only focused on their own goals and activities.

In general, we support the efforts to manage use of the most popular destinations by providing good maps, access to the trailheads, and education for the users of those areas. However, we are very concerned that there are no Management Actions or Allowable Use Decisions for fish or wildlife in any proposed RMA's, and request that the BLM include this direction in the Final RMP. The following are some specific comments on a few of the proposed RMA's.

*Burn Canyon SRMA.* A travel management plan was recently developed for this SRMA and projects are currently being implemented within the planning area. As previously stated, the Burn Canyon area is located within one of the most heavily used big game winter ranges of the San Miguel watershed. The decision includes seasonal use restrictions on the BLM roads and trails to mitigate impacts to wintering big game. Unfortunately, use within the project areas has not gone according to plan. Bicycles continue to use the horse & foot use only trails in McKee Draw. Access to BLM lands is provided by a system of county roads which the BLM has no jurisdiction over. People are using any and all of the trails whenever they physically can,

15

regardless of their seasonal restriction or use designation.  The area attracts more use now that trail systems have been formally developed, and the impacts to big game have increased as a result of the project.

The BLM promised in its decision to monitor use of the area and apply adaptive management to further actions.  The main lessons that should be learned from here is that 1) seasonal restrictions to protect big game winter range are ineffective when the BLM has no jurisdiction over primary access roads managed by the county, 2) overall use of the area increases substantially after becoming a designated RMA, 3) people do not comply with allowable trail use designations, 4) the UFO does not have the resources to monitor and enforce compliance with established regulations for recreational use.

*Dolores River Canyon SRMA*.  We agree entirely with the management goals and objectives for this SRMA.  We are also aware of several user-developed OHV trails in the area that access the south rim of the Dolores River canyon, as well as go all the way into the bottom of the Dolores River canyon from Sylvia's Pocket.  Appendix J should also include direction to obliterate these trails to restore the primitive nature of this Canyon.

*Dry Creek SRMA*.  Management emphasis within this area is primarily for a variety of motorized and mechanized recreation, both trail based and off-trail rock crawling.  The matrix in Appendix J does not have any mitigation measures for wildlife.  There are substantial areas of big game winter range within this SRMA and there is currently a proposal to construct another 50 miles of mountain bike trails.  As stated above, we are concerned with the continued loss of big game winter range to recreation development and the additional trail development proposed in this area would result in an extreme density of trails and associated disturbance.  The BLM needs to develop and include a standard for open route density to alleviate these impacts.  Similar to Burn Canyon, we believe that the presence of county roads and the ineffectiveness of a seasonal closure (if there is one) would not adequately minimize harassment of wildlife or significant disruption of wildlife habitat.

*Paradox Valley SRMA*.  Zone 3 of this SRMA includes a substantial amount of area that should be included in the Zone 4 management strategy.  Any plans to provide OHV and bicycle trail riding in this area should be limited to existing roads that are managed by the county or that are roads that remain from previous mining activity that are somewhat used and maintained, and would create a logical and safe trail system.  Much of the area near the rim of the Paradox Valley and Dolores River canyon is very primitive in nature, and should be left available for dispersed hiking, hunting, and exploring.  Appendix J only includes one alternative, and the BLM should at least consider and analyze an alternative that retains and enhances the primitive nature of this area for wildlife habitat and undeveloped, dispersed uses.

*San Miguel River SRMA*.  The San Miguel River is the most significant fishery in the west end of the UFO and provides other river based recreation opportunities such as rafting and kayaking. The UFO has done an excellent job in providing river access and overnight camping facilities on this portion of the San Miguel.  The San Miguel River above the Cascabel Ranch is also adjacent to public highways and county roads which provide unlimited public access to the river for fishing.  We are opposed to any trail development into the Norwood Canyon below the Cascabel Ranch.  This area is already accessible on foot, and provides an excellent opportunity for more solitude and quiet use.  We also oppose any plans to develop trails into the Beaver Creek and

16

Saltado Creek Canyons, which is compatible with the recreation strategy for zone 2.  These two major tributary canyons also provide excellent opportunities for solitude and backcountry hunting or fishing experiences adjacent to the main river corridor.

## Appendix K – Bighorn/Domestic Sheep Risk of Association Modeling

Rocky Mountain and desert bighorn sheep represent one of the premier backcountry hunts available in Colorado, and are of very high interest to us in the BHA.  We are extremely concerned about the health and productivity of our limited bighorn sheep herds.  There is an abundance of research and anecdotal evidence to undeniably support the devastating effects of disease transmission between wild and domestic sheep.  To prevent this disaster from occurring, the only certain method to avoid disease transmission is to prevent contact between wild and domestic sheep.

We appreciate the efforts the BLM and CPW has taken to utilize both the PoI and RoC Risk Assessment Models to evaluate and compare the results for potential risk of contact between wild and domestic sheep within the UFO.  Although we are skeptical of the assumptions utilized in the local PoI model, we do feel that it adds some perspective to the planning-level analysis when compared to the results of the national RoC model.  When the results of both models are examined, it is very apparent that there are allotments where domestic sheep grazing is authorized directly within and adjacent to existing populations of bighorn sheep, and the BLM needs to take action to eliminate this threat to bighorn sheep.  Based upon the current science and professional experience and judgement of range and wildlife managers, we believe the only effective way to achieve this is to prevent physical contact between wild and domestic sheep.  Domestic sheep herd management practices and mitigation measures included in Appendix K have been short term and marginally effective at preventing contact.

The RMP should use the results of the analysis presented in Appendix K to determine the suitability of existing grazing allotments for domestic sheep grazing.  The risk of contact should preclude other suitability criteria such as historic/current use, terrain, forage type, etc.  We believe this is a planning-level decision that is appropriate and missing from the current Draft RMP/EIS.  In addition to a suitability determination, there should be specific direction to remove domestic sheep from allotments that have potential for contact, and that there will be no conversion of class of livestock from cattle to sheep where there is any potential for contact with bighorn.

Implementation of the decisions within the final RMP would occur through subsequent updates and revisions of allotment management plans.  Those updates and revisions should occur in a timely (5 years) fashion and be based upon the suitability determinations in the RMP with input from the CPW and the public.  This could be achieved through the development of an implementation plan for allotment management plans and permit actions.

## Appendix M – Travel Management

The RMP will determine planning level decisions for the UFO, such as which areas are open, closed, or limited to OHV and bicycle use, and which types of uses will be emphasized within

17

those broad allocations (Recreation Management Areas – Appendix J). We believe the BLM should strive to provide a balance in those allocations, and to recognize the values we place on providing large blocks of undisturbed habitat for fish and wildlife and the opportunity for traditional methods of hunting and fishing in the backcountry. That balance would include a priority for the retention and enhancement of lands with wilderness characteristics and/or lands with low densities of open routes, lands that currently provide seasonally important big game habitat and migration corridors, and lands adjacent to communities surrounding the UFO that will provide opportunities for quiet use and solitude.

Appendix M includes a description of the process and criteria that will be considered by the BLM when evaluating routes within area-specific travel management plans during implementation of the RMP. Within Appendix M we would like to see the BLM include additional management goals and objectives for big game habitat capability and effectiveness. We strongly fell there is a need for additional consideration and recognition of the impacts of motorized and mechanized recreation use upon big game distribution, productivity, vulnerability, and population structure, as well as hunter success in relation to open road/trail density on the landscape. There is a large and growing body of research available that needs to be recognized and implemented by the BLM. We have posted several of the most relevant research studies on our website at backcountryhunters.org:

Literature Reviews of OHV Impacts on Hunting, Fishing and Habitat:

1. ATV Impacts on the Landscape and Wildlife (2011). A white paper by BHA which provides a synthesis of OHV-related articles in three sections focused on the effects of ATV use on: 1) soils, water quality and vegetation 2) wildlife (primarily elk) 3) the habitat and environment that wildlife depend upon.

2. Off Road Vehicle Impacts on Hunting and Fishing. An excellent illustrated literature review by the Isaac Walton League highlighting the impacts that off road vehicle use has on our sporting heritage.

3. Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands (2007). A synthesis of literature compiled by the Department of Interior.

4. The Effects of Off-Road Vehicles on Ecosystems. A research review by Texas Parks and Wildlife.

5. Effects of Roads on Elk: Implication for Management in Forested Ecosystems (2005). Research which builds on a large body of research demonstrating the impacts of roads on elk behavior and habitat.

6. Behavioral Responses of North American Elk to Recreational Activity (2008). A study which found that "activities of elk can be substantially affected by off-road recreation. Mitigating these effects may be appropriate where elk are a management priority. Balancing management of species like elk with off-road recreation will become increasingly important as off-road recreational uses continue to increase on public lands in North America."

18

BLM_0076443

7. Reproductive Success of Elk Following Disturbance Following Disturbance by Humans During Calving Season (2011).  A study which shows that cow/calf ratios decease when disturbance increases and therefore "maintaining disturbance-free areas for elk during parturitional periods" is necessary.

There are additional Goals and Objectives and the associated Actions that relate to open road/trail densities, the impacts of bicycle trails and use, and the conservation of our existing backcountry areas that I request the BLM to include in Appendix M to guide implementation of travel management on the UFO.  These additional Goals, Objectives, and Actions  will also enable the BLM to fully comply with 43CFR 8342.1 b) Areas and trails will be located to minimize harassment of wildlife or significant disruption of wildlife habitat, and c) Areas and trails will be located to minimize conflicts between OHV's and other uses.

Goal/Objective – Locate and manage OHV and mechanized routes and trails to minimize harassment of wildlife or significant disruption of wildlife habitat.

Action #1 – Limit and reduce motorized and mechanized routes and trails in areas managed for mixed uses.  Implement road and trail density standards within these areas that are favorable to big game habitat requirements as defined in current scientific research.

Action #2 – Motorized and mechanized routes and trails will avoid lands managed for wilderness characteristics, critical wildlife areas, and wildlife emphasis areas.

Action #3 – No motorized off-route down game retrieval will be allowed anywhere within the UFO.

Action #4 – Seasonal closures to protect big game winter range will include snowmobiles.

Action #5 – Routes designated for administrative use within all mixed use areas, lands managed for wilderness characteristics, critical wildlife areas, and wildlife emphasis areas will be closed to public OHV and bicycle use yearlong.

**Appendix O - Areas of Critical Environmental Concern**

The Draft RMP/EIS includes analysis of several potential ACEC's that demonstrate the exceptional biological and environmental resource values of several areas within the UFO (Appendix O).  We at Backcountry Hunters and Anglers support the designation of ACEC's for the Roubideau-Potter-Monitor, San Miguel River Expansion, and Dolores River-Slickrock Canyon areas of the UFO.  The Draft RMP/EIS does not appear to contain integrated resource management direction under any alternative that would fully protect these resource values.  Designation of these ACEC's does not preclude livestock grazing, mining, energy development, utility corridors, or recreation emphasis designations such as SMRA or ERMA.  The designation of these ACEC's should provide further emphasis in the RMP to manage these areas for their unique character and biological resources and substantially reduce and limit impacts to these values from recreation, livestock grazing, and energy development.

19

The Roubideau-Potter-Monitor and Dolores-Slickrock Canyon ACEC's provide crucial habitat for existing populations of desert bighorn sheep.  It is essential that the RMP include clear direction for both wildlife and livestock grazing resources to emphasize the perpetuation of healthy populations of desert bighorn sheep within these ACEC's and any other occupied habitat areas within the UFO through active vegetation management and the elimination of any potential contact between wild and domestic sheep.  The BLM must utilize the most current science-based information and nationally accepted analysis methods to determine potential contact between wild and domestic sheep on these landscapes, and implement permit actions to resolve the issues associated with disease transmission to these populations.  The RMP should include specific direction to subsequently develop an implementation plan to resolve the conflicts identified in the EIS through permit actions and/or updated allotment management plans within a five year time period.

Both of these ACEC's also provide critical big game winter range and security areas for elk and mule deer.  The RMP should include clear direction for wildlife, vegetation, and livestock grazing resources to manage vegetation to provide habitat conditions favorable to big game, and to manage livestock grazing use in these areas to provide abundant residual forage for wildlife.  The management prescriptions for recreation included in Appendix J do not adequately address mitigation of the potential impacts of current and future OHV and bicycle use or development within big game winter ranges.  As I stated previously, attempts have been made locally by the BLM and Forest Service to allow OHV and bicycle trail development within big game winter range while mitigating impacts to wildlife through the use of seasonal closures.  Unfortunately this has not prevented use of these trail systems by the public and the impacts from these activities continue to degrade habitat quality and displace big game from preferred wintering areas.  If the conditions on the ground are favorable, people use the roads and trails regardless of a seasonal closure.  The agencies do not have the law enforcement presence capable of ensuring compliance.  It is far better to not create a trail system in these areas in the first place.  Recreation strategies within Appendix J also need to include no motorized or mechanized use in these important wildlife areas.  If there are user-developed routes already in place within these areas, the RMP should also include direction to actively decommission those routes to prevent continued disturbance to wildlife and restore habitat effectiveness.

We also support designation of the San Miguel River ACEC.  It would expand the current ACEC to a total of 35,480 acres, and include the entire river corridor as well as the major tributaries.  The San Miguel River is the most significant fishery in the west end of the UFO and provides other river based recreation opportunities such as rafting and kayaking.  The UFO has done an excellent job in providing river access and overnight camping facilities on this portion of the San Miguel.  The San Miguel River above the Cascabel Ranch is also adjacent to public highways and county roads which provide unlimited public access to the river for fishing.  As previously stated, we are opposed to any trail development into the Norwood Canyon below the Cascabel Ranch.  This area is already accessible on foot, and provides an excellent opportunity for more solitude and quiet use.  We also oppose any plans to develop trails into the Beaver Creek and Saltado Creek Canyons.  These two major tributary canyons also provide excellent opportunities for solitude and backcountry hunting or fishing experiences adjacent to the main river corridor.

20

BLM_0076445



July 26, 2019

Director (210)
Attn: Protest Coordinator
P.O. Box 71383
Washington, D.C. 20224-1383

<u>and</u>

Director (210)
Attn: Protest Coordinator
20 M. Street SE, Room 2134 LM
Washington, D.C. 20003

***U.S. Mail and Electronically Submitted***
***via Instructions Received:***
**https://www.blm.gov/programs/planning-and-nepa/public-participation/filing-a-plan-protest**

Re: Gunnison County Protest to Proposed RMP/Final EIS

Dear Protest Coordinator,

## I.   <u>INTRODUCTION:</u>

The Board of County Commissioners of Gunnison County, Colorado ("Gunnison County") respectfully submits this protest ("Protest") regarding the "Proposed Resource Management Plan and Final Environmental Impact Statement for the Uncompahgre Field Office" ("Proposed RMP/Final EIS"). Pursuant to 43 § C.F.R. 1610.5-2, by this correspondence Gunnison County formally protests approval of the Proposed RMP/Final EIS.

The Proposed RMP/Final EIS contains a primary document numbering more than 800 pages, and 20 appendices numbering more than 2,600 pages, created at a cost

BLM_0076446

identified by the Bureau of Land Management ("BLM") to be $3,592,000.  The Proposed RMP/Final EIS describes and analyzes five alternatives and one partial alternative for managing a planning area of approximately 3.1 million acres including 2,234,670 acres of federal mineral estate in southwestern Colorado throughout six counties, of which Gunnison County is one.  The Proposed RMP/Final EIS does not intend to make any decisions for the BLM Gunnison Gorge in the Dominguez-Escalante Conservation Area, which is managed under separate RMPs.  The Curecanti National Recreation Area is withdrawn to the U.S. Department of the Interior ("DOI"), Bureau of Reclamation ("BOR"), and managed by the National Park Service ("NPS") under a Memorandum of Understanding between NPS and BOR.  However, while BOR's withdrawn lands within the boundary are withdrawn from appropriation under U.S. mining laws, the area is not closed to fluid minerals leasing or mineral materials disposal. (Proposed RMP/Final EIS, Vol. 1, 1-2.)

Gunnison County is exercising its opportunity to file this Protest within the required thirty (30) days of the date of the formal publication of the Proposed RMP/Final EIS.

Gunnison County identifies below its authority to bring this Protest, the analytical framework that the National Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act of 1976 ("FLPMA") require of the Proposed RMP/Final EIS, and a critical review of the Proposed RMP/Final EIS.

Gunnison County formally protests regarding the following issues and requests the BLM to consider these issues both individually and collectively:

A. Alternative E is a substantially new agency alternative that differs so dramatically from the alternatives canvassed in the Draft RMP/EIS – and which was drafted in disregard of the requirements of NEPA, FLPMA and the MOU between the BLM

2

and Gunnison County – as to preclude meaningful consideration by Gunnison County and the public. (See: Section V.A. below)

B.  Alternative E was presented in the Proposed RMP/Final EIS without all supporting data and files being made publicly and timely available.  (See: Section V.B. below)

C.  The Proposed RMP/Final EIS was drafted without consideration of Gunnison County's formal planning and land use regulatory regimes.  (See: Section V.C. below)

D.  The Proposed RMP/Final EIS does not adequately consider the Gunnison Sage-grouse population, habitat and designation as a "threatened species." (See: Section V.D. below.)

E.  The Proposed RMP/Final EIS does not adequately consider oil and gas development, its related impacts and, in particular, the newly adopted Colorado Senate Bill 19-181. (See Section V.E. below.)

F.  The Proposed RMP/Final EIS does not adequately consider or provide protections for sensitive, threatened and endangered fish, including half mile riparian "no surface occupancy" ("NSO") setbacks and other important wildlife habitat mapped by Colorado Parks and Wildlife ("CPW").  (See Section V.F. below.)

G.  The Proposed RMP/Final EIS does not adequately consider the consequences of climate change.  (See Section V.G. below.)

H.  The Proposed RMP/Final EIS does not adequately consider protection and enhancement of agriculture.  (See: Section V.H. below.)

I.  The Proposed RMP/Final EIS does not adequately consider management, protection and enhancement of outdoor recreation. (See Section V.I. below.)

3

BLM_0076448

J.  The Proposed RMP/Final EIS does not adequately consider the negative consequences of allowing fluid mineral leasing in the Curecanti Unit.  (See: Section V.J. below.)

K.  The Proposed RMP/Final EIS does not adequately consider issues regarding coal mine methane, including capture and other mechanisms for mitigation of waste methane from existing and abandoned mines.  (See: Section V.K. below.)

L.  The Proposed RMP/Final EIS is based on inadequate NEPA analysis and protections for waterbodies, aquatic, wetland and hydrologic resources, source water protection areas, domestic water supplies, and cultural resources for fluid mineral leasing and surface disturbing activities.  (See: Section V.L. below.)

M.  Alternative E inappropriately contains lands identified for "disposal" that are within 4 miles of a Gunnison Sage-grouse lek, are adjacent to or intersecting Gunnison Sage-grouse critical habitat, or are adjacent to private land conserved for Gunnison Sage-grouse habitat, or the disposal of which would conflict with existing user access to public or private lands, or water rights and irrigation. Gunnison County further protests the fact that the BLM did not timely or publicly make identification of these lands available for the Protest period – or for the 2016 Draft RMP/Draft EIS.  (See: Section V.M. below.)

N.  Gunnison County protests that, regarding certain species, the BLM failed to make available the BLM Biological Assessment ("BA") and the Fish and Wildlife Service ("USFWS") Biological Opinion ("BO"); it is not clear what Alternative the BA and BO analyzed.  (See: Section V.N. below.)

O.  There is inadequate analysis and protections for waterbodies, aquatic, wetland and hydrologic resources, source water protection areas, domestic water supplies, and

4

cultural resources from the impacts of fluid mineral leasing and other surface disturbing activities.  (See: Section V.O. below.)

## II.   GUNNISON COUNTY'S AUTHORITY TO PROTEST

Gunnison County formally participated as a "cooperating agency" during the development of the Proposed RMP/Final EIS, and has authority to protest both procedural and substantive errors in the Proposed RMP/Final EIS.

Gunnison County has additional authority to file this Protest because, in June 2009, the BLM Uncompahgre Field Office and Gunnison County executed a written "Memorandum of Understanding Between Gunnison County, Colorado and the Bureau of Land Management Uncompahgre Field Office" ("MOU") in which the BLM recognized the "compelling need to ensure that the interests of Gunnison County are accounted for and that [Gunnison County will be] meaningfully engaged in the resource management planning effort and associated EIS."  The MOU also recognized that Gunnison County "has special expertise" as it relates to the development of the Proposed RMP/Final EIS.  Among the areas which the MOU expressly granted Gunnison County the opportunity to participate "to the fullest extent possible" were:

- Identification of issues and concerns to be addressed throughout the planning process;
- Identification of Gunnison County programs, plans and policies potentially affected by the Proposed RMP/Final EIS;
- Identification of socio-economic data such as demographics, activities and values; and
- Review of:
  - The preliminary range of alternatives to be considered in detail;
  - Relevant portions of the "Affected Environment" section;

BLM_0076450

- o   Relevant portions of the "Environmental Consequences" section; and

- o   Relevant portions of the "Consultation and Coordination" section – including information on consistency review.

Among other obligations, the MOU required the BLM to provide to Gunnison County the opportunity to review and comment on "draft sections of the EIS for which Gunnison County provided its input due to its special expertise." A copy of the MOU is attached as "Exhibit 1."

The formal cooperating agency relationship is intended to provide a framework for intergovernmental efforts by:

- Gaining early and consistent involvement;

- Incorporating local knowledge of economic, social, and environmental conditions and land use requirements;

- Addressing intergovernmental issues and avoiding duplication of effort;

- Enhancing credibility and support for EIS's;

- Building a relationship of trust and cooperation that results in better decisions.

As the government of general jurisdiction in Gunnison County, Colorado, which jurisdiction includes land use planning and activities, and protection of the health, safety and welfare of person in Gunnison County, and the protection of the environment and wildlife in Gunnison County, the Board of County Commissioners of Gunnison County has an interest which is or may be adversely affected by the approval of the Proposed RMP/Final EIS. Relevant statutes include Colo. Rev. Stat. § 18-9-117, 29-20-101, 30-28-101 et seq., 30-11-107 et seq., 38-1-202, 42-1-102, 42-4-106, 43-1-217, 43-2-101, 43-2-201.1.

## III.   RELATIONSHIP AMONG THE NATIONAL ENVIRONMENTAL POLICY ACT ("NEPA"), THE FEDERAL LAND POLICY AND

6

BLM_0076451

**MANAGEMENT ACT OF 1976 ("FLPMA"), AND THE PROPOSED RMP/FINAL EIS**

The National Environmental Policy Act ("NEPA") is our "basic national charter for the protection of the environment," achieving its purpose through "action forcing procedures... requir[ing] that agencies take a <u>hard look</u> at environmental consequences." 40 C.F.R. § 1500.1; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citations omitted) (emphasis added). This includes the consideration of the best available information and data, as well as disclosure of any inconsistencies with federal policies and plans. NEPA requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action, as well as reasonable alternatives. *See* 42 U.S.C. § 4331(b) (congressional declaration of national environmental policy); *DOT. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004). The BLM must "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action in comparative form, so as to provide a "clear basis for choice among the options" open to the agency. 40 C.F.R. § 1502.14. At a minimum, the agency must identify and analyze its preferred alternative, as well as a null or "no action" alternative that would occur if the agency elected to maintain the current state of affairs unchanged. In addition, the agency should address all other reasonable alternatives to the proposed action. *See Colorado Envtl. Coal v. Salazar*, 875 F. Supp. 2d 1233, 1249. (D. Colo. 2012).

Through the RMP planning process, the BLM Uncompahgre Field Office is required to "estimate and display the physical, biological, economic, and social effects of implementing each alternative considered in detail. The estimation of effects shall be guided by the planning criteria and procedures implementing [NEPA]." 43 C.F.R. § 1610.4-6. Essential to any NEPA process is a robust analysis of alternatives to the proposed action. Consideration of reasonable alternatives is necessary to ensure that the

7

agency has before it, and takes into account, all possible approaches to, and potential environmental impacts of, a particular project. NEPA's alternatives requirement, therefore, ensures that the "most intelligent, optimally beneficial decision will ultimately be made." *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Com. 146 U.S. App. D.C. 33,* 449 F.2d 1109, 1114 (1971).

"[T]he heart" of an environmental analysis under NEPA is the analysis of alternatives to the proposed project, and agencies must evaluate all reasonable alternatives to a proposed action." *Colo. Envtl. Coal.,* 185 F.3d 1162 at 1174 (10th Cir. 1999)(quoting 40 C.F.R. § 1502.14). An agency must gather "information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *Greater Yellowstone,* 359 F.3d at 1277 (citing *Colo. Envtl. Coal.,* 185 F.3d 1162 at 1174); *see also Holy Cross Wilderness Fund v. Madigan,* 960 F.2d 1515, 1528 (10th Cir. 1992). Thus, agencies must "ensure that the statement contains sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned decision." *Izaak Walton League of America v. Marsh,* 655 F.2d 346, 371 (D.C. Cir. 1981) (citing *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21 (1976)).

When determining whether an EIS analyzed sufficient alternatives to allow the BLM to take a hard look at the available options, courts apply the "rule of reason." *N.M. ex rel. Richardson v. the BLM.,* 565 F.3d 683, 709 (10th Cir. 2009) (citing *Westlands Water Dist. v. U.S. Dep't of the Interior,* 376 F.3d 853, 868 (9th Cir. 2004)).

"The reasonableness of the alternatives considered is measured against two guideposts. First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate." *Westlands,* 376 F.3d at 866. Second, reasonableness is judged with reference to an

8

BLM_0076453

agency's objectives for a particular project.[1] *See Dombeck,* 185 F.3d at 1174–75;
*Simmons v. U.S. Army Corps of Eng'rs,* 120 F.3d 664, 668–69 (7th Cir. 1997); *Idaho
Conservation League v. Mumma,* 956 F.2d 1508, 1520 (9th Cir. 1992).

FLPMA is the BLM's organic act and delegates authority to the agency to create
and amend land use plans. FLPMA's congressional declaration states:

"[I]t is the policy of the United States that … the public lands be managed in a
manner that will protect the quality of scientific, scenic, historical, ecological,
environmental, air and atmospheric, water resource, and archeological values;
that, where appropriate, will preserve and protect certain public lands in their
natural condition; that will provide food and habitat for fish and wildlife and
domestic animals; and that will provide for outdoor recreation and human
occupancy and use…" 43 U.S.C. § 1701(a)(8).

The BLM is duty bound to develop and revise land use plans according to this
congressional mandate, so as to "observe the principles of multiple use." 43 U.S.C. §
1712(c)(1). "Multiple use" means "a combination of balanced and diverse resource uses
that takes into account the long-term needs of future generations for renewable and
nonrenewable resources, including, but not limited to, recreation, range, timber, minerals,
watershed, wildlife and fish, and natural scenic, scientific and historical values." 43
U.S.C. § 1702(c).

The RMP revision process, subject to NEPA and undertaken pursuant to FLPMA,
requires the BLM to engage in the type of foundational land use planning that is intended
to give context to the agency's multiple use mandate.  Accordingly, FLPMA provides

---

[1] While an agency may restrict its analysis to alternatives that suit the "basic policy
objectives" of a planning action, *Seattle Audubon Soc'y v. Moseley,* 80 F.3d 1401,
1404 (9th Cir. 1996), it may do so only as long as "the statements of purpose and
need drafted to guide the environmental review process ... are not unreasonably
narrow," *Dombeck,* 185 F.3d at 1175.

9

BLM_0076454

specific criteria for land use plan revisions, requiring consideration of things such as: observation of the principles of multiple use and sustained yield; integrated consideration of physical, biological, economic, and other sciences; reliance on public lands resources and other values; consideration of present and future uses of the public lands; consideration of the relative scarcity of resource values; and weighing the long-term benefits to the public against the short-term benefits. *See* 43 U.S.C. § 1712(c)(1)-(9). Critically, FLPMA does not mandate that every use be accommodated on every piece of land; rather, delicate balancing is required. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004). "'Multiple use' requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage." *Public Lands Council v. Babbitt*, 167 F.3d 1287, 1290 (10th Cir. 1999) (citing 43 U.S.C. § 1702 (c)).  As provided by the Tenth Circuit:

> "It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses… BLM's obligation to manage for multiple use does not mean that development *must* be allowed on [a particular piece of public land]. Development is a *possible* use, which BLM must weigh against other possible uses—including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration." *N.M. ex rel. Richardson*, 565 F.3d at 710.

Accordingly, the Proposed RMP/Final EIS revision must consider, on equal footing, the value of permanent protection and preservation of public lands in the planning area, along

10

with the potential value of development of those public lands. It is incumbent on the BLM Uncompahgre Field Office to evaluate these competing resources and give suitable weight to FLPMA's mandate to preserve and protect public lands in their natural condition. *See* 43 U.S.C. § 1701(a)(8). This is, after all, the agency's statutory mandate. *See N.M. ex rel. Richardson,* 565 F.3d at 709.

As stated by the BLM:

> "The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses…BLM regulations require that existing land use plans be revised when necessary to address current resource conditions, changes in circumstances (e.g., evolving demands on resources), and new or revised national-level policy." Proposed RMP/Final EIS at 1-2.

This purpose does not take development in the planning area as a foregone conclusion. Rather, the central purpose is to "provide broad-scale direction" in light of "current resource conditions, changes in circumstances… and new or revised national-level policy." *See N.M. ex rel. Richardson,* 565 F.3d at 710-11.

FLPMA also recognizes the importance of Gunnison County's role in the planning process providing that the BLM shall:

> "…to the extent consistent with the laws governing the administration of the public, lands, coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of other Federal departments and agencies and of the State and local governments within which the lands are located…assure that consideration is

11

BLM_0076456

given to those State, local, and tribal plans that are germane in the development of land use plans for public lands; assist in resolving, to the extent practical, inconsistencies between Federal and non-Federal Government plans, and shall provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non-Federal lands…" 43 U.S.C. § 1702(c)(9).

## IV.   **ALTERNATIVES**

To facilitate review of this Protest, Gunnison County is informed of the following "alternatives" identified in the Proposed RMP/Final EIS:

**Alternative A**

Alternative A meets the requirement that a "no action" alternative be considered. Alternative A continues current management direction and prevailing conditions derived from existing planning documents.

**Alternative B**

Alternative B emphasizes improving, rehabilitating, and restoring resources and sustaining the ecological integrity of habitats for all priority plant, wildlife, and fish species, while allowing appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, rights-of-way (ROW), and livestock grazing). It particularly targets the habitats needed for the conservation and recovery of federally listed, proposed, or candidate threatened and endangered plant and animal species. Goals and objectives focus on environmental and social outcomes achieved by sustaining relatively unmodified physical landscapes and natural and cultural

12

BLM_0076457

resource values for current and future generations. This alternative would establish the greatest number of special designation areas such as areas of critical environmental concern ("ACEC")[2] and special recreation management areas, with specific measures designed to protect or enhance resource values. Appropriate and allowable uses and restrictions would be contingent on minimizing impacts on natural and cultural resources.

**Alternative B.I**

Alternative B.I is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River (referred to as the North Fork), primarily in portions of Delta and Gunnison counties.  Alternative B.I is a resource-based set of recommendations provided by a community group.  This partial alternative is treated as a subset of Alternative B and applies only to the North Fork Alternative Plan area, referred to as the "North Fork area." The North Fork area has 63,390 acres of the BLM-administered surface estate and 159,820 acres of federal mineral estate (underlying the BLM surface and split-estate), 139,540 acres of which are federal fluid minerals. The North Fork Alternative Plan would close certain areas to oil and gas leasing and impose development setbacks with strict surface use restrictions, including no surface occupancy ("NSO"), controlled surface use ("CSU"), and timing limitations ("TLs"), in places where leasing may be allowed. Management actions and allowable uses under Alternative B not superseded by those in Alternative B.I would also apply to the North Fork area.

**Alternative C**

Alternative C would emphasize maximizing utilization of resources, while mitigating impacts on land health. Management direction would recognize and expand

---

[2] ACEC's are areas identified by the BLM in accord with the 1976 Federal Lands Policy and Management Act ("FLPMA") which established the first conservation ecology mandate for the BLM, where special management attention is needed to protect important historical, cultural, and scenic values, or fish and wildlife or other natural resources.

13

BLM_0076458

existing uses and accommodate new uses to the greatest extent possible. The appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, ROWs, renewable energy, and livestock grazing) would emphasize maximizing resource production in an environmentally responsible manner, while maintaining the basic protection needed to sustain resources.

**Alternative D**

Alternative D was the Agency-Preferred Alternative from the Draft RMP/EIS, dated 6/3/2016 which emphasizes balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife, and fish habitat. This alternative incorporates a balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land uses. Goals and objectives focus on environmental, economic, and social outcomes achieved by strategically addressing demands across the landscape.

**Alternative E: Agency-Proposed RMP**

Alternative E, a wholly new proposed alternative not previously available for review or comment, is the BLM's Proposed RMP. The BLM proposes that Alternative E is a reasonable combination of objectives and actions from the five alternatives (A, B, B.1., C, and D) presented in the Draft RMP/EIS. The BLM states that, among other reasons for presentation of a wholly new alternative for the first time in the Proposed RMP/Final EIS, there are certain "changes in policy and guidance ..." (Proposed RMP/Final EIS Vol. 1, 1-9.) 43 U.S.C. § 1702(1). Presumably this relates to this Department of Interior's policies to prioritize oil and gas development above other uses, despite the clear direction of FLPMA's multiple use mandate. For example, both a

14

March 28, 2017 Executive Order on "Promoting Energy Independence and Economic Growth" and the related March 29, 2017 Interior Secretarial Order 3349 issued to implement it seek to eliminate regulations and policies that "burden" energy development, but actually eliminate actions that would achieve the required balance that is essential to multiple use management.  These policies have led to changes in agency policies, especially in managing oil and gas leasing and development, and also infuse the creation of Alternative E.

V.      **ISSUES PROTESTED BY GUNNISON COUNTY**

A.  ISSUE 1: ALTERNATIVE E IS A SUBSTANTIALLY NEW AGENCY ALTERNATIVE THAT DIFFERS SO DRAMATICALLY FROM THE ALTERNATIVES CANVASSED IN THE DRAFT RMP/EIS – AND WHICH WAS DRAFTED IN DISREGARD OF THE REQUIREMENTS OF NEPA, FLPMA AND THE MOU BETWEEN THE BLM AND GUNNISON COUNTY – AS TO PRECLUDE MEANINGFUL CONSIDERATION BY GUNNISON COUNTY AND THE PUBLIC.

The overarching – and procedurally fatal – flaw in the Proposed RMP/Final EIS is the development of a wholly new Alternative E in disregard of the requirements of NEPA and FLPMA.  FLPMA requires the BLM to ensure that the views of the general public and third-party participation are adequately incorporated into the land planning process. 43 U.S.C. 1701(a)(5); 43 C.F.R. 1610.2.  The disregard of NEPA and FPLMA has denied to Gunnison County the "meaningful opportunities" guaranteed by those laws to participate in the iterative BLM process that resulted in the Proposed RMP/Final EIS. "The agency (now) has an obligation to re-circulate if a proposed action ultimately differs so dramatically from the alternatives canvassed in the draft EIS as to preclude meaningful consideration by the public." *W. Org. of Res. Councils v. the BLM*, 591 F. Supp. 2d

15

1206, 1218 n.2 (D. Who. 2008), citing *California v. Block*, 690 f. 2d 753, 770 (9th Cir. 1982).

In addition, the creation of a wholly new Alternative E – with neither notice to Gunnison County nor an opportunity for Gunnison County to comment – is in direct contradiction to the BLM's formal recognition, in the MOU, of the "compelling need to ensure that the interests of Gunnison County are accounted for and that [Gunnison County will be] meaningfully engaged in the…resource management planning effort and associated 'EIS'" and the BLM's obligation to create the opportunity for Gunnison County to participate "to the fullest extent possible" in the development of the Proposed RMP/Final EIS. This obligation is also set out in FLPMA, in the BLM's obligation to provide for "meaningful" input and "early" notice to local governments with affected lands and regulations, like Gunnison County.

While the BLM states that "(t)he policy of the BLM is to provide opportunities for the public, various groups, other federal agencies, Native American Tribal Governments, and state and local governments to participate meaningfully and substantively by providing input and comments during the preparation of the RMP/EIS," (Proposed RMP/Final EIS, Vol. 1, ES-1), the BLM has created – in the Proposed RMP/Final EIS – a wholly new Alternative E that thwarts the opportunity for such participation.

REQUESTED REMEDY: Gunnison County asserts that the only solution to this overarching and procedurally fatal flaw in the Proposed RMP/Final EIS is to provide a full "comment" opportunity. This is also required by NEPA, based on the new alternative that has been created through the BLM's creation of Alternative E without sufficient explanation other than an oblique reference to its new policies but fundamentally changed the overall approach to management throughout the planning

16

BLM_0076461

area.  40 C.F.R. § 1502.9(c)(1)(i)(supplemental NEPA analysis, including an opportunity for comment, is required if an "agency makes substantial changes in the proposed action that are relevant to environmental concerns"); see also *N.M. ex rel. Richardson*, 565 F.3d at 705.

B.  ISSUE 2: ALTERNATIVE E WAS PRESENTED IN THE PROPOSED RMP/FINAL EIS WITHOUT ALL SUPPORTING DATA AND FILES BEING MADE PUBLICLY AND TIMELY AVAILABLE.

The 30-day Protest period was initiated by the publication of the official Notice of Availability in the Federal Register on Friday, June 28, 2019.  On that date, on the federal e-planning website[3] there were no GIS files newer than June 23, 2016.  Although the Proposed RMP/Final EIS states on page ES-1 "(t)his website contains background information about the project, a public involvement and project timeline, maps and relevant GIS data of the Planning Area, and copies of public information documents released throughout the RMP/EIS process."  There were no GIS data files for the new Alternative E.  Further the Proposed RMP/Final EIS maps in Volume II, Appendix A are at a scale that shows the entire Uncompahgre Field Office decision area across six counties.  This scale does not permit effective review of proposed disposal parcels in context.  Nor does this scale allow for examination of proposed actions and the proposed Alternative E in an informed manner.

REQUESTED REMEDY:  Gunnison County asserts that the only solution to this fundamental and fatal flaw is to provide a full "comment period" that is fully informed by timely provision to the public of all supporting data and files.

---

[3] https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&CurrentPageId=86604

17

BLM_0076462

C.  ISSUE 3: THE PROPOSED RMP/FINAL EIS WAS DRAFTED WITHOUT
CONSIDERATION OF GUNNISON COUNTY'S FORMAL PLANNING
AND LAND USE REGIMES

The BLM stated that decisions on the Proposed RMP/Final EIS will strive to be compatible with existing plans and policies of local "agencies within the Planning Area" as long as the decisions are consistent with the purposes, policies, and programs of federal law, and regulations applicable to public lands.  As noted above, this is also required by FLPMA, 43 U.S.C. § 1702(c)(9).  The Proposed RMP/Final EIS is fatally flawed because it does not consider – much less align with – fundamental Gunnison County regulatory regimes.

The Proposed RMP/Final EIS, at Vol. 1, 1-7 through 1-8, identifies as a "related plan and authority," the Gunnison County Land Use Resolution (the "Gunnison County LUR").  But while the Gunnison County LUR is one of the County's significant land use planning and regulatory permitting mechanisms, the Proposed RMP/Final EIS neglects to mention, much less consider:

1.  The Gunnison County Regulations for Special Development Projects ("1041 Regulations").  The 1041 Regulations are an exercise of Gunnison County's authority – expressly delegated by the State of Colorado – over subjects that include:

- Development within mineral resource areas;

- Development within natural hazard areas;

- Development within areas around major facilities of a public utility;

- Development within an area containing or having a significant impact upon historical, natural or archeological resources of statewide importance;

- Efficient utilization of municipal and industrial water projects; and

18

- Development of recreation opportunities.

The 1041 Regulations are particularly significant because Colorado S.B. 19-181 – which was adopted earlier in 2019 – grants local governments additional authorities regarding siting and development of oil and gas resources.

2. <u>The Gunnison County Regulations for Oil and Gas Operations.</u>

Pursuant to these regulations, Gunnison County considers potential impacts both on and off federal lands.  The U.S. Forest Service has explicitly recognized the efficacy of the regulations on federal lands.  Subjects considered by these regulations include:

- Ownership of surface;

- Ownership of minerals;

- Characteristics of and current condition of the operation location;

- Topographic features;

- Roads;

- Easements;

- Boundaries of districts, municipalities, or subdivisions;

- Operation plans;

- Water bodies and water structures;

- Access and transportation routes;

- Potential impacts on wildlife and wildlife habitat;

- Potential impacts on vegetation;

- Emergency response;

- Potential impacts on drinking water supplies;

- Municipal watersheds;

- Potential impacts on water quality;

19

BLM_0076464

- Waste management;

- Hydraulic fracturing fluids disposal and reporting; and

- Wildfire hazards.

3. <u>The Gunnison County Coal Resource Special Area Coal Mining Regulations</u>. These regulations have direct import for the North Fork Valley of the Gunnison River.

<u>REQUESTED REMEDY</u>:  Gunnison County asserts that the only solution to the BLM's lack of consideration of the formal Gunnison County planning and land use regulations is to provide a full "comment period."  As discussed above, a new opportunity for input is also required by NEPA, based on the new alternative that has been created through the BLM's creation of Alternative E without sufficient explanation other than an oblique reference to its new policies but fundamentally changes the management approach throughout the planning area in a manner that is inconsistent with Gunnison County's regulations and policies.  40 C.F.R. § 1502.9(c)(1)(i)(supplemental NEPA analysis, including an opportunity for comment, is required if an "agency makes substantial changes in the proposed action that are relevant to environmental concerns"); see also *N.M. ex rel Richardson*, 565 F.3d at 705.

D. <u>ISSUE 4:  THE PROPOSED RMP/FINAL EIS DOES NOT ADEQUATELY CONSIDER THE GUNNISON SAGE-GROUSE POPULATION, HABITAT AND DESIGNATION AS A "THREATENED SPECIES"</u>

The Proposed RMP/Final EIS is fatally deficient in its consideration of Gunnison Sage-grouse ("GuSG").  The following are significant data not fully considered in the Proposed RMP/ Final EIS:

- The BLM Uncompahgre Field Office Proposed RMP/Final EIS was published in the Federal Register on 6/28/19, over 6 months after the Biological Opinion

BLM_0076465

("BO") was signed. The Proposed RMP/Final EIS does not address whether – or how - the BO is still applicable, particularly in the context of Alternative E, which appears to be a very new construct in the Proposed RMP/Final EIS.

- The U.S. Fish and Wildlife Service ("USFWS") received the request for a BO from the BLM on July 31, 2018, which included a BA, which Gunnison County has not seen, prepared by the BLM.

- The BLM determined in their BA that the Proposed RMP/Final EIS may affect, and is likely to adversely affect, the GuSG. The USFWS agreed with this determination.

- NSO's are limited to oil and gas and do not cover all rare earth or uranium deposits.

- The "action area" was determined to have the following occupied and unoccupied critical habitat areas:

- **Table 1. GuSG Habitat on the Uncompahgre[4]**

Field Office Occupied Critical Habitat

| Population | BLM Surface | Split Estate | Total |
|---|---|---|---|
| CSCSM | 4,526 | 8,332 | 12,858 |
| Crawford | 0 | 0 | 0 |
| Gunnison | 0 | 0 | 0 |
| San Miguel | 821 | 6,790 | 7,610 |
| **Total** | **5,347** | **15,122** | **20,469** |

Unoccupied Critical Habitat

| Population | BLM Surface | Split Estate | Total |
|---|---|---|---|
| CSCSM | 3,888 | 4,375 | 8,262 |
| Crawford | 2,727 | 4,159 | 6,887 |
| Gunnison | 326 | 21 | 347 |

---

[4] The source for this table was the USFWS's BO. This information is not available in the Proposed RMP/Final EIS. Because no GIS information has been provided, Gunnison County cannot verify the accuracy of this table.

21

| San Miguel | 0 | 1,228 | 1,228 |
| **Total** | **6,941** | **9,784** | **16,725** |

- There is an apparent discrepancy between Table 1 and mapped occupied habitat in the Crawford population. There are at least 5 known leks, all located on the BLM administered lands in the Crawford population. The BO states that "most of this population falls within the Gunnison Gorge National Conservation Area RMP," but GIS mapping indicates that not all does, and Gunnison County is aware that the BLM wildlife biologist from the BLM Uncompahgre Field Office has long been engaged in GuSG conservation activities. Therefore, the accuracy of this table is questionable, and it likely originated from the BLM's BA for the other populations.

- The BLM evaluated GuSG habitat in the Cerro Summit-Cimarron and Sims Mesa satellite populations in 2015 and 2016 using their Habitat Assessment Framework ("HAF") methodology. The data collection protocols for the HAF differ significantly from the data collection protocols used to develop the GuSG Rangewide Conservation Plan ("RCP") Habitat Guidelines. Gunnison County is unaware of any methodology that crosswalks the two protocols, and therefore assert that any "habitat suitability" assessments made by the BLM are, at minimum, questionable, and certainly not comparable with the RCP GuSG Habitat Guidelines.

- In their BA, the BLM assumed, among a number of other things, that permitted activities would be mitigated to ensure that threatened or endangered species would not be jeopardized, as that term is defined in the ESA, on a project specific basis or at a cumulative level. Mitigation, defined as alleviation or lessening of possible adverse effects on a resource by applying appropriate protective

22

BLM_0076467

measures or adequate scientific study. Mitigation may be achieved by avoidance, minimization, rectification, reduction, and compensation. (Proposed RMP/Final EIS, Volume II, glossary 23). Though defined, there is no GuSG mitigation plan in the Proposed RMP/Final EIS, meaning that by definition, each and every project requiring mitigation would have a unique, one-off mitigation plan. Of particular note is that during the now-aborted development of the BLM Rangewide GuSG RMP/EIS, a mitigation plan was found to be virtually impossible to develop and adequately address lost habitat, direct impacts to the species and importantly, longevity of the mitigation (how long would it be required to "last", who would monitor it, and if the mitigation failed, what would be the outcome, as the impacts to the species likely had already occurred.[5])

- The BLM stipulations under the Proposed RMP/Final EIS could be excepted, modified or waived by the BLM authorized officer, as described and defined in Appendix B of the Final EIS. Though exceptions are apparently rare in the BLM Uncompahgre Field Office, the USFWS determined they could not rely on this assumption for their BO analysis.

- The USFWS addressed the following impacts to GuSG in their BO:
  - Roads
    - Habitat fragmentation
    - Avoidance
    - Increased human access
    - Exotic plant invasions
  - Powerlines

---

[5] In their BO, the USFWS appears to believe the solution to the uncertainties of mitigation is "adaptive management" without further definition.  Gunnison County asserts that this is not a sufficient solution.

BLM_0076468

- Habitat fragmentation

- Collision and electrocution risk

- Reduced lek recruitment

- Predator perches

- Reduced habitat use

o Livestock grazing

  - Decreased vegetation available for concealment

  - Soil compaction (causing vegetation changes)

  - Increased erosion

  - Exotic plant species increases

  - Trampling of nests/nest abandonment

  - Negative aspects of certain types of water developments (primarily WNV)

  - Positive aspects of livestock grazing/benefits to the habitat

o Fences

  - Collisions

  - Raptor and corvid perches

  - Predator corridors

  - Incursion of exotic species

  - Habitat decline

  - Positive aspects of fences, as related to grazing management

o Vegetation management

  - Short term negative impacts post-treatment

  - Long term positive impacts

o Recreation and travel management

24

- Roads and trails

  - Habitat loss

  - Degradation

  - Fragmentation

  - Human activity

  - Proposed RMP "eliminates cross-country use in most of the planning area…"

  - Beneficial aspects to travel restrictions

  - Difficulty of enforcement of travel management restrictions

  - Reduction of open, cross-country motorized use would be allowed on 3,950 acres within the action area

  - Areas closed to motorized travel would be <u>reduced</u> compared to current management (Alternative A) (880 acres, 93 percent fewer acres than under current management). <u>Note: Gunnison County is certain that USFWS was reviewing Alternative E and, therefore, this conclusion may not be applicable</u>.

  - Areas closed to motorized and mechanized travel would increase by 30 percent more than current management.

  - Areas limited to travel on designated routes would increase 4 times from Alternative A.

  - USFWS determined that overall, the Proposed RMP/Final EIS would reduce the potential for effects on GuSG associated with motorized and mechanized travel to a greater extent than current management (Alternative A).

25

- Lands and Realty

  - ROW facilities may result in habitat loss, fragmentation and degradation

    - Pipelines

    - Roads

    - Transmission lines

  - USFWS determined that they "…believe that the revised RMP directs the BLM to reduce the negative impacts of such request and is unlikely to result in significant losses of GuSG habitat within the planning area." Because the term "significant" remains undefined in this context, this conclusion is valid.

- Energy and Mineral Development

  - NSO stipulation within occupied GuSG habitat will limit effects to approximately 20,470 acres of occupied critical habitat and 2,800 acres of unoccupied critical habitat.

  - CSU stipulation on approximately 13,930 acres of unoccupied critical habitat, which could avoid or eliminate effects.

  - The use of exceptions, modifications and waivers within GuSG critical habitat <u>MAY</u> require re-initiation of Section 7 consultation. *Note: There are no criteria defined to determine who makes this decision nor how it is made.*

  - The following is a table of additional, specific concerns:

| Page # | Issue/Analysis |
|--------|----------------|
|        |                |
| 2-38 | General – designated occupied habitat of known populations of federally threatened and endangered species as ROW avoidance |

26

| | |
|---|---|
| | **Analysis:** Further restriction specific to GuSG lek habitat (1,330 acres, determined by the known lek area, plus a 0.6 mile radius) as ROW exclusion and critical habitat as ROW avoidance (same as above). |
| 2-38 | General - close all federally threatened, endangered and proposed plant species' occupied habitat to mineral materials disposal and non-energy solid mineral leasing. |
| | **Analysis:** Affects the skiff milkvetch in Gunnison County |
| T-113 | Stipulation TL-16. GuSG winter habitat. Prohibits surface use and surface disturbing and disruptive activities in mapped important GuSG winter habitat, including but not limited to, all USFWS designated critical habitat and areas also defined by the BLM, USFWS and CPW, from Dec. 1 to March 15 (Appendix B; Figure 2-92, Appendix A) |
| | **Analysis:** It is not clear whether this stipulation applies to only "important" (unclear who and how this is defined) winter habitat, or all designated critical habitat and/or areas defined by the BLM, USFWS and CPW as winter habitat or "all" habitat. |
| T-114 | Stipulation TL -18: Addresses GuSG breeding habitat (lek and nesting) and GuSG critical habitat. Prohibits surface use AND surface disturbing AND disruptive activities in USFWS designated OCCUPIED critical habitat, nesting habitat mapped and defined by the BLM, USFWS and CPW and within 4.0 miles of ACTIVE GuSG leks (if nesting habitat is not mapped) from March 1 to July 15 (Appendix B: Figure 2-92, Appendix A.) |
| | **Analysis:** Extends surface use, surface disturbing, surface disruptive activities to USFWS designated occupied critical habitat, mapped nesting habitat and within 4.0 miles of active GuSG leks if nesting habitat is not mapped from March 1 to July 15. It is not clear if the prohibitions are identified singly, or if they all have to occur to be prohibited. It is also not clear if the nesting habitat mapping has to be accomplished by all three agencies separately, or if the other two agencies can agree with determinations made by the third. There is not a definition of an "active" GuSG lek. There appears to be a discrepancy between the written description of this stipulation and the mapped area impacted as depicted in Figure 2-92. |
| T-114 | Stipulation NSO-31/SSR-32: GuSG breeding habitat. Prohibits surface occupancy and use and applies SSR restrictions in USFWS GuSG OCCUPIED critical habitat and non-designated occupied breeding habitat as mapped and defined by the BLM, USFWS, and CPW (including federal minerals). Appendix B; Figures 2-91 and 2-93, Appendix A. |
| | **Analysis:** Appears to place a no-surface occupancy stipulation, with no timing limitation, on all USFWS designated critical habitat that is also mapped as occupied habitat. Further, it appears to extend that restriction to "non-designated" (outside of designated critical habitat) occupied breeding habitat (leks, nesting, early brood rearing. The written stipulation does not appear to agree with the mapped areas in Figures 2-91 and 2-93. The applicable figure indicates it is for "fluid minerals", so it likely does not apply to other minerals (hard rock, gravel, etc.) |
| T-116 | Stipulation CSU-29/SSR-34: Gunnison sage-grouse potential habitat. Surface occupancy or use may be restricted and SSR restrictions applied in USFWS GuSG UNOCCUPIED critical habitat or to protect GuSG potentials habitats as mapped and defined by the BLM, USFWS and CPW (including ALL federal minerals). Identifies conservation measures that may be imposed as necessary. (Appendix B; Figures 2-91 and 2-93, Appendix A) |
| | **Analysis:** Allows but does not require (may be restricted) restriction of surface occupancy and use in unoccupied critical habitat and potential habitats identified by the BLM, USFWS and CPW outside of designated, unoccupied critical habitat. It then describes "conservation measures" that appear to be more appropriate in occupied |

BLM_0076472

| | habitat (relocation of operations from identified habitat features critical to brood rearing (only occurs in occupied habitat) |
|---|---|
| T-117 | Action: manage GuSG lek habitat (lek area plus 0.6-mile radius (1,330 acres) as ROW avoidance. |
| | Analysis: Appears to exclude ROW's from lek areas and a buffer of 0.6 miles. As lek areas are not circular, indicating a radius does not make sense. It should read "lek area plus a 0.6-mile buffer". If it does not the entirety of the lek use area will not be adequately protected in most cases. |
| T-99; 4-148 | NSO-22/SSR-21: PLANT ESA listed species. Prohibits surface occupancy and use applies SSR restrictions with a 200-meter buffer of the edge of habitat of federally listed, proposed or candidate plant species. |
| | This stipulation only applies to plant species. It would seem to be appropriate for GuSG. |
| T-424 | Line #517, Table T-1. Action: Consider other lands suitable for disposal by any method… |
| | The criteria specific to special status species is: "Are not parcels containing or integral to *significant* habitat for species status species; these parcels may be disposed of only if the habitat for the species of concern can be maintained and if USFWS and CPW concur." The Proposed RMP fails to define or quantify "significant." |

- USFWS' "biological opinion" is that implementation of the Proposed RMP/Final EIS, as proposed, is <u>not likely</u> to jeopardize the continued existence of the GuSG. The USFWS' rationale:

  - "Implementation of the RMP, including the conservation measures and use stipulations, will <u>reduce</u> multiple threats to the GuSG and could restore the species to formerly occupied range. We anticipate some low level of adverse effects to the GuSG, but the majority of these effects would be widely distributed across GuSG habitat in the UFO and likely be of low intensity and severity. Any subsequent actions implemented under the revised plan that may affect the GuSG or critical habitat <u>must</u> go through separate Section 7 consultation. *Note: Gunnison County is now certain that the USFWS did not base this upon the now published Proposed RMP/Final EIS, which includes Alternative E.*

  - USFWS provided a list of "additional recommendations"

28

BLM_0076473

- o Any activity that results in the permanent loss of proposed critical habitat should include mitigation of (to) offset such losses.
  - ▪ It is unclear whether this recommendation was followed by the BLM

- o Recreation – Only allow special recreation permits that have neutral or beneficial affects to occupied habitat areas.
  - ▪ It is unclear whether this recommendation was followed by the BLM.

- o Lands/Realty – Retain public ownership of proposed critical habitat. Subject to valid existing rights, co-locate new rights-of-way within existing ROW's.
  - ▪ USFWS only addresses proposed critical habitat. The BLM appears to have addressed designated occupied critical and actual habitat in Alternative E.
  - ▪ It does not appear that co-locating is addressed in the Proposed RMP/Final EIS.

- o Range Management – Within proposed critical habitat, incorporate GuSG habitat objectives and management considerations in all the BLM grazing allotments through allotment management plans or permits renewals. Work cooperatively on integrated ranch planning within GuSG habitat so operations with deeded/BLM allotments can be planned as single units. Design any new structural range improvements and location of supplements (i.e. salt or protein

29

blocks) to conserve, enhance, or restore GuSG habitat through an improved grazing management system relative to GuSG objectives. When establishing or modifying water developments, use best management practices to mitigate potential impacts from WNV.

- Incorporation of the Proposed RMP/Final EIS GuSG habitat objectives (guidelines) and management considerations into the BLM allotments has a positive impact in the Gunnison Basin for a number of years. The BLM Proposed RMP/Final EIS seems to support the incorporation but only in proposed critical habitats.
- Historically, the Gunnison Basin GuSG CCA has successfully integrated ranch planning into the Gunnison Basin.

○ Fluid Minerals – There is a useful criterion developed for the Northwest Colorado Greater Sage-grouse RMPA for consideration of waivers, exceptions and modifications within NSO designated areas.

- Gunnison County can find no indication that the BLM incorporated any of these criteria in the Proposed RMP/Final EIS

○ Alternative E appears to allow the BLM to privatize – that is, dispose of – GSG critical habitat

- P. 21 Objective FW-OBJ-IVSP-02:

30

Treatment of cheatgrass in Gunnison Sage-grouse designated critical habitat is listed as a priority. Gunnison County suggests that prioritization of cheatgrass treatment across ownership/land manager boundaries (private, BLM, State of Colorado, etc.) be noted as the highest priority to achieve order of magnitude effectiveness and minimize/avoid re-infestation.

- P. 29 Desired Conditions FW-DC-SPEC-29

  Gunnison County cautions the USFS that the accurate use of the GuSG structural habitat guidelines in the GuSG Rangewide Conservation Plan relies on utilization of sampling protocol that established the guidelines. Using a different sampling protocol then trying to "cross-walk" the data will result in erroneous conclusions regarding meeting/not meeting the habitat guidelines.

- P. 30 Objectives FW-OBJ-SPEC-31

  Because of the known impacts that off-leash pets have on Gunnison Sage-grouse, Gunnison County recommends a stronger approach to this issue. We recommend that it be a requirement, not a request, that all pets within Gunnison Sage-grouse habitat be leashed or under immediate command of the owner/public.

- P. 30 Objectives FW-OBJ-SPEC-32

  Fence marking near leks needs to be approached with caution; with consideration given to potential auditory or visual distractions which could impact lek attendance, breeding success, etc.

- P. 30 Objectives FW-OBJ-SPEC-33

  Winter travel is changing in the Gunnison Basin. Mechanical means, such as tracked ATVs, make areas normally not accessible to snowmobiles accessible for both individual users and outfitters. Gunnison County requests, at minimum, a

31

provision for future regulation of over-the-snow travel within Gunnison Sage-grouse critical habitat.

- P. 30 Objectives FW-GDL-SPEC-34

    Gunnison County recommends that this guideline be amended to read "…surface disturbing activities should not be permitted within Tier 1 habitat as defined by the Gunnison Basin Gunnison Sage-grouse Habitat Prioritization Tool (HPT) unless no feasible alternative is available AND that NO surface disturbing activities should be permitted within 0.6 miles of a lek."

- P. 80 Monitoring Question/Indicators

    Gunnison County asks that the USFS clearly identify and define Gunnison Sage-grouse "Core Habitat," to prevent mis-interpretation as the Proposed RMP/Final EIS is implemented.

- FW-DC-SPEC-29

    Forb and grass production and ground cover provide not only "residual" vegetation suitable for nesting cover, but provide hiding cover for all life stages. New vegetation provides food, directly and as a substrate of insects. FW-DC-SPEC-29 focuses only on residual cover. Gunnison County recommends that the SPEC focus not only on residual cover, but on new vegetative cover to address the life stage needs of the Gunnison Sage-grouse.

- Even though the Gunnison Sage-grouse was listed as threatened under the ESA between the Draft RMP/Draft EIS and the Proposed RMP/Final EIS, the BLM has not addressed this listing, and its consequences, sufficiently in the Proposed RMP/Final EIS.  Alternative E has reduced the protection for Gunnison Sage-grouse critical habitat from a right-of-way exclusion to right-of-way avoidance, reducing the certainty of protection.  Proposed RMP/Final EIS, pp.2-38 - 2-39.

BLM_0076477

Alternative E also reduced protection from wind, solar and hydropower developments in Gunnison Sage-grouse breeding, nesting and critical habitat from exclusion to avoidance, removing the certainty that habitat will be safeguarded. Proposed RMP, p. 2-113.  In addition, the NSO stipulations that apply to Gunnison Sage-grouse habitat are subject to "standard" waiver, exception and modification, meaning they can be changed at the discretion of the BLM authorized officer without additional specific criteria being applied.  Proposed RMP/Final EIS, p. B-32.  This approach is significantly less protective than the management being applied to the Greater Sage-grouse, even after amendments completed in 2019 that were focused on increasing energy development and even though that species is not listed as threatened or endangered under the ESA. Under the 2019 Northwest Colorado Greater Sage-grouse Amendment, waivers, exceptions, or modifications of NSO stipulations may only be applied if specific criteria are met and then the State of Colorado must be consulted and agree. (Northwest Colorado Greater Sage-grouse Amendment, pp. G-4 – G-7.)  This management is insufficiently protective of the Gunnison Sage-grouse, is inconsistent with Gunnison County's approach and will risk the current threatened status of the species being upgraded to endangered, which will impact Gunnison County.  Alternative E cannot be supported.  The BLM should return to more protective management, as well as adopting an approach that requires the input of the State of Colorado, for waivers, exception or modification of lease stipulations, similar to that used for the Greater Sage-grouse.

REQUESTED REMEDY:  The numerous, significant and fundamental errors and omissions regarding Gunnison Sage-grouse require correction through a full "comment" opportunity.

BLM_0076478

E. ISSUE 5: THE PROPOSED RMP/DRAFT EIS DOES NOT ADEQUATELY CONSIDER OIL AND GAS DEVELOPMENT, ITS RELATED IMPACTS AND IN PARTICULAR, NEWLY ADOPTED COLORADO SENATE BILL 19-181.

- The BLM states it will "recognize the State's responsibility for permitting related to oil and gas activities and in regulating air quality impacts." (Proposed RMP/Final EIS, Vol. 1, 1-5).

- However, Alternative E does not address Colorado S.B. 19-181, which was made law between the time of the Draft RMP/EIS and the Proposed RMP/Final EIS. S.B. 19-181 prioritizes public health, welfare and safety, the environment, and wildlife.[6] In certain circumstances, this may constrain or even preclude oil and gas exploration and development. In addition, S.B. 19-181 provides local government jurisdictions the ability to develop oil and gas land use regulations that could be more restrictive than the State's permitting requirements. As the BLM is likely aware, Gunnison County has the authority to protect and promote the public health, welfare and safety of the people of Gunnison County, and the authority to regulate land use planning and quality and protection of the environment in the County. To this end, Gunnison County has adopted regulations to exercise such authorities including the review, approval or denial of proposed activities and uses of land and natural resources including oil and gas. It is critical for the BLM to include compliance with all Gunnison County

---

[6] Appendix IV, R-329 contains the following: "Further, the Colorado Oil and Gas Conservation Commission is the primary agency charged with fostering the responsible development of Colorado's oil and gas natural resources in a manner consistent with the protection of public health, safety, and welfare, including the environment and wildlife resources. Although the BLM does have standards and regulations for mineral extraction and development, the BLM requires that all operators be in full compliance with standards and measures set by the Colorado Oil and Gas Conservation Commission when conducting operations on public lands." The mission of the Commission, as identified above, is consistent with the pre-SB-19-181 role but not the current commission mandate.

34

BLM_0076479

regulations regarding oil and gas exploration, development, operation and upstream activities as a mandatory element of the Proposed RMP/Final EIS. In addition, the BLM should include a requirement that any lessee comply with any other land use or environmental regulation imposed by Gunnison County in any way relates to operations on an oil and gas leasehold, including but not limited to water quality, public roads, emergency response, wildlife concerns, agricultural uses and recreation uses.

- Additionally, Alternative E does not provide for adequate "no leasing" and "no surface occupancy" set-backs from residences, steep slopes, geologic hazards, roads and other public use areas.

- Alternative E also does not provide adequate protections for waterbodies and water supply systems. At a minimum, the Proposed RMP/Final EIS must include:

  NSO stipulations as described in Alternative B/B.I requiring minimum setbacks from water bodies and water supply systems, and in areas with highly erodible and saline soils. The Gunnison County Regulations for Oil and Gas Operations require certain mandatory setbacks for such operations in Gunnison County which ought to be adopted in the Proposed RMP/Final EIS at least for Gunnison County, and which can be a model for the Proposed RMP/Final EIS.

- In particular, the Proposed RMP/Final EIS must recognize Gunnison County's authority to regulate mineral development both on private and BLM lands within the County, particularly with regard to oil and gas development and operations. Both the federal courts, and courts here in Colorado, have made clear that "neither the federal statutory scheme nor the case law relied upon by (oil and gas producers) supports the conclusion that Congress intended to

35

BLM_0076480

preempt all local regulations in the area of oil and gas operations." See: Bd. of Cty. Comm'rs v. B.D.S. Int'l, LLC, 159 P.3d 773, 785 (Colo. App. 2006), citing Texas Oil and Gas Corp. v. Phillips Petroleum Co., 406 f. 2d 1303 (10th Cir. 1964), and Kirkpatrick Oil and Gas Co. v. United States, 675 f. 2d 1122, 1124 (10th Cir. 1982) ("Congress has prescribed limited, but not exclusive, controls over the leasing of federal lands for oil and gas production.")

- Proposed RMP/Final EIS included Mesa County in the socio-economic impact analysis – even though it is outside of the planning area.  This inclusion skews the economic impact data to enable development of an inaccurate picture of the true economic benefits of the oil and gas industry within the Uncompahgre Field Office managed areas.  We acknowledge the beneficial economic impacts of the industry within Gunnison County but feel that accurate and relevant data points of areas within the Uncompahgre Field Office managed areas ought be used in this analysis.

REQUESTED REMEDY: The numerous, significant and fundamental errors and omissions regarding oil and gas activities require correction through a full "comment" opportunity.

F. ISSUE 6:  THE PROPOSED RMP/FINAL EIS DOES NOT ADEQUATELY CONSIDER OR PROVIDE PROTECTIONS FOR SENSITIVE, THREATENED AND ENDANGERED FISH, INCLUDING HALF MILE RIPARIAN "NO SURFACE OCCUPANCY" ("NSO") SETBACKS AND OTHER IMPORTANT WILDLIFE HABITAT MAPPED BY COLORADO PARKS AND WILDLIFE ("CPW").

- Alternatives B and B.I, and to a lesser degree Alternative D, provide necessary protections for sensitive, threatened and endangered fish, including

36

half mile riparian NSO set-backs and for other important wildlife habitat mapped by Colorado Parks and Wildlife ("CPW").  Alternative E does not provide those necessary protections.  NSO stipulations must be adopted for riparian areas, and to achieve surface disturbance limits necessary for protecting wildlife corridors, critical habitats and concentration areas; these must include limits on surface occupancy and also seasonal restrictions.

REQUESTED REMEDY:  The failure of the BLM to include these necessary protections for wildlife requires a full "comment" opportunity.

G.  ISSUE 7: THE PROPOSED RMP/FINAL EIS DOES NOT ADEQUATELY CONSIDER THE CONSEQUENCES OF CLIMATE CHANGE

- Alternative E does not acknowledge climate change, make climate change a priority, nor in any substantial way include an analysis of climate impacts of any of the alternatives.

REQUESTED REMEDY:  An adequate RMP/EIS must, at a minimum, include a carbon emission reduction plan that is demonstrably consistent with those efforts of the State to meet the State's climate and carbon emission reduction goals.

H.  ISSUE 8: AGRICULTURAL VALUES: THE PROPOSED RMP/FINAL EIS DOES NOT ADEQUATELY CONSIDER PROTECTION AND ENHANCEMENT OF AGRICULTURE.

- The upper reaches of the North Fork of the Gunnison River in Gunnison County are among the headwaters that provide the water supply to organic agriculture, wineries and farms and ranches in the North Fork of the Gunnison basin.  However, the Proposed RMP/Final EIS provides neither adequate nor

37

BLM_0076482

specific protections to ensure that there are no negative impacts to the quality or quantity of these waters, operations or livelihoods.

<u>REQUESTED REMEDY</u>:  The failure of the BLM to include adequate and specific protections for agriculture requires a full "comment" opportunity.

I.  <u>ISSUE 9: THE PROPOSED RMP/FINAL EIS DOES NOT ADEQUATELY CONSIDER MANAGEMENT AND ENHANCEMENT OF OUTDOOR RECREATION</u>

- In addition to hunting and fishing, which have been integral to local economies, outdoor recreation is a huge and growing driver to the area's economy.  Alternative B/B.I includes NL and NSO stipulations for parks, wildlife refuges, and for federal recreation lands such as Special Recreation Management Areas, including Jumbo Mountain, as well as for public lands recognized for their unique wilderness character.  At a minimum, NSO would ensure that the important, and increasing, recreational uses of these lands are given the attention they warrant.  In addition, the economic analysis of the economic impacts of recreation within the UFO uses flawed and insufficient data to determine the comparative economic impacts of the multiple uses on the BLM land within the region.  There is clear and accurate information on recreation economic benefits within the 2019 Colorado Statewide Comprehensive Outdoor Recreation Plan (SCORP) and within the federal governments own 2019 US Bureau of Economic Analysis which has Outdoor Recreation as a stand-alone designation.  The BLM should redo its analysis utilizing these significant resources for its comparisons.

38

REQUESTED REMEDY:  A full "comment" opportunity is necessary to address these concerns.

J.   ISSUE 10: THE PROPOSED RMP/FINAL EIS DOES NOT ADEQUATELY CONSIDER THE NEGATIVE CONSEQUENCES OF ALLOWING FLUID MINERAL LEASING IN THE CURECANTI UNIT.

- Section 1-2 states: "The Curecanti National Recreation Area is withdrawn to the US DOI, BOR and managed by the NPS under a Memorandum of Understanding between NPS and BOR.  Curecanti National Recreation Area is within the planning boundary until legislation supersedes.  BOR's withdrawn lands with the boundary are withdrawn from appropriation under the US mining laws, and the area is not closed to fluid mineral leasing or mineral materials disposal."

- The Curecanti Unit which includes both the Black Canyon of the Gunnison National Park and the Curecanti National Recreation area are contemplated in the Proposed RMP/Final EIS under Alternative E to be open for fluid mineral leasing which would be a drastic and wholesale change from previous drafts and the BLM policies and would lead to certain precedence across the nation as to the ability for the DOI to allow for extractive industry to lease land within national parks, monuments and other federal recreation areas.  This change is certainly against the desire of the citizens of the United States who overwhelmingly support preservation of these national treasures.  It is almost unfathomable that fluid mineral leasing and mineral materials disposal would be considered available in one of the headwater water supply reservoirs that serve the downstream states of the Colorado River.

39

BLM_0076484

REQUESTED REMEDY:  A full "comment" opportunity is necessary to address these concerns.

K.   ISSUE 11: THE PROPOSED RMP/FINAL EIS DOES NOT ADEQUATELY CONSIDER ISSUES REGARDING COAL MINE METHANE FROM EXISTING AND ABANDONED MINES.

- Alternative E has no provisions nor does it mention the capture, mitigation and/or economic utilization of Coal Mine Methane ("CMM"), a significant greenhouse gas emission.  As the BLM is likely aware Gunnison County has consistently supported the exploration of methods to safely, economically and effectively recover methane from active and inactive coal mines, particularly in the North Fork Coal Mining Area.  In conjunction with Delta County, Gunnison County has convened a North Fork Coal Mine Methane Working Group ("NFCMMWG") which is comprised of stakeholders from industry, conservation, land management agencies and local, state and federal government with the mission to support coal mines and the surrounding communities in the North Fork Valley through the development of a comprehensive strategy for education, capture, exploration of mitigation, and economic utilization of coal mine methane.  That group has been meeting for over a year and has developed a robust discussion on various issues, barrier and technologies available for capture, mitigation and utilization of coal mine methane in both active and inactive mines.

- To the extent that CMM can be safely processed into less damaging constituents, or combusted for energy, there is potential to create local and

40

federal economic benefits and to enhance environmental protection, both of which are benefits to the citizens of the United States.

- Through the collaborative work that has been accomplished within the NFCMMWG we have identified some potential CMM projects overlying general coal in the North Fork Region.  While many challenges are still present in bringing these potential projects in reality, including technical and economic feasibility, an additional challenge is the legal authority for the mine operator/owners to manage CMM generated from the prior mining of federal coal.

REQUESTED REMEDY:  Gunnison County requests a full "comment" opportunity to ensure that the BLM includes in the Proposed RMP/Final EIS a lawful mechanism that would enable operators in the North Fork region to manage CMM other than by venting; so that operators can develop project(s) that are safe and environmentally sound.

L.  ISSUE 13:  THE PROPOSED RMP/FINAL HAS INADEQUATE NEPA ANALYSIS AND PROTECTIONS FOR WATERBODIES, AQUATIC, WETLAND AND HYDROLOGIC RESOURCES, SOURCE WATER PROTECTION AREAS, DOMESTIC WATER SUPPLIES, AND CULTURAL RESOURCES FOR FLUID MINERAL LEASING AND SURFACE DISTURBING ACTIVITIES.

- The Fluid mineral leasing acreage in the newly proposed Alternative E, retains the same open and closed acreage as Alternative A, the current condition.  The current RMP predates the concerns for lynx, Gunnison Sage-grouse and many new conditions that have developed, including new science and data regarding climate change.  There is no explanation for the changes in the newly

41

BLM_0076486

proposed Alternative E.  The acreage identified for NSO is severely cut in the new alternative.  Omission of stipulations NL-8 (Page B-9), NSO-6/SSR-8 (Page B-17), NSO-9/SSR-11 (Page B-18), NSO-11/SSR-13 (Page B-19), NSO-19/SSR-16 (Page B-23), NSO-31/SSR-32 (Page B-128), NSO-69 (Page B-52), CSU-16 (Page B-63), and CSU-23/SSR-26 (B-67) are inadequate for protection of special resources.

REQUESTED REMEDY:  Chapter 2, Pages 2-8 and 2-11, under the headers of Fluid Mineral Leasing, Restrictions for Surface-disturbing Activities, and Locatable Minerals, Mineral Materials, and Nonenergy Solid Leasable Minerals with the contents of Appendix B: Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities constitute an entirely new Alternative.  BLM needs to allow public comment and reconsider Cooperating Agency input for this new Alternative E which severely degrades protections for hydrologic, aquatic, riparian, water supply resources, as well as cultural and wildlife resources.  Colorado Parks and Wildlife guidelines and standards need to be followed.

M. ISSUE 14:  ALTERNATIVE E INAPPROPRIATELY CONTAINS LANDS IDENTIFIED "FOR DISPOSAL" THAT ARE WITHIN 4 MILES OF A GUNNISON SAGE-GROUSE LEK, ARE ADJACENT TO OR INTERSECTING GUNNISON SAGE-GROUSE CRITICAL HABITAT, OR ARE ADJACENT TO PRIVATE LAND CONSERVED FOR GUNNISON SAGE-GROUSE HABITAT, OR THE DISPOSAL OF WHICH WOULD CONFLICT WITH EXISTING USER ACCESS TO PUBLIC OR PRIVATE LANDS, OR WATER RIGHTS AND IRRIGATION.  GUNNISON COUNTY FURTHER PROTESTS THE FACT THAT THE BLM DID NOT

42

BLM_0076487

TIMELY OR PUBLICLY MAKE IDENTIFICATION OF THESE LANDS

AVAILABLE FOR THE PROTEST PERIOD OR FOR THE 2016

DRMP/DEIS.

- Alternative E inappropriately contains lands identified "for disposal" that are within 4 miles of a Gunnison Sage-grouse lek, are adjacent to or intersecting Gunnison Sage-grouse critical habitat, or are adjacent to private land conserved for Gunnison Sage-grouse habitat, or the disposal of which would conflict with existing user access to public or private lands, or water rights and irrigation.  Gunnison County further protests the fact that the BLM did not timely or publicly make identification of these lands available for the protest period or for the 2016 DRMP/DEIS.

REQUESTED REMEDY:  A full "comment" opportunity is necessary to address these concerns.

N.  ISSUE 15: REGARDING CERTAIN SPECIES, AVAILABLE THE

BIOLOGICAL ASSESSMENT ("BA") AND BIOLOGICAL OPINION

("BO"); LACK OF CLARITY ON WHAT ALTERNATIVE THE BA AND

BO ANALYZED.

Gunnison County protests lands identified for disposal that are within 4 miles of a Gunnison Sage-grouse lek, adjacent to or intersecting Gunnison Sage-grouse critical habitat, or are adjacent to private land conserved for Gunnison Sage-grouse habitat, or the disposal of which would conflict with existing user access to public or private lands, or water rights and irrigation.

Reference Citations include but are not limited to:

43

BLM_0076488

a.  Chapter 2, Pages 2-8 to 2-11, under the headers of Fluid Mineral Leasing, Restrictions for Surface – disturbing activities, and Locatable Minerals, Mineral Materials, and Nonenergy Solid Leasing Minerals.

b.  Appendix B: Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities constitute an entirely new Alternative.

The fluid mineral leasing acreage in the newly proposed Alternative E appears to retain the same open and closed acreage as Alternative A, the current condition. However, the current RMP predates the concerns for lynx, the listing of the Gunnison Sage-grouse as a "threatened species," and many new conditions that have developed, including new science and data regarding climate change.  And, the acreage identified for NSO is severely reduced in Alternative E.  Omission of certain stipulations are inadequate for protection of special resources.

Gunnison County, as a Cooperating Agency, has been denied the opportunity to comment on the new Proposed Alternative E in the Proposed RMP/Final EIS.  It is unclear how the proposed actions in the Proposed RMP/Final EIS were contemplated by the BLM's referenced BA, which has not been made available, or contemplated by the USFWS's BO, referenced in the Proposed RMP/Final EIS as having been signed on December 17, 2018, but also not provided for review.[7] The Proposed RMP/Final EIS was published in the Federal Register on June 28, 2019.  A Biological Opinion is a document prepared by USFWS stating their opinion as to whether or not a federal action will likely jeopardize the continued existence or adversely modify the habitat of a listed threatened

---

[7] Biological Opinion – Revision of the Resource Management Plan for the Uncompahgre Field Office. Western Slope Supervisor, US Department of the Interior, Fish and Wildlife Service, Ecological Services, Grand Junction, CO. December 17, 2018.

44

BLM_0076489

or endangered species.  Note: Gunnison County is not certain that the USFWS made a determination or adverse modification of GuSG habitat for the Proposed RMP/Final EIS.

According to the Proposed RMP/Final EIS (page 5-2), the Biological Opinion was issued "concurring with the determinations that the Proposed RMP: 1) may affect, but is not likely to adversely affect, the greenback cutthroat trout, Mexican spotted owl, western yellow-billed cuckoo, Colorado pikeminnow, razorback sucker, bonytail, and humpback chub; and 2) may affect, and is likely to adversely affect, Colorado hookless cactus, clay-loving wild buckwheat (including designated critical habitat), and Gunnison sage-grouse (including designated critical habitat) (USFWS 2018d)."

In 2016, there was a robust Gunnison Sage-Grouse Rangewide RMP Amendment process underway that was considering making all GuSG critical habitat an Area of Critical Environmental Concern, and was considering protective stipulations for not just BLM lands designated as habitat and/or within 4-miles of GuSG leks, but also split estate.

The Gunnison Sage-Grouse (GuSG) was listed as a threatened species under the Endangered Species Act (ESA) by the U.S. Fish and Wildlife Service on November 20, 2014 (79 Fed. Reg. 69192).

At the time of release of this Proposed RMP/Final EIS, the Gunnison Sage-Grouse Rangewide RMP Amendment has been canceled and the process terminated.  This new situation changes the context and significance of Gunnison County's comments and input into the need for necessary land protection, resource allocation, and stipulations to protect and enhance GuSG populations and habitat within the Uncompahgre Field Office managed areas.

45

BLM_0076490

Gunnison County desired the GuSG Rangewide RMP Amendment[8] to modify and strengthen the Proposed RMP/Final EIS measures after completion of this Uncompahgre Field Office Proposed RMP/Final EIS.  That is not going to happen. The Proposed RMP/Final EIS allows for discretion to waive the protective stipulations that are present in the new proposed Alternative E.

REQUESTED REMEDY:

(A) Provide the BLM's Biological Assessment and the USFWS BO for review and clarify whether the BO was based on the June 28, 2019 Proposed RMP/Final EIS or a different alternative.  The BLM should incorporate any recommendations of the BO into any Proposed RMP/Final EIS.  Cooperating Agencies and public should be allowed to comment on the new Proposed Alternative E within the current situational context, which is that there will not be a forthcoming GuSG Rangewide RMP Amendment and this Proposed RMP/Final EIS fails to adequately protect GuSG or address split estate.

(B) The BLM should fully follow and incorporate the recommendations of the BOp for GuSG[9] and the 2005 Rangewide Conservation Plan[10] which include:

*1) Protect occupied habitats from permanent loss. If permanent habitat loss from development (primarily) or conversion is not addressed, successful implementation of all the other conservation strategies is not likely to be successful in conserving GUSG. An equally important strategy is preventing significant degradation, whatever the cause, of existing habitat that is seasonally important to GUSG.*

---

[8] https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=renderDefaultPlanOrProjectSite&projectId=39681
[9] Biological Opinion – Revision of the Resource Management Plan for the Uncompahgre Field Office. Western Slope Supervisor, US Department of the Interior, Fish and Wildlife Service, Ecological Services, Grand Junction, CO. December 17, 2018; Pages 27-28
[10] https://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx

46

BLM_0076491

*2) Coordinate with CPW in their effort to stabilize existing populations demographically and genetically through augmentation, and establish new populations in suitable historically occupied habitats (i.e. unoccupied critical habitat).*

*3) Improve habitat within currently occupied and adjacent potential habitats.*

*4) Protect suitable unoccupied habitat areas from permanent loss.*

*5) Improve habitat conditions within unoccupied habitat, which will accommodate item 2 above.*

(C)  It is unacceptable to allow stipulations intended to protect GuSG be available for administrative waivers, exceptions and modifications without clear criteria and process.  The alternative within the Proposed RMP/Final EIS should follow the guidance of the BO[11]:

**Fluid Minerals - When considering waivers, exceptions, and modifications within NSO designated areas, we recommend implementing the criteria developed for the Northwest Colorado Greater Sage-Grouse RMPA as follows:**

\*\*Exceptions or modifications may be considered if, in consultation with the State of Colorado, it can be demonstrated that there is no impact on Gunnison sage-grouse based on one of the following:

1.  Topography/areas of non-habitat create an effective barrier to impacts

2.  No additional impacts would be realized above those created by existing major infrastructure (for example, State Highway 50).

---

[11] Biological Opinion – Revision of the Resource Management Plan for the Uncompahgre Field Office. Western Slope Supervisor, US Department of the Interior, Fish and Wildlife Service, Ecological Services, Grand Junction, CO. December 17, 2018; Page 28

47

BLM_0076492

3.  The exception or modification precludes or offsets greater potential impacts if the action were proposed on adjacent parcels (for example, due to landownership patterns).

**In order to approve exceptions or modifications to this lease stipulation, the Authorized Officer must obtain: agreement, including written justification, between the BLM District Managers and CPW that the proposed action satisfies at least one of the criteria listed above.

Waivers - No waivers are authorized unless the area or resource mapped as possessing the attributes protected by the stipulation is determined during collaboration with the State of Colorado to lack those attributes or potential attributes. A 30-day public notice and comment period is required before waiver of a stipulation. Waivers would require BLM State Director approval.

Incorporate "Available Conservation Measures" and "Overarching Conservation Objectives" found in the GUSG final listing rule (79 FR 69192, p. 69305-69309).

(D)  Incorporate the management prescriptions and protective ACECs developed for the Gunnison Sage-Grouse Rangewide RMP Amendment into the Proposed RMP/Final EIS, since the Gunnison Sage-Grouse Rangewide RMP process is no longer active.  BLM and Cooperating Agencies invested many years into researching and developing that RMP.  Please see Attachment 3.

(E)  Un-designate or relocate the portion of the Section 368 West Wide Energy Corridor that goes through San Miguel County.  There is no ROW on non-federal land that will not significantly impact GuSG habitat.

O.  <u>ISSUE 16:  THERE IS INADEQUATE ANALYSIS AND PROTECTIONS FOR WATERBODIES, AQUATIC, WETLAND AND HYDROLOGIC RESOURCES, SOURCE WATER PROTECTION AREAS, DOMESTIC</u>

BLM_0076493

<u>WATER SUPPLIES, AND CULTURAL RESOURCES FROM THE</u>

<u>IMPACTS OF FLUID MINERAL LEASING AND SURFACE</u>

<u>DISTURBING ACTIVITIES.</u>

Among the citations that inform this section of the Protest are:

- Chapter 2, Pages 2-8 to 2-11, under the headers of Fluid Mineral Leasing, Restrictions for Surface-disturbing Activities, and Locatable Minerals, Mineral Materials, and Nonenergy Solid Leasable Minerals

- Appendix B: Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities constitute an entirely new Alternative

The fluid mineral leasing acreage in the new Proposed Alternative E, retains the same open and closed acreage as Alternative A, the current condition. The current RMP predates the concerns for lynx, Gunnison Sage-Grouse and many new conditions that have developed, including new science and data regarding climate change. There is no explanation for the changes in the new proposed Alternative E. The acreage identified for NSO is severely cut in the new alternative. Omission of stipulations NL-8 (Page B-9), NSO-6/SSR-8 (Page B-17), NSO-9/SSR-11 (Page B-18), NSO-11/SSR-13 (Page B-19), NSO-19/SSR-16 (Page B-23), NSO-31/SSR-32 (Page B-128), NSO-69 (Page B-52), CSU-16 (Page B-63), ad CSU-23/SSR-26 (B-67) are inadequate for protection of special resources.

<u>REQUESTED REMEDY:</u>  Chapter 2, Pages 2-8 to 2-11, under the headers of Fluid Mineral Leasing, Restrictions for Surface-disturbing Activities, and Locatable Minerals, Mineral Materials, and Nonenergy Solid Leasable Minerals with the contents of Appendix B: Restrictions Applicable to Fluid Minerals Leasing and Other

49

BLM_0076494

Surface-disturbing Activities constitute an entirely new Alternative.  BLM needs to allow public and Cooperating Agency input for this new Alternative which severely degrades protections for hydrologic, aquatic, riparian, water supply resources, as well as cultural and wildlife resources.  Colorado Parks and Wildlife guidelines and standards need to be followed.

VI.   RESERVATION

Given the time constraints of filing this Protest, Gunnison County may not have addressed all issues.  Therefore, Gunnison County reserves its right to further process regarding any and all issues identified by other protestors or commenters.

VII.   CONTACT INFORMATION:

Pursuant to 43 C.F.R. 1610. 5-2, please send all notices and correspondence regarding this Protest to:

> David Baumgarten
> County Attorney for Gunnison County
> 200 E. Virginia Avenue
> Gunnison, Colorado 81230
> (p):  970.641.5300
> (email):  dbaumgarten@gunnisoncounty.org

> and

> Matthew Hoyt
> Deputy County Attorney for Gunnison County
> 200 E. Virginia Avenue
> Gunnison, Colorado 81230
> (p):  970.641.5300
> (email):  mhoyt@gunnisoncounty.org

> and

> Laura Stanley
> 200 E. Virginia Avenue
> Gunnison, Colorado 81230
> (p):  970.641.5300
> (email):  lstanley@gunnisoncounty.org

BLM_0076495

Signed on this 26th Day of July, 2019.


_____
David Baumgarten
County Attorney for Gunnison County
200 E. Virginia Avenue
Gunnison, Colorado 81230
(p):              970.641.5300
(email):         dbaumgarten@gunnisoncounty.org

51



GUNNISON COUNTY
I.E. 09- 117

# MEMORANDUM OF UNDERSTANDING
## BETWEEN
## GUNNISON COUNTY, COLORADO
## AND THE
## BUREAU OF LAND MANAGEMENT
## UNCOMPAHGRE FIELD OFFICE

## I.   INTRODUCTION

The Bureau of Land Management (BLM), Uncompahgre Field Office, is undertaking a major revision of their Resource Management Plan (RMP) beginning in the spring of 2009.  The BLM anticipates that the RMP revision and associated environmental impact statement (EIS) will take approximately four years to complete.

Gunnison County is eligible to become a Cooperating Agency for the duration of the RMP/EIS process.  Cooperating Agency status provides an opportunity for the BLM, Gunnison County and other Cooperating Agencies to work together to enhance the BLM's planning efforts.

This Memorandum of Understanding (MOU) sets forth roles and responsibilities for the Cooperating Agencies as agreed upon between Gunnison County and the Uncompahgre Field Office (UFO) for the purposes of collaborative planning and production of the RMP and EIS.

## II.   PURPOSE

In carrying forth its responsibilities and mandates under the National Environmental Policy Act and Council of Environmental Quality regulations at 40 Code of Federal Regulations (CFR), Part 1500 and the Federal Land Policy and Management Act (as amended) CFR Part 1600, the BLM recognizes a compelling need to ensure that the interests of Gunnison County are accounted for, and that they are meaningfully engaged in the above stated resource management planning effort and associated EIS.

As such, Gunnison County has requested, and the BLM has agreed to grant, Cooperating Agency Status pursuant to 40CFR 1501.6, 1501.2, and 1501.8.  Under the regulations, the BLM recognizes that Gunnison County has special expertise as it relates to various aspects of the planning effort described above.

BLM_0076497

## III.  AGENCY DESIGNATIONS

Appendix A specifies Agency Representatives.  Each participating entity will designate one primary representative to attend meetings and to act as a point of contact to ensure coordination and exchange information between Gunnison County and the BLM during the planning process. An entity may change its representative at any time by providing written notice to the other party.  Cooperating Agencies may also involve "in-house" specialists in discussions, when a specific topic warrants such expertise.

## IV.  AUTHORITIES FOR AGREEMENT

Authority for the BLM and Gunnison County to participate in this agreement is provided by the National Environmental Policy Act, 42 USC 4321 et seq. and 40 CFR 1501.6 – Cooperating Agencies, 1506.2 – Elimination of Duplication with State and Local Procedures, and 1508.5 – Cooperating Agency (CA).

Additional authority comes from the Federal Land Policy Management Act, 43 USC 1712 et seq., which mandates coordination of BLM planning and management efforts with the programs of state and local governments which may be affected by those planning actions.

## V.  ROLES AND RESPONSIBILITIES

### A. RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i.  To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii.  To provide Gunnison County with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,
- identifying or providing data that is suitable, available and relevant to the planning effort,
- reviewing and commenting on draft sections of the EIS for which Gunnison County provided input due to its special expertise.

iii.  To consider and incorporate information and comments provided by Gunnison County into EIS documents to the extent possible and where appropriate.

iv.  To make all final determinations regarding the content of the EIS document.

Page 2 of 6

BLM_0076498

B. RESPONSIBILITIES OF GUNNISON COUNTY

Gunnison County has special expertise in a number of areas related to planning, and as such, is responsible for the following:

i. Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii. To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii. To provide data of potential relevance and value to the RMP revision/EIS effort. This data may include but is not limited to the following:

- approved Gunnison County programs, plans and policies potentially affected by the RMP,

- information regarding planning area resources and current and proposed uses and management actions,

- environmental analyses on issues for which Gunnison County has special expertise,

- socio-economic data such as demographics, activities and values.

iv. To review and provide comments during specified review periods on preliminary baseline and other technical reports for which Gunnison County has contributed data or other pertinent information.

v. To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

- preliminary range of alternatives to be considered in detail,

- relevant portions of the "Affected Environment" section (including the socio-economic portion),

- relevant portions of the "Environmental Consequences" section,

- relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi. During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii. To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

BLM_0076499

## VI.    FUNDING

Each entity agrees to fund its own expenses associated with this planning process.

## VII.   JOINT RESPONSIBILITIES

The parties agree to use their best efforts to meet the timeframes established in the agreement, to work cooperatively, and to resolve differences as quickly as possible.

## VIII.  IMPLEMENTATION, AMENDMENT AND TERMINATION

This agreement becomes effective upon signature by all parties, and may be subsequently amended through written agreement of all signatories.  The parties agree to jointly develop a framework for information exchange and feedback within 60 days of the signing of this agreement.

Gunnison County or the BLM may terminate this agreement by providing written notice of termination to the other party.  If not terminated sooner, this agreement will end when the Notice of Availability for the Final EIS is published in the Federal Register.

Nothing in this agreement will abridge or amend the authorities and responsibilities of Gunnison County or the BLM or any other party on any matter under their respective jurisdictions.

Nothing in this agreement may be construed to require either Gunnison County or the BLM to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act (31 USC 1341) or any State or County law or ordinance.

## IX.   SOVEREIGN IMMUNITY

Neither signatory waives their sovereign immunity by entering into this Memorandum of Understanding.  Each fully retains all immunities and defenses provided by law with respect to any actions based on or occurring as a result of this agreement.

Page 4 of 6

BLM_0076500

## X.  SIGNATURES

The parties hereto have executed this Memorandum of Understanding as of the dates shown below.

BUREAU OF LAND MANAGEMENT

_____
Barbara L. Sharrow, Field Manager
Uncompahgre Field Office, BLM

6-8-09
**Date**

GUNNISON COUNTY, COLORADO

_____
Matthew Birnie, County Manager
Gunnison County

6-01-09
**Date**

Page 5 of 6

BLM_0076501

## APPENDIX A – AGENCY REPRESENTATIVE

REPRESENTING:        **GUNNISON COUNTY, COLORADO**

Mike Pelletier
Long Range Planner
Gunnison County
200 E. Virginia
Gunnison, CO  81230
Phone: (970) 641-0248
Fax:
Email: mbirnie@gunnisoncounty.org

REPRESENTING:        **BUREAU OF LAND MANAGEMENT**
**UNCOMPAHGRE FIELD OFFICE**

Bruce Krickbaum
RMP Project Manager
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
Phone: (970) 240-5384
Fax: (970) 240-5367
Email: bruce_krickbaum@blm.gov

BLM_0076502

To: Jamie Connell, BLM State Director
From: Jim Brett
RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office
Date: 2019 July 26

Dear Director Connell,

As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP (reference 000184_BrettJ_20161017 in Volume IV, June 2019 RMP), I respectfully submit the following protest on behalf of Slow Food Western Slope and the Valley Organic Growers Association. (Original October 2016 comment document is included.)

My contact information is:
Jim Brett
1899 Hawks Haven
PO Box 1682
Paonia, CO 81428
970.210.9718
jmbimagery@icloud.com

My protest addresses the following issues that I have raised in my previous comments:
• Preferred Alternative: Adopting a wholly new alternative at this stage of the process is unacceptable
• Air Quality: Ozone levels are already exceeding EPA thresholds
• Health and Safety: Human health impacts need priority consideration
• Leasable Minerals - Fluid: Fluid mineral development would create negative impacts
• Recreation: The entire Jumbo Mountain unit must be a special recreation management area
• Socioeconomics and Environmental Justice: Oil and gas development threatens agricultural livelihoods
• Water Resources: Clean water is the lifeblood of the North Fork Valley
• Ecological Emphasis Areas: Need uninterrupted public land access for hunting, camping, fishing and travel

Those issues are addressed in the following sections of the RMP:
Section 2.3 - Alternatives Considered for Detailed Analysis
Section 4.3.1 - Air Quality & Climate
Section 4.6.2 - Public Health & Safety
Section 4.3.2 - Soils & Geology
Section 4.4.4 - Recreation
Section 4.6.3 - Socioeconomics and Environmental Justice
Section 4.3.5 - Water Resources
Section 4.4.3 - Fish & Wildlife

I believe the BLM has erred in adopting the Proposed RMP for the following reasons:
• Section 2.3: Alternative E was improperly adopted and was not subject to public comments. The RMP drastically decreases the stipulations in Alternative B and does not include a No-Leasing alternative.
• Section 4.3.1: Alternative E will contribute to increased greenhouse gas emissions thereby exacerbating climate change.
• Section 4.6.2: The Proposed RMP downplays public health risks, and ignores significant evidence provided (reference comment 000184_BrettJ_20161017-9) that shows increased oil and gas development can have serious adverse impacts on public health.
• Section 4.3.2: The BLM does not consider information on earthquakes, human health impact, climate change impact and environmental damage caused by hydraulic fracturing,

injection wells and ongoing oil and gas operations. Also, the RMP does not adequately address the cumulative impacts of unregulated gas gathering lines.

- Section 4.4.4: Alternative E must designate the entire Jumbo Mountain unit as a special recreation management area with no leasing to protect the quality of the recreation experience.
- Section 4.6.3: The RMP does not sufficiently address the potential for soil, air and water contamination as a result of oil and gas development that could destroy the North Fork Valley's farms', orchards' and ranches' ability to market their products as organic and safe - thereby losing their livelihood.
- Section 4.3.5: Since the RMP proposes to lease practically every acre of the North Fork to oil and gas, that would threaten the Valley's drinking and irrigation water. The RMP does not adequately address the permanent removal of water from the hydrologic cycle.
- Section 4.4.3: The RMP needs a No-Leasing alternative with No Surface Occupancy setbacks from streams, riparian areas and water bodies to sustain a multi-million-dollar outdoor industry in the area.

On behalf of Slow Food Western Slope and the Valley Organic Growers Association, I respectfully protest the Proposed RMP, and the sections outlined above. Without having considered a No-Leasing alternative, nor considering how the North Fork Alternative Plan (B1) would be carried out if included in the preferred alternative, the draft RMP fails to fulfill its duty to consider the full range of reasonable management possibilities. Alternative E does not in any means support the BLM Mission "to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations."

Sincerely,

Jim Brett
Leader, Slow Food Western Slope
Secretary, Valley Organic Growers Association

BLM_0076504

Jim Brett
PO Box 1682
Paonia, CO 81428
Leader, Slow Food Western Slope
Secretary, Valley Organic Growers Association
Oct 17, 2016

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Thank you for the opportunity to comment on the draft Uncompahgre Field Office Resource Management Plan (RMP). Slow Food Western Slope and the Valley Organic Growers Association (VOGA) are glad the BLM is considering ways to protect important natural resources like domestic and irrigation water, air quality, wild and scenic rivers, wildlife habitat and recreation. In particular, we support the designation of ecological emphasis areas and special recreation management areas. These will preserve habitat connectivity, wildlife corridors, undeveloped open space and recreation opportunities within our region.

Slow Food Western Slope (http://slowfoodwesternslope.org/) functions as a chapter of Slow Food USA, which is a 501(c)3 non-profit organization. Slow Food USA's and its chapters' mission is to create a dramatic and lasting change in the food system. We envision a world in which all people can eat food that is good for them, good for the people who grow it and good for the planet: good, clean and fair food for all.

Our chapter promotes and supports over 60 farmers, orchardists, ranchers, agricultural businesses and winemakers of the North Fork Valley - all of which depend on good and clean water, air and soil.

Valley Organic Growers Association (http://www.vogaco.org/), a 501(c)5 non-profit organization, was established in 1992 and has a membership of over 80 organic farms, ranches, orchards and agricultural-related businesses and advocates, representing a vibrant and sustainable local economy. Our guiding principles include the maintenance of healthy soil, air and water for the production of nutritious food, free from synthetic inputs.

The North Fork Valley's scenic beauty and temperate growing season have attracted the largest concentration of organic and chemical-free growers in the state of Colorado. Our region has a long history of producing quality high-country, chemical-free food, with a well-deserved reputation that extends around the state and nationally. This history, coupled with the emerging consumer trend for organically crafted products has made this region increasingly known and marketable.

The North Fork Valley has a forcefully developing market for agri-tourism, farm-stays and agriculture-based education. Products from area farms supply markets and top restaurants in towns around western Colorado, including Aspen, Telluride and Crested Butte and serve many Front Range communities, including Colorado Springs, Golden, Denver, Boulder, Longmont and Fort Collins. The farms' customers have created relationships with the growers and forged a

unique community that is the North Fork Valley. These relationships develop as our farmers have been able to furnish organic, high-quality fruits, vegetables, meat, dairy, wine and specialty products.

An October 5, 2016 Aspen Sojourner article (http://www.aspensojo.com/articles/2016/10/5/beyond-the-roundabout-autumn-perfection-in-paonia) highlights the items mentioned above providing credence the North Fork Valley is a destination that must be protected:

- - -

"Nestled in the North Fork Valley in Delta County, Paonia is home to the state's largest concentration of organic farmers thanks to its richly fertile land, which yields ample fruit (peaches, apples, cherries, pears, and plums) and veggies while supporting some of the country's best livestock. Incorporated in 1881 and named by founder Samuel Wade after the peony rootstock he brought in a covered wagon all the way from Ohio, the town has now grown into a haven for aging flower children, new-agers, liberal activists, and environmentalists…The town of just under 2,000 residents prides itself on its vibrant off-beat culture filled with farm-to-table restaurants, progressive media outlets, art galleries, boutiques, and wineries.

"It doesn't get more scenic then driving from Aspen to Paonia in the fall, with expansive views of the western Elk Mountains from McClure Pass. It's a direct route from the Roaring Fork Valley to the North Fork Valley via State Highway 133; the road takes you through Carbondale and Redstone, and is open year-round. The top of the pass is a prime spot for leaf-peeping. The drive then traces Muddy Creek down to Paonia State Park—worth a stop on your way there or back to take in the stunning sight of the Ragged Mountains.

"One of the few regions in Colorado to successfully cultivate and bottle pinot noir, the North Fork Valley is a hotbed for high-altitude grape growing, with plenty of vineyards to explore.

"Continue down the road to the home of Big B's juices and hard ciders, where you can pick apples, along with plenty of other produce, depending on the season. It's the quintessential autumn adventure…

"Founded in 2008 by husband and wife Mike and Gretchen King, [Revolution Brewing] uses locally grown hops with water directly from the springs on nearby Mount Lamborn for beer that's hand stirred and brewed on a six-barrel system."

- - -

Our producers' commitment to quality and the stewardship of clean soil, water and air are crucial to consumers and their perception and choice to buy good and clean food. The potential for soil, air and water contamination as a result of oil and gas development could destroy our Valley's farms', orchards' and ranches' ability to market their products as organic and safe - thereby losing their livelihood.

**Preferred Alternative**

The BLM's preferred alternative would open almost every acre of public lands in the region to oil and gas leasing (865,970 acres or 94.5% of total oil, gas and mineral acreage), and specifically

in sensitive air, water and food sheds. The Preferred Alternative is a roadmap to industrializing this economically and ecologically unique area with gas wells, pipelines, storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks and more.

The potential for human, animal and environmental damage is too high.

Development would contaminate soils, water and air and impair human health, including increases in respiratory, endocrine, immune and cardiovascular disease.

Development of the public lands would destroy local investments and resources required in transitioning the economy to one based on agri-tourism, recreation, renewable energy, agriculture and organic/clean food. Also, development would contribute to increased greenhouse gas emissions and climate change impacts on community resources, including agriculture and wildlife.

A no-leasing alternative is the only reasonable conclusion to a hard-look analysis of the risks posed by oil and gas operations including fracking technologies and large-scale industrialization. Because BLM did not consider new information on earthquakes, human health impact, climate change impact and environmental damage caused by hydraulic fracturing, injection wells and ongoing oil and gas operations, along with its inadequate risk analysis, its draft Resource Management Plan is fundamentally flawed.

BLM should adopt a no-leasing alternative, which is the only option to protect the North Fork Valley, and everyone who depends on it for food and recreation for generations to come. If the BLM will not consider a no-leasing alternative, then by all means it must make Alternative B1 as the preferred alternative.

In addition, unregulated gas gathering pipelines on public lands present an unacceptable risk to human life and the environment. BLM should impose a moratorium on oil and gas leasing until rural gas gathering pipelines are properly regulated under the Pipeline Hazardous Materials and Safety Administration.

**Impact Areas**

<u>Oil and Gas Development</u>

As mentioned above, BLM's preferred alternative would open 94.5% of total oil and gas mineral acreage to leasing, which is .1% less than its current 30-year old RMP. BLM divides oil and gas leasing by potential for development. In its preferred alternative, BLM allocates 53% of the federal mineral estate to higher development potential and the remaining 47% to lower development potential. BLM has based its oil and gas drilling assumptions on a 2004 report, which assumes that 1271 wells will be drilled in the planning area.

Also, the RMP does not impose a cap on drilling.

BLM's assumption on the number of foreseeable wells could be significantly understated given, new research, hydraulic fracturing and multi-stage drilling technologies, which were not considered at the time of the report.

BLM_0076507

Here is at stake with oil and gas development for the North Fork Valley:

- Activities on public lands that have the potential to poison food sheds and threaten to wipe out food security for people on the Western Slope and the Front Range.

- The destruction of clean air, abundant fresh water and food sheds (including Colorado's largest concentration of organic farms).

- Significant harm to human health and a local economy based on agriculture and organic farms, recreation, hunting and tourism.

- Loss of unique biodiversity in Colorado.

- The future of the North Fork Valley. The final RMP will guide oil and gas development for the next 20-30 years.

<u>Other Related Oil and Gas Impacts</u>

*Water Resources*

Needless to say, water quality is important for good, clean, sustainable agriculture. Clean water is the lifeblood of the North Fork Valley. The BLM proposes to lease practically every acre of the North Fork to oil and gas, which would threaten our drinking and irrigation water.

Extracting fuel from shale formations requires pumping hundreds of thousands of gallons of water, sand and chemicals into the ground to break apart rock and free the gas. Some of that water, along with large quantities of existing underground water, returns to the surface, and it can contain high levels of salt, drilling chemicals, heavy metals and naturally occurring radioactive material. Drinking and irrigation water sources have been contaminated by oil and gas chemicals released through leaks and spills, naturally occurring gases and radioactive materials from disturbance of the geologic formation, and air-borne contaminants.

The oil and gas industry, in particular hydraulic fracturing, is exempt from critical sections of the Clean Water Act, the Safe Drinking Water Act, and other laws designed to protect our water resources. Therefore, there is a lack of meaningful regulation.

State regulation of hydraulic fracturing as it relates to potential contamination of ground and surface water is limited to casing construction requirements, setbacks, disposal of oil and gas wastes (hazardous materials), and reporting of leaks and spills. Produced water needs to be disposed of and can be disposed of 6 ways in Colorado:

1. Injection into a properly permitted Class II well;

2. Evaporation/percolation in a properly permitted pit;

3. Disposal at permitted commercial facilities;

BLM_0076508

4. Disposal by roadspreading on lease roads outside sensitive areas under certain conditions;

5. Discharging into state waters, in accordance with the Water Quality Control Act and related rules and regulations; or

6. Evaporation in a properly lined pit at a centralized exploration and production waste management facility permitted by the Colorado Oil and Gas Conservation Commission (COGCC).

For the fluids disposed of, the BLM states that "60 percent goes into deep and closely-regulated waste injection wells, 20 percent evaporates from lined pits and 20 percent is discharged as usable surface water"under permits from the Colorado Water Quality Control Commission." With all of this "deep and closely regulated" activity to protect citizens:

• There were 615 spills, 271 (44%) of which were from produced water, in 2015. That equates to nearly two spills every day in Colorado. 15% of the spills resulted in water contamination, with: 44% within 50 feet of ground water, 31% within 1000 feet of surface water, 39% within 1500 feet of a water well, and 9% within 500 feet of cows, pigs, sheep or other livestock as reported in 2015 by the Center for Western Priorities.

Also, naturally occurring radioactive material comes up with wastewater produced from oil and gas extraction. The waste can remain radioactive for millennia. Excessive radiation exposure can increase cancer risks; radon gas, for example, has been tied to lung cancer. BLM did not analyze the risks of exposure to radioactive waste, and Colorado does not have regulations in place to manage radioactive waste from oil and gas operations.

The BLM is required to honor community source water protection plans, which are developed to protect a community's drinking water source from contamination. The towns of Crawford, Hotchkiss, and Paonia secured source water plans, which were not taken into consideration by the BLM in its preferred alternative.

This video depicts what happened to well water when hydraulic fracturing occurred in Las Animas county in Colorado: https://www.facebook.com/greenpeaceusa/videos/10154706072859684/. This is completely unacceptable.

In addition, the BLM also did not consider the permanent removal of water from the hydrologic cycle or that there are insufficient water supplies necessary to support fracking and other drilling operations, particularly in this period of persistent drought.

Again, a no-leasing alternative is not only reasonable, but represents the best way to protect the North Fork Valley now and in the future. Alternative B1 would be acceptable if a no-leasing alternative cannot be included in the RMP.

*Air Quality*

The final plan must protect the health of the airshed. The North Fork Valley is affected by daily up and down-valley winds and any oil and gas activities occurring in higher elevations could

have direct impact on air quality at lower elevations, including from dust, methane, VOCs, ozone and other particulates and gases hazardous to agriculture and public health.

In Garfield, Mesa, Gunnison and Delta counties, there are 11,825 oil and gas facilities. Within a half mile radius of these facilities, there are over 6,100 people. The American Lung Association gave Mesa County an F Air Quality rating and Gunnison a C rating. Even more disturbing is that Delta county does not monitor air quality.

The BLM does not have the adequate information to assess airshed impacts of oil and gas activities and did not consider that their own modeling of ozone levels in the Bull Mountain area that exceed EPA thresholds of 70 ppb.

The North Fork Valley producers' commitment to quality and the stewardship of clean soil, water and air are crucial to consumers and their perception and choice to buy clean, organic food. The potential for air contamination as a result of oil and gas development could destroy Slow Food and VOGA member farms' ability to market their products as organic and safe.

*Health Impacts*

The BLM did not conduct a human health impact assessment in its Draft Resource Management Plan.

Hundreds of peer reviewed scientific articles exist on all aspects of toxins related to unconventional oil and gas production. The Endocrine Disruption Exchange (TEDX) has published research and aggregated data identifying low-dose exposure to chemicals associated with oil and gas development and operations as Endocrine Disrupting Chemicals (EDC). These chemicals affect not only reproduction and fetal development, but are linked to respiratory health, metabolism issues, malignancy as well as all the problems listed below.

The New York State Department of Health (NYSDOH) released *A Public Health Review Of High Volume Hydraulic Fracturing For Shale Gas Development* in December 2014. In this study, it found that residents living near fracking activities had the following health problems: skin rash, nausea or vomiting, abdominal pain, breathing difficulties, cough, nosebleed, anxiety, stress, headache, dizziness, and eye and throat irritation. This study led to their recommendation that fracking should be banned in New York State.

The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction), Third Edition, October 14, 2015, by Concerned Health Professionals of New York and the Physicians for Social Responsibility cites a number of studies. Below are some studies published in 2015 or 2014. The citing after each will read PSR-C then the page number.

Uncertainty.

- California Council on Science and Technology studied the impacts of well stimulation on human health from the exposure to fracking-related air pollution. The unknown number and toxicity of chemicals mixed in these fluids make it difficult to quantify risk but the paper identifies the potential health risks. One conclusion: that "officials should fully understand the toxicity and environmental profiles of all chemicals before allowing them to be used in

California's oil operations." (PSR-C p.72)

Birth defects, birth weight, and infant mortality.

- In rural Colorado a study of almost 25,000 births from 1996-2009, congenital heart defects and neural tube defects (defects of the brain, spine or spinal cord) were associated with the density and proximity of natural gas wells within a 10-mile radius of mothers' residences. There are several chemicals emitted by natural gas development known to increase the risk of birth defects. (PSC-C p.76)

- University of Pittsburgh study of three heavily drilled PA counties found the more exposure a pregnant woman had to gas wells, the higher her risk for a smaller-than-normal baby. Mothers living nearest to a high density of wells were 34% more likely to have babies small for their gestational age. Low birth weight is a leading cause of infant mortality. (PSR-C p.72, 73)

- Health professionals in Vernal, Utah reported a 6-fold increase in infant death rates over a three-year period. The air quality which was formerly pristine in Uintah County, UT received an "F" rating for ozone in the American Lung Association's 2013 State of the Air Report. The Unitah Basin has 11,200 oil and gas wells. It is known that pregnant women who breathe more air pollution have much higher rates of virtually every adverse pregnancy outcome that exists, said one health professional. (PSR-C p.76)

- Preliminary data from researchers at Princeton University, Columbia University and MIT used Pennsylvania birth records from 2004 to 2011 to assess the health of infants born within a 2.5-kilometer radius of natural-gas fracking sites. They found that proximity to fracking increased the likelihood of low birth weight by more than half, from about 5.6 percent to more than 9 percent. The chances of a low APGAR score, a summary measure of the health of newborn children, roughly doubled, to more than 5 percent. (PSR-C p.77)

- Other preliminary studies from Colorado and Pennsylvania comparing infant birth weights and premature births with proximity to wells had similar findings as above. (PSR-C p.77; 72-73)

Rashes and upper respiratory problems.

- A Pennsylvania, Yale-led study found that health symptoms reported by residents increased in frequency as distance between residence and gas wells decreased. Those living less that one kilometer from drilling activities had increased reports of rashes and upper respiratory problems. (PSR-C p.73)

Urgent Care & Hospitalization.

- Hospitals in the Bakken Shale region reported a sharp rise in ambulance and emergency room visits since the boom in drilling and fracking. Drug overdoses and oil field related injuries accounted for 50% of the cases in one emergency room. (PSR-C p.76)

- University of Pennsylvania's Center of Excellence in Environmental Toxicology found the increasing number of gas wells in Pennsylvania is significantly correlated with inpatient rates

BLM_0076511

of hospitalization. (PSR-C p.75)

<u>Animal Health</u>.

- A Yale University School of Medicine study in SW Pennsylvania found evidence that dogs in households less than one kilometer from a gas well had elevated risks for health problems, especially dermal conditions. (PSR-C p.73)

- Food animals have been shown to have increased respiratory and growth problems over time. The life of a food animal is very short compared to that of humans and some wildlife where cumulative effects would be pronounced. (PSR-C p.73) Conditions like these will definitely harm ranchers' and other producers who raise animals and livestock for a living.

## Recreation

In conjunction with the visitor's agri-tourism experience of the North Fork Valley, recreation definitely plays a significant role.

<u>Jumbo Mountain Trails</u> - The BLM lands on and surrounding Jumbo Mountain are a well-used and well-loved recreation asset for North Fork residents and visitors. The final plan should include the entire Jumbo Mountain unit as a special recreation management area to protect the quality of the recreation experience. This area is essential for quality of life, recreation tourism, and the businesses that rely on those tourists. The final plan should also include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat.

Plus, Jumbo Mountain must be open to hiking, mountain biking (including pedal-assisted electric bikes) and horseback riding - no motorized vehicles are allowed.

<u>Hunting and Fishing</u> - Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat are critical components that help sustain the multi-million-dollar hunting industry in the area. The final plan should include ecological emphasis areas for all critical winter habitat within the North Fork Valley. The final plan should also include the protections of a no-leasing alternative or at least B1 which prohibits surface activities in critical wildlife habitat, and includes both No-Leasing and No Surface Occupancy setbacks from streams, riparian areas and water bodies.

<u>Future Recreation Development</u> - Local economic studies indicate that the economic future of our region will depend upon the diverse industries already present, including land- and water-based recreation. The final plan should include special recreation management areas and extensive recreation management areas for all lands identified as high recreation value by local residents and businesses. Recreation activities include mountain biking, horseback riding, motor biking, OHV use, trail running, hunting, fishing, and backpacking among others. These areas include Jumbo Mountain, Stevens Gulch, the North Fork of the Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant Hill, Lone Cabin, Adobe Butte and Robideau Canyon.

## Conclusion

BLM_0076512

- The draft RMP repeatedly describes how fluid mineral development would negatively impact, to some unknown degree, other resources such as wildlife habitat and migration corridors, grazing land, soil productivity, vegetative diversity, special status fish and aquatic wildlife, air quality and visual resources, as well as non-market values including ecosystem services, natural amenities, scenic beauty, human health, quality of life and sense of place.

- The draft RMP estimates that ecosystem services in the planning area could provide up to $1,492 million in value. (Chap. 4, pg.461)

- The draft RMP states that natural amenities like proximity to wilderness areas, national parks and other special protection areas have a positive impact on tourism, property values, population growth due to positive net migration, higher incomes and employment growth.

- The draft RMP states that approving an alternative that emphasizes "resource development over conservation likely would result in more impacts on nonmarket values and how planning area individuals perceive their own quality of life." (Chap. 4, pg.460)

So, why is Alternative D preferred - an alternative that will open the planning area to potential oil and gas development that will threaten the North Fork Valley's air, land and water?

Slow Food Western Slope and VOGA are opposed to oil and gas leasing on public lands in the North Fork Valley, which is one of the most beautiful and fertile places in the world. We are opposed to oil and gas leasing here because it has the potential to:

1) lead to loss of the clean air and abundant clean fresh water that have made this area Colorado's largest concentration of organic farms, prime hunting grounds, and home to gold medal fishing, and
2) cause significant harm to human health and a local economy based on recreation, hunting, tourism and agriculture. We oppose the BLM's Preferred Alternative, as it relates to oil and gas development, in the Draft Resource Management Plan and Environmental Impact Statement for the Uncompahgre Field Office in Southwest Colorado.

Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan (B1) would be carried out if included in the preferred alternative, the draft RMP fails to fulfill its duty to consider the full range of reasonable management possibilities.

And finally, the following is from the BLM's "Who We Are, What We Do" web page (http://www.blm.gov/wo/st/en/info/About_BLM.html):

"The BLM is focusing on the following priorities:

- The America's Great Outdoors initiative, which is aimed at enhancing the conservation of BLM-managed lands and resources and reconnecting Americans to the outdoors.

- The New Energy Frontier, which encourages and facilitates renewable energy development – solar, wind, and geothermal – on the Nation's public lands.

BLM_0076513

- Cooperative Landscape Conservation, a scientific initiative that recognizes the need to better understand the condition of BLM-managed landscapes at a broad level.

- Youth in the Great Outdoors, which supports programs and partnerships that engage youth in natural resource management and encourages young people and their families to visit, explore, and learn about the public lands.

- Climate Change, which is affecting public lands in ways that could impact on Americans' quality of life. The BLM is responding with two interconnected initiatives: a proposed landscape approach to land management and Rapid Ecoregional Assessments, which will improve the agency's understanding of public land conditions to inform future management decisions.

By strengthening existing and forging new partnerships with stakeholders, the BLM will ensure that the nation's public lands are managed and conserved for future generations of Americans to use and enjoy."

We request that the RMP align with these priorities above, especially in regards to the second item that encourages renewable energy. If the BLM does not consider oil and gas development on public lands a priority, then the Uncompahgre Field Office's RMP, which will probably be in for for decades, must reflect that.

Jim Brett

Leader, Slow Food Western Slope
Secretary, Valley Organic Growers Association

8/12/2019

# Proposed RMP/Final EIS

## Submission Successful
## Your Submission ID is: PRMP-1-500000120

## Names & Addresses

Mrs. Amber D Kleinman
47 Pan American Ave
Paonia, Colorado 81428, United States
Email Address:     alchemyamber@gmail.com
Day Phone:          1970-260-1859
Agency:               Public Web Page

## Comments

Comment iD: 1

Comment Title: UFO RMP Protest 000206_Kleinman_20161025-3

Comment: Protest FEiS and Proposed BLM UFO RMP
July 26, 2019
Amber Kleinman
47 Pan American Ave
Paonia, CO 81428
Comment Number: 000206_Kleinman_20161025-3

As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP(dates of previous ietters of comment: Aprii 2012, Juiy 2015) i submit the foiiowing protest.

My protest addresses the following issues, which I raised in my previous comments on the Draft UFO RMP (attached via this oniine submission form):
- Impacts on the unique economy and character of the North Fork Valley, including organic farming and agricultural tourism; outdoor recreation and recreationai tourism; hunting and fishing activities and reiated tourism; and scenic qualities
- Decreased value of recreational areas
- Decreased vaiue of my North Fork Vaiiey home (Voiume iV of the Proposed RMP does not inciude a comment reference
- Threats to clean water and air, and thereby public health and agriculture

The Proposed UFO RMP sections I'm protesting in relation to above issues include:
- Aiternative E in its entirety
- Section 4.3.1 Air Quality and Climate
- Section 4.3.3 Water Resources
- Section 4.3.5 Fish and Wiidiife
- Section 4.4.4 Recreation and Visitor Services
- Section 4.6.2 Pubiic Heaith and Safety
- Section 4.6.3 Socioeconomics

The Proposed UFO RMP fails to address my issues for the following reasons:
- i protest the entirety of the Proposed RMP's "Alternative E." This is a new alternative that the pubiic did not have a chance to fully review and comment on during a public comment period. The selection of an alternative without full public notice and full vetting is a violation of NEPA and undermines the public commenting process.
- The Proposed RMP opens a large percentage of public lands -- 95% -- to oil and gas development, ignoring the impact stated in page 4-446, of the Proposed RMP: "The organic farming and agritourism industry could be impacted by reai or perceived effects from deveiopment. Potentiai impacts inciude changes to water quaiity or quantity, soii quality, or other factors that result in a decrease in quantity or quality of the product produced, impacts due to a perceived degradation of the area's quality of product that resulted in decreased sales and/or visitation."
- The BLM recognizes that increased oii and gas ieasing in the management area is a threat to the vaiue of my home and my desire to live in the area, yet oil and gas development is open to almost all of the BLM lands in the North Fork Valley. From page 4-447, of the Proposed RMP: "Residents in all five socioeconomic units cited the scenic beauty of the landscapes and sense of community as strong factors in their decision to live and work in the area. While the BLM has not attempted to provide a monetary value on these factors, they do play an important role for both retaining residents and attracting new visitors."
- In the Proposed RMP, the Jumbo Mountain SRMA covers only 1600 acres instead of 5200 acres (as proposed in Alternative B), even though the Proposed RMP recognizes that recreation provides economic and intrinsic value to the management area as stated above. Reducing the size of the SRMA leaves the majority of Jumbo Mountain

BLM_0076515

8/12/2019

altogether unprotected from oil and gas development, undermining the designation of the SRMA, which is meant to preserve the unique characteristics of the area. Nearby gas wells will ruin the scenic aspects of this SRMA.
- The Proposed RMP reduces setbacks from water supplies and waterways, threatening our water supply.
- The Proposed RMP eliminates Ecological Emphasis Areas, reduces Areas of Critical Environmental Concern, and includes inadequate protections for Jumbo Mountain, with lack of an NSO designation, leaving Jumbo Mountain open to development. NSO designations overall are insufficient, decreased from 26% to only 11% compared to Alternative D. This decision does not support proper management of our recreational assets, failing to take into account the impact stated on page 4-447 of the Proposed RMP, which states: "Recreation plays a vital role in all five socioeconomic units (see Chapter 3 for a complete description and map of these units). Many people in the study area not only value their own proximity to recreation areas but see their towns as gateways to these areas, enabling them to attract tourists."
- The Proposed RMP increases the percentage of oil and gas leases with "standard stipulations" -- from 0% to 12% -- primarily in the North Fork Valley and lower Gunnison watershed. This decision
ignores the economy and character of the North Fork Valley and the impacts that increased, weakly regulated oil and gas development will have on our future.

In conclusion, this RMP fails to address the voice of the people in the North Fork Valley who have tried for years to work within the system to inform your decision.  The overall opening up of this land to Oil and Gas interests is dangerous to the unstable mountain passes, the roads, the water supply for our town, the irrigation water for the organic agriculture downstream. These impacts have not been addressed.

Amber Kleinman
July 26, 2019

## Submission Classification

| | |
|---|---|
| Response Type: | Front Office Submission Form |
| Delivery Type: | Front Office Submission Form |
| Receipt Date: | 07/27/2019 |
| Status: | ACTIVE |

## Agreements

Yes -   Please include me on the mailing list for this project?
Yes -   Protesting the Proposed RMP/Final EIS
No -   Withhold personally identifying information from future publications on this project?

## Original Submission Files

BLM_0076516

Adopting a wholly new alternative at this stage is unacceptable and a violation of NEPA. The public has not had a meaningful opportunity to comment on this proposal.

The BLM cannot adopt an alternative the public has not been able to provide comments on.

The Proposed RMP downplays public health risks, and ignores significant evidence we have provided that shows increased oil and gas development can have serious adverse impacts on public health.

The proposed RMP reduces setbacks from water supplies, waterways, areas with highly erodible and saline soils. IT allows oil and gas use on lands with steep slopes greater than 40%. It weakens CSU stipulations &amp; reduces Timing Limitations near critical wildlife habitat.

Susan Friar

Mrs. Susan Friar  PO Box 1317                    Paonia  Colorado          81428   United States    808-482-4926         alima.friar@gmail.com

Alima Comment online letter submitted October 28, 2016

Personalized comment:  Hydraulic fracturing would damage the structure of the earth, poison water, air and soil as well as all inhabitants and visitors to the North Fork valley who breathe and eat anything grown here. The chemicals used in fracking poison everything they touch. Our valley is worth more than the short term gain of corporations and the BLM.

Form Letter:

I am opposed to oil and gas leasing on public lands in the North Fork Valley, which is one of the most beautiful and fertile places in the world. I am opposed to oil and gas leasing here because it has the potential to 1) lead to loss of the clean air and abundant clean fresh water that have made this area Coloradoäó»s largest concentration of organic farms, prime hunting grounds, and home to gold medal fishing, and 2) cause significant harm to human health and a local economy based on recreation, hunting, tourism, and agriculture. I oppose the BLM's Preferred Alternative, as it relates to oil and gas development, in the Draft Resource Management Plan and Environmental Impact Statement for the Uncompahgre Field Office in Southwest Colorado. </span></p> <br /> The BLM's preferred alternative

would open almost every acre of public lands in the region to oil and gas leasing (865,970 acres or 94.5% of total oil, gas, and mineral acreage), and specifically in sensitive air, water and foodsheds. <b>The Preferred Alternative is a roadmap to industrializing this economically and ecologically unique area with gas wells, pipelines, storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks, and more.</b> <br /> The potential for human, animal and environmental damage is too high. <br /> Development would contaminate soils, water, and air, and impair human health, including increases in respiratory, endocrine, immune, and cardiovascular disease.</span></p> <br /> Development of the leases would destroy local investments and resources required in transitioning the economy to one based on agro-tourism, recreation, renewable energy, agriculture, and organic/clean food. In addition, development would contribute to increased greenhouse gas emissions and climate change impacts on community resources, including agriculture and wildlife.</span></p> <br /> A no-leasing alternative is the only reasonable conclusion to a hard-look analysis of the risks posed by oil and gas operations including fracking technologies, and large-scale industrialization. Because BLM did not consider new information on earthquakes, human health impact, climate change impact, and environmental damage caused by hydraulic fracturing, injection wells, and ongoing oil and gas operations, along with its inadequate risk analysis, its draft Resource Management Plan is fundamentally flawed. BLM should adopt a no-leasing alternative, which is the only option to protect the North Fork Valley, and everyone who depends on it for food and recreation for generations to come. In addition, unregulated gas gathering pipelines on public lands present an unacceptable risk to human life and the environment. BLM should impose a moratorium on oil and gas leasing until rural gas gathering pipelines are properly regulated under the Pipeline Hazardous Materials and Safety Administration.

PRMP-1-500000127

This section concludes that Alternative B1 results in the lowest level of air pollutants (greenhouse gases). Climate change must be the deciding factor when determining which alternative to chose, since the planet is rapidly heating, and the IPCC warns that we have  a decade or so to reduce our emissions to a manageable level, before the climate destabilizes and spins out of control.

Brad Thacker

PRMP-1-500000127          Mr. Brad Thacker       39818 Nelson Rd                          Paonia
          Colorado          81428   United States   720-989-8876   bthacker@q.com

To: Jamie Connell, BLM State Director

From:  C. Douglas Beall
        39962 Panorama Rd.
        Paonia, CO 81428

RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office

Date: July 27, 2019

Dear Director Connell,

It is your mission, the mission of the Bureau of Land Management to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.  Your final draft of the Resource Management Plan fails this primary mission.

As a land owner, farmer, affected citizen, homeowner and a consumer of North Fork Valley meat and produce, I submit this formal protest.  The issues stated below were raised in my previous comments contained in the form letter from Citizens for a Healthy Community referenced as form letter "B" in Table A-3 in the BLM Resource Management Plan.

Those issues raised in concern with the draft RMP are as follows:

- The RMP opens 95% of the planning area to oil and gas leasing which thereby reduces the health, diversity and use of those public lands for other uses and denies future generations access to those healthy, diverse and productive lands. This is in conflict with your primary mission.
- The RMP removes almost all Ecological Emphasis Areas which reduces the health, diversity and use of those public lands for other uses and denies future generations access to those healthy, diverse and productive lands.  This is again in conflict with your primary mission.
- The RMP removes proposed management direction in or near raptor or other special status species habitat.  This also reduces the health, diversity and use of those public lands for other uses and denies future generations access to those healthy, diverse and productive lands.  Once again, this conflicts with your mission.
- The RMP weakens protections within existing Areas of Critical Environmental Concern (ACECs), and eliminates or denies 12 existing or proposed ACECs. Once again this reduces the health, diversity and use of those public lands for other uses and denies future generations access to those healthy, diverse and productive lands.  As stated, this is in conflict with the BLM's mission statement.

- The RMP may affect, with the potential to "adversely affect", numerous threatened and endangered species, including Gunnison sage-grouse.  It is no surprise that this also reduces the health, diversity and use of those public lands for other uses and denies future generations access to those healthy, diverse and productive lands.  Once more conflicting with the BLM's primary mission.
- The RMP fails to address how water resources will be secured for the use in extraction industries without negatively affecting the water scarcity issues throughout this management plan area.  This further reduces the health, diversity and use of other public lands for other uses and denies future generations access to those healthy, diverse and productive lands.  And again conflicts with the BLM's primary mission.
- The RMP fails to address climate change and the effects of carbon extraction and combustion on global climate.  Extracting and burning fossil fuels absolutely reduces the health, diversity and use of those public lands for other uses and denies future generations access to those healthy, diverse and productive lands.  Sadly, this also conflicts with the BLM's primary mission and recent court decisions.
- Finally, the BLM erred in adopting the Proposed RMP because an Alternative E was considered which was never presented previously for public review or comment.  While this is likely to be challenged in court because this does not follow NEPA, it is also in conflict with your primary mission since adopting an Alternative E would deny future generations access to healthy, diverse and productive lands which were never presented for public purview.

As a reminder, this is your mission:

**BLM MISSION -- It is the mission of the Bureau of Land Management to sustain the <u>health</u>, <u>diversity</u>, and productivity of the public lands for the use and <u>enjoyment</u> of present and <u>future</u> generations.**

Please act accordingly.

Sincerely,

C. Douglas Beall

Greg H. Thompson

40249 Swanson Road

Paonia,  CO  81428

October 30, 2016

BLM, Uncompahgre Field Office

2465 Townsend Ave.

Montrose, CO  81401

RE:  Draft Resource Management Plan for the Uncompahgre Field Office


Dear BLM-UFO Staff and RMP Comment Team,

Thank you for providing me the opportunity to comment on the above referenced draft plan.  Please carefully and seriously consider the issues presented in these comments (see below).  While I appreciate the time and effort expended to create the draft plan I feel that none of the alternatives offered in the plan adequately address how the North Fork Valley will be protected from oil and gas development. Alternative B.1 (The North Fork Alternative) is a step in the right direction and is my preference of the alternatives presented in the draft plan.  I do, however, feel that a no leasing alternative for the North Fork Valley is the best course of action for the BLM to take and should be included in the final plan.

In light of new research and studies on the impacts that oil and gas has on human health, environmental resources like air and water, as well as the impacts of climate change, a no leasing alternative is not only reasonable, but represents the best way to protect the North Fork Valley now and in the future. Horizontal drilling and multi-stage fracking technologies are relatively new and involve far greater magnitude of impacts, especially in fragile, pristine and bucolic landscapes that characterize the North Fork Valley.

Sincerely,

Greg H. Thompson


## Introduction

I am a resident of Paonia, Colorado and live at 40249 Swanson Road (east end of Pitkin Mesa) near BLM lands.

I have lived here for four and one half years.  My wife and I moved here from Denver specifically to farm and to reap the benefits of living with clean air and water and of consuming locally produced organic food.  We grow organic fruits (from our 100 tree orchard) and wine grapes (from our 150 vines vineyard).  We purchased these farm lands (eight acres) and built our retirement home on the property.  We invested $50,000 in an irrigation system to water our orchard, vineyard and surrounding grassland.  We invested $1,200,000 on our land, house, irrigation and domestic water.

Our drinking water comes from Pitkin Mesa Pipe Line Company whose source is eight separate springs located on the eastern portion of the top of Grand Mesa.  These springs source their water from precipitation on the Grand Mesa.  This water source is near BLM lands that would be left open to oil and gas development in the draft Preferred Alternative.

Our irrigation water comes from Fire Mountain Canal and Reservoir Company, whose source is Paonia Reservoir and ultimately the precipitation above and around the reservoir.  This water source is near BLM lands that would be left open to oil and gas development in the draft Preferred Alternative.

It is not just my economic interest that I seek to protect.  I also want to protect the pristine nature of the North Fork Valley.  My comments (see Substantive Concerns below) are written with the intent to cause the BLM to include in the Final UFO resource management plan adequate protections that will keep the North Fork Valley pristine and in the process protect the economic interests (and thus the wealth) of those living in the North Fork Valley area.  Of the alternatives listed in the draft RMP Alternative B.1 is the only one that I could live with.  My preference is for a "no leasing" alternative but that option was not included in the draft RMP.

I believe there is a need in final UFO RMP for strategic thinking.  In this strategic thinking segment special consideration should be given to climate change and the impact that oil and gas development in the UFO area would have on climate change.  In addition there needs to be strategic analysis done on resource utilization (energy versus agricultural development) as it relates to national security and food independence (food security).  From a strategic viewpoint it is my contention that we, as a nation, need to do everything possible to preserve and protect the productivity of our agricultural lands.  This is a national security issue because without good quality food our populace will suffer from poor health.  Our country is already seeing the effects of a poor diet in the obesity epidemic.   Food calories from processed food (loaded with sugar) need to be replaced by calories from fresh, unprocessed food, especially organic food.  The North Fork Valley produces high quality, organic food, unprocessed food, the kind our populace needs.  It is the North Fork Valley's cool nights and hot days that contribute to such high quality food.  Because of the strategic importance of the North Fork Valley's agricultural resource it is imperative that the final UFO RMP identify this resource and be specific on how this resource will be protected from oil and gas development. It is essential that oil and gas development not be allowed to occur on properties above or around the watershed and food shed and air corridor that drains and funnels into the valley's agricultural lands.  I contend that protection of this vital agricultural resource can only be assured by putting oil and gas leasing off limits in the North Fork Valley and in the watershed area that supplies the valley.  The loss of production from leaving the oil and gas in the ground in these areas can easily be offset because there simply are so many alternative energy

resources available to our country. The alternatives include biomass, solar, wind, geothermal, nuclear, coal, hydro, tidal and oil and gas from less sensitive areas. While this country has many energy choices there are no alternatives or substitutes when it comes to healthy food. We, as a nation, will look very foolish if we do not protect these vital agricultural resources from pollution caused by fossil fuel development.

## Substantive Concerns

Real estate values and wealth impacts on residents of the North Fork Valley:

The final plan must protect the real estate values of property within the North Fork Valley. Oil and gas development in the US causes nearby private property to decline in value, sometimes precipitously. This should come as no surprise since prices of residential and agricultural property near industrial facilities has historically been lower valued. Fracking is an industrial activity and as such can have deleterious impacts on property values. The final RMP needs to include an analysis of contacts/communications/surveys made with realtors in the Paonia area of the North Fork Valley. This analysis needs to include a report on findings/interviews with these realtors based on one question: what happened to real estate sales and activity in the North Fork Valley when a 30,000 acre oil and gas BLM lease sale was announced in 2009 and scheduled for August 2012? I believe you would find that real estate activity went comatose once news of the lease sale was announced. In a 2013 survey of 550 people conducted by business researchers at the University of Denver a strong majority said they would decline to buy a home near a drilling site. The study, published in the *Journal of Real Estate Literature*, also showed that people bidding on homes near fracking locations reduced their offers by up to 25 percent. The draft RMP repeatedly states that, at the projected rate of fluid mineral development outlined in the Reasonably Foreseeable Development Scenario, oil and gas development would not have a significant impact on regional employment or the economy. I strongly doubt that this is correct. The final RMP needs to include results from a comprehensive economic study and analysis of how wealth destruction from declines in property values would impact the local North Fork Valley economy. My guess is that the results would show that the impact would be significant. This raises a larger issue: Should the BLM review and analyze their Western US oil and gas leasing policies from the perspective of explaining how and why those policies may be hurting local economies? Should local Western US economies bear the brunt of pro oil and gas leasing policies practiced by the BLM? A significant chunk of my savings (and accumulated wealth) from 40 years of work are at stake as are the savings and wealth of my North Fork Valley neighbors. A no leasing policy for the North Fork Valley is the antidote for protecting wealth in the North Fork Valley.

Other Economic Impacts:

Recreation and Agri-tourism are significant drivers of economic growth for the North Fork Valley. The phenomenal beauty and pristine nature of the landscape are bringing growing numbers of tourists and recreationalists to the valley. Hunters continue to come to lands around the valley due to its prime location and excellent animal habitat. Cycling tours are growing in popularity with participants coming from all over the world. These bicyclists typically ride a loop that includes Aspen, Crested Butte and

BLM_0076524

Paonia.  Should Highway 133 become congested with heavy trucks and should the view shed become littered with oil and gas tanks, well pads, etc. these cyclists would likely go elsewhere.  These economic drivers would then be lost due to increased oil and gas activity in the North Fork Valley area.  The final RMP must protect the idyllic character and scenic beauty of the North Fork Valley.

<u>Water and Air:</u>

Air:  My wife and I live at the mouth of valley where early morning winds come down the valley.  Our location is ideal for growing fruit due to favorable wind patterns.  Significant oil and gas development up valley would bring polluted air into our air shed, potentially harming not only our crops but also our health.  We leave our windows open during summer nights to cool the house because we do not have air conditioning.  We would be breathing polluted air while we sleep should oil and gas activity be allowed to increase up valley.  BLM did not consider that their own modeling of ozone levels in the Bull Mountain Area exceed EPA thresholds of 70ppb.  I am also concerned about the deleterious impacts from an increase in airborne volatile organic compounds, silicates and diesel exhaust from transportation, well and compressor sites.  **I feel that the draft plan did not take into account the difference in impact that new horizontal fracking technologies have compared to conventional drilling, which include a 333% increase in air pollutant emissions involving 12 more tons of VOCs and 1 additional ton of HAPs per well .**

Water:  At a time when climate change models are forecasting persistent drought for the Western US the BLM needs to make certain that water resources are protected in the UFO RMP area.   BLM did not consider the permanent removal of water from the hydrologic cycle and that there are insufficient water supplies necessary to support fracking and other drilling operations, particularly in this period of persistent drought.   As a user of both irrigation water (Fire Mountain Canal) and domestic water (Pitkin Mesa Pipeline Company) whose sources (springs and snow melt) are near BLM lands affected by the RMP, I am concerned about contamination.  Our domestic water company has spent millions of dollars on piping, filtration equipment, etc. to provide its customers with excellent water.  The quality of this water is at risk should oil and gas activity be allowed near these springs or snow melt basins.  There is a risk of contamination to irrigation water and crops from fracking chemicals that enter ground or surface water in the water shed up valley from our farm.  I am also concerned about damage to irrigation canal access and bridges.

Because fracking is exempt from important sections of the Clean Water Act and the Safe Drinking Act it is imperative that BLM include in the final plan measures that will absolutely protect the North Fork Valley's watershed from the risk of contamination.  As part of this effort BLM needs to analyze the risks of exposure to radioactive waste in the wastewater coming from extraction.  Clean water is the lifeblood of the North Fork Valley and must be protected.  The best way to do so is to not lease any more acreage in the North Fork Valley.  I urge the BLM to consider the no leasing option.

<u>Health impacts:</u>

BLM must conduct a human health impact assessment (HIA) in its final UFO RMP.  The CDC (Centers for Disease Control and Prevention) states, "In the United States, HIA is a rapidly emerging practice among

BLM_0076525

local, state, and federal jurisdictions." Because there are now hundreds of peer reviewed scientific articles on all aspects of toxins related to unconventional oil and gas production, it is imperative that human health be protected. The fact that population centers and food sheds are in the UFO RMP is reason enough to make an HIA a part of the final RMP.

BLM did not take a hard look at direct, indirect, and cumulative impacts, as required by NEPA, including meaningfully analyzing greenhouse gas emissions and the impacts of climate change, including the severity of these impacts and the social cost of carbon.

Traffic from increased oil and gas activity will mean more noise and pollution along Highway 133. I live less than a mile from Hwy 133 and want BLM in the final plan to establish adequate mitigation measures for traffic. Those measures should include provisions that would reduce noise and exhaust levels from heavy trucks.

Pipeline Safety:

Because rural gas gathering lines are exempt from federal pipeline safety regulations, the BLM must implement in the plan measures that will address the issues referenced in the Pipeline Hazardous Materials Safety Administration 2016 Proposed Rulemaking on Gas Pipelines. Measures to insure the safety of hikers. campers, hunters and anglers must be included in the RMP. BLM did not consider; 1) forest fire risks from pipeline explosions, 2) lack of pipeline safety inspections and 3) the impact of extreme weather causing flooding, mudslides and geological instability.

## Conclusion

The BLM should listen to the local residents and incorporate local citizen input in their decision making as it relates to the final RMP. While a no leasing alternative is the best option for the North Fork Valley the BLM should at a minimum adopt the North Fork Alternative , B.1. I would like to close with one additional thought: The BLM may actually be doing the oil and gas industry a favor by closing the North Fork Valley to future leasing. The North Fork Valley is an amazingly beautiful area that people are passionate about preserving. By putting the valley off limits oil and gas companies may be spared from potential embarrassment and distress should they develop with industrial scale fracking technologies and then be held responsible by the public for causing degradation to such a special place.

BLM_0076526

Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision Team

Thank you for the opportunity to comment on the Draft Resource Management Plan (DRMP). We appreciate the effort and the level of detail involved in its preparation, and also appreciate the difficult task you face balancing competing demands upon our public lands.

While the many of the goals, objectives and actions in the DRMP, and your preferred alternative make good sense, reinforce one another, and are significant improvements over the current RMP, we are aware of some inconsistencies, oversights and omissions that should be considered and addressed.   These concerns can best be addressed by moving beyond the North Fork Alternative described in Option B-1 and adopting a "no fluid mineral leasing in the North Fork watershed" option for the North Fork watershed.

Our family purchased a farm in the North Fork valley outside of Paonia in 1994 and moved here, permanently, shortly thereafter.  The adoption of the Valley as our home was driven by a desire to live where the air and water are clean, the area safe, the skies dark at night.  These same pastoral characteristics are driving in-migration to the area today.   While enjoying the natural amenities we are blessed with, we began to craft a vineyard and winery business, opting to develop a sustainable, economically viable return to the agricultural roots of our predecessors in the midwest.  We have spent more than 2 decades and tens of thousands of hours in the pursuit of that dream, clearing land, planting vines, building a home, winery, cellar and other buildings by hand out of the fieldstone cleared from the vineyards.  In that time we have created a sustainable farm and business providing 2 full-time jobs, 3 part-time jobs and as many as 15 seasonal positions.   The sustainable vineyard relies directly on the continued availability of clean, reliable irrigation and domestic water.   The economic viability of the winery business relies on the tourism traffic we have been successful in attracting to the Valley.   This multi-decade investment is under existential threat by the resource management pathway the BLM is currently proposing.

**Likely Development Scenario**

The BLM preferred alternative, alternative D, opens nearly all of the North Fork watershed to oil and gas exploration and development (DRMP at 2-409). While the underlying assumption is a well count of 1,271 throughout the UFO region by the year 2030 (DRMP at 3-14), statements by the energy companies currently operating in the North Fork, on lands already leased by the BLM, exceed that number by a factor of 2 to 3.  This is in advance of the recent USGS study identifying the Mancos Shale as a likely significant gas resource. Therefore, offering nearly all of the North Fork watershed as available for oil and gas leasing virtually guarantees the industrialization of that watershed.   While the specifics of each well will be unique, the commonly accepted impacts include multiple millions of gallons of water per well, multiple thousands of truck trips per well, multiple millions of gallons of produced waste per well and multiple miles of roadway per well pad.  No reasonable person could claim that the current rural/ arboreal landscape would suffer "no significant impact" from such a change of use.  The DRMP admits as much at page 3-176.

BLM_0076527

**Impacts to Economic Viability of Existing Enterprises**

Much of the recent improvement in economic outlook for the North Fork Valley rests upon the desirability of the natural and man-made features of the area.  Personal communications with local realtors indicate that both retirees and young families are relocating to the area for precisely the same reasons our family did in 1994.  Further, the rapidly developing agritourism sector relies on attracting tourists from the Front Range, and from out of state, to enjoy the amenities offered in the Valley.  Our family winery relies heavily on our ability to attract out-of-area customers to our tasting room, vineyard, and guest cottage.  Fully 80% of our income is derived from these sources and we spend significant resources each year attracting these visitors. While the Valley is currently enjoying a blossoming of businesses such as our own (e.g. wineries, organic farms, traditional farms, farm-to-table venues, farmstays, lavender farms, etc.) the robust growth we are experiencing would be brought to a halt should the watershed develop as the BLM proposes.  It is already difficult and expensive to convince visitors to make the 5 hour trip from the Front Range.  It would become exponentially more so if they were asked to traverse a gas field of multiple thousands of wells, with its attendant truck traffic, flares, pipelines, etc.  The destruction of the visual amenities, the clear air, dark skies, and pastoral/agricultural character of the Valley would foster the destruction of those entities dependent upon these values.  In making our decisions, we have relied on the BLM to manage the lands under its jurisdiction so as to maintain these values.  Failure of the BLM to do so represents and existential threat to our livelihood.

Nowhere, either in the DRMP, in associated presentations made by the BLM-UFO, in communications made by the interested energy companies, by the State of Colorado, the COGCC, or by the Delta County Commissioners has anyone articulated a method by which oil and gas development can be made compatible with the entities described above.  Lip service is often paid to the minimization of impacts, the use of "Best Management Practices," and mitigation.  However, no analysis of the expected impacts to existing enterprises is offered.  There is no mention of restrictions on the pace or scale of development, no mention of liquidated damages for unmitigated impacts, no mention of resolving conflict of use in favor of existing entities, etc.  In essence, those of us who live in the Valley are tacitly asked to shoulder these costs of energy extraction in order to facilitate the profitability of the oil and gas industry, and the tax, royalty and severance streams that accrue to various governmental agencies.

The risks described above become concrete the moment an oil and gas lease is let.  At that moment a public good is converted to a private property right.  Every lease is let with the expectation that development will be allowed to occur.  The leaseholder may expect restrictions but outright denial of the right to drill is off the table.  The scale of the threat to existing enterprise and the absence of willingness to explore ways to make the proposed extractive industry compatible with existing uses argues for a no leasing alternative.  Simple deferral to State agencies ostensibly charged oversight of these issues, knowing that the response of these agencies may be inadequate, is a abrogation of the duty of the BLM to manage for multiple use and sustained yield.  Not only does the DRMP fail to propose such an alternative as a preferred pathway, is does not even examine and discard such a pathway.  This is a failure to adhere to the NEPA process and does a disservice to those of us living in the North Fork Valley.

**Impacts to Water Resources**

The agriculture in the North Fork Valley relies on the reliable availability of clean irrigation water. The population of the Valley relies on a combination of clean surface and ground water for domestic use. Further, many of the existing enterprises in the Valley depend upon the image, and actuality, of purity for their business model. Examples include organically and bio-dynamically certified agriculture and those enterprises devoted to healing. Industrial development of the scale proposed by the DRMP and the preferred alternative poses significant, unmitigated risks to each.

**Surface spills**

The Denver Post reports that over the last 3 years, the oil and gas industry has reported nearly 2 spills per day or nearly 700 per year, all of which had the potential to contaminate surface water and 15% of which did contaminate ground water. As the State relies on self-reporting by industry, this number must be assumed to be a lower bound. At the scale of development proposed by the DRMP preferred alternative, the North Fork watershed should expect similar spill activity. Multiple thousands of truck trips per well, many of which carry hazardous or noxious chemicals, will likely add to this number. This is yet another example of a risk/cost that is tacitly expected to be borne by the residents down gradient of the oil and gas extraction activity in support of the profitability of the industry and the revenue streams of various governmental agencies. The absence of viable mitigation measures, the absence of mechanisms to compensate affected entities and penalize responsible parties argues for the realization that the proposed development in the preferred alternative is incompatible with existing uses and with the BLM mandate to manage for multiple use and sustained yield. Further it argues for a "no leasing in the North Fork watershed" option.

**Well bore failures**

Contamination of ground water by oil and gas development, hydraulic fracturing, and associated activity is well documented and of great concern. Although there is little or no data specific to Colorado or specific to the North Fork, Ingraffea et. al., prominent researchers on the effects of oil and gas development, estimate the failure rate of gas well bores to be between 7% and 60%, depending upon the age of the well. Further they describe, "Fluid migration from faulty wells is a well-known chronic problem with an expected rate of occurrence." Should such scientific evidence be supported under North Fork conditions, the extremely conservative estimate in the DRMP of 1,271 wells provides that something like 90 wells would begin leaking shortly after completion and nearly 800 wells might be expected to leak over multiple decades. These wells would leak not only methane but also the 40% to 75% of the fracking fluid volume used to produce the methane. For reasons described earlier, the number of wells in the North Fork is expected to be much higher than that assumed in the DRMP, thereby increasing the expected number of failed wells by a similar factor.

The topology of the North Fork introduces another risk not addressed either in the scientific literature or in the DRMP. In order for the efficient exploitation of the natural gas resource to occur, wells must be drilled on a grid pattern within the bearing strata such that the horizontal portions of one well cluster meet or nearly meet the horizontal portions of an adjacent cluster. The fracturing operation would be expected to open pathways such that trapped gas might find

its way to one or the other well bore and migrate to the collection system. This communication between horizontal well bores provides a pathway for water accumulating in a failed well bore of higher elevation to establish hydrostatic pressure in an adjacent well bore. Should that well bore fail and should it exit the surface at a lower elevation than the first, the result may well be a man-made toxic spring spewing fracking fluid, methane, and other chemicals and radioactive material dissolved in the gas-bearing strata. The resulting effect is reminiscent of the "Gold King" fiasco in Durango Colorado or the on-going struggle in the watershed above Crested Butte to contain and treat mine outflow from the Keystone Mine. The latter requires a million dollar per year treatment plant to be operated indefinitely.

The sum total of groundwater protection measures defined in the DRMP preferred alternative seems to be found on page 2-47 with an exhortation for companies to extend casings through the aquifer and use freshwater mud for drilling. This is wholly inadequate for the risks involved. Again the residents of the North Fork are being tacitly forced to bear the cost of well-bore failures. The absence of any analysis of well bore failures and their effects, any proposed long term mitigation, or any method to assign responsibility, and funding, for the long-term monitoring and remediation of well bores argues that the proposed development embodied in the DRMP preferred alternative is incompatible with existing enterprise in the Valley and incompatible with the BLM mandate for multiple use and sustained yield. It also argues for a "no leasing in the North Fork watershed" alternative.

**Seismicity**

Wastewater generated during hydraulic fracturing operations is commonly disposed of in injection wells. Several such wells are already proposed for the North Fork watershed. The link between wastewater disposal wells and earthquake exacerbation is now well established in Oklahoma and in Ohio. Further, experiments with similar disposal techniques on the Rocky Mountain Arsenal outside of Denver in the 1960's and 70's produced similar results, i.e. an activation of faults beneath Denver and the Front range. The geology of the North Fork is replete with fault zones, fractures, etc. Highway 133 has experienced multiple, extended closures due to rockslides in the past several years. Indeed, the DRM identifies 683 movement features (e.g. rockslides, debris flows, debris slides, etc.) between Paonia and McClure Pass (DRM at 3-178). The increased seismic activity resulting from oil and gas operations can be expected to increase the disturbance of these movement features. Further, increased seismic activity must almost certainly be correlated to increased well bore failure, exacerbating the issues outlined in the previous section.

The geologic character of the North Fork watershed make it uniquely susceptible to induced seismicity and again argues for a "no leasing in the North Fork watershed" alternative.

**Degradation of Watershed**

As mentioned previously, agriculture in the North Fork relies exclusively on the timely availability of clean irrigation water. That can only be accomplished via a healthy, vegetated watershed. Multiple years of drought combined with increasing temperatures have stressed the North Fork watershed in multiple ways. Sudden Aspen Decline, a drought and temperature-induced dieback of aspen groves, has caused a decline in the shadowing protecting the snowpack in mid to late spring. The resultant early runoff occurs at a time when farms are not able to use the runoff water to irrigate, The reservoirs fill as they should but are tapped earlier because the

runoff water is no longer available when crops are ready to use it. Various beetle infestations threaten to decimate the conifer cover of higher elevations in the watershed, again contributing to snowpack degradation and early runoff.   The level of development inherent in the DRMP preferred alternative further exacerbates the degradation of the watershed by road construction, well pad development, pipeline construction and dust. In addition to directly contradicting the DRMP goal of minimizing habitat fragmentation, the DRMP preferred alternative passes the cost of energy extraction on to the residents of the North Fork in the form of decreased irrigation water supply.   There is no mitigation for the construction of the infrastructure necessary to support the development scenario likely to occur as a result of the DRMP preferred alternative. This again argues for the adoption of a "no leasing in the North Fork watershed" alternative.

**Climate Change**

The DRMP explicitly acknowledges the fact of climate change (DRMP at 3-15).   The effects of climate change will likely increase the amount of land in the North Fork that fails to fully meet the land health standard from the current approx. 50% to something significantly more than 50% (DRMP at 3-18).   The effects of climate change are already being felt at the individual farm as lower than typical snow pack, warmer and earlier spring thaws, earlier bud break, warmer summertime highs,  warmer falls, etc.  As mandated by the Council on Environmental Quality, the BLM must begin to assess the contribution of its actions to climate change and, by extension, to avoid them where possible.  When finding oneself in a hole and wishing to get out, the first step is to stop digging.  When tasked with combating climate change the first step is to reduce the production of greenhouse gasses and the first places that should be removed from production are those with the highest risk of damage to non oil and gas resources and enterprises. The North Fork watershed is certainly one of those places and should be protected with a no leasing alternative.

**Conclusion**

The development inherent in the DRMP preferred alternative is incompatible with the existing mandate of the BLM and incompatible with the existing uses of the lands under your management.  In stark contrast to the stated mission of the BLM, the preferred alternative will degrade the health, diversity and productivity of public lands and will curtail the use and enjoyment of present and future generations.  It will result in neither multiple use nor sustained yield.  It will force the costs of energy extraction onto the residents of the North Fork in multiple ways, supporting the profitability of the oil and gas industry and the tax, royalty and severance income of multiple governmental agencies at the expense of those of us who live here.

Further, the DRMP preferred alternative makes the existence of our vineyard and winery untenable and squanders the time and investment made by a family over the course of more than 2 decades.   The adoption of a "no leasing in the North Fork watershed" alternative conversely, fulfills the BLM's mission and preserves and enhances the existing enterprises in the Valley.    It also allows us to continue to grow grapes and produce wine sustainably indefinitely, while continuing to enjoy the clean air and water, the safe areas and the dark night skies we came here for.

Thank you,

Brent Helleckson
Karen Helleckson
Stephanie Helleckson
Jacob Helleckson

Helleckson Vineyards and Stone Cottage Cellars

BLM_0076532

Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision Team

Thank you for the opportunity to comment on the Draft Resource Management Plan (DRMP).

Terror Ditch and Reservoir Company (TDRC) remains opposed to oil and gas development in the watershed of Terror Creek, a tributary to the North Fork of the Gunnison.

The BLM preferred alternative, alternative D, opens nearly all of the North Fork watershed to oil and gas exploration and development (DRMP at 2-409). While the underlying assumption is a well count of 1,271 throughout the UFO region by the year 2030 (DRMP at 3-14), statements by the energy companies currently operating in the North Fork, on lands already leased by the BLM, exceed that number by a factor of 2 to 3.  This is in advance of the recent USGS study identifying the Mancos Shale as a likely significant gas resource.  Therefore, offering nearly all of the North Fork watershed as available for oil and gas leasing virtually guarantees the industrialization of that watershed, including the Terror Creek watershed.  While the specifics of each well will be unique, the commonly accepted impacts include multiple millions of gallons of water per well, multiple thousands of truck trips per well, multiple millions of gallons of produced waste per well and multiple miles of roadway per well pad.  No reasonable person could claim that the current rural/arboreal landscape would suffer "no significant impact" from such a change of use.  The DRMP admits as much at page 3-176.

The farms that are stockholders in TDRC depend upon the reliable availability of clean irrigation water, stock water and domestic water.   Industrial development of the scale proposed by the DRMP and the preferred alternative poses significant, unmitigated risks to each.

The Denver Post reports that over the last 3 years, the oil and gas industry has reported nearly 2 spills per day or nearly 700 per year, all of which had the potential to contaminate surface water and 15% of which did contaminate ground water.  As the State relies on self-reporting by industry, this number must be assumed to be a lower bound.   At the scale of development proposed by the DRMP preferred alternative, the North Fork watershed should expect similar spill activity.   Multiple thousands of truck trips per well, many of which carry hazardous or noxious chemicals, will likely add to this number.  This is yet another example of a risk/cost that is tacitly expected to be borne by the residents down gradient of the oil and gas extraction activity in support of the profitability of the industry and the revenue streams of various governmental agencies.   The absence of viable mitigation measures, the absence of mechanisms to compensate affected entities and penalize responsible parties argues for the realization that the proposed development in the preferred alternative is incompatible with existing uses and with the BLM mandate to manage for multiple use and sustained yield.   Further it argues for a "no leasing in the North Fork watershed" option.

Contamination of ground water by oil and gas development, hydraulic fracturing, and associated activity is well documented and of great concern.  Although there is little or no data specific to Colorado or specific to the Terror Creek drainage, Ingraffea et. al., prominent researchers on the effects of oil and gas development, estimate the failure rate of gas well bores to be between 7% and 60%, depending upon the age of the well.   Further they describe, "Fluid migration from faulty wells is a well-known chronic problem with an expected rate of occurrence."  Should such scientific evidence be supported under North Fork conditions, the extremely conservative

estimate in the DRMP of 1,271 wells provides that something like 90 wells would begin leaking shortly after completion and nearly 800 wells might be expected to leak over multiple decades. These wells would leak not only methane but also the 40% to 75% of the fracking fluid volume used to produce the methane.  For reasons described earlier, the number of wells in the North Fork is expected to be much higher than that assumed in the DRMP, thereby increasing the expected number of failed wells by a similar factor.

The topology of the watershed introduces another risk not addressed either in the scientific literature or in the DRMP.  In order for the efficient exploitation of the natural gas resource to occur, wells must be drilled on a grid pattern within the bearing strata such that the horizontal portions of one well cluster meet or nearly meet the horizontal portions of an adjacent cluster. The fracturing operation would be expected to open pathways such that trapped gas might find its way to one or the other well bore and migrate to the collection system.  This communication between horizontal well bores provides a pathway for water accumulating in a failed well bore of higher elevation to establish hydrostatic pressure in an adjacent well bore.  Should that well bore fail and should it exit the surface at a lower elevation than the first, the result may well be a man-made toxic spring spewing fracking fluid, methane, and other chemicals and radioactive material dissolved in the gas-bearing strata.  The resulting effect is reminiscent of the "Gold King" fiasco in Durango Colorado or the on-going struggle in the watershed above Crested Butte to contain and treat mine outflow from the Keystone Mine.  The latter requires a million dollar per year treatment plant to be operated indefinitely.

The sum total of groundwater protection measures defined in the DRMP preferred alternative seems to be found on page 2-47 with an exhortation for companies to extend casings through the aquifer and use freshwater mud for drilling.  This is wholly inadequate for the risks  involved. Again the residents of the North Fork and the shareholders of TDRC are being tacitly forced to bear the cost of well-bore failures.  The absence of any analysis of well bore failures and their effects, any proposed long term mitigation, or any method to assign responsibility, and funding, for the long-term monitoring and remediation of well bores argues that the proposed development embodied in the DRMP preferred alternative is incompatible with existing enterprise in the Valley and incompatible with the BLM mandate for multiple use and sustained yield.  It also argues for a "no leasing in the North Fork watershed" alternative.


Wastewater generated during hydraulic fracturing operations is commonly disposed of in injection wells.  Several such wells are already proposed for the North Fork watershed. The link between wastewater disposal wells and earthquake exacerbation is now well established in Oklahoma and in Ohio.  Further, experiments with similar disposal techniques on the Rocky Mountain Arsenal outside of Denver in the 1960's and 70's produced similar results, i.e. an activation of faults beneath Denver and the Front range.  The geology of the North Fork is replete with fault zones, fractures, etc.   Highway 133 has experienced multiple, extended closures due to rockslides in the past several years.   Indeed, the DRMP identifies 683 movement features (e.g. rockslides, debris flows, debris slides, etc.) between Paonia and McClure Pass (DRMP at 3-178). The increased seismic activity resulting from oil and gas operations can be expected to increase the disturbance of these movement features.   TDRC expends significant money each year to clear our conveyance system of rockfall and slides.  We also monitor a slide above our reservoir yearly to assure that no motion is occurring. The dam retaining our reservoir water has recently been reclassified to reflect the increased risk of damage to new downstream development, should a dam failure occur. Increased seismicity

BLM_0076534

presents an immediate increase in risk and likely increase in direct cost to TDRC for insurance, monitoring and compliance. Further, increased seismic activity must almost certainly be correlated to increased well bore failure, exacerbating the issues outlined in the previous section.

The geologic character of the North Fork watershed make it uniquely susceptible to induced seismicity and again argues for a "no leasing in the North Fork watershed" alternative.

As mentioned previously, at the shareholders of TDRC rely exclusively on the timely availability of clean irrigation water.  That can only be accomplished via a healthy, vegetated watershed. Multiple years of drought combined with increasing temperatures have stressed the Terror Creek watershed in multiple ways.  Sudden Aspen Decline, a drought and temperature-induced dieback of aspen groves, has caused a decline in the shadowing protecting the snowpack in mid to late spring. The resultant early runoff occurs at a time when farms are not able to use the runoff water to irrigate,  The reservoirs fill as they should but are tapped earlier because the runoff water is no longer available when crops are ready to use it. Various beetle infestations threaten to decimate the conifer cover of higher elevations in the watershed, again contributing to snowpack degradation and early runoff.   The level of development inherent in the DRMP preferred alternative further exacerbates the degradation of the watershed by road construction, well pad development, pipeline construction and dust. In addition to directly contradicting the DRMP goal of minimizing habitat fragmentation, the DRMP preferred alternative passes the cost of energy extraction on to the shareholders of TDRC in the form of decreased irrigation water supply.  There is no mitigation for the construction of the infrastructure necessary to support the development scenario likely to occur as a result of the DRMP preferred alternative.  This again argues for the adoption of a "no leasing in the North Fork watershed" alternative.


The DRMP explicitly acknowledges the fact of climate change (DRMP at 3-15).  The effects of climate change will likely increase the amount of land in the North Fork that fails to fully meet the land health standard from the current approx. 50% to something significantly more than 50% (DRMP at 3-18).  The effects of climate change are already being felt at the individual farm as lower than typical snow pack, warmer and earlier spring thaws, earlier bud break, warmer summertime highs,  warmer falls, etc.  As mandated by the Council on Environmental Quality, the BLM must begin to assess the contribution of its actions to climate change and, by extension, to avoid them where possible.  When finding oneself in a hole and wishing to get out, the first step is to stop digging.  When tasked with combating climate change the first step is to reduce the production of greenhouse gasses and the first places that should be removed from production are those with the highest risk of damage to non oil and gas resources and enterprises.   The Terror Creek watershed is certainly one of those places and should be protected with a no leasing alternative.

The development inherent in the DRMP preferred alternative is incompatible with the existing mandate of the BLM and incompatible with the existing uses of the lands under your management.  In stark contrast to the stated mission of the BLM, the preferred alternative will degrade the health, diversity and productivity of public lands and will curtail the use and enjoyment of present and future generations.  It will result in neither multiple use nor sustained yield.  It will force the costs of energy extraction onto the residents of the North Fork and the shareholders of Terror Ditch and Reservoir Company in multiple ways, supporting the

profitability of the oil and gas industry and the tax, royalty and severance income of multiple governmental agencies at the expense of those of us who live here.

We Strongly urge the BLM to adopt a no fluid mineral leasing policy for the North Fork of the Gunnison as a whole and for the Terror Creek watershed in particular.

Board of Directors
Terror Ditch and Reservoir Company

Brent Helleckson, Secretary

BLM_0076536

Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision Team

Thank you for the opportunity to comment on the Draft Resource Management Plan (DRMP).

The West Elks American Viticultural Area (AVA) is one of two federally-designated areas in Colorado of unique geology, climate, history, and geography capable of producing wines of unique and identifiable qualities. The wineries in this AVA strive to produce Colorado-grown wines of high quality with distinctly Colorado character.

We are concerned that the pathway proscribed by the Draft Resource Management Plan (DRMP) preferred alternative leads to a development scenario that severely impacts our ability to attract visitors to our tasting rooms and may also impact our image of a pastoral environment blessed with clean air, clean water, and beautiful vistas, fostering wines with characteristics uniquely associated with the West Elks mountains and the North Fork of the Gunnison.

The BLM preferred alternative, alternative D, opens nearly all of the North Fork watershed to oil and gas exploration and development (DRMP at 2-409). While the underlying assumption is a well count of 1,271 throughout the UFO region by the year 2030 (DRMP at 3-14), statements by the energy companies currently operating in the North Fork, on lands already leased by the BLM, exceed that number by a factor of 2 to 3. This is in advance of the recent USGS study identifying the Mancos Shale as a likely significant gas resource. Therefore, offering nearly all of the North Fork watershed as available for oil and gas leasing virtually guarantees the industrialization of that watershed. While the specifics of each well will be unique, the commonly accepted impacts include multiple millions of gallons of water per well, multiple thousands of truck trips per well, multiple millions of gallons of produced waste per well and multiple miles of roadway per well pad. No reasonable person could claim that the current rural/arboreal landscape would suffer "no significant impact" from such a change of use. The DRMP admits as much at page 3-176.

The level of development implied by the preferred alternative will certainly impair our ability to attract visitors to our tasting rooms. It is difficult and expensive to convince travelers to make the 5 hour journey from the Front Range to the North Fork Valley. Placing a large gas and oil field development between the North Fork and the Front Range will make that much more difficult and expensive.

Further, all of us growing grapes in the Valley, rely on readily available, clean irrigation water. The development implied by the DRMP preferred alternative would severely impact our watershed, snowpack, spring runoff and, consequently, the timely availability of irrigation water. Also, the likelihood of surface and ground water contamination from oil and gas activity inhibits our ability to produce quality grapes of unique characteristics, thereby eroding our competitive advantage in the marketplace.

We respectfully request that the DRMP consider, and adopt, an alternative that designates the watershed of the North Fork as not available for leasing for oil and gas development.

Thank you,

The West Elks Winery Association

5680'
Alfred Eames Cellars
Azura Cellars
Black Bridge Winery
Leroux Creek Vineyards
Mesa Winds Farm and Winery
North Fork Cellars
Stone Cottage Cellars
Terror Creek Winery

BLM_0076538

July 27, 2019

To: Jamie Connell, BLM State Director
From: Mary Jursinovic
Re: Protest FEIS and Proposed RMP for Uncompahgre Field Office

Dear Director Connell,

I have submitted comments via email or submission form regarding the Draft RMP on the following dates;
December 28, 2011
March 25, 2012
October 12, 2016
October 31, 2016
June 3, 2018
July 17. 2018
September 3, 2018

My contact information is;
Mary Jursinovic
11491 3800 Rd
Paonia, Co 81428
970 275 6701
cbpots@yahoo.com

I am protesting the proposed RMP for the following reasons;
- Alternative E was never mentioned in any previous drafts and was never subject to public comment. It is a wholly new alternative. To consider it as a final plan is in violation of the National Environmental Policy Act.
- All of the issues raised in my previous comments have been ignored or left unaddressed:
-   Oil/gas leasing will have an extreme negative impact on our economic livelihood as it seriously effects agriculture. We rely on unpolluted and plentiful irrigation water whose source is the Paonia Reservoir.
-   Our health and well being requires clean air and water. Any ground water contamination could affect our domestic well.
-   Fracking and seismic activity could result in additional land and rockslides on Hwy 133 resulting in road closures and our ability to travel.
-   Increased industrial truck use on Hwy 133 will result in additional traffic hazards.
-   Our ability to recreate in Stevens Gulch and areas surrounding Paonia reservoir along with all areas north of Hwy 133 will be hindered.
-   Wildlife habitat and migration paths along with numerous bird species will be impacted.
-   Tourism would be impacted resulting in a loss of income from sales of my ceramic artwork.

These issues are addressed in the following sections of the RMP:
Alternative E in its entirety
Section 3.4.2  Public Health and Safety
Section 4.3.1  Air Quality and Climate
Section 4.3.2  Soils and Geology

BLM_0076539

Section 4.3.3  Water Resources
Section 4.3.5  Fish and Wildlife

The Proposed RMP ignores 1000s of comments by residents of the NFV who rely on clean air and water not only for their economic livelihood but their health and well being as well. It increases environmental hazards and deprives the community of recreational opportunities. It has a negative effect on wildlife and fisheries. It ignores the booming agricultural based tourism industry of the area.

For these reasons and all of the specific issues I raised in previous comments I protest the proposed RMP,  Alternative E and its sections, and again request a No Leasing plan for the NFV.

Respectfully submitted,

Mary Jursinovic
11491 3800 Rd
Paonia, Co 81428
970 275 6701
cbpots@yahoo.com

BLM_0076540

July 27, 2019

 Hello BLM,

Alternative E was a surprise for the citizenry.  We had no opportunity to review and comment on it. This constitutes a derailing of due process.

Aside from that, every comment herein reinforces my previous comments set forth in letters 00034_YoungM_20161027, ( dated 10/26/16), and 000558_YoungM_20161031, (dated/29/16).
Both letters have a subtext of grief that our informed suggestions have been ignored; moreover, that the health of life on Earth could conceivably be squandered to enrich the few. I am sure that many employees of the BLM serve because they (probably you) are inspired by the BLM mission statement.

"The BLM's mission statement is to sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations."

Please place sustainability, health and diversity (of viable life forms) above get-rich-quick  industry schemes. After they sully the water they will sell scarce drinking water. In six years there will be eight billion people on Earth. Three % of water is fresh water; of that 0.68 % is available to us. The arid West is no place to poison and squander water. A conservative estimate of the amount of water the gas and oil industry has removed from the hydrologic cycle in Colorado is 200 Billion gallons: 53,000 wells multiplied by two to eight million gallons of water used per fracking instance. From an ecological economic viewpoint, this is untenable. We cannot create new water. How will we explain what we have done to the thirsty generations yet to come?

Regarding my previous comments addressing animal and plant disruption, there are many scientific, peer reviewed journal articles exposing the harm done to animals by fracking. My family has hunted and fished in Western Colorado for three generations, now four.  Please review the articles below.

BLM_0076541

Northrup JM, Anderson CR, Wittemyer G. 2015. Quantifying spatial habitat loss from hydrocarbon development through assessing habitat selection patterns of

Northrup JM, Anderson CR, Wittemyer G. 2015. Quantifying spatial habitat loss from hydrocarbon development through assessing habitat selection patterns of mule deer. Global Change Biology 21(11):3961-3970.10.1111/gcb.13037.

ABSTRACT

Extraction of oil and natural gas (hydrocarbons) from shale is increasing rapidly in North America, with documented impacts to native species and ecosystems. With shale oil and gas resources on nearly every continent, this development is set to become a major driver of global land-use change. It is increasingly critical to quantify spatial habitat loss driven by this development to implement effective mitigation strategies and develop habitat offsets. Habitat selection is a fundamental ecological process, influencing both individual fitness and population-level distribution on the landscape. Examinations of habitat selection provide a natural means for understanding spatial impacts. We examined the impact of natural gas development on habitat selection patterns of mule deer on their winter range in Colorado. We fit resource selection functions in a Bayesian hierarchical framework, with habitat availability defined using a movement-based modeling approach. Energy development drove considerable alterations to deer habitat selection patterns, with the most substantial impacts manifested as avoidance of well pads with active drilling to a distance of at least 800 m. Deer displayed more nuanced responses to other infrastructure, avoiding pads with active production and roads to a greater degree during the day than night. In aggregate, these responses equate to alteration of behavior by human development in over 50% of the critical winter range in our study area during the day and over 25% at night. Compared to other regions, the topographic and vegetative diversity in the study area appear to provide refugia that allow deer to behaviorally mediate some of the impacts of development. This study, and the methods we employed, provides a template for quantifying spatial take by industrial activities in natural areas and the results offer guidance for policy makers, mangers, and industry when attempting to mitigate habitat loss due to energy development.

mule deer. Global Change Biology 21(11):3961-3970, doi: 10.1111/gcb.13037.

BLM_0076542

Sawyer H, Korfanta NM, Nielson RM, Monteith KL, Strickland D. 2017. Mule deer and energy development—Long-term trends of habituation and abundance.

Abstract

As the extent and intensity of energy development in North America increases, so do disturbances to wildlife and the habitats they rely upon. Impacts to mule deer are of particular concern because some of the largest gas fields in the USA overlap critical winter ranges. Short-term studies of 2–3 years have shown that mule deer and other ungulates avoid energy infrastructure; however, there remains a common perception that ungulates habituate to energy development, and thus, the potential for a demographic effect is low. We used telemetry data from 187 individual deer across a 17-year period, including 2 years predevelopment and 15 years during development, to determine whether mule deer habituated to natural gas development and if their response to disturbance varied with winter severity. Concurrently, we measured abundance of mule deer to indirectly link behavior with demography. Mule deer consistently avoided energy infrastructure through the 15-year period of development and used habitats that were an average of 913 m further from well pads compared with predevelopment patterns of habitat use. Even during the last 3 years of study, when most wells were in production and reclamation efforts underway, mule deer remained >1 km away from well pads. The magnitude of avoidance behavior, however, was mediated by winter severity, where aversion to well pads decreased as winter severity increased. Mule deer abundance declined by 36% during the development period, despite aggressive onsite mitigation efforts (e.g. directional drilling and liquid gathering systems) and a 45% reduction in deer harvest. Our results indicate behavioral effects of energy development on mule deer are long term and may affect population abundance by displacing animals and thereby functionally reducing the amount of available habitat

Sawyer H, Nielson RM, Lindzey F, McDonald LL. 2006. Winter habitat selection of mule deer before and during development of a natural gas field. The Journal of Wildlife Management 70(2):396-403.10.2193/0022-541X(2006)70[396:WHSOMD]2.0.CO;2.

ABSTRACT
Increased levels of natural gas exploration, development, and production across the Intermountain West have created a variety of concerns for mule deer (Odocoileus hemionus) populations, including direct habitat loss to road and well-pad construction and indirect habitat losses that may occur if deer use declines near roads or well pads. We examined winter habitat selection patterns of adult female mule deer before and during the first 3 years of development in a natural gas field in western Wyoming. We used global positioning system (GPS) locations collected from a sample of adult female mule deer to model relative frequency or probability of use as a function of habitat variables. Model coefficients and predictive maps suggested mule deer were less likely to occupy areas in close proximity to well pads than those farther away. Changes in habitat selection appeared to be immediate (i.e., year 1 of development), and no evidence of well-pad acclimation occurred through the course of the study; rather, mule deer selected areas farther from well pads as development progressed. Lower predicted probabilities of use within 2.7 to 3.7 km of well pads suggested indirect habitat losses may be substantially larger than direct habitat losses. Additionally, some areas classified as high probability of use by mule deer before gas field development changed to areas of low use following development, and others originally classified as low probability of

BLM_0076543

use were used more frequently as the field developed. If areas with high probability of
use before development were those preferred by the deer, observed shifts in their
distribution as development progressed were toward less-preferred and presumably
less-suitable habitats.

Global Change Biology 23(11):4521-4529, doi: 10.1111/gcb.13711. Sawyer H,

Northrup JM, Anderson CR, Wittemyer G. 2015. Quantifying spatial habitat loss from
hydrocarbon development through assessing habitat selection patterns of mule deer.
Global Change Biology 21(11):3961-3970.10.1111/gcb.13037.

Extraction of oil and natural gas (hydrocarbons) from shale is increasing rapidly in North
America, with documented impacts to native species and ecosystems. With shale oil and
gas resources on nearly every continent, this development is set to become a major
driver of global land-use change. It is increasingly critical to quantify spatial habitat loss
driven by this development to implement effective mitigation strategies and develop
habitat offsets. Habitat selection is a fundamental ecological process, influencing both
individual fitness and population-level distribution on the landscape. Examinations of
habitat selection provide a natural means for understanding spatial impacts. We
examined the impact of natural gas development on habitat selection patterns of mule
deer on their winter range in Colorado. We fit resource selection functions in a Bayesian
hierarchical framework, with habitat availability defined using a movement-based
modeling approach. Energy development drove considerable alterations to deer habitat
selection patterns, with the most substantial impacts manifested as avoidance of well
pads with active drilling to a distance of at least 800 m. Deer displayed more nuanced
responses to other infrastructure, avoiding pads with active production and roads to a
greater degree during the day than night. In aggregate, these responses equate to
alteration of behavior by human development in over 50% of the critical winter range in
our study area during the day and over 25% at night. Compared to other regions, the
topographic and vegetative diversity in the study area appear to provide refugia that
allow deer to behaviorally mediate some of the impacts of development. This study, and
the methods we employed, provides a template for quantifying spatial take by industrial
activities in natural areas and the results offer guidance for policy makers, mangers,
and industry when attempting to mitigate habitat loss due to energy development.

"Elk once ranged over virtually all the continental United States save a very small
strip in the extreme Southeast. " (p.12,  Grassland; Manning, Richard; 2017,
Penguin Books.)  Now Elk live only in the Rocky Mountain area.  Are we to further
relegate the Elk to a more and more fractured ecosystem? Extinction is a real
possibility. The Grand Mesa/ Uncompahgre/ Gunnison group of three contiguous

forests is the largest such in the lower 48 states. It is a jeweled legacy to treasure and guard.  Its animal, plant, and human community has flourished for millennia. Polluting industry destroys the harmonious lives progressing.

The RMP as proposed does not align with the BLM's stated goals. Rather, it is an assault on every necessity for life: clean and available drinking water, clean air, food availability (Deer, Elk, Fish, farm animals, birds, and crops), safe roads, reliable economies, and healthy oxygen producing ecosystems.
My own economy is and could be more adversely affected by the gas and oil industry.  Chemical sensitivity could cause me to have to leave. My land, very close to BLM land near Mt. Lamborn, was  once scrutinized as a possible frack zone. It could fall under threat again. Then it would be difficult to sell, my life's investment lost. I have several good friends who have left this area, tired of the 20 year assault on our well-being.

 It is not open for debate. The oceans are heating up due to human actions. Extreme weather events are causing rapid world-wide changes: three feet of hail in Guadalajara 6/30/19, 90 degrees in Anchorage 7/4/19, today, 7/27/19 a flash flood watch for W. Colorado, flooding and drought switching places. Climate/habitat loss caused extinctions are pervasive. Help!

 The customers for these companies are a hush-hush topic, as are the chemicals they use. Extraction industries do their best to cut corners and avoid the law. Hunters discovered that seismic mapping had begun, unbeknownst to anyone. Price-fixing has been prosecuted. We are not to know of the chemicals added to our environment.

Please answer our many thousands of letters and the evidence presented you.

Millicent Young,
P.O.  614
Paonia, CO, 81428

Below you will find an old list (2014) of the harmed in Colorado. Many victims of the fossil fuel onslaught have agreed not to speak as a condition to receive settlements.

# LIST *of the* HARMED

## Colorado

| NAME | LOCATION | GAS FACILITY | EXPOSURE | SYMPTOMS (Human / Animal) |
|---|---|---|---|---|
| April Beach and son, Sam | Erie Boulder-Weld County, CO | Five drilling pads within a mile | Air, dust | Lesion in spinal cord, asthma, migraines, severe auto immune issues, GI issues and extreme pain |
| Beth and Bill Strudley and sons | Garfield County, CO | Antero Resources gas well | Water, air | Rashes, nosebleeds, blackouts, ( relocated) (drilling by the Anschutz Exploration Corp. in New York contaminated the drinking water of nine families.) |
| Scott Ely | Susquehanna County, PA | Within a couple miles of 9 active wells | arsenic, manganese, aluminum, | Unknown |
| Floyd and Lisa Green | Garfield County, CO | Gas wells, condensate tanks | | Nosebleeds, headaches, nausea, muscle spasms, Chicken death, goat gave birth to a head (relocated) |
| Susan Haire | Morrisania Mesa, Garfield County, CO | Gas wells and compressor stations | Air | Nose bleeds, itching of her eyes and face, coughing, leg nerve inflammation that has hindered her ability to walk and other symptoms. |
| Susan Wallace Babbs | Parachute, Garfield County, CO | Gas wells | Air- benzene, tetrachloroethene and 1,4-dichlorobenzene | Vomiting, diarrhea, lesions, pain, elevated heart rate |
| Elizabeth "Chris" Mobaidi* *deceased Nov. 14, 2010 | Rifle, Garfield County, CO | Gas Facility: 20 wells within a mile of home | Air, dust, wate | Pituitary tumors, joint swelling and large white bumps on her elbows and hands. Steve experienced rectal bleeding; death Two dogs developed tumors |
| Thomas Thompson and wife | Rifle, CO | Encana gas production | Air – noxious fumes, water | Nosebleeds, vomiting blood, danger of speeding heavy equipment, injuries, illness, property damage. polluted water sources, poisoned water wells Wildlife and livestock deaths |
| Karen Trulove | Silt, Garfield County, CO | Gas wells | Air, dust | Constant fatigue, headaches, nausea, fatigue and dizziness |
| Dee Hoffmeister | Silt, Garfield County, CO | 800 feet from a well pad with four wells and two condensate tanks | Air | Weakness, dizziness, fainting, nausea, pain, burning skin and breathing difficulty; four of her grandchildren who live on the same property, have asthma Dog has asthma |
| Lisa Bracken and father (an important case of death and official cover-up) | Silt, Garfield County, CO | Encana wells | Robert Blackcloud died of pancreatic cancer after drinking from a creek that he did not know was polluted with high levels of benzene | Father deceased Widespread wildlife death |
| Brett Corsentino | Huerfano County, CO | Petroglyph Energy Inc. discharges | Water – high levels of sodium, land | Crops ruined, diminished soil's ability to absorb water Symptoms (animal): Abnormally high death rates in cow herd, cows consumed too much sodium from the water |
| Ben Bounds | Huerfano County, CO | Gas wells | Air – methane | Explosion – the state advised that Bounds not allow his grandchildren or any visitors to come to the property, and his insurance company has threatened to drop coverage. He has thought about simply abandoning the home since he could not in good conscience sell the property. |
| Brian Wallace | Weld County, CO | Encana gas well | Encana gas well | Death |

**30**

BLM_0076546

PRMP-1-500000113

This plan is worse that what was in place before this. We are a growing developing agricultural valley and should be given at least the same opportunities as industrial development. I am an organic farmer/rancher and orchardist this plan allows the hydraulic frackturing industry to come more fully into our closed system (air and water) and most assurdily affect our bottom line in a negative way. This is not allowing for spills, accidents and the normal degradation of our air and water quality. This industry uses and poisons potable water and takes it out of our finite amount on this planet forever. This is suicide. Air and water are necessary for life on this planet nothing else can substitute for it. In the future when humans wake up it will be illegal to damge potable water and pollute the air for something as replaceable by alternative means as drilled gas and oil.

Robert Orlando

PRMP-1-500000113          ROBERT ORLANDO      PO BOX 628                      PAONIA
        Colorado        81428  United States   970-274-8765   livingland1@gmail.com

Thomas Bender

505-681-1140

130 Poplar Avenue

Paonia, Colorado, 81428

Parcels 8351 8320

Previously letters sent July 2018 and September 2018.

To Whom it May Concernand and the director of the BLM nationally and locally,

I am a resident of Paonia, Colorado, and am writing to express my deep concern at the BLM&rsquo;s plan to open up land parcels to fracking in the North Fork Valley. My understanding is the land has still not been thoroughly studied as to the impact such undertaking will have on Paonia&#39;s residents, our farms, and live stock in our area.

The North Fork Valley is quite reliant on the organic farms industry, and even a minor leak or pipeline accident could have devastating repercussions on the area.  The parcels closely adjacent to the Paonia Reservoir, an area know to be precarious geologically and prone to landslides is particulalrly susceptible the environmental instability that fracking would bring to the area. Allowing fracking rigs and trucks in the North Fork area make no sense on an environment level. It risks devastating our organic farms and our beuatiful valley. The truck traffic alne would be highly disruptive to the environment and wildlife.

My family moved here 2 1/2 years ago, drawn to the area by its pristine beauty and self-sustaining lush valley. For the sake of my daughter, the rsidents of the North Fork Valley, our residents and children, and the beautiful and fragile ecosystem that is the North Fork Valley, I strongly request the following:

Keep all stipulations deisgned to protect our water supplies, waterways, and areas with highly erodible and slaine soils, increase the  Areas of Critical Environmet Concern to 51,320 acres, and include EEA&#39;s (Ecological Emphasis Areas) of 177,700 acres or more.

Opening up 95% of the planning area to oil and gas leasing will devastate our valley and our people. This may sound naive, but not everything is about the money.

BLM_0076548

Thank you for your time.

Sincerely,

Thomas Bender

505-681-1140

BLM_0076549

To: Jamie Connell, BLM State Director
From: Amy Hayutin, citizen, mother and teacher
        amyzing.hayutin@gmail.com
Re: Protest FEIS and Proposed RMP for the Uncompahgre Field Office
Date:  July 28th, 2019

Dear Director Connell,

As a 27 year resident of the North Fork Valley who has previously submitted comments in 2012 about the draft RMP , I respectfully submit the following protest.  My contact information is Amy Hayutin, 39575 Hadley St., Paonia, CO, 81428, 970-250-9604

## My protest addresses the following issues that I raised in my previous comments to you from 2012: (*file attached)

**Development of oil and gas in the area is NOT responsibly managing the land's resources.**  We all know that the age of fossil fuel use and extraction is closing out!  The majority of scientists worldwide agree that there is a climate crisis that will only partially be averted by the phasing out of non-renewable energy consumption.  The popularly elected Governor of CO, Jared Polis has a commitment to the development of sustainable and renewable energy options. Please, firmly support the wishes of the majority of the state and the recommendations of scientists the world over moving into a more sustainable future for our children's sake!

**Oil and gas development absolutely DOES pose significant impacts to health, safety and quality of life.**
The only studies that suggest oil and gas development poses no risk to health, safety, and quality of life are those paid for and biassed by the people who stand to benefit from these extractive industries.  Water quality,

BLM_0076550

air pollution, light pollution, traffic, water availability, road damages, threats to wildlife, and destruction of a near-pristine landscape, are all major concerns for the citizens of the North Fork Valley in Delta County, Colorado. There are state policies and goals that will not be aligned with your decision; namely, HB 1261 which aims to aggressively reduce greenhouse gas emissions from ALL sources and SB181 which prioritizes public health, safety, welfare, the environment and wildlife, over oil and gas development.

**The RPM does NOT correctly assess the local population NOR does it take into account the concerns of local citizens and the facts presented by local and far-reaching experts about oil and gas development.** The North Fork Valley is a leader in renewable energy, innovative home design, small scale organic, biodynamic, and sustainable agriculture, outdoor recreation, farm to table culinary movement and a creative district for artists of all varieties.  People visit from all over the world to take classes to learn from the innovative and creative farmers, orchardists, ranchers, chefs, visual artists, renewable energy instructors, musicians, photographers, herbalists, and educators.

My protest also addresses what many consider an error on the part of the BLM in adopting the Proposed RMP:

**Alternative E was improperly adopted having never been subjected to public comments.**  I understand there were around 35,000 letters in the original comment phase that urged the BLM to promote conservation of the land and water.  The North Fork Alternative Plan was offered as alternative B1 as a resource based proposal that would ensure strong protections for the North Fork Valley.  It seems that the new E alternative is purely a DC-driven plan reflecting the

BLM_0076551

Trump administration's denial of climate science and does not reflect our community's nor the state's vision for a more sustainable future.

## In conclusion, I strongly protest the BLM UFO's final RMP/ FEIS because I believe it to be inconsistent with the North Fork Valley and Colorado's vision for the future.

Sincerely, Amy Hayutin  7/28/19

\*This letter written and sent to the BLM UFO in April of 2012

**Ladies and Gentlemen of the BLM of the UFO,**

**In reviewing your draft Environmental Assessment of the proposed August 2012 lease sale of 22 parcels in the N. Fork Valley of Colorado, I encourage you to choose #3) "No Action:** the removal of all leases from the August 2012 sale."

Upon reviewing many documents and DOI and other press releases, I have several points that I would like to make to argue why I believe this is the best course of action at this time.

First, My understanding is that the last Resource Management Plan was completed in 1989.  If using this as a baseline for demographics of this area, you would be grossly mistaken as this is way out of date and many things have changed in this valley.  I have been a home owner here since 1992 and have personally experienced vast changes.  My husband and I moved here then to be organic farmers before the Valley Organic Growers Assoc. was even started.  If you will refer to the growth stats. in organic growing alone from another expert in one of the other comments you will see the changes there.  Your USDI/ BLM UFO CO RMP Revision and EIS Final of July 2010 reports that a there was a "13% increase in population from 2000 to 2008".  This does not account for 17 years between 1987 and today 2012.  I guarantee that the population increase is higher than 13% from the last RMP.  Also concluded in this same report, " Local citizens concerns, as reflected in the economic strategy workshops will be analyzed during development of the Uncompahgre RMP."  This still has not happened.

This statement from your recent FONSI that "Oil and gas development is a common practice in the area and no significant impacts to health and safety are known" is preposterous as there is no oil and gas development in this area yet.  All proposals for such have been highly contested and the far reaches of the mesas in the area that have been subjected to the poisoning of the land, water, and air through drilling have in no way been monitored enough to know how they are affecting any humans in the area let alone the wildlife and air and water quality.  I also noticed that in your preliminary Environmental Assessment you say that "leasing of the parcels will have no significant impact" in a number of areas.  This is like