saying that producing the cigarettes is not harmful to people's health, it is what the people do with it when they buy it that it becomes harmful.  Are you just passing the buck for someone else to have to prove their is no harm in frac-ing and drilling? I do not consider this responsible management of our public lands which leads me to the next point.

A recent report on National Public Radio confirmed by natural gas industry representatives that currently there is a "glut" of natural gas in this country.  The BLM is charged with responsible management of its land's natural resources.  This is irresponsible to lease lands to gas drilling when you should be focussed on alternative renewable resources and save the natural gas for later emergency dates in the future when the resources are dwindling.

 I reviewed a press release dated 5/17/2010 from the US Department of the Interior on your website that refers to the "reformed oil and gas leasing policy outlined by the BLM, as part of Secretary of Interior Ken Salazar's ongoing agenda to change how the DOI does business.  The  changes are focussed on improving environmental protection of important natural resources on US public lands while aiding in balanced development of the nation's energy supply."  I would say, once again, that a glut in production of natural gas does not support a decision to lease parcels for gas production and is not balancing the development of the nation's energy supply.  BLM director, Bob Abbey states that, "these reforms will also move control of the leasing process from Washington, DC to the field"  which means you have the power to get out in the field and see for yourselves what kind of a community this is and meet the people that sent you 3,000 comments opposing your August lease sales.  You have the power to remove all the leases from the August sale and at least to defer all the leases so as to investigate further and at least get a new RMP completed so you have the real picture of this valley.  For goodness sakes, women were still wearing their hair in beehive hair-do's when I moved here in 1992!  (A little humor.)

You also may want to avoid costly litigation which will surely be in the works if these leases go on the auction block.

To highlight what I see as the main issues for each of the parcels I will give a quick summary:  Parcels 6189,6190,6192, 6193, and 6194 are all up-slope of Minnesota Creek and will directly affect water quality and air quality and the traffic and light pollution for the East side of Paonia and beyond.  Parcels 6190, 6205, and 6207 are up-slope of the North Fork of the Gunnison River and near the River Park in Paonia again affecting water quality, air pollution, recreation, etc. of the NE part of Paonia and beyond. Parcel 6197 is right in between the McCluskey and Roeber  S Wildlife Areas.
I wonder what the point of protected wildlife areas with limited access is if the BLM is just going to open up drilling there.  Parcels 6198 and 6202 will certainly affect the noise, traffic, and air quality of an important school area in Hotchkiss with playground, swimming pool, soccer fields, the Hotchkiss High School, and the Montessori Elementary school in close range.  Parcels 6191, 6195, and 6196 are connected to very populated Hansen, Sunshine, Stucker and Wakefield Mesas and affect the watershed of the N. Fork of the Gunnison River's water , air , traffic, light and noise pollution for the North side of the highway between Paonia and Hotchkiss.  Parcels 6199, 6201, 6203, 6217 are connected to multiple homes, farms, and ranches and will affect noise, water, air, and light pollution for the valley.  Parcel 6200 is connected to the town of Crawford and a watershed of the Smith Fork of the Gunnison River which will affect water quality, air , noise, traffic, and light pollution.  Then of course, Parcels 6206 and 6215 are adjacent to the Paonia Reservoir which affects the water quality downstream as well as air, traffic, etc.  Then there is the Henderson Creek parcel 6211 which is also a bad idea for all the same reasons.
**Use this land for some solar panels.  What about hydro energy?  Be creative and stop pandering to the already too wealthy oil and gas industry that is trashing this country.  We**

citizens of the N. Fork Valley are truly trying to do something different than the rest of the country. Please don't screw it up for us by catering to a few wealthy men who could care less about our valley.

Sincerely, Amy Hayutin, mother of 2, teacher, organic farmer, activist

BLM_0076554

<p>To: Jamie Connell, BLM State Director</p>

<p>From: Eli Wolcott</p>

<p>RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office</p>

<p>Date: 7/28/2019</p>

<p>Dear Director Connell,</p>

<p>As a local resident of Paonia who has previously submitted comments of the Draft RMP on November 1st 2016, I submit the following protest. My contact information is:</p>

<p> </p>

<p>Eli Wolcott</p>

<p>38270 Stucker Mesa Rd</p>

<p>Hotchkiss, CO 81419</p>

<p>Phone 970.270.8398</p>

<

<p>My protest addresses the following issues that I have raised in my previous comments:</p>

<p> </p>

<p>- steep slopes and landslides</p>

<p>- domestic water sources</p>

<p>- conservation easements</p>

<p>- tourism</p>

<p>- ECONOMIC IMPACTS, QUANTIFYING EXTERNALIZED COSTS</p>

<p>- VIEWSHED ANALYSIS</p>

<p>- PERCIEVED IMPACTS, PERCIEVED RISK, FUTURE PLANNING</p>

<p>- NIGHT TIME LIGHT POLLUTION</p>

<p>- Fire Risk</p>

<p>- NOXIOUS WEEDS AND INVASIVE SPECIES</p>

<p>- Air Quality</p>

<p>- HABITAT FRAGMENTATION AND CORRIDORS</p>

<p>- Cumulative Impacts</p>

<p>- Climate Change</p>

<p>- GRAZING AND LIVESTOCK</p>

<p>- Streams and tributaries</p>

<p>- Recreation</p>

BLM_0076556

<p>- SUBSTANTIVE COMMENTS</p>

<p>- No lease alternative</p>

<p>- EXTEND B1 ANALYSIS, MITIGATION AND PROTECTIONS TO ENTIRE RMP REGION</p>

<p>- Killing the Golden Goose: short-term limited gains at the expense of long term stable benefits</p>

<p> </p>

<p> </p>

<p>Those issues are addressed in the following sections of the RMP:</p>

<p>Alternative E in its entirety</p>

<p>Section 3.4.2 Public Health and Safety</p>

<p>Section 4.3.1 Air Quality and Climate</p>

<p>Section 4.3.2 Soils and Geology</p>

<p>Section 4.3.3 Water Resources</p>

<p>Section 4.3.5 Fish and Wildlife</p>

<p>Section 4.4.3 Energy and Minerals</p>

<p>Section 2.4.3 2.4.3 Prohibit Fluid Mineral Leasing throughout Decision Area</p>

<p>Section 1.4 Public Involvement and Planning Issues</p>

<p>Section 1.8 Changes between Draft RMP/EIS and Proposed RMP/Final EIS</p>

<p>Section 2.2.2 Develop a Reasonable Range of Alternatives for the Draft RMP/EIS</p>

<p>Section 2.3 Alternatives Considered for Detailed Analysis</p>

<p>Section 3.1.12 Visual Resources</p>

<p>Section 5.3 and 5.4 Draft RMP/EIS Availability, Distribution, and Public Comment</p>

<p>Section 5.1 Public Involvement</p>

<p>Section 4.9 4.9 Relationship Between Local Short-term Uses and Long-term Productivity</p>

<p>Section 4.6 Social and Economic Conditions</p>

<p>Section 4.6.4 Environmental Justice</p>

<p>Section 4.7 Unavoidable Adverse Impacts</p>

<p>Section 4.9 Relationship Between Local Short-term Uses and Long-term Productivity</p>

<p>Section 4.5.1 Areas of Critical Environmental Concern</p>

<p>I believe the BLM has erred in adopting the Proposed RMP for the following reasons:</p>

BLM_0076558

<p>Alternative E was improperly adopted and was not subject to public comments.</p>

<p>Decisions to lease or not to lease legally available lands must be made in accordance with planning regulations and appropriate NEPA analysis, and the BLM should have included a no lease alternative, and must immediately rectify this oversight by reissuing the draft with a no lease alternative for public comment. Further, a no lease alternative should be the preferred alternative, as supported by analysis and science. Analysis clearly demonstrates that special lease stipulations cannot satisfactorily mitigate potential impacts to other resource values, as further analysis as outlined in my original comment letter and comment letters from others and under a no lease alternative would support. Comment should be encouraged, not discouraged, and public input should be included whenever possible, not sidelined or discouraged. Unfortunately, public comment was discouraged and hampered. in several ways - by incomplete information, as the draft was woefully short on analysis and recommendations for mitigation of oil and gas development impacts, including all of the topics submitted in my original letter and in this protest.  This should have been addressed with a no lease alternative, alternative B1 analysis and protections considered for the entire RMP area, and a myriad of other analyses and study presented in this letter and others. Hard copies of the draft should have been made readily available directly to any individuals requesting them - but were not readily available. I attended public meetings with BLM staff at the local presentations, and was essentially told by BLM staff that the term &ldquo;non-substantive&rdquo; was to be used by the BLM as an ill- defined excuse to dismiss large numbers of comments and concerns from the public, even if said concerns were in fact substantive. Local presentations and meetings were specifically designed to discourage commenting and input and avoid protest or dissenting opinions. There was no opportunity to make public comment verbally, meeting times were inconvenient and very short, too short to visit and comment or ask questions at all of the various topic stations, staff at each station largely did not have information or expertise in that area beyond general basic questions, and many of the tables including the oil and gas topic table were packed up and staff left before the public meeting was over.</p>

<p>Although the response letter from the BLM to my previous comments dated Nov 1st, 2016 (attached) stated: &quot;The Project Manager for the Uncompahgre RMP has received your email.  Your comments have been received and will be fully considered.  Thank you for your interest in the Uncompahgre RMP.  &quot; - My comments were not fully considered. In fact none of the comments or topics that I submitted very substantive and original comments on were adequately considered, analyzed, studied, mitigated or addressed in the final draft of the EIS. Some topics were not addressed at all, while others were given a one sentence cursory mention lumped in with other topics with no real analysis - for example &quot;Section 4.9 Relationship Between Local Short-term Uses and Long-term Productivity&quot; received one sentence lumping several different topics. Section 102(C) of NEPA requires discussion of the relationship between local, short-term uses of the human environment, and the maintenance and enhancement of long-term productivity of resources. One sentence lumping several entirely different categories of uses and impacts is hardly a discussion, and does not begin to address my comments or the issues that I raised. This is a very important topic, addressed specifically by NEPA. This repeats with almost all of the topics and comments that I submitted and repeat in this protest.</p>

<p>Sincerely,</p>

<p>Eli Wolcott

(original letter attached)</p>

BLM_0076560

To: Jamie Connell, BLM State Director
From: ERICA PELLAND
RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office
Date: July, 28, 2019

Dear Director Connell,

As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP (comments dated: November, 5th, 2016), I respectfully submit the following protest. My contact information is:
ERICA PELLAND
43 Pan American
Paonia, CO 81428
USA
(970)948-4343


My protest addresses the following issues that I have raised in my previous comments:
Alternative E
-Adopting a wholly new alternative at this stage is unacceptable, and a violation of the National Environmental Policy Act (NEPA). The public has not had a meaningful opportunity to comment on this proposal.
-Infrastructure impacts
-Air and water quality
–Health risks o Wildlife resources
- Recreation Management Areas


Those issues are addressed in the following sections of the RMP:
Alternative E in its entirety
-    Section 3.4.2 Public Health & Safety
-    Section 4.3.1 Air Quality & Climate
-    Section 4.3.2 Soils & Geology
-    Section 4.3.3 Water Resources
-    Section 4.3.5 Fish & Wildlife


I believe the BLM has erred in adopting the Proposed RMP for the following reasons:
The Proposed RMP downplays public health risks, and ignores significant evidence we have provided that shows increased oil and gas development can have serious adverse impacts on public health. The Proposed RMP drastically decreases the stipulations in Alternative B1 and even the Preferred Alternative D that were designed to protect resources of value from oil and gas development. It increases lands available for oil & gas lease with 'standard stipulations' - from 0% to 12%. It drastically decreases the amount of land with No Surface Occupancy (NSO) from 26% to 11% compared to Preferred Alternative D. The Proposed RMP reduces setbacks from water supplies, waterways, areas with highly erodible and saline soils. It allows oil & gas surface use on lands with steep slopes greater than 40 percent. It weakens CSU stipulations & reduces Timing Limitations near critical wildlife habitat The Proposed RMP eliminates Ecological Emphasis Areas entirely, reduces Areas of Critical Environmental Concern, and significantly weakens the proposed protections for the Jumbo Mountain Special Recreation Management Area, and does not include

any "No Surface Occupancy" stipulations in that area, effectively opening Jumbo Mountain to oil and gas development. The Proposed RMP opened more of the federal mineral estate to oil and gas development without giving adequate consideration to the impact this will have on infrastructure maintained by the State and other local governments. The Proposed RMP anticipates over 1,000 new hydraulically fractured wells in the UFO, yet does not address the Programmatic Biological Opinion from the US Fish and Wildlife Service that caps surface water withdrawals on the North Fork of the Gunnison River at ~600 acre-feet per year for energy development purposes. Current oil and gas development in the area is already pushing that threshold. The BLM has failed to acknowledge that there is simply not enough water in the North Fork to sustain the level of oil and gas development anticipated in the Proposed RMP. Conclusion Wrap up your protest with a simple conclusion. For those reasons, I respectfully protest the Proposed RMP, and the sections I have outlined above.

Sincerely,
ERICA PELLAND

_____Date: 7/29/2019

BLM_0076562

BLM Uncompahgre Field Office

2465 S. Townsend Ave.
Montrose, CO  81401

Greta Gibb

P.O. Box 484

Paonia, CO  81428

Reference to previous comments: 000216_GibbG_20161026

Dear BLM,

Please find my original letters attached below. These two letters were written in October 2016. It is my understanding that you are no longer considering plans A, B, C or D, but have come up with a new plan, Plan E. This switch is unacceptable when three years ago you presented and asked us to comment on other plans. As I read Plan E I believe that all of my original comments still apply. I continue to be concerned about water, wildlife, traffic and scenic vistas, please see my letters below. There are not enough protections and expectations in place for the oil and gas companies. It does not appear that you are concerned about the above issues. Please rethink the plan that you have put forth.

As written in my previous letter, I am concerned about oil and gas development taking water from sources that we depend on for farming and agriculture. Water was a concern for the original owners of my property in the 1890s and it continues to be a concern for me today. Last year's drought highlighted the need for us to use every drop of water efficiently. The number of wells you propose will tap into too much water as indicated in the Programmatic Biological Opinion from the US Fish and Wildlife Service. Also, in the event of water contamination, the farmers and ranchers will be expected to live without. In your plan it looks like you advise that oil and gas industries stay a certain number of feet away from water resources, however, you do not prohibit activity within a certain number of feet. Since your report is long, I may have missed the prohibition. What recourse do we have against the oil and gas companies who contaminate the water? The United States has a long history of allowing companies to explore below the surface, leave a toxic mess and create problems for current inhabitants and future generations. You discuss drought, however, you do not discuss aridification which is a likely scenario for our region. Many experts believe that this has already begun. While you indicate you will monitor for drought, you have no plan in place when it is discovered that drought is occurring. You simply state "determine if a management plan is needed". A management plan is needed before the event occurs. See Appendix I

One of my major concerns is the traffic impact oil and gas development will have on our already dangerous roads. Mud and rockslides are common. Highway 133 is narrow. Intersections in several places have blind spots. The state and local taxpayers are expected to pay the bills for the roads, but we get no benefit from the oil and gas companies using our roads and other infrastructure. Our roads will be more heavily trafficked and depreciate more rapidly.

The wildlife will be severely impacted by monumental oil and gas development. Given that the natural habitat of the wildlife has already been impacted by climate change as evidenced by the widespread beetle kill and SAD Sudden Aspen Death, it is wrong to damage wildlife habitats further by over developing with oil and gas roads, ponds, pads, wells and pipe. Oil and gas development will fragment and further damage habitats.

Highway 133 is part of the West Elk Scenic Byway. The vistas here are some of the most beautiful in the state. Destroying these views for the sake of short-term gain is unreasonable. There is no indication of moderation in your Oil and Gas Plan E. I wonder why it is necessary to go for it all at once instead of taking a little at a time.

The sections of Plan E that I am protesting are Section 3.4.2 Public Health and Safety, Section 4.3.2 Soils and Geology, Section 4.3.5 Water Resources and Section 4.4.3 Fish and Wildlife. Please note, I am objecting to the overall alternative Plan E. This was not one of the original plans presented to the public.

Thank you for the opportunity to respond. I hope that you choose to follow the proper channels and formally present Plan E to the public as was done with Plans A-D. As I have indicated previously, I am concerned the impacts oil and gas development Plan E allows. Specifically, I am concerned about water resources, wildlife, road safety and scenic views. Additionally, I am concerned that oil and gas wells are allowed to flare during high fire danger periods. I have witnessed this occurring while driving in the area.


Sincerely,

Greta Gibb


Greta Gibb
P.O. Box 484
Paonia, CO  81428

BLM Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO  81401

October 10, 2016, sent October 26, 2016

Dear BLM,

Thank you for giving the public the opportunity to respond to your draft RMP. The following are my comments regarding the Draft RMP and EIS for the Uncompaghre

Field Office. I am writing in support of the inclusion of North Fork Alternative Plan B+1 into the final RMP.

You have proposed to lease 90-95% of the North Fork's public lands to oil and gas. This is too much and does not adequately take into consideration many of the interests the BLM needs to oversee and protect. In particular, I am concerned about wildlife habitat, view sheds and water.

Regarding the wildlife, if a high percentage of leasing occurs the wildlife migration patterns will be fragmented. It is my understanding that mule deer populations are declining. Several research articles indicate that this is due to an increase in development, especially from the oil and gas industry. In addition, many other species will suffer. It will affect hunting and wildlife viewing as well. The BLM also needs to consider wildlife, not just oil and gas. Wells, pads, ponds, pipe and roads will fragment the habitat. Please consider this issue carefully.

As a farmer, I am especially concerned about the water. Little consideration was made about the water. What will happen if we have a prolonged drought. In addition, the likelihood of water contamination is high. The oil and gas industry will suffer no significant consequences, however, the valley's farmers and ranchers will struggle to keep their crops and livestock alive.

Our valley is one of the most scenic, beautiful and fertile areas in all of the state. Driving up Highway 133 this last month there were countless people pulled over taking photos. In addition, there were many others just taking a drive to enjoy the stunning beauty. Oil and gas wells scarring the landscape will destroy the breathtaking scenery for everyone.

It is my hope that you will include the North Fork Alternative Plan B+1 in the final RMP.

Thank you.


Greta Gibb
P.O. Box 484
Paonia, CO  81428

BLM Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO  81401

October 10, 2016 sent October 27, 2016

Dear BLM,

Thank you for giving the public the opportunity to respond to your draft RMP. The following are my concerns regarding the Draft RMP and EIS for the Uncompaghre Field Office. I am writing in support of the inclusion of North Fork Alternative Plan B+1 into the final RMP.

Your proposal to lease 90-95% of the North Fork's public lands to oil and gas is overwhelming. It fails to take into consideration the amount of infrastructure the industry will need. Previously, our valley has been home to 3 coal companies. With coal on the decline, this is changing. Coal mines were in a concentrated area and depended upon the railways to transport their product. Oil and gas will depend on our valley's roads. The coal companies contributed significantly by employing our valley's population, paying taxes and involvement in community affairs. Our valley will receive little to no benefit in these areas from the oil and gas companies. Their contributions will only be negative. Our roads will be heavily trafficked and depreciate more rapidly. Driving will also be more dangerous. Our population gain few, if any, jobs. And sadly, the companies will contribute very little to our local economy.

It is my hope that you will include the North Fork Alternative Plan B+1 in the final RMP. This plan safely limits the encumbrances created by the oil and gas industry.

Thank you.

BLM_0076566

To: Jamie Connell, BLM Colorado State Director
From: Karen M. Ortiz
RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office
Date: July 28, 2019

Dear Director Connell:

I am a resident of Hotchkiss in the North Fork Valley (NFV) of Delta County. I submitted comments on the Draft RMP. (Comment Number: 000557 Dated:Nov 1, 2016)

I read sections of the Proposed RMP and Final EIS related to the North Fork and Lower Gunnison watersheds in Delta and Gunnison counties. Based on that reading I am protesting the following elements contained in the Final EIS and Proposed RMP, Alternative E:

- Visual Resources (Section 3.1.12 ) Travel corridors and scenic vistas along Colorado's West Elk Loop Scenic and Historic Byway on Hwys 92 and 133 will be degraded as much of the BLM lands along the routes will be open for controlled surface mining.
- Ecological Emphasis Areas (EEA -Section 4.3.5) intended to safeguard wildlife habitat and migration corridors have been eliminated. I advocated for greater protections afforded in Alternative B, while the preferred alternative listed 177,700 acres of EEAs. This is unconscionable.
- Recreation and Visitor Services (Section 3.2.4 ) Jumbo Mountain Special Recreation Management Area (SRMA) has been reduced from 5,000 acres proposed in the Draft RMP to a 1,600-acre designation. The Draft RMP recognized the entire SRMA would provide "recreation opportunities and recreation setting characteristics [that] are recognized for their unique value, importance, and/or distinctiveness." Alternative E fails to offer "No Surface Occupancy" in the entire area, degrading the value of this important resource.
- Fish and Wildlife (Sections 3.1.7, 4.4.3) The BLM included the North Fork Alternative (B-1) in the draft RMP. The alternative allowed oil and gas development in my watershed. It's unacceptable to adopt Alternative E as raptor sites (NL-10), Gunnison sage grouse (*Alt. B), Gunnison sage grouse (NSO-33), Leopard frog (NSO-27); Deer & elk habitat (NSO-21); Yellow billed cuckoo (*Alt. B), and Mexican spotted owl (NSO-39) are now at risk. These precious wildlife resources are disregarded in favor of pro-oil and gas extraction across not only the NFV, but 95% of the Uncompahgre Field Office overall.

In closing, I take exception to the adoption of Alternative E in the Final EIS as it was not presented to the public with full notice and full vetting during the draft phase of this RMP process, a violation of NEPA (National Environmental Policy Act). I take exception to the energy dominance agenda presented in this proposal and the Final EIS, one where potential energy development overrides wildlife, waterbodies and riparian areas, migration routes and habitat areas, or recreational uses.

Sincerely,

Karen M. Ortiz

Karen M. Ortiz

BLM_0076567

Karen M. Ortiz
12152 – 3550 Road
Hotchkiss, CO  81419
November 1, 2016

Joe Meir, District Manager, Southwest District of Colorado
Teresa Pfifer, Field Manager, Uncompahgre Field Office
Bureau of Land Management
Montrose District Office
Uncompahgre Field Office
2815 Youngfield St.
Lakewood, CO 80215

Submitted electronically to uformp@blm.gov

RE: 2016 Draft Uncompahgre Field Office Resource Management Plan

Dear Joe Meir and Teresa Pfifer:

Please accept the following comments regarding the draft Uncompahgre Field Office Resource Management Plan.

I lived in Paonia and on Barrow and Redlands mesas in the North Fork Valley from 1982-1999. I enjoyed running rivers, skiing, hiking, mountain biking and camping in the BLM lands, primarily in the North Fork Valley. During that time I was an educator in the Delta and Montrose school districts. As a fourth/fifth grade teacher I promoted the enjoyment of local lands and wildlife resources. I worked with BLM staff at 4th grade water festivals and used *Project Wet*, *Project Wild* as well as other age-appropriate curricula in my classroom.

In 2012 I returned to Delta County, making my present home on a tiny mesa north-east of Hotchkiss. Now semi-retired, I enjoy hiking, skiing, mountain biking and river running on our local public lands and have developed an interest in birding. I just purchased a lot and plan to build a home in the Vista Creek subdivision, adjacent to Jumbo Mountain.

The breadth and detail provided in the draft RMP are commendable. I'd like to thank the BLM's leadership for postponing the release of the draft until the communities and stakeholders in the North Fork Valley (of the Gunnison River) completed their recommendation for oil and gas leasing in the area, otherwise known as the North Fork Alternative Plan (NFAP), into the draft RMP/EIS as Alternative B.1:

> Alternative B.1 is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River (referred to as North Fork), primarily in portions of Delta and Gunnison Counties. Alternative B.1 is a resource-based set of recommendations provided by a community group. [DEIS Executive Summary 2-7]

**I will focus my comments to support inclusion of the North Fork Alternative Plan - Alternative B.1 into the final RMP and some specific recommendations from other alternatives where appropriate.** Alternative B.1, a grassroots effort, offers the strongest protection to the North Fork Valley of any alternative in the draft RMP/EIS[1]. It would safeguard the unique communities and surrounding wild lands in the valley from unacceptable impacts from oil and gas leasing and corresponding development activities, restricting, not eliminating, future surface and underground exploration and development.

Alternative B.1 best preserves the valley's river corridors and scenic visual character of the valley, its surrounding mesas and BLM-administered lands that can be accessed by the West Elk Loop Scenic Byway. As such growing tourism in the valley is safeguarded as B.1 specifically protects scenic vistas and travel corridors (DEIS II 4-208). I

---

[1] See DEIS Volume I, Chapter 2: "Description of Alternatives," Table 2-2 beginning at DEIS 2-22.

BLM_0076568

favor of the **Visual Resource Management classifications in Alternative B.1, and the protection of landscape and visual characteristics through the following stipulations**: NL-11 Prominent landmarks; NL-3 Major river corridors; NSO-52 Travel & Scenic Corridors; NSO-7 Major river corridors; CSU-47 Vistas.[2]

Alternative B.1 not only benefits the tourist economies of the North Fork Valley, it protects the natural resources of the valley and surrounding areas, its abundance and diversity of wildlife, waterbodies and riparian areas, and migration routes and habitat areas. Nesting sites, leks, floodplains and fish habitat, migration routes, and winter range are all important and valued features that deserve the stronger protections than provided by the B.1. **In regards to the valley's natural resources I support specific recommendations in both Alternative B.1 and No Leasing stipulation from Alternative B as follows:** NL-4 Waterbodies; NL-3 Major river corridors; NL-NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major river corridors.

Furthermore, **I would like to see Jumbo Mountain designated a Special Recreation Management Area (SRMA)** as a strategy to develop and protect the special recreational opportunities in that locale for residents and visitors alike. I plan to build a home in the Creek Vista subdivision adjacent to Jumbo Mountain. My friends and I have personally enjoyed mountain bike riding and hiking since the mid-1980s. Alternative B.1 offers protective management to safeguard the natural features adjacent to my future home and the outstanding recreational opportunities at the mountain. The Jumbo Mountain area is also important to the Town of Paonia. Mountain bike groups, the Chamber of Commerce, area merchants, and the Town of Paonia all support inclusion of Jumbo Mountain as a SRMA, with Alternative B.1 acreage and stipulations. Under B.1 the entire Jumbo SRMA would have NSO stipulations, rather than only a slice as under Alternative B (DEIS II 4-306). Should Jumbo Mountain be designated a SRMA in the final plan, I am confident the aforementioned groups supporting the classification would work with the BLM to develop and implement the specifics of a plan and rally around maintaining the area.

I thank you in advance for considering my preference for Alternative B.1 to the Preferred Alternative as you finalize the Uncompahgre RMP. I welcome your questions and feedback.

Respectfully,

Karen M. Ortiz

---

[2] NL is No Leasing, under Alternative B1 these lands and minerals would not be available for future oil and gas leasing. If currently leased lands expire without activity, they would become subject to the revised RMP and its leasing guidance. NSO is No Surface Occupancy, which under Alternative B.1 cannot be waived, modified or excepted.

To: Jamie Connell, BLM State Director
From:  Lincoln Vannah
RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office
Date: 7-28-19

Dear Director Connell,

As a resident of the North Fork Valley who has previously submitted comments on the Draft RMP (copy of comment letter attached, dated: 10-24-2016, emailed to uformp@blm.gov on 10-26-19, and received reply from Gina at that address on 10-26-19, indicating my comment letter was received by the Project Manager for the Uncompahgre RMP), I respectfully submit the following protest. My contact information is:

Lincoln Vannah
PO Box 1588
Paonia, CO  81428

Email:  jeanlinc@hotmail.com
Phone:  970-325-3452

My specific interest in filing this protest is as follows; a) Protection of ground and surface water from contamination from spills related to oil & gas extraction (fracking) and the associated fracking chemicals (or cross contamination from methane-containing fractured strata into aquifers); b) Recreation options.  If the preferred alternative E is adopted, the watershed that I receive my irrigation water from (Roatcap Creek & Overland Ditch and Reservoir) could be threatened by contamination from spills related to oil & gas development (surface and/or subsurface) in the Roatcap Creek and Overland Reservoir watersheds.

Also, I would like to protest the fact that, while I did submit a Draft RMP comment letter on October 26, 2016, and received confirmation of this twice (most recently from Matthew Loscalzo of the BLM on 7-18-19), my comment letter was not included in the Proposed RMP, nor were my comments responded to, despite the fact (my opinion) that I did raise specific concerns related to the Draft RMP.  My impression is that my comments were ignored by the BLM.  At this point, I am wondering how many others respondents comments were also ignored?

My protest addresses the following issues that I raised in my previous comments:

1

BLM_0076570

1. Due to the possibility of spills of fracking fluids (on site and in trucking and disposal), aquifer contamination from leaking well casings, and noise and air pollution associated with the fluid minerals fracking extraction industry on BLM land and mineral estate in the RMP area, my comment letter raised issues of concern regarding drinking water protection, irrigation water protection, protection of surface water (streams, rivers, reservoirs, ponds, lakes), groundwater/aquifer protection.

2. My letter discussed the research indicating that deep injection wells and other oil and gas activities and their effect on increasing seismic activity and the possibility for resulting catastrophic landslides in the North Fork region, (with particular concern being related to the Paonia reservoir and its earthen dam structure).

3. My letter also raised issues regarding protection of quality habitat for wildlife, wildlands protection for recreation and wilderness solitude, as well as economic impacts on the valley's organic agriculture and agritourism industries from impacts related to fracking for fluid minerals extraction from lands affected by the RMP.

4. My letter also requested that the RMP designate all of the Jumbo Mountain Unit as a special recreation management area.

Those issues are addressed in. the following sections of the RMP:

1. From the RMP, Figure 2-91, Appendix A: Alternative E: Fluid Minerals Leasing, and Table 2-5, page 2-69, the RMP Proposed Alternative E leaves 871,810 (94%) of the acreage managed by the UFO BLM open to oil and gas leasing.  Areas open include extremely steep slopes, irrigation water transport streambeds (Roatcap Creek, for example, which carries shares of Overland Ditch & Reservoir water from Overland Canal to the Robins Ditch which serves the land that I live on), irrigation reservoirs (such as the Paonia Reservoir).  Rather than looking to protect all of the resources that the BLM manages in the area, the RMP proposed Alternative E, which appears to be oriented towards unfettered access to fluid mineral extraction at the cost of all else, on all but 6% of the lands managed by the UFO BLM.  Also, If Alternative E is adopted, the BLM would be;
   a. Removing virtually all ecological emphasis areas.
   b. Removing proposed management direction for energy development in or near raptor or other special status species habitat.
   c. Significantly weakening protections within existing Areas of Critical Environmental Concern (ACECs), and eliminating or denying 12 existing or proposed ACECs.

2

    d.  Possibly affecting (with potential for "adversely affect") numerous threatened and endangered species, including Gunnison sage-grouse.

As such, I protest the BLM's recommendation of Alternative E, and strongly urge the BLM to reconsider and adopt Alternative B1.

2.  In regards to my request for designation of all of the Jumbo Mountain Unit as a special recreation management area, the Proposed Alternate E designates what appears to be about 1/3 of that unit as such (Figure 2-97, Appendix A), AND allows for fluid mineral leasing, including surface occupation, inside the Special Recreation Management Area. This is not acceptable, given the growing population of the North Fork Valley area, and its attendant need for more trails and recreation areas close to the population centers. Again, I encourage adoption of Alternative B1.

In addition, I believe the BLM has erred in adopting the Proposed RMP for the following reasons:

- Alternative E was improperly adopted after the Draft had been issued and responded to, and thus was not subject to public comments.

Lastly, I would like to protest the fact that the public has been given 30 days to try to read and respond in a meaningful way to a 3000 plus page document (containing an entire Alternative which didn't even exist for the public until the release in late June 2019). Until a few days ago, the RMP was only available to look at online. A hard copy was finally available at the Paonia Public Library just this last week, about 10 days before public protest comments are due.

Sincerely,

Lincoln Vannah  Date: 7-28-19

3

To: Jamie Connell, BLM State Director
From:
RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office
Date:

Dear Director Connell,

As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP dated 10/31/2016, I respectfully submit the following protest. My contact information is:

Marilyn Stone
P.O. Box 1534
Paonia, CO 81428
970-527-4535
Marilyn.stone@live.com

Although BLM lists 2 reference numbers for letters I have submitted (500255_StoneM20161101-1 and 00031_StoneM_20161031), the letter dated 10/31/16 was not summarized. This is contrary to your procedures and process.

My protest addresses the following issues that I have raised in my previous comments:
**Health issues:** I described in my letter dated 10/31/2016 that when I visited a fracking disposal pond, I suffered nausea and headaches within minutes of arriving on site from air pollution. Effects lasted approximately 3 hours after I left. Workers on site directed me to an air conditioned trailer stating other people had developed my symptoms as well.

Air pollution from oil and gas development near my home or carried in the drainage winds from the east and in areas I hunt and hike, threaten my health and well-being driving me to relocate from an area that is my home.

Section 18.4 does not adequately address cumulative impacts of oil and gas development for a mountain valley with natural geographic risks for air pollution, specifically ozone and methane.

**Hunting:** I have been a bowhunter for deer and elk for over 35 years. I hunt within 30 minutes of my home near Paonia in Game Management Unit (GMU) 521. Drilling activity and truck traffic in this unit will disrupt migration, result in habitat fragmentation and threaten the populations of deer and elk. Research has documented that habitat loss on both winter and summer ranges and

BLM_0076573

fragmentation hurts wildlife populations and interferes with migration. The migration routes available to deer and elk are critical to their survival through the winter (https://www.west-inc.com/resources/) according to research published in 2019. Section 14.2

Hunting is also a significant part of the Delta County's economy. Some hunters have been coming from out-of-state to hunt for over 30 years. Hunters have their meat processed by local businesses, stay in motels, eat in restaurants, buy gas, and shop in grocery stores and other stores.

This economic benefit resulted in $146,000 in sales tax in Delta County according to Statewide Comprehensive Outdoor Recreation Plan (SCORP). http://www.chc4you.org/wp-content/uploads/2018/01/2018_CHC_EconomicImpactOfNaturalGasDev_V2.pdf (page 12) BLM failed to consider this impact to Delta County's economy—one that benefits the county at a crucial time when traditional tourists have gone home.

When oil and gas operations are set up, public access is lost. This affects my access to public lands for hunting as well as hiking, camping and mushroom hunting and flies in the face of BLM's multiple use mandate.

Loss of hunting in GMU 521 will result in a diminished quality of life and avocation as well as a loss of a food source. I moved here in part because I could hunt close to home and also grow a garden.

**Local farms and economy:** Delta County has become a food hub and has the largest concentration of organic farms in the state. Clean air and water is our brand and crucial to the local economy.

In my letter, I described Delta County's agriculture, both conventional and organic, as key to its economy.  Organic farms operate without government subsidies making their reputation for food grown without air and water pollution critical to their survival. Even the threat of water and air contamination would sully the valley's reputation and growing economy based on healthy food. If the North Fork Valley does not have the local farms, it is no longer the iconic North Fork Valley that draws tourists from all over the state and indeed, it is no longer my home thus forcing me to move.

Threats to the North Fork Valley's economy mean a threat to the tax base of Delta County as a whole, already one of the poorer counties in the state. An outsized portion of Delta County's tax base comes from the North Fork Valley. If the county's tax base is diminished, services to residents will have to be cut.

BLM_0076574

http://www.chc4you.org/wp-content/uploads/2018/01/2018_CHC_EconomicImpactOfNaturalGasDev_V2.pdf

Delta County is in close proximity to Black Canyon National Park. Research indicates that visitor numbers are down in national parks near oil and gas drilling. Tourists visiting Black Canyon stay in local motels, eat at local restaurants and do other shopping here. This would be another hit on our local economy.

http://www.chc4you.org/wp-content/uploads/2017/01/Fracturing-Chemicals-on-Agricultural-Topsoil.pdf

http://www.chc4you.org/wp-content/uploads/2017/01/Farm_Human-Health_Ex109_Bamberger-Impacts-Report.pdf

http://www.chc4you.org/wp-content/uploads/2017/01/Parks-Drilling-Report-8-24-16-.pdf

http://www.resource-media.org/drilling-vs-the-american-dream-fracking-impacts-on-property-rights-and-home-values/#.V354cs7I89Y

**Vulnerable water conveyance:** As I pointed out in my 2016 comments, my drinking and irrigation water, as well as most of the North Fork Valley's water comes from springs, creek and reservoirs and is conveyed by open ditches. Open water sources (reservoirs, creeks and ditches) are vulnerable to surface contamination. Oil and gas operators report hundreds of spills per year and that doesn't include those that don't meet the reporting threshold. Oil and gas operations in the North Fork Valley's watershed are risking contamination and threatening people's health and the county's economy by risking local farms and orchards. Alternative Energy further exacerbates this threat by reducing setbacks to waterways, water supplies, erodible soil and soils with high selenium content. Alternate E also allows surface occupancy on slopes greater than 40 degrees increasing the risks of erosion and water contamination. Section 37.3

**Water shortage:** The average precipitation in our area is 15 inches per year. When water is used in fracking, it is taken out of the hydrology cycle forever. All life—wildlife, human and plants—depends on water. During the severe drought in 2018, I lost irrigation water in the middle of June. Climate predictions are for more and longer droughts, not wetter years. Alternative E threatens our water sources and supply. It therefore risks our economy due to inadequate setbacks, no surface occupancy in sensitive areas and steep slopes. Section 37.4

Plan Issues Under Protest:
Section 4.3.1 Air Quality and Climate
Section 4.4.3 Fish & Wildlife
Section 4.3.5 Water Resources R.862

BLM_0076575

Section 5.1 NEPA Public Notification
Section 5.7 NEPA Cumulative Impacts
Section 14.3.1 Air Resources Cumulative Impacts
Section 3.4.2 Health and Safety Cumulative Impacts
Section 4.3.3 Water Impact Analysis
Section 4.3.5 Water: Cumulative Impacts

I believe the BLM has erred in adopting the Proposed RMP for the following reasons:

- Alternative E violates BLM's mission statement:
  *The **Bureau of Land Management's mission** is to sustain the health, diversity, and productivity of public **lands** for the use and enjoyment of present and future generations.* Alternative E does not sustain the health, diversity and productivity of public lands for this generation of Americans, let alone future generations.

- Alternative E was improperly adopted and was not subject to public comments. (Section 5.1). It is also a radical departure from previous alternatives and a violation of NEPA.
- Section 4.3.1 Air Quality and Climate did not address my concerns nor did it consider the volume of research finding health risks associated with oil and gas drilling.
- Alternative E does not include updated information re cumulative impacts of climate change data on water resources (Section 5.7 R- 149)
- Alternative E decreases time limitations for wildlife habitat and is therefore a threat to populations.
- Alternative E uses "site-specific" repeatedly as a means to avoid addressing commenter concerns. This is both inappropriate and a useless suggestion because at that point, the site has already been leased. The state and county are extremely limited in what they can suggest to mitigate impacts to health impacts to wildlife and people, water and air pollution. This is a violation of your mission statement once again to preserve the land and habitat for future generations.

For those reasons, I respectfully protest the proposed RMP and the sections I have outlined above.

Sincerely,

Marilyn Store   7/28/19

To: Jamie Connell, BLM State Director
From: Michael McCarney
RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office
Date: July, 28, 2019

Dear Director Connell,

As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP (comments dated: November, 5th, 2016), I respectfully submit the following protest. My contact information is:
Michael McCarney
624 7th St.
Paonia, CO 81428
USA
(970)274-8888


My protest addresses the following issues that I have raised in my previous comments:
Alternative E
-Adopting a wholly new alternative at this stage is unacceptable, and a violation of the National Environmental Policy Act (NEPA). The public has not had a meaningful opportunity to comment on this proposal.
-Infrastructure impacts
-Air and water quality
–Health risks o Wildlife resources
- Recreation Management Areas

Those issues are addressed in the following sections of the RMP:
Alternative E in its entirety
- Section 3.4.2 Public Health & Safety
- Section 4.3.1 Air Quality & Climate
- Section 4.3.2 Soils & Geology
- Section 4.3.3 Water Resources
- Section 4.3.5 Fish & Wildlife

I believe the BLM has erred in adopting the Proposed RMP for the following reasons:
The Proposed RMP downplays public health risks, and ignores significant evidence we have provided that shows increased oil and gas development can have serious adverse impacts on public health. The Proposed RMP drastically decreases the stipulations in Alternative B1 and even the Preferred Alternative D that were designed to protect resources of value from oil and gas development. It increases lands available for oil & gas lease with 'standard stipulations' - from 0% to 12%. It drastically decreases the amount of land with No Surface Occupancy (NSO) from 26% to 11% compared to Preferred Alternative D. The Proposed RMP reduces setbacks from water supplies, waterways, areas with highly erodible and saline soils. It allows oil & gas surface use on lands with steep slopes greater than 40 percent. It weakens CSU stipulations & reduces Timing Limitations near critical wildlife habitat The Proposed RMP eliminates Ecological Emphasis Areas entirely, reduces Areas of Critical Environmental Concern, and significantly weakens the proposed protections for the Jumbo Mountain Special Recreation Management Area, and does not include

any "No Surface Occupancy" stipulations in that area, effectively opening Jumbo Mountain to oil and gas development. The Proposed RMP opened more of the federal mineral estate to oil and gas development without giving adequate consideration to the impact this will have on infrastructure maintained by the State and other local governments. The Proposed RMP anticipates over 1,000 new hydraulically fractured wells in the UFO, yet does not address the Programmatic Biological Opinion from the US Fish and Wildlife Service that caps surface water withdrawals on the North Fork of the Gunnison River at ~600 acre-feet per year for energy development purposes. Current oil and gas development in the area is already pushing that threshold. The BLM has failed to acknowledge that there is simply not enough water in the North Fork to sustain the level of oil and gas development anticipated in the Proposed RMP. Conclusion Wrap up your protest with a simple conclusion. For those reasons, I respectfully protest the Proposed RMP, and the sections I have outlined above.

Sincerely,
MICHAEL MCCARNEY

_____Date: 7/29/2019

To: Jamie Connell, BLM State Director

From:

RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office

Date:

Dear Director Connell,

As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP (comments dated: January 2012, December 2015), I respectfully submit the following protest. My contact information is:

Michael Price

26559 Redlands Mesa Road

Hotchkiss, Co 81419

Phone: 970 835-3545      email:  mtpricers@aol.com

My protest addresses the following issues that I have raised in my previous comments:

Oil and gas drilling threatens our water quality

Increased traffic and drilling will adversely affect air quality in the North Fork Valley

Wildlife and Recreation will be adversely affected

Those issues are addressed in the following sections of the RMP:

Reducing water set backs

Opening 95% of BLM land to Oil and Gas exploration

Reducing ecological emphasis that adversely affects the environment

I believe the BLM has erred in adopting the Proposed RMP for the following reasons:

<ul>

<li>Alternative E was improperly adopted and was not subject to public comments.

It does not take into account the previous input from concerned local citizens.</li>

</ul>

It places more importance on gas and oil development than the environmental impacts of gas and oil development.

It makes it more difficult for citizens to comment on the RMP.

Sincerely,

Michael Price    Date: 7/28/2019

BLM_0076580

This protest resulting from how my comments were addressed in the proposed RMP/final EIS will be presented under two specific categories coinciding with how they were combined within the BLM's response document.  Please see my attached original comment document.

**BLM Comment Summaries and Responses, Section 5 – NEPA and Section 30. Socioeconomic and Environmental Justice**

My comments as they were identified in my 2016 comment letter –

My introductory text which is presented on page R-709 of the comment summary

Section 1.4 and Table 1.3, last paragraph of my comment is presented on page R-29 of the comment summary

Table 2-6, page 2-429, the first paragraph of which is presented on page R-700 of the comment summary

Section 3.1.3 Geology and Soils presented on page R-721 of the comment summary

Section 4.1.1 Analytical Assumption, fifth bullet presented on page R-43 of the comment summary

Section 4.3.2 Soils and Geology presented on page R-723 comment summary

Section 4.3.3 Water resources, page 4-83 partially presented on page R-710 of the comment summary

In reviewing the BLM's responses to comments I made regarding the above sections of the Draft RMP, it is clear that the BLM has continued to ignore the presence of a thriving agricultural region that will be surrounded by lands open to lease sales. This continues to be unacceptable. The BLM doesn't normally have to create RMP's for BLM lands that are in such close proximity to agricultural areas much less the largest organic agricultural area in Colorado, so I can understand that you would find it difficult to write an RMP that must consider impacts to resources that are so different from the usual setting in the western United State, but this is no excuse for essentially ignoring the existing land uses found in the North Fork Valley and part of the Planning Area.

This lack of acknowledgement of the agricultural land use occurring in the Planning Area is further reinforced by the fact that *agriculture, organic, farmland, orchards, irrigation or prime farmland* are not included in the Reference section indicating that these existing uses and land types have not be adequately addressed nor given the serious attention they deserve.

Changes made to Section 3.1.3 (page 3-8) are inadequate and misrepresent the analytical responsibility of the BLM as identified by the following statement which also appears on page 3-8---"Impacts from federal actions on BLM-administered lands to farmlands identified as prime or unique are required to be analyzed and disclosed to the public during development of an RMP/EIS." Please note that Section 1.2 of the proposed RMP/EIS describes the Uncompahgre

1

RMP Planning Area (Planning Area) as including "BLM; US Department of Agriculture (USDA), Forest Service (Forest Service); US DOI, National Park Service (NPS); State of Colorado lands; and private property (emphasis added)."

The original text found below was removed from the proposed RMP/final EIS, Section 3.1.3 –

"However, according to a report by the Soil Conservation Service, irrigated and prime irrigated lands of statewide importance, most of which are situated at low elevations on valley floors, occur in the Uncompahgre, North Fork, Surface Creek, and Smith Fork drainage basins (Soil Conservation Service1980)."

The deletion of this information does not change the fact that the impacts from federal actions on BLM-administered lands to farmlands identified as prime or unique are required to be analyzed and disclosed to the public during development of an RMP/EIS. This does not mean that the prime or unique lands must be located within the BLM-administered lands, but instead the presence of those lands in the Planning Area must be evaluated for potential impacts resulting from actions occurring ON the BLM-administered lands. In addition. The omitted statement should be included in the Proposed RMP/EIS.

The source of the information populating newly added Table 3-3 is from an unpublished BLM GIS dataset created in 2018 in the Uncompahgre Field Office. How can the reader verify any of this newly added information when the information presented is from an unpublished source?

A Figure has not been included in the proposed RMP/EIS showing the location of each of the prime and unique farmland classifications included in Table 3-3. In addition, no Figures have been provided for each of the respective Alternatives that now include the identification of the amounts of prime or unique farmland that will be included in the NSO stipulation acreage under each alternative*. Again, the reader has no way of knowing which parts of the North Fork Valley are included in these newly added NSO designations. Each of these alternatives identifies that "BLM-administered lands would continue to include farmland of statewide importance, farmland of unique importance, and prime farmland if irrigated, totaling 36,800 acres." There are irrigated farmland acres in the North Fork Valley, therefore there are farmlands of statewide importance that require protection.

Section 3.1.3 now contains the following text:

There are no intentionally irrigated soils on BLM-administered lands within the Planning Area. The National Soil Survey Handbook 622.3(a)(3) states: "Irrigation – Some map units include areas that have a developed irrigation water supply that is dependable and of adequate quality and areas that do not have such a supply. In these units, only the irrigated areas meet the prime farmland criteria." Therefore, there are no irrigated farmlands of national or statewide importance on BLM-administered lands within the Planning Area.

As stated above, this new statement is incorrect and attempts to absolve the BLM from assessing any potential impacts to the very property that makes the North Fork Valley such an abundant and successful agricultural area and contradicts the NSO protections being afforded to farmland

BLM_0076582

within each alternative. There are intentionally irrigated lands within the North Fork Valley and impacts must be identified as required by the USDA.

**BLM Comment Summaries and Responses, Vegetation**

Section 3.1.5, Vegetation & Chapter 4, Section 4.3.4 Vegetation on page R-770 of the comment summary.

My Comment was as follows:

> Section 3.1.5 fails to acknowledge or discuss any of the agricultural crops existing in the North Fork Valley which is part of the Uncompahgre Field Office planning area. Omission of these existing and important resources in Chapter 3 has resulted in the complete omission of possible effects to these resources in Chapter 4, Environmental Consequences. This violates CEQ regulations at 40 CFR 1502.15; Affected Environment and 40 CFR 1508.8; Effects.

The BLM Response to my comment found on page R-770 states the following - Prime and unique farmlands are discussed in Draft RMP/EIS Section 3.1.3, Soils and Geology (page 3-22) and in Section 4.3.2, Soils and Geology (pages 4-61–4-75). The BLM has limited authority over other agricultural operations in the Uncompahgre RMP planning area, as these generally occur on private rather than BLM-administered lands. However, the Proposed RMP/Final EIS was updated to reflect prime and unique farmlands.

This response is unacceptable because the BLM does have the responsibility to identify the potential impacts to lands with the Planning Area which are a consequence of actions occurring on BLM-administered lands and this must be identified regardless of land ownership. The additional token language added regrading prime and unique farmlands does not adequately describe the affected environment or the consequences to the existing agricultural plant community environment within the North Fork Valley.

In addition, Section 4.3.4 is described as follows – "This section discusses impacts on vegetation, forests and woodlands, rangelands, riparian areas, and weeds from proposed management actions of other resources and resource uses. Existing conditions are described in Section 3.1.5 (Vegetation)." As stated previously, this proposed RMP/EIS continues to ignore the agricultural vegetation occurring on a large portion of the Planning Area and BLM-administered lands and is therefore wholly inadequate and does continue to violates CEQ regulations at 40 CFR 1502.15; Affected Environment and 40 CFR 1508.8; Effects.

I assert that the State Director's Decision to adopt a new alternative E is wrong because the Proposed RMP/EIS continues to ignore the agriculturally derived, successful economy in existence in the North Fork Valley by not appropriately describing or acknowledging the area and as a consequence determining that oil and gas exploration and production is more important than protecting an already existing use.

BLM_0076583

Paige Smith
215 Delta Ave.
Paonia, CO 81428
307-631-4544
paige@greenhousegarden.com

*Alt. A page 4-45; BLM-administered lands would continue to include farmland of statewide importance, farmland of unique importance, and prime farmland if irrigated, totaling 36,800 acres. The BLM would continue to apply NSO stipulations on 1,910 acres of farmland. This would continue to protect 5 percent of the surface of farmland from fluid mineral disturbances that could degrade the quality or quantity of farmland.

Alt. B page 4-49; BLM-administered lands include farmland of statewide importance, farmland of unique importance, and prime farmland if irrigated, totaling 36,800 acres. The BLM would apply NSO stipulations on 29,750 acres of farmland. This would increase the protection of the surface of farmland (from 5 percent under Alternative A to 80 percent under Alternative B) from fluid mineral disturbances that could degrade the quality or quantity of farmland.

Alt. C page 4-52; BLM-administered lands include farmland of statewide importance, farmland of unique importance, and prime farmland if irrigated, totaling 36,800 acres. The BLM would apply NSO stipulations on 1,980 acres of farmland. Compared with Alternative A, this would increase the protection of the surface of farmland (by 70 acres) from fluid mineral disturbances that could degrade the quality or quantity of farmland. Impacts would be similar to those under Alternative A.

Alt. D page 4-55; BLM-administered lands include farmland of statewide importance, farmland of unique importance, and prime farmland if irrigated, totaling 36,800 acres. The BLM would apply NSO stipulations on 7,820 acres of farmland. This would increase the protection of the surface of farmland (from 5 percent under Alternative A to 21 percent under Alternative D) from fluid mineral disturbances that could degrade the quality or quantity of farmland.

Alt. E page 4-58; BLM-administered lands include farmland of statewide importance, farmland of unique importance, and prime farmland if irrigated, totaling 36,800 acres. The BLM would apply NSO stipulations on 4,490 acres of farmland. This would increase the protection of the surface of farmland (from 5 percent under Alternative A to 12 percent under Alternative E) from fluid mineral disturbances that could degrade the quality or quantity of farmland.

BLM_0076584

To: Project Manager, Uncompahgre RMP (2016 comments on the draft RMP)

I have reviewed the BLM's draft Resource Management Plan (draft RMP) for the Uncompahgre Field Office and must again reiterate the comment I made in my letter dated February 6, 2012, to your office regarding the BLM's proposal to lease 22 parcels for oil and gas development surrounding the North Fork Valley. In that letter, I noted that the RMP in effect in 2012 (and still in effect) had been approved 23 years earlier and it in no way accounted for the socioeconomic benefits being derived from the agricultural operations that now exist in the North Fork Valley.

Unfortunately, this current draft is no better. It contains only cursory acknowledgement of the existence of this valley within the Uncompahgre Field Office planning area and has not adequately or appropriately described what makes it of such unique agricultural importance to all of Colorado and surrounding states. This omission of fully describing this valley does not constitute meeting the requirement of "succinctly describing the environment of the area(s) to be affected by the alternatives under consideration" as required by 40 CFR 1502.15.

This valley has been formally identified through multiple means as a truly unique place:

a) It has been described as "An American Provence" in the book by the same name written by University of Colorado professor, Thomas Huber. He compares the North Fork Valley with its vineyards to the famous wine growing region of southern France. http://www.merchantherald.com/geographer-says-the-north-fork-is-an-american-provence/

b) This valley was designated by the state of Colorado as a Colorado Certified Creative District in 2013. Information on the significance of this designation can be viewed at http://www.coloradocreativeindustries.org/showcase/colorado-creative-districts

c) Delta County was recently awarded three Blueprint 2.0 Initiatives by the Colorado Office of Economic Development and International Trade. The Initiatives include Strengthening Local Business Brand, Adaptive Reuse Workshop and Tourism Promotion. http://choosecolorado.com/lt-gov-donna-lynne-announces-colorado-blueprint-2-0-initiative-recipients/

d) The North Fork Valley has also been designated as an American Viticulture Area by the U.S. government. This designation was officially adopted in 2001 and codified at 27 CFR https://www.gpo.gov/fdsys/pkg/CFR-2016-title27-vol1/pdf/CFR-2016-title27-vol1-sec9-172.pdf An American Viticulture Area is a delineated grape-growing region having distinguishing features as established in Federal regulation and a name and delineated boundary. This is only one of two such designated areas in Colorado.

The North Fork Valley contains the highest concentration of organic farms, orchards and vineyards in Colorado and provides wine, fruit, fruit juices, produce, meat and dairy products to consumers throughout Colorado and surrounding states.

I describe all of these accolades, awards and designations to make a point - - this valley is recognized for its unique agriculture, local business, art, agribusiness, agritourism, recreation and

5

BLM_0076585

tourism industries and deserves protection from any threat of environmental degradation. Gas exploration and development is not compatible with the economic culture of this valley and in fact, its very presence would threaten the highly regarded reputation as an organic agricultural area.

This draft RMP has been written using the standard BLM RMP boilerplate/template language. There is nothing boilerplate about the North Fork Valley and its presence in the Uncompahgre planning area requires that effects to it from actions occurring in the BLM decision area must be considered. The potential environmental consequences presented in this draft RMP do not in any way address the depth and breadth of potential effects to the valley from fluid mineral exploration and production. This is in direct conflict with BLM regulation 40 CFR 1610.4-6: Estimation of effects of alternatives, which requires that the Field Manager "will estimate and display the physical, biological, economic, and social effects of implementing each alternative considered in detail." Without acknowledging and describing the North Fork Valley in detail, this requirement cannot and has not been achieved.

An example of how this draft RMP has completely omitted any meaningful discussion about the "affected environment" is demonstrated by the fact that there is absolutely no reference to "organic farm" or "organic agriculture" in Chapters 1 or 3. A reference to "organic farm" is found on Pages 2-31 and 2-199 in Chapter 2, but both references are specifically limited to a reiteration of some of the provision of the North Fork Alternative Plan (NFAP)/Alternative B.1. Chapter 4 only contains two references to "organic farm." The first is found on page 4-69 and again is only presented to reiterate a provision in Alternative B.1. The second reference to "organic farming" is the only meaningful reference in the entire RMP. This is found on page 4-84 where the threat to an organic operation's designation as "organic" could be in jeopardy if water being used to irrigate the crops on that operation are contaminated by a gas field spill; a serious potential consequence that should never be allowed to occur.

In the following comments, I would like to point out where the analysis in this draft RMP has not adequately addressed truly significant issues.

A. Chapter 1, Introduction

1. Section 1.4 and Table 1.3:

This section fails to appropriately and adequately acknowledge and discuss the NFAP presented to the BLM during scoping by citizens and governmental entities in the North Fork Valley. This Alternative was submitted in order to provide the BLM with information about the uniqueness and renowned agricultural productivity of the valley and supported the request to remove much of the BLM land surrounding this valley from any future leasing. However, the section summarizing the scoping comments received does not include this important scoping submittal.

The subject of addressing potential impacts to an area with the highest concentration of irrigated organic and traditional farms, orchards and vineyards in Colorado has not been included and certainly isn't represented by BLM boiler plate subjects and broad terms such as, "soil, air,

6

and water resources, special management areas, vegetation (including riparian and wetland areas and noxious weeds), fish and wildlife, special status species, drought management and climate change."

Any meaningful reference to this agriculturally important and productive area is missing throughout the remainder of the draft RMP. This absence of acknowledgement of the North Fork Valley's unique qualities is in direct conflict with Section 1500.1(b) of the Council on Environmental Quality (CEQ) regulations which states that "NEPA documents must concentrate on the **issues that are truly significant to the action in question**, rather than amassing needless detail."

The numerous local governmental entities, private citizens and business leaders in the North Fork Valley that supported the NFAP is unprecedented nationally and to neglect to include this in the scoping section ignores the most basic of NEPA policy and has created a situation where this area has not be adequately identified or described as a part of the human environment. Therefore, the NEPA process has not been appropriately used to identify and assess the reasonable alternatives to proposed actions to **avoid** or minimize adverse effects of these actions upon the quality of the human environment," as required by CEQ regulation 1500.2(e)). In addition, by not appropriately describing the North Fork Valley and potential negative environmental effects to it as a "planning issue," this RMP does not adequately meet the requirement that the preferred alternative be the "alternative that best resolves planning issues," (Table 1-2, Step 7).

## B. Chapter 2 Alternatives

1. Section 2.2.3:

The reference to the "six planning issues" (Section 1.4 and Table 1.3) of the draft RMP which provided guidance for the development of the four action alternatives has created a situation where the significance of potential impact to the human and natural environment within the BLM planning area has not been adequately addressed in the fundamental underpinnings of the analysis.

This absence of appropriate consideration is evident throughout the remainder of the document and in taking this approach, this document does not meet the level of analysis required by CEQ regulations (1502.1; 1502.2; 1508.8; 1508.14 and 1508.27(a), (b)(3), (b)(4) and (b)(6)) or the National Environmental Policy Act Section 101(b). In addition, by not appropriately describing the North Fork Valley and potential negative environmental effects to it as a "planning issue," this RMP does not adequately meet the requirement that the preferred alternative be the "alternative that best resolves planning issues," (Table 1-2, Step 7).

The Uncompahgre BLM Office has created this draft RMP as if management decisions and the preferred alternative are not potentially impacting an incredibly unique part of Colorado and the Intermountain West. Consequently, the use of the standard BLM 'template' for creating RMPs as the basis for this document, including the identification of the affected environment and

BLM_0076587

consequences to the affected environment, are wholly inadequate with respect to the North Fork Valley.

2. Table 2-1 and Appendix D, Ecologic Emphasis Areas:

The North Fork Valley should have been included in this portion of the analysis. Although it does not fit the BLM's routine areas of analysis - *unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors* – does not make this ecologically unique area any less worthy of consideration. In fact, minimizing impacts to this culturally and agriculturally significant geographic area should be the core value addressed throughout the RMP and presented under each of the Alternatives in Tables 2-1 through 2-6.

3. Table 2-2, page 2-28 Soils and Water Resources:

The water goal under this section presents generic references to streams, water quality, watershed function and public uses. This description should include the use of water for irrigation purposes and that public use is not limited to the standard uses of human (public and private water supply) and livestock consumption, fishing and recreation and should acknowledge and describe the water's use for agricultural production. This omission results in the comparison of alternatives on this topic to completely ignore the effects of each alternative on the existing land uses within the North Fork Valley that would be variably impacted/protected by the provisions in each alternative. A token reference on page 2-31 to *Agricultural operations* as identified in the NFAP does not constitute the "hard look" required by NEPA.

4. Table 2-2, page 2-49 Vegetation – General and Uplands:

The Field Office Planning area clearly encompasses portions of the North Fork Valley that are planted in non-native, agricultural crops. However, this Table does not mention non-native vegetation within any alternative.  This omission in identifying and analyzing the effects on this portion of the affected environment must be corrected.

5. Table 2-6, page 2- 429, Socioeconomics:

This entry in Table 2-6 should include a discussion within Alternatives A, C and D as to the effect on the economic contributions and quality of life associated with local agricultural operations (North Fork Valley) that would be attributable to each of these three alternatives.

In addition, the following statement is made on the last page of this Chapter (page 2-430); "Additionally, as discussed in Chapter 4, Section 4.6.3, Socioeconomics, *Nature and Type of Effects*, agriculture is of local economic importance for farms and agritourism; therefore, maintaining water quality would protect these economic sectors from potential development impacts."  This is another token reference to agriculture and surprisingly isn't included and compared in the Soils and Water Resource section of this table, or any other appropriate section.

C. Chapter 3 Affected Environment

BLM_0076588

1. Section 3.1.3 Geology and Soils:

On page 3-22 of this Section, the BLM has included a discussion titled - *Prime or Unique Farmlands and Residential Development*. This subsection states that "Four categories of farmlands are federally regulated by the USDA under the Farmland Protection Policy Act: (1) Prime farmlands, (2) Unique farmlands, (3) Farmlands of statewide importance, and (4) Farmlands of local importance. Impacts from federal actions on BLM-administered lands to farmlands identified as prime or unique are required to be analyzed and disclosed to the public during development of an RMP/EIS."

The last sentence shown directly above indicates that if federal actions occurring on BLM-administered lands impact farmlands identified as prime or unique, these impacts must be analyzed and disclosed to the public during the development of this very document under review.

However, the next paragraph in this section states that "There are no farmlands of national or statewide importance **on BLM-administered lands within the planning area**. However, according to a report by the Soil Conservation Service, irrigated and prime irrigated lands of statewide importance, most of which are situated at low elevations on valley floors, occur in the Uncompahgre, North Fork, Surface Creek, and Smith Fork drainage basins (Soil Conservation Service1980)." The sentence regarding the requirement to analyze and disclose impacts to farmland identified as prime or unique does not limit this analysis to those prime or unique farmlands that exist **on** BLM-administered lands. Instead, it is indicated that this analysis is required for impacts to prime or unique farmlands resulting from federal actions taking place on BLM-administered lands. Therefore, the impacts to identified irrigated and prime irrigated lands occurring in the drainage basins listed in the next sentence (occurring within the Uncompahgre Field Office planning area) of Section 3.1.3 must be analyzed and disclosed in Chapter 4 and they are not. Chapter 4 is completely silent on the impacts to irrigated and prime irrigated lands.

In addition, discussion regarding "residential development" which is included in the title of this subsection is not included and the *Soil Conservation Service 1980* document cited in this section is not included in the "References" appendix. Please include.

2. Section 3.1.5, Vegetation and Chapter 4, Section 4.3.4 Vegetation

Section 3.1.5 fails to acknowledge or discuss any of the agricultural crops existing in the North Fork Valley which is part of the Uncompahgre Field Office planning area. Omission of these existing and important resources in Chapter 3 has resulted in the complete omission of possible effects to these resources in Chapter 4, Environmental Consequences. This violates CEQ regulations at 40 CFR 1502.15; Affected Environment and 40 CFR 1508.8; Effects.

3. Section 3.4.2 Public Health and Safety.

This section fails to mention the potential threat from pipeline and compressor explosions or explosions that can occur at a well site.

9

BLM_0076589

Chapter 4, Environmental Consequences

1. Section 4.1.1 Analytical Assumption, fourth bullet:

This discussion of reasonable foreseeable development and the number of wells that could be developed should be revised to indicate whether this analysis is assuming that these natural gas wells will be developed using directional drilling, hydraulic fracturing completion methodologies and multiple wells per pad. In addition, this section should include an estimate of how many well pads, miles of pipeline and amount of compression that is estimated to be required in order to support this level of drilling. Each of these factors can have a much higher environmental impact to air quality, water quality and water quantity as compared to conventional vertical drilling using a single well per pad.

2. Section 4.1.1 Analytical Assumption, fifth bullet,

"Direct and indirect impacts of implementing the RMP primarily occur on the decision area lands:" This is a seriously flawed assumption in that many of the direct and indirect impacts of implementing the RMP have the potential to seriously impact the people and their livelihoods living in the North Fork Valley encompassed by the Uncompaghre BLM Field Office planning area. "Planning area" is defined as the Uncompahgre Field Office boundary, including all lands, regardless of land ownership, except the Gunnison Gorge NCA Planning Area and the Dominguez-Escalante NCA, whereas "decision area lands" are limited to public lands and federal mineral estate managed by the United States Department of the Interior, Bureau of Land Management. This is an important distinction that must be clearly identified throughout this Chapter, but is not.

The North Fork Valley's unique economy and community is in large part the result of the vast extent of organic and traditional farming, fruit growing and viticulture occurring less than one mile, in many places, from the BLM decision area boundary. This proximity is especially true for the thousands of acres of land surrounding Paonia, Hotchkiss and Crawford that would be made available for fluid minerals leasing if the BLM adopts any alternative other than B1. The assumption provided in the fifth bullet should be eliminated and this Chapter re-written to acknowledge the environmental consequences on this geographic area and the people living in it located within the planning area.

3. Air Quality

A previously published BLM final EIS for the Bull Mountain Unit indicated that there will be an increase in formaldehyde that will be emitted from 3 newly proposed 3,185 horsepower, diesel powered compressor engines. It was also noted that the addition of 3 large compressor engines was not brought to the BLM's attention by SG Interests in time for this increase to be modeled for this area and reported in the Final Bull Mountain EIS. However, previous modeling without considering the three new compressor engines had modeled an exceedance of the allowable level of formaldehyde in the Bull Mountain area. As stated on page 4-48 of the Bull Mountain EIS, maximum modeled formaldehyde concentration from

10

BLM_0076590

compression emissions which is at 81.6 µg/m is above the short-term REL threshold of 55 µg/m. This is troubling since the modeling did not include the large increase in formaldehyde (a known cancer causing compound) emissions which will be emitted by the new compressor engines.

The air modeling reported in this draft RMP has indicated an exceedance of the 70ppb ozone threshold in the Uncompahgre planning for every oil and gas scenario being contemplated.

The predicted presence of elevated formaldehyde and ozone is of concern because the North Fork Valley is a geographic area well known to experience inversions during the winter months. The state of Wyoming experienced unprecedented occurrences of wintertime ozone exceedances in the Upper Green River Basin; an area with heavy gas development which is also prone to wintertime inversions as well. The Green River Basin was declared to be in nonattainment because of these ozone exceedances.

These potential threats to public health (and in the absence of any air monitoring in-place to be used to alert the public to hazardous air conditions) for people living in the North Fork Valley makes it imperative that there is no further leasing in the entire region encompassed by the NFAP.

4. Section 4.3.2 Soils and Geology.

Because Chapter 3, Section 3.1.3 dismisses the need for identifying and describing irrigated and prime irrigated lands occurring within the planning area, this Section is completely silent on the environmental consequences of federal actions on these agriculturally significant lands. This is a serious omission which only further reinforces the perspective that the BLM did not take the environment actually in existence in the Planning Area into consideration which violates 40 CFR 1502.15 of the CEQ regulations.

4. Section 4.3.3 Water Resources, page 4-83

The following information is provided explaining the risks associated with fluid mineral leasing and development:

*Lands that are open for fluid minerals leasing have the potential for future health and safety risks related to oil, gas, and geothermal exploration, development, operation, and decommissioning. The number of acres open for leasing is proportional to the potential for long-term direct health and safety impacts. Use, storage, and transportation of fluids, such as produced water, hydraulic fracturing fluids, and condensate, have the possibility of spills that could migrate to surface or groundwater, causing human health impacts.*

*The US Environmental Protection Agency (EPA) is studying the potential for hydraulic fracturing to contaminate shallow groundwater sources, but no scientific consensus has been reached to date (EPA 2012c). Hydraulic fracturing occurs in the gas-producing formations at depths greater than 5,000 feet. Water, sand, and chemical additives are pumped into the formation at extremely high pressure to create fractures that allow gas to flow into the well. Theoretically, improperly completed wells or perforations into zones*

11

*of geological weakness (i.e., faults or fractures) could create conduits that allow hydrofracturing fluids, produced water, and methane to migrate to groundwater resources. If a groundwater source is contaminated, there are few cost-effective ways to reclaim that water; thus, the long-term impacts of groundwater contamination are considerable.*

Each of these potential consequences are well known, often observed (i.e., the oil and gas industry in CO has reported at least 5,188 spills from statewide operations over the last ten years to the Colorado Oil and Gas Conservation Commission) and can have long-term devastating effects on soils, surface water and groundwater.

Given the following statement made on page 4-84, "*The organic farming industry relies on clean water for agricultural production. Contamination of irrigation waters could affect the ability of local organic farms to maintain their designations,*" such threats to the North Fork Valley cannot be allowed to occur. Oil and gas drilling is absolutely incompatible with the existing land uses currently occurring in this valley.

Conclusion:

The draft RMP states that "When there are conflicts among resource uses or when a land use activity could result in unacceptable or irreversible impacts on the environment, the BLM may restrict or prohibit some land uses in specific areas."

Based on the comments presented above, there is definitely a conflict between the extraction of the gas resource and the prevailing land use in the North Fork Valley. Additionally, the land use activity of producing natural gas would result in unacceptable and irreversible impacts on the environment in the North Fork Valley. Therefore, in this situation, the BLM should prohibit the leasing of any further federal fluid minerals within the borders of the NFAP and incorporate this prohibition on further leasing into the alternative chosen for the revised RMP. This is the only way to preserve and protect the integrity of this unique and renowned part of Colorado.

Thank you for your consideration,

Paige Smith
215 Delta Ave.
Paonia, CO 81428
307-631-4544
paige@greenhousegarden.com

BLM_0076592

To: Jamie Connell, BLM State Director
From: Patrick McCarney
RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office
Date: July, 28, 2019

Dear Director Connell,

As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP (comments dated: November, 5th, 2016), I respectfully submit the following protest. My contact information is:
Patrick McCarney
43 Pan American
Paonia, CO 81428
USA
(970)948-4343


My protest addresses the following issues that I have raised in my previous comments:
Alternative E
-Adopting a wholly new alternative at this stage is unacceptable, and a violation of the National Environmental Policy Act (NEPA). The public has not had a meaningful opportunity to comment on this proposal.
-Infrastructure impacts
-Air and water quality
–Health risks o Wildlife resources
- Recreation Management Areas

Those issues are addressed in the following sections of the RMP:
Alternative E in its entirety
- Section 3.4.2 Public Health & Safety
- Section 4.3.1 Air Quality & Climate
- Section 4.3.2 Soils & Geology
- Section 4.3.3 Water Resources
- Section 4.3.5 Fish & Wildlife

I believe the BLM has erred in adopting the Proposed RMP for the following reasons:
The Proposed RMP downplays public health risks, and ignores significant evidence we have provided that shows increased oil and gas development can have serious adverse impacts on public health. The Proposed RMP drastically decreases the stipulations in Alternative B1 and even the Preferred Alternative D that were designed to protect resources of value from oil and gas development. It increases lands available for oil & gas lease with 'standard stipulations' - from 0% to 12%. It drastically decreases the amount of land with No Surface Occupancy (NSO) from 26% to 11% compared to Preferred Alternative D. The Proposed RMP reduces setbacks from water supplies, waterways, areas with highly erodible and saline soils. It allows oil & gas surface use on lands with steep slopes greater than 40 percent. It weakens CSU stipulations & reduces Timing Limitations near critical wildlife habitat The Proposed RMP eliminates Ecological Emphasis Areas entirely, reduces Areas of Critical Environmental Concern, and significantly weakens the proposed protections for the Jumbo Mountain Special Recreation Management Area, and does not include

any "No Surface Occupancy" stipulations in that area, effectively opening Jumbo Mountain to oil and gas development. The Proposed RMP opened more of the federal mineral estate to oil and gas development without giving adequate consideration to the impact this will have on infrastructure maintained by the State and other local governments. The Proposed RMP anticipates over 1,000 new hydraulically fractured wells in the UFO, yet does not address the Programmatic Biological Opinion from the US Fish and Wildlife Service that caps surface water withdrawals on the North Fork of the Gunnison River at ~600 acre-feet per year for energy development purposes. Current oil and gas development in the area is already pushing that threshold. The BLM has failed to acknowledge that there is simply not enough water in the North Fork to sustain the level of oil and gas development anticipated in the Proposed RMP. Conclusion Wrap up your protest with a simple conclusion. For those reasons, I respectfully protest the Proposed RMP, and the sections I have outlined above.

Sincerely,
PATRICK MCCARNEY

_____Date: 7/29/2019

July 28, 2019

TO:        Colorado State Director,
           Bureau of Land Management

FROM:      Sarah G. and William P. Bishop
           POB 130, Paonia, CO 81428
           970-527-6675

OUR INTEREST:  NEPA REQUIREMENTS

RE:        BLM/UFO RMP/FINAL EIS

We have participated in every opportunity available to us to comment on the process of drafting the proposed RMP and its EIS. Our last written comments were submitted on October 31, 2016.

None of our comments sent to you in October of 2016 are addressed in the new Alternative E, which you state is the selected alternative for the RMP. In selecting Alternative E, you have effectively eliminated all public participation in drafting this RMP.

Your action is a clear violation of NEPA, and therefore must be withdrawn. In our letter of October 2016 we wrote extensively about your ignoring the NEPA process, that of making decisions on the use of public lands based on the most current, available scientific data and information. This is 2019. Most of your reported information gathering is from 2010 or earlier. Your proposed RMP surely makes a mockery of shaping policy and regulations based on current data and information and public input.

To be succinct: Your Resource Management Plan as detailed in Alternative E HAD NO PUBLIC INPUT, VIA HEARINGS OR OTHER FORMS OF PRESENTATION. It is flawed if not fraudulent. It must be rejected. Your decision to move forward with the RMP as proposed is a complete abrogation of your responsibility to lead an open, public and fair process of developing public lands policy.

<p>Dear Mr. Matt Loscalzo,</p>

RE: Uncompahgre BLM Field Office Resource Management Plan/FEIS Inconsistent with North Fork Valley and Colorado Vision For the Future -

On 6/28th the BLM released its Research Management Plan for the Uncompaghre Field Office, which includes the North Fork of the Gunnison Valley in which I reside.  This valley is an organic and local food hot-bed and the state&#39;s &quot;Farm to Table Capital&quot;.  The Trump administration&#39;s plan would open almost the entire resource area - and much of Colorado&#39;s Western Slope from near Telluride to Paonia  and beyond - to oil and gas development, uranium mining, and coal.

The input from hundreds of locals over the last decade was ignored by the administration - in favor of &#39;energy/fossil fueldominance&#39;.  But our health and public lands are worth more then that. The BLM is obligated to protect water and air and the lands themselves - from their scenic features, to their soil health, to their impacts on sedimentation.  The value of our public lands for recreation and wildlife, and the looming climate crisis that demands we move away from fossil fuels, are all factors that must be properly addressed. The North Fork Valley is far too important for it&#39;s many values to open up to additional oil and gas development. Instead, we need to move forward with clean energy solutions and not more drilling for gas and oil.  We need to address climate change now.

Unfortunately, the BLM has a different view of the North Fork Valley.  It sees the North Fork Valley as resources to extract; not as resources and values worth protecting.  The BLMS&#39;s Final Proposed Uncompahgre Rsource Management Plan (RMP) opens 95% of the federal mineral estate to oil and gas leasing, while eliminating stipulations intended to mitigate impacts and protect other valuable resources. The RMP is antithetical to State policies designed to ensure Colorado remains the great, beautiful state that it is, and a magnet for attracting extraordinary talent.

In addition, I would like to add that the BLM submitted an entirely new Alternative E, that was not the subject of public comments its preferred alternative and final proposed RMP.  This is in violation of federal environmental law, Alternative E is invalid.

The State of Colorado has an important opportunity to consider the management proposal in this plan, with Governor Polis given 60-days to provide his official comments.  The importance of public lands to Colorado, and the impact that expanding oil and gas development would have on these lands, on the state&#39;s climate goals, and on disrupting other economic drivers in this region, all deserve to carefully weighed as he formulates the State&#39;s response. The laws that Governor Polis signed in 2019 relating to how we address climate change were historic (HB1261 and SB181.  This will be the first test to see how much of a say our state has in actually executing these new laws&#8203;.

BLM_0076596

&#8203;&#8203;I &#8203;moved to the North Fork Valley&#8203; &#8203;in the winter of 2015, I am a home owner in Paonia, C&#8203;O&#8203; &#8203; My first chance to vote for the Governor of Colorado came in 2018. I was thrilled when Governor Polis won this election, and my main reason for optimism were his campaign pledges to address climate change and the excess oil and gas industry&#39;s influence on the policy in our state.  I am looking forward to seeing Governor Polis stand up to this BLM RMP that ignores the input and interests of the local North Fork Valley residents and business owners.

Sincerely,

Sharon Kime

227 North Fork Ave.

Paonia,CO 81428&#8203;

760-409-2471

sharonkime@gmail.com

BLM_0076597

To:     Bureau of Land Management, Uncompahgre Field Office

From:  Delta Area Mountain Bikers (DAMB), a Chapter of COPMOBA

Re:     Comments regarding Draft Resource Management Plan & Environmental Impact
Statement, May, 2016

Date:   October 26, 2016

Please accept the following comments from Delta Area Mountain Bikers (DAMB) regarding the
draft Resource Management Plan for the BLM public lands managed by the Uncompahgre Field
Office.

DAMB is a Chapter of Colorado Plateau Mountain Bike Trails Association (COPMOBA).
Currently we have 21 paying members, approximately 50 other supporting members locally, as
well as 220 members who support mountain biking in Delta from in and outside the area. Our
mission is to build, maintain, and advocate for singletrack mountain bike trails on the Colorado
Plateau in Western Colorado. Our vision is to provide high-quality sustainable singletrack
mountain bike trails for users of all ages and abilities providing outstanding recreation
opprortunities and improving the quality of life and economies of the communities we serve for
generations to come. As an organized user group on public lands, we are nurturing our
relationships with government agencies accordingly, and hope to bridge the gaps of what is
possible for mountain biking in Delta County. As well, we look forward to working with the
BLM to fulfill their Recreational Strategy of Connecting with Communities. The following
article outlines what else is happening regionally to make the ideas of advocate groups like ours
become a reality.  http://www.adventure-journal.com/2016/08/blm-turns-to-mountain-bikers-to-
build-trails-stem-illegal-routes/

Our organization believes that Alternative B and where it applies Alternative B1 provide the best
management strategies for the preservation of public lands for the uses outlined in COPMOBAs
mission and vision statements, and will also provide support for a local economy based on
recreational activities and development.

DAMB supports the development of any Special Recreation Management Areas (SRMA) and
Extensive Recreation Management Areas (ERMA) in the managed area of the UFO. We believe
creating these environments for local communities will result in unlimited numbers of positive
experiences and benefits. These will develop in all shapes and forms no matter the location of
the SRMA/ERMAs. The experiences include, but are not limited to: developing skills and
abilities specific to mountain biking, enjoying having access to natural landscapes, being able to
frequently participate in desired activities and natural environments, getting much needed
physical exercise, releasing and reducing built-up mental tensions, increasing and maintaining
quality of life, perceived value of the community due to quality of life, and community building
for those who use and enjoy it. Potential general benefits include improved mental well-being,
increased skills for outdoor enjoyment, a greater understanding of the importance of recreation
and tourism to our communities, a more outdoor oriented lifestyle, improved physical fitness and
health maintenance, and an enhanced lifestyle and quality of life. With the epidemic of declining

BLM_0076598

health in America, we feel that the physical and mental benefits listed above are crucial to developing healthy communities in Delta County.

With the amount of time and work put into building and maintaining trail systems,  DAMB prefers "not allowing livestock grazing in areas that conflict with recreation sites would generally improve recreation opportunities by eliminating (or reducing) animals and their waste from these areas over the long term" chapter 4-301.  We also support the concept of creating Ecological Emphasis Areas (EEAs) for winter habitat for mule deer and other animals of concern, where deemed necessary and where EEAs coalesce with the objectives of our organization.  Having ample wildlife in recreation management areas contributes to the experience of natural beauty, and distinction of these environments.

DAMB and COPMOBA support the development of recreational areas because sustainably designed and built trail systems are a major economic driver for local and regional communities. In reference to any proposed SRMA/ERMAs in the North Fork region, DAMB requests for regulations to allow for non-motorized competitive events at the discretion of the Authorized BLM Officer.  We believe this is a key element to economic development surrounding our sport, as well as trail system recognition on a regional scale.

The members of DAMB are not just focused on the advocacy of mountain bike trails for our own leisure. Our group is comprised of people from all walks of life with differing jobs and careers, and participate in a variety of community improvement organizations.  We are experiencing the economic challenges that come with the decline of coal mining operations in Delta County.

A recent economic study funded by Delta County Economic Development (DCED) concluded that the fastest and most attainable route to economic growth in Delta County would be through tourism, primarily agricultural and recreational tourism.  While the Delta Tourism Council is working to promote our rich organic agricultural farms, and vinyards, we feel that the establishment of SMRA/ERMAs in conjunction with sustainably designed trail systems will fast track the popularity of all types of tourism in the area.

Recognizing that families are multidimensional when it comes to travel needs, we believe the more variety of tourism opportunities we can supply for all age levels, the greater opportunity for economic growth through family and baby boomer friendly tourism experiences.  We see the building of mountain biking trail systems throughout the county as an integral component of economic growth through tourism.

For example, the town of Fruita, Colorado, receives $1.5 million from mountain biking annually; has had a 51% increase in sales tax revenue, including 80% sales tax revenues from restaurants. According to americantrails.org over 50% of bicyclist earn $100,000 or more per year and over 80% of bicyclist earn $50,000 or more per year.  More supporting evidence of economics of cycling can be found at this link: http://www.americantrails.org/resources/economics/economic-benefits-trails-macdonald.html

The economics of recreational development directly related to mountain biking is further exemplified in the following articles. This piece follows the history of user data and economic benefits that Fruita and the Grand Valley have enjoyed due to mountain biking: http://www.steamboattoday.com/news/2013/may/19/biking-series-part-2-how-fruita-did-it/ This is an article giving an overview of economic impacts found from mountain biking world wide: http://www.pinkbike.com/news/economic-impacts-of-mountain-biking-tourism-2014.html, http://www.pinkbike.com/news/economic-impacts-of-mountain-bike-tourism-2016-update.html . Lastly, here is an economic and impact analysis study of mountain biking trail development in Alabama that shows influences of mountain bike tourism. http://headwaterseconomics.org/trail/13-coldwater-mountain-bike-trail/ . The potential for trails in varying terrain and scenic beauty, would add Delta County to the list of major mountain biking destinations in Colorado, and enhance the Western Slope as a world class mountain biking destination, rivaling or surpassing Moab.

Members of DAMB have long voiced concern with the fact that there are no official non-motorized trails in Delta County developed for mountain biking, and we as a user group are severely under represented. For that reason, the following section outlines a reasonable proposal for development of SRMA/ERMAs in the UFOs management area. Experiences and benefits specific to each area are included with the areas unique recreational opportunity.

**1.     Jumbo Mountain SRMA** – DAMB believes Jumbo Mountain is unique and could be the keystone recreational hub for the North Fork Valley. As a whole, we believe Jumbo Mountain provides a great location for recreation and visitor service management to be the predominant land use planning focus, as defined by a SRMA. Jumbo Mountain is geographically oriented in a prime location for users to enjoy high scenic values, low altitude trail networks that allow for longer riding season, and close to amenities and higher density population.

Specific experiences and benefits obtained by this management area would be ease of access for local and regional outdoor enthusiasts to a variety of front, middle, and backcountry terrain, diversity within trail system for all skill levels and abilities on non-motorized routes to be used daily by residents, promoting a quiet environment that would enhance the quality of life and health for residents and visitors locally and regionally, and lastly, provide a resource supporting recreation as an economic driver for Delta County.

By designating the entire Jumbo Unit as a SRMA, as outlined in Alternative B, diversification for multi-use opportunities would be possible. These could be delineated by specific Recreation Management Zones (RMZ). Specifically, we suggest expanding RMZ-1 and its proposed characteristics as listed on page J-27 and J-28 in appendix J, to encompass proposed area of RMZ-2. Furthermore, we suggest expanding RMZ-2 and its proposed characteristics to encompass the hatched area as shown on Figure J-4, appendix J.

**2.     North Delta SRMA** - DAMB requests the development of non-motorized singletrack trails in North Delta for mountain biking. Currently cyclists are not considered in the SRMA plan for North Delta. With consideration of our user group, cyclists could access Grand Mesa from Delta city limits on backcountry routes. A mountain bike trail created in this area would

BLM_0076600

mimic the 'Palisade Plunge' trail being developed in Mesa County, a potential destination trail taking cycling enthusiasts from high altitude of Grand Mesa down through multiple geographic regions to the town of Palisade. This trail concept partially has been adapted from 'The Whole Enchilada' in Moab, UT. This in part has proven to be effective in solidifying Moab as a world-class mountain bike destination.

**3.**   **Hotchkiss High School Area ERMA** – Recently DAMB has been working with the Nature Connection to create a master plan of trail networks adjacent to the Hotchkiss High School. This network will include youth oriented bike skill courses and singletrack on Parks and Rec land, and also development of a mountain bike course on Delta County School District property. With BLM property adjoining this location, this would be a great opportunity to expand trail networks to the south, creating a diversified trail network for all types of recreationalists. The Nature Connection plans to give kids and families easy access to mountain bike equipment, for short-term use, to gain experience in a sport that promotes good health, and opportunities of adventure. By developing a fun and exciting trail network on public lands in this area, residents of Delta County will have turn key access to a healthy sport that allows them access to the natural environment, opportunities to improve outdoor knowledge and self-confidence, improve outdoor recreation skills, and gain more understanding of our community's dependence and impact on public lands. DAMB asks that you protect this area for current and future use, with an emphasis on recreation, and designate these lands as an ERMA.

**4.**   **Youngs Peak SRMA, Crawford** – DAMB members and local residents recognize the great potential for the development of recreational non-motorized trails on Youngs Peak. It has great proximity to the community of Crawford, and its K-6 school where it would provide an optimal environment for kids, families, and residents to enjoy the fresh air and beautiful views of the West Elk Mountains. By designating this area as a SRMA, Delta County residents could quickly access the natural environment by means of a trail network that would have them engaging with nature within minutes of downtown Crawford. A well-designed trail network would provide an opportunity for this community to attract recreationalists from around the region, thus stimulating the economy by increased use of developed public lands in the area.

**5.**   **Elephant Hill/Lone Cabin SRMA** - Elephant Hill and Lone Cabin is a great location for the development of a SRMA, with close proximity to the town of Paonia and the Jumbo Mountain trail network. This area would provide citizens with a more remote backcountry experience, and create corridors which would allow access to the high country thru non-motorized trail networks extending into the National Forest. Being this area is so close to town and adjoining neighborhoods, trails on Elephant Hill and Lone Cabin area would quickly provide local residents the splendor of quiet and solitude of the outdoor environment.

**6.**   **Paonia State Park/Paonia Reservoir SRMA**- Members of DAMB and the North Fork Trail Advocacy Group (NFTAG) have been considering development of trails in Paonia State Park to provide a regional attraction and a destination for the mountain bike community. With the cooperation of the Colorado Parks and Wildlife, this area has great potential to provide a high country experience unmatched by any others in Western Colrado at this time. By creating an SRMA in this area, the BLM along with partners of CPW, USFS, DAMB and NFTAG, could tap into territory that is unique and would provide recreational opprotunities that would stand alone in in this region.

**7.**   **South Oak Mesa ERMA, Hotchkiss** – Developing recreational trails on Oak Mesa would allow the community of Hotchkiss close to town access of trails possessing all skill levels,

BLM_0076601

very similar to what is being built in the Ridgeway Area Trails. This location would be ideal for residents to explore the outdoors, and enjoy the fresh air and beautiful views into the North Fork Valley and beyond.

**8.**      **McDonald Mesa ERMA**– McDonald Mesa possesses a small amount of existing multi-use trails that could be developed into a much greater mountain bike trail network if designated as an ERMA. This country provides users great access to front, middle and backcountry, with its proximity to Forest Service land. An ERMA would coincide nicely with the proposed development of SRMA on Youngs Peak just to the south. This area would be developed with the more adventurous mountain biker and trail user in mind, with its diversity of slope aspect and geography.

**9.**      **Stevens Gulch ERMA, Paonia**–Developing a trail network in Stevens Gulch would greatly benefit the community of Paonia due to its proximity and access to varied natural terrain, and would present an opportunity to use old mining territory as the backbone of recreational trail development reaching into the National Forest.

As trail advocacy groups, DAMB, NFTAG, and COPMOBA would greatly value the opportunity to work with the BLM in making these designations a reality. We feel that if the correct measures are taken in developing these proposed recreational areas, great benefits would be established for all the communities involved, and reach beyond the boundaries of the Uncompaghre Field Office Management Area.

Thank you for consideration of our comment,


Jason Love
President, Delta Area Mountain Bikers


Sven Edstrom
COPMOBA Board Member
DAMB Committee Member


Scott Winans
President, Colorado Plateau Mountain Bike Trails Association

<p>To: Jamie Connell, BLM State Director</p>

<p>From:</p>

<p>RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office</p>

<p>Date:</p>

<p> </p>

<p>Dear Director Connell,</p>

<p> </p>

<p>As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP (comments dated: April 14, 2015 and January 2012), I respectfully submit the following protest. My contact information is:</p>

<p> </p>

<p>Tena Price</p>

<p>26559 Redlands Mesa Rd.</p>

<p>Hotchkiss, Co 81419     970-835-3545</p>

<p> </p>

<p>My protest addresses the following issues that I have raised in my previous comments:</p>

<p> </p>

<p>The negative impacts on ground water wells and the millions of gallons of water that will be permanently removed from the hydrologic cycle because of toxic chemicals injected during the gas and

oil extraction process and lack of an adequate required bond from gas and oil companies to be used to clean up and repair impacts on water and air quality in affected areas.  Also, the proposed RMP does not address impact on roads and infrastructure due to oil and gas development, and the impact on elk habitat. </p>

<p>Those issues are addressed in the following sections of the RMP:</p>

<p>Section 4.3.3 water resourced</p>

<p>Section 4.3.1 air quality and climate</p>

<p>Section 3.4.2 public health and safety</p>

<p>Section 4.3.5 fish and wildlife</p>

<p> </p>

<p>I believe the BLM has erred in adopting the Proposed RMP for the following reasons:</p>

<ul>

<li>Alternative E was improperly adopted and was not subject to public comments.

The proposed RMP reduces setbacks from water supplies, waterways, and areas with highly erodible and saline soils

The proposed RMP opened more of the federal mineral estate to oil and gas with giving adequate consideration to the impact this will have on infrastructure maintained by state and local governments</li>

</ul>

<p>For these reasons I respectively protest the proposed RMP and the sections I have outlined above</p>

<p>.</p>

<p>Sincerely,</p>

<p>Tena Price  Date: July 28, 2019</p>

BLM_0076604

To: Jamie Connell, BLM State Director

From: Aiyana R. White

38270 Stucker Mesa Rd.

Hotchkiss, CO 81419

(303)502-4090

RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office

July 29, 2019

Dear Director Connell,

I am a resident of the North Fork Valley, and previously submitted comments of the Draft RMP (comments dated: Nov 1, 2016). I respectfully submit the following protest.

My protest addresses the following issues that I have raised in my previous comments:

Water

Domestic Water Sources - The final plan must protect the health of the watershed for the greatest number of users. Our communities have invested countless dollars developing both domestic and agricultural water systems for their homes, farms and ranches. The final plan must exclude all oil and gas activities within a half-mile of all surface and ground domestic water sources, including municipal waters supplies, that risk being impacted by surface spills and well failure. Most of the domestic water sources in the North Fork Valley are surface springs and streams that are either on or near BLM lands affected by this plan.

The water source that feeds my home, the Stucker Mesa Domestic Water Company, has its source in three springs on BLM property, and flows down five miles of BLM to reach our neighborhood. Any oil or gas drilling on or near the springs or the pipeline could damage or contaminate our water source.

BLM_0076605

Irrigation water and agriculture - The final plan must protect local agriculture by excluding oil and gas activities within a quarter mile of ditches, domestic water decrees, dams, irrigation intakes, or canals. This is a minimum distance required to safeguard direct and rapid impacts from surface spills and other contamination from oil and gas activity.

Organic agriculture is a cornerstone of the north fork valley. I personally enjoy eating a diet largely comprised of local organic meats, fruits, vegetables, juices and wines.

Streams and surface water quality - The final plan must protect streams and surface water quality, protecting ecological resources, aquatic habitat, recreational attractions, water storage, and flood control by closing areas within a half mile of lakes, ponds, wetlands, and reservoirs to oil and gas activities including leasing. The final plan should also recognize that perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters are priority habitats with adequate protections from all surface activities.

Air

The final plan must protect the health of the airshed. The North Fork Valley is affected by daily up and down-valley winds and any oil and gas activities occurring in higher elevations could have direct impact on air quality at lower elevations, including from dust, methane, VOCs, ozone, and other particulates and gases hazardous to public health. The BLM does not have the adequate information to assess airshed impacts of oil and gas activities.

Economic Impacts

Recreation - River and trail recreation are a growing economic opportunity in the North Fork, with these industries bringing millions of dollars to communities in Colorado. The North Fork Alternative provides protection from oil and gas development for streams and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo Mountain area. These protections must be included in the final plan.

Scenic Viewsheds - The North Fork Valley sits at the very heart of the West Elk Loop Scenic Byway, world renowned for its scenery and rural character. Oil and gas development could jeopardize the scenic qualities of the area. The final plan should include Alternative B1, which provides the adequate protections for the Valley&rsquo;s scenic features.

From my home on the north side of the North Fork Valley, I have extensive views of Mt. Lamborn and Land&#39;s End. Any oil or gas development on the South side of the valley would impact my view,

making it such that every time I look out the window, I see scars on the mountains. Where once I saw beauty and inspiration, I would see reason for great sadness.

Real Estate - Real estate sales in the North Fork Valley continue to be driven by those seeking a rural, non-industrial, and agricultural lifestyle. The final plan must protect the investments locals have made in the value of their home and land, and should not allow for speculative oil and gas leasing which discourages homebuyers from purchasing in our communities, producing real and direct negative economic impacts on our communities.

Real estate values have skyrocketed in the Northfork Valley over the past three years, and homeowners and investors who have purchased during this time could suffer significant financial losses from the devaluing of real estate that would certainly follow oil and gas development.

Public health and safety

Traffic impacts - The final plan must adequately mitigate the traffic impacts of oil and gas activity within the North Fork of the Gunnison Watershed. Local residents rely on a handful of narrow state highways for daily transportation and emergency access. Oil and gas activities would significantly increase the number and frequency of oversized trucks and machinery transported on our highways, increasing the risk of accident and emergency vehicle blockage.

Seismic activity - New data indicates deep injection wells and other oil and gas activities increases seismic activities. The final plan must assess and mitigate potential impacts of human-caused earthquakes, particularly in the North Fork region which is prone to unstable soils and landslides.

Any seismic activity could have catastrophic impacts on both my domestic and irrigation water sources.

One of the springs that feeds our domestic water company is in a cave, which could collapse in the event of a human-caused earthquake. The loss of this one spring could be the difference between there being enough water for the members of our water company or not, as we barely have enough water at times, especially late fall.

Our irrigation company, the Roberts-Stucker ditch, recently invested around $100,000 to pipe portions of the ditch that are on a steep slope. Our late water comes from Overland Ditch and Reservoir Company, which recently upgraded its dam. We are currently still paying for this dam upgrade. Seismic activity could threaten both of these upgrades, destroying our water for likely the whole year. A break in

BLM_0076607

the Overland dam would not only deprive many ranches of water for the season, and have a huge fiscal impact to repair, it is also a danger to all lives downstream.

Recreation

Jumbo Mountain Trails - The BLM lands on and surrounding Jumbo Mountain are a well-used and well-loved recreation asset for North Fork residents. The final plan should include the entire Jumbo Mountain unit as a special recreation management area to protect the quality of the recreation experience. T

Hunting and Fishing - Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat are critical components that help sustain the multi-million-dollar hunting industry in the area.

Wildlife

Adobe Badlands - The final plan should protect all lands with wilderness characteristics, including the Adobe Badlands. This area is full of fascinating canyons, mesas and arroyos, and provides important connectivity between the Dominguez-Escalante National Conservation Area and pristine roadless lands in the Grand Mesa National Forest.

Stevens Gulch - The final plan must protect all lands with wilderness characteristics, including the areas up Stevens Gulch. This area is

Those issues are addressed in the following sections of the RMP:

<ul>

       <li>Alternative E in its entirety

       Section 3.4.2 Public Health &amp; Safety

       Section 4.3.1 Air Quality &amp; Climate

       Section 4.3.2 Soils &amp; Geology

       Section 4.3.5 Water Resources

BLM_0076608

Section 4.4.3 Fish &amp; Wildlife</li>

</ul>

I believe the BLM has erred in adopting the Proposed RMP for the following reasons:

<ul>

    <li>Alternative E was improperly adopted and was not subject to public comments.

The proposed RMP proposes to open 95% of its acreage to oil and gas leasing, even though 80% of the public comments urged a no lease alternative.

The proposed RMP fails to provide protections for ecological emphasis areas, raptor habitat, special status species habitat.

The proposed RMP disregards water quality by reducing setbacks from water supplies, waterways, areas with highly erodible and saline soils.

The proposed RMP does not include stipulations to ensure safe and healthy air quality for the residents of the area: human and animal alike.

The proposed RMP proposed oil and gas leases such that outdoor recreation will be negatively impacted.

The proposed RMP allows for a number of hydraulic fracturing wells that could create seismic activity, threatening critical local infrastructures, including the domestic and irrigation waters my family depends upon.</li>

</ul>

I demand that you adopt a no-lease alternative for the health of the people, the long term local economy, the waterways and watersheds, wildlife, and the enjoyment of public lands for the public.

Sincerely,

Aiyana R. White          July 29, 2019



# BOARD OF COMMISSIONERS

## HILARY COOPER   KRIS HOLSTROM   LANCE WARING

July 29, 2019

Director (210)
Attention: Protest Coordinator, WO-210
20 M St SE, Room 2134LM
Washington, D.C. 20003

Via electronic submission button (https://eplanning.blm.gov/epl-front-office/eplanning/comments/commentSubmission.do?commentPeriodId=77137) and overnight (non-USPS) delivery.

> RE: San Miguel County, Colorado Protest of the Proposed Resource Management Plan (PRMP) and Final Environmental Impact Statement (FEIS) for the Bureau of Land Management (BLM) Uncompahgre Field Office (UFO), June 2019

Dear Director,

Please accept this timely protest which is filed in accordance with 43 C.F.R. § 1610.5-2.

**Statement of Resource Management Plan Being Protested:**
We are protesting the Proposed Resource Management Plan (PRMP) and Final Environmental Impact Statement (FEIS) for the Bureau of Land Management (BLM) Uncompahgre Field Office (UFO) released to the public on June 28, 2019.

**This protest is submitted by the Board of County Commissioners (BOCC), San Miguel County, Colorado (SMC).**

> Protester
> **Name:** Board of County Commissioners, San Miguel County, Colorado
> **Address:** Via U.S. Mail – PO Box 1170, Telluride, CO 81435
> Via Delivery (non-USPS) – 333 West Colorado Avenue, 3rd Floor, Telluride, CO 81435
> **Phone:** 970-728-3844
> **Email:** bocc@sanmiguelcountyco.gov

●P.O. BOX 1170 ● Telluride, Colorado 81435 ● (970) 728-3844 ● www.sanmiguelcountyco.gov

**Statement of Protester's Interest:**

The San Miguel County (SMC) Board of County Commissioners (BOCC) are responsible for ensuring health, safety and welfare—including environmental health—within the County. Watershed health, soil health and protection of wildlife habitat are essential elements of San Miguel County. SMC has collaborated, cooperated and coordinated with federal land agencies on federal land planning and projects. Sixty percent of the land in San Miguel County is federal public land with another 4 percent being owned by the State of Colorado. Only 36 percent of San Miguel County consists of private land. San Miguel County is 70.6 percent federal mineral estate.

San Miguel County has assisted in the protection of thousands of acres of private lands with important wildlife habitat values, especially Gunnison sage grouse (GuSG) critical habitat, by participating in the acquisition of conservation easements intended to preserve and protect GuSG habitat. San Miguel County has financially contributed approximately $2 million for GuSG habitat conservation and improvements through the County's Land Heritage Program, co-funding of the Gunnison sage-grouse Working Group and funding of other actions intended to provide direct benefits to GuSG recovery and resilience. SMC continues to actively participate with the stakeholder group that developed the Gunnison sage-grouse Rangewide Conservation Plan and is currently participating in the U.S. Fish and Wildlife Service's 5-year species status review, Species Status Assessment, Recovery Plan and Collaborative Action Plan.

San Miguel County commissioned "A Natural Heritage Assessment San Miguel and Western Montrose Counties, Colorado," prepared by the Colorado Natural Heritage Program in 2000, which identified several areas having high biodiversity as Potential Conservation Areas (PCAs). [1] Citizens of San Miguel County have long recognized the need to plan for the conservation of plants and animals that are native to the San Miguel And Dolores River Basins and have demonstrated their desire to protect significant natural heritage and natural resources by organizing the San Miguel Watershed Coalition, San Miguel Conservation Foundation, San Miguel County Open Space Commission, San Miguel County Land Heritage Program and providing co-funding of collaborative groups such as the previously mentioned Gunnison sage-grouse Working Group and the Public Lands Partnership.

In addition, San Miguel County elected officials, staff and liaisons regularly and vigorously participate publicly and as a cooperating agency in federal public lands planning processes. We have participated throughout the BLM UFO RMP planning process as a cooperating agency and through official public comment periods. SMC has been a cooperating agency with BLM UFO for this RMP revision process since June 10, 2010 when an MOU was signed (attached). We are similarly a cooperating agency for the BLM Gunnison Sage-Grouse (GuSG) Resource Management Plan Amendment (RMPa) process (MOU attached) which was expected to amend or be inserted into the GuSG portion of this plan. We have a 2017 MOU with the UFO to emphasize continued SMC and UFO consultation, coordination, cooperation, collaboration and communication in land use actions and ratifying our partnership for the continued coordination and cooperation for implementation of the "Connecting with Communities" Recreation Strategy (attached). We

---

[1] http://www.cnhp.colostate.edu/download/documents/2000/San_Miguel_and_Western_Montrose.pdf

BLM_0076611

*San Miguel County, Colorado*

commented on the Section 368 Corridor Review (attached) which is reviewing an energy corridor that intersects San Miguel County and the UFO.

Additional recent and ongoing planning processes that SMC is actively participating in include the BLM Tres Rios Field Office (TRFO) RMP/FEIS; BLM TRFO Travel Area Planning (TAP) process; BLM TRFO Areas of Critical Concern (ACEC) RMP amendment process; Alpine Ranger coalition with the BLM, US Forest Service (USFS); the USFS Grand Mesa, Uncompahgre and Gunnison National Forests (GMUG) Forest Plan Revision process; USFS Spruce Beetle Epidemic and Aspen Decline (SBEADMR); Uncompahgre Collaborative Forest Restoration project and others.

Federal lands agency resource management plans and forest plans directly impact San Miguel County's mandate to provide health, safety and welfare services to our citizens and visitors. They impact our socio-economic opportunities, environmental quality and quality of life. We will continue to participate in the planning process for the BLM UFO RMP.

**Issues Being Protested:**

1. Excessive delay between the Draft RMP/EIS (DRMP/DEIS) and Proposed RMP/Final EIS (PRMP/FEIS) and development of a substantially new agency alternative without providing a public comment period.

2. Inadequate Public Comment opportunity without all supporting data and files being made publicly available for the full Protest Period.

3. References to the Gunnison sage grouse: The failure to make available the Biological Assessment (BA) and Biological Opinion (BO). A lack of clarity on which Alternative the BA and BO analyzed. Inadequate NEPA analysis and protections for Gunnison sage grouse and the designation of a Section 368 Energy Corridor that will negatively impact Gunnison sage grouse populations and habitat.

4. Inadequate NEPA analysis and protections for water bodies, aquatic, wetland, and hydrologic resources, source water protection areas, domestic water supplies and cultural resources for fluid mineral leasing and surface disturbing activities.

5. General Wildlife: Failure to follow Colorado Parks & Wildlife (CPW) recommendations and guidelines for wildlife species, including Gunnison sage grouse, aquatic species, desert bighorn sheep and big game migration corridors. Lack of consistency with CPW Best Management Practices (BMPs), species-specific stipulations and ungulate winter range protection. In all cases, BLM UFO RMP should require collaboration, coordination, cooperating and consulting with CPW on wildlife species and habitats.

6. San Miguel River: Inadequate visual resource management protection of the San Miguel River Corridor, adjacent Scenic Byways, and San Miguel River ACEC and inadequate management of lands within the proposed San Miguel River Expansion ACEC.

BLM_0076612

*San Miguel County, Colorado*

7. **Burn Canyon: Failure to appropriately manage Burn Canyon as a Special Recreation Management Area (SRMA) vs. an Extensive Recreation Management Area (ERMA) or provide management direction for appropriate visual resource management protection and protection of sensitive riparian areas from motorized or mechanized uses or surface occupancies.**

8. **Dolores River: Inadequate management direction to protect the lands within the analyzed Dolores River Slickrock Canyon ACEC to protect and prevent degradation of the significant natural, biological, cultural, recreational and scenic resources and values.**

9. **San Miguel River Segment 1 and Beaver Creek Segment ORVs are incompatible with hydro, solar, wind, and mineral development.**

10. **Lands Identified for Disposal: San Miguel County opposes Lands Identified for Disposal within San Miguel County that are within 4-miles of a Gunnison sage grouse lek, adjacent to or intersecting Gunnison sage grouse Critical Habitat, contain Public Rights-Of-Way, contain Lone Cone Reservoir and are adjacent to private land conserved for Gunnison sage grouse Habitat.**

11. **The Proposed PRMP/FEIS does not adequately consider the consequences of climate change.**

12. **Underlying analysis of uranium and other locatable minerals is factually incorrect which renders the analysis of the direct, indirect and cumulative impacts arbitrary, capricious and factually incorrect.**

**Detailed Discussion of Issues with Identification of Parts of the Plan Being Protested:**
Our discussion of each of these issues below provides a statement of the part(s) of the plan being protested (including Chapter, Section, Page and/or Map) with a concise statement explaining why the State Director's decisions are believed to be wrong.

**Excessive delay between the Draft RMP/EIS (DRMP/DEIS) and Proposed RMP/Final EIS (PRMP/FEIS) and development of a substantially new agency alternative without providing a public comment period.**
The Draft RMP/DEIS was released in 2016 and the Proposed RMP/FEIS was released in June 2019 with an entirely new Agency Preferred Alternative. The 30-day protest period does not provide adequate time for a thorough analysis or comparison of the alternatives, especially the previous Agency Preferred Alternative D and the new Preferred Alternative E. The 30-day protest period does not allow for public comment and restricts the ability to protest to those that have commented in the past and restricts content to issues that have been raised in the past. In the three years since the Draft RMP was released, there may be new stakeholders who should have the ability to comment on a Resource Management Plan that is intended to guide land-use

4

BLM_0076613

decisions for at least the next decade. Also, the release of a new Alternative may raise new issues that were not commented on in the past. Without adequate time for review, adequate analysis is not possible by the public and cooperating agencies.

The DRMP/DEIS was released for review May 20, 2016. San Miguel County commented on the DRMP/DEIS in October 2016. We received UFO agency responses to our October 2016 comments in April of 2018. The BLM Southwest Resource Advisory Council (RAC) examined a range of alternatives presented by UFO in February of 2013 and a more timely review should be allowed.

Volume 1, Page I-9 of the Proposed RMP states that following the introduction of the agency preferred alternative in the DRMP/DEIS there was a 150-day comment period incorporating a 60-day extension and six open houses in six Planning Area communities. In contrast, following the PRMP/FEIS with a NEW Alternative there is no opportunity for comment, minimal public outreach and no open houses.

Given the 30-day Protest Period, SMC worked diligently to review the over 4000-page document provided and requested additional information to improve our ability to analyze in the short period of time. GIS other supporting data and documents were not provided on a timely basis for us to adequately understand the potential impacts of the new Alternative.

***Requested Remedy:*** BLM should rescind the Proposed RMP and release the new Alternative as a Draft RMP with a 60-day comment period.

**Inadequate Public Comment opportunity without all supporting data and files being made publicly available for the full Protest Period.**
Issue Reference Citations:
- Volume I, Executive Summary, Page ES-1
- Volume I, Chapter 2, Page 2-5 and Table 2-2
- Volume II, Appendix A, Figures (Pages A1-A267)
- https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=86012
- https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=86011

The 30-day Protest Period was initiated by the publication of the official Notice of Availability in the Federal Register on Friday, June 28, 2019. At that time there were no GIS files newer than June 2016 available on the e-planning website[2]. There were no GIS data files for the new

---

[2] https://eplanning.blm.gov/epl-front office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=86004

BLM_0076614

proposed alternative. After SMC staff requested the current GIS files, they were made available on July 11, 2019. SMC staff identified at least one important supporting data file (Lands Identified for Disposal) still missing from the BLM's e-planning data web page[3]. This file was emailed to SMC staff on July 16, 2019, but as of July 21, 2019 is still not publicly available. Lands Identified for Disposal is a topic which was previously a SMC subject of concern and detailed comments from San Miguel County were provided for the agency preferred alternative to the DRMP/DEIS in 2016. The PRMP/FEIS maps in Volume II, Appendix A are at a scale that shows the entire UFO decision area across six counties. This scale is not conducive to reviewing a 40-acre proposed disposal parcel in context.

Additionally, this scale does not allow for examination of proposed actions and the proposed decision to inform comments and plan understanding. The BLM is required to consult with local governments and citizens regarding site-specific knowledge when making land-use decisions. GIS data files and interactive maps similar to the "Story Maps" made available online by the USFS as part of the Grand Mesa, Uncompahgre, and Gunnison National Forests Plan Revision are needed to examine how the proposed actions affect lands and resources and allow informed input to ensure the best land-use decisions.

Page ES-1 of the PRMP states, "This website contains background information about the project, a public involvement and project timeline, maps and relevant GIS data of the Planning Area, and copies of public information documents released throughout the RMP/EIS process."

This statement is not true and over half of the protest period has passed without the agency publicly posting relevant maps and GIS data to inform reviews of the new proposed alternative. All relevant supporting material upon which the agency's alternative has been based or which contains proposed management codes and administrative or designated area boundaries must be provided at the onset of the protest or public comment period.

There is a significant difference between the objective of Alternative D, the agency preferred alternative in the DRMP/DEIS which described incorporating a "balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land uses,"[4] and the new Proposed Alternative E, which is described by the BLM as a "reasonable combination of objectives and actions from A, B, C, and D"[5]. There is no rationale provided for this significant switch to determine if it is actually "reasonable." "Reasonable" is a subjective term that should not be used for an official Agency Preferred Alternative.
SMC would like the time to conduct a thorough GIS analysis of the Ecological Emphasis Areas, included in Alternative D and eliminated from Alternative E to determine any potential loss of protection of resources.

---

[3] https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=86012
[4] PRMP/FEIS Page 2-5
[5] PRMP/FEIS Page 2-5

BLM_0076615

***Requested Remedy:*** BLM should rescind the Proposed RMP based on the numerous substantive changes made to the alternatives without public and cooperating agency access to complete supporting materials and GIS files at the initial time of publication. Further supplemental analysis is required. An adequate public comment period is warranted due to the introduction of a new Alternative and lack of supporting documentation for review. **All** supporting background and data should be publicly available at the beginning of the comment period or protest period.

**References to the Gunnison Sage Grouse: The failure to make available the Biological Assessment (BA) and Biological Opinion (BO). A lack of clarity on which Alternative the BA and BO analyzed. Inadequate NEPA analysis and protections for Gunnison sage grouse and the designation of a Section 368 Energy Corridor that will negatively impact Gunnison sage grouse populations and habitat.**

Issue Reference Citations:

- Volume I, Pages 1-8, 1-9, 2-38, 2-113, 2-129, 2-130, 3-45, 3-48, 3-52, 3-59, 3-62, 4-13, 4-126, 4-128, 4-129, 4-133, 4-138, 4-141, 4-144, 4-148, 4-149, 4-176, 4-362, 4-363, 4-364, 4-365, 4-366, 4-370, 4-371, 4-372, 4-373, 4-374, 4-375, 4-376, and 4-474
- Volume I, Appendix A, Figure 2-92
- Volume I, Appendix B (all)
- Volume II, Chapter 5, Page 5-2
- Volume III, Appendix T, Pages T-113, T-114, T-115, T-116, T-117, T-235, T-239, T-244, T-245, T-251, T-255, T-256, T-259, T-408, T-409, T-412, T-464, T-465, and T-466

The Gunnison sage grouse (GuSG) was listed as a threatened species under the Endangered Species Act (ESA) by the U.S. Fish and Wildlife Service on November 20, 2014 (79 Fed. Reg. 69192).

San Miguel County, a Cooperating Agency, and the general public are denied the opportunity to adequately review the new Proposed Alternative E in the PRMP/FEIS for GuSG and habitat impacts. It is unclear how the proposed actions in the PRMP/FEIS were contemplated by the BLM's referenced Biological Assessment, which has not been made available or contemplated by the USFWS's Biological Opinion (BO), referenced in the PRMP/FEIS as having been signed on December 17, 2018, and also not provided for review.[6] The PRMP/FEIS was published in the Federal Register on June 28, 2019. A Biological Opinion is a document prepared by USFWS stating their opinion as to whether or not a federal action will likely jeopardize the continued existence or adversely modify the habitat of a listed threatened or endangered species.

According to the PRMP/FEIS (page 5-2), the Biological Opinion was issued "concurring with the determinations that the Proposed RMP: 1) may affect, but is not likely to adversely affect, the greenback cutthroat trout, Mexican spotted owl, western yellow-billed cuckoo, Colorado

---

[6] Biological Opinion – Revision of the Resource Management Plan for the Uncompahgre Field Office. Western Slope Supervisor, US Department of the Interior, Fish and Wildlife Service, Ecological Services, Grand Junction, CO. December 17, 2018.

BLM_0076616

pikeminnow, razorback sucker, bonytail, and humpback chub; and 2) may affect, and is likely to adversely affect, Colorado hookless cactus, clay-loving wild buckwheat (including designated critical habitat), and Gunnison sage grouse (including designated critical habitat) (USFWS 2018d)."

In 2016, San Miguel County provided substantial comments on the DRMP/DEIS treatment of the GuSG and critical habitat, which took into consideration that there was a more robust Gunnison Sage Grouse Rangewide RMP Amendment process underway which was considering making all GuSG critical habitat an Area of Critical Environmental Concern and was considering protective stipulations for not just BLM lands designated as habitat and/or within 4-miles of GuSG leks, but also split estate.

At the time of release of this PRMP/FEIS, the Gunnison Sage Grouse Rangewide RMP Amendment has been canceled and the process ended. This new situation changes the context and importance of comments and input into the need for necessary land protection, resource allocation and stipulations to protect and enhance GuSG populations and habitat within the UFO.

San Miguel County desired the GuSG Rangewide RMP Amendment[7] to modify and strengthen the UFO RMP measures after completion of this UFO RMP. Although we have not had adequate time to thoroughly review the PRMP/FEIS we do find that it allows for discretion to waive the protective stipulations that are present in the new Proposed Alternative E.

San Miguel County has been participating in the Section 368 West Wide Energy Corridor review process[8] since the DRMP/DEIS was released. SMC recommended relocation of the corridor going north-south through SMC because it would have significant negative impacts on GuSG. SMC provided these comments to responsible officials at the UFO and discussed them in-person in 2018.

We are attaching our comments on both the Section 368 West Wide Energy Corridor and the GuSG Rangewide RMP Amendment DRMP/DEIS.

### Requested Remedies:

1.      Provide the BLM's Biological Assessment and the USFWS Biological Opinion for review and clarify whether the BO was based on the June 28, 2019 PRMP/FEIS or a different alternative.  UFO should incorporate any recommendations of the Biological Opinion into the PRMP/FEIS.  Cooperating Agencies and the public should be allowed to comment on the new Proposed Alternative E within the current context of no forthcoming GuSG

---

[7] https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=renderDefaultPlanOrProjectSite&projectId=39681
[8] http://corridoreis.anl.gov

BLM_0076617

*San Miguel County, Colorado*

Rangewide RMP Amendment. This PRMP/FEIS fails to adequately protect GuSG or address split estate.

2.   The UFO should fully follow and incorporate the recommendations of the Biological Opinion for GuSG[9] and the 2005 Rangewide Conservation Plan[10] which include:

   a.   *Protect occupied habitats from permanent loss. If permanent habitat loss from development (primarily) or conversion is not addressed, successful implementation of all the other conservation strategies is not likely to be successful in conserving GUSG. An equally important strategy is preventing significant degradation, whatever the cause, of existing habitat that is seasonally important to GUSG.*

   b.   *Coordinate with Colorado Parks & Wildlife in their effort to stabilize existing populations demographically and genetically through augmentation, and establish new populations in suitable historically occupied habitats (i.e., unoccupied critical habitat).*

   c.   *Improve habitat within currently occupied and adjacent potential habitats.*

   d.   *Protect suitable unoccupied habitat areas from permanent loss.*

   e.   *Improve habitat conditions within unoccupied habitat, which will accommodate item 2 above.*

3.   The BLM should not allow stipulations intended to protect GuSG to be available for administrative waivers, exceptions and modifications without clear criteria and process. The UFO RMP Proposed Alternative should follow the following guidance of the Biological Opinion[11]:

***Fluid Minerals - When considering waivers, exceptions, and modifications within NSO designated areas, we recommend implementing the criteria developed for the Northwest Colorado Greater Sage-Grouse RMPA as follows:***

*\*\*Exceptions or modifications may be considered if, in consultation with the State of Colorado, it can be demonstrated that there is no impact on Gunnison sage-grouse based on one of the following:*

   1.   *Topography/areas of non-habitat create an effective barrier to impacts*

   2.   *No additional impacts would be realized above those created by existing major infrastructure (for example, State Highway 50).*

   3.   *The exception or modification precludes or offsets greater potential impacts if the action were proposed on adjacent parcels (for example, due to land ownership patterns).*

*\*\*In order to approve exceptions or modifications to this lease stipulation, the Authorized Officer must obtain: agreement, including written justification, between the BLM District Managers and CPW that the proposed action satisfies at least one of the criteria listed above*

---

[9] Biological Opinion – Revision of the Resource Management Plan for the Uncompahgre Field Office. Western Slope Supervisor, US Department of the Interior, Fish and Wildlife Service, Ecological Services, Grand Junction, CO. December 17, 2018; Pages 27-28

[10] https://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx

[11] Biological Opinion – Revision of the Resource Management Plan for the Uncompahgre Field Office. Western Slope Supervisor, US Department of the Interior, Fish and Wildlife Service, Ecological Services, Grand Junction, CO. December 17, 2018; Page 28

BLM_0076618

*San Miguel County, Colorado*

*Waivers - No waivers are authorized unless the area or resource mapped as possessing the attributes protected by the stipulation is determined during collaboration with the State of Colorado to lack those attributes or potential attributes. A 30-day public notice and comment period is required before waiver of a stipulation. Waivers would require BLM State Director approval.*

*•Incorporate "Available Conservation Measures" and "Overarching Conservation Objectives" found in the GUSG final listing rule (79 FR 69192, p. 69305-69309).*

> 4.  *Incorporate the management prescriptions and protective ACECs developed for the Gunnison sage grouse Rangewide RMP Amendment into the UFO RMP, since the Gunnison Sage-Grouse Rangewide RMP process is no longer active. BLM and Cooperating Agencies invested many years into researching and developing that RMP. See Attachment 3.*

> 5.  *Un-designate or relocate the portion of the Section 368 West Wide Energy Corridor that goes through San Miguel County. There is no ROW on non-federal land that will not significantly impact GuSG habitat.  See Attachment 4.*

**<u>Inadequate NEPA analysis and protections for waterbodies, aquatic, wetland, and hydrologic resources, source water protection areas, domestic water supplies and cultural resources for fluid mineral leasing and surface disturbing activities.</u>**
Issue Reference Citations:
- Chapter 2, Pages 2-8 to 2-11, under the headers of Fluid Mineral Leasing, Restrictions for Surface-disturbing Activities, and Locatable Minerals, Mineral Materials, and Non-energy Solid Leasable Minerals
- Appendix B: Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities constitute an entirely new Alternative

The fluid mineral leasing acreage in the new Proposed Alternative E, retains the same open and closed acreage as Alternative A, the current condition. The current RMP predates the concerns for Canada lynx, Gunnison sage grouse and many new conditions that have developed, including new science and data regarding climate change. There is no explanation for the changes in the new Proposed Alternative E.  The acreage identified for NSO is significantly reduced in the new alternative. Omission of stipulations NL-8 (Page B-9), NSO-6/SSR-8 (Page B-17), NSO-9/SSR-11 (Page B-18), NSO-11/SSR-13 (Page B-19), NSO-19/SSR-16 (Page B-23), NSO-31/SSR-32 (Page B-128), NSO-69 (Page B-52), CSU-16 (Page B-63), ad CSU-23/SSR-26 (B-67) are inadequate for protection of special resources.

***Requested Remedy:***  The fluid mineral leasing acreage significantly changes from Alternative D to Alternative E and the BLM must allow for adequate public comment and re-consider Cooperating Agency input prior to a protest period for this new Proposed Alternative which significantly reduces protections for hydrologic, aquatic, riparian, water supply resources, as well as cultural

BLM_0076619

and wildlife resources.  Colorado Parks and Wildlife guidelines and standards need to be followed.

**General Wildlife: Failure to follow Colorado Parks & Wildlife recommendations and guidelines for wildlife species, including Gunnison sage grouse, aquatic species, desert bighorn sheep and big game migration corridors. Lack of consistency with CPW Best Management Practices (BMPs), species-specific stipulations and ungulate winter range protection. In all cases, BLM UFO RMP should require collaboration, coordination, cooperating and consulting with CPW on wildlife species and habitats.**

Issue Reference Citations:

- Volume I, Chapter 2
- Volume I, Table 2-2, especially, but not limited to Fish & Wildlife, Special Status Species, and Livestock Grazing
- Volume II, Chapters 4-5 and Appendix B
- Volume III, Appendix K
- Volume IV, Appendix T, Description of Alternatives

San Miguel County works closely with State of Colorado wildlife biologists and CPW staff to ensure the protection of wildlife and habitat in the county. The Final RMP should fully incorporate protective stipulations including NSO's, timing limitations and best management practices in collaboration and consultation with CPW. San Miguel County continues to support Alternative D's overall direction on Page 2-127: "Alternative D's overall management direction is similar to Alternative B, with additional direction to promote ecosystem integrity and protect and restore ecosystem processes. As a result, Alternative D would reduce adverse impacts on special status species, compared with Alternative A, and would provide beneficial impacts through active management to restore and enhance habitats."  In contrast, Alternative E, through the seemingly less restrictive Controlled Surface Use stipulation reduces protections according to the overall management direction on Page 2-127: "The BLM's overall management direction and associated impacts would be similar to Alternative D, although across fewer acres and with less-protective stipulations (i.e., CSU versus NSO)."

***Requested Remedy:*** Incorporate the additional details for desired conditions, standards suggested by CPW and best management practices related to the management, preservation, and consideration of fish and wildlife species and habitat. Fully incorporate previous CPW requests offered during the DRMP/DEIS comment period on Alternative D, through their specific comments on GuSG, aquatic species, bighorn sheep, land health standards and stipulations for fluid mineral leasing and other surface disturbing activities.

**San Miguel River: Inadequate visual resource management protection of the San Miguel River Corridor, adjacent Scenic Byways, and San Miguel River ACEC and inadequate management of lands within the proposed San Miguel River Expansion ACEC.**

Issue Reference Citations:

- Volume I, Page 2-160 to 2-161

BLM_0076620

*San Miguel County, Colorado*

- Volume II, Appendix B
- Volume IV, Page T-490 and T-491
- Volume I, Appendix A: Figures 2-84 [Alternative B], 2-85 [Alternative C], 2-86 [Alternative D], and 2-103 [Alternative E]
- Index, Page I-1, Entire list of ACEC references as they apply to the San Miguel River and San Miguel River Expansion ACECs.

The lands within the existing San Miguel River ACEC currently have a visual resource management protection level of VRM-II (V-2). The Proposed Alternative will change that to VRM-III (V-3). The PRMP/FEIS will treat the San Juan Skyway as VRM Class III and Unaweep/Tabeguache Byway as VRM Class III within 0.5 mile of the road. Visual resources are extremely important to San Miguel County's economy, tourism, and quality of life (see Attachments 1 and 2). The San Miguel River Canyon should be given the greatest possible visual resource management level, no less than a VRM-II.

The BLM describes VRM-II class and objective as follows: "To retain the existing character of the landscape. Allowed Level of Change: The level of change to the characteristic landscape should be low. Management activities may be seen, but should not attract the attention of the casual observer. Any changes must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape." VRM Class III Objective is described as follows: "To partially retain the existing character of the landscape. Allowed Level of Change: The level of change to the characteristic landscape should be moderate. Management activities may attract attention, but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape."[12]

Proposed Alternative E removes the stipulation presented in Alternative D for excluding wind, solar, and hydropower from the San Miguel River ACEC and changes it to avoidance. We have not had adequate time for review of these new and significantly changed stipulations and how they will be put into practice. Due to the strong support from our business, recreation and conservation communities, we continue to support the exclusion of any impacts that would alter the native character and scenic beauty of the San Miguel River corridor and its scenic, recreational, vegetation and wildlife values.

To provide cohesive management and avoid conflicts with recreation and ecological values of the San Miguel River Canyon, San Miguel County believes the final alternative and decision should include the San Miguel River Expansion ACEC and the protective management stipulations described in Alternative B of the DRMP/DEIS.

***Requested Remedy:*** Manage the San Miguel River ACEC and lands within the San Juan Skyway and Unaweep/Tabeguache Byway as VRM Class II. It is unacceptable to diminish the VRM Class and objective of these lands so that objective is to only "partially retain" the existing scenic

---

[12] http://blmwyomingvisual.anl.gov/vr-mgmt/blm/index.cfm

BLM_0076621

character. Incorporate the management prescriptions and designate the San Miguel River Expansion ACEC as described in Alternative B.

**Burn Canyon: Failure to appropriately manage Burn Canyon as a Special Recreation Management Area (SRMA) vs. an Extensive Recreation Management Area (ERMA) or provide management direction for appropriate visual resource management protection and protection of sensitive riparian areas from motorized or mechanized uses or surface occupancies.**

Issue Reference Citations:

- Volume I, Page 2-11, 2-84 to 2-91, 3-112, 3-113, 4-6, 4-212, 4-276, 4-283, 4-284, 4-291, 4-296, 4-298, 4-305
- Volume II, Appendix B
- Volume IV, Appendix T
- Index, Page I-3, I-4, and I-8, Entire lists of SMRA and ERMA references as they apply to the Burn Canyon SMRA or Burn Canyon ERMA

In our previous comments, San Miguel County requested to have Burn Canyon managed as an SRMA vs and ERMA, primarily to retain the sensitive riparian areas in the drainages as non-motorized areas. We requested that if the Burn Canyon is managed as an ERMA, it be given a clear NSO, with the riparian areas in the canyons closed to motorized and mechanized uses. We requested that these areas have VRM-II to further protect the scenic resources. The Proposed Alternative E significantly alters the previous Agency Alternative and removes stipulations for CSU. This is a major change of use in areas considered during the trail planning stages for Burn Canyon to be sensitive habitats which should be avoided.

Burn Canyon and Naturita Canyon were analyzed in Alternative B as Ecological Emphasis Areas. San Miguel County recommended in our 2016 comments (Attachment 2) that the full Naturita Canyon EEA as described in Alternative B and stipulations for the Burn Canyon EEA and the Naturita Canyon EEA presented in Alternative B be incorporated into the final alternative and decision.

***Requested Remedy:*** Burn Canyon should be managed to limit recreational activities to non-motorized, non-mechanized, backcountry primitive types of recreation in the sensitive scenic and riparian areas within the canyon terrain. These areas should be VRM-II. See Attachments 1 and 2. SMC continues to support the management stipulations for the Naturita Canyon EEA and Burn Canyon EEA, as described in Alternative B of the DEIS/FEIS.

**Dolores River: Inadequate management direction to protect the lands within the analyzed Dolores River Slickrock Canyon ACEC to protect and prevent degradation of the significant natural, biological, cultural, recreational and scenic resources and values.**

Issue Reference Citations:

- Volume I, Chapter 2, Including Table 2-2
- Volume II, Chapter 4, Tables 4-69 through 4-72

13

- Volume IV, Appendix T
- All references to Dolores River Slickrock Canyon ACEC and SRMA in Volume II, Index Pages I-1 and I-8.

Management of the Dolores River Slickrock Canyon ACEC should  protect and prevent damage to the significant "scenic, cultural and paleontological resources, desert bighorn sheep, peregrine falcon, roundtail chub and sensitive plant communities, including sensitive species Kachina daisy and Naturita milkvetch. Not including recognition or protection for these resources, plants and animals will likely result in the degradation of significant natural, biological, cultural, recreational and scenic values that are unique to the Dolores River Slickrock Canyon. SMC continues to support the Dolores River Slickrock Canyon ACEC considered in Alternative B of the DRMP/DEIS which was adequate to protect the unique landscape and ecosystems of this section of the Dolores River. SMC continues to support the following stipulations for this section of the Dolores River; ROW exclusion, No Lease, No Ground Disturbance, No Recreational Mining, No Commercial Seed Collection, No Commercial Wood Collection, No Campfires, Camping Only In Designated Sites, Petition Sec of Interior to withdrawal for locatable minerals and exclusion from hydro, solar, and wind energy developments.

***Requested Remedy:***  At a minimum, return to the management levels contained in Alternative D and summarized on Page T-49 and designate a Dolores River Slick Canyon ACEC, which provides a balance between the management levels warranted and other input:
"Manage 9,780 acres as the Dolores River Slickrock Canyon ACEC to protect scenic values, cultural and paleontological resources, desert bighorn sheep, peregrine falcon, roundtail chub, and plant communities and the BLM sensitive species Kachina daisy and Naturita milkvetch. Management actions are as follows:
- Close to motorized and mechanized travel.
- Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, restrooms, barricades and fences, as needed for resource protection.
- Allow dispersed camping unless otherwise posted.
- Prohibit open campfires: require use of fire pans, stoves, or grills.
- Allow on-site collection of dead and downed wood for campfires (fire pans, stoves, or grills required), unless monitoring indicates a need for change.
- Close to wood product sales and/or harvest.
- Require porta-potties for overnight use if restroom is not available.
- Manage as VRM Class II.
- Allowable Use: **STIPULATION** NSO-58/ SSR-57: *Special Designation ACEC*. Prohibit surface occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix B.)
- Manage as ROW avoidance.
- Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry.
- Allowable Use: Close to mineral materials disposal.
- Allowable Use: Close to non-energy solid mineral leasing.

BLM_0076623

The Dolores River SRMA offers some management protection for a lesser extent of the Dolores River Slickrock Canyon, however, stipulations for fluid mineral leasing and other surface disturbing activities are subject to administrative waiver or modification where they would be in effect and if allowed could severely degrade the unique and sensitive conditions of the Dolores River Slickrock Canyon area.

**San Miguel River Segment 1 and Beaver Creek Segment ORVs are incompatible with hydro, solar, wind, and mineral development.**
Issue Reference Citations:
- Wild and scenic river (WSR), 1-5, 2-124, 2-157, 3-118, 3-128, 3-129, 4-47, 4-60, 4-83, 4-104, 4-107, 4-148, 4-193, 4-209, 4-301, 4-313, 4-321, 4-396, 4-400, 4-405, T-25, T-43, T-49, T-163
- Volume II, Appendix A, Figures
- Appendix P

Similar to Alternative D of the DRMP/DEIS, new Proposed Alternative E finds the San Miguel River Segment 1 is Suitable and recommended for a Recreational classification with Scenic, Recreational, Wildlife, Historic, Vegetation, and Paleontology Outstandingly Remarkable Values (ORVs). Beaver Creek is Suitable and recommended for a Recreational classification with Vegetation ORV.  Unlike Alternative D, the protective stipulations provided in the new Alternative E omit exclusion of hydro, solar, or wind energy. This will allow inappropriate and incompatible development of marginal renewable energy resources in these segments.

***Requested Remedy:*** Retain the stipulations that exclude wind, solar, and hydro from Beaver Creek and San Miguel River Segment 1. Review Attachment 1 and consider the list of stipulations that are warranted for these segments and the lands within the San Miguel River ACEC, San Miguel River Expansion ACEC and San Miguel River SRMA. These stipulations provide appropriate and warranted protection and management for these areas which provide irreplaceable scenic beauty, ecological services that protect watershed and forest health, habitat and recreation opportunities that are important to our environmental quality and economy.

**Lands Identified for Disposal: San Miguel County opposes Lands Identified for Disposal within San Miguel County that are within 4-miles of a Gunnison sage grouse lek, adjacent to or intersecting Gunnison sage grouse Critical Habitat, contain Public Rights-Of-Way, contain Lone Cone Reservoir and are adjacent to private land conserved for Gunnison sage grouse habitat.**
Issue Reference Citations:
- Volume III, Appendix N, Page N-6
- Volume II, Appendix A, Figure 2-62 and Table 2-2 (Page 2-12)

Three parcels are in the PRMP/FEIS proposed alternative as Lands Identified for Disposal within San Miguel County on Page N-6:

BLM_0076624

*San Miguel County, Colorado*

N. Legal Descriptions of Lands Identified for Disposal

| Township | Range | Section | Aliquot Lot Tract | Acres | Alt A | Alt B | Alt C | Alt D | Alt E BLM Proposed |
|----------|-------|---------|-------------------|-------|-------|-------|-------|-------|---------------------|
| 43 N | 13 W | 12 | NESW | 40 | No | Yes | No | Yes | Yes |
| 44 N | 13 W | 24 | NESE | 40 | Yes | Yes | Yes | Yes | Yes |
| 44 N | 13 W | 35 | NWSW | 40 | Yes | Yes | Yes | Yes | Yes |

The three parcels are within Lone Cone and Gurley Reservoir areas. The parcel within T43 N R13 W Section 12 intersects Lone Cone Reservoir and is surrounded by Gunnison sage grouse critical habitat (Figure VIII.a below). The parcel is within 0.25 miles of the active Lone Cone Lek complex. It is less than one mile from a historic lek. Due to the conflicts with existing uses, water rights, access and Gunnison sage grouse critical habitat, San Miguel County opposes this action.

The parcel within T44 N R13 W Section 35 intersects and is adjacent to Gunnison sage grouse critical habitat (Figure VIII.a below). The parcel is within 1.25-1.5 miles of the active Lone Cone Lek complex and an additional historic lek. It is surrounded by private land with a conservation easement in place to protect Gunnison sage grouse habitat. There is a BLM route (undesignated) on this parcel and aerial imagery shows tracks that connect to adjacent land. Due to the conflicts with existing uses, access, and Gunnison sage grouse critical habitat and lands conserved for Gunnison sage grouse, San Miguel County opposes this action.

The parcel within T44 N R13 W Section 24 is adjacent to private land with a conservation easement in place to protect Gunnison sage grouse habitat (Figure VIII.a below). The parcel is within 3-4 miles of the active Lone Cone and Beaver Mesa Lek complex and additional historic leks. There is a BLM route (undesignated) on this parcel and aerial imagery shows tracks that connect to adjacent land.  Due to the conflicts with existing uses, access, and Gunnison sage grouse critical habitat and lands conserved for Gunnison sage grouse, San Miguel County opposes this action.

San Miguel County is opposed to any land disposal that interferes with public or private land access, water rights and irrigation and the protection of Gunnison sage grouse habitat or populations. The GIS shapefile of the Lands Identified for Disposal was not made publicly available for the protest period or for the 2016 DRMP/DEIS, which should be considered to be a procedural error.

BLM_0076625

*San Miguel County, Colorado*



Figure VIII.a: Showing the locations of the three parcels identified for disposal in the new Proposed Alternative

> ***Requested Remedy:*** BLM should not include the three parcels above within San Miguel County as "Lands Identified For Disposal" in the final decision due to conflicts with existing water rights and Lone Cone Reservoir, conflicts with existing access routes between public and private lands and conflicts with Gunnison sage grouse habitat conservation.

17

BLM_0076626

*San Miguel County, Colorado*

**The Proposed PRMP/FEIS does not adequately consider the consequences of climate change.**
Alternative E does not acknowledge climate change, make climate change a priority, nor in any substantial way include an analysis of climate impacts of any of the alternatives.
***Requested Remedy***: An adequate PRMP/FEIS must, at a minimum, include a carbon emission reduction plan that is demonstrably consistent with the efforts of the State to meet the State's climate and carbon emission reduction goals.

**Underlying analysis of uranium and other locatable minerals is factually incorrect which renders the analysis of the direct, indirect and cumulative impacts arbitrary, capricious and factually incorrect.**

**Issue Reference Citations:**
- **Volume 1, Chapter 2, 3 & 4**

The current status of the public lands and the likelihood of uranium mining within the project area is set out in Federal District Court Judge Martinez's March 18, 2019 Order (see attachments A-D) dissolving the injunction on lease tracts within the UFO jurisdiction where Dpt of Energy (DOE) manages the minerals and BLM manages the surface. The PRMP/FEIS relies on outdated information and analysis based on the now-invalidated Pinon Ridge Mill license. As stated in the Martinez ruling (page 11): "[T]he supplemental BA [the US Fish and Wildlife Service prepared for the uranium lease tracts jointly managed by BLM and DOE] plausibly and adequately explains why the Piñon Ridge Mill will likely never be constructed, and why substantial uranium mining is not likely to occur anyway". The Pinon Ridge license was revoked by Colorado regulators on April 26, 2018, based on the April 17, 2018 findings entered by Hearing Officer Dana, pursuant to the September 3, 2014 remand order of the Colorado District Judge McGahey that held the license in abeyance. Federal Judge Martinez's Order further confirms that "the only potential location that ULMP-generated uranium ore could be milled is the White Mesa Mill near Blanding, Utah, roughly 100 miles from Paradox Valley." (page 11). Both of Judge Martinez's conclusions - uranium mining is not likely, and White Mesa is the only potential mill for ore mined from the project area -  must be applied to analysis of all uranium mines, whether part of the relocatable minerals BLM leads or the DOE lease program that BLM serves as the surface management agency.

The PRMP/FEIS - and particularly the decision to adopt the new Alternative E - is devoid of accurate direct, indirect and cumulative impacts analysis of the current legal status or actual conditions that have changed since the DRMP/DEIS was issued.

Due to the lack of time for an adequate review of Preferred Alternative E and the considerable time that has elapsed between the initiation of this RMP Revision and the delay between the DRMP and PRMP/FEIS, we assume there are additional errors of fact, due to lack of current information.

18

**Requested Remedy:** Based on the considerably extended ten-year planning process for this RMP, we request that the BLM restart the planning process in order to allow for factually correct and current information used to conduct the thorough analysis needed to develop the ultimate preferred Alternative. We also continue to request that the public and cooperating agencies have adequate time to review and comment on all alternatives.

**List of attachments submitted to BLM UFO and DOI during the planning process by San Miguel County:**

1. April 23, 2018: Letter from San Miguel County to UFO.
2. October 31, 2016: Comments from San Miguel County to UFO on the DRMP/EIS.
3. January 9, 2017: Comments by the San Miguel County, Colorado Board of County Commissioners regarding the Gunnison Sage Grouse Rangewide Draft Resource Management Amendment/Draft EIS ("GuSG DRMPa"); 81 Fed. Reg. 53503 (August 12, 2016)
4. February 28, 2018: Section 368 West-Wide Energy Corridors Region 2 Review Cooperating Agency Agreements demonstrating SMC is an interested and engaged party:
   a. June 10, 2010, MOU Between SMC and BLM UFO to be a Cooperating Agency for the RMP revision
   b. September 4, 2014, MOU Between SMC and Colorado BLM to be a Cooperating Agency for the Gunnison Sage Grouse EIS
   c. May 3, 2017, MOU Between SMC and BLM UFO establishing a mechanism for consultation, coordination, cooperation, collaboration and communication in land use actions and ratifying our partnership for the continued coordination and cooperation for implementation of the "Connecting with Communities" Recreation Strategy.

**List of additional attachments:**

A. A.Doc 166 Order Dissolving.pdf
B. B.12A1318b Findings Conclusions and Ruling on Remand
C. C.Radiation Management - State Licensing - Revocation - Colorado Radioactive Materials License Number CO 1170-01-1
D. D.Order RE_ Energy Fuels Resources Corporation's Motion to Remand to Hearing Officer

**In summary, the State Director's decision does not comply with NEPA, FLPMA or MOU's signed with San Miguel County, does not consider local land use jurisdiction and contains analysis lacking accurate direct, indirect and cumulative impacts.**

Ther agency preferred alternative introduced in the DRMP/DEIS was shaped through considerable public and cooperating agency input over a six-year period. Volume IV, Section 5.2, Page 5-2 states, "The BLM implemented an extensive collaborative outreach and public involvement process that has included conducting a community assessment (BLM 2009f), coordinating with cooperating agencies, and working closely with the Colorado Southwest Resource Advisory Council and a specially created and sanctioned subgroup of the resource

BLM_0076628

advisory council. ***The BLM will continue to meet with interested agencies and organizations throughout the planning process, as appropriate, and will continue coordinating closely with cooperating agencies and the resource advisory council subgroup.*** [Emphasis added].

Section 5.24, Pages 5-2 to 5-4 also state that, "The BLM invites agency cooperation early in the RMP process using the process outlined in 43 CFR 1501.6. A cooperating agency is any federal, state, or local government agency or Indian tribe that enters into a formal agreement with the lead federal agency to help develop an environmental analysis. More specifically, cooperating agencies "work with the BLM, sharing knowledge and resources, to achieve desired outcomes for public lands and communities within statutory and regulatory frameworks" (BLM Land Use Planning Handbook H-1601-1; BLM 2005a). ***The primary role of cooperating agencies during the planning process is to provide input on issues for which they have a special expertise or jurisdiction.*** [Emphasis added].

The UFO has not satisfied the stated Purpose of the MOU or followed through on certain stated Roles and Responsibilities listed in the Memorandum of Understanding Between San Miguel County and the Bureau of Land Management Uncompahgre Field Office (MOU). In the MOU signed in June 2010 (Attachment 5(a)), the BLM provided in the Purpose that, "…the BLM recognizes a compelling need to ensure that the interests of San Miguel County are accounted for, and that they are meaningfully engaged in…resource management planning effort and associated EIS."

The UFO Roles and Responsibilities are listed in Section V.A(i-iv) of the document:

## V.   ROLES AND RESPONSIBILITIES

### A.  RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i.   To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii.  To provide San Miguel County with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,

- identifying or providing data that is suitable, available and relevant to the planning effort,

- reviewing and commenting on draft sections of the EIS for which San Miguel County provided input due to its special expertise.

iii. To consider and incorporate information and comments provided by San Miguel County into EIS documents to the extent possible and where appropriate.

iv.  To make all final determinations regarding the content of the EIS document.

The San Miguel County Roles and Responsibilities are listed in Section V.B(i-vii) of the document:

BLM_0076629

## B. RESPONSIBILITIES OF SAN MIGUEL COUNTY

San Miguel County has special expertise in a number of areas related to planning, and as such, is responsible for the following:

i.   Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii.  To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii. To provide data of potential relevance and value to the RMP revision/EIS effort. This data may include but is not limited to the following:

- approved San Miguel County programs, plans and policies potentially affected by the RMP,
- information regarding planning area resources and current and proposed uses and management actions,
- environmental analyses on issues for which San Miguel County has special expertise,
- socio-economic data such as demographics, activities and values.

iv.  To review and provide comments during specified review periods on preliminary baseline and other technical reports for which San Miguel County has contributed data or other pertinent information.

v.   To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

- preliminary range of alternatives to be considered in detail,
- relevant portions of the "Affected Environment" section (including the socio-economic portion),
- relevant portions of the "Environmental Consequences" section,
- relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi.  During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii. To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

In March 2018, San Miguel County and Cooperating Agencies were invited to meet with UFO and learned about their consideration of new concepts for the RMP. We offered comments on a draft revised Table 2-2 provided to us electronically on March 29, 2018 (see Attachment 1). There was no meaningful opportunity to help develop Alternative E. The public and cooperating agencies have never been given the opportunity to officially comment on this Alternative which introduces completely new concepts and direction. Supporting data including but not limited to, the Biological Assessment, Biological Opinion and GIS files were not made available for all or a significant part of this 30-day Protest Period. It is a procedural error and violation of FLPMA to deny the public an opportunity to comment on materials upon which the BLM bases its decisions. New situations have developed since 2016, such as the halting of the GuSG Rangewide RMP Amendment, which may significantly affect comments received that were contextual to concurrent planning processes and expectations, which have now changed. With the changed

BLM_0076630

*San Miguel County, Colorado*

condition of the stalled GuSG Rangewide RMP process, this RMP/EIS needs to reconsider GuSG management and protections and allow adequate public comment and cooperating agency collaboration. With the significantly changed status of the Pinon Ridge Uranium Mill, the BLM must revise the analysis of all potential impacts of related land use, environmental and socio-economic considerations.

**RESERVATION**:  Given the time constraints of filing this Protest, San Miguel County may not have addressed all issues. Therefore, San Miguel County reserves its right to further process regarding any and all issues identified by other protestors or commenters.

CONTACT INFORMATION:  Pursuant to 43 C.F.R. 1610. 5-2, please send all notices and correspondence regarding this Protest to:

Amy Markwell
San Miguel County Attorney
333 West Colorado Ave. 3rd Floor
PO Box 791
Telluride, CO 81435
Ph: (970)728-3879
amym@sanmiguelcountyco.gov

Sincerely,
San Miguel County, Colorado
Board of Commissioners

Kris Holstrom, Chair
Hilary Cooper
Lance Waring

BLM_0076631

Case No. 1:20-cv-02484-MSK   Document 52-16   filed 04/28/21   USDC Colorado   pg 80 of
148
Case 1:08-cv-01624-WJM-NRN   Document 166   Filed 03/18/19   USDC Colorado   Page 1 of 12

Attacment A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
## Judge William J. Martínez

Civil Action No. 08-cv-1624-WJM-NRN

COLORADO ENVIRONMENTAL COALITION,
INFORMATION NETWORK FOR RESPONSIBLE MINING,
CENTER FOR NATIVE ECOSYSTEMS,
CENTER FOR BIOLOGICAL DIVERSITY, and
SHEEP MOUNTAIN ALLIANCE,

      Plaintiffs,

v.

OFFICE OF LEGACY MANAGEMENT, and
UNITED STATES DEPARTMENT OF ENERGY,

      Defendants.

---

## ORDER GRANTING MOTION TO DISSOLVE INJUNCTION AND
## DIRECTING ENTRY OF FINAL JUDGMENT

---

Plaintiffs bring this lawsuit under the Administrative Procedure Act ("APA"),

5 U.S.C. §§ 701 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C.

§§ 4231 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*,

challenging certain decisions made by the United States Department of Energy's Office

of Legacy Management (for purposes of this order, "DOE") concerning a uranium

mining program in southwestern Colorado that DOE oversees.  That program was

known as the Uranium Lease Management Program ("ULMP").  At some point, the

program dropped "Management" from its title and now goes by "ULP," but the Court will

continue to refer to it as "ULMP" for consistency with prior orders.

In an earlier phase of this lawsuit, the Court enjoined DOE from implementing its

most recent decisions regarding the ULMP.  Currently before the Court is DOE's Motion to the Dissolve Injunction ("Motion to Dissolve").  (ECF No. 160.)  For the reasons explained below, the Court will grant this motion, dissolve the injunction, and enter final judgment.

## I. BACKGROUND

**A.     Early Stages and Original Injunction**

In 2007 and 2008, DOE approved new uranium mining under the ULMP, mostly on lands around Paradox Valley in southwestern Colorado.  Plaintiffs sued in July 2008, claiming that DOE had not satisfied its obligations under NEPA, ESA, and associated regulations when making this decision.  (ECF No. 1.)  Substantive proceedings moved slowly at first due to parallel litigation over collateral matters, and to limited discovery the Court permitted.  (ECF No. 41.)  The case was transferred to the undersigned upon his appointment in February 2011.  (ECF No. 71.)

In October 2011, having finally received full substantive briefing, the Court partially agreed with Plaintiffs' challenges.  *See Colo. Envtl. Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193 (D. Colo. 2011) (ECF No. 94) ("*CEC I*").  Consequently, the Court vacated DOE's environmental review documents, stayed all existing ULMP leases, and enjoined DOE from approving additional leases or other ULMP-related activities on the lease tracts.  *Id.* at 1224.  The Court then invited DOE to "move . . . to dissolve this injunction" after it had "conduct[ed] an environmental analysis on remand that complies with NEPA, ESA, all other governing statutes and regulations, and this Order."  *Id.*

BLM_0076633

Case No. 1:20-cv-02484-MSK   Document 52-16   filed 04/28/21   USDC Colorado   pg 82 of
148
Case 1:08-cv-01624-WJM-NRN   Document 166   Filed 03/18/19   USDC Colorado   Page 3 of 12

**B.      Previous Motion to Dissolve Injunction**

In April 2017, DOE moved to dissolve the injunction.  (ECF No. 147.)  The Court

resolved that motion in February 2018.  *See Colo. Envtl. Coal. v. Office of Legacy*

*Mgmt.*, 302 F. Supp. 3d 1251 (D. Colo. 2018) (ECF No. 151) ("*CEC II*").  The Court

agreed with DOE that it had corrected all previously noted errors, save for one.  The

ESA requires federal agencies to evaluate whether their actions might jeopardize the

habitat of an endangered or threatened species, and this evaluation process may

include consultation with the United States Fish & Wildlife Service ("FWS").  *See id*. at

1269–70.  In this case, the main question was whether reasonably foreseeable uses

and discharges of water in the course of mining and associated activities might

ultimately affect four endangered fish species living in the Colorado River.  *Id*. at 1270,

1273–74.  DOE requested FWS's opinion on the matter (a "Biological Opinion" or

"BiOp") by sending to FWS the DOE's Biological Assessment ("BA") that that water

usage would have at least *some* adverse effect on the endangered Colorado River fish.

*Id*. at 1270.  FWS's resulting BiOp concluded that there was no likelihood of

jeopardizing or threatening those fishes' habitat.  *Id*. at 1270–71.

However, when requesting the BiOp, DOE conveyed to FWS only the forecasted

annual water consumption of ULMP mines, and not water consumption for "other mining

operations expected to coincide with renewed mining on ULMP lease tracts."  *Id*. at

1273.  In particular, DOE's water consumption analysis did not address a uranium mill

planned for Paradox Valley, to be known as the Piñon Ridge Mill:

> Among the many things DOE says about this mill, DOE
> predicts "[a] surge in uranium exploration, mining, and
> permitting . . . if the mill is constructed," referring to mining
> on BLM land rather than ULMP lease tracts.  DOE notes that

BLM_0076634

> the Piñon Ridge Mill would require water as part of its milling operations.  DOE does not, however, estimate the mill's water requirements, nor the water requirements of the non-ULMP uranium mines it predicts will come into existence.

*Id.* (citations omitted; alterations in original).  "Notably," the Court added,

> DOE does not claim that it lacks information from which it can reasonably estimate the amount of water the Piñon Ridge Mill will likely consume, or the amount of water non-ULMP uranium mines will likely consume.  The Court is therefore compelled to presume that DOE possesses the necessary information.

*Id.* at 1274.

With the ability to predict all water consumption associated with renewed mining on the ULMP tracts—whether caused by DOE's decision to resume mining there, or simply coinciding with it and reasonably foreseeable to occur—the Court held that DOE had acted arbitrarily and capriciously by relying on FWS's resulting BiOp, knowing that the BiOp was formulated with materially incomplete information.  *Id.*; *see also id.* at 1272 ("An agency acts 'not in accordance with law,' 5 U.S.C. § 706(2)(A), when it fails to convey material information in its possession to FWS, and the agency behaves arbitrar[ily] and capriciously when it relies on a BiOp resulting from a materially defective consultation.").  "Fortunately," the Court continued,

> the remedy in this circumstance does not require total vacatur . . . .  Instead, the Court will leave the existing injunction in place, for the time being, and order DOE to reinitiate consultation with FWS based on a supplemental BA.  The supplemental BA may be limited solely to the question of water depletion based on DOE's estimates of the likely combined annual water usage of ULMP mines, non-ULMP mines likely to become operational, and the Piñon Ridge Mill.  Upon receiving FWS's response (presumably an additional or supplemental BiOp), DOE may then issue an updated or supplemental ROD [*i.e.*, record of decision] and move once again to dissolve the injunction.  Such a motion

4

> need only address whether DOE fulfilled its ESA § 7
> consultation duties with respect to water depletion that may
> affect Colorado River endangered fish.

*Id.* (footnote omitted).

## C.   Current Motion to Dissolve

By letter dated May 2, 2018, DOE transmitted a supplemental BA to FWS.  (ECF No. 160-1.)  The supplemental BA reports DOE's efforts to search for all relevant current or reasonably foreseeable uranium mining and related activities in the area, and to estimate annual water usage of all these activities.  (*Id.* at 4–7.)  The BA also tabulates all of the estimated water usage.  (*Id.* at 7–10.)

The most notable development reported in the supplemental BA is that, not long after this Court issued *CEC II*, a Colorado administrative law judge ruled that the Colorado Department of Public Health and Environment ("CDPHE") should not have issued the license under which the Piñon Ridge Mill was to be constructed and operated.  (*Id.* at 5–6.)  The supplemental BA further reports that CDPHE elected not to appeal the judge's decision, and "therefore the license [was] revoked as of April 26, 2018."  (*Id.* at 6.)  In this light, the supplemental BA announces that the Piñon Ridge Mill is no longer a reasonably foreseeable action coinciding with renewed ULMP mining, so DOE would not consider its potential water usage.  (*Id.*)  However, perhaps out of a desire not to appear to be shirking the Court's instructions in *CEC II*, DOE included within the supplemental BA the amount of water the Piñon Ridge Mill had been expected to consume.  (*Id.*)  DOE also included a parting comment about the changing uranium market and its potential relationship to the defunct Piñon Ridge proposal:

> Finally, in the [previous BA's] discussion regarding
> cumulative effects from the yet-to-be constructed Piñon

BLM_0076636

> Ridge Mill, whose licensed was revoked in April 2018, DOE
> cited the following text from that company's reports for the
> mill: "A surge in uranium exploration, mining, and permitting
> is anticipated if the mill is constructed, including permitting
> and development of uranium/vanadium deposits controlled
> by Energy Fuels Resources." The cited reports were circa
> 2009 to 2012. This statement may have been appropriate at
> that time; however, since then, various world events
> happened (e.g., Fukushima in 2011) that contributed to
> continued low uranium ore prices—lower than economically
> feasible for new mining or a surge in mining.

(*Id.* at 10–11.)

By letter dated June 19, 2018, FWS responded to DOE's supplemental BA.

(ECF No. 160-2.) As to Piñon Ridge, FWS agreed that it was no longer the sort of

reasonably foreseeable action that must be considered. (*Id.* at 3.) As to all other data

reported in the supplemental BA, FWS announced that its previous BiOp was still

accurate in predicting no jeopardy to the Colorado River endangered fishes' habitat.

(*Id.* at 2–4.)

Having received this information, DOE moved to dissolve the injunction in July

2018. (ECF No. 160.) Plaintiffs remain opposed to dissolving the injunction, except as

to ULMP least tracts that will be reclaimed rather than newly mined. (ECF No. 162 at

9–10.)

## II. LEGAL STANDARD

In opposing the *first* motion to dissolve, Plaintiffs argued from case law that a

party seeking to dissolve an injunction bears a heavy burden to show that

circumstances have changed. (*See* ECF No. 148 at 10–11.) The Court rejected this

argument: "Plaintiffs' cited case law relates to injunctions that were meant to last

indefinitely. Here, however, the Court specifically contemplated lifting its injunction after

BLM_0076637

Case 1:08-cv-01624-WJM-NRN   Document 166   Filed 03/18/19   USDC Colorado   Page 7 of 12

DOE completed the necessary environmental review." *CEC II*, 302 F. Supp. 3d at 1255 (citing *CEC I*, 819 F. Supp. 2d at 1224).

In opposing DOE's *current* Motion to Dissolve, Plaintiffs once again argue that DOE bears a heavy burden of showing changed circumstances. (ECF No. 162 at 4.) The Court again rejects this argument, for the reasons just stated. Although DOE bears the burden in this procedural posture, it is simply a burden to show that it has materially complied with the Court's instructions.

## III. ANALYSIS

### A. Whether a New or Supplemental Administrative Record is Needed

DOE attached its supplemental BA and FWS's response to its Motion to Dissolve (ECF Nos. 160-1, 160-2), but has not submitted any other documents generated during the re-consultation process the Court ordered in *CEC II*. Plaintiffs' primary challenge is that DOE cannot move to dissolve the injunction without first assembling and lodging a new or supplemental administrative record, comprising all documents related to the re-consultation. (ECF No. 162 at 5–6.)

The parties have not cited, nor has the Court located, any authority establishing that a government agency must, in all instances, assemble and disclose a full administrative record before seeking a Court's approval of its administrative action. The case law *assumes* that an administrative record will be assembled, but without discussing it as some sort of categorical or jurisdictional requirement.

Despite the paucity of case law on the topic, judicial review of administrative action will, by nature, nearly always require an administrative record. Under the unique circumstances presented here, however, the Court finds that DOE committed no error,

BLM_0076638

or, if it did, the error is attributable to Plaintiffs as the equivalent of invited error.  These

outcomes are evident from the procedures that led up to the Motion to Dissolve.

 To repeat, the Court's instructions in *CEC II* were as follows:

> Fortunately, the remedy in this circumstance does not
> require total vacatur . . . .  Instead, the Court will leave the
> existing injunction in place, for the time being, and order
> DOE to reinitiate consultation with FWS based on a
> supplemental BA.  The supplemental BA may be limited
> solely to the question of water depletion based on DOE's
> estimates of the likely combined annual water usage of
> ULMP mines, non-ULMP mines likely to become operational,
> and the Piñon Ridge Mill.  Upon receiving FWS's response
> (presumably an additional or supplemental BiOp), DOE may
> then issue an updated or supplemental ROD and move once
> again to dissolve the injunction.  Such a motion need only
> address whether DOE fulfilled its ESA § 7 consultation
> duties with respect to water depletion that may affect
> Colorado River endangered fish.

302 F. Supp. 3d at 1274 (footnote omitted).  A few months later, DOE submitted a

status report announcing that it had transmitted its supplemental BA to FWS and

"intend[ed] to file a motion to dissolve the injunction as soon as practicable after receipt

of [FWS's] final response to the [BA]."  (ECF No. 154 at 1–2.)  The Court then ordered

the parties to "confer and . . . file a joint status report explaining their views (including

their respective views, if they cannot agree) on: (1) what steps remain, if any, before

[DOE] may file a motion to dissolve the injunction, and (2) an appropriate briefing

schedule for such a motion."  (ECF No. 155.)  In the joint status report, "[t]he parties

agree[d] that the only step remaining before [DOE] may file a motion to dissolve the

injunction is for [DOE] and [FWS] to complete their consultation over [the supplemental

BA]."  (ECF No. 156 at 1.)  The parties also presented an agreed-upon briefing

schedule, with the motion to dissolve due "30 days after receipt of final response from

BLM_0076639

FWS to Supplemental BA." (*Id.* at 3.)  The Court adopted the proposed briefing

schedule, with the first deadline (*i.e.*, filing of the motion to dissolve) set for 30 days

after DOE received a final response from FWS regarding the supplemental BA.  (ECF

No. 157.)

This course of events reveals three things.  First, the Court charged DOE with a

limited, discrete task—in contrast to a reopening of the entire process that the Court

ordered in *CEC I.*  Second, the Court expressed its expectation of an updated or

supplemental ROD,[1] but the Court said nothing about a new or supplemental

administrative record—in contrast to proceedings before the original motion to dissolve

(ECF No. 147), where the Court specifically required a new administrative record (*see*

ECF No. 132).  Third, the Court asked the parties to describe "what steps remain, if any,

before [DOE] may file a motion to dissolve the injunction" (ECF No. 155), and Plaintiffs

did not at that time raise the need to produce a new or supplemental administrative

record.

Accordingly, because the Court did not require a new administrative record, DOE

did not err in failing to produce one.  Also, the situation is equivalent to "invited error"

because Plaintiffs had their opportunity to insist on an administrative record as part of

the scheduling order but did not.  *See, e.g., United States v. Edward J.*, 224 F.3d 1216,

1222 (10th Cir. 2000).

Finally, assembling an administrative record would take more time and likely

more briefing.  The Court finds that it would not be in the interest of justice to delay

---

[1] No party has pointed the Court to an updated or supplemental ROD, unless the
supplemental BA (ECF No. 160-1) is deemed to be the same thing.  But Plaintiffs do not object
on this account, so the Court will not explore the matter further.

BLM_0076640

resolution of the matter any further.  This case is almost eleven years old, and the

Court's injunction has been in place for more than seven years.

For all these reasons, the Court holds under the unusual circumstances

presented here that DOE need not have assembled and disclosed a full administrative

record before seeking review of its limited, Court-ordered re-consultation with FWS.

**B.      Whether DOE Properly Evaluated the Significance of the Piñon Ridge Mill
          Developments**

Plaintiffs' only other argument against dissolving the injunction is that DOE

purportedly did not recognize the true significance of the Piñon Ridge Mill's demise.

(ECF No. 162 at 6–8.)  Plaintiffs note that the Piñon Ridge Mill was expected to

consume a substantial amount of water—substantial enough to exceed a numeric

threshold that FWS finds significant, particularly when added to all other estimated

water usage.  (*Id.* at 7.)  Plaintiffs argue that FWS therefore should have considered the

Piñon Ridge estimate as a proxy for whatever mill will handle the uranium likely to be

mined in the area: "the newly presented fact that [the] Piñon Ridge Mill license is no

longer effective *and another mill must be used* does not allow [DOE] to arbitrarily

exclude the water depletions needed to mill the oars from the [DOE] uranium lease

tracts." (*Id.* (emphasis added).)  Plaintiffs' argument fails for at least three reasons.

First, Plaintiffs fail to recognize the significance of the Piñon Ridge Mill in the

Court's previous ruling.  The Court noted DOE's prediction that the Piñon Ridge Mill

would prompt a uranium mining boom in the area, particularly on non-ULMP tracts.

*CEC II*, 302 F. Supp. 3d at 1273.  The Court thus faulted DOE for failing to "estimate the

mill's water requirements, [and] the water requirements of the non-ULMP uranium

mines [DOE] predicts will come into existence." *Id.*  And that is what the Court tasked

BLM_0076641

DOE with estimating and then transmitting to FWS. *Id.* at 1274. The Court never faulted DOE's estimates for water usage associated with ULMP lease tracts. Regardless, the supplemental BA plausibly and adequately explains why the Piñon Ridge Mill will likely never be constructed, and why substantial uranium mining is not likely to occur anyway. There is no hint that the mining that likely *will* occur will require anywhere near the fairly large amount of water predicted for the Piñon Ridge Mill.

Second, FWS in fact conveyed the Piñon Ridge Mill estimate to FWS. It did so, of course with a significant caveat, *i.e.*, that it no longer viewed the estimate as relevant and it was not seeking FWS's opinion in light of the estimate. (ECF No. 160-1 at 5–6.) Nonetheless, FWS came to its own conclusion, in agreement with DOE, that the Piñon Ridge estimate was not a matter it needed to consider. (ECF No. 160-2 at 3.) DOE therefore did not fail to convey the relevant information to FWS—and conveying that information is what the Court ordered in *CEC II*.

Third, the only potential location that ULMP-generated uranium ore could be milled is the White Mesa Mill near Blanding, Utah, roughly 100 miles from Paradox Valley. DOE conveyed White Mesa's estimated water requirements to FWS. (ECF No. 160-1 at 7.) Plaintiffs fault DOE for relying on a 1979 figure for that estimate, stating that "[c]urrent data is [*sic*] presumably available." (ECF No. 162 at 8.) But Plaintiffs then go on to note that the previously-filed administrative record shows the White Mesa Mill processes "only alternate feed" (nuclear waste generated through non-natural processes, from which uranium may be extracted), not uranium ore. (*Id.* (internal quotation marks omitted).) This strongly suggests that useful data for White Mesa Mill are *not* available, given that the mill does not presently process what ULMP and other

11

Case No. 1:20-cv-02484-MSK  Document 52-16  filed 04/28/21  USDC Colorado  pg 91 of 148

uranium mines would produce—uranium ore.

For these reasons, the Court finds that DOE did not fail to convey adequate information to FWS during the re-consultation process.  Consequently, DOE has remedied the only lingering problem noted in *CEC II*, and is entitled to have the injunction dissolved.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Defendants' Motion to Dissolve the Injunction (ECF No. 160) is GRANTED;

2.    The Court's injunction entered October 18, 2011 (ECF No. 94, as modified by ECF No. 102) is DISSOLVED;

3.    The Clerk shall enter judgment in favor of Defendants and against Plaintiffs, and shall terminate this action; and

4.    The parties shall bear their own costs.

Dated this 18th day of March, 2019.

BY THE COURT:

William J. Martinez
United States District Judge

BLM_0076643

Attachment B

JAG No. 12 A 1318; Pursuant to § 24-4-105, C.R.S.

IN RE: THE APPLICATION OF ENERGY FUELS RESOURCES, INC. FOR A
RADIOACTIVE MATERIALS LICENSE FOR THE **PIÑON RIDGE URANIUM MILL**

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND RULING – APRIL 17, 2018**

PROCEDURAL HISTORY

Beginning November 7, 2012 and concluding on November 13, 2012, the undersigned,
acting as the hearing officer appointed by the director of the Colorado Department of Public
Health and the Environment (hereafter CDPHE),  presided over a hearing in Nucla, Colorado to
consider the application of Energy Fuels filed with CDPHE for issuance of a license to mill
radioactive materials.  Sheep Mountain Alliance, Rocky Mountain Wild, Center for Biological
Diversity, Colorado Environment Coalition and Dr. Robert L. Grossman (collectively hereafter
referred to as Sheep Mountain Alliance, et al.) sought and were granted party status to resist the
issuance of the license sought by Energy Fuels.

On January 14, 2013, the undersigned entered "Findings of Fact, Conclusions of Law and
Ruling (hereafter January 14, 2013 Ruling)" following a public hearing.  As noted at pages one
and five of the January 14, 2013 Ruling, the undersigned concluded as a matter of law that the
hearing was an intermediate step in CDPHE's consideration of Energy Fuels application.  Sheep
Mountain Alliance, et al. and Rocky Mountain Wild, the Plaintiffs in the current Judicial
Proceeding, argued at the hearings held in 2012 and  reassert in the current Judicial Proceeding
that the undersigned committed error in refusing to issue an "initial decision" and make findings
and conclusions upon all material issues of fact, law or discretion.

An administrative appeal of the January 14, 2013 Ruling to the Executive Director of
CDPHE was denied and on April 25, 2013 CDPHE issued the uranium milling license sought by
Energy Fuels.  Plaintiffs thereafter filed a complaint in the Denver District Court (Action No.
13CV32397) seeking judicial review of the April 24, 2013 license, including adequacy of the
2012 hearing and the January 14, 2013 Ruling.  Plaintiffs' claims for relief include:

1. Failure of the January 14, 2013 Ruling to meet the requirements of an "initial
   decision" as required by the Administrative Procedure Act.  §24-4-105 (14)(a),
   C.R.S.
2. Failure of the January 14, 2013 Ruling to provide and adhere to an explicit and
   predetermined burden of proof.
3. Failure of the January 14, 2013 Ruling to make factual and legal determinations
   upon each of the procedural requirements and substantive issues enumerated in
   part 18 of the Rules and Regulations pertaining to Radiation Control promulgated
   by CDPHE.

BLM_0076644

4. Failure of the January 14, 2013 Ruling to conclude that the absence of competent localized economic data requires a conclusion that Energy Fuels failed to meet its burden of proof.

5. Inadequacy of the Environmental Impact Analysis upon which the April 24, 2013 license was based.

Plaintiffs' seek a declaration that the license issued is void.

On September 3, 2014, Judge Robert L. McGahey, Jr. of the Denver District Court issued an Order remanding Plaintiffs' action (1) for an "initial decision" as to whether Energy Fuels application met all criteria under state law for issuance of a license pursuant to § 25-11-203 and (2), C.R.S. for a *post hoc* determination of the burdens of proof in the hearing. After limited discovery, the matter was referred to the undersigned as the original hearing officer.

The decision in this review is to be based upon the record made in the hearing held in Nucla, Colorado in 2012. In requiring an "initial decision" upon the evidence previously presented the Court's Order requires a statement of findings and conclusions upon all the material issues of fact, law, or discretion presented by the record. § 24-4-105 (14)a, C.R.S. The parties disagreed about the appropriateness of an additional hearing or briefing to address the application of the standard of an "initial decision" to the record. Therefore the required review of the record and the evidence offered was undertaken without the assistance of counsel.

BURDEN OF PROOF

The parties do not significantly disagree about the applicable burden of proof, Energy Fuels, as the applicant and proponent of the license, bears the ultimate burden of proof to support the entry of an Order that the license should be issued. § 24-4-105 (7), C.R.S.; 6 C.C.R.1007-1 §18.7.6.5. In the briefs filed by Energy Fuels and by Sheep Mountain Alliance, et al., the parties agree, and the undersigned now concludes, that Sheep Mountain Alliance, et al., as the party seeking an affirmative order, bears the burden of persuasion in challenging the sufficiency of the notice for the hearing held and the competence of the Environmental Impact Analysis prepared by CDPHE. As noted in the Conclusions of Law below, § 25-11-203 (3) (c) (III), C.R.S. assigns the burden of proof upon the technical issues argued at the hearing to the Applicant, Energy Fuels. The requirements of proof shall conform, to the extent practicable, with those in civil nonjury cases in the district courts. §24-4-105 (7), C.R.S.. To satisfy the burden of proof, a party must therefore prove its position by a preponderance of the evidence.

JANUARY 14, 2013 RULING

In that earlier ruling, the undersigned made a number of Findings of Fact and Conclusions of Law that are necessary to an "initial decision." That Ruling is attached hereto (Attachment A) and made a part of this Ruling and the undersigned specifically again finds by a preponderance of the evidence that Findings of Fact Number 2 & 3 and Conclusions of Law Number 1, 2 and 3 remain valid and should be repeated in this Ruling.

2

INITIAL DECISION

The initial decision as to whether Energy Fuels application met all criteria under state law for issuance of a license pursuant to § 25-11-203, C.R.S. as required by the District Court Order of September 3, 2014, shall include a statement of findings and conclusions upon all the material issues of fact, law or discretion presented by the record and the appropriate order, sanction, relief or denial thereof.  § 24-4-105 (14) (a), C.R.S.  That initial decision is then subject to appeal to CDPHE.

The conflicting perceptions of counsel and the undersigned about the purpose of the hearing held in Nucla, Colorado in the fall of 2012 caused Energy Fuels and CDPHE to limit the evidence they offered to the voluminous documents filed in support of and response to the application for a license together with an overview of that application process by the witnesses offered by those parties.  Sheep Mountain Alliance, et al. offered technical evidence addressing specific argued deficiencies in the application or CDPHE's evaluation of it.  In some instances, Energy Fuels and CDPHE offered technical evidence in response to those argued deficiencies.  The written record prepared by CDPHE and presented at the hearing was submitted to the undersigned in electronic form without an index, making access to all of the material relating to a particular argument highly difficult.

FINDINGS OF FACT

Applying the burden of proof adopted above to the evidence offered, the undersigned now finds, by a preponderance of the evidence:

1. Energy Fuels and CDPHE substantially complied with the notice and process requirements governing the issuance of a license to mill radioactive materials.  § 25-11-201 et seq., C.R.S.; 6 C.C.R.1007-1 part 18.  Minor procedural defects, if any, in that process do not preclude issuance of a license.  As noted in Conclusion of Law #3 below, the hearing fully satisfied the requirements of § 24-4-105, C.R.S.

2. The Environmental Assessment prepared by Energy Fuels and Submitted to the CDPHE pursuant to § 25-11-203 (2) (b) (II), C.R.S.; § 25-11-203 (2) (c), C.R.S.; 6 C.C.R. 1007-1 §3.8.8; 6 C.C.R. 1007-1 §18.3.4; and 6 C.C.R. 1007-1 §28.3.5.4 substantially complies with the requirements of the statutes of the State of Colorado and the regulations adopted by CDPHE.  A specific dispute with all or part of that Assessment does not make the document unlawful or insufficient.

3. The Environmental Impact Analysis prepared by CDPHE pursuant to C.C.R. 1007-1 §18.4.1 substantially complies with the requirements of the regulations adopted by CDPHE.  A specific dispute with all or part of that Analysis does not make the document unlawful or insufficient.

4. Counsel for Rocky Mountain Wild, Center for Biological Diversity and Colorado Environmental Coalition, (hereafter collectively referred to as the "Wildlife Coalition"), offered documentary evidence that the proposed mill site was a potential habitat area for a number of species of animals, birds and plants.  They further argued that there has been an historical impact

3

BLM_0076646

upon aquatic life in the rivers in the region from the uranium mining and milling industry.  With the exception of one sighting of the Gunnison Sage Grouse several years ago, there was no evidence offered of the presence of an endangered or threatened species on or in the immediate proximity of the proposed mill site.  There are some references in the record reflecting consideration within the Environmental Assessment and the Environmental Impact Analysis of impacts upon animals, birds and plants in proximity to the proposed mill site. The undersigned now finds that Energy Fuels has failed to meet its burden to prove that those impacts have been fully considered.

5. Dr. Craig Little and Dr. Robert Grossman were qualified and testified as experts in the air modeling process and possible wind dispersion of radioactive dust from the tailings ponds and the materials storage piles at the proposed mill.  The conflicts in the expert testimony and the lack of clarity in the documentary record leads the undersigned to find that Energy Fuels has failed to meet its burden to prove that the statutory and regulatory requirements to minimize the impacts to the public and the environment of windborne radioactive dust have been met..

6. Ann Maest testified as an expert to address the qualities of the caffeinate to be discharged to the tailings ponds and its comparison with water quality standards for the ground water and surface water in the vicinity of the proposed mill, and the studies of and issues related to the designed pond liners and pond construction.  Kimberly F. Morrison testified as an expert to discuss the liner systems proposed for the tailings piles and netting to mitigate access of waterfowl.  The conflicts in the testimony and ambiguities in the documentary record leads the undersigned to find that Energy Fuels has failed to meet its burden to prove that the statutory and regulatory requirements to minimize the impacts of contaminated ground water to the public and the environment have been met..

7. Constance L Travers testified as an expert to address the sufficiency of the ground water supply plan and the ground water investigation and monitoring plan, and dispute the conclusion found in the Environmental Assessment and the Environmental Impact Assessment (EIA) that no pathways are present for ground water below the site.  Roman Popielak testified as an expert to address the ground water investigation and the possibility of perched ground water evidenced in the test wells.  The conflicts in the testimony and the lack of clarity in the documentary record leads the undersigned to find that Energy Fuels has failed to meet its burden to prove that the statutory and regulatory requirements to assure a sufficient water supply for operation of the proposed mill have been satisfied.

8. Dr. Thomas M. Power and Sandra L. Goodman testified as experts about the socioeconomic impacts of the proposed mill, each using the employment prediction of Energy Fuels for direct jobs to be created and different study areas for a calculation of indirect jobs that might be created.  Any cost-benefit analysis for this proposed site, as with any other site, is entirely dependent upon the physical area of impact to be studied.  The broader the area included in the study, the less statistically significant the possible benefit would be and the greater the impact of a possible or potential risk.  Considering the reports of each witness, and the absence of separate and distinct economic data for the west end of Montrose County, the conclusions reached by each of them seems highly speculative and without significant probative value.  The proposed mill site is intentionally located as far as possible from any population center.  The absence of precise economic data to support the opinions of experts does not, however, preclude

4

BLM_0076647

a thorough analysis of the environmental, social, technical and other benefits of the proposed application against environmental costs and social effects while considering available alternatives. The hundreds of individuals interviewed or offering comments at numerous public hearings, including the November 2012 hearing in Nucla, where more than two hundred individuals offered oral or written comments, provide a sufficient data base to support CDPHE's conclusions about the socio-economic impact of the proposed license. Energy Fuels has satisfied its burden of proof that is has fully considered the socio-economic impact of the proposed mill.

9. Many of the individuals offering public comments and counsel for Sheep Mountain Alliance, et al. challenge the adequacy of the bond amount set by CDPHE although each relate their objections to the cost of remediation at historic mills that were more loosely regulated or to the cost that might be realized if an upset condition existed. The statutory and regulatory requirements that the bond amount be regularly reviewed make a finding upon the bond amount set in 2012 unnecessary.

10. (2013 Finding #2) Energy Fuels has had internal discussions about the capacity of the proposed mill and the possibility of seeking an amendment or amendments to the license to allow for a greater capacity of production. Those discussions and related analysis and design documents do not mandate a modification of the application to reflect that greater capacity or require a modified Environmental Impact Assessment to reflect that increased capacity. The application seeks to process 500 tons per day and any application to enlarge that capacity would require another full review by CDPHE. There is no evidence offered supporting a conclusion that CDPHE would attempt to circumvent that full review.

11. (2013 Finding #3) Counsel for Sheep Mountain Alliance, et al., and a number of the individuals making public comments, complain that there were too many informal conversations between Energy Fuels and CDPHE, and that the informality of that relationship is evidence of a bias or at least a lack of objectivity on the part of CDPHE in favor of Energy Fuels. Informality in the relationship between a regulated party and the regulator may simply indicate civility. The evidence does not evidence a bias in the behavior of CDPHE or its employees.

CONCLUSIONS OF LAW

Considering the foregoing Findings of Fact, the undersigned now makes the following conclusions of law:

1. § 25-11-203 (3) (c) (II), C.R.S. provides that "the department (CDPHE) may order reasonable mitigation measures to address any substantial adverse impacts to public health or the environment or transportation infrastructure or transportation facilities within the county attributable solely to approval of the license…pertaining to the facility's receipt of the radioactive material." § 25-11-203 (3) (c) (III), C.R.S. provides, in part, "the applicant shall demonstrate that if the license . . . pertaining to the facility's receipt of the radioactive material is approved, then the receipt, storage, processing, and disposal of radioactive material will: (A) Be conducted such that the exposures to workers and the public are within the dose limits of part 4 of the department's rules pertaining to radiation control for workers and the public; (B) Not cause releases to the air, ground or surface or groundwater that exceed permitted limits; . . ."

5

BLM_0076648

2. 6 C.C.R.1007-1 §4.5.2 provides that "the licensee. . . shall use, to the extent practical, procedures and engineering controls based upon sound radiation protection principles to achieve occupational doses and doses to members of the public that are as low as reasonably achievable (ALARA),"

3. (2013 Conclusion #1) The hearing conducted as described in the record of these proceedings fully satisfies the requirements of § 24-4-105, C.R.S., in that notice was properly issued; any entity or individual who sought party status was admitted as a party; the parties were offered the opportunity to call witnesses and offer exhibits and cross-examine the witnesses who testified without limitation; the rules of evidence were relaxed to allow the tender of documents as exhibits without foundation; each step of the proceedings were recorded by a reporter and transcripts of those proceedings were made available to the parties; and that oral and written comments were solicited from members of the public who had not sought party status, without limitation on the time they wished to speak or the content of their comments.

4. (2013 Conclusion #2) As discussed above the purpose and scope of this ruling is to render an "initial decision" as to whether Energy Fuels application met all criteria under state law for issuance of a license pursuant to § 25-11-203, C.R.S., and (2) for a *post hoc* determination of the burdens of proof in the hearing. As an initial issue the undersigned must address the purpose and scope of this hearing. Many of those offering public comments, either oral or written, exceeded the scope of the hearing and the broader issues they raised require some discussion of the role of CDPHE, and its appointed hearing officer, in the regulation of uranium milling. Those public comments offered in support of the application and the proposed license cited primarily the economic opportunities to be realized by bringing additional employment to the west end of Montrose County. Many of the public comments offered in opposition to the application and the proposed license discussed the general impact upon the environment of any energy development, the risk of nuclear power production as evidenced by incidents in the Ukraine and in Japan, the risk of nuclear power production compared to production from other energy sources, the adequacy of the regulatory process put in place to regulate uranium mining and milling, the inherent health and environmental risk from the processing and handling of radioactive materials, alternate possibilities for employment, the possible use of thorium as a safer nuclear fuel and the possible proliferation of nuclear weapons.

Decisions to allow the mining, milling and use of uranium have been made by the United States Congress through the Atomic Energy Act and the Uranium Mill Radiation Control Act and by the legislative process in Colorado through the Radiation Control Act. Through the agreement with the Nuclear Regulatory Commission and the provisions of the Radiation Control Act, the regulation of the nuclear industry has been delegated to CDPHE, which also receives its funding through the state budgetary process. Perhaps the more collegiate process suggested in the testimony of Dr. Grossman would produce a superior result but it is not the process provided by law. The statutory obligation of CDPHE to consider Energy Fuel's application may conflict with both its mission statement and its vision. Neither CDPHE nor its appointed hearing officer has the authority to simply ignore the statutory mandate to consider and act upon Energy Fuels Application. Consideration of the broader questions raised during the public comments must be addressed to the Congress of the United States or the Legislature of the State of Colorado.

BLM_0076649

5. (2013 Conclusion #3) Arguments and a number of public comments urge the possibility that the market price of the minerals produced will be inadequate to support construction and operation of the proposed mill. Economic consequences of that nature are highly speculative and are typically left to the market for resolution.

Applying the Conclusions of Law above to the Findings of Fact above the undersigned now finds that Energy Fuels has failed to meet its burden of proof upon the following issues:

1. Impacts upon animals, birds and plants in proximity to the proposed mill site;
2. Limiting, so far as reasonably achievable, wind dispersion of radioactive materials;
3. Limiting, so far as reasonably achievable, contamination of ground water at the proposed mill site; and
4. Provision of an adequate water supply for operation of the proposed mill.

Application of Energy Fuels for a license to mill radioactive materials should, absent an additional hearing, be denied.

Entered in Denver, Colorado this 17th day of April, 2018.

_____
Richard W. Dana
Appointed Hearing Officer

BLM_0076650

CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of April, 2018, a true and correct copy of the foregoing FINDINGS OF FACT, CONCLUSIONS OF LAW AND RULING – APRIL 17, 2018, was served via electronic filing (E-Mail), addressed to the following:

Jerry W. Goad, Esq.
Ralph Carr Judicial Center
1300 Broadway, 7th Floor
Denver, Colorado 80203
Jerry.goad@coag.gov

Jeffrey C. Parsons, Esq.
Western Mining Action Project
P.O. Box 349
Lyons, Colorado 80537
wmap@igc.org

John D. Fognani, Esq.
Haynes and Boone, LLP
1050 Seventeenth Street, Suite 1800
Denver, Colorado 80265
John.fognani@haynesboone.com

Matt Sandler, Esq.
Rocky Mountain Wild
1536 Wynkoop St., Suite 303
Denver, Colorado 80202
matt@rockymountainwild.org

Travis Stills, Esq.
Energy Conservation Law
1911 Main Avenue, Suite 238
Durango, Colorado 81301
stills@frontier.net

Dr. Robert Grossman
6215 Baseline Road
Boulder, Colorado 80303
grossman@colorado.edu

Original Signature on File
Lisa Garcia, Administrative Clerk
Judicial Arbiter Group, Inc.

8

BLM_0076651

# ATTACHMENT A

JAG No. 12 A 1318

IN RE: THE APPLICATION OF ENERGY FUELS RESOURCES, INC. FOR A
RADIOACTIVE MATERIALS LICENSE FOR THE **PIÑON RIDGE URANIUM MILL**

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND RULING – JANUARY 14, 2013

---

By a Judicial Review Order entered June 13, 2012 by Judge John M. McMullen of the Denver District Court in Action No. 2011CV861 the Colorado Department of Public Health and the Environment (CDPHE) was ordered to convene a hearing pursuant to C.R.S. § 24-04-105. On August 6, 2012 the undersigned was appointed as a hearing officer for that proceeding and CDPHE issued a Notice of Public Hearing and Opportunity for Public Comment describing the process for participation in the hearing and announcing, pursuant to a stipulation of the parties to the District Court litigation and approval by the Court on August 7, 2012, a tentative schedule for pre and post hearing procedures.

Without specific repeating each event here, the parties participated in a pre-hearing and post-hearing process fully described in the Record of Proceedings circulated with this Ruling, specifically including Minute Orders dated August 23, 2012, September 10, 2012, September 19, 2012, October 5, 2012, October 15, 2012, November 2, 2012, November 5, 2012, Hearing Minutes, Index of Exhibits, and a Minute Order dated November 27, 2012. The findings and conclusions made in each of those intermediate Orders and during the hearing are now incorporated in and made a part of these Findings of Fact and Conclusions of Law.

Having concluded as a matter of law that this hearing is an intermediate step in CDPHE's consideration of Energy Fuels application and considering that the administrative record may be further expanded before a final agency action on the license application, the undersigned has limited further Findings of Fact to listing issues and expressing opinions about the evidence presented except in those situations where the evidence offered by all parties appears fully developed.

## FINDINGS OF FACT

1) The District Court Order entered by Judge McMullen sitting in the Denver District Court calls for this hearing as a substitute for a second public meeting occurring on February 17, 2012, and calls for this record to be a part of the record to be considered during CDPHE's reconsideration and remaking of its licensing decision. The Notice of Public Hearing issued and published by CDPHE described the purpose of the hearing as an opportunity to receive comment and evidence on the application of Energy Fuels Resource Corp. (Energy Fuels) for a radioactive materials license and on the Environmental Impact Assessment prepared by CDPHE.

2) Energy Fuels has had internal discussions about the capacity of the proposed mill and the possibility of seeking an amendment or amendments to the license to allow for a greater

BLM_0076652

capacity of production. Those discussion and related analysis and design documents do not mandate a modification of the application to reflect that greater capacity or require a modified Environmental Impact Assessment to reflect that increase capacity. The application seeks to process 500 tons per day and any application to enlarge that capacity would require another full review by CDPHE. There is no evidence offered supporting a conclusion that CDPHE would attempt to circumvent that full review.

3) Counsel for Sheep Mountain Alliance and a number of the individuals making public comments complain that there were too many informal conversations between Energy Fuels and CDPHE and that the informality of that relationship is evidence of a bias or at least a lack of objectivity on the part of CDPHE in favor of Energy Fuels. Informality in the relationship between a regulated party and the regulator may simply indicate civility. The evidence does not evidence a bias in the behavior of CDPHE or its employees.

4) Counsel for Rocky Mountain Wild, Center for Biological Diversity and Colorado Environmental Coalition, hereafter referred to as the "Wildlife Coalition", offered documentary evidence that the proposed mill site was a potential habitat area for a number of species of animals, birds and plaints and further that there has been an historical impact upon aquatic life in the rivers in the region from the uranium mining and milling industry. With the exception of one sighting of the Gunnison Sage Grouse several years ago there was no evidence offered of the presence of an endangered or threatened species on or in the immediate proximity of the proposed mill site. CDPHE is required to consider the evidence and comments offered during this hearing as a part of the administrative record.

5) Dr. Craig Little and Dr. Robert Grossman were qualified and testified as experts in the air modeling process and possible wind dispersion of radioactive dust from the tailings ponds and the materials storage piles at the proposed mill. CDPHE is required to consider the evidence and comments they offered during this hearing as a part of the administrative record.

6) Ann Maest testified as an expert to address the qualities of the caffeinate to be discharged to the tailings ponds and its comparison with water quality standards for the ground water and surface water in the vicinity of the proposed mill, the studies of and issues related to the designed pond liners and pond construction. Kimberly F. Morrison testified as an expert to discuss the liner systems proposed for the tailings piles and netting to mitigate access of waterfowl. CDPHE is required to consider the evidence and comments they offered during this hearing as a part of the administrative record.

7) Constance L Travers testified as an expert to address the sufficiency of the ground water supply plan and the ground water investigation and monitoring plan and dispute the conclusion found in the application and the Environmental Impact Assessment (EIA) that no pathways are present for ground water below the site. Roman Popielak testified as an expert to address the ground water investigation and the possibility of perched ground water evidenced in the test wells. CDPHE is required to consider the evidence and comments they offered during this hearing as a part of the administrative record.

BLM_0076653

8) Dr. Thomas M. Power and Sandra L. Goodman testified as experts about the socioeconomic impacts of the proposed mill, each using the employment prediction of Energy Fuels for direct jobs to be created and different study areas for a calculation of indirect jobs that might be created. Any cost-benefit analysis for this proposed site, as with any other site is entirely dependent upon the physical area of impact to be studied. The broader the area included in the study the less statistically significant the possible benefit would be and the greater the impact of a possible or potential risk. Considering the reports of each witness and the absence of separate and distinct economic data for the west end of Montrose County the conclusions reached by each of them seems highly speculative and without significant probative value. CDPHE is required to consider the evidence and comments they offered during this hearing as a part of the administrative record.

9) Many of the individuals offering public comments and counsel for Sheep Mountain Alliance challenge the adequacy of the bond amount set by CDPH although each relate their objections to the cost of remediation at historic mills that were more loosely regulated or to the cost that might be realized if an upset condition existed. CDPHE is required to consider the evidence and comments offered during this hearing as a part of the administrative record.

## CONCLUSIONS OF LAW

1) The hearing conducted as described in the record of these proceedings fully satisfies the requirements of C.R.S. §24-4-105 in that notice was properly issued; any entity or individual who sought party status was admitted as a party, the parties were offered the opportunity to call witnesses and offer exhibits and cross-examine the witnesses who testified without limitation; the rules of evidence were relaxed to allow the tender of documents as exhibits without foundation; each step of the proceedings were recorded by a reporter and transcripts of those proceedings were made available to the parties; and that oral and written comments were solicited from members of the public who had not sought party status, without limitation on the time they wished to speak or the content of their comments.

2) As an initial issue the undersigned must address the purpose and scope of this hearing. A broad issue is presented with the relief sought by those making public comments, either oral or written, and that broader issue requires some discussion of the role of CDPHE, and its appointed hearing officer, in the regulation of uranium milling. Those public comments offered in support of the application and the proposed license cited primarily the economic opportunities to be realized by bringing additional employment to the west end of Montrose County. Many of the public comments offered in opposition to the application and the proposed license discussed the general impact upon the environment of any energy development, the risk of nuclear power production as evidenced by incidents in the Ukraine and in Japan, the risk of nuclear power production compared to production from other energy sources, the adequacy of the regulatory process put in place to regulate uranium mining and milling, the inherent health and environmental risk from the processing and handling of radioactive materials, alternate possibilities for employment, the possible use of thorium as a safer nuclear fuel and the possible proliferation of nuclear weapons.

11

BLM_0076654

Decisions to allow the mining, milling and use of uranium have been made by the United States Congress through the Atomic Energy Act and the Uranium Mill Radiation Control Act and by the legislative process in Colorado through the Radiation Control Act. Through the agreement with the Nuclear Regulatory Commission and the provisions of the Radiation Control Act the regulation of the nuclear industry has been delegated to CDPHE which also receives its funding through the state budgetary process. Perhaps the more collegiate process suggested in the testimony of Dr. Grossman would produce a superior result but it is not the process provided by law. The statutory obligation of CDPHE to consider Energy Fuel's application may conflict with both its mission statement and its vision. Neither CDPHE nor its appointed hearing officer has the authority to simply ignore the statutory mandate to consider and act upon Energy Fuels Application. Consideration of the broader questions raised during the public comments must be addressed to the Congress of the United States or the Legislature of the State of Colorado.

3) Arguments and a number of public comments urge the possibility that the market price of the minerals produced will be inadequate to support construction and operation of the proposed mill. Economic consequences of that nature are highly speculative and are typically left to the market for resolution.

4) In addition to the general issues raised by those offering public comments there is a fundamental dispute between those granted party status about the scope and purpose of this hearing. Energy Fuels and CDPHE urge that the limited purpose of this hearing is to offer an adversarial hearing with an opportunity to participate, cross-examine and offer comments, and that that hearing becomes part of the record to be considered in the future deliberations of CDPHE about the Energy Fuels application. Sheep Mountain Alliance, the three environmental entities referred to as the "Wildlife Coalition", and the Town of Ophir urge that procedural and substantive deficiencies in Energy Fuel's application and in the Environmental Impact Analysis (EIA) prepared by CDPHE are sufficient to preclude the issuance of the requested license. Dr. Robert Grossman offered evidence and arguments challenging the air pollution conclusions and transportation issues discussed in the EIA and raised issues regarding the design and objectivity of the permitting process.

5) Considering the Order of the Denver District Court and the Published Notice of this Hearing compels a conclusion that this hearing is an intermediate step in CDPHE's consideration of Energy Fuel's application. The undersigned may make findings of fact or conclusions of law upon the evidence presented and the issues raised but those findings and conclusions are to be considered in the future deliberations of CDPHE and are not a final agency decision subject to appeal.

6) During cross examination of witnesses employed by CDPHE by counsel for Sheep Mountain Alliance it became apparent that each individual employee of CDPHE who played a part in the review of the license application at issue in this proceeding may have retained individual files relating to that review process and that those files may not have been placed in the public record available to the parties to this proceeding. Discovery of those files was conducted in a post hearing procedure in the office of CDPHE on November 27, 2012 as reflected in the Minute Order of that date. Sheep Mountain Alliance complains that those documents were not earlier produced in response to the general and broad requests for

12

production of documents earlier addressed to CDPHE.  There was no effort before the hearing to conduct depositions of those CDPHE employees and no reason to conclude that the existence of those individual files would not have been disclosed in any formal or informal discovery process. The documents discovered are now a part of the record in this proceeding.  The record does not support a conclusion that CDPHE failed to respond to reasonable discovery requests and sanctions for discovery violations or reopening the hearing are not appropriate.

Having concluded that this hearing is an intermediate step in CDPHE's consideration of Energy Fuels the single additional issue upon which a Conclusions of Law is made addresses the discovery issue arising from delayed production of personal files from CDPHE personnel.

This Ruling was scheduled to be delivered on January 11, 2013.  In light of the volume of material submitted in the proposed Findings of Fact and Conclusions of Law presented by the parties its completion and delivery was delayed until January 14, 2013.

Entered in Denver, Colorado this 14th day of January, 2013

s/Richard W. Dana
Richard W. Dana
Appointed Hearing Officer

BLM_0076656

Attachment C

 **COLORADO**
Department of Public
Health & Environment

Dedicated to protecting and improving the health and environment of the people of Colorado

April 26, 2018

Pinon Ridge Resources Corporation
31161 Highway 90
PO Box 825
Nucla, CO 81424-0825

Attention: George Glasier, President and CEO

Re: Revocation – Colorado Radioactive Materials License Number CO 1170-01

On April 17, 2018, Richard W. Dana, Appointed Hearing Officer, issued the findings of fact, conclusions of law and ruling in response to Judge Robert L. McGahey, Jr.'s September 3, 2014 order on Colorado Radioactive Materials License Number CO 1170-01. In his ruling, Judge Dana concluded that Energy Fuels failed to meet its burden of proof on four issues and that the application of Energy Fuels for a license to mill radioactive materials should, absent an additional hearing, be denied.

Although the Department believes the original decision on the license application was appropriate, the department has elected not to challenge Judge Dana's decision. As such, this decision provides the Department with the rationale to revoke the license pursuant to Section 3.23.2 of the *Colorado Rules and Regulations Pertaining to Radiation Control*. Therefore, effective the date of this letter, Colorado Radioactive Materials License Number CO 1170-01 is revoked.

If you have any questions regarding this letter please contact me at 303-692-3403 or jennifer.opila@state.co.us.

*Jennifer T. Opila*

Jennifer T. Opila, MPA
Radiation Program Manager
Hazardous Materials and Waste Management Division

CC:     Steven Brown, Radiation Safety Officer
        Jerry Goad, Colorado Attorney General's Office



BLM_0076657

Attachment D

<table>
<tr>
<td>

DISTRICT COURT, CITY AND
COUNTY OF DENVER, COLORADO
1437 Bannock Street
Denver, Colorado 80202

</td>
<td>

DATE FILED: September 3, 2014 12:17 PM
CASE NUMBER: 2013CV32397

</td>
</tr>
<tr>
<td>

SHEEP MOUNTAIN ALLIANCE and
ROCKY MOUNTAIN WILD
Plaintiffs;
v.
COLORADO DEPARTMENT OF
PUBLIC HEALTH AND
ENVIRONMENT, JENNIFER OPILA, IN
HER OFFICIAL CAPACITY; CDPHE
EXECUTIVE DIRECTOR DR.
CHRISTOPHER URBINA, IN HIS
OFFICIAL CAPACITY;
and
DEFENDANT INDISPENSABLE
PARTY ENERGY FUELS RESOURCES
CORPORATION,
Defendants.

</td>
<td>

☐COURT USE ONLY☐

Case No.  13CV32397

Division 409

</td>
</tr>
<tr>
<td colspan="2">

**ORDER RE: ENERGY FUELS RESOURCES CORPORATION'S
MOTION FOR REMAND TO HEARING OFFICER**

</td>
</tr>
</table>

THIS MATTER comes before me on Energy Fuels Resources Corporation's ("Energy Fuels") Motion for Remand to Hearing Officer, filed on May 2, 2014. I have reviewed the Motion, the Colorado Department of Public Health and Environment ("CDPHE") Response, the Sheep Mountain Alliance ("SMA") and others Response, Reply, the entire case file, as well as the applicable case and statutory law, and make the following findings of fact and conclusions of law:

## I.    Background

On November 18, 2009, indispensable party Energy Fuels submitted an application to defendant Colorado Department of Public Health and Environment ("CDPHE") for the issuance of a Radioactive Materials License. Energy Fuels sought to construct and operate a Uranium Mill in Montrose County, Colorado. CDPHE determined that the application, including a voluminous Environmental Impact Analysis, was substantially complete and ready to be presented for public hearings required by Colorado statute. *See* C.R.S. § 25-11-203 (2)(b)(I) (2013). Several public hearings were held, and the license was issued by CDPHE to Energy Fuels in 2011.

Plaintiff Sheep Mountain Alliance ("SMA"), among others, filed an appeal of CDPHE's license decision with the Colorado District Court, alleging that the public hearings held by Energy Fuels and CDPHE did not meet statutory requirements. On June 13, 2012, the Denver District Court found CDPHE's action of issuing Energy Fuels a license without first holding a hearing pursuant to C.R.S. § 24-4-105 to be illegal. The prior court invalidated the issued license and remanded with instructions to hold a §105 hearing, and included a new timeframe for the parties to follow.

The parties proceeded. At the Hearing Plaintiffs claimed the purpose of the Hearing was determine whether Energy Fuel's application met all criteria under state law for issuance of a license. Energy Fuel claimed the purpose was to gather evidence within the procedural confines of APA § 105. The Hearing Officer agreed with Energy Fuels and determined the Hearing was an intermediate step in CDPHE's granting the license. A decision was then reached by CDPHE granting a license to Energy Fuels.

Plaintiffs sought invalidation of a Radioactive Materials License issued to Energy Fuels by CDPHE on April 25, 2013. Plaintiffs made six claims in arguing that the license should be invalidated: (1) CDPHE deprived SMA of an "initial decision" following the required hearing, (2) the hearing officer failed to determine and adhere to an explicit burden of proof in the hearing as required by 6 C.C.R. 1007-1 § 18 ("part 18 regulations"), (3) the hearing officer did not apply the substantive protections of part 18 regulations, (4) the hearing lacked competent socioeconomic data in violation of part 18 regulations, (5) CDPHE arbitrarily relied on an unlawful Environmental Impact Analysis, and (6) cumulatively, CDPHE's licensing action and decision violates the Uranium Mill Tailings Radiation Control Act ("UMTRCA"), the Atomic Energy Act ("AEA"), the Administrative Procedure Act ("APA"), Colorado Radiation Control Act ("RCA"), and part 18 of the implementing regulations.

I denied CDHPE's Motion to Dismiss the Complaint on September 9, 2013 and denied Energy Fuels' Motion to Dismiss the Complaint on September 16, 2013.

In order to resolve issues raised in the Complaint, Energy Fuels requests that I hold its license in abeyance and remand the entire matter to CDPHE and the Hearing Officer to address all of Plaintiff's claims. Specifically, Energy Fuels moves that I (1) order the Hearing Officer render an initial decision based solely on the record from the initial Hearing and (2) determine which party bore the burden of proof and whether that burden was satisfied. Defendant moves that CDPHE review all Plaintiffs substantive and procedural claims (3), (4), (5), and (6). Defendant and Indispensable Party argue remand is appropriate, asserting that the Hearing Officer's Finding of Fact, Conclusions of Law, and Ruling were deficient. They also claim such and order would promote judicial efficiency.

### III.    Law and Analysis

### A.    Order is Not Prejudicial and Promotes Judicial Economy

BLM_0076659

A review of the case record suggests the Order is not Prejudicial because it is not likely to require Plaintiff to expend unnecessary resources. Further, judicial economy is served by remanding this case because it directly allows for the resolutions of issues raised by Plaintiff.

**B.     Hearing Officer Can Resolve Plaintiff's Claim Surrounding the Burden of Proof**

Public officials acting in an adjudicatory capacity are entitled to "quasi-judicial absolute immunity" if there are sufficient procedural safeguards in the adjudicatory actions. *Churchill v. Univ. of Colo. At Boulder*, 285 P.3d 986, 999-1005 (Colo. 2012). There is no case law to suggest that the remand of a post-hearing assignment of the burdens of proof is a violation of due process rights.

**C.     Remand is Appropriate**

The Administrative Procedure Act is to provide "a plain, simple, and prompt remedy to persons or parties . . . aggrieved by agency actions."   C.R.S. § 24-4-106(1).   When there can be no meaningful review on the merits, the proper action is to remand the case for appropriate proceedings.  *See Lawless v. Bach*, 489 P.2d 316, 318 (Colo. 1971); C.R.S. § 24-4-106(7).  Remand is appropriate where a hearing officer "failed to adopt any findings or conclusions or to give any reasons for its action."  *Ivy v. State Personnel Bd.*, 860 P.2d 602, 605 (Colo. App. 1993).   "[T]he court shall determine all questions of law and interpret the statutory and constitutional provisions involved and shall apply such interpretation to the facts duly found or established." C.R.S. § 24-4-106(7).

Here, the Hearing Officer failed to make a conclusion as to whether Energy Fuels application met all criteria for issuance of a license pursuant to C.R.S. § 25-11-203. Additionally, there are no questions of law or constitutional issues that I need to resolve.

## IV.  Order

It is ordered that:  (1) **The Energy Fuels license is held in abeyance**, (2) **That this matter is remanded for hearing consistent with this Order**, including the following:

A. CDPHE is ordered to convene an appropriate Hearing Officer.  Original Hearing Officer shall be selected if he or she is available and are eligible to issue a *post hoc* determination of the burdens of proof in the hearing.  If Original Hearing Officer is unavailable or ineligible to issue a *post hoc* determination of the burdens of proof in the hearing, then CDPHE shall select another appropriate Hearing Officer.   That Hearing Officer shall review the record of the initial §105 hearing.

B. Limited Discovery shall be made available only for the purpose of determining whether the original Hearing Officer is eligible to enter *post hoc* determinations of the burdens of proof in the hearing due to post-hearing ex-parte communications.

BLM_0076660

C.  After limited discovery, CDPHE shall decide whether the original Hearing Officer is eligible.

D.  The Hearing Officer formally assigned to the case shall issue an initial decision as to whether Energy Fuels' application met all criteria under state law for issuance of a license pursuant to C.R.S. § 25-11-203.  Hearing Officer shall also issue a *post hoc* determination of the burdens of proof in the hearing.

E.  Said Hearing Officer shall make decisions based on the record from the initial §105 hearing.

F.  Parties may modify terms of who is the Hearing Officer by written stipulation signed by all parties, provided that any such stipulation does not impair the rights of any party.

G.  Following proceedings with the Hearing Officer, CDPHE shall review whether the original Hearing Officer  in the original Hearing  applied substantive protections of part 18 regulations, possessed competent socioeconomic data as per part 18 regulations, whether CDPHE arbitrarily relied on an unlawful Environmental Impact Analysis and whether the CDPHE's licensing violated UMTRCA, AEA, APA, RCA, and part 18 of the implementing regulations,

H.  CDPHE shall review the determination of Energy Fuel's License with regards to prior §105 record and additional proceedings mandated by this order.

SO ORDERED this 3rd day of August, 2014.

BY THE COURT:

_____
Robert L. McGahey, Jr.
District Court Judge



## GOVERNMENT AFFAIRS/NATURAL RESOURCES

### LYNN PADGETT

April 23, 2018

RE: Draft Alternative E CA Meeting Follow-up

Dear Greg and Matt,

San Miguel County appreciates the opportunity to continue working with the Uncompahgre Field Office as a Cooperating Agency during the extended Resource Management Plan revision process.

Thank you for providing a draft of Uncompahgre Field Office (UFO) and Agency Preferred Alternative, new Alternative E as summarized in the draft revised Table 2-2 for us to review following the UFO RMP Cooperating Agency (CA) meeting held in Montrose on March 28 where some of the concepts of Alternative E were introduced.  Immediately following the March 28 meeting, San Miguel County forwarded a comment document submitted by the Board of County Commissioners on the West-Wide Energy Corridor segment going north-south through San Miguel County for the Section 368 West-Wide Energy Corridors Region 2 Review comment period to help inform UFO and the RMP of our concerns regarding the location of this corridor.

We are grateful to you both for taking the time to meet with Commissioner May and me on April 16 to dialogue about questions and concerns San Miguel County has with the draft Alternative E.

It is our recollection that during our April 16 meeting we heard that Alternative E has been crafted to incorporate new information, BLM and administrative priorities, input from the BLM's interdisciplinary team, comments received from the public and Cooperating Agencies, and to reduce some of the complexities of having overlapping management prescriptions from special designations.

Our recollection and takeaways of our discussion of the important topics that were discussed during our April 16 meeting were:

- San Miguel County expressed a desire that the San Miguel River Expansion ACEC be designated in the final RMP.  We heard from UFO that the mosaic of landownership makes management of the expanded area more difficult.  San Miguel County suggested that the north end of an expanded ACEC could be terminated at the San Miguel County line.  We indicated if this is not possible, that the existing San Miguel River ACEC and SRMA is supported by San Miguel County and is desired to have the highest possible visible resource management and be managed to protect and not degrade important riparian ecosystems and bird habitat and avoid conflicts between recreation, permitted outfitter activities, new routes and rights-of-way, and in-stream mining.  We also asked

P.O. BOX 1170  •  Telluride, Colorado  81435  •  (970) 369-5469  •
lynnp@sanmiguelcountyco.gov

BLM_0076662

that the stipulations that had been part of Alternative D within the existing ACEC, specifically the codes LOCATE, HYDROE, SOLARE, and WINDE be retained in Alternative E with HYDROE being incorporated for all WSR segments being designated as Suitable, vs. just those classified as Wild.

- We asked that the San Miguel River SRMA have a visual resource management level of V-2.  With more protective stipulations that emphasize sustaining the ecological integrity and scenic beauty of the San Miguel River corridor, and Beaver and Saltado Creeks and important riparian habitat, San Miguel County can be supportive of not having an Ecological Emphasis Area co-designated.  We heard that the agency would consult with its interdisciplinary team about the current conditions, but that the UFO would not want to manage areas that have Visual Resource Management Class 3 characteristics as a Class 2.

- During this meeting, we learned more about why target shooting stipulations have changed between Alternatives D and E.

- We indicated concern with potential Gunnison Sage-grouse management differences if they are based on neighbor resource management plans that were created using pre-listing NEPA.  The Gunnison Sage-grouse was listed as a Threatened species and critical habitat was designated by the U.S. Fish and Wildlife Service (USFWS) in November of 2014.

- We indicated desire to have Burn Canyon managed as an SRMA vs. an ERMA as recommended in draft Alternative E, primarily to have the sensitive riparian areas in the drainages be retained as non-motorized area.  We learned from UFO that the BLM has concerns that an SRMA will over-emphasize and/or advertise recreational uses and potentially exacerbate access and enforcement conflicts vs. an ERMA.  UFO has put a lot of thought into this change and has taken into consideration the difficulty of access, the safety of access on existing narrow county roads, honoring and incorporating the recent Burn Canyon Travel Management Plan, and agency direction for energy dominance.

- San Miguel County compared the management codes between the SRMA in Alternative B and the ERMA in Alternatives D and E.  Burn Canyon would have had a clear NSO in Alternative B, with the riparian canyon portions closed to motorized and mechanized uses and/or have visual resource management levels of V-2.  We asked for the UFO to take another look at the ERMA stipulations which would only be CSU, V-3, and DAY for the entire area and re-consider adding more of the protective management to protect the scenic and riparian resources in this incredible area.

- San Miguel County requested more explanation of the new language in draft Alternative E that uses slight variations of language such as "…for greater than 80 percent of [stream segments/vegetation communities/etc.] in ACECs, WSAs, suitable wild and scenic river segments, lands managed to protect wilderness characteristics, and greater than 70 percent of [stream segments/vegetation communities/etc.] on the remaining BLM-administered lands, over 10 years with 80 percent confidence.  We wondered if this could result in losing 30 percent of special characteristics of a special area during successive 10-year intervals.  We also said one interpretation was that BLM was going to manage only 10 percent more of the stream/vegetation communities/etc. (see Rows 43, 63 and 75 for examples of the language) if they were in a special area vs. a non-special area

documented as having special qualities.  We asked how 80 percent confidence will be measured and achieved in a non-subjective way.  We hope to get more information about this new assessment, monitoring and evaluation concept from the BLM.

- We indicated that we would verify if Norwood had a Source Water Protection Area designated and help UFO know where any such areas are in San Miguel County.  In 2002, the Town of Norwood did prepare a Sourcewater Assessment and Protection Report.  San Miguel County will scan and send Greg and Matt the documents we have on file.  The San Miguel County Source Water Assessment Reports we have documentation of are Aldasoro Ranch HOA, Ilium Valley WS, Last Dollar PUD, Mountain Village, Norwood Water Commission, Town of Ophir, Town of Telluride, Wilson Mesa, Telluride Regional Airport, Camp Ilium, Skyline Guest Ranch Ski Lodge, Matterhorn Campground, and Sunshine Campground.  Colorado Department of Public Health and Environment (CDPHE) should also be a reference for these reports and boundaries of source water protection areas.

We did not get a chance to discuss a few topics that San Miguel County has flagged as becoming a concern in the draft Table 2-2 and Alternative E.  We'd like to let you know that we have concerns about what appears to be changes in direction with the new draft Alternative E:

- Lesser protective management for hydrology and wetland features, and omission of protective buffering for intermittent and ephemeral streams, and riparian areas.  Rows 77 and 82 are a couple examples of this.  Where many tributaries in our headwaters position are snow-fed and are technically intermittent, managing resources to provide protection of hydrological systems and water quality is extremely important.
- Changes in language between cooperating, collaborating and coordinating with Colorado Parks and Wildlife (CPW) in various rows.
- Less protective management for irreplaceable cultural resources and national/historic trails.
- No longer proposing to manage Dolores (River) Slickrock Canyon ACEC as an ACEC in Alternative E.  The previous agency preferred alternative D would have managed the Dolores River Slickrock Canyon ACEC to protect and prevent damage to the significant "scenic, cultural and paleontological resources, desert bighorn sheep, peregrine falcon, roundtail chub, and plan communities and the BLM sensitive species Kachina daisy and Naturita milkvetch" (See revised draft Table 2-2, Row 534).  We support the collaborative stakeholder process of the Dolores River Dialogue and feel that management of the Dolores River Slickrock Canyon ACEC as provided in the previous agency preferred Alternative D best protects these significant natural, biological, cultural, recreational and scenic resources and values.

We really appreciated the opportunity to spend a couple hours with you both to learn more about the proposed revisions and Alternative F and to discuss our concerns and make suggestions.  We value our close working relationship with the UFO and its dedicated staff.

Sincerely,

Lynn Padgett
Director, Government Affairs/Natural Resources
San Miguel County

# SAN MIGUEL COUNTY
## BOARD OF COMMISSIONERS
### ART GOODTIMES          AMY LEVEK          JOAN MAY

October 31, 2016

Joseph Meyer, Southwest District Manager
Dana Wilson, Acting Uncompahgre Field Office Manager
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Via Email: uformp@blm.gov

Dear Joe and Dana,

San Miguel County (SMC) is pleased to be offered the opportunity to comment on the Uncompahgre Field Office of the Bureau of Land Management (UFO BLM) Draft UFO Resource Management Plan (RMP) / Environmental Impact Statement (EIS) [hereafter, "*DRMP/EIS*"]

In 2015, the San Miguel County Board of County Commissioners approved Resolution 2015-009[1] (Attachment A), stating that public land under the management of the U.S. Forest Service and BLM constitute more than 60% of the land within San Miguel County and included the following statements:

- federal public lands are essential to the quality of life in San Miguel County, providing public recreational opportunities for wildlife watching, hiking, hunting, fishing, backpacking, horseback riding, skiing, bicycling, sightseeing, and numerous other outdoor recreational activities;
- federal public lands provide essential habitat for wildlife;
- wildlife and scenic landscapes on the public lands attract outdoor recreation and tourism that are the dominant drivers of San Miguel County's economy;
- San Miguel County business owners attract employees in large part because of the iconic landscape and recreational opportunities on federal public lands;
- San Miguel County's agriculture industry includes numerous ranchers and sheepherders who are dependent on grazing on federal public land;
- San Miguel County residents are actively collaborating among diverse interests and with public land managers to improve public land management and public access.

We have attempted to recommend actions that San Miguel County would like to have incorporated into the Final RMP and Record of Decision (ROD) and recommend improvements for what we consider shortcomings in portions of the plan and.  We are not asking for just a single alternative to be implemented.  We have identified places where we do not agree with the agency preferred Alternative D, and might agree in whole or in part with another Alternative, such as Alternative B.  However, we have tried to approach each item that we perceive to be within or directly affecting San Miguel County in such a way as to offer desired actions and stipulations, which may be a customized mix or hybrid of different alternatives.  We have attempted to offer our desires so that they can be practically accomplished when implementation of the Final RMP begins.  We believe incorporating our

---

[1] http://www.sanmiguelcountyco.gov/301/Document-Viewer

1

BLM_0076665

recommendations will strengthen the document so that it provides clearer guidance and expectations in resource management programs, practices, and protections for the present and for the future.

Our comments are also offered in the spirit of the DRMP/EIS statement, "The BLM's planning regulations require that RMPs be consistent with officially approved or adopted resource-related plans ...so long as they are also consistent with the purposes, policies, and programs of federal laws and regulations applicable to BLM-administered lands." [2]

We also offer our comments in the spirit that the BLM attempted to "explore opportunities to enhance management of resources and resources uses; resolve conflicts among resources and resource uses; meet the purpose and need for the RMP; and are feasible to accomplish."

While San Miguel County philosophically is more supportive of the intent of Alternative B over Alternatives C and D, there are times where our comments realize that a balanced multiple use and human activities and structures are necessary for economic development and recreation, where they can avoid or mitigate impacts to other activities or wildlife needs.

> **2.3.3   Alternative B**
> Alternative B emphasizes improving, rehabilitating, and restoring resources and sustaining the ecological integrity of habitats for all priority plant, wildlife, and fish species, while allowing appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, ROWs, and livestock grazing). It particularly targets the habitats needed for the conservation and recovery of federally listed, proposed, or candidate threatened and endangered plant and animal species. Goals and objectives focus on environmental and social outcomes achieved by sustaining relatively unmodified physical landscapes and natural and cultural resource values for current and future generations. This alternative would establish the greatest number of special designation areas such as ACECs and special recreation management areas, with specific measures designed to protect or enhance resource values. Appropriate and allowable uses and restrictions would be contingent on minimizing impacts on natural and cultural resources.

(From Page 2-7 of the DRMP/EIS)

> **2.3.6   Alternative D: Agency Preferred**
> Alternative D is the agency-preferred alternative, which emphasizes balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife, and fish habitat. This alternative incorporates a balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land uses. Goals and objectives focus on environmental, economic, and social outcomes achieved by strategically addressing demands across the landscape. **Section 2.5** (Considerations in Selecting a Preferred Alternative) outlines the selection process for the preferred alternative.

(From Page 2-8 of the DRMP/EIS)

---

[2] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.7326.File.dat/1_UFO-DRMP-2016_508.pdf

BLM_0076666

With the intent that our comments are practical, we are not commenting on Alternative B-1 or designations that are not within or do not have direct impacts on San Miguel County.

We have prepared our comments mostly by special designation or resource use categories, and our comments are generally specific to areas, resources, resource uses, and potential designations within San Miguel County.  In some cases where the RMP decision may affect San Miguel County, we have also commented.  We have attempted to provide clear comments and recommendations, but in reviewing a plan, supporting materials, and spatial data, we realize our comments may not be as clear as we intended.  Please encourage the UFO staff to contact our staff lead, at 970-369-5441 or lynnp@sanmiguelcountyco.gov if there are any questions or clarifications needed.

1. **LANDS WITH WILDERNESS CHARACTERISTICS/WILDERNESS STUDY AREAS (WSAs)**
   Summary:  There are no Lands with Wilderness Characteristics or WSAs mapped within San Miguel County.  San Miguel County appreciates that these lands were inventoried by the BLM and supports comments being submitted by Conservation Colorado and Western Colorado Congress on this subject.

2. **WILD AND SCENIC RIVER (WSR) SUITABILITY.**
   Summary:
   - San Miguel County fully supports the designations of the identified river segments with in the San Miguel Basin as suitable.
   - San Miguel County fully supports the designation as "suitable" of the segments proposed in DRMP/EIS Alternative D, with some differences in the Alternative D stipulations.
   - See Rational/Discussion for specific comments on segment management stipulations.

   Rationale/Discussion:

   **Determination of Suitability**
   By making a determination of "suitable" for inclusion in the National Wild and Scenic Rivers System for the segments contained in Alternative D of the DRMP/EIS, the UFO BLM is honoring the countless hours of work from local stakeholders, citizens, sub-RAC (Resource Advisory Council), RAC members, and state and federal agency specialists, along with all of the public input gathered in-person and via multiple written comment periods.

   The number of segments recommended as "suitable" is a very small subset of the number of segments analyzed and their designation as suitable was found to be the best locally acceptable method to maintaining important native fish or other critical wildlife habitat, recreation and scenic values. Private property rights and water rights were carefully considered during the suitability process led by the stakeholder group and had been appropriately respected in Alternative D of the draft RMP/EIS. [3, 4]

   San Miguel County urges the UFO BLM to support these determinations of suitability within the Dolores and San Miguel Basin and to work with the Colorado Water Conservation Board (CWCB) to obtain flow protections using state processes to support the flow-related Outstandingly Remarkable Values (ORVs) where they do not already exist within these segments.

   In June 2010, the UFO BLM published their findings of eligibility for 174 river segments studied and evaluated in advance of the Uncompahgre Resource Management Plan (RMP). The analysis area included

---

[3]Pages 3-164-167;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.96289.File.dat/3_UFO-DRMP-2016_508.pdf
[4]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.2133.File.dat/P_WSR-Suit_UFO-DRMP-2016_508.pdf

3

a portion of the Dominguez-Escalante National Conservation Area (NCA). An additional segment of the Dolores River, identified in the San Juan Public Lands Draft Land Management Plan, was evaluated by the UFO BLM because the northernmost 11.8-mile downstream portion of this segment is within the UFO planning area.

The BLM found after completion of field assessments and data analysis that informed their eligibility determination process, that 34 segments out of the 174 segments scoped were determined to be both free-flowing and to possess one or more outstandingly remarkable values (ORVs) that are necessary for Wild and Scenic River eligibility.  During the eligibility process, reviews of free-flowing character and determinations of ORVs were made by Colorado Parks and Wildlife (formerly Colorado Division of Wildlife; CPW), U.S. Fish and Wildlife Service (USFWS), and Colorado Natural Heritage Program (CNHP). The Draft Eligibility Report had a typical public comment period with comments received by the BLM from diverse interests.

In addition, fish values were assessed by Colorado Parks and Wildlife (CPW) on the San Miguel and Dolores Rivers. A presentation by Dan Kowalski, Aquatic Biologist, CPW, stated that San Miguel River Segments 1 and 2 are very important and highly used fisheries with important recreational fishing values. San Miguel River Segment 2 was identified as exceeding the Gold Medal Biomass standard in some years. Native fish species identified on the San Miguel River are Colorado Pikeminnow (Federally Endangered/State Threatened); Bluehead Sucker (State Threatened); Flannelmouth Sucker (State Threatened); Roundtail chub (State Species of Special Concern; BLM Sensitive Species); Colorado River Cutthroat Trout (State Species of Special Concern); Speckled Dace and Mottled Sculpin.[5]

In February 2013, the UFO BLM published their final Wild and Scenic River Suitability Report, which further analyzed the suitability of 28 river segments, including the 11 .88-mile segment of the Dolores River.[6] (Six river segments, found eligible, were separately analyzed for suitability within the Dominguez-Escalante NCA RMP.)

During the robust suitability process, the BLM weighed protective measures for eligible river segments and the corresponding corridor in relation to current and potential identified uses. Possible environmental and economic consequences of, management issues resulting from, and reasonable alternatives to WSR designation were considered. Preliminary segment boundaries and classifications were reevaluated in response to public input. Geographic information systems data was recalculated, at times resulting in modified segment lengths and land ownership measures. Public participation and comments resulted in refinement of which segments were considered suitable for 10 stakeholder group meetings within the Dolores/San Miguel Basin.  (Separate stakeholder processes were initiated for segments in the Gunnison River Basin and those in the Dolores and San Miguel river basins.) Stakeholder groups held public meetings during late 2010 and early 2011. The Dolores/San Miguel Basin subgroup considered BLM analysis and public input and developed recommendations for each of the Dolores-San Miguel segments. A second public comment period was held to receive even more input prior to suitability recommendations from the stakeholder group. Hundreds of public comments were considered during the formal suitability public comment period.

San Miguel County fully believes that the stakeholder group, co-chaired by John Reams, a construction and mining contractor and rancher based in Norwood and Naturita, and Peter Mueller, a project director for the Nature Conservancy, based in Telluride, represented diverse backgrounds and interests and solicited diverse input from the public that was deeply considered in the final results of the process.

---

[5] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/wsr_docs.Par.32765.File.dat/San%20Miguel%20Dolores%20Fish%20DOW%20Presentation%20Dan%20Kowalski.pdf
[6] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.70506.File.dat/WSR%20Suitability%20Report_Final_04272012.pdf

4

Stakeholder meetings were held in Norwood, Naturita, and Telluride, whose residents are known to have very different political views on energy, minerals, recreation, agriculture, and forestry.[7] The Dolores/San Miguel Basin subgroup examined 21 different stream segments and public input received was incorporated into their findings.[8] The stakeholder group found 7 segments to be Suitable with modifications, 6 segments to be Suitable, and 8 to be Not Suitable.[9] Their recommendations were then considered by the BLM Southwest Resource Advisory Council (SW RAC) which voted unanimously to recommend that 8 segments in the San Miguel Basin and 5 segments in the Dolores Basin be found suitable. The BLM incorporated these recommendations into its preferred Alternative D of the UFO draft RMP/EIS.

San Miguel County is supportive of NCA legislation on the Dolores River Segments 1 and 2 and the La Sal Creek Segments 2 and 3, which overlap with the Tres Rios and Uncompahgre BLM offices.  If the NCA is successful, we believe that a Suitability determination would no longer be relevant. However, until an NCA is agreed upon, Suitability is a powerful tool to bring stakeholders and governments to the table to agree on NCA terms. Currently, there is no guarantee that an NCA will happen in the near future or that there will be agreement as to how the NCA will protect flows in place of current Suitability. Therefore, until such time as an NCA may be established that protects both flow-related and non-flow dependent ORVs, San Miguel County urges the CWCB to support the Alternative D suitability recommendations for the Dolores River. If an NCA is established that accomplishes full protection of ORVs, we would then support the determination for these 4 segments to be changed to not suitable.

San Miguel County understands that when the CWCB voted to appropriate an Instream Flow right (ISF) on the Dolores River from the San Miguel to Gateway (Lower Dolores Segment), the BLM offered in an unprecedented agreement, not to seek a federal water right on this river segment to protect the ORV flows. This was a very important consideration by the CWCB in voting to appropriate the ISF. We support the CWCB in asking for this language to be carried through on the other Dolores River sections.

While the ISF is important to protect the Lower Dolores segment (25), the ISF alone would not protect the wide array of ORVs, including: recreational and the extraordinary rafting, kayaking and canoeing opportunities; peregrine falcon habitat, including for breeding and nesting; and geologic and scenic, including the historic hanging flume.  The BLM's Report admits that due to the limited unappropriated water, it is unlikely that the high flows needed to sustain recreational activities could be secured. The Suitability determination on the Lower Dolores sections would complement the State's ISF by adding land management protection for this incredibly scenic and remote stretch of river with its historical, cultural and wildlife attributes.

San Miguel County also understands that The Lower Dolores from McPhee Dam to Bedrock already operates with a Suitability designation that was in place when the dam was built. The BLM has made it clear that it can't take away the senior water rights of the Dolores Project or require new reservoir releases through Suitability; rather it must work within the Colorado water rights system. The current Suitability determination on the Dolores has not appeared to affect Drought Contingency Planning or any coordinated management efforts.

    **A. San Miguel River Segment 1** – ORVs are Scenic, Recreational, Wildlife, Historic, Vegetation, and Paleontology.  Over 19 miles of this segment lies within the existing San Miguel ACEC, and it

---

[7] http://www.telluridenews.com/news/article_d60c6f40-91d2-542e-8dad-e06bb13d4e85.html
[8] http://matchbin-assets.s3.amazonaws.com/public/sites/165/assets/64CW_The_Watch___March_17___2011.pdf
[9] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/wsr_docs.Par.31074.File.dat/2011-0225%20WSR%20Dolores%20San%20Miguel%20Segment%20Analysis%20RAC%20Recommendation.pdf

appears nearly the whole segment lies within the proposed San Miguel Expansion ACEC (GIS files).[10]

The San Miguel River corridor is extremely important for the local economy.  Preserving scenic views while allowing for high-quality boating, fishing, and retaining the existing travel management plan uses/limitations is extremely important to San Miguel County.

Due to the scenic and recreational ORVs, the fact that this segment is within the designated San Juan Skyway Scenic Byway and the Unaweep-Tabeguache Scenic and Historic Byway, it is very important to retain no less than a V-2 category for visual resource management.  This is consistent with the San Juan Scenic Byway Management Plan[11], the Unaweep-Tabeguache Scenic and Historic Byway Corridor Management Plan[12], and the San Miguel County Comprehensive Development Plan[13].  While the DRMP/EIS states "The BLM would not permit any actions that would adversely affect the free-flowing condition, ORVs, and adequate water quality to support those ORVs or tentative classification of any of the segments, or would result in the reduction of water quality to the extent that it would no longer support the ORVs…"[14], the stipulations provided in Alternative D do not provide the safeguards needed to make this a true statement.  If this is indeed a fact, then stronger stipulations are needed to replace those in Alternative D and/or in addition to the Alternative D stipulations.  Also, reaches within this segment contain four globally vulnerable (G3) riparian communities.

**B.  Saltado Creek** – This segment is proposed for a WSR designation of Wild in Alternative D.  The stated ORV for this segment is Vegetation, described as an "A-ranked" superior occurrence of globally vulnerable (G3) narrowleaf cottonwood/blue spruce/thinleaf alder riparian forest, which is a primary reason the existing San Miguel ACEC was created.[15]

**C.  Beaver Creek** --

This segment is proposed for a WSR designation of Recreational in Alternative D.  The stated ORV for this segment is Vegetation, described as an "A-ranked" superior occurrence of globally vulnerable (G3) narrowleaf cottonwood/blue spruce/thinleaf alder riparian forest, which is a primary reason the existing San Miguel ACEC was created.[16]  The designation of Recreational received strong support from a primary private landowner and San Miguel County, and was chosen to provide "reasonable certainty that future water development projects would receive consideration and could move forward with minimal difficulty."[17]

---

[10]http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp/ufo_draft_rmp_shape.html
[11]https://www.codot.gov/travel/scenic-byways/southwest/san-juan-skyway/SanJuanSkywayCorridorManagmentPlan.pdf/at_download/file
[12]https://www.codot.gov/travel/scenic-byways/southwest/unaweep-tabeguache/unaweep-tageguache-byway-corridor-management-plan-sep-2013
[13]http://www.sanmiguelcountyco.gov/DocumentCenter/Home/View/222
[14]Page 4-409;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_2.Par.12939.File.dat/4_UFO-DRMP-2016_508.pdf
[15]Page 64;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_docs.Par.16348.File.dat/Final%20WSR%20Eligibility%20Report%20Final%20Web%20071210.pdf
[16]Page 64;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_docs.Par.16348.File.dat/Final%20WSR%20Eligibility%20Report%20Final%20Web%20071210.pdf
[17]Page 37;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.70506.File.dat/WSR%20Suitability%20Report_Final_04272012.pdf

BLM_0076670

**3. SAN MIGUEL RIVER/SALTADO CREEK/BEAVER CREEK AREA COMMENTS:**

First, the San Miguel River corridor along with tributaries Saltado and Beaver Creeks was analyzed by San Miguel County staff holistically. These areas have several existing and proposed designations within either Alternative A, Alternative B, and/or Alternative D. However, we found that the stipulations provided in the UFO BLM DRMP/EIS GIS files did not match the language within the RMP, and added quite literally, layers of complexity to understand which stipulation (generally the most protective or stringent) would apply to which portion of land within this area.

To aid in this analysis, San Miguel County staff prepared a comparison table (Attachment B) that showed the stated stipulations for each designation category, for the San Miguel River mainstem and surrounding canyon/Area of Critical Environmental Concern (ACEC) lands; the Saltado Creek drainage and surrounding canyon/ACEC lands; and the Beaver Creek drainage and surrounding canyon/ACEC lands.

As one example of the inconsistencies of stipulations in this area, a single place within the San Miguel River proposed Wild and Scenic River (WSR) Segment 1, near the confluence with Specie Creek -- was within:

- the Alternative D WSR segment proposed as Suitable, Recreation;
- the Alternative D San Miguel River Special Recreation Management Area (SRMA);
- the Alternative A and D existing San Miguel River Area of Critical Environmental Concern (ACEC) designated in 1993 to protect the high-quality riparian vegetation resources, habitat for many bird species, and the scenic value of the corridor, within or proximal to a State designated Scenic Byway; (According to the BLM's ACEC Final Report of 2013, the riparian vegetation community exists "mainly due to the undammed San Miguel River and its intact hydrology." The report when on to state, "Such communities are becoming increasingly rare in Colorado." [18] The report also states that the Visual Resource Index (VRI) should be V-2 for the existing San Miguel River ACEC.)
- the Alternative D San Miguel Ecological Emphasis Area;
- the Alternative D fluid minerals stipulation: No Surface Occupancy (NSO)
- the Alternative B San Miguel River Expansion ACEC which would expand the ACEC to protect additional lands having high-quality riparian vegetation resources, bird habitats, and scenic values, within or proximal to State designated Scenic Byways; (The BLM's ACEC Final Report states that the VRI should be V-2 for the San Miguel River Expansion ACEC.)
- the Alternative B fluid minerals stipulation: No Lease (NL);
- the Alternative A lands shown as not having Coal potential.

What we found in our comparison table was that the preferred Alternative D, for the above designations and shapefiles, would classify this with a hodge-podge of V-2 within the WSR polygon, but V-3 within the ACEC and SRMA. This makes no sense because these lands are proximal/in/adjacent to two state-designated scenic byways. The Enhanced Ecological Area and WSR would have a Controlled Surface Occupancy (CSO) stipulation, while the overlapping ACEC, SMRA, and fluid minerals layers would have No Surface Occupancy (NSO) for Alternative D. The SMRA, ACEC Expansion, and fluid minerals Alternative B stipulation would be NL.

---

[18] Page 41:
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.52182.File.dat/ACEC%20Report%20Final%2001152013.pdf

BLM_0076671

Rather than have so many overlapping layers with varying and conflicting stipulations overlying each other on the ground, a situation that will certainly be more prone to human error in interpretation and implementation, San Miguel County desires that the lands within the San Miguel Expansion ACEC and/or San Miguel SMRA Alternative B boundaries be given protections that will be simplified, allow for appropriate recreation, allow for adequate protection for the ACEC and WSR values, provide co-protection for wildlife, and adequately protect the visual resources.

**The final decision should:**

 A.  Include a determination of "suitable" for inclusion in the National Wild and Scenic Rivers System for San Miguel River Segment 1, Beaver Creek and Saltado Creek.

 B.  Expand the San Miguel River ACEC to include all of the lands within the existing San Miguel River ACEC and the proposed San Miguel River Expansion ACEC in Alternative B.

 C.  Continue the existing San Miguel River SRMA which is included in the agency preferred Alternative D.  There are an additional 76 acres that would be included in the SRMA just southwest of the confluence of Willow Creek and the San Miguel River.  San Miguel County does not want this SRMA changed to become the San Miguel River Corridor Extensive Recreation Management Area (ERMA) that is proposed in Alternative C.  The VRM classification should be changed from VRM-III to VRM-II to be consistent with the ACEC and the two state-designated scenic byways.  The incredible scenic qualities of this area are very important economically to the region and should be maintained and managed at VRM-II.  The SRMA should be expanded to match the San Miguel River Expansion ACEC boundary, such as in Big Bear Creek area.

According to the BLM, any area not identified as an SRMA is automatically managed as an ERMA.  On the BLM UFO Recreation Management Area web page, the BLM states:  "Within ERMAs, recreation is unstructured and does not require intensive management or significant investment in trails or facilities.  This type of custodial or "dispersed" recreation management provides minimal visitor services and few developed recreational facilities."[19] Because there is a large identified local, regional, national and international market demand for structured recreation, the San Miguel River SRMA is the best management fit.  Within the San Miguel River SRMA, there are developed recreation sites, including campgrounds, staging areas, visitor information, and limited facilities.

 D.  With appropriate stipulations for the above, the complex mosaic of Enhanced Ecological Areas as proposed in the San Miguel River Expansion ACEC/SRMA areas should <u>not</u> be needed as wildlife will be getting protection benefits from the management decisions and implementation of the WSRs, SMRA, and expanded ACEC.  The stipulations contained in the Enhanced Ecological Area shapefile for Alternatives B and D are much weaker than those for the other intersecting designations of ACEC, SRMA, and WSR (see Attachment A). [20]

The BLM's stated reason for contemplating an EEA in the San Miguel River is provided in its description in the DRMP/EIS Appendix D[21]:

---

[19]http://www.blm.gov/co/st/en/fo/ufo/recreation.print.html
[20]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.60521.File.dat/ecological_emphasis_areas.zip
[21]Page D4;http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix.Par.39615.File.dat/D_EEAs_UFO-DRMP-2016_508.pdf

BLM_0076672

| Ecological Emphasis Area Name | Description | Habitat Type | Primary Benefiting Species |
|---|---|---|---|
| San Miguel | Links the Mount Wilson area on National Forest across the San Miguel Canyon to the Uncompahgre Plateau, and contributes to linkage between Mount Sneffels area and Lizard Head area; includes parts of the existing San Miguel ACEC. Divided into seven zones. | Riverine and riparian, cliff and canyon, mountain shrub, pinyon-juniper, montane forest | Bear, mountain lion, lynx, mule deer, elk, native cold water fish |

San Miguel County desires that within the San Miguel River existing/expansion ACEC - San Miguel River SRMA - San Miguel Segment 1/Beaver Creek/Saltaldo Creek WSRs that the final RMP/ROD does not designate the additional San Miguel Enhanced Ecological Areas.  With the stipulations recommended below, these areas will be well served.  All of the stipulations recommended for Alternative D for creating the San Miguel EEA are included or exceeded in our list of stipulations below.

The BLM defines Ecological Emphasis Areas (EEAs) as areas that are "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors," with the objective of having a designated EEA being "manage to preserve the continuity of habitats, vegetation communities, and native wildlife within, while following vegetation mosaic objectives" [22]

E.  San Miguel County believes that the San Miguel River, including the Saltado and Beaver Creek areas, can be served by a single set of stipulations that meet the needs and criteria of all of the overlapping designations recommended by the BLM and/or requested by San Miguel County (San Miguel ACEC Expansion, San Miguel River SRMA, and all 3 WSR segments).  The stipulations for these lands collectively should include:

- **"7"** = Limit camping to 7 days, 6 nights maximum within a 30-day period for dispersed camping.
  - SMC Note: Do not change the current maximum length of stays at the improved BLM campgrounds: Fall Creek (7 days), Caddis Flats (14 days), or Lower Beaver (7 days).
- **"AVOID"** = ROW Avoidance.
  - SMC Note: San Miguel County would support an EXCL = ROW Exclusion for some areas where no ROWs currently exist, however, it is the county's desire to have the ability to scope a bike path or trail from Telluride to Placerville somewhere off of State Highway 135 and near the San Miguel River and/or additional broadband infrastructure on existing ROWs or short segments of new ROW, if there are not significant negative impacts to ACECs, WSR, or recreation.
- **"CAMPFIRE"** = No Campfires for dispersed camping.
  - SMC Note:  San Miguel County is ok with campfires in existing campgrounds - - Fall Creek, Caddis Flats and Lower Beaver if already allowed.
- **"COAL"** = Closed to coal mineral leasing.
  - SMC Note:  BLM data that there is little to no actual coal potential and allowing for coal mineral disposal would negatively impact ORVs with little actual mineral resource benefit.  This entire area is given a classification of no coal potential in Alternative A.

---

[22] Page 2-68;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf

BLM_0076673

- **"CWOD"** = Closed to commercial wood cutting.
- **"DES"** = Limited to designated routes / Limited to existing routes.
- **"DR_Timing"** = Designated routes - Timing Limitations, Limited to designated routes all other times (for wildlife).
- *"**HYDROE**" = Exclusion area for hydropower.
  - SMC Note:  This is consistent with the importance of this segment for fishing and recreational boating.
- **"LOCATE"** = Petition Secretary of Interior to withdrawal for locatable minerals.
- **"NL"** = No lease.
  - SMC Note: There are low oil and gas potential in the eastern portion of the expanded San Miguel River ACEC.  According to Colorado Oil & Gas Commission (COGCC), Well Data downloaded in September 2016, only one well has been drilled within 2 miles of the proposed WSR suitable segments.  This well was a wildcat well near Placerville, drilled in 1960 and was "DA:  dry and abandoned."
  - SMC Note:  SMC finds that the negative impacts to the San Miguel River, Beaver Creek, and Saltado Creek corridors, scenic byways, traffic, recreation, visual resources, and wildlife in an area without any oil/gas infrastructure, identified oil/gas fields, and history of interest or past production far outweighs any possible benefits from resource exploration or extraction within this area.  According to the Fluid Minerals Alt D code in the Fluid Minerals Alt D shapefile[23], the entire San Miguel River Segment 1, Beaver Creek, and Saltado Creek WSRs, and the existing and expanded San Miguel ACEC and San Miguel SRMA is coded as NSO for the preferred alternative.  However, this stipulation seems to missing from the WSR Alt D shapefile attribute table[24].  Alternative B gives all these areas the stipulation of "NL" which is preferred by San Miguel County as it conserves valuable staff time and resources from even going through the federal lease process.
- **"RANGE"** = Closed to livestock grazing.
  - SMC Note: essentially already recommended in Alternatives B and D.  This is a high conflict area with many uses constrained in a narrow canyon.  Monsoonal rains cause road closures, debris flows, and rockfalls multiple times each summer.  Grasses and forbs should not be grazed as they provide protection.  Wildlife needs this food source.
- **"RECMINE"** = No recreational mining.
  - SMC Note:  SMC has found recreational mining is disruptive to other quiet uses, wildlife, and has caused conflicts with public access, boating, fishing, hiking, photography and other quiet use activities within the San Miguel River corridor.  Non-motorized recreational mining does not have the same level of impact and disruption to the aquatic and riparian ecosystems as motorized recreational mining.  San Miguel County believes that to protect the WSR, ACEC, SRMA, and highly scenic and important riparian and aquatic ecosystems, there at should be no motorized recreational mining on the San Miguel River Segment 1, and the Beaver and Saltado Creek segments found suitable for WSR designation.
- **"SALABLE"** = Closed to salable mineral disposal.

---

[23] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_1.Par.20291.File.dat/fluid_minerals_alt_d.zip

[24] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.28698.File.dat/WSR_ALT_D_FINAL.zip

BLM_0076674

- o SMC Note:  Gravel and dimension stone mining is not consistent with the ORVs and ACEC riparian values.
- **"SEED"** = Area closed to seed collection.
- **"SHEEP"** = Grazing of sheep and goats not permitted
  - o SMC Note: essentially already recommended in Alternatives B and D.  SMC Note:  This is a high conflict area with many uses constrained in a narrow canyon.  Monsoonal rains cause road closures, debris flows, and rockfalls multiple times each summer.  Grasses and forbs should not be grazed as they provide protection.  Wildlife needs this food source.
- *****"SOLARE"** = Exclusion area for solar.
  - o SMC Note: Commercial solar concentrators or PV panels are not compatible with the WSR/SRMA/ACEC/scenic and wildlife values here.  The San Miguel River corridor is determined to have "Very Good" Solar PV potential by the UFO BLM Renewable Energy Potential Report (2010), which doesn't take into account distance from substations.  PV arrays for off-site uses need to be proximal to substations. [25]
- **"SOLID"** = Closed to non-energy solid mineral leasing.
  - o SMC Note:  Ground disturbing activities, such as surface mining, are not consistent with the ORVs, wildlife and ACEC values, nor the important scenic qualities.
- **"SSR"** = Site-Specific Relocation.
- **"TAR"** = Prohibit target shooting.
  - o SMC Note:  Target shooting in the narrow rock-walled canyons results in amplified noise and disturbances to the wildlife, birds and pristine experiences of these areas.
- **"V-2"** = VRM II
  - o SMC Note:  WSR and San Miguel River Existing/Expansion ACEC should have a VRM II, as the DRMP/EIS states "Managing the segments according to VRM Class 1 or II objectives would provide direct protection to segments with a scenic ORV by requiring that the alterations to the landscape be done so as not to dominate the viewshed.  If alterations cannot be mitigated to reach the VRM class objective, they would not be permitted...In turn, this would provide indirect protection to segments with a cultural or historical ORV." [26] As noted elsewhere, the BLM 2013 ACEC Final Report states that the San Miguel existing and expansion ACECs should have VRM II.
  - o SMC Note:  Beaver Creek was not provided any VRM stipulation in the WSR Alt D shapefile.  WSR should have a VRM II.
- *****"WINDE"** = Exclusion area for the wind.
  - o SMC Note:  The San Miguel River corridor is determined to have "Poor" wind potential by the UFO BLM Renewable Energy Potential Report (2010). [27]
- **"WOOD"** = Closed to wood cutting.

---

[25]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf

[26]Page 4-412; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_2.Par.12939.File.dat/4_UFO-DRMP-2016_508.pdf

[27]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf

BLM_0076675

*All above stipulations apply where there is BLM surface estate, however, HYDROE, SOLARE, AND WINDE are not included as stipulations on the non-BLM surface estate (private, U.S. Forest Service lands).

We obtained definitions of these codes from BLM GIS metadata made available for each BLM UFO DRMP/EIS shapefile, such as the WSR Alt D shapefile metadata.[28]

3. **Special Recreation Management Areas (SRMAs) & Extensive Recreation Management Areas (ERMAs)**
   <u>Summary:</u>  There are two SRMAs discussed in the DRMP/EIS within San Miguel County:  San Miguel River (which includes the San Miguel River Segment 1, Saltado Creek and Beaver Creek segments determined to be suitable for Wild & Scenic River designation in Alternative D; and Burn Canyon.  We commented above that we desire to continue the designation of the San Miguel River SRMA.  The San Miguel River SRMA already exists but the preferred Alternative D would add approximately 76 acres to this SRMA, just southwest of the confluence of Willow Creek and San Miguel River.

   Specific to the Burn Canyon SRMA, we note that it is within the proposed Naturita Canyon EEA.  The Burn Canyon SRMA is recommended in Alternative B, but not in the agency preferred alternative, Alternative D.  Under Alternative B, if designated, the Burn Canyon SRMA would have the following management stipulations:

**SRMA Scenario (Alternative B)**



---

[28]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.87378.File.dat/WSR_ALT_D_FINAL.html

BLM_0076676

alt_b_code
V-2, AVOID, COAL, NSO, LOCATE, SALABLE, SOLID, CAMPSITE, COMPETE2, DES, TAR
V-2, AVOID, COAL, NSO, LOCATE, SALABLE, SOLID, CAMPSITE, COMPETE2, MM, WOOD, TAR
V-3, AVOID, COAL, NSO, LOCATE, SALABLE, SOLID, CAMPSITE, COMPETE2, DES, TAR

Figure 3.1 -- showing the Burn Canyon SRMA Alternative B scenario.

It would have travel restricted to mostly designated routes, portions (purple) would be closed to mechanized (bikes) and motorized vehicles, and would not allow competitive events.  It would be closed to coal and solid mineral leasing, the BLM would petition for withdrawal of locatable minerals, and there would be no surface occupancy for oil and gas.  It would have VRM II.

Targeted activities would be hiking and horseback riding and enjoyment of nature in the canyons.  On the mesa tops and slopes, activities would also include mountain biking.

Under the agency preferred ERMA in Alternative D, the ERMA would have VRM III and controlled surface use for oil/gas development only.  The SRMA and ERMA have the same boundary.  However, under the ERMA scenario, the lands would be managed to allow ATVs and motorcycles, mountain biking, and hiking in both the canyons and the mesa top/slopes, while retaining a natural appearing landscape and providing necessary recreation facilities such as trails/trailheads/staging areas/signage to facilitate recreational activities. [29]

---

[29]Pages J-5-7; J-91;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.40130.File.dat/J_Rec_UFO-DRMP-2016_508.pdf

BLM_0076677

**ERMA Scenario (Alternative D)**



Figure 3.2 -- showing the Burn Canyon SRMA Alternative D scenario.

San Miguel County desires that the Burn Canyon SMRA as mapped and stipulated in Alternative B be approved and incorporated into the final RMP.  We believe that the SRMA will complement the proposed Naturita Canyon EEA as mapped and recommended in Alternative B, along with the fluid minerals stipulations from Alternative B in this area.

**4.  Enhanced Ecological Areas (EEAs)**

**A.  San Miguel EEA.**
The BLM UFO DRMP/EIS contemplates two EEAs within San Miguel County:  San Miguel EEA and Naturita Canyon EEA. [30]  The San Miguel River Expanded ACEC preferred by San Miguel County, the existing San Miguel SRMA and the Alternative D recommended WSR segments for San Miguel River Segment 1,

---

[30]Pages D-3 & D-4;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix.Par.39615.File.dat/D_EEAs_UFO-DRMP-2016_508.pdf

14

Beaver Creek and Saltado Creek.  San Miguel County recommended a standardized set of stipulations (pages 7-9 of this document) that would meet the needs of all of these San Miguel County desired designations, and also meet and exceed the stipulations that had been proposed by the BLM for the San Miguel EEA.

**B.  Naturita Canyon EEA.**

The BLM describes the reasons for considering Naturita Canyon EEA on Page D-4 of Appendix D of the DRMP/EIS as:

| Ecological Emphasis Area Name | Description | Habitat Type | Primary Benefiting Species |
|---|---|---|---|
| Naturita Canyon | Adjoins National Forest System lands leading up to Lone Cone area; includes the major Naturita Canyon drainage, which has wildlife/indicator species emphasis on adjoining National Forest. Divided into four zones. | Riparian, cliff and canyon, pinyon-juniper | Bear, mountain lion, mule deer elk, native warm water and cold water fish |

Geographically, there are several parcels mapped as comprising the Naturita Canyon EEA for Alternative B.  The purple and red polygons (see figures below) make up the Naturita Canyon EEA.  It would provide linkages between adjacent State land (blue) and National Forest land (green).  The hatching shows occupied critical Gunnison Sage-grouse habitat as designated by U.S. Fish and Wildlife Service (USFWS).  The DRMP/EIS does not list Gunnison Sage-grouse (GuSG) as a species that the EEA would be managed to benefit.

BLM_0076679



Figure 4b.1 -- Showing the Naturita Canyon EEA Alternative B.

In Alternative D, the agency preferred alternative, only the two red parcels of the Naturita Canyon EEA would actually be designated as an EEA:

BLM_0076680



Figure 4b.2 is showing Naturita Canyon EEA Alternative D and Colorado Oil and Gas Commission (COGCC) wells.

Above, the BLM surface that would not be part of the Naturita Canyon EEA is shown in yellow. We also show oil and gas wells, with green wells being producing oil or gas wells, and red wells being mostly wildcat wells that are non-producing. An EEA consisting of just the red polygons, especially with simply controlled surface use (CSU) and ROW avoidance (AVOID), instead of no surface occupancy (NSO), designated routes- timing limitations (DR_TIMING), seems this would result in two small token EEA parcels without meaningful habitat protection or connectivity, beyond what is already anticipated by the fluid minerals management in Alternative D. Most of these two polygons are already anticipated to be

17

NSO.  However, the remainder of the area that is analyzed for Naturita Canyon EEA is CSU under alternative D.

Alternative D, agency preferred, for Naturita Canyon EEA and fluid minerals stipulations:





Figure 4b.3 -- showing the Naturita Canyon EEA Alternative D with fluid minerals Alternative D

BLM_0076682

Alternative B, San Miguel County preferred, for Naturita Canyon EEA and fluid minerals stipulations:



Figure 4b.4 showing Naturita Canyon Alternative B and fluid minerals Alternative B.

San Miguel County believes that since the wildlife values warranted studying the Naturita Canyon area for an EEA, that Alternative B for the EEA boundary and EEA stipulations, as well as Alternative B fluid

19

minerals stipulations, should be applied by the final decision in this area.  We could not locate a discussion in the DRMP/EIS explaining the BLM rationale for how choosing Alternative D over Alternative B with respect to this EEA and the fluid minerals stipulations that overlap, would achieve the stated objectives of preserving the continuity of habitats, vegetation communities, and native wildlife. [31]

San Miguel County recommends that the full Naturita Canyon EEA be designated, as mapped in Alternative B, along with Alternative B fluid minerals stipulations.  This will be complimented by also designating the Burn Canyon SRMA as mapped in Alternative B.


**5. Areas of Critical Environmental Concern (ACECs)**
The UFO DRMP/EIS contemplates three ACECs within San Miguel County:

**A. San Miguel River ACEC and San Miguel River Expansion ACEC.**
These ACECs have been discussed in detail in this document above, and San Miguel County strongly supports Alternative B, which would designate the additional lands within the San Miguel River Expansion ACEC.  According to the BLM's Final ACEC report (2013), all of the relevance and importance criteria were met, just as with the existing San Miguel River ACEC. [32]  San Miguel County also strongly supports a cohesive management of the overlapping ACEC lands, SRMA lands, and WSR segments within San Miguel River Segment 1, Beaver Creek and Saltado Creek through one set of stipulations, with a VRM II stipulation.  The agency preferred VRM III stipulation does not adequately protect the exceptional scenic qualities of this area, nor the regional economy, nor the viewshed of the two state-designated Scenic Byways.  Please see this document, Section 3, pages 5-9 above for specific requests for changes and implementation that San Miguel County desires in the final decision.

**B. San Miguel Gunnison Sage-grouse ACEC.**
This ACEC is comprised of 470 acres in multiple parcels occurring on scattered critical Gunnison Sage-grouse habitat that whose surface estate is managed by the BLM.  San Miguel County was originally one of the proponents of this ACEC.  When the BLM's Final ACEC report was published in 2013, this was prior to the federal decision to list the Gunnison Sage-grouse as Threatened and designate critical habitat in 2014.

On November 12, 2014, the U.S. Fish and Wildlife Service (USFWS) announced that it determined that the Gunnison Sage-grouse, a ground-dwelling bird found only in southwestern Colorado and southeastern Utah, required the protection of the Endangered Species Act (ESA) as a threatened species.  The USFWS originally proposed to list the species as 'endangered' under the ESA in January 2013, but efforts by the two states, tribes, local communities, private landowners and other stakeholders to conserve the species and its habitat were found to have helped reduce the threats to the bird sufficiently to give it the more flexibly protected status of 'threatened.' [33]

The supporting EIS for the Threatened Status designation of the Gunnison Sage-grouse[34] and for the Designation of Critical Habitat for the Gunnison Sage-grouse[35] is dated November 9, 2014.

[31] Pages 2-68 & 2-69;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf
[32] Pages 41-47;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.52182.File.dat/ACEC%20Report%20Final%2001152013.pdf
[33] https://www.fws.gov/mountain-prairie/pressrel/2014/11122014_ServiceProtectsGunnisonSageGrouseAsThreatenedUnderESA.php
[34] https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GUSGFinalListingRule_11202014.pdf
[35] https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GuSGCriticalHabitat_11202014.pdf

BLM_0076684

The Gunnison Sage-grouse ACEC as proposed in this UFO DRMP/EIS does not contemplate the status of the species or critical habitat as listed in the federal register in 2014, does not contemplate surface disturbance and other disturbances on critical habitat that may be non-BLM surface estate but is BLM-managed federal mineral estate, and does not contemplate guidelines within numerous plans and the latest best management practices for stipulations and buffers from leks.

The UFO DRMP/EIS does not take into consideration that Occupied GuSG Habitat includes specific properties (and split estate) that the USFWS excluded from the critical habitat designation.  The political removal of surface lands coinciding within these specific private properties under conservation easements from listed critical habitat is appropriate, but the removal of subsurface public lands from Occupied Habitat is not appropriate because it excludes the subsurface mineral estate from the management actions contained in the UFO DRMP/EIS.

A.  In summary, San Miguel County does not support the Gunnison Sage-grouse ACEC as proposed in Alternative B of this UFO DRMP/EIS.  The proposed alternatives with regards to Gunnison Sage-grouse and this ACEC are neither adequate, accurate, nor informed by the most recent federal actions and data available.  The UFO DRMP/FEIS also predates the new alternative B analysis within the GuSG DRMPa/DEIS which analyzes an ACEC for all GUSG Occupied and Unoccupied Habitat.  Please see Section 6, Gunnison Sage-grouse.


**6.  Gunnison Sage-grouse.**

These designations prompted a process for the BLM to prepare a draft Gunnison Rangewide Plan Amendment that would potentially result in multiple resource plan amendments (GuSG DRMPa) and a companion draft environmental impact statement (GuSG DEIS) which more closely analyzes planning issues, including energy and minerals actions, in order "to analyze the addition of GuSG conservation measures to several existing RMPs", including the BLM UFO DRMP/EIS.  The deadline for comments on the GuSG DRMPa is after the deadline to comment on this UFO DRMP/EIS.  The GuSG DRMPa documents were released as drafts in August 2016.

In the GuSG DRMPa, the BLM states, "The BLM manages approximately 40 percent of GUSG habitat across twelve counties in southwestern Colorado and southeastern Utah…The inadequacy of regulatory mechanisms in land use plans was identified as a major threat in the FWS listing decision." [36]

We realize that since much of the UFO DRMP/EIS work occurred between 2010 and 2013, that the latest work done by the USFWS and BLM for the GuSG DRMPa was not incorporated into this UFO DRMP/EIS.  The San Miguel Gunnison Sage Grouse ACEC analysis was not informed by the latest information, nor the oil and gas stipulations, travel management and several other sections of this UFO DRMP/EIS.

Thus, if the UFO DRMP/EIS moves forward, it should have its Record of Decision signed prior to the BLM RMPa ROD so that the BLM RMPa will amend the relevant portions of this RMP to adequately protect Gunnison Sage-grouse and incorporate the latest science and best management practices.  All leases within the UFO should be deferred until the ROD is signed for the GuSG RMPa so that no lease is allowed a 20-year period with out-of-date stipulations and practices.  While the GuSG DRMPa goes much further than this UFO DRMP/EIS for incorporating protections, conservation measures, and habitat enhancement

---

[36] Page I; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf

BLM_0076685

and connectivity measures, it still needs additional work, which San Miguel County will comment on separately under that comment process.  The GuSG DRMPa does contemplate that removal of subsurface public lands from Occupied Habitat management actions is inappropriate, which is differently than how these lands are treated in the UFO DRMP/EIS.

It would be remiss to issue leases under any circumstances within the UFO until there is a final decision on the Gunnison Sage-grouse amendments.

The Purpose section of the GuSG DRMPa states, *"This RMP amendment provides a framework for conserving and assisting with the recovery of the GuSG and for conserving and restoring habitat upon which the species depends on BLM-administered public lands across the range of the bird."*  The Need section of this document states, *"The BLM conducted land use plan evaluations in accordance with its planning regulations, which require that RMPs 'shall be revised as necessary based on …, new data, new or revised policy...(43 CFR 1610.5-6).'"* [37]

San Miguel County believes that the listing of the GuSG and designation of critical habitat is a new circumstance that requires modification of the UFO DRMP/EIS, but to be consistent where the San Miguel Basin population has key areas such as Miramonte Reservoir area that are split among the UFO and Tres Rios Field Office (TRFO) there needs to be a consistent set of management guidelines and stipulations across the entire San Miguel Basin population.  There may be different lek buffers and needs between the different subpopulations, such as the Gunnison Basin and the San Miguel Basin populations.  Seasonal habitat has not been delineated within the San Miguel Basin population the way it has in the Gunnison population.  The fact that the BLM is conducting the GuSG DRMPa/DEIS process and recommending a preferred alternative that would amend the TRFO RMP seems to point to that need.  San Miguel County also does not agree that the range of alternatives analyzed in the 2013 TRFO RMP/FEIS nor this UFO DRMP/EIS is appropriate with respect to the needs of GuSG.

The range of alternatives considered in the GuSG DRMP/DEIS includes having the stipulation of No Surface Occupancy being applied to all BLM lands within 4-miles of a lek.  These documents analyze all BLM lands within occupied, unoccupied or a 4-mile buffer of a lek as the decision area.  Yet, the 2005 Gunnison Sage-grouse Rangewide Conservation Plan[38] and the presence of occupied critical habitat more than 4 miles from leks within the San Miguel Basin show that GuSG is found occupying habitat and using seasonal habitat 6 or more miles away from leks. [39]  For example, the occupied habitat in the Dry Creek Basin area, San Miguel Basin GuSG population, shown on Map 1 that is beyond the 4-mile lek buffer, is between 6- and 6.25-miles from leks.  The BLM should allow for additional review of appropriate protections for Gunnison Sage-Grouse habitat from oil and gas development within at least a 6-mile buffer, preferably a 6.2-mile buffer of leks within the San Miguel Basin.

### Section 7.  Lands Identified For Disposal.

The DRMP/EIS states that in Alternatives B-D, the UFO's objective is to "consider disposal of lands that would consolidate public ownership for greater management efficiency while serving the public interest, including communities and their expanding needs." [40]

---

[37] Page iii; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf

[38] http://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx

[39] Page J-5;
http://cpw.state.co.us/Documents/WildlifeSpecies/SpeciesOfConcern/GunnisonSageGrouse/ConsPlan/AppendixJSGHabitatUse03.pdf

[40] Page 2-319;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf

BLM_0076686

The lands identified for disposal were identified on Appendix A, Figure 2-60[41] and legal descriptions were provided in Appendix N. [42] It appears that only the lands recommended for disposal under the agency preferred alternative D are shown in Figure 2-60.

We recommend that it would be very helpful for the reviewing public and agencies if the UFO made more readily available the Land Tenure/Land Disposal GIS files on the UFO RMP GIS web page, and also if the name of the county were provided in Appendix N.  We were able to obtain from UFO GIS staff the land tenure shapefile via email.  While actual reasons for recommending individual parcels for disposal or non-disposal in the four alternatives were not located in the DRMP/EIS, there were some cryptic rationales present within the land tenure shapefile attribute table for a few but not all parcels.

San Miguel County does not desire any parcels to be disposed of that would interfere with existing public roads or trails, existing private driveways or access roads, irrigation ditches or other easements.  Any parcels disposed of should conform with the criteria and standards set forth in the San Miguel County Comprehensive Plan.  Parcels that contain critical habitat for sensitive or listed species or that provide connectivity between other public lands should not be disposed of.  If the BLM doesn't want to manage such parcels, then the adjacent federal or state agency should be given an opportunity for management or ownership.

The metadata from the land tenure shapefile for the 10 parcels analyzed by the DRMP/EIS for disposal within San Miguel County is below:

| SMC Parcel Ref # | RMP | gis_acres | alt_A | alt_B | alt_C | alt_D | alt_B_code | alt_C_code | alt_D_code | Comment_ |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | San Juan / San Miguel Planning Area RMP 1985 | 35 | Yes | No | Yes | No | | DISPOSAL | | Riparian |
| 2 | San Juan / San Miguel Planning Area RMP 1985 | 35 | Yes | No | Yes | No | | DISPOSAL | | Riparian |
| 3 | San Juan / San Miguel Planning Area RMP 1985 | 214 | Yes | No | Yes | No | | DISPOSAL | | Range, Veg, Riparian |
| 4 | San Juan / San Miguel Planning Area RMP 1985 | 88 | Yes | No | Yes | No | | DISPOSAL | | Range, Veg, Riparian, Recreation |
| 5 | San Juan / San Miguel Planning Area RMP 1985 | 82 | Yes | No | Yes | No | | DISPOSAL | | Range, Veg, Riparian, Recreation |
| 6 | San Juan / San Miguel Planning Area RMP 1985 | 38 | Yes | Yes | Yes | Yes | DISPOSAL | DISPOSAL | DISPOSAL | |
| 7 | San Juan / San Miguel Planning Area RMP 1985 | 40 | Yes | Yes | Yes | No | DISPOSAL | DISPOSAL | | |
| 8 | San Juan / San Miguel Planning Area RMP 1985 | 41 | Yes | Yes | Yes | Yes | DISPOSAL | DISPOSAL | DISPOSAL | |
| 9 | San Juan / San Miguel Planning Area RMP 1985 | 133 | Yes | No | Yes | No | | DISPOSAL | | salinity/selenium, GuSG |
| 10 | 2011 RMP | 40 | No | Yes | No | Yes | DISPOSAL | | DISPOSAL | |

Table 7.1 -- the land tenure GIS shapefile attribute table for parcels within San Miguel County.

**a. Fall Creek Area Parcels.**
We attempted to map the legal descriptions of the parcels (SMC Parcel Reference #s 1 & 2 in the table above) within San Miguel County and found that these two of the parcels (in T42N R11W Section 2) were

---

[41] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix.Par.78374.File.dat/App%20A%20Combined.pdf

[42] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.77552.File.dat/N_Disposal_UFO-DRMP-2016_508.pdf

23

BLM_0076687

just east of Little Cone, adjacent to Fall Creek Road, County Road 57 P (see pink outlines below). It appears these two parcels were currently listed for disposal by the existing RMP (Alternative A), and are not recommended for disposal in Alternatives B or D. They are located within the Fall Creek riparian corridor. San Miguel County agrees with the Alternative D (no disposal) for these parcels.



Figure 7a. Fall Creek area parcels in T42N R11W Section 2, not recommended by SMC or agency preferred Alternative D for disposal.

### b. Beaver Creek and Saltado Creek Area Parcels.

We could not quite get the legal descriptions rectified for the parcels in Saltado Creek between Appendix N and the GIS land tenure file provided. However, the parcel within the Saltado Creek area intersects the Saltado Creek WSR segment, the existing ACEC and the SRMA. It also is adjacent to critical occupied Gunnison Sage-grouse habitat. It is within 1 to 2 miles of 3 active leks. It should not be disposed of.

The Beaver Creek parcel in T43N R12W Sections 9 & 10 is within the Beaver Creek WSR segment, existing ACEC and SRMA. It also is adjacent to critical occupied Gunnison Sage-grouse habitat. It is within 0.3 to 0.75 mile of 3 active leks. It should not be disposed of.

BLM_0076688

Both of these areas appear also to be within the San Miguel River Expansion ACEC (which San Miguel County recommends be designated.  The DRMP/EIS states that in Alternatives B-D, the UFO's objective is to "retain lands in public ownership when it will serve the public interest, protect valuable resources, or achieve management goals." [43]  Alternative B and Alternative D state that the UFO action will be to retain lands that are within ACECs or SRMAs. [44] Lands immediately adjacent to critical Gunnison Sage-grouse habitat should not be disposed of.  The 2005 Gunnison Sage-grouse Rangewide Conservation Plan[45] and the presence of occupied critical habitat more than 6 to 6.25 miles from leks within the San Miguel Basin subpopulation show that GuSG is found occupying habitat and using seasonal habitat 6 or more miles away from leks. [46]

---

[43]Page 2-321;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_U FO-DRMP-2016_508.pdf
[44]Page 2-322;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_U FO-DRMP-2016_508.pdf
[45]http://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx
[46]Page J-5;
http://cpw.state.co.us/Documents/WildlifeSpecies/SpeciesOfConcern/GunnisonSageGrouse/ConsPlan/AppendixJSGHabitat Use03.pdf

BLM_0076689



Figure 7b.  Showing the Beaver Creek (left) and Saltado Creek (right) area disposal parcels in T43N R12W Sections 9 & 10; not recommended by SMC or agency preferred Alternative D for disposal.  If sold for private development, there would be impacts to the scenic and primitive qualities of these areas, as well as the important riparian ecosystem and wildlife.  Alternatives B and D do not recommend these parcels for disposal.  San Miguel County believes it is best for the public and for the protection of valuable river corridors, ORVs, and Gunnison Sage-grouse if these parcels are not disposed of.

### c. Lone Cone & Gurley Reservoir Area Parcels.

The BLM land tenure shapefile identified 3 parcels in the Lone Cone/Gurley Reservoir area that are recommended for disposal under the agency preferred Alternative D (according to the shapefile attribute table). They are shown with the bright blue highlight around the pink parcel boundaries in Figure 7c below:

BLM_0076690



Figure 7c. Lone Cone Reservoir and Gurley Reservoir Area Parcels identified in GIS metadata within the provided land tenure GIS shapefile as being recommended for disposal in the agency preferred Alternative D.

Appendix N only recommends two parcels for disposal in the agency preferred Alternative D. So we are concerned that there is an error in mapping the southernmost parcel on Figure 7c. It appears to be within T43N R13W S12. However, this does not match a legal description in Appendix N. Appendix N, and the land tenure shapefile should be rectified before the final RMP and ROD. The southernmost parcel is entirely surrounded by Gunnison Sage-grouse occupied habitat and is also mapped on top of (or under?) the Lone Cone Reservoir. This parcel is within 0.5 miles of an active lek and 0.7 miles of a second inactive lek. San Miguel County does not support disposal of this parcel.

The parcel directly west of Gurley Reservoir (just south of Red Cone Rd.) is the parcel with the legal description of T44N R13W Section 35. The parcel directly north of Gurley Reservoir in the northern portion of Figure 7c is the parcel with the legal description of T44N R13W Section 35.

BLM_0076691

The northernmost parcel in Section 24 is 1.5 miles north of occupied Gunnison Sage-grouse habitat but is also surrounded by private land.  It is 3.5 miles from the nearest active lek and 2 miles from the nearest inactive lek.  If a parcel were to be disposed of, this would probably be the only parcel that makes sense.  There are some undesignated BLM routes mapped on the fringes of this parcel.

The parcel in Section 35 is within 0.5 miles of an active lek and is adjacent to occupied Gunnison Sage-grouse critical occupied habitat.  There is an undesignated BLM route mapped on this parcel.  <u>San Miguel County does not recommend disposal of this parcel.</u>

**d. Hastings Mesa Area Parcel**
One additional isolated BLM parcel was analyzed for disposal is located on Hastings Mesa near Alder Creek in T44N R10W Section 29 adjacent to the Alder Creek Ranches subdivision.  This parcel is entirely surrounded by private land.  It was recommended for disposal in Alternatives A-C.  However, no reason is given why it is not included for disposal in the agency preferred Alternative D.  It is close to the Alder Creek riparian area.  We would like an opportunity to review this parcel further with the UFO to examine it with respect to our Comprehensive plan, public rights of way, easements and other items, and to understand the UFO rationale for not including it for disposal in Alternative D.  San Miguel County desires that if the BLM disposes of parcels it ensures there are either public ROW or private easements already in place prior to disposal, to ensure ingress/egress for future owners.

BLM_0076692



Figure 7c.  Hastings Mesa/Alder Creek Area Parcel within T44N R10W Section 29.  This parcel is not recommended for disposal in the agency preferred Alternative D.

**e. Big Bear Creek Area Parcels**
These parcels are within T42N R10W Section 4.  Under the agency preferred alternative they are not recommended for disposal.  San Miguel County agrees that they should not be disposed of by the BLM.  They are within the Big Bear Creek riparian corridor, and the San Miguel River Expansion ACEC desired to be designated by San Miguel County.  <u>The San Miguel SRMA boundary should be expanded to match the San Miguel River Expansion ACEC boundary in this area.</u>

BLM_0076693



Figure 7e.  Showing the Big Bear Creek Area parcels.  If sold for private development, there would be impacts to the scenic and primitive qualities of these areas, as well as the important riparian ecosystem and wildlife.  Alternatives B and D do not recommend these parcels for disposal.  <u>San Miguel County believes it is best for the public and for the protection of valuable river corridors and riparian habitat if these parcels are not disposed of.  The San Miguel River Expansion ACEC should be designated, and it would include these parcels.  The San Miguel River SRMA boundary should be expanded to include all of these parcels and the expansion ACEC.</u>

## Section 8.  Wildlife management.

San Miguel County urges the BLM to further consult and consider the Colorado Parks and Wildlife (CPW), formerly Colorado Department of Wildlife (CDOW), detailed list of Best Management Practices (BMPs) for oil and gas development titled "Actions to Minimize Adverse Impacts to Wildlife Resources." with species-specific BMPs, including recommendations on protective buffers, timing information, and recommendations on surface density caps, referenced in their letter to BLM State Director Helen Hankins dated December 13, 2010.

BLM_0076694

We appreciate the statement in the DRMP/EIS on Page I-11 of Volume 1[47] that says "The BLM will consult with Colorado Parks and Wildlife (CPW).  The RMP will recognize the State's responsibility and authority to manage wildlife."  At the UFO RMP co-operator meeting in Montrose on October 15, 2016, we heard CPW staff say that their information was not incorporated into at least one alternative and that the RMP has not included BMPs, timing limitations or stipulations offered by CPW.

San Miguel County supports CPW's desire that at least a "No Surface Occupancy" (NSO) stipulation be applied to all Federal minerals within the boundaries of State Wildlife Areas (SWAs) and State Park boundaries to balance mineral extraction with the protection of surface resources.

San Miguel County has assisted in the protection of thousands of acres of private lands with important wildlife habitat values, including GuSG critical habitat, during the last few decades by participating in the acquisition of conservation easements intended to preserve and protect GuSG habitat.  San Miguel County has contributed between roughly $1.4 and $1.6 million during this period for habitat conservation and improvements through the County's Land Heritage Program, co-funding of the GuSG working group, and other actions to benefit GuSG.

U.S. Fish and Wildlife Service did not include in its final listed critical habitat private lands that were under conservation easement.  However, the BLM states in the GuSG DRMPa on Page ii, in the introductory discussion of occupied habitat for Gunnison Sage-grouse[48] that "Occupied Habitat includes specific properties coinciding with BLM-administered federal minerals that the [US] FWS excluded from critical habitat designation.  While the removal of surface lands with these properties from critical habitat is appropriate, the removal of subsurface public lands from Occupied Habitat is not."  In other words, the BLM in its GuSG DRMPa understands that subsurface mineral estate actions should not be precluded from management actions.  San Miguel County requests that the UFO RMP obtain from San Miguel County our GIS shapefile and database of private land conservation easements, and where split estate managed by the BLM exists, that the BLM implement NSO and other stipulations consistent with the primary conservation easement values on these properties.

San Miguel County supports CPW in their statement in the 2010 letter, "As the surface density of development increases beyond one well pad per section, literature sources strongly suggest that avoidance and minimization measures alone are no longer sufficient to address adverse impacts to some species, and compensatory mitigation is necessary to offset the permanent loss of wildlife resources."  We support the concept that the UFO (and Tres Rios) RMP incorporate ways to obtain compensatory mitigation when surface density exceeds one well pad per section (within habitats identified by CPW).

San Miguel County requests that the UFO examine carefully CPW recommended species-specific stipulations and ensured that the stipulations in the final UFO RMP/ROD meet or exceed the recommended species-specific stipulations.  We also request that standards and guidelines be developed for oil and gas activities in Gunnison Sage-grouse habitat, mule deer winter range, raptor nesting areas, bighorn sheep lambing areas, lynx denning and winter foraging habitat to address impacts from oil and gas operations to the maximum extent possible.  Such standards and guidelines within these habitats should require that operators use the best technically and economically available development technology to meet the intent of guidelines while acting on a right to develop a lease.

---

[47]Page I-11;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.7326.File.dat/1_UFO-DRMP-2016_508.pdf
[48]Page ii; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf

BLM_0076695

San Miguel County requests that the UFO RMP also consider adding winter range to ungulate protection strategies, which we understand has implications across all management activities.  CPW has strongly recommended the use of deer and elk winter range as defined in CPW species mapping when applying protection strategies for deer and elk in RMP documents in Colorado[49].  CPW states, "Winter concentration areas and critical winter range are more narrowly defined subsets within the broader winter range category that fail to capture the totality of important wintering areas for ungulates.  'Winter Range' is defined as that part of the overall range where 90% of individuals reside during five winters out of ten.  During an 'average' winter, animals residing in 'winter range' are no less sensitive to disturbance than those on severe winter range or winter concentration areas."

San Miguel County requests revisions to the DRMP/EIS and stipulations to acknowledge the increasing body of evidence that Timing Limitation Stipulations on oil and gas development activities are not adequate to protect winter habitats and migratory corridors for big game, and that additional limitations on the density of surface facilities may be necessary to maintain big game populations in developing areas. [50,51,52,53,54]

San Miguel County further requests that a Master Leasing Plan be prepared and implemented as required by BLM IM No. 2010-117.

### Section 9.  Watchable Wildlife Viewing Areas.

Incorporating a watchable wildlife viewing area under the federal Watchable Wildlife Program to foster education and appreciation of wildlife in their habitats would be a positive addition within the UFO.  When there are enhanced opportunities for public and educational institutions like local and regional schools to view, enjoy, and learn about wildlife, then there are tangible positive benefits for the local and regional economies and for appreciation of the national treasure that our public lands are.  When people know about the needs and impacts of human activities on species, then they are more likely to support resource conservation and the hard choices of altering human activities that lead to climate change.

The San Miguel River is identified as being a very rich terrestrial bird habitat within North America by the BLM, the Audubon Society, and others. [55]  San Miguel County supports the concept of studying the San Miguel River ACEC and San Miguel River Expansion ACEC for creating one or more watchable wildlife viewing areas.  We believe this will actually help with future mitigation of threats such as invasive plants, non-native species, feral cats, and other disturbances.  The scenic qualities of this area also further enhance the potential high-quality viewing experience.

---

[49]Such as in the CPW San Juan Plan Revision comment letter dated April 11, 2008 titled "San Juan Public Lands Center, Draft Land Management Plan and Draft Environmental Impact Statement, 72 Fed. Reg. 71148 (December 14, 2007)" and addressed to the San Juan Plan Revision, P.O. Box 162909 Sacramento, CA 95816-2909.
[50]http://fwpiis.mt.gov/content/getItem.aspx?id=35572
[51]http://www.wyofile.com/wp-content/uploads/2011/04/Deer.2010annualreport_muledeer.pdf
[52]http://onlinelibrary.wiley.com/doi/10.2193/2008-478/abstract
[53]http://www.blm.gov/style/medialib/blm/wy/information/NEPA/pfodocs/anticline/revdr-comments/eg.Par.10425.File.dat/02Bio-attach1.pdf
[54]https://www.fws.gov/southwest/ES/Documents/Oil-Gas-Fragmentation-Wilbert%20et%20al%202008.pdf
[55]Page 3-171;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.96289.File.dat/3_UFO-DRMP-2016_508.pdf

BLM_0076696

We appreciate your consideration of these comments for the Uncompahgre Field Office Draft Resource Management Plan/Environmental Impact Statement.  As we have offered specific requests, we hope the final RMP and ROD will not simply take the recommendations of a single alternative but will create a final hybrid decision that will incorporate our specific requests.

Respectfully,

SAN MIGUEL COUNTY
BOARD OF COUNTY COMMISSIONERS

Joan May, Chair

BLM_0076697

ATTACHMENT A:  RESOLUTION 2015-009
ATTACHMENT B: COMPARISON TABLES

BLM_0076698

**RESOLUTION OF THE BOARD OF COUNTY COMMISSIONERS OF
SAN MIGUEL COUNTY, COLORADO,
PUBLICLY STATING THE VALUE OF PUBLIC LANDS TO THE COUNTY'S ECONOMY,
RECREATION, HERITAGE, AND QUALITY OF LIFE; AND OPPOSING ANY EFFORT TO
CLAIM, TAKE OVER, LITIGATE FOR, OR SELL OFF FEDERAL PUBLIC LANDS WITHIN
SAN MIGUEL COUNTY, COLORADO**

**Resolution #2015 - ___9___**

**WHEREAS,** San Miguel County includes many beautiful, natural landscapes, including mountains, rivers, forests, lakes, basins and plateaus; and

**WHEREAS,** many of those stunning places are public lands owned by all Americans; and

**WHEREAS,** public land under the management of the U.S. Forest Service and U.S. Bureau of Land Management constitutes more than 60% of the land in San Miguel County; and

**WHEREAS,** these federal public lands are essential to the quality of life in San Miguel County, providing public recreational opportunity for wildlife watching, hiking, hunting, fishing, backpacking, horseback riding, skiing, bicycling, sightseeing, and numerous other outdoor recreational activities; and

**WHEREAS,** these federal public lands provide essential habitat for wildlife; and

**WHEREAS,** wildlife and the scenic landscape on public lands attract outdoor recreation and tourism that are the dominant drivers of San Miguel County's economy; and

**WHEREAS,** the unified, consistent management of Federal land by the Federal Land Agencies across the nation best protects the national value and utility of the public lands for all Americans and the values on which the economy in San Miguel County is dependent; and

**WHEREAS,** San Miguel County business owners attract employees in large part because of the iconic landscape and recreational opportunities on federal public lands; and

**WHEREAS,** San Miguel County's agriculture industry includes numerous ranchers and sheepherders who depend on grazing on federal public land; and

**WHEREAS,** there is a broad consensus in San Miguel County of the need for effective management of our federal public lands and wildlife, and that collaborative approaches in which federal public land management agencies cooperate with Colorado Parks and Wildlife, San Miguel County officials, and our community are more likely to produce effective management than would ownership or management of federal public lands by the state of Colorado; and

**WHEREAS,** San Miguel County residents are actively collaborating among diverse interests and with public land managers to improve public land management and public access; and

**WHEREAS,** federal public land management agencies employ residents of San Miguel County who are passionate and expert at their jobs, despite lack of adequate federal funding, pay taxes, and contribute to our community; and

**WHEREAS,** Americans from throughout the country value these public lands as a part of our national

BLM_0076699

heritage and as our inalienable birthright as Americans; and

**WHEREAS,** San Miguel County's forests are naturally prone to fire, including periodic large-scale fires, as part of the ecosystem in which they have evolved over millennia, although a warming climate has accentuated the process; and

**WHEREAS,** federal money and expertise to suppress wildfires is essential to protecting our communities, infrastructure, and public lands.

**NOW, THEREFORE, BE IT RESOLVED** by the Board of Commissioners of San Miguel County, Colorado, as follows:

That the Board of County Commissioners opposes any effort to claim, take over, litigate for, or sell off federal public lands within San Miguel County except pursuant to legislative processes established by Congress in the Recreation and Public Purposes Act, National Environmental Policy Act, Federal Land Policy and Management Act, and other applicable federal laws, following public participation and site-based analysis of the wildlife, ecological and community implications of the proposed land transfer.

**NOW, THEREFORE, BE IT RESOLVED** by the Board of Commissioners of San Miguel County, Colorado, as follows:

1. The Board of County Commissioners strongly supports federal land management in San Miguel County and the irreplaceable value public lands bring to our county's economy, recreation, heritage, and quality of life.

2. The Board of County Commissioners enthusiastically commends the dedicated federal employees who manage America's public lands in San Miguel County, and the dedicated employees of Colorado Parks and Wildlife who manage wildlife in San Miguel County, in partnership with the federal public land managers.

**DONE AND APPROVED** by the Board of Commissioners of San Miguel County, Colorado, at a duly noticed public meeting held in Telluride, Colorado, on March 25, 2014.

**BOARD OF COUNTY COMMISSIONERS**
**SAN MIGUEL COUNTY, COLROADO**

Joan May, Chair

ATTEST:

John Huebner, Chief Deputy Clerk to the Board

VOTE:

| | | | | |
|---|---|---|---|---|
| Joan May | Aye | Nay | Abstain | Absent |
| Elaine R.C. Fischer | Aye | Nay | Abstain | Absent |
| Art Goodtimes | Aye | Nay | Abstain | Absent |

2

BLM_0076700